# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.** |
| | ) | |
| TRANSPORT WORKERS UNION OF | ) | **3:17-cv-02278-B** |
| AMERICA LOCAL 556, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

## SOUTHWEST AIRLINE CO.'S BRIEF IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FRCP 12(b)(1) AND 12(b)(6)

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL ALLEGATIONS ................................................................................ 2

    A.   Plaintiff's Employment History ................................................................ 2

    B.   Plaintiff's History of Participation in Intra-Union Disputes ................... 3

    C.   Carter Objects to the Women's March on Facebook .............................. 4

    D.   Carter Sends Harassing Social Media Messages to Stone ...................... 4

    E.   Southwest Terminates Carter's Employment .......................................... 5

    F.   Local 556 Successfully Represents Carter In Grievance Proceedings ......... 6

    G.   Carter Files the Instant Lawsuit .............................................................. 6

III.  LEGAL STANDARD ........................................................................................... 7

IV.   ARGUMENT ........................................................................................................ 8

    A.   This Court Lacks Subject Matter Jurisdiction Because Carter's Claims
        Constitute Minor Disputes Subject to the RLA's Mandatory Dispute
        Resolution Process ...................................................................................... 8

    B.   Carter Has Not Adequately Pled a Breach of the Duty of Fair
        Representation by Local 556 (Count III) ............................................... 14

    C.   Carter's Retaliation Claims Fail Because She Has Not Alleged the
        Requisite Causal Nexus (Counts I, II and IV) ...................................... 16

    D.   Carter Forfeited Any Alleged RLA Speech Protections By Sending
        Unsolicited Graphic Photographs to a Co-Worker (Counts I and II) ......... 18

    E.   Carter Cannot Predicate a Claim Against Southwest – a Private Company
        – On Alleged Constitutional Violations (Count IV) .............................. 20

V.    CONCLUSION .................................................................................................... 21

CERTIFICATE OF SERVICE ..................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Line Pilots Ass'n v. Guilford Transp. Indus.*,
   399 F.3d 89 (1st Cir. 2005)............................................................................8

*Airline Pilots Ass'n v. O'Neill*,
   499 U.S. 65 (1991)..........................................................................................14

*Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Empl. of Am. v.*
   *Lockridge*,
   403 U.S. 274 (1971)........................................................................................14

*Amarsingh v. Jetblue Airways Corp.*,
   409 Fed. Appx. 459 (2d Cir. 2011)..............................................................16

*Ambraco, Inc. v. Bossclip B.V.*,
   570 F.3d 233 (5th Cir. 2009) .........................................................................7

*Andrews v. Louisville & Nashville R.R. Co.*,
   406 U.S. 320 (1972)........................................................................................13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................7

*Beckett v. Atlas Air, Inc.*,
   968 F. Supp. 814 (E.D.N.Y. 1997) ...............................................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................................7

*Bhd. of Maint. of Way Emp. v. Norfolk S. Ry. Co.*,
   745 F.3d 808 (7th Cir. 2014) .........................................................................9

*Bowcock v. Cont'l Airlines, Inc.*,
   432 Fed. Appx. 343 (5th Cir. 2011)..............................................................7

*Chhim v. Univ. of Texas*,
   2016 WL 154142 (W.D. Tex. Jan. 11, 2016) .............................................18

*Consol. Rail Corp. v. Ry. Labor Exec. Ass'n*,
   491 U.S. 299 (1989)....................................................................................9, 10

*In re Cont'l Airlines Corp.*,
   901 F.2d 1259 (5th Cir. 1990) .....................................................................18

60772204.7

*CSX Transp., Inc. v. Bhd. of Maint.*,
  327 F.3d 1309 (11th Cir. 2003) ........................................................9

*DaimlerChrysler Corp.*,
  344 NLRB 1324 (2005) ...................................................................19

*Dingeldey v. VMI-EPE-Holland B.V.*,
  2016 WL 6273235 (W.D.N.Y. Sept. 28, 2016) ................................20

*Dotson v. Norfolk S. R.R. Co.*,
  52 Fed. Appx. 655 (6th Cir. 2002) (per curiam) ............................12

*Elgin, J. & ER Co. v. Burley*,
  325 U.S. 711 (1945).........................................................................9

*Forsyth Hardwood Co.*,
  243 NLRB 1039 (1979) ...................................................................15

*Fry v. Airline Pilots Ass'n, Int'l*,
  88 F.3d 831 (10th Cir. 1996) .........................................................10

*Hawaiian Airlines, Inc. v. Norris*,
  512 U.S. 246 (1994).........................................................................9

*Held v. Am. Airlines, Inc.*,
  2007 WL 433107 (N.D. Ill. Jan. 31, 2007) .............................. *passim*

*Home Builders Ass'n of Miss., Inc. v. City of Madison*,
  143 F.3d 1006 (5th Cir. 1998) .........................................................7

*Honda of Am. Mfg., Inc.*,
  334 NLRB 746 (2001) .....................................................................19

*Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*,
  789 F.2d 139 (2d Cir. 1986)......................................................12, 13

*Johnson v. McDonald*,
  623 Fed. Appx. 701 (5th Cir. 2015) ...............................................17

*Lee v. Norfolk S. Ry. Co.*,
  912 F. Supp. 2d 375 (W.D.N.C. 2012) ............................................12

*Leiser Constr., LLC*,
  349 NLRB 413 (2007) ................................................................18, 19

*Lloyd Corp. v. Tanner*,
  407 U.S. 551 (1972).........................................................................20

iii

*Local 591 v. Am. Airlines, Inc.*,
   2015 WL 3852958 (N.D. Ill. June 19, 2015) .............................................................. 7

*Media Gen. Ops., Inc. v. NLRB*,
   394 F.3d 207 (4th Cir. 2005) ..................................................................................... 19

*Monroe v. Missouri Pac. R.R. Co.*,
   115 F.3d 514 (7th Cir. 1997) ..................................................................................... 13

*Moore v. Bechtel Corp.*,
   840 F.2d 634 (9th Cir. 1986) ..................................................................................... 16

*Moss v. Norfolk W. Ry. Co.*,
   2003 WL 21817127 (E.D. Mich. July 22, 2003) ....................................................... 13

*Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists*,
   915 F.2d 43 (1st Cir. 1990) ........................................................................................ 10

*Neal v. Newspaper Holdings, Inc.*,
   349 F.3d 363 (7th Cir. 2003) ..................................................................................... 14

*Parker v. Am. Airlines, Inc.*,
   2008 WL 2811320 (N.D. Tex. July 22, 2008) ........................................................... 12

*Phillips v. United Parcel Serv.*,
   2011 WL 2680725 (N.D. Tex. June 21, 2011) ........................................................... 18

*Ramming v. United States*,
   281 F.3d 158 (5th Cir. 2001) ....................................................................................... 7

*Renneisen v. Am. Airlines, Inc.*,
   990 F.2d 918 (7th Cir. 1993) ..................................................................................... 14

*Ry. Employees v. Hanson*,
   351 U.S. 225 (1956) .................................................................................................... 21

*Sacred Heart Med. Ctr.*,
   347 NLRB 531 (2006) ................................................................................................ 20

*Sw. Bell Tel. Co.*,
   200 NLRB 667 (1972) ................................................................................................ 20

*TWA, Inc. v. Indep. Fed'n of Flight Attendants*,
   489 U.S. 426 (1989) ................................................................................................. 8, 9

*U.S. Airlines Pilots Ass'n v. US Airways, Inc.*,
   859 F. Supp. 2d 283 (E.D.N.Y. 2012) ................................................................. 10, 13

iv

*Union Pac. R.R. Co. v. Sheehan*,
    439 U.S. 89 (1978)..............................................................................................14

*United Transp. Union v. Nat'l R.R. Passenger Corp.*,
    588 F.3d 805 (2d Cir. 2009)..............................................................................10

*Walker v. S. Ry. Co.*,
    385 U.S. 196 (1966).......................................................................................9, 10

*Wightman v. Springfield Terminal Ry. Co.*,
    100 F.3d 228 (1st Cir. 1996)................................................................................8

*York v. AT&T*,
    95 F.3d 948 (10th Cir. 1996) ............................................................................16

**Statutes**

45 U.S.C. § 151a ......................................................................................................9

45 U.S.C. § 153..........................................................................................................13

National Labor Relations Act ...........................................................................11, 18

Railway Labor Act...............................................................................................2, 8, 9, 20

v

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Defendant Southwest Airlines Co. files this Motion to Dismiss Plaintiff Charlene Carter's First Amended Complaint and Brief in Support, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6):

## I.        INTRODUCTION

Plaintiff Charlene Carter ("Carter") is a former Southwest Airlines Co. ("Southwest" or "Company") Flight Attendant.  Since 2012, Carter has engaged in a public dispute with Transport Workers Union of America, Local 556 ("Local 556" or "Union") leadership regarding a variety of intra-union matters.

In recent years, Carter has directed her ire to Audrey Stone ("Stone"), fellow Flight Attendant and Local 556 President.  In 2015, Carter began sending unsolicited messages to Stone's private Facebook account objecting to her performance as Union President.  Stone never responded to Carter's messages.  Nevertheless, Carter persisted and did so without incident.

However, in 2017, Carter became incensed by Stone's and other Union members' participation in the Washington, D.C. Women's March ("Women's March"), supposedly because Planned Parenthood supported the march.  Upon learning of their participation, Carter sent additional messages to Stone's private Facebook account.  But this time, Carter's messages included **graphic images (and videos) of aborted fetuses and references to Stone as supporting murder.**  The tone of these messages was hostile, and Stone found the images extremely disturbing.  Thus, Stone complained to the Company so it could intervene.  After an investigation and a fact-finding meeting with Carter, Southwest terminated her employment for violating a number of policies regarding bullying, inappropriate use of social media, and harassment.

With Local 556's assistance, Carter filed a grievance challenging her termination. Despite her long-standing disputes with Local 556 leadership, the Union represented Carter during the grievance process and negotiated a settlement with Southwest offering Carter reinstatement as a Southwest Flight Attendant.  Carter declined the offer, retained separate counsel and is currently pursuing her grievance in arbitration.  The arbitration is scheduled for December 7, 2017.  Despite the upcoming arbitration, Carter brings three counts in this lawsuit against Southwest for: (1) retaliation under the Railway Labor Act ("RLA") (45 U.S.C. §§ 152 Third & Fourth); (2) maintenance and overbroad application of Company policies in violation of the RLA (*id.*); and (3) retaliation based on the First and Fifth Amendments of the United States Constitution.  Carter also brings a duty of fair representation claim against Local 556.

Southwest asks the Court to dismiss Carter's First Amended Complaint ("FAC") because the Court lacks subject matter jurisdiction over Carter's claims, as they are "minor disputes" under the RLA and are thus subject to the statute's mandatory arbitration procedures. Alternatively, Carter has failed to state a claim against Southwest because (1) she has not alleged the requisite causal nexus for her retaliation claims; (2) the inflammatory nature of Carter's messages to Stone caused them to lose any alleged protection under federal labor law; (3) Carter has not adequately alleged a breach of the duty of fair representation; and (4) Carter cannot predicate a retaliation claim against Southwest on the First and Fifth Amendments because Southwest is a private employer.

## II.   FACTUAL ALLEGATIONS

### A.   Plaintiff's Employment History

Carter is a former Southwest Flight Attendant.  She worked for the Company from September 1996 until March 2017, when Southwest terminated her employment for sending

unsolicited graphic and harassing messages to a fellow employee in violation of Southwest's policies regarding bullying, social media, and harassment.  (FAC ¶¶ 10-12; Appendix ["App."] Exh. 1 ["Emlet Dec."], Exhs. B – D [App. 7-13]).[1]

Local 556 served as Carter's exclusive bargaining representative throughout her tenure. (FAC ¶ 11).  At the time of her termination, the terms and conditions of Carter's employment were governed by a Collective Bargaining Agreement ("CBA") between Southwest and Local 556.  (*Id.* at ¶ 12; Emlet Dec., Exh. E [App. 14-256]).

**B.    Plaintiff's History of Participation in Intra-Union Disputes**

Carter has been involved in a well-publicized dispute with Union leadership for over five years.  (*See* FAC ¶¶ 13-15).  The dispute began in 2012, when the Union membership elected Carter's preferred slate of candidates to the Local 556 Executive Board.  (*Id.*).  In spring of 2013, the Union suspended two of the elected Board Members for disciplinary infractions, and elevated Stone (also a Southwest Flight Attendant) to replace one of the suspended Board Members as President of Local 556.  (*Id.* at ¶ 14).  In July 2013, Carter began vocally objecting to the Board's actions on Facebook and at Union meetings.  (*Id.* at ¶¶ 15-16, 18).  Out of protest, Carter resigned her Union membership in September 2013 and became an agency fee paying non-member – which is the minimum level of support an airline employee can be compelled to provide a union under the RLA.  (*Id.* at ¶¶ 12, 19).

After Stone became Union President, Carter commenced a relentless campaign against the Union Board.  Not only did Carter lodge objections at Union meetings, she made public Facebook posts disparaging the Union and its leadership throughout 2013 and 2014.  (*Id.* at

---

[1] These policies have been the subject of multiple grievances under the CBA's dispute resolution procedures.  (Emlet Dec., ¶ 11 [App. 4]).

¶¶ 14-24).   In early 2015, Carter began sending private Facebook messages to Stone criticizing her and the Union.  (*Id.* at ¶¶ 28, 40).  Stone did not respond to these messages.  (*Id.* at ¶ 40).

In March 2015, Stone was formally elected to be Local 556's President.  (*Id.* at ¶ 29).  Carter suspected procedural irregularities in the election process.  (*Id.*).  The Department of Labor launched an investigation at a Flight Attendant's behest, but the charge was later dropped.  (*Id.*).

C.      **Carter Objects to the Women's March on Facebook**

On January 21, 2017, Stone and other Southwest Flight Attendants attended the Women's March.  (*Id.* at ¶ 34).  Upon learning this (and despite resigning from the Union more than three years prior), Carter ridiculed the Union's participation on Facebook because Planned Parenthood sponsored the event.  (*Id.* at ¶¶ 37-38).  Carter immediately made at least three public Facebook posts regarding the Union and the Women's March.  (*Id.* at ¶ 39).

On February 6, 2017, Carter posted a link on Facebook supporting a campaign to recall Stone's election.  (*Id.* at ¶¶ 31, 42).  She also posted a link regarding a lawsuit against Local 556 and remarked on the Union's alleged corruption.  (*Id.* ¶ 42).

D.      **Carter Sends Harassing Social Media Messages to Stone**

By February 2017, Carter had spent over four years publicly objecting to the Union's conduct and Stone's leadership, and approximately two years sending unsolicited messages to Stone's private Facebook account, criticizing Stone's performance as Union President.  Southwest never disciplined Carter for her behavior.  But in 2017, the nature and tone of Carter's private messages to Stone drastically changed.

On February 14, 2017, Carter sent Stone five private Facebook messages.  These messages contained graphic images and videos of aborted fetuses and accused Stone of

supporting murder. (*Id.* at ¶ 44, Exh. A). Carter knew the images were disturbing at the time she sent them. Just one week earlier, Carter described one of the videos she would later send to Stone as follows: "WARNING this is VERY GRAPHIC!!" (*Id.* at ¶¶ 43-44). Feeling threatened and harassed by Carter's private messages, Stone reported the incident to the Company. (*Id.* at ¶¶ 89, 91). Carter contends that despite tolerating years of unsolicited private messages and public criticism regarding the Union, Stone reported Carter because of her opposition to Local 556's leadership. (*Id.* at ¶¶ 90, 92).

**E.**     **Southwest Terminates Carter's Employment**

After receiving Stone's complaint, Southwest contacted Carter on February 24, 2017 to schedule a fact-finding meeting regarding her graphic Facebook messages displaying aborted fetuses. (*Id.* at ¶¶ 49-50). The intent of the fact-finding meeting was to allow Carter to present her side of the story prior to Southwest deciding whether discipline was appropriate.

The fact-finding meeting took place on March 7, 2017. (*Id.* at ¶ 61). At the meeting, Southwest told Carter that Stone felt harassed by the graphic messages. (*Id.* at ¶ 60, Exh. A). Carter admitted – as she does now – that she sent the messages to Stone.

On March 14, 2017, Southwest terminated Carter's employment for violation of various Southwest policies related to harassment and bullying. Carter's termination letter states:

> On March 7, 2017, a fact-finding meeting was held with you to discuss certain messages and videos you posted on your Facebook page and sent to another Southwest Employee through Facebook Messenger. … During the meeting, you admitted you posted graphic videos of aborted fetuses on Facebook and sent those same videos in a private Facebook message to another Southwest Flight Attendant. You also admitted to sending the Flight Attendant a private message containing a picture of individuals wearing costumes depicting the female genitalia. You agreed that the pictures and videos were graphic. … [W]hen you posted the graphic videos and pictures on Facebook, you were identifiable as a Southwest Airlines Employee and represented our Company in a

manner that is disparaging to Southwest Flight Attendants as well as to all Southwest Employees. These Facebook posts were highly offensive in nature, and the private messages you sent to the above-mentioned Employee were harassing and inappropriate. Although your posts and messages may have been made and/or sent outside of work, Southwest is obligated to address such conduct given its impact on the workplace. … I have determined that your conduct is in direct violation of the Southwest Airlines Mission statement and the following Company Policies/Rules including but not limited to:

- Workplace Bullying and Hazing Policy

- Social Media Policy

Your conduct could also be a violation of Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination and Retaliation. Accordingly, your employment is terminated effective March 16, 2017.

(*Id.* at Exh. A).

## F.   Local 556 Successfully Represents Carter In Grievance Proceedings

Carter filed a grievance in response to her termination. (Emlet Dec., ¶ 7 [App. 3]). Local 556 represented Carter in the grievance process and negotiated an offer of reinstatement from Southwest. (*Id.* at ¶ 9 [App. 3]). Carter rejected the offer and insisted on proceeding to arbitration. Carter has retained her own attorneys to represent her in the arbitration. The arbitration is scheduled for December 7, 2017. (*Id.* at ¶ 10 [App 4]).

## G.   Carter Files the Instant Lawsuit

In this lawsuit, Carter alleges that Southwest: (1) terminated her based on RLA-protected speech; (2) enforced and maintained overbroad policies that restrict RLA-protected speech; and (3) terminated her based on her exercise of speech rights protected by the First and Fifth Amendments. Carter also alleges Local 556 breached its duty of fair representation. To evade

her claims' jurisdictional defects, Carter avoids reference to the CBA and the relationship of her claims thereto.

### III.   LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction tests the court's statutory or constitutional power to adjudicate the case.  *See Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  When ruling on a Rule 12(b)(1) motion, "the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint[.]" *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009) (internal quotation marks omitted); *see also Local 591 v. Am. Airlines, Inc.*, 2015 WL 3852958, *7 (N.D. Ill. June 19, 2015) (looking to evidence outside of complaint to determine existence of subject matter jurisdiction in RLA action).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a claim.  Fed. R. Civ. P. 12(b)(6).  To avoid dismissal, a complaint must contain more than labels, conclusions, and a formulaic recitation of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, the well-pled factual allegations must "plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Bell Atl. Corp.*, 550 U.S. at 555 (the factual allegations "must be enough to raise a right to relief above the speculative level.").

Because Plaintiff's claims constitute post-certification minor disputes under the RLA, the Court lacks subject matter jurisdiction over this action.  *See, e.g.*, *Bowcock v. Cont'l Airlines, Inc.*, 432 Fed. Appx. 343, 346 (5th Cir. 2011) ("Because [the employee] was … subject to the

RLA's mandatory arbitration provisions, the district court correctly dismissed his case for lack of subject matter jurisdiction."). Even if the Court has jurisdiction, it should dismiss the FAC because Carter has not adequately alleged a viable cause of action.

## IV.   ARGUMENT

### A.   This Court Lacks Subject Matter Jurisdiction Because Carter's Claims Constitute Minor Disputes Subject to the RLA's Mandatory Dispute Resolution Process

Sections 152, Third and Fourth of the RLA protect the right of unrepresented employees to organize a union without interference by the carrier. *See* 45 U.S.C. §§ 152, Third & Fourth. These provisions primarily address "the ***precertification*** rights and freedoms of unorganized employees" – *i.e.*, the period <u>before</u> a union is certified as the exclusive bargaining representative of a craft or class of airline employees. *TWA, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989) (emphasis added). The protection of these provisions of the RLA "extends only to members of unions that have not yet been certified[.]" *Held v. Am. Airlines, Inc.*, 2007 WL 433107, *6 (N.D. Ill. Jan. 31, 2007) (*citing TWA*, 489 U.S. at 440). As the Supreme Court noted, "[f]rom the time of our very first opportunity to interpret [Sections 152 Third and Fourth of the RLA], we have viewed them as addressing primarily the precertification rights and freedoms of unorganized employees." *TWA*, 489 U.S. at 440. Accordingly, "courts must … restrict their role [in post-certification disputes] lest they encroach on the alternative dispute resolution processes that lie at the heart of the RLA." *Air Line Pilots Ass'n v. Guilford Transp. Indus.*, 399 F.3d 89, 103 (1st Cir. 2005); *see also Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 234 (1st Cir. 1996) ("[I]ntervention in a post-certification dispute under §§ 152, Third and Fourth will occur in extremely limited circumstances.").

The reason for this pre-certification focus is straightforward. Once a union is certified, the RLA "establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of

… disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).  After certification, "judicial intervention in RLA procedures is limited to those cases where 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands … [in the] Railway Labor Act." *TWA*, 489 U.S. at 441 (citations omitted).  Stated differently, Sections 152, Third and Fourth of the RLA "do not provide a remedy after a union has been certified except in cases of extreme anti-union bias or animus." *Held*, 2007 WL 433107, *6.

To realize the RLA's goal of "promot[ing] stability in labor-management relations," a System Adjustment Board – basically, a grievance and arbitration process – is made the exclusive forum for resolving "**minor**" disputes.  *Hawaiian Airlines*, 512 U.S. at 252; *see also* 45 U.S.C. § 151a (providing for orderly settlement of "all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.").  Minor disputes generally relate to the "meaning or proper application of a particular [CBA] provision with reference to a specific situation or to an omitted case." *Elgin, J. & ER Co. v. Burley*, 325 U.S. 711, 723 (1945); *see also Walker v. S. Ry. Co.*, 385 U.S. 196, 198 (1966) (The RLA "compels the parties to arbitrate minor disputes" such as a "discharge grievance[.]").  In contrast, "major" disputes relate to the "formation of collective [bargaining] agreements or efforts to secure them." *Elgin, J. & ER Co.*, 325 U.S. at 723.

"[T]he party seeking to establish that a dispute is minor and under the exclusive arbitral jurisdiction of a RLA Adjustment Board faces a 'relatively light burden.'" *Bhd. of Maint. of Way Emp. v. Norfolk S. Ry. Co.*, 745 F.3d 808, 813 (7th Cir. 2014) (*quoting Consol. Rail Corp. v. Ry. Labor Exec. Ass'n*, 491 U.S. 299 (1989)).  "[I]f a reasonable doubt exists as to whether the dispute is major or minor, [courts] will deem it to be minor." *CSX Transp., Inc. v. Bhd. of Maint.*, 327 F.3d 1309, 1321 (11th Cir. 2003).

To evaluate whether a dispute is minor, courts consider more than just the written CBA. *See generally Consol. Rail Corp.*, *491* U.S. at 311-12 ("[T]he parties' 'practice, usage and custom' is [] significan[t] in interpreting their agreement."). "[C]laims are minor disputes if they depend not only on a right found in the CBAs, but also if they implicate ***practices, procedures, implied authority, or codes of conduct*** that are part of the working relationship." *Fry v. Airline Pilots Ass'n, Int'l*, 88 F.3d 831, 836 (10th Cir. 1996) (noting a CBA is comprised of expressed provisions, industry standards, and unstated norms) (emphasis added); *see also Consol. Rail Corp.*, 491 U.S. at 312 ("The collective agreement covers the whole employment relationship.  It calls into being a new common law – the common law of a particular industry or of a particular plant.").  Similarly, Section 152, Third – which prohibits employer interference with employees' choice of union representatives – is "part of the collective bargaining agreement[.]" *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 814 (2d Cir. 2009) (*citing* 45 U.S.C. §§ 152 Third & Eighth)).

Applying these principles, courts have repeatedly concluded that "controversies involving disciplinary matters are 'minor disputes' within the exclusive jurisdiction of the Adjustment Boards."  *Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists*, 915 F.2d 43, 50 (1st Cir. 1990); *see also Walker*, 385 U.S. at 198 (characterizing a "discharge grievance" as a minor dispute); *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 810 (2d Cir. 2009) (granting motion to dismiss because "the category of 'minor disputes' encompasses 'disciplinary disputes even if involving employee discharge.'"); *U.S. Airlines Pilots Ass'n v. US Airways, Inc.*, 859 F. Supp. 2d 283, 306, 308 (E.D.N.Y. 2012) (granting motion to dismiss because "claims that defendants improperly threatened to discipline pilots, conducted investigatory interviews of

pilots, and improperly discharged pilots involve disciplinary issues that are properly presented to the System Board of Adjustment.").

Here, Carter predicates post-certification RLA-based claims on the allegations that (1) Southwest terminated her in retaliation for protected speech (Count I); and (2) Southwest maintained and applied overbroad workplace policies (Count II). Carter's Constitution-based retaliation claim (*see infra* Section IV.E., pp. 21-22) appears to be based on the same or an overlapping factual predicate. These post-certification claims rest on the CBA (which contains a provision requiring just cause for any termination), directly-related work rules, and the bargaining history of the parties, and are thus minor disputes subject to the RLA's dispute resolution process.[2]

In *Held v. Am. Airlines, Inc.*, the employer terminated a pilot based on inflammatory correspondence he sent to a union official. *Held*, 2007 WL 433107, *1-2. While the correspondence contained a number of slurs, it also addressed internal disputes regarding abuse of the union's political process and the employee pension plan. *Id.* at *2-3. American Airlines terminated the employee for violating its Work Environment Policy. The employee alleged that his termination was in retaliation for his off-duty speech related to an ongoing intra-union dispute, which was supposedly protected by the RLA, and thus violated Section 152, Third and Fourth. The court rejected the employee's argument, concluding that because the case involved a post-certification dispute regarding application of work rules, it was a minor dispute that must be resolved before the airline's System Board. *See id.* at *6-7. Additionally, because the

---

[2] Southwest is not aware of any authority authorizing an employee to challenge in federal court the mere existence of a policy based on its alleged overbreadth. (*See* FAC ¶ 80). Indeed, Southwest notes that the authorities cited in the FAC regarding this count arise under the National Labor Relations Act, which is inapplicable here.

employee was able to utilize the internal dispute resolution process, he had a method to vindicate his statutory rights.  *See id.*

Similarly, in *Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139 (2d Cir. 1986), a flight attendant alleged violation of Sections 152, Third and Fourth when the employer suspended her based on her alleged false statements to the Federal Aviation Administration.  *Id.* at 140.  The court concluded that it lacked jurisdiction over this minor dispute.  In doing so, the court emphasized the general principle that "adjustment boards … have exclusive jurisdiction over … disciplinary disputes even if involving employee discharge."  *Id.* at 141.  It also noted that there was no suggestion that the employer "precluded … any [] flight attendant from challenging any disciplinary action through the adjustment board procedure."  *Id.* at 142.  Thus, the employer had not frustrated employees' ability to enforce RLA-protected rights.  *Id.*

As the above cases demonstrate, post-certification termination claims by airline employees are minor disputes and arise under the collective bargaining agreement.  Here, resolving Carter's Section 152, Third and Fourth and Constitution-based retaliation claims would require the Court to analyze and interpret explicit and incorporated terms of the CBA, including:

- The "just cause" provision and its historical application to determine the propriety of Carter's termination.  (CBA Art. 19(1)(I) [App. 154] ["Flight Attendant shall not be disciplined or discharged without just cause"]); *see also Parker v. Am. Airlines, Inc.*, 2008 WL 2811320, *10 (N.D. Tex. July 22, 2008) ("'the parties' practice, usage, and custom is of significance in interpreting'" a CBA); *Dotson v. Norfolk S. R.R. Co.*, 52 Fed. Appx. 655, 658 (6th Cir. 2002) (per curiam) (affirming dismissal of RLA minor dispute because "[w]hether or not Plaintiff was disciplined more harshly ... or ... should have been disciplined at all, depends upon an interpretation of the CBA regulations regarding discipline … [I]n order to dispose of Plaintiff's claims, the Court [would] need to look at more than just Defendants' motives."); *Lee v. Norfolk S. Ry. Co.*, 912 F. Supp. 2d 375, 380

(W.D.N.C. 2012) ("To the extent that [the employee] claims he was more severely disciplined … than a Caucasian employee … this [] requires interpretation of the provisions of the Agreement regarding discipline."); *Moss v. Norfolk W. Ry. Co.*, 2003 WL 21817127, *5 (E.D. Mich. July 22, 2003) (claim was a minor dispute under RLA because employee allegation that he was "discharged for the same conduct when … [another] employee was not depends on interpretation of the CBA regulations regarding discipline").

- The complicated flight attendant compensation system to craft an appropriate remedy. (CBA, Art. 21 [App. 165-178]); *Monroe v. Missouri Pac. R.R. Co.*, 115 F.3d 514, 518 (7th Cir. 1997) ("Monroe's [discharge] claims involve past and future wages, benefits, and promotions – all of which are determined by the CBA.").

- The Southwest Mission Statement, Workplace Bullying and Hazing Policy, Social Media Policy, and Sexual Harassment, Discrimination, and Retaliation Policy, the interpretation and application of which are central to resolution of the present dispute. (*See* FAC, Exh. A); *U.S. Airlines Pilots Ass'n*, 859 F. Supp. 2d at 306 ("[P]laintiff's allegation that defendant's lanyard policy violated its representational and collective bargaining rights is a minor dispute over which this court does not have jurisdiction.").

Finally, Carter – with Local 556's representation – received but declined to accept an offer of reinstatement from Southwest. (Emlet Dec., ¶¶ 9-10 [App. 3-4]). Instead, Carter elected to pursue her claims in arbitration on December 7, 2017, the results of which **will be final and binding**. *See* 45 U.S.C. § 153, First (m); *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 325 (1972) ("A party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding."). Given the availability and Carter's successful use of the RLA's dispute resolution process, there are no special circumstances warranting judicial intervention here. *See, e.g.*, *Indep. Union of Flight Attendants*, 789 F.2d at 142 (declining jurisdiction and noting that plaintiffs could challenge their disciplinary action through the adjustment board procedure); *Held*, 2007 WL 433107, *6 (noting

availability of System Board in declining to exercise jurisdiction). Indeed, the soon-to-be-issued final and binding arbitration decision indicates judicial intervention is unnecessary and a waste of resources. *See Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 95 (1978) ("The Adjustment Board'[s] … decision is final and binding upon the parties, and neither the District Court nor the Court of Appeals had authority to disturb it."). Accordingly, Carter must address her claims in the arbitral forum, and her lawsuit should be dismissed for a lack of subject matter jurisdiction. *See generally Renneisen v. Am. Airlines, Inc.*, 990 F.2d 918 (7th Cir. 1993) (The RLA "was not designed to give minority groups within a union a cause of action against their employer when they cannot persuade their own union to take actions they deem to be in the union's best interest.").

B.   **Carter Has Not Adequately Pled a Breach of the Duty of Fair Representation by Local 556 (Count III)**

Carter does not explicitly allege a hybrid breach of contract claim under the RLA. Accordingly, if the Court determines this case involves a minor dispute, it must dismiss the FAC irrespective of any claims asserted against the Union. However, even if Carter attempts to restyle her lawsuit as a hybrid action, it would still fail as a matter of law because Carter's allegations are insufficient to state a duty of fair representation claim. *See Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 368 (7th Cir. 2003) ("without a valid [claim] for breach of the duty of fair representation, the plaintiffs cannot proceed against [the employer]").

To state a claim for breach of the duty of fair representation, Carter must allege facts that, if proven, would demonstrate arbitrary, discriminatory or bad faith conduct by the Union. *Airline Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991). Arbitrariness requires conduct "so far outside a 'wide range of reasonableness' as to be irrational." *Id.* To demonstrate discriminatory conduct, the employee must present "substantial evidence of discrimination that is intentional,

severe, and unrelated to legitimate union objectives …" *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Empl. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971).  Finally, bad faith requires "substantial evidence of fraud, deceitful action or dishonest conduct."  *Id.* at 299.

The factual predicate of Carter's fair representation claim is that Stone *accurately* reported to Southwest management Carter's unprovoked, graphic, and harassing private messages.  (*See* FAC ¶¶ 89-91).  However, all employees – irrespective of their status as union representatives – are entitled to raise harassment concerns with their employers, and Stone is no different.  Stone was not required to endlessly endure Carter's harassing, graphic, and repeated personal messages to comply with the RLA.  Southwest is not aware of case law suggesting that an employee who holds a union position must decline to report co-worker harassment lest she breach the duty of fair representation.

Additionally, the FAC does not contain any non-conclusory allegations suggesting that Stone's objection to the unsolicited receipt of graphic abortion images was arbitrary, discriminatory or in bad faith.  By Carter's own admission, Stone tolerated *years* of Carter's public and private derisive remarks without response.  (FAC ¶¶ 40, 44, 46, 63); *see also Forsyth Hardwood Co.*, 243 NLRB 1039, 1039 (1979) (finding no breach of duty of fair representation where "[t]here is no evidence of hostility").  It is implausible to contend that Stone developed a newfound desire to harm Carter in February 2017.

The allegations demonstrate that Stone began feeling harassed by Carter's sending of increasingly aggressive messages (*e.g.*, accusing her of supporting murder) and disturbing images.  While Carter may disagree with Stone's reaction to the images, videos and messages (hard to imagine given that Carter identified them as "GRAPHIC!!"), that is not sufficient to create a breach of the duty of fair representation.  Just as a union is free to "take the employer's

---

side" in a dispute based on its understanding (even if faulty) of the merits of a grievance without violating the law, an individual who serves as a union representative can report persistent co-worker harassment. *See York v. AT&T*, 95 F.3d 948, 956 (10th Cir. 1996) (union "is not compelled ... to pursue an individual member's grievance if the union reasonably disagrees with the basis for that grievance."); *Moore v. Bechtel Corp.*, 840 F.2d 634, 637 (9th Cir. 1986) ("To agree with [the employer's] interpretation of the Agreement does not indicate bad faith. Nor does a disagreement between a union and an employee over a grievance, standing alone, constitute evidence of bad faith, even when the employee's grievance is meritorious.").

Finally, Carter's claim is further undermined by the Union's representation of her in the post-termination grievance proceedings, which resulted in Carter obtaining an offer of reinstatement. (Emlet Dec., ¶ 9 [App. 3]). Rather than accepting the offer of reinstatement, Carter chose to retain her own attorneys – including attorneys from the National Right to Work Legal Defense Foundation – and continue her years-long dispute with Local 556. Only at this point did Local 556 decide not to further represent Carter in her grievance. If, as Carter contends, Stone reported her harassment to facilitate her termination, the Union inexplicably jettisoned the strategy shortly thereafter, demonstrating its intention to fairly represent Carter.

**C.**     **Carter's Retaliation Claims Fail Because She Has Not Alleged the Requisite Causal Nexus (Counts I, II and IV)[3]**

When a plaintiff predicates a Section 152, Third and Fourth claim on the termination of employment, the employee "must show by a preponderance of evidence that [] 'protected conduct was a 'substantial' or 'motivating' factor prompting the discharge.'" *Amarsingh v. Jetblue Airways Corp.*, 409 Fed. Appx. 459, 460-61 (2d Cir. 2011). To make this demonstration,

---

[3] This analysis is only material if the Court determines that it has jurisdiction over Carter's claims in this action.

the employee must show (a) she was engaged in protected activity; (b) the employer was aware of that activity; (c) defendant harbored animus toward the protected activity (*i.e.*, extreme anti-union bias or animus); and (d) the animus was a causal factor in plaintiff's termination.  *Id.* at 461; *Beckett v. Atlas Air, Inc.*, 968 F. Supp. 814, 817 (E.D.N.Y. 1997).

Here, Carter does not allege facts to suggest a causal nexus between protected activity and her termination.  In particular, Carter alleges that she first engaged in anti-Union protected speech as early as 2012 – more than ***five years before her termination***, which she claims was retaliation for her long history of opposing the Union.  But such a gap in time refutes Carter's claim of retaliation.  In fact, it shows Southwest's decision to terminate her had nothing to do with her years of anti-Union speech, but rather her targeted, inappropriate harassment of Stone.  Otherwise, Southwest would have terminated Stone in 2012 (or at some time prior to 2017).

For several years, Carter has openly engaged in alleged protected activities with respect to union issues without disciplinary action.  For example:

- Cater began making public complaints about Local 556's leadership in 2012.

- Carter posted anti-abortion commentary on Facebook since at least 2012.

- Carter resigned her Union membership in 2013.

- Carter began sending Stone private correspondence criticizing her handling of internal union matters in early 2015.

Nevertheless, Carter makes the implausible assertion that Southwest waited five years *after* she commenced the alleged protected activity to unlawfully retaliate.

Courts have repeatedly dismissed such retaliation claims, concluding that the lapse of time refutes the requisite causal nexus.  *See Johnson v. McDonald*, 623 Fed. Appx. 701, 704 (5th Cir. 2015) (dismissing Title VII retaliation claim where "the nearly two-year gap between the

[protected activity] and alleged retaliation [] refutes any causal link between the two events."); *Chhim v. Univ. of Texas*, 2016 WL 154142, *5 (W.D. Tex. Jan. 11, 2016) (dismissing Title VII retaliation claim because adverse action "occurred almost two years after he alleges he filed his first complaint … and three months after the alleged [second] complaint.  Such delays between the protected activity and adverse employment action refutes any causal link between the two events."); *Phillips v. United Parcel Serv.*, 2011 WL 2680725, *8 (N.D. Tex. June 21, 2011) (dismissing Title VII retaliation claim where "[t]he timing between the two actions and the protected activity (between nine months and two years)" did not establish a requisite causal connection).  Accordingly, even if the Court concludes it has jurisdiction over Carter's claims, the Court should dismiss her retaliation claims for failure to state a claim.

**D.      Carter Forfeited Any Alleged RLA Speech Protections By Sending Unsolicited Graphic Photographs to a Co-Worker (Counts I and II)**

There is limited legal authority addressing the contours of employees' post-certification right to engage in union-related speech under the RLA.[4]  Nevertheless, it is clear that even otherwise protected "speech relating to union activity loses statutory protection if it is vulgar, offensive, abusive, or harassing."  *Held*, 2007 WL 433107, *7.

In addition, an employee's protected activity "may give way when 'special circumstances' override the employees' [] interests[.]"  *Leiser Constr., LLC*, 349 NLRB 413, 415 (2007).  Special circumstances may include, *inter alia*, situations in which the protected activity is "vulgar or obscene[,] [] may 'exacerbate employee dissension' or situations in which restriction … 'is necessary to maintain decorum and discipline among employees.'"  *Id.*  "Where an employee engages in indefensible or abusive misconduct during otherwise protected activity,

---

[4] As a result of the scarcity of RLA jurisprudence on this issue, reference to NLRA case law is often helpful by analogy.  *See In re Cont'l Airlines Corp.*, 901 F.2d 1259, 1264 (5th Cir. 1990) ("[C]ourts have often looked to decisions under the NLRA for guidance in RLA matters.").

the employee forfeits the [NLRA's] protection." *DaimlerChrysler Corp.*, 344 NLRB 1324, 1329 (2005).

Carter contends Southwest retaliated against her for protected speech, including her repeatedly sending unsolicited messages containing photos and video of aborted fetuses to a co-worker. (*See* FAC ¶¶ 54, 89-91). Even if one assumes the communications generally concerned protected topics and the RLA protects certain types of speech post-certification (it does not), the communications lost protection due to their graphic and harassing nature and Carter's inflammatory commentary (*e.g.*, referring to Stone as a murderer).

The NLRB has repeatedly withdrawn statutory protection from images and commentary that are far less inflammatory than what Carter sent to Stone. *See generally Media Gen. Ops., Inc. v. NLRB*, 394 F.3d 207, 209, 212 (4th Cir. 2005) (Employee forfeited protections by use of terms "bastard," "son of a bitch," and calling supervisor a "racist."). For example, in *Leiser Constr., LLC*, 349 NLRB 413 (2007), the Board held that the employer could prohibit the wearing of union insignia that showed a person urinating on a rat, characterizing it as "unquestionably vulgar and obscene." *Id.* at 415. Similarly, in *Honda of Am. Mfg., Inc.*, 334 NLRB 746 (2001), the Board held that use of phrases "out of the closet" and "bone us" in a union newsletter was "so offensive as to render the otherwise protected newsletters unprotected." *Id.* at 748-49.

These cases demonstrate that even if one has a legal right to send unsolicited private messages to one's co-workers discussing abortion, doing so by sending knowingly graphic images and videos, and referring to the recipient as a murderer, is not protected. As Carter's five-year history of participation in public debates demonstrates, Carter was and is generally free to comment on abortion and internal Union matters without Southwest's interference. *See*

*Sacred Heart Med. Ctr.*, 347 NLRB 531, 534 (2006) (tolerance of other similar protected activities militates against a finding that any particular restriction is unlawful).  However, Carter does not have a legal right to create a harassing environment by distributing graphic images and hurling inflammatory slurs to undesiring recipients.  *See generally Sw. Bell Tel. Co.*, 200 NLRB 667 (1972) ("In view of the controversial nature of the language used and its admitted susceptibility to derisive and profane construction, Respondent could legitimately ban the use of the provocative slogan").

**E.     Carter Cannot Predicate a Claim Against Southwest – a Private Company – On Alleged Constitutional Violations (Count IV)**

In addition to her RLA retaliation claim (*see supra* Section III. A.), Carter brings a retaliation claim against Southwest predicated on violations of the First and Fifth Amendments to the United States Constitution.  (*See* FAC ¶¶ 94-96).[5]  In support of this claim, Carter alleges – without any supporting facts – that Southwest is a "government actor."  (*Id.* at ¶ 96).  Based on this false allegation (Southwest is a publicly traded company),[6] Carter asserts First and Fifth Amendment rights to unfettered speech vis-à-vis Southwest.   (Emlet Dec., ¶ 12 [App. 4]); *Dingeldey v. VMI-EPE-Holland B.V.*, 2016 WL 6273235, *3 (W.D.N.Y. Sept. 28, 2016) ("The court takes judicial notice that the [defendant] is a public company[.]").  This is not supported by law.

Southwest is aware of no case concluding that an employee of a private company is entitled to Constitutional free speech protections.  *Cf. Lloyd Corp. v. Tanner*, 407 U.S. 551, 569-70 (1972) (public does not have free speech rights at privately-owned mall).  Further, contrary to Carter's suggestion, the fact that Southwest's employees pay statutorily and CBA-authorized

---

[5] Because the facts supporting Carter's Count IV are identical to her RLA retaliation claim, Southwest reiterates its previously-stated defenses.  (*See supra* Section IV. A., C., D.).

[6] *See* http://www.southwestairlinesinvestorrelations.com/financials/sec-filings.

agency fees is immaterial to this analysis.  *See* 45 U.S.C. § 152, Eleventh; *Ry. Employees v. Hanson*, 351 U.S. 225, 238 (1956) ("[The requirement for financial support of the [union] … by all who receive the benefits of its work … does not violate either the First or the Fifth Amendments."). Thus, the Court should dismiss Carter's Constitution-based retaliation claim, as the First and Fifth Amendments only operate to protect individuals against *government* action.

## V.   <u>CONCLUSION</u>

Southwest respectfully requests that the Court dismiss all of Carter's claims for lack of subject matter jurisdiction as they are minor disputes subject to the RLA's dispute resolution process. Indeed, that very process is ongoing and is the proper forum to resolve Carter's claims. Alternatively, the Court should dismiss all of Plaintiff's claims for failure to allege sufficient facts to state a cause of action.

Dated:  October 24, 2017                    Respectfully submitted,


                                        By:    /s/ Jonathan E. Clark
                                               Jonathan E. Clark
                                               Texas Bar No. 24069515
                                               jclark@polsinelli.com
                                               2950 N. Harwood Street, Suite 2100
                                               Dallas, Texas  75201
                                               Telephone:  214.397.0030
                                               Facsimile:  214.397.0033

                                               Michele Haydel Gehrke *Admitted Pro Hac Vice*
                                               California State Bar No. 215647
                                               mgehrke@polsinelli.com
                                               Three Embarcadero, Suite 2400
                                               San Francisco, CA 94111
                                               Telephone:  415-248.2100
                                               Facsimile:  415.248.2101

                                               **ATTORNEYS FOR DEFENDANT**
                                               **SOUTHWEST AIRLINES CO.**


                               **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing instrument has been served
upon counsel for Plaintiff via the U.S. District Court, Northern District's CM/ECF system on
October 24, 2017.


                                        By:    /s/ Jonathan E. Clark
                                               Jonathan E. Clark