# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br>　　　　　　Defendant. | Civil Case No. 3:17-cv-02278-B<br><br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF HER RESPONSE TO DEFENDANT LOCAL 556'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................ 1

I.   Local 556's Motion to Dismiss Carter's retaliation claims should be denied because her claims allege a cognizable legal claim that is supported by ample facts. .......................... 3

A.   Local 556's Motion to Dismiss Carter's retaliation claims should be denied because  .. the RLA prohibits unions from causing employers to terminate employees to coerce their free exercise of protected rights. ............................................................... 3

B.   Carter's Complaint sets forth factual allegations demonstrating that Local 556's actions that caused Carter's termination were unlawfully motivated by Carter's exercise of protected rights. ..................................................................................... 7

1.   Local 556's complaints against Carter's speech caused her termination and thus suppressed her free exercise of protected rights. ....................................... 7

2.   Carter's Complaint alleges and demonstrates a reasonable inference that President Stone's actions in reporting Carter for "bullying and harassment" were done in her capacity as President and on the behalf of Local 556. ................................... 10

II.   Local 556's Motion to Dismiss Carter's duty of fair representation claim should be denied because her claim is supported by her factual allegations that Local 556 sought her termination for engaging in protected activities. ............................................. 15

III.   Carter's retaliation and duty of fair representation claims are actionable despite the pending arbitration. ................................................................................ 19

CONCLUSION ....................................................................................................... 20

i

# TABLE OF AUTHORITIES

Cases

*Abramson v. Univ. of Hawaii*,
  594 F.2d 202 (9th Cir. 1979)................................................................... 19

*Air Line Pilots Ass'n, Int'l v. O'Neill*,
  499 U.S. 65 (1991) ................................................................................. 15

*Am. Comm'ns Ass'n v. Douds*,
  339 U.S. 382 (1950) ................................................................................. 6

*Amalgamated Transit Union, Local Union No. 1433 (Veolia Transp. Servs., Inc.)*,
  360 NLRB 261 (2017)............................................................................. 10

*Anderson v. Pasadena Indep. Sch. Dist.*,
  184 F.3d 439 (5th Cir. 1999).................................................................... 5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................. 2

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................. 2

*Bhd. of Ry. Trainmen v. Terminal Co.*,
  394 U.S. 369 (1969) ................................................................................. 3

*Boyer v. City of Philadelphia*,
  2017 WL 3023585................................................................................... 20

*Brady v. Trans World Airlines, Inc.*,
  401 F.2d 87 (3d Cir. 1968)..................................................................... 3, 4

*Breaux v. City of Garland*,
  205 F.3d 150 (5th Cir. 2000).................................................................... 5

*Connick v. Myers*,
  461 U.S. 138 (1983) ................................................................................. 7

*Del Casal v. Eastern Airlines, Inc.*,
  634 F.2d 295 (5th Cir. 1981).................................................................... 15

*Delaware State College v. Ricks,*
    449 U.S. 250 (1980) ................................................................................ 19

*Dixon v. Int'l Bhd. of Police Officers,*
    504 F.3d 73 (1st Cir. 2007) ..................................................................... 6

*Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Bd. of Educ.,*
    649 F.3d 335 (5th Cir. 2011) ................................................................. 19

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks,*
    466 U.S. 435 (1984) .................................................................................. 8

*Ford Motor Co. v. Huffman,*
    345 U.S. 330 (1953) ................................................................................ 15

*Hitt v. Connell,*
    301 F.3d 240 (5th Cir. 2002) ................................................................... 4

*Int'l Union of Operating Eng'rs, Local 406 v. N.L.R.B.,*
    701 F.2d 504 (5th Cir. 1983) ............................................................. 6, 15

Int'*l Ass'n of Machinists v. St.,*
    *367* U.S. 740 (1961) .................................................................................. 8

*James v. Texas Collin Cty.,*
    535 F.3d 365 (5th Cir. 2008) ................................................................... 5

*Local 1814, Int'l Longshoremen's Ass'n v. N.L.R.B,*
    735 F.2d 1384 (D.C. Cir. 1984) ............................................................. 10

*Local 357, Int'l Bhd. of Teamsters v. N.L.R.B.,*
    365 U.S. 667 (1961) ................................................................................ 15

*Lormand v. US Unwired, Inc.,*
    565 F.3d 228 (5th Cir. 2009) ................................................................... 2

*Lovick v. Ritemoney, Ltd.,*
    378 F.3d 433 (5th Cir. 2004) ................................................................... 2

*Miller v. Airline Pilots Ass'n,*
    108 F.3d 1415 (D.C. Cir. 1997) ............................................................... 5

*Mullett v. N.L.R.B.,*
    571 F.2d 1292 (4th Cir. 1978) ............................................................... 10

*N.L.R.B. v. Brookwood Furniture, Div. of U.S. Indus.*,
701 F.2d 452 (5th Cir. 1983) ........................................................................... 14

*N.L.R.B. v. Esco Elevators, Inc.*,
736 F.2d 295 (5th Cir. 1984) ........................................................................... 14

*NLRB v. Allis-Chalmers Mfg. Co.*,
388 U.S. 175 (1967) ........................................................................................... 5

*Oscar Renda Contracting, Inc. v. City of Lubbock*,
463 F.3d 378 (5th Cir. 2006) ............................................................................. 3

*Roscello v. Southwest Airlines*,
726 F.2d 217 (5th Cir. 1984) ............................................................... 3, 14, 15

*Roth v. United States*,
354 U.S. 476 (1957) ........................................................................................... 7

*Ry. Emp. Dep't v.] Hanson*,
351 U.S. [225,] ............................................................................................... 5, 8

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) ........................................................................................... 2

*Shea v. Int'l Ass'n of Machinists*,
154 F.3d 508 (5th Cir. 1998) ............................................................................. 5

*Steele v. Louisville & N.R. Co.*,
323 U.S. 192 (1944) ............................................................................... 5, 6, 15

*Test Masters Educ. Servs., Inc. v. Singh*,
428 F.3d 559 (5th Cir. 2005) ............................................................................. 1

*Thorn v. Amalgamated Transit Union*,
305 F.3d 826 (8th Cir. 2002) ............................................................................. 6

*Urichuck v. Clark*,
689 F.2d 40 (3d Cir. 1982) .............................................................................. 10

*Vaca v. Sipes*,
386 U.S. 171 (1967) ......................................................................................... 15

Statutes

29 U.S.C. § 151 ........................................................................................................ 9

42 U.S.C. § 2000e-3(a) ........................................................................................... 12

45 U.S.C. § 151 ........................................................................................................ 9

Pursuant to Federal Rule of Civil Procedure, Rule 12, Plaintiff Charlene Carter ("Carter"), by and through her undersigned attorneys, hereby submits this brief in support of her Response to Defendant Local 556's Motion to Dismiss (ECF Nos. 23-24).[1]

## INTRODUCTION

Local 556 moves to dismiss Carter's retaliation claims on two grounds: (1) Local 556 did not take any adverse employment action against Carter, Def. Br. at 1-2, 3-4; and (2) Carter has not pled facts supporting that "any official action taken by the union had the effect of suppressing her protected speech rights." Def. Br. at 3.[2] Local 556's motion to dismiss Carter's retaliation claims must be denied in its entirety because the union and its agents caused Carter to suffer an adverse employment action, consistent with how that element has been defined by the courts. Furthermore, Carter's Complaint sets forth well-pled allegations demonstrating how Local 556's actions "suppressed" and prevented her free exercise of protected rights.

Local 556 also moves to dismiss Carter's duty of fair representation claim, arguing that Carter "has failed to plead any facts demonstrating how the Union failed to fulfill its duty of representation." Def. Br. at 2. On the contrary, Carter has set forth detailed factual allegations showing that Local 556, by and through its agents (namely, President Stone), invidiously discriminated against Carter in attempting to cause her termination. Carter shall demonstrate, in turn, why each of Local 556's arguments should be rejected.

## ARGUMENT

Motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005). A

---

[1] Def. Local 556's Rule 12(b)(6) Mot. to Dismiss, ECF No. 23 (October 10, 2017) ("Def. Mot."); Def. Local 556's Br. in Supp. of Mot. to Dismiss, ECF No. 24 (October 10, 2017) ("Def.'s Br.") (collectively "Def.'s Mot. to Dismiss").

complaint must give fair notice of the plaintiff's claim and the grounds upon which it rests, and must allege a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 559 (2007) (internal citations omitted). To allege a plausible entitlement to relief, a "plaintiff must plead sufficient 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Yet, a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations. *Twombly*, 550 U.S. at 555. In evaluating a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, (1982); *Lovick v. Ritemoney, Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).

Here, accepting as true all well-pleaded facts alleged in the Complaint and drawing all reasonable inferences therefrom in Carter's favor, Carter alleged a plausible entitlement to relief on all counts in her Complaint. As demonstrated herein, the Complaint clearly gives Local 556 fair notice of Carter's claims and the grounds upon which each claim rests. Carter has pled factual content allowing the Court to draw the reasonable inference that Local 556 is liable for both retaliation and breach of its duty of fair representation for the reasons set forth below. *See generally* Pl.'s First Amended Compl., Case No. 3:17-cv-002278-B, ECF No. 9 (Sep. 14, 2017) (hereinafter, "Compl."). Local 556's Motion to Dismiss should be denied in its entirety.

**I.      Local 556's Motion to Dismiss Carter's retaliation claims should be denied because her claims allege a cognizable legal claim that is supported by ample facts.**

**A.      Local 556's Motion to Dismiss Carter's retaliation claims should be denied because the RLA prohibits unions from causing employers to terminate employees to coerce their free exercise of protected rights.**

Contrary to Local 556's assertions, retaliation claims *are* cognizable against unions who cause an employer to terminate employees for protected activities. Accordingly, unions can cause employees to suffer adverse employment actions.[3]

Retaliation claims against unions are cognizable for an employee's exercise of rights under both the he Railway Labor Act, 45 U.S.C. § 151 *et seq.*, ("RLA"), and the United States Constitution. The RLA protects employees from retaliation by unions for the exercise of their protected rights under the RLA, including in circumstances where the union wrongfully causes the employee's termination. "[I]n suits involving section 2 (Fourth) (Eleventh) unions should be held liable for their actions in procuring a discharge which violates the employee's statutory rights." *Brady v. Trans World Airlines, Inc.*, 401 F.2d 87, 102 (3d Cir. 1968) (affirming union's joint liability with an employer based on employee's statutory protections under the RLA).[4]

The Fifth Circuit already recognizes that employers can wrongfully discharge employees in retaliation for their exercise of protected rights under the RLA. *See Roscello v. Southwest Airlines*, 726 F.2d 217, 222 (5th Cir. 1984) (holding that retaliation "consists of a discharge *or*

---

[3] Without citing any valid supporting authority, Local 556 argues that unions are free from liability when they demand that an employer terminate an employee for activities that the RLA and U.S. Constitution protect. Def. Br. at 1-2, 3-4. Local 556 cites *Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378, 382 (5th Cir. 2006), for the proposition that retaliation claims cannot be brought against unions, but Local 556 overgeneralizes, arguing illogically that because one such retaliation case was brought against an employer, that all such cases must be. That case did not hold that retaliation claims against unions are not cognizable. Local 556 also asserts that unions "cannot take any adverse employment actions" against employees when unions are not employers. *See* Def. Br. at 1-2. On the contrary, it is established that retaliation claims can be brought against unions in their capacity as exclusive bargaining representative and not as an employer. *See infra* at 3-6.
[4] The U.S. Supreme Court and the Fifth Circuit look to the National Labor Relations Act, 29 U.S.C. § 151 *et. seq.*, and the supporting case law for guidance in construing the Railway Labor Act. *See Roscello v. Southwest Airlines*, 726 F.2d 217, 222 (5th Cir. 1984) (citing *Bhd. of Ry. Trainmen v. Terminal Co.*, 394 U.S. 369 (1969)).

*other adverse action*") (emphasis added). The Third Circuit's holding in *Brady* should extend the same RLA principles and protections to employees for retaliation by unions for the same reasons.

Local 556's argument that only Carter's employer can be held liable for her retaliatory termination despite its role in reporting her was already rejected in *Brady*. There, a union raised its dues but an employee kept paying at the old rate because he believed the union violated procedural requirements for raising dues. *Brady*, 401 F.2d at 90. When the union threatened to request that the airline terminate his employment, the employee tendered dues at the new rate. *Id.* at 91 n.5. But the union rejected his tender claiming he now owed a reinstatement fee, and the airline terminated his employment at the union's request. *Id.* at 91. The employee then sued both the union and airline alleging that they violated RLA Section 2 (Fourth) and (Eleventh) which prohibit discharges that coerce employees into associating with a union. *Id.* at 95. The district court held that ***both*** the union and employer violated the RLA's anti-coercion provisions because the employee had tendered full dues. *Id.* at 95, 98.

On appeal, the Third Circuit affirmed the district court's holding that the union violated RLA Section 2 (Fourth)'s prohibition on coercing union membership. *Id.* at 102. The court acknowledged that Section 2 (Fourth) "does not expressly refer to [unions]." *Id.* But the court reasoned that because "both the employer and the union were treated alike in section 2 (Eleventh), and that section is an exception to the anticoercion provisions of section 2 (Fourth), Congress contemplated that unions would also be held liable for causing a discharge in violation of section 2 (Fourth)." *Id.*

The U.S. Constitution also protects employees from retaliation for the exercise of their First Amendment rights. *See, e.g., Hitt v. Connell*, 301 F.3d 240, 246 (5th Cir. 2002). Employees

4

who are exercising their constitutional rights suffer an adverse employment action when a defendant causes "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *See, e.g,*, *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000). Retaliation claims for the exercise of protected constitutional rights are cognizable against defendants that are "either personally involved in the deprivation or [whose] wrongful actions were causally connected to the deprivation." *James v. Texas Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008); *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999). Thus, Carter's claim that Local 556 retaliated against her for her exercise of First and Fifth Amendment rights is cognizable against Local 556 for wrongfully causing her termination as retaliation for the exercise of her constitutional rights, particularly under circumstances where U.S. Supreme Court precedent establishes that unions and employers are federal actors under color of the RLA.

As Carter sets forth in her Complaint, Local 556 is:

> 96. [a] government actor[], acting under color of federal law, because the RLA confers to Local 556, by federal authority, the power to act as the exclusive bargaining representative of all Southwest employees … [Local 556 and Southwest Airlines] also enforce a "union security clause" and subject employees to the "union security clause" pursuant to the federal authority of the RLA, which "authorizes agency shops … and therefore puts a federal imprimatur on a collective bargaining agreement, forcing an unwilling employee to pay a union agency fee." [*Ry. Emp. Dep't v.*] *Hanson*, 351 U.S. [225,] 232 n.4 [(1956)]; *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 198-99, 204 (1944); *Shea v. Int'l Ass'n of Machinists*, 154 F.3d 508, 513 n.2, 516-17 (5th Cir. 1998); *Miller v. Airline Pilots Ass'n*, 108 F.3d 1415, 1420 (D.C. Cir. 1997).

Compl. at ¶ 96.

Simply put, unions have power and influence to control and affect employees' terms and conditions of employment. A union's liability for retaliation makes all the more sense given the extraordinary power conferred on unions by constitutional and federal law to govern employees' relations with their employers as their exclusive bargaining representative. *See, e.g., N.L.R.B. v.*

5

*Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967); *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 200 (1944); *Am. Comm'ns Ass'n v. Douds*, 339 U.S. 382, 401 (1950) ("The loss of individual rights for the greater benefit of the group results in a tremendous increase in the power of the representative of the group—the union.")

Courts have also established that retaliation claims can be brought against unions in other contexts. *See Dixon v. Int'l Bhd. of Police Officers,* 504 F.3d 73 (1st Cir. 2007) (finding, in a case arising under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a), that a union can effectively retaliate against an employee "in any context including *within* the workplace") (emphasis in original); *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 830–31 (8th Cir. 2002) (holding in a Title VII case that any adverse action is sufficient to establish a retaliation claim against a union, including but not limited to adverse employment actions); *Int'l Union of Operating Eng'rs, Local 406 v. N.L.R.B*, 701 F.2d 504, 508 (5th Cir. 1983) (finding that the National Labor Relations Act prohibits a union from causing an employer to discriminate against an employee in order to encourage or to discourage union membership).

Having established that employees have cognizable actions against unions for retaliation, Carter alleged sufficient facts to establish that Local 556 took steps to cause her termination in response to her speech and activities opposing President Stone and Local 556. Compl. ¶¶ 54-56, 59-62, 67, 89-93; Ex. A to Compl. Carter pleads in her Complaint—and Local 556 admits—that President Stone complained to Southwest that Carter's Facebook messages were "bullying and harassment." Def. Br. at 2, 5; Compl. ¶¶ 89-92, 100. Carter demonstrates in her Complaint that Local 556 and President Stone were personally involved in bringing about the termination and that their actions were causally connected to the discharge:

> 99. Defendants and their agents, under color of federal law, violated Carter's rights under the First and Fifth Amendments to the U.S. Constitution and under

the RLA when (a) Local 556 retaliated against Carter for exercising her protected rights by complaining to Southwest of Carter's speech and activities, knowing that it could cause her discharge….

100. Carter suffered an adverse action when Local 556 complained to Southwest of Carter's speech and activities knowing that Carter could be terminated, and when Southwest subsequently terminated her employment.

Compl. at ¶¶ 99(a), 100.

In summary, unions can be liable for retaliating against employees and for taking adverse actions/adverse employment actions against them for their exercise of constitutional and statutory rights. Carter's Complaint alleges that President Stone caused her termination and Carter has pled facts that Local 556's actions caused her termination, as demonstrated in the next Section.

**B.      Carter's Complaint sets forth factual allegations demonstrating that Local 556's actions that caused Carter's termination were unlawfully motivated by Carter's exercise of protected rights.**

> ### *1.      Local 556's complaints against Carter's speech caused her termination and thus suppressed her free exercise of protected rights.*

Local 556 argues that Carter "has failed to plead facts to support that any official action taken by the Union had the effect of suppressing her protected speech rights." Def. Br. at 3. But Carter pled a myriad of facts showing that Local 556's actions "suppressed" and violated her protected speech rights. Discharge and the fear of discharge prevent and chill employees' protected activity. *See Connick v. Myers*, 461 U.S. 138, 144-45 (1983); *Roth v. United States*, 354 U.S. 476, 484 (1957)).

The First and Fifth Amendments to the United States Constitution guarantee Carter, *inter alia*, the freedoms of speech and association, which, in conjunction with the RLA, give employees the right to refrain from or resign union membership at any time and the right to object

to the payment of political and other union non-bargaining expenses. *See Ellis v. Bhd. of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 439 (1984); *Hanson*, 351 U.S. at 235, 238 (1956); *Int'l Ass'n of Machinists v. St.*, 367 U.S. 740 (1961).

To support that Local 556's actions "suppressed" and silenced Carter's speech, the Complaint shows that Carter engaged in constitutionally and statutorily protected activity when she exercised her rights to resign from Local 556 and object to the union's political, ideological, and other nonbargaining expenses. *See* Compl. at ¶¶ 19, 20-24 (Carter alleging that she  was part of a wave of approximately 90 Southwest employees that resigned from Local 556 membership and objected to paying for the political, ideological, and nonbargaining portion of union dues; and that she opposed Local 556's activities and positions on Facebook, and assisted other employees with resigning from membership in Local 556 and objecting to union dues).

The Complaint demonstrates that Carter exercised other protected rights as well, and Carter alleges that these actions caused Local 556 to retaliate against her. The Complaint alleges that on February 14, 2017, Carter sent Local 556 President Audrey Stone five private messages via Facebook Messenger. Compl. at ¶ 44. The Complaint sets forth the contents of these messages, and thus shows that Carter was sharply criticizing Local 556 and its Executive Board for its participation in a Women's March and for supporting abortion. Compl. at ¶ 44. Carter sent a video of an aborted infant to President Stone, stating "TWU-AFL-CIO and 556 are supporting this Murder." Compl. at ¶ 44. Carter's Facebook messages also criticized how Local 556 and its Executive Board were using employees' dues and fees to support these activities and repeatedly referred to the "Recall Effort," an effort to remove the current members of the Local 556 Executive Board. Compl. at ¶ 44. The Complaint also alleges that several days later, on February

17, 2017, Carter sent an email responding to President Stone and Local 556's solicitation of

funds to fight national right to work legislation, saying:

> First off I do not want your Propaganda coming to my inbox....that being said
> I Support the RIGHT TO WORK Organization 110% ABOVE what I have to
> pay you all in DUES! YOU and TWU-AFL-CIO do not Speak For Me or over
> half of our work group....We have a RECALL right now that we want adhered
> to with over the 50+ 1% and growing. WE WANT YOU all GONE!!!!!
>
> ….
>
> P.S. Just sent The RIGHT TO WORK more money to fight this.....YOU all
> DISGUST ME!!!!!  OH and by the WAY I and so many other of our FAs
> VOTED for TRUMP....so shove that in your Propaganda Machine!

Compl. at ¶ 47. Carter's messages directly implicated Local 556 and its Executive Board,

including President Stone. President Stone reported Carter for these messages, and Carter was

expressly terminated for sending these messages. Compl. ¶¶ 54-56, 59-63, 67, 89-93; Ex. A to

Compl.

Carter alleges that she exercised protected rights in numerous other ways as well,

speaking in opposition against Local 556. For instance, Carter alleges that that she supported and

requested donations to fund Jackson's recall campaign on February 6, 2017. Compl. at ¶ 42.

Carter also alleged that on February 7, 2017, and on February 14, 2017, she posted videos on her

Facebook page that depicted aborted infants. Compl. at ¶¶ 43, 45.

Within weeks of President Stone's reporting Carter for alleged bullying and harassment,

Carter was summarily terminated. Compl. at ¶¶ 60-63; and Ex. A to Compl. Carter's First

Amendment rights of speech, association, self-organization, and other forms of expression, were

all suppressed when Local 556's President reported Carter for exercising her rights under the

pretext of "bullying and harassment," and caused Carter to be terminated. *See* Compl. ¶¶ 54-56,

59-62, 67, 89-93; Ex. A to Compl. *See also* Compl. at ¶ 95 (alleging the rights guaranteed to

Carter under the First and Fifth Amendment to the Constitution and the RLA); ¶ 98 (alleging that

Carter exercised her rights and engaged in protected speech and activity); ¶¶ 12, 13, 16, 17, 18-24, 28, 38-47 (alleging Carter's exercise of protected rights). Local 556's reporting of Carter's speech as "bullying and harassment," by and through its agents, chilled, suppressed, and prevented Carter's free exercise of rights by causing her to lose her job with Southwest for exercising those rights.

> **2.    Carter's Complaint alleges and demonstrates a reasonable inference that President Stone's actions in reporting Carter for "bullying and harassment" were done in her capacity as President and on the behalf of Local 556.**

Carter pleads that the adverse employment action is attributable to Local 556 with factual allegations that President's Stone's motive was to silence and suppress Carter's criticism of Local 556, its President, and its policies. These allegations establish more than a reasonable inference that President Stone's efforts to silence Carter were official actions attributable to Local 556.

To determine whether a person is acting as an agent of the union, the test is "whether the putative agent's position and duties, and the context of the conduct, would create the reasonable belief that the individual was reflecting union policy and speaking and acting for the union." *Amalgamated Transit Union, Local Union No. 1433 (Veolia Transp. Servs., Inc.)*, 360 NLRB 261 (2017). *See also Urichuck v. Clark*, 689 F.2d 40 (3d Cir. 1982) (holding that unions may be held liable for the actions of their officers under common law theories of agency); *Local 1814, Int'l Longshoremen's Ass'n v. N.L.R.B.*, 735 F.2d 1384, 1397 (D.C. Cir. 1984) ("[W]here [union officials'] actions can be understood to further the union's interests, the union is responsible for the officials' unlawful acts."); *Mullett v. N.L.R.B.*, 571 F.2d 1292, 1294 (4th Cir. 1978) ("Responsibility of a union for the acts of its officers or members may be established by common

law rules of agency. Express authorization or ratification is not required; authority may be implied or apparent.").

As demonstrated, *supra* at 8-9, Carter's allegations also show that her messages to President Stone on her TWU page, were directed at Local 556 and its Executive Board, not to Stone in some personal, private capacity. Compl. at ¶¶ 28, 44, 47. In other words, Carter was not messaging Stone as a co-worker about some personal complaint between the two, but about Local 556 business. Carter states in her Complaint that she sent "private Facebook messages to President Stone's Facebook page 'Audrey Stone Twu.'" Compl. at ¶ 28. President Stone was acting as an agent of the Local 556 organization to silence and suppress a union opponent, not as an employee concerned with bullying and harassment.

Carter alleges that President Stone and Local 556 requested that Southwest discipline Carter for sending the February 14, 2017 Facebook messages opposing the union, President Stone, and their political and ideological views, and for supporting the recall of the Local 556 Executive Board, and complained, *knowing* that her complaint could result in Carter's termination. Compl. at ¶¶ 89-92; 99(a), 100. *See also* Compl. ¶¶ 54-56, 59-62, 67, 89-93; Ex. A to Compl. (further supporting the allegations).

President Stone's reporting to Southwest was done in her official capacity as a union officer and on behalf of the union to protect and advance its interests, as evidenced by Carter's allegations showing the content of those messages (e.g., Compl. at ¶¶ 44, 47), and Local 556 and President Stone's retaliatory motive. Carter establishes Local 556 and President Stone's retaliatory motive by alleging:

> Carter's protected speech and other activities were a substantial and motivating factor for Local 556's complaints against Carter as evidenced by, *inter alia*, (a) the timing of Carter's termination in relation to her protected activity, (b) the disparate treatment of Carter in contrast with Local 556's own members, (c) Local

11

> 556's history of retaliatory threats and other discriminatory conduct against Carter and other nonmember objectors, and (d) the inconsistency between Local 556's approach to employee discipline depending on their speech and activities, including discipline under Southwest's social media policy and other company policies.

Compl. at ¶ 101.

Carter's Complaint clearly demonstrates that Southwest Airlines terminated her employment for the content of Facebook messages she sent to Local 556 President Audrey Stone. Compl. at ¶¶ 60-63; and Ex. A to Compl. That content, for which President Stone reported Carter, was strong criticism of Local 556 as well as of the union's leadership (including Stone) and its policies. Compl. at ¶¶ 44, 47. To further demonstrate that Local 556 and President Stone's reports were motivated by retaliatory animus, Carter sets forth even more detailed factual allegations throughout the Complaint. *See, e.g.*, Compl. at ¶¶ 42-48, 65-67 (the messages and posts for which Carter was terminated demonstrating her speech and activity in opposition to Local 556 and the proximity in timing with her termination); ¶¶ 25-28, 30, 35, and 40 (allegations showing disparate treatment and Local 556's inconsistency in approach to employee discipline); and ¶¶ 16-17, 65-67 (history of retaliatory threats and other discriminatory conduct). *See also infra* at 17-18.

Carter alleges specific facts demonstrating that President Stone was not merely acting as a concerned employee when reporting Carter's speech. Carter alleges that Local 556's and President Stone's animus for Carter's protected activity is what compelled them to take the adverse action of reporting Carter in an attempt to cause her termination. *See* Section I, *supra* at 8-9, and Section II, *infra* at 17-18.

Local 556 contends that "Stone's position as Union President does not strip her right as an employee of Southwest to file complaints of bullying and harassment from a co-worker." Def.

12

Br. at 5. Certainly Southwest employees who legitimately confront bullying and harassment can report their concerns to their employer, but Carter's allegation in the Complaint is that Local 556 and its agents were wrongfully motivated by a retaliatory motive to cause Carter's termination. Compl. at ¶¶ 16-17, 25-28, 30, 35, 40, 42-48, 65-67, 101. Carter's allegations further demonstrate that Local 556's explanation that Stone was merely acting as an ordinary employee concerned with bullying and harassment is a pretext for its unlawful actions.[5] Carter's factual allegations supporting the substantial and motivating factor analysis also shows why that pretext is simply implausible. *See supra* 11-12; Compl. at ¶¶ 21, 26-27, 30, 89-92. President Stone is more than just an ordinary Southwest employee. As President of Local 556, Stone wields extraordinary influence in the collective bargaining unit, to negotiate with Southwest Airlines and influence employees' wages, benefits, and other terms and conditions of employment. Compl. at ¶¶ 9, 85. Carter has made adequate allegations to support that claim, and thus the motion to dismiss should be denied. Carter's allegations thus demonstrate a reasonable inference that President Stone's reporting to Southwest was motivated by Stone's desire to remove a vocal opponent of the union.  Ultimately, this factual dispute must be resolved through discovery and at trial. At the motion to dismiss stage, it is sufficient that Carter has adequately alleged facts demonstrating a reasonable inference that President Stone was acting in her official capacity as Local 556 President.

---

[5] Local 556 mistakes the law of retaliation when it asserts that "allegations of pretext are without legal consequence" and that such allegations "fail to support that such action is in anyway [sic] legally attributable to Local 556." Def. Br. at 4. Fifth Circuit precedent establishes that Carter's allegations of pretext are ***not*** "without legal consequence." In *Roscello*, the Fifth Circuit took notice of circuit precedent discussing whether a discharge was based on pretext:

> The proffering of legitimate business reasons for the disciplinary action does not end the inquiry, for it must be determined whether these reasons are bona fide or pretextual…. [I]f the suggested reasons are a mere litigation figment or were not relied upon, then the determination of pretext concludes the inquiry.

*Roscello*, 726 F.2d at 222 (quoting *Marathon Le Tourneau Co., Longview Div. v. N.L.R.B.*, 699 F.2d 248, 252 (5th Cir. 1983). Moreover, Carter's allegations demonstrating pretext support that President Stone was acting in her official capacity as an agent of Local 556.

13

Carter's same factual allegations related to the substantial and motivating factors for her termination also show that Local 556's adverse action "had the effect" of preventing Carter's free exercise of protected rights. To determine whether a defendant's actions caused the plaintiff's adverse action or "had the effect" of violating defendant's rights, courts examine whether the plaintiff's protected conduct was the substantial and motivating factor for defendant's actions. *Roscello*, 726 F.2d at 222.[6]

It is clearly established that a plaintiff may establish a reasonable inference of the causal relationship between the protected activity and retaliatory conduct where she introduces sufficient direct *or circumstantial* evidence to permit a finding that her participation in constitutionally protected activity was a substantial or motivating factor behind the adverse action. *Roscello*, 726 F.2d at 223 ("Overt direct evidence of [animus], a rarity at best, is not a prerequisite to a finding of improper motive.") (quoting *N.L.R.B. v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 465 (5th Cir. 1983); *see also*, *N.L.R.B. v. Esco Elevators, Inc.*, 736 F.2d 295, 300 (5th Cir. 1984) ("Overt direct evidence of an unlawful motive is not a prerequisite to a finding that disciplinary action resulted therefrom.").

Accepting as true all well-pleaded facts alleged in Carter's Complaint and drawing all reasonable inferences therefrom in her favor, Carter has stated a plausible claim for retaliation against Local 556, which by and through its agents, reported Carter for "bullying and harassment" and caused her termination.

---

[6] Although *Roscello* dealt with a case of "anti-union" animus, the same principles apply to cases involving "pro-union" animus as in the instant action.

14

II.     **Local 556's Motion to Dismiss Carter's duty of fair representation claim should be denied because her claim is supported by her factual allegations that Local 556 sought her termination for engaging in protected activities.**

Contrary to Local 556's objections that Carter failed to allege adequately how the union breached the duty of duty of fair representation, Carter set forth detailed factual allegations demonstrating that President Stone complained to Southwest regarding Carter's anti-union activities knowing it would probably result in termination. *See* Def. Br. at 4; Compl. at ¶¶ 85-86. Under the RLA, a union acting as the exclusive representative of a craft/class of employees owes a fiduciary duty of fair representation to all of those employees that it represents, members and nonmembers alike. *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65 (1991); *Steele v. Louisville & Nashville R.R.*, 323 U.S. 192 (1944); *Roscello v. Southwest Airlines Co.*, 726 F.2d 217 (5th Cir. 1984).

The duty of fair representation requires unions to represent all employees in the bargaining unit "without hostility or discrimination toward any." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).[7] "The union's duty of fair representation guarantees employees the right to be represented without invidious treatment … in matters affecting their employment." *Int'l Union of Operating Engineers, Local 406*, 701 F.2d at 508 (quoting *Vaca*, 386 U.S. at 177–178; *Del Casal v. Eastern Airlines, Inc.*, 634 F.2d 295, 300-01 (5th Cir. 1981) (holding that a union violates its duty of fair representation by discrimination between members of a bargaining unit on the basis of the person's status as a nonmember of the union); *see also Int'l Union of Operating Engineers, Local 406*, 701 F.2d at 508 (citing *Local 357, Int'l Bhd. of Teamsters v. N.L.R.B.*, 365

---

[7] *See* Compl. at ¶¶ 85-86. The duty of fair representation is "akin to the duty owed by other fiduciaries to their beneficiaries," such as the "duty a trustee owes to trust beneficiaries," or the duty an "attorney" owes to a "client." *O'Neill*, 499 U.S. at 74. Like any other fiduciary, Local 556, and its agents—including President Stone—owe a duty of "complete loyalty" to "all whom it represents." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953).

U.S. 667, 675 (1961)) ("In instances where . . . a union is alleged to have singled out one employee for disparate treatment, an inquiry into the union's motives is essential.").

Contrary to Local 556's belabored objections that Carter makes legal allegations "without any allegation of any underlying facts that could arguably give rise to those legal conclusions," Def. Br. at 6, the union completely disregards all of the factual allegations Carter makes in support of her legal claims. The Complaint sets forth in great detail allegations showing the discriminatory motive crucial to proving Local 556's breach of its duty of fair representation. Compl. at ¶¶ 16-17, 25-28, 30, 35, 40, 42-48, 65-67, 101. Carter's factual allegations support the inference that Local 556's discriminatory animus for Carter is what caused President Stone—as the Executive Officer of Local 556—and the union to act, and distinguish Local 556's invidious treatment of Carter from the bullying and harassment concerns of an ordinary employee.[8] *See supra* at 11-12 (substantial and motivating factor analysis).

Indeed, the  Complaint sets forth that President Stone complained to Southwest management and sought to discipline or discharge Carter for her February 14, 2017 Facebook messages, a fact which even Local 556 does not dispute, and for her Facebook posts and other speech and activity opposing the union. Compl. at ¶¶ 89-92; Def. Br. at 5. Carter alleged:

> 90. On information and belief, Local 556 President Stone requested that Southwest discipline Carter for sending the February 14, 2017 Facebook messages opposing the union, President Stone, and their political and ideological views, and for supporting the recall of the Local 556 Executive Board.
>
> 91. On information and belief, Local 556, and its agents, complained to Southwest that Carter had posted videos on Facebook of aborted fetuses on February 7, 2017, and February 14, 2017, knowing the complaint would likely result in Carter's termination.

---

[8] Examining the substantial and motivating factor analysis that is relevant to Carter's retaliation claims also supports that it was Local 556's discriminatory animus that caused Local 556 and its President to discriminate against Carter and treat her differently from other employees who had exercised such speech. See supra at 11-12 (substantial and motivating factor analysis).

> 92. Local 556 breached the duty of fair representation when, through the actions of President Stone and/or other agents, it arbitrarily, discriminatorily, and in bad faith, complained to Southwest management of Carter's Facebook messages and posts, and sought to discipline Carter for her speech and other activity opposing the union, President Stone, and their political and ideological views, and for supporting the recall of the Local 556 Executive Board.

Compl. at ¶¶ 90-92.

Moreover, Carter's Complaint makes additional factual allegations to support the allegations made in Paragraphs 90-92. Carter's Complaint alleges that Local 556 singled out Carter for termination, an act inconsistent with President Stone's own policies and pronouncements that flight attendants should not report each other to Southwest regarding social media use. Compl. at ¶¶ 25-27, 30. Carter's Complaint also alleges that President Stone complained of Carter's conduct *knowing her complaint would probably result in Carter's termination*, and thus, with the intent to cause her discipline and termination. *See, e.g.*, Compl. at ¶¶ 89, 91.

Carter's Complaint demonstrates that she had a history of opposing Local 556 and its Executive Board, and that President Stone and the union were fully-aware of that history. Compl. at ¶¶ 18-24. Carter started sending President Stone private Facebook messages to "Audrey Stone Twu" as far back as early 2015, criticizing President Stone and Local 556. Compl. at ¶ 28. Throughout that entire time period, President Stone never responded to Carter's messages, never asked Carter to stop sending those messages, and never blocked Carter's messages. Compl. at ¶ 40. Carter's Complaint states that Local 556 Executive Board members threatened Carter with internal union charges for mentioning that members and employees had a decertification option, by which they could remove Local 556's legal status as the Southwest employees' exclusive bargaining representative. Compl. at ¶¶ 16-17.

17

Carter also alleges that, "[o]n information and belief, Southwest has subjected approximately thirteen supporters of the recall effort to termination of employment, suspension, repeated fact-findings, and/or other disciplinary measures in the last twelve months, ***many times at the request of Local 556 members and officials***." Compl. at ¶ 67 (emphasis added). Carter was part of a wave of approximately 90 Southwest employees that resigned from Local 556 membership and objected to paying for the political, ideological, and nonbargaining portion of union dues. Compl. at ¶ 19. Carter frequently opposed Local 556's activities and positions on Facebook, and assisted other employees with resigning from membership in Local 556 and objecting to union dues. Compl. at ¶¶ 18, 21-24.

By contrast, Carter's Complaint alleges that President Stone defended union members from being disciplined for their offensive and bullying speech on the grounds that it was protected activity. Compl. at ¶ 25. Carter's Complaint also alleges that President Stone emailed Southwest's flight attendants, including Carter, to address Southwest's discipline of flights attendants for criticizing each other on social media.

> President Stone noted that the discipline instances "did not arise out of something Management simply uncovered or stumbled upon" and "[t]hey are not generally monitoring our sites." President Stone also stated: "these cases come about as our own Flight Attendants are turning each other in." She then asked flight attendants to stop fighting on social media and "to recognize that your fellow Employees are entitled to their own thoughts and opinions." She closed by appealing that: "If we have a problem let's work it out as the professionals that we are."

Compl. at ¶ 30.

As Local 556 concedes, "factual allegations <u>must</u> be taken as true." Def. Br. at 6. (emphasis in original). In sum, the Complaint alleges that Local 556, through President Stone, caused Southwest to terminate Carter's employment in response to her Facebook speech

18

opposing Local 556 and those allegations sufficiently state a claim that Local 556 breached the duty of fair representation.[9]

### III.   Carter's retaliation and duty of fair representation claims are actionable despite the pending arbitration.

Finally, Local 556 makes the mistaken contention that Carter has not suffered an "adverse employment action" because Carter's termination is "not yet final." Def. Br. at 6-7. Local 556 argues that Carter's termination is not yet final because she can arbitrate a claim under the collective bargaining agreement regarding whether or not she was fired for just cause.

The proper focus for when a claim becomes actionable is "upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts become most painful." *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (quoting *Abramson v. Univ. of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979) (emphasis in original)).

In *Boyer*, a federal district court rejected plaintiff's timeliness argument that his retaliation claims did not become actionable until "after his termination became final.". The plaintiff in that case relied on the actual harm doctrine, arguing that his claim was not ripe until arbitration was complete. The district court rejected the argument that "the actual harm doctrine required or permitted him to wait to file suit until his termination was upheld in arbitration." The district court held that the alleged retaliatory actions, including those during arbitration

---

[9] The union's representation of Carter during grievance proceedings for termination is not the basis for her claim that Local 556 breached its duty of fair representation, which is apparent from the face of the Complaint. Def. Br. at 5. At least some of Local 556's argument in its Motion to Dismiss is based on that assumption, and as such, it is merely a straw man intended to divert attention away from the central claim that Local 556 violated the duty by attempting to ***cause*** Carter's termination in the first place. Southwest did not terminate Carter for Facebook posts until Local 556, by and through President Stone, reported Carter's messages. Similarly, Local 556 argues that it "successfully negotiated with Southwest to reduce its discipline of Plaintiff from termination to a thirty "30" day suspension with a guaranteed return to work. Plaintiff rejected the negotiated terms and was subsequently terminated." Def. Br. at 5. This argument exceeds the scope of analysis in a motion to dismiss, interjecting facts and allegations that are not within the four corners of the Complaint, and are not proper for consideration at this stage. *See Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Bd. of Educ.*, 649 F.3d 335, 341 (5th Cir. 2011) (*en banc*), rev'd on other grounds, 675 F.3d 849 (5th Cir. 2012). As such, this argument should be disregarded at this stage, and Carter will address why this argument should be rejected during subsequent stages in the litigation of this case.

19

proceedings, were actionable as soon as those actions occurred. Indeed, the court held that the claims were time-barred because he *had* waited. *Boyer v. City of Philadelphia,* 2017 WL 3023585, No. 13-6495 (E.D. Pa. July 17, 2017) (slip copy).

Likewise, when Carter's retaliation and duty of fair representation claims became actionable must turn on the occurrence of the retaliatory and discriminatory acts that Carter is complaining of; not on the completion of arbitration proceedings. Here, the unlawful actions Carter challenges are those set forth in her retaliation and duty of fair representation claims, which are actionable under federal law, not under the collective bargaining agreement. Carter discovered these unlawful acts when she learned that Local 556's actions caused her termination, which she first learned of on March 14, 2017, when she was terminated.

## CONCLUSION

For the foregoing reasons, Local 556's Motion to Dismiss should be DENIED in its entirety.

Dated: October 31, 2017                    Respectfully submitted,


                                           s/ Jason E. Winford (*with permission*)
                                           David E. Watkins
                                           Texas Bar No. 20922000
                                           *dwatkins@jenkinswatkins.com*
                                           Jason E. Winford
                                           Texas Bar No. 00788693
                                           *jwinford@jenkinswatkins.com*
                                           JENKINS & WATKINS, P.C.
                                           4300 MacArthur Avenue, Suite 165
                                           Dallas, Texas 75209
                                           Tel: 214-378-6675
                                           Fax: 214-378-6680

                                           s/ Matthew B. Gilliam
                                           Mathew B. Gilliam (*pro hac vice filed*)
                                           New York Bar No. 5005996

20

*mbg@nrtw.org*
Jeffrey D. Jennings (*pro hac vice filed*)
Virginia Bar No. 87667
*jdj@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319

*Attorneys for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

On the 31st day of October, 2017, I electronically submitted the foregoing document with the Clerk of Court for the United States District Court, Northern District of Texas, using the electronic case files system ("ECF") of the Court, in compliance with this Court's Standing Order Designating Case for Enrollment in the Electronic Case Filing System "CM/ECF." Delivery of the notice of electronic filing that is automatically generated by ECF constitutes service under Fed. R. Civ. P. 5(b)(2)(D) on each party who is a registered user of ECF. Local Rule 5.1(d). I hereby certify that I have served all counsel electronically or by another manner authorized by the Federal Rule of Civil Procedure 5(b)(2).

s/ Matthew B. Gilliam_____