# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER, <br><br> Plaintiff, <br><br> v. <br><br> SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556, <br><br> Defendant. | Civil Case No. 3:17-cv-02278-B <br><br><br> **PLAINTIFF'S BRIEF IN SUPPORT OF HER RESPONSE TO DEFENDANT SOUTHWEST AIRLINES CO.'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 1

I.   Southwest's proffer of the declaration of Maureen Emlet and the collective bargaining agreement should not be considered for purposes of its Rule 12(b)(6) motion. .................. 1

II.   This court has jurisdiction over Carter's claims arising under Section 2 Third and Fourth of the RLA because they are statutory as opposed to contractual and this case involves Southwest's animus towards protected union-related activity. ........................................... 4

    A.   Carter's constitutional and statutory claims are separate and independent from the collective bargaining agreement. ................................................................. 5

    B.   Carter's claims are predicated on Southwest's union-related animus. ...................... 12

III.   Carter sets forth well-pleaded allegations that Local 556 breached its duty of fair representation. ............................................................................................ 13

IV.   Carter alleged sufficient facts to state a claim that her protected activity caused Southwest to terminate her. ........................................................................... 16

V.   Carter's speech did not lose protection because it was not directed to her employer and did not detract from Southwest's ability to maintain discipline in the workplace, and any such inquiry is irrelevant to the motion to dismiss. ................................................ 18

VI.   Southwest is a government actor and acted under color of federal law when the company terminated Carter's employment. ................................................................. 22

CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

Cases

*Abood v. Detroit Bd. of Ed.*,
  431 U.S. 209 (1977) ................................................................................... 24

*Adams v. Fed. Exp. Corp.*,
  547 F.2d 319 (6th Cir. 1976) ....................................................................... 7

*Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc.*,
  399 F.3d 89 (1st Cir. 2005) .......................................................................... 5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................... 2

*Atchison, Topeka & Santa Fe Ry. Co. v. Buell*,
  480 U.S. 557 (1987) .................................................................................... 11

*Atl. Steel Co.*,
  245 NLRB 814 (1979) ................................................................................. 19

*Ballew v. Cont'l Airlines, Inc.*,
  668 F.3d 777 (5th Cir. 2012) ........................................................................ 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007), 550 U.S. n. 8 ............................................................ 14

*Bhd. of R. R. Trainmen v. Howard*,
  343 U.S. 768 (1952) ...................................................................................... 7

*Brady v. Trans World Airlines, Inc.*,
  401 F.2d 87 (3d Cir. 1968) .............................................................. 4, 10, 16

*Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*,
  871 F. Supp. 2d 581 (S.D. Tex. 2012) ....................................................... 14

*Brown v. Ill. Cent. R.R. Co.*,
  254 F.3d 654 (7th Cir.2001) ........................................................................ 10

*CareFlite v. Office And Prof'l Employees Int'l Union, AFL-CIO*,
  612 F.3d 314 (5th Cir. 2010) ........................................................................ 5

iii

*Carmona v. Sw. Airlines Co.*,
    536 F.3d 344 (5th Cir. 2008) .................................................................. 4, 5, 9, 10

*Caterpillar Inc. v. Williams*,
    482 U.S. 386 (1987) ........................................................................................ 16

*Coleman v. Anco Insulations, Inc.*,
    196 F. Supp. 3d 608 (M.D. La. 2016) ............................................................. 3

*Conrad v. Delta Air Lines, Inc.*,
    494 F.2d 914 (7th Cir. 1974) ........................................................................... 7

*Crawford v. Air Line Pilots*,
    992 F.2d 1295 (4th Cir. 1993) .................................................................. 23, 24

*DelCostello v. Int'l Bhd. of Teamsters*,
    462 U.S. 151 (1983) .................................................................................. 15, 16

*Dep't v. Hanson*,
    351 U.S. 225 (1956) ............................................................................ 22, 23, 24

*Dreis & Krump Mfg., Inc.*,
    221 NLRB 309 (1975) .................................................................................... 19

*Elizondo v. Univ. of Texas at San Antonio*,
    No. CIVASA-04-CA-1025-XR; 2005 WL 823353 (W.D. Tex. 2005) ........................ 3

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*,
    466 U.S. 435 (1984) ................................................................................... 8, 24

*Ellis v. W. Airlines, Inc.*,
    652 F. Supp. 938 (S.D. Cal. 1986) .......................................................... 23, 24

*Fennessy v. Sw. Airlines*,
    91 F.3d 1359 (9th Cir. 1996) ............................................................... 5, 12, 13

*Fredericksen v. Halliburton Co.*,
    No. CIV.A. H-10-1892, 2011 WL 1232991 (S.D. Tex. Mar. 31, 2011) .................. 14

*Graves v. Tubb*,
    281 F. Supp. 2d 886 (N.D. Miss. 2003) ......................................................... 3

*Griffin v. Piedmont Aviation, Inc.*,
    384 F. Supp. 1070 (N.D. Ga. 1974) ................................................................ 7

*Hawaiian Airlines, Inc. v. Norris*,
    512 U.S. 246 (1994) ........................................................................ 4, 5, 6, 8, 10, 11

*Held v. Am. Airlines*,
    2007 WL 433107 (N.D. Ill. Jan. 31, 2007) ........................................................ 21

*Held v. Am. Airlines, Inc.*,
    13 F. Supp. 2d 20 (D.D.C. 1998) ................................................................ 5, 12, 13

In *Daimler Chrysler*,
    344 NLRB 1324 (2005) .............................................................................. 19, 20

*In re Cont'l Airlines Corp.*,
    901 F.2d 1259 (5th Cir. 1990) ...................................................................... 8, 19

*Int'l Ass'n of Machinists v. St.*,
    367 U.S. 740 (1961) ........................................................................................ 24

*Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*,
    847 F.2d 186 (5th Cir. 1988) .......................................................................... 2, 3

*Kent v. Fugere*,
    438 F. Supp. 560 (D. Conn. 1977) ...................................................................... 7

*Konop v. Hawaiian Airlines, Inc.*,
    302 F.3d 868 (9th Cir. 2002) .............................................................................. 8

*Lafayette Park Hotel*,
    326 NLRB 824 (1998) ........................................................................................ 8

*Leiser Constr.*,
    349 NLRB 413 (2007) ...................................................................................... 20

*Lingle v. Norge Div. of Magic Chef, Inc.*,
    486 U.S. 399 (1988) ........................................................................................ 11

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
    594 F.3d 383 (5th Cir. 2010) .............................................................................. 2

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) .............................................................................. 2

*Lutz v. Machinists*,
    121 F. Supp.2d 498 (E.D. Va. 2000) ................................................................ 23

*Masiello v. U.S. Airways, Inc.*,
  113 F. Supp. 2d 870 (W.D.N.C. 2000) ............................................................. 23

*Media General Operations*,
  394 F.3d 207 (4th Cir. 2005) ............................................................. 20

*Montez v. Dep't of Navy*,
  392 F.3d 147 (5th Cir. 2004) ............................................................. 2

*N.L.R.B. v. ADCO Elec. Inc.*,
  6 F.3d 1110 (5th Cir. 1993) ............................................................. 17

*N.L.R.B. v. Brookwood Furniture, Div. of U.S. Indus.*,
  701 F.2d 452 (5th Cir. 1983) ............................................................. 17

*N.L.R.B. v. Transp. Mgmt. Corp.*,
  462 U.S. 393 (1983) ............................................................. 13, 17

*N.L.R.B. v. Vanguard Tours, Inc.*,
  981 F.2d 62 (2d Cir. 1992) ............................................................. 8

*Nissho-Iwai Am. Corp. v. Kline*,
  845 F.2d 1300 (5th Cir. 1988) ............................................................. 3

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
  418 U.S. 264 (1974) ............................................................. 8

*Paris Foods Corp. v. SFI Holdings, Inc.*,
  No. 3:12-CV-3261-B, 2012 WL 12937155 (N.D. Tex. Dec. 31, 2012) ..................... 3

*Renneisen v. Am. Airlines, Inc.*,
  990 F.2d 918 (7th Cir. 1993) ............................................................. 13

*Republic Aviation Corp. v. N.L.R.B.*,
  324 U.S. 793 (1945) ............................................................. 8

*Roscello v. Sw. Airlines Co.*,
  726 F.2d 217 (5th Cir. 1984) ............................................. 4, 5, 6, 7, 8, 12, 13, 16, 17

*Ross v. U.S. Capitol Police*,
  195 F.Supp.3d 180 (D.C. Cir. 2016) ............................................................. 3

*Ry. Clerks v. Allen*,
  373 U.S. 113 (1963) ............................................................. 24

*Shea v. Int'l Ass'n of Machinists & Aerospace Workers*,
154 F.3d 508 (5th Cir. 1998) ........................................................................ 22

*Smith v. Allwright*,
321 U.S. 649 (1944) ...................................................................................... 25

*Stanford New York, LLC*,
344 NLRB 558 (2005) ................................................................................... 19

*Steele v. Louisville & N.R. Co.*,
323 U.S. 192 (1944) ...................................................................................... 22

*Teamsters v. Lucas Flour Co.*,
369 U.S. 95 (1962) ........................................................................................ 11

*Thor Power Tool Co.*,
148 NLRB 1379 (1964) ................................................................................. 19

*Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*,
489 U.S. 426 (1989) .......................................................................... 12, 13, 14

*Trinity Marine Prod., Inc. v. United States*,
812 F.3d 481 (5th Cir. 2016) .......................................................................... 2

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*,
355 F.3d 370 (5th Cir. 2004) ........................................................................ 14

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
956 F.2d 1245 (2d Cir. 1992) ........................................................................ 12

*Wightman v. Springfield Terminal Ry. Co.*,
100 F.3d 228 (1st Cir. 1996) ........................................................................... 5

Statutes

45 U.S.C. § 151a ............................................................................................. 6

45 U.S.C. § 152 ........................................................................................ 4, 23

Other Authorities

5 C. Wright & A. Miller, Federal Practice and Procedure § 1366 (1969) ...................................... 2

Pursuant to Federal Rule of Civil Procedure, Rule 12, Plaintiff Charlene Carter ("Carter"), by and through her undersigned attorneys, hereby submits this brief in support of her Response to Defendant Southwest Airlines Co.'s Motion to Dismiss (ECF Nos. 28-30).

## INTRODUCTION

The Court should deny Southwest's Rule 12(b)(1) motion to dismiss because this Court has subject matter jurisdiction over Carter's constitutional and statutory claims. Carter's well-pleaded Complaint demonstrates that her causes of action are separate and independent from any claim under the collective bargaining agreement ("CBA"), and are predicated on allegations of the Defendants' retaliatory and discriminatory animus for her exercise of protected rights. Furthermore, the Court should also deny Southwest's Rule 12(b)(6) motion to dismiss because Carter's Complaint sets forth well-pleaded allegations demonstrating that 1) her exercise of protected rights was the substantial and motivating factor behind Southwest's decision to terminate her (i.e., "the requisite causal nexus" for her retaliation claims); (2) her messages to President Audrey Stone ("President Stone") did not lose their protection under federal labor law; (3) Transport Workers Union of America, Local 556 ("Local 556") breached its duty of fair representation in causing her termination; and (4) Southwest, even as a private employer, is considered a government actor under the RLA.

## ARGUMENT

I. **Southwest's proffer of the declaration of Maureen Emlet and the collective bargaining agreement should not be considered for purposes of its Rule 12(b)(6) motion.**

Southwest's exhibits filed with its appendix in support of its FRCP 12(b)(1) and 12(b)(6) motion to dismiss should not be considered in this Court's analysis of the 12(b)(6) portion of the motion. In a motion under FRCP 12(b)(1), the court may consider supporting affidavits,

1

testimony, or other evidentiary materials. *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004). In evaluating a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). "The court's task is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

To that end, "the court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V*, 594 F.3d at 387. The court may not look at "matters outside the pleadings" without converting the motion to dismiss into a motion for summary judgment. *Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 194 (5th Cir. 1988) (applying Fed. R. Civ. P. 12(b)); *Trinity Marine Prod., Inc. v. United States*, 812 F.3d 481, 487 (5th Cir. 2016). The district court has "complete discretion on whether or not to accept any material beyond the pleadings," and thereby convert the motion to dismiss into a summary judgment motion. *Id.* at 193 n.3. A court should not convert a motion to dismiss into a summary judgment motion when the "extra-pleading material" is "scanty, incomplete, or inconclusive" and not "likely to facilitate the disposition of the action." *Id.* (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1366 (1969)).

Here, Southwest Exhibits 1, E, and F—*i.e.*, the declaration of Maureen Emlet, the Flight Attendant CBA, and Carter's Grievance—are extra-pleading materials that should not be considered at this stage. First, Maureen Emlet's declaration should be disregarded because declarations and affidavits cannot be considered by a district court in a Rule 12(b)(6) motion.

*Graves v. Tubb*, 281 F. Supp. 2d 886, 890 (N.D. Miss. 2003). Southwest Br. Supp. MTD App. Exs. 1. Second, Carter's Complaint references the CBA once, (FAC ¶ 32), but it is hardly "central" to her prima facie case that Southwest and Local 556 violated her rights under the RLA. Carter hereby objects to the Court considering these documents for the Rule 12(b)(6) portion of Southwest's motion.

Nor should Southwest's motion be converted into one for summary judgment because its proffer of one declaration, the CBA, its various policies, and Carter's grievance is a "scanty, incomplete, [and] inconclusive" record to establish that there are no material facts in dispute. *See Isquith*, 847 F.2d at 193 n.3. The declaration of Maureen Emet is also insufficient to qualify as summary judgment evidence. *See Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1305 (5th Cir. 1988). Further, Southwest's motion should not be converted because summary judgment is not appropriate before discovery has even started. *See, e.g.*, *Coleman v. Anco Insulations, Inc.*, 196 F. Supp. 3d 608, 611 (M.D. La. 2016); *Paris Foods Corp. v. SFI Holdings, Inc.*, No. 3:12-CV-3261-B, 2012 WL 12937155, at *1 (N.D. Tex. Dec. 31, 2012) (declining to convert a motion to dismiss into a motion for summary judgment because summary judgment was not "appropriate" before the discovery stage); *Elizondo v. Univ. of Texas at San Antonio*, No. CIVASA-04-CA-1025-XR; 2005 WL 823353, *7 (W.D. Tex. 2005). This is especially true in "employment-discrimination cases," where plaintiffs usually can only proffer evidence after going through discovery regarding the illegality of an employer's motives or the pretext of its asserted justifications for the adverse action. *Ross v. U.S. Capitol Police*, 195 F.Supp.3d 180, 192-93 (D.C. Cir. 2016).

Here, converting Southwest's 12(b)(6) motion into a motion for summary judgment would be highly prejudicial to Carter who has not yet had the opportunity for discovery. As such,

the motion to dismiss should not be converted into a motion summary judgment. Alternatively, if the Court decides to convert the motion to dismiss, Carter asks the Court for reasonable notice of its intent to do so and an opportunity to conduct discovery and present evidence to oppose a summary judgment motion. *See* Fed. Rule Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."). Therefore, Southwest's Motion should be evaluated under the standards for Rules 12(b)(1) and 12(b)(6), and not as a summary judgment motion.

## II.    This court has jurisdiction over Carter's claims arising under Section 2 Third and Fourth of the RLA because they are statutory as opposed to contractual and this case involves Southwest's animus towards protected union-related activity.

This Court has subject matter jurisdiction over Carter's claims because her Complaint states federal causes of action arising under the RLA Section 2, Third, and Fourth,[1] the First Amendment to the U.S. Constitution, and federal labor policies (Counts I, II, and IV). Southwest's objections to this Court's jurisdiction should be dismissed for two reasons: First, U.S. Supreme Court and Fifth Circuit precedent establish that causes of action are not subject to arbitration when they seek to enforce constitutional and statutory rights independent from the CBA. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 258 (1994); *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349 (5th Cir. 2008); *Roscello v. Sw. Airlines Co.*, 726 F.2d 217 (5th Cir. 1984). Second, U.S. Supreme Court and Fifth Circuit precedent also establish that federal courts have subject matter jurisdiction over claims of union-related animus arising under RLA, Section 2.

---

[1] The RLA prohibits airline employers from interfering, influencing, or coercing employees in their choice of representative. RLA Section 2, Third; 45 U.S.C. § 152. It also protects the right of employees "to join, organize, or assist in organizing" a union or to refrain from those activities. RLA Section 2, Fourth; 45 U.S.C. § 152; *Brady v. Trans World Airlines, Inc.*, 401 F.2d 87, 102 (3d Cir. 1968). And the RLA restricts airlines from interfering or coercing employees in these protected activities or to provide assistance to a union. RLA Section 2, Fourth.

*Roscello*, 726 F.2d 217; *Held v. Am. Airlines, Inc.*, 13 F. Supp. 2d 20, 24 (D.D.C. 1998); *Fennessy v. Sw. Airlines*, 91 F.3d 1359, 1362 (9th Cir. 1996).

A.      **Carter's constitutional and statutory claims are separate and independent from the collective bargaining agreement.**

This Court has subject matter jurisdiction over Carter's claims because they arise from ***statutory*** rights and causes of action separate and independent from the CBA. *See Hawaiian Airlines, Inc.*, 512 U.S. at 258; *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012) ("[T]he assertion of any right that is not created by a CBA is … not subject to binding arbitration under the statute.") (quoting *CareFlite v. Office And Prof'l Employees Int'l Union, AFL-CIO*, 612 F.3d 314, 320–21 (5th Cir. 2010)); *Carmona*, 536 F.3d at 349; *Roscello*, 726 F.2d 217.

Southwest argues that employee discharges and other disciplinary disputes must be subject to arbitration because they are all "minor disputes" arising under the CBA.[2] SWA Br. at 9-13. However, U.S. Supreme Court and Fifth Circuit precedent reject Southwest's sweeping assertion. "[T]he RLA's mandatory arbitration mechanism does not apply to all disputes between an employer and its employees, or even to all non-major disputes between an employer and its employees, but only to those rights which arise from the provisions of a CBA. The assertion of any right that is not created by a CBA is therefore not subject to binding arbitration under the statute." *Hawaiian Airlines, Inc.*, 512 U.S. at 258; *CareFlite*, 612 F.3d at 320–21; *Carmona*, 536 F.3d at 349; *Roscello*, 726 F.2d 217.

---

[2] Southwest presents several different cases to expand the scope of minor disputes, but these cases do not apply here, where Carter is alleging that she was terminated for the exercise of rights protected by the U.S. Constitution, the RLA, and federal labor law. By contrast, Southwest relies on numerous distinguishable cases wherein plaintiffs sought enforcement or interpretation of the terms of a collective bargaining agreement. *See, e.g., Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228 (1st Cir. 1996) (plaintiffs sought to enjoin enactment of a clause in a newly-negotiated collective bargaining agreement related to seniority); *Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc.*, 399 F.3d 89, 104 (1st Cir. 2005) (finding that the union's only substantial allegation was that the defendants violated the CBA by transferring covered work to an affiliated corporation and there was nothing to suggest that the defendants tried to interfere with pilots' rights to participate in an organizational campaign).

The U.S. Supreme Court held that the scope of the RLA's mandatory arbitration mechanism in 45 U.S.C. § 151a controls *only* disputes over the interpretation or application of CBAs, such as disagreements over how to give effect to the bargained-for agreement. *Hawaiian Airlines, Inc.*, 512 U.S. at 255. The Court observed, "Significantly, the adjustment boards charged with administration of the minor-dispute provisions have understood these provisions as pertaining only to disputes invoking contract-based rights." *Id.* The Court specifically cited arbitrator's decisions recognizing:

> "[T]his Board lacks jurisdiction to enforce rights created by State or Federal Statutes and is limited to questions arising out of interpretations and application of Railway Labor [collective bargaining agreements]."

*Id.* (citing National Rail Adjustment Board Third Div. Award No. 19790 (1973)); and

> "[B]oth the traditional role of the arbitrator and admonitions of the courts require the Board to refrain from attempting to construe any of the provisions of the [RLA]."

*Id.* (citing *Northwest Airlines/Airline Pilots Ass'n, Int'l System Bd. of Adjustment*, Decision of June 28, 1972, p13). Thus, the Court concluded that the category of minor disputes contemplated by RLA § 151a are those that are grounded in the CBA. *Id.* at 256. Carter's claims will not require this Court to interpret or apply the CBA.

In *Roscello*, a former employee of Southwest Airlines brought a wrongful discharge action against Southwest, alleging that the company discharged him for union-related activity, including organizing and supporting a rival union other than the one recognized by Southwest. The Fifth Circuit held that an employer violates Section 2 of the RLA when it discharges or causes an employee to suffer an adverse action (*e.g.,* a discharge) based in whole or part on union-related animus. The Fifth Circuit concluded that there is "no doubt that this [wrongful discharge] claim, which rests not upon a collective bargaining contract, but upon a charge that

Southwest violated the statute, was within the jurisdiction of the district court rather than an adjustment board." *Roscello*, 726 F.2d at 220 n.2 (citing *Bhd. of R. R. Trainmen v. Howard*, 343 U.S. 768 (1952); *Adams v. Fed. Exp. Corp.*, 547 F.2d 319, 321 (6th Cir. 1976)); *Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 918 (7th Cir. 1974); *Kent v. Fugere*, 438 F. Supp. 560 (D. Conn. 1977); *Griffin v. Piedmont Aviation, Inc.*, 384 F. Supp. 1070 (N.D. Ga. 1974).

Like the Southwest employee in *Roscello*, Carter's Complaint alleges that Southwest violated **the RLA** when it terminated her. The Complaint demonstrates—and Southwest admits—that the company fired Carter for her communications to Local 556 President Audrey Stone. FAC ¶¶ 48-61, 89-93; 99(a), 100, and Ex. A to Compl; *see also* SWA Br. at 1-2, 5-6, 18-20. The Complaint alleges that on February 14, 2017, Carter sent President Stone five private messages via Facebook Messenger. FAC at ¶ 44. The Complaint sets forth the contents of these messages, and thus shows that Carter was sharply criticizing Local 556 and its Executive Board for its participation in a Women's March and for supporting abortion. FAC at ¶ 44. Carter sent a video of an aborted infant to President Stone, stating "TWU-AFL-CIO and 556 are supporting this Murder." FAC at ¶ 44. Carter's Facebook messages also criticized how Local 556 and its Executive Board were using employees' dues and fees to support these activities and repeatedly referred to the "Recall Effort," an effort to remove the current members of the Local 556 Executive Board. FAC at ¶ 44. The Complaint also alleges that several days later, on February 17, 2017, Carter sent an email responding to President Stone and Local 556's solicitation of funds to fight national right to work legislation, saying:

> First off I do not want your Propaganda coming to my inbox....that being said I Support the RIGHT TO WORK Organization 110% ABOVE what I have to pay you all in DUES! YOU and TWU-AFL-CIO do not Speak For Me or over half of our work group....We have a RECALL right now that we want adhered to with over the 50+ 1% and growing. WE WANT YOU all GONE!!!!!

> P.S. Just sent The RIGHT TO WORK more money to fight this.....YOU all DISGUST ME!!!!!   OH and by the WAY I and so many other of our FAs VOTED for TRUMP....so shove that in your Propaganda Machine!

FAC at ¶ 47. After President Stone reported her, Southwest terminated Carter for sending these messages. FAC ¶¶ 48-63, 89-93; 99(a), 100, and Ex. A to Compl; *see also* SWA Br. at 1-2, 5-6, 18-20.[3]

The Fifth Circuit's decision in *Roscello* establishes that Carter's constitutional and statutory claims are independent of the CBA as opposed to "grounded" in it as Southwest argues. None of Carter's factual allegations regarding Counts I, II, and IV involve the CBA. On the contrary, Carter's allegations show that she was exercising RLA-protected speech and association rights. *See, e.g.*, *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273-74 (1974); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002) *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*, 466 U.S. 435, 447 (1984); FAC ¶¶ 69-76, 95. Carter's claims are that Southwest (1) illegally terminated Carter for her RLA-protected speech (FAC ¶¶ 69-76 (Count I)); (2) enforced and maintained social media policies that discriminated against and restricted her RLA-protected rights (FAC ¶¶ 77-83 (Count II));[4] and (3) retaliated against her for exercise of constitutional and statutory rights, including her RLA-protected speech (FAC ¶¶ 94-104 (Count IV)).

---

[3] Carter alleges that she exercised protected rights in numerous other ways as well, speaking in opposition against Local 556. For instance, Carter alleges that that she supported and requested donations to fund Jackson's recall campaign on February 6, 2017. FAC ¶ 42. Carter also alleged that on February 7, 2017, and on February 14, 2017, she posted videos on her Facebook page that depicted aborted infants. FAC ¶¶ 43, 45.

[4] As Southwest recognizes in its brief, "[C]ourts have often looked to decisions under the NLRA for guidance in RLA matters." SWA Br. at 18 n.4 (citing *In re Cont'l Airlines Corp.*, 901 F.2d 1259, 1264 (5th Cir. 1990)); *see also Hawaiian Airlines, Inc.*, 512 U.S. at 262–263; *Roscello*, 726 F.2d at 222. RLA, Section 2, Three and Fourth reflect the same concerns with employee coercion as the National Labor Relations Act (NLRA). The NLRA establishes causes of action for employer's policies that coerce, chill, and restrict employees' substantive rights to refrain from union activity and to oppose a union. *See Republic Aviation Corp. v. N.L.R.B.*, 324 U.S. 793, 797–98, 803 (1945); *N.L.R.B. v. Vanguard Tours, Inc.*, 981 F.2d 62, 67 (2d Cir. 1992); *Lafayette Park Hotel*, 326 NLRB 824, 825 (1998). Accordingly, those principles apply equally to the RLA context. *See* SWA Br. at 11, n.2.

8

Southwest contends here that Carter's claims, such as her Count II claim that the company's enforcement of its social media, bullying, and harassment policy in an effort to restrict her RLA-protected rights are minor disputes because they involve the interpretation of the CBA. Yet, there is no difference between Southwest's argument that Carter's RLA claims are minor disputes and the argument it lost in *Carmona*. SWA Br. 17. In that case, Southwest terminated a male flight attendant whose chronic illnesses caused him to miss work more times than allowed by the CBA. *Carmona*, 536 F.3d at 345. After losing his grievance, the flight attendant sued Southwest for sex and disability discrimination under Title VII and the ADA because Southwest had not assessed negative attendance points when flight attendants were female, not disabled, or had not requested FMLA leave. *Id.* at 346, 348.

The Fifth Circuit rejected Southwest's argument that the flight attendant's discrimination claims were minor disputes and upheld the federal court's subject matter jurisdiction. *Id.* at 347, 348. Southwest argued that the court would have to interpret the CBA's "attendance policy, procedures for obtaining medical and sick leave, and discipline and termination procedures" to evaluate if the flight attendant has a prima facie case and the legitimacy of Southwest's stated reasons for the termination. *Id.* at 348. This is just like Southwest arguing here that Carter's RLA claims will require this Court "to analyze and interpret explicit and "incorporated" terms of the CBA," such as its "'just cause provision,'" its "compensation system," and Southwest's company policies regarding social media, bullying, and harassment. SWA Br. 18-19.[5]

The Fifth Circuit rejected Southwest's arguments, concluding that the flight attendant's case was not a minor dispute because it only required a court to "*refer to,*" rather than interpret, the CBA. *Carmona*, 536 F.3d at 349 (no emphasis added). The court reasoned that the allegations that Southwest treated females more leniently, that supervisors made discriminatory

remarks, and that the flight attendant's "chronic illnesses were the real reason he was fired, [did] not bring the meaning of any CBA provisions into dispute." *Id.* The court concluded this application of the CBA to Title VII and ADA did not preclude federal jurisdiction. *Id.* at 349–50. Similar to the flight attendant's evidence of disparate treatment not requiring CBA interpretation in *Carmona*, Carter's allegations that union members were treated more leniently, and union opponents more harshly, does not require CBA interpretation. FAC ¶¶ 65-68.

Even though Southwest argues it terminated Carter because she violated its social media, bullying, and harassment policies, Carter's RLA claims would only require this Court to refer to the policies as opposed to interpret them. Southwest cannot transform Carter's statutory claim simply by interjecting a CBA-based defense. *See Carmona*, 726 F.2d at 350 n.21 (citing *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 668 (7th Cir.2001)). Nor are Southwest's social media, bullying, and harassment policies part of the CBA. Carter's claims that Southwest enforced these policies to restrict her RLA-protected rights are independent statutory claims.

Southwest also suggests that because some case law suggests that statutory rights under the RLA are incorporated into a CBA, that this means aggrieved plaintiffs are deprived of a forum in federal court to seek relief for those violations. SWA Br. at 10. In *Brady v. Trans World Airlines, Inc.*, however, the Third Circuit held that federal courts have jurisdiction for an employer's violations of the RLA. 401 F.2d 87, 95-96 (3d Cir. 1968). Contrary to Southwest's suggestions, the Third Circuit observed that statutory rights are not subsumed by a CBA's incorporation of them. *Id.*   Although Southwest attempts to relegate Carter's claims to arbitration by recasting them as arising under the CBA's "just cause provision," the Supreme Court has rejected such legerdemain. In *Hawaiian Airlines*, the Supreme Court adopted and applied the logic of an NLRA case where an employee discharged for "just cause" filed both a

grievance and a state-court action. The Court adopted its reasoning, which held that "even if dispute resolution pursuant to a [CBA], on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state law claim can be resolved without interpreting the agreement itself, the case is independent of the agreement." *Hawaiian Airlines, Inc.*, 512 U.S. at 262 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 408–410 (1988)). Accordingly, Carter's arbitration of a "just cause" grievance is wholly-unrelated to her constitutional and statutory claim.

Similarly, the Court observed that "the existence of a potential CBA-based remedy did not deprive an employee of independent remedies available under state [statutory] law." *Hawaiian Airlines, Inc.*, 486 U.S. at 261. Emphasizing that rights derived from a federal statute are independent of the CBA, the Court rejected the argument that simply because an alleged injury results from conduct that is subject to the CBA (*e.g.*, termination), the employee's sole remedy must be through arbitration. *Id.* at 258 ("Notwithstanding the strong policies encouraging arbitration, 'different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.'") (examining and quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 565 (1987)). The Supreme Court also rejected the employer's argument that resort to the CBA was necessary to determine whether the employee was discharged under statutory law, stating that whether there was a violation was "purely a factual question," not requiring interpretation or application of the CBA. *Id.* at 261 ("[P]urely factual questions about an employee's conduct or an employer's conduct and motives do not 'require a court to interpret any term of a [CBA]'") (quoting *Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962) (internal quotations omitted).

11

**B.     Carter's claims are predicated on Southwest's union-related animus.[6]**

Southwest contends that "post-certification" termination claims must go to arbitration, even when they are independent of the CBA and require no interpretation or application of the CBA. SWA Br. at 8. Contrary to Southwest's suggestions, RLA Section 152, Third, and Fourth guarantees rights and freedoms of employees beyond precertification. Southwest relies on the statement from *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989) that RLA Section 2, Third and Fourth "primarily"—***but not exclusively***—address "the precertification rights and freedoms of unorganized employees." Not only has that notion been limited by *Hawaiian Airlines*, but it has also developed with RLA decisions in the Courts of Appeals. Thus, precedent establishes that the scope of rights and freedoms over which federal courts have subject matter jurisdiction is more expansive than Southwest wants the Court to believe.

Federal jurisdiction is proper when an employer's conduct has been motivated by union-related animus or an attempt to interfere with its employees' choice of their collective bargaining representative, when the employer's conduct constitutes discrimination or coercion, or when its conduct involves acts of intimidation that cannot be remedied by administrative means. *Roscello*, 726 F.2d at 222–23; *Held v. Am. Airlines, Inc.*, 13 F. Supp. 2d at 24, 26 (applying "substantial or motivating" factor test for anti-union animus while noting that the U.S. Supreme Court did not create a "heightened jurisdictional barrier" in postcertification cases) (construing *Trans World Airlines,* 489 U.S. 426); *Fennessy*, 91 F.3d at 1363.

---

[6] It is improper to dismiss a claim of animus at the early stage of litigation without factual discovery, particularly where Carter has pled facts sufficient to support a finding of anti-union animus. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1252–53 (2d Cir. 1992).

In *Fennessy*, one of Southwest's ramp agents tried to organize a new union to replace his existing union, similar to how Carter advocated on social media for reorganizing Local 556 through a recall election. *Fennessy*, 91 F.3d at 1361; *see* FAC at ¶¶ 31, 33, 39-44, 47. Southwest terminated the ramp agent, and he filed suit alleging that Southwest violated his union organizing rights under RLA Section 2, Fourth. *Id.* The Ninth Circuit held that RLA Section 2, Fourth protected the employee despite the union's certification. *Id.* at 1363. Here, Carter also claims that Southwest terminated her because of union-related bias. FAC ¶ 102.[7] Carter's Complaint alleges that her "protected speech and other activities were a substantial and motivating factor for Southwest's termination of [her] employment," and she alleges facts to support that claim as discussed *supra* in Section IV, and stated in her Complaint at ¶¶ 102-03.

In sum, RLA Section 2, Third and Fourth's substantive protections reach Carter's case because arbitration cannot remedy her statutory claims that Southwest interfered with her protected speech and activities. Southwest and Local 556's anti-union bias is further evidence that her case falls into the category of cases where "'but for the general jurisdiction of the federal courts there would be no remedy.'" *Renneisen v. Am. Airlines, Inc.*, 990 F.2d 918, 923 (7th Cir. 1993) (quoting *Trans World Airlines, Inc.*, 489 U.S. at 441)). Therefore, this Court has subject matter jurisdiction to hear Carter's RLA claims, and Southwest's motion to dismiss should be denied.

## III.   Carter sets forth well-pleaded allegations that Local 556 breached its duty of fair representation.

Carter's Complaint alleges factual allegations sufficient to state a plausible claim that Local 556, by and through President Stone, breached its duty of fair representation, Southwest's

---

[7] The Fifth Circuit has held that the NLRA test for anti-union bias also applies to RLA Section 2, Third and Fourth claims, *i.e.*, was the employee's protected activities a "substantial or motivating factor" for the termination. *Roscello*, 726 F.2d at 222 (quoting *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983). So has the D.C. Circuit. *See Held*, 13 F. Supp. 2d at 26.

objections notwithstanding.[8] Carter demonstrated how Local 556 and President Stone breached the duty of fair representation in Plaintiff's Response to Local 556's Motion to Dismiss, ECF No. 32, 15-19. Carter's allegations show that President Stone reported Carter, knowing that her reports could cause Carter's termination, and that President Stone was motivated by discriminatory animus. *See* FAC ¶¶ 54-56, 59-62, 67, 89-93; 99(a), 100, Ex. A to Compl.; Carter Resp. to Local 556 at 15-19.

Because Southwest cannot rebut Carter's support for her duty of fair representation claim, the company instead argues why it should prevail on the merits.[9] Yet, at the motion to dismiss stage "the court should not evaluate the merits of the allegation, but must satisfy itself only that the plaintiff has adequately pleaded a legally cognizable claim." *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F. Supp. 2d 581 (S.D. Tex. 2012) (citing *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004); *see also Fredericksen v. Halliburton Co.*, No. CIV.A. H-10-1892, 2011 WL 1232991, at *2 (S.D. Tex. Mar. 31, 2011) ("[W]hen considering a 12(b)(6) motion to dismiss, the Court's task is limited to deciding whether the plaintiff is entitled to offer evidence in support of his claims, not whether the plaintiff will eventually prevail.") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007), 550 U.S. at 563 n. 8 (internal citations omitted). For this reason, the Court should disregard Southwest's arguments on the merits.

---

[8] *See* SWA Br. at 15.

[9] Southwest invites the Court to decide the merits of the case by asserting: "all employees—irrespective of their status as union representatives—are entitled to raise harassment concerns with their employers." SWA Br. at 15. And, President Stone "was not required to endlessly endure Carter's harassing, graphic, and repeated personal messages to comply with the RLA." *Id.* Also, "Stone tolerated years of Carter's public and private derisive remarks without response;" "It is impossible to contend Stone developed a newfound desire to harm Carter in February 2017;" and "The allegations demonstrate that Stone began feeling harassed by Carter's sending of increasingly aggressive messages." *Id.*. Each of these assertions is a substantive response to the merits of the claim. They are not relevant to whether Carter has adequately alleged a plausible entitlement to relief.

Southwest's objections beg the question as to whether President Stone was merely acting as a concerned employee, or was discriminating against Carter as alleged in the Complaint. FAC ¶¶ 54-56, 59-62, 67, 89-93; 99(a), 100, Ex. A to Compl.; *see also* SWA Br. at 15-16. Indeed, Carter sets forth detailed factual allegations showing that Local 556, by and through President Stone, wrongfully discriminated and retaliated against Carter, attempting to cause her termination because of her protected speech and activities. FAC at ¶¶ 16-17, 25-28, 30, 35, 40, 42-48, 65-67, 101. As demonstrated in her Response to Local 556's Motion to Dismiss, Carter's messages to President Stone's TWU page all involved sharp criticism of Local 556 and its Executive Board for its political activities. *See* Carter Br. in Resp. to Local 556 Mot. to Dismiss, ECF No. 32, at 8-9. Carter's allegations supporting the substantial and motivating factor analysis also show why the Defendants' pretexts are simply implausible. FAC at ¶¶ 21, 26-27, 30, 89-92. *See also* Carter Br. in Resp. to Local 556 Mot. to Dismiss, ECF No. 32, at 11-13.

Furthermore, Southwest's attempt to recast Carter's Complaint as a "hybrid" action is a red herring. *See* SWA Br. at 14-16. Carter's Complaint states constitutional and statutory claims against Southwest that arise under the RLA and U.S. Constitution. Carter's Complaint, however, is not concerned with whether the company breached the collective bargaining agreement. When a union representing an employee in a grievance/arbitration procedure breaches its duty of fair representation, an employee ***may*** bring a hybrid § 301 breach of contract/fair representation claim against the union as well as the employer, alleging that the employer breached the collective bargaining agreement. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983) (emphasis added).[10]

---

[10] A hybrid § 301 breach of contract/fair representation claim "comprises two causes of action. The suit against the employer rests on § 301 [of the Labor Management Relations Act], since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation … Yet the two claims are inextricably interdependent. To prevail against either the company or the

Southwest is attempting to recast Carter's Complaint and contrive new claims that Carter does not allege. Alleging a hybrid breach of contract claim is not necessary or relevant to Carter's claims against the company. Carter makes no allegation that Southwest breached the collective bargaining agreement. Likewise, Carter does ***not*** allege that Local 556 breached its fair representation obligations during the grievance/arbitration process.[11] *See, e.g.*, FAC at ¶¶ 84-93. Accordingly, Carter's action cannot be recast and mischaracterized by Southwest as a "hybrid breach of contract claim." *See Roscello*, 726 F.2d at 219–20, n.2; *see also Brady*, 401 F.2d 87 (employee's fair representation action against union and wrongful discharge action against employer not recast as a "hybrid" § 301 breach of contract claim).

As plaintiff, Carter is the master of her complaint, and Southwest cannot foist new claims on her well-pleaded allegations based on arguments it seeks to interject. *Cf. Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Despite Southwest's attempts to mischaracterize Carter's actions, her claims arise under the United States Constitution, the RLA, and federal labor policy, not under the collective bargaining agreement.

## IV.   Carter alleged sufficient facts to state a claim that her protected activity caused Southwest to terminate her.

Carter's factual allegations support that her protected activities caused Southwest to terminate her. To state a claim that an airline employer interfered with an employee's protected rights under RLA Section 2, Third and Fourth, the employee must show causation by demonstrating that her protected conduct "was a substantial or motivating factor" for her

---

Union, … [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union. The employee may, if he chooses, sue one defendant and not the other..." *DelCostello*, 462 U.S. at 164–65 (internal citations and quotations omitted).

[11] Southwest argues that "Carter's claim is "undermined by the Union's representation of her in the post-termination grievance proceedings, which resulted in Carter obtaining an offer of reinstatement." SWA Br. at 16. Carter makes no claim that Local 556 violated its duty of fair representation during post-termination grievance proceedings.

termination. *Roscello*, 726 F.2d at 222 (quoting *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983)). Circumstantial evidence may be used because "[o]vert direct evidence of anti-union animus, [is] a rarity at best." *Roscello*, 726 F.2d at 223 (quoting *N.L.R.B. v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 465 (5th Cir. 1983)).

Carter alleged facts to state a claim that Southwest terminated her because of protected RLA activity. FAC ¶¶ 48-61, 89-93; 99(a), 100, 102 and Ex. A to Compl. Southwest terminated Carter only a month after she engaged in protected activity. Carter also had never received a significant reprimand during her twenty years at Southwest. Yet, one month after Carter engaged in protected activity by, *inter alia*, messaging Local 556 President Stone, Southwest terminated her. Further, Carter alleged that Southwest treated employees that supported Local 556's leadership more leniently, and opponents more harshly, when Southwest received complaints about those employees' social media activities. FAC ¶¶ 65-68. Disparate treatment creates inferences that an employer's proffered reasons for the termination are pretextual. *See N.L.R.B. v. ADCO Elec. Inc.*, 6 F.3d 1110, 1119 (5th Cir. 1993).

In February 2017, President Stone turned Carter in for discipline, relaying to Southwest that Carter had sent her messages opposing Local 556 leadership and supporting the recall. FAC ¶¶ 65-68. Southwest did not know about *that* protected activity until February 2017. SWA Br. 16-18. At the March 7, 2017 "fact-finding" meeting Southwest managers Ed Schneider and Meggan Jones questioned Carter about the messages. FAC ¶¶ 55-61. In the month preceding Carter's termination Southwest learned additional details about Carter's campaign to reorganize Local 556. FAC ¶¶ 55-61, 89-92, 99-101. Southwest's managers learned and/or observed that Carter opposed Local 556's participation in the Women's March, that Local 556 did not represent her political views on abortion and other issues, that she supported the efforts to recall

17

President and other Local 556 leaders, and that she had opted out of paying fees that Local 556 spends on political, ideological, and other nonbargaining spending. FAC ¶¶ 55-59. All of Carter's speech and activities heightened opposition to Local 556 during this January–March 2017 time period. Southwest's decision to terminate her within a month of her Facebook messages and only a week after her fact-finding shows a strong "casual nexus" between her protected activities and the termination.

To the extent that Southwest knew about Carter's history as a nonmember objector and a proponent for the reorganization of Local 556, Carter's Complaint demonstrates that her speech and activity intensified with the sequence of events occurring between January and March 2017. Whether and how Southwest's knowledge of prior events affects timing as evidence of the company's retaliatory motive is a question for the merits, SWA Br. 17-18, but Carter has satisfied her burden at the motion to dismiss stage by making detailed factual allegations to support numerous different factors evincing the company's retaliatory motive, including her showing that she was terminated within weeks of heightened speech and activity. FAC ¶¶ 44-68, 102. In sum, Carter alleged facts that create inferences that her termination is linked to Southwest's animosity towards her protected union activities. FAC ¶¶ 44-68, 102. Therefore, Southwest's motion to dismiss for failure to allege a sufficient casual nexus should be denied.

**V.      Carter's speech did not lose protection because it was not directed to her employer and did not detract from Southwest's ability to maintain discipline in the workplace, and any such inquiry is irrelevant to the motion to dismiss.**

Southwest incorrectly contends that Carter's retaliation and protected speech claims must be dismissed because the purported vulgarity and offensiveness of her pro-life speech strip it of protection. SWA Br. 18-20. Whether Carter's speech is deemed to be so vulgar and offensive such that it loses protection is a factual question that is irrelevant to whether Carter has

adequately alleged facts to support her claim. And contrary to Southwest's suggestions, Carter's speech does not automatically lose protection, even if it is deemed to be "graphic," "harassing," or "inflammatory." *See* SWA Br. at 19.

Offensive, vulgar, defamatory or opprobrious remarks uttered during the course of protected activities will ***not*** remove activities from protection unless they are so flagrant, violent, or extreme as to render the individual unfit for further ***service***. *See Stanford New York, LLC*, 344 NLRB 558, 564 (2005) (emphasis added) (citing *Dreis & Krump Mfg., Inc.*, 221 NLRB 309, 315 (1975)). "Vulgar and offensive" speech only loses its protection when such speech is directed at the employer or affects its ability to maintain discipline in the workplace. "[I]f the activity or the statement enjoys statutory protection, neither a 'rule' nor a low level of managerial tolerance of such statements can curtail the reach of the statute." *Thor Power Tool Co.*, 148 NLRB 1379, 1388 (1964).[12]

To support its position, Southwest relies exclusively on cases where the speech was directed at the employer or diminished the employer's ability to maintain discipline in the workplace. In *Daimler Chrysler*, 344 NLRB 1324,1328-30 (2005), the NLRB held that an employee's speech lost its protection because the speech was made "in a large open area full of cubicles occupied by both supervisory and nonsupervisory personnel" and it was admitted that there were "quite a few" employees in the immediate area. *Id.* Under these circumstances, the NLRB determined that "sustained profanity would reasonably tend to affect workplace discipline by undermining the authority of the supervisor subject to [the employee's] vituperative attack."

---

[12] To determine whether an employee engaged in protected speech and activity loses protection by her conduct, courts applying the NLRA examine (A) the place of the discussion; (B) the subject matter of the discussion; (C) the nature of the employee's outburst; and (D) whether the outburst was, in any way, provoked by an employer's unfair labor practice. *See Atl. Steel Co.*, 245 NLRB 814 (1979) (1979. As Southwest recognizes in its brief, "[C]ourts have often looked to decisions under the NLRA for guidance in RLA matters." SWA Br. at 18 n.4 (citing *In re Cont'l Airlines Corp.*, 901 F.2d 1259, 1264 (5th Cir. 1990)).

*Id.* During the exchange, the employee, in a loud voice, called the supervisor an "asshole," and said, "bullshit, I want the meeting now." *Id.* The employee approached the supervisor in a manner described as "intimidating." *Id.* The employee loudly said, "fuck this shit," and that he did not "have to put up with this bullshit," then turned and left the area. *Id.* Similarly, in *Media General Operations*, 394 F.3d 207, 209, 211-13 (4th Cir. 2005), court held that an employee calling his supervisor a "racist," "bastard," and "redneck son-of-a-bitch" during an employee work performance meeting was not protected. *Id.*[13]

By contrast, Carter's speech was ***not*** directed at the company, ***not*** made at work or during work hours, or had ***no*** detrimental connection to the workplace. Carter alleges that she was discharged for speech and activity protected by the RLA, and nothing in the Complaint establishes that she lost the RLA's protection, particularly given the place and subject matter of her speech. *See* FAC at ¶ 103 ("Defendants had no valid justifications for their actions, and Carter exercised her speech in a manner that would not unduly interfere with any legitimate interest."). Carter's Complaint also recounts in detail the speech for which she was terminated. FAC at ¶¶ 12, 18-24, 28, 39-45, 47.

Carter was clearly terminated for protected speech and activity in her Facebook messages to President Stone, something which Southwest concedes, arguing only that Carter's speech in those messages lost its protection. Southwest cites *Media General Operations* to justify its conclusory assertion that Carter "create[d] a harassing environment." SWA Br. at 20. Even if Southwest could support such an argument, that case is distinguishable because there, the NLRB

---

[13] Southwest also relies on *Leiser*, but in that case, the issue was whether the company could prohibit an employee from wearing a vulgar sticker on his hardhat at work. The sticker depicted someone or something urinating on a rat that was designated as nonunion. *Leiser Constr.*, 349 NLRB 413, 414–15 (2007). The NLRB merely recognized that an employer has the right to restrict an employee from displaying a vulgar sticker at work, not that it could fire him for displaying the sticker or for the content of his speech. In fact, the NLRB specifically noted that the employee was not being discharged for the sticker. *Id.*

found that the employee was not engaged in protected activity at the time of his offensive speech. The Court also observed that his profane words—calling his supervisor a "racist," "bastard," and "redneck son-of-a-bitch"—were devoid of substantive content and of meaningful value that could convey a message of grievance or concern; they were nothing more than offensive words. The employee was not using the derogatory statements in a manner to emphasize a message, or in stating an opinion on a union matter. There was no "nexus between the words [the employee] uttered and protected activity."

For the same reasons, *Held* is distinguishable because the plaintiff in that case was not engaged in protected activity when he published his invective on the company website. *Held v. Am. Airlines*, 2007 WL 433107 *1-1-2 (N.D. Ill. Jan. 31, 2007). Rather, the plaintiff's broad-based slurs in that case were disseminated widely throughout the workplace and constituted nothing more than offensive words. *Id.* By contrast, Carter's words clearly communicated messages of political opposition to the Local 556 President. *See e.g.*, FAC ¶¶ 44, 47. Nothing in Carter's speech is so "vulgar and offensive" as to remove the RLA's protection. Contrary to Southwest's mischaracterizations, Carter's Complaint also demonstrates that she did not refer to Stone as a murderer. *See* SWA Br. at 19. Rather, Carter's Complaint shows:

> …[A]t 12:33 PM, Carter sent President Stone the video of the aborted infant that she had posted on Facebook on February 7 as described in paragraph 43 of this Complaint. Carter's message stated: "TWU-AFL-CIO and 556 are supporting this Murder . . .

FAC at ¶ 44(b). Nothing regarding the place of the discussion affected the Employer's right or ability to maintain order or discipline in the establishment.

**VI.     Southwest is a government actor and acted under color of federal law when the company terminated Carter's employment.**

Contrary to Defendant's assertions, Carter alleges that Southwest, ***under color of federal law***, violated her constitutional and statutory rights by retaliating against her for her exercise of protected rights. FAC at ¶ 1, 3, 4, 94-100, 102-104. Southwest was acting as a government actor when it retaliated against Carter. State or government action arises, even in the private sector, from the RLA, which "authorizes agency shops … and therefore puts a federal imprimatur on a collective bargaining agreement, forcing an unwilling employee to pay a union agency fee." *Ry. Emps.' Dep't v. Hanson*, 351 U.S. 225, 232 n.4 (1956); *Shea v. Int'l Ass'n of Machinists & Aerospace Workers*, 154 F.3d 508, 513, 513 n.2, 516–17 (5th Cir. 1998); *see also Hanson*, 351 U.S. at 232 (citing *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 198–99, 204 (1944))

The RLA transforms Southwest and Local 556 into government actors. "The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction." *Hanson*, 351 U.S. at 232. In *Shea*, Southwest employees subject to the RLA brought an action against the company's union challenging the union's procedure requiring them to object annually in writing, in order to opt out of full union membership. The Fifth Circuit "invoke[d] the protections of the First Amendment" and held that the union's requirements violated the employees' First Amendment rights. The Fifth Circuit declared that "there is sufficient state action to implicate the First Amendment in RLA cases because the RLA expressly states that it supersedes state law, and hence federal law is the authority through which private rights are lost." 154 F.3d at 513 n.2, 516-17 (citing *Hanson*, 351 U.S. 225). Accordingly, the Constitution protects Carter's First Amendment right to resign from the union and object to nonchargeable union expenses.

22

Just as First Amendment scrutiny is warranted for objection procedures, First Amendment scrutiny is likewise necessary to protect employees from retaliation for exercising their First Amendment resignation and objection rights. *See Lutz v. Machinists*, 121 F. Supp.2d 498, 505 (E.D. Va. 2000) (finding that state action that forces an employee to pay a union agency fee also warrants "First Amendment scrutiny of the procedures for asserting the objection …because these procedures have the potential for abridging the First Amendment objection right."); *Ellis v. W. Airlines, Inc.*, 652 F. Supp. 938 (S.D. Cal. 1986); *Crawford v. Air Line Pilots*, 992 F.2d 1295, 1301 (4th Cir. 1993) (en banc), cert. denied, 510 U.S. 869 (1993). Pursuant to its authority under the RLA, Southwest enforces and subjects Carter to a "union security clause" in its collective bargaining agreement with Local 556. FAC at ¶ 11-12, 96.

Contrary to Southwest's suggestions, Carter's Complaint sets forth factual allegations supporting that Southwest was transformed into a government actor under the RLA when it deprived her of First Amendment rights. *See* SWA Br. at 20. Carter's Complaint demonstrates that the RLA was the source of Southwest's power and authority by which Carter's private rights to be free from retaliation for exercise of their First Amendment rights was lost or sacrificed. *Hanson*, 351 U.S. at 232. Acting in concert in accordance with the bargaining agreement, Southwest and Local 556 subject Carter to the union security clause. *See Masiello v. U.S. Airways, Inc.*, 113 F. Supp. 2d 870, 875 (W.D.N.C. 2000) ("The enforcement of a 'union security agreement' under the Railway Labor Act, Section 2 Eleventh, 45 U.S.C. § 152 Eleventh, is governed not only by the RLA, but also by the United States Constitution, since it is considered to be governmental action.").

Vested with governmental authority by the RLA, Southwest engaged in "state action" and "acted under color of federal law" when it interfered with and violated Carter's rights to

resign and to object by retaliating against her for exercising those rights. Carter's Complaint alleges that Southwest terminated Carter in part for her political activities as a union nonmember and objector, having invoked her rights with respect to the enforcement of the "union security" clause, and thus implicating the company's federally-conferred authority and obligations under the RLA. Carter's rights were lost and sacrificed when Southwest terminated her, in part, for her nonmember, objector status.

As an employee subject to the federal power conferred on Southwest, Carter is entitled to First Amendment protections even though she is an employee of a private company. *See Ellis*, 652 F. Supp. 938; *Crawford*, 992 F.2d at 1301; SWA Br. at 20. Southwest misses the point when it asserts, "[T]he requirement for financial support of the [union] … by all who receive the benefits of the work … does not violate either the First or the Fifth Amendments." SWA Br. at 21 (quoting *Hanson*, 351 U.S. at 238). What Southwest fails to recognize is that the U.S. Supreme Court subsequently held that requiring nonmember objectors, like Carter, to support a union's political activities or ideological causes ***does*** violate the First Amendment. *See Ellis v.*, 466 U.S. at 447; *Ry. Clerks v. Allen*, 373 U.S. 113 (1963); *Int'l Ass'n of Machinists v. St.*, 367 U.S. 740 (1961). *See also Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977). "But by allowing the union shop at all, we have already countenanced a significant impingement on First Amendment rights. The dissenting employee is forced support financially an organization with whose principles and demands he may disagree." *Ellis*, 466 U.S. at 455.[14] Thus, it is not "immaterial" that Carter is compelled "to pay statutorily and CBA-authorized agency fees." SWA Br. at 20-21. On the contrary, the U.S. Supreme Court recognizes that this requirement is a federally-sanctioned impingement on employees' constitutional rights. *See Hanson*, 351 U.S. at 232 ("If

---

[14] *See id.* ("To be required to help finance the union as a collective-bargaining agent might well be thought … to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit.") (quoting *Abood*, 431 U.S. at 222.

private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded.") (citing *Smith v. Allwright*, 321 U.S. 649, 663 (1944)). For that reason, Southwest's termination of Carter for her political activities as a union nonmember and objector, implicates its federally-conferred authority and obligations under the RLA, and thus constitutes government action coercive of Carter's constitutional rights.

## CONCLUSION

For the foregoing reasons, Southwest's Motion to Dismiss should be DENIED.


Dated: November 14, 2017                    Respectfully submitted,


                                            s/ Jason E. Winford (*with permission*)
                                            David E. Watkins
                                            Texas Bar No. 20922000
                                            *dwatkins@jenkinswatkins.com*
                                            Jason E. Winford
                                            Texas Bar No. 00788693
                                            *jwinford@jenkinswatkins.com*
                                            JENKINS & WATKINS, P.C.
                                            4300 MacArthur Avenue, Suite 165
                                            Dallas, Texas 75209
                                            Tel: 214-378-6675
                                            Fax: 214-378-6680

                                            s/ Matthew B. Gilliam
                                            Mathew B. Gilliam (*pro hac vice filed*)
                                            New York Bar No. 5005996
                                            *mbg@nrtw.org*
                                            Jeffrey D. Jennings (*pro hac vice filed*)
                                            Virginia Bar No. 87667
                                            *jdj@nrtw.org*
                                            c/o National Right to Work Legal Defense
                                            Foundation, Inc.
                                            8001 Braddock Road, Suite 600
                                            Springfield, Virginia 22160
                                            Tel: 703-321-8510
                                            Fax: 703-321-9319

                                            *Attorneys for the Plaintiff*

25

<u>**CERTIFICATE OF SERVICE**</u>

On the 14th day of November, 2017, I electronically submitted the foregoing document with the Clerk of Court for the United States District Court, Northern District of Texas, using the electronic case files system ("ECF") of the Court, in compliance with this Court's Standing Order Designating Case for Enrollment in the Electronic Case Filing System "CM/ECF." Delivery of the notice of electronic filing that is automatically generated by ECF constitutes service under Fed. R. Civ. P. 5(b)(2)(D) on each party who is a registered user of ECF. Local Rule 5.1(d). I hereby certify that I have served all counsel electronically or by another manner authorized by the Federal Rule of Civil Procedure 5(b)(2).

s/ Matthew B. Gilliam