UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | |
| TRANSPORT WORKERS UNION OF | ) | 3:17-cv-02278-B |
| AMERICA LOCAL 556, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF MOTION TO DISMISS PURSUANT TO
FRCP 12(b)(1) AND 12(b)(6)**

Defendant Southwest Airlines Co. ("Southwest") submits this Reply in Support of its Motion to Dismiss Plaintiff Charlene Carter's ("Plaintiff" or "Carter") First Amended Complaint ("FAC") Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## I.     INTRODUCTION

At its essence, Carter's response to Southwest's motion articulates two central arguments. First, Carter contends that this Court has subject matter jurisdiction over her Railway Labor Act claims ("RLA") (45 U.S.C. §§ 152 Third & Fourth) because she alleges an independent statutory violation (*i.e.*, interference with alleged speech rights under the RLA) that is not rooted in a collective bargaining agreement ("CBA") or related documents and policies.  Second, Carter contends that the five-year gap between her commencement of the alleged protected activities and her termination does not negate the requisite causal nexus for her retaliation claim.  Each of these arguments is unavailing.

Carter makes general references to her allegedly protected RLA speech rights.  However, she fails to identify any case concluding that communications like those at issue here are protected under the RLA such that their alleged infringement confers subject matter jurisdiction on a federal court.  In fact, the law suggests that graphic communications like Carter's lose any protection they arguably otherwise had.  Even if Carter had a statutory RLA retaliation claim (she does not), it would fail because of the gap between the time she commenced the protected activity and her termination.

For the reasons Southwest set forth in its initial motion and as discussed herein, the Court should dismiss each of Plaintiff's claims with prejudice.[1]

---

[1] Carter characterizes Southwest's discussion of the duty of fair representation claim ("DFR") as a red herring. While Southwest understands that Carter does not bring the DFR claim against it, Southwest nevertheless discussed

## II.  ARGUMENT

### A.  The Documents Southwest Submitted Are Appropriate For Judicial Consideration

Plaintiff properly concedes that the Court is entitled to consider documents beyond the four corners of the FAC in evaluating Southwest's jurisdictional challenge under Rule 12(b)(1). While Carter does not contest the veracity of the CBA and related documents, she suggests that the Court is prohibited from considering them in evaluating Southwest's Rule 12(b)(6) motion.

While Southwest believes that would be of little ultimate consequence, it wishes to emphasize that the Court is entitled to consider documents incorporated in the FAC and that are subject to judicial notice.  "A document is 'incorporated in the complaint' if the plaintiff refers to the document in the complaint." *Heflin v. Select Portfolio Servicing, Inc.*, 2013 WL 4532666, *2 (N.D. Tex. Aug. 1, 2013).  Separately, courts are free to take judicial notice collective bargaining agreements.  *See Williams v. Winco Holdings, Inc.*, 2016 WL 3648967, *1 (E.D. Cal. July 7, 2016) ("The court may take judicial notice of a CBA in evaluating a motion to dismiss … [as] such documents properly are … materials not subject to reasonable dispute[.]").

Here, Plaintiff's FAC repeatedly refers to the CBA and other materials and thereby renders them appropriate for judicial consideration.  (FAC ¶¶ 32, 62, 75, 81-82, 101-102, Exh. A).  Additionally, the content of a CBA and related workplace policies can be case dispositive in the context of RLA claims.  Consequently, the documents Southwest provided in its Appendix are appropriately before this Court.

---

the claim in its opening motion to emphasize that Carter cannot allege a "hybrid" claim.  Thus, if the Court dismisses Carter's claims as Southwest requests, it should not permit amendment to bring a hybrid action.

**REPLY IN SUPPORT OF SOUTHWEST'S MOTION TO DISMISS**                                                Page 3

### B. Carter's Claim That She is Asserting an Independent Statutory Right Is Unavailing

Carter devotes a substantial portion of her response to demonstrating that a Court may have subject matter jurisdiction over a claim brought by a CBA-covered airline employee where the claims at issue are statutory and do not require interpretation of a CBA. (*See* Doc. 34, p. 4). Of course, this is true in only very narrow circumstances. But Plaintiff's analysis puts the cart before the horse.

Plaintiff's first task is to identify a protected statutory right that was allegedly violated. In this regard, Plaintiff attempts to hang her hat on, among other things, the alleged RLA "protected right" to send years of unsolicited private messages to co-workers and fellow union members with content ranging from "GRAPHIC" photos of aborted fetuses, accusations that the recipient supports murder and is "despicable" for attending the "Women's March", declarations of one's 2016 election choice, and varied critical commentary regarding Union leadership (in both their personal and leadership capacity).[2] But the RLA does not confer the near unlimited free speech right to which Carter attempts to cling.

Indeed, courts have rejected claims that alleged interference with one's RLA "speech" right creates subject matter jurisdiction. In *Held v. Am. Airlines, Inc.*, 2007 WL 433107 (N.D. Ill. Jan. 31, 2007), the employer terminated plaintiff after a feud with the chairman of the union appeal board regarding representational and inter-union leadership issues. Specifically, the plaintiff communicated his objection to the chairman's reporting members' off-duty political speech to the employer, his "abuse of the political process", and lack of attention to important

---

[2] Carter attempts to sanitize the nature of her communication to Stone by describing it as "pro-life speech." (Doc. 34, p. 18). In fact, Carter sent Stone unsolicited photos of aborted fetuses, which Carter herself had previously described as being "very graphic." This is precisely the kind of speech that results in the loss of protection. *See Held*, 2007 WL 433107, *7 (noting that under the RLA "speech … loses statutory protection if it is vulgar, offensive, abusive, or harassing").

union issues (*e.g.*, pension plan). *Id.* at *2. The court disagreed with the plaintiff's claim that his speech was independently protected under the RLA, concluding that it was a minor dispute subject to the RLA's dispute resolution process.

The *Held* court's decision is consistent with those of other federal courts, which have concluded they lack jurisdiction over claims predicated on alleged interference with RLA-protected speech rights. *See US Airlines Pilots Ass'n v. U.S. Airways, Inc.*, 859 F. Supp. 2d 283, 306 (E.D.N.Y 2012) (court did not have jurisdiction even where plaintiff alleged that employer threatened employees with "termination for engaging in speech and other lawful activities to improve working conditions and safety"; adopted policies restricting employees' "right to wear and display union-associated insignia" and (c) … "render[ed] ineffectual the grievance an arbitration process."); *Ass'n of Flight Attendants v. Horizon Air*, 280 F.3d 901, 904 (9th Cir. 2002) (court lacked subject matter jurisdiction where plaintiffs claimed "a statutory right under Section 152 of the RLA to wear an AFA union pin while on duty").

Plaintiff attempts to distinguish *Held* based on the content of the speech at issue but in doing so, mischaracterizes the decision's import. Contrary to Carter's contention, the communication in *Held* was not "nothing more than offensive words." (Doc. 34, p. 21). It specifically related to the conduct of union leadership vis-à-vis its members and the employer, and the lack of attention on issues such as the pension plan. *See Held*, 2007 WL 433107, *2. Additionally, Carter's attempt to separate the speech in *Held* from her own based on the degree of vulgarity and the resulting loss of RLA speech protection also falls flat. (Doc. 34, p. 21).

While the *Held* court noted that speech can lose protection, that was not the basis for its decision regarding the plaintiff's RLA claim. Prior to addressing the "loss of protection," the court concluded that any remedy for "discriminatory termination based on union organizing

activity … extends only to members of unions that have not yet been certified[.]" *Held*, 2007 WL 433107, *6. Accordingly, the plaintiff's claim was a minor dispute and subject to mandatory arbitration. *Id.*

The decision in *Held* is consistent with three key RLA principles, all of which command arbitration in this case. First, the RLA is principally directed to protecting the right of unrepresented employees. *See TWA, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989) ("[W]e have viewed [the RLA] as addressing primarily the precertification rights and freedoms of unorganized employees."). Second, "controversies involving disciplinary matters are 'minor disputes' within the exclusive jurisdiction of the Adjustment Boards." *Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists*, 915 F.2d 43, 50 (1st Cir. 1990). Finally, Section 152, Third – which prohibits employer interference with employees' choice of union representatives – is incorporated into a CBA and thus such claims are generally subject to arbitration. *See United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 814 (2d Cir. 2009) ("[P]ursuant to § 152 Eighth, § 152 Third is made a part of the contract of employment between the carrier and each employee … A board therefore acts within its jurisdiction by interpreting and applying § 152 Third as if it were part of the [CBA][.]").

Carter emphasizes the Fifth Circuit's decision in *Roscello v. Sw. Airlines Co.*, 726 F.2d 217 (5th Cir. 1984) in support of her "independent statutory right" theory. However, *Roscello* does not do the heavy lifting Carter's claims demand. In *Roscello*, the court exercised jurisdiction over a plaintiff's wrongful termination claim predicated on the employer's alleged retaliation in response to the plaintiff's union organizing efforts. However, Carter omits a number of critical facts from her discussion of this case.

First, the plaintiff in *Roscello* "had no collective bargaining representative at the time" he was organizing on behalf of the Teamsters union (*i.e.*, his organizing efforts were *pre-certification*).  See *Roscello*, 726 F.2d at 219.  Rather, the employer recognized a different union without an election after the plaintiff's organizing effort and terminated the plaintiff five days later.  *Id.*  Second, while a union was recognized, the plaintiff in *Roscello* was not subject to a CBA at the time of his termination.  *Id.* at 219 n.1.  This is critical, as courts are slightly more inclined to exercise jurisdiction pre-contract than they are with respect to claims like Carter's, which arose *after* a CBA was ratified.  *See Pinnacle Airlines, Inc. v. Nat'l Mediation Bd.*, 2003 WL 23281961, *3 (D.D.C. Nov. 5, 2003) ("[P]ost-certification judicial intervention is more often appropriate before a collective bargaining agreement is in place, when non-judicial remedies are more limited.").  Finally, the court noted that "[t]he parties d[id] not question whether the plaintiff ha[d] a private right of action for wrongful discharge under the [RLA]." *Roscello*, 726 F.2d at 220 n.2.  Thus, the court did not make any broad pronouncements regarding alleged free speech rights under the RLA.  Rather, it simply "assume[d] without deciding that plaintiff [] properly stated a claim."  *Id.*  None such facts are present here.

Carter is not engaged in *pre-certification* union organizing or attempting to certify an alternative union.[3]  Rather, Carter is attempting to improperly enlist the Court in her five-year-long intra-union squabble.  *See Renneisen v. Am. Airlines, Inc.*, 990 F.2d 918 (7th Cir. 1993) (The RLA "was not designed to give minority groups within a union a cause of action against their employer when they cannot persuade their own union to take actions they deem to be in the union's best interest.").

---

[3] The fact that Carter is merely battling with rather than seeking to replace her union distinguishes this case from *Fennessy v. Sw. Airlines*, 91 F. 3d 1359 (9th Cir. 1996) (Plaintiff alleged termination "in retaliation for his having engaged in activities to replace ROPA with a Teamsters representative").

**REPLY IN SUPPORT OF SOUTHWEST'S MOTION TO DISMISS**　　　　　　　　　　Page 7

Given the absence of *any* authority adopting the rule Carter advocates – namely, that an employee has an unfettered RLA right to communicate personal and union-related disputes to union officials – her "independent statutory right" theory of this Court's jurisdiction fails.[4] Carter's claims turn on the interpretation of the CBA and related documents such as the CBA's just cause provision, the CBA's flight attendant compensation system, the Southwest Mission Statement, the Workplace Bullying and Hazing Policy, the Social Media Policy, and the Sexual Harassment, Discrimination, and Retaliation Policy. (*See* Doc. 29, pp. 12-13). Carter hotly contests the scope and application of these policies, particularly those referenced in Carter's termination letter. (*See* FAC ¶¶ 80-83). That simply underscores the fact that Carter's claim is appropriately addressed in the RLA's minor dispute resolution process, as evidence by the fact that she filed a grievance challenging her termination under these CBA terms and company policies. *See Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 307 ("Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement.").

C.  **Plaintiff Misrepresents the Timing of Plaintiff's Alleged "Protected Activity" and the Import of Her Union-Related Complaints**

To create a false impression of a causal connection between Carter's union-related commentary and her termination, Carter argues that Southwest terminated her employment "one month after" she engaged in the alleged protected activity. (Doc. 34, pp. 16-17). It is true that Plaintiff did object to the Union's conduct and sent private messages to Audrey Stone in the month prior to her termination. More importantly, however, it is undisputed that Carter publicly

---

[4] The absences of an independent right makes Carter's case readily distinguishable from those where the plaintiff's claim is rooted in a clearly-defined statutory right (*e.g.*, Title VII) the resolution of which does not require CBA interpretation. *See Carmona v. Sw. Airlines Co.*, 536 F.3d 344 (5th Cir. 2008) (in context of Title VII and ADA case, emphasizing that "there is no disagreement about how to interpret the[] provisions of the CBA").

objected to the Union and its leadership for *approximately five years prior to her termination*. (*See* FAC ¶¶ 13-16, 18).  Similarly, Carter admits she sent Stone unsolicited private Facebook messages *since early 2015*.  (*Id.* at ¶¶ 28, 40).  Carter engaged in these activities without retribution from Southwest or complaints from Stone.  *See generally Chhim v. Univ. of Texas*, 2016 WL 154142, *5 (W.D. Tex. Jan. 11, 2016) (dismissing retaliation claim because adverse action "occurred almost two years after he alleges he filed his first complaint … and three months after the alleged [second] complaint.  Such a delay between the protected activity and adverse employment action refutes any causal link between the two events.").[5]  The time between the commencement of Carter's protected activities and termination rebuts a required element of Plaintiff's retaliation claim.

### D.     Plaintiff's First and Fifth Amendment Are Not Cognizable Against Southwest

With respect to the First and Fifth Amendment-based count, Carter states uncontroversial legal points, yet from that base she draws far-reaching and unjustified conclusions.  To start with, Southwest agrees that employees have a First Amendment right to "opt-out" of paying for certain non-collective-bargaining-related costs expenses.  *See Shea v. Int'l Ass'n of Machinists and Aerospace Workers*, 154 F.3d 508 (5th Cir. 1998).  Indeed, Carter did just that over four years ago without incident.  (FAC ¶ 19).

Moreover, an employee can bring a claim against a union based on its charging of improper expenses or related deficiencies.  However, it remains the case that the requirement to

---

[5] Carter suggests that emphasizing the history of Plaintiff's interactions with Stone is an improper invitation for the Court to make a factual determination.  (See Doc. 34, p. 14 n. 9).  That is not the case.  Carter's allegations and reasonable inferences therefrom are directly relevant to whether Carter satisfied the plausibility pleading standard.  *See Shroyer v. New Cingular Wireless Servs., Inc.,* 622 F.3d 1035, 1041 (9th Cir. 2010) (To survive a motion to dismiss, plaintiff must "state a facially plausible claim to relief.").

**REPLY IN SUPPORT OF SOUTHWEST'S MOTION TO DISMISS**                                   **Page 9**

pay agency fees does not – standing alone – violate an employee's rights under the First and Fifth Amendments. *See Ry. Employees v. Hanson*, 351 U.S. 225, 238 (1956).

While Carter appears to object to certain Union political activities, she fails to articulate a basis for liability against *Southwest* based on those expenditures. Instead, Carter makes unjustified leaps of law and logic to concoct a claim that does not exist. For example, Carter contends that because a union cannot create an excessively cumbersome "objection" procedure, she has a retaliation claim against Southwest based on her decision to opt out. (*See* Doc. 34, p. 23). Carter cites no authority on point for this proposition, nor does she identify any facts suggesting Southwest retaliated against her based on her decision to resign her union membership four years ago.

In the end, Carter spends three pages reciting that the payment of union dues can implicate the First and Fifth Amendments. However, Carter fails to identify a recognized legal theory for the radical proposition she puts forward; namely, that Carter – a non-union member – has unlimited First Amendment rights vis-à-vis Southwest simply because it is a signatory to CBA. Given the complete lack of authority supporting Carter's theory that a non-governmental actor like Southwest may be liable for violating the First and Fifth Amendments, her claims should be dismissed.

### III. CONCLUSION

As Southwest set forth in its opening motion, Carter's claims are minor disputes under the RLA, relate directly to the terms of the CBA and incorporated documents, and belong exclusively in the arbitral forum. Therefore, Southwest respectfully requests that the Court dismiss all of Carter's claims with prejudice.

Dated:  November 28, 2017	Respectfully submitted,

By: */s/ Jonathan E. Clark*
Jonathan E. Clark
Texas Bar No. 24069515
jclark@polsinelli.com
2950 N. Harwood Street, Suite 2100
Dallas, Texas  75201
Telephone:  214.397.0030
Facsimile:  214.397.0033

Michele Haydel Gehrke *Admitted Pro Hac Vice*
California State Bar No. 215647
mgehrke@polsinelli.com
Three Embarcadero, Suite 2400
San Francisco, CA 94111
Telephone:  415-248.2100
Facsimile:  415.248.2101

**ATTORNEYS FOR DEFENDANT SOUTHWEST AIRLINES CO.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon counsel for Plaintiff via the U.S. District Court, Northern District's CM/ECF system on November 28, 2017.

By: */s/ Jonathan E. Clark*
Jonathan E. Clark