**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| CHARLENE CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.** |
| | ) | |
| TRANSPORT WORKERS UNION OF | ) | **3:17-cv-02278-B** |
| AMERICA LOCAL 556, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

## SOUTHWEST AIRLINES CO.'S BRIEF IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(1) AND 12(b)(6)

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................... 1

II.     FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY ............................... 3

      A.      Plaintiff's Employment History ...................................................................... 3

      B.      Plaintiff's History of Participation in Intra-Union Disputes ........................... 3

      C.      Carter Objects to Employees Who Attended the Women's March ..................... 4

      D.      Carter Sends Harassing Social Media Messages to Stone .......................... 4

      E.      Southwest Terminates Carter's Employment ............................................... 5

      F.      The Arbitrator Denies Carter's Grievance In Its Entirety ............................... 5

      G.      Carter's Instant Lawsuit ............................................................................. 7

III.    LEGAL STANDARD ............................................................................................. 7

IV.     ARGUMENT ......................................................................................................... 8

      A.      The Binding Arbitration Award Refutes Essential Elements of Carter's
               Claims ........................................................................................................ 8

      B.      This Court Lacks Jurisdiction Because Carter's Claims Are "Minor
               Disputes" (Counts I, II, IV, V) .................................................................... 10

      C.      Carter Has Failed to Plead Anti-Union Animus and Protected Activity
               Necessary to Support Her RLA Claims (Counts I and II) .......................... 16

      D.      Carter's Retaliation Claims Fail Because She Has Not Alleged the
               Requisite Causal Nexus (Counts I, II and IV) .......................................... 17

      E.      Carter Forfeited Any Alleged RLA Speech Protections By Sending
               Unsolicited Graphic Messages to a Co-Worker (Counts I, II, IV) ............ 19

      F.      Carter Cannot Predicate a Claim Against Southwest – a Private Company
               – On Alleged Constitutional Violations (Count IV) ................................... 20

      G.      Carter Fails to State a Title VII Religious Discrimination Claim .................. 21

V.      CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Line Pilots Ass'n v. Guilford Transp. Indus.*,
  399 F.3d 89 (1st Cir. 2005)..................................................................11

*Al-Jabery v. Conagra Foods*,
  2007 WL 3124628 (D. Neb. Oct. 24, 2007) ..........................................23

*Amarsingh v. Jetblue Airways Corp.*,
  409 Fed. Appx. 459 (2d Cir. 2011).......................................................17

*Ambraco, Inc. v. Bossclip B.V.*,
  570 F.3d 233 (5th Cir. 2009) ..................................................................7

*Andrews v. Louisville & Nashville R.R. Co.*,
  406 U.S. 320 (1972)...............................................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................7

*Averett v. Honda of Am. Mfg., Inc.*,
  2010 WL 522826 (S.D. Ohio Feb. 9, 2010)...........................................24

*Beckett v. Atlas Air, Inc.*,
  968 F. Supp. 814 (E.D.N.Y. 1997) ........................................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................7

*Bhd. Of Locomotive Engineers v. Kansas City S. Ry.*,
  26 F.3d 787 (8th Cir. 1994) ...................................................................16

*Bhd. of Maint. of Way Emp. v. Norfolk S. Ry. Co.*,
  745 F.3d 808 (7th Cir. 2014) .................................................................11

*Bowcock v. Cont'l Airlines, Inc.*,
  432 Fed. Appx. 343 (5th Cir. 2011).........................................................7

*Chalmers v. Tulon Co. of Richmond*,
  101 F.3d 1012 (4th Cir. 1996) ..........................................................23, 24

*Chhim v. Univ. of Texas*,
  2016 WL 154142 (W.D. Tex. Jan. 11, 2016) ........................................18

*Consol. Rail Corp. v. Ry. Labor Exec. Ass'n*,
    491 U.S. 299 (1989)................................................................................................12

*In re Cont'l Airlines Corp.*,
    901 F.2d 1259 (5th Cir. 1990) ...............................................................................19

*CSX Transp., Inc. v. Bhd. of Maint.*,
    327 F.3d 1309 (11th Cir. 2003) ..............................................................................12

*DaimlerChrysler Corp.*,
    344 NLRB 1324 (2005) ...........................................................................................19

*Day v. Moscow*,
    955 F.2d 807 (2d Cir. 1992)......................................................................................8

*Dingeldey v. VMI-EPE-Holland B.V.*,
    2016 WL 6273235 (W.D.N.Y. Sept. 28, 2016) .......................................................21

*Dotson v. Norfolk S. R.R. Co.*,
    52 Fed. Appx. 655 (6th Cir. 2002) (per curiam) ....................................................14

*Elgin, J. & ER Co. v. Burley*,
    325 U.S. 711 (1945) ................................................................................................11

*Elhassan v. Proctor & Gamble Mfg. Co.*,
    2014 WL 1281231 (N.D.N.C. Mar. 27, 2014)........................................................24

*Fry v. Airline Pilots Ass'n, Int'l*,
    88 F.3d 831 (10th Cir. 1996) ..................................................................................12

*Gautier v. Celanese*,
    143 F. Supp. 3d 429, 433 (W.D. Va. 2015) ..............................................................8

*Greenblatt v. Drexel Burnham Lambert, Inc.*,
    763 F.2d 1352 (11th Cir. 1985) ..............................................................................10

*Grimes v. BNSF Ry. Co.*,
    746 F.3d 184 (5th Cir. 2014) ................................................................................8, 9

*Hall v. Sky Chefs, Inc.*,
    784 F. Supp. 2d 811 (E.D. Mich. 2011)..................................................................24

*Hawaiian Airlines, Inc. v. Norris*,
    512 U.S. 246 (1994)................................................................................................11

*Held v. Am. Airlines, Inc.*,
    2007 WL 433107 (N.D. Ill. Jan. 31, 2007) .....................................................*passim*

*Home Builders Ass'n of Miss., Inc. v. City of Madison*,
  143 F.3d 1006 (5th Cir. 1998) ................................................................................7

*Honda of Am. Mfg., Inc.*,
  334 NLRB 746 (2001) ...........................................................................................20

*Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*,
  789 F.2d 139 (2d Cir. 1986)........................................................................13, 14, 15

*Int'l Bhd. of Teamsters v. United Parcel Serv. Co.*,
  447 F.3d 491 (6th Cir. 2006) ................................................................................16

*Johnson v. Express One Int'l, Inc.*,
  944 F.2d 247 (5th Cir. 1991) ................................................................................17

*Johnson v. McDonald*,
  623 Fed. Appx. 701 (5th Cir. 2015)......................................................................18

*Lamont v. United States*,
  613 F. Supp. 588 (S.D.N.Y. 1985) .........................................................................8

*Laney v. Ohio Dep't of Youth Servs.*,
  448 Fed. Appx. 553 (6th Cir. 2011)......................................................................22

*Lee v. Kansas City S. Ty. Co.*,
  574 F.3d 254 (5th Cir. 2009) ................................................................................25

*Lee v. Norfolk S. Ry. Co.*,
  912 F. Supp. 2d 375 (W.D.N.C. 2012) .................................................................14

*Leiser Constr., LLC*,
  349 NLRB 413 (2007) ......................................................................................19, 20

*Lloyd Corp. v. Tanner*,
  407 U.S. 551 (1972)...............................................................................................21

*Local 591 v. Am. Airlines, Inc.*,
  2015 WL 3852958 (N.D. Ill. June 19, 2015) .........................................................7

*Machinists v. Nw. Airlines, Inc.*,
  673 F.2d 700 (3d Cir. 1982)..................................................................................16

*Media Gen. Ops., Inc. v. NLRB*,
  394 F.3d 207 (4th Cir. 2005) ................................................................................19

*Monroe v. Missouri Pac. R.R. Co.*,
  115 F.3d 514 (7th Cir. 1997) ................................................................................14

*Moss v. Norfolk W. Ry. Co.*,
2003 WL 21817127 (E.D. Mich. July 22, 2003) ................................................................14

*Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists*,
915 F.2d 43 (1st Cir. 1990) ................................................................12

*Parker v. Am. Airlines, Inc.*,
2008 WL 2811320 (N.D. Tex. July 22, 2008) ................................................................14

*Perry v. Univ. Med. Staffing, Inc.*,
62 F. Supp. 3d 666, 671 (W.D. Mich. 2014) ................................................................24

*Peterson v. Hewlett-Packard Co.*,
358 F.3d 599 (9th Cir. 2004) ................................................................23

*Phillips v. United Parcel Serv.*,
2011 WL 2680725 (N.D. Tex. June 21, 2011) ................................................................18

*Pollak v. Lew*,
2013 WL 1194848 (S.D. Tex. Mar. 22, 2013) ................................................................24

*Ramming v. United States*,
281 F.3d 158 (5th Cir. 2001) ................................................................7

*Renneisen v. Am. Airlines, Inc.*,
990 F.2d 918 (7th Cir. 1993) ................................................................15, 17

*Ry. Employees v. Hanson*,
351 U.S. 225 (1956) ................................................................21

*Sacred Heart Med. Ctr.*,
347 NLRB 531 (2006) ................................................................20

*Stolley v. Lockheed Martin Aeronautics Co.*,
228 Fed. Appx. 379 (5th Cir. 2007) ................................................................23

*Sw. Bell Tel. Co.*,
200 NLRB 667 (1972) ................................................................20

*Tremont LLC v. Halliburton Energy Servs., Inc.*,
696 F. Supp. 2d 741 (S.D. Tex. 2010) ................................................................8

*TWA, Inc. v. Indep. Fed'n of Flight Attendants*,
489 U.S. 426 (1989) ................................................................10, 11, 16

*U.S. Airlines Pilots Ass'n v. U.S. Airways, Inc.*,
859 F. Supp. 2d 283 (E.D.N.Y. 2012) ................................................................14

*United Transp. Union v. Nat'l R.R. Passenger Corp.*,
   588 F.3d 805 (2d Cir. 2009) ................................................................12

*Walker v. S. Ry. Co.*,
   385 U.S. 196 (1966) ....................................................................11, 12

*Warren v. Shaw Group, Inc.*,
   825 F. Supp. 2d 1052 (D. Nev. 2011) ................................................22

*Weber v. Roadway Exp., Inc.*,
   199 F.3d 270 (5th Cir. 2000) ........................................................21, 22

*Wilson v. U.S. West Commc'ns*,
   58 F.3d 1337 (8th Cir.1995) ..............................................................23

**Statutes**

45 U.S.C. § 151a ..................................................................................11

45 U.S.C. §§ 152 ..........................................................................*passim*

45 U.S.C. § 153, First (m) ....................................................................15

National Labor Relations Act ................................................13, 17, 19

Railway Labor Act ........................................................................*passim*

Title VII ......................................................................................*passim*

**Other Authorities**

Fed. R. Civ. Proc. 12(b)(1) ....................................................................7

Fed. R. Civ. Proc. 12(b)(6) ..........................................................7, 8, 10

# I.      INTRODUCTION

Charlene Carter ("Carter") is a former Southwest Airlines Co. ("Southwest" or "Company") Flight Attendant.  On March 14, 2017, Southwest terminated Carter's employment for violating various Southwest policies related to social media, harassment, and bullying.  Carter contested her termination in arbitration.  On April 26, 2018, a neutral arbitrator concluded that: (1) Southwest had just cause to terminate Carter's employment; (2) Southwest did not treat Carter less favorably than similarly situated employees; and (3) Carter violated numerous Southwest policies that warranted termination.  Despite having presented her claims to the arbitrator, Carter reasserts them here, styled as Railway Labor Act ("RLA"), Constitutional, and Title VII claims.  However, Carter's Second Amended Complaint ("SAC") comes up short.

Since 2012, Carter has engaged in a public dispute with Transport Workers Union of America, Local 556 ("Local 556" or "Union") leadership regarding a variety of intra-union matters.  In recent years, Carter began directing her ire to Audrey Stone ("Stone"), fellow Flight Attendant and former Union President.    In 2015, Carter began sending unsolicited messages to Stone's Facebook account objecting to her performance as Union President.  Stone never responded to Carter's messages.  Nevertheless, Carter persisted and did so without incident.

In 2017, Carter became incensed by Stone's and other Union members' participation in the Washington, D.C. Women's March ("Women's March"), supposedly because Planned Parenthood sponsored the march.  Upon learning of their participation, Carter sent additional messages to Stone's private Facebook account.  This time, Carter's messages included **graphic images (and videos) of aborted fetuses, individuals wearing costumes depicting female genitalia, and statements that Stone supported murder.**  Stone reported Carter's messages to the Company.  After an investigation, Southwest terminated Carter's employment.

Carter filed a grievance challenging her termination. The Union represented Carter during the grievance process and negotiated a settlement with Southwest offering Carter reinstatement as a Flight Attendant. Carter declined the offer, retained separate counsel and proceeded to arbitration. As noted above, the arbitrator denied Carter's grievance in its entirety. In doing so, the arbitrator conclusively resolved critical issues in this litigation.

Despite the arbitrator's decision, Carter persists. In the SAC, Carter purports to state four counts against Southwest for: (1) retaliation under the RLA (45 U.S.C. §§ 152 Third & Fourth); (2) maintenance and overbroad application of Company policies in violation of the RLA (*id.*); (3) retaliation based on the First and Fifth Amendments of the United States Constitution; and (4) religious discrimination in violation of Title VII.[1]

As set forth below, the Court should dismiss Carter's SAC against Southwest based on the arbitrator's binding factual determinations, which negate necessary elements of Carter's claims. The Court should also dismiss Carter's claims based on lack of jurisdiction because they are post-certification "minor disputes" and are thus preempted. Even if the Court finds no jurisdictional defect, dismissal remains appropriate because Carter has failed to state a claim against Southwest. Specifically, (1) Carter has not alleged sufficient facts to state post-certification RLA claims; (2) Carter has not alleged the requisite causal nexus for her retaliation claims; (3) the inflammatory nature of Carter's messages to Stone caused them to lose any alleged protection under federal labor law; (4) Carter cannot predicate a retaliation claim against Southwest on the First and Fifth Amendments because Southwest is a private employer; and (5) Carter's religion did not exempt her from application of Southwest's harassment, social media, and related policies.

---

[1] Carter also brings a duty of fair representation claim against Local 556.

## II.     FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

### A.     Plaintiff's Employment History

Carter is a former Southwest Flight Attendant.  Southwest terminated her employment in March 2017 for sending unsolicited graphic and harassing messages to a fellow employee in violation of Southwest's policies regarding bullying, social media, and harassment. (SAC ¶¶ 11, 69-70; dkt. no. 30, Exhs. B–D [App. 7-13]).  Local 556 served as Carter's exclusive bargaining representative throughout her tenure.  (*See* SAC ¶¶ 10, 12).  At the time of her termination, Carter was subject to a Collective Bargaining Agreement ("CBA") between Southwest and Local 556.  (*Id.* at ¶ 12; dkt. no. 30, Exh. E [App. 14-256]).

### B.     Plaintiff's History of Participation in Intra-Union Disputes

Carter has been involved in a well-publicized dispute with Union leadership for over five years.  (*See* SAC ¶¶ 14-20).  The dispute began in 2012, when the Union membership elected Carter's preferred slate of candidates to the Local 556 Executive Board.  (*Id.*).  In spring of 2013, the Union suspended two of the elected Board Members for disciplinary infractions, and elevated Stone (also a Southwest Flight Attendant) to replace a suspended Board Member as President of Local 556.  (*Id.* at ¶ 15).  In July 2013, Carter began vocally objecting to the Board's actions on Facebook and at Union meetings.  (*Id.* at ¶¶ 17-24).  In September 2013, Carter resigned her Union membership and became an agency fee paying non-member. [2]  (*Id.* at ¶¶ 17, 20)

After Stone became Local 556's President[3], Carter commenced a relentless campaign against the Union Board.  Not only did Carter lodge objections at Union meetings, she made public Facebook posts disparaging the Union and its leadership throughout 2013 and 2014.  (*Id.*

---

[2] An agency fee paying non-member is the minimum level of support an airline employee can be compelled to provide a union under the RLA.
[3] In March 2015, Stone was formally elected President of Local 556.  (SAC ¶ 30).

at ¶¶ 17-25).  In early 2015, Carter began sending private Facebook messages to Stone criticizing her and the Union.  (*Id.* at ¶¶ 42).  Stone did not respond to these messages.  (*Id.*).

C.     **Carter Objects to Employees Who Attended the Women's March**

On January 21, 2017, Stone and other Southwest Flight Attendants attended the Women's March.  (*Id.* at ¶ 35).  Carter ridiculed the Union and the individual participants on Facebook because Planned Parenthood sponsored the event.  (*Id.* at ¶¶ 39-45).  On February 6, 2017, Carter posted a link on Facebook supporting a campaign to recall Stone.  She also posted a link regarding a lawsuit against Local 556 and remarked on the Union's alleged corruption. (*Id.* ¶ 44).

D.     **Carter Sends Harassing Social Media Messages to Stone**

By February 2017, Carter had spent over four years publicly objecting to the Union's conduct and Stone's leadership, and approximately two years sending unsolicited messages to Stone's private Facebook account criticizing her performance as Union President.  Stone never complained to Southwest and Southwest never disciplined Carter for her behavior.  But in 2017, the nature of Carter's messages to Stone drastically changed.

On February 14, 2017, Carter sent Stone five private Facebook messages.  These messages contained graphic images and videos of aborted fetuses, individuals wearing costumes that depicted female genitalia, and the accusation that Stone supported murder.  (*Id.* at ¶¶ 45-47, Exh. A).  Carter knew the images were disturbing at the time she sent them.  Just one week earlier, Carter described one of the videos she would later send to Stone as follows: "WARNING this is VERY GRAPHIC!!"  (*Id.* at ¶ 45).  Feeling threatened and harassed by Carter's private messages, Stone reported them to the Company.  Carter contends that despite tolerating years of her unsolicited messages and public criticism, Stone reported Carter because of her opposition to Local 556's leadership.  (*Id.* at ¶¶ 96-99).

**E.**     <u>**Southwest Terminates Carter's Employment**</u>

After receiving Stone's complaint, Southwest contacted Carter to schedule a fact-finding meeting. (*Id.* at ¶¶ 50-51). At the March 7, 2017 meeting, Southwest told Carter that Stone felt harassed by the messages. (*Id.* at ¶¶ 55-56, 67). Carter admitted – as she does now – that she sent the messages to Stone.  Carter claimed that she sent them because she is pro-life and wanted to dissuade others from having abortions. (*Id.* at ¶¶ 57-59).

On March 14, 2017, Southwest terminated Carter's employment for violation of Southwest's harassment, social media, and bullying policies.  Carter's termination letter states:

> On March 7, 2017, a fact-finding meeting was held with you to discuss certain messages and videos you posted on your Facebook page and sent to another Southwest Employee through Facebook Messenger. … [Y]ou admitted you posted graphic videos of aborted fetuses on Facebook and sent those same videos in a private Facebook message to another Southwest Flight Attendant.  You also admitted to sending the Flight Attendant a private message containing a picture of individuals wearing costumes depicting the female genitalia.  You agreed that the pictures and videos were graphic. … [W]hen you posted the graphic videos and pictures on Facebook, you were identifiable as a Southwest Airlines Employee and represented our Company in a manner that is disparaging to … all Southwest Employees.  These Facebook posts were highly offensive in nature, and the private messages you sent to the … Employee were harassing and inappropriate. … Southwest is obligated to address such conduct given its impact on the workplace. … [Y]our conduct is in direct violation of the Southwest Airlines Mission statement and the following Company Policies/Rules including but not limited to:
>
> - Workplace Bullying and Hazing Policy
> - Social Media Policy
>
> Your conduct could also be a violation of Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination and Retaliation. Accordingly, your employment is terminated effective March 16, 2017.

(*Id.* at Exh. A).

**F.**     <u>**The Arbitrator Denies Carter's Grievance In Its Entirety**</u>

Carter filed a grievance in response to her termination.  (Dkt. No. 30, Exh. 1, ¶ 7 [App. 3]).   Local  556  represented  Carter  in  the  grievance  process  and  negotiated  an  offer  of

reinstatement from Southwest.  (*Id.* at ¶ 9 [App. 3]).  Carter rejected the offer and insisted on proceeding to arbitration.  Carter retained her own attorneys to represent her in the arbitration.

On December 7-8, 2017, Carter and Southwest participated in a two-day arbitration before William Lemons.  (*See* Declaration of Michele Haydel Gehrke ["Gehrke Dec."], Exh. A ["Arb. Award"] [App. 4-22]).  Carter and Southwest mutually selected the arbitrator pursuant to the CBA's grievance procedure.  At the arbitration, Carter presented testimony and exhibits, made legal and factual arguments, cross examined witnesses, and submitted a post-hearing brief. The arbitrator denied Carter's grievance.  Critically, the arbitrator concluded that:

- It was "clear beyond a reasonable doubt that the Company had just cause to terminate [Carter] for the reasons it gave and in the manner it did."  (Arb. Award p. 9 [App. 12]).

- Carter violated the Social Media Policy, the Workplace Bullying and Hazing Policy, and the Harassment Policy.  (*Id.* at p. 11 [App. 14]).

- "[A]t least three of the policies [Carter] violated provide an independently sufficient basis for termination[.]"  (*Id.*).

- Carter was not "treated less favorably than others" and the circumstances surrounding her offenses were not "substantively like those of individuals who received more moderate penalties."  (*Id.* at p. 14 [App. 17]).

- "Audrey Stone reported [Carter's] conduct to the Company not to retaliate against her" but because she believed Carter "violat[ed] various policies that were applicable to her." (*Id.*).

- "Audrey Stone did not report [Carter's] conduct to the Company because of [Carter's] criticism of how the Union spent its dues money."  (*Id.*).

- Southwest "does not have a policy or practice of disciplining, or not disciplining employees based upon their view of TWU Local 556 generally, or of Audrey Stone in particular."  (*Id.*).

- "[T]he degree of discipline administered by the Company … was warranted … notwithstanding that [Carter] … had no previous disciplinary record." (*Id.* at p. 17 [App. 20]).

- Carter failed to demonstrate "disparate treatment."  (*Id.* at p. 14 [App. 17]).

## G.   Carter's Instant Lawsuit

In this lawsuit, Carter alleges that Southwest: (1) terminated her based on RLA-protected speech; (2) enforced and maintained overbroad policies that restrict RLA-protected speech; (3) terminated her based on the exercise of rights protected by the First and Fifth Amendments; and (4) discriminated against her based on her religion.[4]

## III.   LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction tests the court's statutory or constitutional power to adjudicate the case.  *See Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).  "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  When ruling on a Rule 12(b)(1) motion, "the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint[.]" *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009) (internal quotation marks omitted); *see also Local 591 v. Am. Airlines, Inc.*, 2015 WL 3852958, *7 (N.D. Ill. June 19, 2015) (looking beyond complaint to evaluate subject matter jurisdiction in RLA action).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim.  To avoid dismissal, a complaint must contain more than labels, conclusions, and a recitation of the elements of a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Factual allegations must "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

As discussed below, Carter has failed to state a claim against Southwest.  Additionally, Carter's claims constitute post-certification minor disputes over which the Court lacks jurisdiction.  *See, e.g.*, *Bowcock v. Cont'l Airlines, Inc.*, 432 Fed. Appx. 343, 346 (5th Cir. 2011).

---

[4]  Southwest and Local 556 previously filed motions to dismiss Carter's First Amended Complaint. On May 21, 2018, the Court denied the motions without prejudice so it could consider the Arbitrator's Award and Carter could add her Title VII claim.  (*See* Dkt. No. 45).

# IV.   ARGUMENT

## A.   The Binding Arbitration Award Refutes Essential Elements of Carter's Claims

"[A]rbitral proceedings can have preclusive effect even in litigation involving federal statutory and constitutional rights[.]"  *Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 188 (5th Cir. 2014); *see also Tremont LLC v. Halliburton Energy Servs., Inc.*, 696 F. Supp. 2d 741, 823 (S.D. Tex. 2010) ("[T]here is ample authority for giving preclusive effect to issues resolved in arbitration[.]").   Thus, an arbitrator's factual determinations can preclude a plaintiff from bringing federal discrimination and other statutory claims in court.  *Gautier v. Celanese*, 143 F. Supp. 3d 429, 433 (W.D. Va. 2015) ("[T]he Fifth Circuit allows courts to give preclusive effect to arbitration decisions in later federal discrimination claims").   A court can dismiss claims based on preclusion in response to a Rule 12(b)(6) motion.  *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (issue preclusion defense "may be upheld on a Rule 12(b)(6) motion").

The decision to apply issue preclusion lies in the district court's discretion.  *Grimes*, 746 F.3d at 188.  In determining whether to do so, courts must consider (a) whether "[t]he findings are within the [arbitrator's] authority and expertise;" and (b) whether the arbitration procedures "adequately protected the rights of the parties."  *Id.*

In this case, the arbitrator was particularly suited to resolve the claims and make factual determinations in the arbitration.  Not only is Arbitrator Lemons experienced, he was mutually selected by the parties to be one of several arbitrators who hear disputes under the CBA.  Courts have long recognized that labor arbitrators are well-positioned to make factual determinations and fairly resolve employee-management disputes.  *See Lamont v. United States*, 613 F. Supp. 588, 591 (S.D.N.Y. 1985) ("[I]n [] labor relations … the arbitrator would have greater expertise than a court in resolving disputes between employers and employees."); *accord Grimes*, 746 F.3d at 187 n.1 (noting "arbitrator's competence to find facts").

"As to the second prong, '[w]hen an arbitration proceeding affords basic elements of adjudicatory procedure, such as an opportunity for presentation of evidence, the determination of issues in an arbitration proceeding *should generally be treated as conclusive in subsequent proceedings*[.]'" *Grimes*, 746 F.3d at 188 (emphasis added).  Thus, where the parties to the arbitration were represented by counsel, presented evidence, made factual and legal arguments, and were permitted to examine and cross examine witnesses before a neutral arbitrator, issue preclusion is appropriate.  *See id.*  As the arbitrator's decision and the 473 page transcript demonstrate, the proceedings satisfied each of these elements.  Thus, the Court should treat the arbitrator's determinations are binding in this litigation.

Substantively, Carter and her counsel presented evidence and argument to the arbitrator, and he and rejected the essential factual predicates of Carter's claims in this litigation:

- Carter contends Southwest's stated reasons for her termination were pretextual and that her termination was unwarranted.  (*See* SAC ¶¶ 89, 109, 129).  The arbitrator concluded that Southwest had "just cause" to terminate Carter "beyond a reasonable doubt."  (Arb. Award pp. 9, 18 [App. 12, 21]).

- Carter suggests Southwest's failure to utilize progressive discipline reflects an improper motive.  (SAC ¶¶ 71, 75, 109).  The arbitrator concluded "the … discipline administered … was warranted … notwithstanding that [Carter] … had no previous disciplinary record."  (Arb. Award p. 17 [App. 20]).

- Carter contends that she was treated less favorably than other employees who engaged in misconduct on social media.  (SAC ¶¶ 72, 125).  The arbitrator concluded that she was not "treated less favorably than others" and the circumstances surrounding her offenses were not "substantively like those … who received more moderate penalties."  (Arb. Award p. 14 [App. 17]).

- Carter contends that Southwest treated employees who opposed Local 556 and Stone less favorably than those who supported them.  (SAC ¶¶ 73-74).  The arbitrator found that Southwest "does not have a policy or practice of disciplining, or not disciplining employees based upon their view of TWU Local 556 generally, or of Audrey Stone in particular."  (Arb. Award p. 14 [App. 17]).

- Carter contends that Stone reported her to Southwest because of her opposition to Stone's conduct as Union President.  (SAC ¶¶ 73-75, 105, 109).  The arbitrator found that "Stone reported [Carter's] conduct to the Company not to retaliate against her" but because she

believed Carter "violat[ed] various policies that were applicable to her." (Arb. Award p. 14 [App. 17]).

- Carter contends that Stone reported her to Southwest based on Carter's objection to the Union's expenditures. (SAC ¶ 3). The arbitrator found that "Stone did not report [Carter's] conduct to the Company because of [Carter's] criticism of how the Union spent its dues money." (Arb. Award p. 14 [App. 17]).

Stated simply, the arbitrator's findings refute Carter's alleged circumstantial evidence of an improper motive by Southwest (disparate treatment, improper motive, misapplication of policy, progressive discipline). The arbitrator's findings also undercut the factual basis of Carter's claims – *i.e.*, Southwest put its "thumb on the scale" in support of Stone and Local 556.

Because the arbitrator has resolved the essential factual predicates of Carter's claims, the Court should dismiss all of Carter's claims pursuant to Rule 12(b)(6). *See Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1359 (11th Cir. 1985) (arbitration of state claims precluded RICO action because factual findings determined the non-existence of predicate required to maintain RICO action); *Held v. Am. Airlines, Inc.*, 2007 WL 433107, *6 (N.D. Ill. Jan. 31, 2007) (dismissing RLA claims because arbitrator's decision regarding the plaintiff's termination is "final and binding").

**B.    This Court Lacks Jurisdiction Because Carter's Claims Are "Minor Disputes" (Counts I, II, IV, V)**

Section 152, Third and Fourth of the RLA protects the right of unrepresented employees to organize a union without interference by the carrier. 45 U.S.C. §§ 152, Third & Fourth. These provisions primarily address "the **precertification** rights and freedoms of unorganized employees" – *i.e.*, the period <u>before</u> a union is certified as the bargaining representative. *TWA, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989) (emphasis added). These RLA protections "extend[] only to members of unions that have not yet been certified[.]" *Held*, 2007 WL 433107, *6 (*citing TWA*, 489 U.S. at 440). As the Supreme Court noted, from its "very

first opportunity to interpret [Section 152, Third and Fourth], … [it] viewed them as addressing primarily the precertification rights and freedoms of unorganized employees." *TWA*, 489 U.S. at 440.  Accordingly, "courts … restrict their role [in post-certification disputes] lest they encroach on the alternative dispute resolution processes … at the heart of the RLA." *Air Line Pilots Ass'n v. Guilford Transp. Indus.*, 399 F.3d 89, 103 (1st Cir. 2005).

The reason for this pre-certification focus is straightforward.  Once a union is certified, the RLA "establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of … disputes."  *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).  Thus, post-certification, "judicial intervention … is limited to those cases where 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the [RLA's] statutory commands[.]" *TWA*, 489 U.S. at 441 (citations omitted).  Stated differently, Section 152, Third and Fourth "do not provide a remedy after a union has been certified except in cases of extreme anti-union bias or animus."  *Held*, 2007 WL 433107, *6.

To realize the RLA's goal of "promot[ing] stability in labor-management relations," a System Adjustment Board (*i.e.*, a grievance and arbitration process) is made the exclusive forum for resolving "minor" disputes.  *Hawaiian Airlines*, 512 U.S. at 252; *see also* 45 U.S.C. § 151a.  Minor disputes generally relate to the "meaning or proper application of a particular [CBA] provision with reference to a specific situation or to an omitted case."  *Elgin, J. & ER Co. v. Burley*, 325 U.S. 711, 723 (1945); *see also Walker v. S. Ry. Co.*, 385 U.S. 196, 198 (1966) (The RLA "compels the parties to arbitrate minor disputes" such as a "discharge grievance[.]").

"[T]he party seeking to establish that a dispute is minor and under the exclusive arbitral jurisdiction of a RLA Adjustment Board faces a 'relatively light burden.'"  *Bhd. of Maint. of Way Emp. v. Norfolk S. Ry. Co.*, 745 F.3d 808, 813 (7th Cir. 2014) (*quoting Consol. Rail Corp. v.

*Ry. Labor Exec. Ass'n*, 491 U.S. 299 (1989)).  "[I]f a reasonable doubt exists as to whether the dispute is major or minor, [courts] will deem it to be minor."  *CSX Transp., Inc. v. Bhd. of Maint.*, 327 F.3d 1309, 1321 (11th Cir. 2003).

To evaluate whether a dispute is minor, courts consider more than just the written CBA. "[C]laims are minor disputes if they depend not only on a right found in the CBAs, but also if they implicate ***practices, procedures, implied authority, or codes of conduct*** that are part of the working relationship."  *Fry v. Airline Pilots Ass'n, Int'l*, 88 F.3d 831, 836 (10th Cir. 1996) (noting a CBA is comprised of expressed provisions, industry standards, and unstated norms) (emphasis added); *see also Consol. Rail Corp.*, 491 U.S. at 312 ("The [CBA] covers the whole employment relationship.  It calls into being a new common law – the common law of a particular industry or of a particular plant.").  Similarly, Section 152, Third – which prohibits employer interference with employees' choice of union representatives – is "part of the collective bargaining agreement[.]"  *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 814 (2d Cir. 2009).

Applying these principles, courts have repeatedly concluded that "controversies involving disciplinary matters are 'minor disputes' within the exclusive jurisdiction of the Adjustment Boards."  *Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists*, 915 F.2d 43, 50 (1st Cir. 1990); *see also Walker*, 385 U.S. at 198 (characterizing a "discharge grievance" as a minor dispute); *United Transp. Union*, 588 F.3d at 810 (granting motion to dismiss because "'minor disputes' encompasses 'disciplinary disputes … involving employee discharge.'

Here, Carter predicates post-certification RLA-based claims on the allegations that (1) Southwest terminated her in retaliation for protected speech; and (2) Southwest maintained and applied overbroad workplace policies.  Carter's Constitution-based retaliation and Title VII

claims appear to be based on the same or an overlapping factual predicate. These post-certification claims rest on and require interpretation of the CBA (which contains a provision requiring just cause for any termination), directly-related work rules, and the bargaining history of the parties. Thus, they are minor disputes subject to the RLA's dispute resolution process.[5]

In *Held v. Am. Airlines, Inc.*, the employer terminated a pilot for inflammatory correspondence he sent to a union official. *Held*, 2007 WL 433107, *1-2. While the correspondence contained a number of slurs, it also addressed internal disputes regarding abuse of the union's political process and the employee pension plan. *Id.* at *2-3. American Airlines terminated the employee for violating its Work Environment Policy. The employee alleged that his termination was in retaliation for his off-duty speech related to an ongoing intra-union dispute, which was supposedly protected by the RLA, and thus violated Section 152, Third and Fourth. The court rejected the employee's argument, concluding that because the case involved a post-certification dispute regarding application of work rules, it was a minor dispute that must be resolved before the airline's System Board. *See id.* at *6-7. Additionally, because the employee was able to utilize the internal dispute resolution process, he had a method to vindicate his statutory rights. *See id.*

Similarly, in *Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139 (2d Cir. 1986), a flight attendant alleged violation of Section 152, Third and Fourth when the employer suspended her based on alleged false statements to the FAA. *Id.* at 140. The court concluded that it lacked jurisdiction over this minor dispute. In doing so, the court emphasized the general principle that "adjustment boards … have exclusive jurisdiction over … disciplinary

---

[5] Southwest is not aware of any authority authorizing an employee to challenge in court the mere existence of a policy based on its alleged overbreadth. Indeed, the authorities cited in the SAC regarding this count arise under the National Labor Relations Act, which is inapplicable here.

disputes even if involving employee discharge." *Id.* at 141. It also noted that there was no suggestion that the employer "precluded … any [] flight attendant from challenging any disciplinary action through the adjustment board procedure." *Id.* at 142. Thus, the employer had not frustrated employees' ability to enforce RLA-protected rights. *Id.*

As the above cases demonstrate, post-certification termination claims by airline employees are minor disputes that arise under and should be resolved in accordance with the CBA. Here, resolving Carter's claims would require the Court to analyze and interpret explicit and incorporated terms of the CBA, including:

- The "just cause" provision and its historical application to determine the propriety of Carter's termination. (Dkt. No. 30, Exh. E, CBA Art. 19(1)(I) [App. 154] ["Flight Attendant shall not be disciplined or discharged without just cause"]); *see also Parker v. Am. Airlines, Inc.*, 2008 WL 2811320, *10 (N.D. Tex. July 22, 2008) ("'the parties' practice, usage, and custom is of significance in interpreting'" a CBA); *Dotson v. Norfolk S. R.R. Co.*, 52 Fed. Appx. 655, 658 (6th Cir. 2002) (per curiam) (affirming dismissal of RLA minor dispute because "[w]hether or not Plaintiff was disciplined more harshly ... or ... should have been disciplined at all, depends upon an interpretation of the CBA regulations regarding discipline … [T]o dispose of Plaintiff's claims, the Court [would] need to look at more than just Defendants' motives."); *Lee v. Norfolk S. Ry. Co.*, 912 F. Supp. 2d 375, 380 (W.D.N.C. 2012) ("To the extent that [employee] claims he was more severely disciplined … than a Caucasian employee … this [] requires interpretation of the provisions … regarding discipline."); *Moss v. Norfolk W. Ry. Co.*, 2003 WL 21817127, *5 (E.D. Mich. July 22, 2003) (claim was a minor dispute under RLA because allegation that employee was "discharged for the same conduct when … [another] employee was not depends on interpretation of the CBA regulations regarding discipline").

- The complicated flight attendant compensation system to craft a remedy. (Dkt. No. 30, Exh. E, CBA Art. 21 [App. 165-178]); *Monroe v. Missouri Pac. R.R. Co.*, 115 F.3d 514, 518 (7th Cir. 1997) ("[Discharge] claims involve past and future wages, benefits, and promotions – all of which are determined by the CBA.").

- The Southwest Mission Statement, Workplace Bullying and Hazing Policy, Social Media Policy, and Sexual Harassment, Discrimination, and Retaliation Policy, the interpretation and application of which are central to resolution of the present dispute. (*See* FAC, Exh. A; dkt. no. 30, exhs. A-D); *U.S. Airlines Pilots Ass'n v. U.S. Airways, Inc.*, 859 F. Supp. 2d 283, 306 (E.D.N.Y. 2012) ("allegation that

defendant's lanyard policy violated its representational and collective bargaining rights is a minor dispute over which this court does not have jurisdiction.").

- Management Rights and similar provisions that govern the scope of employer authority. (*See, e.g.*, Dkt. No. 3, Exh. E, CBA Art. 3).

Finally, Carter – with Local 556's representation – received but declined to accept an offer of reinstatement from Southwest. (Dkt. No. 30, Exh. 1, ¶¶ 9-10 [App. 3-4]). Carter elected to pursue her claims in arbitration, the results of which **are final and binding**. *See* 45 U.S.C. § 153, First (m); *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 325 (1972) ("A party who has litigated an issue before the Adjustment Board … may not relitigate that issue in an independent judicial proceeding."). Given Carter's uninhibited use of the RLA's dispute resolution process, there are no special circumstances warranting judicial intervention. *See, e.g.*, *Indep. Union of Flight Attendants*, 789 F.2d at 142 (declining jurisdiction and noting that plaintiffs could challenge their disciplinary action through the adjustment board); *Held*, 2007 WL 433107, *6 (noting availability of System Board in declining to exercise jurisdiction).

Carter addressed her claims in the arbitral forum. Dissatisfied with the result, Carter pushes forward and in doing so seeks to undermine the RLA and CBA-prescribed arbitral process through parallel litigation involving the same central issues. Furthermore, she seeks to enlist the Court in her years-long battle with Local 556's leadership. This is not appropriate and the Court should dismiss Carter's claims for a lack of subject matter jurisdiction. *See generally Renneisen v. Am. Airlines, Inc.*, 990 F.2d 918, 919 (7th Cir. 1993) (The RLA does not "give minority groups within a union a cause of action against their employer when they cannot persuade their own union to take actions they deem to be in the union's best interest.").

**C.    Carter Has Failed to Plead Anti-Union Animus and Protected Activity Necessary to Support Her RLA Claims (Counts I and II)**

Even if Carter's Section 152, Third and Fourth claims are not preempted, they still fail because she has not pled facts required to state a cause of action.  As noted above, claims under Section 152, Third and Fourth are generally only viable *prior* to a union's certification.  *TWA, Inc.*, 489 U.S. at 440.  It is true that "federal courts **may theoretically** have jurisdiction under [Section 152], Third and Fourth[.]"  *Int'l Bhd. of Teamsters v. United Parcel Serv. Co.*, 447 F.3d 491, 502 (6th Cir. 2006) (emphasis added).  But that only occurs in the presence of "extreme anti-union bias or animus" or a "fundamental attack on the collective bargaining process" that cannot be remedied through RLA dispute resolution.  *Id.*; *see also Held*, 2007 WL 433107, *6.  Mere conclusory allegations in this regard are insufficient to state a claim.  *See Bhd. Of Locomotive Engineers v. Kansas City S. Ry.*, 26 F.3d 787, 795 (8th Cir. 1994).

Carter's allegations in support of her RLA claims do not satisfy this standard.  First, judicial intervention is unnecessary, as Carter had access to and utilized the contractual dispute resolution procedure to address her issues in arbitration.  After being unsuccessful, she now seeks to improperly re-litigate the issues here.  *See Held*, 2007 WL 433107, *6 (dismissing RLA claims because plaintiff "opted to pursue resolution of his grievances"); *Machinists v. Nw. Airlines, Inc.*, 673 F.2d 700, 712 (3d Cir. 1982) ("the controversy which had been properly commenced as a System Board arbitration should have concluded in that forum[.]").

Second, even accepting the veracity of Carter's allegations, they do not suggest conduct so destructive to warrant judicial intervention.  Critically, Carter's allegations have little, if anything, to do with the anti-union animus or threats to the collective bargaining process required to a state a RLA claim.  Rather, Carter's allegations related to a years' long personal vendetta against the Union Executive Board, an ideological spat with those who attended the

Women's March, and a personal attempt to persuade a co-worker of her position on abortion. Carter's participation in these internal disputes and her social media squabbles with Union representatives did not constitute RLA protected activity. *See Held*, 2007 WL 433107, \*4 (plaintiff failed to state RLA claim where he was allegedly terminated for "off-duty, off-premises speech" regarding union representation issues).[6]

At most, Carter's claims involve an internal union dispute that does not, as a matter of law, warrant post-certification judicial intervention. *See Renneisen*, 990 F.2d at 924 (the RLA was "not designed to give minority groups … a cause of action against their employer when they cannot persuade their own union to take actions they deem to be in the union's best interest").

### D.   Carter's Retaliation Claims Fail Because She Has Not Alleged the Requisite Causal Nexus (Counts I, II and IV)[7]

When a plaintiff predicates a Section 152, Third and Fourth claim on the termination of employment, the employee "must show by a preponderance of evidence that [] 'protected conduct was a 'substantial' or 'motivating' factor prompting the discharge.'" *Amarsingh v. Jetblue Airways Corp.*, 409 Fed. Appx. 459, 460-61 (2d Cir. 2011). To satisfy this causal nexus, the employee must show (a) she was engaged in protected activity; (b) the employer was aware of that activity; (c) defendant harbored animus toward the protected activity (*i.e.*, extreme anti-union bias or animus); and (d) the animus was a causal factor in plaintiff's termination. *Id.* at 461; *Beckett v. Atlas Air, Inc.*, 968 F. Supp. 814, 817 (E.D.N.Y. 1997).

---

[6] Throughout the SAC, Carter cites cases arising under the NLRA to suggest that she was engaged in conduct protected by the RLA. Those authorities are not on point, as protections under the RLA are substantially narrower than those under the NLRA. *See generally Johnson v. Express One Int'l, Inc.*, 944 F.2d 247, 252 (5th Cir. 1991) ("We find no indication that the RLA seeks to preserve employees' rights to act in concert for mutual aid or protection.").

[7] This analysis is only material if the Court determines that it has jurisdiction over Carter's claims and that Carter has alleged "protected activity."

Here, Carter does not allege facts to suggest a causal nexus between protected activity and her termination. In particular, Carter alleges that she began engaging in anti-Union protected speech as early as 2012 – more than ***five years before*** her alleged retaliatory termination. Such a gap in time refutes Carter's claim of retaliation as it shows Southwest's decision to terminate her had nothing to do with years of anti-Union speech, but rather her targeted harassment of Stone.

For several years, Carter has openly engaged in alleged protected activities with respect to union issues without disciplinary action. For example:

- Cater began making public complaints about Local 556's leadership in 2012.

- Carter posted anti-abortion commentary on Facebook since 2012.

- Carter resigned her Union membership in 2013.

- Carter began sending Stone private correspondence criticizing her handling of internal union matters in early 2015.

Nevertheless, Carter makes the implausible assertion that Southwest waited five years *after* she commenced the alleged protected activity to unlawfully retaliate.

Courts have repeatedly dismissed such retaliation claims, concluding that the lapse of time refutes the requisite causal nexus. *See Johnson v. McDonald*, 623 Fed. Appx. 701, 704 (5th Cir. 2015) (dismissing Title VII claim where "the nearly two-year gap between the [protected activity] and alleged retaliation [] refutes any causal link[.]"); *Chhim v. Univ. of Texas*, 2016 WL 154142, *5 (W.D. Tex. Jan. 11, 2016) (dismissing Title VII claim because adverse action "occurred almost two years after he … filed his first complaint … and three months after the alleged [second] complaint. Such delays … refutes any causal link between the two events."); *Phillips v. United Parcel Serv.*, 2011 WL 2680725, *8 (N.D. Tex. June 21, 2011) (dismissing Title VII claim where "[t]he timing between the [adverse] actions and the protected activity (between nine months and two years)" did not establish a requisite causal connection.

Accordingly, even if the Court concludes it has jurisdiction over Carter's claims, it should dismiss her retaliation claims for failure to state a claim.

**E.**     **Carter Forfeited Any Alleged RLA Speech Protections By Sending Unsolicited Graphic Messages to a Co-Worker (Counts I, II, IV)**

There is limited legal authority addressing the contours of employees' post-certification right to engage in union-related speech under the RLA.[8]   Nevertheless, it is clear that even otherwise protected "speech relating to union activity loses statutory protection if it is vulgar, offensive, abusive, or harassing."  *Held*, 2007 WL 433107, *7.

In addition, an employee's protected activity "may give way when 'special circumstances' override the employees' [] interests[.]"  *Leiser Constr., LLC*, 349 NLRB 413, 415 (2007).  Special circumstances may include, *inter alia*, situations in which the protected activity is "vulgar or obscene[,] [] may 'exacerbate employee dissension' or situations in which restriction … 'is necessary to maintain decorum and discipline … '"  *Id.*  "Where an employee engages in indefensible or abusive misconduct during otherwise protected activity, the employee forfeits the [NLRA's] protection."  *DaimlerChrysler Corp.*, 344 NLRB 1324, 1329 (2005).

Carter contends Southwest retaliated against her for protected speech, including her repeatedly sending unsolicited messages containing photos and video of aborted fetuses to a co-worker.  (*See* SAC ¶¶ 46, 61, 80).  Even if one assumes the communications generally concerned protected topics and the RLA protects certain types of speech post-certification (it does not), the communications lost protection due to their graphic and harassing nature and Carter's inflammatory commentary (*e.g.*, referring to Stone as supporting murder).

The NLRB has repeatedly withdrawn protection from images and commentary that are far less inflammatory than what Carter sent to Stone.  *See generally Media Gen. Ops., Inc. v.*

---

[8] As a result of the scarcity of RLA jurisprudence on this issue, reference to NLRA case law may be helpful by analogy.  *See In re Cont'l Airlines Corp.*, 901 F.2d 1259, 1264 (5th Cir. 1990).

*NLRB*, 394 F.3d 207, 209, 212 (4th Cir. 2005) (Employee forfeited protections by use of terms "bastard," "son of a bitch," and calling supervisor a "racist."). For example, in *Leiser Constr., LLC*, 349 NLRB 413 (2007), the Board held that the employer could prohibit the wearing of union insignia that showed a person urinating on a rat, characterizing it as "unquestionably vulgar and obscene." *Id.* at 415. Similarly, in *Honda of Am. Mfg., Inc.*, 334 NLRB 746 (2001), the Board held that use of phrases "out of the closet" and "bone us" in a union newsletter was "so offensive as to render the otherwise protected newsletters unprotected." *Id.* at 748-49.

These cases demonstrate that even if an employee has a legal right to send unsolicited messages to co-workers discussing abortion, doing so by sending knowingly graphic images and videos, and referring to the recipient as supporting murder, is not protected. As Carter's five-year history of participation in public debates demonstrates, Carter was and is generally free to comment on abortion and internal Union matters without Southwest's interference. *See Sacred Heart Med. Ctr.*, 347 NLRB 531, 534 (2006) (tolerance of other similar protected activities militates against a finding that any particular restriction is unlawful). However, Carter does not have a legal right to create a harassing environment by distributing graphic images and hurling inflammatory slurs to undesiring recipients. *See generally Sw. Bell Tel. Co.*, 200 NLRB 667 (1972) (given the "controversial nature of the language [] and its admitted susceptibility to [a] derisive … construction, Respondent could [] ban the use of the provocative slogan").

**F.**    **Carter Cannot Predicate a Claim Against Southwest – a Private Company – On Alleged Constitutional Violations (Count IV)**

In addition to her RLA retaliation claim Carter brings a retaliation claim against Southwest predicated on violations of the First and Fifth Amendments to the United States

Constitution.  (*See*  SAC ¶ 102).[9]  In support of this claim, Carter alleges that Southwest is a "government actor."  (*Id.* at ¶ 103).  Based on this false allegation (Southwest is a publicly traded company),[10] Carter asserts First and Fifth Amendment rights to unfettered speech vis-à-vis Southwest.  (Dkt. No. 30, Exh. 1, ¶ 12 [App. 4]); *Dingeldey v. VMI-EPE-Holland B.V.*, 2016 WL 6273235, *3 (W.D.N.Y. Sept. 28, 2016) ("The court takes judicial notice that the [defendant] is a public company[.]").  This is not supported by law.

Southwest is not aware of any case concluding that an employee of a private company is entitled to Constitutional free speech protections.  *Cf. Lloyd Corp. v. Tanner*, 407 U.S. 551, 569-70 (1972) (public does not have free speech rights at privately-owned mall).  Further, contrary to Carter's suggestion, the fact that Southwest's employees pay statutorily and CBA-authorized agency fees is immaterial to this analysis.  *See* 45 U.S.C. § 152, Eleventh; *Ry. Employees v. Hanson*, 351 U.S. 225, 238 (1956) ("[The requirement for financial support of the [union] … by all who receive the benefits of its work … does not violate either the First or the Fifth Amendments.").  Thus, the Court should dismiss Carter's Constitution-based retaliation claim, as the First and Fifth Amendments only operate to protect individuals against *government* action.

## G.   Carter Fails to State a Title VII Religious Discrimination Claim

To state a *prima facie* case of accommodation religious discrimination under Title VII, a plaintiff must establish that she "had a *bona fide* religious belief that conflicted with an employment requirement, that [s]he informed the employer of h[er] belief, and that [s]he was discharged for failing to comply with the conflicting employment requirement."  *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000).

---

[9] Because the facts supporting Carter's Count IV are identical to her RLA retaliation claim, Southwest reiterates its previously-stated defenses.  (*See supra* Section IV. A-C).
[10] *See* http://www.southwestairlinesinvestorrelations.com/financials/sec-filings.

While Title VII requires employers to "make reasonable accommodations for the religious observances of its employees," it does not compel employers to provide accommodations that cause an undue hardship. *Id.* "'Undue hardship' exists, as a matter of law, when an employer is required to bear more than a *de minimis*" burden to provide a requested accommodation. *Id.* (*citing Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)).

Carter contends that because her "sincere religious beliefs require her to share with others that abortion is the taking of a human life," she was legally entitled to send unsolicited photographs and videos of aborted fetuses to co-workers, and to refer to co-workers who Carter surmised disagreed with her politics as "murderers." (*See* SAC ¶¶ 40, 117-118, 129-130). Even though this practice violated Southwest's policies, Carter claims "Title VII required Southwest's policies to give way" to accommodate this alleged religious practice. (*Id.* at ¶ 129). Carter falls well short of stating a valid religious discrimination claim.

While Carter claims she mentioned that she was an anti-abortion Christian during her March 7, 2017 fact-finding meeting, Carter does not claim that she informed Southwest of her alleged religious mandate to share her abortion-related views with co-workers. Nor does Carter allege that she asked Southwest to accommodate her desire to distribute graphic abortion images to co-workers. Absent the provision of specific notice regarding the religious belief and the required accommodation, a plaintiff cannot state a religious discrimination claim. *See, e.g.*, *Laney v. Ohio Dep't of Youth Servs.*, 448 Fed. Appx. 553, 556 (6th Cir. 2011) (Plaintiff's claims failed because she was required to "inform[] the [employer] that she needed a religious accommodation to wear the [head] scarf."); *Warren v. Shaw Group, Inc.*, 825 F. Supp. 2d 1052, 1056 (D. Nev. 2011) (dismissing claim because while plaintiff "argued he believed his Social Security number was the mark of the beast and refused to give it … for religious reasons," he did

inform the employer of the belief and the religious conflict); *Al-Jabery v. Conagra Foods*, 2007 WL 3124628, *4 (D. Neb. Oct. 24, 2007) (plaintiff could not establish *prima facie* case because there was no evidence he told employer that his religion prohibited him from touching pork).

Additionally, Carter's after-the-fact reference to her anti-abortion views, even if construed as a request for accommodation, would not create a viable claim. "There is nothing in Title VII that requires employers to give lesser punishments to employees who claim, ***after they violate company rules*** … , that their religion caused them to transgress the rules." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1020 (4th Cir. 1996) (emphasis added). Carter's failure to notify Southwest of her alleged religious mandate (to communicate her views on abortion to co-workers) and the now-requested accommodation (exception from policies and ability to distribute graphic abortion material) ***prior*** to violating policy alone warrants dismissal.

Separately, courts have repeatedly held that Title VII does not "require an employer to accommodate an employee's desire to impose his religious beliefs upon his co-workers." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004); *see also Chalmers*, 101 F.3d at 1021; *Stolley v. Lockheed Martin Aeronautics Co.*, 228 Fed. Appx. 379, 382 (5th Cir. 2007) ("Title VII does not require … religious accommodations that infringe on the rights of fellow employees."). Based on this principle, employers may to prohibit an employee's religiously-motivated display of graphic abortion images. *See Wilson v. U.S. West Commc'ns*, 58 F.3d 1337, 1342 (8th Cir.1995) (employer did not violate Title VII by restricting employee from wearing a two inch button that "showed a color photograph of an eighteen to twenty-week old fetus" and contained the phrases 'Stop Abortion,' and 'They're Forgetting Someone.'"). Similarly, employers can prohibit a religious employee from mailing letters to co-workers accusing them of immoral conduct, particularly when doing so results in co-worker complaints.

*See Chalmers*, 101 F.3d at 1021; *Averett v. Honda of Am. Mfg., Inc.*, 2010 WL 522826, *9 (S.D. Ohio Feb. 9, 2010) (employee not entitled to accommodation for practice of "express[ing] [] belief that her coworkers were sinful and evil persons whom God would one day punish.").

Title VII did not require Southwest to set aside its social media and related policies to sanction Carter's harassment of co-workers with unsolicited graphic abortion content and religiously-motivated moral condemnations. Indeed, if Southwest granted the accommodation to which Carter claims entitlement, it may well have found itself on the wrong side of a Title VII claim from Stone or another undesiring recipient of Carter's harassment for failing to provide a harassment-free workplace. *See Chalmers*, 101 F.3d at 1021 (employer unable to accommodate because doing could "subject itself to possible suits from [employees] claiming that [the plaintiff's] conduct violated their religious freedoms[.]").

Carter's attempt to predicate a religious discrimination claim on alleged disparate treatment also fails. Carter does not identify the religion of any employee who she claims received preferential treatment. Rather, she relies on the non-specific allegation that Southwest treated her differently than unspecified flight attendants who did not share her religion. (SAC ¶ 125). Carter's bare allegations in this regard are insufficient to state a claim. S*ee Pollak v. Lew*, 2013 WL 1194848, *7 (S.D. Tex. Mar. 22, 2013) (discrimination claim failed because plaintiff did not identify "similarly situated, non-Jewish employees were treated more favorably."); *Perry v. Univ. Med. Staffing, Inc.*, 62 F. Supp. 3d 666, 671 (W.D. Mich. 2014) (plaintiff did not state a *prima facie* case because she failed to "identify anyone of another religion who was treated better than she was."); *Elhassan v. Proctor & Gamble Mfg. Co.*, 2014 WL 1281231, *4 (N.D.N.C. Mar. 27, 2014) ("bare assertion that '[o]ther similarly-situated employees of different faiths were treated more favorably than [Plaintiff]'" insufficient to state a claim); *Hall v. Sky*

*Chefs, Inc.*, 784 F. Supp. 2d 811, 822 (E.D. Mich. 2011) ("Plaintiff's … *prima facie* case rests solely upon the … assertions that she was 'treated differently than similarly situated non-religious or non-Christian employees' … and that unspecified 'Muslim employees were allowed [unspecified] special treatment to observe their religion.' … These contentions … are [] woefully inadequate to raise an inference of discrimination[.]").  Indeed, given the paucity of Carter's allegations regarding disparate treatment, the SAC lacks sufficient information for the Court to evaluate if any identified employee was similarly situated for the purpose of stating a discrimination claim.  *See Lee v. Kansas City S. Ty. Co.*, 574 F.3d 254, 260 (5th Cir. 2009) (noting that similarly situated employees must be "nearly identical").[11]

Accordingly, as set forth above, the Court should dismiss Carter's Title VII claim.

## V.     CONCLUSION

Southwest respectfully requests that the Court dismiss Carter's SAC for failure to state a claim and/or lack of subject matter jurisdiction.  Carter addressed her claims in arbitration and had her opportunity to seek redress for the alleged wrongs she now claims.  The arbitrator ruled against Carter, and in doing so made case-dispositive factual determinations that the Court should treat as preclusive.  Carter should not receive a proverbial "second bite of the apple."

Allowing Carter's Title VII claims to survive would send the message that employees are legally-entitled to harass and discriminate against others based on their protected characteristics (*e.g.*, religious beliefs, race, etc.) so long as the employee acts on a sincerely-held religious belief.  That cannot be the law.  Thus, the Court should dismiss Carter's SAC in its entirety.

---

[11] To bolster her unsupported claim of disparate treatment, Carter repeatedly characterizes employees who attended the Women's March as supporters of abortion.  (SAC ¶¶ 39, 118).  That leap is unsupported by the SAC.  In fact, a number of groups with non-abortion-related messages sponsored the Women's March, including St. Mark's Episcopal Church, States to Prevent Gun Violence, and the Sierra Club.  https://www.womensmarch.com/partners.

Dated:  July 9, 2018                Respectfully submitted,


                                    By:    /s/ Tom E. Reddin
                                           Tom Reddin, Esq.
                                           Texas Bar No. 1660950
                                           treddin@polsinelli.com
                                           2950 N. Harwood Street, Suite 2100
                                           Dallas, Texas  75201
                                           Telephone:  214.397.0030
                                           Facsimile:  214.397.0033

                                           Michele Haydel Gehrke *Admitted Pro Hac Vice*
                                           California State Bar No. 215647
                                           mgehrke@polsinelli.com
                                           Three Embarcadero, Suite 2400
                                           San Francisco, CA 94111
                                           Telephone:  415-248.2100
                                           Facsimile:  415.248.2101

                                    **ATTORNEYS FOR DEFENDANT
                                    SOUTHWEST AIRLINES CO.**


                             **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing instrument has been served
upon counsel for Plaintiff via the U.S. District Court, Northern District's CM/ECF system on
July 9, 2018.



                                    By:    /s/ Tom E. Reddin