1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS

2                        DALLAS DIVISION

3    ***********************************************************

    CHARLENE CARTER                   3:17-cv-02278-S

4

5    VS.                        DALLAS, TEXAS

6    TRANSPORT WORKERS UNION OF
    AMERICA LOCAL 556, et al        DECEMBER 14, 2018

7    ***********************************************************

8

               TRANSCRIPT OF MOTION PROCEEDINGS

9      HEARD BEFORE THE HONORABLE KAREN GREN SCHOLER
              UNITED STATES DISTRICT JUDGE

10

    ***********************************************************

11

    <u>APPEARANCES:</u>

12

    FOR THE PLAINTIFF:         MR. JEFFREY DANIEL JENNINGS

13                       MR. MATTHEW B. GILLIAM
                       National Right to Work

14                       Legal Defense Foundation, Inc.
                       8001 Braddock Road

15                       Suite 600
                       Springfield, VA  22160

16

    FOR THE DEFENDANT         MS. MICHELE HAYDEL GEHRKE

17    SOUTHWEST AIRLINES CO:     ReedSmith
                       101 Second Street

18                       Suite 1800
                       San Francisco, CA  94105

19

    FOR THE DEFENDANT         MR. ADAM S. GREENFIELD

20    TRANSPORT WORKERS UNION    Cloutman & Greenfield, PLLC
    OF AMERICA LOCAL 556:      3301 Elm Street

21                       Dallas, TX  75226

22    Official Court Reporter:    Lanie M. Smith, RPR, CRR
                       1100 Commerce Street, #1654

23                       Dallas, Texas  75242
                       (214) 753-2354

24

        Proceedings recorded by mechanical stenography,

25    transcript produced via computer.

1                    P R O C E E D I N G S

2                 (Call to order of the court.)

3                 (Off-the-record discussion.)

4          THE COURT:  This is Case No. 3:17-CV-02278-S, Carter

5    versus Transport Workers Union of America Local 556, et al.

6                 Counsel, make your appearance on the record,

7    please.

8          MR. GILLIAM:  For the plaintiffs, Matthew Gilliam.

9          MR. JENNINGS:  Jeffrey Jennings.

10         THE COURT:  Thank you.

11         MS. GEHRKE:  For Defendant Southwest Airlines,

12   Michele Gehrke.

13         MR. GREENFIELD:  For Defendant Local 556,

14   Adam Greenfield.

15         THE COURT:  Thank you.

16                 It's my understanding that Southwest will go

17   first, so please proceed.

18         MS. GEHRKE:  Thank you, Your Honor.

19                 Your Honor, as we briefed in our motion papers,

20   we believe the case should be dismissed with prejudice for

21   several reasons.

22                 First, the Court lacks subject matter

23   jurisdiction to hear the case.

24                 Second, Ms. Carter is trying to simply relitigate

25   her claims after they've already been litigated and factual and

1    legal issues decided in arbitration by arbitrator Bill Lemons

2    after a two-day hearing where she had a full opportunity to

3    present evidence, cross-examine witnesses, and present her

4    case.

5              And then finally we believe the allegations as

6    pled, they fail to state a claim on multiple grounds.

7              So I will go into some more detail and elaborate

8    on some of the points we have already made in our briefing;

9    and, of course, if you have any questions along the way, please

10   feel free to ask.

11             So on the jurisdictional issues, as the Court is

12   aware, the Railway Labor Act is a very unique statute and

13   there's not a lot of case authority on some of these issues, so

14   we appreciate the opportunity to provide some oral argument on

15   them.

16             On the claims under 152, Section 3rd and 4th, the

17   heart of those claims is really the allegation that the

18   employer, here Southwest, would be interfering with the right

19   of employees to freely choose their representative for

20   collective bargaining purposes and to organize.

21             And the cases are fairly clear that those two RLA

22   claims only apply in the situation where it's in

23   precertification stage where there is not already a union

24   certified as a bargaining representative.  And the reason for

25   that is important because once a bargaining representative is

1    certified and the parties negotiate a collective bargaining

2    agreement, part of that is the grievance and arbitration

3    procedure.

4              And so that's really where all of these types of

5    minor disputes are funneled into.  But before a union is

6    certified, there is no forum and so that's where those types of

7    issues having to do with organizing employees and letting

8    employees choose which union they want, that's where those RLA

9    claims came in for purposes of court jurisdiction.

10             So here there has been a union in place for a

11   long time.  There's an established collective bargaining

12   agreement with a very robust grievance and arbitration

13   procedure, and there is no basis for Ms. Carter to bring her

14   claims here in court.

15             And we cited to the *TWA* case, that's at

16   489 U.S. 426 and then the *Held* case, 2007 Westlaw 433107.  The

17   *Held* case is very similar factually to Ms. Carter's case in the

18   sense that it involved an employee who had a dispute over union

19   representation issues and was terminated for some of his

20   actions in making vulgar statements.

21             And the Court there held that the Court did not

22   have jurisdiction to hear the dispute under 152, Sections Third

23   and Fourth of the RLA, and that's because there was an adequate

24   remedy and that was to go through the grievance and arbitration

25   procedure.

1            The very limited circumstances where Courts have

2     found federal court jurisdiction for 152, Third and Fourth,

3     claims don't apply here and that's when there's extreme

4     anti-union animus that's been alleged or some other attack on

5     the CBA process where the employer is interfering with the

6     employee's choice of representation by a certain union.  And

7     that's not the allegation here.

8            Ms. Carter has her own disputes with the union

9     and union leadership, but that's no allegation that Southwest

10    is interfering with some kind of election process or anything

11    like that.

12           So I mentioned before this notion of kind of a

13    minor dispute and that this issue belongs in arbitration.  And

14    the reason why it's a minor dispute is because at the essence

15    she's challenging discipline imposed on her in terms of her

16    termination for her actions in the workplace and that's exactly

17    the issue that was litigated in the arbitration with

18    Mr. Lemons.

19           Now, under the contract the legal issue to be

20    decided was whether or not there was just cause to terminate

21    her; but as part of that we presented two days' worth of

22    testimony and evidence and she presented extensive evidence

23    regarding her religious beliefs and her squabbles with the

24    union to try to justify her actions in sending those graphic

25    messages to Ms. Stone and putting some of the other messages on

1    Facebook that she did and the arbitrator considered all of

2    that.  And as part of that process, he made very detailed

3    factual findings which we laid out for you in the briefing.

4              And it's important to note if you look at the

5    *Grimes* case, which is at 746 F.3d 184, it's a Fifth Circuit

6    case that touched on this issue of whether or not there should

7    be issue preclusion.  We recognize that there's no claim

8    preclusion in the sense that she could potentially try to bring

9    federal or statutory claims in court because they're different

10   from a contract issue that was litigated in arbitration.

11             But *Grimes* is very clear that you can still have

12   issue preclusion because the factual determinations made by the

13   arbitrator can be binding if certain procedural safeguards are

14   met and that's exactly what happened here.

15             Like I said, we had two days of testimony.  She

16   presented and cross-examined witnesses and had extensive

17   documentation, which included all of the evidence that you

18   would be hearing if you were to proceed in this matter about

19   her religious beliefs and what motivated her to send those

20   messages as well as her problems that she was having with the

21   union and union leadership.

22             And she was represented by counsel, the same

23   lawyers who are here today.  So, you know, discovery -- counsel

24   had asked that we may need discovery because some of these

25   issues are not appropriate at this stage and we've had

1    extensive discovery because of those proceedings because of all

2    the testimony that was heard and the information exchanged.

3                And then Mr. Lemons issued a very detailed,

4    well-reasoned, written award as part of that arbitration, which

5    we included as an exhibit to my declaration, which we believe

6    is properly before the Court since we are challenging subject

7    matter jurisdiction.

8                So we outlined in our briefing some of the key

9    factual findings that Arbitrator Lemons made, but I wanted to

10   repeat a few of them because I think they're really important

11   in terms of the types of issues that you would be called upon

12   to consider if this case were to proceed here in court.

13               So besides just the fact that he determined that

14   there was just cause to terminate her beyond a clear reasonable

15   doubt, he also made factual findings that she violated the

16   social media policy, Southwest workplace bullying and hazing

17   policy, and Southwest harassment policy.  And he made the

18   finding that each of those policy violations was a sufficient

19   basis to terminate her.

20               And significantly for purposes of the types of

21   claims she is trying to raise here, he found that she was not

22   treated less favorably than other employees who had been

23   disciplined for social media violations and that based on the

24   evidence she presented at the arbitration, which did include,

25   you know, other employees that had been disciplined for social

1   media violations, he rejected her arguments and said that those

2   situations were not substantially similar to her situation and

3   so Southwest did act properly in terminating her even though it

4   may have either offered a lesser amount of discipline or later

5   reinstated those other employees.  So that was a key factual

6   finding with respect to whether or not similarly situated

7   people were treated the same or differently, which I think is

8   relevant to her religious discrimination claim.

9            He also made a factual finding that Audrey Stone,

10   the union president who was the recipient of Ms. Carter's

11   Facebook posts and those graphic abortion videos and images,

12   that Ms. Stone did not report Ms. Carter to retaliate against

13   her because of the union conflict, but that because she

14   believed Ms. Carter had violated company policy and had crossed

15   a line that for her was very personal and very traumatic and

16   upsetting for her.

17            And she gave very emotional testimony during the

18   arbitration that this was very different from the years of

19   messages that she had received from Ms. Stone [sic] about some

20   of these union issues and the leadership issues and how union

21   dues were spent.

22            This was something completely different and

23   really crossed the line for her because she was accusing

24   Ms. Stone of supporting murder, of supporting abortion, just

25   because she had attended the Women's March in Washington DC on

1    behalf of a Southwest committee.

2                    And so Arbitrator Lemons heard all that

3    testimony, both from Ms. Carter, Ms. Stone and other relevant

4    witnesses, and made the factual finding that there was no

5    retaliatory intent by Ms. Stone in reporting Ms. Carter to

6    Southwest.

7                    And he also made the finding that she did not

8    report Ms. Carter because of any concerns or problems she had

9    with respect to union dues money and how union dues money had

10   been spent.  Those discussions and messages between them, which

11   Ms. Stone never answered Ms. Carter, but Ms. Carter has been

12   sending them for years, that had been going on and Ms. Stone

13   never reported her and never engaged her in a dialogue on

14   Facebook, although I think there are plenty of communications

15   among union members regarding those issues, but that that was

16   not a motivating reason for her to report the harassing

17   messages to Southwest, which ultimately triggered the

18   termination.

19                   And then also significantly with respect to some

20   of these RLA statutory claims, Arbitrator Lemons made a factual

21   finding that Southwest does not have a policy or practice of

22   either disciplining or not disciplining employees based on

23   their views with respect to Local 556 or Ms. Stone's

24   leadership.

25                   There was plenty of evidence presented at the

1    arbitration of both union objectors and union supporters who

2    had faced discipline for social media violations; and while

3    Ms. Carter and her lawyers had argued that Southwest somehow

4    was favoring the union supporters, Arbitrator Lemons rejected

5    that argument in his factual findings.

6              And then he agreed with Southwest that the degree

7    of discipline, which was termination, was warranted even though

8    Ms. Carter had a clean disciplinary record over her years at

9    Southwest Airlines.  Because the misconduct was so severe, he

10   made the finding that termination was appropriate.

11             And then finally he made the factual finding that

12   she had failed, despite presenting argument and evidence, that

13   other employees who didn't share her abortion views or who

14   didn't share her views on the union, that they were somewhat

15   treated more favorably and Arbitrator Lemons rejected those

16   arguments.

17             So this is just a long list of all of the

18   findings or some of the more significant findings that

19   Arbitrator Lemons made after a very contentious and thorough

20   hearing after two days where she had the opportunity to present

21   all of her arguments and she did.

22             So we would submit to the Court that the

23   statutory and constitutional claims are not barred by

24   *res judicata*.  They are barred because of the doctrine of issue

25   preclusion under those factual findings and should be binding

1   here under the *Grimes* matter.

2          The other reason why we think the case should be

3   dismissed with prejudice is under Rule 12(b)(6) and that's

4   because Ms. Carter failed to allege sufficient allegations to

5   state viable claims as a matter of law and she's already had

6   one opportunity to amend her complaint, so we believe further

7   leave to amend would be futile.  So I will go through kind of

8   each of our key points on that.

9          With respect to the RLA claims and whether or not

10  there's a sufficient basis for this Court to exercise

11  jurisdiction under those very narrow grounds that I referenced

12  before, she has not alleged any facts to show that there's some

13  kind of anti-union animus by Southwest towards TWU.

14         She has not alleged that there's been any threat

15  to the collective bargaining process or that the arbitration

16  process was unfair or that she was somehow deprived any type of

17  due process that she was owed.  Her issues are really personal

18  to her and between her and her union leadership; and while she

19  has alleged a duty of fair representation claim against the

20  union with respect to Ms. Stone being the one to file the

21  complaint that ultimately led to her termination, she has not

22  alleged that TWU acted improperly in how they handled the

23  grievance process.

24         They actually succeeded in representing her as

25  part of the earlier steps in the grievance process.  Southwest

1   did try to resolve the matter by offering her a conditional

2   offer of reinstatement, which she declined; and the union gave

3   her the option to proceed to arbitration with her own attorneys

4   and she has chosen to do that.  But she has not alleged that

5   TWU did anything wrong with respect to the grievance and

6   arbitration process.

7          So I think that's really important because

8   without those types of allegations, there really is no basis to

9   invoke federal court jurisdiction under those limited

10   exceptions that I referenced earlier, the RLA 152, Third and

11   Fourth, claims.

12          And then, you know, her claims really stem in

13   large part based on her allegations of retaliation and that the

14   termination and the reporting of her social media messages were

15   for retaliatory reasons; but I think her own allegations in the

16   complaint undercut that argument.

17          She alleges that she started having conflict with

18   the union leadership all the way back in 2012.  That was more

19   than five years before her termination.  And she started making

20   comments about these union issues and her views on abortion all

21   the way going back to at least 2012.  And she alleges in her

22   complaint that she resigned her union membership in 2013 and

23   that she sent those graphic messages to Stone all the way in

24   2017.  But she had sent her for years, messages critical of

25   both Stone as a union leader and of how the union dues money

1    was being spent all the way back in 2015.

2              So there's just no temporal connection at all

3    between what she alleges is the protected conduct and the

4    protected activity and the adverse action that occurred five

5    years later.  If her theory were true that it was union animus

6    or it was her messages regarding the union issues, then her

7    termination would have occurred all the way back in 2012

8    through 2015.

9              It wasn't until the nature of those messages

10   changed and they became very personal attacks on Ms. Stone and

11   very graphic, disturbing images with abortion messages, that's

12   what compelled Southwest to have to take action because as an

13   employer they are bound by equal opportunity laws and they have

14   to provide a harassment-free work environment for their

15   employees.

16             And even though Ms. Stone is a union leader, she

17   is still a Southwest employee and she still is subject to

18   Southwest policies and she's still entitled to the protection

19   of those policies.  And when she received those messages, she

20   thought long and hard and was very torn about turning

21   Ms. Carter in because she knew that it could have very serious

22   ramifications, which is why she really was heartbroken about

23   having to do that.  That was her testimony.

24             But she really felt that these messages crossed a

25   line.  This was not just a squabble about union dues and union

1    leadership.  She was accusing her of supporting murder and the

2    killing of fetuses.

3            But the bottom line is there's just no timing.

4    There's no causal connection at all that's alleged in the

5    complaint and the allegations that are in there severely

6    undercut and would make any kind of retaliation claim fail as a

7    matter of law because there could not be that kind of causal

8    connection.

9            Then on the issue of whether or not these

10    messages that Ms. Carter sent, whether or not they were

11    entitled to protection under the labor laws, that really is a

12    relatively novel issue under the Railway Labor Act.  I think

13    both sides have cited some cases under the National Labor

14    Relations Act by analogy because sometimes since there are some

15    very critical differences between these two statutes, but they

16    often do have a lot of similarities and Courts do sometimes

17    look to cases under the National Labor Relations Act when

18    interpreting the RLA.

19            But there is the *Held* case here involving

20    American Airlines out of the Northern District.  And in that

21    case, the district court did adopt a ruling that even if you

22    were to assume under the RLA that certain speech could be

23    protected under federal labor law, just like as under the

24    NLRA --

25            THE COURT:  Wait a minute.  "*Held,*" you said

1    "Northern District."  That's Illinois, right?  H-E-L-D?

2          MS. GEHRKE:  That's correct.  That's out of Chicago.

3    It did involve American Airlines, but it's not here.

4          THE COURT:  It's not binding on this Court.

5          MS. GEHRKE:  Correct.

6          THE COURT:  Do you have anything that is binding on

7    this Court?

8          MS. GEHRKE:  We're not aware of anything under the

9    Railway Labor Act that would be a Fifth Circuit case that has

10   addressed this particular issue.

11         THE COURT:  Anything from the Courts within the

12   Fifth Circuit?

13         MS. GEHRKE:  Not that I'm aware of, Your Honor.

14         THE COURT:  Okay.

15         MS. GEHRKE:  But I think if you look at the cases in

16   other circuits and in other district courts under both labor

17   statutes, it is pretty clear that at some point conduct can

18   cross a line and lose any protection that it might have

19   otherwise had.

20              And I think the type of conduct that Ms. Carter

21   admitted during the fact-finding as part of the grievance

22   process and admitted during the arbitration that she sent these

23   messages, they clearly cross the line into vulgar and offensive

24   and harassing conduct that would lose any protection that the

25   labor laws may provide.

1        She herself described the messages as graphic and

2   warned any viewers that they were graphic and that was part of

3   her point.  She wanted to make the point and kind of shock the

4   conscience and I think it was intentional that she sent them to

5   Ms. Stone.

6        And then on the issue of whether or not she can

7   raise these constitutional claims, Ms. Carter makes the novel

8   argument that because Southwest has a contract with TWU and is

9   collecting union dues under federal labor law, that that

10  somehow makes them a state actor.

11       We don't feel that that's a viable legal theory.

12  They haven't cited any cases that have supported that.  The

13  limited cases that are out there all have to do with public

14  employers and whether or not public employers can require

15  employees to be members of a union and pay dues, but that has

16  not been extended to private employers such as Southwest.  And

17  Southwest is a publicly traded company.  It is a private

18  company in the sense that it's not a state actor, so we believe

19  those constitutional claims should be dismissed.

20       And then I'll conclude with some argument

21  regarding her claim for Title VII religious discrimination.

22  Ms. Carter claims that Southwest should have accommodated her

23  religious views on abortion and her need to spread the word

24  that others should not engage in abortion because it's the

25  taking of a human life based on her beliefs.  But the cases are

1   clear that there's no duty to accommodate an employee when it

2   would involve harassing or infringing on the rights of

3   coworkers or others in the workplace.

4            And I think, first of all, she did not raise her

5   religious beliefs as a justification until after the fact when

6   she was brought into the disciplinary process and then she

7   raised it again during the arbitration to try to justify her

8   conduct which Arbitrator Lemons rejected.

9            But the cases have held that an employee who has

10  a sincere religious belief, while they can request

11  accommodation, they need to do that before they are

12  disciplined; and it needs to be part of this interactive

13  process that we have when you are requesting religious

14  accommodation.

15           And she didn't do that here.  She did not allege

16  that she did that here.  She just alleges that because she

17  holds this belief that she should be allowed to send these

18  messages to other employees or to anybody else that she wants

19  to in the workplace.

20           And we believe that the law is clear.  If you

21  look at the *Chalmers* case, I think that was a Fourth Circuit

22  case, then the *Peterson* case out of the Ninth Circuit, both of

23  them have very good discussion on the fact that while employers

24  do have a duty to accommodate religious beliefs, they do not

25  have a duty to do so when it would involve conduct that would

1   be harassing or potentially violate equal opportunity laws.

2          And I think we made the point in our brief that

3   Southwest would be in a rock and a hard spot if they had

4   ignored Ms. Stone's complaint because then they could have been

5   accused of tolerating harassment in the workplace.

6          So they had to take action, and they did so in

7   accordance with their policies and their procedures in the

8   collective bargaining agreement.  So we would ask that

9   Ms. Carter's case be dismissed with prejudice.

10         THE COURT:  Thank you.

11         MS. GEHRKE:  Thank you.

12         THE COURT:  Mr. Greenfield?

13         MR. GREENFIELD:  Good afternoon, Your Honor.

14         THE COURT:  Good afternoon.

15         MR. GREENFIELD:  Defendants Local 556 also move under

16  12(b)(6) to dismiss --

17         THE COURT:  I was telling my law clerks about this

18  case.  I don't think I've seen both a union and a company on

19  the same side of the "V" very often.

20         MR. GREENFIELD:  Ms. Gehrke and I were having a good

21  joke earlier about sitting on the same side of the table the

22  other day.  It doesn't happen very often.

23         But today we do have very similar grounds and so

24  I will try my best not to rehash arguments already made by

25  Ms. Gehrke.  But we also move under 12(b)(6) for failure to

1    state a claim upon which relief can be granted.

2              Plaintiff Carter has alleged two distinct areas

3    of allegations against the union -- retaliation and a breach of

4    duty of fair representation.

5              To address the retaliation aspect first is well

6    established law in the Fifth Circuit and the entire country

7    that in order to have a retaliation claim, you must have an

8    adverse protected activity on behalf of the plaintiff and then

9    some sort of adverse employment action.  We would contend that

10   neither are present here.

11             If I may address adverse employment action first,

12   the union is not Ms. Carter's employer.  They represent her for

13   purposes of the collective bargaining agreement.  The union can

14   take no adverse employment action in regards to terminating

15   Ms. Carter's employment.

16             All of the case law cited by opposing counsel on

17   this matter does not deal with an issue of -- the cases they

18   cite deal with direct retaliation.  In *Brady* specifically, it

19   was a violation of CBA provision requiring the plaintiff in

20   that case being a member of the union in good standing and so

21   withholding -- preventing them from paying union dues or

22   allowing them to be a member was the retaliation.

23             In this case no adverse employment action has

24   taken place and just cannot.  The only adverse employment

25   action that could be alleged by Ms. Carter is that

1    President Stone reported bullying and harassment to

2    Southwest Airlines.  It was then on Southwest Airlines to

3    determine what they wanted to do with that complaint.

4            Certainly Ms. Stone's position as the president

5    of the union does not take away her rights as an employee to be

6    free from discrimination or harassment within the workplace.

7            On the issue of protected activity, I would

8    concur with Mrs. Gehrke that it is a bit murky regarding the

9    free speech laws, but I think she is spot on -- retaliation

10   regarding those free speech laws.  But I think she is spot on

11   regarding the temporal proximity issue.

12           If we look to Fifth Circuit law in the employment

13   context of Title VII, et cetera, *Johnson v. McDonald,* as little

14   as two years of distance between the protected activity, which

15   would be anti-union animus alleged by Ms. Carter, started in

16   2012.  The termination didn't even take place until 2017.

17           The inciting issue that they are discussing is

18   Ms. Carter's e-mail to President Stone, Employee Stone, that

19   included, in her words, graphic material including pictures of

20   aborted fetuses and alleging that Employee Stone supported

21   murder.

22           On the issue of breach of duty of fair

23   representation, the plaintiff must show that 556 must have

24   acted either arbitrarily, discriminatorily, or in bad faith to

25   trigger those laws.

1          The plaintiff's evidence is that Ms. Stone

2     complained to Southwest Airlines of what the plaintiff admits

3     is graphic material by e-mail.  Certainly reporting graphic

4     material in context of a hostile work environment to the

5     company is not arbitrary, discriminatory, or made in bad faith.

6          The record also goes on to support that as far as

7     a breach of duty of fair representation, the union, even after

8     Ms. Stone reported Ms. Carter to Southwest Airlines for her

9     actions, there was a fact-finding meeting.

10          And at that fact-finding meeting, the union

11     provided Ms. Carter representation.  The union actually

12     represented her and was able to negotiate a 30-day suspension

13     with a return to work.  It was Ms. Carter who refused to accept

14     that deal and move forward to a hearing on the merits, which

15     she was ultimately unsuccessful on.

16          Ultimately, Your Honor, there is no law or case

17     law that the plaintiffs can cite to abridging Ms. Stone from

18     seeking a nonhostile work environment, which is the claim that

19     incites all of this matter.

20          And as such, we ask that this Court dismiss all

21     claims against Local 556 as we did not take any adverse

22     employment action and reporting a hostile work environment

23     cannot be a breach of duty of good faith -- excuse me.  Breach

24     of fair representation on behalf of the union.

25          THE COURT:  Okay.

1          MR. GREENFIELD:  Thank you.

2          THE COURT:  Okay.  On behalf of the plaintiff, just so

3     you're aware of timing, Ms. Gehrke took a little more -- just a

4     couple of minutes more than 20 minutes, Mr. Greenfield took a

5     lot less.  So we have a total of.  They did a total of

6     30 minutes, which I told you you're entitled to at least.

7          MR. GILLIAM:  I appreciate that, Your Honor.

8          THE COURT:  A little bit over is not a big deal.

9          MR. GILLIAM:  I have to admit I'm not very

10    technologically savvy.  It sounds like it's on.

11         THE COURT:  It's definitely on.  Let me ask you this.

12    You know more than anyone here how long you're argument is

13    going to go.  My whole point about bringing that up is do you

14    want to break now, or do you want to just get into your

15    argument?

16         MR. GILLIAM:  Your Honor, I would rather just move on

17    right now.

18         THE COURT:  Okay.  That's fine with me.

19         MR. GILLIAM:  Okay.  Well, good afternoon and may it

20    please the Court.

21             Your Honor commented on how unusual it is to see

22    the employer and the union on the same side --

23         THE COURT:  From my view of the world, okay?

24         MR. GILLIAM:  But that's precisely why we are here.

25    It's because the employer and the union can work together to

1    silence an employee's speech and organizing rights under

2    RLA 152, Third and Fourth, and that's precisely why it provides

3    a cause of action for employees like Ms. Carter.

4            This case is about airline employees' protected

5    speech and organizing rights as well as her Title VII freedoms

6    from religious discrimination and fundamentally the Supreme

7    Court in *Old Dominion v. Austin* -- I'll refer to the case as

8    *"Austin"* -- recognized that labor disputes get very heated.  In

9    fact you often see an exchange of language that's very caustic,

10   very emotional, very sharp and is actionable per se in some

11   jurisdictions.

12           Nevertheless, the Supreme Court said that federal

13   labor law policies protect that speech.  It affords very robust

14   protections to employees' speech.  And not only were the speech

15   protections recognized as protected in *Austin,* but subsequently

16   federal courts have recognized the holding in *Austin* and

17   applied it in the context of RLA.  One of those cases is

18   *Konop v. Hawaiian Airlines* from the Ninth Circuit in 2002;

19   another is *Dunn;* and those cases explicitly recognize those

20   protections.

21           And whatever Southwest's characterizations of the

22   communications that Ms. Carter sent to the union president, in

23   many ways its arguments exceed the scope of what we're here to

24   do today, which is to determine the motion to dismiss and upon

25   motion to dismiss the plaintiff's factual allegations are

1    entitled to an assumption that they are true and I guess what
2    I'd like to start off with is the arbitration.

3            As a threshold matter, the Court should not
4    consider Southwest's extra pleading materials.  In their brief,
5    Southwest cited some cases from New York, *Stacks* and *Schwab,*
6    for the proposition that on a Rule 12(b)(6) motion a court can
7    take judicial notice or actually can decide *res judicata* and
8    issue preclusion.

9            Well, it doesn't stand for that proposition if
10   you look at the cases.  What those cases stand for is that the
11   Court can take judicial notice that an arbitration took place.
12   It can't use the opportunity to delve into the purported
13   findings of the arbitration.

14           And this circuit, the Fifth Circuit, precedent
15   prohibits making *res judicata* and issue preclusion rulings on a
16   12(b)(6) motion unless it's converted into a motion for summary
17   judgment.

18           That holding was *Testmasters v. Singh*, and I can
19   give you the citation if you want.

20       THE COURT:  Actually in the back of my mind was the
21   issue of converting this to a motion for summary judgment,
22   which the Court can do on its own; but I want you to touch on
23   that.

24       MR. GILLIAM:  Correct, Your Honor.  And certainly the
25   Court can do it, and I would argue that the Court should not

1    exercise it's discretion to do that.

2           But first I would also like to mention that --

3           THE COURT:  And you're going to get into why you think

4    the Court should not?

5           MR. GILLIAM:  Yes, Your Honor.

6           THE COURT:  Okay.

7           MR. GILLIAM:  But one step before that, I'd like to

8    point out that nowhere in the complaint do Carter's allegations

9    make any reference to the arbitration, and they're not central

10    to her claims.

11           To understand what it means to be central to

12    their claims, the Court should look to a case called *Scanlan*

13    out of the Fifth Circuit and there on a motion to dismiss, the

14    defendant attached a report to their motion to dismiss and the

15    Court recognized that in that case the plaintiffs actually did

16    rely on portions of the report substantially.

17           However, they had a substantial amount of other

18    evidence to support their claims and this report was mainly

19    introduced for the defendant's defenses and in that case it was

20    deemed not to be central.

21           Carter's complaint is based on RLA-protected

22    speech and organizing, Title VII religious discrimination,

23    U.S. constitutional and statutory retaliation claims that are

24    wholly independent from the question of whether the company had

25    just cause to fire her under the collective bargaining

1    agreement.  That narrow legal issue was what was arbitrated.

2         Now, the reason why the Court should not convert

3    the 12(b)(6) motion to dismiss into motion for summary judgment

4    is because it fails to satisfy the criteria for conversion set

5    forth in the Fifth Circuit case *Isquith* and also *Bradbury*.  The

6    first requirement was -- the first failure is that the

7    materials appended by Southwest are scanty, incomplete and

8    inconclusive, using the wording from *Isquith*.  In other words,

9    they do not present the entire record of the arbitration.

10        So the Court has no way to determine how the

11   arbitrator reached the conclusions it did, what was really

12   within the scope of these legal conclusions, not really factual

13   findings; and so it would be inappropriate to reach those

14   issues without other materials.

15        If you look at the materials appended by

16   Southwest, the arbitrator's decision, he cites to a transcript

17   that's nowhere in our record that wasn't appended.  He cites to

18   a trial record.  None of those materials are appended.  All we

19   have is an affidavit and the decision, but no other context in

20   which this Court could make a reasonable decision and assess

21   whether to exercise any discretion to give preclusive effect.

22        The other requirement under *Isquith* is that the

23   decision to convert has to facilitate a decision in the case;

24   and the arbitration materials don't address Count 1, the speech

25   and organizing claim under the RLA; it does not address

1   Count 2, which is that the social media policies restricted

2   RLA-protected rights; it doesn't address the Title VII claims;

3   and it doesn't -- the only thing it really addresses, arguably,

4   are elements of causation.  And it doesn't address adverse

5   action; it doesn't address whether she was exercising

6   constitutionally-protected speech.

7            And the arbitrator's materials, they contain

8   legal conclusions and vague statements that are very difficult

9   to discern the meaning of.  And even separate from these

10  findings that have been propounded from Southwest, as the

11  briefs have set forth, Carter identifies many other factors by

12  which she can prove causation.  She alleges those in the

13  complaint; and the Court can't dismiss a complaint, unless it

14  appears beyond doubt, that Carter can't prove any set of facts

15  that would entitle her to relief.

16           So even assuming *arguendo* that you give credit to

17  some of those facts, the actual factual findings that were

18  propounded by Southwest, you wouldn't be able to -- Carter

19  would still have other factual allegations that would support

20  her intimacy to relief.  So going through all this process of

21  converting is futile.

22           Another factor that the Court should take into

23  consideration is that Fifth Circuit precedent counsels against

24  conversion prior to discovery.  We cited the *Paris* case and the

25  *Coleman* case and a case out of the DC circuit called *Ross*.  I

1    know that it's not necessarily binding; but I think that it is

2    important that it recognizes that especially in employment

3    discrimination cases where plaintiffs can only proffer evidence

4    after going through discovery regarding the illegality of the

5    employers motives, it just would circumvent due process rights

6    in order to prematurely convert and grant summary judgment.

7              And I would say that if the Court does decide to

8    convert that the plaintiff would ask for reasonable notice and

9    opportunity to conduct discovery and an opportunity to present

10   evidence to oppose a motion for summary judgment, but again I

11   don't think that it would make any sense to convert here.

12             And again the arbitration itself isn't entitled

13   to issue preclusive effect.  The standard is set forth in

14   various cases, *Coleman* and *Petro-Hunt*.  Not only do the facts

15   have to be identical, but the legal standard used to assess and

16   discern the facts also has to be identical.

17             In the arbitration you had -- the only question

18   really before the arbitrator is whether there was just cause to

19   fire Carter under the CBA, and the arbitrator's findings that

20   were appended set that out.

21             The other thing is that the legal conclusions

22   that are put forward by the arbitrator weren't necessary to the

23   arbitrator's decision.  For instance, Southwest says that --

24   made mention of Audrey Stone's testimony and that Audrey Stone

25   didn't have a retaliatory motivation.  That is totally beyond

1    the scope of whether Southwest had just cause to fire Carter.

2    So it's not entitled to any issue of preclusive effect in the

3    first place.

4              I would like to move on to Ms. Carter's speech

5    claims.  It's amply supported by precedent showing that

6    Southwest's objections are all rejected.  There are numerous

7    cases -- *Konop* and *Fennessy* out of the Ninth Circuit;

8    *Stefanyshyn* out of the First Circuit; *Conrad*, which is out of

9    the Seventh Circuit; *Roscello*, *Brady* and *Austin* all support the

10   fact that Carter has rights protecting her speech and

11   association under 152(3) and (4).

12             When Carter made her communications to

13   President Stone, she was engaged in speech about reorganizing

14   the union.  The complaint sets forth the entire context of how

15   there was this campaign to recall the union executive board,

16   and Carter's speech explicitly addresses how the employees are

17   looking to remove this executive board that they had

18   fundamental, ideological and political disagreements with and

19   the messages she sent on Facebook strictly address the union's

20   political and ideological activities and this is what the

21   employees were doing in all of the other cases I just

22   mentioned.

23             For instance, in *Fennessy*, that involved an

24   employee who was reorganizing his union post-certification.  He

25   was basically arguing that another union should come into

1  power.  Here they were arguing that the executive board should

2  be replaced, so they were reorganizing their union.

3           When Southwest fired Carter for those

4  communications, Southwest was indeed interfering with her

5  protected rights under the RLA.  And, again, what is

6  particularly important here is that Federal law establishes

7  very robust protections for speech; and the Supreme Court when

8  it announced the standard that again has been adopted in other

9  RLA cases like *Konop,* says that it recognized that labor

10  disputes are heated affairs and employees shouldn't be

11  restrained by what they say and what they do.

12           It recognized that there were bitter and extreme

13  charges and unfounded rumors, personal attacks,

14  misrepresentations; nevertheless all of that should be

15  protected and they believed that the labor laws should be there

16  to allow labor and management to speak bluntly, recklessly, the

17  Court said, to embellish and engage in hostile language and, as

18  *Konop* and the Supreme Court in *Austin* both agreed, it's given

19  such robust protection, it's protected by a malice standard.

20           So Southwest would have to show that Carter made

21  these communications with knowledge of their falsity.  And

22  maybe they can do that after the motion to dismiss phase, but

23  they can't do it on a motion to dismiss because we're confined

24  and bound by Carter's factual allegations in the complaint.

25           The social media policies that Southwest has

1   implemented are not part of the collective bargaining

2   agreement, regardless of what they've argued in their brief.

3   They are separate.  And you don't have to interpret either the

4   CBA or those policies to find that they restrain Carter's

5   rights under the Railway Labor Act.

6           In *Carmona*, the Fifth Circuit explained the

7   difference between interpreting and referring to a collective

8   bargaining agreement and they said that -- and this was for the

9   purpose of establishing that they had jurisdiction over the

10   claims.  In that case they said that even if you have to refer

11   to the collective bargaining agreement or, let's say, even

12   referring to the social media policies, unless those policies

13   or the collective bargaining agreement conclusively decide an

14   issue, then the Court will have subject matter jurisdiction;

15   and, of course, pursuant to Carter's claims, it doesn't

16   conclusively resolve the issue.  You have to look to her

17   federal rights and whether they restricted her rights is a

18   federal question and, again, this is on all fours with *Carmona*.

19           Now, as for the Title VII religious

20   discrimination claims, *Abercrombie* shows why all of Southwest's

21   arguments should be rejected.  Of course, *Abercrombie* was a

22   Supreme Court case; and it held that employees are not required

23   to give the employer advanced notice of a need for a religious

24   accommodation.  Many, if not most of the cases cited by

25   Southwest in their brief are pre-*Abercrombie,* so they became

1    bad law.

2           What *Abercrombie* says is that to state a claim

3    you have to have an adverse action because of the religious

4    belief or practice and "because of" means that it was motivated

5    by the employer's desire to avoid accommodation of that

6    religious belief.  And it doesn't require that the employer

7    have knowledge of the need; but contrary to what Southwest has

8    argued earlier, the employer did have knowledge of Carter's

9    need for an accommodation prior to firing her.

10          On March 7th during her fact-finding, Carter

11   explained that she is an evangelical Christian with religious

12   beliefs and she believed that abortion is the taking of human

13   life, and Southwest fired her a week later.

14          Southwest repeatedly asked her in her

15   fact-finding why did she send these messages; and her response

16   was, "Well, I'm an evangelical Christian and I believe that I

17   need to share these messages to prevent other people from going

18   through pain and because I believe as part of my religion that

19   I need to share the message."

20          They fired her a week later; so they reputed any

21   type of accommodation.  They've cited the *Nobach* case and that

22   case doesn't help Southwest because *Nobach* -- in *Nobach*, the

23   plaintiff hadn't presented any direct or circumstantial

24   evidence of refusal to accommodate or the need to accommodate

25   before her discharge, and here Carter has.

1          In fact, Southwest should have known from the
2     time these messages were sent that they were of a religious
3     nature.  For instance, she sent an article to President
4     Audrey Stone that talked about the Reverend Martin Luther
5     King's beliefs on abortion, and it included the phrase "Seek
6     God now."
7          In one of the messages posted on her Facebook
8     page it said:  "To anyone who is supporting abortion, God help
9     you."
10         So these were intrinsically religious messages.
11    But at any rate Southwest did know prior to her termination
12    that she was in need of a religious accommodation, so it
13    clearly violates *Abercrombie*.  *Chalmers* and other cases they
14    cite are irrelevant because Carter's messages were not directed
15    to the workplace.  This is crucial.
16         Her messages were directed to the union president
17    as part of a dispute with the union in response to the union's
18    participation in a Planned Parenthood Women's March; and they
19    weren't directed to any other employees, they weren't directed
20    to the employer, only to the union president.  They were sent
21    to Audrey Stone's -- Audrey Stone TWU website -- I'm sorry --
22    Facebook account.
23         Moving on to the retaliation claims, there are
24    two types of retaliation claims.  One is the constitutional
25    retaliation and the other is statutory retaliation.

1          So for the constitutional retaliation claim, the

2     Supreme Court's decision in *Hanson* establishes why Southwest

3     would be considered a federal actor under these circumstances.

4     State action is what forces an employee to pay a union an

5     agency fee.  The Supreme Court recognized that in *Hanson* and

6     again in many other cases cited in our brief.

7          Any time that state action forces an employee to

8     pay a union agency fee, it warrants First Amendment scrutiny

9     and especially where the employee is asserting objections

10    because the fees involve -- the employee is asserting that the

11    fees are being spent on political and ideological activities.

12         And court cases have said, including *Hanson* and

13    *Lutz* out of the Eastern District of Virginia, say that they

14    warrant First Amendment scrutiny because they have the

15    potential to abridge First Amendment rights.

16         And Congress's enactment of the Railway Labor Act

17    imposed the federal imprimatur on the force fee requirements

18    and employment objections to them.  So when Carter was

19    objecting about how the union was spending employee's fees to

20    support political activities such as participating in this

21    march, she was exercising rights that fell within the federal

22    imprimatur established in *Hanson*.  So that is where the state

23    action arises.

24         I recognize that it is a bit of a curiosity

25    because they are in all other respects private sector entities,

1   but Hanson is good law that says that they are considered to be

2   federal actors for the purposes of objections to the forced fee

3   requirement under the Railway Labor Act.

4           And as for the statutory retaliation under the

5   RLA, Southwest's arguments have to be rejected because they've

6   been deemed cognizable in *Roscello*, *Fennessy* and *Konop*, all

7   cases that involve retaliation against an employee for

8   exercising protected rights, protected RLA activity.

9           And they want to delve into the causal nexus

10  including with the questions about timing, but again that

11  question goes beyond the motion to dismiss stage.  Carter's

12  allegations have to be taken as true for the purposes of a

13  motion to dismiss, and Carter has alleged all the facts to

14  support a causal nexus.

15          Returning to subject matter jurisdiction, despite

16  Southwest's argument that the arbitration -- that she has

17  already litigated these matters in an arbitration, what she has

18  really grieved is whether the employer had a just cause to

19  terminate her employment under the CBA.  This argument has been

20  overwhelmingly rejected.  They've made this argument multiple

21  times.  They've made it in the Fifth Circuit where it's been

22  rejected.  They've made it in the Ninth Circuit, where it was

23  also rejected.  They lost the same argument in *Carmona*.  They

24  lost the same argument in *Fennessy*.  And *Hawaiian*

25  *Airlines v. Norris*, which we cite, and all of these other cases

1    we cite establish that an employer's claim under the Railway

2    Labor Act under Title VII are all separate and independent

3    claims from the litigation of a just-cause termination.  It

4    doesn't matter whether it's been litigated or not.  It's

5    completely separate.  It's a separate legal inquiry and facts

6    discerned under a separate legal standard.

7              As far as the distinction they attempt to make

8    between precertification and post-certification rights, again

9    the overwhelming weight of authoritative precedent -- and I

10   say, "authoritative" because I don't consider *Held* to be

11   authoritative either -- demonstrates that Courts have

12   subject-matter jurisdiction over employee speech and organizing

13   rights and that's even after a union is formally certified as

14   the employee's exclusive bargaining representative.  That's

15   established again in *Konop*, *Fennessy*, *Conrad* and *Austin*.

16             Another case -- and, again, I recognize it's

17   outside of the jurisdiction; but it's from the district court

18   in DC.  It observed that the Supreme Court did not create a

19   heightened jurisdictional barrier for post-certification cases.

20             And I think it's also important to consider the

21   ramifications of Southwest's argument.  If employees had no

22   rights to oppose their union after the union had been

23   certified, how were the employees ever supposed to remove it if

24   they're solely confined to an arbitration process controlled by

25   the union and the employer?

1      If this case doesn't exemplify the type of

2  extreme union animus that gives grounds to federal court

3  jurisdiction, I don't know what does.  She was fired for

4  exercising her protected RLA speech and organizing rights.

5      How am I doing on time, Your Honor?

6      THE COURT:  Well, you're --

7      MR. GILLIAM:  Long?

8      THE COURT:  How much time do you need?

9      MR. GILLIAM:  I'd just like to address some of the

10  union arguments pretty quick.

11      THE COURT:  Go ahead.

12      MR. GILLIAM:  Okay.  Carter has alleged the facts to --

13      THE COURT:  But to answer your question, you're getting

14  close to 30; so you're fine.

15      MR. GILLIAM:  Okay.

16      Carter alleged that the union violated its duty

17  of fair representation by seeking and causing her termination.

18  President Audrey Stone knew the consequences of violating

19  Southwest's social media policies.  Earlier -- and this is

20  alleged in the complaint -- Audrey Stone implored other

21  employees not to turn each other in for social media

22  violations.  She knew that the employer could terminate

23  employees for their violation and the allegations supported by

24  elements of causation that are alleged in the complaint

25  demonstrate a claim that the union treated her differently and

1    was actually discriminating against both nonmember objector

2    employees and employees who were supporting the recall effort.

3            There's a factual allegation that 13 of the

4    recall supporters had been targeted by the union's reporting of

5    the recall supporters for the violations of social media

6    policies.  Meanwhile they arduously defended union supporters

7    who violated these policies.

8            Under the RLA, the union owes a fiduciary duty to

9    all the employees in the workplace, members and nonmembers

10   alike; and the union breaches its duty when it discriminates

11   against employees based on their nonmember status.  That's from

12   the case called *Del Casal* out of the Fifth Circuit.

13           And, again, the union is just wrong that Carter

14   didn't plead how the union breached its duty of fair

15   representation.  She sets forth that it complained to Southwest

16   management knowing and intending to discipline her while

17   shielding other employees.

18           And as for the retaliation claim, I've basically

19   addressed why the union would also be considered a federal

20   actor within the scope of *Hanson* because of Carter's objections

21   to their spending of employees fees on political and

22   ideological activities; but as for the adverse action, the

23   Fifth Circuit case we cite, *James,* says that retaliation claims

24   are cognizable against defendants that are either personally

25   involved in the deprivation of rights or when their wrongful

1    actions are causally connected to the deprivation.  And Carter

2    alleges the causal connection.

3            And it's also well established under federal law

4    that retaliation claims are cognizable against unions.  There

5    are Title VII cases out of the First Circuit, the Eighth

6    Circuit and even the Fifth Circuit.  There's an NLRA case, all

7    of which are cited in our brief.

8            And the union raises an argument that

9    Audrey Stone was just another employee who was complaining of

10   harassment, but I think that it -- it would be very, very naive

11   to characterize it in that manner.

12           Audrey Stone is president of the union that sits

13   down at the negotiating table with Southwest and wields

14   tremendous influence over employees' benefits, wages and terms

15   and conditions of employment.  She has a very powerful

16   connection with the employer at the negotiating table.

17           And the test for determining whether somebody is

18   acting within the capacity of a union president or for the

19   union or just as an ordinary employee are established by

20   traditional principles of agency and that's whether the

21   putative agent has positions and duties -- well, you look at

22   the putative agent's position and duties in the context of

23   their conduct and would it create a reasonable belief that the

24   individual was speaking and acting for the union.

25           The conversation or at least the communications

1    that Carter directed to Audrey Stone at the Audrey Stone TWU

2    Facebook page were all addressing union activity.  They weren't

3    addressing her in any other capacity, but as the union

4    president and the union's activity.  She was the union, and she

5    had for years expressed her opposition to union activity at

6    that address.

7              And even, again, under the traditional principles

8    of agency, apparent authority is enough.  It doesn't have to be

9    any kind of express authorization or ratification.

10             And finally I would like to note that the union

11   never addresses Carter's Title VII religious discrimination

12   claims; but they are clearly brought against the union and

13   because the union hasn't addressed them, they're waived.  I'd

14   also like to renew the objection we made to Local 556's motion

15   to dismiss on the basis that it was untimely filed.

16             And I'm going to -- one other point I would like

17   to cover, Your Honor, is *Grimes*.  *Grimes* does give the Court

18   discretion to give weight to an arbitrator's factual findings.

19   However, if it is to be consistent with Supreme Court

20   precedent, it has to be interpreted as to allow the Court to

21   weigh arbitral findings in conjunction with the plaintiff's

22   evidence.

23             *Grimes* itself said itself said that it's not

24   automatic.  Southwest is arguing for a *res judicata* type effect

25   to the arbitration.  It wants -- despite what it says, it wants

1   to give automatic preclusive effect to these arbitral findings;

2   but *Grimes* said that it's not automatic and, again, if *Grimes*

3   is to be consistent with Supreme Court precedent, then it has

4   to be construed as weighing -- allowing the Court to give

5   discretion to the weight amongst all of the other facts that

6   are presented by the plaintiff.

7              I think that's all I have, Your Honor.

8        THE COURT:  Thank you.  Let's go off the record for a

9   second.

10                  (Off-the-record discussion.)

11                     (Court is in recess.)

12        COURTROOM SECURITY OFFICER:  All rise.

13        THE COURT:  Thank you.

14                  (Off-the-record discussion.)

15        THE COURT:  So, Ms. Gehrke, anything further on behalf

16   of Southwest Airlines that you have not already said?

17        MS. GEHRKE:  Just a couple of very brief points.

18        THE COURT:  Sure.  Go ahead.

19        MS. GEHRKE:  Thank you.

20              I did want to address briefly, although it sounds

21   like it may not be an issue, this notion of converting the

22   motion to summary judgment.  We would not prefer that option.

23   We don't think it's necessary because we think that the

24   arbitrator's decision is properly before the Court since we are

25   challenging subject matter jurisdiction; and even though we

1    didn't attach the full transcript and all the exhibits, it is

2    very much detailed in Arbitrator Lemons' detailed factual

3    findings and the arbitrator's award where he does lay out --

4             THE COURT:  You don't have to argue anymore.  I've

5    already telegraphed that I'm not going to convert it to --

6             MS. GEHRKE:  All right.  Very good.

7             THE COURT:  So both sides telling me they don't want to

8    convert it kind of takes it --

9             MS. GEHRKE:  All right.

10            THE COURT:  That takes care of it.

11            MS. GEHRKE:   I would only note a couple of things that

12   counsel said with respect to the preclusive effect of

13   Arbitrator Lemons' arbitration award and I think that he said

14   that Arbitrator Lemons' findings arguably address causation and

15   he was arguing that that wasn't necessarily enough to foreclose

16   the claims that she is pleading here since they are different

17   legal claims.

18            And I would just reiterate the point that

19   causation is a necessary element of most, if not all, of her

20   legal claims in this case; and so because those factual

21   findings by Arbitrator Lemons as to causation, they would

22   negate necessary elements here which would then make it a

23   failure to state a claim, which amendment would be futile.

24            And then counsel made the point regarding the

25   company and the union being on the same side and what is an

1    employee like Ms. Carter supposed to do to challenge the union

2    if they're not fairly representing her in any disputes that she

3    may have with the employer.

4              And the answer to that is simple and that's the

5    duty of fair representation claim.  And she could have filed

6    what we call hybrid action under the Railway Labor Act, which

7    is a breach of contract claim in court with an accompanying

8    breach of the duty of fair representation claim.

9              So if she truly felt that the company and the

10   union were colluding to her detriment, that was the action that

11   she should have taken to challenge those actions; but she did

12   not.  She chose to proceed through the arbitration process all

13   the way to award, and so we believe she is bound by that now.

14        THE COURT:  Okay.

15        MS. GEHRKE:  Thank you.

16        THE COURT:  Thank you.  Anything further?

17        MR. GREENFIELD:  Very briefly.

18        THE COURT:  Sure.

19        MR. GREENFIELD:  Actually let me go to the very end of

20   on the issue of timeliness and the waiver of the religious

21   briefing.  This is literally the, I believe, third time we have

22   filed our motion to dismiss and this one being on the second

23   amended complaint.  They were filed, removed, et cetera.  I

24   don't believe any prejudice has been caused by a calendaring

25   error regarding when our motion was filed.  The arguments

1    remained nearly identical to all made previously.

2                And on the religious briefing waiver, the Court

3    certainly has the ability to hear that.  The doctrinal law

4    regarding retaliation, adverse employment action and protected

5    activity does not change regarding those two issues, which

6    leads us into the adverse action part, branch of the

7    retaliation.

8                Again, every case cited by plaintiff and opposing

9    counsel in their briefing are all distinguishable regarding

10   whether a union can actually retaliate against an employee.  In

11   all of those cases, that was where the union actually took

12   direct action against one of their union members for some sort

13   of issue within their internal union policies, never in an

14   issue where it was the outside company who terminated the

15   plaintiff's employment.

16               Regarding the breach of fiduciary duty, the

17   pleadings say nothing about the issue and there's been very

18   little discussion that in order for that claim to survive, it

19   must inherently abrogate Ms. Stone's federal rights to be free

20   from a hostile work environment and that simply cannot be the

21   case under the law and that's why that claim should be

22   dismissed.

23               Her presidency, her acting as a president, cannot

24   take away the fact that she is still ultimately an employee of

25   Southwest Airlines.

1          And just as a final point, we would concur with

2     Ms. Gehrke's assessment on the issue of proper claim being a

3     hybrid claim being brought underlying to arbitration as opposed

4     to here in court.

5          THE COURT:  Okay.

6          MR. GREENFIELD:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          Anything real quick on your part that you haven't

9     already said?

10         MR. GILLIAM:  Yes.  I will be real quick.

11         So we did cite in our briefs that there are many

12    other ways to prove causation.  Yes, causation is important to

13    Ms. Carter's claims.  However, even if you give preclusive

14    effect to the arbitrator's findings, which you shouldn't

15    because many of them are legal conclusions, they're not

16    adjudicative facts as set forth in the *Taylor v. Medcorp* case

17    which addresses Rule 201 and says that you can't give -- you

18    can't take judicial notice of facts that are really mixed

19    questions of fact and law, and I think the same principle

20    applies here.  You shouldn't issue preclusive effect to

21    something that is a legal conclusion, maybe discerned from some

22    facts, but where you can't really tell based on appended

23    materials how the arbitrator reached that legal conclusion.

24         Mentioning the hybrid DFR claim, that is not an

25    exclusive remedy; and many of the RLA protected rights cases

1   under 152(3) and (4), do establish that explicitly.  You can go

2   to, again, *Konop, Fennessy* and *Carmona* and they will set forth

3   that employees have separate and independent rights and private

4   rights of action under 152(3) and (4).

5            In fact, there's a Supreme Court case that

6   established the private right of action under 152(3) and that's

7   the *Texas New Orleans Railroad* case and it's an older case, but

8   it has basically been reinforced and never overturned.

9            And as far as the late filing of the motion to

10   dismiss, its main prejudice is if it's granted, in which case

11   it's highly prejudicial to the plaintiff.  And the cases that

12   he referred to aren't just internal union disciplinary matters.

13            And then finally they're asserting a defense

14   based off of President Stone's protections.  You've also heard

15   Southwest refer to an undo hardship defense.  All of these are

16   defenses that certainly they're entitled to raise, but not at

17   the motion to dismiss phase.

18            At this phase what we're addressing are whether

19   the facts alleged in the complaint state a plausible

20   entitlement to relief, and we wholeheartedly believe they do.

21            THE COURT:  Okay.  Thank you.

22            All right.  Counsel, I appreciate your argument

23   and your briefing.  I'm not sure what I said about scheduling

24   was on the record, so in an abundance of caution, I'm going to

25   repeat what I think I said off the record.

1            I told you you have three weeks from today, but

2    I'm actually going to give you more because of the holidays, in

3    which to submit to the Court a proposed scheduling order.  If

4    all three of you sign off on it, there's a high degree of

5    likelihood I will, too.  You have until Wednesday,

6    January 10th, to submit that to the Court.

7            In there, I told you off the record you needed to

8    put the case on a three-week docket.  Your first day of trial

9    can be any day of that three weeks, so check with the people

10   you need to be at trial.  The case will not be reset absent

11   extraordinary good cause for the docket of the Court, but you

12   won't know that until we get to the trial setting.

13           The pretrial scheduling final conference will be

14   two Thursdays before the first day of your trial, which will be

15   a Thursday at 1:30, unless your first day of trial falls on a

16   Tuesday because of holidays.

17           Put your dispositive motion deadline at least

18   150 days before trial.  Yes, at least, because then there's

19   going to be responses and replies and then the Court will have

20   to rule on that.

21           The Court has invited the parties to consider

22   some of the mediators that we discussed off the record.  I will

23   likely give a lot of thought and may order you-all to mediation

24   in the next 60 to 90 days.  I appreciate it that you would give

25   it a lot of thought with your respective board and your clients

1    and your client as well.

2            If you need to get me on the phone personally as

3    the judge, I should be available to do so as long as all three

4    of are you on the phone and we get some advance notice of that

5    in the next week or so.

6            But if you-all end up agreeing that you do want

7    to go to mediation and who the mediator should be, you can

8    check with these people's calendars or you can come up with

9    someone else.  Then you just need to advise -- you can do it in

10   a letter to me or you can call my law clerk on this file and go

11   through the judicial assistant.  Her number is on the phone and

12   you can say, "We're all on the phone.  We would like to talk to

13   Blair Watler," who is the law clerk on there and you can tell

14   her, "Yes, we've agreed.  This is who we propose" and she will

15   come find me.  The Court will immediately do an order of

16   referral to mediation and I'll set a deadline with the

17   mediator.

18            So that's where we are.

19            Anything else on the record on behalf of

20   plaintiff?

21        MR. GILLIAM:  No, Your Honor.

22        THE COURT:  On behalf of Southwest?

23        MS. GEHRKE:  No, Your Honor.

24        THE COURT:  The union?

25        MR. GREENFIELD:  No, Your Honor.

1          THE COURT:  Thank you for being here.  I hope we didn't

2     delay your trips back to your wherever home is.  Thank you very

3     much for a most interesting afternoon.

4          COURTROOM SECURITY OFFICER:  All rise.

5               (WHEREUPON, the proceedings were adjourned.)

1                                    * * * *

2                          REPORTER'S CERTIFICATE

3              I, Lanie M. Smith, CRR, RPR, Official Court
   Reporter, United States District Court, Northern District of
4  Texas, do hereby certify that the foregoing is a true and
   correct transcript, to the best of my ability and
5  understanding, from the record of the proceedings in the
   above-entitled and numbered matter.

6

7                                   ___/s/ Lanie M. Smith_____
                                     Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25