## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>                Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br><br>                Defendants. | Civil Case No. 3:17-cv-02278-S<br><br><br>**FOURTH AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Charlene Carter ("Carter"), by and through her undersigned attorneys, files this Fourth Amended Complaint against Defendants Southwest Airlines Co. ("Southwest") and the Transport Workers Union of America Local 556 ("Local 556"), and alleges:

### INTRODUCTION

1. Local 556 acted arbitrarily, discriminatorily, and in bad faith in complaining to Southwest about Carter's protected conduct, knowing that its report would likely result in Carter's termination. *Steele v. Louisville & N.R. Co.*, 323 U.S. 192 (1944). Local 556 thus breached its duty of fair representation by causing Southwest to terminate Carter's employment.

2. Both Defendants retaliated against Carter for her exercise of rights under the Railway Labor Act, 45 U.S.C. § 151, *et seq.* ("RLA"), to become a nonmember and object to payment of Local 556's compelled fees for its political, ideological, and other nonbargaining spending, and to engage in other speech and activity in opposition to Local 556.

3.     Defendant Southwest discriminated against Carter for her religious beliefs and practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), by terminating her employment because of her religious beliefs and practices, including her sharing religious views on her personal Facebook page, with her union president, while off-duty and without any impact on the workplace.

4.     Defendant Local 556 also discriminated and retaliated against Carter in violation of Title VII by complaining about Carter's religious beliefs and practices, and causing and attempting to cause Carter's termination.

## JURISDICTION AND VENUE

5.     Carter's claims arise under the RLA. Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (interstate commerce), and 42 U.S.C. § 2000e-5(f). Under 28 U.S.C. §§ 2201 and 2202, this Court may also declare the rights of Plaintiff.

6.     Venue is proper in the United States District Court for the Northern District of Texas under 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims occurred in this district and both Defendants conduct business and maintain their headquarters in this judicial district.

7.     Carter's Title VII religious discrimination claims are properly before this Court. Carter filed a charge against Southwest with the Equal Employment Opportunity Commission ("EEOC") on September 8, 2017 (attached and incorporated hereto as EXHIBIT A), and a charge against Local 556 with the EEOC on September 21, 2017 (attached and incorporated hereto as EXHIBIT B). On April 2, 2018, Carter received right to sue letters from the EEOC

2

(attached and incorporated hereto as EXHIBIT C), which advised Carter she had a right to institute a civil action against Southwest and Local 556 under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

## PARTIES

8.   At all relevant times Carter was an "employee" within the meaning of 45 U.S.C. § 151, Fifth of the RLA, and employed by Southwest, within a craft/class of flight attendants represented by Local 556. She was also an employee within the meaning of Title VII, 42 U.S.C. § 2000e (f).

9.   Southwest is a "carrier by air" or "air carrier" within the meaning of the RLA, 45 U.S.C. § 181. It is also an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e (b).

10.   Local 556 is a "representative" within the meaning of 45 U.S.C. § 151, Sixth of the RLA, and, at all times relevant hereto, Local 556 has been the exclusive bargaining representative for Carter under 45 U.S.C. § 152, Ninth of the RLA, and owes all represented employees within the bargaining unit it represents, including Carter, a duty of fair representation. Local 556 is also a "labor organization" within the meaning of Title VII, 42 U.S.C. § 2000e (d) and (e).

## FACTUAL ALLEGATIONS

11.   Carter started her employment as a flight attendant at Southwest in September 1996, and worked in that position until March 14, 2017, when Southwest terminated her employment, following its investigation of a complaint that Local 556 President Audrey Stone filed against Carter.

12.   While at Southwest, Carter was employed within a craft/class represented exclusively by Local 556 for purposes of collective bargaining.

3

13.   Although she became a member of Local 556 upon employment with Southwest, Carter resigned from membership in Local 556 on or about September 29, 2013, and exercised her RLA rights under *Ellis* v. *Bhd. of Ry., Airline and S.S. Clerks, Freight Handlers, Express and Station Emps.,* 466 U.S. 435 (1984), to object to paying the union's compelled fees for its political, ideological, and other nonbargaining spending. Since that date, Carter has remained a nonmember objector.

### The labor dispute over the Local 556 Executive Board's legitimacy

14.   In 2012, two parties of candidates ran for the top union officer positions on the Local 556 Executive Board. One party consisted of Allyson Lauck, Audrey Stone, Brett Nevarez, and Cuyler Thompson ("Lauck Party"). The other party consisted of Chris Click, Jerry Lindemann, Stacy Martin, Dawn Wann, and Jannah Dalak ("Martin Party"). In March 2012, the Local 556 membership elected the Martin Party. Carter supported the Martin Party and voted for its candidates.

15.   But around Spring 2013, supporters of the losing party of candidates—the Lauck Party—filed discipline charges against Click and Lindemann, which led to their suspension from the Board while the charges were pending. Two members from the Lauck Party, Audrey Stone and John Parrott, then filled the two vacancies under union bylaws that allowed the runner-up candidates to take an executive board position when board members are suspended. Shortly thereafter, two members of the Martin Party, Dawn Wann and Jannah Dalak, resigned from the Board. And two members of the Lauck Party, Brett Nevarez and Cuyler Thompson, filled those two vacancies. The Board then elevated Stone to the position of Local 556 President ("President Stone").

16.  Carter and many other flight attendants viewed the charges against Click and Lindemann as dubious. They also questioned the legitimacy of removing duly elected officers from the Board and replacing them with members of the losing party, including President Stone.

17.  Around June or July 2013, prior to her resignation as a union member, Carter attended a Local 556 meeting in Denver, Colorado. There, she argued that it was illegal to remove duly elected board members on dubious charges. She also mentioned the option that Local 556 members and other represented employees have of totally removing Local 556's legal status as the exclusive bargaining representative through a decertification election.

18.  During that June or July 2013 meeting, Executive Board Members Nevarez and Thompson—who were present at the meeting and now on the Board—threatened internal union charges against her as a member for saying the word "decertify" and warned that she could lose her job for expressing her opinion and not toeing the union line.

### The campaign of opposition against Local 556 and President Stone

19.  Later that summer, on August 3, 2013, Carter posted in a Facebook group known as "One Luv," which was open to all Southwest flight attendants that requested admission. Carter posted a screenshot of a comment thread on a different Facebook page where a Local 556 member stated that he planned to file union charges against Carter for discussing decertification at the union meeting. Carter replied to another Southwest flight attendant's post on One Luv, which asked "[W]hat charges can they file against you Charlene?" Carter replied:

> Not sure because unless I start the [decertification] Process then it is just on my freedom of speech!! They really do not want anyone to say anything that is against their agenda at all and this one word really upsets them. Wonder why they have to use this for the campaign makes me wonder how many others are talking about how they are tired of getting Threatened by our own Members!!!

20.   At or about this period of time, Local 556 Executive Board Member Nevarez instructed members and/or supporters on Facebook to take screenshots and save Facebook Messages received from Click, an Executive Board opponent, because he believed Click may "private message his way into big troubles for himself."

21.   Carter and other Local 556 members resigned and objected in September 2013, and were part of a wave of more than 90 other Southwest employees that eventually "opted out" of Local 556 around that time.

22.   On information and belief, many of these flight attendants opted out because they opposed non-elected Board members replacing Martin Party candidates that had won the March 2012 election.

23.   On September 6, 2013, Carter posted in One Luv a press release describing a lawsuit filed against TWU challenging its ability to collect forced fees from nonmembers. Carter then replied to her own post: "HMMM with all the Bad Stuff happening with our Local Maybe Opting Out would be my best BET!! It is our Right to do so TOO....do not let them scare you just spoke to an attorney and he told me just that....it is my RIGHT!!" The next day, after several other flight attendants made reply posts debating the merits of opting out of the union, Carter posted: "This thread has got the conversation started!! I for one will Opt Out if this ship does not get turned around for all the Members!! This Corrupt Board did not get voted in they took our Elected Down and told all of us SCREW YOUR VOTE!!"

24.   About a week later, on September 11, 2013, Carter posted in the One Luv Facebook group a sample letter for resigning from a union and exercising the RLA right to object to paying for union spending unrelated to collective bargaining. Her post stated: "Sample Letter to Opt Out of Union....A sample union resignation letter is provided below." On October 22, 2013, Carter

6

posted on her personal Facebook page that she was "opting out" of Local 556. Her post also discussed the legal rights of employees to resign and object to paying for union spending that is unrelated to collective bargaining.

25.   On December 12, 2013, Carter posted in One Luv a news story about union corruption. She also stated: "Just another REASON to OPT OUT of the Sheer Corruption of International Unions!!!! This is True CORRUPTION at its best and it sickens me to think I would have to pay this man if I belonged to the Union he is in!!!! Think on this my friends what does TWU DO that we do NOT KNOW!!! Done for Me."

26.   On July 30, 2014, Carter posted a video in One Luv and stated: "Great Video about NOT Voting in TWU as Your Union!"

27.   Around Fall 2014, President Stone and others started to campaign for the upcoming March 2015 Local 556 Board elections. Around this time, she formed a campaign strategy group known as the "Core Team" that consisted of her supporters to assist her in winning an election scheduled for March 16, 2015.

28.   The members of the Core Team made several posts and messages on a Facebook page called the "Core Member Team." On information and belief, this page was only open to President Stone's closest supporters and those on the Board. The Core Member Team's posts, which were leaked to other flight attendants, viciously attacked those opposed to President Stone.

29.   In early 2015 President Stone sent a message to the flight attendants that apologized for the "hurt and disappointment" caused by the Core Team's social media speech but stated that she would continue to encourage "passionate debate." President Stone also defended Core Team

members from being disciplined by Southwest regarding that same offensive and bullying speech.

30.   Around this time in early 2015, Carter started sending private Facebook messages to President Stone's Facebook page "Audrey Stone Twu." Only President Stone could view these messages that Carter sent her. Carter's messages criticized President Stone and Local 556.

31.   On March 16, 2015, President Stone and several other Board members that had taken the place of the Board members who resigned or were suspended won the election. Carter and several other flight attendants believed that procedural irregularities tainted the election results. One of those flight attendants, Jeanna Jackson, filed a complaint with the Department of Labor on March 16, 2015, which then launched an investigation. DOL later dropped the investigation, in April or May 2015, after it determined that the allegations were untimely.

32.   On April 20, 2015, President Stone emailed the flight attendants, including Carter, that Southwest had been disciplining several flight attendants for criticizing each other via social media. President Stone noted that the discipline instances "did not arise out of something Management simply uncovered or stumbled upon" and "[t]hey are not generally monitoring our sites." President Stone also stated: "these cases come about as our own Flight Attendants are turning each other in." She then asked flight attendants to stop fighting on social media and "to recognize that your fellow Employees are entitled to their own thoughts and opinions." She closed by appealing that: "If we have a problem let's work it out as the professionals that we are."

33.   In her April 20, 2015 message, President Stone communicated that Local 556 was "actively fighting" flight attendants' grievances against Southwest, challenging discipline under the company's social media policies. Stone recognized that these grievances had resulted in

employee discipline up to and including termination. President Stone indicated that the union had been "addressing the Southwest Social Media Policy for a long time," and it would continue to advocate on behalf of employees and their speech on social media. Stone also reported, "…TWU Local 556 made it clear to [Southwest] Management that we believe they are interfering in areas in violation of your rights."

34.   Jackson and several other flight attendants also started a campaign around July 2015 to recall the leadership of Local 556. They started collecting signatures for a petition demanding that Local 556 conduct new elections for 12 of the 17 officers of the union's executive board that won the March 2015 election, including President Stone.

35.   During the recall campaign, Local 556's leadership entered a tentative collective bargaining agreement with Southwest and then proposed it on July 7, 2015, to Local 556's membership for ratification. The members vigorously debated the proposed agreement and 87% voted against ratification on or around July 24, 2015.

36.   About a year and a half later, around December 15, 2016, Jackson presented recall petitions to Local 556 signed by over 7,000 Local 556 members. In the following month, January 2017, Local 556's leaders then voted to reject the petitions.

<u>Local 556 and President Stone participate in the Women's March</u>

37.   The next month, Carter learned that some Local 556 members, including President Stone, had participated in the January 21, 2017 "Women's March on Washington D.C." that protested President Trump's inauguration and advocated for various political causes.

38.   Local 556 participants posted pictures of the Women's March on social media, and featured the event in the union newsletter, TWU Express. The newsletter described Local 556's

activities and how it brought together "more than two dozen Southwest Airlines flight attendants from around the country," including members of Local 556, and how the members lobbied and conducted meetings with elected representatives in Washington, D.C. "in support of women's rights" and "discussing the dangers of national right-to-work legislation." A video and many of the pictures posted by Southwest flight attendants who are members of Local 556 featured the Southwest logos on their signs at the march.

39.   On information and belief, Southwest knew of Local 556 members' activities and participation in the Women's March as described and set forth in the TWU Express newsletter.

40.   On information and belief, Southwest helped accommodate Local 556 members wishing to attend the protest by allowing them to give their work shifts to other employees not attending the protest. Local 556 also paid the expenses of its members that attended the protest.

41.   Pro-abortion group Planned Parenthood was one of the main sponsors of the "Women's March on Washington D.C.," and participants in the Women's March advocated in support of Planned Parenthood and the pro-abortion cause.

42.   Carter is a Christian who believes that abortion is the taking of a human life contrary to the teachings of the Bible and the will of God. Carter's sincere religious beliefs require her to share with others that abortion is the taking of a human life. As a result, Carter opposes abortion and pro-abortion advocate, Planned Parenthood.

43.   On January 21, 2017, Carter posted a news article in a Facebook group called 556 Members for Total Recall that discussed how Southwest used pink cabin lights in some of its flights headed to Washington D.C. to show "solidarity" with those flying to the "Women's Anti-Trump March." The next day Jackson made a reply post on Total Recall to Carter's January 21 post and stated: "Apparently 20-30 [flight attendants] were pulled from trips to attend this protest

with [President Stone] and the Working Women's committee, Jessica Parker. Yes it was paid for

with our dues...smh." Carter replied to Jackson later that day by posting on Total Recall: "Jeanna

Jackson doesn't surprise me that our Union is at this March....and that we are paying them to be

there.....IT IS WRONG and I am SOOOOO TIRED of this CRAP from TWU and 556!"

<u>President Stone asks Southwest to terminate Carter</u>

44.   Since 2015, Carter had been sending President Stone private Facebook messages that

criticized the activities and positions that she and Local 556 took. President Stone never

responded to Carter's private messages, never asked her to stop sending those messages, and

never blocked Carter's messages on Facebook.

45.   At all relevant times, Carter's Facebook page was open and accessible to the general

public, so that everyone could see her posts, including President Stone, union member

employees, and Southwest's management personnel.

46.   On February 6, 2017, Carter posted a link on her Facebook page that requested

donations to fund Jackson's recall campaign. Her post stated:

> All my Southwest Airlines Flight Attendant friends we are going to make our
> Corrupt Union adhere to By-Laws one way or another we are moving fast in this
> fight so please help us bring Truth and Order back for We The Flight
> Attendants... TWU-AFL-CIO and Local 556 will be shown that THEY do Work
> for US!!! Please help us fight this Battle. Thanks

That same day, she also posted a link on her Facebook page to a news story about a lawsuit filed

against Local 556 for refusing to accept the results of the recall election. Her post stated:

> Well TWU-AFL-CIO and Local 556 you are being SUED for not following the
> Rules and working for We The Flight Attendants!!!!! Hopefully the Corruption
> will END

47.   The next day, on February 7, 2017, Carter posted a video on Facebook of an aborted infant. Referring to the video, Carter's post stated: "WARNING this is VERY GRAPHIC!! I want my Tax Dollars to STOP funding this….PERIOD!!!! This is MURDER."

48.   On February 14, 2017, Carter sent Local 556 President Audrey Stone five private messages via Facebook Messenger to the "Audrey Stone Twu" account. These messages were only viewable to President Stone upon her acceptance of the message.

    a.   At 11:22 AM, Carter sent a message containing a video showing an aborted infant. Carter told President Stone:

> This is what you supported during your Paid Leave with others at the Women's MARCH in DC….You truly are Despicable in so many ways…by the way the RECALL is going to Happen and you are limited in the days you will be living off of all the [Southwest Airlines Flight Attendants]..cant wait to see you back on line.

    b.   About an hour later, at 12:33 PM, Carter sent President Stone the video of the aborted infant that she had posted on Facebook on February 7 as described in paragraph 47 of this Complaint. Carter's message to President Stone stated: "TWU-AFL-CIO and 556 are supporting this Murder . . ."

    c.   Approximately 30 minutes later, at 1:00 PM, Carter sent President Stone a third private Facebook message that contained a picture of women wearing hats depicting female genitalia. Carter's message also stated:

> Did you all dress up like this…Wonder how this will be coded in the LM2 Financials…cause I know we paid for this along with your Despicable Party you hosted for signing the Contract….The RECALL [of the Local 556 Executive Board] is going to Happen we are even getting more signatures due to other [flight attendants] finding out what you guys do with our MONEY!!! Can't wait for you to have to be just a regular flight attendant again and not stealing from our DUES for things like this!

    d.  Later that day, Carter sent President Stone a second message via Facebook with a link to an online article discussing how one of the leaders of the January 2017 Women's March was a convicted terrorist. Carter told Stone:

> Did you know this….Hmmmm seems a little counter productive don't you think….you are nothing but a SHEEP in Wolves Clothing or you are just so un-educated you have not [sic] clue who or what you were marching for! Either way you should not be using our DUES to have Marched in this despicable show of TRASH!"

    e.  That same day, Carter also sent President Stone, via Facebook Messenger, an article written by Alveda King, the niece of Civil Rights Leader Martin Luther King Jr. In the article Ms. King explained that Planned Parenthood hid its pro-abortion agenda from her uncle and used his status as a civil rights leader to bolster its credibility.

Stone never responded to Carter.

49.   That same day, February 14, 2017, Carter also posted to Facebook the video she sent to President Stone at 11:22 a.m. that is described in paragraph 48a of this complaint. In that post Carter stated: "THIS IS GRAFIC….but it needs to be shared over and over….this is MURDER! So far all of you that are Pro-Abortion GOD HELP YOU!"

50.   Several days later, on February 17, 2017, Carter received an email from President Stone and Matt Hettich on behalf of Local 556 urging her to contact her legislators to stop a National Right to Work bill in Congress. Carter responded a few hours later by email saying:

> First off I do not want your Propaganda coming to my inbox....that being said I Support the RIGHT TO WORK Organization 110% ABOVE what I have to pay you all in DUES! YOU and TWU-AFL-CIO do not Speak For Me or over half of our work group....We have a RECALL right now that we want adhered to with over the 50+ 1% and growing. WE WANT YOU all GONE!!!!!
>
> ….

P.S. Just sent The RIGHT TO WORK more money to fight this.....YOU all DISGUST ME!!!!!  OH and by the WAY I and so many other of our FAs VOTED for TRUMP....so shove that in your Propaganda Machine!

Southwest terminates Carter

51.   Only six days after Carter emailed Local 556 about her support for right to work legislation, on February 23, 2017, Southwest manager Meggan Jones left Carter a voicemail saying they needed to talk to her as soon as possible.

52.   The next day, February 24, 2017, Southwest Inflight Base Manager Ed Schneider ("Schneider") left Carter a voicemail saying that he wanted to set up a mandatory meeting for Monday, February 27, at the inflight base to discuss some Facebook posts that they had seen.

53.   On February 24, Schneider also sent an email to Carter with the subject line as "Mandatory meeting" and in the body he stated that he "received some information about specific Facebook posts" and he wanted to schedule a meeting with her to discuss those posts. He also noted that if she would like to have a union representative with her in the meeting, she could contact Local 556.

54.   Carter responded later that day via email stating she received his two messages about Facebook posts. Carter explained that she was currently on vacation with her son and daughter out of state and would not return until Tuesday. Carter also asked Schneider to provide a copy of the post he was speaking about and the "Information Report" regarding the post so that she could respond. (The Information Report describes who and what the fact-finding meeting regards.) She also stated she would bring a union representative, Chris Sullivan, with her to the meeting.

55.   Carter also left Schneider a voicemail on February 24, asking him to provide a copy of the post he was speaking about and the information report.

56.   That same day, February 24, 2017, Jackson posted on One Luv a video of her giving an update on the recall campaign. Carter posted a reply stating:

> Well first time for me I am being called in due to a FB post don't know for what but have asked to see what it is before I go in with a Rep... they scheduled without even talking to me first just left a message for me to come in. I am on vacation so I can't make Monday. I have never been called in on anything in 20 years but somebody wants me in trouble! Pretty sad I have never written anyone up EVER! Pray it goes smoothly please.

57.   The next day, Schneider sent Carter another email thanking her for responding and stating "[t]he reason I am calling you in for the meeting is due to some alleged Facebook posts or messages that depicted a fetus that had been possibly aborted." His email stated the fact-finding meeting was rescheduled for February 28, 2017. Schneider never provided Carter a copy of the information report. The meeting was later rescheduled for March 7, 2017.

58.   At the March 7 "fact-finding" meeting, Southwest questioned Carter on why she made pro-life posts to her Facebook page and sent the February 14, 2017 messages to President Stone. Southwest specifically confronted Carter with the messages and posts described in Paragraphs 47-50 of this Complaint.

59.   At the fact-finding meeting, Carter explained to Southwest management that she is a Christian and pro-life. She also noted that she works with various groups to help prevent abortions.

60.   Southwest showed Carter pictures of Local 556 members and Southwest employees who participated in the Women's March. Southwest asked Carter why she sent the Facebook messages to President Stone. Carter explained to Southwest management that she posted and sent the videos depicting the aborted infant because she is a Christian and pro-life. Carter explained the videos were intended to show that unborn infants are human life, and she hoped the videos

would dissuade viewers from supporting abortion. She explained that she wanted to prevent others from going through abortion and experiencing the pain that one can suffer.

61.   During the meeting, Carter explained to Southwest management that she sent the videos to President Stone because Local 556 members, led by President Stone, participated in the Women's March in support of Planned Parenthood and abortion. Carter stated that by doing so, President Stone and the Local 556 members purported to be representing all of the Southwest flight attendants as supporting abortion rights. Carter told Southwest management that Local 556 members even used signs with the Southwest company logo. Carter then explained that the views of pro-life flight attendants, like herself, were not represented by the union at the March.

62.   Carter also told Southwest management that the Local 556 members attending the March wore pink hats resembling female genitalia to promote their vision of women's rights.

63.   In making the communications on Facebook, Carter was attempting to protect her own statutory rights. Carter explained at the fact-finding meeting that she was attempting to open a dialogue with President Stone by sending her the messages and pro-life videos.

64.   Carter also stated to Southwest that she sent the private Facebook messages to President Stone advocating for her recall because there was a campaign to recall President Stone taking place and that they, the recall supporters, had obtained petition signatures from more than fifty percent of members.

65.   Southwest also questioned Carter on why she sent President Stone Facebook messages relating to civil rights leader Martin Luther King, Jr. Carter explained that King did not support abortion and that those at the Women's March twisted his words to support their pro-choice agenda. She also explained that she sent President Stone an article by King's niece explaining

16

how King would not have supported abortion. Carter also noted that King's niece mentioned the phrase "Seek God Now" while explaining King's views.

66.   During the meeting, Southwest management told Carter that they cannot make a political statement while at work and cannot post ideological views on a personal Facebook page with a connection to the workplace.

67.   Southwest employees who do not share Carter's beliefs and practices are permitted to make political and ideological statements and engage in related activities in connection with the workplace.

68.   During the meeting, Carter also explained to Southwest that she had resigned from union membership and objected to paying the union's compelled fees for its political, ideological, and other nonbargaining spending. Carter stated to Southwest that if you post or say anything Local 556 does not like, they go after you, observing how President Stone had turned her in for the Facebook messages and recounting how she was previously threatened by Executive Board member Brett Nevarez that Carter would lose her job if she did not toe the union line.

69.   Throughout the meeting, Southwest representatives repeatedly asked Carter why she sent the messages to President Stone. One Southwest representative, Meggan Jones, implicated President Stone, and stated to Carter that "this person" feels harassed by the images and the statement sent in the messages.

70.   A week after the meeting, on March 14, 2017, Southwest sent Carter a letter informing her that it was terminating her employment effective March 16, 2017 (attached and incorporated herein as EXHIBIT D). Southwest's letter stated that the March 7, 2017 fact-finding meeting was held "to discuss certain messages and videos [she] posted on [her] Facebook page and sent to

17

another Southwest Employee [President Stone] through Facebook messenger." Southwest's letter also stated that when Carter posted the videos and pictures on Facebook, she was identifiable as a Southwest Airlines Employee and represented the company in a manner that is disparaging to Southwest Flight Attendants as well as to all Southwest Employees. Yet, there was nothing on Carter's Facebook page connecting her pro-life views to Southwest, and pictures of Carter in her flight attendant's uniform were posted more than one-year earlier. Meanwhile, Local 556 Members used the Southwest logo when they participated in the Women's March and supported abortion. Southwest characterized Carter's Facebook posts as "highly offensive in nature" and the private messages sent to President Stone as "harassing and inappropriate."

71.   Southwest informed Carter that it was terminating her employment because her conduct violated the Southwest Airlines Mission statement and company policies and rules "including but not limited to" the Workplace Bullying and Hazing Policy and the Social Media Policy. Southwest also stated that Carter's conduct "could also be a violation" of Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination, and Retaliation.

72.   Southwest terminated Carter even though she had never received any prior discipline during her twenty-year career at Southwest.

73.   Southwest also has a progressive discipline policy, but in Carter's case, she was terminated without any opportunity to improve or correct her allegedly unsatisfactory behavior.

<u>Southwest's treatment of other employees' social media activity</u>

74.   Southwest terminated Carter even though complaints filed against other flight attendants involving social media posts that were allegedly threatening or harassing did not result in their termination or ultimately resulted in those flight attendants keeping their jobs, including, but not limited to:

a.  Southwest flight attendant and Local 556 member Ricky Spand posted a video on his Facebook page that purported to show a recall supporter saying that he was "death." The flight attendant spearheading the recall effort, Jeanna Jackson, filed a complaint with Southwest on November 17, 2016, over the video because she felt the video was a death threat against her. Southwest, however, did not terminate Spand over this incident.

b.  On February 14, 2017, flight attendant and Local 556 member Josh Rosenberg was reported to Southwest for posting a profile picture on Instagram, a social media website, of an individual holding a gun and the caption "#GarySignNow" (a likely reference to Southwest's CEO, Gary Kelly)." Rosenberg was not fired over this posting.

c.  On October 10, 2014, Southwest terminated flight attendant and Local 556 member Brian Talburt for making a Facebook post that called for the "public execution" of those opposed to Local 556's leadership. Talburt posted: "We NEED one public execution to stop [the Southwest flight attendants opposed to Local 556's leadership]. They are NOT warriors. They are pussies and certainly you have seen Hoffucker in action for example. ONE execution we will never hear from them again. This I truly believe." "Hoffucker" was a derogatory reference to Greg Hofer, a flight attendant who is a nonmember objector that supports the campaign to reorganize Local 556 through a recall election. Southwest reinstated Talburt only two weeks after his termination.

d.  On March 22, 2016, Southwest fired flight attendant and Local 556 member Casey Rittner for making a Facebook post that called for CEO Kelly to sign the

tentative agreement. The post included a picture displaying a gun with the hashtag "#GarySignNow." Rittner was later reinstated.

e.  Southwest did not terminate flight attendant and union negotiator Bill Holcomb after he made sexually suggestive comments on his Facebook page about a female passenger.

75.  Spand, Rosenberg, Talburt, and Rittner, all union members and supporters of Local 556 leadership, were either not disciplined by Southwest as discussed above or were later reinstated.

76.  Southwest subjected supporters of the recall effort, who were nonmember objectors, and/or union opponents, to termination of employment, suspension, repeated fact-findings, and/or other disciplinary measures, in multiple instances at the request of Local 556 members and officials.

77.  On or about November 7, 2016, Southwest terminated Kent Hand, a Southwest flight attendant who, like Carter, exercised his RLA Rights to resign his membership in Local 556 and objected to paying for the union's political, ideological, and other nonbargaining spending. Like Carter, Hand also supported the recall effort and made posts in social media criticizing Local 556 and its leadership. As with Carter, Southwest terminated Hand without offering him the opportunity to improve or correct his behavior, even though Southwest has a progressive discipline policy.

## COUNT III[1]
### (Local 556 breached the duty of fair representation)

78.   Plaintiff Carter re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs, as if fully set forth herein.

79.   Under the RLA, a union acting as the exclusive representative of a craft/class of employees owes a fiduciary duty of fair representation to all of those employees that it represents, members and nonmembers alike. *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65 (1991); *Steele v. Louisville & N.R. Co.,* 323 U.S. 192 (1944); *Roscello v. Southwest Airlines Co.,* 726 F.2d 217 (5th Cir. 1984). That duty is "akin to the duty owed by other fiduciaries to their beneficiaries," such as the "duty a trustee owes to trust beneficiaries," or the duty an "attorney" owes to a "client." *O'Neill,* 499 U.S. at 74.

80.   Local 556 owed a fiduciary duty of representation to Carter.

81.   A union breaches its duty of fair representation if its actions are either arbitrary, discriminatory, or in bad faith. The duty of fair representation also requires a union to act with complete loyalty towards those it represents.

82.   Union conduct is arbitrary when the union's decisions are based upon personal animosity, political favoritism, or other impermissible factors, instead of relevant, permissible factors; are not a rational result of permissible factors; and do not include fair and impartial considerations of all employees' interests.

83.   Local 556 acted arbitrarily when President Stone and the union caused and attempted to cause Southwest to discipline and terminate Carter (by complaining to Southwest about her

---

[1] Counts I and II, and part of Count IV, of the Second Amended Complaint were dismissed with prejudice by the Court's February 1, 2019 Memorandum Opinion and Order (Dkt. 69).

Facebook messages to President Stone), based on personal animosity towards Carter's speech and activity opposing the union, her nonmember, agency fee objector status, and her support for the recall effort, as evidenced by:

    a. The subject matter of Local 556 and President Stone's complaint to Southwest, which concerned Carter's messages criticizing union activity, including Local 556's support for abortion rights and funding that support through union members and nonmembers' union dues. Carter's messages were also sent to the union President's "Audrey Stone Twu" Facebook page (as alleged in ¶¶ 30, 44, 48);

    b. Local 556 and President Stone's inconsistency with and sudden deviation from their past practice of affirmatively defending union supporters' "offensive and bullying speech" viciously attacking union opponents on social media (rather than reporting such speech to Southwest as a Social Media Policy violation), President Stone's characterization of discipline under the Social Media Policies as Southwest's interference with employees' personal rights, and President Stone's pronouncement that employees should work out their disputes rather than turn each other in to Southwest for Social Media Policy violations, all of which shows the union was not making decisions based on permissible factors, but on animosity towards Carter's views and favoritism towards union supporters (as alleged in ¶¶19, 27-28, 31, 32);

    c. Local 556's disparate treatment of recall supporters and nonmember, agency fee objectors, whom the union affirmatively reported to Southwest for disciplinary action based on the Social Media Policy, which shows favoritism towards union supporters and animosity towards the views of Carter, recall supporters, and other

nonmember, agency fee objectors, rather than fair and impartial consideration of employees' interests (as alleged in ¶76);

d.  Local 556 and its Executive Board Members' prior threats against Carter's employment for opposing the union, and its encouragement that supporters and members take screenshots and save evidence of opponents' social media activity for future use, which shows animosity towards Carter's views and Local 556's intent to cause Carter's discipline and termination (as alleged in ¶¶17-18, 20).

Rather than fairly and impartially considering all employees' interests, Local 556 arbitrarily singled out Carter and other nonmember, agency fee objectors, and recall supporters, based on the union's animosity towards their beliefs and activities.

84.  Unions engage in discriminatory conduct when they treat employees differently based on their political and ideological beliefs and activities.

85.  Local 556 invidiously discriminated against Carter when President Stone and the union caused attempted to cause Southwest to discipline and terminate her (by complaining to Southwest about her Facebook messages to President Stone) based on her speech and activity opposing the union, her nonmember, agency fee objector status, and her support for the recall effort, as evidenced by Paragraphs 83(a)-(d).

86.  Unions engage in bad faith conduct when they act without honest purpose and judgment, or when they act with hostility or discrimination towards an employee, because of the employee's political and ideological activities.

87.  Local 556 acted in bad faith when President Stone and the union caused and attempted to cause Southwest to discipline and terminate Carter (by complaining to Southwest about her

Facebook messages to President Stone) because it did so based on Carter's speech and activity opposing the union, her nonmember, agency fee objector status, and her support for the recall effort, as evidenced by Paragraphs 83(a)-(d). Local 556 acted without honest purpose and judgment in reporting Carter for a social media policy violation, given its practice of affirmatively defending union supporters' "offensive and bullying speech" viciously attacking union opponents on social media (rather than reporting employees' alleged Social Media Policy violations to Southwest), and its encouragement that employees work out their ideological disputes rather than turning each other in to Southwest.

88.    Local 556 and President Stone acted disloyally towards Carter when they caused and attempted to cause Southwest to discipline and terminate her (by complaining to Southwest about her Facebook messages to President Stone) based on Carter's communications to President Stone on her "Audrey Stone Twu" Facebook page that she opposed President Stone's leadership, Local 556's leadership generally, its support of abortion rights and other politically partisan viewpoints, and its use of union membership dues to advance those viewpoints in the public square.

89.    Local 556 and its agents, including President Stone, acted with the knowledge that Carter's discipline and termination were likely and foreseeable consequence of their actions, based on prior Social Media Policy violations that resulted in disparate disciplinary treatment of recall supporters, nonmember objectors, and other union opponents (as alleged in Paragraphs 20, 33, 74-77).

90.    Acts of reprisal may well be considered arbitrary, capricious, discriminatory and in bad faith.

91.    As a result of the arbitrary, discriminatory, and bad faith conduct alleged herein, Local 556 breached its fiduciary duty of representation owed to Carter.

92.    As a result of Local 556's breach of its fiduciary duty of fair representation to Carter, it caused Southwest to terminate Carter, and thereby inflicted substantial monetary and nonmonetary harm on Carter for which she is entitled to declaratory, compensatory, and injunctive relief, including reinstatement and payment of back pay plus interest.

### COUNT IV
### (Southwest and Local 556 retaliated against Carter for the exercise of her protected rights under the RLA)

93.    Plaintiff Carter re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs, as if fully set forth herein.

94.    The RLA guarantees employees the right to refrain from or resign union membership at any time and the right to object to the payment of political and other nonbargaining union expenses. *See Ellis v. Bhd. of Ry., Airline and S.S. Clerks, Freight Handlers, Express and Station Emps.,* 466 U.S. 435 (1984); *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740 (1961); *Ry. Emps.' Dep't v. Hanson,* 351 U.S. 225 (1956).

95.    The RLA prohibits retaliation against an employee for her protected activity. *Roscello v. Southwest Airlines*, 726 F.2d 217, 222 (5th Cir. 1984) (holding that the RLA prohibits retaliation for protected activity).

96.    Carter exercised her rights under the RLA to resign from membership in Local 556 and to object to the forced payment of political and other nonchargeable union expenses. Carter engaged in protected speech and activity in opposing, challenging, and advocating against Local 556, President Stone, and the union's activities and expenditures. Carter opposed Local 556,

President Stone, and their political and ideological views, and supported the recall of the Local 556 Executive Board.

97.   Defendants and their agents, under color of federal law, violated Carter's rights under the RLA when:

    a.   Local 556 retaliated against Carter for exercising her protected rights by complaining to Southwest of Carter's speech and activities, knowing that it could cause her discharge; and

    b.   Southwest retaliated against Carter for exercising her protected rights by terminating her employment.

98.   Carter suffered an adverse action when Local 556 complained to Southwest of Carter's speech and activities knowing that Carter could be terminated, and when Southwest subsequently terminated her employment.

99.   Carter's protected speech and other activities were a substantial and motivating factor for Local 556's complaints against Carter as evidenced by, *inter alia,* (a) the timing of Carter's termination in relation to her protected activity, (b) the disparate treatment of Carter in contrast with Local 556's own members, (c) Local 556's history of retaliatory threats and other discriminatory conduct against Carter and other nonmember objectors, and (d) the inconsistency between Local 556's approach to employee discipline depending on their speech and activities, including discipline under Southwest's social media policy and other company policies.

100.   Carter's protected speech and other activities were a substantial and motivating factor for Southwest's termination of Carter's employment as evidenced by, *inter alia,* (a) the timing of Carter's termination in relation to her protected activity, (b) a pattern of retaliatory discharge of other nonmember objectors and Local 556 opponents, (c) the disparate treatment of Carter and

other nonmember objectors and Local 556 opponents in contrast with Local 556 members and supporters, (d) Carter's 20-year employment history at Southwest without any disciplinary record, (e) Southwest's deviation from past disciplinary practices, (f) the inconsistencies between Southwest's justifications for terminating Carter and its other actions, (g) the implausibility of Southwest's justifications, (h) Southwest's failure to follow its own progressive disciplinary policy and other disciplinary rules, and (i) the manner in which Southwest conducted its investigation and fact finding prior to Carter's termination.

101.   Defendants had no valid justifications for their actions, and Carter exercised her speech in a manner that would not unduly interfere with any legitimate interest.

102.   As a result of Defendants' retaliation against her for her exercise of protected rights, Carter's employment was terminated, and Defendants thereby inflicted substantial monetary and nonmonetary harm on Carter for which she is entitled to declaratory, compensatory, and injunctive relief, including reinstatement and payment of back pay plus interest.

## COUNT V
### (Southwest and Local 556 violated Title VII by discriminating against Carter's religious beliefs and practices)

103.   Plaintiff Carter re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs, as if fully set forth herein.

104.   Title VII prohibits employers from discharging or otherwise discriminating against employees because of their religion, which includes all aspects of religious belief, observance, and practice. 42 U.S.C. § 2000e–(j) and 2(a).

105.   Title VII prohibits unions from discriminating against any individual because of her religion and from causing or attempting to cause an employer to so discriminate. 42 U.S.C. § 2000e-2(c)(1) (3).

106. Title VII obligates employers and unions to reasonably accommodate employees of faith, even when applying an "otherwise-neutral policy" to an employee's religious practice. 42 U.S.C. § 2000e-(j).

107. In accordance with her Christian religious beliefs, Carter believes in the sanctity of human life and that abortion is the taking of a human life contrary to the teachings of the Bible and the will of God.

108. Carter's religious beliefs require her to share with others that abortion is the taking of a human life.

109. Carter discovered that Local 556, the exclusive labor representative of all Southwest flight attendants, participated in the Women's March and supported pro-abortion activities, using Southwest logos on their signs. In accordance with her religious beliefs and practices, Carter posted videos to her personal Facebook page opposing abortion and sent President Stone videos opposing abortion and comments critical of Local 556's support for abortion.

110. Local 556 and its agents complained to Southwest about Carter posting pro-life messages and videos on Facebook and sending videos and comments to the union president.

111. Local 556 and its agents knew and believed that the complaint would result in Carter's termination, and intended to cause her termination.

112. Southwest terminated Carter for posting her pro-life messages and videos on Facebook and for sending the union president videos and comments criticizing the union's support of abortion.

113. Carter was qualified to work as a Southwest flight attendant.

114. Having a pro-choice position on abortion is not a requirement for performing flight attendants' duties.

115.    Carter's religious beliefs and practices, expressed on her personal Facebook page and to her union president, had no impact on the workplace and made no reference to Southwest.

116.    Defendants treated Carter less favorably than similarly-situated flight attendants who did not share Carter's religious beliefs and practices and who violated Southwest's Social Media Policies.

117.    Defendants had no valid non-discriminatory reason for terminating Carter's employment. Reporting and terminating Carter based on the Social Media Policies is pretext and inconsistent with Defendants' application of Social Media Policies in other cases.

118.    Local 556 violated Title VII anti-discrimination provisions when it reported Carter's religious activities to Southwest as part of a successful attempt to cause the company to discharge and otherwise discriminate against her religious beliefs and for engaging in the religious practice of sharing her religious beliefs on abortion with others. 42 U.S.C. § 2000e-2(c)(1)-(3).

119.    Southwest violated Title VII's anti-discrimination provisions when the company terminated Carter for her religious beliefs and for engaging in the religious practice of sharing religious beliefs on abortion with the union president and on her personal Facebook page. 42 U.S.C. § 2000e–2(a).

120.    Title VII required Southwest's policies to give way to the need for an accommodation of Carter's religious beliefs and practices.

121.    Defendants violated Title VII by failing to attempt any accommodation to Carter's religious beliefs and practices, including when Defendants applied the Social Media Policies to Carter's communications on her personal Facebook page and to the union president. Defendants did not inquire into accommodation of Carter's religious beliefs, and instead, summarily fired Carter for her protected rights.

122.    As a result of Defendants' discrimination and retaliation against Carter for her exercise of protected rights under Title VII, Carter's employment was terminated, and Defendants thereby inflicted substantial monetary and nonmonetary harm on Carter for which she is entitled to declaratory, compensatory, and injunctive relief, including reinstatement and payment of back pay plus interest.

## DEMAND FOR JURY TRIAL

123.    Carter requests a jury trial with respect to all claims in this case.

## COSTS AND ATTORNEYS' FEES

124.    Carter seeks an award of her reasonable costs, including attorneys' fees, incurred in the litigation of this case.

## PRAYER FOR RELIEF

Plaintiff Carter requests that this Court:

A.  **Declaratory:**

1.  Enter a judgment declaring that Defendant Southwest violated Carter's rights under the RLA by terminating her employment in retaliation for her exercise of protected rights;

2.  Enter a judgment declaring that Defendant Local 556 breached the duty of fair representation;

3.  Enter a judgment declaring that Defendant Local 556 violated Carter's rights under the RLA by retaliating against her for her exercise of protected rights.

4.  Enter a judgment declaring that Defendant Southwest violated Carter's Title VII rights by discriminating against her religious practices and beliefs.

5. Enter a judgment declaring that Defendant Local 556 violated Carter's Title VII rights by discriminating against her religious practices and beliefs, and by causing and attempting to cause Southwest to discriminate against Carter for her religious practices and beliefs.

6. Enter a judgment declaring that Carter has a right to an accommodation of her sincere religious beliefs that require her to share her views opposing abortion with others.

B. **Injunctive:**

1. Award a permanent injunction enjoining Defendants, their officers, employees, agents, attorneys, and all other persons acting in active concert with them, from engaging in any of the activities listed in Part A above which the Court declares illegal;

2. Award injunctive relief reinstating Carter to her employment with Southwest; and

3. Order the Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for Carter and other employees and which eradicate the effects of its past and present unlawful employment practices.

4. Order other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices.

C. **Compensatory:**

1. Award Carter compensatory damages, including backpay plus all applicable interest, and nominal damages; and

2. Award Carter general damages for emotional distress and pain and suffering.

D. **Punitive:**

1. Order the Defendants to pay Carter punitive damages for their malice or reckless indifference to her federally protected rights under Title VII described above, in amounts to be determined at trial.

E. Award Carter her costs and attorneys' fees in this action.

F. Award Carter such additional relief as this Court deems just and appropriate.

Dated: April 10, 2019                    Respectfully submitted,

s/ Jason E. Winford *(with permission)*
David E. Watkins
Texas Bar No. 20922000
*dwatkins@jenkinswatkins.com*
Jason E. Winford
Texas Bar No. 00788693
*jwinford@jenkinswatkins.com*
JENKINS & WATKINS, P.C.
4300 MacArthur Avenue, Suite 165
Dallas, Texas 75209
Tel: 214-378-6675
Fax: 214-378-6680

s/ Matthew B. Gilliam
Mathew B. Gilliam *(admitted pro hac vice)*
New York Bar No. 5005996
*mbg@nrtw.org*
Jeffrey D. Jennings *(admitted pro hac vice)*
Virginia Bar No. 87667
*jdj@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319

*Counsel for the Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that, on this day, the foregoing was electronically filed with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By**:** /s/ Matthew B. Gilliam _____