IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| | § | |
|     Plaintiff, | § | Civil Action No. 03:17-cv-02278-S |
| v. | § | |
| | § | |
| SOUTHWEST AIRLINES CO., AND | § | |
| TRANSPORT WORKERS UNION | § | |
| OF AMERICA LOCAL 556, | § | |
| | § | |
|     Defendants. | § | |

## DEFENDANT SOUTHWEST AIRLINES CO.'S BRIEF IN SUPPORT OF EMERGENCY MOTION AND REQUEST FOR SANCTIONS

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS ............................................................................................................... 2

     A.    Plaintiff and Gilliam unlawfully use secured Southwest flight data to send
          an armed process server to a crew hotel late at night. ........................................... 2

     B.    Gilliam refuses to disclose the method by which he obtained the schedule
          and location of Southwest flight crew. .................................................................. 5

III.  ARGUMENT ...................................................................................................... 7

     A.    The Court has inherent authority to protect against and remedy improper
          litigation practices like those perpetrated here by Plaintiff and Gilliam. ............... 7

     B.    The Court should take immediate action to require disclosure of the
          sources and methods used by Gilliam to unlawfully obtain Southwest data. ......... 9

          1.    Gilliam's refusal to disclose how he came to possess confidential
               Southwest data poses a continuing threat. .................................................. 9

          2.    Neither Gilliam nor Plaintiff can claim any privilege or work
               product protection with respect to the requested information ................. 11

     C.    Gilliam's conduct appears to violate the Texas Disciplinary Rules of
          Professional Conduct and warrants the shifting of attorneys' fees ...................... 14

IV.   CONCLUSION................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Shell Oil Co.*,
  143 F.R.D. 105 (E.D. La. 1992) ........................................................................11

*Allstate Tex. Lloyd's v. McKinney*,
  964 F. Supp. 2d 678 (S.D. Tex. 2013) ................................................................8

*In re Am. Airlines, Inc.*,
  972 F.2d 605 (5th Cir. 1992) ..............................................................................8

*In re Ashley Madison Customer Data Sec. Breach Litig.*,
  2016 U.S. Dist. LEXIS 57619 (E.D. Mo. Apr. 29, 2016) ................................8, 9

*Brody v. Zix Corp.*,
  2007 WL 1544638 (N.D. Tex. May 25, 2007) ...................................................14

*Chambers v. Nasco, Inc.*,
  501 U.S. 32 (1991) .............................................................................................15

*EF Cultural Travel BV v. Explorica, Inc.*,
  274 F.3d 577 (1st Cir. 2001) ..............................................................................13

*Glynn v. EDO Corp.*,
  2010 WL 3294347 (D. Md. Aug. 20, 2010) ....................................................9, 16

*Goodyear Tire & Rubber Co. v. Haeger*,
  137 S.Ct. 1178 (2017) ..........................................................................................8

*Hill v. Hunt*,
  2008 WL 4108120 (N.D. Tex. Sept. 04, 2008) ..............................................8, 15

*In re Int'l Systems & Controls Corp. Sec. Litig.*,
  693 F.2d 1235 (5th Cir. 1982) ............................................................................14

*Kidder v. Tidewater Marine, LLC*,
  2007 WL 37954 (W.D. La. Jan. 05, 2007) .........................................................14

*Meyers v. Siddons-Martin Emergency Grp., LLC*,
  2016 WL 5337957 (E.D. La. Sept. 23, 2016) .....................................................13

*Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
  86 F.3d 464 (5th Cir. 1996) ................................................................................15

*Orchestrate HR, Inc. v. Trombetta*,
  178 F. Supp. 3d 476 (N.D. Tex. 2016) .........................................................................9, 13, 16

*Orchestrate HR, Inc. v. Trombetta*,
  2014 WL 884742 (N.D. Tex. Feb. 27, 2014)....................................................................12, 13

*Packard v. Darveau*,
  2012 WL 4443505 (D. Neb. Sept. 25, 2012) .........................................................................14

*Resolution Trust Corp. v. Bright*,
  6 F.3d 336 (5th Cir. 1993) .....................................................................................................15

*Scaife v. Assoc. Air Ctr., Inc.*,
  100 F.3d 406 (5th Cir. 1996) ...................................................................................................8

*SEC v. Brady*,
  238 F.R.D. 429 (N.D. Tex. 2006) ....................................................................................12, 14

*SEC v. Microtune, Inc.*,
  258 F.R.D. 310 (N.D. Tex. 2009) ..........................................................................................12

*Southwest Airlines Co. v. Farechase, Inc.*,
  318 F. Supp. 2d 435 (N.D. Tex. 2004) ..................................................................................13

*Texas v. United States*,
  2016 WL 3211803,(S.D. Tex. May 19, 2016) .......................................................................16

*United States v. Edwards*,
  303 F.3d 606 (5th Cir. 2002) .................................................................................................13

*United States v. John*,
  597 F.3d 263 (5th Cir. 2010) .................................................................................................13

*United States v. Kelly*,
  569 F.2d 928 (5th Cir. 1978) .................................................................................................12

*United States v. Nolen*,
  472 F.3d 362 (5th Cir. 2006) ...........................................................................................15, 16

*United States v. Phillips*,
  477 F.3d 215 (5th Cir. 2007) .................................................................................................13

*Woodson v. Surgitek, Inc.*,
  57 F.3d 1406 (5th Cir. 1995) ...................................................................................................8

**Statutes**

18 U.S.C. § 1030......................................................................................................................13

iii

**Rules**

TEX. DISCIPLINARY R. OF PROF'L CONDUCT 4.02(a)......................................................................15

TEX. DISCIPLINARY R. OF PROF'L CONDUCT 4.04(a)......................................................................15

**Regulations**

49 C.F.R. Part 1520.................................................................................................................................1

## I.    <u>INTRODUCTION</u>

Late on July 1, 2020, Matthew Gilliam ("Gilliam"), counsel for Plaintiff Charlene Carter ("Plaintiff"), used misappropriated confidential Southwest Airlines Co. ("Southwest") information to send an armed process server to confront a Southwest flight attendant alone in her room at night at a crew hotel while she was more than 2,000 miles from home.  Based on a careful investigation, Southwest has gathered evidence indicating that Gilliam worked with an unknown Southwest employee to infiltrate Southwest's secure flight scheduling system to steal confidential data classified by Southwest as Sensitive Security Information ("SSI") per 49 C.F.R. Part 1520.  As a result, Southwest seeks emergency relief from the Court to address this apparent serious violation of federal law and the Texas Disciplinary Rules of Professional Conduct.

When confronted, Gilliam refused to reveal the source of the information despite being advised that his actions likely violated the law, contravened ethics rules, and, most critically, continued to jeopardized safety.  Accordingly, Southwest requests the following urgent relief:

1.    Gilliam should be ordered to disclose the identity of the person who provided the information he used to find the flight attendant and effect service at a crew hotel.

2.    Plaintiff, Gilliam, and anyone else associated with representing Plaintiff should be ordered to disclose all documents and communications concerning the unlawful misappropriation and use of Southwest's confidential data.

3.    The Court should refer this matter to the Texas and Virginia disciplinary authorities due to Gilliam's willful ethical violations, apparent breach of federal law, and refusal to cooperate in mitigating the harm he caused.  The Court should also apply Local Rule 83.9(c) to reevaluate Gilliam's admission *pro hac vice*.

4.    Plaintiff and/or Gilliam should be ordered to pay Southwest's costs and fees associated with this motion.

This relief is requested on an emergency basis because Gilliam's refusal to reveal his source means that Southwest's systems remain exposed, and Gilliam may continue to receive information and documents obtained by the unlawful access while this motion is pending.

II.   **FACTS**

This motion concerns Plaintiff's and Gilliam's intentional effort to harass and intimidate Audrey Stone, ("Stone"), a current Southwest flight attendant and the former president of Defendant Transportation Workers' Union 556 ("TWU 556"), by sending an armed process server to stalk her at a hotel and serve her with a subpoena[1] late at night in her hotel room. Moreover, it concerns Plaintiff's and Gilliam's intentional decision to compromise the privacy and safety of Stone, the crew aboard her flight, and, more generally, the public, by apparently using improper means to access Southwest computer systems and refusing to assist in Southwest's efforts to re-secure its systems.

A.   **Plaintiff and Gilliam unlawfully use secured Southwest flight data to send an armed process server to a crew hotel late at night.**

On July 1, 2020, Stone was working a multi-day trip as a Southwest flight attendant.[2] After arriving in Albuquerque, New Mexico from Hartford, Connecticut, Stone and her fellow crew members travelled from the airport to the Southwest crew hotel. Upon arriving, Stone noticed she was being watched in the hotel by an unknown man.[3] Stone was alarmed and, after checking in, retreated to her room.[4] Once Stone left the common area of the hotel, the unknown man apparently engaged with hotel management to find the location of Stone's room. In contradiction of the hotel's own polices, the hotel staff provided the unknown man with Stone's room number and escorted him to Stone's room at nearly 10 p.m.[5]

---

[1] The subpoena, issued under Federal Rule of Civil Procedure 45, merely sought production of documents from Stone. *See* App. 1.
[2] App. 29 at ¶¶ 2, 4.
[3] App. 29-30 at ¶¶ 4-6.
[4] App. 30 at ¶¶ 6-9.
[5] App. 30 at ¶ 7.

Shortly thereafter, Stone heard a knock on her hotel room door and someone identifying themselves as "Front Desk."[6]  She looked through peephole and saw a hotel employee.[7]  However, as soon as she opened the door, the hotel employee walked away away and the man from the lobby appeared.[8]  The unknown man was in street clothes, he had no identifying marks on his clothing, and he had a handgun openly strapped to his hip.[9]  Then, in a hotel room nearly 2,000 miles from Stone's home, the unknown, armed man handed Stone service and stated, *"You've been served, and I wanted to do it here."*[10]

Stone was shocked and terrified by this development for a number of reasons.  On a most basic level, Stone had no idea Plaintiff was attempting to serve her with anything.[11]  Stone is represented in her *ex officio* capacity by counsel for TWU 556, and she is a current Southwest employee.[12]  Yet no one representing Plaintiff contacted TWU 556's counsel or Southwest's counsel to ask about accepting or arranging service on her behalf.[13]  Meanwhile, Stone had made no effort to avoid service at home nor had she been contacted about accepting service.[14]  In other words, Plaintiff had no good reason to choose to effect service in this way.

However, Plaintiff's decision to serve Stone in a way that caused her to be afraid was no accident.  The above-styled lawsuit concerns the termination of Plaintiff's employment with Southwest.[15]  Plaintiff was terminated in March 2017 based on, among other things, her extended

---

[6] App. 30 at ¶¶ 8-9.
[7] *Id.*
[8] App. 30 at ¶ 9.
[9] App. 30 at ¶ 10.  In fact, other members of Stone's crew also took note of the unknown man's firearm when they observed him in the lobby and when they saw him elsewhere in the hotel.  App. 39 at ¶ 22.
[10] App. 30 at ¶ 11.
[11] App. 31 at ¶ 17.
[12] App. 29 at ¶ 3.
[13] App. 36 ¶ 7.
[14] App. 31 ¶ 17.
[15] *See Brief in Support of Motion to Dismiss [ECF 29] at 3-6.*

campaign of harassment and intimidation against Stone.[16]   The harassment Stone previously experienced led her to believe Plaintiff actually meant her harm and forced Stone to report Plaintiff to Southwest.[17]   Plaintiff's decision to effectuate personal service using an armed process server while Stone was in a hotel at night—without even *attempting* less intrusive means of service— echoes the type of harassment and intimidation Plaintiff used against Stone in the past.[18]

More importantly, though, Stone was shocked and afraid because her location was a secret.   Southwest serves a network of approximately 100 destinations supported by approximately 16,770 flight attendants.[19]   To protect passenger and crew safety, Southwest utilizes a secured flight scheduling system to coordinate its massive operation.[20]   Within the flight scheduling system, each flight attendant has a personal schedule, called a "board."  Flight attendant boards are not public nor are they published by Southwest.[21]  Southwest protects flight attendant boards for two major reasons:[22]

- To protect every crew member against personal intrusions, such as stalkers or individuals who mean them harm, while they are working a trip away from home and alone in a hotel room.

- To prevent outside elements from attempting to compromise crew (*e.g.* through blackmail or other means of influence), which can jeopardize the safety of flight.

As a result, the protection of flight attendant boards from access by unknown third-parties, such as Plaintiff in this case, is extremely important and directly related to the safety of airline passengers and crew.[23]   In fact, after Southwest learned that Stone's location was compromised

---

[16] *See Brief in Support of Motion to Dismiss [ECF 29] at 3-6.*
[17] *See Brief in Support of Motion to Dismiss [ECF 29] at 3-6*; *see also* App. 31-32.
[18] *See* App. 31-32.
[19] App. 35.
[20] App. 35-36.
[21] App. 36.
[22] App. 36.
[23] Importantly, this conduct also is prohibited by Southwest's policies governing access of its computer systems and use of its confidential data.  *See App. 41.*  In particular, Southwest's Information Security Policy prohibits any person given access to Southwest computer systems from, among other things: (1) "unauthorized removal or

on July 1, 2020, it immediately cancelled the remaining days on her scheduled trip and returned Stone to her home base out of an abundance of caution.[24]

But Stone was not shocked *just* because flight attendant boards are secured within Southwest's flight scheduling system.  In 2015, Stone contacted Southwest because of threats she received in her capacity as president of TWU 556.  At that time, she had Southwest make her board private.[25]  Once a board is set to private, the universe of individuals able to access the board becomes much smaller.  While active flight attendants[26] can generally seek out each other's boards, a private board can only be viewed by specifically authorized personnel.[27]

In short, finding Stone in New Mexico required Plaintiff and Gilliam to conscript an unknown Southwest employee to circumvent data security protections, engage in unauthorized computer access in violation of Southwest policies, and misappropriate the details of Stone's trip to facilitate service in a manner calculated to cause the maximum amount of fear and distress.

### B.   Gilliam refuses to disclose the method by which he obtained the schedule and location of Southwest flight crew.

Upon learning of these events, Southwest dispatched its counsel, Michael Correll ("Correll"), to contact Gilliam to learn how Gilliam accessed Stone's flight information.[28]

Correll contacted Gilliam for the first time on the morning of July 2, 2020.[29]  Correll explained that: (1) Stone had been served in New Mexico at the crew hotel; (2) the details of

---

conversion for personal use or benefit of any . . . Information Assets owned or managed to Southwest"; and (2) "[r]evealing, publicizing, or publishing, to unauthorized recipients, confidential or proprietary information including, but not limited to . . . personnel information . . . and data used to support business activities."  App. 41. Every Southwest employee is required to affirm Southwest's Information Security Policy annually.  App. 46.

[24] App. 31 at ¶ 16.

[25] App. 31 at ¶¶ 13-14.

[26] App. 36 ¶ 7.  Plaintiff's access to Southwest's flight scheduling system was deactivated upon her termination form Southwest.  As a result, she does not have any current authorized access to any flight attendant boards.  *Id.*

[27] Other crew members aboard Stone's flight to New Mexico would also have known her whereabouts.  Those individuals report that they did not provide the information to Plaintiff or Plaintiff's counsel.  App. 31 at ¶ 15; App. 39 ¶ 22.

[28] App. 36 ¶ 9.

[29] App. 36 ¶ 9.

Stone's trip had been confidential; (3) Southwest believed someone had improperly accessed Stone's board to get those details; and (4) Southwest needed to know how Gilliam learned of Stone's location as a matter of airline security.[30]  Gilliam did not deny or dispute any of the assertions made by Correll.  Instead, he insisted that information about flight attendant locations was public.[31]  In response, Correll stated that this matter would be immediately resolved if Gilliam could provide the public source on which he found Stone's flight data.[32]  Gilliam then clarified that he only meant the information was public—not that he had gotten it from a public source.  He then offered to investigate and report back.[33]

At approximately 2:00 p.m. on July 2, 2020, Gilliam called Correll.[34]  In this conversation, Gilliam wholly abandoned his claim that the information he used to effectuate service on Stone was public.  Nevertheless, he expressly refused to explain how he obtained the data and he asserted attorney-client privilege and work product protection.[35]  Correll then explained that co-opting a Southwest employee to breach Southwest computer systems likely constituted a crime and ethical violation.  Specifically, Correll pointed out that exceeding authorized use of a corporate computer system violates the Computer Fraud and Abuse Act.  Further, Correll advised Gilliam that utilizing an employee of Southwest in this way could violate the Texas Disciplinary Rule of Professional Conduct 4.02(a).[36]  Thus, Correll explained, Gilliam could not claim privilege or work product protection based on conduct falling within the "crime/fraud exception" nor could he claim privilege based on unlawful communications with Correll's client.[37]

Gilliam nonetheless persisted in his refusal and insisted that Correll did not know what

---

[30] App. 36-37 ¶¶ 9-10.
[31] App. 37 ¶ 11.
[32] App. 37 ¶ 12.
[33] App. 37 ¶ 13.
[34] App. 37 ¶ 14.
[35] App. 37 ¶ 14.
[36] App. 37-38 ¶¶ 15-16.
[37] App. 37-38 ¶ 17.

actually happened.[38]  Correll asked Gilliam to explain what happened or deny that Southwest's computer system had been utilized.  Gilliam refused on both items.[39]  Correll then told Gilliam that, at minimum, he needed Gilliam to confirm that the breach of Southwest's systems had not been done at Gilliam's direction.  Correll even stated he would take Gilliam's word for it and not raise ethical issues with the Court if Gilliam represented that he was not personally involved in directing the activity.  Gilliam refused that request as well.[40]

As a result, Southwest was left with no choice but to pursue this emergency motion to secure essential relief to protect its secure flight scheduling system, to protect its crew and passengers, and to determine what other data Plaintiff and Gilliam may have unlawfully accessed and stolen from Southwest's computer systems.

## III.    ARGUMENT

Gilliam appears to have used an unidentified Southwest employee to infiltrate Southwest's secure computer systems and misappropriate confidential, SSI data in violation of federal law and applicable ethics rules.  To make matters worse, the goal of this effort was to intimidate and harass a witness by sending an armed process server to her hotel at night when service could have been accomplished by simple agreement.  This conduct is unacceptable.  The Court should exercise its inherent authority to compel the disclosure of all available information concerning Gilliam's scheme, take formal action on Gilliam's ethics violations, and award Southwest's attorneys' fees incurred in investigating this misconduct and bringing this motion.

### A.    The Court has inherent authority to protect against and remedy improper litigation practices like those perpetrated here by Plaintiff and Gilliam.

The Court has—and should use—its inherent authority to redress the very serious misconduct at issue in this motion.

---

[38] App. 38 ¶ 18.
[39] App. 38 ¶ 18.
[40] App. 38 ¶ 19.

Federal courts have the inherent authority to manage and administer their affairs to ensure the orderly and expeditious disposition of cases. *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. 1178, 1186 (2017); *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995). "That authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Goodyear Tire & Rubber Co.*, 137 S.Ct. at 1186; *see also Scaife v. Assoc. Air Ctr., Inc.*, 100 F.3d 406, 411 (5th Cir. 1996) ("Federal courts have inherent powers … to sanction a party or attorney").

Moreover, a court is "obligated to take measures against unethical conduct occurring in connection with any proceeding before it." *Hill v. Hunt*, 2008 WL 4108120, *2 (N.D. Tex. Sept. 04, 2008) (*citing In re Am. Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992)). When exercising its inherent authority to sanction misconduct, a court has broad discretion in crafting remedies. *See Allstate Tex. Lloyd's v. McKinney*, 964 F. Supp. 2d 678, 682 (S.D. Tex. 2013); *In re Ashley Madison Customer Data Sec. Breach Litig.*, 2016 U.S. Dist. LEXIS 57619, *12 (E.D. Mo. Apr. 29, 2016) (in exercising its inherent authority, a court may "for example, dismiss claims, compel return of all documents, restrict use of the documents at trial, disqualify counsel and award monetary sanctions.").

Federal courts in this district, circuit, and beyond have utilized their inherent authority to remedy the improper obtaining of information from a party. For example:

- Granting sanctions where counsel hired a private investigative firm to contact former employees of represented party to secure confidential information even where the conduct at issue did not violate Texas Disciplinary Rule of Professional Conduct 4.02(a). *Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 488 (N.D. Tex. 2016).

- Relying upon the court's inherent authority to remedy a situation in which a "current or former employee of a corporate defendant has surreptitiously provided documents to counsel for the plaintiff." *In re Ashley Madison Customer Data Sec. Breach Litig.*, 2016 U.S. Dist. LEXIS 57619, *1.

- Finding that "it is an improper litigation tactic" to use an employee to secretly obtain non-public business information regarding a party opponent and imposing $20,000.00 of sanctions even after finding that Maryland Rule of Professional Conduct 4.2 did not apply. *Glynn v. EDO Corp.*, 2010 WL 3294347, *5 (D. Md. Aug. 20, 2010).

This sample case law confirms that the Court has ample authority to address Gilliam's apparent decision to unlawfully take and misuse Southwest's confidential, SSI data by way of an unknown Southwest employee represented either by Southwest or TWU 556 counsel.

Accordingly, the Court should exercise its discretion and order Gilliam to (a) reveal the source of the information that gives rise to this dispute; (b) reveal all communications with the source; and (c) pay all attorneys' fees Southwest incurred in bringing this emergency motion. The Court should also re-evaluate Gilliam's *pro hac vice* admission and consider referring this matter to the relevant state bar disciplinary authorities.

### B.     The Court should take immediate action to require disclosure of the sources and methods used by Gilliam to unlawfully obtain Southwest data.

Gilliam's ability to obtain confidential Southwest data by improper means presents an ongoing, continuing threat that requires immediate relief.  Southwest's secure computer systems remain exposed as long as Gilliam is allowed to keep his sources and methods a secret.  Further, unless relief is granted, Southwest cannot determine if Gilliam has used his apparently unlawful source to access and misappropriate other secure data.  Meanwhile, the information Gilliam possesses is not protected by privilege or work product protection as he asserts.

### 1.     Gilliam's refusal to disclose how he came to possess  confidential Southwest data poses a continuing threat.

Gilliam's misconduct poses an ongoing threat to Southwest and Stone.  Emergency relief is necessary to mitigate that threat and remedy the harm that Gilliam has caused.  Despite a thorough investigation, Southwest cannot identify exactly how Gilliam came to possess Stone's

flight schedule and location information.  However, Southwest's investigation strongly indicates that Gilliam used a Southwest employee to circumvent Southwest's security system:

1.  Stone's flight schedule was confidential, protected by secondary security, and not disclosed by her or any of her fellow crew members.

2.  Correll offered Gilliam the chance to confirm that he got the information from a source other than a Southwest employee.  Gilliam refused to confirm that fact.

3.  Correll offered Gilliam the chance to confirm that he got the information from a source other than the Southwest computer systems.  Gilliam refused to confirm that fact as well.

4.  Correll offered Gilliam the chance to confirm that he had not directed anyone to infiltrate Southwest's computers.  Correll even offered to modify his motion to omit claims of ethics violations for that simple confirmation.  Gilliam refused again.

As of the date of this filing, Gilliam persists in his refusal to explain how he acquired Stone's confidential flight information from Southwest's flight scheduling system.

An order compelling Gilliam to reveal his source and all related communications is essential to protect Southwest employees and passengers.  As discussed above, Gilliam's conduct has already disrupted Stone's work.  Stone has expressed that she is now fears for her safety because of Gilliam's conscious decision to engage in unnecessary intimidation tactics.  As a result, Southwest has had to remove her from flights to protect her.  Meanwhile, Southwest has no way of determining what other information Gilliam may be continuing to take through his unknown agent.  Absent immediate action that will allow Southwest to identify Gilliam's source and secure its internal systems, Gilliam and his unknown source continue to have access to those systems, creating an ongoing security threat to Southwest and Stone.

Meanwhile, Gilliam's resort to self-help outside the normal avenues of discovery is inexcusable.  Gilliam had a number of other options to facilitate service of the subpoena.  He could have simply contacted Correll or counsel for TWU 556 to coordinate service.  Or, if he did not want work collaboratively to accomplish service, he could have issued discovery to

10

Southwest about Stone's schedule or other related information.  But, under no circumstances did Gilliam have a right to recruit a potentially represented Southwest employee to circumvent discovery to procure a party's confidential information.  *See Adams v. Shell Oil Co.*, 143 F.R.D. 105, 108 (E.D. La. 1992) ("The receipt of Shell's documents was more than informal fact-gathering.  The PLC has effectively circumvented the discovery process and prevented Shell from being able to argue against production.").

In short, immediate revelation of the individual who disclosed the information to Gilliam and the communications between that individual and Plaintiff, Gilliam, and/or Plaintiff's other counsel are essential to fully assess the damage caused by Gilliam's conduct and re-secure Southwest's computer systems.

<b><u>2.      Neither Gilliam nor Plaintiff can claim any privilege or work product protection with respect to the requested information</u></b>

The information Southwest seeks from Gilliam is not privileged or covered by work product protections.  Gilliam has failed to show he had an attorney-client relationship with the unidentified source and, even if he did, privilege and other protections fall away in the face of criminal or fraudulent activity.  Accordingly, Gilliam has no defense to immediate production of the requested information and communications.

When Southwest's counsel first raised the inappropriate access and disclosure of Southwest's SSI data, Gilliam initially stated that the information was publicly available.  When asked to identify a public source he utilized, Gilliam could not do so.  Gilliam then acknowledged that he received the information from a third party but refused to identify him or her and claimed that the identity of that person is privileged or protected work product.  Gilliam remained steadfast in his position despite Southwest's counsel's explaining the legal and ethical implications of procuring and using the information, and the immediate safety concerns raised by his conduct.

11

Gilliam's privilege assertion is meritless.  Attorney-client privilege and work product protections are "strictly construed."  *Orchestrate HR, Inc. v. Trombetta*, 2014 WL 884742, *2 (N.D. Tex. Feb. 27, 2014); *SEC v. Microtune, Inc.*, 258 F.R.D. 310, 318 (N.D. Tex. 2009). Accordingly, it is the party asserting them who faces the stiff burden of demonstrating their application.  *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978); *Orchestrate HR, Inc.*, 2014 WL 884742, *2.  Gilliam has not attempted to and cannot demonstrate that either privilege or work product protections cover the identity of or communications with the individual who disclosed Stone's and Southwest's protected information.

Gilliam has failed to provide anything supporting an assertion that he has an attorney-client relationship with the unknown individual who provided the information or that Gilliam's communications with that person had anything to do with securing legal advice.  *See generally SEC v. Brady*, 238 F.R.D. 429, 438 (N.D. Tex. 2006) ("The attorney-client privilege protects from disclosure confidential communications made to obtain a lawyer's professional advice and assistance.").  Indeed, Gilliam made no such assertion.  Meanwhile, Southwest has confirmed that Carter has not had access to Southwest's flight scheduling system since her termination.

Moreover, even if privilege or work product did apply, they would not shield any information (including communications with counsel) regarding the disclosures as they are subject to the crime-fraud exception.  Attorney-client privilege and work product protections are overcome "where communication or work product is intended to further continuing or future criminal or fraudulent activity."  *Orchestrate HR, Inc.*, 2014 WL 884742, *3; *see also United States v. Edwards,* 303 F.3d 606, 618 (5th Cir. 2002).  In this case, the information revealed to Gilliam was likely procured by an individual who lacked the right to access Southwest's systems; or who exceeded his or her authorized access by reviewing Stone's private

12

information and Southwest's data for the purpose of improperly leaking it to Gilliam.  This conduct, if true, violates the Computer Fraud and Abuse Act.  *See* 18 U.S.C. § 1030; *United States v. John*, 597 F.3d 263, 271-72 (5th Cir. 2010); *United States v. Phillips*, 477 F.3d 215, 219-20 (5th Cir. 2007).[41]  Any communications between Gilliam and the individual in question regarding access to and disclosure of Southwest's and Stone's information would been in furtherance of that unlawful activity.  Thus, the Court should require Gilliam to disclose the identity of his source and produce any communications or documents regarding this matter.  *See Orchestrate HR, Inc.*, 178 F. Supp. 3d at 488 (ordering counsel to produce all communications with potentially represented employees due to potential violations of ethical rules).

Lastly, even if the Court does not wish to compel production of communications despite the authority above, the identity of the individual who misappropriated Stone's and Southwest's data on behalf of Carter is not protected under any theory.  Courts routinely compel parties to identify individuals with whom a party communicated regarding ongoing litigation, and potential fact witnesses despite counsel's privilege and work-product objections. *See, e.g.*, *Brody v. Zix Corp.*, 2007 WL 1544638, *2 (N.D. Tex. May 25, 2007) (requiring plaintiff to identify the former employees of defendant who were interviewed by counsel and provided facts alleged in the complaint); *Kidder v. Tidewater Marine, LLC*, 2007 WL 37954, *2 (W.D. La. Jan. 05, 2007) (work product protection did not apply to request for "list[] of [] individuals who were

---

[41] An individual violates the CFAA if he or she obtains information from a computer system by exceeding his or her authorized access.  *See Southwest Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 438 (N.D. Tex. 2004) (*citing* 18 U.S.C. § 1030(a)(2)(C), (a)(4)); *Meyers v. Siddons-Martin Emergency Grp., LLC*, 2016 WL 5337957, *2 (E.D. La. Sept. 23, 2016) (the CFAA "prohibits accessing a computer without authorization, or exceeding authorized access, in order to obtain information from a protected computer").  Accessing Southwest's system for a purpose that violates the Information Security Policy is outside the scope of any authorization and is unlawful. *See, e.g.*, *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 583-84 (1st Cir. 2001) (employee exceed access because "whatever authorization [defendant] had to navigate around EF's site (even in a competitive vein), [defendant] exceeded that authorization by providing proprietary information" to a third party in violation of confidentiality agreement); *United States v. John*, 597 F.3d 263, 272 (5th Cir. 2010) ("Access to a computer and data that can be obtained from that access may be exceeded if the purposes for which access has been given are exceeded.  In other words, John's access to Citigroup's data was confined.  She was not authorized to access that information for any and all purposes but for limited purposes.").

13

interviewed" because identities do not reveal counsel's impressions and conclusions); *Packard v. Darveau*, 2012 WL 4443505, *4 (D. Neb. Sept. 25, 2012) ("The identities of persons who provided statements, along with information on who took the statement and when, is not protected work product and, except for statements between the plaintiff and her attorney, is not protected by the attorney-client privilege.").  Disclosure is particularly appropriate here, as Southwest's need to know the identity of the individual who improperly accessed and revealed private, SSI data is not for the purpose of revealing who Gilliam deems to be a critical fact witness.  It is merely to protect its electronic systems, employees, and the public.[42]  Indeed, Southwest has no basis to conclude that the employee in question is even a potential witness or in possession of any relevant evidence in this case.

As a result, Gilliam has no defense to production of the identity of the individual who supplied him with Stone's flight schedule or the communications he and members of his team had with that individual.  Requiring such disclosure is necessary to redress the harm Gilliam caused.

### C.    Gilliam's conduct appears to violate the Texas Disciplinary Rules of Professional Conduct and warrants the shifting of attorneys' fees

Southwest appreciates the serious gravity of asking a court to take disciplinary action against an attorney.  But Southwest sought in earnest to resolve this issue through direct communication with Gilliam.  Southwest gave Gilliam numerous opportunities to correct his misconduct, Gilliam new that his refusal to cooperate would lead to such a request, and Gilliam has no justification for his continued refusals.  As a result, Southwest asks that the Court discipline Gilliam and take all other necessary steps to correct his violation of the applicable ethics rules.

Federal courts possess inherent authority to discipline an attorney for unprofessional

---

[42] Despite Southwest's efforts to date, it has thus far been unable to identify the source of the disclosure.  Thus, even if the Court considered the identity of the person who disclosed the information to Gilliam to constitute work product, disclosure to Southwest would still be appropriate, as Southwest has a compelling need for the information, *i.e.*, securing its federally regulated Sensitive Security Information.  *See In re Int'l Systems & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1239-40 (5th Cir. 1982); *Brady*, 238 F.R.D. at 443.

conduct. *See Resolution Trust Corp. v. Bright*, 6 F.3d 336, 340 (5th Cir. 1993). Moreover, courts have an obligation to curb unethical conduct taking place in connection with any proceeding before it. *Hill*, 2008 WL 4108120, *2. The courts' inherent power to police counsel includes the "authority to impose reasonable and appropriate sanctions on errant lawyers practicing before the court." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996). Such sanctions include the imposition of monetary sanctions, and the revocation of a *pro hac vice* admission. *See United States v. Nolen*, 472 F.3d 362, 374-75 (5th Cir. 2006); *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45 (1991).

In this case, Gilliam appears to have violated Texas Disciplinary Rule of Professional Conduct 4.02(a) and 4.04(a) either by communicating with a represented party without authorization, and/or using inappropriate means to obtain evidence in violation of Stone's and Southwest's rights to secure confidential and SSI information. *See* Tex. Disciplinary R. of Prof'l Conduct 4.02(a), 4.04(a); *see also id.* at 8.04(a)(1) ("A lawyer shall not violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not the violation occurred in the course of a client-lawyer relationship"). Southwest preferred not to raise ethics issues—much less seek revocation of Gilliam's *pro hac vice* admission and a bar referral. Indeed, Correll made a point of telling Gilliam as much before ever beginning to draft this motion. Unfortunately, Gilliam left Southwest with no choice in light of his refusal to attempt to mitigate the harm he caused. Accordingly, as a result of his willful disregard of these rules, Southwest requests that his *pro hac vice* admission be revoked. *See* Tex. R. Governing Admission to the Bar 19(e) ("[T]he court may revoke the non-resident attorney's permission to participate in [] Texas proceedings"); *Nolen*, 472 F.3d at 375.

Additionally, given the apparent bad faith conduct of Gilliam in securing the improperly

15

obtained data and refusing to reveal his source despite the safety concerns described herein, the Court should require Gilliam and/or his client pay all attorneys' fees and costs Southwest incurs in bringing this motion. *See Texas v. United States*, 2016 WL 3211803, *11,(S.D. Tex. May 19, 2016) ("One of the most frequent [remedies] [] in cases involving attorney misconduct is to award the aggrieved parties the attorneys' fees and costs that may have resulted due to the misconduct."); *Orchestrate HR, Inc.*, 178 F. Supp. 3d at 488 (based on, *inter alia*, potential violation of Rule 4.02, prohibiting counsel from contacting current or former employees of plaintiffs without first coordinating contact with plaintiffs; ordering counsel to produce all communications with potentially represented employees; and to pay attorneys' fees and costs incurrent in brining emergency motion for sanctions); *Glynn*, 2010 WL 3294347, *8 (bad faith privilege assertions and self-help discovery "warrant a $20,000 sanction"). Further, the Court should award Southwest all other relief it deems necessary and proper to redress this serious injury to Southwest and Stone.

## IV.   <u>CONCLUSION</u>

Gilliam's conduct represents an extraordinary violation of judicial norms, the applicable ethics rules, and, as it relates to his treatment of Stone, common decency. This problem was created in order to carry out a malicious and harassing effort to intimidate a witness. Accordingly, Southwest respectfully requests that the Court compel Gilliam to promptly disclose the source of the disputed information, and all communications with the source. Additionally, Southwest requests the imposition of attorneys' fees, and for appropriate disciplinary actions in light of the ethical violations discussed above.

Dated July 8, 2020                    Respectfully submitted,


                                      */s/ Michael A. Correll*
                                      Michael A. Correll
                                      State Bar No. 24069537
                                      **REED SMITH LLP**
                                      2501 N. Harwood Street
                                      Suite 1700
                                      Dallas, Texas 75201
                                      Phone: 469-680-4200
                                      Facsimile: 469-680-4299
                                      Email: mcorrell@reedsmith.com


### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has

been served upon all counsel of record via the Court's ECF System on this 8th day of July, 2020.


                                      */s/ Michael A. Correll*
                                        Michael A. Correll

17