IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 03:17-cv-02278-S |
| v. | § | |
| | § | |
| SOUTHWEST AIRLINES CO., AND | § | |
| TRANSPORT WORKERS UNION | § | |
| OF AMERICA LOCAL 556, | § | |
| | § | |
| Defendants. | § | |

---

**DEFENDANT SOUTHWEST AIRLINES CO.'S APPENDIX IN SUPPORT OF
EMERGENCY MOTION AND REQUEST FOR SANCTIONS**

---

## <u>APPENDIX OF EXHIBITS</u>

Exhibit A    Subpoena to Produce Documents .......……………….…..……………..    App. 1

Exhibit B    Declaration of Audrey Stone ...……………………………………………    App. 28

Exhibit C    Declaration of Michael Correll …………………………………………    App. 34

Exhibit D    Southwest's Information Security Policy ...…………………………    App. 41

Exhibit E    ISP Acknowledgement ……...…………………………………………    App. 46

Dated:  July 8, 2020                              Respectfully submitted,


                                                */s/ Michael A. Correll*
                                                Michael A. Correll
                                                State Bar No. 24069537
                                                **REED SMITH LLP**
                                                2501 N. Harwood Street
                                                Suite 1700
                                                Dallas, Texas 75201
                                                Phone: 469-680-4200
                                                Facsimile: 469-680-4299
                                                Email: mcorrell@reedsmith.com



## <u>CERTIFICATE OF SERVICE</u>


        I hereby certify that a true and correct copy of the above and foregoing document has

been served upon all counsel of record via the Court's ECF System on this 8th day of July, 2020.



                                                */s/ Michael A. Correll*
                                                Michael A. Correll

# EXHIBIT A

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of Texas

| | | |
|---|---|---|
| Charlene Carter | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 3:17-cv-2278-X |
| Southwest Airlines Co., and | ) | |
| Transport Workers Union of America, Local 556 | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                              Audrey Lee Stone
      Monte Carlo Towers, 3301 Bayshore Blvd., Unit 2102, Tampa, FL 33629

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
          See Attachment A

| Place: S & W Process Service | Date and Time: |
|---|---|
| 2801 N. Florida Ave. Tampa, FL 33602 | 07/20/2020 6:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    06/19/2020

              *CLERK OF COURT*
                                              OR
                                                        s/ Matthew B. Gilliam
_____            _____
*Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Plaintiff Charlene Carter _____ , who issues or requests this subpoena, are:

Matthew B. Gilliam, National Right to Work Foundation, 8001 Braddock Rd., Ste. 600, Springfield, VA 22160
(703) 321-8510, mbg@nrtw.org

### Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**App. 002**

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 3:17-cv-2278-X

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

    ☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**App. 003**

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>          Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>          Defendants. | Civil Case No. 3:17-cv-02278-X |

## ATTACHMENT A

### INSTRUCTIONS

1.      In responding to this subpoena, produce all documents in your actual or constructive possession, custody, or control, or in the possession, custody, or control of your agents or attorneys, regardless of the location.

2.      Documents may be produced by providing paper copies or electronic copies in a searchable "pdf" format readable by Adobe Reader and served upon Plaintiff's counsel on a computer readable CD or DVD by mail or by email. In lieu of producing documents as just described, documents may also be produced by allowing Plaintiff's counsel to inspect and copy original documents.

3.      The documents produced are to be segregated and labeled by request number.

4.      The documents sought include all drafts of documents required to be produced and documents that are nearly identical to but that differ in a minor, or any, way from other documents

1

required to be produced (e.g., two documents are identical except one contains handwritten notes; both documents must be produced).

5.    All requests made herein shall be construed to include any documents responsive to these requests that are later prepared, created, or discovered.

6.    These document requests are continuing in nature and are to be timely supplemented.

7.    The U.S. District Court for the Northern District of Texas entered a Stipulated Protective Order (Dkt. 85) in this case on November 5, 2019, which is appended to this Attachment A. Producing Parties may designate documents and things produced during the litigation as containing Confidential Information in accordance with and subject to the provisions in the Order.

8.    For each document to which any privilege is claimed, the party asserting the privilege shall identify the date of the document, any title or heading affixed to the document, the name and address of all persons to whom and by whom the document was sent or distributed to, the type of document (e.g., letter, memorandum), the general subject matter of the document, and the nature of the alleged privilege.

## DEFINITIONS

1.    **"ALL," "ANY,"** and **"EACH"** shall be construed as encompassing "any and all" and "and/or."

2.    **"ANY"** means "each and every" as well as "any one."

3.    **"CARTER'S SOCIAL MEDIA ACTIVITY"** means any of Charlene Carter's messages or posts on Facebook, and any of her other communications and activities on any other social media.

2

4.     **"CARTER'S TERMINATION," "TERMINATE,"** or **"TERMINATION,"** means the incidents, events, actions, and decisions related to the March 16, 2017 termination of Charlene Carter's employment with **SOUTHWEST**.

5.     **"COMMUNICATIONS"** and **"COMMUNICATED"** are defined by way of illustration and not by way of limitation, as any written, oral, or electronic exchange of information, words, statements, expressions, discussions, thoughts, opinions, or ideas, and includes any memorialization of information, words, statements, expressions, discussions, meetings, thoughts, opinions, or ideas of any person, including the person creating the memorialization.

6.     **"DOCUMENT"** is defined to be synonymous in meaning and equal in scope to the usage of this term in Rule 34(a) of the Federal Rules of Civil Procedure and is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronically stored information and all communications which are stored or retrievable or recorded in any manner and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, flash drives, magnetic tape, video tape, magnetic and optical discs, "floppy disks," "PowerPoint" and other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations and telephone calls, text messages, resolutions, interoffice memoranda and other inter and intra office communication and correspondence, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries,

3

telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, teletype messages, financial statements, stenographers' notebooks, punch cards, computer printouts and data, telecopier and facsimile transmissions and printouts.

The term **"DOCUMENT"** also includes preliminary drafts, revisions, and copies of any such document if the copy is in any way different from the original, now in your possession, custody, or control or that of your advisors, agents, employees, servants, representatives, counsel, or other persons purported to act on your behalf.

7.     **"LOCAL 556"** means Transport Workers Union of America, Local 556, and any of its officers, stewards, employees, representatives, agents, intermediaries, and other persons acting on its behalf.

8.     **"RECALL EFFORT"** means the campaign and petition started by **SOUTHWEST** flight attendants around July 2015 to hold recall elections and remove from office certain **LOCAL 556** executive board officers, including President Audrey Stone, and employee activities related to supporting the campaign and petition.

9.     **"RELATING TO," "RELATING THERETO," "RELATE TO," "RELATED TO," "REFLECT," "REGARDING," "REPRESENT,"** or **"CONCERNING"** mean directly or indirectly constituting, mentioning, discussing, describing, or in any way pertaining to or being connected with a stated subject matter or the existence or nonexistence of a fact, alleged fact, misinformation, supposed information, topic, or subject matter, and require you to provide any and all documents that might possibly be relevant, or that might possibly lead to the discovery of relevant evidence related to the facts, information, knowledge, opinions and bases thereof, or documents that are in any way responsive to the document request in which such terms appear.

4

10.     **"SOCIAL MEDIA POLICIES"** means **SOUTHWEST**'s Workplace Bullying and Hazing Policy, Social Media Policy, Policy Concerning Harassment, Sexual Harassment, Discrimination, and Retaliation, Mission Statement, and any other company policies and rules related to employees' social media activities.

11.     **"SOUTHWEST"** means Southwest Airlines Co. and any of its current or former officers, representatives, agents, or intermediaries.

12.     **"YOU"** and **"YOUR"** each mean Audrey Stone in her personal capacity.

13.     Any other words herein shall be defined according to standard American usage, as shown in a dictionary of the English language.

14.     The use of the singular form of any word includes the plural and any plural includes the singular.

## DOCUMENT REQUESTS

1. Produce your **DOCUMENTS** and **COMMUNICATIONS** since January 1, 2014, in your personal possession, custody, or control, related to:

    (A)  **CARTER'S SOCIAL MEDIA ACTIVITY**;

    (B)  Charlene Carter's religious beliefs, views, and practices;

    (C)  Carter's involvement in the **RECALL EFFORT**;

    (D)  Carter's membership or non-membership status, or her agency-fee payer status with **LOCAL 556**;

    (E)  the investigation and review of **CARTER'S SOCIAL MEDIA ACTIVITY**;

    (F)  **CARTER's TERMINATION**;

    (G)  the grievance concerning **CARTER's TERMINATION**.

2. Produce your **DOCUMENTS** and **COMMUNICATIONS** since January 1, 2014, in your personal possession, custody, or control, related to the **SOCIAL MEDIA POLICIES**.

3. Produce your **DOCUMENTS** and **COMMUNICATIONS** since January 1, 2014, in your personal possession, custody, or control, related to the **RECALL EFFORT**.

4. Produce your **DOCUMENTS** and **COMMUNICATIONS** since January 1, 2014, in your personal possession, custody, or control, related to any Southwest flight attendant's status as an agency-fee payer or nonmember of **LOCAL 556**.

**App. 010**

5. Produce your **DOCUMENTS** and **COMMUNICATIONS** since January 1, 2014, in your personal possession, custody, or control, related to any report, complaint, or investigation of a Southwest flight attendant's social media activities in connection with the **SOCIAL MEDIA POLICIES**.

6. Produce your **DOCUMENTS** and **COMMUNICATIONS** since January 1, 2014, in your personal possession, custody, or control, related to:

> (A)   instances where a Southwest flight attendant was terminated or otherwise disciplined in connection with the **SOCIAL MEDIA POLICIES**;
>
> (B)   grievances concerning discipline for violations of the **SOCIAL MEDIA POLICIES**; and
>
> (C)   instances where any Southwest flight attendant terminated in connection with the **SOCIAL MEDIA POLICIES** was later reinstated.

7. Produce your **DOCUMENTS** and **COMMUNICATIONS** since January 1, 2014, in your personal possession, custody, or control, involving your opinions regarding abortion or reproductive rights, or your responses to other persons' opinions regarding abortion or reproductive rights, limited to:

> (A) Those **DOCUMENTS** and **COMMUNICATIONS** exchanged between you and individuals who are or were **LOCAL 556** employees, members, or officers through your respective personal email or social media accounts, personal cell phones, or other personal communication devices; and

7

(B) Those **DOCUMENTS** and **COMMUNICATIONS** exchanged between you and individuals who are or were Southwest employees, through your respective personal email or social media accounts, personal cell phones, or other personal communication devices.

8. Produce your **DOCUMENTS** and **COMMUNICATIONS** since January 1, 2014, in your personal possession, custody, or control, involving your opinions regarding Southwest employees' religious beliefs, views, or practices.

9. Produce your **DOCUMENTS** and **COMMUNICATIONS** since January 1, 2014, in your personal possession, custody, or control, involving your responses to other persons' opinions regarding Southwest employees' religious beliefs, views, or practices.

Date: June 19, 2020                    Respectfully submitted,

s/ Jason E. Winford *(with permission)*
David E. Watkins
Texas Bar No. 20922000
*dwatkins@jenkinswatkins.com*
Jason E. Winford
Texas Bar No. 00788693
*jwinford@jenkinswatkins.com*
JENKINS & WATKINS, P.C.
4300 MacArthur Avenue, Suite 165
Dallas, Texas 75209
Tel: 214-378-6675
Fax: 214-378-6680

s/ Matthew B. Gilliam
Mathew B. Gilliam *(admitted pro hac vice)*
New York Bar No. 5005996
*mbg@nrtw.org*
Jeffrey D. Jennings *(admitted pro hac vice)*
Virginia Bar No. 87667

App. 012

*jdj@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319


*Counsel for the Plaintiff*

9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 03:17-cv-02278-X |
| v. | § | |
| | § | |
| SOUTHWEST AIRLINES CO., AND | § | |
| TRANSPORT WORKERS UNION | § | |
| OF AMERICA LOCAL 556, | § | |
| | § | |
| *Defendants.* | § | |

## STIPULATED PROTECTIVE ORDER

Pursuant to Fed. R. Civ. P. 26(c) and the stipulation of the parties, the Court enters the following Protective Order ("Order").

## Proceedings and Information Governed

1. Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under this Stipulated Protective Order. This Order protects information designated by a party as "Confidential Information" in accordance with the terms of

1

this Order, as well as to any copies, excerpts, abstracts, analyses, summaries, descriptions, or other forms of recorded information containing, reflecting, or disclosing such Confidential Information.

## Definitions

2.      "Discovery Material" means all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (*e.g.*, emails, computer files, other electronic data, paper files, etc.), that is produced or generated in disclosures or responses to discovery in this matter. The information includes, but is not limited to: answers to interrogatories; answers to requests for admission; responses to requests for production of documents; responses to subpoenas and other discovery requests from parties and non-parties; testimony, transcripts, and tangible things; deposition exhibits; and other writings or things produced, given or filed in this action.

3.      "In-house Counsel" means attorneys who are employees of a party to this action. In-house Counsel does not include Outside Counsel.

4.      "Outside Counsel" means attorneys who are not employees of a party to this action but are or previously were retained to represent or advise a party to this action or are affiliated with a law firm which has represented or advised a party to this action.

5.      "Party" means any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel (and their support staffs).

2

App. 015

6.    "Producing Party" means a party that produces Discovery Material in this action.

7.    "Receiving Party" means a party that receives Discovery Material from a Producing Party.

8.    "Third-Party Vendors" means persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

**Designation and Maintenance of Information**

9.    For purposes of this Order, the "Confidential Information" designation means that the document contains trade secrets, sensitive information related to confidential commercial research and development; commercial information that is not publicly known and is of technical or commercial advantage to its possessor, in accordance with Fed. R. Civ. P. 26(c)(7); proprietary software information; information related to employee discipline; employee medical history or information; employee disability status or information; employees' leave of absence history or information; employee personnel files; employee religious beliefs and practices; employee political beliefs and practices; employee compensation; employee grievances (including the settlement or resolution or such grievances); records and notes reflecting or related to deliberations and meetings between Southwest and Local 556 related to grievance adjustment or resolution; records and notes reflecting or related to Southwest's investigations of employee complaints; and information

3

App. 016

required by law or agreement to be kept confidential. Confidential Information does not include, and this Order does not apply to: any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; information that is already in the knowledge or possession of the Party to whom disclosure is made unless that Party is already bound by agreement not to disclose such information; or information that has been disclosed to the public or third persons in a manner making such information no longer confidential.

10.     Documents and things produced during the course of this litigation within the scope of Paragraph 9 may be designated by the Producing Party as containing Confidential Information by placing on each page and each thing a legend, or otherwise conspicuously designating electronically stored information, substantially as follows:

**CONFIDENTIAL INFORMATION**

**SUBJECT TO PROTECTIVE ORDER**

11.     A Party may designate information within the scope of Paragraph 9 disclosed at a deposition as Confidential Information by requesting the reporter to so designate the transcript or any portion of the transcript at the time of the deposition. If no such designation is made at the time of the deposition, any Party will have fourteen (14) calendar days after the date of the deposition to designate, in writing to the other Parties and to the court reporter, whether the transcript is to be designated

4

as Confidential Information. If no such designation is made at the deposition or within this fourteen (14) calendar day period (during which period, the transcript must be treated as Confidential Information, unless the Disclosing Party consents to less confidential treatment of the information), the entire deposition will be considered devoid of Confidential Information. Each Party and the court reporter must attach a copy of any final and timely written designation notice to the transcript and each copy of the transcript in its possession, custody or control, and the portions designated in such notice must thereafter be treated in accordance with this Order. It is the responsibility of counsel for each Party to maintain materials containing Confidential Information in a secure manner and appropriately identified so as to allow access to such information only to such persons and under such terms as is permitted under this Order.

### Inadvertent Failure to Designate

12.    If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order. The information must be treated by the Receiving Party as confidential from the time the Receiving Party is notified in writing of the change in the designation.

### Challenge to Designations

App. 018

13.     A Receiving Party may challenge a Producing Party's designation at any time. Any Receiving Party disagreeing with a designation may request in writing that the Producing Party change the designation. The Producing Party will then have ten (10) business days after receipt of a challenge notice to advise the Receiving Party whether or not it will change the designation. If the parties are unable to reach agreement after the expiration of this ten (10) business day time-frame, and after the conference required under LR 7.1(a), the Receiving Party may at any time thereafter seek an order altering the confidential status of the designated information.  Until any dispute under this paragraph is ruled upon by the presiding judge, the designation will remain in full force and effect, and the information will continue to be accorded the confidential treatment required by this Order.

**Disclosure and Use of Confidential Information**

14.     Information designated as Confidential Information may only be used for purposes of preparation, trial, and appeal of this action.

15.     Subject to paragraph 16 below, Confidential Information may be disclosed by the Receiving Party only to the following individuals, provided that such individuals are informed of the terms of this Order: (a) employees of the Receiving Party who are required in good faith to provide assistance in the conduct of this litigation, including any settlement discussions; (b) In-House Counsel for the Receiving Party; (c) Outside Counsel for the Receiving Party; (d) supporting personnel for or employed by (b) and (c), such as paralegals, legal secretaries, data entry clerks, legal clerks, and private photocopying services; (e) experts or

6

App. 019

consultants; (f) any persons requested by counsel to furnish services such as document coding, image scanning, mock trial, jury profiling, translation services, court reporting services, demonstrative exhibit preparation, or the creation of any computer database from documents, and (g) potential witnesses that a Party may depose or call at trial.

16.     Further, prior to disclosing Confidential Information to a Receiving Party's proposed expert or consultant, the Receiving Party must provide to the Producing Party a signed Confidentiality Agreement in the form attached as Exhibit A.

17.     Counsel is responsible for the adherence by Third-Party Vendors to the terms and conditions of this Order. Counsel may completely fulfill this obligation by obtaining a signed Confidentiality Agreement in the form attached as Exhibit B.

18.     Confidential Information may be disclosed to a person who is not already allowed access to such information under this Protective Order if:

(a) the information was previously received or authored by the person or was authored or received by a director, officer, employee or agent of the company for which the person is testifying as a designee under Fed. R. Civ. P. 30(b)(6);

(b) the Designating Party is the person or is a Party for whom the person is a director, officer, employee, consultant or agent; or

(c) counsel for the Party designating the material agrees that the material may be disclosed to the person.

In the event of disclosure under this paragraph, only the reporter, the person, his or her counsel, the presiding judge, and persons to whom disclosure may be made and who are bound by this Order, may be present during the disclosure or discussion of Confidential Information. Disclosure of material pursuant to this paragraph does not constitute a waiver of the confidential status of the material so disclosed.

**Filing Documents With the Court**

19.     If any Party wishes to file any document containing Confidential Information with the court, such document must be filed in a motion to file under seal in accordance with the local rules for the U.S. District Court for the Northern District of Texas, and with the word "Sealed" in the title or caption of the document intended for filing under seal.

20.     Producing or receiving Confidential Information, or otherwise complying with the terms of this Order, will not (a) operate as an admission by any Party that any particular Confidential Information contains or reflects trade secrets or any other type of confidential or proprietary information; (b) prejudice the rights of a Party to object to the production of information or material that the party does not consider to be within the scope of discovery; (c) prejudice the rights of a Party to seek a determination by the presiding judge that particular materials be produced; (d) prejudice the rights of a Party to apply to the presiding judge for further protective orders; or (e) prevent the Parties from agreeing in writing to alter or waive the provisions or protections provided for in this Order with respect to any particular information or material.

21.     The Court generally discourages requests for filing motions and exhibits under seal.  The parties may agree between themselves to designate documents "confidential" during discovery.  The typical standard there involves the parties assessing whether they want that material in the public domain.  But filing that material with the Court under seal is a different matter altogether.  Court proceedings are, by and large, public matters (and rightfully so given that tax dollars fund the courts and we have this wonderful protection called the First Amendment).[1]

22.     Here, the parties' agreement takes the form of this protective order. Federal Rule of Civil Procedure 26(c) permits the Court to issue a protective order "for good cause."  To assist the parties in showing good cause here, the Court adds the following requirements that complement the sealing practices of the Fifth Circuit.  A party seeking to file a specific document under seal must move for leave to do so and: (1) brief the legal authorities indicating the risks of disclosure outweigh the public's right to know, and (2) explain that no other viable alternative to sealing exists.[2]

---

[1] *See United States v. Holy Land Found. For Relief & Dev.*, 624 F.3d 685, 690 (5th Cir. 2010) ("Public confidence [in our judicial system] cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view." (quoting *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 230 (5th Cir. 2008)); *SEC v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) ("Public access [to judicial records] serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness." (quoting *Littlejohn v. BIC Corp.*, 851 F.2d 673, 682 (3d Cir. 1998))). *See also Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1177 (6th Cir. 1983) (the First Amendment and the common law limit the court's discretion to seal records).

[2] *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kaufman*, No. 17-50534, Doc. 00514098372, at 2 (5th Cir. Aug. 1, 2017) ("This court disfavors the sealing of briefs or portions of the record where the parties on appeal have not articulated a legal basis for the sealing."). The Fifth Circuit has "repeatedly required parties to justify keeping materials under seal." *Id.*; *see, e.g., Claimant ID 100236236 v. BP Exploration & Prod'n, Inc.*, No. 16-30521 (5th Cir. Jan. 31, 2017) (requesting letter briefs *sua sponte* as to whether appeal should remain under seal and entering order unsealing appeal); *United States v. Quintanilla*, No.16-50677 (5th Cir. Nov. 16, 2016) (order authorizing briefs and record excerpts to be filed under seal on condition that the parties filed

Further, all facts recited in any such motion must be verified by the oath or declaration of a person or persons with personal knowledge, which will assist the Court in making fact findings that can withstand appellate scrutiny.[3]

## Conclusion of Litigation

23.     Within sixty (60) calendar days after final judgment in this action, including the exhaustion of all appeals, or within sixty (60) calendar days after dismissal pursuant to a settlement agreement, each Party or other person subject to the terms of this Order is under an obligation to destroy or return to the Producing Party all materials and documents containing Confidential Information, and to certify to the   Producing Party that this destruction or return has been done. However, Outside Counsel for any Party is entitled to retain all court papers, trial transcripts, exhibits, and attorney work provided that any such materials are maintained and protected in accordance with the terms of this Order.

## Other Proceedings

24.     By entering this Order and limiting the disclosure of information in this case, the presiding judge does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or Party subject to this Order who may be subject to a motion to disclose another Party's

---

redacted briefs and record excerpts on the public docket).  Also, the parties should note that a showing that disclosure of the information sought to be sealed would harm a party's reputation or its business is not sufficient to overcome the strong common law presumption in favor of public access. *Brown*, 710 F.2d at 1179.

[3] *See United States v. Edwards*, 823 F.2d 111, 119 (5th Cir. 1987) (if closure of a presumptively open proceeding is to withstand a First Amendment challenge, the court must make specific fact findings that substantial probability exists that an interest of a higher value will be prejudiced and that no reasonable alternatives will adequately protect that interest).

information designated Confidential pursuant to this Order must promptly notify that Party of the motion so that the Party may have an opportunity to appear and be heard on whether that information should be disclosed.

**Miscellaneous**

25.　Nothing in this Order abridges the right of a Party to seek its modification by the court in the future following notice to the Parties.

26.　By stipulating to the entry of this Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Order.

27.　It is Ordered that this Protective Order will be enforced by the sanctions set forth in Fed. R. Civ. P. 37(b) and any other sanctions as may be available to the presiding judge, including the power to hold parties or other violators of this Order in contempt. All other remedies available to any person injured by a violation of this Order are fully reserved.

28.　Any Party may petition the presiding judge for good cause shown if the Party desires relief from a term or condition of this Order.

**The Court added paragraphs 21 and 22 to this order, and changed a reference to "filed under seal" to "filed in a motion to file under seal" in paragraph 19, after it was signed by counsel for the parties. Because of these changes, the Court has not affixed the parties' signatures to this order. Even so, this order binds the parties in their dealings with each other, regardless of whether any contractual agreement exists between the parties.**

IT IS SO ORDERED

DATE: <u>November 5, 2019</u>

                           BRANTLEY STARR
                           UNITED STATES DISTRICT JUDGE

Exhibit A

## CONFIDENTIALITY AGREEMENT FOR EXPERT OR CONSULTANT OF ANY PARTY

I hereby affirm that:

1.      Information, including documents and things, designated as "Confidential Information," as defined in the Protective Order entered in the above-captioned action ("Order"), is being provided to me pursuant to the terms and restrictions of the Protective Order.

2.      I have been given a copy of and have read the Order.

3.      I am familiar with the terms of the Order and I agree to comply with and to be bound by its terms.

4.      I submit to the jurisdiction of this Court for enforcement of the Order.

5.      I agree not to use any Confidential Information disclosed to me pursuant to the Order except for purposes of the above-captioned litigation and not to disclose any of this information to persons other than those specifically authorized by the Order, without the express written consent of the party who designated the information as confidential or by order of the presiding judge.  I also agree to notify any stenographic, clerical or technical personnel who are required to assist me of the terms of this Order and of its binding effect on them and me.

6.      I understand that I am to retain all documents or materials designated as or containing Confidential Information in a secure manner, and that all such documents and materials are to remain in my personal custody until the completion of my assigned duties in this matter, whereupon all such documents and materials, including all copies thereof, and any writings prepared by me containing any Confidential Information are to be returned to counsel who provided me with such documents and materials.

Print: _____

Sign: _____

Date: _____

**Exhibit B**

### CONFIDENTIALITY AGREEMENT FOR THIRD-PARTY VENDORS

I hereby affirm that:

1.      Information, including documents and things, designated as "Confidential Information," as defined in the Protective Order entered in the above-captioned action ("Order"), is being provided to me pursuant to the terms and restrictions of the Protective Order.

2.      I have been given a copy of and have read the Order.

3.      I am familiar with the terms of the Order and I agree to comply with and to be bound by its terms.

4.      I submit to the jurisdiction of this Court for enforcement of the Order.

5.      I agree not to use any Confidential Information disclosed to me pursuant to the Order except for purposes of the above-captioned litigation and not to disclose any of this information to persons other than those specifically authorized by the Order, without the express written consent of the party who designated the information as confidential or by order of the presiding judge.

Print: _____

Sign: _____

Date: _____

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 03:17-cv-02278-S |
| v. | § | |
| | § | |
| SOUTHWEST AIRLINES CO., AND | § | |
| TRANSPORT WORKERS UNION | § | |
| OF AMERICA LOCAL 556, | § | |
| | § | |
| Defendants. | § | |

---

## DECLARATION OF AUDREY STONE

---

1.      My name is Audrey Stone, I am over the age of 21, of sound mind, and capable of making this declaration.   The facts stated herein are true and correct and are based on my personal knowledge.

2.      I work for Southwest Airlines Co. ("Southwest").   Currently, I am a flight attendant based in Baltimore, Maryland.   I reside in Tampa, Florida.   I previously served as the president of Transport Workers Union of America Local 556 ("TWU 556").

3.      I am not a party to this lawsuit.   I am represented by Ed Cloutman and Adam Greenfield in this lawsuit with respect to my prior activities as president of TWU 556.

4.      On June 28, 2020, I utilized Southwest's flight scheduling system, Crew Web Access (CWA), to change my schedule by trading multi-day trip scheduled to depart on June 30, 2020. The second overnight stop on the trip that I traded into was scheduled for Albuquerque, New Mexico.

5.      Our flight arrived shortly before 9 p.m. on July 1, 2020 in Albuquerque, New Mexico.  I, along with the rest of the crew, walked from the airport to the crew hotel, the Albuquerque

**App. 029**

Sheraton.  We arrived at the hotel around 9:15 p.m.

6.      Upon arriving, I immediately noticed a man in the lobby watching me.  I did not know the man, and he made me very uncomfortable.  I was also alarmed by the fact that he clearly had a handgun in a holster on his hip.  As soon as the hotel had us checked in, I went upstairs to my room.

7.      Once in my room, I heard a knock at my door and a male voice announce, "Front Desk." It was shortly before 10 p.m.

8.      I went to the door and looked through the peephole.  On the other side, I saw an employee of the hotel.  I only opened the door because another member of my crew was across the hall and I could see that he was at his door observing the situation.  The individual on the other side was wearing a hotel uniform.

9.      Once I opened the door, the hotel employee immediately walked away and the man from the lobby stepped in front of me.

10.      The man was who I had seen before, wearing street clothes, a lanyard around his neck, and he had a gun.  He did not have any sort of badge or other clear identification that I could see.  He also did not present any identification to me.

11.      The man immediately handed me some papers.  He then stated, "You've been served, and I wanted to do it here."

12.      I was suddenly terrified.  I was more than 2,000 miles from home, alone in a hotel room at night, and this strange man was confronting me with legal papers and a weapon.  This horrible experience instantly took me back to years of abuse I suffered while I was working as the president of the TWU 556.  It has undone years of effort I have gone through to strive to feel safe at work. I wondered what would have happened if the man was someone who wanted to harm me in my

App. 030

hotel. Nothing would have protected me.

13.     The situation was even more frightening because the fact that I was going to be in Albuquerque that night was not public. Since 2015, I have kept my flight board marked "private" in the Southwest system. I have confirmed that my flight board is still marked private today within CWA.

14.     I marked my flight board private because I received a number of very troubling threats during my time as president of TWU 556. Plaintiff Charlene Carter was among those individuals who repeatedly reached out to threaten, intimidate, and harass me during my tenure.

15.     I did not tell anyone or publicly post where I would be on July 1, 2020. The only way an individual would have access to my whereabouts would be by either accessing my board through the Southwest Airlines system, or from one of my fellow crew members. The crew members on this flight are two of my closest friends, and I traded onto the trip specifically to fly with them. I asked my crew members if they had disclosed where we would be to anyone associated with this lawsuit, and they said that they had not. In fact, they were just as alarmed by these events as I was.

16.     I also do not know how the person who created the documents that I received knew my Tampa, Florida address. My permanent address is in Texas. All of my official documents, and licenses utilize my Texas address. I carefully control access to my Tampa address because of my prior experiences. I am concerned that, in addition to my flight board, someone used improper means to find out my private address.

17.     I was so frightened by this event that I worked with Southwest to cancel the rest of my trip, and to travel on a flight worked by my crew members. This was done to help me feel safer on the trip home, because I was afraid to be alone after these events, and return home alone.

18.     I have not accepted any trips since this event. I could not work right now. This event has

3

caused me so much trauma that I am afraid to travel on behalf of Southwest, and be alone overnight on the road.  I don't know how these people found out my flight schedule.  I cannot feel safe until I know how these people found my private information and I can be assured that their access has stopped.  I am concerned they are continuing to watch my board and that further harassment could occur.

19.      I had no idea that Plaintiff was trying to serve me with papers.  No one had contacted me, and I also had not done anything to avoid service.  I would have allowed the lawyers for TWU 556 or the lawyers for Southwest to accept service on my behalf if anyone had asked me.

20.      I believe that the whole point of serving me in the hotel was to scare me and intimidate me.  Plaintiff went to great lengths to try to scare and intimidate me before her termination.  This sort of conduct seems to me like a continuation of what she did back then.

[INTENTIONALLY LEFT BLANK]

App. 032

My name is Audrey Stone, my date of birth is _10-6-77_, and my address is _4001 Raguet St. Nacogdoches_, Texas, and United States. I declare under penalty of perjury that the foregoing is true and correct.

Executed in _Hillsborough_ County, State of _Florida_, on the 8th day of July, 2020.

_Audrey Stone_
Audrey Stone

App. 033

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 03:17-cv-02278-S |
| v. | § | |
| | § | |
| SOUTHWEST AIRLINES CO., AND | § | |
| TRANSPORT WORKERS UNION | § | |
| OF AMERICA LOCAL 556, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF MICHAEL CORRELL

1.        My name is Michael Correll, I am over the age of 21, of sound mind, and capable of making this declaration.  The facts stated herein are true and correct and are based on my personal knowledge.

2.        I am a partner with law firm Reed Smith, LLP.  I represent Southwest Airlines Co. ("Southwest") in the above-styled lawsuit.

3.        On July 2, 2020, I learned that Audrey Stone, a witness in the above-styled lawsuit, had been personally served with process at a crew hotel in Albuquerque, New Mexico while in the middle of a Southwest trip.  Upon learning this information, I immediately began an investigation.

4.        As part of my investigation, I conversed with Sarah Hill, Assistant Manager for Inflight Crew Scheduling at Southwest.  Through that conversation, I confirmed that Southwest maintains flight attendant schedules, sending Southwest's 16,770 flight attendants to more than 100 destinations in the Crew Web Access portal ("CWA").

5.        Hill confirmed that Southwest keeps flight attendant schedules, called "boards,"

**App. 035**

confidential.  Southwest does not publish or make flight attendant schedules public in any forum.

6.      Per Hill, Southwest secures flight attendant schedules both to protect crew safety and public safety.  Among other issues, flight attendant boards are confidential: (1) To protect every crew members against personal intrusions, such as stalkers or individuals who mean them harm, while they are working a trip away from home and alone in a hotel room; and (2) To prevent outside elements from attempting to compromise crew, e.g. through blackmail or other means of influence, that could jeopardize the safety of flight.

7.      Hill also explained to me that Stone's board had been set to "private" along with other parts of her data profile.  As a result, unlike normal boards that can be seen by any flight attendant, Stone's board was only available to a restricted access group.  Hill also confirmed that Plaintiff's access to CWA would have been cut off at the time of her termination from Southwest.

8.      I began my investigation by contacting counsel for TWU 556.  Given their partial representation of Stone, I wanted to determine whether they had provided the information or if they had any idea how Stone's information had been disclosed.  Counsel for TWU 556 expressed grave concerns about what had happened to Stone.  Counsel for TWU 556 also indicated that he likely would have accepted—or at least coordinated—service in a less obtrusive way if Plaintiff's counsel had just asked; however, no one contacted Counsel for TWU 556 about service.  Counsel for TWU 556 also expressed that they did not provide nor could they identify the source of the information.

9.      I then contacted opposing counsel, Matthew Gilliam ("Gilliam").  I called Gilliam on the morning of July 2, 2020.

10.     In that first call, I explained that : (1) Stone had been served in New Mexico at the crew

2

hotel; (2) the details of Stone's trip had been confidential; (3) Southwest believed someone had improperly accessed Stone's board to get those details; and (4) Southwest needed to know how Gilliam learned of Stone's location as a matter of airline security.

11.     Gilliam did not deny or dispute any of the assertions I made.  Instead, he insisted that information about flight attendant locations was public.

12.     In response, I told Gilliam that I did not believe that flight attendant schedules were public.  However, in an effort to resolve the emergency, I stated that this matter would be immediately concluded if Gilliam could provide the public source on which he found Stone's flight data.

13.     Gilliam then clarified that he only meant the information was public—not that he had gotten it from a public source.  This response immediately concerned me as it indicated that— regardless of whether the information was public—Gilliam had gotten it from a non-public source.  I expressed that concern to Gilliam as well as my concern that a Southwest employee falling within my representation had been used to improperly acquire this information.  Gilliam then offered to investigate and report back shortly.

14.     At approximately 2:00 p.m. CDT on July 2, 2020, Gilliam called me back for second conversation.  In this conversation, Gilliam wholly abandoned his claim that the information he used to effectuate service on Stone was public.  Instead, he said he would not tell me how he got the data under an assertion of attorney-client privilege and work product protection.

15.     This statement made clear to me that Gilliam had used an unknown individual to access Southwest's confidential sources to locate Stone.  I again explained that co-opting a Southwest employee to breach Southwest computer systems likely constituted a crime and ethical violation.

16.     I pointed out that exceeding authorized use of a corporate computer system likely violates

3

**App. 037**

the Computer Fraud and Abuse Act.  Further, I told Gilliam that utilizing an employee of Southwest in this way violates the Texas Disciplinary Rule of Professional Conduct 4.02(a).

17.     In light of these realities, I told Gilliam that he could not claim privilege or work product protection based on conduct falling within the "crime/fraud exception" nor could he claim privilege based on unlawful communications with my client.  At the same time, I reiterated that this breach presented serious safety concerns for Stone, the Southwest workforce, and the public.

18.     Gilliam nonetheless persisted in his refusal to tell me anything. He simply insisted I did not know what happened.  I again asked him to explain, and he again refused.  Next, I asked him to at least deny that Southwest's computer system had been utilized.  Gilliam again refused to respond.

19.     Despite the severity of the situation, I realized that Gilliam could be covering for a Southwest employee who went rogue without his permission or direction.  At the same time, I take presenting ethical violation to a federal court and requesting a bar referral very seriously. As a result, I told Gilliam that, at minimum, I needed him to confirm that no breach of Southwest's systems had been done at his direction.  In fact, I committed that I would not seek ethics-related relief under Rule 4.02(a) if Gilliam made a representation that he was not personally involved in directing the activity.  Gilliam refused that request, as well.

20.     After speaking to Gilliam, I worked with Southwest to attempt to identify the source of the information.  As of the date of this filing, neither I nor Southwest has been able to ascertain the specific source.

21.     I have also spoken with management for the hotel where Stone was served.  In that conversation, hotel management admitted that Stone should not have been served in her room nor should hotel employees have participated in service.  However, hotel management also

App. 038

disclosed that Gilliam's process server misled front desk staff to gain access to Stone's hotel room.  The process server led the front desk staff to believe that he was a law enforcement officer engaged in law enforcement activity.  Also troubling, the process server had photos of Stone as well as substantial documentation about her and her schedule.  Thus, it appears based on my investigation that the actual act of service was accomplished through improper means and willful deceit.

22.     Finally, I have reviewed informal statements from other members of the crew aboard Stone's flight.  The crew members corroborated Stone's description of a man in street clothes with firearm prominently displayed on his hip.  Those statements confirm that the other members of the crew did not supply the information about Stone's whereabouts to Plaintiff or Gilliam.

[INTENTIONALLY LEFT BLANK]

My name is [Michael Correll], my date of birth is December 15, 1983, and my address is 421 Allison Drive, Dallas, Texas, and United States.  I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on the 8th day of July, 2020.

Michael Correll

6

**App. 040**

# EXHIBIT D



# Southwest Airlines Co.

# and Affiliates

Information Security Policy

# SWA Internal Only

This document is the property of Southwest Airlines; it contains information that is proprietary or otherwise restricted from disclosure. If you are not an authorized recipient, please return this document to Southwest Airlines. Dissemination, distribution, copying or use of this document in whole or in part by anyone other than the intended recipient is strictly prohibited without prior written permission of Southwest Airlines.

Copyright © 2019, Southwest Airlines Co.
All Rights Reserved

**App. 042**

# Table of Contents

1. Introduction ..................................................................................................... 1

2. Information Classification Policy ..................................................................... 2

3. Acceptable Use Policy ................................................................................... 2

4. End User Access Control Policy .................................................................... 7

5. Network Access Control Policy ...................................................................... 7

6. Computing Policy ........................................................................................... 8

7. Environmental and Physical Security Policy .................................................. 9

8. International Travel Policy .............................................................................. 9

9. Cybersecurity Incident Response Policy ...................................................... 11

Glossary ............................................................................................................. 12

Appendix A ......................................................................................................... 14

Appendix B ......................................................................................................... 18

SWA Internal Only                                    Copyright © 2019, Southwest Airlines Co.
                                                                      All Rights Reserved

**App. 043**

In limited circumstances such as, for example, to investigate a cybersecurity incident or allegations of policy violations, or to implement a preservation notice, Southwest may need physical access to information stored on a Non-Company-Owned Device. In such circumstances, Southwest must first make reasonable, good faith efforts to determine whether the information sought is accessible to the Company on other electronic storage media or on the Company's own information systems.  If the relevant information is not accessible elsewhere, Southwest may, at its discretion, and through an authorized representative, require physical access to the Non-Company-Owned Device in a state that makes inspection of the device possible so that the Company may obtain the relevant information on that device.  When an authorized Company representative accesses information stored on a Non-Company-Owned Device, the authorized representative must make reasonable efforts to limit access to the Company's information and other information relevant to the purpose of the inspection. However, the inspection could result in incidental access to information stored on the Non-Company-Owned Device which is unrelated to the Company.

### 3.10  Unacceptable Use

Under no circumstances is anyone authorized to engage in any activity that is illegal under local, state, federal, or applicable law while using or connected to Company owned or managed resources.

The following activities are, in general, prohibited. The list below is by no means exhaustive, but attempts to provide a framework for activities that fall into the category of unacceptable use. These detailed activities are strictly prohibited while on Southwest property or while using Southwest assets, with no exceptions other than those for whom any of these activities are within the scope of legitimate duties and approved by Director-level or above Southwest Leaders (for example, network scans are performed periodically by Cybersecurity to confirm that devices are properly configured).

a. Violating copyright, trade secret, patent or other intellectual property rights, or similar laws or regulations, through an act such as, but not limited to, the installation or distribution of "pirated" or other software products that are not appropriately licensed for use by Southwest

b. Unauthorized use of copyrighted material including, but not limited to, digitization and distribution of photographs from magazines, books or other copyrighted sources, copyrighted music, and the installation of any copyrighted software for which the Southwest does not have an appropriate active license

c. The unauthorized removal or conversion for personal use or benefit of any technology or Information Assets owned or managed to Southwest

d. Exporting software, technical information, encryption software or technology, in violation of U.S., international or regional export control laws

e. Any violation of harassment or hostile workplace laws in the user's local jurisdiction, such as but not limited to offensive comments about race, gender, disabilities, age, sexual orientation, religious beliefs and practice, or national origin

f. Accessing inappropriate websites, including, but not limited to, those that are pornographic, gambling-related, or discriminatory in nature (e.g., "hate" sites)

g. Making fraudulent offers of Southwest or other products, items, or services from any Southwest user account

h. Soliciting or promoting non-Southwest business for, but not limited to, personal gain, profit, religious, or political causes

i. Revealing, publicizing, or publishing, to unauthorized recipients, confidential or proprietary information including, but not limited to, financial information, cardholder data, confidential Customer information, personnel information, business relationships, marketing strategies and plans, contracts, or information about the systems, software, networks, media, and data used to support business activities

j. Promoting and/or causing security events such as, but not limited to, introducing malicious programs

k. Activities intended or designed to cause damage, attempting to detect or exploit security vulnerabilities

l. Revealing your account password or passphrase to others or allowing the use of your account by others, increasing priority or access to services at the expense of others

m. Circumventing or disabling user authentication and other security controls

Copyright © 2019, Southwest Airlines Co.
All Rights Reserved

**App. 044**

    n.   Port scanning, network monitoring, denial of service
    o.   Denying access to other users
    p.   Misuse of messaging infrastructures
    q.   Unauthorized access to information

**3.11  Interfaces**

*Workstation Protection Standard*
*Company-owned Mobile Device Protection Standard*
*BYOD Protection Standard*
*Guidelines for Employees*
*Information Classification and Handling Standard*
*Records Management Policy*
*Social Media Policy*
*Social Media Dos and Don'ts video*
*Social Media Policy FAQs*
*Social Media Reference Guide*
*Aircraft Network Security Program (ANSP)*

## 4.  End User Access Control Policy

4.1.   All individuals accessing the Southwest network or systems must be issued a unique account to be used in association with, at a minimum, a password or passphrase that meets Southwest's Password Requirements Standard.

4.2.   Passwords, Passphrases, Passcodes, and PINs are strings of characters that authenticate a user to a workstation, laptop, Mobile Device, interface, or system.  Passwords, Passphrases, Passcodes, and PINs must be treated as SWA Confidential information.

4.3.   An individual's password, Passphrase, Passcodes, or PIN is part of the individual's identity to Southwest, establishing a basis for trusted access to Southwest's Information Assets and systems. Passwords, Passphrases, Passcodes, and PINs that are used to conduct Southwest business must not be shared with anyone, and individuals are held responsible for all uses of their Southwest passwords, Passphrases, Passcodes, and PINs by any such parties.

4.4.   Southwest Information Assets (or access to such information), including, but not limited to,  SWA passwords and Passphrases, must not be provided through or disclosed to unapproved Employee or third party developed sites and/or applications, including personal applications or web services. A list of approved Employee or third party developed applications is available through **SWALife**.

4.5.   Employees, Contractors, and Third Parties should not use their Southwest passwords or Passphrases on external or personal applications and web services.

4.6. Interfaces

*Password Requirements Standard*
*ANSP*

## 5.  Network Access Control Policy

5.1.   Access to the Southwest network is limited to users and devices with legitimate business needs.
5.2.   Devices attempting to access the Southwest network must be authenticated and authorized based on device identification and / or user authentication before network access is granted. This requirement applies to all network access methods, including but not limited to internal network access, wireless network access, and remote access.
5.3.   Visitors or guests of Southwest should be able to connect to the Guest Wireless Network across the Southwest Offices and Facilities, covered as part of Visitor Registration.
5.4.   Remote access to the Southwest network must use only secure remote connection solutions approved, supported, or provided by Southwest and must be approved by an Employee's Leader or a Contractor's or Third Party's Corporate Sponsor.

Copyright © 2019, Southwest Airlines Co.
All Rights Reserved

**App. 045**

# EXHIBIT E

# **SWA**Life Announcement

### 2019 Southwest Airlines Q4 Acknowledgement

From time to time, Southwest Employees are asked to acknowledge receipt of current or new Southwest policies.  It is important for Southwest Employees to take the time to read these policies, be aware of the expectations outlined in these policies, and know that they will be held accountable for complying with these policies.  As such, you are being asked to confirm that you are aware you will be held accountable for the policies applicable to you.

### Southwest's Information Security Policy:

Southwest Executive Leadership has identified a cybersecurity breach as one of the most dangerous threats to the success of our Business. A breach could cost us not only millions of dollars, but also a monumental loss in Customer trust. This in turn could severely damage the Southwest brand. Regardless of your specific job function, every Member of the Southwest Family has a shared responsibility to help prevent a cybersecurity breach and protect Southwest's information assets. As part of our commitment to safety and security, securing the data of the organization, our People, and our Customers is paramount.

We have updated the content and structure of the Information Security Policy to make it easier for Southwest Employees and Contractors to understand. The Information Security Policy has now been separated into two documents. The new Information Security Policy is shorter and only contains general content for all users. The new Technical Security Policy contains technical content for Southwest developers, architects, engineers, administrators, etc. who need more detailed guidance on the design, development, implementation, and operation of information systems.

The Information Security Policy is designed to help you understand what you need to do to protect Southwest Airlines. At any time, the SWA Information Security Policy can be accessed through **SWALife > My Work > Resources > Policies > Corporate Governance**. Every Southwest Employee and Contractor is expected to read the Policy and be aware of the associated standards you are required to comply with at work. Acknowledgement of the new Technical Security Policy by those it applies to most will be arranged at a later date.

Employees are required to report any potential security incidents via the Southwest Service Desk at 214-792-3300. Once reported, the Computer Security Incident Response Team (CSIRT) determines when to initiate the Computer Security Incident Response Plan. Under no circumstances should an employee report a potential security incident to anyone outside of Southwest. If warranted, the CSIRT Team will handle outside notifications.

By keeping Southwest cyber secure, you can help ensure that we keep Southwest Airlines an amazing and safe place to work.

---

### Acknowledgement

**CHECK THE BOX BELOW to consent to electronic delivery, acknowledge receipt, and continue to the SWALife home page:**

☐ I, **Redacted** , have read, reviewed, and been given the opportunity to review, and I have received the:

› Southwest's Information Security Policy

I understand the content of these policies. I agree to fully comply with the standards, policies, and procedures contained in these documents.

**Bypass**   Submit

You may dismiss this acknowledgment until midnight, **Nov 04**. At that time, you must acknowledge this notification