# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>                    Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>                    Defendants. | Civil Case No. 3:17-cv-02278-X<br><br><br>**PLAINTIFF CHARLENE CARTER'S RESPONSE TO SOUTHWEST'S EMERGENCY MOTION AND REQUEST FOR SANCTIONS  AND SUPPORTING BRIEF** |

# TABLE OF CONTENTS

Table of Authorities ........................................................................................ iii

Introduction.................................................................................................... 1

Facts .............................................................................................................. 1

Argument ....................................................................................................... 4

I.   The Court should not sanction or discipline Gilliam because he did not solicit
     privileged or confidential information from Southwest employees ...................... 6

     A.   Neither Carter nor her counsel solicited privileged or confidential information
          from Southwest employees .............................................................. 6

     B.   Using purely factual information to serve a subpoena did not disadvantage or
          prejudice Southwest because it had no impact on the litigation of claims and
          defenses ...................................................................................... 7

     C.   Serving a lawful subpoena is not harassment ........................................ 9

     D.   The Court should not discipline Gilliam.............................................. 13

II.  The Court should not exercise its inherent power to force Carter or her counsel to
     disclose information regarding the source for Stone's whereabouts ..................... 15

     A.   The Court should not compel Carter to disclose the source of information
          regarding Stone's whereabouts because courts do not exercise their inherent
          power in matters collateral to the proceedings ................................... 15

     B.   Gilliam's communications with his client are covered by attorney-client and
          work product privilege .................................................................. 18

     1.   *Work product* ............................................................................. 18

     (a)  *The Crime-Fraud Exception does not apply* ..................................... 19

     (b)  *Southwest cannot demonstrate "substantial need" for it to
          overcome Carter's Work Product claim* ........................................... 21

     2.   *Attorney-Client Privilege* ............................................................. 22

III.   The Court should deny Southwest's request for attorney's fees and instead award
       Carter her attorney's fees ......................................................................................22

Conclusion ...............................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Areizaga v. ADW Corp.*,
314 F.R.D. 428 (N.D. Tex. 2016) ................................................................................................21

*Ashman v. Solectron, Corp.*,
No. C–08–1430 JF, 2008 WL 5071101 (N.D. Cal. Dec. 1, 2008)..............................................8, 9

*Barron Builders & Mgmt. Co. v. J & A Conditioning & Refrigeration, Inc.*,
No. CIV. A. 96-2921, 1997 WL 685352 (E.D. La. Oct. 31, 1997) ............................................17

*Bell v. Raytheon Co.*,
No. 3:08-CV-0702-G (BF), 2009 WL 10704498 (N.D. Tex. Apr. 21, 2009) .............................17

*Bockian v. Esanu Katsky Korins & Siger*,
476 N.Y.S.2d 1009 (1984)......................................................................................................11, 12

*Brado v. Vocera Commc'ns, Inc.*,
14 F. Supp. 3d 1316 (N.D. Cal. 2014) ......................................................................................6, 7

*Bridge C.A.T. Scan Assocs. v. Technicare Corp.*,
710 F.2d 940 (2d Cir. 1983)........................................................................................................18

*Brown v. Braddick*,
595 F.2d 961 (5th Cir. 1979) .......................................................................................................10

*Crowe v. Smith*,
261 F.3d 558 (5th Cir. 2001) .........................................................................................................4

*Dondi Props. Corp. v. Commerce Savs. and Loan Assoc.*,
121 F.R.D. 284 (N.D. Tex. 1988) ...............................................................................................13

*Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
218 F.R.D. 125 (E.D. Tex. 2003)................................................................................................22

*Flashmark Technologies LLC v. GTECH Corp.*,
2007 WL 2264765 (E.D. Tex. 2007) ..........................................................................................19

*Giardina v. Ruth U. Fertel, Inc.*,
No. CIV-A-00-1674, 2001 WL 1628597 (E.D. La. Dec. 17, 2001) ............................................16

*Glynn v. EDO Corp.*,
2010 WL 3294347 (D. Md. Aug. 20, 2010) ...................................................................6, 8

*Goff v. Harrah's Operating Co., Inc.*,
240 F.R.D. 659 (D. Nev. 2007)........................................................................................19

*Harrison v. Prather*,
404 F.2d 267 (5th Cir. 1968) ...........................................................................................11

*Henry v. City of Sherman*,
No. 4:17-CV-00313, 2017 WL 6268744 (E.D. Tex. Dec. 8, 2017) ...................................5, 7, 8, 9

*In re Ashley Madison Customer Data Sec. Breach Litig.*,
No. 15-2669, 2016 U.S. Dist. LEXIS 57619 (E.D. Mo. Apr. 29, 2016) .........................................8

*In re Grand Jury Proceedings*,
43 F.3d 966 (5th Cir. 1994) ..............................................................................................20

*In re Grand Jury Subpoenas*,
561 F.3d 408 (5th Cir. 2009) ............................................................................................20

*In re Nitla S.A. de C.V.*,
92 S.W.3d 419 (Tex. 2002)................................................................................................8

*In re Shell Oil Refinery*,
143 F.R.D. 105 (E.D. La. 1992).......................................................................5, 7, 8, 13, 16

*In re Moore*,
739 F.3d 724 (5th Cir. 2014) ............................................................................................4

*Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.*,
953 F.2d 1004 (5th Cir. 1992) ..........................................................................................19

*Madanes v. Madanes*,
186 F.R.D. 279 (S.D.N.Y. 1999) .......................................................................................7

*MMR/Wallace Power & Indus., Inc. v. Thames Assoc.*,
764 F. Supp. 712 (D. Conn. 1991).....................................................................................13

*Nesselrotte v. Allegheny Energy, Inc.*,
Civ. No. 06-01390, 2008 WL 2890832 (W.D. Pa. July 23, 2008) ................................................8

*Orchestrate HR, Inc. v. Trombetta*,
178 F. Supp. 3d 476 (N.D. Tex. 2016) ...............................................................................6

*Orchestratehr, Inc. v. Trombetta,*
No. 3:13-cv-2110-KS-BH, 2016 WL 4563348 (N.D. Tex. Sept. 1, 2016) ....................................8

*Reinsdorf v. Skechers U.S.A., Inc.,*
No. CV 10-7181 DDP (SSX), 2013 WL 12116415 (C.D. Cal. May 31, 2013) .......................7, 16

*Roadway Express, Inc. v. Piper,*
447 U.S. 752 (1980)................................................................................................................4

*Robinson v. Mitchell Int'l Inc.,*
2015 WL 3868559 (M.D. La. June 23, 2015)..........................................................................11

*SEC v. Finazzo,*
543 F. Supp. 2d 224, 228 (S.D.N.Y. 2008)..............................................................................7

*Shanahan v. Vallat,*
No. 03 Civ. 3496 (PAC), 2006 WL 3317018 (S.D.N.Y. Nov. 15, 2006).......................................7

*Spears v. McCraw,*
No. A-17-CA-1105-RP, 2020 WL 589538 (W.D. Tex. Feb. 5, 2020) ............................. 15, 23-34

*Teva Pharm. USA, Inc. v. Sandhu,*
291 F. Supp. 3d 659 (E.D. Pa. 2018) ....................................................................................20

*Turfgrass Grp., Inc. v. Ne. Louisiana Turf Farms, LLC,*
No. CIV.A. 10-1354, 2013 WL 6145294 (W.D. La. Nov. 20, 2013)..........................................4

*Upjohn Co. v. United States,*
449 U.S. 383 (1981)..............................................................................................................22

*Wichansky v. Zowine,*
No. CV-13-01208, 2015 WL 5693521 (D. Ariz. Sept. 29, 2015) ...............................................19

*Woods v. Covington Cty. Bank,*
537 F.2d 804 (5th Cir. 1976) ................................................................................................15

*Wultz v. Bank of China Ltd.,*
304 F.R.D. 384 (S.D.N.Y. 2015) ............................................................................................19

*Wyle v. R.J. Reynolds Indus., Inc.,*
709 F.2d 585 (9th Cir. 1983) ..................................................................................................9

**Rules & Statutes**

42 U.S.C. § 2000e .................................................................................................................1

45 U.SC. § 152 ..................................................................................................................1

Fed. R. Civ. P. 26(a)(1)(A)(i) ....................................................................................2, 11

Fed. R. Civ. P. 26(b)(1) ....................................................................................................21

Fed. R. Civ. P. 26(b)(3)(A) .......................................................................................18, 21

Fed. R. Civ. P. 45(b)(2) ....................................................................................................10

Fed. R. Civ. P. 45 ......................................................................................................10, 11

Tex. Disciplinary R. Prof'l Conduct 4.02(a) ....................................................................13

Tex. Disciplinary R. Prof'l Conduct 4.02(a) ....................................................................13

Tex. Disciplinary R. Prof'l Conduct 4.04(a) ....................................................................13

Tex. Disciplinary R. Prof'l Conduct 8.04(a)(1) ................................................................13

## INTRODUCTION

Southwest's emergency motion seeks to deprive Plaintiff Charlene Carter of her chosen counsel and punish her attorney based on nothing more than wild assertions and rank speculation. Neither Carter nor her counsel solicited privileged or confidential information, knowingly or otherwise. Carter's attorney, Matthew B. Gilliam, never contacted or communicated with any Southwest employee regarding Stone's schedule information. Gilliam never asked anyone—directly or indirectly—to do anything improper to learn Stone's whereabouts. Southwest's motion is nothing more than gamesmanship, calculated to get the upper hand on Carter's case, waste valuable time and resources, and interfere with the lawful service of a subpoena on a critical witness. For these reasons, and those explained herein, the Court should deny Southwest's motion in its entirety.

## FACTS

Carter alleges that Southwest Airlines Co. and TWU Local 556, acting through Audrey Stone, former President of Local 556, fired Carter in retaliation for her protected activity under the Railway Labor Act (45 U.S.C. § 152) and Title VII of the Civil Rights Act (42 U.S.C. § 2000e). FAC ¶¶ 1-4, 8, 13, 37, 38, 41, 46-50, 78-92, 93-102, 103-122.[1] Carter alleges that Stone intentionally worked to cause Southwest to fire her after Carter criticized Stone's leadership of the union, including the union's support for abortion during its participation in the 2017 Women's March. Carter's status as a nonmember of the union, objection to paying for the union's political expenditures, and her opposition to other Local 556 leaders, also motivated Stone and Local 556 to seek Carter's termination. FAC ¶¶ 11, 19-43, 44-50, 58, 60, 61, 63-65, 68-71.

---

[1] Carter's Fourth Amended Complaint, ECF 80 (April 10, 2019) shall be cited to hereinafter as "FAC ¶ __".

Given Carter's burdens to prove her claims, which center around Stone, she had to subpoena Stone for her relevant documents and communications because Local 556's attorneys refused to produce any of Stone's documents possessed "in her personal capacity," and refused to confirm whether they or the union represented Stone in her personal capacity. (ECF 93, p.3, 12-13); (App. 8, ¶ 5). On repeated occasions, Carter's counsel asked attorneys for both Southwest and Local 556 to provide address, telephone, and other information for Stone, as Rule 26(a)(1)(A)(i) requires. (App. 1, ¶ 11) (Apps. 1-3). Yet, they ignored those requests. Meanwhile, discovery disputes have caused substantial delay in this case, and the parties have yet to fully resolve them, while the discovery deadline gets closer.[2]

On June 12, 2020, Carter noticed service of the Stone subpoena to Southwest and Local 556. (App. 4). Carter's counsel hired a process server who attempted to serve Stone at her Tampa residence on June 19, 2020, June 22, 2020, and June 24, 2020. (Apps. 8-9, ¶ 13). After learning of the third failed attempt, Carter asked a Southwest flight attendant where Stone was "based" (i.e., the airport from which Stone would generally depart), but that flight attendant did not know. (App. 6, ¶ 6). Subsequently, two different Southwest employees unexpectedly sent Carter information regarding Stone's upcoming work schedule, which included flight departure and arrival times, her destination, and the name of the hotel where Stone would be staying. (App. 6, ¶ 7).

Having worked for Southwest for 20 years, Carter knew that Southwest flight attendants could find departure and arrival times, destinations, and hotel names for all other flight attendants by accessing the list of flights maintained at each base without having to view a flight attendant's "board," which is one section of Southwest's online system where all flight attendants can view

---

[2] Carter served both Southwest and Local 556 with discovery requests over a year ago, resulting in a motion to compel being filed against Local 556. (ECF 93, 1-6). Meanwhile, Carter and Southwest are still trying to resolve their discovery disputes. (ECF 86, ¶¶4-6).

other flight attendants' schedules. (App. 6, ¶ 8). Carter knew that flight attendants regularly shared trip information, by printing out trip sheets, circulating them, and leaving them in lounges and on planes. *Id.* Carter also knew that Local 556 has used Southwest's computer system to locate flight attendants for the campaigns to elect union officers and to ratify collective bargaining agreements. *Id.* As a matter of general knowledge, and as Carter's attorney, Gilliam knew that Southwest flight attendants regularly accessed and shared flight attendants' trip information. (App. 8, ¶ 12). Not perceiving any problem with the trip information that had been received, Carter's counsel hired a different process server to attempt to serve Stone during one of her upcoming layovers. (App. 9, ¶ 14).

On July 1, 2020, a process server served the subpoena on Stone during her layover in Albuquerque. The next day Southwest Attorney Michael Correll called Gilliam. (App. 9, ¶¶ 15-16). During their first call on July 2, Correll demanded that Gilliam explain to Southwest in writing how he learned of Stone's location. (App. 9, ¶ 15). Gilliam responded that he believed the information was public, and indicated that he would review the matter and report back. (App. 9, ¶ 16).

During their second call on July 2, Gilliam explained that work product privilege and possibly other privileges prevented him from sharing more information. *Id.* Correll responded by saying that was "unfortunate." *Id.* Correll then threatened to file an "emergency" motion for sanctions against Carter and her counsel. *Id.* Without mentioning any evidence, he assumed that either Carter or Gilliam had recruited a Southwest employee to illegally access its system and had effectively committed a crime. *Id.* Correll asked Gilliam to confirm that he had not directed anyone to infiltrate Southwest's computers. *Id.* Gilliam confirmed that he had always complied with his ethical duties. *Id.* Correll responded by saying "I know exactly what that means," insinuating that Gilliam had

3

violated the ethics rules and committed a crime. *Id.* Correll also told Gilliam that he believed Southwest could ascertain the identity of any employee that obtained information from their system. *Id.* The call did not change Gilliam's belief that flight attendants' flight schedules were publicly available based on his prior knowledge that flight attendants circulated that information widely. (App. 9, ¶ 12).

Correll asked Gilliam to confirm that he obtained the information from a source other than a Southwest employee, and had not directed anyone to infiltrate Southwest's computers. (App. 9, ¶ 16). Gilliam confirmed that he did not do anything unethical, but work product and attorney client privilege prevented him from disclosing where he got the information. *Id.* The second call ended and Correll made no further attempts to discuss these issues with Gilliam. *Id.* Southwest filed this motion the next week.

## ARGUMENT

The Court should deny Southwest's Motion for Sanctions. To impose sanctions against a party under its inherent power, the court must make a specific finding that the party acted in bad faith. *In re Moore*, 739 F.3d 724, 729-30 (5th Cir. 2014). Bad faith "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; ... it contemplates a state of mind affirmatively operating with furtive design or ill will." *Turfgrass Grp., Inc. v. Ne. Louisiana Turf Farms, LLC*, No. CIV.A. 10-1354, 2013 WL 6145294, at *3 (W.D. La. Nov. 20, 2013) (citation omitted). The court's finding of bad faith "must be supported by clear and convincing proof," which is a "high standard" that requires "more than a preponderance of the evidence." *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (noting that courts must exercise their inherent powers with restraint and discretion).

Despite having no evidence to meet this burden, Southwest brought this Motion anyway. Neither Carter nor her counsel solicited privileged or confidential information, knowingly or otherwise.  Gilliam did not have any communications or contact with Southwest employees, and did not—directly or indirectly—solicit Southwest's information. (App. 8, ¶¶6-11).[3] Thus, the Court should not discipline Gilliam, rescind his *pro hac vice* status, or refer the matter to any disciplinary committee. The Court should also decline to exercise its powers to force Carter to disclose who gave her information regarding Stone's whereabouts because Southwest's concerns about whether a third party improperly obtained information from its systems is collateral to this case, and federal courts do not exercise their authority in collateral matters. *See In re Shell Oil Refinery*, 143 F.R.D. 105, 108-09 (E.D. La. 1992); *see also infra* at 15-18. Nor should the Court require Carter and her counsel to disclose their documents and communications, which are protected by work product and attorney client privilege.

Lastly, the Court should decline Southwest's request for an award of attorneys' fees, as the company had no basis for seeking sanctions in an emergency motion, particularly when Gilliam explained to Southwest's counsel that he complied with his ethical duties. (App. 9, ¶ 16). Therefore, the Court should instead award Carter attorney's fees and expenses for having to respond to Southwest's ill-advised Motion, which lofted serious accusations against Gilliam and called for sanctions based purely on wild speculation.

---

[3] To be sure, it would not be improper or unethical to contact and communicate with lower-level unrepresented employees who were not involved in the disputed events. *See e.g., Shell Oil,* 143 F.R.D. at 108; *Henry v. City of Sherman*, No. 4:17-CV-00313, 2017 WL 6268744, at *3 (E.D. Tex. Dec. 8, 2017).

## I. The Court should not sanction or discipline Gilliam because he did not solicit privileged or confidential information from Southwest employees.

### A. Neither Carter nor her counsel solicited privileged or confidential information from Southwest employees.

Contrary to Southwest's accusations,[4] Carter's counsel did not solicit privileged or confidential information from Southwest employees or otherwise have any contact or communications with Southwest employees. Courts may sanction attorneys when they steal or solicit privileged information. *See e.g., Brado v. Vocera Commc'ns, Inc.*, 14 F. Supp. 3d 1316, 1320–21 (N.D. Cal. 2014). But, Gilliam never contacted or communicated with any Southwest employee regarding Stone's schedule information. (App. 8, ¶¶6-11). Gilliam never asked anyone—directly or indirectly—to do anything improper in order to learn Stone's whereabouts. *Id.*

As with Gilliam, Carter also never solicited privileged or confidential information. (Apps. 5-6, ¶¶4-7).[5] Carter never asked or suggested that anyone obtain information for her, let alone do anything improper to learn Stone's whereabouts. *Id.* Carter did ask a flight attendant where Stone was based (i.e., the airport where Stone would generally depart from), but she did not otherwise seek information regarding Stone's whereabouts. (App. 6, ¶ 6).

Even in cases when attorneys receive and use privileged information improperly obtained by third parties, courts do not sanction the attorney unless he himself engaged in misconduct in order

---

[4] Without a shred of evidence, Southwest accuses Gilliam of "us[ing] an unidentified Southwest employee to infiltrate Southwest's secure computer systems and misappropriate confidential … data." SWA Br. 7.

[5] While Southwest cites several cases for the proposition that it is improper to intentionally use an employee to secretly obtain confidential information regarding a party opponent or to hire a private investigative firm to extract confidential information from a company, these cases are inapposite because they involve circumstances where an attorney acted improperly in stealing documents. *See Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 488 (N.D. Tex. 2016) (dealing with an attorney that hired a private investigative firm to contact employees with the purpose of securing confidential information). *Glynn v. EDO Corp.*, Civ. No. JFM-07-01660, 2010 WL 3294347, *5 (D. Md. Aug. 20, 2010) (finding that "it is an improper litigation tactic" to use an employee to secretly obtain non-public business information regarding a party opponent). Southwest made its inflammatory sanctions motion without any factual basis of wrongdoing by Carter or Gilliam.

6

to acquire the information.[6] Where a lawyer receives privileged information improperly obtained from an adverse party but was not involved in obtaining that information, he can use that information as long as he did not encourage or cause the dishonest conduct. *See Brado*, 14 F. Supp. 3d at 1321 n.2 ("If the government can use documents misappropriated by a private party not acting as a governmental agent in a criminal prosecution where the defendant's liberty is at issue, it is difficult to discern why such documents should be excluded in an analogous civil case.").

"[T]he specifics of how the source obtained [information], or the exact identity of the source, [do not] implicate the integrity of the discovery process in this Court, which is properly focused on whether Plaintiff purposefully solicited the document, not why or how the source voluntarily produced it, or what the source's name is." *Reinsdorf v. Skechers U.S.A., Inc.*, No. CV 10-7181 DDP (SSX), 2013 WL 12116415, at *3 (C.D. Cal. May 31, 2013) (citing *Madanes*, 186 F.R.D. at 292; *Shell*, 143 F.R.D. at 108); *Shanahan v. Vallat*, No. 03 civ. 3496 (PAC), 2006 WL 3317018 at *2 (S.D.N.Y. Nov. 15, 2006) ("[The] mere fact that the person providing the information might have acted improperly is insufficient" to establish wrongdoing on the receiving party's part.); *SEC v. Finazzo*, 543 F. Supp. 2d 224, 228 (S.D.N.Y. 2008), *aff'd*, 360 F. App'x 169 (2d Cir. 2009).

## B. Using purely factual information to serve a subpoena did not disadvantage or prejudice Southwest because it had no impact on the litigation of claims and defenses.

The Court should not sanction Carter's counsel because receiving factual information regarding Stone's whereabouts and using it to serve a subpoena did not disadvantage or prejudice Southwest. Courts do not sanction attorneys for conduct that has not resulted in actual prejudice to the adverse party. *See Henry*, 2017 WL 6268744, at *3 (finding no showing of prejudice)

---

[6] Where the party receiving evidence was not involved in any wrongful conduct in obtaining it, and where the evidence itself is not privileged, there is no basis for requiring the return of the information obtained or prohibiting its use. *Madanes v. Madanes*, 186 F.R.D. 279, 292–93 (S.D.N.Y. 1999).

(citation omitted); *Orchestratehr, Inc. v. Trombetta*, No. 3:13-cv-2110-KS-BH, 2016 WL 4563348, at *14 (N.D. Tex. Sept. 1, 2016); *Ashman v. Solectron Corp.,* No. C08–1430 JF (HRL), 2008 WL 5071101 (N.D. Cal. Dec. 1, 2008) (denying sanctions because defendants were not prejudiced in any way).

In *Nesselrotte v. Allegheny Energy, Inc.*, the plaintiff copied and gave her counsel hundreds of privileged documents and confidential information without her employer's consent. Civ. No. 06-01390, 2008 WL 2890832 (W.D. Pa. July 23, 2008). Yet, the court held that sanctions were not warranted because the documents were not significant enough to affect the course of litigation, and the conduct of plaintiff and her lawyer was not sufficiently aggravated to warrant sanctions. *Id.*

In *In re Nitla S.A. de C.V.*, a Texas court held that disqualification was neither a necessary nor appropriate remedy to counsel's having reviewed documents, subsequently deemed privileged, where plaintiff's trial strategy did not significantly change after reviewing the documents. 92 S.W.3d 419 (Tex. 2002). Serving Stone with a subpoena using the time, date, and location information that Carter obtained does not disadvantage or prejudice Southwest. Neither Stone nor Southwest had a right to impede actual *service* of a subpoena.

Federal courts may impose sanctions when one party circumvents the discovery rights of an adverse party with respect to their litigation of the substance of their claims and defenses.[7] "[T]here must be a relationship between the behavior in question and the merits of the case such that the

---

[7] *Shell Oil* and related cases involve circumstances circumventing Federal Rules of Civil Procedure designed to protect parties' rights to control discovery documents and object to the production of documents. 143 F.R.D. at 108; *see also e.g.*, *In re Ashley Madison Customer Data Sec. Breach Litig.*, 2016 U.S. Dist. LEXIS 57619, *1 (entering an order that prohibited party intending to use news articles and information leaked onto the internet by computer hackers to draft an amended complaint advancing its claims); *Glynn*, 2001 WL 1628597, at *4-5 (discovery documents regarding the adverse party's claims, defenses, and litigation strategies).

transgression threaten[s] to interfere with the rightful decision of the case." *Ashman*, 2008 WL 5071101, at *2 (quoting *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 591 (9th Cir. 1983) (internal punctuation omitted).[8] Sanctions were warranted in those cases cited by Southwest because the attorneys circumvented the discovery process, obtained privileged information that advanced the merits of their case, and prevented the adverse party from arguing against production.

Carter did not obtain any information relevant to the merits of the case. Carter and her counsel obtained and used information about Stone's whereabouts solely for the purposes of locating Stone and serving a non-party subpoena. (Apps. 5-9). Carter and her counsel gained no advantage by obtaining information regarding where they could serve Stone with a subpoena. Southwest even concedes that it "has no basis to conclude that the employee in question is even a potential witness or in possession of any relevant evidence in this case." SWA Br. 14. Thus, Carter's actions did not "circumvent discovery" or prevent any party from raising objections to the production of discoverable evidence regarding the parties' claims and defenses. Carter gave timely notice to Southwest and Local 556 on June 12, 2020, that a subpoena would be served on Stone as early as June 19. (App. 4). They have been afforded the opportunity to raise objections to the subpoena and have not done so.

**C. Serving a lawful subpoena is not harassment.**

The Court should also deny Southwest's request for emergency relief and sanctions because neither Carter nor Gilliam engaged in any conduct that threatened Stone when they gave a process server information regarding Stone's whereabouts in order to serve her with a subpoena. See SWA Br. 9. Carter served Stone with a subpoena to obtain evidence regarding her claims, not "to

---

[8] *cf. Henry*, 2017 WL 6268744, at *5-6 (deciding that representation of employees did not create the appearance of impropriety because the employees did not have access to confidential information regarding the subject matter of the suit).

intimidate and harass a witness," as Southwest contends. SWA Br. 7. Carter, as the plaintiff in this case, bears the burden to conduct discovery and prove her claims.[9]

Southwest and Local 556 repeatedly refused to disclose Stone's home address, telephone number, and other basic information, as required under Rule 26. (Apps. 1-3). Furthermore, Local 556 refused to produce any of Stone's information "in her personal capacity" making the subpoena all the more necessary. (ECF 93, p.3, 12-13). Carter's counsel asked Local 556's attorneys whether they represented former president Stone in her "personal capacity," but they refused to give a clear response. (App. 8, ¶ 6). Federal Rule 45 allows Carter to issue a subpoena to nonparties. Despite Stone's objections to personal service, Rule 45 requires it and allows service to be accomplished anywhere in the United States. Fed. R. Civ. P. Rules 45(b)(2).

Carter made multiple attempts to serve Stone at her residence in Tampa, Florida. (Apps. 8-9, ¶ 13). Flight attendants are continually traveling throughout the country for work, and, given their ability to trade their trips with other flight attendants, their schedules change frequently and abruptly. Having failed to serve Stone at her residence, Carter asked a flight attendant if the flight attendant knew where Stone was based. (App. 6, ¶ 6). Subsequently, Carter received unsolicited information with Stone's schedule information. (App. 6, ¶ 7).

Despite Southwest's vitriolic language, Gilliam did not engage in any "unnecessary intimidation tactics." First, there is no evidence that anyone engaged in "unnecessary intimidation tactics" here. SWA Br. 10. While Southwest complains that the process server was carrying a firearm, New Mexico is an open carry state, and his carrying a firearm is perfectly permissible under the law. Southwest's claim that serving Stone with a subpoena (after she had finished her

---

[9] Notably, standing to challenge a Rule 45 subpoena based on improper service lies with Stone, the person subject to the subpoena, not Southwest. *See Brown v. Braddick*, 595 F.2d 961, 967 (5th Cir. 1979) (a party's standing to challenge a Rule 45 subpoena issued to a non-party is limited to an alleged "personal right or privilege with respect to the subpoenaed materials").

work day) "disrupted [her] work" is baseless, and there is no reason to believe it was necessary to "remove [Stone] from flights to protect her." SWA Br. 10. She was served by a process server, not harassed by an unknown stalker. There was no reasonable basis for any fear from being served with a subpoena. In addition, neither Carter nor her counsel has any information regarding Stone's future schedule. (App. 6, ¶ 7); (App. 8, ¶¶ 6-11).

Second, even if Stone believed the process server did something wrong, hiring a process server to serve a Rule 45 subpoena is a routine discovery measure. Generally, an attorney or his client cannot be held responsible for a process server's actions. *Bockian v. Esanu Katsky Korins & Siger*, 476 N.Y.S.2d 1009 (1984). Indeed, holding an attorney or client responsible would have a "chilling effect on attempts by citizens, through their lawyers, to place disputes into the legal process for disposition." *Id.* at 1013.

Still, Southwest argues that Carter's counsel "had a number of other options to facilitate service of the subpoena." SWA Br. 10. For instance, Southwest argues that he could have contacted Correll or Local 556, and worked with them to accomplish service. SWA Br. 10. Despite any suggestion that Local 556's attorneys would have been willing to accept service of the subpoena, the Fifth Circuit establishes that service of a subpoena on counsel makes service a nullity altogether. *See Harrison v. Prather*, 404 F.2d 267, 273 (5th Cir. 1968) (finding service of a Rule 45 subpoena on a party's attorney, instead of the party, "renders such service a nullity"); *Robinson v. Mitchell Int'l Inc.*, 2015 WL 3868559, at *1, 1 n.1 (M.D. La. June 23, 2015). Yet, the fact is that neither Local 556 nor Southwest were cooperating with providing any information on Stone. Despite representing that they would assist with service after service was made, the fact remains that Southwest and Local 556 refused to comply with their disclosure duties under Rule 26(a)(1)(A)(i)

11

with respect to Stone's address and telephone information. (Apps. 1-3). Actions still speak louder than words.

Southwest also suggests that Carter could have issued discovery to Southwest about Stone's schedule. SWA Br. 10-11. Even if Southwest did cooperate with discovery requests (which is questionable given their refusal to disclose Stone's information under Rule 26), the requested information—Stone's whereabouts—fluctuates constantly given that flight attendants frequently swap work schedules. Therefore, information regarding Stone's whereabouts given thirty days after it was requested would be useless as soon as it was obtained, necessitating renewed motions to compel, which would take up this Court's time.

Southwest and Stone's new accusations of "harassment" and "fear for [Stone's] safety" are far too familiar. SWA Br. 4, 10. Carter exercised her "robust and uninhibited" free speech rights on union matters under the RLA to criticize Stone's leadership of Local 556 and its support of pro-choice and abortion causes. *See supra* at 1. This criticism also flowed from Carter's Christian beliefs that abortion is wrong and that Christians should speak out against this injustice, even amongst coworkers, which Title VII protects. *See supra* at 1. Yet Stone complained to Southwest that this speech was "harassment" and Southwest terminated Carter as a result. (ECF 80-5, p.2) Now Southwest complains that serving a lawful subpoena is "harassment." But exercising a legal right, whether free speech, or serving a subpoena, is no such thing.

Like Southwest's attempts to chill Carter's free speech rights at work, its "ludicrous notion" that Gilliam or Carter are responsible for the process server's actions is nothing more than an attempt to chill their efforts to litigate this case. *Bockian*, 476 N.Y.S.2d at 611. Such intimidation tactics, like this motion for sanctions, should not be allowed because they will have a "chilling effect" on not just this case but the entire legal system. *Id.*

12

**D.  The Court should not discipline Gilliam.**

The Court should not discipline Gilliam because he did not use or solicit a Southwest employee to "circumvent Southwest's security system." SWA Br. 10. Courts may sanction parties to remedy unfair litigation practices, but "[t]he role of the district court in enforcing the Rules of Professional Conduct is a limited one." *Shell Oil*, 143 F.R.D. at 108 (citing *MMR/Wallace Power & Indus. v. Thames Assoc.,* 764 F. Supp. 712 (D. Conn. 1991)). "'[T]he business of the court is to dispose of litigation" unless an attorney engages in misconduct that causes an unfair advantage in the litigation. *Id.*; *see Dondi Props. Corp. v. Commerce Sav. and Loan Ass'n,* 121 F.R.D. 284, 290 (N.D. Tex. 1988).

Southwest contends that Gilliam "appears" to have violated Texas Disciplinary Rule of Professional Conduct 4.02(a) and 4.04(a) either by communicating with a represented party without authorization, and/or using inappropriate means to obtain evidence in violation of Stone's and Southwest's rights to secure confidential information." *See* SWA Br. 15; Tex. Disciplinary R. Prof'l Conduct 4.02(a); 4.04(a).

But Gilliam did not solicit privileged or confidential information. (App. 8, ¶¶ 6-11). Gilliam had no contacts or communications with any Southwest employee regarding Stone's flight information, let alone a represented party. *Id*. Nor did he "knowingly assist or induce another to [violate these rules], or [violate them] through the acts of another." *See* Tex. Disciplinary R. Prof'l Conduct 8.04(a)(1). After multiple attempts to serve the subpoena failed, Carter asked a flight attendant where Stone was based, but she did not ask anyone to send her Stone's flight schedules. (App. 6, ¶ 6). Carter communicated with flight attendants, who are not in management; nor are they in a position to make Southwest vicariously liable for the purpose of Carter's case. *See* Tex. Disciplinary R. Prof'l Conduct 4.02(c); (App. 6, ¶¶ 6-7). Together with the fact that Gilliam had

no contact or communications with Southwest employees, this fact shows that Gilliam did nothing to assist or induce another to violate any disciplinary rules.

Yet, Southwest filed this motion, making highly inflammatory accusations[10] against Gilliam based on nothing more than its speculation that (1) he must have solicited the information because Stone's schedule was "protected by secondary security," and (2) he asserted work product and attorney-client privilege for communications with an unknown Southwest employee, rather than for those with Carter. *See* SWA Br. 10. With respect to the first assumption, Gilliam has no knowledge of Southwest's internal policies and restrictions apart from what Southwest has now represented with its motion. Even if it is true that Stone's data was secured, that does not provide any reasonable basis for automatically accusing Gilliam of asking a Southwest employee to steal secured data from Southwest's system or accusing him of knowing it was secured information. Carter knows that flight information is widely disseminated and accessible outside of the boards. (App. 6, ¶ 8).

As for the second assumption, Gilliam had an ethical duty not to breach his client's attorney-client privilege or his work product privilege, and he could not disclose any further information without breaching his obligations to his client which are protected by both privileges:  All of Gilliam's communications on this matter were confined to those with Carter and the process server. (App. 8, ¶¶ 6-11). Gilliam had informed Correll that he did not violate any ethical rules, but

---

[10] *See e.g.*, SWA Br. 14 ("Southwest gave Gilliam numerous opportunities to correct *his misconduct*") (emphasis added); SWA Br. 10 (asserting that Stone "fears for her safety because of Gilliam's conscious decision to engage in unnecessary intimidation tactics"); SWA Br. 15 ("willful disregard of these rules"); *id.* ("refused to mitigate *the harm he caused.*") (emphasis added); *id.* ("*apparent bad faith conduct* of Gilliam") (emphasis added). Yet, Southwest knows that that it has no basis for such allegations. *See e.g.*, SWA Br. 7 (stating that "Gilliam *appears* to have [engaged in this conduct]") (emphasis added); SWA Br. 9 ("*apparent* decision to unlawfully take and misuse") (emphasis added); SWA Br. 11 ("[U]nder no circumstances did Gilliam have a right to recruit a *potentially* represented Southwest employee.") (emphasis added); SWA Br. 10 ("Southwest's investigation *strongly indicates* that Gilliam used a Southwest employee to circumvent Southwest's security.") (emphasis added).

14

Southwest still assumed the worst and rushed to file this motion. (App. 9, ¶ 16). Southwest had no evidence for these extremely serious accusations, which were floated based on nothing more than its wild speculation and continued doing Stone's bidding.

For all of these reasons, the Court should deny Southwest's requests for sanctions, discipline, reference to state bar(s), and rescission of Gilliam's *pro hac vice* admission.[11] *Spears v. McCraw*, No. A-17-CA-1105-RP, 2020 WL 589538, at *8 (W.D. Tex. Feb. 5, 2020) (declining to refer complaints to state bars after finding no basis for sanctions).

## II. The Court should not exercise its inherent power to force Carter or her counsel to disclose information regarding the source for Stone's whereabouts.

The Court should reject Southwest's request that it conscript Gilliam and Carter to participate in its internal investigation for two reasons. First, courts do not use their inherent powers to resolve collateral matters, such as Southwest's investigation of whether one of its employee may have violated company policies. Second, the work product doctrine and attorney-client privilege protect communications related to making arrangements to serve the subpoena on Stone.

### A. The Court should not compel Carter to disclose the source of information regarding Stone's whereabouts because courts do not exercise their inherent power in matters collateral to the proceedings.

The Court should not order Carter to disclose sources of information regarding Stone's whereabouts because that would be collateral to these proceedings and is not necessary to remedy any unfair advantage. Federal courts exercise their inherent powers "to achieve the orderly and expeditious resolution of cases," not to intervene in a party's internal matters or investigations,

---

[11] Southwest's request to rescind Gilliam's *pro hac vice* admission is particularly objectionable because it would also unfairly deprive Carter of her choice of counsel. The Fifth Circuit has held that "[a] court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel." *Woods v. Covington Cty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976).

such as determining whether employees might have violated a company rule, how the employees obtained the information, or why they might have divulged the information. *See Shell Oil*, 143 F.R.D. at 108-09 (ruling that Counsel would not be required to identify the source of documents and stating that "learning the identity of the source of these documents is not necessary to remedy any unfair advantage gained"); *Giardina v. Ruth U. Fertel, Inc.*, No. Civ. A. 00-1674, 2001 WL 1628597, at *2 (E.D. La. Dec. 17, 2001); *see also Reinsdorf*, 2013 WL 12116415, at *3 ("[T]he specifics of how the source obtained [information], or the exact identity of the source, [do not] implicate the integrity of the discovery process in this Court.").

Questions regarding Southwest's internal investigation into the identity of any flight attendant or other employee who obtained Stone's information do not implicate the court's discovery processes or the administration of justice in this case. Southwest's invocation of the Court's inherent powers is inappropriate here. The company, admittedly, is not seeking such information "for the purpose of revealing who [Carter's Counsel] deems to be a critical fact witness." SWA Br. 14. Rather, Southwest is trying to use the Court for purposes of its own internal investigation regarding whether an employee violated company policy.

Furthermore, there is no "emergency" warranting relief because Carter does not possess any information or access that would pose an ongoing threat to Southwest or Stone. SWA Br. 9. Despite Southwest's contention that "Gilliam and his unknown source continue to have access to Southwest's "internal systems," neither Carter nor her counsel has access to those systems. SWA Br. 10; (App. 8, ¶¶ 6-11) (App. 6, ¶ 7). Carter and her counsel have nothing more apart from their privileged communications, unsolicited information about Audrey Stone's past flight arrival and departure times and hotel location, and the identities of the persons who communicated with Carter, without any personal knowledge of exactly where or how those persons obtained

16

information. *Id.* Carter's information was limited to a brief time period that has come and gone, and she has not received any information since then. (App. 6, ¶ 7).

While Southwest contends that its purpose is to protect "electronic systems, employees, and the public" (SWA Br. 14), Southwest fails to show how Stone's information implicates any purported harm to the public or the company's system and employees, when Southwest gives nearly 17,000 flight attendants regular access to the same information. (App. 6, ¶ 8); (ECF 102, p.35 ¶4). Flight attendants' knowledge and factual information regarding Stone's schedule—even if learned from company documents that they might have been privy to during the course of their employment—can stand on its own,  and is "akin to removing any prejudice to [defendant]." *See Bell v. Raytheon Co.*, No. 3:08-CV-0702-G (BF), 2009 WL 10704498, at *1–2 (N.D. Tex. Apr. 21, 2009). Facts discernable through reasonable research and investigation are not proprietary. *See Barron Builders & Mgmt. Co. v. J & A Conditioning & Refrigeration, Inc.*, No. CIV. A. 96-2921, 1997 WL 685352, at *4 (E.D. La. Oct. 31, 1997).

Moreover, Correll indicated to Carter's counsel on July 2, 2020 that Southwest, on its own, would be able to learn the identity of any person who might have accessed Stone's Board. (App. 9, ¶ 16). Therefore, it is difficult to fathom how there is an "ongoing security threat to Southwest and Stone" or why "immediate [court] action" is necessary to secure Southwest's internal systems or otherwise justify emergency relief. SWA Br. 10.

To the extent Southwest believes that one of its employees engaged in criminal conduct, it can seek relief through processes and procedures outside of this case. Carter and her counsel do not know whether a Southwest employee violated a law or company policy in obtaining this information. SWA Br. 10. Contrary to Southwest's representations that "Stone's flight schedule

17

was confidential" and "protected by secondary security" through her board,[12] Carter is aware that trip information is also accessible outside of that board, to the 17,000 flight attendants, through base information provided to all of those employees with their regular access. (App. 6, ¶ 8). Carter and her counsel have not had any reason to believe that such information was obtained in furtherance of a crime or fraud, nor any reason to believe that an employee violated any law or policy. (App. 6, ¶¶ 7-8); (App. 8, ¶¶ 10-12). If any Southwest employee acted improperly, then that would be a collateral matter between the company and its employee because there is no basis for granting relief as an incident to any rights asserted in the action. *See Bridge C.A.T. Scan Assocs. v. Technicare Corp.*, 710 F.2d 940, 946–47 (2d Cir. 1983). Thus, it would be improper to litigate that issue in these proceedings and between these parties.

### B. Gilliam's communications with his client are covered by attorney-client and work product privilege.

Given Attorney Gilliam's attorney-client privilege and work product obligations, he had an ethical duty not to disclose information regarding the information he received from his client, which is all of the information he has regarding Stone's past and limited whereabouts. Accordingly, Gilliam correctly asserted work product and attorney client privilege to protect his client's communications as required by the ethics requirements of all state bars.

#### 1. *Work product.*

Under Federal Rule 26(b)(3)(A) "[o]rdinarily, a party may not discover documents and tangible things 'that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or

---

[12] While Southwest contends that Stone's Board is restricted, the company does not explain who or how many employees still have access to that "private" Board. Nor has it demonstrated that it was not possible for employees to obtain the information by other means. Neither Carter nor her counsel has the resources or the information to test and refute Southwest's assertions, and doing so, such as having the opportunity to conduct discovery on the issue, would be wasteful, a burden on court proceedings, and beyond the scope of this litigation.

agent).'" This work product protection extends to "emails." *Wichansky v. Zowine*, No. CV-13-01208-PHX-DGC, 2015 WL 5693521, at *3 n.1 (D. Ariz. Sept. 29, 2015).

This Rule "does not limit the persons who can prepare work product for a party or its representative." *Id.* at *3. Thus, "a lawyer need not be involved at all for the work product protection to take effect." *Id.* (quoting *Goff v. Harrah's Operating Co., Inc.*, 240 F.R.D. 659, 660 (D. Nev. 2007)); *see also Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 394 (S.D.N.Y. 2015); *Flashmark Techs. LLC v. GTECH Corp.*, Civ. No. 2:06-CV-205, 2007 WL 2264765, at *3 (E.D. Tex. Aug. 6, 2007) (rejecting argument that work product is limited to documents created by or for an attorney). In fact, it can extend to communications and documents received from friendly third parties, so long as the third party prepared them in anticipation of litigation. *Wichansky*, 2015 WL 5693521, at *3 n.1.

Here, work product protection (along with attorney-client privilege) covers all of Gilliam's communications with Carter. Gilliam's communications with Carter generally relate to determining Stone's whereabouts so that a process server could effectuate service of the subpoena. Thus, the emails exchanged between Gilliam and Carter were created to further the ends of this litigation, and are protected. The same applies to Gilliam's emails with the process server.

(a) *The Crime-Fraud Exception does not apply.*

Southwest's speculation that the crime-fraud exception applies falls flat. To invoke the crime-fraud exception, Southwest must establish a prima facie case that a crime has been committed. *Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.*, 953 F.2d 1004, 1008 (5th Cir. 1992). Southwest has not presented one iota of evidence of any committed crime. Fifth Circuit dicta has recognized that although "[t]he party intending crime or fraud cannot invoke the work product doctrine, but if the other party did not intend crime or fraud, that party can invoke it." *In*

19

*re Grand Jury Subpoenas*, 561 F.3d 408, 411 (5th Cir. 2009) (footnote omitted); *In re Grand Jury Proceedings*, 43 F.3d 966 (5th Cir. 1994).

Here, neither Carter, nor Gilliam violated the Computer Fraud and Abuse Act or committed crime or fraud. Their affidavits belie Southwest's speculation that "Plaintiff and Gilliam … conscript[ed] an unknown Southwest employee to circumvent data security protections, engage in unauthorized computer access in violation of Southwest policies, and misappropriate the details of Stone's trip." SWA Br. 5; (App. 8, ¶¶ 6-11) (App. 6, ¶¶ 6-7).

Neither of them directed, encouraged, or induced anyone to access Southwest's computer systems, let alone to exceed their authorization or violate company policies. *Id*. Gilliam never had contact or communications with any third party who found Stone's flight information, nor the third parties who delivered this information to Carter. *Id*.

Carter asked a current Southwest employee where Stone's current "base" is. (App. 6, ¶ 6). Without soliciting or requesting any additional information, Carter subsequently received information regarding Stone's schedule. Thus, Carter and Gilliam did not "conscript" a Southwest employee to infiltrate its computer system or violate Southwest policies. Nor can their conduct fall under the Computer Fraud and Abuse Act even under an "indirect" theory of accessing Southwest's computers. *C.f. Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659 (E.D. Pa. 2018). As their affidavits show, neither of them "direct[ed], encourag[ed], or induc[ed]" a third party to access Southwest's system or to violate its policies. *Id.* at 671; (App. 8, ¶¶ 6-11) (App. 6, ¶¶ 6-7). Therefore, neither Carter, nor Gilliam committed a crime or fraud.

Regardless of whether the third party who obtained the flight schedules violated the CFAA or acted criminally, Gilliam and Carter's only intent was to serve a lawful subpoena on a key witness to this case who, as a flight attendant, constantly traveled and could not be served despite three

prior attempts. There is nothing criminal about that. Because Carter and Gilliam are the holders of the work product protection, and neither committed a crime, the protection remains intact.

(b) *Southwest cannot demonstrate "substantial need" for it to overcome Carter's Work Product claim.*

"Under Federal Rule of Civil Procedure 26(b)(3)(A), a party may only obtain discovery of documents prepared in anticipation of litigation or for trial upon showing that the materials are otherwise discoverable under Federal Rule of Civil Procedure 26(b)(1) and that the party seeking discovery has (1) substantial need of the materials to prepare for his or her case and (2) that the party cannot obtain the substantial equivalent of the materials by other means without undue hardship." *Areizaga v. ADW Corp.*, 314 F.R.D. 428, 439 (N.D. Tex. 2016) (citing Fed. R. Civ. P. 26(b)(3)(A)).

Here, Southwest cannot show it has "substantial need" for the communications and documents related to Stone being served with the subpoena for it to "prepare" its "case." *Id.* This information is not even discoverable under Fed. R. Civ. P. 26(b)(1) because it's not "relevant to any party's claim or defense." Southwest concedes this when it states in its motion that "Southwest has no basis to conclude that the employee in question is even a potential witness or in possession of any relevant evidence in this case." SWA Br. 14. Further, to the extent Southwest seeks the information Carter obtained—the dates, times, and location where Audrey Stone would be—it already has that information. Also, Correll previously indicated that the company could obtain information on who may have accessed its system. (App. 9, ¶ 16). Accordingly, Southwest has no need whatsoever for this information even if it needed it, which it does not, to prepare its case.

Lastly, Southwest claims that the identity of third parties that provided Stone's flight schedules to Carter and Gilliam is not covered by work product. But, even if true, that information is irrelevant to the merits of the case as Southwest has conceded. SWA Br. 14. For the reasons

explained *supra* 15-18, Southwest's investigation of whether someone exceeded their authorized use of its computers is collateral to this proceeding.

### 2. *Attorney-Client Privilege*

In addition to being covered by work product, the communications exchanged between Carter and Gilliam about serving Stone with the subpoena fall under the attorney-client privilege. "The attorney-client privilege prevents disclosure of communications between an attorney and client that were made while … rendering legal services." *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D. 125, 133 (E.D. Tex. 2003) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Here, Gilliam arranging service of the non-party subpoena on Stone for this case constitutes "rendering legal services." And Carter and Gilliam's communications about that subject matter are thus privileged.

Although, Southwest claims the crime-fraud exception allows it to pierce this privilege, its claim is meritless. As shown above, Carter did not "direct or encourage" anyone to access Southwest's computers or to violate Southwest's policies. (App. 8, ¶¶ 6-11) (App. 6, ¶¶ 6-7). Accordingly, her communications with Gilliam did not further crime or fraud and remain privileged.

In sum, this Court should not compel Carter or her attorneys to participate in Southwest's internal investigation into whether one of its employees may have violated its policies. That is collateral and irrelevant to this case.

### III. The Court should deny Southwest's request for attorney's fees and instead award Carter her attorney's fees.

The Court should deny Southwest's request for attorney's fees, and instead award Carter her attorney's fees for having to respond to this Motion. Southwest filed an emergency motion for sanctions accusing Gilliam of serious ethical violations based on nothing more than wild

speculation that he might have solicited a Southwest employee to obtain information from the company improperly, which he assured Southwest counsel he did not do. Without any evidence to support such serious allegations, Southwest sought to invoke the court's powers to resolve an internal investigation unrelated to this proceeding.

Correll called Gilliam demanding that he disclose in writing the source of the information for serving Audrey Stone's subpoena. (App. 9, ¶¶ 15-16). When Gilliam explained that he could not share that information based on work product and attorney client privilege, Correll was incensed. (App. 9, ¶ 16). When Gilliam assured Correll that he "complied with all his ethical obligations," Correll jumped to the conclusion that he breached those obligations, telling Gilliam "I know exactly what that means." Southwest made no further attempts to discuss these issues with Gilliam, and instead filed its emergency motion within a week. *Id*. Thus, it is incorrect to say that Gilliam refused to assist in any way. SWA Br. 7, 15.

Likewise, it is not true that Southwest had "no choice." SWA Br. 14. Correll told Gilliam prior to filing the motion that Southwest itself could ascertain the identity of any employee that obtained information from their system. (App. 9, ¶ 16).  Contrary to its assertions, Southwest did not "[seek] in earnest to resolve this issue." SWA Br. 14. Rather, Southwest demanded that Gilliam surrender client privileges that he was ethically required to protect. (App. 9, ¶ 16). Gilliam had a duty to assert attorney client and work product privilege rather than relent to Correll's threats and divulge client confidences. Gilliam did not "refus[e] to cooperate," but, as he explained to Correll, was duty-bound to protect his client's confidential communications. *Id*.

This emergency motion was unnecessary where there was no discernible harm or prejudice to Southwest's litigation of claims and defenses in this case. *See Spears*, 2020 WL 589538, at *8 (observing that the sanctions motions before it are "the very sort of filings that give lawyers a bad

public image" and that "[n]one of the matters complained of … merited the amount of time and attention … and certainly did not merit the amount of time the Court was forced to spend resolving them."). If Southwest wanted to investigate Carter or any current employee's knowledge of information regarding Stone's flight arrival and departure times, it had other means to do so without filing an emergency sanctions motion against Carter's counsel and invoking the court's powers and wasting its time.

## CONCLUSION

For the foregoing reasons the Court should deny Southwest's motion, and award Carter reasonable attorneys' fees.

Dated: July 16, 2020                          Respectfully submitted,

<div style="margin-left: 40%;">

s/ Matthew B. Gilliam
Mathew B. Gilliam (*admitted pro hac vice*)
New York Bar No. 5005996
*mbg@nrtw.org*
Jeffrey D. Jennings (*admitted pro hac vice*)
Virginia Bar No. 87667
*jdj@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319

s/ Jason E. Winford (*with permission*)
David E. Watkins
Texas Bar No. 20922000
*dwatkins@jenkinswatkins.com*
Jason E. Winford
Texas Bar No. 00788693
*jwinford@jenkinswatkins.com*
JENKINS & WATKINS, P.C.
4300 MacArthur Avenue, Suite 165
 Dallas, Texas 75209
Tel: 214-378-6675
Fax: 214-378-6680

</div>

*Attorneys for Plaintiff Charlene Carter*

### Certificate of Service

I hereby certify that on July 16, 2020, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ Matthew B. Gilliam_____