# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>          Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>          Defendants. | Civil Case No. 3:17-cv-02278-X |

**DECLARATION OF MATTHEW B. GILLIAM**

I, Matthew B. Gilliam, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of 21, of sound mind, and capable of making this declaration. The facts stated herein are true and correct and are within my personal knowledge.

2. I am employed full-time as a staff attorney by the National Right to Work Legal Defense Foundation, Inc. ("Foundation"), 8001 Braddock Road, Suite 600, Springfield, Virginia, 22151, which is a nonprofit, charitable public interest organization that provides free legal aid to employees and is exempt from taxation under 26 U.S.C. § 501(c)(3). *Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. United States*, 487 F. Supp. 801 (E.D. N.C. 1979).

3. I represent Plaintiff Charlene Carter ("Carter") in the above-captioned lawsuit.

4. On June 12, 2020, I noticed a subpoena for the former president of Transport Workers Union of America, Local 556 ("Local 556"), Audrey Stone ("Stone"), to Defendants' counsel, Southwest Airlines Co. attorneys Michael Correll ("Correll") and Brian Morris and Local 556 attorneys Ed Cloutman and Adam Greenfield. The subpoena included Audrey Stone's address

at Monte Carlo Towers, 3301 Bayshore Boulevard, Unit 2102, Tampa, Florida 33629. I found Stone's address using a skip tracing service after Southwest and Local 556 refused to disclose her address and telephone information as required by Federal Rule 26(a)(1)(A)(i).

5. On multiple occasions during the litigation, I have had conversations with Local 556's attorneys, and asked them if the union was or would be representing Stone in her personal capacity. Local 556's attorneys would never confirm whether or not they would represent her in such capacity.

6. I never accessed and never had the means to access Southwest's secure flight scheduling system or any other Southwest computer or data system.

7. I have never contacted or attempted to contact any Southwest employee regarding Stone's schedule or Southwest's computer systems.

8. I have never asked anyone to contact or communicate with any Southwest employee for the purpose of obtaining Stone's schedule, or any data from its computer systems.

9. I have never received information regarding Stone's schedule from any Southwest employee.

10. I have never received any information regarding Stone's schedule that I knew or believed to be confidential.

11. I have never received any information regarding Stone's schedule that I knew or had any reason to know had been obtained in violation of any law.

12. As a matter of general knowledge, I knew that Southwest flight attendants regularly accessed and shared flight attendants' trip information.

13. On or about June 12, 2020, I hired S & W Process Service ("S & W") to serve Stone with a subpoena at her Tampa, Florida address. On or about June 24, 2020, S & W informed me

that it had unsuccessfully attempted to serve Stone for the third time at her Tampa, Florida address that same day. S & W confirmed that they also attempted to serve Stone at that address on June 19, 2020, and June 22, 2020.

14. On June 30, 2020, I contacted Serve 2 Perfection, to serve Stone with a subpoena, and gave them information regarding Stone's flight arrival and departure times, and the name and the address of the hotel where she would be located on July 1 and July 2, 2020.

15. On July 2, 2020, Correll called me and demanded that I explain to Southwest in writing how I learned of Stone's location. I responded that I believed the information was public, and indicated that I would review the matter and report back.

16. Later on July 2, 2020, I called Correll back for a second conversation. I explained to Correll that work product privilege and potentially other privileges prevented me from sharing what information I had. He said that was "unfortunate." He demanded that I confess whether I had directed a Southwest employee to access its computer system for the purpose of finding Stone. Correll threatened to file an "emergency" motion for sanctions against Carter and her counsel. Correll asked me to confirm that I obtained the information from a source other than a Southwest employee, and that I had not directed anyone to infiltrate Southwest's computers. I confirmed by telling Correll that I had complied with all of my ethical duties. Correll responded by saying "I know what that means"—jumping to the conclusion that I violated ethics rules or even committed a crime. During our conversation, Correll also indicated to me that he believed Southwest could ascertain the identity of any employee that obtained information from their system. After that phone call Correll made no further attempts to contact me to discuss these issues.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: July 16, 2020

_____
Matthew B. Gilliam

App.10