IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § § § | |
| Plaintiff, | § | Civil Action No. 03:17-cv-02278-S |
| v. | § § | |
| SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA LOCAL 556, | § § § § | |
| Defendants. | § § | |

**DEFENDANT SOUTHWEST AIRLINES CO.'S REPLY IN SUPPORT OF EMERGENCY MOTION AND REQUEST FOR SANCTIONS**

Plaintiff Charlene Carter ("Carter") and her counsel, Matthew Gilliam, ("Gilliam") went to great lengths to track down Audrey Stone ("Stone") in a hotel room thousands of miles from home to terrify her with an openly armed process server. Yet Gilliam and Carter would have this Court believe that Southwest Airline Co.'s ("Southwest") protected Sensitive Security Information ("SSI") just fell into their laps between June 29, 2020 and July 1, 2020 without any effort on their part. This story defies belief.

The solution to this problem is clear—Gilliam and Carter should be required to disclose all sources of the information they used to serve Stone along with all related communications. Nothing about that information is privileged or otherwise protected but, even if some of them were protected, any privileged materials can be reviewed *in camera* to determine if the crime fraud exception applies. Meanwhile, once Gilliam's sources are revealed, the sources can be deposed, Southwest's records can be examined to determine the nature of the sources' actions in Southwest's computer system, and any new factual information can be submitted to the Court.

In the meantime, Gilliam and Carter's refusal to cooperate after intentionally using information known to have been unlawfully taken from Southwest continues to warrant a serious review of Gilliam's continued admission and a grant of attorneys' fees to Southwest for the costs it was forced to incur by Gilliam and Carter's misconduct.

### A. The Court Should Disregard Gilliam and Carter's Implausible Narrative of How They Obtained Southwest's and Stone's Confidential Information

Gilliam and Carter's arguments share a common prerequisite: they are predicated upon the Court wholly accepting Carter and Gilliam's newly proffered description of how they obtained Southwest's and Stone's protected information. However, their narrative is not credible.

Prior to Southwest's filing, Gilliam refused to deny the facts set forth in Southwest's motion. Specifically, Southwest stated that it would not bring the motion if Gilliam confirmed that he did not direct anyone to access Southwest's computer systems. But, as Gilliam admits in his declaration, he refused to proffer that affirmation. *See* Dkt. No. 105-4 ¶ 16. Instead, Gilliam declared that he always complies with his ethical duties. *Id.* As a result, Correll and Southwest quite rightly interpreted Gilliam's refusal to affirm that no one had accessed Southwest computers at his direction as confirmation that Gilliam had made such a request.

Despite refusing to provide any information to Correll, Gilliam and Carter now for the first time offer a new description of events. But what they claim makes no sense. They claim:

- On or before June 25, 2020, Gilliam happened to tell Carter that he was having trouble serving Stone.

- On June 25, 2020, Carter happened to receive an unsolicited call in which Carter happened to ask a flight attendant where Stone was based.

- The flight attendant with whom Carter spoke or some other flight attendant—gratuitously and without encouragement—ran with Carter's inquiry. Instead of just naming Stone's base, the unknown person accessed Southwest systems in a way that required him or her to circumvent security and then provided the full details of Stone's flight plan to Carter.

2

- Carter then passed that information along to Gilliam without a word of encouragement from her counsel.

*See* Dkt. No. 105-3 ¶ 7; 105-4 ¶¶ 4, 6-9, 13. All of this occurred in just four days. And they miraculously happened just in time—Stone's subpoena required production on July 20, 2020. Thus, service had to be complete by July 2, 2020 to be timely given the federal holiday on July 3.

Meanwhile, Gilliam and Carter's story defies belief for several additional reasons. First, Carter has had almost no engagement as a Southwest flight attendant for at least five years. Carter has not worked for Southwest since March 2017. Meanwhile, Carter only flew a *grand total* of fewer than ten (10) trips as a Southwest flight attendant between January 1, 2015 and her termination in March 2017. Yet, despite her lack of Southwest activity, she claims that someone without her prompting decided to violate airline security rules and jeopardize their employment to misappropriate Stone's flight details at exactly the right time to help Carter's case.

Second, information revealed in the response suggests that Gilliam and Carter have had and have used substantial prior access to Southwest's data systems to track Stone earlier in June 2020. Stone regularly travels away from home for work. Nonetheless, Gilliam avers that he attempted to serve Stone with the subpoena at her home on the *only three days in the entire month of June (June 19, 22, and 24) where Stone was listed as off work on sick leave*.[1] Dkt. No. 104 p. 9; App. 2-5, ¶¶ 5-6, 24.[2] This fact indicates that Gilliam and Carter had access to Stone's schedule well before

---

[1] Gilliam likely assumed that Stone would be at her Tampa residence while on sick leave. However, Stone scheduled appointments with multiple physicians (including some out-of-state) during her sick time and was thus not at home when Gilliam attempted to effectuate service.

[2] The Court has discretion to consider new evidence in reply where a party withholds evidence until filing its response. *See Jackson v. Triumph Aerostructures, LLC*, 3:15-CV-0535-B, 2016 WL 4800358, at *2 (N.D. Tex. Sept. 12, 2016). Additionally, the Court has discretion to consider new evidence in reply where additional context is required to provide context to correct a misrepresentation or misleading portrayal of factual information. *See Woods v. Peters*, No. 4;05-cv-724-Y, 2007 WL 2729905, at *6 & n.4 (N.D. Tex. Sept. 19, 2007). Here, Carter and

3

they secured her July 1, 2020 hotel information. App. 3-5 ¶¶ 8-9, 11, 13-23.

Likewise, Carter's effort to find out Stone's base provides a much more plausible explanation of how Carter and Gilliam directed this effort. Stone's board was private, so finding her required an alternative approach. That alternative approach appears to have been using Southwest's Crew-on-Flight Report ("CFR") in conjunction with other SSI to track down Stone. The CFR is an electronic list that identifies all flight crew members transiting a given airport on a given day. The best place to find a flight crew member on the CFR is their base. *See* App. 4-5 ¶¶ 13-15, 19. Thus, it appears the reason Carter was seeking Stone's base was to find her on a CFR.

But the CFR only would have revealed Stone's presence in Baltimore, the members of her crew, and the flight attendant pairing number. Thus, a person seeking full information on Stone's whereabouts would have to first unlawfully access the CFR then (1) unlawfully access the flight boards for her fellow crew members (which were unsecured) or (2) unlawfully pull a report on the flight attendant pairing using the flight attendant pairing number. App. 4-5 ¶¶ 14, 18-21.

In reality, Carter and Gilliam appear to have coordinated with an unknown individual to infiltrate multiple Southwest databases, compromise the security of multiple flight attendants, and misappropriate data to engage in unconscionable harassment and intimidation tactics. Nothing underscores this reality more than Gilliam's failure to provide his newfound story prior to filings his response. Instead, Gilliam waited from July 2, 2020 until July 16, 2020 to deploy his latest explanation. He did not try to contact counsel and have Southwest's motion withdrawn. He did not try to provide partial information to ameliorate Southwest's concern. And, even now, he has failed to present the identity of his source, proof of his prior attempts at service, or any other supporting documentation to validate his improbable assertions.

---

Gilliam withheld all evidence until filing their response, and their recitation of facts is incomplete and misleading without the context provided by the supplemental declarations.

Southwest submits that the only plausible explanation is that Gilliam and/or Carter engaged in the misconduct as previously alleged and they continue to hide the identity of their agent and their communications about serving Stone in an effort to avoid responsibility. Thus, the Court should empower Southwest to fully investigate by ordering the disclosure of Gilliam and Carter's agents and all communications concerning Gilliam's attempts to locate and serve Stone.

      **B.**      **Neither Attorney-Client Privilege or Work Product Protections Shield the Information Southwest Requests from Disclosure**

In its motion, Southwest asked that the Court compel Carter and Gilliam to: (a) disclose the source of the disputed information; (b) disclose all communications with the source; and (c) disclose all communications (including those between Carter and Gilliam) regarding the securing of Stone's schedule and lodging information. Dkt. No. 101 p. 21. Carter and Gilliam fail to address the first two items, thereby waiving any argument in opposition. As to the third item, Carter and Gilliam's communications in furtherance of their potentially criminal misconduct are excepted from the attorney-client privilege and should be disclosed to the Court and Southwest.

First, Carter and Gilliam only address their communications with each other in the response briefing, and they make no argument regarding the first two categories of requested information. *See* Dkt. No. 104 p. 25 ("Gilliam's communications *with his client* are covered by attorney-client and work product privilege") (emphasis added); *id.* at 26 ("[W]ork product protection (along with attorney-client privilege) covers all of *Gilliam's communications with Carter*.") (emphasis added); *id.* ("[T]he emails exchanged *between Gilliam and Carter* … are protected.") (emphasis added); *id.* at 29 ("[T]he *communications exchanged between Carter and Gilliam* about serving Stone with the subpoena fall under the attorney-client privilege.") (emphasis added)). Hence, Carter has waived any privilege claim as to the source of the disputed information and all communications with those individuals, including any such communications that include Gilliam. *See Ledet v. Fleetwood*

5

*Enters., Inc.*, 245 F.3d 791 (5th Cir. 2000) (failure to address issue in opposition constitutes waiver); *Le v. Exeter Fin. Corp.*, 2020 WL 1158429, *4 (N.D. Tex. Mar. 09, 2020) (same).

Moreover, even if such arguments were not waived, the identity of Carter and Gilliam's sources and their communications with those sources are not protected because: (1) identity is a fact rather than a protected communication, *see Brody v. Zix Corp.*, 2007 WL 1544638, *2 (N.D. Tex. May 25, 2007); (2) communications with unrepresented third parties do not give rise to privilege protections absent a special exception, none of which have been argued here, *see Mondis Tech., Ltd. v. LG Elecs., Inc.*, 2011 WL 1714304, *4 (E.D. Tex. May 04, 2011); and (3) Gilliam cannot claim work product protection over the activities of a person he has disclaimed as his agent, *see Robinson v. Tex. Auto. Dealers Ass'n*, 214 F.R.D. 432, 450-51 (E.D. Tex. 2003).

Next, as Southwest argued in its motion, the crime-fraud exception vitiates any claim of privilege over Gilliam's communications with Carter about serving Stone.  Specifically, as previously briefed, any claim of privilege here has been destroyed by Gilliam, Carter, and their sources' apparent violations of the Computer Fraud and Abuse Act ("CFAA") in pursuit of Stone's travel information.  *See Orchestrate HR, Inc. v. Trombetta*, 2014 WL 884742, *3 (N.D. Tex. Feb. 27, 2014); *United States v. Edwards,* 303 F.3d 606, 618 (5th Cir. 2002).  Carter and Gilliam do not contest that the conduct Southwest describes violates the CFAA and would result in the applicability of the crime-fraud exception.  Instead, they contend that Southwest has the facts wrong.  Thus, Gilliam and Carter's attempt to limit disclosure of the allegedly privileged content depends entirely on the credibility of the narrative proffered.  As discussed above, Southwest submits that the narrative lacks credibility and should be disregarded.

Of course, to the extent the Court believes there is ambiguity in this regard, it need not simply allow Gilliam and Carter to withhold potential evidence of concerted criminal activity.

Courts can "require[] the *in camera* submission of privileged materials for a variety of reasons." *United States v. Decay*, 406 F. Supp. 2d 679, 681 n.1 (E.D. La. 2005). In particular, the Court may conduct *in camera* review of privileged contact if there is a "reasonable belief" that the review "may yield evidence" that the crime-fraud exception applies. *United States v. Zolin*, 491 U.S. 554, 574-75 (1989); *Chandler v. Phoenix Servs.*, 2020 WL 487503, *2 (N.D. Tex. Jan. 30, 2020). Here, Southwest and Stone took significant steps to protect the information at issue and Southwest's Information Security Policy prohibited accessing and disclosing Stone's schedule and whereabouts. *See* Dkt. No. 102 p. 33 ¶¶ 13-14, pp. 42-47. The fact that this protected information turned up in Gilliam and Carter's possession at an essential moment (along with Gilliam's evasiveness) provide strong support for Southwest's claim that Gilliam and Carter coordinated with a Southwest employee to misappropriate Southwest data. Thus, at minimum, *in camera* review of Carter and Gilliam's correspondence regarding this matter is appropriate. *See Cole v. Collier*, 2020 WL 2813454, *3 (S.D. Tex. May 28, 2020) ("The Court has [] determined it needs to review documents withheld by Defendants under the attorney-client privilege *in camera* to determine if they are in fact privileged" or if the crime-fraud exception applies). If *in camera* review reveals any misconduct, the communications should then be produced to Southwest.

  **C.**  **The Court Should Order the Requested Disclosure and Impose Sanctions**

Carter and Gilliam claim that it is improper to require disclosure of the source of the disputed information and related communications because it is a "collateral" issue to these proceedings. Dkt. No. 104, p. 22. This argument has no basis in the applicable law.

This Court is obligated to protect litigants against unethical conduct "occurring in connection with any proceeding before it." *Hill v. Hunt*, 2008 WL 4108120, *2 (N.D. Tex. Sept. 04, 2008). Fulfilling that obligation is not collateral to these proceedings or this Court's function—it is central to them. Revealing the source of Southwest's improperly obtained and

disclosed information is necessary to determine if Carter or her counsel solicited the misappropriation of Southwest's data or improperly communicated with a represented party in violation of Texas disciplinary rules.  *See* TEX. DISCIPLINARY R. OF PROF'L CONDUCT 4.02(a), 4.04(a).  Absent disclosure, Gilliam and Carter will be free to continue to use Southwest's employees, whether represented and unrepresented, to access Southwest's SSI to assist Carter in this litigation and facilitate the harassment of non-parties with whom Carter has personal feuds.

Moreover, courts in this district have ordered the same relief Southwest seeks based on similar misconduct.  In *Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476 (N.D. Tex. 2016), counsel used a third party to procure confidential information from the plaintiff's employees.  Based on this misconduct, the court ordered that counsel produce all communications with the individuals and entities who assisted in procuring the confidential information.  *Id.* at 488.  The court also required the attorney to pay all the attorneys' fees associating with the plaintiff's emergency motion for sanctions.  *Id.*  The court also imposed restrictions on counsel beyond what Southwest seeks here—requiring the violating party to secure the non-violating party's permission to have contact with any of the non-violating party's employees.  *Id.*[3]  Just as in *Trombetta*, Gilliam and Carter's misconduct requires swift disclosure to prevent further harm and compensation to make up for the injuries to Southwest.

---

[3] Plaintiff cites two cases for the proposition that the Court should not require disclosure.  While Southwest acknowledges that not all courts have imposed this remedy for the misconduct at issue, this Court has.  *See Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476 (N.D. Tex. 2016).  Moreover, in the cases Plaintiff cites, the courts were not faced with a theft of data that presented an ongoing safety threat.  Further, those courts imposed other sanctions.  *See Giardina v. Ruth U. Fertel, Inc.*, 2001 WL 1628597, *4 (E.D. La. Dec. 17, 2001) (not requiring disclosure of source, but "prohibiting the plaintiff from making any use of the … letter and prohibiting the plaintiff from any further contact with any [defendant's] employees."); *Adams v. Shell Oil Co.*, 143 F.R.D. 105, 108 (E.D. La. 1992) (declining to require disclosure of individual who revealed information, but prohibiting use of the documents, requiring identification and production of the documents to defendant, and prohibiting any contact with other Shell employees).

Faced with this authority, Gilliam first claims that disclosure should not be compelled because Southwest can identify the individual who accessed and disclosed Stone's board. Dkt. No. 104, p. 24. Gilliam's recounting is incorrect. Correll informed Gilliam that Southwest was investigating and hopeful that it could identify who took the information. App. 9 ¶ 4. Southwest has endeavored to identify the source of the improper disclosure both before and after it filed the motion. (*Id.*) However, despite investing significant information technology resources in the endeavor, it has been unsuccessful. App. 9 ¶¶ 5. In fact, based on the information disclosed in Carter's declaration and her apparent use of CFRs, it appears Carter and Gilliam used a strategy specifically designed to avoid detection by Southwest. App. 9-10 ¶¶ 6.

Gilliam next cites limited cases where courts declined to impose sanctions after a party received information regarding an opponent. However, in those cases, counsel provided unmistakable evidence that they were not involved in the misconduct at issue. And, unlike Gilliam, those attorneys took extraordinary steps to ensure they did not use improperly obtained information. *See, e.g.*, *Reinsdorf v. Skechers U.S.A., Inc.*, 2013 WL 12116415, *1-3 (C.D. Cal. May 31, 2013) (declining to impose sanction where "Plaintiff did not solicit the document, engage in wrongful conduct to obtain the document, or improperly attempt to use it"; and counsel did not read the document, sealed the document without reading it and placed it in a safe, deleted the email to which the document was attached, and never used the information after receipt).

Carter and Gilliam next argue that Stone's travel information is not confidential because flight attendants leave printed schedules visible throughout bases. Dkt. No. 104, p. 10. This statement is false. Stone, who is a long term and *current* Southwest flight attendant, avers that she has "never observed flight attendant travel information lying around in any Southwest location." App. 3-4 ¶ 11. Flight attendants now access schedules using mobile devices and rarely print them.

(*Id.*).  Further, the information taken by Gilliam and Carter constitutes SSI protected by federal law and protected by both secure computer systems and policies restricting the use of SSI data.  More troubling still, Stone's particular information was subject to added security that had to be circumvented by Gilliam and Carter.  Thus, Carter's false contention that some flight attendants did not protect this information in the past is no excuse for her and Gilliam's conduct.

Finally, Gilliam contends that even if he and Carter engaged in the misconduct alleged, the Court should ignore it because Southwest was not prejudiced.  Southwest was prejudiced.

- Stone has been removed from the flight schedule, and she has been unable to work because Southwest cannot determine whether others still have access to her confidential location information.

- Southwest has devoted substantial time and costly resources to attempts to ascertain who has improperly accessed its secure computer systems.

- Southwest has incurred substantial attorneys' fees investigating this matter and providing detailed, contested briefing and evidentiary support.

Based on Gilliam and Carter's misconduct and these unnecessary burdens, the Court issue sanctions requiring that payment of Southwest's attorneys' fees and take other appropriate disciplinary action.  *See Orchestrate HR, Inc.*, 178 F. Supp. 3d at 488 (awarding moving party attorneys' fees associated with emergency motion for sanctions); *Ashman v. Solectron Corp.*, 2008 WL 5071101, *4 (N.D. Cal. Dec. 1, 2008) (awarding attorneys' fees to moving party where plaintiff improperly procured defendant's information despite minimal prejudice).

### D.  Gilliam's Demand for Attorneys' Fees is Baseless

Gilliam and Carter very well may have committed a federal crime in an effort to intimidate a witness.  Nonetheless, Gilliam and Carter ask that the Court award Carter attorneys' fees for the costs of opposing Southwest's motion.  Gilliam and Carter cite no case law authorizing any such award in this situation and no such authority exists.  Gilliam and Carter created this problem and the costs attendant with addressing it are costs that they alone should bear.

10

Dated July 21, 2020                                   Respectfully submitted,

                                               */s/ Michael A. Correll*
                                               Michael A. Correll
                                               State Bar No. 24069537
                                               **REED SMITH LLP**
                                               2501 N. Harwood Street
                                               Suite 1700
                                               Dallas, Texas 75201
                                               Phone: 469-680-4200
                                               Facsimile: 469-680-4299
                                               Email: mcorrell@reedsmith.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served upon all counsel of record via the Court's ECF System on this 21st day of July 2020.

                                               */s/ Michael A. Correll*
                                                 Michael A. Correll