# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

|  |  |
|---|---|
| CHARLENE CARTER,<br><br>        Plaintiff,<br><br>V.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>        Defendants. | Civil Case No. 3:17-cv-02278-X |

## NOTICE OF FEDERAL RULE 30(b)(6) DEPOSITION
## OF TRANSPORT WORKERS UNION OF AMERICA LOCAL 556.

To:    Defendant Southwest Airlines Co., through its attorneys of record, Michael A. Correll, and Brian K. Morris, Reed Smith LLP, 2501 N. Harwood Street, Suite 1700, Dallas, Texas 75201.

Defendant Transport Workers Union of America, Local 556, through its attorneys of record, Edward B. Cloutman, III and Adam S. Greenfield, Law Offices of Cloutman & Greenfield, P.L.L.C., 3301 Elm Street, Dallas, Texas 75226-1637.

Please take notice that, pursuant to Federal Rule of Civil Procedure, Rule 30(b)(6), Plaintiff Charlene Carter, by and through her attorneys of record, will take the following oral deposition in the above-captioned matter, by oral examination before a court reporter/notary public, via Zoom videoconference given the circumstances and status of the COVID-19 pandemic:

| **Deponent** | **Date** | **Time** |
|---|---|---|
| TWU Local 556 |  |  |

The deposition will be recorded by stenographic means.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff will examine Transport Workers Union of America Local 556 on the matters described below. Local 556 is directed to designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf, regarding the matters described below.

### DEFINITIONS

1.     **"ALL**,**" "ANY,"** and **"EACH"** shall be construed as encompassing "any and all" and "and/or."

2.     **"ANY"** means "each and every" as well as "any one."

3.     **"CARTER'S SOCIAL MEDIA ACTIVITY"** means any of Charlene Carter's messages or posts on Facebook, or any of her other communications and activities on social media.

4.     **"CARTER'S TERMINATION**,**" "TERMINATE,"** or **"TERMINATION**,**"** means the incidents, events, actions, and decisions related to the March 16, 2017 termination of Charlene Carter's employment with **SOUTHWEST**.

5.     **"COMMUNICATIONS"** and **"COMMUNICATED"** are defined by way of illustration and not by way of limitation, as any written, oral, or electronic exchange of information, words, statements, expressions, discussions, thoughts, opinions, or ideas, and includes any memorialization of information, words, statements, expressions, discussions, meetings, thoughts, opinions, or ideas of any person, including the person creating the memorialization.

6.     **"DOCUMENT"** is defined to be synonymous in meaning and equal in scope to the usage of this term in Rule 34(a) of the Federal Rules of Civil Procedure and is intended to be interpreted in the broadest possible sense and includes, but is not limited to, all electronically stored information and all communications which are stored or retrievable or recorded in any manner and

also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact discs, CD-ROM discs, magnetic tape, video tape, magnetic and optical discs, "floppy disks," "PowerPoint" and other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations and telephone calls, resolutions, interoffice memoranda and other inter and intra office communication and correspondence, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries, telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, teletype messages, financial statements, stenographers' notebooks, punch cards, computer printouts and data, telecopier and facsimile transmissions and printouts.

The term **"DOCUMENT"** also includes preliminary drafts, revisions, and copies of any such document if the copy is in any way different from the original, now in your possession, custody, or control or that of your advisors, agents, employees, servants, representatives, counsel, or other persons purported to act on your behalf.

7.      **"LOCAL 556"** means Transport Workers Union of America, Local 556, and its current and former Executive Board Members, committee members, employees, stewards, and representatives.

8.      **"MARCH 14, 2017 TERMINATION LETTER"** means the letter dated March 14, 2017, that **SOUTHWEST** sent Charlene Carter terminating her employment, and which is Exhibit A to Plaintiff Charlene Carter's Fourth Amended Complaint.

9.      **"RECALL EFFORT"** means any and all employee activities concerning the campaign and petition started by **SOUTHWEST** flight attendants around July 2015 to hold recall elections and remove from office certain **LOCAL 556** executive board officers, including President Audrey Stone.

10.      **"RELATING TO," "RELATING THERETO," "RELATE TO," "RELATED TO," "REFLECT," "REGARDING," "REPRESENT,"** or **"CONCERNING"** mean directly or indirectly constituting, mentioning, discussing, describing, or in any way pertaining to or being connected with a stated subject matter or the existence or nonexistence of a fact, alleged fact, misinformation, supposed information, topic, or subject matter, and require you to provide any and all documents that might possibly be relevant, or that might possibly lead to the discovery of relevant evidence related to the facts, information, knowledge, opinions and bases thereof, or documents that are in any way responsive to the document request in which such terms appear.

11.      **"SOCIAL MEDIA POLICIES"** means **SOUTHWEST**'s Workplace Bullying and Hazing Policy, Social Media Policy, Policy Concerning Harassment, Sexual Harassment, Discrimination, and Retaliation, Mission Statement, and any other company policies and rules related to employees' social media activities.

12.      **"SOUTHWEST"** means Southwest Airlines Co. and any of its current or former officers, managers, or supervisors.

13.      **"YOU"** and **"YOUR"** each mean **LOCAL 556**.

14.      Any other words herein shall be defined according to standard American usage, as shown in a dictionary of the English language.

15.      The use of the singular form of any word includes the plural and any plural includes the singular.

## EXAMINATION REQUESTED ON THE FOLLOWING MATTERS

1.      **LOCAL 556's** process and procedures for searching and collecting information responsive to Plaintiff's April 29, 2019 First Set of Interrogatories and Requests for Production.

2.      **LOCAL 556's** collective bargaining negotiations with **SOUTHWEST** since January 1, 2013, including the campaign to ratify tentative agreements, ratification votes, and final approval of collective bargaining agreements.

3.      Local 556's 2015 union officer elections, campaigns, and the social media activities of the "Core Team" and other union members during those campaigns.

4.      From January 1, 2013, through the present, **LOCAL 556's** actions and communications concerning the formulation, approval, enforcement, and modification of the **SOCIAL MEDIA POLICIES**.

5.      From January 1, 2013, through the present, **LOCAL 556's** Digital Media Team and its actions and communications concerning the **SOCIAL MEDIA POLICIES** and flight attendants' social media activities.

6.      From January 1, 2013, through the present, **LOCAL 556's** communications and actions concerning complaints, reports, and investigations about flight attendants' social media activities and violations of the **SOCIAL MEDIA POLICIES**, including **LOCAL 556's** handling of related grievances.

7.      From January 1, 2013, through the present, **LOCAL 556's** communications and actions about flight attendant discipline for violations of the **SOCIAL MEDIA POLICIES**, including **LOCAL 556's** handling of related grievances.

8.      **LOCAL 556's** communications and actions concerning flight attendants' religious beliefs, views, or practices, and their requests for religious accommodation since January 1, 2013.

9.      From January 1, 2013, through the present, **LOCAL 556's** communications and actions concerning **CARTER'S SOCIAL MEDIA ACTIVITY**, Carter's religious beliefs, views, and practices, Carter's involvement in the **RECALL EFFORT**, and Carter's membership and non-membership/agency-fee payer status with **LOCAL 556**.

10.      From January 1, 2013, through the present, **LOCAL 556's** communications and actions concerning **CARTER'S TERMINATION**, including the Step 2 review of **CARTER'S TERMINATION**.

11.      **LOCAL 556**'s communications about Charlene Carter since January 1, 2013.

12.      **LOCAL 556's** actions and communications concerning the **RECALL EFFORT**.

13.      **LOCAL 556's** actions and communications concerning flight attendants' nonmember or agency-fee payer objector status since January 1, 2013.

14.      **LOCAL 556's** communications with Planned Parenthood in an official capacity since January 1, 2013.

15.      **LOCAL 556's** communications about abortion and reproductive freedom since January 1, 2013.

16.      The "Women's March on Washington, D.C." that took place in January 2017, including **LOCAL 556's** participation in the Women's March, the process for flight attendants to request time off or a change in any time they were scheduled to work in order to attend, its use of nonmembers' agency fees to support its involvement, the role of the Working Women's Committee, and **LOCAL 556's** communications and actions concerning the Women's March.

17.      **LOCAL 556's** responses to Plaintiff's First Set of Interrogatories and Requests for Production to Defendant TWU Local 556, and the identification, authentication, and explanation of documents produced to Plaintiff in response to her discovery requests.

18.   The functions of **LOCAL 556's** Working Women's Committee, Civil and Human Rights Committee, Health Committee, Education Committee, Committee on Political Education, Professional Standards Committee, Shop Steward Committee, Grievance Committee, and their communications and activities since January 1, 2013, concerning (a) abortion and reproductive freedom, (b) Planned Parenthood, (c) the January 2017 Women's March on Washington, D.C., and (d) complaints, reports, investigations, and decisions about flight attendants' violation or alleged violations of the **SOCIAL MEDIA POLICIES**.

19.   **LOCAL 556's** admissions and denials to the allegations in Plaintiff's Fourth Amended Complaint that are set forth in **LOCAL 556's** Answer to Plaintiff's Fourth Amended Complaint.

20.   All persons and resources consulted in preparation for the deposition of **LOCAL 556**.

Date: November 10, 2020

Respectfully submitted,

s/ Jason E. Winford *(with permission)*
David E. Watkins
Texas Bar No. 20922000
*dwatkins@jenkinswatkins.com*
Jason E. Winford
Texas Bar No. 00788693
*jwinford@jenkinswatkins.com*
JENKINS & WATKINS, P.C.
4300 MacArthur Avenue, Suite 165
Dallas, Texas 75209
Tel: 214-378-6675
Fax: 214-378-6680

s/ Matthew B. Gilliam
Mathew B. Gilliam *(admitted pro hac vice)*
New York Bar No. 5005996
*mbg@nrtw.org*
Jeffrey D. Jennings *(admitted pro hac vice)*
Virginia Bar No. 87667
*jdj@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510

Fax: 703-321-9319

*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing **NOTICE OF FEDERAL RULE 30(b)(6) DEPOSITION OF TWU LOCAL 556** was served by electronic mail on Defendants' counsel of record on November 10, 2020.


/s/ Matthew B. Gilliam

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3   CHARLENE CARTER,              §
                                   §
 4        Plaintiff,               §
                                   §
 5   v.                            § Civil Action No.
                                   § 03:17-cv-02278-S
 6   SOUTHWEST AIRLINES CO.,       §
     AND TRANSPORT WORKERS         §
 7   UNION OF AMERICA LOCAL        §
     556,                          §
 8                                 §
          Defendants.              §
 9   _____
10        REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
11                    CHARLENE CARTER
12                  November 20, 2020
     _____
13   ****************************************************
14      PORTIONS OF TRANSCRIPT DESIGNATED CONFIDENTIAL:
15            PAGE 132:13 THROUGH 134:6
               PAGE 134:19 THROUGH 135:10
16
     ****************************************************
17
18
          REMOTE ORAL AND VIDEOTAPED DEPOSITION OF CHARLENE
19   CARTER, located at her residence in Aurora, Colorado,
     produced as a witness at the instance of the Defendant
20   Southwest Airlines Co., and duly sworn, taken in the
     above-styled and numbered cause on November 20, 2020,
21   from 10:02 a.m. to 4:36 p.m., before Joseph D.
     Hendrick, Certified Shorthand Reporter in and for the
22   State of Texas, reported by machine shorthand, pursuant
     to Notice and the Federal Rules of Civil Procedure and
23   any provisions stated on the record or attached hereto.
24
25   Job No. 4341722
```

                                                   Page 1

1     under oath at this time?

2        A.    Yes.

3        Q.    Okay.  While we're on Exhibit 18, I would

4     request that through you and counsel work together, I

5     believe there's a download history function on your

6     Facebook.  If it's possible to produce that document or

7     retrieve that document and produce it in its native

8     format, I would ask that y'all do that.

9            MR. GILLIAM:  We will look into it.

10       A.    Yeah, because I've never heard of anything

11    like that.

12  BY MR. GREENFIELD:

13       Q.    Okay.  I will do my best to send some

14    instructions on how to do that to your counsel for your

15    counsel to share with you.

16       A.    Okay.

17           MR. GILLIAM:  Please do.  Yes.

18           MR. GREENFIELD:  Okay.  Thank you, guys.

19  BY MR. GREENFIELD:

20       Q.    Ms. Carter, is it my understanding that as

21    part of your lawsuit you believe that Audrey Stone

22    tried to get you fired from your position at Southwest

23    Airlines?

24       A.    Did she try to get me fired?

25       Q.    That she tried to do that.

Page 224

```
 1        A.    Yeah, she tried to get me fired and she
 2    did.
 3        Q.    Okay.  And why do you believe that, why do
 4    you think she did that?
 5             MR. GILLIAM:  Objection.  Calls for
 6    speculation but go ahead and answer.
 7        A.    Because I was dissenting against what they
 8    were doing as the union and that I had issues with -- I
 9    was a recall person, I had also opted out.  There was
10    much hate for the people that had opted out and much
11    hate for the people that were supporting the recall.
12    BY MR. GREENFIELD:
13        Q.    Okay.  So you believe that Ms. Stone tried
14    to get you fired from Southwest Airlines because you
15    were an objector, you opted out of the union, and
16    because you took a stance in the recall effort, is that
17    fair?
18        A.    That is correct.
19        Q.    Okay.  And when did you become an objector?
20        A.    I became an objector in 2013.
21        Q.    Okay.  And what does that mean to you that
22    you are an objector?
23        A.    The objector means that I still pay dues to
24    the local, that the only thing that doesn't get taken
25    out of my check which I would get a refund back to or
```

Page 225

1    Q.    Oh, when you say voice your petition, in

2    what way?

3    A.    I supported the people that were recalling

4    our board and was vocal about it.

5    Q.    Okay.  And what information are you basing

6    your account of that Ms. Stone would be aware that you

7    were part of the recall efforts if you weren't actually

8    able to sign that petition?

9    A.    Because they had a list of all the people

10   that were talking about the recall.

11   Q.    Who had a list?

12   A.    The union.

13   Q.    Who at the union?

14   A.    The actual -- the actual people within the

15   union such as Audrey, Brett, Cuyler.  They -- they had

16   a whole list that was made up of all the people that

17   were the objectors that they passed around to the

18   membership and the recall people.

19   Q.    Is this a document you have seen?

20   A.    It is a document, yes, that I have seen.

21   It was posted on all of the Facebook pages that we were

22   all connected to within that time period.

23   Q.    Do you have this document?

24   A.    I believe I've given it to my attorneys,

25   yes.

Page 228

```
 1          A.     Through her -- I believe her fact-finding
 2     meeting.
 3          Q.     Okay.  Are you -- and how did Ms. Immamovic
 4     find out that Ms. Stone allegedly turned her in for
 5     social media violations?
 6          A.     That I do not know.
 7          Q.     Are you claiming as part of your lawsuit
 8     that the union did not represent you properly during
 9     the fact-finding meeting?
10          A.     During the fact-finding meeting?  Chris
11     Sullivan was amazing.
12          Q.     And he was provided to you by the union,
13     correct?
14          A.     Yes.  But I wouldn't have been there if
15     Audrey hadn't turned me in.
16          Q.     All right.  That wasn't my question.  I
17     appreciate that, Ms. Carter.
18                 My question was, Mr. Sullivan was there on
19     behalf of the union to represent you, correct?
20          A.     Chris Sullivan was there on behalf of the
21     union on his -- yes, to represent me.
22          Q.     And did an amazing job?
23          A.     He did, yes.
24          Q.     All right.  And what about step 2?
25          A.     Step 2, Beth Ross and Becky Parker.  I did
```

Page 266

```
 1    all of my step 2.
 2         Q.    Are you claiming as part of your lawsuit
 3    that the union did not represent you properly during
 4    your step 2 hearing?
 5         A.    I represented myself for the most part in
 6    my step 2.  I did all of the research and brought forth
 7    all of the information.  Becky and Beth did not.  They
 8    were just there as representatives.
 9         Q.    Okay.  And that's -- I appreciate you
10    elaborating.  My question is a little bit different.
11    Are you claiming as part of this lawsuit that the union
12    did not properly represent you during your step 2
13    hearing?
14         A.    They were there and represented me, yes.
15         Q.    Okay.  That's still not answering my
16    question, ma'am.  My question is as part of this
17    lawsuit are you claiming that the union did not
18    represent you properly during your step 2 hearing?
19         A.    They represented me properly, both Becky
20    and Beth.
21         Q.    And you previously testified that the
22    process was fair and complete, correct?
23         A.    With --
24               MR. GILLIAM:  The --
25               THE WITNESS:  Go ahead.
```

Page 267

```
 1    BY MR. GREENFIELD:
 2         Q.    Is that correct -- was fair and complete?
 3               MR. GILLIAM:  Objection, vague.
 4         A.    Within my second step meeting, yes.
 5    BY MR. GREENFIELD:
 6         Q.    Okay.  And that it was Southwest who made
 7    the decision to terminate you, correct?
 8         A.    I believe it was Ed Schneider.
 9         Q.    Okay.  And do you have any evidence that
10    the union made the decision to terminate you?
11         A.    No.
12         Q.    Okay.  Are you claiming as part of this
13    case that the union discriminated against you during
14    your grievance process?
15         A.    Can you repeat that?
16         Q.    Yeah.  Are you claiming as part of your
17    lawsuit that the union is discriminating --
18    discriminated against you during your grievance process
19    in either the fact-finding or step 2 hearing?
20         A.    No, neither on those two.
21         Q.    Okay.  Now are you claiming that the union
22    didn't represent you properly because of your religious
23    beliefs at the step 2 or fact-finding meeting?
24         A.    Neither on those two.
25         Q.    Are you aware of any other individuals who
```

Page 268

```
 1     have -- who allegedly haven't been treated properly by

 2     the union because of their religious beliefs?

 3          A.     Any other people?  I'm sorry?  Can you

 4     repeat that?

 5          Q.     Yes, ma'am.  Any -- any -- are you aware of

 6     any other individuals who are -- who haven't been

 7     treated properly --

 8                 MR. CLOUTMAN:  I lost completely my TV set.

 9          A.     He -- I heard -- I heard somebody else over

10     you.

11                 Have I heard anybody else being not being

12     represented equally, is that --

13     BY MR. GREENFIELD:

14          Q.     Yes.  Are you aware of any individuals who

15     haven't been treated properly because of their

16     religious beliefs by the union?

17          A.     I don't have any information on that.

18          Q.     Okay.  Are you claiming that the union

19     didn't -- didn't provide you some sort of

20     accommodation?

21          A.     That the union afforded me some

22     accommodation.

23          Q.     Are you claiming as part of your lawsuit

24     that the union didn't provide you with a religious

25     accommodation?
```

Page 269

```
 1          A.      No, they did not.

 2          Q.      They did not provide you a religious

 3   accommodation?

 4          A.      They did not provide me a religious

 5   accommodation.

 6          Q.      Did you request a religious accommodation

 7   from the union?

 8          A.      I didn't know I had to.

 9          Q.      So the answer to my question is no, you did

10   not request a religious accommodation from the union?

11          A.      Correct.

12          Q.      Okay.  Are you aware of any other

13   individuals that the union has not accommodated -- who

14   has not -- not provided a religious accommodation?

15          A.      I do not have that knowledge.

16          Q.      Okay.  Are you aware if you filed an EEOC

17   charge for religious discrimination against the union?

18          A.      Yes, I did.

19          Q.      Okay.  And you provided that documentation?

20          A.      Yes, I did.

21                  THE WITNESS:  I can't do it right now.  I

22   know.  I know.

23   BY MR. GREENFIELD:

24          Q.      Is it your testimony that -- when was

25   the -- okay.  Let me take a step back.
```

Page 270

1          A.      Not the factual basis.  He knows my lawsuit

2    is going on.  He knows about the lawsuit.  He's read

3    the lawsuit.

4    BY MR. GREENFIELD:

5          Q.      Have you communicated with Mr. Click via

6    text message about the lawsuit?

7          A.      Only when it became public knowledge, yes.

8          Q.      You did communicate with mister -- and when

9    do you believe that it became public knowledge?  What

10   does that mean?

11         A.      That would have been back in -- gosh,

12   whenever it was filed.  I don't remember the date right

13   off the top of my head.

14         Q.      Okay.  And what did you discuss with

15   Mr. Click via text message?

16         A.      Just the fact that it had been filed and

17   then he read it.

18         Q.      And have you provided those text messages

19   between Mr. Click and your -- and yourself to your

20   counsel?

21         A.      I've provided all of my text messages and

22   my emails and so forth, my attorneys have all of that.

23   I turned that over almost two years ago, a year ago,

24   whenever it was.

25         Q.      Did you delete any conversations, text

Page 272

```
 1              REPORTER'S CERTIFICATION

 2          DEPOSITION OF CHARLENE CARTER

 3               November 20, 2020

 4          I, Joseph D. Hendrick, Notary Public and

 5     Certified Shorthand Reporter in the State of Texas,

 6     hereby certify to the following:

 7          That the Witness, CHARLENE CARTER, was duly

 8     sworn by the officer and that the transcript of the

 9     oral deposition is a true record of the testimony given

10     by the witness;

11          I further certify that pursuant to FRCP

12     Rule 30(f)(1) that the signature of the deponent:

13               X      was requested by the deponent or

14     a party before the completion of the deposition and is

15     to be returned within 30 days from date of receipt of

16     the transcript;

17               _____ was not requested by the

18     deponent or a party before the completion of the

19     deposition;

20          I further certify that the amount of time

21     used by each party is as follows:

22          Mathew B. Gilliam - 00:00:00

23          Michael A. Correll - 04:54:50

24          Adam S. Greenfield - 01:08:13

25          Edward B. Cloutman III - 00:00:00
```

Veritext Legal Solutions
800-336-4000

1              I further certify that I am neither counsel

2   for, related to, nor employed by any of the parties or

3   attorneys in the action in which this proceeding was

4   taken;

5              Further, I am not a relative or employee of

6   any attorney of record, nor am I financially or

7   otherwise interested in the outcome of the action.

8              Subscribed and sworn to on this date:

9   December 8, 2020.

10

11

12

13

14

15

16

17

           Joseph D. Hendrick, CSR #947

18        Expiration Date: 04/30/2021

           Notary Comm. Exp. 01/13/23

19        Veritext Legal Solutions

           Firm Registration No. 571

20        300 Throckmorton Street, Ste. 1600

           Fort Worth, TX  76102

21        Telephone (800) 336-4000

22

23

24

25

                                Page 280