**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHARLENE CARTER,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | **Civil Action No. 03:17-cv-02278-S** |
| **v.** | § | |
| | § | |
| **SOUTHWEST AIRLINES CO., AND** | § | |
| **TRANSPORT WORKERS UNION** | § | |
| **OF AMERICA LOCAL 556,** | § | |
| | § | |
| **Defendants.** | § | |

**SOUTHWEST AIRLINES CO.'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY**
**JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

I.      BACKGROUND ........................................................................................... 3

    A.    Southwest Airlines and Its Commitment to Preventing Harassment, Discrimination, and Bullying in the Workplace ...................................... 3

        1.    Southwest's Harassment, Discrimination, and Bullying Policies.............. 4

        2.    Southwest's Emphasis on Flight Attendant Social Media Concerns.......... 6

    B.    Carter's Employment With Southwest ................................................... 8

    C.    Carter's Years-Long Conflict with Local 556 ...................................... 8

    D.    Carter's Campaign of Harassment ......................................................... 9

    E.    Local 556 Members Attend TWU Women's Committee Meeting and Women's March.................................................................................... 10

    F.    Flight Attendants On Fewer Than Five Flights Change Cabin Lights Without Authorization in Support of the Women's March ................... 11

    G.    Carter Posts Abortion Videos On Her Publicly-Accessible Facebook Page ........ 11

    H.    Carter Responds to Flight Attendants Participating in Women's March By Continuing Her Campaign and Sending Graphic Messages to Stone.................. 12

    I.    Fact-Finding Investigation Resulting in Carter's Termination............................ 13

    J.    Carter Grieves Her Termination – the Step 2 Process ........................... 16

    K.    Carter Retains Counsel, Files EEOC Charges, Initiates this Lawsuit, and Takes Her Grievance to Arbitration...................................................... 18

    L.    Procedural History ............................................................................... 20

II.    SUMMARY JUDGMENT STANDARD............................................................... 20

III.    ARGUMENT ......................................................................................... 21

    A.    The Binding Arbitration Award Forecloses Essential Elements of Plaintiff's Claims ................................................................................ 22

    B.    Plaintiff's RLA Retaliation Claim Fails as a Matter of Law ................ 29

        1.    Plaintiff Has No Private Right of Action Under the RLA ...................... 29

        2.    Even if a Private Right of Action is Available, the Court Lacks Jurisdiction Because Plaintiff Asserts A Post-Certification "Minor Dispute" ...................................................................................... 30

        3.    Plaintiff's RLA Retaliation Claim Also Fails on Its Own Lack of Merit........................................................................................... 34

    C.    Plaintiff's Title VII Claims Fail as a Matter of Law............................ 35

i

1.      Plaintiff's Failure-to-Accommodate Claim Fails as a Matter of
        Law ..................................................................................... 36

        a.      Plaintiff Failed to Exhaust Administrative Remedies ................... 36

        b.      There are No Facts Supporting Plaintiff's Failure-to-
                Accommodate Claim .................................................... 38

        c.      Accommodation of Carter's Conduct Would Have Imposed
                An Undue Hardship ...................................................... 42

2.      Plaintiff's Religious Discrimination Claim Fails as a Matter of
        Law ..................................................................................... 44

IV.    CONCLUSION ............................................................................ 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amarsingh v. Jetblue Airways Corp.*,
409 Fed. Appx. 459 (2d Cir. 2011)........................................................34

*Antoine v. First Student, Inc.*,
713 F.3d 824 (5th Cir. 2013) .................................................................42

*Averett v. Honda of Am. Mfg., Inc.*,
2010 U.S. Dist. LEXIS 11307 (S.D. Ohio Feb. 9, 2010)......................43

*B'hood of Ry. Carmen v. Atchison, T. & S. F. R. Co.*,
894 F.2d 1463 (5th Cir. 1990) ..............................................................32

*Baker v. Am. Airlines, Inc.*,
2004 U.S. Dist. LEXIS 18810 (N.D. Tex. Sept. 15, 2004)....................45

*Balderas v. Valdez*,
2018 U.S. Dist. LEXIS 124195 (N.D. Tex. July 25, 2018) ...................42

*Ballew v. Cont'l Airlines, Inc.*,
668 F.3d 777 (5th Cir. 2012) .................................................................33

*Barnard v. L-3 Communs. Integrated Sys. L.P.*,
2017 U.S. Dist. LEXIS 139235 (N.D. Tex. Aug. 30, 2017)..................48

*Beckett v. Atlas Air*,
968 F. Supp. 814 (E.D.N.Y. 1997) ........................................................29

*BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers*,
973 F.3d 326 (5th Cir. 2020) .................................................................33

*Burnett v. Thompson*,
2002 U.S. App. LEXIS 29319 (5th Cir. Feb. 6, 2002) .........................47

*Burton v. Madix Store Fixtures*,
2005 U.S. Dist. LEXIS 37487 (N.D. Tex. Dec. 29, 2005) ....................36

*Caldwell v. KHOU-TV*,
850 F.3d 237 (5th Cir. 2017) .................................................................21

*Carter v. Transp. Workers Union of Am. Local 556*,
353 F. Supp. 3d 556 (N.D. Tex. 2019) ...................................................2

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................................20

*Chalmers v. Tulon Co. of Richmond*,
    101 F.3d 1012 (4th Cir. 1996) ...............................................................................41, 43

*Chapa v. Wells Fargo, N.A.*,
    2014 U.S. Dist. LEXIS 21011 (W.D. Tex. Feb. 20, 2014)......................................48

*Chumney v. Glasscock County Indep. Sch. Dist.*,
    2019 U.S. Dist. LEXIS 233633 (N.D. Tex. Mar. 6, 2019) ......................................45

*Clark v. Champion Nat'l Sec., Inc.*,
    952 F.3d 570 (5th Cir. 2020) ...................................................................................42

*Dotson v. Norfolk S. R.R. Co.*,
    52 Fed. Appx. 655 (6th Cir. 2002)...........................................................................34

*Douglass v. United Servs. Auto. Ass'n*,
    79 F.3d 1415 (5th Cir. 1996) ...................................................................................48

*Duffie v. United States*,
    600 F.3d 362 (5th Cir. 2010) ...................................................................................20

*El v. GM Co.*,
    2021 U.S. Dist. LEXIS 35106 (N.D. Tex. Feb. 25, 2021)......................................42

*In re Express One Int'l*,
    229 B.R. 129 (E.D. Tex. 1999) ................................................................................34

*Fields v. Keith*,
    174 F. Supp. 2d 464 (N.D. Tex. 2001) ...............................................................34, 35

*Fields v. Keith*,
    2000 U.S. Dist. LEXIS 8184 (N.D. Tex. June 8, 2000) ..........................................30

*Fields v. Keith*,
    2001 U.S. App. LEXIS 30634 (5th Cir. 2001) ........................................................35

*Foster v. Target Corp.*,
    2021 U.S. Dist. LEXIS 19248 (N.D. Tex. Feb. 2, 2021)........................................20

*Gautier v. Celanese*,
    143 F. Supp. 3d 429 (W.D. Va. 2015)......................................................................22

*Gibson v. Wayfair, Inc.*,
    2018 U.S. Dist. LEXIS 107425 (S.D. Tex. June 27, 2018).....................................46

*Gonzalez v. Hogg Ins. Group, Inc.*,
   2012 U.S. Dist. LEXIS 2101 (E.D. Va. Jan. 6, 2012) ..........................................39

*Grimes v. BNSF Ry. Co.*,
   746 F.3d 184 (5th Cir. 2014) ..............................................................22, 23, 24

*Hamar v. Ashland, Inc.*,
   211 Fed. Appx. 309 (5th Cir. 2006).................................................................37

*Held v. Am. Airlines, Inc.*,
   2007 U.S. Dist. LEXIS 7665 (N.D. Ill. Jan. 30, 2007) ........................................31

*Hussein v. Waldorf Astoria*,
   134 F. Supp. 2d 591 (S.D.N.Y. 2001)...............................................................42

*Ileiwat v. Envtl. Prods. Int'l*,
   2018 U.S. Dist. LEXIS 14362 (N.D. Tex. Jan. 18, 2018) .....................................39

*Isaac v. EAN Holdings, LLC*,
   2016 U.S. Dist. LEXIS 104580 (E.D. Tex. Aug. 9, 2016) .....................................46

*Johnson v. Express One Int'l Inc.*,
   944 F.2d 247 (5th Cir. 1991) .........................................................................35

*Johnson v. MBNA Hallmark Info. Servs.*,
   2003 U.S. Dist. LEXIS 11003 (N.D. Cal. June 26, 2003) .....................................46

*Knight v. State Dep't of Pub. Health*,
   275 F.3d 156 (2d Cir. 2001)...........................................................................39

*Knox v. Am. Airlines, Inc.*,
   2016 U.S. Dist. LEXIS 136565 (N.D. Tex. Oct. 3, 2016) .....................................32

*Lamont v. United States*,
   613 F. Supp. 588 (S.D.N.Y. 1985)...................................................................23

*Larocca v. Alvin Indep. Sch. Dist.*,
   2020 U.S. Dist. LEXIS 233060 (S.D. Tex. Oct. 28, 2020)....................................38

*Little v. Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) .........................................................................21

*Lorenz v. Wal-Mart Stores, Inc.*,
   2006 U.S. Dist. LEXIS 36145 (W.D. Tex. May 24, 2006) .....................................39

*Lundeen v. Mineta*,
   291 F.3d 300 (5th Cir. 2002) .........................................................................29

*Machinists v. Nw. Airlines, Inc.*,
   673 F.2d 700 (3d Cir. 1982)......................................................................32

*McCall v. Southwest Airlines Co.*,
   2010 U.S. Dist. LEXIS 44782 (N.D. Tex. May 7, 2010) ..........................47

*Melgar v. T.B. Butler Publ'g Co.*,
   931 F.3d 375 (5th Cir. 2019) .....................................................................36

*Mitchell v. Univ. Med. Ctr., Inc.*,
   2010 U.S. Dist. LEXIS 80194 (W.D. Ky. Aug. 9, 2010) ..........................43

*Moss v. Norfolk W. Ry. Co.*,
   2003 U.S. Dist. LEXIS 13566 (E.D. Mich. July 22, 2003) .......................34

*Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists*,
   915 F.2d 43 (1st Cir. 1990)........................................................................32

*Nobach v. Woodland Vill. Nursing Ctr.*,
   799 F.3d 374 (5th Cir. 2015) ...............................................................39, 42

*Novitsky v. Am. Consulting Eng'rs, LLC*,
   196 F.3d 699 (7th Cir. 1999) .....................................................................37

*Pacheco v. Mineta*,
   448 F.3d 783 (5th Cir. 2006) .....................................................................36

*Pantoja v. Brennan*,
   257 F. Supp. 3d 636 (D. Del. 2017)...........................................................37

*Parker v. Am. Airlines, Inc.*,
   2008 U.S. Dist. LEXIS 55769 (N.D. Tex. July 22, 2008) .........................34

*Passmore v. 21st Century Oncology, LLC*,
   2018 U.S. Dist. LEXIS 61085 (M.D. Fla. Apr. 10, 2018).........................40

*Perkins v. City of Greenwood*,
   2016 WL 37119 (N.D. Miss. Mar. 22, 2016) ............................................40

*Peterson v. Hewlett-Packard Co.*,
   358 F.3d 599 (9th Cir. 2004) .....................................................................43

*PHI, Inc. v. Office & Prof'l Employees Int'l Union*,
   440 Fed. Appx. 394 (5th Cir. 2011)...........................................................30

*Pollak v. Lew*,
   2013 U.S. Dist. LEXIS 39750 (S.D. Tex. Mar. 22, 2013).........................45

*Rayyan v. Va. DOT,*
    719 Fed. Appx. 198 (4th Cir. 2018).................................................................36

*Robles v. Tex. Tech Univ. Health Scis. Ctr.,*
    131 F. Supp. 3d 616 (W.D. Tex. 2015).............................................................37

*Rodriquez v. Wal-Mart Stores, Inc.,*
    540 Fed. Appx. 322 (5th Cir. 2013)..................................................................47

*Roscello v. Southwest Airlines Co.,*
    726 F.2d 217 (5th Cir. 1984) ............................................................................30

*Schwartzberg v. Mellon Bank, N.A.,*
    2008 U.S. Dist. LEXIS 1180 (W.D. Pa. Jan. 8, 2008).................................40, 41

*Shakir v. Jim Murray Agency,*
    2015 U.S. Dist. LEXIS 130088 (S.D. Tex. Aug. 11, 2015)..............................46

*Smith v. State Farm Lloyds,*
    2020 U.S. Dist. LEXIS 95641 (N.D. Tex. June 1, 2020) ................................21

*TWA, Inc. v. Indep. Fed'n of Flight Attendants,*
    489 U.S. 426 (1989).........................................................................................31

*Union of Flight Attend. v. Pan American World Airways, Inc.,*
    789 F.2d 139 (2d Cir. 1986).............................................................................32

*United Transp. Union v. Nat'l R.R. Passenger Corp.,*
    588 F.3d 805 (2d Cir. 2009).............................................................................32

*Walton-Lentz v. Innophos, Inc.,*
    476 Fed. Appx. 566 (5th Cir. 2012)..............................................................37, 38

*Warren v. Fannie Mae,*
    733 Fed. Appx. 753 (5th Cir. 2018)..................................................................47

*Weber v. Roadway Exp., Inc.,*
    199 F.3d 270 (5th Cir. 2000) ........................................................................38, 42

*West v. City of Houston,*
    960 F.3d 736 (5th Cir. 2020) ............................................................................47

*Wilkerson v. New Media Tech. Charter Sch., Inc.,*
    522 F.3d 315 (3d Cir. 2008).............................................................................39

*Wilson v. U.S. West Commc'ns,*
    58 F.3d 1337 (8th Cir. 1995) ............................................................................43

*Wright v. Union Pac. R.R. Co.*,
   990 F.3d 428 (5th Cir. 2021) .................................................................................32

**Rules**

Fed. R. Civ. P. 56 ....................................................................................................20, 28

Charlene Carter ("Carter" or "Plaintiff"), a former Southwest Airlines Co. ("Southwest" or "Company") Flight Attendant, asserts that Southwest terminated her employment either (1) in retaliation for Carter's decision to opt out of her union; or (2) based on her religious beliefs in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). However, the undisputed evidence shows that Carter was not terminated for either of these reasons. Instead, Carter was terminated because—as she openly admits—Carter undertook a two-year grossly offensive and terrible campaign to personally torment Audrey Stone ("Stone"), the then-President of Transportation Workers Union, Local 556 ("Local 556" or "Union").

Carter's conduct that led to her termination was shocking. During her campaign to intimidate and harass Stone, Carter sent dozens upon dozens of messages to Stone's Facebook Messenger account. Carter's messages ranged from the insults and name-calling to overtly grotesque imagery designed to inflict severe emotional distress. This behavior was all the more galling in light of the fact that Carter had never attempted to interact with Stone in any other manner—civil or otherwise—aside from asking a question at a single Union meeting.

Stone ignored Carter's behavior until, in early 2017, Carter began sending Stone—a self-identified pro-life supporter— images and videos of aborted fetuses along with an image of women wearing headdresses that looked like anatomically correct vaginas. After enduring years of Carter's abuse, Stone finally could not take it anymore, and she notified her manager about Carter's messages. Southwest investigated Stone's complaint and concluded that Carter violated its policies governing harassment, bullying, and social media. During the investigation, Southwest discovered that Carter not only sent Stone hundreds of harassing messages without provocation, but Carter also posted similarly offensive material on her publicly accessible social media page alongside images and statements that clearly identified her as a Southwest employee.

1

As a result, Southwest terminated Carter's employment on March 14, 2017.

Carter grieved her termination. Through a subsequent system board of adjustment, a neutral arbitrator concluded—after taking evidence and testimony over two full days of hearings in which Carter was represented by counsel, and receiving full post-hearing briefing—that Southwest had just cause to terminate Carter based on, among other things, Carter's egregious harassment of Stone.

Carter does not dispute that she engaged in any of the conduct that resulted in termination. But Carter's claims fails for several reasons beyond her admission to engaging in such horrendous conduct. Specifically, Carter's remaining[1] asserted claims fail for the following reasons:

First, Carter's Railway Labor Act ("RLA") retaliation claim fails for three reasons:

1. The RLA does not create a cognizable express or implied private right of action for individual employees to seek relief for alleged employer retaliation in this context.

2. Even if a private right of action did exist, Carter's RLA claim fails because it presents a so-called "minor dispute" under the RLA as a matter of law, and, thus, the Court lacks subject matter jurisdiction to adjudicate it.

3. Finally, Carter testified that she has no basis to believe that any Southwest manager retaliated against her for union-related activities, and no other competent summary judgment evidence creates a genuine issue of material fact on the essential element of retaliatory intent.

Thus, Carter's RLA claim fails as a matter of law.

Second, Carter's Title VII claims fail because her termination had nothing to do with her religious beliefs. Carter's pleadings appear to allege both a claim for failure to accommodate religious beliefs, and a claim for religious discrimination. Carter's failure-to-accommodate claim

---

[1] This Court dismissed Carter's claims for violation of her alleged RLA-protected speech rights, maintenance of overbroad policies in violation of the RLA, and retaliation for Carter's exercise of First and Fifth Amendment rights. *See Carter v. Transp. Workers Union of Am. Local 556*, 353 F. Supp. 3d 556 (N.D. Tex. 2019); Dkt. No. 47.

fails for three reasons:

1. Carter did not exhaust administrative remedies on this issue because she did not include failure-to-accommodate allegations in her administrative charge.

2. Carter never requested a religious accommodation, and Southwest was unaware of her alleged need for one.

3. The accommodation that Carter now demands – the right to share any material related to abortion without restriction, no matter how graphic or offensive – is not mandated by her stated religious belief, and would impose an undue hardship on Southwest.

Meanwhile, Carter's "religious discrimination" claim fails because there is no record evidence that Carter's religion played any role in her termination. Indeed, all of the Southwest managers who Carter deposed in this case expressly testified that they share her pro-life convictions and have no animus against Christians. Instead, as the system board of adjustment arbitrator concluded, Carter was terminated not for her religious beliefs but her for egregious policy violations—namely, choosing to inflict a systemic campaign of torment and harassment upon Stone and her publication of offensive materials without disassociating her views from Southwest.

As a result, Southwest is entitled to summary judgment on all of Carter's claims.

I.    **BACKGROUND**

  A.    **Southwest Airlines and Its Commitment to Preventing Harassment, Discrimination, and Bullying in the Workplace**

Southwest is a leading commercial airline operating thousands of flights per day and delivering industry leading service to tens of millions of customers each year.[2] Based in Dallas, Texas, Southwest employs more than 50,000 people, including more than 15,000 Flight Attendants.[3] All Flight Attendants at Southwest Airlines are represented by Local 556.[4]

---

[2] App. 19 ¶ 5.
[3] App. 19 ¶ 6.
[4] App. 292; Dkt. No. 30 p. 5 ¶ 6.

1.      __Southwest's Harassment, Discrimination, and Bullying Policies__

Southwest maintains a robust set of policies to protect the rights of each and every member of its workforce. Most relevant here, Southwest presents and trains employees regarding three key policies: (1) a "Workplace Bullying and Hazing Policy"; (2) a "Policy Concerning Harassment, Sexual Harassment, Discrimination & Retaliation"; and (3) a "Social Media Policy."[5] The Workplace Bullying and Hazing Policy states in relevant part:[6]

### WORKPLACE BULLYING AND HAZING

As stated in Southwest Airlines' Mission statement, the Company commits that all Employees are provided the same concern, respect, and caring attitude within the organization that they are expected to share externally with every Southwest Customer. Therefore, hazing and bullying, including cyberbullying, are not tolerated in the workplace.
…
Workplace bullying is defined as malicious, unwelcome, and/or severe mistreatment that harms, intimidates, offends, degrades, or humiliates an Employee or specific group of Employees. Examples of bullying include, but are not limited to the following:

- Verbal bullying includes behaviors such as slandering, ridiculing, hurtful name calling, making personal insults, calling others offensive nicknames, instigating or participating in creating or spreading of rumors, and shouting/raising of the voice.
…
- Cyberbullying includes behaviors outlined in verbal, physical, or exclusion bullying by using electronic technology, devices, and communication tools, including phones, computers, tablets, social media sites, application software (*i.e.*, apps), user-generated content (*i.e.*, UCG), chat, text, and websites, even deleted after creating, sending, or posting.

Hazing and bullying behavior should be reported by the Employee to his or her Supervisor, HR Business Partner, or any Senior Leader. Violation of this policy will result in disciplinary action up to and including termination of Employment.

Meanwhile, the Southwest Policy Concerning Harassment states in relevant part:[7]

---

[5] App. 19 ¶¶ 8-9, 1024, 1026-1028
[6] App. 1024.
[7] App. 1027.

**SOUTHWEST AIRLINES POLICY CONCERNING HARASSMENT, SEXUAL HARASSMENT, DISCRIMINATION & RETALIATION**

Southwest Airlines prohibits any and all types of harassment, sexual harassment, discrimination and/or retaliation against Employees by Leaders, fellow Employees, or third parties. Harassment or discrimination based on race, color, ancestry, religion, age, sex, sexual orientation, gender, gender expression, gender identity, pregnancy, marital status, national origin, physical or mental disability, military and veteran status, genetic information, medical condition, or any other legally protected status, negatively affects morale, motivation, and job performance. Such behavior is inappropriate, offensive, and will not be tolerated.

**EXAMPLES OF TYPES OF DEROGATORY, SEXUALLY SUGGESTIVE, OFFENSIVE, THREATENING, INTIMIDATING, HOSTILE OR RETALIATORY CONDUCT THAT ARE PROHIBITED**
…
- written comments including, email, text messages, or social media online posts;
…
- displaying or forwarding messages, photos, graffiti, pictures, cartoons, drawings, social media posts, or online comments, including displaying such content at one's own work area, computer, or mobile device;

…

**REPORTING & INVESTIGATIONS**
…
- Any Employee who has been found to have acted inappropriately against another Employee in violation of this policy will be subject to appropriate corrective action up to and including termination.

Lastly, Southwest's Social Media Policy prohibits engaging in social media activities that "in any way" is "related to Southwest, reflects poorly upon Southwest, or impacts the workplace."[8]

The policy provides the following non-exclusive list of content that may be found to be a violation:[9]

- "Content that may be viewed as untrue, disrespectful, malicious, obscene, violent, harassing, bullying, defamatory, threatening, lewd, intimidating, discriminatory, or retaliatory[.]"

- "Content that may be viewed as damaging Southwest's public perception[.]"

---

[8] App. 1026.
[9] *Id.*

- "Content that may be viewed as a violation of other Southwest rules or policies[.]"

Employees are expressly notified that violations "will be subject to appropriate corrective action up to and including termination."[10] By its terms, Southwest's Social Media Policy has broad application, governing both on and off-duty social media activity.[11]

Read together, the above policies are directed to achieving Southwest's Mission Statement, which provides:[12]

> We are committed to provide our Employees a stable work environment with equal opportunity for learning and personal growth. Creativity and innovation are encouraged for improving the effectiveness of Southwest Airlines. Above all, Employees will be provided the same concern, respect, and caring attitude within the organization that they are expected to share externally with every Southwest Customer.

Finally, Southwest's Disability Discrimination & Workplace Accommodation Policy "provides [] reasonable workplace accommodations as required by law … to accommodate Employees' religious beliefs or practices[.]"[13] Southwest instructs employees to direct their requests for religious accommodation to the Accommodation & Career Transition (ACT) Team and provides the appropriate contact information.[14]

Carter had ready access to and acknowledged receipt of these policies.[15]

## 2.   <u>Southwest's Emphasis on Flight Attendant Social Media Concerns</u>

Southwest experienced a substantial increase in social media complaints asserted between Flight Attendants in recent years.[16] In an effort to curb violations, Southwest issued multiple

---

[10] *Id.*
[11] *Id.*
[12] App. 1025.
[13] App. 23-24.
[14] *Id.*
[15] App. 19-20, 1037-1040, 914-916 (Arb. Tr. 385:8-387:14), 142 (Emlet 29:23-25).

Read Before Fly ("RBF") notices to employees emphasizing the necessity of compliance with the social media and related policies.[17] RBFs are documents provided to Flight Attendants through the same computer systems that Flight Attendants use to prepare for their flights.[18] Flight Attendants are required to read all RBFs.[19]

Southwest issued a social media-focused RBF to Flight Attendants on October 12, 2016. Southwest issued a social media RBF, which stated, in relevant part:[20]

> [S]ocial media … can [] create a forum for hurtful, untrue, intimidating, or offensive comments. Making such statements, circulating, or forwarding such statements is not only divisive and cruel, but it is contrary to what we stand for at Southwest Airlines and is absolutely unacceptable behavior …
>
> … [I]f comments on social media come into the workplace or impact the ability of our Employees to perform their jobs, Southwest Leadership must address those involved and Southwest policies will be implicated. All Flight Attendants should remember that comments made on social media or comments forwarded or shared on social media may violate, among other things Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination & Retaliation; Southwest's Workplace Bullying and Hazing Policy; or Southwest's Social Media Policy.

Southwest issued a similar RBF on February 22, 2017. In addition to emphasizing policy compliance, Southwest reiterated that violations may result in termination:[21]

> [A]ll Employees are expected to Live and Work the Southwest Way and that includes following The Golden Rule and treating each other with respect. We have noticed behavior on social media that doesn't reflect these expectations. Negative postings undermine our Mission Statement to our Employees, lower the stature of the Flight Attendant profession, and ultimately place our Culture at risk. We have had numerous Flight Attendants recently express concerns about negative comments on social media and its effect on our workplace. The expectation of all Employees to follow The Golden Rule and treat each other with respect not only applies to direct interaction between Employees, but it also

---

[16] App. 282-284 (Hillhouse 5:14-7:5), 285 (Hillhouse 32:5-11), 139-141 (Emlet 25:12-27:18), 144 (Emlet 33:10-17), 35 (Emlet 35:18-20), 976-977 (Arb. Tr. 447:20-448:11).

[17] App. 141 (Emlet 27:14-25), 144 (Emlet 33:10-17), 583-585 (Arb. Tr. 54:18-60:14), 591-592 (Arb. Tr. 62:13-63:3), 976-980 (Arb. Tr. 447:20-448:11, 449:24-451:3), 1030-1035.

[18] App. 44 (Sims 230:9-16).

[19] App. 44 (Sims 230:11-16), 914 (Arb. Tr. 385:17-387:1-18).

[20] App. 1032, 587-588 (Arb. Tr. 58:13-59:16).

[21] App. 1033-1034, 588-589 (Arb. Tr. 59:23-60:14).

applies to interaction on social media sites including Facebook, Twitter, Instagram, and other social media platforms.

Social media comments that negatively impact Southwest, its Employees, and/or its Customers may be in violation of Southwest's Social Media Policy, even if such communication does not reference Southwest directly or is posted anonymously. Further, these comments may also be in violation of Southwest's policy concerning Harassment, Sexual Harassment, Discrimination & Retaliation, or our Workplace Bullying and Hazing policy, which … was updated last year to specifically prohibit cyber bullying.

...

Violations of these policies can result in discipline, up to and including termination.

By issuing these RBFs, Southwest made clear to all Flight Attendants that misuse of social media to harass and abuse colleagues was a serious offense and it underscored the necessity of compliance with all policies governing social media activities.[22]

B.       **Carter's Employment With Southwest**

Carter was hired as a Flight Attendant by Southwest in 1996.[23] Carter was based in Denver, Colorado. Carter rarely performed any work for Southwest as a Flight Attendant in the years leading up to her termination. For example, Carter worked an average of only three trips *per year* in 2015 and 2016.[24] Southwest terminated Carter's employment on March 14, 2017.[25] Carter was terminated for sending unsolicited graphic and harassing messages to a fellow Flight Attendant, Stone, in violation of Southwest's policies regarding bullying, harassment, and social media, as well as related policy violations.[26]

C.       **Carter's Years-Long Conflict with Local 556**

Local 556 served as Carter's exclusive bargaining representative throughout her tenure

---

[22] App. 141 (Emlet 27:14-25), 144 (Emlet 33:10-17), 976-980 (Arb. Tr. 447:20-448:11, 449:24-451:3), 1030-1036.
[23] App. 173 (Carter 25:1-3).
[24] App. 567-568 (Arb. Tr. 38:22-39:16). Carter did not have any flights in 2017. *Id.*
[25] App. 173 (Carter 25:4-6), 1180.
[26] App. 30 (Sims 72:16-20), 54-56 (Schneier 18:18-20:19), 1180.

with Southwest.[27] At the time of her termination, Carter was subject to a Collective Bargaining Agreement ("CBA") between Southwest and Local 556.[28]

For several years, Carter objected, often publicly, to the decisions of Union leadership.[29] Carter's conflict with the Union dates back to a 2012 disputed Union election, which ultimately resulted in the court-ordered removal of leadership members supported by Carter and Stone's elevation to Local 556 President.[30] After publicly objecting to Stone's administration in email messages, Facebook postings, and one membership meeting, Carter eventually resigned her Union membership in September 2013 and became an agency fee paying non-member.[31] As a result, Carter was no longer obligated to pay for certain Union activities and she received a quarterly dues refund from TWU International.[32] Carter's resignation also meant that she could no longer vote in Union elections, sign any recall petitions, attend Union meetings, or be subject to internal Union disciplinary proceedings.[33] Southwest never disciplined Carter or took any action against her for any of these anti-union activities.

### D.    Carter's Campaign of Harassment

Carter was not satisfied with simply resigning from the Union. Instead, in early 2015, Carter began sending insulting and inflammatory Facebook messages to Stone's Facebook Messenger account.[34] Carter's messages included all manner of content intended to provoke Stone, including: allegations about Stone's elevation to president in 2012; the propriety of

---

[27] App. 292; Dkt. No. 30 pp. 5 ¶ 6, 21, 27.
[28] *Id.*
[29] App. 179-183 (Carter 33:24-36:3).
[30] App. 181-182 (Carter 33:17-34:4), 225-226 (Carter 226:3-227:3), 228-229 (Carter 253:24-254:19).
[31] App. 179-182 (Carter 32:18-35:10), 224 (Carter 225:19-20).
[32] App. 224-225 (Carter 225:19-226:2), 239-240 (Stone 86:8-87:8), 277-278 (Montgomery 17:21-18:8).
[33] *Id.*
[34] App. 177-178 (Carter 30:15-31:8), 250 (Stone 238:19-22), 1041-1138.

Stone's re-election in 2016; strange quotes from Saul Alinsky's "Rules for Radicals"; and a picture of a t-shirt stating "FUCKTARD, I VOTED BRETT NEVAREZ CAUSE HE RESPECTS ME,"[35] among other things. Carter also hurled accusations and insults at Stone, referring to her as "morally bankrupt," "lacking morals," a "criminal," "Pure Evil," and a "DISGRACE."[36] Carter continued sending these messages to Stone despite never receiving a response or otherwise engaging with Stone.[37]

    **E.**    **Local 556 Members Attend TWU Women's Committee Meeting and Women's March**

In January 2017, Stone and members of the Union's Women's Committee travelled[38] to Washington, D.C. to participate in a January 19, 2017 TWU Women's Committee meeting.[39] The purpose of the meeting was to support the elevation of women in union leadership.[40] Some members who attended the TWU Women's Committee meeting[41], including Stone, voluntarily stayed in Washington, D.C. to participate in the Women's March on January 21, 2017.[42] Attendees who stayed for the Women's March arranged and paid for their own lodging and did not receive compensation from Southwest or the Union for their attendance.[43] Carter separately travelled to Washington, D.C. to attend the inauguration and participate in the Women's

---

[35] *Id.* Brett Nevarez is a member of Union leadership with whom Carter also had disagreements. *See* App. 222 (Carter 148:1-6), 227 (Carter 231:6-17), 1044-1045, 1067, 1073

[36] App. 177-179 (Carter 30:8-32:6), 1044-1045, 1067, 1073.

[37] App. 245 (Stone 212:7-19), 179 (Carter 32:14-17).

[38] Most Local 556 attendees were not scheduled or had individually arranged to be off work in order attend the meeting. The Union requested that Southwest pull a few Flight Attendants so they could attend, which it is entitled to do under the CBA. App. 269 (Parker 11:1-16), 258-259 (Parrott 22:15-23:4).

[39] App. 246-247 (Stone 225:20-226:3), 263 (Parrott 28:17-21).

[40] App. 270-271 (Parker 20:7-21:10), 670 (Arb. Tr. 141:4-16).

[41] The meeting did not concern abortion, Planned Parenthood, right to work laws, or related issues. App. 270-273 (Parker 20:7-21:10, 25:25-26:9), 248 (Stone 227:15-20).

[42] App. 241-243, 249 (Stone 200:10-13, 202:2-4, 231:7-19).

[43] App. 268 (Parker 10:20-25), 260-262 (Parrott 25:15-26:3, 27:16-23), 242-243 (Stone 201:20-202:4), 668 (Arb. Tr. 139:14-25), 671 (Arb. Tr. 141:17-22).

March.[44]

### F.     Flight Attendants On Fewer Than Five Flights Change Cabin Lights Without Authorization in Support of the Women's March

In the lead up to the Women's March, Flight Attendants on fewer than five trips – out of approximately 4,000 fights in any given day – changed the cabin lights pink. Southwest management did not coordinate, endorse, or authorize the color change, and Carter testified that she has no evidence to the contrary.[45] In fact, when the Company learned about the changed cabin light colors, Southwest immediately issued an RBF on January 20, 2017 instructing Flight Attendants to remain neutral and not to engage in political activities or discussions during flights, particularly those going to Washington, D.C.[46]

### G.     Carter Posts Abortion Videos On Her Publicly-Accessible Facebook Page

On February 7 and February 14, 2017, Carter posted videos of aborted fetuses on her public Facebook page.[47] Carter described both videos as being "GRAPHIC" and characterized all pro-choice individuals as supporters of murder.[48]

Carter was readily identifiable as a Southwest employee on her public Facebook page. Carter had multiple photos of herself donning her Southwest uniform, wearing her Southwest badge, and standing on a Southwest aircraft with fellow crew members.[49] Not only were Carter's graphic abortion videos and the photos identifying her as a Southwest employee visible to Carter's Facebook friends (which included Southwest employees and customers), they were also

---

[44] App. 868 (Arb. Tr. 339:4-13).

[45] App. 27-28 (Sims 16:23-17:9), 36-37 (Sims 189:19-190:2), 38 (Sims 194:18-24), 41 (Sims 201:4-25), 213-216 (Carter 115:18-118:9), 926 (Arb. Tr. 397:16-398:2), 985-986 (Arb. Tr. 456:15-457:4).

[46] App. 38-41 (Sims 194:14-195:24, 200:19-201:17), 44 (Sims 230:2-16), 1036.

[47] App. 1142-1143, 919-921 (Arb. Tr. 390:5-392:10).

[48] *Id.*; *see also* FAC ¶¶ 47, 49.

[49] App. 1147-1156, 116-118 (Jones 46:19-47:4, 48:6-10), 128-129 (Jones 64:9-65:6), 63-65 (Schneider 43:6-44:2, 44:25-45:2), 578-579 (Arb. Tr. 49:21-50:18), 605 (Arb. Tr. 76:8-18), 622-623 (Arb. Tr. 93:23-94:17), 889-890 (Arb. Tr. 360:9-15, 360:25-361:4).

accessible by anyone with an internet connection due to Carter's decision not to limit distribution using the available privacy settings.[50]

    **H.**    **Carter Responds to Flight Attendants Participating in Women's March By Continuing Her Campaign and Sending Graphic Messages to Stone**

Simultaneously, Carter increased her harassment campaign against Stone. On February 14, 2017, Carter sent Stone five more Facebook messages. These messages contained graphic images and videos of aborted fetuses, individuals wearing costumes that depicted female genitalia, and the accusation that Stone supported murder.[51] Carter acknowledges both that the materials she sent Stone were disturbing and Carter knew they were disturbing at the time she sent them.[52] When Carter previously posted these same materials to her personal Facebook page, she included the following: "WARNING this is VERY GRAPHIC!!"[53]

Stone was shocked when she received these messages. As Stone testified:

Q: What impact did receiving these messages have on you …?

A: I completely fell apart. I started sobbing. I had to leave the gate area. And my flight had started boarding already. I had to leave the gate area and go to the women's restroom to try to compose myself. I was worried I wasn't going to be able to get on the flight because I was … very recognizable by flight attendants. And I was afraid that if I boarded the flight and anybody saw me crying, that would be the next post on social medial about me. And so I called … one of my best friends and told her … I needed to hear a friendly voice. And that I needed her to talk to me about something, anything that wasn't Southwest; that I had a flight I needed to get on and I wasn't in an emotional state to be able to do it.

Q: Did you interpret these messages in any way as Ms. Carter inviting you to a conversation?
…

---

[50] App. 597-598 (Arb. Tr. 68:10-69:11), 602-605 (Arb. Tr. 73:23-75:22, 76:8-18), 719 (Arb. Tr. 190:4-24), 757-759 (Arb. Tr. 228:13-230:4, 259:9-11), 918-922 (Arb. Tr. 389:17-392:4, 393:17-19), 148 (Emlet 55:3-13), 151-152 (Emlet 61:19-62:2), 155-157 (Emlet 79:6-12, 83:22-84:13), 31 (Sims 132:8-21), 63-65 (Schneider 43:8-44:2, 44:25-45:23).
[51] App. 1041-1042, 1133, 1139-1141; *see also* FAC ¶¶ 47-49.
[52] App. 175-176 (Carter 28:2-29:18).
[53] App. 1142-1143.

A: No, I did not believe that it was to start a conversation because they were so awful. One of the messages said that we had supported … murder.[54]

On February 22, 2017, feeling threatened and unable to withstand Carter's continued assaults, Stone reported Carter's messages to Stone's base manager, Suzanne Stephenson ("Stephenson"), stating in relevant part:[55]

> I found the messages to be incredibly disturbing and believe it to be a violation of the social media policy. I find it obscene and violent, as well as threatening …
>
> I am a Southwest Airlines Employee first and foremost. I made clear that I will not be seeking re-election, and am now fearful to return to my job as a line-flying Flight Attendant due to repeated personal attacks and threats made both via social media as well as altercations that have occurred face to face while I've been on a Southwest Airlines plane. I can't and won't continue to be disrespected as an Employee of Southwest Airlines, or as a human being.
> …
> The photos don't do justice to the awfulness of the videos.
> …
> I can't "unsee" these images, and I was waiting to board a flight … when I logged in and saw them. I sat in the gate area alone and cried, and had to contact a close friend to even pull myself together enough to board the flight. …
>
> Thank you for addressing this very upsetting matter. I've had the above drafted and it had taken me days to be able to hit "send." … I've spent my career protecting and defending our Flight Attendants, but I realize I must also protect myself and the job I have at Southwest.

Stephensen, in turn, immediately elevated Stone's complaint so Southwest could further investigate.[56]

### I.   Fact-Finding Investigation Resulting in Carter's Termination

Ed Schneider ("Schneider"), the Denver Manager of In-Flight Operations, received Stone's complaint from Stone's manager because Carter is assigned to Schneider's Denver

---

[54] Stone 241:22-243:7.
[55] App. 150 (Emlet 60:6-24), 244 (Stone 210:5-8), 225 (Stone 246:16-20); *see also* 681 (Arb. Tr. 152:13-25), 1144-1145
[56] App. 59-60 (Schneider 31:16-32:13).

base.[57] As a result, Schneider oversaw the investigation that followed, and he was responsible for the ultimate disciplinary decision.[58] Denise Gutierrez ("Gutierrez") (Employee Relations Investigator)[59] and Meggan Jones ("Jones") (Denver Assistant In-flight Base Manager)[60] supported Schneider in the investigation.[61] Schneider met with Stone on February 24, 2017 to gather information regarding her complaint.[62]

On March 7, 2017, Schneider held a fact-finding meeting with Carter regarding Stone's allegations.[63] Carter, her Union representative Chris Sullivan ("Sullivan"), Jones, Gutierrez, and HR Business Partner Manager Edie Barnett attended the meeting.[64] The purpose of the fact-finding meeting was to allow Carter to provide her side of the story and allow Schneider to gather additional relevant facts.[65]

---

[57] App. 49-53 (Schneider 5:19-22, 8:4-12, 9:20-23, 12:21-13:9).

[58] App. 52-53 (Schneider 12:4-13:9), 56 (Schneider 20:7-19), 62 (Schneider 42:11-14), 233 (Carter 268:6-8), 607 (Arb. Tr. 78:10-12), 731 (Arb. Tr. 202:17-18), 749-754 (Arb. Tr. 220:17-221:20, 224:16-225:2), 765-766 (Arb. Tr. 236:22-237:3), 32 (Sims 166:7-10). Schneider had never met or communicated with Stone at the time he began the investigation. App. 61 (Schneider 40:4-8).

[59] App. 167 (Gutierrez 9:11-23).

[60] App. 111-112 (Jones 8:20-9:9).

[61] App. 63-64 (Schneider 43:18-44:2), 70 (Schneider 60:11-20), 75-76 (Schneider 72:11-73:6), 80 (Schneider 82:9-17), 116-117 (Jones 46:16-47:13), 125-126 (Jones 55:2-6, 59:9-14), 1144-1146. Schneider involved Employee Relations and the Human Resource Business Partner ("HRBP") in the investigation because it concerned potential violations of the harassment and bullying policies, which Employee Relations and the HRBP, respectively, help administer; and because Schneider generally communicates with Employee Relations when employment issues may involve protected categories. App. 119-124 (Jones 49:10-21, 50:23-54:1), 66-69 (Schneider 47:8-10, 48:4-50:24), 75-77 (Schneider 72:11-73:25, 75:5-20). While Schneider may involve groups in an investigation, Schneider makes the employment decision and is free to disregard the opinion of others in doing so. *See* App. 78-79 (Schneider 80:8-81:4), 149 (Emlet 56:9-24), 153-154 (Emlet 70:20-71:2), 158 (Emlet 85:1-9).

[62] App. 71-73 (Schneider 63:1-64:7, 65:2-24), 1174-1179.

[63] App. 73-74 (Schneider 65:21-24, 70:13-17), 127-128 (Jones 63:24-64:3).

[64] App. 81 (Schneider 83:2-14), 127-128 (Jones 63:24-64:3), 1157-1174.

[65] App. 206-207 (Carter 86:23-87:2), 751-752 (Arb. Tr. 222:20-223:21).

At the fact-finding, Carter admitted that she sent the messages Stone reported.[66] Carter claimed that she sent the messages to "open up a dialogue" with Stone regarding abortion, and because of dissatisfaction with Local 556 members' participation in the Women's March; anger that Women's March participants who had no affiliation with Local 556 allegedly turned away pro-life attendees and her incorrect belief that Union funds had improperly paid for members' attendance.[67] Notably, the bulk of Carter's messages have nothing to do with abortion. Of the more than 100 messages Cater sent Stone, only a handful had any relationship to abortion.[68] Carter did not state that she needed a religious accommodation, and she did not assert her religion required her to send two years of harassing and offensive messages to Stone.[69]

After the fact-finding meeting and a review of the relevant policies, Schneider determined that the correct course of disciplinary action was to terminate Carter's employment.[70] Schneider memorialized the reasons for the termination in Carter's March 14, 2017 termination letter:[71]

> On March 7, 2017, a fact-finding meeting was held with you to discuss certain messages and videos you posted on your Facebook page and sent to another

---

[66] App. 175-178 (Carter 28:2-29:18, 30:15-31:7), 1041-1138, 718-719 (Arb. Tr. 189:16-190:3), 728-729 (Arb. Tr. 199:7-200:4), 736 (Arb. Tr. 207:1-8), 787-788 (Arb. Tr. 258:1-9, 259:4-16), 916-917 (Arb. Tr. 387:25-388:2), 1187-1352.

[67] *See* App. 184-187 (Carter 39:15-40:13, 40:25-42:2), 720-723 (Arb. Tr. 191:12-194:16), 1187-1352.

[68] App. 177-178 (Carter 30:15-31:7), 1041-1138, 250 (Stone 238:19-22). Indeed, Carter testified that her opposition to Stone wearing a pink hat at the march was "more of an integrity and professional opinion." App. 197 (Carter 64:1-12).

[69] App. 199-200 (Carter 75:24-76:9), 234 (Carter 270:6-11), 57-58, 82 (Schneider 24:21-25:4, 96:3-17), 113 (Jones 28:18-25).

[70] App. 233 (Carter 268:6-8), 607 (Arb. Tr. 78:10-12), 731 (Arb. Tr. 202:12-18), 749-754 (Arb. Tr. 220:25-221:16, 223:22-224:3, 224:25-225:8), 55-56 (Schneider 19:3-20:14), 100-105 (Schneider 120:25-125:17). Schneider communicated with Employee Relations and the HRBP to confirm that Carter violated the harassment and bullying policies, and with Emlet to ensure that the discipline was consistent with past practice. App. 83-102 (Schneider 100:16-22, 104:22-5-122:19), 136-138 (Emlet 13:9-23, 15:17-16:4), 146-147 (Emlet 36:11-18, 37:12-25).

[71] App. 30 (Sims 72:16-20), 54-56 (Schneier 18:18-20:19), 173-174 (Carter 25:23-26:19), 1180.

Southwest Employee through Facebook Messenger. … During the meeting, you admitted you posted graphic videos of aborted fetuses on Facebook and sent those same videos in a private Facebook message to another Southwest Flight Attendant. You also admitted to sending the Flight Attendant a private message containing a picture of individuals wearing costumes depicting the female genitalia. You agreed that the pictures and videos were graphic. … [W]hen you posted the graphic videos and pictures on Facebook, you were identifiable as a Southwest Airlines Employee and represented our Company in a manner that is disparaging to Southwest Flight Attendants as well as to all Southwest Employees. These Facebook posts were highly offensive in nature, and the private messages you sent to the above-mentioned Employee were harassing and inappropriate. Although your posts and messages may have been made and/or sent outside of work, Southwest is obligated to address such conduct given its impact on the workplace. … I have determined that your conduct is in direct violation of the Southwest Airlines Mission statement and the following Company Policies/Rules including but not limited to:

- Workplace Bullying and Hazing Policy

- Social Media Policy

Your conduct could also be a violation of Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination and Retaliation. Accordingly, your employment is terminated effective March 16, 2017.

**J.  __Carter Grieves Her Termination – the Step 2 Process__**

Carter filed a grievance challenging her termination.[72] On April 4, 2017, Carter participated in the Step 2 hearing to address her grievance.[73] The purpose of the Step 2 hearing is to provide an opportunity for a Southwest leader who did not participate in the fact-finding meeting to review the case, consider additional facts, and ensure appropriate application of Southwest policies.[74] Two union representatives attended on Carter's behalf.[75] Mike Sims ("Sims"), Senior Director of Inflight Operations, conducted the Step 2 hearing on behalf of Southwest, and Melissa Burdine (Labor Relations Manager) was present as the note taker.[76]

[72] App. 206 (Carter 86:20-22).
[73] App. 206 (Carter 86:23-24), 1336-1352.
[74] App. 20 ¶ 10, 783-784 (Arb. Tr. 254:25-255:10), 1336-1352.
[75] App. 231-232 (Carter 266:24-267:20).
[76] App. 29 (Sims 54:15-17), 785-786 (Arb. Tr. 256:7-257:5).

During the Step 2 hearing, Carter reiterated the same information she conveyed at the pre-termination fact-finding meeting.[77] Carter also submitted approximately 150 pages of documents that she believed explained her conduct.[78] In these documents, Carter included the very Facebook messages and still images of videos that resulted in her termination. She also submitted a number of other items that did not address her messages to Stone or her public postings, such as documents showing Planned Parenthood's partial sponsorship of the Women's March; documents about the "Pussyhat Project"; and photos of Local 556 members attending the March.[79] Carter asserted in the hearing that she had the right to send the messages—of any sort and as graphic as she deemed fit—to Stone because of her status as the Union President.[80]

After the Step 2 hearing, Sims believed that termination was an appropriate punishment.[81] Nevertheless, to avoid the cost and disruption of arbitral proceedings, Sims offered Carter reinstatement after a 30-day suspension and a Last Chance Agreement.[82] Carter rejected the offer and insisted on taking her grievance to a system board of adjustment for arbitration. Nevertheless, Carter acknowledges that "Mr. Sims was amazing" and "he did give [her] a fair … [Step 2] hearing."[83] Carter also acknowledges that the Union properly represented her during the Step 2 process.[84] Most importantly, Carter does not believe anyone discriminated against her in

---

[77] *See* App. 1336-1352.
[78] App. 791-791 (Arb. Tr. 261:25-262:15), 1187-1352.
[79] App. 1187-1352.
[80] *See* App. 201-203 (Carter 79:21-81:17), 903-909 (Arb. Tr. 374:1-380:24), 1187-1352. Despite claiming the unfettered right to harass fellow Flight Attendants on social media, her position in that regard is not universal. Carter herself previously reported a fellow Flight Attendant for social media activity. App. 188-190 (Carter 48:19-24, 49:16-50:23).
[81] App. 33-35 (Sims 186:7-188:13), 795-796 (Arb. Tr. 266:21-267:5).
[82] *Id.*; App. 210 (Carter 92:3-13), 1181-1186.
[83] App. 206-209 (Carter 86:20-88:12, 91:19-25), 929 (Arb. Tr. 400:10-14).
[84] App. 231-233 (Carter 266:7-268:4).

the Step 2 hearing[85]:

> Q: Do you contend that Mr. Sims discriminated against you on the basis of your religious beliefs at the step 2 level?
>
> A: No.
>
> Q: Do you contend that anyone else discriminated against you on the basis of your religious beliefs at the step 2 level?
> …
> A: Honestly, I don't know. I don't know what's on people's minds.
>
> Q: … What I'm trying to … get is any evidence that you possess that you believe shows that someone at step 2 had … a discriminatory animus … a bias against you because of your Christian beliefs …
>
> A: No.
>
> Q: Do you have any evidence … that Mr. Sims discriminated against you at your step 2 because you were a union objector?
>
> A: No.
>
> Q: … [D]o you have any evidence of anyone else who was discriminating against you from the company at your step 2 on the basis that you were a union objector?
>
> A: No.

### K.   Carter Retains Counsel, Files EEOC Charges, Initiates this Lawsuit, and Takes Her Grievance to Arbitration

In the midst of the grievance proceedings, Carter filed EEOC charges against Local 556 and Southwest, and initiated the instant lawsuit.[86] Carter's EEOC charge against Southwest alleges religious discrimination, and her charge against Local 556 alleges religious discrimination and failure to accommodate.[87]

On December 7-8, 2017, Carter and Southwest participated in a two-day arbitration

---

[85] App. 207-208 (Carter 87:9-88:12).
[86] App. 211-212 (Carter 113:11-114:10), 1022-1023.
[87] App. 1022.

before William Lemons.[88] Carter and Southwest mutually selected the arbitrator pursuant to the CBA's grievance procedure.[89] At the arbitration, Carter was represented by two attorneys from the National Right to Work Foundation, presented testimony and exhibits, made legal and factual arguments, and cross-examined witnesses.[90] In total, the arbitrator considered testimony from nine different witnesses and 32 exhibits along with post-hearing briefing from both parties.[91] Based on that evidence and briefing, the arbitrator made the following factual findings:[92]

- It was "clear beyond a reasonable doubt that the Company had just cause to terminate [Carter] for the reasons it gave and in the manner it did."

- Carter violated the Social Media Policy, the Workplace Bullying and Hazing Policy, and the Harassment Policy.

- "[A]t least three of the policies [Carter] violated provide an independently sufficient basis for termination[.]"

- Carter was not "treated less favorably than others" and the circumstances surrounding her offenses were not "substantively like those of individuals who received more moderate penalties."

- "Audrey Stone reported [Carter's] conduct to the Company not to retaliate against her" but because she believed Carter "violat[ed] various policies that were applicable to her."

- Southwest "does not have a policy or practice of disciplining, or not disciplining employees based upon their view of TWU Local 556 generally, or of Audrey Stone in particular."

- "[T]he degree of discipline administered by the Company … was warranted … notwithstanding that [Carter] … had no previous disciplinary record."

- Carter failed to demonstrate "disparate treatment."

Accordingly, the arbitrator denied Carter's grievance.

---

[88] App. 1003-1004.
[89] App. 20 ¶ 11.
[90] App. 531-534 (Arb. Tr. 2:12-17, 3:1-5:25), 850-851 (Arb. Tr. 321:1-322:13).
[91] *Id.*
[92] App. 1003-1021.

I.     **Procedural History**

Carter originally asserted five claims against Southwest in this lawsuit. At the outset of the case, Southwest moved to dismiss Carter's Second Amended Complaint in this action, which this Court granted in part and denied in part. *See Carter*, 353 F. Supp. 3d at 582. Specifically, the Court dismissed Carter's "protected speech" RLA claim, "restriction of protected rights" RLA claim, and First Amendment and Fifth Amended retaliation claims. As a result, the only remaining claims against Southwest are claims for alleged: (1) retaliation in violation of the RLA; and (2) religious discrimination in violation of Title VII.[93]

The parties have conducted extensive discovery in this case. Specifically, the parties completed at least nine depositions, including producing corporate representatives on numerous topics for both Southwest and Local 556; and the parties exchanged more than 10,000 pages of production. Discovery closed on November 30, 2020.

II.     **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Normally, to support summary judgment, the moving party must identify pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. "But if the non-movant ultimately bears the burden of proof at trial, the summary-judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting an essential element of the non-movant's claim." *Foster v. Target Corp.*, 2021 U.S. Dist. LEXIS 19248, *3-4 (N.D. Tex. Feb. 2, 2021); *see also Duffie v. United States*,

---

[93] *See generally* FAC.

600 F.3d 362, 371 (5th Cir. 2010) (the moving party "need not negate the elements of the nonmovant's case.").

If the moving party makes this initial showing, the burden shifts to the nonmoving party to identify "specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The nonmoving party does not meet this burden by conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation. *Id.* Moreover, "[m]erely colorable evidence or evidence not significantly probative will not defeat a properly supported motion for summary judgment." *Smith v. State Farm Lloyds*, 2020 U.S. Dist. LEXIS 95641, *10 (N.D. Tex. June 1, 2020). The "salutary function of summary judgment in the employment discrimination arena [is that] summary judgment allows patently meritless cases to be nipped in the bud." *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017). As set forth below, this is precisely such a case.

## III.   <u>ARGUMENT</u>

As set forth in more detail below, Southwest is entitled to summary judgment on all of Plaintiff's claims. First, the Court need not even delve into Plaintiff's individual claims to grant summary judgment. Instead, Plaintiff's prior defeat at arbitration has a binding preclusive effect as to essential elements of both of her asserted claims. Second, even if Plaintiff's claims are not precluded by Plaintiff's prior arbitration of these issues, her claims still fail as a matter of law. Specifically:

**RLA Retaliation**: Southwest is entitled to summary judgment because (1) Plaintiff has no private right of action under the RLA; (2) to the extent a private right action exists, Plaintiff's claims are "minor disputes" stripping the Court of subject matter jurisdiction; and (3) the record evidence demonstrates that Plaintiff did not engage in protected activity and that Southwest terminated Plaintiff for reasons unrelated to any alleged union activities.

**Title VII Failure to Accommodate:** Southwest is entitled to summary judgment because (1) Plaintiff did not exhaust administrative remedies; (2) the undisputed facts show that Plaintiff did not request and that Southwest was not otherwise aware of any need for an accommodation; (3) there is no evidence of a conflict between Plaintiff's stated religious belief and a requirement of her position; and (4) the accommodation Plaintiff insists upon—to again engage in the horrific campaign harassment she inflicted upon Stone—would impose an undue hardship on Southwest.

**Title VII Religious Discrimination**: Southwest is entitled to summary judgment because there is no competent summary judgment evidence demonstrating that Plaintiff's termination was motivated in any way by animus toward her religion or religious beliefs.

Thus, the Court should enter summary judgment for Southwest on all asserted claims.

A.     **The Binding Arbitration Award Forecloses Essential Elements of Plaintiff's Claims**

Plaintiff's claims are precluded by the prior arbitration decision that conclusively resolved against Carter essential elements of her claims against Southwest. Accordingly, the Court can and should grant summary judgment based on preclusion alone and need not address the substance of Plaintiff's asserted claims.

An arbitrator's factual determinations preclude a plaintiff from bringing federal discrimination and other statutory claims in subsequent court proceedings under appropriate circumstances. *See Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 188 (5th Cir. 2014) ("[A]rbitral proceedings can have preclusive effect even in litigation involving federal statutory and constitutional rights[.]"); *see also Gautier v. Celanese*, 143 F. Supp. 3d 429, 433 (W.D. Va. 2015) ("[T]he Fifth Circuit allows courts to give preclusive effect to arbitration decisions in later federal discrimination claims"). The decision to apply issue preclusion in a particular case is a

22

matter of discretion entrusted to the district court. *Grimes*, 746 F.3d at 188. In determining whether to apply arbitration-based preclusion, a district court should consider two factors: (a) whether "[t]he findings are within the [arbitrator's] authority and expertise;" and (b) whether the arbitration procedures "adequately protected the rights of the parties." *Id.*

Here, both factors are satisfied. First, Arbitrator Lemons had more than sufficient expertise and experience to make the determinations that would preclude Plaintiff's claims. Courts have long recognized that labor arbitrators are well-positioned to make factual determinations and fairly resolve employee-management disputes. *See Lamont v. United States*, 613 F. Supp. 588, 591 (S.D.N.Y. 1985) ("[I]n [] labor relations … the arbitrator would have greater expertise than a court in resolving disputes between employers and employees."); *accord Grimes*, 746 F.3d at 187 n.1 (noting "arbitrator's competence to find facts"). Here, Arbitrator Lemons has presided over hundreds of arbitrations ranging in size and complexity from small single plaintiff matters to 28-day hearing resulting in a $46 million award involving a complex commercial dispute. *See* App. 8-17. In fact, Southwest and its employees have arbitrated over 30 disputes before Arbitrator Lemons, sometimes resulting in favorable outcomes to Southwest and other times resulting in favorable outcomes to the aggrieved employee. App. 20 ¶ 12. Further, Plaintiff *herself* acknowledged that Arbitrator Lemons was an appropriate choice when she selected him, along with Southwest, as the mutually agreed arbitrator. App. 20 ¶ 11. Thus, Arbitrator Lemons satisfies the first prong of preclusion analysis.

Likewise, Plaintiff was afforded full due process through the arbitration proceedings. "As to the second prong, '[w]hen an arbitration proceeding affords basic elements of adjudicatory procedure, such as an opportunity for presentation of evidence, the determination of issues in an arbitration proceeding *should generally be treated as conclusive in subsequent proceedings*[.]'"

*Grimes*, 746 F.3d at 188 (emphasis added). Thus, where the parties to the arbitration were represented by counsel, presented evidence, made factual and legal arguments, and were permitted to examine and cross examine witnesses before a neutral arbitrator, issue preclusion is appropriate. *See id.* As the arbitrator's decision and the 473-page transcript demonstrate, the proceedings satisfied each of these elements. At arbitration, Plaintiff and Southwest were both represented by counsel, presented nine witnesses and 32 exhibits, cross examined hostile witnesses, and submitted post-hearing briefs. Thus, the second prong of preclusion analysis is also satisfied.

Accordingly, the Court should adopt as preclusive the following findings of fact reached by Arbitrator Lemons:

- <u>Essential Element</u>: Plaintiff contends in this lawsuit Southwest's stated reasons for her termination were pretextual and that her termination was unwarranted.

  <u>Preclusive Finding</u>: The arbitrator concluded that Southwest's stated reasons were not pretextual and Southwest had "just cause" to terminate Plaintiff "beyond a reasonable doubt." App. 1011.

- <u>Essential Element</u>: Plaintiff contends Southwest's refusal to utilize lesser progressive discipline reflects an improper motive.

  <u>Preclusive Finding</u>: The arbitrator concluded "the … discipline administered … was warranted … notwithstanding that [Plaintiff] … had no previous disciplinary record." App. 1019-1020.

- <u>Essential Element</u>: Plaintiff contends that she was treated less favorably than other employees who engaged in misconduct on social media.

  <u>Preclusive Finding</u>: The arbitrator concluded that Plaintiff was not "treated less favorably than others" and the circumstances surrounding her offenses were not "substantively like those … who received more moderate penalties." App. 1019.

- <u>Essential Element</u>: Plaintiff contends that Southwest treated employees who opposed Local 556 and Stone less favorably than those who supported them.

<u>Preclusive Finding</u>: The arbitrator found that Southwest "does not have a policy or practice of disciplining, or not disciplining employees based upon their view of TWU Local 556 generally, or of Audrey Stone in particular." *Id.*

- <u>Essential Element</u>: Plaintiff contends that Stone reported her to Southwest because of her opposition to Stone's conduct as Union President.

   <u>Preclusive Finding</u>: The arbitrator found that "Stone reported [Plaintiff's] conduct to the Company not to retaliate against her" but because she believed Plaintiff "violat[ed] various policies that were applicable to her." *Id.*

*See generally* App. 1003-1021. Stated simply, the arbitrator's findings refute any attempt by Plaintiff to prove that Southwest terminated Plaintiff for anything other than the egregious and offensive nature of Plaintiff's behavior rather than the content or viewpoint or her messages. This preclusion is fatal to both of Plaintiff's claims. Further, even if that fact were not enough, Arbitrator Lemons's findings of fact preclude Plaintiff from resorting to comparator evidence to provide proof of animus.

If preclusion was not itself fatal, it would become fatal when paired with Plaintiff's deposition testimony. Specifically, Plaintiff testified that she cannot identify any evidence that the individuals she claims discriminated and/or retaliated against her (*see* Interrogatory Response No. 12) acted with improper animus[94]:

**Kissman**

Q: Do you believe Mr. Kissman discriminated against you on the basis of your religious beliefs?

A: I never had any dealings with Mr. Kissman. I have no idea.

Q: … [C]an you identify anything that led you to believe that Mr. Kissman was acting to discriminate against you?

A; No, except that they should have known after my fact-finding meeting. Every one of these people should have known that I was a Christian because this all was

---

[94] Plaintiff makes the same admission regarding Tammy Shaffer and Edie Barnett. App. 223 (Carter 158:1-22). Southwest notes that Plaintiff's testimony indicates that her earlier interrogatory responses were untruthful.

sent to them.

…

Q: Do you have any reason to believe Mr. Kissman discriminated against you on the basis of your status as a union objector?

A: Again, I cannot answer that. I do not know what's in his head.

Q: … I'm just making sure that there's nothing else you want to report … that would lead you to believe that he discriminated against you because you are an objector?

A:. No.

App. 220-221 (Carter 127:1-128:12).

### **Schneider, Jones, and Emlet**

Q: Is there any other evidence that you possess that Mr. Schneider acted against you because he was hostile to or discriminating against your religious beliefs?

A: No.

Q: Do you have any evidence that Mr. Schneider was hostile to you or acting against you because you were a union objector?

A: No.

Q: Ms. Jones, Meggan Jones was the assistant base manager at Denver, correct?

A: Yes.

Q: And she participated in the fact-finding, right?

A: Yes.

Q: What evidence, if any, do you have that Ms. Jones sought to discriminate against you on the basis of your religious beliefs?

A: None, except that I said I was a Christian.

Q: And if I ask you the same question about Ms. Gutierrez, would your response be the same?

A: Correct.

Q: And if I ask you the same question about Ms. Emlet, would your response be the same?

A: Yes, sir.

Q: With respect to Ms. Jones, do you have any evidence that she sought to discriminate you based on your status as a union objector?

A: No.

Q: And would the same be true for Ms. Gutierrez?

A: Yes.

Q: And would the same be true for Ms. Emlet?

A: Yes.

App. 204-205 (Carter 84:12-85:20).

### **Sims**

Q: And you've previously testified that you believed that that proceeding was fair and complete, correct?

A: Yes.

Q: Is that still your testimony?

A: Yes.

Q: Do you contend that Mr. Sims discriminated against you on the basis of your religious beliefs at the step 2 level?

A: No.

Q: Do you contend that anyone else discriminated against you on the basis of your religious beliefs at the step 2 level?
…

A: Honestly I don't know. I don't know. I mean, I don't know what's in people's minds.

Q: Well, and that's perfectly fine. What I'm trying to make sure I get is any evidence that you possess that you believe shows that someone at step 2 had what we would call a discriminatory animus so a bias against you because of your

27

Christian beliefs, and so I'm just making sure there's no other names in there that we need to cover.

A: No.

Q: Do you have any evidence or – that Mr. Sims discriminated against you at your step 2 because you were a union objector?

A: No.

Q: And to your knowledge, do you have any evidence of anyone else who was discriminating against you from the company at your step 2 on the basis that you were a union objector?

A: No.

App. 207-208 (Carter 87:3-88:12).

**<u>Lacore</u>**

Q: Do you believe Sonya Lacore discriminated against you on the basis of your religious beliefs?

A: I can't speak for her. I know that she agreed on my firing.
…
Q: Other than her approving of your termination, are you aware of anything else that leads you to believe Ms. Lacore discriminated against you on the basis of your religious beliefs?

A: No.

Q: Are you aware of anything indicating that Ms. Lacore discriminated against you on the basis of your status as a union objector?

A: No, not of my knowledge.

App. 218-219 (Carter 125:24-126:19). Thus, Plaintiff cannot identify any evidence of discriminatory or retaliatory animus, *and* Arbitrator Lemons's prior findings foreclose use of comparator evidence in this case.

The Court should therefore grant summary judgment to Southwest because the arbitrator

has resolved the essential factual predicates of Plaintiff's claims in favor of Southwest.[95]

**B.**     **Plaintiff's RLA Retaliation Claim Fails as a Matter of Law**

Plaintiff's RLA Retaliation claim fails for three additional reasons, even if it is not precluded by the prior arbitration proceeds. Plaintiff's claim fails as a matter of law because: (1) the RLA does not give Plaintiff a private right of action; (2) irrespective of whether or not a private right of action exists, Plaintiff's RLA claim would not be cognizable because it is a post-certification "minor dispute" that must be conclusively resolved, as it was, in the arbitral forum; and (3) Plaintiff conceded at deposition that she has no evidence that any Southwest manager retaliated against her for union-related activities.

1.     Plaintiff Has No Private Right of Action Under the RLA

Plaintiff cannot assert a claim for RLA Retaliation. The RLA does not expressly provide individuals with a private right of action under sections 152 Third & Fourth.[96] *See, e.g.*, *Beckett v. Atlas Air*, 968 F. Supp. 814, 817 (E.D.N.Y. 1997).Thus, the Court should analyze Plaintiff's attempt to assert a novel claim "with the standard 'presumption that Congress did not intend to create a private right of action.'" *Lundeen v. Mineta*, 291 F.3d 300, 310 (5th Cir. 2002). To overcome this presumption, "[t]he plaintiff generally bears the relatively heavy burden" to demonstrate that Congress intended to create a private right of action. *Id.*

Sections 152 Third & Fourth were implemented to prohibit carrier interference with a

---

[95] This Court declined to address the import of the arbitrator's decision at the motion to dismiss stage because doing so would have required it to consider materials outside the pleadings and it did not have the entirety of the arbitration record. *See Carter*, 353 F. Supp. 2d at 569 ("Given that the Second Amended Complaint does not make mention of the Opinion and Award of the Arbitrator, the Court declines to consider the documents attached as exhibits to Southwest's motion."). The Court may consider matters beyond the pleadings at the summary judgment stage.  *See* FED. R. CIV. P. 56.  Accordingly, this argument is now ripe for consideration.

[96] Plaintiff contends that Southwest retaliated against her in violation of the RLA for opting out of Union membership and opposing Local 556 leadership. *See* FAC ¶¶ 96-97.  But Plaintiff has not identified the specific RLA provisions on which she predicates her retaliation claim. Southwest has assumed Plaintiff brings her claims under 45 U.S.C. §§ 152, Third & Fourth.

workgroup's right to organize and collectively bargain through their duly selected and implemented union representatives. 45 U.S.C. §§ 152, Third & Fourth. The limited available case law addressing this issue in this context provides persuasive authority that the Court should refuse Plaintiff's invitation to create a new cause of action where Congress failed to do so. In *PHI, Inc. v. Office & Prof'l Employees Int'l Union*, 440 Fed. Appx. 394 (5th Cir. 2011), the Fifth Circuit affirmed dismissal of an RLA claim based the unavailability of a private right of action. In so doing, the Fifth Circuit declined to disturb the district court's "determination that [] individual pilots do not have a private cause of action under section 2, Third & Fourth of the Railway Labor Act." *Id.* at 396.[97]

Instead, the Court found that Congress solely empowered unions, in their representative capacity, to bring claims under these sections of the RLA. *Id.* The Court should reach the same conclusion here. Congress has not changed the RLA since the *PHI* decision. Meanwhile, Plaintiff cannot point to any evidence of congressional intent beyond the plain language of the statute—to the extent such information is even useful as an interpretative aid—that Congress intended to create the cause of action that she asserts. Accordingly, Plaintiff's RLA Retaliation claim does not exist under the RLA, and it should be dismissed.

> 2.    Even if a Private Right of Action is Available, the Court Lacks Jurisdiction Because Plaintiff Asserts A Post-Certification "Minor Dispute"

Plaintiff cannot carry her burden of establishing that the Court has subject matter jurisdiction over her novel RLA Retaliation claim. Specifically, Plaintiff cannot show that the alleged retaliation speaks to the protection of precertification rights, and she cannot overcome the fact that her claim is a "minor dispute" preempted by the RLA.

---

[97] The only other authority in the Fifth Circuit addressing RLA private causes of action in this context pretermitted the issue and ruled for the carrier on other grounds. *See Roscello v. Southwest Airlines Co.*, 726 F.2d 217, 220 n.2 (5th Cir. 1984); *Fields v. Keith*, 2000 U.S. Dist. LEXIS 8184, *20 n.3 (N.D. Tex. June 8, 2000).

Section 152, Third and Fourth of the RLA protects the right of unrepresented employees to organize a union without interference by the carrier. *See* 45 U.S.C. §§ 152, Third & Fourth. These provisions are designed to protect "the *precertification* rights and freedoms of unorganized employees" – *i.e.*, the period before a union is certified as the bargaining representative. *TWA, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989) (emphasis added). After certification is complete, "judicial intervention … is limited to those cases where 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the [RLA's] statutory commands[.]'" *Id.* at 441 (citations omitted); *see also Carter*, 353 F. Supp. 3d at 571-72. Stated differently, Section 152, Third and Fourth "do not provide a remedy after a union has been certified except in cases of extreme anti-union bias or animus." *Held v. Am. Airlines, Inc.*, 2007 U.S. Dist. LEXIS 7665, *18 (N.D. Ill. Jan. 30, 2007).

Here, the Court has *already* concluded that Plaintiff has not presented any evidence of "anti-union animus or a fundamental attack on the collective bargaining process on the part of Southwest necessary to bring a post-certification dispute within the jurisdiction of the district court." *Carter*, 353 F. Supp. 2d at 572. In fact, Plaintiff's entire retaliation claim is premised on the very unlikely suggestion—a suggestion lacking any evidentiary support—that Southwest is so *pro-union* that it retaliated against Plaintiff for *opposing* the Union.

Additionally, Plaintiff was not deprived of the ability to protect her rights by virtue of the alleged retaliation. To the contrary, Plaintiff presented her grievance to a neutral arbitrator with all of the required due process, and she lost. This fact is critical. It is well established that the RLA does not permit employees "to pursue a claim under §§ 152, Third and Fourth after the employee has submitted to arbitration under the collective bargaining agreement." *Held*, 2007 U.S. Dist. LEXIS 7665, *19 (dismissing section 152, Third & Fourth claims because "plaintiff

… ha[d] a remedy in the form of the System Board and opted to pursue resolution of his grievance in this manner."); *see also Union of Flight Attend. v. Pan American World Airways, Inc.*, 789 F.2d 139, 142 (2d Cir. 1986) (declining jurisdiction and noting that plaintiffs could challenge their disciplinary action through the adjustment board); *Machinists v. Nw. Airlines, Inc.*, 673 F.2d 700, 712 (3d Cir. 1982) ("the controversy which had been properly commenced as a System Board arbitration should have concluded in that forum[.]").

Not only is judicial intervention inappropriate as described above, it is barred because Plaintiff's claim constitutes a "minor dispute" over which this Court lacks subject matter jurisdiction. The Court may not exercise subject matter jurisdiction to consider claims that turn upon the interpretation of and application of an RLA collective bargaining agreement and related policies, including claims that relate to "controversies involving disciplinary matters," because such "minor disputes" may only be addressed through the RLA dispute resolution process. *See Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists*, 915 F.2d 43, 50 (1st Cir. 1990); *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 810 (2d Cir. 2009) (granting motion to dismiss because "'minor disputes' encompasses 'disciplinary disputes … involving employee discharge.'").

More specifically, an RLA claim arising from alleged unlawful termination is a "minor dispute" if it was "arguably justified" by the written or implied terms of the CBA or other applicable workplace rules, or if resolution of the claim will necessitate interpretation of the same. *See Wright v. Union Pac. R.R. Co.*, 990 F.3d 428 (5th Cir. 2021); *Knox v. Am. Airlines, Inc.*, 2016 U.S. Dist. LEXIS 136565, *3 (N.D. Tex. Oct. 3, 2016) ("Based on the [] alleg[ation] by plaintiff [] that she did not violate any of defendant's rules in its code of conduct and that her actions were authorized by the terms of the [CBA] [] this is a 'minor' dispute"); *B'hood of Ry.*

*Carmen v. Atchison, T. & S. F. R. Co.*, 894 F.2d 1463, 1468-69 (5th Cir. 1990) ("the past practices of the parties including previous resignation offerings and individually-negotiated resignation agreements – do have some arguable basis sufficient to render this a minor dispute."). The party arguing that a dispute is minor and thus not subject to the court's jurisdiction bears a light burden. *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers*, 973 F.3d 326, 335 (5th Cir. 2020). "[I]f there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor." *Id.*

Here, the CBA incorporates the social media, harassment, and bullying policies the application of which Plaintiff disputes in this case. As the CBA states:

> Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued … The Union shall be advised of any changes in Inflight Department rules, regulations, or orders governing Flight Attendants at least seven (7) working days before such rules, regulations, or orders become effective, unless the parties mutually agree to a shorter advance notification period.

App. 298, Art. 3(2). Given that Plaintiff's entire claim turns upon whether the policies were appropriately applied, the contract "arguably" supported her termination, rendering this a "minor dispute" that must be decided by an arbitrator rather than court. *See Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 783 (5th Cir. 2012).

Put differently, Plaintiff's core arguments create precisely the sort of RLA quagmire that prevents judicial consideration of "minor disputes." For example, Plaintiff has alleged that (a) Southwest applied the disputed policies to her in a manner that are inconsistent with other employees (FAC ¶¶ 74-75); and (b) the conduct that resulted in her termination did not violate the disputed policies (Carter 118:23-119:20). These contentions will require the Court to: (1) assess whether disciplinary proceedings were conducted in compliance with the applicable CBA; (2) determine the reasons for any differing outcomes; and (3) interpret critical policy documents

to determine whether they were properly understood and utilized by the responsible decision makers. All of these tasks will require the Court to engage in prohibited "minor dispute" analysis as it delves into a mix of contract interpretation and analysis of past practice involving other employees. *See, e.g.*, *Parker v. Am. Airlines, Inc.*, 2008 U.S. Dist. LEXIS 55769, *27 n.7 (N.D. Tex. July 22, 2008) ("'the parties' practice, usage, and custom is of significance in interpreting'" a CBA); *Dotson v. Norfolk S. R.R. Co.*, 52 Fed. Appx. 655, 658 (6th Cir. 2002) (per curiam) (affirming dismissal of RLA "minor dispute" because "[w]hether or not Plaintiff was disciplined more harshly ... or ... should have been disciplined at all, depends upon an interpretation of the CBA regulations regarding discipline"); *Moss v. Norfolk W. Ry. Co.*, 2003 U.S. Dist. LEXIS 13566, *15 (E.D. Mich. July 22, 2003) (claim was a "minor dispute" under RLA because allegation that employee was "discharged for the same conduct when … [another] employee was not depends on interpretation of the CBA regulations regarding discipline").

Plaintiff addressed her retaliation claims in the arbitral forum and she lost. The RLA provides her with no further relief, and her RLA Retaliation claim should be dismissed.

3.      Plaintiff's RLA Retaliation Claim Also Fails on Its Own Lack of Merit

Plaintiff has not adduced evidence creating a genuine issue of material fact on the essential elements of her RLA Retaliation claim. As a result, her RLA Retaliation Claim fails even if she could otherwise overcome all of the other obstacles addressed above.

To prevail on a claim under section 152 of the RLA, the plaintiff must demonstrate that: she engaged in RLA protected activities; the employer had knowledge of the activities; the employer harbored anti-union animus; and the animus was a substantial or motivating factor in plaintiff's termination. *See Fields v. Keith*, 174 F. Supp. 2d 464, 480 (N.D. Tex. 2001); *In re Express One Int'l*, 229 B.R. 129, 134-35 (E.D. Tex. 1999); *Amarsingh v. Jetblue Airways Corp.*, 409 Fed. Appx. 459, 461 (2d Cir. 2011). If the plaintiff demonstrates that anti-union animus was

a motivating factor in the discharge, the employer still avoids liability by showing that the employee would have been discharged even if she had not engaged in union activities. *Fields*, 174 F. Supp. 2d at 480.[98]

Here, Plaintiff does not claim that Southwest terminated her for union organizing, which is the underlying activity that the RLA seeks to protect. If anything, Plaintiff contends that she was terminated for doing the exact opposite of organizing—championing the opposition to Local 556 and its elected leadership as well as choosing to opt-out of union membership. Thus, Plaintiff did not engage in any protected activity under the plain language of the statute.

Likewise, there is no evidence – and indeed, Plaintiff does not even allege – that Southwest harbored anti-union animus towards her. More generally, there is no record evidence indicating that Southwest harbored animus against Plaintiff based on her decision to opt out or otherwise oppose the Union. Plaintiff even admitted in sworn testimony that she is not aware of any such evidence, and, through discovery, all members of Southwest management testified that they harbored no such animus. *See supra* III.A; App. 130-132 (Jones 84:6-86:1), 168-169 (Gutierrez 63:13-64:1), 106-107 (Schneider 130:3-131:14), 162-163 (Emlet 127:10-128:20), 41 (Sims 233:5-22). This evidence is uncontroverted and fatal. *See Fields v. Keith*, 2001 U.S. App. LEXIS 30634, *9 (5th Cir. 2001) (subjective belief of anti-union animus insufficient to support RLA claim). Accordingly, Southwest is, once again, entitled to summary judgment on Plaintiff's RLA Retaliation claim.

### C.   Plaintiff's Title VII Claims Fail as a Matter of Law

Plaintiff has failed to create a triable issue of fact on either of her asserted Title VII

---

[98] Importantly, unlike statutes like the National Labor Relations Act, the RLA does not provide any general retaliation protection for employees who engage in concerted activities. *Johnson v. Express One Int'l Inc.*, 944 F.2d 247, 252 (5th Cir. 1991) (RLA does not protect employees who engage in concerted activities).

religious discrimination theories. "A plaintiff can bring religious discrimination cases under two separate theories – disparate treatment or failure to accommodate." *Rayyan v. Va. DOT*, 719 Fed. Appx. 198, 205 (4th Cir. 2018). As set forth below, Southwest is entitled to summary judgment on both theories.

1.  Plaintiff's Failure-to-Accommodate Claim Fails as a Matter of Law

Plaintiff's religious discrimination claim predicated on Southwest's alleged failure to accommodate fails because: (1) Plaintiff did not exhaust administrative remedies; (2) there is no evidence that Southwest was aware of Plaintiff's alleged need for an accommodation; (3) Plaintiff did not raise anything concerning her religious beliefs until *after* she committed the violations that resulted in her termination; and (4) the accommodation Plaintiff purports to have needed would impose an undue hardship.

a.  Plaintiff Failed to Exhaust Administrative Remedies

Plaintiff's failure-to-accommodate claim fails at the outset for lack of proper exhaustion. Plaintiff not only failed to assert failure-to-accommodate allegations in her charge against Southwest—the available evidence shows that her failure to do so was an intentional choice. Plaintiff must now be bound by that choice, and her claim is foreclosed as a matter of law.

"To bring a suit under Title VII … a complainant must file a charge of discrimination with the EEOC to exhaust his administrative remedies." *Melgar v. T.B. Butler Publ'g Co.*, 931 F.3d 375, 378 (5th Cir. 2019). To assess the plaintiff's exhaustion and thus the permissible scope of the judicial complaint, courts consider the charge and the "investigation which can 'reasonably be expected to grow out of the charge of discrimination.'" *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006). Applying this standard, "[w]here an individual raises claims based on theories of discrimination that were not raised in the EEOC charge, courts consistently find these claims to be unexhausted." *Burton v. Madix Store Fixtures*, 2005 U.S. Dist. LEXIS 37487,

36

*6 (N.D. Tex. Dec. 29, 2005). Indeed, courts in various contexts have repeatedly found that a charge alleging discrimination does not exhaust claims for failure to accommodate. *See, e.g.*, *Hamar v. Ashland, Inc.*, 211 Fed. Appx. 309, 310 (5th Cir. 2006) (EEOC charge alleging disability discrimination did not exhaust administrative remedies with respect to failure to accommodate); *Novitsky v. Am. Consulting Eng'rs, LLC*, 196 F.3d 699, 701-02 (7th Cir. 1999) (charge alleging religious discrimination did not exhaust administrative remedies with respect to failure-to-accommodate claim); *Pantoja v. Brennan*, 257 F. Supp. 3d 636, 642 (D. Del. 2017) ("[T]he crux of plaintiff's claims was that she was … treated differently … because of her religion. … [T]here is no evidence that plaintiff exhausted her administrative remedies with respect to a religious accommodation claim."); *Robles v. Tex. Tech Univ. Health Scis. Ctr.*, 131 F. Supp. 3d 616, 634 (W.D. Tex. 2015) (mere fact that a plaintiff's discrimination charge is "consistent with a failure-to-accommodate claim … [is] not sufficient to exhaust remedies."). Plaintiff's EEOC charge against Southwest – which she prepared with the assistance of legal counsel – alleges religious discrimination but does not allege a failure to accommodate. *See generally Walton-Lentz v. Innophos, Inc.*, 476 Fed. Appx. 566, 570 (5th Cir. 2012) (plaintiff "being represented by counsel in filing her EEOC charges further supports the district court's ruling" that plaintiff failed to exhaust); *Larocca v. Alvin Indep. Sch. Dist.*, 2020 U.S. Dist. LEXIS 233060, *7 (S.D. Tex. Oct. 28, 2020) (*adopted by* 2020 U.S. Dist. LEXIS 232079 (S.D. Tex. Dec. 10, 2020) (conclusion that plaintiff failed to exhaust is "bolstered by the fact that [plaintiff] was represented by counsel before the EEOC."). App. 1022. This failure is sufficient on its own to foreclose Plaintiff's claim.

However, here, the available evidence goes even further to actually confirm that Plaintiff knew how to allege a failure-to-accommodate claim but chose not to do so. Plaintiff's charge

against Local 556 – filed just days after her charge against Southwest – specifically references the Union's alleged failure to accommodate her purported religious practice. App. 1023. This decision to include the claim in one charge and omit from the other underscores the fact that Plaintiff's decision not to allege a failure to accommodate against Southwest reflects an intentional, material strategic decision. Thus, Plaintiff cannot now claim that she should be excused for her decision not to exhaust her failure-to-accommodate claim against Southwest. *See Larocca v. Alvin Indep. Sch. Dist.*, 2020 U.S. Dist. LEXIS 233060, *7-8 (S.D. Tex. Oct. 28, 2020) (*quoting Walton-Lentz v. Innophos, Inc.*, 476 Fed. Appx. 566, 570 (5th Cir. 2012) ("the plaintiff 'being represented by counsel in filing her EEOC charges further supports the district court's ruling' that her failure to mention a hostile work environment claim in the EEOC charge was not a mere technical deficiency and constituted a failure to exhaust").

Thus, Southwest is entitled summary judgment with respect Plaintiff's claim for failure to accommodate.

> b.     <u>There are No Facts Supporting Plaintiff's Failure-to-Accommodate Claim</u>

Even if Plaintiff had exhausted her failure-to-accommodate claim, she has not adduced evidence creating a genuine issue of material fact supporting the essential elements of that claim. To state a *prima facie* case of religious discrimination based on failure to accommodate, a plaintiff must establish that she "had a *bona fide* religious belief that conflicted with an employment requirement, that [s]he informed the employer of h[er] belief, and that [s]he was discharged for failing to comply with the conflicting employment requirement." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000). Plaintiff's claim suffers from multiple *prima facie* defects, each of which are independently sufficient to doom her claim.

First, Plaintiff never informed Southwest management, and management was not

otherwise aware of Plaintiff's purported need for an accommodation. An employer is only obligated to provide a religious accommodation if it is aware that an employee's *bona fide* religious belief conflicts with a requirement of employment. *See Ileiwat v. Envtl. Prods. Int'l*, 2018 U.S. Dist. LEXIS 14362, *10-11 (N.D. Tex. Jan. 18, 2018) (Title VII claim failed because employee did not offer evidence that he requested time off to accommodate religious observance). General references to one's religious beliefs are insufficient to trigger an accommodation obligation. *See Knight v. State Dep't of Pub. Health*, 275 F.3d 156, 167-68 (2d Cir. 2001) ("both plaintiffs hold bona fide religious beliefs, and their employers knew both were born-again Christians, but there is no evidence in the record showing appellants requested any sort of accommodation for their need to evangelize, … Knowledge that [plaintiffs] are born-again Christians is insufficient to put their employers on notice of their need to evangelize."); *Nobach v. Woodland Vill. Nursing Ctr.*, 799 F.3d 374, 379 (5th Cir. 2015) (failure to accommodate claim fails because plaintiff "fail[ed] to advise [the employer] of her religious belief and the conflict with her job duties"); *Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 319 (3d Cir. 2008) ("That [plaintiff] alleges that she told [the employer] that she was a Christian and that [the employer] knew she was a Christian does not sufficiently satisfy [] duty to provide 'fair warning' … that she possessed a religious belief that specifically prevented her from participating in the libations ceremony."); *Lorenz v. Wal-Mart Stores, Inc.*, 2006 U.S. Dist. LEXIS 36145, *31-33 (W.D. Tex. May 24, 2006) (accommodation claim where employee discussed belief in god but did not "expressly inform [] supervisors of his religious beliefs and explain[] … his [a]ttire related to the beliefs."); *Gonzalez v. Hogg Ins. Group, Inc.*, 2012 U.S. Dist. LEXIS 2101, *25 (E.D. Va. Jan. 6, 2012) ("even if defendant [] was on notice that the plaintiff 'ha[d] strong religious beliefs,' … defendant [] was not on notice that those beliefs

would compel the religious statements the plaintiff made at the workplace. The plaintiff thus has failed to satisfy the notice element of a *prima facie* case of religious discrimination under the failure to accommodate theory."). Here, Plaintiff did not request any religious accommodation. *See* App. 196-200 (Carter 63:24-65:3, 75:24-76:9), 234 (270:6-11), 57-58 (Schneider 24:21-25:4), 82 (Schneider 96:3-17), 115 (Jones 29:6-11). At best, Plaintiff mentioned that her opposition to abortion was related to her religious beliefs at the fact-finding and Step 2 meeting. *See* App. 199 (Carter 75:1-5). However, she never made her purported need for an accommodation clear, and much of her behavior—such as sending the photo of the anatomically correct vagina headdresses—had nothing to do with her purported religious beliefs. *See* App. 195-198 (Carter 62:9-65:25), 1041, 1138.

Second, Plaintiff does not contend that her religious beliefs conflicted with a requirement of her employment. Courts have repeatedly held failure-to-accommodate claim does not exist where an employee may engage in their asserted religious practice without violating employer policies. *See, e.g.*, *Passmore v. 21st Century Oncology, LLC*, 2018 U.S. Dist. LEXIS 61085, *9 (M.D. Fla. Apr. 10, 2018) (religious accommodation claim failed because plaintiff "contend[s] that no [] conflict existed" between religion and employer policy and "an employer cannot provide a reasonable accommodation if there is no conflict to eliminate."); *Schwartzberg v. Mellon Bank, N.A.*, 2008 U.S. Dist. LEXIS 1180, *24 (W.D. Pa. Jan. 8, 2008) (granting summary judgment to employer because plaintiff did not identify a conflict between employment requirement ("conduct that denigrates or shows hostility on the basis of sexual orientation is prohibited") and his belief that homosexuality was immoral); *Perkins v. City of Greenwood*, 2016 WL 37119, *19-20 (N.D. Miss. Mar. 22, 2016) (granting summary judgment to employer because, *inter alia*, "Plaintiff … failed to bring forth evidence" of a conflict between his belief

40

and employment requirement). Here, Plaintiff acknowledges that she could act in accordance with her stated religious belief (*i.e.*, share her pro-life views with fellow employees) without violating Southwest policy. App. 216-217 (Carter 118:23-119:20). Indeed, Plaintiff cannot point to any evidence indicating that there is a conflict between her opposition to abortion and her employment. Southwest has never communicated to Plaintiff that she is unable to make such a statement or otherwise disfavored pro-life viewpoints.

Instead, Southwest communicated that Plaintiff could not harass co-workers, repeatedly distribute graphic material to co-workers who do not wish to receive it, and distribute graphic material in a public forum while being readily identifiable as a Southwest employee. *See* App. 1180. Other courts confronted with similar situations have found that no claim arises where an employer refrains from viewpoint restriction and, instead, merely prohibits engaging in denigrating and hostile conduct when expressing a viewpoint. *See, e.g. Schwartzberg*, 2008 U.S. Dist. LEXIS 1180, *25-26 (accommodation claim failed because there was no "conflict between Plaintiff's religious beliefs (homosexuality is immoral) and [] employment requirements ("conduct that denigrates or shows hostility on the basis of sexual orientation is prohibited)"). Thus, Southwest never prevented Plaintiff from fulfilling her alleged religious mandate; it merely enacted general rules of conduct prohibiting abuse of fellow employees. Absent a conflict between Plaintiff's alleged religious mandate and Southwest policy, no accommodation was required.

Third, no religious accommodation would have excused Plaintiff for her serious reported misconduct. "There is nothing in Title VII that requires employers to give lesser punishments to employees who claim, *after they violate company rules* … , that their religion caused them to transgress the rules." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1020 (4th Cir. 1996)

(emphasis added); *see also Nobach*, 799 F.3d at 378 (reversing jury verdict and remanding for entry of judgment for employer where plaintiff failed to notify of need for religious accommodation until after violating employer rules). Plaintiff's failure to notify Southwest of her alleged religious mandate and need for accommodation *prior* to violating policy alone requires dismissal. *See, e.g.*, *Hussein v. Waldorf Astoria*, 134 F. Supp. 2d 591, 597 (S.D.N.Y. 2001) (accommodation claim failed because employee "did not mention the purported conflict between his religion and the hotel's policy until after management questioned him about his beard"); *see also Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir. 2020) (holding that "after-the-fact, retroactive" policy exceptions and accommodations are not required under analogous disability accommodation requirements). Put simply, Plaintiff cannot violate Southwest's reasonable workplace rules without engaging regarding her purported religious beliefs and then demand the avoidance of punishment as an accommodation. Accordingly, Plaintiff's failure-to-accommodate claim fails.

> c.   Accommodation of Carter's Conduct Would Have Imposed An Undue Hardship

Finally, the accommodations Plaintiff contends she should have been provided would have imposed an undue hardship on Southwest. If a plaintiff can show that she was owed a reasonable accommodation, "the burden shifts to the defendant to demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship." *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013). "Undue hardship exists when an employer is required to bear more than a *de minimis* cost" or where an accommodation would impose more than a *de minimis* burden on an employee's co-workers. *Id.* at 839; *see also El v. GM Co.*, 2021 U.S. Dist. LEXIS 35106, *7 (N.D. Tex. Feb. 25, 2021); *see also Weber*, 199 F.3d at 273; *Balderas v. Valdez*, 2018 U.S. Dist.

LEXIS 124195, *12-13 (N.D. Tex. July 25, 2018).[99] Here, Plaintiff's failure-to-accommodate claim fails for the added reasons that the accommodation she demands imposes an undue hardship.

Courts have repeatedly held that Title VII does not "require an employer to accommodate an employee's desire to impose his religious beliefs upon his co-workers." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004); *see also Chalmers*, 101 F.3d at 1021. Based on this principle, employers may to prohibit an employee's religiously-motivated display of graphic abortion images. *See Wilson v. U.S. West Commc'ns*, 58 F.3d 1337, 1342 (8th Cir. 1995) (employer did not violate Title VII by restricting employee from wearing a two inch button that "showed a color photograph of an eighteen to twenty-week old fetus" and contained the phrases 'Stop Abortion,' and 'They're Forgetting Someone.'"). Similarly, employers can prohibit a religious employee from mailing letters to co-workers accusing them of immoral conduct or engaging in other proselytization particularly when doing so results in co-worker complaints. *See Chalmers*, 101 F.3d at 1021; *Averett v. Honda of Am. Mfg., Inc.*, 2010 U.S. Dist. LEXIS 11307, *26-30 (S.D. Ohio Feb. 9, 2010) (employee not entitled to accommodation for practice of "express[ing] [] belief that her coworkers were sinful and evil persons whom God would one day punish."); *Mitchell v. Univ. Med. Ctr., Inc.*, 2010 U.S. Dist. LEXIS 80194, *22-23 (W.D. Ky. Aug. 9, 2010) ("[Plaintiff] wants to be able to have religious conversations with co-workers, including conversations about the dates God sent her," the "date for the end of the world," and the Antichrist. Such conversations … were offensive and troubling to other employees [and] … violated the Hospital's harassment policies. Any accommodation of [plaintiff's] behavior would

---

[99] An employer is not required to have attempted to accommodate an employee to defeat a failure-to-accommodate claim. If accommodating the employee would impose an undue hardship, no effort to do so is required. *Weber*, 199 F.3d at 275.

necessarily infringe on the rights of other employees. Therefore, there is no way to accommodate Mitchell's religious beliefs without imposing an undue burden on the Hospital.").

Here, Plaintiff still demands exactly the sort of accommodation that this authority conclusively establishes Title VII never requires. According to Plaintiff, the accommodation that should have been provided was authorization to send any arguably abortion-related content to co-workers—even if they did not wish to receive it—containing anything of her choosing no matter how graphic. She further asserted that she should be permitted to publicly post similar inflammatory content while being identified as a Southwest Flight Attendant. In fact, Plaintiff testified:

> Q: So your testimony is that you believe Southwest should allow you to say whatever you want however you want if it is in support of your Christian beliefs?
> …
> A: In this context, yes.

App. 203 (Carter 81:8-17).

Plaintiff's testimony makes one thing very clear—she remains unapologetic for embarking on a lengthy campaign expressly intended to insult, distress, and hurt Stone. She openly states that does not consider the content of her messages to Stone and Facebook posts to have been inappropriate and makes no apology for them. App. 191-194 (Carter 52:4-55:6). Thus, the only way Plaintiff's claim can survive summary judgment if Title VII expressly protects an alleged religious adherent's "right" to cause precisely that sort of harm. However, as the authority listed above makes clear, Title VII does not—and never has—allowed anything of the sort. Accordingly, Plaintiff's failure-to-accommodate claim fails because any required accommodation would have imposed an undue hardship.

2.     <u>Plaintiff's Religious Discrimination Claim Fails as a Matter of Law</u>

Like her failure-to-accommodate claim, Plaintiff's religious discrimination claim also

fails as a matter of law. To state a *prima facie* case of religious discrimination, Plaintiff must show that: (a) she had a bona fide religious belief or was a member of an identifiable religion; (b) she was qualified for the position; (c) her beliefs or religion resulted in an adverse employment action; and (d) she was treated differently from members outside that class. *Chumney v. Glasscock County Indep. Sch. Dist.*, 2019 U.S. Dist. LEXIS 233633, *15 (N.D. Tex. Mar. 6, 2019). Plaintiff comes up short at this preliminary step because there is no record evidence that Southwest terminated Plaintiff based on her religion, or that Southwest treated her less favorably than similarly situated non-Christian employees.

Here, each and every Southwest manager testified that they, like Plaintiff, are pro-life and harbor no animus against Christians. App. 130-132 (Jones 84:6-86:1), 168-169 (Gutierrez 63:13-64:1), 106-107 (Schneider 130:3-131:14), 162-163 (Emlet 127:10-128:20), 41 (Sims 233:5-22). Meanwhile, Plaintiff testified that she has no factual basis to believe they discriminated against her based on her religious belief. App. 204-208 (Carter 84:12-85:20, 87:3-88:12), 218-221 (Carter 125:24-126:19, 127:1-128:12). This evidentiary failure dooms her religious discrimination claim. *See Baker v. Am. Airlines, Inc.*, 2004 U.S. Dist. LEXIS 18810, *18-19 (N.D. Tex. Sept. 15, 2004) (granting summary judgment on discrimination claim where plaintiff admitted that she had no evidence that the stated reason for termination is pretext).

Likewise, Plaintiff has failed to adduce any evidence creating a genuine issue of material fact that Southwest treated non-Christian employees more favorably than Plaintiff. S*ee Pollak v. Lew*, 2013 U.S. Dist. LEXIS 39750, *26 (S.D. Tex. Mar. 22, 2013) (discrimination claim failed because plaintiff did not identify "similarly situated, non-Jewish employees were treated more favorably."). Plaintiff identified six Southwest employees who she claims received more favorable treatment and provides an explanation for the assertion. *See* Interrogatory Response

Nos. 3-4.

However, Plaintiff's own recitation of what renders these individuals appropriate comparators proves they are no such thing. *See* App. 1354-1357. First, Plaintiff has offered no evidence of the religious beliefs of the putative comparators identified in her interrogatory response. As a threshold matter, evidence of comparators will only be relevant where competent summary judgment evidence establishes that the comparators are not members of the same protected class as the plaintiff. *See Gibson v. Wayfair, Inc.*, 2018 U.S. Dist. LEXIS 107425, *10 (S.D. Tex. June 27, 2018) (granting summary judgment because plaintiff did not present evidence of non-Christian employees with similar misconduct that received more favorable treatment); *Isaac v. EAN Holdings, LLC*, 2016 U.S. Dist. LEXIS 104580, *16 (E.D. Tex. Aug. 9, 2016) (granting summary judgment because "Plaintiff has not submitted any evidence showing that he was treated differently than other non-Christian employees under 'nearly identical' circumstances."); *Shakir v. Jim Murray Agency*, 2015 U.S. Dist. LEXIS 130088, *11-12 (S.D. Tex. Aug. 11, 2015) (granting summary judgment to employer because plaintiff did not identify similarly situated non-Christian employees who received more favorable treatment). Here, Plaintiff has not provided competent summary judgment evidence that putative comparators were non-Christians or even that they held differing views from her on the issue of abortion. Thus, Plaintiff cannot rely on these comparators to overcome her admitted lack of evidence of discriminatory animus.

Additionally, even if Plaintiff could show that the putative comparators were outside of her protected class, she has failed in her burden to show that they were similarly situated. To be an appropriate comparator for purposes of defeating summary judgment, the plaintiff must show that the individuals in question are "nearly identical." *Johnson v. MBNA Hallmark Info. Servs.*,

2003 U.S. Dist. LEXIS 11003, *16 (N.D. Cal. June 26, 2003); *see also West v. City of Houston*, 960 F.3d 736, 740 (5th Cir. 2020) (noting that similarly situated in defined "narrowly"). At the very least, this requires that comparators worked in the same location, had the same supervisors, had their employment issues resolved by the same decision-maker, violated the same policies, and had comparable work histories. *See Burnett v. Thompson*, 2002 U.S. App. LEXIS 29319, *7 (5th Cir. Feb. 6, 2002) (employees were not similarly situated because "different decision-makers disciplined" plaintiff and the comparator); *McCall v. Southwest Airlines Co.*, 2010 U.S. Dist. LEXIS 44782, *5 (N.D. Tex. May 7, 2010) ("Nor does the court accept plaintiffs argument that similarly situated employees include 'all employees who engaged in alleged violations of similar severity … and all employees who received similar discipline.'"); *Warren v. Fannie Mae*, 733 Fed. Appx. 753, 761 (5th Cir. 2018) ("Employees are not similarly situated if they: (1) had different supervisors; (2) worked for different divisions within the company; (3) held different responsibilities; (4) suffered adverse actions for dissimilar conduct; or (5) suffered adverse actions too remote in time from each other."). Again, here, Plaintiff does not and cannot articulate any of this essential context – *e.g.*, she does not state where the individuals were based, who made the decisions regarding their employment, their work history, what Southwest policies the employee's violated, etc. *See* App. 1354-1357. Without this essential context Plaintiff cannot state a *prima facie* case of discrimination.[100]

Even if Plaintiff could state a *prima facie* case of discrimination, Plaintiff's numerous violations of Southwest policy constitute a good faith and lawful basis for termination that she cannot demonstrate was offered as mere pretext. *See Rodriquez v. Wal-Mart Stores, Inc.*, 540 Fed. Appx. 322, 325-26 (5th Cir. 2013) (violation of employer's social media policy is a

---

[100] Two of the six individuals Plaintiff identified have been terminated, rendering them improper comparators. *See* App. 159-161 (Emlet 89:13-90:2, 91:9-20), 42-43 (Sims 213:24-214:7).

legitimate basis for termination); *Barnard v. L-3 Communs. Integrated Sys. L.P.*, 2017 U.S. Dist. LEXIS 139235, *17 (N.D. Tex. Aug. 30, 2017) ("Violation of company policy is a legitimate, nondiscriminatory reason for termination."). "[A] plaintiff must produce substantial evidence of pretext in order to survive summary judgment." *Chapa v. Wells Fargo, N.A.*, 2014 U.S. Dist. LEXIS 21011, *27 (W.D. Tex. Feb. 20, 2014). Here, the undisputed evidence establishes that Southwest's stated reason for termination— Plaintiff's abusive messages to Stone and her public postings linked to her work at Southwest—were the actual reasons for her termination. Nothing in the record indicates that Plaintiff was terminated for any other reason or that the alleged comparators engaged in similar conduct resulting in a different outcome. Further, the record makes clear that it was the *manner* of communication—insults, threats, and circulating intentionally distressing graphic images to inflict harm—rather than Plaintiff's purportedly pro-life message[101] that resulted in her termination. In fact, as repeatedly noted, everyone involved in Plaintiff's termination *agreed* with Plaintiff's pro-life stance. Meanwhile, Plaintiff's unsupported belief that her religious beliefs motivated her termination is not competent summary judgment evidence. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) ("an employee's subjective belief that he suffered an adverse employment action as a result of discrimination … is not enough to survive a summary judgment motion").

IV.   **CONCLUSION**

Thus, the Court should grant summary judgment to Southwest on all remaining claims.

---

[101] Importantly, the vast majority of Plaintiff's abusive messages did not concern abortion. Likewise, her decision to send the photo of an anatomically correct vagina headdresses to Stone had nothing to do with abortion.

Dated:  September 2, 2021            Respectfully submitted,

                                  */s/ Paulo McKeeby*

                                  Paulo McKeeby
                                  State Bar No. 00784571
                                  Brian K. Morris
                                  State Bar No. 24108707
                                  **REED SMITH LLP**
                                  2850 N. Harwood Street, 1500
                                  Dallas, Texas 75201
                                  Phone: 469-680-4200
                                  Facsimile: 469-680-4299
                                  pmckeeby@reedsmith.com
                                  bmorris@reedsmith.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was filed via the Court's ECF filing system which caused a copy of same to be served on all parties on this 2nd day of September, 2021.

                                  */s/ Paulo McKeeby*
                                   Paulo McKeeby