Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER              )
                             ) CIVIL ACTION NO.
VS.                          ) 3:17-CV-02278-X
                             )
SOUTHWEST AIRLINES CO., AND  )
TRANSPORT WORKERS UNION OF   )
AMERICA, LOCAL 556           )


------------------------------------

CONFIDENTIAL 30(b)(6)
VIDEOTAPED DEPOSITION OF
MICHAEL SIMS
NOVEMBER 2, 2020

------------------------------------




        ANSWERS AND DEPOSITION OF MICHAEL SIMS,
produced as a witness at the instance of the
Plaintiff, taken in the above-styled and -numbered
cause on NOVEMBER 2, 2020, at 9:06 a.m., before
CHARIS M. HENDRICK, a Certified Shorthand Reporter
in and for the State of Texas, witness located in
Midlothian, Texas, County of Ellis, pursuant to the
Federal Rules of Civil Procedure, the current
emergency order regarding the COVID-19 State of
Disaster, and the provisions stated on the record
or attached hereto.

App. 26

Page 16

1      Q.   Okay.  And were -- at the meeting, were

2  they mainly speaking to you or were you speaking to

3  them?

4      A.   It was a dialogue.  So having some

5  questions and they answered them.

6      Q.   Okay.  What were some of your questions?

7      A.   Specifically, did Southwest Airlines

8  receive customer complaints or inquiries regarding

9  the matter of turning the cabin lights in our

10  aircraft pink.  And then did Southwest Airlines

11  endorse or support the women's march that took

12  place on January 20th.

13      Q.   And did they tell you whether or not

14  Southwest did receive complaints about the cabin

15  lights?

16      A.   There were a few complaints and media

17  inquiries.

18      Q.   Okay.  And what were the media inquiries

19  that took place about the cabin lights?

20      A.   It's my understanding it was media

21  entities reaching out to Southwest Airlines for

22  comment -- for official comment.

23      Q.   Did Southwest ever provide an official

24  comment to those --

25      A.   Yes.

App. 27

Page 17

1    Q.   Okay.   And what was Southwest's official
2  comment?
3    A.   The gist of it was we were not supporting
4  or encouraging or underwriting, if you will, the
5  event.   We were very neutral.
6    Q.   Okay.   And when you say the event, do you
7  mean turning the cabin lights pink or turning -- or
8  the women's march?
9    A.   Both.
10   Q.   Okay.  All right.  Did you have any other
11 questions for them?
12   A.   No.
13   Q.   Okay.  Did they have any questions for
14 you?
15   A.   No.
16   Q.   Okay.  You also mentioned that in
17 preparation for today's deposition, you spoke with
18 Tammy Shaffer; is that correct?
19   A.   That is correct.
20   Q.   And what did you speak to Ms. Shaffer
21 about?
22   A.   Ms. Shaffer, that was just a very brief
23 conversation regarding to ensure we had records and
24 such from labor relations.
25   Q.   Okay.  And were those records that you

Page 54

1    investigation we're talking about.  And I think you

2    have already discussed there is a first level and

3    there is a second level.  So if we clarify that,

4    that may fix this issue for you.

5              MR. GILLIAM:  Okay.

6         Q.  (By Mr. Gilliam)  I guess -- and I don't

7    know if it's prior to Step 2 proceedings, would

8    there have been a different labor relations manager

9    involved than one who was involved in Step 2

10   proceedings?

11        A.  Yes.  There could have been.  And -- and

12   was just how the case was assigned.  A manager

13   doesn't necessarily stay with the case for its

14   entire life.

15        Q.  Okay.  And was Melissa Burdine involved in

16   the Step 2 proceedings?

17        A.  That is correct.

18        Q.  Okay.  I don't know if it's correct to

19   call the step before that Step 1; is it -- is that

20   what it's referred to?

21        A.  Yes, in general terms.  I usually consider

22   Step 1 as the actual filing of the grievance.

23        Q.  Okay.  Do -- do you know if Maureen Emlet

24   was involved in that fact-finding stage of

25   Ms. Carter's case?

App. 29

Page 72

1    workplace bullying and hazing policy.  Third is the

2    Southwest Airlines employee social media policy.

3    And then the fourth is the Southwest Airlines

4    policy concerning harassment, sexual harassment,

5    discrimination and retaliation.

6        Q.  Okay.  And so the -- the workplace

7    bullying and hazing policy and then the Southwest

8    Airlines Company policy concerning harassment and

9    sexual harassment, those are two separate policies;

10   is that correct?

11       A.  Yes.

12       Q.  Okay.  And do you -- were -- were these

13   the policies that were in effect when Ms. Carter

14   was terminated?

15       A.  Let me look.  Yes, that is correct.

16       Q.  Okay.  And do you -- was she terminated

17   for -- which ones were -- was she terminated for

18   violating?

19       A.  Harassment and bullying policy, sexual

20   harassment and social media.

21       Q.  Okay.  If we could also mark -- let's see

22   -- Document 7 as Exhibit 2, please.

23            (Exhibit 2 marked.)

24       Q.  (By Mr. Gilliam)  And feel free to -- to

25   look at document --

App. 30

Page 132

1        A.   Okay.

2        Q.   Now, is -- do you know if this was sent to

3   Audrey Stone by Facebook Messenger?

4        A.   I believe it was.

5        Q.   Okay.  All right.  And then going to the

6   next one, 4232 Bates labeled.

7        A.   Okay.

8        Q.   And was this one posted on Charlene

9   Carter's Facebook page?

10       A.   I don't believe it was a post on her

11  specific page, but she's attributed to it.

12       Q.   Okay.  Do you know where -- where it was

13  posted?

14       A.   No.

15       Q.   Okay.  But this wasn't sent as a private

16  message to Ms. Stone, correct?

17       A.   To my knowledge, it was not.

18       Q.   Okay.  Was -- is -- is it your

19  understanding that this particular post was

20  publicly available for other people to see?

21       A.   It is my understanding, yes.

22       Q.   Okay.  Besides Audrey Stone, were there

23  any other complaints to Southwest about the posts

24  that were publicly viewable that Ms. Carter had

25  made?

1  practice for someone who is investigating a

2  complaint against a flight attendant in -- well,

3  let me find another way to ask this.

4           After a fact-finding meeting is held,

5  what -- what is the typical next step as part of an

6  investigation into a complaint against an employee?

7       A.  The -- the manager conducting the meeting

8  will gather his thoughts and his notes and use

9  labor relations as a resource to discuss; and then,

10  ultimately, will make a decision.

11      Q.  Okay.  Does the -- does the -- the lead

12  investigator prepare a report on his investigation?

13      A.  Generally, his notes from that

14  investigation are considered a report, or the --

15  the totality of all the information gathered is the

16  report.  So, in short, there is no formal report

17  that he writes.  He may, but he's not required to.

18      Q.  Okay.  Does the investigator share, I

19  guess, his -- his summation of the investigation

20  with other employees in management?

21      A.  Generally, with the labor relations team

22  and/or his leaders.

23      Q.  Okay.  I would like to mark Document 6 as,

24  I think, Exhibit 7.

25           (Exhibit 7 marked.)

Page 186

1  concluded the fact-finding meeting on Ms. Carter's

2  grievance?

3       A.  Not that I remember, unless I had a quick

4  conversation with Ed Schneider.

5       Q.  Okay.

6       A.  Just to -- to get his point of view.

7       Q.  Okay.  So in reaching -- do you recall

8  when you reached the final decision that her

9  termination was just?

10      A.  I believed it was just after we met, so it

11 would have been within that day of our meeting.

12      Q.  Okay.  And at -- at some point, did you

13 decide to provide Ms. Carter with a last-chance

14 agreement?

15      A.  That is correct.

16      Q.  And did someone tell you that you -- that

17 you should offer her a last-chance agreement?

18      A.  No.

19      Q.  And did anyone recommend that you should

20 provide her with a last-chance agreement?

21      A.  No.

22      Q.  If you believed that her termination was

23 just, why did you offer her a last-chance

24 agreement?

25      A.  I offered her a last-chance agreement for

App. 33

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 187

1   practical reasons.  This dispute had gone on and it
2   was going to continue to get uglier, and at a great
3   cost to everyone.  So I decided that I had the
4   authority to offer a last-chance agreement to
5   reinstate her employment, as she told me she wanted
6   to come back as a flight attendant.
7       Q.  You did not have to get permission from
8   anyone to offer her a last-chance agreement?
9       A.  No.
10      Q.  And did you say that you felt that this --
11  that the dispute could get uglier?
12      A.  Yes.  I just thought, at that point, I
13  could put this all to rest.  Because, ultimately,
14  she indicated to me she just wanted her job back.
15      Q.  And what -- what do you mean by the
16  dispute could get uglier?
17      A.  Well, there were disputes, and this is all
18  encompassing the times at that point.  And so I --
19  I -- I sensed that Ms. Carter was in conflict with
20  TWU 556 and she was conflict with Audrey Stone.
21      Q.  And when you say -- I -- I'm probably not
22  going to quote you exactly in -- in your precise
23  words, but when you -- you referred to the -- the
24  times -- that the sign of the times or the nature
25  of the times, what do you mean by that?

Page 188

1    A.   That time period was tumultuous in terms

2   of there was a effort to recall the Local 556

3   officers.   In addition, there was a lot of

4   political activity surrounding the inauguration of

5   President Trump on January 20th, 2017.

6           And I just came to the conclusion that

7   we all need to -- or everyone needs to step back

8   and review Ms. Carter's case as a long-term

9   employee who had a good track record; who told me

10  that she regretted, to a certain extent, the

11  methodology that she chose; and that she wanted her

12  job back.   And so I used my authority to offer her

13  a last-chance agreement.

14   Q.   And quick question:   Had Ms. Carter ever

15  been disciplined in her career with Southwest?

16   A.   Not to my knowledge.

17   Q.   And -- okay.   And when you say that the --

18  the issue had gone on at great cost to everyone,

19  what -- what was the cost?

20   A.   The cost -- well, we had not gone into

21  monetary costs yet, but that's where it was going.

22  But the cost, I thought, was undermining our

23  culture at Southwest.   And it was impeding our

24  ability to do business.

25   Q.   And -- and what -- I guess, what caused

App. 35

Page 189

1   harm to the culture at Southwest?

2       A.  It didn't necessarily cause harm.  I was

3   concerned that it would.

4       Q.  That -- that what specifically would cause

5   harm to the culture at Southwest?

6       A.  Employees that were fighting via social

7   media.  And that was permeating, in my view, or

8   potentially could permeate into the workplace --

9   further into the workplace.

10      Q.  Okay.  And what -- how would -- when you

11  say that it had the potential to permeate further

12  into the workplace, how would it permeate into the

13  workplace?

14      A.  That, I don't know fully other than I did

15  not want disputes happening, potentially, in front

16  of our customers or with other employees.

17      Q.  Okay.  I would like to -- to shift gears a

18  little, if -- if I could, and go back to a subject

19  we addressed a little bit earlier on.  Now, is it

20  -- it correct that on certain flights to the

21  women's march, that the cabin lights on -- on -- on

22  some number of flights were turned pink?

23      A.  That is correct.

24      Q.  Okay.  And who -- who made the decision to

25  turn the cabin lights pink on those flights?

1     A.   Those decisions were made by individual

2   flight attendants that did that.

3     Q.   Okay.  Were those flight attendants

4   disciplined for their decision to turn the cabin

5   lights pink?

6     A.   They were not.

7     Q.   Were they given a coach and counsel?

8     A.   That, I do not know if we individually had

9   to speak to any employee about it because it

10   stopped pretty quickly.

11    Q.   Do you know if anyone in Southwest

12   management talked to those employees --

13    A.   I do --

14    Q.   -- about --

15    A.   I do not know.

16    Q.   All right.  Did you get complaints from

17   any customers about turning the cabin lights pink?

18    A.   We did receive some complaints.

19    Q.   And -- okay.  Did you also receive

20   favorable press about turning the cabin lights

21   pink?

22    A.   That is correct; we did.

23    Q.   Okay.  Let's see.  I would like to --

24   let's see, which exhibit are we on here now?

25            MR. CORRELL:  I think we are at

Page 194

1    knowledge of this prior to her telling me.

2        Q.  Did -- did -- did you tell her you would

3    look into it or did you -- how did -- how did you

4    respond to her on receiving notification?

5        A.  I don't remember what I said other than I

6    -- I was looking for some sort of confirmation

7    because it was pretty -- at that point, it was

8    unfolding.  So I think that was pretty much the

9    gist of the conversation, of her asking me if I

10   knew about it; which I did not.

11       Q.  So did you investigate the -- the issue

12   after you talked to her?

13       A.  Not at that point.

14       Q.  So at any point, did you conduct some sort

15   of follow-up inquiry on what had happened?

16       A.  No.  Because we were able to get -- get it

17   stopped.

18       Q.  Okay.  And so what -- when you say we were

19   able to get it stopped, who -- who stopped it?

20       A.  Southwest Airlines.  I sent out a

21   memorandum asking our flight attendants to be

22   mindful and to be civil as aircraft were traveling

23   in and out of Washington, D.C. for the inauguration

24   activities.

25       Q.  Before you sent out your -- your memo, did

App. 38

Bradford Court Reporting, LLC    972.931.2799    www.bradfordreporting.com

1    you -- did you speak with anyone?

2        A.   Yeah.   I spoke with corporate

3    communications about the actual memo.

4        Q.   But did you -- did you inquire into what

5    actually had -- had happened on these flights

6    before corresponding to corporate communications?

7        A.   At that point, I was aware because I was

8    able to look at social media and see for myself.

9    Because I was, at that point, not aware that one

10   could even program the lights in an aircraft to a

11   different color than what our standard colors are.

12   So then when I saw on social media pictures, I had

13   confirmation that it -- it was taking place.

14       Q.   Okay.   And once you confirmed that it was

15   taking place, then you communicated with corporate

16   communications?

17       A.   Yes.

18       Q.   Okay.   And you -- you told them that you

19   had made the decision to issue some sort of notice

20   to Southwest employees?

21       A.   To flight attendants, yes.

22       Q.   To flight attendants, yes.   Thanks.   And

23   was that all over the course of a day?

24       A.   Yes.

25       Q.   Okay.   And if I could direct your

1     A.   Okay.

2     Q.   Do you recognize this email?

3     A.   I do.

4     Q.   And what is it?

5     A.   This appears to be an email, again,

6  summarizing the aircraft cabins being turned pink.

7     Q.   Okay.  And who -- do you know who Lan --

8  Lan Nguyen is?

9     A.   I do not know Lan.

10    Q.   Okay.  Do you know anybody on the email

11 who it was addressed to?

12    A.   No.

13    Q.   Okay.  And you don't -- do you know what

14 the PCS team is?

15    A.   Yes.  That is -- PCS is a -- give me a

16 minute.  Social media of -- they are a entity out

17 of our customer relations department.  And PCS

18 stands for proactive customer service.

19    Q.   All right.  And at the -- I guess, the --

20 at the end of the summary events section, it says,

21 inflight reached out to us and will be sending out

22 a memo to crew members advising that this is not

23 the appropriate venue to express these views.

24          Was -- was that your conclusion; that

25 turning the lights pink on the flights was an

App. 40

Page 201

1  inappropriate venue to express political views?

2      A.   Yes.   I did not know it was a political

3  view at that point.

4      Q.   Okay.   But once you realized that it was

5  an expression of a political view, you -- you

6  determined that it was an inappropriate venue to

7  express it?

8      A.   That is correct.

9      Q.   Okay.   And -- and why is that?

10     A.   Southwest Airlines does not have a

11  position on -- or did not have a position or

12  endorsement or support of the women's march or any

13  other political activities taking place in

14  Washington that day.

15     Q.   And was it an inappropriate venue because

16  it was on board a flight?

17     A.   Correct.

18     Q.   Okay.   And was -- did -- did this happen

19  on more than one flight?

20     A.   It did.

21     Q.   On how many different flights did -- did

22  it happen?

23     A.   I do not know the exact number, but I

24  believe it was four or five --

25     Q.   Okay.

1    complaint with Southwest over a video he posted?

2        A.  She may have.

3        Q.  Okay.  Do you know any other details about

4    that incident?

5        A.  No.

6        Q.  Okay.  And Paragraph B, did you read that?

7        A.  Okay.

8        Q.  And do you know who flight attendant Josh

9    Rosenberg is?

10       A.  I do know who Josh Rosenberg is.

11       Q.  And do you know if he posted a profile

12   picture on Instagram with an individual holding a

13   gun and a caption that said, Gary, sign now?

14       A.  That, I -- I do not know.

15       Q.  Okay.  Do you know if Josh Rosenberg was

16   -- was fired from Southwest for social media

17   violation?

18       A.  To my knowledge, he was not.

19       Q.  Okay.  Okay.  Do you know if he was

20   disciplined for a social media violation?

21       A.  To my knowledge -- I do not know.

22       Q.  Okay.  And if you could read Paragraph C.

23       A.  Okay.

24       Q.  And you've mentioned that you -- you know

25   flight attendant Brian Talbert, correct?

Page 214

1    A.  I do know Brian.

2    Q.  Do you know if he made the Facebook post

3  that is described there?

4    A.  He did.

5    Q.  Okay.  And was that one of the reasons for

6  his first termination?

7    A.  Correct.

8    Q.  Okay.  All right.  And if you could read

9  Paragraph D.

10    A.  Okay.

11    Q.  And you -- I think you mentioned earlier

12  Casey Rittner as being one of the flight attendants

13  who was terminated for a social media policy

14  violation?

15    A.  Correct.

16    Q.  And this paragraph describes a Facebook

17  post.  Was this Facebook post what Casey Rittner

18  was terminated for?

19    A.  I believe that's correct.

20    Q.  Okay.  But he was later reinstated,

21  correct?

22    A.  That's correct.

23    Q.  Okay.  And then Paragraph E, if you could

24  read that.

25    A.  Okay.

App. 43

Page 230

BY MR. CORRELL:

Q. Mr. Sims, I am just going to ask you a few questions to clarify some of your testimony from earlier today. First of all, do you recall earlier you were asked questions about a notice that was distributed through cabin services regarding the pink lighting incident?

A. Yes.

Q. Was that message distributed to flight attendants through any other channels?

A. It was distributed to flight attendants through how they receive information, and that is what we call a read-before-fly, which is a mandatory reading and compliance document that we send to them through their elect- -- electronic flight bag.

Q. And you mentioned that the flight attendants involved in the aircraft that actually turned the lights pink were not disciplined. Do you have an understanding as to why Southwest did not discipline those individuals?

A. Well, they didn't violate any rules, per se. And we did realize that they were, in the most part, doing this out of naivety. They didn't understand the ramifications or the political

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 233

1    harassment policy have any impact on

2    Mr. Schneider's discretion regarding other policy

3    violations?

4        A.   They do not.

5        Q.   And, Mr. Sims, you understand, in your

6    personal capacity, that this case today is about

7    religious discrimination and alleged discrimination

8    against union objectors; is that correct?

9        A.   I do understand that.

10        Q.   Do you have a personal preference between

11   union objectors and nonobjectors?

12        A.   I do not.

13        Q.   Do you have a position between pro-life

14   and pro-choice on the issue of abortion?

15        A.   I do.

16        Q.   How would you identify your position?

17        A.   I am pro-life.

18        Q.   Do you have any animus towards other

19   people who are pro-life?

20        A.   I do not.

21        Q.   Do you have any animus towards people of

22   any Christian faith?

23        A.   I do not.

24             MR. CORRELL:  I pass the witness.

25             MR. GILLIAM:  I have got no questions.

Page 237

1                    REPORTER'S CERTIFICATION

2            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
3                      DALLAS DIVISION

4   CHARLENE CARTER              )
                                 ) CIVIL ACTION NO.
5   VS.                          ) 3:17-CV-02278-X
                                 )
6   SOUTHWEST AIRLINES CO., AND )
    TRANSPORT WORKERS UNION OF   )
7   AMERICA, LOCAL 556           )

8

9            ----------------------------------
                    CONFIDENTIAL 30(b)(6)
10              DEPOSITION OF MICHAEL SIMS
                      NOVEMBER 2, 2020
11           ----------------------------------

12

13          I, CHARIS M. HENDRICK, Certified Shorthand

14   Reporter in and for the State of Texas, do hereby

15   certify to the following:

16          That the witness, MICHAEL SIMS, was by me

17   duly sworn and that the transcript of the oral

18   deposition is a true record of the testimony given

19   by the witness.

20          I further certify that pursuant to Federal

21   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)

22   as well as Rule 30(e)(2), that review of the

23   transcript and signature of the deponent:

24      __xx__ was requested by the deponent and/or a

25   party before completion of the deposition.

App. 46

Page 238

1        _____ was not requested by the deponent and/or

2     a party before the completion of the deposition.

3            I further certify that I am neither

4     attorney  nor counsel for, nor related to or

5     employed by any of the parties to the action in

6     which this deposition is taken and further that I

7     am not a relative or employee of any attorney of

8     record in this cause, nor am I financially or

9     otherwise interested in the outcome of the action.

10           The amount of time used by each party at

11    the deposition is as follows:

12           Mr. Gilliam - 6:50 hours/minutes

13           Mr. Correll - 5 minutes

14

15           Subscribed and sworn to on this 12th day

16    of November, 2020.

17

18

19    _____
      *Charis M Hendrick*

20    CHARIS M. HENDRICK, CSR # 3469
      Certification Expires: 10-31-21

21    Bradford Court Reporting, LLC
      7015 Mumford Street

22    Dallas, Texas  75252
      Telephone 972-931-2799

23    Facsimile 972-931-1199
      Firm Registration No. 38

24

25

App. 47