UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER,                )
        Plaintiff,              )
                                )
vs.                             )  Case No.
                                )  3:17-cv-02278-X
SOUTHWEST AIRLINES CO., AND     )
TRANSPORT WORKERS UNION OF      )
AMERICA, LOCAL 556,             )
        Defendants.            )


ORAL VIDEOTAPED DEPOSITION

ED SCHNEIDER

November 3, 2020

(Reported Remotely)

+++CONFIDENTIAL+++


        ORAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER,
produced as a witness at the instance of the
Plaintiff and duly sworn, was taken in the
above-styled and numbered cause on November 3, 2020,
from 10:00 a.m. to 2:55 p.m., before Cheryl Duncan,
CSR in and for the State of Texas, reported by
computerized stenotype machine in Parker, Colorado,
pursuant to the Federal Rules of Civil Procedure, the
First Emergency Order regarding the COVID-19 State of
Disaster, and the provisions stated on the record or
attached hereto.

Page 5

1   nods, no gestures, no "uh-huhs" and "huh-uhs."

2                    Similarly, we have to make sure that

3   we don't talk over each other.  So I'll do my best to

4   try not to talk over you, let you finish your, your

5   answer before I ask another question.  Similarly, if

6   you could make sure that I finish my question before,

7   before you answer.  That way, we can keep the record

8   clear.

9                    Have you read the complaint in this

10  case?

11       A.    I am aware of it, yes.

12       Q.    Okay.  Are you familiar with the claims

13  that Ms. Carter's made against TWU Local 556 and

14  Southwest Airlines?

15       A.    Yes.

16       Q.    Okay.  And you, you work at Southwest; is

17  that correct?

18       A.    Yes.

19       Q.    And what is your current position at

20  Southwest Airlines?

21       A.    I'm the inflight base manager for the

22  Denver base.

23       Q.    Okay.  And how long have you been in that

24  position?

25       A.    Three and a half years.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 8

1    Q.    Okay.  Now, in your current position as

2  base manager in Denver, what are your

3  responsibilities?

4    A.    I oversee the operation of the inflight

5  base, which is the flight attendants of Southwest

6  Airlines that are based in Denver.  I make sure that

7  the daily operations are taken care of,

8  investigations, any type of awards or recognition for

9  our flight attendants.  I have a staff of 16 that

10  works for me, including coordinators and supervisors

11  and assistant base managers, and I oversee their

12  duties also.

13    Q.    Okay.  How many flight attendants do you

14  oversee?

15    A.    Currently 1,926.

16    Q.    Okay.  And has that changed since 2017?

17    A.    Yes.

18    Q.    Okay.  About how many did you oversee in

19  2017?

20    A.    Roughly 1,650.

21    Q.    Okay.  All right.  And who, who is your

22  supervisor?

23    A.    My immediate leader is Dave Kissman.

24    Q.    Okay.  Do you, do you report solely to Dave

25  Kissman?

Page 9

1      A.    He's the next in the chain of command, yes.

2      Q.    Okay.  Do you also report to Mike Sims?

3      A.    Not any longer.

4      Q.    Okay.  Did you report to Mike Sims in 2017?

5      A.    He was Dave Kissman's director, boss, yes.

6      Q.    Okay.  And did, did you ever report to

7  their supervisors?

8      A.    I don't understand.

9      Q.    So did, did you report -- well, let's see.

10  Who, who was Dave Kissman's supervisor?

11      A.    Dave Kissman's boss was Mike Sims.  It is

12  now Steve Murtoff.

13      Q.    Okay.  And in 2017, who was Mike Sims'

14  supervisor?

15      A.    He reported to Sonya Lacore, our VP of

16  inflight.

17      Q.    Okay.  Did you ever take issues to Sonya

18  Lacore?

19      A.    No, we followed the chain of command.

20      Q.    Okay.  And were you Charlene Carter's

21  direct supervisor?

22      A.    I was the base manager for the Denver base,

23  and she reported to the Denver base.

24      Q.    Okay.  If she had any issues to take to

25  who -- to her supervisor, who would she take those

App. 51

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 12

1   responsibilities, did you enforce Southwest

2   disciplinary policies?

3       A.   Yes.

4       Q.   Okay.  And is your -- so did you have the

5   authority to, to fire flight attendants?

6       A.   Yes.

7       Q.   Okay.  Do you know if that was set forth in

8   writing anywhere?

9       A.   No, I'm not aware of that.

10      Q.   Okay.  And I'm not sure that I asked, for

11  the assistant base managers, what are their roles and

12  responsibilities?

13      A.   They oversee the supervisors and the

14  coordinators directly that -- with a team of

15  coordinators and supervisors, put up between three of

16  my assistant base managers.  And they will make sure

17  the daily operation is running smoothly, they will

18  watch for any emails that may come in that need to be

19  addressed, and/or disseminated to the supervisors for

20  follow-up and those type of things.

21      Q.   Now, if there was a disciplinary incident

22  involving a flight attendant operating out of the

23  Denver base, would your assistant base managers have

24  authority to investigate those incidents on their

25  own?

Bradford Court Reporting, LLC    972.931.2799    www.bradfordreporting.com

Page 13

1       A.      As a team, yes, they would.

2       Q.      Okay.  Without your involvement?

3       A.      No.

4       Q.      Okay.

5       A.      I have (audio distortion).

6       Q.      I'm sorry, I was speaking over you.  Could

7  you say that again.

8       A.      I have oversight of the investigations in

9  the base.

10      Q.      Okay.  So you would make the initial

11  decision whether or not to conduct an investigation

12  if there was any disciplinary incident?

13      A.      Yes.

14      Q.      Okay.  So if there was some sort of

15  disciplinary incident, before taking any action on

16  it, your, your base manager -- excuse me, assistant

17  base manager would report that to you?

18      A.      Correct.

19      Q.      Okay.  And did your assistant base managers

20  have authority to terminate any flight attendants

21  without your approval?

22      A.      No.

23      Q.      Okay.

24      A.      Not approval, but my awareness, I would

25  have, of what was happening.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 18

1    Q.    Okay.  Do you know if it was less than

2  five?

3    A.    I would say most likely it's probably five

4  or six, possibly.

5    Q.    Okay.  And let's see, that's five or six

6  employees that were terminated?

7    A.    No.

8    Q.    Oh.  Five or six employees that were

9  disciplined?

10    A.    Five or six investigations.

11    Q.    Five or six investigations, okay.

12         Do you recall how many of those five

13  or six resulted in discipline?

14    A.    No.

15    Q.    Okay.  Do you recall if any of those

16  investigations resulted in termination?

17    A.    No.

18    Q.    Okay.  Let's see, if I could, I'd like to

19  have you review Exhibit 2.

20         MR. CORRELL:  And, Mr. Schneider,

21  that's going to be labeled by a document number

22  that's not the exhibit number.

23         And, Counsel, if we can use the

24  document numbers, that will be easier.

25         MR. GILLIAM:  Sure.  Yeah, that will

1  be document 7.

2      A.    Okay.

3      Q.    Have you had the chance to read this?

4      A.    I have read it in the past, yes.  Do you

5  want me to read it now?

6      Q.    Well, I just want you to -- you don't have

7  to read it out loud.  I just want you to, you know,

8  be familiar with it and --

9      A.    Okay.

10      Q.    Okay.  You've reviewed it?

11      A.    Yes.

12      Q.    Okay.  Do you recognize it?

13      A.    Yes, I do.

14      Q.    And what is it?

15      A.    It's the termination letter for Charlene

16  Carter.

17      Q.    Okay.  And does this letter tell you

18  which -- what are the reasons why she was terminated?

19      A.    Yes, it does.

20      Q.    And does it tell you which policies

21  Southwest said she violated?

22      A.    Yes.

23      Q.    Okay.  And does this refresh your memory

24  about any of the terminations for social media

25  violations that occurred?

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 20

1      A.     No.

2      Q.     Okay.  But you do know Charlene Carter was

3   terminated for violating the social media policy?

4      A.     Yes, I do.

5             MR. CORRELL:  Objection, misstates

6   prior testimony.

7      Q.     Okay.  But you -- did you decide that

8   Charlene Carter violated Southwest's social media

9   policy?

10      A.     Yes.

11      Q.     Okay.  And did you decide that Charlene

12   Carter violated Southwest's workplace bullying and

13   hazing policy?

14      A.     Yes.

15      Q.     Okay.  And do you recall any other

16   employees who -- well, do you recall any other Denver

17   flight attendants who violated Southwest's social

18   media policy?

19      A.     Yes.

20      Q.     Okay.  Who were the others that you recall?

21      A.     I'm not sure names specifically.  But I do

22   recall cases where they were violated and given

23   disciplined.

24      Q.     Okay.  How many of those cases do you

25   recall?

App. 56

Page 24

```
1    involved?

2         A.    I have resources that I utilize for

3    information.

4         Q.    Okay.  So who are the resources that you

5    utilize?

6         A.    It could be employee relations, or in

7    Charlene's case or others, the HRBP, human resource

8    business partner, it is labor relations.  To name a

9    few.

10        Q.    Okay.  Are there others?

11        A.    Possibly drug and alcohol, if they were --

12   if that was the type of case it was.

13        Q.    Okay.  Have you ever conferred with the ACT

14   Team over any issue involving a flight attendant in

15   the Denver region?

16              MR. CORRELL:  Objection, vague.

17        Q.    You can answer.

18        A.    No.

19        Q.    Okay.  Do you know who the ACT Team is?

20        A.    Yes, I do.

21        Q.    Okay.  All right.  Have you ever

22   encountered any cases where a flight attendant is

23   complaining about religious discrimination in the

24   workplace?

25        A.    I don't recall a case like that.
```

App. 57

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 25

1    Q.    Okay.  And have you ever had a flight
2    attendant in the Denver region request from the base
3    a religious accommodation?
4    A.    I don't recall one.
5    Q.    Okay.  Now, when -- when you investigate a
6    social media policy violation, how do you first hear
7    about the social media policy violation?  Excuse me,
8    how do you hear about a complaint of a potential
9    violation?
10   A.    Usually it is a flight attendant's turning
11   in some type of document or social media post of some
12   sort.
13   Q.    Okay.  Does -- is -- are there ever
14   occasions where someone in Southwest management
15   reports it to you?
16   A.    If it came to them first and it was a
17   Denver based flight attendant, that would be a
18   possibility.
19   Q.    Okay.  Do you know if Southwest monitors
20   flight attendants' social media activities?
21   A.    No.
22   Q.    No, you don't know or, no, they do not?
23   A.    They don't, as far as I know.
24   Q.    Okay.  All right.  Have, have you had any
25   cases where a union executive board member has

App. 58

Page 31

1       Q.      You can answer.

2       A.      I'm not aware of one.

3       Q.      Okay.

4               MR. CORRELL:  And, Counsel, real

5       quick.

6               Mr. Schneider, unless I instruct you

7       not to answer the question, you can proceed to answer

8       after I've lodged my objection, okay?

9               THE WITNESS:  Yes.

10      Q.      Now, when did you first hear that a flight

11      attendant had reported Ms. Carter for her Facebook

12      posts and messages?

13      A.      Around February of 2017.

14      Q.      Okay.

15      A.      I'm not sure on the exact date.

16      Q.      And do you know who brought those Facebook

17      posts and messages to your attention?

18      A.      If I remember correctly, it was sent to the

19      Las Vegas base and forwarded.

20      Q.      Okay.  If I could direct you to Exhibit --

21      I'm sorry, document 1.  And if you could review that.

22      And once you've had the chance to review it, let me

23      know.

24      A.      I have reviewed it.

25      Q.      Okay.  Do you recognize this?

App. 59

1    A.    Yes.

2    Q.    And what is it?

3    A.    It's an email that was sent from Audrey

4  Stone to Suzanne Stephensen --

5    Q.    Okay.

6    A.    -- regarding her complaint.

7    Q.    Okay.  And did you receive this complaint,

8  as well?

9    A.    It was forwarded to me, yes.

10    Q.    Okay.  All right.  And do you remember who

11  forwarded it to you?

12    A.    It was either Suzanne Stephensen, herself,

13  or David Kissman.

14    Q.    Okay.  Now, before this email was forwarded

15  to you, did you have any other communications about

16  the email?

17    A.    No.

18    Q.    Okay.  Or had you had any communications

19  about the, the matters raised in, in the email?

20    A.    Not prior to receiving this.

21    Q.    Okay.

22    A.    That I'm aware of.

23    Q.    Okay.  Let's see, and if I could direct you

24  to document 4, and I'll point you to a specific page

25  number.  When you have it up, let me know and I'll --

Case 3:17-cv-02278-X Document 306-4 Filed 05/05/21 Page 14 of 62 PageID 6258

Page 40

1     Q.    Okay.  And did you know who Audrey Stone

2  was?

3     A.    Yes.

4     Q.    Okay.  Had you met Audrey Stone before?

5     A.    No.

6     Q.    Okay.  Had you communicated with Audrey

7  Stone at all?

8     A.    Not that I remember.

9     Q.    Okay.  And so you knew that Audrey Stone

10  was the Local 556 president?

11     A.    Yes, I did.

12     Q.    Okay.  And how did you know that?

13     A.    Through communication, and I was at

14  Southwest Airlines when the election happened.

15     Q.    Okay.  And you knew that she was voted in

16  as president?

17     A.    Yes.

18     Q.    Okay.  And when you say "through

19  communications," through communications with whom?

20     A.    There are TWU communications that come out

21  once in a while, and it has her name on the byline as

22  the president of TWU.

23     Q.    Okay.  You receive those TWU communications

24  directly?

25     A.    No.

Page 42

1     A.    He was aware of the post, he had watched

2  the video and he was pretty disgusted with it.

3     Q.    What did he tell you?

4     A.    He just said simply, like in this part

5  here, that he -- it's very graphic.

6     Q.    Did he, he tell you to start the

7  investigation during that call?

8     A.    No.  That's a decision that I had made

9  already.  But wanted him to be aware that I was

10 starting it.

11    Q.    Okay.  So you made, you made the decision

12 to start the investigation before talking to, to

13 Dave?

14    A.    Yes.

15    Q.    Okay.  All right.  After -- immediately

16 after -- I'm sorry, let me ask this clearly.

17             Did you make the decision to start the

18 investigation after receiving the email from Dave?

19    A.    Yes.

20    Q.    Okay.  All right.  So I think you, you

21 mentioned that you -- one of the next things you did

22 was determine the next steps to take with the

23 investigation.  So what were the next steps you

24 determined you had to take?

25    A.    Collecting as much information as I could

App. 62

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

1   that was out there.  Contacting employee relations,

2   making them aware that I was beginning an

3   investigation, to get their input.  And, and then I

4   would reach out to Audrey Stone and try to set up a

5   meeting so we could discuss and get more details.

6        Q.    Okay.  So how did you go about collecting

7   information?

8        A.    The documents that Suzanne Stephensen

9   received, and making sure I had those and if there

10   was anything else out there that I had forwarded to

11   me.

12       Q.    Okay.  Did you do anything else to collect

13   information?

14       A.    I do recall Facebook posts.  And we did --

15   I did have somebody look at Charlene Carter's

16   Facebook to see if there was anything out there that

17   possibly made a Nexus to the Workplace.

18       Q.    Okay.  Who did you have look at Charlene's

19   Facebook page?

20       A.    Meggan Jones, my assistant base manager.  I

21   believe that labor relations and possibly ER also did

22   some research on that.

23       Q.    Okay.  So did -- when did you ask Meggan to

24   look at Charlene Carter's Facebook page for

25   information?

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 44

1    A.    It was early in the investigation.  I don't

2    specifically remember.

3       Q.    Okay.  After your call with Suzanne?

4       A.    Yes.

5       Q.    Okay.  And did, did Meggan say that she

6    would do it, she would go out to the -- Charlene's

7    Facebook page and look for information?

8       A.    Yes.

9       Q.    Okay.  And was that communication in person

10   or by email?

11      A.    In person.

12      Q.    Okay.  Does Meggan work closely to you?

13      A.    She's one of my assistant base managers.

14      Q.    Okay.  Well, I guess my question is, does

15   she -- is her office close to yours?

16      A.    Yes, they're in the same vicinity.

17      Q.    Okay.  All right.  Do you work next door to

18   each other?

19      A.    At the time, her office was across the

20   hallway from mine.

21      Q.    Okay.  And what, what information did

22   Meggan Jones find on Charlene's Facebook page?

23            MR. CORRELL:  Objection, calls for

24   speculation.

25      Q.    Do you know what information Meggan Jones

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 45

1  found on Charlene's Facebook page?

2      A.    There were posts that showed her associated

3  with Southwest Airlines.

4      Q.    Okay.  And what were those posts?

5      A.    Pictures of her wings, pictures of other

6  statements made with Southwest Airlines' logo.

7      Q.    Okay.  Do you know if those were pictures

8  that Meggan had found?

9      A.    I don't, I don't remember specifically who

10  found them.  I know that some -- there were several

11  that were given to me.

12      Q.    Okay.  Do you know if Meggan Jones found

13  some pictures?

14      A.    Yes.

15      Q.    Okay.  And how do you know that?

16      A.    She showed them to me.

17      Q.    Okay.  Do you recall what she showed you?

18      A.    I don't remember details, but it had

19  pictures of Charlene Carter and, like I said, logos

20  of Southwest Airlines on printed material that were

21  on her Facebook page, the wings, and pictures of

22  Southwest pilots, if I remember right, and possibly

23  pictures of herself in uniform.

24      Q.    Okay.  Do you know how soon after asking

25  Meggan to find that information she, she brought it

Page 47

1    same, same document, document 2, page 4450.  Just

2    once you've found it and have had the chance to

3    review it, let me know.

4           A.    Okay.

5           Q.    Do you recognize this?

6           A.    I have seen it, yes.

7           Q.    Okay.  And what is it?

8           A.    It's an email from me to employee

9    relations, and I'm asking for their thoughts on any

10   protected categories that may have been violated.

11          Q.    Okay.  Now, did you have any communications

12   with employee relations before sending this email?

13          A.    No.

14          Q.    Okay.  So this was your first time reaching

15   out to employee relations?

16          A.    Yes.

17          Q.    Okay.  And it's, I guess, addressed to

18   employee relations DG.  Do you know who receives an

19   email at that address?

20          A.    It is the employee relations investigators,

21   senior investigators.

22          Q.    Okay.  Do you know how many of those senior

23   investigators there are?

24          A.    I think there's four or five.

25          Q.    Okay.  Do you know if anybody apart from

Page 48

1    those four or five investigators receive emails at

2    that address?

3        A.    I'm not aware of that, no.

4        Q.    Okay.  And you -- I guess you want to know

5    their thoughts on protected categories?

6        A.    Yes.

7        Q.    And what, what is a protected category?

8              MR. CORRELL:  Objection, calls for a

9    legal conclusion.

10       A.    As far as I'm aware, it's race, ethnicity,

11   sexual orientation, et cetera.

12       Q.    So that's -- and that's what you meant by

13   "protected category" when you were asking for their

14   views on it?

15       A.    Yes.  Among other things as far as

16   harassment would go.

17       Q.    Okay.  And why did you think that a

18   protected category was involved here?

19       A.    Simply because it depicted several graphic

20   details and -- of fetuses, and if I recall right,

21   female genitalia, things like that.

22       Q.    Okay.  If -- could I -- so when you, you

23   forwarded the email, did you forward -- excuse me,

24   let me ask it this way:  So when you forwarded

25   information for their input, the images you sent,

Page 49

1   were they the same images that are in document 1?

2        A.    It was the images that were attached to

3   that document that Audrey Stone sent to Suzanne

4   Stephensen originally.

5        Q.    Okay.  So I guess your -- was your concern

6   with the protected category, whether Audrey fell

7   within one of the protected categories?

8        A.    I was not trying to determine that, myself.

9   That's why I reached out to employee relations.

10       Q.    Okay.  And so why -- I guess what, what in

11  those images made you suspect that a protected

12  category was involved?

13                MR. CORRELL:  Objection, asked and

14  answered.

15       A.    I wasn't sure.  I was just reaching out to

16  make sure that I covered all areas.

17       Q.    Okay.  All right.  And did you follow up

18  that, that email you sent to employee relations with

19  any phone calls to, to anyone in employee relations?

20       A.    Not at that time.  I wanted to get their

21  input strictly from the information I had.

22       Q.    Okay.  To your knowledge, was this the

23  first time that, that anyone involved in this

24  investigation had communicated with employee

25  relations about this matter?

App. 68

Case 3:19-cv-03770-X Document 66-6 Filed 05/02/22 Page 22 of 62 PageID 976

1    A.    Yes.

2    Q.    Okay.  All right.  And you do say you

3  wanted to know -- you said, let me know your thoughts

4  on protected categories, et cetera.  Was there

5  something else besides protected categories that you

6  were asking them to weigh in on?

7    A.    Anything that had to do with harassment of

8  employees, protected categories, any of those type of

9  things that fall under their policies.

10   Q.    Okay.  So your -- your concern -- well, you

11  wanted to know whether these images involved

12  harassment of Audrey based off of race, religion or

13  one of those other categories you mentioned?

14   A.    Yes, their policy involves harassment,

15  sexual harassment, those type.  And so sexual

16  harassment was one that I wanted to get weighed in

17  on.

18   Q.    Okay.  Now, I think you might have also

19  said that one of your next steps was reaching out to

20  Audrey Stone.

21   A.    Once I had discussed with employee

22  relations, it -- I like to partner with employee

23  relations and talk to the complainant and get any

24  details that I didn't have at that time.

25   Q.    Okay.  Do you know if you had discussions

Page 60

1   issues -- any issues involved with this complaint

2   dealing with the union president?

3               MR. CORRELL:  Objection, vague.

4       A.    I don't understand the question.

5       Q.    Okay.  In, in all of the communications you

6   had before contacting Audrey, did anyone say anything

7   about issues with this matter involving the union

8   president?

9               MR. CORRELL:  Objection, vague.

10      A.    I don't remember.

11      Q.    Okay.  I direct you to 4459, let's see,

12  still in document 2.  Once you've found it and had

13  the chance to review it, let me know.

14      A.    Okay.

15      Q.    In -- do you recognize this?

16      A.    Yes.

17      Q.    Okay.  And what is it?

18      A.    It's an email from Denise Gutierrez to me

19  after she had time to review the information I sent

20  her.

21      Q.    Okay.  And she asks in her email, when is

22  our day seven on this issue?

23      A.    Correct.

24      Q.    What, what is a day seven?

25      A.    We have seven days to complete an

Page 63

1       Q.      Okay.  If I could direct you to 7159, still

2   document 2.  Once you've had the chance to find it

3   and review it, let me know.

4       A.      Okay.

5       Q.      And do you recognize this?

6       A.      No, not specifically.

7       Q.      Okay.  You do see that it's an email from

8   you?

9       A.      Yes.

10      Q.      Okay.  And it's addressed to Suzanne

11  Stephensen?

12      A.      Yes.

13      Q.      Okay.  And it says, Suzanne, I have talked

14  to Audrey and set up a phone discussion tomorrow with

15  Denise Gutierrez, and it continues.  Do you -- and

16  it's dated February 23rd of 2017.  So does that

17  refresh your recollection as to what point in time

18  you may have talked to Audrey?

19      A.      It gives me a time frame, yes.

20      Q.      Okay.  And the phone discussion that's

21  referenced, do you know if that is a fact finding?

22      A.      It's not specifically a fact finding.  We

23  use the same document when we take notes.  But it's

24  more of an information gathering.

25      Q.      Okay.  And so the -- I guess the phone

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 64

1    discussion that's referenced here, do you know if
2    that was the information gathering you conducted as
3    part of your investigation?
4         A.    Yes.
5         Q.    Okay.  And that information gathering would
6    have been with Audrey Stone?
7         A.    Yes.
8         Q.    Okay.  And do you know how many
9    conversations you had with Audrey prior to that
10   information gathering?
11        A.    No, I do not.
12        Q.    Okay.  But you did have one conversation
13   with her, at least?
14        A.    To set up the phone discussion.
15        Q.    Okay.  And what did you tell Audrey in that
16   first conversation?
17        A.    I don't remember specifics on it.
18        Q.    Okay.  Okay.  Do you remember what Audrey
19   said to you in the first conversation?
20        A.    No, I don't recall that.
21        Q.    Okay.  Okay.  So you don't recall anything
22   about that first conversation.  But can you say that
23   it was to set up a fact finding?
24        A.    It was to set up the phone discussion, yes.
25        Q.    Yes, the information gathering, sorry.  I

App. 72

Page 65

1    need to learn the lingo.

2                    Okay.  And do you know if you did have

3    the information gathering on February 24th?

4        A.    I don't know that for sure, if that's what

5    this is saying.

6        Q.    Okay.  If I could direct your attention to,

7    let's see, document 5.  And for others, it's Exhibit

8    5.

9        A.    Okay.

10       Q.    And do you recognize this?

11       A.    Yes.

12       Q.    Okay.  What is it?

13       A.    It's an email to Denise Gutierrez and

14   Maureen Emlet, and attaching the meeting notes from

15   Audrey.

16       Q.    Okay.  And on the notes there's listed a

17   date.

18       A.    On the notes themselves?

19       Q.    Yes.

20       A.    Okay.

21       Q.    Do you know if that's the date that you

22   held the fact-finding meeting?

23       A.    If it's the date on these notes, yes,

24   that's the day I held it.

25       Q.    Okay.  Do you know who prepared these

Page 70

1      Q.     Yeah.

2      A.     Yes.

3      Q.     Okay.  Do you know if you had any -- did

4   you have a chance to make revisions to the notes

5   after Janet took them?

6      A.     I read through them to make sure that they

7   were a good representation of the meeting and what

8   was discussed.

9      Q.     Okay.  Did you make any corrections to her

10  notes?

11     A.     I don't remember in this one, making

12  corrections specifically.

13     Q.     Okay.  All right.  Now, had, had you

14  reached any conclusions after holding the information

15  gathering with Audrey?

16     A.     I reached a conclusion that I needed to

17  have a meeting, a fact-finding meeting with Charlene.

18     Q.     Okay.  And so what were your next steps

19  after you held the information gathering with Audrey?

20     A.     To contact Charlene and set up a

21  fact-finding meeting with her.

22     Q.     And after you, after you held the fact --

23  I'm sorry, the information gathering with Audrey, did

24  you communicate with, with anyone else about the fact

25  finding?

App. 74

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 72

1    finding?

2         A.    When we have investigations of this

3    magnitude, it's my preference to have another leader

4    in there with me and not a coordinator.

5         Q.    And so why didn't you have Meggan involved

6    in the first information gathering?

7         A.    That was simply just gathering information

8    and I just needed somebody to take the notes.   I

9    don't recall specifically if Meggan was there that

10   day or not.

11        Q.    Okay.   And when you communicated with

12   employee relations about the information gathering,

13   what, what did you -- who with employee relations did

14   you talk to?

15        A.    Denise Gutierrez.

16        Q.    And what did you tell her about the

17   information gathering?

18        A.    She was involved with it and simply made my

19   decision known that I wanted to conduct a meeting

20   with Charlene and how she wanted to be involved with

21   it.

22        Q.    Did she tell you that she wanted to be

23   involved?

24        A.    Yes.

25        Q.    And why did she say she -- well, did she

Bradford Court Reporting, LLC    972.931.2799    www.bradfordreporting.com

Page 73

1    tell you why she wanted to be involved?

2        A.    Because it had a possibility of violation

3    of the harassment policy, sexual harassment.

4        Q.    Okay.  And Denise was at the information

5    gathering with Audrey, correct?

6        A.    Correct.

7        Q.    Do you know if you talked to her

8    immediately after that meeting?

9        A.    I don't remember.

10        Q.    Okay.  And do you remember whether that

11    communication was in person or by email?

12        A.    No, it was on the phone.

13        Q.    Okay.  What else, if anything, do you

14    remember telling Denise in that phone call?

15        A.    If I remember correctly, we had discussed

16    not only harassment, but possibly bullying and hazing

17    policy violation.  And that was not in her area of

18    expertise.

19        Q.    Okay.  And what did you tell Denise about

20    the connection to the bullying and hazing policy?

21        A.    We had discussion on that, and that falls

22    more under our HRBP than employee relations.

23        Q.    So did you determine that you had to get

24    the HRBP involved?

25        A.    Yes.

App. 76

Page 75

1    well, scratch that.

2                    And so after this meeting, did you

3    reach out to the HRBP?

4        A.    Which meeting are you referring to?

5        Q.    I'm sorry, after the information gathering

6    with Audrey Stone, did you reach out to the HRBP?

7        A.    I recall at some point I did, to let her

8    know when the meeting would be.

9        Q.    Okay.  Which meeting?

10       A.    The fact-finding meeting with Charlene.

11       Q.    Okay.  And is there a specific HRBP who you

12   would have known to reach out to, or do they -- does

13   that group decide for itself who is going to be

14   involved in your investigation?

15       A.    No, inflight has one specific HRBP.  It's

16   Edie Barnett.

17       Q.    Okay.  So you, you reached out to Edie

18   Barnett sometime between the information gathering

19   with Audrey and the fact finding with Charlene?

20       A.    Correct.

21       Q.    Do you know if you communicated with her by

22   phone, email, or in person?

23       A.    I don't recall specifically, but I'm pretty

24   sure it was email, possibly.

25       Q.    Do you know if you had multiple

Page 80

1      A.    No.

2      Q.    Okay.  So was your next step to hold the

3  fact finding with Charlene?

4      A.    Yes.

5      Q.    Okay.  Do you remember when you, you had

6  that fact finding with Charlene?

7      A.    I don't remember the specific dates, no.

8      Q.    Okay.  Now, I guess another question, I

9  guess, does the human resources business partner, the

10  HRBP, make a decision as to whether the bullying and

11  hazing policy is violated?

12      A.    They give me feedback on whether they feel

13  it was violated, yes.

14      Q.    Okay.  Now, if the HRBP determines that

15  it's not violated, could you still issue discipline

16  for the violation of that policy?

17      A.    Yes.

18      Q.    I'm sorry -- well, okay.  Or maybe a better

19  way to ask it, if the HRBP determines there is not a

20  violation, could you still decide that, yes, there is

21  a violation?

22      A.    We would come to that conclusion together,

23  it would be a consensus.

24      Q.    Okay.  But I guess do, do you have the

25  authority to, to come to a different conclusion, if

App. 78

Page 81

1  HRBP would disagree with you, could you independently

2  decide that it was a violation?

3      A.    I could, but I don't know for sure if I

4  would in this situation.

5      Q.    Okay.  Let's see, if I could refer you to

6  document 9.  Once you find it and review it, let me

7  know.

8      A.    Okay.

9      Q.    And do you recognize this?

10     A.    The email, yes.

11     Q.    Okay.  And what is it?

12     A.    This is an email from me to Maureen Emlet

13  and Denise Gutierrez, indicating information that

14  Charlene brought into the meeting to present to us.

15     Q.    And do you recognize the pages that follow?

16     A.    The fact-finding meeting notes with

17  Charlene?

18     Q.    Yes.

19     A.    Yes.

20     Q.    Okay.  And do you know if these were -- if

21  this is the final version of the notes?

22     A.    As far as I'm aware, looking at it right

23  now, yes.

24     Q.    Were there different drafts of these notes?

25     A.    Not that I'm aware of.

Bradford Court Reporting, LLC    972.931.2799    www.bradfordreporting.com

Page 82

1    Q.    Okay.  Now, did -- okay, did you take any

2    of your own notes for the fact-finding meeting?

3        A.    I did take some notes, yes.

4        Q.    Okay.  Did, did you produce those in

5    response to Ms. Carter's discovery request?

6        A.    When I take notes, I get notes back from my

7    note taker, I incorporate them into those notes and

8    those are the only ones that I have.

9        Q.    Okay.  When you say your "note taker,"

10    you're referring to an individual?

11        A.    Yes.  In this case, Meggan Jones.

12        Q.    Okay.  So did Meggan Jones take the only

13    notes that exist for this fact-finding meeting?

14        A.    She took notes during the fact-finding

15    meeting.  And once she completed them, she sent them

16    to me and I incorporated my notes into them.  So,

17    yes, it's the one document.

18        Q.    Okay.  Okay.  So you incorporated your

19    notes into this document?

20        A.    Correct.

21        Q.    Okay.  Do you know if this fact-finding

22    meeting was recorded?

23        A.    No, it was not.

24        Q.    Okay.  Are, are fact findings ever

25    recorded?

App. 80

1     A.     No, it's not allowed.

2     Q.     Okay.  And it -- this -- I guess at the top

3  of the fact-finding notes, it lists who was in

4  attendance.  And does that accurately say who, who

5  all participated in the meeting?

6     A.     Yes.

7     Q.     Okay.  Now, did -- were Charlene and Chris

8  in your office for this meeting?

9     A.     Yes, they were.

10    Q.     Okay.  And the notes say, conferenced in

11  via phone, Denise Gutierrez and Edie, Edie Barnett --

12  Edith Barnett.  They -- so they were not present,

13  correct?

14    A.     Correct.

15    Q.     Okay.  And I want to step back a second.

16  After the investigation gathering meeting with

17  Audrey, did you determine that you needed more

18  information regarding Facebook posts and social media

19  posts?

20    A.     I'm not sure the sequence of events, but

21  during that time, I asked for more Facebook posts.  I

22  don't know if they came before or after our meeting.

23    Q.     Okay.  Do you recall Denise Gutierrez

24  seeking more information on Facebook posts that were

25  made?

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 96

1    you've had a chance to look at it.

2         A.    Okay.

3         Q.    Okay.  So on 4676, towards the bottom,

4    Charlene says, I'm Christian, I'm a conservative and

5    pro-life.  Do you see where I'm --

6         A.    Yes.

7         Q.    Okay.  And then she says, this happens to

8    be a huge issue for me and I get the message out

9    wherever I can.  And then on the next page, she

10   continues, I think about three or four lines down on

11   the next page, she says, I had an abortion and I

12   regret every bit of it, so I work with other pro-life

13   groups.  And for me, as a Christian, if I can get the

14   word out in any way to every group as possible to

15   touch the issue, I do.  Do you recall her saying that

16   at the hearing?

17        A.    Yes.

18        Q.    And did you make any inquiries as to

19   whether Charlene needed a religious accommodation,

20   based on those comments?

21        A.    No.

22        Q.    Okay.  And why not?

23        A.    That would be up to her to ask for that.

24   And that would be something that would go through the

25   ACT Team.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 100

1    Audrey's email, where she brings up her concern about

2    Brian Talbert, that it wasn't a concern -- or not

3    related to the investigation.  Did your view change

4    here in the fact finding?

5          A.    No.

6          Q.    Okay.  But is it fair to say that you --

7    your opinion was that it was something that should

8    have been confidential?

9          A.    To Brian Talbert and his union rep, not to

10   flight attendants.  Should not have been available to

11   flight attendants, it should have been kept

12   confidential is my point.

13         Q.    Okay.  Was that part of your consideration

14   for discipline here?

15         A.    No.

16         Q.    And so after you concluded this meeting,

17   what were your next steps?

18         A.    To wait for employee relations and/or the

19   HRBP to determine if they feel like there was a

20   violation and then move from there --

21         Q.    Okay.

22         A.    -- towards decision making.

23         Q.    All right.  And immediately after the

24   meeting, did you have any -- had you reached any

25   conclusions as to what -- how you were going to

1    investigation and the possibility of discipline.

2         Q.    Did he -- did Dave Kissman have any

3    recommendations for you in your communications after

4    the fact-finding meeting?

5         A.    I don't remember.

6         Q.    Do you remember how many communications you

7    had with Dave Kissman after the fact finding?

8         A.    Can you say the question one more time.

9         Q.    Yeah.  Do you remember how many

10   communications you had with Dave Kissman after the

11   fact finding?

12        A.    No, I don't.

13        Q.    Okay.  Did you have any communications with

14   Naomi Hudson after the fact finding?

15        A.    No.

16        Q.    Did you have any communications with Mike

17   Sims after the fact finding?

18        A.    I don't remember.

19        Q.    Okay.  Did you have any communications with

20   Sonya Lacore after the fact finding?

21        A.    No.

22        Q.    Okay.  Now, after the fact finding, you

23   said you waited for employee relations to first

24   contact you about their assessment as to whether

25   there was a violation of the sexual harassment

1    policy?

2        A.    Correct.

3        Q.    Okay.  And you also waited for the human

4    resources business partner to reach out to you as to

5    whether there was a violation of the bullying and

6    hazing policy?

7        A.    Yes.

8        Q.    Okay.  And did the human resources business

9    partner follow up with you?

10       A.    Yes.

11       Q.    Okay.  And the human resources business

12   partner is Edie Barnett, correct?

13       A.    Correct.

14       Q.    Okay.  And did Edie Barnett call you?

15       A.    I don't remember specifically if she called

16   me.

17       Q.    Okay.  Is it possible she talked to you in

18   person?

19       A.    No.

20       Q.    Okay.  So she called you or emailed you?

21       A.    Correct.

22       Q.    Okay.  And what did Edie Barnett tell you

23   when she contacted you?

24       A.    It was determined that there was a

25   violation of the Southwest bullying/hazing policy.

Case 3:19-cv-02281-K   Document 206   Filed 05/06/24   Page 39 of 62   PageID 3433

1      Q.      And do you know specifically which

2  individuals were involved in making that

3  determination on behalf of human resources?

4      A.      The name of the person?  Is that what

5  you're asking me?

6      Q.      Yes.  I'm asking you if -- which, which

7  individuals with human resources made the, the

8  determination that there was a violation of the

9  policy?

10      A.      Edie Barnett.

11      Q.      Okay.  Do you know if Edie Barnett reached

12  that decision on her own?

13      A.      No, I do not know that.

14      Q.      Okay.  And so what, what specifically did

15  Edie Barnett communicate to you about the violation

16  of the bullying and hazing policy?

17      A.      Anything other than there was a violation,

18  I don't specifically remember.

19      Q.      Okay.  And what was your reaction to that

20  information?

21      A.      That that was part of my investigation, my

22  determining if there was a violation.

23      Q.      Okay.  And did you just accept that

24  conclusion and decide to adopt that conclusion?

25      A.      I used it as a resource for me making the

1    decision.

2        Q.    Okay.   And apart from that resource, what

3    other factors did you consider in reaching your

4    conclusion?

5        A.    The social media policy, the

6    hazing/bullying policy.

7        Q.    Well, let me ask the question this way -- I

8    mean, just speaking specifically about the bullying

9    and hazing policy, did you adopt her determination as

10   to that specific policy as your own?

11       A.    I used her decision to help me in

12   determining my decision that that violation was part

13   of the discipline.

14       Q.    Okay.   Did you have reasons independent

15   from Ms. Barnett's recommendation that Ms. Carter's

16   conduct violated the bullying and hazing policy?

17       A.    The information that was presented in both

18   meetings from Audrey Stone and Charlene Carter.

19       Q.    Okay.   Now, how did you reach a conclusion

20   that there was a violation of the social media

21   policy?

22       A.    Through discussions, the same thing, the

23   Nexus to the Workplace and the information that was

24   posted on Facebook, and my discussions with labor

25   relations, as well as the information that was given

1    to me in the meetings.

2         Q.    Okay.  Did you have discussions with labor

3    relations about whether there was a violation of the

4    social media policy after the fact-finding meeting?

5         A.    Yes.

6         Q.    Okay.  And what were those discussions?

7         A.    Simply that it did provide the Nexus to the

8    Workplace, as well as the egregious posts that were

9    on her Facebook page that other people could see.

10        Q.    Okay.  And the person in labor relations

11   that you had that discussion with was Maureen Emlet;

12   is that correct?

13        A.    Correct.

14        Q.    Okay.  Did you have that discussion with

15   anyone else in labor relations?

16        A.    Not that I recall.

17        Q.    Okay.  And what opinion did Maureen Emlet

18   have that she communicated to you as to a violation

19   of -- as to whether there was a violation of the

20   social media policy?

21        A.    That we had pretty solid information on a

22   violation.

23        Q.    Okay.  And what did she believe the solid

24   information was?

25                   MR. CORRELL:  Objection, calls for

Page 109

1    speculation.

2        Q.    Did she tell you what the solid information

3    was?

4        A.    Not that I recall outside of the fact that

5    she made Facebook posts and there was a Nexus to the

6    Workplace.

7        Q.    During those discussions, did Maureen Emlet

8    discuss with you any, any cases of other flight

9    attendants who had violated the social media policy?

10       A.    I don't recall that information.

11       Q.    Did Maureen Emlet give you any opinions as

12   to whether any other policy had been violated?

13       A.    I don't recall that.

14       Q.    Okay.  Now, at any point after the fact

15   finding, did you have any communications with Audrey

16   Stone?

17       A.    I don't remember discussing anything after

18   with Audrey Stone.

19       Q.    Okay.  You don't remember discussing

20   anything after the fact finding with Audrey Stone; is

21   that correct?

22       A.    Was that your question?

23       Q.    Yes.

24       A.    Yes.

25       Q.    Okay.  Now, do you recall how soon after

App. 89

1    the fact finding you had those communications with

2    Maureen Emlet?

3        A.    Possibly the next day.

4        Q.    Okay.  Do you recall how soon after the

5    fact finding you had the communications you described

6    with Edie Barnett?

7        A.    No, I don't remember.

8        Q.    Now, at some point after the fact-finding

9    meeting, did you hear from employee relations?

10       A.    Yes.

11       Q.    Okay.  And when did you hear from employee

12   relations?

13       A.    I don't remember the exact date or time of

14   that.

15       Q.    Do you remember roughly how long after the

16   fact-finding meeting it might have been?

17       A.    It was within the next day or -- you know,

18   I'm pretty sure it was the next day.

19       Q.    Okay.  And was it Denise Gutierrez who

20   communicated with you?

21       A.    Yes.

22       Q.    Okay.  And do you know if she emailed you

23   or called you?

24       A.    Possibly both.  I know there was an email

25   indicating her decision on it.

1      Q.      Okay.  And what was Denise Gutierrez's

2   decision?

3      A.      I don't remember specifically, but I know

4   that it supported sexual harassment, possibly, in

5   this case.  I'm not sure without seeing the document

6   or the email.

7      Q.      Okay.  At any point after the

8   investigation -- excuse me, at any point after the

9   fact-finding meeting, did you deliver a -- well, let

10   me ask it this way:  After the fact finding, did you

11   report back to the other persons involved in the

12   investigation about the investigation?

13      A.      Can you be more specific.

14              MR. CORRELL:  Objection.

15      Q.      Well, yeah, after, after the fact-finding

16   meeting, did you report about the investigation to

17   the other persons involved?

18              MR. CORRELL:  Objection, vague.

19      A.      I don't know what you mean.

20      Q.      Did you, did you report your -- so after

21   the fact-finding meeting, did you report your

22   decision to employee relations, labor relations,

23   human resources?

24      A.      At some point I reported it to labor

25   relations.

Page 112

1      Q.      Okay.  What do you remember about the

2  report you made?

3      A.      That I was going forward with discipline.

4      Q.      Okay.  If I could direct your attention to

5  document 6, which is also Exhibit 7.

6      A.      Okay.

7      Q.      Do you recognize this?

8      A.      An email to Maureen Emlet, Denise Gutierrez

9  and Edie Barnett.

10      Q.      And do you know what it is?

11      A.      I need to read it.

12      Q.      Sure.  Yeah, please, do.

13      A.      It is my synopsis, basically, of the

14  meeting with Charlene Carter and the investigation.

15      Q.      Okay.  And in this email do you determine

16  whether there's been a violation of the -- of any

17  Southwest policies?

18      A.      There's the possibility in this email of

19  violations of a social media, bullying and hazing.

20  But it's still an ongoing investigation.

21      Q.      Okay.  So were -- so these were not

22  conclusions that Ms. Carter had actually violated

23  these policies?

24      A.      I'm not sure at this point if I had

25  completely made my decision on this.  I'm -- I don't

1    know the dates, so I can't say specifically of when

2    that determination was made.

3        Q.    Okay.   And the date of this email is March

4    10th, correct?

5        A.    Correct.

6        Q.    But based off of the language that you have

7    there, I guess on document 4712, after social media

8    policy, bullying and hazing policy and harassment

9    policy, you don't know if you're making conclusions

10   as to whether those are violated?

11       A.    I feel at that point that those were

12   violations of those policies, as highlighted there.

13   So it was part of my determination of that, yes.

14       Q.    Okay.   Was this your report where you

15   decided on the, the discipline that should be issued

16   to Ms. Carter?

17       A.    It's part of my investigation that I would

18   use when I made that determination.

19       Q.    Okay.   But it's, it's not your final

20   determination as to the discipline that should be

21   issued?

22       A.    I'm not sure on the dates of how everything

23   transpired is what I'm saying.   So I'm not sure when

24   this was sent, in what part of the investigation.

25       Q.    Okay.   Well, and I guess one of my

Case 3:10-cv-02858-M Document 100-4 Filed 05/09/14 Page 47 of 62 PageID 2301

Page 114

1 questions would be, is there anything here that, that

2 tells you that you've decided on the discipline that

3 should be issued?

4     A.   I am in the decision-making process at this

5 point.

6     Q.   Okay.  All right.  And another question

7 here, do you know if this email has been redacted in

8 any way?

9     A.   Redacted how?

10     Q.   And don't tell me if something has -- if

11 something -- what the contents that may have been

12 removed.  But I was just wondering if, for a

13 privilege reason, if maybe some contents are not

14 included in this email.

15     A.   I am not aware of that.

16     Q.   Okay.  All right.  I ask because there's a

17 big space here on 4712.

18           MR. CORRELL:  And I'll represent,

19 Counsel, that all of our redactions are in

20 identifiable black boxes.

21           MR. GILLIAM:  Okay.  Thank you.  That

22 helps.

23     Q.   All right.  If I could go to -- back to

24 document 2, and Bates numbers 5762 and 5763.  Just

25 let me know once you've found it and have had the

Page 115

1    opportunity to read it.

2        A.    Are those pages close to the bottom of that

3    document?

4        Q.    Yeah, it's close to the end.  Very close to

5    the end.

6        A.    You said 5762 and 5763?

7        Q.    Yes, sir, yeah.

8        A.    Okay, I'm there.

9        Q.    Okay.  And if I could, I guess, direct your

10   attention to the last email in that chain, at the

11   bottom, anyway.  If you want to just read that and

12   review it and let me know once you've had the chance

13   to do that.

14       A.    Okay.

15       Q.    All right.  And do you recognize that?

16       A.    Yes.

17       Q.    And what is it?

18       A.    It's the decision from Denise Gutierrez on

19   employee relations on her portion of the

20   investigation.

21       Q.    Okay.  And what does she decide?

22       A.    That the information partially supports the

23   allegations against Charlene.

24       Q.    Okay.  And which, which portion is

25   supported?

1    A.    The images of women dressed as vaginas.

2    Q.    Okay.  And -- okay.  Then -- and she says,

3    the -- while the videos depicting abortion are

4    considered to be offensive, they do not violate the

5    company's harassment, sexual harassment,

6    discrimination, retaliation policy, but they should

7    be addressed.

8              So I guess one, one question is,

9    did -- I guess, how, how did this report, I guess,

10   figure in to your decision as to what to do with

11   discipline?

12   A.    It helps me to know if employee relations

13   views it as a violation and helps me with my decision

14   making.

15   Q.    Okay.  And this -- you received this email

16   on March 10th, 2017.  Did you make your decision

17   after receiving this email?

18   A.    I wouldn't have made it before, so it must

19   have been.

20   Q.    Okay.  And another question too, I guess,

21   to ask, did you make your decision as to whether

22   there had been a violation of all of the policies --

23   well, let me ask it another way.

24              Did you make any determinations as to

25   whether there had been a violation of the other two

Page 117

1  policies, apart from the sexual harassment policies,

2  before receiving this email?

3      A.    I don't recall the order of making those

4  decisions.

5      Q.    Okay.  Now, on this email, looks like

6  Denise sends it to you and Suzanne.  And do you have

7  any knowledge why Denise sent it to Suzanne?

8      A.    Because Audrey Stone is based in Las Vegas

9  and Suzanne is her leader.

10      Q.    Okay.  And Toni Hamilton is cc'd.  Did --

11  do you know -- do you have any knowledge as to why

12  Toni Hamilton is cc'd?

13      A.    I'm -- I think that Toni Hamilton was

14  Denise Gutierrez's leader.

15      Q.    Okay.

16      A.    And she's just letting her know her

17  position.

18      Q.    Okay.  Now, how soon after receiving this

19  email did you make your final decision as to

20  termination?

21      A.    I don't know specific time frames on it.

22      Q.    Okay.  If I could refer you back to -- it's

23  in here.  Document 7.

24      A.    Okay.

25      Q.    And this is Charlene Carter's termination

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER
Case 3:10-cv-02189-L Document 70-4 Filed 09/08/11 Page 51 of 62 PageID 705

Page 118

1   letter, correct?

2       A.    Correct.

3       Q.    So -- and that's dated March 14th.  So fair

4   to say you made your decision sometime between March

5   10th and March 14th?

6       A.    Yes.

7       Q.    Okay.  And March 10th was a Friday and

8   March 14th was a Tuesday.  Does that help, help you

9   narrow in on the day at all?

10      A.    The day of?

11      Q.    The day you made a decision as to whether

12  to fire Charlene.

13      A.    No, it doesn't.  Because with this, with

14  the time frames we're under, I was working on it

15  during that time.

16      Q.    Okay.  Now, document 7, the termination

17  letter, did you write that termination letter?

18      A.    Yes.

19      Q.    Okay.  Did you have any assistance in, in

20  drafting it?

21      A.    Only such as running it past labor to make

22  sure that it was meeting the requirements of my

23  decision.

24      Q.    Okay.  And what do you mean the

25  requirements of your decision?

1      A.    They like to see them before I issue the

2  discipline.

3      Q.    Okay.  And I want to make sure I understand

4  here.  You said you ran it by labor to make sure that

5  the letter was meeting the requirements of your

6  decision?

7      A.    Just having another person proofread it for

8  me is basically what it is.

9      Q.    Okay.  And --

10            MR. CORRELL:  And before we go any

11  further, Mr. Schneider, if you consulted with legal

12  counsel in connection with drafting or revising this

13  letter, please do not testify to any communications

14  with counsel.  But you may otherwise answer.  I'm

15  just not sure if you did or not.

16            THE WITNESS:  Okay.

17      Q.    So apart -- and I don't want to hear about

18  legal counsel.  But apart from, you know, labor

19  relations, did you have communications with anyone

20  else to assist you in drafting that letter?

21      A.    No.

22      Q.    Okay.  And what, what feedback did you get

23  from labor relations about that letter?

24      A.    I don't remember specifically what details

25  were said to me about the letter.

Case 3:16-cv-02267 Document 364 Filed 05/03/21 Page 53 of 62 PageID 2807

1    Q.    Okay.

2              MR. GILLIAM:  Let's see, I'm looking

3    to see what exhibit number we're on.  20 was the last

4    document.  We're on Exhibit 15 now?

5              MR. CORRELL:  That's what I have, yes.

6              THE WITNESS:  Go to 15, is that what

7    you're saying?

8    Q.    No, no, so I'd like to mark -- I'd like you

9    to go to document 18.  And I would like to have

10   document 18 marked as Exhibit 15.

11             (Exhibit 15 marked)

12   Q.    And once you've found it and had the chance

13   to review it, let me know.

14   A.    Do I have a document 18?  I don't find

15   that.

16             MR. CORRELL:  It should be in the

17   email.  Remember, we had trouble --

18             THE WITNESS:  Oh, I'm sorry.  It was

19   in a separate email.  Okay.

20   A.    All right.  So -- okay, I'm there.

21   Q.    Okay.  And review -- take a moment to

22   review it.  And once you've had an opportunity, let

23   me know.

24   A.    Okay.

25   Q.    Do you recognize this?

Case 3:17-cv-02278-X Document 306-4 Filed 05/05/21 Page 54 of 62 PageID 7708

Page 121

1      A.    Okay.

2      Q.    Can you tell what it is?

3      A.    It looks like a termination letter.

4      Q.    Okay.  Can you say that you did not draft

5  this termination letter?

6      A.    No, I don't remember specifically.  As I --

7  you know, I don't remember.

8      Q.    And do you remember if this was something

9  that you produced in response to Ms. Carter's

10  discovery requests?

11      A.    I don't remember that, no.

12      Q.    Okay.  Well -- and I know you don't

13  recognize this letter, but if I could still direct

14  you to the paragraph number, number 3.

15      A.    Okay.

16      Q.    Where it says, flight attendant work rules

17  and expectations/company policies, and 3.0, basic

18  work rules and expectations.  Did you make any

19  determination as to whether the basic work rules and

20  expectations were violated?

21      A.    I remember considering that in the behavior

22  of flight attendants, but that is all.

23      Q.    Okay.  You did not determine that Charlene

24  Carter violated the basic work rules and

25  expectations?

App. 101

Page 122

1      A.     She could have violated that.  I didn't

2   consider -- I mean, I didn't include it in my term

3   letter.

4      Q.     Okay.

5      A.     Other than just referring to it, possibly.

6      Q.     And going back to document 7 again, looking

7   back there.

8      A.     Okay.

9      Q.     And the beginning of the last paragraph, it

10   says, your conduct could also be a violation of

11   Southwest's policy concerning harassment, sexual

12   harassment, discrimination and retaliation.  So did

13   you, did you not make a determination that her

14   conduct did violate that policy?

15      A.     I determined that the workplace bullying

16   and hazing policy and the social media policy were

17   the violations that she was terminated for.  Also she

18   could have violated other policies.  And that's what

19   that's referring to.

20      Q.     Okay.  Now, copied at the bottom are Sonya

21   Lacore, Mike Sims and Dave Kissman.  Did you not send

22   them a draft prior to sending this letter to

23   Ms. Carter?

24      A.     No.

25      Q.     You did not send them a draft prior?

Case 3:10-cv-02833-L Document 164 Filed 05/03/13 Page 56 of 62 PageID 2810

1    A.    That's all done at the same time, when I

2  finish up the investigation.

3    Q.    Okay.  So they did not see this letter

4  until you sent it to Ms. Carter?

5    A.    Correct.

6    Q.    Okay.  Do you know if you consulted with

7  either Mike Sims or Dave Kissman in reaching your

8  final determination to fire Ms. Carter?

9    A.    Once I made my decision, I made them aware

10  of my decision.

11    Q.    Okay.  Did you make them aware of your

12  decision before sending this letter?

13    A.    Dave Kissman, yes.

14    Q.    Okay.  Did you not inform Mike Sims of your

15  decision until after the letter?

16    A.    I'm not sure when he was made aware of it.

17    Q.    Okay.  Do you know that you did not make

18  him aware of it prior to sending this letter?

19    A.    I don't remember making him aware of it.

20    Q.    Okay.  Do you remember if you communicated

21  your decision to Dave Kissman over the weekend?

22    A.    No, I cannot remember when it was.

23    Q.    Okay.  What did you tell Dave Kissman when

24  you had finally made your decision?

25    A.    Just on the decision I had made and what

Page 124

1    violations they were.

2        Q.    Okay.   And what was Dave Kissman's

3    response?

4        A.    He agreed with it and said that, that it

5    was fine.   So thanks for letting him know, basically

6    all it was.

7        Q.    Okay.

8                  MR. GILLIAM:   I think we may want to

9    take a short break here.

10                 MR. CORRELL:   Sure.   Is ten minutes

11   good?

12                 MR. GILLIAM:   Yeah, ten minutes is

13   good.

14                 MR. CORRELL:   All right.   We'll be

15   back at 2:43.

16                 THE VIDEOGRAPHER:   We are off record

17   at 2:33 p.m.

18                 (Recess from 2:33 to 2:45)

19                 THE VIDEOGRAPHER:   We are back on

20   record at 2:45 p.m.

21       Q.    All right.   Mr. Schneider, I don't have too

22   many more questions here.

23                 But following the fact-finding meeting

24   with Charlene Carter, did Meggan Jones ever recommend

25   to you at some point that you should fire Charlene

Page 125

1       Carter?

2           A.      No.

3           Q.      Okay.   Did you ever consult with her about

4       her recommendations?

5           A.      No.

6           Q.      Okay.   So -- okay.   And prior to sending

7       the termination letter, did you talk to Charlene

8       Carter and her union rep about your decision?

9           A.      Prior to sending the letter, you said?

10          Q.      Yes, sir.

11          A.      On the same day, I rendered and then I sent

12      the letter.

13          Q.      Okay.   And -- okay.   And what, what did you

14      convey to Ms. Charlene Carter and the union rep?

15          A.      That my decision was that she violated the

16      social media policy and the bullying and hazing

17      policy, and that my decision was termination.

18          Q.      Okay.   And were you involved in step two

19      proceedings at all?

20          A.      No.

21          Q.      Okay.   Did Mike Sims ever ask your opinions

22      of any issues regarding step two proceedings?

23          A.      Not that I recall.

24          Q.      Okay.   And after sending your termination

25      letter, did you have any communications with anyone

Case 3:19-cv-01934-ADC Document 76-4 Filed 05/09/23 Page 59 of 62 PageID 2813

1    a couple of quick questions for you before we're done

2    today.

3                    First of all, do you understand that

4    one of the claims asserted in this lawsuit is that

5    Ms. Carter contends that she was treated less

6    favorably because she was a nonmember or objector to

7    the union?

8         A.    Yes.

9         Q.    Do you personally harbor any bias or animus

10   against individuals who opt out of the union?

11        A.    No.

12        Q.    Did the fact that Ms. Carter was a -- well,

13   did you know Ms. Carter was a nonmember of the union

14   at the time of the investigation?

15        A.    Not until she disclosed that in the

16   meeting.

17        Q.    Once she disclosed that to you, did it have

18   any impact on your decision-making process?

19        A.    No.

20        Q.    You also understand that Ms. Carter is

21   alleging religious discrimination in this case with

22   respect to her pro-life views, correct?

23        A.    Yes.

24        Q.    Do you personally have a position between

25   pro-life and pro-choice on the issue of abortion?

Page 131

1      A.    I am pro-life.

2      Q.    Do you harbor any animus or bias against

3  individuals who are pro-life?

4      A.    No.

5      Q.    Did you decide less favorably with respect

6  to Ms. Carter than had she been pro-choice?

7      A.    No.

8      Q.    Did the fact that Ms. Carter attributed her

9  pro-life views to her religious beliefs have any

10  impact on your decision-making process?

11      A.    No.

12      Q.    Do you harbor any animus or have any bias

13  against individuals who express Christian beliefs?

14      A.    No.

15                MR. CORRELL:  I pass the witness.

16                THE VIDEOGRAPHER:  Is there anyone

17  else?

18                MR. GREENFIELD:  Local 556 will

19  reserve their questions for the time of trial.

20                MR. GILLIAM:  Plaintiff has nothing

21  else.

22                THE VIDEOGRAPHER:  Okay.  We are off

23  record at 2:55 p.m.

24                End of deposition.  End of media.

25                (Proceedings concluded at 2:55 p.m.)

Page 134

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER,                  )
        Plaintiff,                )
                                  )
vs.                               )  Case No.
                                  )  3:17-cv-02278-X
SOUTHWEST AIRLINES CO., AND       )
TRANSPORT WORKERS UNION OF        )
AMERICA, LOCAL 556,               )
        Defendants.               )

                REPORTER'S CERTIFICATE

        ORAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

                    November 3, 2020

                  (Reported Remotely)

        I, Cheryl Duncan, CSR, in and for the State of
Texas, hereby certify to the following:

        That the witness, ED SCHNEIDER, was duly sworn
and that the transcript of the deposition is a true
record of the testimony given by the witness;

        I further certify that pursuant to FRCP Rule
30(f)(1) that the signature of the deponent:

        __X___ was requested by the deponent or a party
before the completion of the deposition and is to be
returned within 30 days from date of receipt of the
transcript.  If returned, the attached Changes and
Signature Pages contain any changes and the reasons
therefor;

1        _____ was not requested by the deponent or a

2   party before the completion of the deposition.

3        That pursuant to information given to the

4   deposition officer at the time said testimony was

5   taken, the following includes all parties of record

6   and the amount of time used by each party at the time

7   of the deposition:

8        Mr. Matthew B. Gilliam (3 hours, 41 minutes)
         Mr. Michael A. Correll (02 minutes)
9        Mr. Ed Cloutman (00 minutes)

10       That $_____ is the deposition officer's

11   charges to the Plaintiff for preparing the original

12   deposition and any copies of exhibits.

13       I further certify that I am neither counsel for,

14   related to, nor employed by any of the parties in the

15   action in which this proceeding was taken, and

16   further that I am not financially or otherwise

17   interested in the outcome of this action.

18       Certified to by me on this 12th day of

19   November, 2020.

20                        _____

21                        Cheryl Duncan, CSR
                          Texas CSR 3371
22                        Expiration:  04/30/21
                          Firm Registration Number 38
23                        Bradford Court Reporting, L.L.C.
                          7015 Mumford Street
24                        Dallas, Texas  75252
                          Telephone 972.931.2799
25                        Facsimile 972.931.1199

App. 109