Case 3:17-cv-02278-X Document 143-1 Filed 09/03/21 Page 112 of 326 PageID 3727

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER                )
                               )
                               ) CIVIL ACTION NO.
VS.                            ) 3:17-CV-02278-X
                               )
SOUTHWEST AIRLINES CO., AND )
TRANSPORT WORKERS UNION OF )
AMERICA, LOCAL 556             )


-----------------------------------

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF
MEGGAN JONES
NOVEMBER 4, 2020

-----------------------------------




ANSWERS AND DEPOSITION OF MEGGAN JONES,
produced as a witness at the instance of the
Plaintiff, taken in the above-styled and -numbered
cause on NOVEMBER 4, 2020, at 9:05 a.m., before
CHARIS M. HENDRICK, a Certified Shorthand Reporter
in and for the State of Texas, witness located in
Golden, Colorado, pursuant to the Federal Rules of
Civil Procedure, the current emergency order
regarding the COVID-19 State of Disaster, and the
provisions stated on the record or attached hereto.

1      A.  Tammy Shaffer.

2      Q.  Okay.  And is that in Southwest labor

3  relations department?

4      A.  Yes, it is.

5      Q.  Okay.  And prior to holding your current

6  position with Southwest, what was your position

7  with the company?

8      A.  Inflight base manager at the Phoenix base.

9      Q.  Okay.  And how long were you the -- the

10  base manager at the Phoenix base?

11      A.  Officially, approximately a year and a

12  half; just over a year and a half.

13      Q.  Do you know when you started your -- your

14  job there in Phoenix as inflight base manager?

15      A.  I was formally offered the position in

16  January of 2019.

17      Q.  Okay.  Did you start in January 2019?

18      A.  I worked there as a temporary base manager

19  for four months prior.

20      Q.  Okay.  Okay.  And prior to working in

21  Phoenix, what job did you hold with the company?

22      A.  I was the assistant base manager at the

23  Denver inflight base.

24      Q.  Okay.  And how long were you assistant

25  base manager in Denver?

Case 3:20-cv-00411-M Document 34-1 Filed 09/23/21 Page 3 of 25 PageID 19

1      A.   Approximately, three and a half to four

2   years, approximately.

3      Q.   And so when did you start your -- I guess,

4   your job in that position?

5      A.   It was in 2015.  I don't recall the exact

6   month.

7      Q.   Okay.  And did you leave that position in

8   2018?

9      A.   Officially left it in January of 2019.

10      Q.   Okay.

11      A.   My title changed.

12      Q.   Okay.  All right.  And prior to being

13   assistant base manager in Denver, what -- what job

14   did you hold with the company?

15      A.   I was an inflight supervisor at the Denver

16   base.

17      Q.   Okay.  And how long were you an inflight

18   supervisor?

19      A.   With Southwest, 2011 is when I started.

20   So, approximately, four years, give or take.

21      Q.   Okay.  And did you work with Southwest

22   prior to 2011?

23      A.   No, I did not.

24      Q.   Okay.  Have you ever worked as a flight

25   attendant?

Page 28

1    would be through a flight attendant or a customer.

2        Q.  Okay.

3        A.  Off the top of my head, maybe other

4    avenues.

5        Q.  Okay.  Do you remember any instances where

6    maybe someone in Southwest management discovered

7    some activity that they may have believed was a

8    violation?

9        A.  I can't recall anything like that.

10       Q.  Do you know if Southwest monitors any

11   social media activities?

12       A.  We do not monitor their activity.

13       Q.  Okay.  Now, do you -- were there any

14   instances while you were working at the Denver base

15   where a flight attendant complained of religious

16   discrimination?

17       A.  Religious discrimination?  I don't recall.

18       Q.  Okay.  And do you -- are you familiar with

19   the idea of what a religious accommodation request

20   is?

21       A.  Yes.

22       Q.  And do you know of any instances where a

23   Denver-based flight attendant made a religious

24   accommodation request?

25       A.  Not an actual request, no.

App. 113

Case 3:20-cv-00617 Document 1-4 Filed 09/08/20 Page 5 of 25 PageID 21

1      A.  Approximately, three and a half to four

2  years, approximately.

3      Q.  And so when did you start your -- I guess,

4  your job in that position?

5      A.  It was in 2015.  I don't recall the exact

6  month.

7      Q.  Okay.  And did you leave that position in

8  2018?

9      A.  Officially left it in January of 2019.

10     Q.  Okay.

11     A.  My title changed.

12     Q.  Okay.  All right.  And prior to being

13  assistant base manager in Denver, what -- what job

14  did you hold with the company?

15     A.  I was an inflight supervisor at the Denver

16  base.

17     Q.  Okay.  And how long were you an inflight

18  supervisor?

19     A.  With Southwest, 2011 is when I started.

20  So, approximately, four years, give or take.

21     Q.  Okay.  And did you work with Southwest

22  prior to 2011?

23     A.  No, I did not.

24     Q.  Okay.  Have you ever worked as a flight

25  attendant?

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGGAN JONES

Page 29

1    Q.  Okay.  And you say not an actual request.

2  Do you recall any -- any instance where a flight

3  attendant -- flight attendant's conduct may have

4  involved an accommodation request in some way?

5    A.  I don't understand your question.

6    Q.  Do you remember any incidents involving

7  flight attendants that involved religious

8  incompetent -- accommodation in some way?

9    A.  I have never had a flight attendant put in

10  a request that I know of for religious

11  accommodation.

12    Q.  Okay.  Is there a particular department at

13  Southwest that handles religious accommodation

14  requests?

15    A.  Yes.

16    Q.  And what is the name of that department?

17    A.  They are referred to as the ACT team.

18    Q.  Okay.  And has the ACT team ever contacted

19  the Denver base about a religious accommodation

20  request?

21         MR. CORRELL:  Objection.  Calls for

22  speculation.

23    A.  I don't know.

24    Q.  (By Mr. Gilliam)  Okay.  Now, in working

25  in other areas at Southwest, are -- are you

Bradford Court Reporting, LLC   972.931.2799   www.bradfordreporting.com

Case 3:CONFIDENTIAL-VIDEOTAPED-DEPOSITION-OF-MEGGAN-JONES

Page 46

1    investigation?

2         A.  It's possible that he did ask me to help

3    him with it.  I just -- I don't remember exactly.

4         Q.  Do you remember any other details about

5    how you came to be involved in the investigation?

6         A.  No.

7         Q.  Okay.  Do you know if you talked to

8    Ms. Stone as part of the investigation?

9         A.  No.

10        Q.  No, you don't remember; or, no, you

11   didn't?

12        A.  No, I didn't.

13        Q.  Okay.  Do you know who corresponded with

14   Ms. Stone as part of the investigation?

15        A.  I don't, no.

16        Q.  Okay.  But you do recall participating in

17   Charlene Carter's fact-finding?

18        A.  Yes.

19        Q.  Okay.  Do you know if, prior to Charlene

20   Carter's fact-finding, whether any sort of

21   information-gathering process had -- had started?

22        A.  Yes.

23        Q.  Okay.  And what happened as part of the

24   investigation -- as part of the

25   information-gathering process?

App. 116

Page 47

1      A.  I was asked to look at her Facebook page.

2      Q.  Okay.  I am sorry.  You said you were

3  asked to do what with her Facebook page?

4      A.  To look at her Facebook page.

5      Q.  Okay.  Who asked you to look at her

6  Facebook page?

7      A.  Ed Schneider.

8      Q.  Okay.  And what did Ed -- Ed Schneider ask

9  you to look for on her Facebook page?

10     A.  I don't recall specifically.

11     Q.  So what do you recall about looking at

12  Ms. Carter Facebook page?

13     A.  I remember looking at it.  I don't recall

14  much else.

15     Q.  Okay.  Do you recall taking any

16  information back from her page to Mr. Schneider?

17     A.  I don't recall.

18     Q.  Okay.  Okay.  Do you -- now, the -- the

19  Facebook posts that were attached to the email I

20  sent you earlier -- or I am sorry -- that -- that

21  were attached to the email you reviewed earlier as

22  part of -- which one was it? -- Document 1, do you

23  recall if you saw any of those images from the

24  screenshots on Ms. Carter's Facebook page?

25     A.  I don't recall.

Page 48

1     Q.  Okay.  But you recall those being

2  Charlene's Facebook posts at issue in this case?

3     A.  I'm sorry, can you repeat --

4           MR. CLOUTMAN:  Objection.  Misstates

5  prior testimony.

6     Q.  (By Mr. Gilliam)  Do you -- do you recall

7  those images being the -- some of the images you

8  were investigating and looking at as part of this

9  investigation?

10    A.  Yes.

11    Q.  Okay.  Now, did you talk to either of the

12 other two assistant base managers about those

13 posts?

14    A.  I don't recall.

15    Q.  Okay.  Do you know if you talked to Dave

16 Kissman about those posts?

17    A.  I don't recall.

18    Q.  Do you recall if you communicated with

19 them in any way about the investigation?

20    A.  No, I don't recall.

21    Q.  Okay.  All right.  Let's see if I can

22 refer you to the same document, Document 2.  It

23 should be 4450.

24    A.  4450?

25    Q.  Yes.

App. 118

Case 3:20-cv-01641-X Document 16-3 Filed 09/03/21 Page 10 of 36 PageID 536

Page 49

1    A.  Okay.

2        Q.  If you could just take a look at this.

3    And when you have had the chance to review it, let

4    me know.

5        A.  Okay.

6        Q.  Do you know what this is?

7        A.  It's an email.

8        Q.  Okay.

9        A.  From -- from Ed.

10       Q.  And it's to employee relations DG; do you

11   know who that is?

12       A.  Yes, I do.

13       Q.  Who is that?

14       A.  It's the team that investigates any

15   potential Title 7 issue.

16       Q.  A team that invests (sic) Title 7 issues?

17       A.  Like, harassment, you know, anything like

18   that.  Harassment policy, things like that.

19       Q.  Okay.  And is that what the employee

20   relations group does?

21       A.  Yes.

22       Q.  Okay.  And who are the, I guess, members

23   of that employee relations team who would receive

24   that email?

25       A.  I don't know who is on that team.

App. 119

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGAN JONES

Page 50

```
 1      Q.  Okay.  Did you -- do you know who was on
 2  that team in 2017?
 3      A.  Not entirely.
 4      Q.  Okay.  Who do you remember being on that
 5  team?
 6      A.  Christine Johnson.
 7      Q.  Okay.  Who else?
 8      A.  Denise Gutierrez.
 9      Q.  And who else?
10      A.  That's all I know.
11      Q.  All right.  Do you know if either
12  Christine Johnson or Denise Gutierrez was involved
13  in this investigation?
14      A.  Yes.
15      Q.  Okay.  And which of them was involved in
16  this investigation?
17      A.  Denise Gutierrez.
18      Q.  Okay.  Was Christine Johnson involved in
19  the investigation?
20      A.  I don't recall if she was or not.
21      Q.  Okay.  But Denise Gutierrez was?
22      A.  Yes.
23      Q.  Okay.  Do you know why Ed contacted
24  employee relations about this matter?
25      A.  Yes.
```

App. 120

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGAN JONES

1    Q.   Okay.   And why was that?

2    A.   Because the nature of the allegation being

3    made.

4    Q.   And what about the nature of the

5    allegation made it something that he would send to

6    employee relations?

7    A.   Any time an allegation might fringe on a

8    protected category, we run it past employee

9    relations.

10    Q.   Okay.   And do you know what the allegation

11    here that might have infringed on a protected

12    category was?

13    A.   I would have to go back and read again to

14    be able to determine exactly what that -- that

15    would be.

16    Q.   What would you have to go back and read?

17    A.   The statement from Audrey.

18    Q.   Yeah.   If you could, go back and look at

19    Document 1.

20    A.   Can you confirm the number on that one,

21    the SWA number?

22    Q.   Yeah.   It's the whole thing -- the whole

23    thing.

24    A.   Is it 4226?

25    Q.   4226, yes.   The first page.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGAN JONES

1    A.  Thank you.  Just want to make sure I am on

2  the right page.  Okay.

3    Q.  All right.  So -- so what about the

4  allegation in the complaint involved the need to

5  consider protected categories?

6    A.  She uses the term "harassment" in her

7  complaint, and so that would be an indication it

8  would need to be run past the employee relations

9  team.  And she also makes statements about her

10  religious views, which would also be an indication

11  it would need to be run past that team.

12    Q.  Okay.  What's the statement about

13  religious views you're referring to?

14    A.  Charlene doesn't know me or my religious

15  views.

16    Q.  Okay.  And let's see.  And Ed -- now, in

17  other issues you dealt with involving potential

18  violations of the harassment policy, was it routine

19  to turn in to employee relations any complaint that

20  used the term "harassment"?

21    A.  Yes.

22    Q.  Okay.  So for every single one that used

23  the term "harassment," you would send it to

24  employee relations?

25              MR. CORRELL:  Objection.  Misstates

1  prior testimony.

2      Q.  (By Mr. Gilliam)  You can answer.

3      A.  That's a kind of complicated question

4  because it would depend on the nature of that

5  complaint.  And, you know, typically, if they use

6  the term "harassment," it's sent to that group.

7      Q.  Okay.  What other, I guess,

8  characteristics involved in the nature of the

9  complaint would factor into the decision as to

10 whether to send it to employee relations?

11     A.  If it appeared to fringe on a protected

12 category, it would be sent to employee relations.

13     Q.  Okay.  And did Audrey's complaint present

14 an issue that appeared to infringe on a protected

15 category?

16     A.  Yes.

17     Q.  Okay.  And how so?

18     A.  The language that she used in the

19 complaint.

20     Q.  What -- so I am assuming other language

21 besides harassment, correct --

22     A.  In --

23     Q.  -- is that what we are talking about?

24     A.  In her case, she did use the term

25 "harassment."  And her reference to her religious

Case 3:20-cv-02076-L Document 56-8 Filed 09/02/21 Page 15 of 26 PageID 831

Page 54

1    views.

2        Q.  Okay.  Okay.  Now, after Ed sent this

3    email, do you know if you had additional

4    communications with employee relations?

5        A.  No, I don't know.

6        Q.  Okay.  Okay.  If you could look at

7    Document 2, and it's Number 4459.

8        A.  4459?

9        Q.  Yes.

10       A.  Okay.  I have got it here.

11       Q.  And if you could just read over it.  Once

12   you have read it, let me know.

13       A.  Okay.

14       Q.  Do you recognize this?

15       A.  It's -- I don't recognize it.

16       Q.  Do you know what it is?

17       A.  Yes.

18       Q.  What is it?

19       A.  It's an email from Denise Gutierrez to Ed

20   and the employee relations group.

21       Q.  And you are included on the email too,

22   correct?

23       A.  Yes.  I am CC'd in on the email.

24       Q.  Okay.  Do you know why you were CC'd in?

25       A.  Ed CC'd me in on his communication to

App. 124

```
1   them.  And it looks like they hit reply all.
2       Q.  Okay.  Do you know why Ed CC'd you in --
3       A.  I --
4       Q.  -- to his original email?
5       A.  I was assisting him with the
6   investigation.
7       Q.  Okay.  And after receiving this email --
8   well, let me direct your attention to something
9   real quick.  In the email that Denise sends, she
10  says, please set up a call with Audrey Stone so
11  that we can get more information about her
12  concerns.
13          Do you know if Ed set up a call with
14  Audrey Stone after receiving this email?
15      A.  I don't know.
16      Q.  Okay.  And -- but you do know that a
17  fact-finding with Charlene was set up?
18      A.  Yes.
19      Q.  Okay.  Did Charlene have union
20  representation at that fact-finding?
21      A.  Yes.
22      Q.  And who was her union representative?
23      A.  Chris Sullivan.
24      Q.  Okay.  And prior to the fact-finding, did
25  you talk to Chris Sullivan at all?
```

App. 125

Page 59

1       Q.   Okay.   What did the messages say?

2       A.   I don't recall.

3       Q.   Okay.   All you recall is that they were

4   messages?

5       A.   Yes.

6       Q.   Okay.   And did Ed show these to you in --

7   in the office?

8       A.   Yes.

9       Q.   Okay.   And what did you discuss about the

10   messages and posts?

11       A.   He wanted me to be aware of what the

12   meeting was about, since I was going to be taking

13   notes for him.   And he wanted me to be prepared for

14   some of the images because they were graphic.

15       Q.   Okay.   He wanted you to be prepared?

16       A.   Yes.

17       Q.   Now, you had seen them before, correct?

18       A.   I don't recall when I first saw the

19   images.

20       Q.   Okay.   And he -- he said he wanted you to

21   be aware of what the meeting was about.   As part of

22   that, did he inform you what it was about?

23       A.   Yes.

24       Q.   And what did he tell you it was about?

25       A.   Social media posts that had occurred that

1   on.  Here we go.  Okay.  Let's see.  Okay.

2   Document 9.  And what was the page number?

3        Q.  4675.

4        A.  Yes.  Okay.

5        Q.  And if you could take a look at that.

6        A.  Okay.

7        Q.  And not just 4675, but all of the attached

8   pages as well.

9        A.  Okay.

10        Q.  Do you recognize this?

11        A.  Yes, I do.

12        Q.  And what is it?

13        A.  It's an email from Ed to Maureen Emlet and

14   Denise Gutierrez.

15        Q.  Okay.  And you are CC'd, correct?

16        A.  Yes.

17        Q.  Okay.  Now, what -- do you recognize the

18   pages behind that first page?

19        A.  Yes.

20        Q.  Okay.  And what are those pages?

21        A.  Those are the fact-finding notes.

22        Q.  Okay.  And did you draft those notes?

23        A.  Yes.

24        Q.  Okay.  Now, who attended that fact-finding

25   meeting?

Page 64

1      A.   Charlene Carter, Chris Sullivan, myself,

2  Ed Schneider, Denise Gutierrez and Edie Barnett.

3  But Denise and Edie were conferenced in via phone.

4      Q.   Okay.   And was there anyone else there?

5      A.   No.

6      Q.   Okay.   And I would like to direct you to

7  4679.

8      A.   Okay.

9      Q.   And midway down, Ed says, we did go

10  through it a little bit and there are some here --

11  I guess the sentence before that, sentence is talk

12  -- talk before that about -- well, Ed says, when

13  you are posting on your Facebook page, are you

14  aware of other posts on there that would connect

15  you to Southwest Airlines?   Possibly pictures of

16  you in your uniform?

17          And then it goes on and Ed says, we

18  did go through a little bit and there are some

19  here; shows pictures of Charlene at work in her

20  uniform.

21          Do -- do you know who obtained those

22  pictures?

23          MR. CORRELL:   Objection.

24  Mischaracterizes the document.   You can answer,

25  Ms. Jones.

Page 65

1    A.   I did.

2    Q.   (By Mr. Gilliam)   Okay.   And when did you

3    obtain those pictures?

4    A.   I don't remember when.

5    Q.   Where did you obtain those pictures from?

6    A.   Charlene's Facebook page.

7    Q.   Okay.   And do you remember the dates of

8    those pictures?

9    A.   I don't.

10   Q.   Okay.   And let's see if I can direct you

11   to 4680.

12   A.   Okay.

13   Q.   It says -- let see.   Midway down -- about

14   midway down, there is a comment from Ed that says,

15   with your Facebook post, there is a connection to

16   the workplace and you can't have your political

17   views with Southwest as part of your depiction

18   there.

19          Do you know if Southwest has ever

20   fired another employee for posting their political

21   views on social media?

22   A.   Yes.

23   Q.   Okay.   And what happened in that case?

24   A.   The employee posted political views that

25   were offensive to other individuals, and they were

App. 129

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGGAN JONES

Page 84

1    reserve its questions for time of trial.  I am

2    sorry, Michael.  Go ahead.

3              MR. CORRELL:  No worries.

4                        EXAMINATION

5    BY MR. CORRELL:

6         Q.  Ms. Jones, I have just a couple of quick

7    questions for you.  First, you understand that part

8    of this lawsuit alleges that Ms. Carter was treated

9    less favorably because she was an objector or

10   nonmember of 556, correct?

11        A.  Yes.

12        Q.  Do you have any personal bias or animus

13   against flight attendants who opt-out from the

14   union or object to the union?

15        A.  No.

16        Q.  To your knowledge, did Ms. Carter's status

17   as an objector to the union play any role in the

18   decisions to terminate her?

19        A.  No.

20        Q.  You also understand that this case alleges

21   that Ms. Carter was treated less favorably in the

22   termination process because of her religion?

23        A.  Yes.

24        Q.  And you understand that that's linked to

25   her expression of pro-life views?

Page 85

1    A.  Yes.

2        Q.  Do you personally have a view on abortion

3    as between pro-life and pro-choice?

4        A.  Yes.

5        Q.  What is your position?

6        A.  It's complicated for me to answer that

7    because I am more pro-life; it's not a choice I

8    would make for myself, but I don't feel like I

9    should tell somebody else what they can or can't

10   do.

11       Q.  Do you have a personal bias or animus

12   against individuals who express no pro-life views?

13       A.  No.

14       Q.  Do you have a personal animus or bias

15   against individuals who profess a Christian faith?

16       A.  No.

17       Q.  To your knowledge, did the fact that

18   Ms. Carter's communications were pro-life as

19   opposed to pro-choice have any impact on the

20   decision to terminate her?

21       A.  No.

22       Q.  To your knowledge, did the fact that

23   Ms. Carter professed that her pro-life views were

24   related to her religious beliefs have any impact on

25   the decision to terminate her?

Page 86

1      A.   No.

2                MR. CORRELL:  I pass the witness.

3                MR. GILLIAM:  And I have no additional

4      questions.

5                THE VIDEOGRAPHER:  We are off record

6      at 12:38 p.m.  End of deposition.  End of media.

7                THE REPORTER:  Okay.  Mr. Correll, did

8      you want to -- me to have it -- send it to you for

9      reading and signing?

10               MR. CORRELL:  Yes, please.

11               (End of Proceedings.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bradford Court Reporting, LLC    972.931.2799    www.bradfordreporting.com

Page 89

1              REPORTER'S CERTIFICATION

2          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
3                   DALLAS DIVISION

4    CHARLENE CARTER            )
                                )
5                               ) CIVIL ACTION NO.
     VS.                        ) 3:17-CV-02278-X
6                               )
     SOUTHWEST AIRLINES CO., AND )
7    TRANSPORT WORKERS UNION OF  )
     AMERICA, LOCAL 556          )

8

9        ----------------------------------
                       CONFIDENTIAL
10           DEPOSITION OF MEGGAN JONES
                   NOVEMBER 4, 2020
11               (REPORTED REMOTELY)
         ----------------------------------

12

13          I, CHARIS M. HENDRICK, Certified Shorthand

14   Reporter in and for the State of Texas, do hereby

15   certify to the following:

16          That the witness, MEGGAN JONES, was by me

17   duly sworn and that the transcript of the oral

18   deposition is a true record of the testimony given

19   by the witness.

20          I further certify that pursuant to Federal

21   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)

22   as well as Rule 30(e)(2), that review of the

23   transcript and signature of the deponent:

24       __xx__ was requested by the deponent and/or a

25   party before completion of the deposition.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGGAN JONES
Case 3:20-cv-01616-B Document 63-3 Filed 09/02/21 Page 25 of 25 PageID 2581

Page 90

1        _____ was not requested by the deponent and/or

2    a party before the completion of the deposition.

3            I further certify that I am neither

4    attorney  nor counsel for, nor related to or

5    employed by any of the parties to the action in

6    which this deposition is taken and further that I

7    am not a relative or employee of any attorney of

8    record in this cause, nor am I financially or

9    otherwise interested in the outcome of the action.

10            The amount of time used by each party at

11    the deposition is as follows:

12            Mr. Gilliam - 2:16 hours/minutes

13            Mr. Correll - 2 minutes

14

15            Subscribed and sworn to on this 12th day

16    of November, 2020.

17

18

19    _____
      CHARIS M. HENDRICK, CSR # 3469
20    Certification Expires: 10-31-21
      Bradford Court Reporting, LLC
21    7015 Mumford Street
      Dallas, Texas  75252
22    Telephone 972-931-2799
      Facsimile 972-931-1199
23    Firm Registration No. 38

24

25