IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER            )
                           )   CIVIL ACTION NO.
VS.                        ) 3:17-CV-02278-X
                           )
SOUTHWEST AIRLINES CO., AND )
TRANSPORT WORKERS UNION OF  )
AMERICA, LOCAL 556          )

-----------------------------------

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF
MAUREEN EMLET
NOVEMBER 5, 2020

-----------------------------------

ANSWERS AND DEPOSITION OF MAUREEN EMLET,
produced as a witness at the instance of the
Plaintiff, taken in the above-styled and -numbered
cause on NOVEMBER 5, 2020, at 9:03 a.m., before
CHARIS M. HENDRICK, a Certified Shorthand Reporter
in and for the State of Texas, witness located in
Aurora, Colorado, pursuant to the Federal Rules of
Civil Procedure, the current emergency order
regarding the COVID-19 State of Disaster, and the
provisions stated on the record or attached hereto.

Case 3:17-cv-01617-D Document 143-1 Filed 05/01/20 Page 2 of 31 PageID 1343
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 13

1  the moment.

2        MR. GILLIAM:  Okay.

3     A.  I can hear you now.

4     Q.  (By Mr. Gilliam)  Okay.  And for that

5  group of people you had just described, have you

6  ever heard the term "nonmember" used to refer to

7  them?

8     A.  Yes.

9     Q.  Okay.  All right.  Now, in your position

10  as manager of labor relations, what -- what were

11  your responsibilities?

12     A.  My main responsibilities were to work with

13  the base leadership and the union lead --

14  leadership to ensure that the contract was being

15  correctly applied.  I was involved with cases that

16  had the potential to result in discipline; to

17  ensure that company policies and the inflight work

18  and conduct rules were being followed and applied

19  consistently.

20     Q.  Okay.  And when you say that -- well, did

21  you say that one of your responsibilities was

22  making sure the contract was applied properly?

23     A.  Yes.

24     Q.  Okay.  And by contract, are you referring

25  to the collective bargaining agreement between the

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 15

1    Q.  Okay.  Do you remember any of the flight

2  attendants who contacted you directly?

3    A.  No.

4    Q.  Okay.  Do you remember if you were ever

5  contacted directly by a flight attendant regarding

6  a social media policy violation?

7    A.  I don't know whether or not that was an

8  issue that I discussed directly with a flight

9  attendant.

10   Q.  Okay.  Do you know -- do you remember any

11 of the issues that you might have been contacted

12 about directly?

13   A.  No.

14   Q.  Okay.  All right.  Now, after you learned

15 from the base about a complaint involving a flight

16 attendant's conduct, what -- what do you do?

17   A.  My role would be to, first of all,

18 ascertain from the base leader what their

19 recommendation was in the case.  I would also go

20 through our archive files to ensure that any

21 discipline that was suggested was consistent with

22 what had happened before.

23       I also would have conversation with

24 the base leaders about whether a certain work and

25 conduct rule would apply or if it was a company

1    policy violation.  And then I -- I may have done

2    some research on my own if there were other areas

3    that I felt needed to be addressed prior to the

4    base leader making the final decision.

5         Q.  Okay.  And apart from inflight, did you

6    work with other departments at Southwest on

7    disciplinary issues?

8         A.  I was never employed in any other -- well,

9    no, that's not true.  When I first started, I was

10   part of inflight.  And then after I joined labor

11   relations, it used to be under the inflight

12   department, but then they separated into a separate

13   department.  So I was employed by the general

14   counsel department.  In that capacity, I sometimes

15   consulted with the labor managers of other

16   departments.

17        Q.  Okay.  In your -- your position as manager

18   of labor relations, did you collaborate with other

19   -- other departments in the investigation of flight

20   attendant discipline?

21        A.  Occasionally, yes.

22        Q.  Okay.  What were some of the departments

23   you would collaborate with?

24        A.  The human resources business partner, the

25   employee relations team, the FMLA team; those are

Page 25

1  roughly, about how many total religious

2  accommodation requests you dealt with?

3      A.  I think I was only involved in a small

4  handful.  It wasn't really my area to make those

5  decisions.

6      Q.  Okay.  Do you know if it was less than 10?

7      A.  I am sure it -- it was.

8      Q.  Okay.  Do you know if it was less than

9  five?

10     A.  I don't know, but I would think it was

11 less than five.

12     Q.  Okay.  All right.  And, I guess, as a

13 labor relations manager, were -- were you involved

14 in cases with a complaint about a social media

15 policy violation?  Well, let me -- let me strike

16 that.  Let me reword it.

17     A.  Yes.

18     Q.  Okay.  And were you familiar with the

19 social media policy?

20     A.  Yes.

21     Q.  Okay.  And were you also familiar with

22 Southwest's workplace bullying and hazing policy?

23     A.  Yes.

24     Q.  Okay.  And were you involved in -- or I'm

25 sorry.  Were you familiar with Southwest's sexual

App. 139

1    harassment policy?

2        A.  Yes.

3        Q.  Okay.  And did -- in -- in your time as

4    labor relations manager, did you deal with of

5    potential flight attendant violations of those

6    policies?

7        A.  Yes.

8        Q.  Okay.  And do you -- so as for the social

9    media policy, do you remember any flight attendants

10   who were terminated for violating the social media

11   policy?

12       A.  I know that there were flight attendants

13   terminated for violating the social media policy.

14       Q.  Okay.  And while you were a labor

15   relations manager, how many terminations of -- for

16   a social media policy violation do you remember?

17       A.  I -- I don't know without checking the

18   records.

19       Q.  Okay.  And do you know how many complaints

20   for a social media policy violation Southwest was

21   getting each year?

22       A.  I don't know company-wide.  For inflight,

23   we had hundreds -- over the course of years, we had

24   hundreds of complaints of violators.

25       Q.  Okay.  And if I do say employees, yes, I

1  -- I do, generally, mean flight attendants in -- in

2  -- working in inflight.

3              Okay.  And how -- how -- how did that

4  change between, say, the time you began as labor

5  relations -- well, let me -- let me re- -- let me

6  ask that again.

7              Did -- did the number of social media

8  policy violations decline between the time you

9  began as labor relations manager and when you

10  retired?

11     A.  No.  When I began as the labor relations

12  manager, I am not sure that we even had any social

13  media complaints yet; we may have.  And then the

14  number increased significantly.  Southwest and

15  inflight put out quite a bit of communication.  And

16  then after that, we did see a decline in the social

17  media complaints.  However, they were always --

18  they were always an issue.

19     Q.  Okay.  And -- and what were the

20  communications you referred to that Southwest put

21  out about social media policy violations?

22     A.  There were company-wide communications and

23  there were also inflight read-before-flies, which

24  are the memos that are directed specifically to

25  flight attendants.

1   is now; I don't know.

2        Q.  Okay.  How long were you receiving copies

3   of Unity?

4        A.  It just was occasional.  I -- I don't -- I

5   never could figure out any rhyme or reason to it.

6   Just, occasionally, the union would send a hard

7   copy of the Unity Magazine to me.

8        Q.  Okay.  Do you remember if you were getting

9   it up until the time you retired?

10       A.  I don't think I received any copies in the

11  last few years that I was there.

12       Q.  Okay.  Now, you mentioned company-wide

13  memos on -- regarding social media policy

14  violations.  Do you recall when the company issued

15  those?

16       A.  No.

17       Q.  Okay.  Do you -- do you remember if they

18  were sent frequently?

19       A.  I -- I do not.  They were not sent

20  frequently, that I remember.  I think that it was

21  mainly when the social media violation policy was

22  implemented and then any time that it was updated.

23  Also, the -- each employee was required annually to

24  acknowledge that they read and agreed to abide by

25  the social media policy.

1    to --

2                    THE REPORTER:  Mack --

3                    MR. GILLIAM:  -- send you --

4                    THE REPORTER:  Hold on real quick.

5                    THE VIDEOGRAPHER:  Just a second.  We

6    are off record at 9:49 a.m.

7                    (Recess taken.)

8                    THE VIDEOGRAPHER:  We are back on

9    record at 10:00 a.m.

10       Q.  (By Mr. Gilliam)  Okay.  Ms. Emlet, I

11   think, in your testimony, didn't you mention that

12   you recalled the company issuing some

13   read-before-fly memos about social media policy

14   violations?

15       A.  Yes.

16       Q.  Okay.  But you did not recall the -- the

17   -- the date that -- dates that those were issued?

18       A.  That's correct.

19       Q.  Okay.  Do you recall giving testimony in

20   the arbitration of Ms. Carter's grievance against

21   the company for her termination?

22       A.  Yes.

23       Q.  Okay.  If I could refer you to the

24   document that you were just emailed.

25       A.  Yes.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 33

1    Q.  Does reading that help refresh your

2  recollection as far as when you -- when the

3  read-before-fly memos were issued?

4    A.  It -- that February of 2017 would have

5  been one of the read-before-flies that was issued.

6    Q.  Okay.  Do you remember if another

7  read-before-fly memo was issued before that?

8    A.  Well, according to this testimony, it

9  looks like there was one in 2016 as well.

10    Q.  Okay.  Do you know why the read-before-fly

11  memo was issued in February of 2017 after one had

12  been issued in 2016?

13    A.  Because we were continuing to see an

14  increase in the social media violations among

15  flight attendants.  And so the leadership decided

16  -- determined that it was necessary to give the

17  flight attendants a reminder.

18    Q.  Do you know when they made that

19  determination?

20    A.  No.

21    Q.  Okay.  Do you know how long it takes to

22  issue a read-before-fly memo?

23    A.  Well, it can be issued almost

24  instantaneously, but the question, I imagine, is

25  how long it takes to be written.  If it's already

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 35

1    issued?

2         A.   No.

3         Q.   Okay.  Now, based off of the dates that

4    you have testified to for the read-before-fly memo,

5    do you know if the social media policy violations

6    had declined by 2018?

7         A.   I can't tell you whether they did or not

8    without seeing actual numbers.  I think that they

9    -- we did see a decline in social media violations.

10   And then I think there was another upswing, and

11   then they went down again.

12        Q.   And the -- the upswing you just mentioned,

13   was that after the read-before-fly memo was issued?

14             MR. CORRELL:  Objection.  Vague.

15        Q.   (By Mr. Gilliam)  Let me ask it again.

16   The upswing that you saw, was that after the

17   February 2017 read-before memo?

18        A.   I can't tell you for certain.  My

19   recollection is that the social media policy

20   violations started out with a steady increase; they

21   got very high.  After the 2017 memo, they went

22   down.  Then we saw a slight uptick again, and then

23   they -- so it was kind of a roller coaster, but I

24   -- I believe, without actually looking at specific

25   numbers, that prior to February of '17, we had more

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 36

1    social media violations in inflight.

2        Q.   Okay.  Now, apart from the social media

3    policy, were you involved in cases where there was

4    an alleged violation of the workplace bullying and

5    hazing policy?

6        A.   Yes.

7        Q.   Okay.  And did -- I -- I guess, what --

8    what specific role did you have in investigations

9    of violations of the workplace bullying and hazing

10   policy?

11       A.   Well, the investigation actually would

12   take place at the base level wherever the accused

13   flight attendant was based.  And then my role would

14   be to review the information that the base gathered

15   and determine whether or not a violation had

16   occurred; and to make sure that any potential

17   discipline was being applied consistently across

18   the department and across the company.

19       Q.   Okay.  And in reviewing whether a

20   violation had -- had occurred, would you make your

21   own determination separate from the human resources

22   business partner?

23       A.   No.  They really were our liaisons because

24   they oversaw that policy.

25       Q.   Okay.  And would the human resources

Case 3:20-cv-01174-L Document 164-13 Filed 09/27/21 Page 14 of 31 PageID 2854
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

1 business partner make the ultimate determination

2 whether there was a violation of the bullying and

3 hazing policy?

4      A.   I -- I am not sure that I can say that

5 they made that determination.  It's been a long

6 time since I have been at work.  So my recollection

7 is that they -- they would advise the base on

8 whether or not there had been a violation of the

9 policy.  There -- but they did not consult on

10 discipline or how to proceed with the particular

11 employee.

12      Q.  Okay.  And where would your, I guess,

13 determination of whether there had been a violation

14 of the bullying and hazing policy fit into the -- I

15 guess, the -- the -- the analysis?

16      A.  Well, it -- it was never a stand-alone --

17 it was -- it was more of a consensus.  I think that

18 the base leader used all of their resources, spoke

19 with the experts in the different areas.

20 Ultimately, it would be up to the human resources

21 business partner to tell us whether or not they

22 believed there was a violation of the policy.  And

23 then if the base determined that discipline was

24 warranted, I would work with them to ensure

25 consistency in applying discipline.

Case 3:21-cv-01260-X Document 166-6 Filed 08/21/24 Page 14 of 31 PageID 2755

1   then waited for the base leader to contact me to

2   discuss his investigation.

3       Q.  Okay.  And what did you do as part of your

4   review of the information?

5       A.  I looked at all of the Facebook posts.  I

6   reviewed the videos.  I went to Facebook myself to

7   see if I could access the pictures just to verify

8   that they -- they were, in fact -- that they came

9   from the source that they were purported to have

10  come from.

11      Q.  Okay.  And were you able to access the --

12  the pictures?

13      A.  Yes.

14      Q.  Okay.  And did -- did you, I guess, take

15  screenshots or try to -- I guess, save that

16  information?

17      A.  I probably did, but I would have to check

18  the -- well, I don't have access to any of the

19  company documents anymore.

20      Q.  Okay.  And, I guess, as part of your

21  review, did you start comparing these Facebook

22  posts to any other disciplinary cases you had had

23  involving the social media policies?

24      A.  Yes.  That would have been part of my

25  review.

Page 56

1    Q.  Okay.  And what other, I guess, social

2    media policy cases did you review?

3    A.  Well, I would have reviewed any cases that

4    we had saved in our ProLaw files that resulted in

5    suspension or termination.  General -- well, they

6    could have been lesser disciplines, but, generally,

7    I was only involved in cases that -- that could

8    result in 30-day suspension or a termination.

9    Q.  Okay.  And were you only contacted when a

10   termination or suspension would -- would be

11   involved?

12   A.  Occasionally, I was contacted by the base

13   on lesser offenses.  Or they may -- the base may

14   have thought that this was a terminable offense;

15   and after discussion and review of -- of prior

16   cases, it may -- they may have made a decision to

17   issue a lower discipline.  So it would be a rare

18   case that I was contacted for something less than

19   the termination or the 30-day suspension.

20   Q.  Now, when you were contacted, were -- were

21   you told that this would be a case involving either

22   suspension or termination?

23   A.  No.  No determination had been made at the

24   time that I was first contacted.

25   Q.  Okay.  And after sending this email to

Page 60

1   investigation, if you received Audrey's initial

2   complaint?

3       A.  I wasn't the first one to receive it, but

4   I -- I am sure I reviewed it during the course of

5   the investigation.

6       Q.  Okay.  Let's see.  If I could refer you to

7   Document 1.

8       A.  Okay.

9       Q.  And if you could just read -- I guess,

10  review the whole thing -- read and review the whole

11  thing.

12      A.  Okay.

13      Q.  And do you recognize this?

14      A.  Yes.

15      Q.  And what is it?

16      A.  This is an email that Suzanne Stephensen

17  received.  It -- it looks like it was originally

18  sent on February 22nd of 2017 from Audrey Stone to

19  Suzanne Stephensen.

20      Q.  Okay.  And the -- the screenshots that are

21  a part of this exhibit, do -- were -- were these

22  the screenshots that were at issue in this

23  complaint?

24      A.  These are some of them, yes.

25      Q.  Okay.  The first screenshot that -- well,

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 61

1   let me back up a bit.

2           Do you remember what other screenshots

3   were involved in Ms. Stone's complaint?

4       A.  Well, I don't know if Ms. Stone sent any

5   other screenshots.  I know that there were

6   additional screenshots that were provided during

7   the -- or -- or uncovered during the course of the

8   investigation of these allegations, but I don't

9   know -- I don't know whether or not Audrey provided

10  any other screenshots.

11      Q.  Okay.  And do you know who provided the --

12  the other screenshots?

13      A.  I don't remember.  Some of them, I

14  believe, I found on Ms. Carter's Facebook page.

15  And then -- I -- I don't remember where else they

16  would have come from, but it would have been from

17  company leaders who were working on the

18  investigation, I believe.

19      Q.  Okay.  Do you remember what screenshots

20  you found on -- on -- on Ms. Carter's website that

21  were connected to her termination?

22      A.  I don't know for sure which screenshots I

23  found or if someone else provided them.  I know

24  that there were screenshots of Ms. Carter in her

25  Southwest uniform or on -- on a Southwest airplane,

Case 3:23-cv-00033 Document 16-6 Filed 09/27/24 Page 18 of 31 PageID #: 150

Page 62

1    and those were provided as a nexus to the

2    workplace.

3        Q.  Okay.  All right.  And, I guess, turning

4    back to the Page 4228 in that first screenshot.

5        A.  Are we going back to the last document?

6        Q.  Yes, ma'am.  Document 1.  So --

7        A.  We're still in Document 1?

8        Q.  Yes, ma'am.  Yeah.

9        A.  Okay.

10        Q.  And 4228.  It should be the first

11    screenshot.

12        A.  Okay.

13        Q.  And the -- the message -- part of the

14    message says, you truly are despicable in so many

15    ways.  By the way, the recall is going to happen.

16            What is the recall?

17        A.  If I remember correctly, there was a

18    faction of 556 members who wanted to remove Audrey

19    Stone from office.

20        Q.  Okay.  And how did you learn about the

21    recall?

22        A.  Well, it was common knowledge because

23    flight attendants were very vocal about it.  So I

24    don't know how I learned about it; probably from

25    other Facebook posts.

Page 70

1   decision as to whether Charlene Carter should be

2   terminated?

3       A.   Which information are you referring to?

4       Q.   Where -- where she says I'm Christian, I

5   am a conservative and pro-life?  What I read?

6       A.   Not at all.

7       Q.   Okay.  Now, going back to the first page,

8   the 4675.

9       A.   The email?

10      Q.   Yes, ma'am.

11      A.   Yes.

12      Q.   And Ed Schneider has emailed that to you

13  and Denise, correct?

14      A.   Yes.

15      Q.   Okay.  And he -- he says, can we talk

16  soon?

17              Did -- did you talk to Ed after he

18  sent you these notes?

19      A.   I am sure that I did.

20      Q.   Okay.  And what -- I guess, after reading

21  these notes and your prior review of the -- the --

22  the Facebook posts and pictures, what -- what did

23  you tell Ed?

24      A.   I don't remember what I told him at that

25  time.  I know that he -- we -- we discussed the

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 71

1    case.  He reviewed everything, recommended

2    termination; and I agreed with his decision.

3         Q.  Okay.  At what point did he recommend

4    termination?

5         A.  I don't know.  It was after the

6    fact-finding meeting and after he had reviewed

7    every -- all of the information that he gathered in

8    his investigation.

9         Q.  Okay.  So the -- the date of this email is

10   March 9th, 2017.  Based on what -- what you read --

11   well, strike that.

12            So the date here is March 9th, 2017.

13   And the date of the termin- -- termination letter

14   is March 14th, 2017.  Is it fair to say he made the

15   -- the determination sometime in that -- in that

16   period?

17        A.  Yes.

18        Q.  Okay.  Now, do you know how soon prior to

19   sending the termination letter a decision was made

20   to -- to fire Ms. Carter?

21            MR. CORRELL:  Objection.  Asked and

22   answered.

23        A.  I don't know.  Typically, the termination

24   letter is sent out very soon after the decision is

25   made.  But, of course, we are bound by time frames

App. 154

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 79

1    accusations of what Ms. Carter believed to be

2    Ms. Stone's beliefs about abortion and, certainly,

3    I would think that a longstanding history of

4    harassing Facebook messages could be considered as

5    hazing or bullying.

6        Q.  Okay.  And what was the specific violation

7    that -- that you identified for the social media

8    policy?

9        A.  The -- the videos that she sent to Audrey.

10   As well as those same videos were on her Facebook

11   page, which was a public page.  And she identified

12   herself as a Southwest employee.

13       Q.  Okay.  Do you remember if you found emails

14   on her Facebook page that identified her as a

15   Southwest employee?

16       A.  I didn't know that there were emails on

17   Facebook.

18       Q.  I am sorry.  Do you -- did you find posts

19   on Ms. Carter's Facebook page that identified her

20   as a Southwest employee?

21       A.  Yes.

22       Q.  Okay.  Let's see.  Well, if I could direct

23   you to document -- well, first -- can we mark

24   Document 8 as the next exhibit.  I'm not sure which

25   number we're on.

Case 3:17-cv-02278-X Document 166-6 Filed 09/02/21 Page 22 of 31 PageID 2658

1  involved in all of it.

2      Q.  Okay.  So it was normal that you would

3  send her all of the information of an -- an

4  investigation?

5      A.  Yes.

6      Q.  Okay.  And, now, who made the

7  determination that there was a nexus between

8  Ms. Carter's posts and Southwest?

9      A.  I don't know if any one person made that

10  determination.  Typically, in these high-profile

11  cases, our entire labor relations team would

12  discuss the case.  And then I -- I know that I had

13  some conversation about the nexus to the workplace

14  and her presenting herself in uniform on -- on her

15  Facebook page.

16      Q.  Okay.  Do you know what the dates of those

17  pictures were?

18      A.  No.

19      Q.  Okay.  And I do have a question too about

20  6505.

21      A.  Okay.

22      Q.  And what is the nexus to Southwest on that

23  page?

24      A.  Ms. Carter is standing.  She's the second

25  one from the right and she has her Southwest

1  Airlines ID around her neck.

2      Q.  Okay.  And I -- I realize that this is

3  another copy, but can -- can you -- could you read

4  the -- the version of -- or read that ID in the --

5      A.  I cannot.  Not to my -- my iPad, I can't,

6  no.

7      Q.  Okay.  Do you recall if, on the original

8  version you saw, you could -- you could read what

9  was on the ID?

10     A.  I don't know.  I -- I know that -- I don't

11  know if I could read it.  I know that the coloring

12  and the layout were definitely recognizable as a

13  Southwest ID.

14     Q.  Okay.  Now, did you have any follow-up

15  discussions with Tammy Shaffer or Brianna Grant

16  about any of these pictures?

17     A.  I am sure I did.

18     Q.  Okay.  Do you know if you talked to them

19  about whether there was a nexus between Southwest

20  and the posts?

21     A.  I probably did, yes.

22     Q.  Okay.  And did they give you any

23  conclusions about the posts themselves?

24     A.  I don't remember.  I think it would only

25  be that, yes, there was a nexus to the workplace.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 85

1    Q.  Okay.  Would you have told them that you
2  were -- or would you -- would you have told them
3  whether you were recommending termination to the
4  base manager?
5    A.  I did not recommend the discipline to the
6  base manager.  He told me what he was recommending.
7  And then I -- I probably would have had that
8  discussion with Brianna and Tammy to see whether or
9  not our team was in agreement.
10   Q.  Okay.  Do you remember if you had any
11  communications with Denise Gutierrez about any of
12  the -- the photos involved in the case?
13   A.  I know that I talked with her.  I don't
14  remember the content of any of those conversations.
15   Q.  Okay.  All right.  Now, are -- and do you
16  recall that -- that -- that Ms. Carter was opposed
17  to Ms. Stone's participation in the women's march?
18   A.  Yes.
19   Q.  Okay.  And do you recall why Ms. Carter
20  was opposed to that?
21   A.  I don't know for sure.  I -- I believe
22  that she was under the impression that Ms. Stone
23  was using union funds to participate in the march.
24  And that by participating in the women's march, she
25  was claiming to be pro-choice.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 89

1    Jeanna Jackson?

2        A.   Well, I believe so.  I know of Jeanna's

3    history.  I don't remember if I was directly

4    involved in any of her investigations or hearings

5    or if I just -- she -- she had multiple violations,

6    so I'm not sure if I was directly involved in any

7    of them.

8        Q.   Okay.  Let's see.  And what about Ricky

9    Spand?

10       A.   I know that he had violations.  I don't

11   remember whether or not I was the labor manager on

12   any of those cases.

13       Q.   Okay.  Were you involved in any

14   disciplinary investigations involving Casey

15   Rittner?

16       A.   I believe so, yes.

17       Q.   Okay.  Were you involved in any

18   disciplinary investigations involving Josh

19   Rosenberg?

20       A.   I don't recognize that name.  I might have

21   been, but I don't recognize the name.

22       Q.   Okay.  Were you involved in any

23   disciplinary violations involving Kendall Foss?

24       A.   Yes.

25       Q.   Okay.  And do you know -- do you recall

App. 159

Page 90

1    what the discipline that was issued to Kendall was?

2        A.   She was terminated.

3        Q.   Okay.  And do you know which -- which rule

4    she was terminated for?

5        A.   I don't remember specifically.

6        Q.   Okay.  Do you know if it was a social

7    media policy violation?

8        A.   I -- I just don't remember.  I -- I know

9    that I was heavily involved in that case, but --

10   and even the arbitration, but, now, I don't

11   remember what the violation was.

12       Q.   Okay.  Were -- were you involved in a

13   disciplinary case involving Brandon Conlon (sic)?

14       A.   Well, Brandon was a senior director, so I

15   -- I don't know of anything where he was issued

16   discipline.  He was not a flight attendant.

17       Q.   Okay.  All right.  In Kent Hand's case, do

18   you know what he was terminated for?

19       A.   Off the top of my head, I believe that it

20   was a social media policy violation and workplace

21   violence.

22       Q.   Okay.  And what are some of the details

23   you recall about that -- that case?

24       A.   He -- I don't -- I don't remember if he

25   posted a picture on Facebook, but there was a

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 91

1    picture of someone hanging out of the car window

2    with a machine gun and there was some verbiage on

3    -- on the car.  I don't remember exactly what it

4    said, but I know that the union -- some of the

5    union representatives felt that it was a direct

6    threat against the union.

7         Q.   Okay.  Do you know who reported Mr. Hand?

8         A.   No.  It was not reported to me.

9         Q.   Okay.  Okay.  And what do you recall about

10   Mr. Talbert's case?

11        A.   Nothing.

12        Q.   Okay.

13        A.   I -- that was -- that was a long time ago.

14   I don't remember any specifics of -- of that case.

15        Q.   You don't remember whether he was

16   terminated?

17        A.   I do know he was terminated.  I don't

18   remember what the violation or violations were.  I

19   know it was social media, but I can't -- can't

20   recall any other specifics of the -- that case.

21        Q.   Okay.  Do you know if he got his job back

22   at Southwest after he was terminated?

23        A.   Yes, he did.

24        Q.   Okay.  And is he still employed with

25   Southwest?

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 127

1    otherwise, I pass the witness.

2                    MR. CORRELL:  And Southwest renews its

3    prior responses to those objections, and adds that

4    Ms. Emlet is a non-party witness subject to

5    subpoena, and Southwest reserves the right to move

6    and quash any subsequent subpoenas served on

7    Ms. Emlet.

8                         EXAMINATION

9    BY MR. CORRELL:

10       Q.  Ms. Emlet, before we finish today, I have

11   just a couple of questions for you.  First, do you

12   understand that a part of Ms. Carter's claim

13   concerns her contention that she was treated less

14   favorably because she was a union objector?

15       A.  Yes.

16       Q.  Do you personally have any bias or animus

17   against individuals who are union objectors?

18       A.  No.

19       Q.  Did you observe anything in Ms. Carter's

20   termination process that led you to believe that

21   her union objector status played any role in her

22   termination?

23       A.  No.

24       Q.  You also understand that Ms. Carter is

25   alleging that she was terminated because of her

App. 162

Page 128

1    religiously motivated pro-life views?

2         A.   Yes.

3         Q.   Do you personally have a position on the

4    issue of abortion as between pro-life and

5    pro-choice?

6         A.   Yes.

7         Q.   What is your position?

8         A.   I am pro-life.

9         Q.   Did you see anything in the course of the

10   termination that led you to believe that

11   Ms. Carter's termination was occasioned by the fact

12   that she harbors religiously motivated pro-life

13   beliefs?

14        A.   No.

15        Q.   Do you have any personal bias or animus

16   against individuals who have pro-life beliefs?

17        A.   No.

18        Q.   Do you have any bias or animus against

19   individuals based on their Christian faith?

20        A.   No.

21             MR. CORRELL:  I have no further

22   questions for you, Ms. Emlet.  I pass the witness.

23             MR. GREENFIELD:  Ms. Emlet, you

24   haven't heard much from me today.  This is Adam

25   Greenfield from defendants TWU Local 556.  And I

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 132

1              REPORTER'S CERTIFICATION

2          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
3                   DALLAS DIVISION

4    CHARLENE CARTER              )
                                  )
5                                 ) CIVIL ACTION NO.
     VS.                          ) 3:17-CV-02278-X
6                                 )
     SOUTHWEST AIRLINES CO., AND  )
7    TRANSPORT WORKERS UNION OF   )
     AMERICA, LOCAL 556           )

8

9          ---------------------------------
                        CONFIDENTIAL
10          DEPOSITION OF MAUREEN EMLET
                    NOVEMBER 5, 2020
11                (REPORTED REMOTELY)
           ---------------------------------

12

13          I, CHARIS M. HENDRICK, Certified Shorthand

14    Reporter in and for the State of Texas, do hereby

15    certify to the following:

16          That the witness, MAUREEN EMLET, was by me

17    duly sworn and that the transcript of the oral

18    deposition is a true record of the testimony given

19    by the witness.

20          I further certify that pursuant to Federal

21    Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)

22    as well as Rule 30(e)(2), that review of the

23    transcript and signature of the deponent:

24        __xx__ was requested by the deponent and/or a

25    party before completion of the deposition.

Case 3:21-cv-00881-X Document 176-11 Filed 09/01/23 Page 31 of 31 PageID 11572

1        _____ was not requested by the deponent and/or

2    a party before the completion of the deposition.

3            I further certify that I am neither

4    attorney  nor counsel for, nor related to or

5    employed by any of the parties to the action in

6    which this deposition is taken and further that I

7    am not a relative or employee of any attorney of

8    record in this cause, nor am I financially or

9    otherwise interested in the outcome of the action.

10           The amount of time used by each party at

11   the deposition is as follows:

12           Mr. Gilliam - 3:42 hours/minutes

13           Mr. Correll - 2 minutes

14

15           Subscribed and sworn to on this 12th day

16   of November, 2020.

17

18

19   _____

20   CHARIS M. HENDRICK, CSR # 3469
     Certification Expires: 10-31-21
     Bradford Court Reporting, LLC
21   7015 Mumford Street
     Dallas, Texas  75252
22   Telephone 972-931-2799
     Facsimile 972-931-1199
23   Firm Registration No. 38

24

25