IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. |
| | § | 03:17-cv-02278-S |
| SOUTHWEST AIRLINES CO., | § | |
| AND TRANSPORT WORKERS | § | |
| UNION OF AMERICA LOCAL | § | |
| 556, | § | |
| | § | |
| Defendants. | § | |

_____

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

CHARLENE CARTER

November 20, 2020

_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PORTIONS OF TRANSCRIPT DESIGNATED CONFIDENTIAL:

PAGE 132:13 THROUGH 134:6
PAGE 134:19 THROUGH 135:10

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF CHARLENE CARTER, located at her residence in Aurora, Colorado, produced as a witness at the instance of the Defendant Southwest Airlines Co., and duly sworn, taken in the above-styled and numbered cause on November 20, 2020, from 10:02 a.m. to 4:36 p.m., before Joseph D. Hendrick, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, pursuant to Notice and the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

Job No. 4341722

1        Q.        Now, you started with Southwest Airlines in

2    September of 1996, correct?

3        A.        That is correct.

4        Q.        And you left Southwest Airlines on

5    March 14th of 2017, right?

6        A.        That is correct.

7        Q.        And from the beginning of that period until

8    the end of that period, you held the title of flight

9    attendant, right?

10       A.        Yes, sir.

11       Q.        And you never held any other positions with

12   Southwest Airlines?

13       A.        No, sir.

14       Q.        Do you have the exhibit screen available to

15   you so that I can show you some documents?

16       A.        I do.

17       Q.        Okay.

18       A.        Oop.  And I don't know how to work all of

19   this, to be quite honest with you, but I guess you can

20   see me.  Okay.  So yes, I've got that.

21              (Deposition Ex. 1 marked)

22   BY MR. CORRELL:

23       Q.        And you should see in just a moment what

24   will populate as Exhibit 1.

25       A.        Okay.  Is that just going to pop up on my

 1   screen?

 2        Q.     Yes, ma'am.

 3        A.     Okay.

 4        Q.     It should pop into the folder for the

 5   exhibits.  You may have to refresh.  I am not a hundred

 6   percent certain on that.

 7        A.     Okay.  Well, let me refresh.  Okay.  It

 8   says Exhibit 1.

 9        Q.     Okay.  And can you open that document,

10   please?

11        A.     I sure can.  Okay.

12        Q.     Do you recognize that document?

13        A.     Yes, sir, I do.

14        Q.     What is that document?

15        A.     That is the document that they sent me

16   stating that I was terminated.

17        Q.     And did you receive this letter close in

18   time to the date of March 14th, 2017?

19        A.     Yes.

20        Q.     I just want to walk through a couple points

21   in the letter.  First of all, at the beginning, the

22   first sentence, if you will read along quietly, I will

23   read aloud.  "On March 7, 2017, a fact-finding meeting

24   was held to discuss certain messages and videos you

25   posted on your Facebook page and sent to another

Page 28

1      A.      No.

2          Q.      I want to take you next to the second
3   paragraph and I will read the first sentence to you
4   while you read along quietly.  "During the meeting, you
5   admitted you posted graphic videos of aborted fetuses
6   on Facebook and sent the same videos in a private
7   Facebook message to another Southwest flight
8   attendant."

9              Did I read that correctly?

10         A.      Yes, you did.

11         Q.      Is it true that you admitted during the
12  fact-finding meeting that you posted graphic videos of
13  aborted fetuses on Facebook?

14         A.      Yes.

15         Q.      Is it true that you admitted that you sent
16  the same videos in a private message to another
17  Southwest flight attendant?

18         A.      I sent them to Audrey Stone who was my
19  president of the union, yes.

20         Q.      And Ms. Stone was also employed as a flight
21  attendant by Southwest Airlines at that time, correct?

22         A.      She was employed, yes.

23         Q.      Well, I mean, my question is specific so I
24  want to make sure the record is clear.  She was
25  employed by Southwest Airlines as a flight attendant,

Page 29

1   correct?

2       A.      Correct.

3       Q.      The next sentence reads, "You also admitted

4   to sending the Flight Attendant a private message

5   containing a picture of individuals wearing costumes

6   depicting the female genitalia."

7               Did I read that correctly?

8       A.      Yes, you did.

9       Q.      Is it true that you admitted that in the

10  fact-finding meeting?

11      A.      Yes, it is.

12      Q.      Last sentence of that paragraph, "You

13  agreed that the pictures and videos were graphic."

14              Did I read that correctly?

15      A.      Yes.

16      Q.      Did you admit that at the fact-finding

17  meeting?

18      A.      Yes.

19      Q.      Next I want to take you to two new

20  additional exhibits, and I'll have you look at both of

21  them before we discuss them.

22      A.      Will they just come up on the screen?

23      Q.      Yes, ma'am.  That's how all of -- that's

24  how I'm going to convey all of the documents to you

25  today.

Page 30

1          A.      Okay.   Okay.

2          Q.      And you will have the full ability to look

3     at them as they come up and control them as you need

4     to.

5          A.      Okay.

6                  (Deposition Exs. 2 and 3 marked)

7     BY MR. CORRELL:

8          Q.      So Exhibit 2 should now be available to you

9     if you could take a look at that, and I'll go ahead and

10    release Exhibit 3 as well.

11         A.      Okay.   Okay.   Do I need to refresh again?

12         Q.      Oh.   There's an error here.   That is not

13    the correct document for Exhibit 2.   Give me one

14    moment.

15                 We'll just go to Exhibit 3 and we'll come

16    back to Exhibit 2 later because I believe that's an

17    incorrect upload.   I'll have to get that corrected when

18    we take a break.

19         A.      Okay.   So Exhibit 3?

20         Q.      Yes, ma'am.

21         A.      Okay.

22         Q.      And so this is a fairly lengthy document.

23    If you want to scroll through it you're welcome to, I

24    have some just very simple questions once you have a

25    chance to familiarize yourself with it.

1                      But do you recognize this document?

2          A.      Yes, sir, I do.

3          Q.      What is this document?

4          A.      This is the private message that I sent to

5    my union president Audrey Stone.

6          Q.      And to be clear, this document consists of

7    about 100 pages, right?  If you scroll down.

8          A.      I believe so, yes.

9          Q.      And there's -- and all of these appear to

10   be messages that you sent to Ms. Carter, correct?

11   Excuse me.  To Ms. Stone.

12         A.      Yes.  But I will say the only ones that I

13   was called in for were of the videos that I sent her.

14         Q.      What do you mean when you say that?

15         A.      Those were the only ones that were used in

16   my fact-finding meeting and also in my second step

17   meeting.

18         Q.      When you say "used," what do you mean?

19         A.      Those are the ones that I was called in

20   for.

21         Q.      Well, no, and that's what I'm trying to

22   understand.  Are these the ones that were shown to you,

23   what -- what was done with these documents at your

24   fact-finding?

25         A.      The only ones that were shown to me were

Page 32

1  the ones of the videos, pictures that you see.  The

2  remaining were not -- were not a part of my

3  fact-finding meeting.

4      Q.    Now, do you acknowledge that all of these

5  are messages that you sent to Ms. Stone?

6      A.    Yes, as for being my president of the

7  union, it was.

8      Q.    And prior to sending the messages,

9  beginning on the first page and continuing on to the

10  second page, did Ms. Stone report you to Southwest

11  Airlines?

12      A.    No.  As a matter of fact, we never even had

13  any communications.

14      Q.    Did Ms. Stone ever respond to you with

15  respect to any of these messages?

16      A.    No, she did not.  She was very hard to --

17  to speak with.

18      Q.    What efforts did you make to contact

19  Ms. Stone aside from sending these messages, if any?

20      A.    Through emails.

21      Q.    And --

22      A.    And going to a, you know, a union meeting

23  before I became an objector.

24      Q.    To the best of your recollection, what

25  emails did you send to Ms. Stone?

1          A.      Regarding their -- let's see, it was

2    regarding the National Right to Work Foundation, some

3    of the emails that I responded to had to do with our

4    voting, some of the other emails may have had to do

5    with charges that were brought up against some other

6    union members.  I -- I don't recall all of them.

7          Q.      Did you send those emails from your

8    Southwest email account or from a personal email

9    account?

10         A.      I don't recall.

11         Q.      Have you provided copies of all of those

12   emails to your counsel?

13         A.      Some of them I don't even think that I have

14   anymore because they're not on my system.  I -- I --

15   I've provided everything that I have to my attorney.

16         Q.      The ones that are not on your system

17   anymore, do you have a sense of when they were lost?

18         A.      I don't.  I had a hard drive crash and they

19   tried to get everything, as much as they could off of

20   my old system and put it on this system.

21         Q.      When did that occur?

22         A.      Oh gosh, that was -- let's see, my son --

23   2015 maybe.  2015-2016.

24         Q.      When did you attempt to speak to Ms. Stone

25   at a union meeting?

1      A.      The last time that I spoke with her was in
2  2013, at a union meeting.
3      Q.      Can you tell me about that conversation?
4      A.      Well, I mean, it was a union meeting.  It
5  was put forth -- you know, I mean, there was a lot of
6  topics that were there.  One of them being that she was
7  not the duly elected president.  They had taken out
8  our -- our other team of elected officials.
9      Q.      So was this a one-on-one conversation, or
10  was this just a general meeting environment?
11      A.      Well, everybody has a moment to speak at a
12  union meeting.
13      Q.      So were you standing up in the meeting and
14  speaking in front of the meeting to Ms. Stone, or were
15  you privately speaking to her on the side?
16      A.      No, it was in the meeting.
17      Q.      What did you say to Ms. Stone in that
18  meeting?
19      A.      I don't recall everything that I said that
20  day.
21      Q.      Do you recall anything that you said that
22  day?
23      A.      I read out loud the bylaws that we want to
24  change, I do remember that, and that I read out the --
25  basically the coup that had been talked about with all

Page 35

1  of them now that were representing us to take out the

2  last group, and that would have been Stacy Martin,

3  Chris Click, Jerry Lindermann, Dawn Wann, and Jana

4  Deloache.

5      Q.      Did Ms. Stone respond to you?

6      A.      She did not respond.  It was basically a

7  document that I was able to read, several documents

8  that I was able to read, regarding some of the things

9  that were said by the people that actually now were

10 representing us.

11     Q.      But she -- but she never had a direct

12 response to you.

13     A.      No.  As a matter of fact, she's never

14 really had a direct response with a whole lot of

15 people.  She's very hard -- she was very hard to get

16 ahold of.

17     Q.      Was this the first time you ever engaged

18 directly with Ms. Stone?

19     A.      Yes, it was.

20     Q.      Would it be fair to characterize that

21 meeting as confrontational?

22     A.      It wasn't confrontational.  It was just

23 basically stating some facts that were -- that we all

24 knew about.

25     Q.      Were you upset?

1      A.      Upset at just -- not upset, just more of

2  how could they take out our elected, the way that they

3  did it, and just be placed into office.

4      Q.      Between 1996 and 2013, had you ever had

5  occasion to encounter Ms. Stone in any other setting?

6      A.      No.

7      Q.      Other than the emails you have described in

8  the union meeting at 2013 and sending the messages

9  depicted in Exhibit 3, did you make any other efforts

10  to communicate with Ms. Stone directly?

11      A.      Just by the emails of if I disagreed with

12  something that the union was doing or paying for, and

13  those are, like I said, those would have been the

14  emails that -- you know, I sent most every -- I mean,

15  I've sent everything that I have, but no, I never

16  actually saw her in person.  There was never a reason

17  to as in, you know, she wasn't flying online.

18      Q.      How do you know that?

19      A.      Well, you could look at her board and find

20  out when she was flying at that time.  I mean, all of

21  us were able to see where our elected officials, unless

22  they blocked their screens.

23      Q.      Did you go look at her board to see if she

24  was flying?

25      A.      No, I did not go and look at her board, but

1      Q.      And you were present for Audrey Stone's

2   testimony about those videos, correct?

3      A.      That is correct.

4      Q.      And you were present when she testified

5   that when she opened Facebook, those began playing,

6   correct?

7      A.      They had to turn those videos on to play

8   them.

9      Q.      So you dispute her prior testimony that

10   those played automatically when she opened the

11   messenger window to your messages?

12      A.      That is correct.  Any time you open up a

13   message, you have to click on the actual message for it

14   to play.

15      Q.      Why did you send these messages to

16   Ms. Stone?

17      A.      They had participated in a march, it was

18   after President Trump was elected, they went to DC, and

19   the main sponsor for that march was Planned Parenthood.

20   The entire time everything was -- or through that march

21   was all pretty much to do with reproductive rights, and

22   they went on our dime, as in union dues.  They paid

23   for -- we paid for their food, their travel, their

24   lodging, and whatever incidentals that they did there.

25   The union membership was not informed prior to them

1    going.

2              They took about 20 women and marched at

3    this march, which I felt that -- and along with a lot

4    of others, felt that this was inappropriate, as in

5    representing us as, you know, careered flight

6    attendants, and she and these women went out and there

7    was a campaign and you can look it up, they wore

8    pink -- and they're called pussyhats -- and they also

9    marched with a banner that represented that they were

10   supporting or marching for Southwest Airlines Flight

11   Attendants Local 556, and that march was supported and

12   funded by, and I know my union also funds money to

13   Planned Parenthood, for abortions.

14        Q.     Now, you've previously testified and

15   admitted that the women's march was not exclusively

16   about abortion, correct?

17        A.     That was the main subject.

18        Q.     And what is your basis for contending that

19   the primary purpose of the women's march was to address

20   reproductive rights?

21        A.     That is what Planned Parenthood was there

22   for, and if you listened to the -- Cecile Richards who

23   is -- who was the CEO or president of Planned

24   Parenthood, that was the main focus on that march.

25        Q.     And what were you hoping to accomplish when

Page 41

1    you sent these messages to Ms. Stone?

2         A.      Honestly, I was hoping that she would

3    actually contact me so that we could finally talk in

4    regards to how they spend our money.

5         Q.      I'd like to direct your attention to

6    page 59, and they're a little hard to read because

7    there's images underneath them you can see in the lower

8    right-hand corner, and 596 on the Exhibit 3, so the

9    first two pages.

10        A.      Okay.  Five -- so the first two pages.

11   Okay.

12        Q.      Where on page 595 do you ask Ms. Stone to

13   engage with you in a discussion about reproductive

14   rights or the women's march?

15        A.      I don't specifically ask her.

16        Q.      What about on page 596 with the second

17   abortion video, where there do you invite her, ask her

18   to reach out and contact you?

19        A.      This all had to do with TWU and the local

20   union that we had.  It was all about -- I didn't ask

21   her specifically, but it -- it was sponsored by our

22   union.

23        Q.      But your sworn testimony under oath today

24   is that in sending these two videos but not asking her

25   to contact you, you were trying to get her to contact

1    you?

2         A.    Yes, as our president of our union, yes.

3         Q.    What do you think motivated Ms. Stone to

4    report you to Southwest Airlines?

5              MR. GILLIAM:  Objection.  Speculation.  You

6    can answer.

7         A.    There have been issues within our union for

8    quite some time.  We were never being turned in for

9    anything until Audrey Stone and her team came into

10   office.  Social media was never a issue until they

11   became in office.  There was supporters of the Stone

12   administration and there were objectors to the Stone

13   administration, and most of us that were vocal against

14   the Stone administration were turned in and either

15   suspended or we had people fired.  It was to shut us

16   up.  And it went on for quite some time.

17   BY MR. CORRELL:

18        Q.    So is it your belief then that Ms. Stone

19   would not have reported you if you were not a union

20   objector?

21             MR. GILLIAM:  Objection.  Calls for

22   speculation.

23        A.    Yes.

24   BY MR. CORRELL:

25        Q.    What is your basis for that belief?

Page 48

1   channels within our union that would take care of that.

2   BY MR. CORRELL:

3        Q.      What channel was available to Ms. Stone,

4   since she could not have a union trial?

5        A.      I'm sure she could call me in and I'm sure

6   we could have had a discussion with legal counsel.

7   That is the -- one of the biggest reasons that we have

8   an attorney.  I'm sure there are other channels that

9   she could used.  I know if I were the president, I

10  would have not turned somebody in.

11       Q.      What other channels were available to her?

12       A.      To bring me into the office and speak to me

13  instead of sending this to Southwest Airlines.  There

14  are other channels, just like she had quoted about not

15  turning other flight attendants in and that would have

16  been -- oh, I forget what the -- the -- instead of --

17  oh, I can't think of the name of it.  But where you can

18  actually handle disputes, there is a mechanism there.

19       Q.      Now, you have no problem, yourself,

20  reporting other flight attendants to Southwest

21  Airlines, correct?

22       A.      I have only reported one flight attendant

23  to Southwest Airlines and that was due to a direct

24  threat with the word "execution."

25       Q.      Now, that direct threat was made by Brian

1    Talbert, correct?

2          A.        That is correct.

3          Q.        And he was talking about the objectors from

4    the union, right?

5          A.        Yes, he was.

6          Q.        Did you call the police about that?

7          A.        I believe Greg Hofer did because he

8    actually used his name within that context.  He made a

9    direct threat to him.

10         Q.        Do you know what the police did with that?

11         A.        That, I do not know.  You would have to ask

12   Greg Hofer.

13         Q.        Why didn't you contact the police?

14         A.        He didn't make a direct threat to me

15   personally; otherwise I would have.

16         Q.        Then why did you report him to Southwest

17   Airlines?

18         A.        Because the execution was -- it was after

19   9/11, and when you are wanting to execute somebody,

20   that either means you want to harm them physically or

21   you want to get them fired.

22         Q.        Which did you believe it was?

23         A.        Either way harms either somebody

24   financially within their career or it harms somebody

25   physically.

Page 50

1      Q.        Which threat did you believe he was making?

2   For a physical harm or to get somebody terminated?

3                MR. GILLIAM:   Objection.   Calls for

4   speculation.   You can answer.

5      A.        Knowing Brian Talbert, it would be to get

6   somebody fired.

7   BY MR. CORRELL:

8      Q.        So why did you report that to Southwest

9   Airlines?

10     A.        Because he and others were putting out a

11  list and he had made a direct threat to harm us, as in

12  flight attendants, with our careers.

13     Q.        Because you were objectors, correct?

14     A.        Yes.

15     Q.        Wasn't that union business?

16     A.        Yes.   And nobody did anything about it in

17  the union.

18     Q.        Did you report it to the union?

19     A.        I believe we all reported it to the union

20  with a big letter.

21     Q.        Did you personally and individually make a

22  complaint to the union about this posting on Facebook?

23     A.        Yes, I did.

24     Q.        What came of it?

25     A.        Nothing.

Page 52

1        A.        No, I do not.

2        Q.        Do you dispute that?

3        A.        I can't dispute something if I don't know.

4        Q.        Okay.   As you sit here today, do you agree

5   that these messages in their manner -- not the fact

6   that they're talking about being pro life -- but the

7   way you communicated with Ms. Stone was inappropriate?

8                  MR. GILLIAM:   Objection.   Vague.

9        A.        No, I do not.

10  BY MR. CORRELL:

11       Q.        Okay.   You testified at your own

12  arbitration hearing, correct?

13       A.        Yes, I do -- I did.

14       Q.        You were -- and you recall that you were

15  under oath at that hearing, correct?

16       A.        Yes.

17       Q.        And to the best of your ability you

18  testified truthfully at that hearing, correct?

19       A.        Yes.

20       Q.        I am going to direct you to what will be

21  introduced as Exhibit Number 4.

22                 (Deposition Ex. 4 marked)

23  BY MR. CORRELL:

24       Q.        I will represent to you that this is an

25  excerpt of the --

Page 53

1          A.        I don't have -- I don't have Exhibit

2     Number 4.

3          Q.        Sure.  It should populate in just a moment.

4          A.        Okay.  I have it.  I've got it.

5          Q.        And I will represent to you that this is an

6     excerpt of volume 2 of the deposition -- of the

7     arbitration transcript --

8          A.        Okay.

9          Q.        -- taken on December 8th, 2017.  It has

10    been excerpted to include only your testimony but all

11    of your testimony.  I would like to direct you

12    specifically to page 359 using the page numbers in the

13    upper right-hand corner.

14         A.        Okay.  Okay.

15         Q.        And if we look beginning at line 8 through

16    line 24, can you read that quietly to yourself and

17    please tell me when you have finished.

18         A.        Okay.

19         Q.        So in this testimony when your counsel was

20    questioning you, you were asked if you would send the

21    same messages again in the future and you say you would

22    not, correct?

23         A.        I would not use the Facebook Messenger.  I

24    would walk these into her office.

25         Q.        So your sworn testimony today is when you

1  say, "I realize this is a mistake.  I realize that I

2  need to do it in a different manner, and I'm sorry for

3  the manner that I did send it through and I take full

4  responsibility for it," you meant you would walk

5  pictures of abortions in to Ms. Stone?

6       A.     I would have gone into her office instead

7  and had a meeting with her at that point, because this

8  would have never happened as in getting me fired, they

9  used the social media policy in this to get me fired.

10 If this would have been at a union meeting, which they

11 get heated and things are said and things are produced

12 in union meetings, I would have never been fired.

13      Q.     So when you testified before the arbitrator

14 under oath, "I'm sorry for the manner that I did send

15 it through," what did you mean?

16      A.     I'm sorry for the manner that it was sent

17 through a Facebook Messenger.

18      Q.     So you were not apologizing for the tenor

19 of the messages?

20      A.     When she was at the march, she saw these

21 exact same type of pictures through the march because

22 they were on big screens, and there is no way, unless

23 she shielded her face through the entire march, would

24 she have not seen some of these exact, if not more in

25 detail.

Page 55

1          So the only reason I believe she turned me

2    in and the way that she could get me fired was due to

3    that it fell under the social media policy.  I could

4    have taken these pictures in to a union meeting, if I

5    was not an objector, and been able to do the exact same

6    thing and show her and not have been fired.

7          MR. CORRELL:  I object.  I move to strike

8    as non-responsive.

9          Mr. Hendrick, can you please read back my

10   last question?

11         THE REPORTER:  Question:  "So you were not

12   apologizing for the tenor of the messages?"

13   A.      I apologized for -- if in any way that it

14   harmed her personally, yes.  Am I sorry that I have a

15   very strong objection to them going to a Planned

16   Parenthood march?  I'm not sorry for my belief system

17   in that we should not be represented in that manner.

18   Am I sorry that if it harmed her in any way?  Yes.

19   Q.      So that's all you meant when you said in

20   front of the arbitrator under oath, "I'm sorry for the

21   manner that I did send it through"?

22   A.      I'm sorry if it harmed her in a manner of

23   the way I sent it to her, yes.

24   Q.      And by manner you just mean through

25   Facebook Messenger?

1    up for the march.

2         Q.     Did anything in the minutes say that they

3    were going to march for abortion?

4         A.     No, not specifically.

5         Q.     Did anything in the minutes say why they

6    were going to march?

7         A.     It just said they were going to the march

8    and they were going to be there to help set up.

9         Q.     You also chose to send Ms. Stone an image

10   via Facebook Messenger of women wearing what we have

11   called in earlier proceedings vagina headdresses.  Do

12   you recall that?

13        A.     Yes, I do.

14        Q.     Why did you send that image to her?

15        A.     Because through the march, they -- there

16   were many -- I don't know how many -- but many that

17   were depicted, even small children which I find very

18   disturbing, in homemade costumes that depicted a

19   vagina, and I was just thankful that they did not dress

20   representing us as flight attendants who I believe are

21   professional, you know, it's a career for us, but yet

22   they did don the pink pussyhats.

23        Q.     So I'm not following your answer there.

24   You sent her pictures of women wearing anatomically

25   correct vaginas on their heads because you were

Page 63

1   thankful they didn't dress like vaginas?

2       A.    Yes.  But that yet representing us with the

3   pink pussyhats was not what I would consider very

4   professional.

5       Q.    The pink pussyhats are designed to look

6   like cat ears, aren't they?

7       A.    No, they're not.

8       Q.    They're designed to look anatomically like

9   a vagina?

10      A.    That is correct.

11      Q.    What is your basis for that assertion?

12      A.    There was a whole campaign, and I -- I know

13  that I sent this information to my attorney, that the

14  women that were wearing those was to depict the

15  anatomical version of a pussy.

16      Q.    And your sworn testimony is you believe

17  that a pussyhat looks anatomically like a vagina?

18      A.    That is what they were worn for.

19      Q.    Is that what it looks like?

20      A.    That is what it depicts.

21      Q.    So in your opinion, the pink pussyhats look

22  anatomically like a vagina?

23      A.    As a hat, yes.

24      Q.    Was your objection to the hats also part of

25  what you claim were your religious beliefs?

Page 64

1          A.     I don't believe -- yes, I don't believe

2     that women should be -- if you are going to a women's

3     march and you are in support of women, I don't believe

4     that you should be representing us in such a manner

5     wearing pink pussyhats.

6          Q.     Where does that derive from your religious

7     beliefs?

8          A.     Where does that derive from my religious?

9     That's more of an integrity and professional opinion.

10    I don't believe that we should be representing

11    ourselves as a sexual -- I -- I don't even know how to

12    word that.

13         Q.     So is it part of your claim in this lawsuit

14    that the -- your objections to the pussyhats was you

15    were reaching out because you were furthering your

16    religious beliefs?

17         A.     Yes.

18         Q.     Okay.  What religious belief?

19         A.     You don't go around wearing pink pussyhats

20    on your head as -- as --

21         Q.     How does that square with your religious

22    belief system --

23         A.     I don't know how to absolutely answer that

24    religious belief.  I know where you're going with this.

25    I have to word this in a way I -- I honestly don't

1  know, to be quite honest with you.  All I know is that

2  being a Christian, I would not wear a pink pussyhat

3  marching in a Planned Parenthood march.

4      Q.     But being a Christian you believe it is

5  acceptable to send pictures of vaginas to another

6  employee?

7      A.     When you go to a march and you wear a pink

8  pussyhat and you are surrounded by other people that

9  are marching in such costumes, yes, I would have

10  never -- I believe that that holds true to my Christian

11  values.  I wouldn't be there marching with women --

12      Q.     My question was different, Ms. Carter.  My

13  question was, but you believe it is within your

14  Christian beliefs to send a picture of anatomically

15  correct vaginas around the faces of women to another

16  individual?

17      A.     When she donned the pink pussyhat and

18  represented us as flight attendants at this march and

19  marched with other women, yes, at this point for me it

20  was a -- a direct -- it was a disgusting act as far as

21  I'm concerned, and my belief system, yeah, I -- I

22  wanted her to know that that's how I felt that it was a

23  very disgusting depiction of who I am as a member and

24  that she was out there donning the hats that they did

25  wear and marching with others.

1        A.      I told him that I was a Christian in my

2    faith -- in my fact-finding meeting and that I am

3    against -- well, I was against the march and them

4    marching for Planned Parenthood due to my strong

5    beliefs against abortion.

6        Q.      Do you have any evidence that Mr. Schneider

7    would have reached a different outcome had you been --

8    held the same views but they were not related to your

9    religious beliefs?

10        A.      That, I cannot speak for him.

11        Q.      I'm asking if you have any evidence of that

12    or anything you would point to for that fact.

13        A.      I believe that if -- I should have been

14    able to, given -- and not knowing this prior to this --

15    that I could have some kind of accommodation because of

16    my Christian religion, but when I said that within that

17    meeting, maybe he should have referred me to -- I

18    believe now it's called the ACT committee.  I had no

19    idea that that committee even existed.

20        Q.      Are you aware of Southwest ever giving a

21    religious accommodation to excuse prior conduct?

22                MR. GILLIAM:  Objection to the extent it

23    calls for a legal conclusion.

24        A.      I do not.  I had never known -- I believe

25    that if you stated that you were a Christian, you know,

Page 76

1    that was enough.  I mean, I don't know what else that,

2    you know --

3    BY MR. CORRELL:

4        Q.      Well --

5        A.      I never even knew that we had an ACT

6    committee that you could even reach out to.

7        Q.      What accommodation did you want?

8        A.      I didn't know I had to have an

9    accommodation.

10       Q.      Sitting here today, you've said that you --

11   you didn't know about the ACT committee, you suggest

12   that Mr. Schneider should have referred you to the ACT

13   team.  What is it that you would have asked them for?

14       A.      I believe that I should have been protected

15   as a Christian no matter what of my beliefs.

16       Q.      So your accommodation request would have

17   been to be able to send whatever messages you wanted if

18   they were related to your Christian beliefs?

19       A.      When my union president decided to take

20   20 women in support of Planned Parenthood, yeah, I

21   should have been able to speak my mind since my money

22   was being used to --

23       Q.      My question is different.  What specific

24   exception from the social media policy did you want

25   Southwest to give you?

1    fact-finding meeting when I said I don't -- I -- I

2    don't believe in abortion and I don't believe that

3    our -- my union president should have taken our dues

4    and spent it on a march.  This -- this had everything

5    to do with just that march.

6         Q.    Ms. Carter, what I'm asking you is what is

7    it you're saying Southwest Airlines should have done to

8    accommodate your religious beliefs as soon as you

9    raised them?

10              MR. GILLIAM:  Objection to the extent it

11   calls for a legal conclusion.  You can answer.

12   BY MR. CORRELL:

13        Q.    Are you testifying that they should have

14   just said never mind to this --

15        A.    They should not have fired me over my

16   Christian beliefs.

17        Q.    Okay.

18        A.    After I expressed them in the union meeting

19   and we could have sat down and at least had a

20   conversation regarding that.

21        Q.    So is there any limit to what you would be

22   allowed to say to express your Christian beliefs to

23   other employees of Southwest Airlines in your personal

24   view?

25              MR. GILLIAM:  Objection.  Incomplete

1    hypothetical.

2         A.    They should have accommodated this.

3    BY MR. CORRELL:

4         Q.    My question to you, Ms. Carter, is not

5    whether they should have accommodated this -- have

6    accommodated this.  I'm trying to find the parameters

7    of the accommodation you claim you were denied.  You

8    understand you are claiming in your lawsuit you were

9    denied an accommodation?

10        A.    Yes, I was denied an accommodation.

11        Q.    Do you understand that an accommodation is

12   an exception from a policy to allow for religious

13   beliefs?

14              MR. GILLIAM:  Objection.  Asks for a legal

15   conclusion.

16        A.    I'm just gonna tell you right now I believe

17   that I should have had an accommodation on this

18   specific one, yes.

19   BY MR. CORRELL:

20        Q.    And what would that have looked like?

21        A.    I don't know how they write up the

22   accommodations.  I don't know.  I -- I never even knew

23   you had to have an accommodation.  I believe my

24   accommodation falls under Title VII of the civil rights

25   that I have as a Christian or a believer, that due --

Page 81

1   and due to the fact that my union president spent money

2   to go to a march that supported abortion.  If you're

3   going to go to a march regarding this type of behavior,

4   this reflected that behavior and I should have had my

5   accommodations met once I said I was a Christian, but

6   honestly, this should have also been through the union

7   representatives, they knew where I stood on this.

8       Q.      So your testimony is that you believe

9   Southwest should allow you to say whatever you want

10  however you want if it is in support of your Christian

11  beliefs?

12              MR. GILLIAM:  Objection.  Incomplete

13  hypothetical.

14      A.      In this context --

15  BY MR. CORRELL:

16      Q.      Hang on.  Hang on.

17      A.      In this context, yes.

18      Q.      Hang on, Ms. Carter.  Your testimony --

19              MR. CORRELL:  Not a hypothetical, counsel.

20  BY MR. CORRELL:

21      Q.      -- is that the accommodation you should

22  have been provided is the right to say whatever you

23  want however you want if it is in support of your

24  Christian beliefs?

25      A.      Again --

1    BY MR. CORRELL:

2         Q.    Ms. Carter, before we took the break we had

3    started to talk about -- or we had gone into and talked

4    about religious accommodation issues.  Before that, the

5    question I'd put to you was essentially what evidence

6    do you have that Mr. Schneider sought to discriminate

7    you on the basis of your religious beliefs and I

8    believe your answer was that he did not provide you

9    with a religious accommodation or direct you to the ACT

10   team.  Do I have that correct?

11        A.    Yes.

12        Q.    Is there any other evidence that you

13   possess that Mr. Schneider acted against you because he

14   was hostile to or discriminating against your religious

15   beliefs?

16        A.    No.

17        Q.    Do you have any evidence that Mr. Schneider

18   was hostile to you or acting against you because you

19   were a union objector?

20        A.    No.

21        Q.    Ms. Jones, Meggan Jones was the assistant

22   base manager at Denver, correct?

23        A.    Yes.

24        Q.    And she participated in the fact-finding,

25   right?

Page 85

1          A.      Yes.

2          Q.      What evidence, if any, do you have that

3     Ms. Jones sought to discriminate against you on the

4     basis of your religious beliefs?

5          A.      None, except that I said I was a Christian.

6          Q.      And if I ask you the same question about

7     Ms. Gutierrez, would your response be the same?

8          A.      Correct.

9          Q.      And if I ask you the same question about

10    Ms. Emlet, would your response be the same?

11         A.      Yes, sir.

12         Q.      With respect to Ms. Jones, do you have any

13    evidence that she sought to discriminate you based on

14    your status as a union objector?

15         A.      No.

16         Q.      And would the same be true for

17    Ms. Gutierrez?

18         A.      Yes.

19         Q.      And would the same be true for Ms. Emlet?

20         A.      Yes.

21         Q.      So after the fact-finding was complete,

22    what happened next in your recollection, after the

23    meeting ended?

24         A.      Nothing.  I mean, I went home.  I talked to

25    Chris Sullivan, my rep, and went home.

1      Q.      So Ms. Ross who we spoke about earlier, was

2  she your rep at step 2 then?

3      A.      She was the actual person who did my case

4  through the union.

5      Q.      What do you mean by that?

6      A.      She was the one who did the grievance.  She

7  was the grievance person.

8      Q.      So she did not attend either hearing with

9  you?

10      A.      She attended the second step meeting.

11      Q.      So Chris Sullivan was the only union

12  representative who attended the first step meeting with

13  you?

14      A.      That's correct.

15      Q.      Between the time the fact-finding ended and

16  when you received Exhibit 1, the termination letter,

17  did you have any more interaction with the company

18  individuals who appeared at the fact-finding meeting?

19      A.      No, I don't believe so.

20      Q.      After you received the termination letter,

21  you grieved that decision, correct?

22      A.      Correct.

23      Q.      And that triggered a step 2 hearing, right?

24      A.      Correct.

25      Q.      What can you tell me about the step 2

1      hearing in your recollection?

2          A.    I was able to present my case to Mike Sims.

3          Q.    And you've previously testified that you

4      believed that that proceeding was fair and complete,

5      correct?

6          A.    Yes.

7          Q.    Is that still your testimony?

8          A.    Yes.

9          Q.    Do you contend that Mr. Sims discriminated

10     against you on the basis of your religious beliefs at

11     the step 2 level?

12         A.    No.

13         Q.    Do you contend that anyone else

14     discriminated against you on the basis of your

15     religious beliefs at the step 2 level?

16              MR. GILLIAM:  Objection.  Calls for a legal

17     conclusion.  You can answer.

18         A.    Honestly I don't know.  I don't know.  I

19     mean, I don't know what's in people's minds.

20     BY MR. CORRELL:

21         Q.    Well, and that's perfectly fine.  What I'm

22     trying to make sure I get is any evidence that you

23     possess that you believe shows that someone at step 2

24     had what we would call a discriminatory animus so a

25     bias against you because of your Christian beliefs, and

1    so I'm just making sure there's no other names in there

2    that we need to cover.

3         A.    No.

4         Q.    Do you have any evidence or -- that

5    Mr. Sims discriminated against you at your step 2

6    because you were a union objector?

7         A.    No.

8         Q.    And to your knowledge, do you have any

9    evidence of anyone else who was discriminating against

10   you from the company at your step 2 on the basis that

11   you were a union objector?

12        A.    No.

13        Q.    So at the step 2 you were directly

14   instructed again that all information that you were

15   provided through the hearing process you need to keep

16   confidential, correct?

17        A.    Yes.

18        Q.    Did you continue discussing your case with

19   Ms. Jackson?

20        A.    I believe I did, yes.  She had --

21        Q.    Did you continue to discuss -- oh.  Please

22   go ahead.

23        A.    Yes.

24        Q.    Did you continue discussing your case with

25   any other flight attendant?

1   I had never filed a grievance before so I was unclear

2   of how things happened.

3        Q.    Other than providing you with that

4   information, did Ms. Wann do anything else that you are

5   aware of in response to your communications with her at

6   this time?

7        A.    No.

8        Q.    What did Ms. Deloache provide you, if

9   anything?

10       A.    The same type of thing.

11       Q.    Anything she provided that Ms. Wann did

12  not?

13       A.    No.

14       Q.    Other than Ms. Wann and Ms. Deloache, were

15  you communicating with anyone -- and Ms. Jackson, were

16  you communicating with anyone else about your step 2

17  proceedings at this time?

18       A.    I don't believe so.

19       Q.    Now, the result of your step 2 hearing was

20  an offer of reinstatement subject to a last chance

21  agreement, correct?

22       A.    Correct.

23       Q.    And you did not accept that last chance

24  agreement, correct?

25       A.    Correct.

Page 92

1                    (Deposition Ex. 6 marked)

2    BY MR. CORRELL:

3         Q.    I am going to show you what will be marked

4    as Exhibit 6 to your deposition.   Just a moment here.

5    You should have that in just a moment here and it

6    should populate, like I said, as Exhibit 6.   Let me

7    know when you have that.   I know it may take a minute.

8         A.    Okay.   I have it.

9         Q.    Do you recognize this document?

10        A.    Yes.

11        Q.    What is this document?

12        A.    This is the settlement statement that they

13   offered me.

14        Q.    Why did you decline this offer of

15   reinstatement?

16        A.    Several reasons.   One, first big -- the

17   biggest reason is that I have known flight attendants

18   that have accepted this, and as soon as they accepted

19   it, somebody had turned them in for something that they

20   had done in the past and then they got fired again.

21              Another reason I did not accept this was

22   due to the fact that they wanted to put a letter in my

23   file for 24 months, which exceeded the contract.   It

24   was only supposed to be in there at the -- at the very

25   most for 18 months, so which that meant if, you know, I

Page 113

1          Q.      You violated that before you even signed

2     it, didn't you?

3          A.      I guess I did.

4          Q.      So I want to take you next to the process

5     that commenced after your separation when you filed

6     documents with the Equal Employment Opportunity

7     Commission.  And I'll direct you to a new exhibit, if

8     you will give me one moment.  And that should come up

9     in just a second for you, Ms. Carter.

10         A.      Okay.

11                 (Deposition Ex. 8 marked)

12    BY MR. CORRELL:

13         Q.      Do you recognize this document?

14         A.      I do.

15         Q.      What is this document?

16         A.      That is the charge to the EEOC.

17         Q.      And you filed this on March 14 -- excuse

18    me, that's the date.

19                 Sorry.  You filed this on September 7,

20    2017, correct?

21         A.      Mm-hmm.

22         Q.      Have you had a chance to read this just now

23    just to reacquaint yourself with it?  And if you need a

24    few moments, please take your time.

25         A.      Yeah, hold on a second.  I was going to say

Page 114

1    it's hard to read since it's so tiny.  Here we go.

2    Okay.

3        Q.     So you understand that you signed this

4    document under penalty of perjury, correct?

5        A.     Excuse me?

6        Q.     That you signed this -- at the bottom of

7    this document, do you see where it says, "I declare

8    under penalty of perjury that the foregoing is true and

9    correct," and it's your signature?

10       A.     Yes.

11       Q.     Going to paragraph 3 of your charge, it

12   reads, "My employer (Southwest Airlines), and the union

13   which represents me (Transport Workers Union of America

14   Local 556), both support abortion."

15             Did I read that correctly?

16       A.     Yes, you did.

17       Q.     What evidence do you have that Southwest

18   Airlines supports abortion?

19       A.     When the --

20             MR. GILLIAM:  Objection.  Calls for a legal

21   conclusion but you can answer.

22       A.     When --

23             MR. CORRELL:  I just want to get a

24   clarification for the record.  How does asking her what

25   evidence she has that Southwest supports abortion calls

1    for a legal conclusion?

2              MR. GILLIAM:  What constitutes evidence in

3    support of abortion.

4    BY MR. CORRELL:

5        Q.    What information do you possess,

6    Ms. Carter, that leads you to believe that Southwest

7    Airlines supports abortion?

8        A.    When the union representatives, the

9    20 women that went, they took a banner that said

10   "Southwest Airlines Flight Attendants Under Local 556,"

11   and so Southwest Airlines had their name and banner per

12   se along with our local marching in that march.

13       Q.    So Southwest Airlines' actual logo was on

14   the banner?

15       A.    I believe so, yes.

16       Q.    After lunch we'll get a copy of that

17   picture.

18              Other than that particular piece of

19   information, is there any other piece of information

20   you possess that believe shows -- that you believe

21   shows Southwest Airlines supports abortion?

22       A.    Not -- you know, that's -- it's kind of --

23   they allowed the lights to be turned pink going into

24   that march on the airplanes.

25       Q.    When you say they allowed it, what do you

Page 116

1   mean?

2        A.      Many of the flights that have the mood

3   lighting on it, the flight attendants were able to turn

4   those lights to pink in support of the women's march

5   going into DC that day and coming back from the

6   marches -- or from that march.

7        Q.      How many flights?

8        A.      Oh, I don't know.  There were many.  I

9   just -- I don't know exactly how many.

10       Q.      What's your basis for asserting there were

11  many?

12       A.      Because it was put all over the media and

13  also on Local 556 page and TWU International's page and

14  the AFL-CIO page and on Planned Parenthood's page.

15       Q.      How does that tell you how many airplanes

16  that occurred on?

17       A.      Oh, it doesn't tell me the number.  It's

18  just the different people speaking of different flights

19  in and out of -- let's say they were coming out of

20  Chicago or they were coming out of Vegas or they were

21  coming out of Orlando or going into those places.  So

22  there were -- there were many flights that the cabin

23  lights were turned pink.

24       Q.      You attended Mike Sims' deposition as the

25  corporate representative of Southwest Airlines,

Page 117

1   correct?

2        A.      Yes, I did.

3        Q.      And you were there when he testified that

4   the lights were turned pink on approximately three to

5   four aircraft, correct?

6        A.      I don't recall that.  I don't recall the

7   number.  It's hard to believe that it was only three or

8   four, but if that's what he says, I guess that's what

9   he says.

10       Q.      And other than what you've already

11  testified to, do you have any information that

12  controverts Mr. Sims's testimony that there were three

13  to four flights?

14       A.      Not -- not as in the number, but I do know

15  that there were flights that -- that they had turned

16  the lights pink.  I don't know the number.

17       Q.      What is a read-before-fly memo?

18       A.      I'm sorry?

19       Q.      What is a read-before-fly memo?

20       A.      It is a link that you click on to see

21  what's going on within the company and different things

22  that we're doing as flight attendants and so forth.

23  It's just like a little informational thing.

24       Q.      And are you aware that Southwest Airlines

25  issued a read-before-fly memo instructing flight

Page 118

1   attendants to discontinue this behavior as soon as they

2   learned of it?

3        A.      No, because I wasn't flying at that time so

4   I didn't see it on that day.

5        Q.      Other than the fact that flight attendants

6   turned the lights pink, do you have any other evidence

7   that Southwest played any role in the decision to turn

8   the lights pink?

9        A.      That I don't know.

10        Q.      Let's take you next to paragraph 6 of your

11   charge.  It reads, "Southwest never warned me that

12   using Facebook to protect life was inconsistent with

13   its work rules."

14              Did I read that correctly?

15        A.      That is correct.

16        Q.      You were familiar with Southwest Airlines'

17   social media policy, correct?

18        A.      Yes.

19        Q.      In fact, you had quoted it when you

20   reported Brian Talbert to the company, hadn't you?

21        A.      In regards to an execution or harming

22   somebody?  Yes.

23        Q.      So you were aware that Facebook posts

24   generally could be inconsistent with the work rules?

25        A.      Protecting babies, no, I did not.

1        Q.        So no matter what you say in a Facebook

2    post, if it is pro life, it is not a -- you thought it

3    was not a violation of Southwest policy?

4                  MR. GILLIAM:   Objection.   Calls for a legal

5    conclusion.

6        A.        No.

7    BY MR. CORRELL:

8        Q.        So what could you say in a Facebook post

9    that was pro life that would violate Southwest's policy

10   in your opinion as a flight attendant bound by a policy

11   that you were familiar with?

12       A.        I don't think any --

13                 MR. GILLIAM:   Objection.   Objection,

14   incomplete hypothetical.   You can answer.

15   BY MR. CORRELL:

16       Q.        So -- and just to be clear:   You don't

17   think anything you said could be construed as a

18   violation of the social media policy if it was in

19   connection with a pro life message?

20       A.        No, I don't.

21       Q.        Now, in paragraph 8 of your charge you say,

22   "As a result of my Facebook posts and messages that

23   opposed abortion.   And without prior warning that such

24   activity violated its work rules, my employer fired me

25   on March 14, 2017."

1    sitting here today, can you identify anything in this

2    letter where it says I was denied religious

3    accommodation?

4              MR. GILLIAM:  And objection.  Same

5    objection.  The letter speaks for itself but you can

6    answer.

7         A.    They fired me for my speech on my -- my

8    personal Facebook page in protecting babies and with my

9    union going to a women's march and for me to say that I

10   didn't agree with it and protecting babies.

11   BY MR. CORRELL:

12        Q.    Anything else on this document that you

13   believe indicates that you reported to the EEOC that

14   you were denied a religious accommodation?

15             MR. GILLIAM:  And objection, the letter

16   speaks for itself.  You can answer.

17        A.    I was never ever given a religious

18   accommodation.  They should have known that after I

19   said it in my fact-finding meeting.  And again, this

20   letter speaks of all of that.

21             MR. CORRELL:  One more issue and then we

22   can stop for the lunch break.

23   BY MR. CORRELL:

24        Q.    Do you believe Sonya Lacore discriminated

25   against you on the basis of your religious beliefs?

1          A.      I can't speak for her.  I know that she

2     agreed on my firing.

3          Q.      Other than -- and when you say she agreed

4     to your firing or on your firing, what do you mean by

5     that?

6          A.      She signed off on it.

7          Q.      How do you know?

8          A.      Through the paperwork that was sent to me,

9     and she is our VP of in-flight.  It would have to go

10     through her ultimately.

11          Q.      Other than her approving of your

12     termination, are you aware of anything else that leads

13     you to believe that Ms. Lacore discriminated against

14     you on the basis of your religious beliefs?

15          A.      No.

16          Q.      Are you aware of anything indicating that

17     Ms. Lacore discriminated against you on the basis of

18     your status as a union objector?

19          A.      No, not of my knowledge.

20          Q.      Who is Dave Kissman?

21          A.      I believe he is another -- I think he is

22     the western side, and so we're split up in different

23     categories and since I'm in Colorado, I think he is our

24     main liaison that we go through under -- I think it's

25     the labor department but I'm not sure.

Page 127

1       Q.     Do you believe Mr. Kissman discriminated

2  against you on the basis of your religious beliefs?

3             MR. GILLIAM:  Objection, calls for legal

4  conclusion.  You can answer.

5       A.     I never had any dealings with Mr. Kissman.

6  I have no idea.

7  BY MR. CORRELL:

8       Q.     Well, and separate from a legal conclusion,

9  can you identify anything that led you to believe that

10  Mr. Kissman was acting to discriminate against you?

11       A.     No, except that they should have known

12  after my fact-finding meeting.  Everyone of these

13  people should have known that I was a Christian because

14  this all was sent to them.

15       Q.     What role did Mr. Kissman play in your

16  fact-finding?

17       A.     I don't know to be quite honest with you

18  because I never had contact with him.

19       Q.     Did you have contact with him in connection

20  with your step 2?

21       A.     No, I did not.

22       Q.     Did you have contact with him in connection

23  with your last chance agreement?

24       A.     No, I did not.

25       Q.     Do you have any reason to believe

Page 128

1    Mr. Kissman discriminated against you on the basis of

2    your status as a union objector?

3         A.    Again, I cannot answer that.  I do not know

4    what's in his head.

5         Q.    Well, and that's -- I know you can't.  I'm

6    just making sure that you're not going to show up at

7    trial and tell me, here's what Dave Kissman said one

8    time.  So I'm just making sure that there's nothing

9    else you want to report while you're under oath here

10   today that would lead you to believe that he

11   discriminated against you because you are an objector?

12        A.    No.

13              MR. CORRELL:  Okay.  I think that's a good

14   point to take a lunch break if that works for everybody

15   else?

16              MR. GILLIAM:  Sure.  How much time?

17              MR. CORRELL:  Can we go off the record

18   first?

19              VIDEOGRAPHER:  Yes, sir.  We are going off

20   the record at 12:12 p.m.

21              (Break from 12:12 p.m. until 1:01 p.m.)

22              VIDEOGRAPHER:  We are going back on the

23   record at 1:01 p.m.

24   BY MR. CORRELL:

25        Q.    Ms. Carter, do you understand that you are

1       Q.      Who is Brett Nevarez?

2       A.      Brett Nevarez was -- well, he was a flight

3    attendant, for one, but he was also voted in or placed

4    in office I should say the first go-round, and he, I

5    believe, was the first or second vice president of the

6    union.

7       Q.      To your knowledge, is he still in that

8    role?

9       A.      No, he was part of Audrey's team.

10      Q.      What role, if any, did he play in your

11   termination, to your knowledge?

12      A.      That, I don't know per se.

13      Q.      When you say "per se," what do you mean?

14      A.      I mean, I don't -- I don't know if he

15   played any role except maybe -- no, I take that back.

16   He would have played a role when I went before the

17   board to go to arbitration.

18      Q.      When did that occur?

19      A.      I want to say late late -- well, it would

20   have been summertime of 2018 -- no.

21      Q.      Would it be before --

22      A.      Would that be right?

23      Q.      This was before the arbitration, right?

24      A.      Yeah, before the arbitration.  So maybe it

25   would have been the summer of 2017.  I'm getting my

Page 158

1      Ms. Emlet.  I believe I accidentally omitted

2      Ms. Barnett.  Do you recall Edie Barnett?

3           A.      I do, yes.

4           Q.      And she participated in your fact-finding

5      via telephone, correct?

6           A.      Yes.

7           Q.      What information, if any, do you have that

8      you believe shows that Ms. Barnett acted against you

9      based on your religious beliefs?

10          A.      I don't have any.

11          Q.      And do you have any information that you

12     believe shows that Ms. Barnett acted against you

13     because you were a union objector?

14          A.      No.

15          Q.      Do you have any information that you

16     believe shows that Tammy Shaffer acted against you

17     because of your religious beliefs?

18          A.      No.

19          Q.      Do you have any information that you

20     believe shows that Tammy Shaffer acted against you

21     because you are a union objector?

22          A.      No.

23          Q.      What role, if any, do you believe Tammy

24     Shaffer played in your termination?

25          A.      That, I don't know.

1          A.        Yeah, she tried to get me fired and she

2     did.

3          Q.        Okay.  And why do you believe that, why do

4     you think she did that?

5                    MR. GILLIAM:  Objection.  Calls for

6     speculation but go ahead and answer.

7          A.        Because I was dissenting against what they

8     were doing as the union and that I had issues with -- I

9     was a recall person, I had also opted out.  There was

10    much hate for the people that had opted out and much

11    hate for the people that were supporting the recall.

12    BY MR. GREENFIELD:

13         Q.        Okay.  So you believe that Ms. Stone tried

14    to get you fired from Southwest Airlines because you

15    were an objector, you opted out of the union, and

16    because you took a stance in the recall effort, is that

17    fair?

18         A.        That is correct.

19         Q.        Okay.  And when did you become an objector?

20         A.        I became an objector in 2013.

21         Q.        Okay.  And what does that mean to you that

22    you are an objector?

23         A.        The objector means that I still pay dues to

24    the local, that the only thing that doesn't get taken

25    out of my check which I would get a refund back to or

1   from was international and that had to do with,

2   quote-unquote, supposed political purposes.  Okay?

3               The reason I opted out or was an objector

4   was because I didn't support the things that TWU

5   International, AFL-CIO, and our local at the time were

6   supporting.

7               Another reason that I was an objector was

8   because of the coup that went on again to remove our

9   duly elected representatives.  This had happened twice,

10  once with Melissa Smith and then again with Chris

11  Click, Jerry Lindermann, and Stacy Martin.  Okay?

12  There was no reason to remove these duly elected

13  representatives.

14              And then on top of that -- but my dues

15  still paid for local stuff that they did, so I still

16  paid full dues, I got a check back from international

17  every quarter for about $27 and change, and then I

18  couldn't go to any union meetings and I couldn't vote

19  on anything.  But my voice still stood as they're still

20  collecting my dues.

21              I was called a scab.  I was -- they -- they

22  passed around and entire list of all of us that had --

23  were that the ones that were the objectors and the

24  recall people.  We were all the ones that were targeted

25  by Audrey Stone and her administration and the people

Page 227

1    that supported her, and were all the ones that were

2    turned in for all kinds of -- all kinds of things.  So

3    this was a way for her to get me fired.

4         Q.    Okay.  Thank you for that, Ms. Carter.

5               What I'd like to focus on out of that

6    testimony is that in 2013 when you became an objector,

7    you were no longer a member of the union, correct?

8         A.    I'm an objector but I still pay dues.

9         Q.    Okay.  But as part of that, you are not

10   allowed to vote, correct?

11        A.    I just said that, yes, not allowed a vote.

12        Q.    And you're not allowed to attend union

13   meetings?

14        A.    Correct.

15        Q.    And that has been since 2003?

16        A.    Correct -- '13.

17        Q.    Okay.  Since 2013.  Excuse me.

18              Now as far as the recall efforts go, there

19   was a petition, correct, are you aware of that?

20        A.    Oh yes.  Yes.

21        Q.    And you aren't actually allowed to be a

22   part of that petition or sign that petition as an

23   objector, correct?

24        A.    No, I wasn't able to sign the petition, but

25   I can still voice my opinion on that petition.

1         A.        You know what?  I don't remember.  It had

2    to have been back in -- I can't -- I -- I don't

3    remember the date.  I just know it's been going on for

4    a while.

5         Q.        Did you personally hear him say that?

6         A.        I personally was threatened by Brett

7    Nevarez.

8         Q.        Okay.  I appreciate that but my question

9    was a little bit different.  I was asking if you had

10   personally heard Brett Nevarez speak about the topic

11   that we are discussing right now.

12        A.        About the recallers and the objectors, just

13   seeing it on different messages that he was, you know,

14   on Facebook.

15        Q.        Okay.  But nothing you personally

16   witnessed?

17        A.        Not -- not in that context, no.

18        Q.        Okay.  And same goes for Mr. Brian Talbert,

19   what evidence or information, if any, do you have that

20   Mr. Talbert was creating lists, those lists?

21        A.        I didn't say he created them.  He was

22   distributing them, let's put it that way.

23        Q.        And what is your basis for saying that

24   Mr. Talbert was distributing these lists?

25        A.        It was common knowledge throughout the

1    calls for a legal conclusion.  You can answer.

2         A.    I don't -- I don't know.  I honestly don't

3    know.

4    BY MR. GREENFIELD:

5         Q.    Okay.

6         A.    I don't know why international would be

7    sending money to Planned Parenthood.  I have no idea.

8         Q.    Okay.  Well, it's fair to say that if they

9    are doing what they told you, they're not sending any

10   of your dues that you pay, correct?

11        A.    International?

12        Q.    Well, your money gets refunded by

13   international, isn't that -- wasn't that your

14   testimony?

15        A.    $7 a month for, you know, a quarter, a

16   $27 check.  That is for political as in PACs.  This is

17   what I was told.  Political as in when it comes to

18   politicians.

19        Q.    Okay.  So if it doesn't go to a PAC or to a

20   specific politician, you believe TWU International can

21   use your dues for whatever they like and that they're

22   doing that?

23        A.    Correct.

24        Q.    You described the removal of office of

25   Chris Click and Jerry Lindermann and others as a coup,

1    correct?

2         A.      Mm-hmm.   And it was written about.

3         Q.      You realize that there -- are you aware of

4    a federal -- of a court case against them that upheld

5    the remove -- their removal?

6         A.      Yes, I do.

7         Q.      Okay.   And you still think it's a coup?

8         A.      It was an orchestrated -- it was

9    orchestrated.

10        Q.      Result --

11        A.      They were -- they were removed -- yeah, I

12   do believe that it was still a coup, yes.

13        Q.      Excuse me, Ms. Carter.   And that

14   orchestration extends all the way up to the state and

15   federal court system?

16        A.      I believe that that was a little bit

17   different, that was over property of what the union,

18   that -- that Stacy Martin, they sued him for a laptop I

19   do believe.

20        Q.      Now, Ms. Carter, do you believe that even

21   though you are not a union member, do you think you

22   should still have say on how -- on union operations?

23        A.      If I'm paying still union dues to the

24   local, I believe that I should still have a voice about

25   where the money gets spent, yes.

1    Ms. Stone to her union email?

2         A.      When they -- I do believe it was right

3    before I was turned in, it had to do with, they don't

4    like the National Right to Work Foundation and I have

5    supported the National Right to Work Foundation, gosh,

6    probably since 2009-2010, and they are considered what

7    they -- the union likes to say are union busters, and

8    for me, that they protect union -- I guess I should --

9    for me what I understand for them is that they protect

10   the members from the abuses of unions.

11        Q.      Okay.  And in -- per your testimony you

12   became an objector in 2013, correct?

13        A.      That is correct.

14        Q.      All right.  And you were terminated in

15   2017?

16        A.      That is correct.

17        Q.      So your testimony is that it took Ms. Stone

18   four years to find a way to retaliate against you to

19   terminate you; is that correct?

20        A.      That there -- the -- yes, it took her until

21   then to finally was able -- because why didn't she ever

22   return a call or communicate if it was so blatant that

23   she, you know, claims that I was harassing her.  I

24   wasn't harassing her.  I didn't like how the union was

25   doing things and spending our money and she never

1       A.      Through her -- I believe her fact-finding

2   meeting.

3       Q.      Okay.  Are you -- and how did Ms. Immamovic

4   find out that Ms. Stone allegedly turned her in for

5   social media violations?

6       A.      That I do not know.

7       Q.      Are you claiming as part of your lawsuit

8   that the union did not represent you properly during

9   the fact-finding meeting?

10      A.      During the fact-finding meeting?  Chris

11  Sullivan was amazing.

12      Q.      And he was provided to you by the union,

13  correct?

14      A.      Yes.  But I wouldn't have been there if

15  Audrey hadn't turned me in.

16      Q.      All right.  That wasn't my question.  I

17  appreciate that, Ms. Carter.

18              My question was, Mr. Sullivan was there on

19  behalf of the union to represent you, correct?

20      A.      Chris Sullivan was there on behalf of the

21  union on his -- yes, to represent me.

22      Q.      And did an amazing job?

23      A.      He did, yes.

24      Q.      All right.  And what about step 2?

25      A.      Step 2, Beth Ross and Becky Parker.  I did

Page 267

1    all of my step 2.

2         Q.    Are you claiming as part of your lawsuit

3    that the union did not represent you properly during

4    your step 2 hearing?

5         A.    I represented myself for the most part in

6    my step 2.  I did all of the research and brought forth

7    all of the information.  Becky and Beth did not.  They

8    were just there as representatives.

9         Q.    Okay.  And that's -- I appreciate you

10   elaborating.  My question is a little bit different.

11   Are you claiming as part of this lawsuit that the union

12   did not properly represent you during your step 2

13   hearing?

14        A.    They were there and represented me, yes.

15        Q.    Okay.  That's still not answering my

16   question, ma'am.  My question is as part of this

17   lawsuit are you claiming that the union did not

18   represent you properly during your step 2 hearing?

19        A.    They represented me properly, both Becky

20   and Beth.

21        Q.    And you previously testified that the

22   process was fair and complete, correct?

23        A.    With --

24              MR. GILLIAM:  The --

25              THE WITNESS:  Go ahead.

1   BY MR. GREENFIELD:

2         Q.    Is that correct -- was fair and complete?

3               MR. GILLIAM:  Objection, vague.

4         A.    Within my second step meeting, yes.

5   BY MR. GREENFIELD:

6         Q.    Okay.  And that it was Southwest who made

7   the decision to terminate you, correct?

8         A.    I believe it was Ed Schneider.

9         Q.    Okay.  And do you have any evidence that

10  the union made the decision to terminate you?

11        A.    No.

12        Q.    Okay.  Are you claiming as part of this

13  case that the union discriminated against you during

14  your grievance process?

15        A.    Can you repeat that?

16        Q.    Yeah.  Are you claiming as part of your

17  lawsuit that the union is discriminating --

18  discriminated against you during your grievance process

19  in either the fact-finding or step 2 hearing?

20        A.    No, neither on those two.

21        Q.    Okay.  Now are you claiming that the union

22  didn't represent you properly because of your religious

23  beliefs at the step 2 or fact-finding meeting?

24        A.    Neither on those two.

25        Q.    Are you aware of any other individuals who

1      A.      No, they did not.

2      Q.      They did not provide you a religious

3   accommodation?

4      A.      They did not provide me a religious

5   accommodation.

6      Q.      Did you request a religious accommodation

7   from the union?

8      A.      I didn't know I had to.

9      Q.      So the answer to my question is no, you did

10   not request a religious accommodation from the union?

11      A.      Correct.

12      Q.      Okay.  Are you aware of any other

13   individuals that the union has not accommodated -- who

14   has not -- not provided a religious accommodation?

15      A.      I do not have that knowledge.

16      Q.      Okay.  Are you aware if you filed an EEOC

17   charge for religious discrimination against the union?

18      A.      Yes, I did.

19      Q.      Okay.  And you provided that documentation?

20      A.      Yes, I did.

21             THE WITNESS:  I can't do it right now.  I

22   know.  I know.

23   BY MR. GREENFIELD:

24      Q.      Is it your testimony that -- when was

25   the -- okay.  Let me take a step back.

Page 279

1                    REPORTER'S CERTIFICATION

2                 DEPOSITION OF CHARLENE CARTER

3                       November 20, 2020

4              I, Joseph D. Hendrick, Notary Public and

5     Certified Shorthand Reporter in the State of Texas,

6     hereby certify to the following:

7                    That the Witness, CHARLENE CARTER, was duly

8     sworn by the officer and that the transcript of the

9     oral deposition is a true record of the testimony given

10    by the witness;

11                   I further certify that pursuant to FRCP

12    Rule 30(f)(1) that the signature of the deponent:

13                   X      was requested by the deponent or

14    a party before the completion of the deposition and is

15    to be returned within 30 days from date of receipt of

16    the transcript;

17                   _____ was not requested by the

18    deponent or a party before the completion of the

19    deposition;

20                   I further certify that the amount of time

21    used by each party is as follows:

22         Mathew B. Gilliam - 00:00:00

23         Michael A. Correll - 04:54:50

24         Adam S. Greenfield - 01:08:13

25         Edward B. Cloutman III - 00:00:00

Page 280

1           I further certify that I am neither counsel

2    for, related to, nor employed by any of the parties or

3    attorneys in the action in which this proceeding was

4    taken;

5           Further, I am not a relative or employee of

6    any attorney of record, nor am I financially or

7    otherwise interested in the outcome of the action.

8           Subscribed and sworn to on this date:

9    December 8, 2020.

10

11

12

13

14

15

16

17                         <%12550,Signature%>
                           Joseph D. Hendrick, CSR #947
18                         Expiration Date: 04/30/2021
                           Notary Comm. Exp. 01/13/23
19                         Veritext Legal Solutions
                           Firm Registration No. 571
20                         300 Throckmorton Street, Ste. 1600
                           Fort Worth, TX  76102
21                         Telephone (800) 336-4000

22

23

24

25

1    Mbg@nrtw.org

2                          December 9, 2020

3    RE: Carter, Charlen v. Southwest Airline Co & Transport

4    DEPOSITION OF: Charlene Carter (# 4341722)

5         The above-referenced witness transcript is

6    available for read and sign.

7         Within the applicable timeframe, the witness

8    should read the testimony to verify its accuracy. If

9    there are any changes, the witness should note those

10   on the attached Errata Sheet.

11        The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14        According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                          Yours,

19                          Veritext Legal Solutions

20

21

22

23

24

25