In the Matter of the Arbitration Between )
)
Southwest Airlines Company )
Dallas, Texas ) Termination – Charlene Carter
)
and ) Grievance No. 24-0714
)
Charlene Carter )
_____ )

BEFORE:   WILLIAM H. LEMONS
Impartial Arbitrator
Peoples Petroleum Building, Suite 1026
102 North College Avenue
Tyler, Texas 75702

APPEARANCES:

For the Company:   MICHELE HAYDEL GEHRKE, ESQ.
BRIAN K. MORRIS, ESQ.

For the Grievant:   MILTON L. CHAPPELL, ESQ.
JEFF D. JENNINGS, ESQ.

Place of Hearing:   **Dallas, Texas**

Date of Hearing:   **December 7-8, 2017**

Date Record Closed:   **January 26, 2018**

Type of Grievance:   **Discipline – Termination**

## OPINION AND AWARD OF THE ARBITRATOR

April 26, 2018

SWA000704

App. 1003

## ARBITRATION OPINION AND AWARD

By the terms of the collective bargaining agreement (the "CBA," Joint Exhibit 1) between Southwest Airlines Company, hereinafter referred to as the "Company," and TWU Local 556, Transport Workers Union of America, AFL-CIO, hereinafter referred to as the "Union," William H. Lemons was selected on September 19, 2017 to serve as impartial Arbitrator. A hearing was held on December 7-8, 2017, at the Embassy Suites – Dallas Market Center, located at 2727 Stemmons Freeway, Dallas, Texas.[1]  In addition to the appearances of counsel noted above, several other party representatives attended the arbitration, as reflected in the Official Record. (TR. p. 2). The proceedings concluded at 12:57 p.m. CT on the second day.

Both sides were afforded full opportunity for the introduction of evidence, examination and cross-examination of witnesses and to present oral arguments. The parties jointly submitted eight exhibits, and I applaud them for that. In all, the Company introduced fourteen exhibits and the Grievant introduced three exhibits. These exhibits and their admission into evidence are as described in the Official Record. I have carefully examined each exhibit that was admitted into evidence. I carefully read the Official Record in this case, consisting of four hundred seventy-three pages, and have also studied a number of arbitration decisions by other Arbitrators that were provided to me by counsel. The parties simultaneously presented Post-Hearing Briefs on January 26, 2018, and these proceedings were declared closed for all purposes on that date.

---

[1] The record indicates that on or about September 12, 2017, the Grievant elected not to proceed to the System Board procedure on her grievance. On September 8, 2017, the Grievant signed the TWU Local 556 Release Form, and elected to proceed straight to arbitration, without the assistance of TWU Local 556, instead using outside legal representation. While I am generally aware of some testimony about a "recall" effort pertaining to TWU Local 556, with the exception of President Audrey Stone, I am not aware of who the current officers or Board of TWU Local 556 might be. These extraneous facts have no influence on my Opinion and Award, as I have not considered them in making my decision.

2

## ISSUE

Did the Company have just cause to terminate the Grievant [Charlene Carter], and, if not, what shall be the remedy? (TR. p. 8-9).

## PROCEDURAL HISTORY

No time-frame or grievance process issues having been raised, this matter is properly before me. I need not set forth in this Award pertinent dates in this case given the agreement of the parties and that these dates are clearly and unequivocally established by Joint Exhibit 2.

## PROVISIONS OF THE LABOR AGREEMENT

### ARTICLE 3
### SCOPE OF AGREEMENT

1.   The Company hereby recognizes the Union as the exclusive collective bargaining representative of all Flight Attendant employees.

2.   Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement and which have been made available to the affected employees and the Union prior to becoming effective . . .

3.   The right to manage and direct the working forces, subject to the provisions of this Agreement, is vested in and retained by the Company.

*** 

### ARTICLE 19
### GRIEVANCE PROCEDURES

1.   **DISMISSAL OR DISCIPLINARY PROCEDURE**

     A.   A Flight Attendant shall not be dismissed from the service of the Company or disciplined without notification of such disciplinary action. Such notification shall contain a precise statement of the charges. Notice of the disciplinary action shall be given within seven (7) working days ... from the date the Company could reasonably have knowledge of the incident giving rise to the disciplinary action. Notice of disciplinary action involving suspension or termination will be made in writing, and delivered in person, with receipt acknowledged, or sent by confirmed

3

delivery. If notice is sent by confirmed delivery, such notice will be deemed to be accomplished on the date sent to the last address furnished by the Flight Attendant. It is the responsibility of the Flight Attendant to keep the Company advised of a current address.

B.    A Flight Attendant shall be entitled to a hearing on such disciplinary action provided such Flight Attendant makes written request for such hearing within seven (7) days from receipt of notification. Such written request for hearing shall be addressed to the Vice President – In-Flight Services.

C.    A Flight Attendant may be held out of service by the Company pending investigation and hearing and appeals therefrom and will be compensated for all lost time if returned to work.

D.    Such hearing shall be held by the Vice President - In-Flight Services, or his designee, within ten (10) days, exclusive of Saturdays, Sundays and holidays, of the receipt of the Flight Attendant's written request therefor. A decision shall be rendered within ten (10) days, exclusive of Saturdays, Sundays and holidays, of the hearings.

E.    If the decision of the Vice President - In-Flight Services or his designee is not satisfactory to the Flight Attendant whose grievance is being considered, the matter may be appealed to the Flight Attendant Board of Adjustment, as provided for in Article 20 of this Agreement, provided said appeal must be submitted within ten (10) days of receipt of the decision by the Vice President In-Flight Services.

F.    In cases involving termination of employment, the Flight Attendant Board of Adjustment shall convene within ninety (90) calendar days from the date that the Company receives the notice of appeal to the Board of Adjustment. In cases involving special or extenuating circumstances, either party may extend the deadline to conduct the Flight Attendant Board of Adjustment up to an additional sixty (60) calendar days. Any time after sixty (60) days from the date of the appeal to the Board of Adjustment in cases involving termination, either party may elect to bypass the Board of Adjustment and proceed directly to arbitration. The date of such election shall be treated as a deadlocked decision for time limit purposes under Article 20 of this Agreement.

G.    In any case involving discipline, the appeal to the Board of Adjustment may be waived to expedite the grievance, if mutually agreed to by the Union and the Company. The grievance would then proceed directly to arbitration under Article 20 of this Agreement.

I.    A Flight Attendant shall not be disciplined or discharged without just cause except as provided in Article 7.

4

\*\*\*

## ARTICLE 20
## BOARD OF ADJUSTMENT

14.  If either party desires to arbitrate the grievance after having been fully processed according to the provisions of this contract, it shall be submitted to Arbitration . . .

15.  By mutual consent of the Union and the Company, the parties may choose to bypass the provisions outlined above and proceed directly to expedited arbitration . . .

16.  The functions and jurisdiction of the Arbitrator shall be as fixed and limited by the Agreement.  The Arbitrator shall have no power to change, add to, or delete its terms, and shall have jurisdiction only to determine issues involving the interpretation of application of this Agreement . . .   In the event any disciplinary action taken by the Company is made the subject of the proceedings, the Arbitrator's authority shall . . . be limited to the determination of the question of whether the Flight Attendant involved was disciplined for just cause.  If the Arbitrator finds that the penalty assessed by the Company was arbitrary or unreasonable, she/he may modify or remove the penalty.

\*\*\*

### OTHER POLICIES AND RELATED DOCUMENTS

During the hearing, we also received evidence and took testimony about the following

Company policies and related documents governing expected behavior, including:

- The Southwest Mission Statement.  (Jt. Ex. 3).

- The Southwest Airlines Employee Social Media Policy.  (Jt. Ex. 7).

- The Southwest Airlines Policy Concerning Harassment, Sexual Harassment, Discrimination and Retaliation.  (Jt. Ex. 5).

- Social media-related Read Before Fly ("RBF") notices.  (SWA Exs. 3-6).

- The Workplace Bullying and Hazing Policy.  (Jt. Ex. 6).

- Southwest Flight Attendant Work Rules and Expectations.  (Jt. Ex. 4).

(*See* TR. p. 385-387).

5

I have not repeated the policies reflected in these exhibits in this Opinion and Award because they are voluminous. Rather, the contents of those exhibits are incorporated herein by reference as if set forth *verbatim.*

**STATEMENT OF FACTS**

At the time of her termination, Charlene Carter ("Grievant") had worked for the Company as a Flight Attendant since 1996. The facts leading up to her termination, vividly describing the various social media postings and Facebook Messenger messages directed to Audrey Stone, President of the Union, are set forth in Grievant's Post-Hearing Brief at pages 6-9.[2] The Company sets forth its version of what happened in its Post-Hearing Brief at pages 11-13. Among other actions, this matter centers around the postings of two very graphic videos of aborted fetuses on the Grievant's public Facebook page (Co. Ex. Nos. 7-8; TR. p. 390-392). After an investigation, and following her termination, the Grievant participated in a Step 2 meeting to address her grievance (TR. p. 255). As a result, Mike Sims, the Company's Senior Director of Inflight Operations, offered the Grievant a Last Chance Agreement ("LCA") – an offer of reinstatement after a 30-day suspension, conditioned upon certain promises of future behavior. The Grievant rejected the LCA (Co. Ex. Nos. 11-13; TR. p. 268).

**POSITION OF THE COMPANY**

As is my practice, I try to avoid setting forth in detail the contentions of the parties, as they are very completely and ably set forth in their opening remarks and the Post-Hearing Briefs, and to

---

[2] The Grievant's legal counsel has interspersed in the Grievant's statement of facts various comments about her personal beliefs on abortion, her distaste for current union leadership and her right to refrain from compulsory union activity such as paying *the union's compelled fees for its political, ideological and other nonbargaining spending* (TR. p. 369). I appreciate his enthusiasm. But by incorporating the Grievant's version of the facts, I am not adopting or vouching for those views. Indeed, that the Grievant holds very strong personal views on such subjects, or that she has exercised her Railway Labor Act and First Amendment rights, are not germane to my determination of just cause for her termination.

6

SWA000710

re-state such in an Award is expensive, time-consuming and unnecessary.  Here, to summarize the Company's position, the Company feels that it has met its burden of establishing "just cause" for this termination under the CBA, by demonstrating that:

1.      The Grievant does not/cannot dispute that she made the social media posts in question and sent the Facebook messages – indeed, she feels that she had the right to do so (because she had opted out of the union) and/or feels that Audrey Stone had somehow forfeited the right to be protected from graphic, harassing and inappropriate posts and private Facebook messages when she became President of the Union.  In addition to the graphic videos, she also sent images of women wearing vagina headdresses, accused Audrey Stone of supporting murder and attacked Stones' education and right to hold her own political views;

2.      Here, the evidence establishes that the Grievant never attempted to learn Audrey Stone's viewpoint on any of these topics, or to otherwise engage her in productive conversation on the topics.  Rather, she simply barraged Audrey Stone with unsolicited messages.  Despite the Grievant's endless stream of confrontational and disturbing messages, until the receipt of the videos, Audrey Stone never reported such activity to the Company;

3.      The Company investigated the posts and the unsolicited messages in question, and provided the Grievant with written notice of the Company's disciplinary action and the opportunity for a fact finding meeting.  The Grievant did not provide a basis for questioning or changing the ultimate conclusion, and the Company fully and fairly investigated the Grievant's violation of the various policies before making the final decision to discharge her;

4.      Substantial evidence existed as of the date of the ultimate discipline decision, including Step 2, and that evidence was presented at arbitration.  The admissible evidence, including the Grievant's own admissions, is sufficient to support the Grievant's termination even under a heightened burden of proof;

5.      In issuing this discipline, the Company did not subject the Grievant to unequal or discriminatory treatment.  The Company's decision was not arbitrary, capricious or in any way unreasonable, and should stand; and

6.      There exist no extenuating circumstances sufficient to mitigate the decision to discharge the Grievant for the reasons asserted.

In summary, the Company contends that the Grievant's termination was entirely consistent with the its policies, practices and treatment of other similarly-situated employees, and is

7

supported by significant arbitral authority.  After a careful investigation, and having given the

Grievant the opportunity to respond and present her position, the Grievant was discharged.  The

Company vehemently maintains that it had just cause to discharge the Grievant, and accordingly,

her grievance should be denied and her termination upheld.

## POSITION OF THE GRIEVANT

In her Post-Hearing Brief, the Grievant takes the position that the Company failed to

carry its burden of proving just cause for her termination, and specifically, contends that:

1.      The Company terminated a twenty year employee with no record of previous discipline for criticizing the President of TWU Local 556 for spending union fees ("TWU Local 556 forces Flight Attendants to pay union dues just to keep their job") to send herself and other Local 556 members to the January, 2017 Women's March – thus advocating for abortion rights.  The Company has failed to carry its burden of proof, which in a case such as this, is at least the *Seven Tests of Just Cause* standard, if not higher;

2.      The investigation was inadequate.  The Company failed to make a reasonable effort to discover whether the Grievant, in fact, violated its workplace policies.  Here, the Grievant is being disciplined for off-duty conduct, and there has not been shown a nexus between the conduct and the workplace;

3.      Actually, says the Grievant, she has the right to share her religious and political views on Facebook either through private messages or on her wall.  In any event, the disciplinary action taken was not proportional to the alleged violation of the policies;

4.      Because the Grievant has demonstrated that the Company unfairly applied its policies, the termination cannot stand.  In other words, the Company has not "applied its rules, orders and penalties evenhandedly and without discrimination to all employees." *Providence St. Peter Hospital,* 123 LA 473, 477 (2006) (Gaba).

Accordingly, the Grievant asks that her grievance be sustained, that she be reinstated

immediately as a Flight Attendant with no loss of seniority or accumulated benefits, and that she

receive backpay from the date of her termination through the date of this Award.  Alternatively,

SWA000714

App. 1010

she asks the Arbitrator to reduce her termination to a thirty-day suspension, without pay, in light of the mitigating circumstances discussed in Section C of her Post-Hearing Brief.

**OPINION OF THE ARBITRATOR**

Can this Arbitrator conclude on this record that it is clear beyond a reasonable doubt that the Company had *just cause* to terminate the Grievant for the reasons it gave and in the manner it did.  Yes, I can.  In short, to sustain this grievance would effectively give Flight Attendants (whether or not members of the Union) a free pass to say anything they want to their coworkers (whether or not they are Union officials) – no matter how graphic or disturbing – so long as those comments were motivated by a political or religious belief.  The use of social media has gotten totally out of hand.  The Company has the right to regulate this conduct, and has realized the seriousness of what is happening (Co. Ex. Nos. 4, 5 and 6).  Enough is enough.

Having considered the various factors to be used in making a credibility determination,[3] this Arbitrator finds that the testimony of Maureen Emlet (TR. pp. 37-121), the testimony of Meggan Jones (TR. pp. 181-218), the testimony of Ed Schneider (TR. pp. 219-249) and the testimony of Mike Sims (TR. pp. 250-276), coupled with the documentary evidence, far outweighs and is more credible than the Grievant's testimony and the testimony of the witnesses she called.  I paid particular attention to the testimony of Audrey Stone (TR. pp. 122-180), measuring it for any sign of bias or retribution.  I found none.

Let me first discuss the effect of, and lessons I have learned from, the earlier arbitration decisions that have been referred to me.  Are they binding on me, and if not, what effect should

---

[3] Hill, M. and Sinicropi, A.V., *Evidence in Arbitration* (Washington, D.C.: Bureau of National Affairs 1980); *See also* West Coast Panel Report: *Decisional Thinking of Arbitrators and Judges.* Proceedings of the 33rd Annual Meeting, National Academy of Arbitrators 121 (BNA Books 1981).

SWA000715

App. 1011

they have?  One distinguished Arbitrator, Harry Shulman,[4] has urged that adherence to prior awards is important to the collective bargaining process:

> Even in the absence of arbitration, the parties themselves seek to establish a form of *stare decisis* precedent for their own guidance - by statements of policy, instructions, manuals of procedure, and the like.  This is but a means of avoiding the pain of rethinking every recurring case from scratch, of securing uniformity of action among the many people of co-ordinate authority upon whom each of the parties must rely, of assuring adherence in their action to the policies established by their superiors, and of reducing the possibilities of arbitrary or personal discretion.

> When the parties submit to arbitration in the system of which I speak [successive decisions within the same enterprise], they seek not merely resolution of the particular stalemate, but guidance for the future, at least for similar cases.  They could hardly have a high opinion of the arbitrator's mind if it were a constantly changing mind.  Adherence to prior decisions, except when a departure is adequately explained, is one sign that the determinations are based on reason and are not merely random judgments.

The Grievant has advanced many arguments which endorse and can be addressed within the framework of Carroll Daugherty's *Seven Tests of Just Cause.*[5]  In the final analysis, my determination is based upon a careful and meticulous analysis of the testimony of the witnesses, including with particularity the Grievant's admissions and her recollections as to what happened, coupled with careful analysis of the exhibits.  The essence of this case is whether the Company had just cause to discharge the Grievant based upon the evidence it had before it and the totality of the Grievant's conduct.  Under the facts as established at our hearing, was this discipline, measured by

---

[4] Hill & Sinicropi, supra, quoting Pacific Tel. & Tel., 77 LA (BNA) 1088, 1096 (Brown, 1981) and Shulman, "Reason, Contract and Law in Labor Relations," 68 Harv.L.Rev. 999 1020 (1955).

[5] My use of the Daugherty framework is solely in response to the Grievant's contentions and not an endorsement of Daugherty's approach.  No single formulation of the *just cause* concept has received exclusive acceptance.  *Just cause* continues to be a flexible concept that takes specific shape only in the context of the facts it addresses.  *Discipline and Discharge in Arbitration* (Second Edition), written by Norman Brand and Melissa Biren (ABA Section of Labor and Employment Law).  For an excellent discussion of Daugherty's framework, see John E. Dunsford, *Arbitral Discretion: The Tests of Just Cause, Arbitration 1989: The Arbitrator's Discretion During and After the Hearing* (42nd Annual Meeting, National Academy of Arbitrators (BNA Books, 1990, p. 23).

10

SWA000716

a presumably-reasonable and neutral finder of fact (that would be me), fair and reasonable when all the applicable facts and circumstances are considered – i.e. did the Grievant get a *fair shake?*

Evidence of Guilt.   The record evidence, indeed, the unrefuted evidence, is that the Grievant, in February 2017, sent co-worker and TWU Local 556 President, Audrey Stone, unsolicited private Facebook messages containing graphic videos of aborted fetuses and images of women wearing vagina headdresses. It is clear that the Grievant not only sent Audrey Stone the graphic abortion images and videos, but the evidence is that she posted those same videos to her *unrestricted* public Facebook account.   The evidence is that the public Facebook account clearly (without having to search extensively) identified her as a Southwest employee.   To compound matters, the Grievant also accused Audrey Stone of supporting murder because she participated in the 2017 Women's March ("Women's March") in Washington, D.C., which was apparently sponsored by Planned Parenthood. The Grievant admitted making the posts and sending the messages, and understood them to be graphic.

On this record, I also find (as was her testimony) that the Grievant was expected to read and acknowledged receipt of all the relevant policies, RBFs, and related documents prior to making the offensive Facebook posts and sending the harassing messages (TR. pp. 385-387). I agree with the Company that at least three of the policies the Grievant violated provide an independently sufficient basis for termination – the Social Media Policy (Jt. Ex. 7), the Workplace Bullying and Hazing Policy (Jt. Ex. 6) and the Harassment Policy (Jt. Ex.). I also find that prior to and about the time of this conduct, the Company issued multiple RBFs to Flight Attendants, reminding them of the Company's emphasis on ensuring employees' social media activity did not violate any Company policies. I thus conclude that the Company has shown evidence of guilt in this case beyond any reasonable doubt, as well as by a preponderance of the credible evidence.

11

SWA000717

Due Process.  I feel that the Company's investigation and handling of this matter was entirely complete and appropriate.  I find on this record that the Company spent a good deal of time and effort to investigate what happened.   The investigation was conducted fairly and objectively.  It does not appear that management rushed to judgment or somehow presumed the Grievant to be guilty.  Neither Ed Schneider nor Mike Sims appears to have any animosity toward the Grievant.  "[I]f there is no evidence of ill will toward the accused on the part of the accuser and there are no circumstances upon which to base a conclusion that the accuser is mistaken, the conclusion that the charge is true can hardly be deemed improper."  *Ford Motor Company*, 1 ALAA para. 67,274, 620 (Shulman, 1954).

In response to the Union's contention that the Company's investigation was not adequate, or that someone's notes from the fact finding meeting should have been allowed into evidence, Arbitrator Toedt observes, in the *David MacGregor* case (cite unavailable):

> "The purpose of a fact finding meeting is not to conduct a hearing – that occurs during the arbitration stage – but is intended to inform the employee of allegations or charges against him and allow him the opportunity to respond and present 'his side of the story.'"

It also would appear that the Grievant's version of what happened as presented at the fact finding differs from what she presented at the Step 2 meeting, which differs somewhat from her testimony at the arbitration hearing.  During the fact finding meeting, she was rather adamant that she had done nothing wrong – that actually she had the right to send the messages and/or make the posts.  At the Step 2 meeting, she was perhaps a little less adamant about her personal or political views – she no doubt realized that she had messed up and gotten herself fired.  At the arbitration hearing, the Grievant said that her conduct was a mistake on her part, that she would like to sit down and talk with Audrey Stone about this, and that she was sorry she did this and that it hurt

12

SWA000718

App. 1014

Audrey Stone personally.   As articulated by Arbitrator Marvin Hill in Southwest Airlines and Transport Workers Union of America Local 555:   *Grievances DTW-R-0361/14 (Snowdon) and DTW-R-0360/14 (Carpenter)*, at p. 20 (Hill 2014):

> The point here is this:   *Had the [Grievant] told the same story [at the fact finding or Stage 2 meetings], a story that really has a ring of truth to it, perhaps arbitration would have been avoided. . . . There is something to be said regarding credibility determinations when an employee gives the same story from day one.   The [Grievant] passing on this opportunity does not help [her] cause when asking for a reversal of the entire discipline at issue here. . . .   Long term, it is not in [her] or the Company's interest.*

Equality of Treatment.   The Grievant contends that she was singled out for unequal or disparate discipline.   Or to put it differently, the Company's failure to apply its "rules" to employees Brian Talburt, Ricky Spand, Sam Wilkins and Bill Holcomb show inconsistent enforcement of those "rules."   The Ricky Spand situation, attempted to be explained by Witness Jeanna Jackson, is not a sufficiently similar situation.   Ms. Jackson was not aware of the level of discipline that resulted from her report about Ricky Spand (TR. pp. 421-422).   Indeed, Ms. Jackson received a thirty-day suspension for a social media violation in 2017 (TR. p. 452).   When the Company received a copy of Kent Hand's complaint regarding Bill Holcomb, it took disciplinary action (TR. pp. 455-456).   It is apparent from this record that where the employee violates the social media policy, for example, but not a whole swath of related rules on harassment and hazing, termination for a first offense may not be imposed.

Multiple witnesses testified that the Grievant's case involved the "most egregious" social media violation they had seen.   (TR. pp. 65, 78, 192, 204, 205, 237, 238 and 245).   It appears so on this record, and I further find that her transgressions were at least as serious as those of Holly Imamovic.   Recall that Ms. Imamovic (who clearly was not a supporter of the Union) was given a LCA and suspension of thirty days in lieu of termination, which she promptly violated.   The

13

SWA000710

App. 1015

Grievant takes the position that Flight Attendant Brian Talburt (who allegedly threatened to kill those that opposed Audrey Stone and the Union's leadership team) was voluntarily reinstated by the Company four to six weeks later.  That testimony was speculative at best.  Nonetheless, the evidence is that Brian Talburt was terminated for social media violations *based upon the Grievant's own complaint* (TR. p. 384; TR. pp. 453-455).

Because the Grievant has put into play the issue of whether there is favoritism of or retaliation against a Flight Attendant depending on whether the person is supportive of Audrey Stone and her leadership, or not, I will address that issue based upon my review of this record.  First, I find that the Grievant has not demonstrated *both* that she was treated less favorably than others and that the circumstances surrounding her offenses "were substantively like those of individuals who received more moderate penalties."  *Genie Co.*, 97 LA 542, 549 (1991).  It is her burden to do that, and she has failed.

I also find on this record that Audrey Stone reported the Grievant's conduct to the Company not to retaliate against her, but because she felt in good faith that the Grievant had overstepped the permissible bounds of free speech and protest – thus violating various policies that were applicable to her.  Next, I find on this record that Audrey Stone did not report the Grievant's conduct to the Company because of the Grievant's criticism of how the Union spent its dues money, however unfounded.  Finally, I find on this record that the Company does not have a policy or practice of disciplining, or not disciplining, employees based upon their view of TWU Local 556 generally, or of Audrey Stone in particular.  Rather, the record is that the Company considers the nature and severity of any Flight Attendant's policy violations when determining the appropriate level of discipline.  That some may have ultimately been given and accepted a LCA, or otherwise been reinstated, is not evidence of disparate treatment or pro-Union bias without more.

14

In *State of Ohio*, 99 LA (BNA) 1169, 1173 (1992), Arbitrator Rhonda Rivera stated the principle followed by arbitrators this way:

> The disparate treatment claim is essentially an affirmative defense which may be asserted to overcome a claim of just cause. The burden is on the Union. In the case at hand the Union did show that a number of employees were facially treated differently from the grievant. Different treatment alone does not prove disparate treatment. * * * To prove disparate treatment, the "different treatment" must have no reasonable and contractually appropriate explanation or be motivated by discrimination or other ill purpose. The Union proved only one part of the claim of disparate treatment: different treatment. However, the Union failed to show that the employees in question were in a similar or analogous position.

In another case, *Ohio Department of Rehabilitation and Corrections*, 93 LA (BNA) 1186 (1990), the same arbitrator noted:

> A recognition that not every employee is treated exactly the same does not justify a charge of invidious discrimination against any employee or any other intentional discrimination. To show disparate treatment strong enough to overcome management's decision requires the Union to show by clear and convincing evidence purposeful discrimination.
> In *Genie Co.*, 97 LA (BNA) 542 (1991), Arbitrator Dworkin stated:
>
> In order to prove disparate treatment, a union must conform the existence of both parts of the equation  It is not enough that the employee was treated differently than others; it must also be established that the circumstances surrounding his/her offense were substantially like those of individuals who received more moderate penalties.

<u>Appropriate Penalty.</u> Nothing in this decision should be read as my "green light" authorizing the Company to commit economic capital punishment whenever it finds a violation of the various policies at play here. But I am reminded of how this affected Audrey Stone:

Q: What made you decide to report Ms. Carter's Facebook Messenger posts to Southwest at this point?

A: They hurt me. I couldn't unsee what she sent. I thought it was vile, I thought it was disgusting, and I didn't want any other employee to have to be exposed to that. I was fearful that other flight attendants that went to the march might be sent it, and I felt like it crossed a line that I had overlooked, walked away from a lot of

15

SWA000728

harassment and bullying that had been occurring for years, but that this overstepped a line for me as a human being and as an employee of Southwest.

(TR. p. 152).

I completely concur. I found the postings and messages to be repulsive and beyond the bounds of civility. Under all of the circumstances of this case, termination was the appropriate penalty. There is no justification for progressive discipline under these facts. The Grievant's semi-apology at the hearing does not provide the remorse that might sometimes mitigate against this penalty.[6] As Ed Schneider testified:

> **Q**: Can you explain to us why you decided that termination was the appropriate discipline for Ms. Carter's actions?
>
> **A**: When I read through the bullying and hazing policy and our social media policy, it is very explicit in stating what shows as the violation of those. And to the egregiousness of these videos and how they portrayed the fetus and everything in them, that that was egregious enough for termination.
>
> **Q**: You just mentioned the two videos. Did the still picture, the still post of the vagina headdress, did that factor into your decision at all?
>
> **A**: The three of those together are inclusive in what I made my decision on, the bullying, hazing and social media policy. And also, along the same lines, the videos on her Facebook page where it indicated clearly that she was a Southwest flight attendant.
>
> **Q**: So both – all of that together kind of factored into your decision?
>
> **A**: Yes.

(TR. pp. 237-238).

---

[6] The Grievant's *mea culpas* don't come close to being a sincere apology – rather, it is apparent to me she was beginning to realize for the first time that she was sorry that Audrey Stone had turned her in and that this had become such a big deal – that she had placed her political and social views above her job. That is what the Grievant is sorry about. I have studied, and taught, *The Power of Apology*, and the Grievant's excuses are nowhere near the five elements always present in a sincere apology. I find it very telling that even as of the time of her hearing, the videos and the photographs identifying her as a Southwest employee remained posted on her public Facebook page (TR. p. 360).

16

SWA000720

In the *Tony Vicente* case, Arbitrator Hill states the general rule: if management's decision was not arbitrary, capricious or blatantly unreasonable, or based on a serious mistake of fact, its decision should stand. Further, as outlined by one Arbitrator [M. Beaty, in *Trans World Airlines,* 41 LA (BNA) 142, 143-44]:

> The generally accepted rule is that the arbitrator does not succeed to the functions of management, that an arbitration clause is not an abdication by management of its duties in regard to discipline and discharge and does not grant to the arbitrator authority to redetermine the whole matter by his own standards as if he were making the original decision."

Finally, I learn from Arbitrator Hoffman's decision in the *Deatrick Bledsoe* case [quoting from *Trinity Industries,* 109 LA 86 (Obertstein, 1997)]:

> "Management has not only the right but the duty to its employees, customers and to the community on which it does business, to create and maintain a safe and secure work environment, devoid of either verbally or physically abusive, threatening, hostile, aggressive, intimidating, harassing, disruptive, dangerous or even potentially dangerous behaviors."

There is not even a hint or suggestion that the various policies and Rules of Conduct are not relevant to the safe and efficient performance of the Company's business. These rules are obviously relevant in a company with a far-reaching reputation for concern for both employees and customers. Included in the Company's Mission Statement is the following:

> We are committed to provide our employees a stable work environment with equal opportunity for learning and personal growth. Creativity and innovation are encouraged for improving the effectiveness of Southwest Airlines. Above all, employees will be provided the same concern, respect, and caring attitude within the organization that they are expected to share externally with every Southwest Customer (Jt. Ex. 3).

I am compelled to find under these circumstances that the degree of discipline administered by the Company – here, economic capital punishment – was warranted due to the seriousness of

17

SWA000720

the offenses proven to have occurred, notwithstanding that the Grievant's had no previous disciplinary record. I have taken all of that into consideration.[7]

I again quote Arbitrator Daugherty:

". . . leniency is the prerogative of the employer rather than of the arbitrator: and the latter is not supposed to substitute his judgment in this area for that of the company unless there is compelling evidence that the company abused its discretion." *Enterprise Wire Co. and Enterprise Independent Union,* 46 LA 359 (March 28, 1966).

And thus, I find on this record that the Company had *just cause* for its disciplinary action, and that the penalty of termination was neither arbitrary nor unreasonable. Whether under a more traditional burden of proof, or the Daugherty *Seven Tests of Just Cause* standard that Mr. Chappell suggests should be applicable, the Grievant got a fair shake and I cannot sustain her grievance. To put it another way, taking into account all relevant circumstances, I find sufficient justification in the Grievant's conduct to warrant discharge.[8]

**AWARD**

Having duly heard the proofs and allegations and after consideration, it is my Award that the grievance is denied. The Company did have just cause to discharge the Grievant, and its decision to terminate her is sustained as being reasonable. As provided in the CBA and is the parties' agreement, the cost of the arbitration shall be borne equally by the Grievant and the Company.

---

[7] This Arbitrator also is not abdicating his responsibility under some theory that because of a "zero tolerance" policy, or non-bargained-for concept that precludes an examination of *just cause,* my hands are somehow tied. I know the difference, and this is not the situation before me. But as Arbitrator Marvin Hill declared in the *Tony Vicente* matter, Arbitrators are "not like circuit riders dispensing their own brand of industrial justice as they see fit."

[8] *Providence St. Peter Hospital,* 123 LA 473, 477 (2006) (Gaba), citing *RCA Communications, Inc.,* 29 LA 567, 571 (Harris, 1961) and *Riley Stoker Corp.,* 7 LA 764, 767 (Platt, 1947).

18

**DATED:**  April 26, 2018.

WILLIAM H. LEMONS, Impartial Arbitrator

SWA000725