# EXHIBIT AA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER                    )
                                   ) CIVIL ACTION NO.
VS.                                ) 3:17-CV-02278-X
                                   )
SOUTHWEST AIRLINES CO., AND )
TRANSPORT WORKERS UNION OF  )
AMERICA, LOCAL 556                 )


-----------------------------------

CONFIDENTIAL 30(b)(6)
VIDEOTAPED DEPOSITION OF
MICHAEL SIMS
NOVEMBER 2, 2020

-----------------------------------


        ANSWERS AND DEPOSITION OF MICHAEL SIMS,
produced as a witness at the instance of the
Plaintiff, taken in the above-styled and -numbered
cause on NOVEMBER 2, 2020, at 9:06 a.m., before
CHARIS M. HENDRICK, a Certified Shorthand Reporter
in and for the State of Texas, witness located in
Midlothian, Texas, County of Ellis, pursuant to the
Federal Rules of Civil Procedure, the current
emergency order regarding the COVID-19 State of
Disaster, and the provisions stated on the record
or attached hereto.

Page 2

```
 1                A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3       MR. MATTHEW B. GILLIAM
         NATIONAL RIGHT TO WORK LEGAL DEFENSE
 4       FOUNDATION, INC.
         8001 Braddock Road, Suite 600
 5       Springfield, Virginia  22160
         (703) 770-3339
 6       mbg@nrtw.org

 7

     FOR THE DEFENDANT, SOUTHWEST AIRLINES CO.:
 8

         MR. MICHAEL A. CORRELL
 9       REED SMITH LLP
         2850 North Harwood, Suite 1500
10       Dallas, Texas  75201
         (469) 680-4264
11       mcorrell@reedsmith.com

12

     FOR THE DEFENDANT, TRANSPORT WORKERS UNION OF
13   AMERICA, LOCAL 556:

14       MR. ADAM GREENFIELD
         LAW OFFICES OF CLOUTMAN & GREENFIELD, PLLC
15       3301 Elm Street
         Dallas, Texas  75226
16       (214) 939-9223
         agreenfield@candglegal.com

17

18       ALSO PRESENT:  MR. MACK SPURLOCK -
                          VIDEOGRAPHER
19
                         MS. CHARLENE CARTER
20                       MS. LAUREN ARMSTRONG
                         MR. CHRIS MABERRY
21

22

23

24

25
```

1                          INDEX

2    Appearances .................................2

3    MICHAEL SIMS

4         Examination by Mr. Gilliam...............6

5         Examination by Mr. Correll.............230

6

7    Signature and Changes.......................235

8    Reporter's Certificate......................237

9

10                        EXHIBITS

11   Exhibit 1 - ................................70
     Southwest Airlines Policies, Document 11
12
     Exhibit 2 - ................................72
13   Termination Letter, Document 7

14   Exhibit 3 - ...............................126
     Email to Suzanne Stephensen from Audrey Stone,
15   Document 1

16   Exhibit 4 - ...............................135
     Email to Suzanne Stephensen from Dave Kissman,
17   Document 2

18   Exhibit 5 - ...............................157
     Email to Denise Gutierrez from Ed Schneider,
19   Document 5

20   Exhibit 6 - ...............................160
     Email to Maureen Emlet from Ed Schneider,
21   Document 9

22   Exhibit 7 - ...............................167
     Email to Maureen Emlet from Ed Schneider,
23   Document 6

24

25

Page 4

1                          EXHIBITS

2    Exhibit 8 - ...............................191
     Email to Listening Center from Listening Center,
3    Document 4

4    Exhibit 9 - ...............................206
     Email to Tammy Shaffer from Mike Sims, Document 13
5
     Exhibit 10 - ..............................217
6    Email to Naomi Hudson from Kevin Allen, Document 15

7    Exhibit 11 - ..............................223
     Email to Dave Kissman from Carolene Goulbourne,
8    Document 3

9    Exhibit 12 - ..............................224
     Email to Joe Mendez from Sonya Lacore, Document 14
10
     Exhibit 13 - ..............................224
11   Email to Inflight Labor Relations from Tammy
     Shaffer, Document 12
12
     Document - ................................204
13   80-Carter Fourth Amended Complaint

14   Document - ................................204
     81-SWA Answer to Carter Fourth Amended Complaint
15
     Document - .................................95
16   SWA Response to Plaintiff's Roggs

17

18

19

20

21

22

23

24

25

1        PROCEEDINGS

2            THE VIDEOGRAPHER:  We are now --

3   sorry.  We are now on record.  Today's date is

4   November 2nd, 2020.  The time is 9:06 a.m. Central

5   time.  Will counsel please -- will the court

6   reporter please swear in the witness?

7            THE REPORTER:  This deposition is --

8   of Michael Sims is being conducted remotely in

9   accordance with the current emergency order

10  regarding the COVID-19 State of Disaster.  The

11  witness is located in Midlothian, Texas.

12           My name is Charis Hendrick, Court

13  Reporter, CSR No. 3469.  I am administering the

14  oath and reporting the deposition remotely by

15  stenographic means from my home in Ellis County,

16  Texas.  The witness has been identified to me

17  through counsel.

18           Would counsel please state their

19  appearances and locations for the record?  And the

20  city is fine.

21           MR. GILLIAM:  This is Matthew Gilliam

22  for plaintiff Charlene Carter.  I'm in Springfield,

23  Virginia.

24           MR. CORRELL:  Michael Correll for

25  defendant Southwest Airlines in Dallas, Texas.

Case 3:17-cv-02278-X Document 170-2 Filed 04/06/20 Page 7 of 46 PageID 4359

Page 6

1          MR. GREENFIELD:  Adam Greenfield for

2   defendant TWU Local 556 in Dallas, Texas.

3               MICHAEL SIMS,

4   having been first duly sworn, testified as follows:

5               EXAMINATION

6   BY MR. GILLIAM:

7      Q.  Good morning, Mr. Sims.  Did you already

8   do the oath?  I am sorry.  Okay.  Good morning,

9   Mr. Sims.  My name is Matt Gilliam and I am the

10  attorney representing plaintiff Charlene Carter in

11  this case.  I am here today to ask you some

12  questions about Carter v TWU Local 556 and

13  Southwest Airlines Company.  This is a Rule

14  30(b)(6) deposition of defendant Southwest

15  Airlines; that's your understanding as well?

16     A.  That is correct.

17     Q.  Okay.  And you are the designated

18  representative of defendant Southwest Airlines

19  Company?

20     A.  That is correct.

21     Q.  Okay.  And because this is a 30(b)(6)

22  deposition, you understand that you are speaking on

23  behalf of the company, Southwest Airlines, and not

24  on your personal behalf?

25     A.  I do.

App.275

1  topic amongst many of our flight attendants at the
2  time because, in terms of union parlance, it was a
3  big event.
4      Q.  Do you remember when it first became a
5  topic?
6      A.  To my knowledge, it became a topic shortly
7  after the -- the collective bargaining agreement
8  was signed, which would -- I want to say sometime
9  in the time period of 2016 and on.  It may have
10 been a little sooner than 2016.
11     Q.  Okay.  So was it the current collective
12 bargaining agreement that was signed in 2016?
13     A.  I believe.  I can -- I can get that answer
14 for you.  I have to look on the actual document to
15 see when it was signed.
16     Q.  Okay.  And what else did you and Maureen
17 discuss about the investigation?
18     A.  That was it.
19     Q.  Okay.
20     A.  Was a pretty short conversation.
21     Q.  And who is Nancy Cleburn?
22     A.  Nancy Cleburn is one of the leaders in our
23 ACT team, and that is the accommodations team that
24 makes determinations on workplace accommodations,
25 such as disability, religious and any other type of

Page 28

1   accommodation an employee would seek under the law.

2       Q.  Okay.  And what were your discussions with

3   Ms. Cleburn?

4       A.  Specifically, did Ms. Carter ever seek an

5   accommodation for religious purposes with that

6   team.

7       Q.  Okay.  Did you have any other discussions

8   with Ms. Cleburn?

9       A.  No.

10      Q.  Okay.  And one other question about Nancy.

11  You say she's one of the leaders of the ACT team.

12  Does she have a title?

13      A.  I believe it is manager.

14      Q.  Okay.  So she would be an ACT team

15  manager?

16      A.  Correct.

17      Q.  Okay.  Does she -- is she employed to

18  perform any other roles with the company?

19      A.  Not that I know of.

20      Q.  Okay.  And is the ACT team independent in

21  the same sense as the employee relations group?

22      A.  That is correct.  They report up through

23  human resources and through general counsel.

24      Q.  Okay.  And both the ACT team and employee

25  relations report through human relations; is that

Page 32

1   discussions with Nancy and Audrey apart from

2   whether Ms. Carter ever requested an accommodation?

3      A.  No.  That was the sole purpose of the

4   conversation.

5      Q.  Okay.  And how long did that conversation

6   last?

7      A.  Five to seven minutes.

8      Q.  Okay.  All right.  So I -- I sort of

9   interrupted my -- my introduction a little bit.  So

10  I should go ahead and say now, if at any point you

11  want to take a break, just let me know.  I -- I may

12  use the same.  And I think that's -- you -- you

13  said earlier, I think, that you had -- you read the

14  Complaint; is that right?

15      A.  That's correct.

16      Q.  Okay.  And you are -- you are still

17  employed by Southwest; that's correct?

18      A.  Yes.

19      Q.  Okay.  And how long have you been employed

20  by Southwest?

21      A.  As of this month, it will be 24 years.

22      Q.  Okay.  And what is your current title?

23      A.  Senior director, inflight operations.

24      Q.  All right.  And how long have you been in

25  that position?

Page 33

1    A.   Since 2017.

2    Q.   Okay.  And what position did you hold with

3 Southwest prior to that?

4    A.   Director of inflight operations.

5    Q.   Okay.  When were you director, were you,

6 basically, doing the same things that you are now?

7    A.   For the most part, but my role expanded

8 and it became senior director.  So, yeah, I had

9 been working as a director in the inflight base

10 operations world since 2011.

11    Q.   Okay.  How did your role expand when you

12 became senior director?

13    A.   I was assigned another team to manage,

14 which would be our network operations center

15 managers that are our 24-hour NOC world.  I was

16 also assigned a gentleman who manages our peer

17 support programs for flight attendants.  And then I

18 was assigned a woman who manages a communications

19 tool that we used to interact with our flight

20 attendants known as Link, L-i-n-k.  And that was in

21 addition to operating the inflight bases.

22    Q.   And those employees you just mentioned

23 that were part of your expanded role, they are not,

24 I guess, employees in the same bargaining unit as

25 the flight attendants, right?

Case 3:17-cv-... Document... Filed 09/08/... Page 12 of 46 PageID 364

Page 49

1    Q.  Okay.  Okay.  Yeah.  I was confused.  All

2  right.  All right.  And is there -- who was the --

3  so Denise Gutierrez was the employee relations

4  manager involved in this case; is that -- that

5  correct?

6    A.  Representative; I am not sure if she was a

7  manager or not.

8    Q.  Okay.

9    A.  I am not sure of her title at the time.

10    Q.  Okay.  Do you know who she reported to?

11    A.  I believe, at the time -- I -- I am not

12  sure who she reported to, actually.

13    Q.  Okay.  Do you know if anybody else from

14  employee relations besides Denise Gutierrez was

15  involved in Carter's investigation?

16    A.  Not to my knowledge.

17    Q.  Okay.  At -- at what point do the employee

18  relations representatives typically get involved in

19  an -- in a disciplinary investigation?

20    A.  They become involved at the moment that

21  there is reason to believe that there could

22  possibly be a protected class of people or

23  protected work right had -- may be in question.

24  They get -- they get involved very early on.

25    Q.  Okay.  And when you say protected class,

Page 58

1    Q.  Okay.  Now, have -- have there been any

2  tentative agreements reached between Southwest and

3  Local 556 regarding the collective bargaining

4  agreement?

5    A.  No.

6          MR. CORRELL:  And I am going to object

7  that the current scope of bargaining between the

8  company and the union is beyond the scope of the

9  Notice.  Mr. Sims, you can answer as you are able

10  to in your personal capacity.

11         THE WITNESS:  Okay.

12    Q.  (By Mr. Gilliam)  Has a tentative

13  agreement -- okay.  You said no -- no tentative

14  agreement has ever been reached?

15    A.  That is correct.

16    Q.  Okay.  All right.  But -- okay.  Now, who

17  oversees the inflight services division?

18    A.  That is vice president Sonya Lacore,

19  L-a-c-o-r-e.

20    Q.  Okay.  And what -- what does that position

21  do?

22    A.  The vice president of inflight is in

23  charge of overseeing all budgeting matters.  She

24  serves as a senior leader on the senior management

25  committee at Southwest Airlines.  She's also

Page 59

1  responsible ultimately for the day-to-day operation

2  of inflight and the overall job performance of our

3  flight attendants.

4     Q.  Okay.  And who -- who would the VP for

5  inflight services report to?

6     A.  Reports to a senior vice president of air

7  operations.

8     Q.  Okay.  And who -- who would that be?

9     A.  Currently, Alan Kasher, K-a-s-h-e-r.

10    Q.  Okay.  And do you know who Sonya Lacore's

11 predecessor was?

12    A.  Yes.

13    Q.  And who was that?

14    A.  Mike Hafner, H-a-f-n-e-r.

15    Q.  Okay.  When did Sonya Lacore become the

16 senior V -- I am sorry -- the VP for inflight

17 services?

18    A.  On or around November of 2015.

19    Q.  Okay.  And as senior director of inflight

20 operations, do you report to Sonya Lacore?

21    A.  I do.

22    Q.  Okay.  Is she your direct report?  I am

23 sorry.

24            Do you report directly to her?

25    A.  That is correct.

Case 3:19-cv-01324-X Document 177-12 Filed 09/01/21 Page 15 of 46 PageID 4367

Page 64

1    Q.   Okay.  And about how many base managers do

2  you have in the total West Coast area?

3    A.   Five.

4    Q.   Five.  Okay.

5    A.   Excuse me.  It's six now.  We opened Los

6  Angeles, but it -- during this period, it was five.

7    Q.   So there were -- were five West Coast base

8  managers in 2017?

9    A.   Yes.

10    Q.   Okay.  But six now.  All right.  And how

11  -- how many base managers company-wide for all --

12    A.   Currently, we have 11.

13    Q.   11.  Okay.  Okay.  And the base manager in

14  Denver is Ed Schneider, correct?

15    A.   That is correct.

16    Q.   Okay.  And -- and Ed Schneider, he -- he

17  reported directly to Dave?

18    A.   That is correct.

19    Q.   Okay.  Did he report to you as well or --

20  or just solely to Dave?

21    A.   Solely to Dave.

22    Q.   Okay.  And what -- what -- what did Dave

23  Kissman do in his position?

24    A.   Dave, his responsibilities were provide

25  leadership to the bases that reported up to him to

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 71

1    Q.  Sure.  There --

2    A.  Can you tell me again the -- it's Number

3  11?

4    Q.  Yeah.  It's Document 11.  We've marked it

5  as Exhibit 1.

6    A.  Okay.  So I have it -- I have it pulled up

7  here.  So I am looking at the workplace bullying

8  and hazing policy.  I'm scrolling down.  And let me

9  look at this next one.  Okay.  I reviewed the

10  social media policy and now looking at the next

11  document.

12    Q.  Yeah, and -- and we can stop after you

13  look at the next one, the -- the --

14    A.  Okay.  And then --

15    Q.  And whenever you have finished reviewing

16  that one, let me know.

17    A.  Ready.

18    Q.  Okay.  And do you recognize those and what

19  they are?

20    A.  I do.

21    Q.  Okay.  And what are they?

22    A.  The first document is from the Southwest

23  Airlines flight attendant manual.  It is the

24  mission statement and the explanation of the

25  mission statement.  The second document is the

Page 72

1   workplace bullying and hazing policy.  Third is the

2   Southwest Airlines employee social media policy.

3   And then the fourth is the Southwest Airlines

4   policy concerning harassment, sexual harassment,

5   discrimination and retaliation.

6        Q.  Okay.  And so the -- the workplace

7   bullying and hazing policy and then the Southwest

8   Airlines Company policy concerning harassment and

9   sexual harassment, those are two separate policies;

10  is that correct?

11       A.  Yes.

12       Q.  Okay.  And do you -- were -- were these

13  the policies that were in effect when Ms. Carter

14  was terminated?

15       A.  Let me look.  Yes, that is correct.

16       Q.  Okay.  And do you -- was she terminated

17  for -- which ones were -- was she terminated for

18  violating?

19       A.  Harassment and bullying policy, sexual

20  harassment and social media.

21       Q.  Okay.  If we could also mark -- let's see

22  -- Document 7 as Exhibit 2, please.

23            (Exhibit 2 marked.)

24       Q.  (By Mr. Gilliam)  And feel free to -- to

25  look at document --

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 73

1    A.  It will take me a minute to pull it up.

2          THE VIDEOGRAPHER:  Is this the correct

3    document?

4          MR. GILLIAM:  Yes.

5    Q.  (By Mr. Gilliam)  And, Mr. Sims, whenever

6    you are ready, just let me know.

7    A.  Okay.  That is -- I am ready.

8    Q.  Okay.  And do you recognize this -- this

9    document?

10   A.  That is the termination notice that was

11   sent to Ms. Carter.

12   Q.  Okay.  And, I guess, let's see.  Towards

13   the end, I think, of the -- the third paragraph, it

14   says, after considering -- considering all

15   information gathered in my investigation, as well

16   as the information presented in your fact-finding

17   meeting, I have determined that your conduct is in

18   direct violation of the Southwest Airlines mission

19   statement.  And it says, the following company

20   policies; and it mentions only -- by bullet point

21   there -- workplace bullying and hazing policy and

22   social media policy; is that correct?

23         MR. CORRELL:  Objection.  That

24   misstates the exhibit, but, Mr. Sims, you can

25   answer.

Page 74

1       A.   That's what the bullet points say.

2       Q.   (By Mr. Gilliam)  Okay.  And then it says

3  after that, your conduct could also be a violation

4  of Southwest's policy concerning harassment, sexual

5  harassment, discrimination and retaliation.

6            So in saying that your conduct could

7  also be a violation, was it determined that -- that

8  Ms. Carter violated that policy?

9       A.   That was inconclusive.

10      Q.   Okay.  So Ms. Carter -- I mean, is it --

11  is it correct to say Ms. Carter was -- was fired

12  for violating the workplace bullying and hazing

13  policy and the social media policy?

14      A.   Yes.

15      Q.   Okay.  I would like to return to Exhibit 1

16  now, the document marked as Exhibit 1.  And turning

17  to the -- the second page with the -- the workplace

18  bullying and hazing policy.  Was her conduct

19  considered bullying or hazing?

20      A.   Bullying.

21      Q.   Bullying.  Okay.  Was her conduct

22  considered hazing?

23      A.   Potentially, it could have been, based on

24  this -- definition.

25      Q.   Okay.  But she was -- is it correct to say

Page 75

1   that she was fired for bullying?

2       A.   That's correct.

3       Q.   Okay.   And then it -- it says that hazing

4   and bullying behavior should be reported by the

5   employee to his or her supervisor, HR business

6   partner or any senior leader, something of that

7   sort.   I was just going to ask:   Who was a senior

8   leader?

9       A.   Senior leader can be pretty loosely

10  defined at Southwest.   But, generally, department

11  senior leaders are considered director level and

12  above; yet, we have senior managers, by title, are

13  senior leaders.   So there is not really a -- a

14  clear definition versus how we utilize the term.   A

15  senior leader could be anyone that is higher in the

16  organization.

17      Q.   Okay.   And once hazing and bullying

18  behavior is reported to one of those individuals,

19  what do they do next?

20      A.   They notify employee relations.

21      Q.   Okay.   And then does employee relations

22  head up the investigation?   Or what does employee

23  relations do with it?

24      A.   In -- in bullying allegations, employee

25  relations may or may not be involved.   There are

Page 100

1    representatives may have reported other employees

2    for social media violations before?

3        A.  No, I don't remember.

4        Q.  Okay.  Okay.  In the 122 cases that you

5    mentioned, the disciplinary cases -- well, you --

6    you don't -- you said you do not remember how --

7    whether any of those employee or how many were

8    fired?

9        A.  I don't know how many were terminated.

10       Q.  Okay.

11       A.  And in those cases --

12            MR. CORRELL:  We're going to get that

13   information for you over lunch, so he'll be able to

14   answer that question.

15            MR. GILLIAM:  Okay.

16            MR. CORRELL:  We have it; I just need

17   to refresh his recollection.

18            MR. GILLIAM:  Okay.  Let's see.  I may

19   hold off on a couple of other questions, then.

20            THE VIDEOGRAPHER:  I have roughly 10

21   minutes before I have to do a media change, just to

22   let you know.

23            MR. GILLIAM:  Okay.

24       Q.  (By Mr. Gilliam)  Now, is -- is it the ACT

25   team that is responsible for handling religious

Page 101

1    accommodation requests?

2         A.   That is correct.

3         Q.   And what -- what does the -- what does ACT

4    stand for?

5         A.   Accommodations and Career Transitions.

6         Q.   Okay.  Now, would the ACT team be in

7    charge of any incident where a flight attendant is

8    accused of treating another flight attendant

9    unfairly based on their religion?

10        A.   No.  That would be employee relations.

11        Q.   Okay.  So any incidents of religious

12   discrimination would -- would also be handled by

13   employee relations?

14        A.   In -- incidents of discrimination are

15   handled by employee relations.  The ACT team only

16   grants accommodations.

17        Q.   Okay.  If an incident of religious

18   discrimination is reported to the ACT team, do --

19   do they ever report it to -- I'm -- I'm sorry.  Let

20   me start over.

21             If an incident of religious

22   discrimination is -- is reported to employee

23   relations, does employee relations ever communicate

24   that to the ACT team?

25        A.   That, I do not know.

1    the ACT team.  Or they could contact the ACT team

2    directly.

3        Q.  Okay.  And then when the ACT team receives

4    knowledge of an accommodation request, what do they

5    do with that information?

6        A.  They review it and -- in accordance with

7    company policy and applicable law, and they make a

8    determination whether or not some sort of workplace

9    accommodation will be granted or not.

10       Q.  Okay.  Do they consult with employee

11   relations or inflight or another department in

12   making a determination of an accommodation request?

13       A.  Generally, no.  Other than they may reach

14   out to the respective department to learn more

15   about the job functions itself under the job

16   description.

17       Q.  And is -- is the ACT team comprised of

18   full-time employees?

19       A.  Correct.

20       Q.  Okay.  And they are doing that job on the

21   ACT team in a full-time basis?

22       A.  Correct.

23       Q.  Okay.  And about -- do you know about how

24   many employees are within the ACT team?

25       A.  I do not.

Page 125

1    clarify.  Is there any other group or person at

2    Southwest who is monitoring employees', I guess,

3    social media sites for content?

4         A.  Not that I know of.

5         Q.  Okay.  When did Southwest first learn from

6    Audrey Stone about Charlene Carter's Facebook

7    messages and posts?

8         A.  I do not have the date.

9         Q.  Do -- do you remember how Southwest

10   learned about it?

11        A.  Yes.

12        Q.  Okay.  And -- and how was that?

13        A.  Audrey Stone sent a email to her base

14   leader in Las Vegas.

15        Q.  Do you know if Audrey Stone communicated

16   with any other Southwest management employees prior

17   to communicating with her base manager?

18        A.  No.  I have no knowledge of that.

19        Q.  Okay.  And do you know who -- who her base

20   leader in Las Vegas was?

21        A.  Suzanne Stephensen, S-t-e-p-h-e-n-s-e-n.

22        Q.  Okay.  And do you remember what she

23   reported exactly?

24        A.  I am not clear.  What Audrey reported or

25   what Suzanne --

Page 126

1     Q.   Yeah.  I am sorry.  Do you -- do you
2  recall what Audrey reported to Suzanne?
3     A.   Yes.  She sent an email to Suzanne stating
4  that she had received disturbing email --
5  disturbing private messages on Facebook and also
6  video footage of aborted fetuses and still pictures
7  of aborted fetuses.
8     Q.   Okay.  I would like to mark Document 1 as
9  Exhibit 3.
10            (Exhibit 3 marked.)
11     Q.   (By Mr. Gilliam)  And if you could just
12  review Document 1 briefly and let me know when you
13  have had the chance to take a look at it.
14     A.   Okay.  Okay.
15     Q.   Do you recognize what this is?
16     A.   I do.
17     Q.   And what is it?
18     A.   This is an email authored by Audrey Stone,
19  sent to Las Vegas base manager Suzanne Stephensen
20  with her initial complaint.
21     Q.   Okay.  And it appears she has CC'd Naomi
22  Hudson and Sonya Lacore.  Who -- who is Naomi
23  Hudson?
24     A.   Naomi Hudson is a former senior director
25  in labor relations.  She has retired.

Page 128

1     Q.  Did he tell you who had made the

2  complaint?

3     A.  I believe he did.

4     Q.  Okay.  And, presumably, he told you Audrey

5  Stone?

6     A.  Yes.

7     Q.  And did you know would Audrey Stone was?

8     A.  Yes.

9     Q.  And how -- and you knew that Audrey Stone

10  was president of Local 556?

11     A.  I did.

12     Q.  And how did you know she was president of

13  Local 556?

14     A.  As a general course of business, we know

15  who our union presidents are.

16     Q.  Did you ever communicate with the union

17  president in the regular course of business?

18     A.  Yes, I did.

19     Q.  Okay.  And what -- I guess, what were the

20  matters you -- you discussed with the union

21  president?

22     A.  Generally, employee grievances.

23     Q.  And in the regular course of conducting

24  business and when you had occasion to talk to the

25  union president, did you discuss other matters

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 131

1    the -- the pictures that were attached to this

2    email, correct?

3         A.  Yes.

4         Q.  Okay.  I want to -- let's see.  Turn to --

5    let's see.  Is it -- which page it is in your --

6    maybe the third page, the first picture.

7         A.  Okay.  Say it again.  The first picture?

8         Q.  Yeah.  The first -- the first Facebook

9    screen grab, I guess; the first screenshot, so --

10        A.  Okay.

11             MR. CORRELL:  Counsel, would that be

12   Page 4228?

13             MR. GILLIAM:  Yes.  It's 4228.

14   Southwest Bates label 4228.

15        A.  Okay.

16        Q.  (By Mr. Gilliam)  Now, did -- was this a

17   post that Ms. Carter sent to Audrey Stone by

18   Facebook Messenger?

19        A.  I believe it is.

20        Q.  Okay.  So when -- when Ms. Carter sent

21   this to Audrey Stone, nobody else could see this

22   but Audrey, correct?

23        A.  That, I do not know.

24        Q.  Okay.  And turning to the -- going to the

25   next page, it's Bates labeled Southwest 4230.

Page 132

1     A.  Okay.

2     Q.  Now, is -- do you know if this was sent to

3  Audrey Stone by Facebook Messenger?

4     A.  I believe it was.

5     Q.  Okay.  All right.  And then going to the

6  next one, 4232 Bates labeled.

7     A.  Okay.

8     Q.  And was this one posted on Charlene

9  Carter's Facebook page?

10    A.  I don't believe it was a post on her

11  specific page, but she's attributed to it.

12    Q.  Okay.  Do you know where -- where it was

13  posted?

14    A.  No.

15    Q.  Okay.  But this wasn't sent as a private

16  message to Ms. Stone, correct?

17    A.  To my knowledge, it was not.

18    Q.  Okay.  Was -- is -- is it your

19  understanding that this particular post was

20  publicly available for other people to see?

21    A.  It is my understanding, yes.

22    Q.  Okay.  Besides Audrey Stone, were there

23  any other complaints to Southwest about the posts

24  that were publicly viewable that Ms. Carter had

25  made?

1  you know, and I sent the message to him, let's get

2  employees relations on deck.  And that was it.

3      Q.  Okay.  You also said you knew it was an

4  employee relations matters from glancing at it?

5      A.  Yup.

6      Q.  And how did you know that?

7      A.  She's talking about pro-life and pro- --

8  so after looking at that, and then seeing that

9  there were some allegations there, that I just said

10  -- I just defaulted and -- and suggested they go on

11  with employee relations.

12      Q.  Okay.  And when she was talking about

13  pro-life, did that suggested that a protected

14  category was involved?

15      A.  No, no.

16      Q.  What -- what about pro-life tipped you off

17  that employee relations should be involved?

18      A.  Well, that was just part of it.  When I am

19  talking about the overall context of what I saw, I

20  believed it was employee relations.  I didn't make

21  any conclusion one way or the other.

22      Q.  Okay.  And do you know if -- if someone

23  did contact employee relations?

24      A.  I believe that happened.

25      Q.  And do you know who contacted employment

Page 144

1    the first time where someone communicated with

2    employee relations about this matter?

3         A.  I believe it is.

4         Q.  Okay.  And he -- he refers to protected

5    categories.  Is -- is it exclusively employee

6    relations who gives insight regarding the protected

7    categories?

8         A.  Yes.

9         Q.  Okay.  And I know we discussed it a little

10   bit earlier, but what exactly are the protected

11   categories?

12        A.  Protected categories include racial

13   discrimination, gender discrimination, religious

14   discrimination, disability discrimination, age

15   discrimination, race discrimination.

16        Q.  Okay.  Okay.  Now, with this -- this email

17   address to employee relations DG, do you know if

18   anybody outside of employee relations has access to

19   that mailbox?

20        A.  That, I do not know.

21        Q.  Okay.  All right.  Next, if I could direct

22   your attention to 4456.  Should be the next page.

23        A.  Yeah.  Got it.  Okay.

24        Q.  And do you recognize this email?

25        A.  I do.

Page 145

1     Q.  And what is it?

2     A.  This is an email from Naomi Hudson, who

3  was then the senior director of labor relations,

4  who had also received -- she was copied on that

5  initial email from Audrey Stone, so she is sending

6  this to Suzanne Stephensen.

7     Q.  Okay.

8     A.  Just saying, please also forward to Toni

9  Hamilton.

10    Q.  And who is Toni Hamilton?

11    A.  Toni Hamilton worked in employee

12  relations.

13    Q.  Do you know -- is this a she Toni or he

14  Toni?

15    A.  She.

16    Q.  Okay.

17    A.  Former manager.

18    Q.  Okay.  Former employee relations manager?

19    A.  Yes.

20    Q.  Okay.  And she was an employee relations

21  manager in 2017?

22    A.  Yes.

23    Q.  Okay.  But is no longer an employee

24  relation manager?

25    A.  As far as I know.

Page 146

1    Q.  Okay.  And do you know why Naomi Hudson

2  forwarded -- excuse me.

3         Do you why Naomi Hudson wanted the

4  email to be forwarded to Toni Hamilton?

5    A.  I don't know why she wanted that.

6    Q.  Okay.  I -- I guess it's standard

7  procedure whenever, I guess, one of the -- the

8  leaders investigating believes there is a protected

9  category involved, that they would send it to

10  someone with employee relations --

11    A.  That --

12    Q.  -- is that correct?  Okay.

13         THE REPORTER:  I am sorry.  I didn't

14  hear your answer.

15    A.  That would make sense.

16    Q.  (By Mr. Gilliam)  Okay.  And, next, if I

17  could direct your attention to 4459, next page.

18    A.  Okay.

19    Q.  And do you recognize this email?

20    A.  I do.

21    Q.  Okay.  What is this email?

22    A.  This is an email from Denise Gutierrez

23  advising Ed Schneider that she will be the employee

24  relations leader who will be assisting the base.

25    Q.  Okay.  And Denise Gutierrez was the

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 147

1    employee relations manager who, in fact, assisted
2    the base?
3        A.  That is correct.
4        Q.  Okay.  Then turning to the next email,
5    it's 4465.
6        A.  Okay.
7        Q.  Do you recognize this?
8        A.  This is an email from Dave Kissman to me.
9        Q.  Okay.  And he asks, she's back?
10           It -- it -- was he referring to Toni
11   Hamilton?
12       A.  I do not know.
13       Q.  The email he's forwarding says, please
14   also forward to Toni -- Toni Hamilton.
15       A.  Right.
16       Q.  Do you know why Dave Kissman was asking
17   you that?
18       A.  I do not know.  Oh --
19       Q.  Do you recall?
20       A.  I do.  Naomi Hudson had been on a leave of
21   absence.  She had surgery on her back and was out
22   for a couple of months.  So Dave sent that to me
23   referring to Naomi Hudson returning to work.
24       Q.  Okay.  Do you remember how long Naomi
25   Hudson had been out on her leave of absence?

Page 157

1   when we're actually in the process with an employee

2   who is under investigation.

3       Q.  Okay.  But in -- in this case, Southwest

4   interviewed Audrey Stone as part of its

5   investigative process; is that correct?

6       A.  Correct.

7       Q.  And then it held a meeting subsequently

8   with Ms. Carter too?

9       A.  That is correct.

10      Q.  A fact-finding meeting with Ms. Carter?

11      A.  That is correct.

12      Q.  Okay.  Let's see.  I would like to have

13  marked Document Number 5 as Exhibit 5.

14              (Exhibit 5 marked.)

15      Q.  (By Mr. Gilliam)  And if you want to

16  review these.  And once you have had a chance to --

17  to review it, let me know.

18      A.  Okay.

19      Q.  Do you recognize what -- what this is?

20      A.  These are the notes from Ed Schneider's

21  initial interview with Audrey Stone.

22      Q.  Okay.  And you said initial interview with

23  Audrey Stone.  Do you know if he conducted multiple

24  interviews with Audrey Stone?

25      A.  I believe this is the only one.

Page 160

1      A.   There was one instance.

2      Q.   And what is the instance you recall?

3      A.   Former union president Melissa Smith

4  alleged that a flight attendant by the name of

5  Eddie Pirl, P-i-r-l, had said some things or had

6  written some things that she found disturbing.

7      Q.   Okay.  Do you remember what he had

8  written?

9      A.   This was prior to what we currently know

10  as social media.  There were internet forums at

11  that time, and he had written some things about

12  negotiations.  And he -- he felt that -- she felt

13  that they were threatening towards her.

14      Q.   Okay.  And do you know if he was fired for

15  saying those things?

16      A.   He was.

17      Q.   Okay.  All right.  And I believe you also

18  said that a fact-finding was conducted for

19  Ms. Carter as well?

20      A.   That is correct.

21           MR. GILLIAM:  And I could have

22  Document 9 marked as Exhibit 6.

23           (Exhibit 6 marked.)

24      Q.  (By Mr. Gilliam)  If you want to read

25  that.  And once you have had the chance to review

Page 161

1   it, let me know.

2        A.  Okay.  So I just want to make sure it's

3   the correct document.  These are fact-finding notes

4   from Charlene's meeting with Ed?

5        Q.  Yes.

6        A.  Okay.

7        Q.  And would you like some time to review

8   them?

9        A.  Yes.  Please.

10       Q.  Sure.

11            MR. CORRELL:  And -- and, Counsel,

12   this may be a problem on our end.  I just want to

13   make sure we've got the right document.  It looks

14   like the email has two attachments, and I am only

15   seeing the fact-finding notes.  I don't know if

16   that's because in the production, for some reason,

17   it's not with it; or it's intentionally not here.

18   But that's all there is, is the email and one

19   attachment, it looks like.

20            MR. GILLIAM:  Oh, just including the

21   notes, but not the pictures?

22            MR. CORRELL:  Correct.

23            MR. GILLIAM:  Yeah.  No.  That's -- I

24   -- I was trying to conserve space.

25            MR. CORRELL:  That's perfect.  I just

Page 162

1  want to make sure that we're -- we're all looking

2  at the same document and know we're looking at the

3  same document.

4              MR. GILLIAM:  Yeah, yeah.

5      A.  Okay.

6      Q.  (By Mr. Gilliam)  And do you recognize

7  this?

8      A.  I do.

9      Q.  And what is it?

10     A.  These are fact-finding notes from Ed

11  Schneider's meeting with Ms. Carter.

12     Q.  Okay.  Do you know if the -- if the

13  fact-finding notes went through revisions prior to

14  there being a final version?

15     A.  I don't -- I don't know.

16     Q.  Okay.  Okay.  I wanted to direct your

17  attention to, I guess, the -- the second and the

18  third page.  It's 4676 and 4677.

19     A.  4676.  Okay.

20     Q.  And -- and 4677 towards the bottom.  Where

21  Charlene says, I am a Christian, I am a

22  conservative and I am pro-life.

23              And discussions continue on the second

24  page.  And she -- she says, I work with other

25  pro-life groups; and for me, as a Christian, if I

Page 164

1     A.  -- you are talking about?

2     Q.  So -- and, you know, I don't -- I don't

3  want to, you know, read every line, but where she's

4  talking about being a Christian, a conservative and

5  pro-life; and continuing on the next page,

6  describing working with other pro-life groups and

7  getting -- getting the word out about abortion in

8  any way, did -- did labor relations consider

9  whether that placed Ms. Carter in any protected

10  category?

11     A.  That, I do not know.

12     Q.  Okay.  Same question:  Did inflight

13  question whether that information put Ms. Carter in

14  any protected category?

15     A.  I do not know.

16     Q.  And just to make sure that it -- it's

17  clear, did employee relations consider whether that

18  information put her in any protective category?

19     A.  That, I do not know.

20     Q.  Okay.  Did employee relations consider

21  whether Charlene Carter needed a religious

22  accommodation?

23     A.  I do not know.

24     Q.  Okay.  Did labor relations consider

25  whether Charlene Carter needed a religious

Page 165

1   accommodation?

2        A.  I do not know.

3        Q.  Did inflight consider whether Charlene

4   Carter needed a religious accommodation?

5        A.  I do not know.

6        Q.  And did human resources consider whether

7   Charlene Carter needed a religious accommodation?

8        A.  I do not know.

9        Q.  Okay.  And just to make sure I covered it

10  too, did human resources consider whether the

11  information she shared about being a Christian and

12  pro-life and trying to get the word out in any way,

13  whether that placed her in any protected category?

14       A.  I do not know.

15       Q.  Okay.  Do you know whether the ACT team

16  ever in- -- investigated any aspect of Charlene

17  Carter's matter?

18       A.  Not to my knowledge.

19       Q.  Okay.  As part of the investigation, did

20  anyone with Southwest have communications about

21  Charlene Carter's religious beliefs?

22       A.  Not to my knowledge.

23       Q.  Okay.  Okay.  Now, what is the standard

24  practice for, I guess, the -- the -- well, let me

25  ask the question this way:  What is the standard

Page 188

1    A.   That time period was tumultuous in terms

2    of there was a effort to recall the Local 556

3    officers.  In addition, there was a lot of

4    political activity surrounding the inauguration of

5    President Trump on January 20th, 2017.

6              And I just came to the conclusion that

7    we all need to -- or everyone needs to step back

8    and review Ms. Carter's case as a long-term

9    employee who had a good track record; who told me

10   that she regretted, to a certain extent, the

11   methodology that she chose; and that she wanted her

12   job back.  And so I used my authority to offer her

13   a last-chance agreement.

14   Q.   And quick question:  Had Ms. Carter ever

15   been disciplined in her career with Southwest?

16   A.   Not to my knowledge.

17   Q.   And -- okay.  And when you say that the --

18   the issue had gone on at great cost to everyone,

19   what -- what was the cost?

20   A.   The cost -- well, we had not gone into

21   monetary costs yet, but that's where it was going.

22   But the cost, I thought, was undermining our

23   culture at Southwest.  And it was impeding our

24   ability to do business.

25   Q.   And -- and what -- I guess, what caused

Case 3:17-cv-02278-X Document 100-4 Filed 05/07/21 Page 41 of 46 PageID 2393
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 221

1    Q.  Okay.  But they are -- they are

2  attachments to one of the emails in 7466 to 7470;

3  is that correct?

4    A.  Okay.  Yes.

5    Q.  And do you know why these would be

6  forwarded?

7    A.  Simply for a FYI.

8    Q.  Okay.  All right.  I would like to -- to

9  shift for -- to a few other things here.  So

10 earlier, I think I -- I had asked whether anybody

11 else had complained about Charlene's (sic) Carter's

12 -- well, I -- I may have asked some more narrow

13 questions, so let me ask:  Did -- did Southwest

14 receive any complaints about any of Charlene

15 Carter's Facebook posts made on her Facebook page?

16   A.  Not to my knowledge.

17   Q.  Okay.  Prior to her termination, had

18 Carter's Facebook posts harmed Southwest?

19   A.  I believe so.

20   Q.  How did they harm Southwest?

21   A.  She's representing herself as a Southwest

22 Airlines flight attendant and putting out on her

23 Facebook images that may not be reflective of how

24 Southwest Airlines believes, in terms of what we

25 support, what we don't support.  Because Southwest

Page 222

1    Airlines is neutral.  And as a result, there was

2    harm done.

3        Q.  Did -- was there any financial harm?

4        A.  Not to my knowledge.

5        Q.  Did anyone ever ask her to take them down

6    prior to her termination?

7        A.  Not -- not to my knowledge.

8        Q.  Okay.  All right.  Let's see.  I would

9    like to direct your attention to Document 3.

10       A.  Okay.

11       Q.  And do you recognize this?

12       A.  I do.

13       Q.  Okay.  And what is it?

14       A.  This is correspondence sent from the

15   Oakland base manager Carolene Goulbourne to her

16   leader senior manager, Dave Kissman, regarding

17   Brian Talbert.

18       Q.  And she says that there was -- well, she

19   says, however, their intent to repost was

20   retaliation.

21            Did she reach -- did she reach that

22   conclusion?

23       A.  I do not know if that's -- there is some

24   grammar errors here.  Their intent to repost was

25   re- -- oh, it appears that that is her conclusion.

Page 233

1    harassment policy have any impact on

2    Mr. Schneider's discretion regarding other policy

3    violations?

4         A.  They do not.

5         Q.  And, Mr. Sims, you understand, in your

6    personal capacity, that this case today is about

7    religious discrimination and alleged discrimination

8    against union objectors; is that correct?

9         A.  I do understand that.

10        Q.  Do you have a personal preference between

11   union objectors and nonobjectors?

12        A.  I do not.

13        Q.  Do you have a position between pro-life

14   and pro-choice on the issue of abortion?

15        A.  I do.

16        Q.  How would you identify your position?

17        A.  I am pro-life.

18        Q.  Do you have any animus towards other

19   people who are pro-life?

20        A.  I do not.

21        Q.  Do you have any animus towards people of

22   any Christian faith?

23        A.  I do not.

24             MR. CORRELL:  I pass the witness.

25             MR. GILLIAM:  I have got no questions.

Case 3:19-cv-01174-X Document 12-2 Filed 09/04/20 Page 44 of 46 PageID 4396

Page 236

```
 1        I, MICHAEL SIMS, have read the foregoing
     deposition and hereby affix my signature that same
 2   is true and correct, except as noted above.

 3

 4

 5                 _____
                   MICHAEL SIMS
 6

 7   THE STATE OF _____
     COUNTY OF _____
 8

 9   Before me, _____, on this day
     personally appeared MICHAEL SIMS, known to me (or
10   proved to me under oath or through _____) to
     be the person whose name is subscribed to the
11   foregoing instrument and acknowledged to me that
     they executed the same for the purposes and
12   consideration therein expressed.

13

14   Given under my hand and seal of office this _____
     day of _____, 2020.
15

16

17   _____
     NOTARY PUBLIC IN AND FOR THE
18   STATE OF _____

19

20   MY COMMISSION EXPIRES:_____

21

22

23

24

25
```

**App.312**

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

```
 1                REPORTER'S CERTIFICATION

 2           IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 3                    DALLAS DIVISION

 4    CHARLENE CARTER           )
                                ) CIVIL ACTION NO.
 5    VS.                       ) 3:17-CV-02278-X
                                )
 6    SOUTHWEST AIRLINES CO., AND )
      TRANSPORT WORKERS UNION OF  )
 7    AMERICA, LOCAL 556          )

 8

 9           ------------------------------------
                    CONFIDENTIAL 30(b)(6)
10             DEPOSITION OF MICHAEL SIMS
                    NOVEMBER 2, 2020
11           ------------------------------------

12

13           I, CHARIS M. HENDRICK, Certified Shorthand

14    Reporter in and for the State of Texas, do hereby

15    certify to the following:

16           That the witness, MICHAEL SIMS, was by me

17    duly sworn and that the transcript of the oral

18    deposition is a true record of the testimony given

19    by the witness.

20           I further certify that pursuant to Federal

21    Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)

22    as well as Rule 30(e)(2), that review of the

23    transcript and signature of the deponent:

24        __xx__ was requested by the deponent and/or a

25    party before completion of the deposition.
```

Page 238

1         _____ was not requested by the deponent and/or

2    a party before the completion of the deposition.

3              I further certify that I am neither

4    attorney  nor counsel for, nor related to or

5    employed by any of the parties to the action in

6    which this deposition is taken and further that I

7    am not a relative or employee of any attorney of

8    record in this cause, nor am I financially or

9    otherwise interested in the outcome of the action.

10             The amount of time used by each party at

11   the deposition is as follows:

12             Mr. Gilliam - 6:50 hours/minutes

13             Mr. Correll - 5 minutes

14

15             Subscribed and sworn to on this 12th day

16   of November, 2020.

17

18

19        _Charis M Hendrick_

20        CHARIS M. HENDRICK, CSR # 3469
          Certification Expires: 10-31-21
          Bradford Court Reporting, LLC
21        7015 Mumford Street
          Dallas, Texas  75252
22        Telephone 972-931-2799
          Facsimile 972-931-1199
23        Firm Registration No. 38

24

25