# EXHIBIT DD

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER,                    )
        Plaintiff,                  )
                                    )
vs.                                 )  Case No.
                                    )  3:17-cv-02278-X
SOUTHWEST AIRLINES CO., AND         )
TRANSPORT WORKERS UNION OF          )
AMERICA, LOCAL 556,                 )
        Defendants.                 )


ORAL VIDEOTAPED DEPOSITION

ED SCHNEIDER

November 3, 2020

(Reported Remotely)

+++CONFIDENTIAL+++


        ORAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER,

produced as a witness at the instance of the

Plaintiff and duly sworn, was taken in the

above-styled and numbered cause on November 3, 2020,

from 10:00 a.m. to 2:55 p.m., before Cheryl Duncan,

CSR in and for the State of Texas, reported by

computerized stenotype machine in Parker, Colorado,

pursuant to the Federal Rules of Civil Procedure, the

First Emergency Order regarding the COVID-19 State of

Disaster, and the provisions stated on the record or

attached hereto.

Page 2

```
 1                    APPEARANCES
 2   FOR PLAINTIFF:
 3        Mr. Matthew B. Gilliam
          National Right to Work Legal Defense Foundation
 4        Suite 600
          8001 Braddock Road
 5        Springfield, Virginia  22160
          703.321.8510
 6        703.321.9319 Fax
          mbg@nrtw.org
 7

 8   FOR DEFENDANT TRANSPORT WORKERS UNION OF AMERICA,
     LOCAL 556:
 9
          Mr. Edward B. Cloutman, III
10        Mr. Adam S. Greenfield
          LAW OFFICES OF CLOUTMAN & GREENFIELD, P.L.L.C.
11        3301 Elm Street
          Dallas, Texas  75226-1637
12        214.642.7486
          ecloutman@lawoffices.com
13        agreenfield@candglegal.com
14
     FOR DEFENDANT SOUTHWEST AIRLINES CO.:
15
          Mr. Michael A. Correll
16        REED SMITH LLP
          Suite 1700
17        2501 N. Harwood Street
          Dallas, Texas  75201
18        469.680.4264
          mcorrell@reedsmith.com
19

20   ALSO PRESENT:
21
          Mack Spurlock, Videographer
22        Lauren Armstrong
          Charlene Carter
23

24

25
```

**App.351**

```
 1                          INDEX

 2                                                    PAGE

 3    Appearances .....................................2

 4    ED SCHNEIDER

 5    Examination by Mr. Gilliam .......................4
      Examination by Mr. Correll ....................129
 6

 7    Signature and Changes .........................132

 8    Reporter's Certificate ........................134

 9

10                        EXHIBITS

11

12    EXHIBIT              DESCRIPTION              PAGE

13    2            03-14-17 termination letter to    18
                   C. Carter
14
      3            02-22-17 email to S. Stephensen    31
15                 from A. Stone, SWA004226 - 4233

16    4            02-23-17 email to S. Stephensen    33
                   from D. Kissman, SWA0004421
17
      5            02-28-17 email to D. Gutierrez     65
18                 and M. Emlet from E. Schneider,
                   SWA004633 - 4638
19
      6            03-09-17 email to M. Emlet and     81
20                 D. Gutierrez from E. Schneider,
                   SWA004675 - 4692
21
      7            03-10-17 email to M. Emlet, D.    112
22                 Gutierrez and E. Barnett from
                   E. Schneider, SWA004711 - 4712
23
      14           Email from Denise Gutierrez to     84
24                 Audrey Stone

25    15           Termination letter               120
```

Case 3:17-cv-02278-X Document 212-2 Filed 10/06/21 Page 6 of 42 PageID 4440

Page 4

PROCEEDINGS

 1                PROCEEDINGS

 2         THE VIDEOGRAPHER:  We are now on

 3  record.  Today's date is November 3rd, 2020.  The

 4  time is 10:00 a.m. central.

 5         Will the court reporter please swear

 6  in the witness.

 7            ED SCHNEIDER,

 8  having been first duly sworn, testified as follows:

 9            EXAMINATION

10      Q.    (BY MR. GILLIAM) Good morning,

11  Mr. Schneider.

12      A.    Good morning.

13      Q.    My name is Matt Gilliam, and I represent

14  plaintiff Charlene Carter in this case.  And I'm here

15  today to ask you questions about the case, Carter V

16  Southwest Airlines Company and Transport Workers

17  Union of America, Local 556.  If at any point you

18  need a break, just let me know.  I assume you've been

19  deposed before.

20      A.    I have not.

21      Q.    You have not been deposed, okay.

22              So when I ask you questions, if you

23  could, just answer them to the best of your ability.

24  Since the reporter is preparing a written transcript,

25  it's important to give clear verbal messages, no head

1  nods, no gestures, no "uh-huhs" and "huh-uhs."

2              Similarly, we have to make sure that

3  we don't talk over each other.  So I'll do my best to

4  try not to talk over you, let you finish your, your

5  answer before I ask another question.  Similarly, if

6  you could make sure that I finish my question before,

7  before you answer.  That way, we can keep the record

8  clear.

9              Have you read the complaint in this

10 case?

11      A.    I am aware of it, yes.

12      Q.    Okay.  Are you familiar with the claims

13 that Ms. Carter's made against TWU Local 556 and

14 Southwest Airlines?

15      A.    Yes.

16      Q.    Okay.  And you, you work at Southwest; is

17 that correct?

18      A.    Yes.

19      Q.    And what is your current position at

20 Southwest Airlines?

21      A.    I'm the inflight base manager for the

22 Denver base.

23      Q.    Okay.  And how long have you been in that

24 position?

25      A.    Three and a half years.

Page 6

1      Q.     Okay.  And you were Denver base manager

2   when Charlene was terminated?

3      A.     Yes.

4      Q.     Okay.  And how long had you been in that

5   position when, when Charlene was terminated?

6      A.     About eleven months.

7      Q.     Okay.  So did you, did you become Denver

8   base manager in 2016?

9      A.     2017, January.

10     Q.     January of 2017, okay.

11            And what, what were you doing before

12   you became Denver base manager with Southwest?

13     A.     I was the assistant base manager in

14   Phoenix, Arizona.

15     Q.     Okay.  And who did you report to there in

16   Phoenix as assistant base manager?

17     A.     Deborah Edwards, the base manager.

18     Q.     Okay.  When you worked in Phoenix, did you

19   have the opportunity to work with Suzanne Stephensen?

20     A.     She is the base manage in Las Vegas.  And I

21   had a working relationship with her, but nothing

22   close, because they are two separate basis.

23     Q.     Okay.  Did you know her while you were

24   working at Phoenix?

25     A.     Yes.

Page 9

1      A.     He's the next in the chain of command, yes.

2      Q.     Okay.  Do you also report to Mike Sims?

3      A.     Not any longer.

4      Q.     Okay.  Did you report to Mike Sims in 2017?

5      A.     He was Dave Kissman's director, boss, yes.

6      Q.     Okay.  And did, did you ever report to

7   their supervisors?

8      A.     I don't understand.

9      Q.     So did, did you report -- well, let's see.

10  Who, who was Dave Kissman's supervisor?

11     A.     Dave Kissman's boss was Mike Sims.  It is

12  now Steve Murtoff.

13     Q.     Okay.  And in 2017, who was Mike Sims'

14  supervisor?

15     A.     He reported to Sonya Lacore, our VP of

16  inflight.

17     Q.     Okay.  Did you ever take issues to Sonya

18  Lacore?

19     A.     No, we followed the chain of command.

20     Q.     Okay.  And were you Charlene Carter's

21  direct supervisor?

22     A.     I was the base manager for the Denver base,

23  and she reported to the Denver base.

24     Q.     Okay.  If she had any issues to take to

25  who -- to her supervisor, who would she take those

Case 1:21-cv-01021-DDC-TJJ Document 22 Filed 03/01/22 Page 9 of 42 PageID 4444

Page 12

1    responsibilities, did you enforce Southwest

2    disciplinary policies?

3         A.    Yes.

4         Q.    Okay.  And is your -- so did you have the

5    authority to, to fire flight attendants?

6         A.    Yes.

7         Q.    Okay.  Do you know if that was set forth in

8    writing anywhere?

9         A.    No, I'm not aware of that.

10        Q.    Okay.  And I'm not sure that I asked, for

11   the assistant base managers, what are their roles and

12   responsibilities?

13        A.    They oversee the supervisors and the

14   coordinators directly that -- with a team of

15   coordinators and supervisors, put up between three of

16   my assistant base managers.  And they will make sure

17   the daily operation is running smoothly, they will

18   watch for any emails that may come in that need to be

19   addressed, and/or disseminated to the supervisors for

20   follow-up and those type of things.

21        Q.    Now, if there was a disciplinary incident

22   involving a flight attendant operating out of the

23   Denver base, would your assistant base managers have

24   authority to investigate those incidents on their

25   own?

Page 31

1    Q.    You can answer.

2    A.    I'm not aware of one.

3    Q.    Okay.

4              MR. CORRELL:  And, Counsel, real

5    quick.

6              Mr. Schneider, unless I instruct you

7    not to answer the question, you can proceed to answer

8    after I've lodged my objection, okay?

9              THE WITNESS:  Yes.

10    Q.    Now, when did you first hear that a flight

11    attendant had reported Ms. Carter for her Facebook

12    posts and messages?

13    A.    Around February of 2017.

14    Q.    Okay.

15    A.    I'm not sure on the exact date.

16    Q.    And do you know who brought those Facebook

17    posts and messages to your attention?

18    A.    If I remember correctly, it was sent to the

19    Las Vegas base and forwarded.

20    Q.    Okay.  If I could direct you to Exhibit --

21    I'm sorry, document 1.  And if you could review that.

22    And once you've had the chance to review it, let me

23    know.

24    A.    I have reviewed it.

25    Q.    Okay.  Do you recognize this?

Page 32

1    A.    Yes.

2    Q.    And what is it?

3    A.    It's an email that was sent from Audrey

4  Stone to Suzanne Stephensen --

5    Q.    Okay.

6    A.    -- regarding her complaint.

7    Q.    Okay.  And did you receive this complaint,

8  as well?

9    A.    It was forwarded to me, yes.

10    Q.    Okay.  All right.  And do you remember who

11  forwarded it to you?

12    A.    It was either Suzanne Stephensen, herself,

13  or David Kissman.

14    Q.    Okay.  Now, before this email was forwarded

15  to you, did you have any other communications about

16  the email?

17    A.    No.

18    Q.    Okay.  Or had you had any communications

19  about the, the matters raised in, in the email?

20    A.    Not prior to receiving this.

21    Q.    Okay.

22    A.    That I'm aware of.

23    Q.    Okay.  Let's see, and if I could direct you

24  to document 4, and I'll point you to a specific page

25  number.  When you have it up, let me know and I'll --

Page 40

 1      Q.      Okay.   And did you know who Audrey Stone

 2   was?

 3      A.      Yes.

 4      Q.      Okay.   Had you met Audrey Stone before?

 5      A.      No.

 6      Q.      Okay.   Had you communicated with Audrey

 7   Stone at all?

 8      A.      Not that I remember.

 9      Q.      Okay.   And so you knew that Audrey Stone

10   was the Local 556 president?

11      A.      Yes, I did.

12      Q.      Okay.   And how did you know that?

13      A.      Through communication, and I was at

14   Southwest Airlines when the election happened.

15      Q.      Okay.   And you knew that she was voted in

16   as president?

17      A.      Yes.

18      Q.      Okay.   And when you say "through

19   communications," through communications with whom?

20      A.      There are TWU communications that come out

21   once in a while, and it has her name on the byline as

22   the president of TWU.

23      Q.      Okay.   You receive those TWU communications

24   directly?

25      A.      No.

Page 41

1    Q.    Okay.  How do you receive those TWU
2    communications?
3    A.    They print them and put them in the
4    lounges.  And that is mainly the reason -- or way.
5    We have a place where TWU keeps their documents that
6    they want for the flight attendants available.
7    Q.    Okay.  Do you receive those TWU
8    communications in any other way, apart from them
9    being posted in the lounges?
10    A.    No.
11    Q.    Okay.  And going back to Dave Kissman's
12    email here, he says, he's in TOPS and can be reached
13    on cell if needed.  Did you call Dave Kissman?
14    A.    At some point during the investigation, I
15    did, yes.
16    Q.    Okay.  Do you know if you called him
17    shortly after receiving this email?
18    A.    Most likely, yes.
19    Q.    Okay.  Do you remember if you, you talked
20    to him after giving Suzanne a call?
21    A.    I don't remember the specific order, but at
22    some point I did.
23    Q.    Okay.  Do -- what do you remember about
24    your initial call with Dave Kissman?  What did you
25    discuss?

1   that was out there.  Contacting employee relations,

2   making them aware that I was beginning an

3   investigation, to get their input.  And, and then I

4   would reach out to Audrey Stone and try to set up a

5   meeting so we could discuss and get more details.

6        Q.    Okay.  So how did you go about collecting

7   information?

8        A.    The documents that Suzanne Stephensen

9   received, and making sure I had those and if there

10  was anything else out there that I had forwarded to

11  me.

12       Q.    Okay.  Did you do anything else to collect

13  information?

14       A.    I do recall Facebook posts.  And we did --

15  I did have somebody look at Charlene Carter's

16  Facebook to see if there was anything out there that

17  possibly made a Nexus to the Workplace.

18       Q.    Okay.  Who did you have look at Charlene's

19  Facebook page?

20       A.    Meggan Jones, my assistant base manager.  I

21  believe that labor relations and possibly ER also did

22  some research on that.

23       Q.    Okay.  So did -- when did you ask Meggan to

24  look at Charlene Carter's Facebook page for

25  information?

Page 44

```
 1        A.      It was early in the investigation.  I don't
 2   specifically remember.
 3        Q.      Okay.  After your call with Suzanne?
 4        A.      Yes.
 5        Q.      Okay.  And did, did Meggan say that she
 6   would do it, she would go out to the -- Charlene's
 7   Facebook page and look for information?
 8        A.      Yes.
 9        Q.      Okay.  And was that communication in person
10   or by email?
11        A.      In person.
12        Q.      Okay.  Does Meggan work closely to you?
13        A.      She's one of my assistant base managers.
14        Q.      Okay.  Well, I guess my question is, does
15   she -- is her office close to yours?
16        A.      Yes, they're in the same vicinity.
17        Q.      Okay.  All right.  Do you work next door to
18   each other?
19        A.      At the time, her office was across the
20   hallway from mine.
21        Q.      Okay.  And what, what information did
22   Meggan Jones find on Charlene's Facebook page?
23                MR. CORRELL:  Objection, calls for
24   speculation.
25        Q.      Do you know what information Meggan Jones
```

Page 45

1  found on Charlene's Facebook page?

2      A.    There were posts that showed her associated

3  with Southwest Airlines.

4      Q.    Okay.  And what were those posts?

5      A.    Pictures of her wings, pictures of other

6  statements made with Southwest Airlines' logo.

7      Q.    Okay.  Do you know if those were pictures

8  that Meggan had found?

9      A.    I don't, I don't remember specifically who

10  found them.  I know that some -- there were several

11  that were given to me.

12      Q.    Okay.  Do you know if Meggan Jones found

13  some pictures?

14      A.    Yes.

15      Q.    Okay.  And how do you know that?

16      A.    She showed them to me.

17      Q.    Okay.  Do you recall what she showed you?

18      A.    I don't remember details, but it had

19  pictures of Charlene Carter and, like I said, logos

20  of Southwest Airlines on printed material that were

21  on her Facebook page, the wings, and pictures of

22  Southwest pilots, if I remember right, and possibly

23  pictures of herself in uniform.

24      Q.    Okay.  Do you know how soon after asking

25  Meggan to find that information she, she brought it

Case 1:21-cv-00121-TSE-IDD Document 60-21 Filed 09/02/21 Page 17 of 42 PageID 4452

Page 46

1    to you?

2        A.    It was the same day.

3        Q.    Okay.  Now, I think Dave Kissman emailed

4    you on February 23rd.  Do you know if, if that was --

5    that information was collected and given to you on

6    February 23rd?

7        A.    No, I don't remember that.

8        Q.    Okay.  All right.  Now, I think you, you

9    said you also contacted employee relations to get

10   their input.  Is that correct?

11       A.    Yes.

12       Q.    Okay.  And, and why did you want their

13   input?

14       A.    I viewed the posts as egregious, and there

15   could have been a violation of our harassment policy,

16   which employee relations oversees.

17       Q.    Okay.  Now, would employee relations have

18   had any input into other disciplinary violations?

19       A.    They're familiar with social media, hazing,

20   bullying, but it's not housed in their area.

21       Q.    Okay.  So when you reached out to them, you

22   were really seeking their input on whether that, that

23   one policy was violated?

24       A.    Yes.

25       Q.    Okay.  If I could direct your attention to

Page 47

1  same, same document, document 2, page 4450.  Just

2  once you've found it and have had the chance to

3  review it, let me know.

4       A.    Okay.

5       Q.    Do you recognize this?

6       A.    I have seen it, yes.

7       Q.    Okay.  And what is it?

8       A.    It's an email from me to employee

9  relations, and I'm asking for their thoughts on any

10 protected categories that may have been violated.

11      Q.    Okay.  Now, did you have any communications

12 with employee relations before sending this email?

13      A.    No.

14      Q.    Okay.  So this was your first time reaching

15 out to employee relations?

16      A.    Yes.

17      Q.    Okay.  And it's, I guess, addressed to

18 employee relations DG.  Do you know who receives an

19 email at that address?

20      A.    It is the employee relations investigators,

21 senior investigators.

22      Q.    Okay.  Do you know how many of those senior

23 investigators there are?

24      A.    I think there's four or five.

25      Q.    Okay.  Do you know if anybody apart from

Page 48

1    those four or five investigators receive emails at

2    that address?

3        A.    I'm not aware of that, no.

4        Q.    Okay.  And you -- I guess you want to know

5    their thoughts on protected categories?

6        A.    Yes.

7        Q.    And what, what is a protected category?

8              MR. CORRELL:  Objection, calls for a

9    legal conclusion.

10       A.    As far as I'm aware, it's race, ethnicity,

11   sexual orientation, et cetera.

12       Q.    So that's -- and that's what you meant by

13   "protected category" when you were asking for their

14   views on it?

15       A.    Yes.  Among other things as far as

16   harassment would go.

17       Q.    Okay.  And why did you think that a

18   protected category was involved here?

19       A.    Simply because it depicted several graphic

20   details and -- of fetuses, and if I recall right,

21   female genitalia, things like that.

22       Q.    Okay.  If -- could I -- so when you, you

23   forwarded the email, did you forward -- excuse me,

24   let me ask it this way:  So when you forwarded

25   information for their input, the images you sent,

Page 50

1    A.    Yes.

2    Q.    Okay.  All right.  And you do say you

3  wanted to know -- you said, let me know your thoughts

4  on protected categories, et cetera.  Was there

5  something else besides protected categories that you

6  were asking them to weigh in on?

7    A.    Anything that had to do with harassment of

8  employees, protected categories, any of those type of

9  things that fall under their policies.

10    Q.    Okay.  So your -- your concern -- well, you

11  wanted to know whether these images involved

12  harassment of Audrey based off of race, religion or

13  one of those other categories you mentioned?

14    A.    Yes, their policy involves harassment,

15  sexual harassment, those type.  And so sexual

16  harassment was one that I wanted to get weighed in

17  on.

18    Q.    Okay.  Now, I think you might have also

19  said that one of your next steps was reaching out to

20  Audrey Stone.

21    A.    Once I had discussed with employee

22  relations, it -- I like to partner with employee

23  relations and talk to the complainant and get any

24  details that I didn't have at that time.

25    Q.    Okay.  Do you know if you had discussions

Case 2:21-cv-00121-Z Document 70-21 Filed 09/02/21 Page 21 of 42 PageID 4456

Page 54

 1    A.    I don't.  I handle it myself for the most
 2   part.  But since she is the Facebook person, most
 3   adept at it, I reached out to her.
 4    Q.    Okay.  So you believed that Meggan was more
 5   adept at Facebook than Hector or -- I forget the
 6   other guy's name.
 7    A.    Dustin.  Yes, absolutely.
 8    Q.    Okay.  All right.  And so up, up to this
 9   point, before -- well, let me, let me back up a bit.
10              So before contacting employee
11   relations, had you discussed the contents of Audrey
12   Stone's email with Meggan Jones?
13    A.    I believe so, yes.
14    Q.    And I guess you did say that you -- or you
15   did testify that you, you -- that you asked Meggan to
16   go out to Charlene's Facebook page.  What were your
17   other discussions with Meggan about the contents of
18   Audrey Stone's complaint?
19    A.    Simply that the images were pretty graphic
20   and that I was surprised that those posts were sent
21   to somebody.  And I just wanted to know what other
22   posts might be out there.  And so that was our
23   discussion.
24    Q.    Okay.  And what -- how did Meggan respond
25   to you?

1       A.    She was the same understanding of it,

2   thought process.  And so she went to Facebook and

3   tried to locate anything else.

4       Q.    Now, do you know how she received the

5   images?

6       A.    Those were on my computer.  And I had

7   printed them out to put in my investigation folder.

8       Q.    Okay.  Okay.  Did you -- now, did you ever

9   talk to Hector or Dustin about the content of Audrey

10  Stone's complaint?

11      A.    I don't recall specifics discussing with

12  them or showing them.  But I know that they were

13  aware simply because we work so close together.

14      Q.    Okay.  And did -- what, what did they say

15  to you about the contents of Audrey Stone's

16  complaint?

17      A.    I don't recall the conversation with them

18  about the contents.

19      Q.    Okay.  Did --

20            MR. CORRELL:  We've been going for

21  about -- I guess we're a little shy of an hour and a

22  half.  Can we take a break in the next five, ten

23  minutes?

24            MR. GILLIAM:  Yeah, sure.  Now is

25  probably okay.  Do we want to do a longer break for

1    need to learn the lingo.

2              Okay.  And do you know if you did have

3    the information gathering on February 24th?

4         A.    I don't know that for sure, if that's what

5    this is saying.

6         Q.    Okay.  If I could direct your attention to,

7    let's see, document 5.  And for others, it's Exhibit

8    5.

9         A.    Okay.

10        Q.    And do you recognize this?

11        A.    Yes.

12        Q.    Okay.  What is it?

13        A.    It's an email to Denise Gutierrez and

14   Maureen Emlet, and attaching the meeting notes from

15   Audrey.

16        Q.    Okay.  And on the notes there's listed a

17   date.

18        A.    On the notes themselves?

19        Q.    Yes.

20        A.    Okay.

21        Q.    Do you know if that's the date that you

22   held the fact-finding meeting?

23        A.    If it's the date on these notes, yes,

24   that's the day I held it.

25        Q.    Okay.  Do you know who prepared these

Page 69

1    A.    I don't remember asking that question.

2    Q.    Okay.  And what did she tell you about how

3  she had obtained the posts?

4    A.    They were sent to her in a private message.

5    Q.    Okay.

6    A.    A Facebook private message.

7    Q.    Did she say that all of the posts were sent

8  to her in a private message?

9    A.    I don't recall that.  I know that the

10  graphic ones were.

11    Q.    Okay.  At any point prior to Charlene

12  Carter's termination, do you know if anybody else

13  complained about Charlene Carter's Facebook posts?

14    A.    I don't recall that.

15    Q.    Okay.  And had Charlene ever been

16  disciplined?

17    A.    I don't believe she was prior to this.

18    Q.    Okay.  Now, after -- or do you know if this

19  document here represents the exact notes that Janet

20  took during the meeting?

21    A.    Yes.

22    Q.    Okay.  And are these an accurate

23  representation of the conversations you had in the

24  fact-finding meeting?

25    A.    The meeting with Audrey Stone?

Page 70

```
 1      Q.     Yeah.

 2      A.     Yes.

 3      Q.     Okay.  Do you know if you had any -- did

 4   you have a chance to make revisions to the notes

 5   after Janet took them?

 6      A.     I read through them to make sure that they

 7   were a good representation of the meeting and what

 8   was discussed.

 9      Q.     Okay.  Did you make any corrections to her

10   notes?

11      A.     I don't remember in this one, making

12   corrections specifically.

13      Q.     Okay.  All right.  Now, had, had you

14   reached any conclusions after holding the information

15   gathering with Audrey?

16      A.     I reached a conclusion that I needed to

17   have a meeting, a fact-finding meeting with Charlene.

18      Q.     Okay.  And so what were your next steps

19   after you held the information gathering with Audrey?

20      A.     To contact Charlene and set up a

21   fact-finding meeting with her.

22      Q.     And after you, after you held the fact --

23   I'm sorry, the information gathering with Audrey, did

24   you communicate with, with anyone else about the fact

25   finding?
```

Page 81

1    HRBP would disagree with you, could you independently

2    decide that it was a violation?

3        A.    I could, but I don't know for sure if I

4    would in this situation.

5        Q.    Okay.  Let's see, if I could refer you to

6    document 9.  Once you find it and review it, let me

7    know.

8        A.    Okay.

9        Q.    And do you recognize this?

10       A.    The email, yes.

11       Q.    Okay.  And what is it?

12       A.    This is an email from me to Maureen Emlet

13   and Denise Gutierrez, indicating information that

14   Charlene brought into the meeting to present to us.

15       Q.    And do you recognize the pages that follow?

16       A.    The fact-finding meeting notes with

17   Charlene?

18       Q.    Yes.

19       A.    Yes.

20       Q.    Okay.  And do you know if these were -- if

21   this is the final version of the notes?

22       A.    As far as I'm aware, looking at it right

23   now, yes.

24       Q.    Were there different drafts of these notes?

25       A.    Not that I'm aware of.

Page 83

1    A.    No, it's not allowed.

2    Q.    Okay.  And it -- this -- I guess at the top

3  of the fact-finding notes, it lists who was in

4  attendance.  And does that accurately say who, who

5  all participated in the meeting?

6    A.    Yes.

7    Q.    Okay.  Now, did -- were Charlene and Chris

8  in your office for this meeting?

9    A.    Yes, they were.

10    Q.    Okay.  And the notes say, conferenced in

11  via phone, Denise Gutierrez and Edie, Edie Barnett --

12  Edith Barnett.  They -- so they were not present,

13  correct?

14    A.    Correct.

15    Q.    Okay.  And I want to step back a second.

16  After the investigation gathering meeting with

17  Audrey, did you determine that you needed more

18  information regarding Facebook posts and social media

19  posts?

20    A.    I'm not sure the sequence of events, but

21  during that time, I asked for more Facebook posts.  I

22  don't know if they came before or after our meeting.

23    Q.    Okay.  Do you recall Denise Gutierrez

24  seeking more information on Facebook posts that were

25  made?

Page 84

1      A.     Yes.

2      Q.     Okay.

3             MR. GILLIAM:  I'd like to mark the

4    next exhibit.  It will be document 20.  So I'm not

5    sure which exhibit we are on now.  Is it 13?  No.

6    14?

7             MR. CORRELL:  I believe we are on 14,

8    Counsel.

9             MR. GILLIAM:  Okay.

10            So, yeah, if we could mark document 20

11   as Exhibit 14.

12            (Exhibit 14 marked)

13     Q.     Mr. Schneider, that will be document 20.

14     A.     Document 20?

15     Q.     Yes, sir.  Have you found it?

16     A.     No, I have not.

17            MR. CORRELL:  And, Mr. Schneider, to

18   help you, that will be the very last document I sent

19   you.  I believe it's by itself in its own email.

20     A.     Got it, okay.

21     Q.     If you want to just take a moment to look

22   over that.  Just let me know once you've reviewed it.

23     A.     Okay.

24     Q.     And do you recognize this?

25     A.     Vaguely.

[Redacted and filed under seal]

Case 3:21-cv-00121-N Document 77-10 Filed 09/06/21 Page 30 of 42 PageID 4465

Page 96

1    you've had a chance to look at it.

2         A.    Okay.

3         Q.    Okay.  So on 4676, towards the bottom,

4    Charlene says, I'm Christian, I'm a conservative and

5    pro-life.  Do you see where I'm --

6         A.    Yes.

7         Q.    Okay.  And then she says, this happens to

8    be a huge issue for me and I get the message out

9    wherever I can.  And then on the next page, she

10   continues, I think about three or four lines down on

11   the next page, she says, I had an abortion and I

12   regret every bit of it, so I work with other pro-life

13   groups.  And for me, as a Christian, if I can get the

14   word out in any way to every group as possible to

15   touch the issue, I do.  Do you recall her saying that

16   at the hearing?

17        A.    Yes.

18        Q.    And did you make any inquiries as to

19   whether Charlene needed a religious accommodation,

20   based on those comments?

21        A.    No.

22        Q.    Okay.  And why not?

23        A.    That would be up to her to ask for that.

24   And that would be something that would go through the

25   ACT Team.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 97

1    Q.    Okay.  And the ACT Team never contacted you
2    about that specific issue, correct?
3    A.    No.
4    Q.    Okay.  And you didn't report it to the ACT
5    Team, correct?
6    A.    Report what exactly?
7    Q.    Those comments.
8    A.    No, I didn't see a reason to do that.
9    Q.    Okay.  Let's see, then if I could direct
10   you to 4679, same document.
11   A.    Okay.
12   Q.    And there's a statement here attributed to
13   you, when you were posting on your Facebook page, are
14   you aware of other posts on there that would connect
15   you to Southwest Airlines?  And I think what follows
16   is some discussion about some pictures that were
17   shown there.  This says, shows pictures of Charlene
18   at work in her uniform.  And then one is referenced
19   with a Southwest logo that says, give Herb his old
20   job back.  Do you remember those pictures?
21   A.    Yes.
22   Q.    Do you know if those were the pictures that
23   Meggan Jones had found towards the, I guess,
24   beginning of the investigation?
25   A.    I believe so, yes.

Page 98

1      Q.     Okay.  Do you know the, the date those

2   pictures were posted?

3      A.     Not specifically, no.

4      Q.     Okay.  Do you have a general idea?

5      A.     No, not at this time, I don't remember.

6      Q.     Okay.  Do you know how old those were?

7      A.     No.

8      Q.     Do you know how readily visible those

9   pictures were on her Facebook page?

10      A.     If Meggan found them, then they were on the

11   page for Charlene.

12      Q.     Okay.  I want to direct your attention to

13   4680.  And midway down, there's a statement there

14   attributed to you that says -- that starts with, your

15   Facebook post, there's a connection.  Do you see

16   where I'm referring?

17      A.     Okay.

18      Q.     Okay.  And it says, you can't have your

19   political views with Southwest as part of your

20   depiction there.  Do you know if you have ever fired

21   another flight attendant for posting political views

22   on social media?

23             MR. CORRELL:  Objection, asked and

24   answered.  Counsel, we've already been through his

25   entire issue of discipline.  He's already testified

Page 108

1   to me in the meetings.

2       Q.    Okay.  Did you have discussions with labor

3   relations about whether there was a violation of the

4   social media policy after the fact-finding meeting?

5       A.    Yes.

6       Q.    Okay.  And what were those discussions?

7       A.    Simply that it did provide the Nexus to the

8   Workplace, as well as the egregious posts that were

9   on her Facebook page that other people could see.

10      Q.    Okay.  And the person in labor relations

11  that you had that discussion with was Maureen Emlet;

12  is that correct?

13      A.    Correct.

14      Q.    Okay.  Did you have that discussion with

15  anyone else in labor relations?

16      A.    Not that I recall.

17      Q.    Okay.  And what opinion did Maureen Emlet

18  have that she communicated to you as to a violation

19  of -- as to whether there was a violation of the

20  social media policy?

21      A.    That we had pretty solid information on a

22  violation.

23      Q.    Okay.  And what did she believe the solid

24  information was?

25               MR. CORRELL:  Objection, calls for

Page 112

1    Q.    Okay.  What do you remember about the

2  report you made?

3    A.    That I was going forward with discipline.

4    Q.    Okay.  If I could direct your attention to

5  document 6, which is also Exhibit 7.

6    A.    Okay.

7    Q.    Do you recognize this?

8    A.    An email to Maureen Emlet, Denise Gutierrez

9  and Edie Barnett.

10    Q.    And do you know what it is?

11    A.    I need to read it.

12    Q.    Sure.  Yeah, please, do.

13    A.    It is my synopsis, basically, of the

14  meeting with Charlene Carter and the investigation.

15    Q.    Okay.  And in this email do you determine

16  whether there's been a violation of the -- of any

17  Southwest policies?

18    A.    There's the possibility in this email of

19  violations of a social media, bullying and hazing.

20  But it's still an ongoing investigation.

21    Q.    Okay.  So were -- so these were not

22  conclusions that Ms. Carter had actually violated

23  these policies?

24    A.    I'm not sure at this point if I had

25  completely made my decision on this.  I'm -- I don't

Page 113

1    know the dates, so I can't say specifically of when

2    that determination was made.

3        Q.    Okay.  And the date of this email is March

4    10th, correct?

5        A.    Correct.

6        Q.    But based off of the language that you have

7    there, I guess on document 4712, after social media

8    policy, bullying and hazing policy and harassment

9    policy, you don't know if you're making conclusions

10   as to whether those are violated?

11       A.    I feel at that point that those were

12   violations of those policies, as highlighted there.

13   So it was part of my determination of that, yes.

14       Q.    Okay.  Was this your report where you

15   decided on the, the discipline that should be issued

16   to Ms. Carter?

17       A.    It's part of my investigation that I would

18   use when I made that determination.

19       Q.    Okay.  But it's, it's not your final

20   determination as to the discipline that should be

21   issued?

22       A.    I'm not sure on the dates of how everything

23   transpired is what I'm saying.  So I'm not sure when

24   this was sent, in what part of the investigation.

25       Q.    Okay.  Well, and I guess one of my

Page 117

1  policies, apart from the sexual harassment policies,

2  before receiving this email?

3      A.   I don't recall the order of making those

4  decisions.

5      Q.   Okay.  Now, on this email, looks like

6  Denise sends it to you and Suzanne.  And do you have

7  any knowledge why Denise sent it to Suzanne?

8      A.   Because Audrey Stone is based in Las Vegas

9  and Suzanne is her leader.

10     Q.   Okay.  And Toni Hamilton is cc'd.  Did --

11  do you know -- do you have any knowledge as to why

12  Toni Hamilton is cc'd?

13     A.   I'm -- I think that Toni Hamilton was

14  Denise Gutierrez's leader.

15     Q.   Okay.

16     A.   And she's just letting her know her

17  position.

18     Q.   Okay.  Now, how soon after receiving this

19  email did you make your final decision as to

20  termination?

21     A.   I don't know specific time frames on it.

22     Q.   Okay.  If I could refer you back to -- it's

23  in here.  Document 7.

24     A.   Okay.

25     Q.   And this is Charlene Carter's termination

Case: 1:22-cv-00121-DCN Doc #: 36-21 Filed: 06/09/23 21 of 42. PageID 4472

Page 118

1    letter, correct?

2         A.    Correct.

3         Q.    So -- and that's dated March 14th.  So fair

4    to say you made your decision sometime between March

5    10th and March 14th?

6         A.    Yes.

7         Q.    Okay.  And March 10th was a Friday and

8    March 14th was a Tuesday.  Does that help, help you

9    narrow in on the day at all?

10        A.    The day of?

11        Q.    The day you made a decision as to whether

12   to fire Charlene.

13        A.    No, it doesn't.  Because with this, with

14   the time frames we're under, I was working on it

15   during that time.

16        Q.    Okay.  Now, document 7, the termination

17   letter, did you write that termination letter?

18        A.    Yes.

19        Q.    Okay.  Did you have any assistance in, in

20   drafting it?

21        A.    Only such as running it past labor to make

22   sure that it was meeting the requirements of my

23   decision.

24        Q.    Okay.  And what do you mean the

25   requirements of your decision?

Page 122

1      A.     She could have violated that.  I didn't
2  consider -- I mean, I didn't include it in my term
3  letter.
4      Q.     Okay.
5      A.     Other than just referring to it, possibly.
6      Q.     And going back to document 7 again, looking
7  back there.
8      A.     Okay.
9      Q.     And the beginning of the last paragraph, it
10  says, your conduct could also be a violation of
11  Southwest's policy concerning harassment, sexual
12  harassment, discrimination and retaliation.  So did
13  you, did you not make a determination that her
14  conduct did violate that policy?
15      A.     I determined that the workplace bullying
16  and hazing policy and the social media policy were
17  the violations that she was terminated for.  Also she
18  could have violated other policies.  And that's what
19  that's referring to.
20      Q.     Okay.  Now, copied at the bottom are Sonya
21  Lacore, Mike Sims and Dave Kissman.  Did you not send
22  them a draft prior to sending this letter to
23  Ms. Carter?
24      A.     No.
25      Q.     You did not send them a draft prior?

Page 126

1    regarding your decision?

2         A.    No.

3         Q.    And, you know, I don't mean attorney/client

4    privileged communications.  Communications apart from

5    those with your attorney.

6         A.    Okay.

7         Q.    Now, at any point during the investigation,

8    did you ever ask Ms. Carter if she would take her

9    Facebook posts down?

10        A.    I do not recall that discussion.

11        Q.    Okay.  At any point during the

12   investigation, did you ask Ms. Carter if she would

13   remove any connections to Southwest?

14        A.    I don't remember that discussion either.

15        Q.    Okay.  At any point did you discuss with

16   Ms. Carter whether she would be willing to maybe post

17   a disclaimer on her Facebook page that her posts

18   don't necessarily represent the views of Southwest?

19        A.    After the termination?

20        Q.    At any point during the investigation.

21        A.    I don't remember that discussion.

22        Q.    Okay.  Now, I guess for -- as part of this

23   discovery process, did you search your files for

24   information responsive to Ms. Carter's discovery

25   request?

Page 133

1        I, ED SCHNEIDER, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5                                _____

6                                ED SCHNEIDER

7

8   THE STATE OF _____)

9   COUNTY OF _____)

10

11        Before me, _____, on this day

12   personally appeared ED SCHNEIDER, known to me or

13   proved to me on the oath of or through

14   _____ (description of identity card

15   or other document) to be the person whose name is

16   subscribed to the foregoing instrument and

17   acknowledged to me that he/she executed the same for

18   the purpose and consideration therein expressed.

19        Given under my hand and seal of office on this

20   _____ day of _____, _____.

21

22                                _____

23                                NOTARY PUBLIC IN AND FOR

24                                THE STATE OF _____

25   My Commission Expires: _____

Case 3:17-cv-02278-X Document 190-21 Filed 09/02/22 Page 41 of 42 PageID 4476

Page 134

1

UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION
3
CHARLENE CARTER,                    )
4          Plaintiff,                )
)
5   vs.                             )  Case No.
)  3:17-cv-02278-X
6   SOUTHWEST AIRLINES CO., AND      )
TRANSPORT WORKERS UNION OF        )
7   AMERICA, LOCAL 556,              )
Defendants.              )
8

9                  REPORTER'S CERTIFICATE

10      ORAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

11                   November 3, 2020

12                  (Reported Remotely)

13      I, Cheryl Duncan, CSR, in and for the State of

14   Texas, hereby certify to the following:

15      That the witness, ED SCHNEIDER, was duly sworn

16   and that the transcript of the deposition is a true

17   record of the testimony given by the witness;

18      I further certify that pursuant to FRCP Rule

19   30(f)(1) that the signature of the deponent:

20      __X___ was requested by the deponent or a party

21   before the completion of the deposition and is to be

22   returned within 30 days from date of receipt of the

23   transcript.  If returned, the attached Changes and

24   Signature Pages contain any changes and the reasons

25   therefor;

Page 135

1      _____ was not requested by the deponent or a

2  party before the completion of the deposition.

3      That pursuant to information given to the

4  deposition officer at the time said testimony was

5  taken, the following includes all parties of record

6  and the amount of time used by each party at the time

7  of the deposition:

8      Mr. Matthew B. Gilliam (3 hours, 41 minutes)
       Mr. Michael A. Correll (02 minutes)
9      Mr. Ed Cloutman (00 minutes)

10      That $_____ is the deposition officer's

11  charges to the Plaintiff for preparing the original

12  deposition and any copies of exhibits.

13      I further certify that I am neither counsel for,

14  related to, nor employed by any of the parties in the

15  action in which this proceeding was taken, and

16  further that I am not financially or otherwise

17  interested in the outcome of this action.

18      Certified to by me on this 12th day of

19  November, 2020.

20      _____

21      Cheryl Duncan, CSR
        Texas CSR 3371
22      Expiration:  04/30/21
        Firm Registration Number 38
23      Bradford Court Reporting, L.L.C.
        7015 Mumford Street
24      Dallas, Texas  75252
        Telephone 972.931.2799
25      Facsimile 972.931.1199