# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>                     Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>                     Defendants. | Civil Case No. 3:17-cv-02278-X<br><br><br>**PLAINTIFF CHARLENE CARTER'S BRIEF SUPPORTING HER SECOND MOTION TO COMPEL DISCOVERY FROM DEFENDANT SOUTHWEST AIRLINES CO.** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

SUMMARY ........................................................................................................1

FACTUAL BACKGROUND ...............................................................................2

ARGUMENT AND AUTHORITIES .....................................................................7

I.    Southwest should produce information concerning Local 556 officials who reported flight attendants' social media activities and the flight attendants and activities they reported .......................................................................................................7

       A.    Carter's Second RFP 1 and Second Interrogatory 1: Southwest should identify the Local 556 officials who reported flight attendants' social media activities, identify the names and activities of the flight attendants they reported, and produce the union officials' reports ...........................................................................7

              1.    RFP 1 and Interrogatory 1 seek information relevant to Carter's Duty of Fair Representation and RLA Retaliation Claims ................................7

              2.    RFP 1 and Interrogatory 1 seek information that is proportional .................9

              3.    RFP 1 and Interrogatory 1 seek information within the scope of the Court's discovery order ...............................................................13

       B.    Carter's Second RFP 3: Southwest should produce ████████████████████ ████████ and Southwest's related documents and communications..............14

              1.    RFP 3 seeks information relevant to Carter's Duty of Fair Representation and RLA Retaliation Claims........................................................15

              2.    RFP 3 seeks information that is proportional ...............................16

              3.    RFP 3 seeks information within the scope of the Court's discovery order ..17

II.   Southwest failed to support its attorney-client privilege claims in privilege log entries 1-6 because it did not give adequate information showing that the communications involved legal subject matter and someone giving or seeking legal advice ......................................................................................19

       A.    Southwest's privilege log descriptions for entries 1-6 do not show that the subject matter of the communications was "legal."...............................20

i

**TABLE OF CONTENTS (Cont'd)**

**Page**

     B.     Southwest's privilege log does not establish that entries 1-6 involved communications made by or for the attorneys for the purposes of giving or securing legal advice............................................................................................21

         1.   █████████████████████████████████████████
██████████████████████...................................22

         2.   █████████████████████████████████████████
███████████................................................23

III.     Southwest should produce social media discipline documents it agreed to produce ........24

CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Acklin Stamping*,
    351 N.L.R.B. 1263 (2007) ...............................................................................................12

*Air Line Pilots Ass'n Int'l v. O'Neill*,
    499 U.S. 65 (1991) .............................................................................................................7

*Burns v. Thickel Chem. Corp*
    483 F.2d 300 (5th Cir. 1973) ...........................................................................................10

*Caravan Knight Facilities Mgmt., Inc.*,
    362 N.L.R.B. 1802 (2015) ...............................................................................................12

*Chemtech Royalty Assoc., L.P. v. United States*,
    No. 06-258-RET-DLD, 2009 WL 854358 (M.D. La. Mar. 30, 2009).........................20, 21

*Cole v. Collier*,
    No. 4:14-CV-1968, 2020 WL2813454 (S.D. Tex. May 28, 2020).............................21, 23, 24

*Crosswhite v. Lexington Ins. Co.*,
    321 F.App'x. 365 (5th Cir. 2009) .....................................................................................1

*E.E.O.C. v. BDO USA, L.L.P.*,
    876 F.3d 690 (5th Cir. 2017) ................................................................................. *passim*

*Ellis v. BRAC*,
    466 U.S. 435 (1984).............................................................................................................3

*Firefighters' Ret. Sys. v. Citco Grp. Ltd.*,
    No. 13-373-SDD-EWD, 2018 WL 326504 (M.D. La. Jan. 8, 2018).................................20

*Graphics Commc'ns Local 1-M (Bang Printing)*,
    337 N.L.R.B. 662 (2002) .................................................................................................12

*Heller v. City of Dallas*,
    303 F.R.D. 466 (N.D. Tex. 2014) ...............................................................................10, 16

*In Re Gen. Instrument Corp. Sec. Litig.*,
    190 F.R.D. 527 (N.D. Ill. 2000).................................................................................20, 21

*Int'l Union of Operating Eng'rs Local 406 v. NLRB*,
    701 F.2d 504 (5th Cir. 1983) .............................................................................................8

## TABLE OF AUTHORITIES (Cont'd)

**Cases**                                                                                  **Page(s)**

*Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of Am.,
AFL-CIO v. NLRB*
 368 F.2d 12 (5th Cir. 1966) ............................................................................8

*Lopez v. Don Herring Ltd.,*
 327 F.R.D. 567 (N.D. Tex. 2018) ......................................................10, 14, 17, 25

*McCall v. Sw. Airlines Co.,*
 661 F.Supp. 2d 647 (N.D. Tex. 2009) ............................................................8

*McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.,*
 322 F.R.D. 235 (N.D. Tex. 2016) ..................................................................25

*NLRB v. Interbake Foods, LLC,*
 637 F.3d 492 (4th Cir. 2011) ..................................................................19, 21

*O'Neill v. Air Line Pilots Ass'n, Int'l,*
 939 F.2d 1199 (5th Cir. 1991) .......................................................................8

*Roscello v. Southwest Airlines Co.,*
 726 F.2d 217 (5th Cir. 1984) ....................................................................8, 12

*Steele v. Louisville & N.R. Co.,*
 323 U.S. 192 (1944)...................................................................................3, 9

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.,*
 2005 WL 8173278 (S.D. Cal. Aug. 19, 2005) ...........................................25

*United States v. Chen,*
 99 F.3d 1495 (9th Cir. 1996) .......................................................................23

*United States v. Louisiana,*
 No. 11-470, 2015 WL 4619561 (M.D. La. July 31, 2015) .......................21

*United States v. Robinson,*
 121 F.3d 971 (5th Cir. 1997) ........................................................................19

*United States v. Zolin,*
 491 U.S. 554 (1989).......................................................................................24

*Vaca v. Sipes,*
 386 U.S. 171 (1967).........................................................................................8

## TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

*Vann v. Mattress Firm,*
    Civil Action No. H-12-3566, 2014 WL 1365943 (S.D. Tex. April 7, 2014)....................11, 12

*Wanzer v. Town of Plainville*,
    No. 3:15-CV-00016 (AWT), 2016 WL 1258456 (D. Conn. Mar. 30, 2016) .........................20

## Rules & Statutes

Fed. R. Civ. P. 26(b)(1)..............................................................................................................7

Fed. R. Civ. P. 26(b)(2)(B) .......................................................................................................10

Fed. R. Civ. P. 26(e)(1)(A) .......................................................................................................18

Fed. R. Civ. P. 26(b)(5)..............................................................................................................19

Fed. R. Civ. P. 30(b)(6)........................................................................................................10, 13

Fed. R. Civ. P. 33 .........................................................................................................................1

Fed. R. Civ. P. 33(b)(4)..............................................................................................................14

Fed. R. Civ. P. 34 ...................................................................................................................1, 25

Fed. R. Civ. P. 34(b)(2)(E)(i).....................................................................................................25

Fed. R. Civ. P. 34(b)(3)(B) ........................................................................................................14

Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv) .............................................................................................1

Railway Labor Act,
45 U.S.C. § 151, *et seq.*.................................................................................................... *passim*

Title VII Civil Rights Act,
42 U.S.C. § 2000e, *et seq.*............................................................................................................1

v

## SUMMARY

The Court should order Defendant Southwest Airlines Co. ("Southwest") to search for and produce responsive information in accordance with Plaintiff Charlene Carter's Discovery Requests and the Federal Rules of Civil Procedure. Under Rule 37(a)(3)(B), a party seeking discovery may move for an order compelling production against another party when the latter has failed to answer interrogatories under Fed. R. Civ. P. 33 or produce documents requested under Fed. R. Civ. P. 34. *See* Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv); *accord Crosswhite v. Lexington Ins. Co.*, 321 F.App'x 365, 368 (5th Cir. 2009) ("A party may move to compel production of materials that are within the scope of discovery and have been requested but not received.").

Carter's Second Motion to Compel requests that the Court order Southwest to produce three categories of information and documents: (I) information identifying the Local 556 officials who reported flight attendants' social media activities and the names and social media activities they reported, as well as production of the union officials' reports to Southwest, as requested in Carter's Second RFPs 1, 3, and Second Interrogatory 1 (Apps.24-26); (II) privilege log entry documents 1-6 that Southwest withheld based on unsupported attorney-client privilege claims (App.59); and (III) actual documents that Southwest agreed to produce, as requested in Carter's First RFPs 6, 7, and First Interrogatory 3. (Apps.103)(Apps.6-7, 15).

Carter's Second Discovery Requests seek evidence in Southwest's sole possession, custody, and control, that is relevant to Carter's Count III Duty of Fair Representation claims, and her Count IV retaliation claims under the Railway Labor Act (RLA), 45 U.S.C. § 151, *et seq.* (FAC ¶¶ 78-92) (duty of fair representation); (FAC ¶¶ 93-102) (retaliation against RLA-protected activities).[1] This information is highly relevant to those claims because it can establish Local 556's pattern of

---

[1] Carter's Fourth Amended Complaint, ECF 80 (April 10, 2019) (herein "FAC ¶__").

targeting recall supporters, nonmember objectors, and other union opponents for discipline, like Local 556 President Audrey Stone did with Carter. Local 556's history of discriminating against these groups is relevant to showing that the union acted arbitrarily, discriminatorily, and in bad faith, in breach of the duty of fair representation it owed Carter, and, as with other flight attendants, the union targeted Carter for exercising RLA-protected rights.

This discovery is proportional to the needs of the case given its importance to resolving Carter's Duty of Fair Representation and RLA claims, and the constitutional issues and statutory rights at stake. Southwest cannot assert that this discovery is unduly burdensome because it is narrowly-tailored and presumably involves only a limited number of instances of union officials reporting flight attendants' social media activities given that a union generally breaches its duty of fair representation by reporting flight attendants that it represents. Southwest searched its files for a related request and produced an April 4, 2017 email showing ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

Southwest should produce privilege log entry documents 1-6, which the company withheld under unsupported attorney-client privilege claims. Southwest failed to show that the communications involved legal advice or assistance. (App.59). Southwest has also failed to produce social media disciplinary materials that it previously agreed to produce. (App.103)(Apps.6-7, 15). The Court should grant all of Carter's requests and overrule Southwest's objections.

## FACTUAL BACKGROUND

Before Southwest terminated her employment, Carter was a nonmember of Transport Workers Union of America, Local 556 ("Local 556"). (FAC ¶ 13). Carter opposed Local 556's leadership,

objected to its use of nonmember objectors' forced union fees, and advocated for the removal of union officers, including President Audrey Stone, through a recall election campaign. (FAC ¶¶ 13, 19, 23-26, 30-31, 34-36). Carter sent Facebook messages to President Stone criticizing Local 556 for using forced union fees to pay for members' participation in the 2017 Women's March on Washington D.C., which promoted abortion on demand. (FAC ¶¶ 37, 38, 41, 46-50). Carter's messages also explained to President Stone that the recall was going to happen and would gain more support when flight attendants found out that the union was using their money for the Planned Parenthood Women's March. (FAC ¶¶ 48a, 48c, 48d, 50). In response, Local 556 and President Stone caused Southwest to fire Carter by reporting her for violating its Social Media Policy, Workplace Bullying and Hazing Policy, and its Policy Concerning Harassment, Sexual Harassment, Discrimination, and Retaliation ("Social Media Policies"). (FAC ¶¶ 83, 85, 87-89, 97-99, 110, 111, 118). Those events gave rise to Carter's claims here:

- **Count III: Duty of fair representation.** Local 556 breached its duty of fair representation by causing Southwest to fire Carter.[2] (FAC ¶¶ 78-92).

- **Count IV: RLA-protected rights.** Local 556 and Southwest retaliated against Carter for exercising her rights under the RLA to become a nonmember and object to paying the union's compelled fees for political, ideological, and other nonbargaining spending. (FAC ¶¶ 93-102);[3]

- **Count V: Title VII Religious Discrimination.** Local 556 and Southwest discriminated against Carter in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, by reporting her religious activities to Southwest as part of a successful attempt to cause the company to discriminate against her religious beliefs and practices of sharing her religious views on abortion with others. (FAC ¶¶ 103-122).

Following a long, drawn-out discovery period characterized by numerous disputes, Carter filed a Motion to Extend Discovery Deadlines on November 30, 2020. (ECF 138). The Court granted

---

[2] *See, e.g., Steele v. Louisville & N.R. Co.*, 323 U.S. 192 (1944).
[3] *See, e.g., Ellis v. BRAC*, 466 U.S. 435 (1984).

Carter's Motion on May 5, 2021, and authorized her to conduct "(1) follow-up discovery regarding Local 556's November 30th deposition and (2) follow-up discovery and conferences with Southwest regarding their October 30-31 document production." (ECF 155, p.3). The Court set a new deadline to complete discovery by August 5, 2021. (ECF 154).

Carter conferred with Southwest on May 17, 2021, regarding Southwest's privilege log and production of documents that the company agreed to produce regarding social media cases involving Carter's former base manager in Denver, Ed Schneider. (Apps.103-104). Carter served her Second Set of Interrogatories and Requests for Production on Southwest on May 27, 2021. (Apps. 19-27). Southwest produced its privilege log on June 2, 2021 (App.59), and served its objections and responses to Carter's Second Requests on June 25, 2021. (Apps.50-57). From July 2, 2021 through July 27, 2021, Carter's counsel worked with Southwest's attorneys by email and telephone to address several issues with the company's objections and responses. (Apps.98-102).

### A. Carter's Second RFP 1 and Second Interrogatory 1 and Southwest's Objections

Carter seeks the names of Local 556 officials who reported flight attendants' social media activities, the names and activities of the flight attendants they reported, and the union officials' reports. (Apps.24-25). Southwest's June 25, 2021 Objections asserted that these requests are not relevant to Carter's claims, involved employees that are not "similarly-situated," that it would be unduly burdensome to search for this information, and that the requests sought information regarding union official reports that occurred after Carter's termination. (Apps.51-53). But Southwest did not specifically explain its burdens in terms of time, expense, or procedure, apart from saying, in response to Interrogatory 1, that it "does not track how [social media policy] violations may have come to its attention or whether particular employees or representatives of Local 556 may have made complaints regarding those policies." (Apps.51-52).

4

On July 2, 2021, Counsel discussed Carter's requests and Southwest's objections, and whether there were any options to manage those burdens. (App.101). Carter's counsel offered to identify union officials for whom Southwest could search by name. *Id*. Following the meeting, Southwest's counsel emailed on July 15, 2021, and reported, without offering any specifics, that this would not significantly decrease its burden. (App. 100, ¶3a). Southwest's July 15, 2021 email re-asserted its belief that the requests seek "comparator employee" information "contrary to the magistrate's rulings" on Carter's First Motion to Compel. *Id*. Southwest also asserted, for the first time, that these requests are "well beyond that required by the Court's order limiting discovery to two discrete topics." *Id*. Southwest had not previously made that assertion. (Apps.51-52). Southwest then asserted that it "does not intend to supplement responses or production" for these requests (App. 100, ¶3a).

### B.  Carter's Second RFP 3

Carter's Second RFP 3 seeks documents and communications described in Southwest's April 4, 2017 email ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████ Southwest did not respond to RFP 3 until July 15, 2021, at which time it asserted the same relevance, similarly-situated, and unduly burdensome objections that it  had raised and discussed with Carter on July 2, 2021, in connection with RFP 1 and Interrogatory 1. (Apps.55-56, 100 ¶¶3a,3b, 4)(Apps.51-52). Southwest also asserted that RFP 3 was "outside the scope" of the Court's May 5 Order. (Apps.55-56, 100 ¶3a). Thus, Southwest's objections left Carter's RFP 3 at the same impasse as RFP 1 and Interrogatory 1.

### C.  Southwest's privilege log

Carter asked Southwest to provide more detail about its attorney-client privilege claims for log entries 1-6, because the subject matter descriptions and the context of redacted emails provided (and covered under log entry 6) did not demonstrate that the subject matter of the communications concerned legal advice, or that they were made for the purpose of giving or receiving legal advice. (Apps.98, 101 ¶¶2a-b). Southwest's July 15, 2021 email made the conclusory statement that the privilege documents it withheld "generally related to ongoing labor-related legal issues … with in-house counsel in their capacity as attorneys." (App.100 ¶2). For privilege log entry 6, which covered Southwest's partially-redacted, bates-stamped documents SWA 7464-7470, Southwest argued that the context of the communications "is adequately set forth in the surrounding correspondence." *Id*. Southwest ultimately declined to provide any further information.

### D.  Schneider documents

Following the Court's May 5, 2021 Order, Carter's counsel emailed Southwest's attorneys and noted that Southwest had previously "agreed to produce responsive information regarding other flight attendant reports, complaints, investigations, and discipline involving the social media policy, bullying and hazing policy, and sexual harassment policy that involved Ed Schneider." (Apps.103-105).

On May 24, 2021, Southwest Attorney Michael Correll represented that he "will work with SWA to collect and produce the responsive materials involving Ed Schneider for matters involving social media, sexual harassment, or bulling involving online activities." (App.103). On July 21, 2021, instead of producing the actual Schneider documents, Southwest produced a spreadsheet purporting to summarize information about social media cases involving Schneider. (Apps.77-86).

6

Southwest's summary is insufficient because it prevents Carter from evaluating the complete content of the actual responsive documents and information.

## ARGUMENT AND AUTHORITIES

**I.    Southwest should produce information concerning Local 556 officials who reported flight attendants' social media activities and the flight attendants and activities they reported.**

**A.    Carter's Second RFP 1 and Second Interrogatory 1: Southwest should identify the Local 556 officials who reported flight attendants' social media activities, identify the names and activities of the flight attendants they reported, and produce the union officials' reports.**

For Carter's Second RFP 1 and Second Interrogatory 1, the Court should order Southwest to identify the Local 556 officials who reported flight attendants' social media activities, identify the names and activities of the flight attendants they reported, and produce the union officials' reports. (Apps.24-25). Under Rule 26(b)(1):

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). RFP 1 and Interrogatory 1 seek relevant information that is proportional to the needs of the case and within the scope of the Court's discovery order.

**1.    RFP 1 and Interrogatory 1 seek information relevant to Carter's Duty of Fair Representation and RLA Retaliation claims.**

Carter's RFP 1 and Interrogatory 1 seek information that is relevant because it can prove her Count III Duty of Fair Representation and Count IV RLA claims. First, unions owe a fiduciary duty of fair representation to all employees they represent, whether or not they are nonmembers of the union or recall supporters, and they breach their duty of fair representation when they act arbitrarily, discriminatorily, or in bad faith. *See Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 75-76 (1991). (FAC ¶¶ 78-92). The Duty of Fair Representation requires a union to "act for and

7

not against those whom it represents." *Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. NLRB*, 368 F.2d 12, 16 (5th Cir. 1966).

Unions breach the duty when they make "arbitrary" decisions, "based upon motivations such as personal animosity or political favoritism." *See McCall v. Sw. Airlines Co.*, 661 F. Supp. 2d 647, 654 (N.D. Tex. 2009). Unions breach the duty when they violate the guarantee that employees will be represented without "'invidious treatment … in matters affecting their employment.'" *Int'l Union of Operating Eng'rs Local 406 v. NLRB*, 701 F.2d 504, 508 (5th Cir. 1983) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177-78 (1967). Unions also breach the duty when they "evince a purpose to intentionally harm" employees subject to the union's exclusive representation. *See McCall*, 661 F. Supp. 2d at 654 (citing *O'Neill v. Air Line Pilots Ass'n, Int'l*, 939 F.2d 1199, 1203, 1204 (5th Cir. 1991). Thus, evidence that the union is treating other flight attendants with personal animosity, political favoritism, invidiously with respect to their employment, or with a purpose to harm them can establish a pattern that is highly relevant to Carter's case.

Second, Carter's RLA claim requires Carter to show that her protected activities were a substantial or motivating factor for Local 556's actions in causing her termination. *See Roscello v. Sw. Airlines Co.*, 726 F.2d 217, 222 (5th Cir. 1984). Local 556's and President Stone's history and pattern of discriminatory conduct towards other nonmember objectors, recall supporters, and union opponents, is evidence of discriminatory animus towards RLA-protected activity that is relevant to Carter's case. (FAC ¶99c-d).

RFP 1 and Interrogatory 1 seek the names of Local 556 officials who reported flight attendants' social media activities, the names and activities of the flight attendants they reported, and production of the union officials' reports. (Apps.24-25). That information is highly relevant to Carter's Duty of Fair Representation and RLA claims because it establishes Local 556 officials'

8

history and pattern of targeting and discriminating against flight attendants for opposing the union, supporting the recall campaign to remove union leadership, and objecting to the Local 556's political expenditure of compulsory union fees. (FAC 80, ¶¶ 79-89, 94-101).

### 2. RFP 1 and Interrogatory 1 seek information that is proportional.

Carter's discovery requests are proportional considering (1) the importance of the constitutional issues and statutory rights at stake, (2) the importance of discovery in resolving the issues, (3) Southwest's control over the access to the discovery, and (4) that the discovery's benefits outweigh any burden. First, Carter's request for the names of Local 556 officials who reported recall supporters and nonmember objectors is proportional given that her speech and association rights are at stake in this action. The RLA subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights" and imposes on them "an affirmative constitutional duty equally to protect those rights." *Steele*, 323 U.S. at 198.

Second, Carter's request is important to resolving the issues because the evidence is expected to demonstrate Local 556 officials' pattern of breaching the union's duty of fair representation and discriminating against flight attendants for opposing the union, supporting the recall campaign to remove union leadership, and for objecting to the Local 556's political expenditure of compulsory union fees. (FAC 80, ¶¶ 79-89, 94-101). Third, Southwest has exclusive access to this information: Carter sought this information from Local 556 during its 30(b)(6) deposition, but the union could not identify who turned in Southwest flight attendants for their social media activities. (App.97, Tr. 29:6-9).

Fourth, Southwest cannot demonstrate any real burden or expense with producing this information. "A party resisting discovery must show specifically how each interrogatory or

document request is overly broad, unduly burdensome, or oppressive." *Heller v. City of Dallas*, 303 F.R.D. 466, 490 (N.D. Tex. 2014) (citation omitted). "This requires the party resisting discovery to show how the requested discovery was overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Id*. (citations omitted). The level of detail needed requires the opposing party to "submit an affidavit or otherwise attempt to describe how the discovery requests were unduly burdensome in terms of time, expense, or procedure." *Id*. at 491 (citation omitted). "Failing to do so, as a general matter, makes such an unsupported objection nothing more than unsustainable boilerplate." *Id*. at 490 (citation omitted). Southwest asserts that it would be too burdensome to respond, without providing any evidence to support its claims. (Apps.51-52)(App.100 ¶3a). Without the required support, Southwest cannot satisfy its burden under *Heller*.

> **a.  Southwest's undue burden claim is contradicted by evidence showing that it can readily locate the information sought.**

Southwest's undue burden claim, if it exists at all, is contradicted by ███████████ ████████████████████████████████████████████████████████████████ ██████████████████████████ Southwest "must show that the information is not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). "The fact that a [discovery request] calls for a thorough response—one that will take time and effort to answer— does not make it improper." *Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 579 (N.D. Tex. 2018) (citing *Burns v. Thickel Chem. Corp.*, 483 F.2d 300, 307-08 (5th Cir. 1973).

Southwest fails to show how it would be unduly burdensome to identify the names of union officials who reported flight attendants' social media activities, and the names of the flight attendants and the activities they reported, and to produce the union officials' reports (which likely consist of one or two emails). Searching such a relatively small database for that information is

not burdensome. Cases of union officials reporting flight attendants—which is presumptively a violation of its constitutionally-imposed duties as employees' exclusive representative—likely represent ███████████████████████████ Nor has Southwest sufficiently explained why it cannot conduct a keyword search on the database.

Southwest's objection to Carter's Second Interrogatory 1 stated, "While [Southwest] tracks violations of its social media policies, it does not track how those violations may have come to its attention or whether particular employees or representatives of Local 556 may have made complaints regarding those policies." (Apps.51-52). But, regardless of whether it "tracks" that information, Southwest keeps files that contain that information, as illustrated both by the April 4, 2017 email, and the social media discipline spreadsheet it served on Carter. (App.58) (Apps.77-86). Southwest's spreadsheet shows that Southwest can and has located that information when it wants to do so. (Apps.77-86). Indeed, ████████████████████████████████████ ███████████████████████████████ Simply put, Southwest can easily search its social media disciplinary reports for those cases where union officials reported another flight attendant.

### b.  Carter's requests do not raise "similarly-situated employee" issues.

Contrary to Southwest's objections, Carter's Second RFP 1 and Second Interrogatory 1 do not raise "comparator employee" or "similarly-situated employee" issues. (App.52). Whether an employee is "similarly-situated" is not a freestanding limitation on the Federal Rules' scope of discovery. Those issues only arise in Title VII disparate treatment cases where a litigant relying on circumstantial evidence *must* show that she was "treated less favorably than a similarly situated person outside of her protected class." *See e.g., Vann v. Mattress Firm*, Civil Action No. H-12-3566, 2014 WL 1365943, at *2 (S.D. Tex. April 7, 2014) (citations omitted). But Carter's Second

11

Discovery Requests at issue in this motion seek evidence relevant to her Duty of Fair Representation and RLA claims, not her Title VII claims.

Comparing a Title VII plaintiff's treatment to "similarly-situated employees" is a limit on discovery in the aforementioned Title VII context only because the issue of whether that plaintiff was treated less favorably than "similarly-situated employees" is a *necessary* element—*and the only relevant comparison*—in those cases. But, Carter's RLA and Duty of Fair Representation claims do not require Carter to compare her treatment to "similarly-situated employees." On the contrary, *every* instance when a Local 556 official turned in a flight attendant to the company is presumptively a violation of the union's duty of fair representation, and, thus, relevant to showing a pattern of arbitrary, discriminatory, or bad faith conduct.[4]

Likewise, *every* instance when a Local 556 official turned in a flight attendant is relevant evidence about whether the union was targeting employees for exercising their RLA-protected rights. *See supra* at 7-9. That is because Local 556 owes *all* Southwest flight attendants a duty of fair representation and, as their exclusive representative, must never violate their RLA-protected rights. *See supra* at 7-9. Therefore, the scope of discovery relevant to Carter's RLA and Duty of Fair Representation claims is broader and not limited to "similarly-situated employees," as in *Vann* and other Title VII cases. 2014 WL 1365943, at *3.

For similar reasons, RFP 1 and Interrogatory 1 seek discovery that was not addressed in Carter's First Motion to Compel, which broadly sought all documents concerning the company's investigation and handling of flight attendants' disciplinary cases under the Social Media Policies.

---

[4] *See Caravan Knight Facilities Mgmt., Inc.*, 362 N.L.R.B. 1802, 1805 (2015); *Acklin Stamping*, 351 N.L.R.B. 1263, 1263 (2007); *Graphics Commc'ns Local 1-M (Bang Printing)*, 337 N.L.R.B. 662, 673 (2002); *Roscello*, 726 F.2d at 221 ("[T]he union's duty of fair representation has been the same duty whether the union involved is covered by the NLRA or the RLA.").

(ECF 144, pp.1-2). The Magistrate Judge found that those broad requests were not appropriately narrowed. (ECF 157, Tr. 13:2-3).

Unlike Carter's First Motion to Compel, Carter's Second RFP 1 and Second Interrogatory 1 seek information that Southwest omitted from its October 30-31, 2020 production and that Local 556 could not account for in its November 30 deposition: the names of *union officials* who reported flight attendants for social media violations, the names of the flight attendants they reported, and production of the union officials' reports. (Apps.24-25)(App.97). That is a different, discrete, and far narrower request than the broad one the Magistrate had before her. (ECF 157).

### 3.  RFP 1 and Interrogatory 1 seek information within the scope of the Court's discovery order.

Contrary to Southwest's objection, Carter's Second RFP 1 and Second Interrogatory 1 are within the scope of the Court's May 5, 2021 discovery order.  The Court's order allows Carter to conduct "(1) follow up discovery regarding Local 556's November 30th deposition, and (2) follow-up discovery and conferences with Southwest regarding their October 30-31 document production." (ECF 155, p.3). First, Carter's request for the names of union officials, the flight attendants they reported, and the officials' reports, is follow-up discovery regarding Local 556's Rule 30(b)(6) deposition, where the union could not identify which officials turned in flight attendants for their social media activities. (App. 97). Second, Carter's request is follow-up discovery with Southwest about deficiencies with its October 30-31, 2020 document production, and, specifically, its omission of Local 556 officials' reports to the company of flight attendants' social media activities. Indeed, this discovery was responsive to her First Set of Discovery Requests (RFP 6(B) and Interrogatory 3). (Apps.6, 15).

Furthermore, Southwest waived this objection because it was untimely. Southwest first raised this objection on July 15, 2021, *after* it served its June 25, 2021 discovery responses. (App.100,

¶3a)(Apps.51-52) (omitting the objection). "[A]ny ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure." *Lopez*, 327 F.R.D. at 582 (quoting Fed. R. Civ. P. 33(b)(4)). "Although Rule 34 does not provide that untimely objections are waived, the Fifth Circuit has found that the waiver provision applies equally to Rule 34." *Id.* (citing *In re United States*, 864 F.2d 1153, 1156 (5th Cir. 1989) (other citation omitted). "[E]ven where the responding party has timely served some objections to a Rule 34(a) request, this waiver extends to any grounds not stated in a timely objection." *Id.* (citing Fed. R. Civ. P. 34(b)(3)(B). Not only was Southwest's objection untimely, but it also never explained its claim that the requests were beyond the scope of the Court's Order.

### B. Carter's Second RFP 3: Southwest should produce ██████████████████████ ███████ and Southwest's related documents and communications.

For Carter's Second RFP 3, the Court should order Southwest to produce documents and communications related to ██████████████████████████████████████ ████████████████████████████████████████████████████████████ in Southwest's April 4, 2017 email. (App.58).

Southwest's April 4, 2017 email documents ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ RFP 3 also seeks information that is proportional and within the scope of discovery.

1. **RFP 3 seeks information relevant to Carter's Duty of Fair Representation and RLA Retaliation claims.**

Carter's RFP 3 is relevant because it requests information—similar to but more specific than RFP 1 and Interrogatory 1—that can prove her Count III Duty of Fair Representation and Count IV RLA Retaliation. *See* (I)(A)(1), *supra*, at 7-9. Carter can show Local 556's discriminatory animus for her Duty of Fair Representation and RLA retaliation claims with evidence of union officials' history and pattern of breaching the duty it owed other employees by reporting them to the company, targeting other recall supporters and nonmember objectors for discipline, and discriminating against them for their exercise of RLA-protected rights. *See* I(A)(1), *supra*, at 7-9; (FAC, ¶¶ 79-89, 94-101).

Carter's RFP 3 seeks █████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████

15

## 2.  RFP 3 seeks information that is proportional.

████████████████████████████████████████████████████████████████████

████████████████████████████████████ is proportional for many of the same

reasons set forth above. *See supra* at 9-13. First, Carter's speech and association rights are at stake

with this information. *See supra* at 9. Second, RFP 3 seeks evidence that is important to resolving

Carter's Duty of Fair Representation and RLA claims because it establishes Local 556's ████

████████████████████ breaching the duty of fair representation and discriminating against

flight attendants who opposed the union, supported the recall campaign to remove union

leadership, and objected to Local 556's political expenditure of forced union fees. (FAC 80, ¶¶ 79-

89, 94-101). Third, Southwest has exclusive access to this information and the resources to produce

it. (App.97).

Fourth, Southwest cannot demonstrate any real burden or expense with responding to such a

narrowly-tailored request for information. For RFP 3, Southwest asserts virtually the same undue

burden objection that it raised in connection with RFP 1 and Interrogatory 1. (Apps.55-56). But

Carter's Second RFP 3 is even more narrowly-tailored, so Southwest has even less of a basis for a

burdensome objection. As stated, Southwest "must show specifically how each interrogatory or

document request is overly broad, unduly burdensome, or oppressive." *Heller*, 303 F.R.D. at 490

(citation omitted). The level of detail needed requires the opposing party to "submit an affidavit or

otherwise attempt to describe how the discovery requests were unduly burdensome in terms of

time expense, or procedure." *Id*. at 491 (citation omitted).

Southwest's objection is baseless: How can there be *any* burden or expense with identifying

or retrieving responsive documents when Southwest has already located the key document that

gives the information it needs to retrieve the responsive information (e.g., managers and flight

attendants involved)? Southwest can return to the same file from which it located the April 4, 2017 email, and 

RFP 3 is not burdensome because it seeks information related

to a known instance of

Meanwhile, the "likely benefit" is that it establishes Local 556's

pattern of discriminating against opponents.

Having shown that this information

exists, Southwest cannot assert any valid objection for withholding it.

Notably, Southwest waived its objections to RFP 3 because they were untimely. Carter served discovery on May 27, 2021, and Southwest served its objections on July 15, 2021, stating that it had overlooked Carter's RFP 3. (App.56-57)(App.100, ¶4). "[A]s a general rule, when a party fails to object timely to interrogatories, production requests, or other discovery efforts, objections thereto are waived." *Lopez*, 327 F.R.D. at 582 (quoting *In re United States*, 864 F.2d at 1156).

### 3.   RFP 3 seeks information within the scope of the Court's discovery order.

Contrary to Southwest's objections, the Court order authorized Carter to conduct conferences and discovery with Southwest regarding its October 30-31, 2020 document production. (ECF 155, p.3)(Apps.55-56)(App.100).   Carter's Motion to Extend Discovery Deadlines requested an opportunity to "confer with Southwest regarding questions about potential deficiencies with the company's October 30-31 discovery production." (ECF 139, p.14).

Carter's RFP 3 seeks discovery about a specific deficiency in Southwest's October 30-31 production that was revealed when Local 556 produced a copy of the Southwest April 4, 2017 email. (App.58).

██████████████████████████████████████████████████████

████████████████████████████████████████████ Southwest did not

produce any version of the April 4, 2017 email on October 30-31, even though the document was responsive to Carter's First Discovery Requests (RFP 6(B)). (App.26).

Carter's RFP 3 requests documents and information that relate back to deficiencies in Southwest's October 30-31 production. Following the Court's order granting Carter's Motion to Extend Deadlines, Carter asked Southwest to address the deficiency by producing an unredacted version of the company's April 4, 2017 email. (App.26). Southwest's unredacted version makes it clear that Southwest failed to provide responsive information with its October 30-31 production that related to union officials' targeting and reporting flight attendants for their social media activities.

Southwest argued "that production of this [April 4, 2017] email was [not] in any way required in connection with specific discovery requests" and that it did not "compel[] any duty to supplement any previous discovery responses or document production." (App.100, ¶3b). But Southwest's production of the email *was* responsive to Carter's First Discovery Requests: Carter's First RFP 6(B) and First Interrogatory 3, sought reports and complaints to Southwest regarding flight attendants' social media activities. (Apps.6, 15).██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████             ████

████████████████████████████ Thus, Southwest *does* have a duty to supplement responses to Carter's First Discovery requests under Fed. R. Civ. P. 26(e)(1)(A).

Not only does Southwest have a duty to supplement its responses for Carter's First Discovery Requests. (Apps.6, 8, 15) (RFP 3, 6(B), and 28(B)), but it also has a duty to produce this information in response to Carter's Second RFP 3, which seeks a narrow subset of information that is also responsive to Carter's Second RFP 1 and Interrogatory 1.

## II. Southwest failed to support its attorney-client privilege claims in privilege log entries 1-6 because it did not give adequate information showing that the communications involved legal subject matter and someone giving or seeking legal advice.

The Court should order Southwest to produce complete and unredacted copies of documents covered by privilege log entries 1-6 because the company has not provided adequate information to support its attorney-client privilege claims.[5] Fed. R. Civ. P. 26(b)(5) requires that parties relying on a privilege log must "as to each document … set[] forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed." *E.E.O.C. v. BDO USA, L.L.P.*, 876 F.3d 690, 697 (5th Cir. 2017) (quoting *NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 502 (4th Cir. 2011)).

To assert attorney-client privilege, a party's privilege log must establish "(1) that he made a *confidential* communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." *BDO*, 876 F.3d at 695 (emphasis in original) (quoting *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)).[6] Southwest's privilege log does not support its attorney-client privilege claims because it fails to establish the third element: That the communications at issue were made for the primary

---

[5] While Southwest produced documents on October 30-31, 2020, it did not serve a privilege log until June 2, 2021.

[6] "Determining the applicability of the privilege is a highly fact specific inquiry, and the party asserting the privilege bears the burden of proof." *BDO*, 876 F.3d at 695 (internal punctuation and citation omitted). Ambiguities with respect to whether the elements of a privilege claim have been met are construed against the proponent of the privilege. *Id.*

purpose of securing legal opinion or assistance in some legal proceeding. Specifically, Southwest's privilege log fails to establish that (A) the subject matter of the communications was "legal;" and (B) the communications were made for the purposes of giving legal advice.

### A. Southwest's privilege log descriptions for entries 1-6 do not show that the subject matter of the communications was "legal."

Privilege logs must provide a "substantive description regarding the withheld information" and "enough detail to determine the nature of the advice sought." *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, No. 13-373-SDD-EWD, 2018 WL 326504, at *6, 7 (M.D. La. Jan. 8, 2018). Privilege log entries are inadequate when they consist of general subject matter descriptions, or where the party asserting privilege does not show that the type of information is inherently protected by the privilege. *See e.g., Chemtech Royalty Assocs., L.P. v. United States*, No. 06-258-RET-DLD, 2009 WL 854358, at *4-5 (M.D. La. Mar. 30, 2009) ("It is not possible to tell from the entries whether these entries truly enjoy [privilege protection] … without useless speculation.").

Privilege log entries are deficient where there is "no indication that legal advice is being sought, or revealed." *In re Gen. Instrument Corp. Sec. Litig.*, 190 F.R.D. 527, 531 (N.D. Ill. 2000); *see also Wanzer v. Town of Plainvill*e, No. 3:15-CV-00016 (AWT), 2016 WL 1258456, at *3 (D. Conn. Mar. 30, 2016) ("Without some indication that these documents contain legal advice or requests therefor, and without documentation with respect to the contents of the attachments, the Court cannot review the assertion of privilege.").

Southwest's privilege log does not give an adequate explanation of privilege log entries 1-6's contents or provide enough information to enable Carter and the Court to assess the company's privilege claims. (App.59). Southwest's privilege log descriptions for documents 1-6 are overly-generalized and do not show any inherently legal characteristics in the subject matter of the

communications. *Id*. "'[G]eneral level' description is not in keeping with the intent of Rule 26." *Chemtech*, 2009 WL 854358, at *4-5.

Southwest only describes the emails as correspondence regarding "social media and related issues," "Railway Labor Act issues," and the "recall issue." (App.59). Communications about "social media issues," "Railway Labor Act issues," and the "recall issue," are not inherently privileged and do not necessarily involve any legal proceeding. (App.59). Here, Southwest's "general subject matter descriptions" fail to support its claims. *See Cole v. Collier*, No. 4:14-CV-1968, 2020 WL 2813454, at *2 (S.D. Tex. May 28, 2020) (descriptions such as "the Pack Unit," "inspection of the LeBlanc Unit," and "temperature" logs, were vague and boilerplate descriptions and failed to provide adequate detail to support the privilege claim).

### B. Southwest's privilege log does not establish that entries 1-6 involved communications made by or for attorneys for the purposes of giving or securing legal advice.

To be sure, privilege log entries 1-6 involve correspondence between in-house counsel and the company's managers, but those communications are not necessarily confidential or made for the purpose of securing legal services or assistance. "[T]he attorney-client privilege does not apply simply because documents were sent to an attorney." *BDO*, 876 F.3d at 696 (quoting *Interbake Foods, LLC*, 637 F.3d at 502). Communications with an attorney who is acting solely in a business advisory capacity are not privileged. *See BDO*, 876 F.3d at 696. Attorney-client privilege does not extend to purely factual information that an attorney communicates via memo to other persons. *See United States v. Louisiana*, No. 11-470, 2015 WL 4619561, at *5 (M.D. La. July 31, 2015). "To be privileged, the documents must not only exhibit attorney involvement, but must involve a legal adviser acting in his capacity as such." *In re Gen. Instrument Corp.*, 190 F.R.D. at 531 (internal punctuation and citation omitted). Context is key and Southwest's privilege log entries

21

lack those details. (App.59). Privilege log entries 1-6 do not show that an attorney was giving or receiving information in his capacity as legal adviser. *Id.*

**1.** ████████████████████████████████████████████
████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Privilege log entry 6 merely describes the

redacted email as "correspondence with in-house counsel regarding recall issue." (App.59). ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Southwest also asserted that "the context of these communications are adequately set forth in the surrounding correspondence and the privilege log." (App. 100, ¶2). ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

22

████████████████████████████████████████████████████████

████████████████████████████████████

**2.** ████████████████████████████████████████████

████████████████████████████████████████

During counsel's discussions about Southwest's privilege log, the company's attorneys asserted that documents 1-5 are "generally related to ongoing labor-related legal issues … with in-house counsel in their capacity as attorneys." (App.100, ¶2). But, parties asserting attorney-client privilege must describe the communication as more than just "legal" or "legal advice" to properly establish the privilege. *BDO*, 876 F.3d at 696. "Calling the lawyer's advice 'legal' … does not help in reaching a conclusion; it *is* the conclusion." *BDO*, 876 F.3d at 696 (quoting *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (emphasis in original). "There is no presumption that a company's communications with counsel are privileged." *BDO*, 876 F.3d at 696. The Courts and the parties must determine the nature of advice sought without having to rely on conclusory assertions. The party who asserts a privilege must set forth specific facts and information to allow the courts and other parties to test the merits of the privilege claims. *Id.* at 697.

Southwest's assertion that communications withheld were "with in-house counsel in their capacity as attorneys" is a conclusory description that fails to give any substantive detail regarding the files or establish that they were sent for the primary purpose of obtaining or providing legal advice or assistance. *See BDO*, 876 F.3d at 696. *See Cole*, 2020 WL 2813454, at *2 (finding that descriptions such as "[c]ommunication made for the purpose of obtaining and providing legal advice and assistance in Cole v. Collier litigation" was a vague and boilerplate description and failed to provide adequate detail to support the privilege claim). Similarly, Southwest's assertion that documents withheld are "generally related to … legal issues" does not meet the burden to show that the privilege applies. (App.100, ¶2). Southwest does not provide enough detail or facts

about documents 1-5 that would show in-house counsel were acting in their capacity as attorneys or that they prepared these documents for the primary purpose of giving legal advice about "ongoing labor-related issues." *See Cole*, 2020 WL 2813454, at *2; (App.59)(App.100, ¶2). Therefore, the Court should order Southwest to produce the complete and un-redacted documents covered by privilege log entries 1-6, including SWA 7464, SWA 7466, and SWA 7468.

To the extent that Southwest argues that it cannot provide more detail in its privilege log without revealing potentially privileged information, that would favor *in camera* review of the documents at issue. "If [parties] are unable to express through their privilege log whether documents are privileged or not, then … *in camera* review … [is] the best method to adjudicate privilege without inadvertently revealing privileged information." *See Cole*, 2020 WL 2813454, at *3 (citing *United States v. Zolin*, 491 U.S. 554, 568-69 (1989)).

### III. Southwest should produce social media discipline documents it agreed to produce.

The Court should order Southwest to produce responsive information it had previously agreed to produce on May 24, 2021 and earlier correspondence, regarding other flight attendant reports, complaints, investigations, and discipline involving Southwest's Social Media Policies that involved Denver Base Manager Ed Schneider. (App.103). Carter asked Southwest to follow through with producing this information on November 20, 2020, on May 17, 2021 (after the Court's May 5 Order), and again, on July 13, 2021. (Apps.103-105)(App.101, ¶1). Southwest responded on July 15, 2021, that it would produce this information towards the end of the following week. (App.100, ¶1). Southwest admits (and its spreadsheet demonstrates) that it has responsive materials. (Apps.77-86). But rather than producing those responsive documents, on July 21, 2021, Southwest produced a spreadsheet purporting to summarize these documents. *Id*.

24

Fed. R. Civ. P. 34 gives a party two options when producing information in response to a production request: A party must produce *documents* as they are kept in the usual course of business or must organize and label *them* to correspond to the categories of the request. See Fed. R. Civ. P. 34(b)(2)(E)(i) (emphasis added); *Lopez*, 327 F.R.D. at 578. *See also McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235, 249 (N.D. Tex. 2016) (holding that Rule 34(b)(2)(E)(i) also applies to ESI productions).

Either way, a party that chooses to produce documents must produce the actual documents, not a later, self-serving summary prepared by the party. In *Sundance*, a defendant responded to requests for production by stating that it would provide a summary of customer refunds. But the Court observed that plaintiffs were seeking "all documents related to customer refunds, not a summary of such documents prepared by [defendant]." The Court ordered the defendant to produce the actual documents in the absence of a showing of good cause as to why it could not produce them. *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, 2005 WL 8173278, *6 (S.D. Cal. Aug. 19, 2005). When Southwest finally produced its "information," it produced a summary of information in its possession rather than producing the documents themselves. Southwest cannot demonstrate any good cause as to why it should not produce the documents, especially when Southwest had previously agreed to produce them.

## CONCLUSION

For the foregoing reasons, Carter requests that the Court grant her Second Motion to Compel Discovery from Southwest as requested herein and in the accompanying Motion.

Dated: September 8, 2021                    Respectfully submitted,


                                            s/ Matthew B. Gilliam
                                            Mathew B. Gilliam (*admitted pro hac vice*)
                                            New York Bar No. 5005996
                                            *mbg@nrtw.org*

25

c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319

s/ Jason E. Winford (*with permission*)
David E. Watkins
Texas Bar No. 20922000
*dwatkins@jenkinswatkins.com*
Jason E. Winford
Texas Bar No. 00788693
*jwinford@jenkinswatkins.com*
JENKINS & WATKINS, P.C.
4300 MacArthur Avenue, Suite 165
 Dallas, Texas 75209
Tel: 214-378-6675
Fax: 214-378-6680

*Attorneys for Plaintiff Charlene Carter*

**<u>Certificate of Service</u>**

I hereby certify that on September 8, 2021, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ Matthew B. Gilliam