**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | |
| vs. | § | 3:17-cv-02278-B |
| | § | |
| SOUTHWEST AIRLINES CO., and | § | |
| TRANSPORT WORKERS UNION OF | § | JURY DEMANDED |
| AMERICA, LOCAL 556 | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT TWU LOCAL 556'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**CLOUTMAN & GREENFIELD, PLLC**
3301 Elm Street
Dallas, Texas 75226
214.642.7486
214.939.9229 FAX

 */s/ Adam S. Greenfield*
Adam S. Greenfield
Email:  agreenfield@candglegal.com
Bar No.: 24075494

*Board Certified in Labor & Employment Law by the
Texas Board of Legal Specialization*

Edward B. Cloutman, III
State Bar No. 04411000
Email:  ecloutman@lawoffices.email
**LAW OFFICES OF EDWARD CLOUTMAN, III**
3301 Elm Street
Dallas, Texas  75226-1637
214.939.9222
214.939.9229 Facsimile

**COUNSELS FOR DEFENDANT TWU LOCAL 556**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT AND STATEMENT OF FACT ............................................. 5-9

ARGUMENT AND AUTHORITIES ..................................................................................... 9-20

A.  Summary Judgment Standard  .................................................................................. 9-10

B.  Issue Preclusion – The Court Should Give Preclusive Effect to the Issues Resolved in Arbitration  ........................................................................................................................ 9-13

C. Breach of Duty of Representation and RLA Retaliation – Assuming *Arguendo* that Preclusion does not Apply – Union Officers are NOT required to Abdicate their Federally Protected Rights ....................................................................................................................... 13-18

      1.      Breach of Duty of Representation.................................................................. 13-15

      2.      There was no Retaliation against Plaintiff for Her Exercise of Alleged Protected Rights under the RLA. ................................................................................... 15-18

D. Plaintiff's Claims of Religious Discrimination and Failure to Accommodate – Assuming Arguendo that Preclusion does not Apply – are Fatally Flawed by Plaintiff's Own Testimony      ........................................................................................................... 18-20

CONCLUSION ..................................................................................................................21

## TABLE OF AUTHORITIES

### CASES

*Air Line Pilots Ass'n, Int'l v. O'Neill*
   499 U.S. 65, at 76 (citing), (1991) ........................................................................ 14
Amarsingh v. Jetblue Airways Corp.
   409 Fed. Appx. 459, 460-61 (2d Cir. 2011) ........................................................... 15
*Baker v. Am. Airlines, Inc.*,
   2004 U.S. Dist. LEXIS 18810, *18-19 (N.D. Tex. Sept. 15, 2004) ........................ 19
Beckett v. Atlas Air, Inc
   968 F. Supp. 814, 817 (E.D.N.Y. 1997) ................................................................. 15
*Caldwell v. KHOU-TV*
   850 F.3d 237, 241 (5th Cir. 2017) .......................................................................... 10

*Celotex Corp. v. Catrett*
   477 U.S. 317, 322-23 (1986)..................................................................... 9
Chhim v. Univ. of Texas,
   2016 WL 154142, *5 (W.D. Tex. Jan. 11, 2016) .................................... 18
*Chumney v. Glasscock County Indep. Sch. Dist.*,
   2019 U.S. Dist. LEXIS 233633, *15 (N.D. Tex. Mar. 6, 2019). .............. 19
*Daimler Chrysler Corp.*,
   344 NLRB 1324, 1329 (2005)................................................................. 16
*Duffie v. United States*
   600 F.3d 362, 371 (5th Cir. 2010) ............................................................ 9
*Foster v. Target Corp.*,
   2021 U.S. Dist. LEXIS 19248, *3-4 (N.D. Tex. Feb. 2, 2021)................... 9
*Gautier v. Celanese*,
   143 F. Supp. 3d 429, 433 (W.D. Va. 2015) ............................................ 10
*Gibson v. Wayfair, Inc.*,
   2018 U.S. Dist. LEXIS 107425, *10 (S.D. Tex. June 27, 2018) .............. 20
*Greenblat v. Drexel Burnham Lambert, Inc.*,
   763 F.2d 1352, 1361 (11th Cir. 1985).................................................... 10
*Grimes v. BNSF Ry. Co.*,
   746 F.3d 184, 188 (5th Cir. 2014)..................................................... 10, 11
Held v. Am. Airlines, Inc.,
   2007 WL 433107, *7 (N.D. Ill. Jan. 31, 2007) ...................................... 16
Honda of Am. Mfg., Inc.,
   334 NLRB 746 (2001)............................................................................ 17
Johnson v. McDonald
   623 Fed. Appx. 701, 704 (5th Cir. 2015) ............................................. 18
*Lamont v. United States*
   , 613 F. Supp. 588, 591 (S.D.N.Y. 1985)................................................ 11
*Little v. Liquid Air Corp.*
   37 F.3d 1069, 1075 (5th Cir. 1994)........................................................... 9
Leiser Constr., LLC
   349 NLRB 413, 415 (2007)................................................................ 16, 17
Media Gen. Ops., Inc. v. NLRB
   394 F.3d 207, 209, 212 (4th Cir. 2005).................................................. 17
Phillips v. United Parcel Serv.,
   2011 WL 2680725, *8 (N.D. Tex. June 21, 2011 .................................. 18
Raj v. La. State Univ.,
   714 F.3d 322, 331 (5th Cir. 2013)........................................................... 19
*Smith v. State Farm Lloyds*
   2020 U.S. Dist. LEXIS 95641, *10 (N.D. Tex. June 1, 2020). ................. 9

Sw. Bell Tel. Co.,
   200 NLRB 667 (1972.................................................................................................. 18
Vaca v. Sipes,
   386 U.S. 171, 177 (1967)........................................................................................... 14
*Weber v. Roadway Exp., Inc*
   199 F.3d 270, 273 (5th Cir. 2000)............................................................................. 20

## **STATUTES/OTHER**

Fed. R. Civ. P. 56(a) ...................................................................................................... 9

## I. SUMMARY OF ARGUMENT AND STATEMENT OF FACTS

Plaintiff Charlene Carter ("Plaintiff" and/or "Carter"), former Southwest Airlines Co. ("SWA" and/or "Southwest Airlines") flight attendant, asserts that Defendant TWU Local 556 ("Union" and/or "Local 556"): (1) breached its duty of fair representation to Plaintiff; (2) discriminated against Plaintiff for religious beliefs and practices; and (3) retaliated against Plaintiff for exercising alleged protected rights under the RLA. However, the undisputed evidence shows that Southwest Airlines, and Southwest Airlines alone, made the decision to terminate Plaintiff's employment after receiving a complaint from SWA employee, and then Union President, Audrey Stone. Ms. Stone alerted SWA to Facebook posts sent directly to her by Plaintiff. The videos and corresponding messages depicted graphic videos of aborted fetuses, calling Ms. Stone a murderer, and making threats to Ms. Stone's safety. As such, summary judgment is proper because the record contains no disputed issues of material fact underlying Plaintiff's claims. Defendant's motion should be granted.

TWU Local 556 is the local Union representing flight attendants working at Southwest Airlines. On or about September 29, 2013, Plaintiff Carter resigned as a member of the Union, becoming what is commonly known as an Agency Fee Objector.[1] Prior to resigning her Union membership in 2013, Plaintiff Carter attended a Union meeting and had her first and last direct engagement with Ms. Stone, accusing Ms. Stone of taking part in a coup to become President of the Union.[2] Starting in early 2015, Plaintiff began engaging in a years-long harassment of Ms. Stone via approximately one hundred pages worth of direct and private Facebook Messages and emails, calling Ms. Stone, including but not limited to, "pure evil," "corrupt," "incompetent," and

---

[1] Ex. 1 – Carter's Union Resignation; APP. 002.
[2] Ex. 2 – Carter Deposition – 34:1—35:19; APP. 008-009.

"crook," and discussing Plaintiff's status as a Union objector.[3] Despite this harassment, Ms. Stone did not report Plaintiff's behavior to SWA.[4] However, on February 14, 2017, the tenor of Plaintiff Carter's direct messages changed, sending Ms. Stone what Plaintiff herself admits to be "graphic videos of aborted fetuses."[5] Indeed, Plaintiff Carter believes that there is no limit to what she can say to a fellow employee in expressing her religious beliefs.[6] The messages further assert that Ms. Stone supports "murder" and that Plaintiff "can't wait to see [her] back on line," on line being a term for a flight attendant working on a flight.[7]

On or about February 22, 2017, Ms. Stone reported Plaintiff Carter's actions to SWA, making note that she felt the messages were "obscene and violent, as well as threatening in nature."[8] Accordingly, on March 7, 2017, SWA appropriately took Ms. Stone's complaint seriously, conducting a fact-finding meeting with Mrs. Carter in which she admitted, as noted above, to sending the "graphic videos." Despite Plaintiff being a non-union member, she was provided union representation that Plaintiff describes as doing an "amazing" job.[9]

One week later, March 14, 2017, SWA informed Plaintiff Carter that her employment was being terminated for, including but not limited to, direct violation of their Workplace Bullying and Hazing Policy and Social Media Policy.[10]

After receiving her termination letter, Plaintiff Carter, like all SWA flight attendants, was afforded the opportunity to challenge/grieve her termination at what is called a "Step 2" hearing.[11] The purpose of the Step 2 hearing is to provide an opportunity for a Southwest leader who did not

---

[3] Ex. 4 – Carter Facebook Messages to Stone; APP. 028—125.
[4] Ex. 2 – Carter Deposition – 32:8—13; APP. 007.
[5] Ex. 2 – Carter Deposition – 28-29; APP. 005—006.
[6] Ex. 2 – Carter Deposition – 79-81:17; APP. 012—014.
[7] Ex. 4 – Carter Facebook Messages to Stone (p. 1-3); APP. 028—030.
[8] Ex. 5 – Stone Complaint to SWA; APP. 127—132.
[9] Ex. 2 – Carter Deposition – 266; APP. 018.
[10] Ex. 6 – Carter Termination Ltr.; APP. 134.
[11] Ex. 2 – Carter Deposition – 86:20—24; APP. 015.

participate in the fact-finding meeting to review the case, consider additional facts, and ensure appropriate application of Southwest policies.[12] At this juncture the Union provided Plaintiff two representatives, who Plaintiff Carter admits "represented me properly" and that the process was "fair and complete."[13] After concluding the Step 2 hearing, SWA believed that termination was an appropriate punishment.[14] Nevertheless, the Union was able to secure Carter an offer of reinstatement after a 30-day suspension and a Last Chance Agreement.[15] Plaintiff Carter refused the offer in lieu of termination.[16]

Notably, Plaintiff Carter readily admits that the Union did not discriminate nor improperly represent her, in any way, at either the fact-finding meeting or Step 2 grievance.[17] Furthermore, at no point did Plaintiff Carter ever request a religious accommodation from the Union[18] Plaintiff Carter simply believes that she had the right to send the messages—of any sort and as graphic as she deemed fit—to Stone because of her status as the Union President.[19]

Plaintiff Carter was not finished, and on December 7-8, 2017, Carter and Southwest participated in a two-day arbitration before William Lemons.[20] Carter and Southwest mutually selected the arbitrator pursuant to the CBA's grievance procedure.[21] At the arbitration, Carter was represented by two attorneys from the National Right to Work Foundation, presented testimony and exhibits, made legal and factual arguments, and cross-examined witnesses.[22] In total, the

---

[12] SWA Motion for Summary Judgment at p. 16.
[13] Ex. 2 – Carter Deposition – 266:24—268:4; APP. 018-020.
[14] Ex. 7 – Sims Deposition – 186:7—188:13; APP. 137—138.
[15] Ex. 8 – Carter Last Chance Agreement; APP. 142-147, and Ex. 2 – Carter Deposition – 92:3—13; APP. 017.
[16] Ex. 2 – Carter Deposition – 91:19—25; APP. 016.
[17] Ex. 2 – Carter Deposition – 268:12—24; APP. 020.
[18] Ex. 2 – Carter Deposition – 270:6—11; APP. 021.
[19] Ex. 2 – Carter Deposition – 79:21-81:17; APP. 012-014; and Ex. 9 – Arbitration Transcript – 374:1-380:24; APP. 558-564.
[20] SWA APP. 1003-1004
[21] SWA APP. 20, ¶11
[22] Ex. 9 – Arbitration Transcript –2:12-17, 3:1-5:25 and 321:1-322:13; APP. 150—153 and 505—506.

arbitrator considered testimony from nine different witnesses and 32 exhibits along with post-hearing briefing from both parties.[23] Based on that evidence and briefing, the arbitrator made the following factual findings[24]:

- It was "clear beyond a reasonable doubt that the Company had just cause to terminate [Carter] for the reasons it gave and in the manner it did."
- Carter violated the Social Media Policy, the Workplace Bullying and Hazing Policy, and the Harassment Policy.
- "[A]t least three of the policies [Carter] violated provide an independently sufficient basis for termination[.]"
- Carter was not "treated less favorably than others" and the circumstances surrounding her offenses were not "substantively like those of individuals who received more moderate penalties."
- "Audrey Stone reported [Carter's] conduct to the Company not to retaliate against her" but because she believed Carter "violat[ed] various policies that were applicable to her."
- Southwest "does not have a policy or practice of disciplining, or not disciplining employees based upon their view of TWU Local 556 generally, or of Audrey Stone in particular."
- "[T]he degree of discipline administered by the Company ... was warranted ... notwithstanding that [Carter] ... had no previous disciplinary record."
- Carter failed to demonstrate "disparate treatment."

Arbitrator Lemons denied Carter's grievance. Also of import is that Plaintiff Carter finally accepted responsibility for her actions—"I realize this is a mistake. I realize that I need to do it in a different manner, and I'm sorry for the manner that I did send it through and I take full responsibility for it".[25]

---

[23] Id.
[24] SWA APP. 1003-1021
[25] Ex. 9 – Arbitration Transcript – 359:8—24; APP. 543, and Ex. 2 – Carter Deposition – 53:5—54:4; APP. 010—011.

Despite temporarily accepting responsibility for her actions, Plaintiff Carter moved forward with litigation against the Union, and after having several claims dismissed[26], alleges that the Union (1) breached its duty of fair representation to Plaintiff; (2) discriminated against Plaintiff for religious beliefs and practices; and (3) retaliated against Plaintiff for exercising alleged protected rights under the RLA.

## II. ARGUMENT AND AUTHORITIES

### A.  Summary Judgment Standard

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[27] Normally, to support summary judgment, the moving party must identify pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.[28] "But if the non-movant ultimately bears the burden of proof at trial, the summary-judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting an essential element of the non-movant's claim."[29]

If the moving party makes this initial showing, the burden shifts to the nonmoving party to identify "specific facts showing that there is a genuine issue for trial."[30] The nonmoving party does not meet this burden by conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation.[31] Moreover, "[m]erely colorable evidence or evidence not significantly probative will not defeat a properly supported motion for summary judgment."[32] The

---

[26] See Doc. 69 – Court Order on Defendant's motion to Dismiss.
[27] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
[28] *Celotex*, 477 U.S. at 323.
[29] *Foster v. Target Corp.*, 2021 U.S. Dist. LEXIS 19248, *3-4 (N.D. Tex. Feb. 2, 2021); *see also Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (the moving party "need not negate the elements of the nonmovant's case.").
[30] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[31] *Id.*
[32] *Smith v. State Farm Lloyds*, 2020 U.S. Dist. LEXIS 95641, *10 (N.D. Tex. June 1, 2020).

"salutary function of summary judgment in the employment discrimination arena [is that] summary judgment allows patently meritless cases to be nipped in the bud."[33] As set forth below, this is precisely such a case.

**B.     Issue Preclusion – The Court Should Give Preclusive Effect to the Issues Resolved in Arbitration.**

As a preliminary matter, the Union is entitled to summary judgment on all of Plaintiff's claims as Plaintiff's prior arbitration with SWA has a binding preclusive effect on claim (1) the Union breached its duty of fair representation to Plaintiff, (2) discrimination against Plaintiff for religious beliefs and practices, and (3) retaliation against Plaintiff for exercising alleged protected rights under the RLA. "As a general matter, arbitral proceedings can have a preclusive effect even in litigation involving federal statutory and constitutional rights, and the decision to apply it is within that discretion of the district court."[34] The decision to apply issue preclusion in a particular case is a matter of discretion entrusted to the district court.[35]

In determining whether to apply arbitration-based preclusion, a district court should consider two factors: (1) whether "[t]he findings are within the [arbitrator's] authority and expertise;" and (2) whether the arbitration procedures "adequately protected the rights of the parties."[36] As to the second prong, "[w]hen an arbitration proceeding affords basic elements of adjudicatory procedure, such as the opportunity for presentation of evidence, the determination of issues in an arbitration proceeding should be generally treated as conclusive in subsequent proceedings[.]"[37] Specifically, in deciding whether to exercise its discretion to apply the doctrine,

---

[33] *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017).
[34] *See Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 188 (5th Cir. 2014); *see also Gautier v. Celanese*, 143 F. Supp. 3d 429, 433 (W.D. Va. 2015) ("[T]he Fifth Circuit allows courts to give preclusive effect to arbitration decisions in later federal discrimination claims").
[35] *Grimes*, 746 F.3d at 188.
[36] Id. (quoting *Greenblat v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1361 (11th Cir. 1985)).
[37] Id. (quoting *Greenblat*, 763 F.2d 1t 1360).

the Court should consider the experience of the arbitrator, procedural differences in the proceedings, whether the arbitration proceedings adequately protected the rights of the parties, and whether the findings were within the arbitrator's expertise and authority.[38]

The underlying arbitration and arbiter satisfy the above prongs. First, Arbitrator Lemons had more than sufficient expertise and experience to make the determinations that would preclude Plaintiff's claims. Courts have long recognized that labor arbitrators are well-positioned to make factual determinations and fairly resolve employee-management disputes.[39] Here, Arbitrator Lemons has presided over hundreds of arbitrations ranging in size and complexity from small single plaintiff matters to 28-day hearing resulting in a $46 million award involving a complex commercial dispute.[40] In fact, Southwest and its employees have arbitrated over 30 disputes before Arbitrator Lemons, sometimes resulting in favorable outcomes to Southwest and other times resulting in favorable outcomes to the aggrieved employee.[41] Further, Plaintiff *herself* acknowledged that Arbitrator Lemons was an appropriate choice when she selected him, along with Southwest, as the mutually agreed arbitrator.[42] Thus, Arbitrator Lemons satisfies the first prong of preclusion analysis.

Regarding the second prong of the analysis, Plaintiff was afforded full due process through the arbitration proceedings. Thus, where the parties to the arbitration were represented by counsel, presented evidence, made factual and legal arguments, and were permitted to examine and cross examine witnesses before a neutral arbitrator, issue preclusion is appropriate.[43] As the arbitrator's

---

[38] *Grimes*, 746 F.3d at 188.
[39] *See Lamont v. United States*, 613 F. Supp. 588, 591 (S.D.N.Y. 1985) ("[I]n [] labor relations ... the arbitrator would have greater expertise than a court in resolving disputes between employers and employees."); *accord Grimes*, 746 F.3d at 187 n.1 (noting "arbitrator's competence to find facts").
[40] *See SWA* App. 8-17.
[41] See SWA App. 20 ¶ 12.
[42] See SWA App. 20 ¶ 11.
[43] *Grimes*, 746 F.3d at 188

decision and the 473-page transcript demonstrate, the proceedings satisfied each of these elements. At arbitration, Plaintiff and Southwest were both represented by counsel, presented nine witnesses and 32 exhibits, cross examined hostile witnesses, and submitted post-hearing briefs. Thus, the second prong of preclusion analysis is also satisfied.

Accordingly, and as requested by SWA, the Court should adopt as preclusive the following findings of fact reached by Arbitrator Lemons:

- Essential Element: Plaintiff contends in this lawsuit Southwest's stated reasons for her termination were pretextual and that her termination was unwarranted.

  Preclusive Finding: The arbitrator concluded that Southwest's stated reasons were not pretextual and Southwest had "just cause" to terminate Plaintiff "beyond a reasonable doubt."[44]

- Essential Element: Plaintiff contends Southwest's refusal to utilize lesser progressive discipline reflects an improper motive.

  Preclusive Finding: The arbitrator concluded "the ... discipline administered ... was warranted ... notwithstanding that [Plaintiff] ... had no previous disciplinary record."[45]

- Essential Element: Plaintiff contends that she was treated less favorably than other employees who engaged in misconduct on social media.

  Preclusive Finding: The arbitrator concluded that Plaintiff was not "treated less favorably than others" and the circumstances surrounding her offenses were not "substantively like those ... who received more moderate penalties."[46]

- Essential Element: Plaintiff contends that Southwest treated employees who opposed Local 556 and Stone less favorably than those who supported them.

  Preclusive Finding: The arbitrator found that Southwest "does not have a policy or practice of disciplining, or not disciplining employees based upon their view of TWU Local 556 generally, or of Audrey Stone in particular."[47]

- Essential Element: Plaintiff contends that Stone reported her to Southwest because of her opposition to Stone's conduct as Union President.

---

[44] SWA - App. 1011.
[45] SWA - App. 1019-1020.
[46] SWA - App. 1019.
[47] SWA - App. 1019.

Preclusive Finding: The arbitrator found that "Stone reported [Plaintiff's] conduct to the Company not to retaliate against her" but because she believed Plaintiff "violat[ed] various policies that were applicable to her."[48]

The arbitrator's findings refute any attempt by Plaintiff to prove that Audrey Stone complained about Plaintiff Carter's actions for anything other than SWA policy violations and that SWA terminated Plaintiff for anything other than the egregious and offensive nature of Plaintiff's behavior rather than the content or viewpoint of her messages. This preclusion is fatal to all of Plaintiff's claims. Further, even if that fact were not enough, Arbitrator Lemons' findings of fact preclude Plaintiff from resorting to comparator evidence to provide proof of animus.

If preclusion was not itself fatal, it would become fatal when paired with Plaintiff's deposition testimony. Specifically, Plaintiff Carter readily admits that the Union did not discriminate nor improperly represent her, in any way, at either the fact-finding meeting or Step 2 grievance.[49] Plaintiff Carter was represented by counsel of her choosing at the Arbitration proceeding. Furthermore, at no point did Plaintiff Carter ever request a religious accommodation from the Union[50] Plaintiff Carter simply believes that she had the right to send the messages—of any sort and as graphic as she deemed fit—to Stone because of her status as the Union President,[51] and as the President of the Union, Ms. Stone must renounce her federally protected rights to be free from harassment in the workplace.

## C. Breach of Duty of Representation and RLA Retaliation – Assuming *Arguendo* that Preclusion does not Apply – Union Officers are NOT required to Abdicate their Federally Protected Rights

---

[48] SWA – App. 1019. *See generally* App. 1003-1021.
[49] Ex. 2 – Carter Deposition – 268:12—24; APP. 020.
[50] Ex. 2 – Carter Deposition – 270:6—11; APP. 021.
[51] Ex. 2 – Carter Deposition – 79:21-81:17; APP. 012—014; and Ex. 9 – Arbitration Transcript – 374:1-380:24; APP. 558—564.

The factual essence of Plaintiff's lawsuit necessarily assumes that the Union: 1) actively and continuously conspired with SWA to get her fired in retaliation for her exercise of alleged "protected speech," by having the Local's President pretend to be bothered by Plaintiff's undisputed harassment; then 2) agreed to fight to undo the effect of that conspiracy by getting her job back for her; 3) did get her job back; and, 4) knew, all the while, that she would inexplicably reject the deal and the effect of its "retaliation"— that the Union itself had defeated—would once again take effect. This unique factual backdrop provides helpful context when considering the parties' opposing legal positions. This factual backdrop is the underlying basis for Plaintiff's claims of Retaliation and breach of Duty of Fair Representation against the Union.

## 1.   Breach of Duty of Representation.

A union's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.[52]

As noted above, Plaintiff Carter readily admits that the Union did not discriminate nor improperly represent her, in any way, at either the fact finding meeting or Step 2 grievance.[53] Thus, Plaintiff's claim for a Breach of Duty of Representation is predicated upon two flawed presumptions regarding an employee who holds a union position (i.e. Union President Stone): (1) Ms. Stone is precluded from complaining to her employer about co-worker harassment, as any such complaint would necessarily breach the Local's duty of fair representation to its members; and, 2) That any such action taken by Ms. Stone is the same, in terms of legal effect, as official conduct of Local 555.

---

[52] *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, at 76 (citing Vaca v. Sipes, 386 U.S. 171, 177 (1967)), (1991).
[53] Ex. 2 – Carter Deposition – 268:12—24; APP. 020.

Plaintiff cannot cite any law or statute asserting a SWA employee, Ms. Stone, must renounce her federally protected right to be free from harassment in the workplace in order to hold a union position. Nor can Plaintiff cite any authority supporting the idea that every action taken by a union official has the force and effect of officially sanctioned action on the part of the Union—like, for instance, when the Union decided to assign Ms. Carter an advocate to challenge her discharge.

Ultimately, Mrs. Carter cannot say and do whatever she pleases in the workplace and demand that she be free from any and all repercussions. In order for TWU Local 556 to be liable in anyway, an employee such as President Stone, must abdicate her rights to be free from workplace harassment or the Union is liable when the harasser is punished by their employer. There is no law to support this theory of liability.

## 2. There was no Retaliation against Plaintiff for Her Exercise of Alleged Protected Rights under the RLA.

For a retaliation claim to survive, an employee "must show by a preponderance of evidence that [] 'protected conduct was a 'substantial' or 'motivating' factor prompting the discharge.'" To make this demonstration, the employee must show (a) she was engaged in protected activity; (b) the employer was aware of that activity; (c) defendant harbored animus toward the protected activity (i.e., extreme antiunion bias or animus); and (d) the animus was a causal factor in plaintiff's termination.[54]

Again, Plaintiff Carter cannot present any evidence of a conspiracy to terminate her employment, thus her claims ultimately fail. Defendant SWA terminated Mrs. Carter's employment and there are no allegations of additional harm by the Union.

---

[54] Amarsingh v. Jetblue Airways Corp., 409 Fed. Appx. 459, 460-61 (2d Cir. 2011); Beckett v. Atlas Air, Inc., 968 F. Supp. 814, 817 (E.D.N.Y. 1997).

Even if Plaintiff's legal theories were supported by law or statute, they are not viable as Plaintiff's offensive and harassing emails are not "protected free speech." It is clear that even otherwise protected "speech relating to union activity loses statutory protection if it is vulgar, offensive, abusive, or harassing."[55] In addition, an employee's protected activity "may give way when 'special circumstances' override the employees' [] interests[.]"[56] Special circumstances may include, inter alia, situations in which the protected activity is "vulgar or obscene[,] [] may 'exacerbate employee dissension' or situations in which restriction ... 'is necessary to maintain decorum and discipline among employees.'"[57] "Where an employee engages in indefensible or abusive misconduct during otherwise protected activity, the employee forfeits the [NLRA's] protection."[58]

Here, Plaintiff repeatedly sent a co-worker, who also happens to be the Union President, material that in Plaintiff's own words are "GRAFIC (sic)" in nature. Plaintiff Carter's actions were reported to her employer, who then made the decision to terminate Plaintiff. Plaintiff's contention that both the Union and the Company retaliated against her because she was engaging in alleged "protected speech" (by repeatedly sending unsolicited messages containing photos and video of aborted fetuses to a coworker) and, is thereby completely insulated from liability is unsupported by law. Indeed, had the Company taken the Plaintiff's position that her speech was unconditionally protected, it would be directly exposing itself to liability by knowingly disregarding Plaintiff's co-workers' federally protected rights to be free from a hostile work environment created by other co-workers.

---

[55] Held v. Am. Airlines, Inc., 2007 WL 433107, *7 (N.D. Ill. Jan. 31, 2007) (citing TWA, 489 U.S. at 440).
[56] Leiser Constr., LLC, 349 NLRB 413, 415 (2007).
[57] Id.
[58] Daimler Chrysler Corp., 344 NLRB 1324, 1329 (2005).

Even if one assumes the communications generally concerned protected topics and the RLA protects certain types of speech post-certification (it does not), the communications lost protection due to their graphic and harassing nature and Carter's inflammatory commentary (e.g., referring to Stone as a murderer).

The NLRB has repeatedly withdrawn statutory protection from images and commentary that are far less inflammatory than what Carter sent to Stone.[59] For example, in Leiser Constr., LLC[60], the Board held that the employer could prohibit the wearing of union insignia that showed a person urinating on a rat, characterizing it as "unquestionably vulgar and obscene."[61] Similarly, in Honda of Am. Mfg., Inc.[62], the Board held that use of phrases "out of the closet" and "bone us" in a union newsletter was "so offensive as to render the otherwise protected newsletters unprotected."[63]

These cases demonstrate that even if one has a legal right to send unsolicited private messages to one's co-workers discussing abortion, doing so by sending knowingly graphic images and videos, and referring to the recipient as a murderer, is not protected. As Carter's five-year history of participation in public debates demonstrates, Carter was and is generally free to comment on abortion and internal Union matters without the Union's or Southwest's interference. However, Carter does not have a legal right to create a harassing environment by distributing graphic images and hurling inflammatory slurs to undesiring recipients.[64]

---

[59] See generally Media Gen. Ops., Inc. v. NLRB, 394 F.3d 207, 209, 212 (4th Cir. 2005) (Employee forfeited protections by use of terms "bastard," "son of a bitch," and calling supervisor a "racist.").

[60] Leiser Constr., LLC[7], 349 NLRB 413 (2007).

[61] Id. at 415.

[62] Honda of Am. Mfg., Inc., 334 NLRB 746 (2001).

[63] Id. at 748-49.

[64] See generally Sw. Bell Tel. Co., 200 NLRB 667 (1972) ("In view of the controversial nature of the language used and its admitted susceptibility to derisive and profane construction, Respondent could legitimately ban the use of the provocative slogan").

In addition to her speech not being protected, Plaintiff cannot draw a causal factor from her speech to her termination. In particular, Carter alleges that she first engaged in anti-Union protected speech as early as 2013 – more than four years before her termination, which she claims was retaliation for her long history of opposing the Union. But such a gap in time refutes Carter's claim of retaliation. In fact, it shows Southwest's decision to terminate her had nothing to do with her years of anti-Union speech, but rather her targeted, inappropriate harassment of Stone. Otherwise, Southwest would have terminated Carter in 2013 (or at some time prior to 2017).

Courts have repeatedly dismissed such retaliation claims, concluding that the lapse of time refutes the requisite causal nexus.[65] Such delays between the protected activity and adverse employment action refutes any causal link between the two events.[66] Accordingly, even if the Court concludes that Plaintiff's retaliation claims extend to the Union, the Court should dismiss her retaliation claims for failure to state that factual claim.

**D.  Plaintiff's Claims of Religious Discrimination and Failure to Accommodate – Assuming Arguendo that Preclusion does not Apply – are Fatally Flawed by Plaintiff's Own Testimony.**

To state a *prima facie* case of religious discrimination, Plaintiff must show that: (a) she had a bona fide religious belief or was a member of an identifiable religion; (b) she was qualified for the position; (c) her beliefs or religion resulted in an adverse employment action; and (d) she was treated differently from members outside that class.[67] Plaintiff's cannot meet her initial threshold

---

[65] See Johnson v. McDonald, 623 Fed. Appx. 701, 704 (5th Cir. 2015) (dismissing Title VII retaliation claim where "the nearly two-year gap between the[protected activity] and alleged retaliation [] refutes any causal link between the two events."); Chhim v. Univ. of Texas, 2016 WL 154142, *5 (W.D. Tex. Jan. 11, 2016).

[66] Phillips v. United Parcel Serv., 2011 WL 2680725, *8 (N.D. Tex. June 21, 2011) (dismissing Title VII retaliation claim where "[t]he timing between the two actions and the protected activity (between nine months and two years)" did not establish a requisite causal connection).

[67] *Chumney v. Glasscock County Indep. Sch. Dist.*, 2019 U.S. Dist. LEXIS 233633, *15 (N.D. Tex. Mar. 6, 2019).

because there is no record evidence that the Union turned Plaintiff in to SWA based on her religion, or that the Union treated her less favorably than similarly situated non-Christian employees.

Plaintiff's underlying legal theory is that the Union violated her rights when former President Audrey Stone turned her into the company for harassment and bullying. This however, was in no way tied to Mrs. Carter's religious beliefs or alleged requests for religious accommodations:

> "A. Yeah, [Audrey Stone] tried to get me fired and she did.
>
> Q. Okay. And why do you believe that, you think she did that?
>
> MR. GILLIAM: Objection. Calls for speculation but go ahead and answer.
>
> A. Because I was dissenting against what they were doing as the union and that I had issues with -- I was a recall person, I had also opted out. There was much hate for the people that had opted out and much hate for the people that were supporting the recall.
>
> Q. Okay. So you believe that Ms. Stone tried to get you fired from Southwest Airlines because you were an objector, you opted out of the union, and because you took a stance in the recall effort, is that correct?
>
> A. That is correct." (Ex. 2 – Plaintiff's depo. p. 225:1—18.)

"The ultimate question in a Title VII disparate treatment claim remains whether a defendant took the adverse employment action against a plaintiff *because of* her protected status."[68] This evidentiary failure dooms her religious discrimination claim.[69] Plaintiff also cannot provide competent summary judgment evidence that the Union treated comparators, non-Christians and/or Christians holding differing views from her on the issue of abortion, more favorably.[70]

---

[68] Raj v. La. State Univ., 714 F.3d 322, 331 (5th Cir. 2013).
[69] *See Baker v. Am. Airlines, Inc.*, 2004 U.S. Dist. LEXIS 18810, *18-19 (N.D. Tex. Sept. 15, 2004) (granting summary judgment on discrimination claim where plaintiff admitted that she had no evidence that the stated reason for termination is pretext).
[70] *See Gibson v. Wayfair, Inc.*, 2018 U.S. Dist. LEXIS 107425, *10 (S.D. Tex. June 27, 2018) (granting summary judgment because plaintiff did not present evidence of non-Christian employees with similar misconduct that received more favorable treatment).

To state a *prima facie* case of religious discrimination based on failure to accommodate, a plaintiff must establish that she "had a *bona fide* religious belief that conflicted with an employment requirement, that [s]he informed the employer of h[er] belief, and that [s]he was discharged for failing to comply with the conflicting employment requirement."[71]

Indeed, Plaintiff's testimony continues on to confirm that she **never** requested a religious accommodation from the Union and in no way received improper representation from the Union during her Grievance process:

> Q. Okay. Now are you claiming that the union didn't represent you properly because of your religious beliefs at the step 2 or fact-finding meeting?
> A. Neither on those two. (Ex. 2 – Plaintiff's depo. p. 268:21—24.)
> ...
> Q: So the answer to my question is no, you did not request a religious accommodation from the union?
> A: Correct. (Ex. 2 – Plaintiff's depo. p. 270:9—11.)

As Plaintiff has now provided sworn deposition testimony that Audrey Stone's actions were not motivated by religiously discriminatory purposes nor did the Union fail to accommodate Plaintiff's religious beliefs, ultimately giving her proper representation during the Grievance process, Plaintiff's claims ultimately fail. In addition, Plaintiff Carter cannot present any evidence of a conspiracy to terminate her employment, thus her claims ultimately fail. Defendant SWA terminated Mrs. Carter's employment and there are no allegations of additional harm by the Union.

### III. CONCLUSION

The undisputed evidence shows that Southwest Airlines, and Southwest Airlines alone, made the decision to terminate Plaintiff's employment after receiving a complaint from SWA employee, and then Union President, Audrey Stone. Ms. Stone alerted SWA to Facebook posts

---

[71] *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000).

sent directly to her by Plaintiff. The videos and corresponding messages depicted graphic videos of aborted fetuses, calling Ms. Stone a murderer, and making threats to Ms. Stone's safety. As such, summary judgment is proper because the record contains no disputed issues of material fact underlying Plaintiff's claims. Defendant's motion should be granted.

Dated: September 9, 2021                    Respectfully submitted,

                                            /s/ Adam S. Greenfield
                                            Adam S. Greenfield
                                            Email:  agreenfield@candglegal.com
                                            *Board Certified in Labor & Employment Law by the Texas Board of Legal Specialization*

                                            **Cloutman & Greenfield, PLLC**
                                            3301 Elm Street
                                            Dallas, Texas 75226
                                            214.939.9222
                                            214.939.9229 FAX

                                            **COUNSEL FOR PLAINTIFF**


                            **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing instrument has been served upon all parties, via the CM/ECF system, which will send notification of such filing to all counsel of record, on this the  9th day of September, 2021, as follows:


                                            */s/ Adam S. Greenfield*
                                            Adam S. Greenfield