# EX. 1

# Transport Workers Union of America, AFL-CIO

**Harry Lombardo**
International President

**John Samuelsen**
International Executive Vice President

**Alex Garcia**
International Secretary-Treasurer

**John Bland**
Administrative Vice President

**Gary E. Maslanka**
Administrative Vice President

"We Move America"

**Executive Council**
**Vice Presidents**
Patricia Bowden
Charles Cerf
Michael Conigliaro
Dale Danker
Sean Doyle
Garry Drummond
Jerome Lafragola
Tom Lenane
Carl Martin
Thom McDaniel
Curtis Tate
Tony Utano
James Whalen

**Council Members**
Delisa Brown
Joe Carbon
John Chiarello
Brian Clarke
LaTonya Crisp-Sauray
John Feltz
Horace Marves
Gary Shults
Kevin Smith

**Executive Board**
Matthew Ahern
Bedennia Barnes
Richard Boehm
Jon Bradford
Ralph Darnell
Richard Davis
Derick Echevarria
Fred Fink
Todd Gage
Angel Giboyeaux
Amy Griffin
Jim Guido
Kevin Harrington
Maurice Jenkins
Don May
Mike Maves
John Menshon
Benyoel Morgan
Thomas Murray
J.P. Patafio
John Plowman
Dan Rivera
Richard Rocco
Audrey Stone
Dane Stricoff
Robert Taylor
Luis Ventura
David Virella
Clarence Washington
Eric Williams

November 19, 2013

Charlene Carter


I am in receipt of your letter dated September 29, 2013 and received in this office on November 1, 2013 stating that you want to resign as a member of **T.W.U.** and will continue to meet the lawful obligation of paying a representation fee to the union under its "union shop" or "agency shop" agreement with Southwest Airlines. You are required to also notify your Locals Secretary-Treasurer.

As a non-member you do not have a voice or a vote within **T.W.U.** However, as a condition of employment, you must make timely payments of a monthly fee in accordance with the Collective Bargaining Agreement and the **T.W.U. Agency Fee Policy,** of which a copy is enclosed.

Fraternally,

*Alex Garcia*

Alex Garcia
International Secretary-Treasurer
*AG: sg*
*opeiu-153*
*Enc.*

c:      Garry Drummond
        John Parrott, Secretary-Treasurer Local 556

**App.10**

# EX. 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION
 3    CHARLENE CARTER,              §
                                    §
 4         Plaintiff,               §
                                    §
 5    v.                            § Civil Action No.
                                    § 03:17-cv-02278-S
 6    SOUTHWEST AIRLINES CO.,       §
      AND TRANSPORT WORKERS         §
 7    UNION OF AMERICA LOCAL        §
      556,                          §
 8                                  §
           Defendants.              §
 9    _____

10         REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
11                      CHARLENE CARTER
12                     November 20, 2020

      _____
13    ********************************************************
14        PORTIONS OF TRANSCRIPT DESIGNATED CONFIDENTIAL:
15                  PAGE 132:13 THROUGH 134:6
                    PAGE 134:19 THROUGH 135:10
16
      ********************************************************
17
18
           REMOTE ORAL AND VIDEOTAPED DEPOSITION OF CHARLENE
19    CARTER, located at her residence in Aurora, Colorado,
      produced as a witness at the instance of the Defendant
20    Southwest Airlines Co., and duly sworn, taken in the
      above-styled and numbered cause on November 20, 2020,
21    from 10:02 a.m. to 4:36 p.m., before Joseph D.
      Hendrick, Certified Shorthand Reporter in and for the
22    State of Texas, reported by machine shorthand, pursuant
      to Notice and the Federal Rules of Civil Procedure and
23    any provisions stated on the record or attached hereto.
24
25    Job No. 4341722
```

Page 1

```
 1          A.      No.
 2          Q.      I want to take you next to the second
 3    paragraph and I will read the first sentence to you
 4    while you read along quietly.  "During the meeting, you
 5    admitted you posted graphic videos of aborted fetuses
 6    on Facebook and sent the same videos in a private
 7    Facebook message to another Southwest flight
 8    attendant."
 9                  Did I read that correctly?
10          A.      Yes, you did.
11          Q.      Is it true that you admitted during the
12    fact-finding meeting that you posted graphic videos of
13    aborted fetuses on Facebook?
14          A.      Yes.
15          Q.      Is it true that you admitted that you sent
16    the same videos in a private message to another
17    Southwest flight attendant?
18          A.      I sent them to Audrey Stone who was my
19    president of the union, yes.
20          Q.      And Ms. Stone was also employed as a flight
21    attendant by Southwest Airlines at that time, correct?
22          A.      She was employed, yes.
23          Q.      Well, I mean, my question is specific so I
24    want to make sure the record is clear.  She was
25    employed by Southwest Airlines as a flight attendant,
```

Page 28

```
 1     correct?

 2          A.     Correct.

 3          Q.     The next sentence reads, "You also admitted

 4     to sending the Flight Attendant a private message

 5     containing a picture of individuals wearing costumes

 6     depicting the female genitalia."

 7                 Did I read that correctly?

 8          A.     Yes, you did.

 9          Q.     Is it true that you admitted that in the

10     fact-finding meeting?

11          A.     Yes, it is.

12          Q.     Last sentence of that paragraph, "You

13     agreed that the pictures and videos were graphic."

14                 Did I read that correctly?

15          A.     Yes.

16          Q.     Did you admit that at the fact-finding

17     meeting?

18          A.     Yes.

19          Q.     Next I want to take you to two new

20     additional exhibits, and I'll have you look at both of

21     them before we discuss them.

22          A.     Will they just come up on the screen?

23          Q.     Yes, ma'am.  That's how all of -- that's

24     how I'm going to convey all of the documents to you

25     today.
```

Page 29

```
 1     the ones of the videos, pictures that you see.  The
 2     remaining were not -- were not a part of my
 3     fact-finding meeting.
 4         Q.    Now, do you acknowledge that all of these
 5     are messages that you sent to Ms. Stone?
 6         A.    Yes, as for being my president of the
 7     union, it was.
 8         Q.    And prior to sending the messages,
 9     beginning on the first page and continuing on to the
10     second page, did Ms. Stone report you to Southwest
11     Airlines?
12         A.    No.  As a matter of fact, we never even had
13     any communications.
14         Q.    Did Ms. Stone ever respond to you with
15     respect to any of these messages?
16         A.    No, she did not.  She was very hard to --
17     to speak with.
18         Q.    What efforts did you make to contact
19     Ms. Stone aside from sending these messages, if any?
20         A.    Through emails.
21         Q.    And --
22         A.    And going to a, you know, a union meeting
23     before I became an objector.
24         Q.    To the best of your recollection, what
25     emails did you send to Ms. Stone?
```

Page 32

 1          A.     The last time that I spoke with her was in

 2    2013, at a union meeting.

 3          Q.     Can you tell me about that conversation?

 4          A.     Well, I mean, it was a union meeting.  It

 5    was put forth -- you know, I mean, there was a lot of

 6    topics that were there.  One of them being that she was

 7    not the duly elected president.  They had taken out

 8    our -- our other team of elected officials.

 9          Q.     So was this a one-on-one conversation, or

10    was this just a general meeting environment?

11          A.     Well, everybody has a moment to speak at a

12    union meeting.

13          Q.     So were you standing up in the meeting and

14    speaking in front of the meeting to Ms. Stone, or were

15    you privately speaking to her on the side?

16          A.     No, it was in the meeting.

17          Q.     What did you say to Ms. Stone in that

18    meeting?

19          A.     I don't recall everything that I said that

20    day.

21          Q.     Do you recall anything that you said that

22    day?

23          A.     I read out loud the bylaws that we want to

24    change, I do remember that, and that I read out the --

25    basically the coup that had been talked about with all

                                           Page 34

1   of them now that were representing us to take out the

2   last group, and that would have been Stacy Martin,

3   Chris Click, Jerry Lindermann, Dawn Wann, and Jana

4   Deloache.

5       Q.    Did Ms. Stone respond to you?

6       A.    She did not respond.  It was basically a

7   document that I was able to read, several documents

8   that I was able to read, regarding some of the things

9   that were said by the people that actually now were

10  representing us.

11      Q.    But she -- but she never had a direct

12  response to you.

13      A.    No.  As a matter of fact, she's never

14  really had a direct response with a whole lot of

15  people.  She's very hard -- she was very hard to get

16  ahold of.

17      Q.    Was this the first time you ever engaged

18  directly with Ms. Stone?

19      A.    Yes, it was.

20      Q.    Would it be fair to characterize that

21  meeting as confrontational?

22      A.    It wasn't confrontational.  It was just

23  basically stating some facts that were -- that we all

24  knew about.

25      Q.    Were you upset?

Page 35

PORTIONS OF TRANSCRIPT DESIGNATED CONFIDENTIAL

1    A.    I don't have -- I don't have Exhibit

2    Number 4.

3         Q.    Sure.  It should populate in just a moment.

4         A.    Okay.  I have it.  I've got it.

5         Q.    And I will represent to you that this is an

6    excerpt of volume 2 of the deposition -- of the

7    arbitration transcript --

8         A.    Okay.

9         Q.    -- taken on December 8th, 2017.  It has

10   been excerpted to include only your testimony but all

11   of your testimony.  I would like to direct you

12   specifically to page 359 using the page numbers in the

13   upper right-hand corner.

14        A.    Okay.  Okay.

15        Q.    And if we look beginning at line 8 through

16   line 24, can you read that quietly to yourself and

17   please tell me when you have finished.

18        A.    Okay.

19        Q.    So in this testimony when your counsel was

20   questioning you, you were asked if you would send the

21   same messages again in the future and you say you would

22   not, correct?

23        A.    I would not use the Facebook Messenger.  I

24   would walk these into her office.

25        Q.    So your sworn testimony today is when you

1    say, "I realize this is a mistake.  I realize that I

2    need to do it in a different manner, and I'm sorry for

3    the manner that I did send it through and I take full

4    responsibility for it," you meant you would walk

5    pictures of abortions in to Ms. Stone?

6             A.      I would have gone into her office instead

7    and had a meeting with her at that point, because this

8    would have never happened as in getting me fired, they

9    used the social media policy in this to get me fired.

10   If this would have been at a union meeting, which they

11   get heated and things are said and things are produced

12   in union meetings, I would have never been fired.

13            Q.      So when you testified before the arbitrator

14   under oath, "I'm sorry for the manner that I did send

15   it through," what did you mean?

16            A.      I'm sorry for the manner that it was sent

17   through a Facebook Messenger.

18            Q.      So you were not apologizing for the tenor

19   of the messages?

20            A.      When she was at the march, she saw these

21   exact same type of pictures through the march because

22   they were on big screens, and there is no way, unless

23   she shielded her face through the entire march, would

24   she have not seen some of these exact, if not more in

25   detail.

                                                    Page 54

```
 1    fact-finding meeting when I said I don't -- I -- I
 2    don't believe in abortion and I don't believe that
 3    our -- my union president should have taken our dues
 4    and spent it on a march.  This -- this had everything
 5    to do with just that march.
 6          Q.     Ms. Carter, what I'm asking you is what is
 7    it you're saying Southwest Airlines should have done to
 8    accommodate your religious beliefs as soon as you
 9    raised them?
10              MR. GILLIAM:  Objection to the extent it
11    calls for a legal conclusion.  You can answer.
12    BY MR. CORRELL:
13          Q.     Are you testifying that they should have
14    just said never mind to this --
15          A.     They should not have fired me over my
16    Christian beliefs.
17          Q.     Okay.
18          A.     After I expressed them in the union meeting
19    and we could have sat down and at least had a
20    conversation regarding that.
21          Q.     So is there any limit to what you would be
22    allowed to say to express your Christian beliefs to
23    other employees of Southwest Airlines in your personal
24    view?
25              MR. GILLIAM:  Objection.  Incomplete
```

Page 79

```
 1    hypothetical.
 2        A.    They should have accommodated this.
 3    BY MR. CORRELL:
 4        Q.    My question to you, Ms. Carter, is not
 5    whether they should have accommodated this -- have
 6    accommodated this.  I'm trying to find the parameters
 7    of the accommodation you claim you were denied.  You
 8    understand you are claiming in your lawsuit you were
 9    denied an accommodation?
10        A.    Yes, I was denied an accommodation.
11        Q.    Do you understand that an accommodation is
12    an exception from a policy to allow for religious
13    beliefs?
14            MR. GILLIAM:  Objection.  Asks for a legal
15    conclusion.
16        A.    I'm just gonna tell you right now I believe
17    that I should have had an accommodation on this
18    specific one, yes.
19    BY MR. CORRELL:
20        Q.    And what would that have looked like?
21        A.    I don't know how they write up the
22    accommodations.  I don't know.  I -- I never even knew
23    you had to have an accommodation.  I believe my
24    accommodation falls under Title VII of the civil rights
25    that I have as a Christian or a believer, that due --
```

Page 80

1   and due to the fact that my union president spent money

2   to go to a march that supported abortion.  If you're

3   going to go to a march regarding this type of behavior,

4   this reflected that behavior and I should have had my

5   accommodations met once I said I was a Christian, but

6   honestly, this should have also been through the union

7   representatives, they knew where I stood on this.

8       Q.      So your testimony is that you believe

9   Southwest should allow you to say whatever you want

10  however you want if it is in support of your Christian

11  beliefs?

12              MR. GILLIAM:  Objection.  Incomplete

13  hypothetical.

14      A.      In this context --

15  BY MR. CORRELL:

16      Q.      Hang on.  Hang on.

17      A.      In this context, yes.

18      Q.      Hang on, Ms. Carter.  Your testimony --

19              MR. CORRELL:  Not a hypothetical, counsel.

20  BY MR. CORRELL:

21      Q.      -- is that the accommodation you should

22  have been provided is the right to say whatever you

23  want however you want if it is in support of your

24  Christian beliefs?

25      A.      Again --

                                            Page 81

1    Q.    So Ms. Ross who we spoke about earlier, was
2    she your rep at step 2 then?
3    A.    She was the actual person who did my case
4    through the union.
5    Q.    What do you mean by that?
6    A.    She was the one who did the grievance.  She
7    was the grievance person.
8    Q.    So she did not attend either hearing with
9    you?
10    A.    She attended the second step meeting.
11    Q.    So Chris Sullivan was the only union
12    representative who attended the first step meeting with
13    you?
14    A.    That's correct.
15    Q.    Between the time the fact-finding ended and
16    when you received Exhibit 1, the termination letter,
17    did you have any more interaction with the company
18    individuals who appeared at the fact-finding meeting?
19    A.    No, I don't believe so.
20    Q.    After you received the termination letter,
21    you grieved that decision, correct?
22    A.    Correct.
23    Q.    And that triggered a step 2 hearing, right?
24    A.    Correct.
25    Q.    What can you tell me about the step 2

Page 86

1    I had never filed a grievance before so I was unclear

2    of how things happened.

3         Q.    Other than providing you with that

4    information, did Ms. Wann do anything else that you are

5    aware of in response to your communications with her at

6    this time?

7         A.    No.

8         Q.    What did Ms. Deloache provide you, if

9    anything?

10        A.    The same type of thing.

11        Q.    Anything she provided that Ms. Wann did

12   not?

13        A.    No.

14        Q.    Other than Ms. Wann and Ms. Deloache, were

15   you communicating with anyone -- and Ms. Jackson, were

16   you communicating with anyone else about your step 2

17   proceedings at this time?

18        A.    I don't believe so.

19        Q.    Now, the result of your step 2 hearing was

20   an offer of reinstatement subject to a last chance

21   agreement, correct?

22        A.    Correct.

23        Q.    And you did not accept that last chance

24   agreement, correct?

25        A.    Correct.

Page 91

```
 1                  (Deposition Ex. 6 marked)
 2     BY MR. CORRELL:
 3          Q.     I am going to show you what will be marked
 4     as Exhibit 6 to your deposition.  Just a moment here.
 5     You should have that in just a moment here and it
 6     should populate, like I said, as Exhibit 6.  Let me
 7     know when you have that.  I know it may take a minute.
 8          A.     Okay.  I have it.
 9          Q.     Do you recognize this document?
10          A.     Yes.
11          Q.     What is this document?
12          A.     This is the settlement statement that they
13     offered me.
14          Q.     Why did you decline this offer of
15     reinstatement?
16          A.     Several reasons.  One, first big -- the
17     biggest reason is that I have known flight attendants
18     that have accepted this, and as soon as they accepted
19     it, somebody had turned them in for something that they
20     had done in the past and then they got fired again.
21                 Another reason I did not accept this was
22     due to the fact that they wanted to put a letter in my
23     file for 24 months, which exceeded the contract.  It
24     was only supposed to be in there at the -- at the very
25     most for 18 months, so which that meant if, you know, I
```

Page 92

1    A.    Through her -- I believe her fact-finding

2  meeting.

3    Q.    Okay.  Are you -- and how did Ms. Immamovic

4  find out that Ms. Stone allegedly turned her in for

5  social media violations?

6    A.    That I do not know.

7    Q.    Are you claiming as part of your lawsuit

8  that the union did not represent you properly during

9  the fact-finding meeting?

10    A.    During the fact-finding meeting?  Chris

11  Sullivan was amazing.

12    Q.    And he was provided to you by the union,

13  correct?

14    A.    Yes.  But I wouldn't have been there if

15  Audrey hadn't turned me in.

16    Q.    All right.  That wasn't my question.  I

17  appreciate that, Ms. Carter.

18        My question was, Mr. Sullivan was there on

19  behalf of the union to represent you, correct?

20    A.    Chris Sullivan was there on behalf of the

21  union on his -- yes, to represent me.

22    Q.    And did an amazing job?

23    A.    He did, yes.

24    Q.    All right.  And what about step 2?

25    A.    Step 2, Beth Ross and Becky Parker.  I did

Page 266

```
1     all of my step 2.

2          Q.     Are you claiming as part of your lawsuit

3     that the union did not represent you properly during

4     your step 2 hearing?

5          A.     I represented myself for the most part in

6     my step 2.  I did all of the research and brought forth

7     all of the information.  Becky and Beth did not.  They

8     were just there as representatives.

9          Q.     Okay.  And that's -- I appreciate you

10    elaborating.  My question is a little bit different.

11    Are you claiming as part of this lawsuit that the union

12    did not properly represent you during your step 2

13    hearing?

14         A.     They were there and represented me, yes.

15         Q.     Okay.  That's still not answering my

16    question, ma'am.  My question is as part of this

17    lawsuit are you claiming that the union did not

18    represent you properly during your step 2 hearing?

19         A.     They represented me properly, both Becky

20    and Beth.

21         Q.     And you previously testified that the

22    process was fair and complete, correct?

23         A.     With --

24                MR. GILLIAM:  The --

25                THE WITNESS:  Go ahead.
```

Page 267

1    BY MR. GREENFIELD:

2        Q.    Is that correct -- was fair and complete?

3            MR. GILLIAM:  Objection, vague.

4        A.    Within my second step meeting, yes.

5    BY MR. GREENFIELD:

6        Q.    Okay.  And that it was Southwest who made

7    the decision to terminate you, correct?

8        A.    I believe it was Ed Schneider.

9        Q.    Okay.  And do you have any evidence that

10   the union made the decision to terminate you?

11       A.    No.

12       Q.    Okay.  Are you claiming as part of this

13   case that the union discriminated against you during

14   your grievance process?

15       A.    Can you repeat that?

16       Q.    Yeah.  Are you claiming as part of your

17   lawsuit that the union is discriminating --

18   discriminated against you during your grievance process

19   in either the fact-finding or step 2 hearing?

20       A.    No, neither on those two.

21       Q.    Okay.  Now are you claiming that the union

22   didn't represent you properly because of your religious

23   beliefs at the step 2 or fact-finding meeting?

24       A.    Neither on those two.

25       Q.    Are you aware of any other individuals who

                                            Page 268

```
 1          A.     No, they did not.
 2          Q.     They did not provide you a religious
 3     accommodation?
 4          A.     They did not provide me a religious
 5     accommodation.
 6          Q.     Did you request a religious accommodation
 7     from the union?
 8          A.     I didn't know I had to.
 9          Q.     So the answer to my question is no, you did
10     not request a religious accommodation from the union?
11          A.     Correct.
12          Q.     Okay.  Are you aware of any other
13     individuals that the union has not accommodated -- who
14     has not -- not provided a religious accommodation?
15          A.     I do not have that knowledge.
16          Q.     Okay.  Are you aware if you filed an EEOC
17     charge for religious discrimination against the union?
18          A.     Yes, I did.
19          Q.     Okay.  And you provided that documentation?
20          A.     Yes, I did.
21                 THE WITNESS:  I can't do it right now.  I
22     know.  I know.
23     BY MR. GREENFIELD:
24          Q.     Is it your testimony that -- when was
25     the -- okay.  Let me take a step back.
```

Page 270

PORTIONS OF TRANSCRIPT DESIGNATED CONFIDENTIAL

```
 1              I, CHARLENE CARTER, have read the foregoing
 2    deposition and hereby affix my signature that same is
 3    true and correct, except as noted above.
 4
 5                         _____
      CHARLENE CARTER
 6
 7    STATE OF  _____)
 8    COUNTY OF  _____)
 9
10              Before me _____ on this day
11    personally appeared CHARLENE CARTER, known to me (or
12    proved to me on the oath of _____ or
13    through _____ (description of identity card
14    or other document)) to be the person whose name is
15    subscribed to the foregoing instrument and acknowledged
16    to me that he executed the same for the purposes and
17    consideration therein expressed.
18              Given under my hand and seal of office this
19    _____ day of _____, _____.
20
21                         _____
      Notary Public in and for the
22    State of _____
23
24
25
```

                                                  Page 278

```
 1                   REPORTER'S CERTIFICATION

 2              DEPOSITION OF CHARLENE CARTER

 3                      November 20, 2020

 4              I, Joseph D. Hendrick, Notary Public and

 5      Certified Shorthand Reporter in the State of Texas,

 6      hereby certify to the following:

 7              That the Witness, CHARLENE CARTER, was duly

 8      sworn by the officer and that the transcript of the

 9      oral deposition is a true record of the testimony given

10      by the witness;

11              I further certify that pursuant to FRCP

12      Rule 30(f)(1) that the signature of the deponent:

13                   X      was requested by the deponent or

14      a party before the completion of the deposition and is

15      to be returned within 30 days from date of receipt of

16      the transcript;

17              _____ was not requested by the

18      deponent or a party before the completion of the

19      deposition;

20              I further certify that the amount of time

21      used by each party is as follows:

22          Mathew B. Gilliam - 00:00:00

23          Michael A. Correll - 04:54:50

24          Adam S. Greenfield - 01:08:13

25          Edward B. Cloutman III - 00:00:00
```

Page 279

```
 1                    I further certify that I am neither counsel
 2        for, related to, nor employed by any of the parties or
 3        attorneys in the action in which this proceeding was
 4        taken;
 5                    Further, I am not a relative or employee of
 6        any attorney of record, nor am I financially or
 7        otherwise interested in the outcome of the action.
 8                    Subscribed and sworn to on this date:
 9        December 8, 2020.
10
11
12
13
14
15
16
17
                      Joseph D. Hendrick, CSR #947
18                    Expiration Date: 04/30/2021
                      Notary Comm. Exp. 01/13/23
19                    Veritext Legal Solutions
                      Firm Registration No. 571
20                    300 Throckmorton Street, Ste. 1600
                      Fort Worth, TX  76102
21                    Telephone (800) 336-4000
22
23
24
25
```

Page 280

```
 1   Mbg@nrtw.org

 2                    December 9, 2020

 3   RE: Carter, Charlen v. Southwest Airline Co & Transport

 4   DEPOSITION OF: Charlene Carter (# 4341722)

 5        The above-referenced witness transcript is

 6   available for read and sign.

 7        Within the applicable timeframe, the witness

 8   should read the testimony to verify its accuracy. If

 9   there are any changes, the witness should note those

10   on the attached Errata Sheet.

11        The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14        According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                         Yours,

19                         Veritext Legal Solutions

20

21

22

23

24

25

                                        Page 281
```

# EX. 3 - REMOVED

# EX. 4

‹ **Home (1)**          **Charlene Carter** ›
                          Messenger          📞  📹

This is what you supported during your Paid Leave with others at the Women's MARCH in DC....You truly are Despicable in so many ways...by the way the RECALL is going to Happen and you are limited in the days you will be living off of all the SWA FAs..cant wait to see you back on line.



0:16

**Samina Shah added a new video.**

An aborted baby alive even after the abortion. This is the reason abortion is murder and Hara...

Type a message...

EXHIBIT
0003

📷  🖼  ☺  GIF  🎮  ⚬⚬⚬  👍

SWA000595



‹ **Home (1)**

**Charlene Carter** ›
Messenger

 

TUE 13:33

TWU-AFL-CIO and 556 are
supporting this Murder...



**My Page - My Opinions added a new
video: Abortion.**

#Democrats - This is what you support? If its...

My Page - My Opinions



Did you know this....Hmmmm
seems a little counter productive
don't you think....you are nothing
but a SHEEP in Wolves Clothing or
you are just so un-educated you
have not clue who or what you were
marching for! Either way you should
not be using our DUES to have
Marched in this despicable show of
TRASH!

Type a message...

     

SWA000596

Cancel                    **Comments**



**My Page - My Opinions**
February 4 at 8:08pm · 🌐

#Democrats - This is what you support? If its your body your choice, who is this laying in the fucking bowl? It doesn't looks like your body. #evil #murder #ownit #abortion



👍 Like          💬 Comment          ➤ Share

😢😠👍 **1K**

**3,915 Shares**

💬 View previous comments...



**My Page - My Opinions**
Just so you all know, this has been reported and it is not a violation. Stop trying this dousche tried

SWA000607

Morally bankrupt people are great at deception. They put others in situations so that they can take the fall for their poor judgments, lies, greed, and betrayals. They are not above providing false information to cover their tracks and they are skilled at placing blame other than where it belongs.

Jealousy and Arrogance
Jealousy is a driving force of morally bankrupt people. They see that you have something that they want, and they are going to get it from you at all costs. Their jealousy drives them to the point where nothing matters but "winning." Jealousy is such a beast and so powerful that it tests even the strongest moral character.

Morally bankrupt people love to brag about what they have and what you do not have. They use power unnecessarily and abuse their status to make others look small, incompetent, weak, or foolish. They always see themselves as better than you and will tell you so at any

 **Home**  Charlene Carter ›
Messenger

given moment.

**Fairness**
The morally bankrupt person can't even spell the word fairness. They are driven by what is best for them, not what is best for the good of the whole. They can usually justify any action as being fair, because they are more skilled at deception than at being fair.



03/10/2015, 11:32

inˈtegrədē/
noun
1.
the quality of being honest and having strong moral principles; moral uprightness.
"he is known to be a man of integrity"
synonyms:   honesty, probity, rectitude, honor, good character, principle(s), ethics, morals, righteousness, morality, virtue, decency, fairness, scrupulousness, sincerity, truthfulness, trustworthiness
"I never doubted his integrity"

Type a message...

SWA000599



⟨ **Home**

**Charlene Carter** ⟩
Messenger

 

decency, fairness, scrupulousness, sincerity, truthfulness, trustworthiness
"I never doubted his integrity"
2.
the state of being whole and undivided.
"upholding territorial integrity and national sovereignty"
synonyms:    unity, unification, coherence, cohesion, togetherness, solidarity
"the integrity of the federation"



Integrity.... That is what Lynn and her Team will bring to TWU 556 so sad that this Un-Elected board has none.... Remember you all work for the FAs not the other way around!!!



03/11/2015, 12:32

Had to share with you...
This came from a friend of mine in Denver who also has had the pleasure of the disrespect from a few on this Un-Elected

Type a message...

     

SWA000600


Had to share with you... This came from a friend of mine in Denver who also has had the pleasure of the disrespect from a few on this Un-Elected Board!! He did Say this about Flight Attendants.... What kind of a message does that send when BOARD Members say things like this about the Very Flight Attendants he says he Represents.... Hmmmm very Un-Professional at the very Least!!! To think this iis the very Character (Statement from his own mouth) that we as Flight Attendants PAY FOR!!! Their is such a lack of Morals on this Board.... PRAYING that all of you are Voted Out of office!! Then we can bring back Truth.

SWA000601

Type a message...

 **‹ Home**

**Charlene Carter** ›
Messenger

 

all of you are Voted Out of office!! Then we can bring back Truth, Transparency, Integrity and UNITY!!!





Oh dude NOTE.... This person who sent this to me Voted a straight ticket for Lynn and Team. YAY



Oops got so excited about their vote that misspelled Side Note.... But

Type a message...

      

SWA000602

**Charlene Carter** ›
Messenger

Oh dude NOTE.... This person who sent this to me Voted a straight ticket for Lynn and Team. YAY

Oops got so excited about their vote that misspelled Side Note... But because you are so Smart I am sure you got the meaning of the message.

03/11/2015, 20:22

This is what Radical Unions like TWU use to get their WAY!! Same things being used by this Un-Elected Board....but people are waking up to the tactics and someday the Chickens will come home to ROOST. Praying to GOD it comes sooner then latter.

Saul Alinsky's 12 Rules for Radicals

Here is the complete list from Alinsky.

* RULE 1: "Power is not only what you have, but what the enemy thinks

Type a message...

SWA000603

use to get their WAY!! Same things being used by this Un-Elected Board....but people are waking up to the tactics and someday the Chickens will come home to ROOST. Praying to GOD it comes sooner then latter.

Seen

Saul Alinsky's 12 Rules for Radicals

Here is the complete list from Alinsky.

* RULE 1: "Power is not only what you have, but what the enemy thinks you have." Power is derived from 2 main sources – money and people. "Have-Nots" must build power from flesh and blood. (These are two things of which there is a plentiful supply. Government and corporations always have a difficult time appealing to people, and usually do so almost exclusively with economic arguments.)
* RULE 2: "Never go outside the expertise of your people." It results in confusion, fear and retreat.

Type a message...

SWA000604

* RULE 3: "Whenever possible, go outside the expertise of the enemy." Look for ways to increase insecurity, anxiety and uncertainty. (This happens all the time. Watch how many organizations under attack are blind-sided by seemingly irrelevant arguments that they are then forced to address.)

* RULE 4: "Make the enemy live up to its own book of rules." If the rule is that every letter gets a reply, send 30,000 letters. You can kill them with this because no one can possibly obey all of their own rules. (This is a serious rule. The besieged entity's very credibility and reputation is at stake, because if activists catch it lying or not living up to its commitments, they can continue to chip away at the damage.)

* RULE 5: "Ridicule is man's most potent weapon." There is no defense. It's irrational. It's infuriating. It also works as a key pressure point to force the enemy into concessions. (Pretty crude, rude and mean, huh? They want to create anger and fear.)

* RULE 6: "A good tactic is one your

‹ Home

Charlene Carter ›
Messenger

\* RULE 6: "A good tactic is one your people enjoy." They'll keep doing it without urging and come back to do more. They're doing their thing, and will even suggest better ones. (Radical activists, in this sense, are no different that any other human being. We all avoid "un-fun" activities, and but we revel at and enjoy the ones that work and bring results.)

\* RULE 7: "A tactic that drags on too long becomes a drag." Don't become old news. (Even radical activists get bored. So to keep them excited and involved, organizers are constantly coming up with new tactics.)

\* RULE 8: "Keep the pressure on. Never let up." Keep trying new things to keep the opposition off balance. As the opposition masters one approach, hit them from the flank with something new. (Attack, attack, attack from all sides, never giving the reeling organization a chance to rest, regroup, recover and re-strategize.)

\* RULE 9: "The threat is usually more terrifying than the thing itself."

Type a message...

SWA000606

* RULE 9: "The threat is usually more terrifying than the thing itself." Imagination and ego can dream up many more consequences than any activist. (Perception is reality. Large organizations always prepare a worst-case scenario, something that may be furthest from the activists' minds. The upshot is that the organization will expend enormous time and energy, creating in its own collective mind the direst of conclusions. The possibilities can easily poison the mind and result in demoralization.)

* RULE 10: "If you push a negative hard enough, it will push through and become a positive." Violence from the other side can win the public to your side because the public sympathizes with the underdog. (Unions used this tactic. Peaceful [albeit loud] demonstrations during the heyday of unions in the early to mid-20th Century incurred management's wrath, often in the form of violence that eventually brought public sympathy to their side.)





●●○○○ AT&T LTE 09:37 99%

Home

Charlene Carter >

Messenger

some and not against others, so your letter was in perfect timing!! Hope to see this Denver Flight Attendant back on line VERY Soon!!!

Done 1 of 6

My Attorney called it Blatant Discrimination!!! Just saying... Wonder who on the EB called in this favor for Brian???? Doesn't matter it shows Calaberation and both parties

Type a message...

Aa GIF

 ‹ **Home**  **Charlene Carter** › 

Messenger

shows Calaberation and both parties could suffer, because they are applying it to only a few and that is a NO NO, they are Blatantly ignoring their own Company Policies.... Hmmmm that sounds like corruption.... Wonder who it was in the chain of Management allowed this to happen.... I know that if an attorney takes this that he will find out!! Hope all this gets worked out in a timely manner for this flight attendant.

 And Nicely worked out.

03/24/2015, 13:05

Hmmmm looks likes there is another GROUP that is not happy with TWU...REALLY??????

TWU LOCAL 577 IS NOW ATTEMPTING TO DECERTIFY TWU. This letter below from Local 577 Contract negotiators, Debra Peterson-Barber and Katie Fowle. THEY QUIT!!
--------

Type a message...

      

SWA000609


 
03/24/2015, 13:05

Hmmmm looks likes there is another GROUP that is not happy with TWU...REALLY??????

TWU LOCAL 577 IS NOW ATTEMPTING TO DECERTIFY TWU. This letter below from Local 577 Contract negotiators, Debra Peterson-Barber and Katie Fowle. THEY QUIT!!
---------
Subject: NT resignation
Dear Local 577 members,
For two years our group has been in mediation, with little or no movement. There have been frustrations on the line that the TWU is not living up to the promises they made.
Over the past several months, your NT has worked hard to come up with a plan that would close our contract and give the flight attendants of Allegiant the protection they deserve. With the very real potential of a pilot strike, it was imperative that we act swiftly. Unfortunately, the TWU did not approve the plan we

Type a message...

      

SWA000610

that we act swiftly. Unfortunately, the TWU did not approve the plan we developed because it did not fit their political interests.

Because we could no longer support the TWU in the direction they are taking this campaign, we officially resigned our positions as Negotiating Team members yesterday morning.

We believe this work group needs protection. We believe we deserve fair working conditions and a legally binding contract; but we couldn't stand idly by and lead this work group along a path that we feel does not have the best interests of the flight attendants in mind.

By now you've no doubt heard from the Twu about their new restructure of the NT and their new strategic plan moving forward. We are very sorry that it had to happen like this and we did not take the decision lightly, but the political position of the TWU should not be what is guiding our direction. If our leaving inspires the TWU to do what is necessary to secure our contract,

Type a message...

SWA000611

‹ **Home**

**Charlene Carter** ›
Messenger

inspires the TWU to do what is necessary to secure our contract, then it will be worth it.
Respectfully,
Debra Barber (LAS) & Katie Fowle (BLI)



YEP...Not working for the Common Good of the Flight Attendants....We could have told them that about TWU!! Chickens are coming home to ROOST!....wonder if Virgin will be saying the same things....I have friends over there....but there are many that are already having REMORSE in voting TWU in...



04/01/2015, 10:10

Hey where did Mr. Talburt GO? Will there be another Favor called in, and to think you condoned his behavior along with Brett and the rest!! Really shows your lack of Morals....praying that changes!



05/01/2015, 21:24

Well well well Brian is back and so

Type a message...

     

SWA000612


**Charlene Carter** ›
Messenger

Well well well Brian is back and so are many more I here! Some though had to wait almost a year to get their jobs back or at least get a settlement from being WRONGLY Fired!!!! I know you worked very hard for Brian... I hear for 2 days strait!!! Now what I want to know is why you will do this for him it not others???? That seems to be a little biased!!!! Did the others not deserve the same HARD WORK that you seem to put in for Brian? Guess not. My attorney said this is not good for the Union or the Company to show favoritism!! Especially when I know a Flight Attendant in Denver that you all know about (Rena or Irene) she should have never been fired for her post on SM but for some reason she has fallen at the end of the line... Is it because she is not important enough???? They also Fired her while she was still under Concentra OJI observation. Personally I do not believe the Company can fire anyone for anything they say on their Private

Type a message...

SWA000613

...our observation. Personally I do not believe the Company can fire anyone for anything they say on their Private FB Page unless it is a threat.... Do they not know of the First Amendment to the Constitution??? It trumps what they are firing people for. Do I think Brian should have lost his Job NO except he did use the word Execute in his FIRST firing!!!! That to me was a threat, even my attorney believes so, but the Company has set a Persistence on what they will allow and now they have set themselves up for big trouble along with our Union if they Fire Others for anything LESS and because you all have fast tracks his reinstatement before others shows your discrimination towards the others that have had to wait to get representation... Tell me again why we pay you at TWU-AFL-CIO and 556?? You can nitpick and choose what or who you will represent and that is exactly what you all are doing and have done!! There is a whole list of people who are watching and waiting to see if you all and the company do the RIGHT THING. I

others that have had to wait to get representation... Tell me again why we pay you at TWU-AFL-CIO and 556?? You can nitpick and choose what or who you will represent and that is exactly what you all are doing and have done!! There is a whole list of people who are watching and waiting to see if you all and the company do the RIGHT THING. I would hate to see this go to a Labor Attorney and the Media for the deliberate Corruption between TWU AND SWA. But there are many waiting in the wings to see if TWU and SWA do just that THE RIGHT THING and reinstate and stop harassing people about their PERSONAL opinions they express on FB.... It is a violation of our Constitutional Rights!!!! PERIOD Rena said you are working on her case but sure is not going as fast as Brian's no matter what he deserves your best just like Brian got NO MATTER WHAT that is why we have a Union RIGHT!! This another thing my attorney has told me. I am sick of the CORRUPTION and so are others. Praying you all

 

 
my attorney has told me. I am sick of the CORRUPTION and so are others. Praying you all

di your very best for all the rest of us out here on line!!! Watching and waiting. Have a wonderful evening Audrey



05/05/2015, 13:59

Well you guys have done it again....took and threw out the VOTE of the Dallas Flight Attendants....here are just a few comments about your Corrupt WAYS are being voiced! We just may ge a whole lot more to OPT out of this Corrupt UNION!!

Well if didn't take long for our local to get rid of a newly elected board member!!! Record time someone call The Guinness Book Of World Records!!!! BR Ricks the newly elected DEBM OF DALLAS Has been removed. Something smells

Well, Audrey Stone & Co Removed BR Ricks from his position as Dallas Base Rep. Stating he was not

Type a message...

      

SWA000616

Well, Audrey Stone & Co Removed BR Ricks from his position as Dallas Base Rep. Stating he was not residing in Dallas. BR was on the ballot which means due diligence was applied and he is a qualified candidate.
BR has a Dallas Address....

Well Dallas Flight Attendants Your Union Board just removed the Dallas Domicile Representative! After a few hours in boards they took away your vote and your voice! Shameful dirty and low! Just my humble opinion.

They claim he didn't have a DAL address? I'm not even sure he needs a DAL address based on this bylaw. What does reside in base even mean? Another dysfunctional bylaw.

b) Domicile Executive Board Members must be based and reside in the Domicile they represent. In the event a Domicile Executive Board Member relocates outside of his/her Domicile the position will automatically be considered

Type a message...

SWA000617



Domicile the position will automatically be considered vacated. A Member who is based and resides in that Domicile must fill the vacated position.

If you don't like the VOTE just overturn it....yep...that is Corruption at its best! I honestly do not know how you all SLEEP at NIGHT...



I think we need a RECALL just like we had with Stacey and CREW!!!

The Union is Carpet Bombing AGAIN... that has been your tactic since you all took over, you like the VOTE only when it is for YOU and YOUR People! Disgusting....Hope this Membership wakes up soon to the BACK DOOR Deals and Dirty Politics you all seem to THRIVE ON! and to think we all pay your Salaries....



Yep, but here's the thing...they're getting away with it because no matter how we vote, our vote is irrelevant. Very frustrating!

Type a message...

SWA000618

  

‹ **Home**

**Charlene Carter** ›
Messenger

Yep, but here's the thing...they're getting away with it because no matter how we vote, our vote is irrelevant. Very frustrating!



But he wasn't on their side. They made it their mission and succeeded. Go figure!

Our REP in Denver does not live in DALLAS....so your excuse DOESN'T hold UP Period!!!



Andrea does not live in Dallas either

OUR REP in Denver does not have a Denver Address....it is Fort Collins!! lest split hairs here.....GOD WE ARE SICK OF THIS



As I recall Audrey didn't officially live in base when she was BWI Debm she had a place there... If this along with the 2012 election doesn't open your eyes nothing will.



If this does not fly as the Excuse

Type a message...

      

SWA000619



‹ **Home**

**Charlene Carter** ›
Messenger

 



If this does not fly as the Excuse wonder what you will put out to cover the LIE???? We are all waiting!!!

This is outrageous! He lives with Sarah in Dallas! What about the Denver rep that lives in Fort Collins?

It's because Denver rep is in their "club"



"We" need to DO something about this and not let them get away with this. ...again! !

Didn't Thom McDaniel live in Houston the entire time he was Pres?

I know I supported that the representative should live in city they represent, but I also wanted my Pres. to live in DAL and not in a house that we paid for... This seems to just be a smoke screen to remove the DAL rep..



Type a message...

     

SWA000620



  
< **Home**   Charlene Carter >
Messenger

 There you have just a few of so many who are talking about this....hope we as Opt Out People get MORE to join in...I know there is a magic number when it will really hurt TWU in the BANK ACCOUNT and maybe with all the you are doing to show that you could careless for the ones who voted then just maybe we will reach that critical number....slow and methodical is what our GROUP is and getting the info out to each and every FLIGHT Attendant is the GOAL....especially when you all pull this again!! Shows who you Support and it isn't the FAs!

 it's criminal. Audrey has taken it upon herself to cast out Dallas votes completely. How would everyone feel if someone you elected was told they couldn't do it after the fact? No trial. No charges just locked him out. God damn it I'm tired of everyone just sitting around and pretending everything is okay. This is our lives our futures everyone. Wake the frick up 

Type a message...

     

SWA000621

05/06/2015, 17:02

379 DAL votes wasted and tossed down the drain.
That's the Unity President Audrey Stone is calling for.





Yep this is why I have Opted OUT!!!
Votes don't matter!!

05/10/2015, 16:05



BR Ricks, removed from his ELECTED TWU Executive
Board position because Audrey Stone claims he doesn't
live in the Dallas base yet Southwest Airlines seems to think
he lives in the Dallas base.
Welcome to 556 y'all.

●●●○○ AT&T 4G    4:51 PM    ≵ 93% ▬

‹ BR          3 of 3

Type a message...

Aa  📷  🖼  ☺  GIF  🎮  ⚬⚬⚬  👍

SWA000622



‹ **Home**

**Charlene Carter** ›
Messenger



BR Ricks, removed from his ELECTED TWU Executive
Board position because Audrey Stone claims he doesn't
live in the Dallas base yet Southwest Airlines seems to think
he lives in the Dallas base.
Welcome to 556 y'all.

●●●○○ AT&T 4G    4:51 PM    93% ▮

‹ BR     3 of 3

Write a comment...



Yep more LIES from all of you and
your Sheer CORUPT ways!!! So glad
others are waking up to what this
Union stands for and its not We the
Flight Attendants!!

What's that D word I like so much....
Hmmm maybe just maybe one day
we will see it happen!! Or better yet
we WIN the Law Suite that we have

Type a message...

SWA000623

 ●●○○○ AT&T LTE 09:38 98%

Home

Charlene Carter >

Messenger

What's that D word I like so much.... Hmmm maybe just maybe one day we will see it happen!! Or better yet we WIN the Law Suite that we have with THE RIGHT TO WORK Org has against TWU. Praying the GOOD will eventually Win out against all of the BAD which is what you seem to thrive on!!! I truly HATE having to pay anything to all of you and TWU-AFL-CIO!!!!!

Done

Audrey Stone Twu Yeah she tried asking my philosophy during the DAL meeting, I told her my opinion doesn't matter it's about what the membership wants is to protect and negotiate

Audrey Stone Twu Any word on Jannah or Dawn? Because I expected them to be on Lyn's slate

Andrea Logsdon Garnett I bet Dawn runs against me for DEBM

Bill Holcomb What exactly is Teri Queen's experience ? what exactly is Lyn's philosophy regarding 8 hour days ? What exactly does Kristen see as the duties and responsibilities of 2nd VP ? Should I vote for a slate simply because it is all female ?

Todd Gage Andrea we have your back in Dallas!!

Andrea Logsdon Garnett Thanks Todd!! And I've got all yours too!!

Angie Kilbourne Dawn better start playing nice. She's sent a Fusion member multiple messages telling her she cant talk about last year. If she doesnt want people to talk about it... she better not run.

Robert Swafford ...I guess they don't have anybody they can trust to be financially responsible...

Andrea Logsdon Garnett Wow! Really Angie Kilbourne?? That's very interesting, but I WILL definitely be capitalizing on that.

Courtney Marie Davis Bill Holcomb here is your answer ...

Mary Ellen Matter

Type a message...

Aa GIF

      



Who did you all replace BR with oh that's right it is Andrea!!!! HMMMM Wonder if it was planned all a long.... Bet it was!!!! Sickening not sure how or why you do the things you do???? Guess it is the MOB mentality that is taught by OUR TWU INTERNATIONAL.... Or did you learn this on your own??? I guess it doesn't matter because you do it no matter what or how you learned it. Corruption at its best😡

I have so many friends in Dallas that are very angry about having their VOTE taken and TRASHED hoping they all File Charges against you and the rest that did this to BR!!!! Hope too BR gets an attorney and SUES the Poooo out of TWU and the Board... He sure has a CASE!!! I know the perfect Attorney too that would be more then happy to help him out. GOD help our FAs because if you sell us out like this you will sell us out on a Contract as well.... That is what most are talking about too!!!! THAT

Type a message...

Aa 📷 🖼 🙂 GIF 🎮 ▭

SWA000625

a Contract as well.... That is what most are talking about too!!!! THAT you all will Sell Them out to what ever the Company wants and that we will no longer have the Industry Leading Contract! Praying that is not the case.... But you have a horrible TRACK RECORD for not standing up for the VERY GROUP you get Paid By.... SWA FAs!!!



By the way without your HELP my Friend Rena got her Job Back <u>on Friday</u>!!!!! Thank GOD🔔



05/23/2015, 09:53



Type a message...

SWA000626



**Charlene Carter** ›
Messenger

05/23/2015, 09:53



"The world will not be destroyed
by those who do evil,
but by those who watch them
without doing anything."
*Albert Einstein*



This is how I feel about you and the
rest of the BOARD...Pure Evil...and
there are a lot of us who have
started the process to make sure
that one day the EVIL will stop.  We
all know that BR will be heard by his
Appeal....one more step in showing
others how Corrupt you all are...What
I am Praying for is that you and all
the ones who illegally removed him

Type a message...

SWA000627

 ‹ **Home**

**Charlene Carter** ›
Messenger

 



I am Praying for is that you and all the ones who illegally removed him from his Elected Position get REMOVED from the BOARD and never again get to hold a Union Position AGAIN!! GOD Willing this will HAPPEN...but if not we will keep up the GOOD FIGHT in to bringing Back Truth to our Union...not matter how long it takes. Good Day Audrey

06/13/2015, 19:48

This is AWESOME!!! Hey isn't this what Thom McDaniel worked on... Yes it is! There just may be some justice after all since it looks like he really messed this up BIG TIME!!! So let's see if they are not working in Good Faith for Allegiant then I bet they are not working in Good Faith for SWA FAs???? Such a Joke TWU is and has BEEN!! I personally think we should Join them in their endeavor and so do a lot of other people I talk too about this!!!! Hmmmm maybe my Prayers just may get answered... Just waiting it out to see and I am one patient FA!!!

Type a message...

      

SWA000628

they are not working in Good Faith for SWA FAs???? Such a Joke TWU is and has BEEN!! I personally think we should Join them in their endeavor and so do a lot of other people I talk too about this!!!! Hmmmm maybe my Prayers just may get answered... Just waiting it out to see and I am one patient FA!!! Hey another question doesn't one of our own on the Board have a Wife who is calling for this at Allegiant a Flight Attendant there... Yep there sure is.... Tangled Web! Can't wait to see what happens!!! By the way I have a couple of friends over there.... This is really fun to watch from my perspective. Have a Wonderful Evening.... From a Opted Out FA looking for a BETTER Union then the TWU and 556



**Decertify Allegiant's Union**

Yesterday in Washington DC the
National Mediation Board tallied the
ballots for the flight dispatchers. The
Teamsters failed to gain majority
support thus returning the dispatche...

allegiant14ma.com

Is This Union Illegally
Keeping its Finances From
The Government?



SWA000630

        

AT&T LTE 09:39 98%

Home

Charlene Carter

SWA000631

Wonder if Mr. McDaniel could go to Jail for this???? Wouldn't that be something! Like I said this will be very interesting to say the least to watch play out!!! What's the old saying Birds of a Feather Flock Together... TWU and 556 CERTAINLY Flock Together in the Corruption and Lies seen it for 16 years. Even had the pleasure to testify against Mr. McDaniel at Melissa Smiths trial and have seen the Lies and Corruption FIRST HAND!!! Even have the Transcripts to this Day!!!! Wonder how he will Get out of this though ... It is a lot BIGGER then what they did back then. Praying for JUSTICE to all that have been effected!!!

Hearing rumors of you selling us out on Minimums... Just flew and talked to 2 newer Flight Attendants from AirTran who told me this!!! You better be negotiating an even Better Contract then what we have!!! Since-

SWA000632

cument 183-1   Filed 09/09/21   Pa

Hearing rumors of you selling us out
on Minimums... Just flew and talked
to 2 newer Flight Attendants from
AirTran who told me this!!! You better
be negotiating an even Better
Contract then what we have!! Since
you tell us it's Industry Leading!!!! If
you give anything away it will not be
Industry Leading like the one we
have!!! Nothing less is what we all
will except... And don't intimidate
either like the SLI debacle we are
watching out for each other on line
because we know how corrupt our
Union is... Even the newer Flight
Attendants are paying attention!
Nothing Less then What we Have is
the Slogan!!!!! Do not Sell SWA FAs
OUT!!!!!

Well Looks like the Rumor was
TRUE!!!! You Sold the SWA FAs down
the River!!!!!! You are despicable
along with the rest of you Team...



SWA000633

cument 183-1　Filed 09/09/21　Pa

 TRUE!!!! You Sold the SWA FAs down the River!!!!!! You are despicable along with the rest of you Team.... You all should be Fired. Not one person that I have talked to or seen talking about it on social media is VOTING NO!!! Praying THIS HAPPENS🔴

 Even people from AirTran ... Not one is Voting Yes!!!

Best one I have SEEN SO FAR!!!! We should be able to FIRE YOU as well



SWA000634

cument 183-1 Filed 09/09/21 Pa

Best one I have SEEN SO FAR!!!! We should be able to FIRE YOU as well.



You took a Industry Leading Contract and threw it in the Garbage who the heck are you for the Flight Attendants that pay your Salary that we are FORCED to PAY and you WORK FOR US or Gary Kelly and his Crew at HGQ????? You are a Traitor

SWA000635


cument 183-1   Filed 09/09/21   Pa

WORK FOR US or Gary Kelly and his Crew at HGQ?????? You are a Traitor and I hope we get a card drive together to OUT YOU just like you all did to Stacey and Team!!!!! The Word is out that you should not be our President except for your Fusion buddies the haters!!!!! You are one BIG MISTAKE and people are waking up to that fact🔴

Why do we Need a Union for this????? We DONT!!!

Rumor has it you have a Great Job waiting with Gary Kelley and team after you term ends as President.... HMMMM and wouldn't be even better if you were able to get a Crapy Contract for us but it's a win for the Company so that would look really Good for you.... HMMMM Maybe that's why you are screwing us FA with this TA!!!!!



Yep Hitting hard at MOMS!!! From


SWA000636

cument 183-1    Filed 09/09/21    Pa



Yep Hitting hard at MOMS!!! From one concerned Daddy who him and his wife fly and have a baby!



From another Flight Attendant... You are truly making a name for yourself Audrey... and its not a GOOD One!

I have made a promise to myself that I am going to go quiet after this post. I am tired of hearing myself going on about it. I have never been so worked up over a TA like this. Even when I picketed way back when. It seemed different. Don't know why

SWA000637

seemed different. Don't know why
but it was. This really has struck a
cord in me. Debby Dorsee Fisher
mentioned in a thread here on this
site that her 44 years of hard work is
going to be destroyed by this
contract. She is right, so very right.
The Debbie's and the Sandras and
the CJ's they laid the foundation
down for all of us. My 20 years is a
drop in the bucket compared to
these ladies. If it was not for them
we wouldn't be having a discussion
about contracts and union. These
ladies have invested a whole lot of
time, there lives basically for this
airline. They worked in conditions
and under rules you and I wouldn't.
God Love Herb and Colleen but SW
was not always the place that made
you money in a pay check. And God
knows 6,7,8 legs a day with three
carry on's was hell so my hats off to
the senior ladies for helping us come
to where we are now...
They as myself have put in a lot of
time in with the job and I am sure
some of them would like to start

SWA000638

cument 183-1 Filed 09/09/21 Pa

slowing down. Being we do not have
retirement all you can do is cut back.
Maybe take some hard earned
money and travel a little. Spend time
with friends, there kids, maybe grand
Kids, things you do when you start
thinking about hanging it up for
good

I know after 28 years I don't want nr
need to be flying 150 trips every
month. Every year it gets less and
less. 10 years from now I may want
to take a month or two off because i
can. The only problem is I will be
penalized for this because unless
you fly a certain amount you will
loose your vacation! How sad is that,
you have employees who help make
this company strong, they dedicate
many years to it and when they want
to slow down you kick them to the
curb and not pay them there
vacation. i am not looking for a
correction to this thought I know
what the TA says. I am
flabbergasted the union even
brought this to a vote. Someday you
going to be senior and you may want
to take time off from work. You may

SWA000639



cument 183-1   Filed 09/09/21   Pa

to take time off from work. You may
want to take several months off to
take care of a parent you may just be
burnt out. What ever the case may
he. But if you do not average out
enough trips you will not get paid for
vacation. is vacation not a benefit?
Should that be reduced because you
do not put out for this company? A
friend made a valid point, if I pay you
money to fly my trip and you trade it
down would it be fair for me to be
mad at you for doing that. Or
perhaps they got sick and called in
do I ask for the money back? Of
course not! The deal was you take
this off my hands for x amount of
money. What you do with it is up to
you. To me this is what SW is saying!
Drop your trips as you want or get
someone to cover them for you no
you need to be here to serve our
customers but if you do we are going
to get mad and withhold your
vacation pay. How sad is that! Please
friends don't sell each other down
the river. One day it will come back
and bite you. We all get old, and we

SWA000640



and bite you. We all get old, and we are all going to become senior. You will be here 30, 40, 45 years and you will be holding trips to Milan and Rome and you may want to drop them to just stay at home and watch the trees grow watch your kids do something great. You may get tired of staying home to much and come back and work like the old days. What will suck is next year your vacation will be time off without pay. So much for all the good years you put in. Last year you dorked off and now your being punished for it. Think how sad it will if someone voted away your vacation simply because back in the day you flew 150 trips and you were rewarded with lots of pay for your vacation. Now you have the money and you want to take time off to enjoy it you have to think I'm going to loose money if I do not work all year. We must stay united and stand together, for each other. We are all in this together. Its a contract the world will not come to an end. SW will not go out of business. We can go back and refine what is new

SWA000641



cument 183-1    Filed 09/09/21    Pa

SW will not go out of business. We
can go back and refine what is not
going to work for us. You do not have
to go on strike.This friends I am sorry
but we all deserve better then this...
In Solidarity.

Wow...this one is good... I hear you
are out their Cleaning Planes and
telling people how wonderful this
Contract is... this is what we are all
telling them...just from one more
Wonderful Flight Attendant that gets
you are selling us OUT!!

No way!!! This is only my 3rd
contract, but from my experience,
we've only gotten better deals from
from voting down the crap... This TA
is probably the worst low-ball offer I
could've imagined... Myself and my
family can only keep our fingers
crossed that all F/A's realize that this
is pure junk!! I'm actually
heartbroken that we have a union
that felt this was fit for our entire

SWA000642

that felt this was fit for our entire work group. How dare they push something that can potentially ruin families of F/A's that have given their heart, soul, service, and time to the company that they've protected and adored? I've always been so proud to work for SWA!! I've felt loved and blessed to be a part of this "family." Now I feel betrayed... And laughed at... I feel insignificant. I never voice my opinion- have always just been an observer and listener and never felt like I could educate myself enough on "contract lingo" to persuade anyone -I never wanted to "push" anyone one way or another; but I have a family now that needs me! They rely on me to provide for them in multiple ways. This job is my dream job! I never want to do anything different! It has allowed me to be "mostly" a stay-at-home Mom, AND provide financially for them, and give health insurance to my children and partner. If this passes, it could potentially crush the family lives of so many F/A's... Many of us

SWA000643



lives of so many F/A's... Many of us
will have to leave a "family" that
we've helped build. I am simply
having the most difficult time
processing the fact that anyone can
see anything positive and beneficial
in this TA... I've read it more than 10
times now, and honestly, I'm about to
puke... I truly love SWA, but feel like
our union pissed on the flame that
we got roaring.... WTF TWU558?!?!
I've always stood up for our union
when times were tough, but now that
I realize that they will spit in our face
if it will benefit only them, I'm hoping
we can band together and box their
ears enough to tell them that
EVERYONE deserves better than this
piece of sh*t that's been presented.
We've worked too hard and for too
long for this to divide our own F/A
family!! I love all of you equally, and
am willing to put myself on the line
for a contract that benefits ALL F/A's.
Please stay strong and respect all
your fellow F/A's. You can count on
me to look out for your families... For
my family, and for all of you, my vote
is a "No."

SWA000644

cument 183-1 Filed 09/09/21 Pa



me to look out for your families... For my family, and for all of you, my vote is a "No."

You are a DISGRACE to all of us... and finally others are waking up to it... I guess you forgot you work for US!!! But the FAs that voted for you are waking up as well....you sold them out too and they are very Dissatisfied with YOU to say the LEAST!!



Two wonderful Flight Attendants and their Baby Daughter... You not only are trying to Sell the very Flight Attendants that (YOU WORK FOR) down the RIVER, but you are also SELLING out their Families!!! Heard about the Dallas Meeting and how you really can't answer with clarity about the VERY TA you AGREED TOO and sent out us.... You either are trying to act incompetent or you are just that INCOMPETENT....Or worse you are WORKING FOR

SWA000645

    

cument 183-1    Filed 09/09/21    Pa

are just that INCOMPETENT.... Or worse you are WORKING FOR MANAGEMENT behind closed doors! Anyone of these scenarios are BAD for US SWA FAs and you are not cut out along with your THUG BOARD t‼ be our Representatives!!! You and your NT have started your own demise 😢 shame on you for collecting a Pay Check from US!!!!! Even many stanch supporters are not backing you and your team, so if anything good comes from this HORRID TA will hopefully be your OUTING and back on line....ALL OF YOU .... Praying this HAPPENS

**Attachment Unavailable**

This attachment may have been removed or the person who shared it may not have permission to share it with you.

Wow from what I am hearing from all bases is that you all were looked at like Company supporters and not Flight Attendant supporters!!!! I am

SWA000646




cument 183-1    Filed 09/09/21    Pa

Wow from what I am hearing from all
bases is that you all were looked at
like Company supporters and not
Flight Attendant supporters!!!! I am
hearing an overwhelming NOOOOOO
across the Land of SWA!!!! Now we
just need to Fire all of you... And that
is resonating just as much as the NO
Vote... Maybe just maybe we all will
see that happen as well. They are
saying YOU ALL WORK FOR US... We
pay your Pay Check something I
think you all forget on a daily basis
and not to mention the Pathetic
TWU-AFL-CIO one of the WORST
ORGANIZATIONS around●

WOW... This is REALLY GREAT!! Told
you you all are going to get a BIG
BACK LASHING... and even from
your so called supporters! What is
really great is that it has brought
rivals together... I am hearing it
EVERYWHERE and now in the News...

SWA000647

cument 183-1   Filed 09/09/21   Pa

EVERYWHERE and now in the News
Paper ...YES... maybe you have
woken the Sleeping GIANT with this
SLAP in the FACE TA!!!!! READ

From the Chicago Business Journal
(a follow up story
just released today July 21)
This could wind up a very bad week
for Southwest Airlines CEO Gary
Kelly.
Even if the low fare behemoth, as
expected, reports record 2015
second quarter profits this Thursday
morning, Kelly could have thousands
of very unhappy flight attendants to
contend with by Friday afternoon.
With less than 72 hours until the
voting ends at noon central time on
Friday, sources indicate Southwest's
(NYSE- LUV) rank-and-file unionized
flight attendants, members of
Transport Workers Union Local 556,
look increasingly likely to vote down
a tentative new contract presented
to them for approval earlier this
month.
Multiple sources close to

SWA000648

ument 183-1    Filed 09/09/21    Pa

Multiple sources close to
developments also indicate it may
not even be close.

One flight attendant who has been
polling fellow F/As said the "no" vote
could be overwhelming. "Seems that
sentiment is 9/1 against this
tentative contract," said the source.
One unscientific straw poll had 345
flight attendants voting "no," 8 for
"yes" and 12 "undecided."

Noted another Southwest flight
attendant: "The number of flight
attendants coming out publicly at
work, in F/A lounges and through
social media, email, text, wearing
black ribbons under their union pins,
displaying their "no" vote on their
luggage tags, etc., has been large
and widespread throughout our
flight attendant rank and file."

Yet another Southwest flight
attendant said the likely news of
Southwest's record profits on
Thursday could seal the rejection of
the contract among even those
Southwest flight attendants who are
still on the fence about which way to
vote.

SWA000649





cument 183-1   Filed 09/09/21   Pa

Online voting closes at 12 noon
central time on Friday, and the
results of the vote are expected to
be announced to rank and file at 6
p.m. the same day.

Even some members of the team of
so-called educators who have
fanned out across the Southwest
system in recent days to sell flight
attendants on the new contract
concede the outcome of the vote
could go against Southwest CEO
Kelly and the tentative contract the
airline's top executive wants to see
ratified.

For many flight attendants, two of
the biggest issues in the proposed
contract are the longer duty day (up
from 10.5 to 12 hours) and new
vacation rules.

But many flight attendants also
argue the Southwest company
culture has changed dramatically in
recent years, and not for the better
since Kelly took control of the
company. Those sentiments may
factor into the vote outcome as well.
If flight attendants vote down the

SWA000650

cument 183-1  Filed 09/09/21  Pa

If flight attendants vote down the tentative contract, negotiations will start from scratch again; even after it took two years to get the tentative contract now up for approval. Rank and file FAs also may push for the Local 556 executive board to be recalled and a new board put in place before contract negotiations start once more.

Southwest's more than 13,500 flight attendants, including more than 1,800 domiciled in Chicago, are the largest single group of unionized workers employed at the heavily-unionized carrier.

If the flight attendants vote down the tentative new contract, that means Southwest CEO Kelly still will have to deal with four of his largest and most important worker groups who have been trying to get new contracts for years — flight attendants, mechanics, ramp agents and pilots. Southwest has its largest hub at Chicago's Midway Airport.

RECALL RECALL   RECALL each

SWA000651

cument 183-1 Filed 09/09/21 Pa



RECALL RECALL... RECALL each and everyone one of YOU Traitors!!!



Well there is you MANDATE and the Comparies WE WILL NOT SETTLE FIR ANYTHING LESS TGEN WHAT WE ALREADY HAVE!! Record Profits again released Yesterday as well!!! Who the heck do you think HELPS IN MAKING THISE PROFITS. As far as I AND MANY MORE FAs are concerned you have no right or the REST IF THE NT going back in to Try and Sell us out again!!! i am praying we get rid of all you and start from scratch... You all did not work in the BEST INTERESTS FOR all of us out

SWA000652

scratch... You all did not work in the
BEST INTERESTS FOR all of us out
here on Line... I would love for all of
you to be back doing what you say
you represent OUR JOBS. You
DESERVE TI BE Recalled and sent
packing Audrey and it is
overwhelmingly being talked about.
NOW!! Sometime Prayers don't
happen over night but normally GOD
does destroy those who are Traitors
and you are a BIG ONE😊... Just look
at that number who voted and many
of them voted you in end are now
have VITERS REMORSE, and to think
you did all on your OWN. Have a
Great Day Audrey because I know
11,000 plus FAs are going to😊

Lots of typos just so DARN Happy
that I am typing to FAST 😊

EUPDATE. 1:50 p.m.: The TWU sent
out a press release announcing the
results, with this quote from TWU
Local 586 president Audrey Stone.

SWA000653

cument 183-1   Filed 09/09/21   Pa

results, with this quote from TWU
Local 556 president Audrey Stone:
"Our membership has given us our
marching orders. The terms of the
tentative agreement were
passionately discussed, debated and
ultimately rejected by the
employees. Democracy works best
when members take an active role in
their union."

REALLY AUDREY???? We all know
how you all were trying youR
damnedest to SELL this Garbage and
you KNEW this was a BAD TA and if
you didn't then you have NO
BUSYNESS REPRESENTING any of
US!!!! You will not be able to SPIN
YOURSELF OUT OF THIS NOR ANY
OF THE OF THE NT Team
Members!!!! We know where your
loyalties STAND!!!!!!  WE DONT
TRUST YOU

This is BULL PoopyDear Member,
As reported today by the TWU Local
556 Board of Election. the

SWA000654





This is BULL PoopyDear Member,
As reported today by the TWU Local
556 Board of Election, the
Membership has voted to reject a
new six-year Collective Bargaining
Agreement. The Contract was
rejected by 87% of voting Flight
Attendants.
I appreciate the high voter turnout
and thank the 11,375 Flight
Attendants who voted. Democracy
works best when Members take an
active role in their Union.
We have much work to do on the
heels of this vote. First, we have to
conduct surveys and have dialogue
with the Membership around the
system to ascertain the best
approach on moving forward. We
must also discuss and re-prioritize
our key issues and Contract Articles
since the rejected Tentative
Agreement (TA) deal is now off the
table. Second, we cannot just
assume that Southwest Airlines
Management will give in to our

SWA000655

Management will give in to our demands -- and we surely will not ever just give in to their demands. As a result, we have been developing a Contract action plan. We will need to mobilize our Members in very active ways. I will be calling upon each of you to get involved. Lastly, and importantly, we must continue to be the leading advocates for the well-known Southwest Airlines Culture. Our Membership must make sure that our special and successful culture is maintained, especially as our airline expands into the future. As I promised, regardless of the outcome of the vote, your Union leadership is fully prepared to move forward. Now that the voting has concluded and we start a new round of bargaining, it is imperative that we maintain our Unity as we go forward. This was a vigorously debated and discussed TA. This is a good thing. However, while we debated ideas, we should never debate the value of standing together as a strong and united Union. Let's move forward together as one TWU Local 556

SWA000656



ocument 183-1 Filed 09/09/21 Pa

united Union. Let's move forward
together as one TWU Local 556
Thank you.
Audrey Stone
TWU Local 556 President and Lead
Negotiator... We are a Group who
Overwhelmingly SAID NO to you and
the Company!! YOUR Message to all
of us is WEAK WEAK WEAK and has
fallen on DEF EARS... We want all of
you all FIRED and back on LINE like
you should be... and we will make
this happen, you all will not be
negotiating our next TA... The
Membership is really united in
this... and we are united in this
cause... Praying you all just RESKIN
because that is the talk and it is
LOUD!! YOU all are not our Leaders
and you have proven that time and
time again!

WE WANT YOU FIRED!!! All of
YOU... I believe you will be getting an
overwhelming amount of calls for
it... and we all mean business!



yep... even the Delta Pilots Union

SWA000657



just one of many that I have been
reading tonicht ....This all WANT
YOU GONE TOO.....This is GREAT
NEWS TO ALL OF US who never
trusted you to begin with....your
supporters have turned.....we will
prevail.

Thank you Southwest Flight
attendants for uniting and fighting
back! WE CAN DO THIS! We are not
crap we are ALL worth this and
more...WE Deserve the best
because we ARE the best! Stop
allowing the brain washed ideas of
well...its industry standard or well we
have the leading industry contract or
well we cant think like that that will
never happen...Get rid of the
negative and replace it with
POSITIVE! We can ask for more
money we can ask for better trips we
can ask for better quality of life we
can ask for scheduling to be more
accountable about holding trips
etc....there a lot of improvements we
can all make to get the LUV back and

SWA000658



etc... there a lot of improvements we
can all make to get the LUV back and
as far as im concerned out of
RESPECT from Herb and Colleen
FORGET what that attorney said in
the union meeting! THIS IS STILL
THERE AIRLINE! because most of us
were here and experienced what was
always meant to be a happy loving
family place to work! its in my heart
and they can not touch that EVER! i
will carry on what was taught to me
the best i can because of HERB and
COLLEEN and all my senior manas!
DAMN RIGHT I WILL!



Contract:
9916 - No
1446 - Yes
11,362 Votes
LET THE RECALL BEGIN!!!

Let's do this!! 85% freaking voter
turnout!!! Are ya listening now
Audrey???



**ARTICLE II
OBJECTIVES**

SWA000659

  
cument 183-1 Filed 09/09/21 Pa

**ARTICLE II**
**OBJECTIVES**

*union shall be:*

*avoid Union, regardless of race, creed, color, gender, sexual orientation [gffic for membership]*

*collective bargaining adequate wage standards any improvent benefits r the conditions of employment for the workers in the industry.*

> Has anyone actually read the
> bylaws? I know that the NT and EB
> hasn't.
> This second rate NT and EB (by their
> vote), negotiated a sub standard
> contract and failed to meet a key
> objective from the bylaws.
> It's simple, respond with your NO
> vote.



> I bet you and everyone else on the
> EB and NT mail boxes are full of
> letters calling for you all to
> resign....we all want you OUT!!!



> WOW....not resigning and then you
> go on VACATION... well that shows
> us all just how you DO NOT
> REPRESENT US at all... I smell a

SWA000660



cument 183-1 Filed 09/09/21 Pa

WOW....not resigning and then you
go on VACATION....well that shows
us all just how you DO NOT
REPRESENT US at all....I smell a
RECALL coming....oh how fun this
will be to watch!



Oh now I am LOVING these and look
no 556 on them, just we the SWA

SWA000661

cument 183-1 Filed 09/09/21 Pa

no 556 on them, just we the SWA
FAs standing together Untied in out
JOBS and to getting a GREAT
CONTRACT that we all DESERVE!!!
Now don't try to sell us anymore
CRAP you are paid by all of us so
that means you take your Marching
Orders from all of us... Not the other
way around Audrey.

I hear you are side stepping on
Financials ... HMMMMM I guess we
all need to see them since it is our
money!! This was posted for
tomorrows meeting....you may want
to answer it and truthfully. People are
getting a great picture of what you
all are all about at these meetings!!
The Arrogance is UNBELIEVABLE...
people want all of you GONE and
they are signing the RE-CALL at a
tremendous amount... this RE-Call
just may work.....here is what they are
saying about your Neglect on the
money Issue....you better remember
WE PAY you Paycheck Miss

SWA000662



money issus....you better remember
WE PAY you Paycheck Miss
President!!

Here is is just one of the things they
said about you ...   HOW does a
Prez, not know the costs of the
educators in lounges; the pamphlers,
phone messages, videos (she made);
TWO years negotiations-- along with
NT'S salaries & perks along the
way-- it should all be in the
treasurer's books. Yes?? How can a
Prez say she is unaware of those
numbers? Just ask her to LOOK at
those costs and tell the membership;
Like you say, it's OUR money. I too
would like to know how you claim
you do not know. ..all you have to do
o ask for the numbers from your
Treasurer and I am sure you Know it
any way....or at least you should
since you are the leader miss
president!!

Here is another one I found: anyone
else going to the MDW meeting
tomorow.. p/ease pay very close

SWA000663

tomorrow...please pay very close
attention to the Financial Report!
Specifically the Investment Funds!
We missed it at the DAL meeting I'm
embarrassed to say; but Chris didn't
at the BWI meeting. The Financial
Treasurer was NOT at the DAL
meeting and we were told we would
have to ask him why he wasn't in
attendance! I'm not sure if he's been
in attendance at any meetings so
far??? Also we pressed for a cost of
the failed TA and AS said she didn't
have that information! Keep in mind
in 2012 the opposing group used the
$500,000 that was transferred from
the investment accounts in 2012 to
fuel a recall against Stacey M., Chris
and Jerry L. I was at that meeting
when they were so outraged about
that transfer of funds and all but said
the money was stolen and then used
that rumor actually that LIE to build
momentum to remove the duly
elected Officers. And here we are!
Now if that doesn't convince you the
Board Room at Brookriver Dr. needs
to be swept clean...take YOUR
UNION back it belongs to you and its

SWA000664



cument 183-1   Filed 09/09/21   Pa



to be swept clean...take YOUR
UNION back it belongs to you and its
YOUR MONEY!

YOU are a CROOK Miss Stone.....The
President Audrey Stone is being
vague on purpose.
If she says nothing YOU can't pin her
down. They are just smart enough to
be dangerous



Had to share this.....I am watching
you totally discredit yourself in a
Very BIG WAY!! This was posted
from a Flight Attendant that
supported you last go around....oh
how the TUNE has changed!!

Recall Petition continues to gain
ground, especially after each
meeting...this president continues to
tell half truths and flat out refuses to
answer questions...plus the fact that
our investment accounts were
cashed in to pay bills for the TA and
now they are moving to a new

SWA000665

now they are moving to a new location and yet nothing has been told to the membership about these developments!!! RECALL ON! Just a few reminders for the naysayers. .1. This is a recall not a removal which will force a reelection allowing all eligible flight attendants to run for office. 2. The merits for the recall are in the bylaws, specifically Bylaws Objectives Article II (b) To establish through collective bargaining adequate wage standards and retirement benefits, shorter hours of work and improvements in the conditions of employment for the workers...

They failed this Article II (b) in a very big way! This TA did not bargain for adequate wage standards (the proposed wage increases was less than adequate) and they bargained for LONGER HOURS OF WORK instead of shorter hours of work...that's enough for removal but we chose to go for a recall to force another election...

When you are faced with ta's whm are against this recall or are just

SWA000666

ument 183-1 Filed 09/09/21 Pa

Whem you are faced with fa's who
are against this recall or are just
plain ignorant of the facts, please
remind them of this bylaw Article!!!
And please add that the OEBM's who
are so loved by many voted yes on
this TA...they deserve to be forced to
run again and be elected again if
they are so great!
RECALL ON!!!



And everyone is passing it on and
on!!!!

hmmmm so this is what the new NT
that you appointed to your already
Morally Bankrupt NT Team said
about our work GROUP during the
vote of the first Crappy Offer you
brought to all of us.... REALLY
Audrey you are so transparent with
your hate for our work group and
your alignment with our Company
and Management!!! Har words.
Here is a quote she liked: "get paid
more than policemen, firefighters,

SWA000667

Here is a quote she liked: "get paid more than policemen, firefighters, teachers and every other flight attendant in the country. We work three days a week. We have the best Contract in the industry. The level of greed and entitlement around here is absurd!!" ENOUGH SAID ABOUT THE NEW NT MEMBER!

RECALL ON.... and Pray we send you Packing before you can damage our JOBS anymore!!!!



We all want you all GONE out of Office!!! We do not trust you ONE BIT!!!!!! Boy it sure is clear you all are not liked one bit even AT Flight Attendants are sorry you all are their Leaders!!!!! YOU GET Payed by US you WORK for US not the company!!! Here is just one of the messages I read today ... and there are way more then this one..... Here is my marching orders to the e.b. And 2 of the remaining original negotiators Brett and Bill H. And my first answer

SWA000668

ument 183-1  Filed 09/09/21    Pa

the remaining original negotiators
Brett and Bill H. And my first answer
to "Change" on the survey RESIGN
please effective immediately. As i
was also reading the unity magazine
it's clear how out of touch the (a.b.)
reading Audrey article on how
basically she thought management
and the union were buddy buddy. It
was clear they worked together in
the contract to screw us over for the
next 20 years. Time to go back
"online" and pass out peanuts and
cokes like the rest of us hard
working folks. I'm not buying into the
peace and love approach they keep
trying with us. I'm tired of hearing
stupid catch phrases "buckle up",
"prepare for take off and landing",
"we're on final approach", and "we
are about to land this contract!"



We are all DONE with all of YOU!!!!!!



SWA000669



ument 183-1    Filed 09/09/21    Pa



 I see these Recall tags Everywhere!!!! I believe it's getting CLOSE😂😂😂😂😂😂

Just Saw this.... it is one of the best for today!

Can I just say how embarrassed i am

SWA000670

        

ument 183-1   Filed 09/09/21   Pa

Can I just say how embarrassed I am
about our union representation? It's
pathetic. It's like high school. Oh,
let's send a bunch of pens to make a
point. It's asinine. Childish stunts like
that are not how you deal with the
CEO of a multi-billion dollar
corporation.
Hey, EB/INT, you know why you
haven't heard anything back from
GK? He is an adult. An adult who
doesn't have time to indulge in
playground games. If you really want
to know how to negotiate with a
multi-billion dollar corporation,
watch SWAPA. If TWU556 actually
gave a crap about the membership,
they would be aligning themselves
as tightly as possible with SWAPA.
I'm tired of this cutesy, cartoonish
BS. There are approximately 15,000
flight attendants, who have families
and/or bills to pay. You brought us a
HUGELY concessionary TA, as your
best. Now, you're following it up with
childish stunts. Grow up and get
serious. Start acting like you
represent college educated adult-

SWA000671



serious. Start acting like you
represent college educated adults
instead of Mrs. Smith's kindergarten
class.

To all of you that support TWU556's
"leadership", remember in just a few
short months, it will be a year since
the failed TA. What have they done
since? Taken a lot of personal
vacations, for sure, but have they
earned your money? No. They have
only done two things, slapped
together some ridiculous proposal
and sent GK a bunch of pens and put
out another survey that they won't
listen to. Meanwhile, SWAPA, is
doing informational picketing,
making commercials, and really
seems to be concerned with their
memberships livelihood and well
being. I WISH my union represented
me.

Just flew with another Flight
Attendant that is carrying the
RECALL Petition .... We are almost
there....

SWA000672





ument 183-1 Filed 09/09/21 Pa

Like it or not, professional appearance matters. They have this, we have that.




Wow just another great one I found this morning and it is SO TRUE!!!



SWA000673



**Charlene Carter** ›
Messenger

‹ Home



So, what's next folks? Finger painting? Coloring contests? How about basket weaving? That'll send Gary a message. Seriously, everybody. A lot of you said that I was complaining without offering ideas, you want some ideas?

Run ads in newspapers
Informational Picketing
Bombard the shareholders with letters/emails
Get the media involved
Post on Instagram, Facebook, Snapchat- any social media

There. That's 5 ideas right there. Each one would cause chaos in and of itself, imagine all five.

So, to all you trash talkers, I CAN back up what I say. I HAVE ideas. I'm not trying to divide us as a group, I'm trying to get what is best for us as a group. All of us.

After this contract is over and gone, we are still a team. It's up to us keep SWA, at the top of the heap. Everyday, when we go to work, we(flight attendants) accomplish that. The passengers spend more time with us, than any other work group, and we are pretty fucking amazing. I have two cousins who work for other carriers, and they always tell me how accommodating and friendly we are and how they wished they were Southwest.

We got it. We do. We just have bad representation.

👍 Like          💬 Comment

Write a comment...



Well one more for the day... Just found this😱



We want you all GONE😡and it is just a matter of time!! Thank GOD

05/03/2016, 17:23

WOW....have you read this article....WE will make this happen!!! So Close....cant wait to se you

Type a message...



SWA000674

05/03/2016, 17:23

WOW....have you read this article....WE will make this happen!!! So Close....cant wait to se you removed!!!

Even as Southwest Airlines (NYSE: LUV) flight attendants union president Audrey Stone presses on to get a new labor contract for the group, a band of upset flight attendants said late last week that they also are pressing on with efforts to recall Stone and 12 members of the the union's executive board. Southwest has its largest hub at Chicago's Midway Airport.
A source close to the so-called "Recall556Now" movement said the group was "so close" to getting the required number of signatures on a petition that would set the recall in motion. More more than 4,000 signatures are believed to be affixed to the petition at this juncture.

 Chicago Business Journal....Cant WAIT!!!

SWA000675

Type a message..

      



This growing day by day....just a clever way to see some of the faces of the RECALL...We are getting so CLOSE it makes me Dance and my Daughter Hannah do the Happy Dance together....yup even my 12 year old gets it that you all are Corrupt and do not serve the Membership well...she may even be a future Litigator against Unions one day....her Hero is Melissa Smith who happens to be her God Mother...hmmmm wonder if you remember her...i know Mr. McDaniel

SWA000676

Mother....hmmmm wonder if you
remember her...I know Mr. McDaniel
does and to think he is or at least
was your mentor...EVIL attracts
EVIL...so very SAD to know you went
down that path too....but the
Membership is finally waking up after
all these years that have passed
since Melissa Smith...they are seeing
the Connection to the Corruption
and it hasn't changed one BIT with
you! RECALL is Coming...praise
GOD!



This is what I call TRUE UNITY....one
Flight Attendant at a time!



So where is our Union on this???
Just another reason we want you
and TWU GONE!!! every last one
you are INEPT to Work For Us Flight
Attendants The Recall WILL
HAPPEN



SWA000677



● ●○○○ AT&T  4G   **09:50**   96% ▬

< **Home**

**Charlene Carter** ›
Messenger



**Southwest Pilot Tensions Flare Anew Over Arrival of 737 Max Jets**

Southwest Airlines Co. pilots, frustrated after four years of unsuccessful contract talks, asked the carrier to guarantee it won't force them to fly Boeing Co.'s newest 737...

bloomberg.com

06/08/2016, 13:09



 

Type a message...



 

Wow all I can say is you should be
FIRED along with the others on the
Board who did this‼️ So Un-
Professional and Childish our Pilots
are doing things Right but you all are
a Disgrace⬤

This Just added more Fuel to the
RECALL...

SWA000679

This is my question as well: So here's food for thought: if Audrey is defending her actions in lgb and feels they did nothing wrong, then why did she say they made sure the probationary flight attendant didn't touch the napkins and had no part of it?? If you did nothing wrong why take those precautions? (Although I'm glad the new girl wasn't involved)

We WANT YOU GONE!!!! This is helping in a BIG WAY to get the Recall Finished😂😂😂😂thanks for the help!

Well looks like Brett or Cylar can't THREATEN anyone ANYMORE for saying the word Decertify😂😂😂 you all WORK for US not the other way around.



SWA000680





●●●○○ AT&T  4G                    09:50

< Home        **Charlene Carter** >
                   Messenger

Well looks like Brett or Cylar can't THREATEN anyone ANYMORE for saying the word Decertify😂😂😂😂 you all WORK for US not the other way around!



**NLRB smacks down union for threatening worker | Fox News**

A New York City union violated federal labor law when it threatened to sue members petitioning to withdraw their membership.

foxnews.com





Q  Search in 556 Members For Total Recall

***Edited***Looks like WE the MEMBERSHIP paid for full fare tickets for FA's to pass out that crap on the LGB inaugural flight AND WE PAID THEM 6.5 TFP AND PER DIEM AND they had the nerve to brag about it?  The financial irresponsibility is just baffling...how can anyone find this mismanagement of funds excusable????

Type a message...

            

SWA000681





Oh and here is another helper in the RECALL for all of us on line.... You USED OUR MONEY TO BUY TICKETS to do your Disputable Work on the FLIGHT!!!! You are so CORRUPT....

07/12/2016, 10:51

Well, I got the Propaganda that International and now our Local on who to VOTE FOR....You all can Shove Every bit of it where the sun does not shine because I will never VOTE for Hillary Clinton EVER!!! I have a family member who worked for the Military and flew these guys around and HILLARY LEFT THEM TO DIE!!! You are as Corrupt and EVIL as she is!!! My whole family plus 99% of my friends are voting

Type a message..

      

SWA000682

ument 183-1  Filed 09/09/21    Pa



EVIL as she is!!! My whole family
plus 99% of my friends are voting
TRUMP and that includes friends at
SWA....so take your Hillary CRAP
and SHOVE IT!!!!



**Kris Paronto added a new video.**
Whether it's her emails or Benghazi, some
things don't change, Hillary Clinton puts Ameri...



This is what you supported during
your Paid Leave with others at the
Women's MARCH in DC....You truly
are Despicable in so many ways...by
the way the RECALL is going to
Happen and you are limited in the
days you will be living off of all the
SWA E.A's

SWA000683

↩  ↪  ⬚  ◌  ⬚  ⬚  ▭  👍



This is what you supported during your Paid Leave with others at the Women's MARCH in DC....You truly are Despicable in so many ways...by the way the RECALL is going to Happen and you are limited in the days you will be living off of all the SWA FAs..cant wait to see you back on line.

Samina Shah added a new video.

SWA000684





**Samina Shah added a new video.**

An aborted baby alive even after the abortion.
This is the reason abortion is murder and Hans...



Samina Shah

3:33 PM, 11:53

TWU-AFL-CIO and 556 are
supporting this Murder...



**My Page - My Opinions added a new
video: Abortion.**

#Democrats - This is what you support? If its...

SWA000685

         



ument 183-1   Filed 09/09/21    Pa

Video: Abortion.

#Democrats - This is what you support? # Ins...

My Page - Us Democrat

Did you know this....Hmmmm
seems a little counter productive
don't you think...you are nothing
but a SHEEP in Wolves Clothing or
you are just so un-educated you
have not clue who or what you were
marching for! Either way you should
not be using our DUES to have
Marched in this despicable show of
TRASH!



**WHDA: Look where Women's
March organizer just showed up**

With friends like that...



SWA000686

Did you all dress up like this . Wonder how this will be Coded in the LM2 Financials....cause I know We Payed for this along with your Despicable Party you hosted for signing the Contract....The RECALL is going to Happen we are even getting more signatures due to other FAs finding out what you guys do with our MONEY!!! Cant wait for you to have to be just a regular FA again and not Stealing from of our DUES for things like this!



I'm sure Lefty's like this will make America take feminism more seriously



SWA000687

You and TWU should really know your History as well when it comes to the King Family....Dr. Martin Luther Kings Niece ....he would have never MARCHED for Pro-Life he was a Baptist Minister, nor did he support the Violence the LEFT and you support.



**Unborn Civil Rights (@alvedaking) | Twitter**

The latest Tweets from Unborn Civil Rights (@alvedaking). @AlvedaCKing is the Director of Civil Rights for the Unborn, the African American Outreach of @Priestsforlife. Atlanta ...



Get Educated. .. because you sure are showing your Ignorance!

SWA000688

ument 183-1   Filed 09/09/21   Pa



are showing your ignorance!



Seek God now in prayer as we are
using the key of nonviolent conflict
resolution to resolve our differences.
americanreturntogod.com

Alveda King

This is from Alveda King in regards
to her Uncle Dr. Martin Luther
King. ...READ :http://
www.priestsforlife.org/.../king-
planned-parenthood-1-8...

Click on the Link



SWA000689

       

Click on the Link



Milo Yiannopoulos http://
www.priestsforlife.org/
africanamerican/king-planned-
parenthood-1-8.pdf

Aretha King

http://www.priestsforlife.org/.../
king-planned-parenthood-1-8...

king-planned-p...nthood-1-8.pdf

Just to let you know I just Sent more
money to the RIGHT TO WORK
Org....I support them 110% about my
hard earned DUES i send you all to

SWA000690

ument 183-1   Filed 09/09/21   Pa



Just to let you know I just Sent more money to the RIGHT TO WORK Org... I support them 110% about my hard earned DUES I send you all to waist! So stop sending me your Crappy Union Propaganda...I can think for myself...just like I did during the Election...VOTED for TRUMP-PENCE and guess what THEY WON!!!!!



SWA000691

       



Best President we have had since
Reagan! Thank GOD you and the
other Union/Socialist didn't get your
Gal Hilary Clinton elected.... but you
all sure did do your best with all the
Propaganda you and TWU-AFL-CIO
wasted with OUR Dues Money
putting out! Just meant we all had to
WORK HARDER in getting the Truth
Out.... just like we are doing with the
Recall😊more people signing up to
remove you!!!! NOW that's a win.....
and you will be removed and we will
get to VOTE in new leadership... that
day is sooner than you thing Miss
Stone.



SWA000692



# EX. 5

| From: | Audrey Stone |
| Sent: | Wednesday, February 22, 2017 8:51 PM CST |
| To: | Suzanne Stephensen |
| CC: | Naomi Hudson; Sonya Lacore |
| Subject: | Complaint - contains graphic images |

Dear Suzanne,

Below you will see Facebook messages that were sent to me last week by Southwest Airlines Flight Attendant Charlene Carter. It is in regards to a TWU Local 556 Women's Committee meeting that I participated in last month, and a march that I voluntarily participated in a few days later. Up until December I chaired our TWU Committee, which works with TWU International to collectively help build future women leaders and address women's issues.

The messages contain two graphic videos of an alleged aborted fetus and make references to murder as well as political and religious comments. The first two are the actual messages she sent me, and the bottom two are the links that they came from.

I found the messages to be incredibly disturbing and believe it to be a violation of the social media policy. I find it obscene and violent, as well as threatening in nature. I also believe it is a violation of the Workplace Bullying and Hazing policy, under cyber bullying. Further, I believe the references to religion are a violation of the Harassment Policy. Charlene doesn't know me, or my religious views. I also believe it violates our work and conduct rules under Class II.3. as well as Class IV.6&7.

While I hold a current position within my Union, I am a Southwest Airlines Employee first and foremost. I have made clear that I will not be seeking re-election, and am now fearful to return to my job as a line-flying Flight Attendant due to repeated personal attacks and threats made both via social media as well as altercations that have occurred face to face while I've been on a Southwest Airlines plane. I can't and won't continue to be disrespected as an Employee of Southwest Airlines, or as a human being.

Should you need further information, please let me know. I did not know how to attach the videos themselves from Facebook to an email which is why they are only screenshots. The photos don't do justice to the awfulness of the videos. I also blocked her until I realized that I could no longer access the videos, and until this complaint is investigated, I wanted to be able to have them as evidence. She has continued to send me messages since these but I haven't opened them.

I can't "unsee" these images, and I was waiting to board a flight on us when I logged in and saw them. I sat in the gate area alone and cried, and had to contact a close friend to even pull myself together enough to board the flight.

I am personally pro-choice, and to be sent messages that reference me as a "murderer" couldn't be further from the truth. However, I believe in equality and individual rights, and will continue

CONFIDENTIAL DOCUMENT

SWA004226



EXHIBIT NO. 3

App.105

to support causes and events that promote the fundamental rights I believe every human being should have.

Thank you for addressing this very upsetting matter. I've had the above drafted and it had taken me days to be able to hit "send." It's taken me a week wrestling with the decision. I've spent my career protecting and defending our Flight Attendants, but I realize I must also protect myself and the job I have at Southwest.

**CONFIDENTIAL DOCUMENT**

**SWA004227**

●●●●○ AT&T LTE     **17:55**     1 ✱ 18% 🔋

‹ **Home (1)**     **Charlene Carter** ›     📞 🎥
             Messenger

TUE 12:22

This is what you supported during your Paid Leave with others at the Women's MARCH in DC....You truly are Despicable in so many ways...by the way the RECALL is going to Happen and you are limited in the days you will be living off of all the SWA FAs..cant wait to see you back on line.



**Samina Shah added a new video.**

An aborted baby alive even after the abortion. This is the reason abortion is murder and Hara...

Type a message...

Aa 📷 🖼 🙂 GIF 🎮 ••• 👍

CONFIDENTIAL DOCUMENT

SWA004228

**App.107**

●●●●○ AT&T LTE     17:55     ⚹ 18% 🔋

< Home (1)     Charlene Carter >
              Messenger     📞  📹

TUE 13:33

TWU-AFL-CIO and 556 are
supporting this Murder...



4:07

**My Page - My Opinions added a new
video: Abortion.**

#Democrats - This is what you support? If its...

 My Page - My Opinions

Did you know this....Hmmmm
seems a little counter productive
don't  you think....you are nothing
but a SHEEP in Wolves Clothing or
you are just so un-educated you
have not clue who or what you were
marching for! Either way you should
not be using our DUES to have
Marched in this despicable show of
TRASH!

Type a Message...

Aa  📷    🙂  GIF  🎮  ⚫⚫⚫  👍

**CONFIDENTIAL DOCUMENT**

**SWA004230**



**My Page - My Opinions** 
February 4 at 8:08pm ·

#Democrats - This is what you support? If its your body your choice, who is this laying in the fucking bowl? It doesn't looks like your body. #evil #murder #ownit #abortion




 Like     Comment     Share



😢😡👍 **1K**

**3,915 Shares**

💬 View previous comments...

 **My Page - My Opinions**
Just so you all know, this has been reported and it is not a violation. Stop trying this dousche tried

CONFIDENTIAL DOCUMENT

SWA004232

**App.109**

Sincerely,

Audrey Stone
#74952

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited and subject to legal action. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**App.110**

# EX. 6

Southwest Airlines Co.
Ed Schneider
Base Manager-DEN
7640 Undergrove Street, Unit E
Denver, CO 80249
303-214-2354



March 14, 2017                                CERTIFIED MAIL:  7015 3010 0000 2338 3356

Charlene Carter
6582 S. Queensburg Ct.
Aurora , CO 80016

Dear Charlene,

On March 7, 2017, a fact-finding meeting was held with you to discuss certain messages and videos you posted on your Facebook page and sent to another Southwest Employee through Facebook Messenger.  Present at this meeting were you, TWU Representative Chris Sullivan, Senior Employee Relations Investigator Denise Gutierrez, Inflight Senior Human Resources Business Partner Edie Barnett, Inflight Assistant Base Manager Meggan Jones, and me.

During the meeting, you admitted you posted graphic videos of aborted fetuses on Facebook and sent those same videos in a private Facebook message to another Southwest Flight Attendant.  You also admitted to sending the Flight Attendant a private message containing a picture of individuals wearing costumes depicting the female genitalia.  You agreed that the pictures and videos were graphic.

Charlene, when you posted the graphic videos and pictures on Facebook, you were identifiable as a Southwest Airlines Employee and represented our Company in a manner that is disparaging to Southwest Flight Attendants as well as to all Southwest Employees.   These Facebook posts were highly offensive in nature, and the private messages you sent to the above-mentioned Employee were harassing and inappropriate.   Although your posts and messages may have been made and/or sent outside of work, Southwest is obligated to address such conduct given its impact on the workplace.  After considering all information gathered in my investigation, as well as the information presented in your fact-finding meeting, I have determined that your conduct is in direct violation of the Southwest Airlines Mission statement and the following Company Policies/Rules including but not limited to:

- **Workplace Bullying and Hazing Policy**
- **Social Media Policy**

Your conduct could also be a violation of Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination and Retaliation. Accordingly, your employment is terminated effective March 16, 2017. Please return your Badge, Flight Attendant Manual, eFam, charger, and OHB key to the DEN office immediately at the address above. You will receive your final paycheck via direct deposit.

Respectfully,

Ed Schneider

Copy To:      Sonya Lacore
                     Mike Sims
                     Dave Kissman

**Carter**

**EXHIBIT**

0001

# EX. 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER              )
                            ) CIVIL ACTION NO.
VS.                          ) 3:17-CV-02278-X
                            )
SOUTHWEST AIRLINES CO., AND )
TRANSPORT WORKERS UNION OF  )
AMERICA, LOCAL 556          )


-----------------------------------

CONFIDENTIAL 30(b)(6)
VIDEOTAPED DEPOSITION OF
MICHAEL SIMS
NOVEMBER 2, 2020

-----------------------------------


ANSWERS AND DEPOSITION OF MICHAEL SIMS,
produced as a witness at the instance of the
Plaintiff, taken in the above-styled and -numbered
cause on NOVEMBER 2, 2020, at 9:06 a.m., before
CHARIS M. HENDRICK, a Certified Shorthand Reporter
in and for the State of Texas, witness located in
Midlothian, Texas, County of Ellis, pursuant to the
Federal Rules of Civil Procedure, the current
emergency order regarding the COVID-19 State of
Disaster, and the provisions stated on the record
or attached hereto.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 186

1  concluded the fact-finding meeting on Ms. Carter's

2  grievance?

3      A.  Not that I remember, unless I had a quick

4  conversation with Ed Schneider.

5      Q.  Okay.

6      A.  Just to -- to get his point of view.

7      Q.  Okay.  So in reaching -- do you recall

8  when you reached the final decision that her

9  termination was just?

10     A.  I believed it was just after we met, so it

11  would have been within that day of our meeting.

12     Q.  Okay.  And at -- at some point, did you

13  decide to provide Ms. Carter with a last-chance

14  agreement?

15     A.  That is correct.

16     Q.  And did someone tell you that you -- that

17  you should offer her a last-chance agreement?

18     A.  No.

19     Q.  And did anyone recommend that you should

20  provide her with a last-chance agreement?

21     A.  No.

22     Q.  If you believed that her termination was

23  just, why did you offer her a last-chance

24  agreement?

25     A.  I offered her a last-chance agreement for

App. 33

Page 187

1    practical reasons.  This dispute had gone on and it
2    was going to continue to get uglier, and at a great
3    cost to everyone.  So I decided that I had the
4    authority to offer a last-chance agreement to
5    reinstate her employment, as she told me she wanted
6    to come back as a flight attendant.
7         Q.  You did not have to get permission from
8    anyone to offer her a last-chance agreement?
9         A.  No.
10        Q.  And did you say that you felt that this --
11   that the dispute could get uglier?
12        A.  Yes.  I just thought, at that point, I
13   could put this all to rest.  Because, ultimately,
14   she indicated to me she just wanted her job back.
15        Q.  And what -- what do you mean by the
16   dispute could get uglier?
17        A.  Well, there were disputes, and this is all
18   encompassing the times at that point.  And so I --
19   I -- I sensed that Ms. Carter was in conflict with
20   TWU 556 and she was conflict with Audrey Stone.
21        Q.  And when you say -- I -- I'm probably not
22   going to quote you exactly in -- in your precise
23   words, but when you -- you referred to the -- the
24   times -- that the sign of the times or the nature
25   of the times, what do you mean by that?

```
 1                REPORTER'S CERTIFICATION

 2           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 3                    DALLAS DIVISION

 4   CHARLENE CARTER            )
                                ) CIVIL ACTION NO.
 5   VS.                        ) 3:17-CV-02278-X
                                )
 6   SOUTHWEST AIRLINES CO., AND )
     TRANSPORT WORKERS UNION OF  )
 7   AMERICA, LOCAL 556         )

 8

 9           ----------------------------------
                  CONFIDENTIAL 30(b)(6)
10              DEPOSITION OF MICHAEL SIMS
                    NOVEMBER 2, 2020
11           ----------------------------------

12

13           I, CHARIS M. HENDRICK, Certified Shorthand

14   Reporter in and for the State of Texas, do hereby

15   certify to the following:

16           That the witness, MICHAEL SIMS, was by me

17   duly sworn and that the transcript of the oral

18   deposition is a true record of the testimony given

19   by the witness.

20           I further certify that pursuant to Federal

21   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)

22   as well as Rule 30(e)(2), that review of the

23   transcript and signature of the deponent:

24      __xx__ was requested by the deponent and/or a

25   party before completion of the deposition.
```

App. 46

Page 238

1       _____ was not requested by the deponent and/or

2   a party before the completion of the deposition.

3           I further certify that I am neither

4   attorney  nor counsel for, nor related to or

5   employed by any of the parties to the action in

6   which this deposition is taken and further that I

7   am not a relative or employee of any attorney of

8   record in this cause, nor am I financially or

9   otherwise interested in the outcome of the action.

10          The amount of time used by each party at

11  the deposition is as follows:

12          Mr. Gilliam - 6:50 hours/minutes

13          Mr. Correll - 5 minutes

14

15          Subscribed and sworn to on this 12th day

16  of November, 2020.

17

18

19      _____

20      CHARIS M. HENDRICK, CSR # 3469
        Certification Expires: 10-31-21
        Bradford Court Reporting, LLC
21      7015 Mumford Street
        Dallas, Texas  75252
22      Telephone 972-931-2799
        Facsimile 972-931-1199
23      Firm Registration No. 38

24

25

App. 47

# EX. 8

Melissa Burdine
Manager Labor Relations
Southwest Airlines Co.
2702 Love Field Drive
Dallas, TX 75235
PH:  (214) 792-2560
FAX: (214) 792-3992

**Southwest's**

April 17, 2017

Beth Ross
Grievance Specialist
Transport Workers Union Local 556
8787 N. Stemmons Freeway, Suite 600
Dallas, TX 75247

## PRIVILEGED & CONFIDENTIAL REINSTATEMENT SETTLEMENT AND LAST CHANCE AGREEMENT

Re: Grievance #24-714 (Co. # 6906) #38690 Charlene Carter

This Confidential Last Chance Agreement ("Agreement") is made and entered into by and between Ms. Charlene Carter, the Transport Workers Union Local 556 ("TWU" or the "Union"), and Southwest Airlines Co. ("Southwest" or the "Company") (collectively, the "Parties").

You were terminated effective March 16, 2017, and a related grievance is currently in the grievance process. The Company is willing to reinstate your employment as a Southwest Flight Attendant based upon your compliance with the provisions of this Privileged and Confidential Reinstatement Settlement and Last Chance Agreement ("Agreement"). Failure to meet any of these provisions will be considered a breach of this Agreement and may result in termination of your employment.

- The Company will reinstate you, the Grievant, Charlene Carter, as a Denver-based Flight Attendant with no loss of seniority.
- You will receive no back pay.
- Your termination will be reduced to a 30-day Suspension beginning March 16, 2017 through and including April 14, 2017.
- Upon your termination, you were paid 131.25 TFP of accrued 2017 vacation and 33.75 TFP of accrued 2018 vacation.  If you would like the vacation days returned to your account, you must submit a Cashier's Check for 105 TFP.
- Any record improvement will be delayed a period of time equal to the time from termination until execution of this Agreement or the end of 30-day Suspension, whichever is greater.
- In exchange for the consideration described above, you will sign the settlement agreement attached hereto as **Exhibit A**, which has the primary purpose of releasing legal and contractual claims against Southwest and related parties.
- In addition, you are required to comply with all Company policies and procedures. Any future violation of the Southwest Airlines Workplace Bullying and Hazing Policy, Social Media Policy, or Harassment, Sexual Harassment, Discrimination and Retaliation Policy will result in termination
- Prior to reinstatement, you will be required to meet with Inflight Operations Director Mike Sims or his designee at Southwest HDQ, or a location of Mr. Sims' choosing. This meeting will be uncompensated.
- This Agreement will remain in your file for 24 months from the date of the execution of the Agreement.
- As a condition of reinstatement, you may be required to complete and pass a criminal history records check as deemed necessary by Southwest Airlines.
- Upon completion of the reinstatement process and receipt of SWA Crew ID, you must contact Crew Planning within 48 hours to have a line built.
- The grievance regarding your termination will be withdrawn/dismissed.
- In consideration of the Company's agreement to these terms, Grievant  agrees to release, dismiss, and forever discharge Southwest from all existing claims, liabilities, demands, and causes of action for which she  may have a claim against Southwest arising out of the discipline issued including, but not limited to, claims arising under federal, state, or local laws prohibiting sex, race, age, national origin, disability, or



**Carter**

EXHIBIT

0006

any other form of discrimination or retaliation, claims under the Family Medical Leave Act (FMLA) and claims alleging any legal or equitable restrictions on Southwest's right to issue discipline in this matter.

This agreement is made to compromise, terminate, and constitute an accord and satisfaction of all the claims released by this Agreement. It is agreed that neither Southwest nor the Grievant admits any liability, fault, or wrongdoing alleged or which could be alleged by Grievant or the Union regarding discipline.

The terms of your reinstatement are made on a **non-precedent and non-referral** basis and are to be kept **confidential.** Neither you, the Union, nor designated representatives may reference or use your reinstatement or any part of this Agreement as evidence in a future proceeding.

Charlene, our goal is to assist you in succeeding at being a productive Employee with Southwest Airlines. As always, if you have any questions regarding the application of any Southwest policies or rules, please contact a Southwest Leader as soon as possible for guidance/clarification.

Respectfully,

*Melissa Burdine*

Melissa Burdine

**BY SIGNING BELOW, YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT AND FULLY UNDERSTAND ITS TERMS, AND THAT YOU ENTER INTO AND SIGN THIS AGREEMENT KNOWINGLY AND VOLUNTARILY, WITHOUT DURESS OR COERCION OF ANY KIND, AND WITH THE INTENT OF BEING LEGALLY BOUND BY THE AGREEMENT.**

**ACKNOWLEDGED AND AGREED:**

_____
Charlene Carter                          Date

_____
Becky Parker, TWU Local 556              Date

**Carter 412**

**EXHIBIT A**
**CONFIDENTIAL SETTLEMENT AGREEMENT**
**AND RELEASE OF CLAIMS**

This Confidential Settlement Agreement and Release of Claims ("Agreement") is made and entered into by and between Charlene Carter ("Claimant") and **SOUTHWEST AIRLINES CO.** (the "Company").

Claimant has asserted claims against the Company alleging wrongful termination.

Claimant and the Company have agreed to compromise and settle all claims asserted by Claimant against the Company arising out of or related to Claimant's employment with the Company and/or separation from employment with the Company.

In order to settle and finally resolve all disputes and claims, known and unknown, that have been asserted by Claimant or that could have been asserted by Claimant against the Company, Claimant and the Company agree as follows:

1.   In consideration of Claimant's execution of this Agreement and agreement to be legally bound by its terms, the Company will reinstate Claimant's employment as a Denver-based Flight Attendant with no loss of seniority ten (10) days after Claimant's execution and non-revocation of this Agreement.

2.   In exchange for the reinstatement provided by the Company to Claimant through this Agreement, Claimant individually and on behalf of Claimant's spouse, heirs, successors, and assigns hereby agrees not to sue and unconditionally RELEASES, DISMISSES, AND FOREVER DISCHARGES Southwest Airlines Co., AirTran Airways, Inc. (Southwest's wholly-owned subsidiary), their respective affiliates, related entities, and each of their respective directors, officers, members, partners, managers, employees, representatives, agents, predecessors, successors, benefits plans, and trustees and fiduciaries of such plans (collectively, the "Released Parties") from any and all claims, liabilities, demands, obligations, agreements, damages, debts, and causes of action arising out of or connected with Claimant's employment with or separation from the Company. This waiver and release includes, but is not limited to, all claims and causes of action arising under federal, state, or local laws prohibiting age, sex, race, religious, national origin, disability, or any other form of discrimination, retaliation, or harassment (including claims under the federal Age Discrimination in Employment Act and/or Older Workers Benefit Protection Act), whistleblower claims (including claims under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century "AIR21"), claims under federal, state, or local leave laws (including the Family Medical Leave Act "FMLA"), wrongful discharge claims, breach of contract claims, tort claims, and all claims alleging any legal or equitable restrictions on the Company's right to separate Claimant from employment with the Company.

Claimant represents that Claimant is the owner of the claims being released, dismissed, and discharged pursuant to this Agreement and that Claimant has not previously assigned or transferred all or any part of such claims to another entity or person.

1

**Carter 413**

3.  Claimant agrees to take all action required to dismiss or withdraw with prejudice any outstanding claims of any kind whatsoever that Claimant has brought against the Company or any of the Released Parties, including but not limited to all Charges and Complaints filed with any federal or state Agency, all grievances filed, and all legal claims asserted with any Court. Claimant further agrees not to assert any new claims of any kind against the Company or any of the Released Parties covered by the agreed upon release of claims in Paragraph 2 of this Agreement.

4.  This Agreement precludes Claimant from recovering any relief as a result of any lawsuit, grievance, or claim brought by Claimant or on Claimant's behalf against the Company or any of the Released Parties concerning or arising out of events occurring at any time up to the date of execution of this Agreement. However, nothing in this Agreement affects Claimant's ability to apply for unemployment compensation, or entitlement, if any, to workers' compensation, health insurance benefits under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), or vested benefits under a retirement plan governed by the Employee Retirement Income Security Act ("ERISA"). In addition, nothing in this Agreement prohibits Claimant from communicating with, filing a charge with, or cooperating in the investigations of any governmental agency on matters within their jurisdiction. The Agreement does prohibit Claimant from recovering any relief, including monetary relief, as a result of such activities. By signing this Agreement, Claimant represents that Claimant has already filed workers' compensation claims for any job-related illnesses or injuries that Claimant believes Claimant may have suffered while working for the Company.

5.  Claimant agrees not to make, repeat, or publish any false, disparaging, or derogatory remarks or comments about the Company or any of the Released Parties. This Paragraph does not prohibit Claimant from making truthful statements while cooperating with a governmental investigation or testifying under oath.

6.  Claimant has been given twenty-one (21) days after receipt of this Agreement to review and consider it before signing it. In order to accept the terms of this Agreement, Claimant must sign the Agreement and return it to the Company within twenty-one (21) days of receipt. Claimant has seven (7) days after signing the Agreement within which Claimant may revoke the Agreement by serving written notice of revocation upon the Company ("Revocation Period"). For such revocation to be effective, written notice must be actually received by the Company no later than the close of business on the seventh day after Claimant signs the Agreement. If timely revocation is not made, the Agreement shall be effective and enforceable. Claimant's acceptance of the Agreement and revocation, should Claimant decide to revoke the Agreement within the Revocation Period, should be delivered or mailed to the following address:

Melissa Burdine
2702 Love Field Dr.
Dallas, TX 75235
HDQ-4LR

**Carter 414**

7.   **Claimant agrees to keep the terms and existence of this Agreement confidential.** This paragraph does not preclude Claimant from discussing the consideration being provided to Claimant with Claimant's tax advisor, attorney, or spouse, upon their agreement to keep the Agreement and terms confidential; or to taxing authorities, governmental agencies, or in response to a valid court order or subpoena.

8.   Claimant agrees to pay any taxes not deducted or withheld by the Company pursuant to the terms of this Agreement without any further liability on the part of the Company or any of the Released Parties. Claimant further agrees to indemnify the Company and the Released Parties from any such taxes, penalty, or interest which may be imposed for any alleged failure to withhold taxes from the payment to Claimant.

9.   This Agreement is made to compromise, terminate and constitute an accord and satisfaction of all of the claims released by this Agreement, and neither the Company nor any of the Released Parties admit any liability, fault, or wrongdoing of any kind whatsoever and expressly deny and disclaim any liability, fault, or wrongdoing that Claimant alleged or could have alleged. Claimant acknowledges that no promise, inducement or agreement not expressed within this Agreement has been made to Claimant and this Agreement constitutes the entire agreement between the Parties regarding the subject matter contained herein. No term, provision or condition of this Agreement may be modified in any respect except by a writing signed by each of the Parties.

10.   The failure of any Party to enforce or require timely compliance with any term or provision of this Agreement shall not be deemed to be a waiver or relinquishment of rights or obligations arising hereunder, nor shall this failure preclude the enforcement of any term or provision or avoid the liability for any breach of this Agreement.

11.   In the event of a breach by Claimant or the Company of the terms and conditions of this Agreement, the non-breaching Party shall be entitled to recover all expenses as a result of such breach, including but not limited to, reasonable attorneys' fees and costs.

12.   The Parties agree that this Agreement will be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

13.   Each Party shall bear its own costs and attorneys' fees, if any, except as otherwise provided in this Agreement.

14.   This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflict of law principles, and is performable, in whole or in part, in Dallas County, Texas, where venue shall be proper and required for the determination of any dispute regarding this Agreement.

3

**Carter 415**

15.   Claimant is advised by the Company to consult with legal counsel prior to executing this Agreement, and has had an opportunity to consult with and to be advised by legal counsel of Claimant's choice, fully understands the terms of this Agreement, and enters into this Agreement freely, voluntarily, and intending to be legally bound. Because Claimant has had the opportunity to consult with competent legal counsel of Claimant's own choosing, has carefully read the Agreement, which was mutually negotiated, and has been fully and fairly advised as to its terms, any rule of law or decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived.

**CLAIMANT ACKNOWLEDGES THAT CLAIMANT HAS READ THIS AGREEMENT AND FULLY UNDERSTANDS ITS TERMS, AND THAT CLAIMANT ENTERS INTO AND SIGNS THIS AGREEMENT KNOWINGLY AND VOLUNTARILY, WITHOUT DURESS OR COERCION OF ANY KIND, AND WITH THE INTENT OF BEING LEGALLY BOUND BY THE AGREEMENT.**

**Charlene Carter**

EXECUTED: _____, 2017

**SOUTHWEST AIRLINES CO.**

BY: _Melissa Burdine_

TITLE: Manager Labor Relations

EXECUTED: _____, 2017

4

**Carter 416**

# EX. 9

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 149 of 676   PageID 5260
Charlene Carter - Vol. 1                                    December 7, 2017

1

```
ARBITRATION

IN THE MATTER OF

TERMINATION OF CHARLENE CARTER

CASE NO. 24-0714

BETWEEN

CHARLENE CARTER

and

SOUTHWEST AIRLINES CO.


VOLUME 1


DECEMBER 7, 2017



EMBASSY SUITES - DALLAS MARKET CENTER

2727 NORTH STEMMONS FREEWAY

DALLAS, TEXAS
```

```
 1                  A P P E A R A N C E S
 2   ARBITRATOR:
 3   MR. BILL LEMONS
     Peoples Petroleum Building
 4   102 North College Avenue, Suite 1026
     Tyler, Texas 75702
 5   (903) 630-5039
     whlemons@satexlaw.com
 6
     FOR THE COMPANY:
 7
     MS. MICHELE HAYDEL GEHRKE
 8   MR. BRIAN K. MORRIS
     POLSINELLI
 9   Three Embarcadero Center, Suite 2400
     San Francisco, California 94111
10   (415) 248-2173
     mgehrke@polsinelli.com
11
12   FOR THE GRIEVANT:
13   MR. MILTON L. CHAPPELL
     MR. JEFF D. JENNINGS
14   NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION
     8001 Braddock Road, Suite 600
15   Springfield, Virginia 22160
     (703) 321-8510
16   mlc@nrtw.org
     jdj@nrtw.org
17
     ALSO PRESENT:
18
         Ms. Charlene Carter, Grievant
19
         Ms. Melissa Burdine
20       Manager, Labor Relations
21       Ms. Lauren Armstrong, Paralegal
         General Counsel Department
22
         Mr. Stephen L. Myers
23       Attorney, General Counsel Department
24       Mr. Mark Richard
         Phillips, Richard & Rind, P.A.
25       On Behalf of TWU Local 556
```

```
 1                    I N D E X

 2                                                Page

 3   APPEARANCES                                     2

 4

 5   OPENING STATEMENT

 6      By Ms. Gehrke                               28

 7

 8                  COMPANY WITNESSES

 9   MAUREEN EMLET

10      Direct Examination by Ms. Gehrke      37, 117

11      Cross-Examination by Mr. Chappell         81

12   AUDREY STONE

13      Direct Examination by Ms. Gehrke     122, 178

14      Cross-Examination by Mr. Chappell        162

15   MEGGAN JONES

16      Direct Examination by Ms. Gehrke         181

17      Cross-Examination by Mr. Chappell        205

18   ED SCHNEIDER

19      Direct Examination by Ms. Gehrke     219, 248

20      Cross-Examination by Mr. Chappell        240

21   MIKE SIMS

22      Direct Examination by Ms. Gehrke     250, 276

23      Cross-Examination by Mr. Chappell        270

24

25
```

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 152 of 676   PageID 5263
Charlene Carter - Vol. 1                                    December 7, 2017

4

```
1                    GRIEVANT'S WITNESSES
2    CHRISTOPHER SULLIVAN
3      Direct Examination by Mr. Chappell        277, 314
4      Cross-Examination by Ms. Gehrke           302, 315
5
6    REPORTER'S CERTIFICATE                            318
7
8                      JOINT EXHIBITS
9    No.   Description                              Page
10   1     Collective Bargaining Agreement            6
11   2     Grievance Packet                           6
12   3     Southwest Airlines Mission Statement      39
13   4     Excerpts from Basic Work Rules and        41
           Expectations
14
15   5     Policy Concerning Harassment, Sexual      45
           Harassment, Discrimination and Retaliation
16   6     Workplace Bullying and Hazing Policy      46
17   7     Employee Social Media Policy              48
18   8     3/14/17 Letter to Charlene Carter        239
           from Ed Schneider
19
20                    COMPANY EXHIBITS
21   No.   Description                              Page
22
23   1     SWALife Screenshot                        50
24   2     E-mail re Acknowledgment for Charlene     53
           Carter 38690
25
```

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 153 of 676   PageID 5264
Charlene Carter - Vol. 1                                    December 7, 2017

5

| 3 | 1/11/13 Read Before Fly re Social Media Policy | 54 |
| 4 | 5/16/15 Read Before Fly re Avoiding Speculation | 56 |
| 5 | 10/12/16 Read Before Fly re Social Media Behavior and Policy Reminder | 58 |
| 6 | 2/22/17 Read Before Fly re Social Media/ Anti-Bullying Policies and Expectations | 59 |
| 7 | Facebook Postings | 70 |
| 8 | Facebook Postings | 73 |
| 9 | Facebook Postings | 146 |
| 10 | Videos on CD | 154 |
| 11 | Charlene Carter's February-December 2015 Schedule | 184 |
| 12 | Charlene Carter's January-December 2016 Schedule | 186 |
| 13 | Charlene Carter's January-March 2017 Schedule | 187 |
| 14 | Step 2 Hearing Documents Submitted by Charlene Carter | 262 |

GRIEVANT'S EXHIBITS

| No. | Description | Page |
| CC-1 | Excerpts from Basic Work Rules and Expectations | 95 |
| CC-2 | 4/20/15 TWU Local 556 Publication | 168 |
| CC-3 | Facebook Postings | 174 |

(Exhibits Not Attached Hereto)

Charlene Carter - Vol. 1                                December 7, 2017

6

```
 1                    P R O C E E D I N G S
 2               (Joint Exhibits 1 and 2 marked)
 3                       9:11 a.m.
 4                       *   *   *
 5          THE ARBITRATOR:  This is, according to my
 6   information, Grievance No. 24-0714 involving
 7   Charlene Carter, grievant, who is here.  Good
 8   morning.
 9          MS. CARTER:  Good morning.
10          THE ARBITRATOR:  My name is Bill Lemons.
11   I was next in rotation to hear this case, and I'm
12   happy to do so.
13          Just very briefly, if you would announce
14   your team.
15          MS. GEHRKE:  Good morning.  My name is
16   Michele Gehrke and I'm outside counsel for Southwest
17   Airlines.  With me today is my associate, Brian
18   Morris, at the end of the table.  We have Melissa
19   Burdine, labor relations at Southwest Airlines,
20   Lauren Bobis-Armstrong, paralegal for Southwest
21   Airlines, and Stephen Myers, counsel, labor
22   employment attorney for Southwest Airlines.
23          THE ARBITRATOR:  Thank you very much.
24          And for your side, sir?
25          MR. CHAPPELL:  Thank you.  I'm Milton
```

Charlene Carter - Vol. 1                                December 7, 2017

 1   Chappell, and with me is cocounsel Jeff Jennings and

 2   the grievant, Charlene Carter.

 3            THE ARBITRATOR:  Thank you.  And I

 4   understand we have a legal counsel for TWU 556.

 5            MR. RICHARD:  Yes, Local Union TWU 556 who

 6   is appearing under Article 20, Section 18, Mark

 7   Richard, counsel for the Union.

 8            THE ARBITRATOR:  Thank you, sir.

 9            MR. RICHARD:  Thank you.

10            THE ARBITRATOR:  All right.  So we've

11   talked about timing.  We've talked about some other

12   administrative matters.  I understand the parties

13   are working together on some joint exhibits, and I

14   appreciate that.

15            So yesterday as I was walking out, I

16   received a motion to quash which alerted me for the

17   first time that there may be some other things going

18   on.  Airline arbitrations are kind of like Easter

19   egg hunts.  Until I get to the hearing, I don't know

20   what's going on, I don't know what the issues are.

21   And so to the extent it's relevant to what I'm

22   doing, we need to address those things.

23            Under the collective bargaining agreement,

24   as a general rule, I'm tasked with determining

25   whether or not the Company had just cause to make a

Charlene Carter - Vol. 1                                    December 7, 2017

8

```
 1   decision.  And that's what I do.  So if we have
 2   preliminary matters that you would like to address,
 3   you may do so.
 4            MS. GEHRKE:  Okay.  Thank you.  As you
 5   mentioned, we will have some joint exhibits.  We're
 6   just sorting out a couple.  But is your preference
 7   to move those into evidence at the end or as we go?
 8            THE ARBITRATOR:  Generally they're
 9   presumed to be in evidence and I will make them so
10   unless there's an objection.
11            MS. GEHRKE:  Okay.
12            THE ARBITRATOR:  So, as we go.  And then
13   she will make sure everything's in.  Okay?
14            MS. GEHRKE:  Great.  So we have agreed
15   upon a statement of the issue --
16            THE ARBITRATOR:  All right.
17            MS. GEHRKE:  -- for the arbitrator.  And
18   if I'm paraphrasing it correctly, it's whether or
19   not Southwest Airlines had just cause to terminate
20   the grievant, Charlene Carter, and if not, what
21   shall be the remedy.
22            THE ARBITRATOR:  All right.  Thank you.
23   Is that acceptable?
24            MR. CHAPPELL:  That is acceptable.  And my
25   understanding is that it's not just just cause but
```

Charlene Carter - Vol. 1                                December 7, 2017

9

```
 1   it's just cause to terminate, leaving open that
 2   maybe there was a violation but that the termination
 3   was not the proper remedy for you to consider.  Tell
 4   me if I'm --
 5              THE ARBITRATOR:  Books have been written
 6   about that.
 7              MS. GEHRKE:  Yeah, semantics.
 8              THE ARBITRATOR:  I get it.
 9              MR. CHAPPELL:  Okay.  As long as you get
10   it and we'll do whatever and you can do obviously
11   whatever.
12              THE ARBITRATOR:  We can put that in our
13   post-hearing briefs if we need to.  All right.
14              MR. CHAPPELL:  But I don't understand that
15   I can't at least make those arguments to you by
16   agreeing to this statement.
17              THE ARBITRATOR:  No, I understand.  That's
18   inherent in this.  All right.  I'll accept that then
19   as the issue.
20              On a more basic note, if we do go two
21   days, I will require an additional deposit from the
22   grievant, but I'm not worried about that.  It's
23   $800.
24              MR. CHAPPELL:  I thought we had -- okay.
25              THE ARBITRATOR:  I'm not worried about it.
```

```
 1              MR. CHAPPELL:  We'll make sure it happens.
 2              THE ARBITRATOR:  I know where you live.
 3              MR. CHAPPELL:  Right.
 4              MS. CARTER:  Or at least for the time
 5    being, right?
 6              MR. CHAPPELL:  Yeah.  We may be closer
 7    than we think.  I don't know.
 8              THE ARBITRATOR:  Or another way to put it,
 9    it's not a good idea to stiff the guy who's about to
10    write your decision.
11              MR. CHAPPELL:  I agree wholeheartedly and
12    we've been good so far, so I think you can count on
13    it.
14              THE ARBITRATOR:  I appreciate your working
15    together.  Do you care to raise preliminary matters
16    and tell me what's going on that I need to be aware
17    of?
18              MR. CHAPPELL:  I would like to go back and
19    at some point, we don't have to do it this second,
20    and address the order that you issued yesterday on
21    the motion to quash.
22              THE ARBITRATOR:  All right.
23              MR. CHAPPELL:  And so --
24              MS. GEHRKE:  Go ahead.
25              MR. CHAPPELL:  -- if this isn't the right
```

Charlene Carter - Vol. 1                                    December 7, 2017

11

```
 1   time, just let me know.  I just want to make
 2   sure before we --
 3              THE ARBITRATOR:  No, let's get it out on
 4   the table.
 5              MR. CHAPPELL:  Okay.  The Union in its
 6   motion asked specifically that three subpoenas duces
 7   tecums be quashed.
 8              THE ARBITRATOR:  Yes.
 9              MR. CHAPPELL:  And you included in your
10   order a --
11              THE ARBITRATOR:  Mr. Sullivan's?
12              MR. CHAPPELL:  Right.
13              THE ARBITRATOR:  Yes.
14              MR. CHAPPELL:  And I would like to request
15   that you reconsider and revise that order to exclude
16   him.
17              THE ARBITRATOR:  From my quash?
18              MR. CHAPPELL:  Yes.  Would you like to
19   hear why?
20              THE ARBITRATOR:  What is your position on
21   that?
22              MR. RICHARD:  Yes, your Honor.  Thank you.
23   We had not learned that there was a subpoena served.
24   We think under the rules we should have been given a
25   copy, at least a courtesy copy.  And so we still
```

Charlene Carter - Vol. 1                                December 7, 2017

12

```
 1   have no verification or return of service that
 2   Mr. Sullivan, a steward at the time, was served.
 3   But if he were to be served, the basis is exactly
 4   the same other than I can't argue about the date,
 5   the undue burden, because I wouldn't know when he
 6   was served.  We've been trying to get in contact and
 7   we haven't made it.  Again, I don't know if Counsel
 8   has the date of return service.
 9          But that being said, the issue in terms of
10   these proceedings, which have no discovery, there's
11   no discovery in the contract or under the Railway
12   Labor Act that would permit this, in essence,
13   attempt to get documents.  As you know, there is
14   ancillary litigation which we're not commenting on,
15   I'm not involved in that, but that has not passed or
16   survived discovery stage itself.
17          And so between the undue burden and exact
18   same arguments we made in the motion to quash, they
19   would be -- we would ask for them to be applicable
20   to Mr. Sullivan, who's an agent of the Union, and we
21   would by ore tenus motion ask that our original
22   motion to quash cover Mr. Sullivan's subpoena as
23   well, although I have to represent honestly to the
24   Court I don't even know if there's been service or
25   not.
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1                THE ARBITRATOR:  Okay.  Yes, sir.
 2                MR. CHAPPELL:  Yeah, there has been
 3    effective service.  I would have to ask cocounsel to
 4    give me the date.  But the reason that Mr. Sullivan
 5    was served and is a key witness here is that he was
 6    the steward that represented Charlene at the fact
 7    finding.  And unfortunately I only have one copy --
 8                MR. RICHARD:  That's okay.
 9                MR. CHAPPELL:  -- of the whole book.  Let
10    me bring it.
11                MS. GEHRKE:  What's the relevance of this?
12                MR. RICHARD:  I'm familiar with it.
13                MR. CHAPPELL:  Yeah, I think you know
14    about it, but I want to have -- you're arguing it
15    right now, so I want to make sure you have it.
16                This is the shop steward training handbook
17    put out by the Union which deals specifically with
18    what Mr. Sullivan's duties were at the fact finding.
19    The fact finding and the step 2 are the heart of
20    what you're looking at.  It is within the four
21    corners of the collective bargaining and deal with
22    the just cause.  It has nothing to do with the
23    federal case.  If it overlaps, I should not be
24    precluded from bringing and being able to present
25    the necessary case here because there may be a
```

1   federal case pending.  This is not discovery for

2   that case.  In fact, we don't have discovery here.

3   And these are necessary testimony and documents that

4   go to the heart of this case.

5           And the page 30 and 32 -- if anyone wants

6   to look at the whole thing, I guess I can give up my

7   notes.  But to show that I didn't play any tricks, I

8   did include the table of contents and the page

9   numbers so that you can see.  But to try to make it

10  easier, on page 30 and 32 it explains the role of

11  the shop steward to be present and to make the notes

12  of what occurred at the fact finding.  It also says

13  that a shop steward's notes become the official

14  record of what took place and also that they can be

15  used as evidence in board of adjustment or

16  arbitration.  That's on page 30.  And that's

17  basically repeated again on page 32.

18          And that was the purpose of the subpoena

19  and the subpoena duces tecum to Mr. Sullivan to

20  bring those official notes that he took so that we

21  can have a record of what happened and the

22  information, what I believe is critical in your

23  determination or part of your determination of just

24  cause, is the information that the Company had

25  before it to make the determination.

Charlene Carter - Vol. 1                                    December 7, 2017

15

```
 1                And that is the purpose of the fact
 2    finding, to be able to give the grievant and the
 3    Union the power to bring in all the facts and
 4    anything that is helpful and that the total way of
 5    looking at whether they met their burden of just
 6    cause is to know what they had before them.  And it
 7    also says that they are supposed to consider all the
 8    material after it's been given to make their
 9    determination.
10                So that's the purpose of calling
11    Mr. Sullivan and the documents that he is to bring
12    is basically related to those notes and anything
13    that he might still have that was presented at that
14    fact finding.
15                THE ARBITRATOR:  Yes, ma'am?
16                MS. GEHRKE:  If I can just make a few
17    points.
18                I understand why Mr. Chappell may want
19    Mr. Sullivan here to testify.  That doesn't excuse
20    his tardiness in issuing the subpoena and properly
21    serving the Union so that they could have included
22    him in the motion to quash.
23                I would also note that the parties do have
24    a practice under the collective bargaining agreement
25    not to produce and use in arbitrations those fact
```

Charlene Carter - Vol. 1                          December 7, 2017

 1    finding notes.  And we do not intend to use them,

 2    and the Union does not use them either.  And in

 3    fact, I believe both parties have taken the position

 4    in the past that they are covered by some kind of

 5    deliberative privilege or kind of, you know,

 6    intra-Union privilege.

 7              So we feel that your order yesterday was

 8    proper to quash all four subpoenas and that

 9    Mr. Sullivan should not be compelled to testify or

10    produce his documents.

11              THE ARBITRATOR:  Okay.  Anything further?

12              MR. RICHARD:  Yes, your Honor.  I just

13    want to comment.

14              If you'll note in the manual, this is an

15    internal TWU training document.  I'm familiar with

16    it indeed, having represented the Union for 17

17    years.  They are referred to as "your notes."  They

18    belong to the Union.  They belong to the steward.

19    And they are official to the Union, but they have no

20    role of being official to the process or to the

21    system board of adjustment.

22              Never met Counsel, but she is correct.  I

23    have a long history here.  They're not introduced

24    and have not been introduced by the parties.  In

25    fact, the parties take the position, which is very

```
 1    typical, that either party's notes are their notes
 2    because otherwise people could write self-serving
 3    notes.
 4              We've also not heard any nexus between
 5    these notes and any dispute of what happened at the
 6    hearing, the fact finding hearing.  In fact, if you
 7    look on the page, it's who was there, what the
 8    initials are, abbreviations for the attendees, what
 9    was said, who was said.  We don't know if any of
10    that's in dispute.  I have no clue.  I don't know
11    this case substantively.
12              And so these are our internal notes.  They
13    are for us.  The Union is not appearing.  Ms. Carter
14    has chosen to use her own counsel, which we respect
15    and understand.  She has the right indeed to do so.
16    And we strenuously object to trying to obtain
17    internal notes of an organization that are not even
18    relevant to this proceeding, and there is no
19    practice to introduce same.
20              THE ARBITRATOR:  All right.
21              MR. CHAPPELL:  I'd like to just clarify
22    one point that the only reason that Ms. Carter
23    elected to have her own counsel here today is that
24    TWU decided, which is their right, I'm not
25    questioning that, not to represent her to proceed to
```

Charlene Carter - Vol. 1                                December 7, 2017

18

```
 1   arbitration but gave her the right to come on her
 2   own.  And as I understand Article 19 and especially
 3   Article 20, we basically come through -- and that's
 4   why the title has the Union's name even though the
 5   Union technically isn't representing her.  So I just
 6   want the record to just be clear for the reason that
 7   she elected to come on her own.
 8              THE ARBITRATOR:  I understand that.  Had
 9   one last month the same situation.
10              Here's where I come out on this.  I wrote
11   a decision recently.  You don't have the benefit of
12   it.  You haven't either because I never issued it.
13   There is no discovery in these proceedings.  The
14   collective bargaining agreement does not authorize
15   that.  I would go beyond what I'm empowered to do
16   were I to sanction discovery.
17              When I approved the subpoenas, I was under
18   the impression that the parties might have conferred
19   and that these were okay.  When the motion to quash
20   came in, I determined that apparently they were not
21   okay, and I took the liberty of adding Mr. Sullivan
22   because I thought through oversight that the motion
23   might have excluded him.  And I had read the
24   subpoenas, and the information requested was the
25   same.
```

Charlene Carter - Vol. 1                                December 7, 2017

19

```
 1            There is no place in this proceeding for
 2   the documents that were requested in the duces
 3   tecum.  There is a place perhaps in the federal
 4   court proceeding for that but not before me.
 5            Now, if it comes to -- in my hearing, if
 6   there is a dispute about what happened at the fact
 7   finding hearing and who said what, then Sullivan's
 8   testimony may be very important.  I have been doing
 9   these arbitrations for seven or eight years.  I've
10   done over a hundred.  I have yet to see copies of
11   any notes from fact finding meetings.  I don't
12   welcome those because I view that as being
13   somewhat -- call it the labor relations privilege.
14   It would have a chilling effect on the process
15   itself were those to be introduced into evidence.
16            I also don't allow testimony about
17   settlements made without precedent.  People try,
18   "Well, you agreed to" -- it was without precedent.
19   So I try to run under this collective bargaining
20   agreement as limited a review as I can to still give
21   you a fair hearing, and that involves did the
22   Company have just cause and what was before it when
23   it made the initial decision and went through the
24   step 2 proceedings.
25            So I'm quashing that subpoena as well.  I
```

Charlene Carter - Vol. 1                                    December 7, 2017

20

```
 1  appreciate your remarks.  Let's see what happens.
 2  And if that testimony becomes relevant in rebuttal,
 3  then we'll figure out a way to hopefully get
 4  Mr. Sullivan here.  We can do that by Skype, by
 5  telephone.  We'll do what is efficient.  Okay?
 6              MR. CHAPPELL:  Okay.
 7              MS. GEHRKE:  Thank you.
 8              THE ARBITRATOR:  So I do have a copy of my
 9  order that I never issued.  It talks about discovery
10  under this contract if you want it.  But anyway,
11  that's where I come out.
12              MS. GEHRKE:  Okay.  I have another issue,
13  and he just briefly touched on it, and I think it's
14  important to get out on the table here before we get
15  started today, and that is the issue of settlements
16  made on a nonprecedent-setting, nonreferral basis.
17              You will hear testimony today that there
18  were many other flight attendants terminated for
19  social media violations, and I know you're aware of
20  some of them because of your prior work.  And we
21  intend to limit the testimony to the fact that those
22  flight attendants were terminated and then
23  Ms. Carter was also terminated and, you know, the
24  labor relations department did consider comparable
25  cases in deciding that termination was appropriate
```

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 169 of 676   PageID 5280
Charlene Carter - Vol. 1                                December 7, 2017

21

```
 1   for Ms. Carter.  But we want to make sure that the
 2   evidence is proper that's before you in that offers
 3   of reinstatement that may have been made
 4   post-termination as part of the litigation
 5   settlement or even step 2 hearings and that were
 6   made on a nonprecedent-setting, nonreferral basis
 7   are not going to be brought into evidence because we
 8   think those are improperly before you.
 9            If Mr. Chappell tries to bring them in as
10   evidence, we do not intend to use them as evidence
11   unless you make a ruling that they're free game and
12   then we'll have to get into it, but that's our
13   position.
14            THE ARBITRATOR:  Well, counsel on both
15   sides will use what evidence they can to win their
16   case.  I get it.  My ruling in the past and will be
17   in this case that other settlements, certainly those
18   that are specifically on a nonprecedental basis are
19   simply that.  They are evidence that the Company
20   took action.  And I take those really to show
21   consistency of the Company's action rather than
22   we're not really enforcing that rule, because there
23   are too many variables.  And I don't want to have a
24   mini-trial on whether Suzi should have been
25   reinstated when Ms. Carter wasn't.  That isn't what
```

Charlene Carter - Vol. 1                                December 7, 2017

```
 1    I'm here to do.
 2              So I will listen to their remarks, but
 3    that's my mind-set is that people sit down and work
 4    these out with labor relations for a lot of
 5    different reasons, and I don't really need to know
 6    what those reasons are.
 7              So if you get into a serious conflict
 8    about inconsistency of treatment, that's one thing.
 9    When you get into inconsistency of settlements,
10    that's really not before me.  So we'll look at it,
11    but that's where I'm coming from.
12              MS. GEHRKE:  Okay.  So just so I'm clear,
13    you are going --
14              THE ARBITRATOR:  I didn't mean to make it
15    clear.
16              MS. GEHRKE:  Clear as mud, clear as mud.
17              MR. CHAPPELL:  I believe he wants to deal
18    with it on a case-by-case --
19              THE ARBITRATOR:  Yes.
20              MR. CHAPPELL:  -- settlement or issue or
21    whatever may come up and not make a blanket ruling.
22    I don't mean to say what you're saying, but that's
23    what I heard.  Let me just phrase it that way.
24              THE ARBITRATOR:  Let me say this.  It will
25    be a very unusual situation where I will ever
```

```
 1    consider a nonprecedent-setting settlement as
 2    probative evidence on the Company's mind-set in
 3    these matters.
 4              MS. GEHRKE:  Okay.
 5              THE ARBITRATOR:  Okay?  You could have a
 6    witness disappear.  You could have a labor relations
 7    guy quit.  There are any number of reasons.  They
 8    fired an arbitrator one time and had to say -- who
 9    knows?  I don't.  Okay?  So we'll cross that bridge
10    when we come to it, but it will be a very short
11    bridge.
12              MS. GEHRKE:  Okay.
13              MR. CHAPPELL:  Okay.  Thank you.  Now, I
14    have one other matter.  We have two witnesses that
15    for two different reasons were unable to physically
16    attend, and we would like to be able to have them
17    give their testimony by Skype.  They have the
18    facilities here and we've tested that it worked.  At
19    least it worked when we tested it.  You know how
20    that goes.
21              THE ARBITRATOR:  Sure.
22              MR. CHAPPELL:  And my understanding is
23    that the Company is not agreeing to allow that, so
24    that's why I'm bringing it up now.  And the reasons
25    that these two individuals could not physically come
```

24

```
 1   to Dallas or be in Dallas, the first one is Mr. Kent
 2   Hand, and he was intending to fly here and be here
 3   but on Monday he learned that his partner's father
 4   had passed away and that they are now having to do
 5   all the necessary arrangements that happen when
 6   there's a death in the family.  And it would be an
 7   extreme hardship to require him to take up to two
 8   days, because he's in Oakland, to come here to
 9   Dallas and to testify and be away from his partner
10   during this most troubling and emotional, et cetera,
11   time.
12            And so we requested out of basic courtesy
13   and understanding of that unexpected issue that he
14   be allowed to -- he is willing to take away probably
15   what won't even be an hour of time to testify by
16   Skype.
17            Maybe we should deal with these one by
18   one, or if you want me to go through the next one
19   and then let her respond.
20            THE ARBITRATOR:  What's your thinking?
21            MS. GEHRKE:  Well, we're not trying to be
22   difficult.  We understand people have lives and
23   tragedies occur.  Our concern with Mr. Hand, he was
24   just kind of sprung on us yesterday.  Mr. Hand has
25   his own history with the airline, and he has been
```

```
 1   represented by Mr. Chappell and his team on his own
 2   case which was -- there was a confidential
 3   settlement reached and he does have a
 4   confidentiality clause and nonprecedent-setting
 5   nonreferral.
 6           So our concern was twofold.  One, we're
 7   not really -- we're concerned about him abiding by
 8   those agreements.  And, two, to the extent
 9   Mr. Chappell indicated he was going to give us any
10   documents or exhibits he intended to use with the
11   witnesses when they might be testifying by Skype,
12   and we never received those.  I'm a little
13   concerned, you know, when I go to do the
14   cross-examination, I'm going to need a little time
15   to pull together my exhibits.  And then I guess
16   we're going to have to e-mail them to Mr. Hand,
17   whoever's there, have them print them out, you know,
18   just the logistics.  And I understand you do take
19   testimony by Skype, but those were our concerns.
20           THE ARBITRATOR:  Was there another one
21   besides him?
22           MR. CHAPPELL:  Yes.  Greg Hofer was also
23   intending to be here, but he was told -- the
24   collective bargaining agreement specifically says
25   that if a witness is necessary for this kind of
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1    proceeding that the time off is charged as Union
 2    time, but it doesn't really say anything about what
 3    happens in trading off and being able to be free to
 4    come here.  And so we're told that he could use
 5    what's called supervisor.  Michele can use the right
 6    terminology.
 7              THE ARBITRATOR:  I know what it is.
 8              MR. CHAPPELL:  Right.  And Mr. Hofer was
 9    told by his supervisor that's fine, you can do it as
10    long as you can get a pairing that can match.  And
11    he was unable to get a pairing that matched that
12    would allow him to come here.  He is also on the
13    West Coast.  And so that's why he can't testify.
14              And as far as -- I had offered and I am
15    still willing to do this.  If you rule that they can
16    testify by Skype, I did offer to give her the
17    documents ahead of time that we intend to use them
18    to -- use to move to admit into the record.  But
19    when she would not agree to the Skype and said she
20    would oppose it as she's doing today, obviously I
21    wasn't giving her those documents until this matter
22    was resolved.
23              But to try to -- also we tested that with
24    the cameras we have, we can hold up a document and
25    the witness can see them.  We don't have to wait to
```

Charlene Carter - Vol. 1                         December 7, 2017

27

```
 1   e-mail it to them or anything like that, and they
 2   can read it and they can identify it and talk about
 3   it.
 4           We all agree that live testimony is better
 5   and easier perhaps, but I do know that it's not
 6   uncommon and I believe you have even mentioned that
 7   you have done it through Skype and conference
 8   calling, other ways when the circumstances warranted
 9   it.
10           THE ARBITRATOR:  Sure.  Well, having heard
11   what you have said, I'm perfectly willing to allow
12   those two individuals to testify other than in
13   person.  Now, if we get into -- so you need to share
14   what those documents might be.
15           It was my pleasure to handle about a dozen
16   termination arbitrations for personnel in Iraq when
17   KBR was running that, and we had a lot of the
18   testimony via satellite telephone.  It was amazingly
19   credible because they weren't in a room full of
20   lawyers.  And so I firmly believe that some of the
21   best testimony there is comes from somebody who's in
22   their pajamas talking on Skype.
23           So we'll do that.  And I'll be very
24   careful what we allow and what we don't.  And I'm
25   very sensitive to the "Let me talk about my
```

Charlene Carter - Vol. 1                          December 7, 2017

```
 1    settlement."  Maybe so, maybe not.  So we'll get
 2    into that.  But yes, they can testify remotely,
 3    share the documents, and let's see where that goes.
 4    Often it turns out to be a big issue right now but
 5    not a big issue in 12 hours.  So is that okay?
 6                MR. CHAPPELL:  At the lunch break -- I
 7    mean, we kind of have them.  He's working on them.
 8                MS. GEHRKE:  Sure, yeah, we can do it at
 9    lunch.
10                MR. CHAPPELL:  But at the lunch break we
11    can get them to you.
12                MS. GEHRKE:  Okay.
13                THE ARBITRATOR:  All right.  Let's take a
14    short potty break and then get on the record and
15    have an arbitration.
16                    (Recess from 9:38 to 9:48)
17                THE ARBITRATOR:  I believe it's your
18    burden of proof, so why don't you favor me with an
19    opening statement.
20                MS. GEHRKE:  All right.  I will do that.
21                Good morning.  We are here today because
22    former flight attendant Charlene Carter is
23    challenging her termination for cause under the
24    collective bargaining agreement between Southwest
25    Airlines and TWU Local 556.
```

Charlene Carter - Vol. 1                              December 7, 2017

29

```
 1            Ms. Carter was terminated because she
 2    violated the Company's social media, bullying and
 3    hazing and harassment policies by sending Union
 4    president Audrey Stone unsolicited Facebook messages
 5    that Ms. Carter described as herself as containing
 6    very graphic photos and videos depicting aborted
 7    fetuses.  This is not the first time that Ms. Carter
 8    had sent Ms. Stone harassing, threatening, or
 9    disparaging messages.  In fact, Ms. Carter had opted
10    out of the Union and been sending Ms. Stone messages
11    on Facebook and e-mail for several years to voice
12    her dissent with the way Ms. Stone was leading the
13    Union.
14            Ms. Stone never once responded to these
15    messages or made a complaint to Southwest about
16    them.  She simply ignored them and considered it the
17    plight of a Union official to bear the political
18    attacks.  But these abortion messages were
19    different.  They crossed the line and attacked
20    Ms. Stone at the core of her being.  Ms. Carter
21    accused her of supporting the murder of these
22    aborted fetuses by simply attending the women's
23    march during President Trump's inauguration weekend.
24            Ms. Stone was in town for a women's
25    committee meeting for Local 556 with the
```

Charlene Carter - Vol. 1                              December 7, 2017

30

 1   international union, and she was there to support

 2   women's rights and workers' rights.  Ms. Carter felt

 3   that Ms. Stone's mere presence at the march

 4   supported abortion and the murder of these fetuses,

 5   all because Planned Parenthood happened to be the

 6   sponsor for the march.

 7          Ms. Carter did not know Ms. Stone's

 8   political affiliation nor her views on abortion when

 9   she sent these messages, yet in her mind Ms. Stone's

10   mere presence at the women's march on behalf of the

11   Union's committee was outrageous because Ms. Carter

12   assumed that her Union dues were being used to pay

13   for the trip and Ms. Carter did not want her money

14   going to political causes.

15          As an objector, Ms. Carter paid only the

16   minimum agency fees to contribute towards the

17   collective bargaining and representation provided by

18   the Union.  Ms. Stone's trip to D.C. was part of

19   official Union business for the women's committee.

20          But even if Ms. Carter's dues money were

21   being used by the Union committee to pay for the

22   trip, does that somehow give her the right to harass

23   and attack a fellow employee without provocation, to

24   send her photos and videos of bloody fetuses and

25   accuse her of supporting murder?

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1          Even though Ms. Stone is the local Union
 2   president, she's still a fellow Southwest employee.
 3   And like all Southwest employees, she's entitled to
 4   a workplace environment free of harassment,
 5   intimidation, bullying, and hazing.
 6          Southwest's mission statement and its work
 7   rules prohibit such conduct, and equal employment
 8   opportunity laws also prohibit that conduct.  In
 9   fact, Southwest has a duty as an employer to provide
10   a harassment-free work environment to its employees.
11          The Company learned of these posts when
12   Ms. Stone complained to her Las Vegas based manager
13   because she was very upset about the graphic nature
14   of the messages and because she was upset that
15   Ms. Carter had accused her of supporting murder
16   simply by attending the women's march.
17          The decision to report Ms. Carter weighed
18   heavily on Ms. Stone.  As she struggled to balance
19   her job of supporting all flight attendants as being
20   Union president and then being the victim of this
21   unprovoked attack and while Ms. Stone had been
22   receiving messages from Ms. Carter and other Union
23   dissenters for several years about intra-Union
24   political disagreements, she never reported those
25   messages to management.
```

Charlene Carter - Vol. 1                                    December 7, 2017

32

```
 1              Ms. Stone felt those messages were
 2   different, but these abortion messages crossed a
 3   line and they attacked her on a very personal level
 4   as a human being.  She considered them to be
 5   harassing, inappropriate, and deeply offensive and
 6   she wanted it to stop and that's why she reported it
 7   to Southwest management, so they could take action
 8   to make it stop.
 9              Upon learning of the complaint, Southwest
10   followed its procedures and promptly initiated an
11   investigation.  During that investigation, there was
12   a fact finding meeting and Southwest gathered more
13   information from Ms. Stone and all the social media
14   posts that Ms. Carter had sent her, including those
15   latest abortion messages.
16              And as part of this process, Southwest
17   also learned that Ms. Carter had publicly posted
18   these abortion photos and videos on her Facebook
19   page which was public.  And her Facebook page
20   identifies her in her posts and in her photos as a
21   Southwest flight attendant to draw attention to --
22   Ms. Carter posted those videos and those photos on
23   her public Facebook page to draw attention to her
24   pro-life political beliefs.
25              Southwest met with Ms. Carter with Union
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1  representation present to question her regarding the
 2  posts and the messages and to get her side of the
 3  story as part of the fact finding process.
 4  Ms. Carter admitted sending the messages to
 5  Ms. Stone and she didn't see the harm in it.  She
 6  told the Southwest managers during the fact finding
 7  meeting that she felt she was justified in sending
 8  the messages to try to provoke a conversation with
 9  Ms. Stone regarding her attendance at the women's
10  march and to spread her pro-life beliefs.
11          Ms. Carter was apparently frustrated that
12  Ms. Stone was not engaging in a conversation with
13  her about the women's march or historically that she
14  had been ignored when she wrote to her about Union
15  issues, including her belief that her Union dues
16  money should not be spent for political causes.
17          Ms. Carter had no remorse for her actions
18  or that she had deeply upset Ms. Stone.  After
19  investigating Ms. Stone's complaint and hearing
20  Ms. Carter's side of the story, Denver base manager
21  Ed Schneider made the decision to terminate
22  Ms. Carter's employment because her actions violated
23  the Company's social media, bullying and hazing and
24  harassment policies, policies that Ms. Carter had
25  acknowledged receiving.
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1              The decision to terminate was consistent
 2    with Company policy and its strict enforcement of
 3    its social media policy, and Ms. Carter was notified
 4    of her termination by phone and certified mail.
 5    Ms. Carter appealed her termination through the
 6    grievance process with the help of her Union.
 7    Ms. Stone recused herself from that entire process.
 8              In accordance with the contract,
 9    Ms. Carter attended a step 2 hearing with senior
10    director of inflight operations, Mike Sims.  He was
11    the Company designee responsible for hearing such
12    appeals.  Mr. Sims was a former flight attendant and
13    a Union officer before he joined Southwest's
14    management team.  And with the assistance of her
15    Union representation, Ms. Carter was allowed to
16    present her case and argue why Southwest's decision
17    to terminate her employment was unjust under the
18    collective bargaining agreement.
19              Mr. Sims considered all the facts and the
20    documentation learned during the fact finding
21    investigation and during the step 2 hearing, but to
22    avoid further litigation and having Ms. Stone be
23    required to testify, Mr. Sims negotiated an
24    agreement with the Union to offer Ms. Carter
25    reinstatement with a 24-month last chance agreement
```

Charlene Carter - Vol. 1                                    December 7, 2017

35

```
 1   on a nonprecedent-setting and nonreferral basis.

 2           Ms. Carter rejected that offer and she

 3   retained the National Right to Work Foundation as

 4   independent counsel, which is why we're here today.

 5   Ms. Carter doesn't want her job back, not only

 6   because she rejected the offer of reinstatement but

 7   because she barely worked over the last three years

 8   at the airline.  In the last three years she only

 9   worked a total of nine days because she gave away

10   nearly all of her scheduled flights.

11           This grievance is not about her job.  It's

12   about her federal court case against Southwest and

13   Local 556 for Constitutional violations and Railway

14   Labor Act violations, and it's about her crusade

15   against the current Union officers and to promote

16   her views on right-to-work laws and abortion.

17           Her status as a Union objector and her

18   political views do not give her the right to harass

19   and attack other Southwest employees, including

20   Ms. Stone.  There's a time, place, and manner for

21   speech and activities that we can debate whether

22   it's even protected, but there are limits to those

23   rights and Ms. Carter simply took it too far with

24   Ms. Stone.  And she can't hide behind her status as

25   an objector or pro-life supporter to escape the
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   responsibility of her actions.
 2             After providing due process under the CBA,
 3   Southwest was justified in terminating Ms. Carter's
 4   employment, and we ask that you deny the grievance
 5   in its entirety.  Thank you.
 6             THE ARBITRATOR:  Thank you.
 7             Sir, do you want to reserve your remarks
 8   or make them now?
 9             MR. CHAPPELL:  I will reserve until the
10   start of my case.
11             THE ARBITRATOR:  All right.  Then you may
12   call your first witness.
13             MS. GEHRKE:  Okay.  We will call Maureen
14   Emlet from labor relations.
15                  (Off record from 9:58 to 9:59)
16             THE ARBITRATOR:  Would you spell your name
17   for this young lady.
18             THE WITNESS:  Maureen, M-A-U-R-E-E-N, last
19   name Emlet, E-M-L-E-T.
20             THE ARBITRATOR:  Thank you very much.
21   Would you raise your right hand, please.
22             Do you swear that the testimony you're
23   about to give in this arbitration shall be the
24   truth?
25             THE WITNESS:  I do.
```

Charlene Carter - Vol. 1                                December 7, 2017

37

```
 1                 THE ARBITRATOR:  Thank you.  You may
 2   proceed.
 3                 MS. GEHRKE:  Thank you.
 4                      MAUREEN EMLET,
 5   having been duly sworn, testified as follows:
 6                 DIRECT EXAMINATION
 7   BY MS. GEHRKE:
 8        Q.   Good morning.
 9        A.   Good morning.
10        Q.   Ms. Emlet, how long have you been employed
11   by Southwest Airlines?
12        A.   I am just starting my 20th year with
13   Southwest.
14        Q.   Okay.  And what's your current position?
15        A.   I am the manager of labor relations in the
16   general counsel department.
17        Q.   Okay.  And how long have you held that
18   position?
19        A.   Five and a half years.
20        Q.   Can you tell us briefly about your
21   employment history with Southwest and the positions
22   you've held.
23        A.   Yes.  I began as a flight attendant.  Then
24   I was a recurrent training supervisor for four
25   years.  I transferred over to the base operations
```

Charlene Carter - Vol. 1                                    December 7, 2017

38

```
1   side and was a base manager in Oakland and Chicago
2   for about six years.  Came to headquarters in
3   inflight communications and then transferred to
4   labor relations.
5        Q.   Okay.  And what are your job
6   responsibilities as a labor relations manager?
7        A.   I am kind of a conduit between the base,
8   the Union, and the flight attendant.  I ensure that
9   the contract is being applied the way that it should
10  be.  I oversee Company policies and how they apply
11  to our flight attendants.  I counsel with the base
12  leaders in matters of discipline where there may be
13  a potential violation of a work rule or a Company
14  policy or something in the contract.
15       Q.   And are you familiar with the grievant,
16  Charlene Carter?
17       A.   I know her from -- just from this
18  grievance, yes.
19       Q.   Okay.  So you've been responsible for
20  working on her case?
21       A.   Yes.
22       Q.   As part of handling her case, what steps
23  did you take to familiarize yourself with
24  Ms. Carter's employee file?
25       A.   I did not initially look at her file.  I
```

Charlene Carter - Vol. 1                              December 7, 2017

 1   looked at all of the evidence of the case, the facts

 2   that were gathered by the base as well as other

 3   resources, and then I reviewed her discipline

 4   history for the prior 18 months, because in our

 5   collective bargaining agreement discipline rolls off

 6   after 18 months.  So I reviewed the most recent 18

 7   months, and I reviewed her attendance history.

 8        Q.   Okay.  And what did you observe with

 9   respect to her attendance?

10        A.   She has given away almost all of her trips

11   over the past almost three years.  I believe in 2015

12   she worked one day plus one day of recurrent

13   training.  In 2016 I think she may have flown four

14   days or five days and also went to recurrent

15   training.  And I did not see any trips flown during

16   2017.

17        Q.   Okay.  In your role as labor relations

18   manager, are you familiar with Southwest's

19   employment policies?

20        A.   I am.

21             MS. GEHRKE:  All right.  I'd like to ask

22   you some questions about some of those policies.

23   This will be marked as Joint Exhibit 3.

24                  (Joint Exhibit 3 marked)

25             THE ARBITRATOR:  Thank you.

Charlene Carter - Vol. 1                                    December 7, 2017

40

```
 1   BY MS. GEHRKE:
 2        Q.   Ms. Emlet, are you familiar with Joint
 3   Exhibit 3 which is the mission statement of
 4   Southwest Airlines?
 5        A.   Yes, I am.
 6        Q.   Okay.  And do employees have access to
 7   this mission statement?
 8        A.   Yes, they do.  In fact, every time you
 9   open SWALife, which is our intranet, I guess you'd
10   call it, our internal website, the mission statement
11   is posted there.  It's posted all over.  It's posted
12   in the lounges.  It's posted at headquarters.
13   It's -- this is the backbone of our company.
14        Q.   Okay.  And are all employees expected to
15   abide by the mission statement?
16        A.   Yes.
17        Q.   And is it an important part of Southwest
18   culture?
19        A.   Yes, it is.
20        Q.   Is there anything particular with the
21   mission statement that you felt was relevant to
22   Ms. Carter's case?
23        A.   Yes.  I -- well, the first sentence, of
24   course, is always important, but I think that the
25   second section, "To Our Employees, We are committed
```

Charlene Carter - Vol. 1                                December 7, 2017

```
 1   to provide our Employees a stable work environment
 2   with equal opportunity for learning and personal
 3   growth."  And then it goes on, and the last sentence
 4   states, "Above all, Employees will be provided the
 5   same concern, respect, and caring attitude within
 6   the organization that they are expected to share
 7   externally with every Southwest Customer."
 8            MS. GEHRKE:  Thank you.  I'd like to ask
 9   you about the basic work rules and expectations.
10   This will be Joint Exhibit 4.
11            (Joint Exhibit 4 marked)
12   BY MS. GEHRKE:
13        Q.   Ms. Emlet, can you tell the arbitrator
14   what this document is.
15        A.   Yes.  This is a copy of the work rules and
16   expectations for flight attendants.
17        Q.   Is this an excerpt of a broader document?
18        A.   Yes.
19        Q.   Okay.  And do flight attendants receive a
20   copy of this document?
21        A.   Yes, they do.  It is housed in their
22   flight attendant manual.
23        Q.   Okay.  And what's the purpose of this
24   document?
25        A.   It's -- it's to give them guidelines of
```

Charlene Carter - Vol. 1                                    December 7, 2017

42

```
 1   the expectations for work.  It's not all
 2   encompassing and it states here that not every
 3   single thing could be listed, but it does give them
 4   the groundwork and the framework for what is
 5   expected of them as an employee and a flight
 6   attendant at Southwest Airlines.
 7            It also goes in on the second page to
 8   discuss how we determine whether or not discipline
 9   would be warranted and how that would be applied.
10       Q.   Okay.  So looking at Section 3.2.0. titled
11   "Progressive Discipline" --
12       A.   Yes.
13       Q.   -- does Southwest generally have a
14   progressive discipline policy?
15       A.   Most of the time, yes.  Occasionally there
16   are behaviors or events that are so egregious they
17   warrant termination or staunch suspensions on a
18   first offense.
19       Q.   Okay.  And does Southwest classify
20   different types of offenses based on severity?
21       A.   Yes.  We actually have five classes of
22   work rules.  And if you look at the bottom of the
23   second page, it starts there.  We haven't listed out
24   what those violations are, but it tells you what the
25   discipline is.
```

Charlene Carter - Vol. 1                                December 7, 2017

43

```
 1              So, for instance, on a Class I, a first
 2    violation would be a possible termination up to a
 3    30-day suspension.  For a Class II, a first
 4    violation would be final warning with possible
 5    termination.  In my experience on Class I
 6    violations, I've almost never seen a Class I
 7    violation that did not result in termination on a
 8    first offense.
 9         Q.   Okay.  And what would be an example of a
10    Class I violation?
11         A.   Theft, dishonesty.  My favorite, moral
12    turpitude, just because I like the way that sounds.
13    There is a rule that we have, we refer to it as
14    Class I-17, reserve flight attendants are required
15    to be within two hours' driving distance of their
16    domicile during their contact hours.
17              So they -- in my opinion, you have to work
18    pretty hard to commit a Class I violation, and we
19    take them very, very seriously.
20         Q.   Could a social media policy violation be a
21    Class I violation?
22         A.   It is not listed in our classes of
23    violations.  However, this document here, as you can
24    see from the title, does also reference Company
25    policies, flight attendant work rules and
```

Charlene Carter - Vol. 1                                December 7, 2017

```
 1    expectations slash Company policies.  Our Company
 2    policies, some of them are included in the flight
 3    attendant manual.  All of them are available on
 4    SWALife.  And a social media violation could be a
 5    violation of just the social media policy.  It could
 6    include violations of other Company policies.  It
 7    could include violations of work rules.
 8        Q.   Okay.  And what about the harassment
 9    policy?
10        A.   The harassment policy is housed on
11    SWALife.  It's available to all employees
12    electronically.  It also is replicated in the flight
13    attendant manual.
14        Q.   Could that be a Class I violation?
15        A.   It's not listed under a Class I violation.
16    However, depending on the severity of the violation,
17    it could result in termination on a first offense.
18        Q.   And would the same thing apply to the
19    bullying and hazing policy?
20        A.   Absolutely.
21        Q.   Okay.  And what is generally taken into
22    consideration when deciding what level of discipline
23    is appropriate?
24        A.   Well, it tells you here on page 2 that in
25    determining discipline we look at the nature of the
```

Charlene Carter - Vol. 1                                    December 7, 2017

45

```
 1   violation, the surrounding circumstances if
 2   appropriate, and the overall employee record during
 3   the previous 18-month period.
 4                    (Joint Exhibit 5 marked)
 5        Q.   Okay.  I want to ask you some questions
 6   about the harassment policy issued by Southwest
 7   Airlines.  That's Joint Exhibit No. 5.  And we
 8   confirmed that this was the policy in effect at the
 9   relevant time period.  Are you familiar with this
10   document, Ms. Emlet?
11        A.   Yes, I am.
12        Q.   Okay.  Can you generally describe
13   Southwest's policy on harassment, discrimination,
14   retaliation?
15        A.   Yes.  We take violations of this policy
16   very seriously.  Harassment or discrimination based
17   on -- and it lists, of course, all of the covered
18   categories, race, color, ancestry, religion,
19   et cetera, and then it gives some examples of what
20   would be considered types of derogatory, sexually
21   suggestive, offensive or threatening or intimidating
22   behaviors.
23        Q.   And was this policy relevant during
24   Ms. Carter's investigation?
25        A.   I'm sorry.  Was it what?
```

Charlene Carter - Vol. 1                                    December 7, 2017

46

```
 1          Q.   Relevant to Ms. Carter.

 2          A.   Yes, it was.

 3          Q.   How so?

 4          A.   One of the posts that Ms. Carter sent to

 5     Ms. Stone was of a sexual nature.  It was a still

 6     shot of three women wearing headdresses that were I

 7     guess supposed to be depictions of women's vaginas.

 8     So they were like these vagina headdresses with

 9     women's hats or heads in the center, and she sent

10     that to Ms. Stone.

11          Q.   Okay.  And do employees have access to

12     Southwest's anti-harassment policy?

13          A.   Yes.  Every single year every employee is

14     required to acknowledge that they have read and

15     agree to abide by this policy.  That's done

16     electronically.  This is also available on SWALife,

17     and it is in the flight attendant manual.

18                      (Joint Exhibit 6 marked)

19          Q.   Okay.  Thank you.  I want to ask you some

20     questions about the bullying and hazing policy next.

21     That's Joint Exhibit 6.  Ms. Emlet, are you familiar

22     with this document?

23          A.   Yes, I am.

24          Q.   And is this bullying and hazing policy

25     also available on SWALife?
```

Charlene Carter - Vol. 1                          December 7, 2017

47

```
 1         A.    Yes, it is.
 2         Q.    And do employees have to acknowledge
 3    receiving a copy or having access to this policy?
 4         A.    Yes.
 5         Q.    Can you generally describe the Company's
 6    policy with respect to workplace bullying and
 7    hazing?
 8         A.    Yes.  We take this very seriously, and
 9    it's just not tolerated.  It reiterates the mission
10    statement and that we are to provide all employees
11    with the same concern, respect, and caring attitude
12    within the organization that they are expected to
13    share externally.  And it goes on to state that
14    therefore hazing and bullying, including
15    cyberbullying, which would be social media, are not
16    tolerated in the workplace.
17         Q.    And can you explain how Ms. Carter's
18    actions with respect to Ms. Stone violated this
19    policy.
20         A.    Yes.  If you look at the bullet points,
21    the first bullet point talks about verbal bullying
22    and talks about the behaviors that are included such
23    as slandering, ridiculing, hurtful name-calling,
24    personal insults.
25                And then if you skip down to the fourth
```

Charlene Carter - Vol. 1                          December 7, 2017

48

```
 1   bullet point, where this came into play with
 2   Ms. Carter was the cyberbullying that included
 3   behaviors outlined in the verbal bullying by using
 4   electronic technology devices and communication
 5   tools.
 6                  (Joint Exhibit 7 marked)
 7        Q.   Thank you.  I want to ask you about the
 8   social media policy next.  That is Joint Exhibit 7.
 9   Ms. Emlet, are you familiar with this document?
10        A.   Yes.
11        Q.   And this document was issued in
12   April 2016?  Is that correct?
13        A.   Yes.
14        Q.   Okay.  And do employees have access to
15   this policy?
16        A.   Yes.
17        Q.   Would that be on SWALife?
18        A.   Yes.
19        Q.   And do employees have to acknowledge
20   receipt electronically of this?
21        A.   Yes, they do, of the social media policy.
22        Q.   Okay.  Can you generally describe what the
23   Company's policy is with respect to social media?
24        A.   Yes.  I think that it's well stated in
25   this bold, italicized sentence that states, "For
```

Charlene Carter - Vol. 1                              December 7, 2017

49

```
 1   that reason, certain social media content that in
 2   any way is later related to Southwest, reflects
 3   poorly upon Southwest, or impacts the workplace, is
 4   a violation of this policy and may result in
 5   discipline, up to and including termination."
 6            And then Southwest actually -- you know,
 7   I'm sure that we would love to not be in the social
 8   media violation business, but we've -- we have to
 9   address it because it's a real thing.  And we take
10   it so seriously that not only do we have this policy
11   on SWALife available to all employees, we also have
12   training videos, self-training videos and resources
13   on SWALife attached to this policy that are
14   available to everyone so that they are well educated
15   on what is acceptable social media behavior and what
16   is not.
17       Q.    Okay.  And in fact, the policy also
18   provides employees with examples of the type of
19   conduct that may be a violation of the policy?
20       A.    Yes, it does.
21       Q.    Okay.  Can you explain how Ms. Carter's
22   conduct violated this policy?
23       A.    Yes.  If you go to the first bullet point,
24   it states, "Content that may be viewed as untrue,
25   disrespectful, malicious, obscene, violent,
```

Charlene Carter - Vol. 1                                December 7, 2017

50

```
 1    harassing, bullying, defamatory, threatening, lewd,
 2    intimidating, discriminatory or retaliatory."
 3              Ms. Carter sent two videos along with the
 4    still shot of the women wearing the vagina
 5    headdresses.  She sent two videos of babies being
 6    aborted, of aborted fetuses, and then those were
 7    accompanied by different verbiage such as calling
 8    Ms. Stone a murderer, assuming that she was
 9    pro-abortion, she was a sheep in wolf's clothing.
10    She was accused of stealing and mishandling Union
11    funds.
12              And then in the second bullet point it
13    says, "Content that may be viewed as damaging
14    Southwest's public perception," and these same
15    videos or similar videos were posted on Ms. Carter's
16    public Facebook page along with photos of herself
17    identifying her as a Southwest Airlines flight
18    attendant.
19              (Company Exhibit 1 marked)
20         Q.   I'm going to hand you what's Southwest
21    Exhibit No. 1.
22              Ms. Emlet, you testified that employees
23    had to acknowledge receiving, understanding, and
24    abiding by the policies we just discussed, correct?
25         A.   Yes.
```

Charlene Carter - Vol. 1                                      December 7, 2017

51

```
 1         Q.    And how often do employees have to
 2   acknowledge those policies?
 3         A.    Annually.
 4         Q.    And do you know if Ms. Carter acknowledged
 5   receiving those policies?
 6         A.    Yes.
 7         Q.    All right.   Southwest Company
 8   Exhibit No. 1 is a document that -- well, why don't
 9   you explain to me what this document is.
10         A.    Yes.
11               THE ARBITRATOR:   I would prefer it.
12               MS. GEHRKE:   I'll testify if you want.
13         A.    This is a document that was provided to us
14   from our technology group.   And if you look in this
15   little box that's at the top of the page, you'll
16   notice that it says, "I, Vincent Vasquez."   That's
17   because he is our technology person.   So that box is
18   there simply to show you a replication of the
19   notification that goes out to every employee.   When
20   the employee logs on to SWALife, this box pops up.
21   And since they log in with their employee number,
22   their name would be in this box.
23               And then if you look to the bottom left of
24   the page, it shows you that "e," for employee,
25   38690, which was Ms. Carter's employee number, her
```

Charlene Carter - Vol. 1                               December 7, 2017

52

```
 1   name, Charlene Carter, and that on April 22nd, 2016,
 2   at 10:14 she acknowledged receipt of these policies.
 3        Q.    Okay.   And as part of acknowledging
 4   receipt of these policies, are they also agreeing to
 5   abide by them?
 6        A.    Yes.
 7             THE ARBITRATOR:   Is there an objection
 8   about Southwest 1?
 9             MR. CHAPPELL:   I don't mind it being
10   entered for the purpose of showing the form, but I
11   don't know about whether I need to confer -- why
12   don't you -- may I take a moment to confer with my
13   client?  I may not have an objection.
14             THE ARBITRATOR:   No, that's fine, sure.
15   Yeah, let's take another potty break.  We'll be off
16   seven minutes.
17                  (Recess from 10:20 to 10:27)
18             THE ARBITRATOR:   We'll go back on the
19   record.  You were going to confer and see if she had
20   a problem with this evidencing that she received the
21   policy?
22             MR. CHAPPELL:   We have no problem with it
23   being admitted, and we expect to have some testimony
24   about it.
25             THE ARBITRATOR:   Sure.   All right.
```

Charlene Carter - Vol. 1                                    December 7, 2017

53

```
 1  That'll be fine.  SWA 1 is admitted.
 2                  (Company Exhibit 2 marked)
 3  BY MS. GEHRKE:
 4      Q.   I'm going to hand you what's marked as
 5  Southwest Company Exhibit No. 2.  Ms. Emlet, are you
 6  familiar with this document?
 7      A.   Yes, I am.
 8      Q.   Can you please describe for us what it is?
 9      A.   Yes, this just goes to further show you
10  what the employee sees when they acknowledge the
11  SWALife announcement that they have read and agreed
12  to abide by these Company policies.
13      Q.   Okay.  So here we have page 1.  Can you
14  tell us what that document was, why Mr. Vasquez sent
15  you this e-mail?
16      A.   Yes.  He sent that for Ms. Charlene Carter
17  on January 21st of 2017, she again acknowledged the
18  receipt and agreeing to comply with the Company
19  policies.
20           And then on the second page it briefly
21  tells you what these policies are and just a very
22  tiny synopsis of what they mean.  The very first one
23  talks about the first quarter acknowledgment and
24  reminds the employees that it's important for them
25  to take the time to read the policies, be aware of
```

Charlene Carter - Vol. 1                                    December 7, 2017

54

```
 1    the expectations outlined in the policies, and know
 2    that they will be held accountable for complying
 3    with these policies.  And as such, they are asked to
 4    confirm whether they are aware that they will be
 5    held accountable for the policies being applied to
 6    them.
 7         Q.   Okay.  That's what Ms. Carter did on
 8    January 21st, 2017?
 9         A.   That's correct.
10              MS. GEHRKE:  We would move to introduce
11    Southwest Exhibit No. 2 into evidence.
12              THE ARBITRATOR:  No objection but might
13    have comments?
14              MR. CHAPPELL:  No objection, but obviously
15    you may hear more about it.
16              THE ARBITRATOR:  All right.  That's fine.
17    It'll be admitted.
18                   (Company Exhibit 3 marked)
19    BY MS. GEHRKE:
20         Q.   Ms. Emlet, I want to ask you about
21    documents called "Read Before Fly."  This one is
22    marked as Southwest Exhibit 3.  Ms. Emlet, can you
23    please identify what Southwest Company Exhibit No. 3
24    is?
25         A.   Yes.  This is a read before fly.  These
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   are memos that are issued to flight attendants to
 2   update them on critical information that they need
 3   to know before they fly a trip.  We commonly refer
 4   to them as RBFs.  And this one, you'll see it says
 5   2013-006.  That denotes that this was the sixth RBF
 6   issued in 2013.
 7           And then this one was actually issued on
 8   January 11th to all flight attendants from Mike
 9   Mankin who was the director of employee resources at
10   the time, and at that time that really is labor
11   relations.  We just changed our name.  And this is
12   to alert flight attendants that there is a revised
13   social media policy that was introduced and is
14   applicable to all Southwest employees, members of
15   the board of directors, and the contractors, it's
16   the responsibility of all employees to familiarize
17   themselves with the new policy, and that mandatory
18   acceptance of the policy will be required beginning
19   January 16th of 2013.  It also gives the flight
20   attendants the path that they can follow on SWALife
21   if they want to view the document online.
22       Q.   Okay.  Approximately how many RBFs or read
23   before fly does the Company issue per year?
24       A.   It varies with the needs of the operation.
25   It could be anywhere from 100 to 200 per year.  I
```

Charlene Carter - Vol. 1                        December 7, 2017

56

```
 1   know that during the years that we were acquiring
 2   AirTran that we started international service, we
 3   had so many changes that were critical for the
 4   flight attendants to know, there were more read
 5   before flies.  But they're generally fairly short.
 6   And as I said before, every flight attendant is
 7   required to read any new RBFs that have come out
 8   since the last time they flew.  So if you fly every
 9   Monday of every week and you read all of your RBFs
10   on the first Monday, before the second Monday you'd
11   have to read any new RBFs that had come out during
12   that time period.
13           MS. GEHRKE:  Okay.  Thank you.  We'd like
14   to move to introduce Southwest Exhibit No. 3 into
15   evidence.
16           MR. CHAPPELL:  No objection.
17           THE ARBITRATOR:  Thank you.  It'll be
18   admitted.
19               (Company Exhibit 4 marked)
20           MS. GEHRKE:  I'll be passing out Southwest
21   Company Exhibit No. 4.
22   BY MS. GEHRKE:
23      Q.   Ms. Emlet, can you identify what this
24   document is, please.
25      A.   Yes.  This is a read before fly that was
```

Charlene Carter - Vol. 1                                    December 7, 2017

57

```
 1   issued on May 16th of 2015 by Mike Hafner who was
 2   our vice president at the time.  And at that time
 3   flight attendants were housed under cabin services.
 4   And this actually was issued in response to a social
 5   media post, a video that a customer had posted
 6   taking video of one of our flight attendants on the
 7   jump seat and alleging that the flight attendant was
 8   under the influence of alcohol or drugs.  There was
 9   a lot of speculation by flight attendants on
10   Facebook regarding that post.  This flight attendant
11   actually was having a medical event and had to be
12   hospitalized.
13           And so this is Mike Hafner's request to
14   our flight attendants that they not engage in
15   conversation, speculation, and reminding us that we
16   should know that it is unacceptable to condemn our
17   family members based on assumptions made without
18   knowing all of the facts surrounding very difficult
19   situations.
20       Q.   And how is this RBF relevant to
21   Ms. Carter's case?
22       A.   With the videos and still shots that
23   the -- that Ms. Carter sent to Ms. Stone via
24   Facebook messaging, she told us that -- and by the
25   words that she used in her comments to Ms. Stone,
```

Charlene Carter - Vol. 1                              December 7, 2017

58

```
 1   she was making assumptions that Ms. Stone was
 2   promoting abortion, that she was in favor of
 3   murdering babies, and making assumptions without
 4   knowing really I think any of the facts about
 5   Ms. Stone personally.
 6           MS. GEHRKE:  Thank you.  I'd like to move
 7   Southwest Company Exhibit No. 4 into evidence,
 8   please.
 9           MR. CHAPPELL:  No objection.
10           THE ARBITRATOR:  Thank you, sir.
11           MS. GEHRKE:  We'll mark this next document
12   as Southwest Company Exhibit No. 5.
13               (Company Exhibit 5 marked)
14   BY MS. GEHRKE:
15       Q.   Ms. Emlet, can you identify for us what
16   this document is, please.
17       A.   Yes.  This is an RBF issued on
18   October 12th, 2016, to all flight attendants from
19   Naomi Hudson who is one of our senior directors of
20   labor relations.  And it was a reminder of
21   acceptable and unacceptable behavior regarding
22   social media.
23           And about halfway through the first
24   paragraph, you'll see that it says, "Making such
25   statements, circulating or forwarding such
```

Charlene Carter - Vol. 1                                    December 7, 2017

59

```
 1   statements is not only divisive and cruel, but it is
 2   contrary to what we stand for and is absolutely
 3   unacceptable behavior for a Southwest employee."
 4       Q.   Okay.  So this was just a reminder again
 5   about Southwest's social media policy and
 6   expectations for flight attendants and other
 7   employees?
 8       A.   It is.  And it reminds them as well that
 9   even if they think that their comments are private,
10   they rarely on social media remain that way.  And it
11   also reminds them that comments made on social media
12   may violate, among other things, the policy
13   concerning harassment, sexual harassment,
14   discrimination, and retaliation, Southwest's
15   workplace bullying and hazing policy, and/or
16   Southwest's social media policy.
17            MS. GEHRKE:  Thank you.  I'd like to move
18   Southwest Company Exhibit No. 5 into evidence,
19   please.
20            MR. CHAPPELL:  No objection.
21            THE ARBITRATOR:  Thank you, sir.  Be
22   admitted.
23                 (Company Exhibit 6 marked)
24   BY MS. GEHRKE:
25       Q.   The next document's marked Southwest
```

Charlene Carter - Vol. 1                                    December 7, 2017

60

```
 1   Company Exhibit No. 6.  Ms. Emlet, can you identify
 2   for us what this document is?
 3       A.   Yes.  This is another read before fly
 4   published on February 22nd of this year.  Sonya
 5   Lacore, who is our current vice president of
 6   inflight operations, collaborated with Julie Weber
 7   who's the V.P. of people -- that's basically our
 8   human resources department -- and Russell McCrady,
 9   who is the vice president of labor relations.
10            It's a lengthy document, much longer than
11   most RBFs that we publish, but I think that that
12   goes to show the importance and impact of the
13   message that they are reiterating the second portion
14   of the Southwest mission statement that we --
15            MR. CHAPPELL:  I'm going to object to this
16   one.  So I don't mind her identifying it, but I
17   don't want her to read from it until you rule on my
18   objection.
19            THE ARBITRATOR:  I got you.
20            MR. CHAPPELL:  The main postings and
21   messagings that are the heart of the termination
22   were done on February 14th and this was issued on
23   February 22, so it was not -- I'm not saying
24   something wasn't in effect, but I don't think it's
25   proper to use a read before fly that was issued
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   after the incidents that led to my client's
 2   termination.  So that's why I'd object.
 3             MS. GEHRKE:  I understand your concern.
 4   We're not using this to show that she would have
 5   received this prior to her posts.  I was going to --
 6   my next question to Ms. Emlet was going to be why
 7   the Company issued this RBF at this time.
 8             MR. CHAPPELL:  Even so, I fail to see how
 9   it's relevant, even if you're not going to claim
10   that she knew about it, because you're going to talk
11   about policies that you haven't established existed
12   at the time in this.
13             MS. GEHRKE:  Well, I think it's relevant
14   to the Company's response to not only Ms. Carter's
15   social media posts but other social media posts that
16   were going on around this time and that this was the
17   Company's response because this --
18             THE ARBITRATOR:  Let me short-circuit this
19   a little bit.  How many more RBFs --
20             MS. GEHRKE:  This is the last one.
21             THE ARBITRATOR:  Okay.  It's less relevant
22   than the others, but I'm going to allow it.  I get
23   it.  They're in a social media firestorm and they
24   have to tell everybody they're serious about it.
25   Whether she knew about it and whether it's legally
```

Charlene Carter - Vol. 1                                    December 7, 2017

62

```
 1   significant, I'll sort that out.  So I'm going to
 2   let it in over your objection and accord it what
 3   weight it's entitled to.
 4            MR. CHAPPELL:  Right.  And my only
 5   objection is to the date, the post dates, and it
 6   seems unfair to deal with it when --
 7            THE ARBITRATOR:  Sure.
 8            MR. CHAPPELL:  -- it could not have
 9   applied to her.
10            THE ARBITRATOR:  I got you.
11            MR. CHAPPELL:  Okay.
12   BY MS. GEHRKE:
13       Q.   Okay.  Ms. Emlet, we can all read the
14   document.  The arbitrator's capable of reading the
15   document, so he can see what it says, but can you
16   explain why the Company issued this RBF at this
17   time.
18       A.   Yes.  All of these policies had actually
19   been in place for several years, but the violations
20   of these policies just continued to grow and grow.
21   And so these -- all the different departments -- not
22   all the different.  These different departments came
23   together.  They started working in the fall of 2016
24   on a joint document to publish and to put out to
25   flight attendants just to make sure that they knew
```

Charlene Carter - Vol. 1                                   December 7, 2017

```
 1   how seriously Southwest was taking these issues and
 2   that we did have policies in place that we intended
 3   to enforce and follow.
 4            MS. GEHRKE:  Thank you.  So we would move
 5   this into evidence.
 6            THE ARBITRATOR:  I've admitted it.
 7            MR. CHAPPELL:  I think he's overruled my
 8   objection.
 9            THE ARBITRATOR:  I barely overruled your
10   objection.
11            MR. CHAPPELL:  That means you get it.
12   BY MS. GEHRKE:
13       Q.   All right.  Ms. Emlet, I'd like to ask you
14   now about Southwest's investigation into
15   Ms. Carter's social media posts in 2017.  Were you
16   involved in the Company's investigation and handling
17   of Ms. Carter's social media posts?
18       A.   Yes, I was.
19       Q.   Okay.  Can you tell us briefly how you
20   were involved?
21       A.   Yes.  I generally get involved in cases
22   that have the potential to result in suspension or
23   termination.  This particular issue, we really had
24   not seen anything of this nature prior to this.  And
25   so the base contacted me early on, shared the videos
```

Charlene Carter - Vol. 1                                        December 7, 2017

64

```
 1   with me, the e-mail message -- or I guess the
 2   Facebook messages and the still shots of what
 3   Ms. Carter had sent to Ms. Stone.
 4           I also was privy to the fact finding notes
 5   and the notes from the interview of Ms. Stone.  I
 6   reviewed all of that information and acted as a
 7   consultant with the base leader, Ed Schneider, in
 8   his determination of whether or not there was a
 9   violation and, if there was a violation, what would
10   be the appropriate discipline.
11       Q.   Okay.  Did you actually participate in the
12   fact finding meetings with Ms. Carter?
13       A.   I did not.
14       Q.   Okay.  But you mentioned as part of the
15   investigation Mr. Schneider had sent you a copy of
16   the social media posts that were at issue?
17       A.   Yes.  He sent me the social media posts as
18   well as the fact finding notes from the meeting.
19       Q.   All right.  I'd like to show you the two
20   videos, just the still shots of them.  We're not
21   going to play the videos for you.  I just want to
22   show you the still shots of them so you can identify
23   that these were the documents sent to you.  Okay?
24           All right.  So this is the first one.  You
25   can see in the center of the picture it has a round
```

```
 1   circle with a triangle that signifies to play a
 2   video.
 3        A.   Yes.
 4        Q.   Is this one of the videos that was sent to
 5   you, or does this represent one of the still shots
 6   of the videos?
 7        A.   Yes.
 8        Q.   Okay.  The next one?  Okay.  Was this
 9   another one of the still shots that was sent to you?
10        A.   Yes.
11        Q.   And was this the final video, the second
12   video that was sent to you?
13        A.   Yes.
14        Q.   And was this the third still shot of the
15   vagina headdress that was sent to you?
16        A.   Yes, it is.
17        Q.   All right.  What was your reaction when
18   you received these social media messages Ms. Carter
19   had sent to Ms. Stone in your role as labor
20   relations?
21        A.   I had not personally seen anything as
22   egregious or disturbing as these videos.  I found
23   them extremely offensive.  I was actually -- I was
24   physically ill.  I had to leave my office.
25        Q.   Okay.  And when you saw them, did you
```

Charlene Carter - Vol. 1                                    December 7, 2017

66

```
 1    consider this to be kind of part of the intra-Union
 2    squabbles that you had been hearing about as part of
 3    your role as labor relations manager?
 4         A.   I was not looking at this --
 5              MR. CHAPPELL:  Objection.  Foundation and
 6    leading.
 7              THE ARBITRATOR:  Well, let's break that
 8    down.  Would you repeat her question?
 9              THE REPORTER:  Question:  "And when you
10    saw them, did you consider this to be kind of part
11    of the intra-Union squabbles that you had been
12    hearing about as part of your role as labor
13    relations manager?"
14              THE ARBITRATOR:  Let's dice that up in
15    about two or three questions, was there -- are you
16    aware of a conflict, did you consider this part.  He
17    may not know -- I bet you do, but I do anyway.
18              MS. GEHRKE:  Okay.  Fair enough.
19              MR. CHAPPELL:  Just so the record's
20    clearer?  And I'm assuming you're denying the
21    objection on leading?
22              THE ARBITRATOR:  No, I'm actually granting
23    it.
24              MR. CHAPPELL:  Okay.
25              THE ARBITRATOR:  I want her to rephrase
```

Charlene Carter - Vol. 1                          December 7, 2017

67

```
 1   it, parcel it out.
 2            MR. CHAPPELL:  Thank you.
 3   BY MS. GEHRKE:
 4       Q.   Ms. Emlet, in your role as labor relations
 5   manager, were you aware of any disputes going on
 6   within the Union?
 7       A.   Yes, I was.
 8       Q.   Okay.  And what was, quickly, the summary
 9   of kind of what the concerns were?
10       A.   I'm not sure if it's accurate to say
11   within the Union or if it's more accurate to say
12   within the membership.  I know that there was a
13   large group of flight attendants who did not believe
14   that the current Union leadership should be in
15   office, and they were actively working to have that
16   leadership recalled.
17       Q.   Okay.  Now, when these social media posts
18   were sent to you, did you believe that this was kind
19   of part of the social media -- let me back up.
20            As part of the kind of disputes going on
21   within the membership regarding Union leadership,
22   did those disputes play out on social media?
23       A.   They have played out on social media.  In
24   these posts, Ms. Carter specifically called out the
25   TWU AFL-CIO.  I at that time had no idea of
```

Charlene Carter - Vol. 1                                    December 7, 2017

68

```
 1   Ms. Carter's opinion about the current Union
 2   leadership.  To me this post was -- as potential for
 3   any kind of violation, my opinion was that this was
 4   one employee attacking another employee via social
 5   media.  And the -- her feelings or opinions about
 6   Union leadership to me were irrelevant because the
 7   issue was, did she violate any policies by sending
 8   these messages and videos and screenshots to another
 9   employee.
10       Q.   Now, as part of the Company's
11   investigation, did you learn whether or not
12   Ms. Carter had made these similar posts on her
13   public Facebook page?
14       A.   Yes, I did.
15       Q.   Okay.  And how did you learn about those
16   public posts?
17       A.   One of our employee resources specialists
18   who was working on the case sent those to me as part
19   of my investigation and the base investigation.
20            Typically, anytime we have an allegation
21   of a social media violation, we will go to the
22   employee's public Facebook page and because we need
23   to verify are these real, did they really come from
24   that person.  It's just part of the cross-check and
25   verification process.
```

Charlene Carter - Vol. 1                         December 7, 2017

69

```
 1        Q.   Okay.  And are you very familiar with
 2   social media?
 3        A.   No, I'm not.
 4        Q.   Are you aware that Facebook does have
 5   privacy settings?
 6        A.   I am now.
 7        Q.   Okay.  So when Southwest went to
 8   Ms. Carter's Facebook page, they were looking at
 9   only the information that was publicly available?
10        A.   Yes, on the public page, available to
11   anyone to view.
12             MR. CHAPPELL:  I wasn't watching the
13   screen.  Is this the Facebook one or is this still
14   the Messenger one?  I don't know if you -- did you
15   change?
16             MS. ARMSTRONG:  Yeah, they're all -- it's
17   these three.
18             MS. GEHRKE:  Okay.  So these were the
19   ones.
20             MR. CHAPPELL:  That one seems to be the
21   Messenger one.
22             MS. GEHRKE:  It's the same post both in
23   Messenger and on the public Facebook page?
24             MR. CHAPPELL:  I -- if you're going to
25   talk about whatever you found by going through her
```

```
 1   public Facebook page, I think we should see it, not
 2   the Messenger one.
 3              MS. GEHRKE:  All right.  We can try to
 4   find that.
 5              THE ARBITRATOR:  I think that's a valid
 6   point.
 7              MR. CHAPPELL:  Without seeing it, we don't
 8   know what the commentary --
 9              MS. GEHRKE:  Maybe give us a second to
10   pull it up.
11              MR. CHAPPELL:  Yeah, sure.
12              THE ARBITRATOR:  Off the record.
13                   (Off record from 10:52 to 10:53)
14                   (Company Exhibit 7 marked)
15              MS. GEHRKE:  Can we go back on the record,
16   please?
17              THE ARBITRATOR:  Sure.
18              MS. GEHRKE:  Before we move to the public
19   Facebook posts, I would like to introduce the
20   Messenger posts into evidence.  That's Company
21   Exhibit 7.  These are the Messenger ones.
22              MR. CHAPPELL:  Okay.  And this is what you
23   blew up on the screen?
24              MS. GEHRKE:  Yeah, the first ones.
25              MR. CHAPPELL:  And you're not suggesting
```

Charlene Carter - Vol. 1                          December 7, 2017

```
 1    by using the screen that the witness or anyone else
 2    viewed these at that size or anything?
 3                MS. GEHRKE:  No, these were submitted to
 4    the Company by Ms. Stone.  It was part of her
 5    complaint.
 6                MR. CHAPPELL:  Okay.  I can ask her
 7    questions about it.
 8                THE ARBITRATOR:  Okay.  So no objection to
 9    7, may clear it up on cross?
10                MR. CHAPPELL:  Hang on just a second.  And
11    these are represented that they are the Messenger
12    ones from Ms. Carter to Ms. Stone?
13                MS. GEHRKE:  Correct.
14                MR. CHAPPELL:  Okay.  If you can give me a
15    second.
16                THE ARBITRATOR:  Uh-huh.
17                MS. GEHRKE:  Okay.  So Exhibit 7 is the
18    Messenger posts from Ms. Carter to Ms. Stone.
19    There's two videos which are part of --
20                THE ARBITRATOR:  When you say Messenger,
21    do you mean the Instant Messenger?
22                MS. GEHRKE:  Well, Facebook has a wall
23    where you post, and then there's like a chat feature
24    which is called Messenger.  So these were private
25    messages between Ms. Carter and Ms. Stone.
```

Charlene Carter - Vol. 1                                    December 7, 2017

72

```
 1                THE ARBITRATOR:  Okay.
 2                MS. GEHRKE:  So there's two videos and
 3      then a still shot which we're calling the vagina
 4      headdress shot.
 5                MR. CHAPPELL:  And one other.  There's
 6      two?  That's a still shot too.
 7                MS. GEHRKE:  The second -- page 2 is a
 8      continuation of the first video post.
 9                MR. CHAPPELL:  Okay.  So you're not
10      including the picture in the submission?
11                MS. GEHRKE:  Well, it's all -- if you read
12      the text, it all continues.  It's all part of the
13      same first video.
14                MR. CHAPPELL:  Okay.  But there's a
15      picture.
16                MS. GEHRKE:  We're not getting into that.
17                MR. CHAPPELL:  So you're not really
18      submitting this picture?
19                MS. GEHRKE:  Well, to the extent it's part
20      of the first video post, it's in the record, but
21      we're not -- I'm not saying that this picture is a
22      video or anything like that.
23                MR. CHAPPELL:  Okay.  And you're not
24      saying that this picture is offensive or anything?
25                MS. GEHRKE:  Well, we can testify about
```

 1   that.  I'm not here to testify.  She can testify

 2   about it.

 3              MR. CHAPPELL:  Okay.  I'll clear that up

 4   with her then.

 5              THE ARBITRATOR:  How about if I put a

 6   big -- okay.

 7              MR. CHAPPELL:  Right.  And it's easy to

 8   tell what are videos here.  And you're familiar with

 9   seeing those little --

10              THE ARBITRATOR:  Uh-huh.

11              MR. CHAPPELL:  Right.  And if that's not

12   there, it's not a video.  Okay.  On the last page

13   not there.  In light of all of that, I have no

14   objection to it being admitted.

15              THE ARBITRATOR:  Uh-huh.

16              MS. GEHRKE:  Okay.  So number 7 is in

17   then?

18              THE ARBITRATOR:  Yes.

19              MS. GEHRKE:  Okay.  All right.  I'm going

20   to mark now Southwest Company Exhibit No. 8.

21              (Company Exhibit 8 marked)

22   BY MS. GEHRKE:

23       Q.   Ms. Emlet, can you identify for us what

24   Southwest Company Exhibit No. 8 is.

25       A.   Yes.  These are photos of postings that

Charlene Carter - Vol. 1                                    December 7, 2017

74

```
 1   were on Ms. Carter's public Facebook page.
 2        Q.   Okay.  So can you tell us what the first
 3   page is?  Is that one of the videos that was on the
 4   private Messenger to Ms. Stone as well?
 5        A.   I believe that this is a still shot from
 6   one of the videos that was sent, yes.
 7        Q.   Okay.  Page 2, same thing?
 8        A.   Yes.
 9        Q.   Okay.  And then this is --
10        A.   Page 3 shows Ms. Carter in her Southwest
11   flight attendant uniform along with her crew
12   members.
13        Q.   And this was on her public Facebook page?
14        A.   Yes.
15        Q.   Page 4?
16        A.   This is a picture that was on her Facebook
17   page of a button saying to give Herb his old job
18   back.
19        Q.   And who's Herb?
20        A.   Herb Kelleher, our found -- one of our
21   founders.
22        Q.   Thank you.
23        A.   And then the next page is a picture of
24   Charlene's flight attendant wings, her -- I'm not
25   sure if this is the 20-year pin.  I think it is the
```

Charlene Carter - Vol. 1                                    December 7, 2017

75

```
 1    20-year pin and then a flag of the United States and
 2    Israel.  And the next page is the same shot with
 3    some commentary.  "Live at 35" is one of the
 4    campaigns that we sponsor in the air.  We sponsor
 5    different concerts throughout the company, and we
 6    get the artists to come on the airplane and actually
 7    sing songs on the airplane.  It's live at
 8    35,000 feet.
 9            The next shot is on one of our aircraft
10    with Ms. Carter and two coworkers in their flight
11    attendant uniforms and their ID badges around their
12    necks.  This is a photo of Ms. Carter's -- one of
13    Ms. Carter's friends who is a Southwest pilot and
14    her husband who is a pilot at Frontier, I believe.
15            And I'm not sure what this last picture is
16    except that Ms. Carter is in the photo.  She says
17    she's headed to D.C.  So I'm not sure what that was
18    for.
19       Q.   Okay.  But all of these -- the entire
20    packet of Southwest Company Exhibit No. 8 was on her
21    public Facebook page.  Is that right?
22       A.   That's correct.
23            MS. GEHRKE:  We move to admit this into
24    evidence.
25            MR. CHAPPELL:  The -- give me a moment.
```

Charlene Carter - Vol. 1                          December 7, 2017

76

```
 1              THE ARBITRATOR:  Uh-huh.
 2                   (Off record from 11:00 to 11:01)
 3              MR. CHAPPELL:  I have no objections, but
 4   we'll discuss these a lot.
 5              THE ARBITRATOR:  Okay.  Then it'll be
 6   admitted.
 7   BY MS. GEHRKE:
 8       Q.   Ms. Emlet, can you explain how these
 9   public posts factored into the investigation?
10       A.   Yes.  They factored in because of the fact
11   that she clearly identifies herself as an employee
12   of Southwest Airlines and that our social media
13   policy clearly states that if you are identifiable
14   as a Southwest Airlines employee, that the public
15   opinion of Southwest can be influenced based on
16   the -- based on what you post through social media.
17   So the nexus to the workplace is that she identified
18   herself as an employee of Southwest Airlines.
19       Q.   Okay.  And did you discuss with the base
20   managers your belief as to whether Ms. Carter's
21   public posts violated the Company's policies?
22       A.   Yes.  After the base manager completed his
23   investigation, he contacted me and recapped all of
24   the evidence.  I asked him what he wanted to do,
25   what his opinions were.  He stated that he believed
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   that she had violated the social media policy both
 2   for personal attacks but also for the public image,
 3   and I agreed with him that that was what I believed
 4   as well.
 5        Q.   Okay.  And had you worked with
 6   Mr. Schneider before on employee discipline issues?
 7        A.   Yes.
 8        Q.   And how would you describe Mr. Schneider's
 9   approach generally to employee discipline issues?
10        A.   I think that Mr. Schneider is extremely
11   thorough.  He is very levelheaded and unemotional in
12   his decisions.  He -- I think that he takes it very
13   seriously when there is the possibility of someone
14   losing their employment, and he does not take it
15   lightly.  He does not make decisions lightly.
16             I find him to be one of our better base
17   managers who's very experienced and seasoned, and
18   he -- sometimes he gets too much in the weeds for
19   me, but I know that he has looked at every detail.
20        Q.   And did you and Mr. Schneider discuss how
21   Ms. Carter's alleged violations compared to other
22   social media violations that the Company had
23   considered?
24        A.   Yes, we did.
25        Q.   And what did you discuss about that?
```

Charlene Carter - Vol. 1                                   December 7, 2017

78

 1        A.   I felt that through my research of other
 2   cases, this was the most egregious that I had seen,
 3   the most graphic.  I felt like it was absolutely
 4   intended to be a personal attack as well as the
 5   public image and the connection to Southwest.  I
 6   felt like this was one of the more egregious cases I
 7   had seen.
 8        Q.   And you shared that with him?
 9        A.   Yes, I did.
10        Q.   Okay.  Whose decision was it to terminate
11   Ms. Carter?
12        A.   Mr. Schneider.
13        Q.   And did he consult with you as part of
14   making that decision?
15             THE ARBITRATOR:  Will we hear from
16   Mr. Schneider?
17             MS. GEHRKE:  We will.
18   BY MS. GEHRKE:
19        Q.   He consulted with you in coming up with
20   that decision?
21        A.   Yes, he did.
22        Q.   Was there anybody else, to your knowledge,
23   involved in the decision to terminate Ms. Carter?
24        A.   The decision is ultimately the
25   responsibility of the leader who conducted the fact

Charlene Carter - Vol. 1                                    December 7, 2017

79

```
 1    finding.  There are multiple people involved in
 2    discussing the issue prior to the leader making that
 3    final decision.
 4         Q.   Okay.  And who would that be?
 5         A.   The -- he would have consulted in this
 6    particular case with employee relations because of
 7    the potential for a violation of the harassment and
 8    discrimination policy.  He would have consulted with
 9    the human resources business partner, the HRBP,
10    because of the potential of violation of the
11    bullying and hazing policy.  They oversee that
12    policy.  And he would have consulted with his
13    immediate leaders to ensure that his leader knew the
14    decision that he was making and that that leader did
15    not have any objections or concerns.
16         Q.   Okay.  What was your view regarding the
17    appropriateness of termination?
18         A.   I thought termination was absolutely
19    appropriate.
20         Q.   Okay.  And did Ms. Carter grieve her
21    termination?
22         A.   Yes, she did.
23         Q.   And what's the next step of the grievance
24    process under the collective bargaining agreement?
25         A.   In our agreement with the TWU 556, the
```

Charlene Carter - Vol. 1                                    December 7, 2017

80

```
 1   next step would be called a step 2 hearing, and that
 2   is when Ms. Carter came to -- would have come to
 3   headquarters to have another hearing with the
 4   director of inflight operations.
 5           Q.   And who is that?
 6           A.   Mike Sims.
 7           Q.   And do you know if that happened?
 8           A.   Yes, it did.
 9           Q.   And were you involved in that step 2
10   hearing?
11           A.   I was not.
12               MS. GEHRKE:  Okay.  No further questions
13   for you.  Thank you.
14               MR. CHAPPELL:  If I may have a moment to
15   consult and organize myself.
16               THE ARBITRATOR:  Seven minutes.
17               MR. CHAPPELL:  Okay.  Thank you.
18                   (Recess from 11:07 to 11:20)
19               THE ARBITRATOR:  I'm a little concerned
20   about time.  You try to develop a cadence in these
21   cases, but hear me on this.  Everybody's going to
22   get a chance to put on their case and time is really
23   no -- it doesn't make me any difference.  If we can
24   be more effective, we can.  If we can't, that's
25   okay.  So after awhile we'll get to know each other
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   a little better and we can speak in shorthand and
 2   get to the point, but why don't you go ahead and
 3   cross-examine this witness.
 4            MS. GEHRKE:  Before we start, I did want
 5   to give you a copy of the grievance packet which is
 6   Joint Exhibit 2.
 7            THE ARBITRATOR:  Joint 2?
 8            MR. CHAPPELL:  Okay.
 9            MS. GEHRKE:  So we added that second
10   piece.
11            MR. CHAPPELL:  Right.  Okay.  Great.
12            THE ARBITRATOR:  You can verify it and
13   I'll look at it after lunch.
14                   CROSS-EXAMINATION
15   BY MR. CHAPPELL:
16       Q.   When you looked at Ms. Carter's personnel
17   file and looked at this, were there any other issues
18   of violations or discipline or investigations of
19   social media violations?
20       A.   I looked in her most recent 18 months of
21   her personal file.  There were no violations, but
22   she also really didn't work during that time.  But
23   the answer's no, I didn't find any other violations.
24       Q.   And under the collective bargaining
25   agreement, when you're considering discipline am I
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   correct that you are not to look back more than 18
 2   months in making that determination?
 3        A.   That's correct.
 4        Q.   Okay.  And, yeah, if you want to look at
 5   that.  I just want to -- is one of -- could I -- I
 6   haven't gotten my copy of that yet.  I have it in a
 7   different format.
 8             I show you what's been marked as Joint
 9   Exhibit No. 1, which is the collective bargaining
10   agreement.  Do you agree that's what it is?
11        A.   Yes.
12        Q.   Okay.  And then I'm directing your
13   attention.  It's marked as page 19-140 --
14        A.   Yes.
15        Q.   -- which is actually Article 19, Section
16   3, Subsection J.
17        A.   Okay.
18        Q.   Okay?  And is that -- did I -- is that
19   what I just described and you agreed that in
20   deciding discipline you're not to go back more than
21   18 months?
22        A.   We are not to go back more than 18 months
23   with the exception of if older information is used
24   to impeach the testimony.
25        Q.   Was there any -- where does the
```

Charlene Carter - Vol. 1                         December 7, 2017

```
 1    impeachment occur?  Is that during the fact finding?
 2         A.   No, it would be during board of adjustment
 3    or arbitration.
 4         Q.   Okay.  So for the fact finding and for the
 5    determination to terminate Ms. Carter, you would not
 6    have gone back more than 18 months?
 7         A.   That's correct.
 8         Q.   And at that point there's no basis for
 9    impeachment?
10         A.   That's correct.
11         Q.   Okay.  Then let me direct you so that we
12    don't miss anything.  If you could just read that
13    first sentence of Subsection J.
14         A.   "Disciplinary decisions shall be based
15    only on performance and/or conduct occurring within
16    the 18-month period of active status preceding the
17    incident in question."
18         Q.   Correct.  So would posting on Facebook be
19    conduct?
20         A.   Yes.
21         Q.   And let's look at Southwest Exhibit 8.
22    You should -- in fact, it's right in front of you, I
23    believe.  And I just need to get my copy, and I have
24    it.  And I want to -- it's a multipage exhibit,
25    correct?
```

Charlene Carter - Vol. 1                          December 7, 2017

84

```
 1        A.   Yes.

 2        Q.   Okay.  And after the first two pages, the

 3   remaining pages of that exhibit are basically

 4   pictures that the Company alleges that Charlene

 5   posted on Facebook.  Am I correct?

 6        A.   Yes.

 7        Q.   Okay.  And I believe your testimony was

 8   also that someone -- and you identified who it

 9   was -- at Southwest went through Ms. Carter's

10   Facebook page and found these pictures.  Is that

11   correct?

12        A.   Yes.  They were sent to me via e-mail, and

13   then I actually went onto the Facebook page to

14   confirm that they actually did come from that

15   source.

16        Q.   Right.  What steps were taken by the

17   Company to assure that all of these pictures were

18   conduct that she posted within the 18 months before

19   the incident occurred?

20        A.   That is not -- I don't -- I don't see the

21   relevance to that.  I'm not sure -- maybe I don't

22   understand your question.

23        Q.   Well, you testified that posting on

24   Facebook is conduct.  I would agree with that.

25   Anything you do is almost conduct.  It takes an act
```

Charlene Carter - Vol. 1                                    December 7, 2017

85

```
 1    to post on Facebook.
 2         A.    Uh-huh.
 3         Q.    And you also read from the collective
 4    bargaining agreement, and it speaks for itself, that
 5    disciplinary decisions shall be based only on
 6    performance and/or conduct occurring within the 18
 7    months prior to the incident.
 8         A.    That speaks to what we can review in
 9    determining the discipline.  We cannot go back more
10    than the 18 months.  There is also verbiage in the
11    contract that speaks about that the Company will
12    have seven days to investigate within -- from the
13    time that the Company was made aware of the
14    allegations.
15              So for the purposes of our collective
16    bargaining agreement, the date that these were
17    actually posted on Ms. Carter's page is not as
18    relevant as the timing of when they were brought to
19    our attention.
20         Q.    But if these pictures were actually posted
21    more than 18 months and the date in question is
22    somewhere in February of 2017, so someone can -- I'm
23    not good at math, so someone can do the math for 18
24    months.  So if they were posted like in 2012, we all
25    agree that's more than 18 months from the incident,
```

Charlene Carter - Vol. 1                                    December 7, 2017

86

```
 1   right?
 2          A.    Yes.
 3          Q.    Or if they were posted in 2013 to show
 4   that she is a Southwest and supposedly to bring
 5   Southwest into the issue of the social media policy,
 6   how is that compliant with the collective bargaining
 7   agreement?
 8          A.    Because they were brought to our attention
 9   on -- I'm not sure what date.  I'd have to look that
10   up, but sometime in February of 2017.  And aside
11   from the fact that I believe Ms. Carter requested a
12   few extensions of time frames to hold her fact
13   finding meeting because she was not available, we
14   complied with the investigation being completed
15   within seven working days of the Company's knowledge
16   of the allegations.
17          Q.    You don't know when these pictures were
18   taken, do you?
19          A.    No.
20          Q.    You don't know when they were posted on
21   Facebook?
22          A.    No.
23          Q.    You don't know when the conduct, my client
24   committed the conduct that's now being used to
25   assess discipline that actually is the most serious,
```

Charlene Carter - Vol. 1                    December 7, 2017

1   it's capital punishment, it's termination, do you?

2       A.   The pictures that were posted on the

3   public page and considered in the evaluation of

4   rendering discipline were just one part.  The

5   investigation was initiated because of the private

6   messages that Ms. Carter sent to Ms. Audrey Stone,

7   and during that investigation these violations were

8   also uncovered.

9           For our purposes of the collective

10  bargaining agreement, we are held to time frames of

11  when the Company has reasonable knowledge of an

12  action that may or may not have violated any

13  policies or work rules.

14      Q.   I'm not asking about the time you took to

15  investigate.  I'm asking about the evidence that you

16  used and whether it was conduct within 18 months to

17  then build the case that she had violated a social

18  media policy by her public posting on Facebook.

19      A.   That was one of the ways that she violated

20  the policy.

21      Q.   But the only way that you -- and you put

22  it in -- this is your exhibit and you've testified

23  to it.  The only way that there's a violation of the

24  policy is if she has associated herself -- in other

25  words, if the public in looking at her Facebook

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   page, in looking at the postings that she made on
 2   the first two pages of Exhibit 8 would be able to
 3   associate that with the airline, correct?
 4        A.   The violation is that it doesn't really
 5   make any difference when she posted these pictures
 6   that she worked for Southwest.  The fact of the
 7   matter is that at the time that these pictures were
 8   posted and when we discovered them, she still had
 9   these same photos that -- the violation isn't that
10   she identifies herself as a flight attendant.
11        The violation is that she's identified
12   herself as a flight attendant for Southwest Airlines
13   and is making this very public, graphic post about
14   murder and abortion.  And, I mean, even the wording
15   in here, "If it's your body, your choice, who is
16   this laying in this fucking bowl," I find that very
17   offensive.
18             MS. CARTER:  I didn't write that.
19             THE ARBITRATOR:  If your point is that the
20   Company did not make an investigation to see when
21   pages 3, 4, 5, 6, 7, 8 were actually posted, and her
22   point is they were still there when this was posted,
23   I think she acknowledges that.  We could brief that
24   if we would like.
25             MR. CHAPPELL:  Okay.  I want to do one
```

Charlene Carter - Vol. 1                                    December 7, 2017

89

```
 1  other follow-up.

 2  BY MR. CHAPPELL:

 3       Q.   You don't know because you -- well, let me

 4  ask it this way.  Do you know how far away from this

 5  posting that someone would have to scroll through

 6  her Facebook page and how many either pictures and

 7  go through albums or scroll down before they would

 8  find any picture that would clearly identify to the

 9  public that she was an employee of Southwest?

10       A.   I cannot tell you definitively.  What I

11  can tell you is that I am not very Facebook savvy,

12  and I had no problem finding the pictures of her in

13  her Southwest uniform and wings.

14       Q.   Okay.  So --

15       A.   I don't remember scrolling very far.

16       Q.   Describe what you did for -- because I

17  thought you said these pictures were provided to you

18  by an employee of yours.

19       A.   I did.  I did say that.  I also testified

20  that once they were sent to me, I went to

21  Ms. Carter's Facebook page and I verified that these

22  posts were actually on her Facebook page.

23       Q.   And then you also verified each of these

24  pictures?

25       A.   I really don't --
```

Charlene Carter - Vol. 1                                     December 7, 2017

90

```
 1         Q.    These pictures being the last -- I believe
 2   there's six.  Anyway, after the first two pages,
 3   these pictures of Ms. Carter and -- let's number
 4   this.
 5         A.    I can't tell -- this was probably eight
 6   months ago, so I can't tell you for sure.  I believe
 7   I saw this picture of her with her crew members.  I
 8   do not remember whether or not I saw this button.  I
 9   remember these wings.  I don't remember "Live at
10   35."  And I remember this photo with Ms. Carter and
11   her two coworkers.
12         Q.    But you don't remember that when you --
13   you went on and you found this photo.
14         A.    Yes.
15         Q.    You went on -- went into the computer or
16   whatever media you used to get into Facebook,
17   correct?
18         A.    Yes.
19         Q.    Okay.  And you found this photo and you
20   found this photo.  One -- well, they have the date
21   that they were posted.  The first one is February 7?
22   Is that -- am I reading that correct?
23               MS. GEHRKE:  What year?
24               MR. CHAPPELL:  I don't -- it doesn't say
25   what year.
```

Charlene Carter - Vol. 1                                    December 7, 2017

91

```
 1              MS. GEHRKE:  Okay.  So it's 2017.
 2              MR. CHAPPELL:  Yeah.  Okay.  We all agree
 3   that that means it's 2017.
 4   BY MR. CHAPPELL:
 5       Q.   And the second page is February 14th,
 6   correct, the date, again with no year?
 7       A.   Yes.
 8       Q.   Okay.  Then the next -- the next thing you
 9   see as you're looking down the Facebook scroll to
10   see these two, is it any of these pictures?
11       A.   I don't know.  I don't remember.
12       Q.   You don't remember that it was those
13   pictures, do you?
14       A.   I don't remember where they were.
15       Q.   And you don't remember that in the "About"
16   section on her public Facebook page she made any
17   identification that she was employed by Southwest,
18   do you?
19       A.   I don't recall going to the "About"
20   section.
21       Q.   And so you -- a person, including
22   yourself, would have to go further in and further
23   away from these two postings to ever find any of
24   these pictures, right?
25       A.   I don't know.  But I --
```

Charlene Carter - Vol. 1                                    December 7, 2017

92

1          Q.   Well, you had to.

2          A.   Well, I had to go past the first two posts

3     because otherwise they'd be on top of each other.

4          Q.   And you had to go down quite a few

5     scrolls, didn't you?  They didn't pop up as the next

6     pictures.

7          A.   I don't remember.

8          Q.   You don't remember that they popped up as

9     the next two pictures, do you?

10         A.   I don't remember where they were in the

11    news or in the -- in the feed.

12         Q.   Isn't it true that it probably took you

13    four or five minutes to find all these photos, if

14    not longer?

15         A.   Well, when I'm conducting a complete and

16    thorough investigation, I don't think four or five

17    minutes is very long to spend on getting at the

18    truth.

19         Q.   That wasn't my question.  My question was,

20    didn't it take you --

21              THE ARBITRATOR:  I understand your

22    question.  Let's move on.

23              MR. CHAPPELL:  Okay.

24    BY MR. CHAPPELL:

25         Q.   Let me direct your attention to "Live at

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1    35," I think it's better to describe it as they
 2    don't have page numbers on it.  How does this poster
 3    show that you are employed at Southwest?
 4         A.   It does not.
 5         Q.   Okay.  So if I was looking at this and saw
 6    this on Charlene's Facebook page, I wouldn't
 7    automatically know that she was a flight attendant?
 8         A.   I don't know what you would know.
 9         Q.   Well, a person -- there's no further
10    evidence to show that.
11              MS. GEHRKE:  Is there a question with
12    that?
13              MR. CHAPPELL:  No.  I withdraw it.  I
14    withdraw my comment.
15    BY MR. CHAPPELL:
16         Q.   Look at the last photo which says "Headed
17    to D.C."  And how would -- what is the identifying
18    feature that a random person on Facebook would see
19    here that would tell them, first of all, who
20    Charlene is and, second of all, that she's an
21    employee of Southwest?
22         A.   I don't see anything identifying.
23         Q.   Let's go to the first picture which is the
24    third page.  Any public person looking at Charlene's
25    Facebook page, having seen the first two postings of
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
1   the first two pages and then continuing to scroll
2   for however long and coming up on this picture, how
3   did they know out of the blue that this is Charlene
4   and who is Charlene and that they're employees of
5   Southwest?
6        A.   Well, we have millions and millions of
7   passengers every year.  We have a very highly
8   identifiable aircraft painted sky canyon blue.
9   Anyone who has flown on Southwest recognizes our
10  uniforms.  So I think that it's easy to see that if
11  you go to her page that that would -- she would be
12  employed by Southwest Airlines.
13            Additionally, we have -- whether someone
14  knows that they're Charlene or not, we have -- we
15  have many, many cases where our employees have been
16  disciplined for their overnight behavior because of
17  their being identifiable as Southwest employees.
18       Q.   Again, you don't know when that picture
19  was either taken or put on her Facebook account?
20       A.   No, I do not.
21            MR. CHAPPELL:  Off the record.  I'm going
22  to get my exhibit.
23                 (Off record from 11:40 to 11:41)
24            MR. CHAPPELL:  Okay.  Back on the record.
25            THE ARBITRATOR:  Sure.
```

Charlene Carter - Vol. 1                                December 7, 2017

95

```
 1    BY MR. CHAPPELL:
 2        Q.   I'm going to ask you a couple questions
 3    about Joint Exhibit No. 4 if you want to get that
 4    before you before I start.  It starts at 3.0.0.,
 5    "Basic" -- yeah.  And the first page is Section
 6    3.0.0., correct?
 7        A.   Yes.
 8        Q.   And then if you turn to the second page of
 9    Joint Exhibit 4, that is Section 3.2.0., correct?
10        A.   Yes.
11        Q.   And is it fair to assume that there's a
12    Section 3.1.0. in the full policy?
13        A.   I'm sorry.  Say that again?
14        Q.   Is it fair to assume that there is a
15    Section 3.1.0. in the policy?
16        A.   Yes.
17             MR. CHAPPELL:  Then this will be -- how do
18    you want us to -- Grievant or Carter?
19             THE ARBITRATOR:  CC-1.
20             MR. CHAPPELL:  CC-1 works for me.  Thank
21    you.
22                  (Grievant's Exhibit CC-1 marked)
23    BY MR. CHAPPELL:
24        Q.   I show you what's been marked as Charlene
25    Carter Exhibit No. 1 and direct your attention to
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   halfway down the first page and show you what's been
 2   marked as 3.1.0. --
 3        A.   Yes.
 4        Q.   -- which appears to have been omitted from
 5   Joint Exhibit No. 4.
 6        A.   Yes.
 7        Q.   Correct?  Okay.  But you do recognize that
 8   as 3.1.0. of the policies?
 9        A.   Yes.
10        Q.   Okay.  And --
11        A.   No, not the policies.  These are the work
12   and conduct rules and expectations.  The Company
13   policies are housed in a separate area.
14        Q.   Okay.  Thanks for that clarification.
15   You testified earlier that the violation of bullying
16   and hazing, the violation of the social media policy
17   and the violation of the harassment policies were
18   not technically a Class I --
19        A.   Yes.
20        Q.   -- violation.  Is it -- is this a --
21   number one, does that show the descriptions of what
22   Class I violations are?
23        A.   Yes.
24        Q.   Then where would you think that most
25   likely the -- let's say harassing, violation of the
```

Charlene Carter - Vol. 1                          December 7, 2017

97

```
 1   harassing, what class would that fall under?
 2        A.   Harassing falls under the harassment and
 3   discrimination policy.
 4        Q.   But which class?
 5        A.   It doesn't fall under a class necessarily.
 6   That's why this says "Flight Attendant Work Rules
 7   and Expectations and Company Policies."  So there
 8   are many, many times that a flight attendant or any
 9   employee that is covered by a collective bargaining
10   agreement or work and conduct rules could be
11   disciplined for violation of the policies that apply
12   to all employees.  Other times they may be in
13   violation of the work and conduct rules that are
14   outlined for that specific work group.
15        Q.   Direct your attention to the second page
16   of CC-1.
17        A.   Yes.
18             MR. CHAPPELL:  And I also for the record
19   will note that I did the highlighting.
20             THE ARBITRATOR:  That's fine.  I
21   appreciate it.
22             MR. CHAPPELL:  And the black marks that
23   look like scribbles are also mine.  And I apologize
24   that I didn't realize I was writing on the only one
25   that we had here, and I trust with that
```

Charlene Carter - Vol. 1                          December 7, 2017

98

```
 1   clarification that it's okay.
 2              THE ARBITRATOR:  Sure.
 3              MR. CHAPPELL:  And I move that this be
 4   admitted.
 5              MS. GEHRKE:  No objection.
 6              MR. CHAPPELL:  Okay.
 7   BY MR. CHAPPELL:
 8       Q.   So looking now at that second page, Class
 9   II, number 3 --
10       A.   Yes.
11       Q.   -- which I highlighted, would that
12   possibly be somewhat similar to a violation of a
13   harassment policy or bullying policy?
14       A.   Possibly.
15       Q.   And if that were so, it would then be
16   considered a Class II violation?
17       A.   It could be.
18       Q.   Now if we look at I think it's the third
19   page of the exhibit, if we look at Class IV.
20       A.   Yes.
21       Q.   Then Class IV continues on the next page,
22   correct?
23       A.   Yes.
24       Q.   Okay.  If we look at number 6, would that
25   somewhat be similar or could include the social
```

Charlene Carter - Vol. 1                           December 7, 2017

99

```
1   media policy?
2        A.   Oftentimes there are violations of work
3   and conduct rules via social media.  So there could
4   be a combination of violations.  It could be a
5   violation of a Company policy in addition to
6   violating one or more of the work and conduct rules.
7        Q.   But it could fall under a Class IV
8   violation?
9        A.   Depending on the circumstances.
10       Q.   And then looking back at Joint
11  Exhibit No. 4.
12       A.   Yes.
13       Q.   It does include then under which class
14  this might have fallen how the discipline is
15  handled --
16       A.   Yes.
17       Q.   -- what are the options.  Correct?
18       A.   Yes.
19       Q.   Okay.  And we have Class IV covered there
20  and we have Class II covered there, correct?
21       A.   Yes.
22            MR. CHAPPELL:  Then we're going to look
23  at -- I think it's number 7 that is the Audrey
24  postings.
25            THE ARBITRATOR:  Do you want to borrow
```

Charlene Carter - Vol. 1                                December 7, 2017

100

```
 1    that?
 2            MR. CHAPPELL:  Yeah.  Thank you.
 3            THE ARBITRATOR:  Sure.
 4    BY MR. CHAPPELL:
 5        Q.   Do you have that in front of me?  I don't
 6    want -- well, let me ask it this way.  Did you
 7    testify that Ms. Carter had said that Ms. Stone was
 8    supporting murder?  Is that what I remember you
 9    testifying to?
10        A.   She sent this directly to Ms. Stone, and
11    at the top it states "TWU-AFL-CIO and 556 are
12    supporting this murder."
13        Q.   You also testified that you did not
14    consider this to be part of a Union squabble or
15    something like that, whatever was going on in the
16    membership?  Is that correct?
17        A.   I did not consider it as part of a Union
18    squabble.  However, even if it was part of a Union
19    squabble, it was highly inappropriate and
20    unacceptable.
21        Q.   Well, just show me where Ms. Carter says
22    that Ms. Stone is supporting murder.
23        A.   Well, she sent this to Ms. Stone, so I'm
24    assuming that that's what she meant.
25        Q.   Well, she said what she meant.  It's
```

Charlene Carter - Vol. 1                    December 7, 2017

101

```
1   written there at the top.  So you made an assumption
2   on what she said and didn't look at just what she
3   said?
4        A.   She did not, to my knowledge, send this to
5   anyone else.  She sent it directly to Ms. Stone.
6   And of course Ms. Stone is the president of the 556.
7   And then she went on to say, "You are nothing but a
8   sheep in wolves clothing, you are just so
9   uneducated, and you have not a clue who or what you
10  were marching for."
11       Q.   Okay.  Do you know that when you send
12  videos or share them that you have gotten from
13  another place, the actual statement that was
14  originally put by someone else may also go with
15  them?
16       A.   No, I don't know that.
17       Q.   Okay.  And that you get to write at the
18  top if you want to say something, if you want to
19  post something or share something?  Did you know
20  that about Facebook?
21       A.   I -- I don't know if I've ever shared a
22  video on Facebook.
23       Q.   Okay.  Do you see about halfway down, it's
24  kind of in blue, "My Page - My Opinions"?
25       A.   Yes.
```

Charlene Carter - Vol. 1                           December 7, 2017

102

```
 1        Q.   And then there's some kind of a little
 2   symbol, a circle?
 3        A.   Yes.
 4        Q.   Okay.  And are you aware that that
 5   reflects some other member of Facebook and their
 6   comments?
 7        A.   No.
 8        Q.   So you assumed again that Ms. Carter had
 9   written "Did you know" and the rest of that
10   paragraph?
11        A.   Well, I believe in her fact finding she
12   said she did send these and that she did write this.
13   And then she goes on to state that, "This is what
14   you supported during your paid leave while (sic)
15   others at the women's march in D.C."
16             So I think it's pretty clear if you look
17   at the totality of the postings that her intent was
18   to send this directly to Ms. Carter, that these
19   comments -- or, excuse me, to Ms. Stone and that
20   these comments were directed at her.
21        Q.   But you -- in your testimony earlier you
22   ascribed to my client that she said to Ms. Stone
23   that she was a sheep in wolf's clothing.
24        A.   That's my understanding of this, yes.
25        Q.   But you didn't check that out, and I've
```

Charlene Carter - Vol. 1                                    December 7, 2017

103

```
 1   just shown you how it's possible that this came from
 2   someone else.
 3        A.   Well, I believe that you'll find that she
 4   said in her fact finding meeting she did send this
 5   and that that was her -- what she intended to
 6   communicate.
 7        Q.   Well, she'll be able to testify as to what
 8   she said in the fact finding.  We may revisit that
 9   whole area.
10             On the second page, do you see at the top
11   "Video Abortion"?
12        A.   Yes.
13        Q.   It's a little hard to read, but I think
14   I'm reading it right, with some other language and
15   then again that circle with what, probably some kind
16   of a picture?
17        A.   Yes.
18        Q.   Okay.  And again, would it surprise you to
19   know that that are comments by someone other than
20   Ms. Carter and that's how you know that that is
21   someone else's comments?
22        A.   What I know is that whether Ms. Carter is
23   the original author of this or not, she's the one
24   who selected that language to forward to Ms. Stone
25   and direct it to Ms. Stone.
```

1        Q.   And you don't know enough about Facebook

2   or Messenger to know whether you can pull out a

3   video that is -- that you're sharing that has other

4   comments in it and not let those comments go with

5   it, do you?

6        A.   No, I don't know.

7        Q.   And let's look at the last page.  Yeah,

8   you already have it.  You have no idea where

9   Ms. Carter got this picture?

10        A.   That's correct.

11        Q.   Or who may have posted it originally or

12   whether they were connected with the march or the

13   Union or anything like that?

14        A.   No idea.

15             MR. CHAPPELL:  (To Ms. Gehrke) That's the

16   last page.

17   BY MR. CHAPPELL:

18        Q.   You also testified that you were

19   provided -- you were not at the fact finding,

20   correct?

21        A.   That's correct.

22        Q.   But that you were provided the fact

23   finding notes and you reviewed them as part of your

24   involvement --

25        A.   Yes.

Charlene Carter - Vol. 1                              December 7, 2017

105

```
1         Q.   -- in the termination, correct?  Whose
2    fact finding notes did you review?
3         A.   Well, Ed Schneider and Meggan Jones were
4    at the fact finding meeting.  I can't testify to how
5    those notes were finalized.
6         Q.   Okay.  But my question was, whose fact
7    finding notes did you review?
8         A.   Well, I -- at the fact finding meeting
9    Meggan was the main note taker.  Generally speaking,
10   the way that it works is the person conducting the
11   fact finding meeting takes their own handwritten
12   notes while the other one probably takes typewritten
13   notes.  The note taker prepares those notes, and
14   then the person who was conducting the fact finding
15   meeting reviews them for accuracy.
16        Q.   Okay.  And so Meggan was the one that took
17   the notes, as you understood it?
18        A.   Yes.
19        Q.   Okay.  And who is Meggan again?
20        A.   She's the assistant base manager in
21   Denver.
22             MS. GEHRKE:  And she will be testifying.
23             MR. CHAPPELL:  Okay.
24   BY MR. CHAPPELL:
25        Q.   And even though you reviewed those
```

Charlene Carter - Vol. 1                                    December 7, 2017

106

```
 1   notes -- well, let me ask you.  How instrumental
 2   were those notes for you to make your decision and
 3   to approve the recommendation and support the
 4   recommendation of termination made by the base
 5   manager?
 6        A.   So the supporting of the decision is the
 7   key there.
 8        Q.   Okay.
 9        A.   Because I don't make the decision.  But I
10   think that the notes are always very impactful
11   because that's the opportunity for the flight
12   attendant to come in and tell their side of the
13   story, give us any information or documentation that
14   would be considered in making that decision.
15        Q.   And it's your -- those notes have not been
16   shared with either me or Ms. Carter to prepare for
17   today.
18        A.   Those are internal documents.  We do not
19   share them with the Union or with anyone outside of
20   the team.
21        Q.   One of the things you said that you liked
22   about the -- is it Schneid -- how do you pronounce
23   it?
24        A.   Ed Schneider.
25        Q.   Schneider -- was that he looked at every
```

Charlene Carter - Vol. 1                                    December 7, 2017

107

```
1    detail, he is very detailed?
2         A.    I find him to be a very detailed person,
3    yes.
4         Q.    Okay.  What were some of the details that
5    you found important in this fact finding that he
6    looked at that impressed you?
7         A.    Well, off the top of my head, I thought
8    that the fact that he recognized that there was the
9    potential for violation of the harassment policy was
10   important because he was proactive in engaging our
11   employee resources team who are the experts on
12   managing that policy.  He also recognized that there
13   was a potential violation of the workplace bullying
14   policy and engaged the HRBP.  He reviewed all of the
15   social media -- well, all of those policies plus the
16   social media policy.  He reviewed her work record.
17   He consulted with me on consistent practice.
18            So I -- and I felt that he conducted a
19   very thorough fact finding meeting.  Without looking
20   back, I'd have to look back at the notes, but I felt
21   that he asked a lot of very insightful and thorough
22   questions.
23        Q.    And when you say that he looked at her
24   whole record, did he reveal to you that she's -- in
25   her whole 21-year career has had no discipline, no
```

```
 1   questions, no anything about social media, about
 2   harassing, about bullying, about any of these
 3   matters?
 4        A.   No.  He told me that within the last 18
 5   months there was no discipline in her record.
 6        Q.   And did he tell you about the various
 7   customer appreciations, awards, great audits that
 8   she had received during those 21 years?
 9        A.   No.  Since we are only per the contract
10   allowed to look at the past 18 months, there is
11   nothing in her file for the last 18 months because
12   she hasn't flown.  So she can't get a customer
13   commendation without having flown.
14             She did fly a few days in '15 and '16, I
15   believe.  I don't know whether or not there are
16   commendations, but if there had been, those of
17   course would have been considered in -- and that
18   would be a question for him, whether he considered
19   those, if there are any.  I don't know.
20        Q.   Did he tell you that the first ten years
21   or so she was very active until she became pregnant
22   and flew a lot and was a --
23             MS. GEHRKE:  I'm going to object.  She's
24   already testified all the old stuff's not relevant,
25   just to move this along.
```

Charlene Carter - Vol. 1                           December 7, 2017

109

```
 1              THE ARBITRATOR:  I'll let you answer that
 2    question, and then we're going to move on to
 3    something else.
 4        A.   He told me he reviewed the most recent 18
 5    months.
 6    BY MR. CHAPPELL:
 7        Q.   You also mentioned how she -- I believe
 8    you used the term traded her trips and that's why in
 9    your testimony she hadn't worked?
10              MS. GEHRKE:  I'm going to object.  I think
11    that misstates the testimony.
12    BY MR. CHAPPELL:
13        Q.   Okay.  Tell me -- she was an employee of
14    the Company even though you testified she hadn't
15    worked, right?
16        A.   That's correct.
17        Q.   And is there a procedure that allows
18    flight attendants to get assignments and then be
19    able to let someone else take that assignment?
20        A.   Yes.
21        Q.   Okay.  I don't know all the terminology,
22    so I know you do, but I apologize for that, but
23    anyway.  And is that part of the collective
24    bargaining agreement?
25        A.   Yes.
```

Charlene Carter - Vol. 1                                  December 7, 2017

110

```
 1       Q.   Okay.  So the fact that she may or may not
 2   have worked during the last 18 months in the sense
 3   that she actively flew was not in any way contrary
 4   to the collective bargaining agreement, was it?
 5       A.   That's correct.
 6       Q.   And she had the right under the collective
 7   bargaining agreement to perform her services in that
 8   way and trade off when she was assigned?
 9       A.   That's correct.
10       Q.   And it is true that during the last 18
11   months and longer, but we'll just stick with the
12   last 18 months, she has been assigned routes and to
13   take trips, correct?
14       A.   Yes.
15       Q.   And that her trading off and having
16   someone else perform that was not a violation of the
17   collective bargaining agreement or the Company
18   policy, correct?
19       A.   That's correct.
20            MR. CHAPPELL:  If I could have just one
21   minute to confer with cocounsel.
22            THE ARBITRATOR:  Uh-huh.
23            MR. CHAPPELL:  If we could go off the
24   record a minute.
25            THE ARBITRATOR:  We're off the record.
```

Charlene Carter - Vol. 1                              December 7, 2017

111

```
 1                    (Off record from 12:04 to 12:06)
 2    BY MR. CHAPPELL:
 3         Q.    In your position as -- why don't you tell
 4    me again what your title is.  I apologize.
 5         A.    That's okay.  Manager of labor relations.
 6         Q.    Manager of labor relations.  Would you
 7    know possibly whether some flight attendants are
 8    currently employed at Southwest?
 9         A.    I -- I might know.
10         Q.    Okay.  Ricky Spand, S-P-A-N-D, is he
11    currently employed?
12         A.    I'm actually not sure about Ricky.
13         Q.    Okay.  Do you know whether he was ever
14    terminated from Southwest?
15         A.    I would have to go back and look at the
16    record.  I know that he has had issues that I have
17    dealt with.  I can't tell you -- I've never been
18    involved in his termination.
19         Q.    Okay.  But you do remember within the last
20    couple of years or while you've been in this
21    position, which I think you said five and a half
22    years --
23         A.    Yes.
24         Q.    -- that there have been some issues with
25    Ricky?
```

Charlene Carter - Vol. 1                                December 7, 2017

112

```
 1        A.   Yes.
 2        Q.   Is there a way that you during maybe the
 3   lunch break or something you can call and check
 4   those records?  Maybe they're available here?
 5             MS. GEHRKE:  I'm going to object.  She has
 6   no duty to go and look for answers.  This is not
 7   discovery.
 8             THE ARBITRATOR:  I've not ever seen that
 9   done.
10             MR. CHAPPELL:  Okay.
11             THE ARBITRATOR:  In a perfect world maybe
12   we'd have all the information we need, but this is
13   labor arbitration and it's not a perfect world.
14             MR. CHAPPELL:  True.
15   BY MR. CHAPPELL:
16        Q.   Okay.  Brian Talburt.  I have two
17   spellings for the name.  T-A-L-B-E-R-T?  Is that the
18   right one?
19        A.   U-R-T.
20        Q.   Okay.  I had that one too.  Okay.  Thank
21   you.  Do you know whether Brian is currently
22   employed by Southwest?
23        A.   Yes, he is.
24        Q.   Okay.  Do you know whether he was ever
25   terminated?
```

Charlene Carter - Vol. 1                              December 7, 2017

113

```
 1        A.    I do.
 2        Q.    Okay.  Do you know how many times he was
 3   terminated?
 4        A.    I do.
 5        Q.    Okay.  How many?
 6              MS. GEHRKE:  Well, again I'm going to
 7   object on the grounds what we discussed earlier
 8   about people being brought back as part of a
 9   settlement.
10              THE ARBITRATOR:  They haven't gone there
11   yet and I won't let them.
12              MS. GEHRKE:  Thank you.
13              MR. CHAPPELL:  And I have no intention of
14   asking or introducing or using anything that's
15   confidential and nonprecedential and nonreferral, I
16   think are the terms.  Thank you.
17              So could you read back my question, Court
18   Reporter?
19              THE REPORTER:  Question:  "Do you know how
20   many times he was terminated?"
21              Answer:  "I do."
22              Question:  "Okay.  How many?"
23              THE WITNESS:  Am I able to ask a question?
24   I don't know if I'm allowed to --
25              MS. GEHRKE:  Do you not understand the
```

Charlene Carter - Vol. 1                              December 7, 2017

114

```
 1   question?
 2           THE WITNESS:  I do understand the
 3   question, but --
 4   BY MR. CHAPPELL:
 5       Q.   It's just a number.
 6       A.   Two.
 7       Q.   Okay.  But he is currently employed?
 8       A.   Yes.
 9           MR. RICHARD:  That's where we're going to
10   raise an objection.  Okay?
11           THE ARBITRATOR:  Sir?
12           MR. CHAPPELL:  Well, she had already
13   testified to that.
14           MR. RICHARD:  It doesn't matter, Counsel.
15   There's a sanctity issue going on here that we're
16   here to protect, period.  And that is, when someone
17   is terminated and if they come back by way of a
18   confidential agreement, the fact that they come back
19   is not relevant.
20           THE ARBITRATOR:  Well, that's a little
21   broader.  What I've heard is is got fired twice, he's
22   still here.  Okay?
23           MS. GEHRKE:  He may have reapplied.  We
24   don't know.
25   BY MR. CHAPPELL:
```

Charlene Carter - Vol. 1                                      December 7, 2017

```
1          Q.   Sam Wilkins.  I believe it's a she.  It's
2    probably short for Samantha.  Do you know if she's
3    currently employed with the Company?
4          A.   I believe she is, yes.
5          Q.   And do you know if she was ever
6    terminated?
7          A.   Not to my knowledge.  I don't remember her
8    being terminated.
9          Q.   Okay.  And Bill Holcomb?  I believe it's
10   H-O-L-C-U-M?
11         A.   O-M-B.
12         Q.   O-M-B.  Okay.  Thank you.  Do you know if
13   he's still employed by the Company?
14         A.   Yes, he is.
15         Q.   Okay.  Do you know if he was ever
16   terminated?
17         A.   I don't believe he was terminated.
18         Q.   Okay.  Did he receive a suspension or
19   another form of discipline?
20         A.   I believe so, yes.
21         Q.   Did he receive more than one suspension?
22         A.   Not that I remember.  And I honestly don't
23   remember if he received a suspension or a
24   termination.
25         Q.   Okay.  But what you do remember, whether
```

116

```
 1   it's a termination, suspension, or potentially a
 2   lesser discipline, it was just once?
 3       A.   I generally only deal with 30-day
 4   suspensions and higher.
 5       Q.   Okay.
 6       A.   So he may have had lesser disciplines that
 7   I was not involved in.
 8       Q.   Okay.  So your testimony of why only
 9   applies to either a suspension or a termination?
10       A.   Generally, yes.
11           MR. CHAPPELL:  Fair enough.  Okay.  That's
12   all my direct or whatever we want to call that, and
13   that is the end of my questioning.
14           THE ARBITRATOR:  Okay.
15           MS. GEHRKE:  I just have a few follow-ups
16   if you want to do that before lunch.
17           THE ARBITRATOR:  You always say that,
18   "I'll be brief."
19           MS. GEHRKE:  I will be brief.
20           THE ARBITRATOR:  No, go ahead, go ahead.
21   I haven't said anything about a lunch break.
22           MS. GEHRKE:  Okay.  It is that time, so if
23   you want to make anyone's low blood sugar --
24           THE ARBITRATOR:  I didn't order lunch, did
25   I?
```

Charlene Carter - Vol. 1                                    December 7, 2017

117

```
 1              MS. ARMSTRONG:  No, sir.
 2              THE ARBITRATOR:  Okay.
 3                   REDIRECT EXAMINATION
 4   BY MS. GEHRKE:
 5        Q.   Ms. Emlet, can you look at Southwest
 6   Company Exhibit No. 8.
 7        A.   Yes.
 8        Q.   Mr. Chappell asked you regarding the
 9   Southwest kind of employee posts starting on page 3
10   and going beyond.  Was Ms. Carter disciplined for
11   simply posting pictures of her in her uniform or
12   identifying herself as a Southwest employee?
13        A.   No.
14        Q.   What was the basis for the discipline with
15   respect to the public posts?
16        A.   The basis for that was that she posted
17   these videos of abortions and then also had herself
18   identified as a Southwest employee on the same page
19   and that there was the nexus to the workplace for
20   these very disturbing and graphic videos.
21        Q.   Are you aware that on Facebook you could
22   actually delete pictures or delete posts?
23        A.   Yes.
24        Q.   Is the fact that Ms. Carter made these
25   abortion posts while she continued to keep her
```

Charlene Carter - Vol. 1                                    December 7, 2017

118

```
 1   Southwest employee photos posted, was it the nexus
 2   between those two that led to the discipline?
 3        A.    That was a portion of the discipline, yes.
 4   That was the part that related to the public image
 5   or public perception.
 6        Q.    Counsel was asking you regarding where the
 7   Southwest employee photos were relative to the
 8   abortion posts.  Do you recall that?
 9        A.    Yes.
10        Q.    And I realize that you're not a big user
11   of Facebook, but nonetheless, you testified you did
12   go on to look at Ms. Carter's page, correct?
13        A.    Yes.
14        Q.    Are you aware that on any particular
15   person's Facebook page that there will be a location
16   on that page where all of the or some of the photos
17   that the person has posted will be kind of grouped
18   together under the heading "Photos"?
19        A.    Yes.  It's at the very beginning of the --
20   when you log onto Facebook, I believe, there are
21   different squares that you can click on, and one of
22   them says "Photos."
23        Q.    All right.  And Counsel was asking you
24   earlier regarding these Southwest employee photos
25   and in particular whether or not, you know, someone
```

Charlene Carter - Vol. 1                                December 7, 2017

```
 1   of the public or coworker who was looking at them,
 2   how would they know that it was -- that she was a
 3   Southwest employee.
 4         A.   Yes.
 5         Q.   And you had testimony regarding uniforms,
 6   the plane, kind of, you know, the branding of the
 7   Company, if you will.
 8              Now, the "Live at 35" page that we were
 9   talking about earlier, that actually says
10   "Southwest.com," right?
11         A.   Yes.
12         Q.   And then the page of the picture of her in
13   the airport, it looks like, can you tell what
14   Ms. Carter is wearing?
15         A.   She has -- it appears to me that she has
16   her Southwest ID hanging around her neck.
17         Q.   Does it seem reasonable to you that a
18   coworker or a person of the public who was looking
19   at these photos all grouped together on the Facebook
20   page might conclude that these -- that even in these
21   photos she was a Southwest employee?
22         A.   Yes, absolutely.
23         Q.   I'll ask you about Exhibit 4, Joint
24   Exhibit 4.  You testified earlier regarding the
25   different classes of violations.
```

Charlene Carter - Vol. 1                              December 7, 2017

120

```
 1        A.   Yes.
 2        Q.   And if I can draw your attention to the
 3   first page of Joint Exhibit 4, the last paragraph
 4   there under 3.0.0.
 5        A.   Yes.
 6        Q.   Can you provide -- testify to your
 7   understanding of what the purpose of this paragraph
 8   is with respect to the different classes of
 9   violations?
10        A.   Yes.  There's -- it would be impossible to
11   list every single violation that has or could occur,
12   and so we clearly spell it out here.  "The list is
13   not exhaustive but merely illustrative.  Any other
14   conduct constituting 'just cause' may result in
15   discipline, up to and including termination."
16        Q.   And do you recall whether the Southwest
17   policies regarding harassment, workplace bullying,
18   hazing, and social media that we reviewed earlier
19   that's Joint Exhibits 5 through 7, do you recall
20   whether or not they specifically referenced that
21   violations of these policies could result in
22   termination?
23        A.   Yes.  Every single one of them does
24   reference that.
25             MS. GEHRKE:  Okay.  I have no further
```

```
 1   questions.  Thank you.
 2              MR. CHAPPELL:  I have nothing further.
 3              THE ARBITRATOR:  Thank you.  Appreciate
 4   your time.  And I think you don't have to be -- be
 5   around, available if need be.
 6              All right.  Let's go off the record a
 7   minute.
 8                   (Off record from 12:18 to 12:20)
 9              MR. RICHARD:  The Union counsel will be
10   leaving around 4:00-ish today.  It's my only flight
11   into New York where I have to go for involvement in
12   a case that I have.  With permission of the parties
13   and the arbitrator, if there were an issue that we
14   would bring up relating to contract sanctity, we'll
15   just do it the next day with my colleague and we can
16   always look at the transcript.
17              THE ARBITRATOR:  Sure.  That's fine.  I'm
18   very cognizant of those issues.  I can't favor
19   somebody, but I will keep that door closed if I can.
20   All right?
21              MR. CHAPPELL:  Thank you.
22              THE ARBITRATOR:  You bet.
23              MS. GEHRKE:  Thank you.
24                   (Recess from 12:20 to 1:14)
25              THE ARBITRATOR:  Would you tell her your
```

Charlene Carter - Vol. 1                              December 7, 2017

122

```
 1   name.
 2            THE WITNESS:  Audrey Stone.
 3            THE ARBITRATOR:  Would you raise your
 4   right hand.
 5            Do you swear that the testimony you're
 6   about to give in this arbitration shall be the
 7   truth?
 8            THE WITNESS:  Yes.
 9            THE ARBITRATOR:  Thank you.  Now, you're
10   going to have to speak up for her and for me, so try
11   to do that.
12                     AUDREY STONE,
13   having been duly sworn, testified as follows:
14                  DIRECT EXAMINATION
15   BY MS. GEHRKE:
16       Q.   Good afternoon, Ms. Stone.  My name's
17   Michele Gehrke.  I'm an attorney for Southwest
18   Airlines.  I'm going to be asking you some questions
19   today.  Can you tell the arbitrator how long you've
20   been employed by Southwest.
21       A.   Thirteen years.
22       Q.   And are you currently -- is your job title
23   flight attendant?
24       A.   Yes.
25       Q.   And are you currently flying trips as a
```

Charlene Carter - Vol. 1                    December 7, 2017

123

```
1   flight attendant for Southwest?
2        A.   I fly periodically.  I'm on currently a
3   union pull, but I do fly at least once a quarter.
4        Q.   And why are you on a union pull?
5        A.   I am also the president of TWU Local 556.
6        Q.   Can you tell us briefly about your
7   employment history at Southwest Airlines.
8        A.   I started at Southwest in 2004.  My first
9   position was a flight attendant.  It's the only
10  position I've had at Southwest Airlines during my
11  career.
12       Q.   Okay.  And how long have you held a Union
13  leadership position?
14       A.   I began my work with the Union in 2006 as
15  a shop steward.
16       Q.   Okay.  And how long were you a shop
17  steward?
18       A.   Until 2008.
19       Q.   And did you hold any other leadership
20  positions after you stopped being shop steward?
21       A.   Yes.
22       Q.   Please tell us about those.
23       A.   I was the Baltimore domicile executive
24  board member for -- from 2009 until 2012.  I was
25  also the education committee chairperson, and I also
```

Charlene Carter - Vol. 1                         December 7, 2017

124

```
1    served as the lead negotiator beginning in 2013.
2         Q.   Okay.  Prior to becoming president of
3    Local 556, had you served in other executive level
4    positions in the Union?
5         A.   No.
6         Q.   Were you ever first vice president of
7    Local 556?
8         A.   I was.  Well, actually I guess, yes,
9    technically.  And it depends on if -- our domicile
10   board member positions are considered an executive
11   board position but not considered an officer, so I
12   just want to make that distinction.
13        Q.   Okay.
14        A.   And I was the first vice president for a
15   very brief period of time in 2013 immediately before
16   I became president.  I was first vice president for
17   a few days.
18        Q.   Okay.  Why did you only serve a few days
19   as first vice president?
20        A.   In May of 2013 two of the officers
21   resigned from the Union's executive board, and then
22   immediately following that there was the removal of
23   our first vice president, Chris Click.  Under our
24   bylaws, the next highest votegetter from the
25   election, the position was offered to me as the next
```

Charlene Carter - Vol. 1                    December 7, 2017

125

```
 1    highest votegetter from the election the year
 2    previously.  So I became the first vice president
 3    when he was removed from his position.
 4              And then our then president, Stacy Martin,
 5    was removed a couple of days later.  And under our
 6    bylaws as well, I then moved up from first vice
 7    president to assume the position of the presidency.
 8    Our treasurer was also removed during that same time
 9    period.
10         Q.   Okay.  And did you later run for full term
11    to be president?
12         A.   Yes, I did.
13         Q.   When was that?
14         A.   That was in first quarter of 2015.  And
15    that term began on May 1st, 2015.
16         Q.   And when does your current term end as
17    Union president?
18         A.   April 30th, 2018.
19         Q.   When is the next Union election?
20         A.   It'll be the -- it'll begin in January,
21    next month.
22         Q.   And what airport are you based out of?
23         A.   Las Vegas.
24         Q.   And you live in Las Vegas?
25         A.   Yes.
```

Charlene Carter - Vol. 1                                      December 7, 2017

126

```
 1        Q.   Despite winning the election in the 2015
 2   time frame, has it been difficult for you to be
 3   serving as Union president?
 4        A.    It's been incredibly difficult.  It was --
 5   the circumstances under which I became president
 6   were a little unusual, so I faced a challenge
 7   because there had been, you know, a large upheaval
 8   in the leadership of our Union.  And that happened
 9   right before we were scheduled to begin contract
10   negotiations with Southwest Airlines.
11             There were -- the supporters of the
12   officers who were removed were very angry that
13   myself and other flight attendants had assumed those
14   leadership roles.  They were upset that the people
15   they had voted for the year previously were no
16   longer in office.  So there was a lot of pushback on
17   me being the unelected president.  And that
18   continued even after I won the election in 2015.
19        Q.    Did these issues play out on social media?
20        A.    Yes.  The social media dialogue has been
21   primarily where these conversations have been taking
22   place where -- on group pages where flight
23   attendants, you know, the pro-Union pages, the
24   tend-to-be, you know, anti-Union, the kind of
25   campaigns, you know, against leadership.  You know,
```

Charlene Carter - Vol. 1                              December 7, 2017

127

```
1    both directions have primarily been social media.
2              We are a workforce that is spread out all
3    across the nation and many times don't have a lot of
4    face-to-face interaction with many of our coworkers,
5    our flight attendants.  So our work group is very
6    active on social media as a communication tool to
7    stay in contact with each other.
8         Q.   Okay.  As part of the dissent over the
9    change in Union leadership, did certain members
10   elect to opt out of the Union?
11        A.   Yes.  At the summer of 2013 -- I became
12   president in June -- there was a push, largely
13   generated through social media.  Primarily Facebook
14   is where our flight attendants have the -- that's
15   the digital media vehicle that most of those
16   conversations take place on.  And there was a push
17   by those who had supported the removed officers,
18   Stacy, Chris, and Jerry.  There was a push to opt
19   out of the Union to send a message that we don't
20   support this leadership, it's not who we voted for,
21   so opt out of the Union, it will hurt them
22   financially from, you know, dues.
23             And so there was a push.  We had
24   historically had a handful of flight attendants who
25   had chosen to opt out over the years, and I think
```

Charlene Carter - Vol. 1                                    December 7, 2017

128

```
 1   probably by the end of 2013 at the height we had
 2   around 90 flight attendants out of our membership
 3   who had chosen to opt out after this campaign.
 4       Q.   Okay.  And was Ms. Carter one of the
 5   individuals who had opted out?
 6       A.   Yes.
 7       Q.   Do you recall approximately when she opted
 8   out of the Union?
 9       A.   I believe it was late in the summer of
10   2013.
11       Q.   Is it correct to refer to the people who
12   opt out of the Union as objectors?
13       A.   Yes.
14       Q.   Is that the term of art you use?
15       A.   Yes.  AFO, agency fee objector, is the
16   term that TWU International uses for those
17   non-members.
18       Q.   Okay.  But for shorthand we can call them
19   objectors?  You'll know what I'm talking about?
20       A.   Yes.
21       Q.   Okay.  Just want to get the terminology
22   right so we're on the same page.
23            How has social media been used by the
24   objectors against you personally or directed towards
25   you personally?
```

Charlene Carter - Vol. 1                              December 7, 2017

129

```
 1        A.    It has been used as a vehicle to criticize
 2   my leadership, to criticize decisions the Union has
 3   made.  It has been used as a vehicle to spread false
 4   information regarding Union business, regarding
 5   tentative agreements on the contracts that were
 6   rolled out.  It's been used as a vehicle to attack
 7   me personally and to attack many of my friends who
 8   also work for Southwest, folks that have been
 9   associated with me either professionally or
10   personally.  It's been used to attack them as well.
11        Q.    You mentioned to attack you personally.
12   What do you mean by that?
13        A.    I've been called names on social media.  I
14   have had references made to the fact that I'm not
15   married and the fact that I don't have children.  My
16   appearance has been ridiculed.  I have had videos
17   taken of me on the weekend at a Southwest Airlines
18   function by another employee without me being aware
19   of it that were released on Facebook groups.  I've
20   had personal photographs released and misrepresented
21   on various flight attendant pages.
22        Q.    Did any of the posts by the objectors
23   involve physical threats of violence against you?
24        A.    Yes.
25        Q.    Can you describe those briefly?
```

Charlene Carter - Vol. 1                                    December 7, 2017

130

    1        A.   There have been a couple that involved

    2   kind of general threats to the Union as an entity,

    3   and then there have been two in particular that

    4   referenced threats, threats to me.  When I was made

    5   aware of them, you know, we -- the Union took

    6   appropriate action just from a safety standpoint

    7   because I was concerned for my safety.

    8        Q.   Okay.  Did you ever report any of those

    9   personal attacks, including any of the threats of

   10   physical violence against you, to the Company?

   11        A.   No.

   12        Q.   Why not?

   13        A.   The threats of violence that were made, by

   14   the time I was made aware of them I was also made

   15   aware that other flight attendants had already seen

   16   them and that they had been reported to Southwest

   17   Airlines.

   18             And I had not taken any of the personal or

   19   professional attacks forward because I've spent my

   20   career at Southwest as an advocate for our flight

   21   attendants, you know, fighting for the rights of our

   22   flight attendants.  And I knew when I became the

   23   kind of leader of the Union that there was going to

   24   be, you know, a price you pay with that from the

   25   standpoint of having, you know, some attacks on you

Charlene Carter - Vol. 1                        December 7, 2017

131

```
 1   as a leader.  I knew that there was, you know, going
 2   to be some repercussions for me around that going
 3   into it and, you know, just continued to kind of
 4   turn the other cheek on the things that were being
 5   said.
 6        Q.   Okay.  How well do you know the grievant,
 7   Charlene Carter?
 8        A.   I don't know her well.
 9        Q.   How many times have you ever met her in
10   person prior to today?
11        A.   Once that I'm aware of.
12        Q.   Tell us about that encounter.
13        A.   It was right after I became president.  At
14   least three times a year we have membership meetings
15   where the president or their designee along with our
16   recording secretary and sometimes other officers of
17   our Union travel around to each domicile, or that's
18   how we did it in the past, to go over Union
19   business, to present financial reports, talk about
20   any current topics, any business that's going on.
21            And there were membership meetings that
22   had already been scheduled prior to me coming into
23   office that were scheduled to take place in June, so
24   they began just after I assumed the position.
25   Charlene was one of a handful of flight attendants
```

Charlene Carter - Vol. 1                    December 7, 2017

132

```
 1  present at the Denver session of that membership
 2  meeting in June 2013.
 3       Q.   So you met her there?
 4       A.   Yes.
 5       Q.   And did you engage in any lengthy
 6  discussions with her during that meeting?
 7       A.   No.  Answered some general questions like
 8  I did with -- from the other flight attendants who
 9  were present.
10       Q.   Okay.  So is it fair to say you did not
11  know Ms. Carter well?
12       A.   No.  I mean, that is fair to say.  I do
13  not know her well.
14       Q.   Even today?
15       A.   That's correct.
16       Q.   What is the significance of being an
17  objector to the Union with respect to the members'
18  rights as a Union member?
19       A.   When someone has chosen to opt out and
20  become an objector, they as a flight attendant give
21  up all of their voice, their right to vote.  So they
22  can't vote on a contract, they can't vote in any
23  elections, and they are unable to attend any Union
24  meetings, whether it's a membership meeting or a
25  ratification meeting for a contract.  They still
```

Charlene Carter - Vol. 1                              December 7, 2017

133

```
 1   have the right to file a grievance under our
 2   contract whether it is for a contractual or
 3   discipline issue, and we as a Union still have the
 4   responsibility to represent them should they need
 5   representation in any investigations with Southwest
 6   Airlines management.
 7        Q.   Okay.  Are there any differences in the
 8   Union dues or fees that objectors pay compared to
 9   members?
10        A.   There is.  Our local, Local 556, follows
11   the TWU International agency fee policy, so
12   International sets that once a year and there is a
13   small percentage of the dues that are refunded to
14   the individuals who have opted out.  It is the
15   percentage of dues, it averages around 10 percent,
16   of the money that is used for anything that touches
17   a legislative or political realm within the
18   International Union.
19        Q.   Can you describe the restrictions on how
20   agency fees can be spent relative to the general
21   Union dues?
22        A.   So the way we -- can you repeat the
23   question?  I want to make sure I'm understanding.
24        Q.   Yeah.  I mean, the objectors pay the
25   agency fees and then the regular Union members pay
```

Charlene Carter - Vol. 1                                December 7, 2017

134

```
 1    the full fee.  And you testified that there were
 2    some differences in how the money could be spent.
 3         A.   Well, actually the agency fee objectors,
 4    they pay the regular dues and then it's refunded
 5    back to them by International.  So they get that
 6    percentage back that International has determined
 7    was the percentage that is, again, spent towards
 8    legislative or political activities or expenditures,
 9    you know, items that are not related to negotiating,
10    you know, bargaining, enforcing the contract.
11         Q.   Does the International or the local kind
12    of handle the administration of that process of
13    refunding the fees?
14         A.   They do, yes.
15         Q.   That was an either/or question.  Is it the
16    local or the International?
17         A.   It's the International.
18         Q.   Okay.
19         A.   In fact, when someone chooses to opt out
20    of the Union, they actually have to notify TWU
21    International who then sends notification back to
22    the local that they have received that request and
23    process that request.  And then we then mark it
24    accordingly.
25         Q.   Can you explain in more detail what is
```

Charlene Carter - Vol. 1                                    December 7, 2017

135

```
 1   considered a political cause or political issue that
 2   could not -- agency fee objector fees could not be
 3   used towards?
 4        A.   So our International Union will support
 5   labor-friendly candidates.  We'll, you know, do
 6   lobbying for issues affecting workers that because
 7   it's lobbying work it also falls under that kind of
 8   political umbrella.  So it's money spent directly
 9   towards those causes that is refunded back.  It's
10   anything touching that realm that is not the general
11   day-to-day running of the Union, like I said, you
12   know, contract, discipline, the general Union
13   business.
14        Q.   Okay.  Is it common for Union members,
15   even though they have not opted out, to complain
16   about how Union dues are being spent?
17        A.   It is.  We -- you know, I normally chair
18   the membership meetings that I mentioned earlier,
19   and we present financial reports in those meetings.
20   It is a regular occurrence for flight attendants to
21   ask questions on, you know, why we spent X amount of
22   dollars, you know, in communications and what is
23   that paying for.  They will have an opportunity to
24   look at each committee's budget and, you know, what
25   did our professional standards committee spend their
```

Charlene Carter - Vol. 1                                    December 7, 2017

136

```
 1    money on, you know, for that month or that fiscal
 2    year, why is it higher than another committee.
 3            So we regularly have to answer questions
 4    and explain to our flight attendants, you know, how
 5    we spent the Union dues, why we spent the Union
 6    dues, and the cost of running a union of our size
 7    and the representation that we're providing with
 8    those services.
 9        Q.   Is it more common for the objectors to
10    complain about how Union dues money is spent?
11        A.   In my --
12            MR. CHAPPELL:  Objection.  Foundation.
13            THE ARBITRATOR:  She's about to say in her
14    experience.  I'll hold your objection to let her
15    answer the question.
16        A.    In my experience, for some of them, yes.
17    They -- if they've opted out of the Union because
18    they are unhappy about something, and many of them
19    have been very candid and open, you know, in
20    expressing that, they tend to be very critical of
21    the Union and use that to try to, you know, convince
22    other people to opt out and join in that cause.  So
23    I have seen that in my experience.
24    BY MS. GEHRKE:
25        Q.   Does Local 556 have certain committees
```

Charlene Carter - Vol. 1                                    December 7, 2017

137

```
 1    that are charged with various purposes?
 2         A.   Yes.
 3         Q.   And is one of those a women's committee?
 4         A.   Yes, it is.
 5         Q.   Can you explain to us kind of the purpose
 6    of the women's committee and what it does?
 7         A.   The women's committee was originally
 8    founded through TWU International, and it was to --
 9    within TWU International, outside of our local, many
10    of the other locals within TWU are predominantly
11    male work groups.  And so it was to bring women
12    together to advocate for women's issues in the
13    workplace within TWU, you know, to move them forward
14    as well as to focus on building women leaders within
15    TWU International and the local leadership.
16         Q.   And is the work done by the women's
17    committee considered to be a political cause or
18    political issue for purposes of the fees?
19         A.   No, it's not.  Our local only has one
20    committee that falls under that umbrella, and it's
21    our committee on political education.
22         Q.   So if I understand you correctly, then
23    everyone's dues money, including those of the
24    objectors, would go towards funding activities of
25    the women's committee?
```

Charlene Carter - Vol. 1                                    December 7, 2017

138

```
 1        A.    Yes.
 2        Q.    In January of 2016 did you attend a
 3   women's committee meeting in Washington, D.C.?
 4        A.    It was January 2017.
 5        Q.    I'm sorry.  Thank you.  And where was that
 6   meeting?
 7        A.    That was in Washington, D.C., and it was
 8   held at TWU International headquarters.
 9        Q.    And what was the purpose of that meeting?
10        A.    It was to bring flight attendants from all
11   over the system together, many of whom had expressed
12   interest on, you know, wanting to become more
13   involved with our working women's committee because
14   it had been a very small committee within our local.
15            And so we were looking to expand it, and
16   International, the chairperson of the TWU
17   International working women's committee helped put
18   it together, offered to host it, and actually set up
19   some speakers who were local to the D.C. area,
20   including Liz Shuler from the AFL-CIO, to be able to
21   come and speak to our flight attendants on some of
22   the women's issues that were happening in D.C.
23        Q.    And did Ms. Carter ever express interest
24   to you or anyone else, to your knowledge, about
25   joining in the women's committee?
```

Charlene Carter - Vol. 1                                    December 7, 2017

139

```
 1          A.   No, not to my knowledge.
 2          Q.   Would she have been allowed to participate
 3     in the women's committee as an objector?
 4          A.   No.
 5          Q.   Were certain individuals chosen to go to
 6     the Washington, D.C., meeting, or was everybody on
 7     the committee invited to go?
 8          A.   It wasn't -- people weren't chosen.  It
 9     was more of an organic flight attendants reaching
10     out to the female leaders within our executive
11     board.  And I believe anybody that reached out that,
12     you know, that heard about it or that expressed
13     interest in going was able to come.
14          Q.   And how were the costs associated with
15     attending the meeting paid for?
16          A.   Southwest Airlines provided the travel, so
17     there was no direct cost with that.  The Union dues
18     money were used to cover hotel and the hotel cost,
19     the lodging cost.  Union dues paid for one meal
20     while the group was in D.C.  And then with -- most
21     everybody there volunteered their time.  I'm on a
22     full-time salary, so the day of the meeting I was on
23     my, you know, my Union bar.  But the other rank and
24     file flight attendants volunteered their time to
25     come to the meeting.
```

Charlene Carter - Vol. 1                          December 7, 2017

140

```
 1        Q.   You testified that Southwest provided the
 2   travel, transportation, the flights.  Is that
 3   pursuant to a provision in the collective bargaining
 4   agreement?
 5        A.   It is.  Our contract states that Southwest
 6   Airlines will provide positive space travel for
 7   Union business.
 8        Q.   And this women's committee was deemed
 9   Union business?
10        A.   Yes.
11        Q.   And what were the dates of this meeting in
12   Washington, D.C.?
13        A.   The meeting took place on Thursday,
14   January 19th.
15        Q.   Okay.  And was there any significant
16   events going on in Washington, D.C., around that
17   time?
18        A.   There was.  The inauguration for President
19   Trump occurred January 20th.
20        Q.   And that was a Friday?
21        A.   Yes.
22        Q.   Do you recall that there was also a
23   women's march scheduled for around that time frame?
24        A.   Yes, there was, scheduled for that
25   Saturday.
```

Charlene Carter - Vol. 1                    December 7, 2017

141

1      Q.   Okay.  So that would have been

2  January 21st?

3      A.   Yes.

4      Q.   And did you or the women's committee

5  attend the women's march?

6      A.   Yes.  One of the speakers who attended our

7  meeting that Thursday was the Working America group,

8  and we -- most of our flight attendants who were

9  there volunteered to volunteer with Working America

10  Saturday morning prior to the march to sign people

11  up to go on a mailing list for Working America,

12  which is an organization that helps to advocate for

13  workers who are not under the collective bargaining

14  agreement to better their working environments

15  through different avenues because they don't have a

16  contract or the negotiating power to do that.

17      Q.   Did everyone from the women's committee

18  attend the women's march, or was it voluntary to go?

19      A.   It was completely voluntary.

20      Q.   And was that done basically then on your

21  free time?

22      A.   Yes, it was on our free time.

23      Q.   Did you or the women's committee have

24  anything to do with the lighting on Southwest

25  Airlines planes being pink for the trip to

Charlene Carter - Vol. 1                        December 7, 2017

142

```
 1  Washington?
 2      A.   No.  I actually heard about it after, the
 3  following week.
 4      Q.   Was the lighting on your plane to
 5  Washington, D.C., were the lights pink?
 6      A.   No.
 7      Q.   Do you know who was responsible for making
 8  the lights pink?
 9      A.   I don't know.
10      Q.   Why did you want to attend the women's
11  march on that Saturday?
12      A.   As a labor leader, we -- you know, I've
13  been very active in, you know, advancing human
14  rights, you know, workers' rights, participating in
15  causes around that.  And so for those of us that
16  chose to stay and volunteer, it was to support
17  equality, you know, across the board for women.  You
18  know, civil rights are human rights.  You know, that
19  slogan, that's why I personally chose to stay and
20  both sign up people for Working America that morning
21  and then to be there for the march.
22      Q.   And did the group make signs to carry
23  during the march?
24      A.   Yes.
25      Q.   And did you review those signs for their
```

Charlene Carter - Vol. 1                          December 7, 2017

143

```
 1   content?
 2        A.    I did.   The signs that our flight
 3   attendants carried were things like, you know,
 4   "Civil rights are human rights," you know, "We
 5   support working women."  They were things of that
 6   nature.   They were very inclusive.
 7        Q.    Did they identify the group as employees
 8   of Southwest Airlines?
 9        A.    Yes.   There was one -- we had "TWU Local
10   556," and there was a banner that said, you know,
11   "The flight attendants of Southwest Airlines."  Our
12   actual Union logo normally -- I mean, the logo found
13   on our website and our general printed materials,
14   that's how it states.
15        Q.    Have you ever publicized your political
16   views on abortion?
17        A.    No.
18        Q.    Have you ever discussed those political
19   views with Ms. Carter?
20        A.    No.
21        Q.    Prior to receiving her social media
22   messages, were you aware of Ms. Carter's views on
23   abortion?
24        A.    No.
25        Q.    How would you describe your political
```

Charlene Carter - Vol. 1                               December 7, 2017

```
 1   views on abortion?
 2        A.   I personally do not support abortion.  I
 3   personally do not believe it is a choice that I
 4   could ever make, but I also don't believe that I
 5   have the right to make that choice for any other
 6   woman.  I believe that each woman has the right to
 7   choose what happens to her and what she does with
 8   her body.  Although I don't personally support it, I
 9   just -- I don't think that's my decision to make for
10   you or someone else.
11        Q.   Did you receive private Facebook messages
12   from Ms. Carter regarding abortion and your
13   attendance at the women's march?
14        A.   Yes, I did.
15        Q.   Prior to receiving those abortion
16   messages -- and that was through Facebook Messenger?
17        A.   Yes.
18        Q.   Prior to receiving those messages through
19   Facebook Messenger regarding abortion, had you been
20   receiving other Facebook Messenger posts, messages
21   from Ms. Carter regarding other topics?
22        A.   Yes, I had.
23        Q.   And when do you estimate Ms. Carter
24   started sending you these Facebook Messenger posts?
25        A.   Early -- I think early 2015 during the
```

Charlene Carter - Vol. 1                     December 7, 2017

145

```
 1  officer election.
 2       Q.   And how often do you think Ms. Carter was
 3  sending you Facebook Messenger posts?
 4       A.   It was somewhat sporadic.  I was not --
 5  I'm not very active on Facebook, so it wasn't
 6  something I was checking all the time.  Sometimes I
 7  would open and see a stack of them, many of them,
 8  and I would just close it.  Some were, you know,
 9  multiple messages in a day, and then other times
10  there would be, you know, long periods where there
11  wasn't anything sent.
12       Q.   Can you estimate since 2015 approximately
13  how many private Facebook Messenger posts Ms. Carter
14  has sent you?
15            MR. CHAPPELL:  Objection.  I understand
16  the termination is based on specific messages in one
17  time period and that she was not discharged for a
18  series or over a two-year period, so I don't think
19  this is relevant to the just cause.
20            MS. GEHRKE:  That's actually not accurate.
21  There will be testimony that there was a pile of
22  messages and that it was part of the long campaign
23  of harassment of Ms. Stone that led to -- as part of
24  the decision to terminate her.
25            THE ARBITRATOR:  I'll allow the testimony.
```

Charlene Carter - Vol. 1                                    December 7, 2017

146

```
 1        A.    I would estimate probably around a
 2   hundred.
 3   BY MS. GEHRKE:
 4        Q.    Did you ever respond to these messages
 5   from Ms. Carter?
 6        A.    No.
 7        Q.    Did you ever ask her to stop messaging
 8   you?
 9        A.    No.
10        Q.    And these were all private messages,
11   correct?
12        A.    Yes.
13        Q.    Do you know if she ever tagged you in any
14   public Facebook posts, perhaps on some of these
15   Union pages or even on her personal page?
16        A.    Not that I'm aware of.
17             MS. GEHRKE:  All right.  I'd like to mark
18   as Southwest Company Exhibit 9 this pile of
19   documents.
20                  (Company Exhibit 9 marked)
21   BY MS. GEHRKE:
22        Q.    Ms. Stone, do you recall that as part of
23   the Company's investigation -- well, let me back up.
24             Did you ever complain to the Company
25   regarding messages you received from Ms. Carter?
```

Charlene Carter - Vol. 1                                    December 7, 2017

147

```
 1        A.   I did.
 2        Q.   And did the Company contact you about
 3   investigating that complaint?
 4        A.   Yes, they did.
 5        Q.   And as part of that investigation, did the
 6   Company ask you to provide all of the messages that
 7   you had received in the private Facebook Messenger
 8   from Ms. Carter?
 9        A.   Yes, they did.
10        Q.   Can you take a look at Southwest Exhibit 9
11   and tell me if this represents what you believe you
12   provided to the Company.
13        A.   It does.  I believe -- I couldn't -- I
14   couldn't tell you right this second if this is
15   everything, but yes.
16        Q.   You believe this is at least a substantial
17   subset of the messages, not the entire set?
18        A.   Yes.
19        Q.   And I realize you're not able to sit here
20   and go through each message as you're testifying,
21   but did most of these messages prior to the abortion
22   messages have to do with kind of Union or leadership
23   issues?
24        A.   Yes.  Some are about, you know, hoping I
25   wasn't going to win the election in 2015, that the
```

Charlene Carter - Vol. 1                                    December 7, 2017

148

```
 1   other group was going to win, that Charlene and
 2   other flight attendants were doing everything they
 3   could to ensure that the other group won.  There's
 4   complaints around other flight attendants, and
 5   there's complaints around how the Union was spending
 6   money, dues money.
 7            One references us inviting flight
 8   attendants in for the contract signing when that was
 9   signed with Southwest Airlines.  Some are
10   photographs of memes or, you know, pictures of me
11   that had different captions put on them, derogatory.
12   There's -- it's -- there's a lot of different things
13   in here.
14        Q.   Okay.  Did you receive private Facebook
15   messages from Ms. Carter in February 2017 regarding
16   abortion?
17        A.   Yes.
18        Q.   And what did those messages consist of
19   generally?  Were they videos, pictures, texts?
20        A.   The --
21            MR. CHAPPELL:  I object to her saying
22   anything more than answering your question of
23   whether they were texts, videos, pictures or what.
24            THE ARBITRATOR:  You're asking her to
25   generally describe --
```

Charlene Carter - Vol. 1                          December 7, 2017

149

```
 1              MS. GEHRKE:  Just -- yeah.
 2              THE ARBITRATOR:  -- what's in here so I
 3    don't have to go through it page by page?
 4    BY MS. GEHRKE:
 5         Q.   No, no, no, just the messages on abortion,
 6    what did that consist of generally, like two videos,
 7    one still picture, or what do you recall?
 8              THE ARBITRATOR:  I'll allow that.
 9         A.   The first message that I saw contained a
10    video.  When I was able to go back and finish
11    viewing the rest, there was a second video.  There
12    was texts, and there was a photograph.
13              MS. GEHRKE:  Okay.  We are going to now
14    play the videos so you can authenticate what you
15    received, and I apologize for making you watch this
16    again.
17                   (Video played)
18    BY MS. GEHRKE:
19         Q.   Ms. Stone, is that one of the videos that
20    Ms. Carter sent to you on your private Facebook
21    Messenger?
22         A.   Yes.
23              MS. GEHRKE:  Can you play the second
24    video, please.
25                   (Video played)
```

Charlene Carter - Vol. 1                                    December 7, 2017

150

```
 1   BY MS. GEHRKE:
 2        Q.   Ms. Stone, is that the second video
 3   Ms. Carter sent to you on your private Facebook
 4   Messenger?
 5        A.   Yes, but there was audio.
 6        Q.   There was audio?  Was there audio on that
 7   one?
 8             MS. ARMSTRONG:  Not when it was --
 9   BY MS. GEHRKE:
10        Q.   Do you recall what was on the audio?
11        A.   In one of the videos there was someone in
12   the background saying, "Look, it's still moving."
13             MS. GEHRKE:  Can you pull the headdress
14   picture, please.
15   BY MS. GEHRKE:
16        Q.   Can you look at this picture and tell us
17   if this is the third message that you received from
18   Ms. Carter on your private Facebook Messenger?
19        A.   Yes.
20        Q.   Did you provide the Company with all these
21   messages as part of their investigation?
22        A.   I did.
23        Q.   Did Ms. Carter ever tell you why she was
24   sending you those messages?
25        A.   No.  The messages that were contained in
```

Charlene Carter - Vol. 1                              December 7, 2017

151

```
 1    here are the only communication that I had around
 2    this from her.
 3         Q.   Did you ever discuss abortion with
 4    Ms. Carter?
 5         A.   No.
 6         Q.   Did you ever even discuss politics with
 7    Ms. Carter?
 8         A.   No.
 9         Q.   Did you ever discuss Planned Parenthood
10    with Ms. Carter?
11         A.   No.
12         Q.   Did you ever discuss the women's march
13    with Ms. Carter?
14         A.   No.
15         Q.   Did you receive any other similar messages
16    from other Local 556 members or objectors?
17         A.   No, not like this.
18         Q.   Prior to receiving these abortion
19    messages, had you ever reported Ms. Carter to
20    Southwest management?
21         A.   No, I had not.
22         Q.   Why not?
23         A.   As I mentioned earlier, I have spent most
24    of my career since my second year at Southwest
25    Airlines when I first started doing Union work
```

Charlene Carter - Vol. 1                                    December 7, 2017

152

```
 1   advocating for our flight attendants, fighting for
 2   their rights.  It -- fundamentally I had advocated
 3   against turning fellow flight attendants in.  I had
 4   educated on different avenues to try to resolve, you
 5   know, conflict, some of the avenues that the Union
 6   and Southwest Airlines jointly have available.
 7              So while she had sent some really ugly
 8   messages before, I -- it just went against my
 9   beliefs to turn that in, and I just continued to
10   tell myself that, again, part of my job as a leader
11   was to just recognize that people were going to say
12   ugly things and mean things.
13        Q.   What made you decide to report
14   Ms. Carter's Facebook Messenger posts to Southwest
15   at this point?
16        A.   They hurt me.  I couldn't unsee what she
17   sent.  I thought it was vile, I thought it was
18   disgusting, and I didn't want any other employee to
19   have to be exposed to that.  I was fearful that
20   other flight attendants that went to the march might
21   be sent it, and I felt like it crossed a line that I
22   had overlooked, walked away from a lot of harassment
23   and bullying that had been occurring for years, but
24   that this overstepped a line for me as a human being
25   and as an employee of Southwest.
```

Charlene Carter - Vol. 1                                    December 7, 2017

153

```
 1        Q.   How did you report Ms. Carter's messages
 2   to Southwest Airlines?
 3        A.   I sent an e-mail to my base manager,
 4   Suzanne Stephenson.  I sent an e-mail and attached
 5   screenshots, still shots of the messages.  I didn't
 6   know -- I'm not tech savvy enough, I didn't know how
 7   to send a video from Facebook as an e-mail
 8   attachment, so I just -- again, I sent an e-mail
 9   with the photos attached to her through our
10   Southwest Airlines e-mail system.
11        Q.   And did you hear from the Company in
12   response to your complaint?
13        A.   Yes, I did.
14        Q.   Who did you hear from?
15        A.   I think Suzanne initially e-mailed me back
16   that she was in receipt and -- receipt of it and
17   would be in further contact.  And then the base
18   manager from Denver, Ed, called me I think a day or
19   two later.
20             MS. GEHRKE:  Do you need a break?
21             THE WITNESS:  If I could, please.
22             MS. GEHRKE:  Sure.
23             THE ARBITRATOR:  We'll be off for seven
24   minutes.
25                  (Recess from 2:08 to 2:24)
```

154

```
 1                (Company Exhibit 10 marked)
 2              THE ARBITRATOR:  We'll go back on the
 3    record.
 4              MS. GEHRKE:  All right.  Before we
 5    continue with your questioning, I'd like to move
 6    Southwest Exhibit 10 into evidence.  That is the
 7    videos or a CD of the two videos that we just
 8    played.
 9              THE ARBITRATOR:  Uh-huh.
10              MR. CHAPPELL:  I don't think I have a
11    basis to object, unfortunately.
12              THE ARBITRATOR:  Well, it doesn't always
13    stop people from objecting, but I'll accept this
14    into evidence.
15              MS. GEHRKE:  We appreciate your restraint.
16              MR. CHAPPELL:  Well, I think had I
17    objected, the arbitrator would have overruled it.
18              THE ARBITRATOR:  It's the arbitrator rule.
19    We let everything in.
20              MR. CHAPPELL:  That's another thing I kind
21    of know.
22              THE ARBITRATOR:  We give it the weight
23    that it's accorded, it should be accorded.
24              MR. CHAPPELL:  Exactly.  I trust you to do
25    that correctly.
```

Charlene Carter - Vol. 1                          December 7, 2017

155

```
 1   BY MS. GEHRKE:
 2        Q.   Okay.  Before the break I think we were
 3   talking about how you had for the first time
 4   reported Ms. Carter for the messages she had sent
 5   you on the private Facebook Messenger, right?
 6        A.   (Witness nods head.)
 7        Q.   And I believe you testified that the base
 8   manager, Suzanne Stephenson, acknowledged receipt
 9   and Mr. Schneider had reached out to you.
10             What was the next step in the
11   investigation from your perspective?
12        A.   When Mr. Schneider called me, he said he
13   was going to need to set up a conference call with
14   the base leadership, myself, and employee relations
15   to go through and just ask some further questions
16   regarding the information I had submitted to
17   Southwest Airlines.
18        Q.   Did they offer you Union representation
19   for that call?
20        A.   When we set the call, when the call --
21   when that joint call started, they informed me at
22   that time that I could also have, you know, a Union
23   rep on the call with me if I chose to, and I did.  I
24   did have a fellow flight attendant and Union rep
25   that listened in on that joint base, ER, and myself
```

Charlene Carter - Vol. 1                              December 7, 2017

156

```
 1   phone call.
 2       Q.   Okay.  During this phone call, did they
 3   ask you if you knew why Ms. Carter was sending you
 4   these messages?
 5       A.   Yes.  The ER representative, Denise
 6   Gutierrez, and I apologize if I'm mispronouncing her
 7   name, she asked me repeatedly if I knew why Charlene
 8   had sent me the videos, the videos and the messages
 9   about abortion.
10       Q.   What did you tell her?
11       A.   I told her I didn't know and I couldn't
12   answer that.  She asked me multiple times, and I
13   kept saying I don't know why, I can't -- I can't --
14   I can't explain it, and anything I say would be
15   speculation.
16       Q.   Did she ask you if you had ever spoken to
17   Ms. Carter regarding abortion?
18       A.   Yes, she did.
19       Q.   And what did you tell her?
20       A.   I told her no.
21       Q.   Did she ask you if besides the three
22   abortion messages whether Ms. Carter had ever sent
23   you any other messages on private Facebook
24   Messenger?
25       A.   Yes, she did ask me that.
```

Charlene Carter - Vol. 1                    December 7, 2017

157

```
 1        Q.   And what did you tell her?

 2        A.   I told her yes.

 3        Q.   And did she ask you to provide the Company

 4   with all of those messages from Ms. Carter?

 5        A.   She did.

 6        Q.   And did you do so?

 7        A.   I did.

 8        Q.   And that was Southwest Exhibit 9, correct?

 9        A.   Yes.

10        Q.   Did she ask you what action you wanted

11   Southwest to take?

12        A.   She did ask me what, you know, what my

13   concerns were, why I brought this forward and, you

14   know, what I thought the next steps should be.  And

15   I told her that it was very difficult for me to talk

16   about and that it had upset me tremendously and that

17   I did not want anybody else to be exposed to this,

18   that I believed it was a violation of a number of

19   Southwest Airlines policies and I didn't think it

20   was okay and that I didn't want it to happen to me

21   again and I didn't want it to happen to anyone else.

22        Q.   Did you ask Ms. Gutierrez to fire

23   Ms. Carter?

24        A.   No, I did not.

25        Q.   Did you understand when you made the
```

Charlene Carter - Vol. 1                                  December 7, 2017

158

```
 1   complaint that Southwest would have a legal duty to
 2   investigate?
 3          A.   I did, yes.
 4          Q.   And did you understand that you could be
 5   called to testify about this when you made the
 6   complaint?
 7          A.   I did.  It's actually why it took me -- it
 8   was a very difficult decision for me to make, and it
 9   took me I think a full week from when I saw part of
10   the first video until I actually sent the e-mail
11   with the still shots to Southwest Airlines is
12   because I had never done that before and I
13   understood that Southwest would have a
14   responsibility to investigate and the ramifications
15   of that weren't something I took lightly.
16          Q.   Did the fact that Ms. Carter was an
17   objector have anything to do with your decision to
18   file a complaint?
19          A.   No, it did not.
20          Q.   Did you ever collude with Southwest to try
21   to get Ms. Carter fired because she was an objector?
22          A.   No, I did not.
23          Q.   Did Ms. Carter's involvement in the recall
24   election movement have anything to do with your
25   decision to report her?
```

Charlene Carter - Vol. 1                              December 7, 2017

159

```
 1        A.   No.
 2        Q.   What about her political views on abortion
 3   or right-to-work legislation, did that influence you
 4   at all?
 5        A.   No.
 6        Q.   Are you aware that Ms. Carter was
 7   terminated for sending you these messages?
 8        A.   Yes.
 9        Q.   Are you aware that Ms. Carter grieved her
10   termination?
11        A.   Yes.
12        Q.   And did Local 556 represent Ms. Carter
13   during the grievance proceedings?
14        A.   Yes, they did.
15        Q.   And who was the grievance specialist who
16   was assigned?
17        A.   Beth Ross.
18        Q.   Were you involved at all in Ms. Carter's
19   grievance proceedings or in decisions regarding her
20   grievance?
21        A.   No, I was not.
22        Q.   As president of Local 556, are you
23   normally part of the grievance process or the step 2
24   process?
25        A.   Not normally.  I am -- I don't normally
```

Charlene Carter - Vol. 1                                    December 7, 2017

160

 1   participate in the actual filing of grievances or
 2   the day-to-day managing or handling those cases once
 3   they're filed.  While I have attended some step 2
 4   meetings in the past, it's not a regular occurrence,
 5   and my involvement usually only occurs at the point
 6   that the executive board is hearing a grievance,
 7   hearing a case, and determining whether or not to
 8   proceed forward based off the merits.
 9           I, as president, am the chairman of the
10   executive board, so I chair, you know, those
11   discussions normally.  And then for the cases that
12   the board votes to proceed on, I regularly
13   participate in the monthly grievance meetings
14   between our grievance chairpersons and Southwest
15   Airlines labor relations in, you know, advocating
16   for resolutions and solutions on the cases that have
17   come forward.
18       Q.   Did you do any of that with respect to
19   Ms. Carter's grievance?
20       A.   I did not.  I recused myself from the
21   board meeting and was not there when the board
22   reviewed Ms. Carter's grievance.
23       Q.   Why did you do that?
24       A.   Because I didn't think it would -- I
25   didn't think it would be appropriate for me to even

Charlene Carter - Vol. 1                                    December 7, 2017

161

```
 1   chair a meeting, and quite honestly I didn't want to
 2   be present for it.  I knew that they would be, you
 3   know, going through the details of the case, and
 4   it's difficult for me to look at.
 5            But again, it wasn't -- it was not
 6   something that I needed to be -- I needed to be
 7   present for.  And our first vice president
 8   frequently chairs meetings if I am, you know, not
 9   there, attending to other Union business, so that's
10   what took place.
11       Q.   Even though you kind of officially recused
12   yourself, did you do anything to try to influence
13   the Union's handling of Ms. Carter's grievance?
14       A.   No, absolutely not.
15       Q.   And did you do anything with respect to
16   Southwest management in trying to influence their
17   decision regarding Ms. Carter or her grievance?
18       A.   No, I did not.
19            MS. GEHRKE:  I have no further questions
20   at this time.
21            THE ARBITRATOR:  All right, sir.  Your
22   witness.
23            MR. CHAPPELL:  Okay.
24
25
```

Charlene Carter - Vol. 1                                    December 7, 2017

162

```
 1                    CROSS-EXAMINATION
 2   BY MR. CHAPPELL:
 3        Q.   You testified earlier about some general
 4   personal attacks that collectively the question was
 5   that objectors -- I think we all know what that term
 6   means -- had made against you over the last couple
 7   of years.  Do you remember testifying to that?
 8        A.   I do.
 9        Q.   Okay.  And the record will speak for
10   itself, but my notes say that those personal attacks
11   focused on your marital status, whether you had
12   children, personal photographs.  You remember that
13   string of examples that you gave in answer to the
14   question?
15        A.   Yes, I do.
16        Q.   Okay.  Were you, when you were answering
17   that question, were you referring specifically to
18   anything Ms. Carter had done?
19        A.   No, not with those examples.
20        Q.   Okay.  That was just a general to other
21   people, other objectors in general?
22        A.   Yes, and they were just a few of the
23   examples of what's happened since I've been
24   president.
25        Q.   And actually I think it's Exhibit 9.
```

Charlene Carter - Vol. 1                                    December 7, 2017

163

```
 1              THE ARBITRATOR:  Yeah.
 2   BY MR. CHAPPELL:
 3        Q.   Exhibit 9 is a representation of what
 4   Ms. Carter had sent to you?
 5        A.   Yes.
 6        Q.   Okay.  And, in fact, in most cases or many
 7   times you never even looked at what came in, I
 8   believe you said.  Is that correct?
 9        A.   In some -- some of the cases.
10        Q.   Right.  And to the two videos that were
11   shown here, Exhibit 10, they didn't automatically
12   start playing when you got the message, right?
13        A.   Actually, the video that was on top did.
14   The way Facebook Messenger works -- and again, I'm
15   not a Facebook expert, but when I opened my
16   Messenger account and opened the top message, it was
17   from Ms. Carter and it was the video.  And when I
18   opened that application up, it started playing.
19        Q.   And the second one did the same thing?
20        A.   No.  I closed that after a few seconds,
21   and it was the following day before I was able to go
22   back in and finish looking at what she had sent me.
23        Q.   Now, I realize that you may not have
24   looked at those videos when they appeared in your
25   Messenger feed, but am I correct that they both were
```

Charlene Carter - Vol. 1                                    December 7, 2017

164

```
 1   sent to you pretty close in time, in fact in the
 2   same day?  Is that your recollection?
 3        A.   I believe so.  I know that I saw them on a
 4   Wednesday.  It was February 15th.
 5        Q.   Okay.  And I believe the document --
 6        A.   Or the first one.
 7        Q.   I mean, the document speaks for itself,
 8   but I think it shows a date of Tuesday, so -- okay.
 9            Before or after, including up to today,
10   have you received any additional abortion videos or
11   pictures from Ms. Carter by any means?
12        A.   No, but I blocked Ms. Carter immediately
13   after submitting the documentation to Southwest
14   Airlines.
15        Q.   Okay.
16        A.   Actually once I had pulled it off, I
17   blocked her before I had submitted it.  Once I had
18   taken the screenshots, I blocked her.  And then when
19   Southwest Airlines asked me for the additional
20   information, I had to unblock to pull it off because
21   Facebook -- I guess once you block somebody, it
22   won't let you go back and access previous messages.
23   So I unblocked to pull out at Southwest Airlines'
24   request the additional messages, and then I
25   immediately reblocked her once I had done that.
```

Charlene Carter - Vol. 1                                    December 7, 2017

1          Q.    So not counting when you unblocked it to

2     comply with the request, when you initially blocked

3     her it was a day or so or two days -- because you

4     said you took a week to decide -- it was several

5     days after you had first viewed the video?  Is that

6     correct?

7          A.    When I first blocked her?

8          Q.    Yes.

9          A.    I believe it was the following day.

10         Q.    But between the time that you viewed the

11    videos and you blocked her, you did not receive any

12    more abortion related messages?

13         A.    No, not within that day.

14         Q.    Have you heard other flight attendants

15    receiving Facebook Messenger or direct private

16    videos or pictures from Ms. Carter of abortion

17    related material?

18         A.    No, I'm not aware.

19         Q.    And both as part of your duties as

20    president and also just being a flight attendant,

21    it's not uncommon that you do hear from other flight

22    attendants about various social media or Facebook

23    things that they get from other flight attendants?

24    Isn't that correct?

25         A.    I want to make sure I'm understanding.

Charlene Carter - Vol. 1                                     December 7, 2017

```
 1        Q.    Sure.
 2        A.    Do I hear about other flight attendants
 3   receiving things?
 4        Q.    Right, they talk to you, they say, well, I
 5   got this thing from so-and-so and --
 6        A.    Yes.
 7        Q.    You testified that Ms. Carter did not tell
 8   you why she sent the videos?  Do you remember saying
 9   that?
10        A.    Yes.
11        Q.    Okay.  I'm sorry to draw your attention
12   back to Exhibit 9, but did you notice that at the
13   top of both videos there was some typing, some
14   language?
15        A.    Yes, I did when I went back and looked at
16   it.
17        Q.    Okay.  And did you recognize or do you now
18   know that that typing above the picture or the video
19   representation on Exhibit 9 was written by
20   Ms. Carter?
21        A.    I assumed so.
22        Q.    Okay.  And that applies to both videos
23   shown on the first page of Exhibit 9 and the video
24   on what's marked as a whole bunch of zeros page 2 or
25   the second page?
```

Charlene Carter - Vol. 1                                  December 7, 2017

167

```
 1          A.   Yes.
 2          Q.   Is it now inaccurate to say that
 3     Ms. Carter didn't tell you why she was sending you
 4     the videos?
 5          A.   I still can't explain why she was sending
 6     me the videos of an abortion.
 7          Q.   But she did write --
 8          A.   Right.
 9          Q.   -- something from her, could be -- I'm not
10     trying to put words in your mouth -- could be an
11     explanation for why she sent them to you?
12          A.   Right.  I see what she wrote.
13          Q.   Okay.
14          A.   But I can't explain why she sent the
15     videos.
16               THE ARBITRATOR:  And she never explained
17     to you in person why she sent other than the texts
18     that were included with the videos?
19               THE WITNESS:  That's correct.
20               THE ARBITRATOR:  Is that correct?
21               THE WITNESS:  Yes.
22               THE ARBITRATOR:  There's no dispute in
23     this record that she sent them and that's her
24     comments?  Your answer was what?  No?
25               MR. CHAPPELL:  My answer is that that is
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1    correct, and the comments speak for themselves.
 2              THE ARBITRATOR:  Okay.
 3              MR. CHAPPELL:  There's obviously
 4    descriptions by everybody to try to characterize the
 5    comments or the video as well.
 6    BY MR. CHAPPELL:
 7        Q.   You also testified that you had counseled
 8    flight attendants about the social media policy?  Do
 9    you remember that testimony?
10        A.   Yes.
11              MR. CHAPPELL:  Okay.  And I believe this
12    will be CC-2?  Does that sound right?
13              THE ARBITRATOR:  Yes.
14                  (Grievant's Exhibit CC-2 marked)
15    BY MR. CHAPPELL:
16        Q.   Do you recognize CC-2, Ms. Stone?
17        A.   I do.
18        Q.   And we put -- I believe CC-2 is the full
19    magazine or whatever this is called, but we're
20    really focusing along the first three pages.  Okay?
21    And specifically the president's message, do you see
22    that there?
23        A.   Yes.
24        Q.   And is that your message?
25        A.   It is.
```

Charlene Carter - Vol. 1                          December 7, 2017

169

```
 1          Q.    As president of TWU Local 556?
 2          A.    Yes.
 3          Q.    Okay.  And is that one or what you were
 4    referring to that you had counseled flight
 5    attendants how to handle this policy?
 6          A.    It's a piece of it, but I was also
 7    referring to even individual conversations I had had
 8    with friends and flight attendants over the years
 9    who, you know, come to me and ask my opinion on how
10    to handle issues.
11          Q.    Is it fair to say that your advice when
12    they ask you these questions dealing with the social
13    media and filing complaints was pretty consistent
14    and are reflected in your president's message here?
15          A.    Up to this point, yes.
16          Q.    Right.  Now, if you'd turn to the second
17    page and look at the first full paragraph that
18    begins with "Your Union has been addressing
19    Southwest Airlines' Social Media Policy."  Do you
20    see that paragraph?
21          A.    I do.
22          Q.    Okay.  The next sentence talks about the
23    "policy that is both vague and undefined."  What
24    were you referring to there?
25          A.    We had seen a number of what the Union
```

Charlene Carter - Vol. 1                                    December 7, 2017

170

```
 1   believed was very inconsistent application of the
 2   social media policy and how it was being applied to
 3   flight attendants.
 4       Q.   You're also -- near the end or the next
 5   paragraph, I mean the next sentence, I'm sorry, you
 6   say that "the often-subjective stance."  What did
 7   you mean by subjective stance?
 8       A.   We had had some cases where individuals
 9   were having just conversation back and forth,
10   completely, you know, just on personal nature and
11   then somebody would bring it forward that they were
12   upset about something a coworker had said.  And
13   again, it was very -- we were not seeing consistency
14   in how Southwest Airlines was investigating the
15   situations and applying consistent discipline in
16   them.
17       Q.   Okay.  It would be the third paragraph,
18   and you say -- and again, I believe this was written
19   in 2015.  Do you want to check the front of the
20   page?  Have I got the right date?  You said there
21   were certain "Social Media Policy changes we would
22   like to see in the future."  What was the nature of
23   those changes you were hoping to get?
24       A.   We were wanting to see more specific
25   guidelines that applied to flight attendants because
```

Charlene Carter - Vol. 1                    December 7, 2017

171

 1  we had heard from Southwest that our work group was
 2  experiencing the most issues with social media.  And
 3  the social media policy is a policy that is applied
 4  to all employees, so we wanted to look at having
 5  more specific rules, I mean guidelines for
 6  individually our work group.
 7       Q.   And were you also looking to potentially
 8  have some changes in the existing guidelines so they
 9  would be more focused on your work group?
10       A.   Well, what we were looking for was, as I
11  stated, specific guidelines and rules for the flight
12  attendants separate from just the general Southwest
13  Airlines social media policy.
14       Q.   Now, the last paragraph, I'm going to read
15  it into the record so you don't have to read it.
16            THE ARBITRATOR:  Actually there's no rule
17  of reason for you to do that.  I'm looking at it.
18            MR. CHAPPELL:  Okay.
19            THE ARBITRATOR:  It's in the record.
20            MR. CHAPPELL:  Okay.  Perfect.
21  BY MR. CHAPPELL:
22       Q.   I know you spoke on direct a little bit
23  about this, but in that paragraph is it fair to say
24  at least at that time you were asking that the
25  flight attendants first try to work it out or talk

Charlene Carter - Vol. 1                                    December 7, 2017

172

```
 1  to each other and not just start filing charges with
 2  the Company because of what then happened?
 3       A.   Yes.
 4       Q.   Okay.  And I know you testified on direct
 5  the concerns that you had both to yourself for
 6  future situations that Ms. Carter might do and to
 7  other flight attendants.
 8            And so my question is, why didn't you
 9  contact Ms. Carter to see whether this was a
10  mistake, whether she was sorry, whether you could
11  feel convinced that she wouldn't do it or was
12  planning to do it again and that kind of stuff
13  before filing it?
14       A.   I believed that at the point that she sent
15  me those videos, including the text that you
16  referenced earlier, that there was no way that I was
17  going to be able to have a constructive conversation
18  with her.  And I didn't believe with as upset as I
19  was that there would be any chance that anything
20  productive would come out of that.  And the fact
21  that she had been sending me messages for almost two
22  years at that point, I didn't think that would be
23  successful in resolving my concerns.
24       Q.   But during those two years, you had never
25  gotten any kind of message like this one?
```

Charlene Carter - Vol. 1                                    December 7, 2017

173

```
 1        A.   No, not -- I had never received any videos
 2   that were graphic in nature from her.
 3        Q.   You testified who the -- I think you
 4   called it the grievance agent or something like that
 5   and the name who was assigned to Ms. Carter's
 6   grievance.  Do you remember testifying to that?
 7        A.   Yes.
 8        Q.   Okay.  Do you know whether she had a
 9   steward also at the fact finding?
10        A.   Whether she had a shop steward?
11        Q.   Representative, yeah, shop steward.
12        A.   I believe she did.
13        Q.   Do you know who that was?
14        A.   I believe it was Chris Sullivan.
15        Q.   Chris Sullivan?  And what is your
16   understanding of the role of the shop steward at a
17   termination fact finding?
18        A.   Well, at the fact finding meeting process,
19   a termination hasn't occurred.  It is the initial
20   stages in the Southwest Airlines investigation.  And
21   shop steward's role is to make sure that the
22   investigation is, in terms of what happens in the
23   meeting, is handled correctly in that it's explained
24   to the flight attendant why they're there and that
25   it's explained what Southwest Airlines is looking
```

Charlene Carter - Vol. 1                                    December 7, 2017

174

```
 1   into.  And the steward is also there to take notes
 2   for the Union's records of the meeting and what took
 3   place.
 4               MR. CHAPPELL:  Okay.  I have CC-3.
 5                   (Grievant's Exhibit CC-3 marked)
 6   BY MR. CHAPPELL:
 7       Q.   So I ask you to look at what's been
 8   identified as CC-3 and ask you if you recognize
 9   that.
10       A.   Yes, I do.
11       Q.   Okay.  Could you tell us -- it says "From
12   Audrey" at the top.  That's you, correct?
13       A.   Yes.
14       Q.   Okay.  So go ahead and tell me what this
15   is.
16               THE ARBITRATOR:  Can I have a date?
17   Because I don't see a date on this.  Do you know the
18   date of this post?
19               THE WITNESS:  I couldn't tell you exactly.
20   It was during our officer elections, so the first
21   quarter of 2015.
22               THE ARBITRATOR:  '15?
23               THE WITNESS:  Yes, sir.
24               MR. CHAPPELL:  And also Exhibit CC-2
25   was -- I'm not saying that it came before or after
```

Charlene Carter - Vol. 1                                    December 7, 2017

175

1    but that it was also in 2015.

2    BY MR. CHAPPELL:

3         Q.    Okay.  You were telling us what this was.

4         A.    Some of the flight attendants that I was

5    running with during that election put together a

6    Facebook group.  It was a private group to discuss

7    campaign, you know, elections, when we were going to

8    be, you know, out in the bases and where, and it was

9    a way for flight attendants who wanted to help, for

10   us to give them direction.

11        Some of the flight attendants on that

12   page, you know, were having conversations about

13   other flight attendants, other candidates.  Some of

14   those screenshots got leaked from the private group

15   and were posted on other group pages.  And flight

16   attendants were upset that, you know, there were

17   conversations of "I don't like this person," you

18   know, "Can you believe, you know, he did this,"

19   those kind of things.

20        And so I had made the post on behalf of

21   the group.  There were seven flight attendants, six

22   other flight attendants that ran with me, and this

23   conversation occurred in that group.

24        Q.    Okay.  And basically the six or seven

25   would be what the "Core Team" refers to?

Charlene Carter - Vol. 1                                December 7, 2017

176

```
 1          A.    That was the name of the group.

 2          Q.    Oh, the private group that had a --

 3          A.    Yes.

 4          Q.    Okay.  Now, did any of the comments that

 5    were made there or leaked into the public or

 6    whatever, did any of them lead to any flight

 7    attendants filing complaints with the Company about

 8    any of the things that were said?

 9          A.    I can't speak to confidential information

10    that I know because of my Union position.

11          Q.    Well, the question just asks whether there

12    were any complaints filed with the Company.  I don't

13    see how that reveals confidential information.  I

14    won't ask you the names or anything like that.

15          MS. GEHRKE:  I'm sorry.  Can you repeat

16    the question?

17          THE REPORTER:  "Well, the question just

18    asks whether there were any complaints filed with

19    the Company.  I don't see how that reveals

20    confidential information.  I won't ask you the names

21    or anything like that."

22          THE ARBITRATOR:  I think that's a

23    legitimate question so far as that goes, so I'll

24    allow that.

25          MS. GEHRKE:  No objection.
```

Charlene Carter - Vol. 1                    December 7, 2017

177

```
 1        A.   Yes.
 2   BY MR. CHAPPELL:
 3        Q.   And were there more than ten filed over
 4   that?
 5        A.   I don't know.
 6        Q.   But there was more than one?
 7        A.   I believe so.
 8        Q.   Okay.  Now, when Southwest finished its
 9   investigation of your complaint on Ms. Carter, were
10   you informed by Southwest of the results of the
11   investigation and your complaint?
12        A.   I -- I was, only at the point -- the -- it
13   was still in discussions, the only time that I was
14   informed, and it was just that it was still in
15   discussions on settlements.
16        Q.   Were you at some point informed by
17   Southwest employees, management, I'm not talking
18   about Union people telling you, but Southwest that
19   Ms. Carter had been terminated?
20        A.   No.
21        Q.   You eventually learned that that was the
22   result?
23        A.   I did.
24        Q.   And you were relieved?
25        A.   No.
```

Charlene Carter - Vol. 1                          December 7, 2017

178

```
1          Q.   Well, that would remove her from doing
2     this to your fellow flight attendants as part of
3     being a fellow flight attendant.
4               THE ARBITRATOR:  I think she answered no.
5               MR. CHAPPELL:  Okay.  No further
6     questions.
7                    REDIRECT EXAMINATION
8     BY MS. GEHRKE:
9          Q.   Just a couple quick follow-ups, Ms. Stone.
10              Exhibit CC number 2, that was from looks
11    like the April 2015 time frame, correct?
12         A.   Yes.
13         Q.   And you testified earlier regarding your
14    statement in this message that there was some
15    concern about inconsistent application of the social
16    media policy and how the Company was applying it
17    subjectively.  Is that right?
18         A.   Yes.
19         Q.   Are you aware that there was some changes
20    in how the Company began to apply the social media
21    policy in 2016 moving forward because of all the
22    social media issues that were coming up?  Would you
23    say there was a change?
24         A.   I don't know that I could speak to a
25    change in policy.  I know that we were seeing more
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   activity of just more complaints coming forward from
 2   our flight attendants and that the conversations on
 3   social media were becoming even more negative and
 4   more derogatory.  And so, you know, that's what we
 5   were directly hearing from our flight attendants and
 6   my coworkers is just that it was getting worse.
 7       Q.   And do you know if because of all that
 8   activity the Company started kind of cracking down
 9   in terms of discipline being imposed?  Did you
10   observe a tighter enforcement?
11       A.   Yes, we did.  There was a period of time
12   after this in 2015, what I spoke to in here, where
13   we were having conversations.  And then we didn't
14   see cases coming through for a little while.
15            And then in 2016 we started seeing
16   discipline being issued again and more consistently
17   by Southwest Airlines for conversations that were
18   taking place on social media, although the
19   discipline issued wasn't always specifically around
20   the social media policy.  There was workplace
21   violence, harassment, and other things that we were
22   seeing cited, but where the conversations started
23   were via Facebook.
24       Q.   Okay.  I want to show you Southwest
25   Exhibits 5 and 6.  I don't know if you have those
```

Charlene Carter - Vol. 1                                    December 7, 2017

180

```
 1   there, so I will --
 2           THE ARBITRATOR:  You can hand her that.
 3   Just refer to it for the record.
 4   BY MS. GEHRKE:
 5       Q.   This is Southwest Exhibits 5 and 6.
 6   They're the 2016 and 2015 read before flies that the
 7   Company issued.  Can you take a minute to look at
 8   that document, those documents.  Have you seen these
 9   documents before?
10       A.   Yes, I have.
11       Q.   Do you believe or is it your understanding
12   that the Company issued those read before flies as
13   part of its kind of crackdown on all the social
14   media policies going on with the flight attendants?
15       A.   Yes, it was.
16       Q.   And to kind of warn flight attendants that
17   they were going to be cracking down in terms of the
18   discipline imposed if people were violating social
19   media and the other related policies on harassment,
20   bullying, and workplace violence?
21       A.   Yes.
22           MS. GEHRKE:  Thank you.  No further
23   questions.
24           MR. CHAPPELL:  No further questions.
25           THE ARBITRATOR:  Thank you very much for
```

Charlene Carter - Vol. 1                                    December 7, 2017

181

```
 1  your time.  I appreciated your testimony.  It will
 2  be very helpful to me.  Let's be off for ten
 3  minutes.
 4                    (Recess from 3:05 to 3:17)
 5            THE ARBITRATOR:  We'll go back on the
 6  record.  And would you tell her your name, please.
 7            THE WITNESS:  Meggan Jones.
 8            THE ARBITRATOR:  Meggan Jones.  All right.
 9  And would you raise your right hand, please.
10            Do you swear that the testimony you're
11  about to give in this arbitration shall be the
12  truth?
13            THE WITNESS:  Yes, I do.
14            THE ARBITRATOR:  Thank you.  Your witness.
15            MS. GEHRKE:  Thank you.
16                    MEGGAN JONES,
17  having been duly sworn, testified as follows:
18                    DIRECT EXAMINATION
19  BY MS. GEHRKE:
20      Q.   Good afternoon, Ms. Jones.  Can you please
21  tell us how long you've been employed by Southwest
22  Airlines.
23      A.   About six and a half years.
24      Q.   And what's your current position?
25      A.   Assistant base manager at the Denver
```

Charlene Carter - Vol. 1                                    December 7, 2017

182

```
 1   Inflight base.
 2        Q.   And is that your first position with
 3   Southwest?
 4        A.   No.  Prior to that I was an inflight
 5   supervisor for about four years.
 6        Q.   And where were you located then?
 7        A.   Las Vegas prior to Denver and from 2011,
 8   and then end of 2012 to present in Denver.
 9        Q.   And what are your job responsibilities at
10   Southwest as an assistant base manager?
11        A.   My responsibilities include supporting the
12   base manager, supporting the staff and flight
13   attendants.  We have a staff of 16, about 1,650
14   flight attendants that we provide support to, do
15   recognitions for them.  We assist them with any
16   trouble they might have while they're flying.
17             We also conduct investigations if there's
18   been a potential violation of the work and conduct
19   rules or a violation of a Company policy.  We
20   investigate claims that are made, things of that
21   nature.
22        Q.   Are you familiar with the grievant,
23   Charlene Carter?
24        A.   Yes, I am.
25        Q.   And how do you know Ms. Carter?
```

Charlene Carter - Vol. 1                                  December 7, 2017

183

```
 1        A.    She was a flight attendant at the Denver
 2   base.
 3        Q.    And did you -- were you inflight
 4   supervisor at the time that she was there?
 5        A.    Yes.  I was actually her supervisor at the
 6   time.
 7        Q.    Did you have much interaction with
 8   Ms. Carter while you were her supervisor?
 9        A.    Not much.  We would talk occasionally.  It
10   was always very friendly, but outside of that not
11   really.
12        Q.    Did you have any observations regarding
13   Ms. Carter's work schedule?
14        A.    We used to see her more frequently, but
15   the last few years she hasn't flown a whole lot so
16   we don't see her.  I actually hadn't seen her in
17   almost probably three years.
18        Q.    And was she allowed under the collective
19   bargaining agreement to kind of give away her
20   shifts?
21        A.    Yes.  She gave away most of her shifts.  I
22   believe she worked a total of maybe approximately
23   eight shifts over like the last two and a half,
24   three years.  So she has the provision to basically
25   what we call trading away down to zero under the
```

Charlene Carter - Vol. 1                                   December 7, 2017

184

```
 1   collective bargaining agreement, and that's -- she
 2   was exercising her right to do so.
 3        Q.   And that would allow her to basically not
 4   work but still keep her employee benefits, flight
 5   privileges, things like that?
 6        A.   Yes.
 7        Q.   And would that include paid vacation?
 8        A.   Yes, it does.
 9        Q.   And how much paid vacation would she have
10   received?
11        A.   I don't know exactly what that number
12   would be.  It's based upon years of service.  That's
13   what your vacation is factored in under, and I
14   believe that at her tenure it's approximately four
15   or five weeks of vacation per year.
16             MS. GEHRKE:  Okay.  I'm going to mark this
17   document as Southwest Exhibit No. 11.
18                  (Company Exhibit 11 marked)
19   BY MS. GEHRKE:
20        Q.   We're just going to cover this very
21   briefly.  I don't want to belabor the point, but I
22   wanted you to have the documentation.  Ms. Jones,
23   are you familiar with this document?
24        A.   Yes.
25        Q.   What is it?
```

Charlene Carter - Vol. 1                                    December 7, 2017

185

```
 1        A.   This is a copy of what we call a board,
 2   which is a schedule for a flight attendant, from
 3   February of 2015.  This is Charlene's, a copy of her
 4   February schedule.
 5        Q.   And how are these reports generated or
 6   this board generated?
 7        A.   It's a scheduling system called CWA which
 8   basically manages and tracks trips, gives them the
 9   ability to trade, communicate with other flight
10   attendants, things of that nature.
11        Q.   Okay.  And based on this documentation,
12   can you estimate how many days Ms. Carter actually
13   worked or flew in 2015?
14             MR. CHAPPELL:  Objection.  I fail to see
15   the relevance.  This is provided for in the
16   collective bargaining agreement.  I think it's
17   prejudicial in nature.  And we've already
18   established that she exercised those rights to go
19   in, and the rest of this is taking us into a --
20             THE ARBITRATOR:  The testimony was maybe
21   eight or nine trips or shifts over the last two
22   years?
23             MS. GEHRKE:  I think she said eight or
24   nine days --
25             THE WITNESS:  Days.
```

Charlene Carter - Vol. 1                                    December 7, 2017

186

```
 1              MS. GEHRKE:  -- over three years.
 2              THE ARBITRATOR:  All right.
 3              MS. GEHRKE:  I just want to get these in
 4  so you have the documentation.
 5              THE ARBITRATOR:  We'll let it in, but I
 6  don't need testimony about doing the math.
 7              MS. GEHRKE:  Okay.  So, let 11 in then?
 8              THE ARBITRATOR:  Yeah, it's just
 9  verification.
10              MS. GEHRKE:  Okay.  We'll go through '16
11  and '17 really quick.
12              MR. CHAPPELL:  I still object.
13                   (Company Exhibit 12 marked)
14              MS. GEHRKE:  This is Southwest
15  Exhibit No. 12.
16              MR. CHAPPELL:  Same objection.
17              THE ARBITRATOR:  I got you.  It'll be
18  introduced over your objection for the limited
19  purposes of showing she didn't have that many
20  flights.  Right?
21              MS. GEHRKE:  Correct.  And just for your
22  information as to relevance, if for some reason the
23  arbitrator were to rule that we do not have just
24  cause to terminate, I think it would be relevant to
25  the remedy because back pay would be pretty much
```

Charlene Carter - Vol. 1                                        December 7, 2017

187

```
 1   zero, but --
 2              THE ARBITRATOR:  Okay.
 3              MR. CHAPPELL:  Normally they order back
 4   pay and let everybody figure that out, but anyway.
 5                   (Company Exhibit 13 marked)
 6              MS. GEHRKE:  This is Company Exhibit 13.
 7              MR. CHAPPELL:  And it hasn't changed.
 8              THE ARBITRATOR:  Okay.
 9              MS. GEHRKE:  We'll add that in as well.
10   Thank you.
11              THE ARBITRATOR:  Yeah, 11, 12, 13 are
12   admitted.
13   BY MS. GEHRKE:
14        Q.   All right.  Ms. Jones, can you tell us if
15   you were involved in the investigation involving
16   Ms. Carter and the social media messages?
17        A.   Yes.  I assisted our base manager with the
18   investigation as far as just taking notes in the
19   meeting and supporting him in the meeting.  I asked
20   clarification questions.  That was pretty much the
21   extent of my involvement in the case.
22        Q.   Okay.  And who was present at that fact
23   finding meeting?
24        A.   That was our base manager, Ed Schneider,
25   myself.  Charlene was there with her Union rep,
```

```
 1   Chris Sullivan.  And conferenced in via telephone
 2   was Denise Gutierrez from employee relations and
 3   Edie Barnett from our people department.
 4        Q.   And you were the designated note taker?
 5        A.   Correct.
 6        Q.   And you took those notes on computer?
 7        A.   Yes, I did.
 8        Q.   Did you personally ask questions of
 9   Ms. Carter during the fact finding meeting?
10        A.   I did, yes.
11        Q.   Okay.  Walk us through kind of generally
12   what you remember discussing with Ms. Carter at the
13   meeting with respect to the messages.  How did you
14   start the meeting?
15        A.   Well, Ed opened the meeting and he
16   explained why we were there.  And after
17   introductions from everybody that was present, he
18   opened the meeting by basically asking Charlene if
19   she had sent the messages and why.
20             And Charlene explained her stance on it as
21   to why she sent those messages, and she was very
22   passionate about the reasons why she sent them.  She
23   stated she's a Christian, she's conservative, she's
24   pro-life, and she felt that the Union was not
25   representing her beliefs properly and that they
```

Charlene Carter - Vol. 1                                    December 7, 2017

189

```
 1   didn't stand for the entire membership.
 2            She was also very upset with the Union
 3   president for attending the women's march in D.C.
 4   and felt that that was against her religious beliefs
 5   for what they were marching for there and that she
 6   disagreed with the reasons why they were marching.
 7            And we talked about Facebook posts that
 8   had been sent to Audrey Stone, the Union president.
 9   Since 2015 there had been a series of messages sent
10   to Audrey, but specifically the reason we were there
11   was to discuss the most recent posts which was a
12   picture -- or, I'm sorry, videos of what appeared to
13   be an aborted child with a message underneath that
14   was directed to Audrey which was sent to her in a
15   personal message on Facebook.
16        Q.   Okay.  Did I hear you correctly that
17   Ms. Carter admitted that she had sent those messages
18   to Ms. Carter -- to Ms. Stone regarding abortion?
19        A.   Yes, she did.
20        Q.   Did she admit that the videos were
21   graphic?
22        A.   Yes, she did.
23        Q.   Did you actually show her the pictures of
24   the two videos to identify what had been turned in
25   to the Company?
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1        A.   Yes, we did.  I believe that we actually
 2   played them in the fact finding, both videos.  We
 3   reviewed them.
 4        Q.   We're not going to play it again or
 5   anything like that.  I don't think there's any
 6   dispute that those were the videos.
 7             Did the Company ask her if she had also
 8   posted those videos on her public Facebook page?
 9        A.   Yes.  We discussed that in the meeting as
10   well, that those same videos were posted on her time
11   line, which is public to anybody to see in
12   Charlene's case including people she might be
13   friends with that are Southwest Airlines employees
14   or customers of Southwest Airlines.  Or just anybody
15   who was running a search for anything that was
16   hashtagged in that video, they could see that on her
17   page.
18             And we discussed in addition to that other
19   photographs that she had posted on her page of her
20   at work in her flight attendant uniform and some
21   political statements that she had posted with her
22   flight attendant wings to establish that she had
23   made a nexus to the airline by having those
24   identifiable uniform pictures of her on her page.
25        Q.   Okay.  If you could look at Southwest
```

Charlene Carter - Vol. 1                                    December 7, 2017

191

```
 1   Company Exhibit No. 8, were these the public
 2   Facebook posts of the abortion videos and then the
 3   one still photo with the vagina headdresses and then
 4   the Southwest employee pictures that you guys
 5   discussed at the meeting?
 6        A.   The one with the headdresses is not in
 7   here, but we did discuss that photo at the meeting.
 8        Q.   Okay.  The vagina headdress one was part
 9   of the private Messenger photos that she had sent to
10   Ms. Stone?
11        A.   Yes.
12        Q.   Did Ms. Carter seem to understand during
13   the fact finding meeting why her messages to
14   Ms. Stone and on her posts on her public Facebook
15   page, why they were a problem?
16        A.   No, she didn't.  And she felt that because
17   she did not support the cause that the Union was
18   representing at the women's march and that she was
19   not a Union supporter that she had the right to
20   voice these concerns to Audrey directly.  And she
21   kept referring to her belief system as a Christian,
22   that she had the right to do so based off of her
23   values.
24             And at one point in the meeting I
25   clarified with her that it's not her belief system
```

Charlene Carter - Vol. 1                              December 7, 2017

192

```
 1   or her problem with the Union that is the problem,
 2   it's not the complaining about those things that's
 3   the problem.  You have the right to have those
 4   views.  You have the right to complain about those
 5   views.  It's the manner in which she chose to
 6   express those views to Audrey in those messages.
 7   That was the reason that we were in there for the
 8   meeting, because of the graphic nature and really
 9   egregious nature of what those posts were.
10       Q.   Did Ms. Carter explain to you why
11   Ms. Stone going to the women's march in Washington,
12   D.C., was a problem for her?
13       A.   Yes.  There were several reasons, but
14   primarily because of the abortion issue.  Charlene
15   at the beginning of the meeting told us that's a
16   very near and dear cause to her heart because when
17   she was younger she had an abortion and she realized
18   that it was wrong.  And what she learned, what
19   actually went into that, she felt very remorseful
20   about that and wanted to get the word out as much as
21   she could to educate on what actually happens during
22   an abortion.
23            So when she saw pictures of Audrey at the
24   women's march, she associated that with Audrey being
25   pro-choice, which was very upsetting for Charlene,
```

Charlene Carter - Vol. 1                          December 7, 2017

193

```
 1   and assumed that Audrey's belief system was also
 2   pro-abortion and felt that the pink knit hats that
 3   they wore were a representation of supporting
 4   abortion and pro-choice rights, and she had a big
 5   issue with them marching next to Planned Parenthood.
 6   So she felt that sending those videos to Audrey was
 7   a way to let Audrey know that this is what you were
 8   there supporting, you were supporting this murder.
 9   And she actually called her a murderer in some of
10   those messages.
11        Q.   Did you ask Ms. Carter if she actually
12   knew for a fact what Ms. Stone's views were on
13   abortion?
14        A.   I did.  She said that she did not know
15   what her views were on abortion, and she stated that
16   part of why she sent those messages to Audrey was to
17   open dialogue with her to talk to her.  But from
18   reviewing the posts, there was nothing about them
19   that really inspired an open dialogue.  They were
20   more like statements with lots of exclamation points
21   and kind of like hateful-sounding things.
22             And so I asked Mrs. Carter if she felt
23   that the nature of that post opened dialogue.  She
24   felt that it did.  And I also asked her why she
25   didn't just ask Audrey what her beliefs were on
```

Charlene Carter - Vol. 1                          December 7, 2017

194

```
 1   abortion instead of sending her this awful, graphic
 2   video.  It was very disturbing.  And she didn't
 3   really have a response for that, so --
 4        Q.    Did Ms. Carter say anything during the
 5   fact finding meeting about being upset that she was
 6   not allowed to go with the women's committee to the
 7   women's march?
 8        A.    Yes.  She repeatedly told us that she was
 9   uninvited to the women's march.  And so through the
10   meeting we were able to clarify that Charlene had
11   been turned away from being able to march and it was
12   not the Union that turned her away, it was the
13   organizers of the march.  And she felt that her
14   rights were being violated as a pro-lifer, that she
15   was being turned away from that march because of her
16   beliefs being pro-life.
17             And really what she honed in on on that
18   meeting was "I was not allowed to march at this
19   meeting but my Union was allowed to march at
20   this" -- excuse me, not meeting but women's march --
21   "but my Union was allowed to march at this march and
22   how come they didn't extend this invitation to all
23   flight attendants.  I didn't get invited.  I got
24   uninvited."
25             So that was a really -- kind of --
```

Charlene Carter - Vol. 1                           December 7, 2017

195

```
 1    something that bothered her that she mentioned quite
 2    often throughout the meeting, but it wasn't -- we
 3    clarified that it was not the Union that uninvited
 4    her, because it was kind of unclear to us through
 5    the way she was making her statements.  It was the
 6    organizers of the march, so -- but she felt that
 7    there was a connection there because the Union was
 8    there, Union representatives were there marching in
 9    the march.
10        Q.   Were the organizers of the march Southwest
11    employees?
12        A.   No, they were not.  They were just
13    participants.
14        Q.   Did Ms. Carter say anything during the
15    fact finding meeting regarding the need to even have
16    this women's march?
17        A.   She stated she did not agree with the
18    women's march because it did not represent -- the
19    way she stated it was that she felt that women were
20    treated fairly, that there was not an issue with
21    unequal pay for women or like sexual harassment
22    issues and that there was equality.  So she didn't
23    believe there was a need to have this march because
24    in her viewpoint we as women were treated the same
25    as men.
```

Charlene Carter - Vol. 1                                    December 7, 2017

196

```
 1            And so that was kind of part also of why
 2   she disagreed with the march in addition to being
 3   pro-life, and there was a lot of pro-choice rights
 4   being, like, pushed up at that march.
 5       Q.   Did it come up during the fact finding
 6   meeting that Ms. Carter was an objector and had
 7   opted out of the Union?
 8       A.   Yes, she told us kind of towards the end
 9   of the meeting that she was an opter-outer, is how
10   she phrased it, of the Union and that she supported
11   the right-to-work organization and did not believe
12   in the Union's cause basically and had kind of a
13   longstanding disagreement with the Union.  And she
14   felt that she was being turned in by the Union
15   president because of being an opter-outer and not
16   because the posts were actually disturbing.
17       Q.   Did she mention anything during the fact
18   finding meeting regarding her disagreements over how
19   the Union was spending dues money?
20       A.   Yes.  She talked about that she did not
21   want her Union dues going to a cause that she did
22   not support and that that was -- I believe one of
23   the posts said something about the hardworking --
24   like the money on Audrey's back, the hardworking
25   money from the Union on her back being at these
```

```
 1    events and things like that.
 2              And so for Ms. Carter, she felt that it
 3    was improper use of those funds to go use them for a
 4    political cause or what she had identified as a
 5    political cause that she did not support.
 6        Q.   And at that point did -- well, first of
 7    all, did Ms. Carter have Union representation during
 8    the fact finding meeting?
 9        A.   She did, yes.
10        Q.   And who was that?
11        A.   Chris Sullivan.
12        Q.   And at that point in the meeting, did
13    Mr. Sullivan speak up about the kind of dues issue
14    and how money was being spent?
15        A.   He did.  He clarified what a objector is
16    and basically that they have a partial amount of
17    their fees refunded.  And then he clarified where
18    the money actually does and doesn't go to if you're
19    an objector, so you can't participate in like
20    elections, and he just clarified for us how that
21    money is divided as an objector.
22        Q.   Did he offer an opinion as to whether the
23    women's committee going to Washington, D.C., if that
24    was kind of official Union business versus
25    political?
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1        A.   He didn't, no.

 2             THE ARBITRATOR:  Are you going to call him

 3   as a witness?

 4             MS. GEHRKE:  No.

 5             THE ARBITRATOR:  Okay.

 6   BY MS. GEHRKE:

 7        Q.   Did Ms. Carter mention at all that she was

 8   upset that the International Union had been sending

 9   her mailers and things to her home?

10        A.   She mentioned that she was upset that she

11   had been receiving mailers, but she didn't say that

12   they were from International.  That was clarified by

13   Chris later in the meeting.  She felt that they were

14   from Audrey personally, and she said, "Audrey keeps

15   sending me these things and I don't want to get

16   these things."

17             So I asked her specifically if Audrey had

18   personally sent those to her, and then she

19   clarified, no, that Audrey did not personally send

20   them to her.  And then it was clarified later in the

21   meeting I believe by Chris that those mailers come

22   from International.

23        Q.   Was it asked of Ms. Carter during the fact

24   finding meeting whether Ms. Stone had ever initiated

25   communications with Ms. Carter?
```

Charlene Carter - Vol. 1                                    December 7, 2017

199

```
 1        A.   Yes.  We did ask if they had ever
 2   personally communicated with one another, and
 3   Ms. Carter said that the only time that they had
 4   personally communicated was about four years prior
 5   at a Union meeting but that there had not been any
 6   actual dialogue between the two of them.
 7        Q.   At the time the fact finding meeting
 8   occurred, had the Company already received from
 9   Ms. Stone all of the messages that Ms. Carter had
10   sent her on the private Facebook Messenger?
11        A.   To my understanding, yes.
12        Q.   And did you guys have those with you?
13        A.   Yes, we did.
14        Q.   And did you show them to Ms. Carter?
15        A.   Yes, we did.
16        Q.   Did she admit sending them?
17        A.   Yes, she did.
18        Q.   Did you discuss the sheer volume and tone
19   of those messages with Ms. Carter?
20        A.   Yes, and we discussed the length of time
21   that this had been occurring had dated all the way
22   back to 2015.  And Ms. Carter stated that her goal
23   was simply to open dialogue with Audrey.  But in
24   reviewing those statements, there was nothing about
25   them that ever indicated that she actually wanted to
```

Charlene Carter - Vol. 1                                    December 7, 2017

200

```
 1   speak with Audrey.  They were more like opinion
 2   statements that she sent to her, rhetorical
 3   questions.  There was never an invitation to discuss
 4   any of those issues.
 5        Q.   Did you ask her directly why she was
 6   sending her so many posts?
 7        A.   I don't recall if I asked her that
 8   directly.  I believe that the ER investigator did
 9   ask her why she continued to send these repeated
10   posts after she had not been getting any responses,
11   and her response was, "They're all on different
12   issues and I just wanted to get dialogue going."
13        Q.   And at some point did the Union rep on at
14   least one occasion pull her out of the room?
15        A.   Yes, they stepped out at least twice.
16        Q.   Was there a discussion during the fact
17   finding meeting as to whether or not Ms. Carter had
18   ever attempted to contact Ms. Stone via e-mail or
19   phone or some other method of contact since she
20   wasn't getting a response on Facebook Messenger?
21        A.   Yes, I actually asked her if she had tried
22   any other means of communication to contact Audrey,
23   and she stated she had not.  And I also asked her if
24   she had tried to call the Union office to speak with
25   her, but she stated she had called the office prior
```

Charlene Carter - Vol. 1                                    December 7, 2017

201

```
 1   but never spoke with Audrey.  So she had called for
 2   different issues, not to speak with Audrey directly.
 3       Q.   Did she say she had ever left Ms. Stone a
 4   voice mail that had not been returned?
 5       A.   No.
 6       Q.   Was Ms. Carter apologetic at all regarding
 7   her conduct towards Ms. Stone?
 8       A.   No, she wasn't.  And that was something
 9   that kind of stood out to me as interesting at the
10   meeting because throughout the -- it was a lengthy
11   meeting, and throughout the whole discussion there
12   was never any remorse that this caused another
13   individual some great anxiety and pain watching
14   those videos, and it was more about her dislike for
15   the Union and how she felt justified sending this to
16   her because of her personal belief system.
17            And it didn't appear that she made the
18   connection that this actually hurt another human
19   being in kind of a deep way.  And so there was never
20   like any regret or remorse or apology offered for
21   that behavior.
22       Q.   Did Ms. Carter ever raise the issue of
23   retaliation or that she felt that the Company was
24   retaliating against her because she was an objector?
25       A.   No.
```

Charlene Carter - Vol. 1                              December 7, 2017

```
 1        Q.    Did she ever raise the allegation that she
 2   felt the Company was collaborating with the Union to
 3   try to get rid of her because she was an objector?
 4        A.    No, she didn't.
 5        Q.    Was Ms. Carter upset that Ms. Stone had
 6   turned her in to the management?
 7        A.    Yes.  She made several statements
 8   throughout the meeting that "My own president turned
 9   me in."  And she felt that that was not acceptable
10   that she had taken that -- made that decision and
11   turned the posts over to the Company.
12        Q.    I want to ask you some questions about the
13   decision to terminate Ms. Carter.
14        A.    Okay.
15        Q.    Were you involved in that decision?
16        A.    No, it was not my decision.
17        Q.    Who made that decision?
18        A.    Ed Schneider, our base manager.
19        Q.    And did you provide any feedback to
20   Mr. Schneider to help him in making that decision?
21        A.    We had some discussion after the meeting
22   about the information provided, but that was pretty
23   much it for me.
24        Q.    What was your view regarding the
25   appropriateness of the termination based on what you
```

ABC COURT REPORTERS                         214.303.0ABC  (0222)

Charlene Carter - Vol. 1                                    December 7, 2017

203

```
 1    had seen and heard and the documents you reviewed?
 2         A.   In review of --
 3              MR. CHAPPELL:  Objection.  Foundation.
 4              THE ARBITRATOR:  Well, she said based on
 5    the documents she had seen and the investigation
 6    what was her view.  I think that's the foundation.
 7    I think it's a good question.
 8              MR. CHAPPELL:  Okay.  But she didn't say
 9    that she was involved in the termination decision.
10              THE ARBITRATOR:  She said she didn't make
11    the decision, but I think it's fair for her to --
12              MR. CHAPPELL:  Okay.
13              MS. GEHRKE:  She's seen other
14    terminations, so I think it's --
15              MR. CHAPPELL:  That hasn't been
16    established.
17              THE ARBITRATOR:  Well, let's let her take
18    this step and we'll see where we go.
19              Do you understand the question?
20              THE WITNESS:  Can you reask it?
21              MS. GEHRKE:  Sure.
22              THE WITNESS:  Thank you.
23    BY MS. GEHRKE:
24         Q.   What was your view regarding the
25    appropriateness of the termination in light of what
```

Charlene Carter - Vol. 1                    December 7, 2017

204

```
 1   you learned during the investigation, the fact
 2   finding meeting and the documents you had reviewed?
 3        A.   The purpose of the meeting was to discuss
 4   those videos.  And based off of everything that I
 5   had learned in the meeting, I felt it was
 6   appropriate to terminate Ms. Carter because it was
 7   an egregious violation of the social media policy,
 8   the bullying policy, and those policies protect all
 9   Southwest employees.  It doesn't matter what
10   position you hold or what job you have.  Those
11   policies are designed to encompass the entire
12   workforce.
13             So Charlene is protected under those just
14   like Audrey is.  And disliking or not supporting a
15   cause is okay, but to go to that extent to cross
16   that boundary is not okay.  It's not the core values
17   that Southwest is built on, and it also violated
18   several of our policies.  And so I did feel that
19   termination was appropriate.
20        Q.   In coming to that opinion, did you also
21   factor in the public Facebook posts?
22        A.   Yes.  It's damaging to the Southwest brand
23   and the image that Southwest has on these topics or
24   to the public in general.
25        Q.   And had you ever seen a similar allegation
```

Charlene Carter - Vol. 1                                    December 7, 2017

205

```
 1   or another employee terminated at Southwest for this
 2   type of violation?
 3        A.   This was the most egregious I had seen.
 4   So in the Denver base I had not seen it, but this
 5   was also the most egregious case that we had in
 6   Denver so far, so --
 7             MS. GEHRKE:  I have no further questions.
 8             THE ARBITRATOR:  All right, sir.
 9             MR. CHAPPELL:  Okay.
10                  CROSS-EXAMINATION
11   BY MR. CHAPPELL:
12        Q.   You testified that Ms. Carter called
13   Ms. Stone a murderer or supporting murder?  Was that
14   your testimony?
15        A.   Yes.
16        Q.   Okay.  Now, did she say that specifically
17   in the fact finding meeting?  Did Ms. Carter say
18   that?
19        A.   She did not verbalize it in the meeting.
20   It was in a post and it was part of the discussion
21   of the -- that post was part of the discussion in
22   the meeting.
23        Q.   Okay.  I show you what's been marked as
24   Southwest Exhibit 9, and it's -- I think it consists
25   of more than two pages, but I direct your attention
```

Charlene Carter - Vol. 1                                        December 7, 2017

```
 1    to page 2.

 2           A.   Okay.

 3           Q.   And at the top above the video rendition

 4    here, there is some typing.  You see that?

 5           A.   Uh-huh.

 6           Q.   And is it your understanding that that

 7    typing was done by Ms. Carter?

 8           A.   Yes.

 9           Q.   Okay.  And is that the basis for what is

10    stated there for you saying that she called

11    Ms. Stone individually supporting murder?

12           A.   Do you have the other Facebook posts I

13    could review?

14           Q.   Yes.  This is the whole -- this is

15    Exhibit 9 which is that whole history you talked

16    about.

17           A.   Yes, this is it.

18           Q.   Okay.  And could you just read -- it's

19    very short.  Could you just read those two lines?

20           A.   "TWU-AFL-CIO and 556 are supporting this

21    murder."

22           Q.   Anywhere there does it say Audrey Stone is

23    supporting this murder?

24           A.   As the president of the Union, it's

25    implied through that post.
```

Charlene Carter - Vol. 1                                December 7, 2017

207

```
 1        Q.   And you also, in answer to a question,
 2   said that Ms. Carter admitted that the videos were
 3   graphic.  Do you remember saying that?
 4        A.   Yes.
 5        Q.   Did she actually say graphic or admitted
 6   that she agreed they were graphic in her actual
 7   verbal answers during the fact finding?
 8        A.   She agreed that they were graphic.
 9        Q.   Isn't it true that both Ed and -- anyway,
10   isn't it true that Ed described them as graphic but
11   she did not admit that they were graphic but instead
12   answered it that she had sent the video?
13        A.   To my recollection, she -- there was an
14   agreement, but without looking at the notes to know
15   the exact answer, I couldn't quote what she said.
16   But it's -- from my recollection, he asked her if
17   she agreed that the videos were graphic, and she
18   said, "Yes, they're graphic."  It was something to
19   that extent.
20        Q.   Isn't it true that he really said, "These
21   videos are pretty graphic," but his question then
22   was, "Did you send them to anyone else"?
23        A.   It was, I believe, towards the beginning
24   of the meeting that he asked her that question.
25        Q.   In the same type of -- his
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1    characterization of them being graphic but then the
 2    question being did she send them to Audrey, isn't
 3    that really the way it came up?
 4         A.   I'm sorry.  Can you repeat that?
 5         Q.   Okay.  He described them as graphic in a
 6    statement, but then his question to her that she
 7    answered was whether she had sent the video to
 8    Audrey.  Isn't that the proper way it was done?
 9         A.   I don't believe that it was a -- to my
10    recollection that it was like a double question.  I
11    believe she answered yes when he asked about -- he
12    made the statement about the videos being graphic
13    and then asked her if she had sent the videos and
14    she replied yes.  And I believe she said in
15    agreement that they were graphic.
16         Q.   So you believe that someone asked her
17    point-blank, "Do you agree that they are graphic"?
18         A.   No, it was not a question that was stated
19    that way.  It was when Ed was questioning her, he
20    stated, "These are pretty graphic."  And I believe
21    that Charlene responded with, "Yes, they are
22    graphic."  She agreed that they were graphic.
23         Q.   Okay.  So your recollection is that she
24    used the term "graphic" herself?
25         A.   To my recollection, yes.  I'd have to look
```

```
 1  at the fact finding notes to know specifically what
 2  her wording was on that.
 3       Q.   Okay.  But it's possible that other notes
 4  of people -- there were various people taking notes
 5  in that meeting, correct?
 6       A.   Chris Sullivan also took notes at the
 7  meeting.
 8       Q.   Right.  And you took notes.
 9       A.   Yes.
10       Q.   Right.  And your notes aren't here, at
11  least you're not reviewing them now, correct?
12       A.   No, I didn't think I could bring them with
13  me.
14       Q.   And it's possible that both your notes and
15  Chris Sullivan's notes may not reflect that she
16  actually said the word "graphic" herself.  Isn't
17  that correct?
18       A.   That is very possible.  Chris was
19  handwriting his notes, and I was typing.  And part
20  of why I took the notes in this meeting was I can
21  type very quickly, so it's a more accurate capture
22  of information versus handwriting.
23            THE ARBITRATOR:  Incidentally, I notice
24  the grievant isn't here.  Is that a problem?
25            MR. CHAPPELL:  Unless you would like her
```

Charlene Carter - Vol. 1                              December 7, 2017

```
 1   to be here.
 2             THE ARBITRATOR:  It's her hearing, and if
 3   she wants to be here --
 4             MR. CHAPPELL:  I appreciate you alerting
 5   me to that because I hadn't realized she had walked
 6   out.
 7             MR. JENNINGS:  She'll be back in a few
 8   minutes.
 9             MR. CHAPPELL:  Why don't we take --
10             THE ARBITRATOR:  Because we don't have
11   time.  We'll move on.
12             MR. CHAPPELL:  That's why I was moving on.
13             THE ARBITRATOR:  We'll move on.  She's
14   going to say, "I never admitted it was graphic."
15   Y'all think she did.  I get it.
16   BY MR. CHAPPELL:
17        Q.   You testified that Ms. Carter explained
18   that she had a personal experience with abortion and
19   regretted it?
20        A.   Yes, correct.
21        Q.   And isn't it true that she also said that
22   one of the reasons that she was so passionate about
23   this issue and that she wanted money being -- her
24   money being stopped spent was that she wanted to
25   help another person from going through what she had
```

Charlene Carter - Vol. 1                                    December 7, 2017

211

```
 1    gone through?
 2         A.    That is not true.  That's not how she
 3    phrased it in the meeting.  She stated that the
 4    reason she was passionate about it is that she had
 5    an abortion and she wanted to get the word out
 6    wherever she could.  And later in the meeting she
 7    stated that because she does not support -- because
 8    she's pro-life, that's why she didn't want her money
 9    being used for things like Audrey going to the
10    women's march and representing there, because it did
11    not represent her value system.
12         Q.    So she did not say in the fact finding,
13    "If I can help another person from going through the
14    hurt I went through, I will"?
15         A.    She did make that statement, but not as a
16    reason why she sent those videos to Audrey.  She
17    said that's the reason why she was passionate about
18    the abortion topic.
19         Q.    And didn't she say that in response to the
20    question of why she had posted those videos on her
21    personal Facebook page?
22         A.    I believe that that was her response to
23    that question, but that was separate from the
24    reasons why she sent them to Audrey.  That was her
25    motivation for acting out against the cause of
```

Charlene Carter - Vol. 1                          December 7, 2017

212

```
 1    her -- her belief system, her value system.  The
 2    first thing she said is, "I'm Christian, I'm
 3    conservative," and then she followed it up with her
 4    experience, her personal experience and wanting to
 5    educate on it.  But that was not cited as a reason
 6    for sending that video to Audrey.
 7         Q.   Wasn't she also told that she wasn't
 8    supposed to take sides in political matters and that
 9    was a problem for Southwest if they were connected
10    with that?
11              MS. GEHRKE:  Sorry, who?
12              THE ARBITRATOR:  For Southwest.
13    BY MR. CHAPPELL:
14         Q.   Wasn't Ms. Carter told that she wasn't
15    supposed to take sides on political matters?  I
16    think this was in reference to a screenshot of her
17    supporting Israel.
18         A.   That's not what she was told.  She told
19    that -- she was told that if she connected her
20    political beliefs to the workplace, that's when it
21    became an issue for Southwest.  But taking sides is
22    not an issue for Southwest.  It's if you represent
23    that on your Facebook page, for example, in your
24    uniform, that image it creates that Southwest could
25    support that same belief system.  So there was no
```

Charlene Carter - Vol. 1                              December 7, 2017

213

```
 1   discussion that she shouldn't take sides.  We
 2   discussed the nexus to the workplace.
 3        Q.   Okay.  But when there's a nexus to the
 4   workplace, that casts Southwest as taking sides on
 5   political issues or supporting one person or
 6   another, correct?
 7        A.   It could create that image, yeah, at
 8   Southwest.
 9        Q.   And that's what Southwest is trying to
10   prevent, correct?
11        A.   Correct.
12        Q.   Okay.
13        A.   So she could have posted, you know, like
14   her -- she had a picture of her wings with a
15   statement about Israel.  She could have made that
16   post, but because she had pictures of her with like
17   her uniform and her wings, it created that
18   connection there.
19        Q.   Okay.  So she also -- are you aware that
20   either from Ms. Carter or from your investigation
21   that there were newspaper reports about certain
22   flights of Southwest of women going to the women's
23   march being turned pink?
24        A.   Yes.  That was a separate investigation.
25   That was handled outside of this case for the same
```

Charlene Carter - Vol. 1                                    December 7, 2017

214

```
 1   reasons.
 2        Q.   But you are aware?
 3        A.   Yes.  Yeah.
 4        Q.   And that Southwest officials are quoted as
 5   saying that this is what they wanted?  I mean, isn't
 6   Southwest taking a political stand by letting the
 7   lights turn pink?
 8        A.   I don't -- I don't think I can accurately
 9   answer that question.  I don't know what Southwest
10   officials have said about it.  But what I can speak
11   to is that situation was addressed for the reason
12   that Southwest stays neutral on political issues.
13             So although Ms. Carter had the perception
14   that Southwest was supporting that, we didn't, and
15   that's exactly why we don't allow employees to
16   create a nexus to the workplace with their political
17   beliefs, because it creates that belief system and
18   that image even to our own employees that we are
19   supporting a political cause that is not
20   representative.  We stay neutral as a company.
21        Q.   Did Ms. Carter tell you during the fact
22   finding that she had been threatened by a Union
23   executive board member and that is why she resigned
24   from the Union?
25        A.   She didn't say -- she said she had been
```

Charlene Carter - Vol. 1                              December 7, 2017

 1  threatened four years ago at a Union meeting but

 2  had -- at that point she was already opted out of

 3  the Union.  That was not cited as a reason for

 4  resigning from the Union.

 5       Q.   She did not say that "I was threatened in

 6  the meeting and chose to opt out of the meeting"?

 7            THE ARBITRATOR:  Let me interrupt you a

 8  minute.  We're getting into subject matter that gets

 9  really close to whatever is going on in the federal

10  court, and it doesn't have a place in my

11  arbitration.  If you want to ask her what she said,

12  that's fine.  I don't think we need to go down this

13  path.  I think it's extraneous, it's dangerous.

14  We're judging what the Company's motivation was for

15  making a termination decision, and I just -- I don't

16  want to allow this line of questioning.

17  BY MR. CHAPPELL:

18       Q.   Okay.  Did Ms. Carter say that when she

19  was talking about wanting a dialogue that she

20  would -- she expected a phone call, she would talk

21  to Audrey?

22       A.   What do you mean?

23       Q.   Well, when you were asking her about

24  responding about the dialogue and she had said how

25  she had made contact and called but no one called

Charlene Carter - Vol. 1                                    December 7, 2017

216

```
 1   her back, didn't she also say that if Audrey called
 2   her, she would have a discussion with her about the
 3   videos?
 4        A.   I don't recall her saying that she had
 5   left Audrey a message and that Audrey would call her
 6   back.  Because we discussed that specifically in the
 7   meeting, why she didn't call Audrey, and she said
 8   that she hadn't called Audrey but that she had
 9   called the Union office and did not speak to Audrey,
10   it was for different issues.  So I was not aware if
11   she had placed a phone call to her and left a
12   message.
13        Q.   Didn't she say that if she had gotten such
14   videos or things about the abortion, right to life,
15   pro-choice issue, that she would have reached out to
16   the other person and not turned them in first?
17        A.   She said that's how she would have handled
18   it, yes.
19        Q.   Right.  And didn't she say that that's
20   what she thought would happen with Audrey?
21        A.   She said that's what she had hoped for,
22   not that's what she thought would happen with her,
23   was she had hoped for some dialogue on it.
24   Interestingly enough, over the years from --
25             THE ARBITRATOR:  I don't think you get to
```

Charlene Carter - Vol. 1                              December 7, 2017

217

```
 1   add "interestingly enough."
 2             THE WITNESS:  Okay.
 3             THE ARBITRATOR:  This is my personal
 4   opinion, but he'll ask questions.
 5   BY MR. CHAPPELL:
 6        Q.   Yeah, if you can answer my question.  If I
 7   want to know the interesting, I can ask you.  Do you
 8   have anything -- no, I'm not.
 9             You also testified that the organizers of
10   the march were the ones that didn't allow her to go
11   to the march.  Do you remember testifying to that?
12        A.   That's what Charlene stated in the
13   meeting, yes.
14        Q.   Oh, okay.  So it's possible that Charlene
15   said the Union didn't let her go and you
16   misunderstood her?
17        A.   She was implying that the Union had not
18   invited her and wouldn't allow her to -- well, she
19   actually said that in the meeting, that the Union
20   had uninvited her.  And so I asked the clarifying
21   question was it the Union that did not invite you or
22   was it the Union that turned you away at this event,
23   and she clarified that it was the leaders of the
24   march that had turned her away.
25             MR. CHAPPELL:  Okay.  We'll let her
```

Charlene Carter - Vol. 1                                    December 7, 2017

218

```
 1   testify also about this.
 2           I don't have any other questions.
 3           THE ARBITRATOR:  Okay.
 4           MS. GEHRKE:  Nothing further.
 5           THE ARBITRATOR:  Thank you, ma'am.  I
 6   appreciate your time.
 7           THE WITNESS:  Thank you.
 8           MS. GEHRKE:  We'll bring down the next
 9   witness.
10           THE ARBITRATOR:  That'll be fine.
11           MS. GEHRKE:  While he's coming down, is it
12   okay if we take a break?
13           THE ARBITRATOR:  That'll be fine.
14               (Recess from 4:06 to 4:15)
15           THE ARBITRATOR:  We'll go back on the
16   record.  Would you tell this young lady, who's the
17   court reporter, what your full name is.
18           THE WITNESS:  Ed Schneider.
19           THE ARBITRATOR:  S-C-H --
20           THE WITNESS:  S-C-H-N-E-I-D-E-R.
21           THE ARBITRATOR:  Would you raise your
22   right hand, please.
23           Do you swear the testimony you're about to
24   give in this arbitration shall be the truth?
25           THE WITNESS:  Yes.
```

219

```
 1              THE ARBITRATOR:  Thank you.
 2                    ED SCHNEIDER,
 3   having been duly sworn, testified as follows:
 4                    DIRECT EXAMINATION
 5   BY MS. GEHRKE:
 6        Q.   Good afternoon, Mr. Schneider.  Can you
 7   tell us how long you've been employed by Southwest
 8   Airlines.
 9        A.   23 years.
10        Q.   And what's your current title?
11        A.   Manager of inflight operations in Denver.
12        Q.   And how long have you held that position?
13        A.   Eleven months.
14        Q.   Can you briefly give us an overview of
15   your employment history at Southwest.
16        A.   Prior to base manager, I was assistant
17   base manager in Phoenix base for -- since 2012.  And
18   prior to that I was a supervisor 2 of administration
19   for two years.  Prior to that I was a supervisor in
20   the Dallas base for five years.  I was an RT
21   instructor in --
22        Q.   I'm sorry.  A what?
23        A.   Recurrent training instructor in Orlando
24   for four years.  And before that I was a flight
25   attendant for eight years.
```

Charlene Carter - Vol. 1                          December 7, 2017

220

```
 1          Q.   Okay.
 2          A.   And prior to that I was customer service
 3   agent for two years.
 4          Q.   You made your way around the airline then.
 5          A.   Yes.
 6          Q.   Nice.  What are some of your primary job
 7   responsibilities as base manager in Denver?
 8          A.   I support the Denver base and make sure
 9   obviously that all policies, procedures are
10   followed, that the base is running smoothly.  I take
11   care of 1,654 flight attendants, and I have a staff
12   of 16 to assist me with that.
13              The regular duties are just overseeing all
14   investigations that happen in the base and making
15   sure that we follow all policies and procedures as
16   far as that goes.
17          Q.   Okay.  And are you familiar with the
18   grievant, Charlene Carter?
19          A.   I am.
20          Q.   How do you know Ms. Carter?
21          A.   Through this investigation.
22          Q.   And was Ms. Carter a flight attendant out
23   of the Denver base?
24          A.   She was.
25          Q.   Can you tell us your role in the
```

```
 1    investigation of Ms. Carter and her social media
 2    posts.
 3         A.   Yes.  I received an e-mail from the
 4    Las Vegas base manager, and she sent me information
 5    that she received from Audrey Stone about some
 6    messages that were sent to her and some posts.  And
 7    I began looking into that issue.  I researched it a
 8    little bit with employee relations and labor
 9    relations and began my investigation.
10              I set up a fact finding meeting.  We did
11    two extensions, I think, because Ms. Carter was out
12    of town, I believe, getting ready for this fact
13    finding.  I conducted the fact finding and had
14    employee relations and HRBP on the phone with me
15    during the investigation just to get their input for
16    it.
17              And finished the investigation material
18    that was presented in the fact finding and things
19    that I had gathered outside of that and made my
20    decision on the discipline involved in this case.
21         Q.   Okay.  So let's back up a little bit a
22    couple of things that you said.  You had overall
23    responsibility for the investigation?
24         A.   Correct.
25         Q.   And you involved employee relations and
```

222

```
 1   labor relations, correct?
 2        A.   Yes.
 3        Q.   And did you have your assistant base
 4   manager, Meggan Jones, assist you in any way?
 5        A.   She did.  She assisted me in the fact
 6   finding process in the meeting, taking notes for me.
 7        Q.   And did Ms. Jones also ask questions
 8   herself during that meeting?
 9        A.   She did.
10        Q.   And who did you work with in labor
11   relations on this investigation?
12        A.   Maureen Emlet.
13        Q.   And what about in employee relations?
14        A.   Denise Gutierrez.
15        Q.   And did you consult with anyone in the
16   people department?
17        A.   I did, with Edie Barnett.  She was our
18   HRBP for inflight.  Human resource business partner.
19   I'm sorry.
20        Q.   Walk me through kind of your standard
21   protocol when you're doing an investigation into
22   employee misconduct.
23        A.   If we get information that something could
24   possibly lead to discipline that's egregious or
25   whatever, we look at the case and the information
```

Charlene Carter - Vol. 1                         December 7, 2017

223

```
 1   that we have initially and determine whether we want
 2   to take that case forward, if we want to call the
 3   flight attendant and discuss with them.  We make
 4   that determination.  And once we decide to move
 5   forward with it, then we contact the flight
 6   attendant, let them know the information that was
 7   presented to us and give them the opportunity to
 8   contact the Union and set up the meeting for us.
 9            And once that's done, I start collecting
10   information in my investigation, whatever material
11   would be necessary for me to find out all the
12   information necessary, and then we conduct the fact
13   finding meeting.  In the meeting we give the flight
14   attendant the opportunity to share their side of the
15   story and give us any information from their
16   perspective that may relate to the information that
17   I received initially.
18            And once I conduct that meeting, then, as
19   I stated, I get input from in this case labor
20   relations and employee relations, and from their
21   information I determine what the discipline will be.
22       Q.   Do you determine whether or not there's
23   been violation of Company policy?
24       A.   I do.
25       Q.   And based on whatever that determination
```

Charlene Carter - Vol. 1                                    December 7, 2017

224

```
 1   is, you decide if discipline is appropriate and, if
 2   so, what level of discipline?
 3        A.   Correct, yes.
 4        Q.   And once you decide on an appropriate
 5   level of discipline, who do you inform of that
 6   decision?
 7        A.   I would inform my leader, Dave Kissman and
 8   Mike Sims, of what I intend to do.
 9        Q.   And what are their job titles?
10        A.   Dave Kissman is the senior manager of
11   inflight for the western region, and Dave -- I mean,
12   I'm sorry, Mike Sims is the regional director for
13   inflight operations.
14        Q.   Okay.
15        A.   Senior director.  Sorry.
16        Q.   And the purpose of that is just to share
17   with them what you've been doing, what your
18   conclusions are, and see if they have any objection?
19        A.   I share with them to let them know what my
20   decision is so that they're not caught offguard in
21   the future if something -- if it's grieved or it
22   comes down the line later on, just so they're aware
23   of that and ask them, you know, their thoughts on
24   it.
25        Q.   Do they have the ability to veto your
```

Charlene Carter - Vol. 1                                    December 7, 2017

225

 1   decision?

 2        A.   No.

 3        Q.   Have they ever tried to veto your

 4   decision?

 5        A.   No, no.  Usually by that point -- well,

 6   every time by that point, in my case, I thoroughly

 7   investigate it and they're in agreement with what I

 8   do.

 9        Q.   And then at some point is the decision

10   communicated to the grievant and the Union?

11        A.   Yes.

12        Q.   And how is that done?

13        A.   I call the Union and the representative

14   that is working the case.  They will contact the

15   flight attendant, and on the call we will -- I will

16   render my decision to both the Union and the flight

17   attendant.

18        Q.   And then do you confirm in writing what

19   you did?

20        A.   Yes.  I have a letter that I write up and

21   I send certified mail to the flight attendant the

22   same day that I render.

23        Q.   Okay.  And did you follow that protocol,

24   that standard protocol in Ms. Carter's case?

25        A.   Yes.

Charlene Carter - Vol. 1                                December 7, 2017

226

```
 1        Q.   Okay.  You testified that you kind of
 2   figure out what information is necessary for you to
 3   go out and kind of uncover in order to determine
 4   what happened and render a decision.
 5        A.   Yes.
 6        Q.   Is that right?  In Ms. Carter's case what
 7   types of information were you looking for?  What did
 8   you determine was necessary to kind of figure out
 9   before you could decide what to do?
10        A.   I gathered Facebook posts that were in
11   question on this one and also gathered information
12   on whether those posts were related to the Company
13   in any way and if there was enough information to
14   warrant the discipline.  I also talked to Audrey on
15   the phone to verify information.
16        Q.   I want to ask you some questions about the
17   fact finding meeting that you had with Ms. Carter.
18   Were you basically running that meeting?
19        A.   Yes, I was.
20        Q.   And did you take your own handwritten
21   notes?
22        A.   Yes.
23        Q.   But Ms. Jones was the official, quote,
24   note taker?
25        A.   Correct.
```

Charlene Carter - Vol. 1                                    December 7, 2017

227

```
 1        Q.   Did you review Ms. Jones' notes for
 2   accuracy after she finished typing them up?
 3        A.   Yes, absolutely.
 4        Q.   And were they accurate?
 5        A.   They were very accurate.
 6        Q.   Do you recall approximately how many pages
 7   of notes there were?  I mean, was it only one or two
 8   pages or was it --
 9        A.   No, it was probably closer to 12 pages.
10        Q.   So they were fairly detailed?
11        A.   Yes, they were very detailed.  She did a
12   good job.
13        Q.   During the fact finding meeting with
14   Ms. Carter, did you show her the private Messenger
15   Facebook posts that she had sent to Ms. Stone?
16        A.   I did.
17        Q.   I think you have a pile of documents
18   there, but I can show you my copy if you want.  It's
19   Southwest Exhibit 7.
20        A.   Thank you.
21        Q.   If you could just take a minute to look at
22   this.  Based on the evidence you collected during
23   your investigation and what was discussed with
24   Ms. Carter at the fact finding meeting, does this
25   represent what your understanding is of the private
```

Charlene Carter - Vol. 1                        December 7, 2017

228

```
 1    Facebook Messenger posts that she was sent?
 2         A.   Yes.
 3         Q.   And did you question Ms. Carter regarding
 4    why she sent these messages?
 5         A.   Yes.
 6         Q.   And what did she say?
 7         A.   She said that she was trying to get her
 8    message to Audrey and to elicit communication or
 9    response from her.
10         Q.   Did she specify on what subject matter she
11    was trying to elicit a response?
12         A.   Abortion topic.
13         Q.   Okay.  During the fact finding meeting,
14    did you ask Ms. Carter whether or not she agreed
15    that the Facebook messages were graphic?
16         A.   I did ask her that question.
17         Q.   And what was her response?
18         A.   She said, "Yes, I posted these."
19         Q.   Did you also review with Ms. Carter the
20    information that you had gathered regarding public
21    posts on her Facebook page?
22         A.   Yes.
23         Q.   If you could look at Southwest Exhibit 8.
24    It's this one.
25         A.   I have it.
```

Charlene Carter - Vol. 1                            December 7, 2017

```
 1        Q.   Take a minute to look at this document and
 2   familiarize yourself.  Are these the public Facebook
 3   posts that Southwest had uncovered during the
 4   investigation?
 5        A.   Yes, they are.
 6        Q.   And did you discuss these with Ms. Carter
 7   during the fact finding meeting?
 8        A.   Yes, I did.
 9        Q.   And did you ask her why she had posted
10   these on her public Facebook page?
11        A.   Yes.
12        Q.   What did she say?
13        A.   She said she's trying to get her message
14   out to everyone in hopes that those that see it will
15   make the decision not to have an abortion possibly.
16        Q.   Did you ask Ms. Carter or did you explain
17   to Ms. Carter why it was a concern to the Company
18   that she had made these posts on her public Facebook
19   page?
20        A.   I did.  I showed the pictures of her in
21   uniform on her Facebook page giving her and anyone
22   that would read them information that she's a flight
23   attendant for Southwest Airlines and a nexus to the
24   workplace.
25        Q.   And what was her response?
```

Charlene Carter - Vol. 1                                    December 7, 2017

230

```
 1        A.    Her response was that she had posted those
 2   a long time ago.
 3        Q.    "Those" being what, the photos?
 4        A.    The photos, yes.
 5        Q.    And did you explain to her why they could
 6   still be relevant?
 7        A.    Yes, I did.
 8        Q.    And what did you tell her?
 9        A.    I told her that anybody that had looked at
10   her posts previous to this would know that she was a
11   flight attendant, and once they saw these pictures
12   they could think that the same message she was
13   trying to generate was something that Southwest
14   promoted.
15        Q.    Did you guys discuss at all during the
16   fact finding meeting with Ms. Carter the women's
17   march in Washington, D.C.?
18        A.    She brought that up in the fact finding,
19   yes.
20        Q.    What did she say about that?
21        A.    She said she was upset because the Union
22   was there in the march and she didn't agree with it
23   and they were supporting pro-choice.
24        Q.    Okay.  What exactly upset her about that?
25        A.    Because she is pro-life and they were not
```

Charlene Carter - Vol. 1                                    December 7, 2017

231

```
 1    supporting her and her thoughts respectfully.
 2          Q.    Did she raise the issue of Union dues or
 3    the fact that she was an objector?
 4          A.    She did.  She brought that up in the fact
 5    finding.
 6          Q.    What did she say about that?
 7          A.    She said that she was a dissenter from the
 8    Union and that she did not agree with their use of
 9    the money and what it was being spent on, so she did
10    not want to be a part of the Union.
11          Q.    Did Ms. Carter express disappointment that
12    she was not allowed to attend the march with the
13    women's committee?
14          A.    She was upset because she was uninvited to
15    the march, in her words, and that she wanted to
16    participate in it and she was not allowed to.
17          Q.    Did she say who had uninvited her?
18          A.    Non-Southwest persons that were in charge
19    of the march.
20          Q.    Did the Company representatives discuss
21    with Ms. Carter during the fact finding meeting the
22    nature of these messages and why Ms. Stone had
23    brought them forth to the Company?
24          A.    Because they were egregious in nature and
25    that they were disparaging to her and she did not
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   appreciate receiving them, felt that she was
 2   harassed by the fact that she was receiving them.
 3        Q.   And you spoke to Ms. Stone, right?
 4        A.   I did.
 5        Q.   At the time when you spoke to Ms. Stone
 6   about messages she received from Ms. Carter, did she
 7   convey to you that she was upset because she thought
 8   these messages were somehow different than the prior
 9   messages she had been receiving?
10        A.   Yes.  She --
11             MR. CHAPPELL:  Objection.  Leading.
12             THE ARBITRATOR:  It was a little bit
13   leading, but sometimes that happens.
14             MR. CHAPPELL:  Many times.
15             MS. GEHRKE:  I'm just trying to move this
16   along.
17             MR. CHAPPELL:  Oh, yeah.  Well, that was a
18   nice one you would like him to testify to, a signal.
19             THE ARBITRATOR:  We'd be here until
20   December 14th if we didn't have a little bit of
21   that.
22             Do you understand the question?
23             THE WITNESS:  I do.
24             THE ARBITRATOR:  Good.  All right.  You
25   can answer it.  I know that you --
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1            MR. CHAPPELL:  And I've been restrained in
 2   raising it.
 3            THE ARBITRATOR:  No, you have.  You have
 4   very much, and I appreciate it.
 5            MR. CHAPPELL:  Okay.  Because I don't want
 6   to be here until December 11th.  No offense to
 7   anyone that lives in Dallas.
 8   BY MS. GEHRKE:
 9       Q.   Do you remember the question?
10       A.   She indicated that she had been receiving
11   messages for quite some time and she just let them
12   go, but this one was much worse than any message
13   that she had ever received and it affected her
14   differently.
15       Q.   During the fact finding meeting, did it
16   come up what Ms. Carter -- what Ms. Stone's -- let
17   me start again.
18            During the fact finding meeting, did it
19   come up whether Ms. Carter knew what Ms. Stone's
20   beliefs were on abortion?
21       A.   We asked the question in the meeting, yes.
22       Q.   And what was her response?
23       A.   She did not know.
24       Q.   Did you ask Ms. Carter if she was aware of
25   Ms. Stone's religious affiliation?
```

Charlene Carter - Vol. 1                        December 7, 2017

234

1        A.    We did, and she was not aware of that
2   either.
3        Q.    During the meeting did you ask Ms. Carter
4   regarding any other form of communication that she
5   may have had with Ms. Stone outside of Facebook?
6        A.    We inquired whether she had tried to
7   communicate with Ms. Stone and had she tried any
8   other avenues to reach out to Ms. Stone to try to
9   communicate with her, and she said no.
10        Q.    When you were explaining kind of the
11   Company's concerns regarding both the public and the
12   private Facebook messages, did Ms. Carter seem to
13   understand why the Company was concerned about the
14   messages?
15        A.    I indicated to her that this information,
16   even though she was arguing, or not arguing, but
17   showing her displeasure towards the Union and was
18   upset because of the way the Union was using her
19   money or treating her, that there's a difference
20   there because the actual videos that she sent to
21   Ms. Stone was more of a person-to-person type thing
22   and was separate.
23            And that's something that we take very
24   seriously at Southwest, and I really wanted to get
25   across the point that we need to have a comfortable

Charlene Carter - Vol. 1                                    December 7, 2017

235

```
 1   workplace where people can feel comfortable working
 2   and have access to Facebook and those type of things
 3   without feeling harassed in any way.  And the
 4   working relationship is very important to us between
 5   our flight attendants, and that's what I was trying
 6   to indicate to her.
 7        Q.   Was Ms. Carter apologetic at all for her
 8   actions?
 9        A.   At one point when I explained to her that
10   the Company noticed that her Facebook did indicate
11   she was a flight attendant with Southwest Airlines
12   and that I was worried about that showing Southwest
13   in a bad light and possibly painting a picture where
14   people believed that Southwest had the same beliefs
15   that she had, that she seemed like she didn't know
16   that and that she apologized.
17        Q.   What about with respect to the messages
18   that she had sent Ms. Stone?
19        A.   She never apologized or seemed regretful
20   for sending those to Ms. Stone.
21        Q.   Did Ms. Carter ever raise the issue of --
22   that she felt that she was not being treated fairly
23   because she was an objector by either the Union or
24   Southwest?
25        A.   She brought that up during the meeting and
```

Charlene Carter - Vol. 1                                    December 7, 2017

236

```
 1    said that when she decided not to participate with
 2    the Union anymore and became an opter-outer, an
 3    objector, she said, that she felt like she was
 4    harassed by the Union in one of the meetings that
 5    she went to.  That was the only time that she ever
 6    said she felt that way.
 7         Q.   Did she ever claim any retaliation or
 8    harassment on Southwest's part?
 9         A.   No, never.
10         Q.   Did she ever raise any concerns that she
11    thought that Southwest was trying to get rid of her
12    because she was an objector?
13         A.   No, not the Company.
14         Q.   Was Ms. Carter or did Ms. Carter convey
15    during the meeting that she was upset that Ms. Stone
16    had turned her in to the management?
17         A.   Yes.
18         Q.   Did she explain why?
19         A.   Because flight attendants don't do that to
20    each other is what she told me, they don't turn each
21    other in.
22         Q.   You testified earlier that you made the
23    decision to terminate Ms. Carter, correct?
24         A.   Yes, I did.
25         Q.   Okay.  And other people you consulted with
```

```
 1   as part of that decision, but ultimately you were
 2   the decision-maker, correct?
 3        A.   Yes.
 4        Q.   Can you explain to us why you decided that
 5   termination was the appropriate discipline for
 6   Ms. Carter's actions?
 7        A.   When I read through the bullying and
 8   hazing policy and our social media policy, it is
 9   very explicit in stating what shows as the violation
10   of those.  And to the egregiousness of these videos
11   and how they portrayed the fetus and everything in
12   them, that that was egregious enough for
13   termination.
14        Q.   You just mentioned the two videos.  Did
15   the still picture, the still post of the vagina
16   headdress, did that factor into your decision at
17   all?
18        A.   The three of those together are inclusive
19   in what I made my decision on, the bullying, hazing,
20   and social media policy.  And also, along the same
21   lines, the videos on her Facebook page where it
22   indicated clearly that she was a Southwest flight
23   attendant.
24        Q.   So both -- all of that together kind of
25   factored into your decision?
```

Charlene Carter - Vol. 1                          December 7, 2017

238

1          A.    Yes.

2          Q.    Did you ever consider offering her a

3    30-day suspension or a lesser form of discipline?

4          A.    I did not.

5          Q.    Why not?

6          A.    Because, once again, the egregious state

7    of these videos and how awful they were to view.

8          Q.    Okay.  So once you made your decision to

9    terminate Ms. Carter, I think you testified you ran

10   it by your leaders?

11         A.    Yes.

12         Q.    And did they agree with the decision?

13         A.    They did.

14         Q.    And then your standard procedure would be

15   to call the Union?

16         A.    They conference in Charlene, and then I

17   render my decision to all of them.

18         Q.    Okay.  So that's what happened in this

19   case?

20         A.    Yes.

21         Q.    Okay.  And then did you follow up with a

22   letter?

23         A.    I followed up with a certified letter to

24   her home address.

25               THE ARBITRATOR:  Is that part of Joint 2?

Charlene Carter - Vol. 1                           December 7, 2017

239

```
 1                MS. GEHRKE:  It is part of Joint 2.
 2                THE ARBITRATOR:  Can I have Joint 2
 3    sometime?
 4                MS. GEHRKE:  Did we not give you that?
 5                THE ARBITRATOR:  No.
 6                MS. GEHRKE:  Oh, we didn't pass them out
 7    yet.  We'll just use it as part of Joint 2 then.
 8                THE ARBITRATOR:  Whatever you prefer.
 9                MS. GEHRKE:  We have it separately, but --
10                THE ARBITRATOR:  I'll go ahead and take it
11    separately.
12                MS. GEHRKE:  Okay.  Separate?
13                THE ARBITRATOR:  But I do want Joint 2 so
14    I can read it after dinner.
15                MS. GEHRKE:  Okay.  So here's Joint 2.
16                THE ARBITRATOR:  Thank you.
17                     (Joint Exhibit 8 marked)
18                MS. GEHRKE:  All right.  Let's mark this
19    one as Joint No. 8.  This is the termination letter.
20    BY MS. GEHRKE:
21        Q.   Mr. Schneider, do you recognize this
22    document?
23        A.   Yes.
24        Q.   And is this the termination letter that
25    you sent to Ms. Carter on or about March 14, 2017?
```

Charlene Carter - Vol. 1                    December 7, 2017

240

```
 1        A.   Yes.

 2        Q.   And that's your signature?

 3        A.   Yes, it is.

 4             MS. GEHRKE:  I believe all the joint

 5   exhibits are in evidence, so I think we're good on

 6   that.  I have no further questions.  Thank you.

 7             THE ARBITRATOR:  Thank you.  Your witness.

 8             MR. CHAPPELL:  I need to confer with my

 9   client a second.

10             THE ARBITRATOR:  Sure.  That'll be fine.

11                 (Recess from 4:41 to 4:46)

12             THE ARBITRATOR:  We'll go back on the

13   record then.  It's your witness, sir.

14             MR. CHAPPELL:  Okay.  Thank you.

15                    CROSS-EXAMINATION

16   BY MR. CHAPPELL:

17        Q.   First of all, I'd like you to look at

18   Joint Exhibit 1 which is the collective bargaining

19   agreement.  You have it in front of you.  And I'd

20   like to draw your attention to -- might be already

21   opened here -- Article 19, Section 3, Subsection J

22   on pages 19-140.

23        A.   Okay.

24        Q.   And you see in that article that it says

25   that "Disciplinary decisions shall be based only on
```

Charlene Carter - Vol. 1                              December 7, 2017

241

1   performance and/or conduct occurring within the
2   18-month period of active status preceding the
3   incident"?
4        A.   Okay.
5        Q.   Okay.  So now I'd like you to look at
6   Southwest Exhibit No. 8 which was in front of you
7   earlier and go to the third page and then each of
8   those following pages which are pictures that you
9   testified to from Charlene's Facebook --
10       A.   Yes.
11       Q.   -- public page.  And my question is, what
12  steps did you take to know that those pictures were
13  posted by Charlene within 18 months of the incident?
14       A.   She stated in the fact finding that those
15  were posted on her Facebook page.
16       Q.   But my question to you is not that they
17  were posted on her Facebook page but that they had
18  been posted, the conduct that she had done in
19  posting them was done within 18 months.
20       A.   That was not brought up in the fact
21  finding.
22       Q.   Okay.  So you took no effort to make sure
23  that her conduct in posting these photos were done
24  within the 18 months required by Subsection J?
25       A.   I was only required to look at the

Charlene Carter - Vol. 1                                    December 7, 2017

242

```
 1    incident that we were investigating within the
 2    last -- that it was within the last 18 months.  This
 3    information was from her Facebook page and had
 4    previously been on her Facebook page indicating to
 5    anybody that was a friend of hers or aware of it
 6    that she was a Southwest employee.
 7        Q.   And it may have been put on her Facebook
 8    page more than 18 months before the incident in
 9    question, right?
10        A.   Possibly.
11        Q.   Right.  And the collective bargaining
12    agreement says that you are not to use conduct that
13    is outside the 18 months to consider discipline,
14    correct?
15        A.   Yes, as stated here, yes.
16        Q.   So I am trying to understand how you could
17    consider these Facebook posts to decide whether she
18    had violated a social media policy in a public --
19    private but public, you know, her own Facebook posts
20    when you didn't know whether they were within the
21    18-month requirement.
22        A.   I wasn't aware of when these were posted
23    on there, but they were just as references that her
24    Facebook page at one time indicated that she was a
25    Southwest employee.
```

Charlene Carter - Vol. 1                                    December 7, 2017

243

```
 1        Q.   Let's say that none of those pictures
 2   existed.  Okay?  I'm giving you a hypothetical.  So
 3   when I say "those pictures," I'm talking about from
 4   the third picture to the end of Exhibit 8.
 5        A.   Okay.
 6        Q.   And again, I'm just talking about the
 7   social media policy violation that deals with
 8   putting Southwest in a bad light.
 9        A.   Okay.
10        Q.   Okay?  Would she have violated that policy
11   if all you had were these, the first two pages of
12   Exhibit 8?
13        A.   If she -- that was just a part of my
14   decision in making it, so the actual -- if you're
15   asking if she violated it with just these, then yes,
16   I could say yes.
17        Q.   If she did not have any of the pictures
18   that start on page 3 and go to the end of Exhibit 8,
19   how would anyone connect the two postings on her
20   Facebook page with the first two pages with
21   Southwest Airlines?
22        A.   They may not be able to do that.
23        Q.   Okay.  And isn't it true that if, at least
24   for the social media policy, if the flight
25   attendant's use of social media cannot be connected
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   to Southwest, it's not a violation on the policy?
 2        A.   For this small portion of it, that could
 3   be true, yes.  But overall the answer would be no.
 4        Q.   I'm just asking you about a hypothetical
 5   dealing with Exhibit 8 and the social media policy.
 6             Now, you also testified that it was the
 7   totality of both her public Facebook postings and
 8   her Facebook messaging to Audrey that led you to
 9   believe that termination was the appropriate remedy,
10   right?
11        A.   Correct.
12        Q.   Right.  And so if you did not have the
13   public social media violation, your outcome, your
14   decision could have been different?
15        A.   Not in this case.
16        Q.   Okay.  So you would have still recommended
17   termination just based on the Messenger postings
18   alone?
19        A.   Yes, because of the violation of the
20   policies.
21        Q.   Now, you looked at her employee -- the
22   personnel files, records to see what kind of an
23   employee she was as part of your investigation and
24   decision-making to recommend termination, correct?
25        A.   Yes.
```

Charlene Carter - Vol. 1                                    December 7, 2017

245

```
 1        Q.    And did you see any other kind of
 2   investigations, charges, or anything dealing with
 3   social media policy violations?
 4        A.    I went back 18 months and I did not see
 5   any within the last 18 months.  So at the same time
 6   she did not work very much during that time, so --
 7        Q.    Okay.  But you saw no other violations of
 8   anything on Southwest policy in that period?
 9        A.    No, I did not.
10        Q.    So this was, as far as you knew, her first
11   and only violation --
12        A.    Yes.
13        Q.    -- in her career.  Okay.  It is true that
14   Southwest also has a progressive discipline policy?
15        A.    They do.
16        Q.    Okay.  Did you consider at all that
17   progressive discipline should be applied in this
18   case?
19        A.    I looked at all of the discipline when I
20   was investigating this and getting my material
21   together before I made my decision, and based on the
22   egregiousness of these posts and the personal
23   messages that she sent to Audrey, I made my
24   determination that termination was the correct
25   discipline in this case.
```

Charlene Carter - Vol. 1                                    December 7, 2017

246

1        Q.   We have -- let me ask you a question.   If
2   we need to find the document, we can do it.   Are you
3   aware that there's a schedule of discipline dealing
4   with classes and suggested --
5        A.   Yes.
6        Q.   -- kinds of disciplines?   And that a Class
7   II or a Class IV violation, while it can include
8   termination, normally starts with something less
9   like a final warning or --
10        A.   A Class II gives the range of termination
11   as one of the options --
12        Q.   Right.
13        A.   -- for the first violation.
14        Q.   Almost all of them do, but that's okay.
15   But you did consider these classes?
16        A.   I did.
17        Q.   Where did you think these violations,
18   which of the classes did you think it fell within?
19        A.   My decision was based on the policies that
20   were violated, the bullying, hazing policy and the
21   social media policy.
22        Q.   So it's fair to say you didn't really look
23   at these classes and the suggested --
24        A.   I looked at the classes before I made my
25   determination on the policies that were violated.

Charlene Carter - Vol. 1                               December 7, 2017

247

1          Q.    Okay.  So when you looked at the classes,
2     which class did you think these violation -- for
3     instance, we can break them down.  The workplace
4     bullying and hazing policy, which class did that fit
5     in?
6          A.    They don't fit into a class.  They're
7     separate from the classes that are listed there in
8     the violations.
9          Q.    You testified in the direct testimony that
10    you had asked her if the videos were graphic.  Do
11    you remember saying that?
12         A.    Yes, I do.
13         Q.    Testifying to that, I should say?  And
14    then you followed that and quoted her as saying "And
15    she said, 'Yes, I posted these.'"
16         A.    Yes.
17         Q.    Okay.  How does saying "Yes, I posted
18    these," agree with your description that they are
19    graphic?
20         A.    Because when I asked the question, I asked
21    the specific question did she feel that these posts
22    were graphic, and she answered, "Yes, I posted
23    these, and people did not have to click on them,"
24    and she continued.
25         Q.    Okay.  And have you reviewed your notes to

Charlene Carter - Vol. 1                                      December 7, 2017

```
 1   see that it was said exactly that way?
 2        A.   Yes.
 3        Q.   And there was another note taker there as
 4   well from the Union, correct?
 5        A.   Yes.
 6        Q.   And his notes may not reflect it that way?
 7        A.   I don't -- not aware of his notes.  I did
 8   not see those.
 9             MR. CHAPPELL:  I have no other questions.
10             MS. GEHRKE:  I have two quick ones.
11                  REDIRECT EXAMINATION
12   BY MS. GEHRKE:
13        Q.   Mr. Schneider, did I understand your
14   testimony correctly that even if there had not been
15   those public Facebook posts with the abortion videos
16   and Ms. Carter in Southwest uniform, nametag,
17   whatever, that based solely on the private Facebook
18   messages you still would have terminated Ms. Carter?
19        A.   Yes, that is true.
20        Q.   And Mr. Chappell asked you about the
21   different classes of violations in the workplace --
22   in the flight attendant work rules, and you
23   testified that the social media, the bullying and
24   hazing and sexual harassment policies were separate.
25   Is that right?
```

Charlene Carter - Vol. 1                                    December 7, 2017

249

```
 1        A.   Correct.
 2        Q.   And that they didn't necessarily fall into
 3   the classes.
 4        A.   Correct.
 5        Q.   Is that because -- well, why don't you
 6   explain to me why that's the case.
 7        A.   They had their own discipline which is up
 8   to termination if they are violated, depending on
 9   that.
10        Q.   Do those three policies apply
11   Company-wide, or are they specific to the flight
12   attendants?
13        A.   They apply Company-wide.
14        Q.   And are those classes of discipline, are
15   those Company-wide or are those specific to the
16   flight attendants?
17        A.   Those are specific to flight attendants.
18             MS. GEHRKE:  Okay.  Thank you.  No further
19   questions.
20             MR. CHAPPELL:  I have no further
21   questions.
22             THE ARBITRATOR:  Thank you, sir.
23             THE WITNESS:  Thank you.
24             MS. GEHRKE:  We'll have Mike Sims now.
25                  (Off record from 5:01 to 5:06)
```

Charlene Carter - Vol. 1                                      December 7, 2017

```
 1              THE ARBITRATOR:  Would you raise your
 2   right hand, please.
 3              Do you swear that the testimony you're
 4   about to give in this arbitration shall be the
 5   truth?
 6              THE WITNESS:  I do.
 7              THE ARBITRATOR:  Thank you.
 8                   MIKE SIMS,
 9   having been duly sworn, testified as follows:
10              DIRECT EXAMINATION
11   BY MS. GEHRKE:
12        Q.   Good afternoon, Mr. Sims.
13        A.   Good afternoon.
14        Q.   How long have you been employed by
15   Southwest Airlines?
16        A.   21 years.
17        Q.   And what's your current position?
18        A.   Senior director, inflight operations.
19        Q.   How long have you held that position?
20        A.   I've been an inflight director since 2011.
21   Senior director, was promoted to that title over the
22   summer.
23        Q.   Can you very briefly kind of give us an
24   overview of your employment history at Southwest
25   Airlines.
```

Charlene Carter - Vol. 1                                  December 7, 2017

1        A.    I was hired at Southwest Airlines in 1996
2   as a flight attendant, served in the flight
3   attendant role for almost 11 years.  During that
4   course of that time, I also served as a full-time
5   union officer, TWU Local 556, from 2003 to 2006.
6   2006 I went back to full-time flying as a flight
7   attendant.
8            2007 I went into -- I was promoted into
9   inflight management as labor relations manager.
10  Served as a strategic manager as well during the
11  AirTran acquisition.  Promoted to regional director
12  over inflight bases, which manages our flight
13  attendants is the role I currently hold today.
14       Q.    Okay.  And what are your primary job
15  responsibilities as senior director of inflight
16  operations?
17       A.    We have 15,500 flight attendants, all of
18  which are scattered throughout the United States in
19  ten different domiciles.  Those domiciles are
20  managed and the management of those domiciles report
21  up to me, and my job is to ensure quality assurance,
22  quality control, and overall job performance, among
23  other things.
24       Q.    Do some of your responsibilities involve
25  assisting or making decisions regarding employee

```
 1   discipline or labor relations?

 2        A.   Yes.  I serve as our vice president's

 3   designee as the person who hears step 2 appeals

 4   cases pursuant to our collective bargaining

 5   agreement, which is Articles 19 and 20.

 6        Q.   Okay.  And did I hear you correctly that

 7   you testified you used to be a part of Union

 8   leadership for TWU Local 556?

 9        A.   Correct.

10        Q.   What positions did you hold for the Union?

11        A.   I was elected by the members at large to

12   serve on the executive board.  From there I was

13   appointed as the president -- I mean appointed by

14   the president, excuse me, to serve as the grievance

15   chair and full-time office manager.  So from 2003 to

16   2006 I handled all the grievance issues with our

17   flight attendants.

18        Q.   So is it fair to say you're fairly well

19   versed in the CBA and labor relations with respect

20   to the flight attendants?

21        A.   Yes.  I have a better-than-average working

22   knowledge.

23        Q.   How often would you say you hear step 2

24   appeal?

25        A.   On average anywhere from three to five a
```

Charlene Carter - Vol. 1                         December 7, 2017

253

```
 1   month.
 2       Q.   And are you familiar with the grievant,
 3   Charlene Carter?
 4       A.   I am.
 5       Q.   How do you know Ms. Carter?
 6       A.   I know Ms. Carter through this grievance
 7   process.  I knew of her prior to this process or her
 8   case.
 9       Q.   How did you know of her prior to this
10   process?
11       A.   Charlene is a flight -- was a flight
12   attendant for Southwest Airlines, and just in the
13   course of our business we just tend to know who
14   people are.
15       Q.   Okay.  Were you involved at all in the
16   Company's investigation or fact finding meeting with
17   respect to Ms. Carter?
18       A.   I was not.
19       Q.   Did Ed Schneider inform you of his
20   decision to terminate Ms. Carter's employment?
21       A.   I was informed, correct.
22       Q.   And did you inform Mr. Schneider whether
23   or not you agreed with his decision?
24       A.   I did not.
25       Q.   At the time he informed you of his
```

Charlene Carter - Vol. 1                          December 7, 2017

254

```
 1    decision to terminate Ms. Carter's employment, did
 2    you have an opinion or enough knowledge about the
 3    case to know whether termination was appropriate?
 4         A.   I did not.
 5         Q.   At some point you learned the details of
 6    her case?
 7         A.   Correct.
 8         Q.   When did that occur?
 9         A.   Under the grievance process when Charlene
10    filed her grievance, there's the step 2 process that
11    begins.  And from there I was provided by our labor
12    relations team the file, the contents of all the
13    information there, and then plus I conducted a
14    meeting with Charlene.
15         Q.   Okay.  So did you review the contents of
16    the labor relations file prior to the step 2 meeting
17    with Charlene?
18         A.   I did.
19         Q.   And prior to the meeting with Charlene,
20    after just reviewing the file, had you formed an
21    opinion yet as to the propriety of the termination?
22         A.   No.  I realized it was a serious issue,
23    but I had no final, conclusive thoughts as to which
24    way it ultimately should be disposed.
25         Q.   And what is the real purpose of a step 2
```

Charlene Carter - Vol. 1                              December 7, 2017

255

```
1    meeting?
2         A.   Well, the step 2 provides an opportunity
3    for a leader at Southwest Airlines to further review
4    a case, to look for additional facts that may not
5    have been presented during fact finding, and also to
6    ensure that the Company policies, procedures,
7    et cetera were ultimately held up.
8              So my job was just to provide another
9    review and make a decision whether or not we should
10   make an adjustment on her case.
11        Q.   And sometimes during the step 2 process,
12   do you ever make an adjustment to the termination
13   that was levied based on reasons other than
14   disagreeing with the decision on the merits?
15        A.   Yes.
16        Q.   What would be some of the reasons why you
17   might change a -- the discipline imposed even if you
18   agreed with the merits?
19        A.   Well, in any type of settlement offer, we
20   also want to review the practicality of whether it
21   would be prudent to go forward.  You know, there's
22   legal costs to consider, there's these type of
23   hearings that must consider, and sometimes it's just
24   more practical to offer settlement even if there is
25   just cause.
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1        Q.   Okay.  And we'll ask you in a little bit
 2   about this specific case.
 3        A.   Okay.
 4        Q.   I just wanted to get your overall
 5   philosophy on that.
 6        A.   Okay.
 7        Q.   Now, you mentioned there was a step 2
 8   hearing with Ms. Carter.
 9        A.   Yes.
10        Q.   And did she have Union representation
11   present?
12        A.   She did.
13        Q.   Who else was at that meeting?
14        A.   Along with me was Melissa Burdine, who is
15   our labor relations manager who served as my note
16   taker and also case manager, if you will, on this.
17        Q.   Is this Melissa?
18        A.   And she is in the room, yes.
19        Q.   Just so we're clear.  Okay.  So it's
20   yourself, Melissa Burdine, Ms. Carter, and the Union
21   rep?
22        A.   There was two representatives --
23        Q.   I'm sorry.
24        A.   -- from TWU Local 556.  One, Ms. Becky
25   Parker, and the other was Beth Ross.  And then they
```

Charlene Carter - Vol. 1                        December 7, 2017

```
 1    also had somebody there on their behalf taking
 2    notes.
 3         Q.   Okay.  And you said Ms. Burdine served as
 4    the official note taker for the Company?
 5         A.   Correct.
 6         Q.   Okay.  Can you kind of walk us through an
 7    overview of what occurred during the meeting.  I
 8    assume you started off the meeting.  What's your
 9    typical practice, and what did you do in this case?
10         A.   Typical practice is I have a pretty
11    standard opening that I use consistently, and I
12    brought the grievant up to date of what this was
13    about from the Company point of view, told her that
14    this was her opportunity to discuss this case
15    further, I would ask questions, and there's three
16    possible outcomes from this: I could settle the
17    case, I could deny the grievance at this level, or I
18    could accept it as the Union wishes.
19              And then I ask if there's any questions
20    about the process, also remind them that it's a ten
21    day, business day for the contract for me to make
22    the decision.  So it's mainly the administrative
23    side kind of just an opening, and then I always ask
24    a question right after that is, "Do you feel or why
25    do you feel that this termination was unjust."
```

Charlene Carter - Vol. 1                          December 7, 2017

```
 1          Q.   And did you ask that specific question in
 2    this meeting with Ms. Carter?
 3          A.   I did.
 4          Q.   And what was her response?
 5          A.   Ms. Carter began to discuss she is in
 6    dispute with Transport Workers Union Local 556 and
 7    she believed that the Company should not be involved
 8    in this dispute and fully admitted to sending the
 9    messages to the complainant.  And then we went from
10    there.
11          Q.   Okay.  Let's go over a couple of things
12    you just said.
13          A.   Okay.
14          Q.   What did -- I don't know if these were her
15    words or your words --
16          A.   Okay.
17          Q.   -- that she was in dispute with Local 556.
18    Were those her words or your words, or what do you
19    mean by that?
20          A.   Well, she is engaged in a recall effort of
21    the Local 556 officers.  So I'm not sure if she used
22    the word "dispute," but it was clear to me that she
23    believed that this was an issue over and beyond the
24    actual Company rule violations.
25          Q.   Okay.  And did you have an opinion on
```

Charlene Carter - Vol. 1                          December 7, 2017

259

```
 1   that?
 2        A.   Did I have an opinion on that?  I didn't
 3   necessarily know at that point.
 4        Q.   Okay.  But you said she admitted sending
 5   the messages --
 6        A.   Absolutely.
 7        Q.   -- to Ms. Stone?
 8        A.   Absolutely.
 9        Q.   And did she admit posting the abortion
10   videos on her public Facebook page?
11        A.   Yes.
12        Q.   And did she admit that there were photos
13   of her in her Southwest uniform and various photos
14   with Southwest's name on it on her public Facebook
15   page?
16        A.   Yes.  None of that was in dispute.
17        Q.   Did -- tell me anything else you remember
18   being discussed specifically at the step 2 hearing.
19   Were you asking questions, or was she kind of
20   talking?
21        A.   It was a dialogue.  I asked questions.
22   She also wanted to present information that she felt
23   was relevant to this case, so she had documentation
24   from the AFL-CIO.  She had documentation from TWU
25   International, just those type of things that she
```

Charlene Carter - Vol. 1                              December 7, 2017

260

```
 1   wanted to be considered.
 2            She also said that she wanted her job
 3   back.  She also said that she was saddened that she
 4   was no longer employed and it meant everything to
 5   her to work at Southwest Airlines and that as a
 6   long-term employee she wanted to have a second
 7   chance.
 8        Q.   And did you believe her?  Did she seem
 9   sincere?
10        A.   At the time?
11        Q.   Yes.
12        A.   Yes, I did.
13        Q.   Okay.  Did you ask her why she sent those
14   messages to Ms. Stone?
15        A.   I did.
16        Q.   And what was her response?
17        A.   She again was referencing the ongoing
18   recall effort and the dispute.  She had been trying
19   to reach Ms. Stone on issues that were important to
20   her.  And then when this women's march that took
21   place during the Trump inauguration took place, she
22   felt that she was in disagreement with Audrey's
23   participation on behalf of Transport Workers Local
24   556, so that was why she was communicating with
25   Audrey that she was in disagreement.
```

Charlene Carter - Vol. 1                              December 7, 2017

261

```
 1        Q.   So am I correct that based on what she was
 2   telling you, it was both kind of the political
 3   abortion issues and the Union issues and how money's
 4   being spent --
 5        A.   Uh-huh.
 6        Q.   -- were the reasons she kind of conveyed
 7   to you?
 8        A.   Correct.  She's very well versed in the
 9   pro-life movement.  It's a very passionate subject
10   to her as well as her religious beliefs and also
11   that she was someone who was a dissenter from the
12   Union and felt at the time that moneys that she was
13   paying to the Union were being used to support an
14   event and a cause that she did not support.
15        Q.   Did you speak at all to Ms. Stone
16   regarding the step 2 hearing?
17        A.   No.
18        Q.   Was she part of the step 2 hearing?
19        A.   No.
20        Q.   So you didn't have any input as to
21   Ms. Stone's perspective on this?
22        A.   No.
23        Q.   Just Ms. Carter.
24        A.   Correct.
25        Q.   And you testified previously that she had
```

Charlene Carter - Vol. 1                              December 7, 2017

```
 1    submitted some documentation during the step 2
 2    process?
 3         A.   That is correct.
 4              MS. GEHRKE:  Okay.  We are going to mark
 5    this pile of documents as Southwest Exhibit 14.
 6              (Company Exhibit 14 marked)
 7    BY MS. GEHRKE:
 8         Q.   Mr. Sims, are you familiar with Southwest
 9    Exhibit 14?
10         A.   I am.  This is a packet that are copies of
11    what she presented to me as evidence she wanted to
12    be considered, and it's various photographs,
13    articles, and screenshots from websites as well as
14    the pictures that she -- and video screenshots that
15    she submitted to Audrey Stone.
16         Q.   And did you consider this information that
17    Ms. Carter presented to you?
18         A.   I did.
19         Q.   Did you ask her any questions during the
20    step 2 hearing regarding what she was submitting, or
21    did you just kind of take it and review it later?
22         A.   I reviewed most of this later because
23    during the hearing she was presenting so many items
24    that we were just basically marking them.  And so
25    she would -- she would present this and say, "Please
```

Charlene Carter - Vol. 1                     December 7, 2017

263

```
 1   take a look at this," this is, you know, for

 2   example, something that she found from the AFL-CIO.

 3   So I didn't read it in its entirety until later.

 4        Q.   Okay.  During the step 2 hearing, was

 5   Ms. Carter apologetic or remorseful at all regarding

 6   sending Ms. Stone the abortion messages?

 7        A.   She expressed regret.

 8        Q.   Did she elaborate on that?

 9        A.   She wished that she had not done it and

10   felt that she had gone a little over the top.

11        Q.   She said that?

12        A.   Uh-huh.

13        Q.   Did she express any remorse or apologize

14   for having the abortion videos on her public

15   Facebook page when there were also pictures of her

16   in her Southwest uniform?

17        A.   I think she did.  I'm trying to paraphrase

18   how she said it, but at that meeting and at that

19   time I believe she felt that it was wrong.

20        Q.   Did Ms. Carter ever allege that she felt

21   that she was being retaliated against because she

22   was a Union objector?

23        A.   Yes.

24        Q.   What did she say about it?

25        A.   She believed that because of her
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   activities as a Union objector that she was being
 2   wrongfully targeted and --
 3        Q.   Did she say by who?
 4        A.   Well, at that point she felt it was the
 5   Union and the Company, but specifically the Union.
 6   She had a dispute with the Union and her beliefs,
 7   and she felt that they were trying to retaliate.
 8        Q.   Did she name Ms. Stone specifically in
 9   turning her in with respect to the retaliation?
10        A.   Yes.
11        Q.   Did she say what it was that the Company
12   was doing, if anything, that she felt was
13   retaliatory?
14        A.   Please -- I didn't hear the --
15        Q.   Did she specify anything at all that she
16   felt the Company was doing, if anything, that was
17   retaliatory?
18        A.   She believed that the Company was treating
19   people that supported Audrey differently than they
20   were treating people that were dissenting.
21        Q.   And did she specify any names or provide
22   any examples?
23        A.   Yes, she gave me some names of other
24   flight attendants that she knew of that she believed
25   were getting better treatment than she or her
```

Charlene Carter - Vol. 1                          December 7, 2017

265

```
 1   colleagues or cohorts that were Union dissenters.
 2        Q.   And did you recognize those names?
 3        A.   Yes.
 4        Q.   And were you familiar with those people's
 5   cases?
 6        A.   Yes.
 7        Q.   Had you heard the step 2 hearing on some
 8   of them or all of them?
 9        A.   Most, if not all, I heard the step 2.
10        Q.   And so when she tells you that, did you
11   have an opinion as to whether or not there was any
12   truth to that?
13        A.   I had an opinion.
14        Q.   What was that?
15        A.   I felt that she may not know the entire
16   circumstances surrounding their individual cases.
17        Q.   So did you feel that the Company was
18   retaliating against Ms. Carter?
19        A.   No.
20        Q.   Did you feel that the Union was
21   retaliating against Ms. Carter?
22        A.   I didn't have an opinion on that.
23        Q.   Did Ms. Carter say anything negative about
24   the Company during the step 2 hearing?
25        A.   No.
```

Charlene Carter - Vol. 1                                  December 7, 2017

266

```
 1        Q.   In fact, she asked you to give her her job
 2   back, right?
 3        A.   No, she went ahead and asked me to
 4   reinstate her because she loves Southwest Airlines,
 5   she loved the flight attendant profession, she loved
 6   her job, and she loved the fact that she served
 7   Southwest for 20 years.
 8        Q.   Okay.  Did you render a decision during
 9   the hearing?
10        A.   No.
11        Q.   You went back and reviewed the
12   documentation she provided you?
13        A.   That is correct.
14        Q.   And you said you had ten days to render a
15   decision?
16        A.   Yes, and I took the entire ten days.
17        Q.   Did you consult with anybody in coming up
18   with your decision?
19        A.   I consulted with Melissa Burdine and some
20   of her colleagues.
21        Q.   Okay.  And ultimately what was your
22   decision after the step 2 hearing?
23        A.   My decision was to offer a settlement.
24        Q.   And why did you decide to offer a
25   settlement?
```

Charlene Carter - Vol. 1                              December 7, 2017

267

1          A.    Well, I believe Southwest Airlines had
2     just cause to terminate her employment.  And at the
3     time I thought that it would be practical or it
4     would be a practical solution to offer
5     reinstatement, and I did it out of practicality.
6          Q.    Did the fact that the complainant was the
7     Union president, Ms. Stone, factor into your
8     decision at all?
9          A.    It factored into the practical side of
10    exposing a fellow Southwest Airlines employee to the
11    aftermath of a hearing such as this or potential
12    court cases.  I thought it would be practical, in
13    the best interest of the Company at the time,
14    although we had just cause, to go ahead and offer
15    settlement.
16         Q.    Okay.  So what was the settlement offer
17    that you made to Ms. Carter?
18         A.    The settlement offer was to convert the
19    termination to a 30-day suspension along with a
20    signature for a last chance agreement that stated
21    that the last chance agreement would be in effect
22    for 24 months and that Ms. Carter agreed to cease
23    these type of activities when it involved another
24    Southwest Airlines employee and to -- well, long
25    story short, behave herself.

Charlene Carter - Vol. 1                                     December 7, 2017

268

1        Q.    Okay.  And did you discuss the terms of
2    that offer with Ms. Carter directly or with the
3    Union?
4        A.    I -- no, I sent it to the Union, and then
5    to my knowledge they had the discussions with her.
6    I had no contact with Ms. Carter or her counsel
7    during that process.
8        Q.    Okay.  And what was the response that you
9    received from Ms. Carter regarding the offer?
10       A.    I received a e-mail notification from her
11   Union representative that she was declining to
12   accept the offer.
13       Q.    Okay.  If you would look at Joint
14   Exhibit 2, please.  And probably a little over
15   halfway through the packet there's this letter here
16   that's attached.  Well, let's go to this page.
17       A.    Okay.  This is the grievance form.  Okay.
18   If I'm looking at the right one, it is page 10.
19       Q.    Yeah, page 10.
20       A.    It's handwritten page 10.  Okay.  Got it.
21       Q.    Okay.  This was -- why don't you tell me
22   what this document is.
23       A.    Well, this is the grievance form that the
24   Union initiates whenever they are wanting to
25   initiate -- begin the appeals process.  So it's a

Charlene Carter - Vol. 1                          December 7, 2017

269

```
 1    pretty -- it's just a standard form that says we're
 2    grieving this event.  In this case it was a
 3    termination, and this is basically what begins the
 4    process and starts all the wheels in motion.
 5         Q.   Okay.  And is your signature anywhere here
 6    on this document or no?
 7         A.   On page 10, no.  My signature's not on
 8    there, but someone did sign on my behalf.
 9         Q.   Okay.  So if you look down near the bottom
10    of that page, is this the area designated for the
11    step 2 response?
12         A.   Yes.  If you just look down bottom of the
13    page, there's a number 2 with a circle around it,
14    and that is where we write in our decision after the
15    step 2 hearing.
16         Q.   Okay.  And it indicates here that you
17    decided to offer a settlement, correct?
18         A.   Correct.
19         Q.   And then it says "See attached."  So if
20    you look at the next two pages, actually more than
21    that, next six pages, there is a letter on Southwest
22    letterhead from Ms. Burdine to Beth Ross, the
23    grievance specialist for TWU Local 556.
24              Did you see this letter before it was
25    mailed out?
```

Charlene Carter - Vol. 1                                December 7, 2017

270

```
 1          A.    I did.
 2          Q.    Okay.  And does this letter accurately
 3    reflect the offer of reinstatement --
 4          A.    It does.
 5          Q.    -- and settlement that you made to
 6    Ms. Carter?
 7          A.    It does.
 8          Q.    But ultimately she rejected that offer,
 9    correct?
10          A.    That is correct.
11          MS. GEHRKE:  I have nothing further.
12    Thank you.
13                     CROSS-EXAMINATION
14    BY MR. CHAPPELL:
15          Q.    You said that you heard from the Union
16    that the offer had been rejected, correct?
17          A.    I saw an e-mail.  Whether it was sent to
18    me directly or it was sent to me from labor
19    relations, but yeah, I did receive an e-mail.
20          Q.    And did that e-mail give the reasons for
21    the rejection?
22          A.    It did not.
23          Q.    You do not know why either the Union
24    and/or the grievant rejected the offer?
25          A.    I do not have any knowledge to that.
```

Charlene Carter - Vol. 1                                    December 7, 2017

271

1      Q.    What is -- from your perspective and your
2   being both in the Union and now high management with
3   Southwest, my question goes to what you understand
4   to be Southwest's position in getting involved if
5   there's disputes within the Union membership.
6   What's management's position on that?
7      A.    Traditionally Southwest Airlines does not
8   get involved in Union disputes.  However, in this
9   instant case when it crossed into the line of our
10  harassment policy, social media policy, we were
11  compelled to get into this because this was not a
12  Union case per se as much as it was an employee
13  versus an employee case.
14     Q.    When you looked at both -- well,
15  especially the Audrey -- what number is that?  Is
16  that number 7?
17           MS. GEHRKE:  Yes.
18     A.    Number 7.  Okay.
19  BY MR. CHAPPELL:
20     Q.    When you looked at Exhibit 7, which do you
21  understand to be the Facebook messages from Charlene
22  Carter to Union president Audrey Stone, correct?
23  You understood?
24     A.    I understand that, yes, sir.
25     Q.    Right.  It's not the public postings on

Charlene Carter - Vol. 1                               December 7, 2017

272

```
 1   her Facebook page, correct?
 2        A.   Yes, this is the private message.
 3        Q.   Right.  And do you understand that at the
 4   top of the video descriptions and pictures, that
 5   that is what Ms. Carter wrote?
 6        A.   If I'm understanding you correctly, you're
 7   pointing to "TWU-AFL-CIO are supporting this
 8   murder"?  Is that --
 9        Q.   Right.
10        A.   Yeah.
11        Q.   And that is the language -- what is your
12   understanding of the paragraph and sentences below
13   the picture, who wrote those?
14        A.   I'm not really following the question.
15        Q.   Okay.  Do you know who wrote -- it starts
16   with "Did you know this."  Did you think Ms. Carter
17   wrote that also?
18        A.   Give me a minute to look at it.  Yeah, it
19   appears that Ms. Carter wrote that.
20        Q.   Okay.  Do you notice right above that --
21   it probably was in a color, so it's a little hard to
22   read.  It says "My Page - My Opinions."  Do you see
23   it?
24        A.   I see it.
25        Q.   Okay.  And then there's a little picture
```

Charlene Carter - Vol. 1                          December 7, 2017

273

```
 1    around it.
 2         A.   Of a -- looks like a profile picture of a
 3    dog.
 4         Q.   Right, or something.
 5         A.   Sure.
 6         Q.   Okay.  Did you know that when you have
 7    that profile, that's a comment by someone else that
 8    was part of this post originally that she was
 9    sharing with Ms. Stone?
10         A.   Again, you'll have to help me.  I'm not
11    fully understanding your question.
12         Q.   Okay.  My question is, did you understand
13    that when you are sharing already-existing video or
14    picture or post on Facebook through Messenger, you
15    are given the option to write something if you want
16    at the top of the photo or video that you're
17    showing, but comments following a little icon, they
18    are -- they go with it but they come from someone
19    else?
20         A.   Right, and our discussion focused on the
21    video portion that Ms. Carter sent to Audrey because
22    she wanted her to see that video.
23         Q.   Okay.  And did you take into consideration
24    what Ms. Carter actually wrote at the top, the
25    "TWU-AFL-CIO and 556 are supporting this murder"?
```

Charlene Carter - Vol. 1                          December 7, 2017

274

```
 1        A.   Yes, because I understood that as TWU,
 2   AFL-CIO, and Audrey Stone as their representative.
 3   So, yes, I see that as a message to Audrey Stone
 4   since she's the local president.
 5        Q.   Okay.  In the context of her being the
 6   local president.
 7        A.   Uh-huh.
 8        Q.   Okay.  When you testified earlier that as
 9   part of a step 2 process, it appeared to be before
10   you had the meeting with Ms. Carter and the Union
11   reps, that you reviewed the file from the fact
12   finding meeting?  Do you remember talking about
13   reviewing the file?
14        A.   Correct.
15        Q.   Okay.  Did that review of the file include
16   Ms. Carter's personnel file?
17        A.   No, I did not review her file.
18        Q.   Okay.  So you didn't look to see if she
19   had had any other social media violations or --
20        A.   No.  I did ask labor relations if she had
21   any previous discipline.
22        Q.   And the answer was?
23        A.   The answer was no.
24        Q.   And so this was the first time that she
25   had had a alleged violation that you had to
```

Charlene Carter - Vol. 1                          December 7, 2017

275

```
 1   consider, this kind of violation?
 2        A.   To my knowledge, yes.
 3        Q.   And did you have any information either --
 4   at any time as you considered all the various
 5   documents, and this is now a month or so after the
 6   posting of the videos in February, that Ms. Carter
 7   had sent any of these videos or any abortion
 8   pictures to Ms. Stone or to anyone else?  Do you
 9   know?  Do you have any information that suggested
10   that?
11        A.   And I apologize.  I don't fully understand
12   the question, so if you could repeat it.
13        Q.   That's fine.  In your review of
14   everything, did you come across any instance where
15   Ms. Carter had sent these abortion videos or these
16   abortion pictures to anyone else?
17        A.   No.  I was looking at her -- the employee
18   issue that she created with Audrey Stone, another
19   employee.
20        Q.   And you didn't hear that she had sent
21   repeated or other videos to Audrey Stone after this
22   one either, did you?
23        A.   No.
24             MR. CHAPPELL:  One moment to confer.
25             THE ARBITRATOR:  Uh-huh.
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1              MR. CHAPPELL:  I have nothing further.
 2              THE ARBITRATOR:  Thank you.
 3              MS. GEHRKE:  I just have one quick
 4    follow-up.
 5                    REDIRECT EXAMINATION
 6    BY MS. GEHRKE:
 7         Q.   Mr. Sims, during your direct testimony you
 8    testified that at the time you were making the
 9    decision after the step 2 hearing, you thought it
10    was in the Company's best interest to settle the
11    case.  Do you still feel that that was the right
12    thing to do knowing what you know now?
13         A.   At the time I made the right decision.
14    Knowing what I know now, we had just cause and I
15    think the termination should remain.
16              MS. GEHRKE:  No further questions.
17              MR. CHAPPELL:  No follow-up.
18              THE ARBITRATOR:  Thank you, sir.  I
19    appreciate your testimony.
20              THE WITNESS:  Thank you, sir.
21              MR. CHAPPELL:  I assume we're taking one
22    of those five to seven?
23              THE ARBITRATOR:  Why not?
24                  (Recess from 5:41 to 5:46)
25              THE ARBITRATOR:  For the record, have you
```

Charlene Carter - Vol. 1                          December 7, 2017

277

```
1    any other witnesses?
2            MS. GEHRKE:  That is it for the Company's
3    case in chief.  We reserve the right to call
4    rebuttal if necessary.
5            THE ARBITRATOR:  Thank you.  Let's go off
6    the record.
7                    (Recess from 5:46 to 5:54)
8            THE ARBITRATOR:  Would you tell her your
9    full name, please.
10           THE WITNESS:  Christopher Sullivan.
11           THE ARBITRATOR:  Mr. Sullivan, if you
12   would raise your right hand.
13           Do you swear that the testimony you're
14   about to give in this arbitration shall be the
15   truth?
16           THE WITNESS:  Yes.
17           THE ARBITRATOR:  Thank you.  All right.
18               CHRISTOPHER SULLIVAN,
19   having been duly sworn, testified as follows:
20               DIRECT EXAMINATION
21   BY MR. CHAPPELL:
22      Q.   Mr. Sullivan, what do you currently -- do
23   you have a relationship with TWU Union 556?
24      A.   Currently I'm a shop steward for TWU.
25      Q.   And just briefly describe what the duties
```

Charlene Carter - Vol. 1                                    December 7, 2017

278

```
1  of a shop steward are.

2       A.   Shop steward would represent a flight

3  attendant during a fact finding, a step 2, any kind

4  of like meeting with management.  Usually it's fact

5  findings and step 2s, but it could be something

6  else.

7       Q.   Okay.  And are there special duties that

8  the Union steward during fact finding proceedings

9  do?  Do you have special responsibilities?

10      A.   So a shop steward would be responsible for

11 taking notes during the meeting and also

12 participating in the meeting.  So you kind of have

13 two jobs.  You've got to listen and participate in

14 the meeting at the same time while you're taking the

15 notes of what's going on.

16      Q.   And how long have you been a shop steward

17 for?

18      A.   About 12 years.

19      Q.   And approximately how many fact finding

20 sessions have you represented a flight attendant for

21 and taken notes?

22      A.   Probably a hundred to 150, over, quite a

23 few.

24      Q.   And did there come a time when you learned

25 that there would be a fact finding meeting involving
```

Charlene Carter - Vol. 1                                    December 7, 2017

279

1    flight attendant Charlene Carter?

2         A.   Yes.

3         Q.   And approximately when was that?

4         A.   I can't remember the exact date.  I know I

5    got -- usually what happens is either the Union will

6    contact you and ask you if you can do a meeting for

7    somebody, or you can be requested to be the shop

8    steward for that particular flight attendant.  They

9    have the right to request an individual if they want

10   them or they kind of get whoever can do it.

11            So in this case I remember I think it was

12   a friend of Charlene asking, hey, my friend has a

13   fact finding, would you be willing to be her

14   representative.  And I was like, okay, sure.

15        Q.   And what did you do to prepare for a fact

16   finding?

17        A.   Usually I would talk to the individual,

18   ask them kind of, you know, what's this about, do

19   you know what it's about.  Sometimes they do,

20   sometimes they don't.  Get as much information as

21   you can at the time.  And then would also speak to

22   the Union representative.  Usually there's somebody

23   in the grievance staff that has been assigned that

24   case.  And then between the two of them get as much

25   information as you can.  Sometimes it involves a

Charlene Carter - Vol. 1                                December 7, 2017

```
 1    customer letter, you know, whatever information is
 2    out there.  And, like I said, sometimes there's more
 3    information than others.
 4         Q.    And I'm talking now just generally.  As
 5    you prepare or before you go to the fact finding, do
 6    you have any interaction with the Company or Company
 7    officials about what's going to happen or the reason
 8    for it, anything like that?
 9         A.    Well, sometimes there might be a request
10    for clarification.  Like if -- maybe there isn't a
11    lot of information and maybe they've asked the
12    flight attendant to write an irregularity report but
13    the flight attendant doesn't have anything to write,
14    you know, he didn't present a customer letter, he
15    didn't present a complaint, you're just asking me
16    for an irregularity report and I'm not sure why.
17    So they may be like, hey, what is it you want them
18    to write about.
19              But otherwise, the only other
20    communication would be maybe just on the scheduling
21    side of, hey, okay, let's try to do it on Monday
22    or -- especially if you're requested, sometimes they
23    already have a meeting set on a certain day and time
24    and maybe you can't do that but you said I can do it
25    but how about Monday at 2:00 or something.  And
```

Charlene Carter - Vol. 1                    December 7, 2017

281

```
 1    there's that conversation, but that's about it.
 2         Q.   Okay.  Have any of these, outside of
 3    Ms. Carter's fact finding, the hundred or more that
 4    you have participated in over the years you've been
 5    a shop steward, have any of them involved complaints
 6    by other flight attendants that the flight attendant
 7    that you're representing has violated the social
 8    media policy?
 9         A.   Yes.
10         Q.   Approximately how many?
11         A.   For a violation of social media policy
12    between flight attendants, probably only three or
13    four.
14         Q.   Okay.  What about a violation by one
15    flight attendant against the flight attendant that
16    you're serving as the shop steward for the bullying
17    and hazing policy?
18         A.   Probably the same amount, three or four,
19    not very many.  There's usually more of a conflict
20    between the flight attendants like maybe whether
21    it's a procedure or something like that.  That's
22    often the problem or issue that comes up between
23    flight attendants.
24         Q.   Okay.  And then the last question, similar
25    question about a violation filed by one flight
```

Charlene Carter - Vol. 1                          December 7, 2017

282

```
 1   attendant against the flight attendant you're the
 2   shop steward for for a violation of harassment,
 3   sexual harassment policy.
 4        A.   One.
 5        Q.   One.  Okay.  In those type of violations,
 6   at the fact finding do you learn what the complaint
 7   is of the flight attendant that asks the Company to
 8   investigate the possible violation?
 9        A.   Yeah, it's common for -- if you're in a
10   meeting, whether it's prior to that that the flight
11   attendant is informed of why they're being brought
12   in, whether it's a customer -- usually if it's a
13   customer complaint letter, you receive the letter
14   ahead of time, which then you're asked to then write
15   an irregularity report based on that letter.  So you
16   have the information.  You kind of say, well, okay,
17   this happened or it didn't happen, whatever,
18   depending on the situation.
19             Then if it's a complaint from another
20   employee or it could be even a supervisor or
21   something like that, then usually that is read
22   during the meeting at some point where they would
23   say this is the complaint, this is what this person
24   is saying, whether it's a policy violation or
25   whether it's a harassment, whatever, this is the
```

Charlene Carter - Vol. 1                           December 7, 2017

283

```
 1   complaint.
 2           And with the exception of a management
 3   person like a supervisor, whatever, the names are
 4   always taken out, like they never say "Suzi said
 5   this" or whatever.  I've only ever had it if
 6   supervisor Bob saw you do something or is saying
 7   that you violated a safety thing or something like
 8   that.  Otherwise, the names are taken out.
 9       Q.   Right.  But without the names being given,
10   the complaint that the one flight attendant made to
11   management is usually read to the other one as part
12   of the fact finding?
13       A.   Yes.  There's always in there somewhere
14   is, "This is the complaint we received."  It's
15   usually like, "Okay, I'm going to read this
16   irregularity report or I'm going to read this letter
17   to you and then I'm going to ask you questions about
18   that specific complaint or violation."
19       Q.   Now, let's draw your attention to your
20   being the shop steward for Charlene Carter at the
21   fact finding that was held.  Do you remember
22   approximately when that meeting was held?
23       A.   I'd have to look at the notes for the
24   exact date, but probably about six months ago, I
25   think.
```

Charlene Carter - Vol. 1                                    December 7, 2017

284

```
1        Q.   Okay.  Would March 7 of this year sound
2   about right?
3        A.   That sounds right.
4        Q.   Okay.  And did you take notes during that
5   fact finding meeting?
6        A.   Yes.
7        Q.   And I believe you already testified to
8   this, but I just want to make it clear.  Was that
9   part of your duties as the TWU's shop steward to
10  take those notes?
11       A.   Yes.
12       Q.   And what was the purpose of that duty of
13  you taking those notes?
14       A.   To the best of my knowledge, there's an
15  agreement that's been in place for some time between
16  the Company and the Union that there wouldn't be a
17  recording of the meetings but there would be note
18  taking and that would be the record of what
19  occurred.
20            So both sides -- so while I'm taking
21  notes, usually, and it depends on the meeting,
22  there's another person in the room other than the
23  management person that's taking -- that's running
24  the meeting.  That other person, that's their job
25  normally is to take the notes for their side.
```

Charlene Carter - Vol. 1                                    December 7, 2017

285

 1      Q.   Okay.  And have you been given any
 2   information, either in training or in handbooks or
 3   anything like that as being a Union steward that
 4   deals with the issue of whether your notes are
 5   admissible into system board or arbitration
 6   hearings?
 7      A.   Yes, that --
 8      Q.   You have been told about that?
 9      A.   Correct, that that's why I take the notes,
10   number one, so you have the record of what occurred,
11   but then also that it could be used in any kind of
12   proceeding as it went down the line, whether it's a
13   step 2 or up to arbitration.
14          MS. GEHRKE:  I'm going to object and move
15   to strike.  We've already had a ruling on this that
16   these notes on both sides are not admissible.  So I
17   don't know the relevance of that testimony.
18          MR. CHAPPELL:  We've also had some dispute
19   on what happened there, and he's just testified that
20   he's been told that one of the reasons he is to take
21   these notes is that they can be used later on.
22          THE ARBITRATOR:  I'll let him explore this
23   line and let's see where it goes.  I'm not ruling on
24   whether these notes are admissible.  I'm just
25   letting him explore that.

Charlene Carter - Vol. 1                          December 7, 2017

286

```
 1   BY MR. CHAPPELL:
 2        Q.   As part of what you've been told in your
 3   duties as a shop steward, the fact that they could
 4   be used or may be used in arbitration or system
 5   board, does that affect your responsibility on how
 6   you take those notes?
 7        A.   As the shop steward, responsibility is as
 8   accurately as possible to reflect what occurred in
 9   the meeting because it's the only record that we
10   have since there's no actual recording like audio
11   recording or video recording or anything like that,
12   that notes are the, in a sense, like your official
13   record of what occurred.
14        Q.   And during Charlene Carter's fact finding
15   in March of this year, did you take such notes?
16        A.   Yes.
17        Q.   And did you review them shortly after the
18   hearing?
19        A.   After the fact finding?
20        Q.   Fact finding, yes.
21        A.   So as I typed them -- basically it's like
22   anything else, you have to shorthand and write, you
23   know, and then basically you go in and type them up.
24   They have to be written in a certain format where
25   you put the initials and there's kind of a standard
```

Charlene Carter - Vol. 1                                    December 7, 2017

287

```
 1   format that the shop stewards are supposed to follow
 2   so that they're kind of all uniform so when the
 3   grievance staff or whoever would look at them,
 4   they're not, you know, done ten different ways.
 5        Q.   And you followed all that format that you
 6   have been trained to do?
 7        A.   Yes.
 8        Q.   Okay.  And when you reviewed them, you --
 9   in your opinion, they accurately reflected what had
10   gone on in the fact finding?
11        A.   Yes.
12             MR. CHAPPELL:  Because we have an issue,
13   I'm going to renew my request that his notes be
14   entered into the record here to --
15             THE ARBITRATOR:  What do you intend to
16   show by the use of his notes?
17             MR. CHAPPELL:  Well, I think they give the
18   full view of what the -- was presented at the fact
19   finding, which is the crucial thing of what the
20   Company knew about this issue that goes to your
21   determination of whether they had just cause.
22             MS. GEHRKE:  May I respond?
23             THE ARBITRATOR:  What specifically are you
24   trying to establish through his notes?
25             MR. CHAPPELL:  Well, one of the things
```

Charlene Carter - Vol. 1                           December 7, 2017

288

```
 1    that I'm trying to establish through his notes was
 2    exactly that the grievant felt that she was always
 3    sending these messages, including the ones in
 4    question, to and because of the Union, not on a
 5    personal basis.  And the back and forth is reflected
 6    in here.
 7              There's also the specific questions asked
 8    and the answers that relate to the issue of whether
 9    she admitted that the videos were graphic as opposed
10    to admitting that they were sent.  It also shows the
11    various questions of management.  There were two
12    times that Mr. Click had to leave the room.
13              THE WITNESS:  Sullivan.
14              MR. CHAPPELL:  I'm sorry, not Mr. Click,
15    Mr. Sullivan.  Thank you for correcting me.
16              THE WITNESS:  Happens a lot actually.
17              MR. CHAPPELL:  Their both first names are
18    Chris and they've both been in the Union.
19              And so I just think that it helps to give
20    the total view.  You are free to give it what weight
21    you want, but as you also take the testimony of the
22    different sides, you have another document to look
23    at to decide those questions.  So that's --
24              THE ARBITRATOR:  Sure.
25              MS. GEHRKE:  Thank you.  I've got a couple
```

Charlene Carter - Vol. 1                         December 7, 2017

289

```
 1   of points on this.  First of all, in terms of the
 2   content of the notes, I think the purposes for which
 3   he wants to introduce them or what he's purporting
 4   to want to introduce them for, you know, Ms. Carter
 5   can testify through her own voice what she said
 6   during the fact finding meeting as to the reasons
 7   why she sent the messages to Ms. Stone.  I'm finding
 8   it a little hard to believe that we're even debating
 9   whether or not these messages are graphic, and we'll
10   have testimony that she's admitted in writing that
11   they're graphic.
12           And I think we've already established, and
13   if the Union attorney was still here, that there is
14   the practice and a very firm practice that these
15   will not be introduced into notes, the notes will
16   not be introduced into evidence.  And I think, you
17   know, he can ask him his questions and get his best
18   recollection the same way we just did with our
19   witnesses.  We didn't have the benefit of the notes
20   to go line by line with them.
21           So I think it's inappropriate to admit
22   them both on the merits and the substance of what
23   they are and in terms of the practice under this
24   collective bargaining agreement.
25           THE ARBITRATOR:  All right.  He's here.
```

Charlene Carter - Vol. 1                    December 7, 2017

290

```
 1  Are you available tomorrow?
 2          THE WITNESS:  I can be.  I live in
 3  Colorado, so --
 4          THE ARBITRATOR:  No, I don't want to do
 5  that.  Here's what I'm going to do.  Are you aware
 6  of your notes as a steward ever having been
 7  introduced into evidence in any proceeding, either
 8  it's system board or arbitration?
 9          THE WITNESS:  I don't know specifically,
10  but I can tell you for a fact that all along in the
11  last 12 years, I was also the domicile rep for
12  Denver, that we've always been told that our notes
13  are really important and can be used in proceedings
14  all the way down and that's why they need them.  Can
15  be in courts, you know, they were -- could be put
16  into a court of law.
17          THE ARBITRATOR:  Okay.  I want you to
18  pursue what line of questions you want, let him
19  refer to his notes to refresh his memory.  I'm not
20  going to allow the notes into evidence.
21          MR. CHAPPELL:  But he can have the
22  notes --
23          THE ARBITRATOR:  Yes.
24          MR. CHAPPELL:  -- in front of him.
25          THE ARBITRATOR:  Yes.  We get into we'll
```

Charlene Carter - Vol. 1                                    December 7, 2017

291

```
 1   bring your notes and we'll -- I --
 2            MS. GEHRKE:  Well -- sorry.  I would just
 3   ask the arbitrator to take that into consideration
 4   when he's weighing the credibility of the witnesses
 5   because my witnesses did not have the benefit of
 6   that.
 7            THE ARBITRATOR:  No, I understand that.
 8            MS. GEHRKE:  Thank you.
 9            THE ARBITRATOR:  All right.
10            MR. CHAPPELL:  Those are the notes in
11   question, right?
12            THE WITNESS:  Yeah.
13            MR. CHAPPELL:  I'm just making sure
14   that --
15            MS. GEHRKE:  Do you have a copy for me
16   to --
17            MR. JENNINGS:  Yes.
18            MS. GEHRKE:  Thank you.
19            MR. CHAPPELL:  If you want a copy to go
20   along, if she doesn't object.
21            THE ARBITRATOR:  No.
22            MS. GEHRKE:  Don't pour salt on the
23   wounds.
24            MR. CHAPPELL:  Okay.  I want to be with
25   the arbitrator as well.
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1              THE ARBITRATOR:  All right.  So let's have
 2    a line of questioning about who said what as best he
 3    recalls referring to his notes, and I will keep
 4    credibility issues and your concerns in --
 5              MS. GEHRKE:  Thank you.
 6              MR. CHAPPELL:  And I will ask him if he
 7    can answer it generally, go ahead; if he feels that
 8    he needs to look at the notes, then to do it so we
 9    can --
10              THE ARBITRATOR:  Sure.
11              MS. GEHRKE:  Can I make a request that we
12    put the notes aside unless he needs them for
13    recollection?
14              MR. CHAPPELL:  He turned them over.
15              MS. GEHRKE:  Perfect.  Thank you.
16              THE ARBITRATOR:  Okay.
17    BY MR. CHAPPELL:
18       Q.    Okay.  Was Ms. Carter asked by any of the
19    Company officials or anyone else whether she thought
20    the videos were graphic?
21       A.    I don't recall that particular question.
22    I know that they asked what was the content of the
23    message and, you know, what did it show, and I know
24    she answered that.  But as far as what adjective was
25    to describe it, no.
```

Charlene Carter - Vol. 1                                    December 7, 2017

293

 1        Q.   Do you remember that in asking some of the
 2   questions, management prefaced the question with
 3   describing the videos as graphic?
 4        A.   Yes.
 5        Q.   Okay.  But you didn't understand that her
 6   answer to whether she had sent the videos was an
 7   affirmative answer that she agreed they were
 8   graphic, correct?
 9        A.   Correct.
10        Q.   Was there anything -- you discussed
11   earlier about the general nature of how the fact
12   finding occurs and the different things that happen.
13   Was there anything unique about this fact finding
14   that was different from the others?
15        A.   Well, like I stated earlier, the normal
16   procedure is that somewhere during the meeting that
17   the management representative would either read the
18   complaint or whether it's from a passenger or
19   another flight attendant or employee or a
20   irregularity report, but at no time during the
21   meeting was there any specific complaint read like
22   this is what this person is saying you did and this
23   is why they're feeling harassed or whatever.  They
24   didn't -- there was no -- it was just questions
25   about the content of what you sent, why did you send

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1    it, whatever, but not what was the actual complaint.
 2         Q.   So the e-mail that the flight attendant
 3    had sent to management that started the
 4    investigation leading to the fact finding was not
 5    read?
 6         A.   No, it was not.
 7         Q.   Was there anything else different about
 8    this fact finding or the subject matter or who was
 9    bringing it or anything from the usual ones you deal
10    with?
11         A.   Well, there were three management.  What
12    was not normal was that all three management people
13    were all participating in the meeting.  Usually when
14    you're taking notes, your job is to take notes.
15              So there was a counsel from the Company
16    that was on the phone.  I'd have to look at the
17    notes for a name, but I know it's written in there,
18    and then -- on like a conference call type thing.
19    Then there was the base manager and the assistant
20    base manager, where normally like let's say the
21    manager, usually the senior person would run the
22    meeting and then the other person would be taking
23    notes, but in this case all three were throwing
24    questions and participating.
25         Q.   Did you have to take a break during the
```

Charlene Carter - Vol. 1                                  December 7, 2017

295

 1  fact finding because of this different -- having

 2  three people asking questions and things like that?

 3       A.   Yes.  As far as I remember, I took three

 4  breaks, which I had never done before.

 5       Q.   And what were the reasons for taking those

 6  breaks?

 7       A.   The first one I know was because I was

 8  having a disagreement with the Company counsel on

 9  how posts are -- how people can view posts on

10  Facebook.  I thought what she was saying was

11  incorrect and I tried to state that and then she

12  basically was not listening to me and said she was

13  asking the flight attendant.  And then I said, well,

14  that's fine, but what you're saying is not correct.

15  And, you know, and then eventually I'm like, okay,

16  we need to take a break.

17       Q.   And the other two were the same, or were

18  they different reasons?

19       A.   Different reasons but similar where the

20  line of questioning I thought was maybe improper,

21  whatever.  Usually, like I said, I've never taken

22  three breaks before.  In fact, I've only ever taken

23  one break once, and that's because the person was

24  emotional.  But otherwise, it's just a matter of

25  we're having -- we're not getting anywhere here, we

```
 1   need to stop for a minute and take a break and come
 2   back and restart this.
 3        Q.   So is it fair to say at times it seemed to
 4   get a little contentious?
 5        A.   Yes.
 6        Q.   And that was out of the ordinary of these
 7   other hundred that you've dealt with?
 8        A.   Yes.
 9        Q.   Did you draw any -- never mind.  Strike
10   that.
11             During the fact finding session, did you
12   know or suspect the identity of the complainee
13   flight attendant?
14        A.   Yes.
15        Q.   And was that know or suspect?
16        A.   Know.
17        Q.   You knew who it was?
18        A.   Yes.
19        Q.   Okay.  And who was that?
20        A.   Audrey Stone.
21        Q.   And who is Audrey Stone?
22        A.   The president of TWU Local 556.
23        Q.   Okay.  And was there anything -- what was
24   your reaction to being the shop steward for a flight
25   attendant who had been complaints filed against by
```

Charlene Carter - Vol. 1                                    December 7, 2017

297

```
 1   the president of your Union?
 2        A.   Well, I've never represented anyone who
 3   was brought before management by a member of the
 4   executive board of TWU Local 556.
 5        Q.   So you had never been involved in any kind
 6   where the president or any executive board member
 7   had brought charges against a fellow flight
 8   attendant?
 9        A.   Correct.
10        Q.   Now, you know the nature of these charges
11   dealing with abortion videos and pictures, correct?
12        A.   Yes.
13        Q.   Okay.  Did that change at all your
14   thoughts about that your president was bringing
15   charges against another flight attendant?
16        A.   No.
17        Q.   So the nature of the communications didn't
18   change your view?
19        A.   No.
20        Q.   And what is your view of your president
21   filing charges against another flight attendant?
22        A.   Well, for the longest time the kind of
23   party line for the Union is that we need to talk to
24   each other first.  And then if that -- if we're
25   unsuccessful of trying to work it out amongst
```

Charlene Carter - Vol. 1                              December 7, 2017

298

```
 1   ourselves, whether on the aircraft or off, that our
 2   next step should be to go to professional standards,
 3   which is an avenue that we can try to mediate a
 4   situation before involving management.  So, be
 5   irregular for a Union leader to skip those other
 6   steps and go directly to management.
 7        Q.   During the fact finding were the actual
 8   videos that Charlene had sent to Audrey shown to you
 9   and the people there?
10        A.   No.
11        Q.   You just had still pictures like this?
12        A.   Yes.  It was like printed like this, like
13   it was a printed screenshot or something like that.
14   It wasn't --
15        Q.   Okay.  And yet you obviously looked at
16   these screenshots and know what they depict.
17        A.   Yes.
18        Q.   Okay.  And that didn't change your opinion
19   about the president --
20        A.   No.
21        Q.   -- filing?  And then during the fact
22   finding, is it your recollection of whether
23   Charlene's point was that she was sending these
24   videos to Audrey as a individual because of some
25   beef with Audrey herself or because she had a beef
```

Charlene Carter - Vol. 1                    December 7, 2017

299

```
 1   with the Union and Audrey was the president?
 2        A.   I think it had more to do with the
 3   president, being the president of the Union, not a
 4   personal thing.
 5        Q.   And so you didn't see the videos and the
 6   messages as a personal thing between two flight
 7   attendants?
 8        A.   No.
 9        Q.   What is -- as a shop steward and one for
10   over 12 years, if there is a dispute that a or an
11   issue that a flight attendant has with the Union,
12   would you consider that like an internal or a
13   dispute within the Union?
14        A.   Yes.
15        Q.   Okay.  And what is your position as a
16   Union steward on what the Company should do when
17   there is such a dispute within the Union?
18        A.   Well, I believe that the Company -- it's
19   kind of like unless it directly affects you, there's
20   a fine line between -- it's like especially at
21   election time for the Union, it's kind of that's a
22   Union matter.  The Company seems to say this is a
23   Union matter, we're going to let the Union handle
24   that in-house, and then unless directly requested
25   we're not going to interfere.
```

Charlene Carter - Vol. 1                    December 7, 2017

300

```
 1        Q.   So basically the Company should stay out
 2   of such matters?
 3        A.   Yes.
 4        Q.   Then what was your understanding of what
 5   were your notes on Audrey's response to the
 6   questions about why she had sent these Messenger
 7   videos and still pictures to Audrey?
 8        A.   There wasn't any ever -- there was never
 9   presented any statement from Audrey Stone during
10   that meeting as to any of this at all.
11        Q.   And was there a reference in that meeting
12   to Audrey's feelings at all about receiving this
13   or -- well, answer that one.
14        A.    Not that I recall directly.  The only
15   thing I remember is that towards the end of the
16   meeting, the assistant base manager, Meggan Jones,
17   was making statements.  And I asked her if this was
18   her view on this, it was her opinion on that, or if
19   that was the complaint that was actually being
20   lodged by Audrey Stone, because I had never seen --
21   there was no complaint presented.
22        Q.   And did she answer your question to which
23   it was?
24        A.   Not directly, no.
25        Q.   So you don't feel you got an answer?
```

Charlene Carter - Vol. 1                          December 7, 2017

301

1          A.    No.

2          Q.    Was it your feeling that her expressions

3    were her personal views and not reflecting the

4    complainant's?

5          A.    I felt that the statements that Meggan was

6    making were her own personal views on the situation.

7          Q.    Did Ms. Carter explain to management what

8    she was hoping to get from Audrey by sending these

9    videos?

10         A.    Yes.

11         Q.    And what was her wish or hope?

12         A.    That she was looking to have a dialogue

13   with her about -- had to do with kind of the women's

14   march and why the Union was supporting certain

15   things and that she just wanted to talk to her about

16   that because she didn't feel that the Union should

17   be doing that.

18         Q.    And did she also -- did Ms. Carter also

19   express whether she had attempted to reach Audrey by

20   other means to have this dialogue?

21         A.    Not about this issue, I don't believe.

22         Q.    This march or this -- okay.

23         A.    I don't think so.

24         Q.    And did Ms. Carter mention anything about

25   the basis for her personal belief on abortion and

Charlene Carter - Vol. 1                                    December 7, 2017

302

```
 1   potentially trying to stop people from having
 2   abortions?
 3        A.   Yes, she shared a personal story of
 4   something that had happened to her when she was
 5   younger and that how she -- and what she went
 6   through and that she didn't want that to happen to
 7   anyone else and that's why she felt so strongly
 8   about it.
 9             MR. CHAPPELL:  I have no other questions.
10             THE ARBITRATOR:  Thank you.  Your witness.
11                  CROSS-EXAMINATION
12   BY MS. GEHRKE:
13        Q.   Mr. Sullivan, you testified that you asked
14   for three breaks during the fact finding meeting.
15   The first one you testified that there was some kind
16   of disagreement with the person on the phone from
17   the Company about how posts can be viewed on
18   Facebook and that you called for the break.  What
19   was the purpose of taking the break?
20        A.   Basically at that point I was having an
21   argument with the lawyer about Facebook and how it
22   operates and how posts are presented on Facebook,
23   and she was not allowing me to have the conversation
24   with her.  She said she only wanted to speak to the
25   flight attendant directly, but I believe the
```

Charlene Carter - Vol. 1                              December 7, 2017

```
1   questions that she was asking at the time were
2   improper because that's not how it worked.  And I
3   was trying to explain to her how it worked, and she
4   didn't want to hear anything about it.  So I said,
5   okay, well, we're going to take a break for a
6   minute.
7        Q.   Now, you mentioned that the person on the
8   phone you thought was a lawyer.  Is that right?
9        A.   Correct.
10        Q.   And do you recall that person's name?
11        A.   I'll tell you if you want me to flip it
12   over.
13        Q.   I'll ask you -- if you don't know off the
14   top of your head, I'll ask you a couple of names.
15        A.   I don't know.  I know the initials are
16   D.G.  I remember that much.
17        Q.   Does the name Denise Gutierrez ring a
18   bell?
19        A.   That sounds good.  That's D.G.
20        Q.   Okay.  And if I told you that she was a
21   member of the employee relations department at
22   Southwest, does that ring a bell?
23        A.   That sounds about right.
24        Q.   And do you know for certain that she was a
25   lawyer as opposed to just a member of that
```

Charlene Carter - Vol. 1                                    December 7, 2017

304

```
 1    department?
 2         A.   I thought I was told that she was like a
 3    counsel, you know, like a legal counsel was going to
 4    be who was on the phone.
 5         Q.   But you don't know for sure?
 6         A.   I do not know for sure.  I never met her.
 7         Q.   And then you testified that there was a
 8    second break because you felt that there was -- it
 9    was getting contentious, there wasn't really a lot
10    of progress in the questioning, and you called for a
11    break, correct?
12         A.   Correct.
13         Q.   What was discussed with Ms. Carter during
14    that second break?
15         A.   Probably whatever was being -- I don't
16    know specifically.  I can't remember specifically
17    what was discussed.
18         Q.   Do you remember what you spoke to
19    Ms. Carter about during the first break?
20         A.    It was about Facebook and about the posts
21    and how the posts were made to verify that I was
22    correct in how they perceived and how somebody views
23    a post on Facebook.
24              Once you post it, if you -- you have to
25    click on something and how many clicks you would
```

Charlene Carter - Vol. 1                          December 7, 2017

305

 1   have to take to actually view a video, how many
 2   clicks you would have to look to see a picture or
 3   something like that.
 4        Q.   And were you at the time during the fact
 5   finding meeting, were you guys discussing posts that
 6   were made to Ms. Carter's public time line?
 7        A.   I'm sorry.  During -- at what point?
 8        Q.   During the fact finding meeting you said
 9   there was discussion about how things are viewed on
10   Facebook and the posts.  Are you talking about posts
11   on the time line?
12        A.   I was talking -- my original discussion
13   with whoever this person was was about the posts
14   that she sent or the message that she sent to Audrey
15   Stone, because that was the main thing is if
16   somebody is going to see this picture or these
17   videos, how does that present itself on the Facebook
18   page.
19        Q.   Okay.  So we had two different posts, I
20   believe, that -- let me ask you.  Was the discussion
21   during the fact finding meeting regarding private
22   Facebook Messenger posts to Ms. Stone as well as
23   public Facebook time line posts that Ms. Carter had
24   made with the abortion videos, both?
25        A.   I know the first part, yes.  The second

Charlene Carter - Vol. 1                                    December 7, 2017

306

```
 1   part, I know that there was a discussion about a
 2   post on her page that had to do with Israel, but I
 3   don't know about -- I don't recall that specific
 4   about posts, that post being on her personal page.
 5        Q.   Do you recall the Company asking her
 6   questions regarding abortion videos being on her
 7   public Facebook page?
 8        A.   I can't say for certain a hundred percent
 9   without looking at notes or anything like that.
10        Q.   And I don't want your notes.  Thank you.
11        A.   I'm not going to --
12             MR. CHAPPELL:  Well, I would like him to
13   answer it correctly and we'd like him to refresh his
14   recollection by looking at the notes because they do
15   clearly answer her questions.
16             THE ARBITRATOR:  I think that's
17   appropriate.  Arbitration is a search for the truth.
18   It's not to see who wins by a preponderance of the
19   evidence.  So if it gives me more information, I
20   don't want the notes, you can look at your notes and
21   see whether or not you recall a discussion about the
22   public posting.
23             THE WITNESS:  Okay.
24             MR. CHAPPELL:  So you can take time to
25   look at that and see if that helps clarify her
```

Charlene Carter - Vol. 1                                    December 7, 2017

307

```
 1   questions about the break and all of that.
 2   BY MS. GEHRKE:
 3       Q.   It may make it easier for you that it was
 4   probably around a discussion of her being in uniform
 5   and you mentioned the Southwest pin.  That was
 6   around the discussion.
 7       A.   Okay.
 8       Q.   Go ahead and answer if you know.
 9       A.   Okay.  So it says that there were -- there
10   was a question about posts that she had made on her
11   personal page about abortion, and the question was
12   to why -- why did you post that.  And that's where
13   she went into her personal story of what had
14   happened to her.
15       Q.   Okay.  And you mentioned that you had
16   asked for a third break during the fact finding
17   meeting, correct?
18       A.   As far as I remember, yes.
19       Q.   But I don't think we ever heard any
20   testimony as to why you called for that third break.
21   Do you recall?
22       A.   I don't recall specifically, no.
23       Q.   Do you know if that would be reflected in
24   your notes?
25       A.   It should be.
```

Charlene Carter - Vol. 1                                    December 7, 2017

308

1       Q.   Would you like to look?

2       A.   Sure.

3       Q.   Go ahead.

4       A.   Okay.

5       Q.   Okay.  Do you know why you took the third

6    break?

7       A.   Yes, because at that point there were

8    questions that -- may I look again to see who asked

9    that question?  Sorry.

10      Q.   Go ahead.

11      A.   Okay.  There were repeated -- the same

12   question was coming up again and again basically by

13   each member of management was asking the same

14   question.  It was a question that had been asked and

15   answered, so I just felt like we weren't getting

16   anywhere, and I'm like, this question's been

17   answered before, let's keep moving forward.  And

18   they continued to ask the same question, so I took a

19   break.

20      Q.   What was the subject matter of those

21   alleged repeat questions?

22      A.   So it was the idea is why do you -- why

23   did you think that you should send this message, why

24   did you send this message.

25      Q.   You mentioned earlier or you testified

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1    earlier that one of the reasons that this fact
 2    finding meeting seemed a little unique to you was
 3    because you and Ms. Carter were kind of not given a
 4    letter or complaint or anything in writing to kind
 5    of detail the nature of why you were there, correct?
 6         A.   Correct.
 7         Q.   But you understood why you were there
 8    before you attended, correct?
 9         A.   Yes.
10         Q.   And you testified earlier that -- let me
11    ask you this.  You testified that you had
12    participated in other harassment fact finding
13    meetings, right?
14         A.   Yes.
15         Q.   And during that fact finding meeting or
16    meetings, was the harassment complaint actually
17    presented to the grievant or to the accused during
18    that meeting?
19         A.   So it's presented in a verbal form.  It's
20    never passed across, like you don't get a piece of
21    paper.  The only time you ever see like a piece of
22    paper in your hand usually is if it's a customer
23    complaint with the name blacked out or whatever.
24    If it's a irregularity report or something to that
25    effect from another employee, then it's usually read
```

Charlene Carter - Vol. 1                                    December 7, 2017

310

 1   by one of the management representatives.
 2        Q.   Are you aware that the Company usually
 3   tries to keep harassment complaints and the origin
 4   of the harassment complaints confidential?
 5        A.   Yes.  That's why it's always part of any
 6   type of that meeting is always prefaced with the
 7   whole procedures on retaliation and all that kind of
 8   stuff all throughout the meeting.  So that's always
 9   in there, but they do read the complaints or state
10   the exact nature of the complaint during the
11   meeting.
12        Q.   Okay.  Now, you testified that sometimes
13   the Company will not get involved in dispute
14   involving two flight attendants if it feels that
15   it's a Union matter unless they're requested to get
16   involved.  Is that right?
17        A.   Correct.
18        Q.   Would you agree that in this instance
19   Ms. Stone did ask the Company to get involved --
20        A.   Yes.
21        Q.   -- by filing the complaint?
22        A.   Yes.
23        Q.   And you testified that you saw the still
24   shots of the two abortion videos that were kind
25   of -- form the basis of the complaint, correct?

Charlene Carter - Vol. 1                                    December 7, 2017

311

```
 1          A.    Yeah, it looked just like that.
 2          Q.    Did you actually watch the videos during
 3    the fact finding meeting?
 4          A.    No.
 5          Q.    Have you ever watched the videos?
 6          A.    No.
 7          Q.    Okay.  So you have no basis to say whether
 8    or not they were graphic or not?
 9          A.    No.
10          Q.    And if I heard you correctly, you
11    testified that your practice is to take handwritten
12    notes during the fact finding meeting?
13          A.    That's the practice of all shop stewards
14    and management during fact findings.
15          Q.    And that's what you did in this case,
16    correct?
17          A.    Yes.
18          Q.    And then you'll later go back and kind of
19    take your shorthand and type them up?  Is that
20    right?
21          A.    Correct.
22          Q.    And that's the notes we have here,
23    correct?
24          A.    Correct.
25          Q.    Okay.  If I look at your notes, it looks
```

Charlene Carter - Vol. 1                                    December 7, 2017

312

```
 1    like that's about seven pages?  Does that sound
 2    about right?
 3         A.   Yes.
 4         Q.   And did you sometimes ask for the fact
 5    finding meeting to pause for a moment so you could
 6    catch up on your notes?
 7         A.   I don't remember specifically in this
 8    instance, but that's common that somebody may be
 9    behind a little bit and then catch up, so yes.
10         Q.   And you mentioned that Meggan Jones was
11    present during the fact finding meeting, correct?
12         A.   Yes.
13         Q.   And she was there primarily as the Company
14    representative to take their notes, correct?
15         A.   Yes.
16         Q.   And was Ms. Jones there taking notes on
17    her computer?
18         A.   I don't recall, but I know she has in the
19    past.
20         Q.   Okay.  So as far as you're aware, that's
21    her practice is to take the notes on the computer in
22    realtime?
23         A.   Yes.
24         Q.   If I told you that Ms. Jones' notes total
25    17 pages, would you agree with me that they're
```

Charlene Carter - Vol. 1                               December 7, 2017

313

```
 1    probably more accurate than yours at seven pages?
 2         A.   I would not agree with that, no.
 3         Q.   Why not?
 4         A.   Well, that's an assumption that hers are
 5    more accurate than mine.  I don't -- I would
 6    disagree.
 7         Q.   Would you agree they probably include more
 8    detail that yours don't?
 9         A.   I would not agree, no.
10         Q.   How well do you know the Union president,
11    Ms. Audrey Stone?
12         A.   I've known her for at least ten years.
13         Q.   Did you ever work with her out of the
14    Baltimore airport?
15         A.   Yes.  She was a friend of mine from a long
16    time.
17         Q.   Did you ever run against Ms. Stone for the
18    Baltimore domicile rep?
19         A.   No.
20         Q.   Do you support Ms. Stone as Union
21    president?
22         A.   In what capacity?
23         Q.   Are you a supporter of the Union recall
24    effort to kick Ms. Stone and her team out of office?
25         A.   Did I sign the recall?  Yes.
```

Charlene Carter - Vol. 1                                    December 7, 2017

314

```
 1        Q.   Mr. Sullivan, what did you do to prepare
 2   for your testimony today?
 3        A.   I looked over the notes a little bit on
 4   the way here, but that's it.
 5        Q.   Did you speak to Ms. Carter regarding your
 6   testimony?
 7        A.   No.
 8        Q.   Did you speak to Ms. Carter's lawyers
 9   regarding your testimony?
10        A.   Just about when I was supposed to be where
11   and when.
12        Q.   Did you speak to them about the content of
13   what they'd like you to testify about?
14        A.   No.
15             MS. GEHRKE:  No further questions.  Thank
16   you.
17             MR. CHAPPELL:  I have a brief few
18   follow-up if that's okay.
19             THE ARBITRATOR:  Sure.
20                  REDIRECT EXAMINATION
21   BY MR. CHAPPELL:
22        Q.   During your 12 years, have they been
23   consistent, consecutive 12 years?
24        A.   Yes.
25        Q.   And during that time how many Union
```

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 463 of 676   PageID 5574
Charlene Carter - Vol. 1                                    December 7, 2017

315

```
 1   presidents have there been?
 2        A.   Three.
 3        Q.   And is there any way that the fact that
 4   you signed the recall petition affected the accuracy
 5   of your note taking of this grievance, I mean of
 6   this fact finding?
 7        A.   Absolutely not.
 8        Q.   And as a Union steward, is it true that
 9   you believe that your duties go to the Union, not to
10   a -- whoever is the current president?
11        A.   Correct.
12        Q.   And that your duties of being a proper
13   Union steward and following the rules have no effect
14   on who is the president?
15        A.   Correct.
16             MR. CHAPPELL:  No further questions.
17                  RECROSS-EXAMINATION
18   BY MS. GEHRKE:
19        Q.   I have a question, Mr. Sullivan.  Are you
20   aware that your Union filed a motion to quash your
21   subpoena to have you come and testify today?
22             MR. CHAPPELL:  I -- that's a
23   mischaracterization.
24             THE ARBITRATOR:  Actually they didn't.  I
25   quashed it.  My bad.  It was done in the motion.
```

Charlene Carter - Vol. 1                        December 7, 2017

316

```
 1              MS. GEHRKE:  Okay.  But he said -- I think
 2   he said that it was an oversight, he didn't know if
 3   he had been served, and he would have --
 4              THE ARBITRATOR:  Didn't observe -- he
 5   wasn't aware of the subpoena.
 6              MS. GEHRKE:  Mr. Richard.  But if he had
 7   been, I think he tes -- or indicated he would have
 8   included it in the motion, because the Union --
 9              MR. CHAPPELL:  Well, accurately state what
10   the motion said.
11              THE ARBITRATOR:  Okay.
12              MR. CHAPPELL:  I think the arbitrator
13   knows what the motion said.
14              MS. GEHRKE:  My point being the Union
15   would have preferred that he not testify, yet here
16   he is today on behalf of Ms. Carter.  So I think
17   that goes to the rele -- his -- where his allegiance
18   lies.
19              THE WITNESS:  I testified because I was
20   the shop steward that represented the flight
21   attendant at the meeting, which my sole
22   responsibility as a shop steward is to represent the
23   flight attendant in question no matter who they are.
24   I've represented plenty of people I didn't like and
25   in situations I didn't like, but that's my job as a
```

Charlene Carter - Vol. 1                                    December 7, 2017

```
 1   shop steward.
 2               THE ARBITRATOR:  So I understand.  I'll
 3   weigh that as part of my determination --
 4               MS. GEHRKE:  Fair enough.
 5               THE ARBITRATOR:  -- on the weight to be
 6   given to his testimony.
 7   BY MS. GEHRKE:
 8       Q.   Mr. Sullivan, would you agree that even
 9   though she's the Union president that Ms. Stone is
10   still a Southwest employee?
11       A.   Correct.
12       Q.   And as a Southwest employee, she's still
13   bound by Southwest's policies on the mission
14   statement, harassment, all those kinds of things?
15       A.   Yes.
16       Q.   Would you agree with me that she's still
17   entitled to the protections of those policies?
18       A.   Yes.
19               MS. GEHRKE:  Thank you.  Nothing further.
20               THE ARBITRATOR:  All right.
21               MR. CHAPPELL:  That's it.
22               THE ARBITRATOR:  Off the record then.
23
24               (Proceedings adjourned at 6:44 p.m.)
25                        -oOo-
```

Charlene Carter - Vol. 1                                    December 7, 2017

318

```
1                    REPORTER'S CERTIFICATION

2

3              I, KAREN L. SHELTON, CSR No. 7050,

4    Certified Shorthand Reporter, certify;

5              That the foregoing proceedings were taken

6    before me at the time and place therein set forth;

7              That the testimony of the witnesses, the

8    questions propounded, and all objections and/or

9    statements made at the time of the proceedings were

10   recorded stenographically by me and were thereafter

11   transcribed;

12             That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14             I further certify that I am not a relative

15   or employee of any attorney of the parties, nor

16   financially interested in the action.

17             SUBSCRIBED AND SWORN TO under my hand and

18   seal of office on this the 15th day of December,

19   2017.

20

                            _____
21                          KAREN L. SHELTON, CSR/RDR/CRR
                            Texas CSR 7050  Exp. 12/31/18
22                          ABC Court Reporters
                            CRCB Firm Registration No. 491
23                          The Nathaniel Barrett Building
                            903 E. 18th Street, Suite 115
24                          Plano, Texas 75074
                            214.303.0ABC (0222)
25                          214.303.0202 (fax)
```

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 467 of 676   PageID 5578
Charlene Carter - Vol. 1                                    December 7, 2017

1

**A**

**abbreviations** 17:8
**ABC** 318:22
**abide** 40:15 46:15
  52:5 53:12
**abiding** 25:7 50:24
**ability** 185:9 224:25
**able** 13:24 15:2
  23:16 26:3 88:2
  103:7 109:19
  113:23 138:20
  139:13 147:19
  149:10 163:21
  172:17 194:10,11
  243:22
**aborted** 29:6,22
  50:6,6 189:13
**abortion** 29:18 30:4
  30:8 32:2,15,18
  35:16 58:2 88:14
  103:11 117:25
  118:8 143:16,23
  144:1,2,12,15,19
  147:21 148:16
  149:5 151:3,18
  156:9,17,22 159:2
  164:10 165:12,16
  167:6 189:18
  191:2 192:14,17
  192:22 193:4,13
  193:15 194:1
  210:18 211:5,18
  216:14 228:12
  229:15 233:20
  248:15 259:9
  261:3 263:6,14
  275:7,15,16
  297:11 301:25
  305:24 306:6
  307:11 310:24
**abortions** 117:17
  302:2
**absolutely** 44:20
  59:2 78:3 79:18
  119:22 161:14
  227:3 259:6,8
  315:7
**accept** 9:18 154:13
  257:18 268:12
**acceptable** 8:23,24
  49:15 58:21 202:9
**acceptance** 55:18
**access** 40:6 46:11
  47:3 48:14 164:22
  235:2
**accompanied** 50:7

**accord** 62:2
**accorded** 154:23,23
**account** 94:19
  163:16
**accountable** 54:2,5
**accuracy** 105:15
  227:2 315:4
**accurate** 67:10,11
  145:20 209:21
  227:4,5 313:1,5
**accurately** 214:8
  270:2 286:8 287:9
  316:9
**accuse** 30:25
**accused** 29:21 31:15
  50:10 309:17
**acknowledge** 46:14
  47:2 48:19 50:23
  51:2 53:10
**acknowledged** 33:25
  51:4 52:2 53:17
  155:8
**acknowledges** 88:23
**acknowledging** 52:3
**acknowledgment**
  4:24 53:23
**acquiring** 56:1
**acquisition** 251:11
**act** 12:12 35:14
  84:25
**acted** 64:6
**acting** 211:25
**action** 21:20,21 32:7
  87:12 130:6
  157:10 318:16
**actions** 33:17,22
  36:1 47:18 235:8
  237:6
**active** 83:16 108:21
  127:6 142:13
  145:5 241:2
**actively** 67:15 110:3
**activities** 35:21
  134:8 137:24
  264:1 267:23
**activity** 179:1,8
**actual** 101:13
  143:12 160:1
  199:6 207:6
  234:20 243:14
  258:24 286:10
  294:1 298:7
**add** 187:9 217:1
**added** 81:9
**adding** 18:21
**addition** 99:5

190:18 196:2
**additional** 9:21
  164:10,19,24
  255:4
**Additionally** 94:13
**address** 7:22 8:2
  10:20 49:9 238:24
**addressed** 214:11
**addressing** 169:18
**adjective** 292:24
**adjourned** 317:24
**adjustment** 14:15
  16:21 83:2 255:10
  255:12
**administration**
  134:12 219:18
**administrative** 7:12
  257:22
**admissible** 285:5,16
  285:24
**admit** 26:18 75:23
  189:20 199:16
  207:11 259:9,12
  289:21
**admitted** 33:4 52:23
  53:1 54:17 56:18
  59:22 63:6 73:14
  76:6 98:4 187:12
  189:17 207:2,5
  210:14 258:8
  259:4 288:9
  289:10
**admitting** 288:10
**advancing** 142:13
**advice** 169:11
**advocate** 130:20
  137:12 141:12
**advocated** 152:2
**advocating** 152:1
  160:15
**affect** 286:5
**affiliation** 30:8
  233:25
**affirmative** 293:7
**AFL-CIO** 67:25
  138:20 259:24
  263:2 274:2
**AFO** 128:15
**aftermath** 267:11
**afternoon** 122:16
  181:20 219:6
  250:12,13
**agency** 30:16 128:15
  133:11,20,25
  134:3 135:2
**agent** 12:20 173:4

220:3
**ago** 90:6 215:1
  230:2 283:24
**agree** 10:11 26:19
  27:4 46:15 82:10
  84:24 85:25 91:2
  195:17 208:17
  230:22 231:8
  238:12 247:18
  310:18 312:25
  313:2,7,9 317:8,16
**agreed** 8:14 19:18
  53:11 77:3 82:19
  207:6,8,17 208:22
  228:14 253:23
  255:18 267:22
  293:7
**agreeing** 9:16 23:23
  52:4 53:18
**agreement** 4:10 7:23
  15:24 18:14 19:20
  25:24 28:24 34:18
  34:24,25 39:5
  79:24,25 81:25
  82:10 85:4,16 86:7
  87:10 97:10
  109:24 110:4,7,17
  114:18 140:4
  141:14 183:19
  184:1 185:16
  207:14 208:15
  225:7 240:19
  242:12 252:5
  267:20,21 284:15
  289:24
**agreements** 25:8
  129:5
**ahead** 10:24 26:17
  81:2 116:20,20
  174:14 239:10
  266:3 267:14
  282:14 292:7
  307:8 308:3,10
**air** 75:4
**aircraft** 75:9 94:8
  298:1
**airline** 7:18 24:25
  35:8 88:3 190:23
  220:4
**Airlines** 1:13 4:12
  6:17,19,21,22 8:19
  28:25 37:11 40:4
  42:6 45:7 50:17
  76:12,14,18 88:12
  94:12 122:18
  123:7,10 126:10

129:17 130:17
  133:6 139:16
  140:6 141:25
  143:8,11 148:9
  151:25 152:6
  153:2,10 155:17
  157:19 158:11
  160:15 164:14,19
  164:23 169:19
  170:14 171:13
  173:20,25 179:17
  181:22 190:13,14
  219:8 229:23
  235:11 243:21
  250:15,25 251:1
  253:12 255:3
  260:5 266:4 267:1
  267:10,24 271:7
**airplane** 75:6,7
**airport** 119:13
  125:22 313:14
**AirTran** 56:2
  251:11
**albums** 89:7
**alcohol** 57:8
**alert** 55:12
**alerted** 7:16
**alerting** 210:4
**allegation** 68:20
  202:1 204:25
**allegations** 85:14
  86:16
**allege** 263:20
**alleged** 77:21 274:25
  308:21
**alleges** 84:4
**allegiance** 316:17
**alleging** 57:7
**allow** 19:16 23:23
  26:12 27:11,24
  61:22 145:25
  149:8 176:24
  184:3 214:15
  215:16 217:10,18
  290:20
**allowed** 24:14 34:15
  108:10 113:24
  139:2 183:18
  194:6,18,19,21
  231:12,16
**allowing** 302:23
**allows** 109:17
**already-existing**
  273:13
**amazingly** 27:18
**America** 141:7,9,11

142:20
**amount** 135:21
  197:16 281:18
**ancestry** 45:18
**ancillary** 12:14
**and/or** 59:15 83:15
  85:6 241:1 270:24
  318:8
**angry** 126:12
**announce** 6:13
**announcement**
  53:11
**Annually** 51:3
**answer** 109:1
  113:21 136:3,15
  156:12 162:13
  167:24,25 207:1
  207:15 214:9
  217:6 232:25
  244:3 274:22,23
  292:7 293:6,7
  300:13,22,25
  306:13,15 307:8
**answered** 132:7
  178:4 207:12
  208:7,11 247:22
  292:24 308:15,17
**answering** 148:22
  162:16
**answers** 112:6 207:7
  288:8
**answer's** 81:23
**Anti-Bullying** 5:6
**anti-harassment**
  46:12
**anti-Union** 126:24
**anxiety** 201:13
**anybody** 78:22
  139:11 157:17
  190:11,14 230:9
  242:5 266:17
**anymore** 236:2
**anyone's** 116:23
**anytime** 68:20
**anyway** 20:10 66:17
  90:2 109:23 187:4
  207:9
**apologetic** 201:6
  235:7 263:5
**apologize** 97:23
  109:22 111:4
  149:15 156:6
  263:13 275:11
**apologized** 235:16
  235:19
**apology** 201:20

**apparently** 18:20
  33:11
**appeal** 252:24
**appealed** 34:5
**appeals** 34:12 252:3
  268:25
**appear** 201:17
**appearance** 129:16
**APPEARANCES**
  3:3
**appeared** 163:24
  189:12 274:9
**appearing** 7:6 17:13
**appears** 96:4 119:15
  272:19
**applicable** 12:19
  55:14
**application** 163:18
  170:1 178:15
**applied** 38:9 42:9
  54:5 62:9 170:2,25
  171:3 245:17
**applies** 116:9 166:22
**apply** 38:10 44:18
  97:11 178:20
  249:10,13
**applying** 170:15
  178:16
**appointed** 252:13,13
**appreciate** 7:14
  10:14 20:1 97:21
  121:3 154:15
  210:4 218:6 232:1
  233:4 276:19
**appreciated** 181:1
**appreciations** 108:7
**approach** 77:9
**appropriate** 20:25
  44:23 45:2 64:10
  79:19 130:6
  160:25 204:6,19
  224:1,4 237:5
  244:9 254:3
  306:17
**appropriateness**
  79:17 202:25
  203:25
**approve** 106:3
**approved** 18:17
**approximately**
  55:22 128:7
  145:12 183:22
  184:14 227:6
  278:19 279:3
  281:10 283:22
**April** 48:12 52:1

125:18 178:11
**arbitration** 1:6
  14:16 18:1 28:15
  36:23 83:3 112:13
  122:6 181:11
  215:11 218:24
  250:4 277:14
  285:5,13 286:4
  290:8 306:17
**arbitrations** 7:18
  15:25 19:9 27:16
**arbitrator** 2:2 6:5
  6:10,23 7:3,8,10
  8:8,12,16,17,22
  9:5,8,12,17,25
  10:2,8,14,22 11:3
  11:8,11,13,17,20
  13:1 15:15 16:11
  17:20 18:8 20:8
  21:14 22:14,19,24
  23:5,8,21 24:20
  25:20 26:7 27:10
  28:13,17 36:6,11
  36:16,20 37:1
  39:25 41:13 51:11
  52:7,14,18,25
  54:12,16 56:17
  58:10 59:21 60:19
  61:18,21 62:7,10
  63:6,9 66:7,14,22
  66:25 70:5,12,17
  71:8,16,20 72:1
  73:5,10,15,18 76:1
  76:5 78:15 80:16
  80:19 81:7,12
  88:19 92:21 94:25
  95:19 97:20 98:2
  99:25 100:3 109:1
  110:22,25 112:8
  112:11 113:10
  114:11,20 116:14
  116:17,20,24
  117:2 121:3,13,17
  121:22,25 122:3,9
  122:19 136:13
  145:25 148:24
  149:2,8 153:23
  154:2,9,12,17,18
  154:18,22 161:21
  163:1 167:16,20
  167:22 168:2,13
  171:16,19 174:16
  174:22 176:22
  178:4 180:2,25
  181:5,8,14 185:20
  186:2,5,8,17,23

187:2,8,11 198:2,5
  203:4,10,17 205:8
  209:23 210:2,10
  210:13 212:12
  215:7 216:25
  217:3 218:3,5,10
  218:13,15,19,21
  219:1 232:12,19
  232:24 233:3
  238:25 239:2,5,8
  239:10,13,16
  240:7,10,12
  249:22 250:1,7
  275:25 276:2,18
  276:23,25 277:5,8
  277:11,17 285:22
  287:15,23 288:24
  289:25 290:4,17
  290:23,25 291:3,7
  291:9,21,25 292:1
  292:10,16 302:10
  306:16 314:19
  315:24 316:4,11
  316:12 317:2,5,20
  317:22
**arbitrator's** 62:14
**area** 96:13 103:9
  138:19 269:10
**aren't** 209:10
**argue** 12:4 34:16
**arguing** 13:14
  234:16,16
**argument** 302:21
**arguments** 9:15
  12:18
**Armstrong** 2:21
  69:16 117:1 150:8
**arrangements** 24:5
**art** 128:14
**article** 7:6 18:2,3
  82:15 240:21,24
**articles** 252:5
  262:13
**artists** 75:6
**ascribed** 102:22
**aside** 86:10 292:12
**asked** 11:6 54:3
  76:24 107:21
  117:8 156:7,12
  164:19 187:19
  193:22,24 198:17
  198:23 200:7,21
  200:23 207:16,24
  208:11,13,16
  217:20 233:21
  247:10,20,20

248:20 259:21
  266:1,3 280:11
  282:14 288:7
  292:18,22 300:17
  302:13 307:16
  308:8,14
**asking** 87:14,15
  113:14 118:6,23
  122:18 148:24
  171:24 188:18
  215:23 243:15
  244:4 259:19
  279:12 280:15
  293:1 295:2,13
  303:1 306:5
  308:13
**asks** 176:11,18
  282:7
**assess** 86:25
**assigned** 110:8,12
  159:16 173:5
  279:23
**assignment** 109:19
**assignments** 109:18
**assist** 182:15 220:12
  222:4
**assistance** 34:14
**assistant** 105:20
  181:25 182:10
  219:16 222:3
  294:19 300:16
**assisted** 187:17
  222:5
**assisting** 251:25
**associate** 6:17 88:3
**associated** 87:24
  129:9 139:14
  192:24
**assume** 95:11,14
  125:7 257:8
  276:21
**assumed** 30:12
  102:8 126:13
  131:24 166:21
  193:1
**assuming** 50:8 66:20
  100:24
**assumption** 101:1
  313:4
**assumptions** 57:17
  58:1,3
**assurance** 251:21
**assure** 84:17
**attached** 5:24 49:13
  153:4,9 268:16
  269:17

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 469 of 676   PageID 5580
Charlene Carter - Vol. 1                                          December 7, 2017

3

**attachment** 153:8
**attack** 30:23 31:21
  35:19 78:4 129:6,7
  129:10,11
**attacked** 29:19 32:3
**attacking** 68:4
**attacks** 29:18 77:2
  130:9,19,25 162:4
  162:10
**attempt** 12:13
**attempted** 200:18
  301:19
**attend** 23:16 132:23
  138:2 141:5,18
  142:10 231:12
**attendance** 33:9
  39:7,9 144:13
**attendant** 28:22
  32:21 34:12 37:23
  38:8 41:22 42:6
  43:25 44:3,13
  46:17 50:18 56:6
  57:7,10 74:11,24
  75:11 88:10,12
  93:7 97:6,8 106:12
  122:23 123:1,9
  129:21 132:20
  155:24 165:20
  173:24 178:3
  183:1 185:2
  190:20,22 219:25
  220:22 223:3,6,14
  225:15,17,21
  229:23 230:11
  235:11 237:23
  248:22 251:2,3,7
  253:12 266:5
  278:3,20 279:1,8
  280:12,13 281:6
  281:15,15 282:1,1
  282:7,11 283:10
  293:19 294:2
  295:13 296:13,25
  297:8,15,21
  299:11 302:25
  316:21,23
**attendants** 20:18,22
  31:19 38:11 41:16
  41:19 43:14 55:1,8
  55:12,20 56:4 57:3
  57:6,9,14 58:18
  59:6 62:25 67:13
  109:18 111:7
  126:13,23 127:5
  127:14,24 128:2
  130:15,21,22

131:25 132:8
135:20 136:4
138:10,21 139:9
139:24 141:8
143:3,11 148:2,4,8
152:1,3,20 165:14
165:22,23 166:2
168:8 169:5,8
170:3,25 171:12
171:25 172:7
175:4,9,11,13,16
175:21,22 176:7
178:2 179:2,5
180:14,16 182:13
182:14 185:10
194:23 220:11
235:5 236:19
249:12,16,17
251:13,17 252:17
252:20 264:24
281:6,12,20,23
299:7 310:14
**attendant's** 243:25
**attended** 34:9 141:6
  160:3 309:8
**attendees** 17:8
**attending** 29:22
  31:16 139:15
  161:9 189:3
**attention** 32:21,23
  82:13 85:19 86:8
  92:25 95:25 97:15
  120:2 166:11
  205:25 240:20
  283:19
**attitude** 41:5 47:11
**attorney** 2:23 6:22
  122:17 289:13
  318:15
**audio** 150:5,6,6,10
  286:10
**audits** 108:7
**Audrey** 3:12 29:4
  87:6 99:23 122:2
  122:12 174:12
  189:8,10,14
  191:20 192:6,23
  192:24 193:6,7,16
  193:25 198:14,14
  198:17,19 199:23
  200:1,22 201:1,2
  204:14 206:22
  208:2,8 211:9,16
  211:24 212:6
  215:21 216:1,5,5,7
  216:8,9,20 221:5

226:14 228:8
244:8 245:23
260:25 262:15
264:19 271:15,22
273:21 274:2,3
275:18,21 296:20
296:21 298:8,24
298:25 299:1
300:7,9,20 301:8
301:19 305:14
313:11
**Audrey's** 193:1
  196:24 260:22
  300:5,12
**authenticate** 149:14
**author** 103:23
**authorize** 18:14
**automatically** 93:7
  163:11
**available** 44:3,11
  46:16,25 49:11,14
  69:9,10 86:13
  112:4 121:5 152:6
  290:1
**avenue** 2:4 298:3
**avenues** 141:15
  152:4,5 234:8
**average** 252:25
**averages** 133:15
**avoid** 34:22
**Avoiding** 5:2
**awards** 108:7
**aware** 10:16 20:19
  53:25 54:4 66:16
  67:5 69:4 85:13
  102:4 117:21
  118:14 129:18
  130:5,14,15
  131:11 143:22
  146:16 159:6,9
  165:18 178:19
  213:19 214:2
  216:10 224:22
  233:24 234:1
  242:5,22 246:3
  248:7 290:5 310:2
  312:20 315:20
  316:5
**awful** 194:1 238:7
**awhile** 80:25
**a.m** 6:3

**B**

**babies** 50:5 58:3
**back** 10:18 35:5
  52:18 67:19 70:15

74:18 82:1,20,22
83:6 85:9 94:24
99:10 107:20,20
111:15 113:8,17
114:17,18 134:5,6
134:21 135:9
146:23 149:10
153:15 154:2
163:22 164:22
166:12,15 170:9
181:5 186:25
187:3 196:24,25
199:22 210:7
216:1,6 218:15
221:21 240:12
245:4 251:6 260:3
266:2,11 288:5
296:2 311:18
**backbone** 40:13
**background** 150:12
**bad** 235:13 243:8
  315:25
**badges** 75:11
**balance** 31:18
**Baltimore** 123:23
  313:14,18
**banner** 143:10
**bar** 139:23
**barely** 35:7 63:9
**bargaining** 4:10
  7:23 13:21 15:24
  18:14 19:19 25:24
  28:24 30:17 34:18
  39:5 79:24 81:24
  82:9 85:4,16 86:6
  87:10 97:9 109:24
  110:4,7,17 134:10
  140:3 141:13
  183:19 184:1
  185:16 240:18
  242:11 252:4
  289:24
**Barnett** 188:3
  222:17
**Barrett** 318:23
**base** 33:20 37:25
  38:1,7,11 39:2
  63:25 64:7 68:19
  76:19,22 77:16
  105:20 106:4
  153:3,17 155:7,14
  155:25 181:25
  182:1,10,12 183:2
  187:17,24 202:8
  205:4 219:16,17
  219:17,20 220:7,8

220:10,14,23
221:4 222:3
294:19,20 300:16
**based** 31:12 42:20
  45:16 57:17 76:15
  76:16 83:14 85:5
  125:22 145:16
  160:8 184:12
  185:11 191:22
  202:25 203:4
  204:4 223:25
  227:22 240:25
  244:17 245:21
  246:19 248:17
  255:13 261:1
  282:15
**bases** 175:8 251:12
**basic** 4:13 5:20 9:20
  24:12 41:9 95:5
**basically** 14:17
  15:12 18:3 60:7
  84:3 141:20
  175:24 183:24
  184:3 185:8
  188:18 196:12
  197:16 226:18
  262:24 269:3
  286:21,23 295:12
  300:1 302:20
**basis** 12:3 20:16
  21:6,18 35:1 83:8
  117:14,16 154:11
  206:9 288:5
  301:25 310:25
  311:7
**bear** 29:17
**Becky** 256:24
**becoming** 124:2
  179:3
**beef** 298:25,25
**began** 37:23 123:14
  125:15 131:24
  178:20 217:7,9
  258:5
**beginning** 55:18
  118:19 124:1
  192:15 207:23
**begins** 169:18
  254:11 269:3
**behalf** 2:25 30:10
  175:20 257:1
  260:23 269:8
  316:16
**behave** 267:25
**behavior** 5:4 49:15

58:21 59:3 94:16
201:21
**behaviors** 42:16
45:22 47:22 48:3
**belabor** 184:21
**belief** 33:15 76:20
191:21,25 193:1
201:16 212:1,25
214:17 301:25
**beliefs** 32:24 33:10
152:9 188:25
189:4 193:25
194:16 212:20
214:17 233:20
235:14 261:10
264:6
**believe** 14:22 16:3
22:17 27:6,20
28:17 39:11 67:13
67:18 74:5 75:14
83:23 84:7 86:11
90:1,6 102:11
103:3 108:15
109:7 115:1,4,9,17
115:20 118:20
128:9 139:11
144:3,4,6 147:11
147:13,16 155:7
163:8 164:3,5
165:9 168:11,18
170:18 172:18
173:12,14 175:18
177:7 180:11
183:22 184:14
190:1 195:23
196:11,22 198:21
200:8 207:23
208:9,11,14,16,20
211:22 221:12
240:4 244:9 260:8
263:19 267:1
284:7 289:8
299:18 301:21
302:25 305:20
315:9
**believed** 76:25 77:3
157:18 170:1
172:14 235:14
258:7,23 263:25
264:18,24
**bell** 303:18,22
**belong** 16:18,18
**benefit** 18:11 289:19
291:5
**benefits** 184:4
**best** 27:21 267:13

276:10 284:14
289:17 292:2
**bet** 66:17 121:22
**Beth** 159:17 256:25
269:22
**better** 27:4 77:16
81:1 93:1 141:14
264:25
**better-than-average**
252:21
**beyond** 18:15
117:10 258:23
**big** 28:4,5 73:6
118:10 193:4
**Bill** 2:3 6:10 115:9
**bit** 61:19 171:22
221:8,21 232:12
232:20 256:1
312:9 314:3
**black** 97:22
**blacked** 309:23
**blanket** 22:21
**blew** 70:23
**block** 164:21
**blocked** 164:12,17
164:18 165:2,7,11
**blood** 116:23
**bloody** 30:24
**blue** 94:3,8 101:24
**board** 14:15 16:21
55:15 83:2 123:24
124:10,11,21
139:11 142:17
160:6,10,12,21,21
185:1,6 214:23
252:12 285:5
286:5 290:8 297:4
297:6
**Bob** 283:6
**Bobis-Armstrong**
6:20
**body** 88:15 144:8
**bold** 48:25
**book** 13:9
**Books** 9:5
**borrow** 99:25
**bothered** 195:1
**bottom** 42:22 51:23
269:9,12
**bound** 317:13
**boundary** 204:16
**bowl** 88:16
**box** 51:15,17,20,22
**Braddock** 2:14
**brand** 204:22
**branding** 119:6

**break** 28:6,10,14
52:15 66:7 112:3
116:21 153:20
155:2 218:12
247:3 294:25
295:16,23 296:1
302:18,19 303:5
304:8,11,14,19
307:1,16,20 308:6
308:19
**breaks** 295:4,6,22
302:14
**Brian** 2:8 6:17
112:16,21
**bridge** 23:9,11
**brief** 88:23 116:18
116:19 124:15
314:17
**briefly** 6:13 20:13
37:20 53:20 63:19
123:6 129:25
184:21 219:14
250:23 277:25
**briefs** 9:13
**bring** 13:10 14:20
15:3,11 21:9 86:4
121:14 137:11
138:10 170:11
209:12 218:8
291:1
**bringing** 13:24
23:24 294:9
297:14
**broader** 41:17
114:21
**brought** 21:7 85:18
86:8 113:8 157:13
230:18 231:4,23
235:25 241:20
257:12 282:11
297:3,7
**budget** 135:24
**build** 87:17
**building** 2:3 137:14
318:23
**built** 204:17
**bullet** 47:20,21 48:1
49:23 50:12
**bullying** 4:16 29:2
31:5 33:23 44:19
46:20,24 47:6,14
47:21 48:3 50:1
59:15 79:11 96:15
98:13 107:13
108:2 120:17
152:23 180:20

204:8 237:7,19
246:20 247:4
248:23 281:16
**bunch** 166:24
**burden** 12:5,17 15:5
28:18
**Burdine** 2:19 6:19
256:14,20 257:3
266:19 269:22
**business** 30:19 49:8
79:9 129:4 131:19
131:20 135:13
140:7,9 161:9
197:24 222:18
253:13 257:21
**button** 74:17 90:8
**bylaws** 124:24 125:6

**———————**
**C**
**———————**
**C** 2:1 6:1
**cabin** 57:3
**cadence** 80:20
**California** 2:9
**call** 19:13 36:12,13
40:10 112:3
116:12 128:18
155:13,19,20,20
155:21,23 156:1,2
183:25 185:1
198:2 200:24
215:20 216:5,7,11
223:2 225:13,15
238:15 277:3
294:18
**called** 26:5 54:21
67:24 71:24 80:1
129:13 153:18
155:12 158:5
168:19 173:4
185:7 193:9
200:25 201:1
205:12 206:10
215:25,25 216:1,8
216:9 302:18
304:10 307:20
**calling** 15:10 27:8
50:7 72:3
**cameras** 26:24
**campaign** 128:3
145:22 175:7
**campaigns** 75:4
126:25
**candid** 136:19
**candidates** 135:5
175:13
**canyon** 94:8

**can't** 9:15 12:4
26:13 35:24 80:24
90:5,6 105:4
108:12 111:17
121:18 132:22,22
156:13,13,14
167:5,14 176:9
197:19 279:4
280:24 304:16
306:8
**capable** 62:14
**capacity** 313:22
**capital** 87:1
**captions** 148:11
**capture** 209:21
**care** 10:15 220:11
**career** 107:25
123:11 130:20
151:24 245:13
**careful** 27:24
**caring** 41:5 47:11
**carried** 143:3
**carry** 142:22
**Carter** 1:8,11 2:18
4:18,24 5:16 6:7,9
7:2 8:20 10:4
17:13,22 20:23
21:1,25 28:22 29:1
29:5,7,9,20 30:2,7
30:11,13,15 31:15
31:17,22 32:14,17
32:22,25 33:4,11
33:17,24 34:3,5,9
34:15,24 35:2,5,23
38:16 46:1,4 48:2
50:3 51:4 52:1
53:16 54:7 57:23
64:3,12 65:18
67:24 68:12 71:12
71:18,25 74:10
75:10,16 78:11,23
79:20 80:2 83:5
86:11 87:6 88:18
90:3,10 95:18,25
100:7,21 102:8,18
103:20,22 104:9
106:16 117:10,24
119:14 128:4
131:7 132:11
138:23 143:19
144:12,21,23
145:2,13 146:5,25
147:8 148:15
149:20 150:3,18
150:23 151:4,7,10
151:13,19 155:4

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 471 of 676   PageID 5582
Charlene Carter - Vol. 1                                    December 7, 2017

5

156:3,17,22 157:4
157:23 158:16,21
159:6,9,12 161:17
162:18 163:4,17
164:11,12 165:16
166:7,20 167:3
172:6,9 177:9,19
182:23,25 183:8
185:12 187:16
188:9,12 189:17
189:18 191:12
192:10 193:11,22
194:4 195:14
196:6 197:2,7
198:7,23,25 199:3
199:9,14,19,22
200:17 201:6,22
202:5,13 204:6
205:12,17 206:7
207:2 210:17
212:14 213:20
214:13,21 215:18
220:18,20,22
221:1,11 226:17
227:14,24 228:3
228:14,19 229:6
229:16,17 230:16
231:11,21 232:6
233:16,19,24
234:3,12 235:7,21
236:14,14,23
238:9 239:25
248:16,18 253:3,5
253:6,17 256:8,20
258:2,5 261:23
262:17 263:5,20
265:18,21,23
267:17,22 268:2,6
268:9 270:6
271:22 272:5,16
272:19 273:21,24
274:10 275:6,15
279:1 283:20
289:4 292:18
301:7,18,24
304:13,19 305:23
309:3 314:5
316:16
**Carter's** 5:11,12,14
30:20 33:20,22
36:3 38:24 40:22
45:24 47:17 49:21
50:15 51:25 57:21
61:14 63:15,17
68:1 69:8 74:1
75:12,13 76:20

77:21 81:16 84:9
85:17 89:21
118:12 143:22
152:14 153:1
158:23 159:18
160:19,22 161:13
173:5 183:13
225:24 226:6
237:6 253:20
254:1 274:16
281:3 286:14
305:6 314:8
**case** 1:9 6:11 13:23
13:25 14:1,2,4
17:11 21:16,17
25:2 34:16 35:12
36:10 38:20,22
39:1 40:22 57:21
68:18 79:6 80:22
87:17 121:12
160:7 161:3
187:21 190:12
205:5 213:25
221:20 222:25
223:2,19 225:6,14
225:24 226:6
238:19 244:15
245:18,25 249:6
253:8 254:3,6
255:4,10 256:2,16
257:9,14,17
259:23 269:2
271:9,12,13
276:11 277:3
279:11,24 294:23
311:15
**cases** 20:25 63:21
78:2,6 80:21 94:15
160:2,11,16 163:6
163:9 170:8
179:14 252:4
265:5,16 267:12
**case-by-case** 22:18
**casts** 213:4
**catch** 312:6,9
**categories** 45:18
**caught** 224:20
**cause** 7:25 8:19,25
9:1 13:22 14:24
15:6 19:22 28:23
120:14 135:1
136:22 137:17
145:19 186:24
191:17 192:16
196:12,21 197:4,5
204:15 211:25

214:19 255:25
261:14 267:2,14
276:14 287:21
**caused** 201:12
**causes** 30:14 33:16
135:9 142:15
**CBA** 36:2 252:19
**CC** 178:10
**CC-1** 5:20 95:19,20
95:22 97:16
**CC-2** 5:21 168:12,14
168:16,18 174:24
**CC-3** 5:22 174:4,5,8
**CD** 5:10 154:7
**cease** 267:22
**center** 1:20 2:9 46:9
64:25
**certain** 49:1 127:9
136:25 139:5
170:21 213:21
280:23 286:24
301:14 303:24
306:8
**certainly** 21:17
**CERTIFICATE** 4:6
**CERTIFICATION**
318:1
**certified** 34:4
225:21 238:23
318:4
**certify** 318:4,14
**cetera** 24:10 45:19
255:7
**chair** 135:17 160:10
161:1 252:15
**chairman** 160:9
**chairperson** 123:25
138:16
**chairpersons** 160:14
**chairs** 161:8
**challenge** 126:6
**challenging** 28:23
**chance** 34:25 80:22
172:19 260:7
267:20,21
**change** 69:15 127:9
178:23,25 255:17
297:13,18 298:18
**changed** 55:11
187:7
**changes** 56:3 170:21
170:23 171:8
178:19
**Chappell** 2:13 3:11
3:14,17,20,23 4:3
6:25 7:1 8:24 9:9

9:14,24 10:1,3,6
10:11,18,23,25
11:5,9,12,14,18
13:2,9,13 15:18
17:21 20:6 21:9
22:17,20 23:13,22
25:1,9,22 26:8
28:6,10 36:9 52:9
52:22 54:14 56:16
58:9 59:20 60:15
60:20 61:8 62:4,8
62:11 63:7,11 66:5
66:19,24 67:2
69:12,20,24 70:7
70:11,22,25 71:6
71:10,14 72:5,9,14
72:17,23 73:3,7,11
75:25 76:3 80:14
80:17 81:8,11,15
88:25 89:2 90:24
91:2,4 92:23,24
93:13,15 94:21,24
95:1,17,20,23
97:18,22 98:3,6,7
99:22 100:2,4
104:15,17 105:23
105:24 109:6,12
110:20,23 111:2
112:10,14,15
113:13 114:4,12
114:25 116:11
117:8 121:2,21
136:12 145:15
148:21 154:10,16
154:20,24 161:23
162:2 163:2
167:25 168:3,6,11
168:15 171:18,20
171:21 174:4,6,24
175:2 177:2 178:5
180:24 185:14
186:12,16 187:3,7
203:3,8,12,15
205:9,11 209:25
210:4,9,12,16
212:13 215:17
217:5,25 232:11
232:14,17 233:1,5
240:8,14,16 248:9
248:20 249:20
270:14 271:19
275:24 276:1,17
276:21 277:21
285:18 286:1
287:12,17,25
288:14,17 290:21

290:24 291:10,13
291:19,24 292:6
292:14,17 302:9
306:12,24 314:17
314:21 315:16,22
316:9,12 317:21
**characterization**
208:1
**characterize** 168:4
**charge** 231:18
**charged** 26:1 137:1
**charges** 172:1 245:2
297:7,10,15,21
**Charlene** 1:8,11
2:18 4:18,24 5:11
5:12,14,16 6:7 7:2
8:20 13:6 28:22
38:16 52:1 53:16
84:4 93:20 94:3,4
94:14 95:24 131:7
131:25 148:1
156:7 182:23
187:25 188:18,20
192:14,25 194:10
204:13 208:21
217:12,14 220:18
238:16 241:13
253:3,11 254:9,14
254:17,19 271:21
279:1,12 283:20
286:14 298:8
**Charlene's** 74:24
93:6,24 185:3
190:12 241:9
298:23
**chat** 71:23
**check** 102:25 112:3
170:19
**checking** 145:6
**cheek** 131:4
**Chicago** 38:1
**chief** 277:3
**child** 189:13
**children** 129:15
162:12
**chilling** 19:14
**choice** 88:15 144:3,5
**choose** 144:7
**chooses** 134:19
**chose** 142:16,19
155:23 192:5
215:6
**chosen** 17:14 127:25
128:3 132:19
139:5,8
**Chris** 124:23 127:18

173:14,15 188:1
197:11 198:13,21
209:6,15,18
288:18
**Christian** 188:23
191:21 212:2
**Christopher** 4:2
277:10,18
**circle** 65:1 102:2
103:15 269:13
**circulating** 58:25
**circumstances** 27:8
45:1 99:9 126:5
265:16
**cited** 179:22 212:5
215:3
**civil** 142:18 143:4
**claim** 61:9 236:7
**claims** 182:20
**clarification** 96:14
98:1 187:20
280:10
**clarified** 191:25
195:3 197:15,17
197:20 198:12,19
198:20 217:23
**clarify** 17:21 194:10
306:25
**clarifying** 217:20
**class** 43:1,3,5,6,10
43:14,18,21 44:14
44:15 96:18,22
97:1,4,5 98:8,16
98:19,21 99:7,13
99:19,20 246:6,7
246:10 247:2,4,6
**classes** 42:21 43:22
119:25 120:8
246:4,15,18,23,24
247:1,7 248:21
249:3,14
**classify** 42:19
**clause** 25:4
**clear** 18:6 22:12,15
22:16,16 71:9 73:3
102:16 256:19
258:22 284:8
**clearer** 66:20
**clearly** 76:11,13
89:8 120:12
237:22 306:15
**click** 118:21 124:23
247:23 288:12,14
304:25
**clicks** 304:25 305:2
**client** 52:13 86:23

102:22 240:9
**client's** 61:1
**close** 145:8 164:1
215:9
**closed** 121:19
163:20
**closer** 10:6 227:9
**clothing** 50:9 101:8
102:23
**clue** 17:10 101:9
**Coast** 26:13
**cocounsel** 7:1 13:3
110:21
**cognizant** 121:18
**cohorts** 265:1
**collaborated** 60:6
**collaborating** 202:2
**colleague** 121:15
**colleagues** 265:1
266:20
**collected** 227:22
**collecting** 223:9
**collective** 4:10 7:23
13:21 15:24 18:14
19:19 25:24 28:24
30:17 34:18 39:5
79:24 81:24 82:9
85:3,15 86:6 87:9
97:9 109:23 110:4
110:6,17 140:3
141:13 183:18
184:1 185:16
240:18 242:11
252:4 289:24
**collectively** 162:4
**College** 2:4
**collude** 158:20
**color** 45:18 272:21
**Colorado** 290:3
**combination** 99:4
**come** 18:1,3,7,10
20:11 22:21 23:10
23:25 24:8 26:4,12
56:7,11 68:23 75:6
80:2 84:14 106:12
114:17,18 138:21
139:13,25 160:17
169:9 172:20
194:22 196:5
198:21 233:16,19
273:18 275:14
278:24 296:1
315:21
**comes** 19:5 27:21
224:22 281:22
**comfortable** 234:25

235:1
**coming** 22:11 78:19
94:2 131:22
178:22 179:1,14
204:20 218:11
266:17 308:12
**commendation**
108:13
**commendations**
108:16
**comment** 16:13
93:14 273:7
**commentary** 70:8
75:3
**commenting** 12:14
**comments** 54:13
57:25 59:9,11
102:6,19,20
103:19,21 104:4,4
167:24 168:1,5
176:4 273:17
**commit** 43:18
**committed** 40:25
86:24
**committee** 29:25
30:11,19,21
123:25 135:25
136:2 137:3,6,7,17
137:20,21,25
138:3,13,14,17,25
139:3,7 140:8
141:4,17,23 194:6
197:23 231:13
**committees** 136:25
**committee's** 135:24
**common** 135:14
136:9 282:9 312:8
**commonly** 55:3
**communicate** 103:6
185:9 234:7,9
**communicated**
199:2,4 225:10
**communicating**
260:24
**communication** 48:4
127:6 151:1
200:22 228:8
234:4 280:20
**communications**
38:3 135:22
198:25 297:17
**company** 2:6 3:8
4:20 7:25 14:24
19:22 21:19 23:23
31:11 34:2,11
38:10,13 40:13

43:24 44:1,1,6
50:19 51:7 53:2,5
53:12,18 54:18,23
55:23 56:19,21
58:7,12,13 59:18
59:23 60:1 61:7
62:16 70:14,20
71:4 73:20,21,24
75:5,20 77:22 84:4
84:17 85:11,13
87:11 88:20 96:12
97:7 99:5 109:14
110:17 115:3,13
117:6 119:7
130:10 146:18,20
146:24 147:2,6,12
150:20 153:11
154:1 157:3 172:2
176:7,12,19
178:16,20 179:8
180:7,12 182:19
184:18 186:13
187:5,6 189:25
190:7 191:1 199:8
201:23 202:2,11
214:20 223:23
226:12 229:17
231:20,23 234:13
235:10 236:13
255:6 257:4,13
258:7,24 262:6
264:5,11,16,18
265:17,24 267:13
280:6,6 282:7
284:16 287:20
292:19 294:15
295:8 299:16,18
299:22 300:1
302:17 306:5
310:2,13,19
312:13
**Company's** 21:21
23:2 29:2 33:23
47:5 48:23 61:14
61:17 63:16 68:10
76:21 86:15
146:23 215:14
234:11 253:16
276:10 277:2
**Company-wide**
249:11,13,15
**comparable** 20:24
**compared** 77:21
133:8
**compelled** 16:9
271:11

**complain** 135:15
136:10 146:24
192:4
**complainant** 258:9
267:6
**complainant's** 301:4
**complained** 31:12
**complainee** 296:12
**complaining** 192:2
**complaint** 29:15
32:9 33:19 71:5
147:3 153:12
158:1,6,18 177:9
177:11 280:15
282:6,13,19,23
283:1,10,14,18
293:18,21 294:1
300:19,21 309:4
309:16,23 310:10
310:21,25
**complaints** 148:4,5
169:13 176:7,12
176:18 179:1
281:5 296:25
310:3,4,9
**complete** 92:15
**completed** 76:22
86:14
**completely** 141:19
170:10
**compliant** 86:6
**complied** 86:14
**comply** 53:18 165:2
**complying** 54:2
**computer** 90:15
188:6 312:17,21
**concern** 24:23 25:6
41:5 47:11 61:3
178:15 229:17
**concerned** 25:7,13
80:19 130:7
234:13
**concerning** 4:14
59:13
**concerns** 25:19 67:9
79:15 157:13
172:5,23 191:20
234:11 236:10
292:4
**concerts** 75:5
**conclude** 119:20
**conclusions** 224:18
**conclusive** 254:23
**condemn** 57:16
**conduct** 31:7,8
49:19,22 83:15,19

84:18,24,25 85:6
86:23,24 87:16
96:12 97:10,13
99:3,6 120:14
182:17,18 201:7
223:12,18 241:1
241:18,23 242:12
**conducted** 78:25
107:18 221:13
254:13
**conducting** 92:15
105:10,14
**conduit** 38:7
**confer** 52:11,12,19
110:21 240:8
275:24
**conference** 27:7
155:13 238:16
294:18
**conferenced** 188:1
**conferred** 18:18
**confidential** 25:2
113:15 114:18
176:9,13,20 310:4
**confidentiality** 25:4
**confirm** 54:4 84:14
225:18
**confirmed** 45:8
**conflict** 22:7 66:16
152:5 281:19
**connect** 243:19
**connected** 104:12
212:9,19 243:25
**connection** 78:5
195:7 201:18
213:18
**consecutive** 314:23
**conservative** 188:23
212:3
**consider** 9:3 15:7
20:24 23:1 66:1,10
66:16 100:14,17
238:2 242:13,17
245:16 246:15
255:22,23 262:16
275:1 299:12
**consideration** 44:22
273:23 291:3
**considered** 29:16
32:4 34:19 45:20
77:23 87:3 98:16
106:14 108:17,18
124:10,11 135:1
137:17 260:1
262:12 275:4
**considering** 81:25

**consist** 148:18 149:6
**consistency** 21:21
170:13
**consistent** 34:1
107:17 169:13
170:15 314:23
**consistently** 179:16
257:11
**consists** 205:24
**constituting** 120:14
**Constitutional**
35:13
**constructive** 172:17
**consult** 78:13 80:15
222:15 266:17
**consultant** 64:7
**consulted** 78:19 79:5
79:8,12 107:17
236:25 266:19
**contact** 12:6 43:16
127:7 147:2
153:17 172:9
200:18,19,22
215:25 223:5,8
225:14 268:6
279:6
**contacted** 63:25
76:23
**contained** 149:9
150:25
**containing** 29:5
**content** 49:1,24
50:13 143:1 289:2
292:22 293:25
314:12
**contentious** 296:4
304:9
**contents** 14:8
254:12,15
**context** 274:5
**continuation** 72:8
**continue** 154:5
**continued** 62:20
117:25 126:18
131:3 152:9 200:9
247:24 308:18
**continues** 72:12
98:21
**continuing** 94:1
**contract** 12:11
20:10 34:8 38:9,14
85:11 108:9
121:14 126:9
132:22,25 133:2
134:10 135:12
140:5 141:16

148:8 257:21
**contractors** 55:15
**contracts** 129:5
**contractual** 133:2
**contrary** 59:2 110:3
**contribute** 30:16
**control** 251:22
**conversation** 33:8
33:12 57:15 170:9
172:17 175:23
281:1 302:23
**conversations**
126:21 127:16
169:7 175:12,17
179:2,13,17,22
**convert** 267:18
**convey** 232:7 236:14
**conveyed** 261:6
**convince** 136:21
**convinced** 172:11
**copies** 19:10 262:10
**copy** 11:25,25 13:7
20:8 41:15,20 47:3
64:15 81:5 82:6
83:23 185:1,3
227:18 291:15,19
**core** 29:20 175:25
204:16
**corners** 13:21
**correct** 16:22 48:12
50:24 54:9 71:13
75:22 82:1,3 83:7
83:10,18,25 84:5
84:11 88:3 90:17
90:22 91:6 95:6,9
96:7 98:22 99:17
99:20 100:16
104:10,20,21
105:1 109:16
110:5,9,13,18,19
118:12 128:11
132:15 146:11
157:8 163:8,25
165:6,24 167:19
167:20 168:1
174:12 178:11
186:21 188:5
209:5,11,17
210:20 213:6,10
213:11 221:24
222:1 224:3
226:25 236:23
237:2 242:14
244:11,24 245:24
248:4 249:1,4
252:9 253:21

254:7 257:5 261:1
261:8,24 262:3
266:13 269:17,18
270:9,10,16
271:22 272:1
274:14 285:9
293:8,9 295:14
297:9,11 303:9
304:11,12,22
307:17 309:5,6,8
310:17,25 311:16
311:21,23,24
312:11,14 315:11
315:15 317:11
318:12
**correcting** 288:15
**correctly** 8:18
137:22 154:25
173:23 189:16
248:14 252:6
272:6 306:13
311:10
**cost** 136:6 139:17,18
139:19
**costs** 139:14 255:22
**couldn't** 147:13,14
152:16 156:11
174:19 207:15
**counsel** 2:21,23 6:16
6:21 7:4,7 12:7
16:22 17:14,23
21:14 35:4 37:16
38:11 114:14
118:6,23 121:9
268:6 294:15
295:8 304:3,3
**counseled** 168:7
169:4
**count** 10:12
**counting** 165:1
**couple** 8:6 95:2
111:20 125:5
130:1 162:6 178:9
221:22 258:11
288:25 303:14
**course** 40:24 45:17
101:6 108:17
251:4 253:13
**court** 12:24 19:4
35:12 113:17
215:10 218:17
267:12 290:16
318:22
**courtesy** 11:25
24:12
**courts** 290:15

**cover** 12:22 139:18
184:20
**covered** 16:4 45:17
97:9 99:19,20
**coworker** 119:1,18
170:12
**coworkers** 75:10
90:11 127:4 179:6
**crackdown** 180:13
**cracking** 179:8
180:17
**CRCB** 318:22
**create** 213:7 214:16
**created** 213:17
275:18
**creates** 212:24
214:17
**credibility** 291:4
292:4
**credible** 27:19
**crew** 74:11 90:7
**critical** 14:22 55:2
56:3 136:20
**criticize** 129:1,2
**cross** 23:9 71:9
204:15
**crossed** 29:19 32:2
152:21 271:9
**cross-check** 68:24
**cross-examination**
3:11,14,17,20,23
4:4 25:14 81:14
162:1 205:10
240:15 270:13
302:11
**cross-examine** 81:3
**crucial** 287:19
**cruel** 59:1
**crusade** 35:14
**CSR** 318:3,21
**CSR/RDR/CRR**
318:21
**culture** 40:18
**current** 35:15 37:14
60:5 67:14 68:1
125:16 131:20
181:24 219:10
250:17 315:10
**currently** 111:8,11
112:21 114:7
115:3 122:22,25
123:2 251:13
277:22,24
**customer** 41:7 57:5
108:7,12 220:2
280:1,14 282:12

282:13 309:22
**customers** 190:14
**CWA** 185:7
**cyberbullying** 47:15
48:2

**D**

**D** 2:13 3:1 6:1
**Dallas** 1:20,22 24:1
24:1,9 219:20
233:7
**damaging** 50:13
204:22
**dangerous** 215:13
**date** 12:4,8 13:4
62:5 85:16,21 86:9
90:20 91:6 164:8
170:20 174:16,17
174:18 257:12
279:4 283:24
**dated** 199:21
**dates** 62:5 140:11
**Dave** 224:7,10,11
**day** 39:12,12 121:15
139:22 145:9
153:18 163:21
164:2 165:3,9,13
225:22 257:21,21
280:23 318:18
**days** 9:21 24:8 35:9
39:14,14 85:12
86:15 108:14
124:17,18 125:5
165:3,5 185:12,24
185:25 266:14,16
**day-to-day** 135:11
160:2
**deal** 13:21 22:17
24:17 62:6 116:3
294:9
**dealing** 169:12
244:5 245:2 246:3
297:11
**deals** 13:17 243:7
285:4
**dealt** 111:17 296:7
**dear** 192:16
**death** 24:6
**debate** 35:21
**debating** 289:8
**December** 1:17
232:20 233:6
318:18
**decide** 152:13 165:4
223:4 224:1,4
226:9 242:17

266:24 288:23
**decided** 17:24 236:1
237:4 269:17
**deciding** 20:25
44:22 82:20
**decision** 8:1 10:10
18:11 19:23 31:17
33:21 34:1,16
78:10,14,20,23,24
79:3,14 106:2,6,9
106:14 144:9
145:24 158:8,17
158:25 161:17
202:10,13,15,16
202:17,20 203:9
203:11 215:15
221:20 224:6,20
225:1,4,9,16 226:4
229:15 236:23
237:1,16,19,25
238:8,12,17
243:14 244:14
245:21 246:19
253:20,23 254:1
255:9,14 257:22
266:8,15,18,22,23
267:8 269:14
276:9,13
**decisions** 77:12,15
83:14 85:5 129:2
159:19 240:25
251:25
**decision-maker**
237:2
**decision-making**
244:24
**declining** 268:11
**deemed** 140:8
**deep** 201:19
**deeply** 32:5 33:18
**defamatory** 50:1
**DEFENSE** 2:14
**definitively** 89:10
**delete** 117:22,22
**deliberative** 16:5
**Denise** 156:5 188:2
222:14 303:17
**denotes** 55:5
**Denver** 33:20
105:21 132:1
153:18 181:25
182:7,8 183:1
205:4,6 219:11
220:7,8,23 290:12
**deny** 36:4 257:17
**denying** 66:20

**department** 2:21,23
20:24 37:16 60:8
188:3 222:16
303:21 304:1
**departments** 62:21
62:22
**depending** 44:16
99:9 249:8 282:18
**depends** 124:9
284:21
**depict** 298:16
**depicting** 29:6
**depictions** 46:7
**deposit** 9:21
**derogatory** 45:20
148:11 179:4
**describe** 45:12 47:5
48:22 53:8 77:8
89:16 93:1 129:25
133:19 143:25
148:25 277:25
292:25
**described** 29:5
82:19 207:10
208:5
**describing** 293:3
**description** 4:9,21
5:19 247:18
**descriptions** 96:21
168:4 272:4
**designated** 188:4
269:10
**designed** 204:11
**designee** 34:11
131:15 252:3
**Despite** 126:1
**detail** 77:19 107:1
134:25 309:5
313:8
**detailed** 107:1,2
227:10,11
**details** 107:4 161:3
254:5
**determination** 14:23
14:23,25 15:9 64:8
82:2 83:5 223:4,25
245:24 246:25
287:21 317:3
**determine** 42:8
223:1,21,22 226:3
226:8
**determined** 18:20
134:6
**determining** 7:24
44:25 85:9 160:7
**develop** 80:20

**devices** 48:4
**dialogue** 126:20
193:17,19,23
199:6,23 200:12
215:19,24 216:23
259:21 301:12,20
**dice** 66:14
**didn't** 14:7 22:14
33:5 81:22,23
88:18 92:5,5,20
97:24 101:2
102:25 116:24
152:18 153:5,6
156:11 157:19,20
157:21 160:24,25
161:1 163:11
167:3 172:8,18,22
179:13 186:19
189:1 191:16
193:25 194:2,22
194:23 195:22
198:1,11 201:17
202:4 203:8,10
209:12 211:8,19
214:14,25 216:1,7
216:13,19 217:10
217:15 230:22
232:20 235:15
239:6 242:20
246:22 249:2
259:2 261:20
263:3 264:14
265:22 274:18
275:20 280:14,15
282:17 289:19
293:5,24 297:17
298:18 299:5
301:16 302:6
303:4 315:24
316:2,4,24,25
**difference** 80:23
88:5 234:19
**differences** 133:7
134:2
**different** 22:5 23:15
29:19 32:2 42:20
50:7 62:21,22,22
75:5 82:7 118:21
119:25 120:8
141:15 148:11,12
152:4 200:11
201:2 216:10
232:8 244:14
248:21 251:19
287:4 288:22
293:12,14 294:7

295:1,18,19
305:19
**differently** 233:14
264:19
**difficult** 24:22 57:18
126:2,4 157:15
158:8 161:4
**digital** 127:15
**dinner** 239:14
**direct** 3:10,13,16,19
3:22 4:3 37:6
83:11 92:25 95:25
97:15 103:25
116:12 122:14
139:17 165:15
171:22 172:4
181:18 205:25
219:4 247:9
250:10 276:7
277:20
**directed** 102:20
128:24 189:14
**directing** 82:12
**direction** 175:10
**directions** 127:1
**directly** 100:10
101:5 102:18
135:8 179:5
191:20 200:5,8
201:2 268:2
270:18 298:6
299:19,24 300:14
300:24 302:25
**director** 34:10 55:9
80:4 224:12,15
250:18,20,21
251:11,15
**directors** 55:15
58:19
**disagree** 313:6
**disagreed** 189:6
196:2
**disagreeing** 255:14
**disagreement**
196:13 260:22,25
295:8 302:16
**disagreements** 31:24
196:18
**disappear** 23:6
**disappointment**
231:11
**discharged** 145:17
**disciplinary** 83:14
85:5 240:25
**discipline** 38:12 39:3
39:5 42:8,11,14,25

44:22,25 49:5
64:10 77:6,9 81:18
81:25 82:20 85:9
86:25 87:4 99:14
107:25 108:5
115:19 116:2
117:14 118:2,3
120:15 133:3
135:12 170:15
179:9,16,19
180:18 221:20
222:24 223:21
224:1,2,5 226:14
237:5 238:3
242:13 245:14,17
245:19,25 246:3
249:7,14 252:1
255:17 274:21
**disciplined** 94:16
97:11 117:10
**disciplines** 116:6
246:6
**discovered** 88:8
**discovery** 12:10,11
12:16 14:1,2 18:13
18:16 20:9 112:7
**discrimination** 4:15
45:13,16 59:14
79:8 97:3
**discriminatory** 50:2
**discuss** 42:8 76:4,19
77:20,25 151:3,6,9
151:12 175:6
189:11 191:7
199:18 200:3
204:3 223:3 229:6
230:15 231:20
257:14 258:5
268:1
**discussed** 50:24
113:7 143:18
190:9,18 191:5
199:20 213:2
216:6 227:23
259:18 293:10
304:13,17
**discussing** 79:2
188:12 305:5
**discussion** 200:16
201:11 202:21
205:20,21 213:1
216:2 273:20
305:9,12,20 306:1
306:21 307:4,6
**discussions** 132:6
160:11 177:13,15

268:5
**disgusting** 152:18
**dishonesty** 43:11
**dislike** 201:14
**disliking** 204:14
**disparaging** 29:9
231:25
**displeasure** 234:17
**disposed** 254:24
**dispute** 17:5,10 19:6
167:22 190:6
258:6,8,17,22
259:16 260:18
264:6 285:18
299:10,13,17
310:13
**disputes** 67:5,20,22
271:5,8
**disrespectful** 49:25
**dissent** 29:12 127:8
**dissenter** 231:7
261:11
**dissenters** 31:23
265:1
**dissenting** 264:20
**distance** 43:15
**distinction** 124:12
**disturbing** 65:22
117:20 194:2
196:16
**divided** 197:21
**divisive** 59:1
**document** 16:15
26:24 41:14,17,20
41:24 43:23 45:10
46:22 48:9,11 51:8
51:9,13 53:6,14
55:21 56:24 58:11
58:16 60:2,10
62:14,15,24 164:5
164:7 180:8
184:17,23 229:1
239:22 246:2
268:22 269:6
288:22
**documentation**
34:20 106:13
164:13 184:22
185:11 186:4
259:23,24 262:1
266:12
**documents** 5:15
12:13 14:3 15:11
16:10 19:2 25:10
26:17,21 27:14
28:3 54:21 64:23

106:18 146:19
180:8,9 203:1,5
204:2 227:17
262:5 275:5
**document's** 59:25
**doesn't** 15:19 26:2
35:5 80:23 88:4
90:24 97:5 114:14
154:12 197:18
204:9 215:10
280:13 291:20
**dog** 273:3
**doing** 7:22 19:8
26:20 148:2
151:25 178:1
186:6 222:21
224:17 264:12,16
301:17
**dollars** 135:22
**domicile** 43:16
123:23 124:9
131:17 290:11
313:18
**domiciles** 251:19,19
251:20
**don't** 7:19,20 9:14
10:7,19 12:7,24
14:2 17:9,10 18:11
19:11,16 21:23
22:5,22 23:9 26:25
27:24 28:18 51:8
52:9,11,12 60:16
60:17,24 69:14
70:7 81:2 83:12
84:20,20,21 86:17
86:20,23 89:3,15
89:25 90:9,12,24
91:11,11,12,14,15
91:19,25 92:7,8,10
92:16 93:2,8,22
94:18 100:5
101:16,21 104:1,6
106:9 108:15,19
109:21 111:3
113:24 114:24
115:7,17,22 121:4
127:3,19 129:15
131:8 141:15
142:9 144:4,8,9
145:18 149:3
154:10 156:13
159:25 171:15
174:17 175:17
176:12,19 177:5
178:24 179:25
183:16 184:11,21

186:6 190:5
198:15 200:7
208:9 210:9,10
214:8,8,9,15
215:12,15 216:4
216:25 218:2
233:5 236:19,20
247:6 248:7 249:5
258:14 268:21
275:11 279:20
285:17 290:4,9
291:22 292:21
300:25 301:21,23
303:13,15 304:5
304:15 306:3,3,10
306:20 307:19,22
309:20 312:7,18
313:5,8
**door** 121:19
**double** 208:10
**dozen** 27:15
**draw** 32:21,23 120:2
166:11 240:20
283:19 296:9
**driving** 43:15
**drugs** 57:8
**duces** 11:6 14:19
19:2
**due** 36:2
**dues** 30:12,20 33:15
127:22 133:8,13
133:15,21 134:4
135:16 136:5,6,10
137:23 139:17,19
148:6 196:19,21
197:13 231:2
**duly** 37:5 122:13
181:17 219:3
250:9 277:19
**duties** 13:18 165:19
220:13 277:25
278:7 284:9 286:3
315:9,12
**duty** 31:9 112:6
158:1 284:12
**D.C** 30:18 75:17
93:17 102:15
138:3,7,19,22
139:6,20 140:12
140:16 142:5
189:3 192:12
197:23 230:17
**D.G** 303:16,19

**———————**
**E**
**———————**
**e** 2:1,1 3:1 6:1,1

51:24 318:23
**earlier** 96:15 102:21
113:7 118:24
119:9,24 120:18
135:18 151:23
162:3 172:16
178:13 236:22
241:7 274:8
293:11,15 308:25
309:1,10
**early** 63:25 144:25
144:25
**easier** 14:10 27:5
307:3
**Easter** 7:18
**easy** 73:7 94:10
**Ed** 3:18 4:18 33:21
64:7 105:3 106:24
153:18 187:24
188:15 202:18
207:9,10 208:19
218:18 219:2
253:19
**Edie** 188:3 222:17
**educate** 192:21
212:5
**educated** 49:14
152:4
**education** 123:25
137:21
**effect** 19:14 45:8
60:24 267:21
309:25 315:13
**effective** 13:3 80:24
**efficient** 20:5
**effort** 241:22 258:20
260:18 313:24
**egg** 7:19
**egregious** 42:16
65:22 78:2,6 192:9
204:7 205:3,5
222:24 231:24
237:12 238:6
**egregiousness**
237:10 245:22
**eight** 19:9 90:5
183:23 185:21,23
219:25
**either** 16:2 17:1
18:12 89:6 94:19
106:16 116:9
129:9 213:20
234:2 235:23
270:23 275:3,22
279:5 285:2 290:7
293:17

**either/or** 134:15
**elaborate** 263:8
**elect** 127:10
**elected** 17:23 18:7
   252:11
**election** 124:25
   125:1,19 126:1,18
   145:1 147:25
   158:24 175:5
   299:21
**elections** 132:23
   174:20 175:7
   197:20
**electronic** 48:4
**electronically** 44:12
   46:16 48:20
**Eleven** 219:13
**elicit** 228:8,11
**else's** 103:21
**Embarcadero** 2:9
**EMBASSY** 1:20
**Emlet** 3:9 36:14,19
   37:4,10 40:2 41:13
   45:10 46:21 48:9
   50:22 53:5 54:20
   54:22 56:23 58:15
   60:1 61:6 62:13
   63:13 67:4 73:23
   76:8 117:5 222:12
**emotional** 24:10
   295:24
**employed** 37:10
   91:17 93:3 94:12
   111:8,11 112:22
   114:7 115:3,13
   122:20 181:21
   219:7 250:14
   260:4
**employee** 4:17 30:23
   31:2 38:24 42:5
   45:2 46:13 51:19
   51:20,21,24,25
   53:10 55:9 59:3
   68:4,4,9,17 76:11
   76:14,18 77:6,9
   79:6 89:9,18 93:21
   97:9 107:11
   109:13 117:9,12
   117:18 118:1,7,24
   119:3,21 129:18
   152:18,25 155:14
   184:4 188:2 191:4
   205:1 221:8,14,25
   222:13,22 223:20
   242:6,25 244:21
   244:23 251:18

260:6 267:10,24
   271:12,13 275:17
   275:19 282:20
   293:19 303:21
   309:25 317:10,12
   318:15
**employees** 31:3,10
   35:19 40:6,14,25
   41:1,4 44:11 46:11
   47:2,10 48:14,19
   49:11,18 50:22
   51:1 53:24 55:14
   55:16 59:7 94:4,15
   94:17 97:12 143:7
   171:4 177:17
   190:13 195:11
   204:9 214:15,18
**employee's** 68:22
**employer** 31:9
**employment** 6:22
   31:7 33:22 34:17
   36:4 37:21 39:19
   77:14 123:7
   219:15 250:24
   253:20 254:1
   267:2
**empowered** 18:15
**encompass** 204:11
**encompassing** 42:2
**encounter** 131:12
**enforce** 63:3
**enforcement** 34:2
   179:10
**enforcing** 21:22
   134:10
**engage** 57:14 132:5
**engaged** 107:14
   258:20
**engaging** 33:12
   107:10
**ensure** 38:8 79:13
   148:3 251:21
   255:6
**entered** 52:10
   287:14
**entire** 34:7 75:19
   147:17 189:1
   204:11 265:15
   266:16
**entirety** 36:5 263:3
**entitled** 31:3 62:3
   317:17
**entity** 130:2
**environment** 31:4
   31:10 41:1
**environments**

141:14
**equal** 31:7 41:2
**equality** 142:17
   195:22
**ER** 155:25 156:5
   200:8
**escape** 35:25
**especially** 18:2
   271:15 280:22
   299:20
**essence** 12:12
**establish** 190:22
   287:24 288:1
**established** 61:11
   185:18 203:16
   289:12
**estimate** 144:23
   145:12 146:1
   185:12
**et** 24:10 45:19 255:7
**evaluation** 87:3
**event** 57:11 217:22
   261:14 269:2
**events** 42:16 140:16
   197:1
**eventually** 177:21
   295:15
**everybody** 61:24
   139:6,21 168:4
   187:4 188:17
**Everybody's** 80:21
**everyone's** 137:23
**everything's** 8:13
**evidence** 8:7,9 14:15
   19:15 21:2,7,10,10
   21:15,19 23:2 39:1
   54:11 56:15 58:7
   59:18 63:5 70:20
   75:24 76:24 87:15
   93:10 154:6,14
   227:22 240:5
   262:11 289:16
   290:7,20 306:19
**evidencing** 52:20
**exact** 12:17 207:15
   279:4 283:24
   310:10
**exactly** 12:3 154:24
   174:19 184:11
   214:15 230:24
   248:1 288:2
**Examination** 3:10
   3:13,16,19,22 4:3
   37:6 117:3 122:14
   178:7 181:18
   219:4 248:11

250:10 276:5
   277:20 314:20
**example** 43:9 212:23
   263:2
**examples** 45:19
   49:18 162:13,19
   162:23 264:22
**exception** 82:23
   283:2
**excerpt** 41:17
**Excerpts** 4:13 5:20
**exclamation** 193:20
**exclude** 11:15
**excluded** 18:23
**excuse** 15:19 102:19
   194:20 252:14
**executive** 123:23
   124:3,10,21
   139:10 160:6,10
   214:23 252:12
   297:4,6
**exercised** 185:18
**exercising** 184:2
**exhaustive** 120:13
**exhibit** 39:23,24
   40:3 41:10,11 45:4
   45:7 46:18,21 48:6
   48:8 50:19,21 51:8
   53:2,5 54:11,18,22
   54:23 56:14,19,21
   58:7,12,13 59:18
   59:23 60:1 70:14
   70:21 71:17 73:20
   73:21,24 75:20
   81:6 82:9 83:21,24
   84:3 87:22 88:2
   94:22 95:3,9,22,25
   96:5 98:19 99:11
   117:6 119:23,24
   120:3 146:18,20
   147:10 154:1,6
   157:8 162:25
   163:3,11 166:12
   166:19,23 168:14
   174:5,24 178:10
   184:17,18 186:13
   186:15 187:5,6
   191:1 205:24
   206:15 227:19
   228:23 239:17
   240:18 241:6
   243:4,12,18 244:5
   262:5,6,9 268:14
   271:20
**exhibits** 4:8,20 5:18
   5:24 6:2 7:13 8:5

25:10,15 120:19
   179:25 180:5
   240:5
**existed** 61:11 243:2
**existing** 171:8
**Exp** 318:21
**expand** 138:15
**expect** 52:23
**expectations** 4:13
   5:6,20 41:9,16
   42:1 44:1 54:1
   59:6 96:12 97:7
**expected** 40:14 41:6
   42:5 47:12 215:20
**expenditures** 134:8
**experience** 43:5
   136:14,16,23
   210:18 212:4,4
**experienced** 77:17
**experiencing** 171:2
**expert** 163:15
**experts** 107:11
**explain** 47:17 49:21
   51:9 62:16 76:8
   134:25 136:4
   137:5 156:14
   167:5,14 192:10
   229:16 230:5
   236:18 237:4
   249:6 301:7 303:3
**explained** 167:16
   173:23,25 188:16
   188:20 210:17
   235:9
**explaining** 234:10
**explains** 14:10
**explanation** 167:11
**explicit** 237:9
**explore** 285:22,25
**exposed** 152:19
   157:17
**exposing** 267:10
**express** 138:23
   192:6 231:11
   263:13 301:19
**expressed** 138:11
   139:12 263:7
**expressing** 136:20
**expressions** 301:2
**extend** 194:22
**extensions** 86:12
   221:11
**extent** 7:21 25:8
   72:19 187:21
   204:15 207:19
**externally** 41:7

47:13
extraneous 215:13
extreme 24:7
extremely 65:23
    77:10
e-mail 4:24 25:16
    27:1 29:11 53:15
    64:1 84:12 153:3,4
    153:7,8,10 158:10
    200:18 221:3
    268:10 270:17,19
    270:20 294:2
e-mailed 153:15
E-M-L-E-T 36:19

            F
Facebook 5:7,8,9,22
    29:4,11 32:18,19
    32:23 50:16 57:10
    57:24 64:2 68:13
    68:22 69:4,8,13,23
    70:1,19 71:22 74:1
    74:13,16 75:21
    83:18 84:5,10,13
    84:24 85:1 86:21
    87:18,25 89:6,11
    89:21,22 90:16
    91:9,16 93:6,18,25
    94:19 101:20,22
    102:5 104:1
    117:21 118:11,15
    118:20 119:19
    127:13 129:19
    144:11,16,19,20
    144:24 145:3,5,13
    146:14 147:7
    148:14 149:20
    150:3,18 152:14
    153:7 155:5
    156:23 163:14,15
    164:21 165:15,22
    175:6 179:23
    189:7,15 190:8
    191:2,14 199:10
    200:20 204:21
    206:12 211:21
    212:23 226:10
    227:15 228:1,15
    228:21 229:2,10
    229:18,21 234:5
    234:12 235:2,10
    237:21 241:9,15
    241:17 242:3,4,7
    242:17,19,24
    243:20 244:7,8
    248:15,17 259:10

259:14 263:15
271:21 272:1
273:14 295:10
302:18,21,22
304:20,23 305:10
305:17,22,23
306:7
faced 126:6
face-to-face 127:4
facilities 23:18
fact 13:6,18,19 14:2
    14:12 15:1,14,25
    16:3,25 17:6,6
    19:6,11 20:21 29:9
    31:9 32:12 33:3,6
    34:20 40:8 49:17
    64:4,12,18 76:10
    78:25 83:1,4,22
    86:11,12 88:6
    102:11 103:4,8
    104:19,22 105:2,4
    105:6,8,11,14
    107:5,8,19 110:1
    114:18 117:24
    129:14,15 134:19
    158:16 163:6
    164:1 172:20
    173:9,17,18
    187:22 188:9
    190:2 191:13
    193:12 194:5
    195:15 196:5,17
    197:8 198:23
    199:7 200:16
    204:1 205:17
    207:7 209:1
    211:12 214:21
    221:10,12,13,18
    222:5 223:12
    226:17 227:13,24
    228:13 229:7
    230:16,18 231:3,4
    231:21 232:2
    233:15,18 241:14
    241:20 253:16
    255:5 266:1,6
    267:6 274:11
    278:3,4,8,19,25
    279:13,15 280:5
    281:3 282:6
    283:12,21 284:5
    286:3,14,19,20
    287:10,18 289:6
    290:10 293:11,13
    294:4,8 295:1,22
    296:11 298:7,21

302:14 305:4,8,21
307:16 309:1,12
309:15 311:3,12
311:14 312:4,11
315:3,6
factor 204:21
    237:16 267:7
factored 76:9,10
    184:13 237:25
    267:9
facts 15:3 34:19 39:1
    57:18 58:4 255:4
fail 61:8 185:14
fair 19:21 66:18
    95:11,14 116:11
    132:10,12 169:11
    171:23 203:11
    246:22 252:18
    296:3 317:4
fairly 56:5 195:20
    227:10 235:22
    252:18
fall 62:23 97:1,5
    99:7 249:2
fallen 99:14
falls 97:2 135:7
    137:20
false 129:3
familiar 13:12 16:15
    38:15 39:18 40:2
    45:9 46:21 48:9
    53:6 69:1 73:8
    182:22 184:23
    220:17 253:2
    262:8 265:4
familiarize 38:23
    55:16 229:2
family 24:6 57:17
far 10:12 26:14
    35:23 89:4,15
    176:23 187:18
    205:6 220:16
    245:10 292:24
    295:3 307:18
    312:20
father 24:3
favor 28:18 58:2
    121:18
favorite 43:11
fax 318:25
fearful 152:19
feature 71:23 93:18
February 60:4,22,23
    85:22 86:10 90:21
    91:5 148:15 164:4
    185:3,4 275:6

February-Decemb...
    5:11
federal 13:23 14:1
    19:3 35:12 215:9
fee 128:15 133:11
    134:1,3 135:2
feed 92:11 163:25
feedback 202:19
feel 16:7 172:11
    204:18 235:1
    247:21 257:24,25
    265:17,20 276:11
    300:25 301:16
feeling 235:3 293:23
    301:2
feelings 68:5 300:12
feels 292:7 310:14
fees 30:16 133:8,20
    133:25 134:13
    135:2 137:18
    197:17
feet 75:8
fell 246:18
fellow 30:23 31:2
    152:3 155:24
    178:2,3 267:10
    297:7
felt 30:2 32:1 33:7
    40:21 78:1,3,6
    107:18,20 152:21
    188:24 189:4
    191:16 192:19
    193:2,6,22,24
    194:13 195:6,19
    196:14 197:2
    198:13 201:15,23
    202:2,9 204:5
    232:1 235:22
    236:3,6 259:22
    260:22 261:12
    263:10,19,20
    264:4,7,12,16
    265:15 288:2
    301:5 302:7 304:8
    308:15
female 139:10
fetus 237:11
fetuses 29:7,22 30:4
    30:24 50:6
fighting 130:21
    152:1
figure 20:3 187:4
    226:2,8
file 38:24,25 81:17
    81:21 108:11
    133:1 139:24

158:18 254:12,16
254:20 274:11,13
274:15,16,17
filed 160:3 176:12
    176:18 177:3
    254:10 281:25
    296:25 315:20
files 244:22
filing 160:1 169:13
    172:1,13 176:7
    297:21 298:21
    310:21
final 43:4 65:11 79:3
    246:9 254:23
finalized 105:5
financial 131:19
    135:19
financially 127:22
    318:16
find 70:4 77:16
    81:23 88:16 89:8
    91:23 92:13 103:3
    107:2 223:11
    246:2
finding 13:7,18,19
    14:12 15:2,14 16:1
    17:6 19:7,11 32:12
    33:3,6 34:20 64:4
    64:12,18 79:1 83:1
    83:4 86:13 89:12
    102:11 103:4,8
    104:19,23 105:2,4
    105:7,8,11,14
    107:5,19 173:9,17
    173:18 187:23
    188:9 190:2
    191:13 194:5
    195:15 196:5,18
    197:8 198:24
    199:7 200:17
    204:2 205:17
    207:7 209:1
    211:12 214:22
    221:10,13,13,18
    222:6 223:13
    226:17 227:13,24
    228:13 229:7
    230:16,18 231:5
    231:21 233:15,18
    241:14,21 253:16
    255:5 274:12
    278:3,8,19,25
    279:13,16 280:5
    281:3 282:6
    283:12,21 284:5
    286:14,19,20

287:10,19 289:6,7
293:12,13 294:4,8
295:1 296:11
298:7,22 302:14
305:5,8,21 307:16
309:2,12,15 311:3
311:12 312:5,11
315:6
**findings** 278:5
311:14
**fine** 26:9 52:14 53:1
54:16 97:20
121:17 215:12
218:10,13 240:10
275:13 295:14
299:20
**finish** 149:10 163:22
**finished** 177:8
221:17 227:2
**fire** 157:22
**fired** 23:8 114:21
158:21
**firestorm** 61:23
**firm** 289:14 318:22
**firmly** 27:20
**first** 7:17 24:1 29:7
36:12 40:23 42:18
43:1,3,8 44:17
47:21 49:23 53:22
53:23 56:10 58:23
64:24 70:24 72:8
72:13,20 74:2
83:13 84:2 88:2
90:2,21 92:2 93:19
93:23,25 94:1 95:5
96:1 108:20 120:3
123:8 124:6,14,16
124:19,23 125:2,6
125:14 149:9
151:25 155:3
158:10 161:7
164:6 165:5,7
166:23 168:20
169:17 171:25
174:20 182:2
197:6 212:2
216:16 240:17
243:11,20 245:10
246:13 274:24
288:17 289:1
295:7 297:24
302:15 304:19
305:25
**fiscal** 136:1
**fit** 247:4,6
**five** 37:19 39:14

42:21 92:13,16
111:21 184:15
219:20 252:25
276:22
**flag** 75:1
**flew** 56:8 108:22
110:3 185:13
**flies** 56:5 180:6,12
**flight** 20:18,22 28:22
31:19 32:21 34:12
37:23 38:8,11
41:16,19,22 42:5
43:14,25 44:2,12
46:17 50:17 55:1,8
55:12,19 56:4,6
57:3,6,7,9,10,14
58:18 59:6 62:25
67:13 74:11,24
75:10 88:10,12
93:7 97:6,8 106:11
109:18 111:7
121:10 122:23
123:1,9 126:13,22
127:5,14,24 128:2
129:21 130:15,20
130:22 131:25
132:8,20 135:20
136:4 138:10,21
139:9,24 141:8
143:2,11 148:2,4,7
152:1,3,20 155:24
165:14,20,21,23
166:2 168:8 169:4
169:8 170:3,25
171:11,25 172:7
173:24 175:4,9,11
175:13,15,21,22
176:6 178:2,3
179:2,5 180:14,16
182:12,14 183:1
184:4 185:2,9
190:20,22 194:23
219:24 220:11,22
223:3,5,13 225:15
225:16,21 229:22
230:11 235:5,11
236:19 237:22
243:24 248:22
249:11,16,17
251:2,2,6,12,17
252:17,20 253:11
253:11 264:24
266:5 278:2,20
279:1,8 280:12,13
281:6,6,12,15,15
281:20,23,25

282:1,7,10 283:10
293:19 294:2
295:13 296:13,24
297:7,15,21 299:6
299:11 302:25
310:14 316:20,23
**flights** 35:10 140:2
186:20 213:22
**flip** 303:11
**flown** 39:13,15 94:9
108:12,13 183:15
**fly** 5:1,2,4,5 24:2
54:21,25 55:3,23
56:8,25 60:3,25
108:14 123:2,3
**flying** 122:25 182:16
251:6
**focus** 137:14
**focused** 162:11
171:9 273:20
**focusing** 168:20
**folks** 129:8
**follow** 55:20 63:3
220:15 225:23
238:21 287:1
**followed** 32:10
212:3 220:10
238:23 247:14
287:5
**following** 124:22
142:3 163:21
165:9 241:8
272:14 273:17
315:13
**follows** 37:5 122:13
133:10 181:17
219:3 250:9
277:19
**follow-up** 89:1
276:4,17 314:18
**follow-ups** 116:15
178:9
**foregoing** 318:5,12
**form** 52:10 115:19
234:4 238:3
268:17,23 269:1
309:19 310:25
**format** 82:7 286:24
287:1,5
**formed** 254:20
**former** 28:22 34:12
**forth** 170:9 231:23
288:5 318:6
**forward** 103:24
130:19 137:13
157:13 160:8,17

170:11 178:21
179:1 223:2,5
255:21 308:17
**forwarding** 58:25
**found** 65:22 69:25
74:20 84:10 90:13
90:19,20 107:5
143:12 263:2
**foundation** 2:14
35:3 66:5 136:12
203:3,6
**founded** 137:8
**founders** 74:21
**four** 13:20 16:8
37:24 39:13 92:13
92:16 182:5
184:14 199:4
215:1 219:24
281:13,18
**fourth** 47:25
**frame** 126:2 140:23
178:11
**frames** 86:12 87:10
**framework** 42:4
**Francisco** 2:9
**free** 21:11 26:3 31:4
141:21,22 288:20
**FREEWAY** 1:21
**frequently** 161:8
183:14
**Friday** 140:20
**friend** 242:5 279:12
279:12 313:15
**friendly** 183:10
**friends** 75:13 129:7
169:8 190:13
**front** 83:22 100:5
170:19 240:19
241:6 290:24
**Frontier** 75:14
**frustrated** 33:11
**fucking** 88:16
**full** 27:19 95:12
125:10 134:1
158:9 168:18
169:17 218:17
277:9 287:18
**fully** 258:8 273:11
275:11
**full-time** 139:22
251:4,6 252:15
**function** 129:18
**fundamentally**
152:2
**funding** 137:24
**funds** 50:11 197:3

**further** 16:11 34:22
53:9 80:12 91:22
91:22 93:9 120:25
121:2 153:17
155:15 161:19
178:5 180:22,24
205:7 218:4 240:6
249:18,20 255:3
257:15 270:11
276:1,16 314:15
315:16 317:19
318:14
**future** 170:22 172:6
224:21

---

G

**G** 6:1
**game** 21:11
**gathered** 32:12 39:2
221:19 226:10,11
228:20
**Gehrke** 2:7 3:6,10
3:13,16,19,22 4:4
6:15,16 8:4,11,14
8:17 9:7 10:24
13:11 15:16 20:7
20:12 22:12,16
23:4,12 24:21 28:8
28:12,20 36:13
37:3,7 39:21 40:1
41:8,12 51:12 53:3
54:10,19 56:13,20
56:22 58:6,11,14
59:17,24 61:3,13
61:20 62:12 63:4
63:12 66:18 67:3
69:18,22 70:3,9,15
70:18,24 71:3,13
71:17,22 72:2,7,11
72:16,19,25 73:16
73:19,22 75:23
76:7 78:17,18
80:12 81:4,9 90:23
91:1 93:11 98:5
104:15 105:22
108:23 109:10
112:5 113:6,12,25
114:23 116:15,19
116:22 117:4
120:25 121:23
122:15,17 136:24
145:20 146:3,17
146:21 149:1,4,13
149:18,23 150:1,9
150:13,15 153:20
153:22 154:4,15

155:1 161:19
176:15,25 178:8
180:4,22 181:15
181:19 184:16,19
185:23 186:1,3,7
186:10,14,21
187:6,9,13 198:4,6
203:13,21,23
205:7 212:11
218:4,8,11 219:5
232:15 233:8
239:1,4,6,9,12,15
239:18,20 240:4
248:10,12 249:18
249:24 250:11
262:4,7 270:11
271:17 276:3,6,16
277:2 285:14
287:22 288:25
291:2,8,15,18,22
292:5,11,15
302:12 307:2
314:15 315:18
316:1,6,14 317:4,7
317:19
**general** 2:21,23 7:24
37:16 130:2 132:7
133:20 135:10,12
143:13 162:3,20
162:21 171:12
204:24 293:11
**generally** 8:8 42:13
44:21 45:12 47:5
48:22 56:5 63:21
77:9 105:9 116:3
116:10 148:19,25
149:6 188:11
280:4 292:7
**generate** 230:13
**generated** 127:13
185:5,6
**getting** 72:16 92:17
179:6 200:10,20
215:8 221:12
245:20 264:25
271:4 295:25
304:9 308:15
**give** 13:4 14:6 15:2
19:20 23:17 25:9
26:16 30:22 35:18
36:23 41:25 42:3
70:9 71:14 74:17
75:25 81:5 106:13
122:6 132:20
154:22 175:10
181:11 183:19

218:24 219:14
223:7,13,15 239:4
250:4,23 266:1
270:20 272:18
277:14 287:17
288:19,20
**given** 11:24 15:8
39:10 273:15
283:9 285:1 309:3
317:6
**gives** 45:19 55:19
185:8 246:10
306:19
**giving** 26:21 229:21
243:2
**go** 8:7,12 9:20 10:18
10:24 14:4 18:15
24:18 25:13 49:23
52:18 68:21 70:15
81:2 82:20,22 85:9
89:7 91:22 92:2,4
93:23 94:11
101:14 104:4
110:23 111:15
112:6 116:20,20
118:12 121:6,11
131:18 137:24
139:5,7 141:11,18
147:20 149:3,10
154:2 155:15
163:21 164:22
174:14 181:5
185:18 186:10
194:6 197:3,18
203:18 204:15
215:12 217:10,15
218:15 226:3
233:12 239:10
240:12 241:7
243:18 255:21
258:11 267:14
268:16 273:18
277:5 280:5
286:23 289:20
291:19 292:7
298:2,6 307:8
308:3,10 311:18
315:9
**goal** 199:22
**goes** 23:20 28:3 41:3
42:7 47:13 51:19
53:9 60:12 102:13
176:23 220:16
271:3 285:23
287:20 316:17
**going** 7:17,20 10:16

21:7 22:13 25:9,14
25:16 30:14 50:20
52:19 53:4 60:15
61:5,6,9,10,16,22
62:1 64:21 67:5,20
69:24,25 73:19
80:21 91:19 94:21
95:2 99:22 100:15
108:23 109:2,10
112:5 113:6 114:9
114:15 117:10
122:10,18 130:23
131:1,2,20 139:13
140:16 147:25
148:1 149:13
152:11 155:13
161:3 171:14
172:17 175:7
180:14,17 184:16
184:20 190:4
192:11 196:21
197:23 198:2
200:12 210:14,25
211:9,13 213:22
215:9 262:4
278:15 280:7
283:15,16,17
285:14 287:13
290:5,20 299:23
299:25 303:5
304:3 305:16
306:11
**good** 6:7,9,15 10:9
10:12 28:21 37:8,9
85:23 122:16
181:20 203:7
219:6 227:12
232:24 240:5
250:12,13 303:19
**gotten** 82:6 101:12
172:25 216:13
**granting** 66:22
**graphic** 29:6 31:13
78:3 88:13 117:20
173:2 189:21
192:8 194:1 207:3
207:5,6,8,10,11,17
207:18,21 208:1,5
208:12,15,17,20
208:22,22,24
209:16 210:14
228:15 247:10,19
247:22 288:9
289:9,11 292:20
293:3,8 311:8
**great** 8:14 81:11

108:7 201:13
**Greg** 25:22
**grievance** 4:11 6:6
34:6 35:11 36:4
38:18 79:23 81:5
133:1 159:13,15
159:19,20,23
160:6,13,14,19,22
161:13,17 173:4,6
252:14,16 253:6
254:9,10 257:17
268:17,23 269:23
279:23 287:3
315:5
**grievances** 160:1
**grievant** 2:12,18 6:7
7:2 8:20 9:22 15:2
38:15 95:18 131:6
182:22 209:24
220:18 225:10
253:2 257:12
270:24 288:2
309:17
**Grievant's** 4:1 5:18
95:22 168:14
174:5
**grieve** 79:20
**grieved** 159:9
224:21
**grieving** 269:2
**grounds** 113:7
**groundwork** 42:4
**group** 51:14 67:13
97:14 126:22
127:5 139:20
141:7 142:22
143:7 148:1,3
171:1,6,9 175:6,6
175:14,15,21,23
176:1,2
**grouped** 118:17
119:19
**groups** 129:19
137:11
**grow** 62:20,20
**growth** 41:3
**guess** 14:6 25:15
40:9 46:7 64:1
124:8 164:21
**guidelines** 41:25
170:25 171:5,8,11
**Gutierrez** 156:6
157:22 188:2
222:14 303:17
**guy** 10:9 23:7
**guys** 191:4 199:12

230:15 305:5

**H**

**hadn't** 109:9,14
183:16 210:5
216:8
**Hafner** 57:1
**Hafner's** 57:13
**half** 37:19 111:21
181:23 183:23
**halfway** 58:23 96:1
101:23 268:15
**hand** 24:2,23,24
25:16 36:21 50:20
53:4 122:4 180:2
181:9 218:22
250:2 277:12
309:22 318:17
**handbook** 13:16
**handbooks** 285:2
**handful** 127:24
131:25
**handle** 27:15 134:12
169:5,10 299:23
**handled** 99:15
173:23 213:25
216:17 252:16
**handling** 38:22
63:16 160:2
161:13
**handwriting** 209:19
209:22
**handwritten** 105:11
226:20 268:20
311:11
**Hang** 71:10
**hanging** 119:16
**happen** 24:5 157:20
157:21 216:20,22
220:14 280:7
282:17 293:12
302:6
**happened** 14:21
17:5 19:6 30:5
80:7 126:8 162:23
172:2 226:4
238:18 282:17
285:19 302:4
307:14
**happening** 138:22
**happens** 10:1 20:1
26:3 144:7 173:22
192:21 232:13
279:5 288:16
**happy** 6:12
**harass** 30:22 35:18

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 480 of 676   PageID 5591
Charlene Carter - Vol. 1                                    December 7, 2017

14

**harassed** 232:2
235:3 236:4
293:23
**harassing** 29:8 32:5
50:1 96:25 97:1,2
108:2
**harassment** 4:14,15
29:3 31:4 33:24
44:8,10 45:6,13,16
59:13,13 79:7
96:17 97:2 98:13
107:9 120:17
145:23 152:22
179:21 180:19
195:21 236:8
248:24 271:10
282:2,3,25 309:12
309:16 310:3,4
317:14
**harassment-free**
31:10
**hard** 43:18 103:13
272:21 289:8
**hardship** 24:7
**hardworking**
196:23,24
**harm** 33:5
**hashtagged** 190:16
**hasn't** 108:12
173:19 183:15
187:7 203:15
**hateful-sounding**
193:21
**hats** 46:9 193:2
**haven't** 12:7 18:12
42:23 61:11 82:6
113:10 116:21
**HAYDEL** 2:7
**hazing** 4:16 29:3
31:5 33:23 44:19
46:20,24 47:7,14
59:15 79:11 96:16
120:18 237:8,19
246:20 247:4
248:24 281:17
**head** 107:7 155:6
303:14
**headdress** 65:15
72:4 150:13 191:8
237:16
**headdresses** 46:6,8
50:5 191:3,6
**headed** 75:17 93:16
**heading** 118:18
**headquarters** 38:2
40:12 80:3 138:8

**heads** 46:9
**hear** 6:11 11:19
20:17 54:15 78:15
80:21 153:11,14
165:21 166:2
189:16 252:6,23
264:14 275:20
303:4
**heard** 17:4 22:23
27:10 114:21
139:12 142:2
165:14 171:1
203:1 265:7,9
270:15 307:19
311:10
**hearing** 5:15 7:19
17:6,6 19:5,7,21
33:19 34:9,11,21
66:2,12 80:1,3,10
160:6,7 179:5
210:2 256:8
259:18 261:16,18
262:20,23 263:4
265:7,24 266:9,22
267:11 269:15
276:9 286:18
**hearings** 21:5
255:23 285:6
**hears** 252:3
**heart** 13:19 14:4
60:21 192:16
**heavily** 31:18
**height** 128:1
**held** 37:17,22 54:2,5
87:10 123:12
138:8 219:12
250:19 255:7
283:21,22
**help** 34:6 175:9
202:20 210:25
211:13 273:10
**helped** 138:17
**helpful** 15:4 181:2
**helps** 141:12 288:19
306:25
**Herb** 74:17,19,20
**Hereto** 5:24
**here's** 18:10 239:15
290:5
**hey** 279:12 280:17
280:21
**he'll** 217:4
**he's** 24:8 28:7 63:7
114:21 115:13
218:11 285:19,20
289:3,25 291:4

**hide** 35:24
**high** 271:2
**higher** 116:4 136:2
**highest** 124:24
125:1
**highlighted** 98:11
**highlighting** 97:19
**highly** 94:7 100:19
**hired** 251:1
**historically** 33:13
127:24
**history** 16:23 24:25
37:21 39:4,7 123:7
206:15 219:15
250:24
**Hofer** 25:22 26:8
**Holcomb** 115:9
**hold** 26:24 86:12
123:19 136:14
204:10 251:13
252:10
**home** 198:9 238:24
**honed** 194:17
**honestly** 12:23
115:22 161:1
**Honor** 11:22 16:12
**hope** 301:11
**hoped** 216:21,23
**hopefully** 20:3
**hopes** 229:14
**hoping** 147:24
170:23 301:8
**hospitalized** 57:12
**host** 138:18
**hotel** 139:18,18
**hour** 24:15
**hours** 28:5 43:15,16
**housed** 41:21 44:10
57:3 96:13
**HRBP** 79:9 107:14
221:14 222:18
**Hudson** 58:19
**human** 32:4 60:8
79:9 142:13,18
143:4 152:24
201:18 222:18
**hundred** 19:10
146:2 278:22
281:3 296:7 306:8
**hunts** 7:19
**hurt** 127:21 152:16
201:18 211:14
**hurtful** 47:23
**husband** 75:14
**hypothetical** 243:2
244:4

**H-O-L-C-U-M**
115:10

_____

**I**
**icon** 273:17
**idea** 10:9 67:25
104:8,14 308:22
**identifiable** 76:13
94:8,17 190:24
**identification** 91:17
**identified** 76:17 84:8
88:11 117:18
174:8 197:4
**identifies** 32:20
76:11 88:10
**identify** 27:2 54:23
56:23 58:15 60:1
64:22 73:23 89:8
143:7 189:24
**identifying** 50:17
60:16 93:17,22
117:12
**identity** 296:12
**ignored** 29:16 33:14
**II** 43:3 98:9,16
99:20 246:7,10
**illustrative** 120:13
**image** 77:2 78:5
118:4 204:23
212:24 213:7
214:18
**immediate** 79:13
**immediately** 124:15
124:22 164:12,25
**impact** 60:12
**impactful** 106:10
**impacts** 49:3
**impeach** 82:24
**impeachment** 83:1,9
**implied** 206:25
**implying** 217:17
**importance** 60:12
**important** 19:8
20:14 40:17,24
53:24 107:5,10
235:4 260:19
290:13
**imposed** 179:9
180:18 255:17
**impossible** 120:10
**impressed** 107:6
**impression** 18:18
**improper** 197:3
295:20 303:2
**improperly** 21:8
**inaccurate** 167:2

**inappropriate** 32:5
100:19 289:21
**inauguration** 29:23
140:18 260:21
**incident** 83:17 84:19
85:7,25 241:3,13
242:1,8
**Incidentally** 209:23
**incidents** 61:1
**include** 14:8 44:6,7
98:25 99:13
182:11 184:7
246:7 274:15
313:7
**included** 11:9 15:21
44:2 47:22 48:2
167:18 316:8
**including** 32:14
33:15 35:19 47:14
49:5 72:10 91:21
120:15 130:9
137:23 138:20
164:9 172:15
190:12 288:3
**inclusive** 143:6
237:18
**inconsistency** 22:8,9
**inconsistent** 170:1
178:15
**incorrect** 295:11
**incredibly** 126:4
**independent** 35:4
**indicate** 235:6,10
**indicated** 25:9
199:25 233:10
234:15 237:22
242:24 316:7
**indicates** 269:16
**indicating** 242:4
**individual** 169:7
201:13 265:16
279:9,17 298:24
**individually** 171:6
206:11
**individuals** 23:25
27:12 128:5
133:14 139:5
170:8
**inflight** 34:10 38:3
60:6 80:4 182:1,4
183:3 219:11
222:18 224:11,13
250:18,20 251:9
251:12,15
**influence** 57:8 159:3
161:12,16

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 481 of 676   PageID 5592
Charlene Carter - Vol. 1                                                    December 7, 2017

15

influenced 76:15
inform 224:5,7
  253:19,22
information 6:6
  14:22,24 18:24
  32:13 55:2 64:6
  69:9 82:23 106:13
  112:12 129:4
  155:16 164:20
  176:9,13,20
  186:22 202:22
  209:22 221:4
  222:23,25 223:6
  223:10,12,15,16
  223:21 226:2,7,11
  226:13,15 228:20
  229:22 234:15
  242:3 254:13
  259:22 262:16
  275:3,9 279:20,25
  280:1,3,11 282:16
  285:2 306:19
informed 155:21
  177:10,14,16
  253:21,25 282:11
inherent 9:18
initial 19:23 173:19
initially 38:25
  153:15 165:2
  223:1,17
initials 17:8 286:25
  303:15
initiate 268:25
initiated 32:10 87:5
  198:24
initiates 268:24
input 221:15 223:19
  261:20
inquired 234:6
insightful 107:21
inspired 193:19
instance 43:1 247:3
  275:14 310:18
  312:8
instant 71:21 271:9
instructor 219:21,23
instrumental 106:1
insults 47:24
intend 16:1 20:21
  21:10 26:17 224:8
  287:15
intended 25:10 63:2
  78:4 103:5
intending 24:2 25:23
intent 102:17
intention 113:13

interaction 127:4
  183:7 280:6
interest 138:12,23
  139:13 267:13
  276:10
interested 318:16
interesting 201:9
  217:7
interestingly 216:24
  217:1
interfere 299:25
internal 16:15 17:12
  17:17 40:10
  106:18 299:12
international 30:1
  56:2 128:16
  133:11,12,18
  134:5,6,11,16,17
  134:21 135:4
  137:8,9,15 138:8
  138:16,17 198:8
  198:12,22 259:25
interrupt 215:7
interview 64:5
intimidating 45:21
  50:2
intimidation 31:5
intranet 40:9
intra-Union 16:6
  31:23 66:1,11
introduce 17:19
  54:10 56:14 70:19
  289:3,4
introduced 16:23,24
  19:15 55:13
  186:18 289:15,16
  290:7
introducing 113:14
introductions
  188:17
investigate 85:12
  87:15 158:2,14
  182:20 225:7
  282:8
investigating 33:19
  147:3 170:14
  242:1 245:20
investigation 32:11
  32:11 34:21 45:24
  63:14,16 64:15
  68:11,19,19 76:9
  76:23 86:14 87:5,7
  88:20 92:16
  146:23 147:5
  150:21 155:11
  173:20,22 177:9

177:11 187:15,18
  203:5 204:1
  213:20,24 220:21
  221:1,9,15,17,23
  222:11,21 223:10
  227:23 229:4
  244:23 253:16
  294:4
investigations 81:18
  133:5 182:17
  220:14 245:2
investigator 200:8
invitation 194:22
  200:3
invite 217:21
invited 139:7 194:23
  217:18
inviting 148:7
involve 129:23
  251:24
involved 12:15
  63:16,20,21 78:23
  79:1 80:9 111:18
  116:7 130:1
  138:13 159:18
  187:15 202:15
  203:9 221:20,25
  253:15 258:7
  267:23 271:4,8
  281:5 297:5
  310:13,16,19
involvement 104:24
  121:11 158:23
  160:5 187:21
involves 19:21
  279:25
involving 6:6 187:15
  278:25 298:4
  310:14
in-house 299:24
Iraq 27:16
irregular 298:5
irregularity 280:12
  280:16 282:15
  283:16 293:20
  309:24
irrelevant 68:6
isn't 10:25 18:5
  21:25 88:9 92:12
  165:24 207:9,10
  207:20 208:2,8
  209:16,24 210:21
  214:5 243:23
  280:10
Israel 75:2 212:17
  213:15 306:2

issue 8:15 9:19 12:9
  20:12,15 22:20
  24:13 28:4,5 55:23
  63:23 64:16 68:7
  79:2 86:5 114:15
  121:13 133:3
  135:1 137:18
  192:14 193:5
  195:20 197:13
  201:22 210:23
  212:21,22 216:15
  221:7 231:2
  235:21 254:22
  258:23 275:18
  281:22 285:4
  287:12,20 288:8
  299:11 301:21
issued 10:20 18:12
  20:9 45:6 48:11
  55:1,6,7 57:1,4
  58:17 60:22,25
  61:7 62:16 179:16
  179:19 180:7,12
issues 7:20 33:15
  63:1 77:6,9 81:17
  111:16,24 121:18
  126:19 135:6
  137:12 138:22
  147:23 169:10
  171:2 178:22
  195:22 200:4,12
  201:2 213:5
  214:12 216:10
  252:16 260:19
  261:3,3 292:4
issuing 15:20
italicized 48:25
items 134:9 262:23
it'll 54:17 56:17 76:5
  125:20,20 186:17
it's 7:21 8:18,25 9:1
  9:22 10:9 15:8
  17:7 20:13 27:5
  28:17 35:11,14,22
  40:11,11,12,13
  41:25,25 42:1
  44:11,15 47:9
  48:24 49:9 53:24
  55:15 60:10,24
  61:9,13,21,25 62:3
  67:10,11 68:24
  69:16,22 72:11,12
  72:19,20 73:7,12
  75:7 82:13 83:22
  83:24 87:1,1 88:15
  91:1,3 93:1 94:10

98:1,18 99:23
  100:25 101:23
  102:16 103:1,13
  106:15 112:13
  114:5 115:1,1,9
  116:1 118:19
  121:10 123:9
  126:4 127:20
  129:6,10 132:24
  134:4,17 135:7,8,9
  137:19,20 148:12
  150:12 154:18,23
  158:7 160:4 161:4
  162:25 165:21
  169:6 171:19
  173:23,25 184:12
  184:14 185:7,16
  186:8 191:25
  192:2,5 203:7,11
  203:14 204:16,22
  205:24 206:18,24
  207:16 209:3,14
  209:21 210:2
  212:22 215:13,13
  217:14 224:21
  227:18 228:24
  240:13 244:1
  246:22 255:23
  256:19 257:20,22
  261:9 262:12
  268:20,25 269:1
  271:25 272:21
  278:4 279:19
  281:21 282:9,10
  282:12,12,19,24
  282:25 283:14
  285:12 286:9,21
  289:21 290:8
  293:18 294:17
  295:24 299:18,20
  299:21 306:18
  309:19,19,22,24
  309:25 310:5,15
IV 98:19,21 99:7,19
  246:7
I'd 17:21 39:21 41:8
  58:6 59:17 61:2
  63:13 64:19 86:9
  107:20 146:17
  154:5 208:25
  240:17,19 241:5
  283:23 294:16
I'll 9:18 27:23 51:12
  56:20 62:1 73:3
  81:13 109:1
  116:18 119:23

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 482 of 676   PageID 5593
Charlene Carter - Vol. 1                                              December 7, 2017

16

136:14 145:25
149:8 154:13
176:23 239:10
285:22 303:11,13
303:14 317:2
**I'm** 6:11,16,25 7:21
7:24 8:18 9:4,22
9:25 12:15 13:12
16:15 17:24 18:15
19:25 22:1,11,12
23:24 25:12,14
27:11,24 45:25
49:7 50:20 53:4
60:15,23 61:22
62:1 66:20,22
67:10 69:3 72:21
73:1,19 74:24
75:15,17 80:19
82:12 84:21 85:22
86:9 87:14,15
92:15 94:21 95:2
95:13 100:23
103:14 108:23
109:10 111:12
112:5 113:6,24
121:17 122:17,18
123:2 128:19
129:14 131:11
133:23 138:5
139:21 145:5
146:16 153:6
156:6 163:14
165:18,25 166:11
167:9 170:5
171:14,17 174:25
176:15 177:17
184:16 189:12
208:4 212:2,2
217:8 219:22
222:19 224:12
232:15 243:2,3,6
244:4 256:23
258:21 263:17
268:18 272:6,14
273:10 277:24
280:4,16 283:15
283:16,17 284:20
285:14,23,24
287:13 288:1,14
289:7 290:5,19
291:13 295:15
305:7 306:11
308:16
**I've** 19:9 43:6 63:6
101:21 102:25
111:17 112:8

114:21 123:10
129:13,19 130:19
142:12 162:23
233:1 250:20
283:5 288:25
295:21,22 297:2
313:12 316:24
**I-17** 43:14

**J**

**J** 82:16 83:13
240:21 241:24
**January** 53:17 54:8
55:8,19 125:20
138:2,4 140:14,19
141:2
**January-December**
5:12
**January-March**
5:14
**jdj@nrtw.org** 2:16
**Jeff** 2:13 7:1
**Jennings** 2:13 7:1
210:7 291:17
**Jerry** 127:18
**job** 31:19 35:5,11
38:5 74:17 122:22
152:10 182:9
204:10 220:6
224:9 227:12
251:14,21,22
255:8 260:2 266:1
266:6 284:24
294:14 316:25
**jobs** 278:13
**join** 136:22
**joined** 34:13
**joining** 138:25
**joint** 4:8 6:2 7:13
8:5 39:23,24 40:2
41:10,11 45:4,7
46:18,21 48:6,8
62:24 81:6,7 82:8
95:3,9 96:5 99:10
119:23 120:3,19
155:21,25 238:25
239:1,2,7,13,15,17
239:19 240:4,18
268:13
**jointly** 152:6
**Jones** 3:15 105:3
181:7,8,16,20
184:22 187:14
222:4,7 226:23
227:1 300:16
312:10,16,24

**judging** 215:14
**Julie** 60:6
**jump** 57:7
**June** 127:12 131:23
132:2
**justified** 33:7 36:3
201:15

**K**

**K** 2:8
**KAREN** 318:3,21
**KBR** 27:17
**keep** 117:25 121:19
184:4 292:3
308:17 310:3
**keeps** 198:14
**Kelleher** 74:20
**Kent** 24:1
**kept** 156:13 191:21
**key** 13:5 106:7
**kick** 313:24
**kind** 7:16 16:4,5
24:24 25:25 28:7
38:7 66:1,10 67:9
67:18,20 68:3
101:24 102:1
103:15 117:9
118:17 119:6
126:24 130:2,23
131:3 134:11
135:7 137:5
147:22 154:20
161:11 172:12,25
175:19 179:8
180:13,16 183:19
188:11 193:21
194:25 195:4
196:1,8,12 197:13
197:24 201:9,19
222:20 226:1,3,8
234:10 237:24
244:22 245:1
250:23 257:6,23
259:19 261:2,6
262:21 275:1
278:3,12 279:10
279:18 282:16
285:11 286:25
287:2 297:5,22
299:19,21 301:13
302:15 309:3,4
310:7,24 311:18
**kinds** 246:6 317:14
**Kissman** 224:7,10
**knew** 61:10,25 62:25
79:13 130:22

131:1 156:3,7
161:2 193:12
233:19 245:10
253:7 264:24
287:20 296:17
**knit** 193:2
**know** 7:19,20 10:2,7
11:1 12:5,7,13,24
13:13 15:6 16:5
17:9,10 20:19,23
22:5 23:19 25:13
25:17 26:7 27:5
30:7 38:17 49:6
51:4 52:11 54:1
55:3 56:1,4 57:16
66:17 67:12 69:14
70:8 77:19 80:7,25
86:17,20,23 89:3,4
91:11,25 93:7,8,8
94:3,18 101:11,16
101:19,21 102:9
103:19,20,22
104:1,2,6 108:15
108:19 109:21,22
111:7,9,13,16
112:21,24 113:2
113:19,24 114:24
115:2,5,12,15
118:25 119:2,6
126:7,23,24,25,25
127:22 128:19
130:5,21,24,25
131:1,3,6,8 132:11
132:13 134:9,10
135:5,12,17,21,22
135:24 136:1,4,19
136:21 137:13
138:12 139:12,23
142:7,9,12,13,14
142:17,18,18
143:3,4,10 145:8
145:10 146:13
147:24 148:10
152:5 153:6,6
154:21 155:22
156:11,13 157:12
157:14 160:10,15
161:3,8 162:5
164:3 166:18
169:9 170:10
171:22 172:4
173:8,13 174:17
175:7,8,12,16,18
175:18 176:10
177:5 178:24,25
179:4,7,25 182:25

184:11 193:7,14
207:14 209:1
213:13 214:9
217:7 220:20
223:6 224:19,23
230:10 232:25
233:23 235:15
241:12 242:19,20
253:5,6,9,13 254:3
255:21 258:14
259:3 263:1
265:15 270:23
272:15,16 273:6
275:9 276:12,14
279:4,18,19 280:1
280:14 285:17
286:23 287:4
289:4,17 290:9,15
292:22,23,23
294:17 295:7,15
296:12,15,16
297:10 298:16
303:13,15,15,24
304:3,5,6,16
305:25 306:1,3
307:8,23 308:5
312:18 313:10
316:2
**knowing** 57:18 58:4
276:12,14
**knowledge** 78:22
86:15 87:11 101:4
115:7 138:24
139:1 252:22
254:2 268:5
270:25 275:2
284:14
**known** 313:12
**knows** 23:9 94:14
316:13

**L**

**L** 2:13,22 318:3,21
**labor** 2:20 6:19,21
12:12 19:13 20:24
22:4 23:6 35:14
36:14 37:15 38:4,6
39:17 55:10 58:20
60:9 65:19 66:3,12
67:4 111:5,6
112:13 142:12
160:15 221:8
222:1,10 223:19
251:9 252:1,19
254:11,16 256:15
270:18 274:20

labor-friendly 135:5
Lacore 60:5
lady 36:17 218:16
language 103:14,24
    166:14 272:11
large 67:13 126:7
    252:11
largely 127:12
Las 31:11 125:23,24
    182:7 221:4
late 128:9
latest 32:15
Lauren 2:21 6:20
law 290:16
laws 31:8 35:16
lawyer 302:21 303:8
    303:25
lawyers 27:20 314:8
laying 88:16
lead 124:1 176:6
    222:24
leader 64:7 78:25
    79:2,13,14 130:23
    131:1 142:12
    152:10 224:7
    255:3 298:5
leaders 38:12 79:13
    137:14 139:10
    217:23 238:10
leadership 67:14,16
    67:21 68:2,6
    123:13,19 126:8
    126:14,25 127:9
    127:20 129:2
    137:15 147:22
    155:14 252:8
leading 29:12 66:6
    66:21 232:11,13
    294:4
leaked 175:14 176:5
learn 68:11,15 282:6
learned 11:23 24:3
    31:11 32:17 34:20
    177:21 192:18
    204:1,5 254:5
    278:24
learning 32:9 41:2
leave 65:24 102:14
    288:12
leaving 9:1 121:10
led 61:1 118:2
    145:23 244:8
left 51:23 201:3
    216:5,11
legal 2:14 7:4 158:1
    255:22 304:1

legally 61:25
legislation 159:3
legislative 133:17
    134:8
legitimate 176:23
Lemons 2:3 6:10
length 199:20
lengthy 60:10 132:5
    201:10
lesser 116:2,6 238:3
letter 4:18 225:20
    238:22,23 239:19
    239:24 268:15
    269:21,24 270:2
    280:1,14 282:13
    282:13,15 283:16
    309:4
letterhead 269:22
letting 214:6 285:25
let's 11:3 20:1 28:3
    28:13 52:15 66:7
    66:14 83:21 90:3
    92:22 93:23 96:25
    104:7 121:6 181:2
    203:17 221:21
    239:18 243:1
    258:11 268:16
    277:5 280:21
    283:19 285:23
    292:1 294:20
    308:17
level 32:3 44:22
    124:3 224:2,5
    257:17
levelheaded 77:11
levied 255:13
lewd 50:1
liberty 18:21
lies 316:18
life 216:14
light 73:13 203:25
    235:13 243:8
lighting 141:24
    142:4
lightly 77:15,15
    158:15
lights 142:5,8 214:7
liked 106:21
limit 20:21
limited 19:20 186:18
limits 35:22
line 29:19 32:3
    152:21,24 190:11
    215:16 224:22
    271:9 285:12,23
    289:20,20 290:18

292:2 295:20
    297:23 299:20
    305:6,11,23
lines 206:19 237:21
list 120:11,12 141:11
listed 42:3,23 43:22
    44:15 247:7
listen 22:2 278:13
listened 155:25
listening 295:12
lists 45:17
litigation 12:14 21:4
    34:22
little 25:12,14 51:15
    61:19 73:9 80:19
    81:1 102:1 103:13
    114:20 126:6
    171:22 179:14
    221:8,21 232:12
    232:20 256:1
    263:10 268:14
    272:21,25 273:17
    289:8 296:4 309:2
    312:9 314:3
live 10:2 27:4 75:3,7
    90:9 92:25 119:8
    125:24 290:2
lives 24:22 233:7
Liz 138:20
lobbying 135:6,7
local 2:25 5:21 7:5
    28:25 29:25 31:1
    35:13 123:5 124:3
    124:7 133:10,10
    134:11,16,22
    136:25 137:9,15
    137:19 138:14,19
    143:9 151:16
    159:12,22 169:1
    251:5 252:8
    256:24 258:6,17
    258:21 260:23
    269:23 274:4,6
    296:22 297:4
locals 137:10
located 182:6
location 118:15
lodged 300:20
lodging 139:19
log 51:21 118:20
logistics 25:18
logo 143:12,12
logs 51:20
long 9:9 16:23 26:10
    37:10,17 92:17
    94:2 122:19

123:12,16 145:10
    145:22 181:21
    219:7,12 230:2
    250:14,19 267:24
    278:16 313:15
longer 60:10 92:14
    110:11 126:16
    260:4
longest 297:22
longstanding 196:13
long-term 260:6
look 14:6 17:7 22:10
    38:25 42:22 44:25
    47:20 51:14,23
    81:13 82:1,4 83:21
    86:9 93:16 97:23
    98:18,19,24 99:22
    101:2 102:16
    104:7 107:20
    108:10 111:15
    112:6 117:5
    118:12 121:16
    135:24 147:10
    150:12,16 161:4
    169:17 171:4
    174:7 180:7
    190:25 208:25
    222:25 227:21
    228:23 229:1
    240:17 241:5,25
    246:22 255:4
    263:1 268:13
    269:9,12,20
    272:18 274:18
    283:23 287:3
    288:22 292:8
    294:16 305:2
    306:20,25 308:1,8
    311:25
looked 39:1 77:19
    81:16,17,20
    106:25 107:6,23
    163:7,24 166:15
    230:9 244:21
    245:19 246:24
    247:1 271:14,20
    298:15 311:1
    314:3
looking 13:20 15:5
    42:10 66:4 69:8
    87:25 88:1 91:9
    93:5,24 98:8 99:10
    107:19 119:1,18
    138:15 163:22
    171:7,10,17
    173:25 207:14

221:7 226:7
    268:18 275:17
    301:12 306:9,14
looks 119:13 178:10
    273:2 311:25
losing 77:14
lot 22:4 27:17 57:9
    76:4 107:21
    108:22 126:16
    127:3 148:12
    152:22 183:15
    196:3 280:11
    288:16 304:9
lots 193:20
lounges 40:12
love 49:7
loved 266:5,5,6
loves 266:4
low 116:23
lunch 28:6,9,10
    81:13 112:3
    116:16,21,24

M

magazine 168:19
mail 34:4 201:4
    225:21
mailed 269:25
mailers 198:9,11,21
mailing 141:11
main 60:20 105:9
    305:15
making 58:1,3,24
    78:14 79:2,14 82:2
    88:13 106:14
    142:7 149:15
    195:5 202:20
    215:15 220:14
    243:14 251:25
    276:8 291:13
    300:17 301:6
male 137:11
malicious 49:25
managed 251:20
management 31:25
    32:7 34:14 133:6
    151:20 161:16
    177:17 202:6
    236:16 251:9,20
    271:2 278:4 283:2
    283:11 284:23
    288:11 293:2,17
    294:3,11,12 297:3
    298:4,6 301:7
    308:13 310:1
    311:14

**management's**
271:6
**manager** 2:20 31:12
33:20 37:15 38:1,6
39:18 66:3,13 67:5
76:22 105:20
106:5 111:5,6
153:3,18 155:8
181:25 182:10,12
187:17,24 202:18
219:11,16,17
220:7 221:4 222:4
224:10 251:9,10
252:15 256:15,16
294:19,20,21
300:16
**managers** 33:6
76:20 77:17
**manages** 185:8
251:12
**managing** 107:12
160:2
**mandatory** 55:17
**Mankin** 55:9
**manner** 35:20 192:5
**manual** 16:14 41:22
44:3,13 46:17
**march** 29:23 30:3,6
30:10 31:16 33:10
33:13 102:15
104:12 140:23
141:5,10,18
142:11,21,23
144:13 151:12
152:20 189:3
191:18 192:11,24
194:7,9,11,13,15
194:18,19,20,21
194:21 195:6,9,10
195:16,18,23
196:2,4 211:10
213:23 217:10,11
217:24 230:17,22
231:12,15,19
239:25 260:20
284:1 286:15
301:14,22
**marching** 101:10
189:5,6 193:5
195:8
**marital** 162:11
**mark** 2:24 7:6 58:11
73:20 134:23
146:17 184:16
239:18 262:4
**marked** 6:2 39:23,24

41:11 45:4 46:18
48:6 50:19 53:2,4
54:18,22 56:19
58:13 59:23,25
70:14 73:21 82:8
82:13 95:22,24
96:2 146:20 154:1
166:24 168:14
174:5 184:18
186:13 187:5
205:23 239:17
262:6
**MARKET** 1:20
**marking** 262:24
**marks** 97:22
**married** 129:15
**Martin** 125:4
**match** 26:10
**matched** 26:11
**material** 15:8
165:17 221:17
223:10 245:20
**materials** 143:13
**math** 85:23,23 186:6
**matter** 1:7 23:14
26:21 88:7 114:14
204:9 215:8
228:10 294:8
295:24 299:22,23
308:20 310:15
316:23
**matters** 7:12 8:2
10:15 23:3 38:12
108:3 212:8,15
300:2
**Maureen** 3:9 36:13
36:18 37:4 222:12
**ma'am** 15:15 218:5
**McCrady** 60:8
**meal** 139:19
**mean** 22:14,22 28:7
53:22 71:21 88:14
129:12 132:12
133:24 143:12
152:12 164:7
170:5,7 171:5
214:5 215:22
224:11 227:7
252:13 258:19
315:5
**means** 63:11 91:3
162:6 164:11
200:22 301:20
**meant** 100:24,25
260:4
**media** 4:17 5:1,4,5

20:19 29:2 32:13
33:23 34:3 43:20
44:4,5 47:15 48:8
48:21,23 49:1,8,15
55:13 57:5 58:22
59:5,10,11,16
61:15,15,23 63:15
63:17 64:16,17
65:18 67:17,19,22
67:23 68:5,21 69:2
76:12,16 77:1,22
81:19 86:5 87:18
90:16 96:16 99:1,3
107:15,16 108:1
120:18 126:19,20
127:1,6,13,15
128:23 129:13
143:21 165:22
168:8 169:13,19
170:2,21 171:2,3
171:13 178:16,20
178:22 179:3,18
179:20 180:14,19
187:16 204:7
221:1 237:8,20
242:18 243:7,24
243:25 244:5,13
245:3 246:21
248:23 271:10
274:19 281:8,11
**mediate** 298:3
**medical** 57:11
**meeting** 29:25 32:12
33:7 64:18 86:13
103:4 105:4,8,11
105:15 107:19
132:2,6,24,25
138:3,6,9 139:6,15
139:22,25 140:11
140:13 141:7
160:21 161:1
173:18,23 174:2
187:19,19,23
188:9,13,14,15,18
190:9 191:5,7,13
191:24 192:8,15
194:5,10,18,19,20
195:2,15 196:6,9
196:18 197:8,12
198:13,21,24
199:5,7 200:17
201:10,11 202:8
202:21 204:2,3,5
205:17,19,22
207:24 209:5,7,20
211:3,6 215:1,6,6

216:7 217:13,19
221:10 222:6,8
223:8,13,13,18
226:17,18 227:13
227:24 228:13
229:7 230:16
231:21 233:15,18
233:21 234:3
235:25 236:15
253:16 254:14,16
254:19 255:1
256:13 257:7,8
258:2 263:18
274:10,12 278:4
278:11,12,14,25
279:6 280:23
282:10,22 283:22
284:5,21,24 286:9
289:6 293:16,21
294:13,22 300:10
300:11,16 302:14
305:5,8,21 307:17
309:2,15,18 310:6
310:8,11 311:3,12
312:5,11 316:21
**meetings** 19:11
64:12 131:14,21
132:24 135:18,19
160:4,13 161:8
236:4 284:17
309:13,16
**Meggan** 3:15 105:3
105:9,16,19 181:7
181:8,16 222:4
300:16 301:5
312:10
**Melissa** 2:19 6:18
256:14,17,20
266:19
**member** 102:5
123:24 124:10
132:18 214:23
297:3,6 303:21,25
308:13
**members** 55:14
57:17 74:12 90:7
127:9 132:17
133:9,25 135:14
151:16 252:11
**membership** 67:12
67:21 100:16
128:2 131:14,21
132:1,24 135:18
189:1 271:5
**memes** 148:10
**memory** 290:19

**memos** 55:1
**men** 195:25
**mention** 196:17
198:7 301:24
**mentioned** 8:5 27:6
64:14 109:7
129:11 135:18
151:23 195:1
198:10 237:14
256:7 303:7 307:5
307:15 308:25
312:10
**mere** 30:3,10
**merely** 120:13
**merits** 160:8 255:14
255:18 289:22
**message** 60:13 64:1
127:19 147:20
149:9 150:17
163:12,16 168:21
168:24 169:14
172:25 178:14
189:13,15 216:5
216:12 228:8
229:13 230:12
233:12 272:2
274:3 292:23
305:14 308:23,24
**messages** 29:4,9,10
29:15,18 30:9
31:14,22,25 32:1,2
32:15 33:2,4,8
64:2 65:18 68:8
71:25 87:6 143:22
144:11,16,18,20
145:9,16,22 146:4
146:10,25 147:6
147:17,21,22
148:15,18 149:5
150:21,24,25
151:15,19 152:8
153:1,5 155:4
156:4,8,22,23
157:4 159:7
164:22,24 165:12
172:21 187:16
188:13,19,21
189:9,17 191:13
192:6 193:10,16
199:9,19 221:6
228:4,15 231:22
232:6,8,9 233:11
234:12,14 235:17
245:23 248:18
258:9 259:5
260:14 263:6

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 485 of 676   PageID 5596
Charlene Carter - Vol. 1                                December 7, 2017

19

271:21 288:3
289:7,9 299:6
**messaging** 57:24
146:7 244:8
**messagings** 60:21
**Messenger** 69:14,21
69:23 70:2,20,21
71:11,18,20,21,24
74:4 104:2 144:16
144:19,20,24
145:3,13 147:7
149:21 150:4,18
152:14 155:5
156:24 163:14,16
163:25 165:15
191:9 199:10
200:20 227:14
228:1 244:17
273:14 300:6
305:22
**met** 15:5 16:22
32:25 131:9 132:3
304:6
**method** 200:19
**mgehrke@polsine...**
2:10
**Michele** 2:7 6:16
26:5 122:17
**Mike** 3:21 34:10
55:8 57:1,13 80:6
224:8,12 249:24
250:8
**millions** 94:6,6
**Milton** 2:13 6:25
**mind** 30:9 52:9
60:16 296:9
**mind-set** 22:3 23:2
**mine** 97:23 313:5,15
**minimum** 30:16
**mini-trial** 21:24
**minute** 110:21,24
121:7 180:7 215:8
227:21 229:1
272:18 296:1
303:6
**minutes** 52:16 80:16
92:13,17 153:24
181:3 210:8
**mischaracterization**
315:23
**misconduct** 222:22
**mishandling** 50:10
**mispronouncing**
156:6
**misrepresented**
129:20

**mission** 4:12 31:6
40:3,7,10,15,21
47:9 60:14 317:13
**misstates** 109:11
**mistake** 172:10
**misunderstood**
217:16
**mlc@nrtw.org** 2:16
**moment** 52:12 75:25
80:14 275:24
312:5
**Monday** 24:3 56:9
56:10,10 280:21
280:25
**money** 30:13,20
33:16 133:16
134:2 135:8 136:1
136:10 137:23
139:18 148:6,6
196:19,24,25
197:14,18,21
210:23,24 211:8
231:9 234:19
**moneys** 261:12
**money's** 261:3
**month** 18:9 125:21
136:1 253:1 275:5
**monthly** 160:13
**months** 39:4,6,7
81:20 82:2,21,22
83:6 84:18 85:7,10
85:21,24,25 87:16
90:6 108:5,10,11
109:5 110:2,11,12
219:13 241:13,19
241:24 242:2,8,13
245:4,5 267:22
283:24
**moral** 43:11
**morning** 6:8,9,15
28:21 37:8,9
141:10 142:20
**Morris** 2:8 6:18
**motion** 7:16 10:21
11:6 12:18,21,22
15:22 18:19,22
269:4 315:20,25
316:8,10,13
**motivation** 211:25
215:14
**mouth** 167:10
**move** 8:7 26:18
54:10 56:14 58:6
59:17 63:4 70:18
75:23 92:22 98:3
108:25 109:2

137:13 154:5
210:11,13 223:4
232:15 285:14
**moved** 125:6
**movement** 158:24
261:9
**moving** 150:12
178:21 210:12
308:17
**mud** 22:16,16
**multipage** 83:24
**multiple** 79:1 145:9
156:12
**murder** 29:21 30:4
30:25 31:15 88:14
100:8,12,22 193:8
205:13 206:11,21
206:23 272:8
273:25
**murderer** 50:8
193:9 205:13
**murdering** 58:3
**Myers** 2:22 6:21
**M-A-U-R-E-E-N**
36:18

_____

**N**

**N** 2:1 3:1 6:1
**name** 6:10,15 18:4
36:16,19 51:22
52:1 55:11 112:17
122:1 156:7 173:5
176:1 181:6
218:17 259:14
264:8 277:9
294:17 303:10,17
309:23
**names** 129:13
176:14,20 264:21
264:23 265:2
283:3,8,9 288:17
303:14
**nametag** 248:16
**name's** 122:16
**name-calling** 47:23
**Naomi** 58:19
**Nathaniel** 318:23
**nation** 127:3
**National** 2:14 35:3
46:5 63:24 143:6
170:10,22 173:2
182:21 185:10,17
192:8,9 193:23
231:22,24 293:11
297:10,17 309:5

310:10
**near** 170:4 192:16
269:9
**nearly** 35:10
**necessarily** 97:5
249:2 259:3
**necessary** 13:25
14:3 24:5 25:25
223:11,12 226:2,8
277:4
**neck** 119:16
**necks** 75:12
**need** 7:22 9:13 10:16
22:5 25:14 27:13
52:11 55:2 68:22
83:23 112:12
121:5 133:4
153:20 155:13
186:6 195:15,23
215:12 234:25
240:8 246:2
290:14 295:16
296:1 297:23
**needed** 161:6,6
**needs** 55:24 292:8
292:12
**negative** 179:3
265:23
**negotiated** 34:23
**negotiating** 134:9
141:16
**negotiations** 126:10
**negotiator** 124:1
**neutral** 214:12,20
**never** 16:22 18:12
20:9 25:12 29:14
31:24 43:6 111:17
158:12 163:7
167:16 172:24
173:1 200:3 201:1
201:12,19 210:14
235:19 236:9
283:4 295:4,21
296:9 297:2,5
300:8,20 304:6
309:20
**new** 55:17 56:7,11
121:11
**news** 92:11
**newspaper** 213:21
**nexus** 17:4 76:17
117:19 118:1
190:23 213:2,3
214:16 229:23
**nice** 220:6 232:18
**nine** 35:9 185:21,24

**nods** 155:6
**nonprecedental**
21:18
**nonprecedential**
113:15
**nonprecedent-sett...**
20:16 21:6 23:1
25:4 35:1
**nonreferral** 20:16
21:6 25:5 35:1
113:15
**non-members**
128:17
**Non-Southwest**
231:18
**normal** 293:15
294:12
**normally** 135:17
143:12 159:23,25
159:25 160:11
187:3 246:8
284:25 294:20
**North** 1:21 2:4
**note** 9:20 15:23
16:14 97:19 105:9
105:13 188:4
226:24 248:3
256:15 257:4
284:17 315:5
**notes** 14:7,11,13,20
15:12 16:1,17 17:1
17:1,3,5,12,17
19:11 64:4,5,18
104:23 105:2,5,7
105:12,13,13,17
106:1,2,10,15
107:20 162:10
174:1 187:18
188:6 207:14
209:1,3,4,6,8,10
209:14,15,19,20
222:6 226:21
227:1,7 247:25
248:6,7 257:2
278:11,15,21
283:23 284:4,10
284:13,21,25
285:4,9,16,21,24
286:6,12,15
287:13,16,24
288:1 289:2,15,15
289:19 290:6,12
290:19,20,22
291:1,10 292:3,8
292:12 294:14,14
294:17,23 300:5

306:9,10,14,20,20
307:24 311:12,22
311:25 312:6,14
312:16,21,24
314:3 318:13
**notice** 51:16 166:12
209:23 272:20
**noticed** 235:10
**notification** 51:19
134:21 268:10
**notified** 34:3
**notify** 134:20
**number** 23:7 51:21
51:25 73:16 90:3
96:21 98:9,24
99:23 114:5
157:18 169:25
178:10 184:11
269:13 271:15,16
271:18 285:10
**numbers** 14:9 93:2

─────────────────
**O**

**O** 6:1
**Oakland** 24:8 38:1
**object** 17:16 60:15
61:2 108:23
109:10 112:5
113:7 148:21
154:11 186:12
285:14 291:20
**objected** 154:17
**objecting** 154:13
**objection** 8:10 52:7
52:13 54:12,14
56:16 58:9 59:20
60:18 62:2,5 63:8
63:10 66:5,21 71:8
73:14 98:5 114:10
136:12,14 145:15
176:25 185:14
186:16,18 203:3
224:18 232:11
**objections** 76:3
79:15 318:8
**objector** 30:15
35:17,25 128:15
132:17,20 135:2
139:3 158:17,21
196:6 197:15,19
197:21 201:24
202:3 231:3
235:23 236:3,12
263:22 264:1
**objectors** 128:12,19
128:24 129:22

133:8,24 134:3
136:9 137:24
151:16 162:5,21
**obscene** 49:25
**observations** 183:12
**observe** 39:8 179:10
316:4
**obtain** 17:16
**obviously** 9:10
26:20 54:14 168:3
220:9 298:15
**occasion** 200:14
**occasionally** 42:15
183:9
**occur** 24:23 83:1
120:11 254:8
**occurred** 14:12
84:19 140:19
173:19 175:23
199:8 257:7
284:19 285:10
286:8,13
**occurrence** 135:20
160:4
**occurring** 83:15
85:6 152:23
199:21 241:1
**occurs** 160:5 293:12
**October** 58:18
**offense** 42:18 43:8
44:17 233:6
**offenses** 42:20
**offensive** 32:5 45:21
65:23 72:24 88:17
**offer** 26:16 34:24
35:2,6 155:18
197:22 255:19,24
266:23,24 267:4
267:14,16,18
268:2,9,12 269:17
270:3,8,16,24
**offered** 26:14
124:25 138:18
201:20
**offering** 238:2
**offers** 21:2
**offguard** 224:20
**office** 65:24 67:15
126:16 131:23
200:24,25 216:9
252:15 313:24
318:18
**officer** 34:13 124:11
145:1 174:20
251:5
**officers** 35:15

124:20 126:12
127:17 131:16
258:21
**official** 14:13,20
16:19,20 29:17
30:19 197:24
226:23 257:4
286:12
**officially** 161:11
**officials** 214:4,10
280:7 292:19
**Oftentimes** 99:2
**often-subjective**
170:6
**Oh** 176:2 217:14
232:17 239:6
**okay** 8:4,11,13 9:9
9:24 11:5 13:1,8
16:11 18:19,21
20:5,6,12 22:12
23:4,5,9,12,13
28:5,12 36:13
37:14,17 38:5,19
39:8,17 40:6,14
41:19,23 42:10,19
43:9 44:8,21 45:5
45:12 46:11,19
48:14,22 49:17,21
52:3 53:13 54:7
55:22 56:13 59:4
61:21 62:11,13
63:19 64:11,14,23
65:8,8,25 66:18,24
67:8,17 68:15 69:1
69:7,18 70:22 71:6
71:8,14,17 72:1,9
72:14,23 73:3,6,12
73:16,19 74:2,7,9
75:19 76:5,19 77:5
78:10 79:4,16,20
80:12,17,25 81:8
81:11 82:4,12,17
82:18 83:4,11 84:2
84:7 88:25 89:14
90:19 91:1,2,8
92:23 93:5 94:24
96:7,10,14 98:1,6
98:24 99:19
101:11,17,23
102:4 103:18
105:6,16,19,23
106:8 107:4
109:13,21 110:1
111:5,10,13,19
112:10,16,20,20
112:24 113:2,5,22

114:7,10,22 115:9
115:12,15,18,25
116:5,8,11,14,22
117:2 120:25
123:12,16 124:2
124:13,18 125:10
127:8 128:4,18,21
130:8 131:6
132:10 133:7
134:18 135:14
140:15 141:1
148:14 149:13
155:2 156:2
157:20 161:23
162:9,16,20 163:6
164:5,8,15 166:11
166:17,22 167:13
168:2,11,20 169:3
169:22 170:17
171:18,20 172:4
173:8 174:4,11,14
175:3,24 176:4
177:8 178:5
179:24 184:16
185:11 186:7,10
187:2,8,22 188:11
189:16 190:25
191:8 198:5
202:14 203:8,12
204:15,16 205:9
205:16,23 206:2,9
206:18 208:5,23
209:3 213:3,12,19
215:18 217:2,14
217:25 218:3,12
220:1,17 221:21
224:14 225:23
226:1 228:13
230:24 233:5
236:25 238:8,18
238:21 239:12,15
240:14,23 241:4,5
241:22 243:2,5,9
243:10,23 244:16
245:7,13,16
246:14 247:1,17
247:25 249:18
251:14 252:6
253:15 254:15
256:1,3,6,19 257:3
257:6 258:11,13
258:16,25 259:4
260:13 262:4
263:4 266:8,21
267:16 268:1,8,13
268:17,17,20,21

269:5,9,16 270:2
271:18 272:15,20
272:25 273:6,12
273:23 274:5,8,15
274:18 278:7
279:14 280:21
281:2,14,24 282:5
282:16 283:15
284:1,4 285:1
287:8 290:17
291:24 292:16,18
293:5 295:15
296:19,23 297:13
298:15,18 299:15
301:22 303:5,20
305:19 306:23
307:7,9,15 308:4,5
308:11 310:12
311:7,25 312:20
314:18 316:1,11
**old** 74:17 108:24
**older** 82:23
**omitted** 96:4
**once** 29:14 89:20
116:2 123:3
131:11 133:12
160:2 164:16,17
164:21,25 223:4,9
223:18 224:4
230:11 238:6,8
295:23 304:24
**ones** 69:19 70:21,24
71:12 217:10
248:10 288:3
294:9
**ongoing** 260:17
**online** 55:21
**oOo** 317:25
**open** 9:1 40:9
136:19 145:7
193:17,19 199:23
**opened** 163:15,16,18
188:15,18 193:23
240:21
**opening** 3:5 28:19
257:11,23
**operates** 302:22
**operation** 55:24
**operations** 34:10
37:25 60:6 80:4
219:11 224:13
250:18 251:16
**opinion** 43:17 68:1,3
76:15 169:9
197:22 200:1
204:20 217:4

254:2,21 258:25
259:2 265:11,13
265:22 287:9
298:18 300:18
**opinions** 68:5 76:25
101:24 272:22
**opportunity** 31:8
41:2 106:11
135:23 223:7,14
255:2 257:14
**oppose** 26:20
**opposed** 288:9
303:25
**opt** 127:10,18,21,25
128:3,12 132:19
134:19 136:22
215:6
**opted** 29:9 128:5,7
133:14 135:15
136:17 196:7
215:2
**opter-outer** 196:9
196:15 236:2
**option** 273:15
**options** 99:17
246:11
**order** 10:20 11:10
11:15 16:7 20:9
116:24 187:3
226:3
**ordinary** 296:6
**ore** 12:21
**organic** 139:9
**organization** 17:17
41:6 47:12 141:12
196:11
**organize** 80:15
**organizers** 194:13
195:6,10 217:9
**origin** 310:3
**original** 12:21
103:23 305:12
**originally** 101:14
104:11 137:7
273:8
**Orlando** 219:23
**outcome** 244:13
**outcomes** 257:16
**outlined** 48:3 54:1
97:14
**outrageous** 30:11
**outside** 6:16 106:19
137:9 183:10
213:25 221:19
234:5 242:13
281:2

**overall** 45:2 221:22
244:3 251:22
256:4
**overlaps** 13:23
**overlooked** 152:22
**overnight** 94:16
**overruled** 63:7,9
154:17
**oversee** 38:10 79:11
**overseeing** 220:13
**oversight** 18:22
316:2
**overstepped** 152:24
**overview** 219:14
250:24 257:7
**O-M-B** 115:11,12

─────────────

**P**

**P** 2:1,1 6:1
**packet** 4:11 75:20
81:5 262:10
268:15
**page** 3:2 4:9,21 5:19
14:5,8,10,16,17
17:7 32:19,19,23
42:7,23 44:24
50:16 51:15,24
53:13,20 68:13,22
69:8,10,23 70:1
72:7 73:12 74:1,3
74:7,10,13,15,17
74:23 75:2,21
82:13 84:10,13
85:17 87:3 88:1
89:6,21,22 91:5,16
93:2,6,24,25 94:11
95:5,8 96:1 97:15
98:8,19,21 101:24
103:10 104:7,16
117:9,18 118:12
118:15,16 119:8
119:12,20 120:3
128:22 146:15
149:3,3 166:23,24
166:25 169:17
170:20 175:12
190:8,17,19,24
191:15 206:1
211:21 212:23
228:21 229:10,19
229:21 237:21
241:7,11,15,17
242:3,4,8,24
243:18,20 259:10
259:15 263:15
268:16,18,19,20

**269:**7,10,13 272:1
272:22 305:18
306:2,4,7 307:11
**pages** 84:2,3 88:2,21
90:2 94:1 126:22
126:23 129:21
146:15 168:20
175:15 205:25
227:6,8,9 240:22
241:8 243:11,20
269:20,21 312:1
312:25 313:1
**paid** 30:15 102:14
139:15,19 184:7,9
**pain** 201:13
**painted** 94:8
**painting** 235:13
**pairing** 26:10,11
**pajamas** 27:22
**paper** 309:21,22
**paragraph** 58:24
102:10 120:3,7
169:17,20 170:5
170:17 171:14,23
272:12
**paralegal** 2:21 6:20
**paraphrase** 263:17
**paraphrasing** 8:18
**parcel** 67:1
**Parenthood** 30:5
151:9 193:5
**Parker** 256:25
**part** 14:23 21:4
30:18 32:16 33:3
38:22 40:17 52:3
64:14 66:1,2,10,12
66:16 67:19,20
68:10,18,24 71:4
71:19 72:12,19
78:13 87:4 100:14
100:17,18 104:23
109:23 113:8
118:4 127:8
145:22,23 146:22
147:5 150:21
152:10 158:9
159:23 165:19
178:2 180:13
191:8 193:16
196:1 205:20,21
209:19 231:10
236:8 237:1
238:25 239:1,7
243:13 244:23
252:7 261:18
273:8 274:9

**283:**11 284:9
286:2 305:25
306:1 310:5 317:3
**partial** 197:16
**participants** 195:13
**participate** 64:11
139:2 160:1,13
197:19 231:16
236:1 278:13
**participated** 281:4
309:12
**participating** 142:14
278:12 294:13,24
**participation** 260:23
**particular** 40:20
63:23 79:6 118:14
118:25 130:3
279:8 292:21
**parties** 7:12 15:23
16:3,24,25 18:18
121:12 318:15
**partner** 24:9 79:9
222:18
**partner's** 24:3
**party** 297:23
**party's** 17:1
**pass** 239:6
**passed** 12:15 24:4
309:20
**passenger** 293:18
**passengers** 94:7
**passing** 56:20
**passionate** 188:22
210:22 211:4,17
261:9
**path** 55:20 215:13
**pause** 312:5
**pay** 30:12,21 130:24
133:8,24,25 134:4
186:25 187:4
195:21
**paying** 135:23
261:13
**pending** 14:1
**people** 17:2 19:17
22:3 24:22 60:7
79:1 113:8 126:14
128:11 136:22
139:8 141:10
142:20 152:11
154:13 162:21
177:18 180:18
188:3 190:12
209:4,4 222:16
235:1,14 236:25
247:23 253:14

**264:**19,20 294:12
295:2,9 298:9
302:1 316:24
**Peoples** 2:3
**people's** 265:4
**perceived** 304:22
**percent** 133:15
306:8
**percentage** 133:13
133:15 134:6,7
**perception** 50:14
118:5 214:13
**perfect** 112:11,13
171:20 292:15
**perfectly** 27:11
**perform** 110:7,16
**performance** 83:15
85:6 241:1 251:22
**period** 45:3,9 56:12
83:16 114:16
124:15 125:9
145:17,18 179:11
241:2 245:8
**periodically** 123:2
**periods** 145:10
**permission** 121:12
**permit** 12:12
**person** 27:13 51:17
68:24 91:21 93:9
93:18,24 105:10
105:14 107:2
118:17 119:18
131:10 167:17
175:17 210:25
211:13 213:5
216:16 252:3
282:23 283:3
284:22,23,24
293:22 294:21,22
295:23 302:16
303:7 305:13
**personal** 32:3 41:2
47:24 77:2 78:4
81:21 129:20
130:9,18 146:15
162:4,10,12
170:10 189:15
201:16 210:18
211:21 212:4
217:3 245:22
288:5 299:4,6
301:3,6,25 302:3
306:4 307:11,13
**personally** 58:5
65:21 128:24,25
129:7,10,11

142:19 144:2,3,8
188:8 198:14,18
198:19 199:2,4
**personnel** 27:16
81:16 244:22
274:16
**persons** 231:18
**person's** 118:15
303:10
**person-to-person**
234:21
**perspective** 155:11
223:16 261:21
271:1
**petition** 315:4
**Petroleum** 2:3
**Phillips** 2:24
**philosophy** 256:5
**Phoenix** 219:17
**phone** 34:4 156:1,2
200:19 215:20
216:11 221:14
226:15 294:16
302:16 303:8
304:4
**photo** 75:12,16
90:10,13,19,20
93:16 191:3,7
273:16
**photograph** 149:12
**photographs** 129:20
148:10 162:12
190:19 262:12
**photos** 29:6 30:24
32:18,20,22 50:16
73:25 88:9 92:13
118:1,7,16,18,22
118:24 119:19,21
153:9 191:9 230:3
230:4 241:23
259:12,13
**phrase** 22:23
**phrased** 196:10
211:3
**physical** 129:23
130:10
**physically** 23:15,25
65:24
**picture** 64:25 72:10
72:15,18,21,24
74:16,23 75:15
89:8 90:7 93:23
94:2,18 103:16
104:9 119:12
149:7 150:14,16
166:18 189:12

213:14 235:13
237:15 243:4
272:13,25 273:2
273:14 305:2,16
**pictures** 84:4,10,17
85:20 86:17 87:2
88:5,7 89:6,12,17
89:24 90:1,3 91:10
91:13,24 92:6,9
117:11,22 148:10
148:19,23 164:11
165:16 189:23
190:24 191:4
192:23 213:16
229:20 230:11
241:8,12 243:1,3
243:17 262:14
263:15 272:4
275:8,16 297:11
298:11 300:7
**piece** 81:10 169:6
309:20,21
**pile** 145:21 146:18
227:17 262:5
**pilot** 75:13,14
**pin** 74:25 75:1 307:5
**pink** 141:25 142:5,8
193:2 213:23
214:7
**place** 14:14 19:1,3
35:20 62:19 63:2
101:13 126:22
127:16 131:23
140:13 161:10
174:3 179:18
215:10 260:21,21
284:15 318:6
**placed** 216:11
**plane** 119:6 142:4
**planes** 141:25
**Planned** 30:5 151:9
193:5
**planning** 172:12
**Plano** 318:24
**play** 14:7 48:1 64:21
65:1 67:22 126:19
149:14,23 190:4
**played** 67:23 149:17
149:25 154:8
190:2
**playing** 163:12,18
**please** 36:21 53:8
54:23 56:24 58:8
58:16 59:19 70:16
123:22 149:24
150:14 153:21

181:6,9,20 218:22
250:2 262:25
264:14 268:14
277:9
**pleasure** 27:15
**plenty** 316:24
**plight** 29:17
**plus** 39:12 107:15
254:13
**point** 10:19 17:22
47:21 48:1 49:23
50:12 70:6 81:2
83:8 88:19,22
152:15 160:5
169:15 172:14,22
177:12,16 184:21
191:24 197:6,12
200:13 215:2
225:5,6,9 234:25
235:9 254:5
257:13 259:3
264:4 282:22
298:23 302:20
305:7 308:7
316:14
**pointing** 272:7
**points** 15:17 47:20
193:20 289:1
**point-blank** 208:17
**policies** 5:6 29:3
33:24,24 38:10
39:19,22 43:25
44:1,2,6 50:24
51:2,5 52:2,4
53:12,19,21,25
54:1,3,5 61:11
62:18,20 63:2 68:7
76:21 87:13 96:8
96:11,13,17 97:7
97:11 107:15
120:17,21 157:19
180:14,19 204:8
204:11,18 220:9
220:15 244:20
246:19,25 248:24
249:10 255:6
317:13,17
**policy** 4:14,16,17
5:1,4 34:2,3 38:14
42:14 43:20 44:5,9
44:10,19 45:6,8,13
45:15,23 46:12,15
46:20,24 47:3,6,19
48:8,15,21,23 49:4
49:10,13,17,19,22
52:21 55:13,17,18

59:5,12,15,16
76:13 77:1 79:8,11
79:12 86:5 87:18
87:20,24 95:12,15
96:16 97:3 98:13
98:13 99:1,5 107:9
107:12,14,16
110:18 133:11
168:8 169:5,19,23
170:2,21 171:3,3
171:13 178:16,21
178:25 179:20
182:19 204:7,8
223:23 237:8,8,20
242:18 243:7,10
243:24 244:1,5
245:3,8,14 246:20
246:21 247:4
271:10,10 281:8
281:11,17 282:3
282:24
**political** 29:17 30:8
30:14 31:24 32:24
33:16 35:18
133:17 134:8
135:1,1,8 137:17
137:18,21 143:15
143:18,25 159:2
190:21 197:4,5,25
212:8,15,20 213:5
214:6,12,16,19
261:2
**politics** 151:6
**POLSINELLI** 2:8
**poorly** 49:3
**pop** 92:5
**popped** 92:8
**pops** 51:20
**portion** 60:13 118:3
244:2 273:21
**portrayed** 237:11
**position** 11:20 16:3
16:25 21:13 37:14
37:18 111:3,21
123:9,10,13
124:11,25 125:3,7
131:24 176:10
181:24 182:2
204:10 219:12
250:17,19 271:4,6
299:15
**positions** 37:21
123:20 124:4,10
252:10
**positive** 140:6
**possibility** 77:13

**possible** 43:2,4
103:1 209:3,14,18
217:14 257:16
282:8 286:8
**possibly** 98:12,14
111:7 222:24
229:15 235:13
242:10
**post** 57:5,10 62:5
68:2 69:22 71:23
72:8,20 76:16 85:1
88:13 101:19
174:18 175:20
193:23 205:20,21
206:25 213:16
237:15 273:8,14
304:23,24 306:2,4
307:12
**posted** 32:17,22
40:11,11,11,12
50:15 57:5 84:5,18
85:17,20,24 86:3
86:20 87:2 88:5,8
88:21,22 90:21
104:11 117:16
118:1,17 175:15
190:8,10,19,21
211:20 213:13
228:18 229:9
230:1 241:13,15
241:17,18 242:22
247:15,17,22
**poster** 93:2
**posting** 83:18 84:23
87:18 89:5 117:11
241:19,23 259:9
275:6 306:22
**postings** 5:7,8,9,22
60:20 73:25 88:1
91:23 93:25 99:24
102:17 243:19
244:7,17 271:25
**posts** 31:11 32:14,20
33:2 46:4 61:5,15
61:15 63:15,17
64:16,17 67:17,24
68:12,16 70:19,20
71:18 76:9,21
89:22 92:2 117:9
117:15,22,25
118:8 129:22
144:20,24 145:3
145:13 146:14
152:14 189:7,11
191:2,14 192:9
193:18 196:16,23

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 489 of 676   PageID 5600
Charlene Carter - Vol. 1                                              December 7, 2017

23

200:6,10 202:11
204:21 206:12
221:2,6 226:10,12
227:15 228:1,21
229:3,18 230:10
242:17,19 245:22
247:21 248:15
295:9,9 302:17,22
304:20,21 305:5
305:10,10,13,19
305:22,23 306:4
307:10
**post-hearing** 9:13
**post-termination**
21:4
**potential** 38:13
63:22 68:2 79:7,10
107:9,13 182:18
267:11
**potentially** 116:1
171:7 302:1
**potty** 28:14 52:15
**pour** 291:22
**power** 15:3 141:16
**practical** 255:24
267:3,4,9,12
**practicality** 255:20
267:5
**practice** 15:24 17:19
107:17 257:9,10
289:14,14,23
311:11,13 312:21
**precedent** 19:17,18
**preceding** 83:16
241:2
**precluded** 13:24
**predominantly**
137:10
**prefaced** 293:2
310:6
**prefer** 51:11 239:8
**preference** 8:6
**preferred** 316:15
**pregnant** 108:21
**prejudicial** 185:17
**preliminary** 8:2
10:15
**prepare** 106:16
279:15 280:5
314:1
**prepares** 105:13
**preponderance**
306:18
**presence** 30:3,10
**present** 2:17 13:24
14:11 33:1 34:16

131:19 132:1,9
135:19 161:2,7
182:8 187:22
188:17 256:11
259:22 262:25
280:14,15 305:17
312:11
**presented** 15:13
221:18 223:7
255:5 262:11,17
287:18 300:9,21
302:22 309:17,19
**presenting** 262:23
**presidency** 125:7
**president** 29:4,23
31:2,20 57:2 60:5
60:9 101:6 123:5
124:2,6,14,16,16
124:19,23 125:2,4
125:7,11,17 126:3
126:5,17 127:12
131:13,15 140:18
159:22 160:9
161:7 162:24
165:20 169:1
189:3,8 196:15
202:8 206:24
252:13,14 267:7
271:22 274:4,6
296:22 297:1,6,14
297:20 298:19
299:1,3,3 313:10
313:21 315:10,14
317:9
**presidents** 315:1
**president's** 168:21
169:14 252:2
**presumed** 8:9
**pretty** 43:18 102:16
164:1 169:13
186:25 187:20
202:22 207:21
208:20 257:10
269:1
**prevent** 213:10
**previous** 45:3
164:22 230:10
274:21
**previously** 125:2
126:15 242:4
261:25
**price** 130:24
**primarily** 126:21
127:1,13 192:14
312:13
**primary** 220:6

251:14
**print** 25:17
**printed** 143:13
298:12,13
**prior** 20:20 39:4
61:5 63:24 79:2
85:7 124:2 131:10
131:22 141:10
143:21 144:15,18
147:21 151:18
182:4,7 199:4
200:25 219:16,18
219:19 220:2
232:8 253:7,9
254:16,19 282:10
**privacy** 69:5
**private** 59:9 71:24
74:4 87:5 144:11
145:13 146:10
147:7 148:14
149:20 150:3,18
155:5 156:23
165:15 175:6,14
176:2 191:9
199:10 227:14,25
234:12 242:19
248:17 272:2
305:21
**privilege** 16:5,6
19:13
**privileges** 184:5
**privy** 64:4
**proactive** 107:10
**probably** 24:14 90:5
92:12 103:15
105:12 115:2
128:1 146:1
183:17 227:9
268:14 272:21
278:22 281:12,18
283:24 304:15
307:4 313:1,7
**probative** 23:2
**problem** 52:20,22
89:12 191:15
192:1,1,3,12
209:24 212:9
281:22
**procedure** 109:17
238:14 281:21
293:16
**procedures** 32:10
220:9,15 255:6
310:7
**proceed** 17:25 37:2
160:8,12

**proceeding** 17:18
19:1,4 26:1 285:12
290:7
**proceedings** 12:10
18:13 19:24
159:13,19 278:8
290:13 317:24
318:5,9
**process** 16:20 19:14
32:16 33:3 34:6,7
36:2 68:25 79:24
134:12,23 159:23
159:24 173:18
222:6 253:7,7,10
254:9,10 255:11
257:20 262:2
268:7,25 269:4
274:9
**produce** 15:25 16:10
**productive** 172:20
**profession** 266:5
**professional** 130:19
135:25 298:2
**professionally** 129:9
**profile** 273:2,7
**progress** 304:10
**progressive** 42:11
42:14 245:14,17
**prohibit** 31:7,8
**promote** 35:15
**promoted** 230:14
250:21 251:8,11
**promoting** 58:2
**promptly** 32:10
**pronounce** 106:22
**proof** 28:18
**proper** 9:3 16:8 21:2
60:25 208:8
315:12
**properly** 15:20
188:25
**propounded** 318:8
**propriety** 254:21
**protect** 114:16
204:8
**protected** 35:22
204:13
**protections** 317:17
**protocol** 222:21
225:23,24
**provide** 31:9 41:1
47:10 120:6 140:6
147:6 150:20
157:3 182:14
202:19 255:8
264:21

**provided** 30:17 41:4
51:13 89:17
104:19,22 139:16
140:1 147:12
185:15 202:22
254:11 266:12
**provides** 49:18
255:2
**providing** 36:2
136:7
**provision** 140:3
183:24
**provocation** 30:23
**provoke** 33:8
**pro-abortion** 50:9
193:2
**pro-choice** 192:25
193:4 196:3
216:15 230:23
**pro-life** 32:24 33:10
35:25 188:24
194:16 196:3
211:8 230:25
261:9
**pro-lifer** 194:14
**pro-Union** 126:23
**prudent** 255:21
**public** 32:19,23
50:14,16 68:13,16
68:22 69:10,23
70:1,18 74:1,13
75:21 76:9,14,21
77:2 78:5 87:3,18
87:25 88:13 89:9
91:16 93:24
117:15 118:4,5
119:1,18 146:14
176:5 190:8,11
191:1,14 204:21
204:24 228:20
229:2,10,18
234:11 241:11
242:18,19 244:7
244:13 248:15
259:10,14 263:14
271:25 305:6,23
306:7,22
**Publication** 5:21
**publicized** 143:15
**publicly** 32:17 69:9
**publish** 60:11 62:24
**published** 60:4
**pull** 25:15 70:10
104:2 123:3,4
150:13 164:20,23
200:14

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 490 of 676   PageID 5601
Charlene Carter - Vol. 1                                    December 7, 2017

24

**pulled** 164:16
**punishment** 87:1
**purporting** 289:3
**purpose** 14:18 15:1
  15:10 41:23 52:10
  120:7 137:5 138:9
  204:3 224:16
  254:25 284:12
  302:19
**purposes** 85:15 87:9
  137:1,18 186:19
  289:2
**pursuant** 140:3
  252:4
**pursue** 290:18
**push** 127:12,16,18
  127:23
**pushback** 126:16
**pushed** 196:4
**put** 9:12 10:8 13:17
  62:24 73:5 80:22
  87:21 94:19
  101:14 138:17
  148:11 167:10
  168:18 175:5
  242:7 286:25
  290:15 292:12
**putting** 243:8
**P.A** 2:24
**p.m** 317:24

———————————
        **Q**
———————————
**quality** 251:21,22
**quarter** 53:23 123:3
  125:14 174:21
**quash** 7:16 10:21
  11:17 12:18,22
  15:22 16:8 18:19
  315:20
**quashed** 11:7 315:25
**quashing** 19:25
**question** 33:1 61:6
  66:8,9 83:17 84:22
  85:21 92:19,19,22
  93:11 105:6
  108:18 109:2
  113:17,19,22,23
  114:1,3 133:23
  134:15 136:15
  148:22 162:4,14
  162:17 172:8
  176:11,16,17,23
  203:7,19 207:1,21
  207:24 208:2,6,10
  208:18 211:20,23
  214:9 217:6,21

226:11 228:3,16
232:22 233:9,21
241:11,16 242:9
246:1 247:20,21
257:24 258:1
271:3 272:14
273:11,12 275:12
281:24,25 288:4
291:11 292:21
293:2 300:22
307:10,11 308:9
308:12,14,14,18
315:19 316:23
**questioning** 17:25
  116:13 154:5
  208:19 215:16
  292:2 295:20
  304:10
**questions** 39:22 45:5
  46:20 66:15 71:7
  80:12 95:2 107:22
  108:1 121:1
  122:18 132:7
  135:21 136:3
  155:15 161:19
  169:12 178:6
  180:23,24 187:20
  188:8 200:3
  202:12 205:7
  217:4 218:2 222:7
  226:16 240:6
  248:9 249:19,21
  257:15,19 259:19
  259:21 262:19
  276:16 283:17
  288:7,11,23
  289:17 290:18
  293:2,24 294:24
  295:2 300:6 302:9
  303:1 306:6,15
  307:1 308:8,21
  314:15 315:16
  318:8
**question's** 308:16
**quick** 178:9 186:11
  248:10 276:3
**quickly** 67:8 209:21
**quit** 23:7
**quite** 92:4 161:1
  195:1 233:11
  278:22
**quote** 207:15 226:23
**quoted** 214:4 247:14

———————————
        **R**
———————————
**R** 2:1 6:1

**race** 45:18
**Railway** 12:11 35:13
**raise** 10:15 36:21
  114:10 122:3
  181:9 201:22
  202:1 218:21
  231:2 235:21
  236:10 250:1
  277:12
**raising** 233:2
**ramifications**
  158:14
**ran** 175:22 238:9
**random** 93:18
**range** 246:10
**rank** 139:23
**rarely** 59:10
**ratification** 132:25
**RBF** 55:5 57:20
  58:17 61:7 62:16
**RBFs** 55:4,22 56:7,9
  56:11 60:11 61:19
**reach** 234:8 260:19
  301:19
**reached** 25:3 139:11
  155:9 216:15
**reaching** 139:9
**reaction** 65:17
  296:24
**read** 5:1,2,4,5 18:23
  27:2 46:14 53:11
  53:25 54:21,25
  55:22 56:4,7,9,11
  56:25 60:3,17,25
  62:13 72:11 83:12
  85:3 103:13
  113:17 171:14,15
  180:6,12 206:18
  206:19 229:22
  237:7 239:14
  263:3 272:22
  282:21 283:11,15
  283:16 293:17,21
  294:5 309:25
  310:9
**reading** 62:14 90:22
  103:14
**ready** 221:12
**real** 49:9 68:23
  254:25
**realize** 97:24 118:10
  147:19 163:23
**realized** 192:17
  210:5 254:22
**really** 21:20,22 22:5
  22:10 25:7 26:2

55:10 58:4 63:23
68:23 72:17 80:22
81:22 88:4 89:25
152:7 168:20
183:11 186:11
192:8 193:19
194:3,17,25
207:20 208:3
215:9 234:24
246:22 272:14
290:13 304:9
**realm** 133:17 135:10
**realtime** 312:22
**reapplied** 114:23
**reask** 203:20
**reason** 13:4 17:22
  18:6 49:1 171:17
  186:22 189:10
  192:7 211:4,16,17
  212:5 214:11
  215:3 280:7
**reasonable** 87:11
  119:17
**reasons** 22:5,6 23:7
  23:15,24 188:22
  189:6 192:13
  210:22 211:24
  214:1 255:13,16
  261:6 270:20
  285:20 289:6
  295:5,18,19 309:1
**reblocked** 164:25
**rebuttal** 20:2 277:4
**recall** 91:19 118:8
  120:16,19 128:7
  140:22 146:22
  149:7 150:10
  158:23 200:7
  216:4 227:6
  258:20 260:18
  292:21 300:14
  303:10 306:3,5,21
  307:21,22 312:18
  313:23,25 315:4
**recalled** 67:16
**recalls** 292:3
**recapped** 76:23
**receipt** 48:20 52:2,4
  53:18 153:16,16
  155:8
**receive** 41:19 115:18
  115:21 144:11
  148:14 151:15
  165:11 270:19
  282:13
**received** 7:16 25:12

52:20 61:5 65:18
108:8 115:23
134:22 146:25
147:7 149:15
150:17 164:10
173:1 184:10
199:8 221:3,5
223:17 232:6
233:13 268:9,10
283:14
**receiving** 31:22
  33:25 47:3 50:23
  51:5 143:21
  144:15,18,20
  151:18 165:15
  166:3 198:11
  232:1,2,9 233:10
  300:12
**Recess** 28:16 52:17
  80:18 121:24
  153:25 181:4
  218:14 240:11
  276:24 277:7
**recognitions** 182:15
**recognize** 96:7
  152:11 166:17
  168:16 174:8
  239:21 265:2
**recognized** 107:8,12
**recognizes** 94:9
**recollection** 164:2
  207:13,16 208:10
  208:23,25 289:18
  292:13 298:22
  306:14
**recommend** 244:24
**recommendation**
  106:3,4
**recommended**
  244:16
**reconsider** 11:15
**record** 14:14,21
  18:6 26:18 28:14
  36:15 45:2 52:19
  70:12,13,15 72:20
  76:2 94:21,23,24
  97:18 107:16,24
  108:5 110:24,25
  111:1,16 121:6,8
  154:3 162:9
  167:23 171:15,19
  180:3 181:6
  218:16 240:13
  249:25 276:25
  277:6 284:18
  285:10 286:9,13

Case 3:17-cv-02278-X    Document 183-1    Filed 09/09/21    Page 491 of 676    PageID 5602
Charlene Carter - Vol. 1                                                    December 7, 2017

25

287:14 317:22
**recorded** 318:10
**recording** 131:16
284:17 286:10,11
286:11
**records** 112:4 174:2
244:22
**record's** 66:19
**RECROSS-EXA...**
315:17
**recurrent** 37:24
39:12,14 219:23
**recused** 34:7 160:20
161:11
**REDIRECT** 117:3
178:7 248:11
276:5 314:20
**refer** 43:13 55:3
128:11 180:3
290:19
**reference** 43:24
120:24 212:16
300:11
**referenced** 120:20
130:4 172:16
**references** 129:14
148:7 242:23
**referencing** 260:17
**referred** 16:17
**referring** 162:17
169:4,7,24 191:21
292:3
**refers** 175:25
**reflect** 209:15 248:6
270:3 286:8
**reflected** 169:14
287:9 288:5
307:23
**reflecting** 301:3
**reflects** 49:2 102:5
**refresh** 290:19
306:13
**refunded** 133:13
134:4 135:9
197:17
**refunding** 134:13
**regarding** 33:1,9
57:10 58:21 67:21
79:16 117:8 118:6
118:24 119:5,24
120:17 129:4,4
144:12,19,21
146:25 148:15
155:16 156:17
159:19 161:17
178:13 183:12

189:18 195:15
196:18 201:6
202:24 203:24
228:3,20 234:4,11
251:25 261:16
262:20 263:5
268:9 305:21
306:6 314:5,9
**region** 224:11
**regional** 224:12
251:11
**Registration** 318:22
**regret** 201:20 263:7
**regretful** 235:19
**regretted** 210:19
**regular** 133:25
134:4 135:20
160:4 220:13
**regularly** 136:3
160:12
**reinstate** 266:4
**reinstated** 21:25
**reinstatement** 21:3
34:25 35:6 267:5
270:3
**reiterates** 47:9
**reiterating** 60:13
**rejected** 35:2,6
270:8,16,24
**rejection** 270:21
**relate** 223:16 288:8
**related** 15:12 49:2
118:4 134:9
165:12,17 180:19
226:12
**relating** 121:14
**relations** 2:20 6:19
19:13 20:24 22:4
23:6 36:14 37:15
38:4,6 39:17 55:11
58:20 60:9 65:20
66:3,13 67:4 79:6
111:5,6 155:14
160:15 188:2
221:8,9,14,25
222:1,11,13
223:20,20 251:9
252:1,19 254:12
254:16 256:15
270:19 274:20
303:21
**relationship** 235:4
277:23
**relative** 118:7
133:20 318:14
**rele** 316:17

**released** 129:19,20
**relevance** 13:11
84:21 185:15
186:22 285:17
**relevant** 7:21 17:18
20:2 40:21 45:9,23
46:1 57:20 61:9,13
61:21 85:18
108:24 114:19
145:19 186:24
230:6 259:23
**relieved** 177:24
**religion** 45:18
**religious** 189:4
233:25 261:10
**remain** 59:10 276:15
**remaining** 84:3
**remarks** 20:1 22:2
36:7
**remedy** 8:21 9:3
186:25 244:9
**remember** 89:15
90:8,9,9,10,12
91:11,12,14,15
92:7,8,10 100:8
111:19 115:7,22
115:23,25 162:7
162:12 166:8
168:9 173:6
188:12 207:3
217:11 233:9
247:11 259:17
274:12 279:4,11
283:21 293:1
295:3 300:15
303:16 304:16,18
307:18 312:7
**remind** 257:20
**reminder** 5:4 58:20
59:4
**reminding** 57:15
**reminds** 53:24 59:8
59:11
**remorse** 33:17
201:12,20 263:13
**remorseful** 192:19
263:5
**remotely** 28:2
**removal** 124:22
**remove** 178:1
**removed** 125:3,5,8
126:12 127:17
226:4 238:17
266:8,14
**rendering** 87:4

**rendition** 206:3
**renew** 287:13
**rep** 155:23,24
187:25 200:13
256:21 290:11
313:18
**repeat** 66:8 133:22
176:15 208:4
275:12 308:21
**repeated** 14:17
200:9 275:21
308:11
**repeatedly** 156:7
194:8
**repercussions** 131:2
**rephrase** 66:25
**replicated** 44:12
**replication** 51:18
**replied** 208:14
**report** 31:17 130:8
152:13 153:1
158:25 251:20
280:12,16 282:15
283:16 293:20
309:24
**reported** 31:24 32:6
130:16 151:19
155:4
**reporter** 66:9
113:18,19 176:17
218:17 318:4
**Reporters** 318:22
**REPORTER'S** 4:6
318:1
**reports** 131:19
135:19 185:5
213:21
**represent** 12:23
17:25 65:5 133:4
159:12 195:18
211:11 212:22
227:25 278:2
316:22
**representation**
30:17 33:1 34:15
133:5 136:7
155:18 163:3
166:19 193:3
197:7 256:10
**representative**
156:5 173:11
214:20 225:13
268:11 274:2
279:14,22 293:17
312:14
**representatives**

195:8 231:20
256:22 310:1
**represented** 13:6
16:16 25:1 71:11
278:20 297:2
316:20,24
**representing** 18:5
188:25 191:18
211:10 281:7
**represents** 147:11
**reps** 274:11
**request** 11:14 57:13
134:22,23 164:24
165:2 279:9 280:9
287:13 292:11
**requested** 18:24
19:2 24:12 86:11
279:7 280:22
299:24 310:15
**require** 9:21 24:7
**required** 34:23
43:14 46:14 55:18
56:7 241:24,25
**requirement** 242:21
**research** 78:1
**researched** 221:7
**reserve** 36:7,9 43:14
277:3
**resigned** 124:21
214:23
**resigning** 215:4
**resolutions** 160:16
**resolve** 152:4
**resolved** 26:22
**resolving** 172:23
**resource** 222:18
**resources** 39:3 49:12
55:9 60:8 68:17
79:9 107:11
**respect** 17:14 39:9
41:5 47:6,11,18
48:23 117:15
120:8 132:17
160:18 161:15
188:13 235:17
252:19 253:17
264:9
**respectfully** 231:1
**respond** 24:19 146:4
287:22
**responded** 29:14
208:21
**responding** 215:24
**response** 57:4 61:14
61:17 153:12
194:3 200:11,20

211:19,22 228:9
228:11,17 229:25
230:1 233:22
258:4 260:16
268:8 269:11
300:5
**responses** 200:10
**responsibilities** 38:6
182:9,11 220:7
251:15,24 278:9
**responsibility** 36:1
55:16 78:25 133:4
158:14 221:23
286:5,7 316:22
**responsible** 34:11
38:19 142:7
278:10
**rest** 102:9 149:11
185:19
**restart** 296:2
**restrained** 233:1
**restraint** 154:15
**restrictions** 133:19
**result** 43:7 44:17
49:4 63:22 120:14
120:21 177:22
**results** 177:10
**retained** 35:3
**retaliate** 264:7
**retaliated** 263:21
**retaliating** 201:24
265:18,21
**retaliation** 4:15
45:14 59:14
201:23 236:7
264:9 310:7
**retaliatory** 50:2
264:13,17
**return** 12:1,8
**returned** 201:4
**reveal** 107:24
**reveals** 176:13,19
**review** 19:20 85:8
105:2,7 142:25
203:2 206:13
227:1 228:19
254:15 255:3,9,20
262:21 274:15,17
275:13 286:17
**reviewed** 39:3,6,7
64:6 104:23
105:25 107:14,16
109:4 120:18
160:22 190:3
203:1 204:2
247:25 262:22

266:11 274:11
287:8
**reviewing** 193:18
199:24 209:11
254:20 274:13
**reviews** 105:15
**revise** 11:15
**revised** 55:12
**revisit** 103:8
**rhetorical** 200:2
**Richard** 2:24,24 7:5
7:7,9 11:22 13:8
13:12 16:12 114:9
114:14 121:9
316:6
**Ricky** 111:10,12,25
**rid** 202:3 236:11
**ridiculed** 129:16
**ridiculing** 47:23
**right** 2:14 7:10 8:16
8:22 9:13,18 10:3
10:5,22,25 11:12
13:15 17:15,20,24
18:1 26:5,8 28:4
28:13,20 30:22
35:3,18 36:11,21
39:21 51:7 52:25
54:16 62:4 63:13
64:19,24 65:17
70:3 73:7,11,19
75:21 81:11 83:22
84:16 86:1 91:24
103:14 109:15
110:6 112:18
118:23 119:10
121:6,20 122:4
126:9 128:22
131:13 132:21
133:1 144:5,6
146:17 147:14
154:4 155:5
161:21 163:10,12
166:4 167:8,12
168:12 169:16
170:20 178:17
181:8,9 184:2
186:2,20 187:14
191:19,22 192:3,4
205:8 209:8,10
216:14,19 218:22
226:6 232:3,24
239:18 242:9,11
244:10,12 246:12
248:25 250:2
257:24 266:2
268:18 271:25

272:3,9,20 273:4
273:20 276:11,13
277:3,12,17 279:9
283:9 284:2,3
289:25 291:9,11
292:1 303:8,23
309:13 310:16
311:20 312:2
317:20
**rights** 30:2,2 35:23
130:21 132:18
142:14,14,18,18
143:4,4 152:2
185:18 193:4
194:14 196:3
**right-to-work** 35:16
159:3 196:11
**Rind** 2:24
**ring** 303:17,22
**Road** 2:14
**role** 14:10 16:20
39:17 65:19 66:3
66:12 67:4 173:16
173:21 220:25
251:3,13
**roles** 126:14
**rolled** 129:6
**rolls** 39:5
**room** 27:19 200:14
256:18 284:22
288:12
**Ross** 159:17 256:25
269:22
**rotation** 6:11
**round** 64:25
**routes** 110:12
**RT** 219:20
**rule** 7:24 21:22
26:15 38:13 43:13
60:17 154:18
171:16 186:23
258:24
**rules** 4:13 5:20
11:24 31:7 41:9,15
42:22 43:25 44:7
87:13 96:12 97:6
97:10,13 99:3,6
171:5,11 182:19
248:22 315:13
**ruling** 21:11,16
22:21 285:15,23
**run** 19:19 125:10
294:21 313:17
**running** 27:17
135:11 136:6
175:5 190:15

220:10 226:18
284:23
**Russell** 60:8

**S**

**S** 2:1 6:1
**saddened** 260:3
**safety** 130:6,7 283:7
**salary** 139:22
**salt** 291:22
**Sam** 115:1
**Samantha** 115:2
**San** 2:9
**sanction** 18:16
**sanctity** 114:15
121:14
**satellite** 27:18
**Saturday** 140:25
141:10 142:11
**savvy** 89:11 153:6
**saw** 65:25 66:10
90:7,8 93:5 149:9
158:9 164:3
192:23 230:11
245:7 270:17
283:6 310:23
**saying** 22:22 60:23
72:21,24 74:17
148:21 150:12
156:13 166:8
174:25 206:10
207:3 214:5 216:4
247:11,14,17
282:24 283:6
293:22 295:10,14
**says** 14:12 15:7
25:24 50:13 51:16
55:4 58:24 62:15
75:16 93:16 97:6
100:21 118:22
119:9 174:11
240:24 242:12
269:1,19 272:22
307:9
**scattered** 251:18
**schedule** 5:11,13,14
183:13 185:2,4
246:3
**scheduled** 35:10
126:9 131:22,23
140:23,24
**scheduling** 185:7
280:20
**Schneid** 106:22
**Schneider** 3:18 4:18
33:21 64:7,15 77:6

77:10,20 78:12,16
105:3 106:24,25
155:9,12 187:24
202:18,20 218:18
219:2,6 239:21
248:13 253:19,22
**Schneider's** 77:8
**screen** 69:13 70:23
71:1
**screenshot** 4:23
212:16 298:13
**screenshots** 68:8
153:5 164:18
175:14 262:13,14
298:16
**scribbles** 97:23
**scroll** 89:5,7 91:9
94:1
**scrolling** 89:15
**scrolls** 92:5
**se** 271:12
**seal** 318:18
**search** 190:15
306:17
**seasoned** 77:17
**seat** 57:7
**second** 10:19 40:25
42:7,23 50:12
53:20 56:10 60:13
65:11 70:9 71:10
71:15 72:7 81:9
91:5 93:20 95:8
97:15 98:8 103:10
147:14 149:11,23
150:2 151:24
163:19 166:25
169:16 240:9
260:6 304:8,14
305:25
**seconds** 163:20
**secretary** 131:16
**section** 7:6 40:25
42:10 82:15 91:16
91:20 95:5,9,12,15
240:21
**see** 14:9 19:10 20:1
26:25 28:3 33:5
39:15 43:24 52:19
55:4 58:24 61:8
62:15 64:25 70:1
84:20 88:20 91:9
91:10 93:18,22
94:10 101:23
103:10 145:7
167:12 168:21
169:20 170:22,24

172:9 174:17
176:13,19 179:14
183:14,16 185:14
190:11,16 203:18
206:4 224:18
229:14 240:24
244:22 245:1,4
248:1,8 269:19,24
272:22,24 273:22
274:3,18 285:23
299:5 305:2,16
306:18,21,25
308:8 309:21
seeing 70:7 73:9
170:13 178:25
179:15,22
seen 43:6 63:24
65:21 78:2,7 93:25
112:8 130:15
136:23 169:25
180:8 183:16
203:1,5,13 204:25
205:3,4 300:20
sees 53:10
selected 103:24
self-serving 17:2
self-training 49:12
semantics 9:7
send 30:24 101:4,11
102:12,18 103:4
127:19 153:7
198:19 200:9
207:22 208:2
225:21 293:25
308:23,24
sending 29:3,10 33:4
33:7 68:7 144:24
145:3 150:24
156:3 159:7 167:3
167:5 172:21
193:6 194:1 198:8
198:15 199:16
200:6 201:15
212:6 235:20
258:8 259:4 263:6
288:3 298:23
301:8
sends 134:21
senior 34:9 58:19
224:10,15 250:18
250:21 251:15
294:21
sense 110:2 286:12
sensitive 27:25
sent 29:8 30:9 32:14
46:4,9 50:3,5

53:14,16 57:23
64:3,15,17,23 65:4
65:9,12,15,19
67:18 68:18 74:6
84:12 87:6 89:20
100:10,23 101:5
145:11,14 149:20
150:3 152:7,17,21
153:3,4,8 155:4
156:8,22 158:10
163:4,22 164:1
166:8 167:11,14
167:17,23 172:14
188:19,21,22
189:8,9,14,17
191:9 193:16
198:18 199:10
200:2 207:12
208:7,13 211:16
211:24 221:4,6
227:15 228:1,4
234:20 235:18
239:25 245:23
260:13 268:4
270:17,18 273:21
275:7,15,20
288:10 289:7
293:6,25 294:3
298:8 300:6
305:14,14
sentence 40:23 41:3
48:25 83:13
169:22 170:5
sentences 272:12
separate 96:13
171:12 211:23
213:24 234:22
239:12 247:7
248:24
separately 239:9,11
series 145:18 189:9
serious 22:7 61:24
86:25 254:22
seriously 43:19
45:16 47:8 49:10
63:1 77:13 234:24
serve 124:18 252:2
252:12,14
served 11:23 12:2,3
12:6 13:5 124:1,3
251:2,4,10 256:15
257:3 266:6 316:3
service 12:1,8,24
13:3 56:2 184:12
220:2
services 57:3 110:7

136:8
serving 15:21 126:3
281:16
session 132:1 296:11
sessions 278:20
set 138:18 147:17
155:13,20 221:10
223:8 280:23
318:6
sets 133:12
settings 69:5
settle 257:16 276:10
settlement 21:5
22:20 23:1 25:3
28:1 113:9 255:19
255:24 266:23,25
267:15,16,18
269:17 270:5
settlements 19:17
20:15 21:17 22:9
177:15
seven 19:9 52:16
80:16 85:12 86:15
153:23 175:21,24
276:22 312:1
313:1
severity 42:20 44:16
sexual 4:14 46:5
59:13 195:21
248:24 282:3
sexually 45:20
share 27:13 28:3
41:6 47:13 101:12
101:19 106:19
223:14 224:16,19
shared 63:25 78:8
101:21 106:16
302:3
sharing 104:3 273:9
273:13
sheep 50:9 101:8
102:23
sheer 199:18
SHELTON 318:3,21
she'll 103:7 210:7
she's 26:20 31:2,3
75:17 88:11 93:20
103:23 105:20
107:24 108:23
115:2 136:13
188:23,23,23
203:13 210:13
211:8 229:13,22
261:8 274:4
289:10 317:9,12
317:16

shifts 183:20,21,23
185:21
shop 13:16 14:11,13
123:15,16,20
173:10,11,16,21
277:24 278:1,2,10
278:16 279:7
281:5,16 282:2
283:20 284:9
286:3,7 287:1
296:24 299:9
311:13 316:20,22
317:1
short 23:10 28:14
56:5 115:2 206:19
267:25
shorthand 81:1
128:18 286:22
311:19 318:4,13
shortly 286:17
short-circuit 61:18
shot 46:6 50:4 65:14
72:3,4,6 74:5 75:2
75:9
shots 57:22 64:2,20
64:22 65:5,9 153:5
158:11 310:24
shouldn't 213:1
show 14:7 21:20
51:18 53:9 60:12
61:4 64:19,22 82:8
86:3 93:3,10 95:24
96:1,21 100:21
179:24 189:23
199:14 205:23
227:14,18 287:16
292:23
showed 229:20
showing 52:10
186:19 234:17
235:12 273:17
shown 103:1 163:11
166:23 298:8
shows 51:24 74:10
164:8 237:9
288:10
Shuler 138:20
sic 102:14
side 6:24 33:2,20
38:1 106:12
223:14 257:23
267:9 280:21
284:25
sides 21:15 212:8,15
212:21 213:1,4
284:20 285:16

288:22
sign 141:10 142:20
269:8 313:25
signal 232:18
signature 240:2
267:20 269:5
signature's 269:7
signed 148:9 315:4
significance 132:16
significant 62:1
140:15
signifies 65:1
signing 148:8
signs 142:22,25
143:2
similar 50:15 68:12
98:12,25 151:15
204:25 281:24
295:19
simply 21:19 29:16
29:22 31:16 35:23
51:18 117:11
199:23
Sims 3:21 34:10,12
34:19,23 80:6
224:8,12 249:24
250:8,12 262:8
276:7
sincere 260:9
sing 75:7
single 42:3 46:13
120:11,23
sir 6:24 7:8 13:1
36:7 58:10 59:21
114:11 117:1
161:21 174:23
205:8 240:13
249:22 271:24
276:18,20
sit 22:3 147:19
situation 18:9 22:25
214:11 282:18
298:4 301:6
situations 57:19
170:15 172:6
316:25
six 38:2 90:2 175:21
175:24 181:23
269:21 283:24
sixth 55:5
size 71:2 136:6
skip 47:25 298:5
sky 94:8
Skype 20:4 23:17
24:16 25:11,19
26:16,19 27:7,22

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 494 of 676   PageID 5605
Charlene Carter - Vol. 1                                      December 7, 2017

28

slandering 47:23
slash 44:1
slogan 142:19
small 133:13 138:14
  244:2
smoothly 220:10
social 4:17 5:1,4,5
  20:19 29:2 32:13
  33:23 34:3 43:20
  44:4,5 47:15 48:8
  48:21,23 49:1,7,15
  55:13 57:4 58:22
  59:5,10,11,16
  61:15,15,23 63:15
  63:17 64:16,17
  65:18 67:17,19,22
  67:23 68:4,21 69:2
  76:12,16 77:1,22
  81:19 86:5 87:17
  96:16 98:25 99:3
  107:15,16 108:1
  120:18 126:19,20
  127:1,6,13 128:23
  129:13 143:21
  165:22 168:8
  169:12,19 170:2
  170:21 171:2,3,13
  178:15,20,22
  179:3,18,20
  180:13,18 187:16
  204:7 221:1 237:8
  237:20 242:18
  243:7,24,25 244:5
  244:13 245:3
  246:21 248:23
  271:10 274:19
  281:7,11
sole 316:21
solely 248:17
solution 267:4
solutions 160:16
somebody 27:21
  121:19 164:21
  170:11 257:1
  279:7,22 304:22
  305:16 312:8
somewhat 19:13
  98:12,25 145:4
songs 75:7
Sonya 60:4
sorry 45:25 95:13
  138:5 166:11
  170:5 172:10
  176:15 189:12
  208:4 212:11
  219:22 222:19

224:12,15 256:23
  288:14 291:2
  305:7 308:9
sort 62:1
sorting 8:6
sound 168:12 284:1
  312:1
sounds 43:12 284:3
  303:19,23
source 84:15
Southwest 1:13 4:12
  6:16,19,20,22 8:19
  28:24 29:15 31:2,3
  31:9 32:7,9,12,16
  32:21,25 33:6
  35:12,19 36:3
  37:11,13,21 40:4
  40:17 41:7 42:6,13
  42:19 45:6 49:2,3
  49:6 50:17,20 51:7
  52:8 53:5 54:11,22
  54:23 55:14 56:14
  56:20 58:7,12 59:3
  59:18,25 60:14
  63:1 69:7 73:20,24
  74:10 75:13,20
  76:12,14,15,18
  78:5 83:21 84:9
  86:4,5 88:6,12
  89:9,13 91:17 93:3
  93:21 94:5,9,12,17
  111:8,14 112:22
  117:5,9,12,18
  118:1,7,24 119:3
  119:16,21 120:16
  122:17,20 123:1,7
  123:8,10 126:10
  129:8,17 130:16
  130:20 133:5
  139:16 140:1,5
  141:24 143:8,11
  146:18 147:10
  148:9 151:20,24
  152:6,14,25 153:2
  153:10 154:6
  155:17 157:8,11
  157:19 158:1,11
  158:13,20 160:14
  161:16 164:13,19
  164:23 169:19
  170:14 171:1,12
  173:20,25 177:8
  177:10,17,18
  179:17,24 180:5
  181:21 182:3,10
  184:17 186:14

190:13,14,25
  191:4 195:10
  204:9,17,22,23
  205:1,24 212:9,12
  212:21,22,24
  213:4,8,9,22 214:4
  214:6,9,12,14
  219:7,15 227:19
  228:23 229:3,23
  230:13 234:24
  235:11,12,14,24
  236:11 237:22
  241:6 242:6,25
  243:8,21 244:1
  245:8,14 248:16
  250:15,24 251:1
  253:12 255:3
  259:13 260:5
  262:5,8 263:16
  266:4,7 267:1,10
  267:24 269:21
  271:3,7 303:22
  307:5 317:10,12
Southwest's 31:6
  34:13,16 39:18
  45:13 46:12 50:14
  59:5,14,16 63:14
  236:8 259:14
  271:4 317:13
Southwest.com
  119:10
so-and-so 166:5
space 140:6
Spand 111:10
speak 81:1 122:10
  138:21 162:9
  168:1 176:9
  178:24 197:13
  200:1,24 201:2
  214:10 216:9
  261:15 279:21
  302:24 314:5,8,12
speakers 138:19
  141:6
speaking 105:9
speaks 85:4,8,11
  164:7
special 278:7,9
specialist 159:15
  269:23
specialists 68:17
specific 97:14
  145:16 170:24
  171:5,11 247:21
  249:11,15,17
  256:2 258:1

283:18 288:7
  293:21 306:3
specifically 11:6
  13:17 21:18 25:24
  67:24 120:20
  162:17 168:21
  179:19 189:10
  198:17 205:16
  209:1 216:6
  259:18 264:5,8
  287:23 290:9
  304:16,16 307:22
  312:7
specify 228:10
  264:15,21
speculation 5:3 57:9
  57:15 156:15
speech 35:21
spell 36:16 120:12
spellings 112:17
spend 92:17 135:25
spending 148:5
  196:19
spent 33:16 130:19
  133:20 134:2,7
  135:8,16,21 136:5
  136:5,10 151:23
  197:14 210:24
  231:9 261:4
spoke 171:22 179:12
  201:1 232:3,5
  304:18
spoken 156:16
sponsor 30:6 75:4,4
sporadic 145:4
spread 33:10 127:2
  129:3
Springfield 2:15
sprung 24:24
squabble 100:14,18
  100:19
squabbles 66:2,11
squares 118:21
stable 41:1
stack 145:7
Stacy 125:4 127:18
staff 182:12,13
  220:11 279:23
  287:3
stage 12:16
stages 173:20
stance 170:6,7
  188:20
stand 59:2 189:1
  214:6
standard 222:20

225:24 238:14
  257:11 269:1
  286:25
standards 135:25
  298:2
standpoint 130:6,25
start 36:10 81:4 95:4
  163:12 172:1
  188:14 223:9
  233:17 243:18
started 20:15 56:2
  62:23 123:8
  144:24 151:25
  155:21 163:18
  179:8,15,22 257:8
  294:3
starting 37:12 117:9
starts 42:23 95:4
  246:8 269:4
  272:15
state 47:13 102:13
  238:6 295:11
  310:9 316:9
stated 48:24 76:25
  171:11 188:23
  193:15 195:17,19
  199:22 200:23,25
  206:10 208:18,20
  211:3,7 217:12
  223:19 241:14
  242:15 267:20
  293:15
statement 3:5 4:12
  8:15 9:16 28:19
  31:6 40:3,7,10,15
  40:21 47:10 60:14
  101:13 178:14
  208:6,12 211:15
  213:15 300:9
  317:14
statements 58:25
  59:1 190:21
  193:20 195:5
  199:24 200:2
  202:7 300:17
  301:5 318:9
states 41:4 42:2
  48:25 49:24 75:1
  76:13 100:11
  140:5 143:14
  251:18
stating 237:9
status 35:17,24
  83:16 162:11
  241:2
staunch 42:17

stay 127:7 142:16,19
214:20 300:1
stays 214:12
stealing 50:10
STEMMONS 1:21
stenographically
318:10
step 5:15 13:19
19:24 21:5 34:9,21
79:23 80:1,1,9
155:10 159:23
160:3 203:18
252:3,23 254:10
254:16,25 255:2
255:11 256:7
259:18 261:16,18
262:1,20 263:4
265:7,9,24 266:22
269:11,15 274:9
276:9 278:3,5
285:13 298:2
Stephen 2:22 6:21
Stephenson 153:4
155:8
stepped 200:15
steps 38:22 84:16
157:14 241:12
298:6
steward 12:2 13:6
13:16 14:11 16:18
123:15,17,20
173:9,10,11,16
174:1 277:24
278:1,2,8,10,16
279:8 281:5,16
282:2 283:20
284:9 285:3 286:3
286:7 290:6
296:24 299:9,16
315:8,13 316:20
316:22 317:1
stewards 287:1
311:13
steward's 14:13
173:21
stick 110:11
stiff 10:9
Stone 3:12 29:4,8,10
29:12,14,20,24
31:1,12,18,21 32:1
32:13 33:5,9,12,18
34:7,22 35:20,24
46:5,10 47:18 50:8
57:23,25 58:1,5
64:3,5 65:19 71:4
71:12,18,25 74:4

87:6 100:7,10,22
100:23 101:5,6
102:19,22 103:24
103:25 122:2,12
122:16 145:23
146:22 149:19
150:2 168:16
178:9 189:8,18
191:10,14 192:11
198:24 199:9
200:18 201:3,7
202:5 205:13
206:11,22 221:5
227:15 231:22
232:3,5 234:5,7,8
234:21 235:18,20
236:15 259:7
260:14,19 261:15
262:15 263:6
264:8 267:7
271:22 273:9
274:2,3 275:8,18
275:21 289:7
296:20,21 300:9
300:20 305:15,22
310:19 313:11,17
313:20,24 317:9
Stone's 30:3,7,9,18
33:19 193:12
233:16,19,25
261:21
stood 201:9
stop 32:6,8 146:7
154:13 296:1
302:1
stopped 123:20
210:24
story 33:3,20 106:13
223:15 267:25
302:3 307:13
strategic 251:10
Street 318:23
strenuously 17:16
strict 34:2
strike 285:15 296:9
string 162:13
strongly 302:7
struggled 31:18
stuff 172:12 310:8
stuff's 108:24
subject 215:8
228:10 261:9
294:8 308:20
subjective 170:7
subjectively 178:17
submission 72:10

submitted 5:15 71:3
155:16 164:17
262:1,15
submitting 72:18
164:13 262:20
subpoena 11:23
12:22 14:18,19
15:20 19:25
315:21 316:5
subpoenas 11:6 16:8
18:17,24
SUBSCRIBED
318:17
Subsection 82:16
83:13 240:21
241:24
subset 147:17
substance 289:22
substantial 147:16
substantively 17:11
successful 172:23
sugar 116:23
suggested 246:4,23
275:9
suggesting 70:25
suggestive 45:21
Suite 2:4,9,14
318:23
SUITES 1:20
Sullivan 4:2 12:2,20
13:4 14:19 15:11
15:19 16:9 18:21
20:4 173:14,15
188:1 197:11,13
209:6 277:10,11
277:18,22 288:13
288:15 302:13
314:1 315:19
317:8
Sullivan's 11:11
12:22 13:18 19:7
209:15
summary 67:8
summer 127:11
128:9 250:22
supervisor 26:5,9
37:24 182:5 183:4
183:5,8 219:18,19
282:20 283:3,6
support 30:1 106:3
127:20 135:4
142:16 143:5
144:2,8 182:14
191:17 196:22
197:5 211:7
212:25 220:8

261:13,14 313:20
supported 30:4
102:14 127:17
196:10 264:19
supporter 35:25
191:19 313:23
supporters 126:11
supporting 29:21
30:25 31:15,19
100:8,12,22 106:6
182:11,12 187:19
193:3,8,8 204:14
205:13 206:11,20
206:23 212:17
213:5 214:14,19
230:23 231:1
272:7 273:25
301:14
supposed 15:7 46:7
212:8,15 287:1
314:10
supposedly 86:4
sure 8:13 10:1 11:2
13:15 21:1 23:21
27:10 28:8 49:7
52:14,25 62:7,25
67:10 70:11,17
74:25 75:15,17
84:21 86:9 90:6
94:25 98:2 100:3
111:12 121:17
133:23 153:22
165:25 166:1
173:21 203:21
220:8,15 240:10
241:22 258:21
273:5 279:14
280:16 288:24
291:13 292:10
304:5,6 308:2
314:19
surprise 103:18
surrounding 45:1
57:18 265:16
survived 12:16
suspect 296:12,15
suspension 43:3
63:22 115:18,21
115:23 116:1,9
238:3 267:19
suspensions 42:17
116:4
Suzanne 153:4,15
155:8
Suzi 21:24 283:4
SWA 53:1

SWALife 4:23 40:9
44:4,11 46:16,25
48:17 49:11,13
51:20 53:11 55:20
swear 36:22 122:5
181:10 218:23
250:3 277:13
sworn 37:5 122:13
181:17 219:3
250:9 277:19
318:17
symbol 102:2
synopsis 53:22
system 16:21 138:11
153:10 185:7
191:21,25 193:1
201:16 211:11
212:1,1,25 214:17
285:5 286:4 290:8
S-C-H 218:19
S-C-H-N-E-I-D-E...
218:20
S-P-A-N-D 111:10

                 T
table 6:18 11:4 14:8
20:14
tagged 146:13
take 16:25 21:20
24:7,14 25:18
28:13 32:7 38:23
43:19 45:15 47:8
49:9 52:12,15
53:25 77:14 92:20
109:19 110:13
127:16 131:23
147:10 157:11
174:1 180:7
203:17 210:9
212:8,15 213:1
218:12 220:10
223:2 226:20
227:21 229:1
234:23 239:10
241:12 262:21
263:1 273:23
284:4,10,25 285:9
285:20 286:6,15
288:21 291:3
294:14,25 295:16
296:1 303:5 305:1
306:24 311:11,19
312:14,21
taken 16:3 44:21
84:16 86:18 94:19
129:17 130:18

164:18 202:10
278:21 283:4,8
295:21,22 318:5
318:13
**taker** 105:9,13 188:4
226:24 248:3
256:16 257:4
**takes** 77:12 84:25
105:11,12
**Talburt** 112:16
**talk** 27:2,25 61:10
69:25 131:19
157:15 166:4
171:25 183:9
193:17 215:20
279:17 297:23
301:15
**talked** 7:11,11 189:7
196:20 206:15
226:14
**talking** 27:22 119:9
128:19 155:3
177:17 215:19
243:3,6 259:20
274:12 280:4
305:10,12
**talks** 20:9 47:21,22
53:23 169:22
**tardiness** 15:20
**targeted** 264:2
**tasked** 7:24
**team** 6:14 25:1
34:14 106:20
107:11 175:25
254:12 313:24
**tech** 153:6
**technically** 18:5
96:18 124:9
**technology** 48:4
51:14,17
**tecum** 14:19 19:3
**tecums** 11:7
**telephone** 20:5
27:18 188:1
**tell** 9:3 10:16 37:20
41:13 53:14 61:24
63:19 73:8 74:2
89:10,11 90:5,6
93:19 106:12
108:6,20 109:13
111:3,17 119:13
121:25 122:19
123:6,22 131:12
147:11,14 150:16
150:23 152:10
156:10,19 157:1

166:7 167:3
174:11,14,19
181:6,21 187:14
214:21 218:16
219:7 220:25
230:8 259:17
268:21 277:8
290:10 303:11
**telling** 175:3 177:18
261:2
**tells** 42:24 44:24
53:21 265:10
**ten** 108:20 177:3
181:2 251:19
257:20 266:14,16
287:4 313:12
**tend** 136:20 253:13
**tend-to-be** 126:24
**tentative** 129:5
**tenure** 184:14
**tenus** 12:21
**term** 109:8 125:10
125:15,16 128:14
128:16 162:5
208:24
**terminate** 8:19 9:1
33:21 34:1,17
78:10,23 83:5
145:24 186:24
202:13 204:6
236:23 238:9
253:20 254:1
267:2
**terminated** 20:18,22
20:23 29:1 111:14
112:25 113:3,20
114:17 115:6,8,16
115:17 159:7
177:19 205:1
248:18
**terminating** 36:3
**termination** 1:8 9:2
20:25 27:16 28:23
34:4,5 42:17 43:2
43:5,7 44:17 49:5
60:21 61:2 63:23
79:17,18,21 87:1
105:1 106:4
111:18 115:24
116:1,9 120:15,22
145:16 159:10
173:17,19 202:25
203:9,25 204:19
215:15 237:5,13
239:19,24 244:9
244:17,24 245:24

246:8,10 249:8
254:3,21 255:12
257:25 267:19
269:3 276:15
**terminations** 203:14
**terminology** 26:6
109:21 128:21
**terms** 12:9 113:16
173:22 179:9
180:17 268:1
289:1,23
**tes** 316:7
**tested** 23:18,19
26:23
**testified** 37:5 50:22
84:23 87:22 89:19
96:15 100:13
104:18 108:24
109:14 114:13
118:11 119:24
122:13 134:1
140:1 155:7 162:3
166:7 168:7 172:4
173:3 178:13
181:17 205:12
210:17 217:9
219:3 226:1
236:22 238:9
241:9 244:6 247:9
248:23 250:9
252:7 261:25
274:8 276:8
277:19 284:7
285:19 302:13,15
304:7 308:25
309:10,11 310:12
310:23 311:11
316:19
**testify** 15:19 16:9
24:9,15 26:13,16
27:12 28:2 34:23
51:12 72:25 73:1,1
100:7 103:7 105:4
120:6 158:5 218:1
232:18 289:5
314:13 315:21
316:15
**testifying** 25:11
100:9 105:22
147:20 162:7
173:6 217:11
247:13
**testimony** 14:3 19:8
19:16 20:2,17,21
23:17 25:19 27:4
27:18,21 36:22

52:23 82:24 84:7
102:21 109:9,11
116:8 119:5 122:5
145:21,25 168:9
181:1,10 185:20
186:6 205:14
218:23 247:9
248:14 250:3
276:7,19 277:13
285:17 288:21
289:10 307:20
314:2,6,9 317:6
318:7
**Texas** 1:22 2:4
318:21,24
**text** 72:12 172:15
**texts** 148:19,23
149:12 167:17
**Thank** 6:23,25 7:3,8
7:9 8:4,22 11:22
20:7 23:13 36:5,6
36:20 37:1,3 39:25
41:8 46:19 48:7
56:13,17 58:6,10
59:17,21 63:4 67:2
74:22 80:13,17
95:20 100:2
112:20 113:12,16
115:12 121:1,3,21
121:23 122:9
138:5 180:22,25
181:14,15 187:10
203:22 218:5,7
219:1 227:20
239:16 240:6,7,14
249:18,22,23
250:7 270:12
276:2,18,20 277:5
277:17 288:15,25
291:8,18 292:5,15
302:10 306:10
314:15 317:19
**Thanks** 96:14
**That'll** 53:1 218:10
218:13 240:10
**that's** 8:1 9:17 13:8
14:16,16 15:10
17:10 18:3 20:11
21:2,12 22:3,8,10
22:11,22 23:24
26:9,13 32:6 45:7
46:15,21 51:15,16
52:14 54:7,9,16
60:7 61:2 70:5,20
72:6 73:11 75:22
80:24 82:3,10 83:7

83:10 85:25 86:24
97:6,20 100:24
102:24 103:20
104:10,15,21
106:11 109:8,16
110:5,9,19 111:5
113:14 114:9,20
116:11 120:19
121:17 127:14
131:17,20 132:15
142:19 143:14
144:9 145:20
154:20 161:9
167:19,23 174:12
176:22 179:4
184:1,12 192:2,15
203:6 210:12
211:2,8,17 212:18
212:20 213:9
214:15 215:12
216:17,19,21,22
217:12 222:24
223:9 234:23
235:5 238:18
240:2 246:14
249:6 268:16
273:7 275:13
281:1,21 284:15
284:23,23,24
285:9 288:23
290:14 295:14,23
299:21 302:7
303:2,19 306:16
307:12 310:5,8
311:13,15,22
312:1,8,20 313:4
314:4,18 315:22
316:25 317:21
**Theft** 43:11
**there's** 8:10 12:10
12:24 24:6 35:20
71:19,23 72:2,5,14
83:8 87:23 90:2
93:9 95:11 102:1
114:15 120:10
148:3,5,12,12
167:22 168:3
171:16 182:17
190:5 213:3
223:22 234:19
246:3 254:10
255:21,22 257:15
257:19 268:15
269:13 271:5
272:25 279:22
280:2 281:1,19

283:13 284:14,22
286:10,25 288:7
299:19
**they'd** 92:3 314:13
**they're** 8:8 16:23
21:11 56:5 61:23
61:24 69:16 94:4
94:14 112:4 160:3
173:24 180:6
182:16 200:11
207:18 224:20,22
225:7 247:6
282:11 287:2,4
289:11 293:23
310:15 312:25
**they've** 136:17
280:11 288:18
**thing** 14:6 22:8 42:3
44:18 49:9 74:7
91:8 154:20
163:19 166:5
212:2 234:21
276:12 283:7
287:19 294:18
299:4,6 300:15
305:15
**things** 7:17,22 59:12
106:21 131:4
143:3,5 148:12
152:12,12 165:23
166:3 175:19
176:8 179:21
182:20 184:5
185:10 192:2
193:21 197:1
198:9,15,16 211:9
216:14 221:18,22
235:2 251:23
258:11 259:25
287:25 293:12
295:2 301:15
305:9 317:14
**think** 10:7,12 11:24
13:13 20:13 21:8
39:13 40:24 48:24
58:4 59:9 60:11,24
61:13 63:7 70:1,5
74:25 77:10,12
88:23 92:16 93:1
94:10 96:24 98:18
99:23 102:16
103:13 106:10
109:10 111:21
113:16 121:4
127:25 144:9,25
145:2,18 153:15

153:18 154:10,16
155:2 157:19
158:9 160:24,25
162:5,25 164:8
172:22 173:3
176:22 178:4
185:16,23 186:24
190:5 203:6,7,11
203:14 205:24
209:12 210:15
212:16 214:8
215:12,13 216:25
221:11 227:17
230:12 238:9
240:5 246:17,18
247:2 263:17
272:16 276:15
279:11 283:25
287:17 288:19
289:2,12,16,21
299:2 301:23
306:16 307:19
308:23 316:1,7,12
316:16
**thinking** 24:20
**third** 65:14 93:24
98:18 150:17
170:17 241:7
243:4 307:16,20
308:5
**Thirteen** 122:21
**thorough** 77:11
92:16 107:19,21
**thoroughly** 225:6
**thought** 9:24 18:22
79:18 89:17 107:7
152:17,17 157:14
216:20,22 237:7
236:11 267:3,12
276:9 292:19
295:10,20 303:8
304:2
**thoughts** 224:23
231:1 254:23
297:14
**threatened** 214:22
215:1,5
**threatening** 29:8
45:21 50:1
**threats** 129:23 130:2
130:4,4,9,13
**three** 2:9 11:6 35:7,8
39:11 46:6 66:15
69:17 131:14
156:21 168:20
183:17,24 186:1

237:18 249:10
252:25 257:15
281:12,18 294:11
294:12,23 295:2,3
295:22 302:14
315:2
**throwing** 294:23
**Thursday** 140:13
141:7
**tighter** 179:10
**time** 7:17 10:4 11:1
12:2 23:8 24:11,15
25:14 26:1,2,17
29:7 35:20 40:8
42:15 45:9 53:25
55:10,10 56:8,12
57:2,2 61:7,12,16
62:17 67:25 80:20
80:22 81:22 85:13
86:12 87:10,14
88:7 116:22 121:4
124:15 125:8
126:2 130:14
139:21,24 140:17
140:23 141:21,22
145:6,17 155:3,22
161:20 164:1
165:10 171:24
177:13 178:11
179:11 181:1
183:4,6 190:10
199:3,7,20 210:11
218:6 225:6 230:2
232:5 233:11
236:5 242:24
245:5,6 251:4
253:25 260:10
261:12 263:19
267:3,13 274:24
275:4 276:8,13
278:14,24 279:21
280:23 282:14
284:15 293:20
297:22 299:21
303:1 305:4,6,11
305:23 306:24
309:21 313:16
314:25 318:6,9
**times** 97:8,12 113:2
113:20 127:3
131:9,14 145:9
156:12 163:7
232:14 288:12
296:3
**timing** 7:11 85:18
**tiny** 53:22

**title** 18:4 43:24
111:4 122:22
219:10 250:21
**titled** 42:10
**titles** 224:9
**today** 6:17 17:23
20:15,17 26:20
28:21 35:4 106:17
121:10 122:19
131:10 132:14
164:9 251:13
314:2 315:21
316:16
**told** 25:23 26:4,9
33:6 57:24 108:4
109:4 156:11,20
157:2,15 192:15
194:8 196:8 212:7
212:14,18,18,19
230:9 236:20
257:13 285:8,20
286:2 290:12
303:20 304:2
312:24
**tolerated** 47:9,16
**tomorrow** 290:1
**tone** 199:18
**tool** 127:6
**tools** 48:5
**top** 51:15 92:3
100:11 101:1,18
103:10 107:7
163:13,16 166:13
174:12 206:3
263:10 272:4
273:16,24 303:14
**topic** 211:18 228:12
**topics** 131:20 144:21
204:23
**total** 15:4 35:9
183:22 288:20
312:24
**totality** 102:17
244:7
**touched** 20:13
**touches** 133:16
**touching** 135:10
**town** 29:24 221:12
**tracks** 185:8
**trade** 110:8 185:9
**traded** 109:8
**trading** 26:3 110:15
183:25
**Traditionally** 271:7
**tragedies** 24:23
**trained** 287:6

**training** 13:16 16:15
37:24 39:13,15
49:12 219:23
285:2
**transcribed** 318:11
**transcript** 121:16
318:13
**transferred** 37:25
38:3
**Transport** 258:6
260:23
**transportation**
140:2
**travel** 131:17 139:16
140:2,6
**treasurer** 125:8
**treated** 195:20,24
235:22
**treating** 234:19
264:18,20
**treatment** 22:8
264:25
**tremendously**
157:16
**triangle** 65:1
**tricks** 14:7
**tried** 200:21,24
225:3 234:6,7
295:11
**tries** 21:9 310:3
**trip** 30:13,18,22
55:3 141:25
**trips** 39:10,15 109:8
110:13 122:25
185:8,21
**trouble** 182:16
**troubling** 24:10
**true** 92:12 110:10
112:14 207:9,10
207:20 210:21
211:2 243:23
244:3 245:13
248:19 315:8
318:12
**Trump** 140:19
260:21
**Trump's** 29:23
**trust** 97:25 154:24
**truth** 36:24 92:18
122:7 181:12
218:24 250:5
265:12 277:15
306:17
**try** 14:9 19:17,19
26:23 33:8 70:3
80:20 122:10

136:21 152:4
158:20 161:12
168:4 171:25
202:3 234:8
280:21 298:3
**trying** 12:6 17:16
24:21 161:16
167:10 213:9
228:7,11 229:13
230:13 232:15
235:5 236:11
242:16 260:18
263:17 264:7
287:24 288:1
297:25 302:1
303:3
**Tuesday** 164:8
**turn** 95:8 131:4
152:9 169:16
214:7 236:20
**turned** 189:24
194:11,12,15
196:14 202:6,8,11
213:23 216:16
217:22,24 236:16
292:14
**turning** 152:3 264:9
**turns** 28:4
**turpitude** 43:12
**twice** 114:21 200:15
**two** 9:20 23:14,15
23:25 24:7 25:8
27:12 43:15 50:3,5
64:19 66:15 71:19
72:2,6 75:10 84:2
88:2 90:2,11 91:10
91:23 92:2,9 93:25
94:1 112:16 114:6
118:2 124:20
130:3 149:6
153:19 154:7
163:10 165:3
172:21,24 183:23
185:21 189:24
199:6 205:25
206:19 219:19
220:3 221:11
227:7 237:14
243:11,19,20
248:10 256:22
269:20 278:13
279:24 288:11
295:17 299:6
305:19 310:14,24
**twofold** 25:6
**two-year** 145:18

**TWU** 2:25 5:21 7:4
7:5 16:15 17:24
28:25 67:25 79:25
123:5 128:16
133:11 134:20
137:8,9,10,13,15
138:8,16 143:9
169:1 251:5 252:8
256:24 259:24
269:23 274:1
277:23,24 296:22
297:4
**TWU's** 284:9
**TWU-AFL-CIO**
100:11 206:20
272:7 273:25
**Tyler** 2:4
**type** 49:18 205:2
207:25 209:21
234:21 235:2
255:19,22 259:25
267:23 282:5
286:23 294:18
310:6 311:19
**typed** 286:21
**types** 42:20 45:20
226:7
**typewritten** 105:12
**typical** 17:1 257:9
257:10
**Typically** 68:20
**typing** 166:13,18
206:4,7 209:19
227:2
**T-A-L-B-E-R-T**
112:17

_____

**U**

**ugly** 152:7,12
**Uh-huh** 71:16 73:10
73:15 76:1 85:2
110:22 154:9
206:5 261:5
263:12 274:7
275:25
**ultimately** 78:24
237:1 254:24
255:7 266:21
270:8
**umbrella** 135:8
137:20
**unable** 23:15 26:11
132:23
**unacceptable** 57:16
58:21 59:3 100:20
**unblock** 164:20

**unblocked** 164:23
165:1
**unclear** 195:4
**uncommon** 27:6
165:21
**uncover** 226:3
**uncovered** 87:8
229:3
**undefined** 169:23
**underneath** 189:13
**understand** 7:4,12
9:14,17 15:18
17:15 18:2,8 24:22
25:18 61:3 84:22
92:21 113:25
114:2 137:22
145:15 157:25
158:4 191:12
203:19 232:22
234:13 242:16
248:13 271:3,21
271:24 272:3
273:12 275:11
291:7 293:5 317:2
**understanding** 8:25
23:22 24:13 50:23
102:24 120:7
133:23 165:25
173:16 180:11
199:11 206:6
227:25 272:6,12
273:11 300:4
**understood** 105:17
158:13 271:23
274:1 309:7
**undue** 12:5,17
**uneducated** 101:9
**unelected** 126:17
**unemotional** 77:11
**unequal** 195:21
**unexpected** 24:13
**unfair** 62:6
**unfortunately** 13:7
154:11
**unhappy** 136:18
**uniform** 74:11 89:13
117:11 190:20,24
212:24 213:17
229:21 248:16
259:13 263:16
287:2 307:4
**uniforms** 75:11
94:10 119:5
**uninvited** 194:9,24
195:3 217:20
231:14,17

**union** 7:5,7 11:5
12:20 13:17 15:3
15:21 16:2,16,18
16:19 17:13 18:5
26:1 29:3,10,13,17
30:1,12,18,19,21
31:1,20,22 32:25
33:14,15 34:6,13
34:15,24 35:15,17
38:8 50:10 67:6,11
67:14,21 68:1,6
100:14,17,18
104:13 106:19
121:9 123:3,4,12
123:14 124:4
125:17,19 126:3,8
127:9,10,19,21
128:8,12 129:2,4
130:2,5,23 131:17
131:18 132:17,18
132:23 133:3,8,18
133:21,25 134:20
135:4,11,12,14,16
136:5,5,6,10,17,21
139:17,19,23
140:7,9 143:12
146:15 147:22
148:5 151:25
152:5 155:18,22
155:24 161:9
169:18,25 176:10
177:18 187:25
188:24 189:2,8
191:17,19 192:1
194:12,19,21
195:3,7,8 196:7,10
196:13,14,19,21
196:25 197:7,24
198:8 199:5
200:13,24 201:15
202:2 206:24
214:22,24 215:1,3
215:4 216:9
217:15,17,19,21
217:22 223:8
225:10,13,16
230:21 231:2,8,10
234:17,18 235:23
236:2,4 238:15
248:4 251:5 252:7
252:10 256:10,20
257:18 258:6
261:3,12,13
263:22 264:1,5,5,6
265:1,20 267:7
268:3,4,11,24

270:15,23 271:2,5
271:8,12,22
274:10 277:23
278:8 279:5,22
284:16 285:3
288:4,18 289:13
297:1,23 298:5
299:1,3,11,13,16
299:17,21,22,23
299:23 301:14,16
310:15 313:10,20
313:23 314:25
315:8,9,13,20
316:8,14 317:9
**Union's** 18:4 30:11
124:21 161:13
174:2 196:12
**unique** 293:13 309:2
**United** 75:1 251:18
**unjust** 34:17 257:25
**unprovoked** 31:21
**unsee** 152:16
**unsolicited** 29:4
**unsuccessful** 297:25
**untrue** 49:24
**unusual** 22:25 126:6
**update** 55:2
**upheaval** 126:7
**upset** 31:13,14 33:18
126:14 157:16
170:12 172:18
175:16 189:2
194:5 198:8,10
202:5 230:21,24
231:14 232:7
234:18 236:15
**upsetting** 192:25
**use** 15:25 16:1,2
17:14 21:10,15
25:10 26:4,5,17,18
60:25 128:14
136:21 197:3,3
231:8 239:7
242:12 243:25
257:11 287:16
**user** 118:10
**uses** 128:16
**usual** 294:9
**usually** 160:5 225:5
278:4 279:5,17,22
281:19 282:12,21
283:11,15 284:21
294:13,21 295:21
309:22,25 310:2
**U-R-T** 112:19

**V**

vacation 184:7,9,13
    184:15
vagina 46:8 50:4
    65:15 72:3 191:3,8
    237:15
vaginas 46:7
vague 169:23
valid 70:5
value 211:11 212:1
values 191:23
    204:16
variables 21:23
varies 55:24
various 108:6
    129:21 137:1
    165:22 209:4
    259:13 262:12
    275:4 288:11
Vasquez 51:16
    53:14
Vegas 31:12 125:23
    125:24 182:7
    221:4
vehicle 127:15 129:1
    129:3,6
verbal 47:21 48:3
    207:7 309:19
verbalize 205:19
verbiage 50:7 85:10
verification 12:1
    68:25 186:9
verified 89:21,23
verify 68:23 81:12
    226:15 304:21
versed 252:19 261:8
versus 197:24
    209:22 271:13
veto 224:25 225:3
vice 57:2 60:5,9
    124:6,14,16,19,23
    125:2,6 161:7
    252:2
victim 31:20
video 57:5,6 65:2,11
    65:12 72:8,13,20
    72:22 73:12
    101:22 103:11
    104:3 149:10,11
    149:17,24,25
    150:2 153:7
    158:10 163:13,17
    165:5 166:18,23
    168:5 190:16
    194:2 206:3
    207:12 208:7

212:6 262:14
272:4 273:13,16
273:21,22 286:11
305:1
videos 5:10 29:6
    30:24 32:18,22
    49:12,12 50:3,5,15
    50:15 57:22 63:25
    64:20,21 65:4,6,22
    68:8 71:19 72:2
    73:8 74:3,6 101:12
    117:17,20 129:16
    148:19,23 149:6
    149:14,19 150:11
    154:7,7 156:8,8
    163:10,24 164:10
    165:11,16 166:8
    166:13,22 167:4,6
    167:15,18 172:15
    173:1 189:12,20
    189:24 190:2,6,8
    190:10 191:2
    193:6 201:14
    204:4 207:2,17,21
    208:12,13 211:16
    211:20 216:3,14
    234:20 237:10,14
    237:21 238:7
    247:10 248:15
    259:10 263:14
    275:6,7,15,21
    288:9 292:20
    293:3,6 297:11
    298:8,24 299:5
    300:7 301:9
    305:17,24 306:6
    310:24 311:2,5
view 19:12 55:21
    69:11 79:16
    202:24 203:6,24
    238:7 257:13
    287:18 288:20
    295:9 297:18,20
    300:18 305:1
viewed 49:24 50:13
    71:2 165:5,10
    302:17 305:9
viewing 149:11
viewpoint 195:24
views 30:8 35:16,18
    143:16,19,22
    144:1 159:2 192:4
    192:5,6 193:12,15
    301:3,6 304:22
vile 152:17
Vincent 51:16

violate 59:12 68:7
violated 29:2 33:22
    47:18 49:22 76:21
    77:1 87:12,17,19
    194:14 204:17
    242:18 243:10,15
    246:20,25 249:8
    281:7 283:7
violating 99:6
    180:18
violation 9:2 38:13
    43:2,4,7,10,18,20
    43:21 44:4,5,14,15
    44:16 45:1 49:4,8
    49:19 64:9,9 68:3
    68:21 79:7,10
    87:23 88:4,9,11
    96:15,16,17,20,25
    97:11,13 98:12,16
    99:5,8 107:9,13
    110:16 120:11
    157:18 182:18,19
    204:7 205:2
    223:23 237:9
    243:7 244:1,13,19
    245:11 246:7,13
    247:2 274:25
    275:1 281:11,14
    281:25 282:2,8,24
    283:18
violations 20:19
    35:13,14 42:24
    43:6,23 44:6,7
    45:15 62:19 77:21
    77:22 81:18,19,21
    81:23 87:7 96:22
    99:2,4 119:25
    120:9,21 245:3,7
    246:17 247:8
    248:21 258:24
    274:19 282:5
violence 129:23
    130:10,13 179:21
    180:20
violent 49:25
Virginia 2:15
voice 29:11 132:21
    191:20 201:4
    289:5
volume 1:15 199:18
voluntary 141:18,19
volunteer 141:9
    142:16
volunteered 139:21
    139:24 141:9
vote 132:21,22,22

voted 126:15 127:20
votegetter 124:24
    125:1
votes 160:12
V.P 60:7

**W**

wait 26:25
walk 188:11 222:20
    257:6
walked 152:22
    210:5
walking 7:15
wall 71:22
want 11:1 13:14,15
    15:18 16:13 18:6
    20:10 21:1,23
    24:18 30:13 35:5
    36:7 45:5 46:19
    48:7 51:12 54:20
    55:21 60:17 64:21
    66:25 81:4 82:4,5
    83:24 88:25 95:3
    95:18 99:25 100:6
    101:18,18 116:12
    116:16,23 124:12
    128:21 133:23
    142:10 152:18
    157:17,20,21
    161:1 165:25
    170:19 179:24
    184:21 186:3
    196:21 198:15
    202:12 211:8
    215:11,16 217:7
    223:1,2 226:16
    227:18 231:10
    233:5 239:13
    255:20 273:15
    279:9 280:17
    284:8 288:21
    289:4 290:4,17,18
    291:19,24 302:6
    303:4,11 306:10
    306:20
wanted 32:6 76:24
    157:10 171:4
    175:9 184:22
    192:20 199:25
    200:12 210:23,24
    211:5 214:5
    231:15 234:24
    256:4 259:22
    260:1,2,6 262:11
    273:22 301:15
    302:24

wanting 138:12
    170:24 212:4
    215:19 268:24
wants 14:5 22:17
    210:3 289:3
warn 180:16
warning 43:4 246:9
warrant 42:17
    226:14
warranted 27:8 42:9
Washington 138:3,7
    139:6 140:12,16
    142:1,5 192:11
    197:23 230:17
wasn't 21:25 26:21
    60:24 69:12 92:19
    139:8 145:5,11
    147:25 161:5
    179:19 195:2
    200:20 201:8
    212:7,7,14,14
    242:22 298:14
    300:8 304:9 316:5
watch 149:15 311:2
watched 311:5
watching 69:12
    201:13
way 10:8 15:4 20:3
    22:23 29:12 38:9
    43:12 49:2 59:10
    87:21,23 89:4
    100:6 105:10
    110:3,8 112:12
    114:17 133:22
    163:14 172:16
    175:9 193:7 195:5
    195:19 199:21
    201:19 208:3,8,19
    220:4 222:4
    226:13 234:18
    235:3 236:6 248:1
    248:6 254:24
    289:18 290:14
    314:4 315:3
ways 27:8 87:19
    287:4
wearing 46:6 50:4
    119:14
Weber 60:6
website 40:10
    143:13
websites 262:13
Wednesday 164:4
weeds 77:18
week 56:9 142:3
    158:9 165:4

weekend 29:23
  129:17
weeks 184:15
weigh 317:3
weighed 31:17
weighing 291:4
weight 62:3 154:22
  288:20 317:5
welcome 19:12
went 19:23 39:14
  69:7 84:9,13 89:20
  90:13,15,15 101:7
  152:8,20 166:15
  192:19 211:14
  236:5 245:4 251:6
  251:8 258:9 266:3
  266:11 285:12
  302:5 307:13
weren't 27:19 139:8
  158:15 308:15
West 26:13
western 224:11
we'd 56:13 112:12
  232:19 306:13
we'll 9:10 10:1 20:3
  20:5 21:12 22:10
  23:9 27:23 28:1
  52:15,18 58:11
  76:4 80:25 110:11
  121:14 135:5
  153:23 154:2
  181:5 186:5,10
  187:9 203:18
  210:11,13 217:25
  218:8,15 239:7
  240:12 249:24
  256:1 289:9
  290:25 291:1
we're 8:5 12:14
  21:22 24:21 25:6,7
  25:16 26:4 35:4
  61:4 64:20 72:3,16
  72:21 99:22 109:2
  110:25 114:9,15
  128:22 136:7
  168:19 184:20
  190:4 215:8,14
  240:5 256:19
  269:1 276:21
  289:8 295:25,25
  297:24 299:23,25
  303:5
we've 7:10,11 10:12
  12:6 17:4 23:18
  49:8 185:17
  285:15,18 289:12

290:12
what's 7:20 10:16
  13:11 24:20 26:5
  37:14 41:23 50:20
  53:4 79:23 82:8
  95:24 96:1 149:2
  162:23 166:24
  174:7 181:24
  205:23 219:10
  250:17 257:8
  271:6 278:15
  279:18 280:7
wheels 269:4
whlemons@satexl...
  2:5
whoever's 25:17
wholeheartedly
  10:11
who's 10:9 12:20
  27:21 60:7 74:19
  77:17 218:16
Wilkins 115:1
willing 24:14 26:15
  27:11 279:13
win 21:15 147:25
  148:1
wings 74:24 89:13
  90:9 190:22
  213:14,17
winning 126:1
wins 306:18
wish 301:11
wished 263:9
wishes 257:18
withdraw 93:13,14
witness 13:5 23:6
  25:25 26:25 36:12
  36:18,25 71:1 81:3
  113:23 114:2
  122:2,8 153:21
  155:6 161:22
  167:19,21 174:19
  174:23 181:7,13
  181:14 185:25
  198:3 203:20,22
  217:2 218:7,9,18
  218:20,25 232:23
  240:7,13 249:23
  250:6 276:20
  277:10,16 288:13
  288:16 290:2,9
  291:12 302:10
  306:23 316:19
witnesses 3:8 4:1
  23:14 25:11 277:1
  289:19 291:4,5

318:7
wolf's 50:9 102:23
wolves 101:8
woman 144:6,6
women 46:6 50:4
  137:11,14 142:17
  143:5 195:19,21
  195:24 213:22
women's 29:22,24
  30:2,10,19 31:16
  33:9,13 46:7,9
  102:15 137:3,6,7
  137:12,16,25
  138:3,13,17,22,25
  139:3 140:8,23
  141:4,5,17,18,23
  142:10 144:13
  151:12 189:3
  191:18 192:11,24
  194:6,7,9,20
  195:16,18 197:23
  211:10 213:22
  230:16 231:13
  260:20 301:13
won 126:18 148:3
won't 24:15 113:11
  164:22 176:14,20
word 192:20 209:16
  211:5 258:22
wording 88:14
  209:2
words 57:25 87:25
  167:10 231:15
  258:15,15,18,18
  wore 193:3
work 2:14 4:13 5:20
  20:20 22:3 31:6,10
  35:3 38:13 41:1,9
  41:15 42:1,22
  43:17,25 44:7
  81:22 87:13 96:11
  97:6,10,13,14 99:2
  99:6 107:16
  123:14 127:5
  129:8 135:7
  137:11,16 151:25
  171:1,6,9,25
  182:18 183:13
  184:4 190:20
  222:10 245:6
  248:22 260:5
  297:25 313:13
worked 23:18,19
  35:7,9 39:12 77:5
  88:6 109:9,15
  110:2 183:22

185:13 303:2,3
workers 30:2 135:6
  141:13 142:14
  258:6 260:23
workforce 127:2
  204:12
working 7:13 10:14
  28:7 38:20 62:23
  67:15 68:18 86:15
  138:13,17 141:7,9
  141:11,14 142:20
  143:5 225:14
  235:1,4 252:21
workplace 4:16 31:4
  47:6,16 49:3 59:15
  76:17 107:13
  117:19 120:17
  137:13 179:20
  180:20 212:20
  213:2,4 214:16
  229:24 235:1
  247:3 248:21
works 95:20 105:10
  163:14
world 112:11,13
worried 9:22,25
  235:12
worse 179:6 233:12
wouldn't 12:5 93:6
  172:11 217:18
  284:16
wounds 291:23
write 10:10 17:2
  88:18 101:17
  102:12 167:7
  225:20 269:14
  273:15 280:12,13
  280:18 282:14
  286:22
writing 97:24
  225:18 289:10
  309:4
written 9:5 101:1
  102:9 166:19
  170:18 286:24
  294:17
wrong 192:18
  263:19
wrongfully 264:2
wrote 18:10 33:14
  167:12 272:5,13
  272:15,17,19
  273:24

――――――――
        X
――――――――
X 3:1 135:21

        Y
――――――――
yeah 9:7 10:6 13:2
  13:13 28:8 52:15
  69:16 70:11,24
  82:4 91:2 95:5
  100:2 104:7
  133:24 149:1
  163:1 173:11
  186:8 187:11
  213:7 214:3 217:6
  232:17 268:19
  270:19 272:10,18
  282:9 291:12
  311:1
year 37:12 46:13
  55:23,25 60:4
  90:23,25 91:6 94:7
  125:1 126:15
  131:14 133:12
  136:2 151:24
  184:15 284:1
  286:15
years 16:17 19:9
  29:11 31:23 35:7,8
  37:19,25 38:2
  39:11 56:1 62:19
  108:8,20 111:20
  111:22 122:21
  127:25 152:23
  162:7 169:8
  172:22,24 181:23
  182:5 183:15,17
  183:24 184:12
  185:22 186:1
  199:4 215:1
  216:24 219:9,19
  219:20,24,25
  220:3 250:16
  251:3 266:7
  278:18 281:4
  290:11 299:10
  313:12 314:22,23
yesterday 7:15
  10:20 16:7 24:24
York 121:11
young 36:17 218:16
younger 192:17
  302:5
you'd 40:9 56:10
  169:16
you'll 16:14 51:15
  55:4 58:24 103:3
  128:19 273:10
  311:18
you're 13:14,20
  20:19 22:22 36:22

Charlene Carter - Vol. 1                                    December 7, 2017

35

61:9,10 66:20
69:24 70:25 72:9
72:17,23 73:8
81:25 82:20 91:9
104:3 118:10
122:5,9 147:19,20
148:24 170:4
181:10 197:18
209:11 218:23
222:21 243:14
250:3 252:18
272:6 273:16
277:13 278:14
280:15,22 281:7
281:16 282:1,9,14
294:14 295:14
312:20
**you've** 37:22 38:19
87:22 111:20
122:19 181:21
219:7 224:17
278:13 281:4
286:2 296:7
**Y'all** 210:15

**Z**

**zero** 183:25 187:1
**zeros** 166:24

**$**

**$800** 9:23

**0**

**0222** 318:24

**1**

**1** 1:15 4:10,23 6:2
50:19,21 51:8 52:8
53:1,13 82:9 95:25
240:18
**1st** 125:15
**1,650** 182:13
**1,654** 220:11
**1/11/13** 5:1
**1:14** 121:24
**10** 5:10 133:15
154:1,6 163:11
268:18,19,20
269:7
**10/12/16** 5:4
**10:14** 52:2
**10:20** 52:17
**10:27** 52:17
**10:52** 70:13
**10:53** 70:13
**100** 55:25
**102** 2:4

**1026** 2:4
**11** 5:11 184:17,18
186:7 187:11
251:3
**11th** 55:8 233:6
**11:00** 76:2
**11:01** 76:2
**11:07** 80:18
**11:20** 80:18
**11:40** 94:23
**11:41** 94:23
**115** 318:23
**117** 3:10
**12** 5:12 28:5 186:13
186:15 187:11
227:9 278:18
290:11 299:10
314:22,23
**12th** 58:18
**12/31/18** 318:21
**12:04** 111:1
**12:06** 111:1
**12:18** 121:8
**12:20** 121:8,24
**122** 3:13
**13** 5:14 187:5,6,11
**14** 5:15 239:25
262:5,6,9
**14th** 60:22 91:5
232:20
**146** 5:9
**15** 108:14 174:22
**15th** 164:4 318:18
**15,500** 251:17
**150** 278:22
**154** 5:10
**16** 108:14 182:13
186:10 220:12
**16th** 55:19 57:1
**162** 3:14
**168** 5:21
**17** 16:16 186:11
312:25
**174** 5:22
**178** 3:13
**18** 7:6 39:4,6,6
81:20 82:1,21,22
83:6 84:18 85:6,10
85:21,23,25 87:16
108:4,10,11 109:4
110:2,10,12
241:13,19,24
242:2,8,13 245:4,5
**18th** 318:23
**18-month** 45:3
83:16 241:2

242:21
**181** 3:16
**184** 5:11
**186** 5:12
**187** 5:14
**19** 18:2 82:15
240:21 252:5
**19th** 140:14
**19-140** 82:13 240:22
**1996** 251:1

**2**

**2** 3:3 4:11,24 5:15
6:2 13:19 19:24
21:5 34:9,21 44:24
53:2,5 54:11 72:7
74:7 80:1,9 81:6,7
159:23 160:3
166:24 178:10
206:1 219:18
238:25 239:1,2,7
239:13,15 252:3
252:23 254:10,16
254:25 255:2,11
256:7 259:18
261:16,18 262:1
262:20 263:4
265:7,9,24 266:22
268:14 269:11,13
269:15 274:9
276:9 278:3
285:13
**2s** 278:5
**2/22/17** 5:5
**2:00** 280:25
**2:08** 153:25
**2:24** 153:25
**20** 7:6 18:3 252:5
266:7
**20th** 37:12 140:19
**20-year** 74:25 75:1
**200** 55:25
**2003** 251:5 252:15
**2004** 123:8
**2006** 123:14 251:5,6
252:16
**2007** 251:8
**2008** 123:18
**2009** 123:24
**2011** 182:7 250:20
**2012** 85:24 123:24
182:8 219:17
**2013** 55:6,19 86:3
124:1,15,20
127:11 128:1,10
132:2

**2013-006** 55:5
**2015** 5:11 39:11
57:1 125:14,15
126:1,18 144:25
145:12 147:25
170:19 174:21
175:1 178:11
179:12 180:6
185:3,13 189:9
199:22
**2016** 5:12 39:13
48:12 52:1 58:18
62:23 138:2
178:21 179:15
180:6
**2017** 1:17 5:14
39:16 53:17 54:8
63:15 85:22 86:10
91:1,3 138:4
148:15 239:25
318:19
**2018** 125:18
**205** 3:17
**21** 108:8 250:16
**21st** 53:17 54:8
141:2
**21-year** 107:25
**214.303.0ABC**
318:24
**214.303.0202** 318:25
**219** 3:19
**22** 60:23
**22nd** 52:1 60:4
**22160** 2:15
**23** 219:9
**239** 4:18
**24** 267:22
**24-month** 34:25
**24-0714** 1:9 6:6
**240** 3:20
**2400** 2:9
**248** 3:19
**248-2173** 2:10
**250** 3:22
**262** 5:15
**270** 3:23
**2727** 1:21
**276** 3:22
**277** 4:3
**28** 3:6

**3**

**3** 4:12 5:1 39:23,24
40:3 54:18,22,23
56:14 74:10 82:16
88:21 98:9 117:9

240:21 243:18
**3.0.0** 95:4,6 120:4
**3.1.0** 95:12,15 96:2,8
**3.2.0** 42:10 95:9
**3/14/17** 4:18
**3:05** 181:4
**3:17** 181:4
**30** 14:5,10,16
**30th** 125:18
**30-day** 43:3 116:3
238:3 267:19
**302** 4:4
**314** 4:3
**315** 4:4
**318** 4:6
**32** 14:5,10,17
**321-8510** 2:15
**35** 75:3 90:10 93:1
119:8
**35,000** 75:8
**37** 3:10
**38690** 4:24 51:25
**39** 4:12

**4**

**4** 4:13 5:2 41:10,11
56:19,21 58:7
74:15 88:21 95:3,9
96:5 99:11 119:23
119:24 120:3
**4/20/15** 5:21
**4:00-ish** 121:10
**4:06** 218:14
**4:15** 218:14
**4:41** 240:11
**4:46** 240:11
**41** 4:13
**415** 2:10
**45** 4:14
**46** 4:16
**48** 4:17
**491** 318:22

**5**

**5** 4:14 5:4 45:4,7
58:12,13 59:18
88:21 120:19
179:25 180:5
**5/16/15** 5:22
**5:01** 249:25
**5:06** 249:25
**5:41** 276:24
**5:46** 276:24 277:7
**5:54** 277:7
**50** 4:23
**53** 4:24

Charlene Carter - Vol. 1                                       December 7, 2017

| | | | | |
|---|---|---|---|---|
| **54** 5:1<br>**556** 2:25 5:21 7:4,5<br>   28:25 29:25 35:13<br>   79:25 100:11<br>   101:6 123:5 124:3<br>   124:7 133:10<br>   136:25 143:10<br>   151:16 159:12,22<br>   169:1 206:20<br>   251:5 252:8<br>   256:24 258:6,17<br>   258:21 260:24<br>   269:23 273:25<br>   277:23 296:22<br>   297:4<br>**56** 5:2<br>**58** 5:4<br>**59** 5:5<br><br>—————— **6** ——————<br><br>**6** 4:10,11,16 5:5<br>   46:18,21 59:23<br>   60:1 88:21 98:24<br>   179:25 180:5<br>**6:44** 317:24<br>**600** 2:14<br>**630-5039** 2:5<br><br>—————— **7** ——————<br><br>**7** 1:17 4:17 5:7 48:6<br>   48:8 70:14,21 71:9<br>   71:17 73:16 88:21<br>   90:21 99:23<br>   120:19 227:19<br>   271:16,18,20<br>   284:1<br>**70** 5:7<br>**703** 2:15<br>**7050** 318:3,21<br>**73** 5:8<br>**75074** 318:24<br>**75702** 2:4<br><br>—————— **8** ——————<br><br>**8** 4:18 5:8 73:20,21<br>   73:24 75:20 83:21<br>   88:2,21 117:6<br>   191:1 228:23<br>   239:17,19 241:6<br>   243:4,12,18 244:5<br>**8001** 2:14<br>**81** 3:11<br><br>—————— **9** ——————<br><br>**9** 5:9 146:18,20<br>   147:10 157:8<br>   162:25 163:3 |    166:12,19,23<br>   205:24 206:15<br>**9:11** 6:3<br>**9:38** 28:16<br>**9:48** 28:16<br>**9:58** 36:15<br>**9:59** 36:15<br>**90** 128:2<br>**903** 2:5 318:23<br>**94111** 2:9<br>**95** 5:20 | | | |

1

2

3

4

5

6                    ARBITRATION

7              IN THE MATTER OF

8        TERMINATION OF CHARLENE CARTER

9              CASE NO. 24-0714

10                  BETWEEN

11              CHARLENE CARTER

12                    and

13          SOUTHWEST AIRLINES CO.

14

15                  VOLUME 2

16

17          DECEMBER 8, 2017

18

19

20  EMBASSY SUITES - DALLAS MARKET CENTER

21      2727 NORTH STEMMONS FREEWAY

22              DALLAS, TEXAS

23

24

25

```
 1                    A P P E A R A N C E S
 2     ARBITRATOR:
 3     MR. BILL LEMONS
       Peoples Petroleum Building
 4     102 North College Avenue, Suite 1026
       Tyler, Texas 75702
 5     (903) 630-5039
       whlemons@satexlaw.com
 6
       FOR THE COMPANY:
 7
       MS. MICHELE HAYDEL GEHRKE
 8     MR. BRIAN K. MORRIS
       POLSINELLI
 9     Three Embarcadero Center, Suite 2400
       San Francisco, California 94111
10     (415) 248-2173
       mgehrke@polsinelli.com
11
12     FOR THE GRIEVANT:
13     MR. MILTON L. CHAPPELL
       MR. JEFF D. JENNINGS
14     NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION
       8001 Braddock Road, Suite 600
15     Springfield, Virginia 22160
       (703) 321-8510
16     mlc@nrtw.org
       jdj@nrtw.org
17
       ALSO PRESENT:
18
           Ms. Charlene Carter, Grievant
19
           Ms. Melissa Burdine
20         Manager, Labor Relations
21         Ms. Lauren Armstrong, Paralegal
           General Counsel Department
22
           Mr. Stephen L. Myers
23         Attorney, General Counsel Department
24         Ms. Patricia Ireland
           Phillips, Richard & Rind, P.A.
25         On Behalf of TWU Local 556
```

Charlene Carter - Vol. 2                                    December 8, 2017

321

```
 1                       I N D E X

 2                                              Page

 3   APPEARANCES                                 320

 4

 5              GRIEVANT'S WITNESSES

 6   CHARLENE CARTER

 7      Direct Examination by Mr. Chappell    324, 408

 8      Cross-Examination by Ms. Gehrke          360

 9   JEANNA JACKSON

10      Direct Examination by Mr. Jennings       411

11      Cross-Examination by Ms. Gehrke          420

12   KENT HAND

13      Direct Examination by Mr. Chappell       425

14      Cross-Examination by Ms. Gehrke          436

15

16           COMPANY'S REBUTTAL WITNESS

17   MAUREEN EMLET

18       Direct Examination by Ms. Gehrke        447

19       Cross-Examination by Mr. Chappell       462

20

21   REPORTER'S CERTIFICATE                      473

22

23

24

25
```

Charlene Carter - Vol. 2                                    December 8, 2017

322

```
 1                     COMPANY EXHIBITS

 2    No.   Description                              Page

 3    15    1/20/17 Inflight Info on the Go re        398
            Political Activities
 4
      16    The Basic Principles                      459
 5

 6

 7                    GRIEVANT'S EXHIBITS

 8    No.   Description                              Page

 9    CC-4  Facebook Postings                        337

10    CC-5  11/10/16 E-mail re Comments from R Spand 412

11    CC-6  Video on Flash Drive                     416

12    CC-7  Post by Sam Wilkins                       427

13    CC-8  Facebook Postings                         431

14

15              (Exhibits Not Attached Hereto)

16

17

18

19

20

21

22

23

24

25
```

Charlene Carter - Vol. 2                                    December 8, 2017

323

```
 1                P R O C E E D I N G S
 2                      8:36 a.m.
 3                      *   *   *
 4            THE ARBITRATOR:  We'll go on the record.
 5   This is the second day of our proceeding.  It's
 6   Friday.  I believe it's the 8th, and it's about
 7   8:40.  We've agreed to start sooner.
 8            So the Company has rested subject to
 9   rebuttal, and you now may start your case in chief.
10            MR. CHAPPELL:  I called one witness
11   yesterday as part of my case.
12            THE ARBITRATOR:  Yes, sir.
13            MR. CHAPPELL:  This is calling today the
14   grievant, Charlene Carter, and she's here.  Was she
15   sworn?
16            THE ARBITRATOR:  No, I'm about to do that.
17   Would you raise your right hand.
18            Do you swear that the testimony you're
19   about to give in this arbitration shall be the
20   truth?
21            THE WITNESS:  Yes.
22            THE ARBITRATOR:  Thank you.  All right.
23
24
25
```

Charlene Carter - Vol. 2                                    December 8, 2017

324

```
 1                      CHARLENE CARTER,
 2   having been duly sworn, testified as follows:
 3                   DIRECT EXAMINATION
 4   BY MR. CHAPPELL:
 5        Q.   Ms. Carter, how long were you employed
 6   with Southwest Airlines?
 7        A.   I've been here right at about 20 years or
 8   almost 21 years now.  I was hired in 1996.
 9        Q.   Okay.  And what position were you hired
10   into as?
11        A.   As a flight attendant.
12        Q.   And at the time of your termination, what
13   position did you hold?
14        A.   Flight attendant.
15        Q.   And did that position change at all in
16   those almost 21 years?
17        A.   Things that we do, yes, but not the
18   position.
19        Q.   Not the classification or the position?
20        A.   Right.
21        Q.   Okay.  We had testimony yesterday about
22   that over the last couple of years or several months
23   that you have exercised your rights under the
24   collective bargaining agreement to make trip trades
25   or giveaways.  Do you know what I mean by trip
```

Charlene Carter - Vol. 2                                    December 8, 2017

325

```
 1   trades and giveaways?
 2        A.   Yes, I do.
 3        Q.   And so my question is, what is the reason
 4   that you were exercising the right to make trip
 5   trades and giveaways over the last couple years?
 6        A.   Over the last couple of years.  Well,
 7   first of all, when I started here I had my son and I
 8   was able to share custody with his daddy.
 9             When I got married, now I have a daughter
10   and so from the time I had her it's been sporadic
11   that I've had to give away trips due to scheduling
12   and so forth.  And now that she's 14 and I'm able to
13   do some other types of things with her as in she
14   gets to stay home, you know, through some of the day
15   on her own for a few hours, I can fly more.
16             Also, I've also been injured on the
17   airplane and I was going through some back issues as
18   well, but mostly it has to do with also I homeschool
19   my daughter as well, so there's days that I can't --
20   not can't fly, but she's my main priority.
21        Q.   You might have halfway answered this
22   question, but I want it clear, so I'm going to ask
23   it now.  If you are reinstated to the Company, will
24   the current -- well, the recent pattern of basically
25   giving away or trading trips continue?
```

Charlene Carter - Vol. 2                                December 8, 2017

326

```
 1        A.    No, because my daughter now is of age to
 2   where I can actually either have another neighbor
 3   come over and maybe watch her for a little while or,
 4   you know, she's now of age where she can stay at
 5   home for a couple of hours on her own and I can
 6   actually hold turns which is also another great
 7   thing.  So with her age now, it's a lot easier.
 8        Q.    Okay.  At the fact finding -- well, there
 9   was a fact finding before you were terminated,
10   correct?
11        A.    Uh-huh.
12        Q.    And you remember that fact finding?
13        A.    Yes, sir.
14        Q.    Okay.  And as part of that fact finding,
15   you were shown multiple pictures from your Facebook
16   account that showed you in some form or relationship
17   with Southwest, or that was the allegation.  Do you
18   remember that?
19        A.    Right, yes.
20        Q.    Okay.  If you can look at what's called
21   Southwest Company Exhibit No. 8, which has already
22   been in evidence.  And I'd like you to start at the
23   third page and just look through to the end.  And
24   when you're done, I'll follow up my question.
25        A.    Okay.  Yeah, those are all mine.
```

Charlene Carter - Vol. 2                                    December 8, 2017

327

```
 1        Q.   And are those the pictures that were shown
 2   to you --
 3        A.   Yes, sir.
 4        Q.   -- by the Company people, maybe Ed or
 5   others --
 6        A.   Yes.
 7        Q.   -- during the fact finding?  Okay.
 8             When you were shown these pictures, did
 9   you have any reaction or any comments to Ed or
10   whoever was showing them to you?
11        A.   I did, because these are pretty old
12   pictures.  They were posted in the last I'd say
13   anywhere between three to four years ago, two to
14   three, four years ago.  The only recent one would
15   have been this one.
16        Q.   And this one would be the last one?
17        A.   That's the last one, that is correct.
18        Q.   And just to help the record, at the very
19   bottom it says "Headed to D.C."
20        A.   "Headed to D.C.," uh-huh.  This was in
21   January.  I actually went to the inauguration.
22        Q.   And based on you looking at that picture,
23   do you see anything that someone in the public who
24   came across could identify you as Southwest?
25        A.   No.
```

Charlene Carter - Vol. 2                                    December 8, 2017

328

```
 1        Q.   Okay.

 2        A.   No.

 3        Q.   Do you see some kind of a -- something

around your neck with looks like a rectangle or

something kind of in the middle of your body?

 6        A.   Yeah.

 7        Q.   Okay.  That doesn't identify you as a

Southwest flight attendant?

 9        A.   The only people that would recognize that

at all would be a Southwest employee, because if you

look at this picture, and I've even blown it up, you

cannot read, see anything on that.  Yes, that is my

ID.  I was in the airport, and that's how I get in

and out of the airport and then also, you know, on

my flights because I non-rev.  But that right there,

no, you cannot see it.

17        Q.   And nowhere with this picture do you

identify yourself as being employed by Southwest?

19        A.   No.

20        Q.   And so for a general public person, even

if they say, hey, wait a minute, that looks like

maybe a flight attendant, is this shape unique to

Southwest or would the other airlines have that

shape?

25        A.   Well, I -- heck, half the people that work
```

Charlene Carter - Vol. 2                          December 8, 2017

```
 1   for all corporations now have an ID that they wear
 2   around their -- with a lanyard and so forth.  So,
 3   no.  I mean, I don't believe anybody would know that
 4   that was a Southwest Airlines unless they are an
 5   employee or a Union member.
 6        Q.   So at the fact finding you put management
 7   on notice that these -- all of these pictures except
 8   for the last one were --
 9        A.   Yes, I did.
10        Q.   -- several years old.
11        A.   Yes.
12        Q.   Now, I want you -- after the fact finding,
13   you grieved the -- well, the results of the fact
14   finding was that you received a letter that informed
15   you you were terminated, right?
16        A.   Correct.
17        Q.   And you grieved that termination.
18        A.   Yes, I did.
19        Q.   And the grievance goes to a step 2
20   hearing?
21        A.   That is correct.
22        Q.   Okay.  And that was conducted by Mr. Sims.
23   Is that correct?
24        A.   Yes.
25        Q.   And at that hearing you were allowed to
```

Charlene Carter - Vol. 2                                        December 8, 2017

```
 1   bring documents and were allowed to make comments
 2   and present your case to Mr. Sims, correct?
 3        A.   Correct.
 4        Q.   Okay.  I'm going to now refer to Southwest
 5   Exhibit 14 and direct your attention to -- starting
 6   on page 82.  I don't know that I need to say all the
 7   zeros before it, but it ends up being 82.
 8             THE ARBITRATOR:  That's Company what?
 9             MR. CHAPPELL:  14, one four.
10   BY MR. CHAPPELL:
11        Q.   And starting on page 82 and going
12   through -- well, let's say go through 90.  Does that
13   represent -- did you bring those pictures?
14        A.   I did, yes.
15        Q.   And those pictures look a little different
16   than -- I mean, there's more than just the picture
17   in what you present.  Why is that?
18        A.   Because the other original ones that they
19   had brought in to the Company or that I was
20   presented with in my fact finding meeting did not
21   have dates on them.  And, first of all, somebody had
22   to get onto my Facebook page and actually scroll
23   through and try to find these pictures because it
24   took me awhile to go through my albums just to find
25   some of these.
```

Charlene Carter - Vol. 2                          December 8, 2017

331

```
 1        Q.    Okay.
 2        A.    This was --
 3        Q.    Where is the date then on --
 4        A.    It's going to be up in here, but I
 5   can't --
 6        Q.    Let's do 82.  Okay.  When you point to "up
 7   here," you're pointing right below --
 8        A.    Below my name.
 9        Q.    -- where it says "Charlene Carter"?
10        A.    That is correct.
11        Q.    And is it correct to say that 82, 83 is
12   what we call a screenshot?
13        A.    That is correct.
14        Q.    Again from your Facebook page?
15        A.    Correct.
16        Q.    Okay.  Which includes the picture and then
17   comments on what you said about it --
18        A.    And the date, yes.
19        Q.    -- and what others may have said?
20        A.    Yes.
21        Q.    And that is where the date shows?
22        A.    Yes.
23        Q.    And the date never shows just in the
24   picture?
25        A.    The date does not show?  Is that --
```

Charlene Carter - Vol. 2                                          December 8, 2017

332

```
 1        Q.   No, that's my question.  Does the date
 2   show just in the picture, or the date's always over
 3   here in your comments?
 4        A.   It's always over here in the comments.
 5        Q.   Okay.  Now, there is also highlighting in
 6   this picture.
 7        A.   Uh-huh.
 8        Q.   Do you know who made the highlighting?
 9        A.   I did.
10        Q.   Okay.  And does it appear that the dates
11   are attempted to be highlighted or are more
12   highlighted?
13        A.   Yes.
14        Q.   And does the highlighting make it a little
15   difficult to now read the dates?
16        A.   Yes.
17        Q.   Okay.
18        A.   Unfortunately.
19        Q.   From your computer were you able to print
20   out the pictures that you were shown at the fact
21   finding, the full screenshots that show legible
22   dates?
23        A.   I believe so, yes.
24             MR. CHAPPELL:  Then we can do this two
25   ways.  Why don't we go off the record.
```

Charlene Carter - Vol. 2                                December 8, 2017

```
 1              THE ARBITRATOR:  Sure.
 2                  (Off record from 8:48 to 8:49)
 3              MR. CHAPPELL:  Back on the record.
 4    BY MR. CHAPPELL:
 5         Q.   I'm going to direct your attention back to
 6    Southwest Company Exhibit No. 8 which are the
 7    pictures that you testified that you were shown at
 8    the fact finding.
 9         A.   Correct.
10         Q.   And did you go back to your computer more
11    recently and print out the full screenshots showing
12    the dates of each of these pictures that consist
13    of -- starting on the second page going to the end
14    of number 8?
15         A.   Yes, I did.
16         Q.   Okay.  I'm going to show you now --
17         A.   Okay.
18         Q.   I'm going to do it in the order that the
19    pictures appear in Exhibit No. 8 so that you can
20    compare them.
21         A.   Okay.
22         Q.   So looking at what would be the third
23    picture in Exhibit 8, what I just showed you, is
24    that the screenshot that you printed out?
25         A.   Yes, it is.
```

ABC COURT REPORTERS                        214.303.0ABC  (0222)

Charlene Carter - Vol. 2                          December 8, 2017

334

```
 1        Q.   Does it show the date that that picture
 2   was posted on Facebook?
 3        A.   It says June 30th, 2013.
 4        Q.   Okay.  Turning to the next picture which
 5   would be the fourth picture in number 8, did you do
 6   the same thing, go into your computer and print out
 7   the full screenshot?
 8        A.   Yes, I did.
 9        Q.   Okay.  What I just have handed you, is
10   that that screenshot?
11        A.   Yes, sir, it is.
12        Q.   Okay.  And then can you read the date that
13   it shows that you posted it?
14        A.   January 9th, 2014.
15        Q.   Okay.  Now I'm going to what would be the
16   fifth picture in Exhibit 8, and it also is the sixth
17   picture just to show the -- it's the same picture
18   twice.  And I'm showing you the screenshot that you
19   printed out from your computer.  And is what I just
20   showed you that screenshot?
21        A.   Yes, sir.
22        Q.   Okay.  And what is the date that Facebook
23   put that you first posted that?
24        A.   September 17th, 2014.
25        Q.   Okay.  So I'm skipping because there's two
```

Charlene Carter - Vol. 2                                  December 8, 2017

335

```
 1   that that covers, and I'm now at the picture that
 2   says "Live At 35" in Exhibit 8.  And I'm now handing
 3   you a copy of the screenshot that you printed out of
 4   that picture.  And is what I handed you that
 5   screenshot?
 6        A.   Yes, this is the same picture.
 7        Q.   Okay.  And what is the date that Facebook
 8   put that you first posted that picture?
 9        A.   May 27th, 2013.
10        Q.   Okay.  And the third picture from the end
11   of Exhibit 8, I am showing you a copy of the
12   screenshot that you printed out, is that correct --
13        A.   That is correct.
14        Q.   -- of that picture?  And can you read the
15   date that Facebook said you posted that?
16        A.   I believe it says August 26th, 2013.
17        Q.   Okay.  And now the next to the last
18   picture on Exhibit 8, I'm handing you the copy of
19   the screenshot from your Facebook account that you
20   took.  Is it the same picture?
21        A.   Yes, it is.
22        Q.   And what is the date that Facebook put
23   that you first posted that picture?
24        A.   March 9th, 2014.
25        Q.   Okay.  And the last picture we have
```

Charlene Carter - Vol. 2                                    December 8, 2017

336

```
 1   already discussed, and you have established that it
 2   was -- you said you went to the inauguration?  Was
 3   that it?
 4         A.   Uh-huh.
 5         Q.   Okay.  Just so that we have a complete
 6   record, I really don't need to do this, but here is
 7   the screenshot, the full screenshot of that.  Is
 8   what I just handed you that screenshot?
 9         A.   Yes, sir.
10         Q.   And what is the date that Facebook said?
11         A.   January 19th, and it would be 2017.
12         Q.   Okay.  And how do you know that it's 2017?
13         A.   Because I went to the inauguration of
14   President Trump.
15         Q.   Okay.  And there is no date, no year date
16   on the Facebook?
17         A.   No, there's not.  And the reason, I
18   believe, is just because if it's in that year,
19   it's --
20         Q.   The current year they don't?
21         A.   The current year, yeah, they don't list
22   it.  I believe that's the way this happens.
23              MR. CHAPPELL:  I move the admission of
24   these photos in the order I just marked them.
25              MS. GEHRKE:  Are you going to mark them as
```

Charlene Carter - Vol. 2                              December 8, 2017

```
 1   a single exhibit and number it or --
 2          MR. CHAPPELL:  We can -- I can mark them
 3   all as a -- maybe it's easier just to mark them as
 4   CC-4, 5, 6.
 5          THE ARBITRATOR:  Let's do this.  Do you
 6   have that device that clips these together?
 7          MR. CHAPPELL:  That stapler?
 8          THE ARBITRATOR:  Yeah, because I want to
 9   get one of those.  We'll make it one exhibit,
10   please.
11          MR. CHAPPELL:  Okay.  So it will be CC --
12   I think I'm at 4.
13          THE ARBITRATOR:  I think that's right.
14   Yes, that's 4.
15             (Grievant's Exhibit CC-4 marked)
16   BY MR. CHAPPELL:
17      Q.   Why did seeing some of your Union
18   leadership and members at a women's march earlier
19   this year affect you so much?
20      A.   Well, the reason that it affected me so
21   much is because of my own personal experience.
22   They -- let me back up.  Planned Parenthood was the
23   main sponsor of the women's march.  I personally
24   have dealt with them when I was a young lady.  And
25   my Union dues, when I saw that these ladies went to
```

```
 1   this march and found out later that my Union dues
 2   were spent for them to enjoy this march, and they
 3   did, it brought back some emotions that took over.
 4   And it --
 5        Q.   Emotions of what?
 6        A.   Of something that I did back in the day
 7   that I'm not proud of.  And it brought back a lot of
 8   anger in my heart and sadness and --
 9        Q.   What was it that you're not proud of or
10   that you did in the day?
11        A.   I had an abortion.
12        Q.   How old were you then?
13        A.   I was 18, 19 years old.
14        Q.   And I believe you just testified that
15   brought back anger.  Who were you angry at?
16        A.   Myself and Planned Parenthood and the
17   whole situation.  And --
18        Q.   What situation?
19        A.   Making a decision to abort a baby.  And
20   back then I didn't have the wherewithal, the -- we
21   didn't have social media.  We didn't have the things
22   that we now can share.  I didn't -- I wasn't
23   educated on what was really happening.  And if I
24   would have known what I know now, I would have
25   never, ever done what I did.
```

Charlene Carter - Vol. 2                              December 8, 2017

339

```
1              And so I have since then over the years,
2    and I'm a Christian, I have had to deal with that
3    within my own personal relationship with God and my
4    family and had to come to terms with it.  And I was
5    there on that day when these women were coming in.
6         Q.   When you say you were there, you mean
7    Washington, D.C.?
8         A.   Yes, sir.  I went to the inauguration.
9    And the day after the inauguration, all these women
10   were coming in for this march.  And I saw the signs,
11   I saw the outfits, I saw the hats, I saw people that
12   were pro-life being ridiculed and told that they
13   were not welcomed at this march.
14              I had no idea at that time that my Union
15   was at this march.  And when I found out on -- I
16   don't even remember what the date it was.  It was
17   being talked about within our Union, because this
18   group of women went, dressed, had signs, and then I
19   later found out they were paid to go to this march
20   or me paid for them to go to this march.
21        Q.   Well, how were these feelings that you
22   just described affected, if they were, when you
23   learned that your dues money had supported this?
24        A.   Made me sick.  Made me sick.  I do
25   everything right now to absolutely counteract what
```

Charlene Carter - Vol. 2                               December 8, 2017

340

```
 1  this organization and others are doing right now.  I
 2  don't care if they go --
 3        Q.   Wait a minute.  This organization.  What
 4  does that refer to, what organization?
 5        A.   Planned Parenthood.
 6        Q.   That doesn't refer to the TWU union?
 7        A.   No, it refers to TWU union as well.
 8        Q.   So it refers to both Planned Parenthood
 9  and the TWU union?
10        A.   Yes.
11        Q.   Okay.  Keep going because I want the
12  record clear, so when you use pronouns we need to
13  clear it up.
14        A.   I know that I'm an objector.  I know that
15  my dues do not go up to International anymore.  It's
16  only $7 and something a month.  It's a very small
17  amount.  But the rest of my dues support this local
18  and still pay to go to this march, and it -- it
19  upset me tremendously.  It was a slap in the face
20  for me.
21        Q.   Well, then tell us how you ended up
22  sending the abortion videos and the screenshot that
23  is the first two pages -- it's exhibit -- I'm going
24  to get the right exhibit here.  It's the first two
25  pages -- yeah, so let me first of all establish,
```

```
 1    Southwest Exhibit 9 I've handed before you and pages
 2    1 and 2, do those represent the wording and videos
 3    that you sent Audrey Stone?
 4         A.   Yes, it is.
 5         Q.   And who is Audrey Stone?
 6              THE ARBITRATOR:  We know who Audrey Stone
 7    is.
 8              MR. CHAPPELL:  Okay.  That's fine.
 9    BY MR. CHAPPELL:
10         Q.   Now, my question then is to tell us how
11    you ended up sending the videos that are represented
12    on pages 1 and 2 of Exhibit 9 and to Audrey Stone.
13         A.   The day that -- I had found out that they
14    had gone to march because -- first of all, back up.
15    They never said anything to this membership about
16    going prior.  If this was for the women's committee,
17    that was done on the 19th, as I recall.  They
18    elected to go to the march on I believe it was the
19    21st.  The women's committee was already over.
20              There were, I believe, 20 or so flight
21    attendants that went.  They were pulled from trips.
22    They were given positive space on Southwest
23    Airlines.  My Union dues --
24              THE ARBITRATOR:  To go to the women's
25    committee meeting or to the march?
```

Charlene Carter - Vol. 2                                    December 8, 2017

342

```
 1              THE WITNESS:  To both.  It paid for the
 2   entire trip, sir.  If it would have just been the
 3   committee that they went to, it would have been no
 4   big deal.
 5              THE ARBITRATOR:  Let the record reflect
 6   that a very good counsel has joined us for the
 7   second day.
 8              MS. IRELAND:  And let me suggest my
 9   apologies, but also the door was locked, so that
10   made it really hard to get in.
11              THE ARBITRATOR:  Would you tell this young
12   lady your full name.
13              MS. IRELAND:  Yes.  My name is Patricia
14   Ireland, like the country, and I'm representing
15   Transport Workers 556.
16              THE ARBITRATOR:  And I will disclose I've
17   had one arbitration with Ms. Ireland in the past.
18   Welcome.
19              MS. IRELAND:  Thank you.  I do apologize
20   for interrupting.
21                    (Off record from 9:04 to 9:05)
22              THE ARBITRATOR:  All right.  We were
23   talking about the motivation and -- anyway, continue
24   with explaining.
25   BY MR. CHAPPELL:
```

Charlene Carter - Vol. 2                         December 8, 2017

343

```
 1       Q.   Yeah, explaining exactly how it came up
 2   that you sent these videos to Audrey.
 3       A.   When I found out, like I said, that they
 4   had gone to this march was due to the fact that
 5   others were talking about it.  The day that I found
 6   out that we had possibly spent our money, it just
 7   went all over me.
 8       Q.   What went all over you?
 9       A.   The emotion of -- they're not representing
10   all of the flight attendants when they do these
11   things.  This march was not necessary to go to.  The
12   women's committee I understand, but the women's
13   march was an elected event for them.  They all
14   dressed just like the women that I saw coming into
15   D.C.  They sat around a table knitting those pink
16   hats.  And I don't know if you know what they are or
17   what the -- it was called the pussy hat project.
18       Q.   So how did you discover these videos?
19       A.   These videos, I'm connected to several
20   different organizations and then through friends.
21   This one -- well, these two --
22       Q.   What type of organizations?  I need as
23   much specifics as --
24       A.   Pro-life organizations.  There's one that
25   I give to a lot and it's Alveda King, who is
```

```
 1    Dr. Martin Luther King's niece.  It's called Priests
 2    For Life.  It's one of the biggest ones that I
 3    support.  And if you go to their website, it is
 4    there for everyone.  They show pictures, and I
 5    believe now they also have videos online about the
 6    very --
 7         Q.   Is that where you got this video?
 8         A.    No, this is not where I got these videos.
 9    This is through others that I am associated with on
10    Facebook that had put this out prior to the women's
11    march knowing that this was coming.
12         Q.   When you say "this out," do you mean the
13    videos?
14         A.   The videos, yes.  And I had come across
15    them, and I had posted them on my Facebook page.
16         Q.   Okay.
17         A.   Which was my personal page at the time.
18         Q.   And my question was, how did you end up
19    sending these videos to Audrey?
20         A.   When I found out that our dues paid for
21    this march, my feelings, my emotions, the sickness
22    of everything that I had gone through and the fact
23    that they used our money to go here and represent
24    this, it affected me.  And I -- out of my -- and I
25    do regret this.  I do regret this.
```

Charlene Carter - Vol. 2                                    December 8, 2017

345

```
 1        Q.   When you say "regret this," what does
 2   "this" refer to?  You regret what?
 3        A.   I wished that if it would have upset
 4   Audrey Stone as much as it did -- the reason I sent
 5   it to my president is because she is the leader of
 6   our Union.  It is not because I don't like Audrey
 7   Stone.  It is because she is the leader and she is
 8   the one that elected to take these women to the
 9   women's march.
10             I wanted her to understand if they were
11   going to go and do this what they were absolutely
12   representing us as flight attendants and they were
13   supporting.  I believed at the time that if she
14   really cared about what the issues were that I was
15   concerned with over the period of time that she's
16   been our president, that she would at least reach
17   out.
18             Now, I don't know her political
19   affiliations and I don't know her stance on this,
20   but if you go to this type of event, you cannot tell
21   me as a grown woman that you don't know what you are
22   supporting when it is the main sponsor of this march
23   and the vitriol that was being spewed by the main
24   speakers at this march.  So when --
25        Q.   Had you viewed these videos before you
```

Charlene Carter - Vol. 2                         December 8, 2017

```
 1   sent them?
 2       A.   Yes, I did.  As a matter of fact, I have
 3   let my 14-year-old view these videos as well because
 4   I want my daughter to understand what life -- this
 5   is life.  This is not cells.  This is not a bunch of
 6   just tissue.  This baby right here grew into what I
 7   have now as my son and my daughter.
 8            And I don't care what affiliation you are
 9   or who you support, but when you take my money and
10   you go to this march and you support this, it went
11   all over me.  And I had no one to contact except our
12   main representative about this since she went, she
13   organized it, she planned it, and she was the one
14   who said that our dues money paid for it.
15            So when you take that on as being the
16   representative of Southwest Airlines flight
17   attendants and our Union, I felt that she needed to
18   know how I felt about her supporting this, not as an
19   individual but as our Union president.
20       Q.   When you sent this video, and it has the
21   time, so at that time when you pushed send, was it
22   your intent to hurt anyone?
23       A.   No, it was not my intent to hurt anyone.
24   And I am sorry that if it affected her the way that
25   it did, but I wished as a woman, since this was a
```

Charlene Carter - Vol. 2                            December 8, 2017

347

```
 1   women's march and she went there to protect all
 2   women, that she could see how this may have affected
 3   another woman at Southwest Airlines under the
 4   umbrella of TWU 556 and as just a woman, as a
 5   coworker that she claims that she is as well.
 6           She did not support, they did not support
 7   the entire membership when they went to this march.
 8   I'm not saying the women's committee that they went
 9   to.  I'm talking about the march.  They elected to
10   go to this.  They posted pictures and videos of them
11   having fun at this march.
12       Q.   "They posted" meaning the members from
13   TWU?  Is that who you're talking about?
14       A.   Yes.
15       Q.   Are you talking about just marchers in
16   general?
17       A.   No.
18           THE ARBITRATOR:  About the pronouns,
19   Counsel, "they" means who?  Who posted that?
20           THE WITNESS:  The women that went to this
21   march, there is a YouTube video that they were
22   having a ton of fun making their hats, making their
23   signs, celebrating this march.
24           THE ARBITRATOR:  My question is, who
25   posted the video?  Do you know?
```

Charlene Carter - Vol. 2                        December 8, 2017

348

```
1              THE WITNESS:  Yeah, it's one of the ladies
2    that's -- I don't remember.  I think it's --
3    BY MR. CHAPPELL:
4         Q.   Did you provide that posting to the
5    Company that the arbitrator asked you about?
6         A.   No, I posted her on -- because they also
7    made a video, and they posted it on TWU 556 web
8    page.
9              THE ARBITRATOR:  Okay.  After the break we
10   can verify who actually posted that or not.  Okay?
11             THE WITNESS:  Well, the Union and the
12   women posted this on TWU 556 as well.  It was on our
13   Facebook page at 556.  And they showed all the
14   pictures or some of the pictures that I have taken
15   from that site and celebrating going.
16   BY MR. CHAPPELL:
17        Q.   Earlier you said that Planned Parenthood I
18   believe you said was the main sponsor or some kind
19   of terminology.  Do you remember that testimony?
20        A.   Yes.
21        Q.   Did you inform the Company that Planned
22   Parenthood and the basis for why you were claiming
23   they were the main sponsor?
24        A.   Yes, I did.
25        Q.   And would that have been in the material
```

Charlene Carter - Vol. 2                                    December 8, 2017

349

```
 1   that you submitted in the step 2 to Mr. --
 2        A.   Yes, it was.
 3        Q.   -- Sims?  Okay.  I'm going to show you
 4   Southwest Exhibit 14.  Turn to page 9.
 5             MS. GEHRKE:  Sorry.  What was the exhibit?
 6   BY MR. CHAPPELL:
 7        Q.   14, page 9.  And ask you if that was the
 8   evidence that you presented showing that Planned
 9   Parenthood was the exclusive, premier sponsor of the
10   Women's March on Washington.
11        A.   Yes.  As a matter of fact, this is their
12   web page, the women's march web page.  The executive
13   premier sponsor is Planned Parenthood.
14        Q.   Now, yesterday Mr. Sims testified and you
15   were here and heard that at your step 2 grievance
16   that you told him that you were sorry that you had
17   sent these videos to Audrey.  Is his testimony
18   correct?
19        A.   Yes, it is.
20        Q.   Okay.  Can you tell us why you told him
21   that you were sorry that you had sent the videos?
22        A.   I was sorry that I sent the videos due to
23   the fact that if it upset her personally, that I
24   apologized for that.  I sent the videos hoping --
25   and looking back it was a -- I know we all do
```

Charlene Carter - Vol. 2                           December 8, 2017

350

```
 1    things.  Nobody is not guilty of doing things when
 2    emotions come into play.  This was a mistake on my
 3    part to send it to her like this.
 4            But she has -- when I have e-mailed her in
 5    the past or tried to call the Union office, I don't
 6    get a response.  They treat the people that have
 7    opted out basically not very well.  I've been called
 8    a scab.  I've been called a -- that I shouldn't even
 9    be a part of this Union.  But I still pay local dues
10    and they still spend my money.  I was sorry that I
11    sent this video if it upset her personally, but this
12    video was meant for the fact that our Union went and
13    supported this march and I helped pay for it.
14        Q.   And we had testimony yesterday also about
15    the fact finding that occurred.
16        A.   Yes.
17        Q.   And several people who were there
18    testified that you showed no remorse, you did not
19    sorry, something like that.  The record can speak
20    for itself.  Is that correct that at the fact
21    finding you did not say you were sorry --
22        A.   No, it is not.
23        Q.   -- about sending the video?
24        A.   At that time at the fact finding meeting,
25    honestly I don't remember exactly what I said.
```

Charlene Carter - Vol. 2                                    December 8, 2017

```
 1    There were so many people throwing so many things at
 2    me, and I didn't have all the facts before I could
 3    go into that fact finding meeting.
 4         Q.   Well, I guess my question then is what
 5    changed in your thinking between the fact finding
 6    and the step 2, which was about -- I think about
 7    three to four weeks, that caused you at step 2 to
 8    tell Mr. Sims that you were sorry that you had sent
 9    Audrey these videos?
10         A.   Well, with anybody that makes a mistake,
11    you sit back and reflect and you sit back and -- and
12    due to the fact that I know that these videos, they
13    are disturbing, but they are fact.  And for me, if I
14    can -- if I can say to her and sit down with her and
15    say that I'm sorry, I will, and I would.
16         Q.   Well, that's really where I was going
17    next.  After you told Mr. Sims at the step 2 hearing
18    that you were sorry, did you convey your --
19         A.   I did.
20         Q.   -- feelings towards Aud -- did you convey
21    that?
22         A.   I did.
23         Q.   Did you tell Audrey you were sorry?
24         A.   No, because after --
25         Q.   Why?
```

Charlene Carter - Vol. 2                          December 8, 2017

352

```
 1        A.   -- my second step meeting, when we were in
 2   that meeting he told me to not reach out to anybody.
 3   He told me not to, it would look like retaliation,
 4   it could be considered as retaliation.
 5             I did say I was sorry in that.  He was
 6   going to do his investigation.  This whole thing, I
 7   never would have dreamed my Union president would
 8   have taken it to the Company due to the fact that
 9   this was Union business.  This is nothing to do with
10   Southwest Airlines except that they highlighted
11   Southwest Airlines with their airplane on the web
12   page of 556 through the video.
13             And then our lights of some of our
14   airplanes were turned pink, and they celebrated that
15   as well.  And I have friends that were flying that
16   day that passengers were saying to them that they
17   felt uncomfortable on our airplanes and that they
18   reached out to Southwest Airlines.  And Southwest
19   Airlines said to them that our flight attendants
20   have all the ability to celebrate different things.
21             Do they understand what they were
22   celebrating by turning those lights pink when some
23   of those passengers may have felt very uncomfortable
24   with the fact that they were allowing to celebrate
25   this women's march?  But I was told from my Facebook
```

Charlene Carter - Vol. 2                                    December 8, 2017

1  page that it was disparaging to them because I'm

2  pro-life, but yet they allowed these women or men to

3  turn these lights pink on these airplanes and only

4  explain it to be it's just our mood lighting.  And

5  it was listed on the pages.

6        Q.   My question there was, why didn't you tell

7  Audrey, and I believe you said that you had been

8  informed at the fact finding that you should --

9        A.   Yes.

10       Q.   -- have no contact?

11       A.   They said do not have any contact with --

12  that they were going to do their investigation, and

13  I agreed with that.  I was very honest with him and

14  I was very honest with my base manager and my

15  assistant base manager and all of the people that

16  were there at that meeting.

17       Q.   Do you still want to tell Audrey that

18  you're sorry?

19       A.   Yes.

20       Q.   Especially after what you --

21       A.   Yes.

22       Q.   -- saw yesterday?

23       A.   Yes, I do.  I would have never wanted it

24  to affect her emotionally like that.

25       Q.   And if Southwest made it clear to you that

ABC COURT REPORTERS                        214.303.0ABC  (0222)

Charlene Carter - Vol. 2                                    December 8, 2017

354

```
 1   that is okay or when it's okay to do that, what is
 2   your intention?
 3        A.   I would love to sit down with her and
 4   speak with her about the issues that affect me that
 5   our Union does.  I would love to apologize for this,
 6   for it to have -- that if it affected her.
 7             I would hope that this would bring more of
 8   a dialogue with what our Union does with our money
 9   and that we could come together as different groups
10   in Southwest Airlines about what we do support,
11   because it's really about our jobs.  It's really
12   about our livelihoods.  It's about our safety on our
13   airplanes.  It's got nothing to do with this.  That
14   women's march, they were saying about women's rights
15   with salaries?  I make a good salary, or I did.
16   That's my livelihood.
17        Q.   I have two other questions here relating
18   to the exhibit.  First of all, again, looking at
19   Southwest Exhibit No. 9, above the video there is
20   some writing.
21        A.   Yes.
22        Q.   And you see that.  Okay.  Who did that
23   writing?
24        A.   I did.
25        Q.   Okay.
```

Charlene Carter - Vol. 2                           December 8, 2017

355

```
 1        A.    That was mine.
 2        Q.    Below the video there is more --
 3        A.    Yes.
 4        Q.    -- text and writing.  Who did --
 5        A.    This was who it was sent by or posted by.
 6   These are the comments that were from the posting
 7   that was original, and it always goes with when you
 8   send something to somebody.  And these were private
 9   messages.
10        Q.    Right.  But I'm just getting -- I want the
11   record clear.  Which part of the text because --
12        A.    This is mine.
13        Q.    And I'm going to -- right.
14        A.    This is mine.
15        Q.    Which is yours and which is somebody
16   else's that --
17        A.    Correct.
18        Q.    -- went with the video as you just said.
19   I'm not trying to testify.  Page 2 there's text
20   above the video.  That's yours?
21        A.    Yes.
22        Q.    Below the video there is some more text.
23        A.    This is -- this is below the text.
24        Q.    Okay.
25        A.    This is -- this is mine right here.
```

Charlene Carter - Vol. 2                                    December 8, 2017

356

1      Q.    Okay.  This, did you know that is yours?

2      A.    Yes.

3      Q.    Okay.

4            MS. GEHRKE:  Can you identify what you

5      guys are pointing to?

6            MR. CHAPPELL:  Yeah.

7            THE WITNESS:  Oh, sorry.

8            THE ARBITRATOR:  It's the gray shaded area

9      in the larger font.

10           MR. CHAPPELL:  Right.

11           THE ARBITRATOR:  And immediately below the

12     picture is a smaller font that appears to be in a

13     different type.

14           MR. CHAPPELL:  Right.

15           THE ARBITRATOR:  I got it.

16     BY MR. CHAPPELL:

17     Q.    Now, that covers the private messages

18     which is Exhibit 9.  Exhibit 8 is the Facebook

19     posting, and we have text.  And this is at page 1 of

20     Exhibit 8.  We have text at the very top.

21     A.    This is mine.

22     Q.    And that is yours.  Then we have -- it's a

23     different font, "My Page - Opinions," is that your

24     comments?

25     A.    No.

Charlene Carter - Vol. 2                                December 8, 2017

357

```
 1          MS. GEHRKE:  I can't see what you're
 2   pointing at.
 3          MR. CHAPPELL:  Oh, I'm sorry.  At the top
 4   there is text which she said is hers.  Then next to
 5   that there is in a different font titled "My Page -
 6   My Opinions."
 7          MS. GEHRKE:  I got you.
 8          MR. CHAPPELL:  She said that's not hers,
 9   and I hadn't gotten to the next.
10   BY MR. CHAPPELL:
11      Q.   Then below that there's more text.  It's
12   hard for me to know if it's different font or what,
13   but that starts with "hashtag Democrats."  Did you
14   write that?
15      A.   No.  That went with the post.
16      Q.   That came with the post.  Now on what
17   is -- I'm not sure it's marked as page 2, but it's
18   the second page of Exhibit 8.  At the top there is
19   text at the very top right under your name?
20      A.   Uh-huh.
21      Q.   You wrote that text?
22      A.   I did.
23      Q.   That's three lines of text.  Below that is
24   a graphic, and then I'm probably not pronouncing
25   this right, Samina Shah?
```

```
 1         A.   Yes.
 2         Q.   Okay.  And more text.  Did you write that?
 3         A.   No, I did not.
 4         Q.   Below the Samina Shah there was three
 5    lines of text.  Is that your writing?
 6         A.   No, it is not.
 7         Q.   So you don't know who wrote that?
 8         A.   No.  It would have been attached to this
 9    video.  It was -- this is --
10              THE ARBITRATOR:  So it would have been
11    attached to the video --
12              THE WITNESS:  Yes.
13              MR. CHAPPELL:  Yeah.
14              THE ARBITRATOR:  -- that you posted?
15              THE WITNESS:  To the post.
16              MR. CHAPPELL:  She was using someone --
17    BY MR. CHAPPELL:
18         Q.   Well, were you using someone else's
19    video --
20         A.   Yes.
21         Q.   -- that you were sharing in all of these
22    videos?
23         A.   Yes.
24         Q.   They're not your videos?
25         A.   No, they're not.
```

Charlene Carter - Vol. 2                                December 8, 2017

359

```
 1        Q.   Somehow you got ahold of them, they were
 2   posted to you, and you then shared it?
 3        A.   Yes.
 4        Q.   I need you to say yes --
 5        A.   Yes.
 6        Q.   -- and not nod your head.
 7        A.   I'm sorry.  Yes.
 8        Q.   In light of everything that has happened
 9   since February 7 or 14, including the fact finding,
10   the termination, the step 2, what you've heard
11   yesterday and today and the reflection and
12   everything, today if you -- not that you would be
13   today, but thinking now, reflecting back on
14   everything, if you are reinstated to Southwest,
15   would you in the future send such types of videos or
16   screenshots to Southwest employees, including Union
17   officers?
18        A.   No, I would not.  I would not.
19        Q.   Even though that you're very passionate
20   about this issue?
21        A.   No, because I realize this is a mistake.
22   I realize that I need to do it in a different
23   manner, and I'm sorry for the manner that I did send
24   it through and I take full responsibility for it.
25             MR. CHAPPELL:  No other questions.
```

Charlene Carter - Vol. 2                                    December 8, 2017

```
 1              THE ARBITRATOR:  Let's take a seven-minute
 2   break, get some fresh coffee and stuff like that.
 3                   (Recess from 9:30 to 9:49)
 4              THE ARBITRATOR:  We'll go back on the
 5   record.  And it's your turn to cross-examine this
 6   witness.
 7                   CROSS-EXAMINATION
 8   BY MS. GEHRKE:
 9        Q.   Ms. Carter, you testified during your
10   direct examination regarding Southwest
11   Exhibit No. 8, the Company's investigation photos
12   showing you to be in uniform with some fellow crew
13   members and your nametag and things like that.  Do
14   you recall that testimony?
15        A.   Yes.
16        Q.   And you testified that you posted these
17   photos several years ago.  We kind of went through
18   the dates.  The record will speak for itself, but --
19        A.   Yes.
20        Q.   Okay.  Did you ever delete those photos
21   from your Facebook page?
22        A.   No.
23        Q.   Are they still there today?
24        A.   Yes.
25        Q.   At the time you posted the abortion videos
```

Charlene Carter - Vol. 2                                    December 8, 2017

361

```
1   on your public Facebook page, then your -- these
2   photos identifying you as a Southwest employee were
3   still on your Facebook page, correct?
4        A.   In their albums, yes.
5        Q.   And you testified that someone at the
6   Company would have had to have kind of dug deep or
7   scrolled down quite a bit in order to find these
8   photos because they were so old, right?
9        A.   That is correct.
10       Q.   Are you aware that on Facebook that photos
11  are actually stored on your main page in a section
12  titled "Photo Albums" and that all the photos are
13  together in one spot?
14       A.   There's a little square.
15       Q.   Yeah, let me show you.
16       A.   Yes.  But they have to search within
17  there.
18       Q.   So this is your Facebook page today, is
19  it?
20       A.   That's correct.
21       Q.   Okay.  And if you just scroll down right
22  here, see it says "Photos" and there's a bunch of
23  them?
24       A.   Yeah.
25       Q.   If I click on "Photos, Uploads," here's
```

Charlene Carter - Vol. 2                            December 8, 2017

362

```
 1    every photo you've ever uploaded to Facebook all in
 2    one spot.  You see that?
 3        A.   Yes, I do.
 4        Q.   Okay.  So it didn't take too long to find
 5    them, right?
 6        A.   How many albums do I have?
 7        Q.   I'd have to look.  Well, these are ones
 8    that are uploaded, and then you actually could have
 9    separate albums that, you know, have different ones
10    here.  There's the "Live at 35."  So it depends how
11    you organize them.  You seem to have them pretty
12    well organized.
13             But you would agree with me then they're
14    pretty easy to find, right?
15        A.   If you're on my Facebook page and you want
16    to look for them, yes.
17             THE ARBITRATOR:  Did you get all that?
18    You want to just do -- okay.  That's fine.  I
19    thought it was a good narrative.  It's the only way
20    to go through that.  Okay.
21             MS. GEHRKE:  And it's hard on a cold
22    record, but sometimes with technology it's easier to
23    just show it.
24             THE ARBITRATOR:  I guess I'm going to have
25    to get a cell phone.
```

Charlene Carter - Vol. 2                                   December 8, 2017

363

```
 1              THE WITNESS:  Can I use the technology as
 2   well?
 3              MS. GEHRKE:  Well, not right now.  I'm
 4   asking you some questions.
 5              THE WITNESS:  Okay.
 6   BY MS. GEHRKE:
 7       Q.    Thank you.  You testified that finding out
 8   that your fellow Southwest coworkers who were a part
 9   of the women's committee that had gone to
10   Washington, D.C., and had attended the women's
11   march, when you found out about that and that your
12   dues money had gone to help pay for the trip, that
13   that upset you, right?
14       A.    Uh-huh.  Yes, it did.
15       Q.    Brought back a lot of emotion?
16       A.    Yes.
17       Q.    And you were here yesterday when we had
18   Ms. Stone on the stand and we played the videos.
19       A.    Yes.
20       Q.    And did you see how upset Ms. Stone was
21   yesterday when she was watching those videos?
22       A.    Yes.
23       Q.    Was it upsetting for you to watch those
24   videos?
25       A.    Upsetting for me to watch the videos?
```

Charlene Carter - Vol. 2                          December 8, 2017

364

```
 1   When I watched those videos, I've seen them over and
 2   over.  I know what those videos stand for.  Thinking
 3   back to what I've done, yes, it does.  Does it
 4   affect me in the fact that it upset her?  Yes, it
 5   did.
 6        Q.   You testified that it's your belief that
 7   the Union dues were used in order to pay for the
 8   women's committee members to go on the trip to
 9   Washington, D.C., correct?
10        A.   That is correct.
11        Q.   And you heard testimony yesterday from
12   Ms. Stone that there was a women's committee meeting
13   at the TWU International office.  Did you hear that?
14        A.   That is correct.
15        Q.   Do you have any reason to doubt the truth
16   of that?
17        A.   No.
18        Q.   And you understand that the women's
19   committee is considered to be a official, bona fide
20   Union committee that the Union dues pay for?
21        A.   Yes.  And that was hosted on, I believe,
22   the 19th and possibly the 20th.  That was before the
23   march.  They were done at that committee at that
24   point.
25        Q.   So they were already in town at the time
```

```
 1    that the women's march was occurring on Saturday,
 2    right?
 3         A.   They could have left on Friday, but yes,
 4    they were still there.
 5         Q.   But the march was on a Saturday, right?
 6         A.   Correct, and we were still paying for
 7    their lodging and their transportation on that
 8    specific day.
 9         Q.   What transportation are you referring to?
10         A.   Uber.
11         Q.   How do you know that Union money was --
12         A.   Because we have a --
13         Q.   Hang on.  Let me finish the question just
14    for the record if you don't mind.
15              How do you know that Union dues money was
16    being used to pay for the expenses on that Saturday?
17         A.   Because we have a flight attendant that
18    went to the treasurer and got the list of exactly
19    what was spent for that march and listed it out.
20         Q.   And who is the treasurer?
21         A.   That is John Parrott.
22         Q.   And is Mr. Parrott part of the recall
23    effort?
24         A.   I'm not sure if his name is on the recall
25    effort.
```

Charlene Carter - Vol. 2                                    December 8, 2017

366

```
 1          Q.    And who's the flight attendant that told
 2    you that?
 3          A.    It is on our Facebook page of One Luv, and
 4    it would have been Jeanna Jackson --
 5          Q.    Okay.
 6          A.    -- who posted it who actually went and
 7    spoke with John Parrott and got the list and the
 8    itemized -- how it was spent.
 9          Q.    And then you saw it on the Facebook page
10    by Ms. Jackson's post?
11          A.    There was other flight attendants that had
12    gotten that information from her, because it's our,
13    you know, it was our dues that paid for it.  So
14    people were passing that along to the ones that
15    wanted to know, yes.  Originally she was the one who
16    put it on, which we have every right to see.
17          Q.    On Facebook?
18          A.    On our local -- yes, on our -- on our
19    flight attendant pages, yes, she did.  She did not
20    list it on her own Facebook page, but yes, on our --
21    to show other flight attendants.
22          Q.    Okay.  So did you learn about it from
23    looking at it, at Ms. Jackson's post on Facebook or
24    through conversations?
25          A.    On Facebook.
```

Charlene Carter - Vol. 2                                    December 8, 2017

367

```
 1        Q.   Okay.  So my statement is accurate that
 2   then you actually have no personal knowledge about
 3   how the money was spent because you haven't looked
 4   at the Union books yourself, correct?
 5        A.   I can't go to the Union office, so, no, I
 6   haven't been able to do that.  But I believe John
 7   Parrott, because I just saw him not too long ago at
 8   the Union convention, and we discussed those
 9   numbers.
10        Q.   And what did Mr. Parrott tell you?
11        A.   That, yes, our Union dues went to this
12   march.  And he didn't itemize it for me because we
13   didn't have the opportunity to sit and he didn't
14   have his computer in front of him.  But, yes, he did
15   confirm to me that those Union dues were spent.
16        Q.   For the women to go to D.C. for the
17   committee meeting and the march together?
18        A.   All the way through to the end that they
19   left, yes.
20        Q.   And are you aware that the women committee
21   members were there on their own personal free time,
22   that they were not paid to attend the march?
23        A.   Which -- repeat that again.
24        Q.   I said are you aware that the women's
25   committee members who attended the march, they were
```

Charlene Carter - Vol. 2                               December 8, 2017

```
 1    there on their own free time on Saturday, they were
 2    not paid for that?
 3         A.   They were not paid by the Company as in
 4    salaries or paid by the Union in salaries, yes.  But
 5    our Union dues paid for their lodging, their food,
 6    and along with their transportation.
 7         Q.   Did you hear Audrey Stone's testimony
 8    yesterday that in fact the women's committee members
 9    who attended actually paid for their own food except
10    for the one meal provided during the meeting?
11         A.   We still paid for the lodging and the
12    transportation.
13         Q.   Okay.  I was asking about the meals
14    because you also testified about the --
15         A.   She did -- but we did pay for a meal, did
16    we not?  I just said we did pay for a meal.
17         Q.   During the meeting, right?
18         A.   During the meeting.
19         Q.   Okay.  I just want the record to be clear.
20         A.   I heard her say that, yes.  Do I know that
21    personally as in can we itemize that?  Not sure.
22         Q.   Okay.  You testified a lot about your kind
23    of disagreements with Union leadership and how Union
24    dues money is spent.  But you are an objector,
25    correct?
```

Charlene Carter - Vol. 2                                    December 8, 2017

369

```
 1        A.    Correct.
 2        Q.    When did you opt out of the Union?
 3        A.    2013.
 4        Q.    Okay.  And because you are an objector,
 5   you no longer have the right to vote in Union
 6   elections, correct?
 7        A.    Correct.
 8        Q.    And you no longer have the right to attend
 9   Union meetings, correct?
10        A.    Correct.
11        Q.    And you no longer have the right to go to
12   committee meetings.  For instance, you could not
13   have attended this women's committee meeting, right?
14        A.    Correct.
15        Q.    And because you opted out of the Union,
16   whatever voice you may have had as part of the
17   official voting process, you've given that up,
18   correct?
19        A.    Voting process, yes.
20        Q.    And you've kind of taken to Facebook and
21   other social media to express your views to kind of
22   get your voice out since you can't vote and effect
23   change.  Is that right?
24        A.    I still have a voice when it comes to my
25   local and how my local dues are spent because
```

Charlene Carter - Vol. 2                                    December 8, 2017

370

```
 1   that -- I still pay dues to our local.  Okay?  So
 2   how they conduct business within the local I still
 3   have a voice over.
 4        Q.   How do you have a voice over that?
 5        A.   To speak up against how they spend our
 6   money or the things that they actually take and do
 7   such as transportation or things that -- to go to
 8   this march.  I can voice my opinion still.
 9        Q.   Yes, and you have.
10        A.   Under the Railway Labor Act I still have a
11   voice.
12        Q.   Now, any -- even someone who is a member
13   of the Union who has not opted out, they also have a
14   voice in --
15        A.   Yes, they do.
16        Q.   -- voicing their opinion about how dues
17   money is spent, right?  Is that correct?
18        A.   That is correct.
19        Q.   And if they don't agree with how Union
20   dues money is spent, what -- isn't the Union members
21   have to effect change primarily by voting for
22   different Union leadership?  Isn't that how you kind
23   of create change is by voting them out of office?
24        A.   Yes, it is, and we've done that and they
25   were removed from office.
```

Charlene Carter - Vol. 2                                    December 8, 2017

371

1       Q.   Right.  But because you're an objector and
2  you no longer have the right to vote, it's more
3  difficult for you to effect change that way, isn't
4  it?
5       A.   The -- I can always opt back in when
6  voting time comes, and I do elect to do that.
7       Q.   So you opt in to vote during -- around
8  election time and then you'll opt back out?
9       A.   No, I've been out since 2013.  Prior to
10 that I was a member in good standing for the entire
11 time, paid my dues, went to my Union meetings, and I
12 voted.  My vote twice has been overturned by some of
13 the exact same people.  I testified for my first
14 Union president that was removed illegally.  Now
15 it's happened again with Stacy Martin and Chris
16 Click.
17      Q.   I don't want to get into all that, the
18 Union --
19      A.   Okay.  But my vote was taken away again,
20 and a lot of other members were upset about that.
21      Q.   Okay.  That's not my question.
22      A.   Okay.
23           THE ARBITRATOR:  Let me ask you this
24 question.  We're here to determine whether or not
25 the Company had just cause to terminate this flight

Charlene Carter - Vol. 2                                    December 8, 2017

```
 1   attendant.  What does this line of questions have to
 2   do with that?
 3              MS. GEHRKE:  Well, she's -- I mean, I
 4   think she's raised it as kind of her justification
 5   for why she posted these videos and sent these
 6   videos to Audrey.  I mean, we don't think it's
 7   relevant to the issue that is before you in terms of
 8   just cause, but we do feel that because she's trying
 9   to use that as the justification for her high level
10   of emotion for what she did, we're just trying to
11   get the point across that she chose to opt out and
12   basically take away her vote and her ability to
13   effect change.  And so what she's left with is these
14   social media posts and other things that she was
15   doing to complain about how the dues money was
16   spent.
17              And so my point in kind of going down this
18   line of questioning with her is, you know, we all
19   live in a democracy.  We may not agree with the
20   prior administration, the current administration.
21   We have one vote, we vote, and then we have to pay
22   taxes or we have to pay dues even if we don't agree
23   with it and our money is spent how it's spent.  That
24   doesn't give us the right to, you know, send
25   threatening messages or, you know, do things that
```

Charlene Carter - Vol. 2                              December 8, 2017

373

```
 1   otherwise break the law or violate policy.
 2             THE ARBITRATOR:  That's a door I really
 3   don't want to open in this arbitration.  I
 4   understand what you're saying.  What I heard her say
 5   on direct was she was emotionally affected by the
 6   contrasting views on pro-life and pro-choice and the
 7   march.  I didn't hear that much on direct about,
 8   well, I'm really mad at the Union because they cut
 9   me out and I can't -- so let's move on --
10             MS. GEHRKE:  Okay.
11             THE ARBITRATOR:  -- please.  I understand
12   the countervailing tones in this case, but I'm here
13   to see whether or not there was just cause to
14   terminate this young lady, and so I want to keep it
15   to that.
16             MS. GEHRKE:  Okay.  Fair enough.
17   BY MS. GEHRKE:
18        Q.   Ms. Carter, would you agree with me that
19   the posts that you sent to Ms. Stone violated the
20   Company's mission statement?
21        A.   At the time that I posted those videos, I
22   would have never dreamed that my company, first of
23   all --
24        Q.   That wasn't my question.
25        A.   Okay.  What's your question?
```

Charlene Carter - Vol. 2                                    December 8, 2017

374

1        Q.    My question is, would you agree with me
2    that the messages you sent to Ms. Stone through the
3    Facebook Messenger with the abortion videos and the
4    vagina headdress photo, would you agree with me that
5    that violates the Company's mission statement?
6        A.    When I sent those videos to her, I would
7    have never thought that that violated my right to
8    speak to my Union president, no, I didn't, because
9    this was directed to the Union and then my Union
10   president.  I have also sent to her other things
11   through e-mail as well.
12       Q.    Okay.  My question is really a yes or no.
13   And I think you're saying you don't think that your
14   conduct in sending those videos to Ms. Stone
15   violated the Company's mission statement.  Is that
16   your testimony?
17       A.    There's kind of a double-edged sword here.
18   This was Union business.  If it had -- this was
19   Union business.  I thought that it was okay to still
20   communicate with my Union president.  This would
21   just be like e-mail.  To me that's what it was like.
22       Q.    Okay.  Would you agree with me that
23   Ms. Stone, despite her title as the Union president,
24   she's still a Southwest employee, right?
25       A.    She is a Southwest Airlines employee, but

Charlene Carter - Vol. 2                                    December 8, 2017

375

```
 1    my dues pay her salary.
 2          Q.    Okay.  I'm not asking --
 3          A.    Okay.
 4          Q.    Just listen to my question, please.  Okay?
 5          A.    Okay.
 6          Q.    So she's still a Southwest employee,
 7    right?
 8          A.    Yes.
 9          Q.    And she is still expected to abide by
10    Southwest Airlines' policies and procedures,
11    correct?
12          A.    I believe so.
13          Q.    And she's still entitled to protections of
14    Southwest policies and procedures.  Isn't that
15    right?
16          A.    There's a fine line there.  Yes, she is
17    still protected, but she is also my Union president.
18          Q.    Okay.  I understand her position.  You
19    don't need to keep telling me she's the Union
20    president.  We all know she's the Union president.
21    Okay?
22          A.    Okay.
23          Q.    So take a look at Exhibit -- Joint
24    Exhibit 3, please.  I think it may be in your pile.
25    If not, I can share a copy.
```

Charlene Carter - Vol. 2                                    December 8, 2017

```
 1              MR. CHAPPELL:  Is that read before you
 2   fly?
 3              THE ARBITRATOR:  Here it is.
 4              MR. CHAPPELL:  Or no, joint exhibit.  I'm
 5   sorry.
 6              MS. GEHRKE:  Yes.
 7              MR. CHAPPELL:  I'm in the wrong pile.
 8   BY MS. GEHRKE:
 9       Q.   Okay.  If you look at the last sentence in
10   the second paragraph, says, "Employees will be
11   provided the same concern, care, and -- respect, and
12   caring attitude within the organization that they
13   are expected to share externally with every
14   Southwest Customer."
15              Do you think you treated Ms. Stone with
16   the same concern, respect, and caring attitude that
17   you are supposed to treat every other Southwest
18   employee?
19       A.   Her personally, I believe that, yes.  This
20   was a Union matter, and I believe that it was a
21   Union matter.  It was not directed to her
22   personally.
23       Q.   Okay.  Ms. Stone is one person.  She may
24   wear two hats as the Union president and employee,
25   but she's a single person, so --
```

Charlene Carter - Vol. 2                                    December 8, 2017

377

          1        A.    Correct.

          2        Q.    I understand you're trying to characterize

          3   this as a Union issue.  We obviously disagree with

          4   that, so I don't need the qualifications every time

          5   about it.  My question is just, did you treat her

          6   with the same concern, respect, and caring attitude?

          7             MR. CHAPPELL:  Objection.  Asked and

          8   answered.  I think the answer's been given

          9   repeatedly.

         10             THE ARBITRATOR:  I don't believe it's been

         11   answered.  Let's try one more time.

         12             MR. CHAPPELL:  Okay.

         13             THE ARBITRATOR:  And then we'll move on.

         14        A.    Under this policy, I believe I treated her

         15   with respect as my Union president.  As a person and

         16   as a woman, as -- regarding this women's march --

         17   let me -- let me -- she treated me with just as much

         18   respect as an employee wearing the pink pussy hats

         19   representing me at a women's march as I did with

         20   sending her my dislike for that.

         21             So what I would hope is that she would

         22   have taken her responsibility and her oath that she

         23   took as the president of the Union and addressed

         24   that with me personally instead of taking it to the

         25   Company, okay, under these policies.  I would have

Charlene Carter - Vol. 2                              December 8, 2017

378

```
 1   been more than happy to have a discussion with her.
 2   BY MS. GEHRKE:
 3        Q.   Do you think your messages to her invited
 4   a friendly dialogue?
 5        A.   Do you think that going to a women's march
 6   and taking my money --
 7        Q.   You're not asking me questions.  I'm
 8   asking you questions.
 9             THE ARBITRATOR:  It is getting a little
10   bit argumentative.
11             THE WITNESS:  Okay.
12             THE ARBITRATOR:  I think I get it.  The
13   effect of her answer is maybe not, but she didn't
14   treat me that way either.
15             THE WITNESS:  Yes, that is correct.
16             THE ARBITRATOR:  Let's move on.
17             MS. GEHRKE:  All right.
18   BY MS. GEHRKE:
19        Q.   Ms. Carter, are you familiar with
20   Southwest's sexual harassment policy?
21        A.   Yes, I am.
22        Q.   And you acknowledged receiving that
23   policy, correct?
24        A.   That is correct.
25        Q.   That's Joint Exhibit No. 5.  If you could
```

Charlene Carter - Vol. 2                                    December 8, 2017

379

```
 1   take a look at that.  That should be in your pile.
 2            If you look at the top of the second
 3   paragraph, it says, "Examples of types of
 4   derogatory, sexually suggestive, offensive,
 5   threatening, intimidating, hostile, or retaliatory
 6   conduct that are prohibited."  Do you see that?
 7        A.   Uh-huh, I do.
 8        Q.   And then the fourth bullet point down, it
 9   says, "Displaying or forwarding messages, photos,
10   graffiti, pictures, cartoons, drawings, social media
11   posts, or online comments including displaying such
12   content at one's own work area, computer, or mobile
13   device."  Do you see that?
14        A.   Yes, I do.
15        Q.   Okay.  If you look at Southwest Company
16   Exhibit No. 7, the last page is what we're referring
17   to as the vagina headdress photo that you sent
18   Ms. Stone on private Facebook Messenger.
19            Would you agree with me that sending this
20   picture to Ms. -- and post to Ms. Stone violated the
21   Company's sexual harassment policy, particularly the
22   fourth bullet point I just read to you?
23        A.   Again, she took it upon herself to go to a
24   march.  She saw all of this while she was there.  So
25   if she's so offended --
```

Charlene Carter - Vol. 2                          December 8, 2017

380

```
 1        Q.   All of what?
 2        A.   -- and sexually -- women were dressed like
 3   this at the women's march.  Would you like me to
 4   show you a video of all the different things that
 5   she probably came against?
 6             If she's a woman like I'm a woman, she
 7   would have never subjected herself to that if she
 8   thought that that was disparaging.  And these women
 9   dressed like this at that march.  She saw them,
10   guarantee it.
11        Q.   Okay.
12        A.   They were everywhere.  Yes, is this a --
13   is this a not-so-nice post to send to her?  I didn't
14   send it to her.  I sent it to the Union.  She's our
15   president.  She saw this at the march, guarantee it.
16             If she subjected herself to that at the
17   march, how could it be any different at this
18   particular moment in time that she's also admitted
19   to going to it and I know we paid for it?  I know
20   that these women were dressed like this and they
21   were wearing pink pussy hats, sat around a table and
22   made those pink pussy hats to wear.  Where does this
23   cross the line then in sexual harassment?  Where was
24   it for me?
25             THE ARBITRATOR:  Her answer's no.
```

Charlene Carter - Vol. 2                                    December 8, 2017

381

```
 1        A.    No.
 2              MS. GEHRKE:  I kind of get it.
 3              THE WITNESS:  But I wanted to make sure
 4    that --
 5              THE ARBITRATOR:  No, I understand.  I'm
 6    not making little of your feelings.
 7    BY MS. GEHRKE:
 8        Q.    Let's talk about the -- have you ever
 9    filed a complaint of harassment against another
10    employee?
11        A.    Have I ever filed a complaint of
12    harassment?
13        Q.    Yes.
14        A.    The only person that I would know of would
15    be Brian Talburt, and he told all of us as
16    opter-outers along with one other person that if
17    he -- if they could do one execution, and also back
18    messaged me and also put on another Facebook page
19    that I should not have any, any Union involvement
20    and that he would make sure that I had -- this is
21    when I was a member.
22        Q.    If you look at --
23        A.    That's the only person I have ever written
24    up.
25        Q.    All right.  Let's look at that Southwest
```

Charlene Carter - Vol. 2                                   December 8, 2017

382

```
 1  Exhibit 14.  That's the step 2 documentation you
 2  submitted to Mr. Sims.
 3        A.    Okay.  I don't know what page you're on.
 4             MR. CHAPPELL:  She's going to probably
 5  direct you to a page.
 6  BY MS. GEHRKE:
 7        Q.    134.  Okay.  Do you recognize this
 8  document?
 9        A.    Uh-huh, I sure do.
10        Q.    Okay.  And this is the complaint against
11  Brian Talburt that you made?
12        A.    Correct.
13        Q.    Okay.  And you were complaining that he
14  was harassing you on social media?  Is that right?
15        A.    He was calling my name out with all of the
16  other flight attendants, yes, he was.  This was not
17  a private message.  This was out in --
18        Q.    In the public posts?
19        A.    -- public, yes.
20        Q.    You state, "He has crossed many thresholds
21  with his continued verbal attacks towards me and
22  others, and he's created a hostile work environment.
23  No employee should feel intimidated or frightened
24  from another coworker, period."  Do you see that
25  sentence?
```

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 567 of 676   PageID 5678
Charlene Carter - Vol. 2                                    December 8, 2017

383

1     A.   Yes.  And he also said he wanted to
2   execute people.  There's a difference when it comes
3   to showing pictures of babies being killed and
4   someone saying they want to execute you, especially
5   after 9/11.
6            THE ARBITRATOR:  Time out.  Let's listen
7   to her question and answer her question.
8            THE WITNESS:  Okay.
9            THE ARBITRATOR:  Okay?
10  BY MS. GEHRKE:
11    Q.   All right.  And then you quote the
12  Guidelines for Employees workbook.  Is that the
13  flight attendant work rules, or what were you
14  quoting there in blue?
15    A.   It says, "Employees are responsible for
16  maintaining a positive working environment free of
17  discrimination and harassment and free hos -- and
18  free of hostile, threatening, or intimidating
19  behavior.  Any occurrence or apparent occurrence or
20  (sic) discrimination, harassment, intimidation
21  should be reported immediately by the employee to
22  his or her supervisor, employee relations, the
23  general counsel office, or any senior leader.  All
24  complaints will be investigated, and appropriate,
25  responsive action will be taken.  Violation of this

Charlene Carter - Vol. 2                                    December 8, 2017

384

```
 1   policy may result in corrective action, up to and
 2   including termination."
 3        Q.   Okay.  So my question was -- thank you for
 4   reading it, but what were you quoting there?  Was
 5   that the flight attendant work --
 6        A.   That was the policies at that time, yes,
 7   it was.
 8        Q.   The harassment policy?
 9        A.   Yes.  And he clearly did that through
10   social media in a work group Facebook post out in
11   the open.
12        Q.   And Brian Talburt was what you considered
13   to be a Union supporter?
14        A.   Oh, he's a big Union supporter, yes, but I
15   didn't know that at the time.
16        Q.   And are you aware that Brian Talburt has
17   been terminated at least once for his social media
18   violations?
19        A.   And brought back very quickly by the
20   Company, yes.
21        Q.   That wasn't my question.
22        A.   Yes.
23        Q.   He has been terminated, right?
24        A.   Yes.
25        Q.   All right.
```

Charlene Carter - Vol. 2                                    December 8, 2017

385

```
 1          A.    I believe twice.  Is that correct?
 2               MS. GEHRKE:  I'm not going to answer.
 3               THE ARBITRATOR:  I don't think you get to
 4     ask her questions.
 5          A.    Okay.  Well, I believe it's twice because
 6     that's what I had talked to Mike Sims about.
 7     BY MS. GEHRKE:
 8          Q.    We had testimony yesterday from
 9     Ms. Emlet -- I think you were present -- regarding
10     your electronic acknowledgments of the Company's
11     harassment, discrimination, social media, workplace
12     bullying and hazing policy.
13          A.    Uh-huh.
14          Q.    Do you remember that testimony from
15     Ms. Emlet?
16          A.    I do.
17          Q.    And that's Company Exhibit 1 and 2.  Would
18     you agree that you had received all of these
19     policies prior to your termination?
20          A.    That I received those policies?
21          Q.    Well, that you acknowledged your access
22     and agreeing to abide by those policies?
23          A.    Yes.  And you cannot get online to do
24     anything until you have clicked that.  We don't have
25     an option.  I mean, it comes up and you have to
```

Charlene Carter - Vol. 2                                    December 8, 2017

386

```
 1   click it to be able to go to work.
 2       Q.   Okay.  Good.  And are you also expected to
 3   read the read before fly --
 4            THE ARBITRATOR:  The question was, did you
 5   receive and were you aware of those policies before
 6   your termination?
 7       A.   Was I -- no, I didn't receive any of those
 8   policies before I -- when we -- okay.  The Company
 9   on -- I don't know how often they do it, but -- and
10   it's funny because our pilots don't have to do this,
11   our Union.
12            That right there, you can't even bid
13   unless you click.  You can't get back into SWALife
14   at all.  You can't fly a trip.  It's a mandatory
15   thing.  It's not something that you get to go in
16   there and just, you know, read the stuff.
17            Most flight attendants, and I'm going to
18   be really honest, click that and go on to their
19   business.  It is not something that is discussed,
20   you know, very much at all during the work group at
21   all.  I mean, as in there's not a class that we go
22   to.  You sit there, you read it, and you click on
23   it.  Most people are going to sit there, skim it,
24   click it, and go.
25   BY MS. GEHRKE:
```

Charlene Carter - Vol. 2                                    December 8, 2017

387

```
 1          Q.   Okay.  I'm just trying to establish that
 2    you were aware that the Company had these policies.
 3    You obviously --
 4          A.   Yes.
 5          Q.   -- have utilized it at least once.
 6          A.   Yes.  And they change all the time, yes.
 7          Q.   Okay.  But you had access to them, you
 8    clicked it agreeing that you had obtained the
 9    policy --
10          A.   Correct.
11          Q.   -- and would abide by it, right?
12          A.   Correct.
13          Q.   There's no dispute about that?
14          A.   No.
15          Q.   Okay.  I'll move on.  And same thing with
16    the read before flies.  You were expected to read
17    those before you took any trips, correct?
18          A.   Correct.
19          Q.   Yesterday we had testimony regarding
20    Southwest Exhibit No. 9.  Ms. Stone testified that
21    this was a compilation of the messages that you had
22    sent her over the last couple of years on Facebook
23    Messenger.  Do you recall that?
24          A.   That is correct, yes.
25          Q.   And do you admit sending Ms. Stone all of
```

Charlene Carter - Vol. 2                      December 8, 2017

388

```
 1  these messages in Southwest Exhibit 9?
 2       A.   Our Union president, Ms. Stone, yes.
 3       Q.   Did Ms. Stone ever respond to you on
 4  Facebook Messenger when you would send her these
 5  messages?
 6       A.   Not only did she not respond to me on
 7  those, but every time that I'd e-mail she never
 8  responded to my e-mails.
 9       Q.   Did you ever try to leave Ms. Stone a
10  voice mail on her personal mailbox, cell phone, or
11  at her Union office?
12       A.   I don't have her cell phone.  And yes, I
13  have called the Union in the past.  Most times --
14       Q.   My question was whether you left her a
15  voice mail.
16       A.   No, I did not leave her a voice mail, did
17  not.
18       Q.   There was some discussion, testimony
19  yesterday as to whether or not the Facebook videos
20  that you sent Ms. Stone were graphic.  Do you
21  remember that?
22       A.   Repeat that, please?
23       Q.   There was some discussion or testimony
24  yesterday regarding whether or not the videos that
25  you sent Ms. Stone were graphic.  Do you remember
```

Charlene Carter - Vol. 2                                    December 8, 2017

389

```
 1   that?
 2        A.   I -- yes, I do remember that, yes.
 3        Q.   Would you agree that both of the abortion
 4   videos that you sent to Ms. Stone were graphic?
 5        A.   I'm not going to call them graphic.  I
 6   think they're -- I think they speak for themselves.
 7   They are -- it's real life.
 8        Q.   Okay.  If you could look at Company
 9   Exhibit No. 8 real quick.  It's this one, the public
10   Facebook posts.
11             MR. CHAPPELL:  You said 8, correct?
12        A.   Company?
13             MS. GEHRKE:  Yes.
14   BY MS. GEHRKE:
15        Q.   All right.  These were the --
16        A.   Those are on my personal page.
17        Q.   Yes.  And your personal Facebook page, you
18   don't have it set with -- you're aware Facebook has
19   different privacy settings that you can do, correct?
20        A.   I do now, yes.
21        Q.   Okay.  But it looks like your personal
22   page is pretty much open to the public.  You don't
23   have it limited to people who are friends or friends
24   of friends.  Is that right?
25        A.   No.
```

Charlene Carter - Vol. 2                                    December 8, 2017

390

```
 1        Q.   Okay.  So everything that you put on your
 2   personal Facebook page is open to the public if they
 3   were to Google you or --
 4        A.   Along with all the other people, yes.
 5        Q.   Okay.  So on your public Facebook page on
 6   Company Exhibit 8, the first abortion video that you
 7   posted, you testified that this text up here at the
 8   top was something that you wrote --
 9        A.   That is correct.
10        Q.   -- when you shared the video, correct?
11        A.   Yeah.
12        Q.   Okay.  And it says, "Warning, this is very
13   graphic.  I want my tax dollars to stop funding
14   this, period.  This is murder."  You wrote that.
15        A.   I did.
16        Q.   Okay.  So at the time you wrote this, you
17   thought the video was graphic.
18        A.   For my Facebook page, yes.
19        Q.   Okay.  And did you put a similar warning
20   on the private messages that you sent to Ms. Stone?
21        A.   I don't know.
22        Q.   All right.  Let's take a look.  That would
23   be --
24        A.   The reason that I put this is because my
25   friends who have kids would have read that.  And
```

Charlene Carter - Vol. 2                        December 8, 2017

391

```
 1   it's --
 2           THE ARBITRATOR:  The question was, was
 3   there a similar warning on the one you sent to
 4   Ms. Stone?
 5           MR. CHAPPELL:  And those are Exhibit 7,
 6   Southwest Exhibit 7.
 7           MS. GEHRKE:  That's correct.
 8           THE WITNESS:  I don't have the other one.
 9   Oh, here's the other one.
10           MS. GEHRKE:  No, that's not the other one.
11   This one.
12           MR. CHAPPELL:  Look at Exhibit 7.  That's
13   the one she's asking you about.
14   BY MS. GEHRKE:
15       Q.   I'm having you compare 7 to 8.
16       A.   No, but I --
17       Q.   In 8 you gave a warning.  On the messages
18   to Ms. Stone, you did not, correct?
19       A.   If she went to the march, that's what she
20   supported.  No.
21           MR. CHAPPELL:  Just answer the question.
22   I'm sorry.  I shouldn't have --
23       A.   No, I did not.  I did not put --
24   BY MS. GEHRKE:
25       Q.   Okay.  Thank you.
```

Charlene Carter - Vol. 2                          December 8, 2017

392

```
 1        A.    -- "Graphic."
 2        Q.    And on the second Facebook public post
 3   with the second video --
 4        A.    Yes.
 5        Q.    -- page 2 of Exhibit 8, you similarly said
 6   that this video was graphic, correct?
 7        A.    Uh-huh, I did.
 8        Q.    "But it needs to be shared over and over,
 9   this is murder, so for all of you that are
10   pro-abortion, God help you."
11              If you look at Exhibit 7, page 3, that's
12   the same video that you sent to Ms. Stone, correct?
13        A.    No, I did not.
14        Q.    No, my question was, you sent the same
15   video to Ms. Stone?
16        A.    Oh, yes, I did.
17        Q.    Okay.  But you did not put a warning on
18   your -- the message to Ms. Stone, correct?
19        A.    Yeah, that's correct.  That's what I
20   thought you asked.
21        Q.    Thank you.  I was getting there.  You're
22   just ahead of me.
23        A.    Well, I think you had asked it before, so
24   I was just answering it.
25        Q.    I want to ask you a little bit about --
```

Charlene Carter - Vol. 2                                    December 8, 2017

393

```
 1    did I understand you correctly that this section on
 2    Southwest Exhibit 7, the text below the "My Page -
 3    My Opinions," that reads, "Did you know this ...
 4    Hmmm, seems a little counterproductive, don't you
 5    think ... you are nothing but a sheep in wolves
 6    clothing or you are just so un-educated you have no
 7    clue -- not clue who or what you are marching for.
 8    Either way you should not be using our dues to have
 9    marched in this despicable show of trash."  You
10    wrote that?
11         A.   I did.
12         Q.   Okay.  And that was to Ms. Stone?
13         A.   It was to my president of Southwest
14    Airlines flight attendants, yes, for them going to
15    the march.  It was.  It was not to her personally.
16    She's the leader of our Union.
17         Q.   Are you friends with other Southwest
18    employees on Facebook?
19         A.   I am.
20         Q.   In the -- back to Southwest Exhibit No. 9
21    and the packet of messages that you had sent to
22    Audrey on Facebook Messenger.  If you turn to page
23    48.  They're numbered at the bottom there for your
24    reference.  Are you with me?
25         A.   Uh-huh.
```

Charlene Carter - Vol. 2                                    December 8, 2017

394

```
 1        Q.   Okay.  There's a kind of grayed-out square
 2   on the bottom, and it looks like you're talking
 3   about Hillary Clinton.  And this was a message you
 4   sent to Audrey, correct?
 5        A.   Uh-huh.
 6        Q.   Okay.  And it says, "You are as corrupt
 7   and evil as she is."  Were you referring to "she" as
 8   Hillary Clinton?  You're comparing Audrey to Hillary
 9   Clinton?
10        A.   At this particular message, she had sent
11   me the propaganda to vote for Hillary Clinton in my
12   e-mail, and then also it was sent on the 556 web
13   page.  They were telling us who to vote for.
14             And, yes, I don't believe -- I mean, I
15   can -- I'm sorry, but if she's going to send me who
16   to vote for, I do think that's a little evil.  I
17   think we all have our own voices and we shouldn't be
18   told who to vote for.  And, no, I do not support
19   Hillary Clinton.  She has her opinions.  I have
20   mine.
21        Q.   You just testified that Audrey sent you
22   e-mails.  Was that TWU International who sent you
23   e-mails about the presidential election?
24        A.   Yes, with her name attached to it.
25        Q.   Audrey's name was attached to it?
```

Charlene Carter - Vol. 2                                    December 8, 2017

395

 1          A.    Yes.

 2          Q.    Was it a private message that she sent to

 3    you, or was it like it autogenerated that was sent

 4    to the entire membership?

 5          A.    They've used both.  They've used not only

 6    Messenger but they've used Facebook and they have

 7    used e-mail.

 8          Q.    My question though was, did Audrey send

 9    you a personal, addressed-only-to-you message about

10    the election, or was -- did you receive kind of the

11    call it the election advertisements that all the

12    Union members were receiving?

13          A.    We all get them.

14          Q.    But your response to receiving kind of the

15    general Union election materials was to send this

16    message to Audrey?

17          A.    Do you know why?  Because I've asked

18    them --

19          Q.    I just want a yes or no.

20          A.    Yes.

21          Q.    Thank you.

22          A.    I've asked them to stop sending me these

23    things.

24          Q.    I don't have a question pending.  Thank

25    you.  I'm not here to fight with you.  I'm really

1   not.

2        A.   I know.  I know that.

3        Q.   I'm just trying to ask you some questions.

4        A.   I'm just not sure why the Company got into

5   Union business.

6             MS. GEHRKE:  I move to strike that.  I

7   know you heard it.

8             THE ARBITRATOR:  I didn't hear anything.

9   BY MS. GEHRKE:

10       Q.   Do you recall calling Ms. Stone morally

11  bankrupt in these messages that you sent to her on

12  private Facebook Messenger?

13       A.   No.  And probably the reason why is none

14  of this was discussed in my fact finding meeting nor

15  in my second step meeting.  The only things that we

16  discussed were these videos.

17            MR. CHAPPELL:  And I'm going to object if

18  we keep going here.  This seems far afield for

19  cross-examination from her direct testimony unless

20  she's trying to impeach her testimony or something,

21  but these matters that she just said was not part of

22  either her or what she was told she was being

23  discharged for.

24            THE ARBITRATOR:  Well, part of the problem

25  is it's such a politically charged subject that

```
 1   she's never going to get her to agree, so we're
 2   spinning our wheels.
 3           What I think I would rather do is read
 4   that exhibit in its entirety and draw my own
 5   conclusions.
 6           MS. GEHRKE:  Fair enough.  All right.
 7           THE ARBITRATOR:  Deal?
 8           MR. CHAPPELL:  That's perfectly fine.
 9   It's certainly in the record.  It speaks for itself.
10           MS. GEHRKE:  Yeah.
11           MR. CHAPPELL:  And you get to tell us how
12   you --
13           THE WITNESS:  Yeah, that's fine.
14           MR. CHAPPELL:  -- interpret that speech.
15   BY MS. GEHRKE:
16       Q.   All right.  You testified about the pink
17   lights on the Southwest planes and how you felt that
18   was inappropriate and even some customers may have
19   been upset or whatever.
20           Did all -- do you know if that was a
21   Company-wide initiative to put all the planes in
22   pink lights to support the women's march, or was
23   that just a couple flight attendants who did it on
24   their own accord and may have actually been
25   disciplined for that?
```

Charlene Carter - Vol. 2                    December 8, 2017

398

```
 1        A.   Honestly, I do not know that particular
 2   answer, but I do know how they responded to it.
 3             THE ARBITRATOR:  Okay.  That's a good
 4   answer.
 5             MS. GEHRKE:  Okay.  Can we mark this as
 6   Southwest Exhibit 15, please.
 7                  (Company Exhibit 15 marked)
 8   BY MS. GEHRKE:
 9        Q.   Ms. Carter, do you recall receiving this
10   memo from Mr. Sims regarding political activity
11   surrounding the inauguration?
12        A.   To be quite honest with you, I saw some of
13   this, yes.  I don't -- I can't say as if I read the
14   whole thing, but I did see all the other things that
15   were posted in the media, yes, yes.
16        Q.   Okay.  So Southwest was trying to maintain
17   some kind of neutrality, it appears, from all the
18   politics around the inauguration.  Would you agree?
19             MR. CHAPPELL:  I think the document -- are
20   you asking her opinion of what the document says?
21             MS. GEHRKE:  Yeah.
22             THE ARBITRATOR:  That's what she was
23   testifying.  Do you want to ask her a question?
24             MR. CHAPPELL:  That's why I was objecting.
25             MS. GEHRKE:  Never mind.  It speaks
```

Charlene Carter - Vol. 2                                    December 8, 2017

399

```
 1   for itself.  You can figure it out.
 2           MR. CHAPPELL:  Well, I'm not sure this
 3   goes to the cross either.  I'm objecting.
 4           MS. GEHRKE:  Well, she testified about the
 5   planes and the Company taking a position and that
 6   whole thing.
 7           THE ARBITRATOR:  Yeah, I think it's
 8   relevant.
 9           MR. CHAPPELL:  So it's not admitted?
10           THE ARBITRATOR:  Sir?
11           MS. GEHRKE:  Did you say irrelevant or
12   relevant?
13           THE ARBITRATOR:  No, it is relevant to the
14   issue, and I'll admit it and accord it what weight
15   it's entitled to.
16           MS. GEHRKE:  Thank you.
17           THE WITNESS:  There was a couple of other
18   statements as well.  It wasn't just Mike Sims.
19           MR. CHAPPELL:  And they are in the record
20   already.  I will point them out, the other
21   statements.
22           THE WITNESS:  Yeah, they are.
23           MR. CHAPPELL:  And when you read, you'll
24   come across them and you'll give them the weight you
25   wish.
```

Charlene Carter - Vol. 2                                December 8, 2017

400

```
1   BY MS. GEHRKE:
2        Q.   I want to ask you a few follow-up
3   questions regarding your testimony about the step 2
4   meeting with Mr. Sims.  You provided him the packet
5   of materials which is Southwest Exhibit 14, correct?
6        A.   Correct.
7        Q.   And you asked him to give you your job
8   back, right?
9        A.   Correct.
10       Q.   And did you feel like Mr. Sims gave you a
11  fair opportunity to present your case during the
12  step 2 hearing?
13       A.   Mr. Sims was amazing.  Yes, he did give me
14  a fair -- fair hearing.
15       Q.   Okay.  And do you recall telling Mr. Sims
16  that this is nothing against the Company, this is
17  between you and the Union, you and Audrey, something
18  to that effect?
19       A.   Yes.  And that's why I didn't understand
20  why the Company was getting involved in it.  They've
21  never stepped in Union business before.  There's a
22  line that's supposed to be drawn between the two.
23       Q.   You were here yesterday when Ms. Stone
24  testified regarding how she kind of debated in her
25  own mind whether or not she wanted to report the
```

 1   videos?

 2        A.   I did hear that, but she also took an oath

 3   too.  And if I took an oath to protect somebody, I

 4   would have never done this.

 5        Q.   Did you hear the testimony where she has

 6   said that she understood if she reported it that the

 7   Company would have to do something in terms of

 8   investigating and figuring out if any violation of

 9   policy had occurred?

10        A.   You know what?  I don't know how all that

11   works.  All I know is that when other presidents

12   have gone to the Company, the Company has told them

13   this is Union business.  And I've got two people

14   that I know for a fact --

15        Q.   That wasn't my question.

16        A.   Okay.

17        Q.   My question is, the Company has a duty to

18   investigate once a complaint is made, right?

19        A.   Into Union business?

20        Q.   A harassment complaint or violation of

21   social media, bullying and hazing.  If those types

22   of complaints are made, the Company --

23        A.   If they felt it necessary to go and

24   actually take Union business, then that was their

25   decision, yes.  I was not harassing a flight

Charlene Carter - Vol. 2                                        December 8, 2017

402

```
 1   attendant.  This was all Union business, and this
 2   had to do with Union dues being spent.  This had
 3   nothing to do with personal, anything harassing
 4   towards a person.
 5            It was my Union who took it upon
 6   themselves to represent me.  And if they felt that
 7   they needed to take this kind of action, okay.  You
 8   know, I've already apologized.  I am sorry.  I wish
 9   that I could have -- I wish I could take it back,
10   yes, I do.  Did I hurt Audrey?  I am sorry if I did.
11   I really am.  I'm not that kind of person.  I made a
12   mistake.  I am willing to correct that, and I would
13   love to sit down with my Union president.
14            But this really and truly, the Company
15   probably -- we probably should have sat down as Mike
16   Sims, Audrey, and me and been able to discuss that.
17   That should have been the way it is instead of
18   turning people in and hurting their careers and
19   hurting their livelihoods.  I would have never done
20   this to Audrey.
21       Q.   Did you ever ask Audrey to sit down with
22   the two of you or with Mike Sims to have a dialogue?
23       A.   By that point when I went to my second
24   step meeting, I was told not to contact anybody.
25       Q.   I'm not limiting it to after that.
```

Charlene Carter - Vol. 2                                    December 8, 2017

403

```
 1        A.   No, I didn't, I didn't, and that's my
 2   mistake.  And like I said, I take full
 3   responsibility of that.
 4        Q.   All right.  I want to ask you a little bit
 5   about back to the step 2.  Mr. Sims testified
 6   yesterday that even though he felt that there was
 7   just cause to terminate, he decided for practical
 8   reasons to offer you reinstatement.  And you
 9   received an offer of reinstatement, correct?
10        A.   I did.
11        Q.   And you turned that offer down, correct?
12        A.   Yes, I did.
13        Q.   Okay.  Why did you turn it down?
14        A.   There are too many provisions within this.
15   And I'm not even sure where it's at.
16             Where is it, Milton, the --
17        Q.   Well, I'm not asking about the particular
18   document.  Just, you know, from your own --
19        A.   First of all --
20        Q.   -- recollection, why did you turn it down?
21        A.   -- it silences my voice.
22        Q.   How does it silence your voice?
23        A.   Because I would never be able to talk
24   about what has happened and hopefully help other
25   flight attendants --
```

Charlene Carter - Vol. 2                                    December 8, 2017

404

```
 1        Q.   Because of --
 2        A.   -- to not do this.
 3        Q.   Because of the restrictions of the content
 4   you could put on social media?
 5        A.   It -- I wasn't supposed to speak about any
 6   of it.  It's not just this --
 7             THE ARBITRATOR:  Are you talking about the
 8   confidentiality provision?
 9             THE WITNESS:  Yes, yes.
10   BY MS. GEHRKE:
11        Q.   So the terms of the settlement would have
12   been confidential?  Is that what you're saying?
13        A.   No.  I don't mind that the terms are
14   confidential except the fact that you can't go out
15   and speak about what happened to you so that you can
16   actually talk to other flight attendants and say
17   this is -- and get the word out.
18             There's so many provisions in there as
19   well.  I don't think personally, okay, this is just
20   me, I don't think that termination, first of all,
21   fit the punishment.  I've never been in trouble at
22   Southwest.
23        Q.   Okay.  My question is just why you turned
24   down the last chance agreement, if there was certain
25   terms in it that --
```

Charlene Carter - Vol. 2                                December 8, 2017

405

```
 1        A.    Yes.   There was a 24-month letter that was
 2   supposed to be put in my file.   Basically if I
 3   sneezed wrong on the airplane, I would have been
 4   terminated.   It obviously goes against our CBA.
 5   The --
 6        Q.    What do you mean by that?
 7        A.    The 18-month -- because they can only go
 8   up to 18 months, and they were wanting to put a
 9   24-month letter in my file.
10        Q.    Did you ever go back to the Company and
11   ask them to reduce the 24 months to 18 months?
12        A.    Talked to Becky Parker, who was the
13   grievance lady that took care of the settlement part
14   of it, and she said that was the best we were going
15   to get.
16        Q.    Did you ever contact the Company directly
17   or just Ms. Parker?
18        A.    No, because everything was settled through
19   my grievance person.
20              MS. GEHRKE:   Okay.
21              MR. CHAPPELL:   I'm going to object to any
22   more questions here.   This is a confidential
23   settlement.   I know that she rejected it.   You know
24   she rejected it.   But to get into all the pros and
25   cons --
```

Charlene Carter - Vol. 2                                    December 8, 2017

406

```
 1                THE ARBITRATOR:  I don't know that it
 2      helps me in my decision-making process to realize
 3      why it is she didn't accept a last-chance letter.
 4                MR. CHAPPELL:  That's kind of my point.
 5                MS. GEHRKE:  I just wanted to ask her why
 6      she didn't take it.
 7                THE WITNESS:  There's also been other --
 8                THE ARBITRATOR:  Okay.  We're through with
 9      that.
10                THE WITNESS:  That's fine.
11      BY MS. GEHRKE:
12           Q.  I just have a couple more questions.
13      Ms. Carter, you testified that you're pro-life and
14      you're a Christian woman and you recognize that
15      maybe you over -- you know, we all make mistakes in
16      life and that the fact of your history kind of has
17      affected you a lot in how you reacted to the women's
18      march and your interactions with Ms. Stone, right?
19                THE ARBITRATOR:  Did you answer that?
20           A.  As my Union president, yes, it does.
21      BY MS. GEHRKE:
22           Q.  Are you familiar what they call the golden
23      rule at Southwest Airlines?
24           A.  I sure am.  Herb Kelleher came up with it.
25           Q.  Okay.  And what is the golden rule?
```

Charlene Carter - Vol. 2                                    December 8, 2017

407

```
 1        A.   It means treat each other with respect,
 2   treat others as you would want to be treated.
 3        Q.   Okay.  And did you follow the golden rule
 4   with respect to how you treated Ms. Stone?
 5        A.   Going back to the women's march, I could
 6   say the same to her as my Union president.  Did she
 7   treat us with respect by wearing pink pussy hats and
 8   marching with Planned Parenthood, that the ones that
 9   actually feel the way that we do and reached out to
10   us?  No, she didn't.
11             And I do apologize for the way that I
12   responded to it.  I wish I could take it back.  And
13   if I could have a conversation with her and with
14   Mike Sims, I would love to and apologize to her.
15   And maybe we could start a dialogue, a real good
16   dialogue, because, yes, I do make mistakes, and that
17   is what I did.  And I do apologize for it, and I
18   take full responsibility of it.
19        Q.   I just have one final question for you.
20   If Ms. Stone had sent you the videos that you had
21   sent her, particularly given your history, would you
22   have been offended by that?
23        A.   No, I would have reached out to her.  And
24   I told that to my base manager and I also told that
25   to Mike Sims.  I would have wanted to know was there
```

Charlene Carter - Vol. 2                                    December 8, 2017

408

```
 1   something more that I could do to help that person.
 2   I would have reached out.  As a good leader, I would
 3   have reached out especially.  But as a woman, yeah,
 4   I would have reached out to her and why was she so
 5   upset and so angry and hurt.  I would have.  So
 6   that -- yes, I would have.
 7             As a matter of fact, if this has happened
 8   to her, I would reach out to her as well.
 9             MS. GEHRKE:  Nothing further.
10             MR. CHAPPELL:  I have just I think one
11   quick re -- whatever I'm at.  Is it redirect?  I
12   think it is.  I'm sorry.
13             THE ARBITRATOR:  I think it is redirect.
14                    REDIRECT EXAMINATION
15   BY MR. CHAPPELL:
16        Q.   Ms. Carter, you were asked to look at page
17   134 on Southwest Exhibit 14 which is the documents
18   you submitted at the step 2, to look at a harassment
19   complaint that you had charged against a
20   Mr. Talburt.
21        A.   That is correct.
22        Q.   Okay.  And we have testimony about that.
23   And my -- and the complaint and what you read on
24   page 134 talked about a threat of execution being
25   used against you and things like that that had
```

Charlene Carter - Vol. 2                               December 8, 2017

                                                                   409

 1   appeared on social media.

 2        A.   Right.

 3        Q.   So my question is, if we look at page 136,

 4   is that the social media post that you were

 5   referencing on page 134?

 6        A.   Yes.  Brian Talburt posted, "Holly is a

 7   fine and dandy" -- wait.  "Holly, it is fine and

 8   dandy not to want to turn them in.  However, think

 9   of all the damage they have done to so many.  Ray

10   among many others.  We need one public execution to

11   stop.  They are not warriors.  They are pussies, and

12   certainly you have seen Hoffucker in action, for

13   example.  One execution and we will never hear from

14   them again.  This I truly believe."

15        Q.   Do you know what the reference to

16   Hoffucker -- and it's spelled like you think.  Do

17   you know what that was, who that was, if it was

18   someone?

19        A.   Yes, that is Greg Hofer, and he is one of

20   the people that opted out along with me and others

21   after they removed our executive board --

22        Q.   Okay.

23        A.   -- that we voted in.

24        Q.   And then my only other question, in

25   reference to the letter that is 134 talking about

Charlene Carter - Vol. 2                                    December 8, 2017

410

```
 1    social media that you were complaining, some more
 2    social media of Brian Talburt is also shown on page
 3    137 and --
 4         A.   Correct.
 5         Q.   -- 138, correct?
 6         A.   Yes.  And this is actually --
 7         Q.   That's all.
 8         A.   Okay.
 9         Q.   Thank you.
10         A.   Okay.
11         Q.   Because the arbitrator said he's going to
12    read it and make his own decisions.
13         A.   Okay.
14         Q.   So we don't have to take the time.  I just
15    wanted to establish the full -- and that the
16    appending screenshots were also in the record.
17         A.   And that was public.  It wasn't private.
18              MR. CHAPPELL:  I have no further
19    questions.
20              MS. GEHRKE:  Okay.
21              THE ARBITRATOR:  All right.  Off the
22    record now.
23                   (Recess from 10:49 to 11:08)
24              THE ARBITRATOR:  Would you tell this young
25    lady what your full name is.
```

```
 1              THE WITNESS:  Jeanna Jackson.  It's
 2   J-E-A-N-N-A, Jackson.
 3              THE ARBITRATOR:  I would be the
 4   arbitrator.  My name's Bill Lemons.
 5              THE WITNESS:  Yes, sir.
 6              THE ARBITRATOR:  It's a pleasure to have
 7   you here.  Would you raise your right hand, please.
 8              Do you swear that the testimony you're
 9   about to give in this arbitration shall be the
10   truth?
11              THE WITNESS:  I do.
12              THE ARBITRATOR:  Thank you.  Your witness.
13                    JEANNA JACKSON,
14   having been duly sworn, testified as follows:
15                 DIRECT EXAMINATION
16   BY MR. JENNINGS:
17        Q.   Hi, Jeanna.
18        A.   Hello.
19        Q.   Where do you work?
20        A.   Southwest Airlines.
21        Q.   What's your position there?
22        A.   I'm a flight attendant.
23        Q.   How long have you worked for Southwest?
24        A.   Just started my 31st year in August of
25   this year.
```

Charlene Carter - Vol. 2                                    December 8, 2017

412

```
 1        Q.   Are you aware that Southwest has various
 2   policies regarding social media and workplace
 3   violence?
 4        A.   Yes, I am.
 5        Q.   And what is your understanding of those
 6   policies?
 7        A.   We're not supposed to post anything that's
 8   negative or makes Southwest in a bad light, nothing
 9   negative about Southwest that could be misconstrued.
10   They've changed it a couple of times.  We're not
11   supposed to mention other employees or be rude or
12   harassing or can't say anything negative about
13   anybody even if it's true or not.  You're not
14   supposed to spread rumors and misinformation.  You
15   can't be bullying or threatening or harassing or
16   retaliatory.  I think that's the keyword.
17        Q.   And is there -- are flight attendants able
18   to report each other to Southwest over violations?
19        A.   Yes, they're able to.
20                  (Grievant's Exhibit CC-5 marked)
21        Q.   Please describe what I just handed to you.
22        A.   This is an e-mail I sent to Julie O'Grady
23   and Deborah Edwards.  Julie I believe is in labor
24   relations, and Deborah Edwards is the Phoenix base
25   manager, inflight.  This is --
```

Charlene Carter - Vol. 2                                    December 8, 2017

```
 1        Q.   So are those both Southwest managers?
 2        A.   Yes, yes.  This is an e-mail I sent after
 3   I received a video made by one of our fellow flight
 4   attendants named Ricky Spand who's based in
 5   Las Vegas.  It was an ugly video posted with intent
 6   to do harm to me personally.
 7        Q.   And who is Ricky Spand?
 8        A.   He's a male flight attendant from
 9   Las Vegas that is really prevalent, really busy on
10   social media.
11        Q.   And does he have any relationship with
12   556?
13        A.   He's a big supporter of the officers in
14   office now.  He does a lot of Union work for them.
15             MR. JENNINGS:  Okay.  At this time I'd
16   like to move in this e-mail into evidence.
17             THE ARBITRATOR:  What was it marked, CC --
18             MR. CHAPPELL:  I think we're at 5?
19             MS. GEHRKE:  I think that's right.
20             MR. CHAPPELL:  The court reporter agree?
21   Okay.  CC-5.
22             THE ARBITRATOR:  Then that'll be -- do we
23   have an objection?
24             MS. GEHRKE:  No.
25             THE ARBITRATOR:  All right.  Then CC-5
```

Charlene Carter - Vol. 2                                        December 8, 2017

414

```
 1   will be admitted.
 2   BY MR. JENNINGS:
 3       Q.   So what was the specific thing that you
 4   were reporting to Southwest in this e-mail?
 5       A.   Well, he's alluding to the fact that death
 6   is going to meet me in D.C.  And what that refers
 7   to, I had started a recall petition to recall some
 8   of our members of our executive board, and I had --
 9   at this time, in November of 2016, had collected all
10   the necessary signatures.
11           And at the time it was unclear if I was to
12   turn those signatures in to our international reps
13   in D.C. or if I was supposed to turn them in to the
14   board.  So I just made a post on one of our groups
15   on Facebook that, hey, got the signatures, I'm ready
16   to go to D.C., ready to turn them in and get this
17   going.
18           And just a few days later this video came
19   out saying that death will be meeting him there in
20   D.C., and it was sent to me.  I took that to think
21   death was going to meet me if I took those
22   signatures to D.C.  He was dressed in like a mask
23   and black hood and face paint, but you could -- you
24   could tell who it was, and it had his name on it on
25   the video.
```

Charlene Carter - Vol. 2                                    December 8, 2017

415

```
 1              THE ARBITRATOR:  Had whose name?
 2              THE WITNESS:  Ricky Spand's, because he
 3   posted it on one of his pages.
 4   BY MR. JENNINGS:
 5        Q.   And at the bottom of the exhibit, is
 6   that -- can you identify that URL link or describe
 7   what it is?
 8        A.   In Facebook, yeah, it's a link that you
 9   could go to to see the video.  So I had turned this
10   in to Julie O'Grady and Deborah Edwards, but I never
11   received a response back from them.
12        Q.   Okay.  At this time we're going to show
13   you the video, and you can describe it.
14        A.   Okay.
15                   (Video played)
16        Q.   So could you please describe the video
17   that we just watched?
18        A.   That was posted on, as you can see there,
19   Instagram.  It was also posted on Facebook and
20   directed towards me.  And a lot of people sent that
21   to me through e-mail saying, "Have you seen this,
22   this is pretty -- pretty freaky."  So that's when I
23   wrote the letter.
24              And after a couple of weeks I never heard
25   back from the Company, I never heard from Julie or
```

416

```
 1   Deborah, so I sent another e-mail to Mike Sims
 2   asking if anything was going to be done.  And he
 3   said, "Thanks, I'll look into it."  And that's all I
 4   heard back from them.
 5              MR. JENNINGS:  Okay.  At this time I'd
 6   like to admit the video into evidence.  It's on our
 7   flash drive.
 8              MR. CHAPPELL:  So I guess that would be
 9   CC-6.
10              THE ARBITRATOR:  Yeah.
11                  (Grievant's Exhibit CC-6 marked)
12              MS. GEHRKE:  So I guess I'm not clear
13   where we got -- I mean, I don't understand where the
14   video came from.  It was publicly posted, or was it
15   sent to you directly?
16              THE WITNESS:  Both.  He posted it on
17   Instagram.
18              MS. GEHRKE:  Under --
19              THE WITNESS:  Ricky --
20              MS. GEHRKE:  -- RickyRoundtheWorld?
21              THE WITNESS:  Uh-huh.  He posted on
22   Instagram and another Facebook page that he runs.
23              THE ARBITRATOR:  But it was sent to you?
24              THE WITNESS:  And it was sent to me, yes.
25              THE ARBITRATOR:  All right.  Objection?
```

Charlene Carter - Vol. 2                         December 8, 2017

417

```
 1            MS. GEHRKE:  No.
 2            THE ARBITRATOR:  All right.  It'll be
 3   admitted.
 4   BY MR. JENNINGS:
 5       Q.   And did you ever find out what happened to
 6   Ricky Spand?  Was any discipline taken against him
 7   that you know of?
 8       A.   Not that I'm aware of.
 9       Q.   Have you seen Ricky Spand since sending
10   that report to Southwest about the video?
11       A.   Yes, I have.  I've seen him twice.
12       Q.   Can you describe those encounters, please?
13       A.   One time was at -- was it a -- one time
14   was at the Union office just on October 25th when we
15   had our signature verification meeting.  He was
16   invited to sit in on the verification on behalf of
17   Brett Nevarez, so I physically saw him then.  The
18   second time --
19       Q.   So what was he doing that first time you
20   saw him?  He was doing something with the Union
21   or --
22       A.   Oh, yeah, he was there at the Union's
23   request to sit in and observe the verification
24   process and how the signatures were verified and
25   what the results were.
```

Charlene Carter - Vol. 2                                    December 8, 2017

418

```
 1          Q.   Okay.
 2          A.   That was on October 25th.
 3          Q.   So he was still participating in the
 4   Union?
 5          A.   Oh, yes, he's still in the Union.
 6          Q.   And then can you please describe the
 7   second time you saw him?  Do you remember the month,
 8   year?
 9          A.   I can't remember what month it was.  I
10   think it was at the anniversary party.  June?
11          Q.   Of what year?
12          A.   This year.
13               THE ARBITRATOR:  Whose anniversary party?
14               THE WITNESS:  Southwest Airlines has a big
15   anniversary party every year that's held here in
16   Dallas, and it's supposed to be --
17               THE ARBITRATOR:  Is that the 10-year
18   party?
19               THE WITNESS:  The 10-year party, but it's
20   for the 20, 25, 30, 35, 40 and 45-year employees,
21   but some are known to crash the parties every year.
22   Did y'all crash them?
23               MS. GEHRKE:  Not me.
24               THE ARBITRATOR:  Okay.
25               THE WITNESS:  So I saw him there.
```

Charlene Carter - Vol. 2                                    December 8, 2017

419

BY MR. JENNINGS:

      Q.   And please describe that encounter you
had.

      A.   I just saw him in passing.  I didn't speak
to him.

      Q.   And then just to make sure the record's
clear, the first time you saw him after you sent in
this e-mail to Southwest, do you remember the
general -- I think you said the month, but do you
remember the year that was?

      A.   When I saw him at the Union office?

      Q.   Yes.

      A.   That was October 25th of this year.

      Q.   Okay.  So does that mean that he's still a
Southwest employee?

      A.   I assume he is since he was performing
Union work.  You have to be employed to do Union
work.

      Q.   And going back to that video, when you saw
it how did it make you feel?

      A.   It freaked me out, and I got chills.  Kind
of scared me.

      Q.   Did you feel safe going back to work after
seeing that video?

      A.   I was worried that when I went back to

Charlene Carter - Vol. 2                           December 8, 2017

420

```
 1  work I would have a chance encounter with him, and I
 2  didn't know if he'd, you know, pull some kind of
 3  stunt or hit me or slap -- I didn't -- I was afraid
 4  to run into him on the airplane like if we had an
 5  aircraft swap or had to ride in the crew van
 6  together or go to the same hotel together.  There
 7  was never a chance that I could, you know, feel safe
 8  if I had to be around him.
 9              MR. JENNINGS:  No questions.
10                  CROSS-EXAMINATION
11  BY MS. GEHRKE:
12      Q.   Ms. Jackson, you testified that you
13  started the recall petition for the current 556
14  leadership?  Is that right?
15      A.   Yes.
16      Q.   So is it fair to say that you don't
17  support Audrey Stone and her leadership at the
18  Union?
19      A.   I do not support this leadership, no, I
20  don't.
21      Q.   You testified that when you sent this
22  e-mail to Ms. O'Grady and Ms. Edwards that you did
23  not receive a response?  Is that correct?
24      A.   From this particular one?
25      Q.   Yeah.
```

Charlene Carter - Vol. 2                                    December 8, 2017

```
 1          A.    No, I did not receive a response.
 2          Q.    Did someone acknowledge receipt of it at
 3     all?
 4          A.    I got a receipt of it when I sent it to
 5     Mike Sims.  He said, "I'll check into it."
 6          Q.    Okay.  And you understand the Company
 7     policy is that when complaints come in that an
 8     investigation will be conducted?  Do you understand
 9     that?
10          A.    Yes, I do understand that, yes.
11          Q.    Okay.  And do you know that investigations
12     and complaints are generally treated confidentially
13     by the Company?
14          A.    Yes, they're supposed to be.
15          Q.    Okay.  So you wouldn't necessarily be told
16     the outcome of the investigation or if discipline
17     were imposed on employees.  Do you understand that?
18          A.    That I would not be told?  Sure.  But to
19     see him everywhere leads you to believe he's still
20     employed here after threatening me.
21          Q.    But you would acknowledge that he could
22     have been -- received a warning, a counseling, even
23     a suspension, or maybe he was terminated and for
24     different reasons he was reemployed, correct?
25          A.    If he had been terminated, that would have
```

```
 1   been big news.  So, no, I don't know what
 2   discipline, if any, was issued to him.
 3        Q.   Because it's generally kept confidential?
 4        A.   It's supposed to be kept confidential,
 5   yes.
 6        Q.   You testified that you saw Mr. Spand at
 7   the June 2017 anniversary party and you saw him in
 8   passing?
 9        A.   In passing, uh-huh.
10        Q.   Did you actually have any kind of
11   conversation with him during that party?
12        A.   No.
13        Q.   He never made any threats towards you?
14        A.   I don't know that he saw me.  I saw him
15   and I went a different way.
16        Q.   But there was no incident there?
17        A.   No incident, no.
18        Q.   And the October 25th, 2017, when you saw
19   him at the Union office, did he make any threats to
20   you at that time?
21        A.   He came in the office, and I left the
22   office.
23        Q.   Okay.  So there were no threats, no
24   incidents between the two of you?
25        A.   No.
```

Charlene Carter - Vol. 2                                    December 8, 2017

423

 1        Q.    Has Mr. Spand filed complaints against you
 2   for harassment or violations of the social media
 3   policy?
 4        A.    Yes, he has.
 5        Q.    How many has he filed against you?
 6        A.    Three or four.
 7        Q.    So it's safe to say that there's a lot of
 8   history between you and Mr. Spand?
 9        A.    And we've only met one other time.  It's
10   just all been over social media.
11        Q.    And did the Company investigate those
12   complaints of -- by Mr. Spand against you?
13        A.    I assume they did since I did make the
14   complaint.
15        Q.    No, his complaints against you.
16        A.    Oh, I've been called in for fact findings,
17   yes.
18        Q.    And do you know if there was discipline
19   imposed against you?
20        A.    I've received two suspensions.
21        Q.    Okay.  And have other employees filed
22   complaints against you because of social media
23   violations or harassment?
24        A.    There's been one other person.
25        Q.    Who's that?

Charlene Carter - Vol. 2                                    December 8, 2017

424

```
 1        A.   Brian Talburt.
 2        Q.   Okay.  Has Anita Vinje ever filed a
 3   complaint against you?
 4        A.   Oh, that one just got settled.  That was
 5   Anita Vinje.
 6             MS. GEHRKE:  No further questions.
 7             THE ARBITRATOR:  Thank you.  Anything
 8   further?
 9             MR. JENNINGS:  No.
10             THE ARBITRATOR:  Thank you, ma'am.  I
11   appreciate your time.
12                  (Recess from 11:24 to 11:31)
13             THE ARBITRATOR:  We're sitting here in a
14   conference room.  I am the arbitrator.  We'll be
15   listening to your testimony.  We have a court
16   reporter here who will be taking down your
17   testimony.
18             THE WITNESS:  Okay.
19             THE ARBITRATOR:  So will you tell her your
20   full name, please.
21             THE WITNESS:  Sure.  It's Kent Arthur
22   Hand, H-A-N-D.
23             THE ARBITRATOR:  Thank you.  Would you
24   raise your right hand.
25             Do you swear that the testimony you're
```

Charlene Carter - Vol. 2                              December 8, 2017

425

```
 1   about to give in this arbitration shall be the
 2   truth?
 3            THE WITNESS:  Yes.
 4            THE ARBITRATOR:  Thank you.  All right.
 5   Your witness.
 6                      KENT HAND,
 7   having been duly sworn, testified via Skype as
 8   follows:
 9                 DIRECT EXAMINATION
10   BY MR. CHAPPELL:
11       Q.   Mr. Hand, where are you currently
12   employed?
13       A.   Southwest Airlines.
14       Q.   Okay.  And what is your position?
15       A.   I'm a flight attendant.
16       Q.   Okay.  And how long have you been a flight
17   attendant?
18       A.   About 15 years.
19       Q.   Okay.  And have you always been a flight
20   attendant during your employment with Southwest?
21       A.   No, I was a customer service agent for
22   about a year in Los Angeles prior to going inflight.
23       Q.   Okay.  But once you became inflight or a
24   flight attendant, you remained a flight attendant
25   from that point forward to today?
```

```
 1        A.    Since November 2003.
 2        Q.    Okay.  And are you aware that Southwest
 3   Airlines has a social media policy?
 4        A.    I am.
 5        Q.    Okay.  And that they have a harassment and
 6   bullying and hazing policy?
 7        A.    Yes.
 8        Q.    Okay.  And are you aware that flight
 9   attendants are told that if they see violations of
10   this policy they should report it to management?
11        A.    Yes.
12        Q.    Okay.  And have you ever done that, seen a
13   violation and you yourself have reported another
14   flight attendant?
15        A.    I have.
16              MR. CHAPPELL:  Okay.  I'm going to show
17   you what -- is this 7?  Okay.  This is going to be
18   called CC Exhibit 7.
19              MS. GEHRKE:  Whole packet is 7 or just the
20   first page?
21              MR. CHAPPELL:  We are going -- let's try
22   to do it as one exhibit, which -- well, that is the
23   one exhibit, right?  There's nothing else with that?
24              MR. JENNINGS:  Right.
25              MR. CHAPPELL:  Okay.  So let me pass that
```

Charlene Carter - Vol. 2                                    December 8, 2017

427

```
 1    out.
 2                (Grievant's Exhibit CC-7 marked)
 3    BY MR. CHAPPELL:
 4         Q.   Now, this is where the fun begins.  Can
 5    you see -- do I need to be closer?  Do you recognize
 6    it?
 7         A.   No, I can see it.
 8         Q.   Okay.  Do you recognize what I'm holding
 9    up?
10         A.   I do.
11         Q.   Okay.  Can you describe what it is?
12         A.   It's the post that Sam Wilkins made where
13    she talks about having a gun and she can't stand
14    Mitt Romney.
15         Q.   Okay.  And did you do something about that
16    post at the top of Exhibit CC-7?  Is that your
17    typing, your text?
18         A.   That's my typing, my text, yes.
19         Q.   Okay.  And is that -- would it be fair to
20    characterize that as your complaint to management
21    about the posting by another flight attendant about
22    Mitt Romney and her gun?
23         A.   Yes.
24              MR. CHAPPELL:  I move the admission of
25    CC-7.
```

Charlene Carter - Vol. 2                                    December 8, 2017

428

```
 1            MS. GEHRKE:  I'm going to -- I'll ask him
 2   on cross, but it's not clear to me that this is a
 3   complaint to management.
 4            THE ARBITRATOR:  Yeah, it needs a little
 5   direction.
 6            MR. CHAPPELL:  Okay.  Yeah.  You are
 7   correct.  Let me clear that up.
 8   BY MR. CHAPPELL:
 9       Q.   What did you do with this, "Wow, here is a
10   specific threat of violence"?
11       A.   I mailed it in to Southwest Airlines.
12       Q.   Okay.  To a department or to a person?
13       A.   I think I sent it to employee relations.
14       Q.   Okay.  So this wasn't an e-mail, this is
15   your rendering of a letter that you sent?
16       A.   It was sent through U.S. mail.
17       Q.   Right.  And the -- I'll hold it up here so
18   you can see it.  The actual text that you're talking
19   about seems to have a date of 2012 which would
20   correspond to the Romney campaign.  Is that correct?
21       A.   That's correct.
22       Q.   Okay.  And therefore, is it fair to say
23   that the U.S. mail that you sent, which is the top
24   of CC-7, was sent in 2012 as well?
25       A.   No, it was sent within the last year or
```

Charlene Carter - Vol. 2                               December 8, 2017

```
 1   two.
 2        Q.   Okay.  So last --
 3        A.   Yeah, I didn't -- I didn't keep the date,
 4   but I think it was within the last two years.
 5        Q.   Okay.  So in 2015 or '16?
 6        A.   I think so.
 7             MR. CHAPPELL:  Now I'll try again to move
 8   it.
 9             MS. GEHRKE:  Okay.  I have a couple of
10   objections.  I don't see the relevance because the
11   threat of violence was against a third party, Mitt
12   Romney, not a Southwest -- fellow Southwest Airlines
13   employee.  And it's an old post from October 2012.
14   He didn't turn it in until the last year or two, so
15   I guess I just don't see the connection.
16             THE ARBITRATOR:  Address that on cross.
17   And if that's the case, it'll go to the weight, but
18   I'll allow the exhibit itself.  CC what?
19             MS. GEHRKE:  7.
20             MR. CHAPPELL:  7.
21   BY MR. CHAPPELL:
22        Q.   Okay.  The post by Sam Wilkins, that
23   appeared on Sam's personal Facebook page?
24        A.   I believe so.
25        Q.   Okay.  And you don't know what else was on
```

Charlene Carter - Vol. 2                                    December 8, 2017

430

```
 1   that page, correct?
 2        A.   I do not.  I do not.
 3        Q.   Did you believe that that casts Southwest
 4   in a bad light?
 5        A.   I think so, yeah.
 6        Q.   Now, did -- was that the only time you
 7   turned in a complaint about a Southwest employee
 8   violating the Southwest policies?
 9        A.   No, I sent in another -- another one.
10        Q.   Okay.  And when and what did you send in?
11        A.   I sent in a post about Bill Holcomb.
12        Q.   Did you have a cover letter or some
13   explanation?
14        A.   I did send a letter along that I did not
15   have.  After I changed computers, I lost that Word
16   document.  But I sent it in to employee relations as
17   well, a copy of his Facebook profile page
18   connecting -- showing him as a Southwest Airlines
19   employee and a post that he made about a passenger.
20        Q.   Okay.  And how did -- what format, e-mail,
21   U.S. mail?  How did you submit this complaint to
22   Southwest Airlines?
23        A.   U.S. mail.
24        Q.   U.S. mail?
25        A.   Yeah.
```

1      Q.   Okay.  And again, do you remember what

2  department or person you addressed the letter or

3  envelope?

4      A.   I would have sent it to employee relations

5  also.

6      Q.   Okay.  And the -- but you did -- your

7  recollection is that you did have a cover letter

8  with the actual post that you sent in?

9      A.   Yeah, I did.

10     Q.   Okay.  And just tell me the nature of what

11  you remember that cover letter stating.

12     A.   It was just the facts that I saw in that

13  post that he made, and I felt that they were

14  harassing in nature and passenger shaming --

15     Q.   Okay.

16     A.   -- and not something that I felt that was

17  appropriate.

18               (Grievant's Exhibit CC-8 marked)

19     Q.   Okay.  Now, I'm going to hold up for you,

20  and I will go ahead and pass it out so everyone can

21  see what you're seeing, and we'll call it CC-8.  And

22  this is a time line Facebook post.  Can you see

23  that?  Do I need to be closer?

24     A.   I can.  Yes, I can.

25     Q.   Okay.  And do you recognize the gentleman

Charlene Carter - Vol. 2                                    December 8, 2017

432

```
 1   in the picture?
 2        A.   Yes, I do.
 3        Q.   And who is that?
 4        A.   That's Bill Holcomb.
 5        Q.   And does it have his name on it?
 6        A.   It does.
 7        Q.   Okay.  And do you recognize this as the
 8   time line picture that you saw and submitted to
 9   Southwest?
10        A.   The profile picture, yes.
11        Q.   Yes, profile.  Thank you.  And this is a
12   two-page exhibit.  And I'm now going to hold up and
13   you can see the second page.  Do you recognize that?
14        A.   I do.
15        Q.   Okay.  Can you describe what the picture
16   looks like to you?
17        A.   It shows a passenger sitting in the front
18   row.  There's a banana peel by her feet.
19        Q.   Okay.  And then you may not be able to
20   read it.  I may have to hold it really close, but do
21   you see writing -- let's see -- writing on the --
22   would be the right side of the picture?
23        A.   I do, yeah.
24        Q.   Okay.  And isn't that writing some writing
25   that's attributed to Bill Holcomb?
```

Charlene Carter - Vol. 2                                    December 8, 2017

433

```
 1        A.   Correct.  I think there are two comments
 2   he made about the picture.
 3        Q.   Okay.  And it was those comments that he
 4   made that you were suggesting or requesting an
 5   investigation on whether it violated Company policy?
 6        A.   Correct.
 7             MR. CHAPPELL:  Okay.  I move the admission
 8   of CC-8, the two pages.
 9             MS. GEHRKE:  I have no --
10             THE ARBITRATOR:  By the narrowest, it'll
11   be admitted subject to what weight I give it, but
12   you can cover that on cross-examination.
13             MS. GEHRKE:  Fair enough.
14             MR. CHAPPELL:  Thank you.
15   BY MR. CHAPPELL:
16        Q.   Now, the post beside or the date beside
17   the picture of the passenger -- how do you know
18   that's on the plane or a passenger?
19        A.   Yeah, it looks like -- looks like one of
20   our aircraft.
21        Q.   Okay.
22        A.   Seats are the same color.
23        Q.   Okay.
24        A.   I think the thing that I found
25   objectionable was that he made the post and he
```

Charlene Carter - Vol. 2                              December 8, 2017

434

```
 1    identifies himself as a Southwest Airlines employee
 2    on his profile page.  And whether it was Southwest
 3    or not, I can't -- I wasn't on that flight, but the
 4    fact that he works for an airline and he's clearly
 5    talking about a passenger sitting in an airline seat
 6    and wondering aloud what she did with the banana
 7    that was once encased in that banana peel by her
 8    feet I found to be objectionable.
 9              MR. CHAPPELL:  Okay.  And the arbitrator
10    can read Bill Holcomb's comments and draw his own
11    conclusions --
12              THE ARBITRATOR:  Yes.
13              MR. CHAPPELL:  -- on that, and we don't
14    have to have him read it --
15              THE ARBITRATOR:  No.
16              MR. CHAPPELL:  -- and the rest of that
17    now.
18    BY MR. CHAPPELL:
19        Q.   So this at the top shows that Bill
20    Holcomb's comments are dated or he placed them on
21    Facebook September 17, 2013?
22        A.   Yes.
23        Q.   Okay.  And do you remember approximately
24    when you sent this post with your cover letter
25    through the U.S. mails to employee relations?
```

Charlene Carter - Vol. 2                                  December 8, 2017

435

```
 1        A.   Yes.  Similarly, it wasn't in 2013.  It
 2   was sometime thereafter.  The cover letter that I
 3   would have sent went away with my old laptop, so I
 4   don't have that.
 5        Q.   Okay.  And have you had a chance after you
 6   sent in the complaint on this last one, have you had
 7   a chance to see Bill Holcomb as a flight attendant
 8   or know whether he's still employed at Southwest or
 9   not?
10        A.   I haven't seen him in years.  I haven't
11   talked with him in years.  Because he was a Union
12   negotiator, I think I would have heard through the
13   grapevine or online that he had been removed as a --
14   as a negotiator for our last contract.  But I didn't
15   hear that, so I make the assumption he's still
16   employed with Southwest Airlines.
17        Q.   Right.  Is it your understanding -- you
18   were a member of the Union at one time.  Is that
19   correct?
20        A.   I was.
21        Q.   Okay.  Is it your understanding that if
22   you lose your job at Southwest that you can no
23   longer serve as a Union officer?
24        A.   Repeat that question.  I'm sorry.
25        Q.   Is it your understanding that if you are
```

Charlene Carter - Vol. 2                                    December 8, 2017

436

```
 1   no longer employed by Southwest, you can no longer
 2   be a Union officer?
 3        A.    With the local I believe that's true, yes.
 4              MR. CHAPPELL:  Okay.  And we do have
 5   testimony in the record about Bill Holcomb's status,
 6   current status or whatever, so I won't go further
 7   with that.  I have no other questions.
 8              MS. GEHRKE:  Okay.  I have some.
 9                   CROSS-EXAMINATION
10   BY MS. GEHRKE:
11        Q.    Hello, Mr. Hand.  My name's Michele
12   Gehrke.  I'm outside counsel for Southwest Airlines.
13        A.    Okay.
14        Q.    Nice to meet you.
15        A.    Thank you.  Nice to meet you.
16        Q.    I have a few follow-up questions.
17              Sam Wilkins, you testified that her
18   original post was in October 2012 but that you did
19   not send that post to Southwest for several years?
20   Is that right?
21        A.    Correct.
22        Q.    Why did you wait so long to make the
23   complaint about -- is it a female or a male?
24        A.    I think she's a female, Samantha Wilkins.
25        Q.    Okay.  Ms. Wilkins.  Why did you wait so
```

Charlene Carter - Vol. 2                              December 8, 2017

437

```
 1   long?
 2        A.   I'm sorry.  What was your question?
 3        Q.   Why did you wait so long to send in the
 4   complaint about this post that was from 2012?
 5        A.   I believe someone sent it to me at some
 6   time after the initial post.  It's been -- you know,
 7   once you make the post on social media, it stays
 8   there forever.  And I saw it and I felt it was --
 9   needed to be sent in.
10        Q.   Why would someone send you a post from
11   Ms. Wilkins from years ago?
12        A.   I have no idea.
13        Q.   Who sent it to you?
14        A.   I don't -- I think it was probably Holly
15   Imamovic maybe.
16        Q.   Okay.  Yeah, we're familiar with her.
17   Thank you.  Are you an objector?  You've opted out?
18        A.   I am.  I am.
19        Q.   Sorry.  Go ahead.
20        A.   Yes, yes.
21        Q.   And you support the recall movement,
22   correct?
23        A.   I didn't sign the petition.  I'm not
24   allowed to as an objector.
25        Q.   Okay.  But you would prefer that the
```

Charlene Carter - Vol. 2                                   December 8, 2017

438

```
 1   current Union leadership be replaced.  Is that
 2   right?
 3        A.   That would be correct.
 4        Q.   And do you have any kind of animosity or
 5   dispute with Ms. Wilkins or what -- why did you feel
 6   the need to turn her in years later?
 7        A.   Do I have any dispute with her?
 8        Q.   Animosity or dispute with her, yeah.  I
 9   don't understand why you turned her in.
10        A.   No, no.
11        Q.   Is she a Union supporter?
12        A.   I believe she's a board member actually.
13   So, yes, she would be a Union supporter.
14        Q.   Okay.  If you look at Exhibit 8, that was
15   the Bill Holcomb time line --
16        A.   Okay.
17        Q.   -- exhibit.
18        A.   Yeah.
19        Q.   On the second page where we were talking
20   about the picture, can you see that?
21        A.   Yes.
22        Q.   Okay.  On the right-hand side, it looks
23   like Ray Ward was the initial person who started the
24   post by sending it to the group called The Sassy
25   Stew Crew Room?
```

Charlene Carter - Vol. 2                                    December 8, 2017

439

```
 1          A.    Correct.
 2          Q.    Okay.  What is The Sassy Stew Crew Room?
 3          A.    It would have -- I don't know that it
 4    exists any longer.  It would have been a grouping of
 5    flight attendants I think from a lot of other
 6    airlines.  I was never a member of this group.
 7          Q.    Okay.  Do you know if it was a private
 8    group or a public group?
 9          A.    I do not know.
10          Q.    Okay.  And how did you get a copy of this
11    posting if you were not a member of the group?
12          A.    It was sent to me.
13          Q.    And who sent it to you?
14          A.    I don't recall.
15          Q.    Was it another one of your objector
16    friends from Southwest or a third party?
17          A.    Yeah, I don't know that we have -- I have
18    objector friends that are -- can you rephrase that
19    question?
20          Q.    Well, I'm just trying to figure out who
21    sent it to you.  You said you don't recall?
22          A.    Yeah.  And again, I got a new laptop
23    computer, and like the letters that I would have
24    sent these in with I don't have any longer.  I don't
25    recall how I got these.  They came across, and I
```

Charlene Carter - Vol. 2                                December 8, 2017

440

```
 1    felt they should be sent in to Southwest because
 2    they violated the policies that we're all to uphold.
 3         Q.   Did you ask -- I'm sorry.  I didn't mean
 4    to interrupt you.  Are you done?
 5         A.   No, go ahead.
 6         Q.   Did you ask other Southwest Airline
 7    employees to send you social media posts that could
 8    be questionable or violate Company policy?
 9         A.   No, no.
10         Q.   They just -- they initiated sending you
11    these random posts?
12         A.   I think everyone sends them around.  So,
13    no, I did not request it.
14         Q.   Are you aware that the Company issued what
15    are called read before flies regarding social media?
16         A.   There have been many, I think.
17         Q.   Okay.  Excuse my reach.  We're a little
18    logistically challenged here, but -- how long did
19    you say you've been employed?
20         A.   Since May 2002.
21         Q.   Okay.  And do you recall during the -- at
22    least since 2013, 2015 time frame there's been a lot
23    of use of social media by flight attendants to
24    discuss Union issues?
25         A.   Am I aware?
```

Charlene Carter - Vol. 2                                    December 8, 2017

441

```
 1        Q.   Yes.
 2        A.   That it's discussed on social media?
 3        Q.   Yes.
 4        A.   Yes.
 5        Q.   Okay.  And has that caused problems among
 6   the flight attendants in terms of people turning
 7   each other in and the Company having to investigate
 8   and possibly take corrective action for violation of
 9   Company policy?
10        A.   Yeah, I would have no idea.  Perhaps the
11   Company could ask that -- answer that question.  I
12   don't know how many are sent in or if it's become a
13   problem for them.  I don't know.
14        Q.   So you sent --
15             MR. CHAPPELL:  I think this cross is far
16   afield of the direct, and it's testing his
17   credibility for what he testified.  But if you want
18   to continue to go down this route, we will.
19             THE ARBITRATOR:  No, I think it's entirely
20   appropriate.  You may continue.
21             MR. CHAPPELL:  Okay.
22             MS. GEHRKE:  Thank you.
23   BY MS. GEHRKE:
24        Q.   Mr. Hand, you testified that you sent in
25   these two complaints to Southwest --
```

Charlene Carter - Vol. 2                                    December 8, 2017

442

```
 1        A.    Uh-huh.
 2        Q.    -- Airlines regarding what you thought
 3   were problematic posts under Company policy.  Have
 4   you sent in any other complaints regarding potential
 5   social media violations?
 6        A.    Not that I recall, no.
 7        Q.    Okay.  And have you had any social media
 8   violations complaints made against you?
 9        A.    I have.
10        Q.    How many?
11        A.    One.  I believe one.
12        Q.    Okay.  I was going back to asking you
13   about the read before fly memos that the Company has
14   issued regarding social media.  Are you aware of
15   those documents?
16        A.    You would need to show me which one you
17   might be referring to.
18        Q.    Okay.  I will do that.  Thanks.  This is
19   Southwest Company Exhibit 5.  I don't know if you
20   can read it.
21        A.    What's the date?
22        Q.    It is dated October 12th, 2016.  Can you
23   see it?
24        A.    Yeah.  I just see the top corner.
25        Q.    Okay.  Well, I'll read it to you then.
```

Charlene Carter - Vol. 2                                          December 8, 2017

443

```
 1        A.    Okay.
 2        Q.    At least part of it.  I just want to see
 3   if you recall receiving this -- well, let me ask you
 4   generally.
 5              Do you recall receiving a read before fly
 6   issued around October 12, 2016, to flight attendants
 7   regarding social media behavior and reminder of
 8   Company policy about social media?
 9        A.    Do I remember it?
10        Q.    Yeah.  Do you recall generally
11   receiving -- I know you're not going to know the
12   exact verbiage.
13        A.    Yeah, during that time I was on medical
14   leave.  I was on -- I was injured on the job, so I
15   don't -- specifically I don't recall that one.
16        Q.    Okay.  Would you agree, though, at some
17   point -- you're a current employee, correct?
18        A.    I am now, yes.
19        Q.    And have you flown at all in the last year
20   or two?
21        A.    I flew -- yes, I have.  Yes, I have.
22        Q.    And before you're allowed to fly, you have
23   to read these read before flies that have been
24   issued, correct?
25        A.    Yes.
```

Charlene Carter - Vol. 2                                    December 8, 2017

444

```
 1        Q.   Okay.  So you would have been expected to
 2   read any other read before flies that had come out
 3   while you were out on medical leave up until the
 4   time you were starting to fly again, right?
 5        A.   Repeat that?  I'm sorry?
 6        Q.   You would have been expected to read any
 7   of the read before fly memos that had come out while
 8   you were out before you could fly again.
 9        A.   That's correct.
10        Q.   Okay.  So do you recall receiving or
11   reading this October 12, 2016, read before fly
12   regarding a reminder about the Company's social
13   media policy and discussion about social media
14   behavior?
15        A.   I'm sure I would have read it.
16        Q.   Okay.
17        A.   If that's your -- is that your question,
18   did I read it?
19        Q.   Yeah, I just want to establish that you
20   would have -- you probably would have received this.
21   You would have been expected to read it?
22        A.   I would have been expected to become
23   current for the -- I was off work for about two
24   years, yeah.
25        Q.   Okay.  Fair enough.  And they issued
```

Charlene Carter - Vol. 2                                December 8, 2017

```
 1   another one February 2017 regarding social media and
 2   bullying policies and expectations.  Do you recall
 3   this one?
 4        A.   Again, not specifically, but I would have
 5   been required to read those.
 6        Q.   Okay.  And do you -- are you aware that
 7   from around the 2015 time frame to the present, at
 8   least, there have been a lot of social media
 9   allegations and complaints by flight attendants that
10   may have prompted the Company to issue these?
11        A.   I'm sorry?  Repeat that?
12        Q.   Are you aware that there have been a lot
13   of complaints regarding social media violations
14   among the flight attendants beginning around 2015 at
15   least and that could have been why they issued
16   these?  Do you know?
17        A.   I would assume there's some motivator that
18   would have required Southwest to issue those.
19        Q.   Okay.  Do you have any kind of personal
20   dispute or animosity with Mr. Holcomb that would
21   have prompted you to complain about his social media
22   activity?
23        A.   Do I have personal animosity toward Bill
24   Holcomb?
25        Q.   Well, are there any -- been disputes or
```

```
 1    intra-Union squabbles between the two of you?
 2    Trying to understand why you turned in --
 3         A.   I haven't spoken to Bill Holcomb in
 4    probably five years maybe.
 5         Q.   Okay.  But has there been disputes between
 6    the two of you regarding Union issues during this
 7    time?
 8         A.   No.
 9              MS. GEHRKE:  Nothing further.
10              MR. CHAPPELL:  I have no --
11              THE ARBITRATOR:  Thank you, sir.
12                   (Recess from 11:58 to 12:16)
13              THE ARBITRATOR:  We'll go back on the
14    record.  Have you any other witnesses or proof to
15    offer at this time?
16              MR. CHAPPELL:  I have nothing at this
17    time.  I don't know whether we're going to hear
18    more.  Reserve the right for any potential rebuttal,
19    including Mr. Hofer, if necessary.
20              THE ARBITRATOR:  Okay.  Thank you.  Off
21    the record.
22                   (Recess from 12:16 to 12:23)
23              THE ARBITRATOR:  Back on the record.
24              The Company had a desire to call another
25    witness, to recall a witness, so you may do that.
```

```
 1              MS. GEHRKE:  Okay.  We'd like to recall
 2    Maureen Emlet to testify on rebuttal.
 3              THE ARBITRATOR:  Ms. Emlet, you'll recall
 4    that you were sworn to tell the truth.  That remains
 5    in effect.
 6              THE WITNESS:  Yes.
 7              THE ARBITRATOR:  All right.  Thank you.
 8                   MAUREEN EMLET,
 9    having been previously sworn, testified as follows:
10                   DIRECT EXAMINATION
11    BY MS. GEHRKE:
12        Q.   Ms. Emlet, you testified during your
13    direct testimony yesterday that the Company has had
14    a social media policy for several years, correct?
15        A.   I believe I testified to that, yes.
16        Q.   Okay.  And that it's also issued several
17    read before fly documents regarding social media
18    policy and expectations, correct?
19        A.   Yes.
20        Q.   Has the Company's need to be involved in
21    social media issues with the flight attendants
22    changed over the last several years because of the
23    sheer volume of complaints?
24        A.   Yes, it's changed dramatically.
25        Q.   Can you explain that further, please?
```

Charlene Carter - Vol. 2                                    December 8, 2017

448

```
 1        A.   Yes.  In 2009 I have -- we have recorded
 2   one social media violation complaint.  In 2010 we
 3   had one complaint.  In 2011 the numbers started to
 4   increase, and it seemed that the violations or the
 5   allegations were mainly focused in the inflight
 6   department.  The other departments didn't seem to be
 7   nearly as active on social media.
 8             So then by 2012 and 2013 we were dealing
 9   with social media complaints and potential
10   violations on at least a weekly basis, if not an
11   almost daily basis.
12        Q.   And around this time, this is when the TWU
13   Local 556 was having a lot of internal turmoil
14   regarding Union leadership, right?
15        A.   I don't remember the exact timing, but I
16   believe that was about the time that the former
17   president was under the microscope from some of the
18   membership.  They wanted him ousted from his
19   position.
20        Q.   Is it accurate to say that a lot of the
21   Union's leadership issues played out on social
22   media, though, and that's what kind of caused this
23   spike in complaints?
24        A.   Yes.  The thoughts and feelings of the
25   flight attendants about the Union leadership is what
```

Charlene Carter - Vol. 2                                    December 8, 2017

449

```
 1    played out on social media.
 2         Q.   Were both Union supporters and recall
 3    supporters -- well, I don't know if they were recall
 4    supporters -- Union supporters and people that did
 5    not support the current leadership accused of
 6    violating the social media policy?
 7         A.   Yes.  I am not really schooled on who
 8    supported the Union and who was against the Union.
 9    However, from many of the comments that were posted,
10    you could infer what their feelings were about the
11    leadership.
12         Q.   Okay.  And were both sides, both Union
13    supporters and those who were upset with Union
14    leadership, filing complaints against each other as
15    well?
16         A.   Yes.
17         Q.   And did the Company take those complaints
18    seriously?
19         A.   Absolutely.
20         Q.   Did the Company initiate investigations to
21    determine that there had been a violation of Company
22    policy?
23         A.   Yes.
24         Q.   And has the Company's position with
25    respect to the appropriate level of discipline
```

Charlene Carter - Vol. 2                              December 8, 2017

450

1    changed over the last year or two?

2         A.   Yes, it absolutely has.  The complaints

3    and comments were at such an increased volume, and

4    prior to the advent of social media we would have

5    just -- I would have pulled those people into my

6    office and said quit bickering, next time you're

7    going to get in trouble.

8              But it really did get out of control to

9    the point that in February of 2017, earlier this

10   year, the vice president of inflight operations

11   along with the other two VPs put out that joint read

12   before fly stating, you know, this has got to stop.

13   And actually that has greatly helped in the volume

14   of complaints that we are receiving.

15        Q.   And you testified previously about

16   Southwest Exhibit No. 5, which was the 2016 read

17   before fly?

18        A.   Yes.

19        Q.   And was that kind of the beginning of the

20   Company's crackdown, or was it really in 2017?

21        A.   Well, I think that in 2016 we were -- we

22   were getting much more serious about it and

23   recognized that we had to take a much stronger

24   stance, a firmer hold on it.  The 2016 RBF was not

25   as effective as we would have liked, so we put out

Charlene Carter - Vol. 2                          December 8, 2017

451

```
1   the additional communication in February of 2017.
2   And I know that amongst ourselves we refer to that
3   as the line in the sand.
4        Q.   Now, you testified previously that you
5   were often called to be involved in investigations
6   or discussions regarding flight attendant discipline
7   if there's a potential for suspensions or
8   terminations, correct?
9        A.   Yes.
10       Q.   Okay.  And that would include these social
11  media violations?
12       A.   Yes.
13       Q.   From your experience, if the Company
14  determines that there's been a serious violation of
15  Company policy, whether it be the social media, the
16  bullying, hazing, harassment, is there a kind of
17  framework for what's the appropriate level of
18  discipline, or is it a complete case-by-case
19  scenario?
20       A.   Well, it's a combination of the two.  The
21  discipline, of course, would depend on the
22  circumstances of the case.  If it was just a social
23  media violation and there were not other policies
24  that had been violated, if it was not a credible
25  threat, if it was not some egregious behavior, then
```

Charlene Carter - Vol. 2                          December 8, 2017

452

```
 1    typically we have been this year issuing 30-day
 2    suspensions for every first offense.  I've only seen
 3    one case that has had a second offense since that
 4    RBF came out.
 5              Q.   And what happened to that person?
 6              A.   She received another 30-day suspension.
 7              Q.   And why was she given another suspension?
 8              A.   Well, the nature of the violation, what
 9    she posted was extremely distasteful, it was
10    inappropriate, and it was directed toward another
11    flight attendant.  However, it was not threatening.
12    It was not -- I don't know if -- we didn't determine
13    that there was any violation of the harassment
14    policy, so that one mainly was focused on violation
15    of just the social media policy.
16              Q.   And that was Ms. Jeanna Jackson?
17              A.   Yes.
18              Q.   And are you aware of her feelings
19    regarding the current Union leadership?
20              A.   Yes.
21              Q.   And what's your understanding of her
22    position on the Union leadership?
23              A.   Well, as I understand it, she is leading
24    the recall effort to have the entire executive board
25    recalled, so I'm guessing she does not like the
```

Charlene Carter - Vol. 2                                    December 8, 2017

453

```
 1   Union.
 2        Q.   Okay.  I want to ask you about Mr. Brian
 3   Talburt.
 4        A.   Yes.
 5        Q.   Are you aware of Mr. Talburt?
 6        A.   Yes.
 7        Q.   Okay.  Are you aware that Ms. Carter filed
 8   a complaint against Mr. Talburt?
 9        A.   I think I -- that was several years ago.
10        Q.   If you could look at Southwest Exhibit 14,
11   please.  It's the step 2 hearing documentation,
12   probably near the end.
13             All right.  If you look at page 134 in the
14   packet.
15        A.   Yes.
16        Q.   Are you aware that Ms. Carter filed this
17   complaint against Mr. Talburt or were you aware?
18        A.   At the time of her termination?
19        Q.   Well, let's start back in October 2014
20   when the complaint was made.  Were you aware of this
21   complaint?
22        A.   I remember -- I was not directly
23   involved -- well, I guess I was involved in the
24   investigation with Brian Talburt.  I did not
25   remember that Ms. Carter was the person who brought
```

Charlene Carter - Vol. 2                              December 8, 2017

454

```
 1    the claim forward.
 2         Q.   Okay.  But you had heard or were aware
 3    that there had been a complaint against him for
 4    harassment and social media?
 5         A.   I knew -- I absolutely knew there was a
 6    complaint about -- against Brian Talburt, yes.
 7         Q.   And did you have any involvement in the
 8    investigation or fact finding process?
 9         A.   Yes.
10         Q.   Okay.  What was your involvement?
11         A.   Well, I'd have to -- because this was
12    three years ago, I'd have -- three and a half years
13    ago, I'd have to go back, of course, and look at the
14    file to see what my direct involvement was, but I
15    would have consulted with the base and I would have
16    read through all of the documents at that time to
17    determine what would be the appropriate or to work
18    with the base to determine the appropriate
19    discipline.
20         Q.   Do you recall whether or not the Company
21    concluded Mr. Talburt had violated Company policy?
22         A.   Yes.
23         Q.   The Company did conclude he violated
24    policy?
25         A.   Yes.
```

Charlene Carter - Vol. 2                                    December 8, 2017

455

1      Q.   Okay.  And do you remember the level of
2  discipline issued against Mr. Talburt?
3      A.   He was terminated.
4      Q.   Are you familiar with a gentleman by the
5  name Mr. Kent Hand?
6      A.   Yes.
7      Q.   Mr. Hand testified, and I realize you
8  weren't in the room, that he had sent the Company
9  two complaints regarding what he considered
10  inappropriate social media violations, one involving
11  Sam Wilkins from 2012 and another involving Bill
12  Holcomb from September 2013.
13           During the break we asked you to go look
14  to see if the Company had record of receiving those
15  complaints.  Well, first of all, does the Company
16  generally log complaints as they are received?
17      A.   Absolutely.
18      Q.   And how does it track the complaints that
19  are received?
20      A.   We have a database that we call ProLaw.
21  That's the program is ProLaw.  We also have the
22  base -- at the domicile where the person is based,
23  they keep records on the computer of their
24  investigations.
25      Q.   Okay.  And did you just go look to see if

Charlene Carter - Vol. 2                    December 8, 2017

456

```
1   there were any complaints by Mr. Hand involving
2   Ms. Wilkins or Mr. Holcomb?
3        A.   Yes.
4        Q.   And were there any complaints received by
5   the Company?
6        A.   I could find nothing from Mr. Hand
7   regarding Sam Wilkins.  I did find records of
8   complaints against Bill Holcomb.
9        Q.   And to your knowledge did the Company
10  investigate that complaint?
11       A.   Yes.
12       Q.   And did it take any disciplinary action
13  against Mr. Holcomb?
14       A.   Yes.
15       Q.   I want to ask you about flights that were
16  going to the women's march.  There's been testimony
17  in the arbitration regarding Southwest or -- either
18  as a Company or certain flight attendants making the
19  aircraft lighted pink to show support for the march
20  and the women going to the march.
21            Are you aware that that was part of the
22  step 2 documentation submitted by Ms. Carter?
23       A.   Yes.
24       Q.   Okay.  And do you know if there was a
25  Company-sanctioned or Company-sponsored initiative
```

Charlene Carter - Vol. 2                                    December 8, 2017

457

```
 1   to make the lighting pink on aircraft going towards
 2   the D.C. area for the march?
 3        A.   There was nothing sanctioned by the
 4   Company.
 5        Q.   Okay.  Are you aware of whether or not
 6   certain flight attendants may have taken it upon
 7   themselves to change the lighting in the cabin?
 8        A.   I did hear that that happened on some
 9   flights, yes.
10        Q.   And would that have been a violation of
11   Company policy?
12        A.   Yes, it would have been, except that we do
13   occasionally -- you know, we give our flight
14   attendants a lot of freedom.  And when there are
15   certain special events on the plane, we actually
16   encourage them to celebrate those.
17             For instance, if a sports team or the
18   plane is mostly full of one particular set of fans
19   for a sports team, they may play that team's fight
20   song over the P.A.  Or if there is, you know, one of
21   our honor flights where we're taking veterans to
22   D.C., we recently had a young boy who sang the
23   national anthem over the P.A.  So there -- or
24   weddings are huge.  We oftentimes do big
25   celebrations for people who are getting married.
```

Charlene Carter - Vol. 2                              December 8, 2017

458

```
 1              So they -- we do encourage our flight
 2    attendants to recognize and celebrate with our
 3    customers.
 4         Q.   But in this instance did the Company
 5    receive complaints about the pink lighting on the
 6    plane and that somehow supporting the march?
 7         A.   I would not have been in receipt of those
 8    complaints.  I think there may have been one
 9    customer who wrote in, but otherwise I really don't
10    know.
11         Q.   Are you aware of the Company doing any
12    investigation into complaints about the pink
13    lighting?
14         A.   They would have -- if we received a
15    complaint regarding a specific flight and specific
16    flight attendants, we would have contacted those
17    flight attendants and requested them -- requested
18    reports from them.
19              And then if there was anything that
20    warranted -- if it was just a coach and counsel,
21    that would have been over the phone.  If we felt
22    there was any potential for violation, we would have
23    brought them in.
24              MS. GEHRKE:  Can we mark this as Southwest
25    Exhibit 16, please.
```

Charlene Carter - Vol. 2                            December 8, 2017

459

```
 1                    (Company Exhibit 16 marked)
 2    BY MS. GEHRKE:
 3         Q.   Ms. Emlet, are you familiar with this
 4    document?
 5         A.   Yes, I am, very familiar.
 6         Q.   Is this an excerpt from a larger document?
 7         A.   Yes.  This is an excerpt from our handbook
 8    called the Guidelines for Employees.
 9         Q.   Would it apply to all employees?
10         A.   Yes.
11         Q.   Okay.  And what is this titled The Basic
12    Principles, what is this in reference to?
13         A.   Well, years ago when these were first
14    written, our handbook was actually called the
15    Guidelines for Leaders.  It's -- it was changed at
16    least ten years ago, I think, to the Guidelines for
17    Employees.  And any employee is subject to these,
18    but especially leaders.
19              In all of the in-house leadership training
20    that Southwest provides for their leaders and
21    management, this is one of the things that we
22    stress.  And each one is -- each leader is really
23    bound to make sure that they are following these
24    principles in dealing with other employees.
25         Q.   And is the first bullet point of "Focus on
```

Charlene Carter - Vol. 2                                    December 8, 2017

460

```
 1    the situation, issue, or behavior, not on the
 2    person," how is that relevant to the base leaders?
 3         A.   Well, it's very relevant.  In fact, every
 4    base leader, when they are selected for that
 5    position, receives a framed copy of the basic
 6    principles.  When I was at the base, I kept that
 7    right on my desk because these really are our
 8    guidelines for -- one of the sets of guidelines for
 9    when we are investigating issues or if there are --
10    if there's anything that needs to be dealt with for
11    professional relationships.
12         Q.   And how would this have factored into, if
13    at all, the Company's investigation of Ms. Stone's
14    complaint regarding Ms. Carter's messages?
15         A.   Well, I think that the number 1 has always
16    stood out to me very strongly, "Focus on the
17    situation, issue, or behavior, not on the person."
18    We don't pick and choose which of our employees are
19    protected.  We also -- it's so -- you know, when
20    we're talking about is someone a Union supporter or
21    anti-Union, that has no place in the investigation
22    because we're looking at the situation, the issue,
23    or the behavior, not that person's beliefs or
24    affiliations.
25         Q.   So the fact that Audrey Stone was Union
```

Charlene Carter - Vol. 2                                      December 8, 2017

461

```
 1   president should not necessarily have factored into
 2   the Company's investigation of Ms. Carter?
 3       A.   Absolutely not.   It should not prevent her
 4   from being protected, nor should it give her any
 5   extra rights of protection.   She should be treated
 6   the exact same way that we would any other employee
 7   from the brand-new person in cargo all the way up to
 8   Gary Kelly.
 9       Q.   There has been a lot of testimony from
10   Ms. Carter that she really viewed this as, you know,
11   a Union dispute and this was her Union president and
12   that's who she was writing to when she sent those
13   messages.
14            From the Company's perspective, did the
15   Company see this as a Union issue?
16       A.   No, absolutely not.
17       Q.   Why not?
18       A.   There was nothing in the posts that she
19   sent to Ms. Stone that I saw that had any relation
20   or relevance to Union protected activity or speech.
21   There's a time and a place and a manner for
22   everything, and had she wanted to discuss this issue
23   with Ms. Stone, there would have been an appropriate
24   way to do it.   Her posts and her private messages
25   were not appropriate.
```

462

```
 1              MS. GEHRKE:  I have nothing further.
 2   Thank you.
 3              THE ARBITRATOR:  Yes, sir?
 4              MR. CHAPPELL:  Yeah.  Just a moment.
 5                   CROSS-EXAMINATION
 6   BY MR. CHAPPELL:
 7       Q.   You testified just a few minutes ago that
 8   as a result of the October 6, 2014, complaint
 9   against Brian Talburt that was part of Southwest
10   Exhibit 14 that you looked at, that he was
11   terminated as a result of that investigation of that
12   complaint?
13       A.   I believe that is the one that he was
14   terminated.
15       Q.   Okay.  Was he subsequently reinstated?
16              MS. GEHRKE:  I'm going to object for the
17   reasons we've already discussed.
18              MR. CHAPPELL:  Well, then let me show --
19              THE ARBITRATOR:  Hold on.  Let me think
20   about this.  The fact that the person was reinstated
21   I think is an acceptable question.  The reasons and
22   documents and the motivation for reinstating that
23   person, however, may well be confidential.  So I'll
24   allow you to explore that.
25              I mean, here's the deal.  The guy was
```

1  fired.  That indicates to me the Company was

2  consistent in its discipline.  Then something

3  happened, and there are a lot of variables.  The

4  labor relations guy got sick, the arbitrator got

5  fired, we don't know.  And that's what I don't need

6  testimony about.  So proceed cautiously with that

7  guideline, if you would.

8  BY MR. CHAPPELL:

9       Q.   The question was simply, was Mr. Talburt

10  reinstated after that termination you testified to

11  that related back to the October 14 complaint?

12       A.   Yes.

13       Q.   And after he had been reinstated, were

14  there other complaints filed against Mr. Talburt?

15       A.   Yes.

16       Q.   And were you part of that investigation?

17       A.   I believe I was.

18       Q.   Okay.  And would one of the complaints

19  against Mr. Talburt after he came back in, was

20  reinstated, would that have been filed by

21  Mr. Gregory Hofer, H-O-F-E-R?

22       A.   I believe so, yes.

23       Q.   Okay.  And that's the one that we were

24  referencing that you were involved in as the second

25  investigation?

Charlene Carter - Vol. 2                                    December 8, 2017

464

```
 1        A.   Yes.
 2        Q.   Okay.  And what was the result of that
 3   investigation?
 4        A.   He was terminated.
 5        Q.   Okay.  And when we say "he," we mean
 6   Mr. Talburt?
 7        A.   Yes.
 8        Q.   Okay.  And after that second termination,
 9   was he reinstated again?
10        A.   Yes.
11        Q.   And was that second reinstatement because
12   of a decision of --
13             MS. GEHRKE:  I'm going to object for the
14   reasons --
15             MR. CHAPPELL:  Let me ask the question.
16             THE ARBITRATOR:  Let him ask the question.
17             MS. GEHRKE:  Okay.  Go ahead.  I'm sorry.
18   BY MR. CHAPPELL:
19        Q.   Was the reason he was reinstated the
20   second time or after the second termination because
21   of a decision of an arbitrator or a system board?
22             MS. GEHRKE:  Same objection.  I think
23   we're going down a slippery slope.
24             THE ARBITRATOR:  Well, no, actually I have
25   said in prior decisions a decision by an arbitrator
```

Charlene Carter - Vol. 2                                    December 8, 2017

465

```
 1  in a situation like that is fully admissible.  It's
 2  the deliberations and the not-without-precedent
 3  settlements I don't need to hear about.  So I think
 4  that's a fine question.  I may even be aware of the
 5  decision.
 6            MR. CHAPPELL:  I don't -- I'm fishing
 7  here.
 8            THE ARBITRATOR:  No, go ahead.
 9            MR. CHAPPELL:  I'm doing what I'm not
10  supposed to do.  It may be your decision, but --
11            THE ARBITRATOR:  No, it's not mine.
12            MR. CHAPPELL:  -- if it is, it's not
13  because I knew that.
14  BY MR. CHAPPELL:
15      Q.   Do you need the question read back, or do
16  you remember what it is?  The arbitrator has denied
17  her objection.
18      A.   I think the answer's no.
19      Q.   Okay.  But he was reinstated --
20      A.   Yes.
21      Q.   -- for reasons other than that.  Okay.
22  Then, now, this is after the second reinstatement.
23  Were there further complaints filed against
24  Mr. Talburt?
25      A.   Off the top of my head, I don't remember.
```

```
 1   I don't think he has received any discipline since
 2   then.  I don't -- I really don't remember if there
 3   were any subsequent complaints.
 4        Q.   I believe you testified when I asked
 5   you -- it was just yesterday -- whether he was
 6   currently employed, and I believe your testimony was
 7   yes.
 8        A.   That's correct.
 9        Q.   Okay.  And you don't know of any
10   terminations between the second reinstatement?
11        A.   That's correct.
12        Q.   But you're not a hundred percent sure
13   whether he might have had some other form of
14   discipline less than termination?
15        A.   I do not believe he has had any other
16   discipline.  I don't -- I don't -- I can't tell you
17   that for sure though.
18        Q.   Okay.  In discussion you discussed the
19   Kent Hand complaint against Mr. Holcomb?
20        A.   Yes.
21        Q.   And you said -- I believe you said it was
22   investigated.
23        A.   Yes.
24        Q.   And that -- what I don't remember is what
25   you said was the result of that investigation.
```

Charlene Carter - Vol. 2                                    December 8, 2017

467

```
 1          A.   I don't think I said.
 2          Q.   That's why I don't remember.  Then let me
 3   ask you, what was the result of that investigation?
 4          A.   He received a 30-day suspension.
 5          Q.   Okay.  And I believe that was most likely
 6   filed in either 2015 or 2016?  Does that sound
 7   correct, about right?
 8          A.   Yes.
 9          Q.   And since serving his suspension -- he's
10   still currently employed, right?
11          A.   Yes.
12          Q.   My notes are right on that.  Okay.
13   Has he received another complaint?
14          A.   Not that I'm aware of.
15          Q.   Then let's go to the first reinstatement
16   of Mr. Talburt.  From his termination to his
17   reinstatement, approximately how many weeks or
18   months was that?
19          A.   I don't -- I don't know.  I'd have to look
20   that up.
21          Q.   But it wasn't like a year later, right?
22          A.   Correct.
23          Q.   It was more like maybe six weeks?
24          A.   I -- I really don't know.
25          Q.   But that's more likely than not that it
```

Charlene Carter - Vol. 2                                    December 8, 2017

468

```
 1  was a shorter period?
 2       A.   It's more likely than a year, yes.
 3       Q.   Okay.  And it's also more likely that it
 4  was less than six months too, isn't it?
 5            MS. GEHRKE:  I think she's already
 6  answered she doesn't know.  And again, it's supposed
 7  to be non-referral and we're going down it again.
 8            MR. CHAPPELL:  Well, people sometimes get
 9  helped by remembering, they're not sure, and when
10  you shorten the period or lengthen it, that helps to
11  refresh their recollection.  That's all I'm trying
12  to do.  Let her finish answering, and then I'll
13  quit.
14            THE ARBITRATOR:  Do you know?
15       A.   No.  I deal with hundreds of cases every
16  single year, so I don't know the details of that.
17  BY MR. CHAPPELL:
18       Q.   His second reinstatement, Mr. Talburt's,
19  did that take up to a year to have him reinstated?
20       A.   No, I don't believe so.
21       Q.   That one was maybe a month to six weeks?
22       A.   Yes, I believe that's about right.
23       Q.   Okay.  Your final comment -- let me see.
24  You testified that you didn't think the messages
25  that Ms. Carter sent to Ms. Stone on Facebook
```

Charlene Carter - Vol. 2                           December 8, 2017

```
 1   Messenger could be considered a Union issue.  I
 2   think that's what you said or something similar to
 3   that.  Is that right?
 4         A.   Yes.
 5         Q.   You didn't see it as a --
 6         A.   I said I didn't believe they were Union
 7   protected speech.
 8         Q.   But do you agree that the discussion
 9   that -- or the comments that Ms. Carter put on those
10   messages dealt with Union, dealt with a Union or how
11   dues are being spent?
12         A.   There are some allegations of what
13   Ms. Carter's assumptions were about Union dues being
14   spent, yes.
15         Q.   Okay.  So you're not denying that
16   Ms. Carter was talking about Union matters when she
17   sent it to Ms. Carter, Ms. Stone?  Sorry about that.
18         A.   I think that there are a few sentences in
19   these posts that may have been related to Union
20   dues.
21         Q.   Do you know whether the Company got any
22   complaints about the flight attendants who may have
23   turned the plane lights to pink?
24         A.   Well, as I said before, I think there may
25   have been one complaint, but I can't tell you that
```

Charlene Carter - Vol. 2                                December 8, 2017

470

```
 1    for sure.
 2         Q.   And you think that one, though, was a
 3    customer complaint, right?
 4         A.   I thought it was.
 5         Q.   Okay.  So do you know of any flight
 6    attendants filing a complaint over that?
 7         A.   I don't.
 8         Q.   As far as you know, no one, no flight
 9    attendant filed a complaint?
10         A.   They may have.  I just don't know about
11    it.
12         Q.   And you were not involved in any
13    investigation of an employee over that incident?
14         A.   That's correct.
15         Q.   But someone else in labor relations might
16    have been involved in such a complaint?
17         A.   If there was a complaint that involved
18    flight attendants and it rose to the level of
19    involving our team, yes, somebody would have been
20    involved in it.
21              MR. CHAPPELL:  I have nothing else.
22              THE ARBITRATOR:  Anything further?
23              MS. GEHRKE:  No, that's it.  Thank you.
24              THE ARBITRATOR:  Thank you very much.  All
25    right.  Off the record.
```

Charlene Carter - Vol. 2                               December 8, 2017

471

```
 1                 (Off record from 12:55 to 12:56)
 2                 THE ARBITRATOR:  Let's go back on the
 3       record.  And I believe the Company has rested its
 4       case.
 5                 Did you have anything further or other
 6       proofs to offer?
 7                 MR. CHAPPELL:  I do not.  I don't need to
 8       do anything further.
 9                 THE ARBITRATOR:  All right.  We have
10       discussed off the record the timing of post-hearing
11       briefs.  The parties have indicated it's their
12       desire to submit post-hearing briefs.  My preference
13       is that they be submitted simultaneously to me in
14       PDF as well as MS Word format.  And upon receipt of
15       both sides' submissions, I will cross-serve them to
16       you so you don't have to mess with certified mail
17       and who got what and that sort of stuff.
18                 And I will acknowledge receipt of the
19       transcript on or about December 27 and will look for
20       post-hearing briefs to be due on Friday, January 27?
21                 MS. GEHRKE:  26.
22                 MR. CHAPPELL:  26.
23                 THE ARBITRATOR:  26.  Okay.  Anything
24       further?  I appreciate your professionalism.  I've
25       enjoyed working with you.  I think you have had a
```

Charlene Carter - Vol. 2                                    December 8, 2017

472

```
 1   good opportunity to present your case.  I pledge to

 2   do the best I can to get it right.

 3            And so if there's nothing further, we'll

 4   go off the record.

 5            MR. CHAPPELL:  I have nothing.

 6            MS. GEHRKE:  Nothing further.  Thank you.

 7            THE ARBITRATOR:  All right.

 8            MR. CHAPPELL:  And thank you for your

 9   assistance.

10            THE ARBITRATOR:  You bet.

11

12               (Proceedings concluded at 12:57 p.m.)

13

14                        -oOo-

15

16

17

18

19

20

21

22

23

24

25
```

Charlene Carter - Vol. 2                              December 8, 2017

473

```
 1                REPORTER'S CERTIFICATION

 2

 3            I, KAREN L. SHELTON, CSR No. 7050,

 4   Certified Shorthand Reporter, certify;

 5            That the foregoing proceedings were taken

 6   before me at the time and place therein set forth;

 7            That the testimony of the witnesses, the

 8   questions propounded, and all objections and/or

 9   statements made at the time of the proceedings were

10   recorded stenographically by me and were thereafter

11   transcribed;

12            That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14            I further certify that I am not a relative

15   or employee of any attorney of the parties, nor

16   financially interested in the action.

17            SUBSCRIBED AND SWORN TO under my hand and

18   seal of office on this the 15th day of December,

19   2017.

20
                          _____
21                        KAREN L. SHELTON, CSR/RDR/CRR
                          Texas CSR 7050  Exp. 12/31/18
22                        ABC Court Reporters
                          CRCB Firm Registration No. 491
23                        The Nathaniel Barrett Building
                          903 E. 18th Street, Suite 115
24                        Plano, Texas 75074
                          214.303.0ABC (0222)
25                        214.303.0202 (fax)
```

| | | | | |
|---|---|---|---|---|
| **A** | 416:6 | **airplane** 325:17 | **APPEARANCES** | 471:23 472:7,10 |

**ABC** 473:22
**abide** 375:9 385:22
  387:11
**ability** 352:20
  372:12
**able** 325:8,12 332:19
  367:6 386:1
  402:16 403:23
  412:17,19 432:19
**abort** 338:19
**abortion** 338:11
  340:22 360:25
  374:3 389:3 390:6
**absolutely** 339:25
  345:11 449:19
  450:2 454:5
  455:17 461:3,16
**accept** 406:3
**acceptable** 462:21
**access** 385:21 387:7
**accord** 397:24
  399:14
**account** 326:16
  335:19
**accurate** 367:1
  448:20
**accused** 449:5
**acknowledge** 421:2
  421:21 471:18
**acknowledged**
  378:22 385:21
**acknowledgments**
  385:10
**Act** 370:10
**action** 383:25 384:1
  402:7 409:12
  441:8 456:12
  473:16
**active** 448:7
**Activities** 322:3
**activity** 398:10
  445:22 461:20
**actual** 428:18 431:8
**additional** 451:1
**Address** 429:16
**addressed** 377:23
  431:2
**addressed-only-to...**
  395:9
**administration**
  372:20,20
**admissible** 465:1
**admission** 336:23
  427:24 433:7
**admit** 387:25 399:14

416:6
**admitted** 380:18
  399:9 414:1 417:3
  433:11
**advent** 450:4
**advertisements**
  395:11
**affect** 337:19 353:24
  354:4 364:4
**affiliation** 346:8
**affiliations** 345:19
  460:24
**afield** 396:18 441:16
**afraid** 420:3
**age** 326:1,4,7
**agent** 425:21
**ago** 327:13,14
  360:17 367:7
  437:11 453:9
  454:12,13 459:13
  459:16 462:7
**agree** 362:13 370:19
  372:19,22 373:18
  374:1,4,22 379:19
  385:18 389:3
  397:1 398:18
  413:20 443:16
  469:8
**agreed** 323:7 353:13
**agreeing** 385:22
  387:8
**agreement** 324:24
  404:24
**ahead** 392:22
  431:20 437:19
  440:5 464:17
  465:8
**ahold** 359:1
**aircraft** 420:5
  433:20 456:19
  457:1
**airline** 434:4,5 440:6
**airlines** 319:13
  324:6 328:23
  329:4 341:23
  346:16 347:3
  352:10,11,18,19
  354:10 374:25
  375:10 393:14
  406:23 411:20
  418:14 425:13
  426:3 428:11
  429:12 430:18,22
  434:1 435:16
  436:12 439:6
  442:2

**airplane** 325:17
  352:11 405:3
  420:4
**airplanes** 352:14,17
  353:3 354:13
**airport** 328:13,14
**albums** 330:24
  361:4,12 362:6,9
**allegation** 326:17
**allegations** 445:9
  448:5 469:12
**allow** 429:18 462:24
**allowed** 329:25
  330:1 353:2
  437:24 443:22
**allowing** 352:24
**alluding** 414:5
**aloud** 434:6
**Alveda** 343:25
**amazing** 400:13
**amount** 340:17
**and/or** 473:8
**Angeles** 425:22
**anger** 338:8,15
**angry** 338:15 408:5
**animosity** 438:4,8
  445:20,23
**Anita** 424:2,5
**anniversary** 418:10
  418:13,15 422:7
**answer** 378:13
  383:7 385:2
  391:21 398:2,4
  406:19 441:11
**answered** 325:21
  377:8,11 468:6
**answering** 392:24
  468:12
**answer's** 377:8
  380:25 465:18
**anthem** 457:23
**anti-Union** 460:21
**anybody** 329:3
  351:10 352:2
  402:24 412:13
**anymore** 340:15
**anyway** 342:23
**apologies** 342:9
**apologize** 342:19
  354:5 407:11,14
  407:17
**apologized** 349:24
  402:8
**apparent** 383:19
**appear** 332:10
  333:19

**APPEARANCES**
  321:3
**appeared** 409:1
  429:23
**appears** 356:12
  398:17
**appending** 410:16
**apply** 459:9
**appreciate** 424:11
  471:24
**appropriate** 383:24
  431:17 441:20
  449:25 451:17
  454:17,18 461:23
  461:25
**approximately**
  434:23 467:17
**arbitration** 319:6
  323:19 342:17
  373:3 411:9 425:1
  456:17
**arbitrator** 320:2
  323:4,12,16,22
  330:8 333:1 337:5
  337:8,13 341:6,24
  342:5,11,16,22
  347:18,24 348:5,9
  356:8,11,15
  358:10,14 360:1,4
  362:17,24 371:23
  373:2,11 376:3
  377:10,13 378:9
  378:12,16 380:25
  381:5 383:6,9
  385:3 386:4 391:2
  396:8,24 397:7
  398:3,22 399:7,10
  399:13 404:7
  406:1,8,19 408:13
  410:11,21,24
  411:3,4,6,12
  413:17,22,25
  415:1 416:10,23
  416:25 417:2
  418:13,17,24
  424:7,10,13,14,19
  424:23 425:4
  428:4 429:16
  433:10 434:9,12
  434:15 441:19
  446:11,13,20,23
  447:3,7 462:3,19
  463:4 464:16,21
  464:24,25 465:8
  465:11,16 468:14
  470:22,24 471:2,9

471:23 472:7,10
**area** 356:8 379:12
  457:2
**argumentative**
  378:10
**Armstrong** 320:21
**Arthur** 424:21
**asked** 348:5 377:7
  392:20,23 395:17
  395:22 400:7
  408:16 455:13
  466:4
**asking** 363:4 368:13
  375:2 378:7,8
  391:13 398:20
  403:17 416:2
  442:12
**assistance** 472:9
**assistant** 353:15
**associated** 344:9
**assume** 419:16
  423:13 445:17
**assumption** 435:15
**assumptions** 469:13
**attached** 322:15
  358:8,11 394:24
  394:25
**attacks** 382:21
**attempted** 332:11
**attend** 367:22 369:8
**attendant** 324:11,14
  328:8,22 365:17
  366:1,19 372:1
  383:13 384:5
  402:1 411:22
  413:8 425:15,17
  425:20,24,24
  426:14 427:21
  435:7 451:6
  452:11 470:9
**attendants** 341:21
  343:10 345:12
  346:17 352:19
  366:11,21 382:16
  386:17 393:14
  397:23 403:25
  404:16 412:17
  413:4 426:9 439:5
  440:23 441:6
  443:6 445:9,14
  447:21 448:25
  456:18 457:6,14
  458:2,16,17
  469:22 470:6,18
**attended** 363:10
  367:25 368:9

369:13
**attention** 330:5
  333:5
**attitude** 376:12,16
  377:6
**attorney** 320:23
  473:15
**attributed** 432:25
**Aud** 351:20
**Audrey** 341:3,5,6,12
  343:2 344:19
  345:4,6 349:17
  351:9,23 353:7,17
  368:7 372:6
  393:22 394:4,8,21
  395:8,16 400:17
  402:10,16,20,21
  420:17 460:25
**Audrey's** 394:25
**August** 335:16
  411:24
**autogenerated**
  395:3
**Avenue** 320:4
**aware** 361:10
  367:20,24 384:16
  386:5 387:2
  389:18 412:1
  417:8 426:2,8
  440:14,25 442:14
  445:6,12 452:18
  453:5,7,16,17,20
  454:2 456:21
  457:5 458:11
  465:4 467:14
**awhile** 330:24
**a.m** 323:2

**B**
**babies** 383:3
**baby** 338:19 346:6
**back** 325:17 333:3,5
  333:10 337:22
  338:3,6,7,15,20
  341:14 349:25
  351:11,11 359:13
  360:4 363:15
  364:3 371:5,8
  381:17 384:19
  386:13 393:20
  400:8 402:9 403:5
  405:10 407:5,12
  415:11,25 416:4
  419:19,23,25
  442:12 446:13,23
  453:19 454:13

**big** 342:4 384:14
  413:13 418:14
  422:1 457:24
**biggest** 344:2
**Bill** 320:3 411:4
  430:11 432:4,25
  434:10,19 435:7
  436:5 438:15
  445:23 446:3
  455:11 456:8
**bit** 361:7 378:10
  392:25 403:4
**black** 414:23
**blown** 328:11
**blue** 383:14
**board** 409:21 414:8
  414:14 438:12
  452:24 464:21
**body** 328:5
**bona** 364:19
**books** 367:4
**bottom** 327:19
  393:23 394:2
  415:5
**bound** 459:23
**boy** 457:22
**Braddock** 320:14
**brand-new** 461:7
**break** 348:9 360:2
  373:1 455:13
**Brett** 417:17
**Brian** 320:8 381:15
  382:11 384:12,16
  409:6 410:2 424:1
  453:2,24 454:6
  462:9
**briefs** 471:11,12,20
**bring** 330:1,13
  354:7
**brought** 330:19
  338:3,7,15 363:15
  384:19 453:25
  458:23
**Building** 320:3
  473:23
**bullet** 379:8,22
  459:25
**bullying** 385:12
  401:21 412:15
  426:6 445:2
  451:16
**bunch** 346:5 361:22
**Burdine** 320:19
**business** 352:9 370:2
  374:18,19 386:19
  396:5 400:21

401:13,19,24
  402:1
**busy** 413:9

**C**
**C** 320:1 323:1
**cabin** 457:7
**California** 320:9
**call** 331:12 350:5
  389:5 395:11
  406:22 431:21
  446:24 455:20
**called** 323:10 326:20
  343:17 344:1
  350:7,8 388:13
  423:16 426:18
  438:24 440:15
  451:5 459:8,14
**calling** 323:13
  382:15 396:10
**campaign** 428:20
**can't** 325:19,20
  331:5 357:1 367:5
  369:22 373:9
  386:12,13,14
  398:13 404:14
  412:12,15 418:9
  427:13 434:3
  466:16 469:25
**care** 340:2 346:8
  376:11 405:13
**cared** 345:14
**careers** 402:18
**cargo** 461:7
**caring** 376:12,16
  377:6
**Carter** 319:8,11
  320:18 321:6
  323:14 324:1,5
  331:9 360:9
  373:18 378:19
  398:9 406:13
  408:16 453:7,16
  453:25 456:22
  461:2,10 468:25
  469:9,16,17
**Carter's** 460:14
  469:13
**cartoons** 379:10
**case** 319:9 323:9,11
  330:2 373:12
  400:11 429:17
  451:22 452:3
  471:4 472:1
**cases** 468:15
**case-by-case** 451:18

**casts** 430:3
**cause** 371:25 372:8
  373:13 403:7
**caused** 351:7 441:5
  448:22
**cautiously** 463:6
**CBA** 405:4
**CC** 337:11 413:17
  426:18 429:18
**CC-4** 322:9 337:4,15
**CC-5** 322:10 412:20
  413:21,25
**CC-6** 322:11 416:9
  416:11
**CC-7** 322:12 427:2
  427:16,25 428:24
**CC-8** 322:13 431:18
  431:21 433:8
**celebrate** 352:20,24
  457:16 458:2
**celebrated** 352:14
**celebrating** 347:23
  348:15 352:22
**celebrations** 457:25
**cell** 362:25 388:10
  388:12
**cells** 346:5
**Center** 319:20 320:9
**certain** 404:24
  456:18 457:6,15
**certainly** 397:9
  409:12
**CERTIFICATE**
  321:21
**CERTIFICATION**
  473:1
**certified** 471:16
  473:4
**certify** 473:4,14
**challenged** 440:18
**chance** 404:24 420:1
  420:7 435:5,7
**change** 324:15
  369:23 370:21,23
  371:3 372:13
  387:6 457:7
**changed** 351:5
  412:10 430:15
  447:22,24 450:1
  459:15
**Chappell** 320:13
  321:7,13,19
  323:10,13 324:4
  330:9,10 332:24
  333:3,4 336:23
  337:2,7,11,16

341:8,9 342:25
348:3,16 349:6
356:6,10,14,16
357:3,8,10 358:13
358:16,17 359:25
376:1,4,7 377:7,12
382:4 389:11
391:5,12,21
396:17 397:8,11
397:14 398:19,24
399:2,9,19,23
405:21 406:4
408:10,15 410:18
413:18,20 416:8
425:10 426:16,21
426:25 427:3,24
428:6,8 429:7,20
429:21 433:7,14
433:15 434:9,13
434:16,18 436:4
441:15,21 446:10
446:16 462:4,6,18
463:8 464:15,18
465:6,9,12,14
468:8,17 470:21
471:7,22 472:5,8
**characterize** 377:2
427:20
**charged** 396:25
408:19
**Charlene** 319:8,11
320:18 321:6
323:14 324:1
331:9
**check** 421:5
**chief** 323:9
**chills** 419:21
**choose** 460:18
**chose** 372:11
**Chris** 371:15
**Christian** 339:2
406:14
**circumstances**
451:22
**claim** 454:1
**claiming** 348:22
**claims** 347:5
**class** 386:21
**classification** 324:19
**clear** 325:22 340:12
340:13 353:25
355:11 368:19
416:12 419:7
428:2,7
**clearly** 384:9 434:4
**click** 361:25 371:16

386:1,13,18,22,24
**clicked** 385:24 387:8
**Clinton** 394:3,8,9,11
394:19
**clips** 337:6
**close** 432:20
**closer** 427:5 431:23
**clothing** 393:6
**clue** 393:7,7
**coach** 458:20
**coffee** 360:2
**cold** 362:21
**collected** 414:9
**collective** 324:24
**College** 320:4
**color** 433:22
**combination** 451:20
**come** 326:3 339:4
344:14 350:2
354:9 399:24
421:7 444:2,7
**comes** 369:24 371:6
383:2 385:25
**coming** 339:5,10
343:14 344:11
**comment** 468:23
**comments** 322:10
327:9 330:1
331:17 332:3,4
355:6 356:24
379:11 433:1,3
434:10,20 449:9
450:3 469:9
**committee** 341:16
341:19,25 342:3
343:12 347:8
363:9 364:8,12,19
364:20,23 367:17
367:20,25 368:8
369:12,13
**communicate**
374:20
**communication**
451:1
**company** 320:6
322:1 323:8
325:23 326:21
327:4 330:8,19
333:6 348:5,21
352:8 361:6 368:3
371:25 373:22
377:25 379:15
384:20 385:17
386:8 387:2 389:8
389:12 390:6
396:4 398:7 399:5

400:16,20 401:7
401:12,12,17,22
402:14 405:10,16
415:25 421:6,13
423:11 433:5
440:8,14 441:7,9
441:11 442:3,13
442:19 443:8
445:10 446:24
447:13 449:17,20
449:21 451:13,15
454:20,21,23
455:8,14,15 456:5
456:9,18 457:4,11
458:4,11 459:1
461:15 463:1
469:21 471:3
**Company's** 321:16
360:11 373:20
374:5,15 379:21
385:10 444:12
447:20 449:24
450:20 460:13
461:2,14
**Company-sanctio...**
456:25
**Company-sponsor...**
456:25
**Company-wide**
397:21
**compare** 333:20
391:15
**comparing** 394:8
**compilation** 387:21
**complain** 372:15
445:21
**complaining** 382:13
410:1
**complaint** 381:9,11
382:10 401:18,20
408:19,23 423:14
424:3 427:20
428:3 430:7,21
435:6 436:23
437:4 448:2,3
453:8,17,20,21
454:3,6 456:10
458:15 460:14
462:8,12 463:11
466:19 467:13
469:25 470:3,6,9
470:16,17
**complaints** 383:24
401:22 421:7,12
423:1,12,15,22
441:25 442:4,8

445:9,13 447:23
448:9,23 449:14
449:17 450:2,14
455:9,15,16,18
456:1,4,8 458:5,8
458:12 463:14,18
465:23 466:3
469:22
**complete** 336:5
451:18
**computer** 332:19
333:10 334:6,19
367:14 379:12
439:23 455:23
**computers** 430:15
**concern** 376:11,16
377:6
**concerned** 345:15
**conclude** 454:23
**concluded** 454:21
472:12
**conclusions** 397:5
434:11
**conduct** 370:2
374:14 379:6
**conducted** 329:22
421:8
**conference** 424:14
**confidential** 404:12
404:14 405:22
422:3,4 462:23
**confidentiality**
404:8
**confidentially**
421:12
**confirm** 367:15
**connected** 343:19
**connecting** 430:18
**connection** 429:15
**cons** 405:25
**considered** 352:4
364:19 384:12
455:9 469:1
**consist** 333:12
**consistent** 463:2
**consulted** 454:15
**contact** 346:11
353:10,11 402:24
405:16
**contacted** 458:16
**content** 379:12
404:3
**continue** 325:25
342:23 441:18,20
**continued** 382:21
**contract** 435:14

**contrasting** 373:6
**control** 450:8
**convention** 367:8
**conversation** 407:13
422:11
**conversations**
366:24
**convey** 351:18,20
**copy** 335:3,11,18
375:25 430:17
439:10 460:5
**corner** 442:24
**corporations** 329:1
**correct** 326:10
327:17 329:16,21
329:23 330:2,3
331:10,11,13,15
333:9 335:12,13
349:18 350:20
355:17 361:3,9,20
364:9,10,14 365:6
367:4 368:25
369:1,6,7,9,10,14
369:18 370:17,18
375:11 377:1
378:15,23,24
382:12 385:1
387:10,12,17,18
387:24 389:11,19
390:9,10 391:7,18
392:6,12,18,19
394:4 400:5,6,9
402:12 403:9,11
408:21 410:4,5
420:23 421:24
428:7,20,21 430:1
433:1,6 435:19
436:21 437:22
438:3 439:1
443:17,24 444:9
447:14,18 451:8
466:8,11 467:7,22
470:14 473:12
**corrective** 384:1
441:8
**correctly** 393:1
**correspond** 428:20
**corrupt** 394:6
**counsel** 320:21,23
342:6 347:19
383:23 436:12
458:20
**counseling** 421:22
**counteract** 339:25
**counterproductive**
393:4

Case 3:17-cv-02278-X    Document 183-1    Filed 09/09/21    Page 661 of 676    PageID 5772
Charlene Carter - Vol. 2                                December 8, 2017

4

countervailing
    373:12
country 342:14
couple 324:22 325:5
    325:6 326:5
    387:22 397:23
    399:17 406:12
    412:10 415:24
    429:9
course 451:21
    454:13
court 413:20 424:15
    473:22
cover 430:12 431:7
    431:11 433:12
    434:24 435:2
covers 335:1 356:17
coworker 347:5
    382:24
coworkers 363:8
crackdown 450:20
crash 418:21,22
CRCB 473:22
create 370:23
created 382:22
credibility 441:17
credible 451:24
crew 360:12 420:5
    438:25 439:2
cross 380:23 399:3
    428:2 429:16
    441:15
crossed 382:20
cross-examination
    321:8,11,14,19
    360:7 396:19
    420:10 433:12
    436:9 462:5
cross-examine 360:5
cross-serve 471:15
CSR 473:3,21
CSR/RDR/CRR
    473:21
current 325:24
    336:20,21 372:20
    420:13 436:6
    438:1 443:17
    444:23 449:5
    452:19
currently 425:11
    466:6 467:10
custody 325:8
customer 376:14
    425:21 458:9
    470:3
customers 397:18

458:3
cut 373:8

―――――― **D** ――――――

D 320:13 321:1
    323:1
daddy 325:8
daily 448:11
Dallas 319:20,22
    418:16
damage 409:9
dandy 409:7,8
database 455:20
date 331:3,18,21,23
    331:25 332:1
    334:1,12,22 335:7
    335:15,22 336:10
    336:15,15 339:16
    428:19 429:3
    433:16 442:21
dated 434:20 442:22
dates 330:21 332:10
    332:15,22 333:12
    360:18
date's 332:2
daughter 325:9,19
    326:1 346:4,7
day 323:5 325:14
    338:6,10 339:5,9
    341:13 342:7
    343:5 352:16
    365:8 473:18
days 325:19 414:18
deal 339:2 342:4
    397:7 462:25
    468:15
dealing 448:8
    459:24
dealt 337:24 460:10
    469:10,10
death 414:5,19,21
debated 400:24
Deborah 412:23,24
    415:10 416:1
December 319:17
    471:19 473:18
decided 403:7
decision 338:19
    401:25 464:12,21
    464:25 465:5,10
decisions 410:12
    464:25
decision-making
    406:2
deep 361:6
DEFENSE 320:14

delete 360:20
deliberations 465:2
democracy 372:19
Democrats 357:13
denied 465:16
denying 469:15
department 320:21
    320:23 428:12
    431:2 448:6
departments 448:6
depend 451:21
depends 362:10
derogatory 379:4
describe 412:21
    415:6,13,16
    417:12 418:6
    419:2 427:11
    432:15
described 339:22
Description 322:2,8
desire 446:24
    471:12
desk 460:7
despicable 393:9
despite 374:23
details 468:16
determine 371:24
    449:21 452:12
    454:17,18
determines 451:14
device 337:6 379:13
dialogue 354:8
    378:4 402:22
    407:15,16
didn't 338:20,21,21
    338:22 351:2
    353:6 362:4
    367:12,13,13
    373:7 374:8
    378:13 380:13
    384:15 386:7
    396:8 400:19
    403:1,1 406:3,6
    407:10 419:4
    420:2,3 429:3,3,14
    435:14 437:23
    440:3 448:6
    452:12 468:24
    469:5,6
difference 383:2
different 330:15
    343:20 352:20
    354:9 356:13,23
    357:5,12 359:22
    362:9 370:22
    380:4,17 389:19

421:24 422:15
difficult 332:15
    371:3
direct 321:7,10,13
    321:18 324:3
    330:5 333:5
    360:10 373:5,7
    382:5 396:19
    411:15 425:9
    441:16 447:10,13
    454:14
directed 374:9
    376:21 415:20
    452:10
direction 428:5
directly 405:16
    416:15 453:22
disagree 377:3
disagreements
    368:23
discharged 396:23
disciplinary 456:12
discipline 417:6
    421:16 422:2
    423:18 449:25
    451:6,18,21
    454:19 455:2
    463:2 466:1,14,16
disciplined 397:25
disclose 342:19
discover 343:18
discrimination
    383:17,20 385:11
discuss 402:16
    440:24 461:22
discussed 336:1
    367:8 386:19
    396:14,16 441:2
    462:17 466:18
    471:10
discussion 378:1
    388:18,23 444:13
    466:18 469:8
discussions 451:6
dislike 377:20
disparaging 353:1
    380:8
displaying 379:9,11
dispute 387:13
    438:5,7,8 445:20
    461:11
disputes 445:25
    446:5
distasteful 452:9
disturbing 351:13
document 382:8

398:19,20 403:18
    430:16 459:4,6
documentation
    382:1 453:11
    456:22
documents 330:1
    408:17 442:15
    447:17 454:16
    462:22
doesn't 328:7 340:6
    372:24 468:6
doing 340:1 350:1
    372:15 417:19,20
    458:11 465:9
dollars 390:13
domicile 455:22
don't 329:3 330:6
    332:25 336:6,20
    336:21 339:16
    340:2 343:16
    345:6,18,19,21
    346:8 348:2 350:5
    350:25 358:7
    365:14 370:19
    371:17 372:6,22
    373:3 374:13
    375:19 377:4,10
    382:3 385:3,24
    386:9,10 388:12
    389:18,22 390:21
    391:8 393:4
    394:14 395:24
    398:13 401:10
    404:13,19,20
    406:1 410:14
    416:13 420:16,20
    422:1,14 429:10
    429:15,25 434:13
    435:4 437:14
    438:9 439:3,14,17
    439:21,24,24
    441:12,13 442:19
    443:15,15 446:17
    448:15 449:3
    452:12 458:9
    460:18 463:5
    465:3,6,25 466:1,2
    466:2,9,16,16,24
    467:1,2,19,19,24
    468:16,20 470:7
    470:10 471:7,16
door 342:9 373:2
double-edged
    374:17
doubt 364:15
Dr 344:1

**dramatically** 447:24
**draw** 397:4 434:10
**drawings** 379:10
**drawn** 400:22
**dreamed** 352:7
  373:22
**dressed** 339:18
  343:14 380:2,9,20
  414:22
**drive** 322:11 416:7
**due** 325:11 343:4
  349:22 351:12
  352:8 471:20
**dues** 337:25 338:1
  339:23 340:15,17
  341:23 344:20
  346:14 350:9
  363:12 364:7,20
  365:15 366:13
  367:11,15 368:5
  368:24 369:25
  370:1,16,20
  371:11 372:15,22
  375:1 393:8 402:2
  469:11,13,20
**dug** 361:6
**duly** 324:2 411:14
  425:7
**duty** 401:17
**D.C** 327:19,20 339:7
  343:15 363:10
  364:9 367:16
  414:6,13,16,20,22
  457:2,22

———————
**E**
———————
**E** 320:1,1 321:1
  323:1,1 473:23
**earlier** 337:18
  348:17 450:9
**easier** 326:7 337:3
  362:22
**easy** 362:14
**Ed** 327:4,9
**educated** 338:23
**Edwards** 412:23,24
  415:10 420:22
**effect** 369:22 370:21
  371:3 372:13
  378:13 400:18
  447:5
**effective** 450:25
**effort** 365:23,25
  452:24
**egregious** 451:25
**either** 326:2 378:14

393:8 396:22
399:3 456:17
467:6
**elect** 371:6
**elected** 341:18
  343:13 345:8
  347:9
**election** 371:8
  394:23 395:10,11
  395:15
**elections** 369:6
**electronic** 385:10
**else's** 355:16 358:18
**Embarcadero** 320:9
**EMBASSY** 319:20
**Emlet** 321:17 385:9
  385:15 447:2,3,8
  447:12 459:3
**emotion** 343:9
  363:15 372:10
**emotionally** 353:24
  373:5
**emotions** 338:3,5
  344:21 350:2
**employed** 324:5
  328:18 419:17
  421:20 425:12
  435:8,16 436:1
  440:19 466:6
  467:10
**employee** 328:10
  329:5 361:2
  374:24,25 375:6
  376:18,24 377:18
  381:10 382:23
  383:21,22 419:15
  428:13 429:13
  430:7,16,19 431:4
  434:1,25 443:17
  459:17 461:6
  470:13 473:15
**employees** 359:16
  376:10 383:12,15
  393:18 412:11
  418:20 421:17
  423:21 440:7
  459:8,9,17,24
  460:18
**employment** 425:20
**encased** 434:7
**encounter** 419:2
  420:1
**encounters** 417:12
**encourage** 457:16
  458:1
**ended** 340:21

341:11
**ends** 330:7
**enjoy** 338:2
**enjoyed** 471:25
**entire** 342:2 347:7
  371:10 395:4
  452:24
**entirely** 441:19
**entirety** 397:4
**entitled** 375:13
  399:15
**envelope** 431:3
**environment** 382:22
  383:16
**especially** 353:20
  383:4 408:3
  459:18
**establish** 340:25
  387:1 410:15
  444:19
**established** 336:1
**event** 343:13 345:20
**events** 457:15
**evidence** 326:22
  349:8 413:16
  416:6
**evil** 394:7,16
**exact** 371:13 443:12
  448:15 461:6
**exactly** 343:1 350:25
  365:18
**examination** 321:7
  321:10,13,18
  324:3 360:10
  408:14 411:15
  425:9 447:10
**example** 409:13
**Examples** 379:3
**excerpt** 459:6,7
**exclusive** 349:9
**Excuse** 440:17
**execute** 383:2,4
**execution** 381:17
  408:24 409:10,13
**executive** 349:12
  409:21 414:8
  452:24
**exercised** 324:23
**exercising** 325:4
**exhibit** 326:21 330:5
  333:6,19,23
  334:16 335:2,11
  335:18 337:1,9,15
  340:23,24 341:1
  341:12 349:4,5
  354:18,19 356:18

356:18,20 357:18
360:11 375:23,24
376:4 378:25
379:16 382:1
385:17 387:20
388:1 389:9 390:6
391:5,6,12 392:5
392:11 393:2,20
397:4 398:6,7
400:5 408:17
412:20 415:5
416:11 426:18,22
426:23 427:2,16
429:18 431:18
432:12 438:14,17
442:19 450:16
453:10 458:25
459:1 462:10
**Exhibits** 322:1,7,15
**exists** 439:4
**Exp** 473:21
**expectations** 445:2
  447:18
**expected** 375:9
  376:13 386:2
  387:16 444:1,6,21
  444:22
**expenses** 365:16
**experience** 337:21
  451:13
**explain** 353:4
  447:25
**explaining** 342:24
  343:1
**explanation** 430:13
**explore** 462:24
**express** 369:21
**externally** 376:13
**extra** 461:5
**extremely** 452:9
**e-mail** 322:10
  374:11,21 388:7
  394:12 395:7
  412:22 413:2,16
  414:4 415:21
  416:1 419:8
  420:22 428:14
  430:20
**e-mailed** 350:4
**e-mails** 388:8 394:22
  394:23

———————
**F**
———————
**face** 340:19 414:23
**Facebook** 322:9,13
  326:15 330:22

331:14 334:2,22
335:7,15,19,22
336:10,16 344:10
344:15 348:13
352:25 356:18
360:21 361:1,3,10
361:18 362:1,15
366:3,9,17,20,23
366:25 369:20
374:3 379:18
381:18 384:10
387:22 388:4,19
389:10,17,18
390:2,5,18 392:2
393:18,22 395:6
396:12 414:15
415:8,19 416:22
429:23 430:17
431:22 434:21
468:25
**fact** 326:8,9,12,14
  327:7 329:6,12,13
  330:20 332:20
  333:8 343:4
  344:22 346:2
  349:11,23 350:12
  350:15,20,24
  351:3,5,12,13
  352:8,24 353:8
  359:9 364:4 368:8
  396:14 401:14
  404:14 406:16
  408:7 414:5
  423:16 434:4
  454:8 460:3,25
  462:20
**factored** 460:12
**facts** 351:2 431:12
**fair** 373:16 397:6
  400:11,14,14
  420:16 427:19
  428:22 433:13
  444:25
**familiar** 378:19
  406:22 437:16
  455:4 459:3,5
**family** 339:4
**fans** 457:18
**far** 396:18 441:15
  470:8
**fax** 473:25
**February** 359:9
  445:1 450:9 451:1
**feel** 372:8 382:23
  400:10 407:9

Charlene Carter - Vol. 2

December 8, 2017

6

419:20,23 420:7
438:5
**feelings** 339:21
344:21 351:20
381:6 448:24
449:10 452:18
**feet** 432:18 434:8
**fellow** 360:12 363:8
413:3 429:12
**felt** 346:17,18
352:17,23 397:17
401:23 402:6
403:6 431:13,16
437:8 440:1
458:21
**female** 436:23,24
**fide** 364:19
**fifth** 334:16
**fight** 395:25 457:19
**figure** 399:1 439:20
**figuring** 401:8
**file** 405:2,9 454:14
**filed** 381:9,11 423:1
423:5,21 424:2
453:7,16 463:14
463:20 465:23
467:6 470:9
**filing** 449:14 470:6
**final** 407:19 468:23
**financially** 473:16
**find** 330:23,24 361:7
362:4,14 417:5
456:6,7
**finding** 326:8,9,12
326:14 327:7
329:6,12,14
330:20 332:21
333:8 350:15,21
350:24 351:3,5
353:8 359:9 363:7
396:14 454:8
**findings** 423:16
**fine** 341:8 362:18
375:16 397:8,13
406:10 409:7,7
465:4
**finish** 365:13 468:12
**fired** 463:1,5
**Firm** 473:22
**firmer** 450:24
**first** 325:7 330:21
334:23 335:8,23
340:23,24,25
341:14 354:18
371:13 373:22
390:6 403:19

404:20 417:19
419:7 426:20
452:2 455:15
459:13,25 467:15
**fishing** 465:6
**fit** 404:21
**five** 446:4
**flash** 322:11 416:7
**flew** 443:21
**flies** 387:16 440:15
443:23 444:2
**flight** 324:11,14
328:8,22 341:20
343:10 345:12
346:16 352:19
365:17 366:1,11
366:19,21 371:25
382:16 383:13
384:5 386:17
393:14 397:23
401:25 403:25
404:16 411:22
412:17 413:3,8
425:15,16,19,24
425:24 426:8,14
427:21 434:3
435:7 439:5
440:23 441:6
443:6 445:9,14
447:21 448:25
451:6 452:11
456:18 457:6,13
458:1,5,16,17
469:22 470:5,8,18
**flights** 328:15
456:15 457:9,21
**flown** 443:19
**fly** 325:15,20 376:2
386:3,14 442:13
443:5,22 444:4,7,8
444:11 447:17
450:12,17
**flying** 352:15
**Focus** 459:25 460:16
**focused** 448:5
452:14
**follow** 326:24 407:3
**following** 459:23
**follows** 324:2 411:14
425:8 447:9
**follow-up** 400:2
436:16
**font** 356:9,12,23
357:5,12
**food** 368:5,9
**foregoing** 473:5,12

**forever** 437:8
**form** 326:16 466:13
**format** 430:20
471:14
**former** 448:16
**forth** 325:12 329:2
473:6
**forward** 425:25
454:1
**forwarding** 379:9
**found** 338:1 339:15
339:19 341:13
343:3,5 344:20
363:11 433:24
434:8
**FOUNDATION**
320:14
**four** 327:13,14
330:9 351:7 423:6
**fourth** 334:5 379:8
379:22
**frame** 440:22 445:7
**framed** 460:5
**framework** 451:17
**Francisco** 320:9
**freaked** 419:21
**freaky** 415:22
**free** 367:21 368:1
383:16,17,18
**freedom** 457:14
**FREEWAY** 319:21
**fresh** 360:2
**Friday** 323:6 365:3
471:20
**friendly** 378:4
**friends** 343:20
352:15 389:23,23
389:24 390:25
393:17 439:16,18
**frightened** 382:23
**front** 367:14 432:17
**full** 332:21 333:11
334:7 336:7
342:12 359:24
403:2 407:18
410:15,25 424:20
457:18
**fully** 465:1
**fun** 347:11,22 427:4
**funding** 390:13
**funny** 386:10
**further** 408:9
410:18 424:6,8
436:6 446:9
447:25 462:1
465:23 470:22

471:5,8,24 472:3,6
473:14
**future** 359:15

─────────────
**G**
─────────────
**G** 323:1
**Gary** 461:8
**Gehrke** 320:7 321:8
321:11,14,18
336:25 349:5
356:4 357:1,7
360:8 362:21
363:3,6 372:3
373:10,16,17
376:6,8 378:2,17
378:18 381:2,7
382:6 383:10
385:2,7 386:25
389:13,14 391:7
391:10,14,24
396:6,9 397:6,10
397:15 398:5,8,21
398:25 399:4,11
399:16 400:1
404:10 405:20
406:5,11,21 408:9
410:20 413:19,24
416:12,18,20
417:1 418:23
420:11 424:6
426:19 428:1
429:9,19 433:9,13
436:8,10,12
441:22,23 446:9
447:1,11 458:24
459:2 462:1,16
464:13,17,22
468:5 470:23
471:21 472:6
**general** 320:21,23
328:20 347:16
383:23 395:15
419:9
**generally** 421:12
422:3 443:4,10
455:16
**gentleman** 431:25
455:4
**getting** 355:10 378:9
392:21 400:20
450:22 457:25
**give** 323:19 325:11
343:25 372:24
399:24 400:7,13
411:9 425:1
433:11 457:13

461:4
**giveaways** 324:25
325:1,5
**given** 341:22 369:17
377:8 407:21
452:7
**giving** 325:25
**go** 322:3 323:4
330:12,24 332:25
333:10 334:6
339:19,20 340:2
340:15,18 341:18
341:24 343:11
344:3,23 345:11
345:20 346:10
347:10 351:3
360:4 362:20
364:8 367:5,16
369:11 370:7
379:23 386:1,15
386:18,21,24
401:23 404:14
405:7,10 414:16
415:9 420:6
429:17 431:20
436:6 437:19
440:5 441:18
446:13 454:13
455:13,25 464:17
465:8 467:15
471:2 472:4
**God** 339:3 392:10
**goes** 329:19 355:7
399:3 405:4
**going** 325:17,22
330:4,11 331:4
333:5,13,16,18
334:15 336:25
340:11,23 341:16
345:11 348:15
349:3 351:16
352:6 353:12
355:13 362:24
372:17 378:5
380:19 382:4
385:2 386:17,23
389:5 393:14
394:15 396:17,18
397:1 405:14,21
407:5 410:11
414:6,17,21
415:12 416:2
419:19,23 425:22
426:16,17,21
428:1 431:19
432:12 442:12

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 664 of 676   PageID 5775
Charlene Carter - Vol. 2                                      December 8, 2017

7

443:11 446:17
  450:7 456:16,20
  457:1 462:16
  464:13,23 468:7
**golden** 406:22,25
  407:3
**good** 342:6 354:15
  362:19 371:10
  386:2 398:3
  407:15 408:2
  472:1
**Google** 390:3
**gotten** 357:9 366:12
**graffiti** 379:10
**grapevine** 435:13
**graphic** 357:24
  388:20,25 389:4,5
  390:13,17 392:1,6
**gray** 356:8
**grayed-out** 394:1
**great** 326:6
**greatly** 450:13
**Greg** 409:19
**Gregory** 463:21
**grew** 346:6
**grievance** 329:19
  349:15 405:13,19
**grievant** 320:12,18
  323:14
**Grievant's** 321:5
  322:7 337:15
  412:20 416:11
  427:2 431:18
**grieved** 329:13,17
**group** 339:18
  384:10 386:20
  438:24 439:6,8,8
  439:11
**grouping** 439:4
**groups** 354:9 414:14
**grown** 345:21
**guarantee** 380:10,15
**guess** 351:4 362:24
  416:8,12 429:15
  453:23
**guessing** 452:25
**guideline** 463:7
**guidelines** 383:12
  459:8,15,16 460:8
  460:8
**guilty** 350:1
**gun** 427:13,22
**guy** 462:25 463:4
**guys** 356:5

──────── **H** ────────

**hadn't** 357:9
**half** 328:25 454:12
**halfway** 325:21
**hand** 321:12 323:17
  411:7 424:22,24
  425:6,11 436:11
  441:24 455:5,7
  456:1,6 466:19
  473:17
**handbook** 459:7,14
**handed** 334:9 335:4
  336:8 341:1
  412:21
**handing** 335:2,18
**Hang** 365:13
**happened** 359:8
  371:15 403:24
  404:15 408:7
  417:5 452:5 457:8
  463:3
**happening** 338:23
**happens** 336:22
**happy** 378:1
**harassing** 382:14
  401:25 402:3
  412:12,15 431:14
**harassment** 378:20
  379:21 380:23
  381:9,12 383:17
  383:20 384:8
  385:11 401:20
  408:18 423:2,23
  426:5 451:16
  452:13 454:4
**hard** 342:10 357:12
  362:21
**harm** 413:6
**hashtag** 357:13
**hat** 343:17
**hats** 339:11 343:16
  347:22 376:24
  377:18 380:21,22
  407:7
**haven't** 367:3,6
  435:10,10 446:3
**HAYDEL** 320:7
**hazing** 385:12
  401:21 426:6
  451:16
**head** 359:6 465:25
**headdress** 374:4
  379:17
**Headed** 327:19,20
**hear** 364:13 368:7
  373:7 396:8 401:2
  401:5 409:13

**435:15 446:17
  457:8 465:3
**heard** 349:15 359:10
  364:11 368:20
  373:4 396:7
  415:24,25 416:4
  435:12 454:2
**hearing** 329:20,25
  351:17 400:12,14
  453:11
**heart** 338:8
**heck** 328:25
**held** 418:15
**Hello** 411:18 436:11
**help** 327:18 363:12
  392:10 403:24
  408:1
**helped** 350:13
  450:13 468:9
**helps** 406:2 468:10
**Herb** 406:24
**Hereto** 322:15
**here's** 361:25 391:9
  462:25
**hey** 328:21 414:15
**he'd** 420:2
**he's** 382:22 384:14
  410:11 413:8,13
  414:5 418:5
  419:14 421:19
  434:4 435:8,15
  467:9
**Hi** 411:17
**high** 372:9
**highlighted** 332:11
  332:12 352:10
**highlighting** 332:5,8
  332:14
**Hillary** 394:3,8,8,11
  394:19
**hired** 324:8,9
**history** 406:16
  407:21 423:8
**hit** 420:3
**Hmmm** 393:4
**Hofer** 409:19 446:19
  463:21
**Hoffucker** 409:12
  409:16
**Holcomb** 430:11
  432:4,25 435:7
  438:15 445:20,24
  446:3 455:12
  456:2,8,13 466:19
**Holcomb's** 434:10
  434:20 436:5

**hold** 324:13 326:6
  428:17 431:19
  432:12,20 450:24
  462:19
**holding** 427:8
**Holly** 409:6,7
  437:14
**home** 325:14 326:5
**homeschool** 325:18
**honest** 353:13,14
  386:18 398:12
**honestly** 350:25
  398:1
**honor** 457:21
**hood** 414:23
**hope** 354:7 377:21
**hopefully** 403:24
**hoping** 349:24
**hos** 383:17
**hosted** 364:21
**hostile** 379:5 382:22
  383:18
**hotel** 420:6
**hours** 325:15 326:5
**huge** 457:24
**hundred** 466:12
**hundreds** 468:15
**hurt** 346:22,23
  402:10 408:5
**hurting** 402:18,19
**H-A-N-D** 424:22
**H-O-F-E-R** 463:21

──────── **I** ────────

**idea** 339:14 437:12
  441:10
**identifies** 434:1
**identify** 327:24
  328:7,18 356:4
  415:6
**identifying** 361:2
**illegally** 371:14
**Imamovic** 437:15
**immediately** 356:11
  383:21
**impeach** 396:20
**imposed** 421:17
  423:19
**inappropriate**
  397:18 452:10
  455:10
**inauguration** 327:21
  336:2,13 339:8,9
  398:11,18
**incident** 422:16,17
  470:13

**incidents** 422:24
**include** 451:10
**includes** 331:16
**including** 359:9,16
  379:11 384:2
  446:19
**increase** 448:4
**increased** 450:3
**indicated** 471:11
**indicates** 463:1
**individual** 346:19
**infer** 449:10
**inflight** 322:3
  412:25 425:22,23
  448:5 450:10
**Info** 322:3
**inform** 348:21
**information** 366:12
**informed** 329:14
  353:8
**initial** 437:6 438:23
**initiate** 449:20
**initiated** 440:10
**initiative** 397:21
  456:25
**injured** 325:16
  443:14
**Instagram** 415:19
  416:17,22
**instance** 369:12
  457:17 458:4
**intent** 346:22,23
  413:5
**intention** 354:2
**interactions** 406:19
**interested** 473:16
**internal** 448:13
**international** 340:15
  364:13 394:22
  414:12
**interpret** 397:14
**interrupt** 440:4
**interrupting** 342:20
**intimidated** 382:23
**intimidating** 379:5
  383:18
**intimidation** 383:20
**intra-Union** 446:1
**investigate** 401:18
  423:11 441:7
  456:10
**investigated** 383:24
  466:22
**investigating** 401:8
  460:9
**investigation** 352:6

353:12 360:11
421:8,16 433:5
453:24 454:8
458:12 460:13,21
461:2 462:11
463:16,25 464:3
466:25 467:3
470:13
**investigations**
421:11 449:20
451:5 455:24
**invited** 378:3 417:16
**involved** 400:20
447:20 451:5
453:23,23 463:24
470:12,16,17,20
**involvement** 381:19
454:7,10,14
**involving** 455:10,11
456:1 470:19
**in-house** 459:19
**Ireland** 320:24
342:8,13,14,17,19
**irrelevant** 399:11
**isn't** 370:20,22
371:3 375:14
432:24 468:4
**issue** 359:20 372:7
377:3 399:14
445:10,18 460:1
460:17,22 461:15
461:22 469:1
**issued** 422:2 440:14
442:14 443:6,24
444:25 445:15
447:16 455:2
**issues** 325:17 345:14
354:4 440:24
446:6 447:21
448:21 460:9
**issuing** 452:1
**itemize** 367:12
368:21
**itemized** 366:8
**it'll** 417:2 429:17
433:10
**it's** 323:5,6,6 325:10
326:7 331:4 332:4
334:17 336:12,18
336:19 337:3
340:15,16,23,24
343:25 344:1,2
348:1,2 353:4
354:1,11,11,12,13
356:8,22 357:11
357:12,17,17

360:5 362:19,21
362:22 364:6
366:12 371:2,15
372:6,23 377:10
385:5 386:10,14
386:15 389:7,9
391:1 396:25
397:9 399:7,9,15
403:15 404:6
409:16 411:1,6
412:13 415:8
416:6 418:16,19
422:3,4 423:7,9
424:21 427:12
428:2 429:13
437:6 441:2,12,16
441:19 447:16,24
451:20 453:11
459:15 460:3,19
465:1,11,12 468:2
468:3,6 471:11
**I'd** 326:22 327:12
362:7 388:7
413:15 416:5
454:11,12,13
467:19
**I'll** 326:24 387:15
399:14 416:3
421:5 428:1,17
429:7,18 442:25
462:23 468:12
**I'm** 323:16 325:12
325:22 330:4
333:5,16,18
334:15,18,25
335:1,2,18 337:12
338:7 339:2
340:14,23 342:14
343:19 347:8,9
349:3 351:15
353:1 355:10,13
355:19 357:3,17
357:24 359:7,23
362:24 363:3
365:24 373:8,12
375:2 376:4,7
378:7 380:6 381:5
385:2 386:17
387:1 389:5
391:15,22 394:15
395:25,25 396:3,4
396:17 399:2,3
402:11,25 403:15
403:17 405:21
408:11,12 411:22
414:15 416:12

417:8 425:15
426:16 427:8
428:1 431:19
432:12 435:24
436:12 437:2,23
439:20 440:3
444:5,15 445:11
452:25 462:16
464:13,17 465:6,9
465:9 467:14
**I've** 324:7 325:11,16
328:11 341:1
342:16 350:7,8
364:1,3 371:9
395:17,22 401:13
402:8 404:21
417:11 423:16,20
452:2 471:24

**—— J ——**

**Jackson** 321:9 366:4
411:1,2,13 420:12
452:16
**Jackson's** 366:10,23
**January** 327:21
334:14 336:11
471:20
**jdj@nrtw.org**
320:16
**Jeanna** 321:9 366:4
411:1,13,17
452:16
**JEFF** 320:13
**Jennings** 320:13
321:10 411:16
413:15 414:2
415:4 416:5 417:4
419:1 420:9 424:9
426:24
**job** 400:7 435:22
443:14
**jobs** 354:11
**John** 365:21 366:7
367:6
**joined** 342:6
**joint** 375:23 376:4
378:25 450:11
**Julie** 412:22,23
415:10,25
**June** 334:3 418:10
422:7
**justification** 372:4,9
**J-E-A-N-N-A** 411:2

**—— K ——**

**K** 320:8
**KAREN** 473:3,21
**keep** 340:11 373:14
375:19 396:18
429:3 455:23
**Kelleher** 406:24
**Kelly** 461:8
**Kent** 321:12 424:21
425:6 455:5
466:19
**kept** 422:3,4 460:6
**keyword** 412:16
**kids** 390:25
**killed** 383:3
**kind** 328:3,5 348:18
360:17 361:6
368:22 369:20,21
370:22 372:4,17
374:17 381:2
394:1 395:10,14
398:17 400:24
402:7,11 406:4,16
419:21 420:2
422:10 438:4
445:19 448:22
450:19 451:16
**King** 343:25
**King's** 344:1
**knew** 454:5,5 465:13
**knitting** 343:15
**know** 324:25 325:14
326:4 328:14
329:3 330:6 332:8
336:12 338:24
340:14,14 341:6
343:16,16 345:18
345:19,21 346:18
347:25 349:25
351:12 356:1
357:12 358:7
362:9 364:2
365:11,15 366:13
366:15 368:20
372:18,24,25
375:20 380:19,19
381:14 382:3
384:15 386:9,16
386:20 390:21
393:3 395:17
396:2,2,7 397:20
398:1,2 401:10,10
401:11,14 402:8
403:18 405:23,23
406:1,15 407:25
409:15,17 417:7
420:2,2,7 421:11

422:1,14 423:18
429:25 433:17
435:8 437:6 439:3
439:7,9,17 441:12
441:13 442:19
443:11,11 445:16
446:17 449:3
450:12 451:2
452:12 456:24
457:13,20 458:10
460:19 461:10
463:5 466:9
467:19,24 468:6
468:14,16 469:21
470:5,8,10
**knowing** 344:11
**knowledge** 367:2
456:9
**known** 338:24
418:21

**—— L ——**

**L** 320:13,22 473:3
473:21
**labor** 320:20 370:10
412:23 463:4
470:15
**ladies** 337:25 348:1
**lady** 337:24 342:12
373:14 405:13
410:25
**lanyard** 329:2
**laptop** 435:3 439:22
**larger** 356:9 459:6
**Las** 413:5,9
**last-chance** 406:3
**Lauren** 320:21
**law** 373:1
**leader** 345:5,7
383:23 393:16
408:2 459:22
460:4
**leaders** 459:15,18,20
460:2
**leadership** 337:18
368:23 370:22
420:14,17,19
438:1 448:14,21
448:25 449:5,11
449:14 452:19,22
459:19
**leading** 452:23
**leads** 421:19
**learn** 366:22
**learned** 339:23
**leave** 388:9,16

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 666 of 676   PageID 5777
Charlene Carter - Vol. 2                                    December 8, 2017

9

443:14 444:3
**left** 365:3 367:19
  372:13 388:14
  422:21
**LEGAL** 320:14
**legible** 332:21
**Lemons** 320:3 411:4
**lengthen** 468:10
**letter** 329:14 405:1,9
  406:3 409:25
  415:23 428:15
  430:12,14 431:2,7
  431:11 434:24
  435:2
**letters** 439:23
**let's** 330:12 331:6
  337:5 360:1 373:9
  377:11 378:16
  381:8,25 383:6
  390:22 426:21
  432:21 453:19
  467:15 471:2
**level** 372:9 449:25
  451:17 455:1
  470:18
**life** 344:2 346:4,5
  389:7 406:16
**light** 359:8 412:8
  430:4
**lighted** 456:19
**lighting** 353:4 457:1
  457:7 458:5,13
**lights** 352:13,22
  353:3 397:17,22
  469:23
**liked** 450:25
**limited** 389:23
**limiting** 402:25
**line** 372:1,18 375:16
  380:23 400:22
  431:22 432:8
  438:15 451:3
**lines** 357:23 358:5
**link** 415:6,8
**list** 336:21 365:18
  366:7,20
**listed** 353:5 365:19
**listen** 375:4 383:6
**listening** 424:15
**little** 326:3 330:15
  332:14 361:14
  378:9 381:6
  392:25 393:4
  394:16 403:4
  428:4 440:17
**live** 335:2 362:10

372:19
**livelihood** 354:16
**livelihoods** 354:12
  402:19
**local** 320:25 340:17
  350:9 366:18
  369:25,25 370:1,2
  436:3 448:13
**locked** 428:17
**lodging** 365:7 368:5
  368:11
**log** 455:16
**logistically** 440:18
**long** 324:5 362:4
  367:7 411:23
  425:16 436:22
  437:1,3 440:18
**longer** 369:5,8,11
  371:2 435:23
  436:1,1 439:4,24
**look** 326:20,23
  328:11 330:15
  352:3 362:7,16
  375:23 376:9
  379:1,2,15 381:22
  381:25 389:8
  390:22 391:12
  392:11 408:16,18
  409:3 416:3
  438:14 453:10,13
  454:13 455:13,25
  467:19 471:19
**looked** 367:3 462:10
**looking** 327:22
  333:22 349:25
  354:18 366:23
  460:22
**looks** 328:4,21
  389:21 394:2
  432:16 433:19,19
  438:22
**Los** 425:22
**lose** 435:22
**lost** 430:15
**lot** 326:7 338:7
  343:25 363:15
  368:22 371:20
  406:17 413:14
  415:20 423:7
  439:5 440:22
  445:8,12 448:13
  448:20 457:14
  461:9 463:3
**love** 354:3,5 402:13
  407:14
**Luther** 344:1

**Luv** 366:3
_____
**M**
**mad** 373:8
**mail** 388:10,15,16
  428:16,23 430:21
  430:23,24 471:16
**mailbox** 388:10
**mailed** 428:11
**mails** 434:25
**main** 325:20 337:23
  345:22,23 346:12
  348:18,23 361:11
**maintain** 398:16
**maintaining** 383:16
**making** 338:19
  347:22,22 381:6
  456:18
**male** 413:8 436:23
**management** 329:6
  426:10 427:20
  428:3 459:21
**manager** 320:20
  353:14,15 407:24
  412:25
**managers** 413:1
**mandatory** 386:14
**manner** 359:23,23
  461:21
**march** 335:24
  337:18,23 338:1,2
  339:10,13,15,19
  339:20 340:18
  341:14,18,25
  343:4,11,13
  344:11,21 345:9
  345:22,24 346:10
  347:1,7,9,11,21,23
  349:10,12 350:13
  352:25 354:14
  363:11 364:23
  365:1,5,19 367:12
  367:17,22,25
  370:8 373:7
  377:16,19 378:5
  379:24 380:3,9,15
  380:17 391:19
  393:15 397:22
  406:18 407:5
  456:16,19,20
  457:2 458:6
**marched** 393:9
**marchers** 347:15
**marching** 393:7
  407:8
**mark** 336:25 337:2

337:3 398:5
  458:24
**marked** 336:24
  337:15 357:17
  398:7 412:20
  413:17 416:11
  427:2 431:18
  459:1
**MARKET** 319:20
**married** 325:9
  457:25
**Martin** 344:1
  371:15
**mask** 414:22
**material** 348:25
**materials** 395:15
  400:5
**matter** 319:7 346:2
  349:11 376:20,21
  408:7
**matters** 396:21
  469:16
**Maureen** 321:17
  447:2,8
**ma'am** 424:10
**meal** 368:10,15,16
  368:13
**meals** 368:13
**mean** 324:25 329:3
  330:16 339:6
  344:12 372:3,6
  385:25 386:21
  394:14 405:6
  416:13 419:14
  440:3 462:25
  464:5
**meaning** 347:12
**means** 347:19 407:1
**meant** 350:12
**media** 338:21
  369:21 372:14
  379:10 382:14
  384:10,17 385:11
  398:15 401:21
  404:4 409:1,4
  410:1,2 412:2
  413:10 423:2,10
  423:22 426:3
  437:7 440:7,15,23
  441:2 442:5,7,14
  443:7,8 444:13,13
  445:1,8,13,21
  447:14,17,21
  448:2,7,9,22 449:1
  449:6 450:4
  451:11,15,23
  452:15 454:4

455:10
**medical** 443:13
  444:3
**meet** 414:6,21
  436:14,15
**meeting** 330:20
  341:25 350:24
  351:3 352:1,2
  353:16 364:12
  367:17 368:10,17
  368:18 369:13
  396:14,15 400:4
  402:24 414:19
  417:15
**meetings** 369:9,12
  371:11
**Melissa** 320:19
**member** 329:5
  370:12 371:10
  381:21 435:18
  438:12 439:6,11
**members** 337:18
  347:12 360:13
  364:8 367:21,25
  368:8 370:20
  371:20 395:12
  414:8
**membership** 341:15
  347:7 395:4
  448:18
**memo** 398:10
**memos** 442:13 444:7
**men** 353:2
**mention** 412:11
**mess** 471:16
**message** 382:17
  392:18 394:3,10
  395:2,9,16
**messaged** 381:18
**messages** 355:9
  356:17 372:25
  374:2 378:3 379:9
  387:21 388:1,5
  390:20 391:17
  393:21 396:11
  460:14 461:13,24
  468:24 469:10
**Messenger** 374:3
  379:18 387:23
  388:4 393:22
  395:6 396:12
  469:1
**met** 423:9
**mgehrke@polsine...**
  320:10
**Michele** 320:7

Case 3:17-cv-02278-X    Document 183-1    Filed 09/09/21    Page 667 of 676    PageID 5778
Charlene Carter - Vol. 2                                                December 8, 2017

10

436:11
**microscope** 448:17
**middle** 328:5
**Mike** 385:6 399:18
    402:15,22 407:14
    407:25 416:1
    421:5
**Milton** 320:13
    403:16
**mind** 365:14 398:25
    400:25 404:13
**mine** 326:25 355:1
    355:12,14,25
    356:21 394:20
    465:11
**minute** 328:21 340:3
**minutes** 462:7
**misconstrued** 412:9
**misinformation**
    412:14
**mission** 373:20
    374:5,15
**mistake** 350:2
    351:10 359:21
    402:12 403:2
**mistakes** 406:15
    407:16
**Mitt** 427:14,22
    429:11
**mlc@nrtw.org**
    320:16
**mobile** 379:12
**moment** 380:18
    462:4
**money** 339:23 343:6
    344:23 346:9,14
    350:10 354:8
    363:12 365:11,15
    367:3 368:24
    370:6,17,20
    372:15,23 378:6
**month** 340:16 418:7
    418:9 419:9
    468:21
**months** 324:22
    405:8,11,11
    467:18 468:4
**mood** 353:4
**morally** 396:10
**MORRIS** 320:8
**motivation** 342:23
    462:22
**motivator** 445:17
**move** 336:23 373:9
    377:13 378:16
    387:15 396:6

413:16 427:24
429:7 433:7
**movement** 437:21
**multiple** 326:15
**murder** 390:14
    392:9
**Myers** 320:22

_____
            **N**
**N** 320:1 321:1 323:1
**name** 331:8 342:12
    342:13 357:19
    365:24 382:15
    394:24,25 410:25
    414:24 415:1
    424:20 432:5
    455:5
**named** 413:4
**nametag** 360:13
**name's** 411:4 436:11
**narrative** 362:19
**narrowest** 433:10
**Nathaniel** 473:23
**national** 320:14
    457:23
**nature** 431:10,14
    452:8
**near** 453:12
**nearly** 448:7
**necessarily** 421:15
    461:1
**necessary** 343:11
    401:23 414:10
    446:19
**neck** 328:4
**need** 330:6 336:6
    340:12 343:22
    359:4,22 375:19
    377:4 409:10
    427:5 431:23
    438:6 442:16
    447:20 463:5
    465:3,15 471:7
**needed** 346:17 402:7
    437:9
**needs** 392:8 428:4
    460:10
**negative** 412:8,9,12
**negotiator** 435:12
    435:14
**neighbor** 326:2
**neutrality** 398:17
**Nevarez** 417:17
**never** 331:23 338:25
    341:15 352:7
    353:23 373:22

374:7 380:7 388:7
397:1 398:25
400:21 401:4
402:19 403:23
404:21 409:13
415:10,24,25
420:7 422:13
439:6
**new** 439:22
**news** 422:1
**Nice** 436:14,15
**niece** 344:1
**nod** 359:6
**non-referral** 468:7
**non-rev** 328:15
**North** 319:21 320:4
**notes** 467:12 473:13
**notice** 329:7
**not-so-nice** 380:13
**not-without-prece...**
    465:2
**November** 414:9
    426:1
**number** 333:14
    334:5 337:1
    460:15
**numbered** 393:23
**numbers** 367:9
    448:3

_____
            **O**
**O** 323:1
**oath** 377:22 401:2,3
**object** 396:17
    405:21 462:16
    464:13
**objecting** 398:24
    399:3
**objection** 377:7
    413:23 416:25
    464:22 465:17
**objectionable**
    433:25 434:8
**objections** 429:10
    473:8
**objector** 340:14
    368:24 369:4
    371:1 437:17,24
    439:15,18
**observe** 417:23
**obtained** 387:8
**obviously** 377:3
    387:3 405:4
**occasionally** 457:13
**occurred** 350:15
    401:9

**occurrence** 383:19
    383:19
**occurring** 365:1
**October** 417:14
    418:2 419:13
    422:18 429:13
    436:18 442:22
    443:6 444:11
    453:19 462:8
    463:11
**offended** 379:25
    407:22
**offense** 452:2,3
**offensive** 379:4
**offer** 403:8,9,11
    446:15 471:6
**office** 350:5 364:13
    367:5 370:23,25
    383:23 388:11
    413:14 417:14
    419:11 422:19,21
    422:22 450:6
    473:18
**officer** 435:23 436:2
**officers** 359:17
    413:13
**official** 364:19
    369:17
**oftentimes** 457:24
**Oh** 356:7 357:3
    384:14 391:9
    392:16 417:22
    418:5 423:16
    424:4
**okay** 324:9,21 326:8
    326:14,20,25
    327:7 328:1,7
    329:22 330:4
    331:1,6,16 332:5
    332:10,17 333:16
    333:17,21 334:4,9
    334:12,15,22,25
    335:7,10,17,25
    336:5,12,15
    337:11 340:11
    341:8 344:16
    348:9,10 349:3,20
    354:1,1,22,25
    355:24 356:1,3
    358:2 360:20
    361:21 362:4,18
    362:20 363:5
    366:5,22 367:1
    368:13,19,22
    369:4 370:1
    371:19,21,22

373:10,16,25
374:12,19,22
375:2,3,4,5,18,21
375:22 376:9,23
377:12,25 378:11
379:15 380:11
382:3,7,10,13
383:8,9 384:3
385:5 386:2,8
387:1,7,15 389:8
389:21 390:1,5,12
390:16,19 391:25
392:17 393:12
394:1,6 398:3,5,16
400:15 401:16
402:7 403:13
404:19,23 405:20
406:8,25 407:3
408:22 409:22
410:8,10,13,20
413:15,21 415:12
415:14 416:5
418:1,24 419:14
421:6,11,15
422:23 423:21
424:2,18 425:14
425:16,19,23
426:2,5,8,12,16,17
426:25 427:8,11
427:15,19 428:6
428:12,14,22
429:2,5,9,22,25
430:10,20 431:1,6
431:10,15,19,25
432:7,15,19,24
433:3,7,21,23
434:9,23 435:5,21
436:4,8,13,25
437:16,25 438:14
438:16,22 439:2,7
439:10 440:17,21
441:5,21 442:7,12
442:18,25 443:1
443:16 444:1,10
444:16,25 445:6
445:19 446:5,20
447:1,16 449:12
451:10 453:2,7
454:2,10 455:1,25
456:24 457:5
459:11 462:15
463:18,23 464:2,5
464:8,17 465:19
465:21 466:9,18
467:5,12 468:3,23
469:15 470:5

471:23
**old** 327:11 329:10
338:12,13 361:8
429:13 435:3
**once** 384:17 387:5
401:18 425:23
434:7 437:7
**ones** 330:18 344:2
362:7,9 366:14
407:8
**one's** 379:12
**online** 344:5 379:11
385:23 435:13
**oOo** 472:14
**open** 373:3 384:11
389:22 390:2
**operations** 450:10
**opinion** 370:8,16
398:20
**opinions** 356:23
357:6 393:3
394:19
**opportunity** 367:13
400:11 472:1
**opt** 369:2 371:5,7,8
372:11
**opted** 350:7 369:15
370:13 409:20
437:17
**opter-outers** 381:16
**option** 385:25
**order** 333:18 336:24
361:7 364:7
**organization** 340:1
340:3,4 376:12
**organizations**
343:20,22,24
**organize** 362:11
**organized** 346:13
362:12
**original** 330:18
355:7 436:18
**Originally** 366:15
**ousted** 448:18
**outcome** 421:16
**outfits** 339:11
**outside** 436:12
**overturned** 371:12
**O'Grady** 412:22
415:10 420:22

**P**

**P** 320:1,1 323:1
**packet** 393:21 400:4
426:19 453:14
**page** 321:2 322:2,8

326:23 330:6,11
330:22 331:14
333:13 344:15,17
348:8,13 349:4,7
349:12,12 352:12
353:1 355:19
356:19,23 357:5
357:17,18 360:21
361:1,3,11,18
362:15 366:3,9,20
379:16 381:18
382:3,5 389:16,17
389:22 390:2,5,18
392:5,11 393:2,22
394:13 408:16,24
409:3,5 410:2
416:22 426:20
429:23 430:1,17
432:13 434:2
438:19 453:13
**pages** 340:23,25
341:1,12 353:5
366:19 415:3
433:8
**paid** 339:19,20
342:1 344:20
346:14 366:13
367:22 368:2,3,4,5
368:9,11 371:11
380:19
**paint** 414:23
**paragraph** 376:10
379:3
**Paralegal** 320:21
**Parenthood** 337:22
338:16 340:5,8
348:17,22 349:9
349:13 407:8
**Parker** 405:12,17
**Parrott** 365:21,22
366:7 367:7,10
**part** 323:11 326:14
350:3,9 355:11
363:8 365:22
369:16 396:21,24
405:13 443:2
456:21 462:9
463:16
**participating** 418:3
**particular** 380:18
394:10 398:1
403:17 420:24
457:18
**particularly** 379:21
407:21
**parties** 418:21

471:11 473:15
**party** 418:10,13,15
418:18,19 422:7
422:11 429:11
439:16
**pass** 426:25 431:20
**passenger** 430:19
431:14 432:17
433:17,18 434:5
**passengers** 352:16
352:23
**passing** 366:14
419:4 422:8,9
**passionate** 359:19
**Patricia** 320:24
342:13
**pattern** 325:24
**pay** 340:18 350:9,13
363:12 364:7,20
365:16 368:15,16
370:1 372:21,22
375:1
**paying** 365:6
**PDF** 471:14
**peel** 432:18 434:7
**pending** 395:24
**people** 327:4 328:9
328:25 339:11
350:6,17 351:1
353:15 366:14
371:13 383:2
386:23 389:23
390:4 401:13
402:18 409:20
415:20 441:6
449:4 450:5
457:25 468:8
**Peoples** 320:3
**percent** 466:12
**perfectly** 397:8
**performing** 419:16
**period** 345:15
382:24 390:14
468:1,10
**person** 328:20
376:23,25 377:15
381:14,16,23
402:4,11 405:19
408:1 423:24
428:12 431:2
438:23 452:5
453:25 455:22
460:2,17 461:7
462:20,23
**personal** 337:21
339:3 344:17

367:2,21 388:10
389:16,17,21
390:2 395:9 402:3
429:23 445:19,23
**personally** 337:23
349:23 350:11
368:21 376:19,22
377:24 393:15
404:19 413:6
**person's** 460:23
**perspective** 461:14
**petition** 414:7
420:13 437:23
**Petroleum** 320:3
**Phillips** 320:24
**Phoenix** 412:24
**phone** 362:25
388:10,12 458:21
**photo** 361:12 362:1
374:4 379:17
**photos** 336:24
360:11,17,20
361:2,8,10,12,22
361:25 379:9
**physically** 417:17
**pick** 460:18
**picture** 327:22
328:11,17 330:16
331:16,24 332:2,6
333:23 334:1,4,5
334:16,17,17
335:1,4,6,8,10,14
335:18,20,23,25
356:12 379:20
432:1,8,10,15,22
433:2,17 438:20
**pictures** 326:15
327:1,8,12 329:7
330:13,15,23
332:20 333:7,12
333:19 344:4
347:10 348:14,14
379:10 383:3
**pile** 375:24 376:7
379:1
**pilots** 386:10
**pink** 343:15 352:14
352:22 353:3
377:18 380:21,22
397:16,22 407:7
456:19 457:1
458:5,12 469:23
**place** 460:21 461:21
473:6
**placed** 434:20
**plane** 433:18 457:15

457:18 458:6
469:23
**planes** 397:17,21
399:5
**planned** 337:22
338:16 340:5,8
346:13 348:17,21
349:8,13 407:8
**Plano** 473:24
**play** 350:2 457:19
**played** 363:18
415:15 448:21
449:1
**please** 337:10
373:11 375:4,24
388:22 398:6
411:7 412:21
415:16 417:12
418:6 419:2
424:20 447:25
453:11 458:25
**pleasure** 411:6
**pledge** 472:1
**point** 331:6 364:24
372:11,17 379:8
379:22 399:20
402:23 406:4
425:25 443:17
450:9 459:25
**pointing** 331:7
356:5 357:2
**policies** 375:10,14
377:25 384:6
385:19,20,22
386:5,8 387:2
412:2,6 430:8
440:2 445:2
451:23
**policy** 373:1 377:14
378:20,23 379:21
384:1,8 385:12
387:9 401:9 421:7
423:3 426:3,6,10
433:5 440:8 441:9
442:3 443:8
444:13 447:14,18
449:6,22 451:15
452:14,15 454:21
454:24 457:11
**political** 322:3
345:18 398:10
**politically** 396:25
**politics** 398:18
**POLSINELLI** 320:8
**position** 324:9,13,15
324:18,19 375:18

399:5 411:21
425:14 448:19
449:24 452:22
460:5
**positive** 341:22
383:16
**possibly** 343:6
364:22 441:8
**post** 322:12 357:15
357:16 358:15
366:10,23 379:20
380:13 384:10
392:2 409:4 412:7
414:14 427:12,16
429:13,22 430:11
430:19 431:8,13
431:22 433:16,25
434:24 436:18,19
437:4,6,7,10
438:24
**posted** 327:12 334:2
334:13,23 335:8
335:15,23 344:15
347:10,12,19,25
348:6,7,10,12
355:5 358:14
359:2 360:16,25
366:6 372:5
373:21 390:7
398:15 409:6
413:5 415:3,18,19
416:14,16,21
449:9 452:9
**posting** 348:4 355:6
356:19 427:21
439:11
**Postings** 322:9,13
**posts** 372:14 373:19
379:11 382:18
389:10 440:7,11
442:3 461:18,24
469:19
**post-hearing** 471:10
471:12,20
**potential** 442:4
446:18 448:9
451:7 458:22
**practical** 403:7
**prefer** 437:25
**preference** 471:12
**premier** 349:9,13
**present** 320:17
330:2,17 385:9
400:11 445:7
472:1
**presented** 330:20

349:8
**president** 336:14
345:5,16 346:19
352:7 371:14
374:8,10,20,23
375:17,20,20
376:24 377:15,23
380:15 388:2
393:13 402:13
406:20 407:6
448:17 450:10
461:1,11
**presidential** 394:23
**presidents** 401:11
**pretty** 327:11
362:11,14 389:22
415:22,22
**prevalent** 413:9
**prevent** 461:3
**previously** 447:9
450:15 451:4
**Priests** 344:1
**primarily** 370:21
**principles** 322:4
459:12,24 460:6
**print** 332:19 333:11
334:6
**printed** 333:24
334:19 335:3,12
**prior** 341:16 344:10
371:9 372:20
385:19 425:22
450:4 464:25
**priority** 325:20
**privacy** 389:19
**private** 355:8
356:17 379:18
382:17 390:20
395:2 396:12
410:17 439:7
461:24
**probably** 357:24
380:5 382:4
396:13 402:15,15
437:14 444:20
446:4 453:12
**problem** 396:24
441:13
**problematic** 442:3
**problems** 441:5
**procedures** 375:10
375:14
**proceed** 463:6
**proceeding** 323:5
**proceedings** 472:12
473:5,9

**process** 369:17,19
406:2 417:24
454:8
**professional** 460:11
**professionalism**
471:24
**profile** 430:17
432:10,11 434:2
**program** 455:21
**prohibited** 379:6
**project** 343:17
**ProLaw** 455:20,21
**prompted** 445:10,21
**pronouncing** 357:24
**pronouns** 340:12
347:18
**proof** 446:14
**proofs** 471:6
**propaganda** 394:11
**propounded** 473:8
**pros** 405:24
**protect** 347:1 401:3
**protected** 375:17
460:19 461:4,20
469:7
**protection** 461:5
**protections** 375:13
**proud** 338:7,9
**provide** 348:4
**provided** 368:10
376:11 400:4
**provides** 459:20
**provision** 404:8
**provisions** 403:14
404:18
**pro-abortion** 392:10
**pro-choice** 373:6
**pro-life** 339:12
343:24 353:2
373:6 406:13
**public** 327:23
328:20 361:1
382:18,19 389:9
389:22 390:2,5
392:2 409:10
410:17 439:8
**publicly** 416:14
**pull** 420:2
**pulled** 341:21 450:5
**punishment** 404:21
**pushed** 346:21
**pussies** 409:11
**pussy** 343:17 377:18
380:21,22 407:7
**put** 329:6 334:23
335:8,22 344:10

366:16 381:18
390:1,19,24
391:23 392:17
397:21 404:4
405:2,8 450:11,25
469:9
**P.A** 320:24 457:20
457:23
**p.m** 472:12

_____
**Q**
**qualifications** 377:4
**question** 325:3,22
326:24 332:1
341:10 344:18
347:24 351:4
353:6 365:13
371:21,24 373:24
373:25 374:1,12
375:4 377:5 383:7
383:7 384:3,21
386:4 388:14
391:2,21 392:14
395:8,24 398:23
401:15,17 404:23
407:19 409:3,24
435:24 437:2
439:19 441:11
444:17 462:21
463:9 464:15,16
465:4,15
**questionable** 440:8
**questioning** 372:18
**questions** 354:17
359:25 363:4
372:1 378:7,8
385:4 396:3 400:3
405:22 406:12
410:19 420:9
424:6 436:7,16
473:8
**quick** 389:9 408:11
**quickly** 384:19
**quit** 450:6 468:13
**quite** 361:7 398:12
**quote** 383:11
**quoting** 383:14
384:4

_____
**R**
**R** 320:1 322:10
323:1
**Railway** 370:10
**raise** 323:17 411:7
424:24
**raised** 372:4

**random** 440:11
**Ray** 409:9 438:23
**RBF** 450:24 452:4
**reach** 345:16 352:2
408:8 440:17
**reached** 352:18
407:9,23 408:2,3,4
**reacted** 406:17
**reaction** 327:9
**read** 328:12 332:15
334:12 335:14
376:1 379:22
386:3,3,16,22
387:16,16 390:25
397:3 398:13
399:23 408:23
410:12 432:20
434:10,14 440:15
442:13,20,25
443:5,23,23 444:2
444:2,6,7,11,15,18
444:21 445:5
447:17 450:11,16
454:16 465:15
**reading** 384:4
444:11
**reads** 393:3
**ready** 414:15,16
**real** 389:7,9 407:15
**realize** 359:21,22
406:2 455:7
**really** 336:6 338:23
342:10 345:14
351:16 354:11,11
373:2,8 374:12
386:18 395:25
402:11,14 413:9,9
432:20 449:7
450:8,20 458:9
459:22 460:7
461:10 466:2
467:24
**reason** 325:3 336:17
337:20 345:4
364:15 390:24
396:13 464:19
**reasons** 403:8
421:24 462:17,21
464:14 465:21
**rebuttal** 321:16
323:9 446:18
447:2
**recall** 341:17 360:14
365:22,24 387:23
396:10 398:9
400:15 414:7,7

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 670 of 676   PageID 5781
Charlene Carter - Vol. 2                                    December 8, 2017

13

420:13 437:21
439:14,21,25
440:21 442:6
443:3,5,10,15
444:10 445:2
446:25 447:1,3
449:2,3 452:24
454:20
**recalled** 452:25
**receipt** 421:2,4
458:7 471:14,18
**receive** 386:5,7
395:10 420:23
421:1 458:5
**received** 329:14
385:18,20 403:9
413:3 415:11
421:22 423:20
444:20 452:6
455:16,19 456:4
458:14 466:1
467:4,13
**receives** 460:5
**receiving** 378:22
395:12,14 398:9
443:3,5,11 444:10
450:14 455:14
**Recess** 360:3 410:23
424:12 446:12,22
**recognize** 328:9
382:7 406:14
427:5,8 431:25
432:7,13 458:2
**recognized** 450:23
**recollection** 403:20
431:7 468:11
**record** 323:4 327:18
332:25 333:2,3
336:6 340:12
342:5,21 350:19
355:11 360:5,18
362:22 365:14
368:19 397:9
399:19 410:16,22
436:5 446:14,21
446:23 455:14
470:25 471:1,3,10
472:4
**recorded** 448:1
473:10
**records** 455:23
456:7
**record's** 419:6
**rectangle** 328:4
**redirect** 408:11,13
408:14

**reduce** 405:11
**reemployed** 421:24
**refer** 330:4 340:4,6
345:2 451:2
**reference** 393:24
409:15,25 459:12
**referencing** 409:5
463:24
**referring** 365:9
379:16 394:7
442:17
**refers** 340:7,8 414:6
**reflect** 342:5 351:11
**reflecting** 359:13
**reflection** 359:11
**refresh** 468:11
**regarding** 360:10
377:16 385:9
387:19 388:24
398:10 400:3,24
412:2 440:15
442:2,4,14 443:7
444:12 445:1,13
446:6 447:17
448:14 451:6
452:19 455:9
456:7,17 458:15
460:14
**Registration** 473:22
**regret** 344:25,25
345:1,2
**reinstated** 325:23
359:14 462:15,20
463:10,13,20
464:9,19 465:19
468:19
**reinstatement** 403:8
403:9 464:11
465:22 466:10
467:15,17 468:18
**reinstating** 462:22
**rejected** 405:23,24
**related** 463:11
469:19
**relating** 354:17
**relation** 461:19
**relations** 320:20
383:22 412:24
428:13 430:16
431:4 434:25
463:4 470:15
**relationship** 326:16
339:3 413:11
**relationships** 460:11
**relative** 473:14
**relevance** 429:10

461:20
**relevant** 372:7 399:8
399:12,13 460:2,3
**remained** 425:24
**remains** 447:4
**remember** 326:12
326:18 339:16
348:2,19 350:25
385:14 388:21,25
389:2 418:7,9
419:8,10 431:1,11
434:23 443:9
448:15 453:22,25
455:1 465:16,25
466:2,24 467:2
**remembering** 468:9
**reminder** 443:7
444:12
**remorse** 350:18
**removed** 370:25
371:14 409:21
435:13
**rendering** 428:15
**repeat** 367:23
388:22 435:24
444:5 445:11
**repeatedly** 377:9
**rephrase** 439:18
**replaced** 438:1
**report** 400:25
412:18 417:10
426:10
**reported** 383:21
401:6 426:13
**reporter** 413:20
424:16 473:4
**Reporters** 473:22
**REPORTER'S**
321:21 473:1
**reporting** 414:4
**reports** 458:18
**represent** 330:13
341:2 344:23
402:6
**representative**
346:12,16
**represented** 341:11
**representing** 342:14
343:9 345:12
377:19
**reps** 414:12
**request** 417:23
440:13
**requested** 458:17,17
**requesting** 433:4
**required** 445:5,18

**Reserve** 446:18
**respect** 376:11,16
377:6,15,18 407:1
407:4,7 449:25
**respond** 388:3,6
**responded** 388:8
398:2 407:12
**response** 350:6
395:14 415:11
420:23 421:1
**responsibility**
359:24 377:22
403:3 407:18
**responsible** 383:15
**responsive** 383:25
**rest** 340:17 434:16
**rested** 323:8 471:3
**restrictions** 404:3
**result** 384:1 462:8
462:11 464:2
466:25 467:3
**results** 329:13
417:25
**retaliation** 352:3,4
**retaliatory** 379:5
412:16
**Richard** 320:24
**Ricky** 413:4,7 415:2
416:19 417:6,9
**RickyRoundtheW...**
416:20
**ride** 420:5
**ridiculed** 339:12
**right** 320:14 323:17
323:22 324:7,20
325:4 326:19
328:15 329:15
331:7 337:13
339:25 340:1,24
342:22 346:6
355:10,13,25
356:10,14 357:19
357:25 361:8,21
362:5,14 363:3,13
365:2,5 366:16
368:17 369:5,8,11
369:13,23 370:17
371:1,2 372:24
374:7,24 375:7,15
378:17 381:25
382:14 383:11
384:23,25 386:12
387:11 389:15,24
390:22 397:6,16
400:8 401:18
403:4 406:18

409:2 410:21
411:7 413:19,25
416:25 417:2
420:14 424:24
425:4 426:23,24
428:17 432:22
435:17 436:20
438:2 444:4
446:18 447:7
448:14 453:13
460:7 467:7,10,12
467:21 468:22
469:3 470:3,25
471:9 472:2,7
**rights** 324:23 354:14
461:5
**right-hand** 438:22
**Rind** 320:24
**Road** 320:14
**Romney** 427:14,22
428:20 429:12
**room** 424:14 438:25
439:2 455:8
**rose** 470:18
**route** 441:18
**row** 432:18
**rude** 412:11
**rule** 406:23,25 407:3
**rules** 383:13
**rumors** 412:14
**run** 420:4
**runs** 416:22

_____

### S

**S** 320:1 323:1
**sadness** 338:8
**safe** 419:23 420:7
423:7
**safety** 354:12
**salaries** 354:15
368:4,4
**salary** 354:15 375:1
**Sam** 322:12 427:12
429:22 436:17
455:11 456:7
**Samantha** 436:24
**Samina** 357:25
358:4
**Sam's** 429:23
**San** 320:9
**sanctioned** 457:3
**sand** 451:3
**sang** 457:22
**Sassy** 438:24 439:2
**sat** 343:15 380:21
402:15

**Saturday** 365:1,5,16
  368:1
**saw** 337:25 339:10
  339:11,11,11
  343:14 353:22
  366:9 367:7
  379:24 380:9,15
  398:12 417:17,20
  418:7,25 419:4,7
  419:11,19 422:6,7
  422:14,14,18
  431:12 432:8
  437:8 461:19
**saying** 347:8 352:16
  354:14 373:4
  374:13 383:4
  404:12 414:19
  415:21
**says** 327:19 331:9
  334:3 335:2,16
  361:22 376:10
  379:3,9 383:15
  390:12 394:6
  398:20
**scab** 350:8
**scared** 419:22
**scenario** 451:19
**scheduling** 325:11
**schooled** 449:7
**screenshot** 331:12
  333:24 334:7,10
  334:18,20 335:3,5
  335:12,19 336:7,7
  336:8 340:22
**screenshots** 332:21
  333:11 359:16
  410:16
**scroll** 330:22 361:21
**scrolled** 361:7
**seal** 473:18
**search** 361:16
**seat** 434:5
**Seats** 433:22
**second** 323:5 333:13
  342:7 352:1
  357:18 376:10
  379:2 392:2,3
  396:15 402:23
  417:18 418:7
  432:13 438:19
  452:3 463:24
  464:8,11,20,20
  465:22 466:10
  468:18
**section** 361:11 393:1
**see** 327:23 328:3,12

328:16 347:2
354:22 357:1
361:22 362:2
363:20 366:16
373:13 379:6,13
382:24 398:14
415:9,18 421:19
426:9 427:5,7
428:18 429:10,15
431:21,22 432:13
432:21,21 435:7
438:20 442:23,24
443:2 454:14
455:14,25 461:15
468:23 469:5
**seeing** 337:17
  419:24 431:21
**seen** 364:1 409:12
  415:21 417:9,11
  426:12 435:10
  452:2
**selected** 460:4
**send** 346:21 350:3
  355:8 359:15,23
  372:24 380:13,14
  388:4 394:15
  395:8,15 430:10
  430:14 436:19
  437:3,10 440:7
**sending** 340:22
  341:11 344:19
  350:23 374:14
  377:20 379:19
  387:25 395:22
  417:9 438:24
  440:10
**sends** 440:12
**senior** 383:23
**sent** 341:3 343:2
  345:4 346:1,20
  349:17,21,22,24
  350:11 351:8
  355:5 372:5
  373:19 374:2,6,10
  379:17 380:14
  387:22 388:20,25
  389:4 390:20
  391:3 392:12,14
  393:21 394:4,10
  394:12,21,22
  395:2,3 396:11
  407:20,21 412:22
  413:2 414:20
  415:20 416:1,15
  416:23,24 419:7
  420:21 421:4

428:13,15,16,23
428:24,25 430:9
430:11,16 431:4,8
434:24 435:3,6
437:5,9,13 439:12
439:13,21,24
440:1 441:12,14
441:24 442:4
455:8 461:12,19
468:25 469:17
**sentence** 376:9
  382:25
**sentences** 469:18
**separate** 362:9
**September** 334:24
  434:21 455:12
**serious** 450:22
  451:14
**seriously** 449:18
**serve** 435:23
**service** 425:21
**serving** 467:9
**set** 389:18 457:18
  473:6
**sets** 460:8
**settings** 389:19
**settled** 405:18 424:4
**settlement** 404:11
  405:13,23
**settlements** 465:3
**seven-minute** 360:1
**sexual** 378:20
  379:21 380:23
**sexually** 379:4 380:2
**shaded** 356:8
**Shah** 357:25 358:4
**shaming** 431:14
**shape** 328:22,24
**share** 325:8 338:22
  375:25 376:13
**shared** 359:2 390:10
  392:8
**sharing** 358:21
**sheep** 393:5
**sheer** 447:23
**SHELTON** 473:3,21
**she's** 323:14 325:12
  325:20 326:4
  345:15 372:3,4,8
  372:13 374:24
  375:6,13,19,20
  376:25 379:25
  380:6,14,18 382:4
  391:13 393:16
  394:15 396:20
  397:1 436:24

438:12 468:5
**shorten** 468:10
**shorter** 468:1
**shorthand** 473:4,13
**shouldn't** 350:8
  391:22 394:17
**show** 331:25 332:2
  332:21 333:16
  334:1,17 344:4
  349:3 361:15
  362:23 366:21
  380:4 393:9
  415:12 426:16
  442:16 456:19
  462:18
**showed** 326:16
  333:23 334:20
  348:13 350:18
**showing** 327:10
  333:11 334:18
  335:11 349:8
  360:12 383:3
  430:18
**shown** 326:15 327:1
  327:8 332:20
  333:7 410:2
**shows** 331:21,23
  334:13 432:17
  434:19
**sic** 383:20
**sick** 339:24,24 463:4
**sickness** 344:21
**side** 432:22 438:22
**sides** 449:12 471:15
**sign** 437:23
**signature** 417:15
**signatures** 414:10
  414:12,15,22
  417:24
**signs** 339:10,18
  347:23
**silence** 403:22
**silences** 403:21
**similar** 390:19 391:3
  469:2
**similarly** 392:5
  435:1
**simply** 463:9
**Sims** 329:22 330:2
  349:3,14 351:8,17
  382:2 385:6
  398:10 399:18
  400:4,10,13,15
  402:16,22 403:5
  407:14,25 416:1
  421:5

**simultaneously**
  471:13
**single** 337:1 376:25
  468:16
**sir** 323:12 326:13
  327:3 334:11,21
  336:9 339:8 342:2
  399:10 411:5
  446:11 462:3
**sit** 351:11,11,14
  354:3 367:13
  386:22,23 402:13
  402:21 417:16,23
**site** 348:15
**sitting** 424:13
  432:17 434:5
**situation** 338:17,18
  460:1,17,22 465:1
**six** 467:23 468:4,21
**sixth** 334:16
**skim** 386:23
**skipping** 334:25
**Skype** 425:7
**slap** 340:19 420:3
**slippery** 464:23
**slope** 464:23
**small** 340:16
**smaller** 356:12
**sneezed** 405:3
**social** 338:21 369:21
  372:14 379:10
  382:14 384:10,17
  385:11 401:21
  404:4 409:1,4
  410:1,2 412:2
  413:10 423:2,10
  423:22 426:3
  437:7 440:7,15,23
  441:2 442:5,7,14
  443:7,8 444:12,13
  445:1,8,13,21
  447:14,17,21
  448:2,7,9,21 449:1
  449:6 450:4
  451:10,15,22
  452:15 454:4
  455:10
**somebody** 330:21
  355:8,15 401:3
  470:19
**son** 325:7 346:7
**song** 457:20
**sooner** 323:7
**sorry** 346:24 349:5
  349:16,21,22
  350:10,19,21

351:8,15,18,23
352:5 353:18
356:7 357:3 359:7
359:23 376:5
391:22 394:15
402:8,10 408:12
435:24 437:2,19
440:3 444:5
445:11 464:17
469:17
**sort** 471:17
**sound** 467:6
**Southwest** 319:13
324:6 326:17,21
327:24 328:8,10
328:18,23 329:4
330:4 333:6 341:1
341:22 346:16
347:3 349:4
352:10,11,18,18
353:25 354:10,19
359:14,16 360:10
361:2 363:8
374:24,25 375:6
375:10,14 376:14
376:17 379:15
381:25 387:20
388:1 391:6 393:2
393:13,17,20
397:17 398:6,16
400:5 404:22
406:23 408:17
411:20,23 412:1,8
412:9,18 413:1
414:4 417:10
418:14 419:8,15
425:13,20 426:2
428:11 429:12,12
430:3,7,8,18,22
432:9 434:1,2
435:8,16,22 436:1
436:12,19 439:16
440:1,6 441:25
442:19 445:18
450:16 453:10
456:17 458:24
459:20 462:9
**Southwest's** 378:20
**space** 341:22
**Spand** 322:10 413:4
413:7 417:6,9
422:6 423:1,8,12
**Spand's** 415:2
**speak** 350:19 354:4
360:18 370:5
374:8 389:6 404:5

404:15 419:4
**speakers** 345:24
**speaks** 397:9 398:25
**special** 457:15
**specific** 365:8 414:3
428:10 458:15,15
**specifically** 443:15
445:4
**specifics** 343:23
**speech** 397:14
461:20 469:7
**spelled** 409:16
**spend** 350:10 370:5
**spent** 338:2 343:6
365:19 366:8
367:3,15 368:24
369:25 370:17,20
372:16,23,23
402:2 469:11,14
**spewed** 345:23
**spike** 448:23
**spinning** 397:2
**spoke** 366:7
**spoken** 446:3
**sponsor** 337:23
345:22 348:18,23
349:9,13
**sporadic** 325:10
**sports** 457:17,19
**spot** 361:13 362:2
**spread** 412:14
**Springfield** 320:15
**squabbles** 446:1
**square** 361:14 394:1
**Stacy** 371:15
**stance** 345:19
450:24
**stand** 363:18 364:2
427:13
**standing** 371:10
**stapler** 337:7
**start** 323:7,9 326:22
407:15 453:19
**started** 325:7 411:24
414:7 420:13
438:23 448:3
**starting** 330:5,11
333:13 444:4
**starts** 357:13
**state** 382:20
**statement** 367:1
373:20 374:5,15
**statements** 399:18
399:21 473:9
**stating** 431:11
450:12

**status** 436:5,6
**stay** 325:14 326:4
**stays** 437:7
**STEMMONS**
319:21
**stenographically**
473:10
**step** 329:19 349:1,15
351:6,7,17 352:1
359:10 382:1
396:15 400:3,12
402:24 403:5
408:18 453:11
456:22
**Stephen** 320:22
**stepped** 400:21
**Stew** 438:25 439:2
**Stone** 341:3,5,6,12
345:4,7 363:18,20
364:12 373:19
374:2,14,23
376:15,23 379:18
379:20 387:20,25
388:2,3,9,20,25
389:4 390:20
391:4,18 392:12
392:15,18 393:12
396:10 400:23
406:18 407:4,20
420:17 460:25
461:19,23 468:25
469:17
**Stone's** 368:7
460:13
**stood** 460:16
**stop** 390:13 395:22
409:11 450:12
**stored** 361:11
**Street** 473:23
**stress** 459:22
**strike** 396:6
**stronger** 450:23
**strongly** 460:16
**stuff** 360:2 386:16
471:17
**stunt** 420:3
**subject** 323:8
396:25 433:11
459:17
**subjected** 380:7,16
**submissions** 471:15
**submit** 430:21
471:12
**submitted** 349:1
382:2 408:18
432:8 456:22

471:13
**SUBSCRIBED**
473:17
**subsequent** 466:3
**subsequently** 462:15
**suggest** 342:8
**suggesting** 433:4
**suggestive** 379:4
**Suite** 320:4,9,14
473:23
**SUITES** 319:20
**supervisor** 383:22
**support** 340:17
344:3 346:9,10
347:6,6 354:10
394:18 397:22
420:17,19 437:21
449:5 456:19
**supported** 339:23
350:13 391:20
449:8
**supporter** 384:13,14
413:13 438:11,13
460:20
**supporters** 449:2,3
449:4,4,13
**supporting** 345:13
345:22 346:18
458:6
**supposed** 376:17
400:22 404:5
405:2 412:7,11,14
414:13 418:16
421:14 422:4
465:10 468:6
**sure** 333:1 357:17
365:24 368:21
381:3,20 382:9
396:4 399:2
403:15 406:24
419:6 421:18
424:21 444:15
459:23 466:12,17
468:9 470:1
**surrounding** 398:11
**suspension** 421:23
452:6,7 467:4,9
**suspensions** 423:20
451:7 452:2
**SWALife** 386:13
**swap** 420:5
**swear** 323:18 411:8
424:25
**sword** 374:17
**sworn** 323:15 324:2
411:14 425:7

447:4,9 473:17
**system** 464:21

———————
**T**
**table** 343:15 380:21
**take** 345:8 346:9,15
359:24 360:1
362:4 370:6
372:12 375:23
379:1 390:22
401:24 402:7,9
403:2 406:6
407:12,18 410:14
441:8 449:17
450:23 456:12
468:19
**taken** 348:14 352:8
369:20 371:19
377:22 383:25
417:6 457:6 473:5
473:13
**Talburt** 381:15
382:11 384:12,16
408:20 409:6
410:2 424:1 453:3
453:5,8,17,24
454:6,21 455:2
462:9 463:9,14,19
464:6 465:24
467:16
**Talburt's** 468:18
**talk** 381:8 403:23
404:16
**talked** 339:17 385:6
405:12 408:24
435:11
**talking** 342:23 343:5
347:9,13,15 394:2
404:7 409:25
428:18 434:5
438:19 460:20
469:16
**talks** 427:13
**tax** 390:13
**taxes** 372:22
**team** 457:17,19
470:19
**team's** 457:19
**technology** 362:22
363:1
**tell** 340:21 341:10
342:11 345:20
349:20 351:8,23
353:6,17 367:10
397:11 410:24
414:24 424:19

431:10 447:4
466:16 469:25
**telling** 375:19
394:13 400:15
**ten** 459:16
**terminate** 371:25
373:14 403:7
**terminated** 326:9
329:15 384:17,23
405:4 421:23,25
455:3 462:11,14
464:4
**termination** 319:8
324:12 329:17
359:10 384:2
385:19 386:6
404:20 453:18
463:10 464:8,20
466:14 467:16
**terminations** 451:8
466:10
**terminology** 348:19
**terms** 339:4 372:7
401:7 404:11,13
404:25 441:6
**testified** 324:2 333:7
338:14 349:14
350:18 360:9,16
361:5 363:7 364:6
368:14,22 371:13
387:20 390:7
394:21 397:16
399:4 400:24
403:5 406:13
411:14 420:12,21
422:6 425:7
436:17 441:17,24
447:9,12,15
450:15 451:4
455:7 462:7
463:10 466:4
468:24
**testify** 355:19 447:2
**testifying** 398:23
**testimony** 323:18
324:21 348:19
349:17 350:14
360:14 364:11
368:7 374:16
385:8,14 387:19
388:18,23 396:19
396:20 400:3
401:5 408:22
411:8 424:15,17
424:25 436:5
447:13 456:16

461:9 463:6 466:6
473:7
**testing** 441:16
**Texas** 319:22 320:4
473:21,24
**text** 355:4,11,19,22
355:23 356:19,20
357:4,11,19,21,23
358:2,5 390:7
393:2 427:17,18
428:18
**thank** 323:22 342:19
363:7 384:3
391:25 392:21
395:21,24 399:16
410:9 411:12
424:7,10,23 425:4
432:11 433:14
436:15 437:17
441:22 446:11,20
447:7 462:2
470:23,24 472:6,8
**Thanks** 416:3
442:18
**that'll** 413:22
**that's** 327:17 328:13
330:8 332:1
336:22 337:13,14
341:8 348:2
351:16 354:16
355:20 357:8,23
361:20 362:18
371:21 373:2
374:21 378:25
381:23 382:1
385:6,17 391:7,10
391:12,19 392:11
392:19,19 394:16
397:8,13 398:3,22
398:24 400:19,22
403:1 406:4,10
410:7 412:7,16
413:19 415:22
416:3 418:15
427:18 428:21
429:17 432:4,25
433:18 436:3
444:9,17 448:22
455:21 461:12
463:5,23 465:4
466:8,11 467:2,25
468:11,22 469:2
470:14,23
**there's** 325:19
330:16 334:25
336:17 343:24

355:19 357:11
361:14,22 362:10
374:17 375:16
383:2 386:21
387:13 394:1
400:21 404:18
406:7 423:7,24
426:23 432:18
440:22 445:17
451:7,14 456:16
460:10 461:21
472:3
**they're** 343:9 358:24
358:25 362:13
389:6 393:23
412:19 421:14
468:9
**they've** 395:5,5,6
400:20 412:10
**thing** 326:7 334:6
352:6 386:15
387:15 398:14
399:6 414:3
433:24
**things** 324:17
325:13 338:21
343:11 350:1,1
351:1 352:20
360:13 370:6,7
372:14,25 374:10
380:4 395:23
396:15 398:14
408:25 459:21
**think** 337:12,13
348:2 351:6 372:4
372:6 374:13,13
375:24 376:15
377:8 378:3,5,12
385:3,9 389:6,6
392:23 393:5
394:16,17 397:3
398:19 399:7
404:19,20 408:10
408:12,13 409:8
409:16 412:16
413:18,19 414:20
418:10 419:9
428:13 429:4,6
430:5 433:1,24
435:12 436:24
437:14 439:5
440:12,16 441:15
441:19 450:21
453:9 458:8
459:16 460:15
462:19,21 464:22

465:3,18 466:1
467:1 468:5,24
469:2,18,24 470:2
471:25
**thinking** 351:5
359:13 364:2
**third** 326:23 333:22
335:10 429:11
439:16
**thought** 362:19
374:7,19 380:8
390:17 392:20
442:2 470:4
**thoughts** 448:24
**threat** 408:24
428:10 429:11
451:25
**threatening** 372:25
379:5 383:18
412:15 421:20
452:11
**threats** 422:13,19,23
**three** 320:9 327:13
327:14 351:7
357:23 358:4
423:6 454:12,12
**thresholds** 382:20
**throwing** 351:1
**time** 324:12 325:10
339:14 344:17
345:13,15 346:21
346:21 350:24
360:25 364:25
367:21 368:1
371:6,8,11 373:21
377:4,11 380:18
383:6 384:6,15
386:7 388:7
390:16 410:14
413:15 414:9,11
415:12 416:5
417:13,13,18,19
418:7 419:7
422:20 423:9
424:11 430:6
431:22 432:8
435:18 437:6
438:15 440:22
443:13 444:4
445:7 446:7,15,17
448:12,16 450:6
453:18 454:16
461:21 464:20
473:6,9
**times** 388:13 412:10
**timing** 448:15

471:10
**tissue** 346:6
**title** 374:23
**titled** 357:5 361:12
459:11
**today** 323:13 359:11
359:12,13 360:23
361:18 425:25
**told** 339:12 349:16
349:20 351:17
352:2,3,25 366:1
381:15 394:18
396:22 401:12
402:24 407:24,24
421:15,18 426:9
**ton** 347:22
**tones** 373:12
**top** 356:20 357:3,18
357:19 379:2
390:8 427:16
428:23 434:19
442:24 465:25
**town** 364:25
**track** 455:18
**trades** 324:24 325:1
325:5
**trading** 325:25
**training** 459:19
**transcribed** 473:11
**transcript** 471:19
473:13
**Transport** 342:15
**transportation**
365:7,9 368:6,12
370:7
**trash** 393:9
**treasurer** 365:18,20
**treat** 350:6 376:17
377:5 378:14
407:1,2,7
**treated** 376:15
377:14,17 407:2,4
421:12 461:5
**tremendously**
340:19
**tried** 350:5
**trip** 324:24,25 325:4
342:2 363:12
364:8 386:14
**trips** 325:11,25
341:21 387:17
**trouble** 404:21
450:7
**true** 412:13 436:3
473:12
**truly** 402:14 409:14

Case 3:17-cv-02278-X   Document 183-1   Filed 09/09/21   Page 674 of 676   PageID 5785
Charlene Carter - Vol. 2                                              December 8, 2017

17

**Trump** 336:14
**truth** 323:20 364:15
  411:10 425:2
  447:4
**try** 330:23 377:11
  388:9 426:21
  429:7
**trying** 355:19 372:8
  372:10 377:2
  387:1 396:3,20
  398:16 439:20
  446:2 468:11
**turmoil** 448:13
**turn** 349:4 353:3
  360:5 393:22
  403:13,20 409:8
  414:12,13,16
  429:14 438:6
**turned** 352:14
  403:11 404:23
  415:9 430:7 438:9
  446:2 469:23
**turning** 334:4
  352:22 402:18
  441:6
**turns** 326:6
**twice** 334:18 371:12
  385:1,5 417:11
**two** 327:13 332:24
  334:25 340:23,24
  343:21 354:17
  376:24 400:22
  401:13 402:22
  422:24 423:20
  429:1,4,14 433:1,8
  441:25 443:20
  444:23 446:1,6
  450:1,11 451:20
  455:9
**two-page** 432:12
**TWU** 320:25 340:6
  340:7,9 347:4,13
  348:7,12 364:13
  394:22 448:12
**Tyler** 320:4
**type** 343:22 345:20
  356:13
**types** 325:13 359:15
  379:3 401:21
**typically** 452:1
**typing** 427:17,18

**U**
**Uber** 365:10
**ugly** 413:5
**uh-huh** 326:11

327:20 332:7
336:4 357:20
363:14 379:7
382:9 385:13
392:7 393:25
394:5 416:21
422:9 442:1
**umbrella** 347:4
**unclear** 414:11
**uncomfortable**
  352:17,23
**understand** 343:12
  345:10 346:4
  352:21 364:18
  373:4,11 375:18
  377:2 381:5 393:1
  400:19 416:13
  421:6,8,10,17
  438:9 446:2
  452:23
**understanding**
  412:5 435:17,21
  435:25 452:21
**understood** 401:6
**Unfortunately**
  332:18
**uniform** 360:12
**union** 329:5 337:17
  337:25 338:1
  339:14,17 340:6,7
  340:9 341:23
  345:6 346:17,19
  348:11 350:5,9,12
  352:7,9 354:5,8
  359:16 364:7,20
  364:20 365:11,15
  367:4,5,8,11,15
  368:4,5,23,23
  369:2,5,9,15
  370:13,19,20,22
  371:11,14,18
  373:8 374:8,9,9,18
  374:19,20,23
  375:17,19,20
  376:20,21,24
  377:3,15,23
  380:14 381:19
  384:13,14 386:11
  388:2,11,13
  393:16 395:12,15
  396:5 400:17,21
  401:13,19,24
  402:1,2,5,13
  406:20 407:6
  413:14 417:14,20
  418:4,5 419:11,17

419:17 420:18
422:19 435:11,18
435:23 436:2
438:1,11,13
440:24 446:6
448:14,25 449:2,4
449:8,8,12,13
452:19,22 453:1
460:20,25 461:11
461:11,15,20
469:1,6,10,10,13
469:16,19
**Union's** 417:22
  448:21
**unique** 328:22
**un-educated** 393:6
**uphold** 440:2
**uploaded** 362:1,8
**Uploads** 361:25
**upset** 340:19 345:3
  349:23 350:11
  363:13,20 364:4
  371:20 397:19
  408:5 449:13
**upsetting** 363:23,25
**URL** 415:6
**use** 340:12 363:1
  372:9 440:23
**utilized** 387:5
**U.S** 428:16,23
  430:21,23,24
  434:25

**V**
**vagina** 374:4 379:17
**van** 420:5
**variables** 463:3
**various** 412:1
**Vegas** 413:5,9
**verbal** 382:21
**verbiage** 443:12
**verification** 417:15
  417:16,23
**verified** 417:24
**verify** 348:10
**veterans** 457:21
**vice** 450:10
**video** 322:11 344:7
  346:20 347:21,25
  348:7 350:11,12
  350:23 352:12
  354:19 355:2,18
  355:20,22 358:9
  358:11,19 380:4
  390:6,10,17 392:3
  392:6,12,15 413:3

413:5 414:18,25
415:9,13,15,16
416:6,14 417:10
419:19,24
**videos** 340:22 341:2
  341:11 343:2,18
  343:19 344:5,8,13
  344:14,19 345:25
  346:3 347:10
  349:17,21,22,24
  351:9,12 358:22
  358:24 359:15
  360:25 363:18,21
  363:24,25 364:1,2
  372:5,6 373:21
  374:3,6,14 388:19
  388:24 389:4
  396:16 401:1
  407:20
**view** 346:3
**viewed** 345:25
  461:10
**views** 369:21 373:6
**Vinje** 424:2,5
**violate** 373:1 440:8
**violated** 373:19
  374:7,15 379:20
  433:5 440:2
  451:24 454:21,23
**violates** 374:5
**violating** 430:8
  449:6
**violation** 383:25
  401:8,20 426:13
  441:8 448:2
  449:21 451:14,23
  452:8,13,14
  457:10 458:22
**violations** 384:18
  412:18 423:2,23
  426:9 442:5,8
  445:13 448:4,10
  451:11 455:10
**violence** 412:3
  428:10 429:11
**Virginia** 320:15
**vitriol** 345:23
**voice** 369:16,22,24
  370:3,4,8,11,14
  388:10,15,16
  403:21,22
**voices** 394:17
**voicing** 370:16
**volume** 319:15
  447:23 450:3,13
**vote** 369:5,22 371:2

371:7,12,19
372:12,21,21
394:11,13,16,18
**voted** 371:12 409:23
**voting** 369:17,19
  370:21,23 371:6
**VPs** 450:11

**W**
**wait** 328:21 340:3
  409:7 436:22,25
  437:3
**want** 325:22 329:12
  337:8 340:11
  346:4 353:17
  355:10 362:15,18
  368:19 371:17
  373:3,14 383:4
  390:13 392:25
  395:19 398:23
  400:2 403:4 407:2
  409:8 441:17
  443:2 444:19
  453:2 456:15
**wanted** 345:10
  353:23 366:15
  381:3 383:1
  400:25 406:5
  407:25 410:15
  448:18 461:22
**wanting** 405:8
**Ward** 438:23
**warning** 390:12,19
  391:3,17 392:17
  421:22
**warranted** 458:20
**warriors** 409:11
**Washington** 339:7
  349:10 363:10
  364:9
**wasn't** 338:22
  373:24 384:21
  399:18 401:15
  404:5 410:17
  428:14 434:3
  435:1 467:21
**watch** 326:3 363:23
  363:25
**watched** 364:1
  415:17
**watching** 363:21
**way** 336:22 346:24
  362:19 367:18
  371:3 378:14
  393:8 402:17
  407:9,11 422:15

461:6,7,24
**ways** 332:25
**wear** 329:1 376:24
380:22
**wearing** 377:18
380:21 407:7
**web** 348:7 349:12,12
352:11 394:12
**website** 344:3
**weddings** 457:24
**weekly** 448:10
**weeks** 351:7 415:24
467:17,23 468:21
**weight** 399:14,24
429:17 433:11
**Welcome** 342:18
**welcomed** 339:13
**went** 327:21 336:2
336:13 337:25
339:8,18 341:21
342:3 343:7,8
346:10,12 347:1,7
347:8,20 350:12
355:18 357:15
360:17 365:18
366:6 367:11
371:11 391:19
402:23 419:25
422:15 435:3
**weren't** 455:8
**We'd** 447:1
**we'll** 323:4 337:9
360:4 377:13
424:14 431:21
446:13 472:3
**we're** 371:24 372:10
379:16 397:1
406:8 412:7,10
413:18 415:12
424:13 437:16
440:2,17 446:17
457:21 460:20,22
464:23 468:7
**we've** 323:7 370:24
423:9 462:17
**what's** 326:20
373:25 411:21
442:21 451:17
452:21
**wheels** 397:2
**wherewithal** 338:20
**whlemons@satexl...**
320:5
**who's** 366:1 413:4
423:25
**Wilkins** 322:12

427:12 429:22
436:17,24,25
437:11 438:5
455:11 456:2,7
**willing** 402:12
**wish** 399:25 402:8,9
407:12
**wished** 345:3 346:25
**witness** 321:16
323:10,21 342:1
347:20 348:1,11
356:7 358:12,15
360:6 363:1,5
378:11,15 381:3
383:8 391:8
397:13 399:17,22
404:9 406:7,10
411:1,5,11,12
415:2 416:16,19
416:21,24 418:14
418:19,25 424:18
424:21 425:3,5
446:25,25 447:6
**witnesses** 321:5
446:14 473:7
**wolves** 393:5
**woman** 345:21
346:25 347:3,4
377:16 380:6,6
406:14 408:3
**women** 339:5,9,18
343:14 345:8
347:2,20 348:12
353:2 367:16,20
380:2,8,20 456:20
**women's** 337:18,23
341:16,19,24
343:12,12 344:10
345:9 347:1,8
349:10,12 352:25
354:14,14 363:9
363:10 364:8,12
364:18 365:1
367:24 368:8
369:13 377:16,19
378:5 380:3
397:22 406:17
407:5 456:16
**wondering** 434:6
**won't** 436:6
**word** 404:17 430:15
471:14
**wording** 341:2
**work** 320:14 328:25
379:12 382:22
383:13 384:5,10

386:1,20 411:19
413:14 419:17,18
419:23 420:1
444:23 454:17
**workbook** 383:12
**worked** 411:23
**Workers** 342:15
**working** 383:16
471:25
**workplace** 385:11
412:2
**works** 401:11 434:4
**worried** 419:25
**wouldn't** 421:15
**Wow** 428:9
**write** 357:14 358:2
**writing** 354:20,23
355:4 358:5
432:21,21,24,24
461:12
**written** 381:23
459:14
**wrong** 376:7 405:3
**wrote** 357:21 358:7
390:8,14,16
393:10 415:23
458:9

---

**X**

**X** 321:1

---

**Y**

**yeah** 326:25 328:6
336:21 337:8
340:25 343:1
348:1 356:6
358:13 361:15,24
390:11 392:19
397:10,13 398:21
399:7,22 408:3
415:8 416:10
417:22 420:25
428:4,6 429:3
430:5,25 431:9
432:23 433:19
437:16 438:8,18
439:17,22 441:10
442:24 443:10,13
444:19,24 462:4
**year** 336:15,18,20
336:21 337:19
411:24,25 418:8
418:11,12,15,21
419:10,13 425:22
428:25 429:14
443:19 450:1,10

452:1 467:21
468:2,16,19
**years** 324:7,8,16,22
325:5,6 327:13,14
329:10 338:13
339:1 360:17
387:22 425:18
429:4 435:10,11
436:19 437:11
438:6 444:24
446:4 447:14,22
453:9 454:12,12
459:13,16
**yesterday** 323:11
324:21 349:14
350:14 353:22
359:11 363:17,21
364:11 368:8
385:8 387:19
388:19,24 400:23
403:6 447:13
466:5
**young** 337:24
342:11 373:14
410:24 457:22
**YouTube** 347:21
**you'll** 371:8 399:23
399:24 447:3
**you're** 323:18
326:24 331:7
338:9 347:13
353:18 357:1
359:19 362:15
371:1 373:4
374:13 377:2
378:7 382:3
389:18 392:21
394:2,8 404:12
406:13,14 411:8
412:13 424:25
428:18 431:21
443:11,17,22
450:6 466:12
469:15
**you've** 359:10 362:1
369:17,20 437:17
440:19
**y'all** 418:22

---

**Z**

**zeros** 330:7

---

**$**

**$7** 340:16

---

**0**

**0222** 473:24

---

**1**

**1** 341:2,12 356:19
385:17 460:15
**1/20/17** 322:3
**10-year** 418:17,19
**10:49** 410:23
**102** 320:4
**1026** 320:4
**11/10/16** 322:10
**11:08** 410:23
**11:24** 424:12
**11:31** 424:12
**11:58** 446:12
**115** 473:23
**12** 443:6 444:11
**12th** 442:22
**12/31/18** 473:24
**12:16** 446:12,22
**12:23** 446:22
**12:55** 471:1
**12:56** 471:1
**12:57** 472:12
**134** 382:7 408:17,24
409:5,25 453:13
**136** 409:3
**137** 410:3
**138** 410:5
**14** 325:12 330:5,9
349:4,7 359:9
382:1 400:5
408:17 453:10
462:10 463:11
**14-year-old** 346:3
**15** 322:3 398:6,7
425:18
**15th** 473:18
**16** 322:4 429:5
458:25 459:1
**17** 434:21
**17th** 334:24
**18** 338:13 405:8,11
**18th** 473:23
**18-month** 405:7
**19** 338:13
**19th** 336:11 341:17
364:22
**1996** 324:8

---

**2**

**2** 319:15 329:19
341:2,12 349:1,15
351:6,7,17 355:19
357:17 359:10
382:1 385:17

392:5 400:3,12
403:5 408:18
453:11 456:22
**20** 324:7 341:20
418:20
**20th** 364:22
**2002** 440:20
**2003** 426:1
**2009** 448:1
**2010** 448:2
**2011** 448:3
**2012** 428:19,24
429:13 436:18
437:4 448:8
455:11
**2013** 334:3 335:9,16
369:3 371:9
434:21 435:1
440:22 448:8
455:12
**2014** 334:14,24
335:24 453:19
462:8
**2015** 429:5 440:22
445:7,14 467:6
**2016** 414:9 442:22
443:6 444:11
450:16,21,24
467:6
**2017** 319:17 336:11
336:12 422:7,18
445:1 450:9,20
451:1 473:19
**21** 324:8,16
**21st** 341:19
**214.303.0ABC**
473:24
**214.303.0202** 473:25
**22160** 320:15
**24** 405:11
**24-month** 405:1,9
**24-0714** 319:9
**2400** 320:9
**248-2173** 320:10
**25** 418:20
**25th** 417:14 418:2
419:13 422:18
**26** 471:21,22,23
**26th** 335:16
**27** 471:19,20
**27th** 335:9
**2727** 319:21

**3**

**3** 375:24 392:11
**30** 418:20

**30th** 334:3
**30-day** 452:1,6
467:4
**31st** 411:24
**320** 321:3
**321-8510** 320:15
**324** 321:7
**337** 322:9
**35** 335:2 362:10
418:20
**360** 321:8
**398** 322:3

**4**

**4** 337:12,14
**40** 418:20
**408** 321:7
**411** 321:10
**412** 322:10
**415** 320:10
**416** 322:11
**420** 321:11
**425** 321:13
**427** 322:12
**431** 322:13
**436** 321:14
**447** 321:18
**45-year** 418:20
**459** 322:4
**462** 321:19
**473** 321:21
**48** 393:23
**491** 473:22

**5**

**5** 337:4 378:25
413:18 442:19
450:16
**556** 320:25 342:15
347:4 348:7,12,13
352:12 394:12
413:12 420:13
448:13

**6**

**6** 337:4 462:8
**600** 320:14
**630-5039** 320:5

**7**

**7** 359:9 379:16
391:5,6,12,15
392:11 393:2
426:17,18,19
429:19,20
**703** 320:15
**7050** 473:3,21

**75074** 473:24
**75702** 320:4

**8**

**8** 319:17 326:21
333:6,14,19,23
334:5,16 335:2,11
335:18 356:18,20
357:18 360:11
389:9,11 390:6
391:15,17 392:5
438:14
**8th** 323:6
**8:36** 323:2
**8:40** 323:7
**8:48** 333:2
**8:49** 333:2
**8001** 320:14
**82** 330:6,7,11 331:6
331:11
**83** 331:11

**9**

**9** 341:1,12 349:4,7
354:19 356:18
387:20 388:1
393:20
**9th** 334:14 335:24
**9/11** 383:5
**9:04** 342:21
**9:05** 342:21
**9:30** 360:3
**9:49** 360:3
**90** 330:12
**903** 320:5 473:23
**94111** 320:9