# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| CHARLENE CARTER, | § | Civil Case No. 3:17-cv-02278-X |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SOUTHWEST AIRLINES CO., AND | § | |
| TRANSPORT WORKERS UNION OF AMERICA, | § | |
| LOCAL 556, | § | |
| | § | |
| | § | |
| Defendants. | § | |

---

## SOUTHWEST AIRLINES CO.'S BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO CHARLENE CARTER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

## <u>TABLE OF CONTENTS</u>

Page

I.   CLARIFYING THE RECORD .................................................................. 2

II.  ARGUMENT .......................................................................................... 6

    A.   Carter Is Not Entitled to Summary Judgment On Her RLA Claim ...................... 6

        1.   Carter's Motion Is Based On a Legal Theory This Court Conclusively Rejected and That Is Not Contained In the Operative Complaint ........................................................................... 6

        2.   Carter Does Not Attempt to Satisfy Her "Heavy Burden" To Demonstrate That Section 152, Third & Fourth Provide a Private Right of Action ...................................................................... 10

        3.   Carter's Argument Ignores the Distinction Between Pre- and Post-Certification RLA Claims and the Import of the Arbitral Proceedings .................................................................... 11

        4.   Carter Is Not Entitled to Summary Judgment Because the Conduct that Resulted In Her Termination Is Not RLA Protected Activity ........... 13

            a.   The RLA Does Not Protect Carter's Messages In the Pre- or Post-Certification Context .................................... 14

            b.   Carter Forfeited Any RLA Speech Protections .......................... 19

                (1)   Carter's Attempt to Import the Full Panoply of First Amendment Speech Protections Into the RLA Lacks Legal Support ................................... 19

                (2)   Carter Forfeited Any RLA Speech Protection Due to the Graphic and Harassing Nature of Her Messages ................................................. 21

        5.   Irrespective of the Alleged Protected Status of Carter's Messages to Stone, Carter Effectively Concedes that Summary Judgment Is Inappropriate .................................................................. 23

    B.   Carter Is Not Entitled to Summary Judgment on Her Religious Discrimination Claim ................................................................ 24

        1.   Carter's Failed to Exhaust Administrative Remedies With Respect to Southwest's Alleged Failure to Accommodate ................................. 25

        2.   Carter Is Not Entitled to Summary Judgment On Her Failure to Accommodate Theory ........................................................ 26

        3.   Accommodating Carter's Communications Would Impose An Undue Hardship ................................................................. 32

III.  CONCLUSION ...................................................................................... 34

US_ACTIVE-162852703.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abeles v. Metro. Wash. Airports Auth.*,
   676 Fed. Appx. 170 (4th Cir. 2017)...................................................................................24

*Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*,
   802 F.2d 886 (7th Cir. 1986) ........................................................................................16

*Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*,
   620 F.3d 558 (5th Cir. 2010) ..........................................................................................6

*Amarsingh v. Jetblue Airways Corp.*,
   2010 U.S. Dist. LEXIS 23021 (E.D.N.Y. Jan. 29, 2010) .......................................23

*Amarsingh v. JetBlue Airways Corp.*,
   409 Fed. Appx. 459 (2d Cir. 2011).................................................................................24

*Ams. for Prosperity Found. v. Bonta*,
   141 S.Ct. 2373 (2021)....................................................................................................15

*Anderson v. Browning-Ferris, Inc.*,
   1994 U.S. App. LEXIS 41527 (5th Cir. June 28, 1994)...........................................31

*Antoine v. First Student, Inc.*,
   713 F.3d 824 (5th Cir. 2013) ........................................................................................32

*Averett v. Honda of Am. Mfg., Inc.*,
   2010 U.S. Dist. LEXIS 11307 (S.D. Ohio Feb. 9, 2010)..........................................33

*Balderas v. Valdez*,
   2018 U.S. Dist. LEXIS 124195 (N.D. Tex. July 25, 2018) ....................................32

*Beckett v. Atlas Air*,
   968 F. Supp. 814 (E.D.N.Y. 1997) .................................................................11, 17

*Boudreaux v. Swift Transp. Co., Inc.*,
   402 F.3d 536 (5th Cir. 2005) ..........................................................................................6

*Brandenburg* v. *Ohio*,
   395 U. S. 444 (1969)......................................................................................................20

*Burton v. Madix Store Fixtures*,
   2005 U.S. Dist. LEXIS 37487 (N.D. Tex. Dec. 29, 2005) ......................................25

US_ACTIVE-162852703.1

*Carr v. Chicago Cent. & Pac. R.R.*,
　　853 F. Supp. 282 (N.D. Ill. 1994) ...................................................................16

*Carter v. Transp. Workers Union of Am. Local 556 et al*,
　　353 F. Supp. 3d 556 (N.D. Tex. 2019) ........................................................ *passim*

*Celotex Corp. v. Catrett*,
　　477 U.S. 317 (1986)...........................................................................................6

*Chalmers v. Tulon Co. of Richmond*,
　　101 F.3d 1012 (4th Cir. 1996) .....................................................................28, 33

*Clark v. Avatar Techs. Phl, Inc.*,
　　2014 U.S. Dist. LEXIS 45940 (S.D Tex. Apr. 3, 2014) .......................................11

*Clark v. Champion Nat'l Sec., Inc.*,
　　952 F.3d 570 (5th Cir. 2020) ...........................................................................28

*Constellium Rolled Prods. Ravenswood, LLC v. NLRB*,
　　945 F.3d 546 (D.C. Cir. 2019)..........................................................................22

*Contempora Fabrics, Inc. v. United Food & Commercial Workers Union*,
　　344 NLRB 851 (2005) .......................................................................................22

*DaimlerChrysler Corp.*,
　　344 NLRB 1324 (2005) ....................................................................................21

*Diss v. Portland Pub. Schs.*,
　　2016 U.S. Dist. LEXIS 161829 (D. Or. Nov. 22, 2016) (*aff'd* 727 Fed. Appx.
　　438 (9th Cir. 2018)) .....................................................................................31, 32

*Dunn v. Air Line Pilots Ass'n*,
　　193 F.3d 1185 (11th Cir. 1999) ........................................................................15

*EEOC v. Short*,
　　2021 U.S. Dist. LEXIS 189407 (N.D. Tex. Sept. 30, 2021).................................6

*El v. GM Co.*,
　　2021 U.S. Dist. LEXIS 35106 (N.D. Tex. Feb. 25, 2021)...................................32

*Ellis v. Bhd. of Ry.*,
　　466 U.S. 435 (1984)..........................................................................................14

*Fields v. Keith*,
　　174 F. Supp. 2d 464 (N.D. Tex. 2001) .............................................................23

*Fontenot v. Upjohn Co.*,
　　780 F.2d 1190 (5th Cir. 1986) ...........................................................................6

US_ACTIVE-162852703.1

*Gonzalez v. Hogg Ins. Group, Inc.*,
 2012 U.S. Dist. LEXIS 2101 (E.D. Va. Jan. 6, 2012) ........................................................27

*Hall v. Cole*,
 412 U.S. 1 (1973)..................................................................................................................15

*Hamar v. Ashland, Inc.*,
 211 Fed. Appx. 309 (5th Cir. 2006)......................................................................................25

*Held v. Am. Airlines, Inc.*,
 2007 U.S. Dist. LEXIS 7665 (N.D. Ill. Jan. 30, 2007) ........................................12, 13, 18, 19

*Held v. Am. Airlines, Inc.*,
 2007 WL 433107 (N.D. Ill. Jan. 31, 2007) ....................................................................12, 21

*Honda of Am. Mfg., Inc.*,
 334 NLRB 746 (2001) ...........................................................................................................22

*Hussein v. Waldorf Astoria*,
 134 F. Supp. 2d 591 (S.D.N.Y. 2001)...................................................................................28

*Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*,
 789 F.2d 139 (2d Cir. 1986).......................................................................................13, 17, 19

*Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*,
 673 F.2d 700 (3d Cir. 1982)............................................................................................13, 14

*Jiglov v. Hotel Peabody, G.P.*,
 719 F. Supp. 2d 918 (W.D. Tenn. 2010)................................................................................32

*Johnson v. Express One Int'l, Inc.*,
 944 F.2d 247 (5th Cir. 1991) ................................................................................................17

*Klemens v. Air Line Pilots Ass'n, Int'l*,
 736 F.2d 491 (9th Cir. 1984) ................................................................................................16

*Knight v. State Dep't of Pub. Health*,
 275 F.3d 156 (2d Cir. 2001)..................................................................................................27

*Larocca v. Alvin Indep. Sch. Dist.*,
 2020 U.S. Dist. LEXIS 233060 (S.D. Tex. Oct. 28, 2020)....................................................26

*Leiser Constr., LLC*,
 349 NLRB 413 (2007) ......................................................................................................21, 22

*Letter Carriers v. Austin*,
 418 U.S. 264 (1974)...............................................................................................................14

iv

*Lorenz v. Wal-Mart Stores, Inc.*,
  2006 U.S. Dist. LEXIS 36145 (W.D. Tex. May 24, 2006) ....................................................27

*Lundeen v. Mineta*,
  291 F.3d 300 (5th Cir. 2002) ....................................................................................................11

*Machinists v. Street*,
  367 U.S. 740 (1961) ..................................................................................................................14

*Marchant v. Tsickritzis*,
  506 F. Supp. 2d 63 (D. Mass 2007) ..........................................................................................31

*Marden v. Int'l Ass'n of Machinists & Aerospace Workers*,
  576 F.2d 576 (5th Cir. 1978) ....................................................................................................14

*Media Gen. Ops., Inc. v. NLRB*,
  394 F.3d 207 (4th Cir. 2005) ....................................................................................................22

*Melgar v. T.B. Butler Publ'g Co.*,
  931 F.3d 375 (5th Cir. 2019) ....................................................................................................25

*Mial v. Foxhoven*,
  305 F. Supp. 3d 984 (N.D. Iowa 2018) .....................................................................................32

*Mitchell v. Univ. Med. Ctr., Inc.*,
  2010 U.S. Dist. LEXIS 80194 (W.D. Ky. Aug. 9, 2010) ..........................................................33

*Mobil Expl. and Producing U.S., Inc. v. NLRB*,
  200 F.3d 230 (5th Cir. 1999) ..............................................................................................16, 17

*NAACP v. State of Ala. ex rel. Patterson*,
  357 U.S. 449 (1958) ..................................................................................................................15

*NLRB v. Arkema, Inc.*,
  710 F.3d 308 (5th Cir. 2013) ....................................................................................................21

*Nobach v. Woodland Vill. Nursing Ctr.*,
  799 F.3d 374 (5th Cir. 2015) ..............................................................................................26, 28

*Novitsky v. Am. Consulting Eng'rs, LLC*,
  196 F.3d 699 (7th Cir. 1999) ....................................................................................................25

*Pantoja v. Brennan*,
  257 F. Supp. 3d 636 (D. Del. 2017) ..........................................................................................25

*Passmore v. 21st Century Oncology, LLC*,
  2018 U.S. Dist. LEXIS 61085 (M.D. Fla. Apr. 10, 2018) ...................................................29, 30

US_ACTIVE-162852703.1

*Perkins v. City of Greenwood,*
2016 U.S. Dist. LEXIS 37119 (N.D. Miss. Mar. 22, 2016)....................................................29

*Peterson v. Hewlett-Packard Co.,*
358 F.3d 599 (9th Cir. 2004) ....................................................................................................33

*Petramale v. Local No. 17 of Laborers Int'l Union,*
736 F.2d 13 (2d Cir. 1984).........................................................................................................15

*PHI, Inc. v. Office & Prof'l Employees Int'l Union,*
440 Fed. Appx. 394 (5th Cir. 2011)...........................................................................................11

*Rayyan v. Va. DOT,*
719 Fed. Appx. 198 (4th Cir. 2018)............................................................................................24

*Reed v. Great Lakes Cos.,*
330 F.3d 931 (7th Cir. 2003) .....................................................................................................31

*Roberts v. Lubrizol Corp.,*
582 Fed. Appx. 455 (5th Cir. 2014)............................................................................................10

*Robles v. Tex. Tech Univ. Health Scis. Ctr.,*
131 F. Supp. 3d 616 (W.D. Tex. 2015).......................................................................................25

*Ruby v. Am. Airlines, Inc.,*
323 F.2d 248 (2d Cir. 1963)........................................................................................................16

*Russell v. NMB,*
714 F.2d 1332 (5th Cir. 1983) ....................................................................................................17

*Schwartzberg v. Mellon Bank, N.A.,*
2008 U.S. Dist. LEXIS 1180 (W.D. Pa. Jan. 8, 2008)...............................................................29

*Steele v. Louisville & Nashville, R.R.,*
323 U.S. 192 (1944)....................................................................................................................14

*Stewart v. Spirit Airlines, Inc.,*
503 Fed. Appx. 814 (11th Cir. 2013) ..........................................................................................17

*Sw. Bell Tel. Co.,*
200 NLRB 667 (1972) ................................................................................................................22

*Sw. Bell Tel., L.P. v. City of Houston,*
529 F.3d 257 (5th Cir. 2008) ......................................................................................................11

*Turner v. BSA, Inc.,*
2009 U.S. Dist. LEXIS 73115 (W.D. Ok. Aug. 17, 2009) .........................................................31

US_ACTIVE-162852703.1

*TWA, Inc. v. Indep. Fed'n of Flight Attendants*,
    489 U.S. 426 (1989) ................................................................................... 12, 16

*Virginia v. Black*,
    538 U.S. 343 (2003) ......................................................................................... 20

*Walton-Lentz v. Innophos, Inc.*,
    476 Fed. Appx. 566 (5th Cir. 2012) ................................................................. 26

*Weber v. Roadway Exp., Inc.*,
    199 F.3d 270 (5th Cir. 2000) ...................................................................... 26, 32

*Whitehead v. City of Houston*,
    2009 U.S. Dist. LEXIS 142192 (S.D. Tex. Aug. 31, 2009) ............................. 10

*Wilkerson v. New Media Tech. Charter Sch., Inc.*,
    522 F.3d 315 (3d Cir. 2008) ............................................................................ 27

*Williams v. City of Richardson*,
    2020 U.S. Dist. LEXIS 49339 (N.D. Tex. Mar. 23, 2020) ............................... 10

*Wilson v. U.S. West Commc'ns*,
    58 F.3d 1337 (8th Cir. 1995) ........................................................................... 33

*YMCA of Pikes Peak Region, Inc. v. NLRB*,
    914 F.2d 1442 (10th Cir. 1990) ....................................................................... 21

**Statutes**

29 U.S.C. § 157 ...................................................................................................... 16

45 U.S.C. § 152 ................................................................................................ 11, 14

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 6

US_ACTIVE-162852703.1

Charlene Carter ("Carter" or "Plaintiff") seeks summary judgment against Southwest Airlines Co. ("Southwest") on the two counts in her Fourth Amended Complaint ("FAC") – retaliation in violation of the section 152, Third & Fourth of the Railway Labor Act ("RLA") (Count IV) and religious discrimination in violation of Title VII (Count V).

With respect to the RLA, Carter claims that Facebook messages she sent to fellow Southwest flight attendant Audrey Stone ("Stone"), which included videos of aborted fetuses and depictions of female genitalia, constituted "protected activity" because they expressed opposition to Transport Workers Union of America, Local 556 ("Local 556" or "Union") members' attendance and support of the 2017 Women's March.

With respect to her Title VII claim, Carter claims that her graphic Facebook messages and publicly-accessible posts – which included videos of aborted fetuses and depictions of female genitalia – were manifestations of her religion that Southwest had a legal duty to accommodate irrespective of its employment policies. Carter's motion lacks support in the law or record in this case.

The Court should deny Carter's motion for summary judgment on her RLA claim on each of the following grounds:

1.  This Court already dismissed with prejudice Carter's RLA claim predicated on the legal theory set forth in her motion.

2.  Carter seeks summary judgment on a legal theory not articulated in the FAC.

3.  Section 152, Third & Fourth of the RLA do not provide Carter a private right of action.

4.  Carter has not shown that she engaged in RLA-protected activity and even if she did so, the harassing and vulgar nature of her communications resulted in her losing those protections.

US_ACTIVE-162852703.1

5.      Even based on Carter's recitation of the pertinent facts, the so called "mixed motive" standard for RLA claims – which she does not substantively discuss – would apply and preclude summary judgment.

The Court should also deny Carter's motion for summary judgment on her Title VII claim on each of the following grounds:

1.      Carter did not exhaust administrative remedies with respect to her Title VII claim predicated on an alleged failure to accommodate.

2.      Carter never requested a religious accommodation, and Southwest was unaware of her alleged need for one.

3.      There is no evidence that Southwest took any adverse action against Carter based on her religious belief or a desire to avoid granting her an accommodation.

4.      The accommodation that Carter demands – the right to share any material related to abortion without restriction, no matter how graphic or offensive – is not mandated by her stated religious belief but is instead a personal preference that Southwest is not required to accommodate.

5.      Granting Carter an accommodation would have imposed an undue hardship.

Given the dueling summary judgment motions, on one issue the parties appear to be aligned: there are critical claim-dispositive questions in this case that are legal and that do not involve disputed issues of material fact. As set forth herein and in Southwest's own motion, Carter is not entitled to summary judgment.

## I.      CLARIFYING THE RECORD

Southwest timely moved for summary judgment on all of Carter's claims. Dkt. No. 29. In that motion, Southwest summarized the material facts and the legal basis for dismissal. While Southwest will not burden the Court by restating the factual narrative and legal arguments supporting its motion, it is necessary to address some of the inaccurate or incomplete assertions in Carter's statement of facts.

US_ACTIVE-162852703.1

Carter states that she supported the campaign to recall Stone as Union president. SOF ¶ 13.[1] However, because Carter resigned from Union membership in 2013, she could not vote in Union elections, sign any recall petitions, attend Union meetings, or be subject to Union disciplinary proceedings. SWA App.[2] 224-225 (Carter 225:19-226:2), 239-240 (Stone 86:8-87:8), 277-278 (Montgomery 17:21-18:8). As such, while Carter may have agreed with the recall campaign, she could not meaningfully participate in it.

Carter also mischaracterizes Ed Schneider's March 10, 2017 email summarizing Southwest's investigation into her misconduct. Carter uses partial quotes from the email to suggest that Schneider bore some personal animosity towards her based on her Union opposition and/or her religious beliefs. *See* SOF ¶¶ 76-79. However, as the following chart demonstrates, it is evident that Schneider was simply summarizing what Carter and Stone stated during the investigation process; he was not proffering a personal opinion about Carter.

| Quoted Text from Schneider's Email | Schneider's Email Including Critical Omitted Text |
|---|---|
| "Carter has been making comments that indicated she was not Union friendly since 2008. Audrey Stone became President of TWU Local 556 in 2013 and she stated that Charlene has been sending her messages since that time, before there were any issues due to abortion or women's rights." SOF ¶ 77. | In our investigation *we talked to Audrey Stone first* … **She** [***Stone***] ***stated that Charlene Carter has been making comments that indicated she was not Union friendly since 2008***. Audrey Stone became President of TWU Local 556 in 2013 and ***she*** [***Stone***] ***stated*** that Charlene has been sending her messages since that time, before there were any issues due to abortion or women's rights. Pl's App.[3] 268 (emphasis added). |
| Carter "latched onto the recent Women's March and abortion issues as her defense, | ***In our fact finding meeting with Charlene, she openly admitted*** to sending Facebook |

---

[1] "SOF" refers to the statement of facts in Carter's brief supporting her motion for partial summary judgment.
[2] "SWA App." refers to the Appendix Southwest submitted in support of its motion for summary judgment. Dkt. No. 30.
[3] "Pl's App." refers to the Appendix Carter submitted in support of her motion for summary judgment.

| | |
|---|---|
| stating it was against her values as a Christian." SOF ¶ 78. | messages to Audrey for at least the past two years. She latched onto the recent Women's March and abortion issues as her defense, stating it was against her values as a Christian, but the harassment has been going on for much longer." Pl's App. 268 (emphasis added). |
| Charlene has several posts that are visible on her Facebook timeline showing graphic and disturbing videos of an aborted fetus and statements about her political views. Charlene stated that she had an abortion when she was young and regrets every bit of it, so she works with other pro-life groups as a Christian to spread the anti-abortion message out in any way possible. SOF ¶ 79. | Charlene has several posts that are visible on her Facebook timeline showing graphic and disturbing videos of an aborted fetus and statements about her political views. Charlene stated that she had an abortion when she was young and regrets every bit of it, so she works with other pro-life groups as a Christian to spread the anti-abortion message out in any way possible. ***Charlene acknowledges there are posts on her Facebook page that show her as a Southwest Airlines Employee in uniform and connect her to the workplace***. … ***Charlene admitted she did not know Audrey's political views and she did not know Audrey's stand on abortion issues***. Pl's App. 268 (emphasis added). |

As the above text demonstrates, Schneider's email was not some cryptic reflection of animosity. To the contrary, the email was an accurate summary of statements Carter and Stone made during the investigation. Carter's attempt to attribute the statements directly to Schneider is disingenuous.

During Southwest's investigation into Carter's conduct, Schneider involved Southwest's Employee Relations Department, which is responsible for addressing workplace discrimination and related issues. Carter suggests that Schneider involved Employee Relations because he thought the investigation implicated Carter's views on abortion. *See* SOF ¶¶ 51, 58. Schneider's testimony makes clear, however, that his concern was not Carter's religion, but rather assessing whether Carter's circulation of depictions of vaginas and graphic videos of aborted fetuses constituted harassment of Stone. SWA App. 67-69 (Schneider 48:4-21, 50:2-17). This concern is further

US_ACTIVE-162852703.1

reflected in the investigatory findings set forth in Carter's termination letter, which notes that her conduct potentially violated Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination and Retaliation. SWA App. 1180.

Carter attempts to diminish the graphic nature of her communications by equating the "pink pussy hats" worn at the Women's March with the depictions of anatomically correct female genitalia she sent to Stone, with the unstated implication being that, if Stone does not object to the former, she should not object to receipt of the latter. SOF ¶ 28; Pl's Brief at 37-38. A direct comparison of the two images (*see* Pl's App. 82) renders Carter's comparison untenable:





US_ACTIVE-162852703.1

## II.   ARGUMENT

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on Carter's motion, "the court is required to view all facts and inferences in the light most favorable" to Southwest and "resolve all disputed facts in [its] favor[.]" *EEOC v. Short*, 2021 U.S. Dist. LEXIS 189407, *3 (N.D. Tex. Sept. 30, 2021) (*citing Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005)). With all factual disputes resolved in Southwest's favor, Carter is only entitled to summary judgment if she demonstrates "beyond peradventure *all* of the essential elements of [her] claim[s.]" *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *see also Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010). Carter has not satisfied her burden and thus the Court should deny her motion.

### A.   Carter Is Not Entitled to Summary Judgment On Her RLA Claim

#### 1.   Carter's Motion Is Based On a Legal Theory This Court Conclusively Rejected and That Is Not Contained In the Operative Complaint

The legal theory Carter advances in support of her RLA retaliation claim *is not* that Southwest, when it terminated her employment, was *motivated* by hostility to Union objectors or employees who otherwise disagree with Local 556. Rather Carter claims she had a RLA-protected right to send Stone videos of aborted fetuses and depictions of female genitalia. *See* Pl's Brief[4] at 32, 35 ("Carter engaged in RLA-protected activity when she sent Facebook videos to President Stone"). And because Southwest relied on these messages when it terminated her employment, the

---

[4] "Pl's Brief" refers to Carter's Brief Supporting her Motion for Partial Summary Judgment. Dkt. No. 171-1.

US_ACTIVE-162852703.1

underlying pro- or anti-union motivation of the decision maker is of no import. Thus, under Carter's theory, even if her conduct constituted clear and admitted violations of Southwest policies, Southwest was obligated to excuse those violations because they occurred in the context of RLA-protected activity. Carter's theory finds no support in the law and, more importantly is contrary to the Court's previous ruling on Southwest's motion to dismiss. *See Carter v. Transp. Workers Union of Am. Local 556 et al*, 353 F. Supp. 3d 556 (N.D. Tex. 2019)

Southwest previously moved to dismiss Carter's Second Amended Complaint ("SAC") (dkt. no. 47), which purported to state three counts for violations of section 152, Third & Fourth of the RLA and predicated those counts on the following allegations:

| Count | Stated Grounds | Key Allegations | Disposition |
|-------|----------------|-----------------|-------------|
| Count I | "Southwest illegally terminated Carter for engaging in speech protected by the RLA" | "Carter engaged in RLA-protected speech when she sent Facebook messages to President Stone and made related posts conveying her criticism and opposition, as a nonmember objector, to the political leadership of the union, and to the union's use of dues in support of political, ideological, and religious causes with which she profoundly disagreed, all of which was in the context of a campaign to oppose Local 556's leadership and expenditures, and to reorganize the union via a recall election." SAC ¶ 80.<br><br>"By firing Carter for her Facebook messages to President Stone and for related posts, Southwest violated Carter's rights under RLA Section 2, Third and Fourth to vigorously exercise "uninhibited, robust, and wide-open" free speech related to flight attendants' efforts to reorganize Local 556, to collectively bargain with Southwest, and to oppose the union's leadership and spending." SAC ¶ 81. | Dismissed with prejudice. *Carter*, 353 F. Supp. 3d at 570-73. |
| Count II | "Southwest maintained and | Southwest's policies are "overbroad in the manner in which they were maintained and | Dismissed with prejudice. *Carter*, |

US_ACTIVE-162852703.1

| Count | Stated Grounds | Key Allegations | Disposition |
|---|---|---|---|
| | enforced overbroad and vague policies that chill and restrict employees in their exercise of protected rights" | enforced against Carter, restricting her rights under the RLA to engage in protected speech … in opposition to Local 556." SAC ¶ 88 | 353 F. Supp. 3d at 570-73 |
| Count IV | "Southwest … retaliated against Carter for the exercise of her protected rights under the RLA" | "Carter exercised her rights under the … RLA to resign from membership in Local 556 and to object to the forced payment of political and other nonchargeable union expenses. Carter engaged in protected … activity in opposing … Local 556, President Stone, and the union's activities and expenditures. Carter opposed Local 556, President Stone, and their political and ideological views, and supported the recall of the Local 556 Executive Board." SAC ¶ 105.<br><br>Carter's protected … activities were a substantial and motivating factor for [her] termination … as evidenced by … (a) the timing of Carter's termination in relation to her protected activity, (b) a pattern of retaliatory discharge of other nonmember objectors and Local 556 opponents, (c) the disparate treatment of Carter and other nonmember objectors and Local 556 opponents in contrast with Local 556 members and supporters, (d) Carter's 20-year employment history at Southwest without any disciplinary record, (e) Southwest's deviation from past disciplinary practices, (f) the inconsistencies between Southwest's justifications for terminating Carter and its other actions, (g) the implausibility of Southwest's justifications, (h) Southwest's failure to follow its own progressive disciplinary policy and other disciplinary rules, and (i) the manner in which Southwest conducted its investigation and fact finding prior to Carter's termination. SAC ¶ 109. | Motion to dismiss denied. *Carter*, 353 F. Supp. 3d at 573-74. |

US_ACTIVE-162852703.1

As the above chart demonstrates, Carter predicated Counts I and II on the same legal theory advanced in her motion for summary judgment – *i.e.*, that her messages to Stone were *per se* protected and her termination therefore was necessarily unlawful ("Southwest illegally terminated Carter for engaging in ***speech*** protected by the RLA"). *See* SAC ¶¶ 80-81, 88. But this Court dismissed those counts with prejudice and rejected the theory Carter advances in her summary judgment motion. *Carter*, 556 F. Supp. 3d at 570-73. In doing so, the Court relied on the post-certification nature of the dispute; the availability of the arbitral forum to address Carter's termination; and the absence of allegations suggesting a serious attack on the union or collective bargaining process.[5] *Id.*

On the other hand, the Court – relying on Carter's allegations of disparate treatment – declined to dismiss Count IV. Recounting Carter's history of opposition to Local 556, the Court concluded that she had pled enough facts to avoid dismissal. The Court relied principally on Carter's allegations of disparate treatment of recall supporters and opponents, stating:

> Plaintiff [] alleges that 'Southwest has subjected approximately thirteen supporters of the recall effort to termination of employment, suspension, repeated fact-findings, and/or other disciplinary measures in the last twelve months, many times at the request of Local 556 members and officials.' … In contrast to recall supporters, Plaintiff alleges that other flight attendants were not terminated by Southwest or ultimately were allowed to keep their jobs despite complaints filed against them involving social media posts that were allegedly threatening or harassing.

> Viewing the well-pleaded factual allegations in the light most favorable to Plaintiff, the Court finds that Plaintiff's allegations are sufficient to establish "more than a sheer possibility" that Southwest was motivated by Plaintiff's RLA-protected activities in terminating her employment.

---

[5] Carter attempted to include these dismissed counts in her Third Amended Complaint. Dkt. No. 70. Southwest and Local 556 moved to strike the Third Amended Complaint for this very reason. Dkt. Nos. 72-73. The Court granted that motion. Dkt. No. 79 (striking complaint because Plaintiff "failed to remove causes of action that have been dismissed with prejudice").

9

US_ACTIVE-162852703.1

*Carter*, 353 F. Supp. 3d at 573-74.

The only RLA legal theory that survived dismissal is not the one Carter advances in her motion. Rather, she seeks to resuscitate a legal claim that this Court has already rejected. This alone necessitates denying summary judgment on Carter's RLA claim. *See generally Williams v. City of Richardson*, 2020 U.S. Dist. LEXIS 49339, *16-17 (N.D. Tex. Mar. 23, 2020) ("Plaintiff [] attempts to re-argue facts related to his former supervisor … against whom the claims … were dismissed with prejudice … As these claims have been dismissed with prejudice, the court will not revisit them."); *Whitehead v. City of Houston*, 2009 U.S. Dist. LEXIS 142192, *38 (S.D. Tex. Aug. 31, 2009) (refusing to revisit argument addressed at motion to dismiss stage).

In recognition of the Court's prior dismissal and order striking the Third Amended Complaint, Carter's operative FAC does not advance the previously legal theory that is at the heart of her motion for summary judgment. Rather, in the FAC, Carter relies on Southwest's alleged hostility to objectors like herself, a contention she attempts to bolster with the same unsupported allegations of disparate treatment that were in the SAC. *See* SAC ¶¶ 109; FAC ¶ 100. Cater cannot seek summary judgment on a basis that the Court already rejected and is not plead in the operative complaint. *See Roberts v. Lubrizol Corp.*, 582 Fed. Appx. 455, 461 (5th Cir. 2014) (plaintiff limited to legal theories in the complaint on summary judgment).

2.   Carter Does Not Attempt to Satisfy Her "Heavy Burden" To Demonstrate That Section 152, Third & Fourth Provide a Private Right of Action

In her motion, Carter focuses almost exclusively on the RLA's substantive protections. In doing so, Carter puts the proverbial cart before the horse by failing to address the more basic and dispositive question – whether an individual employee has a private right of action under section 152, Third & Fourth.

10

US_ACTIVE-162852703.1

Section 152, Third & Fourth do not expressly provide individuals with a private right of action. *See, e.g.*, *Beckett v. Atlas Air*, 968 F. Supp. 814, 817 (E.D.N.Y. 1997). Thus, there is a "'presumption that Congress did not intend to create a private right of action.'" *Lundeen v. Mineta*, 291 F.3d 300, 310 (5th Cir. 2002); *see also Sw. Bell Tel., L.P. v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008) ("It is presumed Congress did not intend to create a private enforceable right; the burden is on the plaintiff to show otherwise."). Overcoming this presumption is no small task. "The ***plaintiff generally bears the relatively heavy burden*** of demonstrating that Congress affirmatively contemplated private enforcement when it passed the relevant statute." *Lundeen*, 291 F.3d at 311 (emphasis added). Thus, Carter must provide "affirmative evidence of Congress's intent to grant a private right of action" under section 152, Third & Fourth. *Clark v. Avatar Techs. Phl, Inc.*, 2014 U.S. Dist. LEXIS 45940, *7 (S.D Tex. Apr. 3, 2014).

Importantly, the Fifth Circuit has addressed this question. In *PHI, Inc. v. Office & Prof'l Employees Int'l Union*, 440 Fed. Appx. 394 (5th Cir. 2011), the Fifth Circuit affirmed dismissal of a RLA claim based the unavailability of a private right of action. The Fifth Circuit adopted the district court's "determination that [] individual[s] do not have a private cause of action under section 2, Third & Fourth of the Railway Labor Act." *Id.* at 396. Carter ignores this precedent and does not attempt demonstrate the existence of a private right of action. Thus, Carter necessarily failed to satisfy her "heavy burden" on this claim dispositive question, which necessitates denying her motion.

3.   Carter's Argument Ignores the Distinction Between Pre- and Post-Certification RLA Claims and the Import of the Arbitral Proceedings

Section 152, Third and Fourth of the RLA protects the right of unrepresented employees to organize a union without interference by the carrier. *See* 45 U.S.C. §§ 152, Third & Fourth. These provisions are designed to protect "the *precertification* rights and freedoms of unorganized

11

employees" – *i.e.*, the period before a union is certified as the bargaining representative. *TWA, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989). After certification, "judicial intervention … is limited to those cases where 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the [RLA's] statutory commands[.]'" *Id.* at 441 (citations omitted); *see also Carter*, 353 F. Supp. 3d at 571-72. Stated differently, Section 152, Third and Fourth "do not provide a remedy after a union has been certified except in cases of extreme anti-union bias or animus." *Held v. Am. Airlines, Inc.*, 2007 U.S. Dist. LEXIS 7665, *18 (N.D. Ill. Jan. 30, 2007).

This Court has *already* concluded that Carter cannot demonstrate the degree of "anti-union animus or a fundamental attack on the collective bargaining process on the part of Southwest that is necessary to bring a post-certification dispute within the jurisdiction of the district court." *Carter*, 353 F. Supp. 2d at 572. This Court also concluded that the arbitral forum provided Carter with an adequate opportunity to redress any alleged retaliation and protect her statutory rights, stating:

> [T]he Court finds that Plaintiff cannot establish that Southwest's conduct rose to the level of leaving her "no remedy to enforce" her statutory rights under the RLA. … Even as a nonmember objector, Plaintiff had access to, and in fact utilized, the contractual dispute resolution procedure under the CBA … "It appears that no federal court has permitted an employee to pursue a claim under §§ 2 Third and Fourth after the employee has submitted to arbitration under the [CBA]." *Held v. Am. Airlines, Inc.*, 2007 WL 433107, *6 (N.D. Ill. Jan. 31, 2007).

> Because Plaintiff had a remedy to enforce her rights under the RLA and because Plaintiff failed to plead sufficiently the anti-union animus necessary to support her claims, the Court finds that judicial intervention is unwarranted in Plaintiff's post-certification RLA claims. Even if Plaintiff were given the opportunity to replead, she cannot change the fact that she had access to, and in fact utilized, the contractual dispute resolution procedure under the CBA. Therefore, the Court finds that any further amendment of Plaintiff's RLA claims would be futile.

*Carter*, 353 F. Supp. 2d at 572-73.

12

The RLA does not permit an individual "to pursue a claim under §§ 152 Third & Fourth after the employee has submitted to arbitration under the collective bargaining agreement." *Held*, 2007 U.S. Dist. LEXIS 7665, *19 (dismissing section 152, Third & Fourth claims because "plaintiff … ha[d] a remedy in the form of the System Board and opted to pursue resolution of his grievance in this manner."); *see also Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 142 (2d Cir. 1986) (declining jurisdiction and noting that plaintiffs could challenge their disciplinary action through the adjustment board); *Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700, 712 (3d Cir. 1982) ("the controversy which had been properly commenced as a System Board arbitration should have concluded in that forum[.]").

Plaintiff addressed her claims in the arbitral forum and she lost. The RLA provides her with no further relief. Moreover, Carter does not provide any legal or factual basis for the Court to intervene in this post-certification dispute. Thus, the law does not support summary judgment in her favor.

4.  Carter Is Not Entitled to Summary Judgment Because the Conduct that Resulted In Her Termination Is Not RLA Protected Activity

As noted above, Carter does not contend her termination was motivated by hostility to non-members or recall supporters but rather that she had a RLA-protected right to send Stone videos of aborted fetuses and images of women dressed as anatomically correct vaginas. As such, under Carter's legal theory (which this Court has already rejected), the question before this Court is discrete and the bulk of Carter's factual narrative is immaterial. As set forth below and in Southwest's motion for summary judgment, the RLA does not protect the conduct at issue and, even if it did in general, Carter forfeited any protection due to the graphic content of her communications.

13

a.  The RLA Does Not Protect Carter's Messages In the Pre- or Post-Certification Context

Sections 152, Third & Fourth protect employees' right to organize a union and select their representatives for purposes of collective bargaining without employer interference. *See* 45 U.S.C. § 152, Third & Fourth; *Int'l Ass'n of Machinists & Aerospace Workers*, 673 F.2d at 707 ("[B]y the enactment of Section 152 Third and Fourth, Congress sought to … insur[e] that employees' designation of bargaining representatives would be free from employer coercion or interference."). From this abstraction and others like it, Carter claims she had a legally protected right to circulate videos of aborted fetuses and images of female genitalia to Stone and presumably any co-worker with whom she disagreed on Union-related matters. The authorities Carter cites are largely irrelevant to that assertion.

For example, Carter – quoting the concurring opinion in *Machinists v. Street*, 367 U.S. 740 (1961) – states that an employee "should not be required to finance the promotion of causes with which he disagrees." Pl's Brief at 34-35. This case does not address the scope of activities protected by section 152, Third & Fourth. Rather, it addresses the purposes for which a union can use an objecting employee's dues under section 152, Eleventh. *Id.* at 768-69.[6] Carter also cites inapposite cases that address whether a union can discriminate against members based on race (*see Steele v. Louisville & Nashville, R.R.*, 323 U.S. 192 (1944)); the showing required to prevail on a defamation claim based on statements made in the midst of a labor dispute (*see Letter Carriers v.*

_____

[6] In this regard, Southwest notes that while there are certain expenditures for which non-member objectors cannot be compelled to pay, it remains true that they can be required "to share in the expenses of union activity[.]" *Marden v. Int'l Ass'n of Machinists & Aerospace Workers*, 576 F.2d 576, 579 (5th Cir. 1978); *see also Ellis v. Bhd. of Ry.*, 466 U.S. 435, 448-51 (1984) (union can permissibly charge non-member objectors for costs of sending elected officers to a national convention, social activities, and union publications). While Carter may take issue with this arrangement or the Union's expenditures, the RLA provides her a remedy. But her speculation about the Union's use of funds in the context of the current action says nothing about her rights under section 152, Third & Fourth.

14

US_ACTIVE-162852703.1

*Austin*, 418 U.S. 264 (1974); *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185 (11th Cir. 1999)); and the permissibility of union discipline against members based on statements made during union meetings under the Labor Management Reporting and Disclosure Act (*see Hall v. Cole*, 412 U.S. 1 (1973); *Petramale v. Local No. 17 of Laborers Int'l Union*, 736 F.2d 13 (2d Cir. 1984)).[7]

Carter not only cites irrelevant authorities, she relies on non-sequiturs. For example, quoting the NLRA's language allowing employees "to form, join or assist labor organizations", Carter derives a catch all "[f]reedom[] of association" that "shield[s] dissident speech and expression by the majority." Pl's Brief at 34. Carter cites no RLA or NLRA authority supporting her call for the Court to import the entirety of First Amendment protected speech into the unionized workplace. Rather, she quotes Supreme Court decisions that address the constitutionality of state laws mandating that non-profit organizations disclose certain donor or membership information. *See* Pl's Brief at 34 n.9 (*citing* and *Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373 (2021) and *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958)). Furthermore, as discussed below (*see infra* II.A.4.b.1), treating all First Amendment protected speech as RLA protected activity so long as it has some connection to union matters is a radical proposition that would necessitate wholesale reassessment of established law.

To bolster the legal proposition that is central to Carter's motion – that her Facebook messages to Stone were protected – Carter cites little RLA authority. Rather, she principally relies on authorities applying the NLRA, which she claims is "nearly identical" to the RLA. *See* Pl's

---

[7] Carter plays fast and loose with some authorities in her motion. For example, Carter states that "[f]ederal labor laws, ***including the RLA***, … subject union officers to extreme robust speech from the employees they purport to represent." Pl's Brief at 45 (emphasis added). The authorities Carter cites in support of this do not even mention the RLA.

US_ACTIVE-162852703.1

Brief at 35. While cases applying the NLRA can, in certain circumstances, be relevant in an RLA case, they do not advance Carter's argument here.

"The NLRA and the RLA are fundamentally different." *Klemens v. Air Line Pilots Ass'n, Int'l*, 736 F.2d 491, 496 (9th Cir. 1984). "[S]imply because a practice is deemed unlawful under the NLRA does not automatically translate into a finding that the same practice is unlawful under the RLA." *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 898 (7th Cir. 1986). Indeed, "the claim that the courts should do under the Railway Labor Act what Congress directed the NLRB to do under the National Labor Relations Act … flies in the face of the difference in the language and scheme of the two statutes [and] ignores the diverse problems to which they were addressed." *Ruby v. Am. Airlines, Inc.*, 323 F.2d 248, 256 (2d Cir. 1963).

To be sure, "***carefully drawn*** analogies from the federal common labor law developed under the NLRA ***may*** be helpful in deciding cases under the RLA." *TWA, Inc.*, 489 U.S. at 432 (emphasis added). However, the NLRA "cannot be imported wholesale into the railway labor arena." *Id.* at 439. Indeed, "[e]ven rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes." *Id.*; *see also Carr v. Chicago Cent. & Pac. R.R.*, 853 F. Supp. 282, 286 (N.D. Ill. 1994) ("The NLRA may offer helpful analogies but analogy should not be confused with binding precedent.").

Illustrative of the legal error resulting from Carter's reliance on NLRA authorities is her citation to *Mobil Expl. and Producing U.S., Inc. v. NLRB*, 200 F.3d 230 (5th Cir. 1999) for the general proposition that employees have a protected right to oppose the leadership of an incumbent union. Pl's Brief at 35. The statutory basis for the decision in *Mobil Expl.* was that, in the circumstances of the case, the employee engaged in concerted activities under section 7 (29 U.S.C. § 157) when he opposed union leadership. *See Mobil Expl.*, 200 F.3d at 240 ("we cannot say that

16

the Board erred in concluding that 'Pemberton's conduct … constituted protected *concerted activity*") (emphasis added). However, as the Fifth Circuit has recognized, the RLA "protects employees' right to establish a union" but there is "no indication that the RLA seeks to preserve employees' rights to act in concert for 'mutual aid or protection.'" *Johnson v. Express One Int'l, Inc.*, 944 F.2d 247, 252-53 (5th Cir. 1991); *see also Stewart v. Spirit Airlines, Inc.*, 503 Fed. Appx. 814, 818 (11th Cir. 2013) (Section 152, Fourth "only protects employees in their efforts to join or organize a union not to engage in concerted activities"). The decision in *Mobil Expl.* was based on a legal right that the RLA does not provide. Speaking more generally, the RLA "protects a narrower range of activities … than does section 7 of the NLRA." *Beckett*, 968 F. Supp. at 820; *see also Indep. Union of Flight Attendants*, 789 F.2d at 141 n.2.

In the rare instance where Carter discusses RLA authorities she fares no better. For example, Carter cites *Russell v. NMB*, 714 F.2d 1332 (5th Cir. 1983), for the proposition that the RLA treats all efforts to remove specific union officials as protected. Pl's Brief at 33. As an initial matter, sending private messages to a union official containing videos of aborted fetuses and depictions of genitalia have no discernible relationship to efforts to depose that official or reject collective representation in general. More fundamentally, The issue in *Russell* was neither the scope of an employee's speech rights under section 152, Third & Fourth, nor an individual's purported right to hurl invective to employees who happen to be union officials. Rather, the *Russell* court addressed whether the National Mediation Board had a statutory obligation to investigate a representation dispute that was supported by authorization cards from the majority of the bargaining unit. *Id.* at 1135. *Russell* did not proclaim any legal proposition that speaks to the protected or unprotected nature of Carter's messages.

17

In contrast to the cases Carter cites, the court in *Held v. Am. Airlines, Inc.* rejected claims nearly identical to those Carter alleges here. In *Held*, Allied Pilots Association ("APA") members posted on a password-protected internet forum for union members. *Held*, 2007 U.S. Dist. LEXIS 7665, *2. On the forum, APA members discussed Gary Weller, the elected Chairman of the union's appeal board. *Id.* at *3. "Union members were unhappy because Weller had complained to [] American about a union member's exercise of off-duty, off-premises political speech[.]" *Id.* at *3-4. On January 22, the plaintiff penned a message on the board objecting to the APA Chairman's representation and the union more broadly. The message also contained comments regarding Weller's sexual orientation. As it related to the union, the plaintiff stated that "Weller and his cronies have misused and abused the political process"; indicated that Weller should "move on to true union business"; and objected to the union's conduct with respect to the pilot pension plan. *Id.* at *4-5. Thereafter, APA officials delivered or assisted in delivering the plaintiff's message to American management. *Id.* at *6. American suspended and eventually terminated the plaintiff for violation of its work environment policy. *Id.* at *7-8. The plaintiff filed a grievance and eventually proceeded to arbitration. The System Board concluded that American had good cause to terminate plaintiff employment and denied the grievance. *Id.* *11-12.

The plaintiff brought claims against American under section 152, Third & Fourth. *Id.* at *17. The court dismissed the claims on three grounds, all of which are present here:

> **Post-Certification Dispute**: Section 152, Third & Fourth address the pre-certification rights of unorganized employees. *Id.* at *18. Because the plaintiff's termination did not "strike a fundamental blow" to collective bargaining and was not "inherently destructive" to the union, there was no basis for post-certification judicial intervention. *Id.* at *18-19.

> **Plaintiff's Use of Arbitration Remedy**: Once an employee submits to arbitration under the CBA, she cannot bring claims in court under section 152, Third & Fourth. "[N]o federal court has permitted an employee to pursue a claim under §§ 2 Third and Fourth after the employee has submitted to arbitration under the

18

collective bargaining agreement." *Id.* at \*19. Because "plaintiff did … have a remedy in the form of the System Board and opted to pursue resolution of his grievance in this manner … [he] fails to state a claim under §§ 2 Third and Fourth of the RLA." *Id.*

**Minor Dispute**: Because plaintiff's claim "necessitate[d] the evaluation of the CBA to determine applicable work rules and disciplinary procedures" it was a preempted minor dispute. *Id.*

The key facts in *Held* are the same as those Carter asserts here. Carter's claim arises from messages directed to union officials; the messages involved objections to the representation of union officials; a union official reported the messages to the employer; and the messages criticizing union leadership resulted in termination.

*Held* – which this Court has cited approvingly – is consistent with numerous decisions rejecting RLA claims where the plaintiff had the opportunity to contest an adverse employment action in the contractual arbitral forum. *See, e.g.*, *Carter*, 353 F. Supp. 3d at 572-73 (dismissing RLA claims where plaintiff "cannot establish that Southwest's conduct … [left] her 'no remedy to enforce' her statutory rights under the RLA" because she "had access to, and in fact utilized, the contractual dispute resolution procedure under the CBA"); *Indep. Union of Flight Attendants*, 789 F.2d at 142 (RLA claim failed because, *inter alia*, there was no suggestion that the employer "precluded … any [] flight attendant from challenging any disciplinary action through the adjustment board procedure.").

As this Court previously recognized, there is no basis for judicial involvement in Carter's post-certification, post-arbitration dispute based on the alleged protected status of her communications to Stone.

      b.   <u>Carter Forfeited Any RLA Speech Protections</u>

         (1)   <u>Carter's Attempt to Import the Full Panoply of First Amendment Speech Protections Into the RLA Lacks Legal Support</u>

US_ACTIVE-162852703.1

Carter contends that, notwithstanding the inflammatory nature of her communications to Stone, they did not lose their purported statutory protection. Carter cites context-free generalities from cases recognizing the legal complexities resulting from the unusual relationship between an employee, her union, and the employer. Based on general references to "constitutional limitations" in these cases, Carter attempts to define the scope of RLA-protected speech as equivalent to speech protected by the First Amendment, which is inapplicable to private actors such as Southwest. *See Carter*, 353 F. Supp. 3d at 574-576. Carter declines to cite RLA or NLRA, authority supporting this proposition. Instead, Carter provides an exegesis on the First Amendment's protection of offensive and disturbing speech in contexts divorced from employment or labor relations. *See* Pl's Brief at 45-47.

The standard Carter articulates is not only legally wrong, it invites a radical re-assessment of employment and labor relations. For example, if Carter objected to Local 556's policy against racial discrimination, would the law entitle her to send racial invective, videos of cross burnings, and Klan literature to African American union officials and supporters without disciplinary action? It is difficult to understand why not under Carter's analysis – the First Amendment clearly protects such speech and it would touch upon union policies and practices. *See generally Virginia v. Black*, 538 U.S. 343 (2003); *Brandenburg* v. *Ohio*, 395 U. S. 444, 446, n.1 (1969). Carter could contend, just as she does now, that while cross burning videos "may be offensive to the[] recipients", they are nevertheless protected (Pl's Brief at 37) and that the target of the speech should "avoid [] bombardment of [his] sensibilities [] by averting [his] eye." Pl's Brief at 37 n.16.

Fortunately, Courts applying federal labor law have not embraced the legal standard Carter articulates. Indeed, as set forth below, Carter's communications, even if normally protected, lost that protection due to their inflammatory and harassing content.

US_ACTIVE-162852703.1

(2)     Carter Forfeited Any RLA Speech Protection Due to the
Graphic and Harassing Nature of Her Messages

Assuming, *arguendo*, that Carter could demonstrate she engaged in protected activity, summary judgment on her RLA claim would remain improper. Based on the harassing and vulgar nature of Carter's posts, she forfeited any protections that might otherwise attach to her communications.

Even "speech relating to union activity loses statutory protection if it is vulgar, offensive, abusive, or harassing." *Held*, 2007 WL 433107, *7; *see also NLRB v. Arkema, Inc.*, 710 F.3d 308, 316 (5th Cir. 2013) ("Harassment and intimidation are not protected union activities; offensive, hostile language and threats are not protected even if under the guise of union activity"). Neither do profane or otherwise intemperate expressions carry the protections of Section 7. *See YMCA of Pikes Peak Region, Inc. v. NLRB*, 914 F.2d 1442, 1456 (10th Cir. 1990); *Arkema, Inc.*, 710 F.3d at 316 ("it is preposterous that employees are incapable of organizing a union or exercising their other statutory rights … without resort to abusive or threatening language."). In addition, an employee's protected activity "may give way when 'special circumstances' override the employees' [] interests[.]" *Leiser Constr., LLC*, 349 NLRB 413, 415 (2007). Special circumstances may include, *inter alia*, situations in which the protected activity is "vulgar or obscene[,] [] may 'exacerbate employee dissension' or situations in which restriction … 'is necessary to maintain decorum and discipline … '" *Id.* "Where an employee engages in indefensible or abusive misconduct during otherwise protected activity, the employee forfeits the [NLRA's] protection." *DaimlerChrysler Corp.*, 344 NLRB 1324, 1329 (2005).

Applying these rules, Courts and the NLRB have deemed unprotected images and commentary that are less inflammatory than videos of aborted fetuses, depictions of genitals, declarations that a co-worker supports murder, and a litany of personal insults, among other things.

21

*See generally Media Gen. Ops., Inc. v. NLRB*, 394 F.3d 207, 209, 212 (4th Cir. 2005) (employee forfeited protections by use of terms "bastard," "son of a bitch," and calling supervisor a "racist.").

In *Leiser Constr., LLC*, 349 NLRB 413 (2007), the Board held that the employer could prohibit the wearing of union insignia that showed a person urinating on a rat, characterizing it as "unquestionably vulgar and obscene." *Id.* at 415. In *Honda of Am. Mfg., Inc.*, 334 NLRB 746 (2001), the Board held that use of phrases "out of the closet" and "bone us" in a union newsletter was "so offensive as to render the otherwise protected newsletters unprotected." *Id.* at 748-49; *see also Contempora Fabrics, Inc. v. United Food & Commercial Workers Union*, 344 NLRB 851 (2005) (telling co-worker that she "better not vote no for this union" was unprotected); *Sw. Bell Tel. Co.*, 200 NLRB 667 (1972) (employer could prohibit insignia with "provocative slogan" that "Ma Bell is a Cheap Mother" due to the "controversial nature of the language [] and its admitted susceptibility to [a] derisive … construction, Respondent could [] ban the use of the provocative slogan").

The necessity of withdrawing protection from Carter's communications is heightened by its implications for Southwest's compliance with Title VII and related equal opportunity statutes. *See Constellium Rolled Prods. Ravenswood, LLC v. NLRB*, 945 F.3d 546, 551 (D.C. Cir. 2019) (Board must consider potential conflict with other federal laws in assessing protected status). In light of the regularity, vulgarity, hostility, and sex-related content in Carter's messages, treating them as legally protected runs a serious risk of interfering with federal equal opportunity laws. *Id.* at 552 (identifying co-workers and union members who signed up to work overtime as "whores" could "conflict with … obligations to provide a workplace free of sexual harassment").

22

5.      <u>Irrespective of the Alleged Protected Status of Carter's Messages to Stone, Carter Effectively Concedes that Summary Judgment Is Inappropriate</u>

Even if Carter demonstrates that protected activity motivated her termination, that does not mean she is entitled to summary judgment. Southwest would nevertheless prevail if it would have terminated Carter even if she did not engage in protected activity. *See Fields v. Keith*, 174 F. Supp. 2d 464, 480 (N.D. Tex. 2001) (even if employee demonstrates that anti-union animus was a motivating factor in termination the employer still prevails if it would have terminated the employee in the absence of protected activity or anti-union animus). Carter side steps this issue, by asserting in a footnote that this "mixed motive" framework does not apply because it only governs cases where an employee is terminated based on both protected and unprotected activities. *See* Pl's Brief at 32 n.7. However, Carter refutes her own position.

Carter contends that Southwest terminated her based on her messages to Stone (which Carter claims are protected). But Carter also states that "Southwest [] fired her for videos and messages she posted on her Facebook page[.]" Pl's Brief at 32 n.6. While Carter claims that Southwest's reliance on her public postings violated Title VII, she *does not contend that her public postings were RLA protected activities*. Stated simply, Carter's own recitation of the reasons for her termination – which include both protected and unprotected activity – is a concession that the mixed-motive analysis she disclaims in fact should apply. *See, e.g.*, *Amarsingh v. Jetblue Airways Corp.*, 2010 U.S. Dist. LEXIS 23021, *32-33 (E.D.N.Y. Jan. 29, 2010) (granting summary judgment to employer because, *inter alia*, it would have terminated plaintiff even absent protected activities). And as Southwest argued in its motion for summary judgment, a RLA claim to which this legal standard applies is barred by minor dispute preemption and is precluded by the Arbitrator's findings. *See* Dkt. No. 167 at 31-37, 39-43

US_ACTIVE-162852703.1

Moreover, Southwest notes that Carter's public posting of videos of aborted fetuses while readily identifiable as a Southwest employee (*i.e.*, the conduct Carter does not assert is RLA protected) violated Southwest policy, was a significant part of the investigation into her misconduct, and was a factor in her termination. *See* SWA App. 1013, 1018, 1026, 1157-1174, 1180. Thus, if the Court reaches this issue (which it need not do to deny Carter's motion), there is, at the very least, a dispute of fact regarding mixed motive. *See, e.g.*, *Amarsingh v. JetBlue Airways Corp.*, 409 Fed. Appx. 459, 461 (2d Cir. 2011) (granting summary judgment to employer in mixed motive case despite the fact that employee engaged in protected activity upon which the employer did not look favorably).

**B.    Carter Is Not Entitled to Summary Judgment on Her Religious Discrimination Claim**

While Carter seeks summary judgment on her Title VII religious discrimination claim, she does not expressly state her underlying legal theory (disparate treatment or failure to accommodate). *See generally Rayyan v. Va. DOT*, 719 Fed. Appx. 198, 205 (4th Cir. 2018). Carter does not suggest that any Southwest decision maker had a generalized hostility towards Christians or treated Carter differently because of her religion. In fact, it is undisputed that everyone involved in the investigation into Carter's conduct shared her pro-life views and had no animosity towards Christians. SWA App. 130-132 (Jones 84:6-86:1), 168-169 (Gutierrez 63:13-64:1), 106-107 (Schneider 130:3-131:14), 162-163 (Emlet 127:10-128:20), 41 (Sims 233:5-22). As such, Carter appears to seek summary judgment based on Southwest's alleged failure to accommodate her religious beliefs. *See generally Abeles v. Metro. Wash. Airports Auth.*, 676 Fed. Appx. 170, 174 (4th Cir. 2017) ("To prove a claim under the disparate treatment theory, an employee must demonstrate that the employer treated her differently than other employees because of her religious beliefs.").

24

1.    Carter's Failed to Exhaust Administrative Remedies With Respect to Southwest's Alleged Failure to Accommodate

"To bring a suit under Title VII … a complainant must file a charge of discrimination with the EEOC to exhaust his administrative remedies." *Melgar v. T.B. Butler Publ'g Co.*, 931 F.3d 375, 378 (5th Cir. 2019). "Where an individual raises claims based on theories of discrimination that were not raised in the EEOC charge, courts consistently find these claims to be unexhausted." *Burton v. Madix Store Fixtures*, 2005 U.S. Dist. LEXIS 37487, *6 (N.D. Tex. Dec. 29, 2005). Carter does not mention the exhaustion requirement much less purport to have satisfied it.

Carter filed a charge against Southwest for religious discrimination SWA App. 1022. However, in contrast to her charge against Local 556 – which specifically references the Union's alleged failure to accommodate her purported religious practice – Carter's charge against Southwest contains no such allegation. SWA App. 1022-1023. Courts in various contexts have concluded that a charge alleging discrimination does not exhaust claims for failure to accommodate. *See, e.g.*, *Hamar v. Ashland, Inc.*, 211 Fed. Appx. 309, 310 (5th Cir. 2006) (EEOC charge alleging disability discrimination did not exhaust administrative remedies with respect to failure to accommodate); *Novitsky v. Am. Consulting Eng'rs, LLC*, 196 F.3d 699, 701-02 (7th Cir. 1999) (charge alleging religious discrimination did not exhaust administrative remedies with respect to failure-to-accommodate claim); *Pantoja v. Brennan*, 257 F. Supp. 3d 636, 642 (D. Del. 2017) ("[T]he crux of plaintiff's claims was that she was … treated differently … because of her religion. … [T]here is no evidence that plaintiff exhausted her administrative remedies with respect to a religious accommodation claim."); *Robles v. Tex. Tech Univ. Health Scis. Ctr.*, 131 F. Supp. 3d 616, 634 (W.D. Tex. 2015) (mere fact that a plaintiff's discrimination charge is "consistent with a failure-to-accommodate claim … [is] not sufficient to exhaust remedies.").

US_ACTIVE-162852703.1

Carter filed the charges against the Union and Southwest within days of one another with the assistance of counsel. *See Larocca v. Alvin Indep. Sch. Dist.*, 2020 U.S. Dist. LEXIS 233060, *7-8 (S.D. Tex. Oct. 28, 2020) (*quoting Walton-Lentz v. Innophos, Inc.*, 476 Fed. Appx. 566, 570 (5th Cir. 2012) ("the plaintiff 'being represented by counsel in filing her EEOC charges further supports the district court's ruling' that her failure to mention a hostile work environment claim in the EEOC charge was not a mere technical deficiency and constituted a failure to exhaust")). Carter's decision to alleged failure to accommodate against Local 556, but not Southwest, was no accident – it was the product of Carter's counsel-guided assessment of her claims.

2. Carter Is Not Entitled to Summary Judgment On Her Failure to Accommodate Theory

To state a *prima facie* case of religious discrimination based on a failure to accommodate, a plaintiff must establish that she "had a *bona fide* religious belief that conflicted with an employment requirement, that [s]he informed the employer of h[er] belief, and that [s]he was discharged for failing to comply with the conflicting employment requirement." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000). Carter's failure to accommodate claims fails for several reasons, each of which independently warrant denying Carter's motion.

Carter first concedes that she never asked Southwest to accommodate her alleged religious belief. SWA App. 196-200 (Carter 63:24-65:3, 75:24-76:9), 234 (Carter 270:6-11), 57-58 (Schneider 24:21-25:4), 82 (Schneider 96:3-17), 115 (Jones 29:6-11). Moreover, Carter does not present any evidence indicating that Southwest knew or suspected that she needed a religious accommodation.[8] *Nobach v. Woodland Vill. Nursing Ctr.*, 799 F.3d 374, 379 (5th Cir. 2015)

---

[8] Southwest notes that the assorted commentary accompanying the abortion videos and vagina depictions Carter circulated (*e.g.*, criticizing democrats), she did not express a religious-based motivation for the posts. And as Carter recognizes, there's nothing inherently religious about opposing abortion. *See* SOF ¶ 72 (noting that and "atheist … can still say a prayer for not killing babies").

US_ACTIVE-162852703.1

(failure to accommodate claim fails because plaintiff "fail[ed] to advise [the employer] of her religious belief and the conflict with her job duties").[9]

Carter eventually stated during the investigation that she was a Christian and opposed abortion. However, that is insufficient to convey the need for an accommodation. *See, e.g.*, *Knight v. State Dep't of Pub. Health*, 275 F.3d 156, 167-68 (2d Cir. 2001) ("both plaintiffs hold bona fide religious beliefs, and their employers knew both were born-again Christians, but there is no evidence in the record showing appellants requested any sort of accommodation for their need to evangelize, … Knowledge that [plaintiffs] are born-again Christians is insufficient to put their employers on notice of their need to evangelize."); *Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 319 (3d Cir. 2008) ("That [plaintiff] alleges that she told [the employer] that she was a Christian and that [the employer] knew she was a Christian does not sufficiently satisfy [] duty to provide 'fair warning' … that she possessed a religious belief that specifically prevented her from participating in the libations ceremony."); *Lorenz v. Wal-Mart Stores, Inc.*, 2006 U.S. Dist. LEXIS 36145, *31-33 (W.D. Tex. May 24, 2006) (accommodation claim where employee discussed belief in god but did not "expressly inform [] supervisors of his religious beliefs and explain[] … his [a]ttire related to the beliefs."); *Gonzalez v. Hogg Ins. Group, Inc.*, 2012 U.S. Dist. LEXIS 2101, *25 (E.D. Va. Jan. 6, 2012) ("even if defendant [] was on notice that the plaintiff 'ha[d] strong religious beliefs,' … defendant [] was not on notice that those beliefs would compel the religious statements the plaintiff made at the workplace. The plaintiff thus has failed to satisfy

---

[9] Carter declares – without reference to supporting evidence – that Southwest gathered information demonstrating a nexus between her public posts and the workplace to avoid granting an accommodation. Pl's Brief 58. This assertion is incoherent. Southwest gathered information regarding Carter's public identification as s Southwest employee just after Stone's report and well before the fact-finding meeting where Carter first expressed her religious beliefs to Southwest. *See* SWA App. 1147-1155. Moreover, it unclear how establishing a nexus to the workplace does anything to negate the obligation to grant religious accommodations.

US_ACTIVE-162852703.1

the notice element of a *prima facie* case of religious discrimination under the failure to accommodate theory.").

Additionally, even had Southwest been *immediately* aware of Carter's religious beliefs when Stone reported her messages, that knowledge would not have required Southwest to do what Carter suggests the law compels – that is, retroactively excuse her violations of Southwest's policies. "There is nothing in Title VII that requires employers to give lesser punishments to employees who claim, ***after they violate company rules*** … that their religion caused them to transgress the rules." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1020 (4th Cir. 1996) (emphasis added); *see also Nobach*, 799 F.3d at 378 (reversing jury verdict and remanding for entry of judgment for employer where plaintiff failed to notify of need for religious accommodation until after violating employer rules). As such, Carter's failure to notify Southwest of her alleged religious mandate and the need for accommodation *prior* to violating policy precludes granting Carter summary judgment. *See, e.g.*, *Hussein v. Waldorf Astoria*, 134 F. Supp. 2d 591, 597 (S.D.N.Y. 2001) (accommodation claim failed because employee "did not mention the purported conflict between his religion and the hotel's policy until after management questioned him about his beard"); *see also Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir. 2020) (holding that "after-the-fact, retroactive" policy exceptions and accommodations are not required under analogous disability accommodation requirements).[10]

---

[10] Southwest notes that if Carter admits that her Facebook activity violated its rules, she effectively concedes that she was not entitled to an accommodation because Southwest had no legal obligation to retroactively accommodate her policy violations. On the other hand, if Carter claims that her Facebook activity did not violate Southwest's rules, her accommodation claim also fails because there will be no conflict between her employment and stated religious beliefs and practices.

US_ACTIVE-162852703.1

Separately, Carter does not provide any evidence that her religious beliefs conflicted with a particular requirement of her employment. In her motion, Carter describes the religious practice that the law allegedly compelled Southwest to retroactively accommodate as follows:

> Carter holds a religious belief in the sanctity of human life and believes that abortion is the taking of a human life contrary to the teachings of the Bible and the will of God. … Carter's religious beliefs require her to share with others that abortion is the taking of a human life and to avoid her personal promotion of abortion.

Pl's Brief at 52. Carter does not cite evidence that Southwest precluded her from her articulated religious practice – *i.e.*, sharing her view that abortion is the taking of a human life and avoiding promotion of abortion. In fact, Carter testified that she could post and distribute graphic pro-life content without violating Southwest policy. SWA App. 216-217 (Carter 118:23-119:20). This is fatal, as Courts have repeatedly held that a failure-to-accommodate claim does not exist where an employee fails to identify a conflict between a religious practice and her employer's policies. *See Perkins v. City of Greenwood*, 2016 U.S. Dist. LEXIS 37119, *19-20 (N.D. Miss. Mar. 22, 2016) (granting summary judgment to employer because, *inter alia*, "Plaintiff … failed to bring forth evidence" of a conflict between his belief and employment requirement); *Schwartzberg v. Mellon Bank, N.A.*, 2008 U.S. Dist. LEXIS 1180, *24 (W.D. Pa. Jan. 8, 2008) (granting summary judgment to employer because plaintiff did not identify a conflict between employment requirement ("conduct that denigrates or shows hostility on the basis of sexual orientation is prohibited") and his belief that homosexuality was immoral).

*Passmore v. 21st Century Oncology, LLC*, 2018 U.S. Dist. LEXIS 61085, *9 (M.D. Fla. Apr. 10, 2018) is instructive in this regard. There, the plaintiffs had a "deeply held belief that abortion is contrary to their religious beliefs, and engaged in off-site anti-abortion rallies and protests during non-work hours." *Id.* at *2. Based on that stated belief, the plaintiffs took a video

29

of an ambulance arriving at a nearby abortion clinic and posted it to a pro-life website. *Id.* at *3. The plaintiffs argued that taking and posting the video was a "protected expression" of their religious beliefs. *Id.* at 8. After their employment was terminated, the plaintiffs argued that the employer unlawfully failed to accommodate their religious beliefs. The employer moved to dismiss, arguing that plaintiffs did not allege that their *bona fide* religious beliefs conflicted with a work requirement. The court granted the employer's motion, reasoning as follows:

> "[A] reasonable accommodation is defined as "one that eliminates the conflict between employment requirements and religious practices." [Citation]. Thus, an employer cannot provide a reasonable accommodation if there is no conflict to eliminate. Accordingly, Plaintiffs fail to provide factual allegations sufficient to raise an inference that 21st Century discharged Plaintiffs "with the motive of avoiding the need for accommodating a religious practice." … This deficiency is fatal to Plaintiffs' failure to accommodate claim. … Plaintiffs identify no workplace requirement that plausibly conflicted with their religious beliefs. Indeed they affirmatively contend that no such conflict existed.

*Id.* at *8-10.

The plaintiffs in *Passmore* were terminated for alleged manifestations of their religiously-motivated practice of opposing abortion. However, because they claimed, as does Carter, that their practice did not violate the employer's rules, their failure to accommodate claim failed as a matter of law. Carter's claim should be subject to the same disposition.

Finally, as noted above, Carter does not cite any evidence indicating that Southwest prohibited her from sharing her opposition to abortion. Rather, Southwest terminated Carter for the graphic nature of her communications and public posts that happen to mention abortion. Even if an employer had a duty under Title VII to retroactively accommodate a policy-violating but religiously-motivated expression, that would not support granting Carter summary judgment. To the contrary, the conduct that resulted in Carter's termination was not merely expressing opposition to abortion – the stated religious practice she claims Southwest failed to accommodate.

30

It was the graphic and harassing nature of her communication and her public identification as a Southwest employee. Stated another way, Carter does not claim that her religious practice required that she express her opposition to abortion by, for example, (a) circulating videos of aborted fetuses; (b) posting videos of aborted fetuses while identifiable as a Southwest employee; or (c) circulating vagina depictions. *See Diss v. Portland Pub. Schs.*, 2016 U.S. Dist. LEXIS 161829, *3, 34-35 (D. Or. Nov. 22, 2016) (*aff'd* 727 Fed. Appx. 438 (9th Cir. 2018)) (Catholic pro-life employee who opposed abortion and Planned Parenthood was not entitled to an accommodation because he could not show that his religious beliefs conflicted with his duty to allow Planned Parenthood employee to make a classroom presentation).

Those particular aspects of Carter's conduct were merely reflections of her personal preference as to how she wished to manifest her opposition to abortion, rather than a religious mandate. Title VII does not require an employer to accommodate an employee's personal preference as to how she might wish to articulate a sincerely held religious belief. *See Anderson v. Browning-Ferris, Inc.*, 1994 U.S. App. LEXIS 41527, *5 (5th Cir. June 28, 1994) (employer not required to accommodate personal preferences); *Reed v. Great Lakes Cos.*, 330 F.3d 931, 935 (7th Cir. 2003) ("an employee is not permitted to redefine a purely personal preference or aversion as a religious belief").

For example, while an employer may be required to accommodate an employee's religious service attendance, it need not accommodate his or her preference to attend service at a particular time or location. *See Turner v. BSA, Inc.*, 2009 U.S. Dist. LEXIS 73115, *5 (W.D. Ok. Aug. 17, 2009) ("an employer cannot be forced to accommodate the personal preferences of an employee in the timing of religious practices"); *Marchant v. Tsickritzis*, 506 F. Supp. 2d 63, 69 (D. Mass 2007) (employee's accommodation claim failed because "comparable religious classes were

31

available at different locales and at different times, that [plaintiff's] desire to leave early two days a week to attend classes was based on a personal preference and was not necessary to carry out a bona fide religious practice"). Similarly, a Catholic employee who "observe[s] the church's teachings on defending and promoting the dignity of life from the moment of conception" and strenuously opposes Planned Parenthood in organized anti-abortion activities is not entitled to accommodation to interfere with a Planned Parenthood employee's classroom presentation. *See Diss*, 2016 U.S. Dist. LEXIS 161829, *3, 5, 12-14, 34-35 ("personal antipathy towards Planned Parenthood and its employees is not sufficient to show the need for a religious accommodation").

It could be that Carter's religious beliefs motivated the communications that resulted in her termination. However, that does not mean the specific content of those communications warranted accommodation. *See Mial v. Foxhoven*, 305 F. Supp. 3d 984, 991 (N.D. Iowa 2018) ("the fact that a practice or belief may be connected to religion does not compel the conclusion that it is not a personal preference"). "[A]n employee's right to a reasonable accommodation, including the time, place, and manner of the accommodation, only covers matters dictated by religious practice." *Jiglov v. Hotel Peabody, G.P.*, 719 F. Supp. 2d 918, 929 (W.D. Tenn. 2010).

3.   Accommodating Carter's Communications Would Impose An Undue Hardship

Employers are not required to grant a religious accommodation that would impose an undue hardship.[11] "Undue hardship exists when an employer is required to bear more than a *de minimis* cost" or where an accommodation would impose more than a *de minimis* burden on an employee's co-workers. *Antoine v. First Student, Inc.*, 713 F.3d 824, 839 (5th Cir. 2013); *see also El v. GM Co.*, 2021 U.S. Dist. LEXIS 35106, *7 (N.D. Tex. Feb. 25, 2021); *see also Weber*, 199

---

[11] Carter does not discuss the degree of hardship to Southwest if it granted her the accommodation she seeks.

US_ACTIVE-162852703.1

F.3d at 273; *Balderas v. Valdez*, 2018 U.S. Dist. LEXIS 124195, \*12-13 (N.D. Tex. July 25, 2018). An employer is not required to have attempted to accommodate an employee to defeat a failure-to-accommodate claim; if accommodating the employee would impose an undue hardship, no effort to do so is required. *Weber*, 199 F.3d at 275.

Courts have repeatedly held that Title VII does not "require an employer to accommodate an employee's desire to impose his religious beliefs upon his co-workers." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004); *see also Chalmers*, 101 F.3d at 1021. Based on this principle, employers may to prohibit an employee's religiously-motivated display of graphic abortion images. *See Wilson v. U.S. West Commc'ns*, 58 F.3d 1337, 1342 (8th Cir. 1995) (employer did not violate Title VII by restricting employee from wearing a two inch button that "showed a color photograph of an eighteen to twenty-week old fetus" and contained the phrases 'Stop Abortion,' and 'They're Forgetting Someone.'"). Similarly, employers can prohibit an employee from mailing letters to co-workers accusing them of immoral conduct or engaging in other proselytization particularly when doing so results in co-worker complaints. *See Chalmers*, 101 F.3d at 1021; *Averett v. Honda of Am. Mfg., Inc.*, 2010 U.S. Dist. LEXIS 11307, \*26-30 (S.D. Ohio Feb. 9, 2010) (employee not entitled to accommodation for practice of "express[ing] [] belief that her coworkers were sinful and evil persons whom God would one day punish."); *Mitchell v. Univ. Med. Ctr., Inc.*, 2010 U.S. Dist. LEXIS 80194, \*22-23 (W.D. Ky. Aug. 9, 2010) ("[Plaintiff] wants to be able to have religious conversations with co-workers, including conversations about the dates God sent her," the "date for the end of the world," and the Antichrist. Such conversations … were offensive and troubling to other employees [and] … violated the Hospital's harassment policies. Any accommodation of [plaintiff's] behavior would necessarily infringe on the rights of

US_ACTIVE-162852703.1

other employees. Therefore, there is no way to accommodate Mitchell's religious beliefs without imposing an undue burden on the Hospital.").

According to Carter, the accommodation that Southwest should have provided was authorization to send any arguably abortion-related content to co-workers – even if they did not wish to receive it – containing anything of her choosing no matter how graphic. Carter further claims a legal entitlement to publicly post similar inflammatory content while identified as a Southwest Flight Attendant. As Plaintiff testified:

> Q: So your testimony is that you believe Southwest should allow you to say whatever you want however you want if it is in support of your Christian beliefs?
> …
> A: In this context, yes.

SWA App. 203 (Carter 81:8-17). In effect, Carter demands the exact sort of accommodation that the Title VII does not require.

As Southwest set forth in its motion, it believes the Court should grant summary judgment in its favor and *against* Carter on this issue. If the Court is not inclined to grant that motion, there is, at the very least, an issue of fact regarding the burden associated with granting the accommodation she requests.

III.    **CONCLUSION**

For the reasons set forth herein and in Southwest's motion for summary judgment, the Court should deny Carter's motion.

34

US_ACTIVE-162852703.1

Dated: October 4, 2021                    Respectfully submitted,


                                          */s/ Brian K. Morris*
                                          Paulo B. McKeeby
                                          State Bar No. 00784571
                                          Brian K. Morris
                                          State Bar No. 24108707
                                          **REED SMITH LLP**
                                          2850 N. Harwood Street
                                          Suite 1500
                                          Dallas, Texas 75201
                                          Phone: 469-680-4200
                                          Facsimile: 469-680-4299
                                          pmckeeby@reedsmith.com
                                          bmorris@reedsmith.com

                                          **ATTORNEYS FOR DEFENDANT
                                          SOUTHWEST AIRLINES CO.**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been

filed via the Court's ECF system which caused a copy to be served on all parties on this 4th day

of October, 2021.


                                          */s/ Brian K. Morris*
                                          Brian K. Morris

US_ACTIVE-162852703.1