IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | |
| vs. | § | 3:17-cv-02278-B |
| | § | |
| SOUTHWEST AIRLINES CO., and | § | |
| TRANSPORT WORKERS UNION OF | § | JURY DEMANDED |
| AMERICA, LOCAL 556 | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT TWU LOCAL 556'S REPLY TO PLAINTIFF'S RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**CLOUTMAN & GREENFIELD, PLLC**
3301 Elm Street
Dallas, Texas 75226
214.642.7486
214.939.9229 FAX

/s/ Adam S. Greenfield_____
Adam S. Greenfield
Email: agreenfield@candglegal.com
Bar No.: 24075494

*Board Certified in Labor & Employment Law by the
Texas Board of Legal Specialization*

Edward B. Cloutman, III
State Bar No. 04411000
Email: ecloutman@lawoffices.email
**LAW OFFICES OF EDWARD CLOUTMAN, III**
3301 Elm Street
Dallas, Texas 75226-1637
214.939.9222
214.939.9229 Facsimile

**COUNSELS FOR DEFENDANT TWU LOCAL 556**

**TABLE OF CONTENTS**

I.  SUMMARY OF ARGUMENT ………………………………………………………….. 4-5

II. STATEMENT OF FACTS ........................................................................................... . 5-9

III. ARGUMENT AND AUTHORITIES........................................................................... 9-15

    A. Issue Preclusion – The Court Should Give Preclusive Effect to the Issues Resolved in Arbitration............................................................................................................... 9-10

    B. Breach of Duty of Representation and RLA Retaliation – Assuming *Arguendo* that Preclusion does not Apply ........................................................................................ 10-15

        1.  Plaintiff's Message and Videos do <u>not</u> Constitute Protected Activity............. 10-11

        2.  Plaintiff Fails to Address the Break in the Causal Chain Created by a Lack of Temporal Proximity between Plaintiff's "Protected Speech" and the Alleged Retaliation by Stone ........................................................................................ 12-13

        3.  Plaintiff Fails to Produce Evidence of Anti-Union Animus, Retaliatory Behavior, nor Disparate Treatment by President Stone ………………………………   13-14

        4.  Union Officers are NOT required to Abdicate their Federally Protected Rights. 15

    C. Plaintiff's Claims of Religious Discrimination and Failure to Accommodate – Assuming Arguendo that Preclusion does not Apply – are Fatally Flawed by Plaintiff's Own Testimony ……………………………………………………………………………….15

IV. CONCLUSION ...........................................................................................................16

# **TABLE OF AUTHORITIES**

## **CASES**

*Air Line Pilots Ass'n, Int'l v. O'Neill*
  499 U.S. 65, at 76 (citing), (1991) .................................................................................. 14

*Chhim v. Univ. of Texas*,
  2016 WL 154142, *5 (W.D. Tex. Jan. 11, 2016) ............................................................... 18

*Fabela v. Socorro I.S.D.*,
  329 F.3d 409, 415 (5th Cir. 2003) ................................................................................... 18

*Fierros v. Tex. Dept. of Health,*
  274 F.3d 187, 192 (5th Cir. 2001) ................................................................................... 18

*Johnson v. McDonald*
  623 Fed. Appx. 701, 704 (5th Cir. 2015) ......................................................................... 18

Leiser Constr., LLC
  349 NLRB 413, 415 (2007) ....................................................................................... 16, 17

Phillips v. United Parcel Serv.,
  2011 WL 2680725, *8 (N.D. Tex. June 21, 2011 ............................................................. 18

*Roscello v. Sw. Airlines Co.*,
  726 F.2d 217, 222 (5th Cir. 1984). .................................................................................. 19

*Vaca v. Sipes,*
  386 U.S. 171, 177 (1967) ................................................................................................. 14

## I. SUMMARY OF ARGUMENT

Plaintiff Charlene Carter ("Plaintiff" and/or "Carter"), former Southwest Airlines Co. ("SWA" and/or "Southwest Airlines") flight attendant, asserts that Defendant TWU Local 556 ("Union" and/or "Local 556"): (1) breached its duty of fair representation to Plaintiff; (2) discriminated against Plaintiff for religious beliefs and practices; and (3) retaliated against Plaintiff for exercising alleged protected rights under the RLA. Plaintiff's Response provides no disputed issues of material fact underlying Plaintiff's claims. The Union's motion should be granted.

The undisputed evidence shows that Southwest Airlines, and Southwest Airlines alone, made the decision to terminate Plaintiff's employment after receiving a complaint from SWA employee, and then Union President, Audrey Stone. Ms. Stone alerted SWA to Facebook messages sent directly to her by Plaintiff. The videos and corresponding messages depicted graphic videos of aborted fetuses, calling Ms. Stone a murderer, and making threats to Ms. Stone's safety.

First and foremost, the Union's Motion Should be granted because Plaintiff's claims should be dismissed as precluded. Plaintiff has already been afforded full due process through arbitration proceedings.

Second, all of Plaintiff's claims are dependent on a false premise, that a Union President must relinquish their rights as an employee to be free from harassment and threats of physical violence in the workplace. This false premise necessitates dismissal of Plaintiff's claims.

Third, Plaintiff's claims further rely on another false premise, that First Amendment "Free Speech" provides that an employee can say whatever they want to a co-worker, without repercussion, when employed by a private company. It does not. This false premise also necessitates dismissal of Plaintiff's claims.

Finally, in addition to the above false premises, Plaintiff's claims rely on a factual basis to which Plaintiff offers no evidence, that the Union: 1) actively and continuously conspired with Southwest Airlines to get her fired in retaliation for her exercise of alleged "protected speech," by having the Union's President pretend to be bothered by Plaintiff's admittedly graphic Facebook videos and threat of violence; then 2) the Union agreed to fight to undo the effect of that conspiracy by negotiating with SWA to get Plaintiff her job back; 3) did get her job back; and, 4) knew, all the while, that Plaintiff would inexplicably reject a settlement offer and the effect of its "retaliation"—that the Union itself had defeated—would once again take effect.

This unique factual backdrop provides helpful context when considering the parties' opposing legal positions. This factual backdrop is the underlying basis for Plaintiff's claims of Retaliation and breach of Duty of Fair Representation against the Union. Also contextually significant, is the undisputed fact that despite SWA's finding that the Plaintiff's expression was clearly aimed at harassing a co-worker—Audrey Stone, President of Local 556—Plaintiff's Local Union fought to get her discharge reduced to a suspension, which she rejected.

## II. STATEMENT OF FACTS

TWU Local 556 is the local Union representing flight attendants working at Southwest Airlines. On or about September 29, 2013, Plaintiff Carter resigned as a member of the Union, becoming what is commonly known as an Agency Fee Objector.[1] Prior to resigning her Union membership in 2013, Plaintiff Carter attended a Union meeting and had her first and last direct engagement with Ms. Stone, accusing Ms. Stone of taking part in a coup to become President of the Union.[2] Starting in early 2015, Plaintiff began engaging in a years-long harassment of Ms. Stone via approximately one hundred pages worth of direct and private Facebook Messages and

---

[1] Ex. 1 – Carter's Union Resignation; APP. 002.
[2] Ex. 2 – Carter Deposition – 34:1—35:19; APP. 008-009.

emails, calling Ms. Stone, including but not limited to, "pure evil," "corrupt," "incompetent," and "crook," and discussing Plaintiff's status as a Union objector.[3] Despite this harassment, Ms. Stone did not report Plaintiff's behavior to SWA.[4] However, on February 14, 2017, the tenor of Plaintiff Carter's direct messages changed, sending Ms. Stone what Plaintiff herself admits to be "graphic videos of aborted fetuses."[5] Indeed, Plaintiff Carter believes that there is no limit to what she can say to a fellow employee in expressing her religious beliefs.[6] The messages further assert that Ms. Stone supports "murder" and that Plaintiff "can't wait to see [her] back on line," on line being a term for a flight attendant working on a flight.[7]

On or about February 22, 2017, Ms. Stone reported Plaintiff Carter's actions to SWA, making note that she felt the messages were "obscene and violent, as well as threatening in nature."[8] Accordingly, on March 7, 2017, SWA appropriately took Ms. Stone's complaint seriously, conducting a fact-finding meeting with Mrs. Carter in which she admitted, as noted above, to sending the "graphic videos." Despite Plaintiff being a non-union member, she was provided union representation that Plaintiff describes as doing an "amazing" job.[9]

One week later, March 14, 2017, SWA informed Plaintiff Carter that her employment was being terminated for, including but not limited to, direct violation of their Workplace Bullying and Hazing Policy and Social Media Policy.[10]

After receiving her termination letter, Plaintiff Carter, like all SWA flight attendants, was afforded the opportunity to challenge/grieve her termination at what is called a "Step 2" hearing.[11]

---

[3] Ex. 4 – Carter Facebook Messages to Stone; APP. 028—125.
[4] Ex. 2 – Carter Deposition – 32:8—13; APP. 007.
[5] Ex. 2 – Carter Deposition – 28-29; APP. 005—006.
[6] Ex. 2 – Carter Deposition – 79-81:17; APP. 012—014.
[7] Ex. 4 – Carter Facebook Messages to Stone (p. 1-3); APP. 028—030.
[8] Ex. 5 – Stone Complaint to SWA; APP. 127—132.
[9] Ex. 2 – Carter Deposition – 266; APP. 018.
[10] Ex. 6 – Carter Termination Ltr.; APP. 134.
[11] Ex. 2 – Carter Deposition – 86:20—24; APP. 015.

The purpose of the Step 2 hearing is to provide an opportunity for a Southwest leader who did not participate in the fact-finding meeting to review the case, consider additional facts, and ensure appropriate application of Southwest policies.[12] At this juncture the Union provided Plaintiff two representatives, who Plaintiff Carter admits "represented me properly" and that the process was "fair and complete."[13] After concluding the Step 2 hearing, SWA believed that termination was an appropriate punishment.[14] Nevertheless, the Union was able to secure Carter an offer of reinstatement after a 30-day suspension and a Last Chance Agreement.[15] Plaintiff Carter refused the offer in lieu of termination.[16]

Notably, Plaintiff Carter readily admits that the Union did not discriminate nor improperly represent her, in any way, at either the fact-finding meeting or Step 2 grievance.[17] Furthermore, at no point did Plaintiff Carter ever request a religious accommodation from the Union[18] Plaintiff Carter simply believes that she had the right to send the messages—of any sort and as graphic as she deemed fit—to Stone because of her status as the Union President.[19]

Plaintiff Carter was not finished, and on December 7-8, 2017, Carter and Southwest participated in a two-day arbitration before Arbitrator William Lemons.[20] Carter and Southwest mutually selected the arbitrator pursuant to the CBA's grievance procedure.[21] At the arbitration, Carter was represented by two attorneys from the National Right to Work Foundation, presented

---

[12] SWA Motion for Summary Judgment at p. 16.
[13] Ex. 2 – Carter Deposition – 266:24—268:4; APP. 018-020.
[14] Ex. 7 – Sims Deposition – 186:7—188:13; APP. 137—138.
[15] Ex. 8 – Carter Last Chance Agreement; APP. 142-147, and Ex. 2 – Carter Deposition – 92:3—13; APP. 017.
[16] Ex. 2 – Carter Deposition – 91:19—25; APP. 016.
[17] Ex. 2 – Carter Deposition – 268:12—24; APP. 020.
[18] Ex. 2 – Carter Deposition – 270:6—11; APP. 021.
[19] Ex. 2 – Carter Deposition – 79:21-81:17; APP. 012-014; and Ex. 9 – Arbitration Transcript – 374:1-380:24; APP. 558-564.
[20] SWA APP. 1003-1004
[21] SWA APP. 20, ¶11

testimony and exhibits, made legal and factual arguments, and cross-examined witnesses.[22] In total, the arbitrator considered testimony from nine different witnesses and 32 exhibits along with post-hearing briefing from both parties.[23] Based on that evidence and briefing, the arbitrator made the following factual findings[24]:

- It was "clear beyond a reasonable doubt that the Company had just cause to terminate [Carter] for the reasons it gave and in the manner it did."
- Carter violated the Social Media Policy, the Workplace Bullying and Hazing Policy, and the Harassment Policy.
- "[A]t least three of the policies [Carter] violated provide an independently sufficient basis for termination[.]"
- Carter was not "treated less favorably than others" and the circumstances surrounding her offenses were not "substantively like those of individuals who received more moderate penalties."
- "Audrey Stone reported [Carter's] conduct to the Company not to retaliate against her" but because she believed Carter "violat[ed] various policies that were applicable to her."
- Southwest "does not have a policy or practice of disciplining, or not disciplining employees based upon their view of TWU Local 556 generally, or of Audrey Stone in particular."
- "[T]he degree of discipline administered by the Company ... was warranted ... notwithstanding that [Carter] ... had no previous disciplinary record."
- Carter failed to demonstrate "disparate treatment."

Arbitrator Lemons denied Carter's grievance. Also of import is that Plaintiff Carter finally accepted responsibility for her actions—"I realize this is a mistake. I realize that I need to do it in

---

[22] Ex. 9 – Arbitration Transcript –2:12-17, 3:1-5:25 and 321:1-322:13; APP. 150—153 and 505—506.
[23] Id.
[24] SWA APP. 1003-1021

a different manner, and I'm sorry for the manner that I did send it through and I take full responsibility for it".[25]

Despite temporarily accepting responsibility for her actions, Plaintiff Carter moved forward with litigation against the Union, and after having several claims dismissed[26], alleges that the Union (1) breached its duty of fair representation to Plaintiff; (2) discriminated against Plaintiff for religious beliefs and practices; and (3) retaliated against Plaintiff for exercising alleged protected rights under the RLA.

### III.    ARGUMENT AND AUTHORITIES

**A.    Issue Preclusion – The Court Should Give Preclusive Effect to the Issues Resolved in Arbitration.**

Plaintiff spends over 8-pages of briefing (Doc. 199, p.29—38) attempting to create numerous red herrings to distract the Court regarding the Union and SWA's argument that Plaintiff's prior arbitration with SWA has a binding preclusive effect. The Union has addressed this argument in their opening Motion for Summary judgment as well as their Response to Plaintiff's Partial Motion for Summary Judgment.

From a factual standpoint, the arbitrator found that "Stone reported [Plaintiff's] conduct to the Company not to retaliate against her" but because she believed Plaintiff "violat[ed] various policies that were applicable to her,"[27] that Plaintiff was not "treated less favorably than others" and the circumstances surrounding her offenses were not "substantively like those ... who received more moderate penalties.,"[28] ultimately concluding that Southwest's stated reasons for terminating

---

[25] Ex. 9 – Arbitration Transcript – 359:8—24; APP. 543, and Ex. 2 – Carter Deposition – 53:5—54:4; APP. 010—011.
[26] See Doc. 69 – Court Order on Defendant's motion to Dismiss.
[27] SWA – App. 1019. *See generally* App. 1003-1021.
[28] SWA - App. 1019.

Plaintiff's employment were not pretextual and Southwest had "just cause" to terminate Plaintiff "beyond a reasonable doubt."[29]

Notably, after conducting robust discovery, Plaintiff only points to Mrs. Stone's treatment of union member Brian Talbert as evidence of disparate treatment, because Mrs. Stone provided him support during his Step-2 termination grievance hearing. Mr. Talbert, similar to Mrs. Carter, was provided full union-support during his termination grievance. It would most certainly be a conflict of interest for Mrs. Stone, the complainant, to have inserted herself into Mrs. Carter's hearings.

If SWA's justification for terminating Plaintiff's employment is not a pretext for discrimination then the underlying basis for her being reported to SWA must necessarily be justified as well. The arbitrator's findings refute any attempt by Plaintiff to prove that Audrey Stone complained about Plaintiff Carter's actions for anything other than SWA policy violations and that SWA terminated Plaintiff for anything other than the egregious and offensive nature of Plaintiff's behavior rather than the content or viewpoint of her messages. This preclusion is fatal to all of Plaintiff's claims.

B.  **Breach of Duty of Representation and RLA Retaliation – Assuming *Arguendo* that Preclusion does not Apply**

   **1. Plaintiff's Message and Videos do <u>not</u> Constitute Protected Activity.**

As an initial bar and as cited by Plaintiff, in order for Plaintiff's RLA claims to survive, "Carter's Facebook videos and messages to President Stone [must be] RLA-protected activity. (Doc. 199, p.7). Plaintiff's offensive, harassing, and threatening emails are not "protected Free Speech." Plaintiff herself accepted responsibility for her actions—"I realize this is a mistake. I realize that I need to do it in a different manner, and I'm sorry for the manner that I did send it

---

[29] SWA - App. 1011.

through and I take full responsibility for it,"[30] but her lawyers refuse to do the same by parsing the Facebook message to their tailored needs. The message unequivocally states that "This is what you [Audrey Stone] supported," referring to the attached video caption stating "abortion is murder." That "You [Audrey Stone] are Despicable (sic) in so many ways … cant (sic) wait to see you back on line."[31]

The parties have voluminously briefed this issue. Notably, all of the caselaw cited by Plaintiff on the subject pre-dates the more current caselaw cited by Defendant Union. However Plaintiff ultimately concedes that cases cited by the Union, such as *Leiser Constr., LLC*, 349 NLRB 413 (2007), apply when "vulgar or obscene" speech "may 'exacerbate employee dissension' or situations in which restriction ... 'is necessary to maintain decorum and discipline among employees,'"[32] when the speech "affects the employer's ability to maintain discipline in the workplace." (Doc. 199, p. 14). Plaintiff further recognizes this legal implication by asserting Plaintiff's Facebook messages "had no adverse effect on the workplace." Despite this contention, Plaintiff's message did just that, harassing a co-worker and threatening retaliation on the job, when Mrs. Stone was "back on line." Mrs. Stone specifically notes in her complaint to SWA that she is "now fearful to return to my job as a line-flying Flight Attendant."[33]

Even if one assumes the communications generally concerned protected topics and the RLA protects certain types of speech post-certification (it does not), the communications lost protection due to their graphic and harassing nature and Carter's inflammatory commentary (e.g., referring to Stone as a murderer and threatening her physical safety).

---

[30] Ex. 9 – Arbitration Transcript – 359:8—24; APP. 543, and Ex. 2 – Carter Deposition – 53:5—54:4; APP. 010—011.
[31] Ex. 4 – Carter Facebook Messages to Stone (p. 1-3); APP. 028—030.
[32] *Leiser Constr., LLC*, 349 NLRB 413 (2007).
[33] Ex. 5 – Stone Complaint to SWA; APP. 127—132.

### 2. Plaintiff Fails to Address the Break in the Causal Chain Created by a Lack of Temporal Proximity between Plaintiff's "Protected Speech" and the Alleged Retaliation by Stone.

Prior to resigning her Union membership in 2013, Plaintiff Carter attended a Union meeting and had her first confrontation with Ms. Stone, accusing Ms. Stone of taking part in a coup to become President of the Union.[34] Starting in early 2015, Plaintiff began engaging in a years-long harassment of Ms. Stone via approximately one hundred pages worth of direct and private Facebook Messages and emails, calling Ms. Stone, including but not limited to, "pure evil," "corrupt," "incompetent," and "crook," and discussing Plaintiff's status as a Union objector.[35] Despite this harassment, Ms. Stone did not report Plaintiff's behavior to SWA.[36]

However, on February 14, 2017, the tenor of Plaintiff Carter's direct messages changed, sending Ms. Stone the aforementioned "graphic videos of aborted fetuses."[37] On or about February 22, 2017, Ms. Stone reported Plaintiff Carter's actions to SWA, making note that she felt the messages were "obscene and violent, as well as threatening in nature."[38]

It is undisputed that Plaintiff first engaged in alleged anti-Union protected speech directed at Stone dating back to as early as 2013 – more than four years before her termination. However, such a gap in time refutes Carter's claim of retaliation. In fact, it shows Stones reporting and Southwest's decision to terminate Plaintiff had nothing to do with her years of anti-Union speech, but rather her targeted, inappropriate harassment of Stone. Otherwise, Mrs. Stone would have reported Plaintiff, and SWA would have terminated Plaintiff years prior, or at some time prior to 2017.

---

[34] Ex. 2 – Carter Deposition – 34:1—35:19; APP. 008-009.
[35] Ex. 4 – Carter Facebook Messages to Stone; APP. 028—125.
[36] Ex. 2 – Carter Deposition – 32:8—13; APP. 007.
[37] Ex. 2 – Carter Deposition – 28-29; APP. 005—006.
[38] Ex. 5 – Stone Complaint to SWA; APP. 127—132.

Courts have repeatedly dismissed such retaliation claims, concluding that the lapse of time refutes the requisite causal nexus.[39] Such delays between the protected activity and adverse employment action refutes any causal link between the two events.[40]

### 3. Plaintiff Fails to Produce Evidence of Anti-Union Animus, Retaliatory Behavior, nor Disparate Treatment by President Stone

Plaintiff's claims are based on the theory that the Union, through that actions of President Stone, retaliated against her for her union-opposition. Plaintiff lacks an evidentiary basis for this assertion.

Plaintiff proffers as evidence that President Audrey Stone exerted continuous pressure on Southwest throughout 2017 to fire vocal recall supporters (individuals opposing Mrs. Stone's Presidency). (Doc 199. P.11-12). However, not a single page of Plaintiffs alleged evidence includes a single sentence of written or spoken text by Mrs. Stone. (Carter Resp. App.52-87). Indeed, the only evidence to support their proposition that President Stone herself acted improperly comes from the unsupported hearsay testimony of SWA employee Jeanna Jackson (Carter App. 549-552). As Plaintiff is lacking any actual evidence against Mrs. Stone, the alleged bad actor, Plaintiff's case of retaliatory conduct by the Union, through the actions of Mrs. Stone, must be dismissed.

While Defendant Union 556 contends that this breaks the causal connection needed for retaliatory conduct, we nevertheless address Plaintiff's additional evidentiary basis, which comes down to the actions of three individuals: (1) Brian Talburt, (2) Brett Navarez, and (3) Ricky Spand.

---

[39] See Johnson v. McDonald, 623 Fed. Appx. 701, 704 (5th Cir. 2015) (dismissing Title VII retaliation claim where "the nearly two-year gap between the[protected activity] and alleged retaliation [] refutes any causal link between the two events."); Chhim v. Univ. of Texas, 2016 WL 154142, *5 (W.D. Tex. Jan. 11, 2016).
[40] Phillips v. United Parcel Serv., 2011 WL 2680725, *8 (N.D. Tex. June 21, 2011) (dismissing Title VII retaliation claim where "[t]he timing between the two actions and the protected activity (between nine months and two years)" did not establish a requisite causal connection).

First, Plaintiff cites to emails from SWA employee Brian Talburt. Plaintiff concedes that Mr. Talburt was "not an elected [Union] official" (Doc. 199 p. 12), with the only evidentiary value being that Mrs. Stone did not "disavow" (Doc. 199, p.20) Mr. Talburt and that she had aided in his Step 2 termination hearing with SWA (Doc. 199, p. 20, citing Carter App 451-453). Mr. Talburt, like Mrs. Carter, was provided full union-support during his termination grievances. Representation for both of these parties counters what the Court found in *Roscello v. Sw. Airlines Co.*, 726 F.2d 217, 222 (5th Cir. 1984)*,* and relied upon by Plaintiffs, where the comparators received different treatment during the grievance process.

Next, Plaintiff points to the idea of Union retaliation through former Union Vice President Brett Nevarez, who (1) referred to Plaintiff as "batshit/dipshit" because she didn't understand how Union expenditures work; (2) asked people to save emails of an alleged, without evidentiary support, union opponent Chris Click; and (3) having issues with an individual name Mike Casper who was a non-union member. While Mr. Navarez' communication style lacks diplomacy and leaves something to be desired, it does not provide evidence of retaliatory conduct by Ms. Stone.

Finally, Plaintiff cites to the actions of shop steward Ricky Spand. Plaintiff's evidence consists of the same hearsay testimony discussed above from SWA employee Jeanna Jackson (Carter App. 549-552) and a single email from Mr. Spand to Defendant SWA and Union Leadership (Resp. App. 83) seeking protection from Mrs. Jackson's "harassment." Id.

Ultimately, none of the evidence presented by Plaintiff creates a genuine issue of material fact that would require determination of liability by a jury. There is no evidence of improper, illegal, or retaliatory behavior by Ms. Stone, other than what Plaintiff contends— the complaint to SWA in and of itself, and thus no causal connection exists between the actions of Ms. Stone and the termination of Plaintiff.

### 4. Union Officers are NOT required to Abdicate their Federally Protected Rights

Ultimately, Plaintiff's Claims rely on the theory that a Union President must relinquish their rights as an Employee upon taking office. A union's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.[41] As noted above, Plaintiff presents no evidence that Ms. Stone acted arbitrarily, discriminatorily, or not in good faith.

Ultimately, Mrs. Carter cannot say and do whatever she pleases in the workplace and demand that she be free from any and all repercussions. In order for TWU Local 556 to be liable in anyway, an employee such as President Stone, must abdicate her rights to be free from workplace harassment or the Union is liable when the harasser is punished by their employer. There is no law to support this theory of liability.

**C.  Plaintiff's Claims of Religious Discrimination and Failure to Accommodate – Assuming Arguendo that Preclusion does not Apply – are Fatally Flawed by Plaintiff's Own Testimony.**

As previously discussed, Plaintiff fails to state a *prima facie* case of religious discrimination, relying entirely on the proposition that they don't need to because of their presentment of "direct evidence." Direct evidence includes any "statement or document which shows on its face that an improper criterion served as a basis – not necessarily the sole basis, but a basis – for the adverse employment action [is] direct evidence of discrimination."[42] Plaintiff has failed to provide any evidence that "shows on its face" Ms. Stone reported Plaintiff to SWA for an improper criterion. As such, Plaintiff fails to meet their initial burden.

---

[41] *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, at 76 (citing Vaca v. Sipes, 386 U.S. 171, 177 (1967)), (1991).

[42] *Fabela v. Socorro I.S.D.*, 329 F.3d 409, 415 (5th Cir. 2003), citing *Fierros v. Tex. Dept. of Health*, 274 F.3d 187, 192 (5th Cir. 2001).

## IV. CONCLUSION

The undisputed evidence shows that Southwest Airlines, and Southwest Airlines alone, made the decision to terminate Plaintiff's employment after receiving a complaint from SWA employee, and then Union President, Audrey Stone. Ms. Stone alerted SWA to Facebook posts sent directly to her by Plaintiff. The videos and corresponding messages depicted graphic videos of aborted fetuses, calling Ms. Stone a murderer, and making threats to Ms. Stone's safety. As such, summary judgment is improper because the record contains no disputed issues of material fact underlying Plaintiff's claims. Plaintiff's motion should be granted.

Dated: October 18, 2021                     Respectfully submitted,

                                             /s/ Adam S. Greenfield
                                            Adam S. Greenfield
                                            Email:  agreenfield@candglegal.com
                                            *Board Certified in Labor & Employment Law by the Texas Board of Legal Specialization*

                                            **Cloutman & Greenfield, PLLC**
                                            3301 Elm Street
                                            Dallas, Texas 75226
                                            214.939.9222
                                            214.939.9229 FAX

                                            **COUNSEL FOR PLAINTIFF**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon all parties, via the CM/ECF system, which will send notification of such filing to all counsel of record, on this the  18th  day of October, 2021, as follows:

                                             /s/ Adam S. Greenfield
                                            Adam S. Greenfield