# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

|  |  |
|---|---|
| CHARLENE CARTER,<br><br>                Plaintiff,<br><br>V.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>                Defendants. | Civil Case No. 3:17-cv-02278-X<br><br>**PLAINTIFF CHARLENE CARTER'S REPLY TO DEFENDANT SOUTHWEST AIRLINES CO.'S RESPONSE TO CARTER'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ...................................................................................... iii

SUMMARY ...............................................................................................................1

ARGUMENT AND AUTHORITIES ........................................................................2

I. Southwest violated Carter's RLA-protected rights.........................................2

    A. RLA Section 152 (Third) and (Fourth) protect Carter's expressive activity
       opposing the union's representation and advocating for the reorganization of
       the union and removal of union leadership…………………………….................2

        1. The U.S. Supreme Court's decision in *Street* recognizes the RLA's
           protection of complete freedom of choice and that compulsory unionism
           cannot impair employees' rights to freedom of expression under the Act ..............5

        2. RLA Section 152 (Third) and (Fourth) encompass rights that, under the
           National Labor Relations Act, also protect expression opposing and
           criticizing unions....................................................................................................6

        3. *Wright Line* does not apply because there is no dispute that Southwest
           fired Carter for her private Facebook videos and messages to Local 556's
           President Stone and the pro-life posts on her personal Facebook page ..................7

    B. Carter's expressive activity opposing union representation and advocating
       for the reorganization of the union and removal of union leadership did not
       lose its protection ..................................................................................................8

    C. RLA Section 152 (Third) and (Fourth) give employees express, enforceable rights,
       and a federal court can award all necessary and appropriate relief to remedy
       employers' violations of those rights .......................................................................13

    D. The Court ruled that Carter's Count IV RLA wrongful discharge claim stated
       a cause of action because it alleged animus—that her protected activity
       was a "substantial or motivating factor" or "but for cause" for her termination .........14

II. Southwest violated Title VII by firing Carter and failing to accommodate her
    religious beliefs and practices ....................................................................................15

    A. Southwest fired Carter because of her religious beliefs.............................................16

i

B.  Southwest intentionally discriminated against Carter by failing to accommodate her religious beliefs and practices ................................................................................19

1.  Southwest created the conflict between its Social Media Policies and Carter's religious beliefs and practices ...............................................................20

2.  Title VII's disparate treatment provision does not require employees to request an accommodation or require that the employer have actual knowledge of an employee's need for an accommodation ...........................................................21

C.  Southwest has no undue hardship defense ...............................................................23

CONCLUSION ...........................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Am. Commc'ns Ass'n v. Douds*,
   339 U.S. 382 (1950)............................................................................................11

*Ams. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021)........................................................................................3

*Bhd. Of R.R. Trainmen v. Central of Ga. Ry. Co.*,
   305 F.2d 605 (5th Cir. 1962) ...........................................................................14

*Bostock v. Clayton Cnty., Ga.*,
   140 S. Ct. 1731 (2020)..............................................................................8, 19, 20

*Brady v. Trans World Airlines, Inc.*,
   401 F.2d 87 (3d Cir. 1968).................................................................................5

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
   140 S. Ct. 1009 (2020)......................................................................................17

*EEOC v. Abercrombie & Fitch Stores Inc.*,
   575 U.S. 772 (2015) .................................................................*passim*

*EEOC v. Hacienda Hotel*,
   881 F.2d 1504 (9th Cir. 1989) .........................................................................24

*Ellis v. Bhd. of Ry., Airline and S.S. Clerks*,
   466 U.S. 435 (1984).........................................................................................13

*Held v. Am. Airlines*,
   2007 U.S. Dist. LEXIS 7665, *18 (N.D. Ill. Jan. 30, 2007) ...........................4

*Heller v. EBB Auto Co.*,
   8 F.3d 1433 (9th Cir. 1993) ............................................................................24

*Int'l Ass'n of Machinists v. Street*,
   367 U.S. 740 (1961).........................................................................*passim*

*Konop v. Hawaiian Airlines, Inc.*,
   302 F.3d 868 (9th Cir. 2002) .........................................................................3, 9

*Linn v. United Plant Guard Workers of Am., Local 114*,
   383 U.S. 53 (1966)..........................................................................................8, 9

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*McDonald v. City of West Branch, Mich.*,
   466 U.S. 284 (1984) ...............................................................................................3

*Mobil Expl. and Producing U.S., Inc. v. NLRB*,
   200 F.3d 230 (5th Cir. 1999) ...........................................................................3, 6, 7

*NAACP v. State of Ala. ex rel. Patterson*,
   357 U.S. 449 (1958)................................................................................................3

*NLRB v. Allied Aviation Fueling of Dallas LP*,
   490 F.3d 374 (5th Cir. 2007) ................................................................................7

*NLRB v. Burnup & Sims, Inc.*,
   379 U.S. 21 (1964)................................................................................................14

*NLRB v. Floridan Hotel of Tampa, Inc.*,
   318 F.2d 545 (5th Cir. 1953) ................................................................................7

*Nu-Car Carriers, Inc.*,
   88 N.L.R.B. 75 (1950) .......................................................................................3, 7

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
   418 U.S. 264 (1974)...................................................................................... *passim*

*Poly-America, Inc. v. NLRB*,
   260 F.3d 465 (5th Cir. 2001) ................................................................................7

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984)................................................................................................3

*Roscello v. Sw. Airlines Co.*,
   726 F.2d 217 (5th Cir. 1984) .........................................................................14, 15

*Russell v. NMB*,
   714 F.2d 1332 (5th Cir. 1983) ...........................................................................2, 4

*Shea v. Int'l Ass'n of Machinists and Aerospace Workers*,
   154 F.3d 508 (5th Cir. 1998) ..............................................................................13

*Steele v. Louisville & N.R. Co.*,
   323 U.S. 192 (1944)..................................................................................... *passim*

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*,
    320 U.S. 297 (1943)........................................................................................13, 14

*Texas & N.O.R. Co. v. Bhd. Of Ry. & S.S. Clerks*,
    281 U.S. 548 (1930)........................................................................................13, 14

*Trans World Airlines, Inc. v. Hardison*,
    432 U.S. 63 (1977)..........................................................................................24, 25

*U.S. Dep't of Just., Immigr. and Naturalization Serv., Border Patrol, v. FLRA*,
    955 F.2d 998 (5th Cir. 1992) .........................................................................7

*Va. Ry. Co. v. Sys. Fed'n No. 40*,
    300 U.S. 515 (1937)........................................................................................13

*Vaca v. Sipes*,
    386 U.S. 171 (1967)........................................................................................10, 11, 14

*Weber v. Roadway Express, Inc.*,
    199 F.3d 270 (5th Cir. 2000) .........................................................................23, 24

**Rules & Statutes**

29 U.S.C. § 157...........................................................................................................6, 9

42 U.S.C. § 2000e ......................................................................................................1

42 U.S.C. § 2000e(j) ..................................................................................................16, 23, 24

42 U.S.C. § 2000e-2(a)(1)..........................................................................................16, 22

45 U.S.C. § 151a ........................................................................................................2, 3, 10, 11

45 U.S.C. § 151a (2)-(3) ............................................................................................2

45 U.S.C. § 152 (Third) ...................................................................................... *passim*

45 U.S.C. § 152 (Fourth) ....................................................................................*passim*

45 U.S.C. § 152 (Eleventh).........................................................................................5

45 U.S.C. § 152 (Eleventh) (d) ..................................................................................5

**SUMMARY**

The Court should grant Carter's Motion for Partial Summary Judgment on Carter's claims under the Railway Labor Act, 45 U.S.C. § 151 *et seq*. ("the RLA"), and Title VII of the Civil Rights Act, 42 U.S.C. 2000e *et seq*. ("Title VII").[1] First, Southwest violated Carter's RLA-protected rights. Contrary to Southwest's arguments in opposition, RLA Section 152 (Third) and (Fourth) protect Carter's expressive activity opposing union representation and advocating for the reorganization of the union and removal of union leadership; (B) Carter's RLA-protected activities did not lose their protection under *Austin*, *Steele*, and *Street*; (C) Nearly a century of U.S. Supreme Court precedent establishes that RLA Section 152 (Third) and (Fourth) give employees express, enforceable rights, and that federal courts can remedy those rights; and (D) this Court has already ruled that Carter's RLA wrongful discharge claim stated a cause of action because it alleged animus—that her protected activity was a "substantial or motivating factor" for her termination.

Second, Southwest violated Title VII by firing Carter and failing to accommodate her religious beliefs and practices. Southwest completely ignores Carter's claim that it violated Title VII's disparate treatment provisions by firing her because of her religious beliefs. See 42 U.S.C. § 2000-e2(a)(1). Southwest's response to Carter's failure to accommodate claims is equally futile because it cannot escape the U.S. Supreme Court's decision in *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 772 (2015), which refutes all of their arguments. Finally, Southwest cannot assert an undue hardship defense because Southwest cannot show that any accommodation would have imposed an undue hardship on its business.

---

[1] Carter's Brief in Support of her Motion for Partial Summary Judgment (ECF 171-1) shall be cited to herein as "Carter Br. ___". Carter's Response to Southwest's Brief in Support of its Motion for Summary Judgment (ECF 196-1) shall be cited to as "Carter Resp. ___". Carter's Appendix of Exhibits in Support of her Motion for Partial Summary Judgment (ECF 170) and (ECF 171-2), shall be cited to as "Carter App.___".

ARGUMENT AND AUTHORITIES

**I. Southwest violated Carter's RLA-protected rights.**

**A. RLA Section 152 (Third) and (Fourth) protect Carter's expressive activity opposing the union's representation and advocating for the reorganization of the union and removal of union leadership.**

Contrary to Southwest's arguments, RLA Section 152 (Third) and (Fourth) protect Carter's right to send her Facebook videos and messages opposing the union's representation at the Women's March, advocating for the reorganization and removal of union leadership, and criticizing the union's activities. *See* SWA Resp. 21.[2] Carter Br. 32-35. The RLA expressly "forbid[s] *any* limitation upon freedom of association among employees" and "provide[s] for the *complete independence* … of employees in the matter of self-organization." 45 U.S.C. § 151a (2)-(3) (emphasis added). RLA Section 151a's "concept of 'complete independence' is inconsistent with forced representation, most especially when that forced representation is at odds with employees' will and desires." *Russell v. NMB*, 714 F.2d 1332, 1343 (5th Cir. 1983) (footnote omitted).[3]

"Complete independence" in "self-organization" and freedom from "any limitation" on employee association encompass employees' freedoms to engage in expressive activities to change unwanted union representation or representation that is contrary to the employee's will and desires, whether that means criticizing union leadership, advocating for the removal of union leadership, or advocating that the employees' representative stop supporting Planned Parenthood's pro-

---

[2] Southwest's Brief in Response to Carter's Motion for Partial Summary Judgment (ECF 192) shall be cited to as "SWA Resp. ___ ".

[3] Southwest's attempt to characterize the Fifth Circuit's *Russell* decision as limited to NMB obligations is mistaken. *Russell* examined the scope of employees' statutory rights under RLA Sections 151 and 152 (Third) and (Fourth), and held that the "implicit language throughout the Act," establishes employees' rights to remove forced union representation that is "at odds with employees' will and desires." 714 F.2d at 1343; SWA Resp. 25.

2

abortion policies and spending employees' forced fees to finance its participation in the Woman's March on Washington, D.C.

The RLA Sections 152 (Third) and (Fourth) guarantee employees' express rights with respect to "organizing," "self-organization," choosing representatives, organizing through representatives of her own choosing, joining, organizing, or assisting organizing the labor organization of her choice, and not joining a labor organization, and prohibits the employer's interference "in any way" with employee's organization. 45 U.S.C. §§ 151a, 152 (Third) and (Fourth). The RLA's "self-organization" and "organizing" rights inherently protect union dissidents' "privilege of protest," without which "effective employee representation becomes a nullity." *Mobil Expl. and Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 240 (5th Cir. 1999) (quoting *Nu-Car Carriers, Inc.*, 88 N.L.R.B. 75, 76-77 (1950) (internal citation omitted). *See also infra* at 6-7. *See also Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 872 (9th Cir. 2002).[4] Carter demonstrated that when she sent her Facebook videos and messages to President Stone she was engaged in RLA-protected activities. Carter Br. 35-38.

Contrary to the RLA's plain statutory text and express purpose guaranteeing "complete independence" in matters of self-organization, Southwest contends that employees have no rights under RLA Section 152 (Third) and (Fourth) beyond pre-certification union organizing, meaning that once employees designate a union, employees are permanently divested of their statutory rights, and cannot remove the union. SWA Resp. 21. Nothing in the RLA's statutory text supports Southwest's proposition or otherwise limits employees' RLA rights to pre-certification periods.

---

[4] Despite Southwest's objections to *Roberts*, *Bonta*, *Patterson*, and *McDonald*, these cases demonstrate the general principle that freedom of association protections, such as those established by RLA Section 151a and applicable to RLA Section 152 (Third) and (Fourth), also shield dissident expression. Carter Br. 34, 34 n.9; SWA Resp. 23. Southwest fails to rebut that general proposition, particularly given the Supreme Court's *Steele* and *Street* decisions. *See infra* 5, 9-10.

The RLA's express text shows that, to the contrary, such employee rights under RLA Section 152 (Third) and (Fourth) cannot be limited to the precertification context, stating that employees "shall" have these rights, which contemplates before and after and certifying a union. *See* 45 U.S.C. § 152 (Third) (Fourth).

Southwest's arguments are also precluded by Fifth Circuit precedent, which recognizes employees' rights post-certification to remove unwanted representatives and re-designate new, different representatives or no representatives at all. *Russell*, 714 F.2d at 1345 ("*[I]t is inconceivable that the right to reject collective representation vanishes entirely if the employees of a unit once choose collective representation.*") (emphasis in original) (citations omitted); *see also Austin*, 418 U.S. at 279. Southwest also fails to demonstrate why this Court should suddenly abandon the RLA's "long-standing tradition of voluntary unionism," and "policy of complete individual freedom of choice," which are embodied in RLA Section 152 (Third) and (Fourth). *See Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 750, 762-63 (1961).

Carter has shown that the RLA's statutory text, the Supreme Court's *Street*, *Steele*, and *Austin* decisions, the Fifth Circuit's *Russell* decision, and other federal court precedent recognize that employees have post-certification rights under RLA Section 152 (Third) and (Fourth), and that federal courts have jurisdiction. Carter Resp. 26-28; (ECF 54, pp.14-16). This Court has also already ruled that it has jurisdiction over Carter's post-certification RLA wrongful discharge claims. Carter Resp. 26, 28; (ECF 69, pp.17, 20-21); *see also infra* at 14-15. Despite these authorities, Southwest retreats to a single anomalous and non-binding district court decision from Illinois in *Held*, which is unpersuasive given these authorities.[5] SWA Resp. 20 (citing *Held v. Am. Airlines, Inc.*, 2007 U.S. Dist. LEXIS 7665, *18 (N.D. Ill. Jan. 30, 2007).

---

[5] SWA Resp. 26-27.

1. **The U.S. Supreme Court's decision in *Street* recognizes the RLA's protection of complete freedom of choice and that compulsory unionism cannot impair employees' rights to freedom of expression under the Act.**

Contrary to Southwest's assertions,[6] the U.S. Supreme Court's *Street* decision recognized that compulsory unionism cannot impair employees' freedom of expression by making them pay for unions' political activities. *See Street*, 367 U.S. at 767-68. The U.S. Supreme Court construed Section 152 (Eleventh) "to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes," and preserved dissenters' interests protected by the RLA. *Id.* at 767-68.

*Street* addressed the scope of RLA Section 152 (Fourth), and examined limitations on unions' and employers' power under Section 152 (Eleventh) to use compulsory unionism to impair freedom of expression, union dissidents' political beliefs, and other dissident interests. The Supreme Court observed that "it is abundantly clear that Congress," by adding Section 152 (Eleventh), "did not completely abandon the policy of full freedom of choice embodied in the 1934 Act [i.e., RLA Section 152 (Third) and (Fourth], but rather made inroads on it for the limited purpose of eliminating the problems created by the 'free rider.'" *Street*, 367 U.S. at 767. *See* 45 U.S.C. § 152 (Eleventh) (d) ("Any provision in paragraphs Fourth and Fifth of this section in conflict herewith are to the extent of such conflict amended."). *See Brady v. Trans World Airlines, Inc.*, 401 F.2d 87, 102 (3d Cir. 1968). *See also id*. (RLA Section 2 (Eleventh) "is an exception to the anticoercion provisions of section 2 (Fourth)").

When Congress compelled employees' association with exclusive collective bargaining representatives, as it did under the RLA, the individual cannot be "forced to surrender any matters of conscience, belief, or expression. He should be allowed to enter the group with his own flag

---

[6] SWA Resp. 22.

flying, whether it be religious, political, or philosophical." *Street*, 367, U.S. at 776 (Douglas, J., concurring).

### 2. RLA Section 152 (Third) and (Fourth) encompass rights that, under the National Labor Relations Act, also protect expression opposing and criticizing unions.

Carter demonstrated that RLA Section 152 (Third) and (Fourth) rights—designating and choosing union representatives, "self-organization," "organiz[ing] and bargain[ing] collectively… through representatives of their own choosing," and "join[ing], organiz[ing], or assist[ing] in organizing the labor organization of their choice"—encompass nonmember employees' rights "to oppose the policies and actions of their incumbent union leadership." *See Mobil Expl.*, 200 F.3d at 240. The U.S. Supreme Court has further recognized that employees' rights "to form, join or assist labor organizations" are "[t]he primary source of protection for union freedom of speech." *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 277 (1974).

Southwest objects that the Fifth Circuit's *Mobil Exploration* decision involved concerted activities, which it argues is a legal right "the RLA does not provide." SWA Resp. 16-17. While *Mobil Exploration* involves concerted activities, the Fifth Circuit also invoked the broader, "well-settled" principle that NLRA Section 7's enumerated rights—"to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection" and the right "to refrain from any or all of such activities"—encompass employees' rights to oppose the policies and actions of their incumbent union leadership. *Mobil Expl.*, 200 F.3d at 240.

While engaging in "concerted activities" is certainly one of those enumerated rights, the other rights mirror those in the RLA. Carter Br. 35; 45 U.S.C. § 152 (Fourth); 29 U.S.C § 157. Employee opposition to the policies and actions of incumbent union leadership is grounded generally in this

panoply of rights, and is not inherently concerted activity. *See e.g., U.S. Dep't of Just., Immigr. and Naturalization Serv., Border Patrol, v. FLRA*, 955 F.2d 998, 1003 (5th Cir. 1992) (recognizing that courts have grounded employees' expressive activity in NLRA Section 7 generally, not narrowly in the right to engage in other concerted activity); *NLRB v. Floridan Hotel of Tampa, Inc.*, 318 F.2d 545, 547 (5th Cir. 1953). Indeed, *Mobil Exploration* recognized that "the privilege of protest and persuasion of others" is "inherent in" the "employee's right to self-organization," and "[w]ithout this, effective employee representation becomes a nullity." *Id*. at 240 (quoting *Nu-Car Carriers*, 88 N.L.R.B. at 76-77 (internal citation omitted).

### 3. *Wright Line* does not apply because there is no dispute that Southwest fired Carter for her private Facebook videos and messages to Local 556's President Stone and the pro-life posts on her personal Facebook page.

The *Wright Line* mixed-motive framework and its burden-shifting scheme do not apply in this case because there is no dispute that Southwest fired Carter for sending private Facebook videos and messages to President Stone. (Carter App.222); Carter Br. 31-32 (citing *NLRB v. Allied Aviation Fueling of Dallas LP*, 490 F.3d 374, 379 (5th Cir. 2007)); Carter Resp. 12-13; SWA Resp. 31-32. *Wright Line* only applies in cases when an employee engages in protected activity and different unprotected activity, and the parties dispute whether the protected or the unprotected activity motivated the employee's termination. *See e.g.*, *Poly-America, Inc. v. NLRB*, 260 F.3d 465, 488-89 (5th Cir. 2001).

Southwest asserts that even if Carter's RLA activities are protected *Wright Line* applies because the RLA does not apply to Carter's Facebook videos observing her religious beliefs and practices. SWA Resp. 31. Contrary to Southwest's arguments, *Wright Line* would still not apply because there is no dispute that Southwest fired Carter for her private Facebook videos and messages to President Stone and the pro-life posts on her personal Facebook page. (Carter

7

App.222); Carter Br. 31-32, 39-40, 52-56. *Wright Line* does not apply because Southwest does not advance some *unprotected activity* separate from her Facebook videos and messages as the reason for firing Carter. *Id.*; Carter Resp. 12-13. There is no question as to which activities motivated Carter's termination. *Id*.

Firing Carter for her RLA-protected activity and her Title VII-protected activity were both impermissible but-for causes for her termination. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020); Carter Br. 39-40, 52-56. Southwest admits it fired Carter for both her Title VII and RLA-protected activity. Carter demonstrated that all of her activity was protected by the RLA (Carter Br. 19-20, ¶¶36a-e, 39) and Title VII (Carter Br. 19-21, ¶36a-b, e). Carter Br. 35-40, 42-44 (RLA-protected activity); Carter Br. 52-56 (Title VII-protected activity). Southwest's termination of Carter's employment was unlawful in its entirety because, under Title VII, an employer is prohibited from making an employee's religious practice *any* factor in employment decisions. *See Abercrombie*, 575 U.S. at 773.

**B. Carter's expressive activity opposing union representation and advocating for the reorganization of the union and removal of union leadership did not lose its protection.**

Contrary to Southwest's contentions,[7] the U.S. Supreme Court and other federal courts give employees' RLA rights constitutional protection. Carter Br. 42-47. The Supreme Court recognized that federal labor law protections guarantee employees' freedom to engage in "uninhibited, robust, and wide-open debate in labor disputes." *Austin*, 418 U.S. at 273-74. Employees' union representation and re-organization speech is protected even if others consider their speech to be "intemperate, abusive, or insulting," *Id.* at 273-74, 283, or a "vehement," "caustic," or "unpleasantly sharp attack[]." *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S.

---

[7] SWA Resp. 23.

53, 62 (1966). Even "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth." *Id.* at 63.

The RLA Section 152 (Fourth)'s statutory text—the right "to form, join, or assist labor organizations" and the right "not to join or remain members of any labor organization,"—mirrors the statutory language in NLRA Section 7, which the Supreme Court said was "the primary source" for *Austin*'s robust freedom of speech for employees engaged in union representation disputes. *Austin*, 418 U.S. at 277; *see also* 29 U.S.C. § 157. Federal courts have also applied the *Austin* rule in the RLA context. *See e.g., Konop*, 302 F.3d at 882 n.10 ("We see no reason why the rule announced in *Linn* [and applied in *Austin*] … regarding protected activities, should not apply in the context of the RLA.") (cleaned up). While Southwest argues that *Austin* merely shows "what is required to prevail on a defamation claim," the Supreme Court examined and decided the scope of federal labor law's protection of pre-certification and post-certification speech and activities, as a distinct and separate matter from the defamation issue. *See Austin*, 419 U.S. at 272-89; *see also Konop*, 302 F.3d at 882-83 (applying the *Austin* rule to determine whether employee's RLA-protected activity lost its protection and finding that it did not).

The U.S. Supreme Court's *Steele* decision also demonstrates that RLA Sections 152 (Third) and (Fourth) guarantee protections commensurate with First Amendment rights. The U.S. Supreme Court held in *Steele* that the RLA imposes "constitutional limitations on [unions'] power to deny, restrict, destroy, or discriminate against ... [employees'] rights." *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 198 (1944).[8] The RLA prohibits unions from acting in the exercise of their

---

[8] "[T]he Railway Labor Act imposes upon the statutory representative of a craft [i.e., the union] at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable

9

congressionally-delegated powers to deprive employees of their speech and association rights, because that "would in effect violate the constitutional rights of individuals." *Steele*, 323 U.S. at 208-09 (Murphy, J., concurring). *See also Street*, 367 U.S. at 777 (Douglas, J., concurring); Carter Br. 43-44. Employees' expressive activities therefore get First Amendment protection when related to self-organization and opposing union representation. 45 U.S.C. §§ 151a, 152 (Third) and (Fourth).

Employers cannot circumvent the RLA Section 152 (Third) and (Fourth)'s protection of employees' expressive activities in any matters of self-organization or opposing union representation, particularly when they do not impact the employer. *See supra* at 2-3, 5-6; Carter Br. 32-35. While Southwest objects that it is a private company, it is nevertheless subject to the RLA, which statute expressly prohibits employers from "interfer[ing] in any way with the organization of its employees," and guarantees that employees have "complete independence … in the matter of self-organization." 45 U.S.C. §§ 151a, 152 (Third) and (Fourth).

Contrary to Southwest's characterizations, it is Southwest who asks the Court to endorse a radical proposition necessitating the wholesale reassessment of established law. SWA Resp. 23. Without the constitutional protection on employees' freedom to engage in expressive activities opposing the union, the RLA would be unconstitutional. The U.S. Supreme Court has recognized that "the congressional grant of power to a union to act as exclusive collective bargaining representative, with its corresponding reduction in the individual rights of the employees so represented, would raise grave constitutional problems if unions were free to exercise this power" to unconstitutional ends. *Vaca v. Sipes*, 386 U.S. 171, 182 (1967) (citing *Steele*, 323 U.S. at 198-

---

to those possessed by a legislative body both to create and restrict the rights of those whom it represents." *Steele*, 323 U.S. at 202.

99); *see also Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 401-02 (1950) ("[W]hen authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin … to its exercise by government itself.") (citations omitted).[9]

Furthermore, the RLA "would bear the stigma of unconstitutionality" if Congress conferred exclusive bargaining representative power on unions and authorized them "to ignore rights guaranteed by the Constitution." *Street*, 367 U.S. at 777 (Douglas, J., concurring). Southwest's arguments that it could nullify employees' RLA rights to engage in expressive activities in matters of self-organization and representation (i.e., opposing unions) would re-write the statute, and render RLA Sections 151a and 152(Third) and (Fourth) a dead letter.

Southwest's arguments diminishing constitutional protections of employees' expressive activity with their union representatives would unravel the union's duty of fair representation, which justifies unions' exclusive bargaining power in the first place. *Vaca*, 386 U.S. at 182 (citing *Steele*, 323 U.S. at 198-99). While the First Amendment may not directly apply to private actors, the U.S. Supreme Court's precedent demonstrates that RLA protections in Section 152 (Third) and (Fourth) are at least commensurate with the Constitution's protections of individual rights. *Supra* at 8-10; Carter Br. 42-44. Without those protections, the Supreme Court has strongly suggested that the RLA would be unconstitutional.[10]

Carter's RLA protected activities do not implicate an issue of whether employees' activities are protected in the workplace because Carter's communications were private Facebook videos

---

[9] SWA Resp. 28.

[10] Southwest conjectures that if Carter's pro-life videos and messages are protected under *Austin*, what is to stop employees from engaging in racially-discriminatory activity when opposing union policies. Even under *Austin*, unlawful or threatening communications may not be protected, but that is not this case. Carter sent Facebook videos and messages to President Stone supporting the protection of human life and opposing Local 556, its leadership, and the unions' activities at the Women's March. Carter Br. 35-38.

and messages sent to the union president, and did not affect the workplace. Carter's communications were not "inflammatory," "vulgar," or "harassing." Carter L556 Resp. 24-26.[11] Carter never criticized Southwest management in her communications to President Stone, which concerned only the union and its activities. Carter L556 Resp. 24-26; Carter Br. 35-38. Southwest relies on inapposite NLRB cases involving employees who, unlike Carter, directed their speech at the employer or disrupted the employer's ability to maintain discipline in the workplace. Carter L556 Resp. 22-23. Carter's speech was *not* directed at the company, *not* made at work or during work hours, and had *no* adverse effect on the workplace. (Carter App.105, 80, 81, 531); Carter Br. 35-38; Carter L556 Resp. 22-26.

Carter sent Facebook videos and messages to the Local 556 President after the union used Carter's forced union fees, which she was required to pay as a condition of employment, to support Local 556's participation in the Women's March on Washington D.C. Carter objected to Local 556's use of her compulsory union fees to support the union's political and ideological activities at the Women's March, including how it represented forced fee-paying flight attendants by donning the symbolic pink hats, and marching with participants "dress[ed] like lady parts." Carter sent pictures of costumes like those worn by Women's March participants to convey her objections to Local 556's expenditure of her forced fees on the union's political and ideological activities. Carter demonstrated that such communications about the Women's March and its participants were protected under *Austin*, *Miller*, and *Brown*. Carter Br. 37-38, 46-47.

Contrary to Southwest arguments, it would not "expose itself to liability" if it did not fire Carter for her union-related communications with President Stone. Carter L556 Resp. 27; SWA Resp. 30.

---

[11] Carter demonstrated that her Facebook videos and messages did not impact the workplace in any way in her Response to Local 556's Motion for Summary Judgment (ECF 199-1), which will be cited to as "Carter L556 Resp. __"; Carter L556 Resp. 22-27.

Carter demonstrated that, unlike ordinary employees, Local 556 and its officials take on affirmative duties under the RLA, the Duty of Fair Representation, and Title VII by virtue of their exclusive-bargaining representative status under federal law. Carter Br. 47-51; Carter L556 Resp. 27. Southwest would not have incurred liability by refraining from interposing itself in union matters.

### C. RLA Section 152 (Third) and (Fourth) give employees express, enforceable rights, and a federal court can award all necessary and appropriate relief to remedy employers' violations of those rights.

Carter has demonstrated that she can enforce her rights under RLA Section 152 (Third) and (Fourth), and that Southwest's reliance on non-precedential authority, particularly given Supreme Court and other precedent, is inapposite. Carter Resp. 28-33. For nearly a century, the U.S. Supreme Court has repeatedly recognized that employees have an action to enforce their rights under the RLA, and that the courts can remedy employers' and unions' violations of employees' statutory rights and duties. *See Street*, 367 U.S. at 773-74; *Steele*, 323 U.S. at 207-08; *Ellis v. Bhd. of Ry., Airline and S.S. Clerks*, 466 U.S. 435, 465-66 (1984); *Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 569 (1930); *Va. Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 541-52 (1937); *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 300 (1943); *Shea v. Int'l Ass'n of Machinists and Aerospace Workers*, 154 F.3d 508, 513 (5th Cir. 1998). For the district court to reverse course now, would render employees' rights recognized in these cases unenforceable and nullify almost a century of Supreme Court precedent.

The U.S. Supreme Court specifically recognized that RLA Section 152 (Third) created employees' cause of action to enforce their statutory rights and statutory proscriptions against the employer's interference with or coercion of those rights: "[A] legal obligation is created and the statutory requirements are susceptible of enforcement by proceedings appropriate to each. The

same is true of the prohibition of interference or coercion in connection with the choice of representatives." *Texas & N.O.R.*, 281 U.S. at 569 (1930); *Switchmen's*, 320 U.S. at 300. Under RLA Section 152 (Third) and (Fourth), "[t]he right is created and the remedy exists." *Texas & N.O.R.*, 281 U.S. at 569-70; *Bhd. of R. R. Trainmen v. Central of Ga. Ry. Co.*, 305 F.2d 605, 608-09, 609 n.8 (5th Cir. 1962) (recognizing that "the Courts are open to grant appropriate injunctive relief" for an RLA violation). *See also* Carter Resp. 32-33.

The Court should reject Southwest's request to disregard and vacate one hundred years of Supreme Court precedent recognizing employees' rights of action to enforce their express rights under the RLA. Southwest invites the Court to unravel this precedent and cast the RLA's entire statutory scheme into doubt. *See Vaca*, 386 U.S. at 182 (1967) (citing *Steele*, 323 U.S. at 198-99).

### D. The Court ruled that Carter's Count IV RLA wrongful discharge claim stated a cause of action because it alleged animus—that her protected activity was a "substantial or motivating factor" or "but for cause" for her termination.

Contrary to Southwest's claims, this Court ruled that Carter's Count IV RLA wrongful discharge claim stated a cause of action because, unlike Carter's Count I and Count II claims, it alleged (and has now demonstrated) animus by showing that Carter's RLA protected activity was a substantial or motivating factor for Southwest's termination of her employment.[12] (ECF 69, pp.19-20); SWA Rep. 17; Carter Br. 31-32, 39-40.

Employers can violate RLA Section 152 (Third) and (Fourth) in at least two ways: Employers can cause the deprivation of RLA rights regardless of whether its adverse action was motivated by protected activity. *See e.g., NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964) (recognizing

---

[12] While the Fifth Circuit applied the "substantial or motivating factor" analysis *Roscello*, this Court stated that Carter must show she engaged in protected activity that was a "but for cause" of the employer's adverse action. (ECF 69, p.19) (citations omitted). Carter prevails under either standard—there is no dispute that Southwest fired Carter for her Facebook videos and messages to President Stone. Carter Br. 32-40; (Carter App.222, 268-269).

that employer actions causing deprivation of NLRA Section 7 rights does not necessarily depend on the existence of union-related animus). Employers can also violate employees' RLA-protected rights by making the employee's RLA-protected activity a substantial or motivating factor for its adverse employment action. *See Roscello v. Sw. Airlines Co.*, 728 F.2d 217, 222 (5th Cir. 1984). Carter's Count I claim alleged that Southwest's termination of Carter's employment had the effect of interfering with Carter's RLA-protected rights regardless of whether Carter's protected activity motivated the termination. (ECF 9, pp.19-20 ¶¶ 70-76). Carter's Count IV wrongful discharge claim alleged that Southwest violated Carter's RLA rights by making her protected activity a substantial and motivating factor for her termination. (ECF 80, pp.25-27, ¶¶ 93-96, 97b, 98, 100-102).

While Southwest references one of Carter's allegations related to circumstantial evidence, reliance on circumstantial evidence is merely one of the ways in which Carter can prove her claims: "Circumstantial, as well as direct evidence may be utilized in the determination" of whether the employee's protected activity was a substantial or motivating factor for her termination. *Roscello*, 728 F.2d at 223. Despite Southwest's objections, Carter can prove her claims with direct evidence, and is not required to rely on circumstantial evidence of disparate treatment, which is the subject of Carter's pending motion to compel. SWA Resp. 17-18. This Court ruled that Carter can "establish a prima facie case of retaliation" by showing "she engaged in 'protected activity [that] was a but-for cause of the alleged adverse action by the employer.'" (ECF 69, pp.19-20).

## II. Southwest violated Title VII by firing Carter and failing to accommodate her religious beliefs and practices.

The Court should grant Carter's Motion for Partial Summary Judgment because Southwest violated Title VII's disparate treatment provision in two ways: (A) Southwest fired Carter because of her religious beliefs, observances, and practices; and (B) Southwest intentionally discriminated

against Carter by failing to accommodate her religious beliefs and practices. Furthermore, Southwest also failed to demonstrate that initiating accommodation efforts would have imposed an undue hardship on the company's business. Title VII creates only two causes of action: disparate treatment and disparate impact. *See Abercrombie*, 575 U.S. at 772. Title VII's disparate treatment provision prohibits an employer from discharging an employee or otherwise discriminating against her because of her "religion," which includes "all aspects of [her] religious observance and practice, as well as belief." 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j).

Southwest's response fails to address Carter's Title VII discharge claim let alone contest her claim. SWA Resp. 32-39. Southwest also fails to address the U.S. Supreme Court's controlling decision in *Abercrombie*, which is determinative of both of Carter's Title VII claims.[13] 575 U.S. at 772. Southwest's legal arguments fail because they rely almost exclusively on pre-*Abercrombie* cases, and are based on inapposite precedent. Contrary to Southwest's characterizations, failure to accommodate claims *are* disparate treatment claims. SWA Resp. 32. Title VII's disparate treatment provision is the source for failure to accommodate claims. *See Abercrombie*, 575 U.S. at 772, 773.

**A. Southwest fired Carter because of her religious beliefs.**

Despite's Southwest's failure to even address Carter's Title VII discharge claim under 42 U.S.C. § 2000e-2(a)(1), Carter demonstrated that Southwest violated Title VII's disparate treatment provision by (1) firing her (2) "because of" (3) "her religion," which includes "all aspects of [her] religious observance and practice, as well as belief." *Abercrombie*, 575 U.S. at 772; Carter

---

[13] While Southwest attempts to explain its failure to address Carter's Title VII discharge argument by saying "Carter does not expressly state her underlying legal theory," Carter clearly set forth both arguments in her principal brief, and again in her response brief. Carter Br. 51, 52-56, 57-59; Carter Resp. 33-35; SWA Resp. 32.

Br. 51-56; SWA Resp. 33-35.[14] Carter demonstrated that she holds a religious belief in the sanctity of human life and believes that abortion is the taking of a human life contrary to the teachings of the Bible and the will of God. (Carter App.527, ¶6). Carter's religious beliefs require her to share with others that abortion is the taking of a human life and to avoid her personal promotion of abortion. *Id*. at ¶¶8-9. Carter also demonstrated, with direct evidence, that Southwest fired her "because of" her religious observances, beliefs, and practices. Carter Br. 26-28, 51-56; (Carter App.222, 242-243, 251-252, 268-269).

When Southwest fired Carter it knew that she was observing her religious beliefs and practices by sending her Facebook videos and messages to President Stone and posting the videos and messages on her personal Facebook page. Carter demonstrated that during the fact-finding meeting that Southwest conducted before terminating Carter's employment, Southwest asked Carter why she posted the videos to her Facebook page. (Carter App.242). Carter explained that she posted and sent the videos because of her deeply held religious beliefs:

> I'm a Christian, I'm a conservative, and I'm pro-life. This happens to be a huge issue for me and I get the message out wherever I can. This was sent to me and I decided to post it on my Facebook page. I think if more and more people would see what actually happens… I have a deep, deep want to get the word out.

*Id*. Carter also told Southwest that she "work[s] with other pro-life groups" and that "for me as a Christian, if I can get the word out in any way, to every group as possible to touch this issue," I do. *Id*. Carter also explained her belief that "if more and more people would see what actually happens" they would not do it. (Carter App.242-243). Carter explained that the videos were intended to show "[i]t's an abortion. It's a baby … They need to know that it's a life and not just

---

[14] Southwest's arguments are also flawed because they are based on a legal standard that applies to circumstantial evidence cases. But Carter proves her disparate treatment claims with direct evidence. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020); Carter Br. 56; Carter Resp. 33-34, 33 n.24.

a bunch of tissue." (Carter App.243). Prior to firing Carter, Southwest Base Manager Schneider informed managers that Carter's "defense" was that abortion was "against her values as a Christian." (Carter App.268). Schneider also noted Carter's statement "that she had an abortion when she was young and regrets every bit of it, so she works with other pro-life groups as a Christian to spread the anti-abortion message out in any way possible." *Id*.

While Southwest suggests that holding a pro-life position is not necessarily a religious belief for others, Southwest knew when it fired Carter that she *did* hold a religious belief that abortion was the taking of human life, and that she had a deep religious need to spread the word and show others that abortion is the taking of human life contrary to God's will. Carter Br. 53-56; SWA Resp. 34 n.8. Southwest does not contest Carter's facts showing its knowledge.[15]

Carter's private Facebook videos and messages to President Stone consisted of both Title VII-protected activity (Carter Br. 19-21, ¶36a-b, e) and RLA-protected activity (Carter Br. 19-20, ¶¶36a-e, 39). Carter Br. 35-40 (RLA-protected activity); Carter Br. 52-56 (Title VII-protected activity). Carter's Facebook posts on her personal page were Title VII-protected activity. (Carter Br. 19, 21, ¶¶35, 38); Carter Br. 52-56. While Southwest argues that Carter's private Facebook message to President Stone containing a picture of the women wearing vagina costumes was not religious, it *was* RLA-protected activity: Carter sent the picture with her message criticizing the union's representation of flight attendants at the Women's March (i.e., by donning the symbolic pink hats and marching with participants who wore such costumes), and objecting to the union's use of non-member's forced fees to finance those activities. Carter Br. 37, 38, 38 n.13, 47.

---

[15] Contrary to Southwest's characterizations, Carter did not express opinions or write the Facebook post "criticizing democrats." Carter shared the Facebook video from another person's Facebook page, and sharing the video included the other person's comments criticizing democrats. (Carter App.528, ¶11); SWA 34 n.8. Carter's message expressed that she wanted to stop funding murder.

Carter's RLA-protected activity and Title VII-protected activity were both "but for" causes for her termination. *See Bostock*, 140 S. Ct. at 1739. Southwest's termination of Carter's employment violated Title VII because her religious observances, beliefs, and practices were both a "but for" cause and a "motivating factor" for Southwest's decision to fire her. Carter Br. 51-56. Title VII prohibited Southwest from making an employee's religious practice *any* factor in employment decisions. *See Abercrombie*, 575 U.S. at 773. Southwest made Carter's religious beliefs and practices a factor in its employment decision; thus, its termination of Carter's employment violated Title VII in its entirety irrespective of what other reasons the company might have had for firing Carter. *See Bostock*, 140 S. Ct. at 1741 ("An employer violates Title VII when it intentionally fires an individual employee based in part on [religion].").

### B. Southwest intentionally discriminated against Carter by failing to accommodate her religious beliefs and practices.

Carter demonstrated that Southwest intentionally discriminated against her in violation of Title VII by failing to accommodate her religious beliefs and practices. Firing an employee for her religious beliefs and practices "is synonymous with refusing to accommodate the religious practice." *Abercrombie*, 575 U.S. at 775. Carter Br. 57-59; Carter Resp. 35-45. Southwest cannot defend its failure to accommodate because Southwest (1) created the conflict between its Social Media Policies and Carter's religious beliefs, and (2) avoided Carter's need for a religious accommodation even despite knowing her need for one.[16]

---

[16] Carter has also demonstrated that, contrary to Southwest's arguments, her EEOC charge alleged the failure to accommodate claim and exhausted administrative remedies, and will not re-hash those arguments again here. *See* Carter Resp. 45-46; SWA Resp. 33.

**1. Southwest created the conflict between its Social Media Policies and Carter's religious beliefs and practices.**

Southwest created the conflict by applying its Social Media Policies to Carter's religious practice and firing her instead of acting on its affirmative duty to accommodate her. "[T]he rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions." *Abercrombie*, 575 U.S. at 773. Southwest's arguments that Carter's religious beliefs did not conflict with the company's Social Media Policies, and that it did not prohibit Carter from sharing her religious videos and messages, are clearly wrong because the company fired her for observing her religious beliefs in her communications. Had Southwest not instigated the conflict, Carter would still be employed. SWA Resp. 38; Carter Resp. 36-40; (Carter App.222).

Southwest's contentions that it fired Carter for the graphic nature of her communications (i.e., Social Media Policy violations), not her religious beliefs, are baseless under *Abercrombie*. SWA Resp. 38. "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not to discharge any individual because of such individual's 'religious observance and practice.'" *Abercrombie*, 575 U.S. at 775 (cleaned up); *Bostock*, 140 S. Ct. at 1744 ("[I]t's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it … labels and additional intentions or motivations … cannot make a difference here."). *See also Abercrombie*, 575 U.S. at 779 (Alito, J., concurring).

Despite Southwest's conclusory assertion that Carter's act of sending and posting her pro-life videos was "merely [a] reflection[] of her personal preference," Carter showed that her actions were an essential part of her religious belief in showing others that abortion takes human life

20

contrary to God's will. (Carter App.527, ¶¶ 6-10)(Carter App.242-243), SWA Resp. 39-40.[17] Carter demonstrated she has a deeply held religious belief that abortion is the taking of human life contrary to God's will, and in showing others that abortion takes human life, which she observed in this case by sending pro-life videos to Local 556's president and posting them on her Facebook page. *See supra* at 17-18. Carter's religious beliefs require her to share with others that abortion is the taking of a human life and to avoid her personal promotion of abortion. (Carter App.527, ¶¶ 6-10)(Carter App.242-243). Local 556's use of nonmember employees' forced fees to support Planned Parenthood violated Carter's religious mandate that she not personally promote abortion. Southwest does not dispute those facts or offer any contrary evidence. Carter Br. 16-20, 28-29. To the extent Southwest believed Carter could engage in her religious observances and practices in a time, place, and manner that did not violate the company's Social Media Policies, its policies must yield and it must carry out its *affirmative obligation* to initiate accommodation efforts before firing Carter. *Abercrombie*, 575 U.S. at 775. Firing an employee for her religious practices "is synonymous with refusing to accommodate the religious practice." *Id.*

**2. Title VII's disparate treatment provision does not require employees to request an accommodation or require that the employer have actual knowledge of an employee's need for an accommodation.**

Contrary to Southwest's contentions,[18] the U.S. Supreme Court held in *Abercrombie* that Title VII does not require employees to inform employers of their religious beliefs, or request an

---

[17] While Southwest states that Carter acknowledged she could act in accordance with her stated religious belief (share her pro-life views with fellow employees) without violating Southwest's Social Media Policies, its citation still does not support its assertion. Carter Resp. 39 n.33; SWA Resp. 37 (citing SWA App.216-217). Moreover, Title VII required Southwest's Social Media Policies to give way to Carter's need for an accommodation and affirmatively obligated Southwest not to fire Carter in this particular instance because of her religious observance and practice. *Abercrombie*, 575 U.S. at 775.

[18] SWA Resp. 34-35.

accommodation. 575 U.S. at 773, 774 (Title VII's disparate-treatment provision, § 2000e-2(a)(1), "does not impose a knowledge requirement"); Carter Resp. 40-41;[19] Carter Br. 51-52. Title VII prohibits the employer's motive of avoiding the employee's need for an accommodation. *Abercrombie*, 575 U.S. at 775. Southwest's arguments are baseless because they rely almost exclusively on cases pre-dating the U.S. Supreme Court's *Abercrombie* decision. Carter Resp. 40-45; SWA Resp. 34-35.

While knowledge is not a necessary condition of liability, Southwest knew Carter's need for a religious accommodation, and avoided its affirmative obligations by firing her. Carter Br. 52-56.[20] (Carter. App.242-243, 251, 268); Carter Resp. 41-42; Carter Br. 52-56; SWA Resp. 34; *supra* at 17-18. Having learned of and acknowledged Carter's religious observances, beliefs, and practices, Southwest still fired Carter in violation of its affirmative obligations under *Abercrombie*. (Carter App.242-243, 245, 251, 268). Southwest avoided Carter's need for an accommodation and its affirmative obligation not to fire her by refusing to refer her issues to its ACT (accommodations) Team, and instead actively gathering "nexus" evidence to prosecute the case against her, and ignoring other options apart from termination. Carter Br. 23-25, 29-31; Carter Resp. 41-43.

Southwest concedes that it knew from Carter's Fact Finding and before her termination that Carter was a Christian and opposed abortion. Southwest's knowledge and awareness of Carter's need for an accommodation was even greater than the employer's in *Abercrombie*. 575 U.S. at

---

[19] The Supreme Court's *Abercrombie* decision specifically refuted Southwest's reliance on *Clark* and comparisons to the Americans with Disabilities Act. Carter Resp. 43; SWA Resp. 36.

[20] Contrary to Southwest's arguments, it was clearly avoiding its affirmative obligation to accommodate Carter's religious beliefs prior to the Fact Finding. Carter's February 14, 2017 Facebook post specifically stated, "THIS IS GRAFIC (sic)....but it needs to be shared over and over....this is MURDER! So for all of you that are Pro-Abortion GOD HELP YOU!" Southwest apprehended Carter's religious motivations, beliefs, and practices based on the Facebook posts and messages themselves as evidenced by Southwest's reactions and President Stone's complaints. (Carter App.105); Carter Br. 23-25.

770. Nevertheless, Southwest argues Carter's statements were insufficient to "convey the need for an accommodation." SWA Resp. 35. Southwest's arguments are misplaced because they are based on outdated, pre-*Abercrombie* cases requiring employees to inform the employer of their need for a religious accommodation. Those cases are all inapposite under *Abercrombie*. 575 U.S. at 774.

Moreover, Carter specifically told Southwest during the Fact Finding that she has a deep, religious need as a Christian to show others that "[i]t's an abortion. It's a baby ... They need to know that it's a life and not just a bunch of tissue," and that she works with other pro-life groups to get the word out that abortion takes human life. (Carter App.242-243). Carter told Southwest, "for me as a Christian, if I can get the word out in any way, to every group as possible to touch the issue," I do. *Id*. Following Carter's Fact Finding, Southwest clearly recognized the religious import of Carter's messages and discerned that Carter was observing her religious beliefs, but avoided its statutory duty to accommodate. Carter Br. 26-28.

### C. Southwest has no undue hardship defense.

Southwest fails to demonstrate that the company could not have reasonably accommodated Carter's religious observance and practice "without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).[21] While Southwest argues that employers are not required to make any efforts to accommodate if doing so "would impose an undue hardship," that misstates the burden. Employers need not make efforts to accommodate employees' religious beliefs *if* they can show that *any* accommodation would have imposed an undue hardship on the company's business. *See Weber v. Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000); SWA Resp. 41-42. Southwest failed to show that any possible accommodation would have

---

[21] While it is plaintiff's burden to prove failure to accommodate, an employer who asserts an undue hardship defense "bears both the burden of production and the burden of persuasion." *Abercrombie*, 575 U.S. at 772 n.2; *Id*. at 779-80 (Alito, J., concurring).

imposed an undue hardship on the conduct of its business. *See id*.; *see also* 42 U.S.C. 2000e(j). Carter demonstrated that Southwest, instead of firing her, could have made various different efforts to accommodate her religious beliefs without undue hardship. Carter Resp. 48-49. Southwest never asked Carter if she would remove Facebook posts that it considered to be a nexus to the workplace. (Carter App.387; Schneider 126:11-14).

Having failed to demonstrate that any accommodation would have imposed an undue hardship on its business, Title VII required Southwest to initiate accommodation efforts. But, Southwest fired Carter without initiating any accommodation efforts. Employers cannot raise the undue hardship defense if they do not even initiate any efforts to accommodate. *See Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993). Undue hardship requires "at a minimum," the employer "negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs." *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1513 (9th Cir. 1989) (citing *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)). Therefore, Southwest cannot assert an undue hardship defense.

Contrary to Southwest's assertions, there is no factual dispute here "regarding the burden associated with granting an accommodation." SWA Resp. 42. Southwest presented no evidence showing undue hardship on its business. Carter Resp. 48-49. The undue hardship defense requires more than conclusory assertions. Title VII requires employers to make accommodation efforts even in cases that might impact co-workers. *Weber*, 199 F.3d at 275; SWA Resp. 41-42 (citations omitted). Southwest failed to show that Carter's Facebook videos and messages imposed *any* undue hardship on coworkers. Even if Carter's religious activities had a discernible impact on co-workers (which they did not), Title VII required Southwest to initiate accommodation efforts

24

because Southwest failed to show that any such possible accommodation with respect to "co-workers" would have imposed an undue hardship on the company's business.

Moreover, Southwest's characterization that Carter was imposing religious beliefs on co-workers is false. SWA Resp. 41. Carter sent the private Facebook videos and messages to one person—Local 556 President Stone—in response to the union's participation in the Planned Parenthood March on Washington D.C. Unlike ordinary employees, Local 556 and its president had affirmative obligations to represent Carter and accommodate her religious beliefs and practices under Title VII, the RLA, and the duty of fair representation to represent. Carter Br. 47-48, 51, 56-59; Carter Resp. 49. Southwest would not have incurred more than a *de minimis* cost by refraining from interposing itself in union matters. No other employees complained to Southwest about Carter's Facebook videos and messages posted to her Facebook page, and Southwest failed to present any other discernible impact on the company's business. Carter Resp. 48-49.[22] Carter has also argued that while this Court may be bound by *Hardison*'s "more than *de minimis*" test, it should be overturned because it is incorrectly reasoned and based on an erroneous interpretation of "undue hardship" that deviates from Title VII's text and plain meaning. Carter Resp. 51-52.

## CONCLUSION

For these reasons, the Court should grant Carter's motion for partial summary judgment against Southwest, and allow the parties to proceed to trial on the matter of remedies.

Dated: October 18, 2021                    Respectfully submitted,

                                           s/ Matthew B. Gilliam
                                           Mathew B. Gilliam (*admitted pro hac vice*)
                                           New York Bar No. 5005996

---

[22] Contrary to Southwest's characterizations of Carter's deposition testimony, Carter indicated that the accommodation she should have received "in this context" was simply not to be fired for her Facebook videos and messages sent to the union president in response to the union's participation in the Planned Parenthood Women's March; not based on some other demand. Carter Resp. 17; SWA Resp. 42.

*mbg@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319

<u>s/ Jason E. Winford (*with permission*)</u>
David E. Watkins
Texas Bar No. 20922000
*dwatkins@jenkinswatkins.com*
Jason E. Winford
Texas Bar No. 00788693
*jwinford@jenkinswatkins.com*
JENKINS & WATKINS, P.C.
4300 MacArthur Avenue, Suite 165
 Dallas, Texas 75209
Tel: 214-378-6675
Fax: 214-378-6680

*Attorneys for Plaintiff Charlene Carter*

### Certificate of Service

I hereby certify that on October 18, 2021, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ Matthew B. Gilliam