# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Case No. 3:17-cv-02278-X |
| | § | |
| SOUTHWEST AIRLINES CO., AND | § | |
| TRANSPORT WORKERS UNION OF AMERICA, | § | |
| LOCAL 556, | § | |
| | § | |
| Defendants. | § | |
| | § | |

---

## SOUTHWEST AIRLINES CO.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

**Page**

I.  Argument ........................................................................................................... 2

    A.  The Court Should Grant Summary Judgment On Carter's RLA Claim ................ 2

        1.  The Court Already Dismissed the Legal Theory Upon Which Carter Predicates Her Opposition ........................................................................ 2

        2.  There is No Private Right of Action Under Section 152 Third & Fourth .......................................................................................................... 6

        3.  Carter Does Not Respond to Southwest's Argument Regarding the Necessity of Contract Interpretation to Resolve Her RLA Claim. ............ 8

        4.  Carter Has Not Demonstrated the Requisite Anti-Union Animus Required to Warrant Judicial Intervention .................................................. 8

        5.  Carter Cannot Demonstrate That She Engaged In or Was Terminated For RLA Protected Activity .................................................. 11

        6.  Carter's Forfeited Any Protections That Would Otherwise Attach to Her Communications ................................................................................ 14

    B.  The Court Should Grant Summary Judgment on Carter's Title VII Claim .......... 16

        1.  Carter Did Not Exhaust Administrative Remedies With Respect to Southwest's Alleged Failure to Accommodate .......................................... 16

        2.  Carter Does Not Identify Any Conflict Between Her Religion and An Employment Requirement ................................................................. 18

        3.  Any Potential Accommodation Would Impose An Undue Hardship ....... 22

    C.  The Arbitrator's Decision is Fatal To Carter's RLA and Title VII Claims .......... 24

II. Conclusion ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abeles v. Metro. Wash. Airports Auth.*,
676 Fed. Appx. 170 (4th Cir. 2017)......................................................................20

*Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*,
802 F.2d 886 (7th Cir. 1986) ...............................................................................11

*Alstate Maint., LLC*,
367 NLRB No. 68 (2019) ......................................................................................14

*Antoine v. First Student, Inc.*,
713 F.3d 824 (5th Cir. 2013) ................................................................................18

*Beckett v. Atlas Air*,
968 F. Supp. 814 (E.D.N.Y. 1997) ...................................................................6, 12

*BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers*,
973 F.3d 326 (5th Cir. 2020) ..................................................................................8

*Bob v. Madison Sec. Grp.*,
2016 U.S. Dist. LEXIS 163940 (S.D.N.Y. Nov. 28, 2016) ..................................23

*Bruff v. N. Miss. Health Servs.*,
244 F.3d 495 (5th Cir. 2001) ................................................................................23

*Burton v. Madix Store Fixtures*,
2005 U.S. Dist. LEXIS 37487 (N.D. Tex. Dec. 29, 2005) ...................................17

*c.f. Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*,
2021 U.S. Dist. LEXIS 124466 (W.D. Tex. July 2, 2021) .....................................9

*Carr v. Chicago Cent. & Pac. R.R.*,
853 F. Supp. 282 (N.D. Ill. 1994) .........................................................................12

*Carter v. Transp. Workers Union of Am. Local 556*,
353 F. Supp. 3d 556 (N.D. Tex. 2019) .......................................................2, 4, 5, 10

*Chalmers v. Tulon Co. of Richmond*,
101 F.3d 1012 (4th Cir. 1996) .........................................................................22, 24

*Conrail v. United Transp. Union Gen. Comm. of Adjustment*,
908 F. Supp. 258 (E.D. Pa. 1995) ...........................................................................7

*Constellium Rolled Prods. Ravenswood, LLC v. NLRB*,
    945 F.3d 546 (D.C. Cir. 2019) ............................................................16

*Contempora Fabrics, Inc. v. United Food & Commercial Workers Union*,
    344 NLRB 851 (2005) ....................................................................16

*Cook v. Chrysler Corp.*,
    981 F.2d 336 (8th Cir. 1992) ...........................................................23

*DaimlerChrysler Corp.*,
    344 NLRB 1324 (2005) ..................................................................15

*Dalberiste v. GLE Assocs., Inc.*,
    814 Fed. Appx. 495 (11th Cir. 2020).................................................23

*Ervington v. LTD Commodities, LLC*,
    555 Fed. Appx. 615 (7th Cir. 2014)..................................................23

*George v. Home Depot*,
    2001 U.S. Dist. LEXIS 20627 (E.D. La. Dec. 6, 2001)........................23

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002)........................................................................6

*Grimes v. BNSF Ry. Co.*,
    746 F.3d 184 (5th Cir. 2014) ......................................................24, 25

*Held v. Am. Airlines, Inc.*,
    2007 U.S. Dist. LEXIS 7665 (N.D. Ill. Jan. 30, 2007) ...........9, 10, 11, 15

*Honda of Am. Mfg., Inc.*,
    334 NLRB 746 (2001) ....................................................................16

*Hull v. Kapstone Container Corp.*,
    2018 U.S. Dist. LEXIS 157849 (N.D. Tex. Sep. 17, 2018)..................6, 8

*Hussein v. Waldorf Astoria*,
    134 F. Supp. 2d 591 (S.D.N.Y. 2001)...............................................23

*Indep. Union of Flight Attendnats v. Pan Am. World Airways, Inc.*,
    789 F.2d 139 (2d Cir. 1986)........................................................11, 12

*Indiana Gear Works*,
    156 NLRB 397 (1965) ....................................................................14

*Int'l Bhd. of Teamsters v. UPS Co.*,
    447 F.3d 491 (6th Cir. 2006) .............................................................7

*Johnson v. Express One Int'l, Inc.*,
  944 F.2d 247 (5th Cir. 1991) ................................................................12

*Klemens v. Air Line Pilots Ass'n, Int'l*,
  736 F.2d 491 (9th Cir. 1984) ...............................................................11

*Knox v. Am. Airlines, Inc.*,
  2016 U.S. Dist. LEXIS 136565 (N.D. Tex. Oct. 3, 2016) ......................8

*Leiser Constr., LLC*,
  349 NLRB 413 (2007) ....................................................................15, 16

*Lorenz v. Wal-Mart Stores, Inc.*,
  2006 U.S. Dist. LEXIS 36145 (W.D. Tex. May 24, 2006).....................19

*Lundeen v. Mineta*,
  291 F.3d 300 (5th Cir. 2002) ..............................................................6, 7

*Martin Luther Mem'l Home*,
  343 NLRB 646 (2004) ...........................................................................14

*Media Gen. Ops., Inc. v. NLRB*,
  394 F.3d 207 (4th Cir. 2005) ................................................................15

*Mial v. Foxhoven*,
  305 F. Supp. 3d 984 (N.D. Iowa 2018)................................................18

*Mitchell v. Univ. Med. Ctr., Inc.*,
  2010 U.S. Dist. LEXIS 80194 (W.D. Ky. Aug. 9, 2010) .......................24

*Mobil Expl. and Producing U.S., Inc. v. NLRB*,
  200 F.3d 230 (5th Cir. 1999) ................................................................12

*Moranski v. Gen. Motors Corp.*,
  433 F.3d 537 (7th Cir. 2005) ................................................................20

*NLRB v. Arkema, Inc.*,
  710 F.3d 308 (5th Cir. 2013) ................................................................15

*Novitsky v. Am. Consulting Eng'rs, LLC*,
  196 F.3d 699 (7th Cir. 1999) ................................................................17

*Pantoja v. Brennan*,
  257 F. Supp. 3d 636 (D. Del. 2017)......................................................17

*Passmore v. 21st Century Oncology, LLC*,
  2018 U.S. Dist. LEXIS 61085 (M.D. Fla. Apr. 10, 2018)......................20

*Perkins v. City of Greenwood*,
    2016 U.S. Dist. LEXIS 37119 (N.D. Miss. Mar. 22, 2016)....................................................19

*Peterson v. Hewlett-Packard Co.*,
    358 F.3d 599 (9th Cir. 2004) .................................................................................23

*PHI, Inc. v. Office & Prof'l Employees Int'l Union*,
    440 Fed. Appx. 394 (5th Cir. 2011)..............................................................6, 7, 8

*Rayyan v. Va. DOT*,
    719 Fed. Appx. 198 (4th Cir. 2018).......................................................................17

*Ruby v. Am. Airlines, Inc.*,
    323 F.2d 248 (2d Cir. 1963)....................................................................................11

*Russell v. NMB*,
    714 F.2d 1332 (5th Cir. 1983) ........................................................................12, 13

*Schwartzberg v. Mellon Bank, N.A.*,
    2008 U.S. Dist. LEXIS 1180 (W.D. Pa. Jan. 8, 2008).........................................21

*Stewart v. Spirit Airlines, Inc.*,
    503 Fed. Appx. 814 (11th Cir. 2013) ...................................................................12

*Summers v. Whitis*,
    2016 U.S. Dist. LEXIS 173222 (S.D. Ind. Dec. 15, 2016)...................................22

*Sw. Bell Tel. Co.*,
    200 NLRB 667 (1972) ..........................................................................................16

*Texas & New Orleans R.R. Co. v. Bhd. of Ry. & Steamship Clerks*,
    281 U.S. 548 (1930).................................................................................................7

*Tiano v. Dillard Dep't Stores, Inc.*,
    139 F.3d 679 (9th Cir. 1998) ................................................................................18

*TWA, Inc. v. Indep. Fed'n of Flight Attendants*,
    489 U.S. 426 (1989).....................................................................................9, 11, 12

*United Transp. Union v. Nat'l R.R. Passenger Corp.*,
    588 F.3d 805 (2d Cir. 2009)....................................................................................8

*Weber v. Roadway Express*,
    199 F.3d 270 (5th Cir. 2000) ................................................................................23

*Wilson v. U.S. West Commc'ns*,
    58 F.3d 1337 (8th Cir. 1995) ................................................................................23

*Wright v. Union Pac. R.R. Co.*,
    990 F.3d 428 (5th Cir. 2021) .............................................................................................8

*YMCA of Pikes Peak Region, Inc. v. NLRB*,
    914 F.2d 1442 (10th Cir. 1990) ........................................................................................15

**Statutes**

29 U.S.C. § 157............................................................................................................12, 15

45 U.S.C. §§ 152, Third............................................................................................6, 9

45 U.S.C. §§ 152, Fourth..........................................................................................6, 9

Charlene Carter's ("Carter") opposition to Southwest Airlines Co.'s ("Southwest") motion for summary judgment suffers from fatal defects and fails to address key dispositive arguments regarding both her Railway Labor Act ("RLA") and Title VII claims.

As to her RLA claims, Carter predicates her opposition on a legal theory from her Second Amended Complaint ("SAC") that the Court previously dismissed with prejudice. As such, Carter fails to address the viability of her actual RLA claim as plead in the Fourth Amended Complaint ("FAC"). Moreover, Carter fails to address Southwest's argument that the Court lacks jurisdiction to resolve Carter's RLA claim because doing so would necessitate interpretation and application of the collective bargaining agreement ("CBA") and related policies. Additionally, Carter's argument regarding the availability of a private right of action under Section 152 Third & Fourth of the RLA is not persuasive. The Court should conclude, as the Fifth Circuit has, that individual employees cannot bring claims under Section 152 Third & Fourth. Finally, Carter cannot demonstrate – as she must – that circulating videos of aborted fetuses and depictions of vaginas (publicly and to co-workers) constitutes protected activity under the RLA. Carter attempts to sidestep this issue, implying (without expressly stating) that by appending a Union-related message to her unprotected graphic communications the latter become legally protected. However, Carter cites no authority for this proposition. Finally, there is no evidence of the kind of anti-union animus required to warrant judicial intervention in this post-certification, post-arbitration dispute. Summary judgment against Carter's RLA claim is warranted.

Carter's Title VII claim fares no better. The conduct that resulted in Carter's termination was not her beliefs or practices; it was her graphic and harassing social media posts and messages that went far beyond those beliefs and practices. Separately, Carter raising her religious beliefs after violating Southwest policies did not trigger any duty to accommodate. And even if it did, a

potential accommodation would impose an undue hardship as it would potentially subject Southwest's workforce to Carter's harassing and graphic messages.

Finally, Carter provides no persuasive reason for the Court to look beyond the Arbitrator's determination, which, as Southwest discussed in its motion, conclusively refutes one or more of the critical elements of her claims.[1]

I.      **ARGUMENT**

      A.      **The Court Should Grant Summary Judgment On Carter's RLA Claim**

           1.      The Court Already Dismissed the Legal Theory Upon Which Carter Predicates Her Opposition

Carter opposes summary judgment on her RLA claim based on the contention that Southwest terminated her due to her Facebook messages to Stone and other public posts, and that by doing so, it violated section 152, Third & Fourth. Pl's Opp. at 19, 21 ("Southwest fired Carter for sending private Facebook videos and messages to President Stone."); *id.* at 10 (arguing that Southwest violated section 152, Third & Fourth by "terminat[ing] Carter for the Facebook videos and messages she sent to [] Stone and the pro-life [] videos Carter posted on her [] Facebook page."). Not only does Carter's argument lack support, this Court has already rejected it. *See Carter v. Transp. Workers Union of Am. Local 556*, 353 F. Supp. 3d 556 (N.D. Tex. 2019).

Southwest previously moved to dismiss Carter's Second Amended Complaint ("SAC") (dkt. no. 47), which purported to state three counts for violations of section 152, Third & Fourth of the RLA. Plaintiff predicated those counts on the following allegations:

---

[1] Southwest notes that throughout her opposition, Carter repeatedly states that Local 556 participated in the "Planned Parenthood Women's March." Pl's Opp. at 15. Carter is either referring to an event that does not exist or to an actual event (the 2017 Women's March) using a name she made up. In any case, Southwest is not aware of an event called the "Planned Parenthood Women's March."

| Count | Stated Grounds | Key Allegations | Disposition |
|---|---|---|---|
| Count I | "Southwest illegally terminated Carter for engaging in speech protected by the RLA" | "Carter engaged in RLA-protected speech when she sent Facebook messages to President Stone and made related posts conveying her criticism and opposition, as a nonmember objector, to the political leadership of the union, and to the union's use of dues in support of political, ideological, and religious causes with which she profoundly disagreed, all of which was in the context of a campaign to oppose Local 556's leadership and expenditures, and to reorganize the union via a recall election." SAC ¶ 80.<br><br>"By firing Carter for her Facebook messages to [] Stone and for related posts, Southwest violated Carter's rights under RLA Section 2, Third and Fourth to vigorously exercise "uninhibited, robust, and wide-open" free speech related to flight attendants' efforts to reorganize Local 556, to collectively bargain with Southwest, and to oppose the union's leadership and spending." SAC ¶ 81. | Dismissed with prejudice. *Carter*, 353 F. Supp. 3d at 570-73. |
| Count II | "Southwest maintained and enforced overbroad and vague policies that chill and restrict employees in their exercise of protected rights" | Southwest's policies are "overbroad in the manner in which they were maintained and enforced against Carter, restricting her rights under the RLA to engage in protected speech … in opposition to Local 556." SAC ¶ 88 | Dismissed with prejudice. *Carter*, 353 F. Supp. 3d at 570-73 |
| Count IV | "Southwest … retaliated against Carter for the exercise of her protected rights under the RLA" | "Carter exercised her rights under the … RLA to resign from membership in Local 556 and to object to the forced payment of political and other nonchargeable union expenses. Carter engaged in protected … activity in opposing … Local 556, President Stone, and the union's activities and expenditures. Carter opposed Local 556, President Stone, and their political and ideological views, and supported the recall of the Local 556 Executive Board." SAC ¶ 105. | Motion to dismiss denied. *Carter*, 353 F. Supp. 3d at 573-74. |

| Count | Stated Grounds | Key Allegations | Disposition |
|-------|----------------|-----------------|-------------|
|       |                | Carter's protected … activities were a substantial and motivating factor for [her] termination … as evidenced by … (a) the timing of Carter's termination in relation to her protected activity, (b) a pattern of retaliatory discharge of other nonmember objectors and Local 556 opponents, (c) the disparate treatment of Carter and other nonmember objectors and Local 556 opponents in contrast with Local 556 members and supporters, (d) Carter's 20-year employment history at Southwest without any disciplinary record, (e) Southwest's deviation from past disciplinary practices, (f) the inconsistencies between Southwest's justifications for terminating Carter and its other actions, (g) the implausibility of Southwest's justifications, (h) Southwest's failure to follow its own progressive disciplinary policy and other disciplinary rules, and (i) the manner in which Southwest conducted its investigation and fact finding prior to Carter's termination. SAC ¶ 109. |             |

As the above chart demonstrates, Carter predicated Counts I and II on the contention that she "engaged in RLA-protected speech when she sent Facebook messages to President Stone and made related posts." SAC ¶ 80. The viability of this legal theory is a necessary predicate of Carter's opposition to Southwest's motion for summary judgment. *Compare* SAC ¶ 80 (messages to Stone and public Facebook posts were RLA protected activity) *and* SAC ¶ 81 ("By firing Carter for her Facebook messages to President Stone and for related posts, Southwest violated Carter's rights under RLA Section 2, Third and Fourth") *with* Pl's Opp. at 19, 21 ("Southwest fired Carter for sending private Facebook videos and messages to President Stone.") *and* Pl's Opp. at 10 (arguing Southwest violated section 152, Third & Fourth by "terminat[ing] Carter for the Facebook videos and messages she sent to President Stone and the pro-life Facebook videos Carter posted.").

However, this Court has already dismissed the legal theory advanced by Counts I and II of the SAC *with prejudice*.

In dismissing Counts I and II, the Court relied on the post-certification nature of the dispute; the availability of the arbitral forum to address Carter's termination; and the absence of allegations suggesting a serious attack on the union or collective bargaining process. *See Carter*, 353 F. Supp. 3d at 572-73. On the other hand, the Court declined to dismiss Count IV based principally on Carter's allegations of disparate treatment of recall supporters and opponents:

> Plaintiff [] alleges that 'Southwest has subjected approximately thirteen supporters of the recall effort to termination of employment, suspension, repeated fact-findings, and/or other disciplinary measures in the last twelve months, many times at the request of Local 556 members and officials.' … In contrast to recall supporters, Plaintiff alleges that other flight attendants were not terminated by Southwest or ultimately were allowed to keep their jobs despite complaints filed against them involving social media posts that were [] threatening or harassing.
>
> Viewing the well-pleaded factual allegations in the light most favorable to Plaintiff, the Court finds that Plaintiff's allegations are sufficient to establish "more than a sheer possibility" that Southwest was motivated by Plaintiff's RLA-protected activities in terminating her employment.

*Carter*, 353 F. Supp. 3d at 573-74.

Despite the Court's dismissal Order, Carter attempted to include the dismissed counts in her Third Amended Complaint ("TAC"). Dkt. No. 70. The Court then granted Southwest's motion to strike the TAC and ordered Carter to file the FAC. Dkt. Nos. 72-73, 79 (striking complaint because Plaintiff "failed to remove causes of action that have been dismissed with prejudice"). In recognition of the Court's dismissal and order striking the TAC, the operative FAC does not advance the previously dismissed legal theory that Carter attempts to resuscitate in her opposition. Instead, in the FAC, Carter relies on Southwest's alleged hostility to objectors like herself, a contention she attempts to bolster with the same unsupported allegations of disparate treatment contained in the SAC. *See* SAC ¶¶ 109; FAC ¶ 100.

Moreover, the allegations that the Court ordered Carter to remove from the TAC because they related to her dismissed claims are recited in Carter's opposition. *Compare* TAC ¶¶ 81, 83 *with* Pl's Opp. at 23-24. Stated simply, Carter's opposition relies on legal contentions and factual assertions from the TAC that are not and cannot be a predicate for the claims in the FAC. Carter's reliance on a legal theory that she is precluded from raising is not a minor error. It is fatal because Cater does not substantively respond to Southwest's arguments regarding the RLA count the Court did not dismiss. By failing to respond to Southwest's argument, Carter has conceded summary judgment on Count IV. *Hull v. Kapstone Container Corp.*, 2018 U.S. Dist. LEXIS 157849, *6 (N.D. Tex. Sep. 17, 2018) ("When a party fails to respond to an argument in the opposing party's motion for summary judgment, the party concedes that argument.").

2.   There is No Private Right of Action Under Section 152 Third & Fourth

Section 152, Third & Fourth do not expressly provide individuals with a private right of action. *See, e.g.*, *Beckett v. Atlas Air*, 968 F. Supp. 814, 817 (E.D.N.Y. 1997). Thus, there is a "'presumption that Congress did not intend to create a private right of action.'" *Lundeen v. Mineta*, 291 F.3d 300, 310 (5th Cir. 2002). Accordingly, the Fifth Circuit has found that "individual[s] do not have a private cause of action under section 2, Third & Fourth of the Railway Labor Act." *PHI, Inc. v. Office & Prof'l Employees Int'l Union*, 440 Fed. Appx. 394, 396 (5th Cir. 2011).[2] In light of this authority, Southwest submits that Carter cannot satisfy her "**heavy burden**" to demonstrate

---

[2] Carter states that "Congress created enforceable rights under RLA Section 152 (Third) and (Fourth) in 'clear and unambiguous terms.' *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002)." Pl's Opp. at 28. *Gonzaga* has nothing to do with the RLA. Carter later repeats this declaration and again cites a case that has nothing to do with the RLA. Pl's Opp. at 28-29 (*citing Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)).

that Congress affirmatively contemplated creating a private right of action. *Lundeen*, 291 F.3d at 311 (emphasis added).[3]

The bulk of Carter's response on this dispositive question consists of conveniently-arranged quotations from different portions of the RLA that the Fifth Circuit presumably contemplated when it rejected a private cause of action in *PHI*.[4] Carter also cites a 1930 decision from the Supreme Court which she claims demonstrates the availability of a private right of action under section 152 Third & Fourth. *See* Pl's Opp. at 30 (*citing Texas & New Orleans R.R. Co. v. Bhd. of Ry. & Steamship Clerks*, 281 U.S. 548 (1930)). However, *Texas & New Orleans R.R.* is not persuasive on this question because it was based on a prior and significantly different version of the RLA. *See, e.g.*, *Int'l Bhd. of Teamsters v. UPS Co.*, 447 F.3d 491, 503 (6th Cir. 2006) ("[T]he union argues that § 2, Third confers rights that are always judicially enforceable. But in support of this sweeping proposition, it [] invokes *Texas & New Orleans Railroad*, … a decision that … pre-dates the 1936 amendments to the Act, which extended [] jurisdiction to the system adjustment boards for airlines. *Texas & New Orleans Railroad* also involved a pre-certification dispute[.]"). Moreover, *Texas & New Orleans R.R.* involved a claim brought by a certified union, not an individual employee like Carter. *See Texas & New Orleans R.R. Co.*, 281 U.S. at 554-56.

In an attempt to distinguish the Fifth Circuit precedent, Carter notes that the case involved a minor dispute. Pl's Opp. at 32. Indeed it did. But the fact that there were two independently

---

[3] Carter falsely states that in this case the Court concluded that section 152 Third & Fourth created a private right action. *See* Pl's Opp. at 31. This is false. Until now, the issue was never raised by the parties the Court has never discussed it.

[4] Carter also discusses the general rules regarding the availability of certain remedies in the context of federal claims. *See* Pl's Opp. at 30. But this puts the cart before the horse – Carter must first demonstrate that she has a private right of action. *See Conrail v. United Transp. Union Gen. Comm. of Adjustment*, 908 F. Supp. 258, 262 (E.D. Pa. 1995) ("[T]he question of whether a private right of action exists is 'analytically distinct' from the question of what remedies may be available.").

sufficient grounds to support affirming the district court – minor dispute *and* the absence of a private right of action – does not alter the import of the Fifth Circuit's decision. The absence of a private right of action was a separate and independent basis for its decision. *PHI Inc.*, 440 Fed. Appx. at 396.

3.   Carter Does Not Respond to Southwest's Argument Regarding the Necessity of Contract Interpretation to Resolve Her RLA Claim.

Southwest argued in its motion that the Court lacks jurisdiction to resolve Carter's RLA claim because doing so would necessitate interpretation and application of the CBA and related policies. *See, e.g.*, *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 810 (2d Cir. 2009). As the Fifth Circuit has held, a RLA claim arising from alleged unlawful termination is a preempted "minor dispute" if the termination was "arguably justified" by the written or implied terms of the CBA or other applicable workplace rules; or if resolution of the claim will necessitate interpretation of the same. *See Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 435-36 (5th Cir. 2021); *Knox v. Am. Airlines, Inc.*, 2016 U.S. Dist. LEXIS 136565, *3 (N.D. Tex. Oct. 3, 2016). Importantly, Southwest's burden to demonstrate that Carter's claim is a minor dispute is a light burden. *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers*, 973 F.3d 326, 335 (5th Cir. 2020) ("[I]f there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor.").

Carter does not respond to this argument. Carter does not discuss the relevant CBA provisions or Southwest policies, nor does she address whether interpreting them will be necessary. Carter's failure to address this claim dispositive argument warrants granting Southwest's motion on this basis. *Hull*, 2018 U.S. Dist. LEXIS 157849, *6.

4.   Carter Has Not Demonstrated the Requisite Anti-Union Animus Required to Warrant Judicial Intervention

Section 152, Third and Fourth of the RLA generally protect the right of unrepresented employees to organize a union without interference. *See* 45 U.S.C. §§ 152, Third & Fourth. As Carter acknowledges, these provisions are designed to protect "the *precertification* rights and freedoms of unorganized employees" – *i.e.*, the period before a union is certified as the bargaining representative. *TWA, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989). Section 152, Third and Fourth "do not provide a remedy after a union has been certified except in cases of extreme anti-union bias or animus." *Held v. Am. Airlines, Inc.*, 2007 U.S. Dist. LEXIS 7665, *18 (N.D. Ill. Jan. 30, 2007). Carter has not cited any evidence suggesting anti-union animus much less the "extreme" level of animus required to support a post-certification, post-arbitration RLA claim. *Id.* at *18-19; *c.f. Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 2021 U.S. Dist. LEXIS 124466, *6 (W.D. Tex. July 2, 2021) (exercising jurisdiction in post-certification dispute due to "exceptional circumstance" of employer actions that threaten to weaken union).

The decision in *Held v. Am. Airlines, Inc.* is on all fours with Carter's claims here and demonstrates that her post-certification RLA claim is not viable. In *Held*, Allied Pilots Association ("APA") members posted on a password-protected internet forum for union members. *Held*, 2007 U.S. Dist. LEXIS 7665, *2. On the forum, APA members discussed Gary Weller, the elected Chairman of the union's appeal board. *Id.* at *3. "Union members were unhappy because Weller had complained to [] American about a union member's exercise of off-duty, off-premises political speech[.]" *Id.* at *3-4. The plaintiff penned a message on the board objecting to the APA Chairman's representation and to the union more broadly. The message also contained comments regarding Weller's sexual orientation. As it related to the union, the plaintiff stated that "Weller and his cronies have misused and abused the political process"; indicated that Weller should "move on to true union business"; and objected to the union's conduct with respect to the pilot pension

plan. *Id.* at *4-5. Thereafter, APA officials delivered or assisted in delivering the plaintiff's message to American management. *Id.* at *6. American suspended and later terminated the plaintiff for violation of its work environment policy. *Id.* at *7-8. The plaintiff filed a grievance and eventually proceeded to arbitration. The System Board concluded that American had good cause to terminate the plaintiff's employment and denied the grievance. *Id.* *11-12.

Like Carter, the plaintiff in *Held* asserted claims under section 152, Third & Fourth. *Id.* at *17. The court dismissed the claims on three grounds, all of which are present here:

> **Post-Certification Dispute**: Section 152, Third & Fourth address the pre-certification rights of unorganized employees. *Id.* at *18. Because the plaintiff's termination did not "strike a fundamental blow" to collective bargaining and was not "inherently destructive" to the union, there was no basis for post-certification judicial intervention. *Id.* at *18-19.

> **Plaintiff's Use of Arbitration Remedy**: Once an employee submits to arbitration under the CBA, she cannot bring claims in court under section 152, Third & Fourth. "[N]o federal court has permitted an employee to pursue a claim under §§ 2 Third and Fourth after the employee has submitted to arbitration under the collective bargaining agreement." *Id.* at *19. Because "plaintiff did … have a remedy in the form of the System Board and opted to pursue resolution of his grievance in this manner … [he] fails to state a claim under §§ 2 Third and Fourth of the RLA." *Id.*

> **Minor Dispute**: Because plaintiff's claim "necessitate[d] the evaluation of the CBA to determine applicable work rules and disciplinary procedures" it was a preempted minor dispute. *Id.*

The key facts in *Held* are the same as those Carter asserts here. Carter's claim arises from messages directed to union officials; the messages contained objections to the representation of union officials; a union official reported the messages to the employer; and the messages criticizing union leadership resulted in termination.

*Held* – which this Court has cited approvingly – is consistent with numerous decisions rejecting post-certification RLA claims where the plaintiff had the opportunity to contest an adverse employment action in the contractual arbitral forum. *See, e.g.*, *Carter*, 353 F. Supp. 3d at

572-73; *Indep. Union of Flight Attendants v/ Pan Am. World Airways, Inc.*, 789 F.2d 139, 142 (2d Cir. 1986) (RLA claim failed because, *inter alia*, there was no suggestion that the employer "precluded … any [] flight attendant from challenging any disciplinary action through the adjustment board procedure."). Carter has not identified any authority as directly on point as *Held* and the Court should decline to exercise jurisdiction over this dispute.

5.    <u>Carter Cannot Demonstrate That She Engaged In or Was Terminated For RLA Protected Activity</u>

Even if the Court were inclined to adjudicate Carter's claim despite the absence of required animus, summary judgment would be appropriate because Carter cannot demonstrate that she engaged in protected activity. Carter does not discuss any case where a court endorsed a RLA claim based on events similar to those Carter alleges here. Instead, Carter relies principally on NLRA authorities when discussing the scope of protected activity. While cases applying the NLRA can, in certain circumstances, be relevant in a RLA case, they do not advance Carter's argument here.

"The NLRA and the RLA are fundamentally different." *Klemens v. Air Line Pilots Ass'n, Int'l*, 736 F.2d 491, 496 (9th Cir. 1984). "[S]imply because a practice is deemed unlawful under the NLRA does not automatically translate into a finding that the same practice is unlawful under the RLA." *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 898 (7th Cir. 1986). Indeed, "the claim that the courts should do under the Railway Labor Act what Congress directed the NLRB to do under the National Labor Relations Act … flies in the face of the difference in the language and scheme of the two statutes [and] ignores the diverse problems to which they were addressed." *Ruby v. Am. Airlines, Inc.*, 323 F.2d 248, 256 (2d Cir. 1963).

To be sure, "***carefully drawn*** analogies from the federal common labor law developed under the NLRA ***may*** be helpful in deciding cases under the RLA." *TWA, Inc.*, 489 U.S. at 432

11

(emphasis added). However, the NLRA "cannot be imported wholesale into the railway labor arena." *Id.* at 439. "Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes." *Id.*; *see also Carr v. Chicago Cent. & Pac. R.R.*, 853 F. Supp. 282, 286 (N.D. Ill. 1994) ("The NLRA may offer helpful analogies but analogy should not be confused with binding precedent.").

Illustrative of the legal error resulting from Carter's reliance on NLRA authorities is her citation to *Mobil Expl. and Producing U.S., Inc. v. NLRB*, 200 F.3d 230 (5th Cir. 1999), for the general proposition that employees have a protected right to oppose the leadership of an incumbent union. Pl's Opp. at 35. The statutory basis for the decision in *Mobil Expl.* was that, in the circumstances of the case, the employee engaged in concerted activities under section 7 of the NLRA (29 U.S.C. § 157) when he opposed union leadership. *See Mobil Expl.*, 200 F.3d at 240 ("we cannot say that the Board erred in concluding that 'Pemberton's conduct … constituted protected *concerted activity*") (emphasis added). However, as the Fifth Circuit has recognized, the RLA "protects employees' right to establish a union" but there is "no indication that the RLA seeks to preserve employees' rights to act in concert for 'mutual aid or protection.'" *Johnson v. Express One Int'l, Inc.*, 944 F.2d 247, 252-53 (5th Cir. 1991); *see also Stewart v. Spirit Airlines, Inc.*, 503 Fed. Appx. 814, 818 (11th Cir. 2013) (Section 152, Fourth "only protects employees in their efforts to join or organize a union not to engage in concerted activities"). The decision in *Mobil Expl.* was based on a legal right to engage in concerted activity the RLA does not provide. Speaking more generally, the RLA "protects a narrower range of activities … than does section 7 of the NLRA." *Beckett*, 968 F. Supp. at 820; *see also Indep. Union of Flight Attendants*, 789 F.2d at 141 n.2.

In the rare instance where Carter discusses RLA authorities she fares no better. For example, Carter cites *Russell v. NMB*, 714 F.2d 1332 (5th Cir. 1983), for the proposition that the

RLA treats all efforts to remove specific union officials as protected. Pl's Opp. at 23. As an initial matter, privately sending a union official videos of aborted fetuses and depictions of genitalia has no discernible relationship to any effort to remove that official or reject collective representation in general. More fundamentally, the issue in *Russell* was neither the scope of an employee's speech rights under section 152, Third & Fourth, nor an individual's purported right to hurl invective to employees who happen to be union officials. Rather, the *Russell* court addressed whether the National Mediation Board had a statutory obligation to investigate a representation dispute that was supported by authorization cards from the majority of the bargaining unit. *Id.* at 1135. *Russell* did not proclaim any legal proposition that speaks to the protected or unprotected nature of Carter's social media messages and posts.

Putting aside the distinctions between the NLRA and RLA, Carter's opposition suffers from a separate and more fatal defect. The necessary premise of Carter's argument is that Southwest terminated her based on her Facebook messages and posts *in toto*. However, the undisputed evidence demonstrates that it was not Carter's social medial conduct generally that resulted in her termination. Rather, Southwest terminated Carter for: (1) sending Stone depictions of vaginas; (2) sending Stone videos of aborted fetuses and calling her a murderer; and (3) posting videos of aborted fetuses on her publicly accessible Facebook page while identified as a Southwest employee. SWA App. 1180. While Carter recites various generalities regarding her right to express her views opposing the union, those expressions are not at issue and did not result in the termination of her employment.

Carter's failure to specifically address the videos and images that resulted in her termination is understandable. Carter would not and could not contend that circulating standalone images and videos of vaginas and aborted fetuses is RLA protected. Nevertheless, Carter asks this

Court to hold that, by appending an anti-union sentiment to graphic and otherwise unprotected material, those materials become protected. It is difficult to overstate the impact of such a rule. It would mean that Carter would be legally entitled to circulate any graphic, harassing, or even physically threatening communication to Southwest Flight Attendants so long as she appended an anti-union sentiment to the communication.[5]

Finally, the graphic content aside, decisions applying the NLRA do not support treating Carter's communications as protected. Carter's messages to Stone did not reflect an attempt to persuade her of anything in particular. Rather, Carter's messages consisted of strange invective, assorted political musings about sundry topics like the threat of Sharia law, and general ridicule and insults. Carter's messages were merely scattered gripes and uncivil ridicule expressed for personal reasons rather than communications designed to achieve any representation-related objective. *See, e.g.*, *Alstate Maint., LLC* , 367 NLRB No. 68 (2019) ("griping" does not constitute protected activity); *Indiana Gear Works* , 156 NLRB 397, 409 (1965) ("slinging personal vilifications" is unprotected); *Martin Luther Mem'l Home*, 343 NLRB 646, 647 (2004) (employer can prohibit abusive language and has general right to "establish a 'civil and decent work place.'").

Because Carter cannot point to any authority indicating that the videos and images she circulated are protected, and because it is undisputed that those images (rather than Carter's messages in general) resulted in her termination, summary judgment is appropriate.

6.      Carter's Forfeited Any Protections That Would Otherwise Attach to Her Communications

---

[5] To illustrate the point, Carter could not credibly threaten to assault \ Southwest Flight Attendants who do not oppose abortion. But if Carter threatened to assault all pro-choice Southwest Flight Attendants based on their refusal to opt out of the Union, she could contend that her physical threat is transformed from a terminable offense to legally protected opposition to the Union.

Assuming, *arguendo*, that Carter could demonstrate she engaged in protected activity, summary judgment on her RLA claim would remain proper. Based on the harassing and vulgar nature of Carter's posts, she forfeited any protections that might otherwise attach to her communications.

Even "speech relating to union activity loses statutory protection if it is vulgar, offensive, abusive, or harassing." *Held*, 2007 WL 433107, *7; *see also NLRB v. Arkema, Inc.*, 710 F.3d 308, 316 (5th Cir. 2013) ("Harassment and intimidation are not protected union activities; offensive, hostile language and threats are not protected even if under the guise of union activity"). Neither do profane or otherwise intemperate expressions carry the protections of Section 7. *See YMCA of Pikes Peak Region, Inc. v. NLRB*, 914 F.2d 1442, 1456 (10th Cir. 1990); *Arkema, Inc.*, 710 F.3d at 316 ("it is preposterous that employees are incapable of organizing a union or exercising their other statutory rights … without resort to abusive or threatening language."). In addition, an employee's protected activity "may give way when 'special circumstances' override the employees' [] interests[.]" *Leiser Constr., LLC*, 349 NLRB 413, 415 (2007). Special circumstances may include, *inter alia*, situations in which the protected activity is "vulgar or obscene[,] [] may 'exacerbate employee dissension' or situations in which restriction … 'is necessary to maintain decorum and discipline … '" *Id.* "Where an employee engages in indefensible or abusive misconduct during otherwise protected activity, the employee forfeits the [NLRA's] protection." *DaimlerChrysler Corp.*, 344 NLRB 1324, 1329 (2005). Applying these rules, Courts and the NLRB have deemed unprotected images and commentary that are less inflammatory than videos of aborted fetuses, depictions of genitals, declarations that a co-worker supports murder, and a litany of personal insults, among other things. *See generally Media Gen. Ops., Inc. v. NLRB*, 394

F.3d 207, 209, 212 (4th Cir. 2005) (employee forfeited protections by use of terms "bastard," "son of a bitch," and calling supervisor a "racist.").

In *Leiser Constr., LLC*, 349 NLRB 413 (2007), the Board held that the employer could prohibit the wearing of union insignia that showed a person urinating on a rat, characterizing it as "unquestionably vulgar and obscene." *Id.* at 415. In *Honda of Am. Mfg., Inc.*, 334 NLRB 746 (2001), the Board held that use of phrases "out of the closet" and "bone us" in a union newsletter was "so offensive as to render the otherwise protected newsletters unprotected." *Id.* at 748-49; *see also Contempora Fabrics, Inc. v. United Food & Commercial Workers Union*, 344 NLRB 851 (2005) (telling co-worker that she "better not vote no for this union" was unprotected); *Sw. Bell Tel. Co.*, 200 NLRB 667 (1972) (employer could prohibit insignia with "provocative slogan" that "Ma Bell is a Cheap Mother" due to the "controversial nature of the language [] and its admitted susceptibility to [a] derisive … construction").

The necessity of withdrawing protection from Carter's communications is heightened by its implications for Southwest's compliance with Title VII and related equal opportunity statutes. *See Constellium Rolled Prods. Ravenswood, LLC v. NLRB*, 945 F.3d 546, 551 (D.C. Cir. 2019) (Board must consider potential conflict with other federal laws in assessing protected status). In light of the regularity, vulgarity, hostility, and sex-related content in Carter's messages, treating them as legally protected runs a serious risk of interfering with federal equal opportunity laws. *Id.* at 552 (identifying co-workers and union members who signed up to work overtime as "whores" could "conflict with … obligations to provide a workplace free of sexual harassment"). The Court should therefore grant summary judgment as to any remaining claim under the RLA.

  **B.**  **The Court Should Grant Summary Judgment on Carter's Title VII Claim**

    1.  Carter Did Not Exhaust Administrative Remedies With Respect to Southwest's Alleged Failure to Accommodate

It is undisputed that Carter filed her EEOC charges against Southwest and Local 556 with the guidance of counsel. SWA App. 1022-1023. Carter's charge against Southwest says nothing about failure to accommodate her religious beliefs. SWA App. 1022. Thus, as Southwest argued in its motion, Carter failed to exhaust administrative remedies with respect to any claim predicated on a denied accommodation.

In response, Carter recites the content of the charge. What Carter does not do is discuss or even mention case law holding that alleging religious discrimination in an agency charge does not exhaust administrative remedies with respect to a claim for failure to accommodate. *See, e.g.*, *Novitsky v. Am. Consulting Eng'rs, LLC*, 196 F.3d 699, 701-02 (7th Cir. 1999) (charge alleging religious discrimination did not exhaust administrative remedies with respect to failure-to-accommodate); *Pantoja v. Brennan*, 257 F. Supp. 3d 636, 642 (D. Del. 2017) ("[T]he crux of plaintiff's claims was that she was … treated differently … because of her religion. … [T]here is no evidence that plaintiff exhausted her administrative remedies with respect to a religious accommodation claim."). These cases reflect a straightforward application of the legal rule that theories not raised in an EEOC charge are unexhausted. *Burton v. Madix Store Fixtures*, 2005 U.S. Dist. LEXIS 37487, *6 (N.D. Tex. Dec. 29, 2005).

The only substantive point Carter raises is that failure to accommodate is a form of religious discrimination. Pl's Opp. at 45. This is true but not material and it ignores the authorities cited above. While both disparate treatment and a failure to accommodate can constitute religious discrimination, they remain distinct theories of liability. *See Rayyan v. Va. DOT*, 719 Fed. Appx. 198, 205 (4th Cir. 2018) ("A plaintiff can bring religious discrimination cases under ***two separate theories – disparate treatment or failure to accommodate***.") (emphasis added).

17

If Carter and her counsel thought it appropriate to exhaust administrative remedies with respect to a failure to accommodate claim against Southwest, they should have included supporting allegations as Carter did in her charge against the Union. Because they failed to do so, Carter cannot bring a failure to accommodate claim against Southwest.

2.   Carter Does Not Identify Any Conflict Between Her Religion and An Employment Requirement

The law does not require employers to accommodate any and all conduct that one describes as religiously motivated. *See Mial v. Foxhoven*, 305 F. Supp. 3d 984, 991-92 (N.D. Iowa 2018) ("[T]he fact that a practice or belief may be connected to religion does not compel the conclusion that it is not a personal preference" for which no accommodation is required.). Rather, employers are only required to accommodate an employee's sincerely held religious beliefs to the extent they conflict with an employment requirement. *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013).

Carter describes the religious practice and belief that Southwest was allegedly compelled to accommodate as: (a) the belief "that abortion is the taking of a human life"; and (b) Carter's desire to "share with others that abortion is the taking of a human life." FAC ¶¶ 107-108. Importantly, Carter cites no evidence indicating that this religious belief required her to engage in the conduct that resulted in her termination – *i.e.*, sending graphic videos and images to Stone and publicly posting similar conduct while identifiable as a Southwest employee. In fact, Carter admits that she did not circulate the vagina depictions for religious reasons. SWA App. 195-197 (Carter 62:9-64:12).

Moreover, there is no evidence that Southwest policy prevented Carter from doing precisely what she claims her religion requires – sharing her view that abortion is the taking of life. *See* FAC ¶ 42. The inflammatory form of communication that resulted in Carter's termination

was not a religious mandate that the law required Southwest to accommodate but rather a personal preference as to how to articulate her views. *See, e.g.*, *Mial*, 305 F. Supp. 3d at 991-92; *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682-83 (9th Cir. 1998) (timing of religious pilgrimage was a matter of personal preference). Thus, the there was no conflict between Carter's religious beliefs and a particular Southwest employment rule. *See, e.g.*, *Lorenz v. Wal-Mart Stores, Inc.*, 2006 U.S. Dist. LEXIS 36145, *34 (W.D. Tex. May 24, 2006) (granting summary judgment to employer because plaintiff did not demonstrate that religion required him to dress in a way that "conflicted with defendant's dress code and anti-harassment and offensive conduct policy"); *Perkins v. City of Greenwood*, 2016 U.S. Dist. LEXIS 37119, *19-20 (N.D. Miss. Mar. 22, 2016) (granting summary judgment to employer because, *inter alia*, "Plaintiff … failed to bring forth evidence" of a conflict between his belief and employment requirement).

Indeed, Carter acknowledged her in deposition that there was no particular Southwest policy that prohibited her from expressing any pro-life message:

> Q: So you were aware that Facebook posts [] could be inconsistent with the work rules?
>
> A: Protecting babies, no I did not.
>
> Q: So no matter what you say in a Facebook post, if it is pro-life, it is not a … violation of Southwest policy.
> …
> A: No.
>
> Q: So what could you say in a Facebook post that was pro-life that would violate Southwest's policy in your opinion as a flight attendant bound by a policy that you were familiar with?
>
> A: I don't think any.
>
> Q: So – and just to be clear: You don't think anything you said could be construed as a violation of the social media policy if it was in connection with a pro-life message?

A: No, I don't.

App. 216-217 (Carter 118:23-119:20). There is thus no evidence that Carter's religious belief conflicted with any Southwest employment requirement and, as such, Carter has necessarily *conceded* that she cannot satisfy a required element of her claim.[6]

*Passmore v. 21st Century Oncology, LLC*, 2018 U.S. Dist. LEXIS 61085, *9 (M.D. Fla. Apr. 10, 2018) is instructive on this point. In *Passmore*, the plaintiffs had a "deeply held belief that abortion is contrary to their religious beliefs, and engaged in off-site anti-abortion rallies and protests during non-work hours." *Id.* at *2. Based on those beliefs, the plaintiffs, while on the employer's parking lot, took a video of an ambulance arriving at a neighboring abortion clinic and posted it to a pro-life website. *Id.* at *3. As a result, the employer terminated their employment. The plaintiffs argued that taking the video was a "protected expression" of their religious beliefs and that the employer unlawfully failed to accommodate them. *Id.* at *8. The employer moved to dismiss because the plaintiffs alleged that posting the video did "no[t] conflict with any work requirement." *Id.* at *9. The court granted the employer's motion, reasoning that "an employer cannot provide a reasonable accommodation if there is no conflict to eliminate." *Id.* Given the absence of a conflict between the plaintiffs' religion and the employer's requirements, the court could not "infer[] that [the employer] discharged Plaintiffs 'with the motive of avoiding the need for accommodating a religious practice.'" *Id.* *9. The plaintiffs in *Passmore* were terminated based

---

[6] Having conceded this theory of liability under Title VII, Carter is left to pursue a claim based on alleged disparate treatment. However, as Southwest made clear in its motion, there are no facts supporting any such theory and thus summary judgment is appropriate. *See generally Abeles v. Metro. Wash. Airports Auth.*, 676 Fed. Appx. 170, 174 (4th Cir. 2017) ("To prove a claim under the disparate treatment theory, an employee must demonstrate that the employer treated her differently than other employees because of her religious beliefs."); *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 540-42 (7th Cir. 2005) (Title VII claim failed because plaintiff could not show that the employer would have applied its policies if she belonged to another religion).

on their religiously-motivated conduct opposing abortion. However, because they acknowledged, as does Carter, that their religious practice did not violate a particular work rule, their failure to accommodate claim failed as a matter of law.

Similarly, in *Schwartzberg v. Mellon Bank, N.A.*, 2008 U.S. Dist. LEXIS 1180 (W.D. Pa. Jan. 8, 2008) (*aff'd* 307 Fed. Appx. 676 (3d Cir. 2009)), the plaintiff was a practicing Orthodox Jew who had a religion-based opposition to same-sex relations. In response to an email encouraging employees to attend and support a LGBT affinity group luncheon, the plaintiff made a derogatory remark regarding gay and lesbian relationships and claimed that his opposition to same-sex relations was part of his religious belief. The employee received a warning and was instructed to treat all co-workers with respect in accordance with the employer's policies.

Days later, the plaintiff in *Schwartzberg* received another general email regarding the employer's affinity groups. In response, the plaintiff provided the employer with a written postcard that reiterated his religious beliefs and his opposition to same-sex relationships. Thereafter, the employee received a second warning for violating company policy. The warning stated that his conduct "constitutes proselytization in the workplace, a [] violation of company policy." *Id.* at *13-14

The employee brought a Title VII religious discrimination claim against the employer. The court rejected the claim because the plaintiff did not demonstrate a conflict between his religious belief regarding the immorality of homosexuality and an identifiable employer work rule. *Id.* at *22-25. The plaintiff did not present any evidence indicating that the employer required him to "change his beliefs with regard to homosexuality or that he support or condone homosexuality." *Id.* at *24.

Finally, in *Summers v. Whitis*, 2016 U.S. Dist. LEXIS 173222 (S.D. Ind. Dec. 15, 2016), the plaintiff refused to issue marriage licenses to same-sex couples. The plaintiff claimed that she was religiously led "to refuse to process marriage licenses for same-sex couples." When the plaintiff requested a religious accommodation, the employer ignored her request and terminated her for insubordination. The court rejected the plaintiff's subsequent Title VII claim because the plaintiff was unable to demonstrate a conflict between her opposition to same-sex marriage and the requirement that she process marriage applications and issue licenses. *Id.* at *13-17. "Her employer did not make her express religious approval or condone any particular marriage. Summers remained free to practice her Christian faith and attend church services. She was even free to maintain her belief that marriage is a union between one man and one woman. Thus, she was not forced to 'choose between [her] religious convictions and [her] job.'" *Id.* at *14.

As these cases illustrate, the mere fact that conduct is connected to one's religion is not enough to require an accommodation. Rather, a plaintiff must identify a specific religious belief or practice that is in conflict with an employment requirement. Carter has not done so – rather, she admits there was no Southwest work rule that limited her ability to engage in her claimed religious practice. Thus, her Title VII claim fails.

### 3.   Any Potential Accommodation Would Impose An Undue Hardship

Carter acknowledges that under the applicable and binding legal standard, she faces an uphill battle in contesting Southwest's showing of undue hardship.[7] As Carter implicitly

---

[7] Note that "nothing in Title VII that requires employers to give lesser punishments to employees who claim, *after they violate company rules* … , that their religion caused them to transgress the rules." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1020 (4th Cir. 1996) (emphasis added). It is undisputed that Carter never notified Southwest of her alleged religious mandate until after she engaged in the conduct that resulted in her termination. *See, e.g.*, *Bob v. Madison Sec. Grp.*, 2016 U.S. Dist. LEXIS 163940, *27 (S.D.N.Y. Nov. 28, 2016) ("plaintiff must properly notify the

acknowledges, even a minimal showing of potential harm to Southwest or Carter's co-workers is sufficient for Southwest to prevail. *See Weber v. Roadway Express*, 199 F.3d 270, 274-75 (5th Cir. 2000); *George v. Home Depot*, 2001 U.S. Dist. LEXIS 20627, *26-27 (E.D. La. Dec. 6, 2001). According to Carter, Supreme Court precedent makes it almost impossible for her to prevail:

> *Hardison*['s] [*de minimis* burden test] allows employers to systematically discriminate against and exclude religious minorities from the workplace using overly-broad rules, such as Southwest's Social Media Policies. … It means that an employer need not "grant even the most minor special privilege to religious observers to enable them to follow their faith." … [I]n practice employers can deprive religious employees of their livelihood for simply following their faith.

Pl's Opp. 51-52.[8]

Applying the binding precedent, courts throughout the country have concluded that an employer need not accommodate proselytizing even less inflammatory than Carter's. *See Ervington v. LTD Commodities, LLC*, 555 Fed. Appx. 615 (7th Cir. 2014) (employer "was not required to accommodate [the employee's] religion by permitting her to distribute pamphlets offensive to other employees."); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) (employee was not entitled to post scripture at his cubicle as an accommodation); *Wilson v. U.S. West Commc'ns*, 58 F.3d 1337, 1342 (8th Cir. 1995) (employer did not violate Title VII by restricting employee from wearing a two inch button that "showed a color photograph of an eighteen to twenty-week old fetus" and contained the phrases 'Stop Abortion,' and 'They're

---

employer of the plaintiff's conflicting religious belief … *before* the time the conflicting employment requirement arises")

*Hussein v. Waldorf Astoria*, 134 F. Supp. 2d 591, 597 (S.D.N.Y. 2001) (accommodation claim failed because employee "did not mention the purported conflict between his religion and the hotel's policy until after management questioned him about his beard").

[8] Carter notes that Southwest did not specifically identify any financial harm the resulted from her Facebook posts. Pl's Opp. at 15. However, the law is clear that financial loss is not the only harm that can demonstrate hardship. *Dalberiste v. GLE Assocs., Inc.*, 814 Fed. Appx. 495, 498 (11th Cir. 2020); *Cook v. Chrysler Corp.*, 981 F.2d 336, 338 (8th Cir. 1992). Moreover, the employer is not required to "actually incur accommodation costs before asserting that they are more than *de minimis*." *Bruff v. N. Miss. Health Servs.*, 244 F.3d 495, 501 (5th Cir. 2001).

Forgetting Someone.'"); *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1021 (4th Cir. 1996) (employer not required to accommodate employee's request to proselytize); *Mitchell v. Univ. Med. Ctr., Inc.*, 2010 U.S. Dist. LEXIS 80194, *22-23 (W.D. Ky. Aug. 9, 2010) (allowing employee "to have religious conversations with co-workers, including conversations about the dates God sent her, and whether they could be the date for the end of the world or the Antichrist" would impose an undue hardship). To the extent any conflict existed between Carter's religion and her employment, Southwest did not have a legal obligation to accommodate it.

### C.    The Arbitrator's Decision is Fatal To Carter's RLA and Title VII Claims

Carter concedes that the Court can give evidentiary weight to the conclusion of a labor arbitrator. Pl's Opp. at 53. But the Court's consideration of the arbitration decision *is not* only evidentiary. Arbitral determinations "can have preclusive effect even in litigation involving federal statutory and constitutional rights[.]" *Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 188 (5th Cir. 2014).

In an effort to undermine the import of the arbitrator's factual conclusions, Carter cites various cases addressing the preclusive effect of arbitration decisions in the context of federal statutory claims. Pl's Opp. at 53-54. However, the Fifth Circuit in *Grimes* specifically found that these cases are not material because they address *claim* rather than *issue* preclusion. *Grimes*, 746 F.3d at 186-87 ("*Grimes* urges that a trilogy of [Supreme Court] cases … precludes the application of collateral estoppel here … however, [] those cases counsel against only *claim preclusion*, not issue preclusion."). Accordingly, contrary to Carter's contention, the fact that the arbitrator did not specifically purport to adjudicate her statutory claims is of no import. As Southwest stated in its motion, what matters is that the arbitrator's specific factual determinations, when given preclusive effect, are fatal to Carter's Title VII and RLA claims. Indeed, the entire premise of *Grimes* is that

arbitral findings rendered pursuant to a RLA-covered CBA can be preclusive of *issues* in subsequent and *distinct* federal statutory case. *Grimes*, 746 F.3d at 188.[9]

Carter also emphasizes that the arbitration did not provide the full suite of discovery tools allowed by the federal rules. Pl's Opp. at 54. But that is the case in all labor arbitrations. Carter had all of the procedural protections that the Fifth Circuit deems essential – representation by counsel, the right to present and cross examine witness, and a neutral arbitrator. *See Grimes*, 746 F.3d at 198 ("'When an arbitration proceeding affords basic elements of adjudicatory procedure, such as an opportunity for presentation of evidence, the determination of issues in an arbitration proceeding *should generally be treated as conclusive in subsequent proceedings*[.]'").[10] There is no basis for the Court to ignore the Arbitrator's decision in addressing summary judgment.

## II.   CONCLUSION

For the reasons stated above, the Court should grant Southwest's motion for summary judgment and dismiss the FAC in its entirety.

---

[9] Carter makes a similar error when she discusses the legal standard applicable in just cause proceedings and the ways in which it differs from her claims here. Again, that is not the key question. The preclusive findings are not solely on the issue of just cause. They relate to disparate treatment, the appropriateness of the penalty imposed, the evidence is misconduct, and the motives of key actors, all of which were essential to the Arbitrator's decision. *See* SWA App. 1012-1020.

[10] Carter repeatedly recites the Arbitrator's findings and simply declares that they are legal conclusions rather than factual ones. *See* Pl's Opp. 58-59. However, Carter does not cite a single authority demonstrating that *any* of the cited arbitral findings (much less *all* of them) are legal conclusions rather than factual ones. And as the Fifth Circuit noted in *Grimes*, arbitrators are particularly competent to resolve factual issues.

Dated: October 18, 2021                    Respectfully submitted,

                                           */s/ Paulo B. McKeeby*
                                           Paulo B. McKeeby
                                           State Bar No. 00784571
                                           Brian K. Morris
                                           State Bar No. 24108707
                                           **REED SMITH LLP**
                                           2850 N. Harwood Street
                                           Suite 1500
                                           Dallas, Texas 75201
                                           Phone: 469-680-4200
                                           Facsimile: 469-680-4299
                                           pmckeeby@reedsmith.com
                                           bmorris@reedsmith.com

                                           **ATTORNEYS FOR DEFENDANT
                                           SOUTHWEST AIRLINES CO.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was filed via the Court's ECF filing system which caused a copy of same to be served on all parties on this 18 day of October, 2021.

                                           */s/ Paulo McKeeby*
                                           Paulo B. McKeeby