# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER, <br><br>                 Plaintiff, <br><br> v. <br><br> SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556, <br><br>                 Defendants. | Civil Case No. 3:17-cv-02278-X <br><br><br> **PLAINTIFF CHARLENE CARTER'S BRIEF SUPPORTING HER MOTION FOR PARTIAL SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................... ii

SUMMARY ....................................................................................................... 1

STANDARD OF REVIEW ............................................................................... 3

FACTUAL GROUNDS FOR SUMMARY JUDGMENT ............................... 4

ARGUMENT AND AUTHORITIES ............................................................... 22

I.    Southwest and Local 556 violated Carter's RLA-protected rights ................... 22

    A.  Carter engaged in RLA-protected activity ........................................... 23

        1.  The RLA protects Carter's rights to oppose union representation and
            to advocate for the removal of union officers ................................. 23

        2.  Carter engaged in RLA-protected activity when she sent Facebook videos
            and messages to President Stone objecting to Local 556's participation
            in the Planned Parenthood Women's March ................................. 26

    B.  Southwest and Local 556 targeted Carter's RLA-protected activity ........... 30

        1.  Southwest fired Carter for the private Facebook videos and messages
            she sent to Local 556's President ............................................... 30

        2.  Local 556, by and through President Stone, reported Carter and caused
            Southwest to fire her for exercising RLA-protected rights ................... 31

    C.  Carter's activities did not lose their RLA protection ........................... 33

        1.  Federal labor law guarantees employee freedoms under *Austin*
            to engage in "uninhibited, robust, and wide-open debate in labor disputes" ........ 35

        2.  The RLA places "constitutional limitations" on union and employer
            attempts to restrict dissident speech about union representation matters ............. 36

II.   Local 556 violated the duty of fair representation the union owed Carter ........ 38

    A.  Local 556's arbitrary conduct ................................................... 39

    B.  Local 556's discriminatory conduct ............................................. 40

i

C. Local 556's bad faith…………………………………... ............................................41

III.   Southwest and Local 556 violated Title VII by causing Carter to be fired because of her religious beliefs and practices ......................................................................................42

A.   Carter's religious observances, beliefs, and practices were a "but for" and a "motivating factor" in Southwest's decision to fire her………………………………...............42

1.   Southwest fired Carter for posting and sending pro-life videos and messages in observance of her religious beliefs ..................................................................43

2.   Local 556 discriminated against Carter and caused Southwest to discriminate against her based on the religious beliefs and practices conveyed in her private pro-life Facebook videos and messages ........................47

B.   Southwest and Local 556 failed to accommodate Carter's religious beliefs and practices…………………………………....................................................48

CONCLUSION ...................................................................................................................50

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Acklin Stamping,*
    351 N.L.R.B. 1263 (2007) ........................................................................................39

*Air Line Pilots Ass'n, Int'l v. O'Neill,*
    499 U.S. 65 (1991) ...............................................................................................38

*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021)........................................................................................25

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..............................................................................................3

*Bostock v. Clayton County, Georgia,*
    140 S. Ct. 1731 (2020)...........................................................................42, 43, 46

*BRAC v. Ass'n for Benefit of Non-Contract Emps.,*
    380 U.S. 650 (1965)............................................................................................24

*Brady v. Trans World Airlines, Inc.,*
    401 F.2d 87 (3d Cir. 1968)..................................................................................22

*Brazos Valley Coal. for Life, Inc. v. City of Bryan,*
    421 F.3d 314 (5th Cir. 2005) .............................................................................37

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011).............................................................................................37

*Caravan Knight Facilities Mgmt., Inc.,*
    362 N.L.R.B. 1802 (2015) ............................................................................31, 39

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,*
    140 S. Ct. 1009 (2020).........................................................................................47

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro,*
    477 F.3d 807 (6th Cir. 2007) .............................................................................37

*Dunn v. Air Line Pilots Ass'n,*
    193 F.3d 1185 (11th Cir. 1999) .........................................................................36

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
    575 U.S. 768 (2015)......................................................................43, 47, 48, 49

iii

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Ellis v. Bhd. of Ry., Airline and S.S. Clerks*,
    466 U.S. 435 (1984) ..................................................................................28, 41

*Erznoznik v. Jacksonville*,
    422 U.S. 205 (1975) ..........................................................................................37

*FCC v. Pacifica Found.*,
    438 U.S. 726 (1972) .................................................................................... 36-37

*Fontenot v. Upjohn Co.*,
    780 F.2d 1190 (5th Cir. 1986) ..........................................................................3

*Ford Motor Co. v. Tex. Dep't of Transp.*,
    264 F.3d 493 (5th Cir. 2001) ............................................................................4

*Graphics Commc'ns Local 1-M (Bang Printing)*,
    337 N.L.R.B. 662 (2002) ................................................................................39

*Hall v. Cole*,
    412 U.S. 1 (1973) ............................................................................................36

*Hill v. Colo.*,
    530 U.S. 703 (2000) ........................................................................................37

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*,
    515 U.S. 557 (1995) ........................................................................................36

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46, 54 (1988) ....................................................................................38

*In re Strack & Van Til Supermarkets*,
    340 N.L.R.B. 1410 (2004) ................................................................23, 31, 33

*Int'l Ass'n of Machinists v. Street*,
    367 U.S. 740 (1961) ................................................................................ *passim*

*Int'l Union of Operating Engineers Local 406, AFL-CIO v. NLRB*,
    701 F.2d 504 (5th Cir. 1983) ..........................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Konop v. Hawaiian Airlines, Inc.,*
  302 F.3d 868 (9th Cir. 2002) ..................................................................25, 36

*Lebow v. Am. Trans Air, Inc.,*
  86 F.3d 661 (7th Cir. 1996) ..............................................................................31

*Linn v. United Plant Guard Workers of Am., Local 114,*
  383 U.S. 53 (1966)..................................................................................35, 36

*Little v. Liquid Air Corp.,*
  37 F.3d 1069 (5th Cir. 1994) ...............................................................................3

*Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of Am. v. NLRB,*
  368 F.2d 12 (5th Cir. 1966) ................................................................................39

*McCall v. Sw. Airlines Co.,*
  661 F. Supp. 2d 647 (N.D. Tex. 2009) ..........................................................39, 41

*McDonald v. Longley,*
  4 F.4th 229 (5th Cir. 2021) ................................................................................25

*Miller v. Cal.,*
  413 U.S. 115 (1973)..........................................................................................37

*Mobil Expl. and Producing U.S., Inc. v. NLRB,*
  230 F.3d 200 (5th Cir. 1999) ........................................................................26, 27

*NAACP v. State of Ala. ex rel. Patterson,*
  357 U.S. 449 (1958)..........................................................................................25

*NLRB v. Allied Aviation Fueling of Dallas LP,*
  490 F.3d 374 (5th Cir. 2007) ..............................................................................23

*NLRB v. Wright Line,*
  662 F.2d 899 (1st Cir. 1981)...............................................................................23

*N. River Energy Corp. v. United Mine Workers of Am.*
  664 F.2d 1184 (11th Cir. 1981) .......................................................................2, 32

*Nu-Car Carriers, Inc.,*
  88 N.L.R.B. 75 (1950) ........................................................................................26

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*O'Neill v. Air Line Pilots Ass'n, Int'l*,
939 F.2d 1199 (5th Cir. 1991) .......................................................................41

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
418 U.S. 264 (1974).....................................................................25, 33, 35, 36

*Paperworkers Local 1048 (Jefferson Smurfit Corp.)*,
323 N.L.R.B. 1042 (1997) .............................................................................31

*Petramale v. Local No. 17 of Laborers Int'l Union*,
736 F.3d 13 (2d Cir. 1984)..............................................................................35

*Poly-America, Inc. v. NLRB*,
260 F.3d 465 (5th Cir. 2001) ...........................................................................23

*Ricci v. DeStefano*,
557 U.S. 557 (2009)........................................................................................48

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984).........................................................................................25

*Roscello v. Sw. Airlines Co.*,
726 F.2d 217 (5th Cir. 1984) ....................................................................22, 39

*Russell v. NMB*,
714 F.2d 1332 (5th Cir. 1983) ...............................................................3, 24, 27

*Shea v. Int'l Ass'n of Machinists and Aerospace Workers*,
154 F.3d 508 (5th Cir. 1998) ...........................................................................27

*Snyder v. Phelps*,
562 U.S. 443 (2010)........................................................................................37

*Steele v. Louisville & N.R. Co.*,
323 U.S. 192 (1944)............................................................................... *passim*

*Swagher v. Neighoff*,
398 Fed. Appx. 872 (4th Cir. 2010)................................................................37

*Tedford v. Peabody Coal Co.*,
533 F.2d 952 (5th Cir. 1976) ...........................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Texas v. Johnson*,
    491 U.S. 397 (1989)................................................................................36

*Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*,
    281 U.S. 548 (1983)................................................................................24

*Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*,
    489 U.S. 426 (1989)................................................................................26

*United States v. Marcavage*,
    609 F.3d 264 (3d Cir. 2010).............................................................36, 37

*United States Steel Corp. v. UMWA*,
    519 F.2d 1249 (5th Cir 1975) ............................................................2, 32

*Vaca v. Sipes*,
    386 U.S. 171 (1967)................................................................................40

## Rules & Statutes

28 U.S.C. § 151.............................................................................................26, 36

28 U.S.C. § 157.......................................................................................26, 36, 39

42 U.S.C. § 2000e ....................................................................................... *passim*

42 U.S.C. § 2000e(j) ....................................................................................42, 48

42 U.S.C. § 2000e-2(a)(1)....................................................................................42

42 U.S.C. § 2000e-2(c)(1)....................................................................................48

42 U.S.C. § 2000e-2(c)(3)....................................................................................42

42 U.S.C. § 2000e-2(m)........................................................................................43

45 U.S.C. § 151a..............................................................................................3, 23

45 U.S.C. § 152.......................................................................................... *passim*

45 U.S.C. § 152 (Third) ...................................................................................3, 24

## TABLE OF AUTHORITIES

**Rules and Statutes** **Page(s)**

45 U.S.C. § 152 (Fourth) ........................................................................................................ *passim*

## SUMMARY

Transport Workers Union of America, Local 556 ("Local 556"), was the government-imposed collective bargaining representative of Plaintiff Charlene Carter ("Carter"). When nearly 90% of Southwest flight attendants who voted rejected the collective bargaining agreement that Local 556 had negotiated and put in front of them in 2015, flight attendants started a movement to recall Local 556 Executive Board Members, including President Audrey Stone, and remove them from office. Charlene Carter, who had previously resigned from union membership, became a vocal supporter of the Recall Campaign.

Charlene Carter is also pro-life Christian. Like millions of others who share her religious views, she believes that abortion is the murder of the unborn child. Charlene Carter observes her religious views by working with religious pro-life organizations and trying to show people that abortion is the taking of human life contrary to the will of God. While flight attendants continued waging the Recall Campaign, Carter learned that Local 556 used flight attendants' forced union fees to march with pro-abortion Planned Parenthood in the January 21, 2017 Women's March on Washington, D.C.

The Railway Labor Act, 45 U.S.C. § 151, *et seq.* (the "RLA"), subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights." *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 198 (1944). Predictably, Carter vehemently protested to Local 556 President Audrey Stone for the union's actions. Local 556 has no authority whatsoever to use its government-imposed agency to promote abortion on behalf of Carter, and it is illegal for it to force her to pay to promote what she believes to be murder. She added that it did a lousy job of what it was supposed to be doing—representing her, improving her working conditions, and protecting her job—and that new union leadership was imperative.

President Stone did not like what Carter had to say about how the union was misrepresenting her, and retaliated against her, asking Southwest to take action against Carter. That is just the opposite of the union's legal obligation to Carter, as her government-imposed exclusive bargaining representative, and it was completely contrary to what Carter was forced to pay the union to do on her behalf.

When a union president acts within the scope of her authority as collective bargaining representative, as she was when Carter objected to the union's activities, the union is liable under common law agency principles. *See e.g., North River Energy Corp. v. United Mine Workers of America*, 664 F.2d 1184, 1190 (11th Cir. 1981) (citing *United States Steel Corp. v. UMWA*, 519 F.2d 1249, 1253 (5th Cir 1975) (other citations omitted). Unions are liable for all of their officers' acts within the scope of their general collective bargaining authority, regardless of whether these acts were specifically authorized or ratified. *Id*.

Southwest Airlines Co. ("Southwest") fired Carter when she, as a pro-life Christian, dared to speak up and voice her objections to Local 556 and President Stone about spending employees' compulsory union fees on and representing Southwest flight attendants at the Women's March. Southwest fired Carter on March 14, 2017, for privately sending Facebook videos of an aborted baby to Local 556 President Audrey Stone, which Carter sent to show the union what it really supported at the Women's March—the taking of human life contrary to God's will. Southwest also fired Carter for posting the same pro-life videos on her personal Facebook page.

The RLA prohibits employers from firing union opponents who are opposing their unions and their policies, and attempting to change or remove their union leadership. The RLA protects employee speech and activity regarding union representation, organizing and re-organizing, and opposing union officials and their policies, forbids "any limitation upon freedom of association

2

among employees[,]" and provides "complete independence … of employees in the matter of self-organization," allowing employees to remove unwanted union representatives entirely. 45 U.S.C. § 151a; *see Russell v. NMB*, 714 F.2d 1332, 1343 (5th Cir. 1983) (citation omitted).

Southwest and Local 556 violated Carter's rights in three ways. First, Southwest fired Carter solely for her protests to the union president about the union's activities, which is protected dissident activity under the Railway Labor Act, 45 U.S.C. § 152 (Third) and (Fourth). Local 556 retaliated against Carter and caused her termination in violation of the RLA because she engaged in protected activity under 45 U.S.C. § 152 (Third) and (Fourth). Second, Local 556 breached the duty of fair representation it owed Carter by causing her to be fired. Third, Southwest fired Carter for observing her religious beliefs and practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*, and Local 556 discriminated against Carter because of her religious beliefs and practices and caused Southwest to fire her in violation of Title VII. The Court should grant Carter's motion for partial summary judgment on each of her claims.

## STANDARD OF REVIEW

The Court should grant Carter's Motion for Summary Judgment because there is no dispute of material fact and she is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he substantive law will identify which facts are material."). When the party with the burden of proof is the movant, it must establish each element of its claim as a matter of law. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). On cross-motions for summary judgment, the court "review[s] each party's motion independently, viewing the evidence and inferences in

the light most favorable to the nonmoving party." *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001) (citation omitted).

## FACTUAL GROUNDS FOR SUMMARY JUDGMENT

### The Parties

1.  From at least 1981, through the present, Local 556 has been the certified exclusive bargaining representative for all Southwest Airlines Co. ("Southwest") flight attendants. (App.3).[1]

2.  From around May 2013 through April 2018, Audrey Stone was Local 556 President. (App.417-420; Stone 15:7-9, 27:23-29:9).

3.  From September 1996 to March 14, 2017 Charlene Carter was employed as a Southwest flight attendant within the collective bargaining unit represented by Local 556. (FAC ¶11);[2] (SWA Answer ¶11).[3]

4.  Carter became a member of Local 556 upon her employment with Southwest, and resigned from union membership on or about September 29, 2013, at which time she also objected to paying the union's compelled fees for its political, ideological, and other nonbargaining expenses. Since that date, Carter remained a nonmember objector. (App.10); (App.526, ¶4); (FAC ¶13); (L556 Answer ¶13).[4]

5.  Carter is a Christian who believes that abortion is the taking of a human life contrary to the teachings of the Bible and the will of God. Carter's religious beliefs require her to share with others that abortion is the taking of a human life. As a result, Carter opposes abortion and pro-abortion advocate, Planned Parenthood. (App.527, ¶¶6-9).

---

[1] *See also* twu556.org/about/history/ (last visited Sept. 2, 2021).
[2] Carter's Fourth Amended Complaint, ECF No. 80, will be cited  as "FAC ¶ ___ "
[3] Southwest's Answer to Carter's Complaint, ECF No. 81, will be cited  as "SWA Answer ¶ ___ "
[4] Local 556's Answer to Carter's Complaint, ECF No. 82, will be cited  as "L556 Answer ¶ ___ "

**The Recall Campaign**

6.   Following the March 2015 union elections, President Stone and the Local 556 Executive Board began negotiating a new collective bargaining agreement with Southwest, and presented a tentative agreement to flight attendants for a ratification vote in July 2015. (App.421-424; Stone 73:21-76:23).

7.   Before the July 2015 ratification vote Carter messaged President Stone with her criticism of the tentative agreement and the union's handling of contract negotiations, and shared posts from other Southwest flight attendants who criticized the agreement. (App.166-190). Carter stated that she hoped that the flight attendants get a card drive together to oust Stone, and advocated for "RECALL, RECALL …. RECALL." (App.189-190).

8.   Flight attendants rejected the tentative agreement by a vote of 87% to 13% in July 2015. (Apps.507-508; L556-Stone 9:23-10:8).

9.   Shortly after the July 2015 ratification vote, Carter messaged President Stone objecting to Local 556's representation of employees at the bargaining table. (App.190-191).

10. Following the flight attendants' vote rejecting the Tentative Agreement, President Stone issued a statement recognizing disappointment in her leadership and accepting employees' rights to challenge her. But President Stone refused to step down from leadership. (App.14).

11. From around August 2015 through at least March 25, 2017, Jeanna Jackson and other flight attendants collected signatures and sought support for a Recall petition demanding that Local 556 conduct new elections for 12 of the 17 Local 556 executive board officers, including President Stone, so that new leadership could negotiate the collective bargaining agreement. (App.223-225); (App.15); (FAC ¶34); (Local 556 Answer ¶34). Jackson stated that she collected over 7,600 signatures form flight attendants across 10 bases throughout the country. (App.550-552).

12. On March 25, 2017, Jackson explained that she began the recall petition "after it was proven that this Board would not resign as they should have after a whopping failure of a TA Vote." (App.223-225).

13. Carter supported the Recall Campaign, and "was vocal about it" because she believed that President Stone and other Local 556 leaders had been selling the flight attendants a bad contract and for the other reasons she discussed in her private Facebook messages to Stone. (App.518-519; Carter 228:1-4, 238:21-25); (App.527, ¶5). *See also supra* at ¶¶7-9.

14. From July 2015 through February 2017, Carter messaged President Stone with Facebook posts about flight attendants' support for the Recall, news articles about the "Recall556Now" movement, questions over the union's expenditures on negotiations and "the negotiating team's salaries and perks," social media posts about the union's financial irresponsibility and mismanagement of funds, and her objections to union messages about voting for Hillary Clinton. (App.192-221, 81-82).

15. On December 15, 2016, Jackson delivered a copy of a recall petition to Local 556. (App.16). Jackson continued collecting signatures and seeking support for the recall petition through at least March 25, 2017. (App.223).

16. On February 6, 2017, Jackson sued Local 556 in the U.S. District Court, Northern District of Texas, alleging that "The Local 556 Executive Board (consisting of 17 members, 12 of which were subject to the recall) rejected the recall petitions and refused to verify signatures as required by the Constitution and By-Laws … No valid reason was given for refusing to verify the petitions and carry out the will of the members." Case: No. 3:17-cv-339, ¶15 (Feb. 6, 2017).

17. On February 6, 2017, Carter posted two links on her Facebook page: one requested donations to fund the Recall Campaign. That post stated:

All my Southwest Airlines Flight Attendant friends we are going to make our Corrupt Union adhere to By-Laws one way or another we are moving fast in this fight so please help us bring Truth and Order back for We The Flight Attendants... TWU-AFL-CIO and Local 556 will be shown that THEY do Work for US!!! Please help us fight this Battle. Thanks

(App.76). The other Facebook post was a link to a news story about Jackson's lawsuit filed against Local 556. That post stated, "Well TWU-AFL-CIO and Local 556 you are being SUED for not following the Rules and working for We The Flight Attendants!!!!! Hopefully the Corruption will END." (App.77).

18. Southwest management involved in Carter's investigation were aware of the recall effort and knew that it was an effort by flight attendants to recall current union officials holding office, including President Stone. (App.401-403; Jones 60:18-61:16, 62:5-13); (App.324-325; Emlet 62:17-63:12). The Recall Campaign was common knowledge because flight attendants were very vocal about it, including on Facebook. (App.324; Emlet 62:20-62:25).

**Local 556 members attend the Planned Parenthood-Sponsored Women's March**

19. On January 21, 2017, President Stone and approximately 27 other Local 556 members attended the "Women's March on Washington, D.C." (App.472-473; Parker 9:22-10:1).

20. Planned Parenthood was the "exclusive premiere" sponsor of the Women's March. (App.19-20).

21. Planned Parenthood advocates for women's rights to abortions. (App.21-22).

22. During Local 556's January 10-12, 2017 Executive Board meetings, Executive Board Member and Local 556 Working Women's Committee Chair Jessica Parker reported that she was coordinating meetings and events for the January 21, 2017 Women's March on Washington. Parker's report stated that she "is so proud to be a part of this event with this amazing group of activists," and that the event would be "one of purpose." (App.26-28).

7

23. President Stone assisted the Working Women's Committee Chair with the organization of the union's Women's March event. (App.455; Stone 200:14-21).

24. The Working Women's Committee Chair Parker asked John Parrott, Local 556's Treasurer, to pull union member flight attendants from their work schedules from January 19, 2017 through January 22, 2017, to attend the January 21, 2017 Women's March in Washington, D.C. for union business. (App.58-67); (App.68-72); (App.474, Parker 11:17-22). President Stone and Treasurer Parrott approved Parker's request.

25. During January 2017 Local 556 transmitted to Southwest the requests ("trip pulls") for the union member flight attendants to attend the Women's March. (App.58-67). (App.491-496; Parrott 22:15-24:8; 25:1-26:3; 27:11-23).

26. Under Southwest's and Local 556's collective bargaining agreement, Southwest authorized union members wanting to attend the January 21, 2017 Women's March to give up their work and travel for free on Southwest Airlines for official union business. (FAC ¶40); (SWA Answer ¶40); (App.458-460; Stone 227:21-229:25); (App.58-67). Parker obtained approval from Local 556 to use union business travel, and Local 556 made the actual arrangements for travel to and from the event. (App.472; Parker 9:4-20).

27. Local 556 dues and fees paid approximately $8,000 for all union expenses associated with the Women's March Event, including $486 for President Stone's lost time (i.e., money paid to be away from the airplane and do union work), and $6,314 for the union members' lodging from January 17, 2017 through January 22, 2017. (App.487-490, 497-498; Parrott 18:1-19:23, 20:25-21:25, 33:16-34:3); (App.458-459; Stone 227:21-228:10); (App.68-72).

28. To prepare their LM2 report for the Department of Labor, Local 556 coded all union expenses associated with the Working Women's Committee Meeting and Women's March—lost

8

time, meeting and meal expenses, conference and registration expenses, the union's Women's March banner, lodging, and transportation fees, as chargeable "representation" expenses and not as nonchargeable "political activities." (App.487-488; Parrott 18:1-19:23).

29. Executive Board Member and Working Women's Committee Chair Parker, Local 556, and Local 556 members who participated in the Women's March, posted pictures from the Women's March on Facebook. (App.29-56). Local 556 included a post stating, "Members of the TWU Local 556 Working Women's Committee are in Washington, DC, today standing with other Union Members and participating in the Women's March on Washington. They're standing up for women's rights!" with a hashtag of "#WhyIMarch." (App.53).

30. Local 556 Civil and Human Rights Committee Chair Lori Lochelt procured a TWU Local 556 banner to be used for the Women's March and other events which read: "TWU Local 556 Working Women's Committee, The Union of Southwest Airlines Flight Attendants." President Stone, Executive Board Member Sam Wilkins, Human Rights Committee Chair Lori Lochelt, and union member Angie Kilbourne marched with the banner during the Women's March. Local 556 also took pictures with the same banner at the Working Women's Committee Meeting and Women's March, which were posted on the union's website. (App.27) (App. 31, 49, 50-55) (App.476-477; Parker 28:16-29:23).

31. Parker shared TWU Local 556's video with a message about why they marched and a picture that also appeared on the union Facebook page and the Local 556 website with someone holding a sign that says "My Body My Choice." (App.32); (App. 477-479; Parker 29:25-31:25).

32. Parker also posted a picture on her Facebook page of Local 556 members who attended the Women's March, one of whom carried a sign stating, "Women who don't control their own

reproductive rights are not free." (App. 33) (App.478-479; Parker 30:20-31:3). Local 556 posted pictures on their website featuring the same sign. (App.51-54, 56).

33. On January 21, 2017, Carter posted a news article in a Facebook group for recall supporters called "556 Members for Total Recall" that discussed how Southwest used pink cabin lights in some of its flights headed to Washington D.C. to show "solidarity" with those flying to the Women's March. The next day Jackson made a reply post on Total Recall to Carter's January 21 post and stated: "Apparently 20-30 [flight attendants] were pulled from trips to attend this protest with [President Stone] and the Working Women's committee, Jessica Parker. Yes, it was paid for with our dues…smh." Carter replied to Jackson later that day by posting on Total Recall: "Jeanna Jackson doesn't surprise me that our Union is at this March….and that we are paying them to be there…..IT IS WRONG and I am SOOOOO TIRED of this CRAP from TWU and 556!" (App.74).

34. Southwest knew Local 556 members attended the Women's March. (FAC ¶39); (SWA Answer ¶39).

**Carter's Facebook Page Posts and Messages to President Stone**

35. On February 7, 2017, Carter posted a video on her Facebook page showing an aborted baby. Referring to the video, Carter's post stated: "WARNING this is VERY GRAPHIC!! I want my Tax Dollars to STOP funding this….PERIOD!!!! This is MURDER." (App. 78); (App.531). Carter did not write the other messages directly below hers, which were posts from the site where she found the videos. (App.528, ¶11).

36. On February 14, 2017, Carter sent Local 556 President Audrey Stone five private messages via Facebook Messenger to the "Audrey Stone Twu" account.

    a.        At 11:22 AM, Carter sent a message containing a video showing an aborted baby. Carter told President Stone:

> This is what you supported during your Paid Leave with others at the Women's MARCH in DC….You truly are Despicable in so many ways…by the way the RECALL is going to Happen and you are limited in the days you will be living off of all the [Southwest Airlines Flight Attendants]..cant wait to see you back on line.

(App. 81); (App.531).

b.   About an hour later, at 12:33 PM, Carter sent President Stone the video of the aborted baby that she had posted on Facebook on February 7 as described in Paragraph 35. Carter's message to President Stone stated: "TWU-AFL-CIO and 556 are supporting this Murder . . ." (App.80); (App.531).

c.   Approximately 30 minutes later, at 1:00 PM, Carter sent President Stone a third private Facebook message that contained a picture of women wearing female genitalia costumes. Carter's message stated:

> Did you all dress up like this…Wonder how this will be coded in the LM2 Financials…cause I know we paid for this along with your Despicable Party you hosted for signing the Contract….The RECALL [of the Local 556 Executive Board] is going to Happen we are even getting more signatures due to other [flight attendants] finding out what you guys do with our MONEY!!! Can't wait for you to have to be just a regular flight attendant again and not stealing from our DUES for things like this!

(App.82).

d.   Later that day, Carter sent President Stone a second private message via Facebook with a link to an online article discussing how one of the leaders of the January 2017 Women's March was a convicted terrorist. Carter told Stone, "[Y]ou should not be using our DUES to have Marched in this despicable show of TRASH!" (App.83).

e.   That same day, Carter also sent President Stone, via Facebook Messenger, with links to articles at the "Priests for Life" website, including an article written by Alveda King, the niece of Civil Rights Leader Martin Luther King Jr., about how Planned Parenthood used

him to advance their pro-abortion agenda. Carter included a message: "You and TWU should really know your History as well when it comes to the King Family." (App.84-103).

37. President Stone never responded to Carter's private messages, never asked her to stop sending those messages, and never blocked Carter's messages on Facebook. (Apps.105, 114-115).

38. On February 14, 2017, Carter posted on her Facebook page the video she sent to President Stone at 11:22 a.m. that is described in paragraph 36a. In that post Carter stated: "THIS IS GRAFIC (sic)….but it needs to be shared over and over….this is MURDER! So far all of you that are Pro-Abortion GOD HELP YOU!" (App.79); (App.531).

39. Several days later, on February 17, 2017, Carter received an email from President Stone on behalf of Local 556 urging her to contact her legislators to stop a National Right to Work bill in Congress. Carter responded a few hours later by email saying objecting to receiving the union's "propaganda," stating she supports Right to Work, and that "We have a RECALL right now that we want adhered to with over the 50+ 1% and growing." (App.523-525).

**President Stone reports Carter to Southwest.**

40. Previously, on April 20, 2015, President Stone messaged Southwest employees about Southwest's social media policies, and stated that TWU Local 556 was actively fighting social media grievances on behalf of flight attendants, and that the union would continue to advocate for them, as she recognized that social media is an issue that has the potential to affect the vast majority of their work group. (App.11-12); (App.442, Stone 155:2-14). President Stone stated that Local 556 had been working to resolve grievances challenging flight attendant discipline for alleged social media policy violations, and that "TWU Local 556 made it clear to Management that we believe they are interfering in areas in violation of your personal rights." (App.12).

41. President Stone defended her union "core team" supporters' election-related speech when they were reported for social media policy violations. (App.428-440, 448-449; Stone Tr.118:8-144:3; 167:23-168:7).

42. On February 22, 2017 President Stone emailed Southwest Las Vegas Base Manager Suzanne Stephenson, and copied Southwest's Senior Director of Labor Relations, Naomi Hudson, and Southwest Vice President of In-Flight, Sonya Lacore, with a complaint against Carter for sending Facebook messages "in regards to a TWU Local 556 Women's Committee meeting that I participated in last month, and a march that I voluntarily participated in a few days later." (App.105-110); (App.281-282, 293, 295-296; Sims 58:18-59:3; 126:8-25, 131:1-132:17); (App.358-359; Schneider 31:20-32:9).

43. President Stone's Complaint reported Carter's Facebook videos and private messages described in ¶36a ("This is what you supported during your Paid Leave with others at the Women's MARCH in DC…"), and ¶36b ("TWU AFL CIO and 556 are supporting this murder"). (App.105).

44. For each of those messages, President Stone's Complaint also included the links to the sites that Carter's videos came from, which included the messages that Carter did not write. (App.105).

45. President Stone's Complaint did not report any of Carter's Facebook posts or other private messages. (App.105).

46. President Stone's Complaint stated that Carter's messages refer to "murder as well as political and religious comments" and were "obscene and violent, as well as threatening in nature." (App.105).

47. President Stone's Complaint told Southwest that she believed Carter's messages, including her references to religion, violated the company's harassment, social media and "Workplace

Bullying and Hazing" policies and its "work and conduct rules under Class II.3 as well as Class IV.6&7." (App.105).

48. President Stone's email stated that she holds a "current position within [her] Union." (App.105).

49. Southwest management involved in Carter's investigation knew, as a general course of business, that Stone was President of Local 556. (App.294; Sims 128:9-15); (App.360-361; Schneider 40:9-41:10); (App.399; Jones 32:16-25). Southwest's Director of In-Flight Relations Sims communicated with the union president in the regular course of business. (App.278-279, 294; Sims 32:22-33:1, 128:16-18).

**<u>Southwest's investigation of President Stone's Complaint</u>**

50. On February 23, 2017, Stephenson forwarded President Stone's Complaint to Southwest Base Manager Supervisor Kissman, who sent the complaint and Facebook videos to Sims and Southwest's In-Flight Base Manager Ed Schneider, who oversaw Southwest flight attendants in Denver, Colorado, where Carter was based. (App.226-228); (App.283, Sims 64:1-25); (App.354-356, Schneider 5:19-6:10, 9:4-9:12).

51. On February 23, 2017, Sims emailed Kissman saying, "let's get the Employee Relations Team on deck…." (App.227). Sims knew it was an employee relations matter from glancing at Stone's complaint and seeing the talk about "pro-life" and seeing the allegations there. (App.297, Sims 139:3-24).

52. On February 23, 2017, Southwest's Senior Labor Relations Director Hudson, who was copied on President Stone's complaint, directed Southwest Base Manager Stephenson to forward Stone's complaint to Toni Hamilton, Southwest's Manager for Employee Relations. (App.231); (App.298-301, Sims 144:21-145-146:15; 147:4-19).

14

53. Employee Relations investigates potential Title VII issues and handles religious discrimination complaints and incidents. (App.290, Sims 101:6-16); (App.345-346, Gutierrez 30:24-31:3); (App.323, Emlet 24:10-24:25); (App.400, Jones 49:10-21).

54. Employee Relations oversees any incident where a flight attendant is accused of treating another flight attendant unfairly based on their religion. (App.290, Sims 101:6-16).

55. Employee Relations also gets involved in disciplinary investigations when there is reason to believe protected categories, including religion, or a protected class of people might be in question. (App.280, 298; Sims 49:17-25, 144:9-15).

56. Employee Relations would refer religious accommodation requests to the Accommodations and Career Transitions Team ("ACT Team"), which handles and determines religious accommodations requests. (App.9); (App.345, Gutierrez 30:10-13) (App.276-277, 289-290; Sims 27:23-28:1, 100:24-101:5).

57. When the ACT Team receives an accommodation request they review it and decide whether some sort of workplace accommodation will be granted. (App.9); (App.291, Sims 103:3-9).

58. Schneider emailed Employee Relations to inquire whether any protected categories may have been violated. (App.230); (App.366-367, Schneider 47:1-10; 48:4-18). Schneider believed that a protected category was involved with Carter's Facebook videos because it depicted several graphic details of aborted babies. (App.367, Schneider 48:17-21).

59. Denise Gutierrez was the Southwest Employee Relations investigator involved in Carter's case. (App.339, Gutierrez 9:12-18). As Employee Relations investigator, one of Gutierrez's responsibilities was training Southwest management, including Base Managers about Southwest's harassment policy, which included teaching them about discrimination related to religion and other

protected categories and retaliation against individuals engaging in protected activities. (App.340-344, Gutierrez 12:8-16:1).

60. On February 24, 2017, Southwest interviewed President Stone as part of the investigation. Southwest's Employee Relations representative Gutierrez said that they were there to investigate all allegations of discrimination, including for age, race, disability, religion, pregnancy, retaliation, and sexual harassment. (App. 111).

61. Southwest asked President Stone what she wanted Southwest to do. Stone responded, "Make Charlene … stop … They need to protect me." (App.115); (App.302, Sims 157:19-21) (App.371-373, Schneider 65:2-25, 69:18-70:12).

62. During the interview, President Stone said that Carter had been sending her various Facebook messages since she became union President, that she ignored them and did not read them, that Carter had not been union friendly, and that she is very anti-union. (App.113). It was Carter's anti-unionism that Stone gave as the reason she thought Carter had sent the messages. (App.113-114).

63. At the interview Southwest asked Stone to get all the messages and any information even if it seems trivial, and send it to Southwest. (App.114) (App.375-377, Schneider 83:23-85:20).

64. Accordingly, Stone sent Southwest multiple emails attaching screenshots of Facebook messages that Carter had sent her during the previous 2 years. (App.117-138) (App.377, Schneider 85:1-20).

**Carter's Fact Finding Meeting with Southwest about her Facebook posts and messages**

65. On March 7, 2017, Southwest held a fact-finding meeting with Carter as part of its investigation of President Stone's Complaint. (App.242-258); (App.303-305, Sims 160:17-162:19); (App.374, Schneider 81:5-23); (App.404, Jones 63:2-23).

16

66. During the fact finding meeting, Southwest informed Carter that the reason they were there was to talk about the Facebook posts posted on her Facebook page, which were not the subject of President Stone's complaint. What was the subject of Stone's complaint were the personal messages from Carter to Stone. Southwest asked Carter why these pictures were posted on her Facebook page. Carter explained: "I'm a Christian, I'm a conservative, and I'm pro-life. This happens to be a huge issue for me and I get the message out wherever I can … I have a deep, deep want to get the word out." (App.242).

67. When Southwest asked Carter what she meant when she said, "this has happened to me," she explained:

> I had an abortion and I regret every bit of it so I work with other pro-life groups and for me as a Christian, if I can get the word out in any way, to every group as possible to touch this issue I do. If I had known what was involved in it I wouldn't have ever done it.

(App.242-243).

68. When Southwest asked what is being depicted in the Facebook videos Carter posted, she said: "It's an abortion. It's a baby. People say it's just cells- that it's not just a tissue, it's a baby. It shows someone who made the same mistake that I did- and they need to understand. They need to know that it's a life and not just a bunch of tissue that's my stance on it." (App.243).

69. During the meeting, Southwest asked Carter why she sent the messages directly to President Stone. Carter explained that she sent the videos to President Stone because Local 556 members, led by President Stone, participated in the Women's March in support of Planned Parenthood and abortion. Carter stated that by doing so, President Stone and the Local 556 members purported to be representing all of the Southwest flight attendants as supporting abortion rights. Carter explained that President Stone needs to be back online as a regular flight attendant for being unable to represent the full spectrum of flight attendants' viewpoints. (App.247).

17

70. Carter explained that she is a part of the organization "Priests for Life." (App.251).

71. Southwest read a segment of a message Carter shared with President Stone from Alveda King, noting that it said, "seek God now in prayer…" (App.251). Carter explained that she told President Stone "to go and do some research on what [Martin Luther King] would have marched for" and that he "was a Baptist Minister." (App.251). Carter explained that King did not support abortion and that those at the Women's March twisted his words to support their pro-choice agenda. (App.251).

72. After Carter explained what she sent from Alveda King and the Priests for Life website, Gutierrez asked Carter, "Why do you feel the need to send something religious using praying and God to Audrey?" (App.251). Carter responded, "I'm hoping it might change hearts and minds for people to pray about it and think about what they are doing. Whether you're Muslim, Jewish, Christian or atheist [you] can still say a prayer for not killing babies." (App.251).

73. Southwest also questioned Carter about a picture from her Facebook page showing her "wings" pin with a message stating, "I stand with Israel and America!!" Carter explained that her post was about her love and support for Israel because of her Christian beliefs. (App.245).

74. During the Fact Finding, Schneider asked Carter her reason for resigning from union membership and objecting to paying dues used by the union for political and ideological expenses. Carter explained that it was because of her political and religious views. (App.252).

75. Southwest commented in the Fact Finding that Carter had been sending President Stone Facebook messages from at least March 2015, and that they have been "messages and depictions of [President Stone] not doing her job, or can't wait to get her out of the union, cannot wait for her to get back online." (App.254).

76. On March 10, 2017, Schneider emailed Southwest Labor Relations Manager Maureen Emlet, Gutierrez, and Barnett, his synopsis of the Carter' fact-finding meeting and investigation. (App.268-269); (App.382-383, Schneider 112:1-113:25); (App.321, Emlet 10:3-10).

77. Schneider's Synopsis stated that "Carter has been making comments that indicated she was not Union friendly since 2008. Audrey Stone became President of TWU Local 556 in 2013 and she stated that Charlene has been sending her messages since that time, before there were any issues due to abortion or women's rights." (App.268). Schneider stated, Carter "has continually bombarded Audrey with the recall vote and how she doesn't deserve to be in office and the recall is going to happen." (App.268).

78. Schneider's Synopsis stated that Carter "latched onto the recent Women's March and abortion issues as her defense, stating it was against her values as a Christian." (App.268).

79. Schneider's Synopsis stated: "Charlene has several posts that are visible on her Facebook timeline showing graphic and disturbing videos of an aborted fetus and statements about her political views. Charlene stated that she had an abortion when she was young and regrets every bit of it, so she works with other pro-life groups as a Christian to spread the anti-abortion message out in any way possible." (App.268).

**Southwest terminated Carter**

80. On March 14, 2017, Southwest terminated Carter's employment, and sent her a Termination Notice explaining the company's reasons for firing her. (App.222); (App.286, Sims 73:7-11).

81. Southwest's Termination Notice explained that Carter's conduct was "in direct violation of Southwest Airlines Mission statement, Southwest's Workplace Bullying and Hazing Policy, Southwest's Social Media Policy," and "could also be a violation of Southwest's Policy

Concerning Harassment, Sexual Harassment, Discrimination and Retaliation" ("Social Media Policies"). (App.4-8) (App.285, Sims 72:12-20, Ex. 2); (App.222), (App.287-288; Sims 74:2-9, 74:15-75:2) (App.384-386, Schneider 117:25-118:2, 122:9-19).

82. Schneider did not make any inquiries over whether Charlene needed a religious accommodation because he believed, "that would be up to her to ask for that," and it "would be something that would go through the ACT Team." (App.378, Schneider 96:18-25).

83. Schneider did not report Carter's comments from the March 2017 fact-finding to the ACT Team and did not see any reason to report those comments. (App.379, Schneider 97:4-8).

84. Sims did not know whether Employee Relations considered whether the info Carter gave during her investigation about her religious views on abortion put her in any protected category or whether she needed a religious accommodation (App.306, Sims 164:1-25).

85. Southwest's ACT team did not investigate any aspect of the Carter matter. (App.307, Sims 165:15-18); (App.379, Schneider 97:1-3).

86. Southwest did not make any inquiries over whether Carter needed a religious accommodation. (App.378, Schneider 96:18-21).

87. Carter had never received any prior discipline during her twenty-year career at Southwest. (App.372, Schneider 69:15-17); (App.308, Sims 188:14-16).

88. Southwest did not receive any complaints about the posts Carter made on her Facebook page. (App.309, Sims 221:13-16)

89. Early in the investigation Schneider asked Southwest Assistant Base Manager Meggan Jones to look at Carter's Facebook page to identify any posts that might be out there and to see if there was anything there that possibly established a nexus to the workplace. (App.362, 369-370; Schneider 43:12-25, 54:10-55:23); (App.396-397, Jones 8:17-9:9).

90. During Carter's fact-finding meeting, Schneider showed Carter separate pictures that Jones found on Carter's Facebook timeline, including pictures of Carter in her uniform, pictures of her husband and another Southwest pilot, a picture of a Southwest logo and the statement "Give Herb his old job back," a picture of a Southwest magazine saying, "live at 35" on the cover, and a picture of Carter standing in an airport in plain clothes wearing a badge ("Nexus Pictures"). (App.245-246); (App.259-267); (App.362-365, 379, 381; Schneider 43:13-44-46:2, 97:12-25, 108:3-13); (App.405-406, Jones 64:21-65:9). (App.326-329, Emlet 80:1-81:9, 83:19-84:13).

91. Carter believed that all the Nexus Pictures from her Facebook timeline, except for the picture of her standing in an airport in plain clothes wearing a badge, were at least 2 years old. (App.529-530, ¶17).

92. Southwest did not know when the Nexus Pictures were posted or how old they were. (App.380, Schneider 98:1-7); (App.328, Emlet 83:16-18).

93. Southwest believed that Carter's Facebook posts had harmed Southwest before her termination because she was representing herself as a Southwest flight attendant and putting images out on her Facebook page that may not reflect what Southwest believes and supports. (App.309-310, Sims 221:17-222:2).

94. Carter's Facebook posts did not cause Southwest any financial harm before her termination. (App.309, Sims 222:3-4).

95. Southwest never discussed with Carter whether she would be willing to post a disclaimer on her Facebook page that her posts do not necessarily represent the views of Southwest. (App.387, Schneider 126:15-25).

96. Southwest never asked Carter if she would remove Facebook posts that it considered to be a nexus to the workplace. (App.387, Schneider 126:11-14). Southwest never asked Carter to take

21

any Facebook posts down prior to her termination. (App.309, Sims 222:5-7) (App.387, Schneider 126:7-10).

## ARGUMENT AND AUTHORITIES

### I.  Southwest and Local 556 violated Carter's RLA-protected rights.

Employers and unions violate the RLA if an employee exercises RLA-protected rights, they fire her or cause her to be fired, and the employee's protected activities were a "substantial or motivating factor" for her termination. *See Roscello v. Sw. Airlines Co.*, 726 F.2d 217, 222 (5th Cir. 1984) (citation omitted); *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 198 (1944) (holding that the RLA subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights"); *Brady v. Trans World Airlines, Inc.*, 401 F.2d 87, 102 (3d Cir. 1968) (footnote omitted) (holding that unions are liable under the RLA Sections 2 (Fourth) and (Eleventh) "for their actions in procuring a discharge which violates the employee statutory rights.").[5]

Southwest fired Carter for exercising RLA-protected rights. Local 556 retaliated against Carter and successfully caused Southwest to fire her because she exercised her RLA-protected rights. President Stone, acting in her official capacity and on behalf of Local 556, caused Carter's termination for communications that Carter made about the union's political activities, which fall solely within Stone's role as union president and exclusive bargaining representative. *See In re Strack & Van Til Supermarkets*, 340 N.L.R.B. 1410, 1412 n.10, 1430 (2004).

---

[5] RLA 152 (Eleventh) defines the only circumstances in which the exclusive bargaining representative can restrict dissenting employees' speech and association rights. Under RLA § 152 (Eleventh) Congress authorized labor organizations to contract for a limited type of "union security" coercive of speech rights that is otherwise disallowed by the RLA. *See* 45 U.S.C. § 152 (Eleventh) (d) ("Any provisions in paragraphs Fourth and Fifth of this section in conflict herewith are to the extent of such conflict amended.").

There is no factual dispute that Southwest fired Carter for the private Facebook messages she

sent to President Stone.[6] (App.222). Nor is there any dispute that President Stone reported Carter

for two Facebook videos and messages that Carter privately messaged her. (App.105). When there

is no dispute about which employee activities motivated the employer's decision to fire the

employee or the union's decision to cause the employee to be fired, the only question is whether

the employee's activities were protected. *See NLRB v. Allied Aviation Fueling of Dallas LP*, 490

F.3d 374, 379 (5th Cir. 2007).[7] The Court should grant Carter's motion because, turning to the

only remaining issues: (A) Carter's private Facebook messages and videos she sent to Local 556

President Audrey Stone were RLA-protected; (B) Southwest and Local 556 caused Carter's

termination for RLA-protected speech and activity; and (C) Carter's messages and videos did not

lose their protection.

**A.  Carter engaged in RLA-protected activity.**

> **1.  The RLA protects Carter's rights to oppose union representation and to advocate for the removal of union officers.**

The RLA "forbid[s] *any* limitation upon freedom of association among employees" and

"provide[s] for the complete independence … of employees in the matter of self-organization."

45 U.S.C. § 151a (2)-(3) (emphasis added). RLA Section 2 (Fourth) states:

> Employees shall have the right to organize and bargain collectively through
> representatives of their own choosing…. No carrier, its officers, or agents shall
> deny or in any way question the right of its employees to join, organize, or assist in
> organizing the labor organization of their choice, and it shall be unlawful for any

---

[6] Southwest also fired Carter for the videos and messages she posted on her personal Facebook page, which violated her rights under Title VII of the Civil Rights Act. *See infra*, Section III, 42.
[7] The *Wright Line* mixed-motive framework does not apply here. The *Wright Line* mixed-motive framework applies only in mixed-motive cases when an employee engaged in protected activity and different unprotected activity, and there is a question whether the protected or the unprotected activity motivated the adverse action. *See e.g.*, *Poly-America, Inc. v. NLRB*, 260 F.3d 465, 488-89 (5th Cir. 2001) (applying the *Wright Line* framework when the employer claimed that it discharged the employee for poor performance); *see also NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981).

> carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization[.]

45 U.S.C. § 152 (Fourth). RLA Section 2 (Third) also states that union representatives "shall be designated by the respective parties [*i.e.*, employees] without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives." 45 U.S.C. § 152 (Third); *Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 570-71 (1983).

Not only does the RLA protect employees' right to "organize" unions, but it also protects employees' rights to continuous "self-organization" and "re-organization" campaigns, such as engaging in decertification proceedings to remove unwanted unions, and other efforts to remove unwanted union representatives. *See Russell v. NMB*, 714 F.2d 1332, 1345 (5th Cir. 1983) ("*[I]t is inconceivable that the right to reject collective representation vanishes entirely if the employees of a unit once choose collective representation.*") (emphasis in original) (citations omitted); *see also Austin*, 418 U.S. at 279. In *Russell*, the Fifth Circuit recognized that

> the implicit message throughout the [RLA] is that the "complete independence" of the employees necessarily includes the right to reject collective representation. Indeed, the concept of "complete independence" is inconsistent with forced representation, most especially when that forced representation is at odds with employees' will and desires.

714 F.2d at 1343 (footnote omitted); *BRAC v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 669 n.5 (1965).

Employees' under RLA Section 152 (Fourth)—"self-organization," "organiz[ing] and bargain[ing] collectively… through representatives of their own choosing," and "join[ing], organiz[ing], or assist[ing] in organizing the labor organization of their choice"—protect employee

freedoms to oppose their unions and engage in dissident speech and activities opposing union representation "without interference, influence, or coercion." 45 U.S.C. § 152 (Fourth).

Employees' rights "to form, join or assist labor organizations" are "[t]he primary source of protection for union freedom of speech." *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 277 (1974).[8] Freedoms of association shield dissident speech and expression: "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important … in shielding dissident expression from suppression by the majority.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).[9] *See also Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 882 (9th Cir. 2002) (recognizing "[t]here is no dispute" that employee's critical website publications constitute organizing activity under the RLA where it is not defamatory). When Congress compels employees' association with exclusive collective bargaining representatives, as it did under the RLA, the individual

> should not be forced to surrender any matters of conscience, belief, or expression. He should be allowed to enter the group with his own flag flying, whether it be religious, political, or philosophical, nothing that the group does should deprive him of the privilege of preserving and expressing his agreement, disagreement, or dissent, whether it coincides with the view of the group, or conflicts with it in minor or major ways; and he should not be required to finance the promotion of causes with which he disagrees.

---

[8] The Supreme Court also recognized, "Basic to the right guaranteed to employees … to form, join, or assist … is the right to engage in concerted activities to persuade other employees…" *Austin*, 418 U.S. at 277.

[9] *See also NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause … which embraces freedom of speech."); *McDonald v. Longley*, 4 F.4th 229, 245 (5th Cir. 2021) ("[T]he right to freedom of association is part of the freedom of speech.").

*Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 776 (1961) (Douglas, J., concurring).[10]

Employees' RLA Section 152 (Fourth) rights to "join, organize, or assist" and "not to join or remain members of any labor organization," as well as the "right to organize and bargain collectively through representatives of their own choosing," are nearly identical to employee rights under Section 7 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing," and "to refrain from any or all of such activities" 45 U.S.C. § 152.[11] The Fifth Circuit has affirmed that these employee rights under NLRA Section 7 encompass "the right of employees to oppose the policies and actions of their incumbent union leadership and to seek to persuade other employees to take steps to align the union with these opposing views." *Mobil Expl. and Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 240 (5th Cir. 1999). "[I]nherent in [the employee's right to self-organization] is the privilege of protest and persuasion of others. Without this, effective employee representation becomes a nullity." *Id.* at 240 (quoting *Nu-Car Carriers, Inc.*, 88 N.L.R.B. 75, 76-77 (1950) (internal citation omitted).

### 2. Carter engaged in RLA-protected activity when she sent Facebook videos and messages to President Stone objecting to Local 556's participation in the Planned Parenthood Women's March.

Carter's Facebook videos and messages to President Stone exercised RLA-protected rights to oppose Local 556's support for Planned Parenthood and its pro-abortion agenda, and the union's

---

[10] *See id.* ("[M]embership in a group cannot be conditioned on the individual's acceptance of the group's philosophy. Otherwise, First Amendment rights are required to be exchanged for the group's attitude, philosophy, or politics. I do not see how that is permissible under the Constitution.") (footnote omitted).

[11] When the RLA and NLRA contain analogous terms or provisions, cases interpreting the NLRA courts look to cases interpreting it for guidance. *See Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 432-33 (1989) ("[C]arefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA.").

representation of Southwest flight attendants at the Women's March. Carter's communications voiced her support for re-organization of Local 556 through the recall campaign to remove President Stone and other Local 556 Board Members from office. (SOF ¶¶36, 39). Carter's Facebook videos and messages also expressed her objections to Local 556's expenditure of employees' forced union dues and fees on political and ideological causes at the Women's March, including the union's support for Planned Parenthood and pro-abortion policies. *Id.*

Carter's Facebook communications to President Stone, both the videos and messages—"This is what you supported during Paid Leave with others at the Women's March in D.C……You truly are Despicable in so many ways…" and "TWU-AFL-CIO and 556 are supporting this Murder"— are RLA-protected speech "oppos[ing] the policies and actions of … incumbent union leadership," namely the union's participation in Planned Parenthood's Women's March and its support for pro-abortion policies and activities. *See Mobil*, 200 F.3d at 240; (SOF ¶¶36a-b, 19-32).

Carter conveyed that she did not want to be represented by a union that supported Planned Parenthood and its pro-abortion agenda, and sent videos and messages showing how "forced union representation was at odds with her will and desires." *See Mobil*, 200 F.3d at 240; *Russell*, 714 F.2d at 1343; (SOF ¶¶36a-b, 19-32). Carter's videos and messages were also activities taking steps "aligning the union with her opposing views," by showing Local 556 and President Stone that marching with pro-abortion Planned Parenthood supports the taking of human life. *See Mobil*, 200 F.3d at 240. (SOF ¶¶36a-b, 19-32).

Carter's message to President Stone that "the RECALL is going to Happen," and "you are limited in the days you will be living off of all the [Southwest Airlines Flight Attendants]…cant wait to see you back on line," is re-organizing speech about Carter's and other employees' support for the recall. (SOF ¶36a). Carter's message conveyed that Local 556's involvement in the

27

Women's March, support for Planned Parenthood and its pro-abortion agenda, and expenditure of flight attendants' money for these activities strengthened Carter's and other employees' resolve to remove unwanted union representation, and re-organize the union through recall. (SOF ¶36a-c).

Carter's Facebook communications to President Stone were also RLA-protected because they were nonmember speech objecting to the union's impermissible expenditure of employees' forced dues and fees to support Planned Parenthood, the Women's March, abortion, and other political messages and activities. *Id*. Carter had constitutional and statutory rights to make these objections to the union's impermissible expenditure of employees' forced dues and fees. The First Amendment and the RLA Section 152 (Eleventh) protect employee rights to object to paying compelled fees for unions' political, ideological, and other nonbargaining spending, and make inquiries about how the union is using forced fees. *See Street*, 367 U.S. 768 (holding that the RLA does not authorize a union to spend an objecting employee's money to support political causes); *Ellis v. Bhd. of Ry., Airline and S.S. Clerks*, 466 U.S. 435, 465-66 (1984); *Shea v. Int'l Ass'n of Machinists and Aerospace Workers*, 154 F.3d 508, 513 (5th Cir. 1998). Carter's videos and messages about what President Stone "supported during [her] Paid Leave," and opposing how "TWU-AFL-CIO and 556 are supporting this Murder" are RLA-protected because they communicate Carter's objections—as a nonmember of the union—to being forced to subsidize the union's ideological activities. (SOF ¶36a-b).

Carter also sent President Stone a Facebook message with a picture of women wearing costumes depicting female genitalia, which addressed the "pink pussy hats" worn by Local 556 members and the outfits worn by other participants at the Women's March. (SOF ¶¶36c, 29, 31, 32). Carter's message objected to Local 556's participation in the Women's March, and the "pink pussy hats," a political symbol President Stone, Local 556 members, and other participants knitted

and donned during the march to protest President Trump's inauguration and "support women's rights."[12] *Id.* News outlets covering the Women's March discussed the costumes worn by the participants, including women who were "dress[ing] like lady parts."[13]

Carter's private message asked President Stone how wearing the "pink pussy hats" would be "coded in the LM2 Financials," which references the union's obligation to report its political activities to the Department of Labor. (SOF ¶36c). Carter's message was nonmember objection speech because she was criticizing the union leadership for what they were "do[ing] with our MONEY!!!", objecting to the union's "stealing from our DUES" for participating in the Women's March, and criticizing the political statements they advanced in their "pink pussy hats." *Id.*

Carter's objected to having her forced fees finance the union's ideological expression at the Women's March with the "pink pussy hats." Carter's message—"cause I know we paid for this"— asserts that Local 556's actions impermissibly forced nonmembers to pay for union political speech and activities. *See Street*, 367 U.S. 768; (SOF ¶36c). Carter's message was also re-organizing and representation speech: "[W]e [the recall movement] are getting even more signatures due to other [flight attendants] finding out what you guys do with our MONEY!!!" (SOF ¶36c). Carter's asserted that the recall would succeed and President Stone would be "a regular flight attendant again and not stealing from our DUES for things like this!" *Id.*

---

[12]    Pussyhat    Project,    Design    Interventions    For    Social    Change,    Our    Story, https://www.pussyhatproject.com/ourstory#:~:text=The%20name%20Pussyhat%E2%84%A2%20 0was,the%20hat's%20'pussycat%20ears'. (last visited Sept 1, 2021).

[13] Lauren Tuck, Lady Part Costumes Ruled the Women's March, yahoo!sports (Jan. 22, 2017), https://sports.yahoo.com/news/lady-part-costumes-ruled-the-womens-march-171016296.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_referrer_sig=AQAAAImfCTd-7_klWo0ItkeriUUzczI9tOoVOU-8nSMfTQi9RwOhiidxZOuAfevEIcexpv7iCyDCH6C4icbNAcThomCh8yQHRV7phDmcW6trY80TX385IqgdUtYFOTHPt7JBZV5MHYSXYYN6--f8Zd1uSxsabEG1SSP6aOGObNQMhr-C (last visited Sept. 1, 2021).

### B.  Southwest and Local 556 targeted Carter's RLA-protected activity.

#### 1.  Southwest fired Carter for the private Facebook videos and messages she sent to Local 556's President.

Carter's Facebook videos and messages were the so-called "harassing and inappropriate" messages that motivated Southwest to fire Carter. (App.222). Carter's communications contain nothing but RLA speech and expression addressing Local 556's representation of flight attendants at Planned Parenthood's Women's March, the campaign to re-organize the union through the recall election, and objections to how the union spent flight attendants' forced fees in violation of their constitutional and statutory rights. (SOF ¶36).

Carter informed Southwest of all her reasons for sending President Stone these communications at her fact-finding meeting. (SOF ¶69). Southwest knew that Carter's videos and messages to President Stone and Local 556 involved her opposition to the union's participation in the Women's March, her objections to the union's support of Planned Parenthood and its pro-abortion agenda with its participation in the march, but it fired her for these RLA-protected communications anyway. (SOF ¶¶69, 36). Southwest also knew that Carter was opposing the union's representation of employees by participating in these activities. (SOF ¶¶69, 36).

During Carter's disciplinary fact-finding meeting with Southwest, the company bombarded her with questions about union-related matters. Southwest confronted Carter about her long history of messaging President Stone about her objections to union representation and sending messages about removing President Stone and from union leadership. (SOF, ¶75). Southwest also questioned Carter about her reason for resigning from union membership and objecting to pay dues. (SOF ¶74). Carter's Base Manager, Ed Schneider, prepared a synopsis of his investigation, observing that Carter "latched onto the recent Women's March" as her defense, and summarized his findings that Carter had violated the Social Media Policies by stating:

> Carter has been making comments that indicated she was not Union friendly since 2008. Audrey Stone became President of TWU Local 556 in 2013 and she stated that Charlene has been sending her messages since that time, before there were any issues due to abortion or women's rights … [Carter] has continually bombarded Audrey with the recall vote and how she doesn't deserve to be in office and the recall is going to happen.

(SOF ¶¶77, 78). Schneider's objections to Carter's recall campaign-related speech is enough on its own to prove that Southwest violated her rights under the RLA. *See Lebow v. Am. Trans Air, Inc.*, 86 F.3d 661, 665-667 (7th Cir. 1996) (base manager's statement that employee "was in trouble because of his union [organizing] activities qualifies as evidence of animus under any definition"). Southwest fired Carter because it deemed her Facebook videos and messages to Local 556 and President Stone about union representation, re-organizing issues, and objections to how the union spent employees' forced fees, to be "harassing and inappropriate." Southwest's decision violated Carter's RLA-protected rights.

> **2.** **Local 556, by and through President Stone, reported Carter and caused Southwest to fire her because she was exercising RLA-protected rights.**

> **a.** **President Stone caused Carter's discharge.**

Carter engaged in protected activity, and Local 556 President Audrey Stone reported Carter to Southwest, claiming that her Facebook messages and videos violated the company's Social Media Policies. Unions cause a discharge when their officials report employees and seek to cause them to be disciplined. *See Caravan Knight Facilities Mgmt. Inc.*, 362 N.L.R.B. 1802, 1805 (2015); *In re Strack and Van Til Supermarkets*, 340 N.L.R.B. at 1411, 1430; *Paperworkers Local 1048 (Jefferson Smurfit Corp.)*, 323 N.L.R.B. 1042, 1044 (1997).

Local 556's president knew, when she reported Carter, that discipline and termination were the foreseeable, if not likely, results of her actions. President Stone had warned flight attendants that Southwest was terminating employees for Social Media Policy violations, and knew that the

company had suspended and fired employees for violating these policies. (App.11-12) (SOF, ¶40).

When President Stone reported Carter, she called Southwest's attention to the specific social media

policies that she believed Carter violated. (App.105)(SOF ¶47). Furthermore, when Southwest

interviewed Stone as part of its investigation and asked Stone what she thought should be done,

she asked the company to "make Carter stop" and "protect her," knowing that the best way for

Southwest to accomplish this was to terminate Carter. (App.115)(SOF ¶61).

Carter did not send the Facebook videos and messages to anyone but President Stone, and

nobody else reported Carter for any of her social media activities. Carter had never been disciplined

by Southwest. (SOF ¶87). Southwest would not have investigated or scrutinized Carter's Facebook

activity but for President Stone's complaint. (SOF ¶88). Carter posted videos on her public

Facebook page, but Southwest only discovered those while investigating President Stone's

complaint. (SOF ¶¶87, 45, 63, 64). But for President Stone's actions, Southwest would have never

been aware of Carter's union dissident speech, would have never investigated her social media

activities, and would have never fired her. (SOF ¶¶42-47) (App.105).

### b. President Stone was acting for Local 556 when she caused Carter's discharge.

Carter sent her Facebook videos and messages to President Stone precisely because she was

objecting to union activities. When union presidents act within the scope of their authority as union

representative, as President Stone was when Carter objected to the union's activities, the union is

liable for the officer's actions. *See e.g.*, *N. River Energy Corp. v. United Mine Workers of Am.*,

664 F.2d 1184, 1190 (11th Cir. 1981) (citing *United States Steel Corp. v. UMWA*, 519 F.2d 1249,

1253 (5th Cir 1975) (other citations omitted).

When employees direct communications to a union president in her official capacity (e.g.,

criticizing the union and its leadership), the president's subsequent complaint based on those

communications is considered made in an official capacity. *See In re Strack & Van Til Supermarkets*, 340 N.L.R.B. at 1412 n.10, 1430. President Stone was acting in her official capacity because Carter's communications were directed solely at the union and its president, and the union has a duty to hear employee objections and grievances. (SOF ¶36). Carter directed her messages to President Stone's "Audrey Stone Twu" union Facebook account, not Stone's personal account. (SOF ¶36) (App.425-427; Stone 94:5-96:9). President Stone admitted that she used and created that account solely for union business. (App.425-427; Stone 94:5-96:9).

Having been elected as Local 556's highest-ranking officer, it is President Stone's official duty to hear flight attendants' complaints about union representation. When Carter contacted President Stone in February 2017, it was over what the President and Local 556 were doing during the Women's March event, and about "TWU-AFL-CIO and 556 … supporting this Murder." (SOF ¶36). Carter's communications with President Stone always concerned union business and activities, and nothing more. (SOF ¶36) (App.139-165). Carter and President Stone had no personal relationship, and never communicated outside of Stone's official role. (App.113). When President Stone reported Carter, Stone herself admitted that Carter's Facebook messages were about the union's participation in the Women's March. (SOF, ¶42)(App.105).

### C.  Carter's activities did not lose their RLA protection.

Consistent with the Supreme Court's decisions in *Steele*, *Street*, and *Austin*, RLA Section 152 (Fourth) prohibits unions and employers from diminishing constitutional protections to employee rights. The RLA subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights," including their speech and association rights to re-organize or oppose their unions, and any other employee representation or organizational matters. *See Steele*, 323 U.S. at 198. Under the RLA, Congress has delegated the

33

union power to act as exclusive representative. Unions, who wield congressionally delegated powers as exclusive representative, cannot abridge First Amendment rights. "Since neither Congress nor the state legislatures can abridge those rights, they cannot grant the power to private groups to abridge them." *Street*, 367 U.S. at 777 (Douglas, J., concurring).[14]

The RLA likewise prohibits unions from acting in the exercise of their delegated powers to deprive employees of their speech and association rights, because that "would in effect violate the constitutional rights of individuals." *Steele*, 323 U.S. at 208-09 (Murphy, J., concurring):

> Congress, through the [RLA] has conferred upon the union … the power to represent the entire craft or class in all collective bargaining matters … [I]t cannot be assumed that Congress meant to authorize the representative to act so as to ignore rights guaranteed by the Constitution. Otherwise, the Act would bear the stigma of unconstitutionality under the Fifth Amendment in this respect.

*Id*.

The RLA also prohibits employers from "deny[ing]" or "in any way question[ing] employees' rights "to join, organize, or assist in organizing the [union] of their choice," and from "interfer[ing] in any way with" employee organizational matters. 45 U.S.C. § 152 (Fourth). Thus, the RLA's prohibition against employer restraint of employees' statutory rights (*i.e.*, to oppose the union and its representation), also come with the same "constitutional limitations" on attempts to "deny, restrict, destroy, or discriminate against" those rights insofar as they involve such union-related matters. *See Steele*, 323 U.S. at 198. Just as the RLA subjects the union—as the employees' government imposed exclusive bargaining representative—to "constitutional limitations" on their power to restrict employee speech, RLA Section 152 (Fourth) also prohibits an employer from diminishing employee's RLA speech rights in representation matters, consistent with *Austin*.

---

[14] *See id*. ("As I read the First Amendment, it forbids any abridgment by government whether directly or indirectly.").

While private companies might be able to restrict employee speech in other contexts, the RLA prohibits Southwest from seeking to discipline Carter for union dissident speech privately communicated to Local 556 and President Stone. The RLA also prohibits President Stone from seeking to discipline Carter for union dissident speech when privately communicated in Facebook messages that directly address the activities of the union—activities that the union unlawfully charged to Carter. Nor can Southwest or Local 556 discipline Carter for speech only because they consider her views on abortion to be offensive.

### 1. Federal labor law guarantees employee freedoms under *Austin* to engage in "uninhibited, robust, and wide-open debate in labor disputes."

The Supreme Court has recognized that federal labor law principles guarantee employees' freedom to engage in "uninhibited, robust, and wide-open debate in labor disputes." *Austin*, 418 U.S. at 273-74. Employees' union representation speech is protected even if others consider their speech to be "intemperate, abusive, or insulting," *Austin*, 418 U.S. at 273-74, 283, or a "vehement," "caustic," or "unpleasantly sharp attack[]." *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 62 (1966). Even "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth." *Id.* at 63.[15] In *Austin*, the U.S. Supreme Court explained "[l]abor disputes are ordinarily heated affairs" but "[w]ide latitude for what is written and said in election campaigns is necessary to insure the free exchange of information and opinions." *Austin*, 418 U.S. at 277 n.12.

---

[15] The Supreme Court has recognized union rights to use all lawful propaganda to enlarge their membership. *Austin*, 418 U.S. at 277. Thus, dissident employees have the same right to oppose union leadership and representation. The Supreme Court has held federal labor statutes' protections for this "[v]igorous exercise" of the right to persuade other employees to join must not be stifled by the threat of liability under state libel and defamation laws, including "for the overenthusiastic use of rhetoric or the innocent mistake of fact." *Id*.

The RLA Section 152 (Fourth)'s statutory text—the right "to form, join, or assist labor organizations" and the right "not to join or remain members of any labor organization,"—mirrors the statutory language in NLRA Section 7, which the Supreme Court said was "the primary source" for *Austin*'s robust freedom of speech for employees engaged in union representation disputes. *Austin*, 418 U.S. at 277; *see also* 29 U.S.C. § 157. Federal courts have also applied the *Austin* rule in the RLA context. *See Konop*, 302 F.3d at 882 n.10 ("We see no reason why the rule announced in *Linn* [and applied in *Austin*] … regarding protected activities, should not apply in the context of the RLA.") (cleaned up); *Dunn v. Air Line Pilots Ass'n,* 193 F.3d 1185, 1191-92 (11th Cir. 1999).

Union presidents are no shrinking violets when it comes to heated speech and criticism over union matters. Federal labor laws, including the RLA, NLRA, and LMRDA, all subject union officers to extreme robust speech from the employees they purport to represent. *See Hall v. Cole*, 412 U.S. 1 (1973); *Petramale v. Local No. 17 of Laborers Int'l Union*, 736 F.2d 13, 16 (2d Cir. 1984). The RLA protects union dissident speech about union activities even if it offends the union and its officers.

### 2. The RLA places "constitutional limitations" on union and employer attempts to restrict dissident speech about union representation matters.

Under the First Amendment, it is a "bedrock principle" that the expression of ideas may not be prohibited even if "society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "[T]he point of all speech protection … is to shield just these choices of content that in someone's eyes are misguided or even hurtful." *Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 574 (1995). When anyone restricts speech "based on its perception that the speech will spark fear among or disturb its audience, such regulation is by definition based on the speech's content." *United States v. Marcavage*, 609 F.3d 264, 282 (3d. Cir. 2010); *FCC v. Pacifica Found.*, 438 U.S. 726 (1972) (stating that if the speaker's opinion

36

gives offense that is the reason for protecting it); *cf. Brazos Valley Coal. for Life, Inc. v. City of Bryan*, 421 F.3d 314, 326 (5th Cir. 2005) ("[T]he government cannot restrict speech out of a concern for the discomfort it might elicit in listeners.") (citations omitted).[16]

Carter's private Facebook videos showing an aborted baby—sent to Local 556's president in response to the union's participation in the Women's March and other activities—did not lose their protection just because the company and union considered them to be offensive. The First Amendment protects individuals' rights to display signs communicating their views on abortion, and "[t]he fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of constitutional protection." *See Hill v. Colo.*, 530 U.S. 703, 715 (2000). Federal courts have also recognized that pro-life signs bearing images of aborted babies constitutes protected speech. *Swagher v. Neighoff*, 398 Fed. Appx. 872, 881 (4th Cir. 2010); *Marcavage*, 609 F.3d at 282; *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821-22 (6th Cir. 2007).

Nor were Carter's videos obscene or violent, as President Stone alleged. *See Miller v. Cal.*, 413 U.S. 115, 24 (1973) (obscene materials depict or describe sexual conduct and exclude those which, taken as a whole, do not have serious literary, artistic, political, or scientific value); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792-93 (2011) (recognizing that obscenity is not whatever someone finds shocking, but only depictions of sexual conduct). Carter's videos of the aborted baby have "religious, political, scientific, and educational" value, particularly here, where she is trying to demonstrate to Local 556 and President Stone that an aborted baby is a human life. (SOF ¶36a-b).

---

[16] "[T]he burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Snyder v. Phelps*, 562 U.S. 443, 459 (2010) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 210-11 (1975).

For the same reasons, Carter's Facebook message containing the picture of women in female genitalia costumes did not lose its RLA protection. (SOF ¶36c). Carter's message is union dissident speech responding to the ideological message Local 556 sent when they wore the "pink pussy hats" and joined the women "dress[ing] like lady parts" at the Women's March. *Supra* at 28-29, 29 n.13. "Despite their sometimes caustic nature, from the early cartoon portraying George Washington as an ass down to the present day, graphic depictions and satirical cartoons have played a prominent role in public and political debate … numerous [] efforts have undoubtedly had an effect on the course and outcome of contemporaneous debate." *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54 (1988); *Konop*, 302 F.3d at 883 (finding rhetorical hyperbole protected by the RLA and federal labor laws).

The Court should grant summary judgment because all of Carter's speech is union dissident speech communicated solely and privately to Local 556's President. Carter did not disseminate any false or defamatory information about President Stone. Carter sent all these communications to Local 556 President Audrey Stone via private Facebook messages, and did not send them to any other Southwest employees. Carter never never criticized Southwest management in her communications to President Stone, which concerned only the union and its activities.

## II. Local 556 violated the duty of fair representation the union owed Carter.

Under the RLA, a union acting as the exclusive representative of a craft/class of employees owes a fiduciary duty of fair representation to all those employees it represents, members and nonmembers alike. *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 76 (1991); *Steele,* 323 U.S. 192. That duty is "akin to the duty owed by other fiduciaries to their beneficiaries," such as the "duty a trustee owes to trust beneficiaries," or the duty an "attorney" owes to a "client." *O'Neill,* 499 U.S. at 74.

The RLA empowers unions to govern employees' relations with their employers as their

exclusive bargaining representative, allowing them to wield "extraordinary" powers over those employees' terms and conditions of employment. *See, e.g.*, *Steele*, 323 U.S. at 200. Exclusive representation poses grave constitutional problems unless unions fulfill their duty to represent all employees fairly, regardless of membership status. *Id.* at 202-04. When federal law requires employees to surrender completely their rights to self-representation in deference to an exclusive bargaining agent, "both logic and equity dictate that such agent be impressed with a reciprocal duty … *to act for and not against those whom it represents*.'" *Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. NLRB*, 368 F.2d 12, 16 (5th Cir. 1966) (emphasis added).

Under the duty of fair representation standard, the law presumes a union breaches its duty when it seeks to have the employer discipline an employee it represents. *See Caravan Knight Facilities Mgmt., Inc.*, 362 N.L.R.B. 1802, 1805 (2015); *Acklin Stamping*, 351 N.L.R.B. 1263, 1263 (2007); *Graphics Commc'ns Local 1-M (Bang Printing)*, 337 N.L.R.B. 662, 673 (2002); *see also Roscello*, 726 F.2d at 221 ("[T]he union's duty of fair representation has been the same duty whether the union involved is covered by the NLRA or the RLA."). Local 556 cannot rebut that presumption because it had no legitimate, good faith interest in disciplining Carter for union dissident speech.

### A. Local 556's arbitrary conduct

Local 556 breached the duty of fair representation because President Stone's decision to report Carter for her union dissident speech was impermissibly arbitrary. "[T]o be non-arbitrary, a decision must be: (1) based upon relevant, permissible union factors which excludes the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) a rational result of the consideration of those factors; and (3) inclusive of a fair and impartial consideration of the interests of all employees." *McCall v. Sw. Airlines Co.*, 661 F. Supp. 2d 647, 654 (N.D. Tex.

2009) (quoting *Tedford v. Peabody Coal Co.*, 533 F.2d 952, 957 (5th Cir. 1976)).

President Stone reported Facebook videos and messages comprised entirely of Carter's union dissident speech. *See supra* at 27-28; (SOF ¶¶36, 42-43). President Stone's complaint admits that Carter's Facebook videos and messages were sent in connection with her participation in the Women's March. (SOF ¶42). Stone's complaint also stated that she was reporting Carter for "political and religious comments." (SOF ¶46). There was nothing that President Stone reported *but* Carter's objections to union activities. (SOF ¶45). Carter's political and religious objections to union activities were impermissibly arbitrary grounds for the union to breach its duty of fair representation.

Local 556's actions were also arbitrary because President Stone suddenly deviated from her past practice and duty to affirmatively defend employees from discipline under the Social Media Policies. (SOF ¶¶40-41). With Carter, Stone arbitrarily abandoned her position that Southwest's Social Media Policies interfered with employees' personal rights. (SOF ¶¶40-41)(App.12). Stone's actions contradicted her pronouncement that employees should work out their disputes rather than turn each other in to Southwest for Social Media Policy violations and possible termination. (App.12-13).

### B. Local 556's discriminatory conduct

Local 556 breached its duty of fair representation when it discriminated against Carter because of her support for the recall campaign, her objections to the union's use of forced fees, and her religiously motivated union dissident speech. "The union's duty of fair representation guarantees employees the right to be represented without 'invidious treatment … in matters affecting their employment." *Int'l Union of Operating Eng'rs Local 406 v. NLRB*, 701 F.2d 504, 508 (5th Cir. 1983) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177-78 (1967).

For the reasons set forth, *infra*, Section III, Local 556 discriminated against Carter's religious beliefs and practices in violation of Title VII. Local 556 also discriminated against Carter on the basis of her support for the recall. Local 556, by and through President Stone, had a pattern of targeting recall supporters and union objectors, and specifically targeted recall leader, Jeanna Jackson, for discipline. (App.456-457, Stone Tr.214:14-215:23) (App.549). Shortly after Carter's termination, President Stone reported Jackson for a Social Media Policy violation when she criticized Stone for getting Carter fired for opposing the union. Local 556 also discriminated against Carter based on her exercising constitutional and statutory rights to object to the union's unlawful expenditures of forced fees to support the Women's March, Planned Parenthood, and its pro-abortion policies. *Ellis*, 466 U.S. at 455-56; *Shea*, 154 F.3d at 513.

### C.  Local 556's bad faith

Local 556 also breached the duty of fair representation because it acted in bad-faith by targeting Carter for discipline under Southwest's Social Media Policies. Unions engage in bad faith conduct when they act without honest purpose and judgment, or when they act with hostility or discrimination towards an employee. *See McCall*, 661 F. Supp. 2d at 654. Union conduct that "evince[s] a purpose to intentionally harm" employees subject to the union's exclusive representation is per se bad faith conduct. *See id.* (citing *O'Neill v. Air Line Pilots Ass'n, Int'l*, 939 F.2d 1199, 1203, 1204 (5th Cir. 1991).

Local 556, by and through President Stone, acted with the purpose of intentionally harming Carter because she knew that Carter's discipline and termination were likely and foreseeable consequence of her actions, based on prior known Social Media Policy violations that led to termination. (SOF ¶¶40-41)(App.12). President Stone acted without honest purpose and judgment in reporting Cartern, given the union's obligation to affirmatively defend employees.

41

When Southwest asked President Stone what she wanted to see the company do, Stone responded that she wanted them to "[m]ake Charlene and Chris Click [another union opponent] stop." (SOF ¶62) (App.113) (App.429). President Stone asked Southwest to stop Carter's union dissident speech. President Stone could not have had any honest purpose or judgment in stopping Carter from messaging and criticizing the union about illegally using her money to promote what Carter and millions of others believe is obscene, violent and threatening—the murder of the unborn.

### III. Southwest and Local 556 violated Title VII by causing Carter to be fired because of her religious beliefs and practices.

Southwest and Local 556 violated Carter's Title VII rights. Southwest violated Title VII by firing Carter because of her religious beliefs. Title VII prohibits an employer from discharging an employee because of her "religion," which includes "all aspects of [her] religious observance and practice, as well as belief." 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j).

Local 556 violated Title VII because it discriminated against her because of her religious beliefs and caused Southwest to fire her. Title VII prohibits a union from discriminating against an individual because of her "religion." 42 U.S.C. § 2000e-2(c)(1); 42 U.S.C. § 2000e(j). Local 556 also violated Title VII because it prohibits a union from "caus[ing] or attempt[ing] to cause an employer to discriminate against an individual" because of her religion, which includes her religious observances, beliefs, and practices. 42 U.S.C. § 2000e-2(c)(3); § 2000e(j).

### A. Carter's religious observances, beliefs, and practices were a "but for" cause and a "motivating factor" in Southwest's decision to fire her.

Title VII establishes two different standards for causation. "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation." *Bostock v. Clayton, Cnty.*, 140 S. Ct. 1731, 1739 (2020) (citation omitted). "When it comes to Title VII, the adoption of the traditional but-for causation standard means that a defendant cannot avoid liability just by

citing some *other* factor that contributed to its challenged employment action. So long as the plaintiff's [religious belief, observance, or practice] was one but-for cause of that decision, that is enough to trigger the law." *Id.* (emphasis in original) (citation omitted).[17]

"Title VII relaxes this [but for] standard, however, to prohibit even making a protected characteristic a "motivating factor" in an employment decision." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015); *Bostock*, 140 S. Ct. at 1739-40; 42 U.S.C. § 2000e-2(m). "An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions." *Abercrombie & Fitch*, 575 U.S. at 773. If an employer or union makes an employee's religiously motivated practice a factor in employment decisions Title VII is violated.

### 1. Southwest fired Carter for posting and sending pro-life videos and messages in observance of her religious beliefs.

Carter holds a religious belief in the sanctity of human life and believes that abortion is the taking of a human life contrary to the teachings of the Bible and the will of God. (App.527, ¶6). Carter's religious beliefs require her to share with others that abortion is the taking of a human life and to avoid her personal promotion of abortion. *Id.* at ¶¶8-9. Following Local 556's participation in the pro-abortion Planned Parenthood Women's March, Carter sent President Stone Facebook videos and messages expressing her deeply held religious beliefs about abortion and the value of human life. (SOF ¶¶36a-e). Carter's videos and messages Carter's Facebook videos and messages privately sent to President Stone and the publicly-visible posts on Carter's Facebook page

---

[17] "It doesn't matter if other factors besides the plaintiff's [protected characteristic] contributed to the decision … If the [union or employer] intentionally relies in part on an individual employee's [protected characteristic] … a statutory violation has occurred." *Bostock*, 140 S. Ct. at 1741.

conveyed her religious message that abortion is the taking of a human life. (App.531) (SOF ¶¶35, 36a-b, 36e, 38).

Carter's religious beliefs and practices were both the "but for" cause and the motivating factor in Southwest's decision to fire Carter. Southwest fired Carter for her February 7, 2017 Facebook post of a video showing a baby who had been aborted, and a message expressing her religious belief that abortion is the taking of a human life, and showing the passion with which she holds those beliefs. (SOF ¶¶35)(App.531)(2/7/17 video). Carter states plainly in her post that, despite the graphic nature of what happens when a baby is aborted, people should understand that abortion is the taking of a human life. *Id*. By making her post, Carter was engaging in the very act of sharing that message.

Southwest also fired Carter for a second video she posted on her personal Facebook page on February 14, 2017 (and had also sent to President Stone) showing an aborted baby. (App.531)(2/14/17 video). Carter's Facebook post stated: "THIS IS GRAFIC (sic)….but it needs to be shared over and over….this is MURDER! So for all of you that are Pro-Abortion GOD HELP YOU!" (SOF ¶¶38). Carter's religious beliefs are apparent on the face of her message, and reiterate that even though an aborted baby is a graphic image, "it needs to be shared over and over" to show people that abortion takes human life. *Id*. Carter's post conveys the evangelical purpose of her message and her observance of her religious beliefs: sharing the word that abortion is the taking of human life contrary to God's will. Southwest also fired Carter for sending the same videos to President Stone in private Facebook communications, with the messages, "This is what you supported during your Paid Leave with others at the Women's MARCH in DC," and "TWU-AFL-CIO and 556 are supporting this Murder…." (SOF ¶¶36a-b, 81)(App.222).

Southwest would not have fired Carter "but for" the pro-life videos and messages she posted on her Facebook page and sent by private message to her union president, in observance of her religious beliefs and practices. Carter worked for Southwest for 20 years with no discipline. (SOF ¶87). Southwest admits that it fired Carter for posting pro-life videos on her Facebook page and sending those same videos to President Stone, and that it knew those videos and messages represented Carter's observance of her religious beliefs and practices. (App.222, 268-269)(SOF ¶¶76-79). During the fact-finding meeting that Southwest conducted before terminating Carter's employment, Southwest asked Carter why she posted the videos to her Facebook page. (SOF ¶66). Carter explained that she posted and sent the videos because of her deeply held religious beliefs:

> I'm a Christian, I'm a conservative, and I'm pro-life. This happens to be a huge issue for me and I get the message out wherever I can. This was sent to me and I decided to post it on my Facebook page. I think if more and more people would see what actually happens… I have a deep, deep want to get the word out.

(SOF ¶66)(App.242). Carter also told Southwest that she "work[s] with other pro-life groups" and that "for me as a Christian, if I can get the word out in any way, to every group as possible to touch this issue," I do. (SOF ¶67)(App.242). Carter also explained her belief that "if more and more people would see what actually happens" they would not do it. (SOF ¶67)(App.242-243). Carter explained that the videos were intended to show "[i]t's an abortion. It's a baby … They need to know that it's a life and not just a bunch of tissue." (SOF ¶68)(App.243).

During Carter's fact-finding meeting with the company, Southwest also asked Carter about the Facebook message she sent to President Stone with articles from Alveda King about Planned Parenthood. (SOF ¶¶70-71, 35e)(App.84-103). Carter told Stone to do some research on Martin Luther King and what he would have marched for. *Id*. Southwest Employee Relations Representative Denise Gutierrez asked Carter, "Why do you feel the need to send something religious using praying and god to [President Stone]?" (SOF ¶72)(251). Carter responded, "I'm

45

hoping it might change hearts and minds for people to pray about … and think about what they are doing. Whether you're Muslim, Jewish, Christian, or atheist [you] can still say a prayer for not killing babies." *Id*.

Days before issuing the termination letter, Southwest Base Manager Schneider provided company representatives a synopsis of the Carter investigation, explaining that Carter had "several posts that are visible on her Facebook timeline showing graphic and disturbing videos of an aborted fetus and statements about her political views." (SOF ¶¶78-79)(268). Schneider also informed them that Carter's "defense" was that abortion was "against her values as a Christian." (SOF ¶78)(268). Schneider also noted Carter's statement "that she had an abortion when she was young and regrets every bit of it, so she works with other pro-life groups as a Christian to spread the anti-abortion message out in any way possible." (SOF ¶79)(268).

Carter simply would not have been fired "but for" posting and sending pro-life videos and messages in observance of her religious beliefs.  There is no dispute Southwest fired Carter because it concluded that Carter's pro-life videos on her Facebook page were "highly offensive in nature," that those same videos she privately sent to President Stone were "harassing and inappropriate," and that those actions violated the company's Social Media Policies. (App.222) (SOF ¶¶78-79). Southwest's Termination Letter also said that when she posted the graphic videos on Facebook she represented the company "in a manner that is disparaging to Southwest Flight Attendants as well as to all Southwest Employees."[18] *Id*. Those facts alone establish that Southwest violated Carter's Title VII rights.

---

[18] The Supreme Court explained, "Often, events have multiple but-for causes. So, for example, if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision." *Bostock*, 140 S. Ct. at 1739.

Carter's observance of her religious beliefs—sharing the pro-life videos—was also a "motivating factor" for Southwest's decision to fire her. Southwest's termination decision was motivated by Carter's religious expression and communications made in observance of her religious beliefs. (App.222) (SOF ¶¶78-79). Whether applying the "but for" causation standard of the "motivating factor" standard, Southwest fired Carter for posting and sending pro-life videos in observance of her religious beliefs.

Southwest fired Carter for posting and sending the videos while knowing that Carter, in accordance with her religious beliefs and practices, was sharing them to show that abortion is the taking of human life contrary to God's will. Southwest also knew it was applying its Social Media Policies in a way that intentionally discriminated against Carter observation of her religious beliefs. When there is direct evidence of discrimination, the *McDonnell Douglas* burden shifting paradigm for circumstantial proof is inapplicable. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

> **2. Local 556 discriminated against Carter and caused Southwest to discriminate against Carter based on the religious beliefs and practices conveyed in her private pro-life Facebook videos and messages.**

Local 556, by and through President Stone, "attempted to cause," and did, in fact, "cause" Southwest to fire Carter because of her pro-life religious videos and messages. President Stone sought to discipline Carter for the private Facebook videos and messages while knowing that Carter sent them for religious reasons. (SOF ¶46)(App.105). It is inescapable that Local 556's president was making Carter's religious beliefs a factor in its decision to attempt to harm her job and requesting that Southwest make her religious observances, beliefs, and practices "a factor in employment decisions." *Abercrombie & Fitch*, 575 U.S. at 773.

47

President Stone reported Carter's pro-life videos and messages to Southwest, and specifically pointed out her belief that Carter's "political and religious comments" violated the company's Social Media Policies. (SOF ¶46)(App.105). Stone even identified for Southwest all of the specific policies she believed that Carter's pro-life communications violated. (SOF ¶47)(App.105). Stone knew Southwest had fired employees for prior Social Media Policy violations. (SOF ¶40)(App.12). Indeed, Southwest ultimately terminated Carter for most of the policies that President Stone had cited for the company. (App.222). But for Stone's reports, Southwest would not have fired Carter for her religiously inspired protests in the Facebook videos and messages she sent to Stone. Southwest would have never even discovered Carter's Facebook posts and messages or fired Carter but for President Stone's complaint. (SOF ¶¶42, 45, 63-64)(App.105).

Title VII also prohibits a union from discriminating against an individual because of her "religion," which includes "all aspects of [her] religious observance and practice, as well as belief." 42 U.S.C. § 2000e-2(c)(1); § 2000e(j). To discriminate against a person means to treat her worse than other employees. *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Local 556 treated Carter differently (and worse) for the simple fact that unions must protect employees from discipline; they do not act affirmatively to cause them discipline. *See supra* at 38-39. President Stone defended other Southwest employees facing discipline under the Social Media Policies but treated Carter worse by reporting her religious activities discipline under those policies. (SOF ¶¶46, 40-47).

## B. Southwest and Local 556 failed to accommodate Carter's religious beliefs and practices.

Southwest intentionally discriminated against Carter in violation of her Title VII rights because it fired her without making any attempt to accommodate her religious beliefs and practices. Firing an employee because of her religious practice "is *synonymous* with refusing to accommodate the religious practice." *Abercrombie & Fitch*, 575 U.S. at 772 n.2 (emphasis in original). Title VII

48

affirmatively obligates employers not to discharge an individual because of her religious observances or practices.

Southwest fired Carter because the company said her pro-life Facebook messages violated its Social Media Policies. When an employee "requires an accommodation as an 'aspec[t] of religious … practice,' it is no response that the subsequent [discharge] was due to an otherwise-neutral policy. "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not 'to … discharge any individual … because of such individual's' 'religious observance and practice.'" *Id.* at 775. Title VII requires otherwise-neutral policies to give way to the need for an accommodation." *Id.*

Having learned of and acknowledged Carter's religious observances, beliefs, and practices, Southwest still fired her in breach of its affirmative obligations under *Abercrombie*. (SOF ¶¶66-68, 70-73, 78-79). When Southwest received President Stone's complaint about Carter's pro-life videos and messages privately sent to Stone, the company did not even inquire into whether an accommodation might be feasible. (SOF ¶¶82-86). Not only did Southwest avoid its duty to accommodate Carter's religious beliefs, it actively prosecuted the case against her religious posts by digging up old, highly attenuated posts from Carter's Facebook timeline to establish "a nexus to the workplace." (SOF ¶¶89, 63, 64). Given the highly attenuated nature, this nexus was merely cover for the company to evade its duty to accommodate Carter's religious beliefs and practices. (SOF ¶¶91-92).

Local 556 also intentionally discriminated against Carter by refusing to accommodate her religious beliefs. *Abercrombie & Fitch*, 575 U.S. at 772, 772 n.2. Local 556 violated Carter's right to affirmative protection of her religious practice and her right to a religious accommodation.

Rather than accommodate Carter, Local 556 attempted to fire her. President Stone made no attempt to accommodate Carter's religiously inspired practices when she reported Carter to Southwest and instead asked that action be taken against her. (SOF ¶¶42-47)(App.105).

## CONCLUSION

For these reasons, the Court should grant Carter's motion for partial summary judgment against Southwest and Local 556 on their liability for violating Carter's rights, and allow the parties to proceed to trial on the matter of remedies.

Dated: February 17, 2022                    Respectfully submitted,

s/ Matthew B. Gilliam

Mathew B. Gilliam (*admitted pro hac vice*)
New York Bar No. 5005996
*mbg@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319

s/ Jason E. Winford (*with permission*)
David E. Watkins
Texas Bar No. 20922000
*dwatkins@jenkinswatkins.com*
Jason E. Winford
Texas Bar No. 00788693
*jwinford@jenkinswatkins.com*
JENKINS & WATKINS, P.C.
4300 MacArthur Avenue, Suite 165
 Dallas, Texas 75209
Tel: 214-378-6675
Fax: 214-378-6680

*Attorneys for Plaintiff Charlene Carter*

## Certificate of Service

I hereby certify that on February 17, 2022, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ Matthew B. Gilliam