# EXHIBIT FF

CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER                    )
                                   ) CIVIL ACTION NO.
VS.                                ) 3:17-CV-02278-X
                                   )
SOUTHWEST AIRLINES CO., AND        )
TRANSPORT WORKERS UNION OF         )
AMERICA, LOCAL 556                 )


------------------------------------

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF
AUDREY STONE
NOVEMBER 24, 2020

------------------------------------



        ANSWERS AND DEPOSITION OF AUDREY STONE,
produced as a witness at the instance of the
Plaintiff, taken in the above-styled and -numbered
cause on NOVEMBER 24, 2020, at 9:07 a.m., before
CHARIS M. HENDRICK, a Certified Shorthand Reporter
in and for the State of Texas, witness located at
Gillespie Sanford LLP, 4803 Gaston Avenue, Dallas,
Texas, pursuant to the Federal Rules of Civil
Procedure, the current emergency order regarding
the COVID-19 State of Disaster, and the provisions
stated on the record or attached hereto.

Case 3:17-cv-01102-X Document 119-2 Filed 09/08/21 Page 3 of 59 PageID 2462

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3        MR. MATTHEW B. GILLIAM
          NATIONAL RIGHT TO WORK LEGAL DEFENSE
 4        FOUNDATION, INC.
          8001 Braddock Road, Suite 600
 5        Springfield, Virginia  22160
          (703) 770-3339
 6        mbg@nrtw.org

 7

 8
     FOR THE DEFENDANT, SOUTHWEST AIRLINES CO.:
 9
          MR. MICHAEL A. CORRELL
10        REED SMITH LLP
          2850 North Harwood, Suite 1500
11        Dallas, Texas  75201
          (469) 680-4264
12        mcorrell@reedsmith.com

13

14   FOR THE DEFENDANT, TRANSPORT WORKERS UNION OF
     AMERICA, LOCAL 556:
15
          MR. ADAM GREENFIELD
16        MR. EDWARD B. CLOUTMAN, III
          LAW OFFICES OF CLOUTMAN & GREENFIELD, PLLC
17        3301 Elm Street
          Dallas, Texas  75226
18        (214) 939-9223
          agreenfield@candglegal.com
19        ecloutman@lawoffices.email

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2   FOR THE WITNESS AUDREY STONE:

 3        MR. JOE GILLESPIE
          GILLESPIE SANFORD LLP
 4        4803 Gaston Avenue
          Dallas, Texas  75246
 5        (214) 800-5111
          joe@gillespiesanford.com
 6

 7   ALSO PRESENT:  MR. MACK SPURLOCK - VIDEOGRAPHER

 8                      MS. CHARLENE CARTER
                        MS. LAUREN ARMSTRONG
 9                      MR. CHRIS MABERRY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1                         INDEX

2    Appearances ...................................2

3    AUDREY STONE

4         Examination by Mr. Gilliam..............7

5         Examination by Mr. Correll............216

6         Examination by Mr. Greenfield.........252

7

8    Signature and Changes.......................258

9    Reporter's Certificate......................260

10

11                        EXHIBITS

12   Exhibit 1 - .................................8
     Objections and Responses to Plaintiff's Subpoena
13   to Produce Documents, Information, or Objects,
     Document 20

14
     Exhibit 2 - ................................98
15   Unity Magazine Spring 2018 Issue, Document 23

16   Exhibit 3 - ...............................102
     Email to Inflight Directors from Sonya Lacore,
17   Document 3

18   Exhibit 4 - ...............................108
     Email to Audrey Stone from ████████,
19   Document 27

20   Exhibit 5 - ...............................118
     Core Team Facebook Group Screenshots, Document 24
21
     Exhibit 6 - ...............................140
22   Apology from Audrey Stone, Document 17

23   Exhibit 7 - ...............................141
     Screenshot of Text from ████████, Document 10
24

25

CONFIDENTIAL VIDEOTAPE DEPOSITION OF AUDREY STONE

Page 5

1                    EXHIBITS

2    Exhibit 8 - ...............................146
     Apology from ███████████, Document 11
3
     Exhibit 9 - ...............................150
4    Apology from ███████████, Document 18

5    Exhibit 10 - ..............................155
     President's Message, Document 13
6
     Exhibit 11 - ..............................158
7    Southwest Airlines Policies, Document 8

8    Exhibit 12 - ..............................179
     Email to Audrey Stone from ███████████,
9    Document 30

10   Exhibit 13 - ..............................185
     Email to Audrey Stone from ███████████,
11   Document 31

12   Exhibit 14 - ..............................187
     Email to Audrey Stone from ███████████,
13   Document 32

14   Exhibit 15 - ..............................194
     Email to ███████████ from Audrey Stone,
15   Document 33

16   Exhibit 16 - ..............................197
     Read-Before-Flys, Document 9
17
     Exhibit 17-A - ............................203
18   Screenshots, Document 25-A

19   Exhibit 17-B - ............................203
     Screenshots, Document 25-B
20
     Exhibit 18 - ..............................239
21   Audrey Stone Facebook Messages from Charlene Carter

22   Exhibit 19 - ..............................251
     Facebook Message from Charlene Carter (Bates 616)

23

24

25

CONFIDENTIAL - VIDEOTAPE DEPOSITION OF AUDREY STONE

Page 6

                    PROCEEDINGS

1              THE VIDEOGRAPHER:  We are now on

2   record.  Today's date is November 24th, 2020.  The

3   time is 9:07 a.m.  Will counsel please introduce

4   yourselves; after which, will the court reporter

5   please swear in the witness?

6              MR. GILLIAM:  Matthew Gilliam for

7   plaintiff Charlene Carter.

8              MR. CORRELL:  Michael Correll for

9   defendant Southwest Airlines.

10             MR. GREENFIELD:  Adam Greenfield on

11  behalf of defendant TWU Local 556.

12             MR. CLOUTMAN:  Ed Cloutman also on

13  behalf of TWU Local 556.

14             MR. GILLESPIE:  Joseph Gillespie on

15  behalf of the witness, Audrey Stone.

16             THE REPORTER:  This deposition is

17  being conducted remotely in accordance with the

18  current emergency order regarding the COVID-19

19  State of Disaster.

20             My name is Charis Hendrick, Court

21  Reporter, CSR No. 3469.  I am administering the

22  oath and reporting the deposition remotely by

23  stenographic means from my home in Ellis County,

24  Texas.

CONFIDENTIAL VIDEOTAPE DEPOSITION OF AUDREY STONE

Page 7

                        AUDREY STONE,

2   having been first duly sworn, testified as follows:

3                       EXAMINATION

4   BY MR. GILLIAM:

5       Q.  Good morning, Ms. Stone.

6       A.  Morning.

7       Q.  My name is Matt Gilliam and I am the

8   attorney representing plaintiff Charlene Carter in

9   the case of Carter v. Transport Workers Union of

10  America Local 556 and Southwest Airlines.  And I am

11  here today to ask you some questions regarding the

12  case.

13              If at any point you need a break, just

14  let me know.  And do -- do you understand why

15  you're here today?

16      A.  Yes.

17      Q.  Okay.  And you understand that you are

18  here under Subpoena?

19      A.  Yes.

20      Q.  Okay.  And did you receive the Subpoena?

21      A.  Yes.

22      Q.  And have you had the chance to read the

23  Subpoena?

24      A.  Yes.

25      Q.  Okay.  I would like to mark Document 20 as

CONFIDENTIAL VIDEOTAPE DEPOSITION OF AUDREY STONE

Page 15

1      Q.   Okay.  All right.  And did you remain as

2    DEBM after losing the election for first vice

3    president?

4      A.   No, I did not.

5      Q.   Okay.  And when did you serve as lead

6    negotiator on the negotiating team?

7      A.   That began June 2013 and remained for the

8    duration of my term as president, which ended in

9    April of 2018.

10     Q.   Okay.  Now, I think you said you served on

11   an education committee.  Were you the chair of the

12   education committee?

13     A.   I was the -- a co-chair of the education

14   committee.

15     Q.   Okay.  And when were you co-chair of the

16   education committee?

17     A.   I became co-chair at some point after I

18   joined the executive board as the Baltimore DEBM.

19   And I remained on the education committee through

20   -- through my DEBM term.  And I may -- I may have

21   been chair at one point, the education -- it was

22   two different terms, and we had co-chairs that

23   changed over at some point during that term.

24     Q.   Okay.  And when did you serve on the

25   working women's committee?

1  our members to contact representatives to ask for

2  extension -- an extension on that.

3           So things that were related to -- that

4  impacted that our members that were going on

5  legislatively that impacted the airline world.  If

6  International sent out an update that they wanted

7  us to also send out to our members, they -- they

8  emailed our members separately and then we would

9  sometimes, you know, reiterate communications for

10 them as well.

11     Q.  Okay.  Now, was there a means for the

12 members to communicate back to the COPE committee?

13     A.  Yes.  Some of the emails -- all of our

14 committees have email -- usually have an email -- a

15 designated email address, but the communications

16 committee is who actually sent out our emails.  And

17 so depending the reply, however com set it up, some

18 of those would go direct -- directly back to

19 communications; some would go directly back to the

20 committee.

21     Q.  Okay.

22     A.  As in the committee chairpersons.

23     Q.  Okay.  All right.  And you said that you

24 became president in 2013; is that correct?

25     A.  Yes, it is.

CONFIDENTIAL VIDEOTAPE DEPOSITION OF AUDREY STONE

Page 28

1      Q.   Okay.  And did you -- did you run for

2  president?

3      A.   At that time, no, I had not.

4      Q.   Okay.  How did you come to be president in

5  2013?

6      A.   As I had stated earlier, I had run for the

7  first vice president position in the 2012 election.

8  I lost that election.  And in -- around May 2013,

9  there -- our top five national officers, two of

10  them resigned; and the other three national

11  officers were removed from office by the executive

12  board under the TWU International Constitution, as

13  well as our local bylaws.

14           And under our bylaws, which govern

15  local business -- again, in conjunction with the

16  TWU Constitution, if there is a vacancy in any

17  position for 18 months of the term, then the person

18  that had the next-highest votes for that position

19  in the election, the position goes to them with the

20  exception of the presidency.  And then any vacancy

21  of the presidency, whether it's in the first half

22  or the last half of the term, the first vice

23  president moves up into the position of president.

24           So when resignations occurred of two

25  of the officers in May 2013, those two positions

Page 29

1  went to the people that had -- had the next-highest

2  votes in the previous year's election. And then

3  the first vice president was the first position

4  removed by the executive board. And upon his

5  removal, the first vice presidency went to me. I

6  assumed the first vice president position. And

7  shortly thereafter, both the treasurer and the

8  president were removed from office as well. And I

9  then I assumed the role of the president.

10     Q. Okay. And I am sorry, you said the

11  treasurer and the -- the president were removed?

12     A. Yes. The -- it was -- it was total of the

13  first vice president, the president and the

14  treasurer.

15     Q. Okay. And who was the treasurer that was

16  removed?

17     A. Jerry Lindemann.

18     Q. Okay. And who was the president who was

19  removed?

20     A. Stacy K. Martin.

21     Q. And I apologize for my confusion. The --

22  the first vice president was removed as well?

23     A. Yes.

24     Q. Okay. And who was the first vice

25  president who was removed?

Page 73

1     A.  Our collective bargaining agreements don't

2 expire because we fall under the Railway Labor Act.

3 And under the RLA, they become amendable.

4     Q.  Okay.  The -- the -- the collective

5 bargaining agreements do have an end date on them,

6 correct?

7     A.  They have an amendable date, not an

8 expiration date.  They remain in effect until a new

9 contract is brought up -- is negotiated and

10 ratified.

11     Q.  Okay.  So if a contract has on the front

12 page it's effective from a certain date to October

13 of 2018, then the October 2018 is the amendable

14 date?

15     A.  That's correct.

16     Q.  Okay.  All right.  And after you became

17 president, when did the CBA that was existing at

18 the time first become amendable?

19     A.  June 1st, 2013.

20     Q.  Okay.  And had -- well, were -- were

21 negotiation -- okay.  So did negotiations start

22 sometime after June 1st, 2013?

23     A.  Yes, they did.

24     Q.  Okay.  And you participated in those

25 negotiations?

Page 74

1    A.  Yes, I did.

2    Q.  Okay.  And, now, is the -- the process,

3 basically, Southwest and the union negotiates until

4 they reach a tentative agreement?

5    A.  Yes.

6    Q.  Okay.  And do they try to reach -- well,

7 again -- again, just for my understanding, I mean,

8 are they negotiating to reach a tentative agreement

9 on all issues or do they reach just a tentative

10 agreement on a document as a whole?

11    A.  The tentative agreement for our contract

12 is on the document as a whole, the entire

13 collective bargaining agreement.

14    Q.  Okay.  And when -- do you recall exactly

15 when negotiations started after June 1st, 2013?

16    A.  I believe it was around June 10th.

17    Q.  Okay.  And how -- well, when did -- so

18 after June 10th, when negotiations began, when did

19 Southwest and the union reach a tentative

20 agreement?

21    A.  We reached a tentative agreement, I

22 believe, early July 2015.

23    Q.  Okay.  And were Southwest and the union

24 negotiating continuously between June of 2013 and

25 July of 2015?

1     A.  Yes.

2     Q.  Okay.  And so do -- do they have meetings

3  -- do the negotiating teams have meetings about

4  once a month?

5     A.  No.  We usually met more frequently than

6  that.

7     Q.  Okay.  Okay.  So it was more frequently

8  than once per month.  Was there ever a hiatus --

9  well, that's probably the wrong term to use.

10          Was there ever a -- I guess, a break

11  in the negotiations in the sense that there was

12  some window between June 10th and early July 2015

13  where the parties weren't negotiating?

14     A.  No.

15     Q.  Okay.  All right.  And when Southwest and

16  the union reached a tentative agreement in July of

17  2015, did the union's negotiating team take that

18  tentative agreement to the executive board?

19     A.  Yes, they did.

20     Q.  Okay.  And did the executive board vote to

21  submit that to the membership?

22          MR. GREENFIELD:  And, Ms. Stone, I am

23  going to ask you to refrain from providing

24  testimony to the extent the executive board was in

25  executive session with legal counsel present, as

Page 76

1    it's attorney/client privilege.  But you may answer

2    if -- if it does not include that.

3                THE WITNESS:  Okay.

4         A.   Yes, the executive board put the tentative

5    agreement out to the membership for a vote.

6         Q.   (By Mr. Gilliam)  Okay.  And is that the

7    typical practice that when -- when there is a

8    tentative agreement -- agreement reached between

9    the two parties, that the executive board has a

10   vote whether to, I guess, submit it to the

11   membership or not?

12        A.   Yes, it's outlined in our TWU Local 556

13   bylaws.

14        Q.   Okay.  When that -- what happened when the

15   -- that tentative agreement was presented to the

16   membership?

17        A.   It was rejected.

18        Q.   Okay.  And when -- when did they vote?

19        A.   I don't recall the specific dates that

20   they voted.  It was voted on in July of 2015.

21        Q.   Okay.  All right.  So after July -- I am

22   sorry.  After the membership voted to reject the

23   first TA in July of 2015, did the negotiating team

24   go straight back to the negotiating table?

25        A.   No, we did not.

Page 94

1    to the membership; not for it to be a two-way

2    vehicle.  I -- I did not personally have any

3    Facebook page set up for union members to

4    communicate directly with me.

5        Q.  Okay.  Did you have an account that was

6    labeled Audrey Stone TWU 556?

7        A   I believe I had an account at one point

8    during one of the elections that I had designated

9    as that, where I would post anything union related

10   personally.

11       Q.  Okay.  When did you open that account?

12       A.  I can't remember.  I had a Facebook -- I

13   had a Facebook account for a number of years.  I

14   think I may have designated that one after I became

15   president.

16       Q.  Okay.  So you -- you -- just to make sure

17   I understand, you designated it -- did you

18   designate it as Audrey Stone TWU after you became

19   president?

20       A.  I think so.

21       Q.  Okay.

22       A.  I -- I am -- I am not 100 percent certain

23   of when.  I was not super active on Facebook before

24   or after I was president.  It was not a

25   communication tool I primarily used, but I didn't

Page 95

1  want family and friends to -- to -- if I was going
2  to post something regarding Local 556, I just
3  didn't want family and friends to be inundated with
4  that if -- if I was posting something that was
5  union.
6      Q.  Okay.  And is it -- is it correct to say
7  that you definitely had that account open at the
8  time of one of your elections?
9      A.  I had a Facebook account open during my
10 2015 election.  I may have had a Facebook account
11 open during my DEBM election; I am not certain.
12     Q.  Okay.  And did union members contact you
13 at that Audrey Stone TWU Facebook account?
14     A.  On my page?
15     Q.  Either by sending you messages or posting
16 on -- at Audrey Stone TWU page?
17     A.  Some did, yes.
18     Q.  Okay.
19     A.  It was not -- it was not frequent.  It was
20 not frequently used by members to contact me.
21     Q.  Okay.  Did your family contact you on that
22 page?
23     A.  No.  I think I had a family member that
24 would tag me in things or post some things, but,
25 again, Facebook in general wasn't something I used

CONFIDENTIAL VIDEOTAPE DEPOSITION OF AUDREY STONE

Page 96

1  frequently, so people knew that email or phone

2  calls was a easier way to reach me.

3      Q.  Okay.  Do you know if you -- you checked

4  that Audrey Stone TWU Facebook account on a monthly

5  basis?

6      A.  Probably monthly, yes.

7      Q.  Okay.  Do you think you checked that

8  Audrey Stone TWU account weekly?

9      A.  No.

10     Q.  Okay.  All right.  Now -- and I want to

11  make sure that I specifically ask this question.  I

12  know you talked about your -- your advocacy on

13  behalf of union members and their social media

14  grievances as -- as a whole.  And we talked about

15  some of the things that took place in early 2015.

16              Prior to 2015, did you specifically

17  assist any individual flight attendants with their

18  grievances?

19     A.  In what capacity?

20     Q.  In any capacity.

21     A.  Yes.  As I said earlier, I had been a shop

22  steward since 2006.  Sometimes meetings I did as a

23  shop steward weren't a fact-finding meeting for the

24  investigation team.  It was a Step 2 appeal where

25  they were -- they had filed a grievance on a

Page 118

1    blanks.  They had three other women.

2        Q.  Okay.  You don't remember the other women

3    right now?

4        A.  I -- I am sorry.  I blanked.  It was a --

5    it was a -- it was five -- five women that ran

6    together.  And Lyn and Kristen are the only two I

7    can name right now.

8        Q.  Okay.  And were -- were both groups active

9    on social media at that time?

10       A.  There were members of each of the two

11   slates that were active on social media.

12       Q.  Okay.  So the -- I guess, the supporters

13   for each side were actively discussing the

14   elections on social media; is that right?

15       A.  Yes.

16       Q.  Okay.  Now, did the supporters of your

17   slate have a particular group that they posted in?

18       A.  Yes.

19       Q.  Okay.  And did that group have a name?

20       A.  Yes.

21       Q.  Okay.  And what was the name of that

22   group?

23       A.  The Core Team.

24       Q.  Okay.  Let's see.  I would like to mark

25   Document 24 as Exhibit 5.

Page 123

1    Q.  Okay.

2    A.  -- at Southwest Airlines.

3    Q.  All right.  All right.  And further down,

4    █████████  posts, Click would never support one

5    of the friendlies.  I believe this is being

6    harvested in -- in the surrogates.

7         Do you know what the term "friendlies"

8    refers to?

9    A.  People that were supportive of our

10   administration and were -- you know, that we were

11   doing -- that were outspoken about it.

12   Q.  Okay.  And below that, Audrey Stone TWU;

13   is that your post?

14   A.  Yes.

15   Q.  Okay.  And the second sentence says, the

16   carpet bagger and the ain't-got-time-for-that

17   charges.

18         Who is the carpet bagger?

19   A.  Don Shipman.

20         THE REPORTER:  I'm sorry, say it

21   again.

22   Q.  (By Mr. Gilliam)  Don Shipman?

23   A.  Yes.  I believe that was the nickname for

24   Don Shipman.

25   Q.  Okay.  Why did you call Don Shipman the

Page 130

1     A.  She was not getting grievances settled;

2  grievances were continuing to climb without any

3  progress being made.  We had two grievance chairs

4  at that time; there was one assisting Lyn.  And it

5  reached a point where Southwest -- Southwest was

6  working out grievances with -- with me on breaks

7  from negotiations and caucuses.

8          And we sat down numerous times and

9  talked to her about expectations, what needed to

10  improve, including her attendance in the office.

11  And it -- it didn't.  And at that point, I want to

12  say I had been working with her for probably nine

13  months without seeing improvement.

14     Q.  All right.  So after, I guess -- at some

15  point in early 2015, did some of these posts --

16  well, I guess I should first ask:  Was this a

17  private group?

18     A.  Yes.

19     Q.  Okay.  And at some point in 2015, did

20  these posts leak out?

21     A.  Yes.  Let me add:  I believe it was also a

22  -- considered a secret group.  So there is --

23  again, I am not a Facebook expert, but I believe

24  there is public, private and secret.  There is

25  different privacy settings for each.  So I think

Page 131

1   there is a level that's tighter -- for lack of a
2   better word -- privacy setting than a private
3   group, and I believe that's secret.  And this was a
4   secret group.
5       Q.  Okay.  So it was a surprise when the --
6   the post leaked out?
7       A.  Yes.
8       Q.  Okay.  When did you first hear that the
9   post leaked out?
10      A.  I don't -- I don't remember.
11      Q.  Okay.  Now, do you -- do you remember if
12  -- so let -- let me back up a bit.
13              Is it correct that ███████████ was
14  called in for a social media policy violation for
15  -- for posts he made in this group?
16      A.  I believe so.
17      Q.  Okay.
18      A.  Yes.
19      Q.  Do you remember if anyone else's posts in
20  this group resulted in Southwest finding a social
21  media policy violation?
22      A.  I believe there were other flight
23  attendants who were called in for -- for meetings
24  regarding a possible violation.
25      Q.  Okay.  Do you remember who any of those

Page 134

1    social media.

2         Q.   Okay.  And I am sorry, what is Steve

3    Murtoff's position?  I am sorry.

4              What was Steve Murtoff's position at

5    the time you spoke with him?

6         A.   I believe he was a director.  He was a

7    director in inflight, but I don't recall which --

8    he's moved around within inflight and held various

9    -- had -- held more than one role while

10   instructing.  I don't recall what his specific

11   title was at that point.

12        Q.   Okay.  And do you remember any other

13   specifics of your discussions with Naomi Hudson

14   prior to talking to Hafner in early 2015?

15        A.   That, again, we had hardly seen any social

16   media activity or discipline come down from

17   Southwest.  And that there had suddenly been a lot.

18   It appeared a lot when you go from a handful of

19   cases to more than 10 in a short time frame.  And

20   that it did not appear that the discipline was

21   being applied consistently.

22              And I used the same example I

23   testified to earlier that I spoke to Hafner about;

24   about in, you know, the same base and the same

25   conversation thread and one flight attendant was

Page 135

1    issued, I believe, a written warning and one was

2    terminated; it -- it was -- it was -- it was about

3    that.

4        Q.   Okay.  Do you remember any of the -- your

5    specific -- other specific discussions with Juan

6    Suarez?

7                MR. CORRELL:  And, Ms. Stone, before

8    you answer that question, I need to ask a couple of

9    questions myself to see if there is a privilege

10   issue here.  Ms. Stone, were you speaking to

11   Mr. Suarez on behalf of the union or on behalf of

12   yourself as an employee of Southwest Airlines?

13               THE WITNESS:  I was speaking to him on

14   behalf of the union.

15               MR. CORRELL:  Okay.  In that case, you

16   are free to answer this question.  I would ask that

17   you not reveal any communications you had with

18   Mr. Suarez if he came to you to ask you questions

19   as an employee or if you were coming to him as an

20   employee; do you understand?

21               THE WITNESS:  Yes.

22               MR. CORRELL:  Thank you.

23       A.   So my conversations with Juan were the

24   same -- one of them was a meeting with Naomi and

25   Juan and it was about what I just spoke to with

Page 136

1    regards to my conversation with -- with Naomi.

2                I -- that meeting, I actually set up

3    through Juan because I called him to schedule a

4    meeting because one of the flight attendants that

5    was terminated during that time period had been

6    terminated while on an overnight.  And then

7    Southwest had that flight attendant traveling home

8    in uniform on a Southwest plane.  And it was an

9    issue that had been addressed by the union, by me,

10   before regarding procedures, and it happened again

11   and I was very unhappy about that.

12               And I reached out to Juan to discuss

13   my concerns about the way the termination was

14   handled and to request that we sit down and talk

15   about social media and what was happening with

16   social media.  That termination was because of a

17   social media violation.

18       Q.  (By Mr. Gilliam)  What was the social

19   media violation in that case?

20       A.  ████████████ calling another employee a

21   fucktard.

22       Q.  Okay.  And what was Mr. Suarez's response

23   to what you communicated to him?

24       A.  Which time?

25       Q.  In -- I guess, in that meeting with Naomi.

1    A.  He said they -- he -- they both said they

2  would look into it; that they were unaware of some

3  of the things I showed them when I was asking for

4  explanations on, you know, why did this warrant

5  termination and this warranted a written warning.

6  They said they would look into it, and that was it.

7  It was -- it was -- it was me asking questions and

8  showing them things and them not being able to

9  provide many answers.

10    Q.  Okay.  And what did you show them in that

11  meeting?

12    A.  The post that I just mentioned that I've

13  used -- the one I just said I've used as an example

14  where this flight attendant was terminated for

15  calling somebody a fucktard, but in the same

16  conversation, another flight attendant made some

17  comments about the employee that were not nice and

18  could be construed as a threat and they were issued

19  a written warning.

20    Q.  Okay.  And the other employee, that was a

21  post in the Core group thread as well?

22    A.  I believe so, yes.

23    Q.  Okay.  And who was the other employee?

24    A.  I don't know.  She's the one earlier I

25  said I know that there was another Phoenix --

Page 138

1 Q. Oh, okay.

2 A. -- flight attendant brought in, but I

3 didn't -- I don't recall her name.

4 Q. Okay.  Did you show them anything else to

5 support your argument?

6 A. I don't remember.  That was the -- that

7 was the biggest one that I was using as an example

8 of the lack of consistency.  I think I may have

9 also had other examples of flight attendants that

10 -- in that meeting that had been terminated while

11 on an overnight that had previously been addressed

12 with Southwest Airlines.  Because that was the

13 other piece that I was addressing in that meeting

14 was another incident of that happening.

15 Q. Okay.  And did you have more than one

16 communication with Mr. Suarez about the social

17 media policy?

18 A. No.  That meeting was the only time the --

19 I recall us sitting down and talking outside of the

20 phone call I mentioned to schedule the meeting.

21 And then I believe -- I don't think he -- I don't

22 think -- I don't believe it was he that got back to

23 me.  I believe it was Naomi that got back to me and

24 said that they were not willing to relook at any of

25 the -- the discipline with the social media cases

Page 139

1  and they needed to continue through the grievance

2  process.

3      Q.  Okay.  And it was later that you had your

4  conversation with Mike Hafner about these issues?

5      A.  Yes.  That follow-up is what generated my

6  conversation with Hafner.

7      Q.  Okay.  And -- and did you have any

8  communications with any Southwest management before

9  this -- about the social media policy violations

10  that -- any specific communications you remember

11  besides what you just described with Steve Murtoff

12  and Amy Hudson and Juan Suarez?

13      A.  No.  Not that I -- not that I remember.

14      Q.  Okay.  All right.  Now, were you ever

15  asked by anybody in Southwest management to address

16  complaints made by any of the other flight

17  attendants about what was posted in the Core group?

18      A.  Are you -- can you -- can you reask that

19  question?  I want to make sure I'm understanding it

20  correctly.

21      Q.  Yeah.

22          MR. GILLIAM:  Do you care to read back

23  the question?

24          THE REPORTER:  Sure.

25          (Record read by Reporter.)

Page 140

1     A.  No.

2     Q.  (By Mr. Gilliam)  Okay.  And do you recall

3  making any -- or I am sorry.

4          Do you -- do you recall issuing any

5  communications about what was posted in the Core

6  group?

7     A.  Yes.

8     Q.  Okay.  And do you recall issuing a -- an

9  apology for what was posted in the Core group?

10    A.  Yes.

11    Q.  Okay.  And why did you issue that apology?

12    A.  Based off of some people being upset by

13  some of the comments that were made, that were said

14  by other flight attendants participating in that

15  group.  And while I didn't set the group up, it was

16  a group set up by members of my slate.  I felt

17  responsible to issue an apology for anyone who had

18  been hurt by some -- anything that came out of

19  that.

20    Q.  Okay.  Okay.  If we could mark Document 17

21  as Exhibit 6.

22          (Exhibit 6 marked.)

23    Q.  (By Mr. Gilliam)  And, Ms. Stone, if you

24  don't mind turning to Exhibit 17 -- I am sorry --

25  Document 17.

Page 141

1    A.   Okay.

2    Q.   So in the -- I guess, the first line, I

3  believe it says, I want to apologize on behalf of

4  everyone in the Core Team for the hurt and

5  disappointment caused when screenshots were

6  distributed on Facebook.

7         And it goes on.  Were you contacted

8  directly about flight attendants who were -- were

9  disappointed?

10   A.   Of people just reaching out to just me?

11   Q.   Yes.

12   A.   I don't remember if anybody reached out

13  just to me.

14   Q.   Okay.  How do you remember hearing about

15  the -- you know, what -- what you described as the

16  hurt and disappointment?

17   A.   There was -- I heard from other members of

18  my team that there was chatter on some of the other

19  Facebook groups about it.  And I believe the

20  executive board -- I believed we received some

21  emails about it as well.

22   Q.   Okay.  If we could mark Document 10 as

23  Exhibit 7.

24         (Exhibit 7 marked.)

25   Q.   (By Mr. Gilliam)  Please flip to Document

Page 144

1    -- it's sometime before the elections were over.

2    And I believe that ended around mid- -- mid-March.

3    So it was sometime before then.

4        Q.  Okay.  So could you have told Chris that

5    you -- you were issuing this statement?

6        A.  No.  Not via my union email, which is how

7    he contacted the executive board.

8        Q.  Okay.  Why didn't you email him back with

9    your personal email?

10       A.  Because I did not want Chris Click or

11   other flight attendants to have my personal email.

12       Q.  Okay.  So I want to go to the second page

13   of -- let's see -- Document 17.  Make sure I am in

14   the right place here.  The -- the last paragraph.

15   It says, please remember that SWA management is

16   currently watching our elections closely.  They are

17   watching to see if our flight attendants are paying

18   attention and if they will participate in the vote

19   for who will continue leading our negotiating team.

20           Why did you believe that Southwest

21   management was watching the elections?

22       A.  For the reasons I stated in the next two

23   sentences:  The -- under our bylaws, the vote for

24   president to the Local 556 is also the vote for the

25   lead negotiator.  And at that point, we had been in

Page 145

1    contract negotiations for over a year and a half.

2                And it -- I believed that they were

3    going to be looking at how many flight attendants

4    even participate in voting in the election for the

5    officers and the board members to see how many

6    flight attendants were active in terms of showing

7    up to vote in a critical time of negotiations.

8         Q.  Do you believe it would have hurt

9    negotiations if your team lost the election?

10        A.  Yes, I do.

11        Q.  And why is that?

12        A.  After, again, over 18 months of

13   bargaining, changing out the lead negotiator at

14   that point, putting somebody in to take over a team

15   that had been working together, putting somebody in

16   that didn't have any -- any experience with --

17   potentially putting somebody who had no experience

18   with sections of bargaining; no experience working

19   with any of those individuals.  No experience --

20   potentially no experience with working with the

21   members of the Southwest Airlines negotiating team.

22   I believe it would have slowed things down

23   dramatically, which, I believe, could have had a

24   negative impact.

25        Q.  Did anyone with Southwest management ever

Page 155

1    Q.  Okay.

2           MR. GILLIAM:  Are we up to Exhibit 10?

3           THE REPORTER:  Yes.

4           MR. GILLIAM:  Okay.  I'd like to mark

5    Document 13 as Exhibit 10.

6           (Exhibit 10 marked.)

7    Q.  (By Mr. Gilliam)  Take a look at Document

8    13.  Let me know once you have read it.

9    A.  Okay.

10   Q.  Do you recognize this?

11   A.  Yes.

12   Q.  And what is it?

13   A.  It's a president's message that appeared

14   in a Unity update.

15   Q.  Okay.  And what prompted you to publish

16   this message?

17   A.  The successful resolution of the batch of

18   social media grievances that I had addressed with

19   Mike Hafner that I spoke to about earlier this

20   morning; the successful resolution of the rules is

21   why I published this.

22   Q.  Okay.  And there is a date on the front

23   page of April 20th, 2015.  Is -- do you recall if

24   that's the correct date that you sent this?

25   A.  I believe so.

Page 156

1    Q.  Okay.  Now, on the second page, I think

2    it's the first full sentence, it says, I am pleased

3    that over the last month, Southwest Airlines has

4    finally taken us seriously.

5              And did you believe that Southwest had

6    taken you seriously because it resolved that batch

7    of grievances?

8    A.  Yes.

9    Q.  Okay.  And then I think you continue on in

10   the next sentence.  Your -- and it says, your union

11   has been addressing Southwest Airlines social media

12   policy for a long time.

13             Now, in addressing the social media

14   policy for a long time, was that just the -- the

15   reference to discussing the batch of grievances

16   with Mike Hafner in early 2015?

17   A.   It was primarily that, but social media --

18   there were cases here and there prior to that, just

19   not to the level of volume.  And it -- I had, it

20   felt like, spent a very long time, since the volume

21   had started increasing, trying to address it with

22   the leaders and feeling like it was unheard until

23   the meeting that happened.

24   Q.  Okay.  And then it continues and says, we

25   have been -- we have been bringing forward your

Page 157

1    concerns around the lack of clear guidelines on a

2    policy that is both vague and undefined.

3            Did -- did you also believe that the

4    social media policy was vague and undefined?

5       A.  Yes, I did.

6       Q.  Okay.  And why is that?

7       A.  Because the version that was being applied

8    back then was very -- if it was anything that

9    someone found offensive, even if it wasn't another

10   employee or directed at another employee, Southwest

11   was viewing it as, well, you know, we can -- it can

12   be a violation.  It was -- it was very broad --

13   very, very broad in scope in just that it could --

14   anything that anybody found offensive, it felt like

15   they would say, well, it's a social media violation

16   if it occurred in a social media platform.

17      Q.  Okay.  Do you think that the problem of

18   the policy being vague and undefined was corrected

19   after 2015?

20      A.  No.

21      Q.  Okay.  Would you say that the policy

22   remains vague and undefined today?

23      A.  I haven't read the most recent -- I don't

24   -- I have not recently read the most current

25   policy.  I believe they made some changes to it

Page 158

1    since 2015.

2        Q.  Since what date?

3        A.  I said since 2015, when this was written,

4    I believe Southwest Airlines has updated the social

5    media policy.

6        Q.  Okay.  Do you know if those changes

7    corrected the policy being vague and undefined?

8        A.  I don't know.

9        Q.  Okay.  And you were familiar with the

10   policy while you were president, correct?

11       A.  Yes.

12       Q.  Okay.  Okay.  Let's see.  Could I -- one

13   minute.  I'll find it in this stack shortly.

14   Direct your attention to Document 8 and also mark

15   Document 8 as Exhibit 11.

16           (Exhibit 11 marked.)

17       Q.  (By Mr. Gilliam)  And particularly,

18   everything but the last page.  Or -- actually, more

19   -- well, yeah.  I will ask you some questions about

20   some of the others as well.

21       A.  Okay.  I skimmed it.

22       Q.  Okay.  And do you recognize these?

23       A.  Yes.

24       Q.  And what are they?

25       A.  One is the mission statement as of August

Page 159

1    2013.  One is the workplace bullying and hazing

2    policy as of April 2015.  One is the social media

3    policy effective April 2016.  And one is the

4    harassment, sexual harassment, discrimination,

5    retaliation policy of Southwest Airlines as of

6    April 2014.  And one is disability, discrimination

7    and workplace accommodation policy effective

8    January 2019.

9        Q.  Okay.  And if I could direct your

10   attention to the one that says App 10 at the

11   bottom, the social media policy.

12       A.  Okay.

13       Q.  And do you -- do you believe this is still

14   vague and undefined compared to the policy as you

15   remembered it in 2015?

16       A.  I think pieces of it could be, but, again,

17   I don't -- I don't have the -- I don't know if this

18   is changed.  I don't have the comparison of exactly

19   what was in effect --

20       Q.  Okay.

21       A.  -- there.

22       Q.  Okay.  Now, flipping to App 12, policy

23   concerning harassment, sexual harassment,

24   discrimination, retaliation.

25       A.  Okay.

Page 166

1    -- that were interfered with.

2        A.   That someone should -- well, the flight

3    attendants that -- that were suspended for their

4    photographs believed that they had the right post

5    the lyrics of -- that they had the right to post

6    the lyrics of a song on their personal page and

7    advertise that they were going to a concert.  And

8    they said that they felt like that was their right

9    as a flight attendant and it didn't hurt anyone.

10   So that is an example of a personal right, that

11   those flight attendants felt like they had the

12   right to do that.  And Southwest, at that time, had

13   felt differently.

14       Q.   Do you think that management had

15   interfered in ████████████ personal rights?

16       A.   I felt like management had not applied the

17   appropriate level of discipline to ████████████

18   statement that he made.

19       Q.   Okay.  Do you believe that management had

20   interfered in ████████████ personal rights?

21       A.   Yes, given the discipline they applied.

22       Q.   What personal rights do you believe that

23   management had interfered with in ████████████

24   case?

25       A.   Well, they -- they tried to state -- I

Page 167

1    guess it's not a personal right.  They -- they

2    tried to state that he had violated a -- a

3    protected class by using the word "fucktard."  That

4    -- that was -- that was the crux of my pushback

5    against the discipline he received.  It wasn't

6    about his -- his personal right.  It was about him

7    being cited with a violation of a protected class

8    that I didn't believe was legally -- that there

9    wasn't a definition that was a protected class.

10        Q.  So you do not believe that any of ████

11   ████████ personal rights were implicated by

12   Southwest's actions regarding him?

13        A.  I don't have his discipline letter in

14   front of me and I don't feel comfortable answering

15   that without knowing exactly what he -- what all he

16   was cited and what all they investigated.  I know

17   of the word that he stated that triggered his

18   investigation, but I don't know all of the details,

19   so I -- I don't feel confident answering that.  I

20   know ████ felt like -- well, I actually don't know

21   how ████ felt, so I can't speak to that either;

22   that's speculating.

23        Q.  Do you think that in these cases that were

24   within the batch that you discussed with Mike

25   Hafner involved any -- any flight attendants'

Page 168

1    rights to engage in protected union activity?

2         A.  Yes, for the ones that were specifically

3    discussing the election.

4         Q.  Okay.  So only posts that specifically

5    discuss the election involved protected union

6    activity?

7         A.  Well, that's my opinion.

8         Q.  Okay.  Apart from what you described in

9    the care of ████ -- ██████████ ███████ and ████████

10   ██████, were there -- did you have any other

11   communications with Southwest management about

12   flight attendants' personal rights?

13        A.  No.

14        Q.  Okay.

15        A.  No, not to my recollection.

16        Q.  All right.  In the next paragraph, you

17   say, over the last several weeks, I met with

18   various Southwest Airlines leaders, including our

19   vice president of cabin services, Mike Hafner.

20             So it -- this says various Southwest

21   Airlines leaders.  Now, in the weeks preceding this

22   letter, did you meet -- does that refresh your

23   recollection as to whether you met with other

24   Southwest leaders apart from Naomi or Mike?

25        A.  I testified earlier that I was in a

Page 179

1    Q.  Yes.

2    A.  No, I don't recall that.

3    Q.  Okay.  All right.  Now -- now, you -- we

4  discussed ██████████ earlier.  And I think he

5  had -- he received social media discipline for his

6  fucktard comment.  And he was originally terminated

7  for that, correct?

8    A.  Yes.

9    Q.  Okay.  Had he been terminated before?

10   A.  Yes.

11   Q.  And what had he been terminated for?

12   A.  I believe it also had -- it was a social

13  -- social media.

14   Q.  Okay.  And do you remember any details

15  about his social media violation?

16   A.  No, not that one.

17   Q.  Okay.  All right.  Let's see.  If I could

18  mark Document 30 as Exhibit 12.

19            (Exhibit 12 marked.)

20   A.  Okay.

21   Q.  (By Mr. Gilliam)  Okay.  Do you recognize

22  this?

23   A.  I recognize the -- the first -- the first

24  parts; not the -- the second pieces.

25   Q.  Okay.  And which parts do you recognize,

Page 180

1  just so that I am clear?

2      A.   The first -- the first page and first half

3  of the second page through -- through ████████ email

4  to me.

5      Q.   Okay.  Okay.  And do you recognize ████████

6  -- or, I guess, your -- your email to ██████ on

7  August 13th at 5:13 p.m.?

8      A.   Mine says August -- mine says October

9  13th.

10     Q.   And I am sorry.  Did I say August?

11  October 13th at 5:13 p.m.

12     A.   Yes, now I do that I am looking at it.

13     Q.   Okay.  Okay.  All right.  And what -- what

14  are these emails?

15     A.   I believe this is after he had been

16  terminated the first time.  And I think he had been

17  terminated for making a comment about there needing

18  to be a public execution.

19     Q.   Okay.  Did he say who there should be a

20  public execution of?

21     A.   I don't -- I don't remember exactly what

22  he posted.  I think it was in a large post.  And I

23  think it was -- I believe he was referencing just

24  the constant -- what he believed -- bullying that

25  was going on.  And that if one person had been

Page 181

1    disciplined, then it might stop.  But, again, I

2    don't -- I don't remember the specific of what he

3    posted, but I -- but that public execution was in

4    it.

5        Q.  Okay.  And did -- did you agree with the

6    company terminating ███████████ for using the

7    phrase "public execution"?

8        A.  No.

9        Q.  And why not?

10       A.  Because ████████ did not -- did not literally

11   mean that someone should be executed.  And he

12   explained that, what his intent was, in -- in his

13   comment and what he was -- what he meant by it, and

14   it was not to cause somebody physical harm or to

15   kill them.

16       Q.  Okay.  And did you, I guess, represent

17   ███████████████ at any stage of his disciplinary

18   investigation?

19       A.  Yes.

20       Q.  Okay.  And what -- what part of his

21   disciplinary investigation did you represent him

22   in?

23       A.  I -- well, I assisted his grievance

24   specialist in his Step 2 appeal meeting.

25       Q.  Okay.  And who did you have that Step 2

CONFIDENTIAL VIDEOTAPE DEPOSITION OF AUDREY STONE

Page 182

1    meeting with?

2        A.  I think it was Mike Sims, but I am not 100

3    percent certain.

4        Q.  Okay.  And the company upheld his

5    termination, correct?

6        A.  No.

7        Q.  I am sorry.  So the company did reverse

8    his termination?

9        A.  Yes.  At some point in the grievance

10    process, it was reduced.

11        Q.  Okay.  Do you know what point in the

12    grievance process his discipline was reduced?

13        A.  No.  I don't recall if it was after the

14    Step 2 or after the -- or after it had been heard

15    by the executive -- I believe it was at some point

16    after the Step 2.

17        Q.  Okay.

18        A.  Again, I am -- I am -- I am not -- I am

19    not positive.

20        Q.  And what was the -- well, let me back up.

21    During the Step 2, did you make an argument to

22    Southwest as to why he should not be terminated?

23        A.  His -- his -- ██████ -- in a Step 2

24    meeting, it's the flight -- primarily the flight

25    attendant's responsibility to bring forward new

Page 183

1   information or explain why they believe the

2   discipline is unjust.  So ██████ appealed to

3   Southwest Airlines primarily -- why he felt like --

4          THE REPORTER:  I'm sorry, say the last

5   part; I didn't hear it.

6      A.  -- regarding why he felt like he shouldn't

7   be terminated.

8      Q.  (By Mr. Gilliam)  And at any point in his

9   disciplinary process, did you make any arguments to

10  someone with Southwest as to why he should not be

11  terminated?

12     A.  I -- I feel confident at some point in his

13  Step 2, I would have made some statement.

14     Q.  Okay.  Did you argue that he was engaged

15  in any protected activity in making the comment?

16     A.  I don't recall.  I don't -- I don't think

17  so.

18     Q.  Okay.  So in the -- the email below that

19  continues on to the next page, ██████ comments to

20  you about a private email between Mike and him.

21  And is that Mike Hafner?

22     A.  I believe so.

23     Q.  Okay.  And -- and he says, I am hopeful

24  that relationship is working behind the scenes in

25  some form on his behalf and would not want to do

Page 200

1   the enforcement of the social media policies?

2        A.  No, not that I can recall.

3        Q.  Okay.  And turning to the second page of

4   the February 22nd, 2017 read-before-fly, had you

5   communicated with -- with anyone in Southwest

6   management about that read fly -- read-before-fly

7   being issued before it was issued?

8        A.  No.  I don't recall knowing that this one

9   was -- at the time.

10       Q.  Okay.  All right.  Switching gears a

11  little bit.  Now, you attended the January 2017

12  women's march; is that correct?

13       A.  Yes.

14       Q.  Okay.  And did you help organize that

15  event?

16       A.  I wasn't -- I -- I assisted, yes.

17       Q.  Okay.  And how did you assist with the

18  organization of that event?

19       A.  I assisted the chairperson of the

20  committee; that's how I found out even about

21  anything related to the event.  And she came to me

22  and told me that there were a group -- there were

23  flight attendants throughout the system reaching

24  out -- had reached out to her asking her if the

25  committee -- you know, wanting to know how they

CONFIDENTIAL VIDEOTAPE DEPOSITION OF AUDREY STONE

Page 214

1    policy violations?

2         A.  I, in my report, cited what I believed it

3    was a violation of, yes.

4         Q.  Okay.  Let's see.  How much --

5              MR. GILLIAM:  Can we go off record

6    real quick?

7              THE VIDEOGRAPHER:  We're off record at

8    5:50 -- 5:44 p.m.

9              (Recess taken.)

10             THE VIDEOGRAPHER:  We are back on

11   record at 5:58 p.m.

12        Q.  (By Mr. Gilliam)  Okay.  Ms. Stone, just a

13   few more questions before I wrap up.  So have you

14   -- or I am sorry.  Did you ever report Jeanna

15   Jackson for a social media policy violation?

16        A.  I think so, towards the end of my term.

17        Q.  Okay.  And did you ever report ████████

18   ████████  for a -- any disciplinary violation?

19        A.  No.

20        Q.  Okay.  Did you ever report any other

21   flight attendant for a disciplinary violation?

22        A.  I don't believe so.

23        Q.  Okay.  And what did you report Jeanna

24   Jackson for?

25        A.  She had made some posts of -- about

Page 215

1  contract celebration -- contract-signing

2  celebration that the union hosted.  And in there,

3  she and some other flight attendants had posted

4  photos and -- I am sorry, I don't think that's --

5  that's not what I -- that's not what I reported.  I

6  don't -- I don't remember.  I don't remember the

7  specifics.

8      Q.  Okay.  Do you know if any other executive

9  board member reported a flight attendant for a --

10  any disciplinary violation?

11      A.  Yes.

12      Q.  Okay.  And what other executive board

13  members reported a flight attendant for

14  disciplinary violation?

15      A.  Cuyler Thompson.  And I believe Sam

16  Wilkins --

17      Q.  Okay.

18      A.  -- did as well.

19      Q.  And who did Cuyler Thompson report?

20      A.  I think it was ███████████.

21      Q.  Okay.  And who did Sam Wilkins report?

22      A.  I think it was Jeanna Jackson and another

23  flight attendant by the name of █████ -- I am

24  blanking on her last name.  There is a couple of

25  different flight attendants whose first name is

Page 227

1          So the purpose was to -- to introduce

2  them; to try to foster that; to help actually talk

3  about where the committee could go in the future.

4  It resulted even in a name change of the committee

5  came out of that meeting.  As I mentioned earlier,

6  Liz Schuler was very high up within AFL-CIO; came

7  and spoke about her leadership career.

8          We volunteered to do work with Working

9  America, a group based out of DC that helps

10 employees that aren't represented by a bargaining

11 unit.  It helps -- but it's -- they help them lobby

12 and -- and advocate for better, you know,

13 conditions and rights at work.  Those are -- those

14 are some of the things that the meeting --

15     Q.  Was the women's committee meeting itself

16 about abortion?

17     A.  No, not at all.

18     Q.  Was it even discussed in your involvement

19 with the women's committee meeting?

20     A.  It was never discussed.

21     Q.  How was the trip to DC for the women's

22 committee meeting funded?

23     A.  Southwest Airlines provided the free

24 travel for -- for flight attendants.  All of the

25 other flight attendants volunteered their time for

Page 228

1    the meeting.  I was a salary position, so it was --

2    it was a flat rate, but I -- I believe I was the

3    only one that was -- that -- well, technically,

4    being paid besides Gwen York, our international

5    committee chairperson, who was on full-time staff

6    with International at that time.

7                 And then the -- the hotel and Airbnb

8    cost were paid for out of the working women's

9    committee budget, as well as one meal the day of --

10   the day of the -- the committee meeting.

11   Q.  When you say Southwest provided free

12   travel, what do you mean by that?

13   A.  We have -- we have an agreement that we

14   can submit travel for any official human business.

15   The way that that's done has changed over time

16   during my union career, but it -- it's -- it's,

17   basically, a submission for travel on Southwest

18   Airlines.  And instead of it being nonrevenue with

19   space available, it is -- it's usually what is

20   considered positive space.  So had to be a seat

21   available for sale to reserve it, but it was --

22   that's -- that's what I mean by -- by travel.

23   Q.  And when you say you had an agreement with

24   the company, is this part of the collective

25   bargaining between 556 and the company?

Page 229

1    A.  Yes.

2    Q.  So if Southwest had said, no, you can't

3 have tickets to go to this meeting, would that be

4 something the union could have grieved?

5    A.  I believe so.  If -- you know, because we

6 even had -- we had a process even internally.  It

7 wasn't something that any member could just email

8 this department at Southwest and request union

9 travel.  Like, we had an internal process where it

10 went through us first to ensure that it was, you

11 know, official union travel before it was then sent

12 to Southwest Airlines.

13    Q.  And in this instance, when the union

14 reached out to get this travel authorization, was

15 it required to explain what the union business was;

16 or do you just reach out and say, we need X number

17 of seats for union business?

18    A.  There was -- there is a -- at least under

19 the system then -- and please know I'm not who

20 actually submitted the travel, so I'm not saying it

21 as somebody who -- who did it myself.  But there

22 was -- I believe it was like a line, you had to put

23 in what the purpose was for.  And there were times

24 where Southwest could, you know, question if the

25 purpose wasn't clear enough or if they believed it

```
 1                REPORTER'S CERTIFICATION

 2            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 3                     DALLAS DIVISION

 4   CHARLENE CARTER              )
                                  )
 5                                ) CIVIL ACTION NO.
     VS.                          ) 3:17-CV-02278-X
 6                                )
     SOUTHWEST AIRLINES CO., AND  )
 7   TRANSPORT WORKERS UNION OF   )
     AMERICA, LOCAL 556           )

 8

 9        ------------------------------------

10             DEPOSITION OF AUDREY STONE
                  NOVEMBER 24, 2020
11                (REPORTED REMOTELY)

12        ------------------------------------

13

14        I, CHARIS M. HENDRICK, Certified Shorthand

15   Reporter in and for the State of Texas, do hereby

16   certify to the following:

17        That the witness, AUDREY STONE, was by me

18   duly sworn and that the transcript of the oral

19   deposition is a true record of the testimony given

20   by the witness.

21        I further certify that pursuant to Federal

22   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)

23   as well as Rule 30(e)(2), that review of the

24   transcript and signature of the deponent:

25        __xx__ was requested by the deponent and/or a
```

**App.461**

1    party before completion of the deposition.

2    _____ was not requested by the deponent and/or

3    a party before the completion of the deposition.

4            I further certify that I am neither

5    attorney  nor counsel for, nor related to or

6    employed by any of the parties to the action in

7    which this deposition is taken and further that I

8    am not a relative or employee of any attorney of

9    record in this cause, nor am I financially or

10   otherwise interested in the outcome of the action.

11           The amount of time used by each party at

12   the deposition is as follows:

13           Mr. Gilliam - 6:58 hours/minutes

14           Mr. Correll - 1:07 hours/minutes

15           Mr. Greenfield - 8 minutes

16

17           Subscribed and sworn to on this 4th day of

18   December, 2020.

19

20

21           *Charis M. Hendrick*

             CHARIS M. HENDRICK, CSR # 3469

22           Certification Expires: 10-31-21

             Bradford Court Reporting, LLC

23           7015 Mumford Street

             Dallas, Texas  75252

24           Telephone 972-931-2799

             Facsimile 972-931-1199

25           Firm Registration No. 38

Case 3:17-cv-02278-X   Document 272-32   Filed 09/02/22   Page 55 of 59   PageID 7634

1        I, AUDREY STONE, have read the foregoing
deposition and hereby affix my signature that same
2   is true and correct, except as noted above.

3

4

5                    _____
                     AUDREY STONE
6

7   THE STATE OF _____
    COUNTY OF _____
8

9   Before me, _____, on this day
    personally appeared AUDREY STONE, known to me (or
10  proved to me under oath or through _____) to
    be the person whose name is subscribed to the
11  foregoing instrument and acknowledged to me that
    they executed the same for the purposes and
12  consideration therein expressed.

13

14  Given under my hand and seal of office this _____
    day of _____, 2020.
15

16

17  _____
    NOTARY PUBLIC IN AND FOR THE
18  STATE OF _____

19

20  MY COMMISSION EXPIRES:_____

21

22

23

24

25

1

2   I, AUDREY STONE, have read the foregoing deposition and hereby affix
    my signature and declare under penalty of perjury that the same is true
3   and correct, except as noted within the above correction pages.

4

5

6   AUDREY STONE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

App.464

Page 258

```
1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  AUDREY STONE

3    DATE OF DEPOSITION:  NOVEMBER 24, 2020

4    PAGE          LINE      CHANGEREASON

5    _____

6        See attached correction pages
        _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

Bradford Court Reporting, LLC     972.931.2799     www.bradfordreporting.com

App.465

Audrey Stone Deposition Corrections:

| Page:Line | Correction | Reason |
|---|---|---|
| 16:3 | Change "TW" to "TWU" | Typo |
| 30:1 | Change "Chris Klein" to "Chris Click" | Typo |
| 35:6 | Change "Rena Senel" to "Rena Sinel" | Typo |
| 44:22 | Change "Senel" again to "Sinel" | Typo |
| 48:10 | Change "working conduct" to "work and conduct" | Typo |
| 58:15 | Change first sentence to read, "I believe I actually took them back to grievance chair first, and she disseminated them to the grievance specialist/flight attendants." | Clarification |
| 69:3 | Change "sharing" to "chairing" | Typo |
| 69: 9 | Change "sharing" to "chairing" | Typo |
| 69:23 | Add "COPE" before "chairperson" | Clarification |
| 82:7 and 8 | After "test agreement" on line 7 insert a period and delete the rest of the sentence. | Clarification |
| 102:5 | Change "ranking" to "receiving" | Typo |
| 106:6 | Change "attendants'" to "attendance" | Typo |
| 106:21 and 22 | Change sentence to "I believe that we contacted the shop steward committee chairperson." | Clarification |
| 112:17 | Change "Brad" to "Brett" | Typo |
| 118:1 | Change "blanks" to "blanked" | Typo |
| 126:18 | Change "scores" to "boards" | Typo |
| 129:18 | Change "status" to "position" | Clarification |
| 134:10 | Change "instructing" to "inflight" | Typo |
| 139:12 | Change "Amy" to "Naomi" | Typo |
| 155:20 | Change "rules" to "grievances" | Clarification |
| 173:23 | Change "Brandon" to "Brendan" | Typo |
| 174:17 | Change "Steven" to "Steve" | Typo |
| 174:18 | Change "Brandon" to "Brendan" | Typo |
| 175:12 | Change "working conduct tools" to "work and conduct rules" | Typo |

**App.466**

| 175:17 and 18 | strike "whether it had wanted to be" and change to "why it was" | Clarification |
|---|---|---|
| 177:5 | Change "working conduct rules" to "work and conduct rules" | Typo |
| 190:13 | Change "universal" to "upper" | Typo |
| 192:8 | Change "Vialla" to "Battle" | Typo |
| 192:13 | Change "Vialla" to "Battle" | Typo |
| 193:8 | Change "moved to" to "had been at Southwest" | Clarification |
| 195:9 | Add, to end of answer, add "it could be." | Clarification |
| 197:7 | Change "branch" to "batch" | |
| 199:23 | change answer to, "No, I was focused on the contract." | Clarification |
| 207:6 | After "I don't have anything" add, "that the union does not already have as part of discovery in this litigation." | Clarification |
| 207:11 | After "No, I don't believe so" add, "other than what has been provided to the union as part of discovery in this litigation." | Clarification |
| 228:14 | Change "human" to "union" | Typo |
| 235:7 | Delete "not" | Typo |
| 243:3 | Delete "when" | Typo |