# EXHIBIT HH

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CHARLENE CARTER | ) |
| | ) |
| | ) CIVIL ACTION NO. |
| VS. | ) 3:17-CV-02278-X |
| | ) |
| SOUTHWEST AIRLINES CO., AND | ) |
| TRANSPORT WORKERS UNION OF | ) |
| AMERICA, LOCAL 556 | ) |

---------------------------------------

CONFIDENTIAL
TWU LOCAL 556 30(b)(6)
ORAL DEPOSITION OF
JOHN PARROTT
NOVEMBER 30, 2020

---------------------------------------

ANSWERS AND DEPOSITION OF JOHN PARROTT, produced as a witness at the instance of the Plaintiff, taken in the above-styled and -numbered cause on NOVEMBER 30, 2020, at 1:52 p.m., before CHARIS M. HENDRICK, a Certified Shorthand Reporter in and for the State of Texas, witness located in Portland, Oregon, pursuant to the Federal Rules of Civil Procedure, the current emergency order regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto.

```
 1                   A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3        MR. MATTHEW B. GILLIAM
          NATIONAL RIGHT TO WORK LEGAL DEFENSE
 4        FOUNDATION, INC.
          8001 Braddock Road, Suite 600
 5        Springfield, Virginia  22160
          (703) 770-3339
 6        mbg@nrtw.org

 7
      FOR THE DEFENDANT, SOUTHWEST AIRLINES CO.:
 8
          MR. MICHAEL A. CORRELL
 9        REED SMITH LLP
          2850 North Harwood, Suite 1500
10        Dallas, Texas  75201
          (469) 680-4264
11        mcorrell@reedsmith.com

12
      FOR THE DEFENDANT, TRANSPORT WORKERS UNION OF
13    AMERICA, LOCAL 556:

14        MR. ADAM GREENFIELD
          MR. EDWARD B. CLOUTMAN, III
15        LAW OFFICES OF CLOUTMAN & GREENFIELD, PLLC
          3301 Elm Street
16        Dallas, Texas  75226
          (214) 939-9223
17        agreenfield@candglegal.com
          ecloutman@lawoffices.email
18

19        ALSO PRESENT:  MS. CHARLENE CARTER
                         MS. LAUREN ARMSTRONG
20

21

22

23

24

25
```

```
 1                      INDEX
 2   Appearances ..................................2
 3   JOHN PARROTT
 4       Examination by Mr. Gilliam...............4
 5
 6   Signature and Changes.......................40
 7   Reporter's Certificate......................42
 8
 9                     EXHIBITS
10   Exhibit 24 - ................................7
     Agency Fee Objectors List, Document 38
11
     Exhibit 25 - ...............................16
12   TWU Local 556 Profit & Loss Detail November 2016
     Through March 2017, Document 42
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1                    PROCEEDINGS
2          THE REPORTER:  Today's date is
3   November 30, 2020 and the time is 1:52 p.m.  This
4   is the 30(b)(6) deposition of John Parrott, and it
5   is being conducted remotely in accordance with the
6   current emergency order regarding the COVID-19
7   State of Disaster.  The witness is located in
8   Portland, Oregon.
9          My name is Charis Hendrick, Court
10  Reporter, CSR No. 3469.  I am administering the
11  oath and reporting the deposition remotely by
12  stenographic means from my home in Ellis County,
13  Texas.
14                  JOHN PARROTT,
15  having been first duly sworn, testified as follows:
16                   EXAMINATION
17  BY MR. GILLIAM:
18      Q.  Good afternoon, Mr. Parrott.  Did -- did
19  you review any documents in preparation for today's
20  deposition?
21      A.  Yes.
22      Q.  And what did you review?
23      A.  I looked through some financial records as
24  it pertained to the women's march.  I read back
25  through to refresh myself on Charlene Carter's

1  middle, it says, deposit.
2     A.  At the very top of the screen?
3     Q.  Yeah.  It's towards the top.
4     A.  Yeah.  For $350?
5     Q.  Yes.  And where does that deposit come
6  from?
7     A.  I believe that to be a refund of a deposit
8  that was made towards -- in travel expenses, like
9  69 -- I can't read the exact expense line number; I
10 think it's 6956, lodging.  It would have been a
11 refund of a deposit for one of those -- probably
12 Line 2 or Line 3, their rental agreement or the
13 lodging; one of those two, but I am not certain
14 which one it was a refund for.
15    Q.  Okay. And what does the representation
16 mean?  There is the word "representation" in the
17 column for multiple entries.
18    A.  Sure.  So this would be where -- at the
19 time we had put that to where it would be placed on
20 the LM2.
21    Q.  Okay.  And what does representation --
22 what does that word signify?
23    A.  So general member representation.
24    Q.  Okay.  And what -- what are the other
25 options to populate that field with; what other

1 words?
2  A. So there is administration, general
3 overhead, political activities and representation.
4 I believe those are the categories.
5  Q. Okay. And what is the purpose of that
6 coding?
7  A. On this report?
8  Q. On any report.
9  A. So this would assist us in how we place
10 these expenses on our LM2; that we -- we prepare
11 this yearly for the Department of Labor, that LM2
12 report.
13  Q. Okay. And is it exclusively -- well, let
14 me ask it this way: Does -- does it -- does the --
15 does the coding have anything to do with what a --
16 an objector is refunded?
17  A. No, no. That has nothing to do with that.
18  Q. Okay. Now, as treasurer, do you know why
19 these expenses were made?
20  A. So this report captures the expenses that
21 related to that working women's meeting that was
22 held in Washington, D.C. in 2017.
23  Q. Okay. And maybe a better way to ask the
24 question is: For instance, midway down the page,
25 it looks like there is an entry under membership

CONFIDENTIAL DEPOSITION OF JOHN PARROTT

Page 20

 1  supplies; there is, like, an office supplies area,
 2  membership supplies.  And --
 3       A.  Yes.  I see that.
 4       Q.  -- and it says -- I don't know --
 5  30-by-108 banner plus tax.  Do you know why the
 6  banner was purchased?
 7       A.  No, sir, I don't.
 8       Q.  Okay.  Now, do you -- is there any entry
 9  here that reflects lost time for a flight
10  attendant?
11       A.  So towards the top of the page, if you
12  look under the first line of expenses, like 6350,
13  you will see gross lost time.  And I know it's a
14  $400 figure; I can't make it out fully, but it's
15  400 and some-odd dollars.
16       Q.  Okay.  And you believe that is lost time?
17       A.  So I know that to be lost time, but that
18  would have been for -- I -- that would have been
19  for the month of January for committee work that
20  was done.  I can't attribute this $400 directly to
21  this -- this Washington, D.C. trip.  It was just
22  what did the committee spend that month.
23              So you can see that -- so for January,
24  that was paid out in March because of how our lost
25  time is paid out.  Anything that is -- we're

1  basically 60 days behind.  So any work that was
2  done in the month of January is paid out in March.
3      Q.  Okay.  And what -- what is lost time?
4      A.  So lost time is the money that we pay for
5  our members to be away from the airplane and do
6  union work.
7      Q.  Okay.  And it -- is it the union dues that
8  pay for the lost time?
9      A.  The union dues pay for all expenses, yes.
10     Q.  Okay.  Does Southwest reimburse the union
11  in any way for lost time?
12     A.  There are some committees that we do
13  receive reimbursements for that are joint.  Mostly
14  employee assistant (sic) committees.  Like, we have
15  a -- we do have a safety program that our lost time
16  is reimbursed by Southwest Airlines.  Drug and
17  alcohol, our critical incident stress management,
18  professional standards.  There are a few examples,
19  but this example, we would not have been reimbursed
20  by Southwest.
21     Q.  Okay.  Now, going to one of the next
22  pages.  If you see the -- I think it's the second
23  page.  In the bottom, you should see TWU 556-9489?
24     A.  Give me -- let me rotate pages properly.
25     Q.  This one is very difficult to read, yeah.

1     A. Oh, yeah, this brings up -- this is an old
2 system that we use -- this is Microsoft Access;
3 this was how we transmitted pulls back in the day
4 and it -- I might have a nightmare over it tonight.
5     Q. Well, when you say this transmitted pulls,
6 what does that mean?
7     A. So to have -- so to remove flight
8 attendants from their line of flying, we had a way
9 to transmit -- between the union and Southwest --
10 these are the flight attendants that we need to do
11 union business. So this was the system that
12 repairs -- excuse me -- prepares the reports that
13 we submitted over to Southwest to pull them from
14 their flying schedule.
15     Q. Okay. And do you know if pages that ended
16 in 9489 through 9492 are all pulls that Local 556
17 transmitted to Southwest in January of 2017?
18     A. So, yes, these reflect, accurately, pulls
19 that we would have submitted over to Southwest
20 Airlines, yes.
21     Q. Okay. And do you know if those pull
22 transmittals are automatically granted by
23 Southwest?
24     A. They are, yes.
25     Q. Okay. And is that required under the

1  collective bargaining agreement?

2      A.  There is language in the collective

3  bargaining agreement that allows the union to have

4  members perform union activities, so, yes.

5      Q.  Okay.  And do you know if any other flight

6  attendants were pulled apart from the ones that are

7  in these pull transmittals?

8      A.  I am thinking through how you asked that

9  question.  Can you -- can you ask it another way?

10      Q.  Yeah.  So do you know if any other flight

11  attendants were pulled for the January 2017 women's

12  march than the ones who are identified in one of

13  these screenshots?

14      A.  I believe this is a complete picture of

15  the flight attendants that were pulled from flying

16  to attend the working women's committee meeting in

17  January.

18      Q.  Okay.  Now, if you look at -- it's

19  probably on several of these, but on 9490, for

20  instance, the one that ends TWU 556-9490, there is

21  a -- an approved by field; do you see that?

22      A.  Yes, I do.

23      Q.  And I -- I believe it says, approved by

24  Parrott/Stone; is that correct?

25      A.  Yes, sir.

Page 24

```
 1      Q.  Okay.  And what is being approved exactly?
 2      A.  So that is for an internal process that
 3  two officers have signed off on this particular
 4  pull.
 5      Q.  Okay.  Does Local 556 always require that
 6  at least two officers sign off?
 7      A.  Yes.
 8      Q.  Okay.  All right.  And then I think there
 9  is a box just to the right of that that may say,
10  additional info?
11      A.  Yes, I see that.
12      Q.  And does that say, pull three-day reserve?
13          MR. GREENFIELD:  Objection.  Vague --
14      A.  That -- that does -- that box that you're
15  looking at on nine --
16          MR. GREENFIELD:  Which -- which
17  document are you talking about?
18          MR. GILLIAM:  Sorry.  490.  The one
19  that ends TWU 556-9490.
20      A.  Where a flight attendant with the first
21  name ████?  It looks like ████.  It's very
22  grainy.
23      Q.  (By Mr. Gilliam)  Sorry.  I -- I cannot
24  tell on my copy.  Let me see if I can pull it up
25  here real quick and make sure we're looking at the
```

1  same thing.  Yes.
2      A.  Okay.
3      Q.  And what -- what does pull three-day
4  reserve mean?
5      A.  So that box that you are describing is
6  we're giving information to Southwest on what we're
7  actually asking for.  So in that box, we're saying
8  that we're pulling a three-day reserve block that
9  is on the flight attendant's screen; and to place
10 the union bar as indicated, which, on the left
11 side, you will see that we placed a -- so paid
12 trips is for zero.  So we pulled a reserve block
13 without pay for this flight attendant to attend the
14 working women's committee meeting.
15     Q.  Okay.  So does that mean that the flight
16 attendant is not paid by Southwest for that time?
17     A.  That's correct.  Nor TWU 556; they were
18 not paid at all.
19     Q.  Okay. And when you say TWU 556 was not
20 paid at all, who -- who would they be paid by if a
21 flight attendant is pulled?
22     A.  I am just saying that we -- we are
23 generating no pay off of this pull.  It's a pull
24 without pay.  So there is just no pay associated
25 with this pull.  Sorry, I didn't answer that

 1  correctly.
 2      Q.  Okay.  And did you say you are asking to
 3  place the union bar as indicated?
 4      A.  Correct.  So still staying on that
 5  graphic, if you look at the top in the middle
 6  portion, it says -- and I can't make it -- the top
 7  line is -- I know what it is; it is date of
 8  something, but 1/19/2017.  We are placing the bar
 9  there and we're going for three days.  The return
10  to work is one day after the date in question.  So
11  if the bar ran January 19th, 20th and 21st, that
12  says 1/19/2017 and 1/22, that tells Southwest I
13  only want to place a three-day bar on their screen.
14      Q.  Okay.  And by bar, does that mean the
15  length of the time the flight attendant is pulled?
16      A.  Right.  How are we drawing this on their
17  flight attendant screen?  So we're placing a
18  three-day union bar on their screen for zero TFP.
19      Q.  Okay.  And what does TFP stand for?
20      A.  Trip --
21      Q.  Did you say -- I am sorry.  Did you say
22  trips for pay?
23      A.  Yes.
24      Q.  Okay.  And who from Southwest receives
25  this information when it's transmitted?

1  A.  I don't believe that changed, even since
2  2017.  So this is sent via email to a distribution
3  group at Southwest, which is their schedule and
4  audit team, such as a department over in Southwest
5  inflight operations that processes our union pulls.
6  Q.  Okay.  All right.  Now, did you prepare
7  each one of these individual transmittals?
8  A.  I am going to have to say yes because I
9  was the only one that pretty much did all of them,
10 so -- so, yes.
11 Q.  Okay.  Who told you the names of the
12 flight attendants to prepare the transmittals for?
13 A.  So I get -- well, so our current system is
14 -- so we get an email into our operational email
15 box telling us to pull so-and-so flight attendant
16 for union business.  But the system is currently
17 changed from where we are today.  So it was emailed
18 during this time frame; and then today, we get them
19 via Salesforce, which is our provider.
20 Q.  Okay.  And who emailed the flight
21 attendants who would be pulled to you?
22 A.  I would say that this came from the WISE
23 committee.
24 Q.  Okay.  All right.  And if I could refer
25 you to Document 16.

1  two exhibits because the -- the Document 16 says
2  lost time for Audrey Stone.
3       Q.  Well, yeah, excluding -- not -- not
4  referencing Document 16, based on your knowledge,
5  do you know if Audrey Stone received lost time for
6  attending the January 2017 women's march?
7       A.  I don't recall specifically that.
8       Q.  Okay.  Do you know if any flight
9  attendants received lost time for attending the
10 January 2017 women's march?
11      A.  So should the first document that you
12 asked me about, that P&L sheet, where -- if you --
13 if you will bear with me one moment.  I don't know
14 where that --
15      Q.  Document 42, Page 9488.
16      A.  I think it's safe -- give me one moment,
17 please.  Yup, there it is.  Sorry.  Take this -- so
18 on this Profit and Loss Detail, Line 6350, gross
19 lost time.  So for the month of January, the total
20 lost time expense for the month for this committee
21 was $486.  And I don't have a detail out of how
22 that $486 was -- like, this report doesn't say who
23 that went to.
24      Q.  Okay.  Can you conclude that that -- that
25 amount went to at least one flight attendant as

 1  lost time?
 2           MR. GREENFIELD: Objection. Vague.
 3       A.  Yes.
 4       Q.  (By Mr. Gilliam) Okay. All right. Now,
 5  at some point, the union reached out to certain
 6  officials to gather info from their personal
 7  electronic devices; is that correct?
 8       A.  So I believe that was -- was this the
 9  recent -- the recent request that we -- that was
10  sent out?
11       Q.  Yes, yes.
12       A.  So, yes.
13       Q.  Now, when did the union issue that
14  request?
15           MR. GREENFIELD: I am going to object
16  to that to the extent of any conversations -- the
17  timing and content of when those occurred as
18  attorney/client privilege.
19           MR. GILLIAM: How is that
20  attorney/client privilege?
21           MR. GREENFIELD: That you are talking
22  about a communication about when and in the content
23  of what happened with -- as part of a lawsuit.
24  Explain how it's not, sir.
25           MR. GILLIAM: Well, I mean, if he's --

Page 41

```
 1        I, JOHN PARROTT, have read the foregoing
     deposition and hereby affix my signature that same
 2   is true and correct, except as noted above.

 3

 4

 5                      _____
                        JOHN PARROTT
 6

 7   THE STATE OF _____
     COUNTY OF _____
 8

 9   Before me, _____, on this day
     personally appeared JOHN PARROTT, known to me (or
10   proved to me under oath or through _____) to
     be the person whose name is subscribed to the
11   foregoing instrument and acknowledged to me that
     they executed the same for the purposes and
12   consideration therein expressed.

13

14   Given under my hand and seal of office this _____
     day of _____, 2020.
15

16

17   _____
     NOTARY PUBLIC IN AND FOR THE
18   STATE OF _____

19

20   MY COMMISSION EXPIRES:_____

21

22

23

24

25
```

```
 1                REPORTER'S CERTIFICATION
 2         IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 3                    DALLAS DIVISION

 4   CHARLENE CARTER            )
                                )
 5                              ) CIVIL ACTION NO.
     VS.                        ) 3:17-CV-02278-X
 6                              )
     SOUTHWEST AIRLINES CO., AND )
 7   TRANSPORT WORKERS UNION OF  )
     AMERICA, LOCAL 556          )
 8

 9           ------------------------------------

10                       CONFIDENTIAL
                   TWU LOCAL 556 30(b)(6)
11                DEPOSITION OF JOHN PARROTT
                      NOVEMBER 30, 2020
12                    (REPORTED REMOTELY)

13           ------------------------------------

14

15           I, CHARIS M. HENDRICK, Certified Shorthand
16   Reporter in and for the State of Texas, do hereby
17   certify to the following:
18           That the witness, JOHN PARROTT, was by me
19   duly sworn and that the transcript of the oral
20   deposition is a true record of the testimony given
21   by the witness.
22           I further certify that pursuant to Federal
23   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
24   as well as Rule 30(e)(2), that review of the
25   transcript and signature of the deponent:
```

1      __xx__ was requested by the deponent and/or a
2  party before completion of the deposition.
3      _____ was not requested by the deponent and/or
4  a party before the completion of the deposition.
5           I further certify that I am neither
6  attorney  nor counsel for, nor related to or
7  employed by any of the parties to the action in
8  which this deposition is taken and further that I
9  am not a relative or employee of any attorney of
10 record in this cause, nor am I financially or
11 otherwise interested in the outcome of the action.
12          The amount of time used by each party at
13 the deposition is as follows:
14          Mr. Gilliam - 1:04 hours/minutes
15
16          Subscribed and sworn to on this 8th day of
17 December, 2020.
18
19
20          *Charis M. Hendrick*
            CHARIS M. HENDRICK, CSR # 3469
21          Certification Expires: 10-31-21
            Bradford Court Reporting, LLC
22          7015 Mumford Street
            Dallas, Texas  75252
23          Telephone 972-931-2799
            Facsimile 972-931-1199
24          Firm Registration No. 38
25