# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>                    Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>                    Defendants. | Civil Case No. 3:17-cv-02278-X<br><br><br>**PLAINTIFF CHARLENE CARTER'S BRIEF SUPPORTING HER RESPONSE TO DEFENDANT SOUTHWEST AIRLINES CO.'S MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................... iii

SUMMARY ...................................................................................................................... 1

RESPONSIVE STATEMENT OF FACTS .................................................................... 2

ARGUMENT AND AUTHORITIES ............................................................................ 10

    I.   Southwest violated Carter's RLA-protected rights. ......................................... 10

        A.  Southwest violated Carter's rights under RLA Section 152 (Third)
            and (Fourth) because her RLA-protected activity was *both* a "substantial"
            *and* "motivating" factor for her termination………………………………...........10

            1.  Carter demonstrated Southwest's animus for her RLA-protected
                activity by showing that her Facebook videos and messages to President
                Stone were "substantial" *and* "motivating" factors for her termination ............... 11

            2.  There is no dispute that Southwest fired Carter for her Facebook videos
                and messages to Local 556 and President Stone, so the only remaining
                issue is whether Carter's expressive activities were RLA-protected .................... 12

            3.  RLA Section 152 (Third) and (Fourth) protect Carter's expressive activity
                opposing union representation, advocating for the removal of union officers,
                and objecting to the union's use of forced fees on its political activities ............. 13

        B.  The Court has already ruled that it has jurisdiction over Carter's RLA and Title VII
            claims because they are federal statutory claims separate and independent from the
            CBA, not minor disputes subject to arbitration………………………………... ....16

        C.  The Court has already ruled that it has subject matter jurisdiction over Carter's
            post-certification wrongful discharge claim .............................................................17

        D.  RLA Section 152 (Third) and (Fourth) give employees express, enforceable rights,
            and a federal court can award all necessary and appropriate relief to remedy
            employers' violations of those rights .......................................................................19

    II.  Southwest violated Title VII by firing Carter and otherwise discriminating
        against her because of her religious beliefs and practices ................................. 24

        A.  Southwest fired carter because of her religious beliefs ............................... 24

i

B. Southwest intentionally discriminated against Carter by failing to accommodate her religious beliefs and practices ...............................................................26

    1. Southwest created the conflict between its Social Media Policies and Carter's religious beliefs and practices ...................................................27

    2. Title VII's disparate treatment provision does not require employees to request an accommodation or require that the employer have actual knowledge of a need for an accommodation .........................................31

    3. Carter exhausted her administrative remedies at the EEOC ................36

C. Southwest has no undue hardship defense ....................................................37

III. The CBA-arbitration findings asserted by Southwest should not be given issue preclusive effect for Carter's RLA and Title VII claims ...........................................43

A. Carter's direct evidence and the federal interests warranting protection of Carter's RLA and Title VII rights outweigh the relevance of "just cause" findings from the CBA arbitration ...............................................................44

B. Issue preclusion does not apply because the arbitration of "just cause" under the CBA involves legal standards distinct from those in Carter's RLA and Title VII claims, and the asserted findings are legal conclusions beyond the scope of and unnecessary to the arbitrator's decision ...............................................46

    1. Issue preclusion does not apply because the legal standards applied to the CBA "just cause" issue adjudicated at the arbitration are distinct from Carter's RLA and Title VII claims ...............................................46

    2. Issue preclusion does not apply because Southwest asserts purported "findings" that are legal conclusions and beyond the scope of and unnecessary to the arbitrator's decision ...............................................49

CONCLUSION ........................................................................................................50

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adams v. Federal Express Corp.*,
    547 F.2d 319 (6th Cir. 1976) ...................................................................................22

*Alexander v. Gardner-Denver Co.*,
    415 U.S. 36 (1974)..........................................................................................44, 45

*Amarsingh v. JetBlue Airways Corp.*,
    No. 07-CV-3775 (SLT) (MG), 2010 WL 11527313 (E.D.N.Y. Jan 29, 2010) ...................22

*Arthur v. United Airlines, Inc.*,
    655 F.Supp. 363 (D. Colo. 1987) ..............................................................................13

*Atlas v. ALPA*,
    232 F.3d 218 (D.C. Cir. 2000)...................................................................................22

*Ballew v. Cont'l Airlines, Inc.*,
    668 F.3d 777 (5th Cir. 2012) ....................................................................................16

*Barrentine v. Ark.-Best Freight Sys.*,
    450 U.S. 728 (1981).................................................................................................49

*Beckett v. Atlas Air Inc.*,
    No. CV 95-0480 (RJD) 1995 WL 498703 (E.D.N.Y. Aug. 14, 1995) ...................................22

*Beckett v. Atlas Air Inc.*,
    968 F.Supp. 814 (E.D.N.Y. 1997) ..............................................................................22

*Bell v. Hood*,
    327 U.S. 678 (1946).................................................................................................24

*Bhd. of Locomotive Eng'rs v. Kan. City S. Ry.*,
    26 F.3d 787, 795 (8th Cir. 1994) ..............................................................................22

*Bhd. of Locomotive Eng'rs and Trainmen v. Union Pac. R.R. Co.*,
    EP-21-CV-122-DB, 2021 WL 2784318 (W.D. Tex. July 2, 2021)........................................18

*Bostock v. Clayton County, Georgia*,
    140 S. Ct. 1731 (2020)......................................................................................26, 28, 29

*Bradberry v. Jefferson Cnty.*,
    732 F.3d 540 (5th Cir. 2013) ....................................................................................46

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Brady v. Trans World Airlines, Inc.*,
401 F.2d 87 (3d Cir. 1968)..................................................18, 22

*Calhoun v. Evergreen Int'l Airlines, Inc.*,
1987 WL 38597 (6th Cir. Sept. 2, 1987) ...................................22

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979)..........................................................20

*CareFlite v. Off. and Prof'l Employees Int'l Union*,
612 F.3d 314 (5th Cir. 2010) ...............................................16

*Carmona v. Sw. Airlines Co.*,
536 F.3d 344 (5th Cir. 2008) ...............................................16

*Chalmers v. Tulon Co. of Richmond*,
101 F.3d 1012 (4th Cir. 1996) ..............................28, 31, 41, 42

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
140 S. Ct. 1009 (2020)........................................................25

*Conrad v. Delta Air Lines*,
494 F.2d 914 (7th Cir. 1974) ...............................................22

*Copeland v. Merrill Lynch & Co., Inc.*,
47 F.3d 1415 (5th Cir. 1995) ...............................................46

*Davis v. Fort Bend Cnty.*,
893 F.3d 300 (5th Cir. 2018) ...............................................38

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)..........................................................44

*Diaz v. Amerijet Int'l Inc.*,
2011 WL 13217664 (S.D. Fla. Nov. 28, 2011)......................22, 23

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015)................................................... *passim*

*EEOC v. Hacienda Hotel*,
881 F.2d 1504 (9th Cir. 1989) ..............................................38

iv

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Ellis v. Bhd. of Ry., Airline and S.S. Clerks*,
    466 U.S. 435 (1984)...................................................................................................16

*Erznoznik v. Jacksonville*,
    422 U.S. 205 (1975)...................................................................................................30

*FCC v. Pacifica Found.*,
    438 U.S. 726 (1972)...................................................................................................29

*Fennessy v. Sw. Airlines*,
    91 F.3d 1359 (9th Cir. 1996) ...............................................................................18, 22

*Franklin v. Gwinnett Cnty. Public Schs.*,
    503 U.S. 60 (1992)................................................................................................21, 24

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002)...................................................................................................19

*Gonzalez v. S. Pac. Transp. Co.*,
    773 F.2d 637 (5th Cir. 1985) ......................................................................................44

*Grappe v. Kansas City S. Ry. Co.*,
    71 F.App'x 302 (5th Cir. 2003) ..................................................................................45

*Grimes v. BNSF Ry. Co.*,
    746 F.3d 184 (5th Cir. 2014)  ...................................................................16, 44, 45, 47

*Hawaiian Airlines, Inc. Norris*,
    512 U.S. 246 (1994) ...................................................................................16, 19, 50

*Held v. Am. Airlines, Inc.*,
    13 F. Supp. 2d 20 (D.D.C. 1998) .........................................................................18, 22

*Heller v. EBB Auto Co.*,
    8 F.3d 1433 (9th Cir. 1993) ........................................................................................38

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*,
    515 U.S. 557 (1995)...................................................................................................13

*Konop v. Hawaiian Airlines, Inc.*,
    302 F.3d 872 (9th Cir. 2002) ......................................................................................18

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                      **Page(s)**

*McDonald v. City of West Branch, Mich.*,
    466 U.S. 284 (1984) .................................................................................................44, 45

*McMahon v. Delta Air Lines, Inc.*,
    830 F.Supp. 2d 674 (D. Minn. 2011) ......................................................................22

*Maas v. Frontier Airlines, Inc.*,
    676 F.Supp. 224 (D. Colo. 1987) ..............................................................................22

*Mobil Expl. and Producing U.S., Inc. v. NLRB*,
    200 F.3d 230 (5th Cir. 1999) ......................................................................................15

*NLRB v. Allied Aviation Fueling of Dallas LP*,
    490 F.3d 374 (5th Cir. 2007) ......................................................................................12

*NLRB v. Wright Line*,
    662 F.2d 899 (1st Cir. 1981) ......................................................................................12

*Nu-Car Carriers, Inc.*,
    88 N.L.R.B. 75 (1950) ................................................................................................15

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
    418 U.S. 264 (1974) ...................................................................................14, 15, 17

*PHI, Inc. v. Off. & Pro. Emps. Int'l Union*,
    440 F.App'x 394 (5th Cir. 2011) ..............................................................................23

*Pacheco v. Mineta*,
    448 F.3d 783 (5th Cir. 2006) ......................................................................................37

*Patterson v. Walgreen Co.*,
    140 S. Ct. 686 (2020) ..................................................................................................42

*Poly-America, Inc. v. NLRB*,
    260 F.3d 465 (5th Cir. 2001) ......................................................................................12

*Providence St. Peter*,
    123 LA 473 (2006) (Gaba) ........................................................................................46

*Renneisen v. Am. Airlines, Inc.*,
    990 F.2d 918 (7th Cir. 1993) ......................................................................................18

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Riley v. Empire Airlines,*
    1991 WL 1169056 (N.D.N.Y. Aug. 27, 1991) ......................................................15

*Roscello v. Sw. Airlines Co.,*
    726 F.2d 217 (5th Cir. 1984) ...........................................................11, 13, 17, 22

*Russell v. NMB,*
    714 F.2d 1332 (5th Cir. 1983) ...............................................................14

*Schwartzberg v. Mellon Bank, N.A.,*
    No. 2:06cv1006, 2008 WL 111984 (W.D. Pa. Jan. 8, 2008)............................................30, 31

*Shea v. Int'l Ass'n of Machinists and Aerospace Workers,*
    154 F.3d 508 (5th Cir. 1998) ...............................................................16

*Snyder v. Phelps,*
    562 U.S. 443 (2010)........................................................................30

*Stepanischen v. Merchants Despatch Transp. Corp.,*
    722 F.2d 922 (1st Cir. 1983) ...............................................................22

*Stewart v. Spirit Airlines,*
    503 F.App'x 814 (11th Cir. 2013) ...........................................................22

*Switchmen's Union of N. Am. v. Nat'l Mediation Bd.,*
    320 U.S. 297 (1943)………….........................................................18

*Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks,*
    281 U.S. 548 (1930)...................................................................21, 22, 23

*Trans World Airlines, Inc. v. Hardison,*
    432 U.S. 63 (1977)...............................................................38, 39, 42, 43

*Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants,*
    489 U.S. 426 (1989)........................................................................18

*Transamerica Mortg. Advisors, Inc. Lewis,*
    444 U.S. 11 (1979)........................................................................19

*United States v. Marcavage,*
    609 F.3d 264 (3d Cir. 2010)................................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Weber v. Roadway Express, Inc.*,
    199 F.3d 270 (5th Cir. 2000) ................................................................39

*Wilson v. U.S. West Commc'ns*,
    58 F.3d 1337 (8th Cir. 1995) ...............................................................41


**Rules & Statutes**

42 U.S.C. § 1981a ....................................................................................23

42 U.S.C. § 1983 ......................................................................................45

42 U.S.C. § 2000e ............................................................................ *passim*

42 U.S.C. § 2000e(j) .............................................................24, 38, 39, 40

42 U.S.C. § 2000e-2(a)(1) ...............................................................24, 31

42 U.S.C. § 2000e-5(g) ...........................................................................23

45 U.S.C. § 151 (Sixth) ...........................................................................20

45 U.S.C. § 151a (2)-(3) .....................................................................14, 20

45 U.S.C. § 152 .................................................................................. *passim*

45 U.S.C. § 152 (Third) ...................................................................... *passim*

45 U.S.C. § 152 (Fourth) .................................................................... *passim*

# SUMMARY

The Court should deny Southwest's motion for summary judgment, and grant Carter's motion for partial summary judgment. The Court should deny Southwest's motion for summary judgment on Carter's claims under the Railway Labor Act, 45 U.S.C. § 151 *et seq*. ("RLA"). Contrary to Southwest's arguments, the company wrongfully discharged Carter in violation of RLA Section 152 (Third) and (Fourth) because Carter's RLA-protected activity was both a substantial *and* motivating factor for her termination. The Court has already ruled that Carter's RLA claims are federal statutory claims separate and independent from the CBA, and not minor disputes subject to arbitration. The Court has also ruled that it has subject matter jurisdiction over Carter's post-certification RLA wrongful discharge claim because Carter alleged and now demonstrates Southwest's animus for her protected rights.

The RLA Section 152 (Third) and (Fourth) gives employees express, enforceable rights and a federal court can award all necessary and appropriate relief to remedy violations of those rights. Southwest does not dispute that it terminated Carter for the Facebook videos and messages she sent to President Stone and the pro-life Facebook videos Carter posted on her personal Facebook page. Southwest only disputes whether Carter's speech and expression were protected under the RLA.

The Court should also deny Southwest's motion for summary judgment with respect to Carter's claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"). Southwest violated Title VII's disparate treatment provision by firing Carter for her religious beliefs and practices, and intentionally discriminating against her by failing to accommodate her religious beliefs and practices. Southwest cannot demonstrate that accommodation would have imposed an undue hardship on the company's business.

1

## RESPONSIVE STATEMENT OF FACTS

**I. Local 556 used employees' dues and fees to participate in and pay for the Planned Parenthood Women's March on Washington, D.C.**

Contrary to Southwest's characterizations, Local 556's purpose for traveling to Washington D.C. included participating in the Planned Parenthood Women's March. SWA Br. 19.[1] While it is true that union members also attended a TWU Women's Committee meeting, Local 556 purposefully coordinated the union's participation in the Women's March. *Id.*[2]

Contrary to Southwest's characterizations, Local 556 did pay for lodging, and some were pulled from trips in order to attend. Southwest says that Carter's belief that union funds improperly paid for members' attendance was "incorrect," but the company failed to offer any support for that assertion. SWA Br. 24. The evidence shows that Local 556 did pay for union members' attendance and participation in Planned Parenthood Women's March.

While Local 556 could not lawfully charge agency-fee paying non-members for the union's political and ideological activities, it *did* charge them for the unions' participation in the Planned Parenthood Women's March on Washington D.C. Carter Br. 17.[3] Local 556's funding for the Women's March came directly from the union's budget. *Id*. Local 556's report to the Department of Labor reflected that all union expenses associated with the Working Women's Committee and

---

[1] Southwest's Brief (ECF 167) and Appendix (ECF 168) in Support of its Motion for Summary Judgment shall be cited to as "SWA Br. ___" and "SWA App.___". Carter's Brief in Support of her Motion for Partial Summary Judgment (ECF 171-1) shall be cited to herein as "Carter Br. ___". Carter's Appendix of Exhibits in Support of her Motion for Partial Summary Judgment (ECF 170) and (ECF 171-2), shall be cited to as "Carter App.___".

[2] Carter Br. 16-17; (Carter App.26-28, 31, 49, 50-55, 58-72);(Carter App.455, 458-459; Stone 200:14-21; 227:21-228:10); (Carter App.474, 476-477; Parker 11:17-22, 28:16-29:23); (Carter App.487-499; Parrott 18:1-19:23; 20:25-21:25; 22:15-24:8; 25:1-26:3; 27:11-23; 33:16-34:3); (Carter App.458-460; Stone 227:21-229:25); (Carter App.472, Parker 9:4-20).

[3] (Carter App.487-490, 497-498; Parrott 18:1-19:23, 20:25-21:25, 33:16-34:3); (Carter App.458-459; Stone 227:21-228:10); (Carter App.68-72).

Women's March—lost time, meeting, and meal expenses, conference and registration expenses, the union's Women's March banner, lodging, and transportation fees—were all coded as chargeable to nonmembers as "representation" expenses and not as nonchargeable "political activities." Carter Br. 17-18.[4] Southwest even provided Local 556's travel and transportation to the Women's March event, in accordance with the CBA, which it does for union business. (SWA App.669, Arb. Tr. 140:1-10) (Carter Br. 17).

Even if Carter had been mistaken about union's use of employees' forced fees on its participation in the Women's March, Local 556 and President Stone had a *duty*, as Carter's fiduciary representative to respond to her objection and inform her of that. Carter Br. 37. Instead, President Stone tried to get Carter fired, in violation of the union's duty of fair representation and other legal obligations under the RLA. Carter Br. 31-35, 40-41, 47-57. Carter had the right under the RLA to oppose the union's representation of flight attendants who participated and object to the union's use of forced fees to attend. Carter Br. 32-35, 37.

Southwest also says that Carter traveled to Washington, D.C., to attend the inauguration and "participate in the Women's March." SWA Br. 19-20. Carter traveled to Washington, D.C. to attend President Trump's inauguration, but she did not participate in the Women's March. (SWA App.868; Tr. 339:4-13). Carter left Washington D.C. the day after the inauguration, the same day when the Women's March began. (Carter Resp. App. 19; Carter Tr. 256:9-10).[5]

## II. Carter messaged President Stone about the unions representation matters, the union's collective bargaining failures, and flight attendant support for the campaign to recall and remove President Stone and other union officers.

Carter was a vocal opponent of Local 556, actively opposing the union's representation and collective bargaining activities. Before the July 2015 tentative CBA ratification vote, Carter

---

[4] (Carter App.487-488; Parrott 18:1-19:23).
[5] Carter cites to her Response Appendix as "Carter Resp. App. __".

messaged President Stone with her criticism of the union's tentative CBA and its handling of contract negotiations, and Carter sent Stone posts from other Southwest flight attendants criticizing the union's agreement. (Carter App.166-190). Carter even began advocating for a recall vote to remove the union officers. (Carter App.189-190). Shortly after the July 2015 ratification vote, Carter messaged President Stone objecting to Local 556's representation of employees at the bargaining table. (Carter App.190-191).

Carter sent messages from at least July 2015 through February 2017 about union elections and union representation issues, including flight attendants' claims that the Local 556 Executive Board, had thrown out flight attendants' votes during the 2016 elections, which another flight attendant (not Carter) described as "criminal." SWA Br. 10; Carter Br. 14-16; Carter App.166-190. Carter forwarded that post to President Stone, along with many more, showing *other* flight attendants' frustration with union leadership: "There you have just a few of so many who are talking about this….hope we as Opt Out People [flight attendants who have resigned from the union] get MORE to join in… Shows who you Support and it isn't the [Flight Attendants]!" SWA App. 1067.

Carter also sent President Stone a picture of the t-shirt forwarded to her from a friend that says, "Fucktard" and "I Voted Brett Nevarez Cause he Respects me," which references a statement attributed to Local 556's Executive Vice President Nevarez in the picture (but actually made by one of his supporters) calling another flight attendant, who opposed President Stone and Nevarez, a "fucktard." SWA Br. 19; (Carter App.434, 450; Stone 136:18-21, 179:3-8). Carter sent the t-shirt picture to President Stone because it showed flight attendants' dissatisfaction with how the Local 556 Executive Board treated employees they purportedly represent: "What kind of a message does that send when BOARD Members say things like this about the Very Flight Attendants he says he Represents…. Hmmmm very Un-Professional at the very Least!!! To think this is [sic] the very

Character (Statement from his own mouth) that we as Flight Attendants PAY FOR!!! There [sic] is such a lack of Morals on this Board….PRAYING that all of you are Voted Out of office!! Then we can bring back Truth." (SWA App.1047).

Carter sent the Alinksy Rules for Radicals to President Stone saying, "This is what Radical Unions like TWU use to get their WAY!! Same things being used by this Un-Elected Board….but people are waking up to the tactics and someday the Chickens will come home to ROOST. Praying to GOD it comes sooner th[a]n lat[]er." (Carter App.141-145).

Southwest characterizes these Facebook posts and discussions as a "campaign of harassment." SWA Br. 18. But these communications actually demonstrate Carter's history of engaging in RLA-protected speech with Local 556 and President Stone about the union's representation of employees, collective bargaining failures, and flight attendants' ongoing campaign to recall and remove the union representatives. (Carter App.117-221). President Stone never reported Carter for any of these messages, and, in fact, said she ignored them. (Carter App. 114-115). Southwest did not fire Carter for these messages. (Carter App.222). Nor could it—these messages were protected speech about collective bargaining, union representation, and the recall campaign. *See infra* at 13-16; Carter Br. 32-38.

### III. Southwest's Nexus Pictures did not make Carter "readily identifiable" as a Southwest flight attendant, and show that it treated it differently from President Stone and other Local 556 supporters who carried a banner with the Southwest name and log during the Women's March.

Contrary to Southwest's characterizations, Carter was *not* "readily identifiable" as a Southwest employee on her public Facebook page. SWA Br. 20; Carter Br. 30, 58.[6] Southwest went digging for more information on Carter's Facebook page to prosecute the case against her. Carter Br. 29.[7]

---

[6] (Carter App.245-246, 259-267); (Carter App.529-530, ¶17).
[7] (Carter App.362, 369-370; Schneider 43:12-25, 54:10-55:23); (App.396-397, Jones 8:17-9:9).

Southwest was not even aware of those Facebook posts until after President Stone reported Carter. Carter Br. 25, 29-30.[8] Carter testified that all the Nexus Pictures from her Facebook timeline, except for the picture of her standing in an airport in plain clothes wearing a badge, were at least 2 years old. (Carter App.529-530 ¶17) (Carter Br. 30). But, it is impossible to read or discern what is on the badge from the picture. (SWA App.1148). Southwest did not know when the Nexus Pictures were posted or how old they were. (Carter App.380, Schneider 98:1-7); (Carter App.328, Emlet 83:16-18). Carter's Facebook posts did not cause Southwest any financial harm before her termination. (Carter App.309, Sims 222:3-4). Southwest did not receive any complaints about the posts Carter made on her Facebook page. (Carter App.309, Sims 221:13-16). Moreover, nothing in Carter's pro-life videos or messages posted on her Facebook page mentioned Southwest. Carter Br. 19-21; (Carter App.78-103, 528 ¶11, 531).

Carter also told Southwest that Local 556 used Southwest's name and symbol at the Women's March. (Carter App.247). Southwest also knew that Local 556 carried a banner with the company logo while the union marched with Planned Parenthood. (Carter App.247, 252). While Southwest fired Carter for a "nexus" that was two-year old and buried deep on her Facebook page, Local 556 members were never disciplined or questioned regarding their use of the company logo during the Women's March. (Carter App.27, 29-56); (Carter App.476-479, Parker 28:16-31:25).

Southwest fired Carter for a highly-attenuated nexus between her pro-life Facebook posts and the company. Local 556 could post pro-abortion messages such as "My Body My Choice" in tandem with Southwest's name and logo on its website and "Women who don't control their own reproductive rights are not free." (Carter App.27, 29-56); (Carter App.476-479, Parker 28:16-31:25).

---

[8] (Carter App.113-114, 117-138); (Carter App.375-377, Schneider 83:23-85:20).

**IV. Southwest's managers did not all identify themselves as pro-life supporters.**

Contrary to Southwest's characterizations, the company managers did not all identify themselves as "pro-life." SWA Br. 54. Nor would it matter if they did. Employee Relations Manager Gutierrez testified that she did not have any view or preference on the matter of pro-life or pro-abortion. (SWA App.168; Gutierrez Tr. 63:20-23). Denver Base Assistant Manager Jones stated, "It's complicated for me to answer that because I am more pro-life; it's not a choice I would make for myself, but I don't feel like I should tell somebody else what they can or can't do." (SWA App.131; Jones Tr. 85:2-10). Neither Gutierrez nor Jones is pro-life.

Several others only indicated that they were "personally" pro-life, which is a euphemistic way of saying they are pro-choice. Denver Base Manager Schneider and Labor Relations Manager Emlet responded they were pro-life only when asked whether they "*personally*" have a position. (SWA App.106-107; Schneider Tr. 130:24-131:1); (SWA App. 163; Emlet Tr.128:3-8). Similarly, President Stone did not identify herself as a "pro-life supporter." (Carter Resp. App. 23-24; Stone Tr. 233:21-234:5). President Stone commented "I am personally pro-life, but I support others right to pro-choice and don't believe I have the right to tell them what to do with their body." (Carter App.227). Stone added, "I believe in equality and individual rights, and will continue to support causes and events that promote the fundamental rights I believe every human being should have." (Carter Apps.105-106). President Stone's deposition re-iterated that she's "personally pro-life" and that she doesn't believe that she or anyone else has the right to make that decision for another woman. (Stone Tr. 233:21-234:24). Despite Stone's euphemistic characterization of her views as "personally pro-life," her own caveat reveals that she is "pro-choice" and supports pro-abortion rights. *Id*. Moreover, Southwest's subjective evidence about the managers' general views does not controvert the objective, undisputed evidence—Southwest's express admissions—that the

company fired Carter for her pro-life Facebook videos and messages, which the company called "highly offensive" and "disparaging … to all Southwest employees." (Carter App.222).

### V. Carter's deposition testimony regarding her subjective knowledge of managers' motives for firing her.

Southwest's counsel asked Carter what evidence she had to support her assertion that the company fired her for her religious beliefs. Carter explained that she told the managers she was a Christian in her fact-finding meeting and that she was against the union's support for Planned Parenthood at the Women's March due to her strong religious beliefs against abortion. (Carter Resp. App.2-3; Carter Tr. 74:21-75:5). Carter testified "they should have recognized my Christian beliefs within the fact-finding meeting when I said I don't… believe in abortion and I don't believe that … my union president should have taken our dues and spent it on a march. This … had everything to do with just that march." (Carter Resp. App.4-5; Carter Tr. 78:24-79:5); "They should not have fired me over my Christian beliefs." (Carter Resp. App.5; Carter Tr. 79:15-16).

Carter also answered that her evidence of the company's discrimination against her because of her religious beliefs was that the company did not provide her with a religious accommodation. (SWA App.204; Carter Tr. 84:1-11). Carter repeatedly testified that she should have had an accommodation in this instance and should not have been fired. (Carter Resp. App.5-8, Carter Tr. 79:21-82:9). Carter explained that she should have been allowed to address the Local 556 president about Planned Parenthood and the Women's March in response to her union's participation, without being fired. *Id*.; (Carter Resp. App. 6-9; Carter Tr. 80:15-83:10).

While Southwest's counsel repeatedly asked Carter for subjective evidence of manager's private motivations, Carter also responded that she could not possibly know "what is in their head." (SWA App.657; Carter Tr. 128:3-4). Carter explained in her deposition, that she told them in her fact-finding that she was a Christian, and "[e]veryone of these people should have known that I

was a Christian because this all [her Facebook videos and messages] was sent to them." (SWA App.656; Carter Tr. 127:1-14); (SWA App.614; Carter Tr. 85:2-11). Moreover, it was not Carter's job at the deposition to personally marshal all the evidence supporting her claims.

**VI. Carter declined Southwest's Last Chance Agreement offer of reinstatement because it forced her to waive rights and protections.**

Following Southwest's termination of Carter and her Step 2 grievance proceeding, Southwest offered Carter a Last Chance Agreement ("LCA") that would have reinstated her employment and reduced her termination to a 30-day suspension. (SWA App. 1181-1186). However, Southwest's LCA forced Carter to waive her legal rights and leave her without legal recourse if the company fired her again. To be sure, Carter wanted to keep her job, and brought this action seeking reinstatement. (FAC, p.31 ¶B(2)). But Southwest's LCA forced Carter to waive her legal rights in the event that the company turned around and fired her again. (SWA App. 1181-1186).

Carter did not want to waive her legal rights and be without any legal recourse if the company fired her again. (Carter Resp. App.12-13; Carter Tr. 92:21-93:12) ("I would have been signing all my rights away."). Carter knew a flight attendant, a prominent recall supporter, who signed an LCA and was soon turned in for another violation and fired. (Carter Resp. App.11-12; Carter 91:19-92:20). Another reason she did not accept it was that Southwest wanted to put a disciplinary letter in her file for 24 months, which meant that "if she sneezed wrong on the airplane within 24 months of basically being on probation again, [she] would be fired." (Carter Resp. App.12-13; Carter Tr. 92:21-93:6). Carter also believed that union supporters were looking for pretexts to turn union opponents in and get them fired while they were on such a probation, and she was afraid to sign the LCA and be subject to termination if another flight attendant, again targeted her for daring to oppose the union, and turned her in for discipline. (Carter Resp. App.13-15; Carter Tr. 93:16, 102:24-103:9). Even Local 556 representatives told her to watch her back if she signed it. (Carter

9

Resp. App.15-16; Carter Tr. 103:16-104:2). "So I knew in signing this, it would be pretty much my death sentence at Southwest." (Carter Resp. App.13; Carter Tr. 93:16-18).

## ARGUMENT AND AUTHORITIES

### I. Southwest violated Carter's RLA-protected rights.

The Court should deny Southwest's motion for summary judgment on Carter's RLA claims: (A) Southwest violated Carter's rights under RLA Section 152 (Third) and (Fourth) because her RLA-protected activity was both a substantial *and* motivating factor for her termination; (B) The Court has already ruled that Carter's RLA claims are federal statutory claims separate and independent from the CBA, and not minor disputes subject to arbitration; (C) The Court has already ruled that it has subject matter jurisdiction over Carter's post-certification RLA wrongful discharge claim because Carter alleged and now demonstrates Southwest's animus for her protected rights; (D) RLA Section 152 (Third) and (Fourth) give employees express, enforceable rights and a federal court can award all necessary and appropriate relief to remedy violations of those rights.

### A. Southwest violated Carter's rights under RLA Section 152 (Third) and (Fourth) because her RLA-protected activity was *both* a "substantial" *and* "motivating" factor for her termination.

The Court should reject Southwest's arguments opposing Carter's RLA claims because they are flawed in several critical respects: (1) Despite the company's arguments, Carter demonstrated Southwest's animus for her RLA-protected activity by showing that her Facebook videos and messages to President Stone were "substantial" *and* "motivating factors" for her termination; (2) Southwest overlooks the fact that there is no dispute that the company fired Carter for her Facebook videos and messages to President Stone, so the only issue is whether Carter's activities were RLA-protected; and (3) RLA Section 152 (Third) and (Fourth) protect Carter's expressive activity

10

opposing union representation, advocating for the removal of union officers, and objecting to the union's use of forced fees on its political activities, not just pre-certification organizing as Southwest contends.

1. **Carter demonstrated Southwest's animus for her RLA-protected activity by showing that her Facebook videos and messages to President Stone were "substantial" *and* "motivating" factors for her termination.**

Contrary to Southwest's characterizations,[9] the employer's RLA wrongful discharge violation "consists of a discharge or other adverse action that is based in whole or in part on anti-union animus—or as the Board now puts it, that the employee's protected conduct was a substantial or motivating factor in the adverse action." *See Roscello v. Sw. Airlines Co.*, 726 F.2d 217, 222 (5th Cir. 1984) (citation omitted).

Employers fire employees in violation of the RLA if the employee exercises protected rights, and the employee's protected activities were a "substantial or motivating factor" for the termination. *Id*. Carter demonstrated that Southwest's termination of her employment was "based in whole or in part" on union-related animus by showing that Carter's RLA-protected activities—sending private Facebook videos and messages to Local 556 and President Stone—were a "substantial or motivating factor" for her termination. Carter Br. 31-40.

Southwest's contention that employees must demonstrate whether "animus was a substantial or motivating factor in plaintiff's termination" misstates Fifth Circuit precedent in *Roscello*, which holds that an employee *demonstrates* animus by showing her protected activity was a substantial or motivating factor for her adverse employment action. Carter Br. 32-38; (Carter App.222, 268-

---

[9] SWA Br. 43.

269); SWA Br. 43 (citations omitted).

### 2. There is no dispute that Southwest fired Carter for her Facebook videos and messages to Local 556 and President Stone, so the only remaining issue is whether Carter's expressive activities were RLA-protected.

Southwest's legal arguments regarding Carter's RLA claims are also flawed because there is no dispute that the company fired Carter for her Facebook videos and messages to President Stone. SWA 43-44. When there is no dispute as to which employee activities motivated the employer's termination of the employee, the only question is whether the employee's activities were protected. *See NLRB v. Allied Aviation Fueling of Dallas LP*, 490 F.3d 374, 379 (5th Cir. 2007).

The *Wright Line* mixed-motive framework and its burden-shifting scheme do not apply in this case because there is no dispute that Southwest fired Carter for sending private Facebook videos and messages to President Stone.[10] (Carter App.222); SWA Br. 44. *Wright Line* only applies in cases when an employee engages in protected activity and different unprotected activity, and the parties dispute whether the protected or the unprotected activity motivated the employee's termination. *See e.g.*, *Poly-America, Inc. v. NLRB*, 260 F.3d 465, 488-89 (5th Cir. 2001) (applying the *Wright Line* framework when the employer claimed that it discharged the employee for poor performance); *see also NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981). Shifting the burden back to Southwest to show that the company would have fired Carter for some other activity makes no sense when the company admits that it fired Carter for only her Facebook videos and messages.

Carter's Facebook videos and messages opposing Local 556's representation of flight attendants at the Women's March and objecting to the union's activities, were RLA-protected activity. Southwest's assertion that it fired Carter for violating its Social Media Policies, and not

---

[10] Southwest also fired Carter for the videos and messages she posted on her personal Facebook page, which violated her rights under Title VII of the Civil Rights Act. *See infra*, Section II.

for her RLA-protected activity is question-begging and misses the point of protected rights. *See Arthur v. United Airlines, Inc.*, 655 F. Supp. 363, 367 (D. Colo. 1987). If the employee's activities are RLA-protected, then it is impermissible for the employer to fire her for those activities. *See e.g., Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 574 (1995) ("[T]he point of all speech protection … is to shield just these choices of content that in someone's eyes are misguided or even hurtful.").[11]

Contrary to Southwest's characterizations, Carter's subjective knowledge (or lack thereof) of individual managers' discriminatory motives does not controvert direct objective evidence—supported by Southwest's own admissions—that the company fired Carter for the Facebook videos and messages she sent to President Stone. Carter Br. 32-38; (Carter App.222, 268-269); SWA Br. 35. Carter demonstrates Southwest's animus by showing that her protected activities were both "substantial" *and* "motivating" factors for her termination, in accordance with the Fifth Circuit's holding in *Roscello*. 726 F.2d at 222.

### 3. RLA Section 152 (Third) and (Fourth) protect Carter's expressive activity opposing union representation, advocating for the removal of union officers, and objecting to the union's use of forced fees on its political activities.

Contrary to Southwest's characterizations, the RLA protects employee rights beyond pre-certification union organizing. SWA Br. 44. The RLA protects employee speech and expressive activity regarding union representation, union re-organizing, and opposing unions and their policies. Carter Br. 32-35. Southwest's argument that RLA Section 152 (Third) and (Fourth) protect only precertification rights is inconsistent with the RLA's statutory text and purpose. RLA

---

[11] Carter's Second Motion to Compel Discovery from Southwest, seeks company communications about the RLA, social media issues, and the recall campaign. This information could be further probative of Southwest's motives. (ECF 174, pp.27-31); (ECF 175-6); (ECF 177 pp.27-31); (ECF 178-7).

Section 151a expressly states that the RLA "forbid[s] *any* limitation upon freedom of association among employees" and "provide[s] for the complete independence … of employees in the matter of self-organization." 45 U.S.C. § 151a (2)-(3) (emphasis added). "[T]he concept of 'complete independence' is inconsistent with forced representation, most especially when that forced representation is at odds with employees' will and desires." *Russell v. NMB*, 714 F.2d 1332, 1343 (5th Cir. 1983) (footnote omitted). "Complete independence" necessarily contemplates the right to remove unwanted representatives and re-designate new, different representatives or no representatives at all. 45 U.S.C. § 151a; *Russell*, 714 F.2d at 1343.

Employees do not permanently lose their rights to re-organize or change their union representation after the employees first certify a union. The RLA protects employees' rights to continuous "self-organization" and "re-organization" campaigns, such as decertification proceedings to remove unwanted unions and other efforts to remove unwanted union representatives. *See Russell*, 714 F.2d at 1345 ("*[I]t is inconceivable that the right to reject collective representation vanishes entirely if the employees of a unit once choose collective representation.*") (emphasis in original) (citations omitted); *Austin*, 418 U.S. at 279 (rejecting, for purposes of speech protection, "any distinction between union organizing efforts leading to recognition and post-recognition organizing activity").[12]

Employees' rights under RLA Section 152 (Fourth)—"self-organization," "organiz[ing] and bargain[ing] collectively… through representatives of their own choosing," and "join[ing], organiz[ing], or assist[ing] in organizing the labor organization of their choice"—protect employee

---

[12] Equal protection principles preclude Southwest's contention (SWA Br. 44) that the RLA grants robust speech and association rights to employees who organize unions but denies speech and association rights to employees who oppose unions and advocate for changes in union leadership and representation. *See Russell*, 714 F.2d at 1345; *Austin*, 418 U.S. at 279.

freedoms both pre- and post-certification to oppose their unions and engage in dissident speech and activities opposing union representation "without interference, influence, or coercion." 45 U.S.C. § 152 (Fourth). Employees' rights "to form, join or assist labor organizations" are "[t]he primary source of protection for union freedom of speech." *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 277 (1974).

Employees' RLA Section 152 (Fourth) rights to "join, organize, or assist" and "not to join or remain members of any labor organization," as well as the "right to organize and bargain collectively through representatives of their own choosing," encompass "the right of employees to oppose the policies and actions of their incumbent union leadership and to seek to persuade other employees to take steps to align the union with these opposing views." *Mobil Expl. and Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 240 (5th Cir. 1999). "[I]nherent in [the employee's right to self-organization] is the privilege of protest and persuasion of others. Without this, effective employee representation becomes a nullity." *Id*. at 240 (quoting *Nu-Car Carriers, Inc.*, 88 N.L.R.B. 75, 76-77 (1950) (internal citation omitted).[13]

The First Amendment and the RLA Section 152 (Eleventh) also protect employee rights to object to paying compelled fees for unions' political, ideological, and other nonbargaining spending, and make inquiries about how the union is using forced fees. *See Street*, 367 U.S. 768

---

[13] For these reasons, it is irrelevant that the RLA does not specifically mention "concerted activities." The Supreme Court has recognized, "Basic to the right guaranteed to employees … to form, join, or assist [which RLA Section 152 (Fourth) expressly protects] … is the right to engage in concerted activities to persuade other employees…" *Austin*, 418 U.S. at 277. Thus, Southwest's argument that "the RLA does not provide any general retaliation protection for employees who engage in concerted activities" is misleading. SWA Br. 44 n.98. While Carter was engaged in concerted activities, she was also engaged in RLA-protected expressive activity concerning union representation and re-organization. Carter Br. 35-38. *See also Riley v. Empire Airlines*, 1991 WL 169056 (N.D.N.Y. Aug. 27, 1991).

(holding that the RLA does not authorize a union to spend an objecting employee's money to support political causes); *Ellis v. Bhd. of Ry., Airline and S.S. Clerks*, 466 U.S. 435, 465-66 (1984); *Shea v. Int'l Ass'n of Machinists and Aerospace Workers*, 154 F.3d 508, 513 (5th Cir. 1998).

Carter was engaged in all of the foregoing protected activities when she sent Facebook videos and messages to President Stone about Local 556's participation in the Planned Parenthood Women's March on Washington, D.C. Carter Br. 35-38. Southwest violated the RLA by firing Carter because her private Facebook videos and messages to Local 556 and President Stone were RLA-protected.

### B. The Court has already ruled that it has jurisdiction over Carter's RLA and Title VII claims because they are federal statutory claims separate and independent from the CBA, not minor disputes subject to arbitration.

The Court has already rejected Southwest's arguments that Carter's RLA and Title VII claims are "minor disputes" arising under the CBA. (ECF 69, pp.9-11); SWA Br. 41-43. Carter's claims arise under the RLA and Title VII, and are separate and independent from the CBA. Claims are not "minor disputes," and are not subject to arbitration when they seek to enforce statutory rights separate and independent from the CBA. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 258 (1994); *Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 191 (5th Cir. 2014); *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349 (5th Cir. 2008); *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012) ("[T]he assertion of any right that is not created by a CBA is … not subject to binding arbitration under the statute.") (quoting *CareFlite v. Off. And Prof'l Employees Int'l Union, AFL-CIO*, 612 F.3d 314, 320–21 (5th Cir. 2010)). For similar reasons, Southwest's objection that Carter cannot present her RLA Section 152 (Third) and (Fourth) statutory rights claim because she arbitrated a separate and independent "just cause" claim arising under the CBA is unfounded, and this Court rejected it. (ECF 69, pp.10-11); (ECF 54, pp.11-14); SWA Br. 40.

16

**C. The Court has already ruled that it has subject matter jurisdiction over Carter's post-certification wrongful discharge claim.**

The Court has jurisdiction over Carter's post-certification claims under RLA Section 152 (Third) and (Fourth) because Carter demonstrates Southwest's animus by showing that her Facebook videos and messages to President Stone were *the* "substantial" and "motivating" factors for her termination. SWA Br. 40; Carter Br. 39-40; *supra* at 11-12.

Contrary to Southwest's characterizations, this Court did not conclude at the motion to dismiss stage that Carter "has not presented any evidence of anti-union animus." SWA Br. 40. The Court dismissed Carter's Count I and II post-certification claims because those particular claims did not *allege* animus, but it allowed Carter's Count IV post-certification claim (Southwest discharged Carter for the exercise of her RLA-protected rights) to proceed because it *did* allege animus. The Court concluded that Carter can prevail by demonstrating that her protected activity was a "but for" cause for her termination. (ECF 69, pp.17, 20-21). Carter has now demonstrated Southwest's "animus" (*i.e.*, that the employee's "protected conduct was a substantial or motivating factor in the adverse action") with respect to her Count IV post-certification claim. *See Roscello*, 726 F.2d at 222; FAC ¶100; ECF 69, p.17.

RLA Section 152 (Third) and (Fourth) guarantee employee speech and association rights beyond precertification, particularly where Carter demonstrates Southwest's animus for her protected activity. SWA Br. 39-40. *Austin*, 418 U.S. at 278-79. ("We see no reason to limit this protection to statements made during representation election campaigns. The protection … is much broader.").

Federal courts, including this one, have also recognized that subject matter jurisdiction over post-certification claims is proper when an employer's conduct has been motivated by union-related animus or an attempt to interfere with employees' union-related speech and association

rights; when the employer's conduct constitutes discrimination or coercion. "[W]hile *TWA* may hold that § 152 protects 'primarily the precertification rights and freedoms of unorganized employees,' courts post *TWA* have still found jurisdiction possible in the post-certification context when the employer's conduct is 'motivated by anti-union animus.'" *Bhd. of Locomotive Eng'rs and Trainmen v. Union Pac. R.R. Co.*, EP-21-CV-122-DB, 2021 WL 2784318, *5 (W.D. Tex. July 2, 2021) (cleaned up). *See also  Held v. Am. Airlines, Inc.*, 13 F. Supp. 2d 20, 24, 26 (D.D.C. 1998) (noting that the U.S. Supreme Court did not create a "heightened jurisdictional barrier" in post-certification cases); *Fennessy v. Sw. Airlines*, 91 F.3d 1359, 1361-63 (9th Cir. 1996) (holding that RLA Section 2, Fourth protected employees during a re-organizing campaign despite the union's certification); *Brady v. Trans World Airlines, Inc.*, 401 F.2d 87, 102 (3d Cir. 1968).[14]

Even when an incumbent union is already certified, federal courts have subject matter jurisdiction in instances when "'but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the [RLA] … That would have robbed the Act of its vitality and thwarted its purpose." *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 300 (1943); *Held*, 13 F. Supp. 2d at 25; *Fennessy*, 91 F.3d at 1363 (quoting *TWA*, 489 U.S. at 441); *Renneisen v. Am. Airlines, Inc.*, 990 F.2d 918, 923 (7th Cir. 1993). Federal jurisdiction is necessary to safeguard federal rights such as Carter's RLA-protected speech and association rights. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 872, 872-73; 882 (9th Cir. 2002) (holding that employee's criticism of incumbent union was protected "organizing" activity).

---

[14] *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989) makes a general observation that RLA Section 2, (Third) and (Fourth) "primarily"—*but not exclusively*—addresses "the precertification rights and freedoms of unorganized employees."

Contrary to Southwest's arguments, Carter could not submit her RLA claims to the arbitrator. *See Hawaiian Airlines, Inc.*, 512 U.S. at 255 (arbitration decisions quoted therein); SWA Br. 40. This Court recognized that Carter's claims under the RLA and Title VII were separate and independent from the claims presented to the arbitrator (i.e., whether the company had "just cause" to fire her under the CBA). (ECF 69, pp.10-11). This Court also ruled—by allowing Carter's RLA wrongful discharge claim to proceed—that her claim was properly before the federal court, not the arbitrator, who conceded that he could not consider Carter's RLA speech and association rights: "[T]hat the Grievant … has exercised her Railway Labor Act … rights, [is] *not germane to my determination of just cause for her termination*." (SWA App.1008, n.2) (emphasis added). Carter could not enforce her RLA-statutory rights at arbitration, and the arbitrator was, by his own admission, not qualified to decide those claims.

### D. RLA Section 152 (Third) and (Fourth) give employees express, enforceable rights, and a federal court can award all necessary and appropriate relief to remedy employers' violations of those rights.

Contrary to Southwest's contentions, RLA 152 (Third) and (Fourth)'s statutory text expressly gives Carter individually enforceable rights. SWA Br. 38-39. "[W]hether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979) (citation omitted). Congress created enforceable rights under RLA Section 152 (Third) and (Fourth) in "clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). RLA Section 152 (Third) and (Fourth) grant rights to "members of an[] identifiable class" and "proscribe[] [certain] conduct as unlawful." *See Lewis*, 441 U.S. at 24.

RLA Section 2 (Third) and (Fourth) give employees individually enforceable rights "phrased in terms of the persons benefited." *Gonzaga*, 536 U.S. at 284 (quotations omitted). RLA Section

19

152 (Fourth) contains the clear and unambiguous rights-creating language necessary to establish a private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)[15]:

> *Employees shall have the right* to organize and bargain collectively through representatives of their own choosing.… No carrier, its officers, or agents shall deny or in any way question the *right of its employees* to join, organize, or assist in organizing the labor organization of their choice, and *it shall be unlawful* for any carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization[.]

45 U.S.C. § 152 (Fourth) (emphasis added).[16] RLA Section 152 (Fourth) expressly establishes that employees shall have rights "to organize and bargain collectively through representatives of their own choosing." 45 U.S.C. § 152 (Fourth). RLA Section 152 (Fourth) also establishes employees' rights "to join, organize, or assist in organizing the labor organization of their choice." *Id.*

RLA Section 2 (Third) expressly gives employees[17] the right to designate representatives without the employer's interference, influence, or coercion, and prohibits the employer from "in any way interfer[ing] with, influenc[ing], or coerc[ing] the [employees]" in their "choice of representatives." 45 U.S.C. § 152 (Third). Carter, as an employee governed by the RLA, falls within the class of intended beneficiaries. Moreover, the RLA as a whole "forbid[s] *any* limitation upon freedom of association among employees" and "provide[s] for the complete independence … of employees in the matter of self-organization."  45 U.S.C. § 151a (2)-(3) (emphasis added).

---

[15] A statute that says "[n]o person in the United States shall … be subjected to discrimination" on the basis of race creates an enforceable right to be free from race discrimination. *Cannon*, 441 U.S. at 691.

[16] RLA Section 151 (Fifth) further defines "employee" to include "every person in the service of a carrier." 45 U.S.C. § 151 (Sixth).

[17] RLA Section 151(Sixth) defines "representative" to mean "any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." 45 U.S.C. § 151 (Sixth). Thus, Section 152 (Third)'s reference to "respective parties" designating refers to the "carrier" or "employees" who designate their "representatives" to act for them.

RLA Section 152 (Third) and (Fourth) also proscribe certain conduct as unlawful. Section 152 (Fourth) declares that "*it shall be unlawful* for any carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization[.]" 45 U.S.C. § 152 (Fourth) (emphasis added). RLA Section 152 (Fourth) further states that employers, their officers, and their agents shall not "deny or in any way question" an employee's rights "to join, organize, or assist in organizing the labor organization" of her choice. RLA Section 152 (Third) states that employers shall not "interfere[], influence, or coerc[e]" an employee with respect to her designation of union representatives, and shall not "in any way interfere with, influence, or coerce" an employee in her "choice of representatives." 45 U.S.C. § 152 (Third).

The U.S. Supreme Court has already recognized that RLA Section 152 (Third) created employees' cause of action to enforce their statutory rights and statutory proscriptions against the employer's interference with or coercion of those rights: "[A] legal obligation is created and the statutory requirements are susceptible of enforcement by proceedings appropriate to each. The same is true of the prohibition of interference or coercion in connection with the choice of representatives." *Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 569 (1930).

Employees may enforce their express statutory rights and redress the employer's statutory violations through reinstatement or back pay. Federal courts "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett Cnty. Public Schools*, 503 U.S. 60, 66 (1992) (citations omitted). When the Supreme Court decided *Texas & N.O.R.*, the statutory provision invoked was Section 152 (Third) of the Railway Labor Act of 1926. 281 U.S. at 557-58. Shortly thereafter, in 1934, Congress amended RLA Section 152 by adding an even stronger noninterference provision in RLA Section 152 (Fourth), creating

additional enforceable rights and imposing stronger prohibitions on employer interference. *See Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 926 (1st Cir. 1983).

While the Fifth Circuit has "assume[d] without deciding that plaintiff has properly stated a claim"[18] for enforcing his rights under RLA Section 152 (Third) and (Fourth), virtually every other court to have considered the issue has held that those provisions create a cause of action. *See Texas & N.O.R. Co.*, 281 U.S. at 567-69; *Atlas v. ALPA*, 232 F.3d 218, 223-24, 226 (D.C. Cir. 2000);[19] *Fennessy*, 91 F.3d at 1363; *Bhd. of Locomotive Eng'rs v. Kan. City S. Ry.*, 26 F.3d 787, 795 (8th Cir. 1994);[20] *Calhoun v. Evergreen Int'l Airlines, Inc.*, 1987 WL 38597, **2-3 (6th Cir. Sept. 2, 1987);[21] *Stepanischen*, 722 F.2d at 924-27; *Conrad v. Delta Air Lines*, 494 F.2d 914, 918 (7th Cir. 1974); *Brady*, 401 F.2d at 102 (footnote omitted); *Amarsingh v. JetBlue Airways Corp.*, 07-CV-3775 (SLT) (MG), 2010 WL 11527313, **4-5 (E.D.N.Y. Jan. 29, 2010), *aff'd* by 409 Fed. Appx. 459 (2d Cir. 2011);[22] *Diaz v. Amerijet Int'l Inc.*, 2011 WL 13217664, **3-4 (S.D. Fla. Nov. 28, 2011) ("[E]very court to consider whether a private right of action exists over a major dispute has found jurisdiction[.]"); *Maas v. Frontier Airlines, Inc.*, 676 F.Supp. 224 (D. Colo. 1987). *See also Stewart v. Spirit Airlines*, 503 Fed.App'x 814, 818 (11th Cir. 2013) (assuming without deciding that a private right of action exists). This Court has also recognized Carter's cause of action under the RLA in this case. (ECF 69, pp.19-20).

---

[18] The parties in that case did not question whether the plaintiff had a right of action for wrongful discharge under the RLA. *Roscello*, 726 F.2d at 220 n.2.

[19] *Held*, 13 F. Supp. 2d at 24, 26.

[20] *See also McMahon v. Delta Air Lines, Inc.*, 830 F.Supp.2d 674, 682 (D. Minn. 2011) (recognizing that "the Supreme Court long ago held that there is an implied right of action under § 152, Third to enforce its prohibition against interference, influence, and coercion" (citing *Tex. & N.O.R.*, 281 U.S. at 568-70 (1930))).

[21] *See also Adams v. Federal Express Corp.*, 547 F.2d 319, 321 (6th Cir. 1976).

[22] *Beckett v. Atlas Air Inc.*, No. CV 95-0480 (RJD) 1995 WL 498703, **1-4 (E.D.N.Y. Aug. 14, 1995); *Beckett v. Atlas Air. Inc.*, 968 F. Supp. 814, 817 (E.D.N.Y. 1997).

Southwest's contention that Carter cannot enforce her RLA rights is based on a non-precedential decision in *PHI, Inc. v. Off. & Pro. Emps. Int'l Union*, 440 F.App'x 394 (5th Cir. 2011), which held that individual pilots had no private right of action in a *minor dispute* where the union could adequately represent their interests. RLA Section 152 (Third) and (Fourth)'s plain text and well-established federal court precedent demonstrate that *PHI* is inapposite. *PHI* is distinguishable from Carter's case because it was a minor dispute arising under a CBA, not under RLA Section 152 (Third) and (Fourth), and was subject to mandatory arbitration. *See Diaz*, 2011 WL 13217664, *4 (recognizing that *PHI* concerned minor disputes and is "inapposite" to whether a plaintiff has a private right of action in a major dispute case). Furthermore, *PHI* is distinguishable because the individual pilots' legal interests could be represented by the union. Here, by contrast, Local 556 cannot enforce Carter's RLA rights against the employer and the union because their interests are diametrically opposed.

Carter can seek appropriate relief for Southwest's violations of her RLA rights, including declaratory and equitable relief such as reinstatement, restitution, back-pay, and injunctive relief. *See also* 28 U.S.C. §§ 2201 and 2202.[23] Employees can seek legal and equitable remedies to redress interference, denial, coercion, or influence, because the law declares that the employees shall have rights and employers shall not interfere, deny, coerce, or influence, employees in their exercise of RLA-protected rights. The U.S. Supreme Court has already recognized that, under RLA Section 152 (Third) and (Fourth), "[t]he right is created and the remedy exists." *Texas & N.O.R.*, 281 U.S. at 569-70. "[W]here legal rights have been invaded and a federal statute provides for a general

---

[23] Carter also has remedies under Title VII for Southwest's violation of her rights under that statute. *See* 42 U.S.C. § 1981a (compensatory and punitive damages); 42 U.S.C. § 2000e-5(g) (equitable relief). Carter seeks partial summary judgment on her legal claims. As requested in Carter's motion for partial summary judgment, the Court should grant Carter's motion for partial summary judgment on liability, and allow the parties to proceed to hearing on damages. Carter Br. 59.

right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Franklin*, 503 U.S. at 66 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

## II. Southwest violated Title VII by firing Carter and otherwise discriminating against her because of her religious beliefs and practices.

Title VII creates only two causes of action: disparate treatment claims and disparate impact claims. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015). Title VII's disparate treatment provision prohibits an employer from discharging an employee or otherwise discriminating against her because of her "religion," which includes "all aspects of [her] religious observance and practice, as well as belief." 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j). The Court should deny Southwest's motion for summary judgment because the company violated Title VII's disparate treatment provision by (A) firing Carter for her religious beliefs and practices, (B) intentionally discriminating against her by failing to accommodate her religious beliefs and practices, and (C) Southwest cannot demonstrate that accommodation would have imposed an undue hardship on the company's business.

### A. Southwest fired Carter because of her religious beliefs.

Southwest first violated Carter's rights under Title VII's disparate treatment provision by (1) firing her (2) "because of" (3) "her religion," which includes "all aspects of [her] religious observance and practice, as well as belief." *Abercrombie*, 575 U.S. at 772. Despite the Supreme Court's holding in *Abercrombie*, Southwest invokes the *McDonnell Douglas*'s indirect evidence test, contending that Carter must prove, *inter alia*, she was treated differently from members outside her class.[24] But the indirect proof paradigm only applies when a plaintiff relies on

---

[24] Southwest contends that Carter must demonstrate that she has a bona fide religious belief or was a member of an identifiable religion, that she was qualified for her position as a flight attendant, that her religious beliefs resulted in an adverse employment action, and that she was treated differently from members outside her class. SWA Br. 54. While Carter does not need to prove all

24

circumstantial evidence to prove her case. When there is direct evidence of discrimination, the *McDonnell Douglas* indirect proof paradigm, and burden shifting are inapplicable. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

Southwest admits that it fired Carter under its Social Media Policies for the Facebook videos posted on her personal page and sent to President Stone showing that abortion is the taking of human life. (Carter App.222). Southwest declared that Carter's pro-life videos were "highly offensive" and "disparaging … to all Southwest employees," and that Carter's Facebook videos and private messages sent to President Stone were "harassing and inappropriate." *Id*. Southwest also knew that Carter posted and sent those messages in accordance with her religious beliefs and practices. Carter Br. 26-28, 52-56; (Carter App.222, 242-243, 251-252, 268-269).

Direct evidence demonstrates that Southwest fired Carter "because of" her religious observances, beliefs, and practices. Carter Br. 51-56; (Carter App.222, 268-269). Southwest notes that Carter's message with the picture of women wearing vagina costumes donned at the Women's March was not religious. SWA Br. 49. Carter sent the picture with her message criticizing the union's representation of flight attendants at the Women's March (i.e., donning the symbolic pink hats and marching with participants who wore such costumes), and objecting to the union's use of non-member's forced fees to finance those activities. Carter Br. 38. To be sure, Carter's private Facebook videos and messages to President Stone consisted of both RLA-protected activity (Carter Br. 19-20, ¶¶36a-e, 39), and Title VII-protected activity (Carter Br. 19-21, ¶36a-b, e). Carter Br.

---

of those elements when she is relying on direct evidence of discharge and discrimination, Carter has demonstrated her bona fide religious beliefs (Carter App.527, ¶¶6-9), that she was a member of an identifiable religion (*Id*.), that she was qualified for her position as a flight attendant based on her twenty-year career without discipline (FAC ¶11; SWA Answer, ECF 81, ¶11), that she was fired (Carter App.222), and that she was treated differently from other employees when, as an employee with no disciplinary record, she was fired (*Id*.).

35-40 (RLA-protected activity); Carter Br. 52-56 (Title VII-protected activity). Carter's Facebook posts on her personal page were also Title VII-protected activity. (Carter Br. 19, 21, ¶¶35, 38); Carter Br. 52-56.

Carter observed her religious beliefs and engaged in religious practices when she sent Local 556 and President Stone the pro-life Facebook videos and messages, and posted the pro-life Facebook videos to her personal page. Carter Br. 52-55. Carter's religious observances, beliefs, and practices were both a "but for" cause and a "motivating factor" in Southwest's decision to fire her. Carter Br. 51-56. The Supreme Court explained, "Often, events have multiple but-for causes. So, for example, if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020). Southwest admits it fired Carter for both her religious and RLA-protected activity. But, an employer is prohibited from making an employee's religious practice *any* factor in employment decisions. *See Abercrombie*, 575 U.S. at 773.

### B. Southwest intentionally discriminated against Carter by failing to accommodate her religious beliefs and practices.

Southwest cannot defend its failure to accommodate because, contrary to its characterizations,[25] (1) the company created the conflict between its Social Media Policies and Carter's religious beliefs when it fired Carter for her religious expression, (2) Southwest's liability under Title VII does not depend on Carter' requesting an accommodation or on the company's "actual knowledge" of her need for an accommodation, and (3) Carter exhausted her claim with the EEOC.

---

[25] SWA Br. 45-51.

### 1. Southwest created the conflict between its Social Media Policies and Carter's religious beliefs and practices.

Contrary to Southwest's contentions, Southwest created the conflict between Carter's religious beliefs and practices, and its Social Media Policies.[26] SWA Br. 49. "[T]he rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions." *Abercrombie*, 575 U.S. at 773.[27]

Title VII prohibits Southwest from creating conflicts between neutral "general rules of conduct" and employees' religious beliefs and practices. When an employer applies its policies to an employee, and the employee requires an accommodation as an aspect of religious practice, it is no response that the subsequent discharge was due to an otherwise-neutral policy. *Abercrombie*, 575 U.S. at 775. Southwest created the conflict between Carter's religion and its policies. Southwest's Social Media Policies must yield to Carter's religious practices.

Southwest knew that Carter was observing her religious beliefs and practices by sending and posting her Facebook videos and messages. (Carter App.222, 242-243, 251-252, 268-269); Carter Br. 26-28, 52-56.[28] Despite that knowledge, Southwest applied its broad-sweeping Social Media

---

[26] Contrary to Southwest's arguments, Carter maintained from the outset that Southwest created a conflict between its work rules and her religious beliefs when it concluded that her Facebook posts and messages opposing abortion conflicted with its Social Media Policies, and fired her. Carter Br. 52-56.; ECF 80-2, p.2 ¶¶ 6-8; FAC ¶¶104, 106-115, 119-122; SWA Br. 40.

[27] Southwest's assertion that "general references to religious beliefs are insufficient to trigger an accommodation obligation" is inaccurate and irrelevant in this case because Southwest knew that Carter sent and posted the Facebook videos at issue for religious reasons. *See Abercrombie*, 575 U.S. at 774 n.3; Carter Br. 53-56; SWA Br. 48.

[28] Southwest's contention that it never communicated to plaintiff that she is unable to make statements opposing abortion "or otherwise disfavored pro-life views" misses the point. SWA Br. 50. Southwest fired Carter precisely because of her religious videos opposing abortion. By firing Carter for sending her messages, Southwest's actions were "synonymous" with intentional

Policies to Carter's pro-life videos on her Facebook page, concluding that her posted videos were "highly offensive in nature," and that the same videos she privately sent to President Stone were "harassing and inappropriate." (Carter App.222).[29] Southwest also stated that Carter's pro-life videos posted on her personal represented the company "in a manner that is disparaging to Southwest Flight Attendants as well as to all Southwest Employees." *Id.*

"Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not to discharge any individual because of such individual's 'religious observance and practice.'" *Abercrombie*, 575 U.S. at 775 (cleaned up). Southwest's defense that its Social Media Policies are general rules of conduct prohibiting "abuse of fellow employees" fails because "Title VII requires otherwise-neutral policies to give way to the need for an accommodation." *Abercrombie*, 575 U.S. at 775; SWA Br. 50.

Southwest's objection that "[t]here is nothing in Title VII that requires employers to give lesser punishments" to employees after they violate company rules, was rejected in *Abercrombie*.[30] Southwest also contends that employers can prohibit "denigrating and hostile conduct" under general work rules if it refrains from viewpoint restriction. SWA Br. 50. "[I]t is irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might

---

discrimination. Southwest failed to engage in any accommodations dialogue. "The prohibition of discrimination because of religious practices is meant to force employers to consider whether those practices can be accommodated without undue hardship." *Abercrombie*, 575 U.S. at 778 (Alito, J., concurring).

[29] Contrary to Southwest's characterizations, Southwest's termination letter says that the company fired Carter because the private Facebook messages she sent to President Stone (which included videos showing that abortion was the taking of human life and messages stating that abortion is murder) "were harassing and inappropriate" and that her Facebook posts (showing that abortion is the taking of human life) "were highly offensive in nature." SWA Br. 50 (citing its termination letter at SWA App.1180).

[30] SWA Br. 50 (quoting *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1020 (4th Cir. 1996)).

28

motivate it." *Bostock*, 140 S. Ct. at 1744. Title VII requires Southwest's Social Media Policies to yield to the need for an accommodation. *Abercrombie*, 575 U.S. at 775.

Southwest's contention that the company fired Carter for "the manner of communications, insults, threats, and graphic images" is baseless for the same reasons.[31] "Intentionally burning down a neighbor's house is arson, even if the perpetrator's ultimate intention (or motivation) is only to improve the view." *Bostock*, 140 S. Ct. at 1742. Carter's religious beliefs and practices are *protected* by Title VII, and even neutral policies must yield to Southwest's affirmative obligation to engage Carter's need for an accommodation. Whatever other factors besides Carter's religious beliefs and practices contributed to Southwest's decision, "[i]t doesn't matter." *Id.* at 1741. "An employer violates Title VII when it intentionally fires an individual employee based in part on [religion]." *Id.*

Furthermore, Southwest's termination of Carter for the religious content of her messages *was* viewpoint restriction. SWA Br. 50. When anyone restricts speech "based on its perception that the speech will spark fear among or disturb its audience, such regulation is by definition based on the speech's content." *United States v. Marcavage*, 609 F.3d 264, 282 (3d. Cir. 2010); *FCC v. Pacifica Found.*, 438 U.S. 726 (1972) (stating that if the speaker's opinion gives offense that is the reason

---

[31] Southwest's pejorative characterizations of Carter's Facebook videos and messages demonstrate the company's discrimination based on the content of Carter's expression. Southwest also fails to show how Carter's Facebook messages threatened President Stone. SWA Br. 57. Carter's messages to President Stone included advocacy for the recall campaign: "by the way the RECALL is going to Happen and you are limited in the days you will be living off of all the [Southwest Airlines flight attendants]..cant wait to see you back on line." (Carter App.81, 531). Southwest has previously contended that this was threatening, but Carter was telling President Stone: "Can't wait to see you out of office." Indeed, when President Stone was leaving office, she wrote in a union magazine, "Yippee Ki-yay and I'll see you on Line!" (Carter Resp. App.27).

for protecting it).[32]

Southwest's argument that there is no failure to accommodate when an employee may engage in asserted practice without violating the employer's policies misses the point. SWA Br. 49. Southwest created the conflict by applying its Social Media Policies to Carter's religious practice and then failed in its affirmative duty to accommodate her. To the extent Southwest believed Carter could engage in her practices without violating the company's policies, it had an *affirmative obligation* to explore those options with her first as part of the accommodation process. *Abercrombie*, 575 U.S. at 775. Southwest applied its Social Media Policies to Carter and fired her without making any accommodation attempts. (Carter App.378-379; Schneider 96:18-25, 97:1-8); (Carter App.306-307; Sims 164:1-25, 165:15-18). Firing an employee for her religious practices "is synonymous with refusing to accommodate the religious practice." *Abercrombie*, 575 U.S. at 775.[33]

Southwest's reliance on *Schwartzberg* and pre-*Abercrombie* cases is misplaced because the Supreme Court overruled them with its holding that employer's neutral policies must yield to an employee's religious beliefs and practices, and that Title VII affirmatively obligates employers to accommodate. 575 U.S. at 775; SWA Br. 47-51. Even the employer in *Schwartzberg* did not immediately fire the employee whose religious views involved his opposition to homosexuality. *Schwartzberg v. Mellon Bank, N.A.*, No. 2:06cv1006, 2008 WL 111984, *3-7 (W.D. Pa. Jan. 8,

---

[32] "[T]he burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Snyder v. Phelps*, 562 U.S. 443, 459 (2010) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 210-11 (1975)).

[33] While Southwest states that Carter acknowledged she could act in accordance with her stated religious belief (share her pro-life views with fellow employees) without violating Southwest's Social Media Policies, the citation does not support that assertion. SWA Br. 50 (citing SWA App.216-217). Besides, Title VII required Southwest's Social Media Policies to give way to Carter's need for an accommodation and affirmatively obligated Southwest not to fire Carter because of her religious observance and practice. *Abercrombie*, 575 U.S. at 775.

2008). By contrast, Southwest immediately fired Carter without initiating an accommodations dialogue, which Title VII forbids. Carter Br. 51-56. Unlike any other case cited by Southwest, Carter's complained-of pro-life communications were made to the union president, who, unlike the co-workers in cases like *Schwartzberg* and *Chalmers*, had affirmative obligations to accommodate Carter under Title VII as well as federal obligations under the RLA to represent and protect Carter as her government-imposed exclusive bargaining representative. Carter Br. 47-48, 51, 56-59; SWA Br. 50.

Southwest fired Carter for her religious expression's content, characterizing her pro-life videos and messages as "highly-offensive," "harassing and inappropriate," and "disparaging … to all Southwest employees." (Carter App.222). Simply put, Southwest refuses to recognize that Title VII protects employee religious beliefs and practices.

### 2. Title VII's disparate treatment provision does not require employees to request an accommodation or require that the employer have actual knowledge of a need for an accommodation.

Contrary to Southwest's contentions, showing that an employer has "actual knowledge" of an employee's need for an accommodation is not necessary to showing the company's intentional discrimination.[34] Title VII's disparate-treatment provision, § 2000e-2(a)(1), "does not impose a knowledge requirement." *Abercrombie*, 575 U.S. at 773. For that reason, Carter had no burden to request an accommodation or raise a religious conflict. The U.S. Supreme Court rejected Southwest's argument in *Abercrombie*, reasoning that:

> This [burden to request an accommodation] would require the employer to have actual knowledge of a conflict between an [employee's] religious practice and a work rule. The problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks us to add words to the law to produce what is

---

[34] Thus, Southwest is incorrect that an employer is only obligated to provide a religious accommodation if it is aware that an employee's religious belief conflicts with a requirement of employment. SWA Br. 48.

> thought to be a desirable result. That is Congress's province … [Title VII's]
> disparate-treatment provision prohibits actions taken with the *motive* of avoiding
> the need for accommodating a religious practice. A request for accommodation, or
> the employer's certainty that the practice exists, may make it easier to infer motive,
> but is not a necessary condition of liability.

575 U.S. at 774. "Instead, an [employee] need only show that his need for an accommodation was

a motivating factor in the employer's decision." *Id*.

Having learned of and acknowledged Carter's religious observances, beliefs, and practices,

Southwest still fired Carter in violation of its affirmative obligations under *Abercrombie*. (Carter

App.242-243, 245, 251, 268). Southwest knew that Carter, in accordance with her religious beliefs

and practices, shared her pro-life videos to show that abortion is the taking of human life contrary

to God's will. (Carter. App. 242-243, 251). When President Stone complained about Carter's pro-

life videos and messages Southwest managers immediately recognized the religious import of

Carter's messages, and quickly involved their Employee Relations team, which handles religious

discrimination matters. Carter Br. 24-25.[35] Southwest's Vice President Sims knew that Carter's

case was an employee relations matter from seeing the talk about "pro-life" in President Stone's

complaint and seeing the allegations there. (Carter App.297, Sims 139:3-24) (Carter Br. 23).

Southwest's Senior Labor Relations Director Hudson also directed managers to forward the

complaint to employee relations. (Carter App.231) (Carter App.298-301, Sims 144:21-146:15;

147:4-19). (Carter Br. 23). Southwest also avoided Carter's need for an accommodation and its

affirmative obligation not to fire her by refusing to refer her issues to its ACT Team, and failing

---

[35] (Carter App.9, 230); (Carter App.276-277, 280, 289-291, 298; Sims 27:23-28:1, 49:17-25, 100:24-101:16, 103:3-9, 144:9-15); (Carter App.339-346; Gutierrez 9:12-18, 12:8-16:1, 30:10-31:3); (Carter App.232; Emlet 24:10-25); (Carter App. 366-367; Schneider 47:1-10, 48:4-21); (Carter App.400; Jones 49:10-21).

to consider a multitude of other options apart from termination.[36] *See infra* at 39-40. Southwest was objectively aware of the protected religious characteristics at stake, but the company evaded its duty to inquire into whether an accommodation might be feasible. Carter Br. 29. Southwest clearly recognized the religious import of Carter's messages and discerned that Carter was observing her religious beliefs, but avoided its statutory duty to accommodate.

Carter's pro-life Facebook videos and messages and her statements in the March 2017 fact-finding confronted Southwest with her need for a religious accommodation. While Southwest knew of Carter's need for an accommodation, the company avoided her need by firing Carter instead of attempting to accommodate her. Carter Br. 29.

Not only did Southwest avoid its duty to accommodate Carter's religious beliefs, it actively used its investigation to prosecute the case against her religious posts by digging up old, highly attenuated posts from Carter's Facebook timeline to establish "a nexus to the workplace" and justify its illegal action. Carter Br. 25, 29.[37] Carter stated that all of these posts but one were roughly 2-years old, and Southwest could never say how old they were. Carter Br. 30.[38] The one exception was a Facebook post showing Carter wearing a very small identification badge, but any connection to Southwest was indiscernible. *Id*. There was no connection whatsoever between Carter's religious videos and messages and Southwest. Carter Br. 19-21; (Carter App.78-103, 528 ¶11, 531). Given the highly attenuated nature, this "nexus" was merely cover for the company to evade its duty to accommodate Carter's religious beliefs and practices. When Southwest knew of

---

[36] (Carter App.378-379; Schneider 96:18-25, 97:1-8); (Carter App.306-307; Sims 164:1-25, 165:15-18).

[37] (Carter App.114, 117-138); (Carter App. 362, 369-370, 375-377; Schneider 43:12-25, 54:10-55:23, 83:23-85:20); (Carter App.396-397, Jones 8:17-9:9).

[38] (Carter App. 529-530, ¶17); (Carter App.380; Schneider 98:1-7); (Carter App.328; Emlet 83:16-18).

the conflict between its application of the Social Media Policies and Carter's religious beliefs and practices, it had an affirmative duty not to fire her. *See* SWA Br. 49. Southwest's termination of Carter, without any accommodations inquiry or dialogue was an abject refusal to comply with its affirmative obligations under Title VII.

Southwest's reliance on the Fifth's Circuit's decision in *Clark*, a case arising under the Americans with Disabilities Act, is misplaced. The Supreme Court specifically rejected this comparison between Title VII's disparate treatment provisions and the ADA: While the Americans with Disabilities Act of 1990 defines discrimination to include an employer's failure to make "reasonable accommodations to the *known* physical or mental limitations of an employee," Title VII contains no such limitation. *Id.* (citing § 12112(b)(5)(A))(emphasis in *Abercrombie*).

Southwest relies almost exclusively on authorities that pre-date the U.S. Supreme Court's decision in *Abercrombie*.[39] To be sure, the Fifth Circuit decided *Nobach* after *Abercrombie*, but there was no evidence in *Nobach* the employer in that case was avoiding the employee's need for an accommodation because the employer did not have any reason to know *or suspect* the employee's religious beliefs before it terminated her. *See Nobach v. Woodland Vill. Nursing Ctr.*, 799 F.3d 374, 378-79 (5th Cir. 2015).

Southwest also objects that Carter failed to notify the company of her religious beliefs "prior to violating the [social media] policy." SWA Br. 51. Title VII prohibits the employer's motive of avoiding the employee's need for an accommodation when its application of work rules creates a conflict, not its knowledge prior to applying the policy. *Abercrombie*, 575 U.S. at 775. Title VII "gives [religious practices] favored treatment, affirmatively obligating employers not to discharge any individual because of such individual's 'religious observance and practice.'" *Abercrombie*,

---

[39] *See* SWA Br. 48.

575 U.S. at 775 (cleaned up). Carter did not need an accommodation under Southwest's Social Media Policies until the company applied its Social Media Policies to her religious expression and fired her.

Southwest incorrectly states that all of its managers involved in Carter's termination generally had pro-life views. *See supra* at 8-9. Nor would it matter under Title VII if they did. Southwest's Title VII violations consist of firing Carter because of her religious beliefs and intentionally discriminating against her by failing to accommodate her religious beliefs and practices. Whatever subjective views the individual managers might have generally held, Southwest fired Carter in this instance for pro-life Facebook videos and messages while knowing that Carter sent them in accordance with her religious beliefs, observances, and practices.

For similar reasons, whether Carter had subjective evidence of Southwest managers' private discriminatory intent with respect to her religious beliefs and practices is inconsequential. *See supra* at 8-9. While Carter did not know "what was in their heads," Carter explained in her deposition that she told the managers she was a Christian in her fact-finding meeting and that she was against the Women's March and the union marching for Planned Parenthood due to her strong religious beliefs against abortion. (Carter Resp. App.2-3; Carter Tr. 74:21-75:5); (SWA App.657; Carter Tr. 128:3-4).

Carter testified "they should have recognized my Christian beliefs within the fact-finding meeting when I said I don't… believe in abortion and I don't believe that our … my union president should have taken our dues and spent it on a march." (Carter Resp. App.4-5; Carter Tr. 78:24-79:5). "Everyone of these people should have known that I was a Christian because this all [her Facebook videos and messages] was sent to them." (SWA App.656; Carter Tr. 127:1-14); (SWA App.614; Carter Tr. 85:2-11). "They should not have fired me over my Christian beliefs." (Carter

35

Resp. App.5; Carter Tr. 79:15-16). Carter also answered that her evidence that the company sought to discriminate against her on the basis of her religious beliefs was that the company did not provide her with a religious accommodation (SWA App. 204; Carter Tr. 84:1-11).

### 3.   Carter exhausted her administrative remedies at the EEOC.

Contrary to Southwest's characterizations, Carter's EEOC charge alleged a failure to accommodate claim and exhausted her administrative remedies. SWA Br. 45. Southwest's contention that Carter failed to exhaust EEOC remedies arises from its failure to understand that a failure to accommodate claim *is* an intentional discrimination claim under Title VII's disparate-treatment provisions. *Abercrombie*, 575 U.S. at 771-72, 774-75. The Supreme Court recognized in *Abercrombie* that Title VII creates only two causes of action: disparate treatment claims (intentional discrimination) and disparate impact claims. *Id.* at 772. Carter's EEOC charge alleged all of the elements of a disparate treatment claim: (1) Southwest fired her, (2) "because of", and (3) her religious beliefs and practices (¶¶1-2). *See Abercrombie*, 575 U.S. at 772.

Furthermore, "the rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions." *Id.* at 773. Firing an employee for her religious practice "is synonymous with refusing to accommodate the religious practice." *Id.* at 775. Carter's EEOC charge alleged, "As a result of my Facebook posts and messages that opposed abortion, and without prior warning that such activities violated its work rules, [Southwest] fired me," "Southwest never warned me that using Facebook to protect life was inconsistent with its work rules," and "[a]s a result of the foregoing, my employer discriminated against me on the basis of my sincerely held religious beliefs and speech." FAC Ex. A, ECF 80-2,

36

p.2, (¶¶6, 8-9). Carter's EEOC charge put Southwest on notice of her failure to accommodate claim as it set forth all of the necessary elements under *Abercrombie*.

Contrary to Southwest's suggestions, the Fifth Circuit does "not require that a Title-VII plaintiff check a certain box or recite a specific incantation to exhaust his or her administrative remedies before the proper agency." *Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006) (internal footnote and citation omitted). While the Fifth Circuit does not require "for purposes of exhaustion, that a plaintiff allege a prima facie (sic) case before the EEOC," Carter *did* allege a prima facie case, with all the necessary elements of a failure to accommodate claim. *Id*. The Fifth Circuit asks what EEOC investigations the charge can reasonably be expected to trigger. *Id*. Carter's EEOC charge did trigger an investigation into whether Southwest intentionally discriminated against Carter by firing her for a conflict between Southwest's work rules and her religious beliefs and practices (i.e., failure to accommodate). Southwest opposed Carter's failure to accommodate claims in its Second Motion to Dismiss with substantive arguments, and it did not raise any of the exhaustion arguments it raises now. The company's attempt to raise them now rings hollow. (ECF 49, pp.28-32). Exhaustion is not jurisdictional. *Davis v. Fort Bend Cnty.*, 893 F.3d 300, 307 (5th Cir. 2018). Exhaustion's important is to provide an opportunity for voluntary compliance before a civil action is instituted. *Id*. But Southwest never intended to comply. From the moment Southwest fired Carter and rejected accommodation, it disavowed any non-judicial resolution of her accommodation claim. Southwest's argument is mere pretext because, ultimately, it says "[n]o religious accommodation would have excused Carter for her reported misconduct." SWA Br. 50.

### C.  Southwest has no undue hardship defense.

Contrary to Southwest's claims, the company could have accommodated Carter's religious beliefs without undue hardship. SWA Br. 51-52. Title VII allows an employer to attempt to show that it was unable to reasonably accommodate an individual's religious beliefs without undue

37

hardship on its business. Title VII sets forth this defense in 42 U.S.C. § 2000e(j)'s definition of religion, which requires the employer to accommodate all aspects of religious observance and practice, as well as belief, "unless an employer demonstrates that he is unable to reasonably accommodate to an employee's … religious observance or practice without undue hardship on the conduct of the employer's business." Undue hardship exists when a religious accommodation would require an employer to incur more than a *de minimis* cost to its business. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).

Southwest cannot raise an undue hardship defense because it did not make any efforts to accommodate before firing Carter. Employers cannot raise an undue hardship defense if they do not even initiate any efforts to accommodate. *See Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993). Undue hardship requires "at a minimum, the employer negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs." *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1513 (9th Cir. 1989) (citing *Hardison*, 432 U.S. at 75). "The prohibition of discrimination because of religious practices is meant to force employers to consider whether those practices can be accommodated without undue hardship." *Abercrombie*, 575 U.S. at 778 (Alito, J., concurring).

Having learned in the fact-finding of Carter's religious reasons for posting the videos and sending them to the Local 556 President, Southwest did not attempt or even evaluate a religious accommodation of Carter's beliefs. Southwest never identified any undue hardship prior to firing Carter. Southwest's post hoc "undue hardship" justifications, contrived during litigation, are no defense or explanation for why the company failed to accommodate her religious beliefs in March 2017.

Southwest contends it is not required to make any attempts to accommodate an employee if any accommodation short of firing Carter would have imposed an undue hardship on its business. SWA Br. 52 n.99 (citation omitted). To be sure, the Fifth Circuit has held that employers need not make efforts to accommodate an employee's religious beliefs if they can show that *any* accommodation would impose an undue hardship on the company's business. *See Weber v. Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000). But Southwest cannot show that any, much less every possible accommodation would have imposed an undue hardship on the conduct of its business. *See* 42 U.S.C. 2000e(j).

Southwest cannot even meet *Hardison*'s "more than de minimis" test because the company fails to present evidence showing *any* undue hardship on its business. Without any basis or support, Southwest asserts that "[n]o religious accommodation would have excused Carter for her reported misconduct." SWA Br. 50. The undue hardship defense requires more than conclusory assertions devoid of any impact on the company's business. Southwest did not identify any hardships with accommodating Carter's religious beliefs before firing her. Southwest, in fact, admitted that Carter's Facebook communications imposed no financial harm on the company prior to her termination. (Carter App.310; Sims 222:3-4). Southwest did not receive any complaints about the posts Carter made on her Facebook page. (Carter App.309; Sims 221:13-16). Southwest only discovered those posts as part of its internal investigation of President Stone's complaint, which did not mention any of Carter's public Facebook page posts. *See supra* at 33 n.37.

Southwest never discussed with Carter whether she would be willing to post a disclaimer on her Facebook page that her posts do not necessarily represent the company's views. (Carter App. 387; Schneider 126:15-25). Southwest never asked Carter if she would remove Facebook posts that it considered to be a nexus to the workplace. (Carter App. 387; Schneider 126:11-14). Nor did

Southwest ever ask if Carter would take any Facebook posts down prior to her termination. (Carter App. 387; Schneider 126:7-10). (Carter App. 310; Sims 222:5-7). Instead, Southwest immediately fired her, a 20-year flight attendant without any disciplinary history. (Carter App.372, Schneider 69:15-17); (Carter App.308; Sims 188:14-16). All of the company's arguments now are nothing more than post-hoc rationalizations contrived to justify its unlawful, discriminatory actions.

Carter sent the Facebook videos and messages to one person—Local 556 President Audrey Stone—in response to the union's participation in the Planned Parenthood March on Washington D.C. Thus, Carter did not "harass co-workers" and did not "repeatedly" distribute the Facebook videos to "co-workers." SWA Br. 50. While Carter posted the Facebook videos to her personal Facebook page, that is hardly "distribut[ing] graphic material in a public forum." *Id*. Southwest confirmed that the company did not receive any other reports about her messages or posts. (Carter App.309, Sims 221:13-16). Southwest's claim that Carter was "readily identifiable as a Southwest employee" is also misleading, and demonstrates a pretext for avoiding its affirmative duty to accommodate Carter's religious beliefs. *See supra* at 5-6. Without offering any evidence to support its undue hardship claim, Southwest instead asserts—as a legal matter—that Title VII does not require an employer to accommodate an employee's desire to impose his religious beliefs upon his co-workers. SWA Br. 52.

Contrary to Southwest's characterization, the standard is not whether the accommodation would impose more than a *de minimis* burden "on *an employee's co-workers*." SWA Br. 51 (emphasis added). Title VII requires Southwest to demonstrate that it is unable to reasonably accommodate to an employee's … religious observance or practice without undue hardship on the conduct of the employer's *business*." 42 U.S.C. § 2000e(j) (emphasis added). Carter also posted her pro-life videos to her personal Facebook page, and did not send them to any other employees.

But no other employees complained to Southwest about Carter's Facebook posts. Carter only sent her pro-life Facebook videos and messages to one person—President Stone.

Moreover, Southwest's contention that the union president was offended is not a hardship on the company's business. Southwest cannot evade its affirmative obligation to Carter simply because her protected characteristic—her religious beliefs and practices—offended Local 556's President, who has a duty under federal law to hear represented employees complaints and grievances with union representation. Local 556 and President Stone, as Carter's government-imposed exclusive representative, have affirmative obligations under Title VII to accommodate Carter's religious beliefs and practices and legal duties under the RLA to hear employee objections to the union's activities and representation of employees. Southwest would not have incurred more than a *de minimis* cost by refraining from interposing itself in union matters—Carter's union dissident communications with President Stone. The RLA protects Carter's rights to send videos and messages to an exclusive bargaining representative who is foisted upon her by Congress. President Stone and Local 556 have a legal duty to represent union dissidents, and the RLA prohibits the employer from interfering. Local 556 and President Stone also have legal obligations under Title VII not to discriminate against Carter based on her religious beliefs or attempt to cause the employer to discriminate against her.

Southwest also raises legal authorities that are inapposite to its undue hardship defense. SWA Br. 52. For instance, *Wilson* was not an undue hardship case because the employer made a reasonable accommodation offer to an employee who wished to wear a pro-life button at the workplace. Here, Southwest fired Carter without making any attempts or inquiries into a reasonable accommodation. *See Wilson v. U.S. West Commc'ns*, 58 F.3d 1337, 1342 (8th Cir. 1995). Not only is *Chalmers* distinguishable because it is a pre-*Abercrombie* case, but, unlike

41

*Chalmers*, Carter sent her Facebook videos and messages to the Local 556 President to address union-related activities, and no employees reported Carter's Facebook posts on her website to the company. (Carter App.310; Sims 221:13-16).

While this Court may be bound by *Hardison*'s "more than *de minimis*" test it should be overturned because it is incorrectly reasoned and based on an erroneous interpretation of "undue hardship" that deviates from Title VII's text and plain meaning. Three Supreme Court Justices and the former Solicitor General have agreed that the Court "should grant review in an appropriate case to consider whether *Hardison*'s interpretation should be overruled." *Patterson v. Walgreen Co.*, 140 S. Ct. 686, 686 (2020) (Alito, J., concurring in the denial of certiorari). Carter would preserve that issue for appeal.

*Hardison* contradicts Title VII's text and history because it defines undue hardship as merely something more than a *de minimis* cost. 432 U.S. at 84. Justice Marshall dissented in part on the ground that "[a]s a matter of law, I seriously question whether simple English usage permits 'undue hardship' to be interpreted to mean 'more than a de minimis cost[.]'" 432 U.S. at 92 n.6 (Marshall, J., dissenting). Undue simply does not mean and cannot mean more than *de minimis*. Undue means unwarranted or excessive. By contrast, a *de minimis* burden means trifling, minimal, or so insignificant that a court may overlook it when deciding an issue or case. *Hardison*'s discussion of "undue hardship" was also dicta because the Supreme Court was construing an EEOC guideline in that case, not the statute itself. *See Abercrombie*, 575 U.S. at 787 n. * (Thomas, J., concurring in part and dissenting in part).

Under the guise of equality, *Hardison* allows employers to systematically discriminate against and exclude religious minorities from the workplace using overly-broad rules, such as Southwest's Social Media Policies. *Hardison*'s "more than *de minimis*" standard strips religious employees of

42

their Title VII protections in the workplace. *Hardison*'s consequences cannot be overstated. It means that an employer need not "grant even the most minor special privilege to religious observers to enable them to follow their faith." 432 U.S. at 87 (Marshall, J., dissenting). Its interpretation "nullif[ies]" Congress's legal protections for religious employees. *Id*. (Marshall, J., dissenting). Thus, in practice employers can deprive religious employees of their livelihood for simply following their faith. The Supreme Court, however, recently reversed course and rejected *Hardison*'s conceptual framework. *See Abercrombie*, 575 U.S. at 775 ("Title VII does not demand mere neutrality with regard to religious practices . . . . Rather, it gives them favored treatment."). Congress required accommodation in Title VII to eliminate the cruel choice *Hardison* requires countless religious employees to make—they must either surrender their faith or their job. For these reasons, *Hardison*'s "more than de minimis" test should be overruled.

### III. The CBA-arbitration findings asserted by Southwest should not be given issue preclusive effect for Carter's RLA and Title VII claims.

Contrary to Southwest's characterizations, the arbitrator concluded only that Southwest had "just cause" to terminate Carter under the collective bargaining agreement, and could not reach Carter's RLA and Title VII claims, which were beyond the scope of the arbitrator's authority. Factual findings from the arbitration—which concerned only whether Southwest had "just cause" to fire Carter under the CBA's terms—should not be given issue preclusive effect for Carter's RLA and Title VII claims. The arbitrator made his findings in the strict confines of the CBA, without reference to the legal standards or legal context of Carter's RLA and Title VII claims, and without discovery rules and procedures necessary to protecting federal statutory interests.

### A. Carter's direct evidence and the federal interests warranting protection of Carter's RLA and Title VII rights outweigh the relevance of "just cause" findings from the CBA arbitration.

Contrary to Local 556's characterizations, the arbitrator's findings cannot controvert direct evidence that Local 556 and President Stone caused Carter to be fired for her RLA-protected activity and religious beliefs and practices. To be sure, courts may consider and give evidentiary weight to findings of fact from arbitral proceedings in subsequent federal claims. *Grimes*, 746 F.3d at 188.[40] But issue preclusion is not automatic, and courts have "discretion" as to the weight it will give an arbitration *relative to the weight of the plaintiff's evidence*. *Grimes*, 746 F.3d at 188 (emphasis added). Carter's direct evidence, combined with the arbitrator's own admissions that Carter's RLA and Title VII claims were beyond the scope of his authority, foreclose the relevance of his findings beyond the question of whether Southwest had "just cause" under the strict confines of the CBA. Carter obtained direct evidence through the federal discovery process regarding President Stone's reasons for reporting Carter's conduct that she did not have access to during the arbitration and that were beyond the scope of whether Southwest had "just cause" to fire Carter.

The Fifth Circuit, under *Grimes*, also requires courts to consider "federal interests warranting protection." 746 F.3d at 188 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985)). Federal courts should independently review relevant factual issues when a plaintiff seeks to vindicate her statutory rights in a judicial forum. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 56, 60 n.21 (1974) (Title VII decision recognizing that a court may afford weight to the arbitral decision "where the issue is solely one of fact"); *McDonald v. City of West Branch, Mich.*,

---

[40] *But see Gonzalez v. S. Pac. Transp. Co.*, 773 F.2d 637, 643 (5th Cir. 1985) ("Even if the same claim and factual allegations were determined by binding arbitration, [a] plaintiff is entitled to *de novo* review in a federal court [on his federal discrimination claims] and doctrines of *res judicata* or collateral estoppel are inapplicable.").

466 U.S. 284, 292 (1984) (holding in a 42 U.S.C. § 1983 civil rights action that "a federal court should not afford *res judicata* or collateral-estoppel to effect an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement"); *Grappe v. Kansas City S. Ry. Co.*, 71 F. App'x. 302, 303 (5th Cir. 2003) (holding that issue preclusion is unavailable in a Title VII action "because different policies underlie the proceedings before the [arbitrator] and the Title VII action…").

Giving automatic issue preclusive effect to the arbitrator's findings would prejudice Carter's federal rights and her due process rights when she relies on contrary evidence obtained pursuant to the federal discovery rules. *See McDonald*, 466 U.S. at 290. "The record of the arbitration proceedings is not as complete … the usual rules of evidence do not apply; and the rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath are often severely limited or unavailable." *Alexander*, 415 U.S. at 57-58.

Even where a plaintiff is allowed to call and cross-examine witnesses and submit evidence in arbitration proceedings, fact finding procedures have been deemed inadequate to protect federal rights. *See Grimes*, 746 F.3d at 189. For these reasons, the Court should not give the arbitrator's findings preclusive weight here, especially when, pursuant to the federal rules of discovery, Carter obtained discovery that she did not have at the arbitration and that she could not have obtained through arbitration procedures. For instance, Carter could not propound interrogatories and requests for production or take depositions. Through those processes Carter obtained evidence that she did not have access to at the arbitration. Simply put, the arbitration's evidentiary procedures were not suited to protecting Carter's rights under the RLA, Title VII, and duty of fair representation. Contrary to Southwest's characterizations, the arbitrator's findings cannot

45

controvert direct evidence that it fired Carter for RLA-protected activity and her religious beliefs and practices.

**B. Issue preclusion does not apply because the arbitration of "just cause" under the CBA involves legal issues and standards distinct from those in Carter's RLA and Title VII claims, and the asserted findings are legal conclusions beyond the scope of and unnecessary to the arbitrator's decision.**

The Court should not give the arbitrator's findings preclusive effect with respect to Carter's RLA and Title VII claims. Issue preclusion only applies to findings when the *identical* issue was previously adjudicated and the finding was *necessary* to the arbitrator's decision. *Bradberry v. Jefferson Cnty.*, 732 F.3d 540, 548 (5th Cir. 2013). Neither condition was met.

**1. Issue preclusion does not apply because the legal standards applied to the CBA "just cause" issue adjudicated at the arbitration are distinct from Carter's RLA and Title VII claims.**

Issue preclusion does not apply because the issues adjudicated were not "identical." For issue preclusion to apply *both* the facts and the legal standard used to assess them must be the same in both proceedings. *See Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415, 1422 (5th Cir. 1995). The "just cause" standard used in the arbitration put the burden on the employer to prove the employee engaged in misconduct under the bargaining agreement, and that the "severity of the disciplinary action is reasonably related to the seriousness of the proven offense and the employee's prior record." *Providence St. Peter*, 123 LA 473, 476 (2006) (Gaba). Whether the employer had just cause depends on factors such as whether it obtained proof of the employee's guilt, applied its rules and penalties even-handedly, and whether the degree of discipline was reasonably related to the seriousness of the proven offense and the employee's service record. *Id.*

46

at 477 & n.4. This standard is separate and distinct from what Carter must demonstrate to prove her RLA and Title VII claims.[41]

The Court should not give the arbitrator's "findings" preclusive effect in any of RLA claims because the legal standards used to assess the facts are not the same: Whether Southwest had "just cause" under the CBA is irrelevant to whether Carter's RLA-protected activity was a "substantial or motivating" factor for her termination. "Just cause" is a legal standard limited to whether it could fire her under the CBA's terms. Similarly, whether Southwest had "just cause" under the CBA is irrelevant to whether Local 556 breached its duty of fair representation by acting arbitrarily, discriminatorily, or in bad faith. The legal standards for assessing the facts are also different when comparing "just cause" under the CBA to whether Local 556 caused or attempted to cause Southwest to fire Carter because of her religious beliefs and practices in violation of Title VII or failed to accommodate her religious beliefs and practices. The arbitrator refused to consider Carter's religious beliefs, and if he had, those findings would have been beyond the scope of determining "just cause." The arbitrator conceded that the RLA, Title VII, the duty of fair representation, and employees' rights thereunder were beyond the scope of the arbitration, and that his findings are unrelated to Carter's RLA-speech and association rights.[42]

---

[41] The arbitrator's opinion never defined the elements of "just cause," making the scope extremely unclear and demonstrating further why the findings are not entitled to preclusive effect. *Grimes*, 746 F.3d at 188 (recognizing that arbitral pleadings must state issues clearly to warrant preclusive effect).

[42] The arbitrator mentions Carter's "personal beliefs on abortion, her distaste for current union leadership, and her right to refrain from compulsory union activity such as paying the union's compelled fees for its political, ideological, and other nonbargaining spending." He states, "that the Grievant holds very strong personal views on such subjects, or that she has exercised her Railway Labor Act and First Amendment rights, *are not germane to my determination of just cause for her termination*." SWA App.1008, p6 n.2 (emphasis added).

The CBA arbitration of "just cause" did not assess the facts using the same legal standards that apply to Carter's RLA and Title VII claims. The arbitrator did not consider Carter's RLA-protected rights or Title VII's protection of her religious beliefs, or Local 556's and President Stone's duties and obligations to employees under the RLA and Title VII. When arbitrating "just cause" under the CBA the arbitrator could not evaluate President Stone's federal statutory obligations under the RLA and Title VII, which prohibited union officials from reporting represented employees' conduct. Thus, the Court should not give effect to the arbitrator's finding that Southwest does not have a policy or practice of disciplining or not disciplining employees based upon their view of Local 556 or Audrey Stone. SWA Br. 34.

Similarly, the arbitrator's finding—that President Stone reported Carter's conduct not to retaliate against her but because she believed Carter violated policies that were applicable to her— cannot be given preclusive effect. *Id*. That finding, a conclusion of law more than fact, cannot be applied to Carter's RLA and Title VII claims, because it presumes the application of federal statutory rights and legal standards that the arbitrator admitted he could not reach. The arbitrator did not apply the same legal standards to evaluate the facts or contemplate RLA rights or religious beliefs and practices. For the same reasons, the arbitrator could not determine whether Carter was treated less favorably than other employees based on her exercise of RLA protected rights or her religious beliefs. SWA Br. 33. The arbitrator did not have evidence before him that was produced in discovery, and—by his own admission—he was not qualified to make these conclusions with respect to Carter's exercise of her RLA and Title VII rights.

Southwest also references the arbitrator's comments regarding Carter's twenty-year employment record without discipline. SWA Br. 33. But those comments only show that Southwest may have been justified to fire Carter under the contract; those comments do not

controvert Carter's record or preclude Carter's RLA and Title VII claims, which are based on different protected rights, different causation standards, and distinct statutory schemes.

**2. Issue preclusion does not apply because Southwest asserts purported "findings" that are legal conclusions and beyond the scope of and unnecessary to the arbitrator's decision.**

Southwest's issue preclusion argument is based on legal conclusions the arbitrator made in the strict confines of a "just cause" arbitration. "[A]n arbitrator may be competent to resolve many preliminary factual questions, such as whether the employee 'punched in' when he said he did," but cannot decide ultimate legal issues. *See Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981). Southwest's "just cause" findings asserted here have no preclusive effect because they are legal conclusions limited to the narrow context in which they were made, inapplicable to the RLA and Title VII, and unnecessary to deciding whether Southwest had "just cause" under the CBA. SWA Br. 33-34.

Southwest seeks to assert the arbitrator's findings for legal matters beyond the scope of arbitration and for legal issues which, by his own admission, were not germane to his conclusions. Disparate treatment, whether Carter was "treated less favorably than others," and whether the circumstances surrounding her offenses were "substantively like those … who received more moderate penalties" involve legal conclusions divorced from the RLA's and Title VII's statutory framework (from which Carter's claims here arise), and not necessary to determining whether Southwest had "just cause" to fire Carter under the CBA. *See* SWA Br. 33-34. Given the arbitrator's disregard for Carter's rights under the RLA or her religious beliefs, he did not presume to know which employees are similarly-situated for RLA and Title VII purposes.

Similarly, the arbitrator's finding that Southwest "does not have a policy or practice of disciplining, or not disciplining employees based upon their view of TWU Local 556 generally, or

of Audrey Stone in particular" is another legal conclusion that cannot be given preclusive effect and that was not necessary to deciding "just cause." SWA Br. 34. Southwest also asserts the arbitrator's finding that President Stone reported Carter's conduct not to retaliate against her but because she believed Carter violated policies that were applicable to her. SWA Br. 34. This finding is another legal conclusion. Furthermore, President Stone's subjective reasons for reporting Carter were not necessary to the arbitrator's limited scope and judgment—*i.e.*, determining whether *Southwest* had "just cause" to fire Carter. Nor can this finding controvert Carter's direct evidence—President Stone's admissions for reporting Carter in her complaint and Carter's RLA-protected expression in her Facebook posts and messages. (Carter App.80, 81, 105, 531).

While the arbitrator decided that Southwest was justified for firing Carter under the CBA, that decision is separate and independent from Carter's RLA and Title VII claims, which are based on different protected rights, different causation standards, and distinct statutory schemes. *See Hawaiian Airlines, Inc.*, 512 U.S. at 255. Carter's direct evidence demonstrates that Carter's RLA-protected activity was a substantial and motivating factor for Southwest's termination of her employment, Southwest fired Carter because of her religious beliefs and practices, and Southwest intentionally discriminated against Carter by failing to accommodate her religious beliefs and practices.

## CONCLUSION

For these reasons, the Court should deny Southwest's motion for partial summary judgment, and grant Carter's motion for partial summary judgment against Southwest, and allow the parties to proceed to trial on the matter of remedies.

Dated: February 17, 2022                    Respectfully submitted,

                                            s/ Matthew B. Gilliam
                                            Mathew B. Gilliam (*admitted pro hac vice*)

New York Bar No. 5005996
*mbg@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319

s/ Jason E. Winford (*with permission*)
David E. Watkins
Texas Bar No. 20922000
*dwatkins@jenkinswatkins.com*
Jason E. Winford
Texas Bar No. 00788693
*jwinford@jenkinswatkins.com*
JENKINS & WATKINS, P.C.
4300 MacArthur Avenue, Suite 165
 Dallas, Texas 75209
Tel: 214-378-6675
Fax: 214-378-6680

*Attorneys for Plaintiff Charlene Carter*

**<u>Certificate of Service</u>**

I hereby certify that on February 17, 2022, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ Matthew B. Gilliam