# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>          Plaintiff,<br><br>V.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>          Defendants. | Civil Case No. 3:17-cv-02278-X<br><br><br>**PLAINTIFF CHARLENE CARTER'S BRIEF SUPPORTING HER REFSPONSE TO DEFENDANT TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556'S MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES  .......................................................................................... iii

SUMMARY ...................................................................................................................1

RESPONSIVE STATEMENT OF FACTS ....................................................................2

ARGUMENT AND AUTHORITIES ............................................................................5

I.    Local 556 violated Carter's RLA-protected rights ..............................................5

      A. Local 556 violated Carter's rights under RLA Section 152 (Third) and (Fourth)
         because her RLA-protected activity was a "substantial or motivating factor" for
         the union's actions causing Carter's termination………………………………......5

      B. RLA Section 152 (Third) and (Fourth) protect Carter's speech and activities
         opposing union representation, advocating for the removal of union officers,
         and objecting to the union's use of forced fees on its political activities ....................7

      C. Carter's speech and activities did not lose their RLA-protection ...............................12

           1.  The RLA protects employee freedoms under *Steele* and *Austin*
               to engage in "uninhibited, robust, and wide-open debate in labor disputes ..........13

           2.  Carter's RLA expressive activity was privately communicated to her
               government-imposed exclusive bargaining representative, not to
               Southwest or its ordinary employees ...................................................................14

           3.  Carter's RLA expressive activity did not lose its protection because
               it was not "vulgar, offensive, abusive, or harassing." ...........................................16

           4.  Southwest would not have exposed itself to liability by not firing Carter
               for RLA and Title VII-protected communications to Local 556 and
               President Stone....................................................................................................19

II.   Local 556 violated the duty of fair representation the union owed Carter .......................19

      A. Local 556 failed to overcome the presumption that the union violated the
         duty of fair representation when President Stone caused Carter to be
         disciplined ……………………………………...................................................20

      B. President Stone was acting for Local 556 when she caused
         Carter's discharge…………………………………... ...................................................21

i

III.   Local 556 violated Title VII by causing Southwest to fire Carter and otherwise
       discriminating against her because of her religious beliefs and practices .......................23

       A.  Local 556 caused Southwest to fire Carter because of her religious beliefs
           and practices………………………………….................................................................23

       B.  Local 556 intentionally discriminated against Carter by failing to
           accommodate her religious beliefs and practices, and by treating her
           differently from other represented employees…………………………………... ......27

           1.  Local 556 intentionally discriminated against Carter by failing to
               accommodate her religious beliefs and practices....................................................27

           2.  Local 556 treated Carter differently than other employees ..................................29

IV.    The CBA-arbitration findings asserted by Local 556 should not be given issue
       preclusive effect for Carter's RLA, Title VII, and duty fair representation claims...........29

       A.  Carter's federal statutory claims are not subject to claim preclusion ..........................29

       B.  The Court should not give the CBA arbitration's "just cause" findings
           issue preclusive effect in Carter's RLA, Title VII, and duty of fair
           representation claims ...................................................................................................30

           1.  Carter's direct evidence and the federal interests warranting protection
               of Carter's RLA, Title VII, and duty of fair representation rights
               outweigh the relevance of "just cause" findings from the CBA arbitration .........31

           2.  Issue preclusion does not apply because the arbitration of "just cause"
               under the CBA involves legal standards distinct from those in Carter's
               RLA, Title VII, and duty of fair representation claims, and the asserted
               findings are legal conclusions beyond the scope of and unnecessary to the
               arbitrator's decision ............................................................................................33

CONCLUSION...........................................................................................................................38

## TABLE OF AUTHORITIES

**Cases**                                               **Page(s)**

*Acklin Stamping,*
351 N.L.R.B. 1263 (2007) ...............................................................20

*Alexander v. Gardner-Denver Co.*,
415 U.S. 36 (1974) ..................................................................31, 32

*Ams. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) ....................................................................8

*Ballew v. Cont'l Airlines, Inc.*,
668 F.3d 777 (5th Cir. 2012) .........................................................30

*Barrentine v. Ark.-Best Freight Sys. Inc.*,
450 U.S. 728 (1981) .......................................................................36

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) .......................................................23, 26, 29

*Bradberry v. Jefferson Cnty.*,
732 F.3d 540 (5th Cir. 2013) .........................................................33

*Brady v. Trans World Airlines, Inc.*,
401 F.2d 87 (3d Cir. 1968) ..............................................................6

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......................................................................17

*Burlington N. & S.F.R. Co. v. White*,
548 U.S. 53 (2006) .........................................................................29

*Caravan Knight Facilities Mgmt., Inc.*,
362 N.L.R.B. 1802 (2015) ..............................................................20

*CareFlite v. Off. and Prof'l Emps. Int'l Union*,
612 F.3d 314 (5th Cir. 2010) .........................................................30

*Carmona v. Sw. Airlines Co.*,
536 F.3d 344 (5th Cir. 2008) .........................................................30

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
140 S. Ct. 1009 (2020) ...................................................................24

iii

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Copeland v. Merrill Lynch & Co. Inc.*,
    47 F.3d 1415 (5th Cir. 1995) ............................................................................33

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*,
    477 F.3d 807 (6th Cir. 2007) ...........................................................................17

*Daimler Chrysler*,
    344 N.L.R.B. 1324 (2005) ................................................................................14

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) .........................................................................................31

*Dunn v. Air Line Pilots Ass'n*,
    193 F.3d 1185 (11th Cir. 1999) .......................................................................11

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    575 U.S. 768 (2015)............................................................................... *passim*

*Ellis v. Bhd. of Ry., Airline and S.S. Clerks*,
    466 U.S. 435 (1984)............................................................................................9

*Erznoznik v. Jacksonville*,
    422 U.S. 205 (1975)..........................................................................................18

*Gonzalez v. S. Pac. Transp. Co.*,
    773 F.2d 637 (5th Cir. 1985) ...........................................................................31

*Graphics Commc'ns Local 1-M (Bang Printing)*,
    337 N.L.R.B. 662 (2002) ..................................................................................20

*Grappe v. Kansas City S. Ry. Co.*,
    71 F. App'x 302 (5th Cir. 2003) ......................................................................32

*Grimes v. BNSF Ry. Co.*,
    746 F.3d 184 (5th Cir. 2014) ..........................................................30, 31, 32, 34

*Hall v. Cole*,
    412 U.S. 1 (1973).............................................................................................18

*Hawaiian Airlines, Inc. v. Norris*,
    512 U.S. 246 (1994)....................................................................................30, 37

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Held v. Am. Airlines,*
    2007 WL 433107 (N.D. Ill. Jan. 31, 2007) ...........................................................15

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.,*
    515 U.S. 557 (1995) ..................................................................................................17

*In re Strack & Van Til Supermarkets,*
    340 N.L.R.B. 1410 (2004) .........................................................................................21

*Int'l Ass'n of Machinists v. Street,*
    367 U.S. 740 (1961) ................................................................................................6, 8

*Konop v. Hawaiian Airlines, Inc.,*
    302 F.3d 868 (9th Cir. 2002) .....................................................................................13

*Leiser Constr.,*
    349 N.L.R.B. 413 (2007) ...........................................................................................14

*Linn v. United Plant Guard Workers of Am., Local 114,*
    383 U.S. 53 (1966).............................................................................................13, 14

*Local 9431, Commc'ns Workers of Am.,*
    304 N.L.R.B. 446 (1991) ...........................................................................................11

*McDonald v. City of West Branch, Mich.,*
    466 U.S. 284 (1984) .............................................................................................31, 32

*Media Gen. Operations Inc. v. NLRB,*
    394 F.3d 207 (4th Cir. 2005) .....................................................................................15

*Miller v. Cal.,*
    413 U.S. 115 (1973).....................................................................................................16

*Mobil Expl. and Producing U.S., Inc. v. NLRB,*
    200 F.3d 230 (5th Cir. 1999) .......................................................................................8

*N. River Energy Corp. v. United Mine Workers of Am.*
    664 F.2d 1184 (11th Cir. 1981) .................................................................................21

*NLRB v. Allied Aviation Fueling of Dallas LP,*
    490 F.3d 374 (5th Cir. 2007) .......................................................................................7

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Nu-Car Carriers, Inc.,*
   88 N.L.R.B. 75 (1950) ...................................................................................................8

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,*
   418 U.S. 264 (1974)............................................................................................ *passim*

*Paperworkers Local 1048 (Jefferson Smurfit Corp.),*
   323 N.L.R.B. 1042 (1997) ...........................................................................................21

*Petramale v. Local No. 17 of Laborers Int'l Union,*
   736 F.3d 13 (2d Cir. 1984)..........................................................................................18

*Providence St. Peter,*
   123 LA 473 (2006) (Gaba) .........................................................................................33

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984)......................................................................................................8

*Roscello v. Sw. Airlines Co.,*
   726 F.2d 217 (5th Cir. 1984) ...............................................................................6, 20

*Russell v. NMB,*
   714 F.2d 1332 (5th Cir. 1983) ..........................................................................7, 9, 10

*Shea v. Int'l Ass'n of Machinists and Aerospace Workers,*
   154 F.3d 508 (5th Cir. 1998) .......................................................................................9

*Snyder v. Phelps,*
   562 U.S. 443 (2010)....................................................................................................18

*Steele v. Louisville & N.R. Co.,*
   323 U.S. 192 (1944).........................................................................................6, 12, 13

*Swagher v. Neighoff,*
   398 Fed.App'x 872 (4th Cir. 2010) ...........................................................................17

*Texas v. Johnson,*
   491 U.S. 397 (1989)....................................................................................................17

*United States v. Marcavage,*
   609 F.3d 264 (3d Cir. 2010).......................................................................................17

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*United States Steel Corp. v. UMWA*,
    519 F.2d 1249 (5th Cir 1975) .................................................................................21


**Rules & Statutes**

29 U.S.C. § 157...................................................................................................13

42 U.S.C. § 1983.................................................................................................32

42 U.S.C. § 2000e(j) ......................................................................................23, 27

42 U.S.C. § 2000e-2(c)(1)...................................................................................27

42 U.S.C. § 2000e-2(c)(3)...................................................................................23

45 U.S.C. § 151a ...............................................................................................7, 9

45 U.S.C. § 151a (2)-(3) ...................................................................................7, 9

45 U.S.C. § 152 (Third) ................................................................................. *passim*

45 U.S.C. § 152 (Fourth) ............................................................................... *passim*

45 U.S.C. § 152 (Eleventh)...............................................................................6, 8

45 U.S.C. § 152 (Eleventh) (d) ............................................................................6

**SUMMARY**

The Court should deny Local 556's motion for summary judgment, and grant Carter's motion for partial summary judgment. The Court should deny Local 556's motion for summary judgment on Carter's claims under the Railway Labor Act, 45 U.S.C. § 151 *et seq*. ("RLA"). Carter demonstrated Local 556's animus by showing that her RLA-protected activity was a "substantial or motivating" factor for the union's actions causing her termination. RLA Section 152 (Third) and (Fourth) protect Carter's speech and activities opposing union representation, advocating for the removal of union officers, and objecting to the union's use of employee forced fees on its political activities. Contrary to Local 556's arguments, Carter's speech and activities did not lose their RLA protection.

The Court should deny Local 556's motion for summary judgment on Carter's duty of fair representation claims. Local 556 failed to offer any legal arguments, authorities, or evidence overcoming the presumption that the union violated the duty when President Stone caused Carter to be disciplined. Carter showed that President Stone acted within the scope of her official union authority when Stone caused Southwest to discipline Carter, demonstrated that Local 556 acted arbitrarily, discriminatorily, and in bad faith, and the union fails to offer any legal arguments or evidence to the contrary.

The Court should deny Local 556's motion for summary judgment on Carter's claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"). Local 556 violated Title VII by causing and attempting to cause Southwest to discipline Carter because of her religious beliefs and practices, and intentionally discriminating against Carter by failing to accommodate her religious beliefs and practices and by treating her differently from

1

other represented employees. The Court should deny Local 556's motion for summary judgment because the union failed to support its motion with legal argument, authority, or evidence.

## RESPONSIVE STATEMENT OF FACTS

Carter was a vocal opponent of Local 556, and sent President Stone messages from at least July 2015 through February 2017 about union elections and union representation issues, including flight attendants' claims that the Local 556 Executive Board, had thrown out flight attendants' votes during the 2016 elections. L556 Br. 5-6; Carter Br. 14-16; (Carter App.166-191).[1] Carter communicated private Facebook messages to President Stone about the Board's "pure evil" and "corruption," but it was another flight attendant's message that Carter forwarded (not Carter's) that used the word "criminal" (not "crook"). L556 Br. 6; L556 App.54, 28-125.[2] Carter forwarded that post to President Stone, along with many more, showing *other* flight attendants' frustration with union leadership: "There you have just a few of so many who are talking about this….hope we as Opt Out People [flight attendants who have resigned from the union] get MORE to join in… Shows who you Support and it isn't the [Flight Attendants]!" L556 App.54.

Despite Local 556's characterizations, Carter did not call President Stone a "murderer." *See* L556 Br. 5, 6, 17, 21; Carter App. 80, 81, 531. Carter's Facebook messages stated: "This is what you supported during your Paid Leave with others at the Women's MARCH in DC" and "TWU-AFL-CIO and 556 are supporting this Murder …" (Carter App.80, 81, 531). Carter's messages to President Stone also included advocacy for the recall campaign: "by the way the RECALL is going

---

[1] Local 556's Brief in Support of its Motion for Summary Judgment (ECF 182) shall be cited to herein as "L556 Br. __". Carter's Brief in Support of her Motion for Partial Summary Judgment (ECF 171-1) shall be cited to herein as "Carter Br. ___". Carter's Appendix of Exhibits in Support of her Motion for Partial Summary Judgment (ECF 170) and (ECF 171-2), shall be cited to as "Carter App.___".

[2] Local 556's Appendix Exhibits in Support of its Motion for Summary Judgment (ECF 183-1) shall be cited to herein as "L556 App.__".

to Happen and you are limited in the days you will be living off of all the [Southwest Airlines flight attendants]..cant wait to see you back on line." (Carter App.81, 531). As the union explains, "back on line" refers to "working on a flight." L556 Br. 6. While Local 556 contends that the phrase is threatening, Carter was telling President Stone: "Can't wait to see you out of office." Indeed, when President Stone was leaving office, she wrote in a union magazine, "Yippee Ki-yay and I'll see you on Line!" (Carter Resp. App.31).[3]

While Local 556 characterizes Carter's messages to the union president as "harassment," the communications actually demonstrate Carter's history of engaging in RLA-protected speech with Local 556 and President Stone about the union's representation of employees, collective bargaining failures, and flight attendants' ongoing campaign to recall and remove the union representatives. (Carter App.117-121); L556 Br. 5-6. President Stone never reported Carter for any of these messages, and, in fact, said she ignored them. (Carter App.114-115). Southwest did not fire Carter for these messages. (Carter App.222). Nor could it—they were all protected speech about collective bargaining, union representation, and the recall campaign. *See infra* at 7-10; Carter Br. 32-38. Contrary to Local 556's characterizations of Carter's deposition testimony, Carter was asked if "there is no limit to what she can say to a fellow employee in expressing her religious beliefs." L556 Br. 6. However, Carter repeatedly responded that she believed that she should not have been fired for her religious beliefs in this instance. *See* L556 Br. 6; L556 App.12-14 (Carter Tr. 79:1-81:17).

Following Southwest's termination of Carter and her Step 2 grievance proceeding, Southwest offered Carter a Last Chance Agreement ("LCA") that would have reinstated her employment and reduced her termination to a 30-day suspension. (L556 App.142-147). However, Southwest's LCA

---

[3] Carter cites to her Response Appendix as "Carter Resp. App. __".

forced Carter to waive her legal rights and leave her without legal recourse if the company fired her again.

To be sure, Carter wanted to keep her job, and brought this action seeking reinstatement. But Southwest's LCA forced Carter to waive her legal rights in the event that the company turned around and fired her again. (L556 App.142-147). For instance, the LCA included the following provisions:

- "Any future violation of the Southwest Airlines Workplace Bullying and Hazing Policy, Social Media Policy, or Harassment, Sexual Harassment, Discrimination and Retaliation Policy will result in termination." (L556 App.142);

- "[The LCA] settle[s] and finally resolve[s] all disputes and claims, known and unknown, that have been asserted … or that could have been asserted…" (L556 App.144);

- The employee "agrees not to sue and unconditionally releases, dismisses, and forever discharges" Southwest "from any and all claims … arising out of or connected with [her] employment with or separation from [Southwest]" and "further agrees not to assert any new claims of any kind against [Southwest]" (L556 App.144, 145).

Carter did not want to waive her legal rights and be without any legal recourse if the company fired her again. (Carter Resp. App.12-13; Carter Tr. 92:21-93:12). ("[I] would have been signing all my rights away."). Carter knew a flight attendant, a prominent recall supporter, who signed an LCA and was soon turned in for another violation and fired. (Carter Resp. App.11-12; Carter 91:19-92:20). Another reason she did not accept it was that Southwest wanted to put a disciplinary letter in her file for 24 months, which meant that "if she sneezed wrong on the airplane within 24 months of basically being on probation again, [she] would be fired." (Carter Resp. App.12-13; Carter Tr. 92:21-93:6). Carter also believed that union supporters were looking for pretexts to turn union opponents in and get them fired while they were on such a probation, and she was afraid to sign the LCA and be subject to termination if another flight attendant, again targeted her for daring

4

to oppose the union, and turned her in for discipline. (Carter Resp. App.13-15; Carter Tr. 93:4-5, 93:13-16, 102:24-103:9).

Despite Local 556's suggestion that the union "g[o]t her job back," Southwest's Vice President Mike Sims, not the union, offered Carter the LCA. While Local 556 now attempts to celebrate that as a success, the union cautioned against signing such an agreement: Local 556 representatives told Carter to watch her back if she signed it. (Carter Resp. App.15-16; Carter Tr. 103:16-104:2). Moreover, Carter believed that accepting the LCA would have jeopardized her rights and would not have protected her job in the long term: "So I knew in signing this, it would be pretty much my death sentence at Southwest." (Carter Resp. App.13; Carter Tr. 93:16-18).

## ARGUMENT AND AUTHORITIES

### I.  Local 556 violated Carter's RLA-protected rights.

The Court should reject Local 556's motion for summary judgment on Carter's RLA wrongful discharge claims for three major reasons: (A) Carter demonstrated Local 556's animus by showing that her RLA-protected activity was a "substantial or motivating" factor for the union's actions causing her termination; (B) RLA Section 152 (Third) and (Fourth) protect speech and activities opposing union representation, advocating for the removal of union officers, and objecting to the union's use of employee forced fees on its political activities; and (C) Carter's speech and activities did not lose their RLA protection.

#### A.  Local 556 violated Carter's rights under RLA Section 152 (Third) and (Fourth) because her RLA-protected activity was a "substantial or motivating factor" for the union's actions causing Carter's termination.

Contrary to Local 556's characterizations,[4] unions unlawfully retaliate against an employee in violation of the RLA when the employee exercises RLA-protected rights, the union causes the

---

[4] *See* L556 Br. 15.

employee's discharge or other adverse action, and the employee's protected activities were a "substantial or motivating factor" for the union's adverse action. *See Roscello v. Sw. Airlines Co.*, 726 F.2d 217, 222 (5th Cir. 1984); *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 198 (1944) (holding that the RLA subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights"); *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 747-50 (1961) (construing the RLA to prohibit unions from using compulsory unionism to impair freedom of expression or enforce ideological conformity); *Brady v. Trans World Airlines, Inc.*, 401 F.2d 87, 102 (3d Cir. 1968) (footnote omitted) (holding that unions are liable under the RLA Sections 2 (Fourth) and (Eleventh) "for their actions in procuring a discharge which violates the employee's statutory rights.").[5]

Contrary to Local 556's characterizations, whether "the employer harbored anti-union animus" and whether "the animus was a substantial or motivating factor in plaintiff's termination" are not separate elements of an RLA-wrongful discharge claim under *Roscello*. L556 Br. 15 (citations omitted). The Fifth Circuit reasoned that the employee *demonstrates animus* by showing that her protected conduct was a substantial or motivating factor for the adverse action: The RLA violation consists of an "adverse action that is based in whole or in part on anti-union animus—or as the Board now puts it, that the employee's protected conduct was a substantial or motivating factor in the adverse action." *Roscello*, 726 F.2d at 222. Carter Br. 32-38; (Carter App.222, 268-269).

Carter demonstrated that Local 556's actions were "based in whole or in part" on union-related animus by showing that her RLA-protected activities—sending Facebook videos and messages to

---

[5] RLA 152 (Eleventh) defines the only circumstances in which the union can restrict dissenting employees' speech and association rights. *See* 45 U.S.C. § 152 (Eleventh) (d) ("Any provisions in paragraphs Fourth and Fifth of this section in conflict herewith are to the extent of such conflict amended."). The RLA's structure shows that unions cannot otherwise restrict employee rights under RLA Section 152 (Third) and (Fourth).

Local 556 and President Stone opposing union representation and objecting to union activities—were a "substantial or motivating factor" for the union president's attempt to fire her.[6] Local 556's further suggestions that Carter must show the union's RLA violation with evidence of "conspiracy" are not supported by the RLA's statutory text or court precedent.[7]

When there is no dispute as to which employee activities motivated the union's actions causing an employee's termination, the only remaining question is whether the employee's activities were protected. *See NLRB v. Allied Aviation Fueling of Dallas LP*, 490 F.3d 374, 379 (5th Cir. 2007). Carter's Facebook videos and messages to President Stone were RLA-protected activity.

**B. RLA Section 152 (Third) and (Fourth) protect Carter's speech and activities opposing union representation, advocating for the removal of union officers, and objecting to the union's use of forced fees on its political activities.**

Without presenting any legal argument or authority, Local 556 incorrectly asserts that Carter's Facebook videos and messages are not RLA-protected. L556 Br. 16. The RLA protects employee speech and expressive activity regarding union representation, union re-organizing, and opposing unions and their policies. Carter Br. 32-35. RLA Section 151a expressly states that the RLA "forbid[s] *any* limitation upon freedom of association among employees" and "provide[s] for the complete independence … of employees in the matter of self-organization." 45 U.S.C. § 151a (2)-(3) (emphasis added). "[T]he concept of 'complete independence' is inconsistent with forced representation, most especially when that forced representation is at odds with employees' will and desires." *Russell*, 714 F.2d at 1343 (footnote omitted). Freedoms of association are

---

[6] Contrary to Local 556's characterizations, the RLA's protections are not limited to cases of "extreme *anti-union* bias or animus." L556 Br. 15. The RLA protects nonmember employees, union opponents, and employees attempting to re-organize their workplace by removing unwanted union representation as much as those employees who support bringing in unions. 45 U.S.C. §§ 151a, 152 (Third) and (Fourth).

[7] *See* L556 Br. 15.

"'especially important … in shielding dissident expression from suppression by the majority.'"
*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

Employees' rights under RLA Section 152 (Fourth)—"self-organization," "organiz[ing] and bargain[ing] collectively… through representatives of their own choosing," and "join[ing], organiz[ing], or assist[ing] in organizing the labor organization of their choice"—protect employee freedoms to oppose their unions and engage in dissident speech and activities opposing union representation "without interference, influence, or coercion." 45 U.S.C. § 152 (Fourth). Employees' rights "to form, join or assist labor organizations" are "[t]he primary source of protection for union freedom of speech." *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 277 (1974).

Employees' RLA Section 152 (Fourth) rights to "join, organize, or assist" and "not to join or remain members of any labor organization," as well as the "right to organize and bargain collectively through representatives of their own choosing," encompass "the right of employees to oppose the policies and actions of their incumbent union leadership and to seek to persuade other employees to take steps to align the union with these opposing views." *Mobil Expl. and Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 240 (5th Cir. 1999). "[I]nherent in [the employee's right to self-organization] is the privilege of protest and persuasion of others. Without this, effective employee representation becomes a nullity." *Id.* at 240 (quoting *Nu-Car Carriers, Inc.*, 88 N.L.R.B. 75, 76-77 (1950) (internal citation omitted).

The First Amendment and the RLA Section 152 (Eleventh) also protect employee rights to object to paying compelled fees for unions' political, ideological, and other nonbargaining spending, and make inquiries about how the union is using forced fees. *See Street*, 367 U.S. 768

(holding that the RLA does not authorize a union to spend an objecting employee's money to support political causes); *Ellis v. Bhd. of Ry., Airline and S.S. Clerks*, 466 U.S. 435, 465-66 (1984); *Shea v. Int'l Ass'n of Machinists and Aerospace Workers*, 154 F.3d 508, 513 (5th Cir. 1998).

Contrary to Local 556's characterizations, the RLA also protects employee rights beyond pre-certification.[8] While Local 556 suggests, without legal argument or authority, that the RLA does not protect post-certification speech or activities, the Supreme Court and Fifth Circuit have demonstrated that the RLA protects employees' rights to continuous "self-organization" and "re-organization" campaigns, such as engaging in decertification proceedings to remove unwanted unions, and other efforts to remove unwanted union representatives. *See Russell v. NMB*, 714 F.2d 1332, 1345 (5th Cir. 1983) ("*[I]t is inconceivable that the right to reject collective representation vanishes entirely if the employees of a unit once choose collective representation.*") (emphasis in original) (citations omitted); *Austin*, 418 U.S. at 279 (rejecting, for purposes of speech protection, "any distinction between union organizing efforts leading to recognition and post-recognition organizing activity").

Furthermore, this Court has already recognized that the RLA protects Carter's speech and activities where animus for her protected activities is involved. Local 556's argument that RLA Section 152 (Third) and (Fourth) protect only precertification rights is also contrary to the RLA's statutory text and purpose, which expressly prohibits "*any* limitation upon freedom of association among employees" and "provide[s] for the complete independence … of employees in the matter of self-organization." 45 U.S.C. § 151a (2)-(3) (emphasis added). Nothing in the RLA's statutory text suggests that employees permanently lose their rights to re-organize or change union

---

[8] *See* L556 Br. 17.

representation after they first designate or certify a union. Had Congress intended that result, the RLA would likely have violated employees' First Amendment association rights.[9]

Carter was engaged in all of the foregoing protected activities when she sent Facebook videos and messages to President Stone about Local 556's participation in the Planned Parenthood Women's March on Washington, D.C. Carter Br. 35-38. Carter's communications were, in their entirety, expressive activity opposing union representation, advocating for the removal of union officers, and objecting to the union's use of forced fees on its political activities. *Id*. Local 556 violated the RLA by firing Carter because her private Facebook videos and messages to President Stone were RLA-protected and they did not lose their protection. Carter Br. 32-38.

While Local 556 contends that there is no causal nexus between Carter's protected activities in 2013 and her termination, that misses the point that the union on February 22, 2017, by and through President Stone, reported Carter for discipline because of her RLA-protected activities, which resulted in Southwest firing Carter. L556 Br. 18; (Carter App.222). Carter demonstrated that her RLA-protected activity in the Facebook videos and messages she sent to President Stone were both "substantial" *and* "motivating factors" for Stone's attempt to discipline Carter. Nevertheless, Local 556 exhibited a longstanding pattern of discriminatory animus towards Carter personally and for union opponents generally:

- Executive Vice President Brett Nevarez nicknamed Carter "batshit." (Carter Resp. App.89); (Carter Resp. App.35; L556 (Stone) 73:23-74:8, 76:20-24).

- Local 556's Executive Board mocked Carter for being forced to support union political activities with which she disagreed. (Carter Resp. App.89-91; Carter Resp. App.35; L556 (Stone) 73:23-74:8).

---

[9] Equal protection principles and the RLA's statutory text preclude Local 556's suggestion that employees only have speech and association rights when they organize unions, but have no speech and association rights when they seek to organize by removing unions and unwanted union leadership and representation. *See Russell*, 714 F.2d at 1345.

- When Carter contemplated efforts to decertify the union in 2013 and remove it as her representative, Executive Vice President Nevarez emailed Board Members lamenting that Carter could not be brought up on charges and informing the Board that he would contact legal counsel and TWU International when they decided on a course of action. (Carter Resp. App.92-93).

- When President Stone's supporters were communicating in a Facebook group dedicated to the re-election of Stone's team in 2014 and 2015 Executive Vice President Nevarez told Stone supporters to save union opponent Chris Click's Facebook posts for posterity, and commented: "Click is getting agitated. I think he may private message his way into big troubles for himself … [A]nybody else get [private messages] from Click please screenshot & save for posterity." (Carter Resp. App.95). During Carter's interview with Southwest about Carter's Facebook videos and messages, President Stone asked the company to "Make Charlene [Carter] and Chris Click stop." (Carter App.115).

- When another union opponent spoke up in opposition of Local 556 and had encouraged other flight attendants to resign from union membership, Executive Vice President Nevarez commented, "Leg breaking time for [Mike] Casper the ghost scab." (Carter Resp. App.98, 104).

Thus, Local 556 has demonstrated its willingness to use opponents' social media activities to retaliate against them, and continued that tactic in 2017, when President Stone caused Carter to be fired. President Stone, Local 556 Shop Steward Ricky Spand, and Executive Board-supporter Brian Talburt—who served on President Stone's "Core Team," exerted continuous pressure on Southwest throughout 2017 to fire vocal recall supporters. (Carter Resp. App.52-87). President Stone and Shop Steward Spand reported other union opponents around March and April 2017, around the same time that Stone reported Carter for discipline.[10] (Carter App.549). President Stone and Shop Steward Ricky Spand reported Recall Leader Jeanna Jackson for stating, "It's pathetic

---

[10] Carter's Second Motion to Compel Discovery from Southwest seeks information about President Stone's and other Local 556 officials' pattern of reporting union opponents and Southwest's pattern of disciplining union opponents reported by union officials. (ECF 174, pp.20-24); (ECF 177 pp.20-24); (ECF 177 pp.27-31); (ECF 178-5); (ECF 178-8). Thus, Southwest is withholding information that could also be relevant to Carter's RLA claims. Carter seeks this evidence to further support her showing that Carter's RLA-protected activity as a recall supporter was a "substantial" and "motivating factor" for her termination.

that any union president turns in any member. In any union. Members are allowed to have a dissenting opinion from that of the Officers of the union." (Carter App.549).

While President Stone-supporter Talburt was not an elected official, Talburt bombarded Southwest managers with requests to discipline and terminate recall leader Jeanna Jackson for her recall speech, all with the ratification of President Stone and Executive Vice President Brett Nevarez, who were routinely included on his emails but never disavowed his efforts. *See Local 9431, Commc'ns Workers of Am.*, 304 N.L.R.B. 446, 447 (1991). (Carter Resp. App.66-82). President Stone had previously defended Talburt from discipline after he called on "one public execution" of union opponents to silence them. (Carter App.451-452, Stone 180:15-18, 181:16-19); (Carter Resp. App.81-82); (Carter App.550-551). President Stone believed that by disciplining him Southwest was interfering with his protected rights.

Notably, Talburt asked Southwest to discipline union opponent and recall supporter Greg Hofer and numerous other union opponents (including Carter) on February 22, 2017, the same day President Stone made her complaint against Carter, which suggests a concerted effort on the part of Local 556 to punish its opponents.  (Carter Resp. App.54); (Carter App.105).

### C.  Carter's speech and activities did not lose their RLA-protection.

Carter's speech and activities did not lose their protection because (1) the Supreme Court's decision in *Steele* and *Austin* demonstrate that the RLA protects employee freedoms to engage in "uninhibited, robust, and wide-open debate in labor disputes;" (2) Carter's expressive activity was not directed at Southwest or its ordinary employees but to her government-imposed exclusive bargaining representative, and did not affect the company's ability to maintain discipline in the workplace; (3) Carter's speech and activity was not "vulgar, offensive, abusive, or harassing;" and

(4) Southwest would not have exposed itself to liability by not firing Carter for union-related communications to President Stone.

### 1. The RLA protects employee freedoms under *Steele and Austin* to engage in "uninhibited, robust, and wide-open debate in labor disputes."

Carter's rights to oppose the union are protected under the RLA. Carter's Facebook videos and communications to President Stone would not lose their protection even if they were "vulgar, offensive, abusive, or harassing," which they were not. L556 Br. 16. The RLA Section 152 (Third) and (Fourth) impose "constitutional limitations on the union's power to deny, restrict, destroy, or discriminate against ... [employees'] rights," and the Supreme Court has recognized that, in the federal labor law context, these rights guarantee employee freedoms under *Austin* to engage in "uninhibited, robust, and wide-open debate in labor disputes." *See Steele*, 323 U.S. at 198; *Austin*, 418 U.S. at 273-74. Carter Br. 42-47.

The RLA Section 152 (Fourth)'s statutory text—the right "to form, join, or assist labor organizations" and the right "not to join or remain members of any labor organization,"—mirrors the statutory language in NLRA Section 7, which the Supreme Court said was "the primary source" for *Austin*'s robust freedom of speech for employees engaged in union representation disputes. *Austin*, 418 U.S. at 277; *see also* 29 U.S.C. § 157.

Employees' union representation speech is protected even if others consider their speech to be "intemperate, abusive, or insulting," *Austin*, 418 U.S. at 273-74, 283, or  a "vehement," "caustic," or "unpleasantly sharp attack[]." *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 62 (1966). Even "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth." *Id.* at 63. "Labor disputes are ordinarily heated affairs" and "[w]ide latitude for what is written and said in election campaigns is necessary to insure the free exchange of information and opinions." *Austin*, 418 U.S. at 277 n.12.

Federal courts have also applied the *Austin* rule in the RLA context. *See Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 882 n.10 (9th Cir. 2002) ("We see no reason why the rule announced in *Linn* [and applied in *Austin*] … regarding protected activities, should not apply in the context of the RLA.") (cleaned up); *Dunn v. Air Line Pilots Ass'n,* 193 F.3d 1185, 1191-92 (11th Cir. 1999). Despite Local 556's characterization of Carter's Facebook videos and messages to Local 556 as "vulgar, offensive, abusive, or harassing," Carter's RLA expressive activity did not lose its protection. L556 Br. 16.

### 2. Carter's RLA expressive activity was privately communicated to her government-imposed exclusive bargaining representative, not to Southwest or its ordinary employees.

Carter's RLA expressive activities did not lose their protection because they were not directed at Southwest or its ordinary employees, but to Carter's government-imposed exclusive bargaining representative. To support its position, Local 556 relies on inapposite NLRB cases involving employees who, unlike Carter, directed their speech at the employer or disrupted the employer's ability to maintain discipline in the workplace. *See* L556 Br. 16 nn.56-57, 17.

Local 556's legal authorities all demonstrate that "vulgar and offensive" speech loses its protection when it is directed at the employer or affects the employer's ability to maintain discipline in the workplace. Local 556 relies on *Leiser*, but in that case, the issue was whether the company could prohibit an employee from wearing a vulgar sticker on his hardhat at work. The sticker depicted someone urinating on a rat designated as nonunion. *Leiser Constr.*, 349 N.L.R.B. 413, 414–15 (2007). The NLRB merely recognized that an employer has the right to restrict an employee from displaying a vulgar sticker at work, not that it could fire him for privately sending the sticker to a union official. The NLRB specifically noted that the employee was not being discharged for the sticker. *Id.*

14

In *Daimler Chrysler*, 344 N.L.R.B. 1324, 1328-30 (2005), the NLRB held that an employee's speech lost its protection because the speech was made "in a large open area full of cubicles occupied by both supervisory and nonsupervisory personnel" and it was admitted that there were "quite a few" employees in the immediate area. *Id.* Under these circumstances, the NLRB determined that "sustained profanity would reasonably tend to affect workplace discipline by undermining the authority of the supervisor subject to [the employee's] vituperative attack." *Id.* During the exchange, the employee, in a loud voice, called the supervisor an "asshole," and said, "bullshit, I want the meeting now." *Id.* The employee approached the supervisor in a manner described as "intimidating." *Id.* The employee loudly said, "fuck this shit," and that he did not "have to put up with this bullshit," then turned and left the area. *Id.*

Local 556 also relies on *Media Gen. Operations Inc. v. NLRB*, 394 F.3d 207, 209, 211-13 (4th Cir. 2005), where the court held that an employee calling his supervisor a "racist," "bastard," and "redneck son-of-a-bitch" during an employee work performance meeting was not protected. *Id.* The NLRB found that, unlike Carter, the employee in *Media Gen. Operations* was not engaged in protected activity at the time of his offensive speech. *Id.* The Court also observed that his profane words—calling his supervisor a "racist," "bastard," and "redneck son-of-a-bitch"—were devoid of substantive content and of meaningful value that could convey a message of grievance or concern; they were nothing more than offensive words. *Id.* The employee was not using the derogatory statements in a manner to emphasize a message, or in stating an opinion on a union matter. *Id.* There was no "nexus between the words [the employee] uttered and protected activity." *Id.* Similarly, *Held* is distinguishable because the plaintiff in that case was not engaged in protected activity when he published his invective on the company website. *Held v. Am. Airlines*, 2007 WL 433107 *1-1-2 (N.D. Ill. Jan. 31, 2007). Rather, the plaintiff's broad-based slurs in that case were

15

disseminated widely throughout the workplace and constituted nothing more than offensive words. *Id*.

Contrary to all of these cases, President Stone caused Carter's termination for union dissident speech privately communicated in Facebook communications addressed solely to Local 556 and its leadership. (Carter App.105, 80, 81, 531); Carter Br. 22. Carter did not disseminate any false or defamatory information about President Stone. *Id*. Carter sent all these communications to President Stone via private Facebook messages, and did not send them to any other Southwest employees. *Id*. Southwest received no other reports or complaints of Carter's conduct. (Carter App. 309; Sims 221:13-16). Carter never criticized Southwest management in her communications to President Stone, which concerned only the union and its activities. *Id*. Carter's speech was *not* directed at the company, *not* made at work or during work hours, and had *no* adverse effect on the workplace. *Id*. Carter's words clearly communicated her opposition to Local 556's representation, leadership, and use of employee's forced fees. *Id*. Nothing in Carter's speech is "vulgar and offensive" as to remove the RLA's protection. *Id*. Nothing regarding the place of the discussion affected Southwest's right or ability to maintain order or discipline in the workplace. *Id*.

### 3. Carter's RLA expressive activity did not lose its protection because it was not "vulgar, offensive, abusive, or harassing."

Contrary to Local 556's contentions, Carter's private Facebook videos and messages, "TWU-AFL-CIO and Local 556 are supporting this murder," and "This is what you supported during your Paid Leave with others at the Women's MARCH in DC" were not "vulgar, offensive, abusive, harassing." L556 Br. 16; (Carter App.80, 81, 531). Nor did Carter did call President Stone a "murderer" or make any "inflammatory slurs." L556 Br. 17. Carter's message stated: "TWU-AFL-CIO and 556 are supporting this Murder." (Carter App.80, 531).

16

Carter's Facebook videos and messages were neither vulgar nor obscene, and Local 556 fails to demonstrate that they were vulgar or obscene. Carter did not use any profanity, or language that exceeded statutory protections. Carter's videos were also not obscene. *See Miller v. Cal.*, 413 U.S. 115, 24 (1973) (obscene materials depict or describe sexual conduct and exclude those which, taken as a whole, do not have serious literary, artistic, political, or scientific value); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792-93 (2011) (recognizing that obscenity is not whatever someone finds shocking, but only depictions of sexual conduct). Carter's videos of the aborted baby have "religious, political, scientific, and educational" value, particularly here, where she is trying to show Local 556 and President Stone that abortion takes human life. (Carter App.80, 81, 531).

Carter's private Facebook videos showing an aborted baby—sent to Local 556's president in response to the union's participation in the Women's March and other activities—did not lose their protection because the union considered them to be offensive. The expression of ideas may not be prohibited even if "society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "[T]he point of all speech protection … is to shield just these choices of content that in someone's eyes are misguided or even hurtful." *Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 574 (1995). Federal courts have also recognized that pro-life signs bearing images of aborted babies constitutes protected speech. *Swagher v. Neighoff*, 398 Fed. Appx. 872, 881 (4th Cir. 2010); *United States v. Marcavage*, 609 F.3d 264, 282 (3d Cir. 2010); *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821-22 (6th Cir. 2007). *See also* Carter Br. 45-47.

Carter did not "create a harassing environment" by sending private Facebook videos and messages to President Stone addressing Local 556 and its leadership about objections to her union's support for Planned Parenthood and its pro-abortion agenda at the Women's March. Local

17

556 fails to demonstrate how that "create[d] a harassing environment." L556 Br. 17. Local 556 states that Carter "repeatedly" sent President Stone, graphic material. That is inaccurate. Carter sent two Facebook videos showing an aborted baby at 11:22 a.m. and 12:33 p.m. on February 14, 2017, and President Stone reported Carter only for these videos and the accompanying messages. (Carter App.80, 81, 531). L556 Br. 16.

Union presidents are no shrinking violets when it comes to heated speech and criticism over union matters. Federal labor laws, including the RLA, NLRA, and LMRDA, all subject union officers to extreme robust speech from the employees they purport to represent. *See Hall v. Cole*, 412 U.S. 1 (1973); *Petramale v. Local No. 17 of Laborers Int'l Union*, 736 F.2d 13, 16 (2d Cir. 1984). The RLA protects union dissident speech about union activities even if it offends the union and its officers.

Having successfully run for the presidency, President Stone knew she was undertaking to serve as the exclusive representative of 16,000 Southwest Airlines flight attendants. While Local 556 characterizes Carter's emails to President Stone as "unsolicited," Stone represents thousands of Southwest Airlines flight attendants, and has the duty to represent them and hear their grievances, regardless of whether they are solicited or not. L556 Br. 16. President Stone also cannot claim to be the "undesiring recipient" of employees' criticism of the union's representation, especially when the union uses employees' forced fees to subsidize its participation in Planned Parenthood Women's March. L556 Br. 17. Moreover, President Stone could have simply blocked Carter's messages. "[T]he burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Snyder v. Phelps*, 562 U.S. 443, 459 (2010) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 210-11 (1975). However, the RLA, Title VII, and the

18

duty of fair representation, prohibited President Stone from trying to cause Carter to be disciplined for her videos and messages.

### 4. Southwest would not have exposed itself to liability by not firing Carter for RLA and Title VII-protected communications to Local 556 and President Stone.

Contrary to Local 556's arguments, the company would not "expose itself to liability" if it did not fire Carter for her union-related communications with President Stone. *Id*. Carter privately messaged President Stone opposing the union's representation and objecting to its political activities at the Planned Parenthood Women's March. (Carter App.80-81). President Stone reported Carter only for the two Facebook videos and messages sent to her showing the aborted baby. (Carter App.105). Southwest received no other complaints about Carter.

Whether employees' union representatives have "federally-protected rights to be free from a hostile work environment," the union and its officials take on affirmative duties under the RLA and Title VII by virtue of their exclusive-bargaining representative status under federal law. Carter Br. 47-51. Local 556 and President Stone have affirmative duties under the RLA, Title VII, and with the union's duty of fair representation to hear employee complaints and grievances about representation. *Id*. Unions are presumed to breach their duty of fair representation when they attempt to discipline an employee. *See infra* at 20. Under Title VII, unions and their officials also have duties to accommodate employees' religious beliefs and not discriminate against them by causing them to be fired. *See infra* at 23-28. Southwest would not expose itself to liability for not firing or disciplining Carter for her union-related communications with her president federal law imposes legal duties and obligations on unions and their officials.

## II. Local 556 violated the duty of fair representation the union owed Carter.

The Court should deny Local 556's motion for summary judgment on Carter's duty of fair representation claims because the union failed to offer any legal arguments, authorities, or

evidence overcoming (A) the presumption that the union violated the duty when President Stone caused Carter to be disciplined, and (B) Carter's showing that President Stone acted within the scope of her official union authority when she caused Southwest to discipline Carter. Moreover, Local 556 failed to make any legal arguments or show the absence of evidence that the union acted arbitrarily, discriminatorily, or in bad faith.

### A. Local 556 failed to overcome the presumption that the union violated the duty of fair representation when President Stone caused Carter to be disciplined.

Despite Local 556's unsupported assertion that the union's duty of fair representation does not preclude President Stone "from complaining to her employer about co-worker harassment,"[11] the law presumes a union breaches its duty of fair representation when the union's officials seek to have the employer discipline an employee it represents. *See Caravan Knight Facilities Mgmt., Inc.*, 362 N.L.R.B. 1802, 1805 (2015); *Acklin Stamping*, 351 N.L.R.B. 1263, 1263 (2007); *Graphics Commc'ns Local 1-M (Bang Printing)*, 337 N.L.R.B. 662, 673 (2002); *see also Roscello*, 726 F.2d at 221 ("[T]he union's duty of fair representation has been the same duty whether the union involved is covered by the NLRA or the RLA."). Local 556 fails to rebut that presumption by showing that its actions were done in good faith, based on rational considerations, and were linked in some way to its need effectively to represent its constituency as a whole." *Caravan Knight*, 362 N.L.R.B. at 1805 (citation omitted). Local 556 failed to demonstrate that it had a legitimate, good faith interest in disciplining Carter for union dissident speech, or that President Stone's actions were necessary to represent the constituency as a whole.

Moreover, Carter demonstrated that Local 556 acted arbitrarily, discriminatorily, and in bad faith, and the union failed to offer any legal argument or evidence to the contrary. *See* Carter Br.

---

[11] L556 Br. 14-15.

47-51; L556 Br. 14-15. Local 556 misses the point when it argues that the union did not discriminate nor improperly represent [Carter] … at either the fact-finding meeting or Step 2 grievance." L556 Br. 13. Local 556 violated Title VII and the RLA from the outset when it targeted Carter for discipline for union-related and religious activity. (Carter App.105). Whether other union representatives represented her fairly does not repair the damage and harm it inflicted when it reported Carter for protected rights.

**B.  President Stone was acting for Local 556 when she caused Carter's discharge.**

Contrary to Local 556's assertions, President Stone was acting in her official union capacity when she reported Carter for objections about union representation made to the union about the union's official activities.[12] When union presidents act within the scope of their authority as union representative, as President Stone was with respect to Carter's objections to the union's activities, the union is liable for the officer's actions. *See e.g.*, *N. River Energy Corp. v. United Mine Workers of Am.*, 664 F.2d 1184, 1190 (11th Cir. 1981) (citing *United States Steel Corp. v. UMWA*, 519 F.2d 1249, 1253 (5th Cir 1975) (other citations omitted).

When employees direct communications to a union president in her official capacity (e.g., criticizing the union and its leadership), the president's subsequent complaint based on those communications is considered made in an official capacity. *See In re Strack and Van Til Supermarkets*, 340 N.L.R.B. 1410, 1411-1412 n.10, 1430 (2004) (union caused employee's discharge when its president reported a vocal union opponent for alleged threats); *Paperworkers Local 1048 (Jefferson Smurfit Corp.)*, 323 N.L.R.B. 1042, 1044 (1997) (union attempted to cause

---

[12] Without offering any legal argument, authorities, or evidence to support its position, Local 556 suggests that not every action taken by a union official has the force and effect of union action. Local 556 Br. 14-15.

dissident employee to be disciplined when its representative, who had knowledge of the employee's rules, reported employee).

Having been elected as Local 556's highest-ranking officer, hearing flight attendants' complaints and objections about union representation falls within the scope of President Stone's official duties. President Stone was acting in her official capacity because Carter's objections to the union's activities were directed to the union and its president. (Carter App.80-103, 531). When Carter contacted President Stone in February 2017, her communications concerned what the President and Local 556 were doing during the Women's March event, and about "TWU-AFL-CIO and 556 … supporting this Murder." *Id*. Carter's communications with President Stone always concerned union business and activities, and nothing more. (Carter App.80-103, 139-165, 531). Carter directed her messages to President Stone's "Audrey Stone Twu" union Facebook account, not Stone's personal account. *Id*.; (Carter App.425-427; Stone 94:5-96:9). President Stone admitted that she used and created that account solely for union business. (Carter App.425-427; Stone 94:5-96:9). Carter and President Stone had no personal relationship, and never communicated outside of Stone's official role. (Carter App.113). When President Stone reported Carter, Stone herself admitted that Carter's Facebook messages were about the union's participation in the Women's March. (Carter App.105).

President Stone was acting within the scope of her authority as Carter's exclusive bargaining representative because, when Stone reported Carter for discipline to the company, it was over Carter's objections to the union about its representation of flight attendants, expenditures of forced fees, and the recall campaign, all of which were directed to the union president in her official capacity. Carter Br. 35-38. While Local 556 attempts to label Carter's objections and opposition to union activities as "workplace harassment," Carter's objections to the union president was

entirely RLA-protected activity and Title VII-protected activity. *Id*. "[I]t is irrelevant what [the union] might call its discriminatory practice, how others might label it, or what else might motivate it." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1744 (2020). Local 556 failed to demonstrate with any legal argument or authorities showing that Carter's conduct constituted "harassment." On the contrary, it was Local 556 and President Stone who "harassed" Carter, a vocal union opponent, by depriving her of her career and livelihood. Local 556 had a historical, personal dislike of Carter.

Local 556 has failed to address any legal authority or argument as to why it is entitled to summary judgment, and cannot rebut the evidence supporting Carter's duty of fair representation claims. Carter Br. 47-51. The Court should deny Local 556's motion for summary judgment because it was based on abstract assertions devoid of legal argument or authority.

### III. Local 556 violated Title VII by causing Carter to be fired and otherwise discriminating against her because of her religious beliefs and practices.

The Court should deny Local 556's motion for summary judgment on Carter's Title VII claims because Carter demonstrated that the union violated Title VII by (A) causing and attempting to cause Southwest to discipline Carter because of her religious beliefs and practices, and (B) intentionally discriminating against Carter by failing to accommodate her religious beliefs and practices and by treating her differently from other represented employees.

#### A. Local 556 caused Southwest to fire Carter because of her religious beliefs and practices.

Title VII's disparate-treatment provisions prohibit a union from "caus[ing] or attempt[ing] to cause an employer to discriminate against an individual" because of her religion, which includes

"all aspects of [her] religious observance and practice, as well as belief." 42 U.S.C. § 2000e-2(c)(3); § 2000e(j).[13]

To demonstrate that Local 556 violated Carter's rights under Title VII's disparate treatment provision, Carter must show that Local 556 (1) caused or attempted to cause Southwest to fire her (2) "because of" (3) "her religion," which includes "all aspects of [her] religious observance and practice, as well as belief." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015). Despite the Supreme Court's holding in *Abercrombie*, Local 556 invokes the *McDonnell Douglas*'s indirect evidence test, contending that Carter must prove, *inter alia*, she was treated differently from members outside her class.[14] But the indirect proof paradigm only applies when a plaintiff relies on circumstantial evidence to prove her case. When there is direct evidence of discharge or discrimination because of religious beliefs, the *McDonnell Douglas* indirect proof paradigm, and burden shifting are inapplicable. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

Carter's direct evidence demonstrates that President Stone attempted to cause, and did in fact cause, Carter to be fired based on her religious observances, beliefs, and practices. Carter Br. 56-57; (Carter App.105); (Carter App.80-81, 531); *see also* L556 Br. 19. Carter also demonstrated

---

[13] Contrary to Local 556's arguments, the existence of a "conspiracy to terminate [Carter's] employment" is not an element or any condition of liability for a Title VII claim. *See* L556 Br. 20; Carter Br. 51, 57-58.

[14] Local 556 contends that Carter must demonstrate that she has a bona fide religious belief or was a member of an identifiable religion, that she was qualified for her position as a flight attendant, that her religious beliefs resulted in an adverse employment action, and that she was treated differently from members outside her class. L556 Br. 18. Carter does not need to prove all of those elements when she is relying on direct evidence, but Carter has established her bona fide religious beliefs (Carter App.527, ¶¶6-9), that she was a member of an identifiable religion (*Id.*), that she was qualified for her position as a flight attendant based on her twenty-year career without discipline ((FAC ¶11, SWA Answer (ECF 81), ¶11); (Carter App.372, Schneider 69:15-17); (Carter App.308, Sims 188:14-16)), that she was fired (Carter App.222), and that she was treated differently from other employees (*infra* at 29).

that Southwest fired her "because of" her religious observances, beliefs, and practices. Carter Br. 51-56. Carter observed her religious beliefs and engaged in religious practices when she sent Local 556 and President Stone the pro-life Facebook videos and messages, and posted the pro-life Facebook videos to her personal page. Carter Br. 52-53.

Carter also presented evidence that Carter's Facebook videos and messages to President Stone were both a "but for" cause and "motivating factor" for President Stone's decision to report her for discipline. Carter Br. 51-56. President Stone reported Carter for two pro-life Facebook videos showing an aborted baby, and two private Facebook messages stating, "This is what you supported during your Paid Leave with others at the Women's MARCH in DC," and "TWU-AFL-CIO and 556 are supporting this Murder…." (Carter App. 105); (Carter App.80, 81, 531).

President Stone sought to discipline Carter for her pro-life Facebook videos and messages while knowing that Carter sent them for religious reasons. President Stone's complaint to Southwest specifically pointed out that Carter's Facebook videos and messages make reference to "murder as well as political and religious comments." (Carter App.105). When President Stone reported Carter, she told Southwest she believed that Carter's Facebook videos and messages, and her references to religion were a violation of the company's Social Media Policy. *Id*. Stone even identified for Southwest all of the specific policies she believed that Carter's pro-life communications violated. *Id*. Stone knew Southwest had fired employees for prior Social Media Policy violations. (Carter App.11-12); (Carter App.442, Stone 155:2-14). Indeed, Southwest ultimately terminated Carter for most of the policies that President Stone had identified for the company. (Carter App.222). But for Stone's reports, Southwest would not have fired Carter for her religiously inspired protests in the Facebook videos and messages she sent to Stone. Southwest would have never even discovered Carter's Facebook posts and messages or fired Carter but for

President Stone's complaint. (Carter App.105, 113, 114); (Carter Br. 25). Thus, it is inescapable that Local 556's president was making Carter's "religious practice" a factor in its decision to attempt to harm her job and requesting that Southwest make her religious practice "a factor in employment decisions." *Abercrombie*, 575 U.S. at 773.

Despite the direct evidence, Local 556 argues that Carter's deposition testimony—that she believed President Stone tried to get her fired because she was an objector who resigned from union membership and supported the recall—"confirms" that Local 556 did not discriminate based on Carter's religious beliefs. L556 Br. 19; (ECF 148, pp.4-5). Contrary to Local 556's characterizations, Carter also stated that she believed President Stone attempted to fire her "[b]ecause [she] was dissenting against what they were doing as the union…" Local 556 Br. 19. "What they were doing as a union" was participating in the Women's March and supporting Planned Parenthood's pro-abortion agenda, which was in direct conflict with her religious beliefs. Carter Br. 13, 16-21, 26-27; (Carter App.527, ¶¶6-9);

President Stone attempted to get Carter fired because of her union opposition, support for the recall (i.e., removal of union executive board officers, including Stone), *and* because of Carter's religious beliefs and practices. "Often, events have multiple but-for causes. So, for example, if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision." *Bostock*, 140 S. Ct. at 1739. Moreover, Carter's legal claim does not depend on whether Carter *thought* that Local 556 fired her because of her religious beliefs. Whatever characterizations Local 556 would like to give Carter's subjective beliefs about *some* of the reasons why President Stone reported her, it does not change the fact that President Stone reported Carter for pro-life Facebook videos and messages.

**B. Local 556 intentionally discriminated against Carter by failing to accommodate her religious beliefs and practices, and by treating her differently from other represented employees.**

Title VII also prohibits a union from intentionally discriminating against an individual because of her "religion," which includes "all aspects of [her] religious observance and practice, as well as belief." 42 U.S.C. § 2000e-2(c)(1); § 2000e(j). Local 556 intentionally discriminated against Carter by failing to accommodate her religious beliefs and practices, and by treating her differently from other represented employees.

**1. Local 556 intentionally discriminated against Carter by failing to accommodate her religious beliefs and practices.**

Local 556 intentionally discriminated against Carter by failing to accommodate her religious beliefs and practices. *Abercrombie*, 575 U.S. at 772, 772 n.2. "[T]he rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: [A union] may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions." *Id.* at 773. Causing or attempting to cause an employee to be fired or disciplined because of her religious practice "is *synonymous* with refusing to accommodate the religious practice." *Abercrombie*, 575 U.S. at 772 n.2 (emphasis in original).

When Carter objected to union activities with her pro-life Facebook videos and messages, President Stone reported Carter to Southwest and asked that action be taken against her. President Stone created a conflict between Carter's religious beliefs and practices, and Southwest's Social Media Policies. President Stone caused Southwest to fire Carter for her "religious comments," which Stone said violated the Social Media Policies. (Carter App.105).

"Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating [unions not to cause an employer] to discharge any individual because of such

27

individual's 'religious observance and practice.'" *Abercrombie*, 575 U.S. at 775 (cleaned up). Despite having an affirmative obligation under Title VII, President Stone made no attempt to accommodate Carter's religious practices when she reported Carter's abortion videos and messages to Southwest and instead asked that action be taken against her to "[m]ake Charlene …stop." Carter Br. 22-23, 58-59; (Carter App.105, 115). Local 556 had all sorts of options to attempt to accommodate Carter. An obvious one was to sit down with Carter and seek to agree that she would not send Stone pictures if the union would stop illegally promoting abortion with Carter's money.

Contrary to Local 556's contentions, the union's liability under Title VII does not depend on whether Carter requested a religious accommodation or on the union's "actual knowledge" of her need for an accommodation.[15] Title VII's disparate-treatment provision, § 2000e-2(a)(1), "does not impose a knowledge requirement." *Abercrombie*, 575 U.S. at 773. For that reason, Carter had no burden to request an accommodation or raise a religious conflict. The U.S. Supreme Court rejected Local 556's argument in *Abercrombie*, reasoning that:

> This [burden to request an accommodation] would require the employer to have actual knowledge of a conflict between an [employee's] religious practice and a work rule. The problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks us to add words to the law to produce what is thought to be a desirable result. That is Congress's province … [Title VII's] disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice. A request for accommodation, or the employer's certainty that the practice exists, may make it easier to infer motive, but is not a necessary condition of liability.

575 U.S. at 774. "Instead, an [employee] need only show that his need for an accommodation was a motivating factor in the employer's decision." *Abercrombie*, 575 U.S. at 772.

---

[15] L556 Br. 20.

### 2.  Local 556 treated Carter differently than other employees.

To discriminate against a person means to make "'distinctions or differences in treatment that injure protected individuals' … Firing employees because of a statutorily protected trait surely counts." *Bostock*, 140 S. Ct. at 1753 (quoting *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 59 (2006)).[16] Local 556 treated Carter differently (and worse) for the simple reason that unions must protect employees from discipline; they must not act affirmatively to cause them discipline. Carter Br. 47-48.

When union presidents report represented employees for discipline, which is presumptively a duty of fair representation violation, they are treating an employee differently. President Stone treated Carter differently by complaining to Southwest about Carter's "religious messages," which Stone said violated Southwest's Social Media Policies. President Stone defended other Southwest employees facing discipline under the Social Media Policies but treated Carter worse by reporting her religious activities for discipline under the Social Media Policies. (Carter App.11, 12, 105); (Carter App.442; Stone 155:2-14); (Carter App. 428-440, 448-449; Stone 118:8-144:3, 167:23-168:7).

### III. The CBA-arbitration findings asserted by Local 556 should not be given issue preclusive effect for Carter's RLA, Title VII, and duty of fair representation claims.

### A.  Carter's federal statutory claims are not subject to claim preclusion.

Contrary to Local 556's suggestions,[17] Carter's claims are not subject to claim preclusion because they arise under the RLA, Title VII, and the duty of fair representation. Claims are not

---

[16] Local 556 contends that there is no evidence that the union treated Carter less favorably than similarly-situated non-Christian employees. L556 Br. 19. But, as demonstrated herein, Title VII does not "limit disparate-treatment claims to only those employer policies that treat religious practices less favorably than similar secular practices." *Abercrombie*, 575 U.S. at 775.

[17] *See* L556 Br. 10.

subject to arbitration when they seek to enforce statutory rights separate and independent from the CBA. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 258 (1994); *Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 191 (5th Cir. 2014); *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349 (5th Cir. 2008); *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012) ("[T]he assertion of any right that is not created by a CBA is … not subject to binding arbitration under the statute.") (quoting *CareFlite v. Off. And Prof'l Emps. Int'l Union,* 612 F.3d 314, 320–21 (5th Cir. 2010)). Local 556's suggestions that Carter cannot present her claims because she arbitrated a separate and independent "just cause" claim arising under the collective bargaining agreement is unfounded, and this Court rejected it. (ECF 69, pp.10-11); (ECF 54, pp.11-14); L556 Br. 10.

## B. The Court should not give the CBA arbitration's "just cause" findings issue preclusive effect in Carter's RLA, Title VII, and duty of fair representation claims.

Contrary to Local 556's characterizations, the arbitrator concluded only that Southwest had "just cause" to terminate Carter under the collective bargaining agreement, and could not reach Carter's RLA, Title VII, or duty of fair representation claims, which were beyond the scope of the arbitrator's authority. Factual findings from the arbitration—which concerned only whether Southwest had "just cause" to fire Carter under the CBA's terms—should not be given issue preclusive effect for Carter's RLA and Title VII claims. The arbitrator made his findings in the narrow context of whether Southwest had just cause to fire Carter under the CBA, and made without reference to the legal standards or legal context of Carter's RLA, Title VII, and duty of fair representation claims, and without discovery rules and procedures necessary to protecting federal statutory interests.

1. **Carter's direct evidence and the federal interests warranting protection of Carter's RLA, Title VII, and duty of fair representation rights outweigh the relevance of "just cause" findings from the CBA arbitration.**

Contrary to Local 556's characterizations, the arbitrator's findings cannot controvert direct evidence that Local 556 and President Stone caused Carter to be fired for her RLA-protected activity and religious beliefs and practices. To be sure, courts may consider and give evidentiary weight to findings of fact from arbitral proceedings in subsequent federal claims. *Grimes*, 746 F.3d at 188.[18] But issue preclusion is not automatic, and courts have "discretion" as to the weight it will give an arbitration *relative to the weight of the plaintiff's evidence*. *Grimes*, 746 F.3d at 188 (emphasis added). Carter's direct evidence, combined with the arbitrator's own admissions that Carter's RLA and Title VII claims were beyond the scope of his authority, foreclose the relevance of his findings beyond the question of whether Southwest had "just cause" under the strict confines of the CBA. Carter obtained direct evidence through the federal discovery process regarding President Stone's reasons for reporting Carter's conduct that she did not have access to during the arbitration and that were beyond the scope of whether Southwest had "just cause" to fire Carter.

The Fifth Circuit, under *Grimes*, also requires courts to consider "federal interests warranting protection." 746 F.3d at 188 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985)). Federal courts should independently review relevant factual issues when a plaintiff seeks to vindicate her statutory rights in a judicial forum. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 56, 60 n.21 (1974) (Title VII decision recognizing that a court may afford weight to the arbitral decision "where the issue is solely one of fact"); *McDonald v. City of West Branch, Mich.*,

---

[18] *But see Gonzalez v. S. Pac. Transp. Co.*, 773 F.2d 637, 643 (5th Cir. 1985) ("Even if the same claim and factual allegations were determined by binding arbitration, [a] plaintiff is entitled to *de novo* review in a federal court [on his federal discrimination claims] and doctrines of *res judicata* or collateral estoppel are inapplicable.").

466 U.S. 284, 292 (1984) (holding in a 42 U.S.C. § 1983 civil rights action that "a federal court should not afford *res judicata* or collateral-estoppel to effect an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement"); *Grappe v. Kansas City S. Ry. Co.*, 71 F. App'x. 302, 303 (5th Cir. 2003) (holding that issue preclusion is unavailable in a Title VII action "because different policies underlie the proceedings before the [arbitrator] and the Title VII action…").

Giving automatic issue preclusive effect to the arbitrator's findings would prejudice Carter's federal rights and her due process rights when she relies on contrary evidence obtained pursuant to the federal discovery rules. *See McDonald*, 466 U.S. at 290. "The record of the arbitration proceedings is not as complete … the usual rules of evidence do not apply; and the rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath are often severely limited or unavailable." *Alexander*, 415 U.S. at 57-58.

Even where a plaintiff is allowed to call and cross-examine witnesses and submit evidence in arbitration proceedings, fact finding procedures have been deemed inadequate to protect federal rights. *See Grimes*, 746 F.3d at 189. For these reasons, the Court should not give the arbitrator's findings preclusive weight here, especially when, pursuant to the federal rules of discovery, Carter obtained discovery that she did not have at the arbitration and that she could not have obtained through arbitration procedures. For instance, Carter could not propound interrogatories and requests for production or take depositions. Through those processes Carter obtained evidence that she did not have access to at the arbitration. Simply put, the arbitration's evidentiary procedures were not suited to protecting Carter's rights under the RLA, Title VII, and duty of fair representation. Contrary to Local 556's characterizations, the arbitrator's findings cannot

32

controvert direct evidence that it fired Carter for RLA-protected activity and her religious beliefs and practices.

**2. Issue preclusion does not apply because the arbitration of "just cause" under the CBA involves legal standards distinct from those in Carter's RLA, Title VII, and duty of fair representation claims, and the asserted findings are legal conclusions beyond the scope of and unnecessary to the arbitrator's decision.**

The Court should not give the arbitrator's findings preclusive effect with respect to Carter's RLA, Title VII, and duty of fair representation claims. Issue preclusion only applies to findings when the *identical* issue was previously adjudicated and the finding was *necessary* to the arbitrator's decision. *Bradberry v. Jefferson Cty.*, 732 F.3d 540, 548 (5th Cir. 2013). Neither condition was met.

**a. Issue preclusion does not apply because the issues adjudicated in the arbitration of "just cause" under the CBA are not identical to those in Carter's RLA, Title VII, and duty of fair representation claims.**

Issue preclusion does not apply because the issues adjudicated were not "identical." For issue preclusion to apply *both* the facts and the legal standard used to assess them must be the same in both proceedings. *See Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415, 1422 (5th Cir. 1995). The "just cause" standard used in the arbitration put the burden on the employer to prove the employee engaged in misconduct under the bargaining agreement, and that the "severity of the disciplinary action is reasonably related to the seriousness of the proven offense and the employee's prior record." *Providence St. Peter*, 123 LA 473, 476 (2006) (Gaba). Whether the employer had just cause depends on factors such as whether it obtained proof of the employee's guilt, applied its rules and penalties even-handedly, and whether the degree of discipline was reasonably related to the seriousness of the proven offense and the employee's service record. *Id*.

33

at 477 & n.4. This standard is separate and distinct from what Carter must demonstrate to prove her RLA and Title VII claims.[19]

The Court should not give the arbitrator's "findings" preclusive effect in any of RLA claims because the legal standards used to assess the facts are not the same: Whether Southwest had "just cause" under the CBA is irrelevant to whether Carter's RLA-protected activity was a "substantial or motivating" factor for her termination. "Just cause" is a legal standard limited to whether it could fire her under the CBA's terms. Similarly, whether Southwest had "just cause" under the CBA is irrelevant to whether Local 556 breached its duty of fair representation by acting arbitrarily, discriminatorily, or in bad faith. The legal standards for assessing the facts are also different when comparing "just cause" under the CBA to whether Local 556 caused or attempted to cause Southwest to fire Carter because of her religious beliefs and practices in violation of Title VII or failed to accommodate her religious beliefs and practices. The arbitrator refused to consider Carter's religious beliefs, and if he had, those findings would have been beyond the scope of determining "just cause." The arbitrator conceded that the RLA, Title VII, the duty of fair representation, and employees' rights thereunder were beyond the scope of the arbitration, and that his findings are unrelated to Carter's RLA-speech and association rights.[20]

---

[19] The arbitrator's opinion never defined the elements of "just cause," making the scope extremely unclear and demonstrating further why the findings are not entitled to preclusive effect. *Grimes*, 746 F.3d at 188 (recognizing that arbitral pleadings must state issues clearly to warrant preclusive effect).

[20] The arbitrator mentions Carter's "personal beliefs on abortion, her distaste for current union leadership, and her right to refrain from compulsory union activity such as paying the union's compelled fees for its political, ideological, and other nonbargaining spending." He states, "that the Grievant holds very strong personal views on such subjects, or that she has exercised her Railway Labor Act and First Amendment rights, *are not germane to my determination of just cause for her termination*." SWA App.1008, p6 n.2 (emphasis added).

34

The CBA arbitration of "just cause" did not assess the facts using the same legal standards that apply to Carter's RLA, Title VII, and duty of fair representation claims. The arbitrator did not consider Carter's RLA-protected activities or religious beliefs, or President Stone's duties and obligations to employees under the RLA, Title VII, and the duty of fair representation. When arbitrating "just cause" under the CBA the arbitrator also ignored President Stone's obligations under the RLA that prohibited union officials from reporting represented employees' conduct. L556 Br. 12. Thus, the arbitrator's finding—that President Stone reported Carter's conduct not to retaliate against her but because she believed Carter violated policies that were applicable to her—cannot be given preclusive effect. Local Br. 13. That finding, a conclusion of law more than fact, cannot be applied to Carter's RLA, Title VII, and duty of fair representation claims, because it presumes the application of federal statutory rights and legal standards that the arbitrator admittedly could not reach. L556 Br. 12-13. For the same reasons, the Court should not give issue preclusive effect to the arbitrator's findings that Southwest does not have a policy or practice of disciplining or not disciplining employees based upon their view of TWU Local 556 or Audrey Stone. The arbitrator did not apply the same legal standards to evaluate the facts or contemplate RLA rights or religious beliefs and practices. L556 Br. 12. Likewise, the arbitrator could not determine whether Carter was treated less favorably than other employees based on her exercise of RLA protected rights or her religious beliefs. L556 Br. 12. The arbitrator did not have evidence before him that was produced in discovery, and—by his own admission—he was not qualified to make these conclusion in the context of Carter's RLA and Title VII rights and the duty of fair representation.

Local 556 also references the arbitrator's comments regarding Carter's twenty-year employment record without discipline. L556 Br. 12. But those comments only show that

Southwest may have been justified to fire Carter under the contract; those comments do not controvert Carter's record or preclude Carter's RLA and Title VII claims, which are based on different protected rights, different causation standards, and distinct statutory schemes.

> **b. Issue preclusion does not apply because Local 556 asserts purported "findings" that are legal conclusions and beyond the scope of and unnecessary to the arbitrator's decision.**

Local 556's issue preclusion argument is based on legal conclusions the arbitrator made in the strict confines of a "just cause" arbitration. "[A]n arbitrator may be competent to resolve many preliminary factual questions, such as whether the employee 'punched in' when he said he did," but cannot decide ultimate legal issues. *See Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981). Local 556's "just cause" findings asserted here have no preclusive effect because they are legal conclusions limited to the narrow context in which they were made, inapplicable to the RLA, Title VII, and duty of fair representation, and unnecessary to deciding whether Southwest had "just cause" under the CBA. L556 Br. 12-13.

Local 556 seeks to assert the arbitrator's findings for legal matters beyond the scope of arbitration and for legal issues which, by his own admission, were not germane to his conclusions. Disparate treatment, whether Carter was "treated less favorably than others," and whether the circumstances surrounding her offenses were "substantively like those … who received more moderate penalties" involve legal conclusions divorced from the RLA's and Title VII's statutory framework (from which Carter's claims here arise), and were not necessary to determining whether Southwest had "just cause" to fire Carter under the CBA. *See* L556 Br. 8, 12. Given the arbitrator's disregard for Carter's rights under the RLA or her religious beliefs, he did not presume to know which employees are similarly-situated for RLA and Title VII purposes.

Similarly, the arbitrator's finding that Southwest "does not have a policy or practice of disciplining, or not disciplining employees based upon their view of TWU Local 556 generally, or of Audrey Stone in particular" is another legal conclusion that cannot be given preclusive effect and that was not necessary to deciding "just cause." Local Br. 13. Local 556 also asserts the arbitrator's finding that President Stone reported Carter's conduct not to retaliate against her but because she believed Carter violated policies that were applicable to her. L556 Br. 12-13. This finding is another legal conclusion. Furthermore, President Stone's subjective reasons for reporting Carter were not necessary to the arbitrator's limited scope and judgment—i.e., determining whether *Southwest* had "just cause" to fire Carter. Nor can this finding about Stone's motives controvert Carter's direct evidence—President Stone's admissions for reporting Carter in her complaint and Carter's RLA-protected speech and expression in her Facebook posts and messages. (Carter App.80, 81, 105, 531).

While the arbitrator decided that Southwest was justified for firing Carter under the CBA, that decision is separate and independent from Carter's RLA and Title VII claims, which are based on different protected rights, different causation standards, and distinct statutory schemes. *See Hawaiian Airlines, Inc.*, 512 U.S. at 255. Evaluating whether Carter's activity was protected was beyond the scope of the arbitration and whether Southwest had just cause to fire Carter under the CBA. Carter's direct evidence demonstrates that her RLA-protected activity was a substantial and motivating factor for Local 556's and President Stone's actions in causing Carter's termination, and that Local 556 caused Carter to be fired and failed to accommodate her because of her religious beliefs and practices.

## CONCLUSION

For these reasons, the Court should deny Local 556's motion for partial summary judgment, and grant Carter's motion for partial summary judgment, and allow the parties to proceed to trial on the matter of remedies.

Dated: February 17, 2022                    Respectfully submitted,

<div style="margin-left: 45%;">

s/ Matthew B. Gilliam
Mathew B. Gilliam (*admitted pro hac vice*)
New York Bar No. 5005996
*mbg@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319

s/ Jason E. Winford (*with permission*)
David E. Watkins
Texas Bar No. 20922000
*dwatkins@jenkinswatkins.com*
Jason E. Winford
Texas Bar No. 00788693
*jwinford@jenkinswatkins.com*
JENKINS & WATKINS, P.C.
4300 MacArthur Avenue, Suite 165
 Dallas, Texas 75209
Tel: 214-378-6675
Fax: 214-378-6680

*Attorneys for Plaintiff Charlene Carter*

</div>

38

## **Certificate of Service**

I hereby certify that on February 17, 2022, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ Matthew B. Gilliam