# EXHIBIT A

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3   CHARLENE CARTER,          §
                               §
 4        Plaintiff,           §
                               §
 5   v.                        § Civil Action No.
                               § 03:17-cv-02278-S
 6   SOUTHWEST AIRLINES CO.,   §
     AND TRANSPORT WORKERS     §
 7   UNION OF AMERICA LOCAL    §
     556,                      §
 8                             §
          Defendants.          §
 9   _____
10        REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
11                     CHARLENE CARTER
12                    November 20, 2020
     _____
13   ********************************************************
14      PORTIONS OF TRANSCRIPT DESIGNATED CONFIDENTIAL:
15             PAGE 132:13 THROUGH 134:6
               PAGE 134:19 THROUGH 135:10
16
     ********************************************************
17
18
          REMOTE ORAL AND VIDEOTAPED DEPOSITION OF CHARLENE
19   CARTER, located at her residence in Aurora, Colorado,
     produced as a witness at the instance of the Defendant
20   Southwest Airlines Co., and duly sworn, taken in the
     above-styled and numbered cause on November 20, 2020,
21   from 10:02 a.m. to 4:36 p.m., before Joseph D.
     Hendrick, Certified Shorthand Reporter in and for the
22   State of Texas, reported by machine shorthand, pursuant
     to Notice and the Federal Rules of Civil Procedure and
23   any provisions stated on the record or attached hereto.
24
25   Job No. 4341722
```

Page 1

Resp. App.1

```
 1          Q.      She -- so -- let me put it back up.  I'm
 2     sorry.  That's a bad question.
 3          A.      I --
 4          Q.      So when she said she doesn't want -- when
 5     you write here, "She doesn't want me to let on that I
 6     know this in the meeting" --
 7          A.      Yeah, the --
 8          Q.      What is the "this" -- what is the "this" in
 9     that sentence?
10          A.      "This" would be that -- okay.  Let's see.
11     "She doesn't want me to let on that I know" that --
12     that I know that she knows that it was Audrey Stone who
13     turned -- she wanted to make that reference to Mike
14     Sims.  She wanted to have that meeting with Mike Sims.
15     But I already stated it within my meeting that it was
16     Audrey Stone, my union president, that turned me in.
17          Q.      In the message below, Ms. Jackson says,
18     "I'll call you when I get in my car."  Did you guys
19     have a conversation about this message?
20          A.      You know what?  I don't recall.
21          Q.      You understand that in your lawsuit you
22     assert that Ed Schneider terminated you, in part at
23     least, based on your religious beliefs, correct?
24          A.      That is correct.
25          Q.      What is your basis for that assertion?
```

Resp. App.2

```
 1        A.     I told him that I was a Christian in my
 2   faith -- in my fact-finding meeting and that I am
 3   against -- well, I was against the march and them
 4   marching for Planned Parenthood due to my strong
 5   beliefs against abortion.
 6        Q.     Do you have any evidence that Mr. Schneider
 7   would have reached a different outcome had you been --
 8   held the same views but they were not related to your
 9   religious beliefs?
10        A.     That, I cannot speak for him.
11        Q.     I'm asking if you have any evidence of that
12   or anything you would point to for that fact.
13        A.     I believe that if -- I should have been
14   able to, given -- and not knowing this prior to this --
15   that I could have some kind of accommodation because of
16   my Christian religion, but when I said that within that
17   meeting, maybe he should have referred me to -- I
18   believe now it's called the ACT committee.  I had no
19   idea that that committee even existed.
20        Q.     Are you aware of Southwest ever giving a
21   religious accommodation to excuse prior conduct?
22               MR. GILLIAM:  Objection to the extent it
23   calls for a legal conclusion.
24        A.     I do not.  I had never known -- I believe
25   that if you stated that you were a Christian, you know,
```

**Resp. App.3**

```
 1    they -- I clearly stated I was a Christian.  I don't
 2    believe that my union president should have gone to a
 3    march that supported Planned Parenthood and who was the
 4    main sponsor of that march.  When she went to represent
 5    us, she put herself and our union, our -- she
 6    represented us at a march that supported abortion, so
 7    in this context, yes, I believe that I should have had
 8    a somewhat -- at least send me to the ACT team, talk to
 9    me about it, why is it that I cannot express my
10    dislike, because that's always been the case with our
11    union leadership, but for some reason in my case it's
12    not.  And yes, my Christian beliefs should have been
13    recognized within my union fact-finding meeting.  I
14    brought it up several times in that meeting.
15    BY MR. CORRELL:
16         Q.    Ms. Carter, as you sit here today, is it
17    your sworn testimony that you cannot tell me what
18    accommodation you wanted to request from Southwest
19    Airlines?
20         A.    I don't know what the accommodations are.
21    I don't even know what the ACT team was until just
22    recently.
23         Q.    I'll give you an example --
24         A.    What I can't say is if I don't -- they
25    should have recognized my Christian beliefs within the
```

Page 78

1    fact-finding meeting when I said I don't -- I -- I

2    don't believe in abortion and I don't believe that

3    our -- my union president should have taken our dues

4    and spent it on a march.  This -- this had everything

5    to do with just that march.

6        Q.    Ms. Carter, what I'm asking you is what is

7    it you're saying Southwest Airlines should have done to

8    accommodate your religious beliefs as soon as you

9    raised them?

10            MR. GILLIAM:  Objection to the extent it

11   calls for a legal conclusion.  You can answer.

12   BY MR. CORRELL:

13       Q.    Are you testifying that they should have

14   just said never mind to this --

15       A.    They should not have fired me over my

16   Christian beliefs.

17       Q.    Okay.

18       A.    After I expressed them in the union meeting

19   and we could have sat down and at least had a

20   conversation regarding that.

21       Q.    So is there any limit to what you would be

22   allowed to say to express your Christian beliefs to

23   other employees of Southwest Airlines in your personal

24   view?

25            MR. GILLIAM:  Objection.  Incomplete

Page 79

Resp. App.5

```
 1    hypothetical.
 2         A.    They should have accommodated this.
 3    BY MR. CORRELL:
 4         Q.    My question to you, Ms. Carter, is not
 5    whether they should have accommodated this -- have
 6    accommodated this.  I'm trying to find the parameters
 7    of the accommodation you claim you were denied.  You
 8    understand you are claiming in your lawsuit you were
 9    denied an accommodation?
10         A.    Yes, I was denied an accommodation.
11         Q.    Do you understand that an accommodation is
12    an exception from a policy to allow for religious
13    beliefs?
14              MR. GILLIAM:  Objection.  Asks for a legal
15    conclusion.
16         A.    I'm just gonna tell you right now I believe
17    that I should have had an accommodation on this
18    specific one, yes.
19    BY MR. CORRELL:
20         Q.    And what would that have looked like?
21         A.    I don't know how they write up the
22    accommodations.  I don't know.  I -- I never even knew
23    you had to have an accommodation.  I believe my
24    accommodation falls under Title VII of the civil rights
25    that I have as a Christian or a believer, that due --
```

Page 80

Resp. App.6

```
 1    and due to the fact that my union president spent money
 2    to go to a march that supported abortion.  If you're
 3    going to go to a march regarding this type of behavior,
 4    this reflected that behavior and I should have had my
 5    accommodations met once I said I was a Christian, but
 6    honestly, this should have also been through the union
 7    representatives, they knew where I stood on this.
 8         Q.    So your testimony is that you believe
 9    Southwest should allow you to say whatever you want
10    however you want if it is in support of your Christian
11    beliefs?
12              MR. GILLIAM:  Objection.  Incomplete
13    hypothetical.
14         A.    In this context --
15    BY MR. CORRELL:
16         Q.    Hang on.  Hang on.
17         A.    In this context, yes.
18         Q.    Hang on, Ms. Carter.  Your testimony --
19              MR. CORRELL:  Not a hypothetical, counsel.
20    BY MR. CORRELL:
21         Q.    -- is that the accommodation you should
22    have been provided is the right to say whatever you
23    want however you want if it is in support of your
24    Christian beliefs?
25         A.    Again --
```

Page 81

**Resp. App.7**

```
 1               MR. GILLIAM:  Objection.  Calls for a legal

 2    conclusion.

 3        A.     Again, this was due to a march that my

 4    union president went to, wore pink pussyhats, marched

 5    with a bunch of women in support of, with being the

 6    main sponsor Planned Parenthood.  So in this particular

 7    instance, yes, they should have given me, in this

 8    particular instance, they should have given me an

 9    accommodation.

10    BY MR. CORRELL:

11        Q.     Okay.  So all they needed to do --

12        A.     So should -- so should have the union.

13    This should have never gone to the -- the company.

14    This should have been handled within the union

15    parameters.

16        Q.     Let me ask this differently, then.

17               So I understand you're saying part of what

18    you requested was that you be excused for the messages

19    you previously sent to Ms. Stone.

20               Do I have that correct?

21        A.     Correct.

22        Q.     Would you also have sought to be allowed to

23    send those employees to other employees again in the

24    future?

25        A.     I would have never sent those messages to
```

Page 82

**Resp. App.8**

```
 1    anybody.  This was in reflection -- or this was due to

 2    the actual march that -- and I only sent it to my union

 3    president because she is the one that led this

 4    particular march, as in led these flight attendants to

 5    this women's committee meeting and to the march.  I

 6    never sent it to anyone else.  She was the leader and

 7    this is the reason it got sent to her.  There was no

 8    reason for me to send it to anyone else.  And it was in

 9    her capacity as the union president, not her

10    personally.

11              MR. GILLIAM:  Counsel, whenever it's

12    convenient for you, if you want to take a break, that's

13    fine.  I think everybody's ready.

14              MR. CORRELL:  Yeah, give me just two more

15    minutes and I think we'll be good.

16              MR. GILLIAM:  Okay.

17              MR. CORRELL:  Yeah, let's go ahead and take

18    a break now.

19              MR. GILLIAM:  Okay.  All right.  About

20    what --

21              VIDEOGRAPHER:  Hold on.  Hang on.  We are

22    going off the record at 11:01 a.m.

23              (Break from 11:01 a.m. until 11:14 a.m.)

24              VIDEOGRAPHER:  We are going back on the

25    record at 11:14 a.m.
```

Page 83

**Resp. App.9**

```
 1   BY MR. CORRELL:
 2       Q.     Ms. Carter, before we took the break we had
 3   started to talk about -- or we had gone into and talked
 4   about religious accommodation issues.  Before that, the
 5   question I'd put to you was essentially what evidence
 6   do you have that Mr. Schneider sought to discriminate
 7   you on the basis of your religious beliefs and I
 8   believe your answer was that he did not provide you
 9   with a religious accommodation or direct you to the ACT
10   team.  Do I have that correct?
11       A.     Yes.
12       Q.     Is there any other evidence that you
13   possess that Mr. Schneider acted against you because he
14   was hostile to or discriminating against your religious
15   beliefs?
16       A.     No.
17       Q.     Do you have any evidence that Mr. Schneider
18   was hostile to you or acting against you because you
19   were a union objector?
20       A.     No.
21       Q.     Ms. Jones, Meggan Jones was the assistant
22   base manager at Denver, correct?
23       A.     Yes.
24       Q.     And she participated in the fact-finding,
25   right?
```

Page 84

Resp. App.10

1    I had never filed a grievance before so I was unclear

2    of how things happened.

3         Q.    Other than providing you with that

4    information, did Ms. Wann do anything else that you are

5    aware of in response to your communications with her at

6    this time?

7         A.    No.

8         Q.    What did Ms. Deloache provide you, if

9    anything?

10        A.    The same type of thing.

11        Q.    Anything she provided that Ms. Wann did

12   not?

13        A.    No.

14        Q.    Other than Ms. Wann and Ms. Deloache, were

15   you communicating with anyone -- and Ms. Jackson, were

16   you communicating with anyone else about your step 2

17   proceedings at this time?

18        A.    I don't believe so.

19        Q.    Now, the result of your step 2 hearing was

20   an offer of reinstatement subject to a last chance

21   agreement, correct?

22        A.    Correct.

23        Q.    And you did not accept that last chance

24   agreement, correct?

25        A.    Correct.

Page 91

**Resp. App.11**

```
 1              (Deposition Ex. 6 marked)
 2    BY MR. CORRELL:
 3        Q.     I am going to show you what will be marked
 4    as Exhibit 6 to your deposition.  Just a moment here.
 5    You should have that in just a moment here and it
 6    should populate, like I said, as Exhibit 6.  Let me
 7    know when you have that.  I know it may take a minute.
 8        A.     Okay.  I have it.
 9        Q.     Do you recognize this document?
10        A.     Yes.
11        Q.     What is this document?
12        A.     This is the settlement statement that they
13    offered me.
14        Q.     Why did you decline this offer of
15    reinstatement?
16        A.     Several reasons.  One, first big -- the
17    biggest reason is that I have known flight attendants
18    that have accepted this, and as soon as they accepted
19    it, somebody had turned them in for something that they
20    had done in the past and then they got fired again.
21               Another reason I did not accept this was
22    due to the fact that they wanted to put a letter in my
23    file for 24 months, which exceeded the contract.  It
24    was only supposed to be in there at the -- at the very
25    most for 18 months, so which that meant if, you know, I
```

Veritext Legal Solutions
800-336-4000

**Resp. App.12**

1    sneezed wrong on the airplane within 24 months of

2    basically being on probation again, I would be fired.

3    I would have no recourse if somebody, you know, decided

4    to turn me in for past social media, and I know people

5    were looking for that, and I would get fired

6    immediately after signing this.

7            Another thing is, is that this was union

8    business and the company actually got involved in union

9    business, which never happened in the past, and I

10   believe that this should have been just handled within

11   the union, and I would have been signing all my rights

12   away.  And on top of that, I had already been speaking

13   regarding this.  Again, if I would have signed this,

14   somebody could have dredged something up from the past

15   and had me fired over speaking about it in the past and

16   that has happened to other flight attendants.  So I

17   knew in signing this, it would be pretty much my death

18   sentence at Southwest.

19      Q.    The first point you raised, who do you know

20   who accepted the last chance agreement and was

21   subsequently terminated for conduct that predated the

22   last chance agreement?

23      A.    Holly Immamovic.

24      Q.    Now your testimony is that the behavior

25   that got her fired occurred before she accepted the

                                            Page 93

Resp. App.13

```
 1    attorney-client privileged information.
 2              THE WITNESS:  Okay.
 3        A.    Only because I knew it had happened in --
 4    in our system.
 5    BY MR. CORRELL:
 6        Q.    Can you give me an example?
 7        A.    I -- you know what?  I -- I can't right at
 8    the moment.
 9        Q.    Would it surprise --
10        A.    The only -- the only one that I know of is
11    Holly Immamovic.
12        Q.    The --
13        A.    At that time -- at that time.  And I can't
14    discuss the rest of that.
15        Q.    Why are you unable to discuss the rest of
16    that?
17              MR. GILLIAM:  If it's privileged
18    information then --
19        A.    Yeah.
20              MR. CORRELL:  Well, her communications with
21    Holly Immamovic are not going to be privileged.
22              MR. GILLIAM:  Correct, right.
23    BY MR. CORRELL:
24        Q.    So is there some other reason you are not
25    testifying as to the other details you are aware of
```

Page 102

Resp. App.14

1    with respect to Holly Immamovic?

2        A.    No.  I just know that others were looking

3    for reasons to have other people terminated.  It -- it

4    had become a hostile work environment and everybody was

5    on pins and needles at this point, and I was afraid to

6    sign this particular document and be subject to, let's

7    say, flying with another flight attendant who knew

8    about this and turned me in for something.  I had never

9    been in trouble at my job before ever until this.

10       Q.    I'm trying to understand, Ms. Carter, is

11   there anything on the face of this letter that led you

12   to believe that violations of other policies besides

13   the three listed in bullet 7 would result in immediate

14   termination on the face of this letter?

15       A.    No, not on the face of this letter.

16       Q.    Did Ms. Parker or Ms. Ross tell you that

17   any policy violation, no matter what it was, not the

18   three that are itemized here, but any of them, would

19   result in immediate termination?

20       A.    Not in those words, no.  They just said to

21   watch your back.

22       Q.    What do you mean by that?

23            MR. GILLIAM:  Objection.  Calls for

24   speculation.  You can answer.

25       A.    Yeah, it -- it just means that if there was

                                              Page 103

**Resp. App.15**

1    another violation, that more than likely I would be

2    fired and I would have no recourse.

3    BY MR. CORRELL:

4        Q.    Another violation of what?

5        A.    Of really anything that fell under a policy

6    that Southwest Airlines has, and they --

7        Q.    Would that --

8        A.    And they would be watching me.

9        Q.    What did Ms. Parker and Ms. Ross

10   specifically say that led you to believe that this

11   letter reached beyond the three listed policies?

12       A.    This letter did not as in specific being

13   written.  So no, it did not.

14       Q.    I understand that, but I believe your

15   testimony just now was that when Ms. Ross and

16   Ms. Parker said "watch your back," you interpreted that

17   as them telling you that this extended to all policies

18   not just the three enumerated policies.  Did I

19   understand that testimony correctly?

20       A.    That is correct.

21       Q.    Did they say anything other than the phrase

22   "watch your back" that led you to reach that

23   conclusion?

24       A.    No, that would be -- that would be pretty

25   telling to me.  Watch my back.

Page 104

Resp. App.16

```
 1     understand as a witness who was swearing under penalty
 2     of perjury your own words, "quid pro quo religious
 3     harassment," meant?
 4                MR. GILLIAM:  And to the extent it calls
 5     for a legal conclusion, same objection.
 6     BY MR. CORRELL:
 7        Q.    Okay.  Were these your words, Ms. Carter?
 8        A.    Yes, these were my -- these were -- these
 9     were written within my -- the context of my -- my
10     words, yes, but --
11        Q.    Did you adopt these words --
12        A.    But my -- my --
13        Q.    I need to ask some questions here to lay a
14     foundation.
15                Did you adopt these words here as your own
16     when you were swearing to them under penalty of
17     perjury?
18        A.    I'm not -- I'm not understanding.  I
19     believe that Southwest Airlines violated me when I was
20     in my fact-finding meeting when I said I was a
21     Christian and that I put those things on my Facebook
22     page and referred them back to a women's march that my
23     union president took and spent my money for, and --
24        Q.    And --
25        A.    -- they -- they supported that and fired me
```

Page 122

Resp. App.17

1    because of my direct dislike and expressing my

2    opinions, they violated my Christian rights, yes, I do

3    believe they did.

4         Q.    Having noted counsel's objection, what is

5    your understanding of the phrase "quid pro quo

6    religious harassment"?

7         A.    You're going to have to -- you're going to

8    have to re -- you're going to have to resay -- you're

9    going to have to re --

10        Q.    Sure.  In paragraph 9 where you say, and I

11   am paraphrasing here, please correct me if there's some

12   confusion created by it, as a result of the foregoing,

13   my employer engaged in quid pro quo religious

14   harassment.  I have omitted the discussion of

15   discrimination because that's separate here.  My

16   employer engaged in quid pro quo religious harassment.

17   What did you mean by that?

18        A.    For me, it's they have been -- they've

19   represented -- they -- they -- the company has actually

20   promoted other -- how should I say this -- activities,

21   and never once -- how do I put this?  They protect

22   everybody else, such as gay, lesbian, Black Lives

23   Matter, gay pride week, but they don't protect me under

24   my civil rights as being a Christian.

25        Q.    So that's what you meant when you said, "My

Page 123

Resp. App.18

```
 1          A.      I'm sorry?

 2          Q.      Is there any other basis for that opinion?

 3          A.      The other basis?

 4          Q.      Is there any other basis for that opinion?

 5   Other than the documentation you've turned over to your

 6   attorneys.

 7          A.      The rest of the march was basically all

 8   about productive rights so Planned Parenthood.

 9          Q.      Did you attend the march?

10          A.      I left the day that the march was starting.

11          Q.      Okay.  So what is your basis for forming

12   the opinion about what occurred at the march?

13          A.      Because I was there while the women were

14   coming in to the march and the signs that they were

15   holding and it was basically a pro abortion versus pro

16   choice.  For the most part I'd say 98 percent of the

17   march was that way.

18          Q.      Okay.  And again you weren't at the march,

19   were you?

20          A.      I was in DC in the same areas.  I left that

21   day.

22          Q.      Okay.  So to answer my question, you didn't

23   attend the march, correct?

24          A.      I did not attend the march, no, I did not.

25          Q.      So the foundation of your testimony that
```

Page 256

**Resp. App.19**

```
 1    Yeah, how?
 2              MR. CORRELL:  That's not a communication
 3    between the lawyer and the client.  He's -- we're
 4    allowed to know the date of retention.
 5              MR. GILLIAM:  You can know -- you can --
 6    you can tell them when you -- you retained me, but
 7    don't reveal any communications that we had.
 8              THE WITNESS:  Honestly I don't even know
 9    what the date was that I retained you guys.
10    BY MR. GREENFIELD:
11         Q.    Okay.  Was it before your termination?
12         A.    No.
13         Q.    Okay.  In Exhibit 3, and we can pull it up
14    or not, you mentioned in the 2015 timeline an attorney
15    and you say, "My attorney says this is blatant
16    discrimination."
17              Who are you talking about?
18         A.    That was a family attorney that I had been
19    sending stuff to that Brian Talbert was threatening me
20    with, and told him to either cease and desist or I
21    would -- you know, because he was -- basically it was
22    character assassination, and once I told him that I was
23    sending this to my attorney he stopped.
24         Q.    The messages you sent to Ms. Stone, why did
25    you send them to her on her personal Facebook page?
```

Page 258

Resp. App.20

```
 1        A.      It was the way that we communicated.
 2   Her -- her whole Facebook page at the very beginning,
 3   and you can still look it up, it says, "Audrey Stone
 4   TWU."  She changed that name after she turned me in.
 5   That was the way she communicated to the membership
 6   when she was running for president and she had all of
 7   the stuff that, you know, her team was doing or was --
 8   was going to do and so on and so forth, that's how we
 9   communicated, and then through Messenger, there was
10   Messenger -- or communication through other board
11   members online through Facebook and Messenger.
12        Q.      And I'm talking specifically about
13   Ms. Stone, you describe it as "the way we
14   communicated."  Did Ms. Stone ever communicate with you
15   personally via Facebook Messenger?
16        A.      It -- she didn't communicate with me at all
17   ever.  Even if you called the office she wouldn't
18   return your call.
19        Q.      Are you aware of Ms. Stone having a email
20   in her capacity as the union president?
21        A.      Yes, and I sent her emails as well.
22        Q.      Okay.  And have you turned those over to
23   your counsel for production?
24        A.      I did.  I did.
25        Q.      And when was the last email you sent
```

Page 259

**Resp. App.21**