# EXHIBIT E

Page 1

```
       IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
                  DALLAS DIVISION

CHARLENE CARTER              )
                             )  CIVIL ACTION NO.
VS.                          )  3:17-CV-02278-X
                             )
SOUTHWEST AIRLINES CO., AND  )
TRANSPORT WORKERS UNION OF   )
AMERICA, LOCAL 556           )
```

---

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF
MAUREEN EMLET
NOVEMBER 5, 2020

---

ANSWERS AND DEPOSITION OF MAUREEN EMLET, produced as a witness at the instance of the Plaintiff, taken in the above-styled and -numbered cause on NOVEMBER 5, 2020, at 9:03 a.m., before CHARIS M. HENDRICK, a Certified Shorthand Reporter in and for the State of Texas, witness located in Aurora, Colorado, pursuant to the Federal Rules of Civil Procedure, the current emergency order regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto.

Case 3:17-cv-02278-X Document 230-5 Filed 10/04/22 Page 3 of 14 PageID 6581
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMMETT

Page 99

 1          Do you know if Audrey Stone ever
 2   reported another flight attendant for a policy
 3   violation?
 4      A.  I don't know whether she did.
 5      Q.  Do you know of a case where any union
 6   official ever reported an employee for a policy
 7   violation?
 8      A.  I do.
 9      Q.  Okay.  And what do you recall?
10      A.  I recall that one union leader gave some
11   social media screenshots to one of the labor
12   relations managers and asked to remain anonymous.
13      Q.  Okay.  To a labor relations manager, you
14   said?
15      A.  Yes.
16      Q.  Okay.  And who was that union leader?
17      A.  I don't know.  He -- they didn't give that
18   to me.
19      Q.  When you said they didn't give that to
20   you, you mean the anonymous union leader?
21      A.  Correct.
22      Q.  So you knew that it was a union leader,
23   though?
24      A.  Yes.
25      Q.  Okay.  And how did you know it was a union

Page 100

1 leader?

2 A. Because the manager who received the
3 information said it was.

4 Q. Okay. The -- the manager who received the
5 information told you that they received information
6 from a union leader?

7 A. Yes.

8 Q. Okay. And who was the labor relations
9 manager; who told you that?

10 A. I think it was -- was Kevin.

11 Q. And what is Kevin's last name?

12 A. Let me tell you. Allen, A-l-l-e-n.

13 Q. Okay. Do you know what the information
14 was that Kevin union -- I'm sorry -- Kevin Allen
15 had received?

16 A. I don't remember what case it was.

17 Q. Okay. You don't remember the flight
18 attendant who was being reported?

19 A. No.

20 Q. Okay. Do you remember when that was?

21 A. No, I don't. Two to three years ago.

22 Q. Okay. Do you know if Brian Talbert ever
23 reported another flight attendant for a violation
24 of one of Southwest's policies?

25 A. I believe he did, yes.

```
 1      Q.  Okay.  And who did he report?
 2      A.  I don't remember.
 3      Q.  Do you remember what policy he reported
 4   the -- being violated?
 5      A.  I believe it was the social media policy.
 6      Q.  Okay.  And do you remember when it was?
 7      A.  No.
 8      Q.  All right.  Let's see.  If I could mark as
 9   the next exhibit Document 26.  I think it's Exhibit
10   18.
11              (Exhibit 18 marked.)
12      Q.  (By Mr. Gilliam)  And, Ms. Emlet, if you
13   could review this.  And once you have had the
14   chance to review it, let me know.
15      A.  You say it's Document 18 or Exhibit 18?
16      Q.  It -- it will be your Document 26.
17      A.  I don't -- I don't think I have -- let's
18   see.  Oh, wait.  Let's scroll down some more.  More
19   attachments.  Okay.
20      Q.  And -- and once you find it, review it.
21   And once you have had the chance to review it, just
22   let me know.
23      A.  Okay.
24      Q.  All right.  And what is it?  I am sorry.
25   Do you recognize it?
```

Page 102

1     A. Yes.
2     Q. And what is it?
3     A. It's an email thread that, I believe,
4 originated with Brian Talbert alleging that
5 different flight attendants had violated the social
6 media policy. And then there is a spreadsheet
7 that, I think, Julie O'Grady put together with
8 names of flight attendants who needed to be
9 contacted and addressed regarding the posts.
10     Q. Okay. And who is Julie O'Grady?
11     A. She was one of the -- or is one of the
12 senior investigators with employee relations.
13     Q. Okay. All right. And the -- the chart
14 you referred to -- or I am not sure which word you
15 used, but is -- is that on -- are you talking about
16 the one on 6351 through 6354?
17     A. Yes.
18     Q. Okay. And there is a column that says
19 time and -- well -- well, I guess, hold up on -- on
20 that a little bit. I guess, going -- going back --
21 I am sorry. Going back to 5680, the first page.
22     A. Okay.
23     Q. And there is an email from Julie O'Grady
24 to -- to you and Melissa Burdine and a few others.
25 Do you know if this was the first you -- you would

1    A.  Well, Brian Talbert had brought forward a
2  whole list of alleged social media violations.  And
3  so he -- and he brought his allegations to the
4  employee relations team.  So the -- employee
5  relations, Brian and the base leader were working
6  together to go through each of the allegations.
7    Q.  Okay.  And then moving to the next email,
8  next page, 4483.
9    A.  Yes.
10    Q.  And Julie O'Grady sends you an email,
11  along with several other persons.  And it looks
12  like you -- you forward the email; is that -- I --
13  I guess, do you know when Julie sent you that
14  email?
15    A.  Well, not unless the date stamp is on
16  here, but I don't see a date stamp on this email.
17    Q.  Okay.  Yeah, I didn't either.  And Julie
18  says, after doing some additional research on the
19  information Brian forwarded us -- to us on
20  Wednesday, I did not see any additional information
21  to investigate from an employee relations
22  standpoint.  And I found that some of the posts
23  were previously brought forward to the company and
24  addressed.
25        And then, I -- I guess, you forward it

Page 106

1 to a group of people and say, I am not sure how
2 this will influence your investigation.
3 What -- what investigation were you
4 referring to?
5 A. I believe it was the investigation of the
6 -- the social media violation allegations on all of
7 the flight attendants that were listed in the chart
8 on this email thread.
9 Q. Okay. And who -- who are those people
10 that you are sending it to?
11 A. Some of them were base managers and some
12 of them were assistant base managers. And they
13 were working at the bases of the flight attendants
14 who had been accused of violating the policy.
15 Q. Okay. And which -- I guess, from
16 reviewing the information here, which -- which
17 bases were they from?
18 A. Well, I hope I remember. I think at the
19 time, Joe was in Chicago. Brinkley Flanigan was
20 Baltimore. Danielle Santiago was Baltimore. Brian
21 Ridgeway, I believe, at this time, was senior
22 manager over the Eastern region bases. Carolene
23 Goulbourne was the manager in Oakland. Brett and
24 Keith were assistant base managers in Oakland. And
25 Dave Kissman was the senior manager over the

Bradford Court Reporting, LLC    972.931.2799    www.bradfordreporting.com

**Resp. App.45**

1    Western region of flight attendant bases.
2        Q.  Okay.  All right.  Do you remember having
3    any phone conversations with them about their
4    investigations?
5        A.  I don't remember.
6        Q.  Okay.  And let's see.  Going back to 6351.
7        A.  Yes.
8        Q.  Now, I guess, Julie O'Grady, in her email,
9    says, after review of the attached information,
10   below are the names of the flight attendants, the
11   time and date of their comments in 2014; and the
12   comment they made on social media could be
13   perceived as retaliatory in nature.
14              And I think she goes on to say,
15   reposting messages related to the protected
16   categories that are derogatory, negative or sexual
17   in nature could be a violations (sic) of the
18   company policy concerning harassment, sexual
19   harassment, discrimination and retaliation.
20              Now, do you -- do you know if there
21   was actually a final determination that it -- it --
22   these posts that are listed in this table did
23   violate that policy?
24              MR. CORRELL:  Objection.
25   Mischaracterizes the exhibit.  You can answer as

Page 108

1  you are able, Ms. Emlet.
2      A.  I don't know who or if anybody received
3  discipline as a result of -- of these
4  investigations.
5      Q.  (By Mr. Gilliam)  Okay.  And do you know
6  if -- if any of these posts were deemed to violate
7  one of Southwest's policies?
8      A.  I don't know.
9      Q.  Okay.  Do you know who reached the -- I
10 guess, the -- the decision on whether to issue
11 discipline for these cases?
12     A.  Each of the decisions would have been made
13 separately by the base leader where that flight
14 attendant was domiciled.
15     Q.  Okay.  And -- that exhibit -- okay.  Now,
16 were you involved in -- or I am sorry.
17         Were you aware of any cases where
18 flight attendants were reported for their social
19 media activities during a union campaign?
20     A.  I -- I don't know.  I don't remember.
21     Q.  Okay.  And are you aware if anyone --
22 well, I guess, first of all, do you know who ▆▆▆▆
23 ▆▆▆▆ is?
24     A.  Yes.
25     Q.  And who is ▆▆▆▆▆▆▆▆

Bradford Court Reporting, LLC    972.931.2799    www.bradfordreporting.com

**Resp. App.47**

1   A.  I -- I don't know if he is still with the
2   company, but when I retired, he was a flight
3   attendant based out of Oakland.
4   Q.  Okay.  Do you know -- or I am sorry.
5       Are you aware if anyone ever reported
6   ▇▇▇▇▇▇▇ for Facebook posts he made?
7   A.  Yes.
8   Q.  Okay.  And what -- what do you remember
9   about ▇▇▇▇▇▇▇ being reported for Facebook posts?
10  A.  I don't remember any details about what
11  was posted or what the allegations were, but I do
12  know that he was reported to have allegedly
13  violated the social media policy.
14  Q.  Okay.  Do you know who reported him?
15  A.  I don't remember.
16  Q.  Okay.  If I could mark as Exhibit 19,
17  Document 23.  Ms. Emlet, if you want to turn to
18  that.
19      (Exhibit 19 marked.)
20  Q.  (By Mr. Gilliam)  And take an opportunity
21  to review it.  And once you have had a chance to
22  review it, I will ask some questions.
23  A.  Okay.
24  Q.  All right.  Do you recognize this?
25  A.  I don't remember it, but I -- I recognize

Page 110

1   the format.
2        Q.   Okay.  Do you know what it is?
3        A.   Yes.  It -- it looks like it's an email
4   from me.
5        Q.   Okay.  And you -- I think you -- you sent
6   it to Brianna Grant.  And it says, I couldn't find
7   much with ▊s name on it, but I am happy to keep
8   looking if you like.
9             Do you recall what she had asked you
10  to look for?
11       A.   No.
12       Q.   Okay.  And, I -- I guess, the ▊
13  mentioned here, that -- is that ▊?
14       A.   Yes.
15       Q.   Okay.  Okay.  And what did Brianna, I
16  guess, say to you when, I guess, you emailed and
17  asked for -- asked if you want to dig deep -- if
18  she wanted you to dig deeper?
19       A.   I have no idea.
20       Q.   Okay.  Do you know if she responded to
21  you?
22       A.   I -- I don't know.
23       Q.   Okay.  And you say you did take
24  screenshots of his most recent posts.  Do you
25  remember being out on his Facebook page looking for

Bradford Court Reporting, LLC    972.931.2799    www.bradfordreporting.com

**Resp. App.49**

Page 111

1 posts?

2  A.  I don't remember doing that, but it's --
3 it says in the email that I did.

4  Q.  Uh-huh.  And you -- you also say, I think
5 there is an interesting pattern of trying to milk
6 the company for money.

7      What -- what are you referring to when
8 -- when you mention that pattern of --

9  A.  I --

10  Q.  -- milking the company?

11  A.  I don't remember.

12  Q.  Okay.  Let's see.  If -- at -- let's see.
13 6346, still part of this document.

14  A.  Okay.  My last number is cut off, so can
15 you tell me what is at the top of the page that you
16 are referencing?

17  Q.  It looks like a screenshot of a post.  It
18 has ███████ name on it and then it has a
19 picture of a plane and a clock.

20  A.  Okay.  Okay.  I have it.

21  Q.  Okay.  And did you read it?

22  A.  Yes.

23  Q.  Okay.  Is -- could this be what you were
24 referring to when you said there is a pattern of
25 trying to milk the company for money?

Page 112

 1              MR. CORRELL:  Objection.  Calls for
 2    speculation.  You can answer as you are able,
 3    Ms. Emlet.
 4        A.  I -- I don't see anything here that would
 5    suggest he was trying to milk the company for
 6    money.
 7        Q.  (By Mr. Gilliam)  Okay.  All right.  And
 8    then if you could -- have you turn to 6345.
 9        A.  Yes.
10        Q.  Okay.  And you care to review those
11    messages?
12        A.  Yes.
13        Q.  And is this the post you were referring to
14    or are these the posts you were referring to when
15    you said there is an interesting pattern of trying
16    to topple the union?
17        A.  I don't remember what I was referring to
18    in that email.
19        Q.  Okay.  All right.  Now, the -- these
20    Facebook posts -- well, let me ask it this way:
21    The documents numbered 6323 to 6350, were those
22    attachments to this email you sent to Brianna?
23        A.  I can't tell for sure whether they were or
24    not because at the top of the email, it says that
25    there are attachments, but I don't know if the --

Bradford Court Reporting, LLC     972.931.2799     www.bradfordreporting.com

**Resp. App.51**