## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>                  Plaintiff,<br><br>V.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>                  Defendants. | Civil Case No. 3:17-cv-02278-X |

## PLAINTIFF CHARLENE CARTER'S OBJECTIONS TO DEFENDANTS' PROPOSED JURY CHARGE AND INTERROGATORIES

Plaintiff Charlene Carter ("Carter") responds and objects to Southwest Airlines Co. ("Southwest") and Transport Workers Union, Local 556's ("Local 556," and, with Southwest, "Defendants") Proposed Jury Charge and Interrogatories as follows:

### Damages

In its charge on damages, Defendants include "the amount of other damages sustained by Plaintiff such as emotional distress, pain and suffering, and other noneconomic losses," but they omit from this instruction that the jury should also consider "inconvenience, mental anguish, and loss of enjoyment of life" as a subset of the noneconomic losses.[1]

---

[1] *See Diaz v. Amerijet Int'l Inc.*, 872 F. Supp. 2d 1365, 1381 (S.D. Fla. 2012); *Riley v. Empire Airlines, Inc.*, 823 F. Supp. 1016, 1027 (N.D.N.Y. 1993) (cases cited therein); *Vaca v. Sipes*, 386 U.S. 171, 196-198 (1967) (holding that courts should be free to award appropriate damages or equitable relief to ensure full compensation in a duty of fair representation case).

1

**Back Pay**

Defendants omit from its description of back pay the benefits included in Southwest's pay package for flight attendants, including, "seniority rights and benefits, vacation pay, uniform pay, ratification bonuses, profit sharing, tax relief shared with employees, and 401K and retirement benefits."  Given Southwest's unique set of benefits, failing to instruct the jury regarding each of these recoverable benefits risks confusing the jury such that they do not understand that these components should be included.  Each of these categories is a valuable benefit, and their value should be included in Carter's back pay.

**Punitive Damages**

In its punitive damages charge, Defendants omit the fourth category of considerations for the jury in determining the amount of punitive damages.  In the Fifth Circuit Pattern Jury Instructions, the jury is instructed, "If you decide to award punitive damages, you should consider the following in deciding the amount:".  It then lists the categories included in both Carter and Defendants' proposed charges plus one additional (in brackets, to indicate that it should be adjusted to include the actual fines available): "[The amount of fines and civil penalties applicable to similar conduct]."[2]  A footnote comments that, "This language should be used only if there is evidence of fines and civil penalties."[3]  The RLA imposes criminal fines and penalties for violations of RLA Sections 152 (Third) and (Fourth), but Defendants omitted this instruction.  Carter requests that the instruction include the following language regarding the applicable fines:

> 4.    Criminal and civil sanctions for Defendants' conduct: The Railway Labor Act, 42 U.S.C. Section 152 (Tenth), makes employers' willful violations of employee rights a misdemeanor subject to fines of not less than $1,000, and not more than $20,000, or up to 6 months-imprisonment, or both fine and imprisonment, for each offense. Each day, during which the employer willfully fails or

---

[2] Fifth Circuit Pattern Jury Instruction, Civil Cases, 11.14 (2020), p. 229-230.
[3] *See id.,* at 230 n.18.

refuses to comply with employee's rights under the Railway Labor
Act constitutes a separate offense.

**RLA Retaliation Claim Instructions**:

Defendants oppose Carter's claims based on the false distinction between terminating Carter for violations of Southwest's employment policies and Carter's opposition to union leadership. Southwest terminated Carter because it concluded that Carter's opposition to union leadership violated its policies. Southwest's assertion that it fired Carter for violating its Social Media Policies, and not for her RLA-protected activity is question-begging and misses the point of protected rights.[4]

Defendants' instructions improperly include legal issues that have already been resolved. Defendants' instructions state that RLA Sections 152 (Third) and (Fourth) address primarily employees' pre-certification rights. Federal courts have jurisdiction over post-certification disputes alleging animus—that RLA protected activity was a substantial or motivating factor for an adverse employment action—or discrimination involving protected activities.[5] Not only does the RLA protect employees' right to "organize" unions, but it also protects employees' post-certification rights to continuous "self-organization" and "re-organization" campaigns, such as engaging in decertification proceedings to remove unwanted unions, and other efforts to remove unwanted union representatives.[6]

---

[4] *See Arthur v. United Airlines, Inc.*, 655 F. Supp. 363, 367 (D. Colo. 1987). If the employee's activities are RLA-protected, then it is impermissible for the employer to fire her for those activities. *See e.g., Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 574 (1995) ("[T]he point of all speech protection … is to shield just these choices of content that in someone's eyes are misguided or even hurtful.").

[5] *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 31 F.4th 337, 346 (5th Cir. 2022). Furthermore, any reading of *Trans World Airlines, Inv. v. Independent Federation of Flight Attendants*, 489 U.S. 426 (1989) that would prevent employees from exercising their expressly protected RLA rights, would erase employees' rights out of the statutory text of RLA Section 152 (Third) and (Fourth). *See* 45 U.S.C. § 152 (Third) and (Fourth).

[6] *See Russell v. NMB*, 714 F.2d 1332, 1345 (5th Cir. 1983) ("*[I]t is inconceivable that the right to reject collective representation vanishes entirely if the employees of a unit once choose collective*

3

The Court has resolved that issue, and it is irrelevant to Carter's RLA claim at trial. For the same reasons, Defendants' instruction is improper because it asserts, "an employee engages in protected activity when she attempts to organize and bargain collectively through representatives of their own choosing." As this Court has already decided, the RLA protects rights more broadly than Southwest's instructions suggest, and there is no issue for trial regarding whether Carter engaged in RLA-protected activity. Carter objects to Defendants' instructions because they also suggest that Carter's RLA-protected activity in this case was solely her "decision to opt-out of union membership."[7] Carter's RLA-protected activity was much broader, and included her other activities opposing the union.

When there is no dispute as to which employee activities motivated the employer's termination of the employee, the only question is whether the employee's activities were protected.[8] The Court has already resolved that question of law. As this Court recognized in its May 25, 2022 Order on Southwest's Motion for Reconsideration, Judge Scholer found that Carter' public complaints were protected, and Carter, in her Facebook messages, "was plainly objecting to forced payment of political … union expenses, advocating against and opposing Local 556 and President Stone, and expressing her opposition to the political leadership of the Union."[9]

Defendants' instructions mistakenly include a *Wright Line* mixed-motive burden-shifting scheme that does not apply in this case because there is no dispute that Southwest fired Carter for sending private Facebook videos and messages to President Stone.[10] *Wright Line* only applies in

---

*representation.*") (emphasis in original) (citations omitted); *see also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 279 (1974); *BRAC v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 669 n.5 (1965).
[7] *See* Southwest's and Local 556's Joint Proposed Jury Instructions, Dkt. No. 250-3, at p.5.
[8] *See NLRB v. Allied Aviation Fueling of Dallas LP*, 490 F.3d 374, 379 (5th Cir. 2007).
[9] Court Order on Reconsid., Doc No. 237 at 3.
[10] Southwest's instructions state that "[i]f Plaintiff Charlene Carter demonstrates that protected activity was a motivating factor in the decision to terminate her employment, Defendant Southwest

4

cases when an employee engages in protected activity and different unprotected activity, and the parties dispute whether the protected or the unprotected activity motivated the employee's termination.[11] Shifting the burden back to Southwest to show that the company would have fired Carter for some other activity makes no sense when the company admits that it fired Carter for only her Facebook videos and messages.

Defendants' instructions are also improper because they state that, to prove retaliation, Carter must prove that "[t]he individual(s) who decided to terminate Plaintiff Charlene Carter's employment had knowledge of the protected activity in which she engaged" and the protected activity was a "substantial motivating factor for the decision maker's termination of her employment." As to Southwest, Carter need only prove that her RLA-protected activity was a substantial *or* motivating factor for Southwest's decision to fire her.

Carter further states that Local 556's instructions are improper because they incorrectly suggest that only the employer can retaliate against an employee for exercising her RLA-protected rights. Not so. Unions are liable under the RLA Sections 2 (Fourth) and (Eleventh) "for their actions in procuring a discharge which violates the employee statutory rights."[12] The RLA subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights."[13] Thus, Local 556's instructions are also mistaken because they state, "TWU 556 is not liable … if the jury concludes that it lacked the authority to cause" Carter's termination.

_____

is not liable under the Railway Labor Act if [it] establishes by a preponderance of the evidence that Plaintiff Charlene Carter would have been discharged from employment even if she had not engaged in protected activity."

[11] *See e.g.*, *Poly-America, Inc. v. NLRB*, 260 F.3d 465, 488-89 (5th Cir. 2001) (applying the *Wright Line* framework when the employer claimed that it discharged the employee for poor performance); *see also NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981).

[12] *See Brady*, 401 F.2d at 102 (footnote omitted).

[13] *Steele*, 323 U.S. at 198 (1944); *see also Roscello v. Sw. Airlines*, 726 F.2d 217, 222 (5th Cir. 1984) (citation omitted).

5

Defendants' instructions are also improper because they state that, to prove retaliation, Carter must prove that "[t]he individual(s) who decided to terminate Plaintiff Charlene Carter's employment had knowledge of the protected activity in which she engaged" and the protected activity was a "substantial motivating factor for the decision maker's termination of her employment." Carter need only prove that her protected activity was a substantial *or* motivating factor for Local 556's attempt to cause her discipline for her RLA-protected activity. Thus, Defendants' instructions are also improper for instructing the jury that Local 556 is not liable if it "did not exert undue influence over Southwest's decision."

Defendants' instruction that "[t]he RLA's prohibition of unlawful retaliation applies only to adverse employment actions taken against the employee"[14] is confusing and inappropriate. It confuses the straightforward standard for RLA liability, which the Fifth Circuit has held requires a discharge or other adverse action.[15] Furthermore, without instructions as to what an "adverse employment action" is, this would lead to jury confusion. Here, of course, the adverse action alleged was a discharge, so the instruction is inapplicable.

Defendants' proposed instruction regarding the arbitration findings should not be given. The Court's May 5, 2022 order denying the parties' motions for summary judgment rejected Defendants' attempts to interject irrelevant findings from the arbitration. The Court addressed the arbitrators' decisions in detail,[16] and found that the arbitrators' rulings were legal conclusions that would not be binding on the jury, and that the legal standards the arbitrators' applied were completely different from the ones in this suit.[17] Defendants' instructions are not sufficient to cure the prejudice that would be caused through the introduction of such evidence. Defendants'

---

[14] Dkt. 250-3, p.6.
[15] *Roscello*, 726 F.2d at 222.
[16] Dkt. 232, pp. 14-16.
[17] *Id.,* at 15-16.

arguments for including the arbitrator's decision and findings are unavailing here. Notably, the Fifth Circuit's justification in *Graef*[18] for finding error in the exclusion of such arbitration awards was based upon the similarity of the facts resolved by the arbitrator, i.e., the factors that would justify preclusion, which this Court has rejected.  And, unlike in the Supreme Court's *Alexander*[19] decision, it will be a jury, not the Court as in *Alexander*, determining the factual issues. While a court can give such weight to an arbitration award as it deems appropriate, with a jury, the risk of prejudice associated with an arbitral finding is significantly greater.

Defendants' instruction regarding the delay in the connection between Carter's protected activity and the termination of her employment is improper because it is unnecessarily confusing and misleading. Carter has alleged (and demonstrated) that Defendants' caused her termination for RLA-protected activities she engaged in within a close temporal proximity of her discharge. Thus, Defendants' instruction is likely to confuse the jury.

**Defendants' "Duty of Fair Representation Claim" Instructions**:

Defendants' Duty of Fair Representation Claim instructions are improper because the union's representation of Carter—after it caused her termination—is irrelevant. Carter does not claim that the union's representation in post-termination proceedings was arbitrary, discriminatory, or in bad faith. Similarly, whether the union's conduct "undermined the fairness or integrity of the grievance process" is irrelevant in this case, and not a standard element of duty of fair representation violations.[20] Defendants' instruction is improper because it contains language about an employee's right to pursue grievances and the union's "considerable discretion in controlling the grievance and arbitration procedure."[21] Local 556's control of the grievance and arbitration procedure is

---

[18] *Graef v. Chemical Leaman Corp.*, 106 F.3d 112, 117 (5th Cir. 1997).
[19] *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59 (1974).
[20] *See e.g., Vaca*, 386 U.S. at 177-78.
[21] Dkt. 250-3, at 8-9.

irrelevant to the union's specific treatment of Carter. Thus, these instructions are confusing, and risk misleading the jury regarding the legal standard in this case.

While Local 556's attempt to discipline Carter did result in Carter's discharge, Carter need not prove that she was "discharged from employment by the employer" as an element of her duty of fair representation claim, or that "such discharge was not for a legitimate non-discriminator[y] reason."[22] Local 556's violation of the duty is *attempting* to cause Carter, a represented employee, discipline.[23]

Defendants' instructions are also improper because the duty of fair representation does not "require[] Plaintiff to prove the union acted with a motive to harm her" or that the union's conduct "seriously undermined the integrity of the grievance process."[24]

Defendants' instructions are also improper because the union must rebut the presumption that President Audrey Stone was acting in her official capacity with compelling evidence,[25] *and* the presumption that it acted arbitrarily, discriminatorily, and in bad faith by reporting a represented employee for discipline.[26] Defendants' instruction that Carter must prove that Local 556 President Audrey Stone "arbitrarily, discriminatorily, or in bad faith *reported*" Carter misstates the standard.[27] Carter need only prove that Local 556 President Stone *acted* "arbitrarily, discriminatorily, or in bad faith," and, in accordance with well-settled law, it is presumed that the union did indeed violate the duty by reporting a represented employee.

---

[22] Dkt. 250-3, at 9.
[23] *See Caravan Knight*, 362 N.L.R.B. at 1805.
[24] Dkt. 250-3, at 8.
[25] *See Caravan Knight*, 362 N.L.R.B. at 1804; *IBEW Local 453*, 258 N.L.R.B. at 1428; *SPFPA Local 444*, 360 N.L.R.B. at 436.
[26] *See Caravan Knight*, 362 N.L.R.B. at 1805; *Acklin Stamping*, 351 N.L.R.B. at 1263; *Graphics Commc'ns Local 1-M (Bang Printing)*, 337 N.L.R.B. at 673.
[27] Dkt. 250-3, at 9 (emphasis added).

**"Religious Discrimination Claim" Instructions**:

Defendants characterize Carter's claim as "she would not have had her employment terminated but for her religious beliefs." Contrary to Defendants' characterizations, demonstrating that Southwest would not have fired Carter "but for" her religious observances, beliefs, and practices, is merely one way of demonstrating that Southwest unlawfully fired her "because of" some aspect of her religious observances, beliefs, or practices.[28] Carter can demonstrate "because of" causation by showing that her religious observances, beliefs, or practices, were either a "but-for" cause or a "motivating factor" in Southwest's termination decision. For the same reasons, Defendants' instruction regarding what Carter must prove by a preponderance of the evidence is false.

Defendants' instructions are also improper because they repeatedly refer to whether "illegal discrimination" was a motivating factor, but this misstates the legal standard, which evaluates whether any aspect of Carter's religious observances, beliefs, or practices, is a "but-for" cause or "motivating factor."[29]

Defendants' instruction is improper because its assumption that Southwest can fire Carter under "employment related policies" mistakes the law under Title VII. "An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions."[30] If an employer or union makes an employee's religiously motivated practice a factor in employment decisions Title VII is violated. Title VII requires otherwise-neutral policies to give way.[31] For the same reasons, Southwest's instructions that "An employer may … terminate … an employee for other reasons, good or bad, fair or unfair," and additional instructions instructing the

---

[28] *Abercrombie & Fitch*, 575 U.S. at 773; *Bostock*, 140 S. Ct. at 1739-40; *see also* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j).
[29] *See* 42 U.S.C. § 2000e(j); *Abercrombie & Fitch*, 575 U.S. at 773; *Bostock*, 140 S. Ct. at 1739-40; *see also* 42 U.S.C. § 2000e-2(m).
[30] *Abercrombie & Fitch*, 575 U.S. at 773.
[31] *Id.*

jury not to "second-guess Defendant Southwest's business decisions or act as a personnel manager" are also mistaken and improper.

Defendants' instructions incorrectly state that Carter claims Southwest's stated reasons are a pretext. Not so. This is not a pretext case. Southwest fired Carter because the company said her pro-life Facebook messages and posts—wherein she exercised her religious observances, beliefs, and practices—violated its Social Media Policies. Southwest admits that it fired her these messages, and does not contend that it fired her for some other reason. Contrary to Local 556's suggestions, Carter's Title VII claims do not require her to demonstrate that the union "acted in concert" with the employer to terminate Carter's employment.[32] Title VII makes unions liable for causing or attempting to cause an employer to discriminate.

Defendants' insertion into the instruction that "unsupported assertions, improbable inferences, and unsupported speculation of a discriminatory motive are insufficient to support liability" is highly prejudicial because it undermines Carter's ability to demonstrate that her religious observances, beliefs, or practices, were a "motivating factor" in Defendants' termination decisions. Defendants' instruction is misleading and confusing regarding Title VII's legal standard for demonstrating causation.

Defendants again attempt to insert the instruction regarding the weight to be given to arbitration awards. To avoid repetition, Carter incorporates her argument regarding this instruction from her objections to Defendants' RLA Retaliation Claims Instructions above.

Defendants' instruction is also improper because its repeated statements that the union "had no authority terminate [Carter's] employment" are misleading and irrelevant. Title VII expressly prohibits unions from causing or attempting to cause employers to discriminate against employees

---

[32] Dkt. No. 250-3, at 10.

"because of" their religious observances, beliefs, or practices.[33] Furthermore, whether Local 556 "acted in concert" with Southwest is also irrelevant because the union has separate and independent obligations to employees under Title VII.[34]

**Carter Objections to Defendants' Failure to Accommodate Claim Instructions**:

Defendants' instructions are improper because Defendants contend that Carter "never sought a reasonable accommodation for her religious beliefs." This Court has already decided, "the law does not require Carter to expressly request an accommodation for a religious belief or practice in order for a Title VII violation to occur."[35] Also, Local 556's contention that it "did not exercise control over the terms and conditions of [] Carter's employment" is inapposite—the union has separate, affirmative legal obligations to accommodate an employee's religious observances, beliefs, and practices under Title VII.[36]

Southwest's contention that it did not have to provide an accommodation "because the request occurred after [Carter sent and posted her Facebook videos and messages]" misapprehends the law that Southwest has an affirmative obligation not to fire an employee for her religious, observances, beliefs, and practices, and that Southwest's policies must yield to those practices. Southwest created the conflict with Carter's religious beliefs and practices by firing Carter. Southwest's instructions are improper because they fail to reflect accommodation law under *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).

Defendants' instructions are also improper because Southwest's contention that "it did not know or have reason to suspect Carter's alleged need for any accommodation" is misleading and

---

[33] 42 U.S.C. § 2000e-2(c)(3), (c)(1); 42 U.S.C. § 2000e(j).
[34] *Id.*
[35] Court Order, Dkt. No. 232 at 13-14 (citing *Abercrombie & Fitch*, 575 U.S. at 772 n.2)(quotation omitted).
[36] 42 U.S.C. § 2000e-2(c)(3), (c)(1); 42 U.S.C. § 2000e(j).

confuses Title VII's legal standard. Carter need not show that Southwest had "actual knowledge" of her need for an accommodation to prove the company's intentional discrimination. Title VII's disparate-treatment provision, § 2000e-2(a)(1), "does not impose a knowledge requirement."[37] Contrary to the suggestions in Defendants' instructions, Carter had no burden to request an accommodation or raise a religious conflict. The U.S. Supreme Court rejected Southwest's argument in *Abercrombie*, reasoning that:

> This [burden to request an accommodation] would require the employer to have actual knowledge of a conflict between an [employee's] religious practice and a work rule. The problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks us to add words to the law to produce what is thought to be a desirable result. That is Congress's province … [Title VII's] disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice. A request for accommodation, or the employer's certainty that the practice exists, may make it easier to infer motive, but is not a necessary condition of liability.[38]

"Instead, an [employee] need only show that his need for an accommodation was a motivating factor in the employer's decision."[39]

Defendants' instructions are also improper because they make the misleading statement that an "employer is not required to accommodate an employee's personal preference as to how she expresses her religious beliefs or practices." That may be true when an employer initiates accommodation efforts with an employee, but an employer's termination of an employee for her religious observances, beliefs, and practices, is synonymous with a failure to accommodate.[40]

Defendants' instructions are also improper because they include failure to exhaust administrative remedies instructions, which this Court already rejected.[41]

---

[37] *Abercrombie*, 575 U.S. at 773.
[38] *Id*. at 774.
[39] *Id*.
[40] *Abercrombie & Fitch*, 575 U.S. at 772 n.2.
[41] Court Order, Dkt. No. 232, at pp.13-14.

Defendants' instructions regarding what Carter must prove by a preponderance of the evidence are also inaccurate, and do not reflect the standard set forth by the Supreme Court in *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015). Those instructions also suggest that Carter must establish Southwest's knowledge "of the conflict between Plaintiff Charlene Carter's religious belief or practice and the job requirement before Carter engaged in the conduct for which she sought accommodation," but that is false. Title VII's disparate-treatment provision, § 2000e-2(a)(1), "does not impose a knowledge requirement."[42] For that reason, Carter had no burden to request an accommodation or raise a religious conflict.  Such statement should also be excluded from Defendants' description of Southwest's contentions.

Southwest's instructions should not include instructions regarding an undue hardship defense (including in the statement describing Southwest's contentions) because Southwest never initiated any efforts to accommodate to Carter's religious observances, beliefs, and practices.[43] Southwest never made any attempt to accommodate Carter's religious beliefs, and, by Southwest's own admission, "[N]o religious accommodation would have excused [the plaintiff] for her serious reported misconduct."[44] Southwest did not identify any hardships with accommodating Carter's religious beliefs before firing her. Southwest, in fact, admitted that Carter's Facebook communications imposed no financial harm on the company prior to her termination.[45] Southwest did not receive any complaints about the posts Carter made on her Facebook page.[46] Southwest

---

[42] *Abercrombie & Fitch*, 575 U.S. at 773.

[43] *See Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993). "The prohibition of discrimination because of religious practices is meant to force employers to consider whether those practices can be accommodated without undue hardship." *Abercrombie & Fitch*, 575 U.S. at 778 (Alito, J., concurring). *See also*, Court Order, Dkt. No. 232 at 14 ("[N]o religious accommodation would have excused [the plaintiff] for her serious reported misconduct." (quoting Dkt. No. 167 at 50)).

[44] Court Order, Dkt. No. 232, p.14 (quoting SWA Br., Dkt. No. 167, at 50).

[45] (Carter App.310, Dkt. No. 222-27, Sims 222:3-4).

[46] (Carter App.309, Dkt. No. 222-27, Sims 221:13-16).

only discovered those posts as part of its internal investigation of President Stone's complaint, which did not mention any of Carter's public Facebook page posts.

To be sure, employers need not make any efforts if they can show that *any* accommodation would impose an undue burden.[47] However, Carter demonstrated, and Southwest never disputed, that Southwest could have made minimal efforts to accommodate her that would not have imposed any undue burden. Southwest never discussed with Carter whether she would be willing to post a disclaimer on her Facebook page that her posts do not necessarily represent the company's views.[48] Southwest never asked Carter if she would remove Facebook posts that it considered to be a nexus to the workplace.[49] Nor did Southwest ever ask if Carter would take any Facebook posts down prior to her termination.[50]

Carter further objects to instructions that define "undue hardship" in accordance with the "more than *de minimis*" test in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).[51] While this Court may be bound by *Hardison*'s "more than *de minimis*" test it should be overturned for all of the reasons Carter already set forth in her Response to Southwest's Summary Judgment Brief.[52] *Hardison* is incorrectly reasoned and based on an erroneous interpretation of "undue hardship" that deviates from Title VII's text and plain meaning. Three Supreme Court Justices and

---

[47] *See Weber v. Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000).
[48] (Carter App. 387, Dkt. No. 222-30, Schneider 126:15-25).
[49] (Carter App. 387, Dkt. No. 222-30, Schneider 126:11-14).
[50] (Carter App. 387, Dkt. No. 222-30, Schneider 126:7-10). (Carter App. 310, Dkt. No. 222-27, Sims 222:5-7).
[51] Undue hardship exists when a religious accommodation would require an employer to incur more than a *de minimis* cost to its business. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).
[52] Carter Resp. Br., Dkt. No. 223, at 51-52.

the former Solicitor General have agreed that the Court "should grant review in an appropriate case to consider whether *Hardison*'s interpretation should be overruled."[53]

**Damages, Back Pay, and Punitive Damages**

Defendants include their damages, back pay, and punitive damages instructions twice in their proposed charge. Carter addresses those instructions at the beginning of these objections.


### Carter's Objections Regarding Defendants' Proposed Interrogatories on Claims against Southwest

#### <u>Southwest's Proposed Question No. 1</u>

Has Plaintiff Charlene Carter proved by a preponderance of the evidence that Carter engaged in activity protected by the Railway Labor Act?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 1, then answer Question No. 2.

#### <u>Carter's Objection</u>

The issue of whether the activity that resulted in Carter's termination was protected by the Railway Labor Act is a question of law.[54] The Court has already resolve that question. As this Court recognized in its May 25, 2022 Decision on Southwest's Motion for Reconsideration, Judge Scholer found that Carter' public complaints were protected, and Carter, in her Facebook messages, "was plainly objecting to forced payment of political … union expenses, advocating against and opposing Local 556 and President Stone, and expressing her opposition to the political leadership of the Union."[55] Furthermore, asking a jury to make this legal determination is

---

[53] *Patterson v. Walgreen Co.*, 140 S. Ct. 686, 686 (2020) (Alito, J., concurring in the denial of certiorari).
[54] *N.L.R.B. v. Allied Aviation Fueling of Dallas LP*, 490 F.3d 374, 379 (5th Cir. 2007) (deciding as a matter of law what activities constituted protected conduct).
[55] Court Order on Reconsid., Dkt. 237 at 3.

inappropriate. The parties do not dispute what conduct resulted in Carter's termination.  The question, addressed in Plaintiff's proposed question number 1, is whether that conduct was a substantial or motivating factor in Defendant Southwest's decision to fire Carter.  If the jury finds yes, it is for the Court to decide whether that conduct was protected.

### Southwest's Proposed Question No. 2

Was Plaintiff Charlene Carter's protected activity sufficiently vulgar, offensive, abusive, threatening, or harassing such that it lost protection under the Railway Labor Act?

If you answered "No" to Question No. 2, then answer Question No. 3.

### Carter's Objection

This question is irrelevant under applicable law.  If Carter demonstrates that her protected activity was a "substantial or motivating factor" for Southwest's termination decision, Carter's protected activity does not lose its protection even if the jury decides that Carter's protected activity is "vulgar, offensive, abusive, threatening, or harassing."[56] Employees' union representation speech is protected even if others consider their speech to be "intemperate, abusive,

---

[56] *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273-74 (1974). The Supreme Court has recognized that federal labor law principles guarantee employees' freedom to engage in "uninhibited, robust, and wide-open debate in labor disputes." *Id*. Federal courts have also applied the *Austin* rule in the RLA context. *See*
*Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 882 n. 10 (9th Cir. 2002) ("We see no reason why the rule announced in *Linn* [and applied in *Austin*] … regarding protected activities, should not apply in the context of the RLA.") (cleaned up); *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191-92 (11th Cir. 1999). Consistent with the Supreme Court's decisions in *Steele*, *Street*, and *Austin*, RLA Section 152 (Fourth) prohibits unions and employers from diminishing constitutional protections to employee rights. The RLA subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights," including their speech and association rights to re-organize or oppose their unions, and any *other employee representation or organizational matters. See Steele v. Louisville & N.R. Co.,* 323 U.S. 192, 198 (1944).

or insulting,"[57] or  a "vehement," "caustic," or "unpleasantly sharp attack[]."[58] Even "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth."[59]

### Southwest's Proposed Question No. 3

Has Plaintiff Charlene Carter proved, by a preponderance of the evidence, that her protected activity was a substantial or motivating factor for the termination of her employment?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 3, then answer Question No. 4.

### Carter's Objection

Here, the term "protected activity" is vague.  This question is better posed as whether the specific conduct at issue was a motivating factor and whether Southwest would have terminated Carter's employment even had she not engaged in that specific activity.  Using "protected activity" requires the jury to make a determination of what activities might have been protected, which, as discussed, is a legal question.

### Southwest's Proposed Question No. 4

If "Yes" to Question No. 3, would Southwest have terminated Plaintiff Charlene Carter's employment even if she had not engaged in protected activity?

Answer "Yes or "No."

---

[57] *Austin*, 418 U.S. at 273-74, 283.

[58] *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 62 (1966).

[59] *Id.* at 63. The Supreme Court has recognized union rights to use all lawful propaganda to enlarge their membership. *Austin*, 418 U.S. at 277, 277 n.12. Thus, dissident employees have the same right to oppose union leadership and representation. The Supreme Court has held federal labor statutes' protections for this "[v]igorous exercise" of the right to persuade other employees to join must not be stifled by the threat of liability under state libel and defamation laws, including "for the overenthusiastic use of rhetoric or the innocent mistake of fact." *Id.*

If you answered "Yes" to Question No. 4, then answer Question No. 5.

### Carter's Objection

As Carter discussed in her objection to Defendants' RLA instruction, the question of whether Southwest would have terminated Carter's employment had she not engaged in protected activity is only relevant where a *Wright Line* mixed-motive burden-shifting scheme applies.  *Wright Line* only applies in cases when an employee engages in protected activity and different unprotected activity, and the parties dispute whether the protected or the unprotected activity motivated the employee's termination.[60] Here, there is no dispute that Southwest fired Carter for sending private Facebook videos and messages to President Stone.[61] Shifting the burden back to Southwest to show that the company would have fired Carter for some other activity makes no sense when the company admits that it fired Carter for only her Facebook videos and messages.

### Southwest's Proposed Question No. 5

If you answered "Yes" to Question No. 3 and "No" to Question No. 4, what sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff Charlene Carter for lost wages, if any, Defendant Southwest caused Plaintiff Charlene Carter?

Answer in dollars and cents for the following items and none other:

---

[60] *Allied Aviation*, 490 F.3d at 379; *see also*, *Poly-Am., Inc. v. N.L.R.B.,* 260 F.3d 465, 488-89 (5th Cir. 2001) (applying the *Wright Line* framework when the employer claimed that it discharged the employee for poor performance); *see also Wright Line*, 662 F.2d 899 (1st Cir. 1981).

[61] Southwest's instructions state that "[i]f Plaintiff Charlene Carter demonstrates that protected activity was a motivating factor in the decision to terminate her employment, Defendant Southwest is not liable under the Railway Labor Act if [it] establishes by a preponderance of the evidence that Plaintiff Charlene Carter would have been discharged from employment even if she had not engaged in protected activity."

Wages and benefits from March 14, 2017 to today's date.

**Carter's Objection**

Southwest proposes to ask the same question regarding Carter's lost wages and benefits from March 14, 2017 to today's date both in its proposed Question No. 3 and in the third part of its Question No. 6. Though the conduct motivating the termination is different, the factual question of what wages and benefits were lost during that time is the same. Asking that same question in two different questions creates a risk of an inconsistent verdict. The jury should only answer the back pay question for that period once. Carter also objects to referencing Question 4 for the reasons set forth in her objection to that question.

Southwest also proposes to ask no questions regarding compensatory or punitive damages caused by her termination. Such questions are necessary for a full award.[62]

**Southwest's Proposed Question No. 6**

Did Plaintiff Charlene Carter proved, by a preponderance that she exhausted administrative remedies with respect to her Title VII claim based on a failure to accommodate?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 6, then answer Question No. 7

**Carter's Objection**

The Court has already resolved this issue, and rejected Defendants' arguments.[63] Furthermore, this is not an appropriate question for a jury and involves a high risk of confusion.

---

[62] Federal courts "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett Cnty. Public Schools*, 503 U.S. 60, 66 (1992) (citations omitted); *see also See Diaz v. Amerijet Int'l Inc.*, 872 F. Supp. 2d 1365, 1381 (S.D. Fla. 2012); *Riley v. Empire Airlines, Inc.*, 823 F. Supp. 1016, 1027 (N.D.N.Y. 1993) (cases cited therein); *Vaca v. Sipes*, 386 U.S. 171, 196-198 (1967) (holding that courts should be free to award appropriate damages or equitable relief to ensure full compensation in a duty of fair representation case).

[63] Court Order, Dkt. No. 232, at pp.13-14.

In the Fifth Circuit, "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, we conclude that judges may resolve factual disputes concerning exhaustion without the participation of a jury."[64]

### Southwest's Proposed Question No. 7

Has Plaintiff Charlene Carter proved, by a preponderance of the evidence that her religious beliefs conflicted with a requirement of her employment at Defendant Southwest?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 7, then answer Question No. 8

### Carter's Objection

The question of whether there is a conflict misapprehends the law regarding religious accommodation. Southwest has an affirmative obligation not to fire an employee for her religious, observances, beliefs, and practices, and that Southwest's policies must yield to those practices. Southwest created the conflict with Carter's religious beliefs and practices by firing Carter. Southwest's instructions are improper because they fail to reflect accommodation law under *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).

### Southwest's Proposed Question No. 8

Did Defendant Southwest learn or reasonably suspect that Plaintiff Carter needed an accommodation prior to the time Defendant Southwest learned that she violated Southwest's employment requirements?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 8, then answer Question No. 9

---

[64] *Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010) (discussing exhaustion in the context of Prison Litigation Reform Act case).

#### Carter's Objection

Carter objects that this question is misleading and confuses the legal standard under Title VII. Carter need not show that Southwest had "actual knowledge" of her need for an accommodation to prove the company's intentional discrimination. Title VII's disparate-treatment provision, § 2000e-2(a)(1), "does not impose a knowledge requirement."[65] "Instead, an [employee] need only show that his need for an accommodation was a motivating factor in the employer's decision."[66] "A request for accommodation, or the employer's certainty that the practice exists, may make it easier to infer motive, but is not a necessary condition of liability."[67] Therefore, this question is improper.

#### Southwest's Proposed Question No. 9

Did Defendant Southwest fail to reasonably accommodate Plaintiff Carter's religious beliefs in the application of its policies to Carter?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 9, then answer Question No. 10

---

[65] *Abercrombie*, 575 U.S. at 773. The U.S. Supreme Court rejected Southwest's argument in *Abercrombie*, reasoning that:

> This [burden to request an accommodation] would require the employer to have actual knowledge of a conflict between an [employee's] religious practice and a work rule. The problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks us to add words to the law to produce what is thought to be a desirable result. That is Congress's province … [Title VII's] disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice.

*Id.* at 774.

[66] *Id.*

[67] *Id.*

**Carter's Objection**

By limiting the accommodation of Carter's religion to only her beliefs, the question misleads the jury as to the law.  Title VII protects "all aspects of religious observance and practice, as well as belief."[68]  By limiting the interrogatory only to belief, Southwest misleads the jury and does not get the fact finding to determine if Southwest discriminated against Carter because of her religion, as that term is defined under Title VII.

**Southwest's Proposed Question No. 10**

If "Yes" to Question No. 8, would providing Plaintiff Charlene Carter an accommodation have imposed an undue hardship (*i.e.*, a burden that is more than inconsequential or negligible)?

Answer "Yes or "No."

If you answered "Yes" to Question No. 10, then answer Question No. 11

**Carter's Objection**

As discussed in Carter's Objections to Defendants' Failure to Accommodate Claim Instructions, Southwest's instructions should not include instructions regarding an undue hardship defense because Southwest never initiated any efforts to accommodate to Carter's religious observances, beliefs, and practices.[69] To be sure, employers need not make any efforts if they can show that *any* accommodation would impose an undue burden.[70] However, Carter demonstrated, and Southwest never disputed, that Southwest could have made minimal efforts to accommodate her that would not have imposed any undue burden. Southwest never discussed with Carter

---

[68] 42 U.S.C.A. § 2000e(j).

[69] *See Heller v. EBB Auto Co.,* 8 F.3d 1433, 1440 (9th Cir. 1993). "The prohibition of discrimination because of religious practices is meant to force employers to consider whether those practices can be accommodated without undue hardship." *Abercrombie & Fitch*, *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 778 (2015) (Alito, J., concurring). *See also*, Court Order, Dkt. No. 232 at 14 ("[N]o religious accommodation would have excused [the plaintiff] for her serious reported misconduct." (quoting Dkt.. No. 167 at 50)).

[70] *See Weber v. Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000).

whether she would be willing to post a disclaimer on her Facebook page that her posts do not necessarily represent the company's views. Southwest never asked Carter if she would remove Facebook posts that it considered to be a nexus to the workplace. Nor did Southwest ever ask if Carter would take any Facebook posts down prior to her termination.

Carter further objects to instructions that define "undue hardship" in accordance with the "more than *de minimis*" test in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).[71] While this Court may be bound by *Hardison*'s "more than *de minimis*" test it should be overturned for all of the reasons Carter already set forth in her Response to Southwest's Summary Judgment Brief.[72] *Hardison* is incorrectly reasoned and based on an erroneous interpretation of "undue hardship" that deviates from Title VII's text and plain meaning. Three Supreme Court Justices and the former Solicitor General have agreed that the Court "should grant review in an appropriate case to consider whether *Hardison*'s interpretation should be overruled."[73]

### Southwest's Proposed Question No. 11

Has Plaintiff Charlene Carter proved, by a preponderance of the evidence that she would not have had her employment terminated by Defendant Southwest in the absence of—in other words, but for—her religious beliefs?

Answer "Yes" or "No."

### Carter's Objection

Demonstrating that Southwest would not have fired Carter "but for" her religious observances, beliefs, and practices, is merely one way of demonstrating that Southwest unlawfully

---

[71] Undue hardship exists when a religious accommodation would require an employer to incur more than a *de minimis* cost to its business. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).

[72] Carter Resp. Br., Dkt. No. 223, at 51-52.

[73] *Patterson v. Walgreen Co.*, 140 S. Ct. 686, 686 (2020) (Alito, J., concurring in the denial of certiorari).

fired her "because of" some aspect of her religious observances, beliefs, or practices.[74] Carter can demonstrate "because of" causation by showing that her religious observances, beliefs, or practices, were either a "but-for" cause or a "motivating factor" in Southwest's termination decision. For the same reasons, Southwest's instruction regarding what Carter must prove by a preponderance of the evidence is incorrect.

### Southwest's Proposed Question No. 12

If you answered "Yes" to Questions No. 7-8, and 10, what sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff Charlene Carter for the damages, if any, you have found Defendant Southwest caused Plaintiff Charlene Carter?

Answer in dollars and cents for the following items and none other:

1. Wages and benefits from March 14, 2017 to today's date.

2. Past pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

3. Future pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

### Carter's Objection

Given the unique array of benefits Southwest provides union employees such as Carter (life insurance, health insurance, stock options, 401K and retirement benefits, vacation pay, uniform pay, ratification bonuses, profit sharing, and tax relief shared with employees) breaking the back pay calculation into these components will allow the jury to more accurately assess the damages in each category to reach the full amount of back pay to which Carter is entitled.

---

[74] *Abercrombie & Fitch*, 575 U.S. at 773; *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739-40 (2020); *see also* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j).

24

Additionally, given that back pay from the time of Carter's termination through the time of trial will be the same on all claims, only one back pay question should be asked of the jury to avoid conflicting verdicts.

Also, the mental anguish and pain and suffering question fails to include all components of Carter's compensatory damages claim.

**Southwest's Proposed Question No. 13**

Do you find that Plaintiff Charlene Carter failed to reduce her damages through the exercise of reasonable diligence in seeking, obtaining, and maintaining substantially equivalent employment after the date of her employment termination by Defendant Southwest?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 13, then answer Question No. 14

**Carter's Objection**

None.

**Southwest's Proposed Question No. 14**

How much would Plaintiff Charlene Carter have earned had she exercised reasonable diligence under the circumstances to minimize her damages?

Answer in dollars and cents, if any.

**Carter's Objection**

None.

**Southwest's Proposed Question No. 15**

Do you find that Plaintiff Charlene Carter should be awarded punitive damages?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 15, then answer Question No. 16.

**Carter's Objection**

The punitive damages questions should be asked separately for each of Carter's claims. Each claim implicates different discriminatory conduct by Defendants and may carry different levels of culpability, depending upon the jury's interpretation of the evidence. Additionally, if the Court or an appellate court rules that, as a matter of law, one of the claims the jury included in its punitive damages award must be overturned as a matter of law, a broad-form verdict on punitive damages across all claims would not be sufficient to determine the amount of punitive damages to award.

**Southwest's Proposed Question No. 16**

What sum of money should be assessed against Defendant Damages as punitive damages?

Answer in dollars and  cents:

**Carter's Objection**

The punitive damages questions should be asked separately for each of Carter's claims. Each claim implicates different discriminatory conduct by Defendants and may carry different levels of culpability, depending upon the jury's interpretation of the evidence. Additionally, if the Court or an appellate court rules that, as a matter of law, one of the claims the jury included in its punitive damages award must be overturned as a matter of law, a broad-form verdict on punitive damages across all claims would not be sufficient to determine the amount of punitive damages to award.

Carter also objects to the reference to "Defendant Damages" as nonsensical.

26

**Carter's Objections Regarding Defendants' Proposed Interrogatories
on Claims against Local 556**

**Local 556's Proposed Question No. 1**

Has Plaintiff Charlene Carter proved, by a preponderance of the evidence,  that she engaged in activity protected by the Railway Labor Act?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 1, then answer Question No. 2.

**Carter's Objection**

The issue of whether the activity that resulted in Carter's termination was protected by the Railway Labor Act is a question of law.[75]  The Court has already resolved that question. As this Court recognized in its May 25, 2022 Decision on Southwest's Motion for Reconsideration, Judge Scholer found that Carter' public complaints were protected, and Carter, in her Facebook messages, "was plainly objecting to forced payment of political … union expenses, advocating against and opposing Local 556 and President Stone, and expressing her opposition to the political leadership of the Union."[76] Furthermore, asking a jury to make this legal determination is inappropriate.  The parties do not dispute what conduct resulted in Carter's termination.  The question, addressed in Plaintiff's proposed question number 1, is whether that conduct was a substantial or motivating factor in Defendant Southwest's decision to fire Carter.  If the jury finds yes, it is for the Court to decide whether that conduct was protected.

**Local 556's Question No. 2**

Was Plaintiff Charlene Carter's protected activity sufficiently vulgar, offensive, abusive, threatening, or harassing such that it lost protection under the Railway Labor Act?

---

[75]  *v. Allied Aviation Fueling*, 490 F.3d at 379 (deciding as a matter of law what activities constituted protected conduct).
[76] Court Order on Reconsid., Dkt. 237 at 3.

If you answered "No" to Question No. __, then answer Question No. __.

**Carter's Objection**

This question is irrelevant under applicable law.  If Carter demonstrates that her protected activity was a "substantial or motivating factor" for Southwest's termination decision, Carter's protected activity does not lose its protection even if the jury decides that Carter's protected activity is "vulgar, offensive, abusive, threatening, or harassing."[77] Employees' union representation speech is protected even if others consider their speech to be "intemperate, abusive, or insulting,"[78] or a "vehement," "caustic," or "unpleasantly sharp attack[]."[79] Even "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth."[80]

**Local 556's Question No. 3**

Has Plaintiff Charlene Carter proved, by a preponderance of the evidence, that her protected activity, was a substantial or motivating factor in terminating her employment?

---

[77] *Austin*, 418 U.S. at 273-74. The Supreme Court has recognized that federal labor law principles guarantee employees' freedom to engage in "uninhibited, robust, and wide-open debate in labor disputes." *Id*. Federal courts have also applied the *Austin* rule in the RLA context. *See Konop*, 302 F.3d at 882 n.10 ("We see no reason why the rule announced in *Linn* [and applied in *Austin*] … regarding protected activities, should not apply in the context of the RLA.") (cleaned up); *Dunn*, 193 F.3d at 1191-92. Consistent with the Supreme Court's decisions in *Steele*, *Street*, and *Austin*, RLA Section 152 (Fourth) prohibits unions and employers from diminishing constitutional protections to employee rights. The RLA subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights," including their speech and association rights to re-organize or oppose their unions, and any other employee representation or organizational matters. *See Steele*, 323 U.S. at 198.

[78] *Austin*, 418 U.S. at 273-74, 283.

[79] *Linn*, 383 U.S. at 62.

[80] *Id.* at 63. The Supreme Court has recognized union rights to use all lawful propaganda to enlarge their membership. *Austin*, 418 U.S. at 277, 277 n.12. Thus, dissident employees have the same right to oppose union leadership and representation. The Supreme Court has held federal labor statutes' protections for this "[v]igorous exercise" of the right to persuade other employees to join must not be stifled by the threat of liability under state libel and defamation laws, including "for the overenthusiastic use of rhetoric or the innocent mistake of fact." *Id*.

Answer "Yes" or "No."

If "Yes", Has Plaintiff Charlene Carter proved, by a preponderance of the evidence, that Local 556 either had authority to take an adverse employment action against Carter, including causing the Plaintiff's termination, and/or that Defendant Local 556 acted in concert with Defendant Southwest to cause Plaintiff's termination.

If "Yes", would Southwest have terminated Plaintiff Charlene Carter's employment even if she had not engaged in protected activity?

Answer "Yes or "No."

**Carter's Objection**

As to the first part of the interrogatory, the term "protected activity" is vague. This question is better posed as whether the specific conduct at issue was a motivating factor and whether Southwest would have terminated Carter's employment even had she not engaged in that specific activity. Using "protected activity" requires the jury to make a determination of what activities might have been protected, which, as discussed, is a legal question.

As to the second part of the interrogatory, Local 556's question is improper because it incorrectly suggests that only the employer can retaliate against an employee for exercising her RLA-protected rights. Not so. Unions are liable under the RLA Sections 2 (Fourth) and (Eleventh) "for their actions in procuring a discharge which violates the employee statutory rights."[81] The RLA subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights."[82] Whether Local 556 "had authority to take an adverse employment action against Carter," is irrelevant. Furthermore, whether Local 556 "acted

---

[81] *See Brady*, 401 F.2d at 102 (footnote omitted).
[82] *Steele*, 323 U.S. at 198 (1944); *see also Roscello*, 726 F.2d at 222 (citation omitted).

in concert" with Southwest is also irrelevant because the union has separate and independent obligations to employees under the RLA.[83]

As to the third part, As Carter discussed in her objection to Defendants' RLA instruction, the question of whether Southwest would have terminated Carter's employment had she not engaged in protected activity is only relevant where a *Wright Line* mixed-motive burden-shifting scheme applies. *Wright Line* only applies in cases when an employee engages in protected activity and different unprotected activity, and the parties dispute whether the protected or the unprotected activity motivated the employee's termination.[84] Here, there is no dispute that Southwest fired Carter for sending private Facebook videos and messages to President Stone.[85] Shifting the burden back to Southwest to show that the company would have fired Carter for some other activity makes no sense when the company admits that it fired Carter for only her Facebook videos and messages.

### Local 556's Question No. 3

If you answered "Yes" to the first question under Question No. 2 and "No" to the second question under Question No. 2, what sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff Charlene Carter for the damages, if any, you have found Defendant Local 556 caused Plaintiff Charlene Carter?

Answer in dollars and cents for the following items and none other:

---

[83] *Id.*

[84] *Allied Aviation Fueling*, 490 F.3d at 379; *see also*, *Poly-America, Inc.*, 260 F.3d at 488-89 (applying the *Wright Line* framework when the employer claimed that it discharged the employee for poor performance); *see also Wright Line*, 662 F.2d 899 (1st Cir. 1981).

[85] Southwest's instructions state that "[i]f Plaintiff Charlene Carter demonstrates that protected activity was a motivating factor in the decision to terminate her employment, Defendant Southwest is not liable under the Railway Labor Act if [it] establishes by a preponderance of the evidence that Plaintiff Charlene Carter would have been discharged from employment even if she had not engaged in protected activity."

Wages and benefits from March 14, 2017 to today's date.

**Carter's Objection**

Defendants propose to ask the same question regarding Carter's lost wages and benefits from March 14, 2017 to today's date in multiple questions. Though the conduct motivating the termination is different, the factual question of what wages and benefits were lost during that time is the same. Asking that same question in two different questions creates a risk of an inconsistent verdict. The jury should only answer the back pay question for that period once. Carter also objects to referencing the second question under Question No. 2 for the reasons set forth in her objection to that question.

Defendants also propose to ask no questions regarding compensatory or punitive damages caused by her termination. Such questions are necessary for a full award.[86]

**Local 556's Question No. 4**

Has Plaintiff Charlene Carter proved, by a preponderance of the evidence, that she would not have had her employment terminated by Defendant Southwest in the absence of—in other words, but for—her religious beliefs?

Answer "Yes" or "No."

**Carter's Objection**

Demonstrating that Southwest would not have fired Carter "but for" her religious observances, beliefs, and practices, is merely one way of demonstrating that Southwest unlawfully

---

[86] Federal courts "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin*, 503 U.S. at 66 (citations omitted); *see also See Diaz*, 872 F. Supp. 2d at 1381; *Riley*, 823 F. Supp. at 1027; *Vaca*, 386 U.S. at 196-198 (holding that courts should be free to award appropriate damages or equitable relief to ensure full compensation in a duty of fair representation case).

fired her "because of" some aspect of her religious observances, beliefs, or practices.[87] Carter can demonstrate "because of" causation by showing that her religious observances, beliefs, or practices, were either a "but-for" cause or a "motivating factor" in Southwest's termination decision. For the same reasons, Southwest's instruction regarding what Carter must prove by a preponderance of the evidence is incorrect.

### Local 556's Question No. 5

Did Defendant Local 556 fail to reasonably accommodate Plaintiff's religious beliefs in the application of its policies to Carter?

Answer "Yes" or "No."

If "Yes", would Plaintiff Charlene Carter's requested accommodation have imposed an undue hardship on Defendant Southwest's business operations or Plaintiff Charlene Carter's co-workers?

Answer "Yes or "No."

### Carter's Objection

As to the first part, by limiting the accommodation of Carter's religion to only her beliefs, the question misleads the jury as to the law. Title VII protects "all aspects of religious observance and practice, as well as belief."[88] By limiting the interrogatory only to belief, Local 556 misleads the jury and does not get the fact finding to determine if Local 556 discriminated against Carter because of her religion, as that term is defined under Title VII.

As to the second part, as discussed in Carter's Objections to Defendants' Failure to Accommodate Claim Instructions, Local 556's instructions should not include instructions

---

[87] *Abercrombie & Fitch*, 575 U.S. at 773; *Bostock*, 140 S. Ct. at 1739-40; *see also* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j).
[88] 42 U.S.C.A. § 2000e.

regarding an undue hardship defense because Southwest never initiated any efforts to accommodate to Carter's religious observances, beliefs, and practices.[89] Carter further submits that Local 556's instructions are improper because they suggest that Local 556 can raise an undue hardship burden when the union has waived that as a defense. Local 556 failed to plead any undue hardship as an affirmative defense in its Answer,[90] and never argued an undue hardship defense. Accordingly, Local 556 waived any undue hardship defense.[91] Furthermore, Local 556 cannot raise an undue hardship defense because Title VII's plain statutory text does not countenance a union undue hardship defense for union business. Title VII sets forth the *employer*'s undue hardship defense in 42 U.S.C. § 2000e(j)'s definition of religion, which includes all aspects of religious observance and practice, as well as belief, "unless an *employer* demonstrates that he is unable to reasonably accommodate to an employee's … religious observance or practice without undue hardship on the conduct of the *employer*'s business." (emphasis added).[92]

### Local 556's Question No. 6

If you answered "Yes" to Question No. 4 or "Yes" to the first question under Question No. 5 and "No" to the second question under Question No. 5, what sum of money, if paid now in cash,

---

[89] *See Heller*, 8 F.3d at 1440. "The prohibition of discrimination because of religious practices is meant to force employers to consider whether those practices can be accommodated without undue hardship." *Abercrombie & Fitch*, 575 U.S. at 778 (Alito, J., concurring). *See also*, Court Order, Dkt. No. 232 at 14 ("[N]o religious accommodation would have excused [the plaintiff] for her serious reported misconduct." (quoting Dkt.. No. 167 at 50)).

[90] Local 556 Answer, Doc. No. 82.

[91] *See* Fed. R. Civ. P. 8 (c)(1).

[92] To be sure, the Fifth Circuit held in a plurality opinion that a union can raise an undue hardship defense. *Cooper v. General Dynamics*, 533 F.2d 163, 172-73 (5th Cir. 1976) (Brown, C.J., concurring); *id*. at 174-77 (Rives, J. concurring). Judge Gee dissented as to whether the union had an undue hardship defense: "Because of what the statute says … With deference, none of these reasons persuades me, or even approaches persuading me, that when Congress has said A, in words which admit of neither construction nor misunderstanding, we should say A and B." *Id.* at 170-71 (Gee, J., dissenting).

would fairly and reasonably compensate Plaintiff Charlene Carter for the damages, if any, you have found Defendant Local 556 caused Plaintiff Charlene Carter?

Answer in dollars and cents for the following items and none other:

1.      Wages and benefits from March 14, 2017 to today's date.

2.      Past pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

3.      Future pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**Carter's Objection**

Given the unique array of benefits Southwest provides union employees such as Carter (life insurance, health insurance, stock options, 401K and retirement benefits, vacation pay, uniform pay, ratification bonuses, profit sharing, and tax relief shared with employees) breaking the back pay calculation into these components will allow the jury to more accurately assess the damages in each category to reach the full amount of back pay to which Carter is entitled.

Additionally, given that back pay from the time of Carter's termination through the time of trial will be the same on all claims, only one back pay question should be asked of the jury to avoid conflicting verdicts.

Also, the mental anguish and pain and suffering question fails to include all components of Carter's compensatory damages claim.

**Local 556's Question No. 7**

Has Plaintiff Charlene Carter proved, by a preponderance of the evidence, that former Local 556 President Audrey Stone arbitrarily, discriminatorily, or in bad faith reported Carter to Defendant Southwest for violating company policies?

Answer "Yes" or "No."

34

If you answered "Yes" to Question No. 1, then answer Question No. 2.

**Carter's Objection**

This interrogatory is improper because the union must rebut with compelling evidence the presumption that it acted arbitrarily, discriminatorily, and in bad faith by reporting a represented employee for discipline.[93] Furthermore, Local 556's suggestion that Carter must prove Local 556 President Audrey Stone "arbitrarily, discriminatorily, or in bad faith *reported*" Carter misstates the standard.[94] Carter need only prove that Local 556 President Stone *acted* "arbitrarily, discriminatorily, or in bad faith," and, in accordance with well-settled law, it is presumed that the union did indeed violate the duty by reporting a represented employee.

**Local 556's Question No.   [*sic*]**

Has Plaintiff Carter proved, by a preponderance of the evidence, that former Local 556 President Audrey Stone reported Mrs. Carter solely from her position as Union President and not as a Southwest employee?

If you answered "No" to Question No. __, then answer Question No. __.

**Carter's Objection**

This interrogatory is improper because the union must rebut with compelling evidence the presumption that President Audrey Stone was acting in her official capacity.[95] This interrogatory is more appropriately framed in asking whether Local 556's president, Audrey Stone, was acting

---

[93] *See Caravan Knight Facilities Mgmt., Inc. & Aretha A. Powell Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. (Uaw), Afl-Cio, & Its Local 1700 & Aretha A. Powell,* 362 NLRB 1802, 1805 (N.L.R.B. 2015), *review granted, decision vacated in part sub nom. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Nat'l Labor Relations Bd.,* 844 F.3d 590 (6th Cir. 2016); *Acklin Stamping*, 351 N.L.R.B. 1263 at 1263 (N.L.R.B. 2007); *In Re Graphic Communications Intern. Union, Local 1-M*, 337 NLRB 662, 673 (N.L.R.B. 2002).

[94] Dkt. 250-3, at 9 (emphasis added).

[95] *See Caravan Knight*, 362 N.L.R.B. at 1804; *IBEW Local 453*, 258 N.L.R.B. at 1428; *SPFPA Local 444*, 360 N.L.R.B. at 436.

in her official capacity when she reported Plaintiff Carter for discipline, with official capacity as set forth in Carter's charges and interrogatories.

**Local 556's Question No. 8 [*sic*]**

Has Plaintiff Charlene Carter proved, by a preponderance of the evidence, that the reporting of Carter undermined the fairness or integrity of the grievance process such that the Union failed in its representation?

      Answer "Yes" or "No."

      If "Yes", would Southwest have terminated Plaintiff Charlene Carter's employment even if Defendant Local 556 had breached its duty of representation to Carter?

      Answer "Yes or "No."

**Carter's Objection**

  Carter objects to this interrogatory because Carter does not claim that the union's representation in post-termination proceedings was arbitrary, discriminatory, or in bad faith. Similarly, whether the union's conduct "undermined the fairness or integrity of the grievance process" is irrelevant in this case, and not a standard element of duty of fair representation violations.[96] Defendants' instruction is improper because it contains language about an employee's right to pursue grievances and the union's "considerable discretion in controlling the grievance and arbitration procedure."[97] Local 556's control of the grievance and arbitration procedure is irrelevant to the union's specific treatment of Carter. Thus, these instructions are confusing, and risk misleading the jury regarding the legal standard in this case. Carter objects to the second part of the interrogatory because whether Southwest ultimately terminated Carter's employment or not

---

[96] *See e.g., Vaca*, 386 U.S. at 177-78.
[97] Dkt. 250-3, at 8-9.

is irrelevant to whether the union breached its duty of fair representation to Carter. Local 556's violation of the duty occurs when it attempts to cause a represented employee discipline.

### Local 556's Question No. 9

If you answered "Yes" to the first question under Question No. 8 and "No" to the second question under Question No. 8 what sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff Charlene Carter for the damages, if any, you have found Defendant Southwest caused Plaintiff Charlene Carter?

Answer in dollars and cents for the following items and none other:

- Past pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

- Future pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

### Carter's Objection

This interrogatory fails to include all components of Carter's compensatory damages claim. Carter further objects for the same reasons asserted in her objections to Question 8.

### Local 556's Question No. 10

Do you find that Plaintiff Charlene Carter failed to reduce her damages through the exercise of reasonable diligence in seeking, obtaining, and maintaining substantially equivalent employment after the date of her employment termination by Defendant Southwest?

Answer "Yes" or "No."

If you answered "Yes" to Question No. 7, then answer Question No. 8.

### Carter's Objection

Carter objects that the conditional questions regarding what interrogatory to answer are inaccurate.

**Local 556's Question No. 11**

How much would Plaintiff Charlene Carter have earned had she exercised reasonable diligence under the circumstances to minimize her damages?

Answer in dollars and cents, if any.

**Carter's Objection**

None.

## Conclusion

For the foregoing reasons, Carter respectfully request that the Court reject Defendants' proposed jury charge and interrogatories, and accept those of Carter.


Dated: June 13, 2022                    Respectfully submitted,

                                        s/ Matthew B. Gilliam
                                        Mathew B. Gilliam (*admitted pro hac vice*)
                                        New York Bar No. 5005996
                                        *mbg@nrtw.org*
                                        c/o National Right to Work Legal Defense
                                        Foundation, Inc.
                                        8001 Braddock Road, Suite 600
                                        Springfield, Virginia 22160
                                        Tel: 703-321-8510
                                        Fax: 703-321-9319

                                        Bobby G. Pryor
                                        State Bar No. 16373720
                                        bpryor@pryorandbruce.com
                                        Matthew D. Hill, Of Counsel
                                        State Bar No. 24032296
                                        mhill@pryorandbruce.com
                                        PRYOR & BRUCE
                                        302 N. San Jacinto
                                        Rockwall, TX 75087
                                        Telephone: (972) 771-3933
                                        Facsimile: (972) 771-8343

**<u>Certificate of Service</u>**

I hereby certify that on June 13, 2022, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record

/s/ Matthew B. Gilliam