UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § § § | |
| Plaintiff, | § § | |
| V. | § § § | |
| SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556, | § § § § § § | CIVIL CASE NO. 3:17-CV-02278-X |
| Defendants. | § § § § § | |

### SOUTHWEST AIRLINES CO.'S RESPONSE TO PLAINTIFF'S MOTION IN LIMINE

Defendant Southwest Airlines Co. ("Southwest") files this response to the motion in limine filed by Plaintiff Charlene Carter ("Carter") and would respectfully show as follows in response to each of Carter's numerically ordered motion in limine points:

1. <u>Evidence regarding the arbitration proceedings</u>.

Carter asks the Court to bar any reference to her arbitration proceeding under the CBA, and the arbitrator's decision rejecting her grievance. The Court should deny Carter's request. Carter's arbitration and the resulting decision are relevant to this action and presenting them to the jury will not be prejudicial.

The Supreme Court has recognized that a decision rendered in an arbitration conducted pursuant to a CBA may be relevant evidence in an action involving federal statutory rights. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974); *Parker v. Southwest Airlines Co.*, Case

No. 4:18-cv-03334 (S.D. Tex.), ECF Nos. 64, 71, 76. Moreover, the Fifth Circuit has found that a district court abused its discretion in a Title VII case by failing to admit a labor arbitration decision finding "just cause." *Graef v. Chem. Leaman Corp.*, 106 F.3d 112, 116-17 (5th Cir. 1997). In doing so, the Fifth Circuit stated that "whether binding … or not, an arbitrator's findings relating to an interpretation of the CBA or an application of the CBA to the facts should ordinarily be considered by the court." *Id.* at 117. "[E]ven on issues relating to the existence of discriminatory or retaliatory animus, the award can be highly probative, and wholly ignoring it can constitute an abuse of discretion." *Id.* The fact that the CBA permits an employee's termination "is plainly relevant" because it "makes [the employer's] non-retaliatory reason for the discharge more believable and, therefore, [plaintiff's] allegations of retaliation less probable." *Id.*; *see also Owens v. Texaco, Inc.*, 857 F.2d 262, 264-65 (5th Cir. 1988) (district court erred in excluding arbitrator's decision regarding employment decision in subsequent Title VII action); *Baker v. Union Pac. R.R.*, 145 F. Supp. 2d 837, 843 (S.D. Tex. 2001) ("The arbitrator's finding that Plaintiff violated Union Pacific's Code of Operating Rules is … plainly relevant … because it supports the validity of Defendant's articulated non-discriminatory reason for its decision to terminate Plaintiff's employment."); *Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 142 (6th Cir. 1982) ("[A]n arbitration decision in favor of the employer is sufficient to carry the employer's burden of articulating 'some legitimate, nondiscriminatory reason for the employee's rejection.'"); *Miller v. St. Charles Health Sys.*, 2021 U.S. Dist. LEXIS 241343, at *16-17 (D. Or. Dec. 17, 2021) ("[A]rbitration decisions [are] 'clearly relevant and highly probative' of a defendant's legitimate, nondiscriminatory reasons for the plaintiff's termination . . . ."); *Morel v. Am. Bldg. Maint. Co.*, 124 Fed. Appx. 671, 672 (2d Cir. 2005) (labor arbitration decision is "highly probative of the absence of discriminatory intent"). Accordingly, contrary to Carter's assertion, the mere fact that

the arbitrator in this case addressed (among other things) just cause rather than RLA and Title VII is not a basis to exclude reference to the arbitral proceedings. *See Hawkins v. Leggett*, 955 F. Supp. 2d 474, 503(D. Md. 2013) ("[T]he arbitrator does not have to rule on the Title VII claim *per se* before courts may defer to his or her findings.").

Additionally, in finding just cause, the arbitrator expressly interpreted and applied each of the employment policies (which the CBA expressly incorporate) that are at issue in this case. A labor arbitrator's decision regarding the meaning of the CBA and incorporated policies is relevant to one's assessment of Carter's conduct in this case. *See Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 142 (6th Cir. 1982) ("The court should defer to the arbitrator's construction of the contract."); *Baker v. Union Pac. R.R.*, 145 F. Supp. 2d 837, 843 (S.D. Tex. 2001) ("The arbitrator's finding that Plaintiff violated Union Pacific's Code of Operating Rules is … plainly relevant … because it supports the validity of Defendant's articulated non-discriminatory reason for its decision to terminate Plaintiff's employment.").

Finally, Southwest submits that there is no basis to conclude that evidence or testimony regarding the arbitration will prejudice the jury. While the arbitrator's decision addresses factual issues that are relevant to Carter's claims, it does not purport to address the viability of claims under the RLA or Title VII. Thus, there is no reason to suspect that the jury will understand the denial of her grievance as equivalent to the conclusive resolution of her statutory claims. Carter's counsel is free to address the import and content of the arbitrator's decision in its presentation to the jury. Moreover, in its proposed jury instructions, Southwest states that the arbitrator's decision was is binding. *Pichon v. Murphy Oil U.S.A., Inc.*, 2002 U.S. Dist. LEXIS 23907, at *5 (E.D. La. Dec. 9, 2002) ("[A]ny possible confusion of the jury can be cured prophylactically by the court's charge to the jury.").

2. <u>Evidence or argument that Carter's Facebook posts were not "protected activity."</u>

First, although it is not entirely clear what evidence Carter is seeking to exclude through this limine point, she appears to seek an order prohibiting Southwest's counsel from making what is essentially a legal argument about what constitutes protected conduct under the Railway Labor Act ("RLA"). Whether the entirety of Carter's Facebook communications to Local 556 president Audrey Stone ("Stone") were "protected activity" under the RLA goes to the heart of this case. Southwest does not dispute that some portion of Carter's Facebook communications to Stone—references to the union recall election and how the union spent union member dues—may have been a part of union opposition conduct that could support a retaliation finding under the Court's view of the RLA. But neither this Court's summary judgment rulings or Judge Scholer's order on Southwest's motion to dismiss support Carter's apparent contention that there has been a determination that the entirety of her messages to Stone was "protected activity" under the RLA. Such a view is contrary to Judge Scholer's dismissal of Carter's substantive RLA claims and the language of her order on Southwest's motion to dismiss---"At most, Plaintiff has alleged that Southwest intervened in an internal Union dispute, responded to an employee's concern about graphic and possibly harassing messages from a co-worker, and terminated an employee for violating various policies." (ECF No. 232 at 18). Rather, in denying Southwest's motion to dismiss Carter's RLA retaliation claim, Judge Scholer relied on allegations in Carter's complaint about Carter's support for the recall election, Carter's opposition to the political leadership of the Union, and Carter's opposition to union expenditures (ECF No. 232 at 20). There was no finding that Carter's messages to Stone constituted "protected activity", but simply, and similar to the Court's recent order denying Southwest's motion for reconsideration, that there were sufficient facts plead such that a jury should determine whether Southwest's decision to terminate Carter's

employment was motivated by Carter's union opposition conduct. As such, to the extent Carter's motion in limine point 2 seeks to prevent Southwest from making the legal argument that the Facebook videos Carter sent to Stone was not RLA protected activity, Carter's motion should be denied.

3. <u>Evidence or argument that Carter went to Washington, D.C. to "participate" in the Women's March.</u>

Again, it is not entirely clear what evidence Carter seeks to exclude here, but Southwest does not intend to argue or adduce evidence that Carter traveled to Washington D.C. for the express purpose of participating in the Women's March. Southwest contends, and Carter does not appear to disagree, that Carter's travel to Washington provides context regarding her Facebook messaging to Stone and should be admissible background evidence. But, as worded to narrowly exclude evidence or argument that Carter's purpose in traveling to Washington was to participate in the Women's March, Southwest does not oppose this limine point.

4. <u>Evidence regarding t-shirt messages.</u>

Evidence regarding the T-shirt referenced in Carter motion in limine point is potentially relevant because it reflects Carter's union opposition conduct. Moreover, Carter presented the photographs of the T-shirt to Southwest in connection with the grievance and investigation process as to her Facebook messages to Stone. The jury should be allowed to consider the entirety of the evidence reviewed in connection with this process, and Carter should not be permitted to selectively shield the jury from evidence that might have cast her in a negative light.

5. <u>Evidence or testimony that Carter called Audrey Stone a "murderer."</u>

Carter's Facebook messaging to Stone contained the claim that the union and its international "… are supporting this Murder." Southwest, and Local 556, should be permitted to

make arguments and suggest inferences regarding Carter's intent when making these statements, which Carter is of course free to rebut, and the jury can make up its own mind. Moreover, Stone should be free to express how she understood the messages she received from Carter. Given that the jury will see the underlying message, there is no need for the Court to police the distinction that Carter would have it draw between a "murderer" and "supporter of murder." Carter's limine point 5 addresses no specific evidence or argument that warrants exclusion.

6. <u>Evidence that Carter referred to Local 556 officials as "criminals" or "crooks."</u>

The distinction between Carter directly authoring language in her messages to Stone versus sending communications written by others is meaningless and does not warrant the exclusion of any evidence. Carter can explain to the jury that she was forwarding the messages of other flight attendants who used the terms "criminal" and "crook", and these communications are part of Carter's opposition to union leadership and thus are clearly relevant.

7. <u>Evidence that Carter "threatened" Stone by saying, "can't wait to see you back on line."</u>

Once again, Carter improperly seeks through a motion in limine to limit argument about the meaning of her language and, in this case, how her language was perceived by Stone. Stone will testify, as she did in her deposition, that she felt threatened by Carter's statement "….can't wait to see you back on line." The jury should be allowed to hear Stone's testimony as to her perception of Carter's message. Indeed, the overall impact of the messages on Stone played a part in Southwest's assessment of Carter's conduct and its decision to terminate Carter's employment. Carter can attempt to rebut or address Stone's testimony through cross-examination or through testimony from Carter as to the true intent behind her message. But there is no reason

to shield the jury from any evidence in connection with this message and Carter's motion in limine point 7 should be denied.

8. <u>Evidence that Carter wrote Facebook messages regarding "Democrats" as set forth in Carter motion in limine No. 8</u>.

As with points 5 and 6 above, Carter again seeks an evidentiary ruling in connection with a distinction between her authorship of particular language in a Facebook message versus statements written by others that she admits she sent to Stone. Again, this is a distinction without a difference in this context. Carter is free to explain to the jury what portions of the messages she sent to Stone were written by her and what portions are forwarded statements, but there is no reason to exclude evidence and Carter's motion in limine point 8 should be denied.

9. <u>Evidence regarding Southwest personnel's personal views on abortion</u>.

Carter's related religious discrimination and failure to accommodate claims are based on the notion that her public opposition to abortion is a religious practice and part of her religious beliefs. As such, the views on abortion of the Southeast employees who participated in the investigation of Carter's conduct and in the decision to terminate Carter's employment is entirely relevant to the issue of animus. As such, the jury should not be shielded from those views and beliefs and should be afforded the opportunity to weigh those considerations in assessing if Southwest was motivated by religious animus in its decision to terminate Carter's employment.

Southwest does not fully understand the remainder of what Carter seeks to exclude through this limine point. Southwest believes that Carter's motion relates to questions about Carter's beliefs as to what if any limits apply to Carter's claim that Southwest was required to accommodate her religious beliefs by allowing her to proselytize about her religious beliefs. Southwest should be permitted to explore the scope of Carter's contentions in this context and Carter has not

identified evidence, or argument, that should be excluded. Carter's motion in limine point 9 should be denied.

      10.    <u>Evidence regarding Carter's lack of subjective belief of discriminatory intent</u>.

It is not clear what Carter is seeking to exclude through motion in limine point 10, or what she means by "subjective evidence, but Southwest should be permitted to ask Carter about the basis for her belief that Southwest discriminated or retaliated against her. Carter testified as follows in her deposition, and there is no reason the jury should not be permitted to hear this testimony at trial:

> Q.    Is there any other evidence that you possess that Mr. Schneider acted against you because he was hostile to or discriminating against your religious beliefs?
> A.    No.
>
> Q.    Do you have any evidence that Mr. Schneider was hostile to you or acting against you because you were a union objector?
> A.    No.
>
> Q.    Ms. Jones, Meggan Jones, was the assistant base manager at Denver, correct?
> A.    Yes.
>
> Q.    And she participated in the fact-finding, right?
> A.    Yes.
>
> Q.    What evidence, if any, do you have that Ms. Jones sought to discriminate against you on the basis of your religious beliefs?
> A.    None, except that I said I was a Christian.
>
> Q.    And if I ask you the same question about Ms. Gutierrez, would your response be the same?
> A.    Correct.
>
> Q.    And if I ask you the same question about Ms. Emlet, would your response be the same?
> A.    Yes, sir.
>
> Q.    With respect to Ms. Jones, do you have any evidence that she sought to discriminate you based on your status as a union objector?
> A.    No.

> Q. And would the same be true for Ms. Gutierrez?
> A. Yes.
>
> Q. And would the same be true for Ms. Emlet?
> A. Yes.

[Deposition of Plaintiff Charlene Carter at 84:12-85:20].

The relevance of an individual's so-called "subjective evidence" of discrimination is self-evident. "Subjective evidence" as Carter uses the term would include *any evidence* about which a plaintiff may be aware. For example, a plaintiff may be aware of "subjective evidence" such as a manager's use of derogatory language to refer to Christian employees and union opponents. While the target of such derogatory language would, like Carter, not know "what is in [the speaker's] head" the fact s/he heard a manager make derogatory statements (*i.e.*, s/he had "subjective evidence") regarding religion in a religious discrimination case would obviously be relevant. Similarly, the fact that Carter testified that she had no "subjective evidence" such as derogatory statements or other indicia of improper motive is also relevant.

Ultimately, the purpose of this motion in limine is not to prevent the jury from hearing "subjective evidence" of Carter's claims. It is to allow Carter to present unlimited "subjective evidence" to the jury without being contradicted by her own testimony.

11. <u>Evidence or testimony that Carter believed Stone tried to get Carter fired "only because she was an objector."</u>

This limine point appears to be directed more to Carter's claims against the Local 556, and Southwest cannot otherwise discern the evidence Carter seeks to exclude. As such, Southwest does not have a position as to Carter's motion in limine point 11.

12. <u>Evidence regarding Local 556's representation of Carter.</u>

While this limine point is directed more to Carter's claims against Local 556, Southwest believes that Carter's representation during the grievance process by a representative of her

choosing is relevant to the overall fairness of the procedures associated with the investigation of Stone's complaints about Carter and Carter's appeal of the decision to terminate her employment. It is also relevant to show compliance with the investigatory and grievance procedures set forth in CBA, which is relevant to show Southwest's intent. One can hardly doubt that if Southwest flouted those procedures and denied Carter a Local 556 representative during the grievance process, she would insist that this proves an improper motive. To exclude any reference to Carter's union representation as she requests would suggest Southwest violated the investigatory provisions of the CBA, would necessitate truncating the fact finding notes, step 2 notes, and a litany of other key documents. It would also compel witnesses to make false statements regarding who participated in meetings where critical events related to this case occurred. Finally, prohibiting reference to the fact that Local 556 provided Carter with a representative would suggest a general hostility to her that would unfairly undermine Local 556's defense to her duty of fair representation claim.

As such, the fact that Carter was represented by Local 556 is relevant to Carter's claims against Southwest, not to mention her duty of fair representation claims against the union, and Carter has not identified any evidence that should be excluded.

13.     <u>Evidence regarding Local 556's undue hardship defense.</u>

This limine point is directed to Carter's claims against the Local 556, and Southwest does not have a position as to Carter's motion in limine point 13.

14.     <u>Evidence as to whether or not Carter requested a religious accommodation.</u>

While an affirmative request by an employee may not be a requirement in every religious accommodation case, that does not mean that the dialogue between an employer and an employee in this context, and the extent of an employer's knowledge that an accommodation may be needed,

is irrelevant. *EEOC v Abercrombie & Fitch Stores*, 575 U.S. 770, 135 S.Ct. 2028, 192 L.Ed. 2d 35 (2015), cited by Carter, addresses the causation standard in religious discrimination cases, not evidentiary issues about the dialogue between the employee and the employee regarding accommodation of a religious belief. Indeed, decisions subsequent to *Abercrombie* make it clear that these considerations remain relevant in the Title VII religious accommodation context. *See Nobach v. Woodland Vill. Nursing Ctr.*, 799 F.3d 374, 379, n.8 (5th Cir. 2015) (failure to accommodate claim failed because plaintiff "fail[ed] to advise [the employer] of her religious belief and the conflict with her job duties and [the employer] lack[ed] knowledge or suspicion of any such conflict"); *see also Ileiwat v. Envtl. Prods. Int'l*, 2018 U.S. Dist. LEXIS 14362, at *10-12 (N.D. Tex. Jan 29, 2018) (granting summary judgment for defendant on failure to accommodate claim where plaintiff offered no evidence that he requested an accommodation or that defendant was a aware his job requirements conflicted with his religious observance); *Melenyzer v. Nice Group USA, Inc.*, 2014 U.S. Dist. LEXIS 190818, at *3-5 (W.D. Tex. July 25, 2014) (granting summary judgment where plaintiff failed to failed to notify employer his religious belief conflicted with an employment requirement); *Gonzalez v. Hogg Ins. Group, Inc.*, 2012 U.S. Dist. LEXIS 2101, at *25 (E.D. Va. Jan. 6, 2012) ("[E]ven if defendant [] was on notice that the plaintiff 'ha[d] strong religious beliefs,' … defendant [] was not on notice that those beliefs would compel the religious statements the plaintiff made at the workplace. The plaintiff thus has failed to satisfy the notice element of a *prima facie* case of religious discrimination under the failure to accommodate theory.").

Moreover, the fact that actual knowledge of an employee's need for an accommodation is not mandatory does not make its presence or absence irrelevant. Indeed, the Supreme Court in *Abercrombie* recognized that while motive rather than knowledge is the critical element of a claim

for failure to accommodate, "it is arguable that the motive requirement itself is not met unless the employer at least suspects that the practice in question is a religious practice—*i.e.,* that he cannot discriminate 'because of' a 'religious practice' unless he knows or suspects it to be a religious practice." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 n.3 (2015). It is for this reason that courts throughout the country continue to emphasize the employer's lack of knowledge of an employee's religion, and sometimes to require suspicion. *See, e.g.*, *Nobach*, 799 F.3d at 379 ("Woodland must admit … that Nobach's failure to perform the Rosary with the resident was the factor that precipitated her discharge. If Nobach ***had presented any evidence that Woodland knew, suspected, or reasonably should have known the cause for her refusing this task was her conflicting religious belief*** – and that Woodland was motivated by this knowledge or suspicion – the jury would certainly have been entitled to reject Woodland's explanation for Nobach's termination. But, no such evidence was ever provided to the jury."); *O'Connor v. Lampo Grp., LLC*, 2021 U.S. Dist. LEXIS 204079, *16 (M.D. Tenn. Oct. 22, 2021) ("[P]laintiff has not plausibly alleged … that Defendant knew or suspected she had a need for a religious accommodation. … Thus, even considering *Abercrombie*, she has not plausibly alleged that her need for a religious accommodation was a motivating factor in Defendant's decision to terminate her employment."); *Singleton v. Limestone Univ.*, 2021 U.S. Dist. LEXIS 254476, *12 (D.S.C. Aug. 27, 2021) ("Plaintiff does not plausibly allege that Defendants' knowledge or suspicion of his personal religious beliefs played any role in his termination.").

15.  <u>Evidence that Southwest fired Carter for the "manner of communications, insults, threats, and graphic images."</u>

`As with limine point 2 above, this issue goes to the heart of the case, as the manner and graphic content of Carter's communication is precisely the reason Southwest terminated Carter's

employment. Contrary to the arguments in Carter's motion, this does not mean that Southwest fired Carter "…for reasons based in part on religious observances, beliefs, or practices…" and does not preclude a finding that Southwest reasonably determined that the content of Carter's abortion related Facebook messages, and the fact that she sent them to a co-employee, was a violation of its policies. In any event, Carter has not identified any evidence or argument that should be excluded and her motion in limine point 15 should be denied.

16. <u>Evidence that Carter could engage in her religious observances and beliefs without violating Southwest's social media policies.</u>

Southwest cannot discern what evidence or legal argument Carter seeks to exclude through limine point 16. To the extent Carter is arguing that Southwest should be precluded from arguing, or adducing testimony, that there were other available methods, other than Facebook messages to a co-employee, to express her beliefs, Southwest opposes the motion as such argument and/or evidence is potentially relevant to Carter's religious accommodation claim.

Additionally, to prevail on a failure to accommodate claim, the plaintiff must show that she "had a *bona fide* religious belief that conflicted with an employment requirement." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000); *see also United States EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017) (same). The religious belief at issue here is Carter's belief that abortion is the taking a human life and the desire to share that information with others. If Carter could, as she testified, act in accordance with that belief without violating Southwest policy her failure to accommodate claim fails. *See, e.g.*, *Passmore v. 21st Century Oncology, LLC*, 2018 U.S. Dist. LEXIS 61085, at *9 (M.D. Fla. Apr. 10, 2018) (religious pro-life employees who were terminated for anti-abortion activities did not state failure to accommodate claim because they did not identify policy that conflicted with their religious belief). Thus, evidence regarding

what Southwest's policies allowed and what Carter's alleged religion mandates are central to her Title VII claim.

Carter's argument to exclude from evidence the fact that Southwest policy did not prohibit her from stating her views about abortion appears predicated on the contention that if Southwest had to accommodate her religion-based opposition to abortion, it had to accommodate every particular preference as to how she manifested that belief. Carter is incorrect.  *See id.*; *Diss v. Portland Pub. Schs.*, 2016 U.S. Dist. LEXIS 161829, at *3, 34-35 (D. Or. Nov. 22, 2016), *aff'd* 727 F. App'x 438 (9th Cir. 2018)) (Catholic pro-life employee who opposed abortion and Planned Parenthood was not entitled to an accommodation because he could not show that his religious beliefs conflicted with his duty to allow Planned Parenthood employee to make a classroom presentation); *Marchant v. Tsickritzis*, 506 F. Supp. 2d 63, 69 (D. Mass. 2007) (employee's accommodation claim failed because "comparable religious classes were available at different locales and at different times, that [plaintiff's] desire to leave …to attend classes was based on a personal preference and was not necessary to carry out a bona fide religious practice"); *Mial v. Foxhoven*, 305 F. Supp. 3d 984, 991 (N.D. Iowa 2018) ("[T]he fact that a practice or belief may be connected to religion does not compel the conclusion that it is not a personal preference" for which no accommodation is required.).

17 and 18.  <u>Evidence regarding Southwest's knowledge of Carter's religious beliefs; Evidence that Carter failed to notify Southwest of her religious beliefs prior to violating Southwest's social media policies</u>.

As with limine point 14 above, these limine points apparently seek to limit Southwest's ability to respond to Carter's religious accommodation claim.  Again, while Southwest's knowledge of Carter's alleged need for an accommodation, and Carter's notification to Southwest

of her religious beliefs, may not be dispositive of her claim, that does not mean these factors are irrelevant.  Moreover, the date on which Southwest learned of Carter's claimed religious beliefs (*i.e.*, was it before or after her policy violations) is critical, as Title VII does not "require[] employers to give lesser punishments to employees who claim, after they violate company rules … that their religion caused them to transgress the rules." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1020 (4th Cir. 1996); *see also Nobach v. Woodland Village Nursing Ctr., Inc.*, 799 F.3d 374, 378 (5th Cir. 2015) (citing *Chalmers* with approval and reversing jury verdict and remanding for entry of judgment for employer where plaintiff failed to notify employer of need for religious accommodation until after violating employer rules).

Southwest should be able to introduce evidence of any accommodation dialogue, or the absence thereof and the reasons for that, and whether it understood or had reason to understand that Carter was requesting some type of accommodation based on her religious beliefs.

19.   <u>Evidence regarding Carter's offer of reinstatement</u>.

At the close of the grievance process, after the step 2 hearing at which Carter appeared with representatives of Local 556, Southwest offered Carter a "last chance agreement."  Under the agreement, Carter's termination would have been reduced to a 30 day suspension and she would be reinstated subject to her avoidance of any violation of Southwest's social media and bullying and hazing policies for a period of 24 months.  Carter declined the agreement and now seeks to exclude the agreement, and her declining to accept it, from evidence.

The last chance agreement, and Carter's rejection of it, should be admitted as evidence for the jury's consideration.  *See ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 408-413 (S.D.N.Y 1999) (allowing admission of settlement materials under Rule 408's "another purpose" exception and discussing the purposes of Rule 408).   First, as courts have held, Carter's

refusal to accept the last chance agreement is clearly relevant to her damages claims and her duty to mitigate her damages. *See Bhandari v. First Nat'l Bank of Commerce*, 808 F.2d 1082, (5th Cir. 1987) (affirming district court's admission of settlement materials for purposes of determining whether plaintiff mitigated damages); *see also Urico v. Parnell Oil Co.*, 708 F.2d 852, 854-55 (1st Cir. 1983) (stating evidence of settlement negotiations admissible for purposes of determining efforts to mitigate damages); *Orzel v. Wauwatosa Fire Dep't*, 697 F.2d 743, 757 n.26 (7th Cir. 1983) (affirming trial court's decision to admit testimony regarding reinstatement offer for purposes of determining mitigation of damages); *Williams v. Regus Mgmt. Group, LLC*, 2012 U.S. Dist. LEXIS 74145, at *9 (S.D.N.Y. May 11, 2012) (noting that evidence of settlement communications may be admitted under FRE 408 for "other purposes" including as it relates to efforts to mitigate damages); *Edge Group Waiccs LLC v. Sapir Group LLC*, 705 F. Supp. 2d 304, 317 n.8 (S.D.N.Y. 2010) (finding use of settlement agreement as evidence of efforts to mitigate damages consistent with the terms of Rule 408); *Innovative Eng'g & Consulting Corp. v. Hurley & Assocs.*, 2006 U.S. Dist LEXIS 70502, at *27-28 (N.D. Ohio Sept. 28, 2006) (citing to *Bhandari* and holding that "evidence of settlement negotiations admitted to determine a plaintiff's failure to mitigate . . . is permissible under Rule 408.").

The jury also should be allowed to consider whether Southwest's offer to allow Carter to rejoin its workforce cuts against the notion that it held retaliatory animus against Carter based on either her religion or union opposition. The last chance agreement also is relevant to Carter's duty of fair representation claims against Local 556, as the evidence at trial will show that it represented Carter during the grievance proceedings and negotiated the last chance agreement on her behalf. *See Porter v. United Auto., Aerospace & Agric. Implement Workers*, 1993 U.S. Dist. LEXIS 10400, at *5-6 (N.D. Tex. June 21, 1993) (stating the fact that union representative

negotiated an offer of reinstatement belied any assertion that the union representative acted arbitrarily and in bad faith in representing plaintiff); *see also Ross v. Runyon*, 156 F.R.D. 150, 156-57 (S.D. Tex. 1994) (considering settlement offer including reinstatement as evidence and finding plaintiff could not complain of union's representation, which resulted in an offer of reinstatement that converted termination to thirty-day suspension).

The case law cited by Carter is unhelpful and not relevant to the admissibility of evidence. *Ford Motor Co. v E.E.O.C.,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed. 721 (1982) and *Lewis Grocer Co, v. Holloway*, 874 F.2d 1008 (5th Cir. 1989), both stand for the unremarkable, in this context, legal proposition that an unconditional offer of reinstatement tolls an employer's back pay liability. The cases say nothing about whether an offer of reinstatement should be considered as evidence by the factfinder or support the notion that the jury here should not be allowed to assess the import, both as to liability and mitigation of damages, of the last chance agreement offered to Carter.

20-32.  Miscellaneous.

Southwest does not oppose points 20 through 32 of Cater's motion in limine.

Dated: June 13, 2022  Respectfully submitted,

/s/ Paulo B. McKeeby
Paulo B. McKeeby
State Bar No. 00784571
Brian K. Morris
State Bar No. 24108707
**REED SMITH LLP**
2850 N. Harwood Street
Suite 1500
Dallas, Texas 75201
Phone: 469-680-4200
Facsimile: 469-680-4299
pmckeeby@reedsmith.com
bmorris@reedsmith.com

**ATTORNEYS FOR DEFENDANTS
SOUTHWEST AIRLINES CO.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been filed via the Court's ECF system and all counsel of record have been served on this 13th day of June, 2022.

/s/ Paulo B. McKeeby
Paulo B. McKeeby