## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER           )
                          ) CIVIL ACTION NO.
VS.                       ) 3:17-CV-02278-X
                          )
SOUTHWEST AIRLINES CO., AND )
TRANSPORT WORKERS UNION OF  )
AMERICA, LOCAL 556        )

-----------------------------------
CONFIDENTIAL
VIDEOTAPED DEPOSITION OF
AUDREY STONE
NOVEMBER 24, 2020

-----------------------------------

ANSWERS AND DEPOSITION OF AUDREY STONE,
produced as a witness at the instance of the
Plaintiff, taken in the above-styled and -numbered
cause on NOVEMBER 24, 2020, at 9:07 a.m., before
CHARIS M. HENDRICK, a Certified Shorthand Reporter
in and for the State of Texas, witness located at
Gillespie Sanford LLP, 4803 Gaston Avenue, Dallas,
Texas, pursuant to the Federal Rules of Civil
Procedure, the current emergency order regarding
the COVID-19 State of Disaster, and the provisions
stated on the record or attached hereto.

## Page 2

1   A P P E A R A N C E S
2   FOR THE PLAINTIFF:
3       MR. MATTHEW B. GILLIAM
        NATIONAL RIGHT TO WORK LEGAL DEFENSE
4       FOUNDATION, INC.
        8001 Braddock Road, Suite 600
5       Springfield, Virginia  22160
        (703) 770-3339
6       mbg@nrtw.org
7
8
9   FOR THE DEFENDANT, SOUTHWEST AIRLINES CO.:
10      MR. MICHAEL A. CORRELL
        REED SMITH LLP
10      2850 North Harwood, Suite 1500
11      Dallas, Texas  75201
        (469) 680-4264
12      mcorrell@reedsmith.com
13
14  FOR THE DEFENDANT, TRANSPORT WORKERS UNION OF
    AMERICA, LOCAL 556:
15
        MR. ADAM GREENFIELD
16      MR. EDWARD B. CLOUTMAN, III
        LAW OFFICES OF CLOUTMAN & GREENFIELD, PLLC
17      3301 Elm Street
        Dallas, Texas  75226
18      (214) 939-9223
        agreenfield@candglegal.com
19      ecloutman@lawoffices.email
20
21
22
23
24
25

## Page 3

1   A P P E A R A N C E S
2   FOR THE WITNESS AUDREY STONE:
3       MR. JOE GILLESPIE
        GILLESPIE SANFORD LLP
4       4803 Gaston Avenue
        Dallas, Texas  75246
5       (214) 800-5111
        joe@gillespiesanford.com
6
7   ALSO PRESENT:  MR. MACK SPURLOCK - VIDEOGRAPHER
8               MS. CHARLENE CARTER
                MS. LAUREN ARMSTRONG
9               MR. CHRIS MABERRY
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1                    INDEX
2   Appearances .................................2
3   AUDREY STONE
4       Examination by Mr. Gilliam...............7
5       Examination by Mr. Correll............216
6       Examination by Mr. Greenfield..........252
7
8   Signature and Changes......................258
9   Reporter's Certificate.....................260
10
11                  EXHIBITS
12  Exhibit 1 - ..................................8
    Objections and Responses to Plaintiff's Subpoena
13  to Produce Documents, Information, or Objects,
    Document 20
14
    Exhibit 2 - ................................98
15  Unity Magazine Spring 2018 Issue, Document 23
16  Exhibit 3 - ...............................102
    Email to Inflight Directors from Sonya Lacore,
17  Document 3
18  Exhibit 4 - ...............................108
    Email to Audrey Stone from Brett Nevarez,
19  Document 27
20  Exhibit 5 - ...............................118
    Core Team Facebook Group Screenshots, Document 24
21
    Exhibit 6 - ...............................140
22  Apology from Audrey Stone, Document 17
23  Exhibit 7 - ...............................141
    Screenshot of Text from Chris Click, Document 10
24
25

Page 5

EXHIBITS

Exhibit 8 - ...............................146
Apology from Brett Nevarez, Document 11

Exhibit 9 - ...............................150
Apology from Brett Nevarez, Document 18

Exhibit 10 - ...............................155
President's Message, Document 13

Exhibit 11 - ...............................158
Southwest Airlines Policies, Document 8

Exhibit 12 - ...............................179
Email to Audrey Stone from Brian Talburt,
Document 30

Exhibit 13 - ...............................185
Email to Audrey Stone from Brian Talburt,
Document 31

Exhibit 14 - ...............................187
Email to Audrey Stone from Brian Talburt,
Document 32

Exhibit 15 - ...............................194
Email to Brian Talburt from Audrey Stone,
Document 33

Exhibit 16 - ...............................197
Read-Before-Flys, Document 9

Exhibit 17-A - ...............................203
Screenshots, Document 25-A

Exhibit 17-B - ...............................203
Screenshots, Document 25-B

Exhibit 18 - ...............................239
Audrey Stone Facebook Messages from Charlene Carter

Exhibit 19 - ...............................251
Facebook Message from Charlene Carter (Bates 616)

Page 6

PROCEEDINGS

THE VIDEOGRAPHER:  We are now on record.  Today's date is November 24th, 2020.  The time is 9:07 a.m.  Will counsel please introduce yourselves; after which, will the court reporter please swear in the witness?

MR. GILLIAM:  Matthew Gilliam for plaintiff Charlene Carter.

MR. CORRELL:  Michael Correll for defendant Southwest Airlines.

MR. GREENFIELD:  Adam Greenfield on behalf of defendant TWU Local 556.

MR. CLOUTMAN:  Ed Cloutman also on behalf of TWU Local 556.

MR. GILLESPIE:  Joseph Gillespie on behalf of the witness, Audrey Stone.

THE REPORTER:  This deposition is being conducted remotely in accordance with the current emergency order regarding the COVID-19 State of Disaster.

My name is Charis Hendrick, Court Reporter, CSR No. 3469.  I am administering the oath and reporting the deposition remotely by stenographic means from my home in Ellis County, Texas.

Page 7

AUDREY STONE,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. GILLIAM:
Q.  Good morning, Ms. Stone.
A.  Morning.
Q.  My name is Matt Gilliam and I am the attorney representing plaintiff Charlene Carter in the case of Carter v. Transport Workers Union of America Local 556 and Southwest Airlines.  And I am here today to ask you some questions regarding the case.
If at any point you need a break, just let me know.  And do -- do you understand why you're here today?
A.  Yes.
Q.  Okay.  And you understand that you are here under Subpoena?
A.  Yes.
Q.  Okay.  And did you receive the Subpoena?
A.  Yes.
Q.  And have you had the chance to read the Subpoena?
A.  Yes.
Q.  Okay.  I would like to mark Document 20 as

Page 8

Exhibit 1.
(Exhibit 1 marked.)
Q.  (By Mr. Gilliam) And if you could just take a look at dark -- Document 20.  You know what, let me back up a bit because I realize that this is -- this is a different Subpoena.  So we can -- we can talk about this later.
But returning to the Subpoena that was served upon you for your -- your appearance today, do you understand that Mr. Gillespie accepted that Subpoena on your behalf?
A.  Yes, I do.
Q.  Okay.  And do you have any objections to the Subpoena?
A.  No.
Q.  Okay.  And did you receive the check that was tendered to Mr. Gillespie for $40?
A.  Yes.
Q.  Okay.  All right.  And you also understand that there is a Protective Order in this case?
A.  Yes.
Q.  And you have been informed of the terms of the Protective Order?
A.  Yes, I have.
Q.  Okay.  All right.  Well, have you been

Page 9

1  deposed before?
2      A. Yes.
3      Q. Okay. Then you -- you understand how it
4  goes. I will ask you some questions and you -- you
5  will answer them truthfully to the best of your
6  ability. Since the reporter is preparing a written
7  transcript, it's important that you give clear,
8  verbal answers. No head nods, no huh-uhs and
9  uh-huhs; do you understand?
10      A. Yes, I do.
11      Q. Okay. And so that we can develop a clear
12  record, it's also important that we don't talk over
13  each other. So I will try to let you finish your
14  answers before I ask another question. And
15  likewise, if you could let me finish my question
16  before you answer, that will make sure that we get
17  a clear record; is that understood?
18      A. Yes.
19      Q. Okay. And where are you currently
20  employed?
21      A. Southwest Airlines.
22      Q. Okay. And you're employed as a flight
23  attendant, correct?
24      A. Yes, that's correct.
25      Q. Okay. And where are you based out of?

Page 10

1      A. Baltimore/Washington.
2      Q. Okay. And how long have you been employed
3  with Southwest Airlines?
4      A. 16 years.
5      Q. Okay. And have you always been employed
6  as a flight attendant?
7      A. Yes.
8      Q. Okay. Now, when you first started with
9  Southwest Airlines, where were you originally
10  based?
11      A. Baltimore/Washington.
12      Q. Okay. Have you always been based in
13  Baltimore/Washington?
14      A. No, I haven't.
15      Q. Okay. And where else have you been based
16  besides Baltimore/Washington?
17      A. Las Vegas.
18      Q. Okay. And when were you based from -- out
19  of Las Vegas?
20      A. I was based in Las Vegas from, I believe,
21  2013 until 2018.
22      Q. Okay. And after 2018, did you switch your
23  -- your base back to Baltimore?
24      A. Yes, I did.
25      Q. Okay. Now, have you been based anywhere

Page 11

1  else apart from those two locations?
2      A. No.
3      Q. Okay. All right. And you were formally
4  president of TWU Local 556, correct?
5      A. Yes.
6      Q. And if I say "the union" today, you will
7  understand that I am referring to TWU Local 556?
8      A. Yes.
9      Q. Okay. And, now, prior to serving as
10  president, did you hold any other offices with TWU
11  Local 556?
12      A. I did.
13      Q. I am sorry. You said you did not?
14      A. I said I did.
15      Q. Oh, okay. And what other elected offices
16  have you held with TWU Local 556?
17      A. I have held the elected office of shop
18  steward, a -- in the Baltimore domicile, executive
19  board member. As well as first vice president.
20      Q. Okay. Have you held any other offices
21  with Local 556?
22      A. Yes, I have.
23      Q. Okay. What other offices have you held
24  with Local 556?
25      A. I have held the position of lead

Page 12

1  negotiator for our negotiating team in contract
2  bargaining with Southwest Airlines. I have also
3  held various committee chairperson positions, as
4  well as co-chairperson positions, including the
5  education committee, the working women's committee
6  and the committee on political education.
7      Q. Okay. All right. Have you held any other
8  offices with TWU Local 556?
9      A. Not that I can recall.
10      Q. Okay. And how long have you been a union
11  member?
12      A. Since I completed probation at Southwest
13  Airlines in 2004.
14      Q. Okay. And what was the first elected
15  office you held with TWU Local 556?
16      A. Shop steward.
17      Q. Okay. And who -- who votes in the shop
18  steward elections?
19      A. That is whichever members are attending
20  the -- that domicile's section of membership
21  meeting when the election take place -- takes
22  place, which is every three years following the TWU
23  Local 556 officer elections.
24      Q. Okay. And by domicile, that's the same as
25  a base?

Page 13

1      A.  Yes.
2      Q.  Okay.
3      A.  We use the two interchangeably.
4      Q.  Okay.  And while it's on my mind, I think
5  you -- you might have said that you were the
6  domicile board member for Baltimore?
7      A.  Yes, that's correct.
8      Q.  Is a domicile board member also called a
9  DEBM?
10      A.  Yes.
11      Q.  Okay.  All right.  And when were you first
12  elected shop steward?
13      A.  2006.
14      Q.  Okay.  And how long were you a shop
15  steward for?
16      A.  I believe I have been a shop steward since
17  2006.  You are allowed to hold multiple positions
18  simultaneously.  I believe I have been reelected as
19  a shop steward every three years since 2006.
20      Q.  Okay.  And I apologize.  I had a little
21  problem with the -- the audio when you first said
22  it.  You said a shop steward is elected every three
23  years following a particular event; and I -- I am
24  not sure that I heard clearly the -- the event.
25      A.  Yes.  The shop steward elections take

Page 14

1  place at the membership meetings that follow the
2  officer -- the TWU Local 556 officer elections that
3  occur every three years.
4      Q.  Okay.  All right.  And when did you first
5  become a DEBM out of Baltimore?
6      A.  June 2008, I believe.
7      Q.  Okay.  And how long did you hold that
8  position?
9      A.  Through April 2012.
10      Q.  Okay.  And in 2012, did you decide not to
11  run again?
12      A.  No.  In the 2012 elections, I ran for a
13  different position.
14      Q.  Okay.  And which position did you run for
15  in the 2012 elections?
16      A.  The first vice president.
17      Q.  Okay.  And when you decided to run for
18  first vice president in 2012 -- well, let me -- let
19  me ask the question this way:  Would you have been
20  unable to hold both the DEBM position and the first
21  vice president position at the same time?
22      A.  Yes, that's correct.
23      Q.  Okay.  And in the election for first vice
24  president in 2012, did you win that election?
25      A.  No, I did not.

Page 15

1      Q.  Okay.  All right.  And did you remain as
2  DEBM after losing the election for first vice
3  president?
4      A.  No, I did not.
5      Q.  Okay.  And when did you serve as lead
6  negotiator on the negotiating team?
7      A.  That began June 2013 and remained for the
8  duration of my term as president, which ended in
9  April of 2018.
10      Q.  Okay.  Now, I think you said you served on
11  an education committee.  Were you the chair of the
12  education committee?
13      A.  I was the -- a co-chair of the education
14  committee.
15      Q.  Okay.  And when were you co-chair of the
16  education committee?
17      A.  I became co-chair at some point after I
18  joined the executive board as the Baltimore DEBM.
19  And I remained on the education committee through
20  -- through my DEBM term.  And I may -- I may have
21  been chair at one point, the education -- it was
22  two different terms, and we had co-chairs that
23  changed over at some point during that term.
24      Q.  Okay.  And when did you serve on the
25  working women's committee?

Page 16

1      A.  I served on that beginning in the 2000 --
2  I believe, at some point in 2013, when the
3  international -- I originally was serving on the TW
4  (sic) International working women's committee.  And
5  then they asked all of the locals to begin starting
6  a local chapter within the locals; and I ended up
7  taking over that initially.
8      Q.  Okay.  When -- when had you started
9  serving on the international working women's
10  committee?
11      A.  When I became president.
12      Q.  Okay.
13      A.  I had attended a meeting of the
14  international committee -- when I was a DEBM, I
15  believe I attended one meeting.  And then I started
16  going regularly once I became the president.
17      Q.  Okay.  And that was on the international
18  committee?
19      A.  Yes.
20      Q.  Okay.  All right.  And you -- you
21  mentioned starting the initiative.  Were you
22  involved in setting up working women's committees
23  at other locals, other TWU locals outside of 556?
24      A.  No, I was not.
25      Q.  Okay.  All right.  And how -- and I am

Page 17

1    sorry if you said, how long did you serve on the --
2    the working women's committee?
3        A.  In general or as chair?
4        Q.  As chair.
5        A.  I served as chair until, I believe,
6    December 2016.
7        Q.  Okay.  Okay.  And then at -- at that
8    point, did you step down as chair?
9        A.  The executive board appointed a new chair
10   at -- at -- at my request; at my suggestion, a new
11   chair came in.
12       Q.  Okay.  And why had you suggested to the
13   executive board that they appoint a new chair?
14       A.  I was continuing to go to the meetings for
15   international when my schedule permitted, but we
16   had been involved in contract negotiations and I
17   didn't have the -- the time on my schedule to
18   really fill that committee up within our local.
19   And I had not been able to attend one of the
20   international meetings.
21            And we had someone -- we had a female
22   on our board who was very interested in the
23   committee and had expressed a willingness to take
24   that over and really build it up within our local
25   in a way that I had not been able to do because of

Page 18

1    just time and scheduling, all of the other
2    responsibilities I had as president and being
3    co-chair.
4        Q.  Okay.  And who was that individual who
5    wanted to, I guess, take the -- role?
6        A.  Jessica Parker.
7        Q.  Okay.  And did Jessica Parker become the
8    new chair for the working women's committee?
9        A.  For the local, yes.
10       Q.  Okay.  Now, when you mentioned, I guess,
11   your -- your involvement in international, was that
12   an involvement in the working women's committee at
13   the international level?
14       A.  Yes, it was.
15       Q.  Okay.  Now, were -- were you involved with
16   the international in, I guess, other roles?
17       A.  Yes, I was.
18       Q.  Okay.  What -- what else did you do with
19   the international?
20       A.  I was initially elected to the TWU
21   International executive board.  And then I was
22   later elected to the -- their international
23   council.
24       Q.  Okay.  And who -- I guess, who elected you
25   to the international's executive board?

Page 19

1        A.  Those were the -- the international
2    leadership, which was comprised of the then
3    executive -- at the time, the -- the international
4    council and the international officers, I believe.
5        Q.  Okay.  So --
6        A.  Actually, I am sorry.  Let me rephrase
7    that.  My first position on the board, that
8    election took place at the convention in September
9    2013.  So that was an election of all of the
10   delegates from TWU across the system that elected
11   me to the executive board position.  Later on, it
12   was the -- the international officers that -- when
13   I went from the board position to the council
14   level, that was a vote of them.
15       Q.  Okay.  And are the international officers
16   members of the council?
17       A.  There is three levels of leadership within
18   TWU International.  It's the officers, then the
19   council and then the board.
20       Q.  Okay.  And what does the -- the
21   international board do?
22       A.  The international board attends a meeting.
23   It used to -- at that time, it was annually --
24   along with the council and the officers.  They
25   attend a meeting once a year and review reports,

Page 20

1    financials, and receive updates across the system
2    of the -- all of the various TWU locals.
3        Q.  Okay.  And what -- what sort of updates do
4    they receive?
5        A.  Basic updates about what was going on in
6    the -- each local's -- if they were in bargaining,
7    if they were growing membership.  All of the TWU
8    International committees provided reports on what
9    their committees were working on, items like that.
10       Q.  Okay.  And what did the international
11   council do?
12       A.  The international council was also at
13   these meetings, the annual meeting.  And then they
14   met usually an additional two to three times a year
15   with the officers.
16       Q.  Okay.  All right.  And what type of
17   business did you conduct at the annual meetings?
18            Well, let me ask it this way:  What
19   type of business did the council conduct at -- at
20   its meetings?
21       A.  The -- the similar -- same kind of
22   business that was conducted at the annual meeting.
23   It's just the board was not a part of the -- the
24   more quarterly meetings.
25       Q.  Okay.  And were you ever a international

Page 21

1    officer?
2         A.  No.
3         Q.  Okay.  All right.  And when you were
4    elected to the international board, did you already
5    know someone on the board?
6         A.  I knew one of the councilmembers who was
7    also considered a vice president with
8    international.
9         Q.  And who was that?
10        A.  Thom McDaniel.
11        Q.  Okay.
12             THE REPORTER:  I'm sorry, say it
13    again.
14             THE WITNESS:  Thom McDaniel.
15        Q.  (By Mr. Gilliam)  And how did you know
16    Thom McDaniel?
17        A.  He was a former president at TWU Local
18    556.
19        Q.  Okay.  And when was he president of Local
20    556?
21        A.  He was president -- his term began -- his
22    presidency began before I worked for Southwest
23    Airlines.  I believe it was around 2000 that he
24    became president.  And he remained president
25    through April of 2012.

Page 22

1         Q.  Okay.  All right.  And did you know anyone
2    else at the council or board level from TWU Local
3    556?
4         A.  No.
5         Q.  Okay.  And, again, at the international
6    level, what -- what did the working women's
7    committee do?
8         A.  I am sorry.  May I ask -- the previous
9    question you asked, can I ask you to repeat it?
10    You had asked at the time I was elected about the
11    board and council.  Would you repeat your last
12    question?  I want to make sure I understood it
13    correctly.
14        Q.  Okay.
15             MR. GILLIAM:  Could the reporter read
16    that back?
17             THE REPORTER:  Sure.
18             (Record read by Reporter.)
19        A.  No.  But there was another 556 member that
20    was elected at the same time as I was to serve on
21    the board.
22        Q.  (By Mr. Gilliam)  Okay.  And who was that?
23        A.  Our first vice president, Todd Gage.
24        Q.  Okay.  Okay.  Now, when you were elected,
25    were any of the other officers, I guess, Local 556

Page 23

1    members or -- let me ask that again.
2         So did -- were any of the
3    international officers persons you had known from
4    Local 556?
5         A.  No.
6         Q.  Okay.
7         A.  Not besides Thom McDaniel, as I stated.
8         Q.  Okay.  And -- and, again, at the
9    international level, what did the working women's
10    committee do?
11        A.  The working women's committee at that time
12    was being chaired by a former 556 member who is no
13    longer with us, Gwen York.  She was working
14    full-time for TWU International and she had been
15    appointed chair of that committee.  And a few times
16    a year, the committee met and brought females and
17    males from the locals who wanted to participate to
18    talk about any issues that might be specifically
19    affecting women in the workplace.
20        Outside of our Local 556, the other
21    locals at that time within TWU were all
22    male-dominated and had very small percentages of
23    women in their locals.  So some of the women were
24    bus operators struggling to get female restrooms
25    installed on their bus routes because of the

Page 24

1    environment they were working in.  So the committee
2    met to -- to, you know, just discuss different
3    initiatives or struggles that were facing, in
4    particular, women in their working environments.
5         Some of the locals didn't have any
6    type of contractual pro- -- provisions for
7    maternity or parental leave.  So discussions about,
8    you know, how to advocate or bargain for additional
9    protections for moms.  Those are some of the --
10   the topics that were -- the committee was working on
11   and topics that were discussed.
12        Q.  Okay.  Did it ever make any lobbying
13   decisions?
14        A.  The actual committee, no.
15        Q.  Okay.  Did the committee make any lobbying
16   recommendations?
17        A.  Not to my knowledge, no.
18        Q.  Okay.  And do you know if, among the
19   topics that the working women's committee
20   discussed, did they ever discuss reproductive
21   rights?
22        A.  No.
23        Q.  Okay.  All right.  Now, returning back to
24   some of your work with the local.  I think that you
25   had mentioned that you -- you served on the -- the

Page 25

1  committee for political education; is that correct?
2      A.  Under the TWU Constitution and -- the
3  president of the local is automatically the chair
4  of that committee, yes.
5      Q.  Okay.  And how many persons are on that
6  committee?
7      A.  When I became chair of that committee
8  simply through becoming president, the executive
9  board ended up appointing two co-chairs committee.
10 And they did most of the day-to-day -- well, it
11 wasn't even daily work on the committee, but they
12 handled most of it because I was in bargaining with
13 Southwest Airlines.
14      So the executive board put two strong
15 co-chairs place to handle the day-to-day.  And then
16 there were -- I -- there were various committee
17 members throughout all of our domiciles that worked
18 on that committee with our co-chairs.
19      Q.  Okay.  And who were your co-chairs?
20      A.  Matt Hettich and Bryan Orozco.
21      Q.  All right.  And is the -- the committee on
22 political education also called COPE?
23      A.  Yes.
24      Q.  Okay.  And is -- so did -- did the COPE
25 group have its own separate email that it received?

Page 26

1      A.  What do you mean that it received?
2      Q.  Well, I guess, let -- let me back up.
3      Did -- did COPE -- I guess, what --
4  what did COPE do?
5      A.  The committee on political education was
6  in our local.  They had members that participated
7  in the TWU International state conferences that
8  occurred regionally throughout the system.  They
9  had members that had participated in some of the
10 central label -- labor councils.  Also, regionally
11 and statewide, the committee on political education
12 would work with International on lobbying events
13 that might be going on.
14      Q.  Okay.  And did -- did COPE communicate
15 with the -- the union membership as well?
16      A.  Yes.
17      Q.  Okay.  And did it -- I guess, did it email
18 membership?
19      A.  Periodically, yes.
20      Q.  Okay.  And what sort of things would COPE
21 email the membership about?
22      A.  COPE would email the membership if there
23 were things going on such as -- well, using a
24 current example, you know, emails regarding
25 extensions to the payroll support program, asking

Page 27

1  our members to contact representatives to ask for
2  extension -- an extension on that.
3      So things that were related to -- that
4  impacted that our members that were going on
5  legislatively that impacted the airline world.  If
6  International sent out an update that they wanted
7  us to also send out to our members, they -- they
8  emailed our members separately and then we would
9  sometimes, you know, reiterate communications for
10 them as well.
11      Q.  Okay.  Now, was there a means for the
12 members to communicate back to the COPE committee?
13      A.  Yes.  Some of the emails -- all of our
14 committees have email -- usually have an email -- a
15 designated email address, but the communications
16 committee is who actually sent out our emails.  And
17 so depending the reply, however com set it up, some
18 of those would go direct -- directly back to
19 communications; some would go directly back to the
20 committee.
21      Q.  Okay.
22      A.  As in the committee chairpersons.
23      Q.  Okay.  All right.  And you said that you
24 became president in 2013; is that correct?
25      A.  Yes, it is.

Page 28

1      Q.  Okay.  And did you -- did you run for
2  president?
3      A.  At that time, no, I had not.
4      Q.  Okay.  How did you come to be president in
5  2013?
6      A.  As I had stated earlier, I had run for the
7  first vice president position in the 2012 election.
8  I lost that election.  And in -- around May 2013,
9  there -- our top five national officers, two of
10 them resigned; and the other three national
11 officers were removed from office by the executive
12 board under the TWU International Constitution, as
13 well as our local bylaws.
14      And under our bylaws, which govern
15 local business -- again, in conjunction with the
16 TWU Constitution, if there is a vacancy in any
17 position for 18 months of the term, then the person
18 that had the next-highest votes for that position
19 in the election, the position goes to them with the
20 exception of the presidency.  And then any vacancy
21 of the presidency, whether it's in the first half
22 or the last half of the term, the first vice
23 president moves up into the position of president.
24      So when resignations occurred of two
25 of the officers in May 2013, those two positions

Page 29

1    went to the people that had -- had the next-highest
2    votes in the previous year's election.  And then
3    the first vice president was the first position
4    removed by the executive board.  And upon his
5    removal, the first vice presidency went to me.  I
6    assumed the first vice president position.  And
7    shortly thereafter, both the treasurer and the
8    president were removed from office as well.  And I
9    then I assumed the role of the president.
10       Q.  Okay.  And I am sorry, you said the
11   treasurer and the -- the president were removed?
12       A.  Yes.  The -- it was -- it was total of the
13   first vice president, the president and the
14   treasurer.
15       Q.  Okay.  And who was the treasurer that was
16   removed?
17       A.  Jerry Lindemann.
18       Q.  Okay.  And who was the president who was
19   removed?
20       A.  Stacy K. Martin.
21       Q.  And I apologize for my confusion.  The --
22   the first vice president was removed as well?
23       A.  Yes.
24       Q.  Okay.  And who was the first vice
25   president who was removed?

Page 30

1    A.  Chris Klein (phonetic).
2       Q.  All right.  All right.  And I think you
3    had referred to the officers as national officers;
4    is that right?
5       A.  Yes.
6       Q.  Okay.  And I guess I am trying to
7    understand the term "national."  The -- these were
8    the Local 556 officers, correct?
9       A.  Correct.
10      Q.  Okay.  The union just refers to them as
11   national officers?
12      A.  In our executive board elections, there
13   are -- there are positions that are voted on what
14   we would call nationally, so all domiciles -- all
15   members and all domiciles vote for those positions.
16   And then there are some positions on the executive
17   board that are only voted on locally by the members
18   in that individual domicile.  And then the
19   Constitution defines the positions of officers.
20      Q.  Okay.  All right.
21      A.  So any position amongst our Local 556
22   executive board that is voted on nationally is
23   considered a national position.  And then the top
24   five positions are officers that are elected
25   nationally.

Page 31

1       Q.  Okay.
2       A.  For instance, a domicile executive board
3    member is only voted on locally by the members in
4    that domicile.
5       Q.  Okay.  Okay.  I understand.  Now, during
6    your time as shop steward, did you also represent
7    flight attendants at fact-finding meetings?
8       A.  I did.
9       Q.  Okay.  And so would you say that you've --
10   you've represented 100 employees or flight
11   attendants at fact-finding meetings in your time as
12   a shop steward?
13      A.  Probably.
14      Q.  Okay.  I was just trying to get a general
15   idea.  I assumed it would be many.
16           Now, I guess, have you represented
17   many flight attendants for social media violations?
18      A.  I've represented a few.
19      Q.  Okay.  So it's -- it's fair to say you
20   have represented maybe less than 10 for social
21   media violations?
22      A.  Yes.
23      Q.  Okay.  So while shop steward, who -- who
24   have you represented for social media policy
25   violation?

Page 32

1       A.  As a shop steward, I -- I don't -- I don't
2    know a name off the top of my head that I have
3    represented as a shop steward.
4       Q.  Okay.  Have you ever represented Brett
5    Nevarez for a social media policy violation?
6       A.  Yes.  It was not a fact-finding meeting,
7    though.
8       Q.  Okay.  Was it an investigation conducted
9    by the company?
10      A.  No.  It was a mandatory meeting.
11      Q.  Okay.
12      A.  Mandatory meetings are different than a
13   fact-finding meeting.
14      Q.  Okay.  And what is a mandatory meeting?
15      A.  A mandatory meeting is not an
16   investigation.  A mandatory meeting is where they
17   want to have a discussion with the flight
18   attendant, but they tell you in advance that no
19   discipline will be issued because they are not
20   conducting an investigation, but they want to have
21   a discussion.  And in any discussion with a member
22   of management, a member has the right to have union
23   representation present for that discussion.
24      Q.  Okay.  And did -- in this case, Brett
25   Nevarez was called in for a mandatory meeting?

Page 33

1      A.  Yes.
2      Q.  Okay.  And did Brett ask you to represent
3  him at that meeting?
4      A.  Yes.
5      Q.  Okay.  And what was that mandatory meeting
6  about?
7      A.  That meeting was about something he had
8  posted on his wall that someone had complained to
9  Southwest Airlines about.
10     Q.  And what had Brett posted to his wall?
11     A.  I don't recall.  I -- that was over --
12  that was a year and a half ago.
13     Q.  All right.  Do you know who reported him?
14     A.  I don't know who reported him.  I don't
15  know who reported him.  The -- what was discussed
16  was just reminding him about the social media
17  policy.  And, again, I don't recall specifically
18  what he posted, but I believe it was in regards to
19  one of the lawsuits that had been filed against
20  Local 556.  And that was why there was an
21  investigation and there was no discipline that
22  could be issued because it was a lawsuit that was
23  public information.
24     Q.  Okay.  And who did -- who did you and
25  Brett meet with regarding the -- the votes?

Page 34

1      A.  We met with one of the regional managers,
2  Dave Kissman; and the Las Vegas base manager, Joe
3  Hux, was there taking notes.
4      Q.  Okay.  All right.  Now, did you ever
5  represent other employees, other flight attendants
6  for social media policy violations?
7      A.  As a shop steward?
8      Q.  In any capacity.
9      A.  Yes.
10     Q.  Okay.  And who else did you represent?
11     A.  I attended a Step 2 meeting along with the
12  actual grievance specialist and -- for Brian
13  Talburt.
14     Q.  Okay.  And did you represent any other
15  Southwest flight attendants who were, I guess,
16  being investigated for a social media policy
17  violation?
18     A.  In an actual meeting or just, in general,
19  as -- in my role?
20     Q.  In general.
21     A.  Yes.
22     Q.  Okay.  And -- and who else?
23     A.  I couldn't even go through -- I don't even
24  know the names of all of the flight attendants.
25  There are a number of -- a large number of flight

Page 35

1  attendants that I, as my role as president and
2  assisting grievance staff, spoke to and advocated
3  for.  I know -- I can give you some of their names.
4      Q.  Sure, yeah.  Who -- who do you recall?
5      A.  Michelle Foley, Mary Ellen Matter, Holly
6  Imamovic, Bill Holcomb, Rena Senel (phonetic).
7      Q.  Okay.  And for Michelle Foley, what do you
8  recall about the social media violation that he or
9  she was accused of?
10     A.  She -- she and another flight attendant
11  had attended a concert for a country -- a country
12  musician who had a song out at that time or shortly
13  before about getting drunk on an airplane.  And
14  they had posted photographs, I believe.  I haven't
15  looked at -- I haven't looked at any of that in
16  years, but I believe they posted photographs of --
17  of going to the concert and holding, I think,
18  posters about -- about Southwest flight attendants
19  getting people drunk on a plane.
20          And it was in reference to the song,
21  but I believe they received 30-day suspensions for
22  the -- the photos that they posted and what had
23  been tagged.
24     Q.  Okay.  And at what point did you step in
25  and advocate on their behalves?

Page 36

1      A.  We had, at that time, in a very short
2  window, a lot of social media cases that had come
3  through.  And my grievance chair had let me know
4  that we -- we had just more than we had ever seen
5  at that point and they were coming through quickly.
6  Most of them were 30-day suspensions.
7          So she had come to me looking for
8  guidance on, you know, how best to approach that
9  because it just wasn't something we had -- we had
10  really dealt with much at that point within our
11  local.
12     Q.  Okay.  What -- around what time frame was
13  that?
14     A.  This was early 2015.
15     Q.  Okay.  And -- and who was the grievance
16  chair you referred to?
17     A.  Becky Parker.
18     Q.  Okay.  Was she the only grievance chair or
19  was she a co-chair?
20     A.  At that point, she was the only grievance
21  chair.
22     Q.  Okay.  And had Southwest already issued
23  the 30-day suspensions before Becky Parker came to
24  you?
25     A.  Yes.  They issued numerous 30-day

Page 37

1 suspensions for -- for a number of employees.
2     Q. Okay. And, specifically, Southwest had
3 issued 30-day suspensions in the case of Michelle
4 Foley and this other flight attendant?
5     A. Yes. I believe that one was -- I believe
6 it was Mary -- Mary Ellen Matter that was with her.
7     Q. Okay. And you -- I think you -- so did
8 you advocate on behalf of Michelle and Mary
9 Ellen --
10     A. Yes.
11     Q. -- after -- sorry. I apologize. I am
12 slow with my question. So after hearing from --
13 from Becky, you -- you advocated for Michelle and
14 Mary Ellen Matter to the company?
15     A. Yes.
16     Q. Okay. And had they filed a grievance yet?
17     A. Yes.
18     Q. Okay. And what -- I guess, what -- what
19 did you say to the company?
20     A. There were -- I advocated for them, along
21 with numerous other flight attendants, about the
22 social media -- all of the discipline we had at
23 that time under social media. So it was part of a
24 group discussion with -- with the -- ultimately
25 ended up being the vice president of inflight that

Page 38

1 I met with to discuss all of the social media
2 issues, including Michelle and Mary Ellen Matter's.
3     Q. Okay. And who is the VP of inflight at
4 that time?
5     A. Mike Hafner.
6     Q. And what did you say to -- to Mike
7 Hafner in that meeting?
8     A. I told him that we had -- I had, you know,
9 tried to have conversations with leaders on the
10 lower level about the amount of social media
11 discipline that they were suddenly issuing after we
12 had only seen one or two cases really over a few
13 years' time. And that there seemed to be
14 inconsistencies both base to base; there were
15 inconsistencies regarding whether there was a nexus
16 to work under their definition, that some of the
17 social media violations weren't even -- it wasn't
18 even reported by an employee.
19     There -- it was straight social media.
20 There was no bullying or harassment that had been
21 cited along with many of those. And that we were
22 going to -- that we were having conversations with
23 our attorney on how to best approach those. And
24 that we would look at taking --
25     MR. GREENFIELD: Audrey -- Audrey, if

Page 39

1 I may jump in for a moment. I would, please,
2 advise you that any conversations that stemmed from
3 -- which you had with counsel for Local 556 during
4 that time, that we keep those confidential as those
5 are protected by the attorney/client privilege.
6 And I will instruct you not to base any of your
7 answers on those conversations.
8     And while we're on the record at this
9 point, I would like to make it clear that Ms. Stone
10 is here in her individual capacity and not as a
11 representative of TWU Local 556 at this time; that
12 she is here in her individual capacity and has her
13 own legal counsel. You may continue. I am sorry
14 to interrupt, Matt.
15     MR. GILLIAM: No. You are fine.
16 Understood.
17     Q. (By Mr. Gilliam) Do you need the question
18 read back, Ms. Stone, so you can answer or --
19     A. No.
20     Q. Okay.
21     A. So -- so I was stating that I had stated
22 to Mike Hafner that we were exploring all options
23 on how to approach this sudden influx of social
24 media and what appeared to be inconsistencies with
25 how Southwest was applying it to flight attendants.

Page 40

1     And in that conversation, you know, he
2 asked me if he had an opportunity to look at all of
3 the cases that I brought forward, you know, what
4 was my request. And I told him I was -- you know,
5 specifically asked to meet with him because I
6 hadn't -- you know, that my team had not gotten
7 anywhere speaking to, again, the lower levels of
8 management. And that I hoped he would look at
9 every single case.
10     And, like I said, there were various
11 cases in that batch. There were senior flight
12 attendants, there were junior flight attendants.
13 There was one who was actually on probation; I
14 mentioned her name earlier. There were -- one of
15 them was in union leadership. And there were
16 others in that batch of social media cases who were
17 nonmembers of the union as well. So it was a wide
18 range of flight attendants and I had advocated for
19 them all and asked him to take a look. And he
20 agreed -- he agreed that he would.
21     I gave him the list of every single,
22 you know, name, at that time, of flight attendant
23 we had an active social media grievance for.
24     Q. Okay. And when was it that you met with
25 Mike Hafner?

Page 41

1    A.  I believe it was March 2015.
2    Q.  Okay.  And was this one meeting or a
3  series of meetings you had with Mike Hafner?
4    A.  No.  It was just that one meeting.
5    Q.  Okay.  And after -- well, let me ask
6  first:  Was it just you and Mike Hafner in that
7  meeting?
8    A.  Yes.
9    Q.  Okay.  And -- and where did the meeting
10  take place?
11    A.  Meeting took place at my office.
12    Q.  Okay.  All right.  And after having that
13  meeting with Mike Hafner, did he respond at some
14  point to what -- what you had presented to him?
15    A.  He did.  He contacted me, I believe, the
16  next day -- within the next day or two.  And he
17  said that he was going to have someone contact me
18  directly about settlement offers for -- for all of
19  the -- the cases.
20    Q.  Okay.  And when he responded to you, did
21  he communicate anything else?
22    A.  I -- when I had talked to him, I had asked
23  to -- outside of the -- the cases that were in
24  front of us, I felt like we needed to have further
25  conversations about social media activity amongst

Page 42

1  our work group.  And had said that I hoped we could
2  continue having conversations regardless of the
3  outcome of the individual cases about how Southwest
4  was going to handle, you know, social media
5  specific to our work group going forward.
6       So when he contacted me to follow back
7  up, it was just specific to the active grievances
8  and said, you know, we would try to have future
9  conversations going forward about the second part
10  of my request to -- to, again, just -- just
11  continue the conversation about social media and
12  how the policy was being applied to flight
13  attendants.
14       Because they had indicated that flight
15  attendants -- of all of the work groups at
16  Southwest Airlines, flight attendants were the ones
17  that were most prolific at use -- utilizing social
18  media and the department that had the highest
19  number of social media activity.
20    Q.  Okay.  And did someone reach out to you
21  regarding settlement of those specific cases?
22    A.  Yes.
23    Q.  Okay.  And who was that?
24    A.  Naomi Hudson, who was the senior director
25  of labor relations.

Page 43

1    Q.  Okay.  And when did Naomi Hudson reach out
2  to you?
3    A.  She reached out to me, I believe, the next
4  day after Mike Hafner had called me.
5    Q.  Okay.  And what was the -- the offer, if
6  any, that Naomi Hudson presented?
7    A.  Well, we -- we set up a meeting -- a time
8  to meet.  And she sat down and offered settlements
9  on all but one of the active social media
10  grievances, including, I mean -- on a -- well, all
11  of them.  Some had -- some, the board had not heard
12  yet; some, the board had voted to proceed on; some,
13  the board had voted not to proceed on.  She offered
14  settlements on all of them except for one, and that
15  was the probationary.
16       And all of the settlements were -- for
17  the people that were suspended or terminated, it
18  was to bring them back and remove the suspensions.
19  I believe, most of them, it was converted to a
20  written warning in their file.  And they offered
21  back pay as well for most of the flight attendants
22  that had been on a suspension.
23    Q.  Okay.  And did -- were -- were some of the
24  people who, I guess, obtained one of the -- well,
25  who was offered a favorable settlement, had -- was

Page 44

1  -- the discipline involved termination?
2    A.  Yes.
3    Q.  Okay.  All right.  Do you remember about
4  how many cases were involved in that settlement
5  offer?
6    A.  Off the top of my head, there were
7  probably at least 10.  They were -- and they had
8  all been issued in, I think, less than a 90-day
9  time frame.  We had gone from zero social media
10  cases to -- I guess, had 10 to maybe 15 at that
11  time.
12       And -- and the -- the one -- the one
13  that she didn't want to offer a settlement on
14  because it was a probationary flight attendant and
15  there -- therefore, not covered by the contract,
16  you know, regarding the same union rights in terms
17  of discipline, I pushed back and was able to have
18  that probationary -- who had been terminated as
19  well, I was able to have her brought back too.
20    Q.  Okay.  Do you remember the name of that
21  probationary flight attendant?
22    A.  Rena Senel.
23    Q.  Okay.  And I think you mentioned some of
24  the names earlier.  I guess I will -- I will go
25  through the list.  Was -- was Brian Talburt part of

Page 45

1    that settlement?
2        A. Yes.
3        Q. Okay.  Was -- Michelle Foley part of that
4    settlement?
5        A. Yes.
6        Q. Okay.  Was Mary Ellen Matter part of that
7    settlement?
8        A. Yes.
9        Q. Okay.  Was Holly Imamovic part of that
10   settlement?
11       A. Yes.
12       Q. And was Bill Holcomb part of that
13   settlement?
14       A. Yes.
15       Q. Okay.  Do you remember any other names,
16   other flight attendants who were part of that
17   settlement?
18       A. Those are the ones I remember off the top
19   of my head.  There were others, but I don't recall.
20       Q. Okay.  Now, are you familiar with the term
21   "last-chance agreement"?
22       A. Yes, I am.
23       Q. Okay.  Now, these -- I guess, as part of
24   this settlement, did these employees have to sign a
25   last-chance agreement?

Page 46

1        A. I believe so.
2        Q. Okay.  All right.  And I guess I don't
3    want to misstate what you said, but you seemed to
4    have indicated an increase in the social media
5    policy violation maybe within the prior 90 days or
6    so.  Please correct me if I am wrong.  But in 2014,
7    had you seen many social media policy violations?
8        A. No.
9        Q. Okay.
10       A. And may I go back to a previous question?
11       Q. Sure.
12       A. You had asked about last-chance
13   agreements, and I said I believe so, but I am
14   trying to visualize because that was -- it was five
15   and a half years ago.  They were much shorter.  I
16   am not certain that they were last-chance
17   agreements.  The last-chance agreements are usually
18   longer documents; they are -- got a lot of legalese
19   in them.  They required employees to sign them.
20           And I don't recall -- I don't recall
21   those steps taking place for those social media
22   issues in 2015.  I -- I think they were more of the
23   general settlement offers that are -- that -- that
24   happen regularly between the union and Southwest
25   Airlines for grievances.

Page 47

1        Q. Okay.
2        A. Again, I haven't looked at any of those in
3    years, but in visualizing them, I believe they were
4    just regular settlement offers, not last-chance
5    agreements.
6        Q. Okay.  And so those -- those agreements
7    evolved, in a way, over your time as president?
8        A. I don't understand your question.
9        Q. Yeah.  Sure.  So the -- I guess, the --
10   the settlement agreement that -- well, no.  Just --
11   I'll -- I'll withdraw the question.
12           Going -- going back to 2014, do you
13   know if there would, say, be 10 social media policy
14   violations in a year?
15       A. I -- I don't think we had even seen -- I
16   don't believe so.  I don't think we had 10 the
17   whole year in 2014, to my recollection.
18       Q. Okay.  Might it have been less than five?
19       A. It might have been.
20       Q. Okay.  And I referred to social media
21   policy violations, but at this time, in 2015, did
22   -- did Southwest have several different policies
23   that could be involved based off of a flight
24   attendant's social media activities?
25       A. Southwest had other policies in place in

Page 48

1    2015, but to my recollection, the specific cases
2    we've been -- or you have been asking me about,
3    those, I believe, the majority of those flight
4    attendants was just cited with social -- with
5    social media -- violation of the -- the social
6    media policy.  Again, to my -- to my recollection.
7           But there were other policies in
8    place, yes.  Both via Southwest Airlines' general
9    policies for employees, as well as our specific --
10   at the time, it was called a -- working conduct
11   rules that applied just to flight attendants as
12   well.
13       Q. Okay.  Was there a bullying and hazing
14   policy at the time in 2015?
15       A. Yes, I believe so.
16       Q. Okay.  Do you know if any -- any flight
17   attendants were being called in for a violation of
18   the workplace bullying and hazing policy that --
19       A. I don't know -- sorry.
20       Q. No, that's my fault.  Yeah, I was going to
21   say, were they being called in for a violation of
22   the workplace bullying and hazing policy that
23   stemmed from their -- their social media
24   activities?
25       A. I don't recall that there were any

Page 49

1 specifically addressing that.
2    Q. Okay. And did Southwest also have a, I
3 guess, sexual harassment and discrimination policy
4 at that time?
5    A. Yes.
6    Q. Okay. And do you know if any flight
7 attendants were getting called in because their
8 social media activity was alleged to have violated
9 that sexual harassment, discrimination policy?
10    A. Again, I don't recall that specifically.
11 Because all of my conversations that I was having
12 with Southwest leadership that I had just spoken to
13 were specific to the social media violations.
14    Q. Okay. Now, I want to go back a second.
15 You mentioned Brian Talburt. Who -- who was Brian
16 Talburt?
17    A. He's a Southwest Airlines flight
18 attendant.
19    Q. Okay. And he is still a Southwest flight
20 attendant?
21    A. Yes.
22    Q. Okay. And has he held any positions with
23 the union?
24    A. He's not held the elected positions. He
25 has held, I believe, positions helping the

Page 50

1 negotiating team. And I think the first one was
2 called pre- -- the precinct captain program, before
3 my time. And then we had our version of one at the
4 beginning of our negotiations -- was called the
5 contract action network. So he was one of our --
6 our flight attendants that was on that.
7    Q. Okay. And what is the contract action
8 network?
9    A. They were flight attendants brought in
10 from all of the domiciles to meet with the
11 negotiating team and our strategic advisor and talk
12 about how best to educate our flight attendants.
13 Because we are a large work group spread out across
14 the country, what communication channels should we
15 be using to talk to them to direct people to
16 information about negotiations.
17    They would do what we would call
18 lounge mobilizations where we would have a
19 coordinated day, we would publicize it in advance
20 and let our members know that on this day, in all
21 domiciles, during these times, members of your
22 negotiating team, flight attendants on our contract
23 action network, would be in the lounges to answer
24 questions about negotiations, what was going on.
25    So they were an additional kind of

Page 51

1 bridge to help funnel communication and information
2 from the negotiating team to help dis- --
3 disseminate it to the membership.
4    Q. Okay. And did you call this CAN for sure
5 -- short?
6    A. Yes.
7    Q. And about how many flight attendants were
8 -- were involved in the contract action network?
9    A. I -- initially, I believe we had two to
10 three per domicile; so 20-plus. And then we -- we
11 had people, you know, sign up to be an additional
12 part of that. I don't know what the total number
13 ended up being.
14    Q. Okay. And when -- when was Brian Talburt
15 part of the contract action network?
16    A. I believe -- I believe we put that in
17 place in 2014.
18    Q. Do you know if he's continuously been
19 involved with the contract action network?
20    A. No, he hasn't. We -- we -- the work with
21 contract action network ended in 2015.
22    Q. Okay. And why did that end in 2015?
23    A. After the first tentative agreement
24 failed, that particular committee ended.
25    Q. Okay. And was -- was -- did -- did the --

Page 52

1 did anyone decide to end the contract action
2 network committee because it was deemed to be
3 unsuccessful in light of the -- the tentative --
4 tentative agreements' rejection?
5    A. No, it wasn't that. It was that we just
6 -- we -- we revamped everything. Even our
7 negotiating team had a change of members. We -- we
8 took a reset with everything related to bargaining
9 after that. And that was related to our bargaining
10 agreement.
11    Q. Okay. And do you know when Brian Talburt
12 was a precinct captain?
13    A. I don't. That was before -- that program
14 was set up before I worked for Southwest.
15    Q. Okay. And do you know if Brian Talburt
16 held any other positions with the union?
17    A. No.
18    Q. No, he didn't; or, no, you don't --
19    A. Well, not to my knowledge.
20    Q. Okay. And what -- what do you remember
21 about Brian Talburt's, I guess, social media
22 violation at that time, in 2015?
23    A. He had had a converse -- there was, I
24 believe, a conversation about a flight attendant.
25 And he and another flight attendant were talking

Page 53

1  about this individual.  And I believe Brian used --
2  called him a fucktard.
3       Q.  Okay.  And do you know if the -- the
4  company actually issued any discipline against him?
5       A.  Yes.
6       Q.  Okay.  And was he -- was he terminated or
7  given a 30-day suspension?
8       A.  He was terminated.
9       Q.  Okay.  And, now, apart from the -- the
10 country music concert I think you described, do you
11 know if Mary Ellen Matter was involved in any other
12 social media policy complaints in -- in 2015?
13      A.  I don't recall.
14      Q.  Okay.  And what do you remember about
15 Holly Imamovic's, I guess, social media policy
16 violation?
17      A.  She -- I don't remember the details.  I
18 believe she had posted something and she had
19 hashtagged Southwest Airlines.  And I believe it
20 was -- it was reported by outside of Southwest.
21 And what she posted, I believe, they -- they viewed
22 as -- as a violation of the social media policy
23 because of the -- the negative image they felt like
24 it reflected on that.  But I don't -- I don't
25 remember the details specifically to that -- that

Page 54

1  -- that particular case files.
2       Q.  Okay.  Do you remember who reported her?
3       A.  No.
4       Q.  Okay.  Do you know who reported Brian
5  Talburt?
6       A.  No, I don't.
7       Q.  Okay.  And I am not -- I apologize if I
8  already asked.  Do you know who reported Michelle
9  Foley and Mary Ellen Matter?
10      A.  No.
11      Q.  Okay.  All right.  And what do you
12 remember about Bill Holcomb's social media policy
13 violation?
14      A.  Again, I don't remember the details of
15 what he posted, but I believe it was -- he was
16 having a conversation about another -- another
17 flight attendant and made a disparaging comment
18 about the other flight attendant.
19      Q.  Okay.  Do you remember the name of the
20 other flight attendant?
21      A.  No.
22      Q.  Okay.  Do you remember what the
23 disparaging comment was?
24      A.  I don't.
25      Q.  Okay.  And sorry to shift back to Brian

Page 55

1  Talburt.  I -- I don't think I asked if you knew
2  who the -- the flight attendant was that he called
3  a fucktard?
4       A.  I -- no.  I can picture his face right
5  now, but I am blanking on his -- on his name.
6       Q.  All right.  And was Holly given a
7  suspension or terminated?
8       A.  Going back to your other question, I -- I
9  believe -- I am not 100 percent certain; I believe
10 it may have been T.J. Barrenn.
11      Q.  Okay.  That -- that Brian Talburt called a
12 fucktard?
13      A.  Yes.
14      Q.  Okay.  All right.  And for -- for Holly
15 Imamovic, in 2015, was she terminated or given a
16 30-day suspension?
17          I apologize, maybe I misunderstood
18 too.  Let me -- let me back up and -- and ask the
19 question again.
20          I know this is a group of flight
21 attendants you add -- advocated before.  Were they
22 all originally terminated and you were able to
23 reduce their discipline to a 30-day suspension or
24 was it a mix of discipline -- disciplinary actions
25 that were settled in another way?

Page 56

1       A.  No.  It was not primarily terminations.
2  It was primarily 30-day suspensions with a couple
3  of terminations.
4       Q.  Okay.
5       A.  In that particular -- in this particular
6  batch that -- that I referred to as -- as the group
7  that I went to the VP with.
8       Q.  Okay.  And for that particular batch,
9  going back to Holly Imamovic's discipline, was that
10 30-day suspension originally?
11      A.  Yes.  I believe that one was a 30-day
12 suspension.  So the -- the -- the 30-day
13 suspensions were moved to written warnings, and
14 then the terminations were reduced down.  Again, I
15 don't recall the -- the specifics, but anybody
16 terminated was brought back and suspensions were
17 all removed.
18      Q.  Okay.  And Bill Holcomb, do you remember
19 if, in that 2015 batch, he originally had a 30-day
20 suspension?
21      A.  Yes.
22      Q.  Okay.  And -- and did he originally have a
23 30-day suspension?  Sorry.  I -- my --
24      A.  The same question?
25      Q.  It -- it sounded like it, but I -- I just

Page 57

1  wanted to clarify your -- yes answer.  So, yes,
2  it's correct that Bill Holcomb had a 30-day
3  suspension initially?
4      A.  Yes.
5      Q.  Okay.  Okay.  And going back in time a
6  little bit.  From the time you became president in
7  2013 to 2014, was there -- or were there many
8  social media policy violations?
9      A.  Not that I recall.
10     Q.  Okay.  And so was it your -- I guess, your
11 experience that the social media policy violations
12 started to increase at the beginning of 2015?
13     A.  Yes.  I think the -- the very end of 2014
14 and the very beginning of 2015.
15     Q.  Okay.  And why -- why do you believe there
16 was an increase in the social media policy
17 violations at the end of 2014 beginning of 2015?
18         MR. CORRELL:  Objection.  Calls for
19 speculation.
20     Q.  (By Mr. Gilliam)  And, Ms. Stone, you can
21 -- you can answer.
22     A.  I don't -- I don't know.
23     Q.  Okay.  Okay.  Let's see.
24         MR. GILLESPIE:  Mr. Gilliam, can we
25 take a quick break?  We've been going a little over

Page 58

1  an hour and a half.
2         MR. GILLIAM:  Yeah, sure, we can take
3  a quick break.
4         MR. GILLESPIE:  Okay.
5         THE VIDEOGRAPHER:  We are off record
6  at 10:39 a.m.
7         (Recess taken.)
8         THE VIDEOGRAPHER:  We are back on
9  record at 10:53 a.m.
10     Q.  (By Mr. Gilliam)  All right.  Ms. Stone,
11 when Naomi Hudson presented the offer to settle
12 some of the outstanding grievances in early 2015,
13 did you take that -- those offers directly to the
14 -- the flight attendants?
15     A.  I took them to their grievance specialist
16 that was individually handling each of those cases.
17 And they were then tasked with speaking directly to
18 each of the flight attendants regarding the
19 settlement.  So, no, I -- they were then turned
20 over back to the individual team members that
21 worked agreements.
22     Q.  Okay.  And how were the grievance
23 specialists decided?
24     A.  The grievance specialists, once they're in
25 that role, it's usually through a rotation.  The

Page 59

1  grievance chair manages that.  And the grievance
2  chair, when a new grievance would be -- would --
3  would be filed, she would assign those based off of
4  case loads to make sure that the case load was
5  evenly distributed and that there wasn't one team
6  member who had, say, 10 termination grievances and
7  another had two.
8      Q.  Okay.  And did all the flight attendants
9  end up accepting their offers?
10     A.  I believe -- I believe there may have been
11 one that -- that didn't accept theirs.
12     Q.  Okay.  And do you recall who that was?
13     A.  I think it -- it was Mary Ellen Matter.
14     Q.  Okay.  And do you know why she didn't
15 accept the offer?
16     A.  I don't.
17     Q.  Okay.  All right.  Now, did -- when --
18 when Naomi Hudson made her offer, did she do that
19 in an in-person meeting with you?
20     A.  Yes.
21     Q.  Okay.  And did anybody else attend that
22 meeting?
23     A.  No.
24     Q.  Okay.  And -- and what else did you
25 discuss with Naomi in that meeting?

Page 60

1      A.  We just discussed the -- the settlements
2  on the individual cases.
3      Q.  Okay.  And after that meeting, did you
4  have continued communications with the company
5  about the social media policies?
6      A.  I had one more conversation with Naomi and
7  with Mike on one of the -- one of the grievances on
8  the probationary.  Naomi came back to me and said
9  they were not going to bring the probationary
10 flight attendant back.  And I went back to Mike
11 Hafner and he had been -- reinstate the
12 probationary as well.
13     Q.  Okay.  And when you went back to Mike
14 Hafner, what -- what was your argument to reinstate
15 the probationary employee?
16     A.  That the -- the post she had made, the
17 grievance team, the -- the specialist that had --
18 had, you know -- was working the case, and none of
19 it believed it was a post that had she not been on
20 probation, we don't believe, you know, it -- she
21 would have even -- it would have risen to the level
22 of discipline.
23         And in my conversation -- her
24 conversation with Mike when he followed up with me
25 after our meeting, it had been my understanding

Page 61

1  that he was going to reinstate or remove everyone.
2  So I had been surprised when Naomi singled out the
3  probationary, even though I understood that a
4  probationary employee is treated differently under
5  a contract.  And so it just was -- was simply that;
6  that I had thought she was going to be included in
7  that and that I made an additional request that
8  Rena be reinstated.
9      Q.  Okay.  And as you were, I guess,
10  presenting your case for these flight attendants to
11  Mike ham -- Hafner and -- and Naomi Hudson, was
12  anyone else with the -- the union assisting you in
13  making that case?
14      A.  Not in the meetings I have been speaking
15  to, no.
16      Q.  Okay.  Were -- were any of them assisting
17  you in any other ways?
18      A.  Well, each of those cases that had a
19  grievance specialist that filed the grievance, that
20  handles all of the paperwork around that; some of
21  those flight attendants had already had Step 2
22  meetings, which is the next step in the appeal, you
23  know, process.  So there were various union
24  representatives that had been working those cases
25  up to that point that I sat down and had the

Page 62

1  meeting with Mike Hafner.
2      Q.  Okay.  Do you know if any of the union's
3  representatives were communicating directly with
4  Mike Hafner and Naomi at that time?
5      A.  No, they were not.
6      Q.  Okay.  All right.  And I think you had
7  mentioned that prior to your discussions with Mike
8  Hafner, you had tried to have conversations with
9  the -- the leaders on the lower level about social
10  media.  Would -- would those have been the base
11  managers?
12      A.  The -- my staff, our union office, the
13  grievance specialist.  Again, each of those flight
14  attendants, they were not all in the same point of
15  the grievance process, but most of them had at
16  least gone through the appeal process and their
17  appeals had been denied.  So there were numerous
18  folks having conversations on behalf of the flight
19  attendants up to that point.
20      Q.  Okay.
21      A.  Not just -- not just me.  Because, again,
22  a grievance specialist, that's -- that's what they
23  do.  My role didn't involve day-to-day processing
24  of grievances.
25      Q.  Okay.

Page 63

1      A.  It -- it was -- my team came to me if they
2  needed assistance or they felt like there was a
3  larger, more global issue that needed to be
4  addressed with the higher-up leaders because it was
5  something they were seeing not just in one
6  domicile, but across the system, as was this case.
7      Q.  Okay.  So it's correct that Becky Parker
8  came to you and felt that there needed to be more a
9  global solution, I guess, to the problems you were
10  having with the enforcement of the social media
11  policies?
12      A.  Yes.
13      Q.  Okay.  And do you know if the -- I guess,
14  the -- the grievance specialist had been trying to
15  -- well, let me -- let me withdraw that.
16          I guess -- I think you had mentioned
17  that the union had being seen -- had been seeing
18  inconsistencies in the discipline under the social
19  media policies; is that right?
20      A.  Yes.
21      Q.  Okay.  And, I guess, what -- what were
22  those inconsistencies exactly that the union was
23  seeing in discipline?
24      A.  In one example where two flight attendants
25  were talking about another flight attendant in a

Page 64

1  negative manner, one of the flight attendants was
2  terminated and the other received a written
3  warning.
4      Q.  Now, do you know why there were
5  inconsistencies in those two cases?
6      A.  No.
7      Q.  Okay.  And in those two cases, do you know
8  if different base managers were involved?
9      A.  No.  The two flight attendants came from
10  the same base.
11      Q.  Okay.  Did anyone with the union ask why
12  there was inconsistencies in treatment?
13      A.  I asked when I was having the discussion
14  with Mike Hafner.  I used it as an example to show
15  why I believed there was inconsistencies.
16      Q.  Okay.  Did Mike Hafner explain the
17  inconsistency?
18      A.  No, he did not have an answer.
19      Q.  Okay.  And I think you also mentioned
20  inconsistencies related to the nexus to work; what
21  -- what inconsistencies do you remember there?
22      A.  The -- the -- some of the social media
23  violations were conversations that were directly
24  happening between employees about other employees.
25  And others were items that someone had posted on

Page 65

1  their wall or something that they had shared not
2  with or about, you know, Southwest Airlines; no
3  other employees involved.
4      Q.  In those cases where employees posted on
5  their -- their wall not with or about Southwest
6  Airlines, do you know if they had anything on their
7  site that showed that they were a flight attendant?
8      A.  I don't know.
9      Q.  Okay.  And I -- I think you might have
10  also mentioned that the union might have been
11  exploring options on how to approach issues with
12  inconsistency.  I guess, without revealing any
13  communications you had with your attorneys, what --
14  what options were -- were you exploring regarding
15  those inconsistencies?
16      A.  Those were discussed with legal counsel.
17      Q.  Okay.  And did -- did you ever discuss the
18  -- the, I guess, different options the union had to
19  approach inconsistency with the executive board
20  outside the, I guess, presence of legal counsel?
21      A.  No.
22      Q.  Okay.  And once -- well, after Naomi
23  Hudson presented the offer for the -- the -- the
24  various flight attendants, when did you speak to
25  Naomi Hudson about those flight attendants again?

Page 66

1      A.  I didn't -- I didn't speak to Naomi about
2  the rest of the flight attendants.  I've already
3  answered that I spoke to her again regarding the
4  one flight attendant that she had excluded, who was
5  the probationary.  But after that, it was the
6  grievance specialist that handled the processing of
7  the settlements both with the individual flight
8  attendants, as well as the members on Naomi's
9  corresponding team that handled the day-to-day
10  grievance filing and resolution.
11      Q.  Okay.  And I guess what I am -- I am -- I
12  am asking:  Did you -- did you go back to Mike
13  Hafner -- and confirm that, you know -- well,
14  okay, let me back up.
15          So I -- I think maybe I understand.
16  So the -- did the grievance specialist, I guess,
17  accept those offers on behalf of those employees
18  with the persons they were corresponding with?
19      A.  Well, the flight attendant in a discipline
20  case has -- has to choose to accept it, but then
21  the grievance specialist will sign and send on
22  behalf of the flight attendant.
23      Q.  Okay.  And correct me if I am wrong, I
24  think you had also indicated too that you -- you
25  had told Mike Hafner that you -- you wanted to have

Page 67

1  an ongoing communication about social media policy
2  issues; is that right?
3      A.  Yes.
4      Q.  Okay.  And so after your -- your
5  conversation with Mike about the -- the -- I guess,
6  the probationary flight attendant, did you have
7  continuing communications with Southwest about the
8  social media policies?
9      A.  Not really.  Mike, you know, changed
10  positions and was -- at some -- I believe it was
11  sometime later that year, no longer the vice
12  president of our department.  We got a new vice
13  president of inflight and she wasn't -- she just --
14  the conversations didn't happen once she took over
15  in that position.
16      Q.  Okay.  And who was the new vice president
17  of inflight?
18      A.  Sonya Lacore.
19      Q.  Okay.  Did you try to speak to Ms. Lacore
20  about the social media policy issues?
21      A.  I did.
22      Q.  And did -- I guess, were -- were -- were
23  your efforts to discuss those with her
24  unsuccessful?
25      A.  They just didn't go anywhere.  It had been

Page 68

1  on a -- I think a -- kind of a list that Mike had
2  handed down to her of things that were in the --
3  you know, in the works or on the table, for lack of
4  a better word, with the union.  And they appear, to
5  me, to be very -- just they were different kind of
6  leaders and it just wasn't -- I asked and it just
7  wasn't something that she was -- appeared to be
8  interested in carving time out to really, you know,
9  dig down into.
10      Q.  Okay.  Do you remember when that was you
11  -- you approached Ms. Lacore?
12      A.  It was shortly after Mike left his
13  position.
14      Q.  Okay.  And when did Mike leave his
15  position?
16      A.  I don't recall exactly, but I believe it
17  was -- I believe it was in December of 2015.
18      Q.  Okay.  All right.  Now, earlier, I think
19  you mentioned your -- your involvement on a few
20  different committees.  Now, as -- as president, did
21  you regularly participate in all of the different
22  union committees?
23      A.  No, not regularly.
24      Q.  Okay.  Now, I guess, I am not sure if --
25  okay.  Let's -- I did ask that.

Page 69

1  So what -- what were your day-to-day
2  responsibilities as president?
3  A.  I was responsible for sharing our
4  executive board meetings, communicating with our
5  executive board, keeping them in the loop on
6  anything going on.  My position is one of the few,
7  under our bylaws, that does require that I be in
8  Dallas at our union office on a full-time basis.
9  I was responsible for sharing myself
10  or my designee.  And -- and we do have a caveat in
11  our bylaws for a designee, which is usually one of
12  the vice presidents under all the presidential
13  duties, for the membership meetings that had to
14  take place at least three times a year.  And all of
15  our -- discussion in all of our domiciles.
16  I was responsible for overseeing
17  Section 6 bargaining, our contract negotiation with
18  Southwest Airlines, as well as the negotiating
19  team.  I was responsible for overseeing the
20  grievance team.  The grievance chair reported to
21  me.  I was responsible for staffing the union
22  office.
23  I mentioned I was the chairperson
24  under our TWU Constitution.  I also forgot that,
25  under our Constitution, I became the mobilization

Page 70

1  organizing committee chairperson when that
2  committee was formed.  Our -- because our
3  Constitution stated the president had to be the
4  chair of the organizing committee.  So I oversaw
5  that committee.
6  I was responsible for writing
7  president reports, overseeing communications about
8  negotiations, anything related to negotiations.
9  Was responsible for communicating about -- to the
10  executive board regarding, you know, any topics,
11  anything going on with Southwest Airlines.  I also
12  was responsible in attending quarterly meetings
13  with the other union leaders on property, as well
14  as attending Southwest Airlines' labor earnings
15  briefing every quarter.  I am just trying to think
16  if there is anything I've --
17  Q.  Sure.
18  A.  -- not listed.  I was responsible for --
19  either myself or someone else -- if our committees
20  were meeting for, you know, an annual training,
21  things like that; was -- was responsible to speak
22  to them on behalf of 556 or ensure I had a
23  representative designee go.  I also oversaw our new
24  hire -- the flight attendants that were in
25  training.

Page 71

1  I am sorry.  I forgot about that as
2  well.  I was, at one point, the new-hire committee
3  chairperson.  So I spoke to -- schedule permitting,
4  myself or a designee spoke to the flight attendant
5  candidate training classes, as well as oversaw the
6  dinner that the union hosted at our offices
7  following that.  I was responsible for hiring and
8  filling any vacancies we had on the grievance
9  staff.  That's all I can think of.
10  Q.  Okay.  And if you remember any more, we
11  can -- you know, you can mention it later.  I did
12  have a question.  What -- what does the mobilizing
13  and organizing committee do?
14  A.  The -- the organizing committee is defined
15  in our TWU Constitution.  We're -- we're -- each
16  local is supposed to have one.  Locals within TWU
17  work differently.  We -- our members -- Southwest
18  Airlines flight attendants are required to be a
19  member to be a part of 556.  So we looked at how --
20  within an organizing world, how can we, you know,
21  organize our flight attendants; what would that
22  look like with our group in terms of mobilization;
23  how to get more flight attendants active within the
24  union.
25  And the mobilization organizing

Page 72

1  committee really worked closely with the
2  negotiating team as kind of -- to help the
3  negotiating team with any of the efforts going on.
4  Like with CAN, for example; to help the negotiating
5  team, you know, get information to the members that
6  were going to be out there doing lounge
7  mobilizations; to bring feedback back to the
8  negotiating team.
9  We needed to know about what kind of
10  activities would our members, you know, like to be
11  involved in just to get people more involved, more
12  mobilized, more aware of what was going on,
13  particularly around contract negotiations because
14  that was the focus for us at that time.
15  Q.  Okay.  Did it -- did it address issues
16  related to employees who elected to be nonmembers
17  of the union as opposed to full-dues-paying
18  members?
19  A.  No.  Not at all.
20  Q.  Okay.  All right.  So when you became
21  union president, was there already a collective
22  bargaining agreement in place?
23  A.  There was, yes.
24  Q.  Okay.  Do you recall when that collective
25  bargaining agreement was set to expire?

Page 73

1     A.  Our collective bargaining agreements don't
2  expire because we fall under the Railway Labor Act.
3  And under the RLA, they become amendable.
4     Q.  Okay.  The -- the -- the collective
5  bargaining agreements do have an end date on them,
6  correct?
7     A.  They have an amendable date, not an
8  expiration date.  They remain in effect until a new
9  contract is brought up -- is negotiated and
10  ratified.
11     Q.  Okay.  So if a contract has on the front
12  page it's effective from a certain date to October
13  of 2018, then the October 2018 is the amendable
14  date?
15     A.  That's correct.
16     Q.  Okay.  All right.  And after you became
17  president, when did the CBA that was existing at
18  the time first become amendable?
19     A.  June 1st, 2013.
20     Q.  Okay.  And had -- well, were -- were
21  negotiation -- okay.  So did negotiations start
22  sometime after June 1st, 2013?
23     A.  Yes, they did.
24     Q.  Okay.  And you participated in those
25  negotiations?

Page 74

1     A.  Yes, I did.
2     Q.  Okay.  And, now, is the -- the process,
3  basically, Southwest and the union negotiates until
4  they reach a tentative agreement?
5     A.  Yes.
6     Q.  Okay.  And do they try to reach -- well,
7  again -- again, just for my understanding, I mean,
8  are they negotiating to reach a tentative agreement
9  on all issues or do they reach just a tentative
10  agreement on a document as a whole?
11     A.  The tentative agreement for our contract
12  is on the document as a whole, the entire
13  collective bargaining agreement.
14     Q.  Okay.  And when -- do you recall exactly
15  when negotiations started after June 1st, 2013?
16     A.  I believe it was around June 10th.
17     Q.  Okay.  And how -- well, when did -- so
18  after June 10th, when negotiations began, when did
19  Southwest and the union reach a tentative
20  agreement?
21     A.  We reached a tentative agreement, I
22  believe, early July 2015.
23     Q.  Okay.  And were Southwest and the union
24  negotiating continuously between June of 2013 and
25  July of 2015?

Page 75

1     A.  Yes.
2     Q.  Okay.  And so do -- do they have meetings
3  -- do the negotiating teams have meetings about
4  once a month?
5     A.  No.  We usually met more frequently than
6  that.
7     Q.  Okay.  Okay.  So it was more frequently
8  than once per month.  Was there ever a hiatus --
9  well, that's probably the wrong term to use.
10        Was there ever a -- I guess, a break
11  in the negotiations in the sense that there was
12  some window between June 10th and early July 2015
13  where the parties weren't negotiating?
14     A.  No.
15     Q.  Okay.  All right.  And when Southwest and
16  the union reached a tentative agreement in July of
17  2015, did the union's negotiating team take that
18  tentative agreement to the executive board?
19     A.  Yes, they did.
20     Q.  Okay.  And did the executive board vote to
21  submit that to the membership?
22        MR. GREENFIELD:  And, Ms. Stone, I am
23  going to ask you to refrain from providing
24  testimony to the extent the executive board was in
25  executive session with legal counsel present, as

Page 76

1  it's attorney/client privilege.  But you may answer
2  if -- if it does not include that.
3        THE WITNESS:  Okay.
4     A.  Yes, the executive board put the tentative
5  agreement out to the membership for a vote.
6     Q.  (By Mr. Gilliam)  Okay.  And is that the
7  typical practice that when -- when there is a
8  tentative agreement -- agreement reached between
9  the two parties, that the executive board has a
10  vote whether to, I guess, submit it to the
11  membership or not?
12     A.  Yes, it's outlined in our TWU Local 556
13  bylaws.
14     Q.  Okay.  When that -- what happened when the
15  -- that tentative agreement was presented to the
16  membership?
17     A.  It was rejected.
18     Q.  Okay.  And when -- when did they vote?
19     A.  I don't recall the specific dates that
20  they voted.  It was voted on in July of 2015.
21     Q.  Okay.  All right.  So after July -- I am
22  sorry.  After the membership voted to reject the
23  first TA in July of 2015, did the negotiating team
24  go straight back to the negotiating table?
25     A.  No, we did not.

Page 77

1    Q.  Okay.  When did negotiations between the
2  two sides resume?
3    A.  I believe it was the end of 2015.  I
4  believe it was November, December of that year.
5    Q.  Okay.  All right.  And did the parties
6  reach another tentative agreement at some point
7  after that?
8    A.  Yes, we did.
9    Q.  Okay.  And when did they reach a second
10  tentative agreement?
11    A.  That agreement would be end -- the very
12  end of September 2016.
13    Q.  Okay.  And were negotiations, I guess,
14  continuous between the company and the union from
15  the time they resumed towards the end of 2015 and
16  the end of September 2016?
17    A.  Yes.
18    Q.  Okay.  And were -- were negotiations -- I
19  guess, were -- were negotiation meetings held on
20  about a weekly basis?
21    A.  Usually it was at least twice a month,
22  typically scheduled for two- to three-day
23  increments at a time, but depending on, you know,
24  if there was a lot of progress being made, we had
25  some meetings where we went four or five days in a

Page 78

1  row.
2    Q.  And -- and what you've described in terms
3  of the frequency of -- of negotiations, was that --
4  was that the same with the prior tentative
5  agreement or was that just for the second tentative
6  agreement?
7    A.  No.  That -- that was the -- the typical,
8  you know, of at least twice a month for a few days;
9  just average, all parties' schedules permitting.
10  And either side could always request additional
11  dates as needed.
12    Q.  Okay.  And -- and when -- when the company
13  and the union reached a tentative agreement at the
14  end of September 2016, is -- does that agreement
15  include an agreement on the next amendable date?
16    A.  Yes, it does.
17    Q.  Okay.  And what was the new amendable date
18  that the company and the union agreed to in the
19  second TA?
20    A.  October -- that contract went through
21  October 31st, 2018.  So November 1st of 2018 would
22  have been the -- the first amendable date.
23    Q.  Okay.  And do you know if it was sort of
24  standard to agree on an amendable date two years
25  out?

Page 79

1    A.  It was a shorter duration than some of the
2  previous contracts had been.
3    Q.  Okay.
4    A.  Let me clarify.  Just in terms of from
5  when it was ratified to when it became amendable,
6  but we had been in bargaining since 2013, so the
7  total duration of the contract was a -- was a five
8  -- over-five-year contract.
9    Q.  Okay.
10    A.  The start date goes back to the amendable
11  date.
12    Q.  Okay.  And did the executive board approve
13  submission of the second tentative agreement to the
14  membership?
15    A.  Yes.  They did.
16    Q.  Okay.  And did the membership vote to
17  ratify the second tentative agreement?
18    A.  Yes, they did.
19    Q.  Okay.  So do you recall when the second --
20  well, I am sorry.  Do you recall -- yeah.  Do you
21  recall when the -- the membership ratified the
22  second tentative agreement?
23    A.  October 31st, 2016.
24    Q.  Okay.  And did the company and the union
25  sign it sometime thereafter?

Page 80

1    A.  It was signed, I believe, in January of
2  2017.
3    Q.  Okay.  So once the new, I guess, contract
4  was signed in January 2017, did the negotiating
5  teams for Southwest and the union meet anymore?
6    A.  Yes.  We had a few additional meetings.
7    Q.  And did those meetings take place after
8  January 2017?
9    A.  Yes.
10    Q.  And is the purpose of meeting to discuss
11  the next contract?
12    A.  No.
13    Q.  Okay.  Okay.  And if you can say, what is
14  the purpose of -- of the meetings that were held
15  after the collective bargaining agreement was
16  signed?
17    A.  First, it's to develop an implementation
18  schedule.  So any -- any changes in an agreement,
19  you then have to negotiate when they are going to
20  be implemented.  It's not a simple it's ratified
21  on October 31st and everything goes into effect the
22  next day, particularly anything that requires
23  reprogramming or technology.
24        So -- so there is some things that you
25  hammer out in advance, like when a new pay rate

Page 81

1  will go into effect. Because when you are putting
2  something out, folks need to know, when -- when
3  they are voting on something, the details of
4  something of that significance. But then there is
5  some of the other items that you meet once you
6  reach the agreement and then, you know, once it's
7  been ratified -- because Southwest isn't going to
8  start making technology changes until -- until --
9  until they know the agreement is ratified.
10        So the primary focus is for the
11  implementation schedule piece. And then we also
12  worked on adding to question and answers -- we call
13  them Q&A's -- that had been done for previous
14  contracts, but they existed in various places. So
15  members of our negotiating team worked with some of
16  the members of the Southwest Airlines negotiating
17  team to create a master document that would have
18  all of the various Q&A's that were still in effect,
19  as well as adding any additional ones that needed
20  to be added based off of new language in the
21  ratified CBA. And putting together one
22  comprehensive document that contained those, as
23  well as any letters of agreement or letters of
24  understanding that were not incorporated into the
25  collective bargaining agreement; that was the --

Page 82

1  the primary focus.
2        And then there were some members of
3  the negotiating team and some members of the
4  Southwest Airlines teams that continued to meet
5  after that to -- along with our scheduling
6  committee to discuss satellite -- satellite base
7  test agreement, which we had needed in our contract
8  about it. And it specifically referred to the
9  parties working together after ratification to
10  flesh that out further.
11     Q. Okay. And, I guess, after the parties
12  have signed a collective bargaining agreement, in
13  addition to discussing everything else you -- you
14  just described -- well -- well, I guess, let me ask
15  the question this way: Did Southwest and the union
16  ever discuss modifying the contract at some point
17  in between an amendable date and when the last
18  contract went into effect?
19     A. I don't -- can you repeat your question?
20     Q. Yeah. I guess, let me try to ask a better
21  question here. Did Southwest and -- and the union
22  ever attempt to discuss modifications of an
23  existing contract, I guess, before an amendable
24  date?
25     A. I am not -- I -- I am not certain if I

Page 83

1  understand your question.
2     Q. Let me try to ask a better question. So
3  can -- can Southwest and the union modify their --
4  their contract if there is -- if the need arises
5  for some reason?
6     A. Yes, they could. Both parties would have
7  to agree to it. And it would still have to be --
8  there is -- and, I guess -- I guess, if you could
9  define what you mean by modifying; that's -- there
10  is -- that's the piece I'm -- I'm not sure I am
11  understanding.
12     Q. Sure.
13     A. There is -- there is items that come up
14  that -- that the contract is silent to or there is
15  a discrepancy in, you know, interpretation. And
16  the two parties can agree to a letter of agreement
17  or a letter of understanding to a specific --
18  around specific language in our contract that,
19  again, is silent or there is something that's
20  realized it wasn't adequately addressed within the
21  contract language.
22        So the two parties can negotiate a
23  letter of agreement or a letter of understanding,
24  but that is separate and outside of Section 6
25  negotiations or an actual modification of the

Page 84

1  contract under the way I considered modifying the
2  contract.
3     Q. Okay. And in -- in 2017, were there any
4  of those interpretation issues that the -- that
5  Southwest and the union were -- were trying to
6  address?
7     A. I believe so. I -- I feel like any given
8  year that I was doing any work, there was usually
9  more than one letter of agreement or letter of
10  understanding; more than one a year that the two
11  parties would -- would agree to.
12     Q. Okay.
13     A. And -- and -- yeah, that's it.
14     Q. Okay. And I think you -- you answered my
15  question, so I -- I think we're -- we're good
16  there.
17        MR. GILLIAM: Let's see. We can jump
18  off the record if you want, but I was going to see
19  when you-all might want to do lunch? Do you have a
20  preference?
21        MR. CORRELL: I don't. Whenever you
22  guys want to.
23        MR. GILLIAM: Because I can either
24  break now or keep going, depending on what you-all
25  want to do.

Page 85

1      MR. GILLESPIE:  We have got food
2  coming; not sure it's here yet.  It's just
3  sandwiches, but let me check with my assistant.  Do
4  you want to do, like, another 10 minutes, 15
5  minutes?
6      MR. GILLIAM:  Yeah.  Okay.  Let's --
7      THE VIDEOGRAPHER:  We are -- do you
8  want to go off record?  Hello?
9      MR. GILLESPIE:  I think we are still
10  -- we are still on the record.
11      MR. GILLIAM:  Yeah, I think we are
12  going to go for just a little bit longer.
13      THE VIDEOGRAPHER:  Okay.
14      MR. GILLESPIE:  And whenever -- I've
15  already -- on the record, Matt, I am just going to
16  say before I forget, the witness requested to
17  review and sign under the Federal Rules.  I just
18  need to ask that before the end of the day.
19      MR. GILLIAM:  I am sorry.  I couldn't
20  hear you very well, Joe.
21      MR. GILLESPIE:  We're requesting for
22  the witness to have the right to review and sign
23  under the Federal Rules.
24      MR. GILLIAM:  Okay.
25      MR. GILLESPIE:  The court reporter get

Page 86

1  that?
2      THE REPORTER:  Yes -- yes, sir.
3      Q.  (By Mr. Gilliam)  All right.  I will move
4  forward here.  Okay.  Ms. Stone, are you -- do you
5  recall any union members who resigned from the
6  union, I guess, while you were president?
7      A.  Yes.
8      Q.  Okay.  And do you know -- do you know what
9  an objector is?
10      A.  Yes, I do.
11      Q.  Okay.  And what is an objector?
12      A.  Someone who resigns their union
13  membership.  They still pay their union dues; it's
14  deducted from their paycheck just like a member,
15  but under the TWU International agency fee policy,
16  a percentage of their dues is refunded based upon
17  the calculation that International uses under their
18  policy -- portion of their dues is refunded; and
19  it's the portion of dues that's not directly
20  related to the basic running of the day-to-day
21  operation, grievances, negotiating, enforcing
22  contract.  Specifically, anything that's political
23  or legislative related; that's a portion of their
24  dues that comes back to them.
25      And with the resignation of union

Page 87

1  membership, when they became an objector, an agency
2  fee objector, they also resign their union
3  membership in that they can no longer vote on any
4  elections within TWU Local 556.  They can't vote on
5  the tentative agreement or any side letters.  They
6  can't attend any membership meeting.  They still,
7  of course, have the right to be represented in any
8  grievance matter that should arise if they filed.
9      Q.  Okay.  Now, when you became president,
10  were there any objectors?
11      A.  Yes.
12      Q.  Okay.  How many objectors were there when
13  you became president?
14      A.  I don't know exactly how many.  There had
15  typically been, let's say, a handful during my
16  union career up to that point.
17      Q.  Okay.  And by handful, do you mean less
18  than five?
19      A.  Probably around -- around five.
20  Definitely less than 10.
21      Q.  Okay.  Okay.  And, now, at -- at some
22  point after you became president, did more people
23  resign and become objectors?
24      A.  Yes.
25      Q.  Okay.  And when -- when did that start to

Page 88

1  happen?
2      A.  I think it started to happen fall of 2013,
3  more around in there.  It shortly -- it was very
4  shortly after I became president.
5      Q.  Okay.  Did any of those objectors
6  communicate to you why they were resigning and
7  objecting?
8      A.  I don't know if anyone communicated with
9  me directly.  There -- there -- I know -- I believe
10  the executive board received some communications
11  just in general that there was a -- a push for
12  flight attendants to opt out of the union in
13  response to the executive board's decision to
14  remove the officers that were in place before,
15  which led to me becoming president.  So it -- it
16  was a movement kind of as -- as a stand against
17  those of us that had come into office following the
18  removals.
19      Q.  Okay.  Do you know about how many people
20  opted out in total?
21      A.  At the -- at the most that we had, I
22  believe, was in the low 90s.
23      Q.  Okay.  All right.  Now, so when you -- you
24  started hearing about the objectors opting out, did
25  you first hear about that in an executive board

Page 89

1  meeting?
2      A.  I don't recall.
3      Q.  Okay.  And do you remember the -- the
4  names of any of the objectors?
5      A.  Greg Hofer was one I remember.
6      Q.  Do you remember Jeanna Jackson?
7      A.  Yes.  Jeanna Jackson.  I believe -- I
8  believe Kay Hogan was one of them.  Charlene
9  Carter.  I believe -- Michelle Foley.
10         THE REPORTER:  I'm sorry, say those
11  again.
12     A.  I believe Mary Ellen Matter, Michelle
13  Foley.  And I -- I don't recall other specific
14  names right now.
15     Q.  (By Mr. Gilliam) Okay.  And had -- I
16  guess, were -- were you aware of who those flight
17  attendants were in 2013 or 2014?
18     A.  Not all of them.  There are some of them I
19  have not ever met.  Some of them had come to the
20  membership meeting in the past.
21     Q.  Okay.  In 2013 or 2014, did you know Greg
22  Hofer?
23     A.  Yes.  I knew of him through membership
24  meetings and a union project that we had served on
25  together years before.

Page 90

1      Q.  And what was the union project?
2      A.  It was called Project Redesign.  It was
3  under our previous president, Thom McDaniel.  It
4  was a group of flight attendants from across the
5  system, including Greg Hofer, that were brought in
6  to look at our current union structure because we
7  -- we were growing.  We had been growing at a rapid
8  pace at that point.  That took place -- I believe
9  it was 2010 or so is when that project started.
10         And we had -- we had -- we had
11  undergone a large amount of growth in the
12  mid-2000s.  And we had started growing again, and
13  our union was still being run the same way it had
14  been run, even some of our procedures that were in
15  place, since -- basically, since we started.  And
16  we had started as a much, you know, smaller group
17  with three domiciles.
18         And so it was to look at if there were
19  more efficient ways; if there were different ways
20  to revamp and modernize as -- to help to
21  communicate with the work group within the confines
22  of, you know, the Constitution, what was our
23  bylaws.  And then it was to also look at if there
24  were changes that were recommended, what bylaws
25  needed to then be changed at the next available

Page 91

1  opportunity to keep up with those recommendations.
2  So it was just to kind of look at ways to improve
3  the running of the union.  And what --
4      Q.  Okay.
5      A.  -- the unions would look like.
6      Q.  Now, did you know Jeanna Jackson in
7  2013 and 2014?
8      A.  She had been at, I think just -- being --
9  her being a member -- a membership meeting at some
10  point over the years.
11     Q.  Okay.  And did you know Kay Hogan in 2013
12  or 2014?
13     A.  I knew of her because she's a former
14  president of TWU Local 556.
15     Q.  Okay.  And did you know Charlene Carter in
16  2013 or 2014?
17     A.  Simply -- she attended, I believe, one
18  membership meeting that I had been at.
19     Q.  Okay.  And let's see.  Mary Ellen Matter,
20  did -- had you communicated with her in 2013 or
21  2014?
22     A.  Again, we just -- she'd been at a
23  membership meeting.
24     Q.  Okay.  And is that the same case with
25  Michelle -- Michelle Foley?

Page 92

1      A.  Yes.  With the exception of Greg Hofer and
2  -- in that project, they had just been flight
3  attendants that had been present at a membership
4  meeting.
5      Q.  Okay.
6         MR. GILLESPIE:  Hey, Matt, if you want
7  to go ahead and take that break, our lunch has
8  arrived.  So whenever you are ready to take that
9  break, let us know.
10         MR. GILLIAM:  You know what, now is
11  probably just a good -- as good a time as any,
12  so --
13         MR. GILLESPIE:  Okay.  Excellent.
14         MR. GILLIAM:  How long?
15         THE VIDEOGRAPHER:  Let's go off record
16  real quick.  We are off record at 11:59 a.m.
17         (Lunch break had.)
18         THE VIDEOGRAPHER:  We are back on
19  record at 12:52 p.m.
20     Q.  (By Mr. Gilliam) All right.  Now,
21  Ms. Stone, as president, did you regularly have
22  union members contacting you with various
23  complaints and issues about -- well, of any kind?
24     A.  Yes.
25     Q.  Okay.  And how were they typically

Page 93

1  bringing their issues and complaints to you?
2      A.  Usually they would email -- if it was me
3  directly, they would email me via my president
4  email address for TWU Local 556.  Sometimes they
5  would call the office, either my direct extension,
6  which is published; or call the general line and
7  ask to be transferred to me.  Those were the -- the
8  two most common communication tools which flight
9  attendants could reach me.
10     Q.  Okay.  And did you travel frequently?
11     A.  I did.  At times, more than others, just
12 depending on schedule and, for instance, membership
13 meetings.  When membership meetings were going on,
14 I traveled extensively for those.  So I did some,
15 but the bulk of my work was done in Dallas at our
16 union office.
17     Q.  Okay.  All right.  And would -- would you
18 say you were in the office on a weekly basis?
19     A.  Yes.
20     Q.  Okay.  All right.  And did you also have a
21 Facebook page for members to message you at?
22     A.  Our union had a TWU Local 556 public
23 Facebook page, but it was not -- the public page
24 was not -- comments were not allowed.  It was used
25 as a communication tool for the union to post items

Page 94

1  to the membership; not for it to be a two-way
2  vehicle.  I -- I did not personally have any
3  Facebook page set up for union members to
4  communicate directly with me.
5      Q.  Okay.  Did you have an account that was
6  labeled Audrey Stone TWU 556?
7      A  I believe I had an account at one point
8  during one of the elections that I had designated
9  as that, where I would post anything union related
10 personally.
11     Q.  Okay.  When did you open that account?
12     A.  I can't remember.  I had a Facebook -- I
13 had a Facebook account for a number of years.  I
14 think I may have designated that one after I became
15 president.
16     Q.  Okay.  So you -- you -- just to make sure
17 I understand, you designated it -- did you
18 designate it as Audrey Stone TWU after you became
19 president?
20     A.  I think so.
21     Q.  Okay.
22     A.  I -- I am -- I am not 100 percent certain
23 of when.  I was not super active on Facebook before
24 or after I was president.  It was not a
25 communication tool I primarily used, but I didn't

Page 95

1  want family and friends to -- to -- if I was going
2  to post something regarding Local 556, I just
3  didn't want family and friends to be inundated with
4  that if -- if I was posting something that was
5  union.
6      Q.  Okay.  And is it -- is it correct to say
7  that you definitely had that account open at the
8  time of one of your elections?
9      A.  I had a Facebook account open during my
10 2015 election.  I may have had a Facebook account
11 open during my DEBM election; I am not certain.
12     Q.  Okay.  And did union members contact you
13 at that Audrey Stone TWU Facebook account?
14     A.  On my page?
15     Q.  Either by sending you messages or posting
16 on -- at Audrey Stone TWU page?
17     A.  Some did, yes.
18     Q.  Okay.
19     A.  It was not -- it was not frequent.  It was
20 not frequently used by members to contact me.
21     Q.  Okay.  Did your family contact you on that
22 page?
23     A.  No.  I think I had a family member that
24 would tag me in things or post some things, but,
25 again, Facebook in general wasn't something I used

Page 96

1  frequently, so people knew that email or phone
2  calls was a easier way to reach me.
3      Q.  Okay.  Do you know if you -- you checked
4  that Audrey Stone TWU Facebook account on a monthly
5  basis?
6      A.  Probably monthly, yes.
7      Q.  Okay.  Do you think you checked that
8  Audrey Stone TWU account weekly?
9      A.  No.
10     Q.  Okay.  All right.  Now -- and I want to
11 make sure that I specifically ask this question.  I
12 know you talked about your -- your advocacy on
13 behalf of union members and their social media
14 grievances as -- as a whole.  And we talked about
15 some of the things that took place in early 2015.
16         Prior to 2015, did you specifically
17 assist any individual flight attendants with their
18 grievances?
19     A.  In what capacity?
20     Q.  In any capacity.
21     A.  Yes.  As I said earlier, I had been a shop
22 steward since 2006.  Sometimes meetings I did as a
23 shop steward weren't a fact-finding meeting for the
24 investigation team.  It was a Step 2 appeal where
25 they were -- they had filed a grievance on a

Page 97

1  contractual issue and they had an opportunity to go
2  into the base level and explain why they were, you
3  know, grieving that.  And they would take -- had
4  the right to union representation for that part of
5  their meeting.
6           I also assisted the grievance team
7  going back to when I was a Baltimore -- the
8  Baltimore DEBM.  I assisted grievance team members
9  with board of adjustment and arbitration
10  preparations.  So at that very later stage and then
11  in the individual's grievance, I worked on some
12  cases in terms of preparation for a case to go to
13  hearing.
14      Q.  Okay.  And after you became president, did
15  you assist any specific flight attendants with
16  their grievances from that time through, say, the
17  end of 2014?
18      A.  I think so.  There are a number of cases
19  during my presidency overall that either if it was
20  a flight attendant who specifically knew me,
21  reached out to me; or, as I mentioned earlier, if a
22  member of the grievance team came to me to ask me
23  for help or to get my input on something related to
24  the grievance, then I assisted -- I assisted the
25  team through that avenue as well.

Page 98

1      Q.  Okay.  And I would like to shift gears
2  just a little bit.  Earlier, we -- we talked a
3  little bit about the -- the contract negotiations,
4  but -- and -- and also what happened with the 2000
5  and -- is it '12 election or '13?  2013 election?
6      A.  Is that a question?  Are you asking me?
7      Q.  Yeah.  Well, not really, no.  So, I guess,
8  I would like to take a quick look, if I could, and
9  point you to Document 23.  And you can look at the
10  whole thing if you want, but right now, I'm just
11  going to ask you about the first page of Document
12  23.  And we can mark this as Exhibit 2.
13           (Exhibit 2 marked.)
14      Q.  (By Mr. Gilliam) And once you have had
15  the chance to look at it and you are ready, let me
16  know.  I --
17      A.  I just want to make sure.  This is the
18  first page of the Unity Magazine.
19      Q.  Actually, you know what, it's -- no.
20  That's not what I meant to send you to.  I will
21  give you the actual number at the bottom right-hand
22  corner.  9524.  It's at the bottom, you should see
23  TWU 556-9524.  That's the one I wanted to ask you
24  about.  Just I wanted to start with a question
25  about the -- left-hand column; that's really

Page 99

1  all I am going to direct your attention to.
2      A.  I don't -- I will need a minute.  I --
3  they are labeled differently in the document I am
4  looking at.
5      Q.  Okay.  Document 23.
6      A.  So that --
7           MR. GILLESPIE:  I don't know if you
8  can see, I am just going over here to get her on
9  the right page.
10           MR. GILLIAM:  Sure.
11      A.  But the Unity Magazine is the correct --
12      Q.  (By Mr. Gilliam)  Yes.  Yeah, that's the
13  correct --
14      A.  Okay.  I am sorry.  That was my question,
15  is for the Unity Magazine first page?
16      Q.  I -- I apologize.  I had you on the wrong
17  page, though.
18      A.  Okay.
19      Q.  I didn't want you to have to read the
20  whole document if you didn't want to.
21      A.  Okay.  I am sorry.  I --
22      Q.  No, I -- that was my fault.  I think I
23  confused the confusion.
24      A.  Okay.  So I have the correct one pulled
25  up.  Which -- specifically, where am I looking?

Page 100

1      Q.  So in the -- on the left column, it talks
2  about -- I mean, do you -- you recognize what this
3  is?
4      A.  Yes.
5      Q.  Okay.  And it's the TWU Unity Magazine;
6  that's correct?
7      A.  It's from that, yes.
8      Q.  Okay.  And did -- did you write this
9  particular part; this particular page?
10      A.  Yes.
11      Q.  Okay.  And then at the first bullet point,
12  it says, our TWU -- well, right above the first
13  bullet point, I will read along here.  Our TWU
14  Local 556 team accomplished -- and you agree it
15  says, began contract negotiations on time, as
16  scheduled, despite the changeover of the lead
17  negotiator and union turmoil?
18      A.  Yes.
19      Q.  Okay.  What is the union turmoil you --
20  you are referring to?
21      A.  Two of the five officers of our local
22  resigning and the other three being removed from
23  office all in a very short time frame; that is the
24  union turmoil that I was referring to.  That
25  happened right before our contract became

Page 101

1    amendable.
2        Q.  Okay.  Did you view the -- the union
3    objectors as part of the -- the turmoil?
4        A.  No.
5        Q.  Okay.  Now, at any point, did you have any
6    conversations with Mike Hafner about problems with
7    union objectors?
8        A.  No.
9        Q.  Okay.  Did you have any conversations with
10   Sonya Lacore about problems with union objectors?
11       A.  Yes.
12       Q.  Okay.  And what was that conversation?
13       A.  It was -- I emailed her to let her know
14   that there was someone on one of the joint
15   committees -- so joint meant it was both a
16   Southwest Airlines and TWU Local 556 committee;
17   jointly funded, jointly sponsored -- that there a
18   flight attendant on one of those committees who had
19   opted out of the union and was no longer a member;
20   therefore, he could not continue to be a member of
21   a TWU Local 556 committee.  That was -- that was --
22   I believe it was an email; not a conver- -- well, a
23   conversation in terms of notifying her via email.
24       Q.  Okay.  And when you -- after you emailed
25   that to Sonya, what was Sonya's response to you?

Page 102

1        A.  I think she said, okay.  You know,
2    received; thank you for letting us know.
3        Q.  And did you have any other communications
4    with her about those issues?
5        A.  No.  And she was ranking too because I
6    believe she was the liaison -- each committee of --
7    on the joint committees typically have a liaison,
8    both for the Southwest side, as well as the local
9    side.  And, I believe, at the time, she was the
10   Southwest Airlines liaison for that committee.
11       Q.  Okay.  How many of those jointly funded --
12   joint -- jointly sponsored committees are there?
13       A.  I believe there is three.
14       Q.  Okay.  What were the other two?
15       A.  The other two besides the one I am
16   speaking of?
17       Q.  Yes.
18       A.  Okay.  The other two are our professional
19   standard committee and our FADAP committee, which
20   is the flight attendant drug and alcohol program.
21       Q.  Okay.  Let's see.  If I could direct you
22   to a document -- well, if we could mark Document 4
23   as Exhibit 3.  And, Audrey, that will be
24   Document 4.
25           (Exhibit 3 marked.)

Page 103

1        Q.  (By Mr. Gilliam)  If you could just open
2    this one and review it.  Once you have had a chance
3    to take a look, let me know and I will resume.
4        A.  Okay.
5        Q.  Do you recognize this?
6        A.  Yes.
7        Q.  Okay.  And what -- what are these?
8        A.  The first part is the email I was
9    referring to where I notified Sonya that this
10   flight attendant would no longer be able to serve
11   on the joint committee of CISM, and her
12   acknowledgement.  And the second part is me
13   requesting that she notify the other base
14   leadership that a nonmember may not act as a
15   representative of 556; and -- and that that would
16   include fact-finding meetings as well.
17       Q.  Okay.  Now, in your -- your email, which,
18   I think, is midway down the first page, 6567 -- so
19   it's SWA6567.  I think, midway through your
20   paragraph, it's -- says, Kent Hand is on CISM and
21   we instructed Eileen to let him know he couldn't
22   serve on behalf of 556 anymore.  And then it
23   continues, he is trying to cause her problems.
24           What -- what did you mean by he is
25   trying to cause her problems?

Page 104

1        A.  Eileen refers to the -- Eileen Rodriguez,
2    who was -- and I believe still is -- the
3    chairperson of CISM.  And as chair, she -- reached
4    out to have the conversation with him.  And I
5    wasn't a part of that conversation, but based on
6    what she had reported back to me, he was very
7    angry, very upset, very argumentative with her that
8    he was going to continue serving and that his
9    status should not impact his ability to serve on
10   that committee.  She was very upset.  He had upset
11   her and she was very upset when she reached out to
12   me.  That's what I was referring to.
13       Q.  Okay.  And what -- what -- so why did she
14   bring the issue to you?
15       A.  Why did --
16       Q.  Why -- I am sorry.  Why did Eileen bring
17   the issue to you?
18       A.  Because I was the president of the union.
19   And Eileen and I have always had a good working
20   relationship during my time for the union; that's
21   why she -- she brought it to me.
22       Q.  Okay.  And after Eileen reported that to
23   you, did you tell her what -- what you would do
24   about it?
25       A.  Yes.  I -- and I believe the liaison at

Page 105

1    the time of that was Todd Gage, our first vice
2    president.  We -- we both had told Eileen that, you
3    know, we would -- that we would be responsible for
4    notifying Southwest Airlines.  And just to -- to --
5    you know, that we would handle it from there in
6    terms of notifying and trying to reach out and
7    seeing if there was anything, you know, we could
8    help do to further explain to Kent, you know, why
9    that decision was -- was made.
10       Q.  Oh, okay.  And did -- I guess, did -- did
11   -- did you go back to Kent and tell him that he was
12   being removed from the committee?
13       A.  I know that I tried reaching out to -- to
14   Kent.  I had -- we had worked together on union
15   projects before I was president.  And I don't
16   recall if we actually ever -- we ever directly
17   spoke about it.  I know that another one of my
18   officers, I believe, spoke to him as well.  And
19   there just was -- there was -- he wanted to remain
20   on the committee, and he couldn't.  And there
21   wasn't anything -- there was no meeting in the
22   middle with that, with -- with trying to talk to
23   him.
24       Q.  Okay.  And then referring to your other
25   email on -- on 6571.

Page 106

1       A.  Okay.
2       Q.  And I think in the middle here, it says,
3    we have informed all of our shop stewards who have
4    chosen to opt out that they will no longer be able
5    to -- I am sorry -- no longer be allowed to
6    participate in fact-finding, attendants' meetings,
7    et cetera, on behalf of 556.
8           And where -- or I am sorry.  How did
9    you inform -- well, let me back up.
10          So did you have any shop stewards who
11   -- who opted out?
12       A.  Yes.
13       Q.  Okay.  Do you recall, roughly, how many
14   that was?
15       A.  I don't recall.  I don't -- I don't
16   recall.  I think there were just a few that opted
17   out or -- at that time.
18       Q.  Okay.  And how did you inform them that
19   they would not be allowed to participate in
20   fact-finding or --
21       A.  I believe that we had the shop steward
22   that contacted chairperson.  I actually believe we,
23   at that point, had all of our committee
24   chairpersons send a communication out to their
25   respective committee members letting them know that

Page 107

1    to serve on that committee, they had to be a member
2    of TWU 556.  For the shop stewards, we -- we
3    handled -- we notified -- I notified, you know, the
4    grievance team because of what had happened, you
5    know, to -- to generate this.
6       Q.  Okay.  And did -- did Sonya respond to
7    this email?  To you.  I'm sorry.  Did Sonya
8    respond?
9       A.  I am looking to see.  I don't recall -- I
10   don't recall if she responded to that one.
11      Q.  Okay.  Did you --
12      A.  I don't see it and I don't see a response.
13      Q.  Okay.  Did you have any further
14   communications with anybody at Southwest about the
15   shop stewards opting out?
16      A.  No, not to my recollection.  It was the --
17   they were responsible for notifying the base
18   leadership.
19      Q.  Okay.  All right.  And let's see.  If I
20   could mark as -- let's see -- Document 27 as
21   Exhibit 3.  And --
22          MR. CORRELL:  Counsel, are we -- are
23   we on Exhibit 3 or Exhibit 4?  I thought we --
24          MR. GILLIAM:  Did we do -- actually,
25   you are right.  I think we are on Exhibit 4.

Page 108

1       Q.  (By Mr. Gilliam)  Ms. Stone, just to be
2    clear, that's Document 27 for you.
3          (Exhibit 4 marked.)
4          MR. CORRELL:  And, Counsel, one other
5    question while the witness is reviewing.  Have
6    these documents been produced?  The copy you
7    provided doesn't show any Bates labels.
8          MR. GILLIAM:  These are documents
9    produced by the union.
10         MR. CORRELL:  Okay.  Thank you.
11         MR. GILLIAM:  Yeah.  And I think Adam
12   can -- can correct me if I am wrong, but they are
13   -- I think they were difficult to put Bates labels
14   on.
15         MR. GREENFIELD:  And, Matthew, is this
16   the set of -- I think there was a set of documents
17   that came over, I think, that were originally
18   Outlook files of some sort, perhaps --
19         MR. GILLIAM:  That's --
20         MR. GREENFIELD:  -- that were
21   difficult to Bates --
22         MR. GILLIAM:  That's correct.
23         MR. GREENFIELD:  -- because of that.
24   Okay.  That's this -- part of this set?
25         MR. GILLIAM:  Yeah.

Page 109

1    MR. GREENFIELD: Okay. So, yes,
2 Michael, that is accurate.
3    Q. (By Mr. Gilliam) Ms. Stone, certainly
4 feel free to review as much of this as you want. I
5 -- I'm mainly going to be asking you about the
6 first two pages here.
7    A. Okay. I have reviewed those.
8    Q. Okay. Now, do you -- do you recognize
9 those pages?
10    A. I mean, just from looking at them, I don't
11 -- it was six and a half years ago. There were a
12 lot of emails exchanged during my five years of --
13 president. A lot of emails that I got CC'd on or
14 sent my way, so --
15    Q. I understand. That's fair. So -- but you
16 are -- are you the Audrey Stone that is addressed
17 here by Trudy and Brett Nevarez?
18    A. Yes, I am.
19    Q. Okay. And is -- is that from Brett
20 Nevarez?
21    A. Yes.
22    Q. Okay. He was a vice president with the
23 union at this time, correct?
24    A. Yes.
25    Q. Okay. Was he first vice president or

Page 110

1 second vice president?
2    A. Second.
3    Q. Second vice president. Okay. And do -- I
4 -- I guess my question is: Do you recall -- well,
5 I guess, turning to the second page, there is a, I
6 guess, message; and it says, Kent Hand, above it.
7 And it says, do any of you know of any flight
8 attendant that you may have talked to that wanted
9 to opt out, but hasn't because of the EB's efforts
10 to collect a second initiation fee? If so, I need
11 names. Greg and I are working on a little project.
12    Now, based off that portion, does that
13 refresh your recollection at all as to why Brett
14 emailed you about the subject?
15    A. The -- Brett's email actually refreshes my
16 memory. I think I was mistaken in who reached out
17 to any committee member that had opted out to let
18 them know they couldn't do work. I think Brett --
19 I believe this email was because Brett himself
20 reached out to the committee members to notify
21 them. He is who -- because he kept track -- we
22 didn't publish the list of the agency objectors.
23 We didn't have that laying around the union office.
24    Our local treasurer, once he received
25 the names from our international treasurer, Brett

Page 111

1 was responsible for updating the list; and he kept
2 that private. So I think that he reached out to
3 them because he was who was notifying them that
4 they weren't going to be able to continue serving
5 in a union capacity since they were no longer a
6 union member.
7    Q. Okay. Do you remember Brett -- well, let
8 me ask it this way: Do you remember having any
9 communications with -- with Brett about what Kent
10 Hand refers to in saying, Greg and I are working on
11 a little project?
12    MR. GREENFIELD: And, Ms. Stone, in
13 regard to anything dealing with Kent Hand or any
14 other individuals who are objectors and
15 circumstances on which they were not serving on
16 committees or were allowed to, to the extent any of
17 those communications came from legal counsel and/or
18 legal counsel was advising on those situations, I
19 will instruct you not to answer those questions as
20 attorney/client privilege. But to the extent you
21 can, please do.
22    A. Under -- in our TWU Local 556 bylaws, we
23 actually have an initiation fee that members have
24 to pay when they join TWU 556. Whether it's
25 because they are completing -- the just --

Page 112

1 successfully completed probation and they're
2 charged the initiation fee after that; or because
3 they have opted out, but have decided to opt back
4 in and become a member again, then we have -- under
5 our bylaws, have a duty to collect the initiation
6 fee. I believe that is what Kent is referring to.
7 I -- I can't speak to the last sentence that you
8 read; I don't know what the project is.
9    Q. (By Mr. Gilliam) Okay. All right. And
10 the -- the email address here, do you -- do you
11 recall if Brett communicated with you from this MSN
12 address frequently in the past?
13    A. He would use -- he would use both. I
14 think that's his personal email address. He also
15 had one through TWU Local 556.
16    Q. Okay. And did you -- when you were
17 communicating with Brad about union business, did
18 you -- did you text with him at all?
19    A. No.
20    Q. Okay. Now --
21    A. Email --
22    Q. Go ahead.
23    A. Email was almost -- was -- was always our
24 -- our primary communication, email or phone calls.
25    Q. Okay.

Page 113

1       A.  For -- would -- I am sorry.  I shouldn't
2   -- unless it was, you know, confirming, hey,
3   waiting outside or I am ready to leave for the
4   meeting; you know, those sometimes were texts.  But
5   -- but it was primarily email and phone calls --
6       Q.  Okay.
7       A.  -- or in person.
8       Q.  Apart from those text message you just
9   described, I'm waiting outside, did you ever
10  communicate with anyone in the union by text
11  message?
12      A.  Just in general?
13      Q.  Yes.
14      A.  Sure.
15      Q.  Okay.  Like, who in the union would you --
16  well, let me ask this:  Who in the union office
17  would you communicate with by text message?
18      A.  Well, if I was away at a meeting, anybody
19  that, you know, reached out to me needing to know
20  where I was, what time was I going to be back in
21  the office, when was I available, things like that.
22  Or, frequently, people would email me, but also may
23  have sent a text message saying, hey, I know you
24  are in negotiations, but just -- heads-up, I have
25  emailed you about something; take a look when you

Page 114

1   can.
2       Q.  Okay.  And would -- would you communicate
3   sometimes with anybody in Southwest management by
4   text message?
5       A.  Yes.
6       Q.  Okay.  And -- and who would communicate in
7   Southwest management by text message?
8       A.  Again, that would be a long list.  Any
9   leader that -- confirming meeting times.  The start
10  time for negotiations frequently was confirmed via
11  text message.  Or a lot of times, Southwest, if
12  they needed to push the start time back, would
13  text; hey, is 10:00 an okay start time for
14  tomorrow?  Things like that; things that were very
15  short and didn't -- didn't need a -- a long
16  conversation or discussion on.
17      Q.  Okay.  All right.  All right.  Now, do you
18  know if the -- the group of objectors posted on
19  social media about their issues or complaints with
20  the union?
21      A.  It's my understanding that they -- they
22  all formed a Facebook group to -- and -- and
23  encouraged people that had opted out to join the
24  Facebook group once they opted out.
25      Q.  Okay.  Do you know what the name of that

Page 115

1   Facebook group was?
2       A.  I don't.  I -- I think it had something
3   with opt -- opt out in it, but I -- I am not sure.
4       Q.  Okay.  Did you ever visit that page?
5       A.  No.
6       Q.  Okay.  Now, did union supporters have
7   their own Facebook page?
8       A.  Yes.
9       Q.  Okay.  And what was -- what was the name
10  of that Facebook page?
11      A.  Are you asking me about -- I should have
12  asked this earlier: pages or groups?
13      Q.  This -- I am really archaic.  Okay.  I
14  should have said group.  So what --
15      A.  Because --
16      Q.  -- what Facebook group did union
17  supporters use?
18      A.  I -- I couldn't even give you -- I
19  wouldn't even know what the list of all of those
20  were.  There -- there were and are countless flight
21  attendant groups that I don't even know if you
22  would call supporters or -- or non-supporters.  I
23  think, when I was in office, Fusion was the largest
24  Facebook group.
25          Some groups were public; some were

Page 116

1   private.  There is -- again, I -- I am not a
2   Facebook guru.  Fusion, I believe, was -- was the
3   -- was the largest group in general.  And then at
4   some point, the union -- we actually had a Facebook
5   group as well.
6       Q.  Okay.  Did the union's Facebook group have
7   a particular name?
8       A.  I believe it was the official TWU Local
9   556 Facebook group.
10      Q.  Okay.  All right.  Do you know if Fusion
11  was a -- I guess, did they -- let's see how to word
12  it.  Do you know if any of the -- the people who
13  opted out posted in Fusion?
14      A.  I believe they did.
15      Q.  Okay.  Okay.  And, now, did you -- how
16  many times did you run for reelection as union
17  president?
18      A.  Just once.
19      Q.  Okay.  And when was that that you ran for
20  reelection?
21      A.  2015.
22      Q.  Okay.  When would that election have been?
23      A.  Nominations took place, I believe, in
24  January 2015.  And the election results -- or
25  election closed and results were posted mid-March.

Page 117

1    Q.  Okay.  All right.  And -- and -- well, are
2  -- are presidents -- do they have -- are they term
3  limited?
4    A.  No.  Under the TWU International
5  Constitution, none of our elected positions have
6  term limits.
7    Q.  Okay.  Did you just decide not to run in
8  2018?
9    A.  Yes, that's correct.
10    Q.  Okay.  Now, in 2015, did the -- in -- in
11  2015, did you have a particular slate of candidates
12  that teamed together to run together?
13    A.  Yes.
14    Q.  Okay.  And did that group have a name?
15    A.  Standing -- yes.
16    Q.  Okay.  And what was the name of that
17  group?
18    A.  Standing Together for 556.
19    Q.  Okay.  And who was on your slate?
20    A.  Todd Gage, Brett Nevarez, Cuyler Thompson,
21  John Parrott, Sam Wilkins and Crystal Reven.
22    Q.  Okay.  And was there an opposing slate?
23    A.  There was.
24    Q.  And who ran on the opposing slate?
25    A.  Lyn Montgomery, Kristen Loucks and just

Page 118

1  blanks.  They had three other women.
2    Q.  Okay.  You don't remember the other women
3  right now?
4    A.  I -- I am sorry.  I blanked.  It was a --
5  it was a -- it was five -- five women that ran
6  together.  And Lyn and Kristen are the only two I
7  can name right now.
8    Q.  Okay.  And were -- were both groups active
9  on social media at that time?
10    A.  There were members of each of the two
11  slates that were active on social media.
12    Q.  Okay.  So the -- I guess, the supporters
13  for each side were actively discussing the
14  elections on social media; is that right?
15    A.  Yes.
16    Q.  Okay.  Now, did the supporters of your
17  slate have a particular group that they posted in?
18    A.  Yes.
19    Q.  Okay.  And did that group have a name?
20    A.  Yes.
21    Q.  Okay.  And what was the name of that
22  group?
23    A.  The Core Team.
24    Q.  Okay.  Let's see.  I would like to mark
25  Document 24 as Exhibit 5.

Page 119

1    (Exhibit 5 marked.)
2    Q.  (By Mr. Gilliam)  And, again, I don't know
3  -- this is pretty lengthy.  Probably don't need to
4  read all of this if you don't want to.  I can
5  direct you to particular pages, but if you want to
6  review it real quick.
7    A.  Okay.  I skimmed it.  I have not read
8  everything through thoroughly.
9    Q.  That's -- that's fine.  I will -- I guess,
10  if we look at particular pages, you can -- you can
11  read that more closely, if you would like.  Do you
12  recognize, generally, what this is?
13    A.  Yes.
14    Q.  Okay.  And what is it?
15    A.  It's screenshots from posts within the
16  Core group, Core Facebook group.  I think -- I
17  believe that's what most of these are.
18    Q.  Okay.  Let's see.  Looking at the -- the
19  page at the bottom that's numbered Carter1919; do
20  you see that?
21    A.  I am sorry.  I don't see it yet.
22    Q.  Okay.
23    A.  Okay.
24    Q.  You found it?
25    A.  Yes.

Page 120

1    Q.  Okay.  And this -- this shows a page and
2  it says -- in the -- in the middle, there is a
3  section in that says, Audree Stone TWU; admin added
4  by Crystal Reven.
5    Is it correct that you are an admin on
6  this page?
7    A.  Yes.
8    Q.  Okay.  And were -- did -- did you post in
9  this page seeking advice for, I guess, campaign
10  strategy?
11    A.  I did post some asking for advice, yes.
12    Q.  Okay.  All right.  Let's see.  I will
13  direct you to 2654 -- Carter2654.
14    A.  Okay.
15    Q.  And at the top, it says Lara Silva --
16  well, there is a post from Lara Silva and it says,
17  well, that was quick; I just got a PM from Chris
18  Click.
19    Who is Lara Silva?
20    A.  She's a flight attendant.
21    Q.  Okay.  Was she -- did she hold any
22  positions with the union at this time?
23    A.  I think she was a shop steward.
24    Q.  Okay.  And halfway down, it -- it looks
25  like there's a post from you that says, what's he

Page 121

1  saying?
2        Is that -- is that your post?
3      A.  Yes.
4      Q.  Okay.  Do you know if she -- she told you
5  what he was posting about?
6      A.  I don't know.
7      Q.  Okay.  All right.  And right below your
8  post, Lara Silva says, he said, what do you mean by
9  lost $1,000,000?
10        Do you know what the lost $1,000,000
11  is referring to?
12      A.  I didn't have the conversation with him,
13  so it's -- it's -- it's speculating.  I -- the year
14  that Stacy, Chris and Jerry were in office, the
15  union overspent about $1,000,000 from the treasury;
16  so I am assuming it could be about that.
17      Q.  Okay.  And then if I could refer you to
18  2735 -- Carter2735.  It's probably in very small
19  print at the bottom.  I am sorry, 2733.
20      A.  Okay.
21      Q.  And up at the top, Angie Kilbourne posts,
22  they are the anti-Audrey team, period; thus the
23  promoting of Corliss and Don.  It's almost as
24  ridiculous as their
25  opt-out-because-we-didn't-get-our-way movement.

Page 122

1        And then I think you -- you post -- is
2  that your post two posts below that?
3      A.  Yes.
4      Q.  Okay.  And it says, Angie promoting of CK
5  and Don?
6        Who is CK?
7      A.  Corliss King.
8      Q.  Okay.  And who is Corliss King?
9      A.  She's a flight attendant.
10      Q.  Okay.  Does she hold any elected positions
11  with the union?
12      A.  I believe she is a shop steward.
13      Q.  Okay.  Do you know if she held any
14  positions with the union at this time when these
15  posts were made?
16      A.  I believe she was a shop steward.  We have
17  hundreds.
18      Q.  Okay.
19      A.  So that's -- that's why I -- I am not --
20  and -- and every three years, they are up for
21  reelection, so I -- that's why -- I believe so.
22      Q.  Okay.  And who is Don?
23      A.  Don Shipman.
24      Q.  Okay.  And who is Don Shipman?
25      A.  A flight attendant --

Page 123

1      Q.  Okay.
2      A.  -- at Southwest Airlines.
3      Q.  All right.  All right.  And further down,
4  Brian Talburt posts, Click would never support one
5  of the friendlies.  I believe this is being
6  harvested in -- in the surrogates.
7        Do you know what the term "friendlies"
8  refers to?
9      A.  People that were supportive of our
10  administration and were -- you know, that we were
11  doing -- that were outspoken about it.
12      Q.  Okay.  And below that, Audrey Stone TWU;
13  is that your post?
14      A.  Yes.
15      Q.  Okay.  And the second sentence says, the
16  carpet bagger and the ain't-got-time-for-that
17  charges.
18        Who is the carpet bagger?
19      A.  Don Shipman.
20        THE REPORTER:  I'm sorry, say it
21  again.
22      Q.  (By Mr. Gilliam)  Don Shipman?
23      A.  Yes.  I believe that was the nickname for
24  Don Shipman.
25      Q.  Okay.  Why did you call Don Shipman the

Page 124

1  carpet bagger?
2      A.  I didn't.  That's what other people called
3  him.
4      Q.  Okay.  Do you know the reason for that
5  nickname?
6      A.  I think it was about something that
7  happened during the time that the officers of the
8  union were in changeover and a video of him coming
9  up into the union office.  And other folks started
10  calling him that.
11      Q.  Okay.  Did they call him the carpet bagger
12  or the carpet -- carpet bomber?
13      A.  Bagger.
14      Q.  Okay.  And what does the
15  ain't-got-time-for-that charges refer to?
16      A.  Both of those refer to charges that were
17  filed against the officers that were removed and
18  charges that were filed to the executive board
19  regarding officers.  The ain't got time for dat
20  refers to a sign that a former officer wrote out
21  and handed to a flight attendant at a lobbying
22  event in DC sometime, I think, in early 2013.  And
23  it's the charges -- I believe it's -- it's
24  referring to the charges she filed over that
25  incident.

Page 125

1    Q. The charges who filed in that incident?
2    A. Corliss King.
3    Q. Okay. Did Corliss King call them the
4  ain't-got-time-for-that charges?
5    A. That was what was -- yes, that was -- it
6  was about -- her charges were about the sign;
7  that's the slogan that was on the sign that she
8  filed the charges over.
9    Q. Okay. And let's see. Now, if we could go
10 to the next page. All right. And have you had the
11 chance to review this page?
12   A. I am right now.
13   Q. Okay. Sure. Take your time.
14   A. Okay.
15   Q. All right. And the -- the post at the top
16 is by Brian Talburt. Did -- and -- and in the
17 second sentence, it says, I expressed my
18 disappointment in him nominating Jannah. Sorry.
19 The sentence before that says, I had a long talk
20 with DiPippa today.
21        Who is DiPippa?
22   A. John DiPippa.
23   Q. Okay. And was he -- did he hold union
24 office at this time?
25   A. Yes.

Page 126

1    Q. And I am not sure if I asked, when were
2  these posts made; do you know?
3    A. The -- this one here says February 10th.
4    Q. Okay. Do you know which year?
5    A. 2015.
6    Q. Okay. So this would have been right
7  before the election?
8    A. Yes.
9    Q. Okay. And I am sorry, did you say that
10 DiPippa held union office?
11   A. Yes.
12   Q. Okay. And what was his position with the
13 union?
14   A. Phoenix DEBM.
15   Q. Okay. And you mentioned that you don't
16 trust him. Why -- why didn't you trust him?
17   A. With my experience in working with John on
18 various scores, he would say one thing depending on
19 who he was with. He was never consistent in -- in
20 where he stood because he seemed like he would be
21 easily swayed by whoever his -- his audience was.
22 And he just -- he served -- has served under four
23 presidents. And I wouldn't -- I couldn't say that
24 he was supportive of any of them.
25   Q. Did -- did John DiPippa ever come out in

Page 127

1  this election and publicly support your slate?
2    A. I don't remember if he publicly supported
3  us.
4    Q. Okay. And Brian Talburt -- well, the --
5  there is a post here by Brett Nevarez. It says,
6  thanks for putting the squeeze on him, Brian.
7        Do you know if Brian Talburt put the
8  squeeze on DiPippa?
9    A. I don't know.
10   Q. Okay. If we could go to -- let's see. I
11 think it's 2837. Yeah, 2837.
12   A. Okay.
13   Q. And -- let's see -- the second post down
14 by Brian Talburt, the second-to-last sentence in
15 his post refers to, can I chalk this -- for a win
16 for my adopt-a-fucktard project?
17        Let's see. That's the third-to-last
18 sentence. And you see where I am at?
19   A. Yes.
20   Q. Okay. Was this one of the posts that
21 Brian Talburt was reported for?
22   A. I don't -- I don't think so.
23   Q. Oh, okay. Was he reported for another
24 post in here?
25        Let me ask this: Was he -- was he

Page 128

1  reported for another post in the Core Team group?
2    A. I believe it was from another post in the
3  Core Team group.
4    Q. Okay. And on the same page -- let's see.
5  I am sorry. If you could scroll back to 2836. I
6  guess, the first question: Do you know if -- you
7  mentioned Bill Holcomb as one of the individuals
8  who had a social media violation in early 2015. Do
9  you know if that stemmed from a post he made in
10 this Core Team group?
11   A. I don't remember.
12   Q. Okay. All right. Okay. Let's see. If I
13 could refer you to 2847. And let me know once you
14 are there.
15   A. Okay.
16   Q. All right. And then midway down, there is
17 a post that says, Audrey Stone TWU.
18        Do you know if that was your post?
19   A. Yes.
20   Q. Okay. And the first sentence says, Lyn
21 was addressed repeatedly regarding her performance.
22        Is that Lyn Montgomery?
23   A. Yes.
24   Q. Okay. And was that her performance --
25 well, let me ask it this way: Was that her

Page 129

1   performance in a particular position?
2       A.   Yes.
3       Q.   Okay.  And which position was that?
4       A.   Executive grievance chairperson.
5       Q.   Okay.  Now, when was Lyn Montgomery
6   executive grievance chair?
7       A.   The previous -- the president that was
8   removed, Stacy Martin, appointed her grievance
9   chair with the approval of the executive board, I
10  believe, in May 2012.  And she was in that position
11  until some point in 2014.
12      Q.   Okay.  And was she removed from her
13  position?
14      A.   Yes.
15      Q.   Okay.  And who removed her from her
16  position?
17      A.   I did.  And she was -- I removed her from
18  her full-time union status.
19      Q.   Okay.  And -- go ahead.
20      A.   Sorry.  Her -- her full-time position as
21  grievance chair in the office.
22      Q.   Okay.  And why did you remove her from her
23  full-time position as grievance chair?
24      A.   Because of her poor job performance.
25      Q.   Okay.  What was she doing poorly?

Page 130

1       A.   She was not getting grievances settled;
2   grievances were continuing to climb without any
3   progress being made.  We had two grievance chairs
4   at that time; there was one assisting Lyn.  And it
5   reached a point where Southwest -- Southwest was
6   working out grievances with -- with me on breaks
7   from negotiations and caucuses.
8            And we sat down numerous times and
9   talked to her about expectations, what needed to
10  improve, including her attendance in the office.
11  And it -- it didn't.  And at that point, I want to
12  say I had been working with her for probably nine
13  months without seeing improvement.
14      Q.   All right.  So after, I guess -- at some
15  point in early 2015, did some of these posts --
16  well, I guess I should first ask:  Was this a
17  private group?
18      A.   Yes.
19      Q.   Okay.  And at some point in 2015, did
20  these posts leak out?
21      A.   Yes.  Let me add:  I believe it was also a
22  -- considered a secret group.  So there is --
23  again, I am not a Facebook expert, but I believe
24  there is public, private and secret.  There is
25  different privacy settings for each.  So I think

Page 131

1   there is a level that's tighter -- for lack of a
2   better word -- privacy setting than a private
3   group, and I believe that's secret.  And this was a
4   secret group.
5       Q.   Okay.  So it was a surprise when the --
6   the post leaked out?
7       A.   Yes.
8       Q.   Okay.  When did you first hear that the
9   post leaked out?
10      A.   I don't -- I don't remember.
11      Q.   Okay.  Now, do you -- do you remember if
12  -- so let -- let me back up a bit.
13           Is it correct that Brian Talburt was
14  called in for a social media policy violation for
15  -- for posts he made in this group?
16      A.   I believe so.
17      Q.   Okay.
18      A.   Yes.
19      Q.   Do you remember if anyone else's posts in
20  this group resulted in Southwest finding a social
21  media policy violation?
22      A.   I believe there were other flight
23  attendants who were called in for -- for meetings
24  regarding a possible violation.
25      Q.   Okay.  Do you remember who any of those

Page 132

1   other flight attendants were?
2       A.   No.  I know there was -- another one from
3   Phoenix, but I don't recall her name.
4       Q.   Okay.  Now, apart from the -- the meetings
5   that you described with Mike Hafner and Naomi
6   Hudson earlier, did you have any meetings with
7   anyone from Southwest management specifically about
8   these Core Team posts?
9       A.   No.
10      Q.   Okay.  And, I guess, prior to your
11  communications with Mike Hafner in early 2015, had
12  you spoken to anyone in Southwest management about
13  social media policies in general?
14      A.   Yes.
15      Q.   Okay.  And what were those communications
16  with Southwest management prior to 2015?
17      A.   Well, they -- the -- I -- I may have
18  answered incorrectly.  I know, in 2015, before I
19  spoke to Hafner, there had been some general
20  conversations when I was meeting with other members
21  of management talking about hot, you know, topics
22  going on with our workforce; that I had tried to
23  start the dialogue of we need to talk about, you
24  know, social media, the activities, things like --
25  it's really increasing and it doesn't look like

Page 133

1    things are being applied very consistently.  But,
2    again, I believe that was probably early -- early
3    2015; before going to Hafner in March-ish of that
4    year.
5        Q.  Okay.  And who were those members of
6    Southwest management you had those communications
7    with?
8        A.  I think there was meetings Steve Murtoff
9    was a part of, Naomi Hudson, Juan Suarez; those are
10   the names I can remember, but I -- I met with
11   Southwest leaders all the time in -- in various
12   settings.  So those are the three that I can recall
13   being, you know, a meeting where social media was
14   touched on.
15       Q.  Okay.  So those -- those three members are
16   the only specific members of management you -- you
17   recall?
18       A.  That I recall right now, yes.
19       Q.  Okay.  And do you remember any -- any more
20   specifics from your conversations with Steve
21   Murtoff?
22       A.  No, because that meeting, there was
23   somebody else present on his side; I don't recall
24   who it was.  And it was a meeting where we were
25   covering numerous topics.  It wasn't specific to

Page 134

1    social media.
2        Q.  Okay.  And I am sorry, what is Steve
3    Murtoff's position?  I am sorry.
4            What was Steve Murtoff's position at
5    the time you spoke with him?
6        A.  I believe he was a director.  He was a
7    director in inflight, but I don't recall which --
8    he's moved around within inflight and held various
9    -- held -- held more than one role while
10   instructing.  I don't recall what his specific
11   title was at that point.
12       Q.  Okay.  And do you remember any other
13   specifics of your discussions with Naomi Hudson
14   prior to talking to Hafner in early 2015?
15       A.  That, again, we had hardly seen any social
16   media activity or discipline come down from
17   Southwest.  And that there had suddenly been a lot.
18   It appeared a lot when you go from a handful of
19   cases to more than 10 in a short time frame.  And
20   that it did not appear that the discipline was
21   being applied consistently.
22           And I used the same example I
23   testified to earlier that I spoke to Hafner about;
24   about in, you know, the same base and the same
25   conversation thread and one flight attendant was

Page 135

1    issued, I believe, a written warning and one was
2    terminated; it -- it was -- it was -- it was about
3    that.
4        Q.  Okay.  Do you remember any of the -- your
5    specific -- other specific discussions with Juan
6    Suarez?
7            MR. CORRELL:  And, Ms. Stone, before
8    you answer that question, I need to ask a couple of
9    questions myself to see if there is a privilege
10   issue here.  Ms. Stone, were you speaking to
11   Mr. Suarez on behalf of the union or on behalf of
12   yourself as an employee of Southwest Airlines?
13           THE WITNESS:  I was speaking to him on
14   behalf of the union.
15           MR. CORRELL:  Okay.  In that case, you
16   are free to answer this question.  I would ask that
17   you not reveal any communications you had with
18   Mr. Suarez if he came to you to ask you questions
19   as an employee or if you were coming to him as an
20   employee; do you understand?
21           THE WITNESS:  Yes.
22           MR. CORRELL:  Thank you.
23       A.  So my conversations with Juan were the
24   same -- one of them was a meeting with Naomi and
25   Juan and it was about what I just spoke to with

Page 136

1    regards to my conversation with -- with Naomi.
2            I -- that meeting, I actually set up
3    through Juan because I called him to schedule a
4    meeting because one of the flight attendants that
5    was terminated during that time period had been
6    terminated while on an overnight.  And then
7    Southwest had that flight attendant traveling home
8    in uniform on a Southwest plane.  And it was an
9    issue that had been addressed by the union, by me,
10   before regarding procedures, and it happened again
11   and I was very unhappy about that.
12           And I reached out to Juan to discuss
13   my concerns about the way the termination was
14   handled and to request that we sit down and talk
15   about social media and what was happening with
16   social media.  That termination was because of a
17   social media violation.
18       Q.  (By Mr. Gilliam)  What was the social
19   media violation in that case?
20       A.  Brian Talburt calling another employee a
21   fucktard.
22       Q.  Okay.  And what was Mr. Suarez's response
23   to what you communicated to him?
24       A.  Which time?
25       Q.  In -- I guess, in that meeting with Naomi.

Page 137

1    A.  He said they -- he -- they both said they
2  would look into it; that they were unaware of some
3  of the things I showed them when I was asking for
4  explanations on, you know, why did this warrant
5  termination and this warranted a written warning.
6  They said they would look into it, and that was it.
7  It was -- it was -- it was me asking questions and
8  showing them things and them not being able to
9  provide many answers.
10   Q.  Okay.  And what did you show them in that
11  meeting?
12   A.  The post that I just mentioned that I've
13  used -- the one I just said I've used as an example
14  where this flight attendant was terminated for
15  calling somebody a fucktard, but in the same
16  conversation, another flight attendant made some
17  comments about the employee that were not nice and
18  could be construed as a threat and they were issued
19  a written warning.
20   Q.  Okay.  And the other employee, that was a
21  post in the Core group thread as well?
22   A.  I believe so, yes.
23   Q.  Okay.  And who was the other employee?
24   A.  I don't know.  She's the one earlier I
25  said I know that there was another Phoenix --

Page 138

1    Q.  Oh, okay.
2    A.  -- flight attendant brought in, but I
3  didn't -- I don't recall her name.
4    Q.  Okay.  Did you show them anything else to
5  support your argument?
6    A.  I don't remember.  That was the -- that
7  was the biggest one that I was using as an example
8  of the lack of consistency.  I think I may have
9  also had other examples of flight attendants that
10  -- in that meeting that had been terminated while
11  on an overnight that had previously been addressed
12  with Southwest Airlines.  Because that was the
13  other piece that I was addressing in that meeting
14  was another incident of that happening.
15   Q.  Okay.  And did you have more than one
16  communication with Mr. Suarez about the social
17  media policy?
18   A.  No.  That meeting was the only time the --
19  I recall us sitting down and talking outside of the
20  phone call I mentioned to schedule the meeting.
21  And then I believe -- I don't think he -- I don't
22  think -- I don't believe it was he that got back to
23  me.  I believe it was Naomi that got back to me and
24  said that they were not willing to relook at any of
25  the -- the discipline with the social media cases

Page 139

1  and they needed to continue through the grievance
2  process.
3    Q.  Okay.  And it was later that you had your
4  conversation with Mike Hafner about these issues?
5    A.  Yes.  That follow-up is what generated my
6  conversation with Hafner.
7    Q.  Okay.  And -- and did you have any
8  communications with any Southwest management before
9  this -- about the social media policy violations
10  that -- any specific communications you remember
11  besides what you just described with Steve Murtoff
12  and Amy Hudson and Juan Suarez?
13   A.  No.  Not that I -- not that I remember.
14   Q.  Okay.  All right.  Now, were you ever
15  asked by anybody in Southwest management to address
16  complaints made by any of the other flight
17  attendants about what was posted in the Core group?
18   A.  Are you -- can you -- can you reask that
19  question?  I want to make sure I'm understanding it
20  correctly.
21   Q.  Yeah.
22       MR. GILLIAM:  Do you care to read back
23  the question?
24       THE REPORTER:  Sure.
25       (Record read by Reporter.)

Page 140

1    A.  No.
2    Q.  (By Mr. Gilliam)  Okay.  And do you recall
3  making any -- or I am sorry.
4       Do you -- do you recall issuing any
5  communications about what was posted in the Core
6  group?
7    A.  Yes.
8    Q.  Okay.  And do you recall issuing a -- an
9  apology for what was posted in the Core group?
10   A.  Yes.
11   Q.  Okay.  And why did you issue that apology?
12   A.  Based off of some people being upset by
13  some of the comments that were made, that were said
14  by other flight attendants participating in that
15  group.  And while I didn't set the group up, it was
16  a group set up by members of my slate.  I felt
17  responsible to issue an apology for anyone who had
18  been hurt by some -- anything that came out of
19  that.
20   Q.  Okay.  Okay.  If we could mark Document 17
21  as Exhibit 6.
22       (Exhibit 6 marked.)
23   Q.  (By Mr. Gilliam)  And, Ms. Stone, if you
24  don't mind turning to Exhibit 17 -- I am sorry --
25  Document 17.

Page 141

1      A. Okay.
2      Q. So in the -- I guess, the first line, I
3  believe it says, I want to apologize on behalf of
4  everyone in the Core Team for the hurt and
5  disappointment caused when screenshots were
6  distributed on Facebook.
7          And it goes on. Were you contacted
8  directly about flight attendants who were -- were
9  disappointed?
10     A. Of people just reaching out to just me?
11     Q. Yes.
12     A. I don't remember if anybody reached out
13  just to me.
14     Q. Okay. How do you remember hearing about
15  the -- you know, what -- what you described as the
16  hurt and disappointment?
17     A. There was -- I heard from other members of
18  my team that there was chatter on some of the other
19  Facebook groups about it. And I believe the
20  executive board -- I believed we received some
21  emails about it as well.
22     Q. Okay. If we could mark Document 10 as
23  Exhibit 7.
24         (Exhibit 7 marked.)
25     Q. (By Mr. Gilliam) Please flip to Document

Page 142

1  10. Do you recognize this?
2      A. Just from reviewing it.
3      Q. Okay. And what -- what is it?
4      A. It looks like a screenshot of text from an
5  email that Chris Click is stating he sent to the
6  executive board.
7      Q. Okay. And he -- is it -- I guess, he
8  says, does the board have an official position or
9  statement to make based upon the screenshots
10  forwarded from a secret group and made public to
11  members.
12         On the next page -- make sure I am
13  looking at this correctly -- there is another
14  screenshot where Chris Click says, Audrey replied
15  to me tonight and this is her reply: Dear Chris,
16  the executive board can't comment on events
17  regarding the TWU Local 556 officer elections.
18         Did -- did -- did you initially take
19  the position that you weren't going to address any
20  of the -- the screenshots that were leaked?
21     A. No. It was that, in my official capacity
22  as president, I was not allowed to discuss anything
23  relating to elections, doing anything that could be
24  construed as doing anything election related,
25  utilizing any type of union resources. Or that

Page 143

1  could be a violation of the election practices
2  under the Department of Labor.
3          So even utilizing my union email, for
4  example, I could not utilize that to discuss
5  anything related to officer elections unless it was
6  a simple question of, you know, when does the vote
7  end. And even that, most of those were referred to
8  our board of election committee.
9      Q. Now, turning back on the prior document, I
10  think 17, doesn't that express your opinion about
11  the elections?
12     A. That expresses my opinion about what
13  happened on the Core group. And that was posted on
14  a Facebook group that was not affiliated with 556
15  and was not utilizing any union resources in this
16  communication.
17     Q. Okay.
18     A. Had I -- had I -- I couldn't send a post
19  like this out via my president email or someone
20  would have had grounds to potentially report it as
21  a violation of the election to the DOL.
22     Q. Okay. Do you recall when you -- you
23  posted the -- the apology on behalf of everyone on
24  the Core Team?
25     A. I -- I don't recall. It would appear it's

Page 144

1  -- it's sometime before the elections were over.
2  And I believe that ended around mid- -- mid-March.
3  So it was sometime before then.
4      Q. Okay. So could you have told Chris that
5  you -- you were issuing this statement?
6      A. No. Not via my union email, which is how
7  he contacted the executive board.
8      Q. Okay. Why didn't you email him back with
9  your personal email?
10     A. Because I did not want Chris Click or
11  other flight attendants to have my personal email.
12     Q. Okay. So I want to go to the second page
13  of -- let's see -- Document 17. Make sure I am in
14  the right place here. The -- the last paragraph.
15  It says, please remember that SWA management is
16  currently watching our elections closely. They are
17  watching to see if our flight attendants are paying
18  attention and if they will participate in the vote
19  for who will continue leading our negotiating team.
20         Why did you believe that Southwest
21  management was watching the elections?
22     A. For the reasons I stated in the next two
23  sentences: The -- under our bylaws, the vote for
24  president to the Local 556 is also the vote for the
25  lead negotiator. And at that point, we had been in

Page 145

1    contract negotiations for over a year and a half.
2         And it -- I believed that they were
3    going to be looking at how many flight attendants
4    even participate in voting in the election for the
5    officers and the board members to see how many
6    flight attendants were active in terms of showing
7    up to vote in a critical time of negotiations.
8         Q. Do you believe it would have hurt
9    negotiations if your team lost the election?
10        A. Yes, I do.
11        Q. And why is that?
12        A. After, again, over 18 months of
13   bargaining, changing out the lead negotiator at
14   that point, putting somebody in to take over a team
15   that had been working together, putting somebody in
16   that didn't have any -- any experience with --
17   potentially putting somebody who had no experience
18   with sections of bargaining; no experience working
19   with any of those individuals.  No experience --
20   potentially no experience with working with the
21   members of the Southwest Airlines negotiating team.
22   I believe it would have slowed things down
23   dramatically, which, I believe, could have had a
24   negative impact.
25        Q. Did anyone with Southwest management ever

Page 146

1    indicate that they shared those concerns?
2         A. No.
3         Q. Okay.  I would like to -- so apart from
4    your apology here, do you remember if any other
5    board members issued a statement or an apology?
6         A. I think there were other -- other members
7    of our slate, some of who were board members, who
8    also apologized; I believe so.
9         Q. Okay.  I would like to mark Document 11 as
10   Exhibit 8.  If you could look at Document 11.
11            (Exhibit 8 marked.)
12        A. Okay.
13        Q. (By Mr. Gilliam)  Do you recognize this?
14        A. Reading it here just in this capacity, I
15   don't recall where it came from.
16        Q. Okay.  Do you recall Brett making these
17   statements?
18        A. I recall him telling me that he had made a
19   post on Facebook to apologize.
20        Q. Okay.  And what did he tell you about --
21   in that, I guess, conversation?
22        A. Just that he had -- he -- he was posting
23   an apology about some of the comments he had made
24   in the Core Team.
25        Q. Okay.  And did you indicate any concerns

Page 147

1    with him that he shouldn't use his union email to
2    make any apologies?
3         A. That was something that the board of
4    election always reminded every candidate when they
5    accepted their nomination.  That was something
6    repeated over and over again to all candidates.  So
7    I didn't specifically remind anybody of that.  It
8    was a -- it was a repeated -- something that was
9    ingrained in all of us that had been doing union
10   work for a long time.
11        Q. Okay.  Towards the end here, he -- well,
12   it says, I am the face of the FAAP, Flight
13   Attendant Assistance Program.
14            And then it continues.  What is the
15   Flight Attendant Assistance Program?
16        A. That's -- under the FADAP umbrella, that's
17   one of those joint TWU committees that I spoke to
18   earlier; joint as in TWU Local 556 and Southwest
19   Airlines.
20        Q. Okay.  And what was Brett's role with that
21   program?
22        A. Based on my understanding, before I worked
23   for Southwest Airlines, he was instrumental in
24   spearheading the first program at Southwest
25   Airlines.  It's a peer-based program that is there

Page 148

1    to have flight attendants that are in recovery
2    assist other flight attendants who are going
3    through issues with any type of drugs or alcohol,
4    anything substance related; to assist them in
5    getting help and treatment to either get sober or
6    maintain their sobriety.  And he was -- at this
7    point, I believe, he was the executive board
8    liaison to that committee.
9         Q. Okay.  And then at the very -- looks like
10   the last paragraph, it says, they can concentrate
11   on our FA's needs.  I am the one who interacts with
12   management and our EB so that none of the team are
13   blamed when things go sideways between the
14   suffering FA, management, and the union, which is a
15   regular occurrence.
16            And part of this, Brett indicates that
17   he interacts with management and the EB.  Do you
18   know what specific role he had in interacting
19   between the executive board and management?
20        A. So any -- all of our executive board
21   liaisons, if a committee -- if a committee
22   chairperson or co-chair was also on the executive
23   board, they had an executive board liaison.  And
24   their role was, if the committee chairperson had a
25   request for something that they needed from the

Page 149

1 executive board, then they usually would go to
2 their liaison, who would present requests to the
3 executive board at the next scheduled monthly
4 executive board meeting.
5         If -- for the joint committees, like
6 this, if there was something either of the chairs
7 had needed from either party or both parties, then
8 they would have gone to Brett and asked Brett, you
9 know, sometimes it -- we need to schedule a meeting
10 to sit down, you know, with the Southwest liaison
11 and talk about something that isn't working well
12 within the committee structure.  Or if they needed
13 additional resources or additional funding, things
14 like that.
15     Q.  What role did he have in ensuring that
16 none of the -- as he says -- team are blamed when
17 things go sideways?
18     A.  Team, he is referring to the flight
19 attendants that serve on the committee.  When he --
20 he talked about wanting them to concentrate on the
21 flight attendants' needs, that's helping them get
22 the help they absolutely need; not worried about
23 the logistics of funding or things -- things like
24 that.
25         And sometimes, some of those flight

Page 150

1 attendants didn't end up asking for help until it
2 had already impacted their job.  Sometimes they --
3 FAAP got involved once they had been called in for
4 a meeting, an investigation.  And getting sober
5 doesn't -- doesn't mean you are going to keep your
6 job if you have already, for instance, had a
7 positive drug or alcohol test.
8         So even when people get help, it
9 didn't always have a positive outcome.  And that
10 had nothing to do with the individual flight
11 attendants working on the team.  Brett was always
12 somebody that stepped forward and said, you know,
13 if something isn't going well or you need help or
14 you have somebody that's upset with you, I don't
15 mind you directing them to me.  You know, if you
16 need a buffer; if you need any assistance with
17 dealing -- dealing with them, don't be afraid to,
18 you know, have me assist you.
19     Q.  Okay.  Now, if I could mark Document 18 as
20 Exhibit 9.  Could -- take a look at Document 18.
21         (Exhibit 9 marked.)
22     A.  Okay.
23     Q.  (By Mr. Gilliam)  Do you recognize this?
24     A.  I -- I don't know where this came from.
25     Q.  Okay.

Page 151

1     A.  And I -- and I -- in looking at this, I
2 don't think the previous document I looked at, I
3 don't think they are from the same time period.
4     Q.  Okay.  Do you know -- do you know which
5 time periods they are from?
6     A.  I am not certain, but I believe Document
7 11, based off of there is a bunch of stuff at the
8 bottom of it, mine has a TWU Thom -- there is a
9 bunch of stuff down there.  I am -- I think this
10 was from something that took place prior to my --
11 prior to me being president.
12     Q.  Okay.  You think that Brett's post maybe
13 took place prior to you being president?
14     A.  Yes.  And in that posting, Document 11, he
15 refers to bringing his son to pick out his fourth
16 birthday gifts; that would have been before I was
17 president for 2013.
18     Q.  Okay.  Now, Document 18, do you -- do you
19 know if that refers to the Core Team incident?
20     A.  Yes.  I believe this one refers to the
21 Core Team incident and that this was from March
22 2013.
23     Q.  Okay.  Now, in -- in this statement -- and
24 I -- I guess you -- you don't remember him making
25 this statement itself?

Page 152

1     A.  When I answered to the previous document
2 about him telling me he was going to make an
3 apology, this document we're reviewing right now, I
4 believe this is the apology that he told me he was
5 going to post.
6     Q.  Okay.  In the -- I guess, the -- the last
7 two sentences, it says, please report any and all
8 violations to me and not Southwest management.  And
9 it gives an address there, an email address.  Once
10 again, no comments at this time.  Please read.
11         Did -- did Brett discuss with you
12 having certain social media violations reported to
13 him?
14     A.  No.
15     Q.  Okay.  Do you know what he's referring to
16 here at all?
17     A.  No, I don't.
18     Q.  Okay.
19         MR. CORRELL:  And, Counsel, before you
20 leave this document, for the record, is this
21 redacted?
22         MR. GILLIAM:  No, it's not.  This is
23 how it was received by us.  So no redactions here.
24     Q.  (By Mr. Gilliam)  Let's see.
25         MR. GILLESPIE:  Are we at a good point

Page 153

1  to take a break?
2          MR. GILLIAM:  Yes, we can.  How long
3  of a break would you like?
4          MR. GILLESPIE:  10 minutes would be
5  great.
6          MR. GILLIAM:  Okay.  Yeah.  Sure.
7  How --
8          THE VIDEOGRAPHER:  We are off record
9  at 2:53 p.m.
10          (Recess taken.)
11          THE VIDEOGRAPHER:  We are back on
12  record at 3:10 p.m.
13      Q.  (By Mr. Gilliam)  Okay.  I am trying to
14  pick up where we left off.  Ms. Stone, did -- did
15  you believe that social media policy violations
16  should be reported to the union and not Southwest
17  management?
18      A.  No.
19      Q.  No, they should have been reported to
20  Southwest management?
21      A.  No, that's not what I said.
22      Q.  Okay.  I am sorry.  I misunderstood you.
23  What -- did you -- okay.  You -- you believe that
24  flight attendants shouldn't report social media
25  violations directly to Southwest management?

Page 154

1      A.  I may have misheard your very first
2  question -- I -- that you asked.  I thought you
3  asked if I believed people should report their --
4  violations to the union instead of management.
5      Q.  Okay.  And I am sorry.  You're -- you're
6  right, I think that is how I worded my first
7  question.  So you -- you -- and I want to make sure
8  I understand correctly here.  You -- you don't
9  believe that flight attendants should report social
10  media violations to the union instead of Southwest
11  management?
12          MR. GILLESPIE:  Objection.  Form.
13      Q.  (By Mr. Gilliam)  Okay.  Let me try to ask
14  a better question.  Do -- did you believe the
15  flight attendants should report any social media
16  violations directly to the union?
17      A.  No.
18      Q.  Okay.  And after you issued your apology,
19  did you send out any additional communications to
20  the -- the union membership about social media?
21      A.  I wrote about it at least once in a
22  president's report.
23      Q.  Okay.
24      A.  I don't recall if that was before or after
25  the statement that I posted on Facebook.

Page 155

1      Q.  Okay.
2          MR. GILLIAM:  Are we up to Exhibit 10?
3          THE REPORTER:  Yes.
4          MR. GILLIAM:  Okay.  I'd like to mark
5  Document 13 as Exhibit 10.
6          (Exhibit 10 marked.)
7      Q.  (By Mr. Gilliam)  Take a look at Document
8  13.  Let me know once you have read it.
9      A.  Okay.
10      Q.  Do you recognize this?
11      A.  Yes.
12      Q.  And what is it?
13      A.  It's a president's message that appeared
14  in a Unity update.
15      Q.  Okay.  And what prompted you to publish
16  this message?
17      A.  The successful resolution of the batch of
18  social media grievances that I had addressed with
19  Mike Hafner that I spoke to about earlier this
20  morning; the successful resolution of the rules is
21  why I published this.
22      Q.  Okay.  And there is a date on the front
23  page of April 20th, 2015.  Is -- do you recall if
24  that's the correct date that you sent this?
25      A.  I believe so.

Page 156

1      Q.  Okay.  Now, on the second page, I think
2  it's the first full sentence, it says, I am pleased
3  that over the last month, Southwest Airlines has
4  finally taken us seriously.
5          And did you believe that Southwest had
6  taken you seriously because it resolved that batch
7  of grievances?
8      A.  Yes.
9      Q.  Okay.  And then I think you continue on in
10  the next sentence.  Your -- and it says, your union
11  has been addressing Southwest Airlines social media
12  policy for a long time.
13          Now, in addressing the social media
14  policy for a long time, was that just the -- the
15  reference to discussing the batch of grievances
16  with Mike Hafner in early 2015?
17      A.  It was primarily that, but social media --
18  there were cases here and there prior to that, just
19  not to the level of volume.  And it -- I had, it
20  felt like, spent a very long time, since the volume
21  had started increasing, trying to address it with
22  the leaders and feeling like it was unheard until
23  the meeting that happened.
24      Q.  Okay.  And then it continues and says, we
25  have been -- we have been bringing forward your

Page 157

1  concerns around the lack of clear guidelines on a
2  policy that is both vague and undefined.
3       Did -- did you also believe that the
4  social media policy was vague and undefined?
5    A. Yes, I did.
6    Q. Okay.  And why is that?
7    A. Because the version that was being applied
8  back then was very -- if it was anything that
9  someone found offensive, even if it wasn't another
10 employee or directed at another employee, Southwest
11 was viewing it as, well, you know, we can -- it can
12 be a violation.  It was -- it was very broad --
13 very, very broad in scope in just that it could --
14 anything that anybody found offensive, it felt like
15 they would say, well, it's a social media violation
16 if it occurred in a social media platform.
17   Q. Okay.  Do you think that the problem of
18 the policy being vague and undefined was corrected
19 after 2015?
20   A. No.
21   Q. Okay.  Would you say that the policy
22 remains vague and undefined today?
23   A. I haven't read the most recent -- I don't
24 -- I have not recently read the most current
25 policy.  I believe they made some changes to it

Page 158

1  since 2015.
2    Q. Since what date?
3    A. I said since 2015, when this was written,
4  I believe Southwest Airlines has updated the social
5  media policy.
6    Q. Okay.  Do you know if those changes
7  corrected the policy being vague and undefined?
8    A. I don't know.
9    Q. Okay.  And you were familiar with the
10 policy while you were president, correct?
11   A. Yes.
12   Q. Okay.  Okay.  Let's see.  Could I -- one
13 minute.  I'll find it in this stack shortly.
14 Direct your attention to Document 8 and also mark
15 Document 8 as Exhibit 11.
16      (Exhibit 11 marked.)
17   Q. (By Mr. Gilliam)  And particularly,
18 everything but the last page.  Or -- actually, more
19 -- well, yeah.  I will ask you some questions about
20 some of the others as well.
21   A. Okay.  I skimmed it.
22   Q. Okay.  And do you recognize these?
23   A. Yes.
24   Q. And what are they?
25   A. One is the mission statement as of August

Page 159

1  2013.  One is the workplace bullying and hazing
2  policy as of April 2015.  One is the social media
3  policy effective April 2016.  And one is the
4  harassment, sexual harassment, discrimination,
5  retaliation policy of Southwest Airlines as of
6  April 2014.  And one is disability, discrimination
7  and workplace accommodation policy effective
8  January 2019.
9    Q. Okay.  And if I could direct your
10 attention to the one that says App 10 at the
11 bottom, the social media policy.
12   A. Okay.
13   Q. And do you -- do you believe this is still
14 vague and undefined compared to the policy as you
15 remembered it in 2015?
16   A. I think pieces of it could be, but, again,
17 I don't -- I don't have the -- I don't know if this
18 is changed.  I don't have the comparison of exactly
19 what was in effect --
20   Q. Okay.
21   A. -- there.
22   Q. Okay.  Now, flipping to App 12, policy
23 concerning harassment, sexual harassment,
24 discrimination, retaliation.
25   A. Okay.

Page 160

1    Q. And this says revised April 23, 2014,
2  correct?
3    A. Yes.
4    Q. Okay.  Now, I know you may not have been
5  specifically addressing this one in your message.
6  Do you believe that this policy was vague -- is
7  vague and undefined?
8    A. No, not in the same way I have seen them
9  apply it.
10   Q. Oh, okay.  So you think that the policy
11 was applied in a way that was -- okay.  Let -- let
12 me back up.  Do you think the policy itself was
13 vague and undefined?
14   A. Which one?
15   Q. The policy concerning harassment, sexual
16 harassment, discrimination and retaliation?
17   A. No.
18   Q. Okay.  Do you -- do you believe that this
19 one -- this policy was applied consistently?
20   A. In the cases that I saw, yes.
21   Q. Okay.  And then turning to App 8, the
22 workplace bullying and hazing policy.  Do you --
23 let me know once you are ready.
24   A. I am ready.
25   Q. Okay.  Now, do you believe that this

Page 161

1    policy is vague and undefined?
2        **A. No.**
3        Q. Okay. Do you believe this policy was
4    applied consistently?
5        **A. I didn't see it cited very often.**
6        Q. Okay. Do you remember any cases where
7    someone was disciplined under this policy?
8        **A. I believe Charlene Carter -- I believe**
9    **this may have been one of the policies she was**
10   **cited with.**
11       Q. Okay. Do you remember anybody else who
12   was disciplined under this policy?
13       **A. I don't recall anyone else that was**
14   **specifically under this one.**
15       Q. Okay. Now, turning back to App 12, the
16   policy concerning harassment, sexual harassment,
17   discrimination and retaliation.
18       **A. Okay.**
19       Q. Do you know anyone who was disciplined
20   under this policy?
21       **A. Yes.**
22       Q. Okay. And who?
23       **A. Ricardo Vargas (phonetic).**
24       Q. Okay. Who else?
25       **A. There is another case that I don't**

Page 162

1    **remember the flight attendant -- I don't remember**
2    **his name, but I can remember -- I just remember --**
3    **I don't remember his name.**
4        Q. Okay. Do you remember what that flight
5    attendant did to violate the policy?
6        **A. Yes.**
7        Q. And what did that flight attendant do in
8    violation of the policy?
9        **A. The flight attendant was making sexual**
10   **comments to another coworker.**
11       Q. Okay. Do you know if those were
12   suggestive comments?
13       **A. I don't remember the details of what he**
14   **said.**
15       Q. Okay. Okay. And what -- when -- when did
16   that incident occur?
17       **A. That was sometime -- the one -- the name**
18   **who's -- the flight attendant I don't remember is**
19   **at some point during my presidency.**
20       Q. Okay. You don't remember if it was before
21   2015, after 2015?
22       **A. I think it was after 2015; I am not**
23   **positive.**
24       Q. Okay. And when did the incident involving
25   Ricardo -- was it Vasquez --

Page 163

1        **A. Vargas.**
2        Q. Vargas.
3        **A. That was probably 2010.**
4        Q. Okay. And what -- what did Ricardo Vargas
5    do to violate the policy?
6        **A. He had made a customer feel uncomfortable.**
7    **I think he had asked -- asked her for her number**
8    **and gave her his and -- and she complained to**
9    **Southwest in one of -- in -- that was part of it**
10   **that I can recall.**
11       Q. Okay. You don't recall any other part of
12   that?
13       **A. Ricardo had more -- had more than one**
14   **complaint over a period of time.**
15       Q. Okay. What other complaints did he have?
16       **A. He had made other female coworkers feel**
17   **uncomfortable.**
18       Q. Do you know if that was by making un- --
19   unwanted advancements or --
20       **A. I -- yes, I think so.**
21       Q. Okay. And were those flight attendants
22   terminated?
23       **A. Yes. Both Ricardo and the other flight**
24   **attendant were terminated.**
25       Q. Okay. Do you remember any other flight

Page 164

1    attractants who were disciplined for violating the
2    -- this policy?
3        **A. I know -- I know there were others in the**
4    **nine years I was on the executive board. I don't**
5    **recall specifics. I just don't recall specifics**
6    **outside of --**
7        Q. Okay. Do you recall any other specific
8    flight attendants?
9        **A. I think Al Harbour had a -- an issue.**
10       Q. Okay. Al Harbour?
11       **A. Yes.**
12       Q. Okay. Any other specific flight
13   attendants' names?
14       **A. Not that I -- not that I can recall.**
15       Q. Okay. All right. Let's see. Going back
16   here to Document 310. Now, let's see. In -- let me
17   find where. In that first full paragraph, the last
18   sentence says, dozens of you have been affected and
19   TWU Local 556 made it clear to management that we
20   believe they were interfering in areas in violation
21   of your personal rights.
22           Do you see where I am?
23       **A. Yes.**
24       Q. Okay. And did -- did you talk to Mike
25   Hafner about their application of the policy

Page 165

1    interfering with members' personal rights?
2        A. Yes.
3        Q. Okay. And what did you tell Mike Hafner
4    about the -- about Southwest's interference in the
5    flight attendants' personal rights?
6        A. I don't recall the specifics, but it was
7    part of conversation about the inconsistencies in
8    how they were applying the social media policy;
9    that -- that some of those posts made were
10   celebratory. I keep thinking of the one about the
11   country song. And that it hadn't been directed at
12   any individual. There was nobody at Southwest
13   Airlines who came forward and said they felt
14   harassed or bullied by it. And it was a personal
15   photo of, you know, somebody celebrating going to a
16   concert; things like that.
17       Q. Okay. But hadn't some individuals come
18   forward and reported that they felt harassed or
19   bullied by comments made in the Core Team group?
20       A. Yes, some had.
21       Q. Okay. And what personal rights did you
22   believe that management was interfering with?
23       A. Different from what I explained?
24       Q. Well, I don't think that you identified
25   any personal rights that were -- were -- that you

Page 166

1    -- that were interfered with.
2        A. That someone should -- well, the flight
3    attendants that -- that were suspended for their
4    photographs believed that they had the right post
5    the lyrics of -- that they had the right to post
6    the lyrics of a song on their personal page and
7    advertise that they were going to a concert. And
8    they said that they felt like that was their right
9    as a flight attendant and it didn't hurt anyone.
10   So that is an example of a personal right, that
11   those flight attendants felt like they had the
12   right to do that. And Southwest, at that time, had
13   felt differently.
14       Q. Do you think that management had
15   interfered in Brian Talburt's personal rights?
16       A. I felt like management had not applied the
17   appropriate level of discipline to Brian Talburt's
18   statement that he made.
19       Q. Okay. Do you believe that management had
20   interfered in Brian Talburt's personal rights?
21       A. Yes, given the discipline they applied.
22       Q. What personal rights do you believe that
23   management had interfered with in Brian Talburt's
24   case?
25       A. Well, they -- they tried to state -- I

Page 167

1    guess it's not a personal right. They -- they
2    tried to state that he had violated a -- a
3    protected class by using the word "fucktard." That
4    -- that was -- that was the crux of my pushback
5    against the discipline he received. It wasn't
6    about his -- his personal right. It was about him
7    being cited with a violation of a protected class
8    that I didn't believe was legally -- that there
9    wasn't a definition that was a protected class.
10       Q. So you do not believe that any of Brian
11   Talburt's personal rights were implicated by
12   Southwest's actions regarding him?
13       A. I don't have his discipline letter in
14   front of me and I don't feel comfortable answering
15   that without knowing exactly what he -- what all he
16   was cited and what all they investigated. I know
17   of the word that he stated that triggered his
18   investigation, but I don't know all of the details,
19   so I -- I don't feel confident answering that. I
20   know Brian felt like -- well, I actually don't know
21   how Brian felt, so I can't speak to that either;
22   that's speculating.
23       Q. Do you think that in these cases that were
24   within the batch that you discussed with Mike
25   Hafner involved any -- any flight attendants'

Page 168

1    rights to engage in protected union activity?
2        A. Yes, for the ones that were specifically
3    discussing the election.
4        Q. Okay. So only posts that specifically
5    discuss the election involved protected union
6    activity?
7        A. Well, that's my opinion.
8        Q. Okay. Apart from what you described in
9    the care of Mary -- Mary Ellen Matter and Michelle
10   Foley, were there -- did you have any other
11   communications with Southwest management about
12   flight attendants' personal rights?
13       A. No.
14       Q. Okay.
15       A. No, not to my recollection.
16       Q. All right. In the next paragraph, you
17   say, over the last several weeks, I met with
18   various Southwest Airlines leaders, including our
19   vice president of cabin services, Mike Hafner.
20       So it -- this says various Southwest
21   Airlines leaders. Now, in the weeks preceding this
22   letter, did you meet -- does that refresh your
23   recollection as to whether you met with other
24   Southwest leaders apart from Naomi or Mike?
25       A. I testified earlier that I was in a

Page 169

1  meeting with Steve Murtoff and another leader, and
2  I don't recall which leader.  I also spoke to Juan
3  Suarez, as I stated earlier.  So they were included
4  in Southwest Airline -- they were all Southwest
5  Airlines leaders.
6       Q.  Okay.  So was that meeting with Steve
7  Murtoff and Juan Suarez in the -- the several weeks
8  preceding this message?
9       A.  Yes.
10      Q.  Okay.  All right.  Now, in this letter --
11  let's see.  It's one more paragraph down from where
12  we are.  It starts, we have also scheduled future
13  meetings to sit down with the appropriate members
14  of management to address those social media changes
15  we would like to see in the future.
16           So what were the future meetings about
17  the social media policy changes you had scheduled?
18      A.  We -- they did -- they didn't go anywhere.
19  We regularly meet -- met with Southwest Airlines
20  management.  We have a list of items to talk about
21  in advance.  Social media had been on the list;
22  Mike had agreed that we would continue to discuss
23  it at our future meetings.  And then, as I stated
24  earlier, he ended up leaving his position shortly
25  thereafter.

Page 170

1           And I continued bringing forward the
2  concern and it -- I just -- it didn't go anywhere
3  in terms of redefining or creating, in my
4  conversations with Sonya, of is there a way for
5  flight attendants to have -- to have a social media
6  policy that is more specific to flight attendants
7  based off of what was happening.  And there just
8  wasn't a result that came out of it.  It -- it
9  wasn't something -- I think she -- I am guessing,
10  you know, she went back, she talked to her team,
11  and it just never got acted on.
12      Q.  When you say she went back and talked to
13  the team, who do you mean?
14      A.  I am assuming she did.  Well, anything
15  related to Southwest Airlines policies is also
16  vetted through legal, through general counsel.  So
17  inflight can't just change something arbitrarily.
18  So I am assuming, based off of my conversations
19  with her, that she had -- that she discussed with
20  legal -- and she didn't give me any details of what
21  that was -- and that it just wasn't something they
22  were willing to explore.
23      Q.  Okay.  When you say she, do you mean Sonya
24  Lacore?
25      A.  Yes.

Page 171

1       Q.  Okay.  And so she didn't tell you that
2  they weren't willing to explore that, correct?
3       A.  Well, I -- she wasn't willing to schedule
4  an opportunity for us, legal, all of the parties to
5  meet.
6       Q.  Okay.  And she never told you why she
7  wasn't willing to schedule the opportunity to meet?
8       A.  No.
9       Q.  Okay.
10      A.  And the social media activity, you know --
11  as I stated earlier, died down, wasn't as active.
12  And there were --
13      Q.  The -- the social media activity died down
14  after April of 2015?
15      A.  In terms of the level of discipline that
16  we saw being issued -- or the grievances coming
17  through the office, I should say.
18      Q.  So your testimony is that the number of
19  grievances for social media activity declined after
20  April of 2015?
21      A.  Yes.  Compared to where it was at the
22  beginning of 2015.
23      Q.  Okay.  But as a whole number, did the
24  social media grievances decline after April of
25  2015?

Page 172

1       A.  Yes.
2       Q.  Okay.  All right.  Now, I think -- so I
3  don't want to misstate your testimony, but my
4  recollection was that you said that social media
5  issues had been on the list to discuss with Mike
6  Hafner in -- in future meetings; is that correct
7  yes.
8       A.  Yes.
9       Q.  Okay.  And were -- was it to be discussed
10  in -- as part of some regular meetings you were
11  having with Mike Hafner?
12      A.  Yes.
13      Q.  Okay.  And what were those regular
14  meetings that you were having with Mike Hafner?
15      A.  We typically met with members of my team
16  and member of -- members of my team.  Typically, we
17  met on a monthly basis.  Southwest Airlines also
18  sent representatives -- leaders from various
19  departments within inflight, they send them to meet
20  with the executive board typically on a monthly
21  basis as well.
22      Q.  Now, as part of those meetings, who -- who
23  was on your team?
24      A.  Which ones?
25      Q.  The -- the -- the meetings that you were

Page 173

1  having regularly with Southwest's team.
2      A.  The ones with the entire executive board
3  or without?
4      Q.  Without.
5      A.  Okay.  It was usually -- usually was other
6  officers.  So at the time, Todd Gage, Brett Nevarez
7  and John Parrott were usually who attended those
8  meetings.  Sometimes not all three.
9      Q.  Okay.  Did any union members who were not
10  officers go to those meetings with you?
11     A.  No.
12     Q.  Okay.  Did any other union members, apart
13  from Brett Nevarez and John Parrott and Todd Gage,
14  go to those meetings with you?
15     A.  I believe Cuyler Thompson went to one, I
16  believe.
17     Q.  Okay.
18     A.  He was an officer.
19     Q.  Is there anyone else you recall?
20     A.  No.
21     Q.  Okay.  And who from Southwest's team
22  attended those meetings?
23     A.  Usually Mike Hafner, Sonya Lacore, Brandon
24  Conlon, Steve Murtoff.  Again, not all four of them
25  every time.  And then every now and then, they

Page 174

1  brought somebody else.  They brought someone from
2  provisioning one day.
3      Q.  Okay.  Did Randy Babbitt ever attend those
4  meetings?
5      A.  No, not in the monthly meetings.
6      Q.  Did Randy attend any social media meetings
7  that you were a part of?
8      A.  No.
9      Q.  Okay.  Now, the executive board meetings
10  you described, would that involve anyone on the
11  union side apart from the executive board?
12     A.  The grievance chairpersons were usually in
13  -- we usually had them in the board meeting while
14  members from Southwest Airlines management would --
15     Q.  And was there a regular representative
16  from Southwest who attended those meetings?
17     A.  Typically, it would be Steven Murtoff, at
18  that time; Henry Thompson, Brandon Conlon came
19  sometimes.  Depending on what time frame you are
20  asking about, there is other members of Southwest
21  Airlines management that attended one of the board
22  meetings, but there is a number of them over a
23  five-year period.
24     Q.  Okay.  And apart from social media issues
25  that you -- you might have discussed from time to

Page 175

1  time, what other types of issues did you discuss in
2  those meetings?
3      A.  Which ones?
4      Q.  The -- the ones with your team and then
5  Southwest's team --
6      A.  But --
7      Q.  -- not involving the executive board?
8      A.  Okay.  Any -- any big issue we were seeing
9  collectively, systemwide, that wasn't related to
10  contract negotiations or bargaining.  An example of
11  that would be the application of one of the -- at
12  the time, they were called working conduct tools,
13  right?  And we were seeing an uptick in how many
14  flight attendants were being terminated for this
15  particular rule.
16         So one of the meetings, we kind of
17  discussed the intent of the rule; whether it had
18  wanted to be created and whether or not it was
19  being applied currently with the same intent that
20  the rule was created -- you know, the problem it
21  was created to address.
22     Q.  Okay.  Now in any of those meetings,
23  whether it was with the full executive board
24  meeting or -- or just the two teams without the
25  executive board meeting, did you-all ever discuss

Page 176

1  the bullying and hazing policy?
2      A.  No.
3      Q.  Okay.  And in any of those meetings,
4  again, whether it involved just the two teams
5  without the executive board or the executive board
6  and Southwest representatives, did you-all ever
7  discuss the recall?
8      A.  No.
9      Q.  Okay.  And you understand what I mean by
10  the recall?
11     A.  Yes.
12     Q.  Okay.  Now, again, returning back to
13  Document 13, that -- looks like the second-to-last
14  -- well, the paragraph that starts, we have also
15  scheduled future meetings.  And it -- it mentions
16  addressing those social media policy changes we
17  would like to see.
18         Now, I understand that you didn't have
19  those meetings, but what were the social media
20  policy changes that you wanted to see?
21     A.  I wanted to see it more clearly defined as
22  to what people, you know, could and couldn't say
23  and what would be attached to the workplace.
24  Versus it like feeling like it was simply a -- if
25  anyone, even outside of Southwest Airlines, is

Page 177

1    offended, it was an automatic similarly 30-day
2    suspension or termination.  And there really
3    weren't levels of discipline in between.
4            So I wanted to see it more in line
5    with our working conduct rules, which outlined
6    class levels and a range of discipline that can be
7    applied to -- to that violation, depending on the
8    class and the overall circumstances.  Because that
9    wasn't something that we were seeing with the
10   application of the social media policy.
11       Q.  Okay.  And did you reach a conclusion
12   about those social media policy changes on your
13   own?
14       A.  No.
15       Q.  And the -- the social media policy changes
16   you wanted to see, was that something you had
17   discussed with other executive board members?
18       A.  Yes.
19       Q.  Okay.  And were those social media policy
20   changes something you had discussed with the -- the
21   grievance committee members?
22       A.  Grievance chairpersons.
23       Q.  Okay.  And which specific grievance
24   chairpersons had you discussed those social media
25   policy changes with?

Page 178

1        A.  At that point, Becky Parker.
2        Q.  Okay.  Was there any other grievance
3    chairperson you had discussed the social media
4    policy changes with?
5        A.  No.
6        Q.  And which members of the executive
7    board had you discussed those changes with?
8        A.  The executive board in general had -- had
9    discussed it.  The whole executive board had talked
10   about it.  Any time -- any time we heard a
11   grievance that reached the executive board level
12   and it was a social media violation, there was
13   discussion amongst the executive board.
14       Q.  Okay.  And did you speak with any other
15   union members outside of Becky Parker and the
16   executive board about the social media policy
17   changes that you -- you wanted to see?
18       A.  Not directly, no.  There were other
19   members who were constantly giving me and other
20   board members feedback on what they believed it
21   should and shouldn't be.
22       Q.  Okay.  Now, was there anybody who
23   communicated their views that you remember agreeing
24   with about what the social media policy should be?
25       A.  That I agreed with?

Page 179

1        Q.  Yes.
2        A.  No, I don't recall that.
3        Q.  All right.  Now -- now, you -- we
4    discussed Brian Talburt earlier.  And I think he
5    had -- he received social media discipline for his
6    fucktard comment.  And he was originally terminated
7    for that, correct?
8        A.  Yes.
9        Q.  Okay.  Had he been terminated before?
10       A.  Yes.
11       Q.  And what had he been terminated for?
12       A.  I believe it also had -- it was a social
13   -- social media.
14       Q.  Okay.  And do you remember any details
15   about his social media violation?
16       A.  No, not that one.
17       Q.  Okay.  All right. Let's see.  If I could
18   mark Document 30 as Exhibit 12.
19           (Exhibit 12 marked.)
20       A.  Okay.
21       Q.  (By Mr. Gilliam)  Okay.  Do you recognize
22   this?
23       A.  I recognize the -- the first -- the first
24   parts; not the -- the second pieces.
25       Q.  Okay.  And which parts do you recognize,

Page 180

1    just so that I am clear?
2        A.  The first -- the first page and first half
3    of the second page through -- through Brian's email
4    to me.
5        Q.  Okay.  Okay.  And do you recognize Brian's
6    -- or, I guess, your -- your email to Brian on
7    August 13th at 5:13 p.m.?
8        A.  Mine says August -- mine says October
9    13th.
10       Q.  And I am sorry.  Did I say August?
11   October 13th at 5:13 p.m.
12       A.  Yes, now I do that I am looking at it.
13       Q.  Okay.  Okay.  All right.  And what -- what
14   are these emails?
15       A.  I believe this is after he had been
16   terminated the first time.  And I think he had been
17   terminated for making a comment about there needing
18   to be a public execution.
19       Q.  Okay.  Did he say who there should be a
20   public execution of?
21       A.  I don't -- I don't remember exactly what
22   he posted.  I think it was in a large post.  And I
23   think it was -- I believe he was referencing just
24   the constant -- what he believed -- bullying that
25   was going on.  And that if one person had been

Page 181

1  disciplined, then it might stop.  But, again, I
2  don't -- I don't remember the specific of what he
3  posted, but I -- but that public execution was in
4  it.
5      Q.  Okay.  And did -- did you agree with the
6  company terminating Brian Talburt for using the
7  phrase "public execution"?
8      A.  No.
9      Q.  And why not?
10     A.  Because Brian did not -- did not literally
11  mean that someone should be executed.  And he
12  explained that, what his intent was, in -- in his
13  comment and what he was -- what he meant by it, and
14  it was not to cause somebody physical harm or to
15  kill them.
16     Q.  Okay.  And did you, I guess, represent
17  Brian Talburt at any stage of his disciplinary
18  investigation?
19     A.  Yes.
20     Q.  Okay.  And what -- what part of his
21  disciplinary investigation did you represent him
22  in?
23     A.  I -- well, I assisted his grievance
24  specialist in his Step 2 appeal meeting.
25     Q.  Okay.  And who did you have that Step 2

Page 182

1  meeting with?
2      A.  I think it was Mike Sims, but I am not 100
3  percent certain.
4      Q.  Okay.  And the company upheld his
5  termination, correct?
6      A.  No.
7      Q.  I am sorry.  So the company did reverse
8  his termination?
9      A.  Yes.  At some point in the grievance
10  process, it was reduced.
11     Q.  Okay.  Do you know what point in the
12  grievance process his discipline was reduced?
13     A.  No.  I don't recall if it was after the
14  Step 2 or after the -- or after it had been heard
15  by the executive -- I believe it was at some point
16  after the Step 2.
17     Q.  Okay.
18     A.  Again, I am -- I am -- I am not -- I am
19  not positive.
20     Q.  And what was the -- well, let me back up.
21  During the Step 2, did you make an argument to
22  Southwest as to why he should not be terminated?
23     A.  His -- his -- Brian -- in a Step 2
24  meeting, it's the flight -- primarily the flight
25  attendant's responsibility to bring forward new

Page 183

1  information or explain why they believe the
2  discipline is unjust.  So Brian appealed to
3  Southwest Airlines primarily -- why he felt like --
4      THE REPORTER:  I'm sorry, say the last
5  part; I didn't hear it.
6      A.  -- regarding why he felt like he shouldn't
7  be terminated.
8      Q.  (By Mr. Gilliam)  And at any point in his
9  disciplinary process, did you make any arguments to
10  someone with Southwest as to why he should not be
11  terminated?
12     A.  I -- I feel confident at some point in his
13  Step 2, I would have made some statement.
14     Q.  Okay.  Did you argue that he was engaged
15  in any protected activity in making the comment?
16     A.  I don't recall.  I don't -- I don't think
17  so.
18     Q.  Okay.  So in the -- the email below that
19  continues on to the next page, Brian comments to
20  you about a private email between Mike and him.
21  And is that Mike Hafner?
22     A.  I believe so.
23     Q.  Okay.  And -- and he says, I am hopeful
24  that relationship is working behind the scenes in
25  some form on his behalf and would not want to do

Page 184

1  anything to harm him.
2      Do you know what relationship Brian
3  Talburt had with Mike Hafner?
4      A.  Just that they were both long-term
5  Southwest Airlines employees.  I think at this
6  point, both of them had been with Southwest for 30
7  -- 30 years.
8      Q.  Okay.
9      A.  I know they had known each other a very,
10  very long time.
11     Q.  Okay.  Now, was Brian Talburt doing any
12  work on behalf of the union with Mike Hafner?
13     A.  No.
14     Q.  And he continues and says, this is just an
15  illustration of the types of conversations I've had
16  with senior SW management, re- -- re:  dealing with
17  problem people; in this case, specifically, Hofer
18  and Casper.
19     Did Brian Talburt tell you about
20  communications he was having with Southwest
21  management about Hofer and Casper?
22     A.  No.
23     Q.  Okay.  Did you ask him about conversations
24  he -- he was having with Southwest management?
25     A.  No.  I did not want to know.

Page 185

1    Q.  Okay.  Why not?
2    A.  Just because I had a million other things
3  on my plate.  And if every flight attendant had
4  come to me to tell me about every conversation they
5  had with a member of Southwest Airlines management,
6  I would have never been able to actually do my job.
7    Q.  Okay.  All right.  Now, did Brian Talburt
8  communicate with you about other conversations he
9  was having about social media with other members of
10  -- or with any members of management?
11    A.  No.  Not outside of what he shared further
12  in this email.
13    Q.  Okay.  Let's see.  If I could mark as
14  Document 31 as Exhibit 13.
15        (Exhibit 13 marked.)
16    A.  Okay.
17    Q.  (By Mr. Gilliam)  Do you recognize this?
18    A.  No.
19    Q.  Okay.  This -- this is an email that Brian
20  sent to you, correct?
21    A.  Yes.
22    Q.  Okay.  And he refers to discussing his
23  thoughts on the social media topic.  Were there
24  discussions about any social media document that
25  were -- topic that were taking place with some of

Page 186

1  the individuals named here in this email, including
2  Sonya Lacore, Mike Hafner, Jamie Willard?
3    A.  With me or with Brian?
4    Q.  With -- with anyone?
5        MR. CORRELL:  Objection.  Calls for
6  speculation.
7    A.  I can't speak to the conversations.  This
8  email that Brian sent me was forwarded from an
9  email that was sent in January -- to these
10  individuals in January 2013.  I wasn't in office.
11  I wasn't having any conversations with anyone.  I
12  wasn't involved in the union at that time.  If --
13  this was something he apparently forwarded me a
14  year and a half, almost two years later.
15    Q.  (By Mr. Gilliam)  Okay.  Did he tell you
16  why he was forwarding this to you?
17    A.  I believe this may have been during the
18  time of his first termination, or around then.
19    Q.  Okay.  And do you know who Jamie Willard
20  is?
21    A.  Yes.
22    Q.  And who is Jamie Willard?
23    A.  I am sorry.  Give me one second to pull
24  that back up.  What was the document number?
25    Q.  31.

Page 187

1    A.  Thank you.
2    Q.  Sure.
3    A.  I am not positive what her title was in
4  2013.  I think she was a senior manager for
5  inflight.  And I don't recall what -- what her --
6  her title was during that time.
7    Q.  Okay.  While you were president, did you
8  have any -- well, let me back up.  While you were
9  president, did you or -- well, let me strike that
10  and start all over.
11        While you were president, did you have
12  any communications with Southwest management about
13  a social media virtual roundtable?
14    A.  No.
15    Q.  Okay.  All right.  Okay.  And did anyone
16  from the company ever communicate with you about
17  Brian's email?
18    A.  No.
19    Q.  Okay.  All right.  Let's see.  If I could
20  mark Document 32 as Exhibit 14.
21        (Exhibit 14 marked.)
22    A.  Okay.  I have scanned the top part.
23    Q.  (By Mr. Gilliam)  Okay.  And do you
24  recognize this?
25    A.  Not really.  Not until I see it.

Page 188

1    Q.  Okay.  And what is it?
2    A.  It's an email Brian sent me with a forward
3  from an email between he and Sonya, as well as, it
4  looks like, a very long conversation with a lot of
5  posts on some sort of social media platform.
6    Q.  Okay.  In the first line, Brian says, so
7  this is part of a thread between Sonya and I re: a
8  Facebook post regarding not taking fourth when
9  asked.
10        And it continues.  What does not
11  taking fourth mean?
12    A.  That is recurring -- I believe, based off
13  of skimming this -- the fourth jump seat.  So on
14  the aircraft at -- on either a 700 or an 800 -- on
15  a 700, there are -- every jump seat has two seats,
16  two spaces on it.  On a 700 aircraft, we only have
17  three flight attendants; on an 800 aircraft, we
18  have four.  On a 700 aircraft, there is one extra
19  jump seat; it's called the fourth.  On the 800,
20  it's now referred to as the fifth and sixth.  And
21  it is a seat available to any commuting employee.
22        So if there -- if the cabin is full
23  and there is not an empty seat in the cabin, and
24  your -- employees fly -- unless they purchased a
25  ticket, they fly standby.  So nonrevenue travel,

Page 189

1    there has to be an empty seat.  If there isn't one
2    in the cabin, they can sign up for the fourth jump
3    seat.  That's what the fourth is that he is
4    referring to.
5        Q.  Okay.  And in the second paragraph, second
6    sentence, he says, note, once again, using the
7    targeted assassination metaphor and being quite
8    clear about what I was referring to.
9            Did -- did he send these emails to you
10   in connection with his grievance?
11       A.  Yes, I think so.  Brian forwarded me, it
12   looks like, a couple of things in a row.  And based
13   off the time frame, I believe that this was about
14   his grievance and the point he was trying to make;
15   that he's used phrases like that before, even with
16   members of management.  And that he was clear in
17   his intent that it was not to actually assassinate
18   someone or execute someone.
19       Q.  Okay.  Was that an argument you made when
20   you were trying to reverse the discipline he
21   received?
22       A.  I believe so.  I know it's an argument
23   Brian made in his meetings.
24       Q.  Okay.  All right.  And this -- this email
25   -- sent from Brian to Sonya Lacore at a Gmail

Page 190

1    address, right?
2        A.  Yes.
3        Q.  Okay.  Now, did you ever email Sonya at
4    her Gmail address?
5        A.  No, I don't think I ever even had her
6    personal email address.
7        Q.  Okay.  And does it surprise you that Brian
8    has her personal email address?
9        A.  No.  Because, as I stated earlier, Brian
10   at that time had -- was a, I think, 30-plus-year
11   employee who had relationships with many other
12   Southwest Airlines employees in inflight and other
13   departments, both flight attendants and universal
14   management.  And Sonya had been a flight attendant.
15   And I believe she had been a flight attendant in
16   Phoenix where Brian was based before she moved into
17   her leadership role.
18       Q.  Do you know when Sonya was a flight
19   attendant in Phoenix?
20       A.  I -- I don't know.
21       Q.  Okay.  Do you know how long Sonya has been
22   with the company?
23       A.  No.  I just know she started as a flight
24   attendant with Southwest.
25       Q.  Okay.  Now, did Sonya ever communicate any

Page 191

1    concerns to you that Brian had, I guess, referred
2    to targeted assassinations in an email to her?
3        A.  No.
4        Q.  And did Sonya ever communicate any
5    concerns with emails that Brian had sent to her
6    to --
7        A.  No.  Sorry.  I didn't mean to --
8        Q.  No.  That's okay.
9        A.  Are you -- are you finished with the
10   question?
11       Q.  Yes.
12       A.  Okay.  No, she hadn't.  She -- she had
13   communicated with me that she very much had an
14   open-door policy and that a lot of flight
15   attendants regularly reached out to her, including
16   on her personal cell phone.
17       Q.  Okay.  Okay.  Did -- did Sonya ever tell
18   you who she was communicating with on her cell
19   phone from the union?
20       A.  From the what?
21       Q.  Well, let me ask the question again.  Did
22   -- did Sonya ever indicate to you who she
23   communicated with on her cell phone about anything
24   union related?
25       A.  Not -- no, not specific to union related.

Page 192

1        Q.  Okay.  Did she ever communicate with you
2    about who was contacting her on her cell phone?
3        A.  I know of one other senior flight
4    attendant that -- that had reached out to her.  And
5    I think she had directed him to the union.  And I
6    know that he regularly communicated with her.
7        Q.  Okay.  And who was that?
8        A.  That was Carlos Vialla (phonetic).  I may
9    not be pronouncing his last name correctly.
10       Q.  Okay.  And how did you know that?
11       A.  She told me.  I think she asked me if he
12   had reached out to us.
13       Q.  Okay.  And who is Carlos Vialla?
14       A.  A flight attendant.
15       Q.  Okay.  Was Carlos a union member?
16       A.  Yes.
17       Q.  Okay.  Did he hold any offices with the
18   union?
19       A.  Not to my knowledge.
20       Q.  Okay.  All right.
21       A.  He's just the only one I can think
22   specifically think of that -- that I know
23   communicated directly with her -- like,
24   specifically.  But I do know many, many flight
25   attendants did.

Page 193

1    Q.  Okay.  Now, was -- to your knowledge, was
2  Brian Talburt ever disciplined before this
3  discipline in October of 2014?
4    **A.  Not that I am aware of --**
5    Q.  Okay.
6    **A.  -- recall.**
7    Q.  All right.
8    **A.  Brian moved to Southwest, though, a lot**
9  **longer than my union involvement goes back,**
10  **so --**
11    Q.  Okay.  All right.  Well, while you --
12  while you were union president, do you know if
13  Brian Talburt was called in for any matters?
14    **A.  Not that I remember.**
15    Q.  Okay.  All right.  Also, do you know who
16  Brian Siebenlist is?
17    **A.  I --**
18    Q.  I am sorry.  Do you know who Matthew
19  Siebenlist is?
20    **A.  Yes.**
21    Q.  And who is that?
22    **A.  He's a flight attendant.**
23    Q.  Okay.  Is -- is Matthew Siebenlist in
24  management?
25    **A.  He -- he held a -- I don't know -- I don't**

Page 194

1  **think so, but I know he was on a Southwest Airlines**
2  **committee.  And I think, at some point, he held a**
3  **full-time position doing work for Southwest**
4  **Airlines, but I don't believe it was -- I don't**
5  **believe he was technically in management.**
6    Q.  Okay.  Did he hold any union positions?
7    **A.  Not to my knowledge.**
8    Q.  Okay.  And let's see.  If I could mark
9  Document 33 as Exhibit 15.
10    (Exhibit 15 marked.)
11    MR. GREENFIELD:  I am sorry, Matthew,
12  can you repeat that number?  I didn't hear it.
13    MR. GILLIAM:  Yeah.  Document 33
14  marked as --
15    MR. GREENFIELD:  Thank you.
16    MR. GILLIAM:  -- Exhibit 15.
17    MR. GREENFIELD:  Thank you.
18    **A.  Okay.**
19    Q.  (By Mr. Gilliam)  Do you recognize this?
20    **A.  Yes.**
21    Q.  And what is it?
22    **A.  It is -- it is an email Brian sent me with**
23  **a forward of some emails, as well as Facebook posts**
24  **from 2013.**
25    Q.  Okay.  And in his email that he sends you,

Page 195

1  he says that, I, along with Mike and Sonya, had a
2  meeting last summer with VdV to discuss social
3  media as a tool together with management and FAS to
4  deliver and reinforce messages.
5    Do you know who VdV is?
6    **A.  No, I don't.**
7    Q.  Okay.  Do you know if that could be Mike
8  Van de Ven?
9    **A.  I have no idea.**
10    Q.  Okay.  Do you know if Brian was having any
11  meetings with Mike Van de Ven about social media?
12    **A.  I -- I don't -- I don't know.**
13    Q.  As union president, would you have been
14  familiar with that, if -- if he was?
15    **A.  Well, the time frame that I believe he's**
16  **referencing, I don't think I was in office.  Based**
17  **off of what the email thread is talking about and**
18  **that project, that project started before I was in**
19  **office.**
20    Q.  Okay.  He says he had a meeting with them
21  last summer, and that was in October of 2014.  You
22  were union president in the summer of 2014,
23  correct?
24    **A.  I became the president then, yes.**
25    Q.  Okay.  And you -- you were president in

Page 196

1  the summer of 2013, weren't you?
2    **A.  Yes.  I am sorry.  That's what I thought**
3  **you meant, yes.**
4    Q.  Oh, okay.  And if Brian Talburt, I -- I
5  guess, was having meetings about using social media
6  as a tool with Mike Van de Ven, would you have been
7  informed of that?
8    **A.  I -- I -- I would have hoped so, but**
9  **again, flight attendants had conversations with**
10  **members of management that I was not aware of on a**
11  **regular basis.**
12    Q.  Okay.  Okay.  Now, am I -- am I correct
13  that it's your testimony that social media
14  violations declined after March of 2015?
15    **A.  For a while, yes.**
16    Q.  Okay.  Did they increase again?
17    **A.  They appeared to be on the rise at the --**
18  **later on towards the end of my term.**
19    Q.  Okay.  And when were they on the rise
20  again?
21    **A.  I don't know specifically.  I know right**
22  **before I left office, we, I think, saw the first,**
23  **you know -- or more than one 30-day suspension.  So**
24  **that would have been spring 2018.  And I feel like**
25  **we had gone a long period of time without seeing --**

Page 197

1  without seeing any.
2      Q.  Do you know if it's possible that social
3  media violations were on the rise in 2016?
4      A.  They could have been.  I -- I -- I don't
5  recall.  I just -- I know that there was -- it
6  seemed like there was a decrease and a break after
7  this branch in 2015.  After those were resolved, it
8  seemed like there were less violations being
9  issued.  And then it felt like they started back
10  up.
11      Q.  Okay.  All right.  If -- if I could
12  reference you to -- refer you to Document 9, mark
13  that as Exhibit 16.
14          (Exhibit 16 marked.)
15      A.  Okay.
16      Q.  (By Mr. Gilliam)  Do you recognize these?
17      A.  Yes.
18      Q.  And what are they?
19      A.  They are both read-before-flys that
20  Southwest Airlines issued to our work group.
21      Q.  Okay.  And, I guess, focusing on the first
22  page, the October 12th, 2016 read-before-fly, does
23  that refresh your recollection in any way as to
24  when social media violations were on the rise
25  again?

Page 198

1      A.  No.  But we were in the middle of the
2  rollout of the second tentative agreement during
3  October 2016.
4      Q.  Okay.  And what does that mean as far as
5  being in the rollout of the second tentative
6  agreement?
7      A.  The tentative agreement details had been
8  released to the membership at this point.  And I
9  can't recall if voting had started yet, but it was
10  around the time frame that flight attendants would
11  be voting on the tentative agreement --
12      Q.  And --
13      A.  -- of the contract.
14      Q.  I am sorry.  And what significance did the
15  rollout of the second tentative agreement have with
16  respect to when this read-before-fly policy was
17  issued?
18      A.  Well, I -- I think that Southwest Airlines
19  had seen an increase in social media activity
20  around the last couple of union-related events,
21  whether it was the election in '15 or the rollout
22  of the first tentative agreement in 2015.  There
23  tended to be more chatter online and people talking
24  about work when there was a contract vote going on.
25      Q.  Okay.  Was there an increase in -- in

Page 199

1  chatter when the recall petition was filed?
2      A.  I think so.
3      Q.  And do you know if that resulted in more
4  social media violations being reported?
5      A.  I think some -- some of them were, but I
6  don't recall the dates.
7      Q.  Okay.  And did anyone with Southwest
8  consult you before this 2016 read-before-fly was
9  issued?
10      A.  I think -- I think Naomi told me that they
11  were going to be putting out a reminder about the
12  policy.  I think she told me they were -- they were
13  going to be putting it out, just like they normally
14  communicated to us.  I think, at one point -- yeah,
15  I think there is -- yeah, I think she -- she told
16  me they were going to put something out.  I don't
17  remember the term.
18      Q.  Okay.  And did you express any of your
19  former concerns about social media violations with
20  Naomi or Sonya?
21      A.  At this time?
22      Q.  Yes.  In October of 2016 or --
23      A.  No.  I don't think it's on the contract.
24      Q.  Okay.  And after that, did you have
25  communications with Naomi and Sonya about, I guess,

Page 200

1  the enforcement of the social media policies?
2      A.  No, not that I can recall.
3      Q.  Okay.  And turning to the second page of
4  the February 22nd, 2017 read-before-fly, had you
5  communicated with -- with anyone in Southwest
6  management about that read fly -- read-before-fly
7  being issued before it was issued?
8      A.  No.  I don't recall knowing that this one
9  was -- at the time.
10      Q.  Okay.  All right.  Switching gears a
11  little bit.  Now, you attended the January 2017
12  women's march; is that correct?
13      A.  Yes.
14      Q.  Okay.  And did you help organize that
15  event?
16      A.  I wasn't -- I -- I assisted, yes.
17      Q.  Okay.  And how did you assist with the
18  organization of that event?
19      A.  I assisted the chairperson of the
20  committee; that's how I found out even about
21  anything related to the event.  And she came to me
22  and told me that there were a group -- there were
23  flight attendants throughout the system reaching
24  out -- had reached out to her asking her if the
25  committee -- you know, wanting to know how they

Page 201

1  could get more involved; wanting to know if there
2  were any events coming up.
3       She said that there were some flight
4  attendants that were talking about wanting to go to
5  the -- the march in DC and asked me if I thought
6  that could be -- just that -- could be a union
7  event.
8       Q.  Okay.  And did you say you thought it
9  could be a union event?
10      A.  No.  I actually told her that the women's
11 march itself wasn't something that I believed would
12 fall under general, you know, union business or
13 even the committee.  But I encouraged her to reach
14 out to the chairperson of the TWU International
15 women's committee and see if there was work that
16 could be done through the committee; that, earlier
17 that week, if flight attendants wanted to volunteer
18 their time and actually do some official committee
19 work.
20      And then if they chose to stay over
21 and go to the march on their own time -- because I
22 believe it was a Saturday -- that she could look at
23 doing that; or that was my opinion.  If she had the
24 money in her budget, her committee budget, to pay
25 for any of the -- the travel expenses for the

Page 202

1  actual meeting.
2       Q.  Okay.  And did you also decide to attend
3  the women's march?
4       A.  Yes, part of it.
5       Q.  Okay.  How many days was the women's
6  march?
7       A.  I believe -- I believe the march was just
8  one day.
9       Q.  Was just one day?
10      A.  The march -- the women's march in DC?
11      Q.  Yes.
12      A.  Yes.  I believe it was just one day.
13      Q.  Okay.  Now, were you there for related
14 events for several days?
15      A.  Yes.
16      Q.  Okay.  And how many days were you in
17 Washington, DC for the march?
18      A.  I was only in DC for the march for half a
19 day.  I was in DC for other events not related to
20 the march for a couple of days.
21      Q.  Okay.  What were the other events you were
22 in DC for?
23      A.  A meeting at TWU national headquarters
24 that was chaired by our local committee
25 chairperson, as well as facilitated by the TWU

Page 203

1  International chairperson.  And we had other
2  speakers that attended that meeting: Liz Shuler
3  from the AFL-CIO; that took place, I believe, the
4  day before the march.
5       Q.  Okay.  And let's see.  If I could turn
6  your attention to Document 25 and mark that as
7  Exhibit 17.
8            MR. GREENFIELD:  Matthew, is there a
9  25-A and B?
10           MR. GILLIAM:  I sent them in two
11 pieces, yeah.  It's all one exhibit, but I broke
12 them up because of the file size.
13           MR. GREENFIELD:  Thank you, sir.
14      A.  Okay.
15           (Exhibit 17 marked.)
16      Q.  (By Mr. Gilliam)  Now, do you recognize
17 these?
18      A.  I recognize some of them.  I recognize the
19 first page.  There are other posts and photos in
20 here I do not recognize.
21      Q.  Okay.  Well, starting with the first page,
22 do you know who Elizabeth Alexander is?
23      A.  The first page?
24      Q.  Yeah.  Let's see; did I send them to you
25 in a different order?

Page 204

1       A.  At the very bottom of the first page?
2       Q.  I'm sorry, I think I sent them -- I am
3  looking at them in a different order.  Okay.
4  Starting with the first page, you do recognize
5  this?
6       A.  If we're looking at the same thing and
7  it's a post by TWU Local 556 dated February 6th?
8       Q.  Yes.
9       A.  Yes.
10      Q.  Okay.  And where was this picture taken?
11      A.  That was taken at the TW -- TWU
12 International offices in Washington, DC.
13      Q.  Okay.  And who is pictured here in this
14 photo?
15      A.  Pictured here are the flight attendants,
16 the TWU 556 members, that attended the meeting.
17      Q.  Okay.
18      A.  Again, I -- I am not finished.  I am
19 sorry.
20      Q.  Oh, I am sorry.  I need to --
21      A.  Also, is the -- the TWU International
22 chair of the international working women's
23 committee meeting, and that was Gwen York.
24           MR. CORRELL:  Why don't we take a
25 break, Ms. Stone; is that okay?

Page 205

1    THE WITNESS: Yes.  Thank you.
2    MR. GILLIAM:  Let's take a break.
3    THE VIDEOGRAPHER:  We are off record
4  at 5:06 p.m.
5    (Recess taken.)
6    THE VIDEOGRAPHER:  We are back on
7  record at 5:24 p.m.
8    Q. (By Mr. Gilliam) Okay.  Ms. Stone, I know
9  we were talking about a different subject when we
10  left off.  I would like to shift, if I could, to
11  Document 20, which I think we made Exhibit 1.  And
12  my questions -- my first question involves just a
13  couple of pages.
14    MR. GILLESPIE:  Can you repeat that
15  document number, please?
16    MR. GILLIAM:  20.
17    MR. GILLESPIE:  Okay.
18  **A. Okay.**
19    Q. (By Mr. Gilliam) Do you recognize this?
20  **A. Yes.**
21    Q. And what is it?
22  **A. It is the response that Mr. Gillespie**
23  **submitted, response to the personal Subpoena I was**
24  **served.**
25    Q. Okay.  And starting at the bottom of Page

Page 206

1  2 and continuing on to Page 3, it -- it reads, to
2  the extent the requests seek information and
3  documents from Ms. Stone in her union capacity as
4  opposed to her individual capacity, such requests
5  seek core union communications between union
6  members and their union representative regarding
7  their personal union grievances and work-related
8  questions.
9    Did -- did you have, I guess, union
10  documents and information that were responsive to
11  each of these requests for production?
12  **A. No.**
13    Q. Okay.  So you -- you have no union
14  information at all that's in -- in your -- that you
15  have?
16  **A. Can you repeat the question?**
17    Q. Yeah.  So, I guess, my question is:  Do
18  you -- did you turn over information to the union
19  that would have otherwise been response --
20  responsive to these requests for production?
21  **A. No.  We -- any union documents that I had**
22  **from my -- my position were items that the union**
23  **has records of.  I didn't maintain personal records**
24  **of documents from my union capacity.**
25    Q. Okay.  Did you have any union documents on

Page 207

1  your personal computer?
2  **A. No, not that the union didn't already**
3  **have.**
4    Q. Okay.  So you had some, but the union
5  already had them?
6  **A. I don't have anything.  I don't have my**
7  **own records of stuff.**
8    Q. Okay.  Did you have any information that
9  related to your work with the union that's on your
10  personal Hotmail account?
11  **A. No, I don't believe so.**
12    Q. Okay.  And did -- did you have any
13  information related to the union on your cell
14  phone?
15  **A. Not that I am aware of.**
16    Q. Okay.  And -- okay.  And then another
17  question.  The very last two pages that are
18  attached to this document, have you review those.
19  **A. Okay.**
20    Q. And is that a text -- or what is that?
21  **A. It is a text message.**
22    Q. Okay.  And who is it a text message to?
23  **A. It's a text message to me.**
24    Q. Okay.  And who is it from?
25  **A. Courtney Davis.**

Page 208

1    Q. Okay.  And who is Courtney Davis?
2  **A. A flight attendant.**
3    Q. Okay.  Is she -- does -- does Courtney
4  Davis -- or let me ask it this way:  Has Courtney
5  Davis ever hold -- held any position with the
6  union?
7  **A. I think so.**
8    Q. And what positions has Courtney Davis held
9  with the union?
10  **A. I believe -- I believe she's a shop**
11  **steward.  And then she also -- I guess it would be**
12  **defined as a position.  She served -- she was one**
13  **of the flight attendants who answered questions for**
14  **our members on the official TWU 556 Facebook group.**
15    Q. Okay.  And when did Courtney Davis send
16  you this text message?
17  **A. She sent it to me on December 15th of last**
18  **year, 2019.**
19    Q. Okay.  And she says that, you said you had
20  wanted this during girls' weekend and I never sent
21  it.
22    What did you tell her that you had
23  wanted?
24  **A. She had told me that Charlene Carter had**
25  **had an abortion; and I did not know that.  And she**

Page 209

1 was surprised because she said Charlene had openly
2 posted about it on Facebook. I told her I, you
3 know, don't really participate in Facebook and --
4 and I was definitely not going and looking at
5 Ms. Carter's Facebook page. And she said she would
6 send me one of the posts. And that -- then months
7 later, she sent this text message.
8    Q. Okay. And why did you want the post?
9    A. I was surprised to find that out and I
10 wanted to make sure that -- that other -- that --
11 that the attorneys, you know, knew that, that were
12 representing in the lawsuit.
13    Q. Okay. And, now, you had, I guess,
14 reported specific Facebook messages that Ms. Carter
15 sent; is that correct?
16    A. Yes.
17    Q. And did you report those messages in 2017?
18    A. Yes.
19    Q. Okay. And were you reporting Ms. Carter
20 for both Facebook messages and posts she made?
21    A. No.
22    Q. Okay. And what -- why did you -- I guess,
23 what were you specifically reporting Ms. Carter
24 for?
25    A. I was specifically reporting Ms. Carter

Page 210

1 for two videos that she sent me that contained very
2 disturbing graphic images of -- allegedly of a
3 pregnancy that had been terminated and the -- the
4 fetus.
5    Q. Okay. And who did you report these videos
6 to?
7    A. I reported them to my inflight base
8 manager.
9    Q. Okay. Did you also report them to Naomi
10 Hudson and Sonya Lacore?
11    A. Yes. I CC'd them on my report.
12    Q. Okay. And after you reported it to them,
13 did Naomi contact you about your complaint?
14    A. No.
15    Q. Okay. You -- so after -- at no point
16 after reporting Ms. Carter did you ever hear
17 anything about your complaint from Naomi Hudson?
18    A. Not to my recollection, no.
19    Q. Okay. At any point after reporting
20 Ms. Carter, did you hear from Sonya Lacore?
21    A. No. Not after my complaint, no.
22    Q. Okay. After you reported Ms. Carter to
23 Suzanne Stephensen, who from Southwest management
24 did you hear from?
25    A. I believe Suzanne emailed me back

Page 211

1 acknowledging receipt of my complaint. And then
2 the base manager where Ms. Carter was based, Ed
3 Schneider, the Denver base manager, I think, is the
4 next person that contacted me via phone regarding
5 my complaint.
6    Q. Okay. Did Ms. -- did Dave Kissman ever
7 communicate with you regarding any of the matters
8 raised in your complaint?
9    A. No.
10    Q. Okay. Did Denise Gutierrez ever
11 communicate with you regarding any of the matters
12 raised in your complaint?
13    A. Yes.
14    Q. Okay. And why did Denise Gutierrez
15 contact you?
16       MR. CORRELL: Objection. Calls for
17 speculation.
18    Q. (By Mr. Gilliam) I will ask again. Do
19 you know -- if you know, why did Denise Gutierrez
20 contact you?
21    A. She was -- she was on the second call that
22 I had with Ed when she was there representing
23 employee relations. She was on -- she was on the
24 call with -- with Ed. And that's when she -- that
25 was the contact I had with her.

Page 212

1    Q. Okay. Now, Ms. Carter had been sending
2 you messages for a long time; is that correct?
3    A. Yes.
4    Q. Okay. Had you ever opened any of those
5 messages you had received from Ms. Carter before?
6    A. Some of them, yes.
7    Q. Okay. And you didn't respond to any of
8 those messages; is that correct?
9    A. Yes.
10    Q. Okay. And why did you not respond to any
11 of Ms. Carter's prior messages?
12    A. They were all ugly and hateful and were
13 not asking me questions, the ones that I read; they
14 were calling me names. And there was -- and they
15 were also sent to my personal -- you know,
16 Messenger. And I didn't feel like there was
17 anything that would -- anything good that would
18 come out of me responding to any of the vile
19 messages she sent.
20    Q. Were you reporting Ms. Carter, in part,
21 because of all of the prior messages she had sent?
22    A. No. Not at the moment I reported it, no.
23    Q. Okay. And -- all right. Where were you
24 when you had received these messages from
25 Ms. Carter?

Page 213

1    A.  Which ones?
2    Q.  Where were you when you had received the
3  videos of the aborted babies from Ms. Carter?
4    A.  I was -- I was in the Denver airport
5  waiting to board a flight.
6    Q.  Okay.  And were you on your way to a
7  vacation?
8    A.  No.
9    Q.  Were you coming back from a vacation?
10   A.  Yes.
11   Q.  Okay.  And is it correct you were on a ski
12  trip?
13   A.  Yes.
14   Q.  Okay.  And were you on that trip with any
15  flight attendants?
16   A.  Yes.
17   Q.  Okay.  Which flight attendants were with
18  you on that trip?
19   A.  Shelby Pierce.  And I think she was the
20  only one.
21   Q.  Okay.  Was anyone from Southwest
22  management on that trip with you?
23   A.  No.
24   Q.  Okay.  All right.  Now, when you reported
25  Ms. Carter, did you report her for any particular

Page 214

1  policy violations?
2    A.  I, in my report, cited what I believed it
3  was a violation of, yes.
4    Q.  Okay.  Let's see.  How much --
5    MR. GILLIAM:  Can we go off record
6  real quick?
7    THE VIDEOGRAPHER:  We're off record at
8  5:50 -- 5:44 p.m.
9    (Recess taken.)
10   THE VIDEOGRAPHER:  We are back on
11  record at 5:58 p.m.
12   Q.  (By Mr. Gilliam)  Okay.  Ms. Stone, just a
13  few more questions before I wrap up.  So have you
14  -- or I am sorry.  Did you ever report Jeanna
15  Jackson for a social media policy violation?
16   A.  I think so, towards the end of my term.
17   Q.  Okay.  And did you ever report Holly
18  Imamovic for a -- any disciplinary violation?
19   A.  No.
20   Q.  Okay.  Did you ever report any other
21  flight attendant for a disciplinary violation?
22   A.  I don't believe so.
23   Q.  Okay.  And what did you report Jeanna
24  Jackson for?
25   A.  She had made some posts of -- about

Page 215

1  contract celebration -- contract-signing
2  celebration that the union hosted.  And in there,
3  she and some other flight attendants had posted
4  photos and -- I am sorry, I don't think that's --
5  that's not what I -- that's not what I reported.  I
6  don't -- I don't remember.  I don't remember the
7  specifics.
8    Q.  Okay.  Do you know if any other executive
9  board member reported a flight attendant for a --
10  any disciplinary violation?
11   A.  Yes.
12   Q.  Okay.  And what other executive board
13  members reported a flight attendant for
14  disciplinary violation?
15   A.  Cuyler Thompson.  And I believe Sam
16  Wilkins --
17   Q.  Okay.
18   A.  -- did as well.
19   Q.  And who did Cuyler Thompson report?
20   A.  I think it was Mike Casper.
21   Q.  Okay.  And who did Sam Wilkins report?
22   A.  I think it was Jeanna Jackson and another
23  flight attendant by the name of Diane -- I am
24  blanking on her last name.  There is a couple of
25  different flight attendants whose first name is

Page 216

1  Diane and whose last name, I think, start -- starts
2  with an S.  But I believe the flight attendant's
3  name is Diane.
4    Q.  Could it have been Diane Cavanaugh?
5    A.  I don't -- no, I don't believe so.
6    Q.  Okay.  Do you know if any other executive
7  board member has reported a flight attendant for a
8  disciplinary violation?
9    A.  I don't know of others.  I don't know.
10   Q.  Okay.  Do you know what Sam Wilkins
11  reported Jeanna Jackson for?
12   A.  I think it was -- I think it was the
13  thread about the contract party and some of the --
14  the comments made on that.  One that was a very
15  unflattering photo of a woman who had on a tank top
16  with writing on it.  And there was a reference made
17  using Sam's initials that it was her leaving the
18  party.  And it was a very ugly phrase on the T --
19  on the tank top.
20   Q.  Okay.
21   MR. GILLIAM:  I think that's it, so
22  I'll -- with that, I will pass the witness.
23   EXAMINATION
24  BY MR. CORRELL:
25   Q.  Ms. Stone, thank you for bearing with us.

Page 217

1   My name is Michael Correll and I am an attorney
2   representing Southwest Airlines in this case.  I
3   know you are very tired.  We have to go through a
4   couple of more topics, but as we go, if you need a
5   break, let me know.  Also, as you can probably
6   expect, we're going to talk about some things that
7   are very emotional.  So if you need to take your
8   time, please don't feel rushed.  I understand that
9   some of these discussions are challenging.
10        At the beginning of the day today, you
11  gave us some information about your background, but
12  we -- there were a couple of parts I wanted to fill
13  in.  When did you end your term as president of
14  556?
15      A.  My last day as president was April 30th,
16  2018.
17      Q.  Since that time, have you returned to the
18  line?
19      A.  Yes.
20      Q.  So have you worked flights for Southwest
21  as a flight attendant since leaving the union --
22  excuse me -- leaving the union president job?
23      A.  Yes.
24      Q.  And earlier today, you talked a bit about
25  some of the social media activity that was going on

Page 218

1   during your tenure as president of the union; do
2   you recall that testimony?
3       A.  Yes.
4       Q.  Were you ever the subject of personal
5   attacks through social media during your time as
6   the union president?
7       A.  Yes.
8       Q.  Can you tell us a little bit about your
9   experience in that area?
10      A.  It -- it started at the -- there was some
11  at the beginning when I assumed office under the
12  circumstances which my presidency happened.  There
13  -- but it was -- you know, I was the unelected
14  president, you know.  It was -- it was stuff more
15  in that vein.
16        And then during the election in 2015,
17  it got nastier.  Things that were more personal,
18  that had nothing to do with my leadership, started
19  becoming the object of discussion.  Including, you
20  know, my weight, my appearance; the fact that I was
21  not married, there -- then I must be a
22  home-wrecker.  The fact that I don't have children,
23  that I didn't care about moms in our membership or
24  kids.
25        And then after the -- after the first

Page 219

1   tentative agreement failed in 2015, it became even
2   uglier.  And that's when some of the posts started
3   becoming more violent.  Aggressive discussions were
4   taking place regarding the fact that I should never
5   return to the line as a flight attendant.  Because
6   if I did, there were going to be thousands of
7   flight attendants lined up to hurt me and that I
8   was going to need to travel with a bodyguard
9   because of what people were going to do to me.
10        There were some posts that were very
11  specific and graphic to that, on how they were
12  going to do it.  There were also some posts made
13  divulging the address of the duplex that the union
14  rented as corporate housing for us in lieu of
15  hotels; that address was published and people were
16  encouraged to do a drive-by or stop and have me
17  give them a tour.
18        And because of the nature of some of
19  the posts, we had to take additional safety
20  precautions; both at the union office, as well as
21  those of us that were coming to and from the
22  duplex.  We were on very, very high alert.
23      Q.  After you've had all of these experiences
24  -- or as you had all of these experiences, other
25  than taking additional safety precautions, what

Page 220

1   other steps, if any, did you take to address these
2   posts that were out there saying these things?
3       A.  I filed a police report in Dallas.
4       Q.  And did anything come of that police
5   report, as far as you know?
6       A.  No.  They said that a flight attendant
7   would actually have to come on property with a
8   weapon and -- and threaten me with it, basically,
9   before they could take additional action.
10      Q.  And what is the time frame we're talking
11  about here?  Because I believe you mentioned that
12  this got worse around the failure of the first TA.
13      A.  That was -- that was July 2015.
14      Q.  And when you received these messages, the
15  more aggressive messages that you have described
16  around the failure of the TA, did you report those
17  individuals to the company?
18      A.  No.
19      Q.  Why not?
20      A.  By the time I heard about them, it was --
21  it was -- people had told me it had already been
22  reported to Southwest; that it was already under
23  investigation.  They weren't messages sent to me
24  directly.  They were messages that had been posted
25  or leaked from Facebook groups.  They didn't --

Page 221

1  they didn't come to me.
2      Q.  Did you think it was wrong that those
3  posts had been reported to the company?
4      A.  No.
5      Q.  Why not?
6      A.  Because I had an entire office staff of
7  flight attendants, many of whom were afraid to come
8  to work because some of the posts had been very
9  general against 556.  And it was also my workplace.
10  I had a team member that was afraid to go on the
11  road to do ratification meetings because he was
12  afraid of being hit by a stray bullet meant for me.
13  And I don't think anyone should ever have to be
14  afraid to go to work.
15      Q.  If those Facebook posts and other messages
16  you have described had not been reported by other
17  employees, do you believe you would have reported
18  them to the company?
19      A.  I don't know.  I -- I think so, looking
20  back now on everything that I went through.
21      Q.  Earlier today, you were also asked some
22  questions about opting out; do you remember
23  testifying about that earlier today?
24      A.  Yes.
25      Q.  And I believe you testified that the

Page 222

1  number peaked somewhere around 90 during your
2  tenure; does that sound right?
3      A.  Yes.
4      Q.  How many flight attendants worked at
5  Southwest Airlines during your tenure?
6      A.  When I left office, I believe we were at
7  16,000 and counting.
8      Q.  So is it fair to say that the number of
9  opt-outs is a pretty small percentage of the
10  overall union?
11      A.  Yes --
12      Q.  -- core group?
13      A.  Yes, it wasn't even one percent.
14      Q.  When you experienced the increase in
15  opt-outs -- and I believe you said five to this --
16  this 90 figure -- what was your personal response,
17  if any?
18      A.  Personal response, what do you -- what do
19  you mean?
20      Q.  How did you react?
21      A.  Probably, I -- I didn't react.
22  Internally, some of the people that opted out, it
23  meant that they couldn't come to membership
24  meeting.  And, personally, that gave me a sense of
25  relief because they were names of flight attendants

Page 223

1  that would come and it was never to just ask
2  questions, it was always to be combative; to try to
3  make whoever was there look bad; sometimes to raise
4  a ruckus in the membership meetings.  So with some
5  of the names, I thought, oh, well, membership
6  meetings will be easier without that person being
7  able to attend.
8      Q.  Did it upset you to learn that someone
9  opted out of the union, generally?
10      A.  No.
11      Q.  Did you ever make an effort to go out of
12  your way to punish people for opting out of the
13  union?
14      A.  No.  Never.
15      Q.  Did you consider them to be your
16  adversaries?
17      A.  No.  There were people that opted out of
18  the union that I never even met or dealt with.  And
19  there were also flight attendants that opted out of
20  the union that I advocated for down the road in
21  grievance-related matters.
22      Q.  On that last point, you previously
23  testified that you met with Mike Hafner and secured
24  several settlements, correct?
25      A.  Yes.

Page 224

1      Q.  And most of those were related to social
2  media, right?
3      A.  The particular ones that I was speaking to
4  with regards to meeting with Mike Hafner, they were
5  all social media violations.
6      Q.  And one of the people that you secured a
7  better outcome for, if you will, was Mary Ellen
8  Matter, correct?
9      A.  Yes.
10      Q.  And she was a objector?
11      A.  Yes.
12      Q.  And --
13      A.  At that time, yes.
14      Q.  And another person you secured -- secured
15  a better outcome for under the social media policy
16  was Mich- -- Michelle Foley?
17      A.  Yes.
18      Q.  And she was an objector?
19      A.  Yes.
20      Q.  And another person that you received a
21  more favorable outcome for was Holly Imamovic,
22  correct?
23      A.  Yes.
24      Q.  And she was a union objector?
25      A.  I don't -- I don't -- I don't believe she

Page 225

1  was an objector at that time.
2      Q.  Are there any other times you recall
3  successfully getting discipline reduced for a union
4  objector?
5      A.  That I was directly involved in or the
6  union?
7      Q.  Let's take them in pieces.  First, that
8  you were directly involved in.
9      A.  Right now, I can't think of any others off
10  the top of my head that I was personally, you know,
11  involved in.
12      Q.  Were you aware of the union working to get
13  better outcomes for objectors during your tenure as
14  president?
15      A.  Yes.
16      Q.  Did you ever do anything to discourage
17  union representatives from trying to get better
18  outcomes for objectors?
19      A.  No.
20      Q.  And earlier today, you also testified a
21  bit about a trip to DC in January of 2017 that also
22  involved you going to the women's march; do you
23  remember that testimony?
24      A.  Yes.
25      Q.  And I believe you testified that prior to

Page 226

1  the march, there was a women's committee meeting;
2  is that right?
3      A.  Yes.
4      Q.  What was the purpose of that women's
5  committee meeting that you attended?
6      A.  Prior to that point, our women's committee
7  within Local 556 just -- there -- there wasn't a
8  lot of activity.  There hadn't been a lot of
9  interest.  At one point, we took applications for
10  the chairperson position and no one even applied.
11  So it was -- it was really the -- the first time
12  our local had had any kind of real interest from
13  females or males wanting to be a part of work
14  through that committee.
15          So it was kind of a kickoff and --
16  because it was a committee that had been long
17  established within TWU International.  And the
18  chairperson of that committee was, at that time,
19  still a 556 member, who has passed away, but it was
20  a cause near and dear to her heart, so she was more
21  than happy to help facilitate, help host, help
22  organize it.  So the purpose was to bring 556
23  members in from around the nation who had, on their
24  own, reached out to our -- the chairperson saying,
25  hey, I -- I am interested.  I want to get involved.

Page 227

1          So the purpose was to -- to introduce
2  them; to try to foster that; to help actually talk
3  about where the committee could go in the future.
4  It resulted even in a name change of the committee
5  came out of that meeting.  As I mentioned earlier,
6  Liz Schuler was very high up within AFL-CIO; came
7  and spoke about her leadership career.
8          We volunteered to do work with Working
9  America, a group based out of DC that helps
10  employees that aren't represented by a bargaining
11  unit.  It helps -- but it's -- they help them lobby
12  and -- and advocate for better, you know,
13  conditions and rights at work.  Those are -- those
14  are some of the things that the meeting --
15      Q.  Was the women's committee meeting itself
16  about abortion?
17      A.  No, not at all.
18      Q.  Was it even discussed in your involvement
19  with the women's committee meeting?
20      A.  It was never discussed.
21      Q.  How was the trip to DC for the women's
22  committee meeting funded?
23      A.  Southwest Airlines provided the free
24  travel for -- for flight attendants.  All of the
25  other flight attendants volunteered their time for

Page 228

1  the meeting.  I was a salary position, so it was --
2  it was a flat rate, but I -- I believe I was the
3  only one that was -- that -- well, technically,
4  being paid besides Gwen York, our international
5  committee chairperson, who was on full-time staff
6  with International at the time.
7          And then the -- the hotel and Airbnb
8  cost were paid for out of the working women's
9  committee budget, as well as one meal the day of --
10  the day of the -- the committee meeting.
11      Q.  When you say Southwest provided free
12  travel, what do you mean by that?
13      A.  We have -- we have an agreement that we
14  can submit travel for any official human business.
15  The way that that's done has changed over time
16  during my union career, but it -- it's -- it's,
17  basically, a submission for travel on Southwest
18  Airlines.  And instead of it being nonrevenue with
19  space available, it is -- it's usually what is
20  considered positive space.  So had to be a seat
21  available for sale to reserve it, but it was --
22  that's -- that's what I mean by -- by travel.
23      Q.  And when you say you had an agreement with
24  the company, is this part of the collective
25  bargaining between 556 and the company?

Page 229

1    A.  Yes.
2    Q.  So if Southwest had said, no, you can't
3  have tickets to go to this meeting, would that be
4  something the union could have grieved?
5    A.  I believe so.  If -- you know, because we
6  even had -- we had a process even internally.  It
7  wasn't something that any member could just email
8  this department at Southwest and request union
9  travel.  Like, we had an internal process where it
10  went through us first to ensure that it was, you
11  know, official union travel before it was then sent
12  to Southwest Airlines.
13    Q.  And in this instance, when the union
14  reached out to get this travel authorization, was
15  it required to explain what the union business was;
16  or do you just reach out and say, we need X number
17  of seats for union business?
18    A.  There was -- there is a -- at least under
19  the system then -- and please know I'm not who
20  actually submitted the travel, so I'm not saying it
21  as somebody who -- who did it myself.  But there
22  was -- I believe it was like a line, you had to put
23  in what the purpose was for.  And there were times
24  where Southwest could, you know, question if the
25  purpose wasn't clear enough or if they believed it

Page 230

1  was vague or it -- they could ask for additional
2  information so that they were ensuring that it was,
3  you know, being used for the intended purpose.
4    Q.  Is it fair to say that union business
5  requests for travel were routinely granted?
6    A.  Yes.
7    Q.  So it would be unusual for the company to
8  get involved in the details on most of those
9  requests?
10    A.  Yes, that would be very unusual.
11    Q.  And you mentioned before that the other
12  flight attendants volunteered the -- their time and
13  you were on salary; did I hear that correctly?
14    A.  Yes.
15    Q.  So the -- the flight attendants who were
16  volunteering their time for both the meeting and
17  the subsequent march, were they paid anything, as
18  far as you know?
19    A.  No.  And my time for the march itself was
20  also volunteer because it took place on a Saturday.
21    Q.  To your knowledge, did everyone who went
22  to -- on this trip to go to the women's committee
23  meeting actually go to the women's committee
24  meeting?
25    A.  Yes, they did.

Page 231

1    Q.  Was it mandatory for folks who were coming
2  out for this trip to attend that portion of the
3  trip?
4    A.  Yes.  They all understood that the purpose
5  of the trip to DC was -- was for the working
6  women's committee meeting.
7    Q.  What about the march; was attendance at
8  the march mandatory?
9    A.  No.
10    Q.  Did anyone not stay for the march?
11    A.  I think so.  I think there were some
12  flight attendants that -- that left by Friday
13  evening.
14    Q.  Having completed the women's --
15    A.  I --
16    Q.  Oh, please go ahead.
17    A.  And there were also flight attendants that
18  didn't stay for the entire march, myself included.
19  I was only there for the first part of the day.
20    Q.  When you say that -- and -- and -- with --
21  about the march, was there actually, like, a march
22  route that everyone walked the whole day or was
23  this a stationary thing?  Can you kind of give me a
24  sense of what you mean when you say you stayed for
25  part of it, but there was more to it?

Page 232

1    A.  Well, we -- that morning, part of the
2  volunteer work we did with Working America was that
3  -- was that morning.  So when we first met up the
4  day of the march, we weren't marching.  We were --
5  we were passing out -- so we met with the Working
6  America representatives.  I think we got buttons
7  from them, some T-shirts; some flight attendants
8  were wearing that so we would be more easily
9  identifiable.  And we were talking to the men and
10  women that were there for the march, explaining
11  what Working America was and passing out the
12  postcards.
13        And then I think there had initially
14  -- the march itself, there had been routes planned,
15  but there were so many people there and because we
16  had been doing the Working America activity at the
17  beginning of the morning, there -- there -- I
18  didn't actually participate in the designated,
19  like, route because there -- there were people
20  everywhere.  There were certain areas where you
21  couldn't even -- you couldn't move.  You couldn't
22  walk; much less, you know, head down the street.
23    Q.  Did the group that was with you, including
24  you, at the march have a goal that they were trying
25  to accomplish by attending the march?

Page 233

1    A.  No.  It was just to be there in support of
2  equal rights and civil rights and to carry the
3  enthusiasm from our members that week at the
4  meeting, you know, about wanting to support each
5  other and standing up for equality and what that
6  looks like.  It was -- it was -- you know, our goal
7  was just to -- to be there in solidarity with some
8  of the other union groups and leaders that were
9  there.
10    Q.  Did you understand that you personally
11  were there advocating for abortion in any way?
12    A.  No.
13    Q.  Did anybody else in the group from 556
14  indicate to you that they were there to advocate
15  for abortion?
16    A.  No.  And one of our members that was there
17  with us was visibly pregnant.
18    Q.  And you personally -- or do you consider
19  yourself to be an advocate for abortion?
20    A.  No.
21    Q.  What -- what is your view with respect to
22  abortion and reproductive rights?
23    A.  I am personally pro-life.  I don't believe
24  it's -- I don't believe that I could ever make a
25  decision to terminate a pregnancy.  However, I

Page 234

1  don't believe I or anyone else has the right to
2  make that decision for another woman.  And -- and
3  my career before Southwest Airlines shifted that
4  for me.  Because prior to that, I had been very
5  black and white on pro-life as the only option.
6    Q.  What was your view before and what changed
7  it?
8    A.  Before, I -- I felt like -- I felt like it
9  was -- it was -- was taking a baby's life; and that
10  that was wrong.  That's how I was raised.  That was
11  my religious belief as well.  And then I went to
12  work for an outpatient child and adolescent mental
13  health clinic.
14        And in that capacity, I worked with
15  children and teenagers, as well as their parents.
16  And during my time there, two of the clients I
17  worked with, two of the children were the product
18  of an incestual rape.  And after working with them
19  and their family, it shifted it and it was no
20  longer a black-and-white issue for me because I
21  didn't think anyone had the right to tell either of
22  those women that they had to carry those
23  pregnancies to term when it was a rape from a
24  brother or an uncle or anyone else.
25    Q.  While you were at the march, did you see

Page 235

1  any imagery around similar to the imagery that you
2  received from Ms. Carter?
3    A.  No.
4    Q.  While you were at the march, did you see
5  messages about abortion or against abortion?
6    A.  I -- I saw -- I think I saw a sign that,
7  you know, Planned Parenthood is not involved.  And
8  some signs that, you know, a woman should have
9  control over her body.  It's a woman's choice; some
10  things like that.
11    Q.  Based on your experience being physically
12  at the march, were you under the impression once
13  you got there that it was primarily about abortion?
14    A.  No.
15    Q.  Why not?
16    A.  Because there were -- not just our local,
17  but there were other women there marching or
18  participating who were pregnant.  There were women
19  who had their children there with them.  There were
20  men; there were fathers; there were people of --  of
21  all gender, ages, from all walks of life.  It -- it
22  felt very much like what -- why we went, of
23  celebrating everyone regardless of those visible
24  physical differences.
25    Q.  One of the things we saw in some of the

Page 236

1  pictures earlier were that a lot of people at the
2  march were wearing pink hats.  And I believe those
3  hats were part of a campaign where they were called
4  pussy hats; are you familiar with that?
5    A.  I am now, yes.
6    Q.  Well, you say you are now; what do you
7  mean?
8    A.  Going into that week, I didn't know that
9  that's a -- I had not heard of them; I had not seen
10  them.  And there were -- some of the flight
11  attendants that were knitting them and -- and I saw
12  pink.  I had always associated pink with breast
13  cancer awareness.  And it's typically something,
14  you know, girl -- a girl color.  And then, you
15  know, I was informed that it was -- you know, it
16  was -- that -- and it looked like ears, because I
17  saw a final version of one and that it was a
18  pussycat with ears in them.
19    Q.  When -- when you put that hat on, did you
20  understand it was supposed to look like --
21  anatomically, like a vagina?
22    A.  No, I did not.
23    Q.  It -- did you ever come to find out that
24  that was the purpose or was it supposed to look
25  like cat ears, in your understanding?

Page 237

1    A. At the time, I -- I thought it was -- it
2  was -- I thought it was -- it was cat ears for a
3  pussycat. I found out later that it was meant to
4  represent a vagina.
5    Q. When you say later, was that during the
6  march or after the march?
7    A. No. It was after the march.
8    Q. Ms. Stone, how well would you say you know
9  Charlene Carter.
10    A. I -- I don't know her.
11    Q. So is it fair to say, as you sit here
12  today, you don't know her well?
13    A. That's correct, yes.
14    Q. Is it -- is it fair to say you have never
15  known her well?
16    A. Yes.
17    Q. Prior to her termination from Southwest
18  Airlines in 2017, how many times would you say you
19  had met her?
20    A. I believe it was just once.
21    Q. Is that the membership meeting that you
22  testified to earlier?
23    A. Yes.
24    Q. Had you ever conversed with her over the
25  telephone?

Page 238

1    A. No.
2    Q. Had you ever exchanged emails with her?
3    A. Not exchange. She had sent emails to
4  either the board or a committee -- email
5  distribution address that I was also on.
6    Q. Did you receive emails from her that
7  were directly addressed to you?
8    A. No, not that I recall.
9    Q. And you testified earlier today that, at
10  some point, you received private messages through
11  Facebook Messenger from Ms. Carter about abortion
12  and your attendance at the women's march, right?
13    A. Yes.
14    Q. And you also testified earlier today that
15  prior to receiving those messages, you'd received
16  other private Facebook Messenger messages from
17  Ms. Carter on other topics, right?
18    A. Yes.
19    Q. About how many messages would you say you
20  received from Ms. Carter through Facebook
21  Messenger?
22    A. Probably at least 100.
23    Q. Was -- was that unusual, in your
24  experience, to get that many messages from a flight
25  attendant through Facebook Messenger?

Page 239

1    A. Yes. I rarely had flight attendants
2  utilize Facebook to communicate with me. And never
3  repeatedly like that.
4    Q. I am going to show you what will be marked
5  as Exhibit 18 to your deposition.
6    (Exhibit 18 marked.)
7    MR. CORRELL: This will be the
8  document, counsel, that I just circulated to
9  everyone.
10    Q. (By Mr. Correll) Ms. Stone, you should be
11  able to get that from Mr. Gillespie. It is labeled
12  as SWA000595692. And I'll just ask that you
13  quickly skim through it to make yourself familiar.
14  We're not going to linger on it because I know they
15  are unpleasant to look at, but I do need you to be
16  able to identify these documents. So if you could
17  just look through briefly and let me know when you
18  have had a chance to scroll through.
19    MR. GILLESPIE: Court -- Court
20  Reporter, are we on Exhibit 18 or Exhibit 19?
21    THE REPORTER: I have Exhibit 18.
22    MR. GILLESPIE: Okay.
23    A. Do you want me to scroll through the whole
24  thing?
25    Q. (By Mr. Correll) Just briefly through

Page 240

1  because I am going to ask you to identify it for
2  me, and so I would like to make sure that you're
3  comfortable that you've seen it all the way
4  through, but you don't need to read it. And once
5  you are familiar with it, you can set it aside.
6  And please take your time. I know this is
7  difficult.
8    Now, Ms. Stone, do you recognize those
9  documents?
10    A. Yes.
11    Q. What are those documents?
12    A. The messages Charlene Carter sent to me
13  personally via Facebook Messenger.
14    Q. And after reviewing them just now, do they
15  look to be true and correct copies of the materials
16  that you retrieved from your Facebook page?
17    A. Yes, I think so.
18    Q. At some point, you complained to Southwest
19  Airlines about these messages, right?
20    A. Yes, I did.
21    Q. Did you provide copies of the messages
22  that you've just reviewed to Southwest Airlines?
23    A. Yes.
24    Q. We're not going to watch the videos today;
25  I'll put you at ease about that right now. But I

Page 241

1  do need to ask you a couple of questions about
2  them.
3        First of all, in the first couple of
4  messages there, there are images that have a play
5  symbol on them.  Were those, in fact, videos that
6  were sent to you?
7        A.  Yes.
8        Q.  Did you have to click play for them to
9  start playing?
10       A.  I -- I think so, but when I opened my IM
11  that day and opened -- however I opened my instant
12  messenger that day, her message was at the top and
13  it was the video and it started -- one of them
14  started playing.
15       Q.  Did the videos contain any audio?
16       A.  Yes.
17       Q.  What do you recall about the audio from
18  the videos that you received?
19       A.  That there was a voice in the background
20  that said, look, it's still alive; it's moving.
21  Something like that.
22       Q.  What impact did receiving these messages
23  have on you when you opened up your Facebook
24  Messenger in the Denver airport?
25       A.  I completely fell apart.  I started

Page 242

1  sobbing.  I had to leave the gate area.  And my
2  flight had started boarding already.  I had to
3  leave the gate area and go to the women's restroom
4  to try to compose myself.  I was worried I wasn't
5  going to be able to get on the flight because I was
6  -- am still -- very recognizable by flight
7  attendants.  And I was afraid that if I boarded the
8  flight and anybody saw me crying, that would be the
9  next post on social media about me.
10       And so I called -- I called one of my
11  best friends and told her I just -- I needed to
12  hear a friendly voice.  And that I needed her to
13  talk to me about something, anything that wasn't
14  Southwest; that I had a flight I needed to get on
15  and I wasn't in an emotional state to be able to do
16  it.
17       Q.  Did you interpret these messages in any
18  way as Ms. Carter inviting you to a conversation?
19       A.  Absolutely not.
20       Q.  Why not?
21       A.  They were -- are you asking about the
22  videos specifically or all of the messages?
23       Q.  I mean the videos specifically regarding
24  abortion and the messages surrounding the videos
25  regarding abortion.

Page 243

1        A.  No, I did not believe that it was to start
2  a conversation because they were so awful.  One of
3  the messages said that we had supported that when
4  referenced murder.
5        Q.  Did you feel you were being accused of
6  being a murderer?
7        A.  Yes.
8        Q.  And in one of those messages that you have
9  just looked at, it concludes with the line, can't
10  wait to see you back on line.
11       Do you recall reading that?
12       A.  Yes.
13       Q.  What did you interpret that to mean?
14       A.  I interpreted it as a threat that she or
15  someone she was friendly with would be looking for
16  me when I came back on line, especially because
17  this was after flight attendants had talked about
18  physically hurting me when I came back on line.
19       Q.  Did that portion of Ms. Carter's message
20  encourage you to report what had happened to the
21  company?  And please take your time, Ms. Stone.
22       A.  Yes.
23       Q.  Ms. Stone, next, I am going to want to
24  direct you to what has been previously circulated
25  as Document 6-A.

Page 244

1        MR. CORRELL:  Mr. Gillespie, if you
2  wouldn't mind taking it straight to the last page;
3  that's the only page we will be looking at.
4  Carter616 is the page number in the lower
5  right-hand corner.
6        Q.  (By Mr. Correll)  Have you seen that
7  message before?
8        A.  Yes.
9        Q.  What is that document; specifically, Page
10  616?
11       A.  It's -- it's part of the messages that
12  were sent in between or with the -- the videos; was
13  part of that group.
14       Q.  And to the best of your ability, can you
15  just briefly describe what the message depicts?
16       A.  The text or the photograph?
17       Q.  The photograph.
18       A.  Women's faces inside of a vagina.
19       Q.  Did you find this message offensive?
20       A.  Yes.
21       Q.  Did you find it harassing?
22       A.  Yes.
23       Q.  Why?
24       A.  Because she references us dressing up like
25  that.  And we didn't.  And it was ugly.  It is

Page 245

1  ugly.  And I didn't feel like anything I did ever,
2  or at the meeting or march, was at all related to
3  that image.
4       Q.  And Ms. Cart -- Ms. Stone, you can set
5  aside the -- the iPad now.  I will tell you:  There
6  is no more documents.  I just have a few more
7  questions, okay?
8           At any point, did Ms. Carter reach out
9  to you to try to discuss any of these messages
10  after you reported them to Southwest?
11      A.  No.
12      Q.  Did you subsequently ever discuss abortion
13  with her?
14      A.  No.
15      Q.  Did you subsequently ever address --
16  discuss Planned Parenthood with her?
17      A.  No.
18      Q.  Did you subsequently ever discuss the
19  women's march with her?
20      A.  No.
21      Q.  Prior to receiving the abortion images,
22  did you ever report Ms. Carter to Southwest for
23  anything at all?
24      A.  No.
25      Q.  Did you report Ms. Carter because she was

Page 246

1  a union objector?
2      A.  No.
3      Q.  Did you report Ms. Carter because she was
4  pro-life?
5      A.  No.
6      Q.  Did you report Ms. Carter because she
7  purports to advance her views based on her
8  Christian beliefs?
9      A.  No.
10      Q.  Rather than have you retell us everything
11  you have already said, I just want to make sure we
12  have covered a couple of points about what happened
13  after you made your report.  So you initially made
14  your report to your base manager; is that correct?
15      A.  Yes.  And as --
16      Q.  Why -- why did you choose to go to your
17  base manager as opposed to somebody else?
18      A.  Because I was reporting it as -- as a
19  flight attendant, and that was the highest leader
20  at my domicile.
21      Q.  And you testified that the next person you
22  heard from was Ed Schneider; is that correct?
23      A.  Yes, that's correct.
24      Q.  And did you engage with Mr. Schneider
25  prior to the investigation call that you testified

Page 247

1  to earlier?
2      A.  He -- he called -- there were two -- Ed
3  made two -- I had two phone calls with Ed.  And the
4  first was just to set up the next call, which was
5  the actual investigation call.
6      Q.  The -- the second one was the actual
7  investigation call?
8      A.  Yes.
9      Q.  Going into that call with Mr. Schneider,
10  did you have a union rep with you?
11      A.  I had not scheduled to have one in
12  advance, going into the call.  I should have.  I --
13  that's what I would have always advised a flight
14  attendant, but it was my first time -- very
15  different being on the other side.  So when they
16  asked me if I wanted a rep, I think I asked if I
17  needed one because that's what we've always taught
18  flight attendants to say going into any
19  conversation with a member of Southwest Airlines
20  leadership or management.  And they said that I,
21  you know, had the right to have one.  And I was
22  physically with another officer, so I asked --
23  asked him if he could join me on the call.
24      Q.  Who was the officer who joined you on the
25  call?

Page 248

1      A.  Brett Nevarez.
2      Q.  And then on the other side from
3  management, it was Mr. Schneider.  I believe
4  earlier you said Ms. Gutierrez was on the line too,
5  correct?
6      A.  Yes, that's correct.
7      Q.  Was there anybody else who participated in
8  that discussion with you?
9      A.  I don't -- I don't think so.
10      Q.  Going into that conversation, did you have
11  any goals in mind of what you hoped to accomplish
12  in that call?
13      A.  No.  Just to answer any questions they
14  had.
15      Q.  Were you trying to get Ms. Carter fired?
16      A.  No.
17      Q.  During that call, did you make any
18  recommendations about the type of discipline that
19  should be issued?
20      A.  No, I didn't.
21      Q.  Were you asked to provide that
22  information?
23      A.  I was asked -- I believe so.  I believe
24  Denise asked me and -- what I wanted to see happen,
25  I think, is how she worded it; what I wanted to see

Page 249

1 happen out of the investigation. And I told her I
2 just wanted the harassment to stop; that I didn't
3 want to receive anything else like this. And that
4 I was fearful other members and other women on the
5 executive board who were there would be sent those
6 images. And I didn't want that to happen. I
7 wanted to protect them from seeing what I saw.
8     Q. And as this process has continued through
9 Step 2 arbitration and today in litigation, is that
10 still what you want?
11     A. Yes.
12     Q. After the fact-finding -- or -- excuse me
13 -- the investigation call that we've just
14 discussed, did you have any further interaction
15 with Ed Schneider about Charlene Carter?
16     A. No.
17     Q. Did you interact with anyone else about
18 the investigation into your complaint?
19     A. No.
20     Q. Did you do anything at all to try to
21 influence the outcome of the decision of the
22 fact-finding process after you participated in this
23 investigation call?
24     A. No. Not at all.
25     Q. When did you first learn that Charlene

Page 250

1 Carter was terminated as a result of your report?
2     A. I don't remember when. I don't remember.
3 I don't remember how -- how soon in terms of dates.
4 I don't -- I don't remember who told me. I know it
5 was someone in -- someone in the union office who
6 -- who told me she had been terminated after
7 Southwest Airlines did their rendering.
8     Q. How did you react when you learned that
9 information?
10     A. I was conflicted. Part of me -- part of
11 me was relieved that she wouldn't -- when I went
12 back on line, that she wouldn't be able to harass
13 or hurt me. And the other part of me was upset
14 because the instant emotional reaction made me feel
15 like I -- I had cost someone their job because I
16 came forward; and I had never had that on me
17 before. But I also had to remind myself that I
18 didn't do anything to cause her to send me those
19 things.
20     Q. Were you happy to learn that she had been
21 terminated?
22     A. No, I wasn't.
23     Q. Once her disciplinary process went beyond
24 the initial termination decision and became a
25 grievance, did you play any role in the grievance

Page 251

1 process?
2     A. No, I didn't. And I made it clear to our
3 grievance chairperson that they needed to leave me
4 very much out of it. Typically, if it was a 30-day
5 suspension or a termination at some point or
6 another, someone working the case, you know, would
7 seek advice, particularly after we were finished
8 with contract negotiation and I didn't have that on
9 my plate.
10         So they were specifically instructed,
11 you know, that they couldn't -- by me, that they
12 couldn't talk to me; they couldn't seek advice; and
13 that I, you know, was not going to be privy to any
14 of the documents or conversations revolving her
15 grievance or, you know, potential settlements or
16 outcomes.
17     Q. I am sorry to sidetrack us for a moment.
18         MR. CORRELL: But, Madam Reporter, did
19 I mark Exhibit 19?
20         THE REPORTER: No, you did not.
21         MR. CORRELL: Okay. I would like to
22 mark Carter616, just that page, as Exhibit 19 to
23 Ms. Stone's deposition, which was the document
24 previously introduced and identified.
25         (Exhibit 19 marked.)

Page 252

1     Q. (By Mr. Gilliam) Ms. Stone, during your
2 time as president of 556, you've talked about a
3 whole bunch of social media things. Did you ever
4 receive direct private messages containing anything
5 as graphic as what you received from Ms. Carter?
6     A. No. Never.
7     Q. What, if anything, has been the lasting
8 impact of Ms. Carter's messages on you?
9     A. They still haunt me. I still can't look
10 at them without breaking down. I still can't talk
11 about it and it's been almost four years. And the
12 sequence of events that happened afterwards and the
13 actions that are still going on because of the
14 lawsuit have caused me tremendous emotional
15 distress.
16     Q. Ms. Stone, thank you very much for taking
17 the time to talk to us today. I appreciate it. I
18 know it's been a very long and hard day for you.
19         MR. CORRELL: And I have no further
20 questions for you at this time. And I will pass
21 the witness. Thank you.
22         EXAMINATION
23 BY MR. GREENFIELD:
24     Q. Ms. Stone, hello. This is Adam Greenfield
25 from TWU Local 556. I would like to discuss just

Page 253

1   one quick topic with you because I know it's been a
2   very long day.  Can you hear me okay?
3      A.  Yes.
4      Q.  Okay.  As part of the discussion you just
5   had with Mr. Correll, I would like to discuss a
6   portion of Ms. Carter's Facebook messages to you in
7   which she ended one of them with, can't wait to see
8   you back on line.
9       Do you know what I am referencing?
10     A.  Yes.
11     Q.  Okay.  And my understanding is that you
12   described this message as a threat to you; is that
13   correct?
14     A.  Yes.
15     Q.  Okay.  I would like to just briefly put
16   that message into context a little bit.  Do you
17   remember a time during your presidency when union
18   membership meetings were being protected by hired
19   off-duty police officers?
20     A.  Yes, I do remember.
21     Q.  Can you expand on that a little bit as --
22   as far as the time frame and any other details that
23   you can recall?
24     A.  The -- the time frame of that was less
25   than six months prior to me receiving these

Page 254

1   messages from Ms. Carter.  It was October 2016 and
2   it was because of a screenshot that was being
3   disseminated of what appeared to be a conversation
4   between two flight attendants on Facebook.
5      And in the conversation, the name --
6   there was a name that was blacked out in what I
7   saw.  And the first comment made some very
8   derogatory references to that individual's sexual
9   orientation, their ethnicity.  And they -- and that
10   flight attendant made a comment about hiring
11   someone to kill him.
12      And a second flight attendant
13   commented and said maybe we could get a two-for-one
14   deal and hire them to put a bullet in the head of
15   the TWU cunt in charge of Local 556.  And that
16   screenshot surfaced the very beginning of October
17   right as we were releasing the tentative agreement
18   to the membership and going into what was scheduled
19   to be a month-long ratification process.  We had
20   ratification meetings scheduled in all domiciles.
21   And I immediately consulted with legal counsel --
22     Q.  And I would like you to -- I will just cut
23   you off briefly to ask you not to divulge the
24   contents of any of those conversations, but please
25   continue if you can without doing so.

Page 255

1     A.  Yes.  And the -- and I consulted with
2   other officers, and the decision was made that we
3   needed to take that -- that seriously.  And that to
4   protect everyone, including the members that would
5   be coming to the ratification meetings, that we
6   needed to have police there as a visible -- as a
7   visible deterrent.
8      We also had signs that we had already,
9   prior to that, started printing that you couldn't
10   bring a weapon into a meeting.  Because we had
11   already experienced the previous comments made on
12   social media, we had had flight attendants that
13   expressed fear about coming to a membership
14   meeting, particularly in the states that have open
15   carry laws.
16      So given that that had happened, we --
17   we felt like that -- protect everyone -- we didn't
18   want people to be afraid to come to ratification
19   meeting to get information about an important
20   contract -- contract vote because they were scared.
21     Q.  Okay.  Thank you, Ms. Stone.  I appreciate
22   you providing that context.
23      MR. GREENFIELD:  And I will reserve
24   any other questions I have for trial or a later
25   date.  And I appreciate you being here today.  I

Page 256

1   know it's been a long day.  And I will pass the
2   witness back to anyone else who has any remaining
3   questions.  Thank you.
4      MR. GILLESPIE:  This is Mr. Gillespie.
5   No questions on behalf of the witness' attorney.
6      THE VIDEOGRAPHER:  We are off record
7   at 7:15 p.m.
8      MR. GREENFIELD:  If we can hold on one
9   second -- if we can hold on one second on going
10   completely off record.  I have one last point if
11   everyone is done with questions.
12      THE VIDEOGRAPHER:  Proceed.
13      MR. GREENFIELD:  Okay.  Mr. Gilliam,
14   Mr. Correll, I would like to at least discuss with
15   you on record the possibility of designating the
16   entire deposition as confidential.  There has been
17   -- pursuant to the Protective Order, there has been
18   in-depth conversation about several personal
19   details, including parties that are not -- to this
20   lawsuit and grievances that they went through.  And
21   so I think, out of an abundance of caution, I would
22   like to designate whole thing confidential at this
23   time.
24      MR. CORRELL:  No objection from
25   Southwest.

Page 257

```
1            MR. GILLIAM:  Let's see.  I -- at this
2    time, I don't think we -- we have an objection.
3    Doesn't the -- the Protective Order basically
4    provide a process -- I think it's assumed to be
5    confidential for a certain period, right?
6            MR. GREENFIELD:  That -- that is
7    correct.
8            MR. GILLIAM:  Yeah.  So certainly, you
9    know, within that period.  But, I guess, if -- if
10   we have any challenge at any time, you know, we'll
11   communicate that to you.
12           MR. GREENFIELD:  Thank you.  Perfect.
13           THE VIDEOGRAPHER:  Anything further?
14           MR. GILLIAM:  Nothing further.
15           THE VIDEOGRAPHER:  We are off record
16   at 7:17 p.m.  End of deposition, end of media.
17           (End of Proceedings.)
18
19
20
21
22
23
24
25
```

Page 259

```
1            I, AUDREY STONE, have read the foregoing
2    deposition and hereby affix my signature that same
3    is true and correct, except as noted above.
4
5            _____
6            AUDREY STONE
7    THE STATE OF _____
8    COUNTY OF _____
9    Before me, _____, on this day
10   personally appeared AUDREY STONE, known to me (or
     proved to me under oath or through _____) to
11   be the person whose name is subscribed to the
     foregoing instrument and acknowledged to me that
12   they executed the same for the purposes and
     consideration therein expressed.
13
14   Given under my hand and seal of office this _____
     day of _____, 2020.
15
16   _____
17
     NOTARY PUBLIC IN AND FOR THE
18   STATE OF _____
19
20   MY COMMISSION EXPIRES:_____
21
22
23
24
25
```

Page 258

```
1            CHANGES AND SIGNATURE
2    WITNESS NAME:  AUDREY STONE
3    DATE OF DEPOSITION:  NOVEMBER 24, 2020
4    PAGE      LINE    CHANGEREASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

Page 260

```
1            REPORTER'S CERTIFICATION
2        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3               DALLAS DIVISION
4    CHARLENE CARTER          )
                              )
5                             ) CIVIL ACTION NO.
     VS.                      ) 3:17-CV-02278-X
6                             )
     SOUTHWEST AIRLINES CO., AND )
7    TRANSPORT WORKERS UNION OF  )
     AMERICA, LOCAL 556      )
8
9    --------------------------------
10      DEPOSITION OF AUDREY STONE
            NOVEMBER 24, 2020
11          (REPORTED REMOTELY)
12   ----------------------------------
13
14       I, CHARIS M. HENDRICK, Certified Shorthand
15   Reporter in and for the State of Texas, do hereby
16   certify to the following:
17       That the witness, AUDREY STONE, was by me
18   duly sworn and that the transcript of the oral
19   deposition is a true record of the testimony given
20   by the witness.
21       I further certify that pursuant to Federal
22   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
23   as well as Rule 30(e)(2), that review of the
24   transcript and signature of the deponent:
25       __xx__ was requested by the deponent and/or a
```

1  party before completion of the deposition.
2  _____ was not requested by the deponent and/or
3  a party before the completion of the deposition.
4      I further certify that I am neither
5  attorney  nor counsel for, nor related to or
6  employed by any of the parties to the action in
7  which this deposition is taken and further that I
8  am not a relative or employee of any attorney of
9  record in this cause, nor am I financially or
10  otherwise interested in the outcome of the action.
11     The amount of time used by each party at
12  the deposition is as follows:
13     Mr. Gilliam - 6:58 hours/minutes
14     Mr. Correll - 1:07 hours/minutes
15     Mr. Greenfield - 8 minutes
16
17     Subscribed and sworn to on this 4th day of
18  December, 2020.
19
20
21     *Charis M. Hendrick*
       CHARIS M. HENDRICK, CSR # 3469
22     Certification Expires: 10-31-21
       Bradford Court Reporting, LLC
23     7015 Mumford Street
       Dallas, Texas  75252
24     Telephone 972-931-2799
       Facsimile 972-931-1199
25     Firm Registration No. 38

**A**

**a.m** 1:18 6:4
58:6,9 92:16
**ability** 9:6 104:9
244:14
**able** 17:19,25
44:17,19 55:22
103:10 106:4
111:4 137:8
185:6 223:7
239:11,16
242:5,15
250:12
**aborted** 213:3
**abortion** 208:25
227:16 233:11
233:15,19,22
235:5,5,13
238:11 242:24
242:25 245:12
245:21
**above-styled**
1:17
**absolutely**
149:22 242:19
**abundance**
256:21
**accept** 59:11,15
66:17,20
**accepted** 8:10
147:5
**accepting** 59:9
**accommodation**
159:7
**accomplish**
232:25 248:11
**accomplished**
100:14
**account** 94:5,7
94:11,13 95:7
95:9,10,13
96:4,8 207:10
**accurate** 109:2
**accused** 35:9
243:5
**acknowledged**

259:11
**acknowledge...**
103:12
**acknowledging**
211:1
**act** 73:2 103:14
**acted** 170:11
**action** 1:3 50:5,7
50:23 51:8,15
51:19,21 52:1
220:9 260:5
261:6,10
**actions** 55:24
167:12 252:13
**active** 40:23
42:7 43:9
71:23 94:23
118:8,11 145:6
171:11
**actively** 118:13
**activities** 47:24
48:24 72:10
132:24
**activity** 41:25
42:19 49:8
134:16 168:1,6
171:10,13,19
183:15 198:19
217:25 226:8
232:16
**actual** 24:14
34:12,18 83:25
98:21 202:1
247:5,6
**Adam** 2:15 6:11
108:11 252:24
**add** 55:21
130:21
**added** 81:20
120:3
**adding** 81:12,19
**addition** 82:13
**additional** 20:14
24:8 50:25
51:11 61:7
78:10 80:6

81:19 149:13
149:13 154:19
219:19,25
220:9 230:1
**address** 27:15
72:15 84:6
93:4 112:10,12
112:14 139:15
142:19 152:9,9
156:21 169:14
175:21 190:1,4
190:6,8 219:13
219:15 220:1
238:5 245:15
**addressed** 63:4
83:20 109:16
128:21 136:9
138:11 155:18
238:7
**addressing** 49:1
138:13 156:11
156:13 160:5
176:16
**adequately**
83:20
**adjustment** 97:9
**admin** 120:3,5
**administering**
6:22
**administration**
123:10
**adolescent**
234:12
**adopt-a-fuckt...**
127:16
**advance** 32:18
50:19 80:25
169:21 246:7
247:12
**advancements**
163:19
**adversaries**
223:16
**advertise** 166:7
**advice** 120:9,11
251:7,12

**advise** 39:2
**advised** 247:13
**advising** 111:18
**advisor** 50:11
**advocacy** 96:12
**advocate** 24:8
35:25 37:8
227:12 233:14
233:19
**advocated** 35:2
37:13,20 40:18
55:21 223:20
**advocating**
233:11
**affiliated** 143:14
**affix** 259:1
**AFL-CIO** 203:3
227:6
**afraid** 150:17
221:7,10,12,14
242:7 255:18
**agency** 86:15
87:1 110:22
**ages** 235:21
**aggressive** 219:3
220:15
**ago** 33:12 46:15
109:11
**agree** 78:24 83:7
83:16 84:11
100:14 181:5
**agreed** 40:20,20
78:18 169:22
178:25
**agreeing** 178:23
**agreement**
45:21,25 47:10
51:23 52:10
72:22,25 74:4
74:8,10,11,13
74:20,21 75:16
75:18 76:5,8,8
76:15 77:6,10
77:11 78:5,6
78:13,14,15
79:13,17,22

80:15,18 81:6
81:9,23,25
82:7,12 83:16
83:23 84:9
87:5 198:2,6,7
198:11,15,22
219:1 228:13
228:23 254:17
**agreements**
46:13,17,17
47:5,6 58:21
73:1,5
**agreements'**
52:4
**agreenfield@c...**
2:18
**ahead** 92:7
112:22 129:19
231:16
**ain't** 124:19
**ain't-got-time-...**
123:16 124:15
125:4
**Airbnb** 228:7
**aircraft** 188:14
188:16,17,18
**airline** 27:5
169:4
**Airlines** 1:5 2:8
5:7 6:10 7:10
9:21 10:3,9
12:2,13 21:23
25:13 33:9
42:16 46:25
49:17 53:19
65:2,6 69:18
70:11 71:18
81:16 82:4
101:16 102:10
105:4 123:2
135:12 138:12
145:21 147:19
147:23,25
156:3,11 158:4
159:5 165:13
168:18,21

169:5,19
170:15 172:17
174:14,21
176:25 183:3
184:5 185:5
190:12 194:1,4
197:20 198:18
217:2 222:5
227:23 228:18
229:12 234:3
237:18 240:19
240:22 247:19
250:7 260:6
**Airlines'** 48:8
70:14
**airplane** 35:13
**airport** 213:4
241:24
**AI** 164:9,10
**alcohol** 102:20
148:3 150:7
**alert** 219:22
**Alexander**
203:22
**alive** 241:20
**alleged** 49:8
**allegedly** 210:2
**allowed** 13:17
93:24 106:5,19
111:16 142:22
**amendable** 73:3
73:7,13,18
78:15,17,22,24
79:5,10 82:17
82:23 101:1
**America** 1:6
2:14 7:10
227:9 232:2,6
232:11,16
260:7
**amount** 38:10
90:11 261:11
**Amy** 139:12
**anatomically**
236:21
**and/or** 111:17

260:25 261:2
**Angie** 121:21
122:4
**angry** 104:7
**annual** 20:13,17
20:22 70:20
**annually** 19:23
**answer** 9:5,16
39:18 50:23
57:1,21 64:18
76:1 111:19
135:8,16
248:13
**answered** 66:3
84:14 132:18
152:1 208:13
**answering**
167:14,19
**answers** 1:15
9:8,14 39:7
81:12 137:9
**anti-Audrey**
121:22
**anybody** 56:15
59:21 107:14
113:18 114:3
139:15 141:12
147:7 157:14
161:11 178:22
233:13 242:8
248:7
**anymore** 80:5
103:22
**apart** 11:1 53:9
113:8 132:4
146:3 168:8,24
173:12 174:11
174:24 241:25
**apologies** 147:2
**apologize** 13:20
29:21 37:11
54:7 55:17
99:16 141:3
146:19
**apologized**
146:8

**apology** 4:22 5:2
5:4 140:9,11
140:17 143:23
146:4,5,23
152:3,4 154:18
**App** 159:10,22
160:21 161:15
**apparently**
186:13
**appeal** 61:22
62:16 96:24
181:24
**appealed** 183:2
**appeals** 62:17
**appear** 68:4
134:20 143:25
**appearance** 8:9
218:20
**Appearances**
4:2
**appeared** 39:24
68:7 134:18
155:13 196:17
254:3 259:9
**application**
164:25 175:11
177:10
**applications**
226:9
**applied** 42:12
48:11 133:1
134:21 157:7
160:11,19
161:4 166:16
166:21 175:19
177:7 226:10
**apply** 160:9
**applying** 39:25
165:8
**appoint** 17:13
**appointed** 17:9
23:15 129:8
**appointing** 25:9
**appreciate**
252:17 255:21
255:25

**approach** 36:8
38:23 39:23
65:11,19
**approached**
68:11
**appropriate**
166:17 169:13
**approval** 129:9
**approve** 79:12
**April** 14:9 15:9
21:25 155:23
159:2,3,6
160:1 171:14
171:20,24
217:15
**arbitrarily**
170:17
**arbitration** 97:9
249:9
**archaic** 115:13
**area** 218:9 242:1
242:3
**areas** 164:20
232:20
**argue** 183:14
**argument** 60:14
138:5 182:21
189:19,22
**argumentative**
104:7
**arguments**
183:9
**arises** 83:4
**ARMSTRONG**
3:8
**arrived** 92:8
**aside** 240:5
245:5
**asked** 16:5 22:9
22:10 40:2,5
40:19 41:22
46:12 54:8
55:1 64:13
68:6 115:12
126:1 139:15
149:8 154:2,3

163:7,7 188:9
192:11 201:5
221:21 247:16
247:16,22,23
248:21,23,24
**asking** 26:25
48:2 66:12
98:6 109:5
115:11 120:11
137:3,7 150:1
174:20 200:24
212:13 242:21
**assassinate**
189:17
**assassination**
189:7
**assassinations**
191:2
**assign** 59:3
**assist** 96:17
97:15 148:2,4
150:18 200:17
**assistance** 63:2
147:13,15
150:16
**assistant** 85:3
**assisted** 97:6,8
97:24,24
181:23 200:16
200:19
**assisting** 35:2
61:12,16 130:4
**associated**
236:12
**assumed** 29:6,9
31:15 218:11
257:4
**assuming**
121:16 170:14
170:18
**attached** 1:25
176:23 207:18
**attacks** 218:5
**attempt** 82:22
**attend** 17:19
19:25 59:21

87:6 174:3,6
202:2 223:7
231:2
**attendance**
130:10 231:7
238:12
**attendant** 9:23
10:6 32:18
35:10 37:4
40:22 44:14,21
49:18,20 52:24
52:25 54:17,18
54:20 55:2
60:10 63:25
65:7 66:4,19
66:22 67:6
71:4 97:20
101:18 102:20
103:10 110:8
115:21 120:20
122:9,25
124:21 134:25
136:7 137:14
137:16 138:2
147:13,15
162:1,5,7,9,18
163:24 166:9
185:3 190:14
190:15,19,24
192:4,14
193:22 208:2
214:21 215:9
215:13,23
216:7 217:21
219:5 220:6
238:25 246:19
247:14 254:10
254:12
**attendant's**
47:24 182:25
216:2
**attendants** 31:7
31:11,17 34:5
34:15,24 35:1
35:18 37:21
39:25 40:12,12

40:18 42:13,15
42:16 43:21
45:16 48:4,11
48:17 49:7
50:6,9,12,22
51:7 55:21
58:14,18 59:8
61:10,21 62:14
62:19 63:24
64:1,9 65:24
65:25 66:2,8
70:24 71:18,21
71:23 88:12
89:17 90:4
92:3 93:9
96:17 97:15
131:23 132:1
136:4 138:9
139:17 140:14
141:8 144:11
144:17 145:3,6
148:1,2 149:19
150:1,11
153:24 154:9
154:15 163:21
164:8 166:3,11
170:5,6 175:14
188:17 190:13
191:15 192:25
196:9 198:10
200:23 201:4
201:17 204:15
208:13 213:15
213:17 215:3
215:25 219:7
221:7 222:4,25
223:19 227:24
227:25 230:12
230:15 231:12
231:17 232:7
236:11 239:1
242:7 243:17
247:18 254:4
255:12
**attendants'**
106:6 149:21

164:13 165:5
167:25 168:12
**attended** 16:13
16:15 34:11
35:11 91:17
173:7,22
174:16,21
200:11 203:2
204:16 226:5
**attending** 12:19
70:12,14
232:25
**attends** 19:22
**attention** 99:1
144:18 158:14
159:10 203:6
**attorney** 7:8
38:23 217:1
256:5 261:5,8
**attorney/client**
39:5 76:1
111:20
**attorneys** 65:13
209:11
**attractants**
164:1
**audience** 126:21
**audio** 13:21
241:15,17
**Audrey** 1:10,15
3:2 4:3,18,22
5:8,10,12,14
5:21 6:16 7:1
38:25,25 94:6
94:18 95:13,16
96:4,8 102:23
109:16 120:3
123:12 128:17
142:14 258:2
259:1,5,9
260:10,17
**August** 158:25
180:7,8,10
**authorization**
229:14
**automatic** 177:1

**automatically**
25:3
**available** 90:25
113:21 188:21
228:19,21
**avenue** 1:21 3:4
97:25
**average** 78:9
**aware** 72:12
89:16 193:4
196:10 207:15
225:12
**awareness**
236:13
**awful** 243:2

---

**B**

**B** 2:3,16 203:9
260:22
**Babbitt** 174:3
**babies** 213:3
**baby's** 234:9
**back** 8:5 10:23
22:16 24:23
26:2 27:12,18
27:19 39:18
42:6 43:18,21
44:17,19 46:10
47:12 49:14
54:25 55:8,18
56:9,16 57:5
58:8,20 60:8
60:10,10,13
66:12,14 72:7
76:24 79:10
86:24 92:18
97:7 104:6
105:11 106:9
112:3 113:20
114:12 128:5
131:12 138:22
138:23 139:22
143:9 144:8
153:11 157:8
160:12 161:15
164:15 170:10
170:12 176:12

182:20 186:24
187:8 193:9
197:9 205:6
210:25 213:9
214:10 221:20
243:10,16,18
250:12 253:8
256:2
**background**
217:11 241:19
**bad** 223:3
**bagger** 123:16
123:18 124:1
124:11,13
**Baltimore** 10:23
11:18 13:6
14:5 15:18
97:7,8
**Baltimore/Wa...**
10:1,11,13,16
**bargain** 24:8
**bargaining** 12:2
20:6 25:12
52:8,9 69:17
72:22,25 73:1
73:5 74:13
79:6 80:15
81:25 82:12
145:13,18
175:10 227:10
228:25
**Barrenn** 55:10
**base** 10:23 12:25
34:2 38:14,14
39:6 62:10
64:8,10 82:6
97:2 103:13
107:17 134:24
210:7 211:2,3
246:14,17
**based** 9:25
10:10,12,15,18
10:20,25 47:23
59:3 81:20
86:16 104:5
110:12 140:12

CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

142:9 147:22
151:7 170:7,18
188:12 189:12
190:16 195:16
211:2 227:9
235:11 246:7
**basic** 20:5 86:20
**basically** 74:3
90:15 220:8
228:17 257:3
**basis** 69:8 77:20
93:18 96:5
172:17,21
196:11
**batch** 40:11,16
56:6,8,19
155:17 156:6
156:15 167:24
**Bates** 5:22 108:7
108:13,21
**bearing** 216:25
**Becky** 36:17,23
37:13 63:7
178:1,15
**becoming** 25:8
88:15 218:19
219:3
**began** 15:7
21:21,22 74:18
100:15
**beginning** 16:1
50:4 57:12,14
57:17 171:22
217:10 218:11
232:17 254:16
**behalf** 6:12,14
6:16 8:11 37:8
62:18 66:17,22
70:22 96:13
103:22 106:7
135:11,11,14
141:3 143:23
183:25 184:12
256:5
**behalves** 35:25
**belief** 234:11

**beliefs** 246:8
**believe** 10:20
13:16,18 14:6
16:2,15 17:5
19:4 21:23
33:18 35:14,16
35:21 37:5,5
41:1,15 43:3
43:19 46:1,13
47:3,16 48:3
48:15 49:25
51:9,16,16
52:24 53:1,18
53:19,21 54:15
55:9,9 56:11
57:15 59:10,10
60:20 67:10
68:16,17 74:16
74:22 77:3,4
80:1 84:7 88:9
88:22 89:7,8,9
89:12 90:8
91:17 94:7
101:22 102:6,9
102:13 104:2
104:25 105:18
106:21,22
110:19 112:6
116:2,8,14,23
119:17 122:12
122:16,21
123:5,23
124:23 128:2
129:10 130:21
130:23 131:3
131:16,22
133:2 134:6
135:1 137:22
138:21,22,23
141:3,19 144:2
144:20 145:8
145:22,23
146:8 148:7
151:6,20 152:4
153:15,23
154:9,14

155:25 156:5
157:3,25 158:4
159:13 160:6
160:18,25
161:3,8,8
164:20 165:22
166:19,22
167:8,10
173:15,16
179:12 180:15
180:23 182:15
183:1,22
186:17 188:12
189:13,22
190:15 194:4,5
195:15 201:22
202:7,7,12
203:3 207:11
208:10,10
210:25 214:22
215:15 216:2,5
220:11 221:17
221:25 222:6
222:15 224:25
225:25 228:2
229:5,22
233:23,24
234:1 236:2
237:20 243:1
248:3,23,23
**believed** 60:19
64:15 141:20
145:2 154:3
166:4 178:20
180:24 201:11
214:2 229:25
**best** 9:5 36:8
38:23 50:12
242:11 244:14
**better** 68:4
82:20 83:2
131:2 154:14
224:7,15
225:13,17
227:12
**beyond** 250:23

**big** 175:8
**biggest** 138:7
**Bill** 35:6 45:12
54:12 56:18
57:2 128:7
**birthday** 151:16
**bit** 8:5 57:6
85:12 98:2,3
131:12 200:11
217:24 218:8
225:21 253:16
253:21
**black** 234:5
**black-and-wh...**
234:20
**blacked** 254:6
**blamed** 148:13
149:16
**blanked** 118:4
**blanking** 55:5
215:24
**blanks** 118:1
**board** 11:19
13:6,8 15:18
17:9,13,22
18:21,25 19:7
19:11,13,19,21
19:22 20:23
21:4,5 22:2,11
22:21 25:9,14
28:12 29:4
30:12,17,22
31:2 43:11,12
43:13 65:19
69:4,5 70:10
75:18,20,24
76:4,9 79:12
88:10,25 97:9
124:18 129:9
141:20 142:6,8
142:16 143:8
144:7 145:5
146:5,7 147:3
148:7,19,20,23
148:23 149:1,3
149:4 164:4

172:20 173:2
174:9,11,13,21
175:7,23,25
176:5,5 177:17
178:7,8,9,11
178:13,16,20
213:5 215:9,12
216:7 238:4
249:5
**board's** 88:13
**boarded** 242:7
**boarding** 242:2
**body** 235:9
**bodyguard**
219:8
**bomber** 124:12
**bottom** 98:21,22
119:19 121:19
151:8 159:11
204:1 205:25
**Brad** 12:17
**Braddock** 2:4
**Bradford**
261:22
**branch** 197:7
**Brandon** 173:23
174:18
**break** 7:13
57:25 58:3
75:10 84:24
92:7,9,17
153:1,3 197:6
204:25 205:2
217:5
**breaking** 252:10
**breaks** 130:6
**breast** 236:12
**Brett** 4:18 5:2,4
32:4,24 33:2
33:10,25
109:17,19
110:13,18,19
110:25 111:7,9
112:11 117:20
127:5 146:16
148:16 149:8,8

150:11 152:11
173:6,13 248:1
**Brett's** 110:15
147:20 151:12
**Brian** 5:8,10,12
5:14 34:12
44:25 49:15,15
51:14 52:11,15
52:21 53:1
54:4,25 55:11
123:4 125:16
127:4,6,7,14
127:21 131:13
136:20 166:15
166:17,20,23
167:10,20,21
179:4 180:6
181:6,10,17
182:23 183:2
183:19 184:2
184:11,19
185:7,19 186:3
186:8 188:2,6
189:11,23,25
190:7,9,16
191:1,5 193:2
193:8,13,16
194:22 195:10
196:4
**Brian's** 180:3,5
187:17
**bridge** 51:1
**briefing** 70:15
**briefly** 239:17
239:25 244:15
253:15 254:23
**bring** 43:18 60:9
72:7 104:14,16
182:25 226:22
255:10
**bringing** 93:1
151:15 156:25
170:1
**broad** 157:12,13
**broke** 203:11
**brother** 234:24

**brought** 23:16
40:3 44:19
50:9 56:16
73:9 90:5
104:21 138:2
174:1,1
**Bryan** 25:20
**budget** 201:24
201:24 228:9
**buffer** 150:16
**build** 17:24
**bulk** 93:15
**bullet** 100:11,13
221:12 254:14
**bullied** 165:14
165:19
**bullying** 38:20
48:13,18,22
159:1 160:22
176:1 180:24
**bunch** 151:7,9
252:3
**bus** 23:24,25
**business** 20:17
20:19,22 28:15
112:17 201:12
228:14 229:15
229:17 230:4
**buttons** 232:6
**bylaws** 28:13,14
69:7,11 76:13
90:23,24
111:22 112:5
144:23

———————
**C**
**C** 2:1 3:1
**cabin** 168:19
188:22,23
189:2
**calculation**
86:17
**call** 30:14 50:17
51:4 81:12
93:5,6 115:22
123:25 124:11
125:3 138:20

211:21,24
246:25 247:4,5
247:7,9,12,23
247:25 248:12
248:17 249:13
249:23
**called** 13:8
25:22 32:25
43:4 48:10,17
48:21 49:7
50:2,4 53:2
55:2,11 90:2
124:2 131:14
131:23 136:3
150:3 175:12
188:19 193:13
236:3 242:10
242:10 247:2
**calling** 124:10
136:20 137:15
212:14
**calls** 57:18 96:2
112:24 113:5
186:5 211:16
247:3
**campaign** 120:9
236:3
**cancer** 236:13
**candidate** 71:5
147:4
**candidates**
117:11 147:6
**capacity** 34:8
39:10,12 96:19
96:20 111:5
142:21 146:14
206:3,4,24
234:14
**captain** 50:2
52:12
**care** 139:22
168:9 218:23
**career** 87:16
227:7 228:16
234:3
**Carlos** 192:8,13

192:15
**carpet** 123:16
123:18 124:1
124:11,12,12
**carry** 233:2
234:22 255:15
**Cart** 245:4
**Carter** 1:3 3:8
5:21,22 6:8 7:8
7:9 89:9 91:15
161:8 208:24
209:14,19,23
209:25 210:16
210:20,22
211:2 212:1,5
212:20,25
213:3,25 235:2
237:9 238:11
238:17,20
240:12 242:18
245:8,22,25
246:3,6 248:15
249:15 250:1
252:5 254:1
260:4
**Carter's** 209:5
212:11 243:19
252:8 253:6
**Carter1919**
119:19
**Carter2654**
120:13
**Carter2735**
121:18
**Carter616** 244:4
251:22
**carving** 68:8
**case** 7:9,12 8:20
32:24 37:3
40:9 54:1 59:4
59:4 60:18
61:10,13 63:6
66:20 91:24
97:12 135:15
136:19 161:25
166:24 184:17

217:2 251:6
**cases** 36:2 38:12
40:3,11,16
41:19,23 42:3
42:21 44:4,10
48:1 58:16
60:2 61:18,24
64:5,7 65:4
97:12,18
134:19 138:25
156:18 160:20
161:6 167:23
**Casper** 184:18
184:21 215:20
**cat** 236:25 237:2
**caucuses** 130:7
**cause** 1:18
103:23,25
181:14 226:20
250:18 261:9
**caused** 141:5
252:14
**caution** 256:21
**Cavanaugh**
216:4
**caveat** 69:10
**CBA** 73:17
81:21
**CC'd** 109:13
210:11
**celebrating**
165:15 235:23
**celebration**
215:1,2
**celebratory**
165:10
**cell** 191:16,18,23
192:2 207:13
**central** 26:10
**certain** 46:16
55:9 73:12
82:25 94:22
95:11 151:6
152:12 182:3
232:20 257:5
**certainly** 109:3

257:8
**Certificate** 4:9
**Certification**
260:1 261:22
**Certified** 1:19
260:14
**certify** 260:16
260:21 261:4
**cetera** 106:7
**chair** 15:11,21
17:3,4,5,8,9,11
17:13 18:8
23:15 25:3,7
36:3,16,18,21
59:1,2 69:20
70:4 104:3
129:6,9,21,23
204:22
**chaired** 23:12
202:24
**chairperson**
12:3 69:23
70:1 71:3
104:3 106:22
129:4 148:22
148:24 178:3
200:19 201:14
202:25 203:1
226:10,18,24
228:5 251:3
**chairpersons**
27:22 106:24
174:12 177:22
177:24
**chairs** 130:3
149:6
**chalk** 127:15
**challenge**
257:10
**challenging**
217:9
**chance** 7:22
98:15 103:2
125:11 239:18
**change** 52:7
170:17 227:4

**changed** 15:23
67:9 90:25
159:18 228:15
234:6
**changeover**
100:16 124:8
**CHANGERE...**
258:4
**changes** 4:8
80:18 81:8
90:24 157:25
158:6 169:14
169:17 176:16
176:20 177:12
177:15,20,25
178:4,7,17
258:1
**changing** 145:13
**channels** 50:14
**chapter** 16:6
**charge** 254:15
**charged** 112:2
**charges** 123:17
124:15,16,18
124:23,24
125:1,4,6,8
**Charis** 1:19 6:21
260:14 261:21
**Charlene** 1:3
3:8 5:21,22 6:8
7:8 89:8 91:15
161:8 208:24
209:1 237:9
240:12 249:15
249:25 260:4
**chatter** 141:18
198:23 199:1
**check** 8:16 85:3
**checked** 96:3,7
**child** 234:12
**children** 218:22
234:15,17
235:19
**choice** 235:9
**choose** 66:20
246:16

**chose** 201:20
**chosen** 106:4
**Chris** 3:9 4:23
30:1 120:17
121:14 142:5
142:14,15
144:4,10
**Christian** 246:8
**circulated** 239:8
243:24
**circumstances**
111:15 177:8
218:12
**CISM** 103:11,20
104:3
**cited** 38:21 48:4
161:5,10 167:7
167:16 214:2
**civil** 1:3,22
233:2 260:5,22
**CK** 122:4,6
**clarify** 57:1 79:4
**class** 167:3,7,9
177:6,8
**classes** 71:5
**clear** 9:7,11,17
39:9 108:2
157:1 164:19
180:1 189:8,16
229:25 251:2
**clearly** 13:24
176:21
**click** 4:23
120:18 123:4
142:5,14
144:10 241:8
**clients** 234:16
**climb** 130:2
**clinic** 234:13
**closed** 116:25
**closely** 72:1
119:11 144:16
**Cloutman** 2:16
2:16 6:13,13
**co-chair** 15:13
15:15,17 18:3

36:19 148:22
**co-chairperson**
12:4
**co-chairs** 15:22
25:9,15,18,19
**collect** 110:10
112:5
**collective** 72:21
72:24 73:1,4
74:13 80:15
81:25 82:12
228:24
**collectively**
175:9
**color** 236:14
**column** 98:25
100:1
**com** 27:17
**combative** 223:2
**come** 28:4 36:2
36:7 83:13
88:17 89:19
126:25 134:16
165:17 185:4
212:18 220:4,7
221:1,7 222:23
223:1 236:23
255:18
**comes** 86:24
**comfortable**
167:14 240:3
**coming** 36:5
85:2 124:8
135:19 171:16
201:2 213:9
219:21 231:1
255:5,13
**comment** 54:17
54:23 142:16
179:6 180:17
181:13 183:15
254:7,10
**commented**
254:13
**comments** 93:24
137:17 140:13

146:23 152:10
162:10,12
165:19 183:19
216:14 255:11
**COMMISSION**
259:20
**committee** 12:3
12:5,5,6 15:11
15:12,14,16,19
15:25 16:4,10
16:14,18 17:2
17:18,23 18:8
18:12 22:7
23:10,11,15,16
24:1,10,14,15
24:19 25:1,4,6
25:7,9,11,16
25:18,21 26:5
26:11 27:12,16
27:20,22 51:24
52:2 70:1,2,4,5
71:2,13,14
72:1 82:6
101:16,21
102:6,10,19,19
103:11 104:10
105:12,20
106:23,25
107:1 110:17
110:20 143:8
148:8,21,21,24
149:12,19
177:21 194:2
200:20,25
201:13,15,16
201:18,24
202:24 204:23
226:1,5,6,14
226:16,18
227:3,4,15,19
227:22 228:5,9
228:10 230:22
230:23 231:6
238:4
**committees**
16:22 20:8,9

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 73 of 106   PageID 8674
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 268

27:14 68:20,22
70:19 101:15
101:18 102:7
102:12 111:16
147:17 149:5
**common** 93:8
**communicate**
26:14 27:12
41:21 88:6
90:21 94:4
113:10,17
114:2,6 185:8
187:16 190:25
191:4 192:1
211:7,11 239:2
257:11
**communicated**
88:8 91:20
112:11 136:23
178:23 191:13
191:23 192:6
192:23 199:14
200:5
**communicating**
62:3 69:4 70:9
112:17 191:18
**communication**
50:14 51:1
67:1 93:8,25
94:25 106:24
112:24 138:16
143:16
**communicatio...**
27:9,15,19
60:4 65:13
67:7 70:7
88:10 102:3
107:14 111:9
111:17 132:11
132:15 133:6
135:17 139:8
139:10 140:5
154:19 168:11
184:20 187:12
199:25 206:5
**commuting**

188:21
**company** 32:9
37:14,19 53:4
60:4 77:14
78:12,18 79:24
181:6 182:4,7
187:16 190:22
220:17 221:3
221:18 228:24
228:25 230:7
243:21
**compared**
159:14 171:21
**comparison**
159:18
**complained** 33:8
163:8 240:18
**complaint**
163:14 210:13
210:17,21
211:1,5,8,12
249:18
**complaints**
53:12 92:23
93:1 114:19
139:16 163:15
**completed** 12:12
112:1 231:14
**completely**
241:25 256:10
**completing**
111:25
**completion**
261:1,3
**compose** 242:4
**comprehensive**
81:22
**comprised** 19:2
**computer** 207:1
**concentrate**
148:10 149:20
**concern** 170:2
**concerning**
159:23 160:15
161:16
**concerns** 136:13

146:1,25 157:1
191:1,5 199:19
**concert** 35:11,17
53:10 165:16
166:7
**concludes** 243:9
**conclusion**
177:11
**conditions**
227:13
**conduct** 20:17
20:19 48:10
175:12 177:5
**conducted** 6:18
20:22 32:8
**conducting**
32:20
**conferences**
26:7
**confident**
167:19 183:12
**confidential** 1:9
39:4 256:16,22
257:5
**confines** 90:21
**confirm** 66:13
**confirmed**
114:10
**confirming**
113:2 114:9
**conflicted**
250:10
**confused** 99:23
**confusion** 29:21
99:23
**conjunction**
28:15
**Conlon** 173:24
174:18
**connection**
189:10
**consider** 223:15
233:18
**consideration**
259:12
**considered** 21:7

30:23 84:1
130:22 228:20
**consistency**
138:8
**consistent**
126:19
**consistently**
133:1 134:21
160:19 161:4
**constant** 180:24
**constantly**
178:19
**Constitution**
25:2 28:12,16
30:19 69:24,25
70:3 71:15
90:22 117:5
**construed**
137:18 142:24
**consult** 199:8
**consulted**
254:21 255:1
**contact** 27:1
41:17 95:12,20
95:21 210:13
211:15,20,25
**contacted** 41:15
42:6 106:22
141:7 144:7
211:4
**contacting** 92:22
192:2
**contain** 241:15
**contained** 81:22
210:1
**containing**
252:4
**contents** 254:24
**context** 253:16
255:22
**continue** 39:13
42:2,11 101:20
104:8 111:4
139:1 144:19
156:9 169:22
254:25

**continued** 60:4
82:4 170:1
249:8
**continues**
103:23 147:14
156:24 183:19
184:14 188:10
**continuing**
17:14 67:7
130:2 206:1
**continuous**
77:14
**continuously**
51:18 74:24
**contract** 12:1
17:16 44:15
50:5,7,22 51:8
51:15,19,21
52:1 61:5
69:17 72:13
73:9,11 74:11
78:20 79:7,8
80:3,11 82:7
82:16,18,23
83:4,14,18,21
84:1,2 86:22
98:3 100:15,25
145:1 175:10
198:13,24
199:23 215:1
216:13 251:8
255:20,20
**contract-signi...**
215:1
**contracts** 79:2
81:14
**contractual** 24:6
97:1
**control** 235:9
**convention** 19:8
**conver-** 101:22
**conversation**
40:1 42:11
52:24 54:16
60:6,23,24
67:5 101:12,23

104:4,5 114:16
121:12 134:25
136:1 137:16
139:4,6 146:21
165:7 185:4
188:4 242:18
243:2 247:19
248:10 254:3,5
256:18
**conversations**
38:9,22 39:2,7
41:25 42:2,9
49:11 62:8,18
64:23 67:14
101:6,9 132:20
133:20 135:23
170:4,18
184:15,23
185:8 186:7,11
196:9 251:14
254:24
**converse** 52:23
**conversed**
237:24
**converted** 43:19
**coordinated**
50:19
**COPE** 25:22,24
26:3,4,14,20
26:22 27:12
**copies** 240:15,21
**copy** 108:6
**core** 4:20 118:23
119:16,16
128:1,3,10
132:8 137:21
139:17 140:5,9
141:4 143:13
143:24 146:24
151:19,21
165:19 206:5
222:12
**Corliss** 121:23
122:7,8 125:2
125:3
**corner** 98:22

244:5
**corporate**
219:14
**correct** 9:23,24
11:4 13:7
14:22 25:1
27:24 30:8,9
46:6 57:2 63:7
66:23 73:6,15
95:6 99:11,13
99:24 100:6
108:12,22
109:23 117:9
120:5 131:13
155:24 158:10
160:2 171:2
172:6 179:7
182:5 185:20
195:23 196:12
200:12 209:15
212:2,8 213:11
223:24 224:8
224:22 237:13
240:15 246:14
246:22,23
248:5,6 253:13
257:7 259:2
**corrected**
157:18 158:7
**correctly** 22:13
139:20 142:13
154:8 192:9
230:13
**Correll** 2:9 4:5
6:9,9 57:18
84:21 107:22
108:4,10 135:7
135:15,22
152:19 186:5
204:24 211:16
216:24 217:1
239:7,10,25
244:1,6 251:18
251:21 252:19
253:5 256:14
256:24 261:14

**corresponding**
66:9,18
**cost** 228:8
250:15
**council** 18:23
19:4,13,16,19
19:24 20:11,12
20:19 22:2,11
**councilmembe...**
21:6
**councils** 26:10
**counsel** 6:4 39:3
39:13 65:16,20
75:25 107:22
108:4 111:17
111:18 152:19
170:16 239:8
254:21 261:5
**counting** 222:7
**countless** 115:20
**country** 35:11
35:11 50:14
53:10 165:11
**County** 6:24
259:7
**couple** 56:2
135:8 189:12
198:20 202:20
205:13 215:24
217:4,12 241:1
241:3 246:12
**course** 87:7
**court** 1:1 6:5,21
85:25 239:19
239:19 260:2
261:22
**Courtney**
207:25 208:1,3
208:4,8,15
**covered** 44:15
246:12
**covering** 133:25
**COVID-19** 1:24
6:19
**coworker**
162:10

**coworkers**
163:16
**create** 81:17
**created** 175:18
175:20,21
**creating** 170:3
**critical** 145:7
**crux** 167:4
**crying** 242:8
**Crystal** 117:21
120:4
**CSR** 6:22
261:21
**cunt** 254:15
**current** 1:23
6:19 26:24
90:6 157:24
**currently** 9:19
144:16 175:19
**customer** 163:6
**cut** 254:22
**Cuyler** 117:20
173:15 215:15
215:19

———————

**D**
**daily** 25:11
**Dallas** 1:2,21
2:11,17 3:4
69:8 93:15
220:3 260:3
261:23
**dark** 8:4
**dat** 124:19
**date** 6:3 73:5,7,8
73:12,14 78:15
78:17,22,24
79:10,11 82:17
82:24 155:22
155:24 158:2
255:25 258:3
**dated** 204:7
**dates** 76:19
78:11 199:6
250:3
**Dave** 34:2 211:6
**Davis** 207:25

208:1,4,5,8,15
**day** 41:16,16
43:4 50:19,20
80:22 85:18
174:2 202:8,9
202:12,19
203:4 217:10
217:15 228:9
228:10 231:19
231:22 232:4
241:11,12
252:18 253:2
256:1 259:9,14
261:17
**day-to-day**
25:10,15 62:23
66:9 69:1
86:20
**days** 46:5 77:25
78:8 202:5,14
202:16,20
**DC** 124:22
201:5 202:10
202:17,18,19
202:22 204:12
225:21 227:9
227:21 231:5
**de** 195:8,11
196:6
**deal** 254:14
**dealing** 111:13
150:17,17
184:16
**dealt** 36:10
223:18
**dear** 142:15
226:20
**DEBM** 13:9
14:5,20 15:2
15:18,20 16:14
95:11 97:8
126:14
**December** 17:6
68:17 77:4
208:17 261:18
**decide** 14:10

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 75 of 106   PageID 8676
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 270

52:1 117:7
202:2
**decided** 14:17
58:23 112:3
**decision** 88:13
105:9 233:25
234:2 249:21
250:24 255:2
**decisions** 24:13
**decline** 171:24
**declined** 171:19
196:14
**decrease** 197:6
**deducted** 86:14
**deemed** 52:2
**defendant** 2:8
2:14 6:10,12
**DEFENSE** 2:3
**define** 83:9
**defined** 71:14
176:21 208:12
**defines** 30:19
**definitely** 87:20
95:7 209:4
**definition** 38:16
167:9
**delegates** 19:10
**deliver** 195:4
**denied** 62:17
**Denise** 211:10
211:14,19
248:24
**Denver** 211:3
213:4 241:24
**department**
42:18 67:12
143:2 229:8
**departments**
172:19 190:13
**depending**
27:17 77:23
84:24 93:12
126:18 174:19
177:7
**depicts** 244:15
**deponent** 260:24

260:25 261:2
**deposed** 9:1
**deposition** 1:9
1:15 6:17,23
239:5 251:23
256:16 257:16
258:3 259:1
260:10,19
261:1,3,7,12
**derogatory**
254:8
**describe** 244:15
**described** 53:10
78:2 82:14
113:9 132:5
139:11 141:15
168:8 174:10
220:15 221:16
253:12
**designate** 94:18
256:22
**designated**
27:15 94:8,14
94:17 232:18
**designating**
256:15
**designee** 69:10
69:11 70:23
71:4
**despite** 100:16
**details** 53:17,25
54:14 81:3
162:13 167:18
170:20 179:14
198:7 230:8
253:22 256:19
**deterrent** 255:7
**develop** 9:11
80:17
**dialogue** 132:23
**Diane** 215:23
216:1,3,4
**died** 171:11,13
**differences**
235:24
**different** 8:6

14:13 15:22
24:2 32:12
47:22 64:8
65:18 68:5,20
68:21 90:19
130:25 165:23
203:25 204:3
205:9 215:25
247:15
**differently** 61:4
71:17 99:3
166:13
**difficult** 108:13
108:21 240:7
**dig** 68:9
**dinner** 71:6
**DiPippa** 125:20
125:21,22
126:10,25
127:8
**direct** 27:18
50:15 93:5
99:1 102:21
119:5 120:13
158:14 159:9
243:24 252:4
**directed** 157:10
165:11 192:5
**directing** 150:15
**directly** 27:18
27:19 41:18
58:13,17 62:3
64:23 86:19
88:9 93:3 94:4
105:16 141:8
153:25 154:16
178:18 192:23
220:24 225:5,8
238:7
**director** 42:24
134:6,7
**Directors** 4:16
**dis-** 51:2
**disability** 159:6
**disappointed**
141:9

**disappointment**
125:18 141:5
141:16
**Disaster** 1:24
6:20
**disciplinary**
55:24 181:17
181:21 183:9
214:18,21
215:10,14
216:8 250:23
**discipline** 32:19
33:21 37:22
38:11 44:1,17
53:4 55:23,24
56:9 60:22
63:18,23 66:19
134:16,20
138:25 166:17
166:21 167:5
167:13 171:15
177:3,6 179:5
182:12 183:2
189:20 193:3
225:3 248:18
**disciplined**
161:7,12,19
164:1 181:1
193:2
**discourage**
225:16
**discrepancy**
83:15
**discrimination**
49:3,9 159:4,6
159:24 160:16
161:17
**discuss** 24:2,20
38:1 59:25
65:17 67:23
80:10 82:6,16
82:22 136:12
142:22 143:4
152:11 168:5
169:22 172:5
175:1,25 176:7

195:2 245:9,12
245:16,18
252:25 253:5
256:14
**discussed** 24:11
24:20 33:15
60:1 65:16
167:24 170:19
172:9 174:25
175:17 177:17
177:20,24
178:3,7,9
179:4 227:18
227:20 249:14
**discussing** 82:13
118:13 156:15
168:3 185:22
**discussion** 32:17
32:21,21,23
37:24 64:13
69:15 114:16
178:13 218:19
248:8 253:4
**discussions** 24:7
62:7 134:13
135:5 185:24
217:9 219:3
**disparaging**
54:17,23
**disseminate**
51:3
**disseminated**
254:3
**distress** 252:15
**distributed** 59:5
141:6
**distribution**
238:5
**DISTRICT** 1:1
1:1 260:2,2
**disturbing**
210:2
**DIVISION** 1:2
260:3
**divulge** 254:23
**divulging**

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 76 of 106   PageID 8677
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 271

219:13
**document** 4:13
4:15,17,19,20
4:22,23 5:2,4,5
5:7,9,11,13,15
5:16,18,19
7:25 8:4 74:10
74:12 81:17,22
98:9,11 99:3,5
99:20 102:22
102:22,24
107:20 108:2
118:25 140:20
140:25 141:22
141:25 143:9
144:13 146:9
146:10 150:19
150:20 151:2,6
151:14,18
152:1,3,20
155:5,7 158:14
158:15 164:16
176:13 179:18
185:14,24
186:24 187:20
194:9,13
197:12 203:6
205:11,15
207:18 239:8
243:25 244:9
251:23
**documents** 4:13
46:18 108:6,8
108:16 206:3
206:10,21,24
206:25 239:16
240:9,11 245:6
251:14
**doing** 72:6 84:8
123:11 129:25
142:23,24
147:9 184:11
194:3 201:23
232:16 254:25
**DOL** 143:21
**domicile** 11:18

12:24 13:6,8
30:18 31:2,4
51:10 63:6
246:20
**domicile's** 12:20
**domiciles** 25:17
30:14,15 50:10
50:21 69:15
90:17 254:20
**Don** 121:23
122:5,22,23,24
123:19,22,24
123:25
**dozens** 164:18
**dramatically**
145:23
**dressing** 244:24
**drive-by** 219:16
**drug** 102:20
150:7
**drugs** 148:3
**drunk** 35:13,19
**dues** 86:13,16,18
86:19,24
**duly** 7:2 260:18
**duplex** 219:13
219:22
**duration** 15:8
79:1,7
**duties** 69:13
**duty** 112:5

---
**E**

**E** 2:1,1 3:1,1
**earlier** 28:6
40:14 44:24
68:18 96:21
97:21 98:2
115:12 132:6
134:23 137:24
147:18 155:19
168:25 169:3
169:24 171:11
179:4 190:9
201:16 217:24
221:21,23
225:20 227:5

236:1 237:22
238:9,14 247:1
248:4
**early** 36:14
58:12 74:22
75:12 96:15
124:22 128:8
130:15 132:11
133:2,2 134:14
156:16
**earnings** 70:14
**ears** 236:16,18
236:25 237:2
**ease** 240:25
**easier** 96:2
223:6
**easily** 126:21
232:8
**EB** 148:12,17
**EB's** 110:9
**ecloutman@la...**
2:19
**Ed** 6:13 211:2
211:22,24
246:22 247:2,3
249:15
**educate** 50:12
**education** 12:5,6
15:11,12,13,16
15:19,21 25:1
25:22 26:5,11
**EDWARD** 2:16
**effect** 73:8 80:21
81:1,18 82:18
159:19
**effective** 73:12
159:3,7
**efficient** 90:19
**effort** 223:11
**efforts** 67:23
72:3 110:9
**Eileen** 103:21
104:1,1,16,19
104:22 105:2
**either** 70:19
78:10 84:23

93:5 95:15
97:19 148:5
149:6,7 167:21
188:14 234:21
238:4
**elected** 11:15,17
12:14 13:12,22
18:20,22,24
19:10 21:4
22:10,20,24
30:24 49:24
72:16 117:5
122:10
**election** 12:21
14:23,24 15:2
19:8,9 28:7,8
28:19 29:2
95:10,11 98:5
98:5 116:22,24
116:25 126:7
127:1 142:24
143:1,8,21
145:4,9 147:4
168:3,5 198:21
218:16
**elections** 12:18
12:23 13:25
14:2,12,15
30:12 87:4
94:8 95:8
118:14 142:17
142:23 143:5
143:11 144:1
144:16,21
**Elizabeth**
203:22
**Ellen** 35:5 37:6
37:9,14 38:2
45:6 53:11
54:9 59:13
89:12 91:19
168:9 224:7
**Ellis** 6:24
**Elm** 2:17
**else's** 131:19
**email** 4:16,18

5:8,10,12,14
25:25 26:17,21
26:22 27:14,14
27:15 93:2,3,4
96:1 101:22,23
103:8,17
105:25 107:7
110:15,19
112:10,14,21
112:23,24
113:5,22 142:5
143:13,19 144:6
144:8,9,11
147:1 152:9
180:3,6 183:18
183:20 185:12
185:19 186:1,8
186:9 187:17
188:2,3 189:24
190:3,6,8
191:2 194:22
194:25 195:17
229:7 238:4
**emailed** 27:8
101:13,24
110:14 113:25
210:25
**emails** 26:24
27:13,16
109:12,13
141:21 180:14
189:9 191:5
194:23 238:2,3
238:6
**emergency** 1:23
6:19
**emotional** 217:7
242:15 250:14
252:14
**employed** 9:20
9:22 10:2,5
261:6
**employee** 38:18
60:15 61:4
135:12,19,20
136:20 137:17

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 77 of 106   PageID 8678
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 272

157:10,10
188:21 190:11
211:23 261:8
**employees** 31:10
34:5 37:1
45:24 46:19
48:9 64:24,24
65:3,4 66:17
72:16 184:5
188:24 190:12
221:17 227:10
**empty** 188:23
189:1
**encourage**
243:20
**encouraged**
114:23 201:13
219:16
**ended** 15:8 16:6
25:9 37:25
51:13,21,24
144:2 169:24
253:7
**enforcement**
63:10 200:1
**enforcing** 86:21
**engage** 168:1
246:24
**engaged** 183:14
**ensure** 70:22
229:10
**ensuring** 149:15
230:2
**enthusiasm**
233:3
**entire** 74:12
173:2 221:6
231:18 256:16
**environment**
24:1
**environments**
24:4
**equal** 233:2
**equality** 233:5
**especially**
243:16

**established**
226:17
**et** 106:7
**ethnicity** 254:9
**evening** 231:13
**evenly** 59:5
**event** 13:23,24
124:22 200:15
200:18,21
201:7,9
**events** 26:12
142:16 198:20
201:2 202:14
202:19,21
252:12
**evolved** 47:7
**exactly** 63:22
68:16 74:14
87:14 159:18
167:15 180:21
**Examination**
4:4,5,6 7:3
216:23 252:22
**example** 26:24
63:24 64:14
72:4 134:22
137:13 138:7
143:4 166:10
175:10
**examples** 138:9
**Excellent** 92:13
**exception** 28:20
92:1
**exchange** 238:3
**exchanged**
109:12 238:2
**excluded** 66:4
**excuse** 217:22
249:12
**execute** 189:18
**executed** 181:11
259:11
**execution**
180:18,20
181:3,7
**executive** 11:18

15:18 17:9,13
18:21,25 19:3
19:11 25:8,14
28:11 29:4
30:12,16,22
31:2 65:19
69:4,5 70:10
75:18,20,24,25
76:4,9 79:12
88:10,13,25
124:18 129:4,6
129:9 141:20
142:6,16 144:7
148:7,19,20,22
148:23 149:1,3
149:4 164:4
172:20 173:2
174:9,11 175:7
175:23,25
176:5,5 177:17
178:6,8,9,11
178:13,16
182:15 215:8
215:12 216:6
249:5
**exhibit** 4:12,14
4:16,18,20,21
4:23 5:2,3,5,6
5:8,10,12,14
5:16,17,19,20
5:22 8:1,2
98:12,13
102:23,25
107:21,23,23
107:25 108:3
118:25 119:1
140:21,22,24
141:23,24
146:10,11
150:20,21
155:2,5,6
158:15,16
179:18,19
185:14,15
187:20,21
194:9,10,16

197:13,14
203:7,11,15
205:11 239:5,6
239:20,20,21
251:19,22,25
**EXHIBITS** 4:11
5:1
**existed** 81:14
**existing** 73:17
82:23
**expand** 253:21
**expect** 217:6
**expectations**
130:9
**expenses** 201:25
**experience**
57:11 126:17
145:16,17,18
145:19,20
218:9 235:11
238:24
**experienced**
222:14 255:11
**experiences**
219:23,24
**expert** 130:23
**expiration** 73:8
**expire** 72:25
73:2
**Expires** 259:20
261:22
**explain** 64:16
97:2 105:8
183:1 229:15
**explained**
165:23 181:12
**explaining**
232:10
**explanations**
137:4
**explore** 170:22
171:2
**exploring** 39:22
65:11,14
**express** 143:10
199:18

**expressed** 17:23
125:17 255:13
259:12
**expresses**
143:12
**extension** 27:2,2
93:5
**extensions** 26:25
**extensively**
93:14
**extent** 75:24
111:16,20
206:2
**extra** 188:18

---

### F

**FA** 148:14
**FA's** 148:11
**FAAP** 147:12
150:3
**face** 55:4 147:12
**Facebook** 4:20
5:21,22 93:21
93:23 94:3,12
94:13,23 95:9
95:10,13,25
96:4 114:22,24
115:1,7,10,16
115:24 116:2,4
116:6,9 119:16
130:23 141:6
141:19 143:14
146:19 154:25
188:8 194:23
208:14 209:2,3
209:5,14,20
220:25 221:15
238:11,16,20
238:25 239:2
240:13,16
241:23 253:6
254:4
**faces** 244:18
**facilitate** 226:21
**facilitated**
202:25
**facing** 24:3

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 78 of 106   PageID 8679
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 273

Facsimile 261:24
fact 218:20,22 219:4 241:5
fact-finding 31:7,11 32:6 32:13 96:23 103:16 106:6 106:20 249:12 249:22
FADAP 102:19 147:16
failed 51:24 219:1
failure 220:12 220:16
fair 31:19 109:15 222:8 230:4 237:11 237:14
fall 73:2 88:2 201:12
familiar 45:20 158:9 195:14 236:4 239:13 240:5
family 95:1,3,21 95:23 234:19
far 198:4 220:5 230:18 253:22
FAS 195:3
fathers 235:20
fault 48:20 99:22
favorable 43:25 224:21
fear 255:13
fearful 249:4
February 126:3 200:4 204:7
Federal 1:22 85:17,23 260:21
fee 86:15 87:2 110:10 111:23 112:2,6

feedback 72:7 178:20
feel 84:7 109:4 163:6,16 167:14,19 183:12 196:24 212:16 217:8 243:5 245:1 250:14
feeling 156:22 176:24
fell 241:25
felt 41:24 53:23 63:2,8 140:16 156:20 157:14 165:13,18 166:8,11,13,16 167:20,21 183:3,6 197:9 234:8,8 235:22 255:17
female 17:21 23:24 163:16
females 23:16 226:13
fetus 210:4
fifth 188:20
figure 222:16
file 43:20 203:12
filed 33:19 37:16 59:3 61:19 87:8 96:25 124:17,18,24 125:1,8 199:1 220:3
files 54:1 108:18
filing 66:10
fill 17:18 217:12
filling 71:8
final 236:17
finally 156:4
financially 261:9
financials 20:1
find 158:13 164:17 209:9

236:23 244:19 244:21
finding 131:20
fine 39:15 119:9
finish 9:13,15
finished 191:9 204:18 251:7
fired 248:15
Firm 261:25
first 7:2 10:8 11:19 12:14 13:11,21 14:4 14:16,18,20,23 15:2 19:7 22:23 28:7,21 28:22 29:3,3,5 29:6,13,22,24 41:6 50:1 51:23 73:18 76:23 78:22 80:17 88:25 98:11,18 99:15 100:11,12 103:8,18 105:1 109:6,25 128:6 128:20 130:16 131:8 141:2 147:24 154:1,6 156:2 164:17 179:23,23 180:2,2,2,16 186:18 188:6 196:22 197:21 198:22 203:19 203:21,23 204:1,4 205:12 215:25 218:25 220:12 225:7 226:11 229:10 231:19 232:3 241:3,3 247:4 247:14 249:25 254:7
five 28:9 30:24 46:14 47:18 77:25 79:7

87:18,19 100:21 109:12 118:5,5 222:15
five-year 174:23
flat 228:2
flesh 82:10
flight 9:22 10:6 31:7,10,17 32:17 34:5,15 34:24,25 35:10 35:18 37:4,21 39:25 40:11,12 40:18,22 42:12 42:14,16 43:21 44:14,21 45:16 47:23 48:3,11 48:16 49:6,17 49:19 50:6,9 50:12,22 51:7 52:24,25 54:17 54:18,20 55:2 55:20 58:14,18 59:8 60:10 61:10,21 62:13 62:18 63:24,25 64:1,9 65:7,24 65:25 66:2,4,7 66:19,22 67:6 70:24 71:4,18 71:21,23 88:12 89:16 90:4 92:2 93:8 96:17 97:15,20 101:18 102:20 103:10 110:7 115:20 120:20 122:9,25 124:21 131:22 132:1 134:25 136:4,7 137:14 137:16 138:2,9 139:16 140:14 141:8 144:11 144:17 145:3,6 147:12,15 148:1,2 149:18

149:21,25 150:10 153:24 154:9,15 162:1 162:4,7,9,18 163:21,23,25 164:8,12 165:5 166:2,9,11 167:25 168:12 170:5,6 175:14 182:24,24 185:3 188:17 190:13,14,15 190:18,23 191:14 192:3 192:14,24 193:22 196:9 198:10 200:23 201:3,17 204:15 208:2 208:13 213:5 213:15,17 214:21 215:3,9 215:13,23,25 216:2,7 217:21 219:5,7 220:6 221:7 222:4,25 223:19 227:24 227:25 230:12 230:15 231:12 231:17 232:7 236:10 238:24 239:1 242:2,5 242:6,8,14 243:17 246:19 247:13,18 254:4,10,12 255:12
flights 217:20
flip 141:25
flipping 159:22
fly 188:24,25 200:6
focus 72:14 81:10 82:1
focusing 197:21
Foley 35:5,7

37:4 45:3 54:9
89:9,13 91:25
168:10 224:16
**folks** 62:18 81:2
124:9 231:1
**follow** 14:1 42:6
**follow-up** 139:5
**followed** 60:24
**following** 12:22
13:23 71:7
88:17 260:16
**follows** 7:2
261:12
**food** 85:1
**foregoing** 259:1
259:11
**forget** 85:16
**forgot** 69:24
71:1
**form** 154:12
183:25
**formally** 11:3
**formed** 70:2
114:22
**former** 21:17
23:12 91:13
124:20 199:19
**forward** 40:3
42:5,9 86:4
150:12 156:25
165:13,18
170:1 182:25
188:2 194:23
250:16
**forwarded**
142:10 186:8
186:13 189:11
**forwarding**
186:16
**foster** 227:2
**found** 119:24
157:9,14
200:20 237:3
**FOUNDATION**
2:4
**four** 77:25

126:22 173:24
188:18 252:11
**fourth** 151:15
188:8,11,13,19
189:2,3
**frame** 36:12
44:9 100:23
134:19 174:19
189:13 195:15
198:10 220:10
253:22,24
**free** 109:4
135:16 227:23
228:11
**frequency** 78:3
**frequent** 95:19
**frequently** 75:5
75:7 93:10
95:20 96:1
112:12 113:22
114:10
**Friday** 231:12
**friendlies** 123:5
123:7
**friendly** 242:12
243:15
**friends** 95:1,3
242:11
**front** 41:24
73:11 155:22
167:14
**fucktard** 53:2
55:3,12 136:21
137:15 167:3
179:6
**full** 156:2
164:17 175:23
188:22
**full-dues-payi...**
72:17
**full-time** 23:14
69:8 129:18,20
129:23 194:3
228:5
**funded** 101:17
102:11 227:22

**funding** 149:13
149:23
**funnel** 51:1
**further** 41:24
82:10 105:8
107:13 123:3
185:11 249:14
252:19 257:13
257:14 260:21
261:4,7
**Fusion** 115:23
116:2,10,13
**future** 42:8
169:12,15,16
169:23 172:6
176:15 227:3

**G**

**Gage** 22:23
105:1 117:20
173:6,13
**Gaston** 1:21 3:4
**gate** 242:1,3
**gears** 98:1
200:10
**gender** 235:21
**general** 17:3
31:14 34:18,20
46:23 48:8
88:11 93:6
95:25 113:12
116:3 132:13
132:19 170:16
178:8 201:12
221:9
**generally** 119:12
223:9
**generate** 107:5
**generated** 139:5
**getting** 35:13,19
49:7 130:1
148:5 150:4
225:3
**gifts** 151:16
**Gillespie** 1:21
3:3,3 6:15,15
8:10,17 57:24

58:4 85:1,9,14
85:21,25 92:6
92:13 99:7
152:25 153:4
154:12 205:14
205:17,22
239:11,19,22
244:1 256:4,4
**Gilliam** 2:3 4:4
6:7,7 7:4,7 8:3
21:15 22:15,22
39:15,17 57:20
57:24 58:2,10
76:6 84:17,23
85:6,11,19,24
86:3 89:15
92:10,14,20
98:14 99:10,12
103:1 107:24
108:1,8,11,19
108:22,25
109:3 112:9
119:2 123:22
136:18 139:22
140:2,23
141:25 146:13
150:23 152:22
152:24 153:2,6
153:13 154:13
155:2,4,7
158:17 179:21
183:8 185:17
186:15 187:23
194:13,16,19
197:16 203:10
203:16 205:2,8
205:16,19
211:18 214:5
214:12 216:21
252:1 256:13
257:1,8,14
261:13
**girl** 236:14,14
**girls'** 208:20
**give** 9:7 35:3
98:21 115:18

170:20 186:23
219:17 231:23
**given** 53:7 55:6
55:15 84:7
166:21 255:16
259:14 260:19
**gives** 152:9
**giving** 178:19
**global** 63:3,9
**Gmail** 189:25
190:4
**go** 17:14 27:18
27:19 34:23
44:24 46:10
49:14 66:12
67:25 70:23
76:24 81:1
85:8,12 92:7
92:15 97:1,12
105:11 112:22
125:9 127:10
129:19 134:18
144:12 148:13
149:1,17
169:18 170:2
173:10,14
201:4,21 214:5
217:3,4 221:10
221:14 223:11
227:3 229:3
230:22,23
231:16 242:3
246:16
**goal** 232:24
233:6
**goals** 248:11
**goes** 9:4 28:19
79:10 80:21
141:7 193:9
**going** 16:16 20:5
26:13,23 27:4
35:17 38:22
41:17 42:4,5,9
47:12,12 48:20
50:24 55:8
56:9 57:5,25

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 80 of 106   PageID 8681
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 275

60:9 61:1,6
69:6 70:11
72:3,6,12
75:23 80:19
81:7 84:18,24
85:12,15 93:13
95:1 97:7
98:11 99:1,8
104:8 109:5
111:4 113:20
132:22 133:3
142:19 145:3
148:2 150:5,13
152:2,5 164:15
165:15 166:7
180:25 198:24
199:11,13,16
209:4 217:6,25
219:6,8,9,12
225:22 236:8
239:4,14 240:1
240:24 242:5
243:23 247:9
247:12,18
248:10 251:13
252:13 254:18
256:9
**good** 7:5 84:15
92:11,11
104:19 152:25
212:17
**gotten** 40:6
**govern** 28:14
**granted** 230:5
**graphic** 210:2
219:11 252:5
**great** 153:5
**Greenfield** 2:15
2:16 4:6 6:11
6:11 38:25
75:22 108:15
108:20,23
109:1 111:12
194:11,15,17
203:8,13
252:23,24

255:23 256:8
256:13 257:6
257:12 261:15
**Greg** 89:5,21
90:5 92:1
110:11 111:10
**grievance** 34:12
35:2 36:3,15
36:18,20 37:16
40:23 58:15,22
58:24 59:1,1,2
60:17 61:19,19
62:13,15,22
63:14 66:6,10
66:16,21 69:20
69:20 71:8
87:8 96:25
97:6,8,11,22
97:24 107:4
129:4,6,8,21
129:23 130:3
139:1 174:12
177:21,22,23
178:2,11
181:23 182:9
182:12 189:10
189:14 250:25
250:25 251:3
251:15
**grievance-rela...**
223:21
**grievances** 42:7
43:10 46:25
58:12 59:6
60:7 62:24
86:21 96:14,18
97:16 130:1,2
130:6 155:18
156:7,15
171:16,19,24
206:7 256:20
**grieved** 229:4
**grieving** 97:3
**grounds** 143:20
**group** 4:20
25:25 37:24

42:1,5 50:13
55:20 56:6
71:22 90:4,16
90:21 114:18
114:22,24
115:1,14,16,24
116:3,5,6,9
117:14,17
118:17,19,22
119:16,16
128:1,3,10
130:17,22
131:3,4,15,20
137:21 139:17
140:6,9,15,15
140:16 142:10
143:13,14
165:19 197:20
200:22 208:14
222:12 227:9
232:23 233:13
244:13
**groups** 42:15
115:12,21,25
118:8 141:19
220:25 233:8
**growing** 20:7
90:7,7,12
**growth** 90:11
**guess** 18:5,10,16
18:24 22:25
26:2,3,17 30:6
31:16 34:15
37:18 43:24
44:10,24 45:23
46:2 47:9 49:3
52:21 53:15
57:10 61:9
63:9,13,16,21
65:12,18,20
66:11,16 67:5
67:22 68:24
75:10 76:10
77:13,19 80:3
82:11,14,20,23
83:8,8 86:6

89:16 98:7
105:10 110:4,5
110:6 116:11
118:12 119:9
120:9 128:6
130:14,16
132:10 136:25
141:2 142:7
146:21 151:24
152:6 167:1
180:6 181:16
191:1 196:5
197:21 199:25
206:9,17
208:11 209:13
209:22 257:9
**guessing** 170:9
**guidance** 36:8
**guidelines** 157:1
**guru** 116:2
**Gutierrez**
211:10,14,19
248:4
**guys** 84:22
**Gwen** 23:13
204:23 228:4

---

### H

**Hafner** 38:5,7
39:22 40:25
41:3,6,13 43:4
60:11,14 61:11
62:1,4,8 64:14
64:16 66:13,25
101:6 132:5,11
132:19 133:3
134:14,23
139:4,6 155:19
156:16 164:25
165:3 167:25
168:19 172:6
172:11,14
173:23 183:21
184:3,12 186:2
223:23 224:4
**half** 28:21,22
33:12 46:15

58:1 109:11
145:1 180:2
186:14 202:18
**halfway** 120:24
**ham** 61:11
**hammer** 80:25
**hand** 103:20
110:6 111:10
111:13 259:14
**handed** 68:2
124:21
**handful** 87:15
87:17 134:18
**handle** 25:15
42:4 105:5
**handled** 25:12
66:6,9 107:3
136:14
**handles** 61:20
**handling** 58:16
**happen** 46:24
67:14 88:1,2
248:24 249:1,6
**happened** 76:14
98:4 100:25
107:4 124:7
136:10 143:13
156:23 218:12
243:20 246:12
252:12 255:16
**happening**
64:24 136:15
138:14 170:7
**happy** 226:21
250:20
**harass** 250:12
**harassed** 165:14
165:18
**harassing**
244:21
**harassment**
38:20 49:3,9
159:4,4,23,23
160:15,16
161:16,16
249:2

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 81 of 106   PageID 8682
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 276

Harbour 164:9
164:10
hard 252:18
harm 181:14
184:1
harvested 123:6
Harwood 2:10
hashtagged
53:19
hat 236:19
hateful 212:12
hats 236:2,3,4
haunt 252:9
hazing 48:13,18
48:22 159:1
160:22 176:1
head 9:8 32:2
44:6 45:19
225:10 232:22
254:14
headquarters
202:23
heads-up 113:24
health 234:13
hear 85:20
88:25 131:8
183:5 194:12
210:16,20,24
230:13 242:12
253:2
heard 13:24
43:11 141:17
178:10 182:14
220:20 236:9
246:22
hearing 37:12
88:24 97:13
141:14
heart 226:20
held 11:16,17,20
11:23,25 12:3
12:7,15 49:22
49:24,25 52:16
77:19 80:14
122:13 126:10
134:8,9 193:25

194:2 208:5,8
hello 85:8
252:24
help 51:1,2 72:2
72:4 90:20
97:23 105:8
148:5 149:22
150:1,8,13
200:14 226:21
226:21,21
227:2,11
helping 49:25
149:21
helps 227:9,11
Hendrick 1:19
6:21 260:14
261:21
Henry 174:18
hereto 1:25
Hettich 25:20
hey 92:6 113:2
113:23 114:13
226:25
hiatus 75:8
high 219:22
227:6
higher-up 63:4
highest 42:18
246:19
hire 70:24
254:14
hired 253:18
hiring 71:7
254:10
hit 221:12
Hofer 89:5,22
90:5 92:1
184:17,21
Hogan 89:8
91:11
Holcomb 35:6
45:12 56:18
57:2 128:7
Holcomb's
54:12
hold 11:10 13:17

14:7,20 120:21
122:10 125:23
192:17 194:6
208:5 256:8,9
holding 35:17
Holly 35:5 45:9
53:15 55:6,14
56:9 214:17
224:21
home 6:24 136:7
home-wrecker
218:22
hoped 40:8 42:1
196:8 248:11
hopeful 183:23
host 226:21
hosted 71:6
215:2
hot 132:21
hotel 228:7
hotels 219:15
Hotmail 207:10
hour 58:1
hours/minutes
261:13,14
housing 219:14
Hudson 42:24
43:1,6 58:11
59:18 61:11
65:23,25 132:6
133:9 134:13
139:12 210:10
210:17
huh-uhs 9:8
human 228:14
hundreds
122:17
hurt 140:18
141:4,16 145:8
166:9 219:7
250:13
hurting 243:18
Hux 34:3

_____
I
_____
idea 31:15 195:9
identifiable

232:9
identified
165:24 251:24
identify 239:16
240:1
III 2:16
illustration
184:15
IM 241:10
image 53:23
245:3
imagery 235:1,1
images 210:2
241:4 245:21
249:6
Imamovic 35:6
45:9 55:15
214:18 224:21
Imamovic's
53:15 56:9
immediately
254:21
impact 104:9
145:24 241:22
252:8
impacted 27:4,5
150:2
implementation
80:17 81:11
implemented
80:20
implicated
167:11
important 9:7
9:12 255:19
impression
235:12
improve 91:2
130:10
improvement
130:13
in-depth 256:18
in-person 59:19
incestual 234:18
incident 124:25
125:1 138:14

151:19,21
162:16,24
include 76:2
78:15 103:16
included 61:6
169:3 231:18
including 12:4
38:2 43:10
90:5 130:10
168:18 186:1
191:15 218:19
232:23 255:4
256:19
inconsistencies
38:14,15 39:24
63:18,22 64:5
64:12,15,20,21
65:15 165:7
inconsistency
64:17 65:12,19
incorporated
81:24
incorrectly
132:18
increase 46:4
57:12,16
196:16 198:19
198:25 222:14
increasing
132:25 156:21
increments
77:23
INDEX 4:1
indicate 146:1
146:25 191:22
233:14
indicated 42:14
46:4 66:24
indicates 148:16
individual 18:4
30:18 39:10,12
42:3 53:1
58:20 60:2
66:7 96:17
150:10 165:12
206:4

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 82 of 106   PageID 8683
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 277

individual's
97:11 254:8
individually
58:16
individuals
111:14 128:7
145:19 165:17
186:1,10
220:17
inflight 4:16
37:25 38:3
67:13,17 134:7
134:8 170:17
172:19 187:5
190:12 210:7
influence 249:21
influx 39:23
inform 106:9,18
information
4:13 33:23
50:16 51:1
72:5 183:1
206:2,10,14,18
207:8,13
217:11 230:2
248:22 250:9
255:19
informed 8:22
106:3 196:7
236:15
ingrained 147:9
initial 250:24
initially 16:7
18:20 51:9
57:3 142:18
232:13 246:13
initials 216:17
initiation 110:10
111:23 112:2,5
initiative 16:21
initiatives 24:3
input 97:23
inside 244:18
installed 23:25
instance 1:16
31:2 93:12

150:6 229:13
instant 241:11
250:14
instruct 39:6
111:19
instructed
103:21 251:10
instructing
134:10
instrument
259:11
instrumental
147:23
intended 230:3
intent 175:17,19
181:12 189:17
interact 249:17
interacting
148:18
interaction
249:14
interacts 148:11
148:17
interchangeably
13:3
interest 226:9
226:12
interested 17:22
68:8 226:25
261:10
interfered 166:1
166:15,20,23
interference
165:4
interfering
164:20 165:1
165:22
internal 229:9
internally
222:22 229:6
international
16:3,4,9,14,17
17:15,20 18:11
18:13,16,19,21
18:22 19:1,3,4
19:12,15,18,21

19:22 20:8,10
20:12,25 21:4
21:8 22:5 23:3
23:9,14 26:7
26:12 27:6
28:12 86:15,17
110:25 117:4
201:14 203:1
204:12,21,22
226:17 228:4,6
international's
18:25
interpret 242:17
243:13
interpretation
83:15 84:4
interpreted
243:14
interrupt 39:14
introduce 6:4
227:1
introduced
251:24
inundated 95:3
investigated
34:16 167:16
investigation
32:8,16,20
33:21 96:24
150:4 167:18
181:18,21
220:23 246:25
247:5,7 249:1
249:13,18,23
inviting 242:18
involve 62:23
174:10
involved 16:22
17:16 18:15
44:1,4 47:23
51:8,19 53:11
64:8 65:3
72:11,11 150:3
167:25 168:5
176:4 186:12
201:1 225:5,8

225:11,22
226:25 230:8
235:7
involvement
18:11,12 68:19
193:9 227:18
involves 205:12
involving
162:24 175:7
iPad 245:5
issue 4:15 63:3
97:1 104:14,17
135:10 136:9
140:11,17
164:9 175:8
234:20
issued 32:19
33:22 36:22,25
37:3 44:8 53:4
135:1 137:18
146:5 154:18
171:16 197:9
197:20 198:17
199:9 200:7,7
248:19
issues 23:18
38:2 46:22
65:11 67:2,20
72:15 74:9
84:4 92:23
93:1 102:4
114:19 139:4
148:3 172:5
174:24 175:1
issuing 38:11
140:4,8 144:5
items 20:9 64:25
81:5 83:13
93:25 169:20
206:22

**J**

Jackson 89:6,7
91:6 214:15,24
215:22 216:11
Jamie 186:2,19
186:22

Jannah 125:18
January 80:1,4
80:8 116:24
159:8 186:9,10
200:11 225:21
Jeanna 89:6,7
91:6 214:14,23
215:22 216:11
Jerry 29:17
121:14
Jessica 18:6,7
job 129:24 150:2
150:6 185:6
217:22 250:15
Joe 3:3 34:2
85:20
joe@gillespies...
3:5
John 117:21
125:22 126:17
126:25 173:7
173:13
join 111:24
114:23 247:23
joined 15:18
247:24
joint 101:14,15
102:7,12
103:11 147:17
147:18 149:5
jointly 101:17
101:17 102:11
102:12
Joseph 6:15
Juan 133:9
135:5,23,25
136:3,12
139:12 169:2,7
July 74:22,25
75:12,16 76:20
76:21,23
220:13
jump 39:1 84:17
188:13,15,19
189:2
June 14:6 15:7

73:19,22 74:15
74:16,18,24
75:12
**junior** 40:12

**K**

**K** 29:20
**Kay** 89:8 91:11
**keep** 39:4 84:24
91:1 150:5
165:10
**keeping** 69:5
**Kent** 103:20
105:8,11,14
110:6 111:9,13
112:6
**kept** 110:21
111:1
**kickoff** 226:15
**kids** 218:24
**Kilbourne**
121:21
**kill** 181:15
254:11
**kind** 20:21
50:25 68:1,5
72:2,9 88:16
91:2 92:23
175:16 226:12
226:15 231:23
**King** 122:7,8
125:2,3
**Kissman** 34:2
211:6
**Klein** 30:1
**knew** 21:6 55:1
89:23 91:13
96:1 97:20
209:11
**knitting** 236:11
**know** 7:14 8:4
21:5,15 22:1
24:2,8,18
26:24 27:9
32:2 33:13,14
33:15 34:24
35:3 36:3,8

38:8 40:1,3,4,6
40:22 42:4,8
44:16 47:13
48:16,19 49:6
50:20 51:11,12
51:18 52:11,15
53:3,11 54:4,8
55:20 57:22
59:14 60:18,20
61:23 62:2
63:13 64:4,7
65:2,6,8 66:13
67:9 68:3,8
70:10,20 71:11
71:20 72:5,9
72:10 77:23
78:8,23 81:2,6
81:9 83:15
86:8,8 87:14
88:8,9,19
89:21 90:16,22
91:6,11,15
92:9,10 96:3
96:12 97:3
98:16,19 99:7
101:13 102:1,2
103:3,21 105:3
105:5,7,8,13
105:17 106:25
107:3,5 110:7
110:18 112:8
113:2,4,19,19
113:23 114:18
114:25 115:19
115:21 116:10
116:12 119:2
121:4,6,10
122:13 123:7
123:10 124:4
126:2,4 127:7
127:9 128:6,9
128:13,18
132:2,18,21,24
133:13 134:24
137:4,24,25
141:15 143:6

148:18 149:9
149:10 150:12
150:15,18,24
151:4,4,19
152:15 155:8
157:11 158:6,8
159:17 160:4
160:23 161:19
162:11 163:18
164:3,3 165:15
167:16,18,20
167:20 170:10
171:10 175:20
176:22 182:11
184:2,9,25
186:19 189:22
190:18,20,21
190:23 192:3,6
192:10,22,24
193:12,15,18
193:25 194:1
195:5,7,10,12
196:21,21,23
197:2,5 199:3
200:25,25
201:1,12
203:22 205:8
208:25 209:3
209:11 211:19
211:19 212:15
215:8 216:6,9
216:9,10 217:3
217:5 218:13
218:14,20
220:5 221:19
225:10 227:12
229:5,11,19,24
230:3,18
232:22 233:4,6
235:7,8 236:8
236:14,15,15
237:8,10,12
239:14,17
240:6 247:21
250:4 251:6,11
251:13,15

252:18 253:1,9
256:1 257:9,10
**knowing** 167:15
200:8
**knowledge**
24:17 52:19
192:19 193:1
194:7 230:21
**known** 23:3
184:9 237:15
259:9
**Kristen** 117:25
118:6

**L**

**label** 26:10
**labeled** 94:6
99:3 239:11
**labels** 108:7,13
**labor** 26:10
42:25 70:14
73:2 143:2
**lack** 68:3 131:1
138:8 157:1
**Lacore** 4:16
67:18,19 68:11
101:10 170:24
173:23 186:2
189:25 210:10
210:20
**language** 81:20
83:18,21
**Lara** 120:15,16
120:19 121:8
**large** 34:25
50:13 90:11
180:22
**larger** 63:3
**largest** 115:23
116:3
**Las** 10:17,19,20
34:2
**last-chance**
45:21,25 46:12
46:16,17 47:4
**lasting** 252:7
**LAUREN** 3:8

**LAW** 2:16
**laws** 255:15
**lawsuit** 33:22
209:12 252:14
256:20
**lawsuits** 33:19
**laying** 110:23
**lead** 11:25 15:5
100:16 144:25
145:13
**leader** 114:9
169:1,2 246:19
**leaders** 38:9
62:9 63:4 68:6
70:13 133:11
156:22 168:18
168:21,24
169:5 172:18
233:8
**leadership** 19:2
19:17 40:15
49:12 103:14
107:18 190:17
218:18 227:7
247:20
**leading** 144:19
**leak** 130:20
**leaked** 131:6,9
142:20 220:25
**learn** 223:8
249:25 250:20
**learned** 250:8
**leave** 24:7 68:14
113:3 152:20
242:1,3 251:3
**leaving** 169:24
216:17 217:21
217:22
**led** 88:15
**left** 68:12 100:1
153:14 196:22
205:10 222:6
231:12
**left-hand** 98:25
**legal** 2:3 39:13
65:16,20 75:25

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 84 of 106   PageID 8685
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 279

111:17,18
170:16,20
171:4 254:21
**legalese** 46:18
**legally** 167:8
**legislative** 86:23
**legislatively**
27:5
**lengthy** 119:3
**let's** 57:23 68:25
84:17 85:6
87:15 91:19
92:15 102:21
107:19,20
116:11 118:24
119:18 120:12
125:9 127:10
127:13,17
128:4,12
144:13 152:24
158:12 164:15
164:16 169:11
179:17 185:13
187:19 194:8
203:5,24 205:2
214:4 225:7
257:1
**letter** 83:16,17
83:23,23 84:9
84:9 167:13
168:22 169:10
**letters** 81:23,23
87:5
**letting** 102:2
106:25
**level** 18:13
19:14 22:2,6
23:9 38:10
60:21 62:9
97:2 131:1
156:19 166:17
171:15 178:11
**levels** 19:17 40:7
177:3,6
**liaison** 102:6,7
102:10 104:25

148:8,23 149:2
149:10
**liaisons** 148:21
**lieu** 219:14
**life** 234:9 235:21
**light** 52:3
**likewise** 9:15
**limited** 117:3
**limits** 117:6
**Lindemann**
29:17
**line** 93:6 141:2
177:4 188:6
217:18 219:5
229:22 243:9
243:10,16,18
248:4 250:12
253:8 258:4
**lined** 219:7
**linger** 239:14
**list** 40:21 44:25
68:1 110:22
111:1 114:8
115:19 169:20
169:21 172:5
**listed** 70:18
**literally** 181:10
**litigation** 249:9
**little** 13:20 57:6
57:25 85:12
98:2,3 110:11
111:11 200:11
218:8 253:16
253:21
**Liz** 203:2 227:6
**LLC** 261:22
**LLP** 1:21 2:10
3:3
**load** 59:4
**loads** 59:4
**lobby** 227:11
**lobbying** 24:12
24:15 26:12
124:21
**local** 1:6 2:14
6:12,14 7:10

11:4,7,11,16
11:21,24 12:8
12:15,23 14:2
16:6 17:18,24
18:9 21:17,19
22:2,25 23:4
23:20 24:24
25:3 26:6
28:13,15 30:8
30:21 33:20
36:11 39:3,11
71:16 76:12
87:4 91:14
93:4,22 95:2
100:14,21
101:16,21
102:8 110:24
111:22 112:15
116:8 142:17
144:24 147:18
164:19 202:24
204:7 226:7,12
235:16 252:25
254:15 260:7
**local's** 20:6
**locally** 30:17
31:3
**locals** 16:5,6,23
16:23 20:2
23:17,21,23
24:5 71:16
**located** 1:20
**locations** 11:1
**logistics** 149:23
**long** 10:2 12:10
13:14 14:7
17:1 92:14
114:8,15
125:19 147:10
153:2 156:12
156:14,20
184:10 188:4
190:21 196:25
212:2 226:16
252:18 253:2
256:1

**long-term** 184:4
**longer** 23:13
46:18 67:11
85:12 87:3
101:19 103:10
106:4,5 111:5
193:9 234:20
**look** 8:4 38:24
40:2,8,19
71:22 90:6,18
90:23 91:2,5
98:8,9,15
103:3 113:25
119:10 132:25
137:2,6 146:10
150:20 155:7
201:22 223:3
236:20,24
239:15,17
240:15 241:20
252:9
**looked** 35:15,15
47:2 71:19
151:2 236:16
243:9
**looking** 36:7
99:4,25 107:9
109:10 119:18
142:13 145:3
151:1 180:12
204:3,6 209:4
221:19 243:15
244:3
**looks** 120:24
142:4 148:9
176:13 188:4
189:12 233:6
**loop** 69:5
**losing** 15:2
**lost** 28:8 121:9
121:10 145:9
**lot** 36:2 46:18
77:24 109:12
109:13 114:11
134:17,18
188:4 191:14

193:8 226:8,8
236:1
**Loucks** 117:25
**lounge** 50:18
72:6
**lounges** 50:23
**low** 88:22
**lower** 38:10 40:7
62:9 244:4
**lunch** 84:19 92:7
92:17
**Lyn** 117:25
118:6 128:20
128:22 129:5
130:4
**lyrics** 166:5,6

**M**

**M** 1:19 260:14
261:21
**MABERRY** 3:9
**MACK** 3:7
**Madam** 251:18
**Magazine** 4:15
98:18 99:11,15
100:5
**maintain** 148:6
206:23
**majority** 48:3
**making** 61:13
81:8 140:3
146:16 151:24
162:9 163:18
180:17 183:15
**male-dominat...**
23:22
**males** 23:17
226:13
**management**
32:22 40:8
114:3,7 132:7
132:12,16,21
133:6,16 139:8
139:15 144:15
144:21 145:25
148:12,14,17
148:19 152:8

Case 3:17-cv-02278-X Document 263-1 Filed 06/13/22 Page 85 of 106 PageID 8686
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 280

153:17,20,25
154:4,11
164:19 165:22
166:14,16,19
166:23 168:11
169:14,20
174:14,21
184:16,21,24
185:5,10
187:12 189:16
190:14 193:24
194:5 195:3
196:10 200:6
210:23 213:22
247:20 248:3
**manager** 34:2
187:4 210:8
211:2,3 246:14
246:17
**managers** 34:1
62:11 64:8
**manages** 59:1
**mandatory**
32:10,12,14,15
32:16,25 33:5
231:1,8
**manner** 64:1
**march** 41:1
151:21 196:14
200:12 201:5
201:11,21
202:3,6,7,10
202:10,17,18
202:20 203:4
225:22 226:1
230:17,19
231:7,8,10,18
231:21,21
232:4,10,14,24
232:25 234:25
235:4,12 236:2
237:6,6,7
238:12 245:2
245:19
**March-ish** 133:3
**marching** 232:4

235:17
**mark** 7:25 98:12
102:22 107:20
118:24 140:20
141:22 146:9
150:19 155:4
158:14 179:18
185:13 187:20
194:8 197:12
203:6 251:19
251:22
**marked** 8:2
98:13 102:25
108:3 119:1
140:22 141:24
146:11 150:21
155:6 158:16
179:19 185:15
187:21 194:10
194:14 197:14
203:15 239:4,6
251:25
**married** 218:21
**Martin** 29:20
129:8
**Mary** 35:5 37:6
37:6,8,14 38:2
45:6 53:11
54:9 59:13
89:12 91:19
168:9,9 224:7
**master** 81:17
**materials**
240:15
**maternity** 24:7
**Matt** 7:7 25:20
39:14 85:15
92:6
**matter** 35:5 37:6
37:14 45:6
53:11 54:9
59:13 87:8
89:12 91:19
168:9 224:8
**Matter's** 38:2
**matters** 193:13

211:7,11
223:21
**Matthew** 2:3 6:7
108:15 193:18
193:23 194:11
203:8
**mbg@nrtw.org**
2:6
**McDaniel** 21:10
21:14,16 23:7
90:3
**mcorrell@ree...**
2:12
**meal** 228:9
**mean** 26:1 43:10
74:7 83:9
87:17 100:2
103:24 109:10
121:8 150:5
170:13,23
176:9 181:11
188:11 191:7
198:4 222:19
228:12,22
231:24 236:7
242:23 243:13
**means** 6:24
27:11
**meant** 98:20
101:15 181:13
196:3 221:12
222:23 237:3
**media** 31:17,21
31:24 32:5
33:16 34:6,16
35:8 36:2
37:22,23 38:1
38:10,17,19
39:24 40:16,23
41:25 42:4,11
42:18,19 43:9
44:9 46:4,7,21
47:13,20,24
48:5,6,23 49:8
49:13 52:21
53:12,15,22

54:12 57:8,11
57:16 60:5
62:10 63:10,19
64:22 67:1,8
67:20 96:13
114:19 118:9
118:11,14
128:8 131:14
131:21 132:13
132:24 133:13
134:1,16
136:15,16,17
136:19 138:17
138:25 139:9
152:12 153:15
153:24 154:10
154:15,20
155:18 156:11
156:13,17
157:4,15,16
158:5 159:2,11
165:8 169:14
169:17,21
170:5 171:10
171:13,19,24
172:4 174:6,24
176:16,19
177:10,12,15
177:19,24
178:3,12,16,24
179:5,13,15
185:9,23,24
187:13 188:5
195:3,11 196:5
196:13 197:3
197:24 198:19
199:4,19 200:1
214:15 217:25
218:5 224:2,5
224:15 242:9
252:3 255:12
257:16
**meet** 33:25 40:5
43:8 50:10
80:5 81:5 82:4
168:22 169:19

171:5,7 172:19
**meeting** 12:21
16:13,15 19:22
19:25 20:13,22
32:6,10,13,14
32:15,16,25
33:3,5,7 34:11
34:18 38:7
41:2,4,7,9,11
41:13 43:7
59:19,22,25
60:3,25 62:1
70:20 80:10
87:6 89:1,20
91:9,18,23
92:4 96:23
97:5 105:21
113:4,18 114:9
132:20 133:13
133:22,24
135:24 136:2,4
136:25 137:11
138:10,13,18
138:20 149:4,9
150:4 156:23
169:1,6 174:13
175:24,25
181:24 182:1
182:24 195:2
195:20 202:1
202:23 203:2
204:16,23
222:24 224:4
226:1,5 227:5
227:14,15,19
227:22 228:1
228:10 229:3
230:16,23,24
231:6 233:4
237:21 245:2
255:10,14,19
**meetings** 14:1
17:14,20 20:13
20:17,20,24
31:7,11 32:12
41:3 61:14,22

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 86 of 106   PageID 8687
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 281

69:4,13 70:12
75:2,3 77:19
77:25 80:6,7
80:14 89:24
93:13,13 96:22
103:16 106:6
131:23 132:4,6
133:8 169:13
169:16,23
172:6,10,14,22
172:25 173:8
173:10,14,22
174:4,5,6,9,16
174:22 175:2
175:16,22
176:3,15,19
189:23 195:11
196:5 221:11
223:4,6 253:18
254:20 255:5
**member** 11:19
12:11 13:6,8
22:19 23:12
31:3 32:21,22
59:6 71:19
86:14 91:9
95:23 97:22
101:19,20
107:1 110:17
111:6 112:4
172:16 185:5
192:15 215:9
216:7 221:10
226:19 229:7
247:19
**members** 12:19
19:16 23:1
25:17 26:6,9
27:1,4,7,8,12
30:15,17 31:3
50:20,21 52:7
58:20 66:8
71:17 72:5,10
72:18 81:15,16
82:2,3 86:5
92:22 93:21

94:3 95:12,20
96:13 97:8
106:25 110:20
111:23 118:10
132:20 133:5
133:15,16
140:16 141:17
142:11 145:5
145:21 146:5,6
146:7 169:13
172:15,16
173:9,12
174:14,20
177:17,21
178:6,15,19,20
185:9,10
189:16 196:10
204:16 206:6
208:14 215:13
226:23 233:3
233:16 249:4
255:4
**members'** 165:1
**membership**
12:20 14:1
20:7 26:15,18
26:21,22 51:3
69:13 75:21
76:5,11,16,22
79:14,16,21
86:13 87:1,3,6
89:20,23 91:9
91:18,23 92:3
93:12,13 94:1
154:20 198:8
218:23 222:23
223:4,5 237:21
253:18 254:18
255:13
**memory** 110:16
**men** 232:9
235:20
**mental** 234:12
**mention** 71:11
**mentioned**
16:21 18:10

24:25 40:14
44:23 49:15
62:7 63:16
64:19 65:10
68:19 69:23
97:21 126:15
128:7 137:12
138:20 220:11
227:5 230:11
**mentions** 176:15
**message** 5:5,22
93:21 110:6
113:8,11,17,23
114:4,7,11
155:13,16
160:5 169:8
207:21,22,23
208:16 209:7
241:12 243:19
244:7,15,19
253:12,16
**messages** 5:21
95:15 195:4
209:14,17,20
212:2,5,8,11
212:19,21,24
220:14,15,23
220:24 221:15
235:5 238:10
238:15,16,19
238:24 240:12
240:19,21
241:4,22
242:17,22,24
243:3,8 244:11
245:9 252:4,8
253:6 254:1
**messenger**
212:16 238:11
238:16,21,25
240:13 241:12
241:24
**met** 20:14 23:16
24:2 34:1 38:1
40:24 75:5
89:19 133:10

168:17,23
169:19 172:15
172:17 223:18
223:23 232:3,5
237:19
**metaphor** 189:7
**Mich-** 224:16
**Michael** 2:9 6:9
109:2 217:1
**Michelle** 35:5,7
37:3,8,13 38:2
45:3 54:8 89:9
89:12 91:25,25
168:9 224:16
**mid-** 144:2
**mid-2000s** 90:12
**mid-March**
116:25 144:2
**middle** 105:22
106:2 120:2
198:1
**midway** 103:18
103:19 128:16
**Mike** 38:5,6
39:22 40:25
41:3,6,13 43:4
60:7,10,13,24
61:11 62:1,4,7
64:14,16 66:12
66:25 67:5,9
68:1,12,14
101:6 132:5,11
139:4 155:19
156:16 164:24
165:3 167:24
168:19,24
169:22 172:5
172:11,14
173:23 182:2
183:20,21
184:3,12 186:2
195:1,7,11
196:6 215:20
223:23 224:4
**million** 185:2
**mind** 13:4

140:24 150:15
244:2 248:11
**mine** 151:8
180:8,8
**minute** 99:2
158:13
**minutes** 85:4,5
153:4 261:15
**misheard** 154:1
**mission** 158:25
**misstate** 46:3
172:3
**mistaken** 110:16
**misunderstood**
55:17 153:22
**mix** 55:24
**mobilization**
69:25 71:22,25
**mobilizations**
50:18 72:7
**mobilized** 72:12
**mobilizing**
71:12
**modernize**
90:20
**modification**
83:25
**modifications**
82:22
**modify** 83:3
**modifying** 82:16
83:9 84:1
**moment** 39:1
212:22 251:17
**moms** 24:9
218:23
**money** 201:24
**Montgomery**
117:25 128:22
129:5
**month** 75:4,8
77:21 78:8
156:3
**month-long**
254:19
**monthly** 96:4,6

149:3 172:17
172:20 174:5
**months** 28:17
130:13 145:12
209:6 253:25
**morning** 7:5,6
155:20 232:1,3
232:17
**move** 86:3
232:21
**moved** 56:13
134:8 190:16
193:8
**movement** 88:16
121:25
**moves** 28:23
**moving** 241:20
**MSN** 112:11
**multiple** 13:17
**Mumford**
261:23
**murder** 243:4
**murderer** 243:6
**Murtoff** 133:8
133:21 139:11
169:1,7 173:24
174:17
**Murtoff's** 134:3
134:4
**music** 53:10
**musician** 35:12

——————
**N**
——————
**N** 2:1 3:1
**name** 6:21 7:7
32:2 40:14,22
44:20 54:19
55:5 114:25
115:9 116:7
117:14,16
118:7,19,21
132:3 138:3
162:2,3,17
192:9 215:23
215:24,25
216:1,3 217:1
227:4 254:5,6

**258:2 259:10**
**named** 186:1
**names** 34:24
35:3 44:24
45:15 89:4,14
110:11,25
133:10 164:13
212:14 222:25
223:5
**Naomi** 42:24
43:1,6 58:11
59:18,25 60:6
60:8 61:2,11
62:4 65:22,25
66:1 132:5
133:9 134:13
135:24 136:1
136:25 138:23
168:24 199:10
199:20,25
210:9,13,17
**Naomi's** 66:8
**nastier** 218:17
**nation** 226:23
**national** 2:3
28:9,10 30:3,7
30:11,23
202:23
**nationally** 30:14
30:22,25
**nature** 219:18
**near** 226:20
**need** 7:13 39:17
81:2 83:4
85:18 99:2
110:10 114:15
119:3 132:23
135:8 149:9,22
150:13,16,16
204:20 217:4,7
219:8 229:16
239:15 240:4
241:1
**needed** 41:24
63:2,3,8 72:9
78:11 81:19

82:7 90:25
114:12 130:9
139:1 148:25
149:7,12
242:11,12,14
247:17 251:3
255:3,6
**needing** 113:19
180:17
**needs** 148:11
149:21
**negative** 53:23
64:1 145:24
**negotiate** 80:19
83:22
**negotiated** 73:9
**negotiates** 74:3
**negotiating** 12:1
15:6 50:1,11
50:22 51:2
52:7 69:18
72:2,3,4,8 74:8
74:24 75:3,13
75:17 76:23,24
80:4 81:15,16
82:3 86:21
144:19 145:21
**negotiation**
69:17 73:21
77:19 251:8
**negotiations**
17:16 50:4,16
50:24 70:8,8
72:13 73:21,25
74:15,18 75:11
77:1,13,18
78:3 83:25
98:3 100:15
113:24 114:10
130:7 145:1,7
145:9 175:10
**negotiator** 12:1
15:6 100:17
144:25 145:13
**neither** 261:4
**network** 50:5,8

50:23 51:8,15
51:19,21 52:2
**Nevarez** 4:18
5:2,4 32:5,25
109:17,20
117:20 127:5
173:6,13 248:1
**never** 123:4
126:19 170:11
171:6 185:6
208:20 219:4
223:1,14,18
227:20 237:14
239:2 250:16
252:6
**new** 17:9,10,13
18:8 59:2
67:12,16 70:23
73:8 78:17
80:3,25 81:20
182:25
**new-hire** 71:2
**next-highest**
28:18 29:1
**nexus** 38:15
64:20
**nice** 137:17
**nickname**
123:23 124:5
**nine** 130:12
164:4
**nods** 9:8
**nominating**
125:18
**nomination**
147:5
**Nominations**
116:23
**non-supporters**
115:22
**nonmember**
103:14
**nonmembers**
40:17 72:16
**nonrevenue**
188:25 228:18

**normally** 199:13
**North** 2:10
**NORTHERN**
1:1 260:2
**NOTARY**
259:17
**note** 189:6
**noted** 259:2
**notes** 34:3
**notified** 103:9
107:3,3
**notify** 103:13
110:20
**notifying** 101:23
105:4,6 107:17
111:3
**November** 1:10
1:18 6:3 77:4
78:21 258:3
260:10
**number** 34:25
34:25 37:1
42:19 51:12
94:13 97:18
98:21 163:7
171:18,23
174:22 186:24
194:12 205:15
222:1,8 229:16
244:4
**numbered** 1:17
119:19
**numerous** 36:25
37:21 62:17
130:8 133:25

——————
**O**
——————
**oath** 6:23 259:10
**object** 218:19
**objecting** 88:7
**objection** 57:18
154:12 186:5
211:16 256:24
257:2
**objections** 4:12
8:13
**objector** 86:9,11

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 88 of 106   PageID 8689
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 283

| | | | | |
|---|---|---|---|---|
| 87:1,2 224:10 | 121:14 124:9 | 12:24 13:2,4 | 54:22,25 55:11 | 101:24 102:1 |
| 224:18,24 | 125:24 126:10 | 13:11,14,20 | 55:14 56:4,8 | 102:11,14,18 |
| 225:1,4 246:1 | 129:21 130:10 | 14:4,7,10,14 | 56:18,22 57:5 | 102:21 103:4,7 |
| **objectors** 87:10 | 171:17 186:10 | 14:17,23 15:1 | 57:5,10,15,23 | 103:17 104:13 |
| 87:12,23 88:5 | 195:16,19 | 15:5,10,15,24 | 57:23 58:4,22 | 104:22 105:10 |
| 88:24 89:4 | 196:22 218:11 | 16:8,12,17,20 | 59:8,12,14,17 | 105:24 106:1 |
| 101:3,7,10 | 219:20 221:6 | 16:25 17:7,7 | 59:21,24 60:3 | 106:13,18 |
| 110:22 111:14 | 222:6 250:5 | 17:12 18:4,7 | 60:13 61:9,18 | 107:6,11,13,19 |
| 114:18 225:13 | 259:14 | 18:10,15,18,24 | 62:2,6,20,25 | 108:10,24 |
| 225:18 | **officer** 12:23 | 19:5,15,20 | 63:7,13,21 | 109:1,7,8,19 |
| **Objects** 4:13 | 14:2,2 21:1 | 20:3,10,16,25 | 64:7,11,16,19 | 109:22,25 |
| **obtained** 43:24 | 124:20 142:17 | 21:3,11,19 | 65:9,17,22 | 110:3 111:7 |
| **occur** 14:3 | 143:5 173:18 | 22:1,5,14,22 | 66:11,14,23 | 112:9,16,20,25 |
| 162:16 | 247:22,24 | 22:24,24 23:6 | 67:4,16,19 | 113:6,15 114:2 |
| **occurred** 26:8 | **officers** 19:4,12 | 23:8 24:12,15 | 68:10,14,18,24 | 114:6,13,17,25 |
| 28:24 157:16 | 19:15,18,24 | 24:18,23 25:5 | 68:25 71:10 | 115:4,6,9,13 |
| **occurrence** | 20:15 22:25 | 25:19,24 26:14 | 72:15,20,24 | 116:6,10,15,15 |
| 148:15 | 23:3 28:9,11 | 26:17,20 27:11 | 73:4,11,16,20 | 116:19,22 |
| **October** 73:12 | 28:25 30:3,3,8 | 27:21,23 28:1 | 73:21,24 74:2 | 117:1,7,10,14 |
| 73:13 78:20,21 | 30:11,19,24 | 28:4 29:10,15 | 74:6,14,17,23 | 117:16,19,22 |
| 79:23 80:21 | 88:14 100:21 | 29:18,24 30:6 | 75:2,7,15,20 | 118:2,8,12,16 |
| 180:8,11 193:3 | 105:18 124:7 | 30:10,20 31:1 | 76:3,6,14,18 | 118:19,21,24 |
| 195:21 197:22 | 124:17,19 | 31:5,5,9,14,19 | 76:21 77:1,5,9 | 119:7,14,18,22 |
| 198:3 199:22 | 145:5 173:6,10 | 31:23 32:4,8 | 77:13,18 78:12 | 119:23 120:1,8 |
| 254:1,16 | 253:19 255:2 | 32:11,14,24 | 78:17,23 79:3 | 120:12,14,21 |
| **off-duty** 253:19 | **offices** 2:16 | 33:2,5,24 34:4 | 79:9,12,16,19 | 120:24 121:4,7 |
| **offended** 177:1 | 11:10,15,20,23 | 34:10,14,22 | 79:24 80:3,13 | 121:17,20 |
| **offensive** 157:9 | 12:8 71:6 | 35:7,24 36:12 | 80:13 82:11 | 122:4,8,10,13 |
| 157:14 244:19 | 192:17 204:12 | 36:15,18,22 | 84:3,12,14 | 122:18,22,24 |
| **offer** 43:5 44:5 | **official** 116:8 | 37:2,7,16,18 | 85:6,13,24 | 123:1,12,15,25 |
| 44:13 58:11 | 142:8,21 | 38:3,6 39:20 | 86:4,8,11 87:9 | 124:4,11,14 |
| 59:15,18 65:23 | 201:18 208:14 | 40:24 41:2,5,9 | 87:12,17,21,21 | 125:3,9,13,14 |
| **offered** 43:8,13 | 228:14 229:11 | 41:12,20 42:20 | 87:25 88:5,19 | 125:23 126:4,6 |
| 43:20,25 | **oh** 11:15 105:10 | 42:23 43:1,5 | 88:23 89:3,15 | 126:9,12,15 |
| **offers** 41:18 | 127:23 138:1 | 43:23 44:3,20 | 89:21 91:4,6 | 127:4,10,12,20 |
| 46:23 47:4 | 160:10 196:4 | 44:23 45:3,6,9 | 91:11,15,19,24 | 127:23 128:4 |
| 58:13 59:9 | 204:20 223:5 | 45:15,20,23 | 92:5,13,25 | 128:12,12,15 |
| 66:17 | 231:16 | 46:2,9 47:1,6 | 93:10,17,20 | 128:20,24 |
| **office** 11:17 | **okay** 7:17,20,25 | 47:18,20 48:13 | 94:5,11,16,21 | 129:3,5,12,15 |
| 12:15 28:11 | 8:13,16,19,25 | 48:16 49:2,6 | 95:6,12,18,21 | 129:19,22,25 |
| 29:8 41:11 | 9:3,11,19,22 | 49:14,19,22 | 96:3,7,10 | 130:19 131:5,8 |
| 62:12 69:8,22 | 9:25 10:2,5,8 | 50:7 51:4,14 | 97:14 98:1 | 131:11,17,25 |
| 88:17 93:5,16 | 10:12,15,18,22 | 51:22,25 52:11 | 99:5,14,18,21 | 132:4,10,15 |
| 93:18 100:23 | 10:25 11:3,9 | 52:15,20 53:3 | 99:24 100:5,8 | 133:5,15,19 |
| 110:23 113:16 | 11:15,20,23 | 53:6,9,14 54:2 | 100:11,19 | 134:2,12 135:4 |
| 113:21 115:23 | 12:7,10,14,17 | 54:4,7,11,19 | 101:2,5,9,12 | 135:15 136:22 |

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 89 of 106   PageID 8690
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 284

137:10,20,23
138:1,4,15
139:3,7,14
140:2,8,11,20
140:20 141:1
141:14,22
142:3,7 143:17
143:22 144:4,8
144:12 146:3,9
146:12,16,20
146:25 147:11
147:20 148:9
150:19,22,25
151:4,12,18,23
152:6,15,18
153:6,13,22,23
154:5,13,18,23
155:1,4,9,15
155:22 156:1,9
156:24 157:6
157:17,21
158:6,9,12,12
158:21,22
159:9,12,20,22
159:25 160:4
160:10,11,18
160:21,25
161:3,6,11,15
161:18,22,24
162:4,11,15,15
162:20,24
163:4,11,15,21
163:25 164:7
164:10,12,15
164:24 165:3
165:17,21
166:19 168:4,8
168:14 169:6
169:10 170:23
171:1,6,9,23
172:2,9,13
173:5,9,12,17
173:21 174:3,9
174:24 175:8
175:22 176:3,9
176:12 177:11

177:19,23
178:2,6,14,22
179:3,9,14,17
179:20,21,25
180:5,5,13,13
180:19 181:5
181:16,20,25
182:4,11,17
183:14,18,23
184:8,11,23
185:1,7,13,16
185:19,22
186:15,19
187:7,15,15,19
187:22,23
188:1,6 189:5
189:19,24
190:3,7,21,25
191:8,12,17,17
192:1,7,10,13
192:15,17,20
193:1,5,11,15
193:23 194:6,8
194:18,25
195:7,10,20,25
196:4,12,12,16
196:19 197:11
197:15,21
198:4,25 199:7
199:18,24
200:3,10,14,17
201:8 202:2,5
202:13,16,21
203:5,14,21
204:3,10,13,17
204:25 205:8
205:17,18,25
206:13,25
207:4,8,12,16
207:16,19,22
207:24 208:1,3
208:15,19
209:8,13,19,22
210:5,9,12,15
210:19,22
211:6,10,14

212:1,4,7,10
212:23 213:6
213:11,14,17
213:21,24
214:4,12,17,20
214:23 215:8
215:12,17,21
216:6,10,20
239:22 245:7
251:21 253:2,4
253:11,15
255:21 256:13
**once** 16:16
  19:25 58:24
  65:22 67:14
  75:4,8 80:3
  81:5,6 98:14
  103:2 110:24
  114:24 116:18
  128:13 150:3
  152:9 154:21
  155:8 160:23
  189:6 235:12
  237:20 240:4
  250:23
**ones** 42:16 45:18
  81:19 168:2
  172:24 173:2
  175:3,4 212:13
  213:1 224:3
**ongoing** 67:1
**online** 198:23
**open** 94:11 95:7
  95:9,11 103:1
  255:14
**open-door**
  191:14
**opened** 212:4
  241:10,11,11
  241:23
**openly** 209:1
**operation** 86:21
**operators** 23:24
**opinion** 143:10
  143:12 168:7
  201:23

**opportunity**
  40:2 91:1 97:1
  171:4,7
**opposed** 72:17
  206:4 246:17
**opposing** 117:22
  117:24
**opt** 88:12 106:4
  110:9 112:3
  115:3,3
**opt-out-becau...**
  121:25
**opt-outs** 222:9
  222:15
**opted** 88:20
  101:19 106:11
  106:16 110:17
  112:3 114:23
  114:24 116:13
  222:22 223:9
  223:17,19
**opting** 88:24
  107:15 221:22
  223:12
**option** 234:5
**options** 39:22
  65:11,14,18
**oral** 260:18
**order** 1:23 6:19
  8:20,23 203:25
  204:3 256:17
  257:3
**organization**
  200:18
**organize** 71:21
  200:14 226:22
**organizing** 70:1
  70:4 71:13,14
  71:20,25
**orientation**
  254:9
**originally** 10:9
  16:3 55:22
  56:10,19,22
  108:17 179:6
**Orozco** 25:20

**outcome** 42:3
  150:9 224:7,15
  224:21 249:21
  261:10
**outcomes**
  225:13,18
  251:16
**outlined** 76:12
  177:5
**Outlook** 108:18
**outpatient**
  234:12
**outside** 16:23
  23:20 41:23
  53:20 65:20
  83:24 113:3,9
  138:19 164:6
  176:25 178:15
  185:11
**outspoken**
  123:11
**outstanding**
  58:12
**over-five-year**
  79:8
**overall** 97:19
  177:8 222:10
**overnight** 136:6
  138:11
**oversaw** 70:4,23
  71:5
**overseeing**
  69:16,19 70:7
**overspent**
  121:15

**P**
**P** 2:1,1 3:1,1
**p.m** 92:19 153:9
  153:12 180:7
  180:11 205:4,7
  214:8,11 256:7
  257:16
**pace** 90:8
**page** 73:12
  93:21,23,23
  94:3 95:14,16

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 90 of 106   PageID 8691
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 285

95:22 98:11,18
99:9,15,17
100:9 103:18
110:5 115:4,7
115:10 119:19
120:1,6,9
125:10,11
128:4 142:12
144:12 155:23
156:1 158:18
166:6 180:2,3
183:19 197:22
200:3 203:19
203:21,23
204:1,4 205:25
206:1 209:5
240:16 244:2,3
244:4,9 251:22
258:4
**pages** 109:6,9
115:12 119:5
119:10 205:13
207:17
**paid** 228:4,8
230:17
**paperwork**
61:20
**paragraph**
103:20 144:14
148:10 164:17
168:16 169:11
176:14 189:5
**parental** 24:7
**Parenthood**
235:7 245:16
**parents** 234:15
**Parker** 18:6,7
36:17,23 63:7
178:1,15
**Parrott** 117:21
173:7,13
**part** 20:23 37:23
42:9 44:25
45:3,6,9,12,16
45:23 51:12,15
71:19 97:4

100:9 101:3
103:8,12 104:5
108:24 133:9
148:16 163:9
163:11 165:7
172:10,22
174:7 181:20
183:5 187:22
188:7 202:4
212:20 226:13
228:24 231:19
231:25 232:1
236:3 244:11
244:13 250:10
250:10,13
253:4
**participate**
23:17 68:21
106:6,19
144:18 145:4
209:3 232:18
**participated**
26:6,9 73:24
248:7 249:22
**participating**
140:14 235:18
**particular** 13:23
24:4 51:24
54:1 56:5,5,8
100:9,9 116:7
117:11 118:17
119:5,10 129:1
175:15 213:25
224:3
**particularly**
72:13 80:22
158:17 251:7
255:14
**parties** 75:13
76:9 77:5 82:9
82:11 83:6,16
83:22 84:11
149:7 171:4
256:19 261:6
**parties'** 78:9
**parts** 179:24,25

217:12
**party** 149:7
216:13,18
261:1,3,11
**pass** 216:22
252:20 256:1
**passed** 226:19
**passing** 232:5,11
**pay** 43:21 80:25
86:13 111:24
201:24
**paycheck** 86:14
**paying** 144:17
**payroll** 26:25
**peaked** 222:1
**peer-based**
147:25
**people** 29:1
35:19 43:17,24
50:15 51:11
72:11 87:22
88:19 96:1
113:22 114:23
116:12 123:9
124:2 140:12
141:10 150:8
154:3 176:22
184:17 198:23
219:9,15
220:21 222:22
223:12,17
224:6 232:15
232:19 235:20
236:1 255:18
**percent** 55:9
94:22 182:3
222:13
**percentage**
86:16 222:9
**percentages**
23:22
**Perfect** 257:12
**performance**
128:21,24
129:1,24
**period** 121:22

136:5 151:3
163:14 174:23
196:25 257:5,9
**Periodically**
26:19
**periods** 151:5
**permitted** 17:15
**permitting** 71:3
78:9
**person** 28:17
113:7 180:25
211:4 223:6
224:14,20
246:21 259:10
**personal** 112:14
144:9,11
164:21 165:1,5
165:14,21,25
166:6,10,15,20
166:22 167:1,6
167:11 168:12
190:6,8 191:16
205:23 206:7
206:23 207:1
207:10 212:15
218:4,17
222:16,18
256:18
**personally** 94:2
94:10 222:24
225:10 233:10
233:18,23
240:13 259:9
**persons** 23:3
25:5 66:18
**petition** 199:1
**Phoenix** 126:14
132:3 137:25
190:16,19
**phone** 96:1
112:24 113:5
138:20 191:16
191:19,23
192:2 207:14
211:4 247:3
**phonetic** 30:1

35:6 161:23
192:8
**photo** 165:15
204:14 216:15
**photograph**
244:16,17
**photographs**
35:14,16 166:4
**photos** 35:22
203:19 215:4
**phrase** 181:7
216:18
**phrases** 189:15
**physical** 181:14
235:24
**physically**
235:11 243:18
247:22
**pick** 151:15
153:14
**picture** 55:4
204:10
**pictured** 204:13
204:15
**pictures** 236:1
**piece** 81:11
83:10 138:13
**pieces** 159:16
179:24 203:11
225:7
**Pierce** 213:19
**pink** 236:2,12
236:12
**place** 12:21,22
14:1 19:8
25:15 41:10,11
46:21 47:25
48:8 51:17
69:14 72:22
80:7 88:14
90:8,15 96:15
116:23 144:14
151:10,13
185:25 203:3
219:4 230:20
**places** 81:14

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 91 of 106   PageID 8692
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 286

**plaintiff** 1:17
2:2 6:8 7:8
**Plaintiff's** 4:12
**plane** 35:19
136:8
**planned** 232:14
235:7 245:16
**plate** 185:3
251:9
**platform** 157:16
188:5
**play** 241:4,8
250:25
**playing** 241:9,14
**please** 6:4,6 39:1
46:6 111:21
141:25 144:15
152:7,10
205:15 217:8
229:19 231:16
240:6 243:21
254:24
**pleased** 156:2
**PLLC** 2:16
**PM** 120:17
**point** 7:13 15:17
15:21,23 16:2
17:8 35:24
36:5,10,20
39:9 41:14
61:25 62:14,19
71:2 77:6
82:16 87:16,22
90:8 91:10
94:7 98:9
100:11,13
101:5 106:23
116:4 129:11
130:5,11,15,19
134:11 144:25
145:14 148:7
152:25 162:19
178:1 182:9,11
182:15 183:8
183:12 184:6
189:14 194:2

198:8 199:14
210:15,19
223:22 226:6,9
238:10 240:18
245:8 251:5
256:10
**points** 246:12
**police** 220:3,4
253:19 255:6
**policies** 5:7
47:22,25 48:7
48:9 60:5
63:11,19 67:8
132:13 161:9
170:15 200:1
**policy** 31:24
32:5 33:17
34:6,16 42:12
46:5,7 47:13
47:21 48:6,14
48:18,22 49:3
49:9 53:12,15
53:22 54:12
57:8,11,16
67:1,20 86:15
86:18 131:14
131:21 138:17
139:9 153:15
156:12,14
157:2,4,18,21
157:25 158:5,7
158:10 159:2,3
159:5,7,11,14
159:22 160:6
160:10,12,15
160:19,22
161:1,3,7,12
161:16,20
162:5,8 163:5
164:2,25 165:8
169:17 170:6
176:1,16,20
177:10,12,15
177:19,25
178:4,16,24
191:14 198:16

199:12 214:1
214:15 224:15
**political** 12:6
25:1,22 26:5
26:11 86:22
**poor** 129:24
**poorly** 129:25
**portion** 86:18,19
86:23 110:12
231:2 243:19
253:6
**position** 11:25
14:8,13,14,20
14:21 19:7,11
19:13 28:7,17
28:18,19,23
29:3,6 30:21
30:23 67:15
68:13,15 69:6
126:12 129:1,3
129:10,13,16
129:20,23
134:3,4 142:8
142:19 169:24
194:3 206:22
208:5,12
226:10 228:1
**positions** 12:3,4
13:17 28:25
30:13,15,16,19
30:24 49:22,24
49:25 52:16
67:10 117:5
120:22 122:10
122:14 194:6
208:8
**positive** 150:7,9
162:23 182:19
187:3 228:20
**possibility**
256:15
**possible** 131:24
197:2
**post** 60:16,19
93:25 94:9
95:2,24 120:8

120:11,16,25
121:2,8 122:1
122:2 123:13
125:15 127:5
127:13,15,24
128:1,2,9,17
128:18 131:6,9
137:12,21
143:18 146:19
151:12 152:5
166:4,5 180:22
188:8 204:7
209:8 242:9
**postcards**
232:12
**posted** 33:8,10
33:18 35:14,16
35:22 53:18,21
54:15 64:25
65:4 114:18
116:13,25
118:17 139:17
140:5,9 143:13
143:23 154:25
**posters** 35:18
**posting** 95:4,15
121:5 146:22
151:14
**posts** 119:15
121:21 122:2
122:15 123:4
126:2 127:20
130:15,20
131:15,19
132:8 165:9
168:4 188:5
194:23 203:19
209:6,20
214:25 219:2
219:10,12,19
220:2 221:3,8
221:15
**potential** 251:15

**potentially**
143:20 145:17
145:20
**practice** 76:7
**practices** 143:1
**pre-** 50:2
**precautions**
219:20,25
**preceding**
168:21 169:8
**precinct** 50:2
52:12
**preference**
84:20
**pregnancies**
234:23
**pregnancy**
210:3 233:25
**pregnant** 233:17
235:18
**preparation**
97:12
**preparations**
97:10
**preparing** 9:6
**presence** 65:20
**present** 3:7
32:23 75:25
92:3 133:23
149:2
**presented** 41:14
43:6 58:11
65:23 76:15
**presenting**
61:10
**presidency**
21:22 28:20,21
29:5 97:19
162:19 218:12
253:17
**president** 11:4
11:10,19 14:16
14:18,21,24
15:3,8 16:11
16:16 18:2
21:7,17,19,21

Case 3:17-cv-02278-X    Document 263-1    Filed 06/13/22    Page 92 of 106    PageID 8693
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 287

21:24,24 22:23
25:3,8 27:24
28:2,4,7,23,23
29:3,6,8,9,11
29:13,13,18,22
29:25 35:1
37:25 47:7
57:6 67:12,13
67:16 68:20
69:2 70:3,7
72:21 73:17
86:6 87:9,13
87:22 88:4,15
90:3 91:14
92:21 93:3
94:15,19,24
97:14 104:18
105:2,15
109:13,22,25
110:1,3 116:17
129:7 142:22
143:19 144:24
151:11,13,17
158:10 168:19
187:7,9,11
193:12 195:13
195:22,24,25
217:13,15,22
218:1,6,14
225:14 252:2
**president's** 5:5
154:22 155:13
**presidential**
69:12
**presidents** 69:12
117:2 126:23
**pretty** 119:3
222:9
**previous** 22:8
29:2 46:10
79:2 81:13
90:3 129:7
151:2 152:1
255:11
**previously**
138:11 223:22

243:24 251:24
**primarily** 56:1,2
94:25 113:5
156:17 182:24
183:3 235:13
**primary** 81:10
82:1 112:24
**print** 121:19
**printing** 255:9
**prior** 11:9 46:5
62:7 78:4
96:16 132:10
132:16 134:14
143:9 151:10
151:11,13
156:18 212:11
212:21 225:25
226:6 234:4
237:17 238:15
245:21 246:25
253:25 255:9
**privacy** 130:25
131:2
**private** 111:2
116:1 130:17
130:24 131:2
183:20 238:10
238:16 252:4
**privilege** 39:5
76:1 111:20
135:9
**privy** 251:13
**pro-** 24:6
**pro-life** 233:23
234:5 246:4
**probably** 31:13
44:7 75:9
87:19 92:11
96:6 119:3
121:18 130:12
133:2 163:3
217:5 222:21
238:22
**probation** 12:12
40:13 60:20
112:1

**probationary**
43:15 44:14,18
44:21 60:8,9
60:12,15 61:3
61:4 66:5 67:6
**problem** 13:21
157:17 175:20
184:17
**problems** 63:9
101:6,10
103:23,25
**Procedure** 1:23
260:22
**procedures**
90:14 136:10
**proceed** 43:12
43:13 256:12
**Proceedings** 6:1
257:17
**process** 61:23
62:15,16 74:2
139:2 182:10
182:12 183:9
229:6,9 249:8
249:22 250:23
251:1 254:19
257:4
**processing**
62:23 66:6
**Produce** 4:13
**produced** 1:16
108:6,9
**product** 234:17
**production**
206:11,20
**professional**
102:18
**program** 26:25
50:2 52:13
102:20 147:13
147:15,21,24
147:25
**progress** 77:24
130:3
**project** 89:24
90:1,2,9 92:2

110:11 111:11
112:8 127:16
195:18,18
**projects** 105:15
**prolific** 42:17
**promoting**
121:23 122:4
**prompted**
155:15
**pronouncing**
192:9
**property** 70:13
220:7
**protect** 249:7
255:4,17
**protected** 39:5
167:3,7,9
168:1,5 183:15
253:18
**protections** 24:9
**Protective** 8:20
8:23 256:17
257:3
**proved** 259:10
**provide** 137:9
240:21 248:21
257:4
**provided** 20:8
108:7 227:23
228:11
**providing** 75:23
255:22
**provisioning**
174:2
**provisions** 1:24
24:6
**public** 33:23
93:22,23
115:25 130:24
142:10 180:18
180:20 181:3,7
259:17
**publicize** 50:19
**publicly** 127:1,2
**publish** 110:22
155:15

**published** 93:6
155:21 219:15
**pull** 186:23
**pulled** 99:24
**punish** 223:12
**purchased**
188:24
**purports** 246:7
**purpose** 80:10
80:14 226:4,22
227:1 229:23
229:25 230:3
231:4 236:24
**purposes** 259:11
**pursuant** 1:22
256:17 260:21
**push** 88:11
114:12
**pushback** 167:4
**pushed** 44:17
**pussy** 236:4
**pussycat** 236:18
237:3
**put** 25:14 51:16
76:4 108:13
127:7 199:16
229:22 236:19
240:25 253:15
254:14
**putting** 81:1,21
127:6 145:14
145:15,17
199:11,13

---

**Q**

**Q&A's** 81:13,18
**quarter** 70:15
**quarterly** 20:24
70:12
**question** 9:14,15
14:19 22:9,12
37:12 39:17
46:10 47:8,11
55:8,19 56:24
71:12 81:12
82:15,19,21
83:1,2 84:15

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 93 of 106   PageID 8694
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 288

96:11 98:6,24
99:14 108:5
110:4 128:6
135:8,16
139:19,23
143:6 154:2,7
154:14 191:10
191:21 205:12
206:16,17
207:17 229:24
**questions** 7:11
9:4 50:24
111:19 135:9
135:18 137:7
158:19 205:12
206:8 208:13
212:13 214:13
221:22 223:2
241:1 245:7
248:13 252:20
255:24 256:3,5
256:11
**quick** 57:25 58:3
92:16 98:8
119:6 120:17
214:6 253:1
**quickly** 36:5
239:13
**quite** 189:7

**R**

**R** 2:1 3:1
**Railway** 73:2
**raise** 223:3
**raised** 211:8,12
234:10
**ran** 14:12
116:19 117:24
118:5
**Randy** 174:3,6
**range** 40:18
177:6
**ranking** 102:5
**rape** 234:18,23
**rapid** 90:7
**rarely** 239:1
**rate** 80:25 228:2

**ratification** 82:9
221:11 254:19
254:20 255:5
255:18
**ratified** 73:10
79:5,21 80:20
81:7,9,21
**ratify** 79:17
**re-** 184:16
**reach** 42:20 43:1
74:4,6,8,9,19
77:6,9 81:6
93:9 96:2
105:6 177:11
201:13 229:16
245:8
**reached** 43:3
74:21 75:16
76:8 78:13
97:21 104:3,11
110:16,20
111:2 113:19
130:5 136:12
141:12 178:11
191:15 192:4
192:12 200:24
226:24 229:14
**reaching** 105:13
141:10 200:23
**react** 222:20,21
250:8
**reaction** 250:14
**read** 7:22 22:15
22:18 39:18
99:19 100:13
112:8 119:4,7
119:11 139:22
139:25 152:10
155:8 157:23
157:24 200:6
212:13 240:4
259:1
**read-before-fly**
197:22 198:16
199:8 200:4,6
**read-before-flys**

5:16 197:19
**reading** 146:14
243:11
**reads** 206:1
**ready** 92:8
98:15 113:3
160:23,24
**real** 92:16 119:6
214:6 226:12
**realize** 8:5
**realized** 83:20
**really** 17:18,24
36:10 38:12
67:9 68:8 72:1
98:7,25 115:13
132:25 177:2
187:25 209:3
226:11
**reask** 139:18
**reason** 83:5
124:4
**reasons** 144:22
**recall** 12:9 33:11
33:17 35:4,8
45:19 46:20,20
48:25 49:10
53:13 56:15
57:9 59:12
68:16 72:24
74:14 76:19
79:19,20,21
86:5 89:2,13
105:16 106:13
106:15,16
107:9,10 110:4
112:11 132:3
133:12,17,18
133:23 134:7
134:10 138:3
138:19 140:2,4
140:8 143:22
143:25 146:15
146:16,18
154:24 155:23
161:13 163:10
163:11 164:5,5

164:7,14 165:6
169:2 173:19
176:7,10 179:2
182:13 183:16
187:5 193:6
197:5 198:9
199:1,6 200:2
200:8 218:2
225:2 238:8
241:17 243:11
253:23
**receipt** 211:1
**receive** 7:20
8:16 20:1,4
238:6 249:3
252:4
**received** 25:25
26:1 35:21
64:2 88:10
102:2 110:24
141:20 152:23
167:5 179:5
189:21 212:5
212:24 213:2
220:14 224:20
235:2 238:10
238:15,20
241:18 252:5
**receiving** 238:15
241:22 245:21
253:25
**Recess** 58:7
153:10 205:5
214:9
**recognizable**
242:6
**recognize** 100:2
103:5 109:8
119:12 142:1
146:13 150:23
155:10 158:22
179:21,23,25
180:5 185:17
187:24 194:19
197:16 203:16
203:18,18,20

204:4 205:19
240:8
**recollection**
47:17 48:1,6
107:16 110:13
168:15,23
172:4 197:23
210:18
**recommendati...**
24:16 91:1
248:18
**recommended**
90:24
**record** 1:25 6:3
9:12,17 22:18
39:8 58:5,9
84:18 85:8,10
85:15 92:15,16
92:19 139:25
152:20 153:8
153:12 205:3,7
214:5,7,11
256:6,10,15
257:15 260:19
261:9
**records** 206:23
206:23 207:7
**recovery** 148:1
**recurring**
188:12
**redacted** 152:21
**redactions**
152:23
**redefining** 170:3
**Redesign** 90:2
**reduce** 55:23
**reduced** 56:14
182:10,12
225:3
**REED** 2:10
**reelected** 13:18
**reelection**
116:16,20
122:21
**refer** 121:17
124:15,16

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 94 of 106   PageID 8695
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 289

128:13 197:12
**reference** 35:20
156:15 197:12
216:16
**referenced**
243:4
**references**
244:24 254:8
**referencing**
180:23 195:16
253:9
**referred** 30:3
36:16 47:20
56:6 82:8
143:7 188:20
191:1
**referring** 11:7
100:20,24
103:9 104:12
105:24 112:6
121:11 124:24
149:18 152:15
189:4,8
**refers** 30:10
104:1 111:10
123:8 124:20
127:15 151:15
151:19,20
185:22
**reflected** 53:24
**refrain** 75:23
**refresh** 110:13
168:22 197:23
**refreshes** 110:15
**refunded** 86:16
86:18
**regard** 111:13
**regarding** 1:23
6:19 7:11
26:24 33:25
38:15 42:21
44:16 58:18
65:14 66:3
70:10 95:2
124:19 128:21
131:24 136:10

142:17 167:12
183:6 188:8
206:6 211:4,7
211:11 219:4
242:23,25
**regardless** 42:2
235:23
**regards** 33:18
136:1 224:4
**regional** 34:1
**regionally** 26:8
26:10
**Registration**
261:25
**regular** 47:4
148:15 172:10
172:13 174:15
196:11
**regularly** 16:16
46:24 68:21,23
92:21 169:19
173:1 191:15
192:6
**reinforce** 195:4
**reinstate** 60:11
60:14 61:1
**reinstated** 61:8
**reiterate** 27:9
**reject** 76:22
**rejected** 76:17
**rejection** 52:4
**related** 27:3
52:8,9 64:20
70:8 72:16
86:20,23 94:9
97:23 142:24
143:5 148:4
170:15 175:9
191:24,25
200:21 202:13
202:19 207:9
207:13 224:1
245:2 261:5
**relating** 142:23
**relations** 42:25
211:23

**relationship**
104:20 183:24
184:2
**relationships**
190:11
**relative** 261:8
**released** 198:8
**releasing** 254:17
**relief** 222:25
**relieved** 250:11
**religious** 234:11
**relook** 138:24
**remain** 15:1
73:8 105:19
**remained** 15:7
15:19 21:24
**remaining** 256:2
**remains** 157:22
**remember** 44:3
44:20 45:15,18
52:20 53:14,17
53:25 54:2,12
54:14,19,22
56:18 64:21
68:10 71:10
89:3,5,6 94:12
111:7,8 118:2
127:2 128:11
131:10,11,19
131:25 133:10
133:19 134:12
135:4 138:6
139:10,13
141:12,14
144:15 146:4
151:24 161:6
161:11 162:1,1
162:2,2,3,4,13
162:18,20
163:25 178:23
179:14 180:21
181:2 193:14
199:17 215:6,6
221:22 225:23
250:2,2,3,4
253:17,20

**remembered**
159:15
**remind** 147:7
250:17
**reminded** 147:4
**reminder**
199:11
**reminding** 33:16
**remotely** 6:18
6:23 260:11
**removal** 29:5
**removals** 88:18
**remove** 43:18
61:1 88:14
129:22
**removed** 28:11
29:4,8,11,16
29:19,22,25
56:17 100:22
105:12 124:17
129:8,12,15,17
**Rena** 35:6 44:22
61:8
**rendering** 250:7
**rented** 219:14
**rep** 247:10,16
**repeat** 22:9,11
82:19 194:12
205:14 206:16
**repeated** 147:6
147:8
**repeatedly**
128:21 239:3
**rephrase** 19:6
**replied** 142:14
**reply** 27:17
142:15
**report** 143:20
152:7 153:24
154:3,9,15,22
209:17 210:5,9
210:11 213:25
214:2,14,17,20
214:23 215:19
215:21 220:3,5
220:16 243:20

245:22,25
246:3,6,13,14
250:1
**reported** 33:13
33:14,15 38:18
53:20 54:2,4,8
69:20 104:6,22
127:21,23
128:1 152:12
153:16,19
165:18 199:4
209:14 210:7
210:12,22
212:22 213:24
215:5,9,13
216:7,11
220:22 221:3
221:16,17
245:10 260:11
**reporter** 1:19
6:5,17,22 9:6
21:12 22:15,17
22:18 85:25
86:2 89:10
123:20 139:24
139:25 155:3
183:4 239:20
239:21 251:18
251:20 260:15
**Reporter's** 4:9
260:1
**reporting** 6:23
209:19,23,25
210:16,19
212:20 246:18
261:22
**reports** 19:25
20:8 70:7
**represent** 31:6
33:2 34:5,10
34:14 181:16
181:21 237:4
**representation**
32:23 97:4
**representative**
39:11 70:23

103:15 174:15
206:6
**representatives**
27:1 61:24
62:3 172:18
176:6 225:17
232:6
**represented**
31:10,16,18,20
31:24 32:3,4
87:7 227:10
**representing** 7:8
209:12 211:22
217:2
**reproductive**
24:20 233:22
**reprogramming**
80:23
**request** 17:10
40:4 42:10
61:7 78:10
136:14 148:25
229:8
**requested** 85:16
260:25 261:2
**requesting**
85:21 103:13
**requests** 149:2
206:2,4,11,20
230:5,9
**require** 69:7
**required** 46:19
71:18 229:15
**requires** 80:22
**reserve** 228:21
255:23
**reset** 52:8
**resign** 87:2,23
**resignation**
86:25
**resignations**
28:24
**resigned** 28:10
86:5
**resigning** 88:6
100:22

**resigns** 86:12
**resolution** 66:10
155:17,20
**resolved** 156:6
197:7
**resources**
142:25 143:15
149:13
**respect** 198:16
233:21
**respective**
106:25
**respond** 41:13
107:6,8 212:7
212:10
**responded** 41:20
107:10
**responding**
212:18
**response** 88:13
101:25 107:12
136:22 205:22
205:23 206:19
222:16,18
**Responses** 4:12
**responsibilities**
18:2 69:2
**responsibility**
182:25
**responsible** 69:3
69:9,16,19,21
70:6,9,12,18
70:21 71:7
105:3 107:17
111:1 140:17
**responsive**
206:10,20
**rest** 66:2
**restroom** 242:3
**restrooms** 23:24
**result** 170:8
250:1
**resulted** 131:20
199:3 227:4
**results** 116:24
116:25

**resume** 77:2
103:3
**resumed** 77:15
**retaliation** 159:5
159:24 160:16
161:17
**retell** 246:10
**retrieved** 240:16
**return** 219:5
**returned** 217:17
**returning** 8:8
24:23 176:12
**revamp** 90:20
**revamped** 52:6
**reveal** 135:17
**revealing** 65:12
**Reven** 117:21
120:4
**reverse** 182:7
189:20
**review** 19:25
85:17,22 103:2
109:4 119:6
125:11 207:18
260:23
**reviewed** 109:7
240:22
**reviewing** 108:5
142:2 152:3
240:14
**revised** 160:1
**revolving**
251:14
**Ricardo** 161:23
162:25 163:4
163:13,23
**ridiculous**
121:24
**right** 2:3 8:19,25
11:3 12:7
13:11 14:4
15:1 16:20,25
20:16 21:3
22:1 24:23
25:21 27:23
30:2,2,4,20

32:22 33:13
34:4 41:12
44:3 46:2
54:11 55:4,6
55:14 58:10
59:17 62:6
63:19 67:2
68:18 72:20
73:16 75:15
76:21 77:5
85:22 86:3
87:7 88:23
89:14 92:20
93:17,20 96:10
97:4 98:10
99:9 100:12,25
107:19,25
112:9 114:17
114:17 116:10
117:1 118:3,7
118:14 120:12
121:7,7 123:3
123:3 125:10
125:12,15
126:6 128:12
128:16 130:14
133:18 139:14
144:14 152:3
154:6 164:15
166:4,5,8,10
166:12 167:1,6
168:16 169:10
172:2 175:13
179:3,17
180:13 185:7
187:15,19
189:24 190:1
192:20 193:7
193:11,15
196:21 197:11
200:10 212:23
213:24 222:2
224:2 225:9
226:2 234:1,21
238:12,17
240:19,25

247:21 254:17
257:5
**right-hand**
98:21 244:5
**rights** 24:21
44:16 164:21
165:1,5,21,25
166:15,20,22
167:11 168:1
168:12 227:13
233:2,2,22
**rise** 196:17,19
197:3,24
**risen** 60:21
**RLA** 73:3
**road** 2:4 221:11
223:20
**Rodriguez** 104:1
**role** 18:5 29:9
34:19 35:1
58:25 62:23
134:9 147:20
148:18,24
149:15 190:17
250:25
**roles** 18:16
**rollout** 198:2,5
198:15,21
**rotation** 58:25
**roughly** 106:13
**roundtable**
187:13
**route** 231:22
232:19
**routes** 23:25
232:14
**routinely** 230:5
**row** 78:1 189:12
**ruckus** 223:4
**rule** 175:15,17
175:20 260:22
260:23
**rules** 1:22 48:11
85:17,23
155:20 177:5
260:22

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 96 of 106   PageID 8697
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 291

run 14:11,14,17
28:1,6 90:13
90:14 116:16
117:7,12
running 86:20
91:3
rushed 217:8

**S**

S 2:1 3:1 216:2
safety 219:19,25
salary 228:1
230:13
sale 228:21
Sam 117:21
215:15,21
216:10
Sam's 216:17
sandwiches 85:3
Sanford 1:21
3:3
sat 43:8 61:25
130:8
satellite 82:6,6
Saturday 201:22
230:20
saw 160:20
171:16 196:22
235:6,6,25
236:11,17
242:8 249:7
254:7
saying 111:10
113:23 121:1
220:2 226:24
229:20
says 100:12,15
103:20 106:2
110:6,7 120:2
120:3,15,16,25
121:8 122:4
123:15 125:17
125:19 126:3
127:5 128:17
128:20 141:3
142:8,14
144:15 147:12

148:10 149:16
152:7 156:2,10
156:24 159:10
160:1 164:18
168:20 180:8,8
183:23 184:14
188:6 189:6
195:1,20
208:19
scanned 187:22
scared 255:20
scenes 183:24
schedule 17:15
17:17 71:3
80:18 81:11
93:12 136:3
138:20 149:9
171:3,7
scheduled 77:22
100:16 149:3
169:12,17
176:15 247:11
254:18,20
schedules 78:9
scheduling 18:1
82:5
Schneider 211:3
246:22,24
247:9 248:3
249:15
Schuler 227:6
scope 157:13
scores 126:18
screenshot 4:23
142:4,14 254:2
254:16
screenshots 4:20
5:18,19 119:15
141:5 142:9,20
scroll 128:5
239:18,23
seal 259:14
seat 188:13,15
188:19,21,23
189:1,3 228:20
seats 188:15

229:17
second 42:9
49:14 77:9
78:5,19 79:13
79:17,19,22
103:12 110:1,2
110:3,5,10
123:15 125:17
127:13 144:12
156:1 179:24
180:3 186:23
189:5,5 198:2
198:5,15 200:3
211:21 247:6
254:12 256:9,9
second-to-last
127:14 176:13
secret 130:22,24
131:3,4 142:10
section 12:20
69:17 83:24
120:3
sections 145:18
secured 223:23
224:6,14,14
see 57:23 84:17
84:18 91:19
98:22 99:8
102:21 107:9
107:12,12,19
107:20 116:11
118:24 119:18
119:20,21
120:12 125:9
127:10,13,17
127:18 128:4
128:12 135:9
144:13,17
145:5 152:24
158:12 161:5
164:15,16,22
169:11,15
176:17,20,21
177:4,16
178:17 179:17
185:13 187:19

187:25 194:8
201:15 203:5
203:24 214:4
234:25 235:4
243:10 248:24
248:25 253:7
257:1
seeing 63:5,17
63:23 105:7
130:13 175:8
175:13 177:9
196:25 197:1
249:7
seek 206:2,5
251:7,12
seeking 120:9
seen 36:4 38:12
46:7 47:15
63:17 134:15
160:8 198:19
236:9 240:3
244:6
send 27:7 66:21
98:20 106:24
143:18 154:19
172:19 189:9
203:24 208:15
209:6 250:18
sending 95:15
212:1
sends 194:25
Senel 35:6 44:22
senior 40:11
42:24 184:16
187:4 192:3
sense 75:11
222:24 231:24
sent 27:6,16
109:14 113:23
142:5 155:24
172:18 185:20
186:8,9 188:2
189:25 191:5
194:22 203:10
204:2 208:17
208:20 209:7

209:15 210:1
212:15,19,21
220:23 229:11
238:3 240:12
241:6 244:12
249:5
sentence 112:7
123:15 125:17
125:19 127:14
127:18 128:20
156:2,10
164:18 189:6
sentences
144:23 152:7
separate 25:25
83:24
separately 27:8
September 19:8
77:12,16 78:14
sequence 252:12
series 41:3
seriously 156:4
156:6 255:3
serve 15:5,24
17:1 22:20
103:10,22
104:9 107:1
149:19
served 8:9 15:10
16:1 17:5
24:25 89:24
126:22,22
205:24 208:12
services 168:19
serving 11:9
16:3,9 104:8
111:4,15
session 75:25
set 27:17 43:7
52:14 72:25
94:3 108:16,16
108:24 136:2
140:15,16
240:5 245:4
247:4
setting 16:22

131:2
**settings** 130:25
133:12
**settle** 58:11
**settled** 55:25
130:1
**settlement** 41:18
42:21 43:25
44:4,13 45:1,4
45:7,10,13,17
45:24 46:23
47:4,10 58:19
**settlements** 43:8
43:14,16 60:1
66:7 223:24
251:15
**sexual** 49:3,9
159:4,23
160:15 161:16
162:9 254:8
**shared** 65:1
146:1 185:11
**sharing** 69:3,9
**she'd** 91:22
**Shelby** 213:19
**shift** 54:25 98:1
205:10
**shifted** 234:3,19
**Shipman** 122:23
122:24 123:19
123:22,24,25
**shop** 11:17
12:16,17 13:12
13:14,16,19,22
13:25 31:6,12
31:23 32:1,3
34:7 96:21,23
106:3,10,21
107:2,15
120:23 122:12
122:16 208:10
**short** 36:1 51:5
100:23 114:15
134:19
**shorter** 46:15
79:1

**Shorthand** 1:19
260:14
**shortly** 29:7
35:12 68:12
88:3,4 158:13
169:24
**show** 64:14
108:7 137:10
138:4 239:4
**showed** 65:7
137:3
**showing** 137:8
145:6
**shows** 120:1
**Shuler** 203:2
**sic** 16:4
**side** 78:10 87:5
102:8,9 118:13
133:23 174:11
247:15 248:2
**sides** 77:2
**sidetrack** 251:17
**sideways** 148:13
149:17
**Siebenlist**
193:16,19,23
**sign** 45:24 46:19
51:11 66:21
79:25 85:17,22
124:20 125:6,7
189:2 235:6
**signature** 4:8
258:1 259:1
260:24
**signed** 80:1,4,16
82:12
**significance**
81:4 198:14
**signs** 235:8
255:8
**silent** 83:14,19
**Silva** 120:15,16
120:19 121:8
**similar** 20:21
235:1
**similarly** 177:1

**simple** 80:20
143:6
**simply** 25:8 61:5
91:17 176:24
**Sims** 182:2
**simultaneously**
13:18
**single** 40:9,21
**singled** 61:2
**sir** 86:2 203:13
**sit** 136:14
149:10 169:13
237:11
**site** 65:7
**sitting** 138:19
**situations**
111:18
**six** 109:11
253:25
**sixth** 188:20
**size** 203:12
**ski** 213:11
**skim** 239:13
**skimmed** 119:7
158:21
**skimming**
188:13
**slate** 117:11,19
117:22,24
118:17 127:1
140:16 146:7
**slates** 118:11
**slogan** 125:7
**slow** 37:12
**slowed** 145:22
**small** 23:22
121:18 222:9
**smaller** 90:16
**SMITH** 2:10
**sobbing** 242:1
**sober** 148:5
150:4
**sobriety** 148:6
**social** 31:17,20
31:24 32:5
33:16 34:6,16

35:8 36:2
37:22,23 38:1
38:10,17,19
39:23 40:16,23
41:25 42:4,11
42:17,19 43:9
44:9 46:4,7,21
47:13,20,24
48:4,5,5,23
49:8,13 52:21
53:12,15,22
54:12 57:8,11
57:16 60:5
62:9 63:10,18
64:22 67:1,8
67:20 96:13
114:19 118:9
118:11,14
128:8 131:14
131:20 132:13
132:24 133:13
134:1,15
136:15,16,17
136:18 138:16
138:25 139:9
152:12 153:15
153:24 154:9
154:15,20
155:18 156:11
156:13,17
157:4,15,16
158:4 159:2,11
165:8 169:14
169:17,21
170:5 171:10
171:13,19,24
172:4 174:6,24
176:16,19
177:10,12,15
177:19,24
178:3,12,16,24
179:5,12,13,15
185:9,23,24
187:13 188:5
195:2,11 196:5
196:13 197:2

197:24 198:19
199:4,19 200:1
214:15 217:25
218:5 224:1,5
224:15 242:9
252:3 255:12
**solidarity** 233:7
**solution** 63:9
**somebody**
133:23 137:15
145:14,15,17
150:12,14
165:15 174:1
181:14 229:21
246:17
**son** 151:15
**song** 35:12,20
165:11 166:6
**Sonya** 4:16
67:18 101:10
101:25 103:9
107:6,7 170:4
170:23 173:23
186:2 188:3,7
189:25 190:3
190:14,18,21
190:25 191:4
191:17,22
195:1 199:20
199:25 210:10
210:20
**Sonya's** 101:25
**soon** 250:3
**sorry** 11:13 17:1
19:6 21:12
22:8 29:10
37:11 39:13
48:19 54:25
56:23 71:1
76:22 79:20
85:19 89:10
99:14,21
104:16 106:5,8
107:7 113:1
118:4 119:21
121:19 123:20

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 98 of 106   PageID 8699
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 293

125:18 126:9
128:5 129:20
134:2,3 140:3
140:24 153:22
154:5 180:10
182:7 183:4
186:23 191:7
193:18 194:11
196:2 198:14
204:2,19,20
214:14 215:4
251:17
**sort** 20:3 26:20
78:23 108:18
188:5
**sound** 222:2
**sounded** 56:25
**Southwest** 1:5
2:8 5:7 6:10
7:10 9:21 10:3
10:9 12:2,12
21:22 25:13
33:9 34:15
35:18 36:22
37:2 39:25
42:3,16 46:24
47:22,25 48:8
49:2,12,17,19
52:14 53:19,20
65:2,5 67:7
69:18 70:11,14
71:17 74:3,19
74:23 75:15
80:5 81:7,16
82:4,15,21
83:3 84:5
101:16 102:8
102:10 105:4
107:14 114:3,7
114:11 123:2
130:5,5 131:20
132:7,12,16
133:6,11
134:17 135:12
136:7,8 138:12
139:8,15

144:20 145:21
145:25 147:18
147:23,24
149:10 152:8
153:16,20,25
154:10 156:3,5
156:11 157:10
158:4 159:5
163:9 165:12
166:12 168:11
168:18,20,24
169:4,4,19
170:15 172:17
174:14,16,20
176:6,25
182:22 183:3
183:10 184:5,6
184:20,24
185:5 187:12
190:12,24
193:8 194:1,3
197:20 198:18
199:7 200:5
210:23 213:21
217:2,20
220:22 222:5
227:23 228:11
228:17 229:2,8
229:12,24
234:3 237:17
240:18,22
242:14 245:10
245:22 247:19
250:7 256:25
260:6
**Southwest's**
165:4 167:12
173:1,21 175:5
**space** 228:19,20
**spaces** 188:16
**speak** 65:24
66:1 67:19
70:21 112:7
167:21 178:14
186:7
**speakers** 203:2

**speaking** 40:7
58:17 61:14
102:16 135:10
135:13 224:3
**spearheading**
147:24
**specialist** 34:12
58:15 60:17
61:19 62:13,22
63:14 66:6,16
66:21 181:24
**specialists** 58:23
58:24
**specific** 42:5,7
42:21 48:1,9
49:13 76:19
83:17,18 89:13
97:15 133:16
133:25 134:10
135:5,5 139:10
148:18 164:7
164:12 170:6
177:23 181:2
191:25 209:14
219:11
**specifically**
23:18 33:17
37:2 40:5 49:1
49:10 53:25
82:8 86:22
96:11,16 97:20
99:25 132:7
147:7 160:5
161:14 168:2,4
184:17 192:22
192:24 196:21
209:23,25
242:22,23
244:9 251:10
**specifics** 56:15
133:20 134:13
164:5,5 165:6
215:7
**speculating**
121:13 167:22
**speculation**

57:19 186:6
211:17
**spent** 156:20
**spoke** 35:2 66:3
71:3,4 105:17
105:18 132:19
134:5,23
135:25 147:17
155:19 169:2
227:7
**spoken** 49:12
132:12
**sponsored**
101:17 102:12
**spread** 50:13
**spring** 4:15
196:24
**Springfield** 2:5
**SPURLOCK**
3:7
**squeeze** 127:6,8
**stack** 158:13
**Stacy** 29:20
121:14 129:8
**staff** 35:2 62:12
71:9 221:6
228:5
**staffing** 69:21
**stage** 97:10
181:17
**stand** 88:16
**standard** 78:24
102:19
**standby** 188:25
**standing** 117:15
117:18 233:5
**start** 73:21
79:10 81:8
87:25 98:24
114:9,12,13
132:23 187:10
216:1 241:9
243:1
**started** 10:8
16:8,15 57:12
74:15 88:2,24

90:9,12,15,16
124:9 156:21
190:23 195:18
197:9 198:9
218:10,18
219:2 241:13
241:14,25
242:2 255:9
**starting** 16:5,21
203:21 204:4
205:25
**starts** 169:12
176:14 216:1
**state** 1:20,24
6:20 26:7
166:25 167:2
242:15 259:7
259:18 260:15
**stated** 1:25 23:7
28:6 39:21
70:3 144:22
167:17 169:3
169:23 171:11
190:9
**statement** 142:9
144:5 146:5
151:23,25
154:25 158:25
166:18 183:13
**statements**
146:17
**states** 1:1 255:14
260:2
**statewide** 26:11
**stating** 39:21
142:5
**stationary**
231:23
**status** 104:9
129:18
**stay** 201:20
231:10,18
**stayed** 231:24
**stemmed** 39:2
48:23 128:9
**stenographic**

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 99 of 106   PageID 8700
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 294

6:24
**step** 17:8 34:11
35:24 61:21,22
96:24 181:24
181:25 182:14
182:16,21,23
183:13 249:9
**Stephensen**
210:23
**stepped** 150:12
**steps** 46:21
220:1
**Steve** 133:8,20
134:2,4 139:11
169:1,6 173:24
**Steven** 174:17
**steward** 11:18
12:16,18 13:12
13:15,16,19,22
13:25 31:6,12
31:23 32:1,3
34:7 96:22,23
106:21 120:23
122:12,16
208:11
**stewards** 106:3
106:10 107:2
107:15
**Stone** 1:10,15
3:2 4:3,18,22
5:8,10,12,14
5:21 6:16 7:1,5
39:9,18 57:20
58:10 75:22
86:4 92:21
94:6,18 95:13
95:16 96:4,8
108:1 109:3,16
111:12 120:3
123:12 128:17
135:7,10
140:23 153:14
204:25 205:8
206:3 214:12
216:25 237:8
239:10 240:8

243:21,23
245:4 252:1,16
252:24 255:21
258:2 259:1,5
259:9 260:10
260:17
**Stone's** 251:23
**stood** 126:20
**stop** 181:1
219:16 249:2
**straight** 38:19
76:24 244:2
**strategic** 50:11
**strategy** 120:10
**stray** 221:12
**street** 2:17
232:22 261:23
**strike** 187:9
**strong** 25:14
**structure** 90:6
149:12
**struggles** 24:3
**struggling** 23:24
**stuff** 151:7,9
207:7 218:14
**Suarez** 133:9
135:6,11,18
138:16 139:12
169:3,7
**Suarez's** 136:22
**subject** 110:14
205:9 218:4
**submission**
79:13 228:17
**submit** 75:21
76:10 228:14
**submitted**
205:23 229:20
**Subpoena** 4:12
7:18,20,23 8:6
8:8,11,14
205:23
**subscribed**
259:10 261:17
**subsequent**
230:17

**subsequently**
245:12,15,18
**substance** 148:4
**successful**
155:17,20
**successfully**
112:1 225:3
**sudden** 39:23
**suddenly** 38:11
134:17
**suffering** 148:14
**suggested** 17:12
**suggestion** 17:10
**suggestive**
162:12
**Suite** 2:4,10
**summer** 195:2
195:21,22
196:1
**super** 94:23
**support** 26:25
123:4 127:1
138:5 233:1,4
**supported** 127:2
243:3
**supporters**
115:6,17,22
118:12,16
**supportive**
123:9 126:24
**supposed** 71:16
236:20,24
**sure** 9:16 13:24
22:12,17 35:4
46:11 47:9
51:4 58:2 59:4
68:24 70:17
83:10,12 85:2
94:16 96:11
98:17 99:10
113:14 115:3
125:13 126:1
139:19,24
142:12 144:13
153:6 154:7
187:2 209:10

240:2 246:11
**surfaced** 254:16
**surprise** 131:5
190:7
**surprised** 61:2
209:1,9
**surrogates**
123:6
**surrounding**
242:24
**suspended**
43:17 166:3
**suspension**
43:22 53:7
55:7,16,23
56:10,12,20,23
57:3 177:2
196:23 251:5
**suspensions**
35:21 36:6,23
37:1,3 43:18
56:2,13,16
**Suzanne** 210:23
210:25
**SW** 184:16
**SWA** 144:15
**SWA000595692**
239:12
**SWA6567**
103:19
**swayed** 126:21
**swear** 6:6
**switch** 10:22
**Switching**
200:10
**sworn** 7:2
260:18 261:17
**symbol** 241:5
**system** 19:10
20:1 26:8 63:6
90:5 200:23
229:19
**systemwide**
175:9

————————
**T**
————————
**T** 216:18

**T-shirts** 232:7
**T.J** 55:10
**TA** 76:23 78:19
220:12,16
**table** 68:3 76:24
**tag** 95:24
**tagged** 35:23
**take** 8:4 12:21
13:25 17:23
18:5 40:19
41:10 57:25
58:2,13 69:14
75:17 80:7
92:7,8 97:3
98:8 103:3
113:25 125:13
142:18 145:14
150:20 153:1
155:7 204:24
205:2 217:7
219:19 220:1,9
225:7 240:6
243:21 255:3
**taken** 1:17 58:7
153:10 156:4,6
204:10,11
205:5 214:9
261:7
**takes** 12:21
**Talburt** 5:8,10
5:12,14 34:13
44:25 49:15,16
51:14 52:11,15
54:5 55:1,11
123:4 125:16
127:4,7,14,21
131:13 136:20
179:4 181:6,17
184:3,11,19
185:7 193:2,13
196:4
**Talburt's** 52:21
166:15,17,20
166:23 167:11
**talk** 8:7 9:12
23:18 50:11,15

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 100 of 106   PageID 8701
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 295

105:22 125:19
132:23 136:14
149:11 164:24
169:20 217:6
227:2 242:13
251:12 252:10
252:17
**talked** 41:22
96:12,14 98:2
110:8 130:9
149:20 170:10
170:12 178:9
217:24 243:17
252:2
**talking** 52:25
63:25 132:21
134:14 138:19
195:17 198:23
201:4 205:9
220:10 232:9
**talks** 100:1
**tank** 216:15,19
**targeted** 189:7
191:2
**tasked** 58:17
**taught** 247:17
**team** 4:20 12:1
15:6 40:6 50:1
50:11,22 51:2
52:7 58:20
59:5 60:17
63:1 66:9
69:19,20 72:2
72:3,5,8 75:17
76:23 81:15,17
82:3 96:24
97:6,8,22,25
100:14 107:4
118:23 121:22
128:1,3,10
132:8 141:4,18
143:24 144:19
145:9,14,21
146:24 148:12
149:16,18
150:11 151:19

151:21 165:19
170:10,13
172:15,16,23
173:1,21 175:4
175:5 221:10
**teamed** 117:12
**teams** 75:3 80:5
82:4 175:24
176:4
**technically**
194:5 228:3
**technology**
80:23 81:8
**teenagers**
234:15
**telephone**
237:25 261:24
**tell** 32:18 104:23
105:11 146:20
165:3 171:1
184:19 185:4
186:15 191:17
208:22 218:8
234:21 245:5
**telling** 146:18
152:2
**tended** 198:23
**tendered** 8:17
**tentative** 51:23
52:3,4 74:4,8,9
74:11,19,21
75:16,18 76:4
76:8,15 77:6
77:10 78:4,5
78:13 79:13,17
79:22 87:5
198:2,5,7,11
198:15,22
219:1 254:17
**tenure** 218:1
222:2,5 225:13
**term** 15:8,20,23
21:21 28:17,22
30:7 45:20
75:9 117:2,6
123:7 196:18

199:17 214:16
217:13 234:23
**terminate**
233:25
**terminated**
43:17 44:18
53:6,8 55:7,15
55:22 56:16
64:2 135:2
136:5,6 137:14
138:10 163:22
163:24 175:14
179:6,9,11
180:16,17
182:22 183:7
183:11 210:3
250:1,6,21
**terminating**
181:6
**termination**
44:1 59:6
136:13,16
137:5 177:2
182:5,8 186:18
237:17 250:24
251:5
**terminations**
56:1,3,14
**terms** 8:22 15:22
44:16 71:22
78:2 79:4
97:12 101:23
105:6 145:6
170:3 171:15
250:3
**test** 82:7 150:7
**testified** 7:2
134:23 168:25
221:25 223:23
225:20,25
237:22 238:9
238:14 246:21
246:25
**testifying** 221:23
**testimony** 75:24
171:18 172:3

196:13 218:2
225:23 260:19
**Texas** 1:1,20,22
2:11,17 3:4
6:25 260:2,15
261:23
**text** 4:23 112:18
113:8,10,17,23
114:4,7,11,13
142:4 207:20
207:21,22,23
208:16 209:7
244:16
**texts** 113:4
**thank** 102:2
108:10 135:22
187:1 194:15
194:17 203:13
205:1 216:25
252:16,21
255:21 256:3
257:12
**thanks** 127:6
**theirs** 59:11
**thing** 98:10
126:18 204:6
231:23 239:24
256:22
**things** 26:20,23
27:3 68:2
70:21 80:24
95:24,24 96:15
113:21 114:14
114:14 132:24
133:1 137:3,8
145:22 148:13
149:13,17,23
149:23 165:16
185:2 189:12
217:6 218:17
220:2 227:14
235:10,25
250:19 252:3
**think** 13:4 15:10
24:24 30:2
35:17 37:7

44:8,23 46:22
47:15,16 50:1
53:10 55:1
57:13 59:13
62:6 63:16
64:19 65:9
66:15,24 68:1
68:18 70:15
71:9 84:14,15
85:9,11 88:2
91:8 94:14,20
95:23 96:7
97:18 99:22
102:1 103:18
103:19 106:2
106:16 107:25
108:11,13,16
108:17 110:16
110:18 111:2
112:14 115:2
115:23 119:16
120:23 122:1
124:6,22
127:11,22
130:25 133:8
138:8,21,22
143:10 146:6
151:2,3,9,12
154:6 156:1,9
157:17 159:16
160:10,12
162:22 163:7
163:20 164:9
165:24 166:14
167:23 170:9
172:2 179:4
180:16,22,23
182:2 183:16
184:5 187:4
189:11 190:5
190:10 192:5
192:11,21,22
194:1,2 195:16
196:22 198:18
199:2,5,10,10
199:12,14,15

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 101 of 106   PageID 8702
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 296

199:15,23
204:2 205:11
208:7 211:3
213:19 214:16
215:4,20,22
216:1,12,12,21
221:2,13,19
225:9 231:11
231:11 232:6
232:13 234:21
235:6 240:17
241:10 247:16
248:9,25
256:21 257:2,4
**thinking** 165:10
**third-to-last**
127:17
**Thom** 21:10,14
21:16 23:7
90:3 151:8
**Thompson**
117:20 173:15
174:18 215:15
215:19
**thoroughly**
119:8
**thought** 61:6
107:23 154:2
196:2 201:5,8
223:5 237:1,2
**thoughts** 185:23
**thousands** 219:6
**thread** 134:25
137:21 188:7
195:17 216:13
**threat** 137:18
243:14 253:12
**threaten** 220:8
**three** 12:22
13:19,22 14:3
19:17 20:14
28:10 51:10
69:14 90:17
100:22 102:13
118:1 122:20
133:12,15

173:8 188:17
**three-day** 77:22
**ticket** 188:25
**tickets** 229:3
**tighter** 131:1
**time** 6:4 14:21
17:17 18:1
19:3,23 22:10
22:20 23:11,21
28:3 31:6,11
35:12 36:1,12
37:23 38:4,13
39:4,11 40:22
43:7 44:9,11
47:7,21 48:10
48:14 49:4
50:3 52:22
57:5,6 62:4
68:8 72:14
73:18 77:15,23
92:11 95:8
97:16 100:15
100:23 102:9
104:20 105:1
106:17 109:23
113:20 114:10
114:12,13
118:9 120:22
122:14 124:7
124:19 125:13
125:24 130:4
133:11 134:5
134:19 136:5
136:24 138:18
145:7 147:10
151:3,5 152:10
156:12,14,20
163:14 166:12
173:6,25
174:18,19,25
175:1,12
178:10,10
180:16 184:10
186:12,18
187:6 189:13
190:10 195:15

196:25 198:10
199:21 200:9
201:18,21
212:2 217:8,17
218:5 220:10
220:20 224:13
225:1 226:11
226:18 227:25
228:6,15
230:12,16,19
234:16 237:1
240:6 243:21
247:14 252:2
252:17,20
253:17,22,24
256:23 257:2
257:10 261:11
**times** 20:14
23:15 50:21
69:14 93:11
114:9,11
116:16 130:8
225:2 229:23
237:18
**tired** 217:3
**title** 134:11
187:3,6
**today** 7:11,15
8:9 11:6
125:20 157:22
217:10,24
221:21,23
225:20 237:12
238:9,14
240:24 249:9
252:17 255:25
**Today's** 6:3
**Todd** 22:23
105:1 117:20
173:6,13
**told** 38:8 40:4
66:25 105:2
121:4 144:4
152:4 171:6
192:11 199:10
199:12,15

200:22 201:10
208:24 209:2
220:21 242:11
249:1 250:4,6
**tomorrow**
114:14
**tonight** 142:15
**tool** 93:25 94:25
195:3 196:6
**tools** 93:8
175:12
**top** 28:9 30:23
32:2 44:6
45:18 120:15
121:21 125:15
187:22 216:15
216:19 225:10
241:12
**topic** 185:23,25
253:1
**topics** 24:10,11
24:19 70:10
132:21 133:25
217:4 238:17
**total** 29:12
51:12 79:7
88:20
**touched** 133:14
**tour** 219:17
**track** 110:21
**training** 70:20
70:25 71:5
**transcript** 9:7
260:18,24
**transferred** 93:7
**Transport** 1:5
2:14 7:9 260:7
**travel** 93:10
188:25 201:25
219:8 227:24
228:12,14,17
228:22 229:9
229:11,14,20
230:5
**traveled** 93:14
**traveling** 136:7

**treasurer** 29:7
29:11,14,15
110:24,25
**treasury** 121:15
**treated** 61:4
**treatment** 64:12
148:5
**tremendous**
252:14
**trial** 255:24
**tried** 38:9 62:8
105:13 132:22
166:25 167:2
**triggered** 167:17
**trip** 213:12,14
213:18,22
225:21 227:21
230:22 231:2,3
231:5
**Trudy** 109:17
**true** 240:15
259:2 260:19
**trust** 126:16,16
**truthfully** 9:5
**try** 9:13 42:8
67:19 74:6
82:20 83:2
154:13 223:2
227:2 242:4
245:9 249:20
**trying** 30:6
31:14 46:14
63:14 70:15
84:5 103:23,25
105:6,22
153:13 156:21
189:14,20
225:17 232:24
248:15
**turmoil** 100:17
100:19,24
101:3
**turn** 203:5
206:18
**turned** 58:19
**turning** 110:5

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 102 of 106   PageID 8703
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 297

140:24 143:9
160:21 161:15
200:3
**TW** 16:3 204:11
**twice** 77:21 78:8
**two** 11:1 13:3
15:22 20:14
25:9,14 28:9
28:24,25 38:12
41:16 51:9
59:7 63:24
64:5,7,9 76:9
77:2 78:24
83:16,22 84:10
93:8 100:21
102:14,15,18
109:6 118:6,10
122:2 130:3
144:22 152:7
175:24 176:4
186:14 188:15
188:16 203:10
207:17 210:1
234:16,17
247:2,3,3
254:4
**two-** 77:22
**two-for-one**
254:13
**two-way** 94:1
**TWU** 6:12,14
11:4,7,10,16
12:8,15,22
14:2 16:23
18:20 19:10,18
20:2,7 21:17
22:2 23:14,21
25:2 26:7
28:12,16 39:11
69:24 71:15,16
76:12 86:15
87:4 91:14
93:4,22 94:6
94:18 95:13,16
96:4,8 98:23
100:5,12,13

101:16,21
107:2 111:22
111:24 112:15
116:8 117:4
120:3 123:12
128:17 142:17
147:17,18
151:8 164:19
201:14 202:23
202:25 204:7
204:11,16,21
208:14 226:17
252:25 254:15
**type** 20:16,19
24:6 142:25
148:3 248:18
**types** 175:1
184:15
**typical** 76:7 78:7
**typically** 77:22
87:15 92:25
102:7 172:15
172:16,20
174:17 236:13
251:4

_____

**U**
**uglier** 219:2
**ugly** 212:12
216:18 244:25
245:1
**uh-huhs** 9:9
**ultimately** 37:24
**umbrella** 147:16
**un-** 163:18
**unable** 14:20
**unaware** 137:2
**uncle** 234:24
**uncomfortable**
163:6,17
**undefined** 157:2
157:4,18,22
158:7 159:14
160:7,13 161:1
**undergone**
90:11
**understand** 7:14

7:17 8:10,19
9:3,9 11:7 30:7
31:5 47:8
66:15 83:1
94:17 109:15
135:20 154:8
176:9,18 217:8
233:10 236:20
**understanding**
60:25 74:7
81:24 83:11,17
83:23 84:10
114:21 139:19
147:22 236:25
253:11
**understood** 9:17
22:12 39:16
61:3 231:4
**unelected**
218:13
**unflattering**
216:15
**unhappy** 136:11
**unheard** 156:22
**uniform** 136:8
**union** 1:5 2:14
7:9 11:6 12:10
26:15 30:10
32:22 40:15,17
44:16 46:24
49:23 52:16
61:12,23 62:12
63:17,22 64:11
65:10,18 68:4
68:22 69:8,21
70:13 71:6,24
72:17,21 74:3
74:19,23 75:16
77:14 78:13,18
79:24 80:5
82:15,21 83:3
84:5 86:5,6,12
86:13,25 87:2
87:16 88:12
89:24 90:1,6
90:13 91:3

92:22 93:16,22
93:25 94:3,9
95:5,12 96:13
97:4 100:17,19
100:24 101:2,7
101:10,19
104:18,20
105:14 108:9
109:23 110:23
111:5,6 112:17
113:10,15,16
114:20 115:6
115:16 116:4
116:16 120:22
121:15 122:11
122:14 124:8,9
125:23 126:10
126:13 129:18
135:11,14
136:9 142:25
143:3,15 144:6
147:1,9 148:14
153:16 154:4
154:10,16,20
156:10 168:1,5
173:9,12
174:11 178:15
184:12 186:12
191:19,24,25
192:5,15,18
193:9,12 194:6
195:13,22
201:6,9,12
206:3,5,5,6,7,9
206:13,18,21
206:22,24,25
207:2,4,9,13
208:6,9 215:2
217:21,22
218:1,6 219:13
219:20 222:10
223:9,13,18,20
224:24 225:3,6
225:12,17
228:16 229:4,8
229:11,13,15

229:17 230:4
233:8 246:1
247:10 250:5
253:17 260:7
**union's** 62:2
75:17 116:6
**union-related**
198:20
**unions** 91:5
**unit** 227:11
**UNITED** 1:1
260:2
**Unity** 4:15 98:18
99:11,15 100:5
155:14
**universal** 190:13
**unjust** 183:2
**unpleasant**
239:15
**unsuccessful**
52:3 67:24
**unusual** 230:7
230:10 238:23
**unwanted**
163:19
**update** 27:6
155:14
**updated** 158:4
**updates** 20:1,3,5
**updating** 111:1
**upheld** 182:4
**upset** 104:7,10
104:10,11
140:12 150:14
223:8 250:13
**uptick** 175:13
**use** 13:3 42:17
75:9 112:13,13
115:17 147:1
**uses** 86:17
**usually** 20:14
27:14 46:17
58:25 69:11
75:5 77:21
84:8 93:2
149:1 173:5,5

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 103 of 106   PageID 8704
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 298

173:7,23
174:12,13
228:19
utilize 143:4
239:2
utilizing 42:17
142:25 143:3
143:15

**V**

v 7:9
vacancies 71:8
vacancy 28:16
28:20
vacation 213:7,9
vagina 236:21
237:4 244:18
vague 157:2,4
157:18,22
158:7 159:14
160:6,7,13
161:1 230:1
Van 195:8,11
196:6
Vargas 161:23
163:1,2,4
various 12:3
20:2 25:16
40:10 61:23
65:24 81:14,18
92:22 126:18
133:11 134:8
168:18,20
172:18
Vasquez 162:25
VdV 195:2,5
Vegas 10:17,19
10:20 34:2
vehicle 94:2
vein 218:15
Ven 195:8,11
196:6
verbal 9:8
version 50:3
157:7 236:17
Versus 176:24
vetted 170:16

Vialla 192:8,13
vice 11:19 14:16
14:18,21,23
15:2 21:7
22:23 28:7,22
29:3,5,6,13,22
29:24 37:25
67:11,12,16
69:12 105:1
109:22,25
110:1,3 168:19
video 124:8
241:13
VIDEOGRAP...
3:7 6:2 58:5,8
85:7,13 92:15
92:18 153:8,11
205:3,6 214:7
214:10 256:6
256:12 257:13
257:15
videos 210:1,5
213:3 240:24
241:5,15,18
242:22,23,24
244:12
VIDEOTAPED
1:9
view 101:2
233:21 234:6
viewed 53:21
viewing 157:11
views 178:23
246:7
vile 212:18
violate 162:5
163:5
violated 49:8
167:2
violating 164:1
violation 31:25
32:5 34:17
35:8 46:5 48:5
48:17,21 52:22
53:16,22 54:13
128:8 131:14

131:21,24
136:17,19
143:1,21
157:12,15
162:8 164:20
167:7 177:7
178:12 179:15
214:3,15,18,21
215:10,14
216:8
violations 31:17
31:21 34:6
38:17 46:7
47:14,21 49:13
57:8,11,17
64:23 139:9
152:8,12
153:15,25
154:4,10,16
196:14 197:3,8
197:24 199:4
199:19 214:1
224:5
violent 219:3
Virginia 2:5
virtual 187:13
visible 235:23
255:6,7
visibly 233:17
visit 115:4
visualize 46:14
visualizing 47:3
voice 241:19
242:12
volume 156:19
156:20
volunteer
201:17 230:20
232:2
volunteered
227:8,25
230:12
volunteering
230:16
vote 19:14 30:15
75:20 76:5,10

76:18 79:16
87:3,4 143:6
144:18,23,24
145:7 198:24
255:20
voted 30:13,17
30:22 31:3
43:12,13 76:20
76:20,22
votes 12:17
28:18 29:2
33:25
voting 81:3
145:4 198:9,11
VP 38:3 56:7
VS 1:4 260:5

**W**

wait 243:10
253:7
waiting 113:3,9
213:5
walk 232:22
walked 231:22
walks 235:21
wall 33:8,10
65:1,5
want 22:12
32:17,20 44:13
46:3 49:14
84:18,19,22,25
85:4,8 92:6
95:1,3 96:10
98:10,17 99:19
99:20 109:4
119:4,5 130:11
139:19 141:3
144:10,12
154:7 172:3
183:25 184:25
209:8 226:25
239:23 243:23
246:11 249:3,6
249:10 255:18
wanted 18:5
23:17 27:6
57:1 66:25

98:23,24
105:19 110:8
175:18 176:20
176:21 177:4
177:16 178:17
201:17 208:20
208:23 209:10
217:12 247:16
248:24,25
249:2,7
wanting 149:20
200:25 201:1,4
226:13 233:4
warning 43:20
64:3 135:1
137:5,19
warnings 56:13
warrant 137:4
warranted
137:5
Washington
202:17 204:12
wasn't 25:11
36:9 38:17
52:5 59:5
67:13 68:6,7
83:20 95:25
104:5 105:21
133:25 157:9
167:5,9 170:8
170:9,21 171:3
171:7,11 175:9
177:9 186:10
186:11,12
200:16 201:11
222:13 226:7
229:7,25 242:4
242:13,15
250:22
watch 240:24
watching 144:16
144:17,21
way 14:19 17:25
20:18 47:7
55:25 82:15
84:1 90:13

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 104 of 106   PageID 8705
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 299

96:2 109:14
111:8 128:25
136:13 160:8
160:11 170:4
197:23 208:4
213:6 223:12
228:15 233:11
240:3 242:18
**ways** 61:17
90:19,19 91:2
**we'll** 257:10
**we're** 39:8 71:15
71:15 84:15,15
85:21 152:3
204:6 214:7
217:6 220:10
239:14 240:24
**we've** 48:2 57:25
247:17 249:13
**weapon** 220:8
255:10
**wearing** 232:8
236:2
**week** 201:17
233:3 236:8
**weekend** 208:20
**weekly** 77:20
93:18 96:8
**weeks** 168:17,21
169:7
**weight** 218:20
**went** 19:13 29:1
29:5 56:7
60:10,13 77:25
78:20 82:18
170:10,12
173:15 221:20
229:10 230:21
234:11 235:22
250:11,23
256:20
**weren't** 38:17
75:13 96:23
111:4 142:19
171:2 177:3
196:1 220:23

232:4
**whichever** 12:19
**white** 234:5
**wide** 40:17
**Wilkins** 117:21
215:16,21
216:10
**Willard** 186:2
186:19,22
**willing** 138:24
170:22 171:2,3
171:7
**willingness**
17:23
**win** 14:24
127:15
**window** 36:2
75:12
**withdraw** 47:11
63:15
**witness** 1:16,20
3:2 6:6,16
21:14 76:3
85:16,22 108:5
135:13,21
205:1 216:22
252:21 256:2
258:2 260:17
260:20
**witness'** 256:5
**woman** 216:15
234:2 235:8
**woman's** 235:9
**women** 23:19,23
23:23 24:4
118:1,2,5
232:10 234:22
235:17,18
249:4
**women's** 12:5
15:25 16:4,9
16:22 17:2
18:8,12 22:6
23:9,11 24:19
200:12 201:10
201:15 202:3,5

202:10 204:22
225:22 226:1,4
226:6 227:15
227:19,21
228:8 230:22
230:23 231:6
231:14 238:12
242:3 244:18
245:19
**word** 68:4
116:11 131:2
167:3,17
**worded** 154:6
248:25
**work** 2:3 24:24
25:11 26:12
38:16 42:1,5
42:15 50:13
51:20 64:20
71:17 84:8
90:21 93:15
110:18 147:10
184:12 194:3
197:20 198:24
201:15,19
207:9 221:8,14
226:13 227:8
227:13 232:2
234:12
**work-related**
206:7
**worked** 21:22
25:17 52:14
58:21 72:1
81:12,15 97:11
105:14 147:22
217:20 222:4
234:14,17
**Workers** 1:5
2:14 7:9 260:7
**workforce**
132:22
**working** 12:5
15:25 16:4,9
16:22 17:2
18:8,12 20:9

22:6 23:9,11
23:13 24:1,4
24:10,19 48:10
60:18 61:24
82:9 104:19
110:11 111:10
126:17 130:6
130:12 145:15
145:18,20
149:11 150:11
175:12 177:5
183:24 204:22
225:12 227:8
228:8 231:5
232:2,5,11,16
234:18 251:6
**workplace** 23:19
48:18,22 159:1
159:7 160:22
176:23 221:9
**works** 68:3
**world** 27:5
71:20
**worried** 149:22
242:4
**worse** 220:12
**wouldn't** 115:19
126:23 244:2
250:11,12
**wrap** 214:13
**write** 100:8
**writing** 70:6
216:16
**written** 9:6
43:20 56:13
64:2 135:1
137:5,19 158:3
**wrong** 46:6
66:23 75:9
99:16 108:12
221:2 234:10
**wrote** 124:20
154:21

**X**

**X** 229:16
**xx** 260:25

22:6 23:9,11
23:13 24:1,4
24:10,19 48:10
60:18 61:24
82:9 104:19
110:11 111:10
126:17 130:6
130:12 145:15
145:18,20
149:11 150:11
175:12 177:5
183:24 204:22
225:12 227:8
228:8 231:5
232:2,5,11,16
234:18 251:6

**Y**

**yeah** 35:4 47:9
48:20 58:2
79:20 82:20
84:13 85:6,11
98:7 99:12
108:11,25
127:11 139:21
153:6 158:19
194:13 199:14
199:15 203:11
203:24 206:17
257:8
**year** 19:25 20:14
23:16 33:12
47:14,17 67:11
69:14 77:4
84:8,10 121:13
126:4 133:4
145:1 186:14
208:18
**year's** 29:2
**years** 10:4 12:22
13:19,23 14:3
35:16 46:15
47:3 78:24
89:25 91:10
94:13 109:11
109:12 122:20
164:4 184:7
186:14 252:11
**years'** 38:13
**York** 23:13
204:23 228:4
**you-all** 84:19,24
175:25 176:6

**Z**

**zero** 44:9

**0**

**1**

**1** 4:12 8:1,2
205:11
**1,000,000** 121:9
121:10,15

Case 3:17-cv-02278-X    Document 263-1    Filed 06/13/22    Page 105 of 106    PageID 8706
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 300

**1:07** 261:14
**10** 4:23 5:5
  31:20 44:7,10
  47:13,16 59:6
  85:4 87:20
  134:19 141:22
  142:1 153:4
  155:2,5,6
  159:10
**10-31-21** 261:22
**10:00** 114:13
**10:39** 58:6
**10:53** 58:9
**100** 31:10 55:9
  94:22 182:2
  238:22
**102** 4:16
**108** 4:18
**10th** 74:16,18
  75:12 126:3
**11** 5:2,6 146:9
  146:10 151:7
  151:14 158:15
  158:16
**11:59** 92:16
**118** 4:20
**12** 5:8 98:5
  159:22 161:15
  179:18,19
**12:52** 92:19
**12th** 197:22
**13** 5:5,10 98:5
  155:5,8 164:16
  176:13 185:14
  185:15
**13th** 180:7,9,11
**14** 5:12 187:20
  187:21
**140** 4:21
**141** 4:23
**146** 5:2
**15** 5:14 44:10
  85:4 194:9,10
  194:16 198:21
**150** 5:3
**1500** 2:10

**155** 5:5
**158** 5:6
**15th** 208:17
**16** 5:16 10:4
  197:13,14
**16,000** 222:7
**17** 4:22 140:20
  140:24,25
  143:10 144:13
  203:7,15
**17-A** 5:17
**17-B** 5:19
**179** 5:8
**18** 5:4,20 28:17
  145:12 150:19
  150:20 151:18
  239:5,6,20,21
**185** 5:10
**187** 5:12
**19** 5:22 239:20
  251:19,22,25
**194** 5:14
**197** 5:16
**1st** 73:19,22
  74:15 78:21

___

**2**

**2** 4:2,14 34:11
  61:21 96:24
  98:12,13
  181:24,25
  182:14,16,21
  182:23 183:13
  206:1 249:9
**2:53** 153:9
**20** 4:13 7:25 8:4
  205:11,16
**20-plus** 51:10
**2000** 16:1 21:23
  98:4
**2004** 12:13
**2006** 13:13,17
  13:19 96:22
**2008** 14:6
**2010** 90:9 163:3
**2012** 14:9,10,12
  14:15,18,24

**21:25** 28:7
  129:10
**2013** 10:21 15:7
  16:2 19:9
  27:24 28:5,8
  28:25 57:7
  73:19,22 74:15
  74:24 79:6
  88:2 89:17,21
  91:7,11,16,20
  98:5 124:22
  151:17,22
  159:1 186:10
  187:4 194:24
  196:1
**2014** 46:6 47:12
  47:17 51:17
  57:7,13,17
  89:17,21 91:7
  91:12,16,21
  97:17 129:11
  159:6 160:1
  193:3 195:21
  195:22
**2015** 36:14 41:1
  46:22 47:21
  48:1,14 51:21
  51:22 52:22
  53:12 55:15
  56:19 57:12,14
  57:17 58:12
  68:17 74:22,25
  75:12,17 76:20
  76:23 77:3,15
  95:10 96:15,16
  116:21,24
  117:10,11
  126:5 128:8
  130:15,19
  132:11,16,18
  133:3 134:14
  155:23 156:16
  157:19 158:1,3
  159:2,15
  162:21,21,22
  171:14,20,22

**171:25** 196:14
  197:7 198:22
  218:16 219:1
  220:13
**2016** 17:6 77:12
  77:16 78:14
  79:23 159:3
  197:3,22 198:3
  199:8,22 254:1
**2017** 80:2,4,8
  84:3 200:4,11
  209:17 225:21
  237:18
**2018** 4:15 10:21
  10:22 15:9
  73:13,13 78:21
  78:21 117:8
  196:24 217:16
**2019** 159:8
  208:18
**2020** 1:10,18 6:3
  258:3 259:14
  260:10 261:18
**203** 5:17,19
**20th** 155:23
**214** 2:18 3:5
**216** 4:5
**22160** 2:5
**22nd** 200:4
**23** 4:15 98:9,12
  99:5 160:1
**239** 5:20
**24** 1:10,18 4:20
  118:25 258:3
  260:10
**24th** 6:3
**25** 203:6
**25-A** 5:18 203:9
**25-B** 5:19
**251** 5:22
**252** 4:6
**258** 4:8
**260** 4:9
**2654** 120:13
**27** 4:19 107:20
  108:2

**2733** 121:19
**2735** 121:18
**2836** 128:5
**2837** 127:11,11
**2847** 128:13
**2850** 2:10

___

**3**

**3** 4:16,17 102:23
  102:25 107:21
  107:23 206:1
**3:10** 153:12
**3:17-CV-0227...**
  1:4 260:5
**30** 5:9 179:18
  184:6,7
**30-day** 35:21
  36:6,23,25
  37:3 53:7
  55:16,23 56:2
  56:10,11,12,19
  56:23 57:2
  177:1 196:23
  251:4
**30-plus-year**
  190:10
**30(e)(1)(A)**
  260:22
**30(e)(2)** 260:23
**30th** 217:15
**31** 5:11 185:14
  186:25
**31st** 78:21 79:23
  80:21
**32** 5:13 187:20
**33** 5:15 194:9,13
**3301** 2:17
**3469** 6:22
  261:21
**38** 261:25

___

**4**

**4** 4:18 102:22,24
  107:23,25
  108:3
**40** 8:17
**469** 2:11

Case 3:17-cv-02278-X   Document 263-1   Filed 06/13/22   Page 106 of 106   PageID 8707
CONFIDENTIAL VIDEOTAPED DEPOSITION OF AUDREY STONE

Page 301

**4803** 1:21 3:4
**4th** 261:17

---
**5**

**5** 4:20 118:25
 119:1
**5:06** 205:4
**5:13** 180:7,11
**5:24** 205:7
**5:44** 214:8
**5:50** 214:8
**5:58** 214:11
**556** 1:6 2:14
 6:12,14 7:10
 11:4,7,11,16
 11:21,24 12:8
 12:15,23 14:2
 16:23 21:18,20
 22:3,19,25
 23:4,12,20
 30:8,21 33:20
 39:3,11 70:22
 71:19 76:12
 87:4 91:14
 93:4,22 94:6
 95:2 100:14
 101:16,21
 103:15,22
 106:7 107:2
 111:22,24
 112:15 116:9
 117:18 142:17
 143:14 144:24
 147:18 164:19
 204:7,16
 208:14 217:14
 221:9 226:7,19
 226:22 228:25
 233:13 252:2
 252:25 254:15
 260:7
**556-9524** 98:23

---
**6**

**6** 4:21 69:17
 83:24 140:21
 140:22

**6-A** 243:25
**6:58** 261:13
**600** 2:4
**616** 5:22 244:10
**6567** 103:18
**6571** 105:25
**680-4264** 2:11
**6th** 204:7

---
**7**

**7** 4:4,23 141:23
 141:24
**7:15** 256:7
**7:17** 257:16
**700** 188:14,15
 188:16,18
**7015** 261:23
**703** 2:5
**75201** 2:11
**75226** 2:17
**75246** 3:4
**75252** 261:23
**770-3339** 2:5

---
**8**

**8** 4:12 5:2,7
 146:10,11
 158:14,15
 160:21 261:15
**800** 188:14,17
 188:19
**800-5111** 3:5
**8001** 2:4

---
**9**

**9** 5:3,16 150:20
 150:21 197:12
**9:07** 1:18 6:4
**90** 46:5 222:1,16
**90-day** 44:8
**90s** 88:22
**939-9223** 2:18
**9524** 98:22
**972-931-1199**
 261:24
**972-931-2799**
 261:24

**98** 4:14