## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER            )
                           ) CIVIL ACTION NO.
VS.                        ) 3:17-CV-02278-X
                           )
SOUTHWEST AIRLINES CO., AND )
TRANSPORT WORKERS UNION OF  )
AMERICA, LOCAL 556         )

-----------------------------------

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF
MAUREEN EMLET
NOVEMBER 5, 2020

-----------------------------------

ANSWERS AND DEPOSITION OF MAUREEN EMLET, produced as a witness at the instance of the Plaintiff, taken in the above-styled and -numbered cause on NOVEMBER 5, 2020, at 9:03 a.m., before CHARIS M. HENDRICK, a Certified Shorthand Reporter in and for the State of Texas, witness located in Aurora, Colorado, pursuant to the Federal Rules of Civil Procedure, the current emergency order regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto.

## Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
    MR. MATTHEW B. GILLIAM
    NATIONAL RIGHT TO WORK LEGAL DEFENSE
    FOUNDATION, INC.
    8001 Braddock Road, Suite 600
    Springfield, Virginia 22160
    (703) 770-3339
    mbg@nrtw.org

FOR THE DEFENDANT, SOUTHWEST AIRLINES CO.:

    MR. MICHAEL A. CORRELL
    REED SMITH LLP
    2850 North Harwood, Suite 1500
    Dallas, Texas 75201
    (469) 680-4264
    mcorrell@reedsmith.com

FOR THE DEFENDANT, TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556:
    MR. ADAM GREENFIELD
    LAW OFFICES OF CLOUTMAN & GREENFIELD, PLLC
    3301 Elm Street
    Dallas, Texas 75226
    (214) 939-9223
    agreenfield@candglegal.com

ALSO PRESENT:  MR. MACK SPURLOCK -
    VIDEOGRAPHER

    MS. CHARLENE CARTER
    MS. LAUREN ARMSTRONG

## Page 3

INDEX

Appearances ...................................2
MAUREEN EMLET
    Examination by Mr. Gilliam...............6
    Examination by Mr. Correll...........127

Signature and Changes......................130
Reporter's Certificate....................132

EXHIBITS

Exhibit 2 - ...............................48
Termination Letter, Document 7

Exhibit 3 - ...............................60
Email to Suzanne Stephensen from Audrey Stone,
Document 1

Exhibit 4 - ...............................52
Email to Suzanne Stephensen from Dave Kissman,
Document 2

Exhibit 6 - ...............................67
Email to Maureen Emlet from Ed Schneider,
Document 9

Exhibit 7 - ...............................75
Email to Maureen Emlet from Ed Schneider,
Document 6

Exhibit 16 - ..............................80
Email to Tammy Shaffer from Maureen Emlet,
Document 8

Exhibit 17 - ..............................86
Email to Maureen Emlet from Bryan Smith,
Document 10

## Page 4

EXHIBITS

Exhibit 18 - .............................101
Email to Inflight Labor Relations Mailbox from
Maureen Emlet, Document 26

Exhibit 19 - .............................109
Email to Brianna Grant from Maureen Emlet,
Document 23

Exhibit 20 - .............................114
Email to Tammy Shaffer from Maureen Emlet,
Document 24

Exhibit 21 - .............................118
Email to Employee Relations-DG from Maureen Emlet,
Document 25

Exhibit 22 - .............................121
Email to Maureen Emlet from Maureen Emlet,
Document 27

Page 5

1           PROCEEDINGS
2           THE VIDEOGRAPHER:  We are now on
3  record.  Today's date is November 5th, 2020.  The
4  time is 9:04 Central.  Will the court reporter
5  please swear in the witness?
6           THE REPORTER:  This is the video oral
7  deposition of Maureen Emlet, and it is being
8  conducted remotely in accordance with the current
9  emergency order regarding the COVID-19 State of
10  Disaster.  The witness is located in Aurora,
11  Colorado.  And counsel has agreed that I can swear
12  in the witness.
13           My name is Charis Hendrick, Court
14  Reporter, CSR No. 3469.  I am administering the
15  oath and reporting the deposition remotely by
16  stenographic means from my home in Ellis County,
17  Texas.
18           Would counsel please state their
19  appearances and locations for the record?  And the
20  city is fine.
21           MR. GILLIAM:  Matthew B. Gilliam for
22  plaintiff Charlene Carter in Springfield, Virginia.
23           MR. CORRELL:  Michael Correll for
24  defendant Southwest Airlines in Dallas, Texas.
25           MR. GREENFIELD:  Adam Greenfield for

Page 6

1  the defendant TWU Local 556 in Dallas, Texas.
2           MAUREEN EMLET,
3  having been first duly sworn, testified as follows:
4           EXAMINATION
5  BY MR. GILLIAM:
6     Q.  Good morning, Ms. Emlet.
7     A.  Good morning.
8     Q.  My name is -- my name is Matt Gilliam and
9  I represent plaintiff Charlene Carter in the case
10  Carter v. Southwest Airlines Company and Transport
11  Workers Union of America Local 556.  And I am here
12  today to ask you questions about the case.  If at
13  any point you would like a break, just let me know
14  and we'll -- we'll take a break.  And do you
15  understand why you are here today?
16     A.  Yes.
17     Q.  Okay.  And do you understand you are here
18  under subpoena?
19     A.  Yes.
20     Q.  Okay.  And did you receive the subpoena to
21  testify?
22     A.  Yes.
23     Q.  Okay.  And have you had the chance to
24  review the subpoena?
25     A.  Yes.

Page 7

1     Q.  Okay.  And you understand that Mr. Correll
2  accepted the subpoena on your behalf, correct?
3     A.  Yes.
4     Q.  Okay.  And is Mr. Correll representing --
5  representing you at today's deposition?
6           MR. CORRELL:  Objection.  Calls for a
7  legal conclusion.
8     Q.  (By Mr. Gilliam)  You can answer.
9     A.  Well, I thought he was representing
10  Southwest Airlines, so I don't know if he's
11  representing me.  I don't know if that's the legal
12  jargon.
13     Q.  Okay.  Another quick question:  Did you
14  receive the check that we tendered to Mr. Correll
15  for your attendance at today's deposition?
16     A.  Yes.
17     Q.  Okay.
18           MR. GILLIAM:  Can we go off record and
19  maybe have a private conversation with counsel?
20           MR. CORRELL:  I'd prefer to have it on
21  the record.  If it's about -- if it's about the
22  scope of my representation of Ms. Emlet, I would
23  rather have it on the record.
24           MR. GILLIAM:  Oh, okay.  Well, I mean,
25  I was concerned about having discussions in front

Page 8

1  of the -- the witness, is all; that's my only
2  concern.  I don't know if we could -- we can put
3  something on the record.
4           MR. CORRELL:  Sure.  I will just tell
5  you:  We take the position that, consistent with
6  Texas law concerning representation of corporate
7  officers, we represent Ms. Emlet in her prior
8  capacity as an -- as a management personnel member
9  of Southwest Airlines.  And as a result, we reserve
10  the right to assert the privilege on behalf of
11  Southwest Airlines or any communications concerning
12  Ms. Emlet's services to Southwest Airlines.
13           MR. GILLIAM:  Okay.  Are we still on
14  the record?
15           THE REPORTER:  Yes.
16           MR. GILLIAM:  Okay.
17     Q.  (By Mr. Gilliam)  And, Ms. Emlet, have you
18  had the chance to confer with an attorney about the
19  subpoena?
20     A.  Yes.
21     Q.  Okay.  And did you have any objections to
22  the subpoena?
23     A.  No.
24     Q.  Okay.  All right.  Now, have you been
25  deposed before?

Page 9

1    A. Yes.
2    Q. Okay. And one -- one other question, I
3  guess. Okay. No, I think I am good.
4         So have you read the Complaint in this
5  case?
6    **A. No, I don't believe that I have read the**
7  **Complaint.**
8    Q. Okay. Are you familiar with the claims
9  that Ms. Carter is making in the Complaint against
10 Transport Workers Union of America Local 556 and
11 Southwest Airlines Company?
12   **A. Yes.**
13   Q. Okay. And you understand that she is --
14 is claiming religious discrimination under Title 7
15 of the Civil Rights Act?
16   **A. Yes.**
17   Q. Okay. And you understand she's claiming
18 retaliation in connection with the Railway Labor
19 Act; that she was terminated from her employment
20 for exercise of her rights under that -- that act?
21   **A. Yes.**
22   Q. Okay. All right. And do you work with
23 Southwest Airlines?
24   **A. No. I am retired from Southwest Airlines.**
25   Q. Okay. Congratulations. When did you

Page 10

1  retire?
2    **A. December 31st of 2019.**
3    Q. All right. And prior to your retirement,
4  what was the last position you held with Southwest?
5    **A. Manager of labor relations for inflight**
6  **services.**
7    Q. Okay. And how long did you hold that
8  position?
9    **A. I think it was about seven and a half**
10 **years.**
11   Q. Okay. And what -- what position did you
12 hold prior to being manager of labor relations?
13   **A. Prior to that, I was manager of inflight**
14 **communications. Prior to that, I was an inflight**
15 **base manager. And prior to that, a recurrent**
16 **training supervisor. And I started my Southwest**
17 **career as a flight attendant.**
18   Q. Okay. How long did you work as a flight
19 attendant?
20   **A. 10 months.**
21   Q. All right. During that 10-month time
22 frame, were you a member of the union?
23   **A. Yes.**
24   Q. Okay. Were you a member of TWU Local 556?
25   **A. Yes.**

Page 11

1    Q. Okay. And if I refer to TWU or Local 556
2  or the union, you will understand today that I mean
3  Transport Workers Union of America Local 556?
4    **A. Yes.**
5    Q. Okay. And how -- I guess, did you hold
6  any elected positions with the union?
7    **A. No.**
8    Q. Okay. All right. And when I say union
9  member, you understand that I mean a
10 full-dues-paying member?
11   **A. Yes.**
12   Q. Okay. And if I refer to a non-member, I
13 -- that I mean somebody who is employed in the
14 collective bargaining agreement represented by the
15 union, but not a full-dues-paying member.
16   **A. Okay.**
17   Q. You -- you understand that there are
18 employees or flight attendants who are represented
19 by TWU and employed in the bargaining unit, but are
20 not full-dues-paying members?
21   **A. I think that they are not full-dues-paying**
22 **members. They can opt out of the international,**
23 **but not local, I believe.**
24   Q. Okay. Do you -- do you have a terminology
25 you use for those persons?

Page 12

1    **A. No.**
2    Q. Okay. Have you ever heard the term opt --
3  "opt-outers"?
4    **A. Yes.**
5    Q. Okay. And who are the opt-outers?
6    **A. The -- the flight attendants who have --**
7  **chosen full amount of dues.**
8         MR. GILLIAM: Did the court reporter
9  get that response?
10        THE REPORTER: Yes, sir.
11        MR. GILLIAM: Okay. I don't know if
12 my connection was bad or not.
13   Q. (By Mr. Gilliam) Okay. And are -- are
14 those persons also called objectors?
15   **A. I don't know that I've ever heard that**
16 **term used for those flight attendants.**
17   Q. Okay. Have you heard those flight
18 attendants be called nonmembers?
19   **A. I am sorry, but I am not getting your**
20 **audio right now.**
21   Q. Okay.
22        MR. GILLIAM: Is anybody else having
23 trouble with my audio?
24        MR. CORRELL: I -- I believe it's the
25 witness who has got the issue with connection at

Page 13

1 the moment.
2        MR. GILLIAM:  Okay.
3     **A. I can hear you now.**
4     Q. (By Mr. Gilliam)  Okay.  And for that
5 group of people you had just described, have you
6 ever heard the term "nonmember" used to refer to
7 them?
8     **A. Yes.**
9     Q. Okay.  All right.  Now, in your position
10 as manager of labor relations, what -- what were
11 your responsibilities?
12    **A. My main responsibilities were to work with**
13 **the base leadership and the union lead --**
14 **leadership to ensure that the contract was being**
15 **correctly applied.  I was involved with cases that**
16 **had the potential to result in discipline; to**
17 **ensure that company policies and the inflight work**
18 **and conduct rules were being followed and applied**
19 **consistently.**
20    Q. Okay.  And when you say that -- well, did
21 you say that one of your responsibilities was
22 making sure the contract was applied properly?
23    **A. Yes.**
24    Q. Okay.  And by contract, are you referring
25 to the collective bargaining agreement between the

Page 14

1 union and the company?
2     **A. Yes.**
3     Q. Okay.  And in -- in what ways would you
4 make sure that the contract was being applied
5 properly?
6     **A. Well, it -- it came into play when there**
7 **was an allegation or a potential of a violation of**
8 **the contract or a violation of a work and conduct**
9 **rule or company policy.  Also, to -- I didn't**
10 **really deal with -- with the -- the noncontract**
11 **cases where it involved pay or hours of service.  I**
12 **was more on the discipline side of things.**
13    Q. Okay.  Okay.  And did you get involved in
14 investigations and discussions of flight attendant
15 discipline where there was a potential for any
16 discipline?
17    **A. Yes.**
18    Q. Okay.  And at what stage of the
19 investigation did you come in?
20    **A. Generally, the base would contact me once**
21 **the fact-finding meeting had been held, and discuss**
22 **the findings of their investigation with me.**
23    Q. Okay.  Were you ever contacted by flight
24 attendants directly?
25    **A. On rare occasion, yes.**

Page 15

1     Q. Okay.  Do you remember any of the flight
2 attendants who contacted you directly?
3     **A. No.**
4     Q. Okay.  Do you remember if you were ever
5 contacted directly by a flight attendant regarding
6 a social media policy violation?
7     **A. I don't know whether or not that was an**
8 **issue that I discussed directly with a flight**
9 **attendant.**
10    Q. Okay.  Do you know -- do you remember any
11 of the issues that you might have been contacted
12 about directly?
13    **A. No.**
14    Q. Okay.  All right.  Now, after you learned
15 from the base about a complaint involving a flight
16 attendant's conduct, what -- what do you do?
17    **A. My role would be to, first of all,**
18 **ascertain from the base leader what their**
19 **recommendation was in the case.  I would also go**
20 **through our archive files to ensure that any**
21 **discipline that was suggested was consistent with**
22 **what had happened before.**
23       **I also would have conversation with**
24 **the base leaders about whether a certain work and**
25 **conduct rule would apply or if it was a company**

Page 16

1 **policy violation.  And then I -- I may have done**
2 **some research on my own if there were other areas**
3 **that I felt needed to be addressed prior to the**
4 **base leader making the final decision.**
5     Q. Okay.  And apart from inflight, did you
6 work with other departments at Southwest on
7 disciplinary issues?
8     **A. I was never employed in any other -- well,**
9 **no, that's not true.  When I first started, I was**
10 **part of inflight.  And then after I joined labor**
11 **relations, it used to be under the inflight**
12 **department, but then they separated into a separate**
13 **department.  So I was employed by the general**
14 **counsel department.  In that capacity, I sometimes**
15 **consulted with the labor managers of other**
16 **departments.**
17    Q. Okay.  In your -- your position as manager
18 of labor relations, did you collaborate with other
19 -- other departments in the investigation of flight
20 attendant discipline?
21    **A. Occasionally, yes.**
22    Q. Okay.  What were some of the departments
23 you would collaborate with?
24    **A. The human resources business partner, the**
25 **employee relations team, the FMLA team; those are**

Page 17

1    the ones I can think of off the top of my head.
2        Q.  Do you know what the ACT team is?
3        A.  Oh, yes.  I worked with them quite a bit.
4        Q.  Okay.  And what -- what sort of issues did
5    you work with them on?
6        A.  There was a wide range.  It was for
7    accommodations.  If there were -- well,
8    accommodations that needed to be made for the --
9    the -- a specific flight attendant or that they
10   were requesting.
11       Q.  Okay.
12       A.  It also -- they also deal with career
13   transitions.  So I dealt with them on quite a few
14   cases where flight attendants were no longer
15   capable of doing the flight attendant duties,
16   performing the flight attendant duties.  And I
17   would work with the ACT team to assist them in
18   transitioning to different roles within the
19   company.
20       Q.  I see.  So that's what you mean by career
21   transitions?
22       A.  Transitions, yes.
23       Q.  Okay.  And did you ever deal with
24   accommodations of a religious nature?
25       A.  I remember one in particular -- well,

Page 18

1    actually, not one.  I remember a couple, yes.
2        Q.  Okay.  What -- what are the two you
3    remember?
4        A.  One flight attendant had converted to
5    Judaism and he requested an accommodation to wear a
6    yarmulke as part of his uniform.  And then we had
7    other flight attendants who had requested being
8    able to wear a hijab.  I am not sure that -- I am
9    not sure that any of those flight attendants who
10   approached me with that request actually went
11   through with it, but I know that it was discussed.
12       Q.  Okay.
13       A.  There was -- there was another flight
14   attendant who requested specific days off due to
15   his religious beliefs; those are the ones that I
16   remember.
17       Q.  Okay.  And the -- the flight attendant who
18   requested days off -- I am sorry -- did you say
19   whether that request was granted?  We may -- may
20   have froze up.
21       A.  I -- I remember that the request for the
22   yarmulke was granted.  I don't know about any other
23   requests.
24       Q.  Okay.
25       A.  I know that the request for specific days

Page 19

1    off was not granted.  It was not a reasonable
2    request given the flight attendant
3    responsibilities, and also the freedom that flight
4    attendants have to manipulate their own schedule
5    and move trips around.
6        Q.  Okay.  Do you ever remember an occasion
7    where you and the ACT team were involved in a
8    matter where the ACT team was considering whether
9    an employee needed a request, but the employee had
10   not specifically asked for a request?
11            MR. CORRELL:  Objection.  Vague.
12            THE WITNESS:  Should I answer that?
13            MR. CORRELL:  Ms. Emlet, today,
14   when I --
15            THE WITNESS:  Are you --
16            MR. CORRELL:  Just so you know,
17   Ms. Emlet, today, when I make objections, you are
18   permitted to proceed to answer the question as you
19   are able unless I specifically instruct you that
20   the information is privileged and you should not
21   disclose it.  So, in this case, yes, you may.
22            THE WITNESS:  Would -- would you --
23   thank you.
24       A.  Do you mind repeating the question?
25       Q.  (By Mr. Gilliam)  Yeah.  Do you remember

Page 20

1    any occasions where you collaborated with the ACT
2    team regarding a matter where the employee didn't
3    make a specific request, but someone else with
4    Southwest had determined that they needed to
5    consider it?
6            MR. CORRELL:  Objection.  Vague.
7        A.  I don't remember any cases like that.
8        Q.  (By Mr. Gilliam)  Okay.  Now, what -- what
9    did the ACT team ask you to do as part of your
10   involvement in those cases?
11       A.  Every case was individual.  And so just
12   generally speaking, the ACT team usually consulted
13   me on items that were specific to inflight.
14   Because they over -- they work with every
15   department, they are not as intimately familiar
16   with each collective bargaining agreement for each
17   of the different work groups, nor are they as
18   intimately familiar with the requirements for the
19   specific jobs.
20            And so my interaction with them
21   usually entailed questions about would this be a
22   reasonable accommodation given the requirements of
23   the flight attendant job; and is it in accordance
24   with their collective bargaining agreement.
25       Q.  Okay.  Now, in -- and -- and -- and you --

Page 21

1  you made that evaluation; is that correct, whether
2  it was in -- in accordance with the collective
3  bargaining agreement and consistent with the
4  requirements of a flight attendant's job?
5      **A. I don't know that I make the decision. I**
6  **would offer the information to the ACT team. And I**
7  **believe that, ultimately, they consulted with our**
8  **legal department to make their final decisions.**
9      Q. Okay. And in consulting with you on those
10  matters, did -- did you also involve the base
11  managers?
12      **A. Occasionally, the base manager would be**
13  **involved if they were the ones who had brought the**
14  **concern forward on the -- on behalf of the flight**
15  **attendant. However, I believe that all of that**
16  **information was privileged and, therefore, the ACT**
17  **team would not -- I wouldn't bring in the base**
18  **manager unless they were already involved.**
19      Q. Okay.
20          MR. CORRELL: And thank you for
21  applying that, Ms. Emlet. To the extent when you
22  are answering questions today, you believe they
23  call for communications with counsel, please alert
24  us because I will instruct you not to provide that
25  information in the deposition.

Page 22

1          THE WITNESS: Okay.
2      Q. (By Mr. Gilliam) So did you -- you -- you
3  corresponded directly with the base managers where
4  some sort of inquiry -- well, where they maybe
5  brought forth an inquiry on behalf of a flight
6  attendant?
7      **A. Possibly, yes.**
8      Q. Okay. And did you communicate with any --
9  any other department, I guess, doing your
10  evaluation; whether, you know, the -- the requested
11  accommodation was consistent with the CBA and the
12  requirements of the job?
13      **A. I am sorry. I didn't hear the last part**
14  **of that -- yes.**
15      Q. I'm sorry. I heard you say yes. Was that
16  yes in response to the question? Or you -- would
17  you like --
18      **A. Well --**
19      Q. -- the question read back?
20      **A. -- could you repeat the question?**
21      Q. Yeah.
22      **A. I didn't hear -- yes, I didn't hear the**
23  **end of the question.**
24      Q. Okay. I -- I apologize, Ms. Emlet. I --
25  there might be a little bit of delay between us

Page 23

1  too.
2          MR. GILLIAM: Ms. Hendrick, would you
3  mind -- would the court reporter mind reading that
4  back?
5          THE REPORTER: Sure.
6          (Record read by Reporter.)
7      **A. I would not have consulted with another**
8  **department to see if the request was consistent**
9  **with the inflight CBA, nor the requirements for the**
10  **flight attendant job. That was my job to know**
11  **whether or not it was in -- in compliance.**
12      Q. (By Mr. Gilliam) Okay. In your -- I
13  guess, your -- your experience as labor relations
14  manager, did you ever handle any investigations
15  involving a flight attendant with a religious
16  discrimination complaint?
17      **A. I --**
18          MR. CORRELL: Objection. Vague.
19      **A. -- do not remember handling any -- I do**
20  **not remember handling any -- any cases that**
21  **involved religious discrimination complaints.**
22      Q. (By Mr. Gilliam) Do you know, as a -- I
23  guess, a procedural matter, if a -- if labor
24  relations would handle that sort of issue, a
25  religious discrimination issue, or would the ACT

Page 24

1  team handle that issue?
2          MR. CORRELL: Objection. Vague.
3      **A. The ACT team and labor relations would**
4  **work together. Ultimately, it would be the labor**
5  **relations' responsibility to investigate. I just**
6  **don't remember ever having any religious**
7  **discrimination complaints brought forward.**
8      Q. (By Mr. Gilliam) Okay.
9      **A. Other than Ms. Carter.**
10      Q. Okay. Do you understand if -- or I am
11  sorry. Do you know if employee relations handles
12  religious discrimination issues?
13      **A. Oh, yes. Employee relations would handle**
14  **those complaints.**
15      Q. Okay. And did -- just to make sure that I
16  understand correctly. Did you ever work with
17  employee relations on those types of complaints?
18      **A. I may have, but, again, I don't remember**
19  **having any religious discrimination complaints**
20  **brought forward that I worked on or that I worked**
21  **with employee relations on. There -- there may**
22  **have been one, but without going back and reviewing**
23  **files, I just don't remember.**
24      Q. Okay. And, I guess, in your -- your time
25  as manager for labor relations, do you recall,

Page 25

1  roughly, about how many total religious
2  accommodation requests you dealt with?
3  **A.  I think I was only involved in a small**
4  **handful.  It wasn't really my area to make those**
5  **decisions.**
6  Q.  Okay.  Do you know if it was less than 10?
7  **A.  I am sure it -- it was.**
8  Q.  Okay.  Do you know if it was less than
9  five?
10  **A.  I don't know, but I would think it was**
11  **less than five.**
12  Q.  Okay.  All right.  And, I guess, as a
13  labor relations manager, were -- were you involved
14  in cases with a complaint about a social media
15  policy violation?  Well, let me -- let me strike
16  that.  Let me reword it.
17  **A.  Yes.**
18  Q.  Okay.  And were you familiar with the
19  social media policy?
20  **A.  Yes.**
21  Q.  Okay.  And were you also familiar with
22  Southwest's workplace bullying and hazing policy?
23  **A.  Yes.**
24  Q.  Okay.  And were you involved in -- or I'm
25  sorry.  Were you familiar with Southwest's sexual

Page 26

1  harassment policy?
2  **A.  Yes.**
3  Q.  Okay.  And did -- in -- in your time as
4  labor relations manager, did you deal with of
5  potential flight attendant violations of those
6  policies?
7  **A.  Yes.**
8  Q.  Okay.  And do you -- so as for the social
9  media policy, do you remember any flight attendants
10  who were terminated for violating the social media
11  policy?
12  **A.  I know that there were flight attendants**
13  **terminated for violating the social media policy.**
14  Q.  Okay.  And while you were a labor
15  relations manager, how many terminations of -- for
16  a social media policy violation do you remember?
17  **A.  I -- I don't know without checking the**
18  **records.**
19  Q.  Okay.  And do you know how many complaints
20  for a social media policy violation Southwest was
21  getting each year?
22  **A.  I don't know company-wide.  For inflight,**
23  **we had hundreds -- over the course of years, we had**
24  **hundreds of complaints of violations.**
25  Q.  Okay.  And if I do say employees, yes, I

Page 27

1  -- I do, generally, mean flight attendants in -- in
2  -- working in inflight.
3  Okay.  And how -- how -- how did that
4  change between, say, the time you began as labor
5  relations -- well, let me -- let me re- -- let me
6  ask that again.
7  Did -- did the number of social media
8  policy violations decline between the time you
9  began as labor relations manager and when you
10  retired?
11  **A.  No.  When I began as the labor relations**
12  **manager, I am not sure that we even had any social**
13  **media complaints yet; we may have.  And then the**
14  **number increased significantly.  Southwest and**
15  **inflight put out quite a bit of communication.  And**
16  **then after that, we did see a decline in the social**
17  **media complaints.  However, they were always --**
18  **they were always an issue.**
19  Q.  Okay.  And -- and what were the
20  communications you referred to that Southwest put
21  out about social media policy violations?
22  **A.  There were company-wide communications and**
23  **there were also inflight read-before-flies, which**
24  **are the memos that are directed specifically to**
25  **flight attendants.**

Page 28

1  Q.  Okay.
2  **A.  And I know that the union also had**
3  **communication in their Unity Magazine.**
4  Q.  Okay.  Did you receive the union's Unity
5  Magazine?
6  **A.  Occasionally, I received it.  I did not**
7  **receive it regularly because I was no longer a**
8  **union member.**
9  Q.  Okay.  And how did you receive the Unity
10  Magazine?
11  **A.  The union leaders sent it to me.**
12  Q.  Okay.  They -- did they send it to you by
13  email?
14  **A.  No.  I think that they used company board**
15  **mail and sent me a hard copy.**
16  Q.  And how does the company board mail work?
17  **A.  There is a large manila envelope; and on**
18  **the front of it, you write the department that it's**
19  **coming from and the department that it's going to.**
20  **And then, I guess, the mail department picks it up**
21  **and carts it around the -- the country sending it**
22  **to -- to whomever it is addressed.**
23  Q.  Okay.  So it's -- it's not electronic?
24  **A.  I think that the -- it's -- when I was**
25  **receiving them, it was not electronic.  I think it**

Page 29

1    is now; I don't know.
2        Q.  Okay.  How long were you receiving copies
3    of Unity?
4        A.  It just was occasional.  I -- I don't -- I
5    never could figure out any rhyme or reason to it.
6    Just, occasionally, the union would send a hard
7    copy of the Unity Magazine to me.
8        Q.  Okay.  Do you remember if you were getting
9    it up until the time you retired?
10       A.  I don't think I received any copies in the
11   last few years that I was there.
12       Q.  Okay.  Now, you mentioned company-wide
13   memos on -- regarding social media policy
14   violations.  Do you recall when the company issued
15   those?
16       A.  No.
17       Q.  Okay.  Do you -- do you remember if they
18   were sent frequently?
19       A.  I -- I do not.  They were not sent
20   frequently, that I remember.  I think that it was
21   mainly when the social media violation policy was
22   implemented and then any time that it was updated.
23   Also, the -- each employee was required annually to
24   acknowledge that they read and agreed to abide by
25   the social media policy.

Page 30

1        Q.  Okay.  And who prepared the
2    read-before-fly memos?
3        A.  It could be a different -- authored by
4    many different people.  And then published by the
5    communications team.
6        Q.  Okay.  When the social media policy
7    violations escalated, do you know who authored
8    those read-before-fly memos?
9        A.  I -- I don't know off the top of my head.
10   I believe that there was communication from Mike
11   Mankin, Mike Hafner and Sonya Lacore.
12       Q.  Okay.  Do you know -- go ahead.  Oh, I am
13   sorry.  Do you know when they issued those
14   read-before-fly memos?
15       A.  Not without seeing them, no.
16       Q.  Okay.  All right.  Now, did the -- did the
17   social media policy violations decline the year
18   prior to your retirement?
19       A.  I don't know without looking at specific
20   numbers.
21       Q.  Okay.  All right.  Okay.
22           MR. GILLIAM:  Can we maybe go off
23   record for just a second?
24           MR. CORRELL:  Sure.
25           MR. GILLIAM:  Would it be possible

Page 31

1    to --
2            THE REPORTER:  Mack --
3            MR. GILLIAM:  -- send you --
4            THE REPORTER:  Hold on real quick.
5            THE VIDEOGRAPHER:  Just a second.  We
6    are off record at 9:49 a.m.
7            (Recess taken.)
8            THE VIDEOGRAPHER:  We are back on
9    record at 10:00 a.m.
10       Q.  (By Mr. Gilliam)  Okay.  Ms. Emlet, I
11   think, in your testimony, didn't you mention that
12   you recalled the company issuing some
13   read-before-fly memos about social media policy
14   violations?
15       A.  Yes.
16       Q.  Okay.  But you did not recall the -- the
17   -- the date that -- dates that those were issued?
18       A.  That's correct.
19       Q.  Okay.  Do you recall giving testimony in
20   the arbitration of Ms. Carter's grievance against
21   the company for her termination?
22       A.  Yes.
23       Q.  Okay.  If I could refer you to the
24   document that you were just emailed.
25       A.  Yes.

Page 32

1        Q.  And if you want to look at -- I guess, I
2    direct you to Page 447.  That's where the start of
3    your testimony would be.  That's 447 of the
4    arbitration.  It might not be the page number of
5    your PDF.
6        A.  Okay.
7            MR. CORRELL:  Ms. Emlet, it will be
8    Page 129 of your PDF.
9            THE WITNESS:  Okay.
10       Q.  (By Mr. Gilliam)  And I would represent
11   that that's your arbitration testimony.
12       A.  Yes.
13       Q.  And then my question will be about Page
14   450, Lines 16 and 17.
15       A.  Okay.  Could you tell me where I am
16   looking?  I am on my testimony now.  And what --
17   what am I looking at; page what?
18       Q.  It actually -- of your PDF, it might be --
19   what -- 132, it's --
20       A.  Okay.
21       Q.  -- it's 450 of the arbitration.
22       A.  Okay.  I have got it.
23       Q.  And then, I guess, between Lines 8 and 17
24   of the transcript.
25       A.  Yes.

Page 33

1    Q. Does reading that help refresh your
2  recollection as far as when you -- when the
3  read-before-fly memos were issued?
4    **A. It -- that February of 2017 would have**
5  **been one of the read-before-flies that was issued.**
6    Q. Okay.  Do you remember if another
7  read-before-fly memo was issued before that?
8    **A. Well, according to this testimony, it**
9  **looks like there was one in 2016 as well.**
10    Q. Okay.  Do you know why the read-before-fly
11  memo was issued in February of 2017 after one had
12  been issued in 2016?
13    **A. Because we were continuing to see an**
14  **increase in the social media violations among**
15  **flight attendants.  And so the leadership decided**
16  **-- determined that it was necessary to give the**
17  **flight attendants a reminder.**
18    Q. Do you know when they made that
19  determination?
20    **A. No.**
21    Q. Okay.  Do you know how long it takes to
22  issue a read-before-fly memo?
23    **A. Well, it can be issued almost**
24  **instantaneously, but the question, I imagine, is**
25  **how long it takes to be written.  If it's already**

Page 34

1  **written, you can publish it in a matter of minutes.**
2    Q. Okay.  And -- and you don't know how long
3  it took to -- for Southwest to prepare that memo?
4    **A. No.  I was not involved in that.**
5    Q. Okay.  And do you know if the 2017 memo
6  came from Mike Hafner or Sonya Lacore?
7    **A. I don't remember which -- who -- who**
8  **issued it.**
9    Q. Okay.  And in -- I guess, in -- between
10  2016 and 2017, with those read-before-fly memos
11  issued at that time, do you recall that there were
12  more social media policy violations during those
13  two years?
14      MR. CORRELL:  Objection.  Asked and
15  answered.
16    **A. My recollection is that there were more**
17  **social media violations before the February of 2017**
18  **memo was issued.**
19    Q. (By Mr. Gilliam)  Okay.  And do you -- do
20  you know during those years about how many social
21  media policy violation complaints you were seeing?
22    **A. No.**
23    Q. Okay.  Do you know how many social media
24  policy violations -- violation complaints you were
25  getting after the 2017 read-before-fly memo was

Page 35

1  issued?
2    **A. No.**
3    Q. Okay.  Now, based off of the dates that
4  you have testified to for the read-before-fly memo,
5  do you know if the social media policy violations
6  had declined by 2018?
7    **A. I can't tell you whether they did or not**
8  **without seeing actual numbers.  I think that they**
9  **-- we did see a decline in social media violations.**
10  **And then I think there was another upswing, and**
11  **then they went down again.**
12    Q. And the -- the upswing you just mentioned,
13  was that after the read-before-fly memo was issued?
14      MR. CORRELL:  Objection.  Vague.
15    Q. (By Mr. Gilliam)  Let me ask it again.
16  The upswing that you saw, was that after the
17  February 2017 read-before memo?
18    **A. I can't tell you for certain.  My**
19  **recollection is that the social media policy**
20  **violations started out with a steady increase; they**
21  **got very high.  After the 2017 memo, they went**
22  **down.  Then we saw a slight uptick again, and then**
23  **they -- so it was kind of a roller coaster, but I**
24  **-- I believe, without actually looking at specific**
25  **numbers, that prior to February of '17, we had more**

Page 36

1  **social media violations in inflight.**
2    Q. Okay.  Now, apart from the social media
3  policy, were you involved in cases where there was
4  an alleged violation of the workplace bullying and
5  hazing policy?
6    **A. Yes.**
7    Q. Okay.  And did -- I -- I guess, what --
8  what specific role did you have in investigations
9  of violations of the workplace bullying and hazing
10  policy?
11    **A. Well, the investigation actually would**
12  **take place at the base level wherever the accused**
13  **flight attendant was based.  And then my role would**
14  **be to review the information that the base gathered**
15  **and determine whether or not a violation had**
16  **occurred; and to make sure that any potential**
17  **discipline was being applied consistently across**
18  **the department and across the company.**
19    Q. Okay.  And in reviewing whether a
20  violation had -- had occurred, would you make your
21  own determination separate from the human resources
22  business partner?
23    **A. No.  They really were our liaisons because**
24  **they oversaw that policy.**
25    Q. Okay.  And would the human resources

Page 37

1  business partner make the ultimate determination
2  whether there was a violation of the bullying and
3  hazing policy?
4      A.  I -- I am not sure that I can say that
5  they made that determination.  It's been a long
6  time since I have been at work.  So my recollection
7  is that they -- they would advise the base on
8  whether or not there had been a violation of the
9  policy.  There -- but they did not consult on
10  discipline or how to proceed with the particular
11  employee.
12      Q.  Okay.  And where would your, I guess,
13  determination of whether there had been a violation
14  of the bullying and hazing policy fit into the -- I
15  guess, the -- the -- the analysis?
16      A.  Well, it -- it was never a stand-alone --
17  it was -- it was more of a consensus.  I think that
18  the base leader used all of their resources, spoke
19  with the experts in the different areas.
20  Ultimately, it would be up to the human resources
21  business partner to tell us whether or not they
22  believed there was a violation of the policy.  And
23  then if the base determined that discipline was
24  warranted, I would work with them to ensure
25  consistency in applying discipline.

Page 38

1      Q.  Okay.  And before, I guess, applying any
2  discipline and determining whether a violation had
3  occurred, would you communicate your conclusions
4  directly to the human resources business partner or
5  to the base manager?
6      A.  I did not, generally, work with the human
7  resources business partner; the base manager would
8  have worked with that person.  And I would work
9  with the base manager.
10      Q.  Okay.  All right.  And, I guess, during --
11  during your work as a labor relations manager, how
12  many violations of the workplace bullying and
13  hazing policy were there?
14      A.  I don't know.
15      Q.  Were -- were there very many?
16      A.  I -- I -- I think that is a subjective
17  question.  I -- I don't know how many there were.
18  I -- I can't even guess.
19      Q.  Okay.
20      A.  I think that there -- I know that there
21  were multiple, but I -- I can't tell you how many.
22      Q.  Okay.  Do you remember if anyone was ever
23  terminated for a workplace bullying and hazing
24  policy violation?
25      A.  I don't remember definitively.  I believe

Page 39

1  that there were terminations for workplace bullying
2  and hazing.
3      Q.  Okay.  Now, with the sexual harassment
4  policy, was your role similar to the one you had
5  with the workplace bullying and hazing policy in
6  that you would review whether a violation had
7  occurred and then get involved in the assessment of
8  the consistency of the discipline?
9      A.  Yes.  The only difference is that with
10  sexual harassment, the -- the base would engage the
11  employee relations team.
12      Q.  Okay.  And, again, during your time as a
13  labor relations manager, were -- were there any
14  terminations for sexual harassment policy
15  violation?
16      A.  Yes.
17      Q.  Okay.  And which ones do you recall, if
18  any?
19      A.  I don't -- I don't remember specific
20  names, but I do know that there were terminations
21  for sexual harassment policy violations.
22      Q.  Okay.  Do you remember if there were more
23  than five?
24      A.  I don't know.  I -- I think there were
25  more than five, but I don't know for sure.

Page 40

1      Q.  Okay.  Now, did -- did you keep records of
2  some of the other discipline that was issued under
3  these policies?
4      A.  While I was employed with Southwest
5  Airlines, there -- we had archives of previous
6  cases.
7      Q.  Okay.  And did you archive those cases in
8  the ProLaw database?
9      A.  Yes.
10      Q.  Okay.  And were those records also kept at
11  the base as well?
12      A.  I don't know.
13      Q.  Okay.  And is -- is that what -- would you
14  rely on those records for purposes of making sure
15  that discipline was consistent?
16      A.  Yes.
17      Q.  Okay.  What other resources did you
18  utilize to make sure that the discipline that was
19  being issued was consistent?
20      A.  If it was a company vial- -- company
21  policy violation, we would consult with -- for
22  instance, in the hazing and bullying, we would
23  consult with the HR VP.  If it was any kind of
24  harassment, we would consult with employee
25  relations.  And then, also, if -- if inflight did

Page 41

1 not have any experience in those allegations or
2 violations, we would consult with the other
3 departments throughout the company to ensure that
4 the company's discipline was consistent.
5    Q. Okay. Now, what -- I guess, what
6 interactions did the labor relations department
7 have with Local 556?
8         MR. CORRELL: Objection. Calls for
9 speculation.
10   Q. (By Mr. Gilliam) Well, let me ask it this
11 way: So what -- what interactions did you have as
12 labor relations manager with Local 556?
13   A. I spoke with different union leaders
14 almost on a daily basis. We would discuss open
15 cases or if they were looking for settlement on
16 different things or clarification on how -- how
17 policies or contractual language was being applied.
18 Also, we -- the labor relations team met with the
19 Local 556 leadership on a monthly basis to discuss
20 open grievances and the possibility of reaching
21 settlements on some of those cases.
22   Q. Okay. And did -- did -- did labor
23 relations talk -- well, let me -- let's see.
24         MR. GILLIAM: Need to take a quick
25 five-minute break, if I could?

Page 42

1         MR. CORRELL: Sure.
2         MR. GILLIAM: I will be right back.
3         THE VIDEOGRAPHER: We are off record
4 at 10:19 a.m.
5         (Recess taken.)
6         THE VIDEOGRAPHER: We are back on
7 record at 10:30 a.m.
8    Q. (By Mr. Gilliam) All right. Ms. Emlet,
9 was there a collective bargaining agreement in
10 effect between the union and the company when you
11 retired from Southwest?
12   A. Yes.
13   Q. Do you know how long it had been in
14 effect?
15   A. I don't remember when the -- the last
16 contract was ratified.
17   Q. Okay. Do you remember how long --
18 roughly, how long it -- well, no. Let me ask it
19 another way.
20         Were there -- while you were labor
21 relations manager, were -- were there negotiations
22 regarding the contract that were ongoing between
23 Southwest --
24   A. Yes.
25   Q. -- and the company -- I am sorry,

Page 43

1 Southwest and the union?
2    A. Yes.
3    Q. Okay. And was there ever a time between
4 when you started as labor relations manager and
5 when you retired, that, I guess, the company and
6 the union reached a tentative agreement?
7    A. Yes.
8    Q. Okay. Do you recall, roughly, how long
9 before your retirement that was?
10   A. Well, there were multiple contract
11 negotiations during my time with Southwest
12 Airlines, so I -- I don't remember -- I just don't
13 remember when the last CBA -- the one that is
14 currently in effect, I don't remember what year it
15 was ratified. But then when I -- at the time I
16 retired from Southwest Airlines, that contract had
17 become amendable and there were ongoing
18 negotiations with the union and the company.
19   Q. Okay. And, I guess, can you say how long
20 negotiations had been going on prior to you
21 retiring?
22   A. For the current CBA, I think that the
23 negotiations began in maybe November of 2018.
24   Q. Okay. All right. And can you say, before
25 that, how long the prior contract had been

Page 44

1 amendable?
2    A. I don't know. I think it became amendable
3 in May of 2018, but I don't have the CBA in front
4 of me, so I don't know the exact date.
5    Q. Okay. Can -- well, were you involved in
6 contract negotiations at all?
7    A. No, no.
8    Q. Okay. And your labor relations department
9 wasn't involved in contract negotiations?
10   A. One person from our team was involved in
11 the contract negotiations, but I was not.
12         MR. CORRELL: And before we proceed,
13 Ms. Emlet, I am going to advise you that my
14 understanding is that the 556 contract is
15 negotiated that team -- the team that negotiates
16 the 556 contract includes counsel. As a result,
17 please do not testify about communications you had
18 about the negotiations with members of the
19 negotiating team, and do not testify about
20 information you supplied to the negotiating team to
21 the extent you did supply information to them.
22   Q. (By Mr. Gilliam) Now, shifting gears a
23 little bit, is it correct that you -- you did have
24 meetings with the union regarding the application
25 of the CBA?

Page 45

1      A.  Yes.
2      Q.  Okay.  Did the union ever raise concerns
3   with you about the application of social media
4   policies?
5      A.  As I recall, the union was on the same
6   page as the company regarding social media
7   violations.  I don't -- I don't remember any
8   conversations that you are referencing.
9      Q.  Okay.  And when you say that the union was
10  on the same page as the company regarding social
11  media violations, what do you mean?
12     A.  They agreed that there was a problem in
13  the company with the misuse of social media.
14     Q.  Okay.  And what misuse of social media did
15  they -- did the union convey to you was occurring?
16     A.  I don't think that there is anything I can
17  -- I don't think I can answer that question.  There
18  is nothing specific that I know of that they
19  conveyed to me.
20     Q.  Okay.  So in your -- your work -- I guess,
21  within the labor relations department, did -- did
22  you -- did you learn that the union had expressed
23  concerns about inconsistencies in how the social
24  media policy was being applied?
25     A.  They may have expressed that.  They -- I

Page 46

1   know that they were concerned about any
2   inconsistencies that they believed they saw with
3   any policy or work rule.  So we -- we had lots of
4   conversations over the years about whether or not
5   things were being applied consistently.
6      Q.  Okay.  And who did you have those
7   conversations with?
8      A.  Well, they would have most likely been at
9   our monthly grievance meetings with the grievance
10  chairs or with the -- the union president usually
11  attended those meetings as well.
12     Q.  Okay.  Do you remember, in any of those
13  meetings, the union president or the -- the
14  grievance committee expressing those concerns?
15     A.  I don't remember.
16     Q.  Okay.  Now, apart from inconsistencies,
17  did -- in any of those meetings, did anyone ever
18  express a concern about the company applying the
19  policies in a way that violate or interfere with
20  flight attendants' rights?
21     A.  I don't remember those conversations at
22  all.
23     Q.  Okay.  Did -- did the union, in those
24  meetings, bring to your attention any changes they
25  wanted to see with the enforcement of the social

Page 47

1   media policies?
2      A.  I don't know if they brought forward
3   concerns or -- or requests to make changes to the
4   social media policy or the enforcement of it.  They
5   frequently discussed things that they would like to
6   see changed, but I -- I can't tell you just from
7   memory what those -- what those topics were.
8      Q.  Okay.  Now, in your -- your -- your
9   meetings with the union about work policies, did
10  you discuss either the workplace bullying and
11  hazing policy or the sexual harassment policy?
12     A.  I know that we had discussions about the
13  sexual harassment policy.  I don't remember whether
14  or not we ever discussed the workplace bullying or
15  hazing policy.
16     Q.  And what discussions did you have about
17  the sexual harassment policy?
18     A.  I -- I don't know.  I have no idea.
19  Probably -- it -- it -- it most likely was related
20  to a specific case, but I -- I can't tell you what
21  the discussions were.
22     Q.  Okay.  All right.  Again, shifting gears,
23  you -- you know that Southwest terminated Charlene
24  Carter's employment, correct?
25     A.  Yes.

Page 48

1      Q.  Do you recall which policies she was
2   terminated for?
3      A.  Without looking at the termination letter,
4   I don't know for sure.  I know that there were
5   multiple violations.
6      Q.  Okay.  If I could direct your attention to
7   Document 7.
8         MR. GILLIAM:  And for anyone else,
9   it's Exhibit 2.
10     Q.  (By Mr. Gilliam)  And when you have it,
11  Feel free to read it over and let me know when you
12  are ready.
13     A.  I -- I don't see -- on my email
14  attachments, I don't see a Document 7.  Do you know
15  what I'm -- what am I looking for?
16        MR. CORRELL:  Ms. Emlet, it will be in
17  the email I sent you this morning labeled
18  Deposition Documents 2 of 5.
19        THE WITNESS:  Okay.
20        MR. CORRELL:  Open that up; there will
21  be a bunch of PDFs attached to it.  One of them is
22  labeled 7doc.PDF.
23        THE WITNESS:  Is it the termination
24  letter?
25        MR. CORRELL:  Yes, ma'am.

Page 49

1    THE WITNESS: Okay. That's -- that's
2 already open on mine.
3    A. Okay. I have it.
4    Q. (By Mr. Gilliam) Okay. And so I take it
5 you recognize the document?
6    A. Yes.
7    Q. And does this help refresh your memory as
8 far as which -- which policy she was terminated for
9 -- for violating?
10    A. Yes.
11    Q. Okay. And in the letter, it says that the
12 -- let's see. I have determined that your conduct
13 is in direct violation of the Southwest Airlines
14 mission statement and the following company
15 policies/rules, including, but not limited to:
16 workplace bullying and hazing policy and social
17 media policy.
18    Do -- I guess, a question I have is:
19 Do you ever assist in the drafting of termination
20 letters?
21    A. No.
22    Q. Okay. Okay. All right. And do you
23 recall -- I -- I guess, do -- do you recall
24 specifically what conduct Ms. Carter was --
25 violated -- or excuse me -- was -- was terminated

Page 50

1 for by Southwest?
2    A. Apart from what it says in the letter?
3    Q. Yes. Well --
4    A. Yes, I do.
5    Q. Okay. And you recall that she was fired
6 for Facebook pictures and posts?
7    A. Yes.
8    Q. Okay. And do -- I guess, did you -- when
9 did you first hear that a flight attendant had
10 complained about Ms. Carter's Facebook pictures and
11 posts?
12    A. I don't know what the date was, but I know
13 that -- I -- and I don't remember if it was before
14 or after the fact-finding meeting. I think that
15 prior to the fact-finding meeting, I was given the
16 Facebook posts, the pictures and the videos to
17 review.
18    Q. Okay. All right. And who -- who would
19 have provided those to you to review?
20    A. I believe that the labor relations
21 specialist gave them to me.
22    Q. And who -- who would the labor relations
23 specialist have been?
24    A. It would have either been Michelle or Sue
25 Ann.

Page 51

1    Q. Okay. What is Michelle's last name?
2    A. I knew you were going ask me that. I am
3 -- I am sitting here -- I have only known her for,
4 like, 15 years. I -- I don't know. Sue Ann's last
5 name is Chaffin, C-h-a-f-f-i-n. And Michelle's
6 name will come to me; I have to think about that.
7    Q. Okay.
8    A. I can look it up, but I don't know off the
9 top of my head.
10    Q. Do you know if Charlene Carter's base
11 manager would have contacted you?
12    A. Well, yes. She -- the base manager would
13 have contacted me at some point during that
14 investigation. And Michelle's last name is Lusk,
15 L-u-s-k.
16    Q. Okay. All right. Let's see. If I could
17 direct you to Document 2. And I will give you a
18 specific page number when you are ready.
19    A. Is -- is this the -- it looks like an
20 email thread; is that --
21    Q. Yes.
22    A. -- Document 2? Okay.
23    Q. Yes, ma'am.
24    A. I am ready.
25    Q. Okay. If you could find the -- the number

Page 52

1 at the bottom SWA005682, so Document 5682.
2    A. Almost there. Are these in numerical
3 order?
4    Q. No, they're -- they're not. Not exactly.
5    A. Okay. So --
6    Q. It's maybe in the first third.
7    A. Okay.
8    Q. Maybe not; I have got a bigger stack of
9 documents here.
10    A. Okay. I have it.
11    Q. Okay. And then the -- the second email
12 down -- well, I guess, the first two emails.
13    A. Okay.
14    Q. Those. Do you recognize those?
15    A. Yes.
16    Q. Okay. And what are they?
17    A. Well, it looks like email communication
18 between me and my leaders. And then there is an
19 email from Ed Schneider, who was the base manager
20 -- Charlene's base manager.
21    Q. Okay. And is it -- is it correct that
22 Denise Gutierrez forwarded the information to you?
23    A. I don't remember who sent me what. I know
24 that Denise and I did work together on these --
25 these -- this case. It's possible that Denise was

Page 53

1    the one who sent me the documents, but I got some
2    from the -- the labor relations specialist, and
3    then I think that I received others from Denise
4    Gutierrez.
5       Q.  Okay.  And who is Denise Gutierrez?
6       A.  She -- I am not -- I am not sure what her
7    exact title is, but she works in the employee
8    relations department.  I am not sure if she is
9    called a specialist or -- I don't know what -- what
10   the title of her position is, but she deals with
11   the investigations of harassment and policy.
12      Q.  Okay.  When the labor relations specialist
13   sent you, I guess, the -- the complaint, did -- did
14   they have any communications with you apart from
15   email?
16      A.  Not that I remember.
17      Q.  Okay.  And did they send you -- and you
18   may have said, but I am not entirely sure if I
19   heard.  Did they send you the actual Facebook posts
20   and pictures that were involved?
21      A.  I -- I thought that it was the labor
22   relations specialists, but I don't really remember
23   who sent what to me.
24      Q.  Okay.  But you -- you -- you did have that
25   information by February 24th, 2017, correct?

Page 54

1       A.  Yes.
2       Q.  Okay.  So when you received it, why did
3    you forward it on to Tammy Shaffer and Brianna
4    Grant?
5       A.  This were my direct leaders.  And I had
6    never seen a case like this, and so I wanted to be
7    sure that they were looped in.  Also, Tammy Shaffer
8    had requested that she be copied on any social --
9    any allegations of social media violation.
10      Q.  Okay.  And why did she ask that?
11          MR. CORRELL:  Objection.  Calls for
12   speculation.
13      Q.  (By Mr. Gilliam)  Did -- did Tammy Shaffer
14   tell you why she had requested that?
15      A.  No.
16      Q.  Okay.  Okay.  Did anyone tell you why
17   Tammy Shaffer was requesting that?
18      A.  No.
19      Q.  Okay.  And did -- in forwarding it to
20   them, did -- did you expect them to take any action
21   on it?
22      A.  No.
23      Q.  Okay.  So once you had received the
24   information, what -- what did you do with it?
25      A.  I reviewed all of the information.  And

Page 55

1    then waited for the base leader to contact me to
2    discuss his investigation.
3       Q.  Okay.  And what did you do as part of your
4    review of the information?
5       A.  I looked at all of the Facebook posts.  I
6    reviewed the videos.  I went to Facebook myself to
7    see if I could access the pictures just to verify
8    that they -- they were, in fact -- that they came
9    from the source that they were purported to have
10   come from.
11      Q.  Okay.  And were you able to access the --
12   the pictures?
13      A.  Yes.
14      Q.  Okay.  And did -- did you, I guess, take
15   screenshots or try to -- I guess, save that
16   information?
17      A.  I probably did, but I would have to check
18   the -- well, I don't have access to any of the
19   company documents anymore.
20      Q.  Okay.  And, I guess, as part of your
21   review, did you start comparing these Facebook
22   posts to any other disciplinary cases you had had
23   involving the social media policies?
24      A.  Yes.  That would have been part of my
25   review.

Page 56

1       Q.  Okay.  And what other, I guess, social
2    media policy cases did you review?
3       A.  Well, I would have reviewed any cases that
4    we had saved in our ProLaw files that resulted in
5    suspension or termination.  General -- well, they
6    could have been lesser disciplines, but, generally,
7    I was only involved in cases that -- that could
8    result in 30-day suspension or a termination.
9       Q.  Okay.  And were you only contacted when a
10   termination or suspension would -- would be
11   involved?
12      A.  Occasionally, I was contacted by the base
13   on lesser offenses.  Or they may -- the base may
14   have thought that this was a terminable offense;
15   and after discussion and review of -- of prior
16   cases, it may -- they may have made a decision to
17   issue a lower discipline.  So it would be a rare
18   case that I was contacted for something less than
19   the termination or the 30-day suspension.
20      Q.  Now, when you were contacted, were -- were
21   you told that this would be a case involving either
22   suspension or termination?
23      A.  No.  No determination had been made at the
24   time that I was first contacted.
25      Q.  Okay.  And after sending this email to

Page 57

1    Tammy and Brianna, did you have any communications
2    with them about the post?
3        **A.  Probably, but I don't remember.**
4        Q.  Okay.  And I think you mentioned that they
5    were your leaders.  What -- what was Tammy
6    Shaffer's job title?
7        **A.  She was the director of inflight labor**
8    **relations.  And Brianna was the senior manager of**
9    **inflight labor relations.**
10       Q.  Okay.  And did the director report to the
11   senior manager?
12       **A.  No.  The other way around.**
13       Q.  Senior manager reports to the director.
14   Okay.
15       **A.  Right.**
16       Q.  All right.  So was Brianna your direct
17   supervisor?
18       **A.  Yes.**
19       Q.  Okay.  And Tammy was Brianna's direct
20   supervisor?
21       **A.  That's correct.**
22       Q.  Okay.  And who did Tammy Shaffer report
23   to?
24       **A.  Actually, I don't remember, especially at**
25   **that date because there was a lot of -- of**

Page 58

1    **reshuffling, organizational changes.  So I -- I --**
2    **I actually don't remember who she reported to.  I**
3    **think that she -- when she first joined the**
4    **inflight team, she reported to Naomi Hudson.  And**
5    **then I think that Kevin Minchey became her -- her**
6    **leader.**
7        Q.  And do you remember the job title that she
8    reported to?
9        **A.  Well, when it was Naomi Hudson, she was**
10   **the senior director of inflight labor relations.**
11   **And Kevin Minchey is one of our attorneys.**
12       Q.  Okay.  And at this time --
13       **A.  Actually, I don't even know if it was**
14   **Kevin that she reported to.  I -- I just don't**
15   **remember.**
16       Q.  Okay.  And at this time, in February 2017,
17   do you remember if Tammy had -- Tammy Shaffer had
18   been director of inflight labor relations for very
19   long?
20       **A.  I do not remember when she joined inflight**
21   **labor relations.  She has been with the company, I**
22   **think, 35 years; maybe 38 years.  And she was the**
23   **director of -- of labor relations for another**
24   **department for -- I don't know -- 10 or 15 years**
25   **prior to taking on inflight.**

Page 59

1        Q.  Okay.  Do you know if she was director for
2    inflight labor relations when you became labor
3    relations manager?
4        **A.  She was not.**
5        Q.  Okay.  All right.  And Brianna Grant, was
6    she senior manager of inflight labor relations when
7    you became labor relations manager?
8        **A.  No.**
9        Q.  Okay.  And do -- do you recall if both had
10   been there, at least in -- in their respective
11   positions, about several months?
12       **A.  At the time of the -- February of 2017?**
13       Q.  Yes.
14       **A.  Brianna had been.  I think that -- I -- I**
15   **don't remember for sure, but I think that Tammy**
16   **joined labor relations -- inflight labor relations,**
17   **I thought it was 2016, but I just don't remember**
18   **for sure.**
19       Q.  Okay.  Okay.  As part of your email here,
20   you say, I will send you an additional email with
21   links to videos that were sent to Audrey.
22           And who is Audrey there?
23       **A.  Audrey Stone.  At the time, she was the**
24   **president of TWU 556.**
25       Q.  Okay.  Do you know, as part of this

Page 60

1    investigation, if you received Audrey's initial
2    complaint?
3        **A.  I wasn't the first one to receive it, but**
4    **I -- I am sure I reviewed it during the course of**
5    **the investigation.**
6        Q.  Okay.  Let's see.  If I could refer you to
7    Document 1.
8        **A.  Okay.**
9        Q.  And if you could just read -- I guess,
10   review the whole thing -- read and review the whole
11   thing.
12       **A.  Okay.**
13       Q.  And do you recognize this?
14       **A.  Yes.**
15       Q.  And what is it?
16       **A.  This is an email that Suzanne Stephensen**
17   **received.  It -- it looks like it was originally**
18   **sent on February 22nd of 2017 from Audrey Stone to**
19   **Suzanne Stephensen.**
20       Q.  Okay.  And the -- the screenshots that are
21   a part of this exhibit, do -- were -- were these
22   the screenshots that were at issue in this
23   complaint?
24       **A.  These are some of them, yes.**
25       Q.  Okay.  The first screenshot that -- well,

Page 61

1    let me back up a bit.
2         Do you remember what other screenshots
3    were involved in Ms. Stone's complaint?
4         A. Well, I don't know if Ms. Stone sent any
5    other screenshots.  I know that there were
6    additional screenshots that were provided during
7    the -- or -- or uncovered during the course of the
8    investigation of these allegations, but I don't
9    know -- I don't know whether or not Audrey provided
10   any other screenshots.
11        Q. Okay.  And do you know who provided the --
12   the other screenshots?
13        A. I don't remember.  Some of them, I
14   believe, I found on Ms. Carter's Facebook page.
15   And then -- I -- I don't remember where else they
16   would have come from, but it would have been from
17   company leaders who were working on the
18   investigation, I believe.
19        Q. Okay.  Do you remember what screenshots
20   you found on -- on -- on Ms. Carter's website that
21   were connected to her termination?
22        A. I don't know for sure which screenshots I
23   found or if someone else provided them.  I know
24   that there were screenshots of Ms. Carter in her
25   Southwest uniform or on -- on a Southwest airplane,

Page 62

1    and those were provided as a nexus to the
2    workplace.
3         Q. Okay.  All right.  And, I guess, turning
4    back to the Page 4228 in that first screenshot.
5         A. Are we going back to the last document?
6         Q. Yes, ma'am.  Document 1.  So --
7         A. We're still in Document 1?
8         Q. Yes, ma'am.  Yeah.
9         A. Okay.
10        Q. And 4228.  It should be the first
11   screenshot.
12        A. Okay.
13        Q. And the -- the message -- part of the
14   message says, you truly are despicable in so many
15   ways.  By the way, the recall is going to happen.
16        What is the recall?
17        A. If I remember correctly, there was a
18   faction of 556 members who wanted to remove Audrey
19   Stone from office.
20        Q. Okay.  And how did you learn about the
21   recall?
22        A. Well, it was common knowledge because
23   flight attendants were very vocal about it.  So I
24   don't know how I learned about it; probably from
25   other Facebook posts.

Page 63

1         Q. Okay.  All right.  Do you know when the, I
2    guess, issues with the recall started to -- well, I
3    guess, crop up?
4         A. I don't know.  It was prior to this time.
5    I don't know how long they had been going on.
6         Q. Okay.  Were there issues with the recall
7    when you retired?
8         A. No.
9         Q. Okay.  Do you know when those -- the
10   issues about the -- the recall, I guess, subsided?
11        A. I think when the new union president was
12   voted into office.
13        Q. Okay.  Do you know when that was?
14        A. I think it was January -- well, actually,
15   I don't know.  I think it was the beginning of
16   2019, but I don't -- I don't remember for sure.
17        Q. Okay.
18        A. Might have been October of '18.
19        Q. Okay.  All right.  And, I guess, turning
20   back to Document 2.  Well, I'll probably ask you a
21   question before we get there.  Do you know if Ed
22   Schneider eventually contacted you about the
23   investigation?
24        A. Yes.
25        Q. Okay.  And what -- when -- when he

Page 64

1    contacted you, what did he -- I guess, what did he
2    say to you?
3         A. Well, I don't know what the actual
4    conversation was; that was three years ago.  But he
5    -- he relayed the specifics of the case to me.  And
6    he would have asked me, you know, what I had seen;
7    what other -- what other cases of social media or
8    bullying or hazing, sexual harassment cases.  We
9    would have discussed what the -- what prior cases
10   we had seen.  And then, ultimately, he would have
11   told me what his decision was in -- in the
12   discipline of the case.
13        Q. Okay.  Would you have discussed the, I
14   guess, other -- the other cases that you were using
15   as a comparison before the fact-finding?
16        A. No.
17        Q. Okay.  So you would have had that
18   discussion after the fact-finding?
19        A. Yes.
20        Q. Okay.  Did -- do you know if you would
21   have had any conversations with Ed Schneider about
22   the -- the merits of the case before the
23   fact-finding?
24        A. I would not.
25        Q. Okay.  Do you recall if you had any

Page 65

1  conversations with -- any communications with Ed
2  Schneider about other -- other
3  information-gathering he was conducting?
4  **A. I -- I don't know in this case, but it was**
5  **-- it would be common practice for me to -- to**
6  **direct leaders to different resources in case they**
7  **had not looked at all of the areas in an**
8  **investigation. So -- so I might have said, well,**
9  **did you look at this; did you look at that? But I**
10 **don't -- I don't remember specific conversations.**
11 Q. And just generally, what -- what are those
12 resources that you would direct base managers to?
13 **A. It would depend on the case.**
14 Q. Okay. Are there particular resources that
15 you would direct a base manager to in a social
16 policy -- social media policy violation case?
17 **A. Well, I would probably ask them to look at**
18 **the -- the social media site themselves; to make**
19 **sure that they had reviewed the social media policy**
20 **to determine whether or not there was actually any**
21 **violation. And then depending on what the alleged**
22 **violation was, it could be a violation of another**
23 **work rule or company policy that was committed via**
24 **social media. So, for instance, there could be a**
25 **sexual harassment violation that was completed via**

Page 66

1  **social media.**
2  Q. Okay. And what -- what resources would
3  you refer a base manager to if they were
4  investigating a potential violation of the
5  workplace bullying and hazing policy?
6  **A. The human resources business partner.**
7  Q. Okay. Okay. Is that really the only
8  resource you would direct them to in the case of a
9  workplace bullying and hazing violation?
10 **A. Well, I typically would also make sure**
11 **that they had discussed the case with their direct**
12 **leader. But if it's specific to the workplace**
13 **bullying and hazing policy, that -- that's the HR**
14 **VP that oversaw that.**
15 Q. Okay. Do you know here if -- if -- if
16 Mr. Schneider had discussed these policy violations
17 with his direct leader?
18 **A. I believe so, yes.**
19 Q. Okay. Did you talk to his direct leaders
20 about the policy -- potential policy violations?
21 **A. Probably not. That -- that conversation**
22 **was typically held between the base leader and**
23 **their leader.**
24 Q. Okay. Do you know if Ed Schneider ever
25 told you what his communications were with his

Page 67

1  leaders?
2  **A. I don't know.**
3  Q. Okay. All right. And you didn't attend
4  the fact-fighting -- -finding meeting for Charlene
5  Carter, did you?
6  **A. I did not.**
7  Q. Okay. Do you remember if you received
8  notes about that fact-finding meeting?
9  **A. I did.**
10 Q. Okay. Let's see. I could direct you to
11 -- so many papers here. Let's see. It's Exhibit
12 6, but that's not what you need. Document 9.
13 **A. Okay.**
14 Q. And have you had the chance to review it?
15 **A. Oh, the -- the whole fact-finding notes?**
16 **I have not reviewed these since the arbitration**
17 **hearing.**
18 Q. Okay. If you want to take a moment to
19 review it, go ahead. And when you are ready --
20 **A. Do you want me to read the entire**
21 **document?**
22 Q. You don't have to read it word for word.
23 I just wanted you -- I was going to ask you some
24 questions about it. I didn't know if you wanted
25 to --

Page 68

1  **A. Okay.**
2  Q. -- take a look at -- look at it.
3  **A. All right.**
4  Q. Okay. So you recognize these documents?
5  **A. Yes.**
6  Q. And what are they?
7  **A. These are the fact-finding notes from**
8  **Ms. Carter's fact-finding meeting with Ed**
9  **Schneider.**
10 Q. Okay. And at the time, do you recall if
11 you reviewed the -- the fact-finding -- and when I
12 say at the time, when -- when Ed sent these to you,
13 do you know if you reviewed them at some point
14 after March 9th, 2017?
15 **A. Yes, I did.**
16 Q. Okay. And if I could focus your attention
17 on the second-to-last paragraph on 4676 and then
18 continue over to 4677.
19 **A. Okay.**
20 Q. Where Charlene says, I am Christian, I am
21 a conservative and I am pro-life. This happens to
22 be a huge issue for me and I get the message out
23 wherever I can. And this was sent to me and I
24 decided to post it on my Facebook page. I think it
25 -- if more and more people would see what actually

Page 69

1  happens -- then it continues. And on the second
2  page, it -- Charlene says, I had an abortion and I
3  regret every bit of it, so I work with other
4  pro-life groups. And for me as a Christian, if I
5  can get the word out in any way to every group as
6  possible to touch this issue, I do.
7       Do you remember reading -- reading
8  that?
9       A. Yes.
10      Q. Okay. Now, when you read that, did you
11  consider reporting that to the -- the ACT team?
12      A. I don't remember whether or not I reported
13  it to the ACT team.
14      Q. Okay. Did you consider whether a -- an
15  accommodation should be made based off of that
16  information?
17      A. I don't -- I don't -- I don't know what I
18  considered at that time. This doesn't look to me
19  like there is a request for an accommodation.
20      Q. All right. Did that information
21  factor into your -- your evaluation of the case?
22      A. Did --
23      MR. CORRELL: Objection. Vague.
24      Q. (By Mr. Gilliam) Did -- did -- I guess,
25  did -- did that information factor into your

Page 70

1  decision as to whether Charlene Carter should be
2  terminated?
3       A. Which information are you referring to?
4       Q. Where -- where she says I'm Christian, I
5  am a conservative and pro-life? What I read?
6       A. Not at all.
7       Q. Okay. Now, going back to the first page,
8  the 4675.
9       A. The email?
10      Q. Yes, ma'am.
11      A. Yes.
12      Q. And Ed Schneider has emailed that to you
13  and Denise, correct?
14      A. Yes.
15      Q. Okay. And he -- he says, can we talk
16  soon?
17      Did -- did you talk to Ed after he
18  sent you these notes?
19      A. I am sure that I did.
20      Q. Okay. And what -- I guess, after reading
21  these notes and your prior review of the -- the --
22  the Facebook posts and pictures, what -- what did
23  you tell Ed?
24      A. I don't remember what I told him at that
25  time. I know that he -- we -- we discussed the

Page 71

1  case. He reviewed everything, recommended
2  termination; and I agreed with his decision.
3       Q. Okay. At what point did he recommend
4  termination?
5       A. I don't know. It was after the
6  fact-finding meeting and after he had reviewed
7  every -- all of the information that he gathered in
8  his investigation.
9       Q. Okay. So the -- the date of this email is
10  March 9th, 2017. Based on what -- what you read --
11  well, strike that.
12      So the date here is March 9th, 2017.
13  And the date of the termin- -- termination letter
14  is March 14th, 2017. Is it fair to say he made the
15  -- the determination sometime in that -- in that
16  period?
17      A. Yes.
18      Q. Okay. Now, do you know how soon prior to
19  sending the termination letter a decision was made
20  to -- to fire Ms. Carter?
21      MR. CORRELL: Objection. Asked and
22  answered.
23      A. I don't know. Typically, the termination
24  letter is sent out very soon after the decision is
25  made. But, of course, we are bound by time frames

Page 72

1  in the collective bargaining agreement. So any
2  decision in termination or issuing of discipline
3  would have to be within those time frames.
4       Q. (By Mr. Gilliam) Okay. Now, if I could
5  direct your attention back to Document 2, Exhibit
6  4. I am sorry. Document 2 for you. And it -- it
7  would be Page 5762; it's towards the very back.
8       A. Okay.
9       Q. And if you could just look at five --
10  actually, if you could review 5672 (sic) and 5763.
11      A. I am sorry. Say those numbers again.
12      Q. 5762 and 5763.
13      A. Okay.
14      Q. And do you recognize this?
15      A. Well, I am not sure I remember it, but I
16  -- I recognize the formatting, yes.
17      Q. Do you know what it is?
18      A. Yes.
19      Q. And what is it?
20      A. It looks like Ed Schneider sent me a copy
21  of the termination letter. He was asking whether
22  or not the harassment policy should be included.
23  And then I had some questions about whether or not
24  this could be considered sexual harassment. Then
25  under that, the email from Denise is her recap of

Page 73

1  her investigation as to whether or not there were
2  any harassment policy violations.
3      Q.  Okay.  And Denise -- Denise's email
4  preceded your email, correct?
5      A.  Yes.
6      Q.  Okay.  And then Ed responded to you,
7  correct?
8      A.  Yes.
9      Q.  And what was Denise's determination as far
10  as whether there was a sexual harassment policy
11  violation?
12      A.  She says that they do not violate the
13  company's harassment -- sexual harassment,
14  discrimination and retaliation.  However, the
15  images of the women -- women dressed as vaginas do
16  violate the policy.
17      Q.  Okay.  And then in your response email,
18  you -- you -- you mention -- you ask, where were
19  the vagina pictures posted?  I haven't seen those.
20  Wouldn't that make this sexual harassment?
21          Do you know if anybody responded to
22  your question?
23      A.  I don't remember, but I'm -- I'm -- if
24  they didn't, I would have -- I would have kept
25  asking until I got an answer.  But I don't -- I

Page 74

1  don't remember who -- who responded or -- or what
2  the response was.
3      Q.  I guess Ed's letter does say, do you want
4  me to add the harassment policy?
5          Do you know if you responded to his
6  question in that email at the top?
7      A.  I don't know, but I -- I probably would
8  have turned that back on him and said, do you think
9  there is a violation of the harassment policy?  If
10  so, it needs to be included.
11      Q.  Okay.  All right.
12          MR. CORRELL:  Counsel, when you get to
13  a good spot, can we take a quick bathroom break?
14          MR. GILLIAM:  Yeah, sure.  Are we --
15  is it time for a lunch break or --
16          MR. CORRELL:  Probably still too early
17  because Ms. Emlet is in Mountain time, so it's only
18  10:30 for her.
19          MR. GILLIAM:  Okay.  Yeah.  Let's --
20  let's take a bathroom break.  Might as well here.
21          MR. CORRELL:  Thank you.
22          THE VIDEOGRAPHER:  We are off record
23  at 11:28 a.m.
24          (Recess taken.)
25          THE VIDEOGRAPHER:  We are back on

Page 75

1  record at 11:36 a.m.
2      Q.  (By Mr. Gilliam)  All right.  Ms. Emlet,
3  before Ed Schneider made his decision to -- to
4  terminate Ms. Carter, did he provide you with an
5  investigation report about his investigation?
6      A.  I don't think there was anything that
7  would be classified as an investigation report
8  specifically.  He -- he provided me with the
9  fact-finding notes and whatever other documentation
10  he had received or gathered.
11      Q.  Okay.
12      A.  If that's -- if that's what you mean by
13  investigation report.
14      Q.  Well, did he give you information maybe
15  summarizing his thoughts on the case prior to
16  making a decision?
17      A.  I don't remember if he sent me anything or
18  if we had a verbal discussion.
19      Q.  Okay.  Can I refer you to Document 6, or
20  Exhibit 7?
21      A.  Okay.
22      Q.  And if you could just review that.  And
23  once you are ready, let me know.
24      A.  Okay.
25      Q.  Do you recognize this?

Page 76

1      A.  I don't remember it, but I -- I recognize
2  what it would be.
3      Q.  Okay.  What is it?
4      A.  This is an email from Ed Schneider to me,
5  Denise Gutierrez and Edie -- Edith Barnett, with
6  Meggan Jones copied on it.  And it looks like it's
7  a recap or a summary of his investigation with
8  Charlene Carter.
9      Q.  Okay.  And at the bottom and continuing to
10  the next page, it says, violations of SWA policies.
11  Then it mentions social media policy; there is a
12  paragraph that follows.  And the same for bullying
13  and hazing and harassment policy.
14      A.  Yes.
15      Q.  And do -- do you remember if he had --
16  have you talked to -- do you remember if you had
17  talked to him about the policy -- the specific
18  policy violations before he sent this email?
19      A.  I don't remember the timing of any of
20  this.  So I may have spoken with him, but I don't
21  remember.
22      Q.  Okay.  And you don't remember if you would
23  have spoken to him about this email after he sent
24  it?
25      A.  I probably spoke to him afterward.  I

Page 77

1 don't know whether or not I spoke to him
2 beforehand.
3 Q. Okay. And do you know if you agreed with
4 his assessment of the violations of the policies
5 there?
6 A. I did agree.
7 MR. CORRELL: Misstates the document.
8 Ms. Emlet, you can answer.
9 Q. (By Mr. Gilliam) Okay. And do you recall
10 whether you -- you discussed the -- the termination
11 decision with Tammy Shaffer or Brianna?
12 A. I don't recall, but that would have been
13 my usual practice. And especially in a case like
14 this, I would have -- I -- I would say that I would
15 have to have discussed it with both of them.
16 Q. Okay. And did you discuss other -- other
17 cases with them as well?
18 A. I don't know if I discussed specific cases
19 or gave a broad overview of -- of what some of
20 those cases were and what the discipline was in
21 those cases.
22 Q. Okay. Now, in -- in this email, he -- he
23 says -- second paragraph -- it was then discovered
24 the longstanding history of Charlene sending
25 harassing Facebook messages to Audrey.

Page 78

1 Was it your conclusion that that was
2 the specific violation of the harassment and
3 bullying policy?
4 MR. CORRELL: Objection. Vague.
5 A. I am not sure where you are reading from.
6 Could you --
7 Q. (By Mr. Gilliam) Sure. Second paragraph,
8 last sentence.
9 A. Oh, okay. And what was your question?
10 Q. Do you know if -- or did you -- did you
11 conclude that it was the longstanding history of
12 Charlene sending the -- the Facebook messages to
13 Audrey that violated the bullying and hazing
14 policy?
15 A. I don't remember if that was the case.
16 But I think that Audrey only brought those Facebook
17 messages forward after the investigation had
18 already begun into the messages that included the
19 abortion videos.
20 Q. Okay. What did you believe the -- the
21 violation of the workplace bullying and hazing
22 policy was?
23 A. Well, I don't remember what I thought at
24 that time. In reviewing it now, I think that --
25 that the sending of the videos, the accusing -- the

Page 79

1 accusations of what Ms. Carter believed to be
2 Ms. Stone's beliefs about abortion and, certainly,
3 I would think that a longstanding history of
4 harassing Facebook messages could be considered as
5 hazing or bullying.
6 Q. Okay. And what was the specific violation
7 that -- that you identified for the social media
8 policy?
9 A. The -- the videos that she sent to Audrey.
10 As well as those same videos were on her Facebook
11 page, which was a public page. And she identified
12 herself as a Southwest employee.
13 Q. Okay. Do you remember if you found emails
14 on her Facebook page that identified her as a
15 Southwest employee?
16 A. I didn't know that there were emails on
17 Facebook.
18 Q. I am sorry. Do you -- did you find posts
19 on Ms. Carter's Facebook page that identified her
20 as a Southwest employee?
21 A. Yes.
22 Q. Okay. Let's see. Well, if I could direct
23 you to document -- well, first -- can we mark
24 Document 8 as the next exhibit. I'm not sure which
25 number we're on.

Page 80

1 THE REPORTER: Last where I left off
2 on Monday was Exhibit 13, but --
3 MR. GILLIAM: Was --
4 THE REPORTER: -- I don't know if you
5 marked anything in Mr. Schneider.
6 MR. GILLIAM: I -- I think I do have
7 it. I think the next one would be 16.
8 THE REPORTER: Okay.
9 (Exhibit 16 marked.)
10 Q. (By Mr. Gilliam) Ms. Emlet, this will be
11 Document 8 for you, if you could review it.
12 A. Okay.
13 Q. And once you've had a chance to review all
14 of it, let me know.
15 A. Okay.
16 Q. Do you recognize this?
17 A. Yes.
18 Q. And what is it?
19 A. This is an email that I sent to Tammy
20 Shaffer and Brianna. And it -- it looks like I
21 have forwarded an email from Denise Gutierrez, and
22 it has different posts from Facebook.
23 Q. Okay. And it's -- is it also attaching
24 images?
25 A. Yes.

Page 81

1    Q.  Okay.  Do you know if the images that
2  follow on Pages 6505 through 6513 were the
3  attachments to your email?
4    A.  I think that they were.  But looking at
5  this document now, it looks to me like Denise sent
6  them to me and then I forwarded them.
7    Q.  Okay.  All right.  But you recognize the
8  pictures as well?
9    A.  Yes.
10    Q.  Okay.  And one quick question.  On the CC
11  line, you have inflight labor relations mailbox.
12    A.  Yes.
13    Q.  Who receives email there?
14    A.  Michelle Lusk and Sue Ann Chaffin.
15    Q.  Okay.  Does anyone else receive email from
16  that box?
17    A.  Do you mean is anyone on that mailbox?
18    Q.  Yeah -- yeah.  Let me ask the --
19    A.  Not --
20    Q.  -- question another -- another way.  Does
21  -- can anyone else access email from that mailbox?
22    A.  Yes.  The -- when I was there, the labor
23  relations team could view emails in that mailbox,
24  but not send anything from it.  So this was our
25  repository for the specialists to collect

Page 82

1  information that needed to then be stored in -- in
2  ProLaw or to respond to union correspondence.
3    Q.  Okay.  I guess, why would you use that --
4  that mailbox as a repository for responding to
5  union correspondence?
6    A.  Well, I didn't, but when the union would
7  email our labor relations team, this is the mailbox
8  that it went into.  And then the specialists were
9  mainly responsible for either sorting through that
10  -- the correspondence and forwarding it on to a
11  labor manager, if needed; or responding to the
12  union directly for what they were requesting.
13    Q.  Okay.  And why did you forward these --
14  these images to Tammy and Brianna?
15    A.  Because they were my leaders and Tammy had
16  told us that she wanted to be copied on social
17  media investigations.
18    Q.  Okay.  Was it your understanding that she
19  wanted to be copied on all components for the
20  social media investigation?
21    A.  I don't remember.  I think that, for
22  lesser -- and it changed over the years also, what
23  she wanted to be involved in and what she didn't.
24  But for more serious cases and when she first came
25  over to the inflight department, she wanted to be

Page 83

1  involved in all of it.
2    Q.  Okay.  So it was normal that you would
3  send her all of the information of an -- an
4  investigation?
5    A.  Yes.
6    Q.  Okay.  And, now, who made the
7  determination that there was a nexus between
8  Ms. Carter's posts and Southwest?
9    A.  I don't know if any one person made that
10  determination.  Typically, in these high-profile
11  cases, our entire labor relations team would
12  discuss the case.  And then I -- I know that I had
13  some conversation about the nexus to the workplace
14  and her presenting herself in uniform on -- on her
15  Facebook page.
16    Q.  Okay.  Do you know what the dates of those
17  pictures were?
18    A.  No.
19    Q.  Okay.  And I do have a question too about
20  6505.
21    A.  Okay.
22    Q.  And what is the nexus to Southwest on that
23  page?
24    A.  Ms. Carter is standing.  She's the second
25  one from the right and she has her Southwest

Page 84

1  Airlines ID around her neck.
2    Q.  Okay.  And I -- I realize that this is
3  another copy, but can -- can you -- could you read
4  the -- the version of -- or read that ID in the --
5    A.  I cannot.  Not to my -- my iPad, I can't,
6  no.
7    Q.  Okay.  Do you recall if, on the original
8  version you saw, you could -- you could read what
9  was on the ID?
10    A.  I don't know.  I -- I know that -- I don't
11  know if I could read it.  I know that the coloring
12  and the layout were definitely recognizable as a
13  Southwest ID.
14    Q.  Okay.  Now, did you have any follow-up
15  discussions with Tammy Shaffer or Brianna Grant
16  about any of these pictures?
17    A.  I am sure I did.
18    Q.  Okay.  Do you know if you talked to them
19  about whether there was a nexus between Southwest
20  and the posts?
21    A.  I probably did, yes.
22    Q.  Okay.  And did they give you any
23  conclusions about the posts themselves?
24    A.  I don't remember.  I think it would only
25  be that, yes, there was a nexus to the workplace.

Page 85

1    Q.  Okay.  Would you have told them that you
2  were -- or would you -- would you have told them
3  whether you were recommending termination to the
4  base manager?
5    A.  I did not recommend the discipline to the
6  base manager.  He told me what he was recommending.
7  And then I -- I probably would have had that
8  discussion with Brianna and Tammy to see whether or
9  not our team was in agreement.
10    Q.  Okay.  Do you remember if you had any
11  communications with Denise Gutierrez about any of
12  the -- the photos involved in the case?
13    A.  I know that I talked with her.  I don't
14  remember the content of any of those conversations.
15    Q.  Okay.  All right.  Now, are -- and do you
16  recall that -- that -- that Ms. Carter was opposed
17  to Ms. Stone's participation in the women's march?
18    A.  Yes.
19    Q.  Okay.  And do you recall why Ms. Carter
20  was opposed to that?
21    A.  I don't know for sure.  I -- I believe
22  that she was under the impression that Ms. Stone
23  was using union funds to participate in the march.
24  And that by participating in the women's march, she
25  was claiming to be pro-choice.

Page 86

1    Q.  Okay.  And you recall that -- Ms. Carter
2  saying that she was opposed to the march because it
3  was also sponsored by Planned Parenthood?
4    A.  I don't remember that.
5    Q.  Okay.
6    A.  I don't know if she said that.
7    Q.  And do -- do you remember if she had
8  shared some information showing that the march was
9  sponsored by Planned Parenthood?
10    A.  I don't remember.
11    Q.  Okay.  Have -- are you aware of any
12  incidents at the company where a -- an employee has
13  taken a position on Planned Parenthood?
14    A.  I am not aware of any.
15    Q.  Okay.  Or -- and I -- I may not have
16  stated this exactly right, but are you aware of any
17  incidents where a company employee has taken a -- I
18  guess, a position on Planned Parenthood?
19    A.  I am not aware of any.
20    Q.  Okay.  If I could -- let's see -- mark
21  Document 10 as the next exhibit, 17.
22         (Exhibit 17 marked.)
23    Q.  (By Mr. Gilliam)  And, Ms. Emlet, if you
24  could review Document 10.
25    A.  I see this.

Page 87

1    Q.  Okay.  And do you recognize it?
2    A.  No.  I don't know -- I am looking to see
3  if I was ever on this email thread.
4    Q.  If you could look at the very top --
5    A.  I am sorry.
6    Q.  The --
7    A.  The very top?
8    Q.  Yeah.  Direct your attention to the very
9  top of 5530.
10         MR. CORRELL:  Though, I would note for
11  the witness that this packet contains multiple
12  email threads.
13         THE WITNESS:  Okay.
14    A.  I do see -- oh, I am CC'd on it.  Yeah, I
15  don't remember this at all.
16    Q.  (By Mr. Gilliam)  Okay.
17    A.  It was directed to Bryan Smith, who, at
18  the time, would have been my colleague.  And -- or,
19  actually, it's from him.  So I think he must have
20  followed up on this -- this case.  I don't -- I --
21  I don't remember it.
22    Q.  You -- you do see he sent it to you?
23    A.  Yes.
24    Q.  Okay.
25    A.  But I am CC -- yes.  But I don't remember

Page 88

1  -- I don't remember --
2    Q.  I'm sorry.  I said he CC'd you.  I guess
3  he addressed it to you.
4    A.  Yeah.  I don't remember this case at all.
5    Q.  Okay.  And you said Bryan Smith is your
6  colleague.  What's -- what's his position?
7    A.  Well, at the time of this email, he was a
8  manager of labor relations.  He's not anymore.
9    Q.  Okay.  So you were not involved in the --
10  the issues described here?
11    A.  I don't remember this case at all, so I
12  don't know if I was involved in it or -- or not.
13    Q.  Okay.  All right.  Now, earlier, we were
14  talking about some of the other social media policy
15  violations.  I can't remember whether you said
16  whether you recalled any specific social media
17  policy violation cases you were involved in.  Do --
18  do you recall some of the specific individuals?
19    A.  Yes.
20    Q.  Okay.  Who -- what -- who were some of the
21  specific individuals whose cases you -- you recall?
22    A.  Kent Hand, Brian Talbert, Holly Imamovic,
23  Bill Holcomb.  I think -- I don't know.  There were
24  -- there were a lot of social media cases.
25    Q.  Were you involved in any cases involving

Page 89

1  Jeanna Jackson?
2      A.  Well, I believe so.  I know of Jeanna's
3  history.  I don't remember if I was directly
4  involved in any of her investigations or hearings
5  or if I just -- she -- she had multiple violations,
6  so I'm not sure if I was directly involved in any
7  of them.
8      Q.  Okay.  Let's see.  And what about Ricky
9  Spand?
10     A.  I know that he had violations.  I don't
11  remember whether or not I was the labor manager on
12  any of those cases.
13     Q.  Okay.  Were you involved in any
14  disciplinary investigations involving Casey
15  Rittner?
16     A.  I believe so, yes.
17     Q.  Okay.  Were you involved in any
18  disciplinary investigations involving Josh
19  Rosenberg?
20     A.  I don't recognize that name.  I might have
21  been, but I don't recognize the name.
22     Q.  Okay.  Were you involved in any
23  disciplinary violations involving Kendall Foss?
24     A.  Yes.
25     Q.  Okay.  And do you know -- do you recall

Page 90

1  what the discipline that was issued to Kendall was?
2      A.  She was terminated.
3      Q.  Okay.  And do you know which -- which rule
4  she was terminated for?
5      A.  I don't remember specifically.
6      Q.  Do you know if it was a social
7  media policy violation?
8      A.  I -- I just don't remember.  I -- I know
9  that I was heavily involved in that case, but --
10  and even the arbitration, but, now, I don't
11  remember what the violation was.
12     Q.  Okay.  Were -- were you involved in a
13  disciplinary case involving Brandon Conlon (sic)?
14     A.  Well, Brandon was a senior director, so I
15  -- I don't know of anything where he was issued
16  discipline.  He was not a flight attendant.
17     Q.  Okay.  All right.  In Kent Hand's case, do
18  you know what he was terminated for?
19     A.  Off the top of my head, I believe that it
20  was a social media policy violation and workplace
21  violence.
22     Q.  Okay.  And what are some of the details
23  you recall about that -- that case?
24     A.  He -- I don't -- I don't remember if he
25  posted a picture on Facebook, but there was a

Page 91

1  picture of someone hanging out of the car window
2  with a machine gun and there was some verbiage on
3  -- on the car.  I don't remember exactly what it
4  said, but I know that the union -- some of the
5  union representatives felt that it was a direct
6  threat against the union.
7      Q.  Okay.  Do you know who reported Mr. Hand?
8      A.  No.  It was not reported to me.
9      Q.  Okay.  Okay.  And what do you recall about
10  Mr. Talbert's case?
11     A.  Nothing.
12     Q.  Okay.
13     A.  I -- that was -- that was a long time ago.
14  I don't remember any specifics of -- of that case.
15     Q.  You don't remember whether he was
16  terminated?
17     A.  I do know he was terminated.  I don't
18  remember what the violation or violations were.  I
19  know it was social media, but I can't -- can't
20  recall any other specifics of the -- that case.
21     Q.  Okay.  Do you know if he got his job back
22  at Southwest after he was terminated?
23     A.  Yes, he did.
24     Q.  Okay.  And is he still employed with
25  Southwest?

Page 92

1      A.  I don't know.  I haven't -- I retired
2  almost a year ago, so I don't know whether or not
3  he's still employed at Southwest.
4      Q.  Okay.  Do you know what a last-chance
5  agreement is?
6      A.  Yes.
7      Q.  Okay.  And what is it?
8      A.  It's an agreement that the company offers
9  sometimes to flight attendants to -- to possibly
10  reduce discipline that had been issued; and
11  outlining that if you do X, Y or Z again, this is
12  the result.  So, basically, it's a -- you do this
13  again -- this is your last chance; we'll -- we'll
14  give you another chance, but this is it.  It's just
15  what it says; it's a last-chance agreement.
16     Q.  Okay.  Do you help decide whether an
17  employee should be offered a last-chance agreement?
18     A.  Sometimes, yes.
19     Q.  Okay.  When do you make that decision?
20     A.  It depends on where -- where the flight
21  attendant is in the grievance process.  So after
22  the Step 2 hearing, if the flight attendant decides
23  to take the case forward to board of adjustment or
24  to arbitration, at any point during that process, I
25  could offer a last-chance agreement.

Page 93

1    Q.  Okay.  Were you part of the decision to --
2  well, let me ask it this way:  Did you make the
3  decision to offer Ms. Carter a last-chance
4  agreement in this case?
5    A.  I did not.
6    Q.  Do you know who made that decision?
7    A.  I believe it was Mike Sims.
8    Q.  Okay.  And how do you know that?
9    A.  Because Mike conducted the Step 2 hearing.
10  And I remember being told at that time that he was
11  offering a last-chance agreement for reinstatement.
12    Q.  Okay.  And which flight attendants, if
13  any, have you offered a last-chance agreement to?
14    A.  I -- I don't know.
15    Q.  Okay.
16    A.  I would have to look it up.
17    Q.  All right.  Now, do you know what Holly
18  Imamovic was disciplined for?
19    A.  Yes.  I don't remember exactly, but I
20  believe that it was the social media policy and
21  workplace violence.
22    Q.  Okay.  And what -- what details about that
23  case do you remember?
24    A.  Well, there were actually two cases.
25  Holly was terminated.  She was, I believe, brought

Page 94

1  back on a last-chance agreement.  And then she
2  violated the last-chance agreement and was
3  terminated a second time.
4    Q.  Okay.  What -- what conduct did she engage
5  in that gave rise to the first termination?
6    A.  I don't remember.  I believe it was a
7  social media violation.  And -- but I don't
8  remember -- I don't remember the specifics of what
9  she did that -- that was a violation.
10    Q.  Okay.  Do you remember what conduct gave
11  rise to the second violation?
12    A.  She violated the -- the last-chance
13  agreement by violating the social media policy.
14    Q.  Okay.  And how did she violate the social
15  media policy the second time?
16    A.  I don't remember.
17    Q.  Okay.  And Bill Holcomb, what do you
18  recall about his case?
19    A.  I believe that his was a social media
20  violation.  It may have also included sexual
21  harassment, but I don't know for sure.
22    Q.  Okay.  And do you know the specific
23  conduct -- conduct he engaged in that violated the
24  social media policy?
25    A.  I believe that he posted a photo of a

Page 95

1  passenger with some derogatory comments.
2    Q.  Okay.  Do you remember what the derogatory
3  comments were?
4    A.  No.
5    Q.  Okay.  And do you know if he was rehired
6  by the company?  Or let me ask it another way.
7        Do you know if he received a
8  last-chance agreement?
9    A.  I don't know.
10        MR. GILLIAM:  I don't know if we're at
11  a lunch breaking point yet; are we?
12        MR. CORRELL:  I mean, if you think you
13  are going to have enough after lunch break to make
14  a break worthwhile, we can stop.
15        MR. GILLIAM:  Yeah, I probably will.
16        MR. CORRELL:  Okay.  That's fine by
17  me.
18        MR. GILLIAM:  Is that okay by you,
19  Ms. Emlet?
20        THE WITNESS:  Sure.
21        MR. GILLIAM:  Okay.
22        THE VIDEOGRAPHER:  We are off record
23  at 12:15 p.m.
24        (Lunch break had.)
25        THE VIDEOGRAPHER:  We are back on

Page 96

1  record at 1:01 p.m.
2    Q.  (By Mr. Gilliam)  All right.  Ms. Emlet,
3  and were -- were you familiar with any cases where
4  Casey Rittner was accused of a policy violation?
5    A.  I -- I don't remember whether or not I was
6  involved in Casey's cases.  I believe I was in at
7  least one.
8    Q.  What do you remember about Casey's cases?
9    A.  The one I worked on was the social media
10  violation.
11    Q.  Okay.  And what happened in that case?
12    A.  I have no idea.
13    Q.  Okay.  Do you remember the conduct that
14  constituted the social media violation?
15    A.  Casey posted something on -- on Facebook,
16  but I don't remember what it was.
17    Q.  Okay.  Do you remember anything about his
18  other case?
19    A.  I only know of one that I was involved in.
20    Q.  Okay.  And do you remember whether Casey
21  was terminated for -- for the case you were
22  involved in?
23    A.  I don't remember.
24    Q.  Okay.  Do you remember anything else about
25  that case?

Page 97

1    A. I don't. I'm -- I'm not even sure if I am
2  thinking of the right case, so I -- I really can't
3  speak to any specifics.
4    Q. Okay. Are -- are you familiar with any
5  cases where Glenn Thompson was accused of a social
6  media violation?
7    A. Yes. But I don't think that I worked on
8  that case.
9    Q. Okay. What do you know about that case?
10   A. Nothing. I don't remember anything --
11   Q. Okay.
12   A. -- about it.
13   Q. You just remember that he -- he was
14  accused of a social media policy violation?
15   A. Yes.
16   Q. I am sorry. Policy violations, I said.
17  Okay. Do you know if it was a social media policy
18  violation?
19   A. I don't remember.
20   Q. Okay. Are you familiar with a case where
21  Chris Slough was accused of a policy violation?
22   A. I don't recognize that name at all.
23   Q. Okay. Do you recognize the name Michael
24  Kammas?
25   A. No.

Page 98

1    Q. Okay. How about Brett Nevarez?
2    A. Yes.
3    Q. Okay. And who is Brett Nevarez?
4    A. He is a flight attendant. And at one
5  time, he was a union board member, I believe.
6    Q. Okay. Are you --
7    A. Or --
8    Q. Oh, go ahead.
9    A. Officer, I think. He was a union officer.
10   Q. Okay. Are you aware of any case where he
11  was accused of a policy violation?
12   A. I know that he was accused, yes.
13   Q. Okay. And what was the policy he was
14  accused of violating?
15   A. I don't -- I don't know.
16   Q. Okay. Do you remember what the conduct
17  was that gave rise to the accusation?
18   A. I don't. It -- I don't know. I don't
19  remember.
20   Q. Okay. Do you recall when -- when that
21  occurred?
22   A. It -- it might have been 2018.
23   Q. Okay. All right. Now, shifting gears a
24  little bit. Do you know if any union board member
25  -- I am sorry.

Page 99

1    Do you know if Audrey Stone ever
2  reported another flight attendant for a policy
3  violation?
4    A. I don't know whether she did.
5    Q. Do you know of a case where any union
6  official ever reported an employee for a policy
7  violation?
8    A. I do.
9    Q. Okay. And what do you recall?
10   A. I recall that one union leader gave some
11  social media screenshots to one of the labor
12  relations managers and asked to remain anonymous.
13   Q. Okay. To a labor relations manager, you
14  said?
15   A. Yes.
16   Q. Okay. And who was that union leader?
17   A. I don't know. He -- they didn't give that
18  to me.
19   Q. When you said they didn't give that to
20  you, you mean the anonymous union leader?
21   A. Correct.
22   Q. So you knew that it was a union leader,
23  though?
24   A. Yes.
25   Q. Okay. And how did you know it was a union

Page 100

1  leader?
2    A. Because the manager who received the
3  information said it was.
4    Q. Okay. The -- the manager who received the
5  information told you that they received information
6  from a union leader?
7    A. Yes.
8    Q. Okay. And who was the labor relations
9  manager; who told you that?
10   A. I think it was -- was Kevin.
11   Q. And what is Kevin's last name?
12   A. Let me tell you. Allen, A-l-l-e-n.
13   Q. Okay. Do you know what the information
14  was that Kevin union -- I'm sorry -- Kevin Allen
15  had received?
16   A. I don't remember what case it was.
17   Q. Okay. You don't remember the flight
18  attendant who was being reported?
19   A. No.
20   Q. Okay. Do you remember when that was?
21   A. No, I don't. Two to three years ago.
22   Q. Okay. Do you know if Brian Talbert ever
23  reported another flight attendant for a violation
24  of one of Southwest's policies?
25   A. I believe he did, yes.

Page 101

1    Q. Okay. And who did he report?
2    A. I don't remember.
3    Q. Do you remember what policy he reported
4  the -- being violated?
5    A. I believe it was the social media policy.
6    Q. Okay. And do you remember when it was?
7    A. No.
8    Q. All right. Let's see. If I could mark as
9  the next exhibit Document 26. I think it's Exhibit
10  18.
11       (Exhibit 18 marked.)
12    Q. (By Mr. Gilliam) And, Ms. Emlet, if you
13  could review this. And once you have had the
14  chance to review it, let me know.
15    A. You say it's Document 18 or Exhibit 18?
16    Q. It -- it will be your Document 26.
17    A. I don't -- I don't think I have -- let's
18  see. Oh, wait. Let's scroll down some more. More
19  attachments. Okay.
20    Q. And -- and once you find it, review it.
21  And once you have had the chance to review it, just
22  let me know.
23    A. Okay.
24    Q. All right. And what is it? I am sorry.
25  Do you recognize it?

Page 102

1    A. Yes.
2    Q. And what is it?
3    A. It's an email thread that, I believe,
4  originated with Brian Talbert alleging that
5  different flight attendants had violated the social
6  media policy. And then there's a spreadsheet
7  that, I think, Julie O'Grady put together with
8  names of flight attendants who needed to be
9  contacted and addressed regarding the posts.
10    Q. Okay. And who is Julie O'Grady?
11    A. She was one of the -- or is one of the
12  senior investigators with employee relations.
13    Q. Okay. All right. And the -- the chart
14  you referred to -- or I am not sure which word you
15  used, but is -- is that on -- are you talking about
16  the one on 6351 through 6354?
17    A. Yes.
18    Q. Okay. And there is a column that says
19  time and -- well -- well, I guess, hold up on -- on
20  that a little bit. I guess, going -- going back --
21  I am sorry. Going back to 5680, the first page.
22    A. Okay.
23    Q. And there is an email from Julie O'Grady
24  to -- to you and Melissa Burdine and a few others.
25  Do you know if this was the first you -- you would

Page 103

1  have been aware of Mr. Talbert's report?
2    A. It appears that that would be the case,
3  yes.
4    Q. Okay. All right. Now, I guess, another
5  question I have is: Who -- who are these other
6  people? Who is Melissa Burdine?
7    A. Melissa Burdine was another labor
8  relations manager.
9    Q. Okay. And she did what you did?
10    A. That's correct.
11    Q. Okay. And who is Carolene Goulbourne?
12    A. Carolene, at that time -- I -- she is
13  currently the base manager in Oakland. And I think
14  that she was at the time of this email as well.
15    Q. Okay. Do you know why she would be
16  involved?
17    A. I know that she did some work in Phoenix.
18  I think that they were without a base manager for a
19  while, and Carolene may have been out there
20  assisting.
21    Q. Okay. And who is Toni Hamilton?
22    A. She was the manager of employee relations.
23    Q. Okay. And, I am sorry, Deborah Edwards?
24    A. Well, at the time of this email, I am not
25  sure if Deborah was the Phoenix-based manager; I

Page 104

1  think that she was. She has transitioned to a
2  different position since then.
3    Q. Okay. And what did you do with this
4  information when you received it?
5    A. I -- I don't remember.
6    Q. Okay. And on the -- the next page, if you
7  could look at the next page, 5681.
8    A. Yes.
9    Q. Okay. And you sent an email to -- to
10  Tammy Shaffer and copied Brianna Grant and -- I --
11  well, here, it says, I think he's going through all
12  of his archive files and digging up everything he
13  can.
14       What was he trying to obtain?
15       MR. CORRELL: Objection. Calls for
16  speculation.
17       MR. GILLIAM: I will ask it again.
18    Q. (By Mr. Gilliam) Do you know what he was
19  trying to obtain?
20    A. No.
21    Q. Okay. And then it says, ER is working
22  with the bases and Brian.
23       And, I guess, do you know what
24  employee relations was -- was working with the
25  bases and Brian on?

Page 105

1    A. Well, Brian Talbert had brought forward a
2  whole list of alleged social media violations. And
3  so he -- and he brought his allegations to the
4  employee relations team. So the -- employee
5  relations, Brian and the base leader were working
6  together to go through each of the allegations.
7    Q. Okay. And then moving to the next email,
8  next page, 4483.
9    A. Yes.
10   Q. And Julie O'Grady sends you an email,
11 along with several other persons. And it looks
12 like you -- you forward the email; is that -- I --
13 I guess, do you know when Julie sent you that
14 email?
15   A. Well, not unless the date stamp is on
16 here, but I don't see a date stamp on this email.
17   Q. Okay. Yeah, I didn't either. And Julie
18 says, after doing some additional research on the
19 information Brian forwarded us -- to us on
20 Wednesday, I did not see any additional information
21 to investigate from an employee relations
22 standpoint. And I found that some of the posts
23 were previously brought forward to the company and
24 addressed.
25          And then, I -- I guess, you forward it

Page 106

1  to a group of people and say, I am not sure how
2  this will influence your investigation.
3          What -- what investigation were you
4  referring to?
5    A. I believe it was the investigation of the
6  -- the social media violation allegations on all of
7  the flight attendants that were listed in the chart
8  on this email thread.
9    Q. Okay. And who -- who are those people
10 that you are sending it to?
11   A. Some of them were base managers and some
12 of them were assistant base managers. And they
13 were working at the bases of the flight attendants
14 who had been accused of violating the policy.
15   Q. Okay. And which -- I guess, from
16 reviewing the information here, which -- which
17 bases were they from?
18   A. Well, I hope I remember. I think at the
19 time, Joe was in Chicago. Brinkley Flanigan was
20 Baltimore. Danielle Santiago was Baltimore. Brian
21 Ridgeway, I believe, at this time, was senior
22 manager over the Eastern region bases. Carolene
23 Goulbourne was the manager in Oakland. Brett and
24 Keith were assistant base managers in Oakland. And
25 Dave Kissman was the senior manager over the

Page 107

1  Western region of flight attendant bases.
2    Q. Okay. All right. Do you remember having
3  any phone conversations with them about their
4  investigations?
5    A. I don't remember.
6    Q. Okay. And let's see. Going back to 6351.
7    A. Yes.
8    Q. Now, I guess, Julie O'Grady, in her email,
9  says, after review of the attached information,
10 below are the names of the flight attendants, the
11 time and date of their comments in 2014; and the
12 comment they made on social media could be
13 perceived as retaliatory in nature.
14          And I think she goes on to say,
15 reposting messages related to the protected
16 categories that are derogatory, negative or sexual
17 in nature could be a violations (sic) of the
18 company policy concerning harassment, sexual
19 harassment, discrimination and retaliation.
20          Now, do you -- do you know if there
21 was actually a final determination that it -- it
22 these posts that are listed in this table did
23 violate that policy?
24          MR. CORRELL: Objection.
25 Mischaracterizes the exhibit. You can answer as

Page 108

1  you are able, Ms. Emlet.
2    A. I don't know who or if anybody received
3  discipline as a result of -- of these
4  investigations.
5    Q. (By Mr. Gilliam) Okay. And do you know
6  if -- if any of these posts were deemed to violate
7  one of Southwest's policies?
8    A. I don't know.
9    Q. Okay. Do you know who reached the -- I
10 guess, the -- the decision on whether to issue
11 discipline for these cases?
12   A. Each of the decisions would have been made
13 separately by the base leader where that flight
14 attendant was domiciled.
15   Q. Okay. And -- that exhibit -- okay. Now,
16 were you involved in -- or I am sorry.
17          Were you aware of any cases where
18 flight attendants were reported for their social
19 media activities during a union campaign?
20   A. I -- I don't know. I don't remember.
21   Q. Okay. And are you aware if anyone --
22 well, I guess, first of all, do you know who Greg
23 Hofer is?
24   A. Yes.
25   Q. And who is Greg Hofer?

Page 109

1    A. I -- I don't know if he is still with the
2 company, but when I retired, he was a flight
3 attendant based out of Oakland.
4    Q. Okay. Do you know -- or I am sorry.
5       Are you aware if anyone ever reported
6 Greg Hofer for Facebook posts he made?
7    A. Yes.
8    Q. Okay. And what -- what do you remember
9 about Greg Hofer being reported for Facebook posts?
10    A. I don't remember any details about what
11 was posted or what the allegations were, but I do
12 know that he was reported to have allegedly
13 violated the social media policy.
14    Q. Okay. Do you know who reported him?
15    A. I don't remember.
16    Q. Okay. If I could mark as Exhibit 19,
17 Document 23. Ms. Emlet, if you want to turn to
18 that.
19       (Exhibit 19 marked.)
20    Q. (By Mr. Gilliam) And take an opportunity
21 to review it. And once you have had a chance to
22 review it, I will ask some questions.
23    A. Okay.
24    Q. All right. Do you recognize this?
25    A. I don't remember it, but I -- I recognize

Page 110

1 the format.
2    Q. Okay. Do you know what it is?
3    A. Yes. It -- it looks like it's an email
4 from me.
5    Q. Okay. And you -- I think you -- you sent
6 it to Brianna Grant. And it says, I couldn't find
7 much with Greg's name on it, but I am happy to keep
8 looking if you like.
9       Do you recall what she had asked you
10 to look for?
11    A. No.
12    Q. Okay. And, I -- I guess, the Greg
13 mentioned here, that -- is that Greg Hofer?
14    A. Yes.
15    Q. Okay. Okay. And what did Brianna, I
16 guess, say to you when, I guess, you emailed and
17 asked for -- asked if you want to dig deep -- if
18 she wanted you to dig deeper?
19    A. I have no idea.
20    Q. Okay. Do you know if she responded to
21 you?
22    A. I -- I don't know.
23    Q. Okay. And you say you did take
24 screenshots of his most recent posts. Do you
25 remember being out on his Facebook page looking for

Page 111

1 posts?
2    A. I don't remember doing that, but it's --
3 it says in the email that I did.
4    Q. Uh-huh. And you -- you also say, I think
5 there is an interesting pattern of trying to milk
6 the company for money.
7       What -- what are you referring to when
8 -- when you mention that pattern of --
9    A. I --
10    Q. -- milking the company?
11    A. I don't remember.
12    Q. Okay. Let's see. If -- at -- let's see.
13 6346, still part of this document.
14    A. Okay. My last number is cut off, so can
15 you tell me what is at the top of the page that you
16 are referencing?
17    Q. It looks like a screenshot of a post. It
18 has Greg Hofer's name on it and then it has a
19 picture of a plane and a clock.
20    A. Okay. Okay. I have it.
21    Q. Okay. And did you read it?
22    A. Yes.
23    Q. Okay. Is -- could this be what you were
24 referring to when you said there is a pattern of
25 trying to milk the company for money?

Page 112

1       MR. CORRELL: Objection. Calls for
2 speculation. You can answer as you are able,
3 Ms. Emlet.
4    A. I -- I don't see anything here that would
5 suggest he was trying to milk the company for
6 money.
7    Q. (By Mr. Gilliam) Okay. All right. And
8 then if you could -- have you turn to 6345.
9    A. Yes.
10    Q. Okay. And you care to review those
11 messages?
12    A. Yes.
13    Q. And is this the post you were referring to
14 or are these the posts you were referring to when
15 you said there is an interesting pattern of trying
16 to topple the union?
17    A. I don't remember what I was referring to
18 in that email.
19    Q. Okay. All right. Now, the -- these
20 Facebook posts -- well, let me ask it this way:
21 The documents numbered 6323 to 6350, were those
22 attachments to this email you sent to Brianna?
23    A. I can't tell for sure whether they were or
24 not because at the top of the email, it says that
25 there are attachments, but I don't know if the --

Page 113

1  the screenshots that are here are the same as the
2  attachments in that heading.
3      Q. Okay. Do you know if you -- if you
4  collected and produced this south -- I'm sorry --
5  produced -- let me start over.
6          Do you know if you collected and
7  produced this information in response to
8  Ms. Carter's discovery requests?
9      A. I have no idea.
10     Q. Okay.
11     A. The discovery request for this hearing?
12     Q. This case, yes, ma'am.
13     A. I was not involved in that at all.
14     Q. Okay. Did you not collect or produce any
15  information for Ms. Carter's discovery request?
16     A. On this lawsuit?
17     Q. In this case.
18     A. No, I am -- I am not -- I don't even have
19  access to that information anymore.
20     Q. All right. Okay. And do you
21  remember anything about the issue or question that
22  Brianna Grant had originally emailed you about?
23     A. No.
24     Q. Okay. All right. Now, are you aware of
25  whether Jeanna Jackson has ever reported any social

Page 114

1  media violations?
2      A. I believe she has.
3      Q. Okay. And what do you remember about
4  social media violations that she's reported?
5      A. Nothing. I don't -- I don't remember what
6  she reported.
7      Q. Okay. Let's see. I could mark Document
8  24 as Exhibit 20.
9          (Exhibit 20 marked.)
10     Q. (By Mr. Gilliam)  And, Ms. Emlet, if you
11  could review all of the pages in that document and
12  let me know once you have had the chance to review
13  all of those pages.
14     A. Okay.
15     Q. All right. Do you recognize this?
16     A. I don't remember it.
17     Q. Do you know what it is?
18     A. Well, it's -- looks like it's an email
19  from me to my leaders regarding possible social
20  media violations for Jeanna Jackson. It looks like
21  it was just an FYI email and that I forwarded it on
22  -- information that I received from the base.
23     Q. Okay. Do you know if the, I guess, two or
24  three pages that follow, are those what you
25  forwarded?

Page 115

1      A. I have no idea.
2      Q. Okay. Or do you know if those were the
3  attachments to this document?
4      A. I -- yeah, I -- I don't know. I don't
5  even -- I don't know if those were the attachments.
6      Q. Okay. Do you remember talking to Tammy
7  Shaffer -- well, do you remember talking to Tammy
8  Shaffer about either this email or the attachment
9  -- or I am sorry.
10         Do you remember talking to Tammy
11  Shaffer about this email or the screenshots?
12     A. I don't remember.
13     Q. Okay. Do you remember having any
14  conversations about this email or the attachments
15  with Mike Sims?
16     A. No.
17     Q. Okay. No, you didn't; or, no, you don't
18  remember?
19     A. I don't remember.
20     Q. Okay. And who is Tammi Feuling?
21     A. She is the Dallas base manager.
22     Q. Okay. And in her email to you, the one at
23  4:38 p.m., she says, I want to make sure these get
24  to the proper bases for follow-up.
25         So was your understanding that she

Page 116

1  wanted you to send this to base managers?
2      A. No. I think that she was just informing
3  me that she was forwarding the information to the
4  appropriate base leaders.
5      Q. Okay. And do you know which base leaders
6  she's referring to?
7      A. No, I don't know which bases were
8  involved.
9      Q. Okay. Okay. And do you know why she sent
10  it to you; just as an FYI?
11     A. I think so.
12     Q. Okay. And she says, this is one of many
13  coming your way.
14         I guess, one of many what; do you
15  know?
16     A. I don't remember.
17     Q. Okay. Do you know -- do you remember if
18  you ever communicated with Jeanna Jackson about
19  this email?
20     A. I do not believe I -- I don't remember
21  ever handling any of Jeanna Jackson's cases -- and
22  I -- so I would not have communicated with her.
23     Q. Okay. Do you know who Alexandria Jeffers
24  is?
25     A. No.

Page 117

1      Q.  Okay.  And do you know if anyone was ever
2  disciplined for this report?
3      A.  I don't know.
4      Q.  Okay.  And let's see.  If I could direct
5  you -- I think my page is maybe cut off as well,
6  but the -- the third page in this series; it's one
7  of the screenshots, I guess, or one of the
8  pictures.
9      A.  Okay.
10     Q.  And then towards the very bottom, it says,
11 as far as my involvement with 556.
12         Do you see where I am referring to?
13     A.  Yes.
14     Q.  Okay.  And then it says, I attended a
15 conference for human tra- -- trafficking and helped
16 implement the human trafficking recurrent training
17 module.
18         Do you know what that is, the human
19 trafficking recurrent training module?
20     A.  I know a little bit about it.
21     Q.  And what is it?
22     A.  I thought that it was a program that was
23 company-wide to educate all of our employees -- but
24 specifically flight attendants -- of the signs to
25 look out for, the warning signs for human

Page 118

1  trafficking.  And then the resources to follow up
2  if you suspected human trafficking on the aircraft.
3      Q.  Okay.  And then she says, I served on the
4  DMT.
5          Do you know what the DMT is?
6      A.  No.
7      Q.  Okay.  And she says, I was a TA2 educator.
8          Do you know what a TA2 educator is?
9      A.  No.
10     Q.  Okay.  Now, do you know if purpose -- if
11 you -- well, strike that.  I will start again.
12         Do you know if you ever reviewed
13 social media posts by Dee Dee Merrick?
14     A.  That name does not sound familiar.
15     Q.  Okay.  Do you know the name Eslandra
16 Merrick?
17     A.  No.
18     Q.  Okay.  Let's see.  If I could mark as
19 Exhibit 21, Document 25.
20         (Exhibit 21 marked.)
21     Q.  (By Mr. Gilliam)  So, Ms. Emlet, if you
22 want to turn to Document 25.
23     A.  Is that an email?  It looks like an email
24 from me to employee relations?
25     Q.  Yes.  There is 624 -- oh, wait, you don't

Page 119

1  -- the numbers cut off for you at the bottom still?
2      A.  This one is.  And it's -- it doesn't --
3  it's -- it's already opened, so I don't know -- I
4  just wanted to verify that was the document you
5  meant.
6      Q.  Sure, sure.  Take a second to look it
7  over.  And once you have had the chance, let me
8  know.
9      A.  Okay.
10     Q.  Do you recognize this?
11     A.  Well, I don't remember it.
12     Q.  Do you know what it is?
13     A.  It's an email from me to the employee
14 relations team asking them to review fact-finding
15 notes and it looks like Facebook posts for Dee Dee
16 Merrick, to see if there -- if they felt that there
17 were any violations against any protected
18 categories.
19     Q.  Okay.  From what I understand earlier --
20 and please correct me if I am wrong -- you did not
21 produce any documents in response to Ms. Carter's
22 discovery requests, correct?
23     A.  That's correct.
24     Q.  Okay.  So you don't know whether those
25 fact-finding meeting notes -- these attachments

Page 120

1  that are referred to here in this email were
2  produced?
3      A.  I don't know.
4      Q.  Okay.  All right.  And -- and you don't
5  remember whether you received any responses to
6  this?
7      A.  I don't know.
8      Q.  Okay.  And you don't remember the case
9  either?
10     A.  I don't remember the case at all.
11     Q.  Okay.  And who is Brian Ridgeway?
12     A.  At the -- at the time, he was -- or I
13 think he still is -- the senior manager for half of
14 the inflight bases.
15     Q.  Do you know, was he senior manager for a
16 particular region?
17     A.  Yes.  And he was the senior manager for
18 Graham Vandergrift.
19     Q.  And we've gone through so many names, so I
20 think you told me.  Did you tell me that he was
21 senior manager for East Coast?
22     A.  Well, when I was there, he was.  I don't
23 know if that's been changed.
24     Q.  Yeah.  And I -- I did mean at this time,
25 in 2017.

Page 121

1    A.  Yes.
2    Q.  Okay.  All right.  Now, did you ever
3  review any harassment complaints made by Bill
4  Holcomb?
5    A.  I believe I did.
6    Q.  And what were those harassment
7  complaints about?
8    A.  I -- I don't remember.
9    Q.  Okay.  Do you remember when -- when you
10 might have been involved in reviewing those
11 complaints?
12   A.  No.
13   Q.  Okay.  If I can mark as Exhibit 22,
14 Document 27.
15       (Exhibit 22 marked.)
16   Q.  (By Mr. Gilliam)  Ms. Emlet, if you want
17 to take a look at Document 27 and review all the
18 pages.  Once you have had a chance to take a look,
19 let me know.
20   A.  Okay.
21   Q.  And do you recognize this?
22   A.  I believe so, yes.
23   Q.  Okay.  And what is it?
24   A.  This appears to be an email thread started
25 by Bill Holcomb.  He sent the original email to

Page 122

1  Naomi Hudson.  And then it's a series of emails
2  discussing allegations that Bill brought forward
3  against other flight attendants.
4    Q.  Okay.  And is she sending this information
5  to you for an investigation?
6    A.  I believe so, yes.
7    Q.  Okay.  And do you recall whether you had
8  an existing investigation when you received this?
9    A.  An existing investigation on this?
10   Q.  Well, into any other matter involving
11 flight attendants.
12   A.  I -- my whole job was investigating flight
13 attendants.
14   Q.  Well, and I am sorry.  I will try to ask
15 this in a better way.  Did you have another
16 investigation that you were currently working on
17 when you received this email that this information
18 was relevant to?
19   A.  I don't remember.
20   Q.  Okay.  Or was she sending this to you for
21 you to take part in this investigation?
22   A.  It would have been to take part in this
23 specific investigation, but it -- it looks to me
24 like I was not the primary on this case.
25   Q.  And what does that mean, the primary?

Page 123

1    A.  The labor manager who was doing the
2  investigating.
3    Q.  Okay.  Let's see.  And why -- why do you
4  think that?
5    A.  Because it appears that these emails were
6  addressed to Bryan Smith, who, at the time, was --
7  had the same job I had.  And then I was CC'd on
8  them.
9    Q.  Okay.  You are -- you are talking about
10 5138 and the ones that follow?
11   A.  Yes.
12   Q.  Okay.  Now, in 5198, she sends it directly
13 to you, though, the -- the very first page.
14   A.  Uh-huh.
15   Q.  And --
16   A.  I don't know why that would be unless she
17 didn't realize that Brian was already working on
18 it.
19   Q.  Okay.  And the very top email says from
20 Maureen to Maureen.  Did -- did you email it to the
21 same inbox or did you email it to a different email
22 address you have?
23   A.  I have no idea.  I might have accidentally
24 deleted it and sent it back to myself; I don't
25 know.

Page 124

1    Q.  Okay.  All right.  Now, another question:
2  Do you know any flight attendants that supported
3  the recall?
4    A.  I know there were flight attendants who
5  supported it.  I don't know their names.
6    Q.  Okay.  You don't know which flight
7  attendants supported the recall?
8        MR. CORRELL:  Objection.  Asked and
9  answered.
10   A.  I know -- I believe Jeanna Jackson
11 supported the recall.  Other than that, I don't
12 know any specific names.
13   Q.  (By Mr. Gilliam)  Okay.  Did you ever see
14 the recall petition?
15   A.  No.
16   Q.  Okay.  Now, did you ever discuss Charlene
17 Carter's termination with Suzanne Stephensen?
18   A.  I don't believe so.
19   Q.  Okay.  How about Meggan Jones?
20   A.  It's possible, since she was involved in
21 the -- I believe she was involved in the
22 fact-finding meeting.
23   Q.  Okay.  Do you know what communications you
24 might have had with Meggan Jones about --
25   A.  No.

Page 125

1  Q. Okay.
2  **A. Sorry.**
3  Q. And did you ever have any discussions
4  about Charlene Carter's termination with Dave
5  Kissman or Mike Sims?
6  **A. I don't remember whether I did or not. I**
7  **just -- I don't remember.**
8  Q. Okay. Do you remember if you ever had any
9  discussions about Charlene Carter's termination
10 with Sonya Lacore or Naomi Hudson?
11 **A. I did not talk with Sonya Lacore. I don't**
12 **believe I spoke to Naomi Hudson.**
13 Q. Okay. Did you ever have any
14 communications with anyone about Charlene Carter's
15 Step 2 proceedings?
16 **A. I don't remember if I discussed it with**
17 **anyone. I was not at the Step 2.**
18 Q. Okay. You didn't have any involvement in
19 the Step 2 proceedings?
20 **A. Not that I remember, no.**
21 Q. Do you know if anyone besides Audrey Stone
22 complained about Charlene Carter's Facebook posts
23 or messages?
24 **A. I don't know.**
25 Q. Okay. And at any point prior to your

Page 126

1  retirement, did you know how many recall supporters
2  had been disciplined for a policy violation?
3  **A. No.**
4  MR. CORRELL: Objection. Calls for
5  speculation. You can answer, Ms. Emlet.
6  **A. I do not know.**
7  Q. (By Mr. Gilliam) Okay. Let's see.
8  MR. GILLIAM: I think I'd like to take
9  a short 10-minute break and then I might be done
10 after that.
11 MR. CORRELL: Very good.
12 MR. GILLIAM: Okay.
13 THE VIDEOGRAPHER: We are off record
14 at 1:55 p.m.
15 (Recess taken.)
16 THE VIDEOGRAPHER: We are back on
17 record at 2:08 p.m.
18 MR. GILLIAM: I am done with my
19 questions, but, as with prior days, we would
20 reserve the right to reopen the deposition in the
21 event that we would seek to conduct any follow-up
22 discovery.
23 MR. CORRELL: And -- oh, go ahead.
24 Sorry.
25 MR. GILLIAM: I was going to say,

Page 127

1  otherwise, I pass the witness.
2  MR. CORRELL: And Southwest renews its
3  prior responses to those objections, and adds that
4  Ms. Emlet is a non-party witness subject to
5  subpoena, and Southwest reserves the right to move
6  and quash any subsequent subpoenas served on
7  Ms. Emlet.
8  EXAMINATION
9  BY MR. CORRELL:
10 Q. Ms. Emlet, before we finish today, I have
11 just a couple of questions for you. First, do you
12 understand that a part of Ms. Carter's claim
13 concerns her contention that she was treated less
14 favorably because she was a union objector?
15 **A. Yes.**
16 Q. Do you personally have any bias or animus
17 against individuals who are union objectors?
18 **A. No.**
19 Q. Did you observe anything in Ms. Carter's
20 termination process that led you to believe that
21 her union objector status played any role in her
22 termination?
23 **A. No.**
24 Q. You also understand that Ms. Carter is
25 alleging that she was terminated because of her

Page 128

1  religiously motivated pro-life views?
2  **A. Yes.**
3  Q. Do you personally have a position on the
4  issue of abortion as between pro-life and
5  pro-choice?
6  **A. Yes.**
7  Q. What is your position?
8  **A. I am pro-life.**
9  Q. Did you see anything in the course of the
10 termination that led you to believe that
11 Ms. Carter's termination was occasioned by the fact
12 that she harbors religiously motivated pro-life
13 beliefs?
14 **A. No.**
15 Q. Do you have any personal bias or animus
16 against individuals who have pro-life beliefs?
17 **A. No.**
18 Q. Do you have any bias or animus against
19 individuals based on their Christian faith?
20 **A. No.**
21 MR. CORRELL: I have no further
22 questions for you, Ms. Emlet. I pass the witness.
23 MR. GREENFIELD: Ms. Emlet, you
24 haven't heard much from me today. This is Adam
25 Greenfield from defendants TWU Local 556. And I

## Page 129

1  will reserve any questions for the time of trial.
2  You are done for the day, ma'am.
3          THE WITNESS:  Thank you.
4          THE VIDEOGRAPHER:  We are off -- we
5  are off record at 2:10 p.m.  End of deposition.
6  End of media.
7          THE REPORTER:  And, Mr. Correll, you
8  want me to send you the original for reading and
9  signing?
10          MR. CORRELL:  Yes, ma'am.  I will
11  route that to the witness.
12          (End of Proceedings, 2:10 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 130

1          CHANGES AND SIGNATURE
2  WITNESS NAME:  MAUREEN EMLET
3  DATE OF DEPOSITION:  NOVEMBER 5, 2020
4  PAGE     LINE     CHANGE     REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

## Page 131

1          I, MAUREEN EMLET, have read the foregoing
   deposition and hereby affix my signature that same
2  is true and correct, except as noted above.
3
4
5          _____
           MAUREEN EMLET
6
7  THE STATE OF _____
   COUNTY OF _____
8
9  Before me, _____, on this day
   personally appeared MAUREEN EMLET, known to me (or
10  proved to me under oath or through _____) to
   be the person whose name is subscribed to the
11  foregoing instrument and acknowledged to me that
   they executed the same for the purposes and
12  consideration therein expressed.
13
14  Given under my hand and seal of office this _____
   day of _____, 2020.
15
16
17  _____
   NOTARY PUBLIC IN AND FOR THE
18  STATE OF _____
19
20  MY COMMISSION EXPIRES:_____
21
22
23
24
25

## Page 132

1          REPORTER'S CERTIFICATION
2  IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF TEXAS
3          DALLAS DIVISION
4  CHARLENE CARTER          )
                            )
5                          ) CIVIL ACTION NO.
   VS.              ) 3:17-CV-02278-X
6                          )
   SOUTHWEST AIRLINES CO., AND )
7  TRANSPORT WORKERS UNION OF )
   AMERICA, LOCAL 556          )
8
9  ----------------------------------
          CONFIDENTIAL
10  DEPOSITION OF MAUREEN EMLET
       NOVEMBER 5, 2020
11     (REPORTED REMOTELY)
   ----------------------------------
12
13          I, CHARIS M. HENDRICK, Certified Shorthand
14  Reporter in and for the State of Texas, do hereby
15  certify to the following:
16          That the witness, MAUREEN EMLET, was by me
17  duly sworn and that the transcript of the oral
18  deposition is a true record of the testimony given
19  by the witness.
20          I further certify that pursuant to Federal
21  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
22  as well as Rule 30(e)(2), that review of the
23  transcript and signature of the deponent:
24  __xx__ was requested by the deponent and/or a
25  party before completion of the deposition.

Page 133

1      _____ was not requested by the deponent and/or
2   a party before the completion of the deposition.
3      I further certify that I am neither
4   attorney  nor counsel for, nor related to or
5   employed by any of the parties to the action in
6   which this deposition is taken and further that I
7   am not a relative or employee of any attorney of
8   record in this cause, nor am I financially or
9   otherwise interested in the outcome of the action.
10      The amount of time used by each party at
11   the deposition is as follows:
12      Mr. Gilliam - 3:42 hours/minutes
13      Mr. Correll - 2 minutes
14
15      Subscribed and sworn to on this 12th day
16   of November, 2020.
17
18
19   _Charis M Hendrick_____
     CHARIS M. HENDRICK, CSR # 3469
20   Certification Expires: 10-31-21
     Bradford Court Reporting, LLC
21   7015 Mumford Street
     Dallas, Texas  75252
22   Telephone 972-931-2799
     Facsimile 972-931-1199
23   Firm Registration No. 38
24
25

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

**A**

**A-l-l-e-n** 100:12
**a.m** 1:19 31:6,9
  42:4,7 74:23
  75:1
**abide** 29:24
**able** 18:8 19:19
  55:11 108:1
  112:2
**abortion** 69:2
  78:19 79:2
  128:4
**above-styled**
  1:18
**accepted** 7:2
**access** 55:7,11
  55:18 81:21
  113:19
**accidentally**
  123:23
**accommodation**
  18:5 20:22
  22:11 25:2
  69:15,19
**accommodati...**
  17:7,8,24
**accusation**
  98:17
**accusations** 79:1
**accused** 36:12
  96:4 97:5,14
  97:21 98:11,12
  98:14 106:14
**accusing** 78:25
**acknowledge**
  29:24
**acknowledged**
  131:11
**act** 9:15,19,20
  17:2,17 19:7,8
  20:1,9,12 21:6
  21:16 23:25
  24:3 69:11,13
**action** 1:3 54:20
  132:5 133:5,9
**activities** 108:19

**actual** 35:8
  53:19 64:3
**Adam** 2:14 5:25
  128:24
**add** 74:4
**additional** 59:20
  61:6 105:18,20
**address** 123:22
**addressed** 16:3
  28:22 88:3
  102:9 105:24
  123:6
**adds** 127:3
**adjustment**
  92:23
**administering**
  5:14
**advise** 37:7
  44:13
**affix** 131:1
**afterward** 76:25
**ago** 64:4 91:13
  92:2 100:21
**agree** 77:6
**agreed** 5:11
  29:24 45:12
  71:2 77:3
**agreement**
  11:14 13:25
  20:16,24 21:3
  42:9 43:6 72:1
  85:9 92:5,8,15
  92:17,25 93:4
  93:11,13 94:1
  94:2,13 95:8
**agreenfield@c...**
  2:16
**ahead** 30:12
  67:19 98:8
  126:23
**aircraft** 118:2
**Airlines** 1:5 2:7
  5:24 6:10 7:10
  8:9,11,12 9:11
  9:23,24 40:5
  43:12,16 49:13

**84:1** 132:6
**airplane** 61:25
**alert** 21:23
**Alexandria**
  116:23
**allegation** 14:7
**allegations** 41:1
  54:9 61:8
  105:3,6 106:6
  109:11 122:2
**alleged** 36:4
  65:21 105:2
**allegedly** 109:12
**alleging** 102:4
  127:25
**Allen** 100:12,14
**amendable**
  43:17 44:1,2
**America** 1:6
  2:13 6:11 9:10
  11:3 132:7
**amount** 12:7
  133:10
**analysis** 37:15
**and/or** 132:24
  133:1
**animus** 127:16
  128:15,18
**Ann** 50:25 81:14
**Ann's** 51:4
**annually** 29:23
**anonymous**
  99:12,20
**answer** 7:8
  19:12,18 45:17
  73:25 77:8
  107:25 112:2
  126:5
**answered** 34:15
  71:22 124:9
**answering** 21:22
**ANSWERS** 1:16
**anybody** 12:22
  73:21 108:2
**anymore** 55:19
  88:8 113:19

**apart** 16:5 36:2
  46:16 50:2
  53:14
**apologize** 22:24
**appearances** 3:2
  5:19
**appeared** 131:9
**appears** 103:2
  121:24 123:5
**application**
  44:24 45:3
**applied** 13:15,18
  13:22 14:4
  36:17 41:17
  45:24 46:5
**apply** 15:25
**applying** 21:21
  37:25 38:1
  46:18
**approached**
  18:10
**appropriate**
  116:4
**arbitration**
  31:20 32:4,11
  32:21 67:16
  90:10 92:24
**archive** 15:20
  40:7 104:12
**archives** 40:5
**area** 25:4
**areas** 16:2 37:19
  65:7
**ARMSTRONG**
  2:20
**ascertain** 15:18
**asked** 19:10
  34:14 64:6
  71:21 99:12
  110:9,17,17
  124:8
**asking** 72:21
  73:25 119:14
**assert** 8:10
**assessment** 39:7
  77:4

**assist** 17:17
  49:19
**assistant** 106:12
  106:24
**assisting** 103:20
**attached** 1:25
  48:21 107:9
**attaching** 80:23
**attachment**
  115:8
**attachments**
  48:14 81:3
  101:19 112:22
  112:25 113:2
  115:3,5,14
  119:25
**attend** 67:3
**attendance** 7:15
**attendant** 10:17
  10:19 14:14
  15:5,9 16:20
  17:9,15,16
  18:4,14,17
  19:2 20:23
  21:15 22:6
  23:10,15 26:5
  36:13 50:9
  90:16 92:21,22
  98:4 99:2
  100:18,23
  107:1 108:14
  109:3
**attendant's**
  15:16 21:4
**attendants**
  11:18 12:6,16
  12:18 14:24
  15:2 17:14
  18:7,9 19:4
  26:9,12 27:1
  27:25 33:15,17
  62:23 92:9
  93:12 102:5,8
  106:7,13
  107:10 108:18
  117:24 122:3

Page 135

122:11,13
124:2,4,7
**attendants'**
46:20
**attended** 46:11
117:14
**attention** 46:24
48:6 68:16
72:5 87:8
**attorney** 8:18
133:4,7
**attorneys** 58:11
**audio** 12:20,23
**Audrey** 3:13
59:21,22,23
60:18 61:9
62:18 77:25
78:13,16 79:9
99:1 125:21
**Audrey's** 60:1
**Aurora** 1:22
5:10
**authored** 30:3,7
**aware** 86:11,14
86:16,19 98:10
103:1 108:17
108:21 109:5
113:24

──────── **B** ────────

**B** 2:3 5:21
132:21
**back** 22:19 23:4
24:22 31:8
42:2,6 61:1
62:4,5 63:20
70:7 72:5,7
74:8,25 91:21
94:1 95:25
102:20,21
107:6 123:24
126:16
**bad** 12:12
**Baltimore**
106:20,20
**bargaining**
11:14,19 13:25

20:16,24 21:3
42:9 72:1
**Barnett** 76:5
**base** 10:15 13:13
14:20 15:15,18
15:24 16:4
21:10,12,17
22:3 36:12,14
37:7,18,23
38:5,7,9 39:10
40:11 51:10,12
52:19,20 55:1
56:12,13 65:12
65:15 66:3,22
85:4,6 103:13
103:18 105:5
106:11,12,24
108:13 114:22
115:21 116:1,4
116:5
**based** 35:3
36:13 69:15
71:10 109:3
128:19
**bases** 104:22,25
106:13,17,22
107:1 115:24
116:7 120:14
**basically** 92:12
**basis** 41:14,19
**bathroom** 74:13
74:20
**began** 27:4,9,11
43:23
**beginning** 63:15
**begun** 78:18
**behalf** 7:2 8:10
21:14 22:5
**beliefs** 18:15
79:2 128:13,16
**believe** 9:6
11:23 12:24
21:7,15,22
30:10 35:24
38:25 50:20
61:14,18 66:18

78:20 85:21
89:2,16 90:19
93:7,20,25
94:6,19,25
96:6 98:5
100:25 101:5
102:3 106:5,21
114:2 116:20
121:5,22 122:6
124:10,18,21
125:12 127:20
128:10
**believed** 37:22
46:2 79:1
**better** 122:15
**bias** 127:16
128:15,18
**bigger** 52:8
**Bill** 88:23 94:17
121:3,25 122:2
**bit** 17:3 22:25
27:15 44:23
61:1 69:3
98:24 102:20
117:20
**board** 28:14,16
92:23 98:5,24
**bottom** 52:1
76:9 117:10
119:1
**bound** 71:25
**box** 81:16
**Braddock** 2:4
**Bradford**
133:20
**Brandon** 90:13
90:14
**break** 6:13,14
41:25 74:13,15
74:20 95:13,14
95:24 126:9
**breaking** 95:11
**Brett** 98:1,3
106:23
**Brian** 88:22
100:22 102:4

104:22,25
105:1,5,19
106:20 120:11
123:17
**Brianna** 4:4
54:3 57:1,8,16
59:5,14 77:11
80:20 82:14
84:15 85:8
104:10 110:6
110:15 112:22
113:22
**Brianna's** 57:19
**bring** 21:17
46:24
**Brinkley** 106:19
**broad** 77:19
**brought** 21:13
22:5 24:7,20
47:2 78:16
93:25 105:1,3
105:23 122:2
**Bryan** 3:23
87:17 88:5
123:6
**bullying** 25:22
36:4,9 37:2,14
38:12,23 39:1
39:5 40:22
47:10,14 49:16
64:8 66:5,9,13
76:12 78:3,13
78:21 79:5
**bunch** 48:21
**Burdine** 102:24
103:6,7
**business** 16:24
36:22 37:1,21
38:4,7 66:6

──────── **C** ────────

**C** 2:1
**C-h-a-f-f-i-n**
51:5
**call** 21:23
**called** 12:14,18
53:9

**Calls** 7:6 41:8
54:11 104:15
112:1 126:4
**campaign**
108:19
**capable** 17:15
**capacity** 8:8
16:14
**car** 91:1,3
**care** 112:10
**career** 10:17
17:12,20
**Carolene** 103:11
103:12,19
106:22
**Carter** 1:3 2:19
5:2 6:9,10 9:9
24:9 49:24
61:24 67:5
70:1 71:20
75:4 76:8 79:1
83:24 85:16,19
86:1 93:3
127:24 132:4
**Carter's** 31:20
47:24 50:10
51:10 61:14,20
68:8 79:19
83:8 113:8,15
119:21 124:17
125:4,9,14,22
127:12,19
128:11
**carts** 28:21
**case** 6:9,12 9:5
15:19 19:21
20:11 47:20
52:25 54:6
56:18,21 64:5
64:12,22 65:4
65:6,13,16
66:8,11 69:21
71:1 75:15
77:13 78:15
83:12 85:12
87:20 88:4,11

Case 3:17-cv-02278-X   Document 263-2   Filed 06/13/22   Page 37 of 54   PageID 8744
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 136

90:9,13,17,23
91:10,14,20
92:23 93:4,23
94:18 96:11,18
96:21,25 97:2
97:8,9,20
98:10 99:5
100:16 103:2
113:12,17
120:8,10
122:24
cases 13:15
14:11 17:14
20:7,10 23:20
25:14 36:3
40:6,7 41:15
41:21 55:22
56:2,3,7,16
64:7,8,9,14
77:17,18,20,21
82:24 83:11
88:17,21,24,25
89:12 93:24
96:3,6,8 97:5
108:11,17
116:21
Casey 89:14
96:4,15,20
Casey's 96:6,8
categories
107:16 119:18
cause 1:19 133:8
CBA 22:11 23:9
43:13,22 44:3
44:25
CC 81:10 87:25
CC'd 87:14 88:2
123:7
Central 5:4
certain 15:24
35:18
certainly 79:2
Certificate 3:8
Certification
132:1 133:20
Certified 1:20

132:13
certify 132:15
132:20 133:3
Chaffin 51:5
81:14
chairs 46:10
chance 6:23
8:18 67:14
80:13 92:13,14
101:14,21
109:21 114:12
119:7 121:18
change 27:4
changed 47:6
82:22 120:23
CHANGERE...
130:4
changes 3:7
46:24 47:3
58:1 130:1
Charis 1:20 5:13
132:13 133:19
Charlene 1:3
2:19 5:22 6:9
47:23 51:10
67:4 68:20
69:2 70:1 76:8
77:24 78:12
124:16 125:4,9
125:14,22
132:4
Charlene's
52:20
chart 102:13
106:7
check 7:14
55:17
checking 26:17
Chicago 106:19
chosen 12:7
Chris 97:21
Christian 68:20
69:4 70:4
128:19
city 5:20
Civil 1:3,23 9:15

132:5,21
claim 127:12
claiming 9:14,17
85:25
claims 9:8
clarification
41:16
classified 75:7
clock 111:19
CLOUTMAN
2:14
Coast 120:21
coaster 35:23
collaborate
16:18,23
collaborated
20:1
colleague 87:18
88:6
collect 81:25
113:14
collected 113:4
113:6
collective 11:14
13:25 20:16,24
21:2 42:9 72:1
Colorado 1:22
5:11
coloring 84:11
column 102:18
come 14:19 51:6
55:10 61:16
coming 28:19
116:13
comment 107:12
comments 95:1
95:3 107:11
COMMISSION
131:20
committed
65:23
committee 46:14
common 62:22
65:5
communicate
22:8 38:3

communicated
116:18,22
communication
27:15 28:3
30:10 52:17
communicatio...
8:11 10:14
21:23 27:20,22
30:5 44:17
53:14 57:1
65:1 66:25
85:11 124:23
125:14
company 6:10
9:11 13:17
14:1,9 15:25
17:19 28:14,16
29:14 31:12,21
36:18 40:20,20
41:3 42:10,25
43:5,18 45:6
45:10,13 46:18
49:14 55:19
58:21 61:17
65:23 86:12,17
92:8 95:6
105:23 107:18
109:2 111:6,10
111:25 112:5
company's 41:4
73:13
company-wide
26:22 27:22
29:12 117:23
comparing
55:21
comparison
64:15
complained
50:10 125:22
complaint 9:4,7
9:9 15:15
23:16 25:14
53:13 60:2,23
61:3
complaints

23:21 24:7,14
24:17,19 26:19
26:24 27:13,17
34:21,24 121:3
121:7,11
completed 65:25
completion
132:25 133:2
compliance
23:11
components
82:19
concern 8:2
21:14 46:18
concerned 7:25
46:1
concerning 8:6
8:11 107:18
concerns 45:2
45:23 46:14
47:3 127:13
conclude 78:11
conclusion 7:7
78:1
conclusions 38:3
84:23
conduct 13:18
14:8 15:16,25
49:12,24 94:4
94:10,23,23
96:13 98:16
126:21
conducted 5:8
93:9
conducting 65:3
confer 8:18
conference
117:15
CONFIDENT...
1:9 132:9
Congratulatio...
9:25
Conlon 90:13
connected 61:21
connection 9:18
12:12,25

Case 3:17-cv-02278-X   Document 263-2   Filed 06/13/22   Page 38 of 54   PageID 8745
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 137

consensus 37:17
conservative
  68:21 70:5
consider 20:5
  69:11,14
consideration
  131:12
considered
  69:18 72:24
  79:4
considering 19:8
consistency
  37:25 39:8
consistent 8:5
  15:21 21:3
  22:11 23:8
  40:15,19 41:4
consistently
  13:19 36:17
  46:5
constituted
  96:14
consult 37:9
  40:21,23,24
  41:2
consulted 16:15
  20:12 21:7
  23:7
consulting 21:9
contact 14:20
  55:1
contacted 14:23
  15:2,5,11
  51:11,13 56:9
  56:12,18,20,24
  63:22 64:1
  102:9
contains 87:11
content 85:14
contention
  127:13
continue 68:18
continues 69:1
continuing
  33:13 76:9
contract 13:14

13:22,24 14:4
  14:8 42:16,22
  43:10,16,25
  44:6,9,11,14
  44:16
contractual
  41:17
conversation
  7:19 15:23
  64:4 66:21
  83:13
conversations
  45:8 46:4,7,21
  64:21 65:1,10
  85:14 107:3
  115:14
converted 18:4
convey 45:15
conveyed 45:19
copied 54:8 76:6
  82:16,19
  104:10
copies 29:2,10
copy 28:15 29:7
  72:20 84:3
corporate 8:6
correct 7:2 21:1
  31:18 44:23
  47:24 52:21
  53:25 57:21
  70:13 73:4,7
  99:21 103:10
  119:20,22,23
  131:2
correctly 13:15
  24:16 62:17
Correll 2:8 3:5
  5:23,23 7:1,4,6
  7:14,20 8:4
  12:24 19:11,13
  19:16 20:6
  21:20 23:18
  24:2 30:24
  32:7 34:14
  35:14 41:8
  42:1 44:12

48:16,20,25
  54:11 69:23
  71:21 74:12,16
  74:21 77:7
  78:4 87:10
  95:12,16
  104:15 107:24
  112:1 124:8
  126:4,11,23
  127:2,9 128:21
  129:7,10
  133:13
corresponded
  22:3
correspondence
  82:2,5,10
counsel 5:11,18
  7:19 16:14
  21:23 44:16
  74:12 133:4
country 28:21
County 5:16
  131:7
couple 18:1
  127:11
course 26:23
  60:4 61:7
  71:25 128:9
court 1:1 5:4,13
  12:8 23:3
  132:2 133:20
COVID-19 1:24
  5:9
crop 63:3
CSR 5:14
  133:19
current 1:23 5:8
  43:22
currently 43:14
  103:13 122:16
cut 111:14 117:5
  119:1

───────────
**D**
daily 41:14
Dallas 1:2 2:10
  2:15 5:24 6:1

115:21 132:3
  133:21
Danielle 106:20
database 40:8
date 5:3 31:17
  44:4 50:12
  57:25 71:9,12
  71:13 105:15
  105:16 107:11
  130:3
dates 31:17 35:3
  83:16
Dave 3:15
  106:25 125:4
day 129:2 131:9
  131:14 133:15
days 18:14,18,25
  126:19
deal 14:10 17:12
  17:23 26:4
deals 53:10
dealt 17:13 25:2
Deborah 103:23
  103:25
December 10:2
decide 92:16
decided 33:15
  68:24
decides 92:22
decision 16:4
  21:5 56:16
  64:11 70:1
  71:2,19,24
  72:2 75:3,16
  77:11 92:19
  93:1,3,6
  108:10
decisions 21:8
  25:5 108:12
decline 27:8,16
  30:17 35:9
declined 35:6
Dee 118:13,13
  119:15,15
deemed 108:6
deep 110:17

deeper 110:18
defendant 2:7
  2:12 5:24 6:1
defendants
  128:25
DEFENSE 2:3
definitely 84:12
definitively
  38:25
delay 22:25
deleted 123:24
Denise 52:22,24
  52:25 53:3,5
  70:13 72:25
  73:3 76:5
  80:21 81:5
  85:11
Denise's 73:3,9
department
  16:12,13,14
  20:15 21:8
  22:9 23:8
  28:18,19,20
  36:18 41:6
  44:8 45:21
  53:8 58:24
  82:25
departments
  16:6,16,19,22
  41:3
depend 65:13
depending
  65:21
depends 92:20
deponent 132:23
  132:24 133:1
deposed 8:25
deposition 1:9
  1:16 5:7,15 7:5
  7:15 21:25
  48:18 126:20
  129:5 130:3
  131:1 132:10
  132:18,25
  133:2,6,11
derogatory 95:1

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 138

95:2 107:16
**described** 13:5
88:10
**despicable** 62:14
**details** 90:22
93:22 109:10
**determination**
33:19 36:21
37:1,5,13
56:23 71:15
73:9 83:7,10
107:21
**determine** 36:15
65:20
**determined** 20:4
33:14 37:23
49:12
**determining**
38:2
**difference** 39:9
**different** 17:18
20:17 30:3,4
37:19 41:13,16
65:6 80:22
102:5 104:2
123:21
**dig** 110:17,18
**digging** 104:12
**direct** 32:2 48:6
49:13 51:17
54:5 57:16,19
65:6,12,15
66:8,11,17,19
67:10 72:5
79:22 87:8
91:5 117:4
**directed** 27:24
87:17
**directly** 14:24
15:2,5,8,12
22:3 38:4
82:12 89:3,6
123:12
**director** 57:7,10
57:13 58:10,18
58:23 59:1

90:14
**Disaster** 1:24
5:10
**disciplinary**
16:7 55:22
89:14,18,23
90:13
**discipline** 13:16
14:12,15,16
15:21 16:20
36:17 37:10,23
37:25 38:2
39:8 40:2,15
40:18 41:4
56:17 64:12
72:2 77:20
85:5 90:1,16
92:10 108:3,11
**disciplined**
93:18 117:2
126:2
**disciplines** 56:6
**disclose** 19:21
**discovered**
77:23
**discovery** 113:8
113:11,15
119:22 126:22
**discrimination**
9:14 23:16,21
23:25 24:7,12
24:19 73:14
107:19
**discuss** 14:21
41:14,19 47:10
55:2 77:16
83:12 124:16
**discussed** 15:8
18:11 47:5,14
64:9,13 66:11
66:16 70:25
77:10,15,18
125:16
**discussing** 122:2
**discussion** 56:15
64:18 75:18

85:8
**discussions** 7:25
14:14 47:12,16
47:21 84:15
125:3,9
**DISTRICT** 1:1
1:1 132:2,2
**DIVISION** 1:2
132:3
**DMT** 118:4,5
**document** 3:11
3:13,15,17,19
3:21,23 4:3,5,7
4:9,11 31:24
48:7,14 49:5
51:17,22 52:1
60:7 62:5,6,7
63:20 67:12,21
72:5,6 75:19
77:7 79:23,24
80:11 81:5
86:21,24 101:9
101:15,16
109:17 111:13
114:7,11 115:3
118:19,22
119:4 121:14
121:17
**documentation**
75:9
**documents**
48:18 52:9
53:1 55:19
68:4 112:21
119:21
**doing** 17:15 22:9
105:18 111:2
123:1
**domiciled**
108:14
**drafting** 49:19
**dressed** 73:15
**due** 18:14
**dues** 12:7
**duly** 6:3 132:17
**duties** 17:15,16

| | **E** |

**E** 2:1,1
**earlier** 88:13
119:19
**early** 74:16
**East** 120:21
**Eastern** 106:22
**Ed** 3:17,19
52:19 63:21
64:21 65:1
66:24 68:8,12
70:12,17,23
72:20 73:6
75:3 76:4
**Ed's** 74:3
**Edie** 76:5
**Edith** 76:5
**educate** 117:23
**educator** 118:7
118:8
**Edwards** 103:23
**effect** 42:10,14
43:14
**either** 47:10
50:24 56:21
82:9 105:17
115:8 120:9
**elected** 11:6
**electronic** 28:23
28:25
**Ellis** 5:16
**Elm** 2:15
**email** 3:13,15,17
3:19,21,23 4:2
4:4,6,8,10
28:13 48:13,17
51:20 52:11,17
52:19 53:15
56:25 59:19,20
60:16 70:9
71:9 72:25
73:3,4,17 74:6
76:4,18,23
77:22 80:19,21
81:3,13,15,21
82:7 87:3,12

88:7 102:3,23
103:14,24
104:9 105:7,10
105:12,14,16
106:8 107:8
110:3 111:3
112:18,22,24
114:18,21
115:8,11,14,22
116:19 118:23
118:23 119:13
120:1 121:24
121:25 122:17
123:19,20,21
123:21
**emailed** 31:24
70:12 110:16
113:22
**emails** 52:12
79:13,16 81:23
122:1 123:5
**emergency** 1:23
5:9
**Emlet** 1:10,16
3:3,17,19,21
3:23 4:3,4,6,8
4:10,10 5:7 6:2
6:6 7:22 8:7,17
19:13,17 21:21
22:24 31:10
32:7 42:8
44:13 48:16
74:17 75:2
77:8 80:10
86:23 95:19
96:2 101:12
108:1 109:17
112:3 114:10
118:21 121:16
126:5 127:4,7
127:10 128:22
128:23 130:2
131:1,5,9
132:10,16
**Emlet's** 8:12
**employed** 11:13

Case 3:17-cv-02278-X   Document 263-2   Filed 06/13/22   Page 40 of 54   PageID 8747
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 139

11:19 16:8,13
40:4 91:24
92:3 133:5
**employee** 4:8
16:25 19:9,9
20:2 24:11,13
24:17,21 29:23
37:11 39:11
40:24 53:7
79:12,15,20
86:12,17 92:17
99:6 102:12
103:22 104:24
105:4,4,21
118:24 119:13
133:7
**employees** 11:18
26:25 117:23
**employment**
9:19 47:24
**enforcement**
46:25 47:4
**engage** 39:10
94:4
**engaged** 94:23
**ensure** 13:14,17
15:20 37:24
41:3
**entailed** 20:21
**entire** 67:20
83:11
**entirely** 53:18
**envelope** 28:17
**ER** 104:21
**escalated** 30:7
**Eslandra** 118:15
**especially** 57:24
77:13
**evaluation** 21:1
22:10 69:21
**event** 126:21
**eventually** 63:22
**exact** 44:4 53:7
**exactly** 52:4
86:16 91:3
93:19

**Examination**
3:4,5 6:4 127:8
**excuse** 49:25
**executed** 131:11
**exercise** 9:20
**exhibit** 3:11,12
3:14,16,18,20
3:22 4:2,4,6,8
4:10 48:9
60:21 67:11
72:5 75:20
79:24 80:2,9
86:21,22 101:9
101:9,11,15
107:25 108:15
109:16,19
114:8,9 118:19
118:20 121:13
121:15
**EXHIBITS** 3:10
4:1
**existing** 122:8,9
**expect** 54:20
**experience**
23:13 41:1
**experts** 37:19
**Expires** 131:20
133:20
**express** 46:18
**expressed** 45:22
45:25 131:12
**expressing**
46:14
**extent** 21:21
44:21

————————
**F**
————————
**Facebook** 50:6
50:10,16 53:19
55:5,6,21
61:14 62:25
68:24 70:22
77:25 78:12,16
79:4,10,14,17
79:19 80:22
83:15 90:25
96:15 109:6,9

110:25 112:20
119:15 125:22
**Facsimile**
133:22
**fact** 55:8 128:11
**fact-fighting**
67:4
**fact-finding**
14:21 50:14,15
64:15,18,23
67:8,15 68:7,8
68:11 71:6
75:9 119:14,25
124:22
**faction** 62:18
**factor** 69:21,25
**fair** 71:14
**faith** 128:19
**familiar** 9:8
20:15,18 25:18
25:21,25 96:3
97:4,20 118:14
**far** 33:2 49:8
73:9 117:11
**favorably**
127:14
**February** 33:4
33:11 34:17
35:17,25 53:25
58:16 59:12
60:18
**Federal** 1:22
132:20
**Feel** 48:11
**felt** 16:3 91:5
119:16
**Feuling** 115:20
**figure** 29:5
**files** 15:20 24:23
56:4 104:12
**final** 16:4 21:8
107:21
**financially**
133:8
**find** 51:25 79:18
101:20 110:6

**finding** 67:4
**findings** 14:22
**fine** 5:20 95:16
**finish** 127:10
**fire** 71:20
**fired** 50:5
**Firm** 133:23
**first** 6:3 15:17
16:9 50:9 52:6
52:12 56:24
58:3 60:3,25
62:4,10 70:7
79:23 82:24
94:5 102:21,25
108:22 123:13
127:11
**fit** 37:14
**five** 25:9,11
39:23,25 72:9
**five-minute**
41:25
**Flanigan** 106:19
**flight** 10:17,18
11:18 12:6,16
12:17 14:14,23
15:1,5,8,15
16:19 17:9,14
17:15,16 18:4
18:7,9,13,17
19:2,3 20:23
21:4,14 22:5
23:10,15 26:5
26:9,12 27:1
27:25 33:15,17
36:13 46:20
50:9 62:23
90:16 92:9,20
92:22 93:12
98:4 99:2
100:17,23
102:5,8 106:7
106:13 107:1
107:10 108:1
108:18 109:2
117:24 122:3
122:11,12

124:2,4,6
**FMLA** 16:25
**focus** 68:16
**follow** 81:2
114:24 118:1
123:10
**follow-up** 84:14
115:24 126:21
**followed** 13:18
87:20
**following** 49:14
132:15
**follows** 6:3
76:12 133:11
**foregoing** 131:1
131:11
**format** 110:1
**formatting**
72:16
**forth** 22:5
**forward** 21:14
24:7,20 47:2
54:3 78:17
82:13 92:23
105:1,12,23,25
122:2
**forwarded**
52:22 80:21
81:6 105:19
114:21,25
**forwarding**
54:19 82:10
116:3
**Foss** 89:23
**found** 61:14,20
61:23 79:13
105:22
**FOUNDATION**
2:4
**frame** 10:22
**frames** 71:25
72:3
**free** 48:11
**freedom** 19:3
**frequently** 29:18
29:20 47:5

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

**front** 7:25 28:18
  44:3
**froze** 18:20
**full** 12:7
**full-dues-payi...**
  11:10,15,20,21
**funds** 85:23
**further** 128:21
  132:20 133:3,6
**FYI** 114:21
  116:10

_____
**G**
**gathered** 36:14
  71:7 75:10
**gears** 44:22
  47:22 98:23
**general** 16:13
  56:5
**generally** 14:20
  20:12 27:1
  38:6 56:6
  65:11
**getting** 12:19
  26:21 29:8
  34:25
**Gilliam** 2:3 3:4
  5:21,21 6:5,8
  7:8,18,24 8:13
  8:16,17 12:8
  12:11,13,22
  13:2,4 19:25
  20:8 22:2 23:2
  23:12,22 24:8
  30:22,25 31:3
  31:10 32:10
  34:19 35:15
  41:10,24 42:2
  42:8 44:22
  48:8,10 49:4
  54:13 69:24
  72:4 74:14,19
  75:2 77:9 78:7
  80:3,6,10
  86:23 87:16
  95:10,15,18,21
  96:2 101:12

104:17,18
108:5 109:20
112:7 114:10
118:21 121:16
124:13 126:7,8
126:12,18,25
133:12
**give** 33:16 51:17
  75:14 84:22
  92:14 99:17,19
**given** 19:2 20:22
  50:15 131:14
  132:18
**giving** 31:19
**Glenn** 97:5
**go** 7:18 15:19
  30:12,22 67:19
  98:8 105:6
  126:23
**goes** 107:14
**going** 24:22
  28:19 43:20
  44:13 51:2
  62:5,15 63:5
  67:23 70:7
  95:13 102:20
  102:20,21
  104:11 107:6
  126:25
**good** 6:6,7 9:3
  74:13 126:11
**Goulbourne**
  103:11 106:23
**Graham** 120:18
**Grant** 4:4 54:4
  59:5 84:15
  104:10 110:6
  113:22
**granted** 18:19
  18:22 19:1
**Greenfield** 2:14
  2:14 5:25,25
  128:23,25
**Greg** 108:22,25
  109:6,9 110:12
  110:13 111:18

**Greg's** 110:7
**grievance** 31:20
  46:9,9,14
  92:21
**grievances**
  41:20
**group** 13:5 69:5
  106:1
**groups** 20:17
  69:4
**guess** 9:3 11:5
  22:9 23:13,23
  24:24 25:12
  28:20 32:1,23
  34:9 36:7
  37:12,15 38:1
  38:10,18 41:5
  43:5,19 45:20
  49:18,23 50:8
  52:12 53:13
  55:14,15,20
  56:1 60:9 62:3
  63:2,3,10,19
  64:1,14 69:24
  70:20 74:3
  82:3 86:18
  88:2 102:19,20
  103:4 104:23
  105:13,25
  106:15 107:8
  108:10,22
  110:12,16,16
  114:23 116:14
  117:7
**gun** 91:2
**Gutierrez** 52:22
  53:4,5 76:5
  80:21 85:11

_____
**H**
**Hafner** 30:11
  34:6
**half** 10:9 120:13
**Hamilton**
  103:21
**hand** 88:22 91:7
  131:14

**Hand's** 90:17
**handful** 25:4
**handle** 23:14,24
  24:1,13
**handles** 24:11
**handling** 23:19
  23:20 116:21
**hanging** 91:1
**happen** 62:15
**happened** 15:22
  96:11
**happens** 68:21
  69:1
**happy** 110:7
**harassing** 77:25
  79:4
**harassment** 26:1
  39:3,10,14,21
  40:24 47:11,13
  47:17 53:11
  64:8 65:25
  72:22,24 73:2
  73:10,13,13,20
  74:4,9 76:13
  78:2 94:21
  107:18,19
  121:3,6
**harbors** 128:12
**hard** 28:15 29:6
**Harwood** 2:9
**hazing** 25:22
  36:5,9 37:3,14
  38:13,23 39:2
  39:5 40:22
  47:11,15 49:16
  64:8 66:5,9,13
  76:13 78:13,21
  79:5
**head** 17:1 30:9
  51:9 90:19
**heading** 113:2
**hear** 13:3 22:13
  22:22,22 50:9
**heard** 12:2,15
  12:17 13:6
  22:15 53:19

128:24
**hearing** 67:17
  92:22 93:9
  113:11
**hearings** 89:4
**heavily** 90:9
**held** 10:4 14:21
  66:22
**help** 33:1 49:7
  92:16
**helped** 117:15
**Hendrick** 1:20
  5:13 23:2
  132:13 133:19
**hereto** 1:25
**high** 35:21
**high-profile**
  83:10
**hijab** 18:8
**history** 77:24
  78:11 79:3
  89:3
**Hofer** 108:23,25
  109:6,9 110:13
**Hofer's** 111:18
**Holcomb** 88:23
  94:17 121:4,25
**hold** 10:7,12
  11:5 31:4
  102:19
**Holly** 88:22
  93:17,25
**home** 5:16
**hope** 106:18
**hours** 14:11
**hours/minutes**
  133:12
**HR** 40:23 66:13
**Hudson** 58:4,9
  122:1 125:10
  125:12
**huge** 68:22
**human** 16:24
  36:21,25 37:20
  38:4,6 66:6
  117:15,16,18

Case 3:17-cv-02278-X Document 263-2 Filed 06/13/22 Page 42 of 54 PageID 8749
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 141

117:25 118:2
**hundreds** 26:23
26:24

**I**

**ID** 84:1,4,9,13
**idea** 47:18 96:12
110:19 113:9
115:1 123:23
**identified** 79:7
79:11,14,19
**images** 73:15
80:24 81:1
82:14
**imagine** 33:24
**Imamovic** 88:22
93:18
**implement**
117:16
**implemented**
29:22
**impression**
85:22
**inbox** 123:21
**incidents** 86:12
86:17
**included** 72:22
74:10 78:18
94:20
**includes** 44:16
**including** 49:15
**inconsistencies**
45:23 46:2,16
**increase** 33:14
35:20
**increased** 27:14
**INDEX** 3:1
**individual** 20:11
**individuals**
88:18,21
127:17 128:16
128:19
**inflight** 4:2 10:5
10:13,14 13:17
16:5,10,11
20:13 23:9
26:22 27:2,15

27:23 36:1
40:25 57:7,9
58:4,10,18,20
58:25 59:2,6
59:16 81:11
82:25 120:14
**influence** 106:2
**information**
19:20 21:6,16
21:25 36:14
44:20,21 52:22
53:25 54:24,25
55:4,16 69:16
69:20,25 70:3
71:7 75:14
82:1 83:3 86:8
100:3,5,5,13
104:4 105:19
105:20 106:16
107:9 113:7,15
113:19 114:22
116:3 122:4,17
**information-g...**
65:3
**informing** 116:2
**initial** 60:1
**inquiry** 22:4,5
**instance** 1:17
40:22 65:24
**instantaneously**
33:24
**instruct** 19:19
21:24
**instrument**
131:11
**interaction**
20:20
**interactions**
41:6,11
**interested** 133:9
**interesting**
111:5 112:15
**interfere** 46:19
**international**
11:22
**intimately** 20:15

20:18
**investigate** 24:5
105:21
**investigating**
66:4 122:12
123:2
**investigation**
14:19,22 16:19
36:11 51:14
55:2 60:1,5
61:8,18 63:23
65:8 71:8 73:1
75:5,5,7,13
76:7 78:17
82:20 83:4
106:2,3,5
122:5,8,9,16
122:21,23
**investigations**
14:14 23:14
36:8 53:11
82:17 89:4,14
89:18 107:4
108:4
**investigators**
102:12
**involve** 21:10
**involved** 13:15
14:11,13 19:7
21:13,18 23:21
25:3,13,24
34:4 36:3 39:7
44:5,9,10
53:20 56:7,11
61:3 82:23
83:1 85:12
88:9,12,17,25
89:4,6,13,17
89:22 90:9,12
96:6,19,22
103:16 108:16
113:13 116:8
121:10 124:20
124:21
**involvement**
20:10 117:11

125:18
**involving** 15:15
23:15 55:23
56:21 88:25
89:14,18,23
90:13 122:10
**iPad** 84:5
**issue** 12:25 15:8
23:24,25 24:1
27:18 33:22
56:17 60:22
68:22 69:6
108:10 113:21
128:4
**issued** 29:14
30:13 31:17
33:3,5,7,11,12
33:23 34:8,11
34:18 35:1,13
40:2,19 90:1
90:15 92:10
**issues** 15:11
16:7 17:4
24:12 63:2,6
63:10 88:10
**issuing** 31:12
72:2
**items** 20:13

**J**

**Jackson** 89:1
113:25 114:20
116:18 124:10
**Jackson's**
116:21
**January** 63:14
**jargon** 7:12
**Jeanna** 89:1
113:25 114:20
116:18,21
124:10
**Jeanna's** 89:2
**Jeffers** 116:23
**job** 20:23 21:4
22:12 23:10,10
57:6 58:7
91:21 122:12

123:7
**jobs** 20:19
**Joe** 106:19
**joined** 16:10
58:3,20 59:16
**Jones** 76:6
124:19,24
**Josh** 89:18
**Judaism** 18:5
**Julie** 102:7,10
102:23 105:10
105:13,17
107:8

**K**

**Kammas** 97:24
**keep** 40:1 110:7
**Keith** 106:24
**Kendall** 89:23
90:1
**Kent** 88:22
90:17
**kept** 40:10 73:24
**Kevin** 58:5,11
58:14 100:10
100:14,14
**Kevin's** 100:11
**kind** 35:23
40:23
**Kissman** 3:15
106:25 125:5
**knew** 51:2 99:22
**know** 6:13 7:10
7:11 8:2 12:11
12:15 15:7,10
17:2 18:11,22
18:25 19:16
21:5 22:10
23:10,22 24:11
25:6,8,10
26:12,17,19,22
28:2 29:1 30:7
30:9,12,13,19
33:10,18,21
34:2,5,20,23
35:5 38:14,17
38:20 39:20,24

Case 3:17-cv-02278-X   Document 263-2   Filed 06/13/22   Page 43 of 54   PageID 8750
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 142

| | | | | |
|---|---|---|---|---|
| 39:25 40:12 | 110:2,20,22 | **large** 28:17 | 117:4 118:18 | 72:9 87:4 |
| 42:13 44:2,4 | 112:25 113:3,6 | **last-chance** 92:4 | 123:3 126:7 | 93:16 104:7 |
| 45:18 46:1 | 114:12,17,23 | 92:15,17,25 | **letter** 3:11 48:3 | 110:10 117:25 |
| 47:2,12,18,23 | 115:2,4,5 | 93:3,11,13 | 48:24 49:11 | 119:6 121:17 |
| 48:4,4,11,14 | 116:5,7,9,15 | 94:1,2,12 95:8 | 50:2 71:13,19 | 121:18 |
| 50:12,12 51:4 | 116:17,23 | **LAUREN** 2:20 | 71:24 72:21 | **looked** 55:5 65:7 |
| 51:8,10 52:23 | 117:1,3,18,20 | **law** 2:14 8:6 | 74:3 | **looking** 30:19 |
| 53:9 58:13,24 | 118:5,8,10,12 | **lawsuit** 113:16 | **letters** 49:20 | 32:16,17 35:24 |
| 59:1,25 61:4,5 | 118:15 119:3,8 | **layout** 84:12 | **level** 36:12 | 41:15 48:3,15 |
| 61:9,9,11,22 | 119:12,24 | **lead** 13:13 | **liaisons** 36:23 | 81:4 87:2 |
| 61:23 62:24 | 120:3,7,15,23 | **leader** 15:18 | **limited** 49:15 | 110:8,25 |
| 63:1,4,5,9,13 | 121:19 123:16 | 16:4 37:18 | **line** 81:11 130:4 | **looks** 33:9 51:19 |
| 63:15,21 64:3 | 123:25 124:2,4 | 55:1 58:6 | **Lines** 32:14,23 | 52:17 60:17 |
| 64:6,20 65:4 | 124:5,6,10,12 | 66:12,17,22,23 | **links** 59:21 | 72:20 76:6 |
| 66:15,24 67:2 | 124:23 125:21 | 99:10,16,20,22 | **list** 105:2 | 80:20 81:5 |
| 67:24 68:13 | 125:24 126:1,6 | 100:1,6 105:5 | **listed** 106:7 | 105:11 110:3 |
| 69:17 70:25 | **knowledge** | 108:13 | 107:22 | 111:17 114:18 |
| 71:5,18,23 | 62:22 | **leaders** 15:24 | **little** 22:25 | 114:20 118:23 |
| 72:17 73:21 | **known** 51:3 | 28:11 41:13 | 44:23 98:24 | 119:15 122:23 |
| 74:5,7 75:23 | 131:9 | 52:18 54:5 | 102:20 117:20 | **looped** 54:7 |
| 77:1,3,18 | ——— | 57:5 61:17 | **LLC** 133:20 | **lot** 57:25 88:24 |
| 78:10 79:16 | **L** | 65:6 66:19 | **LLP** 2:9 | **lots** 46:3 |
| 80:4,14 81:1 | **L-u-s-k** 51:15 | 67:1 82:15 | **local** 1:6 2:13 | **lower** 56:17 |
| 83:9,12,16 | **labeled** 48:17,22 | 114:19 116:4,5 | 6:1,11 9:10 | **lunch** 74:15 |
| 84:10,10,11,11 | **labor** 4:2 9:18 | **leadership** 13:13 | 10:24 11:1,3 | 95:11,13,24 |
| 84:18 85:13,21 | 10:5,12 13:10 | 13:14 33:15 | 11:23 41:7,12 | **Lusk** 51:14 |
| 86:6 87:2 | 16:10,15,18 | 41:19 | 41:19 128:25 | 81:14 |
| 88:12,23 89:2 | 23:13,23 24:3 | **learn** 45:22 | 132:7 | ——— |
| 89:10,25 90:3 | 24:4,25 25:13 | 62:20 | **located** 1:21 | **M** |
| 90:6,8,15,18 | 26:4,14 27:4,9 | **learned** 15:14 | 5:10 | **M** 1:20 132:13 |
| 91:4,7,17,19 | 27:11 38:11 | 62:24 | **locations** 5:19 | 133:19 |
| 91:21 92:1,2,4 | 39:13 41:6,12 | **led** 127:20 | **long** 10:7,18 | **ma'am** 48:25 |
| 93:6,8,14,17 | 41:18,22 42:20 | 128:10 | 29:2 33:21,25 | 51:23 62:6,8 |
| 94:21,22 95:5 | 43:4 44:8 | **left** 80:1 | 34:2 37:5 | 70:10 113:12 |
| 95:7,9,10 | 45:21 50:20,22 | **legal** 2:3 7:7,11 | 42:13,17,18 | 129:2,10 |
| 96:19 97:9,17 | 53:2,12,21 | 21:8 | 43:8,19,25 | **machine** 91:2 |
| 98:12,15,18,24 | 57:7,9 58:10 | **lesser** 56:6,13 | 58:19 63:5 | **Mack** 2:18 31:2 |
| 99:1,4,5,17,25 | 58:18,21,23 | 82:22 | 91:13 | **Magazine** 28:3,5 |
| 100:13,22 | 59:2,2,6,7,16 | **let's** 41:23 49:12 | **longer** 17:14 | 28:10 29:7 |
| 101:14,22 | 59:16 81:11,22 | 51:16 60:6 | 28:7 | **mail** 28:15,16,20 |
| 102:25 103:15 | 82:7,11 83:11 | 67:10,11 74:19 | **longstanding** | **mailbox** 4:2 |
| 103:17 104:18 | 88:8 89:11 | 74:20 79:22 | 77:24 78:11 | 81:11,17,21,23 |
| 104:23 105:13 | 99:11,13 100:8 | 86:20 89:8 | 79:3 | 82:4,7 |
| 107:20 108:2,5 | 103:7 123:1 | 101:8,17,18 | **look** 32:1 51:8 | **main** 13:12 |
| 108:8,9,20,22 | **Lacore** 30:11 | 107:6 111:12 | 65:9,9,17 68:2 | **making** 9:9 |
| 109:1,4,12,14 | 34:6 125:10,11 | 111:12 114:7 | 68:2 69:18 | 13:22 16:4 |
| | **language** 41:17 | | | 40:14 75:16 |

**management**
8:8
**manager** 10:5
10:12,13,15
13:10 16:17
21:12,18 23:14
24:25 25:13
26:4,15 27:9
27:12 38:5,7,9
38:11 39:13
41:12 42:21
43:4 51:11,12
52:19,20 57:8
57:11,13 59:3
59:6,7 65:15
66:3 82:11
85:4,6 88:8
89:11 99:13
100:2,4,9
103:8,13,18,22
103:25 106:22
106:23,25
115:21 120:13
120:15,17,21
123:1
**managers** 16:15
21:11 22:3
65:12 99:12
106:11,12,24
116:1
**manila** 28:17
**manipulate** 19:4
**Mankin** 30:11
**march** 68:14
71:10,12,14
85:17,23,24
86:2,8
**mark** 79:23
86:20 101:8
109:16 114:7
118:18 121:13
**marked** 80:5,9
86:22 101:11
109:19 114:9
118:20 121:15
**Matt** 6:8

**matter** 19:8 20:2
23:23 34:1
122:10
**matters** 21:10
**Matthew** 2:3
5:21
**Maureen** 1:10
1:16 3:3,17,19
3:21,23 4:3,4,6
4:8,10,10 5:7
6:2 123:20,20
130:2 131:1,5
131:9 132:10
132:16
**mbg@nrtw.org**
2:6
**mcorrell@ree...**
2:11
**mean** 7:24 11:2
11:9,13 17:20
27:1 45:11
75:12 81:17
95:12 99:20
120:24 122:25
**means** 5:16
**meant** 119:5
**media** 15:6
25:14,19 26:9
26:10,13,16,20
27:7,13,17,21
29:13,21,25
30:6,17 31:13
33:14 34:12,17
34:21,23 35:5
35:9,19 36:1,2
45:3,6,11,13
45:14,24 47:1
47:4 49:17
54:9 55:23
56:2 64:7
65:16,18,19,24
66:1 76:11
79:7 82:17,20
88:14,16,24
90:7,20 91:19
93:20 94:7,13

94:15,19,24
96:9,14 97:6
97:14,17 99:11
101:5 102:6
105:2 106:6
107:12 108:19
109:13 114:1,4
114:20 118:13
129:6
**meeting** 14:21
50:14,15 67:4
67:8 68:8 71:6
119:25 124:22
**meetings** 44:24
46:9,11,13,17
46:24 47:9
**Meggan** 76:6
124:19,24
**Melissa** 102:24
103:6,7
**member** 8:8
10:22,24 11:9
11:10,15 28:8
98:5,24
**members** 11:20
11:22 44:18
62:18
**memo** 33:7,11
33:22 34:3,5
34:18,25 35:4
35:13,17,21
**memory** 47:7
49:7
**memos** 27:24
29:13 30:2,8
30:14 31:13
33:3 34:10
**mention** 31:11
73:18 111:8
**mentioned**
29:12 35:12
57:4 110:13
**mentions** 76:11
**merits** 64:22
**Merrick** 118:13
118:16 119:16

**message** 62:13
62:14 68:22
**messages** 77:25
78:12,17,18
79:4 107:15
112:11 125:23
**met** 41:18
**Michael** 2:8
5:23 97:23
**Michelle** 50:24
81:14
**Michelle's** 51:1
51:5,14
**Mike** 30:10,11
34:6 93:7,9
115:15 125:5
**milk** 111:5,25
112:5
**milking** 111:10
**Minchey** 58:5
58:11
**mind** 19:24 23:3
23:3
**mine** 49:2
**minutes** 34:1
133:13
**Mischaracteri...**
107:25
**mission** 49:14
**Misstates** 77:7
**misuse** 45:13,14
**module** 117:17
117:19
**moment** 13:1
67:18
**Monday** 80:2
**money** 111:6,25
112:6
**monthly** 41:19
46:9
**months** 10:20
59:11
**morning** 6:6,7
48:17
**motivated** 128:1
128:12

**Mountain** 74:17
**move** 19:5 127:5
**moving** 105:7
**multiple** 38:21
43:10 48:5
87:11 89:5
**Mumford**
133:21

**N**

**N** 2:1
**name** 5:13 6:8,8
51:1,5,6,14
89:20,21 97:22
97:23 100:11
110:7 111:18
118:14,15
130:2 131:10
**names** 39:20
102:8 107:10
120:19 124:5
124:12
**Naomi** 58:4,9
122:1 125:10
125:12
**NATIONAL** 2:3
**nature** 17:24
107:13,17
**necessary** 33:16
**neck** 84:1
**need** 41:24
67:12
**needed** 16:3
17:8 19:9 20:4
82:1,11 102:8
**needs** 74:10
**negative** 107:16
**negotiated** 44:15
**negotiates** 44:15
**negotiating**
44:19,20
**negotiations**
42:21 43:11,18
43:20,23 44:6
44:9,11,18
**neither** 133:3
**Nevarez** 98:1,3

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 144

| | | | | |
|---|---|---|---|---|
| **never** 16:8 29:5 | **oath** 5:15 131:10 | **OFFICES** 2:14 | 40:17 41:5,22 | 83:2,6,16,19 |
| 37:16 54:6 | **Objection** 7:6 | **official** 99:6 | 42:17 43:3,8 | 83:21 84:2,7 |
| **new** 63:11 | 19:11 20:6 | **oh** 7:24 17:3 | 43:19,24 44:5 | 84:14,18,22 |
| **nexus** 62:1 83:7 | 23:18 24:2 | 24:13 30:12 | 44:8 45:2,9,14 | 85:1,10,15,19 |
| 83:13,22 84:19 | 34:14 35:14 | 67:15 78:9 | 45:20 46:6,12 | 86:1,5,11,15 |
| 84:25 | 41:8 54:11 | 87:14 98:8 | 46:16,23 47:8 | 86:20 87:1,13 |
| **non-member** | 69:23 71:21 | 101:18 118:25 | 47:22 48:6,19 | 87:16,24 88:5 |
| 11:12 | 78:4 104:15 | 126:23 | 49:1,3,4,11,22 | 88:9,13,20 |
| **non-party** 127:4 | 107:24 112:1 | **okay** 6:17,20,23 | 49:22 50:5,8 | 89:8,13,17,22 |
| **noncontract** | 124:8 126:4 | 7:1,4,13,17,24 | 50:18 51:1,7 | 89:25 90:3,6 |
| 14:10 | **objections** 8:21 | 8:13,16,21,24 | 51:16,22,25 | 90:12,17,22 |
| **nonmember** | 19:17 127:3 | 9:2,3,8,13,17 | 52:5,7,10,11 | 91:7,9,9,12,21 |
| 13:6 | **objector** 127:14 | 9:22,25 10:7 | 52:13,16,21 | 91:24 92:4,7 |
| **nonmembers** | 127:21 | 10:11,18,24 | 53:5,12,17,24 | 92:16,19 93:1 |
| 12:18 | **objectors** 12:14 | 11:1,5,8,12,16 | 54:2,10,16,16 | 93:6,8,12,15 |
| **normal** 83:2 | 127:17 | 11:24 12:2,5 | 54:19,23 55:3 | 93:22 94:4,10 |
| **North** 2:9 | **observe** 127:19 | 12:11,13,17,21 | 55:11,14,20 | 94:14,17,22 |
| **NORTHERN** | **obtain** 104:14 | 13:2,4,9,20,24 | 56:1,9,25 57:4 | 95:2,5,16,18 |
| 1:1 132:2 | 104:19 | 14:3,13,13,18 | 57:10,14,19,22 | 95:21 96:11,13 |
| **NOTARY** | **occasion** 14:25 | 14:23 15:1,4 | 58:12,16 59:1 | 96:17,20,24 |
| 131:17 | 19:6 | 15:10,14 16:5 | 59:5,9,19,19 | 97:4,9,11,17 |
| **note** 87:10 | **occasional** 29:4 | 16:17,22 17:4 | 59:25 60:6,8 | 97:20,23 98:1 |
| **noted** 131:2 | **occasionally** | 17:11,23 18:2 | 60:12,20,25 | 98:3,6,10,13 |
| **notes** 67:8,15 | 16:21 21:12 | 18:12,17,24 | 61:11,19 62:3 | 98:16,20,23 |
| 68:7 70:18,21 | 28:6 29:6 | 19:6 20:8,25 | 62:9,12,20 | 99:9,13,16,25 |
| 75:9 119:15,25 | 56:12 | 21:9,19 22:1,8 | 63:1,6,9,13,17 | 100:4,8,13,17 |
| **November** 1:10 | **occasioned** | 22:24 23:12 | 63:19,25 64:13 | 100:20,22 |
| 1:19 5:3 43:23 | 128:11 | 24:8,10,15,24 | 64:17,20,25 | 101:1,6,19,23 |
| 130:3 132:10 | **occasions** 20:1 | 25:6,8,12,18 | 65:14 66:2,7,7 | 102:10,13,18 |
| 133:16 | **occurred** 36:16 | 25:21,24 26:3 | 66:15,19,24 | 102:22 103:4,9 |
| **number** 27:7,14 | 36:20 38:3 | 26:8,14,19,25 | 67:3,7,10,13 | 103:11,15,21 |
| 32:4 51:18,25 | 39:7 98:21 | 27:3,19 28:1,4 | 67:18 68:1,4 | 103:23 104:3,6 |
| 79:25 111:14 | **occurring** 45:15 | 28:9,12,23 | 68:10,16,19 | 104:9,21 105:7 |
| **numbered** 1:18 | **October** 63:18 | 29:2,8,12,17 | 69:10,14,20 | 105:17 106:9 |
| 112:21 | **offense** 56:14 | 30:1,6,12,16 | 70:7,15,20 | 106:15 107:2,6 |
| **numbers** 30:20 | **offenses** 56:13 | 30:21,21 31:10 | 71:3,9,18 72:4 | 108:5,9,15,15 |
| 35:8,25 72:11 | **offer** 21:6 92:25 | 31:16,19,23 | 72:8,13 73:3,6 | 108:21 109:4,8 |
| 119:1 | 93:3 | 32:6,9,15,20 | 73:17 74:11,19 | 109:14,16,23 |
| **numerical** 52:2 | **offered** 92:17 | 32:22 33:6,10 | 75:11,19,21,24 | 110:2,5,12,15 |
| | 93:13 | 33:21 34:2,5,9 | 76:3,9,22 77:3 | 110:15,20,23 |
| **———— O ————** | **offering** 93:11 | 34:19,23 35:3 | 77:9,16,22 | 111:12,14,20 |
| **O'Grady** 102:7 | **offers** 92:8 | 36:2,7,19,25 | 78:9,20 79:6 | 111:20,21,23 |
| 102:10,23 | **office** 62:19 | 37:12 38:1,10 | 79:13,22 80:8 | 112:7,10,19 |
| 105:10 107:8 | 63:12 131:14 | 38:19,22 39:3 | 80:12,15,23 | 113:3,10,14,20 |
| **Oakland** 103:13 | **officer** 98:9,9 | 39:12,17,22 | 81:1,7,10,15 | 113:20,24 |
| 106:23,24 | **officers** 8:7 | 40:1,7,10,13 | 82:3,13,18 | 114:3,7,14,23 |
| 109:3 | | | | |

Page 145

115:2,6,13,17
115:20,22
116:5,9,9,12
116:17,23
117:1,4,9,14
118:3,7,10,15
118:18 119:9
119:19,24
120:4,8,11
121:2,6,9,13
121:20,23
122:4,7,20
123:3,9,12,19
124:1,6,13,16
124:19,23
125:1,8,13,18
125:25 126:7
126:12
**once** 14:20
54:23 75:23
80:13 101:13
101:20,21
109:21 114:12
119:7 121:18
**ones** 17:1 18:15
21:13 39:17
123:10
**ongoing** 42:22
43:17
**open** 41:14,20
48:20 49:2
**opened** 119:3
**opportunity**
109:20
**opposed** 85:16
85:20 86:2
**opt** 11:22 12:2
**opt-outers** 12:3
12:5
**oral** 5:6 132:17
**order** 1:23 5:9
52:3
**organizational**
58:1
**original** 84:7
121:25 129:8

**originally** 60:17
113:22
**originated** 102:4
**outcome** 133:9
**outlining** 92:11
**oversaw** 36:24
66:14
**overview** 77:19

**P**

**P** 2:1,1
**p.m** 95:23 96:1
115:23 126:14
126:17 129:5
129:12
**packet** 87:11
**page** 32:2,4,8,13
32:17 45:6,10
51:18 61:14
62:4 68:24
69:2 70:7 72:7
76:10 79:11,11
79:14,19 83:15
83:23 102:21
104:6,7 105:8
110:25 111:15
117:5,6 123:13
130:4
**pages** 81:2
114:11,13,24
121:18
**papers** 67:11
**paragraph**
68:17 76:12
77:23 78:7
**Parenthood**
86:3,9,13,18
**part** 16:10 18:6
20:9 22:13
55:3,20,24
59:19,25 60:21
62:13 93:1
111:13 122:21
122:22 127:12
**participate**
85:23
**participating**

85:24
**participation**
85:17
**particular** 17:25
37:10 65:14
120:16
**parties** 133:5
**partner** 16:24
36:22 37:1,21
38:4,7 66:6
**party** 132:25
133:2,10
**pass** 127:1
128:22
**passenger** 95:1
**pattern** 111:5,8
111:24 112:15
**pay** 14:11
**PDF** 32:5,8,18
**PDFs** 48:21
**people** 13:5 30:4
68:25 103:6
106:1,9
**perceived**
107:13
**performing**
17:16
**period** 71:16
**permitted** 19:18
**person** 38:8
44:10 83:9
131:10
**personal** 128:15
**personally**
127:16 128:3
131:9
**personnel** 8:8
**persons** 11:25
12:14 105:11
**petition** 124:14
**Phoenix** 103:17
**Phoenix-based**
103:25
**phone** 107:3
**photo** 94:25
**photos** 85:12

**picks** 28:20
**picture** 90:25
91:1 111:19
**pictures** 50:6,10
50:16 53:20
55:7,12 70:22
73:19 81:8
83:17 84:16
117:8
**place** 36:12
**plaintiff** 1:18
2:2 5:22 6:9
**plane** 111:19
**Planned** 86:3,9
86:13,18
**play** 14:6
**played** 127:21
**please** 5:5,18
21:23 44:17
119:20
**PLLC** 2:14
**point** 6:13 51:13
68:13 71:3
92:24 95:11
125:25
**policies** 13:17
26:6 40:3
41:17 45:4
46:19 47:1,9
48:1 55:23
76:10 77:4
100:24 108:7
**policies/rules**
49:15
**policy** 14:9 15:6
16:1 25:15,19
25:22 26:1,9
26:11,13,16,20
27:8,21 29:13
29:21,25 30:6
30:17 31:13
34:12,21,24
35:5,19 36:3,5
36:10,24 37:3
37:9,14,22
38:13,24 39:4

39:5,14,21
40:21 45:24
46:3 47:4,11
47:11,13,15,17
49:8,16,17
53:11 56:2
65:16,16,19,23
66:5,13,16,20
66:20 72:22
73:2,10,16
74:4,9 76:11
76:13,17,18
78:3,14,22
79:8 88:14,17
90:7,20 93:20
94:13,15,24
96:4 97:14,16
97:17,21 98:11
98:13 99:2,6
101:3,5 102:6
106:14 107:18
107:23 109:13
126:2
**position** 8:5 10:4
10:8,11 13:9
16:17 53:10
86:13,18 88:6
104:2 128:3,7
**positions** 11:6
59:11
**possibility** 41:20
**possible** 30:25
52:25 69:6
114:19 124:20
**possibly** 22:7
92:9
**post** 57:2 68:24
111:17 112:13
**posted** 73:19
90:25 94:25
96:15 109:11
**posts** 50:6,11,16
53:19 55:5,22
62:25 70:22
79:18 80:22
83:8 84:20,23

102:9 105:22
107:22 108:6
109:6,9 110:24
111:1 112:14
112:20 118:13
119:15 125:22
**potential** 13:16
14:7,15 26:5
36:16 66:4,20
**practice** 65:5
77:13
**preceded** 73:4
**prefer** 7:20
**prepare** 34:3
**prepared** 30:1
**PRESENT** 2:18
**presenting**
83:14
**president** 46:10
46:13 59:24
63:11
**previous** 40:5
**previously**
105:23
**primary** 122:24
122:25
**prior** 8:7 10:3
10:12,13,14,15
16:3 30:18
35:25 43:20,25
50:15 56:15
58:25 63:4
64:9 70:21
71:18 75:15
125:25 126:19
127:3
**private** 7:19
**privilege** 8:10
**privileged** 19:20
21:16
**pro-choice**
85:25 128:5
**pro-life** 68:21
69:4 70:5
128:1,4,8,12
128:16

**probably** 47:19
55:17 57:3
62:24 63:20
65:17 66:21
74:7,16 76:25
84:21 85:7
95:15
**problem** 45:12
**procedural**
23:23
**Procedure** 1:23
132:21
**proceed** 19:18
37:10 44:12
**proceedings** 5:1
125:15,19
129:12
**process** 92:21,24
127:20
**produce** 113:14
119:21
**produced** 1:17
113:4,5,7
120:2
**program** 117:22
**ProLaw** 40:8
56:4 82:2
**proper** 115:24
**properly** 13:22
14:5
**protected**
107:15 119:17
**proved** 131:10
**provide** 21:24
75:4
**provided** 50:19
61:6,9,11,23
62:1 75:8
**provisions** 1:25
**public** 79:11
131:17
**publish** 34:1
**published** 30:4
**purported** 55:9
**purpose** 118:10
**purposes** 40:14

131:11
**pursuant** 1:22
132:20
**put** 8:2 27:15,20
102:7

_____
**Q**
**quash** 127:6
**question** 7:13
9:2 19:18,24
22:16,19,20,23
32:13 33:24
38:17 45:17
49:18 63:21
73:22 74:6
78:9 81:10,20
83:19 103:5
113:21 124:1
**questions** 6:12
20:21 21:22
67:24 72:23
109:22 126:19
127:11 128:22
129:1
**quick** 7:13 31:4
41:24 74:13
81:10
**quite** 17:3,13
27:15

_____
**R**
**R** 2:1
**Railway** 9:18
**raise** 45:2
**range** 17:6
**rare** 14:25 56:17
**ratified** 42:16
43:15
**re-** 27:5
**reached** 43:6
108:9
**reaching** 41:20
**read** 9:4,6 22:19
23:6 29:24
48:11 60:9,10
67:20,22 69:10
70:5 71:10

84:3,4,8,11
111:21 131:1
**read-before**
35:17
**read-before-fl...**
27:23 33:5
**read-before-fly**
30:2,8,14
31:13 33:3,7
33:10,22 34:10
34:25 35:4,13
**reading** 23:3
33:1 69:7,7
70:20 78:5
129:8
**ready** 48:12
51:18,24 67:19
75:23
**real** 31:4
**realize** 84:2
123:17
**really** 14:10
25:4 36:23
53:22 66:7
97:2
**reason** 29:5
**reasonable** 19:1
20:22
**recall** 24:25
29:14 31:16,19
34:11 39:17
43:8 45:5 48:1
49:23,23 50:5
59:9 62:15,16
62:21 63:2,6
63:10 64:25
68:10 77:9,12
84:7 85:16,19
86:1 88:18,21
89:25 90:23
91:9,20 94:18
98:20 99:9,10
110:9 122:7
124:3,7,11,14
126:1
**recalled** 31:12

88:16
**recap** 72:25 76:7
**receive** 6:20
7:14 28:4,7,9
60:3 81:15
**received** 28:6
29:10 53:3
54:2,23 60:1
60:17 67:7
75:10 95:7
100:2,4,5,15
104:4 108:2
114:22 120:5
122:8,17
**receives** 81:13
**receiving** 28:25
29:2
**Recess** 31:7 42:5
74:24 126:15
**recognizable**
84:12
**recognize** 49:5
52:14 60:13
68:4 72:14,16
75:25 76:1
80:16 81:7
87:1 89:20,21
97:22,23
101:25 109:24
109:25 114:15
119:10 121:21
**recollection** 33:2
34:16 35:19
37:6
**recommend**
71:3 85:5
**recommendati...**
15:19
**recommended**
71:1
**recommending**
85:3,6
**record** 1:25 5:3
5:19 7:18,21
7:23 8:3,14
23:6 30:23

31:6,9 42:3,7
74:22 75:1
95:22 96:1
126:13,17
129:5 132:18
133:8
**records** 26:18
40:1,10,14
**recurrent** 10:15
117:16,19
**reduce** 92:10
**REED** 2:9
**refer** 11:1,12
13:6 31:23
60:6 66:3
75:19
**referencing** 45:8
111:16
**referred** 27:20
102:14 120:1
**referring** 13:24
70:3 106:4
111:7,24
112:13,14,17
116:6 117:12
**refresh** 33:1
49:7
**regarding** 1:24
5:9 15:5 20:2
29:13 42:22
44:24 45:6,10
102:9 114:19
**region** 106:22
107:1 120:16
**Registration**
133:23
**regret** 69:3
**regularly** 28:7
**rehired** 95:5
**reinstatement**
93:11
**related** 47:19
107:15 133:4
**relations** 4:2
10:5,12 13:10
16:11,18,25

23:13,24 24:3
24:11,13,17,21
24:25 25:13
26:4,15 27:5,9
27:11 38:11
39:11,13 40:25
41:6,12,18,23
42:21 43:4
44:8 45:21
50:20,22 53:2
53:8,12,22
57:8,9 58:10
58:18,21,23
59:2,3,6,7,16
59:16 81:11,23
82:7 83:11
88:8 99:12,13
100:8 102:12
103:8,22
104:24 105:4,5
105:21 118:24
119:14
**relations'** 24:5
**Relations-DG**
4:8
**relative** 133:7
**relayed** 64:5
**relevant** 122:18
**religious** 9:14
17:24 18:15
23:15,21,25
24:6,12,19
25:1
**religiously** 128:1
128:12
**rely** 40:14
**remain** 99:12
**remember** 15:1
15:4,10 17:25
18:1,3,16,21
19:6,25 20:7
23:19,20 24:6
24:18,23 26:9
26:16 29:8,17
29:20 33:6
34:7 38:22,25

39:19,22 42:15
42:17 43:12,13
43:14 45:7
46:12,15,21
47:13 50:13
52:23 53:16,22
57:3,24 58:2,7
58:15,17,20
59:15,17 61:2
61:13,15,19
62:17 63:16
65:10 67:7
69:7,12 70:24
72:15 73:23
74:1 75:17
76:1,15,16,19
76:21,22 78:15
78:23 79:13
82:21 84:24
85:10,14 86:4
86:7,10 87:15
87:21,25 88:1
88:4,11,15
89:3,11 90:5,8
90:11,24 91:3
91:14,15,18
93:10,19,23
94:6,8,8,10,16
95:2 96:5,8,13
96:16,17,20,23
96:24 97:10,13
97:19 98:16,19
100:16,17,20
101:2,3,6
104:5 106:18
107:2,5 108:20
109:8,10,15,25
110:25 111:2
111:11 112:17
113:21 114:3,5
114:16 115:6,7
115:10,12,13
115:18,19
116:16,17,20
119:11 120:5,8
120:10 121:8,9

122:19 125:6,7
125:8,16,20
**reminder** 33:17
**remotely** 5:8,15
132:11
**remove** 62:18
**renews** 127:2
**reopen** 126:20
**repeat** 22:20
**repeating** 19:24
**report** 57:10,22
75:5,7,13
101:1 103:1
117:2
**reported** 58:2,4
58:8,14 69:12
91:7,8 99:2,6
100:18,23
101:3 108:18
109:5,9,12,14
113:25 114:4,6
132:11
**reporter** 1:20
5:4,6,14 8:15
12:8,10 23:3,5
23:6 31:2,4
80:1,4,8 129:7
132:14
**Reporter's** 3:8
132:1
**reporting** 5:15
69:11 133:20
**reports** 57:13
**repository** 81:25
82:4
**reposting**
107:15
**represent** 6:9
8:7 32:10
**representation**
7:22 8:6
**representatives**
91:5
**represented**
11:14,18
**representing** 7:4

7:5,9,11
**request** 18:10,19
18:21,25 19:2
19:9,10 20:3
23:8 69:19
113:11,15
**requested** 18:5,7
18:14,18 22:10
54:8,14 132:24
133:1
**requesting**
17:10 54:17
82:12
**requests** 18:23
25:2 47:3
113:8 119:22
**required** 29:23
**requirements**
20:18,22 21:4
22:12 23:9
**research** 16:2
105:18
**reserve** 8:9
126:20 129:1
**reserves** 127:5
**reshuffling** 58:1
**resource** 66:8
**resources** 16:24
36:21,25 37:18
37:20 38:4,7
40:17 65:6,12
65:14 66:2,6
118:1
**respective** 59:10
**respond** 82:2
**responded** 73:6
73:21 74:1,5
110:20
**responding** 82:4
82:11
**response** 12:9
22:16 73:17
74:2 113:7
119:21
**responses** 120:5
127:3

Case 3:17-cv-02278-X   Document 263-2   Filed 06/13/22   Page 49 of 54   PageID 8756
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 148

**responsibilities**
13:11,12,21
19:3
**responsibility**
24:5
**responsible** 82:9
**result** 8:9 13:16
44:16 56:8
92:12 108:3
**resulted** 56:4
**retaliation** 9:18
73:14 107:19
**retaliatory**
107:13
**retire** 10:1
**retired** 9:24
27:10 29:9
42:11 43:5,16
63:7 92:1
109:2
**retirement** 10:3
30:18 43:9
126:1
**retiring** 43:21
**review** 6:24
36:14 39:6
50:17,19 55:4
55:21,25 56:2
56:15 60:10,10
67:14,19 70:21
72:10 75:22
80:11,13 86:24
101:13,14,20
101:21 107:9
109:21,22
112:10 114:11
114:12 119:14
121:3,17
132:22
**reviewed** 54:25
55:6 56:3 60:4
65:19 67:16
68:11,13 71:1
71:6 118:12
**reviewing** 24:22
36:19 78:24

106:16 121:10
**reword** 25:16
**rhyme** 29:5
**Ricky** 89:8
**Ridgeway**
106:21 120:11
**right** 2:3 8:10,24
9:22 10:3,21
11:8 12:20
13:9 15:14
25:12 30:16,21
38:10 42:2,8
43:24 47:22
49:22 50:18
51:16 57:15,16
59:5 62:3 63:1
63:19 67:3
68:3 69:20
74:11 75:2
81:7 83:25
85:15 86:16
88:13 90:17
93:17 96:2
97:2 98:23
101:8,24
102:13 103:4
107:2 109:24
112:7,19
113:20,24
114:15 120:4
121:2 124:1
126:20 127:5
**rights** 9:15,20
46:20
**rise** 94:5,11
98:17
**Rittner** 89:15
96:4
**Road** 2:4
**role** 15:17 36:8
36:13 39:4
127:21
**roles** 17:18
**roller** 35:23
**Rosenberg**
89:19

**roughly** 25:1
42:18 43:8
**route** 129:11
**rule** 14:9 15:25
46:3 65:23
90:3 132:21,22
**rules** 1:22 13:18
132:21

─────────
**S**

**S** 2:1
**Santiago** 106:20
**save** 55:15
**saved** 56:4
**saw** 35:16,22
46:2 84:8
**saying** 86:2
**says** 49:11 50:2
62:14 68:20
69:2 70:4,15
73:12 76:10
77:23 92:15
102:18 104:11
104:21 105:18
107:9 110:6
111:3 112:24
115:23 116:12
117:10,14
118:3,7 123:19
**schedule** 19:4
**Schneider** 3:17
3:19 52:19
63:22 64:21
65:2 66:16,24
68:9 70:12
72:20 75:3
76:4 80:5
**scope** 7:22
**screenshot**
60:25 62:4,11
111:17
**screenshots**
55:15 60:20,22
61:2,5,6,10,12
61:19,22,24
99:11 110:24
113:1 115:11

117:7
**scroll** 101:18
**seal** 131:14
**second** 30:23
31:5 52:11
69:1 77:23
78:7 83:24
94:3,11,15
119:6
**second-to-last**
68:17
**see** 17:20 23:8
27:16 33:13
35:9 41:23
46:25 47:6
48:13,14 49:12
51:16 55:7
60:6 67:10,11
68:25 79:22
85:8 86:20,25
87:2,14,22
89:8 101:8,18
105:16,20
107:6 111:12
111:12 112:4
114:7 117:4,12
118:18 119:16
123:3 124:13
126:7 128:9
**seeing** 30:15
34:21 35:8
**seek** 126:21
**seen** 54:6 64:6
64:10 73:19
**send** 28:12 29:6
31:3 53:17,19
59:20 81:24
83:3 116:1
129:8
**sending** 28:21
56:25 71:19
77:24 78:12,25
106:10 122:4
122:20
**sends** 105:10
123:12

**senior** 57:8,11
57:13 58:10
59:6 90:14
102:12 106:21
106:25 120:13
120:15,17,21
**sent** 28:11,15
29:18,19 48:17
52:23 53:1,13
53:23 59:21
60:18 61:4
68:12,23 70:18
71:24 72:20
75:17 76:18,23
79:9 80:19
81:5 87:22
104:9 105:13
110:5 112:22
116:9 121:25
123:24
**sentence** 78:8
**separate** 16:12
36:21
**separated** 16:12
**separately**
108:13
**series** 117:6
122:1
**serious** 82:24
**served** 118:3
127:6
**service** 14:11
**services** 8:12
10:6
**settlement** 41:15
**settlements**
41:21
**seven** 10:9
**sexual** 25:25
39:3,10,14,21
47:11,13,17
64:8 65:25
72:24 73:10,13
73:20 94:20
107:16,18
**Shaffer** 3:21 4:6

54:3,7,13,17
57:22 58:17
77:11 80:20
84:15 104:10
115:7,8,11
**Shaffer's** 57:6
**shared** 86:8
**shifting** 44:22
47:22 98:23
**short** 126:9
**Shorthand** 1:20
132:13
**showing** 86:8
**sic** 72:10 90:13
107:17
**side** 14:12
**signature** 3:7
130:1 131:1
132:23
**significantly**
27:14
**signing** 129:9
**signs** 117:24,25
**similar** 39:4
**Sims** 93:7
115:15 125:5
**sir** 12:10
**site** 65:18
**sitting** 51:3
**slight** 35:22
**Slough** 97:21
**small** 25:3
**Smith** 2:9 3:23
87:17 88:5
123:6
**social** 15:6 25:14
25:19 26:8,10
26:13,16,20
27:7,12,16,21
29:13,21,25
30:6,17 31:13
33:14 34:12,17
34:20,23 35:5
35:9,19 36:1,2
45:3,6,10,13
45:14,23 46:25

47:4 49:16
54:8,9 55:23
56:1 64:7
65:15,16,18,19
65:24 66:1
76:11 79:7
82:16,20 88:14
88:16,24 90:6
90:20 91:19
93:20 94:7,13
94:14,19,24
96:9,14 97:5
97:14,17 99:11
101:5 102:5
105:2 106:6
107:12 108:18
109:13 113:25
114:4,19
118:13
**somebody** 11:13
**Sonya** 30:11
34:6 125:10,11
**soon** 70:16
71:18,24
**sorry** 12:19
18:18 22:13,15
24:11 25:25
30:13 42:25
72:6,11 79:18
87:5 88:2
97:16 98:25
100:14 101:24
102:21 103:23
108:16 109:4
113:4 115:9
122:14 125:2
126:24
**sort** 17:4 22:4
23:24
**sorting** 82:9
**sound** 118:14
**source** 55:9
**south** 113:4
**Southwest** 1:5
2:7 5:24 6:10
7:10 8:9,11,12

9:11,23,24
10:4,16 16:6
20:4 26:20
27:14,20 34:3
40:4 42:11,23
43:1,11,16
47:23 49:13
50:1 61:25,25
79:12,15,20
83:8,22,25
84:13,19 91:22
91:25 92:3
127:2,5 132:6
**Southwest's**
25:22,25
100:24 108:7
**Spand** 89:9
**speak** 97:3
**speaking** 20:12
**specialist** 50:21
50:23 53:2,9
53:12
**specialists** 53:22
81:25 82:8
**specific** 17:9
18:14,25 20:3
20:13,19 30:19
35:24 36:8
39:19 45:18
47:20 51:18
65:10 66:12
76:17 77:18
78:2 79:6
88:16,18,21
94:22 122:23
124:12
**specifically**
19:10,19 27:24
49:24 75:8
90:5 117:24
**specifics** 64:5
91:14,20 94:8
97:3
**speculation** 41:9
54:12 104:16
112:2 126:5

**spoke** 37:18
41:13 76:25
77:1 125:12
**spoken** 76:20,23
**sponsored** 86:3
86:9
**spot** 74:13
**spreadsheet**
102:6
**Springfield** 2:5
5:22
**SPURLOCK**
2:18
**stack** 52:8
**stage** 14:18
**stamp** 105:15,16
**stand-alone**
37:16
**standing** 83:24
**standpoint**
105:22
**start** 32:2 55:21
113:5 118:11
**started** 10:16
16:9 35:20
43:4 63:2
121:24
**state** 1:21,24 5:9
5:18 131:7,18
132:14
**stated** 1:25
86:16
**statement** 49:14
**STATES** 1:1
132:2
**status** 127:21
**steady** 35:20
**stenographic**
5:16
**Step** 92:22 93:9
125:15,17,19
**Stephensen** 3:13
3:15 60:16,19
124:17
**Stone** 3:13 59:23
60:18 61:4

62:19 85:22
99:1 125:21
**Stone's** 61:3
79:2 85:17
**stop** 95:14
**stored** 82:1
**Street** 2:15
133:21
**strike** 25:15
71:11 118:11
**subject** 127:4
**subjective** 38:16
**subpoena** 6:18
6:20,24 7:2
8:19,22 127:5
**subpoenas**
127:6
**subscribed**
131:10 133:15
**subsequent**
127:6
**subsided** 63:10
**Sue** 50:24 51:4
81:14
**suggest** 112:5
**suggested** 15:21
**Suite** 2:4,9
**summarizing**
75:15
**summary** 76:7
**supervisor**
10:16 57:17,20
**supplied** 44:20
**supply** 44:21
**supported** 124:2
124:5,7,11
**supporters**
126:1
**sure** 8:4 13:22
14:4 18:8,9
23:5 24:15
25:7 27:12
30:24 36:16
37:4 39:25
40:14,18 42:1
48:4 53:6,8,18

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

54:7 59:15,18
60:4 61:22
63:16 65:19
66:10 70:19
72:15 74:14
78:5,7 79:24
84:17 85:21
89:6 94:21
95:20 97:1
102:14 103:25
106:1 112:23
115:23 119:6,6
**suspected** 118:2
**suspension** 56:5
56:8,10,19,22
**Suzanne** 3:13,15
60:16,19
124:17
**SWA** 76:10
**SWA005682**
52:1
**swear** 5:5,11
**sworn** 6:3
132:17 133:15

**T**
**TA2** 118:7,8
**table** 107:22
**take** 6:14 8:5
36:12 41:24
49:4 54:20
55:14 67:18
68:2 74:13,20
92:23 109:20
110:23 119:6
121:17,18
122:21,22
126:8
**taken** 1:18 31:7
42:5 74:24
86:13,17
126:15 133:6
**takes** 33:21,25
**Talbert** 88:22
100:22 102:4
105:1
**Talbert's** 91:10

103:1
**talk** 41:23 66:19
70:15,17
125:11
**talked** 76:16,17
84:18 85:13
**talking** 88:14
102:15 115:6,7
115:10 123:9
**Tammi** 115:20
**Tammy** 3:21 4:6
54:3,7,13,17
57:1,5,19,22
58:17,17 59:15
77:11 80:19
82:14,15 84:15
85:8 104:10
115:6,7,10
**team** 16:25,25
17:2,17 19:7,8
20:2,9,12 21:6
21:17 24:1,3
30:5 39:11
41:18 44:10,15
44:15,19,20
58:4 69:11,13
81:23 82:7
83:11 85:9
105:4 119:14
**Telephone**
133:22
**tell** 8:4 32:15
35:7,18 37:21
38:21 47:6,20
54:14,16 70:23
100:12 111:15
112:23 120:20
**tendered** 7:14
**tentative** 43:6
**term** 12:2,16
13:6
**termin-** 71:13
**terminable**
56:14
**terminate** 75:4
**terminated** 9:19

26:10,13 38:23
47:23 48:2
49:8,25 70:2
90:2,4,18
91:16,17,22
93:25 94:3
96:21 127:25
**termination**
3:11 31:21
48:3,23 49:19
56:5,8,10,19
56:22 61:21
71:2,4,13,19
71:23 72:2,21
77:10 85:3
94:5 124:17
125:4,9 127:20
127:22 128:10
128:11
**terminations**
26:15 39:1,14
39:20
**terminology**
11:24
**testified** 6:3 35:4
**testify** 6:21
44:17,19
**testimony** 31:11
31:19 32:3,11
32:16 33:8
132:18
**Texas** 1:1,21
2:10,15 5:17
5:24 6:1 8:6
132:2,14
133:21
**thank** 19:23
21:20 74:21
129:3
**thing** 60:10,11
**things** 14:12
41:16 46:5
47:5
**think** 9:3 10:9
11:21 17:1
25:3,10 28:14

28:24,25 29:10
29:20 31:11
35:8,10 37:17
38:16,20 39:24
43:22 44:2
45:16,17 50:14
51:6 53:3 57:4
58:3,5,22
59:14,15 63:11
63:14,15 68:24
74:8 75:6
78:16,24 79:3
80:6,7 81:4
82:21 84:24
87:19 88:23
95:12 97:7
98:9 100:10
101:9,17 102:7
103:13,18
104:1,11
106:18 107:14
110:5 111:4
116:2,11 117:5
120:13,20
123:4 126:8
**thinking** 97:2
**third** 52:6 117:6
**Thompson** 97:5
**thought** 7:9
53:21 56:14
59:17 78:23
117:22
**thoughts** 75:15
**thread** 51:20
87:3 102:3
106:8 121:24
**threads** 87:12
**threat** 91:6
**three** 64:4
100:21 114:24
**time** 5:4 10:21
24:24 26:3
27:4,8 29:9,22
34:11 37:6
39:12 43:3,11
43:15 56:24

58:12,16 59:12
59:23 63:4
68:10,12 69:18
70:25 71:25
72:3 74:15,17
78:24 87:18
88:7 91:13
93:10 94:3,15
98:5 102:19
103:12,14,24
106:19,21
107:11 120:12
120:24 123:6
129:1 133:10
**timing** 76:19
**title** 9:14 53:7,10
57:6 58:7
**today** 6:12,15
11:2 19:13,17
21:22 127:10
128:24
**today's** 5:3 7:5
7:15
**told** 56:21 64:11
66:25 70:24
82:16 85:1,2,6
93:10 100:5,9
120:20
**Toni** 103:21
**top** 17:1 30:9
51:9 74:6 87:4
87:7,9 90:19
111:15 112:24
123:19
**topics** 47:7
**topple** 112:16
**total** 25:1
**touch** 69:6
**tra-** 117:15
**trafficking**
117:15,16,19
118:1,2
**training** 10:16
117:16,19
**transcript** 32:24
132:17,23

Case 3:17-cv-02278-X   Document 263-2   Filed 06/13/22   Page 52 of 54   PageID 8759
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 151

**transitioned**
  104:1
**transitioning**
  17:18
**transitions**
  17:13,21,22
**Transport** 1:5
  2:12 6:10 9:10
  11:3 132:7
**treated** 127:13
**trial** 129:1
**trips** 19:5
**trouble** 12:23
**true** 16:9 131:2
  132:18
**truly** 62:14
**try** 55:15 122:14
**trying** 104:14,19
  111:5,25 112:5
  112:15
**turn** 109:17
  112:8 118:22
**turned** 74:8
**turning** 62:3
  63:19
**two** 18:2 34:13
  52:12 93:24
  100:21 114:23
**TWU** 6:1 10:24
  11:1,19 59:24
  128:25
**types** 24:17
**typically** 66:10
  66:22 71:23
  83:10

———————
      **U**
———————
**Uh-huh** 111:4
  123:14
**ultimate** 37:1
**ultimately** 21:7
  24:4 37:20
  64:10
**uncovered** 61:7
**understand** 6:15
  6:17 7:1 9:13
  9:17 11:2,9,17

24:10,16
  119:19 127:12
  127:24
**understanding**
  44:14 82:18
  115:25
**uniform** 18:6
  61:25 83:14
**union** 1:5 2:12
  6:11 9:10
  10:22 11:2,3,6
  11:8,15 13:13
  14:1 28:2,8,11
  29:6 41:13
  42:10 43:1,6
  43:18 44:24
  45:2,5,9,15,22
  46:10,13,23
  47:9 63:11
  82:2,5,6,12
  85:23 91:4,5,6
  98:5,9,24 99:5
  99:10,16,20,22
  99:25 100:6,14
  108:19 112:16
  127:14,17,21
  132:7
**union's** 28:4
**unit** 11:19
**UNITED** 1:1
  132:2
**Unity** 28:3,4,9
  29:3,7
**updated** 29:22
**upswing** 35:10
  35:12,16
**uptick** 35:22
**use** 11:25 82:3
**usual** 77:13
**usually** 20:12,21
  46:10
**utilize** 40:18

———————
      **V**
———————
**v** 6:10
**vagina** 73:19
**vaginas** 73:15

**Vague** 19:11
  20:6 23:18
  24:2 35:14
  69:23 78:4
**Vandergrift**
  120:18
**verbal** 75:18
**verbiage** 91:2
**verify** 55:7
  119:4
**version** 84:4,8
**vial-** 40:20
**video** 5:6
**VIDEOGRAP...**
  2:18 5:2 31:5,8
  42:3,6 74:22
  74:25 95:22,25
  126:13,16
  129:4
**videos** 50:16
  55:6 59:21
  78:19,25 79:9
  79:10
**VIDEOTAPED**
  1:9
**view** 81:23
**views** 128:1
**violate** 46:19
  73:12,16 94:14
  107:23 108:6
**violated** 49:25
  78:13 94:2,12
  94:23 101:4
  102:5 109:13
**violating** 26:10
  26:13 49:9
  94:13 98:14
  106:14
**violation** 14:7,8
  15:6 16:1
  25:15 26:16,20
  29:21 34:21,24
  36:4,15,20
  37:2,8,13,22
  38:2,24 39:6
  39:15 40:21

49:13 54:9
  65:16,21,22,22
  65:25 66:4,9
  73:11 74:9
  78:2,21 79:6
  88:17 90:7,11
  90:20 91:18
  94:7,9,11,20
  96:4,10,14
  97:6,14,18,21
  98:11 99:3,7
  100:23 106:6
  126:2
**violations** 26:5
  26:24 27:8,21
  29:14 30:7,17
  31:14 33:14
  34:12,17,24
  35:5,9,20 36:1
  36:9 38:12
  39:21 41:2
  45:7,11 48:5
  66:16,20 73:2
  76:10,18 77:4
  88:15 89:5,10
  89:23 91:18
  97:16 105:2
  107:17 114:1,4
  114:20 119:17
**violence** 90:21
  93:21
**Virginia** 2:5
  5:22
**vocal** 62:23
**voted** 63:12
**VP** 40:23 66:14
**VS** 1:4 132:5

———————
      **W**
———————
**wait** 101:18
  118:25
**waited** 55:1
**want** 32:1 67:18
  67:20 74:3
  109:17 110:17
  115:23 118:22
  121:16 129:8

**wanted** 46:25
  54:6 62:18
  67:23,24 82:16
  82:19,23,25
  110:18 116:1
  119:4
**warning** 117:25
**warranted**
  37:24
**wasn't** 25:4 44:9
  60:3
**way** 41:11 42:19
  46:19 57:12
  62:15 69:5
  81:20 93:2
  95:6 112:20
  116:13 122:15
**ways** 14:3 62:15
**we'll** 6:14,14
  92:13,13
**we're** 62:7 79:25
  95:10
**we've** 120:19
**wear** 18:5,8
**website** 61:20
**Wednesday**
  105:20
**went** 18:10
  35:11,21 55:6
  82:8
**Western** 107:1
**wide** 17:6
**window** 91:1
**witness** 1:17,21
  5:5,10,12 8:1
  12:25 19:12,15
  19:22 22:1
  32:9 48:19,23
  49:1 87:11,13
  95:20 127:1,4
  128:22 129:3
  129:11 130:2
  132:16,19
**women** 73:15,15
**women's** 85:17
  85:24

Case 3:17-cv-02278-X   Document 263-2   Filed 06/13/22   Page 53 of 54   PageID 8760
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MAUREEN EMLET

Page 152

**word** 67:22,22
69:5 102:14
**work** 2:3 9:22
10:18 13:12,17
14:8 15:24
16:6 17:5,17
20:14,17 24:4
24:16 28:16
37:6,24 38:6,8
38:11 45:20
46:3 47:9
52:24 65:23
69:3 103:17
**worked** 17:3
24:20,20 38:8
96:9 97:7
**Workers** 1:5
2:12 6:11 9:10
11:3 132:7
**working** 27:2
61:17 104:21
104:24 105:5
106:13 122:16
123:17
**workplace** 25:22
36:4,9 38:12
38:23 39:1,5
47:10,14 49:16
62:2 66:5,9,12
78:21 83:13
84:25 90:20
93:21
**works** 53:7
**worthwhile**
95:14
**wouldn't** 21:17
73:20
**write** 28:18
**written** 33:25
34:1
**wrong** 119:20

**X**

**X** 92:11
**xx** 132:24

**Y**

**Y** 92:11
**yarmulke** 18:6
18:22
**yeah** 19:25
22:21 62:8
74:14,19 81:18
81:18 87:8,14
88:4 95:15
105:17 115:4
120:24
**year** 26:21 30:17
43:14 92:2
**years** 10:10
26:23 29:11
34:13,20 46:4
51:4 58:22,22
58:24 64:4
82:22 100:21

**Z**

**Z** 92:11

**0**

**1**

**1** 3:13 60:7 62:6
62:7
**1:01** 96:1
**1:55** 126:14
**10** 3:23 10:20
25:6 58:24
86:21,24
**10-31-21** 133:20
**10-minute** 126:9
**10-month** 10:21
**10:00** 31:9
**10:19** 42:4
**10:30** 42:7 74:18
**101** 4:2
**109** 4:4
**11:28** 74:23
**11:36** 75:1
**114** 4:6
**118** 4:8
**12:15** 95:23
**121** 4:10
**127** 3:5

**129** 32:8
**12th** 133:15
**13** 80:2
**130** 3:7
**132** 3:8 32:19
**14th** 71:14
**15** 51:4 58:24
**1500** 2:9
**16** 3:20 32:14
80:7,9
**17** 3:22 32:14,23
35:25 86:21,22
**18** 4:2 63:18
101:10,11,15
101:15
**19** 4:4 109:16,19

**2**

**2** 3:2,11,15 48:9
48:18 51:17,22
63:20 72:5,6
92:22 93:9
125:15,17,19
133:13
**2:08** 126:17
**2:10** 129:5,12
**20** 4:6 114:8,9
**2014** 107:11
**2016** 33:9,12
34:10 59:17
**2017** 33:4,11
34:5,10,17,25
35:17,21 53:25
58:16 59:12
60:18 68:14
71:10,12,14
120:25
**2018** 35:6 43:23
44:3 98:22
**2019** 10:2 63:16
**2020** 1:10,19 5:3
130:3 131:14
132:10 133:16
**21** 4:8 118:19,20
**214** 2:16
**22** 4:10 121:13
121:15

**22160** 2:5
**22nd** 60:18
**23** 4:5 109:17
**24** 4:7 114:8
**24th** 53:25
**25** 4:9 118:19,22
**26** 4:3 101:9,16
**27** 4:11 121:14
121:17
**2850** 2:9

**3**

**3** 3:12
**3:17-CV-0227...**
1:4 132:5
**3:42** 133:12
**30-day** 56:8,19
**30(e)(1)(A)**
132:21
**30(e)(2)** 132:22
**31st** 10:2
**3301** 2:15
**3469** 5:14
133:19
**35** 58:22
**38** 58:22 133:23

**4**

**4** 3:14 72:6
**4:38** 115:23
**4228** 62:4,10
**447** 32:2,3
**4483** 105:8
**450** 32:14,21
**4675** 70:8
**4676** 68:17
**4677** 68:18
**469** 2:10
**48** 3:11

**5**

**5** 1:10,19 48:18
130:3 132:10
**5138** 123:10
**5198** 123:12
**52** 3:14
**5530** 87:9

**556** 1:6 2:13 6:1
6:11 9:10
10:24 11:1,3
41:7,12,19
44:14,16 59:24
62:18 117:11
128:25 132:7
**5672** 72:10
**5680** 102:21
**5681** 104:7
**5682** 52:1
**5762** 72:7,12
**5763** 72:10,12
**5th** 5:3

**6**

**6** 3:4,16,19
67:12 75:19
**60** 3:12
**600** 2:4
**624** 118:25
**6323** 112:21
**6345** 112:8
**6346** 111:13
**6350** 112:21
**6351** 102:16
107:6
**6354** 102:16
**6505** 81:2 83:20
**6513** 81:2
**67** 3:16
**680-4264** 2:10

**7**

**7** 3:11,18 9:14
48:7,14 75:20
**7015** 133:21
**703** 2:5
**75** 3:18
**75201** 2:10
**75226** 2:15
**75252** 133:21
**770-3339** 2:5
**7doc.PDF** 48:22

**8**

**8** 3:21 32:23