## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER          )
                         )
                         ) CIVIL ACTION NO.
VS.                      ) 3:17-CV-02278-X
                         )
SOUTHWEST AIRLINES CO., AND )
TRANSPORT WORKERS UNION OF )
AMERICA, LOCAL 556        )

---------------------------------
CONFIDENTIAL
VIDEOTAPED DEPOSITION OF
MEGGAN JONES
NOVEMBER 4, 2020

---------------------------------

ANSWERS AND DEPOSITION OF MEGGAN JONES,
produced as a witness at the instance of the
Plaintiff, taken in the above-styled and -numbered
cause on NOVEMBER 4, 2020, at 9:05 a.m., before
CHARIS M. HENDRICK, a Certified Shorthand Reporter
in and for the State of Texas, witness located in
Golden, Colorado, pursuant to the Federal Rules of
Civil Procedure, the current emergency order
regarding the COVID-19 State of Disaster, and the
provisions stated on the record or attached hereto.

## Page 2

1           A P P E A R A N C E S
2   FOR THE PLAINTIFF:
3       MR. MATTHEW B. GILLIAM
        NATIONAL RIGHT TO WORK LEGAL DEFENSE
4       FOUNDATION, INC.
        8001 Braddock Road, Suite 600
5       Springfield, Virginia  22160
        (703) 770-3339
6       mbg@nrtw.org
7
    FOR THE DEFENDANT, SOUTHWEST AIRLINES CO.:
8
        MR. MICHAEL A. CORRELL
9       REED SMITH LLP
        2850 North Harwood, Suite 1500
10      Dallas, Texas  75201
        (469) 680-4264
11      mcorrell@reedsmith.com
12
    FOR THE DEFENDANT, TRANSPORT WORKERS UNION OF
13  AMERICA, LOCAL 556:
14      MR. ADAM GREENFIELD
        MR. EDWARD B. CLOUTMAN, III
15      LAW OFFICES OF CLOUTMAN & GREENFIELD, PLLC
        3301 Elm Street
16      Dallas, Texas  75226
        (214) 939-9223
17      agreenfield@candglegal.com
        ecloutman@lawoffices.email
18
19  ALSO PRESENT:  MR. MACK SPURLOCK -
                   VIDEOGRAPHER
20
        MS. CHARLENE CARTER
21      MS. LAUREN ARMSTRONG
22
23
24
25

## Page 3

1              INDEX
2   Appearances ..................................2
3   MEGGAN JONES
4       Examination by Mr. Gilliam...............5
5       Examination by Mr. Correll.............84
6
7   Signature and Changes.......................87
8   Reporter's Certificate.....................89
9
10             EXHIBITS
11  Exhibit 3 - ................................39
    Email to Suzanne Stephensen from Audrey Stone,
12  Document 1
13  Exhibit 4 - ................................36
    Email to Suzanne Stephensen from Dave Kissman,
14  Document 2
15  Exhibit 6 - ................................62
    Email to Maureen Emlet from Ed Schneider,
16  Document 9
17
18
19
20
21
22
23
24
25

## Page 4

1              PROCEEDINGS
2           THE VIDEOGRAPHER:  We are now on
3   record.  Today's date is November 4th, 2020.  The
4   time is 9:05 a.m. Central.  Will the court reporter
5   please swear in the witness?
6           THE REPORTER:  This is the videotaped
7   deposition of Meggan Jones, and it is being
8   conducted remotely in accordance with the current
9   emergency order regarding the COVID-19 State of
10  Disaster.  The witness is located in Golden,
11  Colorado.  Counsel has agreed that I can swear in
12  the witness from -- in -- out of state.
13          My name is Charis Hendrick, Court
14  Reporter, CSR No. 3469.  I am administering the
15  oath and reporting the deposition remotely by
16  stenographic means from my home in Ellis County,
17  Texas.
18          Would counsel please state their
19  appearances and locations for the record?  And the
20  city is fine.
21          MR. GILLIAM:  Matthew B. Gilliam for
22  plaintiff Charlene Carter in Springfield, Virginia.
23          MR. CORRELL:  Mike Correll for
24  defendant Southwest Airlines in Dallas, Texas.
25          MR. GREENFIELD:  Adam Greenfield on

Page 5

1  behalf of defendant TWU Local 556 from Dallas,
2  Texas.
3          MR. CLOUTMAN:  And Ed Cloutman also
4  for TWU Local 556, Dallas, Texas.
5              MEGGAN JONES,
6  having been first duly sworn, testified as follows:
7              EXAMINATION
8  BY MR. GILLIAM:
9      Q.  Good morning, Ms. Jones.  My name is --
10     A.  Morning.
11     Q.  My name is Matt Gilliam and I'm the
12  attorney representing Charlene Carter in the matter
13  of Carter v. Southwest Airlines and Transport
14  Workers Union of America Local 556.  And I am here
15  today to ask you some questions about the case.  If
16  at any point you need a break, just let me know and
17  we can take a break.  Have you been deposed before?
18     A.  I have not.
19     Q.  Okay.  So, basically, the way it works is
20  I will -- I will ask you some questions, and if you
21  could just answer to the best of your ability.
22  Since the reporter is preparing a written
23  transcript, it's important that you give clear,
24  verbal answers; no huh-uhs and uh-huhs and no head
25  nods or gestures.

Page 6

1          We also need to both make sure that we
2  don't talk over each other so that we make a clear
3  record.  So if you could just let me finish my
4  question before you answer, and I will do my best
5  to make sure that I let you finish your answer
6  before I ask my next question; under -- understand
7  all that?
8      A.  I do, yes.
9      Q.  Okay.  And if you don't understand my
10  question, let me know; otherwise, I will assume
11  that you understood.
12          Have you read the Complaint in this
13  case?
14     A.  I have not.
15     Q.  Okay.  Are you familiar with Ms. Carter's
16  claims in this case?
17     A.  Not really.  Not entirely.
18     Q.  Okay.  Do you know that Ms. -- Ms. Carter
19  makes a claim against both Southwest and Transport
20  Workers Union of America Local 556 that they --
21  they violated her rights under Title 7 Civil Rights
22  Act?
23     A.  No.
24     Q.  Okay.  And you are -- you are not aware
25  either that she makes a claim that the union

Page 7

1  violated its duty of fair representation to her?
2      A.  No, I am not aware of that.
3      Q.  Okay.  And are you aware that she makes a
4  claim that her rights were violated under the
5  Railway Labor Act?
6      A.  Yes, I am aware of that.
7      Q.  Okay.  Okay.  And you are -- you are aware
8  of her allegation that both the union and Southwest
9  re- -- retaliated against her exercise of rights
10  under the Railway Labor Act?
11     A.  Not -- not against the union; I was not
12  aware of that.  But against the company, yes, I was
13  aware of that.
14     Q.  Okay.  Well, just shifting gears a little
15  bit, how long have you worked at Southwest?
16     A.  Nine and a half years.
17     Q.  Okay.  And what is your current occupation
18  with Southwest?
19     A.  I am a senior manager of labor
20  administration.
21     Q.  Okay.  And how long have you held that
22  position?
23     A.  For approximately three months.
24     Q.  Okay.  And who do you report to in that
25  position?

Page 8

1      A.  Tammy Shaffer.
2      Q.  Okay.  And is that in Southwest labor
3  relations department?
4      A.  Yes, it is.
5      Q.  Okay.  And prior to holding your current
6  position with Southwest, what was your position
7  with the company?
8      A.  Inflight base manager at the Phoenix base.
9      Q.  Okay.  And how long were you the -- the
10  base manager at the Phoenix base?
11     A.  Officially, approximately a year and a
12  half; just over a year and a half.
13     Q.  Do you know when you started your -- your
14  job there in Phoenix as inflight base manager?
15     A.  I was formally offered the position in
16  January of 2019.
17     Q.  Okay.  Did you start in January 2019?
18     A.  I worked there as a temporary base manager
19  for four months prior.
20     Q.  Okay.  And prior to working in
21  Phoenix, what job did you hold with the company?
22     A.  I was the assistant base manager at the
23  Denver inflight base.
24     Q.  Okay.  And how long were you assistant
25  base manager in Denver?

Page 9

1    A. Approximately, three and a half to four
2 years, approximately.
3    Q. And so when did you start your -- I guess,
4 your job in that position?
5    A. It was in 2015. I don't recall the exact
6 month.
7    Q. Okay. And did you leave that position in
8 2018?
9    A. Officially left it in January of 2019.
10    Q. Okay.
11    A. My title changed.
12    Q. Okay. All right. And prior to being
13 assistant base manager in Denver, what -- what job
14 did you hold with the company?
15    A. I was an inflight supervisor at the Denver
16 base.
17    Q. Okay. And how long were you an inflight
18 supervisor?
19    A. With Southwest, 2011 is when I started.
20 So, approximately, four years, give or take.
21    Q. Okay. And did you work with Southwest
22 prior to 2011?
23    A. No, I did not.
24    Q. Okay. Have you ever worked as a flight
25 attendant?

Page 10

1    A. Yes, I have.
2    Q. Okay. Which company -- for which company
3 did you work as a flight attendant?
4    A. America West Airlines.
5    Q. Okay. And were you a member of the union
6 when you worked at -- as a flight attendant at
7 American West?
8    A. Yes, I was.
9    Q. Okay. Okay. What was the union?
10    A. It was the AFA.
11    Q. Okay. And did you hold any elected
12 offices with your union?
13    A. I did not, no.
14    Q. All right. Well, so while you were
15 assistant base manager in Denver, what were your
16 job responsibilities?
17    A. My job was to support the base staff,
18 support the flight attendants and to also support
19 the base manager.
20    Q. Okay. Did you have any other
21 responsibilities?
22    A. That support included, you know,
23 recognition. It could include investigating any,
24 like, potential work and conduct violations. It
25 included staff development, things like that.

Page 11

1 There is a wide variety of responsibility.
2    Q. Okay. And who did you report to as
3 assistant base manager?
4    A. Ed Schneider.
5    Q. Okay. Did you report to anyone else or
6 only Ed Schneider?
7    A. I had previous base managers, but Ed was
8 the -- there is only one base manager, and Ed is
9 the most recent person that I had reported to at
10 the Denver base.
11    Q. Okay. And did you ever have, in the
12 regular course of business, communications with
13 Ed's supervisors?
14    A. Like, Ed's -- you mean Ed's leaders?
15    Q. Well, I don't know about the term
16 "leader," so, yeah, I -- I guess I should be
17 careful with supervisor.
18        So let me back up this way: Who did
19 Ed report to?
20    A. Ed reported to Dave Kissman.
21    Q. Okay. And in the regular course of
22 business, did you have communications with Dave
23 Kissman?
24    A. Yes. Sometimes.
25    Q. Okay. And who did Dave Kissman report to?

Page 12

1    A. At that time, I am not entirely certain --
2    Q. Okay.
3    A. -- who he reported to.
4    Q. Okay. All right. And did you have --
5 have individuals who reported directly to you?
6    A. Yes, I did.
7    Q. Okay. And, I guess, what positions at the
8 Southwest base reported to you as assistant base
9 manager?
10    A. I had several supervisors -- inflight
11 supervisors and several inflight coordinators
12 report directly to me.
13    Q. How many inflight coordinators reported to
14 you?
15    A. It would vary depending on our team
16 structure, but I couldn't tell you. I don't
17 remember how many I had most recently in that
18 position.
19    Q. In 2017, do you remember how many inflight
20 coordinators reported to you?
21    A. I don't. I am sorry. I don't --
22    Q. Okay.
23    A. -- remember that.
24    Q. And do you remember how many of the
25 supervisors reported to you?

Page 13

1     A. I don't remember how many -- what the team
2  split was at that point.
3     Q. Okay. All right. Did you have anybody
4  else who reported to you?
5     A. No.
6     Q. Okay. Now, did you directly supervise
7  flight attendants?
8     A. Not directly.
9     Q. Okay. Who -- who were the -- I am sorry.
10  Who were the flight attendants -- again, I have to
11  word this very carefully.
12        So who did the flight attendants
13  report to?
14     A. They would report to inflight supervisors
15  directly.
16     Q. Okay. All right. Now, while you were
17  assistant base manager in Denver, did you know
18  Charlene Carter, the plaintiff in this case?
19     A. Yes, I did.
20     Q. Okay. How did you come to know
21  Ms. Carter?
22     A. Just from her being a flight attendant
23  there, coming in to report for her trips; that's
24  how.
25     Q. Okay. And who -- do you recall who her

Page 14

1  supervisor was?
2     A. I don't recall who it was.
3     Q. Okay. Let's see. Now, were there other
4  assistant base managers in the Denver region?
5     A. At the Denver base, yes.
6     Q. Yes. Okay. And what were their names?
7     A. Hector Barrera and Dustin Moore.
8     Q. Okay. And they were assistant base
9  managers in 2017?
10     A. Yes.
11     Q. Okay. Did you work with them on any
12  issues?
13     A. Can you be more specific?
14     Q. Yeah. For instance, in -- I guess, in --
15  enforcing work policies -- or excuse me. Let me
16  ask it another way.
17        In investigating work and conduct
18  violations, did you work with the other assistant
19  base managers?
20     A. Sometimes.
21     Q. Okay. And on -- when -- when would you be
22  required to work with another assistant base
23  manager on a work-violation issue?
24        MR. CORRELL: Objection. Misstates
25  prior testimony. And, Ms. Jones, when I make

Page 15

1  objections today, unless I specifically tell you
2  you cannot answer the question or do not answer the
3  question, you should go ahead and answer. Thank
4  you.
5        THE WITNESS: Okay.
6     A. Can you repeat the question? I am sorry.
7     Q. (By Mr. Gilliam) Yeah. So when -- when
8  investigating a -- work violation, did you have
9  occasion to work with the other assistant base
10  managers?
11     A. Yes.
12     Q. Okay. And I -- and I guess it was on --
13  only on some occasions you would work with the
14  other assistant base managers?
15     A. Yes. Correct.
16     Q. Okay. And what -- what types of work
17  violations would you work with them on?
18     A. Any of them that would happen to come up,
19  there would be an array of different violations
20  that we would work together on.
21     Q. Okay. Were there particular types of
22  matters that you had to coordinate with them on?
23     A. It just would depend on the nature of the
24  investigation or potential investigation. We
25  primarily would work together to take notes for the

Page 16

1  other person if they needed a notetaker, things
2  like that.
3     Q. Okay. Is there something about -- what
4  about the nature of the investigation would require
5  your collaboration with other assistant base
6  managers?
7     A. Experience level of the assistant manager
8  handling the case would sometimes dictate that
9  collaboration. If they were newer and they needed,
10  you know, to talk through something and understand,
11  you know, how to -- how we normally handle this or,
12  you know, what is the best approach here; that type
13  of collaboration.
14     Q. Okay. All right. Okay. Did -- did you
15  work in close proximity to the other base manager
16  -- the other assistant base managers?
17     A. Yes, I did.
18     Q. Okay. Was your office, like, next door to
19  theirs?
20     A. Yes.
21     Q. Okay. And was your office in close
22  proximity to -- to Mr. Schneider's?
23     A. Yes.
24     Q. Okay. And where in relation to
25  Mr. Schneider's office was your office?

Page 17

1    A.  His office was diagonally across from
2    mine.
3    Q.  Okay.  All right.  Now, do you know how
4    many investigation of work violations -- excuse me.
5       Do you know how many work-violation
6    investigations you participated in as an assistant
7    base manager?
8    A.  I don't know the number.
9    Q.  Okay.  Was it -- was it a lot?
10   A.  Yes, it was a lot.
11   Q.  Okay.  Were you having to conduct
12   work-violation investigations on a monthly basis or
13   how frequently did you have to conduct --
14   A.  It was driven by the -- just what was
15   happening with the flight attendants.  So it would
16   just vary on -- on how busy we would be from month
17   to month.  So I can't say that we did them every
18   month, but we did them frequently.
19   Q.  Do you know, roughly, about how many
20   disciplinary incidents you had at the Denver base
21   each year?
22   A.  I don't know.
23   Q.  Okay.  Do you know if it was over five?
24   A.  Yes, it was over five.
25   Q.  Okay.  Do you know if it was over 10 a

Page 18

1    year?
2    A.  Yes.  There were more than 10 a year.
3    Q.  Okay.  Were there more than 50
4    disciplinary incidents a year?
5    A.  I don't know.
6    Q.  Okay.  More than 10.  Do you know
7    if it was more than 20 a year?
8    A.  I don't know.
9    Q.  Okay.  Okay.  And when -- when there was a
10   need to investigate a work -- I guess, a work
11   violation, did -- did you conduct those
12   investigations on your own?
13   A.  What do you mean by on my own?
14   Q.  Did you -- I guess, did you have authority
15   to investigate a work -- workplace violation
16   without the involvement of Ed Schneider?
17   A.  Yes.
18   Q.  Okay.  And do you know how often you
19   conducted the work -- like, the -- the work rule
20   violations -- well, let me be careful with terms
21   here again.
22       Do you know how often you conducted
23   investigation of a workplace violation without Ed's
24   involvement?
25   A.  No, I don't know.  Ed -- Ed wouldn't be

Page 19

1    directly involved, necessarily, but I would always
2    make him aware that something was happening.
3    Q.  Okay.  Did Ed ever conduct workplace
4    violations on his own without the involvement of
5    his assistant base managers?
6    A.  Yes.
7       MR. CORRELL:  Objection.  Calls for
8    speculation.  Take your time after a question just
9    so I can jump in, Ms. Jones.
10      THE WITNESS:  Okay.  No problem.
11   Q.  (By Mr. Gilliam)  And I'll -- I'll ask it
12   again just for the -- the -- the record.  Do you
13   know if Ed Schneider conducted any workplace
14   violations on his own without the involvement of
15   his assistant base managers?
16   A.  Ed has the authority to do that.  I
17   couldn't give you a specific example.
18   Q.  Okay.  Did -- did Ed ordinarily have his
19   assistant base managers assist him with
20   investigations of a disciplinary matter?
21   A.  I don't know.
22   Q.  Okay.  Now, did you have the -- did you
23   have the authority to issue any discipline to a
24   flight attendant without Ed's approval?
25   A.  No.  We had to get Ed's approval.

Page 20

1    Q.  Okay.  After investigating a matter, did
2    he have to approve your decision to issue or even
3    not to issue discipline to a flight attendant?
4    A.  Yes.
5    Q.  Okay.  Now, in doing investigation of some
6    -- well, in conducting investigations of
7    disciplinary matters, did you ever deal with
8    violations of Southwest's social media policy?
9    A.  Did I personally handle those types of
10   investigations?
11   Q.  Were you ever involved in any social media
12   policy violation investigation?
13   A.  Yes, I was.
14   Q.  Okay.  And did you ever conduct any of the
15   social media policy violation investigations on
16   your own?
17   A.  I can't remember if I did them alone or
18   not.
19   Q.  Okay.  Do you know how many reports of a
20   social media policy violation the Denver base
21   received each year?
22   A.  I don't know.
23   Q.  Do you know if it was more than 10 a year?
24   A.  I don't know.
25   Q.  Okay.  You just know that they -- they

Page 21

1    happened, or at least there were complaints of a
2    social media policy violation and you investigated
3    it?
4        A. Yes.
5        Q. Okay.  Do -- do you know how many of those
6    reports resulted in the discipline of a flight
7    attendant?
8        A. I don't know.
9        Q. Okay.  Do you know if a Denver-base flight
10   attendant was ever terminated for a violation of
11   the social media policy?
12       A. I don't know.
13       Q. Okay.
14       A. I mean, are you -- I am sorry.  To
15   clarify, are you referring to prior to Charlene
16   or --
17       Q. Ever in your whole -- the whole time
18   working at the Denver base.
19       A. Can you ask me again?  I am sorry.
20       Q. Sure.  So in your whole time working as an
21   assistant base manager in Denver, was there ever a
22   flight attendant who was terminated for a violation
23   of the social media policy?
24       A. Yes, there was.
25       Q. Okay.  And how many of those terminations

Page 22

1    were there?
2        A. I don't know how many terminations there
3    were.
4        Q. Okay.  How many terminations do you
5    recall?
6        A. I definitely recall one.
7        Q. Okay.  And which one was that?
8        A. Charlene Carter.
9        Q. Okay.  Do you remember -- you don't
10   remember any other social media violations --
11       A. I don't.
12       Q. -- that resulted in termination?
13       A. I don't remember that at the Denver base.
14       Q. Okay.  Do you know -- do you recall any
15   other terminations of a flight attendant under the
16   social media policy?
17       A. Yes.
18       Q. Okay.  What were some of the other ones
19   you recall?
20       A. I had a Phoenix-based flight attendant
21   that was terminated under that policy.
22       Q. Okay.  And who was the Phoenix-based
23   flight attendant who was terminated?
24       A. Tammy Feldhausen.
25       Q. Okay.  And what -- what was Tammy

Page 23

1    Feldhausen's violation of the social policy?
2        A. She made a post that was offensive in
3    nature.  Another Southwest Airlines employee
4    reported it.
5        Q. Okay.  When did that incident occur?
6        A. I don't know exactly when that was.
7        Q. Did that occur while you were working as a
8    base manager in Phoenix?
9        A. Yes, yes.
10       Q. Okay.  So that would have been after
11   January 2019?
12       A. Yes.
13       Q. Okay.  And do you remember who had
14   reported Tammy Feldhausen?
15       A. I don't remember.
16       Q. Okay.  What was the offensive post that
17   Tammy Feldhausen made?
18       A. I don't remember the exact contents of it.
19       Q. Okay.  What -- what about the contents do
20   you remember?
21       A. That it was racially motivated, but I
22   don't remember exactly what it said.
23       Q. Okay.  Do you remember any other details
24   about the -- the post?
25       A. I don't.  I am sorry.

Page 24

1        Q. And do you remember -- well, was there any
2    other conduct that Tammy Feldhausen was terminated
3    for?
4        A. I don't believe so.
5        Q. Okay.  All right.  Do you remember any
6    other terminations at Southwest for a social media
7    policy violation?
8        A. I don't know.  I don't recall any other
9    terminations.
10       Q. Okay.  Now, are you familiar with
11   Southwest's workplace bullying and hazing policy?
12       A. I am familiar with it.
13       Q. Okay.  Do you remember whether any flight
14   attendants at the Denver base were -- were
15   disciplined for violating the workplace bullying
16   and hazing policy?
17       A. I don't remember.
18       Q. Okay.  And I think I asked specifically
19   about the Denver base.  Do you remember whether --
20   do you remember any cases at Southwest of a flight
21   attendant -- excuse me -- being disciplined for a
22   violation of the workplace bullying and hazing
23   policy?
24       A. I don't -- I don't know.  I don't remember
25   anything right now.

Page 25

1      Q.  Okay.  And are you familiar with
2  Southwest's policy concerning harassing --
3  harassment, sexual harassment, discrimination and
4  retaliation?
5      A.  Yes.
6      Q.  Okay.  Do you know of any flight
7  attendants at the Denver base who were fired for
8  violating that policy?
9      A.  Yes.
10      Q.  Okay.  And how many flight attendants do
11  you remember being fired for that policy?
12      A.  I can only recall -- excuse me -- two.
13      Q.  Okay.  And who are the two that you
14  recall?
15      A.  Charlene Carter and an employee named
16  Ralph Garrett, former employee.
17      Q.  Okay.  And Ralph Garrett was a flight
18  attendant?
19      A.  Yes.
20      Q.  Okay.  And apart from termination, do you
21  know whether any of the flight attendants at the
22  Denver base were -- were disciplined in any other
23  way for violating that sexual harassment policy?
24      A.  I don't know.
25      Q.  Okay.  And what do you remember about

Page 26

1  Ralph Garrett's violation?
2      A.  It was primarily sexual harassment.
3      Q.  Okay.  What -- what was the conduct that
4  he engaged in that violated the rule?
5      A.  Several employees had reported that he
6  made inappropriate remarks to them and our
7  customers.
8      Q.  What were the inappropriate remarks?
9      A.  I don't remember all of them.
10      Q.  Okay.  What do you remember?
11      A.  He made a remark to more than one flight
12  attendant about them having DSL, which he stated
13  was dick-sucking lips.
14      Q.  Okay.
15      A.  And he was singing a song that was
16  inappropriate.  Like, he was humming it and singing
17  it around those flight attendants.  And he was
18  flirting with a 14-year-old girl on an airplane.
19      Q.  Okay.  Okay.  Was he terminated for
20  violations of any other policies as well or just
21  the sexual harassment policy?
22      A.  I don't remember.
23      Q.  Okay.  Do you remember if there were --
24  well, let me ask it this way:  Do you remember any
25  other Southwest flight attendants who were

Page 27

1  disciplined for a violation of Southwest's sexual
2  harassment policy?
3      A.  I don't remember.
4      Q.  Now, do you remember investigating any
5  reports of flight attendant conduct that were
6  alleged to be a violation of one of those policies
7  that did not result in discipline?
8      A.  I don't remember.
9      Q.  Okay.  And how do you ordinarily hear
10  about reported violations?
11      A.  Normally, flight attendants or other
12  employees will turn something over to the company
13  that they feel is offensive or disturbing in
14  nature.
15      Q.  Apart from the employees turning it over,
16  do you -- do you hear about, I guess, a potential
17  violation in other ways?
18      A.  Sometimes a customer will make an
19  allegation.
20      Q.  Okay.  Apart from customers and other
21  flight attendants, do you hear about a --
22  complaints about a potential violation through
23  other means?
24      A.  Not that I can recall; that's the typical
25  -- that I know about it.  It's the most common way,

Page 28

1  would be through a flight attendant or a customer.
2      Q.  Okay.
3      A.  Off the top of my head, maybe other
4  avenues.
5      Q.  Okay.  Do you remember any instances where
6  maybe someone in Southwest management discovered
7  some activity that they may have believed was a
8  violation?
9      A.  I can't recall anything like that.
10      Q.  Do you know if Southwest monitors any
11  social media activities?
12      A.  We do not monitor their activity.
13      Q.  Okay.  Now, do you -- were there any
14  instances while you were working at the Denver base
15  where a flight attendant complained of religious
16  discrimination?
17      A.  Religious discrimination?  I don't recall.
18      Q.  Okay.  And do you -- are you familiar with
19  the idea of what a religious accommodation request
20  is?
21      A.  Yes.
22      Q.  And do you know of any instances where a
23  Denver-based flight attendant made a religious
24  accommodation request?
25      A.  Not an actual request, no.

Page 29

1      Q.  Okay.  And you say not an actual request.
2  Do you recall any -- any instance where a flight
3  attendant -- flight attendant's conduct may have
4  involved an accommodation request in some way?
5      **A.  I don't understand your question.**
6      Q.  Do you remember any incidents involving
7  flight attendants that involved religious
8  incompetent -- accommodation in some way?
9      **A.  I have never had a flight attendant put in**
10  **a request that I know of for religious**
11  **accommodation.**
12      Q.  Okay.  Is there a particular department at
13  Southwest that handles religious accommodation
14  requests?
15      **A.  Yes.**
16      Q.  And what is the name of that department?
17      **A.  They are referred to as the ACT team.**
18      Q.  Okay.  And has the ACT team ever contacted
19  the Denver base about a religious accommodation
20  request?
21           MR. CORRELL:  Objection.  Calls for
22  speculation.
23      **A.  I don't know.**
24      Q.  (By Mr. Gilliam)  Okay.  Now, in working
25  in other areas at Southwest, are -- are you

Page 30

1  familiar with any case where any flight attendant
2  made a religious accommodation request?
3      **A.  No.**
4      Q.  Okay.  And in working at Southwest, have
5  you ever been contacted by the ACT team about any
6  flight attendant?
7      **A.  About any flight attendant, yes.**
8      Q.  Okay.  And what -- what did the ACT team
9  -- so in that instance, what -- what communications
10  did you have with the ACT team?
11      **A.  They had contacted me to inquire about**
12  **uniform standards and feasibility of, like, wearing**
13  **a brace with the uniform and clarification on job**
14  **duties to -- to under -- so they could better**
15  **understand the accommodation that was being asked.**
16      Q.  So a flight had -- had a flight
17  attendant -- do you know if a flight attendant had
18  contacted them directly about a request for a
19  religious accommodation involving their uniforms?
20      **A.  I don't know.**
21      Q.  Okay.  So what -- I -- I guess, what --
22  what was the specific request they were asking you
23  to -- to evaluate involving the uniform and the
24  brace?
25      **A.  If a flight attendant could wear a brace**

Page 31

1  **on their wrist that was flesh colored that would be**
2  **visible to customers.**
3      Q.  Okay.  What -- what kind of brace?
4      **A.  Like a carpal tunnel brace.**
5      Q.  Okay.  And was your understanding that it
6  was a -- maybe a -- some sort of disability
7  accommodation request?
8      **A.  I don't recall specifically what it was**
9  **falling under when they called to ask me that**
10  **question.**
11      Q.  Okay.  Apart from that instance, were you
12  ever contacted by the ACT team about some sort of
13  accommodation issue?
14      **A.  I don't remember.**
15      Q.  Okay.  You don't remember if you were
16  contacted another time?
17      **A.  Correct.  I don't remember.**
18      Q.  Okay.  And I don't think I quite asked it
19  this way, but were you in -- in your work at other
20  locations in Southwest's system, did you ever hear
21  of a flight attendant who had a religious
22  discrimination complaint?
23      **A.  No, not that I am aware of.**
24      Q.  Okay.  Do -- were you aware, during your
25  work at the Denver base, of the -- the number of

Page 32

1  religious accommodation requests that Southwest
2  received each year?
3      **A.  No.**
4      Q.  Okay.  Okay.  All right.  When did you
5  first learn that a flight attendant had reported
6  Ms. Carter for her Facebook posts and messages?
7      **A.  I don't recall when that was.**
8      Q.  Okay.  If I could -- do you recall
9  receiving a complaint about Ms. Carter's Facebook
10  posts and messages?
11      **A.  No, I didn't receive a complaint about it.**
12      Q.  Okay.  Who did?
13      **A.  I don't know who received that complaint.**
14      Q.  Okay.  But you are aware of a complaint?
15      **A.  Yes, I am.**
16      Q.  Okay.  And who made that complaint?
17      **A.  It was Audrey Stone.**
18      Q.  Okay.  And at the time the complaint was
19  made, did you know who Audrey Stone was?
20      **A.  Yes.**
21      Q.  Okay.  And how did you know Audrey Stone?
22      **A.  She was the president of the union.**
23      Q.  Okay.  And how did you know that she was
24  union president?
25      **A.  The union puts that information out.**

Page 33

1    Q.  Okay.  Do you know where the union puts
2  that information out?
3    A.  No, I don't know all of their -- their
4  avenues.
5    Q.  Okay.  Do you know where the union puts
6  that information out that it would have been
7  communicated to you?
8    A.  No, I don't know where they would put that
9  out for that --
10    Q.  Had you -- did you have any conversations
11  with Audrey Stone in the past?
12    A.  I don't recall ever talking to her.  I
13  don't know if I did or not.
14    Q.  Did you ever have any, I guess,
15  communications with the union prior to the
16  complaint against Ms. Carter?
17    A.  Yes.
18    Q.  Okay.  And what sorts of communications
19  did you have with the union?
20    A.  I would communicate with the -- the local
21  DEBM, as they call it, and the local shop stewards
22  and the individuals who would answer the phone at
23  the Dallas office to schedule meetings and render
24  outcomes.
25    Q.  Okay.  And what's -- what's a DEBM?

Page 34

1    A.  It's a -- I don't know the entire acronym,
2  but it's an executive board member --
3    Q.  Okay.
4    A.  -- in a local domicile.
5    Q.  Okay.  Who were the DEBMs you had -- who
6  you had communicated with in the past?
7    A.  Jessica Parker and Chris Sullivan.
8    Q.  Okay.  Had you -- while working in Denver,
9  had you communicated with any other DEBMs?
10    A.  I don't know.  There is only one per base,
11  one --
12    Q.  Okay.
13    A.  -- DEBM per base.
14    Q.  Okay.  At Phoenix, did you work with any
15  DEBMs?
16    A.  Yes.
17    Q.  And which DEBMs did you work with there?
18    A.  Just one.  John DiPippa.
19    Q.  Okay.  And while at Denver, who were the
20  shop stewards you communicated with?
21    A.  I don't remember who they were.
22    Q.  Okay.  And what -- what sorts of
23  communications did you have with Jessica Parker?
24    A.  Those communications were limited to just
25  ongoings (sic) at the base, like base happenings;

Page 35

1  you know, updates about base events.  And if she
2  was representing a flight attendant, we would have
3  discussion in the fact-finding meeting about, you
4  know, that case.
5    Q.  Okay.  What cases do you remember talking
6  to Ms. Parker about?
7    A.  I don't remember which cases we worked
8  together on.
9    Q.  Do you remember any details of any cases
10  you worked together on?
11    A.  I don't.
12    Q.  Okay.  And, I guess, did you also work
13  with Chris Sullivan on cases?
14    A.  I recall working with him on cases, yes.
15    Q.  Okay.  And what types of cases did you
16  work with Chris Sullivan on?
17    A.  Charlene's case.
18    Q.  Okay.  Did you work with Chris Sullivan on
19  any other flight attendants' cases?
20    A.  I don't remember.
21    Q.  Okay.  And prior to working with Chris on
22  Charlene's case, what sorts of communications did
23  you have with Chris?
24    A.  Very limited.  I would say hello to him
25  when he came into the base.  He used to be the

Page 36

1  DEBM, so he used to be in the base more often, but
2  I don't recall what types of communication or --
3  you know, specifics of that.
4    Q.  Okay.  Was he the DEBM when you first
5  started working at the Denver base?
6    A.  Yes.
7    Q.  Okay.  All right.  And how did you get
8  involved in the investigation involving
9  Ms. Carter's Facebook posts and messages?
10    A.  I don't recall exactly how I got involved
11  in it.
12    Q.  What do you recall about your involvement
13  in it?
14    A.  I recall working with Ed on it.  I recall
15  him saying that we had this investigation, but I
16  don't recall exactly how I was selected to work
17  with him on it.
18    Q.  Okay.  If I could direct your attention to
19  Document 4.  This is Exhibit 2.  I will give you a
20  specific page number.  Page 4436.  It's towards the
21  front.
22    A.  Hang on.  Document 4?
23    Q.  Yeah.  Document 4.
24    A.  Okay.
25    Q.  And Exhibit 2 if anybody is following the

Page 37

1  exhibit numbers.  And it's --
2           MR. CORRELL:  Counsel, I think that
3  may be inverted.  I think it's Document 2, but
4  Exhibit 4.
5           MR. GILLIAM:  I am sorry.  Yes.  It's
6  Exhibit 4, Document 2.  So Exhibit 4.
7       A.  By Document 2, do you mean Page 2 of --
8           MR. CORRELL:  One second, Ms. Jones.
9  Let me see how -- I believe we sent them to you by
10  document number, not by exhibit number, so let me
11  just confirm that.  Yes, we did.  So it's the --
12  the document you will open will be the one labeled
13  2docs.PDF in the email from Ms. Armstrong.
14          THE WITNESS:  Okay.  Thank you.
15      Q.  (By Mr. Gilliam)  And then if you will
16  look for the -- the Bates-numbered page, it's the
17  -- there is a number that says SWA00 followed by
18  numbers at the bottom right-hand corner.  If you
19  look for the SWA004436.  Again, it's maybe the
20  fourth document.
21      A.  Okay.
22      Q.  Fourth page.  And if you could just take a
23  look at it and review it once you have had a chance
24  to look at it.
25      A.  Confirming it's SWA004436?

Page 38

1       Q.  Yes, ma'am.  Yeah.
2       A.  Thank you.  Okay.
3       Q.  Do you recognize this?
4       A.  Not really.
5       Q.  Well, I guess, at the top, it  -- it says,
6  from Dave Kissman and it's dated Thursday, February
7  23rd, 2017.  And you are -- you are one of the
8  recipients, correct?
9       A.  Yes.
10      Q.  Okay.  And can you -- can you tell what it
11  is?
12      A.  It's an email, and I was copied in on it,
13  but I don't -- I don't know that I recognize the --
14  the email.
15      Q.  Okay.  And are you familiar with the --
16  some of the paragraphs towards the bottom of the
17  email?
18      A.  Familiar in -- in what regard?
19      Q.  Do -- does that help refresh your -- your
20  memory of --
21      A.  Yes.
22      Q.  -- investigation?
23      A.  Yes.
24      Q.  Okay.  All right.  And let's see.  Next,
25  if I could direct your attention to Document 1.

Page 39

1  Did I screw this up?
2       A.  Which one is Document 1?
3       Q.  I'm sorry.  You know what, I screwed this
4  up again.  I think Mike may not have sent it to you
5  because I was thinking that this was Document 3,
6  but I -- I had the exhibits and document numbers
7  inverted.
8           MR. CORRELL:  Let me check real quick.
9           MR. GILLIAM:  Because this was not one
10  of the numbers I gave you.
11          MR. CORRELL:  Well, no, it is Exhibit
12  3.  You said Exhibits 2 through 7.  So,
13  Ms. Jones --
14          MR. GILLIAM:  Okay.
15          MR. CORRELL:  -- it will be the
16  document labeled 1docs.PDF on the email that you
17  received from Ms. Armstrong at 11:34 p.m.
18  yesterday.
19          THE WITNESS:  Okay.
20      A.  I believe I have it here.
21      Q.  (By Mr. Gilliam)  Okay.  And once you find
22  it and get it open, take a -- take a look at it.
23      A.  Can you confirm the SWA number on the
24  bottom?  I just want to make sure I have got the
25  right one.

Page 40

1       Q.  Yeah.  No, no.  Sure.  It's 4226.
2       A.  Okay.  Got it.  Thank you.  Okay.
3       Q.  Do you recognize this?
4       A.  I don't.
5       Q.  Okay.  Do you know if you've -- you've
6  seen this email before?
7       A.  I don't know.  I don't remember if I have
8  seen it before or not.
9       Q.  Okay.  And did you also -- let's see.  Did
10  you also take a look at the other pages that are
11  part of this document?
12      A.  This -- the part that carries into the
13  second page, 4227?
14      Q.  Yeah.  All the way -- yeah.  I guess, if
15  you could review the whole document, all of
16  Document 1, including the -- I guess, all the way
17  to -- well, they are not sequential, but it's -- I
18  think 4233 is the last page.
19      A.  Okay.
20      Q.  All right.  And have -- the -- some of the
21  pages that follow are screenshots, correct?
22      A.  Correct.
23      Q.  Okay.  And have you seen those screenshots
24  before?
25      A.  Yes, I have.

Page 41

1  Q. Okay. And where did you see those?
2  A. In Charlene's meeting.
3  Q. Okay. Which -- which meeting was that?
4  A. She had a fact-finding meeting.
5  Q. Okay. All right. And I guess you've --
6  so -- well, let me -- let me look here.
7       So do you know when Charlene's
8  fact-finding meeting was?
9  A. I don't remember when it was.
10  Q. Okay. Turning back to the other document,
11  Document 2. And the page we were looking at there.
12  A. One moment, please. I don't recall which
13  one that was in.
14  Q. It's Document 2 and it was 4436.
15  A. One moment, please. 4436?
16  Q. Yeah.
17  A. Just a moment, please. Okay. Got it.
18  Q. Now, in this email, Dave Kissman sends it
19  to Ed Schneider, you, Hector Barrera, and Dustin
20  Moore and attaches some images -- or there's some
21  images attached. Do you know if the -- images
22  in Document 1 you looked at were attached to this
23  email?
24  A. I don't remember.
25  Q. Okay. And Dave Kissman says, Ed, give

Page 42

1  Suzanne a call.
2  A. Yes, he does.
3  Q. Okay. And as part of this email chain,
4  the -- the -- email below it is from Audrey
5  Stone to Suzanne Stephensen?
6  A. Yes.
7  Q. Okay. And, I guess, do you see, as part
8  of this chain, the -- the -- the bottom part of
9  this chain on 4436 is the same email as Document 1;
10  does that seem correct to you?
11       MR. CORRELL: Objection. The document
12  speaks for itself.
13  Q. (By Mr. Gilliam) You can answer, though.
14  A. It -- it looks like part of it, but it
15  doesn't look like it's all in there.
16  Q. Okay. But it -- it looks like at least
17  that part of the email was forwarded to you, right?
18  A. Yes.
19  Q. Okay. And do you know if Dave Kissman was
20  asking Ed to begin his investigation into the
21  Facebook post?
22  A. It's -- it look like he was asking him to.
23  Q. Okay. And -- and I am sorry. For the
24  -- the email in the chain below is from Audrey
25  Stone to Suzanne Stephensen and it CC's Naomi

Page 43

1  Hudson and Sonya Lacore.
2  A. Yes.
3  Q. Do you know who Suzanne Stephensen is?
4  A. Yes.
5  Q. And who is she?
6  A. At the time, she was the Las Vegas base
7  manager.
8  Q. Okay. Did you --
9       MR. GREENFIELD: Matthew?
10       MR. GILLIAM: Yes.
11       MR. GREENFIELD: Matthew, I am so
12  sorry to interrupt. When you get to a stopping
13  place, if we could just take a very quick
14  five-minute break. I have a personal emergency
15  situation I have to tend to.
16       MR. GILLIAM: Yeah, sure. Let's -- if
17  everybody else is okay, we can take a five-minute
18  break now.
19       THE WITNESS: Yes.
20       MR. CORRELL: Very good.
21       THE WITNESS: That would be great.
22  Thank you.
23       THE VIDEOGRAPHER: We are off record
24  at 10:10 a.m.
25       (Recess taken.)

Page 44

1       THE VIDEOGRAPHER: We are back on
2  record at 10:28 a.m.
3  Q. (By Mr. Gilliam) All right. Ms. Jones,
4  if I could direct you back to Document 4436, I
5  think that's where we left off before the break.
6  It's part of Document 2.
7  A. Yes.
8  Q. Okay. And I -- I may have just asked you
9  if you knew Suzanne Stephensen. And did -- do you
10  know who Suzanne Stephensen is?
11  A. Yes.
12  Q. Okay. And how do you know Suzanne
13  Stephensen?
14  A. She was the base manager in Las Vegas.
15  Q. Okay. Is she still the base manager in
16  Las Vegas?
17  A. No.
18  Q. Does Suzanne Stephensen work with
19  Southwest?
20  A. No.
21  Q. Okay. And had you had any communications
22  with Suzanne Stephensen before you were sent this
23  email by Davis Kissman?
24  A. No.
25  Q. Okay. Now, here, Dave Kissman's email

Page 45

1  says, Ed, give Suzanne a call.
2        Do you know if Ed Schneider
3  communicated with Suzanne Stephensen about Carter's
4  Facebook post?
5        **A. I don't know.**
6        Q. Okay. But you -- you do know that Ed
7  started conducting an investigation into Charlene
8  Carter's Facebook post, right?
9        **A. Yes.**
10       Q. Okay. Now, after receiving this email, do
11  you know if -- well, let me back up.
12       During the investigation, did you ever
13  have any communications with Suzanne about the
14  Facebook post?
15       **A. I don't recall.**
16       Q. Okay. What -- what communications do you
17  recall during the investigation?
18       **A. Can you be more specific?**
19       Q. Sure. Sure. So after -- after Ed started
20  his investigation, do you remember Ed asking you
21  to participate in the investigation?
22       **A. I don't remember if he asked me to**
23  **participate. I don't remember the -- a specific**
24  **conversation that took place.**
25       Q. How did you come to be involved in the

Page 46

1  investigation?
2        **A. It's possible that he did ask me to help**
3  **him with it. I just -- I don't remember exactly.**
4        Q. Do you remember any other details about
5  how you came to be involved in the investigation?
6        **A. No.**
7        Q. Okay. Do you know if you talked to
8  Ms. Stone as part of the investigation?
9        **A. No.**
10       Q. No, you don't remember; or, no, you
11  didn't?
12       **A. No, I didn't.**
13       Q. Okay. Do you know who corresponded with
14  Ms. Stone as part of the investigation?
15       **A. I don't, no.**
16       Q. Okay. But you do recall participating in
17  Charlene Carter's fact-finding?
18       **A. Yes.**
19       Q. Okay. Do you know if, prior to Charlene
20  Carter's fact-finding, whether any sort of
21  information-gathering process had -- had started?
22       **A. Yes.**
23       Q. Okay. And what happened as part of the
24  investigation -- as part of the
25  information-gathering process?

Page 47

1        **A. I was asked to look at her Facebook page.**
2        Q. Okay. I am sorry. You said you were
3  asked to do what with her Facebook page?
4        **A. To look at her Facebook page.**
5        Q. Okay. Who asked you to look at her
6  Facebook page?
7        **A. Ed Schneider.**
8        Q. Okay. And what did Ed -- Ed Schneider ask
9  you to look for on her Facebook page?
10       **A. I don't recall specifically.**
11       Q. So what do you recall about looking at
12  Ms. Carter Facebook page?
13       **A. I remember looking at it. I don't recall**
14  **much else.**
15       Q. Okay. Do you recall taking any
16  information back from her page to Mr. Schneider?
17       **A. I don't recall.**
18       Q. Okay. Okay. Do you -- now, the -- the
19  Facebook posts that were attached to the email I
20  sent you earlier -- or I am sorry -- that -- that
21  were attached to the email you reviewed earlier as
22  part of -- which one was it? -- Document 1, do you
23  recall if you saw any of those images from the
24  screenshots on Ms. Carter's Facebook page?
25       **A. I don't recall.**

Page 48

1        Q. Okay. But you recall those being
2  Charlene's Facebook posts at issue in this case?
3        **A. I'm sorry, can you repeat --**
4        MR. CLOUTMAN: Objection. Misstates
5  prior testimony.
6        Q. (By Mr. Gilliam) Do you -- do you recall
7  those images being the -- some of the images you
8  were investigating and looking at as part of this
9  investigation?
10       **A. Yes.**
11       Q. Okay. Now, did you talk to either of the
12  other two assistant base managers about those
13  posts?
14       **A. I don't recall.**
15       Q. Okay. Do you know if you talked to Dave
16  Kissman about those posts?
17       **A. I don't recall.**
18       Q. Do you recall if you communicated with
19  them in any way about the investigation?
20       **A. No, I don't recall.**
21       Q. Okay. All right. Let's see if I can
22  refer you to the same document, Document 2. It
23  should be 4450.
24       **A. 4450?**
25       Q. Yes.

Page 49

1    A. Okay.
2    Q. If you could just take a look at this.
3  And when you have had the chance to review it, let
4  me know.
5    A. Okay.
6    Q. Do you know what this is?
7    A. It's an email.
8    Q. Okay.
9    A. From -- from Ed.
10   Q. And it's to employee relations DG; do you
11 know who that is?
12   A. Yes, I do.
13   Q. Who is that?
14   A. It's the team that investigates any
15 potential Title 7 issue.
16   Q. A team that invests (sic) Title 7 issues?
17   A. Like, harassment, you know, anything like
18 that. Harassment policy, things like that.
19   Q. Okay. And is that what the employee
20 relations group does?
21   A. Yes.
22   Q. Okay. And who are the, I guess, members
23 of that employee relations team who would receive
24 that email?
25   A. I don't know who is on that team.

Page 50

1    Q. Okay. Did you -- do you know who was on
2  that team in 2017?
3    A. Not entirely.
4    Q. Okay. Who do you remember being on that
5  team?
6    A. Christine Johnson.
7    Q. Okay. Who else?
8    A. Denise Gutierrez.
9    Q. And who else?
10   A. That's all I know.
11   Q. All right. Do you know if either
12 Christine Johnson or Denise Gutierrez was involved
13 in this investigation?
14   A. Yes.
15   Q. Okay. And which of them was involved in
16 this investigation?
17   A. Denise Gutierrez.
18   Q. Okay. Was Christine Johnson involved in
19 the investigation?
20   A. I don't recall if she was or not.
21   Q. Okay. But Denise Gutierrez was?
22   A. Yes.
23   Q. Okay. Do you know why Ed contacted
24 employee relations about this matter?
25   A. Yes.

Page 51

1    Q. Okay. And why was that?
2    A. Because the nature of the allegation being
3  made.
4    Q. And what about the nature of the
5  allegation made it something that he would send to
6  employee relations?
7    A. Any time an allegation might fringe on a
8  protected category, we run it past employee
9  relations.
10   Q. Okay. And do you know what the allegation
11 here that might have infringed on a protected
12 category was?
13   A. I would have to go back and read again to
14 be able to determine exactly what that -- that
15 would be.
16   Q. What would you have to go back and read?
17   A. The statement from Audrey.
18   Q. Yeah. If you could, go back and look at
19 Document 1.
20   A. Can you confirm the number on that one,
21 the SWA number?
22   Q. Yeah. It's the whole thing -- the whole
23 thing.
24   A. Is it 4226?
25   Q. 4226, yes. The first page.

Page 52

1    A. Thank you. Just want to make sure I am on
2  the right page. Okay.
3    Q. All right. So -- so what about the
4  allegation in the complaint involved the need to
5  consider protected categories?
6    A. She uses the term "harassment" in her
7  complaint, and so that would be an indication it
8  would need to be run past the employee relations
9  team. And she also makes statements about her
10 religious views, which would also be an indication
11 it would need to be run past that team.
12   Q. Okay. What's the statement about
13 religious views you're referring to?
14   A. Charlene doesn't know me or my religious
15 views.
16   Q. Okay. And let's see. And Ed -- now, in
17 other issues you dealt with involving potential
18 violations of the harassment policy, was it routine
19 to turn in to employee relations any complaint that
20 used the term "harassment"?
21   A. Yes.
22   Q. Okay. So for every single one that used
23 the term "harassment," you would send it to
24 employee relations?
25        MR. CORRELL: Objection. Misstates

Page 53

1  prior testimony.
2      Q.  (By Mr. Gilliam)  You can answer.
3      A.  That's a kind of complicated question
4  because it would depend on the nature of that
5  complaint.  And, you know, typically, if they use
6  the term "harassment," it's sent to that group.
7      Q.  Okay.  What other, I guess,
8  characteristics involved in the nature of the
9  complaint would factor into the decision as to
10  whether to send it to employee relations?
11      A.  If it appeared to fringe on a protected
12  category, it would be sent to employee relations.
13      Q.  Okay.  And did Audrey's complaint present
14  an issue that appeared to infringe on a protected
15  category?
16      A.  Yes.
17      Q.  Okay.  And how so?
18      A.  The language that she used in the
19  complaint.
20      Q.  What -- so I am assuming other language
21  besides harassment, correct --
22      A.  In --
23      Q.  -- is that what we are talking about?
24      A.  In her case, she did use the term
25  "harassment."  And her reference to her religious

Page 54

1  views.
2      Q.  Okay.  Okay.  Now, after Ed sent this
3  email, do you know if you had additional
4  communications with employee relations?
5      A.  No, I don't know.
6      Q.  Okay.  Okay.  If you could look at
7  Document 2, and it's Number 4459.
8      A.  4459?
9      Q.  Yes.
10      A.  Okay.  I have got it here.
11      Q.  And if you could just read over it.  Once
12  you have read it, let me know.
13      A.  Okay.
14      Q.  Do you recognize this?
15      A.  It's -- I don't recognize it.
16      Q.  Do you know what it is?
17      A.  Yes.
18      Q.  What is it?
19      A.  It's an email from Denise Gutierrez to Ed
20  and the employee relations group.
21      Q.  And you are included on the email too,
22  correct?
23      A.  Yes.  I am CC'd in on the email.
24      Q.  Okay.  Do you know why you were CC'd in?
25      A.  Ed CC'd me in on his communication to

Page 55

1  them.  And it looks like they hit reply all.
2      Q.  Okay.  Do you know why Ed CC'd you in --
3      A.  I --
4      Q.  -- to his original email?
5      A.  I was assisting him with the
6  investigation.
7      Q.  Okay.  And after receiving this email --
8  well, let me direct your attention to something
9  real quick.  In the email that Denise sends, she
10  says, please set up a call with Audrey Stone so
11  that we can get more information about her
12  concerns.
13          Do you know if Ed set up a call with
14  Audrey Stone after receiving this email?
15      A.  I don't know.
16      Q.  Okay.  And -- but you do know that a
17  fact-finding with Charlene was set up?
18      A.  Yes.
19      Q.  Okay.  Did Charlene have union
20  representation at that fact-finding?
21      A.  Yes.
22      Q.  And who was her union representative?
23      A.  Chris Sullivan.
24      Q.  Okay.  And prior to the fact-finding, did
25  you talk to Chris Sullivan at all?

Page 56

1      A.  I don't recall.
2      Q.  Okay.  Did you trade emails with him at
3  all?
4      A.  I don't believe so.
5      Q.  Okay.  All right.  Prior to the
6  fact-finding, do you know if you had communications
7  with anyone from any other Southwest department
8  regarding the investigation?
9      A.  I don't recall.
10      Q.  Okay.  Do you know if you talked to
11  Maureen Emlet?
12      A.  I don't recall.
13      Q.  Okay.  Do you know if Maureen Emlet was
14  involved in the investigation?
15      A.  I don't know.
16      Q.  Okay.  Do you know if Edie Barnett was
17  involved in the investigation?
18      A.  Yes.
19      Q.  Okay.  And how do you know that?
20      A.  The work group that she is in oversaw the
21  bullying policy.
22      Q.  Okay.  How do you know that Edie Barnett
23  specifically was involved in the investigation?
24      A.  She was the only member of that team that
25  supported our base.

Page 57

1    Q. Okay. Now, who from the Denver base, if
2  anybody, communicated with Edie Barnett?
3    **A. I don't know.**
4    Q. Okay. Did you have any communications
5  with Edie Barnett?
6    **A. No.**
7    Q. Okay. All right. Prior to having the
8  fact-finding with Charlene, did you have any
9  conversations with Ed about setting up the
10 fact-finding with Charlene?
11   **A. I don't recall.**
12   Q. Okay. Do you recall who set up the
13 fact-finding with Charlene?
14   **A. I don't recall.**
15   Q. All right. During the investigation and
16 prior to the fact-finding, do you remember if
17 Audrey Stone -- well, let me back up.
18        During the investigation and prior to
19 the fact-finding, do you remember if you had seen
20 any other posts or messages that Charlene had sent
21 Audrey Stone -- had you received those?
22   **A. I didn't personally receive them.**
23   Q. Okay. Who did?
24   **A. I believe Ed did.**
25   Q. Okay. Did Ed send them to you?

Page 58

1    **A. No.**
2    Q. Okay. How do you know Ed received them?
3    **A. He showed them to me.**
4    Q. Okay. He showed them to you before the
5  fact-finding?
6    **A. Yes.**
7    Q. Okay. And what did he show to you?
8    **A. He showed me the screenshots of some**
9  **messages and some postings.**
10   Q. Okay. And what were the messages and
11 postings he showed you?
12   **A. I don't recall the specifics of them, but**
13 **they were between Audrey and Charlene.**
14   Q. Okay. What do you recall about the
15 messages and postings?
16   **A. There was a lot of them and some of them**
17 **were very graphic.**
18   Q. When you say very graphic, what do you
19 mean?
20   **A. There were images that were graphic of a**
21 **aborted fetus.**
22   Q. Okay.
23   **A. Some of them.**
24   Q. And what were some of the others?
25   **A. Messages from Charlene to Audrey.**

Page 59

1    Q. Okay. What did the messages say?
2    **A. I don't recall.**
3    Q. Okay. All you recall is that they were
4  messages?
5    **A. Yes.**
6    Q. Okay. And did Ed show these to you in --
7  in the office?
8    **A. Yes.**
9    Q. Okay. And what did you discuss about the
10 messages and posts?
11   **A. He wanted me to be aware of what the**
12 **meeting was about, since I was going to be taking**
13 **notes for him. And he wanted me to be prepared for**
14 **some of the images because they were graphic.**
15   Q. Okay. He wanted you to be prepared?
16   **A. Yes.**
17   Q. Now, you had seen them before, correct?
18   **A. I don't recall when I first saw the**
19 **images.**
20   Q. Okay. And he -- he said he wanted you to
21 be aware of what the meeting was about. As part of
22 that, did he inform you what it was about?
23   **A. Yes.**
24   Q. And what did he tell you it was about?
25   **A. Social media posts that had occurred that**

Page 60

1  **was reported by another flight attendant.**
2    Q. And what else did he tell you about what
3  the meeting dealt with?
4    **A. I don't remember.**
5    Q. Okay. Were you and Ed the only two in
6  that meeting?
7    **A. As far as -- what do you mean?**
8    Q. Were you and Ed the only two in that
9  meeting you had where he informed you what the --
10 the fact-finding would be about?
11   **A. Yes.**
12   Q. Okay. Do you know if that was your first
13 conversation with Ed Schneider about what -- I
14 guess, about the Facebook messages and posts?
15   **A. I don't recall.**
16   Q. Okay. I would like to take you back to
17 Document 1 again.
18   **A. Okay.**
19   Q. And if you could focus on 4228.
20   **A. You said this was Document 1?**
21   Q. Document 1, yeah.
22   **A. Okay.**
23   Q. And this -- this post mentions that the
24 recall is going to happen. What is the recall?
25   **A. The recall was -- effort to recall the**

Page 61

1  union officials that were holding office at that
2  time.
3      Q. Okay. What does that mean?
4      A. Just -- it means that flight attendant
5  union members -- some of the members had started a
6  petition to recall the current elected officials.
7      Q. Okay. Do you know which members started
8  the petition?
9      A. No.
10     Q. Okay. When did you first learn about the
11  recall?
12     A. I don't know.
13     Q. Where did you hear about it?
14     A. At work.
15     Q. Who talked about it at work?
16     A. I don't remember.
17     Q. Did Jessica Parker talk to you about the
18  recall?
19     A. No.
20     Q. Okay. Did you ever talk to Jessica Parker
21  about the investigation into the Facebook posts?
22     A. No.
23     Q. Okay. Did you ever communicate with
24  Jessica Parker about any aspect of the
25  investigation into Carter's Facebook post?

Page 62

1      A. No.
2      Q. Okay. And do you know if the recall was
3  successful?
4      A. I -- I don't know if it was or not.
5      Q. Okay. Do you know if any -- so as for the
6  recall, would -- you mentioned that it was a
7  petition to -- I think you mentioned that it was a
8  petition, more or less, to remove union officers;
9  is that right?
10     A. Yes.
11     Q. Okay. And would that have been to remove
12  Audrey Stone as well?
13     A. Yes.
14     Q. Okay. Do you know if Audrey Stone was
15  removed from the executive board?
16     A. I don't know.
17     Q. Okay. Do you know when that recall
18  petition began?
19     A. No.
20     Q. Okay. Let's see. If I could direct you
21  to -- let's see here. I am jumbled up. There we
22  go. Document 9. And 4675 is the first page
23  number.
24     A. I don't know that I have Document 9.
25  Okay. I -- maybe I do in a different email. Hang

Page 63

1  on. Here we go. Okay. Let's see. Okay.
2  Document 9. And what was the page number?
3      Q. 4675.
4      A. Yes. Okay.
5      Q. And if you could take a look at that.
6      A. Okay.
7      Q. And not just 4675, but all of the attached
8  pages as well.
9      A. Okay.
10     Q. Do you recognize this?
11     A. Yes, I do.
12     Q. And what is it?
13     A. It's an email from Ed to Maureen Emlet and
14  Denise Gutierrez.
15     Q. Okay. And you are CC'd, correct?
16     A. Yes.
17     Q. Okay. Now, what -- do you recognize the
18  pages behind that first page?
19     A. Yes.
20     Q. Okay. And what are those pages?
21     A. Those are the fact-finding notes.
22     Q. Okay. And did you draft those notes?
23     A. Yes.
24     Q. Okay. Now, who attended that fact-finding
25  meeting?

Page 64

1      A. Charlene Carter, Chris Sullivan, myself,
2  Ed Schneider, Denise Gutierrez and Edie Barnett.
3  But Denise and Edie were conferenced in via phone.
4      Q. Okay. And was there anyone else there?
5      A. No.
6      Q. Okay. And I would like to direct you to
7  4679.
8      A. Okay.
9      Q. And midway down, Ed says, we did go
10  through it a little bit and there are some here --
11  I guess the sentence before that, sentence is talk
12  -- talk before that about -- well, Ed says, when
13  you are posting on your Facebook page, are you
14  aware of other posts on there that would connect
15  you to Southwest Airlines? Possibly pictures of
16  you in your uniform?
17         And then it goes on and Ed says, we
18  did go through a little bit and there are some
19  here; shows pictures of Charlene at work in her
20  uniform.
21         Do -- do you know who obtained those
22  pictures?
23         MR. CORRELL: Objection.
24  Mischaracterizes the document. You can answer,
25  Ms. Jones.

Page 65

1    A. I did.
2    Q. (By Mr. Gilliam) Okay. And when did you
3  obtain those pictures?
4    A. I don't remember when.
5    Q. Where did you obtain those pictures from?
6    A. Charlene's Facebook page.
7    Q. Okay. And do you remember the dates of
8  those pictures?
9    A. I don't.
10    Q. Okay. And let's see if I can direct you
11  to 4680.
12    A. Okay.
13    Q. It says -- let see. Midway down -- about
14  midway down, there is a comment from Ed that says,
15  with your Facebook post, there is a connection to
16  the workplace and you can't have your political
17  views with Southwest as part of your depiction
18  there.
19         Do you know if Southwest has ever
20  fired another employee for posting their political
21  views on social media?
22    A. Yes.
23    Q. Okay. And what happened in that case?
24    A. The employee posted political views that
25  were offensive to other individuals, and they were

Page 66

1    -- an investigation ensued and they were
2  terminated.
3    Q. Okay. And what were the -- those
4  political posts?
5    A. They were in relation to the Black Lives
6  Matter movement.
7    Q. Okay. What was name of the employee that
8  posted the -- those posts?
9    A. Brandon Colson.
10    Q. Okay. Was that a flight attendant in the
11  Denver region?
12    A. No.
13    Q. What -- what base was he operating out of?
14    A. Phoenix.
15    Q. Okay. Did you fire him?
16    A. No.
17    Q. Who terminated him?
18    A. One of the assistant managers at the
19  Phoenix base.
20    Q. Okay. What was the name of the assistant
21  manager at the Phoenix base?
22    A. I don't recall.
23    Q. Do you recall the names of any of the
24  assistant managers at the Phoenix base?
25    A. Yes.

Page 67

1    Q. Okay. What are their names?
2    A. Jim Day.
3    Q. Okay.
4    A. Ted Thornton.
5    Q. Okay.
6    A. And Heidi Patrick.
7    Q. Okay. Do you remember if there were any
8  other assistant base managers?
9    A. In Phoenix?
10    Q. Yes.
11    A. Specific to when I worked there or --
12    Q. Well, so let me ask it this way: Did Jim
13  Day terminate Brandon Colson?
14    A. I don't --
15         MR. CORRELL: Objection. Asked and
16  answered.
17    A. I don't remember.
18    Q. (By Mr. Gilliam) Okay. Were these
19  assistant base managers assistant base managers at
20  the Phoenix location when Brandon was terminated?
21    A. Yes.
22    Q. Okay. So would it have been one of those
23  three base managers who fired Brandon?
24    A. Yes.
25    Q. Do you know if one of the three you

Page 68

1  mentioned did not fire Brandon?
2    A. Yes.
3    Q. Okay. And which one is that?
4    A. Heidi Patrick.
5    Q. Okay. So by process of elimination,
6  either Jim Day or Ted fired --
7    A. Yes --
8    Q. -- Brandon?
9    A. -- it was one of those two, yes.
10    Q. Okay. So what did Brandon post about
11  Black Lives Matter?
12    A. I don't recall the specific content of the
13  post.
14    Q. What do you -- I'm sorry?
15    A. I am sorry. There were several.
16    Q. Okay. There were several posts. What do
17  you remember about the posts?
18    A. They were violent-sounding.
19    Q. What do you mean by they were
20  violent-sounding?
21    A. The posts sounded hateful and violent;
22  like, they sounded like he wanted to incite
23  violence.
24    Q. He -- it sounded like he wanted to incite
25  violence against who?

Page 69

1    A. Just against members of the Black Lives
2  Matter movement.
3    Q. Did he have a -- well, let me back
4  up and ask it this way: Was there a nexus between
5  his post about Black Lives Matter and Southwest
6  Airlines?
7    A. Yes.
8    Q. And what was that nexus?
9    A. Multiple pictures of him in flight
10  attendant -- his Southwest flight attendant
11  uniform.
12    Q. Okay. Where -- were there other posts or
13  things on his -- on his page that had -- that made
14  a nexus or created a nexus with Southwest?
15    A. I don't recall.
16    Q. Okay. And were you -- were you involved
17  in the investigation of this matter?
18    A. I was not involved in it, no.
19    Q. Okay. Did you -- and I -- I asked if you
20  were involved in the investigation, but were you
21  involved in making the decision in any way?
22    A. No, I was not.
23    Q. Okay. How did you become aware of this
24  incident?
25    A. It occurred while I was still the Phoenix

Page 70

1  base manager.
2    Q. Okay. So even as the Phoenix base
3  manager, you didn't have any role in the
4  investigation or decision to terminate Brandon?
5    A. I did not.
6    Q. Okay. And even as the Phoenix base
7  manager, you don't remember which assistant base
8  manager made the termination?
9      MR. CORRELL: Objection. Asked and
10  answered three times.
11    A. Correct.
12    Q. (By Mr. Gilliam) Okay. So your assistant
13  base managers in Phoenix could make the decision to
14  terminate Brandon without your knowledge?
15    A. That's not necessarily true. I had -- I
16  had transitioned out of that role into my new role
17  by the time they made the decision.
18    Q. Okay. Had they started the investigation
19  while you were there?
20    A. Yes.
21    Q. Okay. Did -- did the assistant base
22  manager involved consult with you in any way
23  about --
24    A. No.
25    Q. -- Brandon's termination?

Page 71

1    A. No.
2    Q. Okay. But the assistant base managers in
3  Phoenix had the authority to investigate and then
4  terminate an employee all on their own?
5    A. No.
6    Q. Okay. So was the -- your successor the
7  one who made the decision?
8      MR. CORRELL: Objection. Calls for
9  speculation.
10    A. I don't know who made the decision.
11    Q. (By Mr. Gilliam) Okay. I guess what I am
12  trying to understand is if you were still the base
13  manager, but no assistant base manager could make
14  the decision to fire somebody without the base
15  manager's approval, how they were able to do that;
16  can you explain that to me?
17      MR. CORRELL: Objection. Misstates
18  prior testimony. It's an incomplete hypothetical.
19  You can answer if you are able, Ms. Jones.
20    A. I was no longer the base manager when it
21  came time to make that decision. The investigation
22  is a process. So it wasn't me in that role.
23    Q. (By Mr. Gilliam) Okay. But let's step
24  back a bit. So the -- the base -- the assistant
25  base manager would have had to obtain the base

Page 72

1  manager's approval in order to fire a flight
2  attendant; is that correct?
3    A. Correct.
4    Q. Okay. So if there was no base manager at
5  the time, could the assistant base manager have
6  made that decision on his own?
7    A. Can you rephrase your question?
8    Q. Well, yeah. I am just trying to
9  understand how it happened, and I feel like you are
10  being evasive.
11    A. I'm not trying --
12      MR. CORRELL: Okay --
13    A. -- to be evasive.
14      MR. CORRELL: Hang on. Hang on.
15  She's told you she wasn't there; she was replaced
16  and she doesn't know. So what is she being evasive
17  about, Counsel?
18      MR. GILLIAM: Well, she's being
19  evasive about how a -- an assistant base manager
20  can terminate a flight attendant when --
21      MR. CORRELL: No, she's not, Counsel.
22  What she said was she wasn't there; someone else
23  came in. She doesn't have knowledge of how the
24  process ended.
25      MR. GILLIAM: Okay. But --

Page 73

1     MR. CORRELL: We're getting close to
2  -- we're getting close to an objection of badgering
3  and instructing her not to answer because she's
4  told you multiple times she left during the
5  investigation; a new person came in. She has no
6  additional knowledge. What is she not telling you?
7     MR. GILLIAM: How a base manager could
8  -- I guess what I am trying to understand is how a
9  base manager could terminate a flight attendant
10 without having approval.
11    MR. CORRELL: She didn't say that was
12 possible.
13    MR. GILLIAM: Okay.
14    MR. CORRELL: You just asked her, can
15 an assistant base manager terminate without a base
16 manager? She said, no. She said she wasn't the
17 base manager at the time of termination and she
18 doesn't know what was happening with the actual
19 base manager at that time.
20    Q. (By Mr. Gilliam) Do you know who the base
21 manager was that followed you?
22    A. Yes.
23    Q. And what was the name of the base manager
24 that followed you?
25    A. Deborah Edwards.

Page 74

1     Q. Okay. So what stage had the investigation
2  reached before you left?
3     A. It had just begun. My last day in the
4  base is the day that investigation began.
5     Q. Okay. Thank you. Okay. And do you
6  remember cases of other flight attendants who were
7  terminated for posting political views on social
8  media?
9     A. No.
10    Q. Okay. Do you know how long the
11 fact-finding meeting lasted?
12    A. I don't know.
13    Q. Okay. And do you know where the
14 fact-finding meeting was held?
15    A. Yes.
16    Q. Okay. Where was that?
17    A. It was in Ed's office.
18    Q. Okay. And after the meeting, did you talk
19 to Ed about the fact-finding?
20    A. I don't recall.
21    Q. Okay. After the fact-finding meeting, did
22 you give any feedback to Ed to help him make his
23 decision?
24    A. No.
25    Q. You didn't?

Page 75

1     A. No, not that I recall.
2     Q. Okay.
3     MR. GILLIAM: Can we go off the record
4  for a second?
5     THE VIDEOGRAPHER: We are off record
6  at 11:22 a.m.
7     (Recess taken.)
8     THE VIDEOGRAPHER: We are back on
9  record at 11:44 a.m.
10    Q. (By Mr. Gilliam) Okay. Ms. Jones, I
11 think we were talking, when we left off, about the
12 fact-finding and maybe what -- what happened after
13 the fact-finding. And I -- so let's start here.
14    After the fact-finding, did you have
15 any communications with Mr. Schneider about what
16 happened in the fact-finding?
17    A. I don't remember.
18    Q. Okay. So do you remember testifying in
19 the arbitration of Ms. Charlene Carter's -- I
20 guess, the arbitration involving her -- her
21 termination?
22    A. Yes.
23    Q. Okay. If I could direct you to the -- the
24 document we just sent you.
25    A. Okay.

Page 76

1     Q. And, specifically, to Page 202. Let's
2  see. Actually, what we might want to do is back up
3  a bit.
4     THE REPORTER: And which exhibit is
5  this or document number?
6     MR. GILLIAM: It's not an exhibit or
7  document number. Do you -- would you like me to
8  send it to you?
9     THE REPORTER: We can get --
10    MR. GILLIAM: It's not --
11    THE REPORTER: It's not a problem.
12    MR. GILLIAM: It's not going to be
13 admitted as an exhibit.
14    A. Okay.
15    Q. (By Mr. Gilliam) And I don't know if you
16 want to scroll up to -- to verify that this is the
17 testimony you gave before I continue. Does -- does
18 this look like the testimony you gave --
19    A. I -- I don't know. I need a little more
20 time to look at it.
21    Q. Sure.
22    A. I am just scrolling to try to find the
23 beginning of this.
24    MR. CORRELL: Meggan, I believe it
25 starts on page -- either 181 or 182 with your

Page 77

1  testimony.
2       THE WITNESS:  Okay.  Thank you.
3       Q.  (By Mr. Gilliam)  181.
4       A.  Okay.  I see on Page 181 where I began my
5  testimony.
6       Q.  Okay.  And if you could scroll back down
7  to 202.
8       A.  Okay.  I am just looking over it to make
9  sure that that's all me.
10      Q.  Sure, yeah.  Please do.  It's long.
11      A.  Sorry.  And I just accidentally clicked
12  into a totally different page.
13      Q.  That's okay.  Take your time.
14      A.  Getting used to this virtual thing, so
15  bear with me.  Which page did you want me to end
16  on?  I am sorry.
17      Q.  202.
18      A.  I am almost there.
19      Q.  All right.  No problem.
20      A.  Okay.
21      Q.  All right.  Do you see down on Line 12
22  where Ms. Gehrke asks, I want to ask you some
23  questions about the decision to terminate
24  Ms. Carter.
25      A.  Yes.

Page 78

1       Q.  Okay.  And then she asks you a couple more
2  questions.  And then on 19 and 20, she asks, and
3  did you provide any feedback to Mr. Schneider to
4  help them in making that decision -- help him in
5  making that decision?
6       A.  I see that, yes.
7       Q.  Okay.  And your answer there says, we had
8  some discussion after the meeting about the
9  information provided, but that was pretty much it
10  for me.
11      A.  Yes.
12      Q.  Okay.  And does that help refresh your
13  memory as to your discussions with Mr. Schneider
14  after the fact-finding meeting?
15      A.  Yes, it does.
16      Q.  Okay.  What do you remember about the
17  discussion you had at -- about the information
18  provided at the fact-finding meeting?
19      A.  I don't remember a lot about it.  We just
20  discussed what she had said in the meeting.
21      Q.  Discussed what Charlene had said in the
22  meeting?
23      A.  Yeah.  What she presented in the meeting.
24      Q.  Okay.  What did you discuss about what she
25  had presented?

Page 79

1       A.  I don't remember the specifics.
2       Q.  Okay.  Any general details you remember?
3       A.  I don't remember.
4       Q.  Okay.  And -- so did -- did you provide
5  any feedback to Mr. Schneider about what course of
6  action he should take with regard to Ms. Carter?
7       A.  I don't recall.
8       Q.  Okay.  Did Mr. Schneider tell you, after
9  the fact-finding meeting, what he planned to do?
10      A.  I -- I do recall him saying that he was
11  going to look into some of the information she
12  provided.
13      Q.  Did he say what he was going to look into?
14      A.  I don't recall.
15      Q.  Was there something specific that
16  Ms. Carter had provided that he was going to look
17  into?
18      A.  I don't remember.
19      Q.  Okay.  And after the fact-finding meeting,
20  did you communicate with anyone else involved in
21  the investigation about the fact-finding meeting
22  itself?
23      A.  I don't remember.
24      Q.  Okay.  Do you know if you contacted -- if
25  you communicated with anyone about it?

Page 80

1       A.  I don't remember.  It -- it wasn't my
2  investigation, so -- it was Ed's investigation.
3       Q.  Okay.  At any point during the course of
4  his investigation, did he ask your opinion?
5       A.  I don't remember.
6       Q.  Okay.  Do you know if Ed did end up
7  looking into the information she provided?
8       A.  I don't know.
9       Q.  Okay.  Do you know when Ed reached a
10  conclusion as to what to do with the matter?
11      A.  I don't remember.
12      Q.  Okay.  And you do recall that Ms. Carter
13  was terminated for violation of at least the social
14  media policy?
15      A.  Yes.
16      Q.  Okay.  Do you know if she received a
17  termination letter?
18      A.  She was sent a termination letter.
19      Q.  Okay.
20      A.  -- received it.
21      Q.  Okay.
22          THE REPORTER:  I am sorry.  I didn't
23  hear the last part.
24      A.  I don't know if she received it, but she
25  was sent a letter.

Page 81

1    THE REPORTER:  Thank you.
2    Q. (By Mr. Gilliam)  Okay.  Do you know who
3  sent her a termination letter?
4    **A. Ed Schneider.**
5    Q. All right.  Did -- did you assist Ed in
6  preparing the termination letter?
7    **A. No.**
8    Q. Okay.  Do you know if Ed wrote it all on
9  his own?
10   **A. I don't know.**
11   Q. Okay.  Did you see a copy of it before it
12  was sent?
13   **A. No.**
14   Q. Okay.  Do you know if employee relations
15  reached any final conclusions regarding the
16  termination?
17   **A. I don't recall what they came back with.**
18   Q. Okay.  Do you recall that they came back
19  with something?
20   **A. They do.  They did come back with a**
21  **result, but I -- the decision to terminate is not**
22  **their decision.**
23   Q. Okay.  And -- how do you know that they
24  came back with something?
25   **A. Because that's our process.  Any time they**

Page 82

1  **are involved, they come back with a conclusion.**
2    Q. Okay.  Do you know if the HR VP came back
3  with any conclusion?
4    **A. I don't know.**
5    Q. Okay.  Would that be part of the process
6  too; that the HR VP comes back with a conclusion?
7    **A. I am not super familiar with their process**
8  **on the HR VP side.**
9    Q. Okay.  Okay.
10   MR. GILLIAM:  So I would probably like
11  to take another break.
12   MR. CORRELL:  I am on mute.  Yeah,
13  that's -- that's fine by us.  Do you want to go
14  ahead and do lunch or what are you thinking?
15   MR. GILLIAM:  I would say let's --
16  let's go ahead and do lunch.  I may not have very
17  much when we come back.
18   MR. CORRELL:  Okay.
19   MR. GILLIAM:  But that's probably the
20  best way to do it, I would say.
21   MR. CORRELL:  Okay.  Do you want --
22   THE VIDEOGRAPHER:  So off record?
23   MR. CORRELL:  -- to do 45 minutes?
24  What works for you?
25   MR. GILLIAM:  Let's see.  Does 30

Page 83

1  minutes work for everybody else?
2    MR. CORRELL:  Is that okay with you,
3  Ms. Jones?
4    THE WITNESS:  Yes.
5    MR. CORRELL:  Fine by us, then.
6    MR. GILLIAM:  Okay.  We will do 30.
7    THE VIDEOGRAPHER:  We are off record
8  at 12:00 p.m.
9    (Lunch break had.)
10   THE VIDEOGRAPHER:  We are back on
11  record at 12:35 p.m.
12   MR. GILLIAM:  So I don't think we have
13  any more questions for the witness at this time.
14  But, as before, we will reserve the right to reopen
15  the deposition pending the need for any follow-up
16  discovery.
17   MR. CORRELL:  And Southwest reasserts
18  the same objections; it has asserted its same
19  positions that it has asserted with respect to that
20  claim that the dep -- the deposition should be
21  reopened.
22   MR. GILLIAM:  We pass the witness.
23   MR. GREENFIELD:  And defendant --
24   MR. CORRELL:  Ms. Jones --
25   MR. GREENFIELD:  -- TWU Local 556 will

Page 84

1  reserve its questions for time of trial.  I am
2  sorry, Michael.  Go ahead.
3    MR. CORRELL:  No worries.
4    EXAMINATION
5  BY MR. CORRELL:
6    Q. Ms. Jones, I have just a couple of quick
7  questions for you.  First, you understand that part
8  of this lawsuit alleges that Ms. Carter was treated
9  less favorably because she was an objector or
10  nonmember of 556, correct?
11   **A. Yes.**
12   Q. Do you have any personal bias or animus
13  against flight attendants who opt-out from the
14  union or object to the union?
15   **A. No.**
16   Q. To your knowledge, did Ms. Carter's status
17  as an objector to the union play any role in the
18  decisions to terminate her?
19   **A. No.**
20   Q. You also understand that this case alleges
21  that Ms. Carter was treated less favorably in the
22  termination process because of her religion?
23   **A. Yes.**
24   Q. And you understand that that's linked to
25  her expression of pro-life views?

Page 85

1    **A. Yes.**
2    Q. Do you personally have a view on abortion
3 as between pro-life and pro-choice?
4    **A. Yes.**
5    Q. What is your position?
6    **A. It's complicated for me to answer that**
7 **because I am more pro-life; it's not a choice I**
8 **would make for myself, but I don't feel like I**
9 **should tell somebody else what they can or can't**
10 **do.**
11    Q. Do you have a personal bias or animus
12 against individuals who express no pro-life views?
13    **A. No.**
14    Q. Do you have a personal animus or bias
15 against individuals who profess a Christian faith?
16    **A. No.**
17    Q. To your knowledge, did the fact that
18 Ms. Carter's communications were pro-life as
19 opposed to pro-choice have any impact on the
20 decision to terminate her?
21    **A. No.**
22    Q. To your knowledge, did the fact that
23 Ms. Carter professed that her pro-life views were
24 related to her religious beliefs have any impact on
25 the decision to terminate her?

Page 86

1    **A. No.**
2       MR. CORRELL:  I pass the witness.
3       MR. GILLIAM:  And I have no additional
4 questions.
5       THE VIDEOGRAPHER:  We are off record
6 at 12:38 p.m.  End of deposition.  End of media.
7       THE REPORTER:  Okay.  Mr. Correll, did
8 you want to -- me to have it -- send it to you for
9 reading and signing?
10       MR. CORRELL:  Yes, please.
11       (End of Proceedings.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

1              CHANGES AND SIGNATURE
2    WITNESS NAME:  MEGGAN JONES
3    DATE OF DEPOSITION:  NOVEMBER 4, 2020
4    PAGE      LINE    CHANGE   REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Page 88

1       I, MEGGAN JONES, have read the foregoing
deposition and hereby affix my signature that same
2 is true and correct, except as noted above.
3
4
5       _____
         MEGGAN JONES
6
7  THE STATE OF _____
   COUNTY OF _____
8
9  Before me, _____, on this day
   personally appeared MEGGAN JONES, known to me (or
10 proved to me under oath or through _____) to
   be the person whose name is subscribed to the
11 foregoing instrument and acknowledged to me that
   they executed the same for the purposes and
12 consideration therein expressed.
13
14 Given under my hand and seal of office this _____
   day of _____, 2020.
15
16
17 _____
   NOTARY PUBLIC IN AND FOR THE
18 STATE OF _____
19
20 MY COMMISSION EXPIRES:_____
21
22
23
24
25

Page 89

```
 1        REPORTER'S CERTIFICATION
 2     IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
 3          DALLAS DIVISION
 4  CHARLENE CARTER          )
                             )
 5                           ) CIVIL ACTION NO.
    VS.               ) 3:17-CV-02278-X
 6                           )
    SOUTHWEST AIRLINES CO., AND )
 7  TRANSPORT WORKERS UNION OF  )
    AMERICA, LOCAL 556          )
 8
 9     ---------------------------------
            CONFIDENTIAL
10      DEPOSITION OF MEGGAN JONES
            NOVEMBER 4, 2020
11         (REPORTED REMOTELY)
       ---------------------------------
12
13       I, CHARIS M. HENDRICK, Certified Shorthand
14  Reporter in and for the State of Texas, do hereby
15  certify to the following:
16       That the witness, MEGGAN JONES, was by me
17  duly sworn and that the transcript of the oral
18  deposition is a true record of the testimony given
19  by the witness.
20       I further certify that pursuant to Federal
21  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
22  as well as Rule 30(e)(2), that review of the
23  transcript and signature of the deponent:
24       __xx__ was requested by the deponent and/or a
25  party before completion of the deposition.
```

Page 90

```
 1       _____ was not requested by the deponent and/or
 2  a party before the completion of the deposition.
 3       I further certify that I am neither
 4  attorney  nor counsel for, nor related to or
 5  employed by any of the parties to the action in
 6  which this deposition is taken and further that I
 7  am not a relative or employee of any attorney of
 8  record in this cause, nor am I financially or
 9  otherwise interested in the outcome of the action.
10       The amount of time used by each party at
11  the deposition is as follows:
12       Mr. Gilliam - 2:16 hours/minutes
13       Mr. Correll - 2 minutes
14
15       Subscribed and sworn to on this 12th day
16  of November, 2020.
17
18
19  _____
    CHARIS M. HENDRICK, CSR # 3469
20  Certification Expires: 10-31-21
    Bradford Court Reporting, LLC
21  7015 Mumford Street
    Dallas, Texas  75252
22  Telephone 972-931-2799
    Facsimile 972-931-1199
23  Firm Registration No. 38
24
25
```

Case 3:17-cv-02278-X   Document 263-3   Filed 06/13/22   Page 25 of 36   PageID 8786
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGGAN JONES

Page 91

**A**

**a.m** 1:19 4:4
43:24 44:2
75:6,9
**ability** 5:21
**able** 51:14 71:15
71:19
**aborted** 58:21
**abortion** 85:2
**above-styled**
1:18
**accidentally**
77:11
**accommodation**
28:19,24 29:4
29:8,11,13,19
30:2,15,19
31:7,13 32:1
**acknowledged**
88:11
**acronym** 34:1
**Act** 6:22 7:5,10
29:17,18 30:5
30:8,10 31:12
**action** 1:4 79:6
89:5 90:5,9
**activities** 28:11
**activity** 28:7,12
**actual** 28:25
29:1 73:18
**Adam** 2:14 4:25
**additional** 54:3
73:6 86:3
**administering**
4:14
**administration**
7:20
**admitted** 76:13
**AFA** 10:10
**affix** 88:1
**agreed** 4:11
**agreenfield@c...**
2:17
**ahead** 15:3
82:14,16 84:2
**Airlines** 1:5 2:7

4:24 5:13 10:4
23:3 64:15
69:6 89:6
**airplane** 26:18
**allegation** 7:8
27:19 51:2,5,7
51:10 52:4
**alleged** 27:6
**alleges** 84:8,20
**America** 1:6
2:13 5:14 6:20
10:4 89:7
**American** 10:7
**amount** 90:10
**and/or** 89:24
90:1
**animus** 84:12
85:11,14
**answer** 5:21 6:4
6:5 15:2,2,3
33:22 42:13
53:2 64:24
71:19 73:3
78:7 85:6
**answered** 67:16
70:10
**answers** 1:16
5:24
**anybody** 13:3
36:25 57:2
**apart** 25:20
27:15,20 31:11
**appearances** 3:2
4:19
**appeared** 53:11
53:14 88:9
**approach** 16:12
**approval** 19:24
19:25 71:15
72:1 73:10
**approve** 20:2
**approximately**
7:23 8:11 9:1,2
9:20
**arbitration**
75:19,20

**areas** 29:25
**Armstrong** 2:21
37:13 39:17
**array** 15:19
**asked** 24:18
30:15 31:18
44:8 45:22
47:1,3,5 67:15
69:19 70:9
73:14
**asking** 30:22
42:20,22 45:20
**asks** 77:22 78:1
78:2
**aspect** 61:24
**asserted** 83:18
83:19
**assist** 19:19 81:5
**assistant** 8:22,24
9:13 10:15
11:3 12:8
13:17 14:4,8
14:18,22 15:9
15:14 16:5,7
16:16 17:6
19:5,15,19
21:21 48:12
66:18,20,24
67:8,19,19
70:7,12,21
71:2,13,24
72:5,19 73:15
**assisting** 55:5
**assume** 6:10
**assuming** 53:20
**attached** 1:25
41:21,22 47:19
47:21 63:7
**attaches** 41:20
**attendant** 9:25
10:3,6 13:22
19:24 20:3
21:7,10,22
22:15,20,23
24:21 25:18
26:12 27:5

28:1,15,23
29:3,9 30:1,6,7
30:17,17,25
31:21 32:5
35:2 60:1 61:4
66:10 69:10,10
72:2,20 73:9
**attendant's** 29:3
**attendants**
10:18 13:7,10
13:12 17:15
24:14 25:7,10
25:21 26:17,25
27:11,21 29:7
74:6 84:13
**attendants'**
35:19
**attended** 63:24
**attention** 36:18
38:25 55:8
**attorney** 5:12
90:4,7
**Audrey** 3:11
32:17,19,21
33:11 42:4,24
51:17 55:10,14
57:17,21 58:13
58:25 62:12,14
**Audrey's** 53:13
**authority** 18:14
19:16,23 71:3
**avenues** 28:4
33:4
**aware** 6:24 7:2,3
7:6,7,12,13
19:2 31:23,24
32:14 59:11,21
64:14 69:23

**B**

**B** 2:3,14 4:21
89:21
**back** 11:18
41:10 44:1,4
45:11 47:16
51:13,16,18
57:17 60:16

69:3 71:24
75:8 76:2 77:6
81:17,18,20,24
82:1,2,6,17
83:10
**badgering** 73:2
**Barnett** 56:16
56:22 57:2,5
64:2
**Barrera** 14:7
41:19
**base** 8:8,8,10,10
8:14,18,22,23
8:25 9:13,16
10:15,17,19
11:3,7,8,10
12:8,8 13:17
14:4,5,8,19,22
15:9,14 16:5
16:15,16 17:7
17:20 19:5,15
19:19 20:20
21:18,21 22:13
23:8 24:14,19
25:7,22 28:14
29:19 31:25
34:10,13,25,25
35:1,25 36:1,5
43:6 44:14,15
48:12 56:25
57:1 66:13,19
66:21,24 67:8
67:19,19,23
70:1,2,6,7,13
70:21 71:2,12
71:13,14,20,24
71:25,25 72:4
72:5,19 73:7,9
73:15,15,17,19
73:20,23 74:4
**basically** 5:19
**basis** 17:12
**Bates-number...**
37:16
**bear** 77:15
**began** 62:18

74:4 77:4
**beginning** 76:23
**begun** 74:3
**behalf** 5:1
**beliefs** 85:24
**believe** 24:4
   37:9 39:20
   56:4 57:24
   76:24
**believed** 28:7
**best** 5:21 6:4
   16:12 82:20
**better** 30:14
**bias** 84:12 85:11
   85:14
**bit** 7:15 64:10,18
   71:24 76:3
**Black** 66:5
   68:11 69:1,5
**board** 34:2
   62:15
**bottom** 37:18
   38:16 39:24
   42:8
**brace** 30:13,24
   30:25 31:3,4
**Braddock** 2:4
**Bradford** 90:20
**Brandon** 66:9
   67:13,20,23
   68:1,8,10 70:4
   70:14
**Brandon's**
   70:25
**break** 5:16,17
   43:14,18 44:5
   82:11 83:9
**bullying** 24:11
   24:15,22 56:21
**business** 11:12
   11:22
**busy** 17:16

――――――――
**C**
――――――――
**C** 2:1
**call** 33:21 42:1
   45:1 55:10,13

**called** 31:9
**Calls** 19:7 29:21
   71:8
**careful** 11:17
   18:20
**carefully** 13:11
**carpal** 31:4
**carries** 40:12
**Carter** 1:3 2:20
   4:22 5:12,13
   6:18 13:18,21
   22:8 25:15
   32:6 33:16
   47:12 64:1
   77:24 79:6,16
   80:12 84:8,21
   85:23 89:4
**Carter's** 6:15
   32:9 36:9 45:3
   45:8 46:17,20
   47:24 61:25
   75:19 84:16
   85:18
**case** 5:15 6:13
   6:16 13:18
   16:8 30:1 35:4
   35:17,22 48:2
   53:24 65:23
   84:20
**cases** 24:20 35:5
   35:7,9,13,14
   35:15,19 74:6
**categories** 52:5
**category** 51:8,12
   53:12,15
**cause** 1:19 90:8
**CC'd** 54:23,24
   54:25 55:2
   63:15
**CC's** 42:25
**Central** 4:4
**certain** 12:1
**Certificate** 3:8
**Certification**
   89:1 90:20
**Certified** 1:20

89:13
**certify** 89:15,20
   90:3
**chain** 42:3,8,9
   42:24
**chance** 37:23
   49:3
**changed** 9:11
**CHANGERE...**
   87:4
**Changes** 3:7
   87:1
**characteristics**
   53:8
**Charis** 1:20 4:13
   89:13 90:19
**Charlene** 1:3
   2:20 4:22 5:12
   13:18 21:15
   22:8 25:15
   45:7 46:17,19
   52:14 55:17,19
   57:8,10,13,20
   58:13,25 64:1
   64:19 75:19
   78:21 89:4
**Charlene's**
   35:17,22 41:2
   41:7 48:2 65:6
**check** 39:8
**choice** 85:7
**Chris** 34:7 35:13
   35:16,18,21,23
   55:23,25 64:1
**Christian** 85:15
**Christine** 50:6
   50:12,18
**city** 4:20
**Civil** 1:4,23 6:21
   89:5,21
**claim** 6:19,25
   7:4 83:20
**claims** 6:16
**clarification**
   30:13
**clarify** 21:15

**clear** 5:23 6:2
**clicked** 77:11
**close** 16:15,21
   73:1,2
**Cloutman** 2:14
   2:15 5:3,3 48:4
**collaboration**
   16:5,9,13
**Colorado** 1:22
   4:11
**colored** 31:1
**Colson** 66:9
   67:13
**come** 13:20
   15:18 45:25
   81:20 82:1,17
**comes** 82:6
**coming** 13:23
**comment** 65:14
**COMMISSION**
   88:20
**common** 27:25
**communicate**
   33:20 61:23
   79:20
**communicated**
   33:7 34:6,9,20
   45:3 48:18
   57:2 79:25
**communication**
   36:2 54:25
**communicatio...**
   11:12,22 30:9
   33:15,18 34:23
   34:24 35:22
   44:21 45:13,16
   54:4 56:6 57:4
   75:15 85:18
**company** 7:12
   8:7,21 9:14
   10:2,2 27:12
**complained**
   28:15
**complaint** 6:12
   31:22 32:9,11
   32:13,14,16,18

33:16 52:4,7
   52:19 53:5,9
   53:13,19
**complaints** 21:1
   27:22
**completion**
   89:25 90:2
**complicated**
   53:3 85:6
**concerning** 25:2
**concerns** 55:12
**conclusion**
   80:10 82:1,3,6
**conclusions**
   81:15
**conduct** 10:24
   14:17 17:11,13
   18:11 19:3
   20:14 24:2
   26:3 27:5 29:3
**conducted** 4:8
   18:19,22 19:13
**conducting** 20:6
   45:7
**conferenced**
   64:3
**CONFIDENT...**
   1:9 89:9
**confirm** 37:11
   39:23 51:20
**Confirming**
   37:25
**connect** 64:14
**connection**
   65:15
**consider** 52:5
**consideration**
   88:12
**consult** 70:22
**contacted** 29:18
   30:5,11,18
   31:12,16 50:23
   79:24
**content** 68:12
**contents** 23:18
   23:19

Case 3:17-cv-02278-X   Document 263-3   Filed 06/13/22   Page 27 of 36   PageID 8788
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGGAN JONES

Page 93

continue 76:17
conversation
  45:24 60:13
conversations
  33:10 57:9
coordinate
  15:22
coordinators
  12:11,13,20
copied 38:12
copy 81:11
corner 37:18
correct 15:15
  31:17 38:8
  40:21,22 42:10
  53:21 54:22
  59:17 63:15
  70:11 72:2,3
  84:10 88:2
Correll 2:8 3:5
  4:23,23 14:24
  19:7 29:21
  37:2,8 39:8,11
  39:15 42:11
  43:20 52:25
  64:23 67:15
  70:9 71:8,17
  72:12,14,21
  73:1,11,14
  76:24 82:12,18
  82:21,23 83:2
  83:5,17,24
  84:3,5 86:2,7
  86:10 90:13
corresponded
  46:13
counsel 4:11,18
  37:2 72:17,21
  90:4
County 4:16
  88:7
couple 78:1 84:6
course 11:12,21
  79:5 80:3
court 1:1 4:4,13
  89:2 90:20

**COVID-19** 1:24
  4:9
created 69:14
CSR 4:14 90:19
current 1:23 4:8
  7:17 8:5 61:6
customer 27:18
  28:1
customers 26:7
  27:20 31:2

**D**
**Dallas** 1:2 2:10
  2:16 4:24 5:1,4
  33:23 89:3
  90:21
date 4:3 87:3
dated 38:6
dates 65:7
Dave 3:13 11:20
  11:22,25 38:6
  41:18,25 42:19
  44:25 48:15
Davis 44:23
day 67:2,13 68:6
  74:3,4 88:9,14
  90:15
deal 20:7
dealt 52:17 60:3
DEBM 33:21,25
  34:13 36:1,4
DEBMs 34:5,9
  34:15,17
Deborah 73:25
decision 20:2
  53:9 69:21
  70:4,13,17
  71:7,10,14,21
  72:6 74:23
  77:23 78:4,5
  81:21,22 85:20
  85:25
decisions 84:18
defendant 2:7
  2:12 4:24 5:1
  83:23
**DEFENSE** 2:3

definitely 22:6
**Denise** 50:8,12
  50:17,21 54:19
  55:9 63:14
  64:2,3
**Denver** 8:23,25
  9:13,15 10:15
  11:10 13:17
  14:4,5 17:20
  20:20 21:18,21
  22:13 24:14,19
  25:7,22 28:14
  29:19 31:25
  34:8,19 36:5
  57:1 66:11
**Denver-base**
  21:9
**Denver-based**
  28:23
dep 83:20
department 8:3
  29:12,16 56:7
depend 15:23
  53:4
depending
  12:15
depiction 65:17
deponent 89:23
  89:24 90:1
deposed 5:17
deposition 1:9
  1:16 4:7,15
  83:15,20 86:6
  87:3 88:1
  89:10,18,25
  90:2,6,11
details 23:23
  35:9 46:4 79:2
determine 51:14
development
  10:25
DG 49:10
diagonally 17:1
dick-sucking
  26:13
dictate 16:8

different 15:19
  62:25 77:12
DiPippa 34:18
direct 36:18
  38:25 44:4
  55:8 62:20
  64:6 65:10
  75:23
directly 12:5,12
  13:6,8,15 19:1
  30:18
disability 31:6
Disaster 1:24
  4:10
disciplinary
  17:20 18:4
  19:20 20:7
discipline 19:23
  20:3 21:6 27:7
disciplined
  24:15,21 25:22
  27:1
discovered 28:6
discovery 83:16
discrimination
  25:3 28:16,17
  31:22
discuss 59:9
  78:24
discussed 78:20
  78:21
discussion 35:3
  78:8,17
discussions
  78:13
**DISTRICT** 1:1
  1:1 89:2,2
disturbing
  27:13
**DIVISION** 1:2
  89:3
document 3:12
  3:14,16 36:19
  36:22,23 37:3
  37:6,7,10,12
  37:20 38:25

39:2,5,6,16
  40:11,15,16
  41:10,11,14,22
  42:9,11 44:4,6
  47:22 48:22,22
  51:19 54:7
  60:17,20,21
  62:22,24 63:2
  64:24 75:24
  76:5,7
doing 20:5
domicile 34:4
door 16:18
draft 63:22
driven 17:14
DSL 26:12
duly 5:6 89:17
Dustin 14:7
  41:19
duties 30:14
duty 7:1

**E**
E 2:1,1
earlier 47:20,21
ecloutman@la...
  2:17
Ed 3:15 5:3 11:4
  11:6,7,8,19,20
  18:16,25,25
  19:3,13,16,18
  36:14 41:19,25
  42:20 45:1,2,6
  45:19,20 47:7
  47:8,8 49:9
  50:23 52:16
  54:2,19,25
  55:2,13 57:9
  57:24,25 58:2
  59:6 60:5,8,13
  63:13 64:2,9
  64:12,17 65:14
  74:19,22 80:6
  80:9 81:4,5,8
Ed's 11:13,14,14
  18:23 19:24,25
  74:17 80:2

Page 94

**Edie** 56:16,22
  57:2,5 64:2,3
**EDWARD** 2:14
**Edwards** 73:25
**effort** 60:25
**either** 6:25
  48:11 50:11
  68:6 76:25
**elected** 10:11
  61:6
**elimination** 68:5
**Ellis** 4:16
**Elm** 2:15
**email** 3:11,13,15
  37:13 38:12,14
  38:17 39:16
  40:6 41:18,23
  42:3,4,9,17,24
  44:23,25 45:10
  47:19,21 49:7
  49:24 54:3,19
  54:21,23 55:4
  55:7,9,14
  62:25 63:13
**emails** 56:2
**emergency** 1:23
  4:9 43:14
**Emlet** 3:15
  56:11,13 63:13
**employed** 90:5
**employee** 23:3
  25:15,16 49:10
  49:19,23 50:24
  51:6,8 52:8,19
  52:24 53:10,12
  54:4,20 65:20
  65:24 66:7
  71:4 81:14
  90:7
**employees** 26:5
  27:12,15
**ended** 72:24
**enforcing** 14:15
**engaged** 26:4
**ensued** 66:1
**entire** 34:1

**entirely** 6:17
  12:1 50:3
**evaluate** 30:23
**evasive** 72:10,13
  72:16,19
**events** 35:1
**everybody** 43:17
  83:1
**exact** 9:5 23:18
**exactly** 23:6,22
  36:10,16 46:3
  51:14
**Examination**
  3:4,5 5:7 84:4
**example** 19:17
**excuse** 14:15
  17:4 24:21
  25:12
**executed** 88:11
**executive** 34:2
  62:15
**exercise** 7:9
**exhibit** 3:11,13
  3:15 36:19,25
  37:1,4,6,6,10
  39:11 76:4,6
  76:13
**exhibits** 3:10
  39:6,12
**Experience** 16:7
**Expires** 88:20
  90:20
**explain** 71:16
**express** 85:12
**expressed** 88:12
**expression**
  84:25

─────────── **F** ───────────

**Facebook** 32:6,9
  36:9 42:21
  45:4,8,14 47:1
  47:3,4,6,9,12
  47:19,24 48:2
  60:14 61:21,25
  64:13 65:6,15
**Facsimile** 90:22

**fact** 85:17,22
**fact-finding**
  35:3 41:4,8
  46:17,20 55:17
  55:20,24 56:6
  57:8,10,13,16
  57:19 58:5
  60:10 63:21,24
  74:11,14,19,21
  75:12,13,14,16
  78:14,18 79:9
  79:19,21
**factor** 53:9
**fair** 7:1
**faith** 85:15
**falling** 31:9
**familiar** 6:15
  24:10,12 25:1
  28:18 30:1
  38:15,18 82:7
**far** 60:7
**favorably** 84:9
  84:21
**feasibility** 30:12
**February** 38:6
**Federal** 1:22
  89:20
**feedback** 74:22
  78:3 79:5
**feel** 27:13 72:9
  85:8
**Feldhausen**
  22:24 23:14,17
  24:2
**Feldhausen's**
  23:1
**fetus** 58:21
**final** 81:15
**financially** 90:8
**find** 39:21 76:22
**fine** 4:20 82:13
  83:5
**finish** 6:3,5
**fire** 66:15 68:1
  71:14 72:1
**fired** 25:7,11

65:20 67:23
  68:6
**Firm** 90:23
**first** 5:6 32:5
  36:4 51:25
  59:18 60:12
  61:10 62:22
  63:18 84:7
**five** 17:23,24
**five-minute**
  43:14,17
**flesh** 31:1
**flight** 9:24 10:3
  10:6,18 13:7
  13:10,12,22
  17:15 19:24
  20:3 21:6,9,22
  22:15,20,23
  24:13,20 25:6
  25:10,17,21
  26:11,17,25
  27:5,11,21
  28:1,15,23
  29:2,3,7,9 30:1
  30:6,7,16,16
  30:17,25 31:21
  32:5 35:2,19
  60:1 61:4
  66:10 69:9,10
  72:1,20 73:9
  74:6 84:13
**flirting** 26:18
**focus** 60:19
**follow** 40:21
**follow-up** 83:15
**followed** 37:17
  73:21,24
**following** 36:25
  89:15
**follows** 5:6
  90:11
**foregoing** 88:1
  88:11
**formally** 8:15
**former** 25:16
**forwarded**

42:17
**FOUNDATION**
  2:4
**four** 8:19 9:1,20
**fourth** 37:20,22
**frequently** 17:13
  17:18
**fringe** 51:7
  53:11
**front** 36:21
**further** 89:20
  90:3,6

─────────── **G** ───────────

**Garrett** 25:16
  25:17
**Garrett's** 26:1
**gears** 7:14
**Gehrke** 77:22
**general** 79:2
**gestures** 5:25
**getting** 73:1,2
  77:14
**Gilliam** 2:3 3:4
  4:21,21 5:8,11
  15:7 19:11
  29:24 37:5,15
  39:9,14,21
  42:13 43:10,16
  44:3 48:6 53:2
  65:2 67:18
  70:12 71:11,23
  72:18,25 73:7
  73:13,20 75:3
  75:10 76:6,10
  76:12,15 77:3
  81:2 82:10,15
  82:19,25 83:6
  83:12,22 86:3
  90:12
**girl** 26:18
**give** 5:23 9:20
  19:17 36:19
  41:25 45:1
  74:22
**given** 88:14
  89:18

**go** 15:3 51:13,16
  51:18 62:22
  63:1 64:9,18
  75:3 82:13,16
  84:2
**goes** 64:17
**going** 59:12
  60:24 76:12
  79:11,13,16
**Golden** 1:22
  4:10
**good** 5:9 43:20
**graphic** 58:17
  58:18,20 59:14
**great** 43:21
**Greenfield** 2:14
  2:15 4:25,25
  43:9,11 83:23
  83:25
**group** 49:20
  53:6 54:20
  56:20
**guess** 9:3 11:16
  12:7 14:14
  15:12 18:10,14
  27:16 30:21
  33:14 35:12
  38:5 40:14,16
  41:5 42:7
  49:22 53:7
  60:14 64:11
  71:11 73:8
  75:20
**Gutierrez** 50:8
  50:12,17,21
  54:19 63:14
  64:2

          **H**
**half** 7:16 8:12
  8:12 9:1
**hand** 88:14
**handle** 16:11
  20:9
**handles** 29:13
**handling** 16:8
**Hang** 36:22

**62**:25 72:14,14
**happen** 15:18
  60:24
**happened** 21:1
  46:23 65:23
  72:9 75:12,16
**happening**
  17:15 19:2
  73:18
**happenings**
  34:25
**harassing** 25:2
**harassment** 25:3
  25:3,23 26:2
  26:21 27:2
  49:17,18 52:6
  52:18,20,23
  53:6,21,25
**Harwood** 2:9
**hateful** 68:21
**hazing** 24:11,16
  24:22
**head** 5:24 28:3
**hear** 27:9,16,21
  31:20 61:13
  80:23
**Hector** 14:7
  41:19
**Heidi** 67:6 68:4
**held** 7:21 74:14
**hello** 35:24
**help** 38:19 46:2
  74:22 78:4,4
  78:12
**Hendrick** 1:20
  4:13 89:13
  90:19
**hereto** 1:25
**hit** 55:1
**hold** 8:21 9:14
  10:11
**holding** 8:5 61:1
**home** 4:16
**hours/minutes**
  90:12
**HR** 82:2,6,8

**Hudson** 43:1
**huh-uhs** 5:24
**humming** 26:16
**hypothetical**
  71:18

          **I**
**idea** 28:19
**III** 2:14
**images** 41:20,21
  41:21 47:23
  48:7,7 58:20
  59:14,19
**impact** 85:19,24
**important** 5:23
**inappropriate**
  26:6,8,16
**incident** 23:5
  69:24
**incidents** 17:20
  18:4 29:6
**incite** 68:22,24
**include** 10:23
**included** 10:22
  10:25 54:21
**including** 40:16
**incompetent**
  29:8
**incomplete**
  71:18
**INDEX** 3:1
**indication** 52:7
  52:10
**individuals** 12:5
  33:22 65:25
  85:12,15
**inflight** 8:8,14
  8:23 9:15,17
  12:10,11,13,19
  13:14
**inform** 59:22
**information**
  32:25 33:2,6
  47:16 55:11
  78:9,17 79:11
  80:7
**information-g...**

**46**:21,25
**informed** 60:9
**infringe** 53:14
**infringed** 51:11
**inquire** 30:11
**instance** 1:17
  14:14 29:2
  30:9 31:11
**instances** 28:5
  28:14,22
**instructing** 73:3
**instrument**
  88:11
**interested** 90:9
**interrupt** 43:12
**inverted** 37:3
  39:7
**investigate**
  18:10,15 71:3
**investigated**
  21:2
**investigates**
  49:14
**investigating**
  10:23 14:17
  15:8 20:1 27:4
  48:8
**investigation**
  15:24,24 16:4
  17:4 18:23
  20:5,12 36:8
  36:15 38:22
  42:20 45:7,12
  45:17,20,21
  46:1,5,8,14,24
  48:9,19 50:13
  50:16,19 55:6
  56:8,14,17,23
  57:15,18 61:21
  61:25 66:1
  69:17,20 70:4
  70:18 71:21
  73:5 74:1,4
  79:21 80:2,2,4
**investigations**
  17:6,12 18:12

**19**:20 20:6,10
  20:15
**invests** 49:16
**involved** 19:1
  20:11 29:4,7
  36:8,10 45:25
  46:5 50:12,15
  50:18 52:4
  53:8 56:14,17
  56:23 69:16,18
  69:20,21 70:22
  79:20 82:1
**involvement**
  18:16,24 19:4
  19:14 36:12
**involving** 29:6
  30:19,23 36:8
  52:17 75:20
**issue** 14:23
  19:23 20:2,3
  31:13 48:2
  49:15 53:14
**issues** 14:12
  49:16 52:17

          **J**
**January** 8:16,17
  9:9 23:11
**Jessica** 34:7,23
  61:17,20,24
**Jim** 67:2,12 68:6
**job** 8:14,21 9:4
  9:13 10:16,17
  30:13
**John** 34:18
**Johnson** 50:6,12
  50:18
**Jones** 1:10,16
  3:3 4:7 5:5,9
  14:25 19:9
  37:8 39:13
  44:3 64:25
  71:19 75:10
  83:3,24 84:6
  87:2 88:1,5,9
  89:10,16
**jumbled** 62:21

**jump** 19:9

**K**

**kind** 31:3 53:3
**Kissman** 3:13
  11:20,23,25
  38:6 41:18,25
  42:19 44:23
  48:16
**Kissman's** 44:25
**knew** 44:9
**know** 5:16 6:10
  6:18 8:13
  10:22 11:15
  13:17,20 16:10
  16:11,12 17:3
  17:5,8,19,22
  17:23,25 18:5
  18:6,8,18,22
  18:25 19:13,21
  20:19,22,23,24
  20:25 21:5,8,9
  21:12 22:2,14
  23:6 24:8,24
  25:6,21,24
  27:25 28:10,22
  29:10,23 30:17
  30:20 32:13,19
  32:21,23 33:1
  33:3,5,8,13
  34:1,10 35:1,4
  36:3 38:13
  39:3 40:5,7
  41:7,21 42:19
  43:3 44:10,12
  45:2,5,6,11
  46:7,13,19
  48:15 49:4,6
  49:11,17,25
  50:1,10,11,23
  51:10 52:14
  53:5 54:3,5,12
  54:16,24 55:2
  55:13,15,16
  56:6,10,13,15
  56:16,19,22
  57:3 58:2

60:12 61:7,12
62:2,4,5,14,16
62:17,24 64:21
65:19 67:25
71:10 72:16
73:18,20 74:10
74:12,13 76:15
76:19 79:24
80:6,8,9,16,24
81:2,8,10,14
81:23 82:2,4
**knowledge**
  70:14 72:23
  73:6 84:16
  85:17,22
**known** 88:9

**L**

**labeled** 37:12
  39:16
**labor** 7:5,10,19
  8:2
**Lacore** 43:1
**language** 53:18
  53:20
**Las** 43:6 44:14
  44:16
**lasted** 74:11
**LAUREN** 2:21
**LAW** 2:15
**lawsuit** 84:8
**leader** 11:16
**leaders** 11:14
**learn** 32:5 61:10
**leave** 9:7
**left** 9:9 44:5 73:4
  74:2 75:11
**LEGAL** 2:3
**let's** 14:3 38:24
  40:9 43:16
  48:21 52:16
  62:20,21 63:1
  65:10 71:23
  75:13 76:1
  82:15,16,25
**letter** 80:17,18
  80:25 81:3,6

**level** 16:7
**limited** 34:24
  35:24
**Line** 77:21 87:4
**linked** 84:24
**lips** 26:13
**little** 7:14 64:10
  64:18 76:19
**Lives** 66:5 68:11
  69:1,5
**LLC** 90:20
**LLP** 2:9
**local** 1:6 2:13
  5:1,4,14 6:20
  33:20,21 34:4
  83:25 89:7
**located** 1:21
  4:10
**location** 67:20
**locations** 4:19
  31:20
**long** 7:15,21 8:9
  8:24 9:17
  74:10 77:10
**longer** 71:20
**look** 37:16,19,23
  37:24 39:22
  40:10 41:6
  42:15,22 47:1
  47:4,5,9 49:2
  51:18 54:6
  63:5 76:18,20
  79:11,13,16
**looked** 41:22
**looking** 41:11
  47:11,13 48:8
  77:8 80:7
**looks** 42:14,16
  55:1
**lot** 17:9,10 58:16
  78:19
**lunch** 82:14,16
  83:9

**M**

**M** 1:20 89:13
  90:19

**ma'am** 38:1
**MACK** 2:19
**making** 69:21
  78:4,5
**management**
  28:6
**manager** 7:19
  8:8,10,14,18
  8:22,25 9:13
  10:15,19 11:3
  11:8 12:9
  13:17 14:23
  16:7,15 17:7
  21:21 23:8
  43:7 44:14,15
  66:21 70:1,3,7
  70:8,22 71:13
  71:13,20,25
  72:4,5,19 73:7
  73:9,15,16,17
  73:19,21,23
**manager's** 71:15
  72:1
**managers** 11:7
  14:4,9,19
  15:10,14 16:6
  16:16 19:5,15
  19:19 48:12
  66:18,24 67:8
  67:19,19,23
  70:13 71:2
**Matt** 5:11
**matter** 5:12
  19:20 20:1
  50:24 66:6
  68:11 69:2,5
  69:17 80:10
**matters** 15:22
  20:7
**Matthew** 2:3
  4:21 43:9,11
**Maureen** 3:15
  56:11,13 63:13
**mbg@nrtw.org**
  2:6
**mcorrell@ree...**

2:11
**mean** 11:14
  18:13 21:14
  37:7 58:19
  60:7 61:3
  68:19
**means** 4:16
  27:23 61:4
**media** 20:8,11
  20:15,20 21:2
  21:11,23 22:10
  22:16 24:6
  28:11 59:25
  65:21 74:8
  80:14 86:6
**meeting** 35:3
  41:2,3,4,8
  59:12,21 60:3
  60:6,9 63:25
  74:11,14,18,21
  78:8,14,18,20
  78:22,23 79:9
  79:19,21
**meetings** 33:23
**Meggan** 1:10,16
  3:3 4:7 5:5
  76:24 87:2
  88:1,5,9 89:10
  89:16
**member** 10:5
  34:2 56:24
**members** 49:22
  61:5,5,7 69:1
**memory** 38:20
  78:13
**mentioned** 62:6
  62:7 68:1
**mentions** 60:23
**messages** 32:6
  32:10 36:9
  57:20 58:9,10
  58:15,25 59:1
  59:4,10 60:14
**Michael** 2:8
  84:2
**midway** 64:9

Case 3:17-cv-02278-X   Document 263-3   Filed 06/13/22   Page 31 of 36   PageID 8792
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGGAN JONES

Page 97

65:13,14
**Mike** 4:23 39:4
**mine** 17:2
**minutes** 82:23
83:1 90:13
**Mischaracteri...**
64:24
**Misstates** 14:24
48:4 52:25
71:17
**moment** 41:12
41:15,17
**monitor** 28:12
**monitors** 28:10
**month** 9:6 17:16
17:17,18
**monthly** 17:12
**months** 7:23
8:19
**Moore** 14:7
41:20
**morning** 5:9,10
**motivated** 23:21
**movement** 66:6
69:2
**multiple** 69:9
73:4
**Mumford** 90:21
**mute** 82:12

**N**

**N** 2:1
**name** 4:13 5:9
5:11 29:16
66:7,20 73:23
87:2 88:10
**named** 25:15
**names** 14:6
66:23 67:1
**Naomi** 42:25
**NATIONAL** 2:3
**nature** 15:23
16:4 23:3
27:14 51:2,4
53:4,8
**necessarily** 19:1
70:15

**need** 5:16 6:1
18:10 52:4,8
52:11 76:19
83:15
**needed** 16:1,9
**neither** 90:3
**never** 29:9
**new** 70:16 73:5
**newer** 16:9
**nexus** 69:4,8,14
69:14
**Nine** 7:16
**nods** 5:25
**nonmember**
84:10
**normally** 16:11
27:11
**North** 2:9
**NORTHERN**
1:1 89:2
**NOTARY** 88:17
**noted** 88:2
**notes** 15:25
59:13 63:21,22
**notetaker** 16:1
**November** 1:10
1:19 4:3 87:3
89:10 90:16
**number** 17:8
31:25 36:20
37:10,10,17
39:23 51:20,21
54:7 62:23
63:2 76:5,7
**numbered** 1:18
**numbers** 37:1
37:18 39:6,10

**O**

**oath** 4:15 88:10
**object** 84:14
**objection** 14:24
19:7 29:21
42:11 48:4
52:25 64:23
67:15 70:9
71:8,17 73:2

**objections** 15:1
83:18
**objector** 84:9,17
**obtain** 65:3,5
71:25
**obtained** 64:21
**occasion** 15:9
**occasions** 15:13
**occupation** 7:17
**occur** 23:5,7
**occurred** 59:25
69:25
**offensive** 23:2
23:16 27:13
65:25
**offered** 8:15
**office** 16:18,21
16:25,25 17:1
33:23 59:7
61:1 74:17
88:14
**officers** 62:8
**offices** 2:15
10:12
**Officially** 8:11
9:9
**officials** 61:1,6
**okay** 5:19 6:9,15
6:18,24 7:3,7,7
7:14,17,21,24
8:2,5,9,17,20
8:20,24 9:7,10
9:12,17,21,24
10:2,5,9,9,11
10:20 11:2,5
11:11,21,25
12:2,4,7,22
13:3,6,9,16,20
13:25 14:3,6,8
14:11,21 15:5
15:12,16,21
16:3,14,14,18
16:21,24 17:3
17:9,11,23,25
18:3,6,6,9,9,18
19:3,10,18,22

20:1,5,14,19
20:25 21:5,9
21:13,25 22:4
22:7,9,14,18
22:22,25 23:5
23:10,13,16,19
23:23 24:5,10
24:13,18 25:1
25:6,10,13,17
25:20,25 26:3
26:10,14,19,19
26:23 27:9,20
28:2,5,13,18
29:1,12,18,24
30:4,8,16,21
31:3,5,11,15
31:18,24 32:4
32:4,8,12,14
32:16,18,21,23
33:1,5,18,25
34:3,5,8,12,14
34:19,22 35:5
35:12,15,18,21
36:4,7,18,24
37:14,21 38:2
38:10,15,24
39:14,19,21
40:2,2,5,9,19
40:23 41:1,3,5
41:10,17,25
42:3,7,16,19
42:23 43:8,17
44:8,12,15,21
44:25 45:6,10
45:16 46:7,13
46:16,19,23
47:2,5,8,15,18
47:18 48:1,11
48:15,21 49:1
49:5,8,19,22
50:1,4,7,15,18
50:21,23 51:1
51:10 52:2,12
52:16,22 53:7
53:13,17 54:2
54:2,6,6,10,13

54:24 55:2,7
55:16,19,24
56:2,5,10,13
56:16,19,22
57:1,4,7,12,23
57:25 58:2,4,7
58:10,14,22
59:1,3,6,9,15
59:20 60:5,12
60:16,18,22
61:3,7,10,20
61:23 62:2,5
62:11,14,17,20
62:25 63:1,1,4
63:6,9,15,17
63:20,22,24
64:4,6,8 65:2,7
65:10,12,23
66:3,7,10,15
66:20 67:1,3,5
67:7,18,22
68:3,5,10,16
69:3,12,16,19
69:23 70:2,6
70:12,18,21
71:2,6,11,23
72:4,12,25
73:13 74:1,5,5
74:10,13,16,18
74:21 75:2,10
75:18,23,25
76:14 77:2,4,6
77:8,13,20
78:1,7,12,16
78:24 79:2,4,8
79:19,24 80:3
80:6,9,12,16
80:19,21 81:2
81:8,11,14,18
81:23 82:2,5,9
82:9,18,21
83:2,6 86:7
**once** 37:23
39:21 54:11
**ones** 22:18
**ongoings** 34:25

**open** 37:12
  39:22
**operating** 66:13
**opinion** 80:4
**opposed** 85:19
**opt-out** 84:13
**oral** 89:17
**order** 1:23 4:9
  72:1
**ordinarily** 19:18
  27:9
**original** 55:4
**outcome** 90:9
**outcomes** 33:24
**oversaw** 56:20

        **P**

**P** 2:1,1
**p.m** 39:17 83:8
  83:11 86:6
**page** 36:20,20
  37:7,16,22
  40:13,18 41:11
  47:1,3,4,6,9,12
  47:16,24 51:25
  52:2 62:22
  63:2,18 64:13
  65:6 69:13
  76:1,25 77:4
  77:12,15 87:4
**pages** 40:10,21
  63:8,18,20
**paragraphs**
  38:16
**Parker** 34:7,23
  35:6 61:17,20
  61:24
**part** 40:11,12
  42:3,7,8,14,17
  44:6 46:8,14
  46:23,24 47:22
  48:8 59:21
  65:17 80:23
  82:5 84:7
**participate**
  45:21,23
**participated**

  17:6
**participating**
  46:16
**particular** 15:21
  29:12
**parties** 90:5
**party** 89:25 90:2
  90:10
**pass** 83:22 86:2
**Patrick** 67:6
  68:4
**pending** 83:15
**person** 11:9 16:1
  73:5 88:10
**personal** 43:14
  84:12 85:11,14
**personally** 20:9
  57:22 85:2
  88:9
**petition** 61:6,8
  62:7,8,18
**Phoenix** 8:8,10
  8:14,21 23:8
  34:14 66:14,19
  66:21,24 67:9
  67:20 69:25
  70:2,6,13 71:3
**Phoenix-based**
  22:20,22
**phone** 33:22
  64:3
**pictures** 64:15
  64:19,22 65:3
  65:5,8 69:9
**place** 43:13
  45:24
**plaintiff** 1:18
  2:2 4:22 13:18
**planned** 79:9
**play** 84:17
**please** 4:5,18
  41:12,15,17
  55:10 77:10
  86:10
**PLLC** 2:15
**point** 5:16 13:2

**80:3**
**policies** 14:15
  26:20 27:6
**policy** 20:8,12
  20:15,20 21:2
  21:11,23 22:16
  22:21 23:1
  24:7,11,16,23
  25:2,8,11,23
  26:21 27:2
  49:18 52:18
  56:21 80:14
**political** 65:16
  65:20,24 66:4
  74:7
**position** 7:22,25
  8:6,6,15 9:4,7
  12:18 85:5
**positions** 12:7
  83:19
**possible** 46:2
  73:12
**Possibly** 64:15
**post** 23:2,16,24
  42:21 45:4,8
  45:14 60:23
  61:25 65:15
  68:10,13 69:5
**posted** 65:24
  66:8
**posting** 64:13
  65:20 74:7
**postings** 58:9,11
  58:15
**posts** 32:6,10
  36:9 47:19
  48:2,13,16
  57:20 59:10,25
  60:14 61:21
  64:14 66:4,8
  68:16,17,21
  69:12
**potential** 10:24
  15:24 27:16,22
  49:15 52:17
**prepared** 59:13

**59:15**
**preparing** 5:22
  81:6
**present** 2:19
  53:13
**presented** 78:23
  78:25
**president** 32:22
  32:24
**pretty** 78:9
**previous** 11:7
**primarily** 15:25
  26:2
**prior** 8:5,19,20
  9:12,22 14:25
  21:15 33:15
  35:21 46:19
  48:5 53:1
  55:24 56:5
  57:7,16,18
  71:18
**pro-choice** 85:3
  85:19
**pro-life** 84:25
  85:3,7,12,18
  85:23
**probably** 82:10
  82:19
**problem** 19:10
  76:11 77:19
**Procedure** 1:23
  89:21
**Proceedings** 4:1
  86:11
**process** 46:21,25
  68:5 71:22
  72:24 81:25
  82:5,7 84:22
**produced** 1:17
**profess** 85:15
**professed** 85:23
**protected** 51:8
  51:11 52:5
  53:11,14
**proved** 88:10
**provide** 78:3

**79:4**
**provided** 78:9
  78:18 79:12,16
  80:7
**provisions** 1:25
**proximity** 16:15
  16:22
**PUBLIC** 88:17
**purposes** 88:11
**pursuant** 1:22
  89:20
**put** 29:9 33:8
**puts** 32:25 33:1
  33:5

        **Q**

**question** 6:4,6
  6:10 15:2,3,6
  19:8 29:5
  31:10 53:3
  72:7
**questions** 5:15
  5:20 77:23
  78:2 83:13
  84:1,7 86:4
**quick** 39:8 43:13
  55:9 84:6
**quite** 31:18

        **R**

**R** 2:1
**racially** 23:21
**Railway** 7:5,10
**Ralph** 25:16,17
  26:1
**re-** 7:9
**reached** 74:2
  80:9 81:15
**read** 6:12 51:13
  51:16 54:11,12
  88:1
**reading** 86:9
**real** 39:8 55:9
**really** 6:17 38:4
**reasserts** 83:17
**recall** 9:5 13:25
  14:2 22:5,6,14

22:19 24:8
25:12,14 27:24
28:9,17 29:2
31:8 32:7,8
33:12 35:14
36:2,10,12,14
36:14,16 41:12
45:15,17 46:16
47:10,11,13,15
47:17,23,25
48:1,6,14,17
48:18,20 50:20
56:1,9,12
57:11,12,14
58:12,14 59:2
59:3,18 60:15
60:24,24,25,25
61:6,11,18
62:2,6,17
66:22,23 68:12
69:15 74:20
75:1 79:7,10
79:14 80:12
81:17,18
**receive** 32:11
49:23 57:22
**received** 20:21
32:2,13 39:17
57:21 58:2
80:16,20,24
**receiving** 32:9
45:10 55:7,14
**Recess** 43:25
75:7
**recipients** 38:8
**recognition**
10:23
**recognize** 38:3
38:13 40:3
54:14,15 63:10
63:17
**record** 1:25 4:3
4:19 6:3 19:12
43:23 44:2
75:3,5,9 82:22
83:7,11 86:5

89:18 90:8
**REED** 2:9
**refer** 48:22
**reference** 53:25
**referred** 29:17
**referring** 21:15
52:13
**refresh** 38:19
78:12
**regard** 38:18
79:6
**regarding** 1:24
4:9 56:8 81:15
**region** 14:4
66:11
**Registration**
90:23
**regular** 11:12,21
**related** 85:24
90:4
**relation** 16:24
66:5
**relations** 8:3
49:10,20,23
50:24 51:6,9
52:8,19,24
53:10,12 54:4
54:20 81:14
**relative** 90:7
**religion** 84:22
**religious** 28:15
28:17,19,23
29:7,10,13,19
30:2,19 31:21
32:1 52:10,13
52:14 53:25
85:24
**remark** 26:11
**remarks** 26:6,8
**remember** 12:17
12:19,23,24
13:1 20:17
22:9,10,13
23:13,15,18,20
23:22,23 24:1
24:5,13,17,19

24:20,24 25:11
25:25 26:9,10
26:22,23,24
27:3,4,8 28:5
29:6 31:14,15
31:17 34:21
35:5,7,9,20
40:7 41:9,24
45:20,22,23
46:3,4,10
47:13 50:4
57:16,19 60:4
61:16 65:4,7
67:7,17 68:17
70:7 74:6
75:17,18 78:16
78:19 79:1,2,3
79:18,23 80:1
80:5,11
**remotely** 4:8,15
89:11
**remove** 62:8,11
**removed** 62:15
**render** 33:23
**reopen** 83:14
**reopened** 83:21
**repeat** 15:6 48:3
**rephrase** 72:7
**replaced** 72:15
**reply** 55:1
**report** 7:24 11:2
11:5,19,25
12:12 13:13,14
13:23
**reported** 11:9
11:20 12:3,5,8
12:13,20,25
13:4 23:4,14
26:5 27:10
32:5 60:1
89:11
**reporter** 1:20
4:4,6,14 5:22
76:4,9,11
80:22 81:1
86:7 89:14

**Reporter's** 3:8
89:1
**reporting** 4:15
90:20
**reports** 20:19
21:6 27:5
**representation**
7:1 55:20
**representative**
55:22
**representing**
5:12 35:2
**request** 28:19,24
28:25 29:1,4
29:10,20 30:2
30:18,22 31:7
**requested** 89:24
90:1
**requests** 29:14
32:1
**require** 16:4
**required** 14:22
**reserve** 83:14
84:1
**respect** 83:19
**responsibilities**
10:16,21
**responsibility**
11:1
**result** 27:7
81:21
**resulted** 21:6
22:12
**retaliated** 7:9
**retaliation** 25:4
**review** 37:23
40:15 49:3
89:22
**reviewed** 47:21
**right** 2:3 9:12
10:14 12:4
13:3,16 16:14
17:3 24:5,25
32:4 36:7
38:24 39:25
40:20 41:5

42:17 44:3
45:8 48:21
50:11 52:2,3
56:5 57:7,15
62:9 77:19,21
81:5 83:14
**right-hand**
37:18
**rights** 6:21,21
7:4,9
**Road** 2:4
**role** 70:3,16,16
71:22 84:17
**roughly** 17:19
**routine** 52:18
**rule** 18:19 26:4
90:21,22
**Rules** 1:22 89:21
**run** 51:8 52:8,11

**S**

**S** 2:1
**saw** 47:23 59:18
**saying** 36:15
79:10
**says** 37:17 38:5
41:25 45:1
55:10 64:9,12
64:17 65:13,14
78:7
**schedule** 33:23
**Schneider** 3:15
11:4,6 18:16
19:13 41:19
45:2 47:7,8,16
60:13 64:2
75:15 78:3,13
79:5,8 81:4
**Schneider's**
16:22,25
**screenshots**
40:21,23 47:24
58:8
**screw** 39:1
**screwed** 39:3
**scroll** 76:16 77:6
**scrolling** 76:22

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGGAN JONES

Page 100

**seal** 88:14
**second** 37:8
 40:13 75:4
**see** 14:3 37:9
 38:24 40:9
 41:1 42:7
 48:21 52:16
 62:20,21 63:1
 65:10,13 76:2
 77:4,21 78:6
 81:11 82:25
**seen** 40:6,8,23
 57:19 59:17
**selected** 36:16
**send** 51:5 52:23
 53:10 57:25
 76:8 86:8
**sends** 41:18 55:9
**senior** 7:19
**sent** 37:9 39:4
 44:22 47:20
 53:6,12 54:2
 57:20 75:24
 80:18,25 81:3
 81:12
**sentence** 64:11
 64:11
**sequential** 40:17
**set** 55:10,13,17
 57:12
**setting** 57:9
**sexual** 25:3,23
 26:2,21 27:1
**Shaffer** 8:1
**shifting** 7:14
**shop** 33:21
 34:20
**Shorthand** 1:20
 89:13
**show** 58:7 59:6
**showed** 58:3,4,8
 58:11
**shows** 64:19
**sic** 34:25 49:16
**side** 82:8
**signature** 3:7

 87:1 88:1
 89:23
**signing** 86:9
**singing** 26:15,16
**single** 52:22
**situation** 43:15
**SMITH** 2:9
**social** 20:8,11,15
 20:20 21:2,11
 21:23 22:10,16
 23:1 24:6
 28:11 59:25
 65:21 74:7
 80:13
**somebody** 71:14
 85:9
**song** 26:15
**Sonya** 43:1
**sorry** 12:21 13:9
 15:6 21:14,19
 23:25 37:5
 39:3 42:23
 43:12 47:2,20
 48:3 68:14,15
 77:11,16 80:22
 84:2
**sort** 31:6,12
 46:20
**sorts** 33:18
 34:22 35:22
**sounded** 68:21
 68:22,24
**Southwest** 1:5
 2:7 4:24 5:13
 6:19 7:8,15,18
 8:2,6 9:19,21
 12:8 23:3 24:6
 24:20 26:25
 28:6,10 29:13
 29:25 30:4
 32:1 44:19
 56:7 64:15
 65:17,19 69:5
 69:10,14 83:17
 89:6
**Southwest's**

 20:8 24:11
 25:2 27:1
 31:20
**speaks** 42:12
**specific** 14:13
 19:17 30:22
 36:20 45:18,23
 67:11 68:12
 79:15
**specifically** 15:1
 24:18 31:8
 47:10 56:23
 76:1
**specifics** 36:3
 58:12 79:1
**speculation** 19:8
 29:22 71:9
**split** 13:2
**Springfield** 2:5
 4:22
**SPURLOCK**
 2:19
**staff** 10:17,25
**stage** 74:1
**standards** 30:12
**start** 8:17 9:3
 75:13
**started** 8:13
 9:19 36:5 45:7
 45:19 46:21
 61:5,7 70:18
**starts** 76:25
**state** 1:21,24 4:9
 4:12,18 88:7
 88:18 89:14
**stated** 1:25
 26:12
**statement** 51:17
 52:12
**statements** 52:9
**STATES** 1:1
 89:2
**status** 84:16
**stenographic**
 4:16
**step** 71:23

**Stephensen** 3:11
 3:13 42:5,25
 43:3 44:9,10
 44:13,18,22
 45:3
**stewards** 33:21
 34:20
**Stone** 3:11 32:17
 32:19,21 33:11
 42:5,25 46:8
 46:14 55:10,14
 57:17,21 62:12
 62:14
**stopping** 43:12
**Street** 2:15
 90:21
**structure** 12:16
**subscribed**
 88:10 90:15
**successful** 62:3
**successor** 71:6
**Suite** 2:4,9
**Sullivan** 34:7
 35:13,16,18
 55:23,25 64:1
**super** 82:7
**supervise** 13:6
**supervisor** 9:15
 9:18 11:17
 14:1
**supervisors**
 11:13 12:10,11
 12:25 13:14
**support** 10:17
 10:18,22
**supported** 56:25
**sure** 6:1,5 21:20
 39:24 40:1
 43:16 45:19,19
 52:1 76:21
 77:9,10
**Suzanne** 3:11,13
 42:1,5,25 43:3
 44:9,10,12,18
 44:22 45:1,3
 45:13

**SWA** 39:23
 51:21
**SWA00** 37:17
**SWA004436**
 37:19,25
**swear** 4:5,11
**sworn** 5:6 89:17
 90:15
**system** 31:20

———

**T**

**take** 5:17 9:20
 15:25 19:8
 37:22 39:22,22
 40:10 43:13,17
 49:2 60:16
 63:5 77:13
 79:6 82:11
**taken** 1:18 43:25
 75:7 90:6
**talk** 6:2 16:10
 48:11 55:25
 61:17,20 64:11
 64:12 74:18
**talked** 46:7
 48:15 56:10
 61:15
**talking** 33:12
 35:5 53:23
 75:11
**Tammy** 8:1
 22:24,25 23:14
 23:17 24:2
**team** 12:15 13:1
 29:17,18 30:5
 30:8,10 31:12
 49:14,16,23,25
 50:2,5 52:9,11
 56:24
**Ted** 67:4 68:6
**Telephone** 90:22
**tell** 12:16 15:1
 38:10 59:24
 60:2 79:8 85:9
**telling** 73:6
**temporary** 8:18
**tend** 43:15

**term** 11:15 52:6
52:20,23 53:6
53:24
**terminate** 67:13
70:4,14 71:4
72:20 73:9,15
77:23 81:21
84:18 85:20,25
**terminated**
21:10,22 22:21
22:23 24:2
26:19 66:2,17
67:20 74:7
80:13
**termination**
22:12 25:20
70:8,25 73:17
75:21 80:17,18
81:3,6,16
84:22
**terminations**
21:25 22:2,4
22:15 24:6,9
**terms** 18:20
**testified** 5:6
**testifying** 75:18
**testimony** 14:25
48:5 53:1
71:18 76:17,18
77:1,5 89:18
**Texas** 1:1,21
2:10,16 4:17
4:24 5:2,4 89:2
89:14 90:21
**Thank** 15:3
37:14 38:2
40:2 43:22
52:1 74:5 77:2
81:1
**theirs** 16:19
**thing** 51:22,23
77:14
**things** 10:25
16:1 49:18
69:13
**think** 24:18

31:18 37:2,3
39:4 40:18
44:5 62:7
75:11 83:12
**thinking** 39:5
82:14
**Thornton** 67:4
**three** 7:23 9:1
67:23,25 70:10
**Thursday** 38:6
**time** 4:4 12:1
19:8 21:17,20
31:16 32:18
43:6 51:7 61:2
70:17 71:21
72:5 73:17,19
76:20 77:13
81:25 83:13
84:1 90:10
**times** 70:10 73:4
**title** 6:21 9:11
49:15,16
**today** 5:15 15:1
**Today's** 4:3
**told** 72:15 73:4
**top** 28:3 38:5
**totally** 77:12
**trade** 56:2
**transcript** 5:23
89:17,23
**transitioned**
70:16
**Transport** 1:6
2:12 5:13 6:19
89:7
**treated** 84:8,21
**trial** 84:1
**trips** 13:23
**true** 70:15 88:2
89:18
**try** 76:22
**trying** 71:12
72:8,11 73:8
**tunnel** 31:4
**turn** 27:12 52:19
**turning** 27:15

41:10
**two** 25:12,13
48:12 60:5,8
68:9
**TWU** 5:1,4
83:25
**type** 16:12
**types** 15:16,21
20:9 35:15
36:2
**typical** 27:24
**typically** 53:5

---

## U

**uh-huhs** 5:24
**understand** 6:6
6:9 16:10 29:5
30:15 71:12
72:9 73:8 84:7
84:20,24
**understanding**
31:5
**understood** 6:11
**uniform** 30:12
30:13,23 64:16
64:20 69:11
**uniforms** 30:19
**union** 1:6 2:12
5:14 6:20,25
7:8,11 10:5,9
10:12 32:22,24
32:25 33:1,5
33:15,19 55:19
55:22 61:1,5
62:8 84:14,14
84:17 89:7
**UNITED** 1:1
89:2
**updates** 35:1
**use** 53:5,24
**uses** 52:6

---

## V

**v** 5:13
**variety** 11:1
**vary** 12:15
17:16

**Vegas** 43:6
44:14,16
**verbal** 5:24
**verify** 76:16
**VIDEOGRAP...**
2:19 4:2 43:23
44:1 75:5,8
82:22 83:7,10
86:5
**videotaped** 1:9
4:6
**view** 85:2
**views** 52:10,13
52:15 54:1
65:17,21,24
74:7 84:25
85:12,23
**violated** 6:21 7:1
7:4 26:4
**violating** 24:15
25:8,23
**violation** 15:8
18:11,15,23
20:12,15,20
21:2,10,22
23:1 24:7,22
26:1 27:1,6,17
27:22 28:8
80:13
**violations** 10:24
14:18 15:17,19
17:4 18:20
19:4,14 20:8
22:10 26:20
27:10 52:18
**violence** 68:23
68:25
**violent** 68:21
**violent-soundi...**
68:18,20
**Virginia** 2:5
4:22
**virtual** 77:14
**visible** 31:2
**VP** 82:2,6,8
**VS** 1:4 89:5

---

### W

**want** 39:24 52:1
76:2,16 77:15
77:22 82:13,21
86:8
**wanted** 59:11,13
59:15,20 68:22
68:24
**wasn't** 71:22
72:15,22 73:16
80:1
**way** 5:19 11:18
14:16 25:23
26:24 27:25
29:4,8 31:19
40:14,16 48:19
67:12 69:4,21
70:22 82:20
**ways** 27:17
**we're** 73:1,2
**wear** 30:25
**wearing** 30:12
**West** 10:4,7
**wide** 11:1
**witness** 1:17,21
4:5,10,12 15:5
19:10 37:14
39:19 43:19,21
77:2 83:4,13
83:22 86:2
87:2 89:16,19
**word** 13:11
**work** 2:3 9:21
10:3,24 14:11
14:15,17,18,22
15:8,9,13,16
15:17,20,25
16:15 17:4
18:10,10,15,19
18:19 31:19,25
34:14,17 35:12
35:16,18 36:16
44:18 56:20
61:14,15 64:19
83:1
**work-violation**

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MEGGAN JONES

Page 102

14:23 17:5,12
**worked** 7:15
  8:18 9:24 10:6
  35:7,10 67:11
**Workers** 1:6
  2:12 5:14 6:20
  89:7
**working** 8:20
  21:18,20 23:7
  28:14 29:24
  30:4 34:8
  35:14,21 36:5
  36:14
**workplace** 18:15
  18:23 19:3,13
  24:11,15,22
  65:16
**works** 5:19
  82:24
**worries** 84:3
**wouldn't** 18:25
**wrist** 31:1
**written** 5:22
**wrote** 81:8

**X**

**xx** 89:24

**Y**

**yeah** 11:16
  14:14 15:7
  36:23 38:1
  40:1,14,14
  41:16 43:16
  51:18,22 60:21
  72:8 77:10
  78:23 82:12
**year** 8:11,12
  17:21 18:1,2,4
  18:7 20:21,23
  32:2
**years** 7:16 9:2
  9:20
**yesterday** 39:18

**Z**

---

**0**

---

**1**

**1** 3:12 38:25
  39:2 40:16
  41:22 42:9
  47:22 51:19
  60:17,20,21
**10** 17:25 18:2,6
  20:23
**10-31-21** 90:20
**10:10** 43:24
**10:28** 44:2
**11:22** 75:6
**11:34** 39:17
**11:44** 75:9
**12** 77:21
**12:00** 83:8
**12:35** 83:11
**12:38** 86:6
**12th** 90:15
**14-year-old**
  26:18
**1500** 2:9
**181** 76:25 77:3,4
**182** 76:25
**19** 78:2
**1docs.PDF**
  39:16

---

**2**

**2** 3:2,14 36:19
  36:25 37:3,6,7
  37:7 39:12
  41:11,14 44:6
  48:22 54:7
  90:13
**2:16** 90:12
**20** 18:7 78:2
**2011** 9:19,22
**2015** 9:5
**2017** 12:19 14:9
  38:7 50:2
**2018** 9:8
**2019** 8:16,17 9:9
  23:11
**202** 76:1 77:7,17

---

**2020** 1:10,19 4:3
  87:3 88:14
  89:10 90:16
**214** 2:16
**22160** 2:5
**23rd** 38:7
**2850** 2:9
**2docs.PDF**
  37:13

---

**3**

**3** 3:11 39:5,12
**3:17-CV-0227...**
  1:4 89:5
**30** 82:25 83:6
**30(e)(1)(A)**
  89:21
**30(e)(2)** 89:22
**3301** 2:15
**3469** 4:14 90:19
**36** 3:13
**38** 90:23
**39** 3:11

---

**4**

**4** 1:10,19 3:13
  36:19,22,23
  37:4,6,6 87:3
  89:10
**4226** 40:1 51:24
  51:25
**4227** 40:13
**4228** 60:19
**4233** 40:18
**4436** 36:20
  41:14,15 42:9
  44:4
**4450** 48:23,24
**4459** 54:7,8
**45** 82:23
**4675** 62:22 63:3
  63:7
**4679** 64:7
**4680** 65:11
**469** 2:10
**4th** 4:3

---

**5**

**5** 3:4
**50** 18:3
**556** 1:6 2:13 5:1
  5:4,14 6:20
  83:25 84:10
  89:7

---

**6**

**6** 3:15
**600** 2:4
**62** 3:15
**680-4264** 2:10

---

**7**

**7** 6:21 39:12
  49:15,16
**7015** 90:21
**703** 2:5
**75201** 2:10
**75226** 2:16
**75252** 90:21
**770-3339** 2:5

---

**8**

**8001** 2:4
**84** 3:5
**87** 3:7
**89** 3:8

---

**9**

**9** 3:16 62:22,24
  63:2
**9:05** 1:19 4:4
**939-9223** 2:16
**972-931-1199**
  90:22
**972-931-2799**
  90:22