## Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER,            )
   Plaintiff,        )
                 )
vs.                         ) Case No.
              ) 3:17-cv-02278-X
SOUTHWEST AIRLINES CO., AND )
TRANSPORT WORKERS UNION OF  )
AMERICA, LOCAL 556,         )
   Defendants.       )

ORAL VIDEOTAPED DEPOSITION
ED SCHNEIDER
November 3, 2020
(Reported Remotely)
+++CONFIDENTIAL+++

ORAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on November 3, 2020, from 10:00 a.m. to 2:55 p.m., before Cheryl Duncan, CSR in and for the State of Texas, reported by computerized stenotype machine in Parker, Colorado, pursuant to the Federal Rules of Civil Procedure, the First Emergency Order regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto.

## Page 2

APPEARANCES

FOR PLAINTIFF:
  Mr. Matthew B. Gilliam
  National Right to Work Legal Defense Foundation
  Suite 600
  8001 Braddock Road
  Springfield, Virginia 22160
  703.321.8510
  703.321.9319 Fax
  mbg@nrtw.org

FOR DEFENDANT TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556:

  Mr. Edward B. Cloutman, III
  Mr. Adam S. Greenfield
  LAW OFFICES OF CLOUTMAN & GREENFIELD, P.L.L.C.
  3301 Elm Street
  Dallas, Texas 75226-1637
  214.642.7486
  ecloutman@lawoffices.com
  agreenfield@candglegal.com

FOR DEFENDANT SOUTHWEST AIRLINES CO.:

  Mr. Michael A. Correll
  REED SMITH LLP
  Suite 1700
  2501 N. Harwood Street
  Dallas, Texas 75201
  469.680.4264
  mcorrell@reedsmith.com

ALSO PRESENT:

  Mack Spurlock, Videographer
  Lauren Armstrong
  Charlene Carter

## Page 3

INDEX
                      PAGE
Appearances ....................................... 2
ED SCHNEIDER
Examination by Mr. Gilliam ..................... 4
Examination by Mr. Correll .................... 129

Signature and Changes .......................... 132
Reporter's Certificate ........................ 134

EXHIBITS

EXHIBIT     DESCRIPTION       PAGE
2       03-14-17 termination letter to  18
        C. Carter

3       02-22-17 email to S. Stephensen  31
        from A. Stone, SWA004226 - 4233
4       02-23-17 email to S. Stephensen  33
        from D. Kissman, SWA0004421

5       02-28-17 email to D. Gutierrez  65
        and M. Emlet from E. Schneider,
        SWA004633 - 4638

6       03-09-17 email to M. Emlet and  81
        D. Gutierrez from E. Schneider,
        SWA004675 - 4692

7       03-10-17 email to M. Emlet, D.  112
        Gutierrez and E. Barnett from
        E. Schneide, SWA004711 - 4712

14     Email from Denise Gutierrez to  84
        Audrey Stone
15     Termination letter       120

## Page 4

PROCEEDINGS

THE VIDEOGRAPHER:  We are now on record.  Today's date is November 3rd, 2020.  The time is 10:00 a.m. central.

Will the court reporter please swear in the witness.

ED SCHNEIDER,
having been first duly sworn, testified as follows:

EXAMINATION

Q.   (BY MR. GILLIAM) Good morning, Mr. Schneider.

A.   **Good morning.**

Q.   My name is Matt Gilliam, and I represent plaintiff Charlene Carter in this case.  And I'm here today to ask you questions about the case, Carter V Southwest Airlines Company and Transport Workers Union of America, Local 556.  If at any point you need a break, just let me know.  I assume you've been deposed before.

A.   **I have not.**

Q.   You have not been deposed, okay.

So when I ask you questions, if you could, just answer them to the best of your ability.  Since the reporter is preparing a written transcript, it's important to give clear verbal messages, no head

Page 5

1    nods, no gestures, no "uh-huhs" and "huh-uhs."
2         Similarly, we have to make sure that
3    we don't talk over each other.  So I'll do my best to
4    try not to talk over you, let you finish your, your
5    answer before I ask another question.  Similarly, if
6    you could make sure that I finish my question before,
7    before you answer.  That way, we can keep the record
8    clear.
9         Have you read the complaint in this
10   case?
11   **A.   I am aware of it, yes.**
12   Q.    Okay.  Are you familiar with the claims
13   that Ms. Carter's made against TWU Local 556 and
14   Southwest Airlines?
15   **A.   Yes.**
16   Q.    Okay.  And you, you work at Southwest; is
17   that correct?
18   **A.   Yes.**
19   Q.    And what is your current position at
20   Southwest Airlines?
21   **A.   I'm the inflight base manager for the**
22   **Denver base.**
23   Q.    Okay.  And how long have you been in that
24   position?
25   **A.   Three and a half years.**

Page 6

1    Q.    Okay.  And you were Denver base manager
2    when Charlene was terminated?
3    **A.   Yes.**
4    Q.    Okay.  And how long had you been in that
5    position when, when Charlene was terminated?
6    **A.   About eleven months.**
7    Q.    Okay.  So did you, did you become Denver
8    base manager in 2016?
9    **A.   2017, January.**
10   Q.    January of 2017, okay.
11        And what, what were you doing before
12   you became Denver base manager with Southwest?
13   **A.   I was the assistant base manager in**
14   **Phoenix, Arizona.**
15   Q.    Okay.  And who did you report to there in
16   Phoenix as assistant base manager?
17   **A.   Deborah Edwards, the base manager.**
18   Q.    Okay.  When you worked in Phoenix, did you
19   have the opportunity to work with Suzanne Stephensen?
20   **A.   She is the base manage in Las Vegas.  And I**
21   **had a working relationship with her, but nothing**
22   **close, because they are two separate basis.**
23   Q.    Okay.  Did you know her while you were
24   working at Phoenix?
25   **A.   Yes.**

Page 7

1    Q.    Okay.  Was Suzanne Stephensen also working
2    at Phoenix?
3    **A.   No.**
4    Q.    Okay.  All right.  And have you ever worked
5    as a flight attendant with Southwest Airlines?
6    **A.   Yes.**
7    Q.    Okay.  How long did you work as a flight
8    attendant?
9    **A.   Eight and a half years.**
10   Q.    Okay.  And that was all with Southwest?
11   **A.   Yes.**
12   Q.    Okay.  Were you a member of the union while
13   you were a flight attendant?
14   **A.   Yes.**
15   Q.    Okay.  How long were you a union member?
16   **A.   For the eight and half years I was a flight**
17   **attendant.**
18   Q.    Okay.  And when I say "union," you
19   understand I'm referring to TWU Local 556?  Or if I
20   refer to "556," I'm referring to the Transport
21   Workers Union of America, Local 556?
22   **A.   Yes.**
23   Q.    Okay.  Did you ever hold an elected office
24   with the union?
25   **A.   No.**

Page 8

1    Q.    Okay.  Now, in your current position as
2    base manager in Denver, what are your
3    responsibilities?
4    **A.   I oversee the operation of the inflight**
5    **base, which is the flight attendants of Southwest**
6    **Airlines that are based in Denver.  I make sure that**
7    **the daily operations are taken care of,**
8    **investigations, any type of awards or recognition for**
9    **our flight attendants.  I have a staff of 16 that**
10   **works for me, including coordinators and supervisors**
11   **and assistant base managers, and I oversee their**
12   **duties also.**
13   Q.    Okay.  How many flight attendants do you
14   oversee?
15   **A.   Currently 1,926.**
16   Q.    Okay.  And has that changed since 2017?
17   **A.   Yes.**
18   Q.    Okay.  About how many did you oversee in
19   2017?
20   **A.   Roughly 1,650.**
21   Q.    Okay.  All right.  And who, who is your
22   supervisor?
23   **A.   My immediate leader is Dave Kissman.**
24   Q.    Okay.  Do you, do you report solely to Dave
25   Kissman?

Page 9

1    A.   He's the next in the chain of command, yes.
2    Q.   Okay.  Do you also report to Mike Sims?
3    A.   Not any longer.
4    Q.   Okay.  Did you report to Mike Sims in 2017?
5    A.   He was Dave Kissman's director, boss, yes.
6    Q.   And did, did you ever report to
7  their supervisors?
8    A.   I don't understand.
9    Q.   So did, did you report -- well, let's see.
10  Who, who was Dave Kissman's supervisor?
11    A.   Dave Kissman's boss was Mike Sims.  It is
12  now Steve Murtoff.
13    Q.   And in 2017, who was Mike Sims'
14  supervisor?
15    A.   He reported to Sonya Lacore, our VP of
16  inflight.
17    Q.   Okay.  Did you ever take issues to Sonya
18  Lacore?
19    A.   No, we followed the chain of command.
20    Q.   And were you Charlene Carter's
21  direct supervisor?
22    A.   I was the base manager for the Denver base,
23  and she reported to the Denver base.
24    Q.   Okay.  If she had any issues to take to
25  who -- to her supervisor, who would she take those

Page 10

1  to?
2    A.   I don't recall specifically which
3  supervisor was hers at the time.  But it would have
4  been one of my supervisors that reports to me.
5    Q.   Okay.  So she wouldn't report directly to
6  you, she would report to a supervisor?
7    A.   Correct.
8    Q.   Okay.  Now, how many coordinators did you
9  have reporting to you?
10    A.   Three.
11    Q.   Okay.  And how many supervisors did you
12  have reporting to you?
13    A.   Ten.
14    Q.   Okay.  And who were the three coordinators?
15    A.   By name?
16    Q.   Yes.  In 2017.
17    A.   Janet Rhea.
18    Q.   Okay.
19    A.   Jen Luna and Mike Herrick.
20    Q.   Okay.  And what, what do coordinators do?
21    A.   They take care of the front entrance into
22  the lounge where the flight attendants report.  And
23  they manage anything that a flight attendant needs,
24  any documents, any paperwork.  They take care of
25  parking for flight attendants, any type of resources

Page 11

1  they would need.
2    Q.   Okay.  When you say they take care of the
3  front lounge, what do you mean?
4    A.   The lounge is where the flight attendants
5  walk in to, it's the front part of our space.  And
6  the office area is behind that.  Their customer
7  service desk, basically, is out in that lounge area,
8  and they sit at that desk and take care of any needs
9  from the flight attendants.
10    Q.   Okay.  And what do supervisors do?
11    A.   Supervisors, on a daily basis, they will
12  conduct A checks at the gate, where the aircraft
13  departs, make sure that flight attendants are
14  reporting on time, they have the required items.
15  They will do assessment flights where they'll go out
16  and observe flight attendants working in action.  And
17  they will also be a resource for flight attendants
18  that come into the lounge that may need some
19  leadership-type -- and also they will go down to the
20  gates and monitor the daily operation down there,
21  working in conjunction with ground operations.
22    Q.   Okay.  Now, did you say you did not recall
23  who Charlene Carter's supervisor was?
24    A.   Not specifically, no.
25    Q.   Okay.  All right.  Now, as part of your

Page 12

1  responsibilities, did you enforce Southwest
2  disciplinary policies?
3    A.   Yes.
4    Q.   Okay.  And is your -- so did you have the
5  authority to, to fire flight attendants?
6    A.   Yes.
7    Q.   Okay.  Do you know if that was set forth in
8  writing anywhere?
9    A.   No, I'm not aware of that.
10    Q.   Okay.  And I'm not sure that I asked, for
11  the assistant base managers, what are their roles and
12  responsibilities?
13    A.   They oversee the supervisors and the
14  coordinators directly that -- with a team of
15  coordinators and supervisors, put up between three of
16  my assistant base managers.  And they will make sure
17  the daily operation is running smoothly, they will
18  watch for any emails that may come in that need to be
19  addressed, and/or disseminated to the supervisors for
20  follow-up and those type of things.
21    Q.   Now, if there was a disciplinary incident
22  involving a flight attendant operating out of the
23  Denver base, would your assistant base managers have
24  authority to investigate those incidents on their
25  own?

Page 13

1  **A.  As a team, yes, they would.**
2  Q.  Okay.  Without your involvement?
3  **A.  No.**
4  Q.  Okay.
5  **A.  I have (audio distortion).**
6  Q.  I'm sorry, I was speaking over you.  Could
7  you say that again.
8  **A.  I have oversight of the investigations in**
9  **the base.**
10  Q.  Okay.  So you would make the initial
11  decision whether or not to conduct an investigation
12  if there was any disciplinary incident?
13  **A.  Yes.**
14  Q.  Okay.  So if there was some sort of
15  disciplinary incident, before taking any action on
16  it, your, your base manager -- excuse me, assistant
17  base manager would report that to you?
18  **A.  Correct.**
19  Q.  Okay.  And did your assistant base managers
20  have authority to terminate any flight attendants
21  without your approval?
22  **A.  No.**
23  Q.  Okay.
24  **A.  Not approval, but my awareness, I would**
25  **have, of what was happening.**

Page 14

1  Q.  Okay.  Was there ever a situation where an
2  assistant base manager conducted most of an
3  investigation and -- that you were not involved in?
4  **A.  Not involved in as far as hands-on**
5  **assistant awareness, yes, that has happened.**
6  Q.  Okay.  How many times has, has that
7  happened?
8  **A.  I can't begin to even count them.**
9  Q.  Okay.  So it's many, it's not just a few
10  times?  It's many times?
11  **A.  Yes.**
12  Q.  Okay.  And who, who were your assistant
13  base managers in 2017?
14  **A.  Meggan Jones, Dustin Moore and Hector**
15  **Barrera.**
16  Q.  Okay.  Now, as part of your
17  responsibilities as base manager, did you ever
18  terminate any employees for violating the social
19  media policy?
20  **A.  I don't recall doing so.**
21  Q.  Okay.  Do you know if you had many
22  disciplinary incidents involving the social media
23  policy?
24  **A.  I did, yes.**
25  Q.  Okay.  Now, about how many -- about how

Page 15

1  many social media policy violations have you been
2  involved in?
3  **A.  I don't know for sure.**
4  Q.  Okay.  Do you know if it would be more than
5  ten?
6  **A.  I would say it might be close to ten.  I**
7  **don't know for sure how many.  I haven't counted**
8  **them.**
9  Q.  Okay.  Do you have records of any social
10  media policy cases you might have been involved in?
11  **A.  Not here with me now.**
12  Q.  Okay.  But, but you do have them in your
13  office?
14  **A.  They are kept on the shared drive with**
15  **labor relations.  I don't have them specifically, no.**
16  Q.  Okay.  But, there, there are other cases in
17  the Denver region involving -- or there are cases in
18  the Denver region of social media policy violations?
19  **A.  Yes.**
20  Q.  Okay.  And do you -- I guess, do you recall
21  Southwest's workplace bullying and hazing policy?
22  **A.  Yes.**
23  Q.  Okay.  Do you know if you have ever dealt
24  with any violations of the workplace bullying and
25  hazing policy?

Page 16

1  **A.  Yes.**
2  Q.  Okay.  About how many of those have you,
3  you experienced since being Denver base manager?
4  **A.  I can only think of possibly one or two.**
5  Q.  Okay.  And one of those was the -- involved
6  Charlene Carter?
7  **A.  Yes.**
8  Q.  Okay.  And you think there was one other?
9  **A.  Possibly.**
10  Q.  Okay.  Do you recall who, who it was?
11  **A.  No.**
12  Q.  Okay.  Do you, do you know if that
13  violation resulted in that employee's termination?
14  **A.  No.**
15  Q.  No, you can't recall or, no, it did not
16  result in termination?
17  **A.  It did not.**
18  Q.  Okay.  So the other case did not result in
19  termination?
20  **A.  Correct.**
21  Q.  Okay.  And have you -- well, since being --
22  becoming Denver base manager, have you dealt with any
23  violations of Southwest policy concerning harassment,
24  sexual harassment, discrimination and retaliation?
25  **A.  Yes.**

Page 17

1    Q.   Okay.  And how many of those have you dealt
2  with?
3    A.   **Once again, I don't know the exact number.**
4    Q.   Okay.  Was it more than ten?
5    A.   **No.**
6    Q.   Okay.  Less than ten.
7         Do you know if it was less than five?
8    A.   **Most likely, yes.**
9    Q.   Okay.  And do you know if any of those
10  resulted in the employee's termination?
11   A.   **None that I can recall.**
12   Q.   Okay.  And you said you, you don't recall
13  much about Southwest social media policy?
14   A.   **I didn't say that.**
15   Q.   Oh, okay.  So you do, you do recall
16  social -- Southwest social media policy?
17   A.   **Yes.**
18   Q.   Okay.  And you -- but you're not sure how
19  many employees were disciplined under that policy in
20  the Denver region while you've been base manager?
21   A.   **No, I don't have an exact number.**
22   Q.   Okay.  Do you know if that's more than ten?
23   A.   **No.**
24   Q.   No, it's not more than ten?
25   A.   **Correct, yes.**

Page 18

1    Q.   Okay.  Do you know if it was less than
2  five?
3    A.   **I would say most likely it's probably five
4  or six, possibly.**
5    Q.   Okay.  And let's see, that's five or six
6  employees that were terminated?
7    A.   **No.**
8    Q.   Oh.  Five or six employees that were
9  disciplined?
10   A.   **Five or six investigations.**
11   Q.   Five or six investigations, okay.
12        Do you recall how many of those five
13  or six resulted in discipline?
14   A.   **No.**
15   Q.   Okay.  Do you recall if any of those
16  investigations resulted in termination?
17   A.   **No.**
18   Q.   Okay.  Let's see, if I could, I'd like to
19  have you review Exhibit 2.
20        MR. CORRELL:  And, Mr. Schneider,
21  that's going to be labeled by a document number
22  that's not the exhibit number.
23        And, Counsel, if we can use the
24  document numbers, that will be easier.
25        MR. GILLIAM:  Sure.  Yeah, that will

Page 19

1  be document 7.
2    A.   **Okay.**
3    Q.   Have you had the chance to read this?
4    A.   **I have read it in the past, yes.  Do you
5  want me to read it now?**
6    Q.   Well, I just want you to -- you don't have
7  to read it out loud.  I just want you to, you know,
8  be familiar with it and --
9    A.   **Okay.**
10   Q.   Okay.  You've reviewed it?
11   A.   **Yes.**
12   Q.   Okay.  Do you recognize it?
13   A.   **Yes, I do.**
14   Q.   And what is it?
15   A.   **It's the termination letter for Charlene
16  Carter.**
17   Q.   Okay.  And does this letter tell you
18  which -- what are the reasons why she was terminated?
19   A.   **Yes, it does.**
20   Q.   And does it tell you which policies
21  Southwest said she violated?
22   A.   **Yes.**
23   Q.   Okay.  And does this refresh your memory
24  about any of the terminations for social media
25  violations that occurred?

Page 20

1    A.   **No.**
2    Q.   Okay.  But you do know Charlene Carter was
3  terminated for violating the social media policy?
4    A.   **Yes, I do.**
5         MR. CORRELL:  Objection, misstates
6  prior testimony.
7    Q.   Okay.  But you -- did you decide that
8  Charlene Carter violated Southwest's social media
9  policy?
10   A.   **Yes.**
11   Q.   Okay.  And did you decide that Charlene
12  Carter violated Southwest's workplace bullying and
13  hazing policy?
14   A.   **Yes.**
15   Q.   Okay.  And do you recall any other
16  employees who -- well, do you recall any other Denver
17  flight attendants who violated Southwest's social
18  media policy?
19   A.   **Yes.**
20   Q.   Okay.  Who were the others that you recall?
21   A.   **I'm not sure names specifically.  But I do
22  recall cases where they were violated and given
23  disciplined.**
24   Q.   Okay.  How many of those cases do you
25  recall?

Page 21

1          MR. CORRELL:  Objection, asked and
2  answered.
3      Q.   You can answer.
4      A.   I don't recall.
5      Q.   Do you recall any details about those
6  cases?
7      A.   Not at this moment.  I know that it had to
8  do with social media and towards other flight
9  attendants.
10     Q.   Okay.  Do you recall what, what those
11  flight attendants who were fired did on social media
12  towards the other flight attendants?
13     A.   I don't recall one being fired.
14     Q.   Okay.  Well, that's not what I asked.  I
15  asked, do you recall what those flight attendants did
16  to other flight attendants on social media?
17     A.   It was mostly surrounding any disparaging
18  comments about political or towards their beliefs or
19  opinions.
20     Q.   Okay.  Do you recall any other details?
21     A.   No, I don't.
22     Q.   Now, when you say "disparaging comments"
23  about beliefs or opinions, what kind of beliefs or
24  opinions?
25     A.   I really don't remember the specifics.  I

Page 22

1  know that when they made their comments, there was a
2  Nexus to the Workplace.  And that's -- those comments
3  and opinions were directly disparaging to the
4  company.
5      Q.   Okay.  And in those cases, what was the
6  Nexus to the Workplace?
7      A.   Their Facebook page had something that
8  identified them as an employee of Southwest Airlines.
9      Q.   Do you remember what those things were?
10     A.   No, I don't.
11     Q.   Okay.  Do you know how many flight
12  attendants receive some form of discipline in the
13  Denver region each year?
14     A.   Each year?
15     Q.   Yes.
16     A.   I couldn't even start to imagine how many
17  that would be.  I couldn't give a direct answer.
18     Q.   Okay.  I mean, do you think that's in the
19  hundreds?
20     A.   No, I don't believe it's 100, no.
21     Q.   You don't believe it's 100?
22     A.   No.
23     Q.   Do you believe it's more than 50?
24     A.   Are you asking me of any discipline at all?
25     Q.   Yes, any discipline at all.

Page 23

1      A.   In an entire year, it probably could be
2  between 25 to 50.
3      Q.   Okay.  Now, would those include, those
4  disciplinary cases include coaching counsels?
5      A.   No, I'm talking specifically discipline.
6      Q.   Okay.  And what would the different forms
7  of discipline be?
8      A.   A letter in their file up to suspension or
9  termination.
10     Q.   Okay.  Do you know how many flight
11  attendants in the Denver base are suspended each
12  year?
13     A.   No.  It's a much smaller number.
14     Q.   Okay.  In total, do you know how many
15  flight attendants in the Denver region may be
16  terminated each year?
17     A.   Once again, I don't know exact numbers.
18     Q.   Would it be more than five?
19     A.   Possibly five to six.  Less than ten, for
20  sure, I mean, it depends on the year.
21     Q.   And that's terminated for any reason?
22     A.   Correct.
23     Q.   Okay.  Now, when you have -- when you're
24  dealing with a social media policy violation, are
25  there other departments of the company that get

Page 24

1  involved?
2      A.   I have resources that I utilize for
3  information.
4      Q.   Okay.  So who are the resources that you
5  utilize?
6      A.   It could be employee relations, or in
7  Charlene's case or others, the HRBP, human resource
8  business partner, it is labor relations.  To name a
9  few.
10     Q.   Okay.  Are there others?
11     A.   Possibly drug and alcohol, if they were --
12  if that was the type of case it was.
13     Q.   Okay.  Have you ever conferred with the ACT
14  Team over any issue involving a flight attendant in
15  the Denver region?
16          MR. CORRELL:  Objection, vague.
17     Q.   You can answer.
18     A.   No.
19     Q.   Okay.  Do you know who the ACT Team is?
20     A.   Yes, I do.
21     Q.   Okay.  All right.  Have you ever
22  encountered any cases where a flight attendant is
23  complaining about religious discrimination in the
24  workplace?
25     A.   I don't recall a case like that.

Page 25

1    Q.   Okay.  And have you ever had a flight
2 attendant in the Denver region request from the base
3 a religious accommodation?
4    A.   I don't recall one.
5    Q.   Okay.  Now, when -- when you investigate a
6 social media policy violation, how do you first hear
7 about the social media policy violation?  Excuse me,
8 how do you hear about a complaint of a potential
9 violation?
10   A.   Usually it is a flight attendant's turning
11 in some type of document or social media post of some
12 sort.
13   Q.   Okay.  Does -- is -- are there ever
14 occasions where someone in Southwest management
15 reports it to you?
16   A.   If it came to them first and it was a
17 Denver based flight attendant, that would be a
18 possibility.
19   Q.   Okay.  Do you know if Southwest monitors
20 flight attendants' social media activities?
21   A.   No.
22   Q.   No, you don't know or, no, they do not?
23   A.   They don't, as far as I know.
24   Q.   Okay.  All right.  Have, have you had any
25 cases where a union executive board member has

Page 26

1 reported a flight attendant for a social media policy
2 violation?
3    A.   Not directly to me.  But this case is one
4 of them, the Charlene Carter case.
5    Q.   Do you recall any other cases where that
6 happened?
7    A.   No, I do not recall.
8    Q.   Okay.  You don't even recall any cases
9 where it might have involved another base?
10   A.   Executive board members, no, I don't recall
11 that.
12   Q.   Okay.  Do you recall any situations where
13 maybe some other union official reported a flight
14 attendant with a -- some sort of social media
15 complaint?
16   A.   No, I do not recall.
17   Q.   Okay.  Now, is this case the only, only one
18 you do recall?
19   A.   I don't understand the question.
20   Q.   Is this case the only instance you recall
21 where a union official has reported a flight
22 attendant with a social media complaint?
23   A.   Yes, this is the only one I can think of at
24 this time.
25   Q.   Okay.  All right.  Do you know if there

Page 27

1 have been any more -- well, let me ask it this way:
2 Have there been many social media policy violations
3 this year?
4        MR. CORRELL:  Objection, vague, and
5 calls for speculation.
6    Q.   You can answer.
7    A.   Not that I recall specifically that I dealt
8 with personally.
9    Q.   Okay.  When you say not that you dealt with
10 personally, do you know if they were -- if they
11 involved the Denver base?
12   A.   There possibly was one or two that were
13 investigated this year, since the beginning of the
14 year.
15   Q.   Okay.  Do you recall any details about
16 those two?
17   A.   Only that they were political in nature due
18 to the society and issues that are going on right
19 now.
20   Q.   And do you know if any flight attendants
21 were disciplined for those incidents?
22   A.   Not from my base, no.
23   Q.   Okay.  Do you recall flight attendants from
24 other bases who were disciplined?
25   A.   Possibly.  I've heard that they have

Page 28

1 happened.
2    Q.   Okay.  What have you heard?
3    A.   Just that it resulted in discipline, but no
4 specifics.  I don't know for sure what the discipline
5 was or if it, in fact, for sure happened.
6    Q.   Okay.  Do you recall any details about the
7 allegations?
8        MR. CORRELL:  Objection, asked and
9 answered.
10   Q.   You can answer.
11   A.   No, I do not.
12   Q.   Okay.  All right.  Do you know if there
13 have ever been cases in, say, the last seven years --
14 well, excuse me, let me back up.
15        So in 2017, did you have any cases
16 where one of your assistant base managers was
17 handling the investigation of a social media incident
18 where they issued some form of discipline?
19   A.   I don't recall 2017 specifically any case
20 that resulted in discipline.
21   Q.   Okay.  Well, in the time since you've been
22 there, do you recall some cases of alleged social
23 media policy violations that your, your base managers
24 have investigated that you weren't directly involved
25 in?

Page 29

1    A.    Yes.
2    Q.    Okay.  And what were those investigations?
3    A.    As far as specific details of it, I don't
4  know those, but I know that the decision was made
5  that they did violate social media policy.
6    Q.    Okay.  And who made that -- those
7  decisions?
8    A.    The assistant base manager for Denver.
9    Q.    Okay.  And who was that?
10   A.    I think it was possibly Dustin Moore.
11   Q.    Okay.  Did any of the other base managers
12 make those decisions?
13   A.    The assistant base managers?
14   Q.    Yes, I'm sorry, the assistant base
15 managers.
16   A.    I don't recall any others.
17   Q.    Okay.  And how many of those investigations
18 resulted in discipline?
19   A.    What cases are you talking about?
20   Q.    The cases that were investigated by the
21 assistant base managers.
22   A.    I don't know the answer specifically.
23   Q.    You don't know how many were involved, how
24 many cases were involved?
25   A.    No, I don't.

Page 30

1    Q.    Okay.  Do you remember the employees who
2  were involved?
3    A.    No.
4    Q.    Okay.  You don't know the names of the
5  employees?
6    A.    Correct.
7          MR. CORRELL:  Objection, asked and
8  answered.
9    Q.    Do you know if any of your assistant base
10 managers have ever handled a religious accommodation
11 request?
12   A.    I don't recall that.
13   Q.    Okay.  Do you know if any of your assistant
14 base managers have handled any cases involving
15 complaints of religious discrimination?
16   A.    No, I don't recall that.
17   Q.    Okay.  Now, has, has another department at
18 Southwest ever contacted you about a religious
19 discrimination issue?
20   A.    Not that I can recall.
21   Q.    Okay.  Or has any department at Southwest
22 ever contacted one of your assistant base managers
23 about a religious discrimination issue?
24         MR. CORRELL:  Objection, calls for
25 speculation.

Page 31

1    Q.    You can answer.
2    A.    I'm not aware of one.
3    Q.    Okay.
4          MR. CORRELL:  And, Counsel, real
5  quick.
6          Mr. Schneider, unless I instruct you
7  not to answer the question, you can proceed to answer
8  after I've lodged my objection, okay?
9          THE WITNESS:  Yes.
10   Q.    Now, when did you first hear that a flight
11 attendant had reported Ms. Carter for her Facebook
12 posts and messages?
13   A.    Around February of 2017.
14   Q.    Okay.
15   A.    I'm not sure on the exact date.
16   Q.    And do you know who brought those Facebook
17 posts and messages to your attention?
18   A.    If I remember correctly, it was sent to the
19 Las Vegas base and forwarded.
20   Q.    Okay.  If I could direct you to Exhibit --
21 I'm sorry, document 1.  And if you could review that.
22 And once you've had the chance to review it, let me
23 know.
24   A.    I have reviewed it.
25   Q.    Okay.  Do you recognize this?

Page 32

1    A.    Yes.
2    Q.    And what is it?
3    A.    It's an email that was sent from Audrey
4  Stone to Suzanne Stephensen --
5    Q.    Okay.
6    A.    -- regarding her complaint.
7    Q.    Okay.  And did you receive this complaint,
8  as well?
9    A.    It was forwarded to me, yes.
10   Q.    Okay.  All right.  And do you remember who
11 forwarded it to you?
12   A.    It was either Suzanne Stephensen, herself,
13 or David Kissman.
14   Q.    Okay.  Now, before this email was forwarded
15 to you, did you have any other communications about
16 the email?
17   A.    No.
18   Q.    Okay.  Or had you had any communications
19 about the, the matters raised in, in the email?
20   A.    Not prior to receiving this.
21   Q.    Okay.
22   A.    That I'm aware of.
23   Q.    Okay.  Let's see, and if I could direct you
24 to document 4, and I'll point you to a specific page
25 number.  When you have it up, let me know and I'll --

Page 33

1    A.   I have it up.
2    Q.   Okay.  If you go to the page that has the
3  number at the bottom, 4436, Bates labeled 4436.  And
4  review that page.
5         MR. CORRELL:  Counsel, are we talking
6  about document 4 or Exhibit 4?
7         MR. GILLIAM:  I'm sorry, it's document
8  2, document 2.
9    A.   Okay.
10   Q.   Okay.  And you're on page 4436?
11   A.   Yes, I am.
12   Q.   Okay.  And have you reviewed it?
13   A.   One moment, please.
14   Q.   Sure.
15   A.   Okay.
16   Q.   And do you recognize this?
17   A.   Yes.
18   Q.   Okay.  And what is it?
19   A.   It is an email from Dave Kissman to myself
20  and my assistant base managers concerning the
21  complaint from Audrey Stone, showing the post of
22  Charlene Carter.
23   Q.   Okay.  After you received this email, what,
24  what did you do?
25   A.   I began the investigation into looking at

Page 34

1  those specific posts and determining next steps.
2    Q.   Okay.  And which specific posts do you
3  mean?
4    A.   The ones referred to in the -- on the page,
5  the letter.
6    Q.   Okay.  In document 1?
7    A.   Do you want me to go to document 1?
8    Q.   Well, yeah.  You're referring to the
9  pictures, though, in document 1?
10        MR. CORRELL:  Actually misstates prior
11  testimony.
12   Q.   Well, when you said that you were looking
13  at these specific posts, which --
14        MR. CORRELL:  The problem is this
15  exhibit is incomplete.  It's cut off at the end of
16  4436.  It shows attachments, but the attachments are
17  not included in the exhibit.
18        MR. GILLIAM:  Let's see -- right.
19  4436 is.  But if you go back to document 1 -- that's
20  why I'm asking if the specific posts he's referring
21  to are the, the pictures in document 1.
22   A.   Correct.
23   Q.   Okay.  And if I could direct your attention
24  to document 1 and page 4228.  If I could ask you to
25  review that.

Page 35

1    A.   Okay.
2    Q.   It, it mentions "the recall."  Do you know
3  what "the recall" is?
4    A.   I remember that there was a group of flight
5  attendants trying to recall the executive board.
6    Q.   Okay.  And -- I'm sorry, did I interrupt
7  you?
8    A.   Ms. Stone.
9    Q.   Okay.  And when did you first learn about
10  the recall?
11   A.   I don't remember.  I had heard rumors about
12  it, but didn't have any details.  And during this
13  investigation is when Charlene Carter gave more
14  details about it.
15   Q.   Okay.  Who did you hear about the rumors
16  from?
17   A.   Other flight attendants making comments
18  about their frustration with the current leadership
19  of the union.
20   Q.   Were those flight attendants making those
21  communications to you directly in person?
22   A.   No.  I don't remember that.
23   Q.   Okay.  Did these other flight attendants
24  send you emails?
25   A.   No.

Page 36

1    Q.   Okay.  Do you know what channels you heard
2  these rumors from?
3    A.   It was through possibly other leaders,
4  maybe.  I don't recall specifics to it.  I just know
5  that there was talk around the bases about being
6  frustrated with the leadership in the union.
7    Q.   Okay.  And when you say "other leaders,"
8  what do you mean by "leaders"?
9    A.   I don't recall, is what I'm saying, who it
10  was.  It could have been -- or it might have been
11  flight attendants, just as I walk through the lounge,
12  having -- because I do speak to a lot of people,
13  flight attendants and leaders, but I can't recall
14  specifically.
15   Q.   Yeah, I understand.  I guess what I'm
16  asking is, when you say -- when you use the term
17  "leaders," who are you referring to?
18   A.   Any person in leadership at Southwest
19  Airlines inflight.
20   Q.   Okay.  Anyone in, in inflight management?
21   A.   Correct.
22   Q.   Okay.  And so a leader would also be a base
23  manager?
24   A.   Correct.
25   Q.   Okay.  All right.  And turning back to

Page 37

1    document 2, and the page number we were on, 4436,
2    Dave Kissman's email to you and the assistant base
3    manager says, Ed, give Suzanne a call.  Did, did you
4    call Suzanne after this email?
5        A.   Yes.
6        Q.   Okay.  And what was the subject matter of
7    the conversation?
8        A.   Audrey Stone was Las Vegas based at the
9    time.  And I needed to find out if there was any
10   other communication from Audrey that I wasn't aware
11   of, any other posts or specifically how she obtained
12   this information.
13       Q.   And what did Suzanne tell you about
14   how Audrey obtained the information?
15       A.   The posts that were sent to Suzanne
16   Stephensen were from Audrey's personal Facebook page,
17   and they were specific posts sent to her directly.
18       Q.   Okay.  Do you know if -- and do you know if
19   that was true, that all of the posts were sent to her
20   directly?
21       A.   All of which posts?
22       Q.   Well, the posts referencing your
23   conversation with Suzanne Stephensen.
24       A.   Some were, yes.
25       Q.   Okay.

Page 38

1        A.   The ones that we had at that moment in time
2    were, yes.
3        Q.   Okay.  If I could direct your attention
4    back to document 1 again.  And, let's see, page 4232.
5        A.   Okay.
6        Q.   And let me know once you've reviewed that.
7        A.   I've reviewed it.
8        Q.   Do you know if this screen shot was sent to
9    Audrey Stone directly?
10            MR. CORRELL:  Objection,
11   mischaracterizes the exhibit.
12       A.   I don't -- I don't know that specifically
13   by looking at this document.
14       Q.   Okay.  I guess, you know, you had said that
15   at that time when you talked to Suzanne Stephensen,
16   all of the posts that you had viewed were sent
17   directly to Ms. Stone.  And I'm wondering if this was
18   a post that was sent directly to Ms. Stone or was
19   this on Charlene Carter's actual Facebook page?
20       A.   I stated that those that were attached to
21   the email were the ones supposedly sent directly to
22   Audrey Stone.
23       Q.   Okay.  But from looking at this page, which
24   was one of the screen shots that Audrey Stone first
25   sent, does it look like this is one that was -- that

Page 39

1    could have been directly sent to Ms. Stone?
2        A.   Yes, it does.
3        Q.   Okay.  Did you -- you see it says, my page,
4    my opinions?
5        A.   Yes.
6        Q.   And comments.
7        A.   Yes, I see that.
8        Q.   Okay.  And so you think that's something
9    that could have been sent directly to Ms. Stone?
10       A.   Yes, it could have been.
11       Q.   Okay.  Are you -- do you use Facebook a
12   lot?
13       A.   No, I do not.
14       Q.   Okay.  Do you use Facebook at all?
15       A.   My wife has Facebook, and she shows me
16   things.  But other than that, I'm not real educated
17   on it.
18       Q.   Okay.  All right.  So going -- I'd like to
19   turn back to document 2 again, the same page we were
20   looking at, and your phone call with Suzanne
21   Stephensen.  What, what else did you-all discuss in
22   that phone call?
23       A.   I don't remember anything else other than
24   the preliminary information and where it was
25   obtained.

Page 40

1        Q.   Okay.  And did you know who Audrey Stone
2    was?
3        A.   Yes.
4        Q.   Okay.  Had you met Audrey Stone before?
5        A.   No.
6        Q.   Okay.  Had you communicated with Audrey
7    Stone at all?
8        A.   Not that I remember.
9        Q.   Okay.  And so you knew that Audrey Stone
10   was the Local 556 president?
11       A.   Yes, I did.
12       Q.   Okay.  And how did you know that?
13       A.   Through communication, and I was at
14   Southwest Airlines when the election happened.
15       Q.   Okay.  And you knew that she was voted in
16   as president?
17       A.   Yes.
18       Q.   Okay.  And when you say "through
19   communications," through communications with whom?
20       A.   There are TWU communications that come out
21   once in a while, and it has her name on the byline as
22   the president of TWU.
23       Q.   Okay.  You receive those TWU communications
24   directly?
25       A.   No.

Page 41

1    Q.   Okay.  How do you receive those TWU
2  communications?
3    A.   They print them and put them in the
4  lounges.  And that is mainly the reason -- or way.
5  We have a place where TWU keeps their documents that
6  they want for the flight attendants available.
7    Q.   Okay.  Do you receive those TWU
8  communications in any other way, apart from them
9  being posted in the lounges?
10   A.   No.
11   Q.   Okay.  And going back to Dave Kissman's
12 email here, he says, he's in TOPS and can be reached
13 on cell if needed.  Did you call Dave Kissman?
14   A.   At some point during the investigation, I
15 did, yes.
16   Q.   Okay.  Do you know if you called him
17 shortly after receiving this email?
18   A.   Most likely, yes.
19   Q.   Okay.  Do you remember if you, you talked
20 to him after giving Suzanne a call?
21   A.   I don't remember the specific order, but at
22 some point I did.
23   Q.   Okay.  Do -- what do you remember about
24 your initial call with Dave Kissman?  What did you
25 discuss?

Page 42

1    A.   He was aware of the post, he had watched
2  the video and he was pretty disgusted with it.
3    Q.   What did he tell you?
4    A.   He just said simply, like in this part
5  here, that he -- it's very graphic.
6    Q.   Did he, he tell you to start the
7  investigation during that call?
8    A.   No.  That's a decision that I had made
9  already.  But wanted him to be aware that I was
10 starting it.
11   Q.   Okay.  So you made, you made the decision
12 to start the investigation before talking to, to
13 Dave?
14   A.   Yes.
15   Q.   Okay.  All right.  After -- immediately
16 after -- I'm sorry, let me ask this clearly.
17            Did you make the decision to start the
18 investigation after receiving the email from Dave?
19   A.   Yes.
20   Q.   Okay.  All right.  So I think you, you
21 mentioned that you -- one of the next things you did
22 was determine the next steps to take with the
23 investigation.  So what were the next steps you
24 determined you had to take?
25   A.   Collecting as much information as I could

Page 43

1  that was out there.  Contacting employee relations,
2  making them aware that I was beginning an
3  investigation, to get their input.  And, and then I
4  would reach out to Audrey Stone and try to set up a
5  meeting so we could discuss and get more details.
6    Q.   Okay.  So how did you go about collecting
7  information?
8    A.   The documents that Suzanne Stephensen
9  received, and making sure I had those and if there
10 was anything else out there that I had forwarded to
11 me.
12   Q.   Okay.  Did you do anything else to collect
13 information?
14   A.   I do recall Facebook posts.  And we did --
15 I did have somebody look at Charlene Carter's
16 Facebook to see if there was anything out there that
17 possibly made a Nexus to the Workplace.
18   Q.   Okay.  Who did you have look at Charlene's
19 Facebook page?
20   A.   Meggan Jones, my assistant base manager.  I
21 believe that labor relations and possibly ER also did
22 some research on that.
23   Q.   Okay.  So did -- when did you ask Meggan to
24 look at Charlene Carter's Facebook page for
25 information?

Page 44

1    A.   It was early in the investigation.  I don't
2  specifically remember.
3    Q.   Okay.  After your call with Suzanne?
4    A.   Yes.
5    Q.   Okay.  And did, did Meggan say that she
6  would do it, she would go out to the -- Charlene's
7  Facebook page and look for information?
8    A.   Yes.
9    Q.   Okay.  And was that communication in person
10 or by email?
11   A.   In person.
12   Q.   Okay.  Does Meggan work closely to you?
13   A.   She's one of my assistant base managers.
14   Q.   Okay.  Well, I guess my question is, does
15 she -- is her office close to yours?
16   A.   Yes, they're in the same vicinity.
17   Q.   Okay.  All right.  Do you work next door to
18 each other?
19   A.   At the time, her office was across the
20 hallway from mine.
21   Q.   Okay.  And what, what information did
22 Meggan Jones find on Charlene's Facebook page?
23        MR. CORRELL:  Objection, calls for
24 speculation.
25   Q.   Do you know what information Meggan Jones

Page 45

1    found on Charlene's Facebook page?
2        A.   There were posts that showed her associated
3    with Southwest Airlines.
4        Q.   Okay.  And what were those posts?
5        A.   Pictures of her wings, pictures of other
6    statements made with Southwest Airlines' logo.
7        Q.   Okay.  Do you know if those were pictures
8    that Meggan had found?
9        A.   I don't, I don't remember specifically who
10   found them.  I know that some -- there were several
11   that were given to me.
12       Q.   Okay.  Do you know if Meggan Jones found
13   some pictures?
14       A.   Yes.
15       Q.   Okay.  And how do you know that?
16       A.   She showed them to me.
17       Q.   Okay.  Do you recall what she showed you?
18       A.   I don't remember details, but it had
19   pictures of Charlene Carter and, like I said, logos
20   of Southwest Airlines on printed material that were
21   on her Facebook page, the wings, and pictures of
22   Southwest pilots, if I remember right, and possibly
23   pictures of herself in uniform.
24       Q.   Okay.  Do you know how soon after asking
25   Meggan to find that information she, she brought it

Page 46

1    to you?
2        A.   It was the same day.
3        Q.   Okay.  Now, I think Dave Kissman emailed
4    you on February 23rd.  Do you know if, if that was --
5    that information was collected and given to you on
6    February 23rd?
7        A.   No, I don't remember that.
8        Q.   Okay.  All right.  Now, I think you, you
9    said you also contacted employee relations to get
10   their input.  Is that correct?
11       A.   Yes.
12       Q.   Okay.  And, and why did you want their
13   input?
14       A.   I viewed the posts as egregious, and there
15   could have been a violation of our harassment policy,
16   which employee relations oversees.
17       Q.   Okay.  Now, would employee relations have
18   had any input into other disciplinary violations?
19       A.   They're familiar with social media, hazing,
20   bullying, but it's not housed in their area.
21       Q.   Okay.  So when you reached out to them, you
22   were really seeking their input on whether that, that
23   one policy was violated?
24       A.   Yes.
25       Q.   Okay.  If I could direct your attention to

Page 47

1    same, same document, document 2, page 4450.  Just
2    once you've found it and have had the chance to
3    review it, let me know.
4        A.   Okay.
5        Q.   Do you recognize this?
6        A.   I have seen it, yes.
7        Q.   Okay.  And what is it?
8        A.   It's an email from me to employee
9    relations, and I'm asking for their thoughts on any
10   protected categories that may have been violated.
11       Q.   Okay.  Now, did you have any communications
12   with employee relations before sending this email?
13       A.   No.
14       Q.   Okay.  So this was your first time reaching
15   out to employee relations?
16       A.   Yes.
17       Q.   Okay.  And it's, I guess, addressed to
18   employee relations DG.  Do you know who receives an
19   email at that address?
20       A.   It is the employee relations investigators,
21   senior investigators.
22       Q.   Okay.  Do you know how many of those senior
23   investigators there are?
24       A.   I think there's four or five.
25       Q.   Okay.  Do you know if anybody apart from

Page 48

1    those four or five investigators receive emails at
2    that address?
3        A.   I'm not aware of that, no.
4        Q.   Okay.  And you -- I guess you want to know
5    their thoughts on protected categories?
6        A.   Yes.
7        Q.   And what, what is a protected category?
8            MR. CORRELL:  Objection, calls for a
9    legal conclusion.
10       A.   As far as I'm aware, it's race, ethnicity,
11   sexual orientation, et cetera.
12       Q.   So that's -- and that's what you meant by
13   "protected category" when you were asking for their
14   views on it?
15       A.   Yes.  Among other things as far as
16   harassment would go.
17       Q.   Okay.  And why did you think that a
18   protected category was involved here?
19       A.   Simply because it depicted several graphic
20   details and -- of fetuses, and if I recall right,
21   female genitalia, things like that.
22       Q.   Okay.  If -- could I -- so when you, you
23   forwarded the email, did you forward -- excuse me,
24   let me ask it this way:  So when you forwarded
25   information for their input, the images you sent,

Page 49

1   were they the same images that are in document 1?
2       A.   It was the images that were attached to
3   that document that Audrey Stone sent to Suzanne
4   Stephensen originally.
5       Q.   Okay.  So I guess your -- was your concern
6   with the protected category, whether Audrey fell
7   within one of the protected categories?
8       A.   I was not trying to determine that, myself.
9   That's why I reached out to employee relations.
10      Q.   And so why -- I guess what, what in
11  those images made you suspect that a protected
12  category was involved?
13           MR. CORRELL:  Objection, asked and
14  answered.
15      A.   I wasn't sure.  I was just reaching out to
16  make sure that I covered all areas.
17      Q.   Okay.  All right.  And did you follow up
18  that, that email you sent to employee relations with
19  any phone calls to, to anyone in employee relations?
20      A.   Not at that time.  I wanted to get their
21  input strictly from the information I had.
22      Q.   Okay.  To your knowledge, was this the
23  first time that, that anyone involved in this
24  investigation had communicated with employee
25  relations about this matter?

Page 50

1       A.   Yes.
2       Q.   Okay.  All right.  And you do say you
3   wanted to know -- you said, let me know your thoughts
4   on protected categories, et cetera.  Was there
5   something else besides protected categories that you
6   were asking them to weigh in on?
7       A.   Anything that had to do with harassment of
8   employees, protected categories, any of those type of
9   things that fall under their policies.
10      Q.   Okay.  So your -- your concern -- well, you
11  wanted to know whether these images involved
12  harassment of Audrey based off of race, religion or
13  one of those other categories you mentioned?
14      A.   Yes, their policy involves harassment,
15  sexual harassment, those type.  And so sexual
16  harassment was one that I wanted to get weighed in
17  on.
18      Q.   Okay.  Now, I think you might have also
19  said that one of your next steps was reaching out to
20  Audrey Stone.
21      A.   Once I had discussed with employee
22  relations, it -- I like to partner with employee
23  relations and talk to the complainant and get any
24  details that I didn't have at that time.
25      Q.   Okay.  Do you know if you had discussions

Page 51

1   with employee relations before reaching out to Audrey
2   Stone in this case?
3       A.   Verbally or through email?
4       Q.   Either way.  Any sort of communication.
5       A.   Yes.  They thought that it was worth
6   investigating and wanted to get more details.
7       Q.   Okay.  And who -- I guess who communicated
8   that to you?
9       A.   Denise Gutierrez.
10      Q.   Okay.  So at some point after you sent this
11  email, Denise Gutierrez contacted you?
12      A.   Correct.
13      Q.   Okay.  And do you know if she, she called
14  you over the phone, or did she email you?
15      A.   If I recall correctly, she emailed and then
16  we did talk over the phone also.
17      Q.   Okay.  And was it in the phone conversation
18  where she said that she thought it was worth
19  investigating?
20      A.   Yes.
21      Q.   Okay.  Why, why did she say it was worth
22  investigating?
23      A.   Because it possibly violated the
24  harassment, sexual harassment policy.
25      Q.   Okay.  Did she say why it possibly violated

Page 52

1   the sexual harassment policy?
2       A.   Because of the graphic images that were
3   sent to Audrey Stone.
4       Q.   Did she say it was because they were sent
5   to Audrey Stone?
6       A.   No.  It would have been any employee.
7       Q.   Okay.  Well, I guess what I mean, was it --
8   was it the images themselves that she thought
9   constituted sexual harassment?
10           MR. CORRELL:  Objection, calls for
11  speculation.
12      A.   I don't recall her specific reasons.
13      Q.   Okay.  Do you know if she gave you any
14  specific reasons?
15      A.   She possibly could have at that time, but I
16  know that we decided to move forward with setting up
17  a meeting.
18      Q.   Okay.  When Denise Gutierrez told you that
19  it was worth investigating, what did you say?
20      A.   I agreed with her.
21      Q.   Okay.  Did you give her your reasons why
22  you agreed?
23      A.   Most likely, I did.
24      Q.   And what were those reasons?
25      A.   Because of the egregiousness of the posts.

Page 53

1    Q.   Okay.  And do you recall how long that
2  conversation was?
3    A.   No, I do not.
4    Q.   Okay.  So after the conversation is when
5  you reached out to Ms. Stone?
6    A.   Yes.
7    Q.   Okay.  Now, in between that time, did you
8  have any more communications with Denise Gutierrez?
9    A.   Not that I'm aware of.  She just asked me
10 to let her know the time and date of the meeting and
11 when it was set up.
12    Q.   Okay.  And after you spoke with Denise
13 Gutierrez, did you talk to any of your assistant base
14 managers about any of the matters involving
15 Ms. Stone's complaint?
16    A.   Most likely, because I don't always set up
17 those meetings myself.  I have others do it at times.
18 I don't remember in this particular case.
19    Q.   Okay.  Did you talk to all of your
20 assistant base managers about the matters raised in
21 Ms. Stone's complaint?
22    A.   I don't recall that.  I only recall
23 specifically talking to Meggan.
24    Q.   Okay.  How did you decide which assistant
25 base manager to involve in an investigation?

Page 54

1    A.   I don't.  I handle it myself for the most
2  part.  But since she is the Facebook person, most
3  adept at it, I reached out to her.
4    Q.   Okay.  So you believed that Meggan was more
5  adept at Facebook than Hector or -- I forget the
6  other guy's name.
7    A.   Dustin.  Yes, absolutely.
8    Q.   Okay.  All right.  And so up, up to this
9  point, before -- well, let me, let me back up a bit.
10        So before contacting employee
11 relations, had you discussed the contents of Audrey
12 Stone's email with Meggan Jones?
13    A.   I believe so, yes.
14    Q.   And I guess you did say that you -- or you
15 did testify that you, you -- that you asked Meggan to
16 go out to Charlene's Facebook page.  What were your
17 other discussions with Meggan about the contents of
18 Audrey Stone's complaint?
19    A.   Simply that the images were pretty graphic
20 and that I was surprised that those posts were sent
21 to somebody.  And I just wanted to know what other
22 posts might be out there.  And so that was our
23 discussion.
24    Q.   Okay.  And what -- how did Meggan respond
25 to you?

Page 55

1    A.   She was the same understanding of it,
2  thought process.  And so she went to Facebook and
3  tried to locate anything else.
4    Q.   Now, do you know how she received the
5  images?
6    A.   Those were on my computer.  And I had
7  printed them out to put in my investigation folder.
8    Q.   Okay.  Okay.  Did you -- now, did you ever
9  talk to Hector or Dustin about the content of Audrey
10 Stone's complaint?
11    A.   I don't recall specifics discussing with
12 them or showing them.  But I know that they were
13 aware simply because we work so close together.
14    Q.   Okay.  And did -- what, what did they say
15 to you about the contents of Audrey Stone's
16 complaint?
17    A.   I don't recall the conversation with them
18 about the contents.
19    Q.   Okay.  Did --
20        MR. CORRELL:  We've been going for
21 about -- I guess we're a little shy of an hour and a
22 half.  Can we take a break in the next five, ten
23 minutes?
24        MR. GILLIAM:  Yeah, sure.  Now is
25 probably okay.  Do we want to do a longer break for

Page 56

1  lunch or do we want to do -- what does everybody want
2  to do?
3        MR. CORRELL:  It's only 10:30 for
4  Mr. Schneider, so...
5        MR. GILLIAM:  I'm okay, but --
6        MR. CORRELL:  I'm fine coming back for
7  another hour or so after a short break and then do a
8  lunch unless anybody has an objection.
9        THE WITNESS:  I'm okay with that.
10        MR. GILLIAM:  Okay.  That's fine by
11 me.
12        MR. CORRELL:  Okay.  So let's take ten
13 and we'll be back here right after.
14        MR. GILLIAM:  Okay.  Sounds good.
15        THE VIDEOGRAPHER:  We are off record
16 at 11:23 a.m.
17        (Recess from 11:23 to 11:35)
18        THE VIDEOGRAPHER:  We are back on
19 record at 11:36 a.m.
20    Q.   Okay, Mr. Schneider, at what point during
21 an investigation do you have to communicate with a
22 flight attendant's union representative instead of
23 talking to the flight attendant directly?
24    A.   Once we have called the flight attendant
25 and made them aware of the investigation, we tell

Page 57

1  them that they are allowed to have union
2  representation and to please call the union if they
3  would like to have that representation.  At that
4  point we only talk to the union.
5     Q.   Okay.  And does that approach apply to both
6  the complainant and the person whose conduct is being
7  complained of?
8     A.   No, it does not.
9     Q.   Okay.  So you can continue communicating
10 with the complainant even if they're not represented?
11    A.   Correct.
12    Q.   Okay.  All right.  So prior to contacting
13 Audrey, how many communications had you had with Dave
14 Kissman about Audrey Stone's complaint?
15    A.   I don't recall.
16    Q.   Do you know if it was more than one?
17    A.   Possibly.  I don't recall for sure.
18    Q.   Okay.  Do you know if you had more than one
19 phone conversation with him prior to talking to
20 Audrey?
21    A.   I don't recall.
22    Q.   Okay.  Did, did you have any communications
23 with anyone else apart from Dave Kissman or Meggan
24 Jones prior to contract -- excuse me.  Did you have
25 any communications with anybody apart from Dave

Page 58

1  Kissman, Meggan Jones or other assistant base
2  managers or Denise Gutierrez prior to contacting
3  Audrey?
4            MR. CORRELL:  Objection, misstates
5  prior testimony.
6     A.   I made labor relations aware of the
7  investigation.
8     Q.   Okay.  Who in labor relations did you
9  communicate with?
10    A.   Maureen Emlet.
11    Q.   Okay.  And what -- I guess, how did you
12 communicate with Maureen?
13    A.   The phone conversation.
14    Q.   Okay.  And what did you tell Maureen in
15 your phone conversation?
16    A.   That I was beginning an investigation into
17 Charlene Carter, and that it had to do with Facebook
18 posts that were sent to Audrey Stone.
19    Q.   Okay.  And what was Maureen's response?
20    A.   She was fine with me continuing and moving
21 through the steps and she -- that I can remember -- I
22 don't know for sure if she said anything else about
23 it.
24    Q.   Okay.  Did you explain the content of those
25 Facebook messages and posts?

Page 59

1     A.   I did.
2     Q.   Okay.  And did, did you have any
3  communications with Naomi Hudson before contacting
4  Audrey?
5     A.   No.
6     Q.   Okay.  Did you have any communications with
7  Sonya Lacore before contacting Audrey?
8     A.   No.
9     Q.   Okay.  Did you have any communications with
10 Mike Sims before contacting Audrey?
11    A.   I don't remember.
12    Q.   Okay.  Now, prior to you contacting Audrey,
13 do you know if anyone else in -- involved in the
14 investigation contacted Audrey about her complaint?
15    A.   I don't recall that happening.
16    Q.   Okay.  All right.  Before contacting
17 Audrey, how many communications did you have with
18 Suzanne Stephensen about the matter?
19    A.   I only remember the one conversation.
20    Q.   Okay.  And just to make sure that I say it
21 clearly, did you have any other communications with
22 Suzanne Stephensen apart from the one conversation?
23    A.   I don't remember.
24    Q.   Okay.  Now, in -- before contacting Audrey
25 Stone, did anyone have any communications about the

Page 60

1  issues -- any issues involved with this complaint
2  dealing with the union president?
3            MR. CORRELL:  Objection, vague.
4     A.   I don't understand the question.
5     Q.   Okay.  In, in all of the communications you
6  had before contacting Audrey, did anyone say anything
7  about issues with this matter involving the union
8  president?
9            MR. CORRELL:  Objection, vague.
10    A.   I don't remember.
11    Q.   Okay.  I direct you to 4459, let's see,
12 still in document 2.  Once you've found it and had
13 the chance to review it, let me know.
14    A.   Okay.
15    Q.   In -- do you recognize this?
16    A.   Yes.
17    Q.   Okay.  And what is it?
18    A.   It's an email from Denise Gutierrez to me
19 after she had time to review the information I sent
20 her.
21    Q.   Okay.  And she asks in her email, when is
22 our day seven on this issue?
23    A.   Correct.
24    Q.   What, what is a day seven?
25    A.   We have seven days to complete an

# CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 61

1    investigation from beginning to end.  And day seven
2    would be the final day that we would have to render
3    our decision.
4        Q.   Okay.  And what happens if you have not
5    completed the investigation within seven days?
6        A.   You miss the deadline and you cannot issue
7    discipline.
8        Q.   Okay.  And are you, are you able to get
9    extensions on the seven days?
10       A.   Yes.
11       Q.   Okay.  And how do you get an extension?
12       A.   In this case, I don't remember specifics,
13   but it seems like Charlene did ask for more time.
14   And it seems to me, if I recall correctly, that there
15   were one or two extensions done.  And I contacted the
16   union to get those completed.
17       Q.   Okay.  So is it correct that you have to
18   get the union's approval in order to get an
19   extension?
20       A.   It's an agreement between the company and
21   the union.
22       Q.   Okay.  Have you ever had an investigation
23   where the union would not agree to give an extension?
24       A.   Yes.
25       Q.   Okay.  What do you recall from that

Page 62

1    investigation?
2        A.   We were at day seven and we asked for more
3    information and I needed more time to get that
4    information.  And the union was unwilling, and so I
5    was forced to make my decision that day.
6        Q.   Okay.  Do you recall many incidents where
7    the union has denied your extension request?
8        A.   No.
9        Q.   Okay.  And I should clarify.  When you say
10   "no," the union has not denied your extension request
11   in many instances?
12       A.   No, they have not.
13       Q.   Okay.  Is there only one instance you
14   recall of the union denying your extension request?
15       A.   One that I can recall, yes.
16       Q.   Okay.  All right.  And were there any
17   situations where you may not recall the details, but
18   the, the union did still deny an extension request?
19       A.   I don't remember.
20       Q.   All right.  Did you ever communicate
21   with Toni Hamilton about this matter?
22       A.   I don't remember.
23       Q.   Okay.  Do you know whether this matter had
24   been forwarded to Toni Hamilton?
25       A.   I don't know that.

Page 63

1        Q.   Okay.  If I could direct you to 7159, still
2    document 2.  Once you've had the chance to find it
3    and review it, let me know.
4        A.   Okay.
5        Q.   And do you recognize this?
6        A.   No, not specifically.
7        Q.   Okay.  You do see that it's an email from
8    you?
9        A.   Yes.
10       Q.   Okay.  And it's addressed to Suzanne
11   Stephensen?
12       A.   Yes.
13       Q.   Okay.  And it says, Suzanne, I have talked
14   to Audrey and set up a phone discussion tomorrow with
15   Denise Gutierrez, and it continues.  Do you -- and
16   it's dated February 23rd of 2017.  So does that
17   refresh your recollection as to what point in time
18   you may have talked to Audrey?
19       A.   It gives me a time frame, yes.
20       Q.   Okay.  And the phone discussion that's
21   referenced, do you know if that is a fact finding?
22       A.   It's not specifically a fact finding.  We
23   use the same document when we take notes.  But it's
24   more of an information gathering.
25       Q.   Okay.  And so the -- I guess the phone

Page 64

1    discussion that's referenced here, do you know if
2    that was the information gathering you conducted as
3    part of your investigation?
4        A.   Yes.
5        Q.   Okay.  And that information gathering would
6    have been with Audrey Stone?
7        A.   Yes.
8        Q.   Okay.  And do you know how many
9    conversations you had with Audrey prior to that
10   information gathering?
11       A.   No, I do not.
12       Q.   Okay.  But you did have one conversation
13   with her, at least?
14       A.   To set up the phone discussion.
15       Q.   Okay.  And what did you tell Audrey in that
16   first conversation?
17       A.   I don't remember specifics on it.
18       Q.   Okay.  Okay.  Do you remember what Audrey
19   said to you in the first conversation?
20       A.   No, I don't recall that.
21       Q.   Okay.  Okay.  So you don't recall anything
22   about that first conversation.  But can you say that
23   it was to set up a fact finding?
24       A.   It was to set up the phone discussion, yes.
25       Q.   Yes, the information gathering, sorry.  I

Page 65

1    need to learn the lingo.
2         Okay.  And do you know if you did have
3    the information gathering on February 24th?
4         A.   I don't know that for sure, if that's what
5    this is saying.
6         Q.   Okay.  If I could direct your attention to,
7    let's see, document 5.  And for others, it's Exhibit
8    5.
9         A.   Okay.
10        Q.   And do you recognize this?
11        A.   Yes.
12        Q.   Okay.  What is it?
13        A.   It's an email to Denise Gutierrez and
14   Maureen Emlet, and attaching the meeting notes from
15   Audrey.
16        Q.   Okay.  And on the notes there's listed a
17   date.
18        A.   On the notes themselves?
19        Q.   Yes.
20        A.   Okay.
21        Q.   Do you know if that's the date that you
22   held the fact-finding meeting?
23        A.   If it's the date on these notes, yes,
24   that's the day I held it.
25        Q.   Okay.  Do you know who prepared these

Page 66

1    notes?
2         A.   It was Janet Rhea, one of my coordinators.
3         Q.   Okay.  Now, was Janet Rhea involved in the
4    investigation of this case?
5         A.   No.
6         Q.   Okay.  And did Janet Rhea have any part in
7    the decision making in this case?
8         A.   No.
9         Q.   Okay.  And did, did Audrey have a union
10   representative with her on the call?
11        A.   She did.
12        Q.   Okay.  And who was that?
13        A.   Brett Nevarez.
14        Q.   All right.  And do you know if she had told
15   you ahead of time that she would be bringing a union
16   rep?
17        A.   She did not tell me that, that I recall.
18        Q.   Okay.  Do you know if he just joined at
19   some point during the call?
20        A.   If I remember correctly at some point, yes,
21   when the call started.  Because we always ask them as
22   part of our protocol.
23        Q.   Do you know how long information gathering
24   lasted?
25        A.   No idea.

Page 67

1         Q.   All right.  And it -- I guess it lists the
2    employee name, union representative and company
3    representatives here.  Those were the only meeting --
4    I'm sorry, those were the only persons in attendance?
5         A.   Yes.
6         Q.   Okay.  All right.  And were -- did you
7    conduct this meeting by teleconference?
8         A.   Yes.
9         Q.   Okay.  And was anybody else in your office
10   with you when you held the meeting?
11        A.   Janet Rhea was in my office with me.
12        Q.   Okay.  Where was Denise Gutierrez?
13        A.   In -- I don't know for sure.  Wherever her
14   office or home is, I'm not positive.
15        Q.   Okay.  But she wasn't in your office?
16        A.   No.
17        Q.   And was Audrey Stone in, in your office?
18        A.   No.
19        Q.   Okay.  Do you know where Audrey Stone was
20   at the time?
21        A.   No, I do not.
22        Q.   Okay.  And Brett Nevarez wasn't in your
23   office?
24        A.   No.
25        Q.   Okay.  Do you know where he was?

Page 68

1         A.   No.
2         Q.   Do you know if they were together
3    somewhere?
4         A.   I do not know that for sure, I don't
5    recall.
6         Q.   Okay.  And I have a question.  If I could
7    direct you to 4635, still part of the same document,
8    towards the bottom of the page, the last block there.
9         A.   Okay.
10        Q.   And Audrey refers to the Women's Committee
11   Team.  Do you know if that Women's Committee Team is
12   a joint committee between Southwest and the union?
13        A.   I do not know that.
14        Q.   Okay.  As, as part of this meeting, what
15   questions did you, did you have that you wanted to
16   ask Audrey?
17        A.   I don't recall specific questions, but I
18   wanted to find out how she obtained the video, the
19   graphics, the posts, and if they were sent to her
20   directly as a private message, if they were generally
21   put on a Facebook page and referenced her or what the
22   specifics were.
23        Q.   All right.  Did you ask her whether she
24   also saw any sort of connection to Southwest on the
25   page?

Page 69

1    A.   I don't remember asking that question.
2    Q.   Okay.  And what did she tell you about how
3  she had obtained the posts?
4    A.   They were sent to her in a private message.
5    Q.   Okay.
6    A.   A Facebook private message.
7    Q.   Did she say that all of the posts were sent
8  to her in a private message?
9    A.   I don't recall that.  I know that the
10  graphic ones were.
11    Q.   Okay.  At any point prior to Charlene
12  Carter's termination, do you know if anybody else
13  complained about Charlene Carter's Facebook posts?
14    A.   I don't recall that.
15    Q.   Okay.  And had Charlene ever been
16  disciplined?
17    A.   I don't believe she was prior to this.
18    Q.   Okay.  Now, after -- or do you know if this
19  document here represents the exact notes that Janet
20  took during the meeting?
21    A.   Yes.
22    Q.   Okay.  And are these an accurate
23  representation of the conversations you had in the
24  fact-finding meeting?
25    A.   The meeting with Audrey Stone?

Page 70

1    Q.   Yeah.
2    A.   Yes.
3    Q.   Okay.  Do you know if you had any -- did
4  you have a chance to make revisions to the notes
5  after Janet took them?
6    A.   I read through them to make sure that they
7  were a good representation of the meeting and what
8  was discussed.
9    Q.   Okay.  Did you make any corrections to her
10  notes?
11    A.   I don't remember in this one, making
12  corrections specifically.
13    Q.   All right.  Now, had, had you
14  reached any conclusions after holding the information
15  gathering with Audrey?
16    A.   I reached a conclusion that I needed to
17  have a meeting, a fact-finding meeting with Charlene.
18    Q.   Okay.  And so what were your next steps
19  after you held the information gathering with Audrey?
20    A.   To contact Charlene and set up a
21  fact-finding meeting with her.
22    Q.   And after you, after you held the fact --
23  I'm sorry, the information gathering with Audrey, did
24  you communicate with, with anyone else about the fact
25  finding?

Page 71

1    A.   I had conversations with employee
2  relations, and I informed labor relations that I
3  would be conducting a fact-finding meeting with
4  Charlene.
5    Q.   Okay.  And after the information gathering
6  with Audrey, did you communicate with anyone else
7  about that meeting?
8    A.   I most likely informed Dave Kissman also.
9  I don't recall the exact steps.
10    Q.   Okay.  Did you communicate with anybody
11  else about the information gathering?
12    A.   I don't recall.
13    Q.   Okay.  Now, why wasn't Meggan Jones in
14  attendance at the information gathering?
15    A.   She was not conducting the investigation,
16  she wasn't a part of that specifically.
17    Q.   Okay.  Now, at any point thereafter did you
18  communicate with Meggan Jones about Audrey Stone's
19  information gathering?
20    A.   I informed her that I was going forward
21  with the meeting with Charlene, and I asked her to
22  take the notes in that meeting for me.
23    Q.   Okay.  And given that Meggan hadn't been
24  involved in Audrey's information gathering, why did
25  you ask her to participate in Charlene's fact

Page 72

1  finding?
2    A.   When we have investigations of this
3  magnitude, it's my preference to have another leader
4  in there with me and not a coordinator.
5    Q.   And so why didn't you have Meggan involved
6  in the first information gathering?
7    A.   That was simply just gathering information
8  and I just needed somebody to take the notes.  I
9  don't recall specifically if Meggan was there that
10  day or not.
11    Q.   Okay.  And when you communicated with
12  employee relations about the information gathering,
13  what, what did you -- who with employee relations did
14  you talk to?
15    A.   Denise Gutierrez.
16    Q.   And what did you tell her about the
17  information gathering?
18    A.   She was involved with it and simply made my
19  decision known that I wanted to conduct a meeting
20  with Charlene and how she wanted to be involved with
21  it.
22    Q.   Did she tell you that she wanted to be
23  involved?
24    A.   Yes.
25    Q.   And why did she say she -- well, did she

Page 73

1 tell you why she wanted to be involved?
2     A.   Because it had a possibility of violation
3 of the harassment policy, sexual harassment.
4     Q.   Okay.  And Denise was at the information
5 gathering with Audrey, correct?
6     A.   Correct.
7     Q.   Do you know if you talked to her
8 immediately after that meeting?
9     A.   I don't remember.
10     Q.   Okay.  And do you remember whether that
11 communication was in person or by email?
12     A.   No, it was on the phone.
13     Q.   Okay.  What else, if anything, do you
14 remember telling Denise in that phone call?
15     A.   If I remember correctly, we had discussed
16 not only harassment, but possibly bullying and hazing
17 policy violation.  And that was not in her area of
18 expertise.
19     Q.   Okay.  And what did you tell Denise about
20 the connection to the bullying and hazing policy?
21     A.   We had discussion on that, and that falls
22 more under our HRBP than employee relations.
23     Q.   So did you determine that you had to get
24 the HRBP involved?
25     A.   Yes.

Page 74

1     Q.   Okay.  Now, had the HRBP been involved up
2 to that point?
3     A.   No.
4     Q.   Okay.  At what point did you believe that
5 the bullying and hazing policy was implicated in this
6 matter?
7     A.   After the information gathering from Audrey
8 Stone.
9     Q.   And what about the information gathering, I
10 guess, caused you to think that that might be
11 involved here?
12     A.   The graphic nature of it and also that it
13 was not a one-time instance of her contacting Audrey
14 Stone.
15     Q.   Okay.  Now, had Charlene Carter ever sent
16 the -- I guess the, the aborted fetus images to
17 Audrey prior to this incident?
18          MR. CORRELL:  Objection, calls for
19 speculation.
20     A.   I don't know that.
21     Q.   Okay.  But this was the first time you had
22 heard of those images being sent to Audrey Stone by
23 Charlene?
24     A.   Yes.
25     Q.   Okay.  So when you say that this had --

Page 75

1 well, scratch that.
2          And so after this meeting, did you
3 reach out to the HRBP?
4     A.   Which meeting are you referring to?
5     Q.   I'm sorry, after the information gathering
6 with Audrey Stone, did you reach out to the HRBP?
7     A.   I recall at some point I did, to let her
8 know when the meeting would be.
9     Q.   Okay.  Which meeting?
10     A.   The fact-finding meeting with Charlene.
11     Q.   Okay.  And is there a specific HRBP who you
12 would have known to reach out to, or do they -- does
13 that group decide for itself who is going to be
14 involved in your investigation?
15     A.   No, inflight has one specific HRBP.  It's
16 Edie Barnett.
17     Q.   Okay.  So you, you reached out to Edie
18 Barnett sometime between the information gathering
19 with Audrey and the fact finding with Charlene?
20     A.   Correct.
21     Q.   Do you know if you communicated with her by
22 phone, email, or in person?
23     A.   I don't recall specifically, but I'm pretty
24 sure it was email, possibly.
25     Q.   Do you know if you had multiple

Page 76

1 conversations with Ms. Barnett prior to Charlene's
2 fact finding?
3     A.   No.
4     Q.   Okay.  No, you didn't, or no, you don't
5 recall?
6     A.   I don't recall having multiple.
7     Q.   Okay.  All right.  And did you speak with
8 anyone besides Denise Gutierrez and employee
9 relations about the information gathering?
10     A.   Your question was did I speak to anybody
11 else in employee relations other than Denise?
12     Q.   Yes.  About the information.
13     A.   No, I don't recall speaking to anybody
14 else.
15     Q.   Okay.  You didn't have any communications
16 with anyone else of any sort?
17     A.   Not that I recall.
18     Q.   Okay.  And I think -- did you say that you
19 also communicated with somebody in labor relations
20 after the information gathering with Audrey?
21     A.   Yes.
22     Q.   Okay.  And who was that?
23     A.   Maureen Emlet.
24     Q.   Okay.  And what did you tell Maureen?
25     A.   That I felt we needed to have a meeting

Page 77

1  with Charlene and that I was going to set it up.
2     Q.   Okay.  Did you tell Maureen which policies
3  might have been at issue based off the conduct
4  involved?
5     A.   We discussed that, yes.
6     Q.   Okay.  And what did -- which policies did
7  you discuss?
8     A.   The bullying, hazing policy and the
9  harassment policy, as well as the social media
10  policy.
11     Q.   Okay.  At what point did you feel that the
12  social media policy might be implicated by the
13  conduct in this complaint?
14     A.   Because of the information we gathered
15  indicating the Nexus to the Workplace.
16     Q.   Okay.  And at what point did you, I guess,
17  start considering that there might have been a social
18  media policy violation?
19     A.   When I learned that this was on social
20  media also.
21     Q.   Okay.  All right.  What, if anything, did
22  you tell Dave Kissman when you communicated with him
23  after the information gathering?
24     A.   Simply that I felt we needed to go forward
25  with the investigation and conduct a fact-finding

Page 78

1  meeting with Charlene.
2     Q.   And what was Dave's response?
3     A.   He agreed.
4     Q.   Okay.  Did -- now, do you know if you
5  called Dave or did Dave call you after the
6  information gathering?
7     A.   I don't recall specifically.
8     Q.   Okay.  And I'm sorry, was this a phone
9  call?
10     A.   Yes.
11     Q.   Okay.  All right.  And as part of that
12  conversation, were there any other communications
13  about this matter?
14     A.   Not that I can recall.
15     Q.   Okay.  And how about your, your
16  communication with Maureen, was there any other
17  communication about other aspects of this matter?
18     A.   Only discussing the policies involved.
19     Q.   Okay.  Did -- what did she say about the
20  policies that you mentioned?
21     A.   She agreed that there was potential for
22  harassment, sexual harassment, the social media
23  policy or bullying and hazing policy violations.
24     Q.   And in this conversation did Maureen
25  mention any other cases that she was involved in

Page 79

1  involving these policies?
2     A.   I don't recall that.
3     Q.   Okay.  Now, at, at this stage after the
4  information gathering, did you ask Maureen her
5  opinion on whether you should proceed to the fact
6  finding?
7     A.   No.  Just sharing information.  And I came
8  to that conclusion myself.
9     Q.   Okay.  And when you talked to Dave Kissman,
10  did you ask his opinion as to whether you should
11  proceed to the fact finding?
12     A.   Same type of thing, we just discussed the
13  details and let them know that I was proceeding.
14     Q.   Okay.  And apart from those communications,
15  did you have any communications with anyone else
16  about events continuing up through the information
17  gathering with Audrey?
18     A.   I don't remember having those.
19     Q.   Okay.  After the information gathering, did
20  you have any communications with, with Audrey about
21  the information gathering?
22     A.   I don't recall that.
23     Q.   Okay.  Did you have any communications with
24  Brett Nevarez during the investigation outside of the
25  information gathering?

Page 80

1     A.   No.
2     Q.   Okay.  So was your next step to hold the
3  fact finding with Charlene?
4     A.   Yes.
5     Q.   Okay.  Do you remember when you, you had
6  that fact finding with Charlene?
7     A.   I don't remember the specific dates, no.
8     Q.   Okay.  Now, I guess another question, I
9  guess, does the human resources business partner, the
10  HRBP, make a decision as to whether the bullying and
11  hazing policy is violated?
12     A.   They give me feedback on whether they feel
13  it was violated, yes.
14     Q.   Okay.  Now, if the HRBP determines that
15  it's not violated, could you still issue discipline
16  for the violation of that policy?
17     A.   Yes.
18     Q.   I'm sorry -- well, okay.  Or maybe a better
19  way to ask it, if the HRBP determines there is not a
20  violation, could you still decide that, yes, there is
21  a violation?
22     A.   We would come to that conclusion together,
23  it would be a consensus.
24     Q.   Okay.  But I guess do, do you have the
25  authority to, to come to a different conclusion, if

Page 81

1 HRBP would disagree with you, could you independently
2 decide that it was a violation?
3     **A.   I could, but I don't know for sure if I**
4 **would in this situation.**
5     Q.   Okay.  Let's see, if I could refer you to
6 document 9.  Once you find it and review it, let me
7 know.
8     **A.   Okay.**
9     Q.   And do you recognize this?
10     **A.   The email, yes.**
11     Q.   Okay.  And what is it?
12     **A.   This is an email from me to Maureen Emlet**
13 **and Denise Gutierrez, indicating information that**
14 **Charlene brought into the meeting to present to us.**
15     Q.   And do you recognize the pages that follow?
16     **A.   The fact-finding meeting notes with**
17 **Charlene.**
18     Q.   Yes.
19     **A.   Yes.**
20     Q.   Okay.  And do you know if these were -- if
21 this is the final version of the notes?
22     **A.   As far as I'm aware, looking at it right**
23 **now, yes.**
24     Q.   Were there different drafts of these notes?
25     **A.   Not that I'm aware of.**

Page 82

1     Q.   Okay.  Now, did -- okay, did you take any
2 of your own notes for the fact-finding meeting?
3     **A.   I did take some notes, yes.**
4     Q.   Okay.  Did, did you produce those in
5 response to Ms. Carter's discovery request?
6     **A.   When I take notes, I get notes back from my**
7 **note taker, I incorporate them into those notes and**
8 **those are the only ones that I have.**
9     Q.   Okay.  When you say your "note taker,"
10 you're referring to an individual?
11     **A.   Yes.  In this case, Meggan Jones.**
12     Q.   Okay.  So did Meggan Jones take the only
13 notes that exist for this fact-finding meeting?
14     **A.   She took notes during the fact-finding**
15 **meeting.  And once she completed them, she sent them**
16 **to me and I incorporated my notes into them.  So,**
17 **yes, it's the one document.**
18     Q.   Okay.  Okay.  So you incorporated your
19 notes into this document?
20     **A.   Correct.**
21     Q.   Okay.  Do you know if this fact-finding
22 meeting was recorded?
23     **A.   No, it was not.**
24     Q.   Okay.  Are, are fact findings ever
25 recorded?

Page 83

1     **A.   No, it's not allowed.**
2     Q.   Okay.  And it -- this -- I guess at the top
3 of the fact-finding notes, it lists who was in
4 attendance.  And does that accurately say who, who
5 all participated in the meeting?
6     **A.   Yes.**
7     Q.   Okay.  Now, did -- were Charlene and Chris
8 in your office for this meeting?
9     **A.   Yes, they were.**
10     Q.   Okay.  And the notes say, conferenced in
11 via phone, Denise Gutierrez and Edie, Edie Barnett --
12 Edith Barnett.  They -- so they were not present,
13 correct?
14     **A.   Correct.**
15     Q.   Okay.  And I want to step back a second.
16 After the investigation gathering meeting with
17 Audrey, did you determine that you needed more
18 information regarding Facebook posts and social media
19 posts?
20     **A.   I'm not sure the sequence of events, but**
21 **during that time, I asked for more Facebook posts.  I**
22 **don't know if they came before or after our meeting.**
23     Q.   Okay.  Do you recall Denise Gutierrez
24 seeking more information on Facebook posts that were
25 made?

Page 84

1     **A.   Yes.**
2     Q.   Okay.
3          MR. GILLIAM:  I'd like to mark the
4 next exhibit.  It will be document 20.  So I'm not
5 sure which exhibit we are on now.  Is it 13?  No.
6 14?
7          MR. CORRELL:  I believe we are on 14,
8 Counsel.
9          MR. GILLIAM:  Okay.
10          So, yeah, if we could mark document 20
11 as Exhibit 14.
12          (Exhibit 14 marked)
13     Q.   Mr. Schneider, that will be document 20.
14     **A.   Document 20?**
15     Q.   Yes, sir.  Have you found it?
16     **A.   No, I have not.**
17          MR. CORRELL:  And, Mr. Schneider, to
18 help you, that will be the very last document I sent
19 you.  I believe it's by itself in its own email.
20     **A.   Got it, okay.**
21     Q.   If you want to just take a moment to look
22 over that.  Just let me know once you've reviewed it.
23     **A.   Okay.**
24     Q.   And do you recognize this?
25     **A.   Vaguely.**

Page 85

1     Q.   Do you, do you know what it is?
2     A.   It's an Email from Denise Gutierrez to
3  Audrey Stone.  It looks like clarifying some
4  information.
5     Q.   Okay.  And are these -- well, Audrey says
6  in her email to Denise, Suzanne, you and Brett, below
7  are screen shots of every message Charlene Carter has
8  sent me via Facebook at your request.  There are a
9  lot and span the last two years.
10         And you -- I think you may have said
11 earlier that -- and please correct me if I'm wrong,
12 because I don't want to misstate anything -- that one
13 of the reasons why you considered a bullying and
14 hazing policy violation is that this didn't involve
15 one instance, it involved more than one instance.
16    A.   Correct.
17    Q.   Are, are these the repeated communications
18 that gave rise to your concern about the violation of
19 the bullying and hazing policy?
20    A.   They seem to be, yes.
21    Q.   Okay.  And in that same email that's, I
22 guess, midway through the first page here, I guess
23 the end of the last paragraph in Audrey's email, it
24 says, also very concerning is repeated references
25 regarding Brian Talbert's termination and subsequent

Page 86

1  reinstatement.
2     A.   Are you on a specific page?
3     Q.   Yeah.  The first page of, of document 20,
4  it's 529, is the Bates label number.
5     A.   Okay.
6     Q.   And I guess my, my question is, Audrey
7  says, very concerning is repeated references
8  regarding Brian Talbert's termination and subsequent
9  reinstatement.  And my question is, do you, do you
10 know what Audrey Stone's concern was there that she
11 referenced?
12    A.   No.  But Brian Talbert is not in the Denver
13 base.  That must have been another base.
14    Q.   Okay.  Do you, do you know who he is?
15    A.   I know of him, yes.
16    Q.   Okay.  How do you know of Brian Talbert?
17    A.   He is Phoenix based, I think, still.  I'm
18 not sure at this time.  But when I was in Phoenix, he
19 was based there.
20    Q.   Okay.  And you, you knew him personally
21 through your work in Phoenix?
22    A.   Just knowing him like I know -- or are
23 familiar with most flight attendants or -- or a lot
24 of flight attendants.
25    Q.   Okay.  And the, the repeated references

Page 87

1  regarding Brian Talbert's termination and subsequent
2  reinstatement, did that raise any concerns for you?
3     A.   Not specifically, no.
4     Q.   Okay.  And you say "not specifically."  In
5  any way did it raise any concerns for you?
6     A.   Only in the fact that she mentioned it
7  here.  But it had nothing to do with this case.
8     Q.   Okay.  Let's see, I'd like to switch back
9  to -- let's see which document.  Document 9.
10         MR. GILLIAM:  And, Mr. Schneider,
11 anytime you want to take a break for lunch, you just
12 let me know, you just stop me.
13         THE WITNESS:  I'll let you guys decide
14 that.
15         MR. GILLIAM:  Okay.
16         MR. CORRELL:  Counsel, I was thinking
17 about 10, 15 more minutes, unless you're at a good
18 stopping point.  I'm happy to do it whenever.
19         MR. GILLIAM:  Now is probably as good
20 a stopping point as any, if you wanted to break.
21         MR. CORRELL:  45 minutes about right?
22         MR. GILLIAM:  I think that's about
23 right for me, if that's okay with others.  If anybody
24 else needs a little more time, that's fine too.
25         MR. CORRELL:  I think that will do.

Page 88

1  So it's 12:35 now, so we'll be back in about 45
2  minutes.
3         MR. GILLIAM:  Okay.
4         THE VIDEOGRAPHER:  We are off record
5  at 12:36 p.m.
6         (Recess from 12:36 to 1:24)
7         THE VIDEOGRAPHER:  We are back on
8  record at 1:24 p.m.
9     Q.   Let's -- one moment.
10         All right.  Mr. Schneider, I just had
11 a few questions for clarification before moving on.
12 I wanted to direct your attention back to document
13 20, which is also Exhibit 14.  Once you've found it,
14 let me know.
15    A.   Okay.
16    Q.   Do you have it?
17    A.   Yes, I do.
18    Q.   Okay.  And Suzanne Stephensen is included
19 on these emails between Denise Gutierrez and Audrey
20 Stone.  Was Suzanne Stephensen involved in the
21 investigation at that point?
22    A.   Not from my perspective.  Audrey Stone is
23 Las Vegas based, and Suzanne Stephensen is the base
24 manager for Las Vegas.  That's probably why she was
25 cc'd on those.

Page 89

1    Q.   Okay.  Do you know if Suzanne Stephensen
2  was conducting any, any investigation on her own?
3    A.   No.
4    Q.   Okay.  And did you ask Suzanne to help you
5  with any aspect of the investigation?
6    A.   **Only sending me what she had from Audrey.**
7    Q.   Okay.  And I'm sorry to speak over you.
8         I guess after you had that
9  communication with Suzanne, you did not ask her to
10  participate in the investigation from any point -- or
11  excuse me, let me ask that a different way.
12         So after you had that communication
13  with Suzanne, Suzanne did not participate in your
14  investigation in any way?
15    A.   **That's correct.**
16    Q.   Okay.  Did you have any communications with
17  her to keep her updated on the investigation?
18    A.   **I don't recall that.**
19    Q.   Okay.  Okay.
20         Next I want to direct your attention
21  to document 2.  And let's see, it will be, I think
22  Bates number 4277.  It will actually be 4277 through
23  4279.
24    A.   **Okay, I'm there.**
25    Q.   Okay.  And once you've had a chance to read

Page 90

1  over them, let me know.
2    A.   **Okay.**
3    Q.   Do you recognize these?
4    A.   **I vaguely remember them.**
5    Q.   Okay.  What are they?
6    A.   **It's a discussion through email with**
7  **Charlene Carter about obtaining an extension of time**
8  **limits.**
9    Q.   Okay.  And is she asking for an extension?
10    A.   **It looks to be that when we called her for**
11  **the meeting, she was not available until a certain**
12  **time.  So, yes, she let us know, and we -- looks like**
13  **I directed her to call the union at some point to**
14  **start the extension process.**
15    Q.   Okay.  I direct your attention on -- to
16  4277.
17    A.   **Okay.**
18    Q.   And the second email down.
19    A.   **Okay.**
20    Q.   That's your email to Charlene, correct?
21    A.   **Yes.**
22    Q.   And you say, you will need an extension of
23  time limits?
24    A.   **Since she couldn't be there at a specific**
25  **time, if I remember correctly.**

Page 91

1    Q.   Okay.  And how many extensions did you, you
2  request here?
3    A.   **It seems like two.  I don't recall**
4  **specifically.**
5    Q.   Okay.  All right.  And you -- I think,
6  let's see, if I can direct you to 4278 and 4279, the
7  last email there that carries over between the two
8  pages.
9    A.   **Okay.**
10    Q.   And have you had the chance to look that
11  one over?
12    A.   **Let me just look at the bottom part.**
13    Q.   Sure.
14    A.   **Okay.**
15    Q.   And I think you say -- the email states, if
16  you would like to have union representation in the
17  meeting, you may do so by calling TWU 556.  Do you
18  know if Charlene had a -- ended up having a union
19  representative?
20    A.   **In her meeting or do you mean in Dallas?**
21    Q.   I guess did she have union representation
22  in this matter?
23    A.   **Yes.  It would be required if she wanted**
24  **the extension because she wasn't going to be in town.**
25    Q.   Okay.  So I think she -- in her email on

Page 92

1  4278, it -- she says, I have already been in contact
2  with Chris Sullivan and he will represent me in this
3  meeting.  And I guess before continuing on -- well,
4  no, then your -- I guess your follow-up email --
5  let's go there.  And you say, I understand Chris will
6  be representing you in the meeting, but that was
7  different.  So are there two senses of union --
8  having a union representative here?
9    A.   **There is a local representative that would**
10  **be in the meeting with her.**
11    Q.   Okay.
12    A.   **And there is a representative from TWU in**
13  **Dallas who oversees the investigation for the flight**
14  **attendant.**
15    Q.   Okay.  Do you know who the representative
16  was in Dallas?
17    A.   **No, I don't recall who it was at that time.**
18  **I work with a lot.**
19    Q.   Okay.  Do you recall talking to
20  Ms. Carter's representative in Dallas?
21    A.   **I don't recall specifically, no.**
22    Q.   Okay.  Is it possible you didn't speak to
23  the union representative in Dallas?
24    A.   **I would need to speak with them to get the**
25  **extension.  Or one of my assistant base managers may**

Page 93

1     have spoken with them if I was out of the office.
2         Q.   Okay.  Do -- would you have to communicate
3     with the union representative in Dallas about other
4     aspects of the investigation?
5         A.   Meeting times and dates and extensions, any
6     correspondence necessary with the flight attendant.
7         Q.   Okay.  Do you communicate with the union
8     representative about any, I guess, substantive
9     matters, about the merits of the complaints and the
10    investigation?
11        A.   No.
12        Q.   Okay.  Can you communicate directly with
13    the flight attendant about those matters?
14        A.   No.
15        Q.   So who do you communicate with about
16    the, I guess, the merits of the, of the complaint?
17        A.   That takes place in the fact-finding
18    meeting.
19        Q.   Okay.  With the local representative?
20        A.   Correct.
21        Q.   Okay.  And -- now, in this email, Charlene
22    says that she's been in contact with Chris Sullivan
23    and he will represent her in this meeting.  Did you
24    have any communications with Chris Sullivan?
25        A.   I don't remember having communication with

Page 94

1     him prior to the meeting.  There normally isn't.
2         Q.   Okay.  All right.  Also, on 4277, the
3     bottom email there, and the second line of the email
4     says, Hector just called me about this meeting, as
5     well, and I relayed that, as well, to him.  Do you
6     recall if Hector Barrera contacted Charlene about
7     setting up the fact-finding meeting?
8         A.   I don't remember that specifically.  But it
9     does happen sometimes, like I said, when I'm out of
10    the office.
11        Q.   Okay.  Was, was Hector involved in this
12    investigation at, at this stage?  Did he get involved
13    at this stage?
14             MR. CORRELL:  Objection, asked and
15    answered.
16        A.   I may have only asked him to set up the
17    meeting for me.
18        Q.   Okay.  Okay.  Earlier we were talking about
19    some of the -- I guess the complaints and violations
20    of the social media policy, the hazing and bullying
21    policy and harassment policy in the Denver area.  Do
22    you remember a violation of any of those policies
23    involving a flight attendant named Kendall Foss?
24        A.   I'm vaguely familiar.  I didn't conduct
25    that investigation.

Page 95

1         Q.   Do you know who conducted that
2     investigation?
3         A.   No, I don't remember.
4         Q.   Okay.  Would it have been one of your
5     assistant base managers?
6         A.   Yes.
7         Q.   Okay.  Do you know if that resulted in
8     termination?
9         A.   I believe so.
10        Q.   And if it involved termination, you would
11    have had to authorize that, correct?
12        A.   Not authorize it.  I would be aware of it.
13        Q.   Oh, so one of the assistant base managers
14    could terminate Kendall Foss without your
15    authorization?
16        A.   Yes.  They, they make the decision on how
17    they conduct the investigation.
18        Q.   Okay.  And do you know what she was
19    terminated for?
20        A.   I don't recall.
21        Q.   Okay.  All right.  Let's see, if I could
22    direct your attention back to document 9.  And if you
23    need to review that again -- you may have reviewed it
24    earlier, but we've jumped around a bit, so...
25             Just let me know when you're ready and

Page 96

1     you've had a chance to look at it.
2         A.   Okay.
3         Q.   Okay.  So on 4676, towards the bottom,
4     Charlene says, I'm Christian, I'm a conservative and
5     pro-life.  Do you see where I'm --
6         A.   Yes.
7         Q.   Okay.  And then she says, this happens to
8     be a huge issue for me and I get the message out
9     wherever I can.  And then on the next page, she
10    continues, I think about three or four lines down on
11    the next page, she says, I had an abortion and I
12    regret every bit of it, so I work with other pro-life
13    groups.  And for me, as a Christian, if I can get the
14    word out in any way to every group as possible to
15    touch the issue, I do.  Do you recall her saying that
16    at the hearing?
17        A.   Yes.
18        Q.   And did you make any inquiries as to
19    whether Charlene needed a religious accommodation,
20    based on those comments?
21        A.   No.
22        Q.   Okay.  And why not?
23        A.   That would be up to her to ask for that.
24    And that would be something that would go through the
25    ACT Team.

Page 97

1    Q.   Okay.  And the ACT Team never contacted you
2  about that specific issue, correct?
3    A.   No.
4    Q.   Okay.  And you didn't report it to the ACT
5  Team, correct?
6    **A.   Report what exactly?**
7    Q.   Those comments.
8    **A.   No, I didn't see a reason to do that.**
9    Q.   Okay.  Let's see, then if I could direct
10 you to 4679, same document.
11   **A.   Okay.**
12   Q.   And there's a statement here attributed to
13 you, when you were posting on your Facebook page, are
14 you aware of other posts on there that would connect
15 you to Southwest Airlines?  And I think what follows
16 is some discussion about some pictures that were
17 shown there.  This says, shows pictures of Charlene
18 at work in her uniform.  And then one is referenced
19 with a Southwest logo that says, give Herb his old
20 job back.  Do you remember those pictures?
21   **A.   Yes.**
22   Q.   Do you know if those were the pictures that
23 Meggan Jones had found towards the, I guess,
24 beginning of the investigation?
25   **A.   I believe so, yes.**

Page 98

1    Q.   Okay.  Do you know the, the date those
2  pictures were posted?
3    **A.   Not specifically, no.**
4    Q.   Okay.  Do you have a general idea?
5    **A.   No, not at this time, I don't remember.**
6    Q.   Okay.  Do you know how old those were?
7    **A.   No.**
8    Q.   Do you know how readily visible those
9  pictures were on her Facebook page?
10   **A.   If Meggan found them, then they were on the**
11 **page for Charlene.**
12   Q.   Okay.  I want to direct your attention to
13 4680.  And midway down, there's a statement there
14 attributed to you that says -- that starts with, your
15 Facebook post, there's a connection.  Do you see
16 where I'm referring?
17   **A.   Okay.**
18   Q.   Okay.  And it says, you can't have your
19 political views with Southwest as part of your
20 depiction there.  Do you know if you have ever fired
21 another flight attendant for posting political views
22 on social media?
23        MR. CORRELL:  Objection, asked and
24 answered.  Counsel, we've already been through his
25 entire issue of discipline.  He's already testified

Page 99

1  to what he knows on those topics.
2        MR. GILLIAM:  Well, he didn't remember
3  very much, so --
4        MR. CORRELL:  Correct.
5        MR. GILLIAM:  -- this will refresh his
6  memory.
7        MR. CORRELL:  You can ask him the
8  question over and over again, but the answer is still
9  going to be he doesn't remember.  This isn't, this
10 isn't a refreshing document that shows him new
11 information.  It's talking about Charlene Carter's
12 fact finding.  So I'm trying to figure out how many
13 times you're going to ask this question.
14       MR. GILLIAM:  Well, it's -- I think
15 it's slightly different, as well.
16   Q.   But, Mr. Schneider, you can answer.
17   **A.   I don't recall.**
18   Q.   Then if I could direct your attention to
19 4690, then the second block down.
20   **A.   Okay.**
21   Q.   And you say, you go into different things,
22 Brian Talbert, which should have been something that
23 was confidential as far as that investigation goes.
24       I think earlier -- and correct me if
25 I'm wrong.  But you may have said, in referring to

Page 100

1  Audrey's email, where she brings up her concern about
2  Brian Talbert, that it wasn't a concern -- or not
3  related to the investigation.  Did your view change
4  here in the fact finding?
5    **A.   No.**
6    Q.   Okay.  But is it fair to say that you --
7  your opinion was that it was something that should
8  have been confidential?
9    **A.   To Brian Talbert and his union rep, not to**
10 **flight attendants.  Should not have been available to**
11 **flight attendants, it should have been kept**
12 **confidential is my point.**
13   Q.   Okay.  Was that part of your consideration
14 for discipline here?
15   **A.   No.**
16   Q.   And so after you concluded this meeting,
17 what were your next steps?
18   **A.   To wait for employee relations and/or the**
19 **HRBP to determine if they feel like there was a**
20 **violation and then move from there --**
21   Q.   Okay.
22   **A.   -- towards decision making.**
23   Q.   All right.  And immediately after the
24 meeting, did you have any -- had you reached any
25 conclusions as to what -- how you were going to

Page 101

1 decide this matter?
2    A.   Not at -- directly after.  I had some more
3 investigation to do, and she presented some
4 information that I had to look into.
5    Q.   When you said "she" presented some
6 additional information, who was that?
7    A.   Charlene Carter.
8    Q.   Okay.  What did she present that you had to
9 look into?
10    A.   The information that we talked about in
11 these notes.
12    Q.   What information is that?
13    A.   Anything that she brought forward.  I
14 needed to make sure that I did a thorough
15 investigation of anything that she presented as part
16 of my investigation.
17    Q.   Okay.
18    A.   I don't know specifically.  I can't
19 remember details of every part of it.
20    Q.   Do you know if she brought you any
21 additional information?
22    A.   She -- just the information that she shared
23 about what she had been through, her thoughts and
24 processes and presenting that information to me.
25    Q.   Okay.  Do you know if your attorneys

Page 102

1 presented that information or if they --
2         MR. CORRELL:  Hold on, hold on.
3         Mr. Schneider, I don't want you to
4 testify about any communications you've had with us
5 in response to any question by counsel.
6         THE WITNESS:  Say that one more time,
7 I'm sorry, Mike.
8         MR. CORRELL:  In responding to
9 Mr. Gilliam's questions, please do not convey any
10 communications you've had with me, the lawyer who was
11 involved at the arbitration or any in-house counsel
12 for Southwest Airlines.
13    Q.   And, and my question is, again, without,
14 you know, revealing any of your privileged
15 communications, did you produce any of the -- all of
16 the information you had received from Charlene Carter
17 after the fact-finding meeting?
18    A.   I was simply talking about the notes and
19 any information in those notes.
20    Q.   Okay.  Are you -- when you say "the notes,"
21 you mean the fact-finding meeting notes?
22    A.   Yes.
23    Q.   Okay.  And I'm sorry, I'm confused.  Did
24 you -- did she send you more information after the
25 fact finding that was not reviewed in the fact

Page 103

1 finding?
2    A.   I don't recall that.  I don't remember for
3 sure.
4    Q.   Okay.  After this fact finding was
5 concluded, did you talk to Meggan Jones about the
6 fact finding?
7    A.   Yes.
8    Q.   Okay.  And what did you discuss with Meggan
9 Jones?
10    A.   Any discussions in the fact finding, she
11 was working on the notes and we discussed the notes.
12    Q.   What else did you discuss with Meggan
13 Jones?
14    A.   I don't recall.
15    Q.   Okay.  Did you have any communications with
16 Dave Kissman after the fact finding?
17    A.   At some point, yes.  I don't know for sure
18 how soon it was.
19    Q.   Okay.  What, what communications did you
20 have with Dave Kissman after the fact finding?
21    A.   I don't recall specifically what it was.
22    Q.   Do you recall general themes of your
23 conversation?
24    A.   Just letting him know that -- my plans to
25 research as much as I could, continue the

Page 104

1 investigation and the possibility of discipline.
2    Q.   Did he -- did Dave Kissman have any
3 recommendations for you in your communications after
4 the fact-finding meeting?
5    A.   I don't remember.
6    Q.   Do you remember how many communications you
7 had with Dave Kissman after the fact finding?
8    A.   Can you say the question one more time.
9    Q.   Yeah.  Do you remember how many
10 communications you had with Dave Kissman after the
11 fact finding?
12    A.   No, I don't.
13    Q.   Okay.  Did you have any communications with
14 Naomi Hudson after the fact finding?
15    A.   No.
16    Q.   Did you have any communications with Mike
17 Sims after the fact finding?
18    A.   I don't remember.
19    Q.   Okay.  Did you have any communications with
20 Sonya Lacore after the fact finding?
21    A.   No.
22    Q.   Okay.  Now, after the fact finding, you
23 said you waited for employee relations to first
24 contact you about their assessment as to whether
25 there was a violation of the sexual harassment

Page 105

1  policy?
2     **A.  Correct.**
3     Q.  Okay.  And you also waited for the human
4  resources business partner to reach out to you as to
5  whether there was a violation of the bullying and
6  hazing policy?
7     **A.  Yes.**
8     Q.  Okay.  And did the human resources business
9  partner follow up with you?
10    **A.  Yes.**
11    Q.  Okay.  And the human resources business
12 partner is Edie Barnett, correct?
13    **A.  Correct.**
14    Q.  Okay.  And did Edie Barnett call you?
15    **A.  I don't remember specifically if she called**
16 **me.**
17    Q.  Okay.  Is it possible she talked to you in
18 person?
19    **A.  No.**
20    Q.  Okay.  So she called you or emailed you?
21    **A.  Correct.**
22    Q.  Okay.  And what did Edie Barnett tell you
23 when she contacted you?
24    **A.  It was determined that there was a**
25 **violation of the Southwest bullying/hazing policy.**

Page 106

1     Q.  And do you know specifically which
2  individuals were involved in making that
3  determination on behalf of human resources?
4     **A.  The name of the person?  Is that what**
5  **you're asking me?**
6     Q.  Yes.  I'm asking you if -- which, which
7  individuals with human resources made the, the
8  determination that there was a violation of the
9  policy?
10    **A.  Edie Barnett.**
11    Q.  Okay.  Do you know if Edie Barnett reached
12 that decision on her own?
13    **A.  No, I do not know that.**
14    Q.  Okay.  And so what, what specifically did
15 Edie Barnett communicate to you about the violation
16 of the bullying and hazing policy?
17    **A.  Anything other than there was a violation,**
18 **I don't specifically remember.**
19    Q.  Okay.  And what was your reaction to that
20 information?
21    **A.  That that was part of my investigation, my**
22 **determining if there was a violation.**
23    Q.  Okay.  And did you just accept that
24 conclusion and decide to adopt that conclusion?
25    **A.  I used it as a resource for me making the**

Page 107

1  decision.
2     Q.  Okay.  And apart from that resource, what
3  other factors did you consider in reaching your
4  conclusion?
5     **A.  The social media policy, the**
6  **hazing/bullying policy.**
7     Q.  Well, let me ask the question this way -- I
8  mean, just speaking specifically about the bullying
9  and hazing policy, did you adopt her determination as
10 to that specific policy as your own?
11    **A.  I used her decision to help me in**
12 **determining my decision that that violation was part**
13 **of the discipline.**
14    Q.  Okay.  Did you have reasons independent
15 from Ms. Barnett's recommendation that Ms. Carter's
16 conduct violated the bullying and hazing policy?
17    **A.  The information that was presented in both**
18 **meetings from Audrey Stone and Charlene Carter.**
19    Q.  Okay.  Now, how did you reach a conclusion
20 that there was a violation of the social media
21 policy?
22    **A.  Through discussions, the same thing, the**
23 **Nexus to the Workplace and the information that was**
24 **posted on Facebook, and my discussions with labor**
25 **relations, as well as the information that was given**

Page 108

1  to me in the meetings.
2     Q.  Okay.  Did you have discussions with labor
3  relations about whether there was a violation of the
4  social media policy after the fact-finding meeting?
5     **A.  Yes.**
6     Q.  Okay.  And what were those discussions?
7     **A.  Simply that it did provide the Nexus to the**
8  **Workplace, as well as the egregious posts that were**
9  **on her Facebook page that other people could see.**
10    Q.  Okay.  And the person in labor relations
11 that you had that discussion with was Maureen Emlet;
12 is that correct?
13    **A.  Correct.**
14    Q.  Okay.  Did you have that discussion with
15 anyone else in labor relations?
16    **A.  Not that I recall.**
17    Q.  Okay.  And what opinion did Maureen Emlet
18 have that she communicated to you as to a violation
19 of -- as to whether there was a violation of the
20 social media policy?
21    **A.  That we had pretty solid information on a**
22 **violation.**
23    Q.  Okay.  And what did she believe the solid
24 information was?
25           MR. CORRELL:  Objection, calls for

Page 109

1  speculation.
2      Q.   Did she tell you what the solid information
3  was?
4      A.   Not that I recall outside of the fact that
5  she made Facebook posts and there was a Nexus to the
6  Workplace.
7      Q.   During those discussions, did Maureen Emlet
8  discuss with you any, any cases of other flight
9  attendants who had violated the social media policy?
10     A.   I don't recall that information.
11     Q.   Did Maureen Emlet give you any opinions as
12  to whether any other policy had been violated?
13     A.   I don't recall that.
14     Q.   Okay.  Now, at any point after the fact
15  finding, did you have any communications with Audrey
16  Stone?
17     A.   I don't remember discussing anything after
18  with Audrey Stone.
19     Q.   Okay.  You don't remember discussing
20  anything after the fact finding with Audrey Stone; is
21  that correct?
22     A.   Was that your question?
23     Q.   Yes.
24     A.   Yes.
25     Q.   Okay.  Now, do you recall how soon after

Page 110

1  the fact finding you had those communications with
2  Maureen Emlet?
3      A.   Possibly the next day.
4      Q.   Okay.  Do you recall how soon after the
5  fact finding you had the communications you described
6  with Edie Barnett?
7      A.   No, I don't remember.
8      Q.   Now, at some point after the fact-finding
9  meeting, did you hear from employee relations?
10     A.   Yes.
11     Q.   Okay.  And when did you hear from employee
12  relations?
13     A.   I don't remember the exact date or time of
14  that.
15     Q.   Do you remember roughly how long after the
16  fact-finding meeting it might have been?
17     A.   It was within the next day or -- you know,
18  I'm pretty sure it was the next day.
19     Q.   Okay.  And was it Denise Gutierrez who
20  communicated with you?
21     A.   Yes.
22     Q.   Okay.  And do you know if she emailed you
23  or called you?
24     A.   Possibly both.  I know there was an email
25  indicating her decision on it.

Page 111

1      Q.   Okay.  And what was Denise Gutierrez's
2  decision?
3      A.   I don't remember specifically, but I know
4  that it supported sexual harassment, possibly, in
5  this case.  I'm not sure without seeing the document
6  or the email.
7      Q.   Okay.  At any point after the
8  investigation -- excuse me, at any point after the
9  fact-finding meeting, did you deliver a -- well, let
10  me ask it this way:  After the fact finding, did you
11  report back to the other persons involved in the
12  investigation about the investigation?
13     A.   Can you be more specific.
14          MR. CORRELL:  Objection.
15     Q.   Well, yeah, after, after the fact-finding
16  meeting, did you report about the investigation to
17  the other persons involved?
18          MR. CORRELL:  Objection, vague.
19     A.   I don't know what you mean.
20     Q.   Did you, did you report your -- so after
21  the fact-finding meeting, did you report your
22  decision to employee relations, labor relations,
23  human resources?
24     A.   At some point I reported it to labor
25  relations.

Page 112

1      Q.   Okay.  What do you remember about the
2  report you made?
3      A.   That I was going forward with discipline.
4      Q.   Okay.  If I could direct your attention to
5  document 6, which is also Exhibit 7.
6      A.   Okay.
7      Q.   Do you recognize this?
8      A.   An email to Maureen Emlet, Denise Gutierrez
9  and Edie Barnett.
10     Q.   And do you know what it is?
11     A.   I need to read it.
12     Q.   Sure.  Yeah, please, do.
13     A.   It is my synopsis, basically, of the
14  meeting with Charlene Carter and the investigation.
15     Q.   Okay.  And in this email do you determine
16  whether there's been a violation of the -- of any
17  Southwest policies?
18     A.   There's the possibility in this email of
19  violations of a social media, bullying and hazing.
20  But it's still an ongoing investigation.
21     Q.   Okay.  So were -- so these were not
22  conclusions that Ms. Carter had actually violated
23  these policies?
24     A.   I'm not sure at this point if I had
25  completely made my decision on this.  I'm -- I don't

Page 113

1    know the dates, so I can't say specifically of when
2    that determination was made.
3        Q.   Okay.  And the date of this email is March
4    10th, correct?
5        A.   Correct.
6        Q.   But based off of the language that you have
7    there, I guess on document 4712, after social media
8    policy, bullying and hazing policy and harassment
9    policy, you don't know if you're making conclusions
10   as to whether those are violated?
11       A.   I feel at that point that those were
12   violations of those policies, as highlighted there.
13   So it was part of my determination of that, yes.
14       Q.   Okay.  Was this your report where you
15   decided on the, the discipline that should be issued
16   to Ms. Carter?
17       A.   It's part of my investigation that I would
18   use when I made that determination.
19       Q.   Okay.  But it's, it's not your final
20   determination as to the discipline that should be
21   issued?
22       A.   I'm not sure on the dates of how everything
23   transpired is what I'm saying.  So I'm not sure when
24   this was sent, in what part of the investigation.
25       Q.   Okay.  Well, and I guess one of my

Page 114

1    questions would be, is there anything here that, that
2    tells you that you've decided on the discipline that
3    should be issued?
4        A.   I am in the decision-making process at this
5    point.
6        Q.   Okay.  All right.  And another question
7    here, do you know if this email has been redacted in
8    any way?
9        A.   Redacted how?
10       Q.   And don't tell me if something has -- if
11   something -- what the contents that may have been
12   removed.  But I was just wondering if, for a
13   privilege reason, if maybe some contents are not
14   included in this email.
15       A.   I am not aware of that.
16       Q.   Okay.  All right.  I ask because there's a
17   big space here on 4712.
18           MR. CORRELL:  And I'll represent,
19   Counsel, that all of our redactions are in
20   identifiable black boxes.
21           MR. GILLIAM:  Okay.  Thank you.  That
22   helps.
23       Q.   All right.  If I could go to -- back to
24   document 2, and Bates numbers 5762 and 5763.  Just
25   let me know once you've found it and have had the

Page 115

1    opportunity to read it.
2        A.   Are those pages close to the bottom of that
3    document?
4        Q.   Yeah, it's close to the end.  Very close to
5    the end.
6        A.   You said 5762 and 5763?
7        Q.   Yes, sir, yeah.
8        A.   Okay, I'm there.
9        Q.   Okay.  And if I could, I guess, direct your
10   attention to the last email in that chain, at the
11   bottom, anyway.  If you want to just read that and
12   review it and let me know once you've had the chance
13   to do that.
14       A.   Okay.
15       Q.   All right.  And do you recognize that?
16       A.   Yes.
17       Q.   And what is it?
18       A.   It's the decision from Denise Gutierrez on
19   employee relations on her portion of the
20   investigation.
21       Q.   Okay.  And what does she decide?
22       A.   That the information partially supports the
23   allegations against Charlene.
24       Q.   Okay.  And which, which portion is
25   supported?

Page 116

1        A.   The images of women dressed as vaginas.
2        Q.   Okay.  And -- okay.  Then -- and she says,
3    the -- while the videos depicting abortion are
4    considered to be offensive, they do not violate the
5    company's harassment, sexual harassment,
6    discrimination, retaliation policy, but they should
7    be addressed.
8            So I guess one, one question is,
9    did -- I guess, how, how did this report, I guess,
10   figure in to your decision as to what to do with
11   discipline?
12       A.   It helps me to know if employee relations
13   views it as a violation and helps me with my decision
14   making.
15       Q.   Okay.  And this -- you received this email
16   on March 10th, 2017.  Did you make your decision
17   after receiving this email?
18       A.   I wouldn't have made it before, so it must
19   have been.
20       Q.   Okay.  And another question too, I guess,
21   to ask, did you make your decision as to whether
22   there had been a violation of all of the policies --
23   well, let me ask it another way.
24           Did you make any determinations as to
25   whether there had been a violation of the other two

Page 117

1  policies, apart from the sexual harassment policies,
2  before receiving this email?
3    **A.   I don't recall the order of making those**
4  **decisions.**
5    Q.   Okay.  Now, on this email, looks like
6  Denise sends it to you and Suzanne.  And do you have
7  any knowledge why Denise sent it to Suzanne?
8    **A.   Because Audrey Stone is based in Las Vegas**
9  **and Suzanne is her leader.**
10   Q.   Okay.  And Toni Hamilton is cc'd.  Did --
11  do you know -- do you have any knowledge as to why
12  Toni Hamilton is cc'd?
13   **A.   I'm -- I think that Toni Hamilton was**
14  **Denise Gutierrez's leader.**
15   Q.   Okay.
16   **A.   And she's just letting her know her**
17  **position.**
18   Q.   Okay.  Now, how soon after receiving this
19  email did you make your final decision as to
20  termination?
21   **A.   I don't know specific time frames on it.**
22   Q.   Okay.  If I could refer you back to -- it's
23  in here.  Document 7.
24   **A.   Okay.**
25   Q.   And this is Charlene Carter's termination

Page 118

1  letter, correct?
2    **A.   Correct.**
3    Q.   So -- and that's dated March 14th.  So fair
4  to say you made your decision sometime between March
5  10th and March 14th?
6    **A.   Yes.**
7    Q.   Okay.  And March 10th was a Friday and
8  March 14th was a Tuesday.  Does that help, help you
9  narrow in on the day at all?
10   **A.   The day of?**
11   Q.   The day you made a decision as to whether
12  to fire Charlene.
13   **A.   No, it doesn't.  Because with this, with**
14  **the time frames we're under, I was working on it**
15  **during that time.**
16   Q.   Now, document 7, the termination
17  letter, did you write that termination letter?
18   **A.   Yes.**
19   Q.   Okay.  Did you have any assistance in, in
20  drafting it?
21   **A.   Only such as running it past labor to make**
22  **sure that it was meeting the requirements of my**
23  **decision.**
24   Q.   Okay.  And what do you mean the
25  requirements of your decision?

Page 119

1    **A.   They like to see them before I issue the**
2  **discipline.**
3    Q.   Okay.  And I want to make sure I understand
4  here.  You said you ran it by labor to make sure that
5  the letter was meeting the requirements of your
6  decision?
7    **A.   Just having another person proofread it for**
8  **me is basically what it is.**
9    Q.   Okay.  And --
10       MR. CORRELL:  And before we go any
11  further, Mr. Schneider, if you consulted with legal
12  counsel in connection with drafting or revising this
13  letter, please do not testify to any communications
14  with counsel.  But you may otherwise answer.  I'm
15  just not sure if you did or not.
16       THE WITNESS:  Okay.
17   Q.   So apart -- and I don't want to hear about
18  legal counsel.  But apart from, you know, labor
19  relations, did you have communications with anyone
20  else to assist you in drafting that letter?
21   **A.   No.**
22   Q.   Okay.  And what, what feedback did you get
23  from labor relations about that letter?
24   **A.   I don't remember specifically what details**
25  **were said to me about the letter.**

Page 120

1    Q.   Okay.
2        MR. GILLIAM:  Let's see, I'm looking
3  to see what exhibit number we're on.  20 was the last
4  document.  We're on Exhibit 15 now?
5        MR. CORRELL:  That's what I have, yes.
6        THE WITNESS:  Go to 15, is that what
7  you're saying?
8    Q.   No, no, so I'd like to mark -- I'd like you
9  to go to document 18.  And I would like to have
10  document 18 marked as Exhibit 15.
11       (Exhibit 15 marked)
12   Q.   And once you've found it and had the chance
13  to review it, let me know.
14   **A.   Do I have a document 18?  I don't find**
15  **that.**
16       MR. CORRELL:  It should be in the
17  email.  Remember, we had trouble --
18       THE WITNESS:  Oh, I'm sorry.  It was
19  in a separate email.  Okay.
20   **A.   All right.  So -- okay, I'm there.**
21   Q.   Okay.  And review -- take a moment to
22  review it.  And once you've had an opportunity, let
23  me know.
24   **A.   Okay.**
25   Q.   Do you recognize this?

Page 121

1    A.   Okay.
2    Q.   Can you tell what it is?
3    A.   It looks like a termination letter.
4    Q.   Okay.  Can you say that you did not draft
5  this termination letter?
6    A.   No, I don't remember specifically.  As I --
7  you know, I don't remember.
8    Q.   And do you remember if this was something
9  that you produced in response to Ms. Carter's
10  discovery requests?
11    A.   I don't remember that, no.
12    Q.   Okay.  Well -- and I know you don't
13  recognize this letter, but if I could still direct
14  you to the paragraph number, number 3.
15    A.   Okay.
16    Q.   Where it says, flight attendant work rules
17  and expectations/company policies, and 3.0, basic
18  work rules and expectations.  Did you make any
19  determination as to whether the basic work rules and
20  expectations were violated?
21    A.   I remember considering that in the behavior
22  of flight attendants, but that is all.
23    Q.   Okay.  You did not determine that Charlene
24  Carter violated the basic work rules and
25  expectations?

Page 122

1    A.   She could have violated that.  I didn't
2  consider -- I mean, I didn't include it in my term
3  letter.
4    Q.   Okay.
5    A.   Other than just referring to it, possibly.
6    Q.   And going back to document 7 again, looking
7  back there.
8    A.   Okay.
9    Q.   And the beginning of the last paragraph, it
10  says, your conduct could also be a violation of
11  Southwest's policy concerning harassment, sexual
12  harassment, discrimination and retaliation.  So did
13  you, did you not make a determination that her
14  conduct did violate that policy?
15    A.   I determined that the workplace bullying
16  and hazing policy and the social media policy were
17  the violations that she was terminated for.  Also she
18  could have violated other policies.  And that's what
19  that's referring to.
20    Q.   Now, copied at the bottom are Sonya
21  Lacore, Mike Sims and Dave Kissman.  Did you not send
22  them a draft prior to sending this letter to
23  Ms. Carter?
24    A.   No.
25    Q.   You did not send them a draft prior?

Page 123

1    A.   That's all done at the same time, when I
2  finish up the investigation.
3    Q.   Okay.  So they did not see this letter
4  until you sent it to Ms. Carter?
5    A.   Correct.
6    Q.   Okay.  Do you know if you consulted with
7  either Mike Sims or Dave Kissman in reaching your
8  final determination to fire Ms. Carter?
9    A.   Once I made my decision, I made them aware
10  of my decision.
11    Q.   Okay.  Did you make them aware of your
12  decision before sending this letter?
13    A.   Dave Kissman, yes.
14    Q.   Okay.  Did you not inform Mike Sims of your
15  decision until after the letter?
16    A.   I'm not sure when he was made aware of it.
17    Q.   Okay.  Do you know that you did not make
18  him aware of it prior to sending this letter?
19    A.   I don't remember making him aware of it.
20    Q.   Okay.  Do you remember if you communicated
21  your decision to Dave Kissman over the weekend?
22    A.   No, I cannot remember when it was.
23    Q.   Okay.  What did you tell Dave Kissman when
24  you had finally made your decision?
25    A.   Just on the decision I had made and what

Page 124

1  violations they were.
2    Q.   Okay.  And what was Dave Kissman's
3  response?
4    A.   He agreed with it and said that, that it
5  was fine.  So thanks for letting him know, basically
6  all it was.
7    Q.   Okay.
8        MR. GILLIAM:  I think we may want to
9  take a short break here.
10        MR. CORRELL:  Sure.  Is ten minutes
11  good?
12        MR. GILLIAM:  Yeah, ten minutes is
13  good.
14        MR. CORRELL:  All right.  We'll be
15  back at 2:43.
16        THE VIDEOGRAPHER:  We are off record
17  at 2:33 p.m.
18        (Recess from 2:33 to 2:45)
19        THE VIDEOGRAPHER:  We are back on
20  record at 2:45 p.m.
21    Q.   All right.  Mr. Schneider, I don't have too
22  many more questions here.
23        But following the fact-finding meeting
24  with Charlene Carter, did Meggan Jones ever recommend
25  to you at some point that you should fire Charlene

Page 125

1   Carter?
2       A.   No.
3       Q.   Okay.  Did you ever consult with her about
4   her recommendations?
5       A.   No.
6       Q.   Okay.  So -- okay.  And prior to sending
7   the termination letter, did you talk to Charlene
8   Carter and her union rep about your decision?
9       A.   Prior to sending the letter, you said?
10      Q.   Yes, sir.
11      A.   On the same day, I rendered and then I sent
12  the letter.
13      Q.   Okay.  And -- okay.  And what, what did you
14  convey to Ms. Charlene Carter and the union rep?
15      A.   That my decision was that she violated the
16  social media policy and the bullying and hazing
17  policy, and that my decision was termination.
18      Q.   Okay.  And were you involved in step two
19  proceedings at all?
20      A.   No.
21      Q.   Okay.  Did Mike Sims ever ask your opinions
22  of any issues regarding step two proceedings?
23      A.   Not that I recall.
24      Q.   Okay.  And after sending your termination
25  letter, did you have any communications with anyone

Page 126

1   regarding your decision?
2       A.   No.
3       Q.   And, you know, I don't mean attorney/client
4   privileged communications.  Communications apart from
5   those with your attorney.
6       A.   Okay.
7       Q.   Now, at any point during the investigation,
8   did you ever ask Ms. Carter if she would take her
9   Facebook posts down?
10      A.   I do not recall that discussion.
11      Q.   Okay.  At any point during the
12  investigation, did you ask Ms. Carter if she would
13  remove any connections to Southwest?
14      A.   I don't remember that discussion either.
15      Q.   Okay.  At any point did you discuss with
16  Ms. Carter whether she would be willing to maybe post
17  a disclaimer on her Facebook page that her posts
18  don't necessarily represent the views of Southwest?
19      A.   After the termination?
20      Q.   At any point during the investigation.
21      A.   I don't remember that discussion.
22      Q.   Okay.  Now, I guess for -- as part of this
23  discovery process, did you search your files for
24  information responsive to Ms. Carter's discovery
25  request?

Page 127

1       A.   Yes.
2       Q.   Okay.  And did you find responsive
3   information?
4            MR. CORRELL:  Objection, calls for a
5   legal conclusion.
6       Q.   Yeah, let me ask it in another way.
7            Did you -- for any request, did you
8   decide that you don't have any information that you
9   felt was responsive?
10      A.   I shared all of my information with labor.
11  And the information that I had, they have.
12      Q.   Okay.  And how did you go about searching
13  for information that you felt would be responsive to
14  Ms. Carter's request?
15           MR. CORRELL:  Again, Mr. Schneider,
16  please do not relate communications or instructions
17  that you received from counsel.
18      A.   I simply looked on anything I had on my
19  hard drive or in paper form, any files that we had.
20      Q.   Okay.  Does Southwest issue you a cell
21  phone?
22      A.   No.
23      Q.   Okay.  Does Southwest issue you any
24  electronic devices?
25      A.   An iPad.

Page 128

1       Q.   Okay.  Did you search your iPad for any
2   responsive information?
3       A.   I only use my iPad for communication for
4   virtual.  And I don't have anything saved on my iPad.
5   So I wouldn't have anything on there.  I searched it,
6   but there's nothing on there.  So it's useless.
7       Q.   Okay.  Would you have anything about this
8   case on any of your personal electronic devices?
9       A.   No.  Only company.
10      Q.   Okay.  All right.
11           MR. GILLIAM:  I think that's about it.
12  Again, you know, we are going to reserve the right to
13  reopen the deposition if we --
14           MR. CORRELL:  Counsel, what
15  information are you contending you have not been
16  provided that is --
17           MR. GILLIAM:  Well, look --
18           (Audio distortion)
19           MR. CORRELL:  I just want it on the
20  record so that when you go to make your motion, I can
21  tell the court we already gave it to you.  Because
22  we've already produced everything Mr. Schneider has.
23           MR. GILLIAM:  Okay.  I understand.
24  But we received 3500 documents between Friday and
25  Saturday.  And we are trying to conduct depositions,

Page 129

1  given the time limits. And if we determine that
2  there's a need for follow-up discovery, then, you
3  know, we want to reserve the right to reopen the
4  deposition.
5           MR. CORRELL: I'll state for the
6  record that this is the first time you have raised
7  the timing of production. You've used documents from
8  the highest numbers of our production, which
9  indicates a full review. And you have not identified
10  any part of the production you've not had an
11  opportunity to review and examine the witness on.
12  Further, we are within 30 days of the close of
13  discovery, so additional discovery request would be
14  improper at this time unless the court were to issue
15  an extension of the discovery deadline. As a result,
16  we oppose any request to reopen this deposition on
17  any grounds.
18           MR. GILLIAM: Understood.
19           MR. CORRELL: Mr. Schneider, are
20  you --
21           Or are you passing the witness?
22           MR. GILLIAM: Yes. Pass the witness.
23                EXAMINATION
24                   (2:53)
25      Q.  (BY MR. CORRELL) Mr. Schneider, I just have

Page 130

1  a couple of quick questions for you before we're done
2  today.
3           First of all, do you understand that
4  one of the claims asserted in this lawsuit is that
5  Ms. Carter contends that she was treated less
6  favorably because she was a nonmember or objector to
7  the union?
8      A.  Yes.
9      Q.  Do you personally harbor any bias or animus
10  against individuals who opt out of the union?
11      A.  No.
12      Q.  Did the fact that Ms. Carter was a -- well,
13  did you know Ms. Carter was a nonmember of the union
14  at the time of the investigation?
15      A.  Not until she disclosed that in the
16  meeting.
17      Q.  Once she disclosed that to you, did it have
18  any impact on your decision-making process?
19      A.  No.
20      Q.  You also understand that Ms. Carter is
21  alleging religious discrimination in this case with
22  respect to her pro-life views, correct?
23      A.  Yes.
24      Q.  Do you personally have a position between
25  pro-life and pro-choice on the issue of abortion?

Page 131

1      A.  I am pro-life.
2      Q.  Do you harbor any animus or bias against
3  individuals who are pro-life?
4      A.  No.
5      Q.  Did you decide less favorably with respect
6  to Ms. Carter than had she been pro-choice?
7      A.  No.
8      Q.  Did the fact that Ms. Carter attributed her
9  pro-life views to her religious beliefs have any
10  impact on your decision-making process?
11      A.  No.
12      Q.  Do you harbor any animus or have any bias
13  against individuals who express Christian beliefs?
14      A.  No.
15           MR. CORRELL: I pass the witness.
16           THE VIDEOGRAPHER: Is there anyone
17  else?
18           MR. GREENFIELD: Local 556 will
19  reserve their questions for the time of trial.
20           MR. GILLIAM: Plaintiff has nothing
21  else.
22           THE VIDEOGRAPHER: Okay. We are off
23  record at 2:55 p.m.
24           End of deposition. End of media.
25           (Proceedings concluded at 2:55 p.m.)

Page 132

1  WITNESS NAME: Ed Schneider
2  DATE OF DEPOSITION: November 3, 2020
3         CHANGES AND SIGNATURE
4  PAGE LINE  CHANGE                 REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 133

1    I, ED SCHNEIDER, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5    _____
6         ED SCHNEIDER
7
8 THE STATE OF _____)
9 COUNTY OF _____)
10
11    Before me, _____, on this day
12 personally appeared ED SCHNEIDER, known to me or
13 proved to me on the oath of or through
14 _____ (description of identity card
15 or other document) to be the person whose name is
16 subscribed to the foregoing instrument and
17 acknowledged to me that he/she executed the same for
18 the purpose and consideration therein expressed.
19    Given under my hand and seal of office on this
20 _____ day of _____, _____.
21
22    _____
23         NOTARY PUBLIC IN AND FOR
24         THE STATE OF _____
25 My Commission Expires: _____

Page 134

1
2         UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3             DALLAS DIVISION
4 CHARLENE CARTER,          )
      Plaintiff,         )
5                        )
  vs.                    ) Case No.
6                        ) 3:17-cv-02278-X
  SOUTHWEST AIRLINES CO., AND   )
7 TRANSPORT WORKERS UNION OF   )
  AMERICA, LOCAL 556,        )
      Defendants.        )
8
9         REPORTER'S CERTIFICATE
10    ORAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER
11         November 3, 2020
12         (Reported Remotely)
13    I, Cheryl Duncan, CSR, in and for the State of
14 Texas, hereby certify to the following:
15    That the witness, ED SCHNEIDER, was duly sworn
16 and that the transcript of the deposition is a true
17 record of the testimony given by the witness;
18    I further certify that pursuant to FRCP Rule
19 30(f)(1) that the signature of the deponent:
20    __X___ was requested by the deponent or a party
21 before the completion of the deposition and is to be
22 returned within 30 days from date of receipt of the
23 transcript. If returned, the attached Changes and
24 Signature Pages contain any changes and the reasons
25 therefor;

Page 135

1    _____ was not requested by the deponent or a
2 party before the completion of the deposition.
3    That pursuant to information given to the
4 deposition officer at the time said testimony was
5 taken, the following includes all parties of record
6 and the amount of time used by each party at the time
7 of the deposition:
8    Mr. Matthew B. Gilliam (3 hours, 41 minutes)
     Mr. Michael A. Correll (02 minutes)
9    Mr. Ed Cloutman (00 minutes)
10    That $_____ is the deposition officer's
11 charges to the Plaintiff for preparing the original
12 deposition and any copies of exhibits.
13    I further certify that I am neither counsel for,
14 related to, nor employed by any of the parties in the
15 action in which this proceeding was taken, and
16 further that I am not financially or otherwise
17 interested in the outcome of this action.
18    Certified to by me on this 12th day of
19 November, 2020.
20
21    _____
     Cheryl Duncan, CSR
     Texas CSR 3371
22    Expiration: 04/30/21
     Firm Registration Number 38
23    Bradford Court Reporting, L.L.C.
     7015 Mumford Street
24    Dallas, Texas  75252
     Telephone 972.931.2799
25    Facsimile 972.931.1199

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

**A**

**a.m** 1:19 4:4
  56:16,19
**ability** 4:23
**able** 61:8
**aborted** 74:16
**abortion** 96:11
  116:3 130:25
**above-styled**
  1:18
**absolutely** 54:7
**accept** 106:23
**accommodation**
  25:3 30:10
  96:19
**accurate** 69:22
**accurately** 83:4
**acknowledged**
  133:17
**ACT** 24:13,19
  96:25 97:1,4
**action** 11:16
  13:15 135:15
  135:17
**activities** 25:20
**actual** 38:19
**Adam** 2:10
**additional** 101:6
  101:21 129:13
**address** 47:19
  48:2
**addressed** 12:19
  47:17 63:10
  116:7
**adept** 54:3,5
**adopt** 106:24
  107:9
**affix** 133:2
**agree** 61:23
**agreed** 52:20,22
  78:3,21 124:4
**agreement**
  61:20
**agreenfield@c...**
  2:13
**ahead** 66:15

**aircraft** 11:12
**Airlines** 1:5 2:14
  4:16 5:14,20
  7:5 8:6 22:8
  36:19 40:14
  45:3,20 97:15
  102:12 134:6
**Airlines'** 45:6
**alcohol** 24:11
**allegations** 28:7
  115:23
**alleged** 28:22
**alleging** 130:21
**allowed** 57:1
  83:1
**America** 1:6 2:8
  4:17 7:21
  134:7
**amount** 135:6
**and/or** 12:19
  100:18
**animus** 130:9
  131:2,12
**answer** 4:23 5:5
  5:7 21:3 22:17
  24:17 27:6
  28:10 29:22
  31:1,7,7 99:8
  99:16 119:14
**answered** 21:2
  28:9 30:8
  49:14 94:15
  98:24
**anybody** 47:25
  56:8 57:25
  67:9 69:12
  71:10 76:10,13
  87:23
**anytime** 87:11
**anyway** 115:11
**apart** 41:8 47:25
  57:23,25 59:22
  79:14 107:2
  117:1 119:17
  119:18 126:4
**Appearances**

**2:1** 3:3
**appeared**
  133:12
**apply** 57:5
**approach** 57:5
**approval** 13:21
  13:24 61:18
**arbitration**
  102:11
**area** 11:6,7
  46:20 73:17
  94:21
**areas** 49:16
**Arizona** 6:14
**Armstrong** 2:22
**asked** 12:10
  21:1,14,15
  28:8 30:7
  49:13 53:9
  54:15 62:2
  71:21 83:21
  94:14,16 98:23
**asking** 22:24
  34:20 36:16
  45:24 47:9
  48:13 50:6
  69:1 90:9
  106:5,6
**asks** 60:21
**aspect** 89:5
**aspects** 78:17
  93:4
**asserted** 130:4
**assessment**
  11:15 104:24
**assist** 119:20
**assistance**
  118:19
**assistant** 6:13,16
  8:11 12:11,16
  12:23 13:16,19
  14:2,5,12
  28:16 29:8,13
  29:14,21 30:9
  30:13,22 33:20
  37:2 43:20

**44:13** 53:13,20
  53:24 58:1
  92:25 95:5,13
**associated** 45:2
**assume** 4:18
**attached** 1:25
  38:20 49:2
  134:23
**attaching** 65:14
**attachments**
  34:16,16
**attendance** 67:4
  71:14 83:4
**attendant** 7:5,8
  7:13,17 10:23
  12:22 24:14,22
  25:2,17 26:1
  26:14,22 31:11
  56:23,24 92:14
  93:6,13 94:23
  98:21 121:16
**attendant's**
  25:10 56:22
**attendants** 8:5,9
  8:13 10:22,25
  11:4,9,13,16
  11:17 12:5
  13:20 20:17
  21:9,11,12,15
  21:16 22:12
  23:11,15 27:20
  27:23 35:5,17
  35:20,23 36:11
  36:13 41:6
  86:23,24
  100:10,11
  109:9 121:22
**attendants'**
  25:20
**attention** 31:17
  34:23 38:3
  46:25 65:6
  88:12 89:20
  90:15 95:22
  98:12 99:18
  112:4 115:10

**attorney** 126:5
**attorney/client**
  126:3
**attorneys**
  101:25
**attributed** 97:12
  98:14 131:8
**audio** 13:5
  128:18
**Audrey** 3:24
  32:3 33:21
  37:8,10,14
  38:9,22,24
  40:1,4,6,9 43:4
  49:3,6 50:12
  50:20 51:1
  52:3,5 54:11
  54:18 55:9,15
  57:13,14,20
  58:3,18 59:4,7
  59:10,12,14,17
  59:24 60:6
  63:14,18 64:6
  64:9,15,18
  65:15 66:9
  67:17,19 68:10
  68:16 69:25
  70:15,19,23
  71:6,18 73:5
  74:7,13,17,22
  75:6,19 76:20
  79:17,20 83:17
  85:3,5 86:6,10
  88:19,22 89:6
  107:18 109:15
  109:18,20
  117:8
**Audrey's** 37:16
  71:24 85:23
  100:1
**authority** 12:5
  12:24 13:20
  80:25
**authorization**
  95:15
**authorize** 95:11

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 137

95:12
**available** 41:6
90:11 100:10
**awards** 8:8
**aware** 5:11 12:9
31:2 32:22
37:10 42:1,9
43:2 48:3,10
53:9 55:13
56:25 58:6
81:22,25 95:12
97:14 114:15
123:9,11,16,18
123:19
**awareness** 13:24
14:5

**B**

**B** 2:3,9 135:8
**back** 28:14
34:19 36:25
38:4 39:19
41:11 54:9
56:6,13,18
82:6 83:15
87:8 88:1,7,12
95:22 97:20
111:11 114:23
117:22 122:6,7
124:15,19
**Barnett** 3:22
75:16,18 76:1
83:11,12
105:12,14,22
106:10,11,15
110:6 112:9
**Barnett's** 107:15
**Barrera** 14:15
94:6
**base** 5:21,22 6:1
6:8,12,13,16
6:17,20 8:2,5
8:11 9:22,22
9:23 12:11,16
12:23,23 13:9
13:16,17,19
14:2,13,17

16:3,22 17:20
23:11 25:2
26:9 27:11,22
28:16,23 29:8
29:11,13,14,21
30:9,14,22
31:19 33:20
36:22 37:2
43:20 44:13
53:13,20,25
58:1 86:13,13
88:23 92:25
95:5,13
**based** 8:6 25:17
37:8 50:12
77:3 86:17,19
88:23 96:20
113:6 117:8
**bases** 27:24 36:5
**basic** 121:17,19
121:24
**basically** 11:7
112:13 119:8
124:5
**basis** 6:22 11:11
**Bates** 33:3 86:4
89:22 114:24
**becoming** 16:22
**began** 33:25
**beginning** 27:13
43:2 58:16
61:1 97:24
122:9
**behalf** 106:3
**behavior** 121:21
**beliefs** 21:18,23
21:23 131:9,13
**believe** 22:20,21
22:23 43:21
54:13 69:17
74:4 84:7,19
95:9 97:25
108:23
**believed** 54:4
**best** 4:23 5:3
**better** 80:18

**bias** 130:9 131:2
131:12
**big** 114:17
**bit** 54:9 95:24
96:12
**black** 114:20
**block** 68:8 99:19
**board** 25:25
26:10 35:5
**boss** 9:5,11
**bottom** 33:3
68:8 91:12
94:3 96:3
115:2,11
122:20
**boxes** 114:20
**Braddock** 2:4
**Bradford**
135:23
**break** 4:18
55:22,25 56:7
87:11,20 124:9
**Brett** 66:13
67:22 79:24
85:6
**Brian** 85:25
86:8,12,16
87:1 99:22
100:2,9
**bringing** 66:15
**brings** 100:1
**brought** 31:16
45:25 81:14
101:13,20
**bullying** 15:21
15:24 20:12
46:20 73:16,20
74:5 77:8
78:23 80:10
85:13,19 94:20
105:5 106:16
107:8,16
112:19 113:8
122:15 125:16
**bullying/hazing**
105:25

**business** 24:8
80:9 105:4,8
105:11
**byline** 40:21

**C**

**C** 3:13
**call** 37:3,4 39:20
39:22 41:13,20
41:24 42:7
44:3 57:2
66:10,19,21
73:14 78:5,9
90:13 105:14
**called** 41:16
51:13 56:24
78:5 90:10
94:4 105:15,20
110:23
**calling** 91:17
**calls** 27:5 30:24
44:23 48:8
49:19 52:10
74:18 108:25
127:4
**card** 133:14
**care** 8:7 10:21
10:24 11:2,8
**carries** 91:7
**Carter** 1:3 2:22
3:13 4:14,15
16:9 19:16
20:2,8,12 26:4
31:11 33:22
35:13 45:19
58:17 74:15
85:7 90:7
101:7 102:16
107:18 112:14
112:22 113:16
121:24 122:23
123:4,8 124:24
125:1,8,14
126:8,12,16
130:5,12,13,20
131:6,8 134:3
**Carter's** 5:13

9:20 11:23
38:19 43:15,24
69:12,13 82:5
92:20 99:11
107:15 117:25
121:9 126:24
127:14
**case** 1:4 4:14,15
5:10 16:18
24:7,12,25
26:3,4,17,20
28:19 51:2
53:18 61:12
66:4,7 82:11
87:7 111:5
128:8 130:21
134:5
**cases** 15:10,16
15:17 20:22,24
21:6 22:5 23:4
24:22 25:25
26:5,8 28:13
28:15,22 29:19
29:20,24 30:14
78:25 109:8
**categories** 47:10
48:5 49:7 50:4
50:5,8,13
**category** 48:7,13
48:18 49:6,12
**cause** 1:18
**caused** 74:10
**cc'd** 88:25
117:10,12
**cell** 41:13
127:20
**central** 4:4
**certain** 90:11
**Certificate** 3:8
134:9
**Certified** 135:18
**certify** 134:14
134:18 135:13
**cetera** 48:11
50:4
**chain** 9:1,19

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 138

115:10
chance 19:3
  31:22 47:2
  60:13 63:2
  70:4 89:25
  91:10 96:1
  115:12 120:12
change 100:3
  132:4
changed 8:16
changes 3:7
  132:3 134:23
  134:24
channels 36:1
charges 135:11
Charlene 1:3
  2:22 4:14 6:2,5
  9:20 11:23
  16:6 19:15
  20:2,8,11 26:4
  33:22 35:13
  38:19 43:15,24
  45:19 58:17
  61:13 69:11,13
  69:15 70:17,20
  71:4,21 72:20
  74:15,23 75:10
  75:19 77:1
  78:1 80:3,6
  81:14,17 83:7
  85:7 90:7,20
  91:18 93:21
  94:6 96:4,19
  97:17 98:11
  99:11 101:7
  102:16 107:18
  112:14 115:23
  117:25 118:12
  121:23 124:24
  124:25 125:7
  125:14 134:3
Charlene's 24:7
  43:18 44:6,22
  45:1 54:16
  71:25 76:1
checks 11:12

Cheryl 1:19
  134:13 135:21
Chris 83:7 92:2
  92:5 93:22,24
Christian 96:4
  96:13 131:13
Civil 1:22
claims 5:12
  130:4
clarification
  88:11
clarify 62:9
clarifying 85:3
clear 4:25 5:8
clearly 42:16
  59:21
close 6:22 15:6
  44:15 55:13
  115:2,4,4
  129:12
closely 44:12
Cloutman 2:9
  2:10 135:9
coaching 23:4
collect 43:12
collected 46:5
collecting 42:25
  43:6
Colorado 1:21
come 11:18
  12:18 40:20
  80:22,25
coming 56:6
command 9:1,19
comments 21:18
  21:22 22:1,2
  35:17 39:6
  96:20 97:7
Commission
  133:25
committee 68:10
  68:11,12
communicate
  56:21 58:9,12
  62:20 70:24
  71:6,10,18

93:2,7,12,15
  106:15
communicated
  40:6 49:24
  51:7 72:11
  75:21 76:19
  77:22 108:18
  110:20 123:20
communicating
  57:9
communication
  37:10 40:13
  44:9 51:4
  73:11 78:16,17
  89:9,12 93:25
  128:3
communicatio...
  32:15,18 35:21
  40:19,19,20,23
  41:2,8 47:11
  53:8 57:13,22
  57:25 59:3,6,9
  59:17,21,25
  60:5 76:15
  78:12 79:14,15
  79:20,23 85:17
  89:16 93:24
  102:4,10,15
  103:15,19
  104:3,6,10,13
  104:16,19
  109:15 110:1,5
  119:13,19
  125:25 126:4,4
  127:16
company 4:16
  22:4 23:25
  61:20 67:2
  128:9
company's
  116:5
complainant
  50:23 57:6,10
complained 57:7
  69:13
complaining

24:23
complaint 5:9
  25:8 26:15,22
  32:6,7 33:21
  53:15,21 54:18
  55:10,16 57:14
  59:14 60:1
  77:13 93:16
complaints
  30:15 93:9
  94:19
complete 60:25
completed 61:5
  61:16 82:15
completely
  112:25
completion
  134:21 135:2
computer 55:6
computerized
  1:21
concern 49:5
  50:10 85:18
  86:10 100:1,2
concerning
  16:23 33:20
  85:24 86:7
  122:11
concerns 87:2,5
concluded
  100:16 103:5
  131:25
conclusion 48:9
  70:16 79:8
  80:22,25
  106:24,24
  107:4,19 127:5
conclusions
  70:14 100:25
  112:22 113:9
conduct 11:12
  13:11 57:6
  67:7 72:19
  77:3,13,25
  94:24 95:17
  107:16 122:10

122:14 128:25
conducted 14:2
  64:2 95:1
conducting 71:3
  71:15 89:2
conferenced
  83:10
conferred 24:13
confidential
  1:13 99:23
  100:8,12
confused 102:23
conjunction
  11:21
connect 97:14
connection
  68:24 73:20
  98:15 119:12
connections
  126:13
consensus 80:23
conservative
  96:4
consider 107:3
  122:2
consideration
  100:13 133:18
considered
  85:13 116:4
considering
  77:17 121:21
constituted 52:9
consult 125:3
consulted
  119:11 123:6
contact 70:20
  92:1 93:22
  104:24
contacted 30:18
  30:22 46:9
  51:11 59:14
  61:15 94:6
  97:1 105:23
contacting 43:1
  54:10 57:12
  58:2 59:3,7,10

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 139

59:12,16,24
60:6 74:13
**contain** 134:24
**contending**
128:15
**contends** 130:5
**content** 55:9
58:24
**contents** 54:11
54:17 55:15,18
114:11,13
**continue** 57:9
103:25
**continues** 63:15
96:10
**continuing**
58:20 79:16
92:3
**contract** 57:24
**conversation**
37:7,23 51:17
53:2,4 55:17
57:19 58:13,15
59:19,22 64:12
64:16,19,22
78:12,24
103:23
**conversations**
64:9 69:23
71:1 76:1
**convey** 102:9
125:14
**coordinator**
72:4
**coordinators**
8:10 10:8,14
10:20 12:14,15
66:2
**copied** 122:20
**copies** 135:12
**correct** 5:17
10:7 13:18
16:20 17:25
23:22 30:6
34:22 36:21,24
46:10 51:12

57:11 60:23
61:17 73:5,6
75:20 82:20
83:13,14 85:11
85:16 89:15
90:20 93:20
95:11 97:2,5
99:4,24 105:2
105:12,13,21
108:12,13
109:21 113:4,5
118:1,2 123:5
130:22 133:3
**corrections** 70:9
70:12
**correctly** 31:18
51:15 61:14
66:20 73:15
90:25
**Correll** 2:15 3:5
18:20 20:5
21:1 24:16
27:4 28:8 30:7
30:24 31:4
33:5 34:10,14
38:10 44:23
48:8 49:13
52:10 55:20
56:3,6,12 58:4
60:3,9 74:18
84:7,17 87:16
87:21,25 94:14
98:23 99:4,7
102:2,8 108:25
111:14,18
114:18 119:10
120:5,16
124:10,14
127:4,15
128:14,19
129:5,19,25
131:15 135:8
**correspondence**
93:6
**counsel** 18:23
31:4 33:5 84:8

87:16 98:24
102:5,11
114:19 119:12
119:14,18
127:17 128:14
135:13
**counsels** 23:4
**count** 14:8
**counted** 15:7
**COUNTY** 133:9
**couple** 130:1
**court** 1:1 4:5
128:21 129:14
134:1 135:23
**covered** 49:16
**COVID-19** 1:23
**CSR** 1:20
134:13 135:21
135:21
**current** 5:19 8:1
35:18
**Currently** 8:15
**customer** 11:6
**cut** 34:15

---

**D**

**D** 3:16,17,20,21
**daily** 8:7 11:11
11:20 12:17
**Dallas** 1:2 2:11
2:17 91:20
92:13,16,20,23
93:3 134:2
135:24
**date** 4:3 31:15
53:10 65:17,21
65:23 98:1
110:13 113:3
132:2 134:22
**dated** 63:16
118:3
**dates** 80:7 93:5
113:1,22
**Dave** 8:23,24 9:5
9:10,11 33:19
37:2 41:11,13
41:24 42:13,18

46:3 57:13,23
57:25 71:8
77:22 78:5,5
79:9 103:16,20
104:2,7,10
122:21 123:7
123:13,21,23
124:2
**Dave's** 78:2
**David** 32:13
**day** 46:2 60:22
60:24 61:1,2
62:2,5 65:24
72:10 110:3,17
110:18 118:9
118:10,11
125:11 133:11
133:20 135:18
**days** 60:25 61:5
61:9 129:12
134:22
**deadline** 61:6
129:15
**dealing** 23:24
60:2
**dealt** 15:23
16:22 17:1
27:7,9
**Deborah** 6:17
**decide** 20:7,11
53:24 75:13
80:20 81:2
87:13 101:1
106:24 115:21
127:8 131:5
**decided** 52:16
113:15 114:2
**decision** 13:11
29:4 42:8,11
42:17 61:3
62:5 66:7
72:19 80:10
95:16 100:22
106:12 107:1
107:11,12
110:25 111:2

111:22 112:25
115:18 116:10
116:13,16,21
117:19 118:4
118:11,23,25
119:6 123:9,10
123:12,15,21
123:24,25
125:8,15,17
126:1
**decision-maki...**
114:4 130:18
131:10
**decisions** 29:7
29:12 117:4
**DEFENDANT**
2:8,14
**Defendants** 1:7
134:7
**Defense** 2:3
**deliver** 111:9
**denied** 62:7,10
**Denise** 3:23 51:9
51:11 52:18
53:8,12 58:2
60:18 63:15
65:13 67:12
72:15 73:4,14
73:19 76:8,11
81:13 83:11,23
85:2,6 88:19
110:19 111:1
112:8 115:18
117:6,7,14
**Denver** 5:22 6:1
6:7,12 8:2,6
9:22,23 12:23
15:17,18 16:3
16:22 17:20
20:16 22:13
23:11,15 24:15
25:2,17 27:11
29:8 86:12
94:21
**deny** 62:18
**denying** 62:14

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

department
  30:17,21
departments
  23:25
departs 11:13
depends 23:20
depicted 48:19
depicting 116:3
depiction 98:20
deponent 134:19
  134:20 135:1
deposed 4:19,21
deposition 1:9
  1:15 128:13
  129:4,16
  131:24 132:2
  133:2 134:10
  134:16,21
  135:2,4,7,10
  135:12
depositions
  128:25
described 110:5
description 3:12
  133:14
desk 11:7,8
details 21:5,20
  27:15 28:6
  29:3 35:12,14
  43:5 45:18
  48:20 50:24
  51:6 62:17
  79:13 101:19
  119:24
determination
  106:3,8 107:9
  113:2,13,18,20
  121:19 122:13
  123:8
determinations
  116:24
determine 42:22
  49:8 73:23
  83:17 100:19
  112:15 121:23
  129:1

determined
  42:24 105:24
  122:15
determines
  80:14,19
determining
  34:1 106:22
  107:12
devices 127:24
  128:8
DG 47:18
different 23:6
  80:25 81:24
  89:11 92:7
  99:15,21
direct 9:21
  22:17 31:20
  32:23 34:23
  38:3 46:25
  60:11 63:1
  65:6 68:7
  88:12 89:20
  90:15 91:6
  95:22 97:9
  98:12 99:18
  112:4 115:9
  121:13
directed 90:13
directly 10:5
  12:14 22:3
  26:3 28:24
  35:21 37:17,20
  38:9,17,18,21
  39:1,9 40:24
  56:23 68:20
  93:12 101:2
director 9:5
disagree 81:1
Disaster 1:24
disciplinary
  12:2,21 13:12
  13:15 14:22
  23:4 46:18
discipline 18:13
  22:12,24,25
  23:5,7 28:3,4

28:18,20 29:18
  61:7 80:15
  98:25 100:14
  104:1 107:13
  112:3 113:15
  113:20 114:2
  116:11 119:2
disciplined
  17:19 18:9
  20:23 27:21,24
  69:16
disclaimer
  126:17
disclosed 130:15
  130:17
discovery 82:5
  121:10 126:23
  126:24 129:2
  129:13,13,15
discrimination
  16:24 24:23
  30:15,19,23
  116:6 122:12
  130:21
discuss 39:21
  41:25 43:5
  77:7 103:8,12
  109:8 126:15
discussed 50:21
  54:11 70:8
  73:15 77:5
  79:12 103:11
discussing 55:11
  78:18 109:17
  109:19
discussion 54:23
  63:14,20 64:1
  64:14,24 73:21
  90:6 97:16
  108:11,14
  126:10,14,21
discussions
  50:25 54:17
  103:10 107:22
  107:24 108:2,6
  109:7

disgusted 42:2
disparaging
  21:17,22 22:3
disseminated
  12:19
distortion 13:5
  128:18
DISTRICT 1:1
  1:1 134:1,2
DIVISION 1:2
  134:2
document 18:21
  18:24 19:1
  25:11 31:21
  32:24 33:6,7,8
  34:6,7,9,19,21
  34:24 37:1
  38:4,13 39:19
  47:1,1 49:1,3
  60:12 63:2,23
  65:7 68:7
  69:19 81:6
  82:17,19 84:4
  84:10,13,14,18
  86:3 87:9,9
  88:12 89:21
  95:22 97:10
  99:10 111:5
  112:5 113:7
  114:24 115:3
  117:23 118:16
  120:4,9,10,14
  122:6 133:15
documents
  10:24 41:5
  43:8 128:24
  129:7
doing 6:11 14:20
door 44:17
draft 121:4
  122:22,25
drafting 118:20
  119:12,20
drafts 81:24
dressed 116:1
drive 15:14

127:19
drug 24:11
due 27:17
duly 1:17 4:8
  134:15
Duncan 1:19
  134:13 135:21
Dustin 14:14
  29:10 54:7
  55:9
duties 8:12

_____
        E
_____
E 3:18,20,22,22
earlier 85:11
  94:18 95:24
  99:24
early 44:1
easier 18:24
ecloutman@la...
  2:12
Ed 1:10,15 3:4
  4:7 37:3 132:1
  133:1,6,12
  134:10,15
  135:9
Edie 75:16,17
  83:11,11
  105:12,14,22
  106:10,11,15
  110:6 112:9
Edith 83:12
educated 39:16
Edward 2:9
Edwards 6:17
egregious 46:14
  108:8
egregiousness
  52:25
eight 7:9,16
either 32:12
  51:4 123:7
  126:14
elected 7:23
election 40:14
electronic
  127:24 128:8

Page 141

**eleven** 6:6
**Elm** 2:11
**email** 3:14,16,17
  3:19,21,23
  32:3,14,16,19
  33:19,23 37:2
  37:4 38:21
  41:12,17 42:18
  44:10 47:8,12
  47:19 48:23
  49:18 51:3,11
  51:14 54:12
  60:18,21 63:7
  65:13 73:11
  75:22,24 81:10
  81:12 84:19
  85:2,6,21,23
  90:6,18,20
  91:7,15,25
  92:4 93:21
  94:3,3 100:1
  110:24 111:6
  112:8,15,18
  113:3 114:7,14
  115:10 116:15
  116:17 117:2,5
  117:19 120:17
  120:19
**emailed** 46:3
  51:15 105:20
  110:22
**emails** 12:18
  35:24 48:1
  88:19
**Emergency** 1:23
**Emlet** 3:18,19
  3:21 58:10
  65:14 76:23
  81:12 108:11
  108:17 109:7
  109:11 110:2
  112:8
**employed**
  135:14
**employee** 22:8
  24:6 43:1 46:9

46:16,17 47:8
47:12,15,18,20
49:9,18,19,24
50:21,22 51:1
52:6 54:10
67:2 71:1
72:12,13 73:22
76:8,11 100:18
104:23 110:9
110:11 111:22
115:19 116:12
**employee's**
  16:13 17:10
**employees** 14:18
  17:19 18:6,8
  20:16 30:1,5
  50:8
**encountered**
  24:22
**ended** 91:18
**enforce** 12:1
**entire** 23:1
  98:25
**entrance** 10:21
**ER** 43:21
**et** 48:11 50:4
**ethnicity** 48:10
**events** 79:16
  83:20
**everybody** 56:1
**exact** 17:3,21
  23:17 31:15
  69:19 71:9
  110:13
**exactly** 97:6
**Examination**
  3:5,5 4:9
  129:23
**examine** 129:11
**excuse** 13:16
  25:7 28:14
  48:23 57:24
  89:11 111:8
**executed** 133:17
**executive** 25:25
  26:10 35:5

**exhibit** 3:12
  18:19,22 31:20
  33:6 34:15,17
  38:11 65:7
  84:4,5,11,12
  88:13 112:5
  120:3,4,10,11
**exhibits** 3:10
  135:12
**exist** 82:13
**expectations**
  121:18,20,25
**expectations/c...**
  121:17
**experienced**
  16:3
**expertise** 73:18
**Expiration**
  135:22
**Expires** 133:25
**explain** 58:24
**express** 131:13
**expressed**
  133:18
**extension** 61:11
  61:19,23 62:7
  62:10,14,18
  90:7,9,14,22
  91:24 92:25
  129:15
**extensions** 61:9
  61:15 91:1
  93:5

_____
**F**
**Facebook** 22:7
  31:11,16 37:16
  38:19 39:11,14
  39:15 43:14,16
  43:19,24 44:7
  44:22 45:1,21
  54:2,5,16 55:2
  58:17,25 68:21
  69:6,13 83:18
  83:21,24 85:8
  97:13 98:9,15
  107:24 108:9

109:5 126:9,17
**Facsimile**
  135:25
**fact** 28:5 63:21
  63:22 64:23
  70:22,24 71:25
  75:19 76:2
  79:5,11 80:3,6
  82:24 87:6
  99:12 100:4
  102:25,25
  103:4,6,10,16
  103:20 104:7
  104:11,14,17
  104:20,22
  109:4,14,20
  110:1,5 111:10
  130:12 131:8
**fact-finding**
  65:22 69:24
  70:17,21 71:3
  75:10 77:25
  81:16 82:2,13
  82:14,21 83:3
  93:17 94:7
  102:17,21
  104:4 108:4
  110:8,16 111:9
  111:15,21
  124:23
**factors** 107:3
**fair** 100:6 118:3
**fall** 50:9
**falls** 73:21
**familiar** 5:12
  19:8 46:19
  86:23 94:24
**far** 14:4 25:23
  29:3 48:10,15
  81:22 99:23
**favorably** 130:6
  131:5
**Fax** 2:6
**February** 31:13
  46:4,6 63:16
  65:3

**Federal** 1:22
**feedback** 80:12
  119:22
**feel** 77:11 80:12
  100:19 113:11
**fell** 49:6
**felt** 76:25 77:24
  127:9,13
**female** 48:21
**fetus** 74:16
**fetuses** 48:20
**figure** 99:12
  116:10
**file** 23:8
**files** 126:23
  127:19
**final** 61:2 81:21
  113:19 117:19
  123:8
**finally** 123:24
**financially**
  135:16
**find** 37:9 44:22
  45:25 63:2
  68:18 81:6
  120:14 127:2
**finding** 63:21,22
  64:23 70:25
  72:1 75:19
  76:2 79:6,11
  80:3,6 99:12
  100:4 102:25
  103:1,4,6,10
  103:16,20
  104:7,11,14,17
  104:20,22
  109:15,20
  110:1,5 111:10
**findings** 82:24
**fine** 56:6,10
  58:20 87:24
  124:5
**finish** 5:4,6
  123:2
**fire** 12:5 118:12
  123:8 124:25

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 142

**fired** 21:11,13 98:20
**Firm** 135:22
**first** 1:23 4:8 25:6,16 31:10 35:9 38:24 47:14 49:23 64:16,19,22 72:6 74:21 85:22 86:3 104:23 129:6 130:3
**five** 17:7 18:2,3 18:5,8,10,11 18:12 23:18,19 47:24 48:1 55:22
**flight** 7:5,7,13 7:16 8:5,9,13 10:22,23,25 11:4,9,13,16 11:17 12:5,22 13:20 20:17 21:8,11,12,15 21:16 22:11 23:10,15 24:14 24:22 25:1,10 25:17,20 26:1 26:13,21 27:20 27:23 31:10 35:4,17,20,23 36:11,13 41:6 56:22,23,24 86:23,24 92:13 93:6,13 94:23 98:21 100:10 100:11 109:8 121:16,22
**flights** 11:15
**folder** 55:7
**follow** 49:17 81:15 105:9
**follow-up** 12:20 92:4 129:2
**followed** 9:19
**following**

124:23 134:14 135:5
**follows** 4:8 97:15
**forced** 62:5
**foregoing** 133:1 133:16
**forget** 54:5
**form** 22:12 28:18 127:19
**forms** 23:6
**forth** 12:7
**forward** 48:23 52:16 71:20 77:24 101:13 112:3
**forwarded** 31:19 32:9,11 32:14 43:10 48:23,24 62:24
**Foss** 94:23 95:14
**found** 45:1,8,10 45:12 47:2 60:12 84:15 88:13 97:23 98:10 114:25 120:12
**Foundation** 2:3
**four** 47:24 48:1 96:10
**frame** 63:19
**frames** 117:21 118:14
**FRCP** 134:18
**Friday** 118:7 128:24
**front** 10:21 11:3 11:5
**frustrated** 36:6
**frustration** 35:18
**full** 129:9
**further** 119:11 129:12 134:18 135:13,16

**G**

**gate** 11:12
**gates** 11:20
**gathered** 77:14
**gathering** 63:24 64:2,5,10,25 65:3 66:23 70:15,19,23 71:5,11,14,19 71:24 72:6,7 72:12,17 73:5 74:7,9 75:5,18 76:9,20 77:23 78:6 79:4,17 79:19,21,25 83:16
**general** 98:4 103:22
**generally** 68:20
**genitalia** 48:21
**gestures** 5:1
**Gilliam** 2:3 3:5 4:10,13 18:25 33:7 34:18 55:24 56:5,10 56:14 84:3,9 87:10,15,19,22 88:3 99:2,5,14 114:21 120:2 124:8,12 128:11,17,23 129:18,22 131:20 135:8
**Gilliam's** 102:9
**give** 4:25 22:17 37:3 52:21 61:23 80:12 97:19 109:11
**given** 20:22 45:11 46:5 71:23 107:25 129:1 133:19 134:17 135:3
**gives** 63:19
**giving** 41:20
**go** 11:15,19 33:2 34:7,19 43:6

44:6 48:16 54:16 77:24 92:5 96:24 99:21 114:23 119:10 120:6,9 127:12 128:20
**goes** 99:23
**going** 18:21 27:18 39:18 41:11 55:20 71:20 75:13 77:1 91:24 99:9,13 100:25 112:3 122:6 128:12
**good** 4:10,12 56:14 70:7 87:17,19 124:11,13
**graphic** 42:5 48:19 52:2 54:19 69:10 74:12
**graphics** 68:19
**Greenfield** 2:10 2:10 131:18
**ground** 11:21
**grounds** 129:17
**group** 35:4 75:13 96:14
**groups** 96:13
**guess** 15:20 36:15 38:14 44:14 47:17 48:4 49:5,10 51:7 52:7 54:14 55:21 58:11 63:25 67:1 74:10,16 77:16 80:8,9 80:24 83:2 85:22,22 86:6 89:8 91:21 92:3,4 93:8,16 94:19 97:23 113:7,25 115:9

116:8,9,9,20 126:22
**Gutierrez** 3:17 3:20,22,23 51:9,11 52:18 53:8,13 58:2 60:18 63:15 65:13 67:12 72:15 76:8 81:13 83:11,23 85:2 88:19 110:19 112:8 115:18
**Gutierrez's** 111:1 117:14
**guy's** 54:6
**guys** 87:13

**H**

**half** 5:25 7:9,16 55:22
**hallway** 44:20
**Hamilton** 62:21 62:24 117:10 117:12,13
**hand** 133:19
**handle** 54:1
**handled** 30:10 30:14
**handling** 28:17
**hands-on** 14:4
**happen** 94:9
**happened** 14:5,7 26:6 28:1,5 40:14
**happening** 13:25 59:15
**happens** 61:4 96:7
**happy** 87:18
**harassment** 16:23,24 46:15 48:16 50:7,12 50:14,15,16 51:24,24 52:1 52:9 73:3,3,16 77:9 78:22,22

Page 143

94:21 104:25
111:4 113:8
116:5,5 117:1
122:11,12
**harbor** 130:9
131:2,12
**hard** 127:19
**Harwood** 2:17
**hazing** 15:21,25
20:13 46:19
73:16,20 74:5
77:8 78:23
80:11 85:14,19
94:20 105:6
106:16 107:9
107:16 112:19
113:8 122:16
125:16
**hazing/bullying**
107:6
**he/she** 133:17
**head** 4:25
**hear** 25:6,8
31:10 35:15
110:9,11
119:17
**heard** 27:25
28:2 35:11
36:1 74:22
**hearing** 96:16
**Hector** 14:14
54:5 55:9 94:4
94:6,11
**held** 65:22,24
67:10 70:19,22
**help** 84:18 89:4
107:11 118:8,8
**helps** 114:22
116:12,13
**Herb** 97:19
**hereto** 1:25
**Herrick** 10:19
**highest** 129:8
**highlighted**
113:12
**hold** 7:23 80:2

102:2,2
**holding** 70:14
**home** 67:14
**hour** 55:21 56:7
**hours** 135:8
**housed** 46:20
**HRBP** 24:7
73:22,24 74:1
75:3,6,11,15
80:10,14,19
81:1 100:19
**Hudson** 59:3
104:14
**huge** 96:8
**huh-uhs** 5:1
**human** 24:7
80:9 105:3,8
105:11 106:3,7
111:23
**hundreds** 22:19

_____
                **I**
**idea** 66:25 98:4
**identifiable**
114:20
**identified** 22:8
129:9
**identity** 133:14
**III** 2:9
**images** 48:25
49:1,2,11
50:11 52:2,8
54:19 55:5
74:16,22 116:1
**imagine** 22:16
**immediate** 8:23
**immediately**
42:15 73:8
100:23
**impact** 130:18
131:10
**implicated** 74:5
77:12
**important** 4:25
**improper**
129:14
**in-house** 102:11

**incident** 12:21
13:12,15 28:17
74:17
**incidents** 12:24
14:22 27:21
62:6
**include** 23:3,4
122:2
**included** 34:17
88:18 114:14
**includes** 135:5
**including** 8:10
**incomplete**
34:15
**incorporate**
82:7
**incorporated**
82:16,18
**independent**
107:14
**independently**
81:1
**INDEX** 3:1
**indicates** 129:9
**indicating** 77:15
81:13 110:25
**individual** 82:10
**individuals**
106:2,7 130:10
131:3,13
**inflight** 5:21 8:4
9:16 36:19,20
75:15
**inform** 123:14
**information**
24:3 37:12,14
39:24 42:25
43:7,13,25
44:7,21,25
45:25 46:5
48:25 49:21
60:19 62:3,4
63:24 64:2,5
64:10,25 65:3
66:23 70:14,19
70:23 71:5,11

71:14,19,24
72:6,7,12,17
73:4 74:7,9
75:5,18 76:9
76:12,20 77:14
77:23 78:6
79:4,7,16,19
79:21,25 81:13
83:18,24 85:4
99:11 101:4,6
101:10,12,21
101:22,24
102:1,16,19,24
106:20 107:17
107:23,25
108:21,24
109:2,10
115:22 126:24
127:3,8,10,11
127:13 128:2
128:15 135:3
**informed** 71:2,8
71:20
**initial** 13:10
41:24
**input** 43:3 46:10
46:13,18,22
48:25 49:21
**inquiries** 96:18
**instance** 1:16
26:20 62:13
74:13 85:15,15
**instances** 62:11
**instruct** 31:6
**instructions**
127:16
**instrument**
133:16
**interested**
135:17
**interrupt** 35:6
**investigate**
12:24 25:5
**investigated**
27:13 28:24
29:20

**investigating**
51:6,19,22
52:19
**investigation**
13:11 14:3
28:17 33:25
35:13 41:14
42:7,12,18,23
43:3 44:1
49:24 53:25
55:7 56:21,25
58:7,16 59:14
61:1,5,22 62:1
64:3 66:4
71:15 75:14
77:25 79:24
83:16 88:21
89:2,5,10,14
89:17 92:13
93:4,10 94:12
94:25 95:2,17
97:24 99:23
100:3 101:3,15
101:16 104:1
106:21 111:8
111:12,12,16
112:14,20
113:17,24
115:20 123:2
126:7,12,20
130:14
**investigations**
8:8 13:8 18:10
18:11,16 29:2
29:17 72:2
**investigators**
47:20,21,23
48:1
**involve** 53:25
85:14
**involved** 14:3,4
15:2,10 16:5
24:1 26:9
27:11 28:24
29:23,24 30:2
48:18 49:12,23

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

50:11 59:13
60:1 66:3
71:24 72:5,18
72:20,23 73:1
73:24 74:1,11
75:14 77:4
78:18,25 85:15
88:20 94:11,12
95:10 102:11
106:2 111:11
111:17 125:18
**involvement**
13:2
**involves** 50:14
**involving** 12:22
14:22 15:17
24:14 30:14
53:14 60:7
79:1 94:23
**iPad** 127:25
128:1,3,4
**issue** 24:14
30:19,23 60:22
61:6 77:3
80:15 96:8,15
97:2 98:25
119:1 127:20
127:23 129:14
130:25
**issued** 28:18
113:15,21
114:3
**issues** 9:17,24
27:18 60:1,1,7
125:22
**items** 11:14

___
**J**
**Janet** 10:17 66:2
66:3,6 67:11
69:19 70:5
**January** 6:9,10
**Jen** 10:19
**job** 97:20
**joined** 66:18
**joint** 68:12
**Jones** 14:14

43:20 44:22,25
45:12 54:12
57:24 58:1
71:13,18 82:11
82:12 97:23
103:5,9,13
124:24
**jumped** 95:24

___
**K**
**keep** 5:7 89:17
**keeps** 41:5
**Kendall** 94:23
95:14
**kept** 15:14
100:11
**kind** 21:23
**Kissman** 3:16
8:23,25 32:13
33:19 41:13,24
46:3 57:14,23
58:1 71:8
77:22 79:9
103:16,20
104:2,7,10
122:21 123:7
123:13,21,23
**Kissman's** 9:5
9:10,11 37:2
41:11 124:2
**knew** 40:9,15
86:20
**know** 4:18 6:23
12:7 14:21
15:3,4,7,23
16:12 17:3,7,9
17:22 18:1
19:7 20:2 21:7
22:1,11 23:10
23:14,17 24:19
25:19,22,23
26:25 27:10,20
28:4,12 29:4,4
29:22,23 30:4
30:9,13 31:16
31:23 32:25
35:2 36:1,4

37:18,18 38:6
38:8,12,14
40:1,12 41:16
44:25 45:7,10
45:12,15,24
46:4 47:3,18
47:22,25 48:4
50:3,3,11,25
51:13 52:13,16
53:10 54:21
55:4,12 57:16
57:18 58:22
59:13 60:13
62:23,25 63:3
63:21 64:1,8
65:2,4,21,25
66:14,18,23
67:13,19,25
68:2,4,11,13
69:9,12,18
70:3 73:7
74:20 75:8,21
75:25 78:4
79:13 81:3,7
81:20 82:21
83:22 84:22
85:1 86:10,14
86:15,16,22
87:12 88:14
89:1 90:1,12
91:18 92:15
95:1,7,18,25
97:22 98:1,6,8
98:20 101:18
101:20,25
102:14 103:17
103:24 106:1
106:11,13
110:17,22,24
111:3,19
112:10 113:1,9
114:7,25
115:12 116:12
117:11,16,21
119:18 120:13
120:23 121:7

121:12 123:6
123:17 124:5
126:3 128:12
129:3 130:13
**knowing** 86:22
**knowledge**
49:22 117:7,11
**known** 72:19
75:12 133:12
**knows** 99:1

___
**L**
**L.L.C** 135:23
**label** 86:4
**labeled** 18:21
33:3
**labor** 15:15 24:8
43:21 58:6,8
71:2 76:19
107:24 108:2
108:10,15
111:22,24
118:21 119:4
119:18,23
127:10
**Lacore** 9:15,18
59:7 104:20
122:21
**language** 113:6
**Las** 6:20 31:19
37:8 88:23,24
117:8
**lasted** 66:24
**Lauren** 2:22
**LAW** 2:10
**lawsuit** 130:4
**lawyer** 102:10
**leader** 8:23
36:22 72:3
117:9,14
**leaders** 36:3,7,8
36:13,17
**leadership** 35:18
36:6,18
**leadership-type**
11:19
**learn** 35:9 65:1

**learned** 77:19
**legal** 2:3 48:9
119:11,18
127:5
**let's** 9:9 18:5,18
32:23 34:18
38:4 56:12
60:11 65:7
81:5 87:8,9
88:9 89:21
91:6 92:5
95:21 97:9
120:2
**letter** 3:13,25
19:15,17 23:8
34:5 118:1,17
118:17 119:5
119:13,20,23
119:25 121:3,5
121:13 122:3
122:22 123:3
123:12,15,18
125:7,9,12,25
**letting** 103:24
117:16 124:5
**limits** 90:8,23
129:1
**line** 94:3 132:4
**lines** 96:10
**lingo** 65:1
**listed** 65:16
**lists** 67:1 83:3
**little** 55:21
87:24
**LLP** 2:16
**local** 1:6 2:8
4:17 5:13 7:19
7:21 40:10
92:9 93:19
131:18 134:7
**locate** 55:3
**lodged** 31:8
**logo** 45:6 97:19
**logos** 45:19
**long** 5:23 6:4 7:7
7:15 53:1

Page 145

66:23 110:15
**longer** 9:3 55:25
**look** 38:25 43:15
    43:18,24 44:7
    84:21 91:10,12
    96:1 101:4,9
    128:17
**looked** 127:18
**looking** 33:25
    34:12 38:13,23
    39:20 81:22
    120:2 122:6
**looks** 85:3 90:10
    90:12 117:5
    121:3
**lot** 36:12 39:12
    85:9 86:23
    92:18
**loud** 19:7
**lounge** 10:22
    11:3,4,7,18
    36:11
**lounges** 41:4,9
**Luna** 10:19
**lunch** 56:1,8
    87:11

_____
**M**
**M** 3:18,19,21
**machine** 1:21
**Mack** 2:21
**magnitude** 72:3
**making** 35:17
    35:20 43:2,9
    66:7 70:11
    100:22 106:2
    106:25 113:9
    116:14 117:3
    123:19
**manage** 6:20
    10:23
**management**
    25:14 36:20
**manager** 5:21
    6:1,8,12,13,16
    6:17 8:2 9:22
    13:16,17 14:2

14:17 16:3,22
    17:20 29:8
    36:23 37:3
    43:20 53:25
    88:24
**managers** 8:11
    12:11,16,23
    13:19 14:13
    28:16,23 29:11
    29:13,15,21
    30:10,14,22
    33:20 44:13
    53:14,20 58:2
    92:25 95:5,13
**March** 113:3
    116:16 118:3,4
    118:5,7,8
**mark** 84:3,10
    120:8
**marked** 84:12
    120:10,11
**material** 45:20
**Matt** 4:13
**matter** 37:6
    49:25 59:18
    60:7 62:21,23
    74:6 78:13,17
    91:22 101:1
**matters** 32:19
    53:14,20 93:9
    93:13
**Matthew** 2:3
    135:8
**Maureen** 58:10
    58:12,14 65:14
    76:23,24 77:2
    78:16,24 79:4
    81:12 108:11
    108:17 109:7
    109:11 110:2
    112:8
**Maureen's**
    58:19
**mbg@nrtw.org**
    2:6
**mcorrell@ree...**

2:18
**mean** 11:3 22:18
    23:20 34:3
    36:8 52:7
    91:20 102:21
    107:8 111:19
    118:24 122:2
    126:3
**meant** 48:12
**media** 14:19,22
    15:1,10,18
    17:13,16 19:24
    20:3,8,18 21:8
    21:11,16 23:24
    25:6,7,11,20
    26:1,14,22
    27:2 28:17,23
    29:5 46:19
    77:9,12,18,20
    78:22 83:18
    94:20 98:22
    107:5,20 108:4
    108:20 109:9
    112:19 113:7
    122:16 125:16
    131:24
**meeting** 43:5
    52:17 53:10
    65:14,22 67:3
    67:7,10 68:14
    69:20,24,25
    70:7,17,17,21
    71:3,7,21,22
    72:19 73:8
    75:2,4,8,9,10
    76:25 78:1
    81:14,16 82:2
    82:13,15,22
    83:5,8,16,22
    90:11 91:17,20
    92:3,6,10 93:5
    93:18,23 94:1
    94:4,7,17
    100:16,24
    102:17,21
    104:4 108:4

110:9,16 111:9
    111:16,21
    112:14 118:22
    119:5 124:23
    130:16
**meetings** 53:17
    107:18 108:1
**Meggan** 14:14
    43:20,23 44:5
    44:12,22,25
    45:8,12,25
    53:23 54:4,12
    54:15,17,24
    57:23 58:1
    71:13,18,23
    72:5,9 82:11
    82:12 97:23
    98:10 103:5,8
    103:12 124:24
**member** 7:12,15
    25:25
**members** 26:10
**memory** 19:23
    99:6
**mention** 78:25
**mentioned**
    42:21 50:13
    78:20 87:6
**mentions** 35:2
**merits** 93:9,16
**message** 68:20
    69:4,6,8 85:7
    96:8
**messages** 4:25
    31:12,17 58:25
**met** 40:4
**Michael** 2:15
    135:8
**midway** 85:22
    98:13
**Mike** 9:2,4,11
    9:13 10:19
    59:10 102:7
    104:16 122:21
    123:7,14
    125:21

**mine** 44:20
**minutes** 55:23
    87:17,21 88:2
    124:10,12
    135:8,8,9
**mischaracteri...**
    38:11
**misstate** 85:12
**misstates** 20:5
    34:10 58:4
**moment** 21:7
    33:13 38:1
    84:21 88:9
    120:21
**monitor** 11:20
**monitors** 25:19
**months** 6:6
**Moore** 14:14
    29:10
**morning** 4:10,12
**motion** 128:20
**move** 52:16
    100:20
**moving** 58:20
    88:11
**multiple** 75:25
    76:6
**Mumford**
    135:23
**Murtoff** 9:12

_____
**N**
**N** 2:17
**name** 4:13 10:15
    24:8 40:21
    54:6 67:2
    106:4 132:1
    133:15
**named** 94:23
**names** 20:21
    30:4
**Naomi** 59:3
    104:14
**narrow** 118:9
**National** 2:3
**nature** 27:17
    74:12

**necessarily**
126:18
**necessary** 93:6
**need** 4:18 11:1
11:18 12:18
65:1 90:22
92:24 95:23
112:11 129:2
**needed** 37:9
41:13 62:3
70:16 72:8
76:25 77:24
83:17 96:19
101:14
**needs** 10:23 11:8
87:24
**neither** 135:13
**Nevarez** 66:13
67:22 79:24
**never** 97:1
**new** 99:10
**Nexus** 22:2,6
43:17 77:15
107:23 108:7
109:5
**nods** 5:1
**nonmember**
130:6,13
**normally** 94:1
**NORTHERN**
1:1 134:2
**NOTARY**
133:23
**note** 82:7,9
**noted** 133:3
**notes** 63:23
65:14,16,18,23
66:1 69:19
70:4,10 71:22
72:8 81:16,21
81:24 82:2,3,6
82:6,7,13,14
82:16,19 83:3
83:10 101:11
102:18,19,20
102:21 103:11

103:11
**November** 1:11
1:18 4:3 132:2
134:11 135:19
**number** 17:3,21
18:21,22 23:13
32:25 33:3
37:1 86:4
89:22 120:3
121:14,14
135:22
**numbered** 1:18
**numbers** 18:24
23:17 114:24
129:8

---

**O**

**oath** 133:13
**objection** 20:5
21:1 24:16
27:4 28:8 30:7
30:24 31:8
38:10 44:23
48:8 49:13
52:10 56:8
58:4 60:3,9
74:18 94:14
98:23 108:25
111:14,18
127:4
**objector** 130:6
**observe** 11:16
**obtained** 37:11
37:14 39:25
68:18 69:3
**obtaining** 90:7
**occasions** 25:14
**occurred** 19:25
**offensive** 116:4
**office** 7:23 11:6
15:13 44:15,19
67:9,11,14,15
67:17,23 83:8
93:1 94:10
133:19
**officer** 135:4
**officer's** 135:10

**OFFICES** 2:10
**official** 26:13,21
**Oh** 17:15 18:8
95:13 120:18
**okay** 4:21 5:12
5:16,23 6:1,4,7
6:10,15,18,23
7:1,4,7,10,12
7:15,18,23 8:1
8:13,16,18,21
8:24 9:2,4,6,13
9:17,20,24
10:5,8,11,14
10:18,20 11:2
11:10,22,25
12:4,7,10 13:2
13:4,10,14,19
13:23 14:1,6,9
14:12,16,21,25
15:4,9,12,16
15:20,23 16:2
16:5,8,10,12
16:18,21 17:1
17:4,6,9,12,15
17:18,22 18:1
18:5,11,15,18
19:2,9,10,12
19:17,23 20:2
20:7,11,15,20
20:24 21:10,14
21:20 22:5,11
22:18 23:3,6
23:10,14,23
24:4,10,13,19
24:21 25:1,5
25:13,19,24
26:8,12,17,25
27:9,15,23
28:2,6,12,21
29:2,6,9,11,17
30:1,4,13,17
30:21 31:3,8
31:14,20,25
32:5,7,10,14
32:18,21,23
33:2,9,10,12

33:15,18,23
34:2,6,23 35:1
35:6,9,15,23
36:1,7,20,22
36:25 37:6,13
37:18,25 38:3
38:5,14,23
39:3,8,11,14
39:18 40:1,4,6
40:9,12,15,18
40:23 41:1,7
41:11,16,19,23
42:11,15,20
43:6,12,18,23
44:3,5,9,12,14
44:17,21 45:4
45:7,12,15,17
45:24 46:3,8
46:12,17,21,25
47:4,7,11,14
47:17,22,25
48:4,17,22
49:5,10,17,22
50:2,10,18,25
51:7,10,13,17
51:21,25 52:7
52:13,18,21
53:1,4,7,12,19
53:24 54:4,8
54:24 55:8,8
55:14,19,25
56:5,9,10,12
56:14,20 57:5
57:9,12,18,22
58:8,11,14,19
58:24 59:2,6,9
59:12,16,20,24
60:5,11,14,17
60:21 61:4,8
61:11,17,22,25
62:6,9,13,16
62:20,23 63:1
63:4,7,10,13
63:20,25 64:5
64:8,12,15,18
64:18,21,21

65:2,6,9,12,16
65:20,25 66:3
66:6,9,12,18
67:6,9,12,15
67:19,22,25
68:6,9,14 69:2
69:5,11,15,18
69:22 70:3,9
70:13,18 71:5
71:10,13,17,23
72:11 73:4,10
73:13,19 74:1
74:4,15,21,25
75:9,11,17
76:4,7,15,18
76:22,24 77:2
77:6,11,16,21
78:4,8,11,15
78:19 79:3,9
79:14,19,23
80:2,5,8,14,18
80:24 81:5,8
81:11,20 82:1
82:1,4,9,12,18
82:18,21,24
83:2,7,10,15
83:23 84:2,9
84:20,23 85:5
85:21 86:5,14
86:16,20,25
87:4,8,15,23
88:3,15,18
89:1,4,7,16,19
89:19,24,25
90:2,5,9,15,17
90:19 91:1,5,9
91:14,25 92:11
92:15,19,22
93:2,7,12,15
93:19,21 94:2
94:11,18,18
95:4,7,18,21
96:2,3,7,22
97:1,4,9,11
98:1,4,6,12,17
98:18 99:20

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 147

100:6,13,21
101:8,17,25
102:20,23
103:4,8,15,19
104:13,19,22
105:3,8,11,14
105:17,20,22
106:11,14,19
106:23 107:2
107:14,19
108:2,6,10,14
108:17,23
109:14,19,25
110:4,11,19,22
111:1,7 112:1
112:4,6,15,21
113:3,14,19,25
114:6,16,21
115:8,9,14,21
115:24 116:2,2
116:15,20
117:5,10,15,18
117:22,24
118:7,16,19,24
119:3,9,16,22
120:1,19,20,21
120:24 121:1,4
121:12,15,23
122:4,8,20
123:3,6,11,14
123:17,20,23
124:2,7 125:3
125:6,6,13,13
125:18,21,24
126:6,11,15,22
127:2,12,20,23
128:1,7,10,23
131:22
**old** 97:19 98:6
**once** 17:3 23:17
31:22 38:6
40:21 47:2
50:21 56:24
60:12 63:2
81:6 82:15
84:22 88:13

89:25 114:25
115:12 120:12
120:22 123:9
130:17
**one-time** 74:13
**ones** 34:4 38:1
38:21 69:10
82:8
**ongoing** 112:20
**operating** 12:22
**operation** 8:4
11:20 12:17
**operations** 8:7
11:21
**opinion** 79:5,10
100:7 108:17
**opinions** 21:19
21:23,24 22:3
39:4 109:11
125:21
**opportunity**
6:19 115:1
120:22 129:11
**oppose** 129:16
**opt** 130:10
**ORAL** 1:9,15
134:10
**order** 1:23 41:21
61:18 117:3
**orientation**
48:11
**original** 135:11
**originally** 49:4
**outcome** 135:17
**outside** 79:24
109:4
**oversee** 8:4,11
8:14,18 12:13
**oversees** 46:16
92:13
**oversight** 13:8

**P**

**P.L.L.C** 2:10
**p.m** 1:19 88:5,8
124:17,20
131:23,25

**page** 3:2,12 22:7
32:24 33:2,4
33:10 34:4,24
37:1,16 38:4
38:19,23 39:3
39:19 43:19,24
44:7,22 45:1
45:21 47:1
54:16 68:8,21
68:25 85:22
86:2,3 96:9,11
97:13 98:9,11
108:9 126:17
132:4
**pages** 81:15 91:8
115:2 134:24
**paper** 127:19
**paperwork**
10:24
**paragraph**
85:23 121:14
122:9
**Parker** 1:21
**parking** 10:25
**part** 11:5,25
14:16 42:4
54:2 64:3 66:6
66:22 68:7,14
71:16 78:11
91:12 98:19
100:13 101:15
101:19 106:21
107:12 113:13
113:17,24
126:22 129:10
**partially** 115:22
**participate**
71:25 89:10,13
**participated**
83:5
**particular** 53:18
**parties** 135:5,14
**partner** 24:8
50:22 80:9
105:4,9,12
**party** 134:20

135:2,6
**pass** 129:22
131:15
**passing** 129:21
**people** 36:12
108:9
**person** 35:21
36:18 44:9,11
54:2 57:6
73:11 75:22
105:18 106:4
108:10 119:7
133:15
**personal** 37:16
128:8
**personally** 27:8
27:10 86:20
130:9,24
133:12
**persons** 67:4
111:11,17
**perspective**
88:22
**Phoenix** 6:14,16
6:18,24 7:2
86:17,18,21
**phone** 39:20,22
49:19 51:14,16
51:17 57:19
58:13,15 63:14
63:20,25 64:14
64:24 73:12,14
75:22 78:8
83:11 127:21
**pictures** 34:9,21
45:5,5,7,13,19
45:21,23 97:16
97:17,20,22
98:2,9
**pilots** 45:22
**place** 41:5 93:17
**plaintiff** 1:3,17
2:2 4:14
131:20 134:4
135:11
**plans** 103:24

**please** 4:5 33:13
57:2 85:11
102:9 112:12
119:13 127:16
**point** 4:17 32:24
41:14,22 51:10
54:9 56:20
57:4 63:17
66:19,20 69:11
71:17 74:2,4
75:7 77:11,16
87:18,20 88:21
89:10 90:13
100:12 103:17
109:14 110:8
111:7,8,24
112:24 113:11
114:5 124:25
126:7,11,15,20
**policies** 12:2
19:20 50:9
77:2,6 78:18
78:20 79:1
94:22 112:17
112:23 113:12
116:22 117:1,1
121:17 122:18
**policy** 14:19,23
15:1,10,18,21
15:25 16:23
17:13,16,19
20:3,9,13,18
23:24 25:6,7
26:1 27:2
28:23 29:5
46:15,23 50:14
51:24 52:1
73:3,17,20
74:5 77:8,9,10
77:12,18 78:23
78:23 80:11,16
85:14,19 94:20
94:21,21 105:1
105:6,25 106:9
106:16 107:5,6
107:9,10,16,21

Case 3:17-cv-02278-X   Document 263-6   Filed 06/13/22   Page 47 of 54   PageID 8880
CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 148

108:4,20 109:9
109:12 113:8,8
113:9 116:6
122:11,14,16
122:16 125:16
125:17
**political** 21:18
27:17 98:19,21
**portion** 115:19
115:24
**position** 5:19,24
6:5 8:1 117:17
130:24
**positive** 67:14
**possibility** 25:18
73:2 104:1
112:18
**possible** 92:22
96:14 105:17
**possibly** 16:4,9
18:4 23:19
24:11 27:12,25
29:10 36:3
43:17,21 45:22
51:23,25 52:15
57:17 73:16
75:24 110:3,24
111:4 122:5
**post** 25:11 33:21
38:18 42:1
98:15 126:16
**posted** 41:9 98:2
107:24
**posting** 97:13
98:21
**posts** 31:12,17
34:1,2,13,20
37:11,15,17,19
37:21,22 38:16
43:14 45:2,4
46:14 52:25
54:20,22 58:18
58:25 68:19
69:3,7,13
83:18,19,21,24
97:14 108:8

109:5 126:9,17
**potential** 25:8
78:21
**preference** 72:3
**preliminary**
39:24
**prepared** 65:25
**preparing** 4:24
135:11
**present** 2:20
81:14 83:12
101:8
**presented** 101:3
101:5,15 102:1
107:17
**presenting**
101:24
**president** 40:10
40:16,22 60:2
60:8
**pretty** 42:2
54:19 75:23
108:21 110:18
**print** 41:3
**printed** 45:20
55:7
**prior** 20:6 32:20
34:10 57:12,19
57:24 58:2,5
59:12 64:9
69:11,17 74:17
76:1 94:1
122:22,25
123:18 125:6,9
**private** 68:20
69:4,6,8
**privilege** 114:13
**privileged**
102:14 126:4
**pro-choice**
130:25 131:6
**pro-life** 96:5,12
130:22,25
131:1,3,9
**probably** 18:3
23:1 55:25

87:19 88:24
**problem** 34:14
**Procedure** 1:22
**proceed** 31:7
79:5,11
**proceeding**
79:13 135:15
**proceedings** 4:1
125:19,22
131:25
**process** 55:2
90:14 114:4
126:23 130:18
131:10
**processes**
101:24
**produce** 82:4
102:15
**produced** 1:16
121:9 128:22
**production**
129:7,8,10
**proofread** 119:7
**protected** 47:10
48:5,7,13,18
49:6,7,11 50:4
50:5,8
**protocol** 66:22
**proved** 133:13
**provide** 108:7
**provided** 128:16
**provisions** 1:24
**PUBLIC** 133:23
**purpose** 133:18
**pursuant** 1:22
134:18 135:3
**put** 12:15 41:3
55:7 68:21

_____
**Q**
**question** 5:5,6
26:19 31:7
44:14 60:4
68:6 69:1
76:10 80:8
86:6,9 99:8,13
102:5,13 104:8

107:7 109:22
114:6 116:8,20
**questions** 4:15
4:22 68:15,17
88:11 102:9
114:1 124:22
130:1 131:19
**quick** 31:5 130:1

_____
**R**
**race** 48:10 50:12
**raise** 87:2,5
**raised** 32:19
53:20 129:6
**ran** 119:4
**reach** 43:4 75:3
75:6,12 105:4
107:19
**reached** 41:12
46:21 49:9
53:5 54:3
70:14,16 75:17
100:24 106:11
**reaching** 47:14
49:15 50:19
51:1 107:3
123:7
**reaction** 106:19
**read** 5:9 19:3,4
19:5,7 70:6
89:25 112:11
115:1,11 133:1
**readily** 98:8
**ready** 95:25
**real** 31:4 39:16
**really** 21:25
46:22
**reason** 23:21
41:4 97:8
114:13 132:4
**reasons** 19:18
52:12,14,21,24
85:13 107:14
134:24
**recall** 10:2 11:22
14:20 15:20
16:10,15 17:11

17:12,15 18:12
18:15 20:15,16
20:20,22,25
21:4,5,10,13
21:15,20 24:25
25:4 26:5,7,8
26:10,12,16,18
26:20 27:7,15
27:23 28:6,19
28:22 29:16
30:12,16,20
35:2,3,5,10
36:4,9,13
43:14 45:17
48:20 51:15
52:12 53:1,22
53:22 55:11,17
57:15,17,21
59:15 61:14,25
62:6,14,15,17
64:20,21 66:17
68:5,17 69:9
69:14 71:9,12
72:9 75:7,23
76:5,6,13,17
78:7,14 79:2
79:22 83:23
89:18 91:3
92:17,19,21
94:6 95:20
96:15 99:17
103:2,14,21,22
108:16 109:4
109:10,13,25
110:4 117:3
125:23 126:10
**receipt** 134:22
**receive** 22:12
32:7 40:23
41:1,7 48:1
**received** 33:23
43:9 55:4
102:16 116:15
127:17 128:24
**receives** 47:18
**receiving** 32:20

Page 149

41:17 42:18
116:17 117:2
117:18
**Recess** 56:17
88:6 124:18
**recognition** 8:8
**recognize** 19:12
31:25 33:16
47:5 60:15
63:5 65:10
81:9,15 84:24
90:3 112:7
115:15 120:25
121:13
**recollection**
63:17
**recommend**
124:24
**recommendati...**
107:15
**recommendati...**
104:3 125:4
**record** 1:24 4:3
5:7 56:15,19
88:4,8 124:16
124:20 128:20
129:6 131:23
134:17 135:5
**recorded** 82:22
82:25
**records** 15:9
**redacted** 114:7
114:9
**redactions**
114:19
**REED** 2:16
**refer** 7:20 81:5
117:22
**referenced**
63:21 64:1
68:21 86:11
97:18
**references** 85:24
86:7,25
**referencing**
37:22

**referred** 34:4
**referring** 7:19
7:20 34:8,20
36:17 75:4
82:10 98:16
99:25 122:5,19
**refers** 68:10
**refresh** 19:23
63:17 99:5
**refreshing** 99:10
**regarding** 1:23
32:6 83:18
85:25 86:8
87:1 125:22
126:1
**region** 15:17,18
17:20 22:13
23:15 24:15
25:2
**Registration**
135:22
**regret** 96:12
**reinstatement**
86:1,9 87:2
**relate** 127:16
**related** 100:3
135:14
**relations** 15:15
24:6,8 43:1,21
46:9,16,17
47:9,12,15,18
47:20 49:9,18
49:19,25 50:22
50:23 51:1
54:11 58:6,8
71:2,2 72:12
72:13 73:22
76:9,11,19
100:18 104:23
107:25 108:3
108:10,15
110:9,12
111:22,22,25
115:19 116:12
119:19,23
**relationship**

6:21
**relayed** 94:5
**religion** 50:12
**religious** 24:23
25:3 30:10,15
30:18,23 96:19
130:21 131:9
**remember** 21:25
22:9 30:1
31:18 32:10
35:4,11,22
39:23 40:8
41:19,21,23
44:2 45:9,18
45:22 46:7
53:18 58:21
59:11,19,23
60:10 61:12
62:19,22 64:17
64:18 66:20
69:1 70:11
73:9,10,14,15
79:18 80:5,7
90:4,25 93:25
94:8,22 95:3
97:20 98:5
99:2,9 101:19
103:2 104:5,6
104:9,18
105:15 106:18
109:17,19
110:7,13,15
111:3 112:1
119:24 120:17
121:6,7,8,11
121:21 123:19
123:20,22
126:14,21
**Remotely** 1:12
134:12
**remove** 126:13
**removed** 114:12
**render** 61:2
**rendered** 125:11
**reopen** 128:13
129:3,16

**rep** 66:16 100:9
125:8,14
**repeated** 85:17
85:24 86:7,25
**report** 6:15 8:24
9:2,4,6,9 10:5
10:6,22 13:17
97:4,6 111:11
111:16,20,21
112:2 113:14
116:9
**reported** 1:12
1:20 9:15,23
26:1,13,21
31:11 111:24
134:12
**reporter** 4:5,24
**Reporter's** 3:8
134:9
**reporting** 10:9
10:12 11:14
135:23
**reports** 10:4
25:15
**represent** 4:13
92:2 93:23
114:18 126:18
**representation**
57:2,3 69:23
70:7 91:16,21
**representative**
56:22 66:10
67:2 91:19
92:8,9,12,15
92:20,23 93:3
93:8,19
**representatives**
67:3
**represented**
57:10
**representing**
92:6
**represents** 69:19
**request** 25:2
30:11 62:7,10
62:14,18 82:5

85:8 91:2
126:25 127:7
127:14 129:13
129:16
**requested**
134:20 135:1
**requests** 121:10
**required** 11:14
91:23
**requirements**
118:22,25
119:5
**research** 43:22
103:25
**reserve** 128:12
129:3 131:19
**resource** 11:17
24:7 106:25
107:2
**resources** 10:25
24:2,4 80:9
105:4,8,11
106:3,7 111:23
**respect** 130:22
131:5
**respond** 54:24
**responding**
102:8
**response** 58:19
78:2 82:5
102:5 121:9
124:3
**responsibilities**
8:3 12:1,12
14:17
**responsive**
126:24 127:2,9
127:13 128:2
**result** 16:16,18
129:15
**resulted** 16:13
17:10 18:13,16
28:3,20 29:18
95:7
**retaliation** 16:24
116:6 122:12

Case 3:17-cv-02278-X   Document 263-6   Filed 06/13/22   Page 49 of 54   PageID 8882
CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 150

returned 134:22
  134:23
revealing 102:14
review 18:19
  31:21,22 33:4
  34:25 47:3
  60:13,19 63:3
  81:6 95:23
  115:12 120:13
  120:21,22
  129:9,11
reviewed 19:10
  31:24 33:12
  38:6,7 84:22
  95:23 102:25
revising 119:12
revisions 70:4
Rhea 10:17 66:2
  66:3,6 67:11
right 2:3 7:4
  8:21 11:25
  24:21 25:24
  26:25 27:18
  28:12 32:10
  34:18 36:25
  39:18 42:15,20
  44:17 45:22
  46:8 48:20
  49:17 50:2
  54:8 56:13
  57:12 59:16
  62:16,20 66:14
  67:1,6 68:23
  70:13 76:7
  77:21 78:11
  81:22 87:21,23
  88:10 91:5
  94:2 95:21
  100:23 114:6
  114:16,23
  115:15 120:20
  124:14,21
  128:10,12
  129:3
rise 85:18
Road 2:4

roles 12:11
roughly 8:20
  110:15
Rule 134:18
rules 1:22
  121:16,18,19
  121:24
rumors 35:11,15
  36:2
running 12:17
  118:21

————— S —————
S 2:10 3:14,16
Saturday 128:25
saved 128:4
saw 68:24
saying 36:9 65:5
  96:15 113:23
  120:7
says 37:3 39:3
  41:12 63:13
  85:5,24 86:7
  92:1 93:22
  94:4 96:4,7,11
  97:17,19 98:14
  98:18 116:2
  121:16 122:10
Schneider 1:10
  1:15 3:4,18,20
  3:22 4:7,11
  18:20 31:6
  56:4,20 84:13
  84:17 87:10
  88:10 99:16
  102:3 119:11
  124:21 127:15
  128:22 129:19
  129:25 132:1
  133:1,6,12
  134:10,15
scratch 75:1
screen 38:8,24
  85:7
seal 133:19
search 126:23
  128:1

searched 128:5
searching
  127:12
second 83:15
  90:18 94:3
  99:19
see 9:9 18:5,18
  32:23 34:18
  38:4 39:3,7
  43:16 60:11
  63:7 65:7 81:5
  87:8,9 89:21
  91:6 95:21
  96:5 97:8,9
  98:15 108:9
  119:1 120:2,3
  123:3
seeing 111:5
seeking 46:22
  83:24
seen 47:6
send 35:24
  102:24 122:21
  122:25
sending 47:12
  89:6 122:22
  123:12,18
  125:6,9,24
sends 117:6
senior 47:21,22
senses 92:7
sent 31:18 32:3
  37:15,17,19
  38:8,16,18,21
  38:25 39:1,9
  48:25 49:3,18
  51:10 52:3,4
  54:20 58:18
  60:19 68:19
  69:4,7 74:15
  74:22 82:15
  84:18 85:8
  113:24 117:7
  123:4 125:11
separate 6:22
  120:19

sequence 83:20
service 11:7
set 12:7 43:4
  53:11,16 63:14
  64:14,23,24
  70:20 77:1
  94:16
setting 52:16
  94:7
seven 28:13
  60:22,24,25
  61:1,5,9 62:2
sexual 16:24
  48:11 50:15,15
  51:24 52:1,9
  73:3 78:22
  104:25 111:4
  116:5 117:1
  122:11
shared 15:14
  101:22 127:10
sharing 79:7
short 56:7 124:9
shortly 41:17
shot 38:8
shots 38:24 85:7
showed 45:2,16
  45:17
showing 33:21
  55:12
shown 97:17
shows 34:16
  39:15 97:17
  99:10
shy 55:21
signature 3:7
  132:3 133:2
  134:19,24
Similarly 5:2,5
simply 42:4
  48:19 54:19
  55:13 72:7,18
  77:24 102:18
  108:7 127:18
Sims 9:2,4,11
  59:10 104:17

122:21 123:7
  123:14 125:21
Sims' 9:13
sir 84:15 115:7
  125:10
sit 11:8
situation 14:1
  81:4
situations 26:12
  62:17
six 18:4,5,8,10
  18:11,13 23:19
slightly 99:15
smaller 23:13
SMITH 2:16
smoothly 12:17
social 14:18,22
  15:1,9,18
  17:13,16,16
  19:24 20:3,8
  20:17 21:8,11
  21:16 23:24
  25:6,7,11,20
  26:1,14,22
  27:2 28:17,22
  29:5 46:19
  77:9,12,17,19
  78:22 83:18
  94:20 98:22
  107:5,20 108:4
  108:20 109:9
  112:19 113:7
  122:16 125:16
society 27:18
solely 8:24
solid 108:21,23
  109:2
somebody 43:15
  54:21 72:8
  76:19
Sonya 9:15,17
  59:7 104:20
  122:20
soon 45:24
  103:18 109:25
  110:4 117:18

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 151

sorry 13:6 29:14
  31:21 33:7
  35:6 42:16
  64:25 67:4
  70:23 75:5
  78:8 80:18
  89:7 102:7,23
  120:18
sort 13:14 25:12
  26:14 51:4
  68:24 76:16
Sounds 56:14
Southwest 1:5
  2:14 4:16 5:14
  5:16,20 6:12
  7:5,10 8:5 12:1
  16:23 17:13,16
  19:21 22:8
  25:14,19 30:18
  30:21 36:18
  40:14 45:3,6
  45:20,22 68:12
  68:24 97:15,19
  98:19 102:12
  105:25 112:17
  126:13,18
  127:20,23
  134:6
Southwest's
  15:21 20:8,12
  20:17 122:11
space 11:5
  114:17
span 85:9
speak 36:12
  76:7,10 89:7
  92:22,24
speaking 13:6
  76:13 107:8
specific 29:3
  32:24 34:1,2
  34:13,20 37:17
  41:21 52:12,14
  68:17 75:11,15
  80:7 86:2
  90:24 97:2

107:10 111:13
  117:21
specifically 10:2
  11:24 15:15
  20:21 23:5
  27:7 28:19
  29:22 36:14
  37:11 38:12
  44:2 45:9
  53:23 63:6,22
  70:12 71:16
  72:9 75:23
  78:7 87:3,4
  91:4 92:21
  94:8 98:3
  101:18 103:21
  105:15 106:1
  106:14,18
  107:8 111:3
  113:1 119:24
  121:6
specifics 21:25
  28:4 36:4
  55:11 61:12
  64:17 68:22
speculation 27:5
  30:25 44:24
  52:11 74:19
  109:1
spoke 53:12
spoken 93:1
Springfield 2:5
Spurlock 2:21
staff 8:9
stage 79:3 94:12
  94:13
start 22:16 42:6
  42:12,17 77:17
  90:14
started 66:21
starting 42:10
starts 98:14
state 1:20,23
  129:5 133:8,24
  134:13
stated 1:24

38:20
statement 97:12
  98:13
statements 45:6
states 1:1 91:15
  134:1
stenotype 1:21
step 80:2 83:15
  125:18,22
Stephensen 3:14
  3:16 6:19 7:1
  32:4,12 37:16
  37:23 38:15
  39:21 43:8
  49:4 59:18,22
  63:11 88:18,20
  88:23 89:1
steps 34:1 42:22
  42:23 50:19
  58:21 70:18
  71:9 100:17
Steve 9:12
Stone 3:15,24
  32:4 33:21
  35:8 37:8 38:9
  38:17,18,22,24
  39:1,9 40:1,4,7
  40:9 43:4 49:3
  50:20 51:2
  52:3,5 53:5
  58:18 59:25
  64:6 67:17,19
  69:25 74:8,14
  74:22 75:6
  85:3 88:20,22
  107:18 109:16
  109:18,20
  117:8
Stone's 53:15,21
  54:12,18 55:10
  55:15 57:14
  71:18 86:10
stop 87:12
stopping 87:18
  87:20
Street 2:11,17

135:23
strictly 49:21
subject 37:6
subscribed
  133:16
subsequent
  85:25 86:8
  87:1
substantive 93:8
Suite 2:4,16
Sullivan 92:2
  93:22,24
supervisor 8:22
  9:10,14,21,25
  10:3,6 11:23
supervisors 8:10
  9:7 10:4,11
  11:10,11 12:13
  12:15,19
supported 111:4
  115:25
supports 115:22
supposedly
  38:21
sure 5:2,6 8:6
  11:13 12:10,16
  15:3,7 17:18
  18:25 20:21
  23:20 28:4,5
  31:15 33:14
  43:9 49:15,16
  55:24 57:17
  58:22 59:20
  65:4 67:13
  68:4 70:6
  75:24 81:3
  83:20 84:5
  86:18 91:13
  101:14 103:3
  103:17 110:18
  111:5 112:12
  112:24 113:22
  113:23 118:22
  119:3,4,15
  123:16 124:10
surprised 54:20

surrounding
  21:17
suspect 49:11
suspended
  23:11
suspension 23:8
Suzanne 6:19
  7:1 32:4,12
  37:3,4,13,15
  37:23 38:15
  39:20 41:20
  43:8 44:3 49:3
  59:18,22 63:10
  63:13 85:6
  88:18,20,23
  89:1,4,9,13,13
  117:6,7,9
SWA0004421
  3:16
SWA004226
  3:15
SWA004633
  3:18
SWA004675
  3:20
SWA004711
  3:22
swear 4:5
switch 87:8
sworn 1:17 4:8
  134:15
synopsis 112:13

        T

take 9:17,24,25
  10:21,24 11:2
  11:8 42:22,24
  55:22 56:12
  63:23 71:22
  72:8 82:1,3,6
  82:12 84:21
  87:11 120:21
  124:9 126:8
taken 1:17 8:7
  135:5,15
taker 82:7,9
takes 93:17

Bradford Court Reporting, LLC972.931.2799    www.Bradfordreporting.com

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

**Talbert** 86:12
  86:16 99:22
  100:2,9
**Talbert's** 85:25
  86:8 87:1
**talk** 5:3,4 36:5
  50:23 51:16
  53:13,19 55:9
  57:4 72:14
  103:5 125:7
**talked** 38:15
  41:19 63:13,18
  73:7 79:9
  101:10 105:17
**talking** 23:5
  29:19 33:5
  42:12 53:23
  56:23 57:19
  92:19 94:18
  99:11 102:18
**team** 12:14 13:1
  24:14,19 68:11
  68:11 96:25
  97:1,5
**teleconference**
  67:7
**Telephone**
  135:24
**tell** 19:17,20
  37:13 42:3,6
  56:25 58:14
  64:15 66:17
  69:2 72:16,22
  73:1,19 76:24
  77:2,22 105:22
  109:2 114:10
  121:2 123:23
  128:21
**telling** 73:14
**tells** 114:2
**ten** 10:13 15:5,6
  17:4,6,22,24
  23:19 55:22
  56:12 124:10
  124:12
**term** 36:16

122:2
**terminate** 13:20
  14:18 95:14
**terminated** 6:2,5
  18:6 19:18
  20:3 23:16,21
  95:19 122:17
**termination**
  3:13,25 16:13
  16:16,19 17:10
  18:16 19:15
  23:9 69:12
  85:25 86:8
  87:1 95:8,10
  117:20,25
  118:16,17
  121:3,5 125:7
  125:17,24
  126:19
**terminations**
  19:24
**testified** 4:8
  98:25
**testify** 54:15
  102:4 119:13
**testimony** 20:6
  34:11 58:5
  134:17 135:4
**Texas** 1:1,20
  2:11,17 134:2
  134:14 135:21
  135:24
**Thank** 114:21
**thanks** 124:5
**themes** 103:22
**therefor** 134:25
**thing** 79:12
  107:22
**things** 12:20
  22:9 39:16
  42:21 48:15,21
  50:9 99:21
**think** 16:4,8
  22:18 26:23
  29:10 39:8
  42:20 46:3,8

47:24 48:17
  50:18 74:10
  76:18 85:10
  86:17 87:22,25
  89:21 91:5,15
  91:25 96:10
  97:15 99:14,24
  117:13 124:8
  128:11
**thinking** 87:16
**thorough** 101:14
**thought** 51:5,18
  52:8 55:2
**thoughts** 47:9
  48:5 50:3
  101:23
**three** 5:25 10:10
  10:14 12:15
  96:10
**time** 4:4 10:3
  11:14 26:24
  28:21 37:9
  38:1,15 44:19
  47:14 49:20,23
  50:24 52:15
  53:7,10 60:19
  61:13 62:3
  63:17,19 66:15
  67:20 74:21
  83:21 86:18
  87:24 90:7,12
  90:23,25 92:17
  98:5 102:6
  104:8 110:13
  117:21 118:14
  118:15 123:1
  129:1,6,14
  130:14 131:19
  135:4,6,6
**times** 14:6,10,10
  53:17 93:5
  99:13
**timing** 129:7
**today** 4:15 130:2
**Today's** 4:3
**told** 52:18 66:14

**tomorrow** 63:14
**Toni** 62:21,24
  117:10,12,13
**top** 83:2
**topics** 99:1
**TOPS** 41:12
**total** 23:14
**touch** 96:15
**town** 91:24
**transcript** 4:24
  134:16,23
**transpired**
  113:23
**Transport** 1:6
  2:8 4:16 7:20
  134:6
**treated** 130:5
**trial** 131:19
**tried** 55:3
**trouble** 120:17
**true** 37:19 133:3
  134:16
**try** 5:4 43:4
**trying** 35:5 49:8
  99:12 128:25
**Tuesday** 118:8
**turn** 39:19
**turning** 25:10
  36:25
**two** 6:22 16:4
  27:12,16 61:15
  85:9 91:3,7
  92:7 116:25
  125:18,22
**TWU** 5:13 7:19
  40:20,22,23
  41:1,5,7 91:17
  92:12
**type** 8:8 10:25
  12:20 24:12
  25:11 50:8,15
  79:12

_____

**U**

**uh-huhs** 5:1
**understand** 7:19
  9:8 26:19

36:15 60:4
  92:5 119:3
  128:23 130:3
  130:20
**understanding**
  55:1
**Understood**
  129:18
**uniform** 45:23
  97:18
**union** 1:6 2:8
  4:17 7:12,15
  7:18,21,24
  25:25 26:13,21
  35:19 36:6
  56:22 57:1,2,4
  60:2,7 61:16
  61:21,23 62:4
  62:7,10,14,18
  66:9,15 67:2
  68:12 90:13
  91:16,18,21
  92:7,8,23 93:3
  93:7 100:9
  125:8,14 130:7
  130:10,13
  134:6
**union's** 61:18
**UNITED** 1:1
  134:1
**unwilling** 62:4
**updated** 89:17
**use** 18:23 36:16
  39:11,14 63:23
  113:18 128:3
**useless** 128:6
**Usually** 25:10
**utilize** 24:2,5

_____

**V**

**V** 4:15
**vaginas** 116:1
**vague** 24:16
  27:4 60:3,9
  111:18
**vaguely** 84:25
  90:4 94:24

Case 3:17-cv-02278-X   Document 263-6   Filed 06/13/22   Page 52 of 54   PageID 8885
CONFIDENTIAL VIDEOTAPED DEPOSITION OF ED SCHNEIDER

Page 153

**Vegas** 6:20
  31:19 37:8
  88:23,24 117:8
**verbal** 4:25
**Verbally** 51:3
**version** 81:21
**vicinity** 44:16
**video** 42:2 68:11
**Videographer**
  2:21 4:2 56:15
  56:18 88:4,7
  124:16,19
  131:16,22
**videos** 116:3
**VIDEOTAPED**
  1:9,15 134:10
**view** 100:3
**viewed** 38:16
  46:14
**views** 48:14
  98:19,21
  116:13 126:18
  130:22 131:9
**violate** 29:5
  116:4 122:14
**violated** 19:21
  20:8,12,17,22
  46:23 47:10
  51:23,25 80:11
  80:13,15
  107:16 109:9
  109:12 112:22
  113:10 121:20
  121:24 122:1
  122:18 125:15
**violating** 14:18
  20:3
**violation** 16:13
  23:24 25:6,7,9
  26:2 46:15
  73:2,17 77:18
  80:16,20,21
  81:2 85:14,18
  94:22 100:20
  104:25 105:5
  105:25 106:8

106:15,17,22
107:12,20
108:3,18,19,22
112:16 116:13
116:22,25
122:10
**violations** 15:1
  15:18,24 16:23
  19:25 27:2
  28:23 46:18
  78:23 94:19
  112:19 113:12
  122:17 124:1
**Virginia** 2:5
**virtual** 128:4
**visible** 98:8
**voted** 40:15
**VP** 9:15
**vs** 1:4 134:5

**W**
**wait** 100:18
**waited** 104:23
  105:3
**walk** 11:5 36:11
**want** 19:5,6,7
  34:7 41:6
  46:12 48:4
  55:25 56:1,1
  83:15 84:21
  85:12 87:11
  89:20 98:12
  102:3 115:11
  119:3,17 124:8
  128:19 129:3
**wanted** 42:9
  49:20 50:3,11
  50:16 51:6
  54:21 68:15,18
  72:19,20,22
  73:1 87:20
  88:12 91:23
**wasn't** 37:10
  49:15 67:15,22
  71:13,16 91:24
  100:2
**watch** 12:18

**watched** 42:1
**way** 5:7 27:1
  41:4,8 48:24
  51:4 80:19
  87:5 89:11,14
  96:14 107:7
  111:10 114:8
**we'll** 56:13 88:1
  124:14
**we're** 55:21
  118:14 120:3,4
  130:1
**we've** 55:20
  95:24 98:24
  128:22
**weekend** 123:21
**weigh** 50:6
**weighed** 50:16
**went** 55:2
**weren't** 28:24
**wife** 39:15
**willing** 126:16
**wings** 45:5,21
**witness** 1:16 4:6
  31:9 56:9
  87:13 102:6
  119:16 120:6
  120:18 129:11
  129:21,22
  131:15 132:1
  134:15,17
**women** 116:1
**Women's** 68:10
  68:11
**wondering**
  38:17 114:12
**word** 96:14
**work** 2:3 5:16
  6:19 7:7 44:12
  44:17 55:13
  86:21 92:18
  96:12 97:18
  121:16,18,19
  121:24
**worked** 6:18 7:4

**Workers** 1:6 2:8
  4:16 7:21
  134:6
**working** 6:21,24
  7:1 11:16,21
  103:11 118:14
**workplace** 15:21
  15:24 20:12
  22:2,6 24:24
  43:17 77:15
  107:23 108:8
  109:6 122:15
**works** 8:10
**worth** 51:5,18
  51:21 52:19
**wouldn't** 10:5
  116:18 128:5
**write** 118:17
**writing** 12:8
**written** 4:24
**wrong** 85:11
  99:25

**X**
**X** 134:20

**Y**
**yeah** 18:25 34:8
  36:15 55:24
  70:1 84:10
  86:3 104:9
  111:15 112:12
  115:4,7 124:12
  127:6
**year** 22:13,14
  23:1,12,16,20
  27:3,13,14
**years** 5:25 7:9
  7:16 28:13
  85:9
**you-all** 39:21

**Z**

**0**
**00** 135:9
**02** 135:8

**02-22-17** 3:14
**02-23-17** 3:16
**02-28-17** 3:17
**03-09-17** 3:19
**03-10-17** 3:21
**03-14-17** 3:13
**04/30/21** 135:22

**1**
**1** 31:21 34:6,7,9
  34:19,21,24
  38:4 49:1
**1,650** 8:20
**1,926** 8:15
**1:24** 88:6,8
**10** 87:17
**10:00** 1:19 4:4
**10:30** 56:3
**100** 22:20,21
**10th** 113:4
  116:16 118:5,7
**11:23** 56:16,17
**11:35** 56:17
**11:36** 56:19
**112** 3:21
**12:35** 88:1
**12:36** 88:5,6
**120** 3:25
**129** 3:5
**12th** 135:18
**13** 84:5
**132** 3:7
**134** 3:8
**14** 3:23 84:6,7
  84:11,12 88:13
**14th** 118:3,5,8
**15** 3:25 87:17
  120:4,6,10,11
**16** 8:9
**1700** 2:16
**18** 3:13 120:9,10
  120:14

**2**
**2** 3:3,13 18:19
  33:8,8 37:1
  39:19 47:1

60:12 63:2
89:21 114:24
**2:33** 124:17,18
**2:43** 124:15
**2:45** 124:18,20
**2:53** 129:24
**2:55** 1:19 131:23
131:25
**20** 84:4,10,13,14
86:3 88:13
120:3
**2016** 6:8
**2017** 6:9,10 8:16
8:19 9:4,13
10:16 14:13
28:15,19 31:13
63:16 116:16
**2020** 1:11,18 4:3
132:2 134:11
135:19
**214.642.7486**
2:12
**22160** 2:5
**23rd** 46:4,6
63:16
**24th** 65:3
**25** 23:2
**2501** 2:17

---
**3**
---
**3** 1:11,18 3:14
121:14 132:2
134:11 135:8
**3.0** 121:17
**3:17-cv-02278...**
1:5 134:5
**30** 129:12
134:22
**30(f)(1)** 134:19
**31** 3:14
**33** 3:16
**3301** 2:11
**3371** 135:21
**3500** 128:24
**38** 135:22
**3rd** 4:3

---
**4**
---
**4** 3:5,16 32:24
33:6,6
**41** 135:8
**4228** 34:24
**4232** 38:4
**4233** 3:15
**4277** 89:22,22
90:16 94:2
**4278** 91:6 92:1
**4279** 89:23 91:6
**4436** 33:3,3,10
34:16,19 37:1
**4450** 47:1
**4459** 60:11
**45** 87:21 88:1
**4635** 68:7
**4638** 3:18
**4676** 96:3
**4679** 97:10
**4680** 98:13
**469.680.4264**
2:18
**4690** 99:19
**4692** 3:20
**4712** 3:22 113:7
114:17

---
**5**
---
**5** 3:17 65:7,8
**50** 22:23 23:2
**529** 86:4
**556** 1:6 2:8 4:17
5:13 7:19,20
7:21 40:10
91:17 131:18
134:7
**5762** 114:24
115:6
**5763** 114:24
115:6

---
**6**
---
**6** 3:19 112:5
**600** 2:4
**65** 3:17

---
**7**
---
**7** 3:21 19:1
112:5 117:23
118:16 122:6
**7015** 135:23
**703.321.8510**
2:5
**703.321.9319**
2:6
**7159** 63:1
**75201** 2:17
**75226-1637** 2:11
**75252** 135:24

---
**8**
---
**8001** 2:4
**81** 3:19
**84** 3:23

---
**9**
---
**9** 81:6 87:9
95:22
**972.931.1199**
135:25
**972.931.2799**
135:24