## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER            )
                           ) CIVIL ACTION NO.
VS.                        ) 3:17-CV-02278-X
                           )
SOUTHWEST AIRLINES CO., AND )
TRANSPORT WORKERS UNION OF )
AMERICA, LOCAL 556         )

-----------------------------------
CONFIDENTIAL 30(b)(6)
VIDEOTAPED DEPOSITION OF
MICHAEL SIMS
NOVEMBER 2, 2020

-----------------------------------

ANSWERS AND DEPOSITION OF MICHAEL SIMS,
produced as a witness at the instance of the
Plaintiff, taken in the above-styled and -numbered
cause on NOVEMBER 2, 2020, at 9:06 a.m., before
CHARIS M. HENDRICK, a Certified Shorthand Reporter
in and for the State of Texas, witness located in
Midlothian, Texas, County of Ellis, pursuant to the
Federal Rules of Civil Procedure, the current
emergency order regarding the COVID-19 State of
Disaster, and the provisions stated on the record
or attached hereto.

## Page 2

1           A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3      MR. MATTHEW B. GILLIAM
       NATIONAL RIGHT TO WORK LEGAL DEFENSE
4      FOUNDATION, INC.
       8001 Braddock Road, Suite 600
5      Springfield, Virginia  22160
       (703) 770-3339
6      mbg@nrtw.org
7
     FOR THE DEFENDANT, SOUTHWEST AIRLINES CO.:
8
       MR. MICHAEL A. CORRELL
9      REED SMITH LLP
       2850 North Harwood, Suite 1500
10     Dallas, Texas  75201
       (469) 680-4264
11     mcorrell@reedsmith.com
12
     FOR THE DEFENDANT, TRANSPORT WORKERS UNION OF
13   AMERICA, LOCAL 556:
14     MR. ADAM GREENFIELD
       LAW OFFICES OF CLOUTMAN & GREENFIELD, PLLC
15     3301 Elm Street
       Dallas, Texas  75226
16     (214) 939-9223
       agreenfield@candglegal.com
17
18   ALSO PRESENT:  MR. MACK SPURLOCK -
                    VIDEOGRAPHER
19
       MS. CHARLENE CARTER
20     MS. LAUREN ARMSTRONG
       MR. CHRIS MABERRY
21
22
23
24
25

## Page 3

1              INDEX
2    Appearances ....................................2
3    MICHAEL SIMS
4      Examination by Mr. Gilliam................6
5      Examination by Mr. Correll.............230
6
7    Signature and Changes.....................235
8    Reporter's Certificate....................237
9
10             EXHIBITS
11   Exhibit 1 - ...............................70
     Southwest Airlines Policies, Document 11
12
     Exhibit 2 - ...............................72
13   Termination Letter, Document 7
14   Exhibit 3 - ..............................126
     Email to Suzanne Stephensen from Audrey Stone,
15   Document 1
16   Exhibit 4 - ..............................135
     Email to Suzanne Stephensen from Dave Kissman,
17   Document 2
18   Exhibit 5 - ..............................157
     Email to Denise Gutierrez from Ed Schneider,
19   Document 5
20   Exhibit 6 - ..............................160
     Email to Maureen Emlet from Ed Schneider,
21   Document 9
22   Exhibit 7 - ..............................167
     Email to Maureen Emlet from Ed Schneider,
23   Document 6
24
25

## Page 4

1             EXHIBITS
2    Exhibit 8 - ..............................191
     Email to Listening Center from Listening Center,
3    Document 4
4    Exhibit 9 - ..............................206
     Email to Tammy Shaffer from Mike Sims, Document 13
5
     Exhibit 10 - .............................217
6    Email to Naomi Hudson from Kevin Allen, Document 15
7    Exhibit 11 - .............................223
     Email to Dave Kissman from Carolene Goulbourne,
8    Document 3
9    Exhibit 12 - .............................224
     Email to Joe Mendez from Sonya Lacore, Document 14
10
     Exhibit 13 - .............................224
11   Email to Inflight Labor Relations from Tammy
     Shaffer, Document 12
12
     Document - ...............................204
13   80-Carter Fourth Amended Complaint
     Document - ...............................204
14   81-SWA Answer to Carter Fourth Amended Complaint
15
     Document - ................................95
16   SWA Response to Plaintiff's Roggs
17
18
19
20
21
22
23
24
25

Page 5

```
 1              PROCEEDINGS
 2         THE VIDEOGRAPHER:  We are now --
 3  sorry.  We are now on record.  Today's date is
 4  November 2nd, 2020.  The time is 9:06 a.m. Central
 5  time.  Will counsel please -- will the court
 6  reporter please swear in the witness?
 7         THE REPORTER:  This deposition is --
 8  of Michael Sims is being conducted remotely in
 9  accordance with the current emergency order
10  regarding the COVID-19 State of Disaster.  The
11  witness is located in Midlothian, Texas.
12         My name is Charis Hendrick, Court
13  Reporter, CSR No. 3469.  I am administering the
14  oath and reporting the deposition remotely by
15  stenographic means from my home in Ellis County,
16  Texas.  The witness has been identified to me
17  through counsel.
18         Would counsel please state their
19  appearances and locations for the record?  And the
20  city is fine.
21         MR. GILLIAM:  This is Matthew Gilliam
22  for plaintiff Charlene Carter.  I'm in Springfield,
23  Virginia.
24         MR. CORRELL:  Michael Correll for
25  defendant Southwest Airlines in Dallas, Texas.
```

Page 6

```
 1         MR. GREENFIELD:  Adam Greenfield for
 2  defendant TWU Local 556 in Dallas, Texas.
 3               MICHAEL SIMS,
 4  having been first duly sworn, testified as follows:
 5               EXAMINATION
 6  BY MR. GILLIAM:
 7    Q.  Good morning, Mr. Sims.  Did you already
 8  do the oath?  I am sorry.  Okay.  Good morning,
 9  Mr. Sims.  My name is Matt Gilliam and I am the
10  attorney representing plaintiff Charlene Carter in
11  this case.  I am here today to ask you some
12  questions about Carter v TWU Local 556 and
13  Southwest Airlines Company.  This is a Rule
14  30(b)(6) deposition of defendant Southwest
15  Airlines; that's your understanding as well?
16    A.  That is correct.
17    Q.  Okay.  And you are the designated
18  representative of defendant Southwest Airlines
19  Company?
20    A.  That is correct.
21    Q.  Okay.  And because this is a 30(b)(6)
22  deposition, you understand that you are speaking on
23  behalf of the company, Southwest Airlines, and not
24  on your personal behalf?
25    A.  I do.
```

Page 7

```
 1    Q.  And if I say Southwest or the company, you
 2  will -- you will understand that I am referring to
 3  defendant Southwest Airlines Company?
 4    A.  I will.
 5    Q.  Okay.  And your -- you also understand
 6  that you are speaking on the knowledge of
 7  potentially being briefed on the collective
 8  knowledge of Southwest and not just on your own
 9  personal knowledge?
10    A.  That is correct.
11    Q.  And you are okay with that?
12    A.  Yes, sir.
13    Q.  Okay.  If I ask a question that you feel
14  that you haven't been briefed for, don't know, will
15  you also let me know that?
16    A.  I will.
17    Q.  Okay.  And if that does happen, we can try
18  to establish who -- who would know or whether
19  someone else should be designated to fulfill that
20  role for speaking for Southwest.
21         Now, when we served the Notice of
22  Deposition on Southwest counsel, there was a list
23  of potential areas that we might be asking
24  questions about; were you shown that list?
25    A.  I was.
```

Page 8

```
 1    Q.  Okay.  And have you reviewed that list?
 2    A.  I have.
 3    Q.  Okay.  And did you review any documents in
 4  preparation for this deposition?
 5    A.  I have reviewed documents, that is
 6  correct.
 7    Q.  Okay.  And what did you review?
 8    A.  Documents that I reviewed with counsel
 9  pertaining to this matter.
10    Q.  Okay.  I mean, without telling me about
11  any of your communications with counsel, can you
12  tell me what documents you reviewed?
13    A.  Well, it's been a variety of documents,
14  including, but not limited to, termination letter,
15  fact-finding notes, emails involving this matter
16  and the like.
17    Q.  Okay.  And when you say emails involving
18  this matter, was this -- were these emails between
19  Southwest personnel?
20    A.  Emails that were supplied by counsel.
21    Q.  Okay.  Do you know if all of those emails
22  were part of Southwest production?
23    A.  Yes, as far as I know.
24    Q.  Okay.  So as far as you know, Southwest
25  did produce those documents to -- to the plaintiff?
```

Page 9

1     A. Absolutely.
2     Q. Okay. Did you review the -- the
3  Complaint, Plaintiff's Complaint and Answer?
4     A. Yes.
5     Q. Okay. And you understand Plaintiff
6  Carter's claims in this case?
7     A. I do.
8     Q. Okay. Did you have any communications
9  with any current or former Southwest employees in
10 preparation for the deposition?
11    A. I did.
12    Q. Okay. And who did you have communications
13 with?
14    A. That was with counsel.
15    Q. Apart from counsel, did --
16    A. No, no.
17    Q. Okay.
18    A. No.
19    Q. Just -- just to make sure, I --
20    A. Oh, okay.
21    Q. -- I get the question out there and I
22 understand.
23    A. Okay.
24    Q. And -- and during the deposition, we'll --
25 we'll try our best not to talk over each other. I

Page 10

1  will try not to talk over you so we can get your
2  answers clear in the record, and I can get my -- my
3  -- my questions clear in the record.
4        So apart from counsel, did you have
5  any communications with any Southwest employees in
6  preparation?
7        MR. CORRELL: And, Counsel, may I jump
8  in real quick?
9        MR. GILLIAM: Sure.
10       MR. CORRELL: Mr. Sims, you can speak
11 to who you spoke to with me and the things they
12 talked to you about as they relate to your 30(b)(6)
13 topics. Please do not communicate my
14 communications with you.
15       THE WITNESS: Okay.
16       MR. CORRELL: So it is okay to
17 disclose the names of the people that you spoke to
18 and the topics that you addressed with them for
19 Mr. Gilliam.
20       THE WITNESS: Okay.
21    A. So beginning with Meggan Jones, Ed
22 Schneider, Linda Rutherford, Melissa Ford, Tammy
23 Shaffer. I believe that is it.
24    Q. (By Mr. Gilliam) Okay. And what did you
25 discuss with Meggan Jones?

Page 11

1     A. Meggan Jones was part of the termination,
2  so we discussed that process. Also, same with Ed
3  Schneider.
4     Q. Okay. And how -- how long was your
5  conversation with Meggan Jones?
6     A. Roughly, one hour, give or take.
7     Q. Okay. And about how long, roughly, was
8  your conversation with Mr. Schneider?
9     A. It was part of the same conversation;
10 roughly, about an hour.
11    Q. Okay. Okay. So you-all -- all talked
12 together?
13    A. That's correct.
14    Q. Okay. Was anyone else present?
15    A. Counsel.
16    Q. Okay. All right. And what aspects of the
17 termination process did you-all discuss?
18    A. The process itself that Southwest Airlines
19 employs and the fact-finding and portions of the
20 case.
21    Q. Okay. And what were your communications
22 about the fact-finding?
23    A. That there was a report that -- a claim
24 that Ms. Carter was harassing another employee.
25 And as a result, a fact-finding process commenced.

Page 12

1     Q. Okay. And did you discuss how that
2  fact-finding process began?
3     A. Yes.
4     Q. Okay. And how did that fact-finding
5  process begin?
6     A. There was a claim made by Audrey Stone to
7  her local base manager in Las Vegas; that manager
8  pressed the -- pushed the matter forward to the
9  local base where Charlene was based, which was
10 Denver; and that's how the case began.
11    Q. Okay. And do you recall the name of the
12 Las Vegas base manager?
13    A. Suzanne Stephensen.
14    Q. Okay. All right. And subsequent to the
15 beginning of the fact-finding process at the local
16 Denver base, what subsequent steps in the
17 termination process did you discuss?
18    A. I am so sorry. I haven't understood the
19 question.
20    Q. Yeah. Sure. If -- if you need me to
21 repeat any question, just let me know and I will do
22 my best to -- to try to repeat it so that you do
23 understand.
24       So after the -- I guess, after the
25 Denver base got involved, what was the next step in

Page 13

1  the fact-finding process that you discussed with
2  Meggan -- Meggan Jones and Ed Schneider?
3      A.  Well, the actual fact-finding process was
4  the base reaching out to Charlene Carter, advising
5  her that they would like to conduct a meeting with
6  her to hear her point of view as to what happened.
7  She had a meeting with her base leaders.
8      Q.  Okay.  And did the investigative team, I
9  guess, have any additional conversations with --
10  with anyone else as part of their fact-finding?
11     A.  There was a employee relations -- which is
12  a separate entity at Southwest Airlines --
13  interview that took place with Audrey Stone.  And I
14  do want to correct something very quickly.  I did
15  have a discussion with Denise Gutierrez, who was
16  the employee relations leader at that time that
17  conducted that investigation.
18     Q.  Okay.  And when you say employee relations
19  is a separate entity, what do you mean?
20     A.  Employee relations is a department in --
21  within Southwest Airlines that reports to general
22  counsel; that conducts investigations regarding
23  Southwest Airlines' harassment policy, among
24  others.  And it is separate from other departments
25  and we're not always privy to those investigations

Page 14

1  to keep them independent.
2      Q.  And what -- I guess, what's the objective
3  in keeping the employee relations group's
4  investigations independent?
5      A.  To ensure fairness.
6      Q.  Okay.  To -- fairness to a particular
7  group?
8      A.  Any -- any party that is involved in -- in
9  an employee relations investigation.
10     Q.  Okay.  All right.  And did employee
11  relations investigate all aspects of the
12  allegations that were brought forward against
13  Ms. Carter?
14     A.  They were party to the investigation --
15     Q.  Okay.
16     A.  -- with Ms. Carter.
17     Q.  Did they -- did they -- did they have the
18  -- scratch that.
19         Were they -- were they in charge in
20  any particular aspect of the investigation?
21     A.  No.  Not in this instance.
22     Q.  Okay.  And a little bit earlier when we
23  were talking about the communications you had with
24  Southwest employees in preparation for this
25  deposition, you mentioned Melissa Ford?

Page 15

1      A.  Correct.
2      Q.  And what -- what is her position with
3  Southwest Airlines?
4      A.  Melissa Ford is director of corporate
5  communications and outreach.  She reports to -- up
6  to Linda Rutherford, who is senior vice president
7  of corporate communications and outreach.
8      Q.  Okay.  And what does the department of
9  corporate communications and outreach do?
10     A.  It is our public relations or corporate
11  communications that handle all external messaging
12  for Southwest Airlines.
13     Q.  And did you speak with -- well,
14  scratch that.
15         Did you -- I guess, did you have a
16  meeting with Melissa Ford and Linda Rutherford at
17  the same time?
18     A.  Correct.
19     Q.  Okay.  And how long did that meeting last?
20     A.  It was a short meeting, about 20 minutes.
21     Q.  Okay.  And what did you discuss with them?
22     A.  We discussed Southwest Airlines messaging
23  during the Trump inauguration festivities;
24  specifically, the women's march that took place on
25  January 20th, 2017.

Page 16

1      Q.  Okay.  And were -- at the meeting, were
2  they mainly speaking to you or were you speaking to
3  them?
4      A.  It was a dialogue.  So having some
5  questions and they answered them.
6      Q.  Okay.  What were some of your questions?
7      A.  Specifically, did Southwest Airlines
8  receive customer complaints or inquiries regarding
9  the matter of turning the cabin lights in our
10  aircraft pink.  And then did Southwest Airlines
11  endorse or support the women's march that took
12  place on January 20th.
13     Q.  And did they tell you whether or not
14  Southwest did receive complaints about the cabin
15  lights?
16     A.  There were a few complaints and media
17  inquiries.
18     Q.  Okay.  And what were the media inquiries
19  that took place about the cabin lights?
20     A.  It's my understanding it was media
21  entities reaching out to Southwest Airlines for
22  comment -- for official comment.
23     Q.  Did Southwest ever provide an official
24  comment to those --
25     A.  Yes.

Page 17

1    Q.  Okay.  And what was Southwest's official
2  comment?
3    **A.  The gist of it was we were not supporting**
4  **or encouraging or underwriting, if you will, the**
5  **event.  We were very neutral.**
6    Q.  Okay.  And when you say the event, do you
7  mean turning the cabin lights pink or turning -- or
8  the women's march?
9    **A.  Both.**
10    Q.  Okay.  All right.  Did you have any other
11  questions for them?
12    **A.  No.**
13    Q.  Okay.  Did they have any questions for
14  you?
15    **A.  No.**
16    Q.  Okay.  You also mentioned that in
17  preparation for today's deposition, you spoke with
18  Tammy Shaffer; is that correct?
19    **A.  That is correct.**
20    Q.  And what did you speak to Ms. Shaffer
21  about?
22    **A.  Ms. Shaffer, that was just a very brief**
23  **conversation regarding to ensure we had records and**
24  **such from labor relations.**
25    Q.  Okay.  And were those records that you

Page 18

1  just referred to, were those all records that
2  Southwest produced to --
3    **A.  That is correct, to my understanding.**
4    Q.  Okay.  And you only had one meeting with
5  Tammy Shaffer?
6    **A.  That is correct.**
7    Q.  Okay.  Did you only have one meeting with
8  Meggan Jones and Ed Schneider?
9    **A.  Yes.**
10    Q.  Okay.  And only one meeting with Melissa
11  Ford and Linda Rutherford?
12    **A.  Yes.**
13    Q.  Okay.  All right.  And let's see.  You
14  said your meeting with Tammy Shaffer was very
15  brief.  Roughly how long?
16    **A.  Less than 10 minutes.**
17    Q.  Okay.  All right.  And you also had a
18  meeting with Denise Gutierrez; is that correct?
19    **A.  That is correct.**
20    Q.  Okay.  And what did you-all discuss?
21    **A.  Her role.  She's a former employee, so she**
22  **was part of the employee relations portion of the**
23  **investigation.  So we discussed Charlene Carter and**
24  **that aspect to the claims.**
25    Q.  Okay.  And what did you discuss about

Page 19

1  Charlene Carter?
2    **A.  That she was -- went through a**
3  **fact-finding process with Denise as an entity to**
4  **that.  And that Denise just confirmed that she was**
5  **part of it, the investigation.**
6    Q.  Okay.  Did you have any questions for
7  Denise?
8    **A.  No.**
9    Q.  Okay.  And did you only have one meeting
10  with Denise?
11    **A.  That is correct.**
12    Q.  Okay.  How long did that meeting last?
13    **A.  Approximately 20 minutes.**
14    Q.  Okay.  All right.
15    MR. CORRELL:  And, Counsel, before you
16  move on, there is several other names that Mr. Sims
17  has not mentioned so far.  If you'd like, I can
18  give them to you now so you can examine him or I
19  can tell him at a break so he can modify his
20  answer.  It's just a 30(b)(6), I just wanted to be
21  efficient as you like it.
22    MR. GILLIAM:  I -- I appreciate that.
23  Yes, let's go ahead and discuss those now.
24    MR. CORRELL:  Sure.  So, Mr. Sims, you
25  -- again, you are under oath and testifying to your

Page 20

1  own truthful recollection, but the other names I
2  have are Lisa Goode, Brooks Thomas, Nancy Cleburn,
3  Aubrey Wilson, Maureen Emlet and Brendan Conlon
4  were all additional individuals with whom you spoke
5  to prepare for your deposition.  And if that is
6  correct, in your recollection, please feel free to
7  answer Mr. Gilliam's questions.
8    **A.  That is correct.**
9    MR. GILLIAM:  Okay.  And I think I
10  missed a name there.  Lisa Goode, Brooks Thomas,
11  Brendan Conlon, Maureen Emlet and who else?
12    MR. CORRELL:  Two more.  Nancy Cleburn
13  and Aubrey Wilson.
14    Q.  (By Mr. Gilliam)  Okay.  Okay.  And,
15  Mr. Sims, who is Lisa Goode?
16    **A.  Lisa Goode is a director in our corporate**
17  **communications department, but she provides**
18  **leadership to the Southwest Airlines social media**
19  **team.  And that is a team that monitors social**
20  **media where Southwest Airlines is mentioned.**
21    Q.  Okay.  And when you say they monitor
22  media, what -- how do they monitor media?
23    **A.  Southwest Airlines has what we call a**
24  **listening center where there are employees that are**
25  **tasked in a room and they monitor Facebook,**

Page 21

1  Twitter, Instagram and other social media platforms
2  for Southwest Airlines mentions.  And the purpose
3  of that is to ensure that our customers have that
4  as a channel to communicate to Southwest Airlines
5  and/or communicate about Southwest Airlines.
6     Q.  Okay.  Does the social media team monitor
7  employees' social media activity?
8     A.  They do not.
9     Q.  Okay.  So they -- they never monitor sites
10  like One Luv, infusion and all of those?
11     A.  If it is not a Southwest Airlines site,
12  they do not monitor it.
13     Q.  Okay.  All right.  And was your
14  communication with Lisa Goode part of the same
15  meeting and communications you had with Linda
16  Rutherford and Melissa Ford?
17     A.  It was separate.
18     Q.  Okay.  And what did you discuss with
19  Ms. Goode?
20     A.  We wanted confirmation that Southwest
21  Airlines does not monitor personal social media
22  accounts, which she confirmed.
23     Q.  Okay.  And has that always been the case?
24     A.  As far as I know.
25     Q.  Okay.  And did -- did you specifically

Page 22

1  discuss that with Ms. Goode, whether that's always
2  been the case?
3     A.  Not that specific question.  I did not ask
4  that, but it is my understanding that we have not
5  monitored personal social media accounts as a
6  company.  We're not set up to do that.
7     Q.  Okay.  Did -- did Ms. Goode have any
8  questions for you?
9     A.  She did not.
10     Q.  Okay.  And did you have any other
11  questions for her?
12     A.  No.
13     Q.  Okay.  Did you discuss any other matters
14  during your meeting with Ms. Goode?
15     A.  No.
16     Q.  Okay.  How long did that meeting last?
17     A.  It was roughly 10 minutes or less.
18     Q.  Okay.  And I apologize.  I may have asked
19  you this already.  Was anybody else present at that
20  meeting?
21     A.  Counsel.
22     Q.  Okay.  And -- meaning your -- meaning
23  Mr. Correll?
24     A.  Correct.
25     Q.  Okay.  And who is Brooks Thomas?

Page 23

1     A.  Brooks Thomas is part of a -- the social
2  media team.
3     Q.  Okay.  And what did you discuss with
4  Mr. Thomas?
5     A.  I -- I did not have a meeting with
6  Mr. Thomas, so I think -- and -- and I may have to
7  get with my counsel here to get a little further
8  understanding on -- on that.
9     Q.  Okay.  We can -- we can come back to
10  that --
11     A.  Okay.
12     Q.  -- later.  What about Brendan Conlon; who
13  -- who is Brendan Conlon?
14     A.  Brendan Conlon is senior director of labor
15  relations.  He is the chief negotiator for our
16  collective bargaining agreement with TWU Local 556.
17     Q.  Okay.  How long has he held that position?
18     A.  I want to say five years.  He has
19  negotiated the last two collective bargaining
20  agreements with 556.  And he is in current
21  negotiations with the current administration.
22     Q.  Okay.  And what did you discuss with
23  Mr. Conlon?
24     A.  My question to him was, during the course
25  of his business, did he ever have conversations

Page 24

1  with Audrey Stone regarding the TWU recall.
2     Q.  And had he had any conversations with
3  Ms. Stone about the TWU recall?
4     A.  He did not.
5     Q.  Okay.  Did -- did you discuss whether
6  Mr. Conlon had any other communications with the
7  recall with any other union representatives?
8     A.  We did not specifically have that
9  conversation because he said that he had no
10  recollection of having discussions regarding the
11  recall with -- with anyone.
12     Q.  Okay.  Did you -- did you discuss any of
13  the prior CBA negotiations?
14     A.  No.
15     Q.  Okay.  Did you have any other
16  conversations with Mr. Conlon?
17     A.  No.
18     Q.  Okay.  About how long did that
19  conversation last?
20     A.  Between five and seven minutes.
21     Q.  Okay.  And what were your communications
22  with Maureen Emlet in preparation for today's
23  deposition?
24     A.  Maureen Emlet, we had a discussion about
25  the investigation that took place.  And it was a

Page 25

1    pretty short conversation.
2        Q.  How long did that conversation last?
3        A.  15 minutes or less.
4        Q.  Okay.  And what -- what aspects of the
5    investigation did you discuss?
6        A.  The -- the investigation itself, and then
7    the pink October event and the women's march event,
8    if she had any recollection of -- of any company
9    involvement or opinion on that.
10       Q.  Okay.  When you say the pink October
11   event, what --
12       A.  I --
13       Q.  -- do you mean?
14       A.  I apologize.  I apologize.  Pink October
15   is a different event that's supported by Susan G.
16   Komen; has nothing to do with this.  I meant pink
17   hat or women's march.
18       Q.  Okay.  And did she -- and I am sorry.  You
19   discussed whether -- you discussed Southwest's
20   involvement?
21       A.  If she had any recollection of being
22   involved or Southwest Airlines endorsing that
23   event.  Her answer was no.  And then the other
24   topic was did she have any knowledge of Southwest
25   Airlines' involvement in a recall event taking

Page 26

1    place with TWU 556, which her answer was no.
2        Q.  Okay.  When you asked about Southwest's
3    participation in the recall event, what specific
4    types of involvement did you discuss?
5        A.  It was very broad question; just if she
6    had any recollection of were we involved or did we
7    have any interest, if you will, in it.  Which the
8    answer was no.
9        Q.  Okay.  But she was aware of what the
10   recall was?
11       A.  Yes.
12       Q.  Okay.  And are -- are you also aware of
13   what the recall -- what that --
14       A.  I am -- I am aware.
15       Q.  Okay.  And -- and what is it?
16       A.  The recall -- in just very broad terms,
17   TWU International has a constitution.  And there is
18   a provision in there that allows the members at
19   large to secure enough names signed on a petition
20   to recall an officer, if you will, and begin the
21   process of a new election.
22       Q.  Okay.  And how did you learn of the
23   recall?
24       A.  I can't tell you specifically because it
25   was very -- it was discussed.  It -- it was a -- a

Page 27

1    topic amongst many of our flight attendants at the
2    time because, in terms of union parlance, it was a
3    big event.
4        Q.  Do you remember when it first became a
5    topic?
6        A.  To my knowledge, it became a topic shortly
7    after the -- the collective bargaining agreement
8    was signed, which would -- I want to say sometime
9    in the time period of 2016 and on.  It may have
10   been a little sooner than 2016.
11       Q.  Okay.  So was it the current collective
12   bargaining agreement that was signed in 2016?
13       A.  I believe.  I can -- I can get that answer
14   for you.  I have to look on the actual document to
15   see when it was signed.
16       Q.  Okay.  And what else did you and Maureen
17   discuss about the investigation?
18       A.  That was it.
19       Q.  Okay.
20       A.  Was a pretty short conversation.
21       Q.  And who is Nancy Cleburn?
22       A.  Nancy Cleburn is one of the leaders in our
23   ACT team, and that is the accommodations team that
24   makes determinations on workplace accommodations,
25   such as disability, religious and any other type of

Page 28

1    accommodation an employee would seek under the law.
2        Q.  And what were your discussions with
3    Ms. Cleburn?
4        A.  Specifically, did Ms. Carter ever seek an
5    accommodation for religious purposes with that
6    team.
7        Q.  Okay.  Did you have any other discussions
8    with Ms. Cleburn?
9        A.  No.
10       Q.  Okay.  And one other question about Nancy.
11   You say she's one of the leaders of the ACT team.
12   Does she have a title?
13       A.  I believe it is manager.
14       Q.  Okay.  So she would be an ACT team
15   manager?
16       A.  Correct.
17       Q.  Okay.  Does she -- is she employed to
18   perform any other roles with the company?
19       A.  Not that I know of.
20       Q.  Okay.  And is the ACT team independent in
21   the same sense as the employee relations group?
22       A.  That is correct.  They report up through
23   human resources and through general counsel.
24       Q.  Okay.  And both the ACT team and employee
25   relations report through human relations; is that

Page 29

1  what you said?
2      A. Employee relations reports directly to
3  general counsel.
4      Q. Okay.
5      A. The ACT team reports through the human
6  resources function. And then they -- they work
7  with counsel regularly.
8      Q. Okay. And when you say general counsel,
9  is that one individual or is that an office?
10     A. General counsel is Southwest Airlines'
11 legal counsel, which consists of a variety of
12 people, whether it's attorneys, paralegals and the
13 like.
14     Q. Okay. Does employee relations report to
15 one specific person in the general counsel's
16 office?
17     A. I believe, ultimately, they report to
18 Kevin Minchey --
19     Q. Okay.
20     A. -- who is Southwest Airlines' legal
21 counsel. He is an attorney for us, but he also has
22 some associate attorneys that interface with them.
23     Q. Okay.
24     A. Let me correct that. It's Juan Suarez.
25     Q. Juan Suarez? Okay.

Page 30

1      A. Yeah. Juan Suarez. Which is -- Kevin
2  reports to Juan. Ultimately, they report to Juan
3  Suarez.
4      Q. All right. And you said the ACT team
5  reports through the human resources group. Is that
6  the same as the human resource business partners?
7      A. Yeah, same department, but different work
8  stream. Human resource business partner is not --
9  does not do ACT activities.
10     Q. Okay.
11     A. They may liaison with them, but they --
12 they are not the decision-maker.
13     Q. Okay. When you say work stream, what do
14 you mean? I think I am confused as far as that.
15     A. A human resources business partner is one
16 who is embedded in the individual departments
17 around Southwest Airlines. They provide general
18 human resource functions that would be mainly in
19 the noncontract realm. So they -- they handle
20 talent review, succession planning, hiring,
21 interviewing and other general business functions
22 related to human resources.
23         Your employee relations representative
24 solely is responsible for employee relations
25 investigations where there are claims of

Page 31

1  discrimination, harassment or violation of other --
2  of -- of another Southwest policy that they would
3  -- they would oversee.
4      Q. And as human -- is it human relations or
5  human resources; I want to make sure?
6      A. Human -- human resources, but you'll also
7  -- at Southwest Airlines, it's referred to -- the
8  people department.
9      Q. Okay.
10     A. But it is a human resources function.
11     Q. Okay. And so human resources is a -- it's
12 its own separate department?
13     A. That is correct.
14     Q. Okay. And is department the right
15 nomenclature or -- or is -- does Southwest use
16 division or something else like that or --
17     A. In this instance, it's okay; it is the
18 human resources or people department.
19     Q. Okay. Okay. And Audrey Wilson, was that
20 the other name, the other person --
21     A. That is correct. She was with the meeting
22 with Nancy Cleburn. She is a representative and
23 she reports to Nancy, so she is part of the ACT
24 team.
25     Q. Okay. And did you have any other

Page 32

1  discussions with Nancy and Audrey apart from
2  whether Ms. Carter ever requested an accommodation?
3      A. No. That was the sole purpose of the
4  conversation.
5      Q. Okay. And how long did that conversation
6  last?
7      A. Five to seven minutes.
8      Q. Okay. All right. So I -- I sort of
9  interrupted my -- my introduction a little bit. So
10 I should go ahead and say now, if at any point you
11 want to take a break, just let me know. I -- I may
12 use the same. And I think that's -- you -- you
13 said earlier, I think, that you had -- you read the
14 Complaint; is that right?
15     A. That's correct.
16     Q. Okay. And you are -- you are still
17 employed by Southwest; that's correct?
18     A. Yes.
19     Q. Okay. And how long have you been employed
20 by Southwest?
21     A. As of this month, it will be 24 years.
22     Q. Okay. And what is your current title?
23     A. Senior director, inflight operations.
24     Q. All right. And how long have you been in
25 that position?

Page 33

1    A. Since 2017.
2    Q. Okay. And what position did you hold with
3  Southwest prior to that?
4    A. Director of inflight operations.
5    Q. Okay. When were you director, were you,
6  basically, doing the same things that you are now?
7    A. For the most part, but my role expanded
8  and it became senior director. So, yeah, I had
9  been working as a director in the inflight base
10  operations world since 2011.
11    Q. Okay. How did your role expand when you
12  became senior director?
13    A. I was assigned another team to manage,
14  which would be our network operations center
15  managers that are our 24-hour NOC world. I was
16  also assigned a gentleman who manages our peer
17  support programs for flight attendants. And then I
18  was assigned a woman who manages a communications
19  tool that we used to interact with our flight
20  attendants known as Link, L-i-n-k. And that was in
21  addition to operating the inflight bases.
22    Q. And those employees you just mentioned
23  that were part of your expanded role, they are not,
24  I guess, employees in the same bargaining unit as
25  the flight attendants, right?

Page 34

1    A. That is correct. They are all noncontract
2  employees.
3    Q. Okay. And then prior to becoming director
4  of inflight, what -- what did you do with
5  Southwest?
6    A. I was a manager of strategic planning for
7  a short time, which that was during the time we
8  were in the middle of the acquisition of AirTran
9  Airlines. So I worked on inflight portion of that
10  acquisition.
11    Q. Okay. And when did you start that role?
12    A. 2009, 2010.
13    Q. Okay. And what -- what position did you
14  hold with Southwest prior to being a manager of
15  strategic planning?
16    A. I was a labor relations manager from 2007
17  to 2009 -- or may -- I think 2007 to 2010. And
18  during that time, I also served as an intern
19  inflight base manager in Oakland, California during
20  the year 2007 through spring of 2008.
21    Q. Okay. What did you do as a labor
22  relations manager?
23    A. I was representative for Southwest
24  Airlines' inflight department where we handled con-
25  -- labor contract administration, the managing of

Page 35

1  grievances that were filed by TWU 556. And served
2  as the department liaison as a labor relations
3  manager between TWU 556 and Southwest Airlines
4  leadership.
5    Q. Does a labor relations manager have any
6  role in the collective bargaining process?
7    A. Not in the actual negotiation of the
8  contract, but more on the administration side
9  afterwards. And -- and that is, you know -- the
10  contract is a document that requires daily work to
11  ensure that we are in compliance with it.
12    Q. Okay. And is -- so does a labor relations
13  manager have any involvement at all in the
14  collective bargaining negotiation process?
15    A. At that time, no. I would -- and I don't
16  -- I cannot speak to current day because I -- I've
17  have been removed from -- I mean, I am removed from
18  that department. And it is no longer part of
19  inflight. It is a separate department at Southwest
20  Airlines.
21    Q. Okay. And what -- what -- what work does
22  a labor relations manager do in administering the
23  CBA?
24    A. For the most part, it would be -- the
25  union would file a grievance based on Articles 19

Page 36

1  and 20 of our collective bargaining agreement. And
2  the labor relations manager's role is to research
3  the dispute and then answer the dispute back to the
4  union and then have ongoing dialogue as to how that
5  dispute will be disposed of, ultimately.
6    Q. Okay. Now, prior to being labor relations
7  manager, what role did you have with the company?
8    A. I was a flight attendant.
9    Q. And were -- were you originally
10  hired on as a flight attendant?
11    A. I was hired in 1996 as a flight attendant.
12    Q. Okay. Were you a member of TWU Local 556?
13    A. Yes.
14    Q. Okay. Did you ever hold any offices with
15  TWU Local 556?
16    A. I did. I was elected to the executive
17  board that oversees the collective bargaining
18  agent. I was executive board member at large,
19  which I was elected to. And then I was appointed
20  as office manager and grievance chair, in which I
21  served from 2003 to 2006.
22    Q. Okay. Did you ever hold any other offices
23  with the union?
24    A. No. I correct that. Other than shop
25  steward prior to being elected.

Page 37

1    Q. Okay. Okay. And how long did you serve
2  as a board member at large?
3    A. May 1 to -- of 2003 to May 1 of 2006. The
4  -- that was the extent of the term, three years.
5    Q. Okay. Now, are you -- are you familiar
6  with Southwest's efforts to collect and produce
7  documents in response to Ms. Carter's discovery
8  request?
9    A. I am.
10   Q. Okay. And would you be able to describe
11  the -- the collection process that the custodians
12  engaged in?
13   A. Yes. So how that worked was during her
14  fact-finding process, all of the documents that
15  were produced during that time were uploaded to our
16  labor relations team for archiving purposes. And
17  then when the discovery process started for this
18  case, our general counsel went out and asked for
19  documents, if anyone had any; and then went forward
20  and asked people that may be part of this case to
21  produce any documents that they may have or any
22  emails that they may have or any other piece that
23  could be relevant to this case.
24   Q. Okay.
25   A. And I do believe it was a total of 14

Page 38

1  custodians.
2    Q. Was that for the most recent production?
3    A. Yes, sir.
4    Q. Okay. And did each custodian basically
5  search their electronic and -- and hard copy files
6  for responsive information?
7    A. Yes.
8    Q. Okay. Do you know what approach each
9  custodian used to retrieve electronic information?
10   A. I don't know the exact approach everyone
11  utilized other than -- or asked to do searches
12  through any files that they may have, any emails
13  that they may have or anything that would be
14  relative of it --
15   Q. Okay.
16   A. -- relevant to the case.
17   Q. Okay. And did every -- every one of the
18  custodians provide information of some sort?
19   A. They provided it if they had it.
20   Q. Okay. Was there any custodian who had no
21  responsive information?
22   A. Not that I know of.
23   Q. Okay. All right. I would like to go back
24  and discuss a little bit more some of the -- I
25  guess, some questions I had about the -- the

Page 39

1  various departments. I -- I think that as far as
2  being involved in Ms. Carter's investigation, human
3  resources, labor relations, inflight, employee
4  relations and the ACT team were all involved -- I
5  am sorry, not the ACT team.
6      Human resources, labor relations,
7  inflight and employee relations were all involved
8  in Ms. Carter's case; is that your understanding?
9    A. Yes, sir.
10   Q. Okay. Now, what does human resources --
11  what -- what do they generally do as a department?
12   A. Human resources as a department?
13   Q. Yeah.
14   A. They have a variety of tasks from, you
15  know, sourcing potential employees to interviewing
16  them to hiring. They also are the owners of
17  certain Southwest Airlines policies. And they also
18  provide guidance on leadership and how to manage.
19  And they also ensure that we are in compliance with
20  Southwest Airlines policies and the like.
21   Q. Okay. And the human resources did have a
22  role in the investigation in this matter involving
23  Ms. Carter?
24   A. In this case, yes.
25   Q. Okay. Does it, generally, have a -- a

Page 40

1  role in investigating disciplinary matters?
2    A. It depends. In this case, yes, because
3  what was a question were some of the Southwest
4  Airlines policies that they technically administer.
5    Q. Okay.
6    A. Or -- or owned, if you will. They -- they
7  create.
8    Q. Okay. And which policies at issue in --
9  in this matter did they own?
10   A. They -- they help us interpret --
11  interpret social media policies. And then they
12  also just serve as a liaison with employee
13  relations on these policies.
14   Q. Okay. And does the human resources
15  business partner have a separate role in -- well,
16  let me rephrase that.
17      Did human re- -- the human resources
18  business partner -- or did a human resources
19  business partner have a separate role in
20  investigating Ms. Carter's matter?
21   A. Not that I know of. I -- I am pretty
22  certain, no, it did not.
23   Q. Okay. Would there have been a -- or is
24  there one human resources business partner embedded
25  in inflight?

Page 41

1    A. That is correct.
2    Q. Okay. Okay. So only one that's embedded
3 in all of inflight?
4    A. Correct.
5    Q. Okay. Now, is there any particular
6 department that's tasked with handing personnel
7 issues when they involve nonunion employees?
8    A. That would be --
9       MR. CORRELL: Hang on one second,
10 Mike. I am going to object that that's beyond the
11 scope of the Notice, but you can answer in your
12 personal capacity to the extent that you are able.
13      THE WITNESS: Okay.
14   A. Can you repeat the question?
15   Q. (By Mr. Gilliam) Yeah. So, again, I am
16 -- I am just trying to understand, you know, who --
17 I guess, the -- the type of disciplinary matters
18 that human resources gets involved in. And do --
19 and do human resources -- does -- does human
20 resources get involved in disciplinary matters for
21 nonunion employees?
22      MR. CORRELL: And just same objection,
23 but you can answer if you can.
24      THE WITNESS: Okay.
25   A. As -- as far as I know, they do.

Page 42

1    Q. (By Mr. Gilliam) Okay. And when I say
2 nonunion employee, I mean those that would involve
3 anybody who is a flight attendant in -- in the
4 bargaining unit represented by TWU, but just not a
5 full-dues-paying member; do you -- do you
6 understand that? I am sorry, did -- did you lose
7 me or --
8    A. I did. I -- I am sorry. The screen froze
9 up as you said, when I am saying nonunion employee.
10 So if you could repeat it.
11   Q. Sure. Yeah. Just to clarify things. So
12 if I refer to a union employee, you understand that
13 I am referring to somebody who is a
14 full-union-dues-paying member, but still a flight
15 attendant who is in the bargaining unit represented
16 by TWU?
17   A. Yes, I understand that.
18   Q. Okay. All right. But, I guess,
19 disciplinary matters aren't really -- well, let me
20 scratch that.
21      So there is not a particular
22 department that's tasked with handling disciplinary
23 matters when they involve a nonunion employee?
24   A. If I understand what you are saying
25 correctly, your nonunion or noncontract employees,

Page 43

1 that is the human resources function when it comes
2 to discipline. When it is -- when it is a
3 unionized employee, that is a labor relations
4 function.
5    Q. Okay. And when you say unionized
6 employee, you mean somebody who works under the
7 collective bargaining agreement between TWU Local
8 556 and Southwest?
9    A. That is correct.
10   Q. Okay. But it wouldn't matter whether the
11 flight attendant is an agency fee objector or not
12 -- and I am sorry. Do you know what I mean by
13 agency fee objector?
14   A. I do.
15   Q. Okay. So it wouldn't matter whether the
16 -- the flight attendant was an agency fee objector
17 or not; human resources would still be involved in
18 a disciplinary matter either way?
19   A. I can't say that for certain.
20   Q. Okay. And I apologize. It's probably --
21 I'm probably not asking the question very well.
22      So let's say somebody who is an agency
23 fee objector is being reported for some fort --
24 sort of disciplinary investigation or they are
25 subject to a disciplinary investigation; does that

Page 44

1 change which departments are involved in
2 investigating that matter?
3    A. It -- it does not change anything because
4 we don't have knowledge of who is an agency
5 objector and who is not.
6    Q. Does TWU Local 556 ever communicate -- it
7 never communicates who is a agency fee objector and
8 who --
9    A. They do not.
10   Q. Okay. And Southwest keeps no -- no
11 records of that?
12   A. That is correct.
13   Q. Do you know if Southwest automatically
14 deducts dues from employees' paychecks?
15   A. Yes.
16   Q. Okay. And how do they know which
17 employees to deduct the full amount from -- or, no,
18 scratch that.
19      Does the union ever communicate whose
20 -- whose dues should be deducted to Southwest?
21   A. There is an automated process that
22 involves TWU 5536 and Southwest Airlines payroll
23 functions where Southwest Airlines deducts union
24 dues and then transfers those funds to the union.
25   Q. Okay. Does the union send any sort of

Page 45

1  communication to Southwest to let them know when to
2  deduct dues from a particular flight attendant?
3  **A. No.**
4  Q. Okay.  And does, I guess -- well, scratch
5  that.
6          Now, is there -- is there a VP for
7  human resources?
8  **A. There is.**
9  Q. And who is the VP for human resources?
10 **A. Julie Weber, W-e-b-e-r.**
11 Q. Okay.  And how long has she been human
12 resources VP?
13 **A. I believe just under 10 years.**
14 Q. Okay.  And how many employees report
15 directly to the human resources VP?
16         MR. CORRELL:  Again, I am going to
17 object that this level of detail on the human
18 resources department is beyond the scope of the
19 Notice, but you can answer, Mr. Sims.
20 **A. I do not know.**
21 Q. (By Mr. Gilliam)  Okay.
22         MR. GILLIAM:  And I would say that
23 this -- this is within -- this is part of Paragraph
24 Number 2 of the examination topics.
25         MR. CORRELL:  I would note for the

Page 46

1  record that examine -- that the Topic Number 2
2  ends, when reviewing, investigating and deciding
3  issues involving social media policies of the
4  flight attendant disciplinary matters, which does
5  not speak to the identity of the vice president or
6  who reports to her or anything of that nature
7  unless it is specifically tailored to those topics.
8          And the questions being presented are
9  far broader than that particular issue.  And,
10 again, Mr. Sims is welcome to answer if he knows,
11 but we -- we've prepared him on the organizational
12 structure and interactions and communications
13 between human resources and other entities on those
14 topics; not just the entire history of the human
15 resources department at Southwest.
16         MR. GILLIAM:  Okay.
17 Q. (By Mr. Gilliam)  And go -- go ahead,
18 Mr. Sims, and answer the question.
19 **A. In regards to how many people are**
20 **reporting up to Julie Weber, I do not know.**
21 Q. Okay.  But would -- would there be a
22 manager or director of human resources that reports
23 to Julie Weber?
24 **A. Yes.**
25 Q. And is it both?

Page 47

1  **A. I am not completely familiar with their**
2  **organization chart.**
3  Q. Okay.  Do you know approximately how many
4  managers human resources has?
5  **A. I do not.**
6  Q. Would it be more than 10?
7  **A. That, I do not know.**
8  Q. Okay.  And you don't know how many
9  directors human resources would have either?
10 **A. I do not know.**
11 Q. Okay.  Do you know how many employees are
12 in human relations?
13 **A. I do not know.**
14 Q. And who was the human resources manager
15 that was involved in Ms. Carter's investigation?
16 **A. That would be Edie Barnett.**
17 Q. Okay.
18 **A. E-d-i-e, B-a-r-n-e-t-t.**
19 Q. Okay.  And she reported to Julie Weber at
20 the time?
21 **A. I am not sure what the reporting structure**
22 **was, but I am pretty confident she did not report**
23 **directly to Julie Weber.**
24 Q. Okay.  Who -- who would she have reported
25 to?

Page 48

1  **A. I do not know.**
2  Q. Okay.  Did Edie Barnett have a staff that
3  worked under her?
4  **A. She did not.**
5  Q. Was she a human resources business
6  partner?
7  **A. That is correct.**
8  Q. Okay.  Which that's a separate stream from
9  human relations; is that right?
10 **A. I am not fully understanding what you are**
11 **saying.**
12 Q. Sorry.  So the way I understand it --
13 -stood it earlier is the human resources business
14 partner was a different entity than an -- outside
15 of human resources; is that -- that correct?
16 **A. No.  Human resources -- I think you're, if**
17 **I understand correctly, may be mixing up employee**
18 **relations with the human resources function.**
19 Q. Oh, okay.  So human resources and the
20 human resource business partners are -- are,
21 basically, within the same department?
22 **A. That is correct.**
23 Q. Okay.  Or -- or they are the same
24 department?
25 **A. That is correct.**

Page 49

1    Q.  Okay.  Okay.  Yeah.  I was confused.  All
2  right.  All right.  And is there -- who was the --
3  so Denise Gutierrez was the employee relations
4  manager involved in this case; is that -- that
5  correct?
6    A.  Representative; I am not sure if she was a
7  manager or not.
8    Q.  Okay.
9    A.  I am not sure of her title at the time.
10    Q.  Do you know who she reported to?
11    A.  I believe, at the time -- I -- I am not
12  sure who she reported to, actually.
13    Q.  Okay.  Do you know if anybody else from
14  employee relations besides Denise Gutierrez was
15  involved in Carter's investigation?
16    A.  Not to my knowledge.
17    Q.  Okay.  At -- at what point do the employee
18  relations representatives typically get involved in
19  an -- in a disciplinary investigation?
20    A.  They become involved at the moment that
21  there is reason to believe that there could
22  possibly be a protected class of people or
23  protected work right had -- may be in question.
24  They get -- they get involved very early on.
25    Q.  Okay.  And when you say protected class,

Page 50

1  what -- what do you mean?
2    A.  That would be any person that may have a
3  touch point with a harassment policy, sexual
4  harassment, bullying, discrimination claim.
5    Q.  Okay.  And when you say a touch point, do
6  you mean a complaint or -- or what do you mean by
7  touch point?
8    A.  I mean -- I mean an allegation.
9    Q.  Okay.  All right.  And at -- at what point
10  does labor relations get involved in a disciplinary
11  investigation?
12    A.  Labor relations is involved at the onset
13  when an inflight base initiates a labor relations
14  investigation regarding flight attendant behavior.
15    Q.  Okay.  All right.  And what is labor
16  relations' precise role in -- in the disciplinary
17  investigation?
18    A.  They are the one that archives the
19  information; they take the notes on behalf of --
20  well, excuse me.  They don't take notes at that
21  point, but they archive the information and provide
22  guidance in -- regarding to -- Articles 19 and 20
23  of the collective bargaining agreement.
24    Q.  Okay.  When you say they archive
25  information, specifically what -- what type of

Page 51

1  information are they archiving?
2    A.  Anything that is generated from the
3  investigation.
4    Q.  Okay.  And what sort of guidance do they
5  provide with respect to Articles 19 and 20?
6    A.  To ensure that the process is thorough and
7  complete.
8    Q.  And are -- are Articles 19 and 20 the
9  provisions of the collective bargaining agreement
10  that deal with grievances?
11    A.  That's correct.
12    Q.  Okay.  So are they ensuring that the
13  investigations are thorough and complete in order
14  to, I guess, prepare for the grievance stage?
15    A.  Well, Article 19 also has the provision
16  for flight attendant discipline procedures, so they
17  just -- they just provide guidance to ensure that
18  we -- our adherence to time frames and that things
19  are properly documented and communicated with --
20  with the union.
21    Q.  Documented and communicated with the
22  union?
23    A.  Correct.
24    Q.  Okay.  And what does that process of
25  documenting and communicating with the union

Page 52

1  entail?
2    A.  Mainly, setting up meetings to ensure that
3  a union representative can be present, working with
4  the union to ensure that time frames are adhered to
5  and answering general questions along the way about
6  the process.
7    Q.  Okay.  What sort of time frames do, I
8  guess, the -- that the personnel involved in an
9  investigation have to adhere to?
10    A.  Well, under Article 19, from the time of
11  reasonable knowledge, the company has seven
12  business days to investigate and potentially take
13  action; that is the first stage of the time frames.
14    Q.  Okay.  And who is the labor relations
15  representative involved in Ms. Carter's
16  investigation?
17    A.  This would be Melissa Burdine.
18    Q.  Okay.  And is that her correct title,
19  labor relations representative?
20    A.  She was a manager of labor relations.
21    Q.  Okay.  Do you know who Melissa Burdine
22  reported to at the time of Ms. Carter's
23  investigation?
24    A.  Yes.  She reported to Brianna Grant;
25  B-r-i-a-n-n-a, G-r-a-n-t.

Page 53

1    Q.  Okay.  And what was Brianna Grant's title?
2    **A.  Senior manager, labor relations.**
3    Q.  Okay.  All right.  Do you know how many
4  labor relations managers are typically involved in
5  the investigation of a case?
6    **A.  One.**
7    Q.  One.  Okay.  Now, was Maureen Emlet also
8  involved in the investigation of Ms. Carter's case?
9    **A.  Maureen Emlet was -- I am not sure of her**
10  **total involvement on the Charlene Carter matter.  I**
11  **think she was involved more with the Audrey Stone**
12  **employee relations portion.**
13    Q.  Okay.
14    **A.  I would like to confirm with counsel on**
15  **that.**
16    Q.  Would -- would there be two labor
17  relations representatives involved in -- in the
18  same case; one for maybe the person who is
19  complaining and one for the person who is being
20  investigated?
21    **A.  Potentially.  I am not sure how it was set**
22  **up for this case.**
23    MR. CORRELL:  And, Counsel, just to
24  avoid having to clean up a whole bunch of stuff
25  later, I am not clear which portion of the Carter

Page 54

1  investigation we're talking about.  And I think you
2  have already discussed there is a first level and
3  there is a second level.  So if we clarify that,
4  that may fix this issue for you.
5    MR. GILLIAM:  Okay.
6    Q.  (By Mr. Gilliam)  I guess -- and I don't
7  know if it's prior to Step 2 proceedings, would
8  there have been a different labor relations manager
9  involved than one who was involved in Step 2
10  proceedings?
11    **A.  Yes.  There could have been.  And -- and**
12  **was just how the case was assigned.  A manager**
13  **doesn't necessarily stay with the case for its**
14  **entire life.**
15    Q.  Okay.  And was Melissa Burdine involved in
16  the Step 2 proceedings?
17    **A.  That is correct.**
18    Q.  Okay.  I don't know if it's correct to
19  call the step before that Step 1; is it -- is that
20  what it's referred to?
21    **A.  Yes, in general terms.  I usually consider**
22  **Step 1 as the actual filing of the grievance.**
23    Q.  Okay.  Do -- do you know if Maureen Emlet
24  was involved in that fact-finding stage of
25  Ms. Carter's case?

Page 55

1    **A.  I -- I will have to -- to confirm that.**
2    Q.  Okay.
3    **A.  I cannot confirm that right now.**
4    Q.  Okay.  Is there a reason why you would
5  have two different labor relations managers
6  involved between Step 1 and Step 2?
7    **A.  It could be as simple as just scheduling**
8  **the meeting.  If Maureen Emlet was involved, as an**
9  **example, in the case prior to Step 2, she may have**
10  **not been available per schedule to sit in on a Step**
11  **2 meeting.**
12    Q.  Okay.
13    **A.  That's -- and I don't know if that is --**
14  **is the case in this -- in this matter.**
15    Q.  Okay.  Do you know if Tammy Shaffer was
16  involved in the -- in either the Step 1 or Step 2
17  proceedings?
18    **A.  No.**
19    Q.  Okay.  And, no, you don't know; or, no,
20  she wasn't involved?
21    **A.  To my knowledge, she was not involved.**
22    Q.  Okay.  And is she labor relations
23  director?
24    **A.  That is correct.**
25    Q.  Okay.  And Melissa -- well, I am sorry.

Page 56

1  Would Brianna Grant report to Tammy Shaffer?
2    **A.  That is correct.**
3    Q.  Okay.  All right.  Would a labor relations
4  director participate in a Step 1 or Step 2
5  proceeding?
6    **A.  No.**
7    Q.  Okay.  Okay.  And flight attendants all
8  work within inflight services; is that correct?
9    **A.  Yes.**
10    Q.  Okay.  But pilots don't work within
11  inflight services, do they?
12    **A.  They do not.**
13    Q.  Okay.  They are -- they are a separate
14  department?
15    **A.  They are a separate department that the**
16  **org structure is -- that they report -- both vice**
17  **presidents of the respective departments report to**
18  **an air operations senior VP, but in -- but they are**
19  **separate departments.**
20    Q.  Okay.  Now, does anybody else but flight
21  attendants work -- well, let me -- let me rephrase
22  this.
23    Now, I guess, the -- the collective
24  bargaining agreement covering flight attendants
25  between TWU and Southwest, that only covers flight

Page 57

1  attendants; is that right?
2  A. That is correct.
3  Q. Okay. And there -- there is a collective
4  bargaining agreement that's in -- in effect right
5  now?
6  A. Yes.
7  Q. Okay. Do you know when that came to be in
8  effect?
9  A. I will have to get you the exact date.
10  Q. Okay.
11  A. I mean, I can look now, if I can -- if you
12  are okay with me reaching for a book.
13  Q. Yeah. I am okay with that.
14  A. Well, the one I have -- actually, I don't
15  have one that's in date, but it would be the one
16  that -- 2018 is when this one expired, so the other
17  one came into effect, roughly, in 2018. I -- I do
18  need to get verification on that because this is
19  not accurate.
20  Q. Okay. All right.
21  A. Excuse me. It is -- it is accurate
22  because it has, technically -- it is amendable
23  right now. So let me get the dates. June 1, 2013
24  to October 31, 2018, but it is currently amendable,
25  so Section 6 negotiations are ongoing.

Page 58

1  Q. Okay. Now, have -- have there been any
2  tentative agreements reached between Southwest and
3  Local 556 regarding the collective bargaining
4  agreement?
5  A. No.
6  MR. CORRELL: And I am going to object
7  that the current scope of bargaining between the
8  company and the union is beyond the scope of the
9  Notice. Mr. Sims, you can answer as you are able
10  to in your personal capacity.
11  THE WITNESS: Okay.
12  Q. (By Mr. Gilliam) Has a tentative
13  agreement -- okay. You said no -- no tentative
14  agreement has ever been reached?
15  A. That is correct.
16  Q. Okay. All right. But -- okay. Now, who
17  oversees the inflight services division?
18  A. That is vice president Sonya Lacore,
19  L-a-c-o-r-e.
20  Q. Okay. And what -- what does that position
21  do?
22  A. The vice president of inflight is in
23  charge of overseeing all budgeting matters. She
24  serves as a senior leader on the senior management
25  committee at Southwest Airlines. She's also

Page 59

1  responsible ultimately for the day-to-day operation
2  of inflight and the overall job performance of our
3  flight attendants.
4  Q. Okay. And who -- who would the VP for
5  inflight services report to?
6  A. Reports to a senior vice president of air
7  operations.
8  Q. Okay. And who -- who would that be?
9  A. Currently, Alan Kasher, K-a-s-h-e-r.
10  Q. Okay. And do you know who Sonya Lacore's
11  predecessor was?
12  A. Yes.
13  Q. And who was that?
14  A. Mike Hafner, H-a-f-n-e-r.
15  Q. Okay. When did Sonya Lacore become the
16  senior V -- I am sorry -- the VP for inflight
17  services?
18  A. On or around November of 2015.
19  Q. Okay. And as senior director of inflight
20  operations, do you report to Sonya Lacore?
21  A. I do.
22  Q. Okay. Is she your direct report? I am
23  sorry.
24  Do you report directly to her?
25  A. That is correct.

Page 60

1  Q. Okay. And are there any other directors
2  for inflight operations?
3  A. There are.
4  Q. Okay. Who are the other directors for
5  inflight operations?
6  A. There are four senior directors: that
7  would include Steve Murtoff, M-u-r-t-o-f-f; Mike
8  Sikes, S-i-k-e-s; and Wayne Shaw. Those are
9  Sonya's direct reports.
10  Q. Okay.
11  A. And then there is a layer of directors
12  that report to senior directors.
13  Q. And who are the directors who report to
14  you?
15  A. Currently -- well, we recently changed,
16  but during this time period, it was Rachel
17  Loudermilk, L-u-d-e-r-m-i-l-k (sic). And she was
18  director -- is director of inflight base
19  operations.
20  Q. Okay. And you said during this time; you
21  mean in 2017?
22  A. Correct.
23  Q. Okay. And did you have anyone else who --
24  any other directors who reported to you?
25  A. Not at that time.

Page 61

1    Q. Okay.
2    **A. I do want to correct that. Rachel did not**
3  **begin reporting to me until 2018. Prior to that,**
4  **in 2017, she was a senior manager who did report**
5  **directly to me, but she had a different title.**
6    Q. Okay. All right. And -- and what was her
7  title?
8    **A. Senior manager, onboarding.**
9    Q. Okay.
10   **A. I was the sole director in 2017 over**
11 **inflight base operations.**
12   Q. Okay. Would senior managers and inflight
13 report to you?
14   **A. Yes.**
15   Q. Okay. Now, were there other senior
16 managers who reported to you in 2017?
17   **A. Yes.**
18   Q. And who were they?
19   **A. Dave Kissman, K-i-s-s-m-i -- man-n.**
20   Q. Okay.
21   **A. Brian Ridgeway, R-i-d-g-e -- way -- w-a-y.**
22       THE REPORTER: I'm sorry, say the last
23 part again.
24       THE WITNESS: Ridgeway. Brian
25 Ridgeway, R-i-d-g-e-w-a-y.

Page 62

1        THE REPORTER: Thank you.
2    Q. (By Mr. Gilliam) Okay. Were there any
3  others in 2017?
4    **A. Senior manager Tom Crabtree. And that --**
5  **that was it.**
6    Q. Okay. Did they cover --
7        MR. CORRELL: Counsel, before you --
8  sorry to interrupt. Before you move on, are we
9  close to a point where it would be okay to take a
10 break, quick restroom stop?
11       MR. GILLIAM: Yeah. That's fine.
12 Yeah. We can --
13       MR. CORRELL: Do you want to go a
14 little further or are you -- is now okay?
15       MR. GILLIAM: Let's see. Now is okay.
16 Let's just go ahead and -- and do it now.
17       MR. CORRELL: Great. Thank you. Just
18 10 minutes sound about right?
19       MR. GILLIAM: Yeah. Sure.
20       MR. CORRELL: Okay. Thanks.
21       THE VIDEOGRAPHER: We are off record
22 at 10:34 a.m.
23       (Recess taken.)
24       THE VIDEOGRAPHER: We are back on
25 record at 10:48 a.m.

Page 63

1    Q. (By Mr. Gilliam) All right. I think we
2  were discussing, when we took a break, the -- some
3  of the senior managers who reported to you, Mike.
4  One of the senior managers you mentioned was Dave
5  -- Dave Kissman. Did he have a particular area
6  that he was in charge of?
7    **A. Dave's role is to serve as leader of the**
8  **West Coast region of our inflight bases.**
9    Q. Okay. And the other two, Brian Ridgeway
10 and Tom Crabtree, the other two senior managers you
11 mentioned, do they handle different geographic
12 areas?
13   **A. Brian Ridgeway manages the East Coast.**
14 **Tom Crabtree is nonoperational program -- peer**
15 **support programs. And then the last one that I**
16 **didn't mention before, Cetta Larabee,**
17 **L-a-r-a-b-e-e. And at the time, she served as the**
18 **manager of our network operations management team**
19 **in our network operations center.**
20   Q. Okay. And does -- does Dave Kissman have
21 a staff that reports to him?
22   **A. The inflight base managers on the West**
23 **Coast report to Dave.**
24   Q. Okay.
25   **A. And at the time, Dave reported to me.**

Page 64

1    Q. Okay. And about how many base managers do
2  you have in the total West Coast area?
3    **A. Five.**
4    Q. Five. Okay.
5    **A. Excuse me. It's six now. We opened Los**
6  **Angeles, but it -- during this period, it was five.**
7    Q. So there were -- were five West Coast base
8  managers in 2017?
9    **A. Yes.**
10   Q. Okay. But six now. All right. And how
11 -- how many base managers company-wide for all --
12   **A. Currently, we have 11.**
13   Q. 11. Okay. Okay. And the base manager in
14 Denver is Ed Schneider, correct?
15   **A. That is correct.**
16   Q. Okay. And -- and Ed Schneider, he -- he
17 reported directly to Dave?
18   **A. That is correct.**
19   Q. Okay. Did he report to you as well or --
20 or just solely to Dave?
21   **A. Solely to Dave.**
22   Q. Okay. And what -- what -- what did Dave
23 Kissman do in his position?
24   **A. Dave, his responsibilities were provide**
25 **leadership to the bases that reported up to him to**

Page 65

1  ensure that they were operating within their
2  budget, within the standards and policies that we
3  have set as -- in terms of how we operate our
4  bases.  And then just provide leadership, coaching
5  and then training to -- to the managers.
6      Q.  Does -- or did Dave, in 2017, have
7  authority to hire and fire employees?
8      A.  No.  Excuse me.  If it -- noncontract
9  employees.
10     Q.  Okay.  And to make sure I understand, he
11 -- he had authority to hire and fire employees that
12 were not covered by the CBA?
13     A.  Correct.
14     Q.  Okay.  But he had no authority to hire and
15 fire flight attendants?
16     A.  No.
17     Q.  Okay.  Who -- who has authority to hire
18 and fire flight attendants?
19     A.  The hiring is done through the human
20 resources department with the bases and flight
21 leaders participating.  The termination of
22 employment is solely the inflight base manager.
23     Q.  Okay.  Is that set forth in writing
24 anywhere?
25     A.  No, not that I know of.

Page 66

1      Q.  Okay.  It's -- it's just Southwest
2  practice?
3      A.  Correct.
4      Q.  Okay.  And for the -- the Denver base, how
5  -- I guess -- well, let me ask this cleanly.
6          So at the Denver base, would the base
7  manager there have a staff of personnel assisting
8  him?
9      A.  Yes.
10     Q.  And how many employees are on that staff?
11     A.  A base manager will have up to three
12 assistant managers reporting to him.  And,
13 generally, up to 10 or so -- 10 to 15 inflight
14 supervisors reporting up through the assistant base
15 managers.  And then there is a administrative staff
16 at each base that reports through the assistant
17 base managers.
18     Q.  Okay.  And at -- at the Denver base, do
19 you know, roughly, how big the administrative staff
20 was?
21     A.  Administrative staff would be three or
22 four people.
23     Q.  Okay.  All right.  And who -- who reported
24 -- I am sorry -- who were the three assistant
25 managers that assisted Ed Schneider at the Denver

Page 67

1  base in 2017?
2      A.  Meggan Jones -- Meggan with two Gs; Hector
3  Barerra.  And then at that time, there was not a
4  third.
5      Q.  Okay.  Now, was -- well, no.  Let me back
6  up.
7          So to clarify, when a flight attendant
8  has a disciplinary issue arise, who from Southwest
9  is the -- the first person involved?
10     A.  The first person who is involved is the
11 one who has reasonable knowledge of something has
12 happened that would warrant discussions.
13     Q.  Okay.  And I assume that that depends on
14 the channels that the report comes through?
15     A.  That's correct.
16     Q.  Okay.  Okay.  And in -- in this case, you
17 know that Ms. Carter was violated -- was fired for
18 violating several policies; is that correct?
19     A.  Yes.
20     Q.  Okay.  And do you -- do you remember which
21 -- which policies they were?
22     A.  Harassment, bullying, social media policy.
23     Q.  And --
24     A.  Sexual harassment.
25         THE REPORTER:  I'm sorry, I didn't

Page 68

1  hear the last part.
2          THE WITNESS:  Sexual harassment.
3      Q.  (By Mr. Gilliam)  Is harassment and
4  bullying one -- one policy?
5      A.  Correct.
6      Q.  Okay.  And then the social media policy is
7  a separate policy?
8      A.  Correct.
9      Q.  Okay.  And then sexual harassment is a
10 third policy?
11     A.  Yeah.  Part of the -- the harassment
12 policy.
13     Q.  Well, just to make sure I am clear, is --
14 is the sexual harassment policy separate from the
15 harassment and bullying policy?
16     A.  I am going to have to -- to go back and
17 just make sure that I am correct on that, but --
18     Q.  Well, let's see here.  Can we mark
19 Document 1 as Exhibit 1?  It looks like Mack is
20 muted.
21         THE VIDEOGRAPHER:  You want me to
22 bring the document up?
23         MR. GILLIAM:  Well, I -- I guess
24 however we need to mark it.  I -- I am sort of new
25 to the Zoom process, but I assume that we need mark

Page 69

1    it first.
2         THE VIDEOGRAPHER:  I can bring it up
3    and, I guess, if you say on the record that it's
4    Exhibit 1 -- Charis, what's your recommendation?
5         THE REPORTER:  Does it have Bates
6    numbers or anything to identify it?
7         MR. GILLIAM:  It -- it does.  And I am
8    sorry, I said Document 1; I actually meant Document
9    11.
10         THE REPORTER:  We'll just need to be
11    real clear about identifying it, so that way, when
12    I receive them, then we can go and change the -- so
13    I will know which one is Exhibit 1, et cetera.
14         MR. GILLIAM:  Oh, okay.  So we --
15    yeah, I think each document has a -- a number
16    attached to it.
17         THE VIDEOGRAPHER:  Correct.
18         THE REPORTER:  So, for example, are
19    you saying Document 11, can we make that as Exhibit
20    11 or are you wanting to make that exhibit --
21         MR. GILLIAM:  Yeah, can we -- can we
22    mark as exhibit -- no, mark -- I am sorry.  Mark
23    Document 11 as Exhibit 1?
24         THE REPORTER:  Yes, we can.
25         MR. GILLIAM:  Okay.  All right.

Page 70

1         (Exhibit 1 marked.)
2    Q.  (By Mr. Gilliam)  And if you could just
3    review this, Mr. Sims, briefly and let me know when
4    you've -- you've reviewed it.
5    A.  Is this the entire document here?  Because
6    what I am seeing is the Southwest Airlines mission
7    statement and an explanation for it.
8    Q.  If I could, I guess, first, have you look
9    at 810 -- I am sorry.  It should be the second,
10    third, fourth and fifth pages.
11    A.  Okay.
12    Q.  Do you -- do you have those?  Yeah.
13         MR. CORRELL:  And -- and, Mike, if
14    it's easier, you have -- you have electronic copies
15    of these, and you are welcome to use your own
16    electronic copy.  They correspond to the numbers
17    that Mr. Gilliam has been using.  So that way, you
18    can control the document as you review as needed.
19         THE WITNESS:  Okay.
20    A.  So I am going to -- I'm going to access
21    them through my iPad; is that okay?
22    Q.  (By Mr. Gilliam)  Yes.  Go -- go ahead.
23    A.  And then now I am looking at the work --
24    workplace bullying and hazing.  It will take me a
25    few minutes to pull up the document.

Page 71

1    Q.  Sure.  There --
2    A.  Can you tell me again the -- it's Number
3    11?
4    Q.  Yeah.  It's Document 11.  We've marked it
5    as Exhibit 1.
6    A.  Okay.  So I have it -- I have it pulled up
7    here.  So I am looking at the workplace bullying
8    and hazing policy.  I'm scrolling down.  And let me
9    look at this next one.  Okay.  I reviewed the
10    social media policy and now looking at the next
11    document.
12    Q.  Yeah, and -- and we can stop after you
13    look at the next one, the -- the --
14    A.  Okay.  And then --
15    Q.  And whenever you have finished reviewing
16    that one, let me know.
17    A.  Ready.
18    Q.  Okay.  And do you recognize those and what
19    they are?
20    A.  I do.
21    Q.  Okay.  And what are they?
22    A.  The first document is from the Southwest
23    Airlines flight attendant manual.  It is the
24    mission statement and the explanation of the
25    mission statement.  The second document is the

Page 72

1    workplace bullying and hazing policy.  Third is the
2    Southwest Airlines employee social media policy.
3    And then the fourth is the Southwest Airlines
4    policy concerning harassment, sexual harassment,
5    discrimination and retaliation.
6    Q.  Okay.  And so the -- the workplace
7    bullying and hazing policy and then the Southwest
8    Airlines Company policy concerning harassment and
9    sexual harassment, those are two separate policies;
10    is that correct?
11    A.  Yes.
12    Q.  Okay.  And do you -- were -- were these
13    the policies that were in effect when Ms. Carter
14    was terminated?
15    A.  Let me look.  Yes, that is correct.
16    Q.  Okay.  And do you -- was she terminated
17    for -- which ones were -- was she terminated for
18    violating?
19    A.  Harassment and bullying policy, sexual
20    harassment and social media.
21    Q.  Okay.  If we could also mark -- let's see
22    -- Document 7 as Exhibit 2, please.
23         (Exhibit 2 marked.)
24    Q.  (By Mr. Gilliam)  And feel free to -- to
25    look at document --

Page 73

1    A. It will take me a minute to pull it up.
2         THE VIDEOGRAPHER:  Is this the correct
3    document?
4         MR. GILLIAM:  Yes.
5    Q. (By Mr. Gilliam)  And, Mr. Sims, whenever
6    you are ready, just let me know.
7    A. Okay.  That is -- I am ready.
8    Q. Okay.  And do you recognize this -- this
9    document?
10   A. That is the termination notice that was
11   sent to Ms. Carter.
12   Q. Okay.  And, I guess, let's see.  Towards
13   the end, I think, of the -- the third paragraph, it
14   says, after considering -- considering all
15   information gathered in my investigation, as well
16   as the information presented in your fact-finding
17   meeting, I have determined that your conduct is in
18   direct violation of the Southwest Airlines mission
19   statement.  And it says, the following company
20   policies; and it mentions only -- by bullet point
21   there -- workplace bullying and hazing policy and
22   social media policy; is that correct?
23        MR. CORRELL:  Objection.  That
24   misstates the exhibit, but, Mr. Sims, you can
25   answer.

Page 74

1    A. That's what the bullet points say.
2    Q. (By Mr. Gilliam)  Okay.  And then it says
3    after that, your conduct could also be a violation
4    of Southwest's policy concerning harassment, sexual
5    harassment, discrimination and retaliation.
6         So in saying that your conduct could
7    also be a violation, was it determined that -- that
8    Ms. Carter violated that policy?
9    A. That was inconclusive.
10   Q. Okay.  So Ms. Carter -- I mean, is it --
11   is it correct to say Ms. Carter was -- was fired
12   for violating the workplace bullying and hazing
13   policy and the social media policy?
14   A. Yes.
15   Q. Okay.  I would like to return to Exhibit 1
16   now, the document marked as Exhibit 1.  And turning
17   to the -- the second page with the -- the workplace
18   bullying and hazing policy.  Was her conduct
19   considered bullying or hazing?
20   A. Bullying.
21   Q. Bullying.  Okay.  Was her conduct
22   considered hazing?
23   A. Potentially, it could have been, based on
24   this -- definition.
25   Q. Okay.  But she was -- is it correct to say

Page 75

1    that she was fired for bullying?
2    A. That's correct.
3    Q. Okay.  And then it -- it says that hazing
4    and bullying behavior should be reported by the
5    employee to his or her supervisor, HR business
6    partner or any senior leader, something of that
7    sort.  I was just going to ask:  Who was a senior
8    leader?
9    A. Senior leader can be pretty loosely
10   defined at Southwest.  But, generally, department
11   senior leaders are considered director level and
12   above; yet, we have senior managers, by title, are
13   senior leaders.  So there is not really a -- a
14   clear definition versus how we utilize the term.  A
15   senior leader could be anyone that is higher in the
16   organization.
17   Q. Okay.  And once hazing and bullying
18   behavior is reported to one of those individuals,
19   what do they do next?
20   A. They notify employee relations.
21   Q. Okay.  And then does employee relations
22   head up the investigation?  Or what does employee
23   relations do with it?
24   A. In -- in bullying allegations, employee
25   relations may or may not be involved.  There are

Page 76

1    allegations that touch potential discrimination,
2    sexual -- and things that would fall under the
3    other policy.
4    Q. When you say the other policy, which --
5    which one do you mean?
6    A. Harassment, sexual harassment,
7    discrimination and retaliation.
8    Q. Okay.  Would -- would employee relations
9    make a determination as to whether there was a
10   violation of the workplace bullying and hazing
11   policy?
12   A. No.  That would ultimately fall onto the
13   manager or the leader that is conducting the
14   fact-finding.
15        THE REPORTER:  I'm sorry, you cut out.
16   So it would fall onto the main, and then it cut
17   out.
18        THE WITNESS:  Oh.  The manager or
19   leader that is conducting the fact-finding.
20   Q. (By Mr. Gilliam)  Okay.  And the -- by the
21   manager conducting the fact -- fact-fighting --
22   finding, that would be the base manager?
23   A. Correct.
24   Q. Okay.  But it -- it could be another
25   leader who is conducting the investigation as well,

Page 77

1    right?  You said it would fall on the base -- I am
2    sorry -- the manager or the leader; is that -- is
3    that right?
4        A.  That's correct.  When I say base manager
5    or leader, a case would be investigated by a base
6    manager or, potentially, assistant base manager who
7    has the authority to conduct these type of
8    meetings.
9        Q.  Okay.  And could the leader be somebody
10   else apart from that assistant base manager?
11       A.  No.
12       Q.  Okay.  And how many -- how many flight
13   attendants have been fired for violating the
14   workplace bullying and hazing policy in, say, the
15   -- the last seven years?
16       A.  I do not know the exact number.
17       Q.  Do you know if it's over 100?
18       A.  I do not know.
19       Q.  Okay.  Do you know who -- who would know
20   or how we could find that out?
21       A.  We could do a query with labor relations.
22       Q.  You-all keep -- keep the data of that --
23   or I -- I should ask.  Do you keep the data of how
24   many employees are -- are fired for violating a
25   certain policy?

Page 78

1        A.  Yes, I believe that would be labor
2    relations -- archives that information.
3        Q.  Okay.  And is that -- is that the ProLaw
4    database --
5        A.  Yes.
6        Q.  -- where they archive that information?
7        A.  Yes.
8        Q.  Okay.  And while we're on that topic, is
9    -- is ProLaw used solely by the labor man -- labor
10   relations department to record that type of data or
11   does it -- is it used for other purposes as well?
12       A.  ProLaw is a legal management software
13   program that has numerous capabilities.  Labor
14   relations manager is using that specifically to
15   archive information and generate inquiries.
16       Q.  Okay.  And when you say generate
17   inquiries, like if they had -- what -- what type of
18   inquiry do you mean?
19       A.  Similar to what you asked for.
20       Q.  Okay.
21       A.  How many terminations have we had
22   regarding this topic.
23       Q.  Okay.
24       A.  Or -- or matters of that, not necessarily
25   terminations.

Page 79

1        Q.  And do you -- do you recall cases of
2    flight attendants who have been fired for violating
3    the workplace bullying and hazing policy?
4        A.  I do.
5        Q.  Okay.  And apart from Ms. Carter --
6            MR. CORRELL:  And I am going to object
7    that this is beyond the scope of the Notice because
8    there is no Notice topic regarding enforcement of
9    the bullying and hazing policy.  We have prepared
10   Mr. Sims on formulation, approval, enforcement and
11   modification of the social media policy, but there
12   is no topic that speaks to this category, so
13   Mr. Sims is testifying in his personal capacity at
14   this point.
15           MR. GILLIAM:  Well, I would just point
16   out for the record that in -- where we say
17   enforcement of the social media policies, social
18   media policies is a defined terms and it means each
19   of the policies.  It's just a shorthand we've used
20   to refer to each one.  If you look at Paragraph 11
21   in the definition section, you will see what I am
22   talking about.
23           MR. CORRELL:  Well, that was not clear
24   to us when we were preparing Mr. Sims.  I can try
25   to find information with respect to queries of

Page 80

1    prolonged -- I will tell you he is prepared to
2    testify on social media policy on those points.  He
3    is not prepared to provide numerical information
4    about prior terminations with respect to bullying
5    slash -- or I'm sorry -- the work -- workplace
6    bullying and hazing policy or with respect to the
7    sexual harassment policy.  We'll work on seeing if
8    we can get that information so it can be disclosed
9    today as part of this deposition.
10           MR. GILLIAM:  Okay.  I appreciate
11   that.  Is it -- do you think it's worthwhile
12   inquiring now based on -- off of his personal
13   knowledge or you want to just reserve it?
14           MR. CORRELL:  It's -- it's your
15   preference, Counsel.  I am going to go ahead and
16   send an email while you continue to see if I can
17   get that --
18           MR. GILLIAM:  Okay.
19           MR. CORRELL:  -- information quickly
20   so we can do this as -- in one day as much as
21   possible.
22           MR. GILLIAM:  Okay.  If -- you know,
23   if it possibly saves some time for later, I might
24   ask Mr. Sims to testify what he -- what he recalls.
25           MR. CORRELL:  Sure.  I will just have

Page 81

1 it be -- Mr. Sims, at this point, you are
2 testifying in your personal capacity.  We will talk
3 during lunch to provide you with corporate
4 information to relay.
5     Q.  (By Mr. Gilliam)  And just to -- to -- to
6 go back, Mr. Sims, if -- if you -- what -- what --
7 roughly, how many cases of employee -- well, let me
8 back up.
9          How -- how many cases of flight
10 attendant terminations under the workplace bullying
11 and hazing policy do you recall in the last seven
12 years?
13     **A.  I -- I would have to go back and look at**
14 **the records.  I don't know.**
15     Q.  Well, do you recall any cases off the top
16 of your head?
17     **A.  No.**
18     Q.  Okay.  All right.  Well, maybe -- let's
19 see.  Maybe, then, we just should wait until --
20 until later to -- to discuss this, then.  And I --
21 I also note that -- I see Ms. Hendrick is -- is
22 looking for the documents.  If somebody hasn't
23 already sent that to you, maybe at our next break,
24 I could -- I could forward those to you.
25          MR. GILLIAM:  And I -- I should go on

Page 82

1 the -- I guess I can go on the record as saying
2 that, you know, I'll -- I'll represent that
3 Ms. Hendrick and Mr. Spurlock have both signed
4 confidentiality agreements, so they -- they have
5 signed that ahead of time before this deposition.
6     Q.  (By Mr. Gilliam)  So let's -- let's turn
7 to the social media policy since we were -- were
8 just talking about it.  Do you -- do you recall how
9 many flight attendants have been fired for
10 violating this -- this policy in the last seven
11 years?
12     **A.  As far as discipline, not necessarily**
13 **firing, we've had 122.**
14     Q.  In the last seven years?
15     **A.  Correct.**
16     Q.  Okay.  Do you know how that breaks down
17 each year?
18     **A.  I don't have it per year.  I have the**
19 **totals.**
20     Q.  Okay.  When you say the totals, which --
21 which totals; just the 122 total?
22     **A.  Correct.**
23     Q.  Okay.  Do you know how many of those were
24 -- were terminations?
25     **A.  No.**

Page 83

1     Q.  Okay.  Or do you know how many were some
2 level of suspension?
3     **A.  When it reaches discipline level, it can**
4 **go anywhere from a coaching/counseling, letter of**
5 **warning, suspension, up to and including**
6 **termination.**
7     Q.  Okay.  Is -- is coaching and counseling
8 one category; you know, they --
9     **A.  Coaching/counseling is not a disciplinary**
10 **action.  It's -- it's simply having a discussion**
11 **with an employee about a dis- -- discipline.**
12     Q.  Okay.  And it's fair to say suspension is
13 discipline?
14     **A.  Correct.**
15     Q.  And -- and are they always 30-day
16 suspensions or they -- they -- they vary in terms
17 of the duration?
18     **A.  The -- they became 30-day suspensions**
19 **effective January, February of 2017.  Prior to**
20 **that, they were not always 30-day suspensions.**
21     Q.  And why did they become 30-day suspensions
22 beginning January 2017?
23     **A.  Social media violations have become really**
24 **difficult to manage because they were becoming more**
25 **egregious and more often during the year 2016.**

Page 84

1     Q.  Do you know what was causing them to be --
2 become more egregious and --
3     **A.  There were several things taking place in**
4 **2016; namely, the presidential campaign involving**
5 **Donald Trump and Hillary Clinton; and along with**
6 **the TWU Local 556 recall effort.**
7     Q.  And based on what -- what you said
8 earlier, I guess, you -- you don't know how -- how
9 many disciplinary cases of the 122 fell in 2016?
10     **A.  No, not for that year.**
11     Q.  Okay.  Is there any way we could find out
12 that number?
13     **A.  Again, we could potentially do another**
14 **query with labor relations.  I am not sure if we're**
15 **able to.  I -- I don't know on that.**
16     Q.  All right.  Did -- did the number of cases
17 -- disciplinary cases spike dramatically in 2016?
18     **A.  That is correct.**
19     Q.  Okay.  And did they, I guess, continue at
20 the same level in 2017?  Let -- let me withdraw
21 that question.  Let me ask it another way.
22          Were there as many disciplinary cases
23 involving the social media policy in 2017 as there
24 were in 2016?
25     **A.  That, I do not know if there were -- I --**

Page 85

1 I do not know.
2    Q.  Okay.  And in -- do you know if the number
3 of terminations in 2016 escalated over prior years
4 under the social media policy?
5    A.  I do not know.
6    Q.  Between 2013 and 2014, did you see
7 many violations of the social media policy?
8    A.  I am not fully understanding when you say
9 by many.
10    Q.  Right.  Yeah, I guess without the -- the
11 -- the specific -- yeah.  But I -- but I -- I think
12 you -- you did answer already the question about
13 2016 and the cases had -- had increased over prior
14 years?
15    A.  That is correct.
16    Q.  That's correct?  Okay.  Do you know if, in
17 the years since 2017, whether the -- the -- the
18 cases of discipline under the social media policy
19 have declined?
20    A.  I am not able to confirm if they have
21 declined because we still manage social media
22 issues.
23    Q.  Okay.  I think you had also commented that
24 the -- I guess, the -- the -- the disciplinary
25 cases under the social media policy have become

Page 86

1 very difficult to manage; and that's one of the
2 reasons why 30-day suspensions started to happen in
3 -- in -- in 2017.  When you -- when you say they
4 were difficult to -- to manage, you mean, they were
5 administratively difficult to manage?
6       MR. CORRELL:  I am going to object
7 that that misstates prior testimony.
8    Q.  (By Mr. Gilliam)  And -- and please
9 correct -- yeah.  Please correct me if I misstated
10 your testimony.
11    A.  Can you ask me the question again, sir?
12    Q.  Yeah.  I -- I guess what I am trying to
13 find out is:  Did -- did you testify that the --
14 the -- the disciplinary cases involving the social
15 media policy, the number had become more difficult
16 to manage?
17    A.  Yes.
18    Q.  And in -- in what ways were they more
19 difficult to manage?
20    A.  The sheer volume of managing employee
21 issues began taking a toll on having to sort
22 through them; in essence, referee personal disputes
23 when Southwest Airlines did not want to be part of
24 that.  We want our employees to work for the cause
25 of Southwest Airlines.  And internal disputes were

Page 87

1 just an -- ongoing.  So it was getting in the way
2 -- these disputes were getting in the way of the
3 normal course of business.
4    Q.  Okay.  Now, shifting to Southwest's policy
5 concerning harassment, sexual harassment,
6 discrimination and retaliation, I -- I guess you --
7 that -- that -- is that another one we will have to
8 save until later in terms of -- okay.
9    A.  I think so --
10       MR. GILLIAM:  I saw Mr. Correll
11 shaking his head yes, so --
12       MR. CORRELL:  Yeah, and we -- we --
13 we've put it -- we've requested that information --
14       MR. GILLIAM:  Okay.
15       MR. CORRELL:  -- so that Mr. Sims can
16 be prepared on it to testify to you later today.
17       MR. GILLIAM:  Okay.  All right.  I'll
18 -- I'll shelve that one as -- as well, then.
19    Q.  (By Mr. Gilliam)  Let's see.  Yeah.  I
20 still have some other questions.  If you would turn
21 back to, I guess, Exhibit 1.
22    A.  Okay.
23    Q.  Which is Document 11.  And have there been
24 any revisions of this policy since 2017?
25    A.  I believe so.

Page 88

1    Q.  Okay.  And do -- do you know how it's been
2 revised?
3    A.  No.  I would have to go back and -- and
4 compare.  A lot of it's formatting and language and
5 such.
6    Q.  Okay.  And is it -- is it employee
7 relations' role to determine whether there was a
8 violation of this policy?  And by this policy, I
9 mean the -- the policy concerning harassment,
10 sexual harassment, discrimination and retaliation?
11    A.  Yeah, the -- their role is to support the
12 claim or not support the claim or draw an
13 inconclusion.
14    Q.  Okay.  If they don't support the claim or
15 draw an inconclusion, can an employee be fired for
16 the violation of this policy?
17    A.  The sexual harassment policy?
18    Q.  Yes.
19    A.  Generally, no.
20    Q.  Okay.  All right.  And who -- who drafted
21 this policy?
22    A.  Which policy?
23    Q.  Yeah -- I am sorry.  Which department --
24 well, was there a particular department that was
25 charged with drafting the policy concerning

Page 89

1 harassment, sexual harassment, discrimination,
2 retaliation?
3 **A. General counsel.**
4 Q. Okay. And did general counsel also draft
5 the social media policy?
6 **A. Yes.**
7 Q. Okay. And did they also -- did general
8 counsel also draft the workplace bullying and
9 hazing policy?
10 **A. Yes.**
11 Q. Do they -- when they draft these policies,
12 do they work with anybody, any managers or
13 supervisors or directors in either employee
14 relations --
15 MR. CORRELL: I am going to object to
16 that question as -- as infringing on the
17 attorney/client privilege and instruct the witness
18 not to answer about general counsel's
19 communications about these policies.
20 MR. GILLIAM: Okay. Yeah.
21 MR. CORRELL: Even disclosing the
22 identities whom they are communicating reveals
23 counsel's approach to the policy and -- and their
24 -- their -- the way in which they are dispensing
25 legal advice to the client, because then you will

Page 90

1 have information about how they go about it as an
2 attorney. And so we don't -- we're -- we're not
3 going to be able to disclose that information.
4 Q. (By Mr. Gilliam) I am trying to think if
5 there was another way I can ask the question
6 without going there.
7 MR. CORRELL: Well, and before we get
8 into a whole bunch of privilege objections, just to
9 kind of preview. I mean, the -- as the witness has
10 testified, general counsel at Southwest owns these
11 policies; they formulate them; they revise them.
12 It is done within the umbrella of legal services.
13 So if we try to get into the how or why of things
14 like this, it's going to be a privilege objection
15 again and again.
16 If we need to make a record, that's
17 fine. Just know that that's where this is going to
18 go. I just want to make sure that we aren't
19 wasting your time.
20 Q. (By Mr. Gilliam) Let me -- let me ask
21 this question: Is -- does -- does Local 556 have
22 any input into the -- the preparation of these
23 policies?
24 **A. No, not to my knowledge.**
25 Q. Okay. Now, in -- well, when the -- the

Page 91

1 social media policies -- social media policy
2 violations began to escalate, did the -- the union
3 ever approach anyone at Southwest about how these
4 policies were being enforced?
5 **A. I am not really sure I am understanding**
6 **the question.**
7 Q. So as -- as there became more cases of
8 social media policy violations, did anyone from the
9 union communicate any objections to Southwest about
10 the approach to enforcement that Southwest was
11 taking?
12 **A. I don't know specifically other than in**
13 **the course of their normal representing people. So**
14 **they may have raised those objections during**
15 **individual cases, and they may not have. It was**
16 **all in the normal course of their role as**
17 **collective bargaining agent.**
18 Q. Out -- outside of the -- outside of
19 grievances, were there ever any meetings where the
20 union tried to argue for a different approach to
21 enforcement of the social media policies?
22 **A. Not that I remember.**
23 Q. I mean, is there -- I mean, outside of
24 collective bargaining negotiations and grievances,
25 is there some sort of channel set up where any time

Page 92

1 the union has an issue regarding a particular
2 matter, that they -- they -- they communicate their
3 concerns or objections to Southwest?
4 **A. Yes. They -- they can reach out to labor**
5 **relations and -- and have a meeting to discuss any**
6 **issue they are concerned of.**
7 Q. Okay. Do you know if any representatives
8 from Local 556 ever reached out to labor relations
9 regarding the -- the -- the manner of enforcement
10 of the social media policies?
11 **A. That, I do not know.**
12 Q. Do you know who might know that?
13 **A. Someone from our labor relations area may**
14 **know that.**
15 Q. Okay. All right. And just to make sure I
16 understand; I -- I think I do. But does general
17 counsel have final approval of these social media
18 policies?
19 **A. That's my understanding.**
20 Q. Okay. And this -- do you know if any
21 employees have ever been fired for just violating
22 the social -- I am sorry.
23 Do you know if any employees have ever
24 been fired for violating the Southwest mission
25 statement?

Page 93

1  **A. Yes. I -- I imagine there have been.**
2  Q. Do you know how many cases?
3  **A. I do not.**
4  Q. Or do you recall any specific cases?
5  **A. I do not.**
6  Q. Okay. Now, do you know if Ms. Carter
7  violated Southwest work rules?
8  **A. No. She was not -- she was not terminated**
9  **for work-rule violations.**
10 Q. Okay. I don't want to bring this up as an
11 exhibit, but if I could refer you to the
12 interrogatories. This would be a stand-alone
13 document. It's not one of the numbered documents.
14 Southwest's Response -- Objections and Responses to
15 Plaintiff's First Set of Interrogatories. When you
16 pull it up, I can direct you to an actual number; I
17 think I can, anyway.
18 **A. Unfortunately, I'm having a hard time**
19 **finding them on --**
20     MR. CORRELL: Mike, it's in the fourth
21 -- it's in the fourth email that was forwarded to
22 you containing documents for today.
23     THE WITNESS: Okay.
24 Q. (By Mr. Gilliam) When you find it, I will
25 direct you to the -- the page number; that's

Page 94

1  probably easiest.
2  **A. Okay. So due to the iPad being not as**
3  **user-friendly when it comes to pulling up some of**
4  **these documents, would you object to me pulling it**
5  **up on my laptop computer?**
6  Q. That's fine. I don't know if Mack could
7  pull it up too, but if that would help.
8      THE VIDEOGRAPHER: Let me try to pull
9  it up. But I can have -- I have control of it; he
10 won't have control of it.
11     MR. GILLIAM: Oh, okay.
12     MR. CORRELL: Is this -- for the
13 interrogatory document, I am not worried about it
14 if you're directing him to a specific answer. It
15 will make it clearer for the record anyways.
16     MR. GILLIAM: Yeah.
17     MR. CORRELL: So if we want to just
18 use a centrally controlled document, that's fine by
19 me for this particular document.
20     THE VIDEOGRAPHER: What document
21 number is it?
22     MR. GILLIAM: It's -- this one doesn't
23 have a number. It -- it will be in the fourth
24 email I sent. And it will, probably, be the very
25 bottom document; says, SWA Carter final, SWA

Page 95

1  response.
2      THE VIDEOGRAPHER: Can you give me the
3  titles again?
4      MR. GILLIAM: Yeah. It's -- sorry.
5  SWA_Carter_Final SWA Response to Plaintiff's Roggs,
6  R-o-g-g-s.
7      THE VIDEOGRAPHER: Does this look
8  correct?
9      MR. GILLIAM: That looks like it.
10 And then we're going to look at Page 10. It's 6E
11 on Page 10. Be the next page, and it'll be the
12 letter E. That's the response. But the question
13 -- if you want to scroll back to the previous page.
14 Q. (By Mr. Gilliam) The question says, For
15 each of the policies listed below, explain all ways
16 in which Carter social's media activity violated
17 Southwest's -- and then Part E is any other
18 Southwest policies.
19     And then back to E. It says, Carter's
20 social media activity violated Southwest's basic
21 work rules and expectations.
22     And my -- my question was, you know,
23 which -- which work rules and expectations did her
24 social media activity violate?
25 **A. I -- I think I misunderstood your**

Page 96

1  **question. She did not violate a specific work**
2  **rule. What she did violate was the preamble to the**
3  **work rules and expectations, which is what we call**
4  **south -- Southwest 3.0.0, which is the preamble to**
5  **the workplace rules.**
6  Q. Okay. Is that in Exhibit 2 or not? I am
7  sorry. Exhibit 1.
8  **A. I did not see it in there, but we can --**
9  Q. And I would suspect that has been produced
10 at some point, but do -- do you remember what that
11 preamble says or what -- let me withdraw that.
12     Do you remember which portion of the
13 preamble, specifically, her social media activity
14 violated?
15 **A. I don't remember specifically what -- no,**
16 **I don't remember that.**
17 Q. Okay. And that was not included -- well,
18 let me strike that and reword this.
19     Her termination letter did not mention
20 a violation of the work rules, did it?
21     MR. CORRELL: Objection. Document
22 speaks for itself. You can answer, Mr. Sims.
23 **A. Can I go back and look at the document,**
24 **then, please?**
25 Q. (By Mr. Gilliam) Sure. It's --

Page 97

1 MR. GILLIAM: This one -- Exhibit 2, I
2 think, Document Number 7?
3 THE REPORTER: Yes.
4 MR. GILLIAM: Sorry for the confusion
5 over the numbers.
6 THE REPORTER: That's okay.
7 THE WITNESS: Okay. So I am looking
8 for that document.
9 MR. GILLIAM: And I am just sending
10 these to the court reporter right now, so -- so she
11 has access to them.
12 A. Okay.
13 Q. (By Mr. Gilliam) Okay. Did -- and if --
14 if you want me to ask the question again, I can.
15 A. Please do.
16 Q. Did -- did Southwest's termination letter
17 indicate that Ms. Carter had violated the work
18 rules?
19 A. Yes. And here on Letter 3, it's 3.0.0;
20 that's the one I referred to.
21 Q. Let's see. Where -- I am sorry. Where is
22 it? Are you looking at the termination letter?
23 A. Yes, sir.
24 Q. Okay. And -- and where -- where is it
25 mentioned in the termination letter?

Page 98

1 A. Okay. I am going to have to check and see
2 if I have the right -- it says, after considering
3 all the information gathered in my investigation,
4 as well as information presented, I have determined
5 your conduct is a violation of the following
6 company policies/rule. And then it has social
7 media policy, bullying and flights and work rules
8 and expectations, 3.0.0. And it was marked --
9 yeah.
10 Q. Okay. I am not seeing that on the
11 exhibit.
12 MR. GILLIAM: Mack, I don't know if
13 you're able to pull up that exhibit.
14 THE VIDEOGRAPHER: Document 7?
15 MR. GILLIAM: Yeah. Exhibit -- what
16 has been marked as Exhibit 2 now.
17 Q. (By Mr. Gilliam) Is that the version that
18 you are seeing, Mr. Sims?
19 A. No. That's a different version. This --
20 the one that we are looking at is the final
21 version, which does not include the bullet point on
22 3.0.0.
23 Q. Okay. The -- the version we have marked
24 as Exhibit 2 is the final version, correct?
25 A. I got it. I am with you. The 3.0.0 is

Page 99

1 implied in here because the 3.0.0 refers to the
2 overall image of a Southwest Airlines flight
3 attendant.
4 Q. Okay. Do you know when Southwest first
5 adopted the -- the social media policy?
6 A. No. I think it was probably around -- no,
7 I don't know the exact date of the original social
8 media policy.
9 Q. Okay. Do you know how often it's revised?
10 A. No.
11 Q. Okay. So going -- going back to our --
12 our discussion about some of the social media
13 policy violations, do you know if any Local 556
14 executive board members ever reported other
15 employees for a social media policy violation?
16 A. I -- I believe that may have happened.
17 Q. Okay. Which -- what -- what -- what case
18 do you recall of a executive board member?
19 A. I -- I don't have any specific cases that
20 I recall other than, I believe, that they -- they
21 may have reported it before.
22 Q. Okay. Do you -- do you remember how many
23 -- how many times that may have happened?
24 A. I do not.
25 Q. Okay. Do you remember if any other union

Page 100

1 representatives may have reported other employees
2 for social media violations before?
3 A. No, I don't remember.
4 Q. Okay. Okay. In the 122 cases that you
5 mentioned, the disciplinary cases -- well, you --
6 you don't -- you said you do not remember how --
7 whether any of those employee or how many were
8 fired?
9 A. I don't know how many were terminated.
10 Q. Okay.
11 A. And in those cases --
12 MR. CORRELL: We're going to get that
13 information for you over lunch, so he'll be able to
14 answer that question.
15 MR. GILLIAM: Okay.
16 MR. CORRELL: We have it; I just need
17 to refresh his recollection.
18 MR. GILLIAM: Okay. Let's see. I may
19 hold off on a couple of other questions, then.
20 THE VIDEOGRAPHER: I have roughly 10
21 minutes before I have to do a media change, just to
22 let you know.
23 MR. GILLIAM: Okay.
24 Q. (By Mr. Gilliam) Now, is -- is it the ACT
25 team that is responsible for handling religious

Page 101

1  accommodation requests?
2  **A. That is correct.**
3  Q. And what -- what does ACT
4  stand for?
5  **A. Accommodations and Career Transitions.**
6  Q. Okay. Now, would the ACT team be in
7  charge of any incident where a flight attendant
8  is accused of treating another flight attendant
9  unfairly based on their religion?
10 **A. No. That would be employee relations.**
11 Q. Okay. So any incidents of religious
12 discrimination would -- would also be handled by
13 employee relations?
14 **A. In -- incidents of discrimination are**
15 **handled by employee relations. The ACT team only**
16 **grants accommodations.**
17 Q. Okay. If an incident of religious
18 discrimination is reported to the ACT team, do --
19 do they ever report it to -- I'm -- I'm sorry. Let
20 me start over.
21     If an incident of religious
22 discrimination is -- is reported to employee
23 relations, does employee relations ever communicate
24 that to the ACT team?
25 **A. That, I do not know.**

Page 102

1  Q. Do you know if there are ever occasions
2  where employee relations is investigating some sort
3  of allegation of religious discrimination and they
4  need to determine whether an accommodation is
5  needed?
6  **A. I don't think I fully understood your**
7  **question. I apologize.**
8  Q. Do you know if there are ever any
9  occasions when an employee alleges some sort of
10 religious discrimination in the workplace, and the
11 -- and employee relations needs to go to the ACT
12 team to see if they can grant an accommodation to
13 that employee?
14 **A. Yeah, I -- I don't know -- I don't know**
15 **the answer.**
16 Q. Maybe another way to ask the question: Do
17 all religious-accommodation issues originate with
18 the ACT team?
19 **A. No.**
20 Q. Where -- where else would they -- they
21 originate?
22 **A. Any time somebody is seeking an**
23 **accommodation, they can reach out to anybody at**
24 **Southwest Airlines. And a Southwest Airlines**
25 **representative leader will put them in touch with**

Page 103

1  **the ACT team. Or they could contact the ACT team**
2  **directly.**
3  Q. Okay. And then when the ACT team receives
4  knowledge of an accommodation request, what do they
5  do with that information?
6  **A. They review it and -- in accordance with**
7  **company policy and applicable law, and they make a**
8  **determination whether or not some sort of workplace**
9  **accommodation will be granted or not.**
10 Q. Okay. Do they consult with employee
11 relations or inflight or another department in
12 making a determination of an accommodation request?
13 **A. Generally, no. Other than they may reach**
14 **out to the respective department to learn more**
15 **about the job functions itself under the job**
16 **description.**
17 Q. And is -- is the ACT team comprised of
18 full-time employees?
19 **A. Correct.**
20 Q. Okay. And they are doing that job on the
21 ACT team in a full-time basis?
22 **A. Correct.**
23 Q. Okay. And about -- do you know about how
24 many employees are within the ACT team?
25 **A. I do not.**

Page 104

1  Q. Do you -- do you know if it's over 50?
2  **A. It's not over 50.**
3  Q. Okay. Over 20?
4  **A. I don't believe it's over 20.**
5  Q. Okay. And did they -- does the ACT team
6  -- is it -- is it split up geographically? For --
7  for instance, let me ask the question this way:
8  Would an ACT team representative, like, cover a
9  particular territory?
10 **A. Not to my knowledge. I believe they are**
11 **all generalists.**
12 Q. Okay. Do you know about how many
13 religious-accommodation requests they get each
14 year?
15 **A. I do not know.**
16 Q. Okay. Do you know about how many
17 religious discrimination allegations there are each
18 year that are reported?
19 **A. I do not know.**
20 Q. Do you know if there are any Equal
21 Employment Opportunity Commission complaints of a
22 religious nature that are currently pending against
23 Southwest?
24     MR. CORRELL: Objection. That's
25 beyond the scope of the Notice. You can answer if

Page 105

1  you are able, Mr. Sims.
2    **A.  I do not know.**
3    Q.  (By Mr. Gilliam)  Okay.  Turning back to
4  Exhibit 1.  And the last document, if you could
5  look over that document, last page of Exhibit --
6  Exhibit 1; and that's Document 11.
7    **A.  Okay.  I am having a hard time pulling it**
8  **up.  I am going to switch to the laptop computer.**
9    THE VIDEOGRAPHER:  Can we go off the
10  record so I can do a media change while he sets up
11  his laptop and stuff?
12    MR. GILLIAM:  Yeah, sure.  And I don't
13  know if, at some point, you-all needed to break for
14  lunch or what?
15    MR. CORRELL:  I mean, I'm -- I'm fine
16  going and taking a break for lunch now, if that
17  works for you.  Just do -- we can do 30 or 45
18  minutes and then come back.  Because I'm going to
19  try to get the rest of this info for you so you can
20  get the details that we previously needed to
21  supply.
22    MR. GILLIAM:  Yeah.  That's -- that's
23  fine.
24    MR. CORRELL:  Okay.
25    MR. GILLIAM:  Let's go --

Page 106

1    MR. CORRELL:  Then we'll go off the
2  record for 45 minutes?
3    MR. GILLIAM:  Yeah.  That's fine by
4  me, if it's okay --
5    MR. CORRELL:  Okay.
6    MR. GILLIAM:  -- with everybody else.
7  Yup.
8    MR. CORRELL:  Sounds good.  Then we'll
9  be back right around -- just a little bit before
10  the hour.
11    MR. GILLIAM:  Okay.
12    THE VIDEOGRAPHER:  We are off record
13  at 12:07 p.m.
14    (Lunch break had.)
15    THE VIDEOGRAPHER:  We are back on
16  record at 12:58 p.m.
17    MR. CORRELL:  Counsel, before you
18  resume your examination, I want to note for the
19  record that during the lunch break, we reached out
20  to the labor relations department at Southwest
21  Airlines to get additional information about the
22  history of claims, discipline and termination
23  involving the three policies at issue here.  I can
24  tell you, based on that interaction, that getting a
25  year-by-year breakdown is an extremely laborious

Page 107

1  task that we're not going to be able to perform in
2  the immediate future.
3    However we have managed to gather
4  information about total reports, total discipline,
5  total terminations.  And then, additionally,
6  Mr. Sims has been prepared on some more specific
7  details regarding last-chance agreements with
8  respect to the social media policy.  And all of
9  that was derived from reports from -- from the
10  labor relations group given to us over the lunch
11  break.
12    MR. GILLIAM:  Okay.  Thank you,
13  Counsel.
14    Q.  (By Mr. Gilliam)  And I guess we're --
15  we're ready to resume.  And maybe we can -- we can
16  start off there.  So my -- my understanding is that
17  you -- you don't have a year-by-year breakdown.  Do
18  you have a total on the number of social media
19  policy violations for that time period?
20    **A.  We do.**
21    Q.  Okay.  And what's -- what is that number?
22    **A.  314 total reports.**
23    Q.  Total reports?
24    **A.  Correct.**
25    Q.  Okay.  So of those reports, not all of

Page 108

1  them resulted in a suspension?
2    **A.  That is correct.**
3    Q.  And do -- do you know -- okay.  So that's
4  304 -- -14 total reports for the seven-year period,
5  for the last --
6    **A.  Plus or minus.**
7    Q.  (By Mr. Gilliam)  Okay.  Approximately,
8  314 reports for -- well, when you say plus or
9  minus, plus or minus 314 or plus or minus seven
10  years?
11    **A.  Oh, plus or minus 314.  It's --**
12    Q.  Okay.
13    **A.  -- it's an approximate number.**
14    Q.  Okay.  That's for the last seven years.
15  Okay.  And do you know, of those, how many resulted
16  in terminations?
17    **A.  Let's see.  Approximately 10.**
18    Q.  Okay.  Approximately 10 terminations.  And
19  I understand you don't have a year-by-year
20  breakdown, but do you know what years those 10
21  terminations occurred in?
22    **A.  I do not.**
23    Q.  Okay.  Okay.  And do you know how many of
24  those resulted in suspensions?
25    **A.  Suspensions?  I don't have the exact**

Page 109

1 number for suspensions.
2 Q. Okay.
3 A. I can --
4 Q. I am sorry. You about to say you can get
5 it or --
6 A. I only have a number for total discipline
7 cases, which would include suspensions and
8 terminations and written warnings.
9 Q. Okay. Do you know how many of the 314
10 were just coaches and counsels?
11 A. No.
12 Q. Okay. So the 314, would -- would that
13 also include scenarios where somebody was reported
14 for something, but Southwest took no action at all?
15 A. Correct.
16 Q. Do you know how many instances of the 314
17 there were where Southwest took no action at all?
18 MR. CORRELL: Objection. Vague.
19 Q. (By Mr. Gilliam) Yeah. Let me -- let me
20 rephrase that. So of the 314 reports, how many did
21 Southwest determine where lacking in merit?
22 A. That, I do not know that answer.
23 Q. Okay. All right. For the 10
24 terminations, do you know which employees were
25 terminated in those 10 instances?

Page 110

1 A. I know of most of them.
2 Q. Okay. Who -- what were the names of the
3 employees that you remember who were terminated?
4 A. Highly -- excuse me -- Holly Imamovic,
5 that's I-m-a-m-o-v-i-c; Casey Rittner,
6 R-i-t-t-n-e-r; Kendall Floss, F-l-o-s-s (sic);
7 Glenn Thompson, T-h-o-m-p-s-o-n; Chris Slough,
8 S-l-o-u-g-h; Ms. Carter; Brian Talbert. And those
9 are the only -- and there is a few others I just
10 don't remember.
11 Q. Do you remember if there was an employee
12 named Kent Hand who was terminated for violation of
13 the social media policy?
14 A. I do recall Kent Hand.
15 Q. And -- and do you recall if he was
16 terminated for violation of the social media
17 policy?
18 A. That, I do not recall.
19 Q. Okay. All right. And for -- for
20 clarification, do you know how many disciplinary
21 incidents there were for violations of the
22 workplace bullying and hazing policy?
23 A. We have a total of 44 reports.
24 Q. Okay. 44 reports of bullying. All right.
25 And do you know how many of those 44 resulted in an

Page 111

1 employee's termination?
2 A. Five.
3 Q. Okay. And just to make sure we're clear,
4 when we say 314 total reports, all of these numbers
5 we're using, they reference flight attendants,
6 correct?
7 A. Correct.
8 Q. We're not talking about other employees
9 outside of the bargaining agreement?
10 A. No. Only the ones within this bargaining
11 group.
12 Q. Okay. Do you recall the names of the five
13 employees who were terminated for violating the
14 bullying and hazing policy?
15 A. I do not.
16 Q. Okay. Okay. Do you know the total number
17 of incidents in the last seven years where an
18 employee was reported for violating the sexual
19 harassment policy?
20 A. We have total of 143 reports.
21 Q. I am sorry. Did you say 143?
22 A. Correct.
23 Q. Okay. And how many of those 143 reports
24 resulted in a termination?
25 A. 12.

Page 112

1 Q. 12. Okay. And that was for the last
2 seven years, correct?
3 A. Yes, sir. Yes, I believe, yes.
4 Q. Okay.
5 A. No. Excuse me. I believe that's since --
6 I need to get clarification. I believe it's since
7 2016.
8 Q. Okay. If you can just clarify that.
9 A. Okay.
10 Q. And for the -- the reports of bullying and
11 hazing incidents, do you know what time frame that
12 was for?
13 A. I will confirm it, but I believe it was
14 2016 on.
15 Q. Okay.
16 MR. CORRELL: Actually, I can -- I can
17 jump in as the person running between folks on this
18 information. This is derived from reports that go
19 back to 2013.
20 THE WITNESS: Okay. Great. Thank
21 you.
22 Q. (By Mr. Gilliam) Okay. So it's 2013
23 through the present?
24 A. Correct.
25 Q. Okay. All right. And do you know any of

Page 113

1  the 12 employees who were -- who were terminated
2  under the sexual harassment policy?
3      A.  Not that I recall.
4      Q.  Okay.  Do you know if there were any
5  employees who were terminated only for violating
6  Southwest's mission statement?
7      A.  That, I do not know.
8      Q.  Okay.
9          MR. CORRELL:  And, Counsel, I'll
10  represent that's something we found we cannot run a
11  query for as an independent, freestanding grounds.
12  I don't know if that means it's never happened; I
13  just don't have the ability to run a query.
14          MR. GILLIAM:  Okay.
15      Q.  (By Mr. Gilliam)  And do you know how many
16  accommodation requests Southwest has received --
17      A.  I do not know.
18      Q.  Do not know?  Okay.  Do you know if an
19  employee has ever been terminated in the last seven
20  years for religious discrimination?
21      A.  Not that I know of.
22      Q.  Okay.  Now, returning to the -- the
23  employees who were terminated for violating the
24  social media policy.  I -- I think you said those
25  are all flight attendants; is that correct?

Page 114

1      A.  Correct.
2      Q.  Okay.  And of those -- let's see.  One,
3  two, three, four -- I have seven employees, I
4  think, you named.  Did any -- were any of them
5  reinstated to employment at Southwest?
6      A.  Several of them were.
7      Q.  Okay.  Who -- who was reinstated to their
8  employment?
9      A.  We offered a last-chance agreement to
10  Holly Imamovic, Casey Rittner, Kendall Foss,
11  Michael Kammas, Glenn Thompson, Chris Slough.  And
12  then Brian Talbert was reinstated with 30-day
13  suspension.
14      Q.  Okay.  And did Brian Talbert sign a
15  last-chance agreement?
16      A.  Not to my knowledge.
17      Q.  Okay.  Did -- did you know each of these
18  employees pretty well?
19      A.  I am not sure --
20      Q.  Let me ask it this way:  Did you have a --
21  well, strike that.
22          So did you have any communications
23  with these employees outside of the -- the
24  grievance context?
25      A.  No.

Page 115

1      Q.  Okay.  So your -- your communications with
2  -- with each of -- each of the -- the employees
3  that -- that you just named was really limited to
4  the grievance context?
5      A.  If I understand you correctly, but I was a
6  flight attendant for Southwest Airlines, so I do
7  know a lot of people.
8      Q.  Sure.  Yeah.  Understood.  Okay.  And
9  Michael Thomas (sic), was that an employee who was
10  term- -- terminated for violating the social media
11  policy?
12      A.  Michael Thomas?
13      Q.  I may have misunderstood.  I thought I
14  heard you say Michael Thomas.
15      A.  Glenn Thompson?
16      Q.  Glenn Thompson?  Okay.  I -- I probably
17  misheard.  So if I understand correctly, of the
18  employees you named, five of them signed a
19  last-chance agreement?
20          Well, I -- I don't want to misstate
21  you here, but maybe you said that they were offered
22  a last-chance agreement.
23      A.  Well, I had -- we have six flight
24  attendants that accepted a last-chance agreement.
25      Q.  Okay.  Six accepted.  Okay.

Page 116

1      A.  Correct.
2      Q.  And -- okay.  I misheard one of those, and
3  I apologize.  So I from what I understand, Holly,
4  Casey Rittner, Kendall Floss, Glenn Thompson and
5  Chris Slough all accepted a last-chance agreement?
6      A.  Correct.
7      Q.  And am I missing one?
8      A.  It may be Michael Kammas, K-a-m-m-a-s.
9      Q.  Oh, that's the one.  Okay.  And of those
10  six who accepted the last-chance agreement, were
11  any of them fired after accepting the last-chance
12  agreement?
13      A.  One.
14      Q.  Okay.  And who was that?
15      A.  Holly Imamovic.
16      Q.  Okay.  And do the -- the other five still
17  work at Southwest?
18      A.  To my knowledge, they do.
19      Q.  Okay.  Do you remember the details of any
20  of their violations?
21      A.  No.
22      Q.  Okay.  Do you remember any of the details
23  of Brian Talbert's violation?
24      A.  To a certain extent.
25      Q.  What -- what do you remember about his

Page 117

1  violation?
2      A. Brian was terminated for violating the
3  social media policy. He was reinstated during the
4  grievance process with the termination converted to
5  a 30-day suspension.
6      Q. Okay. Do you know what he did to violate
7  the policy?
8      A. He was writing inflammatory messages using
9  social media, both on a --
10     Q. I'm sorry. You may have cut out. You
11 said he -- did you say both on a --
12     A. He was writing messages to employees --
13 personal messages, to my understanding; and writing
14 inflammatory and bullying comments on social media.
15     Q. Okay. Do -- do you remember the specific
16 violations of any of the others on besides Charlene
17 Carter?
18     A. They were all similar. They all have
19 their differences, so I -- I don't -- I don't -- I
20 can't categorize them as a group.
21     Q. Okay. Do you remember what Casey Rittner
22 did to violate the policy?
23     A. Casey, to my understanding, posted a
24 picture that was inappropriate for the workplace.
25     Q. Okay. Do you remember what was in the

Page 118

1  picture?
2      A. No.
3      Q. Okay. Do you remember what Kendall Floss
4  did to violate the policy?
5      A. Kendall published a -- a picture of
6  another employee and wrote comments about that
7  employee that were inappropriate for the workplace.
8      Q. Okay. Do you remember what she said?
9  Well, do you remember what she wrote?
10     A. Vaguely.
11     Q. What -- what do you recall about --
12     A. It was something to the extent of
13 disparaging another employee for wearing a
14 Halloween costume or wearing a costume while at
15 work while she was working with him. And she did
16 not like it.
17     Q. Do you remember who the employee was --
18     A. No.
19     Q. -- she disparaged?
20     A. No.
21     Q. Do you remember Michael Kammas' specific
22 violation of the policy?
23     A. I do not.
24     Q. Okay. Do you remember Glenn Thompson's --
25     A. I do not.

Page 119

1      Q. Okay. And do you remember any of the
2  details of Chris Slough's violation of the policy?
3      A. No.
4      Q. Okay. Did -- do you know on how many
5  occasions a union executive board member reported
6  another employee for a violation of the social
7  media policy?
8      A. I do not.
9      Q. Okay. Do you know the number of -- or do
10 -- do you know if an executive board member ever
11 reported another employee for the sexual harassment
12 policy or the bullying and hazing policy?
13     A. Not that I remember.
14     Q. Okay. Do you know if any employees have
15 been terminated more than one time for violating
16 the social media policy?
17     A. I do.
18     Q. Okay. How many employees were ter-- I'm
19 sorry -- terminated more than one time for
20 violating social media policy?
21     A. To my knowledge, it was two.
22     Q. Two. Okay. And who were those two?
23     A. Holly Imamovic and Brian Talbert.
24     Q. Okay. Now, the -- I think -- I think you
25 might have mentioned that Brian Talbert was

Page 120

1  reinstated with a 30-day suspension; is that right?
2      A. That is correct.
3      Q. Okay. Was that for his first termination
4  or his second termination?
5      A. First termination.
6      Q. Okay. And then his second termination,
7  was he reinstated again after -- excuse me. Let me
8  ask that clearly.
9          After his second termination, was he
10 reinstated again?
11     A. Correct.
12     Q. Okay. And did he sign a last-chance
13 agreement when he was reinstated the second time?
14     A. Not to my knowledge.
15     Q. Okay. And what was the -- so do -- do you
16 know why he was terminated the second time?
17     A. It's my understanding it was another
18 violation of the social media policy.
19     Q. Do you remember what the specific
20 violation of the social media policy was the second
21 time?
22     A. No.
23     Q. Do you know why he was reinstated the
24 second time?
25     A. Yes.

Page 121

1    Q. And -- and why is that?
2    **A. There was a procedural error in how his**
3    **termination was handled.**
4    Q. And what was the procedural error?
5    **A. He was terminated while on duty without**
6    **union representation.  As a result, he was**
7    **reinstated.**
8    Q. And at all times during his employment
9    with Southwest, did he work as a flight attendant?
10   **A. Yes.**
11   Q. Okay.  Did -- did he ever work in any
12   other capacity with Southwest?
13   **A. Not to my knowledge.**
14   Q. Okay.  So I wanted to follow up something
15   earlier.  And correct me if I -- if I get this
16   wrong.  But is it my understanding that Southwest's
17   social media team does not monitor flight attendant
18   social media accounts?
19   **A. That is correct.**
20   Q. Okay.  Are there ever any instances where
21   they monitor --
22   **A. In the instance of somebody reporting**
23   **something or in the instance that it comes through**
24   **them -- comes to them from some channel that I**
25   **would not know of, but they are not actively**

Page 122

1    **looking at employee social media accounts.**
2    Q. Okay.  But are there occasions when an
3    employee might report something to the social media
4    team?
5    **A. That is a possibility.**
6    Q. Okay.  So if I could, I guess, direct your
7    attention to Exhibit 1, which you -- you may have
8    marked it -- or which you may have as Document 11.
9    And when -- when you bring it up, let me know and I
10   will --
11   **A. Okay.  I have it up.**
12   Q. And I would like to direct your attention
13   to the -- the first sentence under the last headed
14   -- heading, monitoring and reporting prohibited
15   content.
16   **A. Okay.  Can you tell me which page you are**
17   **on, please?**
18   Q. Oh, I am sorry.  I am looking at the third
19   page.
20   **A. Under social media policy?**
21   Q. Yes, sir.  Yeah.  And then under the
22   heading, monitoring and reporting prohibitive
23   content.  The -- the first sentence there.
24   **A. Southwest reviews and monitors all social**
25   **media activity that is available to the public.**

Page 123

1    Q. And I think it says, included on Southwest
2    social media accounts or reported to Southwest.
3    **A. Correct.**
4    Q. Does -- so under this policy, is it
5    assumed that the social media team is monitoring
6    employee social media accounts?
7    **A. No.**
8    Q. Okay.  So that -- it excludes employee
9    social media activities?
10   **A. To my understanding.**
11   Q. Okay.  So would all social media
12   violations come through an employee?
13   **A. Potentially.**
14   Q. Would a social media violation ever
15   originate from someone else besides a flight
16   attendant?
17   **A. Yes.**
18       MR. CORRELL: Objection.  Calls for
19   speculation.  One second.  Calls for speculation.
20   You can answer, Mr. Sims.
21   **A. Yes.  We do receive reports from customers**
22   **and general public.**
23   Q. (By Mr. Gilliam)  Okay.  Has anyone at
24   Southwest management ever reported a flight
25   attendant for a violation of the social media

Page 124

1    policy to one of these groups that handles the
2    policies?
3    **A. That, I do not know.**
4    Q. I do have another question while -- back
5    on that page again, there is a -- an email address
6    about midway down through that same paragraph we
7    were looking at.
8    **A. Social media policy?**
9    Q. Yeah, -dg@wnco.com; who -- who does that
10   email go to?
11   **A. That is a mailbox that -- that is**
12   **disbursed to the social media team.**
13   Q. Okay.  And who is on that social media
14   team?
15   **A. I do not know all of their employees.**
16   Q. Okay.  Does the DG refer to Denise
17   Gutierrez?
18   **A. No, not at all.**
19   Q. What does the DG stand for?
20   **A. I -- I believe it's direct group.**
21   Q. Okay.
22   **A. Something that is a email function that**
23   **designated it's a mailbox monitored by several**
24   **people.**
25   Q. Okay.  And another question just to

Page 125

1 clarify.  Is there any other group or person at
2 Southwest who is monitoring employees', I guess,
3 social media sites for content?
4     **A.  Not that I know of.**
5     Q.  Okay.  When did Southwest first learn from
6 Audrey Stone about Charlene Carter's Facebook
7 messages and posts?
8     **A.  I do not have the date.**
9     Q.  Do -- do you remember how Southwest
10 learned about it?
11     **A.  Yes.**
12     Q.  Okay.  And -- and how was that?
13     **A.  Audrey Stone sent a email to her base**
14 **leader in Las Vegas.**
15     Q.  Do you know if Audrey Stone communicated
16 with any other Southwest management employees prior
17 to communicating with her base manager?
18     **A.  No.  I have no knowledge of that.**
19     Q.  Okay.  And do you know who -- who her base
20 leader in Las Vegas was?
21     **A.  Suzanne Stephensens, S-t-e-p-h-e-n-s-e-n.**
22     Q.  Okay.  And do you remember what she
23 reported exactly?
24     **A.  I am not clear.  What Audrey reported or**
25 **what Suzanne --**

Page 126

1     Q.  Yeah.  I am sorry.  Do you -- do you
2 recall what Audrey reported to Suzanne?
3     **A.  Yes.  She sent an email to Suzanne stating**
4 **that she had received disturbing email --**
5 **disturbing private messages on Facebook and also**
6 **video footage of aborted fetuses and still pictures**
7 **of aborted fetuses.**
8     Q.  Okay.  I would like to mark Document 1 as
9 Exhibit 3.
10         (Exhibit 3 marked.)
11     Q.  (By Mr. Gilliam)  And if you could just
12 review Document 1 briefly and let me know when you
13 have had the chance to take a look at it.
14     **A.  Okay.  Okay.**
15     Q.  Do you recognize what this is?
16     **A.  I do.**
17     Q.  And what is it?
18     **A.  This is an email authored by Audrey Stone,**
19 **sent to Las Vegas base manager Suzanne Stephensen**
20 **with her initial complaint.**
21     Q.  Okay.  And it appears she has CC'd Naomi
22 Hudson and Sonya Lacore.  Who -- who is Naomi
23 Hudson?
24     **A.  Naomi Hudson is a former senior director**
25 **in labor relations.  She has retired.**

Page 127

1     Q.  Okay.  When did she retire?
2     **A.  I believe either end of 2019 or first**
3 **quarter this year.**
4     Q.  Okay.  But at the time, in 2017, she was a
5 senior director for labor relations?
6     **A.  That is correct.**
7     Q.  Okay.  And when -- when did you first see
8 this -- this email?
9     **A.  The first time I have seen this actual**
10 **email is this week.**
11     Q.  Okay.  You did not see it as part of the
12 investigation into Ms. Carter's case?
13     **A.  No.**
14     Q.  And you did not see it during the Step 2
15 proceedings?
16     **A.  No.**
17     Q.  Okay.  Do you recall when you first heard
18 that Audrey Stone had made a complaint against
19 Ms. Carter?
20     **A.  Yes.**
21     Q.  And -- and when was that?
22     **A.  I received an a email from Dave Kissman.**
23     Q.  And what did Dave Kissman say to you?
24     **A.  We had a complaint.  It was just a -- for**
25 **an awareness.  He was nonspecific.**

Page 128

1     Q.  Did he tell you who had made the
2 complaint?
3     **A.  I believe he did.**
4     Q.  Okay.  And, presumably, he told you Audrey
5 Stone?
6     **A.  Yes.**
7     Q.  And did you know would Audrey Stone was?
8     **A.  Yes.**
9     Q.  And how -- and you knew that Audrey Stone
10 was president of Local 556?
11     **A.  I did.**
12     Q.  And how did you know she was president of
13 Local 556?
14     **A.  As a general course of business, we know**
15 **who our union presidents are.**
16     Q.  Did you ever communicate with the union
17 president in the regular course of business?
18     **A.  Yes, I did.**
19     Q.  Okay.  And what -- I guess, what were the
20 matters you -- you discussed with the union
21 president?
22     **A.  Generally, employee grievances.**
23     Q.  And in the regular course of conducting
24 business and when you had occasion to talk to the
25 union president, did you discuss other matters

Page 129

1 besides employee grievances?
2 **A. No.**
3 Q. Okay. So your -- your communications with
4 the union president were strictly dealing with
5 employee grievances?
6 **A. Employee grievances or other company**
7 **business.**
8 Q. And what -- what types of other company
9 business would you discuss with a union president?
10 **A. As an example, she could bring concern**
11 **regarding how we handled scheduling of flight**
12 **attendants during a winter storm. You know,**
13 **generally, operational concerns or something of**
14 **that nature are pretty typical of any union**
15 **president.**
16 Q. And she would discuss those matters with
17 you in your capacity as director or senior director
18 of inflight?
19 **A. Correct.**
20 Q. But she did not ever discuss the social
21 media policies as a general matter with you?
22 **A. Not as a general matter.**
23 Q. Okay. Did she ever discuss the social
24 media -- and did Audrey Stone ever discuss the
25 social media policies with you outside the context

Page 130

1 of a specific employee grievance?
2 **A. No.**
3 Q. What were some of the specific employee
4 grievances Audrey Stone discussed with you?
5 **A. I don't remember.**
6 Q. Do you remember if she ever discussed
7 Brian Talbert's grievance with you?
8 **A. I never had a discussion with Audrey Stone**
9 **about Brian Talbert.**
10 Q. Okay. Did you have a discussion with
11 Audrey Stone regarding any of the other seven names
12 you mentioned earlier, the employees who were --
13 were terminated --
14 **A. No --**
15 Q. -- for violating the social media policy?
16 **A. No, I did not.**
17 Q. And do you know if Audrey Stone had ever
18 specifically reported any flight attendants for
19 violating the social media policy?
20 **A. Not prior to Ms. Carter.**
21 Q. Okay. After Ms. Carter, did Audrey Stone
22 ever report another employee's social media
23 activity?
24 **A. Not to my knowledge.**
25 Q. And -- you have had a chance to look at

Page 131

1 the -- the pictures that were attached to this
2 email, correct?
3 **A. Yes.**
4 Q. Okay. I want to -- let's see. Turn to --
5 let's see. Is it -- which page it is in your --
6 maybe the third page, the first picture.
7 **A. Okay. Say it again. The first picture?**
8 Q. Yeah. The first -- the first Facebook
9 screen grab, I guess; the first screenshot, so --
10 **A. Okay.**
11    MR. CORRELL: Counsel, would that be
12 Page 4228?
13    MR. GILLIAM: Yes. It's 4228.
14 Southwest Bates label 4228.
15 **A. Okay.**
16 Q. (By Mr. Gilliam) Now, did -- was this a
17 post that Ms. Carter sent to Audrey Stone by
18 Facebook Messenger?
19 **A. I believe it is.**
20 Q. Okay. So when -- when Ms. Carter sent
21 this to Audrey Stone, nobody else could see this
22 but Audrey, correct?
23 **A. That, I do not know.**
24 Q. Okay. And turning to the -- going to the
25 next page, it's Bates labeled Southwest 4230.

Page 132

1 **A. Okay.**
2 Q. Now, is -- do you know if this was sent to
3 Audrey Stone by Facebook Messenger?
4 **A. I believe it was.**
5 Q. Okay. All right. And then going to the
6 next one, 4232 Bates labeled.
7 **A. Okay.**
8 Q. And was this one posted on Charlene
9 Carter's Facebook page?
10 **A. I don't believe it was a post on her**
11 **specific page, but she's attributed to it.**
12 Q. Okay. Do you know where -- where it was
13 posted?
14 **A. No.**
15 Q. Okay. But this wasn't sent as a private
16 message to Ms. Stone, correct?
17 **A. To my knowledge, it was not.**
18 Q. Okay. Was -- is -- is it your
19 understanding that this particular post was
20 publicly available for other people to see?
21 **A. It is my understanding, yes.**
22 Q. Okay. Besides Audrey Stone, were there
23 any other complaints to Southwest about the posts
24 that were publicly viewable that Ms. Carter had
25 made?

Page 133

1      A. Not to my knowledge.
2      Q. Okay. I would like to go back to the --
3  email that is on the first page, Bates label
4  4226. And the -- I guess, the third paragraph
5  down. I think the -- the last sentence, Ms. Stone,
6  I think, writes, I also believe it violates our
7  work and conduct rules under Class II.3, as well as
8  Class IV.6 and 7.
9          Do you -- do you know what those rules
10  are?
11      A. I would if I had the document in front of
12  me. I don't know them off the top of my head.
13      Q. Oh, okay. When you say you would if you
14  knew (sic) the document, you mean the -- the work
15  rules, the company work rules?
16      A. Yeah.
17      Q. Is -- is that what those refer to, a
18  couple of the work rules?
19      A. Yes. They are called our work --
20  workplace rules for flight attendants.
21      Q. Okay. And do you know if Southwest
22  investigated a violation of those rules?
23      A. I imagine they did do -- during the
24  fact-finding conducted by Ed Schneider.
25      Q. Okay. But there was no conclusion that --

Page 134

1  that Ms. Carter violated those rules, correct?
2      A. Not to my knowledge.
3      Q. Okay. And in the first paragraph,
4  Ms. Stone mentions that the Facebook -- well, I'll
5  -- I'll just try to read it here. It says, below
6  you will see Facebook messages that were sent to me
7  last week by Southwest Airlines flight attendant
8  Charlene Carter. It is in regards to a TWU Local
9  556 women's committee meeting that I participated
10  in last month and a march that I voluntarily
11  participated in a few days later.
12          Prior to the -- the women's march, did
13  -- was Southwest aware that TWU Local 556 was
14  participating in the march?
15      A. No.
16      Q. If Southwest was aware, would Southwest
17  have had any concerns about the union's
18  participation in that march?
19          MR. CORRELL: I am going to object
20  that that's beyond the scope of the Notice. The
21  topic on the Washington march is about what
22  Southwest did; not speculation about what it might
23  have been have done if it had known in advance.
24          Mr. Sims, you can answer in your
25  personal capacity if you are able.

Page 135

1      A. I -- I don't know.
2      Q. (By Mr. Gilliam) Okay. Was Southwest
3  aware that the Local 556 members participating in
4  the march carried banners that mentioned Southwest?
5      A. No.
6      Q. Okay. Let's see. So after this was
7  reported to Ms. Suzanne Stephensen, do you know who
8  she communicated with after receiving this email
9  from Audrey?
10      A. I -- I don't know exactly who she spoke
11  to.
12      Q. Okay. If we could -- let's see. Like to
13  mark Document 2 as Exhibit 4.
14          (Exhibit 4 marked.)
15      Q. (By Mr. Gilliam) And if you could just --
16  start with reviewing the first page.
17      A. Okay.
18      Q. Let me know once you have had a chance to
19  review the first page.
20      A. Okay.
21      Q. I would like to direct your attention to
22  the -- I guess, the -- the email that Suzanne
23  Stephensen sends to Dave Kissman on February 23rd
24  at 10:59 a.m. She says, FYI, I am going into the
25  IOM. I'll call you when I am finished.

Page 136

1          Do you know if this was Southwest's
2  first communication about Ms. Stone's complaint
3  after receiving Ms. Stone's first email?
4      A. I believe it was.
5      Q. Okay. Do you know, apart from sending
6  this email, if Ms. Stephensen contemporaneously had
7  any communications by other means besides email
8  with other Southwest management?
9      A. That, I do not know.
10      Q. She says, I am going into the IOM. What
11  -- what is IOM?
12      A. IOM stands for integrated operations
13  management. And what it is, it's a -- it's either
14  a daily or weekly meeting -- depending on the city
15  -- of the operating departments at the airport;
16  where they talk about common issues, like on-time
17  performance, net promoter score and baggage
18  handling.
19      Q. Okay. So it's a routine meeting?
20      A. Yes.
21      Q. Okay. And then Dave Kissman responds
22  above that at 11:26 a.m. He says, at TOPS in
23  meetings.
24          What is TOPS?
25      A. TOPS is one of our buildings. Southwest

Page 137

1    has a campus of three building.  TOPS is -- stands
2    for training and operations.  So all of our
3    training functions and operation functions were in
4    that particular building.
5        Q.  Okay.  Do you know if that building is in
6    Dallas?
7        A.  It is.
8        Q.  Okay.  So Dave Kissman was in Dallas when
9    he sent that email?
10       A.  Yes.
11       Q.  Okay.  Is -- is Dave Kissman based in
12   Dallas?
13       A.  No.  Dave Kissman lives in Phoenix,
14   Arizona.
15       Q.  Okay.  And at -- at the time -- at this
16   time, in 2017, did he work from Phoenix as well?
17       A.  Yes.
18       Q.  Okay.  And he -- he responds to
19   Ms. Stephensen and says, call me -- call me cell --
20   as call my cell, I guess.
21           Do you know if Ms. Stephensen and Dave
22   Kissman had a conversation after that email?
23       A.  That, I do not know.
24       Q.  Okay.  And after Naomi Hudson and Sonya
25   Lacore received an email from Audrey, did they

Page 138

1    communicate with you directly about the -- about
2    Audrey's email?
3        A.  No, they did not.
4        Q.  Okay.  Do you know if they -- if they
5    communicated with anyone after receiving Audrey's
6    initial email?
7        A.  That, I do not know.
8        Q.  Okay.  And then if I could, I guess, ask
9    you to review the two pages on -- it's 4433, Bates
10   Number 4433.
11       A.  Yup.
12       Q.  And it -- it looks like Dave Kissman
13   forwards this to you on February 23rd at 11:29 a.m.
14   And then it looks like you -- you respond maybe a
15   couple of minutes later?
16       A.  Yeah.  Yes.
17       Q.  And when you received the email from Dave
18   Kissman, did you, I guess, review all of the
19   contents of Audrey Stone's email?
20       A.  I read just a portion of it because I
21   knew, just based on the beginning of it, that it
22   was a employee relations matter, so I --
23       Q.  How did -- I am sorry, I didn't mean to
24   talk over you.  Go ahead and finish.
25       A.  I reviewed it; I glanced at it.  And --

Page 139

1    you know, and I sent the message to him, let's get
2    employees relations on deck.  And that was it.
3        Q.  Okay.  You also said you knew it was an
4    employee relations matters from glancing at it?
5        A.  Yup.
6        Q.  And how did you know that?
7        A.  She's talking about pro-life and pro- --
8    so after looking at that, and then seeing that
9    there were some allegations there, that I just said
10   -- I just defaulted and -- and suggested they go on
11   with employee relations.
12       Q.  Okay.  And when she was talking about
13   pro-life, did that suggested that a protected
14   category was involved?
15       A.  No, no.
16       Q.  What -- what about pro-life tipped you off
17   that employee relations should be involved?
18       A.  Well, that was just part of it.  When I am
19   talking about the overall context of what I saw, I
20   believed it was employee relations.  I didn't make
21   any conclusion one way or the other.
22       Q.  Okay.  And do you know if -- if someone
23   did contact employee relations?
24       A.  I believe that happened.
25       Q.  And do you know who contacted employment

Page 140

1    (sic) relations?
2        A.  No.
3        Q.  Okay.  All right.  Let's see.  If I could
4    direct you to the next page.
5        A.  Can you tell me the page number there?
6        Q.  I'm sorry.  4436 is the Bates number.
7        A.  Okay.
8        Q.  In -- in his email -- so directing your
9    attention to Dave Kissman's email at the top.  He
10   references Day 2.  Is he speaking in terms of Day 2
11   because you have a -- so many days in order to
12   process the investigation?
13       A.  That is correct.
14       Q.  Okay.  And he sends his email to Ed
15   Schneider, Dustin Moore, Hector Barrera and Meggan
16   Jones.  Do you know who Dustin Moore is?
17       A.  Dustin is the third assistant base manager
18   in Denver, who I forgot to tell you this morning
19   because he had just been added around that time --
20       Q.  Okay.
21       A.  -- been added.  He was new.
22       Q.  Okay.  Okay.  All right.  I understand.
23   Do you know if Dustin was involved in the
24   investigation of Ms. Carter's case?
25       A.  I don't -- I don't believe he was.

Page 141

1    Q. Okay. Do you know if Hector Barrera --
2    A. I don't --
3    Q. -- was involved?
4    A. I don't believe Hector was.
5    Q. Okay. So if I could, next, have you turn
6  to the next page, it's Bates labeled 4441.
7    A. It's in this group?
8    Q. Yes.
9    A. Okay. Tell me again. 4441?
10   Q. Yeah. And it's at the top. It should be
11 email from Dave Kissman, February 23rd.
12   A. Okay. I want to make sure we're the on
13 the same document. 4421?
14   Q. Unless I screwed up the pages. No. It
15 should be 4441.
16   A. 4441. Okay. Let me -- okay. I now have
17 it.
18   Q. Okay.
19   A. Okay.
20   Q. And do you -- do you recognize this email?
21   A. I do.
22   Q. Okay. And -- and what is this email from
23 Dave to you?
24   A. This is Dave just advising me that he
25 notified Ed Schneider. And the reason being is

Page 142

1  because the flight attendant -- it was -- part of
2  this was based in Denver.
3    Q. Okay. And so during, I guess, this Stage
4  1, what was your -- your involvement; were you
5  communicating with anyone?
6    A. No. This is pretty standard. I was just
7  being advised.
8    Q. Okay. And he -- was Dave Kissman advising
9  you because you are his supervisor?
10   A. Yes.
11   Q. Okay. All right. Then if I could direct
12 your attention to the -- the next page, 4444.
13   A. 4444? Okay.
14   Q. Yeah. Do you recognize this email?
15   A. I do.
16   Q. Okay. And what is this email?
17   A. This is an email -- Dave Kissman sending
18 to his -- his team -- his counterparts in regards
19 to this email.
20   Q. Okay. And did you say earlier that these
21 four individuals -- Lucetta Larabee, Brian
22 Ridgeway, Rachel Loudermilk, Tom Crabtree -- are
23 all senior managers?
24   A. At that point, they were.
25   Q. Okay. And they are based in other

Page 143

1  regions, correct?
2    A. Correct.
3    Q. And they -- I guess they handle different
4  areas?
5    A. That is true.
6    Q. And why -- why is he sending it to them?
7    A. I do not know.
8    Q. Okay. Do you know if any of those four
9  had any involvement in Ms. Carter's case?
10   A. They did not.
11   Q. Okay. Okay. If I could direct you to
12 4450. I think it's a couple of pages down.
13   A. Okay.
14   Q. Do you recognize this?
15   A. I do.
16   Q. And -- and what is this email?
17   A. This is an email -- Ed Schneider --
18 sending to the employee relations direct group; I
19 believe that's that DG again, which is a mailbox
20 that is worked by the team. And this is his
21 notification to them regarding this issue.
22   Q. Okay. Do you know who specifically would
23 have received this email at that mailbox address?
24   A. No.
25   Q. Okay. And do you know if this is the --

Page 144

1  the first time where someone communicated with
2  employee relations about this matter?
3    A. I believe it is.
4    Q. Okay. And he -- he refers to protected
5  categories. Is -- is it exclusively employee
6  relations who gives insight regarding the protected
7  categories?
8    A. Yes.
9    Q. Okay. And I know we discussed it a little
10 bit earlier, but what exactly are the protected
11 categories?
12   A. Protected categories include racial
13 discrimination, gender discrimination, religious
14 discrimination, disability discrimination, age
15 discrimination, race discrimination.
16   Q. Okay. Now, with this -- this email
17 address to employee relations DG, do you know if
18 anybody outside of employee relations has access to
19 that mailbox?
20   A. That, I do not know.
21   Q. Okay. All right. Next, if I could direct
22 your attention to 4456. Should be the next page.
23   A. Yeah. Got it. Okay.
24   Q. And do you recognize this email?
25   A. I do.

Page 145

1  Q. And what is it?
2  **A. This is an email from Naomi Hudson, who**
3  **was then the senior director of labor relations,**
4  **who had also received -- she was copied on that**
5  **initial email from Audrey Stone, so she is sending**
6  **this to Suzanne Stephensen.**
7  Q. Okay.
8  **A. Just saying, please also forward to Toni**
9  **Hamilton.**
10  Q. And who is Toni Hamilton?
11  **A. Toni Hamilton worked in employee**
12  **relations.**
13  Q. Do you know -- is this a she Toni or he
14  Toni?
15  **A. She.**
16  Q. Okay.
17  **A. Former manager.**
18  Q. Okay. Former employee relations manager?
19  **A. Yes.**
20  Q. Okay. And she was an employee relations
21  manager in 2017?
22  **A. Yes.**
23  Q. Okay. But is no longer an employee
24  relation manager?
25  **A. As far as I know.**

Page 146

1  Q. Okay. And do you know why Naomi Hudson
2  forwarded -- excuse me.
3  Do you why Naomi Hudson wanted the
4  email to be forwarded to Toni Hamilton?
5  **A. I don't know why she wanted that.**
6  Q. Okay. I -- I guess it's standard
7  procedure whenever I, I guess, one of the -- the
8  leaders investigating believes there is a protected
9  category involved, that they would send it to
10  someone with employee relations --
11  **A. That --**
12  Q. -- is that correct? Okay.
13  THE REPORTER: I am sorry. I didn't
14  hear your answer.
15  **A. That would make sense.**
16  Q. (By Mr. Gilliam) Okay. And, next, if I
17  could direct your attention to 4459, next page.
18  **A. Okay.**
19  Q. And do you recognize this email?
20  **A. I do.**
21  Q. Okay. What is this email?
22  **A. This is an email from Denise Gutierrez**
23  **advising Ed Schneider that she will be the employee**
24  **relations leader who will be assisting the base.**
25  Q. Okay. And Denise Gutierrez was the

Page 147

1  employee relations manager who, in fact, assisted
2  the base?
3  **A. That is correct.**
4  Q. Okay. Then turning to the next email,
5  it's 4465.
6  **A. Okay.**
7  Q. Do you recognize this?
8  **A. This is an email from Dave Kissman to me.**
9  Q. Okay. And he asks, she's back?
10  It -- it -- was he referring to Toni
11  Hamilton?
12  **A. I do not know.**
13  Q. The email he's forwarding says, please
14  also forward to Toni -- Toni Hamilton.
15  **A. Right.**
16  Q. Do you know why Dave Kissman was asking
17  you that?
18  **A. I do not know. Oh --**
19  Q. Do you recall?
20  **A. I do. Naomi Hudson had been on a leave of**
21  **absence. She had surgery on her back and was out**
22  **for a couple of months. So Dave sent that to me**
23  **referring to Naomi Hudson returning to work.**
24  Q. Okay. Do you remember how long Naomi
25  Hudson had been out on her leave of absence?

Page 148

1  **A. It was approximately three months.**
2  Q. Okay. Do you -- did you ever respond to
3  Dave Kissman?
4  **A. No.**
5  Q. Okay. Did you -- did you contact Naomi
6  Hudson?
7  **A. No.**
8  Q. And if you could turn to the next email,
9  4477.
10  **A. Okay.**
11  Q. And do you -- and do you recognize these
12  emails?
13  **A. Yes.**
14  Q. And what are they?
15  **A. This is email correspondence between Naomi**
16  **Hudson and Dave Kissman.**
17  Q. And do you know why Dave forwarded the --
18  the communication to Naomi?
19  **A. I do not know.**
20  Q. Okay. Did -- did you ask him to forward
21  the communication to Naomi?
22  **A. No, I did not.**
23  Q. Okay. Okay. And if I could direct you to
24  4624. And do you recognize this email?
25  **A. This is -- yes.**

Page 149

1    Q. Okay. And what's this email?
2    A. This is email correspondence from Denise
3 Gutierrez to Maureen Emlet.
4    Q. Okay. Was this Maureen Emlet's first
5 point of knowledge regarding this matter?
6    A. I believe so.
7    Q. Okay. Okay. And, next, turning to 5682.
8    A  I apologize. These -- these are not in
9 numerical order, are they?  They're --
10    Q. No, no, they are not.
11    A. All right. Tell me the number again,
12 please.
13    Q. 5682.
14    A. 5682.
15    Q. Yeah. It should be the next page.
16    A. Okay.
17    Q. Do you recognize this email?
18    A. Yes.
19    Q. And -- and what is this email?
20    A. This is an email from Maureen Emlet
21 advising her director of labor relations, Tammy
22 Shaffer; and her direct leader, Brianna Grant,
23 senior, of this -- this said issue.
24    Q. Okay. And do you know why Maureen was
25 advising them of this matter?

Page 150

1    A. I think that's typical in a course of
2 business.
3    Q. Okay. Were both Tammy and Brianna --
4 well, let me ask it this way: Was -- was Tammy
5 Maureen's supervisor?
6    A. No. Brianna was.
7    Q. Okay. And is -- is Tammy, I guess,
8 Maureen's counterpart in the same department?
9    A. Brianna reports to Tammy.
10    Q. Oh, Brianna reports to Tammy?
11    A. Yes.
12    Q. Okay. And does Maureen report to Brianna?
13    A. Yes.
14    Q. Okay. And it -- it was customary to, I
15 guess, report up the chain in labor relations?
16    A. That is correct.
17    Q. Okay. All right. Next, I would like to
18 direct you to the next two documents. It should
19 immediately follow, 4277 and 4278.
20    A. Okay.
21    Q. Do you recognize these?
22    A. I do.
23    Q. And what are they?
24    A. These -- this is email correspondence from
25 Ms. Carter to Ed Schneider regarding the

Page 151

1 fact-finding meeting that was -- looked like in
2 process of being scheduled.
3    Q. Okay. On the second page -- so it's
4 starting on the first page continuing onto the
5 second. It -- it's an email from Ed to Charlene.
6 And in the second sentence -- I am sorry. Let's
7 say maybe the fourth sentence. He says, I
8 understand Chris will be representing you in the
9 meeting.
10        Do you know if he is referring to
11 Chris Sullivan?
12    A. That's who I believe he is referring to.
13    Q. Okay. And do you know if anybody from the
14 company talked to Chris about this matter?
15    A. No.
16    Q. Okay. And in the next email down,
17 Charlene sends an email to Ed. And in her second
18 paragraph, it says, due to the nature of this
19 meeting, I am requesting -- kindly requesting for
20 you to send me what post you are speaking about and
21 the IR that was written on this post. And it
22 continues.
23        Do you know what she's referring to
24 with IR?
25    A. IR means irregularity report. And in

Page 152

1 Southwest parlance, that is just a written --
2 written statement. It could be anything.
3 Traditionally, it was a form, but now it could be
4 anything.
5    Q. Okay. Is -- is an irregularity report
6 provided to the -- the persons involved at some
7 point during an investigation?
8    A. I -- can you ask me again?
9    Q. Yeah. Sorry. Is -- is that irregularity
10 report routinely provided to the persons involved
11 in a -- in an investigation?
12    A. The contents are provided.
13    Q. When you say the contents, the contents of
14 the irregularity report?
15    A. Yes -- yes.
16    Q. Okay. And who is that irregularity report
17 provided to?
18    A. The irregularity report is provided to --
19    Q. I'm sorry. I misstated that. Who are the
20 contents of the irregularity report provided to?
21    A. I want to make sure we're using
22 irregularly report in its proper context, okay?
23 Because --
24    Q. Sure.
25    A. -- there is a reporting function that we

Page 153

1 use called IRs. But when it comes to
2 investigations, an irregularity could be an email.
3 It could be any -- written on a piece of paper by
4 hand. So -- so the IR is -- is the -- the initial
5 complaint; or the IR is the response to a
6 complaint.
7 Q. Okay. Is the initial complaint
8 customarily provided to the person whose conduct is
9 being complained of?
10 A. The contents or the subject matter is
11 provided during the meeting of this is what this
12 matter is about.
13 Q. Okay.
14 A. The actual document is not provided during
15 the fact-finding process. It is provided later if
16 there is a grievance filed.
17 Q. At what point in the fact-finding process
18 is the subject matter provided?
19 A. It should be provided at the meeting with
20 the employee.
21 Q. Okay. Meaning the fact-finding meeting?
22 A. Correct.
23 Q. Okay. And as part of that report, does
24 Southwest tell the employee whose conduct is being
25 complained of who's complained of the conduct --

Page 154

1 conduct?
2 A. Okay. Can you ask it one more time?
3 Q. Yeah, yeah. Does -- does Southwest inform
4 the -- the employee whose conduct is at issue who
5 -- who reported them?
6 A. Not generally during the fact-finding
7 process.
8 Q. Okay. At -- at what stage is that
9 information revealed?
10 A. In the event that a grievance is filed --
11 and as an example, in a case that would result in
12 discipline, a grievance would be filed to challenge
13 the discipline in the form of an appeal. And at
14 that point, that -- that information would be
15 provided under the auspices of a grievance, formal
16 process.
17 Q. Okay. Okay. If you could turn to the --
18 the next page. It's -- actually, it's maybe a
19 couple pages on, 4630.
20 A. Okay.
21 Q. Do you recognize this?
22 A. This is an email correspondence from
23 Denise Gutierrez to Edith -- or Edie -- Barnett,
24 our HR VP.
25 Q. Okay. And is it -- is it customary for --

Page 155

1 for ER to report this information to the HR VP?
2 A. I think so.
3 Q. Does employee relations report most
4 incidents to the HR VP?
5 A. Not necessarily.
6 Q. Okay. Why would they report an incident
7 to the HR VP?
8 A. They were wanting counsel on other
9 policies, potentially, that's outside the employee
10 relations scope.
11 Q. Okay. Do you know if Denise Gutierrez
12 sought counsel as to the other policies from Edie
13 Barnett in --
14 A. I --
15 Q. -- this investigation?
16 A. I don't know.
17 Q. Okay. Do you know if this is the first
18 time that somebody had contacted Edie Barnett about
19 this matter?
20 A. To my knowledge, yes.
21 Q. Okay. And did -- did you ever have any
22 communications with Edie Barnett about this matter?
23 A. I did not.
24 Q. Let me focus here.
25     MR. CORRELL: Counsel, if we are going

Page 156

1 to move to a new topic, would now be an okay time
2 for a break? It's been about an hour and a half.
3     MR. GILLIAM: Yeah, sure. Sure. We
4 can take a break.
5     MR. CORRELL: Great. So about 10
6 minutes and we will be back.
7     MR. GILLIAM: 10-minute break, all
8 right.
9     THE VIDEOGRAPHER: We are off record
10 at 2:29 p.m.
11     (Recess taken.)
12     THE VIDEOGRAPHER: We are back on
13 record at 2:42 p.m.
14 Q. (By Mr. Gilliam) Okay. Mr. Sims, during
15 the investigative process, Southwest conducted
16 fact-findings; is that correct?
17 A. Yes.
18 Q. And it -- Southwest conducted
19 fact-findings with both Audrey Stone and Charlene
20 Carter; is that correct?
21 A. Yes, but I want to make sure we are using
22 fact-finding in its proper context.
23 Q. Sure.
24 A. Fact-finding can be pretty loosely used,
25 but, generally, we use the term "fact-finding" for

Page 157

1  when we're actually in the process with an employee
2  who is under investigation.
3      Q. Okay. But in -- in this case, Southwest
4  interviewed Audrey Stone as part of its
5  investigative process; is that correct?
6      A. Correct.
7      Q. And then it held a meeting subsequently
8  with Ms. Carter too?
9      A. That is correct.
10     Q. A fact-finding meeting with Ms. Carter?
11     A. That is correct.
12     Q. Okay. Let's see. I would like to have
13  marked Document Number 5 as Exhibit 5.
14         (Exhibit 5 marked.)
15     Q. (By Mr. Gilliam) And if you want to
16  review these. And once you have had a chance to --
17  to review it, let me know.
18     A. Okay.
19     Q. Do you recognize what -- what this is?
20     A. These are the notes from Ed Schneider's
21  initial interview with Audrey Stone.
22     Q. Okay. And you said initial interview with
23  Audrey Stone. Do you know if he conducted multiple
24  interviews with Audrey Stone?
25     A. I believe this is the only one.

Page 158

1      Q. Okay. All right. And let's see. I would
2  like to, I guess, direct you to -- make sure I have
3  got the right page number here -- 4634 that says,
4  fact-finding meetings notes at the top.
5      A. Correct.
6      Q. Okay. And it says, date, February 24th,
7  2017. Do you -- do you know what time this meeting
8  was held?
9      A. I do not.
10     Q. Okay. And do you know who took these
11  notes?
12     A. I do not know.
13     Q. Okay. And, I guess, I would like to
14  direct your attention to 4074. Hold on. Let me --
15  let me make sure that's correct. Actually, it's --
16  that is not correct. Hold on. It's 4637.
17     A. Okay.
18     Q. And going to the fourth box down -- well,
19  actually -- well, yeah, the fourth box down, she
20  men- -- mentions Robert Picket. She says, Robert
21  Picket was one with the knife that was terminated.
22         Do you remember a flight attendant
23  named Robert Picket that was terminated?
24     A. I don't remember that case.
25     Q. Okay. And then she refers to -- she says,

Page 159

1  Holly Imamovic was the shooting range and target.
2         Do you -- do you recall that case?
3      A. I do.
4      Q. And was that what Holly was -- was fired
5  for?
6      A. Yes.
7      Q. Okay. And do you know who reported Holly
8  for that incident?
9      A. I do not know.
10     Q. Okay. All right. And Denise Gutierrez
11  here asks, what do you want Southwest to do? And
12  she says, make Charlene and Chris Click stop. And
13  tell those flight attendants not to talk about me
14  or the union president trying to get flight
15  attendants fired.
16         And I guess you -- you were -- you
17  said earlier that you were a former union officer,
18  correct?
19     A. I -- yes.
20     Q. Do you recall any instances where a union
21  officer ever went to the company and asked them to
22  stop criticism of them?
23         MR. CORRELL: I am going to object
24  that this is beyond the scope of the Notice.
25  Mr. Sims, you can answer in your personal capacity.

Page 160

1      A. There was one instance.
2      Q. And what is the instance you recall?
3      A. Former union president Melissa Smith
4  alleged that a flight attendant by the name of
5  Eddie Pirl, P-i-r-l, had said some things or had
6  written some things that she found disturbing.
7      Q. Okay. Do you remember what he had
8  written?
9      A. This was prior to what we currently know
10  as social media. There were internet forums at
11  that time, and he had written some things about
12  negotiations. And he -- he felt that -- she felt
13  that they were threatening towards her.
14     Q. Okay. And do you know if he was fired for
15  saying those things?
16     A. He was.
17     Q. Okay. All right. And I believe you also
18  said that a fact-finding was conducted for
19  Ms. Carter as well?
20     A. That is correct.
21         MR. GILLIAM: And I could have
22  Document 9 marked as Exhibit 6.
23         (Exhibit 6 marked.)
24     Q. (By Mr. Gilliam) If you want to read
25  that. And once you have had the chance to review

Page 161

1  it, let me know.
2      A.  Okay.  So I just want to make sure it's
3  the correct document.  These are fact-finding notes
4  from Charlene's meeting with Ed?
5      Q.  Yes.
6      A.  Okay.
7      Q.  And would you like some time to review
8  them?
9      A.  Yes.  Please.
10     Q.  Sure.
11         MR. CORRELL:  And -- and, Counsel,
12  this may be a problem on our end.  I just want to
13  make sure we've got the right document.  It looks
14  like the email has two attachments, and I am only
15  seeing the fact-finding notes.  I don't know if
16  that's because in the production, for some reason,
17  it's not with it; or it's intentionally not here.
18  But that's all there is, is the email and one
19  attachment, it looks like.
20         MR. GILLIAM:  Oh, just including the
21  notes, but not the pictures?
22         MR. CORRELL:  Correct.
23         MR. GILLIAM:  Yeah.  No.  That's -- I
24  -- I was trying to conserve space.
25         MR. CORRELL:  That's perfect.  I just

Page 162

1  want to make sure that we're -- we're all looking
2  at the same document and know we're looking at the
3  same document.
4         MR. GILLIAM:  Yeah, yeah.
5      A.  Okay.
6      Q.  (By Mr. Gilliam)  And do you recognize
7  this?
8      A.  I do.
9      Q.  And what is it?
10     A.  These are fact-finding notes from Ed
11  Schneider's meeting with Ms. Carter.
12     Q.  Okay.  Do you know if the -- if the
13  fact-finding notes went through revisions prior to
14  there being a final version?
15     A.  I don't -- I don't know.
16     Q.  Okay.  Okay.  I wanted to direct your
17  attention to, I guess, the -- the second and the
18  third page.  It's 4676 and 4677.
19     A.  4676.  Okay.
20     Q.  And -- and 4677 towards the bottom.  Where
21  Charlene says, I am a Christian, I am a
22  conservative and I am pro-life.
23         And discussions continue on the second
24  page.  And she -- she says, I work with other
25  pro-life groups; and for me, as a Christian, if I

Page 163

1  can get the word out in any way to every group as
2  possible to touch this issue, I do.
3         So I wanted to ask you specifically
4  about that information.  Did employee relations act
5  on that information in any way?
6      A.  Not to my knowledge.
7      Q.  Okay.  And do you know if labor relations
8  or inflight or human resources acted on that
9  information in any way?
10         MR. CORRELL:  Objection.
11     A.  Believe --
12         MR. CORRELL:  Compound and vague.
13     Q.  (By Mr. Gilliam)  Let -- let me split it
14  up.  So that -- that same information referring to
15  Charlene's Christian -- well -- well, where she
16  says, I am a Christian, I am a conservative and
17  pro-life, referring to that same information that I
18  described, did labor relations take any action with
19  respect to that information?
20         MR. CORRELL:  Objection.  Vague.
21     A.  I am a little confused about the question
22  itself.  When you mention regarding that
23  information, can I get a little more insight as to
24  what information specifically --
25     Q.  (By Mr. Gilliam)  Yeah.

Page 164

1      A.  -- you are talking about?
2      Q.  So -- and, you know, I don't -- I don't
3  want to, you know, read every line, but where she's
4  talking about being a Christian, a conservative and
5  pro-life; and continuing on the next page,
6  describing working with other pro-life groups and
7  getting -- getting the word out about abortion in
8  any way, did -- did labor relations consider
9  whether that placed Ms. Carter in any protected
10  category?
11     A.  That, I do not know.
12     Q.  Okay.  Same question:  Did inflight
13  question whether that information put Ms. Carter in
14  any protected category?
15     A.  I do not know.
16     Q.  And just to make sure that it -- it's
17  clear, did employee relations consider whether that
18  information put her in any protective category?
19     A.  That, I do not know.
20     Q.  Okay.  Did employee relations consider
21  whether Charlene Carter needed a religious
22  accommodation?
23     A.  I do not know.
24     Q.  Okay.  Did labor relations consider
25  whether Charlene Carter needed a religious

Page 165

1 accommodation?
2 **A. I do not know.**
3 Q. Did inflight consider whether Charlene
4 Carter needed a religious accommodation?
5 **A. I do not know.**
6 Q. And did human resources consider whether
7 Charlene Carter needed a religious accommodation?
8 **A. I do not know.**
9 Q. Okay. And just to make sure I covered it
10 too, did human resources consider whether the
11 information she shared about being a Christian and
12 pro-life and trying to get the word out in any way,
13 whether that placed her in any protected category?
14 **A. I do not know.**
15 Q. Okay. Do you know whether the ACT team
16 ever in- -- investigated any aspect of Charlene
17 Carter's matter?
18 **A. Not to my knowledge.**
19 Q. Okay. As part of the investigation, did
20 anyone with Southwest have communications about
21 Charlene Carter's religious beliefs?
22 **A. Not to my knowledge.**
23 Q. Okay. Okay. Now, what is the standard
24 practice for, I guess, the -- the -- well, let me
25 ask the question this way: What is the standard

Page 166

1 practice for someone who is investigating a
2 complaint against a flight attendant in -- well,
3 let me find another way to ask this.
4 After a fact-finding meeting is held,
5 what -- what is the typical next step as part of an
6 investigation into a complaint against an employee?
7 **A. The -- the manager conducting the meeting**
8 **will gather his thoughts and his notes and use**
9 **labor relations as a resource to discuss; and then,**
10 **ultimately, will make a decision.**
11 Q. Okay. Does the -- does the -- the lead
12 investigator prepare a report on his investigation?
13 **A. Generally, his notes from that**
14 **investigation are considered a report, or the --**
15 **the totality of all the information gathered is the**
16 **report. So, in short, there is no formal report**
17 **that he writes. He may, but he's not required to.**
18 Q. Okay. Does the investigator share, I
19 guess, his -- his summation of the investigation
20 with other employees in management?
21 **A. Generally, with the labor relations team**
22 **and/or his leaders.**
23 Q. Okay. I would like to mark Document 6 as,
24 I think, Exhibit 7.
25 (Exhibit 7 marked.)

Page 167

1 Q. (By Mr. Gilliam) And if you could review
2 this one. Let me know once you have reviewed it.
3 **A. Okay.**
4 Q. Okay. Do you recognize this?
5 **A. This is Ed Schneider's email to Maureen**
6 **Emlet, labor relations manager; Denise Gutierrez,**
7 **the employee relations leader; Edith Barnett, our**
8 **human resource business partner; with his assistant**
9 **manager Meggan Jones copied.**
10 Q. And -- and is this type of report
11 common in an investigation?
12 **A. It is, depending on the manager, depending**
13 **on their style.**
14 Q. Did Ed Schneider -- I mean, Ed -- Ed
15 Schneider reported to you. Do you know if Ed
16 Schneider typically prepared reports in this
17 manner?
18 **A. That, I do not know.**
19 Q. Okay. And did you personally receive
20 this --
21 **A. No.**
22 Q. -- during the investigation? Sorry.
23 **A. No.**
24 Q. Okay. And -- and so you would not have
25 reviewed this during Step 2 proceedings?

Page 168

1 **A. If it was presented to me, I would have,**
2 **but I don't recall reviewing this.**
3 Q. Okay. Prior to Step 2 proceedings, did Ed
4 discuss this investigation with you?
5 **A. Not that I remember.**
6 Q. Okay. Now, did -- I guess, do you see
7 that Ed presented any conclusions in this email?
8 **A. Does -- yes.**
9 Q. Okay. And -- and what are the
10 conclusions?
11 MR. CORRELL: Objection. Document
12 speaks for itself. You can answer, Mr. Sims.
13 **A. Yeah. It's listed under violations of**
14 **Southwest Airlines' policies.**
15 Q. (By Mr. Gilliam) Okay. He does not say
16 here, though, what the -- the disciplinary action,
17 if any, should be issued, though, correct?
18 **A. I believe that is correct.**
19 Q. Now, prior to reaching a decision, do you
20 know if he consulted with you regarding the
21 decision on whether to terminate Ms. Carter?
22 **A. I don't remember -- remember having any**
23 **consultation with Ed over this.**
24 Q. Do you know if Ed consulted with Dave
25 Kissman about his decision to fire Ms. Carter?

Page 169

1      A. I do not know.
2      Q. Okay. So Ed -- Ed concludes there is a
3  violation of the harassment policy, correct?
4      A. Can you point to where you are referring?
5      Q. Yeah. On 4712, last paragraph.
6      A. Okay. So --
7      Q. Is -- is this a conclusion that Charlene
8  Carter violated the harassment policy?
9      A. I believe it is.
10     Q. Now, would inflight make that
11 determination?
12     A. Yes. Ed can make that -- Ed can make that
13 decision.
14     Q. Independent from employee relations?
15     A. Excuse me. I want to correct that.
16 Employee relations would, again, either support the
17 claims or deny the claims or they would be
18 inconclusive. I was looking at the wrong
19 paragraph.
20     Q. Okay. But does inflight make a -- an
21 initial decision on whether the harassment policy
22 has been violated?
23     A. Generally, we go with what the employer
24 relations team concludes.
25     Q. Okay. Does inflight ever make a

Page 170

1  determination of whether the sexual harassment
2  policy was violated before employee relations
3  reaches its conclusion?
4      A. No.
5      Q. Okay. Do you know if employee relations
6  reached a conclusion on whether there was a
7  violation of the sexual harassment policy here?
8      A. I believe they did.
9      Q. Okay. And what was employee relations'
10 conclusion?
11     A. That it may have happened.
12     Q. And when you say that it may have
13 happened, that Ms. Carter's conduct may have
14 violated the policy?
15     A. That is correct.
16     Q. Okay. If I could direct your attention
17 back to Exhibit 4, towards the very back. I think
18 it's Bates number 5762 and 5763.
19     A. Okay. So we're going to have -- I have
20 got Documents 4, so when you say Exhibit 4 --
21     Q. It's Document 2, but Exhibit 4.
22     A. Okay. Document 2. Okay. Stand by.
23 Okay. Which page?
24     Q. 5762 and 5763.
25     A. Apologize. Still looking. In mine --

Page 171

1          MR. CORRELL: -- helps, it's five
2  pages from the end of that packet.
3          THE WITNESS: Okay.
4      A. 5762.
5      Q. (By Mr. Gilliam) Yes.
6      A. Okay.
7      Q. And 5763.
8      A. Okay.
9      Q. And if you could -- could review those.
10     A. Okay.
11     Q. All right. You recognize these?
12     A. I do.
13     Q. And what are they?
14     A. This is Denise Gutierrez -- Gutierrez, her
15 report back that the employee relations
16 investigation was partially supported.
17     Q. Okay. What part was supported?
18     A. It is my belief that it was the pictures
19 of women that were dressed as vaginas.
20     Q. Okay. She said -- she says that, the
21 images of women dressed as vaginas do violate the
22 aforementioned policy due their sexual nature.
23          But is it correct that Denise
24 determined that the videos depicting abortion do
25 not violate the company's harassment, sexual

Page 172

1  harassment, discrimination, retaliation policy?
2      A. That is correct.
3      Q. She -- she does say they are considered to
4  be offensive, correct?
5      A. That is correct.
6      Q. And then she says they should be
7  addressed; is that correct?
8      A. That is correct.
9      Q. Now, when conduct does not violate the
10 policy, but there is a conclusion that it should be
11 addressed, how -- how should it be addressed?
12     A. Generally, the employee relations reaches
13 a conclusion and then they turn it over to the
14 respective department to address. In this -- in --
15 in -- in cases, addressing could be a simple
16 conversation or it could fall under discipline
17 under other rules.
18     Q. Now, if it -- for a violation of just a
19 harassment, sexual harassment, discrimination,
20 retaliation policy -- well, let me -- let me back
21 that up.
22          For conduct that does not rise to a
23 violation of the harassment, sexual harassment,
24 discrimination, retaliation policy that is
25 determined to have a need to be addressed, does --

Page 173

1  again, let me -- let me try to word this more
2  clearly.
3          When conduct should be addressed, but
4  it is not a violation of that specific policy, does
5  that mean that it should be addressed in some form
6  of discipline less than termination, assuming that
7  it violates no other policy?
8          MR. CORRELL: Objection. Confusing.
9          MR. GILLIAM: I understand.
10  Q. (By Mr. Gilliam) Okay. Let me try again.
11  When -- for -- speaking only to the harassment and
12  sexual harassment policy, ignoring whether there
13  are any other violations for the moment. Under
14  that policy, if you have conduct that is not a
15  violation, but should be addressed, does that mean
16  that it should be addressed with some form of
17  discipline less than termination?
18      A. Generally, yes.
19      Q. Okay. Now, in follow-up to this email, I
20  think, on March 13th of 2017, Ed sends an email to
21  Maureen and he says he's attached the termination
22  letter. And then says, do you want me to add the
23  harassment policy?
24          Do you know at what stage it was
25  determined whether or not to add a violation for

Page 174

1  the harassment policy?
2      A. Can you refer me to the document that you
3  are talking about?
4      Q. Sorry. Yeah. It's 5762, the -- email
5  at the top. It -- so it's in the same chain as the
6  Denise Gutierrez email we were just discussing, but
7  it's two -- two emails above that.
8      A. 5762?
9      Q. Yes.
10      A. Okay. Okay.
11      Q. And Ed asks Maureen if she wants him to
12  add the harassment policy.
13      A. Okay.
14      Q. Do you know when Southwest made the
15  decision whether or not to add the harassment
16  policy?
17      A. I do not know when that decision was made.
18      Q. Okay. Okay. And he says, I have attached
19  the termination letter.
20          So, presumably, he's already decided
21  that termination is the -- the course of action
22  that Southwest is going to take. When did
23  Southwest reach the decision to terminate Charlene
24  Carter?
25      A. It was during the period after the

Page 175

1  fact-finding until the actual deadline; so that
2  determination was made during those days.
3      Q. So he says, I have attached the
4  termination letter, here on Monday, March 13th.
5          Now, if you go back to Exhibit 7, his
6  email about the investigation into Charlene Carter,
7  he doesn't state that termination is the decision
8  there. Did he reach the decision -- or did
9  Southwest reach the decision to terminate
10  Ms. Carter some -- sometime between the 10th and
11  the 13th?
12      A. Can you refer me to the document that you
13  are referring to now? Are you looking at 4863?
14      Q. It's -- so the -- the March 10th document
15  I am referring to is Exhibit 7 -- or Document 6, if
16  that's easier. And it's 4711. The first one we
17  were talking about for comparison purposes was --
18  5762 is the March 13th email.
19      A. Okay. So that March 10th document would
20  be found in -- where is that found again, the
21  document --
22      Q. It -- it's Document 6, Exhibit 7.
23      A. Okay. All right. I am pulling it up now.
24  So that decision was made in that time period.
25      Q. Okay. Do you know which day between the

Page 176

1  10th and the 13th Southwest made the final decision
2  to terminate Ms. Carter?
3      A. I do not know.
4      Q. Okay. Okay. So after -- after the
5  termination letter was sent, would you have --
6  well, let me back up here.
7          If I could refer back to Exhibit 2,
8  which would be your Document 7.
9      A. Document 7. Okay.
10      Q. And this is the -- the termination letter.
11  At the bottom, it -- it's signed by Ed Schneider
12  and it says copied to Sonya Lacore, Mike Sims and
13  Dave Kissman. Before this letter was issued, do
14  you know if Ed Schneider talked to you about
15  sending this letter?
16      A. He did not.
17      Q. Okay. And prior to this letter being
18  sent, did you have any communications with Sonya or
19  Dave about this letter?
20      A. I had no communication with Sonya and I
21  had no communication with Dave about the letter.
22      Q. Okay. Did you have any communication with
23  them about the decision of the investigation?
24      A. Other than I advised Sonya of it taking
25  place as we -- as a general course of business.

Page 177

1  She is always advised of terminations. And then
2  Dave advised me that this was where it was going.
3  Q. At what point did you advise Sonya of the
4  termination?
5  A. Most -- I -- I don't know, but, most
6  likely, it was that day.
7  Q. The -- day that the termination letter
8  was sent?
9  A. I don't know exactly when I notified her.
10  Q. Okay. But you said, it was most likely
11  that day. When you said, it was most likely that
12  day, which day?
13  A. It was -- what I -- as a general -- as
14  normal course of business, I do -- advised her as
15  things happen, so it would have been on that day or
16  the day prior.
17  Q. Okay. And what -- what specifically did
18  you advise Ms. Lacore?
19  A. That we were terminating a flight
20  attendant for these violations.
21  Q. And -- and what violations did you explain
22  to her?
23  A. That was social media and workplace
24  bullying.
25  Q. Okay. Did you explain what the specific

Page 178

1  violations were?
2  A. No.
3  Q. Okay. So you just told her that you were
4  violating (sic) an employee for workplace bullying?
5  A. I didn't understand the question. Sorry.
6  Q. Did -- did you just tell her that you were
7  violating -- excuse me.
8       Did you tell her that you were
9  terminating an employee for violating the two
10  policies?
11  A. Yes.
12  Q. Okay. Did she ask you any questions?
13  A. No.
14  Q. Okay. Was this communication verbal?
15  A. Yes.
16  Q. Okay. And -- and was it in person?
17  A. Yes.
18  Q. Okay. Was it during a particular meeting?
19  A. That, I do not recall. We speak several
20  times during the course of the day.
21  Q. Okay. Do -- are your office -- are your
22  offices located close to each other?
23  A. Yes.
24  Q. Okay. All right. And -- okay. And you
25  also mentioned that -- that Dave Kissman advised

Page 179

1  you that this is the way it was going. Did that
2  conversation happen by telephone, in person or
3  email?
4  A. I do not remember.
5  Q. Okay. And what did Dave specifically tell
6  you?
7  A. In the -- just as any other case, he -- he
8  just said that we're going to be terminating
9  employment of a flight attendant out of Denver.
10  And in this case, this was Charlene's.
11  Q. Okay. And did you ask him why?
12  A. No, I did not.
13  Q. Okay.
14  A. I knew of the -- at that point, I knew of
15  the gist of what was taking place.
16  Q. Okay. Did you know at that time that
17  there was a possibility that you might be involved
18  in Step 2 proceedings?
19  A. Yes.
20  Q. Okay. And did you have any more
21  communications with anyone regarding Charlene
22  Carter's matter prior to her filing a grievance?
23  A. No.
24  Q. And is it fair to say that Step 2
25  proceedings begin with the filing of a grievance?

Page 180

1  A. That is correct.
2  Q. Okay. And is it -- was it with the filing
3  of the grievance that you started to receive
4  documentation about this matter?
5  A. I received the documentation, I believe,
6  the day previous -- the day prior to our having our
7  meeting.
8  Q. Okay. But after the filing of the
9  grievance?
10  A. Yes.
11  Q. Okay.
12       MR. GILLIAM: Can we maybe take a
13  five-minute break?
14       MR. CORRELL: Sure.
15       MR. GILLIAM: Okay.
16       THE VIDEOGRAPHER: We are off record
17  at 3:31 p.m.
18       (Recess taken.)
19       THE VIDEOGRAPHER: We are back on
20  record at 3:43 p.m.
21  Q. (By Mr. Gilliam) Okay. Mr. Sims, during
22  the Step 2 process, did you communicate with
23  someone in particular with Local 556 about
24  Ms. Carter's grievance?
25  A. No one outside the normal realm of

Page 181

1  business, and that would have been her
2  representative Becky Parker.
3  Q.  Okay.  So you -- you only communicated
4  with Becky Parker about Ms. Carter's grievance?
5  A.  Correct.
6  Q.  Okay.  All right.  And, I guess, after the
7  grievance was filed, did you have someone on
8  Southwest's side who helped bring you up to speed
9  on what was happening?
10  A.  Correct.  I met with Melissa Burdine, the
11  labor relations manager, prior to meeting with
12  Ms. Carter.
13  Q.  Okay.  Did you work with anyone else at
14  Southwest to, I guess, again, bring you up to speed
15  about Ms. Carter's grievance?
16  A.  No.
17  Q.  Okay.  Let's see.  I would like to turn
18  your attention to Exhibit 4, and this is Document
19  2.  And it will be page -- I want to say, I think
20  it's 6819.  Should be the last -- second-to-last
21  page.
22  A.  6819?
23  Q.  I think so, yeah.  Do you -- do you
24  recognize this?
25  A.  Yes.

Page 182

1  Q.  And what is this?
2  A.  That is director of labor relations Tammy
3  Shaffer sending the Charlene Carter fact-finding
4  notes.
5  Q.  Okay.  And, I guess, why -- why was Tammy
6  Shaffer sending you the fact-finding notes?
7  A.  It could be for -- for a variety of
8  reasons.  It could be somebody on her team asked
9  her to send it to me.  I -- I don't know.  She --
10  Q.  Okay.  Did -- does -- does Ed Schneider
11  have a role in the Step 2 proceedings to bring you
12  up to speed and apprise you of what's happening
13  and --
14  A.  Yes and no.  Generally, if I had any
15  questions, I could reach out to him and call.  In
16  this case, I didn't have any questions prior to the
17  Step 2.
18  Q.  Okay.  Now, during this Step 2, did you
19  have any questions for Ed Schneider?
20  A.  No.
21  Q.  Okay.  During Step 2, did you communicate
22  with Ed Schneider at all?
23  A.  Not that I remember.
24  Q.  And I should specifically say, did you
25  communicate with Ed Schneider about Charlene

Page 183

1  Carter's matter?  But your -- your answer is still
2  not that you remember?
3  A.  I don't remember.
4  Q.  Okay.  Do you know if Melissa Burdine
5  communicated with Ed Schneider?
6  A.  That, I -- I do not know.
7  Q.  Okay.  And did you review the decision to
8  fire Ms. Carter with anyone else besides
9  Ms. Burdine?
10  A.  No, not that -- anyone I remember.
11  Q.  Okay.  All right.  And so what -- I guess,
12  had you reached a conclusion prior to the
13  fact-finding meeting you held with Ms. Carter how
14  you were going to decide her grievance?
15  A.  No.
16  Q.  And what -- I guess, what were the
17  questions you set out to address when you held the
18  -- your fact-finding on her grievance?
19  A.  Yeah, I am not fully -- I'm sorry.  I
20  don't fully understand your question.
21  Q.  So were there specific questions you had
22  in mind that had to be resolved during your meeting
23  with Ms. Carter about her grievance?
24  A.  No.
25  Q.  Okay.  So -- but you had not made up your

Page 184

1  mind how -- what you were going to -- to -- to --
2  to do about her grievance?
3  A.  That is correct.
4  Q.  So did you not really have any, I guess,
5  specific questions for Ms. Carter at her
6  fact-finding?
7  A.  That's incorrect.  I had one specific
8  question, and that was at the onset of the meeting.
9  And that was:  Tell me why you feel that your
10  termination was unjust or why did Southwest
11  Airlines, in your view, make a mistake for
12  terminating your employment?  And that was -- that
13  was the question that -- that began what I would
14  consider a dialogue.
15  Q.  Okay.  And following the meeting, had you
16  made up your mind at the end of the meeting whether
17  the termination was unjust?
18  A.  For the most part, yes.
19  Q.  Okay.  And -- and you -- to make sure I
20  understand, you had decided that the termination
21  was just at the conclusion of the meeting?
22  A.  Yes, within that day.
23  Q.  Okay.  Did you -- did you discuss the --
24  the matter with anyone before reaching a final
25  decision?

Page 185

1    A.  I discussed it with the labor relations
2  representatives, and that would have been Melissa
3  Burdine and possibly Tammy Shaffer, her version.
4    Q.  Okay.  And what did you discuss with --
5  with Melissa Burdine?
6    A.  I wanted to hear what her point of view
7  was.  And then also advise her of what my
8  intentions were to do with --
9    Q.  And --
10    A.  -- with the case.
11    Q.  And what was Melissa Burdine's point of
12  view?
13    A.  She believed the termination was just.
14    Q.  Okay.  Did Ms. Burdine have any doubts?
15    A.  Regarding her belief?
16    Q.  Correct.
17    A.  I don't think so.
18    Q.  Okay.  And did you have communications
19  with Tammy Shaffer about whether the termination
20  was just?
21    A.  I don't remember specifically, but, most
22  likely, yes.
23    Q.  Okay.  And did you have any communications
24  about the grievance with anyone else besides
25  Melissa Burdine and Tammy Shaffer after you

Page 186

1  concluded the fact-finding meeting on Ms. Carter's
2  grievance?
3    A.  Not that I remember, unless I had a quick
4  conversation with Ed Schneider.
5    Q.  Okay.
6    A.  Just to -- to get his point of view.
7    Q.  Okay.  So in reaching -- do you recall
8  when you reached the final decision that her
9  termination was just?
10    A.  I believed it was just after we met, so it
11  would have been within that day of our meeting.
12    Q.  Okay.  And at -- at some point, did you
13  decide to provide Ms. Carter with a last-chance
14  agreement?
15    A.  That is correct.
16    Q.  And did someone tell you that you -- that
17  you should offer her a last-chance agreement?
18    A.  No.
19    Q.  And did anyone recommend that you should
20  provide her with a last-chance agreement?
21    A.  No.
22    Q.  If you believed that her termination was
23  just, why did you offer her a last-chance
24  agreement?
25    A.  I offered her a last-chance agreement for

Page 187

1  practical reasons.  This dispute had gone on and it
2  was going to continue to get uglier, and at a great
3  cost to everyone.  So I decided that I had the
4  authority to offer a last-chance agreement to
5  reinstate her employment, as she told me she wanted
6  to come back as a flight attendant.
7    Q.  You did not have to get permission from
8  anyone to offer her a last-chance agreement?
9    A.  No.
10    Q.  And did you say that you felt that this --
11  that the dispute could get uglier?
12    A.  Yes.  I just thought, at that point, I
13  could put this all to rest.  Because, ultimately,
14  she indicated to me she just wanted her job back.
15    Q.  And what -- what do you mean by the
16  dispute could get uglier?
17    A.  Well, there were disputes, and this is all
18  encompassing the times at that point.  And so I --
19  I -- I sensed that Ms. Carter was in conflict with
20  TWU 556 and she was conflict with Audrey Stone.
21    Q.  And when you say -- I -- I'm probably not
22  going to quote you exactly in -- in your precise
23  words, but when you -- you referred to the -- the
24  times -- that the sign of the times or the nature
25  of the times, what do you mean by that?

Page 188

1    A.  That time period was tumultuous in terms
2  of there was a effort to recall the Local 556
3  officers.  In addition, there was a lot of
4  political activity surrounding the inauguration of
5  President Trump on January 20th, 2017.
6       And I just came to the conclusion that
7  we all need to -- or everyone needs to step back
8  and review Ms. Carter's case as a long-term
9  employee who had a good track record; who told me
10  that she regretted, to a certain extent, the
11  methodology that she chose; and that she wanted her
12  job back.  And so I used my authority to offer her
13  a last-chance agreement.
14    Q.  And quick question:  Had Ms. Carter ever
15  been disciplined in her career with Southwest?
16    A.  Not to my knowledge.
17    Q.  And -- okay.  And when you say that the --
18  the issue had gone on at great cost to everyone,
19  what -- what was the cost?
20    A.  The cost -- well, we had not gone into
21  monetary costs yet, but that's where it was going.
22  But the cost, I thought, was undermining our
23  culture at Southwest.  And it was impeding our
24  ability to do business.
25    Q.  And -- and what -- I guess, what caused

Page 189

1  harm to the culture at Southwest?
2      A. It didn't necessarily cause harm. I was
3  concerned that it would.
4      Q. That -- that what specifically would cause
5  harm to the culture at Southwest?
6      A. Employees that were fighting via social
7  media. And that was permeating, in my view, or
8  potentially could permeate into the workplace --
9  further into the workplace.
10     Q. Okay. And what -- how would -- when you
11  say that it had the potential to permeate further
12  into the workplace, how would it permeate into the
13  workplace?
14     A. That, I don't know fully other than I did
15  not want disputes happening, potentially, in front
16  of our customers or with other employees.
17     Q. Okay. I would like to -- to shift gears a
18  little, if -- if I could, and go back to a subject
19  we addressed a little bit earlier on. Now, is it
20  -- it correct that on certain flights to the
21  women's march, that the cabin lights on -- on -- on
22  some number of flights were turned pink?
23     A. That is correct.
24     Q. Okay. And who -- who made the decision to
25  turn the cabin lights pink on those flights?

Page 190

1      A. Those decisions were made by individual
2  flight attendants that did that.
3      Q. Okay. Were those flight attendants
4  disciplined for their decision to turn the cabin
5  lights pink?
6      A. They were not.
7      Q. Were they given a coach and counsel?
8      A. That, I do not know if we individually had
9  to speak to any employee about it because it
10  stopped pretty quickly.
11     Q. Do you know if anyone in Southwest
12  management talked to those employees --
13     A. I do --
14     Q. -- about --
15     A. I do not know.
16     Q. All right. Did you get complaints from
17  any customers about turning the cabin lights pink?
18     A. We did receive some complaints.
19     Q. And -- okay. Did you also receive
20  favorable press about turning the cabin lights
21  pink?
22     A. That is correct; we did.
23     Q. Okay. Let's see. I would like to --
24  let's see, which exhibit are we on here now?
25     MR. CORRELL: I think we are at

Page 191

1  Number 8.
2      MR. GILLIAM: 8. Let's see. I would
3  like to mark Document 4 as Exhibit 8.
4      (Exhibit 8 marked.)
5      Q. (By Mr. Gilliam) Once you pull it up and
6  had the opportunity to review it, let me know.
7      A. Okay.
8      Q. Do you recognize these documents?
9      A. Yes.
10     Q. And what are they?
11     A. This is a summation of the lights being
12  turned to pink. And this is mainly correspondence
13  from people on our corporate communications team.
14     Q. And are, I guess, the -- is the corporate
15  communications team -- does that -- well, you
16  mentioned corresponding some -- with some folks in
17  preparation for your deposition. Was that a couple
18  members of the corporate communications team?
19     A. That's correct.
20     Q. Okay. I would like to direct your
21  attention to 6807. I think it should be the third
22  document in, maybe. I am sorry -- yeah, no, 6807.
23     A. Okay.
24     Q. And, I guess, it -- it says from Southwest
25  Airlines media inquiry to SWA communication teams

Page 192

1  DG. Do you know who -- who all would be receiving
2  that email?
3      A. I don't know exactly who receives that.
4  That's, again, an open mailbox where several people
5  have access to that.
6      Q. Do you know if anybody outside of
7  the corporate communications team has access to
8  that mailbox?
9      A. I don't -- I don't think so, but I don't
10  know.
11     Q. Okay. Would any of the VPs have access to
12  that box?
13     A. Only the -- Linda Rutherford, who was --
14     Q. Okay.
15     A. -- the senior vice president of corporate
16  communications; and I don't know that to be fact.
17     Q. Okay. And it says from Southwest Airlines
18  media inquiry. Who, I guess -- who -- who is that,
19  exactly?
20     A. That, I do not know.
21     Q. Now, at the bottom, it says, thank you;
22  Rachel Barry. Do you know who Rachel Barry is?
23     A. I do know Rachel.
24     Q. And it says corporate communication. I
25  guess she works in the corporate communications

Page 193

1  group?
2  **A. She does.**
3  Q. Do you know if she sent this email?
4  **A. That, I -- I do not know.**
5  Q. Okay. And it's forwarded to you from
6  Cindy Hermosillo?
7  **A. Correct.**
8  Q. And who is Cindy Hermosillo?
9  **A. Cindy Hermosillo works in corporate**
10 **communications. And she is the inflight -- or our**
11 **department's liaison to corporate communications.**
12 Q. Okay. And she says, the latest.
13       So had she been communicating with you
14 regarding the pink cabin lights?
15 **A. Yes. That morning, she had.**
16 Q. Okay. And what did she report to you that
17 morning?
18 **A. She contacted me to ask if I knew what it**
19 **was about because they had started to receive**
20 **inquiries from the media and from the customers.**
21 **So her initial conversation with me was, we are**
22 **unaware of this because this is not a Southwest**
23 **Airlines-sanctioned event; do you know about it?**
24 Q. And what -- what did you tell her?
25 **A. That was my notification. I had no**

Page 194

1  **knowledge of this prior to her telling me.**
2  Q. Did -- did you tell her you would
3  look into it or did you -- how did -- how did you
4  respond to her on receiving notification?
5  **A. I don't remember what I said other than I**
6  **-- I was looking for some sort of confirmation**
7  **because it was pretty -- at that point, it was**
8  **unfolding. So I think that was pretty much the**
9  **gist of the conversation, of her asking me if I**
10 **knew about it; which I did not.**
11 Q. So did you investigate the -- the issue
12 after you talked to her?
13 **A. Not at that point.**
14 Q. So at any point, did you conduct some sort
15 of follow-up inquiry on what had happened?
16 **A. No. Because we were able to get -- get it**
17 **stopped.**
18 Q. Okay. And so what -- when you say we were
19 able to get it stopped, who -- who stopped it?
20 **A. Southwest Airlines. I sent out a**
21 **memorandum asking our flight attendants to be**
22 **mindful and to be civil as aircraft were traveling**
23 **in and out of Washington, D.C. for the inauguration**
24 **activities.**
25 Q. Before you sent out your -- your memo, did

Page 195

1  you -- did you speak with anyone?
2  **A. Yeah. I spoke with corporate**
3  **communications about the actual memo.**
4  Q. But did you -- did you inquire into what
5  actually had -- had happened on these flights
6  before corresponding to corporate communications?
7  **A. At that point, I was aware because I was**
8  **able to look at social media and see for myself.**
9  **Because I was, at that point, not aware that one**
10 **could even program the lights in an aircraft to a**
11 **different color than what our standard colors are.**
12 **So then when I saw on social media pictures, I had**
13 **confirmation that it -- it was taking place.**
14 Q. Okay. And once you confirmed that it was
15 taking place, then you communicated with corporate
16 communications?
17 **A. Yes.**
18 Q. Okay. And you -- you told them that you
19 had made the decision to issue some sort of notice
20 to Southwest employees?
21 **A. To flight attendants, yes.**
22 Q. To flight attendants, yes. Thanks. And
23 was that all over the course of a day?
24 **A. Yes.**
25 Q. Okay. And if I could direct your

Page 196

1  attention to 6811 in the same packet.
2  **A. Right.**
3  Q. And that bottom section of this chain, was
4  that the memo you prepared?
5  **A. Yes.**
6  Q. Okay. And this email says from cabin
7  services to cabin services. Do you know -- who --
8  who is sending that and who is it going to?
9  **A. I do not know how this copy was generated.**
10 **But cabin services is the former name of inflight.**
11 Q. Okay.
12 **A. We did go through a name change, so that's**
13 **what I -- I suppose that is.**
14 Q. When did inflight change its name?
15 **A. I believe that would have been the**
16 **beginning of 2018.**
17 Q. Okay. And then just above it, there is an
18 email from Myra Smith to -- to cabin services. Who
19 -- who is Myra Smith?
20 **A. I do not know Myra, but it appears she is**
21 **an employee.**
22 Q. Okay. Do you -- do you know what
23 department she would be employed in?
24 **A. Considering the fact that she's writing to**
25 **cabin services, I am going to assume she's --**

Page 197

1  flight attendant.
2      Q.  Okay.  And do -- do all flight attendants
3  receive emails that are directed to cabin services?
4  So -- I'm sorry.  Just ask the question again.
5          The email is addressed to cabin
6  services.
7      A.  Uh-huh.
8      Q.  Is that a -- an email box that includes
9  all flight attendants on its distribution list?
10     A.  No.  That -- no.  I -- I know that to be
11  not true.
12     Q.  Okay.  But you're not sure who receives
13  emails directed to cabin services?
14     A.  Not at that time.  I am -- I don't know
15  who was receiving those at that time.
16     Q.  Do you know what positions were receiving
17  those?
18     A.  No.
19     Q.  Okay.  And you don't know whether it's
20  personnel just within cabin services?
21     A.  It would have been just within cabin
22  services, which -- which is, in essence, the
23  inflight department.
24     Q.  Okay.  But you don't know what level of
25  the cabin services department it was?

Page 198

1      A.  No.
2      Q.  Okay.  And then the -- top email says
3  it's from cabin services to you.  Do you know if
4  that's just a email that's automatically generated
5  to you or --
6      A.  It's not.  It's been -- it was sent to me
7  from somebody who can write emails under that --
8  that address.
9      Q.  Okay.  But you don't know who -- who that
10  would have been; who sent you that email?
11     A.  No.  But I do believe it is corporate
12  communications.
13     Q.  Okay.  And corporate communications is
14  considered separate from inflight?
15     A.  That is true.
16     Q.  Okay.  Let's see.  Now, going to a first
17  page in the series here, I believe it's marked
18  4311.  Still on Document 4.
19     A.  4311.
20     Q.  On Document 4, Exhibit 8.
21     A.  Okay.
22     Q.  And -- and what -- what is this document?
23     A.  It appears to be a report generated by
24  corporate communications' social media team on
25  trending topics that are being viewed on social

Page 199

1  media by the listening center.
2      Q.  Okay.  And who is the listening center?
3      A.  The listening center is the social media
4  team that monitors social media and Southwest
5  Airlines mentions.
6      Q.  Okay.  And is -- this is a -- a tweet by
7  Planned Parenthood?
8      A.  Yes, that's what it appears to be.
9      Q.  Did anyone from Southwest follow up --
10  well, let me ask it this way:  Did any Southwest
11  management follow up with Planned Parenthood about
12  this tweet?
13     A.  I don't think so.
14     Q.  Okay.  Do you know if Planned Parenthood
15  had any more communications with Southwest about
16  this tweet?
17     A.  They did not --
18        MR. CORRELL:  Objection.  There's --
19  there's the word "more" in there, so I am going to
20  say misstates prior testimony.
21     Q.  (By Mr. Gilliam)  Yeah.  So let me reword
22  it.  Did Planned Parenthood have any communications
23  with Southwest after making this tweet?
24     A.  Not that I am aware of.
25     Q.  Okay.  And then on 6808.

Page 200

1      A.  Okay.
2      Q.  Do you recognize this email?
3      A.  I do.
4      Q.  And what is it?
5      A.  This appears to be an email, again,
6  summarizing the aircraft cabins being turned pink.
7      Q.  Okay.  And who -- do you know who Lan --
8  Lan Nguyen is?
9      A.  I do not know Lan.
10     Q.  Okay.  Do you know anybody on the email
11  who it was addressed to?
12     A.  No.
13     Q.  Okay.  And you don't -- do you know what
14  the PCS team is?
15     A.  Yes.  That is -- PCS is a -- give me a
16  minute.  Social media of -- they are a entity out
17  of our customer relations department.  And PCS
18  stands for proactive customer service.
19     Q.  All right.  And at the -- I guess, the --
20  at the end of the summary events section, it says,
21  inflight reached out to us and will be sending out
22  a memo to crew members advising that this is not
23  the appropriate venue to express these views.
24        Was -- was that your conclusion; that
25  turning the lights pink on the flights was an

Page 201

1  inappropriate venue to express political views?
2      A.  Yes.  I did not know it was a political
3  view at that point.
4      Q.  Okay.  But once you realized that it was
5  an expression of a political view, you -- you
6  determined that it was an inappropriate venue to
7  express it?
8      A.  That is correct.
9      Q.  Okay.  And -- and why is that?
10     A.  Southwest Airlines does not have a
11  position on -- or did not have a position or
12  endorsement or support of the women's march or any
13  other political activities taking place in
14  Washington that day.
15     Q.  And was it an inappropriate venue because
16  it was on board a flight?
17     A.  Correct.
18     Q.  Okay.  And was -- did -- did this happen
19  on more than one flight?
20     A.  It did.
21     Q.  On how many different flights did -- did
22  it happen?
23     A.  I do not know the exact number, but I
24  believe it was four or five --
25     Q.  Okay.

Page 202

1      A.  -- flights going in the evening before and
2  then that morning.
3      Q.  Did the flight attendants involved
4  coordinate that?
5      A.  They did.
6      Q.  Okay.  And how did Southwest learn that
7  the flight attendants had coordinated that?
8      A.  One of the base managers called -- no.
9  Let me back up.  We have an NOC base manager team
10  on the network floor that -- that called, I
11  believe, flights -- and asked, you know, from one
12  crew, what was this?  Because at the point -- at
13  that point, we did not know that one could program
14  lights to pink.  Because that only happens -- you
15  are only able to do that on certain aircraft type.
16     Q.  And you -- did you say NOC base?
17     A.  Yeah.  NOC, network operations center.
18     Q.  Okay.  And I am sorry, what is the network
19  operations center?
20     A.  That is our operations center more -- it's
21  our mission control, if you will, where we dispatch
22  aircraft, crew flights and then handle any issues
23  that come up during the operating day.
24     Q.  Okay.  Now, the flight attendants who
25  coordinated turning the lights pink, of those

Page 203

1  flight attendants, did any of them participate in
2  the women's march?
3      A.  Not to -- not to my knowledge.
4      Q.  Okay.  Do you know if any of those flight
5  attendants who coordinated turning the lights pink
6  were Local 556 officers?
7      A.  I don't have knowledge of that.  To my
8  knowledge, there is no working officers serving as
9  crew members on that day.
10     Q.  Okay.  Okay.  Let's see.  I would like to
11  refer to, I guess, the Complaint and the -- the
12  Answer, and some questions about the Complaint and
13  the Answer to the Complaint.  These are not
14  document numbers.  Let's see.  I am not -- I can't
15  remember how they were labeled.  I think they were
16  -- actually, I think they were -- they were
17  numbers.  And these do not need to be exhibits, but
18  I would like to -- like you to be able to see them
19  to refer to them.
20        MR. CORRELL:  Mike, for your
21  reference, those would be contained in Email 4 of 4
22  that I sent to you on Sunday forwarding Counsel's
23  documents.
24        MR. GILLIAM:  And --
25        THE WITNESS:  4?

Page 204

1      Q.  (By Mr. Gilliam)  And so this -- this
2  should be in the fourth email that I sent out to
3  everybody.  And one of them is called 80-Carter
4  Fourth Amended Complaint, and then it has a date.
5  And the other one is 81-SWA Answer to Carter Fourth
6  Amended Complaint.  Once you have had the chance to
7  review them, just let me know.  I -- I'm probably
8  going to be directing your attention to specific
9  paragraphs too, so --
10     A.  Okay.
11     Q.  I just want to make sure you are able to
12  get everything open.
13     A.  Yeah.  Okay.  I am ready.
14     Q.  Okay.  So, first of all, if I could direct
15  your attention to Paragraph 34 of the -- the
16  Complaint.
17     A.  This is Number 80 or 81?
18     Q.  80.
19     A.  80?
20     Q.  And it's -- yeah.  And it's on Page 9.
21     A.  Okay.
22     Q.  And so you have read Paragraph 34?
23     A.  Yes.
24     Q.  And you understand that's Ms. Carter's
25  allegation in her Complaint, her factual

Page 205

1 allegation?
2 **A. I do want to make sure we're on the right**
3 **paragraph.**
4 Q. Sure.
5 **A. Are you referring to the paragraph that**
6 **says, Jackson and several other flight attendants?**
7 Q. Yes. Yeah.
8 **A. Okay.**
9 Q. And in -- in and its Answer, if you look at
10 the corresponding Paragraph 34, Southwest says it
11 -- it lacks sufficient knowledge or information;
12 and then, therefore, denies it.
13 **A. Okay.**
14 Q. So, I guess, you -- you were aware of --
15 or Southwest was aware of the -- the effort to
16 recall the leadership of Local 556, correct?
17 **A. Eventually, yes.**
18 Q. And do you -- do you recall when you were
19 aware of that?
20 **A. I don't -- I don't think I was aware until**
21 **later on in 2015, later in 2015.**
22 Q. Okay. Okay. And do you know if that
23 campaign started around July of 2015?
24 **A. Yes.**
25 Q. Okay. Let's see. Now, if I could have

Page 206

1 marked as Exhibit 9, I think, Document 13.
2    (Exhibit 9 marked.)
3    MR. CORRELL: Counsel, if you are
4 moving to recall questions, I just want to alert
5 you that we found, I think it's two additional
6 emails that got hung up in our privilege redaction
7 that should have been produced. It's like three
8 pages total that were sent to you while we've been
9 on the record this afternoon. So at the next
10 break, if you want to look at those, if you think
11 there is something you are going to need, just let
12 me know. But I didn't want you to find that after
13 you close the deposition. It's -- I think it's
14 three or four pages.
15    MR. GILLIAM: Okay. And, you know, we
16 -- we also talked -- I know we talked in the past
17 about, you know, reserving the right to reopen.
18 And I understand you -- you have an objection, and
19 we can put that on the record as well.
20    MR. CORRELL: Sure. I mean, that --
21 that's assuming there is time left, so we will just
22 see how far we get today because you only get seven
23 hours with a corporate rep.
24    MR. GILLIAM: So you said you -- you
25 sent an email?

Page 207

1    MR. CORRELL: It should have come from
2 Brian Morris. I believe the timestamp on the email
3 is -- one second. So you should have received it
4 at 4:20 p.m. Central time, 5:20 your time.
5 Contains Bates number 7464 and 7470.
6    MR. GILLIAM: Okay.
7    MR. CORRELL: And, again, I don't know
8 if it's necessary for your examination. I just
9 didn't want you to find it after the deposition.
10 And it does address, I believe, recall-related
11 issues.
12    MR. GILLIAM: Okay. I could tell you
13 I have had some email -- I am sorry -- some Outlook
14 issues today. I don't see it, but, like I said,
15 I've -- I have had some Outlook issues.
16    MR. CORRELL: It was also sent to
17 Mr. Jennings, if that's helpful. I don't know if
18 he is near you and could print that off for you.
19 Just, again, as you see fit, or we can deal with it
20 at a break. I don't want to interrupt your dep --
21 your -- your examination.
22    MR. GILLIAM: Okay.
23   Q. (By Mr. Gilliam) And, Mr. Sims, are you
24 still reviewing Document 13? I am sorry. You cut
25 out.

Page 208

1    **A. I am looking for Document 13. Hold on.**
2 **Yes.**
3 Q. Okay. And do you recognize this?
4    **A. Yes. This begins with correspondence from**
5 **me to director of labor relations Tammy Shaffer**
6 **regarding a email I received from Phoenix flight**
7 **attendant brown -- Brian Talbert.**
8 Q. Okay. And what -- what did he send you
9 here?
10    **A. Brian sent a email that appeared to be**
11 **generated by a Dallas flight attendant by the name**
12 **of Jeanna Jackson.**
13 Q. And do you know why he was sending you
14 this email?
15    **A. No.**
16 Q. And you -- you tell Tammy -- you -- why
17 did you forward it to Tammy?
18    **A. I just wanted it archived.**
19 Q. For -- for what purposes?
20    **A. I didn't have a specific purpose other**
21 **than I just wanted it archived.**
22 Q. And I am sorry. Did you say who -- who
23 the Brian was who sent it?
24    **A. Brian Talbert.**
25 Q. Okay.

Page 209

1     A. He is a Phoenix-based flight attendant.
2     Q. Okay. And down in the body of Jeanna's
3  email towards the bottom, it says, this, of course,
4  was after the EB voted to send the first TA to the
5  membership in which we voted it down by a whopping
6  90 -- 9,916 no votes.
7        I guess, do you know when -- when the
8  TA was rejected?
9     A. I don't have the date, but it was
10  rejected.
11    Q. And this was the -- I guess, the TA is the
12  tentative agreement, correct?
13    A. Correct.
14    Q. And it was -- do you know which collective
15  bargaining agreement it was the tentative agreement
16  for?
17    A. I believe it was the one prior to the one
18  we have now.
19    Q. Okay. And after the first TA was voted
20  down, was there a second tentative agreement on the
21  collective bargaining -- bargaining agreement?
22        MR. CORRELL: And I'm going to object
23  real quick that this is beyond the scope of the
24  Notice. But, Mr. Sims, you can answer as you are
25  able in your personal capacity.

Page 210

1     A. When the TA was rejected, negotiations
2  resumed and another TA was brought forth.
3     Q. (By Mr. Gilliam) Okay. And was that
4  second TA ratified?
5     A. Yes.
6     Q. Okay. Do you know when that second TA was
7  ratified?
8     A. No.
9     Q. Okay. Do you know what year it was
10  ratified?
11    A. It was either -- no, wait, I don't know
12  off the top of my head what year it was.
13    Q. Okay. And Brian -- in his email to you --
14  says that, here is her latest attempt.
15        Do you know attempt -- what he's
16  talking about; what he means by attempt at what?
17    A. I do not know what he meant.
18    Q. Okay. All right. So, next, if I could
19  direct your attention back to the Complaint.
20    A. Okay.
21    Q. And it says, during the recall campaign --
22  so, I guess, read -- if you could read Paragraph
23  35.
24    A. Okay.
25    Q. So -- and then, also, if you could read

Page 211

1  Southwest's Answer to Paragraph 35.
2     A. Okay.
3     Q. So does that refresh your recollection on
4  when the first TA was unsuccessfully submitted?
5     A. It does.
6     Q. And that was in 2015?
7     A. Correct.
8     Q. Do you remember when the second TA was
9  submitted, based off of that information?
10    A. I apologize. Can you ask the question one
11  more time so I can make sure that I am looking for
12  the right information that you are seeking?
13    Q. Yeah. So does knowing that the first
14  tentative collective bargaining agreement was
15  rejected in 2015 refresh your recollection as to
16  when the second one was approved?
17    A. I believe it was either late 2015 or early
18  2016.
19    Q. Okay. And do you know if the -- the date
20  in Ms. Carter's Complaint that the first tentative
21  agreement was rejected on July 24th, 2015 is
22  correct?
23    A. I believe that's correct.
24    Q. Okay. Let's see. If I could direct your
25  attention to Paragraph 60 of the Complaint and the

Page 212

1  Answer. Oh, actually -- actually, skip that. If
2  -- if I could direct your attention to Paragraph
3  74, and Subparts A through E.
4     A. Okay.
5     Q. Now -- and -- and did you read Southwest's
6  Answer?
7     A. Stand by. Okay.
8     Q. So for Subpart A of the Complaint, do you
9  know if that allegation is incorrect?
10    A. I do not know if it's correct.
11    Q. Okay. Do you know if Ricky Spand posted a
12  video on his Facebook page, as described there?
13    A. Yeah, I don't know if he did or if he did
14  not.
15    Q. Okay. And do you -- I should have asked:
16  Do you know who flight attendant Ricky Spand is?
17    A. I do know who Ricky Spand is.
18    Q. Okay.
19    A. Or was. He passed away about two weeks
20  ago.
21    Q. Oh, I am sorry to hear that. The -- so do
22  you know if -- if Jeanna Jackson -- do you know who
23  Jeanna Jackson is?
24    A. I do know Jeanna.
25    Q. Okay. Do you recall whether she filed a

Page 213

1  complaint with Southwest over a video he posted?
2  **A. She may have.**
3  Q. Okay. Do you know any other details about
4  that incident?
5  **A. No.**
6  Q. Okay. And Paragraph B, did you read that?
7  **A. Okay.**
8  Q. And do you know who flight attendant Josh
9  Rosenberg is?
10  **A. I do know who Josh Rosenberg is.**
11  Q. And do you know if he posted a profile
12  picture on Instagram with an individual holding a
13  gun and a caption that said, Gary, sign now?
14  **A. That, I -- I do not know.**
15  Q. Okay. Do you know if Josh Rosenberg was
16  -- was fired from Southwest for social media
17  violation?
18  **A. To my knowledge, he was not.**
19  Q. Okay. Okay. Do you know if he was
20  disciplined for a social media violation?
21  **A. To my knowledge -- I do not know.**
22  Q. Okay. And if you could read Paragraph C.
23  **A. Okay.**
24  Q. And you've mentioned that you -- you know
25  flight attendant Brian Talbert, correct?

Page 214

1  **A. I do know Brian.**
2  Q. Do you know if he made the Facebook post
3  that is described there?
4  **A. He did.**
5  Q. Okay. And was that one of the reasons for
6  his first termination?
7  **A. Correct.**
8  Q. Okay. All right. And if you could read
9  Paragraph D.
10  **A. Okay.**
11  Q. And you -- I think you mentioned earlier
12  Casey Rittner as being one of the flight attendants
13  who was terminated for a social media policy
14  violation?
15  **A. Correct.**
16  Q. And this paragraph describes a Facebook
17  post. Was this Facebook post what Casey Rittner
18  was terminated for?
19  **A. I believe that's correct.**
20  Q. Okay. But he was later reinstated,
21  correct?
22  **A. That's correct.**
23  Q. Okay. And then Paragraph E, if you could
24  read that.
25  **A. Okay.**

Page 215

1  Q. Do you know if Bill Holcomb was ever
2  reported for making sexually suggestive comments on
3  Facebook about a female passenger?
4  **A. That, I don't have knowledge of.**
5  Q. Okay. All right. Let's see. Again, I am
6  not sure that I want to make this an exhibit, but I
7  did have questions about documents that Southwest
8  produced. If I could turn your attention to
9  Document 15.
10  MR. CORRELL: And, Counsel, I believe
11  these documents were attached to the emails that we
12  had produced to you today. So that's -- that's how
13  this whole issue came up because I couldn't figure
14  out where the cover email was for this --
15  MR. GILLIAM: Oh, okay.
16  MR. CORRELL: -- 15 --
17  MR. GILLIAM: Okay.
18  MR. CORRELL: -- I think that document
19  may be helpful to this portion of --
20  MR. GILLIAM: Ah. Okay. Well, then,
21  that's probably -- okay. I see that Brian's email
22  came through. I should probably -- rather than
23  spend more time with this, I should probably take a
24  look at Brian's email.
25  MR. CORRELL: Do you want to take a

Page 216

1  break now to do that or you want to come back to
2  it? It's up to you.
3  MR. GILLIAM: Yeah. I would like to
4  take a break to do that. And how much more time do
5  we have?
6  THE REPORTER: I can figure that up
7  off the record.
8  THE VIDEOGRAPHER: Are we going off
9  record?
10  MR. GILLIAM: Yeah, I would say let's
11  go off record.
12  THE VIDEOGRAPHER: We are off record
13  at 4:50 p.m.
14  (Recess taken.)
15  THE VIDEOGRAPHER: We are back on
16  record at 5:08 p.m.
17  Q. (By Mr. Gilliam) All right. Mr. Sims, I
18  would like to direct your attention to -- well,
19  let's see.
20  MR. GILLIAM: If we could mark the
21  Document 15 as the next exhibit. Are we at 10?
22  THE REPORTER: You -- yes, you are
23  right.
24  (Exhibit 10 marked.)
25  Q. (By Mr. Gilliam) And, Mr. Sims, if you

Page 217

1  could review these documents.
2      **A. Okay.**
3      Q. Do you recognize these?
4      **A. Yeah. This is the first time I have seen**
5  **these. Yup, I do.**
6      Q. And what are they?
7      **A. This is correspondence from Naomi Hudson,**
8  **former senior director of labor relations, advising**
9  **others that Audrey Stone has notified her of an**
10 **effort to a recall process at TWU 556.**
11     Q. Okay. Do you know why she's notifying
12 these individuals of the -- the recall petition?
13     **A. At the time, her direct leader was Mike**
14 **Ryan, who was the vice president of labor**
15 **relations; so she's notifying her boss. Mike**
16 **Hafner, who is inflight vice president at that**
17 **time; and Randy Babbitt, who was the senior vice**
18 **president of labor relations at that time.**
19         **So it's a pretty standard notification**
20 **to her leadership chain of information that she was**
21 **just passing -- passing to them for their**
22 **knowledge.**
23     Q. Okay. And what is the significance of
24 this development to -- to these individuals?
25     **A. The significance is it's just for their**

Page 218

1  **information.**
2      Q. Okay. And let's see. Do you know who
3  Gerry Anderson is?
4      **A. It's pronounced Gerry. Gerry Anderson was**
5  **a director in the labor relations department.**
6      Q. Okay. And Russell McCrady, McCrady?
7      **A. Russell is currently the vice president of**
8  **labor relations.**
9      Q. And do you know what position he had in
10 2015?
11     **A. He was a senior director in labor**
12 **relations.**
13     Q. Okay. Now, part of this chain, there is
14 an email from Kevin Allen to Naomi. Who is Kevin
15 Allen?
16     **A. Kevin Allen is a labor relations manager**
17 **who also participates on the Southwest Airlines**
18 **negotiating team.**
19     Q. Okay. And has a portion of this email
20 been redacted?
21     **A. It appears so.**
22     Q. Do you know if it's redacted for
23 attorney/client privilege?
24     **A. That is what I believe.**
25     Q. Okay. Who's the -- I guess, the attorney

Page 219

1  here? Or who are the attorneys, if there are
2  multiple ones?
3      **A. Are you -- are you talking about the --**
4      Q. I am sorry. The -- the recipients of the
5  email, which of them are -- are attorneys?
6      **A. Juan Suarez.**
7      Q. Okay.
8      **A. Joe Harris.**
9      Q. Okay. All right. And if I could direct
10 your attention to 7468. Is -- in the email from
11 Jim Jordan -- if -- do you know if Jim Jordan is an
12 attorney?
13     **A. He is not.**
14     Q. Okay. What's his position?
15     **A. Jim Jordan, at the time, was director of**
16 **crew scheduling for inflight. He's no longer**
17 **employed at Southwest Airlines.**
18     Q. Okay.
19         MR. CORRELL: And, Counsel, I'll
20 represent -- because it's too soon for us to have
21 given you a privileged log -- that the ones that
22 are redacted are redacted because of the
23 communications with Mr. Suarez and Mr. Harris.
24     Q. Okay. Now, if you look at Document 7358
25 to 7367. I don't know if you have looked at those

Page 220

1  yet.
2      **A. Okay. And so I am confused. Are we**
3  **looking at this -- current documents?**
4      Q. Yes, I think, is the answer to your
5  question. When you say, these current documents --
6      **A. So I have got 7464 through 7470.**
7      Q. Okay.
8      **A. And they appear to be numerical.**
9      Q. Yes. And then what we're -- we're doing
10 is we're, I guess, merging those with Exhibit 10.
11     **A. Okay.**
12     Q. And so what was Document 15 and is now
13 Exhibit 10 should include 7358 to 7367.
14     **A. Okay.**
15     Q. And --
16     **A. I have got it.**
17     Q. -- have you reviewed those?
18     **A. Yes.**
19     Q. And what are those?
20     **A. This appears to be a variety of**
21 **cut-and-pasted postings from social media regarding**
22 **the inflight -- I mean, excuse me -- the TWU Local**
23 **556 recall.**
24     Q. Okay. And do you know who sent these?
25     **A. No.**

Page 221

1    Q.  Okay.  But they are -- they are
2  attachments to one of the emails in 7466 to 7470;
3  is that correct?
4    A.  Okay.  Yes.
5    Q.  And do you know why these would be
6  forwarded?
7    A.  Simply for a FYI.
8    Q.  Okay.  All right.  I would like to -- to
9  shift for -- to a few other things here.  So
10  earlier, I think I -- I had asked whether anybody
11  else had complained about Charlene's (sic) Carter's
12  -- well, I -- I may have asked some more narrow
13  questions, so let me ask:  Did -- did Southwest
14  receive any complaints about any of Charlene
15  Carter's Facebook posts made on her Facebook page?
16    A.  Not to my knowledge.
17    Q.  Okay.  Prior to her termination, had
18  Carter's Facebook posts harmed Southwest?
19    A.  I believe so.
20    Q.  How did they harm Southwest?
21    A.  She's representing herself as a Southwest
22  Airlines flight attendant and putting out on her
23  Facebook images that may not be reflective of how
24  Southwest Airlines believes, in terms of what we
25  support, what we don't support.  Because Southwest

Page 222

1  Airlines is neutral.  And as a result, there was
2  harm done.
3    Q.  Did -- was there any financial harm?
4    A.  Not to my knowledge.
5    Q.  Did anyone ever ask her to take them down
6  prior to her termination?
7    A.  Not -- not to my knowledge.
8    Q.  Okay.  All right.  Let's see.  I would
9  like to direct your attention to Document 3.
10    A.  Okay.
11    Q.  And do you recognize this?
12    A.  I do.
13    Q.  Okay.  And what is it?
14    A.  This is correspondence sent from the
15  Oakland base manager Carolene Goulbourne to her
16  leader senior manager, Dave Kissman, regarding
17  Brian Talbert.
18    Q.  And she says that there was -- well, she
19  says, however, their intent to repost was
20  retaliation.
21       Did she reach -- did she reach that
22  conclusion?
23    A.  I do not know if that's -- there is some
24  grammar errors here.  Their intent to repost was
25  re- -- oh, it appears that that is her conclusion.

Page 223

1    Q.  Okay.  And did Brian Talbert report these
2  posts that -- that she has identified here?
3    A.  It does appear that way.
4    Q.  Okay.  Do you know the -- the -- the final
5  disposition of this matter?
6    A.  I do not.
7    Q.  Okay.  And, I guess, we can -- I guess
8  mark exhibit -- I am sorry.  Mark Document 14 as
9  the next exhibit.  Wait.  Let me back up a second.
10  Did we mark Document 3 as an exhibit?
11       THE REPORTER:  We did not mention it
12  on the record.
13       MR. GILLIAM:  Okay.  Could we mark
14  Document 3 as an exhibit and make it the next
15  exhibit?
16       THE REPORTER:  Yes.  Number 11.
17       (Exhibit 11 marked.)
18       MR. GILLIAM:  Okay.  All right.  And,
19  now, if we could mark Document 14 as Exhibit 12.
20       THE REPORTER:  Yes, sir.
21       (Exhibit 12 marked.)
22    Q.  (By Mr. Gilliam)  And, Mr. Sims, do you
23  recognize what this is?
24    A.  I do.
25    Q.  Okay.  And what is it?

Page 224

1    A.  This is correspondence from Sonya Lacore
2  to Joe Mendez.  And this is in regards, it appears,
3  another TWU local, which would be Local 555.
4    Q.  Okay.  And there is a individual in here
5  named Mitch -- Mitchell Motta.  Was he a member of
6  Local 555?
7    A.  I do not know.
8    Q.  Okay.  Do you know if Mitch Motta was a
9  flight attendant?
10    A.  I do not know.
11    Q.  Okay.
12    A.  Okay.
13    Q.  I am sorry.  Did you -- were you about to
14  say something else or --
15    A.  No.  He was not a flight attendant.
16    Q.  Okay.  He was not a flight attendant.
17  Okay.  Let's see.  If we could mark Document 12 as
18  Exhibit 13.
19       (Exhibit 13 marked.)
20    Q.  (By Mr. Gilliam)  Have you had the chance
21  to review it?
22    A.  Yeah.  I want to make sure I am on the
23  correct one.  Document 15?
24    Q.  No.  Document 12.
25    A.  Document 12.  Excuse me.  Sorry about

Page 225

1  that.  Yeah, this one is a little -- okay.  I now
2  recognize it.
3      Q.  Okay.  And what is it?
4      A.  This is correspondence that I forward -- I
5  am having a hard time reading the top page, but
6  it's correspondence between me and inflight
7  director Tammy -- excuse me -- inflight labor
8  relations director Tammy Shaffer, forwarding her a
9  flyer that was found in the Houston lounge in
10  regards to the Audrey Stone recall.
11      Q.  And did you have any -- any other
12  communications with Tammy about this email and --
13      A.  No.
14      Q.  -- besides -- okay.  Did you have any
15  communications with anybody about the flyer?
16      A.  No.
17      Q.  Okay.  Only Tammy?
18      A.  Yeah.  Only -- I -- well, I sent it to
19  her.
20      Q.  And why did you send it to Tammy?
21      A.  Just to archive it in the labor relations
22  files.  I didn't have any purpose for it.
23      Q.  Were there a lot of these flyers that were
24  being circulated?
25      A.  It was my understanding there were at the

Page 226

1  time, or flyers similar.
2      Q.  Were they be -- were they being circulated
3  at -- at various bases?
4      A.  Yes.
5      Q.  Okay.  Do you know how many bases they
6  were being circulated at?
7      A.  I do not know.
8      Q.  Were the flyers disrupting operations in
9  any way?
10      A.  No.
11      Q.  Okay.  And then if I could direct your
12  attention to 6551.  And who is Joy Hunkins?
13      A.  Joy is Dallas assistant base manager.
14      Q.  Okay.  And she mentions that she was told
15  by a flight attendant that he was coming to Dallas
16  to picket the union office.  Do you -- do you know
17  if there -- there was such a picket?
18      A.  That, I don't recall.
19      Q.  Okay.  Okay.  I want to go back, if I
20  could, to -- let's see.  Which one was it?  Exhibit
21  10, which is Document 15.
22      A.  Okay.
23      Q.  At -- at the time this email was
24  circulated, were collective bargaining agreement
25  negotiations ongoing?

Page 227

1      A.  Give me one minute to flip back --
2      Q.  Sure.
3      A.  -- to -- I have got a lot of documents
4  open.  August 4th, 2015?
5      Q.  Yes.  That's the date.
6      A.  Negotiations were either underway or about
7  to be underway.
8      Q.  Okay.  And were any of the individuals
9  listed on the email involved in collective
10  bargaining agreement negotiations?
11      A.  Yes.
12      Q.  Which ones?
13      A.  Naomi Hudson, at that point, was.  And
14  then her direct leader, Mike Ryan, had -- you know,
15  he was her -- her leader.  And then Randy Babbitt
16  was his leader.  So this is what they would do, is
17  collective bargaining.  Mike Hafner, who was
18  inflight vice president, was a stakeholder; he was
19  not a direct negotiator.  And then Mike Van de Ven
20  is our chief operating officer.
21      Q.  Okay.  Was Mike Van de Ven involved in
22  collective bargaining agreement negotiations?
23      A.  Not to my knowledge.
24      Q.  Okay.  When you say Mike Hafner was a
25  stakeholder, what do you mean by that?

Page 228

1      A.  Labor relations is a separate department
2  from inflight.  Labor relations was in negotiations
3  with TWU 556 on behalf of inflight.  So he -- he
4  had -- he was a stakeholder.  He was called in, I
5  believe, for negotiations on -- times as -- you
6  know, when -- when negotiation opened, but he was
7  very close to the process.
8      Q.  Okay.  And were Randy Babbitt and Mike
9  Ryan and Naomi -- do I understand correctly that
10  they were all on the negotiating team?
11      A.  Randy Babbitt and Mike Ryan were not, but
12  they are who Naomi Hudson reported to.
13      Q.  Okay.  And Naomi was on the negotiating
14  team?
15      A.  Correct.
16      Q.  Okay.  I -- okay.  I understand.  Do you
17  recall a -- a -- any social media policy violations
18  in late 2015 by the TWU Local 556 core team that
19  was campaigning for reelection?
20      A.  I don't recall any violations at that
21  time.
22      Q.  Okay.  Do you recall if there was a -- any
23  -- any major disputes that erupted between the two
24  teams campaigning for -- for office in Local 556
25  around that time?

Page 229

1    A. No.
2    Q. Okay. Okay. Let's see. I think that's
3  all of the questions that I have for now.
4         MR. GILLIAM: I guess, we -- we do
5  reserve the right to reopen the deposition pending,
6  you know, the need for follow-up discovery.
7         MR. CORRELL: On -- on what grounds
8  since we're now at the close of the discovery
9  period and everything has been produced?
10        MR. GILLIAM: Well, again, we may --
11 we may still seek to extend the discovery
12 deadlines. And I know Southwest is opposed to
13 that.
14        MR. CORRELL: And so to be clear,
15 you're -- you're -- you're positioning for -- on
16 the record to hold open the deposition to reopen it
17 for 10 additional minutes since we have gone for
18 six hours and 50 minutes?
19        MR. GILLIAM: Yes.
20        MR. CORRELL: Okay. I do have a
21 couple of questions for the witness, if you are
22 passing, but let me know.
23        MR. GILLIAM: Yeah. I am passing. Go
24 ahead.
25              EXAMINATION

Page 230

1  BY MR. CORRELL:
2    Q. Mr. Sims, I am just going to ask you a few
3  questions to clarify some of your testimony from
4  earlier today. First of all, do you recall earlier
5  you were asked questions about a notice that was
6  distributed through cabin services regarding the
7  pink lighting incident?
8    A. Yes.
9    Q. Was that message distributed to flight
10 attendants through any other channels?
11   A. It was distributed to flight attendants
12 through how they receive information, and that is
13 what we call a read-before-fly, which is a
14 mandatory reading and compliance document that we
15 send to them through their elect- -- electronic
16 flight bag.
17   Q. And you mentioned that the flight
18 attendants involved in the aircraft that actually
19 turned the lights pink were not disciplined. Do
20 you have an understanding as to why Southwest did
21 not discipline those individuals?
22   A. Well, they didn't violate any rules, per
23 se. And we did realize that they were, in the most
24 part, doing this out of naivety. They didn't
25 understand the ramifications or the political

Page 231

1  belief. They thought they were just having fun
2  with customers that were boarding the aircraft
3  heading to inauguration, wearing pink hats and
4  such. So they weren't taking any political
5  position at all.
6    Q. Very early in the deposition today, you
7  were asked about complaints from executive board
8  members leading to disciplinary proceedings; do you
9  recall that testimony?
10   A. Yes.
11   Q. Have you ever done anything different in
12 an investigation because the original complaint
13 came from an executive board member of the union?
14   A. No. Always stayed the same course.
15   Q. Does the fact that an executive board
16 member makes a complaint have any impact on how you
17 have made decisions in any of the cases you have
18 handled at Southwest?
19   A. It doesn't have an impact.
20   Q. All right. You were also asked some
21 questions about whether religious accommodation
22 steps followed out of the fact-finding; do you
23 recall that testimony?
24   A. I do.
25   Q. At Southwest Airlines, when they -- when

Page 232

1  -- when the accommodations policy is applied, does
2  it apply retroactively to policy violations?
3    A. It does not.
4    Q. How does that work, if an employee commits
5  a policy violation and then seeks a religious
6  accommodation?
7    A. It doesn't reset the clock or move the
8  time back, if you will. If there is an infraction
9  and they later give an accommodation, it does not
10 change what took place with the infraction.
11   Q. You were also asked some questions about
12 Ms. Gutierrez's summary of her findings with
13 respect to the harassment violation investigation;
14 do you recall that testimony?
15   A. I do.
16   Q. And, I believe, as part of that, you were
17 asked about a phrase in her email where she talked
18 about additional action should be taken, or
19 something to that effect; do you recall that
20 portion of the email?
21   A. I do.
22   Q. Was it Ms. Gutierrez's role to advise on
23 the level of punishment to be administered?
24   A. It is not her role.
25   Q. Does her conclusions with respect to the

Page 233

1  harassment policy have any impact on
2  Mr. Schneider's discretion regarding other policy
3  violations?
4  **A. They do not.**
5  Q. And, Mr. Sims, you understand, in your
6  personal capacity, that this case today is about
7  religious discrimination and alleged discrimination
8  against union objectors; is that correct?
9  **A. I do understand that.**
10  Q. Do you have a personal preference between
11  union objectors and nonobjectors?
12  **A. I do not.**
13  Q. Do you have a position between pro-life
14  and pro-choice on the issue of abortion?
15  **A. I do.**
16  Q. How would you identify your position?
17  **A. I am pro-life.**
18  Q. Do you have any animus towards other
19  people who are pro-life?
20  **A. I do not.**
21  Q. Do you have any animus towards people of
22  any Christian faith?
23  **A. I do not.**
24  MR. CORRELL:  I pass the witness.
25  MR. GILLIAM:  I have got no questions.

Page 235

1  CHANGES AND SIGNATURE
2  WITNESS NAME:  MICHAEL SIMS
3  DATE OF DEPOSITION:  NOVEMBER 2, 2020
4  PAGE       LINE     CHANGE     REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 234

1  THE REPORTER:  Off the record?
2  MR. GREENFIELD:  I will reserve my
3  questions for the time of trial.
4  THE REPORTER:  Okay.
5  THE VIDEOGRAPHER:  We are off record
6  at 5:39 p.m.  End of deposition.  End of media.
7  THE REPORTER:  Mr. Correll, send the
8  original to you for signature?
9  MR. CORRELL:  Yes.
10  (End of Proceedings.)

Page 236

1  I, MICHAEL SIMS, have read the foregoing
   deposition and hereby affix my signature that same
2  is true and correct, except as noted above.
3
4
5  _____
   MICHAEL SIMS
6
7  THE STATE OF _____
   COUNTY OF _____
8
9  Before me, _____, on this day
   personally appeared MICHAEL SIMS, known to me (or
10  proved to me under oath or through _____) to
   be the person whose name is subscribed to the
11  foregoing instrument and acknowledged to me that
   they executed the same for the purposes and
12  consideration therein expressed.
13
14  Given under my hand and seal of office this _____
   day of _____, 2020.
15
16
17  _____
   NOTARY PUBLIC IN AND FOR THE
18  STATE OF _____
19
20  MY COMMISSION EXPIRES:_____
21
22
23
24
25

Page 237

1     REPORTER'S CERTIFICATION
2     IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF TEXAS
3           DALLAS DIVISION
4   CHARLENE CARTER          )
                             ) CIVIL ACTION NO.
5   VS.              ) 3:17-CV-02278-X
                             )
6   SOUTHWEST AIRLINES CO., AND )
    TRANSPORT WORKERS UNION OF )
7   AMERICA, LOCAL 556         )
8
9     ----------------------------------
      CONFIDENTIAL 30(b)(6)
10    DEPOSITION OF MICHAEL SIMS
      NOVEMBER 2, 2020
11    ----------------------------------
12
13      I, CHARIS M. HENDRICK, Certified Shorthand
14  Reporter in and for the State of Texas, do hereby
15  certify to the following:
16      That the witness, MICHAEL SIMS, was by me
17  duly sworn and that the transcript of the oral
18  deposition is a true record of the testimony given
19  by the witness.
20      I further certify that pursuant to Federal
21  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
22  as well as Rule 30(e)(2), that review of the
23  transcript and signature of the deponent:
24    __xx__ was requested by the deponent and/or a
25  party before completion of the deposition.

Page 238

1       _____ was not requested by the deponent and/or
2   a party before the completion of the deposition.
3       I further certify that I am neither
4   attorney  nor counsel for, nor related to or
5   employed by any of the parties to the action in
6   which this deposition is taken and further that I
7   am not a relative or employee of any attorney of
8   record in this cause, nor am I financially or
9   otherwise interested in the outcome of the action.
10      The amount of time used by each party at
11  the deposition is as follows:
12      Mr. Gilliam - 6:50 hours/minutes
13      Mr. Correll - 5 minutes
14
15      Subscribed and sworn to on this 12th day
16  of November, 2020.
17
18
19  _Charis M Hendrick_____
    CHARIS M. HENDRICK, CSR # 3469
20      Certification Expires: 10-31-21
        Bradford Court Reporting, LLC
21      7015 Mumford Street
        Dallas, Texas  75252
22      Telephone 972-931-2799
        Facsimile 972-931-1199
23      Firm Registration No. 38
24
25

Case 3:17-cv-02278-X   Document 263-7   Filed 06/13/22   Page 61 of 94   PageID 8948
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 239

**A**

**a.m** 1:18 5:4
 62:22,25
 135:24 136:22
 138:13
**ability** 113:13
 188:24
**able** 37:10 41:12
 58:9 84:15
 85:20 90:3
 98:13 100:13
 105:1 107:1
 134:25 194:16
 194:19 195:8
 202:15 203:18
 204:11 209:25
**aborted** 126:6,7
**abortion** 164:7
 171:24 233:14
**above-styled**
 1:17
**absence** 147:21
 147:25
**Absolutely** 9:1
**accepted** 115:24
 115:25 116:5
 116:10
**accepting**
 116:11
**access** 70:20
 97:11 144:18
 192:5,7,11
**accommodation**
 28:1,5 32:2
 101:1 102:4,12
 102:23 103:4,9
 103:12 113:16
 164:22 165:1,4
 165:7 231:21
 232:6,9
**accommodati...**
 27:23,24 101:5
 101:16 232:1
**accounts** 21:22
 22:5 121:18
 122:1 123:2,6

**accurate** 57:19
 57:21
**accused** 101:8
**acknowledged**
 236:11
**acquisition** 34:8
 34:10
**act** 27:23 28:11
 28:14,20,24
 29:5 30:4,9
 31:23 39:4,5
 100:24 101:3,6
 101:15,18,24
 102:11,18
 103:1,1,3,17
 103:21,24
 104:5,8 163:4
 165:15
**acted** 163:8
**action** 1:3 52:13
 83:10 109:14
 109:17 163:18
 168:16 174:21
 232:18 237:4
 238:5,9
**actively** 121:25
**activities** 30:9
 123:9 194:24
 201:13
**activity** 21:7
 95:16,20,24
 96:13 122:25
 130:23 188:4
**actual** 13:3
 27:14 35:7
 54:22 93:16
 127:9 153:14
 175:1 195:3
**Adam** 2:14 6:1
**add** 173:22,25
 174:12,15
**added** 140:19,21
**addition** 33:21
 188:3
**additional** 13:9
 20:4 106:21

206:5 229:17
 232:18
**additionally**
 107:5
**address** 124:5
 143:23 144:17
 172:14 183:17
 198:8 207:10
**addressed** 10:18
 172:7,11,11,25
 173:3,5,15,16
 189:19 197:5
 200:11
**addressing**
 172:15
**adhere** 52:9
**adhered** 52:4
**adherence** 51:18
**administer** 40:4
**administered**
 232:23
**administering**
 5:13 35:22
**administration**
 23:21 34:25
 35:8
**administrative**
 66:15,19,21
**administrativ...**
 86:5
**adopted** 99:5
**advance** 134:23
**advice** 89:25
**advise** 177:3,18
 185:7 232:22
**advised** 142:7
 176:24 177:1,2
 177:14 178:25
**advising** 13:4
 141:24 142:8
 146:23 149:21
 149:25 200:22
 217:8
**affix** 236:1
**aforementioned**
 171:22

**afternoon** 206:9
**age** 144:14
**agency** 43:11,13
 43:16,22 44:4
 44:7
**agent** 36:18
 91:17
**ago** 212:20
**agreement**
 23:16 27:7,12
 36:1 43:7
 50:23 51:9
 56:24 57:4
 58:4,13,14
 111:9 114:9,15
 115:19,22,24
 116:5,10,12
 120:13 186:14
 186:17,20,24
 186:25 187:4,8
 188:13 209:12
 209:15,15,20
 209:21 211:14
 211:21 226:24
 227:10,22
**agreements**
 23:20 58:2
 82:4 107:7
**agreenfield@c...**
 2:16
**Ah** 215:20
**ahead** 19:23
 32:10 46:17
 62:16 70:22
 80:15 82:5
 138:24 229:24
**air** 56:18 59:6
**aircraft** 16:10
 194:22 195:10
 200:6 202:15
 202:22 230:18
 231:2
**Airlines** 1:5 2:7
 3:11 5:25 6:13
 6:15,18,23 7:3
 11:18 13:12,21

15:3,12,22
 16:7,10,21
 20:18,20,23
 21:2,4,5,11,21
 25:22 30:17
 31:7 34:9 35:3
 35:20 39:17,20
 40:4 44:22,23
 58:25 70:6
 71:23 72:2,3,8
 73:18 86:23,25
 99:2 102:24,24
 106:21 115:6
 134:7 184:11
 191:25 192:17
 194:20 199:5
 201:10 218:17
 219:17 221:22
 221:24 222:1
 231:25 237:6
**Airlines'** 13:23
 25:25 29:10,20
 34:24 168:14
**Airlines-sanct...**
 193:23
**airport** 136:15
**AirTran** 34:8
**Alan** 59:9
**alert** 206:4
**allegation** 50:8
 102:3 204:25
 205:1 212:9
**allegations**
 14:12 75:24
 76:1 104:17
 139:9
**alleged** 160:4
 233:7
**alleges** 102:9
**Allen** 4:6 218:14
 218:15,16
**allows** 26:18
**amendable**
 57:22,24
**Amended** 4:13
 4:14 204:4,6

Page 240

**AMERICA** 1:6
2:13 237:7
**amount** 44:17
238:10
**and/or** 21:5
166:22 237:24
238:1
**Anderson** 218:3
218:4
**Angeles** 64:6
**animus** 233:18
233:21
**answer** 4:14 9:3
19:20 20:7
25:23 26:1,8
27:13 36:3
41:11,23 45:19
46:10,18 58:9
73:25 85:12
89:18 94:14
96:22 100:14
102:15 104:25
109:22 123:20
134:24 146:14
159:25 168:12
183:1 203:12
203:13 204:5
205:9 209:24
211:1 212:1,6
220:4
**answered** 16:5
**answering** 52:5
**answers** 1:15
10:2
**anybody** 22:19
42:3 49:13
56:20 89:12
102:23 144:18
151:13 192:6
200:10 221:10
225:15
**anyway** 93:17
**anyways** 94:15
**apart** 9:15 10:4
32:1 77:10
79:5 136:5

**apologize** 22:18
25:14,14 43:20
102:7 116:3
149:8 170:25
211:10
**appeal** 154:13
**appear** 220:8
223:3
**appearances** 3:2
5:19
**appeared**
208:10 236:9
**appears** 126:21
196:20 198:23
199:8 200:5
218:21 220:20
222:25 224:2
**applicable** 103:7
**applied** 232:1
**apply** 232:2
**appointed** 36:19
**appreciate**
19:22 80:10
**apprise** 182:12
**approach** 38:8
38:10 89:23
91:3,10,20
**appropriate**
200:23
**approval** 79:10
92:17
**approved**
211:16
**approximate**
108:13
**approximately**
19:13 47:3
108:7,17,18
148:1
**archive** 50:21,24
78:6,15 225:21
**archived** 208:18
208:21
**archives** 50:18
78:2
**archiving** 37:16

51:1
**area** 63:5 64:2
92:13
**areas** 7:23 63:12
143:4
**argue** 91:20
**Arizona** 137:14
**ARMSTRONG**
2:20
**Article** 51:15
52:10
**Articles** 35:25
50:22 51:5,8
**asked** 22:18
26:2 37:18,20
38:11 78:19
159:21 182:8
202:11 212:15
221:10,12
230:5 231:7,20
232:11,17
**asking** 7:23
43:21 147:16
194:9,21
**asks** 147:9
159:11 174:11
**aspect** 14:20
18:24 165:16
**aspects** 11:16
14:11 25:4
**assigned** 33:13
33:16,18 54:12
**assistant** 66:12
66:14,16,24
77:6,10 140:17
167:8 226:13
**assisted** 66:25
147:1
**assisting** 66:7
146:24
**associate** 29:22
**assume** 67:13
68:25 196:25
**assumed** 123:5
**assuming** 173:6
206:21

**attached** 1:25
69:16 131:1
173:21 174:18
175:3 215:11
**attachment**
161:19
**attachments**
161:14 221:2
**attempt** 210:1
210:15,16
**attendant** 36:8
36:10,11 42:3
42:15 43:11,16
45:2 46:4
50:14 51:16
67:7 71:23
81:10 99:3
101:7,8 115:6
121:9,17
123:16,25
134:7 142:1
158:22 160:4
166:2 177:20
179:9 187:6
197:1 208:7,11
209:1 212:16
213:8,25
221:22 224:9
224:15,16
226:15
**attendants** 27:1
33:17,20,25
56:7,21,24
57:1 59:3
65:15,18 77:13
79:2 82:9
111:5 113:25
115:24 129:12
130:18 133:20
159:13,15
190:2,3 194:21
195:21,22
197:2,9 202:3
202:7,24 203:1
203:5 205:6
214:12 230:10

230:11,18
**attention** 122:7
122:12 135:21
140:9 142:12
144:22 146:17
158:14 162:17
170:16 181:18
191:21 196:1
204:8,15
210:19 211:25
212:2 215:8
216:18 219:10
222:9 226:12
**attorney** 6:10
29:21 90:2
218:25 219:12
238:4,7
**attorney/client**
89:17 218:23
**attorneys** 29:12
29:22 219:1,5
**attributed**
132:11
**Aubrey** 20:3,13
**Audrey** 3:14
12:6 13:13
24:1 31:19
32:1 53:11
125:6,13,15,24
126:2,18
127:18 128:4,7
128:9 129:24
130:4,8,11,17
130:21 131:17
131:21,22
132:3,22 135:9
137:25 138:19
145:5 156:19
157:4,21,23,24
187:20 217:9
225:10
**Audrey's** 138:2
138:5
**August** 227:4
**auspices** 154:15
**authored** 126:18

**authority** 65:7
65:11,14,17
77:7 187:4
188:12
**automated**
44:21
**automatically**
44:13 198:4
**available** 55:10
122:25 132:20
**avoid** 53:24
**aware** 26:9,12
26:14 134:13
134:16 135:3
195:7,9 199:24
205:14,15,19
205:20
**awareness**
127:25

**B**

**B** 2:3 213:6
237:21
**B-a-r-n-e-t-t**
47:18
**B-r-i-a-n-n-a**
52:25
**Babbitt** 217:17
227:15 228:8
228:11
**back** 23:9 36:3
38:23 62:24
67:5 68:16
81:6,8,13
87:21 88:3
95:13,19 96:23
99:11 105:3,18
106:9,15
112:19 124:4
133:2 147:9,21
156:6,12
170:17,17
171:15 172:20
175:5 176:6,7
180:19 187:6
187:14 188:7
188:12 189:18

202:9 210:19
216:1,15 223:9
226:19 227:1
232:8
**bag** 230:16
**baggage** 136:17
**banners** 135:4
**Barerra** 67:3
**bargaining**
23:16,19 27:7
27:12 33:24
35:6,14 36:1
36:17 42:4,15
43:7 50:23
51:9 56:24
57:4 58:3,7
91:17,24 111:9
111:10 209:15
209:21,21
211:14 226:24
227:10,17,22
**Barnett** 47:16
48:2 154:23
155:13,18,22
167:7
**Barrera** 140:15
141:1
**Barry** 192:22,22
**base** 12:7,9,12
12:16,25 13:4
13:7 33:9
34:19 50:13
60:18 61:11
63:22 64:1,7
64:11,13 65:22
66:4,6,6,11,14
66:16,17,18
67:1 76:22
77:1,4,5,6,10
125:13,17,19
126:19 140:17
146:24 147:2
202:8,9,16
222:15 226:13
**based** 12:9
35:25 74:23

80:12 84:7
101:9 106:24
137:11 138:21
142:2,25 211:9
**bases** 33:21 63:8
64:25 65:4,20
226:3,5
**basic** 95:20
**basically** 33:6
38:4 48:21
**basis** 103:21
**Bates** 69:5
131:14,25
132:6 133:3
138:9 140:6
141:6 170:18
207:5
**Becky** 181:2,4
**becoming** 34:3
83:24
**began** 12:2,10
86:21 91:2
184:13
**beginning** 10:21
12:15 83:22
138:21 196:16
**begins** 208:4
**behalf** 6:23,24
50:19 228:3
**behavior** 50:14
75:4,18
**belief** 171:18
185:15 231:1
**beliefs** 165:21
**believe** 10:23
27:13 28:13
29:17 37:25
45:13 49:11,21
78:1 87:25
99:16,20 104:4
104:10 112:3,5
112:6,13
124:20 127:2
128:3 131:19
132:4,10 133:6
136:4 139:24

140:25 141:4
143:19 144:3
149:6 151:12
157:25 160:17
163:11 168:18
169:9 170:8
180:5 196:15
198:11,17
201:24 202:11
207:2,10
209:17 211:17
211:23 214:19
215:10 218:24
221:19 228:5
232:16
**believed** 139:20
185:13 186:10
186:22
**believes** 146:8
221:24
**best** 9:25 12:22
**beyond** 41:10
45:18 58:8
79:7 104:25
134:20 159:24
209:23
**big** 27:3 66:19
**Bill** 215:1
**bit** 14:22 32:9
38:24 106:9
144:10 189:19
**board** 36:17,18
37:2 99:14,18
119:5,10
201:16 231:7
231:13,15
**boarding** 231:2
**body** 209:2
**book** 57:12
**boss** 217:15
**bottom** 94:25
162:20 176:11
192:21 196:3
209:3
**box** 158:18,19
192:12 197:8

**Braddock** 2:4
**Bradford**
238:20
**break** 19:19
32:11 62:10
63:2 81:23
105:13,16
106:14,19
107:11 156:2,4
156:7 180:13
206:10 207:20
216:1,4
**breakdown**
106:25 107:17
108:20
**breaks** 82:16
**Brendan** 20:3
20:11 23:12,13
23:14
**Brian** 61:21,24
63:9,13 110:8
114:12,14
116:23 117:2
119:23,25
130:7,9 142:21
207:2 208:7,10
208:23,24
210:13 213:25
214:1 222:17
223:1
**Brian's** 215:21
215:24
**Brianna** 52:24
53:1 56:1
149:22 150:3,6
150:9,10,12
**brief** 17:22
18:15
**briefed** 7:7,14
**briefly** 70:3
126:12
**bring** 68:22 69:2
93:10 122:9
129:10 181:8
181:14 182:11
**broad** 26:5,16

Case 3:17-cv-02278-X   Document 263-7   Filed 06/13/22   Page 64 of 94   PageID 8951
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 242

broader 46:9
**Brooks** 20:2,10
  22:25 23:1
**brought** 14:12
  210:2
**brown** 208:7
**budget** 65:2
**budgeting** 58:23
**building** 137:1,4
  137:5
**buildings**
  136:25
**bullet** 73:20
  74:1 98:21
**bullying** 50:4
  67:22 68:4,15
  70:24 71:7
  72:1,7,19
  73:21 74:12,18
  74:19,20,21
  75:1,4,17,24
  76:10 77:14
  79:3,9 80:4,6
  81:10 89:8
  98:7 110:22,24
  111:14 112:10
  117:14 119:12
  177:24 178:4
**bunch** 53:24
  90:8
**Burdine** 52:17
  52:21 54:15
  181:10 183:4,9
  185:3,5,14,25
**Burdine's**
  185:11
**business** 23:25
  30:6,8,15,21
  40:15,18,19,24
  48:5,13,20
  52:12 75:5
  87:3 128:14,17
  128:24 129:7,9
  150:2 167:8
  176:25 177:14
  181:1 188:24

**C**

**C** 2:1 213:22
**cabin** 16:9,14,19
  17:7 189:21,25
  190:4,17,20
  193:14 196:6,7
  196:10,18,25
  197:3,5,13,20
  197:21,25
  198:3 230:6
**cabins** 200:6
**California** 34:19
**call** 20:23 54:19
  96:3 135:25
  137:19,19,20
  182:15 230:13
**called** 133:19
  153:1 202:8,10
  204:3 228:4
**Calls** 123:18,19
**campaign** 84:4
  205:23 210:21
**campaigning**
  228:19,24
**campus** 137:1
**capabilities**
  78:13
**capacity** 41:12
  58:10 79:13
  81:2 121:12
  129:17 134:25
  159:25 209:25
  233:6
**caption** 213:13
**career** 101:5
  188:15
**Carolene** 4:7
  222:15
**carried** 135:4
**Carter** 1:3 2:19
  4:14 5:22 6:10
  6:12 11:24
  13:4 14:13,16
  18:23 19:1
  28:4 32:2
  39:23 53:10,25

67:17 72:13
73:11 74:8,10
74:11 79:5
93:6 94:25
95:16 97:17
110:8 117:17
127:19 130:20
130:21 131:17
131:20 132:24
134:1,8 150:25
156:20 157:8
157:10 160:19
162:11 164:9
164:13,21,25
165:4,7 168:21
168:25 169:8
174:24 175:6
175:10 176:2
181:12 182:3
183:8,13,23
184:5 186:13
187:19 188:14
204:5 237:4
**Carter's** 9:6
  37:7 39:2,8
  40:20 47:15
  49:15 52:15,22
  53:8 54:25
  95:19 125:6
  127:12 132:9
  140:24 143:9
  165:17,21
  170:13 179:22
  180:24 181:4
  181:15 183:1
  186:1 188:8
  204:24 211:20
  221:11,15,18
**case** 6:11 9:6
  11:20 12:10
  21:23 22:2
  37:18,20,23
  38:16 39:8,24
  40:2 49:4 53:5
  53:8,18,22
  54:12,13,25

55:9,14 67:16
77:5 99:17
127:12 140:24
143:9 154:11
157:3 158:24
159:2 179:7,10
182:16 185:10
188:8 233:6
**cases** 79:1 81:7,9
  81:15 84:9,16
  84:17,22 85:13
  85:18,25 86:14
  91:7,15 93:2,4
  99:19 100:4,5
  100:11 109:7
  172:15 231:17
**Casey** 110:5
  114:10 116:4
  117:21,23
  214:12,17
**categories** 144:5
  144:7,11,12
**categorize**
  117:20
**category** 79:12
  83:8 139:14
  146:9 164:10
  164:14,18
  165:13
**cause** 1:18 86:24
  189:2,4 238:8
**caused** 188:25
**causing** 84:1
**CBA** 24:13
  35:23 65:12
**CC'd** 126:21
**cell** 137:19,20
**center** 4:2,2
  20:24 33:14
  63:19 199:1,2
  199:3 202:17
  202:19,20
**Central** 5:4
  207:4
**centrally** 94:18
**certain** 39:17

40:22 43:19
77:25 116:24
188:10 189:20
202:15
**Certificate** 3:8
**Certification**
  237:1 238:20
**Certified** 1:19
  237:13
**certify** 237:15
  237:20 238:3
**cetera** 69:13
**Cetta** 63:16
**chain** 150:15
  174:5 196:3
  217:20 218:13
**chair** 36:20
**challenge**
  154:12
**chance** 126:13
  130:25 135:18
  157:16 160:25
  204:6 224:20
**change** 44:1,3
  69:12 100:21
  105:10 196:12
  196:14 232:10
**changed** 60:15
**CHANGERE...**
  235:4
**Changes** 3:7
  235:1
**channel** 21:4
  91:25 121:24
**channels** 67:14
  230:10
**charge** 14:19
  58:23 63:6
  101:7
**charged** 88:25
**Charis** 1:19 5:12
  69:4 237:13
  238:19
**Charlene** 1:3
  2:19 5:22 6:10
  12:9 13:4

18:23 19:1
53:10 117:16
125:6 132:8
134:8 151:5,17
156:19 159:12
162:21 164:21
164:25 165:3,7
165:16,21
169:7 174:23
175:6 179:21
182:3,25
221:14 237:4
**Charlene's**
161:4 163:15
179:10 221:11
**chart** 47:2
**check** 98:1
**chief** 23:15
227:20
**chose** 188:11
**Chris** 2:20 110:7
114:11 116:5
119:2 151:8,11
151:14 159:12
**Christian**
162:21,25
163:15,16
164:4 165:11
233:22
**Cindy** 193:6,8,9
**circulated**
225:24 226:2,6
226:24
**city** 5:20 136:14
**civil** 1:3,22
194:22 237:4
237:21
**claim** 11:23 12:6
50:4 88:12,12
88:14
**claims** 9:6 18:24
30:25 106:22
169:17,17
**clarification**
110:20 112:6
**clarify** 42:11

54:3 67:7
112:8 125:1
230:3
**class** 49:22,25
133:7,8
**clean** 53:24
**cleanly** 66:5
**clear** 10:2,3
53:25 68:13
69:11 75:14
79:23 111:3
125:24 164:17
229:14
**clearer** 94:15
**clearly** 120:8
173:2
**Cleburn** 20:2,12
27:21,22 28:3
28:8 31:22
**Click** 159:12
**client** 89:25
**Clinton** 84:5
**clock** 232:7
**close** 62:9
178:22 206:13
228:7 229:8
**CLOUTMAN**
2:14
**coach** 190:7
**coaches** 109:10
**coaching** 65:4
83:7
**coaching/coun...**
83:4,9
**Coast** 63:8,13,23
64:2,7
**collect** 37:6
**collection** 37:11
**collective** 7:7
23:16,19 27:7
27:11 35:6,14
36:1,17 43:7
50:23 51:9
56:23 57:3
58:3 91:17,24
209:14,21

211:14 226:24
227:9,17,22
**color** 195:11
**colors** 195:11
**come** 23:9
105:18 123:12
187:6 202:23
207:1 216:1
**comes** 43:1
67:14 94:3
121:23,24
153:1
**coming** 226:15
**commenced**
11:25
**comment** 16:22
16:22,24 17:2
**commented**
85:23
**comments**
117:14 118:6
215:2
**Commission**
104:21 236:20
**commits** 232:4
**committee** 58:25
134:9
**common** 136:16
167:11
**communicate**
10:13 21:4,5
44:6,19 91:9
92:2 101:23
128:16 138:1
180:22 182:21
182:25
**communicated**
51:19,21
125:15 135:8
138:5 144:1
181:3 183:5
195:15
**communicates**
44:7
**communicating**
51:25 89:22

125:17 142:5
193:13
**communication**
21:14 45:1
136:2 148:18
148:21 176:20
176:21,22
178:14 191:25
192:24
**communicatio...**
8:11 9:8,12
10:5,14 11:21
14:23 15:5,7,9
15:11 20:17
21:15 24:6,21
33:18 46:12
89:19 114:22
115:1 129:3
136:7 155:22
165:20 176:18
179:21 185:18
185:23 191:13
191:15,18
192:7,16,25
193:10,11
195:3,6,16
198:12,13
199:15,22
219:23 225:12
225:15
**communicatio...**
198:24
**company** 6:13
6:19,23 7:1,3
22:6 25:8
28:18 36:7
52:11 58:8
72:8 73:19
98:6 103:7
129:6,8 133:15
151:14 159:21
**company's**
171:25
**company-wide**
64:11
**compare** 88:4

**comparison**
175:17
**complained**
153:9,25,25
221:11
**complaining**
53:19
**complaint** 4:13
4:14 9:3,3
32:14 50:6
126:20 127:18
127:24 128:2
136:2 153:5,6
153:7 166:2,6
203:11,12,13
204:4,6,16,25
210:19 211:20
211:25 212:8
213:1 231:12
231:16
**complaints** 16:8
16:14,16
104:21 132:23
190:16,18
221:14 231:7
**complete** 51:7
51:13
**completely** 47:1
**completion**
237:25 238:2
**compliance**
35:11 39:19
230:14
**Compound**
163:12
**comprised**
103:17
**computer** 94:5
105:8
**con-** 34:24
**concern** 129:10
**concerned** 92:6
189:3
**concerning** 72:4
72:8 74:4 87:5
88:9,25

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 244

concerns 92:3
129:13 134:17
concluded 186:1
concludes 169:2
169:24
conclusion
133:25 139:21
169:7 170:3,6
170:10 172:10
172:13 183:12
184:21 188:6
200:24 222:22
222:25
conclusions
168:7,10
232:25
conduct 13:5
73:17 74:3,6
74:18,21 77:7
98:5 133:7
153:8,24,25
154:1,4 170:13
172:9,22 173:3
173:14 194:14
conducted 5:8
13:17 133:24
156:15,18
157:23 160:18
conducting
76:13,19,21,25
128:23 166:7
conducts 13:22
confident 47:22
CONFIDENT...
1:9 237:9
confidentiality
82:4
confirm 53:14
55:1,3 85:20
112:13
confirmation
21:20 194:6
195:13
confirmed 19:4
21:22 195:14
conflict 187:19

187:20
confused 30:14
49:1 163:21
220:2
Confusing 173:8
confusion 97:4
Conlon 20:3,11
23:12,13,14,23
24:6,16
conservative
162:22 163:16
164:4
conserve 161:24
consider 54:21
164:8,17,20,24
165:3,6,10
184:14
consideration
236:12
considered
74:19,22 75:11
166:14 172:3
198:14
considering
73:14,14 98:2
196:24
consists 29:11
constitution
26:17
consult 103:10
consultation
168:23
consulted
168:20,24
contact 103:1
139:23 148:5
contacted
139:25 155:18
193:18
contained
203:21
containing
93:22
Contains 207:5
contemporane...
136:6

content 122:15
122:23 125:3
contents 138:19
152:12,13,13
152:20 153:10
context 114:24
115:4 129:25
139:19 152:22
156:22
continue 80:16
84:19 162:23
187:2
continues
151:22
continuing
151:4 164:5
contract 34:25
35:8,10
control 70:18
94:9,10 202:21
controlled 94:18
conversation
11:5,8,9 17:23
24:9,19 25:1,2
27:20 32:4,5
137:22 172:16
179:2 186:4
193:21 194:9
conversations
13:9 23:25
24:2,16
converted 117:4
coordinate
202:4
coordinated
202:7,25 203:5
copied 145:4
167:9 176:12
copies 70:14
copy 38:5 70:16
196:9
core 228:18
corporate 15:4,7
15:9,10 20:16
81:3 191:13,14
191:18 192:7

192:15,24,25
193:9,11 195:2
195:6,15
198:11,13,24
206:23
correct 6:16,20
7:10 8:6 11:13
13:14 15:1,18
17:18,19 18:3
18:6,18,19
19:11 20:6,8
22:24 28:16,22
29:24 31:13,21
32:15,17 34:1
36:24 41:1,4
43:9 44:12
48:7,15,22,25
49:5 51:11,23
52:18 54:17,18
55:24 56:2,8
57:2 58:15
59:25 60:22
61:2 64:14,15
64:18 65:13
66:3 67:15,18
68:5,8,17
69:17 72:10,15
73:2,22 74:11
74:25 75:2
76:23 77:4
82:15,22 83:14
84:18 85:15,16
86:9,9 95:8
98:24 101:2
103:19,22
107:24 108:2
109:15 111:6,7
111:22 112:2
112:24 113:25
114:1 116:1,6
120:2,11
121:15,19
123:3 127:6
129:19 131:2
131:22 132:16
134:1 140:13

143:1,2 146:12
147:3 150:16
153:22 156:16
156:20 157:5,6
157:9,11 158:5
158:15,16
159:18 160:20
161:3,22
168:17,18
169:3,15
170:15 171:23
172:2,4,5,7,8
180:1 181:5,10
184:3 185:16
186:15 189:20
189:23 190:22
191:19 193:7
201:8,17
205:16 209:12
209:13 211:7
211:22,23
212:10 213:25
214:7,15,19,21
214:22 221:3
224:23 228:15
233:8 236:2
correctly 42:25
48:17 115:5,17
228:9
Correll 2:8 3:5
5:24,24 10:7
10:10,16 19:15
19:24 20:12
22:23 41:9,22
45:16,25 53:23
58:6 62:7,13
62:17,20 70:13
73:23 79:6,23
80:14,19,25
86:6 87:10,12
87:15 89:15,21
90:7 93:20
94:12,17 96:21
100:12,16
104:24 105:15
105:24 106:1,5

106:8,17
109:18 112:16
113:9 123:18
131:11 134:19
155:25 156:5
159:23 161:11
161:22,25
163:10,12,20
168:11 171:1
173:8 180:14
190:25 199:18
203:20 206:3
206:20 207:1,7
207:16 209:22
215:10,16,18
215:25 219:19
229:7,14,20
230:1 233:24
234:7,9 238:13
**correspond**
70:16
**correspondence**
148:15 149:2
150:24 154:22
191:12 208:4
217:7 222:14
224:1 225:4,6
**corresponding**
191:16 195:6
205:10
**cost** 187:3
188:18,19,20
188:22
**costs** 188:21
**costume** 118:14
118:14
**counsel** 5:5,17
5:18 7:22 8:8
8:11,20 9:14
9:15 10:4,7
11:15 13:22
19:15 22:21
23:7 28:23
29:3,7,8,10,11
29:21 37:18
53:14,23 62:7

80:15 89:3,4,8
90:10 92:17
106:17 107:13
113:9 131:11
155:8,12,25
161:11 190:7
206:3 215:10
219:19 238:4
**counsel's** 29:15
89:18,23
203:22
**counseling** 83:7
**counsels** 109:10
**counterpart**
150:8
**counterparts**
142:18
**County** 1:21
5:15 236:7
**couple** 100:19
133:18 138:15
143:12 147:22
154:19 191:17
229:21
**course** 23:24
87:3 91:13,16
128:14,17,23
150:1 174:21
176:25 177:14
178:20 195:23
209:3 231:14
**court** 1:1 5:5,12
97:10 237:2
238:20
**cover** 62:6 104:8
215:14
**covered** 65:12
165:9
**covering** 56:24
**covers** 56:25
**COVID-19** 1:23
5:10
**Crabtree** 62:4
63:10,14
142:22
**create** 40:7

**crew** 200:22
202:12,22
203:9 219:16
**criticism** 159:22
**CSR** 5:13
238:19
**culture** 188:23
189:1,5
**current** 1:22 5:9
9:9 23:20,21
27:11 32:22
35:16 58:7
220:3,5
**currently** 57:24
59:9 60:15
64:12 104:22
160:9 218:7
**custodian** 38:4,9
38:20
**custodians**
37:11 38:1,18
**customarily**
153:8
**customary**
150:14 154:25
**customer** 16:8
200:17,18
**customers** 21:3
123:21 189:16
190:17 193:20
231:2
**cut** 76:15,16
117:10 207:24
**cut-and-pasted**
220:21

———————
**D**
**D** 214:9
**D.C** 194:23
**daily** 35:10
136:14
**Dallas** 1:2 2:10
2:15 5:25 6:2
137:6,8,12
208:11 226:13
226:15 237:3
238:21

**data** 77:22,23
78:10
**database** 78:4
**date** 5:3 57:9,15
99:7 125:8
158:6 204:4
209:9 211:19
227:5 235:3
**dates** 57:23
**Dave** 3:16 4:7
61:19 63:4,5
63:20,23,25
64:17,20,21,22
64:24 65:6
127:22,23
135:23 136:21
137:8,11,13,21
138:12,17
140:9 141:11
141:23,24
142:8,17 147:8
147:16,22
148:3,16,17
168:24 176:13
176:19,21
177:2 178:25
179:5 222:16
**Dave's** 63:7
**day** 35:16 80:20
140:10,10
175:25 177:6,7
177:11,12,12
177:15,16
178:20 180:6,6
184:22 186:11
195:23 201:14
202:23 203:9
236:9,14
238:15
**day-to-day** 59:1
**days** 52:12
134:11 140:11
175:2
**de** 227:19,21
**deadline** 175:1
**deadlines**

229:12
**deal** 51:10
207:19
**dealing** 129:4
**decide** 183:14
186:13
**decided** 174:20
184:20 187:3
**deciding** 46:2
**decision** 166:10
168:19,21,25
169:13,21
174:15,17,23
175:7,8,9,24
176:1,23 183:7
184:25 186:8
189:24 190:4
195:19
**decision-maker**
30:12
**decisions** 190:1
231:17
**deck** 139:2
**declined** 85:19
85:21
**deduct** 44:17
45:2
**deducted** 44:20
**deducts** 44:14
44:23
**defaulted**
139:10
**defendant** 2:7
2:12 5:25 6:2
6:14,18 7:3
**DEFENSE** 2:3
**defined** 75:10
79:18
**definition** 74:24
75:14 79:21
**denies** 205:12
**Denise** 3:18
13:15 18:18
19:3,4,7,10
49:3,14 124:16
146:22,25

149:2 154:23
155:11 159:10
167:6 171:14
171:23 174:6
**Denver** 12:10,16
12:25 64:14
66:4,6,18,25
140:18 142:2
179:9
**deny** 169:17
**dep** 207:20
**department**
13:20 15:8
20:17 30:7
31:8,12,14,18
34:24 35:2,18
35:19 39:11,12
41:6 42:22
45:18 46:15
48:21,24 56:14
56:15 65:20
75:10 78:10
88:23,24
103:11,14
106:20 150:8
172:14 196:23
197:23,25
200:17 218:5
228:1
**department's**
193:11
**departments**
13:24 30:16
39:1 44:1
56:17,19
136:15
**depending**
136:14 167:12
167:12
**depends** 40:2
67:13
**depicting** 171:24
**deponent** 237:23
237:24 238:1
**deposition** 1:9
1:15 5:7,14

6:14,22 7:22
8:4 9:10,24
14:25 17:17
20:5 24:23
80:9 82:5
191:17 206:13
207:9 229:5,16
231:6 234:6
235:3 236:1
237:10,18,25
238:2,6,11
**derived** 107:9
112:18
**describe** 37:10
**described**
163:18 212:12
214:3
**describes** 214:16
**describing** 164:6
**description**
103:16
**designated** 6:17
7:19 124:23
**detail** 45:17
**details** 105:20
107:7 116:19
116:22 119:2
213:3
**determination**
76:9 103:8,12
169:11 170:1
175:2
**determinations**
27:24
**determine** 88:7
102:4 109:21
**determined**
73:17 74:7
98:4 171:24
172:25 173:25
201:6
**development**
217:24
**DG** 124:16,19
143:19 144:17
192:1

dg@wnco.com
124:9
**dialogue** 16:4
36:4 184:14
**differences**
117:19
**different** 25:15
30:7 48:14
54:8 55:5 61:5
63:11 91:20
98:19 143:3
195:11 201:21
231:11
**difficult** 83:24
86:1,4,5,15,19
**direct** 59:22
60:9 73:18
93:16,25 122:6
122:12 124:20
135:21 140:4
142:11 143:11
143:18 144:21
146:17 148:23
149:22 150:18
158:2,14
162:16 170:16
191:20 195:25
204:14 210:19
211:24 212:2
216:18 217:13
219:9 222:9
226:11 227:14
227:19
**directed** 197:3
197:13
**directing** 94:14
140:8 204:8
**directly** 29:2
45:15 47:23
59:24 61:5
64:17 103:2
138:1
**director** 15:4
20:16 23:14
32:23 33:4,5,8
33:9,12 34:3

46:22 55:23
56:4 59:19
60:18,18 61:10
75:11 126:24
127:5 129:17
129:17 145:3
149:21 182:2
208:5 217:8
218:5,11
219:15 225:7,8
**directors** 47:9
60:1,4,6,11,12
60:13,24 89:13
**dis-** 83:11
**disability** 27:25
144:14
**Disaster** 1:24
5:10
**disbursed**
124:12
**disciplinary**
40:1 41:17,20
42:19,22 43:18
43:24,25 46:4
49:19 50:10,16
67:8 83:9 84:9
84:17,22 85:24
86:14 100:5
110:20 168:16
231:8
**discipline** 43:2
51:16 82:12
83:3,11,13
85:18 106:22
107:4 109:6
154:12,13
172:16 173:6
173:17 230:21
**disciplined**
188:15 190:4
213:20 230:19
**disclose** 10:17
90:3
**disclosed** 80:8
**disclosing** 89:21
**discovery** 37:7

37:17 229:6,8
229:11
**discretion** 233:2
**discrimination**
31:1 50:4 72:5
74:5 76:1,7
87:6 88:10
89:1 101:12,14
101:18,22
102:3,10
104:17 113:20
144:13,13,14
144:14,15,15
172:1,19,24
233:7,7
**discuss** 10:25
11:17 12:1,17
15:21 18:20,25
19:23 21:18
22:1,13 23:3
23:22 24:5,12
25:5 26:4
27:17 38:24
81:20 92:5
128:25 129:9
129:16,20,23
129:24 166:9
168:4 184:23
185:4
**discussed** 11:2
13:1 15:22
18:23 25:19,19
26:25 54:2
128:20 130:4,6
144:9 185:1
**discussing** 63:2
174:6
**discussion** 13:15
24:24 83:10
99:12 130:8,10
**discussions**
24:10 28:2,7
32:1 67:12
162:23
**disparaged**
118:19

Case 3:17-cv-02278-X   Document 263-7   Filed 06/13/22   Page 69 of 94   PageID 8956
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 247

disparaging 118:13
dispatch 202:21
dispensing 89:24
disposed 36:5
disposition 223:5
dispute 36:3,3,5 187:1,11,16
disputes 86:22 86:25 87:2 187:17 189:15 228:23
disrupting 226:8
distributed 230:6,9,11
distribution 197:9
DISTRICT 1:1 1:1 237:2,2
disturbing 126:4,5 160:6
division 1:2 31:16 58:17 237:3
document 3:11 3:13,15,17,19 3:21,23 4:3,4,6 4:8,9,11,12,14 4:15 27:14 35:10 68:19,22 69:8,8,15,19 69:23 70:5,18 70:25 71:4,11 71:22,25 72:22 72:25 73:3,9 74:16 87:23 93:13 94:13,18 94:19,20,25 96:21,23 97:2 97:8 98:14 105:4,5,6 122:8 126:8,12 133:11,14

135:13 141:13
153:14 157:13
160:22 161:3
161:13 162:2,3
166:23 168:11
170:21,22
174:2 175:12
175:14,15,19
175:21,22
176:8,9 181:18
191:3,22
198:18,20,22
203:14 206:1
207:24 208:1
215:9,18
216:21 219:24
220:12 222:9
223:8,10,14,19
224:17,23,24
224:25 226:21
230:14
documentation 180:4,5
documented 51:19,21
documenting 51:25
documents 8:3,5 8:8,12,13,25 37:7,14,19,21 81:22 93:13,22 94:4 150:18 170:20 191:8 203:23 215:7 215:11 217:1 220:3,5 227:3
doing 33:6 103:20 220:9 230:24
Donald 84:5
doubts 185:14
draft 89:4,8,11
drafted 88:20
drafting 88:25
dramatically 84:17

draw 88:12,15
dressed 171:19 171:21
due 94:2 151:18 171:22
dues 44:14,20,24 45:2
duly 6:4 237:17
duration 83:17
Dustin 140:15 140:16,17,23
duty 121:5

___ E ___

E 2:1,1 95:12,17 95:19 212:3 214:23
E-d-i-e 47:18
earlier 14:22 32:13 48:13 84:8 121:15 130:12 142:20 144:10 159:17 189:19 214:11 221:10 230:4,4
early 49:24 211:17 231:6
easier 70:14 175:16
easiest 94:1
East 63:13
EB 209:4
Ed 3:18,20,22 10:21 11:2 13:2 18:8 64:14,16 66:25 133:24 140:14 141:25 143:17 146:23 150:25 151:5,17 157:20 161:4 162:10 167:5 167:14,14,14 167:15 168:3,7 168:23,24 169:2,2,12,12 173:20 174:11

176:11,14
182:10,19,22
182:25 183:5
186:4
Eddie 160:5
Edie 47:16 48:2 154:23 155:12 155:18,22
Edith 154:23 167:7
effect 57:4,8,17 72:13 232:19
effective 83:19
efficient 19:21
effort 84:6 188:2 205:15 217:10
efforts 37:6
egregious 83:25 84:2
either 43:18 47:9 55:16 89:13 127:2 136:13 169:16 210:11 211:17 227:6
elect- 230:15
elected 36:16,19 36:25
election 26:21
electronic 38:5,9 70:14,16 230:15
Ellis 1:21 5:15
Elm 2:15
email 3:14,16,18 3:20,22 4:2,4,6 4:7,9,11 80:16 93:21 94:24 124:5,10,22 125:13 126:3,4 126:18 127:8 127:10,22 131:2 133:3 135:8,22 136:3 136:6,7 137:9 137:22,25

138:2,6,17,19
140:8,9,14
141:11,20,22
142:14,16,17
142:19 143:16
143:17,23
144:16,24
145:2,5 146:4
146:19,21,22
147:4,8,13
148:8,15,24
149:1,2,17,19
149:20 150:24
151:5,16,17
153:2 154:22
161:14,18
167:5 168:7
173:19,20
174:4,6 175:6
175:18 179:3
192:2 193:3
196:6,18 197:5
197:8 198:2,4
198:10 200:2,5
200:10 203:21
204:2 206:25
207:2,13 208:6
208:10,14
209:3 210:13
215:14,21,24
218:14,19
219:5,10
225:12 226:23
227:9 232:17
232:20
emails 8:15,17 8:18,20,21 37:22 38:12 148:12 174:7 197:3,13 198:7 206:6 215:11 221:2
embedded 30:16 40:24 41:2
emergency 1:23 5:9

Page 248

**Emlet** 3:20,22
 20:3,11 24:22
 24:24 53:7,9
 54:23 55:8
 149:3,20 167:6
**Emlet's** 149:4
**employed** 28:17
 32:17,19
 196:23 219:17
 238:5
**employee** 11:24
 13:11,16,18,20
 14:3,9,10
 18:21,22 28:1
 28:21,24 29:2
 29:14 30:23,24
 39:3,7 40:12
 42:2,9,12,23
 43:3,6 48:17
 49:3,14,17
 53:12 72:2
 75:5,20,21,22
 75:24 76:8
 81:7 83:11
 86:20 88:6,15
 89:13 100:7
 101:10,13,15
 101:22,23
 102:2,9,11,13
 103:10 110:11
 111:18 113:19
 115:9 118:6,7
 118:13,17
 119:6,11 122:1
 122:3 123:6,8
 123:12 128:22
 129:1,5,6
 130:1,3 138:22
 139:4,11,17,20
 139:23 143:18
 144:2,5,17,18
 145:11,18,20
 145:23 146:10
 146:23 147:1
 153:20,24
 154:4 155:3,9

 157:1 163:4
 164:17,20
 166:6 167:7
 169:14,16
 170:2,5,9
 171:15 172:12
 178:4,9 188:9
 190:9 196:21
 232:4 238:7
**employee's**
 111:1 130:22
**employees** 9:9
 10:5 14:24
 20:24 33:22,24
 34:2 39:15
 41:7,21 42:25
 44:17 45:14
 47:11 65:7,9
 65:11 66:10
 77:24 86:24
 92:21,23 99:15
 100:1 103:18
 103:24 109:24
 110:3 111:8,13
 113:1,5,23
 114:3,18,23
 115:2,18
 117:12 119:14
 119:18 124:15
 125:16 130:12
 139:2 166:20
 189:6,16
 190:12 195:20
**employees'** 21:7
 44:14 125:2
**employer**
 169:23
**employment**
 65:22 104:21
 114:5,8 121:8
 139:25 179:9
 184:12 187:5
**employs** 11:19
**encompassing**
 187:18
**encouraging**

 17:4
**endorse** 16:11
**endorsement**
 201:12
**endorsing** 25:22
**ends** 46:2
**enforced** 91:4
**enforcement**
 79:8,10,17
 91:10,21 92:9
**engaged** 37:12
**ensure** 14:5
 17:23 21:3
 35:11 39:19
 51:6,17 52:2,4
 65:1
**ensuring** 51:12
**entail** 52:1
**entire** 46:14
 54:14 70:5
**entities** 16:21
 46:13
**entity** 13:12,19
 19:3 48:14
 200:16
**Equal** 104:20
**ER** 155:1
**error** 121:2,4
**errors** 222:24
**erupted** 228:23
**escalate** 91:2
**escalated** 85:3
**essence** 86:22
 197:22
**establish** 7:18
**et** 69:13
**evening** 202:1
**event** 17:5,6
 25:7,7,11,15
 25:23,25 26:3
 27:3 154:10
 193:23
**events** 200:20
**Eventually**
 205:17
**everybody** 106:6

 204:3
**exact** 38:10 57:9
 77:16 99:7
 108:25 201:23
**exactly** 125:23
 135:10 144:10
 177:9 187:22
 192:3,19
**examination** 3:4
 3:5 6:5 45:24
 106:18 207:8
 207:21 229:25
**examine** 19:18
 46:1
**example** 55:9
 69:18 129:10
 154:11
**excludes** 123:8
**exclusively**
 144:5
**excuse** 50:20
 57:21 64:5
 65:8 110:4
 112:5 120:7
 146:2 169:15
 178:7 220:22
 224:25 225:7
**executed** 236:11
**executive** 36:16
 36:18 99:14,18
 119:5,10 231:7
 231:13,15
**exhibit** 3:11,12
 3:14,16,18,20
 3:22 4:2,4,5,7
 4:9,10 68:19
 69:4,13,19,20
 69:22,23 70:1
 71:5 72:22,23
 73:24 74:15,16
 87:21 93:11
 96:6,7 97:1
 98:11,13,15,16
 98:24 105:4,5
 105:6 122:7
 126:9,10

 135:13,14
 157:13,14
 160:22,23
 166:24,25
 170:17,20,21
 175:5,15,22
 176:7 181:18
 190:24 191:3,4
 198:20 206:1,2
 215:6 216:21
 216:24 220:10
 220:13 223:8,9
 223:10,14,15
 223:17,19,21
 224:18,19
 226:20
**exhibits** 3:10 4:1
 203:17
**expand** 33:11
**expanded** 33:7
 33:23
**expectations**
 95:21,23 96:3
 98:8
**expired** 57:16
**Expires** 236:20
 238:20
**explain** 95:15
 177:21,25
**explanation**
 70:7 71:24
**express** 200:23
 201:1,7
**expressed**
 236:12
**expression**
 201:5
**extend** 229:11
**extent** 37:4
 41:12 116:24
 118:12 188:10
**external** 15:11
**extremely**
 106:25

_____
**F**
_____
**F-l-o-s-s** 110:6

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 249

Facebook 20:25
  125:6 126:5
  131:8,18 132:3
  132:9 134:4,6
  212:12 214:2
  214:16,17
  215:3 221:15
  221:15,18,23
Facsimile
  238:22
fact 76:21 147:1
  192:16 196:24
  231:15
fact-fighting
  76:21
fact-finding
  8:15 11:19,22
  11:25 12:2,4
  12:15 13:1,3
  13:10 19:3
  37:14 54:24
  73:16 76:14,19
  133:24 151:1
  153:15,17,21
  154:6 156:22
  156:24,25
  157:10 158:4
  160:18 161:3
  161:15 162:10
  162:13 166:4
  175:1 182:3,6
  183:13,18
  184:6 186:1
  231:22
fact-findings
  156:16,19
factual 204:25
fair 83:12
  179:24
fairness 14:5,6
faith 233:22
fall 76:2,12,16
  77:1 172:16
familiar 37:5
  47:1
far 8:23,24

19:17 21:24
  30:14 39:1
  41:25 46:9
  82:12 145:25
  206:22
favorable
  190:20
February 83:19
  135:23 138:13
  141:11 158:6
Federal 1:22
  237:20
fee 43:11,13,16
  43:23 44:7
feel 7:13 20:6
  72:24 184:9
fell 84:9
felt 160:12,12
  187:10
female 215:3
festivities 15:23
fetuses 126:6,7
fifth 70:10
fighting 189:6
figure 215:13
  216:6
file 35:25
filed 35:1 153:16
  154:10,12
  181:7 212:25
files 38:5,12
  225:22
filing 54:22
  179:22,25
  180:2,8
final 92:17
  94:25 98:20,24
  162:14 176:1
  184:24 186:8
  223:4
financial 222:3
financially
  238:8
find 77:20 79:25
  84:11 86:13
  93:24 166:3

206:12 207:9
finding 76:22
  93:19
findings 232:12
fine 5:20 62:11
  90:17 94:6,18
  105:15,23
  106:3
finish 138:24
finished 71:15
  135:25
fire 65:7,11,15
  65:18 168:25
  183:8
fired 67:17
  74:11 75:1
  77:13,24 79:2
  82:9 88:15
  92:21,24 100:8
  116:11 159:4
  159:15 160:14
  213:16
firing 82:13
Firm 238:23
first 6:4 27:4
  52:13 54:2
  67:9,10 69:1
  70:8 71:22
  93:15 99:4
  120:3,5 122:13
  122:23 125:5
  127:2,7,9,17
  131:6,7,8,8,9
  133:3 134:3
  135:16,19
  136:2,3 144:1
  149:4 151:4
  155:17 175:16
  198:16 204:14
  209:4,19 211:4
  211:13,20
  214:6 217:4
  230:4
fit 207:19
five 23:18 24:20
  32:7 64:3,4,6,7

111:2,12
  115:18 116:16
  171:1 201:24
five-minute
  180:13
fix 54:4
flight 27:1 33:17
  33:19,25 36:8
  36:10,11 42:3
  42:14 43:11,16
  45:2 46:4
  50:14 51:16
  56:7,20,24,25
  59:3 65:15,18
  65:20 67:7
  71:23 77:12
  79:2 81:9 82:9
  99:2 101:7,8
  111:5 113:25
  115:6,23 121:9
  121:17 123:15
  123:24 129:11
  130:18 133:20
  134:7 142:1
  158:22 159:13
  159:14 160:4
  166:2 177:19
  179:9 187:6
  190:2,3 194:21
  195:21,22
  197:1,2,9
  201:16,19
  202:3,7,24
  203:1,4 205:6
  208:6,11 209:1
  212:16 213:8
  213:25 214:12
  221:22 224:9
  224:15,16
  226:15 230:9
  230:11,16,17
flights 98:7
  189:20,22,25
  195:5 200:25
  201:21 202:1
  202:11,22

flip 227:1
floor 202:10
Floss 110:6
  116:4 118:3
flyer 225:9,15
flyers 225:23
  226:1,8
focus 155:24
folks 112:17
  191:16
follow 121:14
  150:19 199:9
  199:11
follow-up
  173:19 194:15
  229:6
followed 231:22
following 73:19
  98:5 184:15
  237:15
follows 6:4
  238:11
footage 126:6
Ford 10:22
  14:25 15:4,16
  18:11 21:16
foregoing 236:1
  236:11
forgot 140:18
form 152:3
  154:13 173:5
  173:16
formal 154:15
  166:16
formatting 88:4
former 9:9
  18:21 126:24
  145:17,18
  159:17 160:3
  196:10 217:8
formulate 90:11
formulation
  79:10
fort 43:23
forth 65:23
  210:2

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 250

forums 160:10
forward 12:8
 14:12 37:19
 81:24 145:8
 147:14 148:20
 208:17 225:4
forwarded
 93:21 146:2,4
 148:17 193:5
 221:6
forwarding
 147:13 203:22
 225:8
forwards 138:13
Foss 114:10
found 113:10
 160:6 175:20
 175:20 206:5
 225:9
FOUNDATION
 2:4
four 60:6 66:22
 114:3 142:21
 143:8 201:24
 206:14
fourth 4:13,14
 70:10 72:3
 93:20,21 94:23
 151:7 158:18
 158:19 204:2,4
 204:5
frame 112:11
frames 51:18
 52:4,7,13
free 20:6 72:24
freestanding
 113:11
front 133:11
 189:15
froze 42:8
fulfill 7:19
full 44:17
full-dues-payi...
 42:5
full-time 103:18
 103:21

full-union-due...
 42:14
fully 48:10 85:8
 102:6 183:19
 183:20 189:14
fun 231:1
function 29:6
 31:10 43:1,4
 48:18 124:22
 152:25
functions 30:18
 30:21 44:23
 103:15 137:3,3
funds 44:24
further 23:7
 62:14 189:9,11
 237:20 238:3,6
future 107:2
FYI 135:24
 221:7

_____

**G**

G 25:15
G-r-a-n-t 52:25
Gary 213:13
gather 107:3
 166:8
gathered 73:15
 98:3 166:15
gears 189:17
gender 144:13
general 13:21
 28:23 29:3,8
 29:10,15 30:17
 30:21 37:18
 52:5 54:21
 89:3,4,7,18
 90:10 92:16
 123:22 128:14
 129:21,22
 176:25 177:13
generalists
 104:11
generally 39:11
 39:25 66:13
 75:10 88:19
 103:13 128:22

129:13 154:6
 156:25 166:13
 166:21 169:23
 172:12 173:18
 182:14
generate 78:15
 78:16
generated 51:2
 196:9 198:4,23
 208:11
gentleman 33:16
geographic
 63:11
geographically
 104:6
Gerry 218:3,4,4
getting 87:1,2
 106:24 164:7,7
Gilliam 2:3 3:4
 5:21,21 6:6,9
 10:9,19,24
 19:22 20:9,14
 41:15 42:1
 45:21,22 46:16
 46:17 54:5,6
 58:12 62:2,11
 62:15,19 63:1
 68:3,23 69:7
 69:14,21,25
 70:2,17,22
 72:24 73:4,5
 74:2 76:20
 79:15 80:10,18
 80:22 81:5,25
 82:6 86:8
 87:10,14,17,19
 89:20 90:4,20
 93:24 94:11,16
 94:22 95:4,9
 95:14 96:25
 97:1,4,9,13
 98:12,15,17
 100:15,18,23
 100:24 105:3
 105:12,22,25
 106:3,6,11

107:12,14
 108:7 109:19
 112:22 113:14
 113:15 123:23
 126:11 131:13
 131:16 135:2
 135:15 146:16
 156:3,7,14
 157:15 160:21
 160:24 161:20
 161:23 162:4,6
 163:13,25
 167:1 168:15
 171:5 173:9,10
 180:12,15,21
 191:2,5 199:21
 203:24 204:1
 206:15,24
 207:6,12,22,23
 210:3 215:15
 215:17,20
 216:3,10,17,20
 216:25 223:13
 223:18,22
 224:20 229:4
 229:10,19,23
 233:25 238:12
Gilliam's 20:7
gist 17:3 179:15
 194:9
give 11:6 19:18
 95:2 200:15
 227:1 232:9
given 107:10
 190:7 219:21
 236:14 237:18
gives 144:6
glanced 138:25
glancing 139:4
Glenn 110:7
 114:11 115:15
 115:16 116:4
 118:24
go 19:23 32:10
 38:23 46:17,17
 62:13,16 68:16

69:12 70:22,22
 80:15 81:6,13
 81:25 82:1
 83:4 88:3 90:1
 90:18 96:23
 102:11 105:9
 105:25 106:1
 112:18 124:10
 133:2 138:24
 139:10 169:23
 175:5 189:18
 196:12 216:11
 226:19 229:23
going 41:10
 45:16 58:6
 68:16 70:20,20
 75:7 79:6
 80:15 86:6
 89:15 90:3,6
 90:14,17 95:10
 98:1 99:11,11
 100:12 105:8
 105:16,18
 107:1 131:24
 132:5 134:19
 135:24 136:10
 155:25 158:18
 159:23 170:19
 174:22 177:2
 179:1,8 183:14
 184:1 187:2,22
 188:21 196:8
 196:25 198:16
 199:19 202:1
 204:8 206:11
 209:22 216:8
 230:2
good 6:7,8 106:8
 188:9
Goode 20:2,10
 20:15,16 21:14
 21:19 22:1,7
 22:14
Goulbourne 4:7
 222:15
grab 131:9

Case 3:17-cv-02278-X    Document 263-7    Filed 06/13/22    Page 73 of 94    PageID 8960
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 251

grammar
    222:24
grant 52:24 56:1
    102:12 149:22
Grant's 53:1
granted 103:9
grants 101:16
great 62:17
    112:20 156:5
    187:2 188:18
Greenfield 2:14
    2:14 6:1,1
    234:2
grievance 35:25
    36:20 51:14
    54:22 114:24
    115:4 117:4
    130:1,7 153:16
    154:10,12,15
    179:22,25
    180:3,9,24
    181:4,7,15
    183:14,18,23
    184:2 185:24
    186:2
grievances 35:1
    51:10 91:19,24
    128:22 129:1,5
    129:6 130:4
grounds 113:11
    229:7
group 14:7
    28:21 30:5
    107:10 111:11
    117:20 124:20
    125:1 141:7
    143:18 163:1
    193:1
group's 14:3
groups 124:1
    162:25 164:6
Gs 67:2
guess 12:24 13:9
    14:2 15:15
    33:24 38:25
    41:17 42:18

45:4 51:14
52:8 54:6
56:23 66:5
68:23 69:3
70:8 73:12
82:1 84:8,19
85:10,24 86:12
87:6,21 107:14
122:6 125:2
128:19 131:9
133:4 135:22
137:20 138:8
138:18 142:3
143:3 146:6,7
150:7,15 158:2
158:13 159:16
162:17 165:24
166:19 168:6
181:6,14 182:5
183:11,16
184:4 188:25
191:14,24
192:18,25
200:19 203:11
205:14 209:7
209:11 210:22
218:25 220:10
223:7,7 229:4
guidance 39:18
    50:22 51:4,17
gun 213:13
Gutierrez 3:18
    13:15 18:18
    49:3,14 124:17
    146:22,25
    149:3 154:23
    155:11 159:10
    167:6 171:14
    171:14 174:6
Gutierrez's
    232:12,22

—— H ——
H-a-f-n-e-r
    59:14
Hafner 59:14
    217:16 227:17

227:24
half 156:2
Halloween
    118:14
Hamilton 145:9
    145:10,11
    146:4 147:11
    147:14
hand 110:12,14
    153:4 236:14
handing 41:6
handle 15:11
    30:19 63:11
    143:3 202:22
handled 34:24
    101:12,15
    121:3 129:11
    231:18
handles 124:1
handling 42:22
    100:25 136:18
Hang 41:9
happen 7:17
    86:2 177:15
    179:2 201:18
    201:22
happened 13:6
    67:12 99:16,23
    113:12 139:24
    170:11,13
    194:15 195:5
happening
    181:9 182:12
    189:15
happens 202:14
harassing 11:24
harassment
    13:23 31:1
    50:3,4 67:22
    67:24 68:2,3,9
    68:11,14,15
    72:4,4,8,9,19
    72:20 74:4,5
    76:6,6 80:7
    87:5,5 88:9,10
    88:17 89:1,1

111:19 113:2
119:11 169:3,8
169:21 170:1,7
171:25 172:1
172:19,19,23
172:23 173:11
173:12,23
174:1,12,15
232:13 233:1
hard 38:5 93:18
    105:7 225:5
harm 189:1,2,5
    221:20 222:2,3
harmed 221:18
Harris 219:8,23
Harwood 2:9
hat 25:17
hats 231:3
hazing 70:24
    71:8 72:1,7
    73:21 74:12,18
    74:19,22 75:3
    75:17 76:10
    77:14 79:3,9
    80:6 81:11
    89:9 110:22
    111:14 112:11
    119:12
he'll 100:13
head 75:22
    81:16 87:11
    133:12 210:12
headed 122:13
heading 122:14
    122:22 231:3
hear 13:6 68:1
    146:14 185:6
    212:21
heard 115:14
    127:17
Hector 67:2
    140:15 141:1,4
held 23:17 157:7
    158:8 166:4
    183:13,17
help 40:10 94:7

helped 181:8
helpful 207:17
    215:19
helps 171:1
Hendrick 1:19
    5:12 81:21
    82:3 237:13
    238:19
hereto 1:25
Hermosillo
    193:6,8,9
higher 75:15
Highly 110:4
Hillary 84:5
hire 65:7,11,14
    65:17
hired 36:10,11
hiring 30:20
    39:16 65:19
history 46:14
    106:22
Holcomb 215:1
hold 33:2 34:14
    36:14,22
    100:19 158:14
    158:16 208:1
    229:16
holding 213:12
Holly 110:4
    114:10 116:3
    116:15 119:23
    159:1,4,7
home 5:15
hour 11:6,10
    106:10 156:2
hours 206:23
    229:18
hours/minutes
    238:12
Houston 225:9
HR 75:5 154:24
    155:1,4,7
Hudson 4:6
    126:22,23,24
    137:24 145:2
    146:1,3 147:20

Page 252

147:23,25
148:6,16 217:7
227:13 228:12
**human** 28:23,25
29:5 30:5,6,8
30:15,18,22
31:4,4,5,6,6,10
31:11,18 39:2
39:6,10,12,21
40:14,17,17,18
40:24 41:18,19
41:19 43:1,17
45:7,9,11,15
45:17 46:13,14
46:22 47:4,9
47:12,14 48:5
48:9,13,15,16
48:18,19,20
65:19 163:8
165:6,10 167:8
**hung** 206:6
**Hunkins** 226:12

**I**

**I-m-a-m-o-v-i-c**
110:5
**identified** 5:16
223:2
**identify** 69:6
233:16
**identifying**
69:11
**identities** 89:22
**identity** 46:5
**ignoring** 173:12
**II.3** 133:7
**image** 99:2
**images** 171:21
221:23
**imagine** 93:1
133:23
**Imamovic** 110:4
114:10 116:15
119:23 159:1
**immediate**
107:2
**immediately**

**150**:19
**impact** 231:16
231:19 233:1
**impeding**
188:23
**implied** 99:1
**in-** 165:16
**inappropriate**
117:24 118:7
201:1,6,15
**inauguration**
15:23 188:4
194:23 231:3
**incident** 101:7
101:17,21
155:6 159:8
213:4 230:7
**incidents** 101:11
101:14 110:21
111:17 112:11
155:4
**include** 60:7
98:21 109:7,13
144:12 220:13
**included** 96:17
123:1
**includes** 197:8
**including** 8:14
83:5 161:20
**inconclusion**
88:13,15
**inconclusive**
74:9 169:18
**incorrect** 184:7
212:9
**increased** 85:13
**independent**
14:1,4 28:20
113:11 169:14
**INDEX** 3:1
**indicate** 97:17
**indicated** 187:14
**individual** 29:9
30:16 91:15
190:1 213:12
224:4

**individually**
190:8
**individuals** 20:4
75:18 142:21
217:12,24
227:8 230:21
**inflammatory**
117:8,14
**inflight** 4:11
32:23 33:4,9
33:21 34:4,9
34:19,24 35:19
39:3,7 40:25
41:3 50:13
56:8,11 58:17
58:22 59:2,5
59:16,19 60:2
60:5,18 61:11
61:12 63:8,22
65:22 66:13
103:11 129:18
163:8 164:12
165:3 169:10
169:20,25
193:10 196:10
196:14 197:23
198:14 200:21
217:16 219:16
220:22 225:6,7
227:18 228:2,3
**info** 105:19
**inform** 154:3
**information**
38:6,9,18,21
50:19,21,25
51:1 73:15,16
78:2,6,15
79:25 80:3,8
80:19 81:4
87:13 90:1,3
98:3,4 100:13
103:5 106:21
107:4 112:18
154:9,14 155:1
163:4,5,9,14
163:17,19,23

163:24 164:13
164:18 165:11
166:15 205:11
211:9,12
217:20 218:1
230:12
**infraction** 232:8
232:10
**infringing** 89:16
**infusion** 21:10
**initial** 126:20
138:6 145:5
153:4,7 157:21
157:22 169:21
193:21
**initiates** 50:13
**input** 90:22
**inquire** 195:4
**inquiries** 16:8
16:17,18 78:15
78:17 193:20
**inquiring** 80:12
**inquiry** 78:18
191:25 192:18
194:15
**insight** 144:6
163:23
**Instagram** 21:1
213:12
**instance** 1:16
14:21 31:17
104:7 121:22
121:23 160:1,2
**instances** 109:16
109:25 121:20
159:20
**instruct** 89:17
**instrument**
236:11
**integrated**
136:12
**intent** 222:19,24
**intentionally**
161:17
**intentions** 185:8
**interact** 33:19

**interaction**
106:24
**interactions**
46:12
**interest** 26:7
**interested** 238:9
**interface** 29:22
**intern** 34:18
**internal** 86:25
**International**
26:17
**internet** 160:10
**interpret** 40:10
40:11
**interrogatories**
93:12,15
**interrogatory**
94:13
**interrupt** 62:8
207:20
**interrupted** 32:9
**interview** 13:13
157:21,22
**interviewed**
157:4
**interviewing**
30:21 39:15
**interviews**
157:24
**introduction**
32:9
**investigate**
14:11 52:12
194:11
**investigated**
53:20 77:5
133:22 165:16
**investigating**
40:1,20 44:2
46:2 102:2
146:8 166:1
**investigation**
13:17 14:9,14
14:20 18:23
19:5 24:25
25:5,6 27:17

39:2,22 43:24
43:25 47:15
49:15,19 50:11
50:14,17 51:3
52:9,16,23
53:5,8 54:1
73:15 75:22
76:25 98:3
127:12 140:12
140:24 152:7
152:11 155:15
157:2 165:19
166:6,12,14,19
167:11,22
168:4 171:16
175:6 176:23
231:12 232:13
**investigations**
13:22,25 14:4
30:25 51:13
153:2
**investigative**
13:8 156:15
157:5
**investigator**
166:12,18
**involve** 41:7
42:2,23
**involved** 12:25
14:8 25:22
26:6 39:2,4,7
41:18,20 43:17
44:1 47:15
49:4,15,18,20
49:24 50:10,12
52:8,15 53:4,8
53:11,17 54:9
54:9,15,24
55:6,8,16,20
55:21 67:9,10
75:25 139:14
139:17 140:23
141:3 146:9
152:6,10
179:17 202:3
227:9,21

230:18
**involvement**
25:9,20,25
26:4 35:13
53:10 142:4
143:9
**involves** 44:22
**involving** 8:15
8:17 39:22
46:3 84:4,23
86:14 106:23
**IOM** 135:25
136:10,11,12
**iPad** 70:21 94:2
**IR** 151:21,24,25
153:4,5
**irregularity**
151:25 152:5,9
152:14,16,18
152:20 153:2
**irregularly**
152:22
**IRs** 153:1
**issue** 40:8 46:9
54:4 67:8 92:1
92:6 106:23
143:21 149:23
154:4 163:2
188:18 194:11
195:19 215:13
233:14
**issued** 168:17
176:13
**issues** 41:7 46:3
85:22 86:21
102:17 136:16
202:22 207:11
207:14,15
**it'll** 95:11
**IV.6** 133:8

---

**J**

**Jackson** 205:6
208:12 212:22
212:23
**January** 15:25
16:12 83:19,22

188:5
**Jeanna** 208:12
212:22,23,24
**Jeanna's** 209:2
**Jennings** 207:17
**Jim** 219:11,11
219:15
**job** 59:2 103:15
103:15,20
187:14 188:12
**Joe** 4:9 219:8
224:2
**Jones** 10:21,25
11:1,5 13:2
18:8 67:2
140:16 167:9
**Jordan** 219:11
219:11,15
**Josh** 213:8,10,15
**Joy** 226:12,13
**Juan** 29:24,25
30:1,2,2 219:6
**Julie** 45:10
46:20,23 47:19
47:23
**July** 205:23
211:21
**jump** 10:7
112:17
**June** 57:23

---

**K**

**K-a-m-m-a-s**
116:8
**K-a-s-h-e-r** 59:9
**K-i-s-s-m-i**
61:19
**Kammas** 114:11
116:8
**Kammas'**
118:21
**Kasher** 59:9
**keep** 14:1 77:22
77:22,23
**keeping** 14:3
**keeps** 44:10
**Kendall** 110:6

114:10 116:4
118:3,5
**Kent** 110:12,14
**Kevin** 4:6 29:18
30:1 218:14,14
218:16
**kind** 90:9
**kindly** 151:19
**Kissman** 3:16
4:7 61:19 63:5
63:20 64:23
127:22,23
135:23 136:21
137:8,11,13,22
138:12,18
141:11 142:8
142:17 147:8
147:16 148:3
148:16 168:25
176:13 178:25
222:16
**Kissman's** 140:9
**knew** 128:9
133:14 138:21
139:3 179:14
179:14 193:18
194:10
**knife** 158:21
**know** 7:14,15,18
8:21,23,24
12:21 21:24
28:19 32:11
35:9 38:8,10
38:22 39:15
40:21 41:16,25
43:12 44:13,16
45:1,20 46:20
47:3,7,8,10,11
47:13 48:1
49:10,13 52:21
53:3 54:7,18
54:23 55:13,15
55:19 57:7
59:10 65:25
66:19 67:17
69:13 70:3

71:16 73:6
77:16,17,18,19
77:19 80:22
81:14 82:2,16
82:23 83:1,8
84:1,8,15,25
85:1,2,5,16
88:1 90:17
91:12 92:7,11
92:12,12,14,20
92:23 93:2,6
94:6 95:22
98:12 99:4,7,9
99:13 100:9,22
101:25 102:1,8
102:14,14
103:23 104:1
104:12,15,16
104:19,20
105:2,13 108:3
108:15,20,23
109:9,16,22,24
110:1,20,25
111:16 112:11
112:25 113:4,7
113:12,15,17
113:18,18,21
114:17 115:7
117:6 119:4,9
119:10,14
120:16,23
121:25 122:9
124:3,15 125:4
125:15,19
126:12 128:7
128:12,14
129:12 130:17
131:23 132:2
132:12 133:9
133:12,21
135:1,7,10,18
136:1,5,9
137:5,21,23
138:4,7 139:1
139:6,22,25
140:16,23

Page 254

141:1 143:7,8
143:22,25
144:9,17,20
145:13,25
146:1,5 147:12
147:16,18
148:17,19
149:24 151:10
151:13,23
155:11,16,17
157:17,23
158:7,10,12
159:7,9 160:9
160:14 161:1
161:15 162:2
162:12,15
163:7 164:2,3
164:11,15,19
164:23 165:2,5
165:8,14,15
167:2,15,18
168:20,24
169:1 170:5
173:24 174:14
174:17 175:25
176:3,14 177:5
177:9 179:16
182:9 183:4,6
189:14 190:8
190:11,15
191:6 192:1,3
192:6,10,16,20
192:22,23
193:3,4,23
196:7,9,20,22
197:10,14,16
197:19,24
198:3,9 199:14
200:7,9,10,13
201:2,23
202:11,13
203:4 204:7
205:22 206:12
206:15,16,17
207:7,17
208:13 209:7

209:14 210:6,9
210:11,15,17
211:19 212:9
212:10,11,13
212:16,17,22
212:22,24
213:3,8,10,11
213:14,15,19
213:21,24
214:1,2 215:1
217:11 218:2,9
218:22 219:11
219:25 220:24
221:5 222:23
223:4 224:7,8
224:10 226:5,7
226:16 227:14
228:6 229:6,12
229:22
**knowing** 211:13
**knowledge** 7:6,8
7:9 25:24 27:6
44:4 49:16
52:11 55:21
67:11 80:13
90:24 103:4
104:10 114:16
116:18 119:21
120:14 121:13
125:18 130:24
132:17 133:1
134:2 149:5
155:20 163:6
165:18,22
188:16 194:1
203:3,7,8
205:11 213:18
213:21 215:4
217:22 221:16
222:4,7 227:23
**known** 33:20
134:23 236:9
**knows** 46:10
**Komen** 25:16
_____
**L**
**L-a-c-o-r-e**

58:19
**L-a-r-a-b-e-e**
63:17
**L-i-n-k** 33:20
**L-u-d-e-r-m-i-...**
60:17
**label** 131:14
133:3
**labeled** 131:25
132:6 141:6
203:15
**labor** 4:11 17:24
23:14 34:16,21
34:25 35:2,5
35:12,22 36:2
36:6 37:16
39:3,6 43:3
50:10,12,13,15
52:14,19,20
53:2,4,16 54:8
55:5,22 56:3
77:21 78:1,9,9
78:13 84:14
92:4,8,13
106:20 107:10
126:25 127:5
145:3 149:21
150:15 163:7
163:18 164:8
164:24 166:9
166:21 167:6
181:11 182:2
185:1 208:5
217:8,14,18
218:5,8,11,16
225:7,21 228:1
228:2
**laborious**
106:25
**lacking** 109:21
**lacks** 205:11
**Lacore** 4:9
58:18 59:15,20
126:22 137:25
176:12 177:18
224:1

**Lacore's** 59:10
**Lan** 200:7,8,9
**language** 88:4
**laptop** 94:5
105:8,11
**Larabee** 63:16
142:21
**large** 26:19
36:18 37:2
**Las** 12:7,12
125:14,20
126:19
**last-chance**
107:7 114:9,15
115:19,22,24
116:5,10,11
120:12 186:13
186:17,20,23
186:25 187:4,8
188:13
**late** 211:17
228:18
**latest** 193:12
210:14
**LAUREN** 2:20
**law** 2:14 28:1
103:7
**layer** 60:11
**lead** 166:11
**leader** 13:16
58:24 63:7
75:6,8,9,15
76:13,19,25
77:2,5,9
102:25 125:14
125:20 146:24
149:22 167:7
217:13 222:16
227:14,15,16
**leaders** 13:7
27:22 28:11
65:21 75:11,13
146:8 166:22
**leadership** 20:18
35:4 39:18
64:25 65:4

205:16 217:20
**leading** 231:8
**learn** 26:22
103:14 125:5
202:6
**learned** 125:10
**leave** 147:20,25
**left** 206:21
**legal** 2:3 29:11
29:20 78:12
89:25 90:12
**let's** 18:13 19:23
43:22 62:15,16
68:18 72:21
73:12 81:18
82:6,6 87:19
97:21 100:18
105:25 108:17
114:2 131:4,5
135:6,12 139:1
140:3 151:6
157:12 158:1
181:17 190:23
190:24 191:2
198:16 203:10
203:14 205:25
211:24 215:5
216:10,19
218:2 222:8
224:17 226:20
229:2
**letter** 3:13 8:14
83:4 95:12
96:19 97:16,19
97:22,25
173:22 174:19
175:4 176:5,10
176:13,15,17
176:19,21
177:7
**level** 45:17 54:2
54:3 75:11
83:2,3 84:20
197:24 232:23
**liaison** 30:11
35:2 40:12

Case 3:17-cv-02278-X   Document 263-7   Filed 06/13/22   Page 77 of 94   PageID 8964
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 255

193:11
**life** 54:14
**lighting** 230:7
**lights** 16:9,15,19
  17:7 189:21,25
  190:5,17,20
  191:11 193:14
  195:10 200:25
  202:14,25
  203:5 230:19
**limited** 8:14
  115:3
**Linda** 10:22
  15:6,16 18:11
  21:15 192:13
**line** 164:3 235:4
**Link** 33:20
**Lisa** 20:2,10,15
  20:16 21:14
**list** 7:22,24 8:1
  197:9
**listed** 95:15
  168:13 227:9
**listening** 4:2,2
  20:24 199:1,2
  199:3
**little** 14:22 23:7
  27:10 32:9
  38:24 62:14
  106:9 144:9
  163:21,23
  189:18,19
  225:1
**lives** 137:13
**LLC** 238:20
**LLP** 2:9
**local** 1:6 2:13
  6:2,12 12:7,9
  12:15 23:16
  36:12,15 43:7
  44:6 58:3 84:6
  90:21 92:8
  99:13 128:10
  128:13 134:8
  134:13 135:3
  180:23 188:2

203:6 205:16
220:22 224:3,3
224:6 228:18
228:24 237:7
**located** 1:20
  5:11 178:22
**locations** 5:19
**log** 219:21
**long** 11:4,7
  15:19 18:15
  19:12 22:16
  23:17 24:18
  25:2 32:5,19
  32:24 37:1
  45:11 147:24
**long-term** 188:8
**longer** 35:18
  145:23 219:16
**look** 27:14 57:11
  70:8 71:9,13
  72:15,25 79:10
  81:13 95:7,10
  96:23 105:5
  126:13 130:25
  194:3 195:8
  205:9 206:10
  215:24 219:24
**looked** 151:1
  219:25
**looking** 70:23
  71:7,10 81:22
  97:7,22 98:20
  122:1,18 124:7
  139:8 162:1,2
  169:18 170:25
  175:13 194:6
  208:1 211:11
  220:3
**looks** 68:19 95:9
  138:12,14
  161:13,19
**loosely** 75:9
  156:24
**Los** 64:5
**lose** 42:6
**lot** 88:4 115:7

188:3 225:23
227:3
**Loudermilk**
  60:17 142:22
**lounge** 225:9
**Lucetta** 142:21
**lunch** 81:3
  100:13 105:14
  105:16 106:14
  106:19 107:10
**Luv** 21:10

————————

**M**

**M** 1:19 237:13
  238:19
**m-a-n** 61:19
**M-u-r-t-o-f-f**
  60:7
**MABERRY**
  2:20
**Mack** 2:18
  68:19 94:6
  98:12
**mailbox** 124:11
  124:23 143:19
  143:23 144:19
  192:4,8
**main** 76:16
**major** 228:23
**making** 103:12
  199:23 215:2
**man** 78:9
**manage** 33:13
  39:18 83:24
  85:21 86:1,4,5
  86:16,19
**managed** 107:3
**management**
  58:24 63:18
  78:12 123:24
  125:16 136:8
  136:13 166:20
  190:12 199:11
**manager** 12:7,7
  12:12 28:13,15
  34:6,14,16,19
  34:22 35:3,5

35:13,22 36:7
36:20 46:22
47:14 49:4,7
52:20 53:2
54:8,12 61:4,8
62:4 63:18
64:13 65:22
66:7,11 76:13
76:18,21,22
77:2,4,6,6,10
78:14 125:17
126:19 140:17
145:17,18,21
145:24 147:1
166:7 167:6,9
167:12 181:11
202:9 218:16
222:15,16
226:13
**manager's** 36:2
**managers** 33:15
  47:4 53:4 55:5
  61:12,16 63:3
  63:4,10,22
  64:1,8,11 65:5
  66:12,15,17,25
  75:12 89:12
  142:23 202:8
**manages** 33:16
  33:18 63:13
**managing** 34:25
  86:20
**mandatory**
  230:14
**manner** 92:9
  167:17
**manual** 71:23
**march** 15:24
  16:11 17:8
  25:7,17 134:10
  134:12,14,18
  134:21 135:4
  173:20 175:4
  175:14,18,19
  189:21 201:12
  203:2

**mark** 68:18,24
  68:25 69:22,22
  69:22 72:21
  126:8 135:13
  166:23 191:3
  216:20 223:8,8
  223:10,13,19
  224:17
**marked** 70:1
  71:4 72:23
  74:16 98:8,16
  98:23 122:8
  126:10 135:14
  157:13,14
  160:22,23
  166:25 191:4
  198:17 206:1,2
  216:24 223:17
  223:21 224:19
**Matt** 6:9
**matter** 8:9,15,18
  12:8 16:9
  39:22 40:9,20
  43:10,15,18
  44:2 53:10
  55:14 92:2
  129:21,22
  138:22 144:2
  149:5,25
  151:14 153:10
  153:12,18
  155:19,22
  165:17 179:22
  180:4 183:1
  184:24 223:5
**matters** 22:13
  40:1 41:17,20
  42:19,23 46:4
  58:23 78:24
  128:20,25
  129:16 139:4
**Matthew** 2:3
  5:21
**Maureen** 3:20
  3:22 20:3,11
  24:22,24 27:16

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 256

53:7,9 54:23
55:8 149:3,4
149:20,24
150:12 167:5
173:21 174:11
**Maureen's**
150:5,8
**mbg@nrtw.org**
2:6
**McCrady** 218:6
218:6
**mcorrell@ree...**
2:11
**mean** 8:10 13:19
17:7 25:13
30:14 35:17
42:2 43:6,12
50:1,6,6,8,8
57:11 60:21
74:10 76:5
78:18 86:4
88:9 90:9
91:23,23
105:15 133:14
138:23 167:14
173:5,15
187:15,25
206:20 220:22
227:25
**meaning** 22:22
22:22 153:21
**means** 5:15
79:18 113:12
136:7 151:25
210:16
**meant** 25:16
69:8 210:17
**media** 16:16,18
16:20 20:18,20
20:22,22 21:1
21:6,7,21 22:5
23:2 40:11
46:3 67:22
68:6 71:10
72:2,20 73:22
74:13 79:11,17

79:18 80:2
82:7 83:23
84:23 85:4,7
85:18,21,25
86:15 89:5
91:1,1,8,21
92:10,17 95:16
95:20,24 96:13
98:7 99:5,8,12
99:15 100:2,21
105:10 107:8
107:18 110:13
110:16 113:24
115:10 117:3,9
117:14 119:7
119:16,20
120:18,20
121:17,18
122:1,3,20,25
123:2,5,6,9,11
123:14,25
124:8,12,13
125:3 129:21
129:24,25
130:15,19,22
160:10 177:23
189:7 191:25
192:18 193:20
195:8,12
198:24 199:1,3
199:4 200:16
213:16,20
214:13 220:21
228:17 234:6
**meeting** 13:5,7
15:16,19,20
16:1 18:4,7,10
18:14,18 19:9
19:12 21:15
22:14,16,20
23:5 31:21
55:8,11 73:17
92:5 134:9
136:14,19
151:1,9,19
153:11,19,21

157:7,10 158:7
161:4 162:11
166:4,7 178:18
180:7 181:11
183:13,22
184:8,15,16,21
186:1,11
**meetings** 52:2
77:8 91:19
136:23 158:4
**Meggan** 10:21
10:25 11:1,5
13:2,2 18:8
67:2,2 140:15
167:9
**Melissa** 10:22
14:25 15:4,16
18:10 21:16
52:17,21 54:15
55:25 160:3
181:10 183:4
185:2,5,11,25
**member** 36:12
36:18 37:2
42:5,14 99:18
119:5,10 224:5
231:13,16
**members** 26:18
99:14 135:3
191:18 200:22
203:9 231:8
**membership**
209:5
**memo** 194:25
195:3 196:4
200:22
**memorandum**
194:21
**men-** 158:20
**Mendez** 4:9
224:2
**mention** 63:16
96:19 163:22
223:11
**mentioned**
14:25 17:16

19:17 20:20
33:22 63:4,11
97:25 100:5
119:25 130:12
135:4 178:25
191:16 213:24
214:11 230:17
**mentions** 21:2
73:20 134:4
158:20 199:5
226:14
**merging** 220:10
**merit** 109:21
**message** 132:16
139:1 230:9
**messages** 117:8
117:12,13
125:7 126:5
134:6
**messaging** 15:11
15:22
**Messenger**
131:18 132:3
**met** 181:10
186:10
**methodology**
188:11
**Michael** 1:10,15
2:8 3:3 5:8,24
6:3 114:11
115:9,12,14
116:8 118:21
235:2 236:1,5
236:9 237:10
237:16
**middle** 34:8
**Midlothian** 1:21
5:11
**midway** 124:6
**Mike** 4:4 41:10
59:14 60:7
63:3 70:13
93:20 176:12
203:20 217:13
217:15 227:14
227:17,19,21

227:24 228:8
228:11
**Minchey** 29:18
**mind** 183:22
184:1,16
**mindful** 194:22
**mine** 170:25
**minus** 108:6,9,9
108:9,11
**minute** 73:1
200:16 227:1
**minutes** 15:20
18:16 19:13
22:17 24:20
25:3 32:7
62:18 70:25
100:21 105:18
106:2 138:15
156:6 229:17
229:18 238:13
**misheard**
115:17 116:2
**missed** 20:10
**missing** 116:7
**mission** 70:6
71:24,25 73:18
92:24 113:6
202:21
**misstate** 115:20
**misstated** 86:9
152:19
**misstates** 73:24
86:7 199:20
**mistake** 184:11
**misunderstood**
95:25 115:13
**Mitch** 224:5,8
**Mitchell** 224:5
**mixing** 48:17
**modification**
79:11
**modify** 19:19
**moment** 49:20
173:13
**Monday** 175:4
**monetary**

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

188:21
monitor 20:21
20:22,25 21:6
21:9,12,21
121:17,21
monitored 22:5
124:23
monitoring
122:14,22
123:5 125:2
monitors 20:19
122:24 199:4
month 32:21
134:10
months 147:22
148:1
Moore 140:15
140:16
morning 6:7,8
140:18 193:15
193:17 202:2
Morris 207:2
Motta 224:5,8
move 19:16 62:8
156:1 232:7
moving 206:4
multiple 157:23
219:2
Mumford
238:21
Murtoff 60:7
muted 68:20
Myra 196:18,19
196:20

N

N 2:1
naivety 230:24
name 5:12 6:9
12:11 20:10
31:20 160:4
196:10,12,14
208:11 235:2
236:10
named 110:12
114:4 115:3,18
158:23 224:5

names 10:17
19:16 20:1
26:19 110:2
111:12 130:11
Nancy 20:2,12
27:21,22 28:10
31:22,23 32:1
Naomi 4:6
126:21,22,24
137:24 145:2
146:1,3 147:20
147:23,24
148:5,15,18,21
217:7 218:14
227:13 228:9
228:12,13
narrow 221:12
NATIONAL 2:3
nature 46:6
104:22 129:14
151:18 171:22
187:24
near 207:18
necessarily
54:13 78:24
82:12 155:5
189:2
necessary 207:8
need 12:20
57:18 68:24,25
69:10 90:16
100:16 102:4
112:6 172:25
188:7 203:17
206:11 229:6
needed 70:18
102:5 105:13
105:20 164:21
164:25 165:4,7
needs 102:11
188:7
negotiated 23:19
negotiating
218:18 228:10
228:13
negotiation 35:7

35:14 228:6
negotiations
23:21 24:13
57:25 91:24
160:12 210:1
226:25 227:6
227:10,22
228:2,5
negotiator 23:15
227:19
neither 238:3
net 136:17
network 33:14
63:18,19
202:10,17,18
neutral 17:5
222:1
never 21:9 44:7
113:12 130:8
new 26:21 68:24
140:21 156:1
Nguyen 200:8
NOC 33:15
202:9,16,17
nomenclature
31:15
noncontract
30:19 34:1
42:25 65:8
nonobjectors
233:11
nonoperational
63:14
nonspecific
127:25
nonunion 41:7
41:21 42:2,9
42:23,25
normal 87:3
91:13,16
177:14 180:25
North 2:9
NORTHERN
1:1 237:2
NOTARY
236:17

note 45:25 81:21
106:18
noted 236:2
notes 8:15 50:19
50:20 157:20
158:4,11 161:3
161:15,21
162:10,13
166:8,13 182:4
182:6
notice 7:21
41:11 45:19
58:9 73:10
79:7,8 104:25
134:20 159:24
195:19 209:24
230:5
notification
143:21 193:25
194:4 217:19
notified 141:25
177:9 217:9
notify 75:20
notifying 217:11
217:15
November 1:10
1:18 5:4 59:18
235:3 237:10
238:16
number 45:24
46:1 69:15
71:2 77:16
84:12,16 85:2
86:15 93:16,25
94:21,23 97:2
107:18,21
108:13 109:1,6
111:16 119:9
138:10 140:5,6
149:11 157:13
158:3 170:18
189:22 191:1
201:23 204:17
207:5 223:16
numbered 1:17
93:13

numbers 69:6
70:16 97:5
111:4 203:14
203:17
numerical 80:3
149:9 220:8
numerous 78:13

O

Oakland 34:19
222:15
oath 5:14 6:8
19:25 236:10
object 41:10
45:17 58:6
79:6 86:6
89:15 94:4
134:19 159:23
209:22
objection 41:22
73:23 90:14
96:21 104:24
109:18 123:18
163:10,20
168:11 173:8
199:18 206:18
objections 90:8
91:9,14 92:3
93:14
objective 14:2
objector 43:11
43:13,16,23
44:5,7
objectors 233:8
233:11
occasion 128:24
occasions 102:1
102:9 119:5
122:2
occurred 108:21
October 25:7,10
25:14 57:24
offensive 172:4
offer 186:17,23
187:4,8 188:12
offered 114:9
115:21 186:25

Page 258

| | | | | |
|---|---|---|---|---|
| 36:20 178:21 | 24:21 25:4,10 | 60:10,20,23 | 107:12,21,25 | 140:3,7,14,20 |
| 226:16 228:24 | 25:18 26:2,9 | 61:1,6,9,12,15 | 108:3,7,12,14 | 140:22,22 |
| 236:14 | 26:12,15,22 | 61:20 62:2,6,9 | 108:15,18,23 | 141:1,5,9,12 |
| **officer** 26:20 | 27:11,16,19 | 62:14,15,20 | 108:23 109:2,9 | 141:16,16,18 |
| 159:17,21 | 28:2,7,10,14 | 63:9,20,24 | 109:12,23 | 141:19,22 |
| 227:20 | 28:17,20,24 | 64:1,4,10,13 | 110:2,19,24 | 142:3,8,11,13 |
| **officers** 188:3 | 29:4,8,14,19 | 64:13,16,19,22 | 111:3,12,16,16 | 142:16,20,25 |
| 203:6,8 | 29:23,25 30:10 | 65:10,14,17,23 | 111:23 112:1,4 | 143:8,11,11,13 |
| **offices** 2:14 | 30:13 31:9,11 | 66:1,4,18,23 | 112:8,9,15,20 | 143:22,25 |
| 36:14,22 | 31:14,17,19,19 | 67:5,13,16,16 | 112:22,25 | 144:4,9,16,16 |
| 178:22 | 31:25 32:5,8 | 67:20 68:6,9 | 113:4,8,14,18 | 144:21,23 |
| **official** 16:22,23 | 32:16,19,22 | 69:14,25 70:11 | 113:22 114:2,7 | 145:7,16,18,20 |
| 17:1 | 33:2,5,11 34:3 | 70:19,21 71:6 | 114:14,17 | 145:23 146:1,6 |
| **oh** 9:20 48:19 | 34:11,13,21 | 71:9,14,18,21 | 115:1,8,16,25 | 146:12,16,18 |
| 69:14 76:18 | 35:12,21 36:6 | 72:6,12,16,21 | 115:25 116:2,9 | 146:21,25 |
| 94:11 108:11 | 36:9,12,14,22 | 73:7,8,12 74:2 | 116:14,16,19 | 147:4,6,9,24 |
| 116:9 122:18 | 37:1,1,5,10,24 | 74:10,15,21,25 | 116:22 117:6 | 148:2,5,10,20 |
| 133:13 147:18 | 38:4,8,15,17 | 75:3,17,21 | 117:15,21,25 | 148:23,23 |
| 150:10 161:20 | 38:20,23 39:10 | 76:8,20,24 | 118:3,8,24 | 149:1,4,7,7,16 |
| 212:1,21 | 39:21,25 40:5 | 77:9,12,19 | 119:1,4,9,14 | 149:24 150:3,7 |
| 215:15 222:25 | 40:8,14,23 | 78:3,8,16,20 | 119:18,22,24 | 150:12,14,17 |
| **okay** 6:8,17,21 | 41:2,2,5,13,24 | 78:23 79:5 | 120:3,6,12,15 | 150:20 151:3 |
| 7:5,11,13,17 | 42:1,18 43:5 | 80:10,18,22 | 121:11,14,20 | 151:13,16 |
| 8:1,3,7,10,17 | 43:10,15,20 | 81:18 82:16,20 | 122:2,6,11,16 | 152:5,16,22 |
| 8:21,24 9:2,5,8 | 44:10,16,25 | 82:23 83:1,7 | 123:8,11,23 | 153:7,13,21,23 |
| 9:12,17,20,23 | 45:4,11,14,21 | 83:12 84:11,19 | 124:13,16,21 | 154:2,8,17,17 |
| 10:15,16,20,24 | 46:16,21 47:3 | 85:2,6,16,23 | 124:25 125:5 | 154:20,25 |
| 11:4,7,11,11 | 47:8,11,17,19 | 87:4,8,14,17 | 125:12,19,22 | 155:6,11,17,21 |
| 11:14,16,21 | 47:24 48:2,8 | 87:22 88:1,6 | 126:8,14,14,21 | 156:1,14 157:3 |
| 12:1,4,11,14 | 48:19,23 49:1 | 88:14,20 89:4 | 127:1,4,7,11 | 157:12,18,22 |
| 13:8,18 14:6 | 49:1,8,10,13 | 89:7,20 90:25 | 127:17 128:4 | 158:1,6,10,13 |
| 14:10,15,22 | 49:17,25 50:5 | 92:7,15,20 | 128:19 129:3 | 158:17,25 |
| 15:8,13,19,21 | 50:9,15,24 | 93:6,10,23 | 129:23 130:10 | 159:7,10 160:7 |
| 16:1,6,18 17:1 | 51:4,12,24 | 94:2,11 96:6 | 130:21 131:4,7 | 160:14,17 |
| 17:6,10,13,16 | 52:7,14,18,21 | 96:17 97:6,7 | 131:10,15,20 | 161:2,6 162:5 |
| 17:25 18:4,7 | 53:1,3,7,13 | 97:12,13,24 | 131:24 132:1,5 | 162:12,16,16 |
| 18:10,13,17,20 | 54:5,15,18,23 | 98:1,10,23 | 132:7,12,15,18 | 162:19 163:7 |
| 18:25 19:6,9 | 55:2,4,12,15 | 99:4,9,11,17 | 132:22 133:2 | 164:12,20,24 |
| 19:12,14 20:9 | 55:19,22,25 | 99:22,25 100:4 | 133:13,21,25 | 165:9,15,19,23 |
| 20:14,14,21 | 56:3,7,7,10,13 | 100:4,10,15,18 | 134:3 135:2,6 | 165:23 166:11 |
| 21:6,9,13,18 | 56:20 57:3,7 | 100:23 101:6 | 135:12,17,20 | 166:18,23 |
| 21:23,25 22:7 | 57:10,12,13,20 | 101:11,17 | 136:5,19,21 | 167:3,4,10,19 |
| 22:10,13,16,18 | 58:1,11,13,16 | 103:3,10,20,23 | 137:5,8,11,15 | 167:24 168:3,6 |
| 22:22,25 23:3 | 58:16,20 59:4 | 104:3,5,12,16 | 137:18,24 | 168:9,15 169:2 |
| 23:9,11,17,22 | 59:8,10,15,19 | 105:3,7,24 | 138:4,8 139:3 | 169:6,20,25 |
| 24:5,12,15,18 | 59:22 60:1,4 | 106:4,5,11 | 139:12,22 | 170:5,9,16,19 |

170:22,22,23
171:3,6,8,10
171:17,20
173:10,19
174:10,10,13
174:18,18
175:19,23,25
176:4,4,9,17
176:22 177:10
177:17,25
178:3,12,14,16
178:18,21,24
178:24 179:5
179:11,13,16
179:20 180:2,8
180:11,15,21
181:3,6,13,17
182:5,10,18,21
183:4,7,11,25
184:15,19,23
185:4,14,18,23
186:5,7,12
188:17 189:10
189:17,24
190:3,19,23
191:7,20,23
192:6,11,14,17
193:5,12,16
194:18 195:14
195:18,25
196:6,11,17,22
197:2,12,19,24
198:2,9,13,16
198:21 199:2,6
199:14,25
200:1,7,10,13
201:4,9,18,25
202:6,18,24
203:4,10,10
204:10,13,14
204:21 205:8
205:13,22,22
205:25 206:15
207:6,12,22
208:3,8,25
209:2,19 210:3

210:6,9,13,18
210:20,24
211:2,6,19,24
212:4,7,11,15
212:18,25
213:3,6,7,15
213:19,19,22
213:23 214:5,8
214:10,20,23
214:25 215:5
215:15,17,20
215:21 217:2
217:11,23
218:2,6,13,19
218:25 219:7,9
219:14,18,24
220:2,7,11,14
220:24 221:1,4
221:8,17 222:8
222:10,13
223:1,4,7,13
223:18,25
224:4,8,11,12
224:16,17
225:1,3,14,17
226:5,11,14,19
226:19,22
227:8,21,24
228:8,13,16,16
228:22 229:2,2
229:20 234:4
**on-time** 136:16
**onboarding**
61:8
**once** 75:17
135:18 157:16
160:25 167:2
191:5 195:14
201:4 204:6
**ones** 72:17
111:10 219:2
219:21 227:12
**ongoing** 36:4
57:25 87:1
226:25
**onset** 50:12

184:8
**open** 192:4
204:12 227:4
229:16
**opened** 64:5
228:6
**operate** 65:3
**operating** 33:21
65:1 136:15
202:23 227:20
**operation** 59:1
137:3
**operational**
129:13
**operations**
32:23 33:4,10
33:14 56:18
59:7,20 60:2,5
60:19 61:11
63:18,19
136:12 137:2
202:17,19,20
226:8
**opinion** 25:9
**opportunity**
104:21 191:6
**opposed** 229:12
**oral** 237:17
**order** 1:23 5:9
51:13 140:11
149:9
**org** 56:16
**organization**
47:2 75:16
**organizational**
46:11
**original** 99:7
231:12 234:8
**originally** 36:9
**originate** 102:17
102:21 123:15
**outcome** 238:9
**Outlook** 207:13
207:15
**outreach** 15:5,7
15:9

**outside** 48:14
91:18,18,23
111:9 114:23
129:25 144:18
155:9 180:25
192:6
**overall** 59:2
99:2 139:19
**oversee** 31:3
**overseeing**
58:23
**oversees** 36:17
58:17
**owned** 40:6
**owners** 39:16
**owns** 90:10

**P**

**P** 2:1,1
**P-i-r-l** 160:5
**p.m** 106:13,16
156:10,13
180:17,20
207:4 216:13
216:16 234:6
**packet** 171:2
196:1
**page** 74:17
93:25 95:10,11
95:11,13 105:5
122:16,19
124:5 131:5,6
131:12,25
132:9,11 133:3
135:16,19
140:4,5 141:6
142:12 144:22
146:17 149:15
151:3,4 154:18
158:3 162:18
162:24 164:5
170:23 181:19
181:21 198:17
204:20 212:12
221:15 225:5
235:4
**pages** 70:10

138:9 141:14
143:12 154:19
171:2 206:8,14
**paper** 153:3
**paragraph**
45:23 73:13
79:20 124:6
133:4 134:3
151:18 169:5
169:19 204:15
204:22 205:3,5
205:10 210:22
211:1,25 212:2
213:6,22 214:9
214:16,23
**paragraphs**
204:9
**paralegals** 29:12
**Parenthood**
199:7,11,14,22
**Parker** 181:2,4
**parlance** 27:2
152:1
**part** 8:22 11:1,9
13:10 18:22
19:5 21:14
23:1 31:23
33:7,23 35:18
35:24 37:20
45:23 61:23
68:1,11 80:9
86:23 95:17
127:11 139:18
142:1 153:23
157:4 165:19
166:5 171:17
184:18 218:13
230:24 232:16
**partially** 171:16
**participate** 56:4
203:1
**participated**
134:9,11
**participates**
218:17
**participating**

Page 260

65:21 134:14
135:3
**participation**
26:3 134:18
**particular** 14:6
14:20 41:5
42:21 45:2
46:9 63:5
88:24 92:1
94:19 104:9
132:19 137:4
178:18 180:23
**parties** 238:5
**partner** 30:8,15
40:15,18,19,24
48:6,14 75:6
167:8
**partners** 30:6
48:20
**party** 14:8,14
237:25 238:2
238:10
**pass** 233:24
**passed** 212:19
**passenger** 215:3
**passing** 217:21
217:21 229:22
229:23
**paychecks** 44:14
**payroll** 44:22
**PCS** 200:14,15
200:17
**peer** 33:16 63:14
**pending** 104:22
229:5
**people** 10:17
29:12 31:8,18
37:20 46:19
49:22 66:22
91:13 115:7
124:24 132:20
191:13 192:4
233:19,21
**perfect** 161:25
**perform** 28:18
107:1

**performance**
59:2 136:17
**period** 27:9
60:16 64:6
107:19 108:4
174:25 175:24
188:1 229:9
**permeate** 189:8
189:11,12
**permeating**
189:7
**permission**
187:7
**person** 29:15
31:20 50:2
53:18,19 67:9
67:10 112:17
125:1 153:8
178:16 179:2
236:10
**personal** 6:24
7:9 21:21 22:5
41:12 58:10
79:13 80:12
81:2 86:22
117:13 134:25
159:25 209:25
233:6,10
**personally**
167:19 236:9
**personnel** 8:19
41:6 52:8 66:7
197:20
**persons** 152:6
152:10
**pertaining** 8:9
**petition** 26:19
217:12
**Phoenix** 137:13
137:16 208:6
**Phoenix-based**
209:1
**phrase** 232:17
**picket** 158:20,21
158:23 226:16
226:17

**picture** 117:24
118:1,5 131:6
131:7 213:12
**pictures** 126:6
131:1 161:21
171:18 195:12
**piece** 37:22
153:3
**pilots** 56:10
**pink** 16:10 17:7
25:7,10,14,16
189:22,25
190:5,17,21
191:12 193:14
200:6,25
202:14,25
203:5 230:7,19
231:3
**Pirl** 160:5
**place** 13:13
15:24 16:12,19
24:25 26:1
84:3 176:25
179:15 195:13
195:15 201:13
232:10
**placed** 164:9
165:13
**plaintiff** 1:17
2:2 5:22 6:10
8:25 9:5
**Plaintiff's** 4:16
9:3 93:15 95:5
**Planned** 199:7
199:11,14,22
**planning** 30:20
34:6,15
**platforms** 21:1
**please** 5:5,6,18
10:13 20:6
72:22 86:8,9
96:24 97:15
122:17 145:8
147:13 149:12
161:9
**PLLC** 2:14

**plus** 108:6,8,9,9
108:11
**point** 13:6 32:10
49:17 50:3,5,7
50:9,21 62:9
73:20 79:14,15
81:1 96:10
98:21 105:13
142:24 149:5
152:7 153:17
154:14 169:4
177:3 179:14
185:6,11 186:6
186:12 187:12
187:18 194:7
194:13,14
195:7,9 201:3
202:12,13
227:13
**points** 74:1 80:2
**policies** 3:11
39:17,20 40:4
40:8,11,13
46:3 65:2
67:18,21 72:9
72:13 73:20
79:17,18,19
89:11,19 90:11
90:23 91:1,4
91:21 92:10,18
95:15,18
106:23 124:2
129:21,25
155:9,12
168:14 178:10
**policies/rule**
98:6
**policy** 13:23
31:2 50:3
67:22 68:4,6,7
68:10,12,14,15
71:8,10 72:1,2
72:4,7,8,19
73:21,22 74:4
74:8,13,13,18
76:3,4,11

77:14,25 79:3
79:9,11 80:2,6
80:7 81:11
82:7,10 84:23
85:4,7,18,25
86:15 87:4,24
88:8,8,9,16,17
88:21,22,25
89:5,9,23 91:1
91:8 98:7 99:5
99:8,13,15
103:7 107:8,19
110:13,17,22
111:14,19
113:2,24
115:11 117:3,7
117:22 118:4
118:22 119:2,7
119:12,12,16
119:20 120:18
120:20 122:20
123:4 124:1,8
130:15,19
169:3,8,21
170:2,7,14
171:22 172:1
172:10,20,24
173:4,7,12,14
173:23 174:1
174:12,16
214:13 228:17
232:1,2,5
233:1,2
**political** 188:4
201:1,2,5,13
230:25 231:4
**portion** 18:22
34:9 53:12,25
96:12 138:20
215:19 218:19
232:20
**portions** 11:19
**position** 15:2
23:17 32:25
33:2 34:13
58:20 64:23

218:9 219:14
231:5 233:13
233:16
**positioning**
229:15
**positions** 197:16
**possibility** 122:5
179:17
**possible** 80:21
163:2
**possibly** 49:22
80:23 185:3
**post** 131:17
132:10,19
151:20,21
214:2,17,17
**posted** 117:23
132:8,13
212:11 213:1
213:11
**postings** 220:21
**posts** 125:7
132:23 221:15
221:18 223:2
**potential** 7:23
39:15 76:1
189:11
**potentially** 7:7
52:12 53:21
74:23 77:6
84:13 123:13
155:9 189:8,15
**practical** 187:1
**practice** 66:2
165:24 166:1
**preamble** 96:2,4
96:11,13
**precise** 50:16
187:22
**predecessor**
59:11
**preference**
80:15 233:10
**preparation** 8:4
9:10 10:6
14:24 17:17

24:22 90:22
191:17
**prepare** 20:5
51:14 166:12
**prepared** 46:11
79:9 80:1,3
87:16 107:6
167:16 196:4
**preparing** 79:24
**present** 2:18
11:14 22:19
52:3 112:23
**presented** 46:8
73:16 98:4
168:1,7
**president** 15:6
46:5 58:18,22
59:6 128:10,12
128:17,21,25
129:4,9,15
159:14 160:3
188:5 192:15
217:14,16,18
218:7 227:18
**presidential**
84:4
**presidents** 56:17
128:15
**press** 190:20
**pressed** 12:8
**presumably**
128:4 174:20
**pretty** 25:1
27:20 40:21
47:22 75:9
114:18 129:14
142:6 156:24
190:10 194:7,8
217:19
**preview** 90:9
**previous** 95:13
180:6
**previously**
105:20
**print** 207:18
**prior** 24:13 33:3

34:3,14 36:6
36:25 54:7
55:9 61:3 80:4
83:19 85:3,13
86:7 125:16
130:20 134:12
160:9 162:13
168:3,19
176:17 177:16
179:22 180:6
181:11 182:16
183:12 194:1
199:20 209:17
221:17 222:6
**private** 126:5
132:15
**privilege** 89:17
90:8,14 206:6
218:23
**privileged**
219:21
**privy** 13:25
**pro-** 139:7
**pro-choice**
233:14
**pro-life** 139:7,13
139:16 162:22
162:25 163:17
164:5,6 165:12
233:13,17,19
**proactive**
200:18
**probably** 43:20
43:21 94:1,24
99:6 115:16
187:21 204:7
215:21,22,23
**problem** 161:12
**procedural**
121:2,4
**procedure** 1:22
146:7 237:21
**procedures**
51:16
**proceeding** 56:5
**proceedings** 5:1

54:7,10,16
55:17 127:15
167:25 168:3
179:18,25
182:11 231:8
234:10
**process** 11:2,17
11:18,25 12:2
12:5,15,17
13:1,3 19:3
26:21 35:6,14
37:11,14,17
44:21 51:6,24
52:6 68:25
117:4 140:12
151:2 153:15
153:17 154:7
154:16 156:15
157:1,5 180:22
217:10 228:7
**produce** 8:25
37:6,21
**produced** 1:16
18:2 37:15
96:9 206:7
215:8,12 229:9
**production** 8:22
38:2 161:16
**profile** 213:11
**program** 63:14
78:13 195:10
202:13
**programs** 33:17
63:15
**prohibited**
122:14
**prohibitive**
122:22
**ProLaw** 78:3,9
78:12
**prolonged** 80:1
**promoter**
136:17
**pronounced**
218:4
**proper** 152:22

156:22
**properly** 51:19
**protected** 49:22
49:23,25
139:13 144:4,6
144:10,12
146:8 164:9,14
165:13
**protective**
164:18
**proved** 236:10
**provide** 16:23
30:17 38:18
39:18 50:21
51:5,17 64:24
65:4 80:3 81:3
186:13,20
**provided** 38:19
152:6,10,12,17
152:18,20
153:8,11,14,15
153:18,19
154:15
**provides** 20:17
**provision** 26:18
51:15
**provisions** 1:24
51:9
**public** 15:10
122:25 123:22
236:17
**publicly** 132:20
132:24
**published** 118:5
**pull** 70:25 73:1
93:16 94:7,8
98:13 191:5
**pulled** 71:6
**pulling** 94:3,4
105:7 175:23
**punishment**
232:23
**purpose** 21:2
32:3 208:20
225:22
**purposes** 28:5

37:16 78:11
175:17 208:19
236:11
**pursuant** 1:21
237:20
**pushed** 12:8
**put** 87:13
102:25 164:13
164:18 187:13
206:19
**putting** 221:22

**Q**

**quarter** 127:3
**queries** 79:25
**query** 77:21
84:14 113:11
113:13
**question** 7:13
9:21 12:19,21
22:3 23:24
26:5 28:10
40:3 41:14
43:21 46:18
49:23 84:21
85:12 86:11
89:16 90:5,21
91:6 95:12,14
95:22 96:1
97:14 100:14
102:7,16 104:7
124:4,25
163:21 164:12
164:13 165:25
178:5 183:20
184:8,13
188:14 197:4
211:10 220:5
**questions** 6:12
7:24 10:3 16:5
16:6 17:11,13
19:6 20:7 22:8
22:11 38:25
46:8 52:5
87:20 100:19
178:12 182:15
182:16,19

183:17,21
184:5 203:12
206:4 215:7
221:13 229:3
229:21 230:3,5
231:21 232:11
233:25 234:3
**quick** 10:8 62:10
186:3 188:14
209:23
**quickly** 13:14
80:19 190:10
**quote** 187:22

**R**

**R** 2:1
**R-i-d-g-e** 61:21
**R-i-d-g-e-w-a-y**
61:25
**R-i-t-t-n-e-r**
110:6
**R-o-g-g-s** 95:6
**race** 144:15
**Rachel** 60:16
61:2 142:22
192:22,22,23
**racial** 144:12
**raised** 91:14
**ramifications**
230:25
**Randy** 217:17
227:15 228:8
228:11
**range** 159:1
**ratified** 210:4,7
210:10
**re-** 40:17 222:25
**reach** 92:4
102:23 103:13
174:23 175:8,9
182:15 222:21
222:21
**reached** 58:2,14
92:8 106:19
170:6 183:12
186:8 200:21
**reaches** 83:3

170:3 172:12
**reaching** 13:4
16:21 57:12
168:19 184:24
186:7
**read** 32:13
134:5 138:20
160:24 164:3
204:22 210:22
210:22,25
212:5 213:6,22
214:8,24 236:1
**read-before-fly**
230:13
**reading** 225:5
230:14
**ready** 71:17
73:6,7 107:15
204:13
**real** 10:8 69:11
209:23
**realize** 230:23
**realized** 201:4
**really** 42:19
75:13 83:23
91:5 115:3
184:4
**realm** 30:19
180:25
**reason** 49:21
55:4 141:25
161:16
**reasonable**
52:11 67:11
**reasons** 86:2
182:8 187:1
214:5
**recall** 12:11 24:1
24:3,7,11
25:25 26:3,10
26:13,16,20,23
79:1 81:11,15
82:8 84:6 93:4
99:18,20
110:14,15,18
111:12 113:3

118:11 126:2
127:17 147:19
159:2,20 160:2
168:2 178:19
186:7 188:2
205:16,18
206:4 210:21
212:25 217:10
217:12 220:23
225:10 226:18
228:17,20,22
230:4 231:9,23
232:14,19
**recall-related**
207:10
**recalls** 80:24
**receive** 16:8,14
69:12 123:21
167:19 180:3
190:18,19
193:19 197:3
221:14 230:12
**received** 113:16
126:4 127:22
137:25 138:17
143:23 145:4
180:5 207:3
208:6
**receives** 103:3
192:3 197:12
**receiving** 135:8
136:3 138:5
192:1 194:4
197:15,16
**Recess** 62:23
156:11 180:18
216:14
**recipients** 219:4
**recognize** 71:18
73:8 126:15
141:20 142:14
143:14 144:24
146:19 147:7
148:11,24
149:17 150:21
154:21 157:19

162:6 167:4
171:11 181:24
191:8 200:2
208:3 217:3
222:11 223:23
225:2
**recollection** 20:1
20:6 24:10
25:8,21 26:6
100:17 211:3
211:15
**recommend**
186:19
**recommendati...**
69:4
**recommendati...**
69:4
**record** 1:24 5:3
5:19 10:2,3
46:1 62:21,25
69:3 78:10
79:16 82:1
90:16 94:15
105:10 106:2
106:12,16,19
156:9,13
180:16,20
188:9 206:9,19
216:7,9,11,12
216:16 223:12
229:16 234:1,5
237:18 238:8
**records** 17:23
17:25 18:1
44:11 81:14
**redacted** 218:20
218:22 219:22
219:22
**redaction** 206:6
**REED** 2:9
**reelection**
228:19
**refer** 42:12
79:20 93:11
124:16 133:17
174:2 175:12
176:7 203:11
203:19

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 263

referee 86:22
reference 111:5
    203:21
references
    140:10
referred 18:1
    31:7 54:20
    97:20 187:23
referring 7:2
    42:13 147:10
    147:23 151:10
    151:12,23
    163:14,17
    169:4 175:13
    175:15 205:5
refers 99:1
    144:4 158:25
reflective 221:23
refresh 100:17
    211:3,15
regarding 1:23
    5:10 13:22
    16:8 17:23
    24:1,10 50:14
    50:22 58:3
    78:22 79:8
    92:1,9 107:7
    129:11 130:11
    143:21 144:6
    149:5 150:25
    163:22 168:20
    179:21 185:15
    193:14 208:6
    220:21 222:16
    230:6 233:2
regards 46:19
    134:8 142:18
    224:2 225:10
region 63:8
regions 143:1
Registration
    238:23
regretted 188:10
regular 128:17
    128:23
regularly 29:7

reinstate 187:5
reinstated 114:5
    114:7,12 117:3
    120:1,7,10,13
    120:23 121:7
    214:20
rejected 209:8
    209:10 210:1
    211:15,21
relate 10:12
related 30:22
    238:4
relation 145:24
relations 4:11
    13:11,16,18,20
    14:3,9,11
    15:10 17:24
    18:22 23:15
    28:21,25,25
    29:2,14 30:23
    30:24 31:4
    34:16,22 35:2
    35:5,12,22
    36:2,6 37:16
    39:3,4,6,7
    40:13 43:3
    47:12 48:9,18
    49:3,14,18
    50:10,12,13
    52:14,19,20
    53:2,4,12,17
    54:8 55:5,22
    56:3 75:20,21
    75:23,25 76:8
    77:21 78:2,10
    78:14 84:14
    89:14 92:5,8
    92:13 101:10
    101:13,15,23
    101:23 102:2
    102:11 103:11
    106:20 107:10
    126:25 127:5
    138:22 139:2,4
    139:11,17,20
    139:23 140:1

143:18 144:2,6
    144:17,18
    145:3,12,18,20
    146:10,24
    147:1 149:21
    150:15 155:3
    155:10 163:4,7
    163:18 164:8
    164:17,20,24
    166:9,21 167:6
    167:7 169:14
    169:16,24
    170:2,5 171:15
    172:12 181:11
    182:2 185:1
    200:17 208:5
    217:8,15,18
    218:5,8,12,16
    225:8,21 228:1
    228:2
relations' 50:16
    88:7 170:9
relative 38:14
    238:7
relay 81:4
relevant 37:23
    38:16
religion 101:9
religious 27:25
    28:5 100:25
    101:11,17,21
    102:3,10
    104:17,22
    113:20 144:13
    164:21,25
    165:4,7,21
    231:21 232:5
    233:7
religious-acco...
    102:17 104:13
remember 27:4
    67:20 91:22
    96:10,12,15,16
    99:22,25 100:3
    100:6 110:3,10
    110:11 116:19

116:22,25
    117:15,21,25
    118:3,8,9,17
    118:21,24
    119:1,13
    120:19 125:9
    125:22 130:5,6
    147:24 158:22
    158:24 160:7
    168:5,22,22
    179:4 182:23
    183:2,3,10
    185:21 186:3
    194:5 203:15
    211:8
remotely 5:8,14
removed 35:17
    35:17
reopen 206:17
    229:5,16
rep 206:23
repeat 12:21,22
    41:14 42:10
rephrase 40:16
    56:21 109:20
report 11:23
    28:22,25 29:14
    29:17 30:2
    45:14 47:22
    56:1,16,17
    59:5,20,22,24
    60:12,13 61:4
    61:13 63:23
    64:19 67:14
    101:19 122:3
    130:22 150:12
    150:15 151:25
    152:5,10,14,16
    152:18,20,22
    153:23 155:1,3
    155:6 166:12
    166:14,16,16
    167:10 171:15
    193:16 198:23
    223:1
reported 43:23

47:19,24 49:10
    49:12 52:22,24
    60:24 61:16
    63:3,25 64:17
    64:25 66:23
    75:4,18 99:14
    99:21 100:1
    101:18,22
    104:18 109:13
    111:18 119:5
    119:11 123:2
    123:24 125:23
    125:24 126:2
    130:18 135:7
    154:5 159:7
    167:15 215:2
    228:12
reporter 1:19
    5:6,7,13 61:22
    62:1 67:25
    69:5,10,18,24
    76:15 97:3,6
    97:10 146:13
    216:6,22
    223:11,16,20
    234:1,4,7
    237:14
Reporter's 3:8
    237:1
reporting 5:14
    46:20 47:21
    61:3 66:12,14
    121:22 122:14
    122:22 152:25
    238:20
reports 13:21
    15:5 29:2,5
    30:2,5 31:23
    46:6,22 59:6
    60:9 63:21
    66:16 107:4,9
    107:22,23,25
    108:4,8 109:20
    110:23,24
    111:4,20,23
    112:10,18

Page 264

123:21 150:9
150:10 167:16
**repost** 222:19,24
**represent** 82:2
113:10 219:20
**representation** 121:6
**representative**
6:18 30:23
31:22 34:23
49:6 52:3,15
52:19 102:25
104:8 181:2
**representatives**
24:7 49:18
53:17 92:7
100:1 185:2
**represented**
42:4,15
**representing**
6:10 91:13
151:8 221:21
**request** 37:8
103:4,12
**requested** 32:2
87:13 237:24
238:1
**requesting**
151:19,19
**requests** 101:1
104:13 113:16
**required** 166:17
**requires** 35:10
**research** 36:2
**reserve** 80:13
229:5 234:2
**reserving**
206:17
**reset** 232:7
**resolved** 183:22
**resource** 30:6,8
30:18 48:20
166:9 167:8
**resources** 28:23
29:6 30:5,15
30:22 31:5,6

31:10,11,18
39:3,6,10,12
39:21 40:14,17
40:18,24 41:18
41:19,20 43:1
43:17 45:7,9
45:12,15,18
46:13,15,22
47:4,9,14 48:5
48:13,15,16,18
48:19 65:20
163:8 165:6,10
**respect** 51:5
79:25 80:4,6
107:8 163:19
232:13,25
**respective** 56:17
103:14 172:14
**respond** 138:14
148:2 194:4
**responds** 136:21
137:18
**response** 4:16
37:7 93:14
95:1,5,12
153:5
**Responses** 93:14
**responsibilities**
64:24
**responsible**
30:24 59:1
100:25
**responsive** 38:6
38:21
**rest** 105:19
187:13
**restroom** 62:10
**result** 11:25
121:6 154:11
222:1
**resulted** 108:1
108:15,24
110:25 111:24
**resume** 106:18
107:15
**resumed** 210:2

**retaliation** 72:5
74:5 76:7 87:6
88:10 89:2
172:1,20,24
222:20
**retire** 127:1
**retired** 126:25
**retrieve** 38:9
**retroactively**
232:2
**return** 74:15
**returning**
113:22 147:23
**revealed** 154:9
**reveals** 89:22
**review** 8:3,7 9:2
30:20 70:3,18
103:6 126:12
135:19 138:9
138:18 157:16
157:17 160:25
161:7 167:1
171:9 183:7
188:8 191:6
204:7 217:1
224:21 237:22
**reviewed** 8:1,5,8
8:12 70:4 71:9
138:25 167:2
167:25 220:17
**reviewing** 46:2
71:15 135:16
168:2 207:24
**reviews** 122:24
**revise** 90:11
**revised** 88:2
99:9
**revisions** 87:24
162:13
**reword** 96:18
199:21
**Ricky** 212:11,16
212:17
**Ridgeway** 61:21
61:24,25 63:9
63:13 142:22

**right** 2:3 11:16
12:14 14:10
17:10 18:13,17
19:14 21:13
30:4 31:14
32:8,14,24
33:25 38:23
42:18 48:9
49:2,2,23 50:9
50:15 53:3
55:3 56:3 57:1
57:4,20,23
58:16 61:6
62:18 63:1
64:10 66:23
69:25 77:1,3
81:18 84:16
85:10 87:17
88:20 92:15
97:10 98:2
106:9 109:23
110:19,24
112:25 120:1
132:5 140:3,22
142:11 144:21
147:15 149:11
150:17 156:8
158:1,3 159:10
160:17 161:13
171:11 175:23
178:24 181:6
183:11 190:16
196:2 200:19
205:2 206:17
210:18 211:12
214:8 215:5
216:17,23
219:9 221:8
222:8 223:18
229:5 231:20
**rise** 172:22
**Rittner** 110:5
114:10 116:4
117:21 214:12
214:17
**Road** 2:4

**Robert** 158:20
158:20,23
**Roggs** 4:16 95:5
**role** 7:20 18:21
33:7,11,23
34:11 35:6
36:2,7 39:22
40:1,15,19
50:16 63:7
88:7,11 91:16
182:11 232:22
232:24
**roles** 28:18
**room** 20:25
**Rosenberg**
213:9,10,15
**roughly** 11:6,7
11:10 18:15
22:17 57:17
66:19 81:7
100:20
**routine** 136:19
**routinely** 152:10
**rule** 6:13 96:2
237:21,22
**rules** 1:22 93:7
95:21,23 96:3
96:5,20 97:18
98:7 133:7,9
133:15,18,18
133:20,22
134:1 172:17
230:22 237:21
**run** 113:10,13
**running** 112:17
**Russell** 218:6,7
**Rutherford**
10:22 15:6,16
18:11 21:16
192:13
**Ryan** 217:14
227:14 228:9
228:11

_____

**S**

**S** 2:1
**S-i-k-e-s** 60:8

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 265

**S-l-o-u-g-h**
110:8
**S-t-e-p-h-e-n-s...**
125:21
**save** 87:8
**saves** 80:23
**saw** 87:10
139:19 195:12
**saying** 42:9,24
48:11 69:19
74:6 82:1
145:8 160:15
**says** 73:14,19
74:2 75:3
94:25 95:14,19
96:11 98:2
123:1 134:5
135:24 136:10
136:22 137:19
147:13 151:7
151:18 158:3,6
158:20,25
159:12 162:21
162:24 163:16
171:20 172:6
173:21,22
174:18 175:3
176:12 191:24
192:17,21,24
193:12 196:6
198:2 200:20
205:6,10 209:3
210:14,21
222:18,19
**scenarios** 109:13
**schedule** 55:10
**scheduled** 151:2
**scheduling** 55:7
129:11 219:16
**Schneider** 3:18
3:20,22 10:22
11:3,8 13:2
18:8 64:14,16
66:25 133:24
140:15 141:25
143:17 146:23

150:25 167:14
167:15,16
176:11,14
182:10,19,22
182:25 183:5
186:4
**Schneider's**
157:20 162:11
167:5 233:2
**scope** 41:11
45:18 58:7,8
79:7 104:25
134:20 155:10
159:24 209:23
**score** 136:17
**scratch** 14:18
15:14 42:20
44:18 45:4
**screen** 42:8
131:9
**screenshot**
131:9
**screwed** 141:14
**scroll** 95:13
**scrolling** 71:8
**se** 230:23
**seal** 236:14
**search** 38:5
**searches** 38:11
**second** 41:9 54:3
70:9 71:25
74:17 120:4,6
120:9,13,16,20
120:24 123:19
151:3,5,6,17
162:17,23
207:3 209:20
210:4,6 211:8
211:16 223:9
**second-to-last**
181:20
**section** 57:25
79:21 196:3
200:20
**secure** 26:19
**see** 18:13 27:15

62:15 68:18
72:21 73:12
79:21 80:16
81:19,21 85:6
87:19 96:8
97:21 98:1
100:18 102:12
108:17 114:2
127:7,11,14
131:4,5,21
132:20 134:6
135:6,12 140:3
157:12 158:1
168:6 181:17
190:23,24
191:2 195:8
198:16 203:10
203:14,18
205:25 206:22
207:14,19
211:24 215:5
215:21 216:19
218:2 222:8
224:17 226:20
229:2
**seeing** 70:6 80:7
98:10,18 139:8
161:15
**seek** 28:1,4
229:11
**seeking** 102:22
211:12
**seeks** 232:5
**seen** 127:9 217:4
**send** 44:25
80:16 146:9
151:20 182:9
208:8 209:4
225:20 230:15
234:7
**sending** 97:9
136:5 142:17
143:6,18 145:5
176:15 182:3,6
196:8 200:21
208:13

**sends** 135:23
140:14 151:17
173:20
**senior** 15:6
23:14 32:23
33:8,12 53:2
56:18 58:24,24
59:6,16,19
60:6,12 61:4,8
61:12,15 62:4
63:3,4,10 75:6
75:7,9,11,12
75:13,15
126:24 127:5
129:17 142:23
145:3 149:23
192:15 217:8
217:17 218:11
222:16
**sense** 28:21
146:15
**sensed** 187:19
**sent** 73:11 81:23
94:24 125:13
126:3,19
131:17,20
132:2,15 134:6
137:9 139:1
147:22 176:5
176:18 177:8
193:3 194:20
194:25 198:6
198:10 203:22
204:2 206:8,25
207:16 208:10
208:23 220:24
222:14 225:18
**sentence** 122:13
122:23 133:5
151:6,7
**separate** 13:12
13:19,24 21:17
31:12 35:19
40:15,19 48:8
56:13,15,19
68:7,14 72:9

198:14 228:1
**series** 198:17
**serve** 37:1 40:12
63:7
**served** 7:21
34:18 35:1
36:21 63:17
**serves** 58:24
**service** 200:18
**services** 56:8,11
58:17 59:5,17
90:12 196:7,7
196:10,18,25
197:3,6,13,20
197:22,25
198:3 230:6
**serving** 203:8
**set** 22:6 53:21
65:3,23 91:25
93:15 183:17
**sets** 105:10
**setting** 52:2
**seven** 24:20 32:7
52:11 77:15
81:11 82:10,14
108:9,14
111:17 112:2
113:19 114:3
130:11 206:22
**seven-year**
108:4
**sexual** 50:3
67:24 68:2,9
68:14 72:4,9
72:19 74:4
76:2,6 80:7
87:5 88:10,17
89:1 111:18
113:2 119:11
170:1,7 171:22
171:25 172:19
172:23 173:12
**sexually** 215:2
**Shaffer** 4:4,11
10:23 17:18,20
17:22 18:5,14

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 266

55:15 56:1
149:22 182:3,6
185:3,19,25
208:5 225:8
**shaking** 87:11
**share** 166:18
**shared** 165:11
**Shaw** 60:8
**sheer** 86:20
**shelve** 87:18
**shift** 189:17
221:9
**shifting** 87:4
**shooting** 159:1
**shop** 36:24
**short** 15:20 25:1
27:20 34:7
166:16
**shorthand** 1:19
79:19 237:13
**shortly** 27:6
**shown** 7:24
**sic** 60:17 110:6
115:9 133:14
140:1 178:4
221:11
**side** 35:8 181:8
**sign** 114:14
120:12 187:24
213:13
**signature** 3:7
234:8 235:1
236:1 237:23
**signed** 26:19
27:8,12,15
82:3,5 115:18
176:11
**significance**
217:23,25
**Sikes** 60:8
**similar** 78:19
117:18 226:1
**simple** 55:7
172:15
**simply** 83:10
221:7

**Sims** 1:10,15 3:3
4:4 5:8 6:3,7,9
10:10 19:16,24
20:15 45:19
46:10,18 58:9
70:3 73:5,24
79:10,13,24
80:24 81:1,6
87:15 96:22
98:18 105:1
107:6 123:20
134:24 156:14
159:25 168:12
176:12 180:21
207:23 209:24
216:17,25
223:22 230:2
233:5 235:2
236:1,5,9
237:10,16
**sir** 7:12 38:3
39:9 86:11
97:23 112:3
122:21 223:20
**sit** 55:10
**site** 21:11
**sites** 21:9 125:3
**six** 64:5,10
115:23,25
116:10 229:18
**skip** 212:1
**slash** 80:5
**Slough** 110:7
114:11 116:5
**Slough's** 119:2
**Smith** 2:9 160:3
196:18,19
**social** 20:18,19
21:1,6,7,21
22:5 23:1
40:11 46:3
67:22 68:6
71:10 72:2,20
73:22 74:13
79:11,17,17
80:2 82:7

83:23 84:23
85:4,7,18,21
85:25 86:14
89:5 91:1,1,8
91:21 92:10,17
92:22 95:20,24
96:13 98:6
99:5,7,12,15
100:2 107:8,18
110:13,16
113:24 115:10
117:3,9,14
119:6,16,20
120:18,20
121:17,18
122:1,3,20,24
123:2,5,6,9,11
123:14,25
124:8,12,13
125:3 129:20
129:23,25
130:15,19,22
160:10 177:23
189:6 195:8,12
198:24,25
199:3,4 200:16
213:16,20
214:13 220:21
228:17
**social's** 95:16
**software** 78:12
**sole** 32:3 61:10
**solely** 30:24
64:20,21 65:22
78:9
**somebody** 42:13
43:6,22 77:9
81:22 102:22
109:13 121:22
155:18 182:8
198:7
**Sonya** 4:9 58:18
59:10,15,20
126:22 137:24
176:12,18,20
176:24 177:3

224:1
**Sonya's** 60:9
**soon** 219:20
**sooner** 27:10
**sorry** 5:3 6:8
12:18 25:18
39:5 42:6,8
43:12 48:12
55:25 59:16,23
61:22 62:8
66:24 67:25
69:8,22 70:9
76:15 77:2
80:5 88:23
92:22 95:4
96:7 97:4,21
101:19 109:4
111:21 117:10
119:19 122:18
126:1 138:23
140:6 146:13
151:6 152:9,19
167:22 174:4
178:5 183:19
191:22 197:4
202:18 207:13
207:24 208:22
212:21 219:4
223:8 224:13
224:25
**sort** 32:8 38:18
43:24 44:25
51:4 52:7
68:24 75:7
86:21 91:25
102:2,9 103:8
194:6,14
195:19
**sought** 155:12
**sound** 62:18
**Sounds** 106:8
**sourcing** 39:15
**south** 96:4
**Southwest** 1:5
2:7 3:11 5:25
6:13,14,18,23

7:1,3,8,20,22
8:19,22,24 9:9
10:5 11:18
13:12,21,23
14:24 15:3,12
15:22 16:7,10
16:14,21,23
20:23 21:2,4,5
21:11,20 25:22
25:24 29:10,20
30:17 31:2,7
31:15 32:17,20
33:3 34:5,14
34:23 35:3,19
39:17,20 40:3
43:8 44:10,13
44:20,22,23
45:1 46:15
56:25 58:2,25
66:1 67:8 70:6
71:22 72:2,3,7
73:18 75:10
86:23,25 90:10
91:3,9,10 92:3
92:24 93:7
95:18 96:4
99:2,4 102:24
102:24 104:23
106:20 109:14
109:17,21
113:16 114:5
115:6 116:17
121:9,12
122:24 123:1,2
123:24 125:2,5
125:9,16
131:14,25
132:23 133:21
134:7,13,16,16
134:22 135:2,4
136:8,25 152:1
153:24 154:3
156:15,18
157:3 159:11
165:20 168:14

Bradford Court Reporting, LLC 972.931.2799   www.bradfordreporting.com

174:14,22,23
175:9 176:1
181:14 184:10
188:15,23
189:1,5 190:11
191:24 192:17
193:22 194:20
195:20 199:4,9
199:10,15,23
201:10 202:6
205:10,15
213:1,16 215:7
218:17 219:17
221:13,18,20
221:21,24,25
229:12 230:20
231:18,25
237:6
**Southwest's**
17:1 25:19
26:2 37:6 74:4
87:4 93:14
95:17,20 97:16
113:6 121:16
136:1 181:8
211:1 212:5
space 161:24
**Spand** 212:11
212:16,17
speak 10:10
15:13 17:20
35:16 46:5
178:19 190:9
195:1
speaking 6:22
7:6,20 16:2,2
140:10 151:20
173:11
speaks 79:12
96:22 168:12
specific 22:3
26:3 29:15
85:11 93:4
94:14 96:1
99:19 107:6
117:15 118:21

120:19 130:1,3
132:11 173:4
177:25 183:21
184:5,7 204:8
208:20
**specifically**
15:24 16:7
21:25 24:8
26:24 28:4
46:7 50:25
78:14 91:12
96:13,15
130:18 143:22
163:3,24
177:17 179:5
182:24 185:21
189:4
**speculation**
123:19,19
134:22
**speed** 181:8,14
182:12
**spend** 215:23
**spike** 84:17
**split** 104:6
163:13
**spoke** 10:11,17
17:17 20:4
135:10 195:2
**spring** 34:20
**Springfield** 2:5
5:22
**Spurlock** 2:18
82:3
**staff** 48:2 63:21
66:7,10,15,19
66:21
**stage** 51:14
52:13 54:24
142:3 154:8
173:24
**stakeholder**
227:18,25
228:4
**stand** 101:4
124:19 170:22

212:7
**stand-alone**
93:12
**standard** 142:6
146:6 165:23
165:25 195:11
217:19
**standards** 65:2
**stands** 136:12
137:1 200:18
**start** 34:11
101:20 107:16
135:16
**started** 37:17
86:2 180:3
193:19 205:23
**starting** 151:4
**state** 1:20,23
5:10,18 175:7
236:7,18
237:14
**stated** 1:24
**statement** 70:7
71:24,25 73:19
92:25 113:6
152:2
**STATES** 1:1
237:2
**stating** 126:3
**stay** 54:13
**stayed** 231:14
**stenographic**
5:15
**step** 12:25 54:7
54:9,16,19,19
54:22 55:6,6,9
55:10,16,16
56:4,4 127:14
166:5 167:25
168:3 179:18
179:24 180:22
182:11,17,18
182:21 188:7
**Stephensen** 3:14
3:16 12:13
125:21 126:19

135:7,23 136:6
137:19,21
145:6
steps 12:16
231:22
**Steve** 60:7
steward 36:25
**Stone** 3:14 12:6
13:13 24:1,3
53:11 125:6,13
125:15 126:18
127:18 128:5,7
128:9 129:24
130:4,8,11,17
130:21 131:17
131:21 132:3
132:16,22
133:5 134:4
145:5 156:19
157:4,21,23,24
187:20 217:9
225:10
**Stone's** 136:2,3
138:19
stood 48:13
stop 62:10 71:12
159:12,22
stopped 190:10
194:17,19,19
storm 129:12
strategic 34:6,15
stream 30:8,13
48:8
**Street** 2:15
238:21
strictly 129:4
strike 96:18
114:21
structure 46:12
47:21 56:16
stuff 53:24
105:11
style 167:13
**Suarez** 29:24,25
30:1,3 219:6
219:23

**subject** 43:25
153:10,18
189:18
**submitted** 211:4
211:9
**Subpart** 212:8
**Subparts** 212:3
subscribed
236:10 238:15
subsequent
12:14,16
subsequently
157:7
succession 30:20
sufficient
205:11
suggested
139:10,13
suggestive 215:2
**Suite** 2:4,9
**Sullivan** 151:11
summarizing
200:6
summary
200:20 232:12
summation
166:19 191:11
**Sunday** 203:22
supervisor 75:5
142:9 150:5
supervisors
66:14 89:13
supplied 8:20
supply 105:21
support 16:11
33:17 63:15
88:11,12,14
169:16 201:12
221:25,25
supported 25:15
171:16,17
supporting 17:3
suppose 196:13
sure 9:19 10:9
12:20 19:24
31:5 42:11

Page 268

47:21 49:6,9
49:12 53:9,21
62:19 65:10
68:13,17 71:1
80:25 84:14
90:18 91:5
92:15 96:25
105:12 111:3
114:19 115:8
141:12 152:21
152:24 156:3,3
156:21,23
158:2,15 161:2
161:10,13
162:1 164:16
165:9 180:14
184:19 197:12
204:11 205:2,4
206:20 211:11
215:6 224:22
227:2
**surgery** 147:21
**surrounding**
188:4
**Susan** 25:15
**suspect** 96:9
**suspension** 83:2
83:5,12 108:1
114:13 117:5
120:1
**suspensions**
83:16,18,20,21
86:2 108:24,25
109:1,7
**Suzanne** 3:14,16
12:13 125:21
125:25 126:2,3
126:19 135:7
135:22 145:6
**SWA** 4:16 94:25
94:25 95:5
191:25
**SWA_Carter_...**
95:5
**swear** 5:6
**switch** 105:8

**sworn** 6:4
237:17 238:15

___

**T**

**T-h-o-m-p-s-o-n**
110:7
**TA** 209:4,8,11
209:19 210:1,2
210:4,6 211:4
211:8
**tailored** 46:7
**take** 11:6 32:11
50:19,20 52:12
62:9 70:24
73:1 126:13
156:4 163:18
174:22 180:12
215:23,25
216:4 222:5
**taken** 1:17 62:23
156:11 180:18
216:14 232:18
238:6
**Talbert** 110:8
114:12,14
119:23,25
130:9 208:7,24
213:25 222:17
223:1
**Talbert's** 116:23
130:7
**talent** 30:20
**talk** 9:25 10:1
81:2 128:24
136:16 138:24
159:13
**talked** 10:12
11:11 151:14
176:14 190:12
194:12 206:16
206:16 232:17
**talking** 14:23
54:1 79:22
82:8 111:8
139:7,12,19
164:1,4 174:3
175:17 210:16

219:3
**Tammy** 4:4,11
10:22 17:18
18:5,14 55:15
56:1 149:21
150:3,4,7,9,10
182:2,5 185:3
185:19,25
208:5,16,17
225:7,8,12,17
225:20
**target** 159:1
**task** 107:1
**tasked** 20:25
41:6 42:22
**tasks** 39:14
**team** 13:8 20:19
20:19 21:6
23:2 27:23,23
28:6,11,14,20
28:24 29:5
30:4 31:24
33:13 37:16
39:4,5 63:18
100:25 101:6
101:15,18,24
102:12,18
103:1,1,3,17
103:21,24
104:5,8 121:17
122:4 123:5
124:12,14
142:18 143:20
165:15 166:21
169:24 182:8
191:13,15,18
192:7 198:24
199:4 200:14
202:9 218:18
228:10,14,18
**teams** 191:25
228:24
**technically** 40:4
57:22
**telephone** 179:2
238:22

**tell** 8:12 16:13
19:19 26:24
71:2 80:1
106:24 122:16
128:1 140:5,18
141:9 149:11
153:24 159:13
178:6,8 179:5
184:9 186:16
193:24 194:2
207:12 208:16
**telling** 8:10
194:1
**tentative** 58:2
58:12,13
209:12,15,20
211:14,20
**ter-** 119:18
**term** 37:4 75:14
156:25
**term-** 115:10
**terminate**
168:21 174:23
175:9 176:2
**terminated**
72:14,16,17
93:8 100:9
109:25 110:3
110:12,16
111:13 113:1,5
113:19,23
115:10 117:2
119:15,19
120:16 121:5
130:13 158:21
158:23 214:13
214:18
**terminating**
177:19 178:9
179:8 184:12
**termination**
3:13 8:14 11:1
11:17 12:17
65:21 73:10
83:6 96:19
97:16,22,25

106:22 111:1
111:24 117:4
120:3,4,5,6,9
121:3 173:6,17
173:21 174:19
174:21 175:4,7
176:5,10 177:4
177:7 184:10
184:17,20
185:13,19
186:9,22 214:6
221:17 222:6
**terminations**
78:21,25 80:4
81:10 82:24
85:3 107:5
108:16,18,21
109:8,24 177:1
**terms** 26:16 27:2
54:21 65:3
79:18 83:16
87:8 140:10
188:1 221:24
**territory** 104:9
**testified** 6:4
90:10
**testify** 80:2,24
86:13 87:16
**testifying** 19:25
79:13 81:2
**testimony** 86:7
86:10 199:20
230:3 231:9,23
232:14 237:18
**Texas** 1:1,20,21
2:10,15 5:11
5:16,25 6:2
237:2,14
238:21
**thank** 62:1,17
107:12 112:20
192:21
**Thanks** 62:20
195:22
**things** 10:11
33:6 42:11

Case 3:17-cv-02278-X   Document 263-7   Filed 06/13/22   Page 91 of 94   PageID 8978
CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 269

51:18 76:2
84:3 90:13
160:5,6,11,15
177:15 221:9
**think** 20:9 23:6
30:14 32:12,13
34:17 39:1
48:16 53:11
54:1 63:1
69:15 73:13
80:11 85:11,23
87:9 90:4
92:16 93:17
95:25 97:2
99:6 102:6
113:24 114:4
119:24,24
123:1 133:5,6
143:12 150:1
155:2 166:24
170:17 173:20
181:19,23
185:17 190:25
191:21 192:9
194:8 199:13
203:15,16
205:20 206:1,5
206:10,13
214:11 215:18
220:4 221:10
229:2
**third** 67:4 68:10
70:10 72:1
73:13 122:18
131:6 133:4
140:17 162:18
191:21
**Thomas** 20:2,10
22:25 23:1,4,6
115:9,12,14
**Thompson**
110:7 114:11
115:15,16
116:4
**Thompson's**
118:24

**thorough** 51:6
51:13
**thought** 115:13
187:12 188:22
231:1
**thoughts** 166:8
**threatening**
160:13
**three** 37:4 66:11
66:21,24
106:23 114:3
137:1 148:1
206:7,14
**time** 5:4,5 13:16
15:17 27:2,9
34:7,7,18
35:15 37:15
47:20 49:9,11
51:18 52:4,7
52:10,13,22
60:16,20,25
63:17,25 67:3
80:23 82:5
90:19 91:25
93:18 102:22
105:7 107:19
112:11 119:15
119:19 120:13
120:16,21,24
127:4,9 137:15
137:16 140:19
144:1 154:2
155:18 156:1
158:7 160:11
161:7 175:24
179:16 188:1
197:14,15
206:21 207:4,4
211:11 215:23
216:4 217:4,13
217:17,18
219:15 225:5
226:1,23
228:21,25
232:8 234:3
238:10

**times** 99:23
121:8 178:20
187:18,24,24
187:25 228:5
**timestamp**
207:2
**tipped** 139:16
**title** 28:12 32:22
49:9 52:18
53:1 61:5,7
75:12
**titles** 95:3
**today** 6:11 80:9
87:16 93:22
206:22 207:14
215:12 230:4
231:6 233:6
**today's** 5:3
17:17 24:22
**told** 128:4 178:3
187:5 188:9
195:18 226:14
**toll** 86:21
**Tom** 62:4 63:10
63:14 142:22
**Toni** 145:8,10
145:11,13,14
146:4 147:10
147:14,14
**tool** 33:19
**top** 81:15 133:12
140:9 141:10
158:4 174:5
198:2 210:12
225:5
**topic** 25:24 27:1
27:5,6 46:1
78:8,22 79:8
79:12 134:21
156:1
**topics** 10:13,18
45:24 46:7,14
198:25
**TOPS** 136:22,24
136:25 137:1
**total** 37:25

53:10 64:2
82:21 107:4,4
107:5,18,22,23
108:4 109:6
110:23 111:4
111:16,20
206:8
**totality** 166:15
**totals** 82:19,20
82:21
**touch** 50:3,5,7
76:1 102:25
163:2
**track** 188:9
**Traditionally**
152:3
**training** 65:5
137:2,3
**transcript**
237:17,23
**transfers** 44:24
**Transitions**
101:5
**TRANSPORT**
1:5 2:12 237:6
**traveling** 194:22
**treating** 101:8
**trending** 198:25
**trial** 234:3
**tried** 91:20
**true** 143:5
197:11 198:15
236:2 237:18
**Trump** 15:23
84:5 188:5
**truthful** 20:1
**try** 7:17 9:25
10:1 12:22
79:24 90:13
94:8 105:19
134:5 173:1,10
**trying** 41:16
86:12 90:4
159:14 161:24
165:12
**tumultuous**

188:1
**turn** 82:6 87:20
131:4 141:5
148:8 154:17
172:13 181:17
189:25 190:4
215:8
**turned** 189:22
191:12 200:6
230:19
**turning** 16:9
17:7,7 74:16
105:3 131:24
147:4 149:7
190:17,20
200:25 202:25
203:5
**tweet** 199:6,12
199:16,23
**Twitter** 21:1
**two** 20:12 23:19
53:16 55:5
63:9,10 67:2
72:9 114:3
119:21,22,22
138:9 150:18
161:14 174:7,7
178:9 206:5
212:19 228:23
**TWU** 6:2,12
23:16 24:1,3
26:1,17 35:1,3
36:12,15 42:4
42:16 43:7
44:6,22 56:25
84:6 134:8,13
187:20 217:10
220:22 224:3
228:3,18
**type** 27:25 41:17
50:25 77:7
78:10,17
167:10 202:15
**types** 26:4 129:8
**typical** 129:14
150:1 166:5

Page 270

typically 49:18
53:4 167:16

**U**

uglier 187:2,11
187:16
Uh-huh 197:7
ultimately 29:17
30:2 36:5 59:1
76:12 166:10
187:13
umbrella 90:12
unaware 193:22
undermining
188:22
understand 6:22
7:2,5 9:5,22
12:23 41:16
42:6,12,17,24
48:12,17 65:10
92:16 108:19
115:5,17 116:3
140:22 151:8
173:9 178:5
183:20 184:20
204:24 206:18
228:9,16
230:25 233:5,9
understanding
6:15 16:20
18:3 22:4 23:8
39:8 48:10
85:8 91:5
92:19 107:16
117:13,23
120:17 121:16
123:10 132:19
132:21 225:25
230:20
understood
12:18 102:6
115:8
underway 227:6
227:7
underwriting
17:4
unfairly 101:9

unfolding 194:8
**Unfortunately**
93:18
union 1:5 2:12
24:7 27:2
35:25 36:4,23
42:12 44:19,23
44:24,25 51:20
51:22,25 52:3
52:4 58:8 91:2
91:9,20 92:1
99:25 119:5
121:6 128:15
128:16,20,25
129:4,9,14
159:14,17,20
160:3 226:16
231:13 233:8
233:11 237:6
union's 134:17
unionized 43:3,5
unit 33:24 42:4
42:15
UNITED 1:1
237:2
unjust 184:10
184:17
unsuccessfully
211:4
uploaded 37:15
use 31:15 32:12
70:15 94:18
153:1 156:25
166:8
user-friendly
94:3
usually 54:21
utilize 75:14
utilized 38:11

**V**

v 6:12 59:16
vaginas 171:19
171:21
vague 109:18
163:12,20
Vaguely 118:10

Van 227:19,21
variety 8:13
29:11 39:14
182:7 220:20
various 39:1
226:3
vary 83:16
Vegas 12:7,12
125:14,20
126:19
Ven 227:19,21
venue 200:23
201:1,6,15
verbal 178:14
verification
57:18
version 98:17,19
98:21,23,24
162:14 185:3
versus 75:14
vice 15:6 46:5
56:16 58:18,22
59:6 192:15
217:14,16,17
218:7 227:18
video 126:6
212:12 213:1
**VIDEOGRAP...**
2:18 5:2 62:21
62:24 68:21
69:2,17 73:2
94:8,20 95:2,7
98:14 100:20
105:9 106:12
106:15 156:9
156:12 180:16
180:19 216:8
216:12,15
234:5
videos 171:24
**VIDEOTAPED**
1:9
view 13:6
184:11 185:6
185:12 186:6
189:7 201:3,5

viewable 132:24
viewed 198:25
views 200:23
201:1
violate 95:24
96:1,2 117:6
117:22 118:4
171:21,25
172:9 230:22
violated 67:17
74:8 93:7
95:16,20 96:14
97:17 134:1
169:8,22 170:2
170:14
violates 133:6
173:7
violating 67:18
72:18 74:12
77:13,24 79:2
82:10 92:21,24
111:13,18
113:5,23
115:10 117:2
119:15,20
130:15,19
178:4,7,9
violation 31:1
73:18 74:3,7
76:10 88:8,16
96:20 98:5
99:15 110:12
110:16 116:23
117:1 118:22
119:2,6 120:18
120:20 123:14
123:25 133:22
169:3 170:7
172:18,23
173:4,15,25
213:17,20
214:14 232:5
232:13
violations 83:23
85:7 91:2,8
93:9 99:13

100:2 107:19
110:21 116:20
117:16 123:12
168:13 173:13
177:20,21
178:1 228:17
228:20 232:2
233:3
Virginia 2:5
5:23
volume 86:20
voluntarily
134:10
voted 209:4,5,19
votes 209:6
VP 45:6,9,12,15
56:18 59:4,16
154:24 155:1,4
155:7
VPs 192:11
VS 1:4 237:5

**W**

w-a-y 61:21
W-e-b-e-r 45:10
wait 81:19
210:11 223:9
want 13:14
23:18 27:8
31:5 32:11
61:2 62:13
68:21 80:13
86:23,24 90:18
93:10 94:17
95:13 97:14
106:18 115:20
131:4 141:12
152:21 156:21
157:15 159:11
160:24 161:2
161:12 162:1
164:3 169:15
173:22 181:19
189:15 204:11
205:2 206:4,10
206:12 207:9
207:20 215:6

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 271

215:25 216:1
224:22 226:19
**wanted** 19:20
21:20 121:14
146:3,5 162:16
163:3 185:6
187:5,14
188:11 208:18
208:21
**wanting** 69:20
155:8
**wants** 174:11
**warning** 83:5
**warnings** 109:8
**warrant** 67:12
**Washington**
134:21 194:23
201:14
**wasn't** 55:20
132:15
**wasting** 90:19
**way** 43:18 48:12
52:5 61:21
69:11 70:17
84:11,21 87:1
87:2 89:24
90:5 102:16
104:7 114:20
139:21 150:4
163:1,5,9
164:8 165:12
165:25 166:3
179:1 199:10
223:3 226:9
**Wayne** 60:8
**ways** 86:18
95:15
**we'll** 9:24,25
69:10 80:7
106:1,8
**we're** 13:25 22:6
54:1 78:8
84:14 90:2,2
95:10 100:12
107:1,14,15
111:3,5,8

141:12 152:21
157:1 162:1,1
162:2 170:19
179:8 205:2
220:9,9,10
229:8
**we've** 46:11 71:4
79:19 82:13
87:13,13
161:13 206:8
**wearing** 118:13
118:14 231:3
**Weber** 45:10
46:20,23 47:19
47:23
**week** 127:10
134:7
**weekly** 136:14
**weeks** 212:19
**welcome** 46:10
70:15
**went** 19:2 37:18
37:19 159:21
162:13
**weren't** 231:4
**West** 63:8,22
64:2,7
**whopping** 209:5
**Wilson** 20:3,13
31:19
**winter** 129:12
**withdraw** 84:20
96:11
**witness** 1:16,20
5:6,11,16
10:15,20 41:13
41:24 58:11
61:24 68:2
70:19 76:18
89:17 90:9
93:23 97:7
112:20 171:3
203:25 229:21
233:24 235:2
237:16,19
**woman** 33:18

**women** 171:19
171:21
**women's** 15:24
16:11 17:8
25:7,17 134:9
134:12 189:21
201:12 203:2
**word** 163:1
164:7 165:12
173:1 199:19
**words** 187:23
**work** 2:3 29:6
30:7,13 35:10
35:21 49:23
56:8,10,21
70:23 80:5,7
86:24 89:12
93:7 95:21,23
96:1,3,20
97:17 98:7
116:17 118:15
121:9,11 133:7
133:14,15,18
133:19 137:16
147:23 162:24
181:13 232:4
**work-rule** 93:9
**worked** 34:9
37:13 48:3
143:20 145:11
**WORKERS** 1:5
2:12 237:6
**working** 33:9
52:3 118:15
164:6 203:8
**workplace** 27:24
70:24 71:7
72:1,6 73:21
74:12,17 76:10
77:14 79:3
80:5 81:10
89:8 96:5
102:10 103:8
110:22 117:24
118:7 133:20
177:23 178:4

189:8,9,12,13
**works** 43:6
105:17 192:25
193:9
**world** 33:10,15
**worried** 94:13
**worthwhile**
80:11
**wouldn't** 43:10
43:15
**write** 198:7
**writes** 133:6
166:17
**writing** 65:23
117:8,12,13
196:24
**written** 109:8
151:21 152:1,2
153:3 160:6,8
160:11
**wrong** 121:16
169:18
**wrote** 118:6,9

———————————
**X**
———————————
**xx** 237:24

———————————
**Y**
———————————
**yeah** 12:20 30:1
30:7 33:8
39:13 41:15
42:11 49:1
57:13 62:11,12
62:19 68:11
69:15,21 70:12
71:4,12 85:10
85:11 86:9,12
87:12,19 88:11
88:23 89:20
94:16 95:4
98:9,15 102:14
105:12,22
106:3 109:19
115:8 122:21
124:9 126:1
131:8 133:16
138:16 141:10

142:14 144:23
149:15 152:9
154:3,3 156:3
158:19 161:23
162:4,4 163:25
168:13 169:5
174:4 181:23
183:19 191:22
195:2 199:21
202:17 204:13
204:20 205:7
211:13 212:13
216:3,10 217:4
224:22 225:1
225:18 229:23
**year** 34:20 82:17
82:18 83:25
84:10 104:14
104:18 127:3
210:9,12
**year-by-year**
106:25 107:17
108:19
**years** 23:18
32:21 37:4
45:13 77:15
81:12 82:11,14
85:3,14,17
108:10,14,20
111:17 112:2
113:20
**you-all** 11:11,17
18:20 77:22
105:13
**Yup** 106:7
138:11 139:5
217:5

———————————
**Z**
———————————
**Zoom** 68:25

———————————
**0**
———————————

———————————
**1**
———————————
**1** 3:11,15 37:3,3
54:19,22 55:6
55:16 56:4

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL SIMS

Page 272

57:23 68:19,19
69:4,8,13,23
70:1 71:5
74:15,16 87:21
96:7 105:4,6
122:7 126:8,12
142:4
**10** 4:5 18:16
22:17 45:13
47:6 62:18
66:13,13 95:10
95:11 100:20
108:17,18,20
109:23,25
156:5 216:21
216:24 220:10
220:13 226:21
229:17
**10-31-21** 238:20
**10-minute** 156:7
**10:34** 62:22
**10:48** 62:25
**10:59** 135:24
**100** 77:17
**10th** 175:10,14
175:19 176:1
**11** 3:11 4:7
64:12,13 69:9
69:19,20,23
71:3,4 79:20
87:23 105:6
122:8 223:16
223:17
**11:26** 136:22
**11:29** 138:13
**12** 4:9,11 111:25
112:1 113:1
223:19,21
224:17,24,25
**12:07** 106:13
**12:58** 106:16
**122** 82:13,21
84:9 100:4
**126** 3:14
**12th** 238:15
**13** 4:4,10 206:1

207:24 208:1
224:18,19
**135** 3:16
**13th** 173:20
175:4,11,18
176:1
**14** 4:9 37:25
108:4 223:8,19
**143** 111:20,21
111:23
**15** 4:6 25:3
66:13 215:9,16
216:21 220:12
224:23 226:21
**1500** 2:9
**157** 3:18
**160** 3:20
**167** 3:22
**19** 35:25 50:22
51:5,8,15
52:10
**191** 4:2
**1996** 36:11

―――――――――
**2**
―――――――――

**2** 1:10,18 3:2,12
3:17 45:24
46:1 54:7,9,16
55:6,9,11,16
56:4 72:22,23
96:6 97:1
98:16,24
127:14 135:13
140:10,10
167:25 168:3
170:21,22
176:7 179:18
179:24 180:22
181:19 182:11
182:17,18,21
235:3 237:10
**2:29** 156:10
**2:42** 156:13
**20** 15:20 19:13
36:1 50:22
51:5,8 104:3,4
**2003** 36:21 37:3

**2006** 36:21 37:3
**2007** 34:16,17
34:20
**2008** 34:20
**2009** 34:12,17
**2010** 34:12,17
**2011** 33:10
**2013** 57:23 85:6
112:19,22
**2014** 85:6
**2015** 59:18
205:21,21,23
211:6,15,17,21
218:10 227:4
228:18
**2016** 27:9,10,12
83:25 84:4,9
84:17,24 85:3
85:13 112:7,14
211:18
**2017** 15:25 33:1
60:21 61:4,10
61:16 62:3
64:8 65:6 67:1
83:19,22 84:20
84:23 85:17
86:3 87:24
127:4 137:16
145:21 158:7
173:20 188:5
**2018** 57:16,17
57:24 61:3
196:16
**2019** 127:2
**2020** 1:10,18 5:4
235:3 236:14
237:10 238:16
**204** 4:12,14
**206** 4:4
**20th** 15:25 16:12
188:5
**214** 2:16
**217** 4:5
**22160** 2:5
**223** 4:7
**224** 4:9,10

**230** 3:5
**235** 3:7
**237** 3:8
**23rd** 135:23
138:13 141:11
**24** 32:21
**24-hour** 33:15
**24th** 158:6
211:21
**2850** 2:9
**2nd** 5:4

―――――――――
**3**
―――――――――

**3** 3:14 4:8 97:19
126:9,10 222:9
223:10,14
**3.0.0** 96:4 97:19
98:8,22,25
99:1
**3:17-CV-0227...**
1:4 237:5
**3:31** 180:17
**3:43** 180:20
**30** 105:17
**30-day** 83:15,18
83:20,21 86:2
114:12 117:5
120:1
**30(b)(6)** 1:9 6:14
6:21 10:12
19:20 237:9
**30(e)(1)(A)**
237:21
**30(e)(2)** 237:22
**304** 108:4
**31** 57:24
**314** 107:22
108:8,9,11
109:9,12,16,20
111:4
**3301** 2:15
**34** 204:15,22
205:10
**3469** 5:13
238:19
**35** 210:23 211:1
**38** 238:23

―――――――――
**4**
―――――――――

**4** 3:16 4:3
135:13,14
170:17,20,20
170:21 181:18
191:3 198:18
198:20 203:21
203:21,25
**4:20** 207:4
**4:50** 216:13
**4074** 158:14
**4226** 133:4
**4228** 131:12,13
131:14
**4230** 131:25
**4232** 132:6
**4277** 150:19
**4278** 150:19
**4311** 198:18,19
**44** 110:23,24,25
**4421** 141:13
**4433** 138:9,10
**4436** 140:6
**4441** 141:6,9,15
141:16
**4444** 142:12,13
**4450** 143:12
**4456** 144:22
**4459** 146:17
**4465** 147:5
**4477** 148:9
**45** 105:17 106:2
**4624** 148:24
**4630** 154:19
**4634** 158:3
**4637** 158:16
**4676** 162:18,19
**4677** 162:18,20
**469** 2:10
**4711** 175:16
**4712** 169:5
**4863** 175:13
**4th** 227:4

―――――――――
**5**
―――――――――

**5** 3:18,19 157:13