## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER,              §
                              §
        Plaintiff,            §
                              §
v.                            § Civil Action No.
                              § 03:17-cv-02278-S
SOUTHWEST AIRLINES CO.,       §
AND TRANSPORT WORKERS         §
UNION OF AMERICA LOCAL        §
556,                          §
                              §
        Defendants.           §

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
CHARLENE CARTER
November 20, 2020

*********************************************************

PORTIONS OF TRANSCRIPT DESIGNATED CONFIDENTIAL:
PAGE 132:13 THROUGH 134:6
PAGE 134:19 THROUGH 135:10

*********************************************************

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF CHARLENE
CARTER, located at her residence in Aurora, Colorado,
produced as a witness at the instance of the Defendant
Southwest Airlines Co., and duly sworn, taken in the
above-styled and numbered cause on November 20, 2020,
from 10:02 a.m. to 4:36 p.m., before Joseph D.
Hendrick, Certified Shorthand Reporter in and for the
State of Texas, reported by machine shorthand, pursuant
to Notice and the Federal Rules of Civil Procedure and
any provisions stated on the record or attached hereto.

Job No. 4341722

## Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mathew B. Gilliam (Via Zoom)
    NATIONAL RIGHT TO WORK
     LEGAL DEFENSE FOUNDATION, INC.
    8001 Braddock Road, Suite 600
    Springfield, Virginia 22160
    Telephone: 703-321-8510
    Facsimile: 703-321-9319
    Email: Mbg@nrtw.org

FOR THE DEFENDANT SOUTHWEST AIRLINES:
    Michael A. Correll (Via Zoom)
    REED SMITH LLP
    2501 N. Harwood Street, Suite 1700
    Dallas, Texas 75201
    Telephone: 469-680-4200
    Facsimile: 469-680-4299
    Email: mcorrell@reedsmith.com

FOR THE DEFENDANT TRANSPORT WORKERS UNION OF AMERICA
LOCAL 556:
    Adam S. Greenfield (Via Zoom)
    Edward B. Cloutman III (Via Zoom)
    CLOUTMAN & GREENFIELD
    3301 Elm St.
    Dallas, TX 75226
    Phone: 214-939-9222
    Email: agreenfield@candglegal.com

ALSO PRESENT:
    Chris Maberry (Via Zoom)
    Lauren Armstrong (Via Zoom)
    Norm Harris, Videographer (Via Zoom)

## Page 3

INDEX

Appearances ................................... 2
Portion of transcript designated ............
confidential
End of confidential designation .............

Portion of transcript designated ............
confidential
End of confidential designation .............

Telephone conference with Judge Rutherford ..
End of telephone conference...................

CHARLENE CARTER
    EXAMINATION BY MR. CORRELL ............... 6
    EXAMINATION BY MR. GREENFIELD ............ 223

Signature and Changes ........................277

Reporter's Certification .....................279

EXHIBITS

NO.      DESCRIPTION          PAGE(S)

EXHIBIT 1   Certified Mail sent by      25
    Southwest Airlines Co. to
    Charlene Carter dated March
    14, 2017
EXHIBIT 2   Exhibit marked but not offered  30
EXHIBIT 3   SWA000595 to SWA000692     30
    Text messages from Charlene
    Carter to Audrey Stone
EXHIBIT 4   Excerpt of testimony from the   52
    arbitration re the termination
    of Charlene Carter dated
    December 8, 2017

## Page 4

EXHIBIT 5   CONFIDENTIAL DOCUMENT      68
    Message between Charlene
    Carter and Jeanna Jackson
    dated March 30,2017

EXHIBIT 6   Carter 411 to Carter 416   92
    Privileged & Confidential
    Reinstatement Settlement and
    Last Chance Agreement dated
    April 17, 2017, unsigned

EXHIBIT 7   CONFIDENTIAL DOCUMENT      105
    Text messages between Charlene
    Carter and Lynn McGomery

EXHIBIT 8   EEOC charge          113

EXHIBIT 9   Carter 2417          143
    Billing records from Leader
    Care

EXHIBIT 10   CONFIDENTIAL DOCUMENT     143
    Billing records from Leader
    Care

EXHIBIT 11   Plaintiff Charlene Carter's   166
    Responses and Objections to
    Defendant Southwest Airlines
    Co.'s First Set of
    Interrogatories

EXHIBIT 12   Email from Charlene Carter to  188
    Jim Little dated 5/28/2013
    with attachments, Caught in
    Collusion
EXHIBIT 13   Carter 380 to Carter 382   204
    Email chain date 8/3/2013 re
    Thom McDaniel for TWU
    Convention Delegate
EXHIBIT 14   Carter 4015 to Carter 4017  209
    Message posted by Brett
    Nevarez; Memorandum Regarding
    Social Media Concerns
EXHIBIT 15   App. 4187          210
    Message from Brian Talbert and
    an unsent response

Page 5

1    EXHIBIT 16  App. 4190              211
          Facebook post; Mike Casper to
2         Business Owners Fight Back
          Against Cyberbullies
3
     EXHIBIT 17  Exhibit marked but not offered  213
4
     EXHIBIT 18  CONFIDENTIAL DOCUMENT     213
5         Carter 4490 to Carter 4491
          Screen shots
6
7
          REQUESTED DOCUMENTS/INFORMATION
8
     NO.   DESCRIPTION               PAGE
9
     1 List of people treated unfairly by    264
10     Audrey Stone and her administration
11
12
          CERTIFIED QUESTIONS/INSTRUCTIONS NOT TO ANSWER
13
     NO.              PAGE/LINE
14
               None
15
16
17
18
19
20
21
22
23
24
25

Page 6

1        THE REPORTER:  Before we go on the record,
2   could I ask you to announce your appearances?
3        MR. CORRELL:  Mike Correll appearing for
4   defendant Southwest Airlines.
5        MR. GILLIAM:  Matthew Gilliam appearing for
6   plaintiff Charlene Carter.
7        MR. CLOUTMAN:  Ed Cloutman, one of the
8   attorneys for Transport Workers Union Local 556.
9        MR. GREENFIELD:  Adam Greenfield for
10  defendant Transportation Workers Union Local 556.
11       THE WITNESS:  Charlene Carter, plaintiff.
12       MR. CORRELL:  And we are also joined by
13  Chris Maberry who is counsel for Southwest Airlines and
14  Lauren Armstrong who is also from Southwest Airlines.
15       THE REPORTER:  Would you raise your right
16  hand, please.
17       Do you swear or affirm that the testimony
18  you are about to give in this case will be the truth,
19  the whole truth, and nothing but the truth, so help you
20  God?
21       THE WITNESS:  Yes, I do.
22            CHARLENE CARTER
23       having been duly sworn, testified as follows:
24            EXAMINATION
25  BY MR. CORRELL:

Page 7

1        Q.    Good morning, Ms. Carter.  As I mentioned a
2   moment ago, my name is Michael Correll and I am outside
3   counsel representing Southwest Airlines in this matter.
4        Ms. Carter, have you ever sat for a
5   deposition before?
6        A.    No, I have not.
7        Q.    In that case let's go over just a couple of
8   the basic ground rules that will make things go
9   smoothly today.  First of all, Mr. Hendrick, the
10  reporter, just put you under oath.  You will remain
11  under oath for the duration of the deposition.  That
12  means if we take a break or if we go to lunch and come
13  back or if for some reason the deposition continues
14  day-to-day, then you will be under oath whenever you
15  are testifying on the record.  Do you understand that?
16       A.    Yes, I do.
17       Q.    Mr. Hendrick will be writing down
18  everything we say.  As a result, if you do a couple of
19  things and I do a couple of things it will make for a
20  clear record so we understand what happened here today.
21  The first thing is, if you will let me finish my
22  questions, I'll try to let you finish your answers so
23  that we're not speaking over each other.  Okay?
24       A.    Sounds good.
25       Q.    The second thing is, when you give answers

Page 8

1   if you can give clear verbal answers it will make it
2   come out more clearly on the record.  So if you can say
3   "yes" or "no" as opposed to nodding your head, shaking
4   your head or saying uh-huh or hu-huh.  Okay?
5        A.    Yes.
6        Q.    The third thing is, sometimes I ask a bad
7   question, sometimes I ask a confusing question.  If I
8   ask a question that you don't understand or that you
9   believe is confusing, please just let me know at any
10  time, I'm happy to clarify or rephrase the question.
11  Okay?
12       A.    Okay.
13       Q.    The other thing that's different today is
14  we are in a remote deposition.  In a remote deposition
15  there's two extra things to be aware of.  The first is
16  since we're not all sitting in the same room the court
17  reporter can't see when people enter the room and exit
18  the room so if anyone comes and joins you during the
19  deposition for an extended period of time, and I don't
20  mean just passing through the room, please let us know
21  so we can note their appearance.  Okay?
22       A.    Okay.
23       Q.    Is there anyone with you in the room right
24  now for the deposition?
25       A.    No, there's not, but I need to go open the

1   door so that my dog can come in.
2       Q.    Perfect.  If you can do that right now,
3   please go ahead and we'll just wait right here.
4       A.    Sorry.
5           THE WITNESS:  Come on.
6           She can let herself out but she cannot let
7   herself back in.
8           MR. CORRELL:  That's more talented than
9   most dogs.
10           THE WITNESS:  Yeah.
11   BY MR. CORRELL:
12       Q.    The second issue with remote depositions is
13   since I'm not in the room with you, I can't see what
14   you are looking at.  So if you choose to access
15   materials or receive communications from someone while
16   we are on the record, you need to let us know.  Now
17   when we take a break, if you talk to counsel or someone
18   else, that's entirely your business and not something
19   we'll be intruding upon, but if you are looking at
20   documents or receiving messages or anything like that
21   during the deposition you need to let us know.  Okay?
22       A.    Okay.
23           MR. CORRELL:  And Mr. Hendrick, I just got
24   a message from my paralegal that apparently the
25   videographer was delayed and so the videographer is not

1   here, which I was suspicious about.  Do we need to stop
2   and let the videographer join?  I won't worry about
3   redoing this piece of it, but I just got that message.
4           THE REPORTER:  Yes, I would say we should
5   go off the record.
6           MR. CORRELL:  Okay.
7           THE REPORTER:  I had no indication that we
8   were going to have a videographer, so I apologize.
9           MR. CORRELL:  Understood.  No problem.
10           Let's take about five, ten minutes while I
11   figure out where the videographer is and we'll jump
12   back on and pick up where we left off.
13           (Break from 10:08 a.m. until 10:15 a.m.)
14           VIDEOGRAPHER:  We are going back on the
15   record at 9:15 a.m.
16           MR. CORRELL:  Ms. Carter, thank you for
17   your patience.  I just want to state for the record
18   that the first five or so minutes of the deposition
19   were not video recorded, they were transcribed.  During
20   that period Ms. Carter was put under oath and we just
21   covered some basic preliminaries and that's where we
22   stopped to have the videographer join us.
23   BY MR. CORRELL:
24       Q.    And Ms. Carter, when I left off, we had
25   just talked about remote deposition rules.  The next

1   thing is, as we are going today, if you need to take a
2   break, please just let me know.  I'm happy to stop at
3   any time or as frequently as you need.  The only thing
4   I would ask is that if I have a question pending to you
5   that you answer the question before we take a break.
6   Okay?
7       A.    Okay.
8       Q.    Are you under the influence of any
9   substance or do you have any injury or illness that
10   would prevent you from testifying truthfully and
11   completely today?
12       A.    No.
13       Q.    Do you have any other reason you can't
14   testify truthfully and completely today?
15       A.    No.
16       Q.    What did you do to prepare for your
17   deposition today?
18       A.    Just went back through some of the
19   documents that -- like my complaint.
20       Q.    Other than your complaint, what other
21   documents did you review?
22       A.    The interrogatories.
23       Q.    Any other documents you reviewed besides
24   your complaint and the interrogatories?
25       A.    I believe that I was sent a link yesterday

1   and there were some documents on there that you had
2   prepared.
3       Q.    Okay.  Anything else that you reviewed to
4   prepare for your deposition?
5       A.    No, no, sir.
6       Q.    Other than speaking with counsel, did you
7   speak with anyone to prepare for your deposition?
8       A.    No, sir.
9       Q.    Did you review your testimony from the
10   arbitration conducted in, I believe it was 2018, to
11   prepare for your deposition?
12       A.    No, I did not.
13       Q.    When is the last -- have you ever reviewed
14   the transcript of your testimony at the arbitration?
15       A.    It -- once it came out so it's been since
16   whenever he rendered his decision.
17       Q.    So probably around in the 2019 time frame?
18       A.    Yes.  Yes, sir.
19       Q.    And where do you currently reside,
20   Ms. Carter?
21       A.    I live in Aurora, Colorado.
22       Q.    How long have you been at your current
23   residence?
24       A.    A little over eight years.
25       Q.    And can you give us just a brief overview

Page 13

1    of your educational history both prior to coming to
2    Southwest and then any subsequent education that you
3    have had.
4         A.    I've had, oh, maybe two years of junior
5    college.
6         Q.    When was that?
7         A.    Oh gosh.  Back in 19 -- let's see.  I
8    graduated in '83 so it would have been like '84
9    and '85.
10        Q.    Since that time have you had any other
11   college courses or earned any college degrees?
12        A.    No, I have not.
13        Q.    Do you hold any certifications or licenses?
14        A.    I did.  I was a dental assistant at one
15   point.
16        Q.    When was that?
17        A.    Oh, that was back in 1986-'87 maybe -- No.
18   I'm sorry, that -- no.  That was in '84 and '85.  While
19   I was going through junior college.
20        Q.    And that certification has been lapsed
21   since then?
22        A.    Yes, sir.
23        Q.    Since leaving Southwest, have you gotten
24   any new certifications or any new degrees?
25        A.    Yes, I got my Pilates instructor's

Page 14

1    certification.
2         Q.    When did you secure that?
3         A.    About three months ago my class ended and
4    my certification came through.
5         Q.    So about August of 2020 sound right?
6         A.    That's correct.
7         Q.    Other than the Pilates certification, any
8    other certifications that you have received since you
9    left your employment with Southwest?
10        A.    No, sir.
11        Q.    Are you currently employed?
12        A.    Unfortunately no, I'm not.
13        Q.    When was the last time you were employed?
14        A.    Last time I was actually employed and
15   making money was at Southwest Airlines.  I've had two
16   business ventures since then.
17        Q.    What was the first business venture that
18   you just referenced?
19        A.    It was called Project Purpose.
20        Q.    What was Project Purpose?
21        A.    It was a program for children that had
22   either been expelled or had trouble at school, and it
23   was an after-school program to help them get back on
24   track so that they could go back to school.
25        Q.    What was your role at Project Purpose?

Page 15

1         A.    I was the educational director.  I put the
2    program pretty much together.
3         Q.    What was the date range from when you
4    started and left Project Purpose?
5         A.    The date range -- actually I started right
6    before I left -- or Southwest terminated me, so it
7    would have been January of 2017.
8         Q.    And when did you leave Project Purpose?
9         A.    Well, and this kind of sounds funny, but
10   there were four of us that were partners within this
11   venture, two of us left and went on to name it, another
12   business, and it was called Divine Intervention and
13   we --
14        Q.    Was -- oh please.  Go ahead.  I'm sorry.
15        A.    I'm sorry.  And we were trying to implement
16   an actual academy school and that would have been like
17   in Ferguson, St. Louis.  So everything that I was doing
18   was in the underdeveloped communities within St. Louis,
19   Missouri.
20        Q.    Is Divine Intervention the second business
21   venture you referenced a little earlier in your
22   testimony?
23        A.    Yes, sir.
24        Q.    When did you make the transition from
25   Project Purpose to Divine Intervention?

Page 16

1         A.    Probably six to eight months into the
2    Project Purpose.  It might have been a year.  I don't
3    know what the exact date.  We were looking to get our
4    501(c)(3) with Project Purpose.  That did not go
5    through because two of us left and created the
6    501(c)(3) for Divine Intervention.
7         Q.    Were you paid by Project Purpose?
8         A.    No, I was not.  It --
9         Q.    Were you --
10        A.    -- was a business venture that we all paid
11   into.
12        Q.    So you did not draw any form of salary from
13   Project Purpose?
14        A.    No, we weren't -- we hadn't established our
15   501(c)(3) yet so all of us were, you know, putting in
16   our own money and funds into the -- into the project.
17        Q.    Why did you leave Project Purpose and go to
18   Divine Intervention?
19        A.    We had a bigger vision, the two of us, in
20   regards to how we wanted to structure and implement our
21   educational platform, and two of the other partners had
22   different views and it just wasn't -- it just wasn't
23   working.  The --
24        Q.    To your knowledge -- oh.  Please go ahead.
25        A.    I'm saying they just went their way and we

Page 17

```
 1    went our way.
 2       Q.   Does Project Purpose still exist?
 3       A.   If it does, I don't know.  I think they
 4    decided to come back here to Colorado and pursue that,
 5    but I don't think that it has gone anywhere.
 6       Q.   You said both of these ventures were in
 7    St. Louis, correct?
 8       A.   That is correct.
 9       Q.   At some point, did you move to St. Louis to
10    participate in these businesses, or did you do that
11    from Colorado?
12       A.   Did it from Colorado.  I actually was being
13    housed there when I did go into St. Louis, and we did
14    go about every two to three months as we were
15    seeking -- well, basically donors and things like that
16    for the 501(c)(3).  And then setting up the school that
17    we were going to open up.
18       Q.   And so for Project Purpose, I have January
19    2017 and then about six to eight months.  So that
20    sounds right?
21       A.   Yeah, give or take, I'm not sure exactly
22    the dates.
23       Q.   During that period did you seek paying
24    employment from any other source?
25       A.   Not at that time because I was very much
```

Page 18

```
 1    involved in getting the educational program off the
 2    ground.
 3       Q.   Was your work with Project Purpose
 4    full-time?
 5       A.   Pretty much, yes.
 6       Q.   When you say "pretty much," what do you
 7    mean?
 8       A.   Well, I would say more than full-time
 9    because I was going back and forth from here to
10    St. Louis.
11       Q.   And so you transitioned to Divine
12    Intervention sometime in 2017 then?
13       A.   Yeah, like I said, it's give or take, you
14    know, a couple of months there.  It may have been right
15    at about a year, and transferred.  I could find out
16    because we got our 501(c)(3) at a certain time and I
17    just don't know exactly the date.
18       Q.   What -- are -- how long -- did you leave
19    Divine Intervention at some point or are you still
20    working with them?
21       A.   No.  No.  Divine Intervention?  No.  I left
22    them.
23       Q.   When did you leave Divine Intervention?
24       A.   I would say it was last September.  Not
25    this -- no.  I'm sorry.  It would have been last March,
```

Page 19

```
 1    Aprilish.
 2       Q.   So when you say "last," do you mean 2019 or
 3    2020?
 4       A.   2020.  That -- when I officially left.
 5       Q.   And when you say "officially" there, was
 6    there some period of time where you were still listed
 7    but not doing anything, or what do you mean by that?
 8       A.   No, that was when I resigned from my
 9    position.
10       Q.   Okay.  What was your position at Divine
11    Intervention?
12       A.   I was the educational director.
13       Q.   Did you hold that title the entire time?
14       A.   Yes, I did.
15       Q.   What did you do as the educational
16    director?
17       A.   I was in control of putting together all of
18    the curriculum that we were using in our classrooms,
19    getting all of the structure together to train our
20    teachers, putting everything together, too, as how we
21    structured our classrooms, and then I would oversee
22    the -- the actual -- once we got the school opened I
23    would oversee all teachers and training and so forth.
24       Q.   Did you receive any pay for the work you
25    did for Divine Intervention?
```

Page 20

```
 1       A.   No, we did not.  That was where I was -- we
 2    were still seeking.  Because it's a 501 -- 501(c)(3),
 3    we were still seeking funding.
 4       Q.   And that's true for the entire period you
 5    were with Divine Intervention?
 6       A.   That is correct.
 7       Q.   Why did you leave Divine Intervention?
 8       A.   We were having issues with the funding and
 9    we had been -- we had been given a specific building
10    that we were going to be opening up as our school and
11    that fell through, and at that point it just -- it kind
12    of dissolved.  I mean, we had put so much money into
13    this, I could no longer -- I could no longer do it.
14       Q.   So is Divine Intervention still operating?
15       A.   The partner that I was working with, I
16    believe that he, because he bought me out of the
17    501(c)(3), he is actually trying to start that I think
18    up in Colorado Springs.  So far it has not come to
19    fruition, unfortunately.
20       Q.   So when you say the partner bought you out,
21    what transaction occurred there?
22       A.   Well, what I mean is he had to -- he had to
23    give me the money back of, you know, because I -- I
24    paid for half of the 501(c)(3) and got it all
25    implemented, so it was like $350 I think it is that he
```

Page 21

1    paid me back.
2        Q.    Okay.  So --
3        A.    And then took my name off the 501(c)(3).
4        Q.    So the only exchange there was he paid you
5    $350 back that you had previously paid into the entity?
6        A.    Yes.
7        Q.    Did anything similar happen when you left
8    Project Purpose?
9        A.    No, because we had not gotten our 501(c)(3)
10   set up yet.
11       Q.    In terms of workload, would you say the
12   Divine Intervention workload was the same as what you
13   described for Project Purpose, more than full-time?
14       A.    Yes, it was actually more so because I was
15   spending a lot more time in St. Louis.
16       Q.    While you were working with Divine
17   Intervention, did you seek paying employment from
18   anywhere else?
19       A.    I did actually.  I got a quote-unquote
20   supposed interview with Delta, and then also with
21   United Airlines as flight attendant positions.
22       Q.    And I'm sorry, you said Delta, and who was
23   the second one?
24       A.    United.
25       Q.    What happened with the Delta Air Lines

Page 22

1    application?
2        A.    Well, they sent me everything so that I
3    could do my interview but never sent the link, and so I
4    had corresponded between them in that time period, I
5    would say within a three, four-week time period and
6    never received the link.  And they still don't know why
7    to this day.
8             But anyway, from there, you know, things
9    have changed with hiring, unfortunately they're now
10   letting people go; and United I did interview with
11   them.
12       Q.    What was the result of the interview?
13       A.    I did not get the position.
14       Q.    Did they tell you why?
15       A.    No.  It just said that -- thank you for
16   applying, and thank you for interviewing, and we look
17   forward to hopefully hearing from you again the next
18   go-round.
19       Q.    So with the Delta and the United
20   applications, were those ones where you just submitted
21   one each and those are the only flight attendant
22   applications you submitted or were there others?
23       A.    No, those were the only two at the time.
24   Nobody -- at that time I wasn't seeking employment as
25   in with other airlines except for those two.

Page 23

1        Q.    Why not?
2        A.    I don't know.  Those were the two on my top
3    list.  I had worked for American back in the day and
4    was a flight attendant for them, and then came to
5    Southwest.
6        Q.    So how many applications would you say you
7    have submitted for flight attendant positions since you
8    left Southwest?
9        A.    I submitted four.  I submitted one to
10   Frontier, my husband is a captain for them, and then I
11   submitted another one to JetBlue and didn't hear
12   anything back from either one.
13       Q.    Did you ever reapply to any of the airlines
14   we have discussed, Delta, United, Frontier, or JetBlue?
15       A.    No, I did not, and the reason being was
16   because of the business venture that I was in with --
17   especially with Divine Intervention.
18       Q.    Aside from applying for flight attendant
19   positions, is there any other paying employment you
20   sought while you were working with Divine Intervention?
21       A.    Not -- not so much as in seeking because I
22   was really involved in the venture that I was trying
23   to do with Divine Intervention.  It was going to be a
24   paid position.  I had a salary already set up.  But no,
25   I did not.  I was very much involved in getting that

Page 24

1    started.  That was -- that was my passion at that
2    point.
3        Q.    What was the salary you were expecting at
4    Divine Intervention?
5        A.    Around 120.
6        Q.    Thousand?
7        A.    Yes.
8        Q.    Since leaving Divine Intervention, have you
9    sought paying employment from anyone?
10       A.    Through my certification with my Pilates,
11   yes.
12       Q.    I'll ask you about the Pilates in a moment.
13   Other than the Pilates, any other paying employment
14   that you have sought since you left Divine
15   Intervention?
16       A.    No.
17       Q.    What have you done with respect to the
18   Pilates certification?
19       A.    Well, I got my certification and -- which
20   was, you know, a year-long's worth of schooling, and
21   right now with the COVID being that it is, the two
22   studios that I was actually going to try and work with
23   are not hiring so right now there's no real hiring
24   within that industry due to there's -- I mean, some of
25   my friends are losing their jobs because of this.

Page 25

1    Q.    Now, you started with Southwest Airlines in
2    September of 1996, correct?
3    A.    That is correct.
4    Q.    And you left Southwest Airlines on
5    March 14th of 2017, right?
6    A.    That is correct.
7    Q.    And from the beginning of that period until
8    the end of that period, you held the title of flight
9    attendant, right?
10    A.    Yes, sir.
11    Q.    And you never held any other positions with
12    Southwest Airlines?
13    A.    No, sir.
14    Q.    Do you have the exhibit screen available to
15    you so that I can show you some documents?
16    A.    I do.
17    Q.    Okay.
18    A.    Oop.  And I don't know how to work all of
19    this, to be quite honest with you, but I guess you can
20    see me.  Okay.  So yes, I've got that.
21    (Deposition Ex. 1 marked)
22    BY MR. CORRELL:
23    Q.    And you should see in just a moment what
24    will populate as Exhibit 1.
25    A.    Okay.  Is that just going to pop up on my

Page 26

1    screen?
2    Q.    Yes, ma'am.
3    A.    Okay.
4    Q.    It should pop into the folder for the
5    exhibits.  You may have to refresh.  I am not a hundred
6    percent certain on that.
7    A.    Okay.  Well, let me refresh.  Okay.  It
8    says Exhibit 1.
9    Q.    Okay.  And can you open that document,
10    please?
11    A.    I sure can.  Okay.
12    Q.    Do you recognize that document?
13    A.    Yes, sir, I do.
14    Q.    What is that document?
15    A.    That is the document that they sent me
16    stating that I was terminated.
17    Q.    And did you receive this letter close in
18    time to the date of March 14th, 2017?
19    A.    Yes.
20    Q.    I just want to walk through a couple points
21    in the letter.  First of all, at the beginning, the
22    first sentence, if you will read along quietly, I will
23    read aloud.  "On March 7, 2017, a fact-finding meeting
24    was held to discuss certain messages and videos you
25    posted on your Facebook page and sent to another

Page 27

1    Southwest employee through Facebook Messenger."
2    Did I read that correctly?
3    A.    Yes, you did.
4    Q.    Based on your understanding, is that true,
5    was there a fact-finding meeting conducted as described
6    on March 7, 2017?
7    A.    Yes.
8    Q.    The next sentence describes a list of
9    individuals who attended that meeting.  Do you see that
10    sentence?
11    A.    Yes.
12    Q.    Have you had a chance to read it?
13    A.    Yes.
14    Q.    Does that accurately list the individuals
15    who attended your fact-finding meeting?
16    A.    Yes, except that when Ed started the
17    meeting, Denise Gutierrez -- and this is also in my
18    fact-finding minutes on my rep -- she was introduced as
19    an attorney for Southwest.
20    Q.    Okay.  But she was present and I believe
21    she appeared by telephone, correct?
22    A.    That is correct.
23    Q.    Is there anybody not listed who either
24    appeared in person or via telephone at your
25    fact-finding meeting?

Page 28

1    A.    No.
2    Q.    I want to take you next to the second
3    paragraph and I will read the first sentence to you
4    while you read along quietly.  "During the meeting, you
5    admitted you posted graphic videos of aborted fetuses
6    on Facebook and sent the same videos in a private
7    Facebook message to another Southwest flight
8    attendant."
9    Did I read that correctly?
10    A.    Yes, you did.
11    Q.    Is it true that you admitted during the
12    fact-finding meeting that you posted graphic videos of
13    aborted fetuses on Facebook?
14    A.    Yes.
15    Q.    Is it true that you admitted that you sent
16    the same videos in a private message to another
17    Southwest flight attendant?
18    A.    I sent them to Audrey Stone who was my
19    president of the union, yes.
20    Q.    And Ms. Stone was also employed as a flight
21    attendant by Southwest Airlines at that time, correct?
22    A.    She was employed, yes.
23    Q.    Well, I mean, my question is specific so I
24    want to make sure the record is clear.  She was
25    employed by Southwest Airlines as a flight attendant,

Page 29

1  correct?
2      A.   Correct.
3      Q.   The next sentence reads, "You also admitted
4  to sending the Flight Attendant a private message
5  containing a picture of individuals wearing costumes
6  depicting the female genitalia."
7           Did I read that correctly?
8      A.   Yes, you did.
9      Q.   Is it true that you admitted that in the
10 fact-finding meeting?
11     A.   Yes, it is.
12     Q.   Last sentence of that paragraph, "You
13 agreed that the pictures and videos were graphic."
14          Did I read that correctly?
15     A.   Yes.
16     Q.   Did you admit that at the fact-finding
17 meeting?
18     A.   Yes.
19     Q.   Next I want to take you to two new
20 additional exhibits, and I'll have you look at both of
21 them before we discuss them.
22     A.   Will they just come up on the screen?
23     Q.   Yes, ma'am.  That's how all of -- that's
24 how I'm going to convey all of the documents to you
25 today.

Page 30

1      A.   Okay.  Okay.
2      Q.   And you will have the full ability to look
3  at them as they come up and control them as you need
4  to.
5      A.   Okay.
6           (Deposition Exs. 2 and 3 marked)
7  BY MR. CORRELL:
8      Q.   So Exhibit 2 should now be available to you
9  if you could take a look at that, and I'll go ahead and
10 release Exhibit 3 as well.
11     A.   Okay.  Okay.  Do I need to refresh again?
12     Q.   Oh.  There's an error here.  That is not
13 the correct document for Exhibit 2.  Give me one
14 moment.
15          We'll just go to Exhibit 3 and we'll come
16 back to Exhibit 2 later because I believe that's an
17 incorrect upload.  I'll have to get that corrected when
18 we take a break.
19     A.   Okay.  So Exhibit 3?
20     Q.   Yes, ma'am.
21     A.   Okay.
22     Q.   And so this is a fairly lengthy document.
23 If you want to scroll through it you're welcome to, I
24 have some just very simple questions once you have a
25 chance to familiarize yourself with it.

Page 31

1           But do you recognize this document?
2      A.   Yes, sir, I do.
3      Q.   What is this document?
4      A.   This is the private message that I sent to
5  my union president Audrey Stone.
6      Q.   And to be clear, this document consists of
7  about 100 pages, right?  If you scroll down.
8      A.   I believe so, yes.
9      Q.   And there's -- and all of these appear to
10 be messages that you sent to Ms. Carter, correct?
11 Excuse me.  To Ms. Stone.
12     A.   Yes.  But I will say the only ones that I
13 was called in for were of the videos that I sent her.
14     Q.   What do you mean when you say that?
15     A.   Those were the only ones that were used in
16 my fact-finding meeting and also in my second step
17 meeting.
18     Q.   When you say "used," what do you mean?
19     A.   Those are the ones that I was called in
20 for.
21     Q.   Well, no, and that's what I'm trying to
22 understand.  Are these the ones that were shown to you,
23 what -- what was done with these documents at your
24 fact-finding?
25     A.   The only ones that were shown to me were

Page 32

1  the ones of the videos, pictures that you see.  The
2  remaining were not -- were not a part of my
3  fact-finding meeting.
4      Q.   Now, do you acknowledge that all of these
5  are messages that you sent to Ms. Stone?
6      A.   Yes, as for being my president of the
7  union, it was.
8      Q.   And prior to sending the messages,
9  beginning on the first page and continuing on to the
10 second page, did Ms. Stone report you to Southwest
11 Airlines?
12     A.   No.  As a matter of fact, we never even had
13 any communications.
14     Q.   Did Ms. Stone ever respond to you with
15 respect to any of these messages?
16     A.   No, she did not.  She was very hard to --
17 to speak with.
18     Q.   What efforts did you make to contact
19 Ms. Stone aside from sending these messages, if any?
20     A.   Through emails.
21     Q.   And --
22     A.   And going to a, you know, a union meeting
23 before I became an objector.
24     Q.   To the best of your recollection, what
25 emails did you send to Ms. Stone?

Page 33

1    A.    Regarding their -- let's see, it was
2  regarding the National Right to Work Foundation, some
3  of the emails that I responded to had to do with our
4  voting, some of the other emails may have had to do
5  with charges that were brought up against some other
6  union members.  I -- I don't recall all of them.
7    Q.    Did you send those emails from your
8  Southwest email account or from a personal email
9  account?
10    A.    I don't recall.
11    Q.    Have you provided copies of all of those
12  emails to your counsel?
13    A.    Some of them I don't even think that I have
14  anymore because they're not on my system.  I -- I --
15  I've provided everything that I have to my attorney.
16    Q.    The ones that are not on your system
17  anymore, do you have a sense of when they were lost?
18    A.    I don't.  I had a hard drive crash and they
19  tried to get everything, as much as they could off of
20  my old system and put it on this system.
21    Q.    When did that occur?
22    A.    Oh gosh, that was -- let's see, my son --
23  2015 maybe.  2015-2016.
24    Q.    When did you attempt to speak to Ms. Stone
25  at a union meeting?

Page 34

1    A.    The last time that I spoke with her was in
2  2013, at a union meeting.
3    Q.    Can you tell me about that conversation?
4    A.    Well, I mean, it was a union meeting.  It
5  was put forth -- you know, I mean, there was a lot of
6  topics that were there.  One of them being that she was
7  not the duly elected president.  They had taken out
8  our -- our other team of elected officials.
9    Q.    So was this a one-on-one conversation, or
10  was this just a general meeting environment?
11    A.    Well, everybody has a moment to speak at a
12  union meeting.
13    Q.    So were you standing up in the meeting and
14  speaking in front of the meeting to Ms. Stone, or were
15  you privately speaking to her on the side?
16    A.    No, it was in the meeting.
17    Q.    What did you say to Ms. Stone in that
18  meeting?
19    A.    I don't recall everything that I said that
20  day.
21    Q.    Do you recall anything that you said that
22  day?
23    A.    I read out loud the bylaws that we want to
24  change, I do remember that, and that I read out the --
25  basically the coup that had been talked about with all

Page 35

1  of them now that were representing us to take out the
2  last group, and that would have been Stacy Martin,
3  Chris Click, Jerry Lindermann, Dawn Wann, and Jana
4  Deloache.
5    Q.    Did Ms. Stone respond to you?
6    A.    She did not respond.  It was basically a
7  document that I was able to read, several documents
8  that I was able to read, regarding some of the things
9  that were said by the people that actually now were
10  representing us.
11    Q.    But she -- but she never had a direct
12  response to you.
13    A.    No.  As a matter of fact, she's never
14  really had a direct response with a whole lot of
15  people.  She's very hard -- she was very hard to get
16  ahold of.
17    Q.    Was this the first time you ever engaged
18  directly with Ms. Stone?
19    A.    Yes, it was.
20    Q.    Would it be fair to characterize that
21  meeting as confrontational?
22    A.    It wasn't confrontational.  It was just
23  basically stating some facts that were -- that we all
24  knew about.
25    Q.    Were you upset?

Page 36

1    A.    Upset at just -- not upset, just more of
2  how could they take out our elected, the way that they
3  did it, and just be placed into office.
4    Q.    Between 1996 and 2013, had you ever had
5  occasion to encounter Ms. Stone in any other setting?
6    A.    No.
7    Q.    Other than the emails you have described in
8  the union meeting at 2013 and sending the messages
9  depicted in Exhibit 3, did you make any other efforts
10  to communicate with Ms. Stone directly?
11    A.    Just by the emails of if I disagreed with
12  something that the union was doing or paying for, and
13  those are, like I said, those would have been the
14  emails that you know, I sent most every -- I mean,
15  I've sent everything that I have, but no, I never
16  actually saw her in person.  There was never a reason
17  to as in, you know, she wasn't flying online.
18    Q.    How do you know that?
19    A.    Well, you could look at her board and find
20  out when she was flying at that time.  I mean, all of
21  us were able to see where our elected officials, unless
22  they blocked their screens.
23    Q.    Did you go look at her board to see if she
24  was flying?
25    A.    No, I did not go and look at her board, but

Page 37

1   we all knew when she was flying basically.
2       Q.   Well, and that's what I'm trying to figure
3   out is how did you know personally, you, Charlene
4   Carter, know when she was flying if you weren't looking
5   at her board.
6       A.   The only times that I knew that she
7   actually flew was when she was out campaigning for our
8   contract, and she had posted on her -- or I guess it
9   was on Southwest 556 web page.  That's basically how we
10  all knew how our, you know, member -- or our leaders
11  were either flying or not flying was through the 556
12  web page and through the -- through the LM2s which are
13  the financials.
14      Q.   What's an LM2?
15      A.   The LM2s are the recorded financial
16  statements, and every quarter you could actually
17  request to see those.  There was a couple of times that
18  I had gone in and talked to John Parrott, especially
19  since my dues were not being collected and put into my
20  account properly at one point.
21      Q.   Now, a union officer can fly trips for pay
22  while serving as a union officer, correct?
23      A.   Oh, yes.  Yes.
24      Q.   So how do you know that Ms. Stone was not
25  flying trips for pay?

Page 38

1       A.   Well, I knew she was at some point because
2   they would post it when they were flying.
3       Q.   So your understanding was that any time
4   Ms. Stone did not post that she was flying and working
5   as a flight attendant, she was not doing so?
6       A.   No.  She has a full-time job within the
7   union office.
8       Q.   Going back to Exhibit 3, if we look at the
9   first page and the second page, those both appear to be
10  videos; is that correct?
11      A.   Yes.
12      Q.   Are they videos?
13      A.   They are videos, yes.
14      Q.   Now, when an individual goes into Facebook
15  Messenger and opens it, those videos play
16  automatically, don't they?
17      A.   No, they do not.
18      Q.   What is your basis for disputing that those
19  videos automatically begin playing when you open the
20  message?
21      A.   You have to click on the button that plays
22  it.
23      Q.   You were present at the arbitration in
24  2018, correct?
25      A.   That is correct.

Page 39

1       Q.   And you were present for Audrey Stone's
2   testimony about those videos, correct?
3       A.   That is correct.
4       Q.   And you were present when she testified
5   that when she opened Facebook, those began playing,
6   correct?
7       A.   They had to turn those videos on to play
8   them.
9       Q.   So you dispute her prior testimony that
10  those played automatically when she opened the
11  messenger window to your messages?
12      A.   That is correct.  Any time you open up a
13  message, you have to click on the actual message for it
14  to play.
15      Q.   Why did you send these messages to
16  Ms. Stone?
17      A.   They had participated in a march, it was
18  after President Trump was elected, they went to DC, and
19  the main sponsor for that march was Planned Parenthood.
20  The entire time everything was -- or through that march
21  was all pretty much to do with reproductive rights, and
22  they went on our dime, as in union dues.  They paid
23  for -- we paid for their food, their travel, their
24  lodging, and whatever incidentals that they did there.
25  The union membership was not informed prior to them

Page 40

1   going.
2       They took about 20 women and marched at
3   this march, which I felt that -- and along with a lot
4   of others, felt that this was inappropriate, as in
5   representing us as, you know, careered flight
6   attendants, and she and these women went out and there
7   was a campaign and you can look it up, they wore
8   pink -- and they're called pussyhats -- and they also
9   marched with a banner that represented that they were
10  supporting or marching for Southwest Airlines Flight
11  Attendants Local 556, and that march was supported and
12  funded by, and I know my union also funds money to
13  Planned Parenthood, for abortions.
14      Q.   Now, you've previously testified and
15  admitted that the women's march was not exclusively
16  about abortion, correct?
17      A.   That was the main subject.
18      Q.   And what is your basis for contending that
19  the primary purpose of the women's march was to address
20  reproductive rights?
21      A.   That is what Planned Parenthood was there
22  for, and if you listened to the -- Cecile Richards who
23  is -- who was the CEO or president of Planned
24  Parenthood, that was the main focus on that march.
25      Q.   And what were you hoping to accomplish when

Page 41

1  you sent these messages to Ms. Stone?
2      A.    Honestly, I was hoping that she would
3  actually contact me so that we could finally talk in
4  regards to how they spend our money.
5      Q.    I'd like to direct your attention to
6  page 59, and they're a little hard to read because
7  there's images underneath them you can see in the lower
8  right-hand corner, and 596 on the Exhibit 3, so the
9  first two pages.
10      A.    Okay.  Five -- so the first two pages.
11  Okay.
12      Q.    Where on page 595 do you ask Ms. Stone to
13  engage with you in a discussion about reproductive
14  rights or the women's march?
15      A.    I don't specifically ask her.
16      Q.    What about on page 596 with the second
17  abortion video, where there do you invite her, ask her
18  to reach out and contact you?
19      A.    This all had to do with TWU and the local
20  union that we had.  It was all about -- I didn't ask
21  her specifically, but it -- it was sponsored by our
22  union.
23      Q.    But your sworn testimony under oath today
24  is that in sending these two videos but not asking her
25  to contact you, you were trying to get her to contact

Page 42

1  you?
2      A.    Yes, as our president of our union, yes.
3      Q.    What do you think motivated Ms. Stone to
4  report you to Southwest Airlines?
5          MR. GILLIAM:  Objection.  Speculation.  You
6  can answer.
7      A.    There have been issues within our union for
8  quite some time.  We were never being turned in for
9  anything until Audrey Stone and her team came into
10  office.  Social media was never a issue until they
11  became in office.  There was supporters of the Stone
12  administration and there were objectors to the Stone
13  administration, and most of us that were vocal against
14  the Stone administration were turned in and either
15  suspended or we had people fired.  It was to shut us
16  up.  And it went on for quite some time.
17  BY MR. CORRELL:
18      Q.    So is it your belief then that Ms. Stone
19  would not have reported you if you were not a union
20  objector?
21          MR. GILLIAM:  Objection.  Calls for
22  speculation.
23      A.    Yes.
24  BY MR. CORRELL:
25      Q.    What is your basis for that belief?

Page 43

1      A.    If I would have not been an objector, she
2  would have been able to file charges against me and
3  then I would have had a trial, which I would have had
4  to have paid for, and then they would have put me in
5  bad standing.  The only way that they could go after me
6  at this point was to get me fired.
7      Q.    So just so I understand then, Ms. Stone's
8  only option, because you were an objector, was to go to
9  the company as opposed to going through the union --
10          MR. GILLIAM:  Objection --
11  BY MR. CORRELL:
12      Q.    -- if she wanted -- if she wanted to
13  pursue --
14          MR. CORRELL:  Let me finish, counsel, I
15  wasn't finished with my question.
16          MR. GILLIAM:  Sure, sure.  I'm sorry.  I
17  thought you were done.
18          MR. CORRELL:  Let -- I'll just rephrase it.
19  BY MR. CORRELL:
20      Q.    Based on your understanding as a flight
21  attendant, former member of TWU 556, if Ms. Stone felt
22  she was being intimidated by these images, because you
23  were an objector, did she have anywhere else she could
24  report it?
25          MR. GILLIAM:  Objection.  Incomplete

Page 44

1  hypothetical.
2      A.    If Ms. Stone were the president of our
3  union -- which she was -- and this was directly a union
4  per se business because this is what our union
5  represented at this march, this should have been
6  handled within the union.  It has never been the
7  practice until Audrey Stone and her administration, had
8  it ever been the practice to turn union members in to
9  the company when it re -- when it related to union
10  business, and this is clearly union business when they
11  took these 20 women to this march and represented us as
12  flight attendants.  It was our union president who I
13  sent this message to, and it refers to Local 556 and
14  TWU.  This had nothing to do with her as an individual.
15  It had everything to do with how the union was
16  conducting our business and -- and using our money.
17  BY MR. CORRELL:
18      Q.    So is it your position then that because
19  she was the president of the union, no matter what you
20  did, she shouldn't report you to Southwest Airlines?
21      A.    When they take office, they, under oath,
22  swear to hold up the constitution under TWU to never
23  harm a member.  Now, I was an objector, but I also
24  paid, still, union dues, which they used to go to this
25  march, and we have always, until their administration,

Page 45

1  been able to voice our objections in any way, whether
2  it be through a union meeting, through emails, or
3  through -- now, because we have the ability to do it
4  through Facebook messaging, which the union had used --
5  this was strictly regarding how they were spending our
6  money and what they were doing to represent us as a
7  whole.  They did not represent every union person at
8  this march.  And under the rules of our constitution I
9  believe it was -- is what it is, we have our -- we had
10 freedoms to speak because we actually pay them to
11 represent us.
12     Q.    So if you had sent her messages threatening
13 her harm would it have been appropriate for her to
14 report you to Southwest Airlines?
15          MR. GILLIAM:  Objection.  Calls for
16 speculation.
17     A.    If anybody threatens anybody harm, if
18 that's how she felt, then she should have reported me
19 to the police.
20 BY MR. CORRELL:
21     Q.    So the answer to my question is no, you do
22 not believe she should have reported you to Southwest
23 Airlines if you threatened her harm?
24          MR. GILLIAM:  Objection.  Vague.
25     A.    No.

Page 46

1  BY MR. CORRELL:
2     Q.    Let me ask it again just to make the record
3  clear.
4          Had you sent Ms. Stone a message that said,
5  "I am going to harm you," is it your view, based on
6  what you have testified to today, that it would be
7  inappropriate for her to report you to Southwest
8  Airlines?
9          MR. GILLIAM:  Objection.  Incomplete
10 hypothetical.
11     A.    She should report me if she is afraid of me
12 personally harming her, she should send it to the
13 police.
14          MR. CORRELL:  Move to strike as
15 non-responsive.
16 BY MR. CORRELL:
17     Q.    I am asking a very specific question.  I
18 understand that you would have her report it to the
19 police.  Would it be inappropriate for her to also
20 report it to Southwest Airlines?
21          MR. GILLIAM:  Objection, incomplete.
22     A.    Yes, it would be inappropriate to send it
23 to Southwest Airlines.
24 BY MR. CORRELL:
25     Q.    Okay.  Thank you.

Page 47

1     A.    This is union business.
2     Q.    If -- if you were to send a message to a
3  union officer who is African-American including the N
4  word, would it be inappropriate for that person to
5  report that to Southwest Airlines?
6          MR. GILLIAM:  Objection.  Incomplete
7  hypothetical.
8     A.    It's union business, it would be handled
9  through the union.
10         MR. CORRELL:  Mr. Reporter, can you please
11 restate the question.
12 BY MR. CORRELL:
13     Q.    Mrs. Carter, I need you to answer the
14 questions I'm asking.
15    A.    No, they should not take it to Southwest.
16 It's union business.
17    Q.    So no matter what happens between an
18 objector and a union officer, the union officer should
19 never report it to Southwest Airlines?
20         MR. GILLIAM:  Objection.  Incomplete
21 hypothetical.
22         MR. CORRELL:  It's not a hypothetical,
23 Counsel.
24    A.    No, they should not take it to Southwest
25 Airlines.  If it regards to union business there are

Page 48

1  channels within our union that would take care of that.
2  BY MR. CORRELL:
3     Q.    What channel was available to Ms. Stone,
4  since she could not have a union trial?
5     A.    I'm sure she could call me in and I'm sure
6  we could have had a discussion with legal counsel.
7  That is the -- one of the biggest reasons that we have
8  an attorney.  I'm sure there are other channels that
9  she could used.  I know if I were the president, I
10 would have not turned somebody in.
11    Q.    What other channels were available to her?
12    A.    To bring me into the office and speak to me
13 instead of sending this to Southwest Airlines.  There
14 are other channels, just like she had quoted about not
15 turning other flight attendants in and that would have
16 been -- oh, I forget what the -- the -- instead of --
17 oh, I can't think of the name of it.  But where you can
18 actually handle disputes, there is a mechanism there.
19    Q.    Now, you have no problem, yourself,
20 reporting other flight attendants to Southwest
21 Airlines, correct?
22    A.    I have only reported one flight attendant
23 to Southwest Airlines and that was due to a direct
24 threat with the word "execution."
25    Q.    Now, that direct threat was made by Brian

Page 49

1  Talbert, correct?
2      A.    That is correct.
3      Q.    And he was talking about the objectors from
4  the union, right?
5      A.    Yes, he was.
6      Q.    Did you call the police about that?
7      A.    I believe Greg Hofer did because he
8  actually used his name within that context.  He made a
9  direct threat to him.
10     Q.    Do you know what the police did with that?
11     A.    That, I do not know.  You would have to ask
12  Greg Hofer.
13     Q.    Why didn't you contact the police?
14     A.    He didn't make a direct threat to me
15  personally; otherwise I would have.
16     Q.    Then why did you report him to Southwest
17  Airlines?
18     A.    Because the execution was -- it was after
19  9/11, and when you are wanting to execute somebody,
20  that either means you want to harm them physically or
21  you want to get them fired.
22     Q.    Which did you believe it was?
23     A.    Either way harms either somebody
24  financially within their career or it harms somebody
25  physically.

Page 50

1      Q.    Which threat did you believe he was making?
2  For a physical harm or to get somebody terminated?
3          MR. GILLIAM:  Objection.  Calls for
4  speculation.  You can answer.
5      A.    Knowing Brian Talbert, it would be to get
6  somebody fired.
7  BY MR. CORRELL:
8      Q.    So why did you report that to Southwest
9  Airlines?
10     A.    Because he and others were putting out a
11  list and he had made a direct threat to harm us, as in
12  flight attendants, with our careers.
13     Q.    Because you were objectors, correct?
14     A.    Yes.
15     Q.    Wasn't that union business?
16     A.    Yes.  And nobody did anything about it in
17  the union.
18     Q.    Did you report it to the union?
19     A.    I believe we all reported it to the union
20  with a big letter.
21     Q.    Did you personally and individually make a
22  complaint to the union about this posting on Facebook?
23     A.    Yes, I did.
24     Q.    What came of it?
25     A.    Nothing.

Page 51

1      Q.    When did you make that complaint to the
2  union?
3      A.    That would have been the year that this
4  happened.  I do not recall the actual year that it
5  happened.  I think it was 2015.
6      Q.    How long after -- please go ahead.
7      A.    I'm not sure on the exact date.
8      Q.    How long after reporting Mr. Talbert to the
9  union did you wait before contacting Southwest
10  Airlines?
11     A.    That, I don't recall.
12     Q.    Now, in looking at, again, Exhibit 3,
13  page 595 and 596, you previously admitted under oath
14  that you understand that the manner of your messages
15  was unacceptable, correct?
16     A.    The manner in which my messages were
17  unacceptable, can you clarify that?
18     Q.    Sure.  You have previously admitted under
19  oath that sending videos of aborted fetuses and using
20  the language that you used in these messages was
21  unacceptable --
22         MR. GILLIAM:  Objection, vague.
23     A.    And where do you find that?
24  BY MR. CORRELL:
25     Q.    I'm asking if you recall the testimony.

Page 52

1      A.    No, I do not.
2      Q.    Do you dispute that?
3      A.    I can't dispute something if I don't know.
4      Q.    Okay.  As you sit here today, do you agree
5  that these messages in their manner -- not the fact
6  that they're talking about being pro life -- but the
7  way you communicated with Ms. Stone was inappropriate?
8          MR. GILLIAM:  Objection.  Vague.
9      A.    No, I do not.
10  BY MR. CORRELL:
11     Q.    Okay.  You testified at your own
12  arbitration hearing, correct?
13     A.    Yes, I do -- I did.
14     Q.    You were -- and you recall that you were
15  under oath at that hearing, correct?
16     A.    Yes.
17     Q.    And to the best of your ability you
18  testified truthfully at that hearing, correct?
19     A.    Yes.
20     Q.    I am going to direct you to what will be
21  introduced as Exhibit Number 4.
22         (Deposition Ex. 4 marked)
23  BY MR. CORRELL:
24     Q.    I will represent to you that this is an
25  excerpt of the --

Page 53

1    A.   I don't have -- I don't have Exhibit
2  Number 4.
3    Q.   Sure.  It should populate in just a moment.
4    A.   Okay.  I have it.  I've got it.
5    Q.   And I will represent to you that this is an
6  excerpt of volume 2 of the deposition -- of the
7  arbitration transcript --
8    A.   Okay.
9    Q.   -- taken on December 8th, 2017.  It has
10  been excerpted to include only your testimony but all
11  of your testimony.  I would like to direct you
12  specifically to page 359 using the page numbers in the
13  upper right-hand corner.
14    A.   Okay.  Okay.
15    Q.   And if we look beginning at line 8 through
16  line 24, can you read that quietly to yourself and
17  please tell me when you have finished.
18    A.   Okay.
19    Q.   So in this testimony when your counsel was
20  questioning you, you were asked if you would send the
21  same messages again in the future and you say you would
22  not, correct?
23    A.   I would not use the Facebook Messenger.  I
24  would walk these into her office.
25    Q.   So your sworn testimony today is when you

Page 54

1  say, "I realize this is a mistake.  I realize that I
2  need to do it in a different manner, and I'm sorry for
3  the manner that I did send it through and I take full
4  responsibility for it," you meant you would walk
5  pictures of abortions in to Ms. Stone?
6    A.   I would have gone into her office instead
7  and had a meeting with her at that point, because this
8  would have never happened as in getting me fired, they
9  used the social media policy in this to get me fired.
10  If this would have been at a union meeting, which they
11  get heated and things are said and things are produced
12  in union meetings, I would have never been fired.
13    Q.   So when you testified before the arbitrator
14  under oath, "I'm sorry for the manner that I did send
15  it through," what did you mean?
16    A.   I'm sorry for the manner that it was sent
17  through a Facebook Messenger.
18    Q.   So you were not apologizing for the tenor
19  of the messages?
20    A.   When she was at the march, she saw these
21  exact same type of pictures through the march because
22  they were on big screens, and there is no way, unless
23  she shielded her face through the entire march, would
24  she have not seen some of these exact, if not more in
25  detail.

Page 55

1      So the only reason I believe she turned me
2  in and the way that she could get me fired was due to
3  that it fell under the social media policy.  I could
4  have taken these pictures into a union meeting, if I
5  was not an objector, and been able to do the exact same
6  thing and show her and not have been fired.
7    MR. CORRELL:  I object.  I move to strike
8  as non-responsive.
9      Mr. Hendrick, can you please read back my
10  last question?
11    THE REPORTER:  Question:  "So you were not
12  apologizing for the tenor of the messages?"
13    A.   I apologized for -- if in any way that it
14  harmed her personally, yes.  Am I sorry that I have a
15  very strong objection to them going to a Planned
16  Parenthood march?  I'm not sorry for my belief system
17  in that we should not be represented in that manner.
18  Am I sorry that if it harmed her in any way?  Yes.
19    Q.   So that's all you meant when you said in
20  front of the arbitrator under oath, "I'm sorry for the
21  manner that I did send it through"?
22    A.   I'm sorry if it harmed her in a manner of
23  the way I sent it to her, yes.
24    Q.   And by manner you just mean through
25  Facebook Messenger?

Page 56

1    A.   The only way that she could get me fired
2  was through the social media policy.  If this were have
3  been -- if this had been at a union meeting, this would
4  have never come to me being fired.
5    Q.   Now, she didn't get you fired exclusively
6  under the workplace bullying -- or excuse me, under the
7  social media policy, did she?
8    A.   That was what I was called in for, yes.
9    Q.   I'd like to direct you back to Exhibit 1.
10    A.   Okay.  They're not pulling up so you'll
11  have to give me a second.
12    Q.   Please take your time.
13    A.   I don't have 1.  I have 4.  That's all
14  that's showing up.
15    Q.   If you go back to the folder labeled Marked
16  Exhibits, it should prevent -- present you with all
17  four exhibits.  You may have to refresh the folder by
18  clicking on the folder icon.
19    A.   Okay.  That -- okay.  That's what I did.
20  I'm still only seeing Number 4.
21    Q.   So on the left-hand side of the screen, you
22  should have a file tree.
23    A.   Mm-hmm.
24    Q.   On the right-hand side of the screen you
25  should have icons for PDFs and you're saying you only

Page 57

1 see Exhibit 4, you don't see the other three?
2 A. Yeah, no, there's -- there's only number 4.
3 Q. Okay. Let's try refreshing the browser.
4 A. And that's what I did do. I've done that
5 twice.
6 Q. Okay.
7 A. I just did it again. Let's see if it shows
8 back up. Now I have nothing in that folder.
9 Q. Let's try this. On the left-hand file tree
10 do you see the folder labeled Deposition of Charlene
11 Carter?
12 A. Yes.
13 Q. Let's click on that.
14 A. Oh. There you go. Okay. So go to 1?
15 Q. Yes, ma'am.
16 A. Okay.
17 Q. Now your termination references -- your
18 termination letter references two additional policies,
19 correct, beyond the social media policy?
20 A. That is correct.
21 Q. It references both a workplace bullying and
22 hazing policy and Southwest's policy concerning
23 harassment, sexual harassment, discrimination and
24 retaliation, right?
25 A. Mm-hmm, yes.

Page 58

1 Q. Both of those policies were addressed
2 during your fact-finding, were they not?
3 A. During the fact-finding? Very small on the
4 bullying/hazing. It was mainly social media.
5 Q. What is your basis for making that
6 statement?
7 A. My -- well, I can't remember because I'd
8 have to read back into my -- into my fact-finding
9 notes.
10 Q. So as you sit here today, without
11 refreshing your memory, you cannot recall?
12 A. Correct.
13 Q. Do you know if Ms. Stone reported you for
14 bullying?
15 A. I believe she did, yes.
16 Q. So she didn't report you just for social
17 media issues?
18 A. She reported me also as just being a flight
19 attendant at Southwest Airlines.
20 Q. What do you mean by that?
21 A. She never referenced that this was due to a
22 planned union march and she never referenced that she
23 was the president of the union.
24 Q. In one of your messages to Ms. Stone
25 associated with the abortion videos, you tell her, you

Page 59

1 "can't wait to see you back on the line." What did you
2 mean by that?
3 A. She is paid by all of us and the things
4 that they'd been doing a lot of us did not agree with,
5 and we would be happy to see her back on -- on line as
6 in not having to pay her through our union dues.
7 Q. Do you understand how that could be
8 perceived as a threat?
9 MR. GILLIAM: Objection, form. Calls for
10 speculation.
11 A. No. No, I do not. She -- I believe she
12 just needed to start flying again and us not paying her
13 for the things that we didn't agree with them doing.
14 If she wanted to go to a march such as this, pay for it
15 yourself.
16 BY MR. CORRELL:
17 Q. She was also in Washington for the women's
18 committee meeting of the TWU, correct?
19 A. That is correct.
20 Q. When did that conclude?
21 A. I believe on Thursday. And I'm going to
22 make reference to this. There were minutes, meeting
23 minutes before this that the executive board put forth
24 that they were going to this march. This march was
25 already set up and planned, and during their executive

Page 60

1 meetings, they were knitting their pink pussyhats for
2 that march.
3 Q. Did they state why they were going to the
4 march?
5 A. They stated they were going to -- no, I
6 don't believe they did in the minutes. It was Jessica
7 Parker and all of them that led the women's committee,
8 and Audrey was part of that.
9 Q. At any point did --
10 A. They went on either a Thursday or a Friday,
11 and then the March was on Saturday. But the whole
12 reason they were going to that meeting was to set up
13 for that march.
14 Q. So your testimony is that but for the
15 women's march they would not have attended the women's
16 committee meeting?
17 A. The women's committee meeting was set up
18 because of this march.
19 Q. What is your basis for that assertion?
20 A. In the executive board minute meeting -- or
21 minutes prior to that march.
22 Q. So TWU International only set up a women's
23 committee meeting in Washington, D.C., because of this
24 meeting?
25 A. The local, our local representatives within

Page 61

1  the minutes -- the meeting minutes prior to this march,
2  they knew they were going to the march. It was the
3  whole reason to have this meeting at the same time so
4  that they could participate in this march.
5      Q.    Who set the meeting in Washington, D.C.?
6      A.    I don't know exactly who set the meeting
7  up, but I do know that the main representatives for
8  that at the time were Audrey Stone and Jessica Parker,
9  I do believe.
10     Q.    The meeting in Washington, D.C., of the
11 women's committee was hosted by TWU International for
12 women's committees across the country, correct?
13     A.    I believe so, yes. And their objective was
14 to go to the march.
15     Q.    Who? Who is "their"?
16     A.    I don't know who else was there in the --
17     Q.    Hold on, let me say it differently --
18     A.    But from what I have seen, it is our
19 leadership at Southwest Airlines Local 556.
20     Q.    When you say it is "their objective," who
21 are you referring to?
22     A.    Local 556 within their meeting minutes
23 prior to the march, they speak about how they're
24 getting ready for the women's committee meeting and the
25 march and that they will there -- be there to help set

Page 62

1  up for the march.
2      Q.    Did anything in the minutes say that they
3  were going to march for abortion?
4      A.    No, not specifically.
5      Q.    Did anything in the minutes say why they
6  were going to march?
7      A.    It just said they were going to the march
8  and they were going to be there to help set up.
9      Q.    You also chose to send Ms. Stone an image
10 via Facebook Messenger of women wearing what we have
11 called in earlier proceedings vagina headdresses. Do
12 you recall that?
13     A.    Yes, I do.
14     Q.    Why did you send that image to her?
15     A.    Because through the march, they -- there
16 were many -- I don't know how many -- but many that
17 were depicted, even small children which I find very
18 disturbing, in homemade costumes that depicted a
19 vagina, and I was just thankful that they did not dress
20 representing us as flight attendants who I believe are
21 professional, you know, it's a career for us, but yet
22 they did don the pink pussyhats.
23     Q.    So I'm not following your answer there.
24 You sent her pictures of women wearing anatomically
25 correct vaginas on their heads because you were

Page 63

1  thankful they didn't dress like vaginas?
2      A.    Yes. But that yet representing us with the
3  pink pussyhats was not what I would consider very
4  professional.
5      Q.    The pink pussyhats are designed to look
6  like cat ears, aren't they?
7      A.    No, they're not.
8      Q.    They're designed to look anatomically like
9  a vagina?
10     A.    That is correct.
11     Q.    What is your basis for that assertion?
12     A.    There was a whole campaign, and I -- I know
13 that I sent this information to my attorney, that the
14 women that were wearing those was to depict the
15 anatomical version of a pussy.
16     Q.    And your sworn testimony is you believe
17 that a pussyhat looks anatomically like a vagina?
18     A.    That is what they were worn for.
19     Q.    Is that what it looks like?
20     A.    That is what it depicts.
21     Q.    So in your opinion, the pink pussyhats look
22 anatomically like a vagina?
23     A.    As a hat, yes.
24     Q.    Was your objection to the hats also part of
25 what you claim were your religious beliefs?

Page 64

1      A.    I don't believe -- yes, I don't believe
2  that women should be -- if you are going to a women's
3  march and you are in support of women, I don't believe
4  that you should be representing us in such a manner
5  wearing pink pussyhats.
6      Q.    Where does that derive from your religious
7  beliefs?
8      A.    Where does that derive from my religious?
9  That's more of an integrity and professional opinion.
10 I don't believe that we should be representing
11 ourselves as a sexual -- I -- I don't even know how to
12 word that.
13     Q.    So is it part of your claim in this lawsuit
14 that the -- your objections to the pussyhats was you
15 were reaching out because you were furthering your
16 religious beliefs?
17     A.    Yes.
18     Q.    Okay. What religious belief?
19     A.    You don't go around wearing pink pussyhats
20 on your head as -- as --
21     Q.    How does that square with your religious
22 belief system --
23     A.    I don't know how to absolutely answer that
24 religious belief. I know where you're going with this.
25 I have to word this in a way I -- I honestly don't

Page 65

1  know, to be quite honest with you.  All I know is that
2  being a Christian, I would not wear a pink pussyhat
3  marching in a Planned Parenthood march.
4      Q.    But being a Christian you believe it is
5  acceptable to send pictures of vaginas to another
6  employee?
7      A.    When you go to a march and you wear a pink
8  pussyhat and you are surrounded by other people that
9  are marching in such costumes, yes, I would have
10  never -- I believe that that holds true to my Christian
11  values.  I wouldn't be there marching with women --
12      Q.    My question was different, Ms. Carter.  My
13  question was, but you believe it is within your
14  Christian beliefs to send a picture of anatomically
15  correct vaginas around the faces of women to another
16  individual?
17      A.    When she donned the pink pussyhat and
18  represented us as flight attendants at this march and
19  marched with other women, yes, at this point for me it
20  was a -- a direct -- it was a disgusting act as far as
21  I'm concerned, and my belief system, yeah, I -- I
22  wanted her to know that that's how I felt that it was a
23  very disgusting depiction of who I am as a member and
24  that she was out there donning the hats that they did
25  wear and marching with others.

Page 66

1      Q.    In your opinion, was it a disgusting act to
2  send her the anatomically correct vagina headdresses
3  around the faces of women?
4      A.    I believe it was a disgusting act that she
5  represented us at this march, her and 20 other women,
6  and she saw these types of women there and/or men or
7  other things, so it should not have been a surprise to
8  her as my union president and going to that march to
9  see that.
10          MR. CORRELL:  Mr. Hendrick, can you please
11  read back my last question?
12      A.    I'm just gonna say yes.
13  BY MR. CORRELL:
14      Q.    Well, I would like to get that on the
15  record.
16      A.    Okay.
17          THE REPORTER:  Question: "In your opinion,
18  was it a disgusting act to send her the anatomically
19  correct vagina headdresses around the faces of women?"
20      A.    No.
21  BY MR. CORRELL:
22      Q.    At your fact-finding hearing you were told
23  to keep the proceedings confidential, correct?
24      A.    At my fact-finding meeting, yes.
25      Q.    But you didn't, did you?

Page 67

1      A.    I didn't?
2      Q.    No, you did not.  You did not keep your
3  fact-finding proceedings confidential, did you, at the
4  time that you were still going through the
5  fact-finding?
6      A.    I spoke to my representative and I spoke to
7  the people at the union, Beth Ross.
8      Q.    But you also contacted other people to tell
9  them that Audrey Stone was the one that reported you,
10  didn't you?
11      A.    That was prior to my fact-finding meeting.
12      Q.    Okay.  Tell me about that.
13      A.    I had never been called in before and spoke
14  about it just like anybody -- any other flight
15  attendant would have.
16      Q.    And prior to going to your fact-finding,
17  you were told that it was Audrey Stone that had
18  reported you?
19      A.    When Meggan Jones left the very first
20  message and then when Ed Schneider said to me that it
21  had to do with something that I had sent another what
22  he called flight attendant, I had only sent it to one
23  person and that would have been my union president
24  Audrey Stone.
25      Q.    But you weren't certain until you went to

Page 68

1  the fact-finding meeting, right?
2      A.    No, I was certain, because I'd only sent it
3  to one person and that was my union president Audrey
4  Stone.
5          (Deposition Ex. 5 marked)
6  BY MR. CORRELL:
7      Q.    I am going to direct you to another
8  exhibit.  This is going to be EE.  I'm sorry.  That's
9  my designation.  I'll have to get you the new one.
10  It's going to be Exhibit 5.  Takes just a moment here.
11  Let me know when you have that in front of you.
12      A.    Okay.  I have it.
13      Q.    Okay.  Do you recognize this document?
14      A.    Yes, I do.
15      Q.    What is this document?
16      A.    It is talking to Jeanna Jackson regarding
17  my being called in.
18      Q.    And this is dated March 30th, 2017,
19  correct?
20      A.    That is correct.
21      Q.    And that is after your fact-finding but
22  before your step 2 proceedings, right?
23      A.    That is correct.
24      Q.    Who is Jeanna Jackson?
25      A.    She is a very good friend of mine who has

Page 69

1    also been harmed by this administration, and she is a
2    flight attendant at Southwest Airlines.
3        Q.    And who is the Beth referenced in the
4    message here?
5        A.    Beth Ross was my union representative.
6        Q.    And so here on March 30th, 2017, you write,
7    "Beth got the info from Employee Relations and it was
8    Audrey that wrote me up.  She also said they sent her
9    more info than she thinks they may not have wanted her
10   to see."
11       Did I read that correctly?
12       A.    You did.
13       Q.    So is it your sworn testimony today that
14   you had confirmed prior to Beth giving you this
15   information that Audrey was the one who had reported
16   you?
17       A.    Yes, this just confirmed it because Beth
18   and I had been talking about who had turned me in, and
19   she had actually given me the info.  This was after
20   the -- the whole thing started.  I already knew this,
21   but Beth and I had talked about it and she finally
22   confirmed it when she got the information from employee
23   relations that Audrey had turned me in.
24       Q.    Why are you sharing this information with
25   Ms. Jackson?

Page 70

1        A.    Due to the fact that Jeanna and I are very
2    good friends and we're both flight attendants and we
3    had both been harmed by this administration, I was
4    sharing it confidentially with her.
5        Q.    But in so doing, you were violating the
6    instruction to keep the information from your
7    fact-finding confidential, correct?
8        A.    I had already shared this information prior
9    to my fact-finding meeting with Jeanna.
10       Q.    Who all did you --
11       A.    This was just another -- this was just
12   another confirmation that I sent to Jeanna.
13       Q.    Did you do that before or after your
14   fact-finding meeting?
15       A.    Well, Jeanna knew before my fact-finding
16   meeting.
17       Q.    Who all did you tell prior to your
18   fact-finding meeting that Audrey Stone had reported you
19   to the company?
20       A.    I shared it on ONE LUV.
21       Q.    What is ONE LUV?
22       A.    Which is a union page.
23       Everybody knew that Audrey had turned me
24   in.
25       Q.    Why did you share it on that page?

Page 71

1        A.    That is a union page that we all share,
2    there's several of them on -- online, on Facebook.  I'm
3    hooked to several -- or actually was hooked to many of
4    them.  And I am not the only one that has ever shared
5    anything quite like this.
6        Q.    Why did you choose to share it?
7        A.    Because I wanted people to know that this
8    is who represents us, and that a union leader should
9    not harm a union member, and they had been doing this
10   over and over again.
11       Q.    Prior to posting that information to ONE
12   LUV, at any point did you stop and consider whether
13   doing so could expose Ms. Stone to retaliation?
14       A.    Ms. Stone had already been a part of
15   another Facebook group that she was actually the admin
16   to who allowed a ton of harm to come to other flight
17   attendants.  This was way before my messaging.
18       MR. CORRELL:  Objection, move to strike as
19   non-responsive.
20       Mr. Hendrick, will you read back my
21   question.
22       THE REPORTER:  Question: "Prior to posting
23   that information to ONE LUV, at any point did you stop
24   and consider whether doing so could expose Ms. Stone to
25   retaliation?"

Page 72

1        A.    No.  Ms. Stone was protected because she
2    was our union president.
3        MR. CORRELL:  Move to strike as
4    non-responsive everything after the answer "no."
5    BY MR. CORRELL:
6        Q.    In this message below, it also says, "They
7    sent her more info than she thinks they may not
8    want" -- "may not wanted to have her see."
9        What is that referencing?
10       A.    It means that Beth didn't believe that they
11   really wanted them to see that information because
12   instead of -- due to the fact that Audrey tells them
13   exactly how they should punish me.
14       Q.    Audrey tells who?
15       A.    Audrey in her letter tells, I believe it is
16   Suzanne, her base manager, Sonya Lacore, which is our
17   VP of in flight, and whoever else is blind copied or
18   copied to that email, and it may be Mike Sims, and it
19   also may be my base manager Ed Schneider.
20       She references in her letter how I should
21   be punished.
22       Q.    We'll come back to that after a break.
23       What specific info was she referencing?  It
24   says here, "So she is going to share that with me
25   before my meeting."  Did she subsequently share

Page 73

1    additional information with you that she told you was
2    accidentally disclosed to her?
3        A.   Yes, she said that she was going to share
4    that with me prior to my second step meeting.
5        Q.   Did she do so?
6        A.   She did not, unfortunately.  She said she
7    was gonna take it -- instead of showing me -- she did
8    tell me that she was the one who turned me in and who
9    she turned me in to, and then she was going to have
10   another meeting with Mike Sims after the fact, and Mike
11   Sims, when he found out it was -- he even states it in
12   my second step meeting that the company should stay out
13   of union business.
14       Q.   In the next line she said -- you say, "She
15   doesn't want me to let on that I know in this meeting."
16            Did I read that correctly?
17       A.   That is correct.  Because she wanted to
18   have a meeting with Mike Sims on her own.
19       Q.   So what information did you conceal from
20   Mr. Sims on Ms. Ross's instruction?
21       A.   I didn't conceal anything because she
22   didn't give me anything.
23       Q.   So there was nothing for you to "not let on
24   what I know" about?
25       A.   Let on -- no, I --

Page 74

1        Q.   She -- so -- let me put it back up.  I'm
2    sorry.  That's a bad question.
3        A.   I --
4        Q.   So when she said she doesn't want -- when
5    you write here, "She doesn't want me to let on that I
6    know this in the meeting" --
7        A.   Yeah, the --
8        Q.   What is the "this" -- what is the "this" in
9    that sentence?
10       A.   "This" would be that -- okay.  Let's see.
11   "She doesn't want me to let on that I know" that --
12   that I know that she knows that it was Audrey Stone who
13   turned -- she wanted to make that reference to Mike
14   Sims.  She wanted to have that meeting with Mike Sims.
15   But I already stated it within my meeting that it was
16   Audrey Stone, my union president, that turned me in.
17       Q.   In the message below, Ms. Jackson says,
18   "I'll call you when I get in my car."  Did you guys
19   have a conversation about this message?
20       A.   You know what?  I don't recall.
21       Q.   You understand that in your lawsuit you
22   assert that Ed Schneider terminated you, in part at
23   least, based on your religious beliefs, correct?
24       A.   That is correct.
25       Q.   What is your basis for that assertion?

Page 75

1        A.   I told him that I was a Christian in my
2    faith -- in my fact-finding meeting and that I am
3    against -- well, I was against the march and them
4    marching for Planned Parenthood due to my strong
5    beliefs against abortion.
6        Q.   Do you have any evidence that Mr. Schneider
7    would have reached a different outcome had you been --
8    held the same views but they were not related to your
9    religious beliefs?
10       A.   That, I cannot speak for him.
11       Q.   I'm asking if you have any evidence of that
12   or anything you would point to for that fact.
13       A.   I believe that if -- I should have been
14   able to, given -- and not knowing this prior to this --
15   that I could have some kind of accommodation because of
16   my Christian religion, but when I said that within that
17   meeting, maybe he should have referred me to -- I
18   believe now it's called the ACT committee.  I had no
19   idea that that committee even existed.
20       Q.   Are you aware of Southwest ever giving a
21   religious accommodation to excuse prior conduct?
22            MR. GILLIAM:  Objection to the extent it
23   calls for a legal conclusion.
24       A.   I do not.  I had never known -- I believe
25   that if you stated that you were a Christian, you know,

Page 76

1    that was enough.  I mean, I don't know what else that,
2    you know --
3    BY MR. CORRELL:
4        Q.   Well --
5        A.   I never even knew that we had an ACT
6    committee that you could even reach out to.
7        Q.   What accommodation did you want?
8        A.   I didn't know I had to have an
9    accommodation.
10       Q.   Sitting here today, you've said that you --
11   you didn't know about the ACT committee, you suggest
12   that Mr. Schneider should have referred you to the ACT
13   team.  What is it that you would have asked them for?
14       A.   I believe that I should have been protected
15   as a Christian no matter what of my beliefs.
16       Q.   So your accommodation request would have
17   been to be able to send whatever messages you wanted if
18   they were related to your Christian beliefs?
19       A.   When my union president decided to take
20   20 women in support of Planned Parenthood, yeah, I
21   should have been able to speak my mind since my money
22   was being used to --
23       Q.   My question is different.  What specific
24   exception from the social media policy did you want
25   Southwest to give you?

Page 77

1    A.   I should have been able to post my belief
2    systems without retaliation on my own personal page,
3    and that is one of the things that they got me for.
4    Q.   Well, let's stick with the private
5    messages.  Let's stick with the private messages first.
6    The private messages --
7    A.   The private messages were to my union
8    president regarding a march that she took place at.  So
9    yes, I do believe that that should have been protected
10   not only under my Christian value system, but also due
11   to the fact that she's my union president.  Not Audrey
12   Stone, but being the union president.  So yes, I --
13   Q.   Ms. Carter, I am asking you a very specific
14   question.  You have contended in this lawsuit that you
15   wanted Southwest to make an exception to the social
16   media and workplace bullying policies to accommodate
17   your religious beliefs.  Do you understand that?
18   A.   Yes, I do.
19   Q.   What exception did you want them to create
20   for you?  What would the rule be if you had gone to
21   Southwest and they'd given you what you'd wanted?
22        MR. GILLIAM:  Objection.  Calls for legal
23   conclusion.
24   A.   I don't know what kind of exception.  I
25   don't even know of what an exception would be.  But

Page 78

1    they -- I clearly stated I was a Christian.  I don't
2    believe that my union president should have gone to a
3    march that supported Planned Parenthood and who was the
4    main sponsor of that march.  When she went to represent
5    us, she put herself and our union, our -- she
6    represented us at a march that supported abortion, so
7    in this context, yes, I believe that I should have had
8    a somewhat -- at least send me to the ACT team, talk to
9    me about it, why is it that I cannot express my
10   dislike, because that's always been the case with our
11   union leadership, but for some reason in my case it's
12   not.  And yes, my Christian beliefs should have been
13   recognized within my union fact-finding meeting.  I
14   brought it up several times in that meeting.
15   BY MR. CORRELL:
16   Q.   Ms. Carter, as you sit here today, is it
17   your sworn testimony that you cannot tell me what
18   accommodation you wanted to request from Southwest
19   Airlines?
20   A.   I don't know what the accommodations are.
21   I don't even know what the ACT team was until just
22   recently.
23   Q.   I'll give you an example --
24   A.   What I can't say is if I don't -- they
25   should have recognized my Christian beliefs within the

Page 79

1    fact-finding meeting when I said I don't -- I -- I
2    don't believe in abortion and I don't believe that
3    our -- my union president should have taken our dues
4    and spent it on a march.  This -- this had everything
5    to do with just that march.
6    Q.   Ms. Carter, what I'm asking you is what is
7    it you're saying Southwest Airlines should have done to
8    accommodate your religious beliefs as soon as you
9    raised them?
10        MR. GILLIAM:  Objection to the extent it
11   calls for a legal conclusion.  You can answer.
12   BY MR. CORRELL:
13   Q.   Are you testifying that they should have
14   just said never mind to this --
15   A.   They should not have fired me over my
16   Christian beliefs.
17   Q.   Okay.
18   A.   After I expressed them in the union meeting
19   and we could have sat down and at least had a
20   conversation regarding that.
21   Q.   So is there any limit to what you would be
22   allowed to say to express your Christian beliefs to
23   other employees of Southwest Airlines in your personal
24   view?
25        MR. GILLIAM:  Objection.  Incomplete

Page 80

1    hypothetical.
2    A.   They should have accommodated this.
3    BY MR. CORRELL:
4    Q.   My question to you, Ms. Carter, is not
5    whether they should have accommodated this -- have
6    accommodated this.  I'm trying to find the parameters
7    of the accommodation you claim you were denied.  You
8    understand you are claiming in your lawsuit you were
9    denied an accommodation?
10   A.   Yes, I was denied an accommodation.
11   Q.   Do you understand that an accommodation is
12   an exception from a policy to allow for religious
13   beliefs?
14        MR. GILLIAM:  Objection.  Asks for a legal
15   conclusion.
16   A.   I'm just gonna tell you right now I believe
17   that I should have had an accommodation on this
18   specific one, yes.
19   BY MR. CORRELL:
20   Q.   And what would that have looked like?
21   A.   I don't know how they write up the
22   accommodations.  I don't know.  I -- I never even knew
23   you had to have an accommodation.  I believe my
24   accommodation falls under Title VII of the civil rights
25   that I have as a Christian or a believer, that due --

Page 81

1  and due to the fact that my union president spent money
2  to go to a march that supported abortion. If you're
3  going to go to a march regarding this type of behavior,
4  this reflected that behavior and I should have had my
5  accommodations met once I said I was a Christian, but
6  honestly, this should have also been through the union
7  representatives, they knew where I stood on this.
8       Q.   So your testimony is that you believe
9  Southwest should allow you to say whatever you want
10 however you want if it is in support of your Christian
11 beliefs?
12          MR. GILLIAM: Objection. Incomplete
13 hypothetical.
14      A.   In this context --
15 BY MR. CORRELL:
16      Q.   Hang on. Hang on.
17      A.   In this context, yes.
18      Q.   Hang on, Ms. Carter. Your testimony --
19          MR. CORRELL: Not a hypothetical, counsel.
20 BY MR. CORRELL:
21      Q.   -- is that the accommodation you should
22 have been provided is the right to say whatever you
23 want however you want if it is in support of your
24 Christian beliefs?
25      A.   Again --

Page 82

1          MR. GILLIAM: Objection. Calls for a legal
2  conclusion.
3       A.   Again, this was due to a march that my
4  union president went to, wore pink pussyhats, marched
5  with a bunch of women in support of, with being the
6  main sponsor Planned Parenthood. So in this particular
7  instance, yes, they should have given me, in this
8  particular instance, they should have given me an
9  accommodation.
10 BY MR. CORRELL:
11      Q.   Okay. So all they needed to do --
12      A.   So should -- so should have the union.
13 This should have never gone to the -- the company.
14 This should have been handled within the union
15 parameters.
16      Q.   Let me ask this differently, then.
17          So I understand you're saying part of what
18 you requested was that you be excused for the messages
19 you previously sent to Ms. Stone.
20          Do I have that correct?
21      A.   Correct.
22      Q.   Would you also have sought to be allowed to
23 send those employees to other employees again in the
24 future?
25      A.   I would have never sent those messages to

Page 83

1  anybody. This was in reflection -- or this was due to
2  the actual march that -- and I only sent it to my union
3  president because she is the one that led this
4  particular march, as in led these flight attendants to
5  this women's committee meeting and to the march. I
6  never sent it to anyone else. She was the leader and
7  this is the reason it got sent to her. There was no
8  reason for me to send it to anyone else. And it was in
9  her capacity as the union president, not her
10 personally.
11          MR. GILLIAM: Counsel, whenever it's
12 convenient for you, if you want to take a break, that's
13 fine. I think everybody's ready.
14          MR. CORRELL: Yeah, give me just two more
15 minutes and I think we'll be good.
16          MR. GILLIAM: Okay.
17          MR. CORRELL: Yeah, let's go ahead and take
18 a break now.
19          MR. GILLIAM: Okay. All right. About
20 what --
21          VIDEOGRAPHER: Hold on. Hang on. We are
22 going off the record at 11:01 a.m.
23          (Break from 11:01 a.m. until 11:14 a.m.)
24          VIDEOGRAPHER: We are going back on the
25 record at 11:14 a.m.

Page 84

1  BY MR. CORRELL:
2       Q.   Ms. Carter, before we took the break we had
3  started to talk about -- or we had gone into and talked
4  about religious accommodation issues. Before that, the
5  question I'd put to you was essentially what evidence
6  do you have that Mr. Schneider sought to discriminate
7  you on the basis of your religious beliefs and I
8  believe your answer was that he did not provide you
9  with a religious accommodation or direct you to the ACT
10 team. Do I have that correct?
11      A.   Yes.
12      Q.   Is there any other evidence that you
13 possess that Mr. Schneider acted against you because he
14 was hostile to or discriminating against your religious
15 beliefs?
16      A.   No.
17      Q.   Do you have any evidence that Mr. Schneider
18 was hostile to you or acting against you because you
19 were a union objector?
20      A.   No.
21      Q.   Ms. Jones, Meggan Jones was the assistant
22 base manager at Denver, correct?
23      A.   Yes.
24      Q.   And she participated in the fact-finding,
25 right?

Page 85

```
 1    A.   Yes.
 2    Q.   What evidence, if any, do you have that
 3 Ms. Jones sought to discriminate against you on the
 4 basis of your religious beliefs?
 5    A.   None, except that I said I was a Christian.
 6    Q.   And if I ask you the same question about
 7 Ms. Gutierrez, would your response be the same?
 8    A.   Correct.
 9    Q.   And if I ask you the same question about
10 Ms. Emlet, would your response be the same?
11    A.   Yes, sir.
12    Q.   With respect to Ms. Jones, do you have any
13 evidence that she sought to discriminate you based on
14 your status as a union objector?
15    A.   No.
16    Q.   And would the same be true for
17 Ms. Gutierrez?
18    A.   Yes.
19    Q.   And would the same be true for Ms. Emlet?
20    A.   Yes.
21    Q.   So after the fact-finding was complete,
22 what happened next in your recollection, after the
23 meeting ended?
24    A.   Nothing.  I mean, I went home.  I talked to
25 Chris Sullivan, my rep, and went home.
```

Page 86

```
 1    Q.   So Ms. Ross who we spoke about earlier, was
 2 she your rep at step 2 then?
 3    A.   She was the actual person who did my case
 4 through the union.
 5    Q.   What do you mean by that?
 6    A.   She was the one who did the grievance.  She
 7 was the grievance person.
 8    Q.   So she did not attend either hearing with
 9 you?
10    A.   She attended the second step meeting.
11    Q.   So Chris Sullivan was the only union
12 representative who attended the first step meeting with
13 you?
14    A.   That's correct.
15    Q.   Between the time the fact-finding ended and
16 when you received Exhibit 1, the termination letter,
17 did you have any more interaction with the company
18 individuals who appeared at the fact-finding meeting?
19    A.   No, I don't believe so.
20    Q.   After you received the termination letter,
21 you grieved that decision, correct?
22    A.   Correct.
23    Q.   And that triggered a step 2 hearing, right?
24    A.   Correct.
25    Q.   What can you tell me about the step 2
```

Page 87

```
 1 hearing in your recollection?
 2    A.   I was able to present my case to Mike Sims.
 3    Q.   And you've previously testified that you
 4 believed that that proceeding was fair and complete,
 5 correct?
 6    A.   Yes.
 7    Q.   Is that still your testimony?
 8    A.   Yes.
 9    Q.   Do you contend that Mr. Sims discriminated
10 against you on the basis of your religious beliefs at
11 the step 2 level?
12    A.   No.
13    Q.   Do you contend that anyone else
14 discriminated against you on the basis of your
15 religious beliefs at the step 2 level?
16         MR. GILLIAM:  Objection.  Calls for a legal
17 conclusion.  You can answer.
18    A.   Honestly I don't know.  I don't know.  I
19 mean, I don't know what's in people's minds.
20 BY MR. CORRELL:
21    Q.   Well, and that's perfectly fine.  What I'm
22 trying to make sure I get is any evidence that you
23 possess that you believe shows that someone at step 2
24 had what we would call a discriminatory animus so a
25 bias against you because of your Christian beliefs, and
```

Page 88

```
 1 so I'm just making sure there's no other names in there
 2 that we need to cover.
 3    A.   No.
 4    Q.   Do you have any evidence or -- that
 5 Mr. Sims discriminated against you at your step 2
 6 because you were a union objector?
 7    A.   No.
 8    Q.   And to your knowledge, do you have any
 9 evidence of anyone else who was discriminating against
10 you from the company at your step 2 on the basis that
11 you were a union objector?
12    A.   No.
13    Q.   So at the step 2 you were directly
14 instructed again that all information that you were
15 provided through the hearing process you need to keep
16 confidential, correct?
17    A.   Yes.
18    Q.   Did you continue discussing your case with
19 Ms. Jackson?
20    A.   I believe I did, yes.  She had --
21    Q.   Did you continue to discuss -- oh.  Please
22 go ahead.
23    A.   Yes.
24    Q.   Did you continue discussing your case with
25 any other flight attendant?
```

Page 89

1   A.   There may have been one or two, yes.
2   Q.   Who?
3   A.   Dawn Wann.
4   Q.   Is that D-A-W-N?
5   A.   Mm-hmm.  She also used to be a person who
6   sat on the board.
7   Q.   Who else besides Ms. Wann?
8   A.   Jana Deloache.  And she also used to be a
9   representative on the board.
10   Q.   So why were you communicating with Ms. Wann
11   about your proceedings?
12   A.   Due to the fact that she used to sit on the
13   board, I looked for I guess some help.
14   Q.   Was she still sitting on the board or
15   working in any union capacity when you were
16   communicating with her at this time?
17   A.   I believe she was doing fact-finding
18   meetings at that time.  I think.  I don't -- I don't
19   know that for a fact.
20   Q.   Did you ask the company's permission to
21   share information with Ms. Wann?
22   A.   No.
23   Q.   Did you tell your -- Ms. Ross that you were
24   going to communicate with Ms. Wann?
25   A.   I believe she knew I was talking to her,

Page 90

1   yes.
2   Q.   How did she know that --
3   A.   Because I told her I had reached out to a
4   couple other people.
5   Q.   What was Ms. Ross's response when you told
6   her that information, if anything?
7   A.   She just told me not to share specifics,
8   but I didn't share the specifics, I just shared the --
9   what had happened.  You know, that I had gone to my --
10   my fact-finding meeting -- or my second step meeting.
11   Q.   And you said Ms. Deloache, is that correct?
12   A.   Deloache.
13   Q.   Deloache.  Ms. Deloache was also a former
14   board member?
15   A.   That is correct.
16   Q.   Did she hold any union offices at the time
17   you were communicating with her about this?
18   A.   I -- I think she was doing fact-finding
19   meetings, and I'm not sure if she was on the team for
20   safety.
21   Q.   I'm sorry.  Going back to Ms. Wann, what
22   advice, if any, did Ms. Wann give you in response to
23   your communications?
24   A.   It was just basically how the -- how the
25   union works with their grievances and so forth, because

Page 91

1   I had never filed a grievance before so I was unclear
2   of how things happened.
3   Q.   Other than providing you with that
4   information, did Ms. Wann do anything else that you are
5   aware of in response to your communications with her at
6   this time?
7   A.   No.
8   Q.   What did Ms. Deloache provide you, if
9   anything?
10   A.   The same type of thing.
11   Q.   Anything she provided that Ms. Wann did
12   not?
13   A.   No.
14   Q.   Other than Ms. Wann and Ms. Deloache, were
15   you communicating with anyone -- and Ms. Jackson, were
16   you communicating with anyone else about your step 2
17   proceedings at this time?
18   A.   I don't believe so.
19   Q.   Now, the result of your step 2 hearing was
20   an offer of reinstatement subject to a last chance
21   agreement, correct?
22   A.   Correct.
23   Q.   And you did not accept that last chance
24   agreement, correct?
25   A.   Correct.

Page 92

1        (Deposition Ex. 6 marked)
2   BY MR. CORRELL:
3   Q.   I am going to show you what will be marked
4   as Exhibit 6 to your deposition.  Just a moment here.
5   You should have that in just a moment here and it
6   should populate, like I said, as Exhibit 6.  Let me
7   know when you have that.  I know it may take a minute.
8   A.   Okay.  I have it.
9   Q.   Do you recognize this document?
10   A.   Yes.
11   Q.   What is this document?
12   A.   This is the settlement statement that they
13   offered me.
14   Q.   Why did you decline this offer of
15   reinstatement?
16   A.   Several reasons.  One, first big -- the
17   biggest reason is that I have known flight attendants
18   that have accepted this, and as soon as they accepted
19   it, somebody had turned them in for something that they
20   had done in the past and then they got fired again.
21        Another reason I did not accept this was
22   due to the fact that they wanted to put a letter in my
23   file for 24 months, which exceeded the contract.  It
24   was only supposed to be in there at the -- at the very
25   most for 18 months, so which that meant if, you know, I

Page 93

1  sneezed wrong on the airplane within 24 months of
2  basically being on probation again, I would be fired.
3  I would have no recourse if somebody, you know, decided
4  to turn me in for past social media, and I know people
5  were looking for that, and I would get fired
6  immediately after signing this.
7       Another thing is, is that this was union
8  business and the company actually got involved in union
9  business, which never happened in the past, and I
10 believe that this should have been just handled within
11 the union, and I would have been signing all my rights
12 away.  And on top of that, I had already been speaking
13 regarding this.  Again, if I would have signed this,
14 somebody could have dredged something up from the past
15 and had me fired over speaking about it in the past and
16 that has happened to other flight attendants.  So I
17 knew in signing this, it would be pretty much my death
18 sentence at Southwest.
19     Q.   The first point you raised, who do you know
20 who accepted the last chance agreement and was
21 subsequently terminated for conduct that predated the
22 last chance agreement?
23     A.   Holly Immamovic.
24     Q.   Now your testimony is that the behavior
25 that got her fired occurred before she accepted the

Page 94

1  last chance agreement?
2            MR. GILLIAM:  Objection to the form.
3     A.   That I don't know for a fact.  I just know
4  something was dredged up and they immediately turned
5  her in again.
6  BY MR. CORRELL:
7     Q.   Would it surprise you if she was terminated
8  for a social media violation that occurred after she
9  signed the social media agreement -- excuse me -- the
10 last chance agreement?
11    A.   You know what?  I can't speculate on that.
12    Q.   If that were the case, would it change your
13 assessment of how Ms. Immamovic's or -momavic's outcome
14 informed your approach to this letter?
15           MR. GILLIAM:  Objection.  Incomplete
16 hypothetical.  You can answer.
17    A.   No, because I -- I knew what was going on
18 due to people turning each other in which --
19 BY MR. CORRELL:
20    Q.   I -- sorry.  Go ahead.
21    A.   That was a big huge factor for me not to
22 sign this.  I knew that --
23    Q.   Other than Ms. Immamovic, what person do
24 you know who signed a last chance agreement but was
25 subsequently terminated for a social media violation?

Page 95

1     A.   At that time she was the only person that I
2  did know.
3     Q.   Since then who have you discovered?
4     A.   I have -- I don't know because I don't -- I
5  have no idea.  I don't know who has been fired and who
6  hasn't been fired.
7     Q.   Well, in your complaint and in your
8  discovery responses, you allege that Casey Rittner was
9  terminated for a social media violation, correct?
10    A.   Casey Rittner, yes, and that was -- which
11 is -- yes.
12    Q.   So was Ms. Rittner reinstated?
13    A.   It's Mr. Rittner, but yes, he was
14 reinstated.
15    Q.   Was Mr. Rittner subsequently terminated
16 after that reinstatement?
17    A.   That, I don't know.
18    Q.   The 24-month issue that you raised as your
19 second point, what was your concern there?
20    A.   Well, it exceeded our contract and I'm
21 not -- I'm not sure why we weren't staying within the
22 realms of the contract, and mine seemed to be extreme
23 due to the fact that it was 24 months and not the
24 18 months.
25    Q.   Do you know if other people also received a

Page 96

1  24-month period of --
2     A.   No, I believe I was the first and only at
3  that time.
4     Q.   What's your basis for making that
5  assertion?
6     A.   Talking to Beth Ross, my union
7  representative, she had not seen a 24-month.
8     Q.   So your testimony is that Beth Ross told
9  you she had not seen other LCAs with a 24-month period?
10    A.   That's what we had discussed, yes, that it
11 was excessive.
12    Q.   At any point did you contact anyone at
13 Southwest Airlines to address the 24-month issue?
14    A.   I was told not to and that was by Becky
15 Parker.
16    Q.   Who is Becky --
17    A.   She said this was -- she was also a -- she
18 was the grievance chair and she told me that was the
19 best I was gonna get.
20    Q.   When did she tell you that?
21    A.   Right after the -- this was sent to me, the
22 last chance agreement.
23    Q.   What is your basis for claiming that you
24 would still be exposed to termination for social media
25 posts that predate this letter?

Page 97

1    MR. GILLIAM:  I would just instruct
2  Ms. Carter that you shouldn't reveal any
3  attorney-client communications to the extent that your
4  answer might involve any attorney-client communication.
5    THE WITNESS:  Okay.
6    A.    I just knew that there were others out
7  there trying to harm.
8  BY MR. CORRELL:
9    Q.    But I guess what I'm asking is:  What on
10  this letter says to you that Southwest can now go
11  terminate you for conduct that predates this letter, if
12  anything?
13    A.    The reason that I would come to that
14  conclusion is because people were being harmed, not --
15  not just from signing the last chance agreement, but
16  people were being harmed for things that they had said
17  two or three or four years prior to this and being
18  called in.  So I already knew, due to the social media
19  violations that were becoming increasingly horrible,
20  that I was not going to sign on the dotted line on this
21  one.
22    Q.    So did you reach out to Southwest to say,
23  hey, can I get in trouble for prior south -- for prior
24  social media posts and be terminated based on this
25  letter?

Page 98

1    A.    I was told by Becky Parker that I was to
2  contact her and my grievance team on this issue.  I did
3  not contact anyone at Southwest Airlines management.
4    Q.    Did you contact your union and ask them to
5  get clarification from Southwest Airlines as to whether
6  or not prior conduct would result in termination under
7  the last chance agreement?
8    A.    We talked about it, but like I said, Becky
9  Parker told me that this would be the best I was going
10  to get.
11    Q.    Did Ms. Parker tell you yes, they could go
12  find old posts and fire you for it after the last
13  chance agreement was signed?
14    A.    Beth knew and both Becky had known that,
15  yes, other people had been fired for things that were
16  posted back in, you know, further -- I mean, from --
17  from that day back, anybody could be turned in.
18    Q.    Well, and I guess I'm asking a different
19  question here.  Is -- are you saying that what they
20  told you is that if you signed this letter and somebody
21  reported three-year-old social media violations, you
22  would be subject to immediate termination under the
23  letter, is that what they told you?
24    A.    If they found anything else that I had
25  posted, that I could be fired again, yes.

Page 99

1    Q.    Did they name any names when they were
2  talking to you about other cases?
3    A.    No.
4    Q.    Did they provide you with any details?
5    A.    No, because they're not supposed to.
6    Q.    I mean, if you had it to do over again,
7  would you have accepted this letter?
8    A.    No, because I believe I would have been
9  fired.
10    Q.    So was the only issue that you were
11  concerned with then -- setting aside the 24 months, if
12  this letter had said you won't be punished for anything
13  you've previously posted to social media, that would
14  have been sufficient for you to sign it except for the
15  24-month issue?
16    A.    Yes, I would have signed it.
17    Q.    Did you tell that to Becky Parker and Beth
18  Ross?
19    A.    I spoke to Becky Parker on all the issues
20  regarding this last chance agreement and she
21  specifically told me, this is the best you are going to
22  get, Charlene.  That's all I can refer you to.
23    Q.    And you testified at the arbitration that
24  you would not engage in the same behavior again if you
25  had been reinstated, correct?

Page 100

1    A.    That is correct.
2    Q.    So with the 24-month issue, is it your view
3  that it's just a violation of the collective bargaining
4  agreement or is it your view that it's just too long?
5  I'm just trying to understand what you are coming at
6  with that point.
7    A.    Well, it's both.  It's the -- it's the fact
8  that for some reason that mine exceeded, which we have
9  a contract with Southwest Airlines, exceeded the
10  contract and I'm not sure exactly why.  The 18 months I
11  still think is a little harsh, but it is in our
12  contract and I'm not sure why mine -- they didn't
13  decide that it would stay within the realms of the
14  contract.
15    Q.    And you described this I think a moment ago
16  as a death sentence.
17    A.    Yes.
18    Q.    What was your understanding of how
19  discipline would proceed if you were disciplined for
20  something other than a similar issue, so other than a
21  social media violation, other than a bullying
22  violation, and other than a sexual harassment
23  violation?
24    A.    Okay.  Can you say that again?
25    Q.    Sure.  Let me ask that a little more

Page 101

1   clearly.
2       You understand that there are three
3   policies referenced in this letter, and I think we
4   can -- I can point to them.
5       A.   The third policy, though, was a possible
6   and --
7       Q.   Understood.  And I'm just talking about the
8   letter here.  So in the letter it says your -- "Any
9   future violation of the Southwest Airlines Workplace
10  Bullying and Hazing Policy, Social Media Policy, or
11  Harassment, Sexual Harassment, Discrimination and
12  Retaliation Policy will result in termination."
13      That is the -- the seventh bullet down.
14  Did I read that correctly?
15      A.   That is correct.
16      Q.   So was it your understanding that -- you
17  were talking about sneezing on the airplane.  Was it
18  your understanding you would also be subject to
19  immediate termination if you broke some other work
20  rule?
21      A.   Yes.
22      Q.   How did you arrive at that conclusion?
23      MR. GILLIAM:  I would just say again if you
24  received any information from an attorney on this, not
25  to answer -- or not to respond with your

Page 102

1   attorney-client privileged information.
2       THE WITNESS:  Okay.
3       A.   Only because I knew it had happened in --
4   in our system.
5   BY MR. CORRELL:
6       Q.   Can you give me an example?
7       A.   I -- you know what?  I -- I can't right at
8   the moment.
9       Q.   Would it surprise --
10      A.   The only -- the only one that I know of is
11  Holly Immamovic.
12      Q.   The --
13      A.   At that time -- at that time.  And I can't
14  discuss the rest of that.
15      Q.   Why are you unable to discuss the rest of
16  that?
17      MR. GILLIAM:  If it's privileged
18  information then --
19      A.   Yeah.
20      MR. CORRELL:  Well, her communications with
21  Holly Immamovic are not going to be privileged.
22      MR. GILLIAM:  Correct, right.
23  BY MR. CORRELL:
24      Q.   So is there some other reason you are not
25  testifying as to the other details you are aware of

Page 103

1   with respect to Holly Immamovic?
2       A.   No.  I just know that others were looking
3   for reasons to have other people terminated.  It -- it
4   had become a hostile work environment and everybody was
5   on pins and needles at this point, and I was afraid to
6   sign this particular document and be subject to, let's
7   say, flying with another flight attendant who knew
8   about this and turned me in for something.  I had never
9   been in trouble at my job before ever until this.
10      Q.   I'm trying to understand, Ms. Carter, is
11  there anything on the face of this letter that led you
12  to believe that violations of other policies besides
13  the three listed in bullet 7 would result in immediate
14  termination on the face of this letter?
15      A.   No, not on the face of this letter.
16      Q.   Did Ms. Parker or Ms. Ross tell you that
17  any policy violation, no matter what it was, not the
18  three that are itemized here, but any of them, would
19  result in immediate termination?
20      A.   Not in those words, no.  They just said to
21  watch your back.
22      Q.   What do you mean by that?
23      MR. GILLIAM:  Objection.  Calls for
24  speculation.  You can answer.
25      A.   Yeah, it -- it just means that if there was

Page 104

1   another violation, that more than likely I would be
2   fired and I would have no recourse.
3   BY MR. CORRELL:
4       Q.   Another violation of what?
5       A.   Of really anything that fell under a policy
6   that Southwest Airlines has, and they --
7       Q.   Would that --
8       A.   And they would be watching me.
9       Q.   What did Ms. Parker and Ms. Ross
10  specifically say that led you to believe that this
11  letter reached beyond the three listed policies?
12      A.   This letter did not as in specific being
13  written.  So no, it did not.
14      Q.   I understand that, but I believe your
15  testimony just now was that when Ms. Ross and
16  Ms. Parker said "watch your back," you interpreted that
17  as them telling you that this extended to all policies
18  not just the three enumerated policies.  Did I
19  understand that testimony correctly?
20      A.   That is correct.
21      Q.   Did they say anything other than the phrase
22  "watch your back" that led you to reach that
23  conclusion?
24      A.   No, that would be -- that would be pretty
25  telling to me.  Watch my back.

Page 105

1    Q.   Did you ask directly whether other policies
2    would trigger immediate termination under this last
3    chance agreement to anyone other than counsel?
4    A.   You mean as in Becky Parker and them?
5    Q.   That includes them or anybody else.
6    A.   No, I -- I had asked Beth about this.  If I
7    sign this letter, you know, is this going to be
8    something that, you know, within the next 24 months
9    they could pretty much fire me, you know, because
10   they're going to be watching me and she said yes.
11        Now, it may not state it in that letter.
12   And that my -- the 24 months she believed was
13   excessive.  She wasn't sure why they -- they put the
14   24 months on to my letter.
15   Q.   I want to direct you next to what I believe
16   will be Exhibit 7 to your deposition.  Let me know when
17   you are able to access that document.
18   A.   Okay.
19   Q.   Do you recognize this document?
20        (Deposition Ex. 7 marked)
21   A.   Yes, I do.
22   BY MR. CORRELL:
23   Q.   And is this a text message from you to a
24   Lynn McGomery?
25   A.   That is correct.

Page 106

1    Q.   Who is Lynn McGomery?
2    A.   She happens to be a friend of mine.  And
3    she's a flight attendant at Southwest.
4    Q.   Now, previously I asked you questions about
5    who you communicated with about your fact-finding and
6    step 2 proceedings.  Had you communicated with
7    Ms. Montgomery prior to sending this text message --
8    text message regarding these topics?
9    A.   Regarding that the --
10   Q.   Fact-finding and step 2.
11   A.   The women's march, yes.  Yes.  She's a
12   friend of mine.
13   Q.   Had you communicated with Ms. Montgomery
14   about your fact-finding?
15   A.   She knew of my fact-finding, yes, because
16   of, you know, ONE LUV.
17   Q.   Did you communicate directly with
18   Ms. Montgomery about your fact-finding?
19   A.   You know what, I don't recall.  I don't
20   recall talking to her directly about it.  I know that I
21   shared some information about the women's march and
22   that our union, you know, was representing us there.
23   Q.   And Ms. Carter, I understand your testimony
24   that the union went to the women's march and your
25   objection to that.  My question is about your

Page 107

1    engagement with Ms. Montgomery about specific events.
2        So the next one is did you confer with
3    Ms. Montgomery at all about your step 2?
4    A.   I don't recall.
5    Q.   Why did -- when you say here, "Just sent
6    you an email with my reinstatement letter... enjoy,"
7    and an emoji, what is the reinstatement letter you are
8    referencing?
9    A.   That would be my second step -- that would
10   be the -- the last chance agreement.
11   Q.   And this -- this text message is dated
12   April 19th, 2017, correct?
13   A.   That's correct.
14   Q.   And I believe the last chance letter is
15   also dated April 17, 2017; is that correct?
16   A.   April -- hold on.
17   MR. GILLIAM:  Objection.  Misstates prior
18   testimony.
19   MR. CORRELL:  I'm talking about an exhibit,
20   Counsel.
21   MR. GILLIAM:  I know.  Misstates the
22   exhibit.
23   A.   Yeah, that's April 17 -- yes.
24   BY MR. CORRELL:
25   Q.   So did you receive this letter on

Page 108

1    April 17th, 2017?
2    A.   It's dated then.  I don't know if I
3    actually got it on that day.
4    Q.   Is it possible you got it sooner than
5    April 17th, 2017?
6    A.   No, I wouldn't have gotten it sooner.
7    Q.   And you sent a text message telling someone
8    you sent it to them on April 19th, 2017, right?
9    A.   Yeah, that's several days after that.
10   Q.   Two days, correct?
11   A.   I'm sorry?
12   Q.   You said several.  It's two days after
13   April 17th.
14   A.   Okay.  Two days.
15   Q.   Well, why did you send your letter to
16   Ms. Montgomery?
17   A.   Ms. Montgomery used to be our grievance
18   chair and I wanted her to take a look at it.
19   Q.   What advice, if any, did Ms. Montgomery
20   give you about the letter?
21   A.   She thought it was excessive, she'd never
22   seen anything quite like it.
23   Q.   What did she say was excessive?
24   A.   The fact that it exceeded our contract, for
25   one, and that, you know, she -- that we didn't -- we

Page 109

1    didn't used to have these agreements back in the day.
2    This only -- this only came about under Audrey's
3    administration.
4        Q.    So your testimony is that last chance
5    agreements didn't exist before Audrey Stone was
6    president of 556?
7        A.    As far as I knew, they did not.  Now, I may
8    be wrong on that.  I don't know exactly when these
9    started to -- and then on top of that too, we always
10   had a step process in disciplining and I was not re --
11   I was not given that opportunity to correct what they
12   had said was, you know, my violations.  Normally you
13   would get either like -- like a 30-day suspension, you -- you
14   wouldn't just be fired.  We -- we didn't use to fire
15   flight attendants the way we do now.
16       Q.    Didn't the last chance agreement offer you
17   a 30-day suspension and let you continue working as
18   long as you didn't engage in any behavior again?
19       A.    Yes.  That was after already being off for
20   30 days.
21       Q.    Well, and we can go back to Exhibit 6, but
22   the suspension was already retroactively completed on
23   the date that you received it, was it not?
24       A.    That is correct.
25       Q.    So when Ms. Montgomery responded to you

Page 110

1    about the last chance agreement, what form did that
2    response take?  Was it a call?  A letter?  More text
3    messages?
4        A.    No, it wasn't a call.  I think it was just
5    the text message.
6        Q.    Do you have those text messages?
7        A.    No, I've given everything over to my
8    attorneys.  I think that this was, she just read it and
9    that was it.
10       Q.    Well, you just testified that she gave you
11   input on the --
12       A.    Oh, I'm sorry.  Yes, yes, yes.  I'm sorry.
13   I -- I didn't hear your question.
14             Yeah.  We discussed this on the phone after
15   the fact, and she told me, she said, she goes,
16   "Charlene, I've never seen anything quite like this."
17       Q.    When did you discuss it with her?
18       A.    It probably was a couple of days after.
19   And again, she used to be our grievance chair.  So I
20   knew that, you know, she -- she had dealt with things
21   like this before.
22       Q.    Other than Ms. Montgomery, who else did you
23   send copies of this last chance agreement to?
24       A.    I don't believe anybody else.
25       Q.    If we go back to Exhibit 6.

Page 111

1        A.    Okay.  Okay.
2        Q.    Then just let me know when you are there.
3        A.    I'm there.
4        Q.    You see at the top in bold all caps,
5    "Privileged & Confidential Reinstatement Settlement and
6    Last Chance Agreement"?
7        A.    Yes.
8        Q.    Did you ask anyone before you sent this
9    letter to someone other than Ms. Ross?
10       A.    I know that I had talked to them regarding
11   this, and I was going to send it also to the -- the
12   attorney.
13       Q.    And I don't need to know anything about
14   your communications with counsel.  But did you get any
15   permission to send this confidential document to
16   Ms. Montgomery before you sent it?
17       A.    I had spoken with Beth and I was gonna -- I
18   told her that I was probably gonna send this to let --
19   let Lynn read it since she used to be our grievance
20   chair.
21       Q.    And what was Ms. Ross's reaction to you
22   saying you were going to send this confidential
23   document to someone else?
24       A.    Due to the fact that she used to be our
25   grievance chair, she used to handle these things, so

Page 112

1    she thought that that might be, you know, helpful for
2    me to really understand it, even though Beth -- you
3    know, she -- because she -- basically I was getting a
4    second opinion on this.  I was afraid to sign anything.
5        Q.    Did you send this to Jeanna Jackson?
6        A.    I don't -- I don't think I did, no.  I
7    think I may have discussed it with her.
8        Q.    What did you tell her about it?
9        A.    Just the -- just the -- just the fact that
10   the 24 months, and I didn't think I was gonna sign it.
11       Q.    Did you ask permission from anyone before
12   you discussed it with Jeanna Jackson?
13       A.    No, but once again, Jeanna also was a --
14   oh, she did a fact-finding meeting so she was very
15   knowledgeable about these things as well.
16       Q.    I'd like to direct to you the second page
17   of the last chance agreement, to the second full
18   paragraph.  Let me know when you are there.  It begins
19   with, "The terms your reinstatement."
20       A.    Yes.
21       Q.    "The terms of your reinstatement are made
22   on a non-precedent and non-referral basis and are to be
23   kept confidential."
24             Did I read that correctly?
25       A.    Yes, you did.

Page 113

1     Q.    You violated that before you even signed
2  it, didn't you?
3     A.    I guess I did.
4     Q.    So I want to take you next to the process
5  that commenced after your separation when you filed
6  documents with the Equal Employment Opportunity
7  Commission.  And I'll direct you to a new exhibit, if
8  you will give me one moment.  And that should come up
9  in just a second for you, Ms. Carter.
10    A.    Okay.
11          (Deposition Ex. 8 marked)
12 BY MR. CORRELL:
13    Q.    Do you recognize this document?
14    A.    I do.
15    Q.    What is this document?
16    A.    That is the charge to the EEOC.
17    Q.    And you filed this on March 14 -- excuse
18 me, that's the date.
19          Sorry.  You filed this on September 7,
20 2017, correct?
21    A.    Mm-hmm.
22    Q.    Have you had a chance to read this just now
23 just to reacquaint yourself with it?  And if you need a
24 few moments, please take your time.
25    A.    Yeah, hold on a second.  I was going to say

Page 114

1  it's hard to read since it's so tiny.  Here we go.
2  Okay.
3     Q.    So you understand that you signed this
4  document under penalty of perjury, correct?
5     A.    Excuse me?
6     Q.    That you signed this -- at the bottom of
7  this document, do you see where it says, "I declare
8  under penalty of perjury that the foregoing is true and
9  correct," and it's your signature?
10    A.    Yes.
11    Q.    Going to paragraph 3 of your charge, it
12 reads, "My employer (Southwest Airlines), and the union
13 which represents me (Transport Workers Union of America
14 Local 556), both support abortion."
15          Did I read that correctly?
16    A.    Yes, you did.
17    Q.    What evidence do you have that Southwest
18 Airlines supports abortion?
19    A.    When the --
20          MR. GILLIAM:  Objection.  Calls for a legal
21 conclusion but you can answer.
22    A.    When --
23          MR. CORRELL:  I just want to get a
24 clarification for the record.  How does asking her what
25 evidence she has that Southwest supports abortion calls

Page 115

1  for a legal conclusion?
2          MR. GILLIAM:  What constitutes evidence in
3  support of abortion.
4  BY MR. CORRELL:
5     Q.    What information do you possess,
6  Ms. Carter, that leads you to believe that Southwest
7  Airlines supports abortion?
8     A.    When the union representatives, the
9  20 women that went, they took a banner that said
10 "Southwest Airlines Flight Attendants Under Local 556,"
11 and so Southwest Airlines had their name and banner per
12 se along with our local marching in that march.
13    Q.    So Southwest Airlines' actual logo was on
14 the banner?
15    A.    I believe so, yes.
16    Q.    After lunch we'll get a copy of that
17 picture.
18          Other than that particular piece of
19 information, is there any other piece of information
20 you possess that believe shows -- that you believe
21 shows Southwest Airlines supports abortion?
22    A.    Not -- you know, that's -- it's kind of --
23 they allowed the lights to be turned pink going into
24 that march on the airplanes.
25    Q.    When you say they allowed it, what do you

Page 116

1  mean?
2     A.    Many of the flights that have the mood
3  lighting on it, the flight attendants were able to turn
4  those lights to pink in support of the women's march
5  going into DC that day and coming back from the
6  marches -- or from that march.
7     Q.    How many flights?
8     A.    Oh, I don't know.  There were many.  I
9  just -- I don't know exactly how many.
10    Q.    What's your basis for asserting there were
11 many?
12    A.    Because it was put all over the media and
13 also on Local 556 page and TWU International's page and
14 the AFL-CIO page and on Planned Parenthood's page.
15    Q.    How does that tell you how many airplanes
16 that occurred on?
17    A.    Oh, it doesn't tell me the number.  It's
18 just the different people speaking of different flights
19 in and out of -- let's say they were coming out of
20 Chicago or they were coming out of Vegas or they were
21 coming out of Orlando or going into those places.  So
22 there were -- there were many flights that the cabin
23 lights were turned pink.
24    Q.    You attended Mike Sims' deposition as the
25 corporate representative of Southwest Airlines,

Page 117

1   correct?
2       A.   Yes, I did.
3       Q.   And you were there when he testified that
4   the lights were turned pink on approximately three to
5   four aircraft, correct?
6       A.   I don't recall that.  I don't recall the
7   number.  It's hard to believe that it was only three or
8   four, but if that's what he says, I guess that's what
9   he says.
10      Q.   And other than what you've already
11  testified to, do you have any information that
12  controverts Mr. Sims's testimony that there were three
13  to four flights?
14      A.   Not -- not as in the number, but I do know
15  that there were flights that -- that they had turned
16  the lights pink.  I don't know the number.
17      Q.   What is a read-before-fly memo?
18      A.   I'm sorry?
19      Q.   What is a read-before-fly memo?
20      A.   It is a link that you click on to see
21  what's going on within the company and different things
22  that we're doing as flight attendants and so forth.
23  It's just like a little informational thing.
24      Q.   And are you aware that Southwest Airlines
25  issued a read-before-fly memo instructing flight

Page 118

1   attendants to discontinue this behavior as soon as they
2   learned of it?
3       A.   No, because I wasn't flying at that time so
4   I didn't see it on that day.
5       Q.   Other than the fact that flight attendants
6   turned the lights pink, do you have any other evidence
7   that Southwest played any role in the decision to turn
8   the lights pink?
9       A.   That I don't know.
10      Q.   Let's take you next to paragraph 6 of your
11  charge.  It reads, "Southwest never warned me that
12  using Facebook to protect life was inconsistent with
13  its work rules."
14           Did I read that correctly?
15      A.   That is correct.
16      Q.   You were familiar with Southwest Airlines'
17  social media policy, correct?
18      A.   Yes.
19      Q.   In fact, you had quoted it when you
20  reported Brian Talbert to the company, hadn't you?
21      A.   In regards to an execution or harming
22  somebody?  Yes.
23      Q.   So you were aware that Facebook posts
24  generally could be inconsistent with the work rules?
25      A.   Protecting babies, no, I did not.

Page 119

1       Q.   So no matter what you say in a Facebook
2   post, if it is pro life, it is not a -- you thought it
3   was not a violation of Southwest policy?
4            MR. GILLIAM:  Objection.  Calls for a legal
5   conclusion.
6       A.   No.
7   BY MR. CORRELL:
8       Q.   So what could you say in a Facebook post
9   that was pro life that would violate Southwest's policy
10  in your opinion as a flight attendant bound by a policy
11  that you were familiar with?
12      A.   I don't think any --
13           MR. GILLIAM:  Objection.  Objection,
14  incomplete hypothetical.  You can answer.
15  BY MR. CORRELL:
16      Q.   So -- and just to be clear:  You don't
17  think anything you said could be construed as a
18  violation of the social media policy if it was in
19  connection with a pro life message?
20      A.   No, I don't.
21      Q.   Now, in paragraph 8 of your charge you say,
22  "As a result of my Facebook posts and messages that
23  opposed abortion.  And without prior warning that such
24  activity violated its work rules, my employer fired me
25  on March 14, 2017."

Page 120

1            Is that correct?
2       A.   That is correct.
3       Q.   Now you were also confronted with the
4   balance of Exhibit 1, which consists of another 80
5   pages of messages sent to Ms. Stone over three years
6   during your fact-finding, correct?
7       A.   That is correct.
8       Q.   All of those messages don't concern
9   abortion, do they?
10      A.   No, but they all do -- do concern
11  everything that union and what they were representing
12  or doing within the union so it was to my local
13  president.
14      Q.   And in paragraph 9, you claim that
15  Southwest "engaged in quid pro quo religious
16  harassment."
17           When you signed this under oath, what did
18  you understand that to mean?
19           MR. GILLIAM:  Objection.  Calls for a legal
20  conclusion.  You can answer.
21  BY MR. CORRELL:
22      Q.   And -- and Ms. Carter, I'm not asking for
23  your legal opinion.  I'm asking what you were swearing
24  to under penalty of perjury.
25           MR. GILLIAM:  Same objection.

Page 121

1    A.   I believe they did discriminate towards me.
2  BY MR. CORRELL:
3    Q.   But there's a phrase there that says "quid
4  pro quo religious harassment."  That's what you are
5  accusing Southwest of, and you're saying you swear it's
6  true that Southwest engaged in quid pro quo religious
7  harassment.  What did you as a witness mean when you
8  swore to that statement?
9         MR. GILLIAM:  Objection, calls for legal
10  conclusion.
11        MR. CORRELL:  Counsel, how does it call for
12  a legal conclusion to ask a witness to explain their
13  own affidavit?
14        MR. GILLIAM:  Well, it's asking what she
15  understands quid pro quo religious harassment to mean.
16        MR. CORRELL:  If I accuse you of a legal
17  violation and I swear that it happened, I should be
18  able to explain what I think was the violation.
19  BY MR. CORRELL:
20    Q.   What is -- what the words mean in my own
21  statement.
22        MR. GILLIAM:  Is there a question pending?
23        MR. CORRELL:  Fine.
24  BY MR. CORRELL:
25    Q.   Ms. Carter, just let me know what you

Page 122

1  understand as a witness who was swearing under penalty
2  of perjury your own words, "quid pro quo religious
3  harassment," meant?
4         MR. GILLIAM:  And to the extent it calls
5  for a legal conclusion, same objection.
6  BY MR. CORRELL:
7    Q.   Okay.  Were these your words, Ms. Carter?
8    A.   Yes, these were my -- these were -- these
9  were written within my -- the context of my -- my
10  words, yes, but --
11    Q.   Did you adopt these words --
12    A.   But my -- my --
13    Q.   I need to ask some questions here to lay a
14  foundation.
15         Did you adopt these words here as your own
16  when you were swearing to them under penalty of
17  perjury?
18    A.   I'm not -- I'm not understanding.  I
19  believe that Southwest Airlines violated me when I was
20  in my fact-finding meeting when I said I was a
21  Christian and that I put those things on my Facebook
22  page and referred them back to a women's march that my
23  union president took and spent my money for, and --
24    Q.   And --
25    A.   -- they -- they supported that and fired me

Page 123

1  because of my direct dislike and expressing my
2  opinions, they violated my Christian rights, yes, I do
3  believe they did.
4    Q.   Having noted counsel's objection, what is
5  your understanding of the phrase "quid pro quo
6  religious harassment"?
7    A.   You're going to have to -- you're going to
8  have to re -- you're going to have to resay -- you're
9  going to have to re --
10    Q.   Sure.  In paragraph 9 where you say, and I
11  am paraphrasing here, please correct me if there's some
12  confusion created by it, as a result of the foregoing,
13  my employer engaged in quid pro quo religious
14  harassment.  I have omitted the discussion of
15  discrimination because that's separate here.  My
16  employer engaged in quid pro quo religious harassment.
17  What did you mean by that?
18    A.   For me, it's they have been -- they've
19  represented -- they -- they -- the company has actually
20  promoted other -- how should I say this -- activities,
21  and never once -- how do I put this?  They protect
22  everybody else, such as gay, lesbian, Black Lives
23  Matter, gay pride week, but they don't protect me under
24  my civil rights as being a Christian.
25    Q.   So that's what you meant when you said, "My

Page 124

1  employer engaged in quid pro quo religious harassment"?
2    A.   I believe that is correct.
3         MR. GILLIAM:  Objection.  Again, calls for
4  a legal conclusion.  I also think asked and answered.
5    A.   Yes.
6  BY MR. CORRELL:
7    Q.   Where in this document do you complain that
8  Southwest did not offer you a religious accommodation?
9    A.   They did not offer me a religious --
10  anything religious accommodation after -- within my
11  fact-finding meeting.  I think that they should have
12  reached out to me but they did not.
13         MR. CORRELL:  Move to strike as
14  non-responsive.
15  BY MR. CORRELL:
16    Q.   Ms. Carter, this document was what you
17  reported to the EEOC as violations of Southwest
18  Airlines.  Where in this document did you tell the EEOC
19  that you were denied religious accommodation?
20         MR. GILLIAM:  Objection, the letter speaks
21  for itself.
22    A.   Exactly.  The letter speaks for itself.
23  The whole letter speaks for itself.
24  BY MR. CORRELL:
25    Q.   Yeah, but you are my deponent.  As you're

Page 125

```
 1  sitting here today, can you identify anything in this
 2  letter where it says I was denied religious
 3  accommodation?
 4          MR. GILLIAM:  And objection.  Same
 5  objection.  The letter speaks for itself but you can
 6  answer.
 7      A.    They fired me for my speech on my -- my
 8  personal Facebook page in protecting babies and with my
 9  union going to a women's march and for me to say that I
10  didn't agree with it and protecting babies.
11  BY MR. CORRELL:
12      Q.    Anything else on this document that you
13  believe indicates that you reported to the EEOC that
14  you were denied a religious accommodation?
15          MR. GILLIAM:  And objection, the letter
16  speaks for itself.  You can answer.
17      A.    I was never ever given a religious
18  accommodation.  They should have known that after I
19  said it in my fact-finding meeting.  And again, this
20  letter speaks of all of that.
21          MR. CORRELL:  One more issue and then we
22  can stop for the lunch break.
23  BY MR. CORRELL:
24      Q.    Do you believe Sonya Lacore discriminated
25  against you on the basis of your religious beliefs?
```

Page 126

```
 1      A.    I can't speak for her.  I know that she
 2  agreed on my firing.
 3      Q.    Other than -- and when you say she agreed
 4  to your firing or on your firing, what do you mean by
 5  that?
 6      A.    She signed off on it.
 7      Q.    How do you know?
 8      A.    Through the paperwork that was sent to me,
 9  and she is our VP of in-flight.  It would have to go
10  through her ultimately.
11      Q.    Other than her approving of your
12  termination, are you aware of anything else that leads
13  you to believe that Ms. Lacore discriminated against
14  you on the basis of your religious beliefs?
15      A.    No.
16      Q.    Are you aware of anything indicating that
17  Ms. Lacore discriminated against you on the basis of
18  your status as a union objector?
19      A.    No, not of my knowledge.
20      Q.    Who is Dave Kissman?
21      A.    I believe he is another -- I think he is
22  the western side, and so we're split up in different
23  categories and since I'm in Colorado, I think he is our
24  main liaison that we go through under -- I think it's
25  the labor department but I'm not sure.
```

Page 127

```
 1      Q.    Do you believe Mr. Kissman discriminated
 2  against you on the basis of your religious beliefs?
 3          MR. GILLIAM:  Objection, calls for legal
 4  conclusion.  You can answer.
 5      A.    I never had any dealings with Mr. Kissman.
 6  I have no idea.
 7  BY MR. CORRELL:
 8      Q.    Well, and separate from a legal conclusion,
 9  can you identify anything that led you to believe that
10  Mr. Kissman was acting to discriminate against you?
11      A.    No, except that they should have known
12  after my fact-finding meeting.  Everyone of these
13  people should have known that I was a Christian because
14  this all was sent to them.
15      Q.    What role did Mr. Kissman play in your
16  fact-finding?
17      A.    I don't know to be quite honest with you
18  because I never had contact with him.
19      Q.    Did you have contact with him in connection
20  with your step 2?
21      A.    No, I did not.
22      Q.    Did you have contact with him in connection
23  with your last chance agreement?
24      A.    No, I did not.
25      Q.    Do you have any reason to believe
```

Page 128

```
 1  Mr. Kissman discriminated against you on the basis of
 2  your status as a union objector?
 3      A.    Again, I cannot answer that.  I do not know
 4  what's in his head.
 5      Q.    Well, and that's -- I know you can't.  I'm
 6  just making sure that you're not going to show up at
 7  trial and tell me, here's what Dave Kissman said one
 8  time.  So I'm just making sure that there's nothing
 9  else you want to report while you're under oath here
10  today that would lead you to believe that he
11  discriminated against you because you are an objector?
12      A.    No.
13          MR. CORRELL:  Okay.  I think that's a good
14  point to take a lunch break if that works for everybody
15  else?
16          MR. GILLIAM:  Sure.  How much time?
17          MR. CORRELL:  Can we go off the record
18  first?
19          VIDEOGRAPHER:  Yes, sir.  We are going off
20  the record at 12:12 p.m.
21          (Break from 12:12 p.m. until 1:01 p.m.)
22          VIDEOGRAPHER:  We are going back on the
23  record at 1:01 p.m.
24  BY MR. CORRELL:
25      Q.    Ms. Carter, do you understand that you are
```

Page 129

1  seeking damages from Southwest as part of your claim in
2  this lawsuit?
3      A.   Yes.
4      Q.   All right.  Have you made an effort to
5  calculate what you believe you are owed by Southwest
6  Airlines?
7      A.   No.
8      Q.   Do you believe you are owed back pay by
9  Southwest Airlines?
10     A.   Yes.
11     Q.   How much do you believe they owe you?
12     A.   I'm not sure how they base it all, but I
13 would imagine it's based on what I was flying at the
14 time.
15     Q.   And if I were to tell you from looking at
16 prior documents that it looks like you were earning
17 about $15,000 per year as a flight attendant, is that
18 consistent with your recollection?
19     A.   The last, the last couple years, yes.
20     Q.   Had you remained employed with Southwest
21 Airlines, do you believe you would have continued to be
22 involved with Project Purpose?
23     A.   On the back end, yes.
24     Q.   What do you mean?
25     A.   I believe I would have -- yes.

Page 130

1      Q.   When you say "on the back end," what do you
2  mean?
3      A.   Just handling the day-to-day stuff with the
4  education part, making sure that everything was set for
5  the teachers.
6      Q.   Would you have been working less for
7  Project Purpose?
8      A.   I would imagine so yes, if I was still
9  working at Southwest, yes.
10     Q.   And what about Divine Intervention, do you
11 believe you would have worked with Divine Intervention
12 if you'd remained employed at Southwest Airlines?
13     A.   Divine Intervention, I would not have gone
14 as far as working with them if I would have remained at
15 Southwest, it would have taken away much more of my
16 time.
17     Q.   At the time you were terminated from
18 Southwest Airlines, did you have a plan to increase the
19 amount you were flying?
20     A.   Yes, I did.
21     Q.   What was your plan?
22     A.   To fly a full line.
23     Q.   What does that mean?
24     A.   It means that when I got my schedule from
25 80 to, let's say, 100, it just depends on what the

Page 131

1  trips are here in Denver, I would fly my line.
2      Q.   When did you form the plan to begin flying
3  a full line?
4      A.   When my -- the reason for me not flying a
5  full line in the past three years before I was let go
6  was due to my husband having a drinking problem and
7  leaving my daughter at home by herself at that time;
8  she was too young.  So, she is now 17, has her driver's
9  license, and I also have other means for her to stay
10 with someone as I fly, or if I was able to fly.
11     Q.   And when did your daughter become old
12 enough, in your opinion, to begin left being home by
13 herself as you described?
14     A.   Well, at the time, I was actually seeking
15 somebody to -- I don't have family near me here, so I
16 was actually seeking somebody at the time that I was
17 fired, and prior to that, to help with some type of day
18 care or per se, and within my home schooling family I
19 had found somebody at that point.
20     Q.   And was there a cost associated with that
21 day care?
22     A.   Yeah, there would have been.  Not -- not a
23 whole lot, but enough for -- I mean, it would still be
24 good for me to fly, let's put it that way.
25     Q.   How much was the day care going to cost?

Page 132

1      A.   I would say for each visit, maybe $300, and
2  that would be for a three-day -- three-day trip, so a
3  hundred dollars a day.
4      Q.   So was this care designed to take care of
5  your daughter overnight?
6      A.   Yes.
7      Q.   So it was a hundred dollars a day including
8  overnight care?
9      A.   Yeah.
10     Q.   And how many days per week were you
11 expecting to be gone while you were flying a full line?
12     A.   When I used to fly a full line, it was
13 usually three to four days a week.
14     Q.   And I know this will be sensitive testimony
15 and we will go ahead and designate this portion of the
16 transcript confidential.
17          You mentioned your husband had a drinking
18 problem at the time.  When did that begin?
19     A.   Well, he had been sober for about six
20 years, and it began pretty much when we moved here to
21 Denver.  It started over again.
22     Q.   When was that?
23     A.   So that would have been 2012.  And, you
24 know, on and off it became a huge problem again.
25     Q.   Is that a problem that has been resolved at

Page 133

1    this stage, or is it still an ongoing issue in your
2    marriage?
3        A.    It's not as bad as it was, but it is still
4    an ongoing issue.  The thing is is that now my daughter
5    is 17, going on 18, she'll be going off to college
6    within the next year, and so it would not be an issue
7    at all once she goes off to college.
8        Q.    But during this period you were
9    uncomfortable leaving her in your husband's care?
10       A.    Yes, I was, very uncomfortable.
11       Q.    Are you still married to your husband who
12   you are referencing here?
13       A.    We are currently living together but we are
14   separated.
15       Q.    Understood.  And again, just -- and I'm not
16   trying to pry too deeply into this, I just want to have
17   some context on the decisions you were making about
18   returning to the line.
19       A.    Yes.
20       Q.    When did y'all first get married?
21       A.    1998.
22       Q.    And have you been married continuously to
23   the present?
24       A.    Yes.
25       Q.    And what is your husband's name?

Page 134

1        A.    His name is Jhara, and it's spelled
2    J-H-A-R-A, last name is Carter.
3             MR. CORRELL:  And I think we can stop the
4    confidential designation there because I don't intend
5    to ask any more questions on that topic.
6    BY MR. CORRELL:
7        Q.    How much more were you expecting to earn if
8    you began flying a full line as opposed to what you had
9    been doing in the years prior to your termination?
10       A.    I can't even speculate on that due to the
11   fact that, you know, there's VJA pickup.  I -- I
12   personally was going to be flying a lot more due to the
13   fact that, if I had my job I still wouldn't be in the
14   position that I am with my husband, so more than likely
15   online being the topped out flight attendant, I can
16   make a hundred-plus.
17       Q.    Per year?
18       A.    Yes.
19            MR. CORRELL:  And again we will make this
20   confidential just because I just want to be sensitive
21   to this issue for you, Mrs. Carter.
22   BY MR. CORRELL:
23       Q.    But when you say you wouldn't be in this
24   position with your husband, what do you mean?
25       A.    If I -- the reason that I'm still here in

Page 135

1    this marriage is because I don't have that means right
2    now to be able to earn that for my daughter and I.
3        Q.    Was that true when you were working at
4    Divine Intervention without pay?
5        A.    At the time, yes, but my daughter was
6    actually traveling with me, which made it -- because I
7    home school, so she's been home schooled for the last
8    eight years, so she was actually traveling with me to
9    St. Louis.
10       Q.    Do you still seek to be reinstated as a
11   flight attendant at Southwest Airlines?
12       A.    I would love to be reinstated as a flight
13   attendant at Southwest Airlines.
14       Q.    Are you seeking other damages aside from
15   back pay and -- and I guess not damages, but other
16   relief besides back pay and reinstatement as far as you
17   know?
18       A.    Yes, but I can't put a number on that.
19   And --
20       Q.    Okay.  What category is it?
21       A.    It really harmed my -- it harmed me.  let's
22   put it this way.  It harmed my family in other ways,
23   and it harmed my daughter.  She saw me go through
24   things that rocked my world after losing my job.  To be
25   quite honest with you, though, and this is -- I'm

Page 136

1    not -- I didn't go into this seeking money.  I went
2    into this because I believed I was fired wrongly.  I'd
3    never been in trouble at my job before.  I loved my job
4    and I was a good flight attendant and I was a good
5    employee.  And you can't put a price on the career I
6    had for 20 years that I loved.
7        Q.    Do you understand that you are also seeking
8    damages associated with costs that you incurred seeking
9    medical treatment; is that correct?
10       A.    Yes.
11       Q.    What medical treatment did you seek as a
12   result of your termination?
13       A.    I was on a trip to St. Louis a couple
14   months after I was fired, and because of the stress and
15   just, you know, preparing for my second step meeting,
16   everything, just going through all of that, because I
17   never dreamed that I would be going through that, I had
18   basically what they call a walking stroke, which means
19   I did not pass out, but I have no recollection for at
20   least six hours, they think longer than that, and I
21   ended up, once I finally started coming to and talking
22   to people, one being my husband, told me I needed to
23   get myself to the emergency room, which I did, and they
24   kept me for -- I think I got in there around 11 o'clock
25   at night, something like that, and I was there until

Page 137

1    about 7:00 in the morning the next day, and the only
2    reason they released me was because, while I was
3    working with Project Purpose, I -- we had a prayer
4    meeting that next day that I actually was in charge of
5    so I was on a business per se outing or whatever in
6    St. Louis and I ended up accruing -- accruing, you
7    know, some -- or not legal, but some medical bills from
8    that.
9        Q.    And just so I understand, when you say the
10   phrase "walking stroke," and I understand that you're
11   not a doctor --
12       A.    Right.
13       Q.    -- is it your understanding that that's
14   actually a stroke like loss of oxygen to the brain or
15   is this something --
16       A.    Yes.  Yeah.  It's lack of -- loss of -- my
17   blood pressure was spiking so high and my heart rate
18   was so erratic, and later to find out the reason for
19   all of that was just due to the -- fight-and-flight
20   response that your body goes through, and for months I
21   hadn't been sleeping, I hadn't been eating, the stress
22   was overtaking me regarding the fact that I lost my
23   career.
24       Q.    Who gave you the diagnosis that a walking
25   stroke was caused by losing your job?

Page 138

1        A.    Well, the -- the doctor.  I had explained
2    to him the stuff that I was going through and he told
3    me that just an overwhelming amount of stress can cause
4    these types of things.  He didn't say it was due to me
5    losing my job.  He just said if those are the stresses
6    that are causing this, then I needed to, you know, seek
7    help for it and then he wanted to make sure that he put
8    me on a blood pressure medicine so that I could
9    continue my trip while I was there in St. Louis.
10       Q.    When you were talking to that doctor, did
11   you also relay to him what you shared with us today
12   about the situation with your spouse?
13       A.    I told him that I was having some also
14   marital problems, too, yes, I did.
15       Q.    Who -- what is the name of the doctor that
16   you are referencing?
17       A.    You know what, I do not remember.  It was
18   the emergency room physician, and actually I think
19   there were two at one point because they had sent me
20   back to get a CT scan to make sure that I didn't have a
21   blood clot or anything going on, and then I think the
22   other doctor, there was somebody else that came in so I
23   can't tell you for sure who that is.
24       Q.    If I say the name Dr. Collin Ballain,
25   B-A-L-L-A-I-N, does that ring any bells as to who

Page 139

1    that -- who the doctor was or is that somebody else?
2        A.    No, that's somebody else.  That's my doctor
3    here in Denver.
4        Q.    Do you have any documents from your visit
5    to the hospital in St. Louis for the walking stroke?
6        A.    Yeah, I believe that -- I mean, I sent it
7    to my attorney, I would figure that you'd have it.
8        MR. CORRELL:  So, counsel, the only
9    document that I have seen is a bill from St. Mary's
10   Hospital.  I haven't seen any medical records that were
11   in Ms. Carter's possession.  Are there other documents
12   that --
13       MR. GILLIAM:  No -- sorry to talk over you.
14   Yeah, that's correct.  That's the only thing we had to
15   produce.
16       MR. CORRELL:  Okay.  Just confirming.
17       MR. GILLIAM:  Sure.  Sure.
18   BY MR. CORRELL:
19       Q.    After you left St. Louis following the
20   incident there -- and I just want to confirm, was that
21   St. Mary's Hospital where you were treated?
22       A.    Yes, that is correct.
23       Q.    After you left St. Mary's Hospital, did you
24   get any additional treatment for a walking stroke?
25       A.    I did.  I went to my doctor when I got home

Page 140

1    and got a -- you know, some blood pressure medicine and
2    then some other -- I went to, later on, a psychologist
3    and his name is David Ragsdale.
4        Q.    Prior to your termination at Southwest, had
5    you ever been on blood pressure medication before?
6        A.    No.
7        Q.    Had you ever been diagnosed as
8    hypertensive?
9        A.    No.
10       Q.    Are you still on blood pressure medication?
11       A.    I -- yes, I am.
12       Q.    Other than going to your doctor at home, is
13   that Dr. Ballain?
14       A.    Yes.
15       Q.    And going to Dr. Ragsdale, the
16   psychologist, did you see any other professionals for
17   treatment regarding your walking stroke?
18       A.    No, huh-uh, no, because my doctor, she was
19   able to get -- to -- to finally regulate some sort of
20   my blood pressure, Dr. Ballain was, and then just with
21   the stress level, my psychologist, and he -- he
22   basically -- well, he diagnosed me with PTSD, which
23   means it's a fight and flight, you're constantly in a
24   turmoil, you never can release it, and he was able to
25   help me through EMDR, which is -- it's a -- it's like a

Page 141

1   brain wave-type thing that they do for you and it helps
2   a lot.
3       Q.   So Dr. Ragsdale told you he was actually
4   diagnosing you with PTSD?
5       A.   He said I had the signs within -- I mean,
6   he gave me a test and went through all this stuff with
7   me.  Yes, he said that I was -- I had classic signs of
8   PTSD.
9       Q.   Did you tell Dr. Ragsdale that you had been
10  exposed to death or threatened death in connection with
11  your termination?
12      A.   I'm sorry.  Repeat that?
13      Q.   Did you tell Dr. Ragsdale that you had been
14  exposed to death or the threat of death in connection
15  with your termination?
16      A.   No.
17      Q.   Did you tell Dr. Ragsdale that you had been
18  exposed to actual or threatened serious physical injury
19  in connection with your termination?
20      A.   No.
21      Q.   Did you tell Dr. Ragsdale that you had been
22  exposed to actual or threatened sexual violation in
23  connection with your termination?
24      A.   No.
25      Q.   Did -- did any discussion of death, serious

Page 142

1   physical injury or sexual violation come up in your
2   discussions with Dr. Ragsdale?
3       A.   No.
4       Q.   Are you still suffering from the symptoms
5   of PTSD?
6       A.   The stress level has come way down with the
7   visit and the EMDR that he did with me, and just with
8   also, too, keeping my blood pressure medicine -- you
9   know, my blood pressure, trying to keep it equalized,
10  yes, and -- and he gave me other mechanisms to help
11  with that.
12      Q.   And just so I'm clear on your primary care
13  physician, is it Colleen Ballain?
14      A.   Yes.
15      Q.   Okay.  I was mispronouncing her name.  I
16  thought it was Collin.  Thank you.
17      A.   Yeah, that's okay.
18      Q.   Are you still receiving treatments from
19  Dr. Ragsdale?
20      A.   I have been going into him, it's more
21  sporadic because I haven't had as much of the issues
22  that I had been dealing with before, but yes, I still
23  have seen him.  It's been -- it's been a while due to
24  the COVID stuff that we've had going on, so it --
25  that's kind of put us behind the scenes I guess -- or

Page 143

1   not behind the scenes right now.  So I just do more
2   stuff at home.
3           (Deposition Exs. 9 and 10 marked)
4   BY MR. CORRELL:
5       Q.   I am going to show you two exhibits that
6   we're going to look at together that are related to
7   Dr. Ragsdale.  The first one should start populating
8   here in just a second.  Then I'll go ahead and release
9   the second one while you look at the first one.
10      A.   Okay.
11      Q.   And the second one should be available to
12  you as well.  So those will be Exhibits 9 and
13  Exhibit 10.
14      A.   Okay.  I've got 9.  Let me go back and see.
15  I guess I have to keep refreshing every time.  And
16  Exhibit 10.  Yes.  Okay.
17      Q.   Do you recognize these two documents?
18      A.   I do.
19      Q.   What are these two documents?
20      A.   This is the billing from Dr. Ragsdale.
21      Q.   So first of all, other than these two
22  documents, do you possess any other documents
23  concerning your work with Dr. Ragsdale?
24      A.   Not at the moment.  This -- I think this is
25  the most current.

Page 144

1       Q.   Do you have any other documents about your
2   treatment with Dr. Ragsdale in your possession?
3       A.   No.
4       Q.   And as you can imagine, what I'm trying to
5   figure out is if there's anything else I need to get
6   from you about your interactions with Dr. Ragsdale
7   since he's an issue in this case.
8           MR. GILLIAM:  Can I interject here for just
9   a question?
10          MR. CORRELL:  Sure.
11          MR. GILLIAM:  Did -- were you able to get
12  those documents that we -- that you had subpoenaed?
13          MR. CORRELL:  We have asked them to be
14  produced and the doctors are not moving quickly.
15          MR. GILLIAM:  Oh.  Okay.  We -- we do have
16  something.
17          MR. CORRELL:  Okay.
18          MR. GILLIAM:  And so, yeah, we should get
19  that to you.
20          MR. CORRELL:  Okay.  Is there a way to get
21  that produced basically now while I continue the
22  deposition so that I can make sure there's nothing I
23  need to ask Ms. Carter about?
24          MR. GILLIAM:  Yeah.  Let me -- let me get
25  that to you.

Page 145

```
 1          MR. CORRELL:  Thank you.
 2          MR. GILLIAM:  I apologize.  I didn't -- I
 3   thought you had that, so --
 4          MR. CORRELL:  No worries.  No, we're
 5   waiting on them to produce as well.
 6          MR. GILLIAM:  Okay.  I will send you what
 7   we have.
 8          MR. CORRELL:  Thank you.  I appreciate
 9   that.  That will make this much more efficient.
10   BY MR. CORRELL:
11      Q.   Ms. Carter, on these two documents, do you
12   see where it lists dates of service on -- in the first
13   column on both pages?
14      A.   Mm-hmm, I sure do.
15      Q.   To your recollection, does that actually
16   capture -- accurately capture all of the dates that you
17   saw Dr. Ragsdale?
18      A.   I believe so.
19      Q.   And so is it your understanding that you
20   did not see -- and I see actually that the two are
21   cumulative it now appears, the first one has --
22   Exhibit 10 appears to have everything that is also
23   on -- no, it does not.  They're not -- they're not.
24   They're not cumulative.
25          Is it your understanding you did not see
```

Page 146

```
 1   Dr. Ragsdale prior to July 12, 2018?
 2      A.   Let me look because I don't remember what
 3   it was.  I know it was some time after the fact that I
 4   went and saw him because I was looking for a specific
 5   counselor, a Christian counselor, but also to the fact
 6   that if you're -- yeah, I mean, that -- yes.  So I --
 7   the date.
 8      Q.   Did you see anybody else for counseling or
 9   psychological services prior to July 12, 2018,
10   following your termination?
11      A.   No, I did not.
12      Q.   You see here a list of charges and
13   payments, correct?
14      A.   Correct.
15      Q.   Did you personally pay those charges?
16      A.   Yes, I did.
17      Q.   Were any of those charges reimbursed to you
18   by your insurance or any other source?
19      A.   No, they were not.
20      Q.   Other than Dr. Ragsdale, Dr. Ballain, and
21   St. Mary's Hospital, are there any other physicians or
22   medical professionals for whom you are seeking to --
23   about whom you are seeking to recover damages in this
24   lawsuit?
25      A.   No.  No.
```

Page 147

```
 1      Q.   I know we've talked at some length earlier
 2   today about your post Southwest Airlines employment and
 3   activities.  Outside of that, have you received income
 4   from any other sources aside from income normally
 5   coming in to your home from your spouse?
 6      A.   No.  No, I mean, I've done a few little
 7   things for friends here and there, I'm a photographer,
 8   but it's -- it doesn't amount to anything.
 9      Q.   How much is "not anything"?
10      A.   I'd say less than $500 give or take.
11      Q.   Any other sources of income that you have
12   received?  It doesn't have to be worked-for income.  It
13   could be money given to you by other people.
14      A.   What, gifts you mean?
15      Q.   Money you've solicited to support yourself.
16   It doesn't need to be Christmas presents or birthday
17   presents, but any kind of --
18      A.   I didn't.  I didn't solicit anything.
19      Q.   Okay.
20          MR. GILLIAM:  And counsel, wouldn't you
21   know it, my Outlook has crashed.  I tried to send it to
22   you.  But we will try to get it to you before this
23   deposition is up.  So...
24          MR. CORRELL:  Sure.  No, I appreciate that.
25   BY MR. CORRELL:
```

Page 148

```
 1      Q.   Who is Brett Nevarez?
 2      A.   Brett Nevarez was -- well, he was a flight
 3   attendant, for one, but he was also voted in or placed
 4   in office I should say the first go-round, and he, I
 5   believe, was the first or second vice president of the
 6   union.
 7      Q.   To your knowledge, is he still in that
 8   role?
 9      A.   No, he was part of Audrey's team.
10      Q.   What role, if any, did he play in your
11   termination, to your knowledge?
12      A.   That, I don't know per se.
13      Q.   When you say "per se," what do you mean?
14      A.   I mean, I don't -- I don't know if he
15   played any role except maybe -- no, I take that back.
16   He would have played a role when I went before the
17   board to go to arbitration.
18      Q.   When did that occur?
19      A.   I want to say late late -- well, it would
20   have been summertime of 2018 -- no.
21      Q.   Would it be before --
22      A.   Would that be right?
23      Q.   This was before the arbitration, right?
24      A.   Yeah, before the arbitration.  So maybe it
25   would have been the summer of 2017.  I'm getting my
```

Page 149

1  dates, years mixed up.
2      Q.    What happened when you went before the
3  board in the summer of 2017?
4      A.    I had to plead my case to the board for
5  them to take it to arbitration and they denied it.
6      Q.    So 556 declined to take your case to
7  arbitration?
8      A.    That is correct.
9      Q.    Was Ms. Stone on that board?
10     A.    Yes.
11     Q.    Do you know if she voted or recused
12 herself?
13     A.    I do not know.
14     Q.    Do you know what the vote was among the
15 board members?
16     A.    That -- I wasn't there.  I don't either.
17     Q.    Did they tell you why they weren't taking
18 your case to arbitration?
19     A.    No, they did not.  They just said they
20 denied it.
21     Q.    So you sought a release from the union at
22 the first arbitration, correct?
23     A.    Yes, I did.
24     Q.    At that point in time it was your
25 understanding that the union would not take your case

Page 150

1  forward?
2      A.    They had already denied it.
3      Q.    And that's what I'm just confirming is that
4  the time you sought the release they had already told
5  you we're not going to take your case to arbitration?
6      A.    That is correct.
7      Q.    Who is Cuyler Thompson, spelled
8  C-U-Y-L-E-R?
9      A.    He was our recording secretary.
10     Q.    What role, if any, did Mr. Thompson play in
11 your termination, if you know?
12     A.    I would imagine he was probably one that
13 sat on the board to deny my going to arbitration as
14 well.  That would be the only thing that he would be
15 involved in.
16     Q.    Was he there?
17     A.    What do you mean?  On the board that day?
18     Q.    Well, when you -- when you presented your
19 case to the board, was this a physical meeting where
20 you stood with a group of people or --
21     A.    No, it was actually a phone conver -- or a
22 phone meeting.
23     Q.    So as you sit here today, you do know that
24 Brett Nevarez was on that call?
25     A.    I believe so.  I believe that -- I believe

Page 151

1  so because they have to have -- I forget how many board
2  members that are there.
3      Q.    But you don't know for sure if Mr. Thompson
4  was there?
5      A.    I don't know for sure, no.
6      Q.    And I think this is a name similar to one
7  we have heard earlier, but it's spelled differently so
8  I don't know if it's the same person.  A Lyn, L-Y-N,
9  Montgomery, M-O-N-T-G-O-M-E-R-Y?
10     A.    Okay.
11     Q.    Who is Lyn Montgomery?
12     A.    Lyn Montgomery used to be our grievance
13 chair.  Audrey fired her.  So at that point she would
14 have not been on the -- on the board when I went
15 through.
16     Q.    This name is actually coming from the
17 initial disclosures provided by your counsel in this
18 case, and Ms. Montgomery's title here is listed as
19 president of Local 556.
20     A.    That is what she is now.
21     Q.    I see.  When did that occur?
22     A.    Well, it was after I was fired so that
23 would have been 2018.
24     Q.    What role, if any, did Ms. Montgomery play
25 in your termination, to your knowledge?

Page 152

1      A.    She played none.
2      Q.    Have you had any communications with
3  Ms. Montgomery since your termination other than the
4  one we have already discussed today?
5      A.    Yes, we are friends.
6      Q.    Have you communicated with Ms. Montgomery
7  about any aspect of this case since it was filed in
8  September of 2018 I believe?
9      A.    She knows of my case, yes.  I mean, she's
10 the president of the union and she's also a friend of
11 mine.
12     Q.    When is the last time you spoke to Lyn
13 Montgomery about your case?
14     A.    It would have been last December.
15     Q.    So in December of 2019, you spoke to Lyn
16 Montgomery about your case?
17     A.    Not about the case, but, you know, I spoke
18 to her.
19     Q.    When is the last time you spoke to her
20 about the case?
21     A.    She can't discuss the case so we don't
22 discuss the case.  We are friends.
23     Q.    Have you ever talked to Lyn Montgomery
24 about Audrey Stone?
25     A.    In the past, yes.

Page 153

1    Q.   When is the last time you spoke to Lyn
2  Montgomery about Audrey Stone?
3    A.   It would have been before she became
4  president, so that would have been, what, 2000, I don't
5  know, '18.
6    Q.   I'm not going to try to pronounce this last
7  name, Ms. Carter, but I'll spell it for you.  Who is
8  Chad K-L-E-I-B-S-C-H --
9    A.   Okay.
10    Q.   -- E-I-D-E-L?
11    A.   He is -- and I know who you are talking
12  about.  He is a board member.
13    Q.   What role, if any, did he play in your
14  termination to your knowledge?
15    A.   He didn't play any.
16    Q.   Has he had any involvement in your lawsuit?
17    A.   No.
18    Q.   Have you communicated with him about your
19  lawsuit?
20    A.   No.
21    Q.   Have you communicated with him about Audrey
22  Stone?
23    A.   No.
24    Q.   Who is LaTonia Paul Benoit, B-E-N-O-I-T?
25    A.   She is another board member.

Page 154

1    Q.   What role, if any, did Ms. Benoit play in
2  your termination, if you know?
3    A.   I -- that I don't know because she was in
4  the union prior to me being fired.  I'm just not sure
5  what her role was.
6    Q.   Have you ever spoken or communicated -- I
7  shouldn't say spoken.  Have you ever communicated with
8  Ms. Benoit about your lawsuit?
9    A.   No.
10    Q.   Have you ever communicated with Ms. Benoit
11  about Audrey Stone?
12    A.   No.
13    Q.   Who is John Parrott?
14    A.   He is and has been the union controller,
15  takes care of all the finances.
16    Q.   What role, if any, did Mr. Parrott have in
17  your termination, if you know?
18    A.   I don't know if he was at that board
19  hearing of mine or not.
20    Q.   Any other roles that you believe he may
21  have had in your termination?
22    A.   Not that I know of.
23    Q.   Have you communicated with Mr. Parrott
24  about your termination?
25    A.   I --

Page 155

1    Q.   I'm sorry.  I misspoke.  Have you
2  communicated with Mr. Parrott about your lawsuit?
3    A.   No.
4    Q.   Have you communicated with Mr. Parrott
5  about Audrey Stone?
6    A.   No.
7    Q.   Who is Key, K-E-Y, Ander, A-N-D-E-R, Early?
8    A.   I think she is on the board as well.  I
9  just don't know what her title is.
10    Q.   What role, if any, did Ms. Early have in
11  your termination, if you know?
12    A.   I don't believe any.
13    Q.   Have you ever communicated with Ms. Early
14  about your lawsuit?
15    A.   No.
16    Q.   Have you communicated with Ms. Early about
17  Audrey Stone?
18    A.   No.
19    Q.   I believe Becky Parker is who you
20  identified as one of the two people assisting you with
21  your grievance in 2017; is that correct?
22    A.   That is correct.
23    Q.   Since that time, have you had any
24  communications with Becky Parker regarding your
25  lawsuit?

Page 156

1    A.   No, I have not.
2    Q.   Have you had any communications with Becky
3  Parker regarding Audrey Stone?
4    A.   No.
5    Q.   Other than what we've discussed already,
6  and that is Ms. Parker's role advising you in
7  connection with your grievance, are you aware of
8  Ms. Parker playing any other role in the decision to
9  terminate your employment?
10    A.   No.
11    Q.   Who is Jessica Parker?
12    A.   She is on the board.  She is one of the
13  ones that's on the -- heads up now the women's
14  committee, and she is also the Denver based rep so
15  she's a DEBM.  So she sits on the board.
16    Q.   And what was the acronym you just
17  mentioned, DEBM?
18    A.   It's a DEBM.  It's a -- it's a base --
19  she's actually on the board but she represents the
20  Denver base.
21    Q.   And just so we get it clear on the record,
22  would that be D-E-B-M?
23    A.   Yeah.
24    Q.   Thank you.
25    A.   That's the acronym for -- I forget what

## Page 157

1  it's called.
2  Q.  What role, if any, did Ms. Parker play in
3  your termination, if you know?
4  A.  I think she may have been on the board the
5  day that my grievance came to the board.
6  Q.  Any other activities by Ms. Parker that you
7  are aware of concerning your termination?
8  A.  Not that I know of.
9  Q.  Have you communicated with Ms. Parker at
10  all about your lawsuit?
11  A.  No.
12  Q.  Have you communicated with Ms. Parker at
13  all about Audrey Stone?
14  A.  No.
15      And if you don't mind, I'm just going to
16  step right over here and close this door again.  My dog
17  had gone out and she left it --
18  Q.  Go ahead.
19  A.  That's what you get when you have a
20  120-pound bloodhound --
21  Q.  That's a big dog.
22  A.  -- who can open the door.
23  Q.  Earlier today I was asking you about the
24  individuals who attended your fact-finding meeting and
25  we covered Mr. Schneider, Ms. Jones, Ms. Gutierrez and

## Page 158

1  Ms. Emlet.  I believe I accidentally omitted
2  Ms. Barnett.  Do you recall Edie Barnett?
3  A.  I do, yes.
4  Q.  And she participated in your fact-finding
5  via telephone, correct?
6  A.  Yes.
7  Q.  What information, if any, do you have that
8  you believe shows that Ms. Barnett acted against you
9  based on your religious beliefs?
10  A.  I don't have any.
11  Q.  And do you have any information that you
12  believe shows that Ms. Barnett acted against you
13  because you were a union objector?
14  A.  No.
15  Q.  Do you have any information that you
16  believe shows that Tammy Shaffer acted against you
17  because of your religious beliefs?
18  A.  No.
19  Q.  Do you have any information that you
20  believe shows that Tammy Shaffer acted against you
21  because you are a union objector?
22  A.  No.
23  Q.  What role, if any, do you believe Tammy
24  Shaffer played in your termination?
25  A.  That, I don't know.

## Page 159

1  Q.  Who is Greg Hofer?
2  A.  Greg Hofer is a flight attendant and a
3  friend of mine.
4  Q.  What role, if any, did Mr. Hofer play in
5  the termination of your employment with Southwest, if
6  you know?
7  A.  He didn't play any role.
8  Q.  Have you had any communications with
9  Mr. Hofer about your lawsuit?
10  A.  He knows of my lawsuit, but no.
11  Q.  Have you had any communications with
12  Mr. Hofer about Audrey Stone?
13  A.  Just in the -- just in the past about
14  things about the union and what they were doing.
15  Q.  When is the last time you recall having
16  communications with Greg Hofer about Audrey Stone?
17  A.  Oh gosh.  It would have been when we were
18  both flying so that would have been 2017.
19  Q.  Who is Kent Hand?
20  A.  Another flight attendant and very good
21  friend.
22  Q.  What role, if any, did Mr. Hand play in the
23  process of your termination, if you know?
24  A.  He didn't play any role in it.
25  Q.  Have you communicated with Mr. Hand about

## Page 160

1  your lawsuit?
2  A.  He knows of it.
3  Q.  When is the last time you communicated with
4  Mr. Hand about your lawsuit?
5  A.  Not about my lawsuit.  I mean, we talk a
6  lot.  I mean, he's a very good friend of mine.
7  Q.  Have you communicated with Mr. Hand about
8  Audrey Stone?
9  A.  No.
10  Q.  Who is Bill Holcomb?
11  A.  He was also a flight attendant.
12  Q.  Do you have any idea -- and just so you
13  know, Ms. Carter, I'm going through the list of people
14  identified as having information relevant to this case.
15  I'm not asking you to tell me based on why your lawyers
16  put them on here.  I'm just trying to get your
17  knowledge of these people as it relates to your
18  termination and the events of the case just so you know
19  what we're doing here.
20  A.  Okay.
21  Q.  So did Mr. Holcomb play any role in, to
22  your knowledge, the termination of your employment from
23  Southwest Airlines?
24  A.  Not that I know of.
25  Q.  You've mentioned a couple of these other

Page 161

1  folks are your friends.  Is Mr. Holcomb one of your
2  friends?
3      A.   No, I know of him, but no, he was -- he was
4  not a friend.  He was an acquaintance flight attendant.
5      Q.   Have you communicated with Mr. Holcomb
6  about your lawsuit?
7      A.   No.
8      Q.   Have you communicated with Mr. Holcomb
9  about Audrey Stone?
10     A.   No.
11     Q.   And earlier we got some testimony about
12 Holly Immamovic.  To your knowledge, did Ms. Immamovic
13 play any role in Southwest's decision to terminate your
14 employment?
15     A.   No.
16     Q.   Is south -- is Ms. Immamovic still
17 separated from Southwest Airlines as far as you know?
18     A.   Yes, she is.
19     Q.   Have you communicated with Ms. Immamovic
20 about your lawsuit?
21     A.   She knows of it.
22     Q.   Have you had any substantive discussions
23 with her about it?
24     A.   I know that she knows why I was fired and,
25 you know, we've discussed things like that, but she

Page 162

1  doesn't know the inner -- in -- what's going on on the
2  interim through me.
3      Q.   Have you communicated with her at all about
4  Audrey Stone?
5      A.   In the past, yeah.
6      Q.   When is the last time you communicated with
7  Ms. Immamovic about Audrey Stone?
8      A.   When -- when I first got fired.
9      Q.   So spring 2017 time frame?
10     A.   Yes.
11     Q.   Have you communicated with Jeanna Jackson
12 about your lawsuit?
13     A.   She knows of it, yes.
14     Q.   When is the last time you had a
15 communication with Ms. Jackson that concerned your
16 lawsuit?
17     A.   It's been a while.  It's probably been
18 eight, nine months ago.
19     Q.   So probably before COVID, I mean, maybe
20 that's a good benchmark.
21     A.   Yeah, I would say so.  We -- I mean, we
22 talk a lot, but -- and she knows I'm still within
23 the -- in the lawsuit, but we don't discuss at all.
24     Q.   Have you discussed Audrey Stone with
25 Ms. Jackson since your termination?

Page 163

1      A.   No, I have not.
2      Q.   Do you have any personal connection to
3  Casey Rittner?
4      A.   No, I don't.
5      Q.   Who is Josh Rosenberg?
6      A.   He was a flight attendant at Southwest
7  also.
8      Q.   Did Mr. Rosenberg play any role in your
9  termination as far as you know?
10     A.   Not that I know of.
11     Q.   Have you communicated with Mr. Rosenberg
12 about your lawsuit?
13     A.   No.
14     Q.   Have you communicated with Mr. Rosenberg
15 about Audrey Stone?
16     A.   No.
17     Q.   Who is Chris Click?
18     A.   He is a flight attendant, a friend of mine,
19 and then he also was I believe the vice president of
20 our union before they remove -- were removed.
21     Q.   Are you aware that in your interrogatories
22 you indicate that Mr. Click provided you with a
23 statement in this case?
24     A.   Yes.
25     Q.   What was the form of that statement?

Page 164

1      A.   I don't remember it, I don't recall what
2  all it is.  I'd have to go back and look.
3      Q.   Is it a written document?  Is it -- was it
4  a telephone conversation?
5      A.   You know what?  I don't remember.
6      Q.   When did you get this information from
7  Mr. Click?
8      A.   That I don't remember either.
9      Q.   Can you tell me what year?
10     A.   I know he played a part in my -- or was
11 going to play a part.  I can't remember if he was
12 actually at my arbitration or not.
13     Q.   Do you remember any of the information that
14 Mr. Click has provided to you?
15     A.   Not off the top of my head right now, no.
16     Q.   Does it concern any of the circumstances of
17 your termination?
18     A.   He knew about my termination, yes.
19     Q.   But as you sit here today, you can't tell
20 me anything about the statement that was provided to
21 you by Chris Click?
22     A.   I don't know what all he said, no, I'm
23 sorry, I don't.
24     Q.   Has he provided you any additional
25 statements since the one that you are referencing now?

Page 165

1    A.    No.
2    Q.    Chris Sullivan was your representative at
3    your fact-finding meeting, correct?
4    A.    That's correct.
5    Q.    Are you aware in your interrogatories you
6    state that Mr. Sullivan has provided you with a
7    statement?
8    A.    I believe so, yes.
9    Q.    Do you know what the form of that statement
10   is?
11   A.    No, I do not.  I'd have to go back and read
12   it.
13   Q.    Is it a document?
14   A.    No.  If it's in my interrogatories, I mean,
15   that's what you are referencing it to, correct?
16   Q.    Well, I mean I can show you the
17   interrogatories, Ms. Carter, but there's an
18   interrogatory that asks you to list people who have
19   provided you with a statement and there's a list of
20   names of people that provided you statements.
21   A.    I don't have those statements with me.  I
22   don't have those statements.  I would have given
23   everything over to my attorney.
24   Q.    I fully understand that.  But I'm still
25   asking you questions about did he send you an email,

Page 166

1    did he send you a Word document, did he send you a
2    handwritten letter.  Like what was given to you that is
3    identified in your interrogatories as a statement?
4    A.    He -- he didn't send me an email.  He
5    didn't -- I don't -- whatever it was that I turned over
6    to my attorneys.  I don't recall what he gave me.
7    Q.    Okay.  But, I mean, you don't even recall
8    if it was something you wrote or he wrote?
9    A.    It would have been something that he would
10   have written I would imagine if it came from him.
11   Q.    Okay.  Let's go to the interrogatories.
12   A.    Okay.
13   Q.    Hold on.  Just to make this easier.  One
14   second.  I'm introducing what will be marked as Exhibit
15   Number 11.  Let me know when you have that in front of
16   you and then I will direct you to the correct
17   interrogatory.
18        (Deposition Ex. 11 marked)
19   A.    Okay.  I'm on that.
20   BY MR. CORRELL:
21   Q.    Okay.  And if you scroll down to page 8 of
22   that document.
23   A.    Okay.  Okay.
24   Q.    You will see interrogatory number 5,
25   "Identify all persons from whom you have received

Page 167

1    statements (oral or written) relating to the
2    allegations set forth in the complaint."
3        Do you see that?
4    A.    "Identify persons from whom you have
5    received" -- okay.  Yes.
6    Q.    Do you see down below the paragraph of
7    objections there are several names with bullets next to
8    them.  Do you see that?
9    A.    Yes.
10   Q.    So with Mr. Click you've testified you
11   don't know whether you received an oral or written
12   statement.  Is that correct?
13   A.    I don't remember what -- what I've
14   received.  When they -- both Chris, Chris Sullivan,
15   Kent Hand, and Greg Hofer, those were I believe stuff
16   that I had gotten before my arbitration.
17   Q.    Okay.  And look, at the end of the day on
18   things that you don't remember that's a perfectly
19   acceptable answer, I just need to know what you do
20   remember and that's why I'm asking you --
21   A.    And honestly I don't remember what they
22   gave me or if it was a document that -- whatever I got
23   I have -- I have turned over to my attorney.
24   Q.    Okay.  So with respect to Mr. Sullivan,
25   Mr. Hand, and Mr. Hofer, as you sit here today you

Page 168

1    don't remember the contents of any statement that they
2    have given you?
3    A.    I honestly don't.  No, I don't.
4    Q.    With Ms. Immamovic, what form of statement
5    did she give to you, was it written or verbal?
6    A.    I don't -- I don't remember.  Again, this
7    has been such a long time ago.
8    Q.    That is perfectly fine, I just have to go
9    through all the questions.
10   A.    That's okay.
11   Q.    Do you remember anything about the contents
12   of the statement from Ms. Immamovic?
13   A.    No, I do not.
14   Q.    And with Jeanna Jackson, do you remember
15   whether she provided you an oral or written statement?
16   A.    No, I do not.  These -- like I said, this
17   was all during my arbitration.
18   Q.    Have you reviewed any of these statements
19   since your arbitration?
20   A.    No, I have not.
21   Q.    Okay.  Going next down to interrogatory
22   number 6, you will see a similar list of individuals in
23   response to the question, "Identify all persons with
24   whom you had any communication about the allegations in
25   the complaint."

Page 169

1  Did I read that correctly?
2  A.  Yes.
3  Q.  What communications have you had with TJ
4  Barrenn, spelled B-A-R-R-E-N-N, regarding your
5  complaint?
6  A.  He just knows of it.
7  Q.  Have you had any discussions other than
8  just making him generally aware of the lawsuit?
9  A.  No.  We're -- but we're friends.
10  Q.  With Mr. Click, when is the last time you
11  spoke to him regarding the allegations in your
12  complaint?
13  A.  Oh, it's probably been over a year ago
14  maybe, if not longer.
15  Q.  What do you recall about your
16  communications directly with Mr. Click about the
17  allegations in your complaint?
18  A.  Just the fact that it's ongoing.  I didn't
19  go into specifics.
20  Q.  Who is Victor Conejo?
21  A.  He's a friend of mine.
22  Q.  Does he work for Southwest Airlines?
23  A.  Yes, he's another flight attendant.
24  Q.  What -- when was the last time you
25  communicated with Mr. Conejo about your lawsuit?

Page 170

1  A.  It -- it's the same.  Normally Victor, he
2  just checks on me.  He's a very good friend of mine.
3  Q.  Have you communicated with Mr. Conejo about
4  Audrey Stone?
5  A.  No.
6  Q.  With Ms. Coughlin, Mary Coughlin,
7  C-O-U-G-H-L-I-N, what communications did you have with
8  her about the allegations in your complaint?
9  A.  Just that she knows about it and has read
10  it.
11  Q.  When did you last communicate with
12  Ms. Coughlin about your complaint?
13  A.  About the complaint, it's been when it was
14  first introduced and --
15  Q.  Let me ask that question different.  About
16  your lawsuit.
17  A.  I haven't talked to her about my lawsuit.
18  Q.  When is the -- well, and let me -- let me
19  back up there.  So I -- let's try to agree on a term
20  here so that you understand my question and I
21  understand your answer.
22  A.  Okay.
23  Q.  What I'm trying to figure out is who have
24  you spoken to and when have you spoken to them about
25  the circumstances of your lawsuit.  That includes the

Page 171

1  allegations that you have asserted and the process of
2  your lawsuit to the present.  Do you understand that?
3  A.  Yes.
4  Q.  So if I say -- and let me just be clear for
5  the record.  So if I say have you spoken to them about
6  your lawsuit, I mean all of that, will you understand
7  that if I ask the question that way?  And if not, I can
8  alter it.  I just want to do it in a way that's
9  efficient so we don't spend five hours on this.
10  A.  Okay.  But let me -- let me clarify that.
11  Every one of these people know about my lawsuit.  They
12  can pull it up and read it.  It was also in the media
13  when it first got filed.  So when you ask these
14  questions, I want to give you're an -- I want to give
15  you a full answer on these.
16  I don't go around sitting and talking to
17  these people about my lawsuit on a daily basis or on a
18  yearly basis or on a monthly basis.  They ask me
19  where's the case going at this point, has it gone to
20  court, has -- you know, I mean, they'd ask me questions
21  like that and those are the things that I've answered.
22  I don't --
23  Q.  Let me ask this a different way then and
24  I'll make this a little bit easier.  Starting in
25  November 2020, this month --

Page 172

1  A.  Okay.
2  Q.  -- who have you communicated with at
3  Southwest Airlines this month about your lawsuit in any
4  way?
5  A.  The only person would be Dawn Wann and
6  Jeanna Jackson.
7  Q.  Have you also communicated with them about
8  Audrey Stone in November 2020?
9  A.  No.  No.
10  Q.  What -- what have your communications with
11  Ms. Wann and Ms. Jackson been about in November 2020?
12  A.  Just what -- what's happening in the
13  lawsuit.  I mean, they -- they just wanted to know is,
14  you know, is -- are we getting ready to do depositions,
15  are we getting ready to do the things that, you know,
16  move this case forward.
17  Q.  Okay.
18  A.  And how am I doing, you know, am I doing
19  okay.  They're very good friends of mine and, you know,
20  I've known them for years.
21  Q.  What about October of 2020?
22  A.  Dawn and I, we talk almost -- at least
23  twice a week.  We're very good friends.
24  Q.  So is it fair to say that you've spoken to
25  Ms. Wann every month this year about your lawsuit?

Page 173

1    A.   No, we don't always talk about my lawsuit,
2  no.  No.  As a matter of fact, we try to stay off that
3  topic.
4    Q.   So, and again, what I'm trying to do is
5  figure out who you have communicated with because that
6  helps inform who I am going to go communicate with.
7    A.   Right.
8    Q.   So -- so in October -- in November it was
9  just Ms. Wann and Ms. Jackson and only on lawsuit, not
10  on this stuff.
11         In October, who did you communicate with
12  about your lawsuit, if anyone, who works for Southwest
13  Airlines?
14    A.   It would have only been Dawn.
15    Q.   Okay.  Did those communications also
16  concern Audrey Stone?
17    A.   No.
18    Q.   Okay.  September of 2020, anyone other --
19  did you -- who did you communicate with about your
20  lawsuit in September of 2020?
21    A.   Nobody.
22    Q.   Did you communicate with anyone about
23  Ms. Stone?
24    A.   No.
25    Q.   Okay.  How about August of 2020?

Page 174

1         MR. GILLIAM:  Counsel, if I may, the one
2  little I guess stipulation I would make is to the
3  extent that any of these communications involved the
4  subject matter of the motions for sanctions, I would
5  instruct my client not to answer that.
6         MR. CORRELL:  Then we're going to need to
7  suspend the deposition because if she had
8  communications that also included those, I'm entitled
9  to know about those other communications and I'll have
10  to get the court on the line.
11         MR. GILLIAM:  Okay.  I -- I believe that
12  would be collateral to this matter and there is no
13  discoverable evidence that would really result from
14  that line of questioning.  I mean, I -- I can
15  understand asking about communications about Audrey
16  Stone or about certain allegations in the complaint,
17  but regarding the -- you know, the specific matters
18  that were raised in the motions for sanctions, I would
19  say those I will have to instruct her not to answer.
20         MR. CORRELL:  So let me be clear before I
21  call Judge Rutherford.
22         MR. GILLIAM:  Okay.
23         MR. CORRELL:  I'm going to ask her to tell
24  me the name of every Southwest employee with whom she
25  has communicated about her lawsuit or Audrey Stone.  I

Page 175

1  am going to ask when those communications occurred, and
2  to the extent those communications contain anything
3  other than discussion of Audrey Stone's flight
4  schedule, I'm going to have ask -- to be that
5  conversation.
6         MR. GILLIAM:  I'm sorry, I missed the last
7  part of what you said.
8         MR. CORRELL:  Sure.  The only thing I
9  believe -- any protection over are specific
10  communications regarding Audrey Stone's flight
11  schedule.  You cannot protect the name of the people
12  and the other contact communications that they had
13  because they are potential witnesses in this lawsuit
14  with whom Ms. Carter has communicated about the case.
15         MR. GILLIAM:  No, I think I agree with
16  that, counsel.
17         MR. CORRELL:  Okay.
18         MR. GILLIAM:  If you want to know about
19  allegations in the complaint or about Audrey Stone,
20  that -- that's fine.  It's just specifically --
21         MR. CORRELL:  And I want to be -- I want to
22  be super clear here.  If Ms. Carter got on the phone or
23  in person or via email communicated with a Southwest
24  employee and the subject matter of the conversation was
25  in any way related to the allegations of the complaint

Page 176

1  or Audrey Stone, I'm entitled to know that that
2  communication took place.  It goes to bias, it goes to
3  witness influence, and it goes to discovery of
4  potential people with knowledge of facts that I need to
5  go talk to.
6         Now, if you want to assert a protection
7  over the specific discussion between Ms. Carter and
8  some person about Audrey Stone's flight schedule, you
9  are welcome to do that.  But if I am going to be
10  constrained in any other way, I am going to need the
11  judge to make a ruling because I believe I am entitled
12  to that information because it speaks to a number of
13  issues relevant to witnesses.
14         MR. GILLIAM:  Okay.  I mean I guess would
15  the better way be to proceed to see what you -- I guess
16  what your questions are, your specific questions might
17  be regarding --
18         MR. CORRELL:  That's -- that's fine as long
19  as there's not a pending instruction not to answer and
20  you're welcome to jump in whenever you feel necessary
21  if we need to stop to figure that out because I don't
22  want to run you into that situation.
23         MR. GILLIAM:  Yeah, yeah, no, I agree
24  there's a lot of information that you're entitled to.
25  That's -- that's just my one specific concern, but --

Page 177

1    MR. CORRELL: Fair. And I'm not -- I'm not
2 going to go in and say what information about Audrey
3 Stone's schedule or was this information about Audrey
4 Stone's schedule, those are not questions I'm planning
5 to ask, but I do need to know the nature of who she was
6 communicating with.
7    MR. GILLIAM: Absolutely. That I agree you
8 are entitled to.
9    MR. CORRELL: Okay.
10 BY MR. CORRELL:
11   Q.   And so, Ms. Carter, just again for
12 reference to kind of reorient you, I'm going to want to
13 walk through months going back to 2019 to know who you
14 have been interacting with because I'm trying to
15 identify witnesses and the nature of the communications
16 they have received. Does that make sense?
17   A.   Yes.
18   Q.   Okay. And it doesn't have to be long,
19 we'll just kind of go through as quickly as we can. So
20 I believe for September you said there was no one. For
21 August of 2020, anyone who is employed by Southwest
22 Airlines who you communicated with about your lawsuit?
23   A.   Not that I recall.
24   Q.   Anyone you communicated with about Audrey
25 Stone?

Page 178

1    A.   No.
2    Q.   July of 2020, anyone who works for
3 Southwest Airlines that you communicated with about
4 your lawsuit?
5    A.   In July? Not that I recall.
6    Q.   Anybody you have communicated with about
7 Audrey Stone?
8    A.   I don't communicate with anybody about
9 Audrey Stone.
10   Q.   Did you receive communications from anyone
11 about Audrey Stone?
12   A.   No.
13   Q.   Okay. June of 2020, did you communicate
14 with anyone at Southwest Airlines about your lawsuit?
15   A.   Not that I recall.
16   Q.   Did you communicate with anyone at
17 Southwest Airlines about Audrey Stone?
18   A.   Again, I don't usually communicate anything
19 about Audrey Stone.
20   Q.   And that's not my question, Ms. Carter.
21   A.   No.
22   Q.   So you are aware you submitted a
23 declaration to the court previously stating that you
24 had communications with people at Southwest Airlines
25 about your lawsuit in June of 2020.

Page 179

1    A.   I don't know if it was a Southwest Airlines
2 person or not.
3    MR. GILLIAM: Again, Ms. Carter, I would
4 instruct you not to answer the question to the extent
5 that it reveals any of that subject matter, but you can
6 answer Mr. Correll's question as far as whether you had
7 communications about Audrey Stone.
8    A.   Okay. Communications about Audrey Stone
9 no, no communications about Audrey Stone.
10   MR. CORRELL: One moment, please.
11 BY MR. CORRELL:
12   Q.   In a sworn declaration to the court you
13 stated, "On or about June 25th, 2020, a Southwest
14 flight attendant called me. During the conversation I
15 asked the flight attendant where Stone was based.
16 Based on my 20 years of employment with Southwest I
17 know that this information is commonly known among
18 flight attendants."
19    Do you now change your testimony that you
20 had no communications about Audrey Stone in June of
21 2020?
22   A.   Okay. I didn't know that it was in June.
23 But yes, I did ask where she was based.
24   MR. GILLIAM: Ms. Carter, again I would
25 instruct you that that is the subject matter that was

Page 180

1 part of the motions for sanctions. Again, you can
2 discuss generally who you had communications about --
3 BY MR. CORRELL:
4    Q.   Who was the person you were communicating
5 with?
6    A.   I'm sorry?
7    Q.   Who were you communicating with?
8    MR. GILLIAM: Objection, vague.
9 BY MR. CORRELL:
10   Q.   When you signed this declaration under oath
11 that was submitted to the court that said on or about
12 June 25th a Southwest flight attendant called me, who
13 is the unnamed Southwest flight attendant?
14   MR. GILLIAM: Objection. That's -- that's
15 precisely in the area --
16   MR. CORRELL: We're calling Judge
17 Rutherford. We're taking a break. This is not
18 protected. She had a communication. I get to know the
19 full context of that communication to go talk to that
20 person. Now you can cover up whatever she was doing at
21 the direction of counsel, but the fact that she spoke
22 to a person is not privileged or work product.
23   MR. GILLIAM: No, I mean, again you can ask
24 her who she talked to --
25   MR. CORRELL: I just did. I said who is

Page 181

1   the person who is --
2       MR. GILLIAM:  Identified in the
3   declaration.  That was part of the motions for
4   sanctions.
5       MR. CORRELL:  I'm refreshing her
6   recollection, because she told me she doesn't -- this
7   may be easier just to call Judge Rutherford, because
8   you're going to assert objections that don't exist
9   here.
10      MR. GILLIAM:  Okay.
11      MR. CORRELL:  I mean, at the end of the
12  day, I'm allowed to know who Ms. Carter's been talking
13  to her case about.
14      MR. GILLIAM:  Correct.  Okay.
15      MR. CORRELL:  So are you standing on the
16  objection that I don't get to know who the unnamed
17  flight attendant is?
18      MR. GILLIAM:  Not in that declaration, I
19  mean, you can ask who she talked to with about Audrey
20  Stone.
21  BY MR. CORRELL:
22      Q.   So who did you speak to about Audrey Stone
23  in June of 2020?
24      A.   On what context?
25      MR. CORRELL:  Counsel, she's making --

Page 182

1   she's opening the door.
2       MR. GILLIAM:  Um --
3       A.   I'm not trying to open a door.
4   BY MR. CORRELL:
5       Q.   First she told me she didn't speak to
6   anybody in June 2020.  Then when I confront her with
7   the declaration, she admits it happened, but she can't
8   tell what context it is unless I tell her and you're
9   telling me not to tell her the context.
10      MR. GILLIAM:  Well, again, I mean, I think
11  that you refreshed her recollection that she did speak
12  to some people in June of 2020.  I think, you know, the
13  question should be, you know, did you speak to
14  anybody -- I think you did ask, did she speak to anyone
15  about Audrey Stone in June of 2020, and I don't think
16  she's answered that.
17      MR. CORRELL:  Okay.
18  BY MR. CORRELL:
19      Q.   Tell me about every flight attendant in
20  June 2020 who you spoke to where the words "Audrey
21  Stone" or "Audrey" or "Stone" came up in any way.
22      A.   The only person that I ever spoke with in
23  regards to anything that had to do with her was -- it
24  was -- it would have been probably Dawn because Dawn
25  and I talk about, you know, flight stuff and all that

Page 183

1   good kind of stuff all the time.
2       But now all I wanted to, you know, speak
3   with her about is does she know maybe where she's based
4   now because she was in -- oh, what was it called --
5   Vegas.
6       Q.   So is it your understanding that the
7   unnamed flight attendant in the sworn statement
8   submitted to the court is Dawn Wann?
9       A.   No.
10      MR. GILLIAM:  I -- I --
11      A.   I don't know --
12      MR. CORRELL:  It's a document I can impeach
13  her with at trial, counsel.  I'm allowed to know the
14  name of the person.
15      MR. GILLIAM:  But that's collateral to
16  these proceedings.
17      MR. CORRELL:  Not if she's lying about
18  something.  It's an impeachment device.
19      MR. GILLIAM:  I disagree.
20      MR. CORRELL:  I'm allowed to know who she
21  is referencing because I need to go talk to -- I need
22  to know who to go talk to, who she's been influencing
23  who she's listed as a person she may call to trial.  If
24  she influenced Dawn Wann in June of 2020 I'm allowed to
25  go talk to her.

Page 184

1       MR. GILLIAM:  Well, sure, and she said
2   she's talked to Dawn Wann so you have that name.  But I
3   don't -- where I do draw the line where we would have
4   to get magistrate -- Judge Rutherford on the phone is
5   if you want to ask specific questions regarding who she
6   talks to -- who that person was --
7       MR. CORRELL:  What's the basis -- what's
8   the basis of your objection there?
9       MR. GILLIAM:  That it's not discoverable
10  evidence, it's not calculated to lead to discovery and
11  that it's collateral to these proceedings and that the
12  court has already made your motion --
13      MR. CORRELL:  The rule -- the rules used to
14  have the requirement that it lead to admissible
15  evidence.  It's now been changed to proportionality
16  standard.  I'm unaware of a collateral objection.
17  So --
18      MR. GILLIAM:  Again, the judge has already
19  ruled on it.
20      MR. CORRELL:  Okay.  Let's go ahead --
21  look, we're just going to call Judge Rutherford and see
22  if we can get her on the phone.
23      MR. GILLIAM:  That's fine.  Okay.
24      MR. CORRELL:  Take a break for five
25  minutes.  Counsel, if you'll stay close by I'll get her

Page 185

1    and see if I can patch her in.
2           MR. GILLIAM:  Okay.
3           VIDEOGRAPHER:  We are going off the record
4    at 2:10 p.m.
5           (Break from 2:10 p.m. until 2:15 p.m.)
6           VIDEOGRAPHER:  We are going back on the
7    record at 2:15 p.m.
8    BY MR. CORRELL:
9        Q.   Ms. Carter, while we wait on the judge
10   we're going to skip the months of June and July and we
11   will come back to those after we've heard from the
12   court.
13          So we will go next to May of 2020.  Who
14   employed by Southwest Airlines did you have
15   communications with during May of 2020 about your
16   lawsuit?
17       A.   Nobody.  I mean, I don't talk to people all
18   throughout every month about my lawsuit.
19       Q.   Okay.  Has there been anyone between
20   January 1, 2020, and May 31st, 2020, who is employed by
21   Southwest Airlines who you have communicated with about
22   your lawsuit in any way?
23       A.   No, not like that, no.
24       Q.   What do you mean by "not like that"?
25       A.   As in talking about my lawsuit.

Page 186

1        Q.   I'm not limiting it specifically to
2    talking.  I'm talk -- I'm including emails and text
3    messages and any other form of communication.
4        A.   No.  I've turned over everything.
5        Q.   Have you had any communications with anyone
6    between January 1, 2020, and May 31st, 2020, about
7    Audrey Stone?
8        A.   No.
9        Q.   Okay.  Go back to 2019.  We'll do this in
10   quarters to try and speed it up.  Between October 1st
11   of 2019 and December 31st of 2019, did you communicate
12   with anyone employed by Southwest Airlines about your
13   lawsuit?
14       A.   I don't recall from there -- from that time
15   period.
16       Q.   So you have no recollection at all of any
17   of those -- of any communications in that time frame?
18       A.   Whatever I had and communicated I've
19   already turned over to you guys so I don't remember all
20   of these people.
21       Q.   As long as your testimony is you don't
22   remember, we will keep on going.
23       A.   Okay.
24       Q.   Or if you have others that you do remember,
25   let me know.

Page 187

1           Did you have any communications during that
2    same time period with anyone employed with Southwest
3    Airlines about Audrey Stone?
4        A.   No.
5        Q.   Between July 1st, 2019 and September 30th,
6    2019, did you have any communications with anyone
7    employed by Southwest Airlines about your lawsuit?
8        A.   From what time period?
9        Q.   The third quarter of 2019, so from the
10   beginning of July until the end of September.
11       A.   I don't recall.
12       Q.   Okay.  Do you recall communications with
13   anyone concerning your lawsuit between the arbitration
14   in 2017 and the present other than Dawn Wann and Jeanna
15   Jackson?
16       A.   I don't recall.
17       Q.   Okay.  Do you -- and again I'm excluding
18   the -- we'll come back to June and July 2020.  Since
19   the arbitration have you communicated with anyone
20   employed by Southwest Airlines about Audrey Stone other
21   than we're setting aside June and July of 2020?
22       A.   I don't recall.  I don't speak about Audrey
23   Stone, though, I can tell you that.
24       Q.   We'll come back to that because you did
25   submit a declaration saying on at least one occasion

Page 188

1    you did, right?
2        A.   And that was to find out where she was
3    based.  That was all.
4        Q.   Is that the only occasion since 2018 that
5    you have spoken to anyone employed by Southwest
6    Airlines about?
7        A.   Audrey Stone?  Yes.  That I can recall,
8    yes.  I don't speak about Audrey Stone.
9        Q.   Now, Ms. Carter, I am going to direct you
10   to what will be introduced as Exhibit 12 to your
11   deposition.
12       A.   Okay.
13          (Deposition Ex. 12 marked)
14          MR. CORRELL:  And one moment please, I want
15   to make sure this isn't the court.
16          Mr. Gilliam, we have Ms. Rutherford or
17   Judge -- excuse me, Judge Rutherford on the line.
18          We'll take a moment for counsel to speak to
19   the court.
20          Judge Rutherford, can you hear me?
21          THE COURT:  I can.
22          MR. CORRELL:  And Mr. Gilliam, do you mind
23   testing real quick to make sure she can hear you?
24          MR. GILLIAM:  Yeah.  Judge Rutherford, can
25   you hear me as well?

Page 189

1   THE COURT:  I can, thank you.
2   MR. CORRELL:  And can you hear Judge
3   Rutherford?
4   THE COURT:  Yes, I can.
5   MR. CORRELL:  I apologize, Your Honor,
6   we're kind of chewing gum and duct-taping it together
7   between Zoom and cell phones to be able to communicate
8   with everyone.
9   The issue we are reaching out to you about,
10  Your Honor, is we are in the middle of the deposition
11  of Charlene Carter.  Over the summer there was a series
12  of motions filed regarding how plaintiff came to
13  acquire certain information about a witness.  In order
14  to track that witness down, as part of my deposition
15  today I'm attempting to examine the witness about all
16  communications that she's had with third parties
17  regarding her lawsuit, and plaintiff's counsel is
18  objecting and instructing the witness not to provide me
19  with that information.
20  Defendant takes the position that we have a
21  right to know every person with whom Ms. Carter has
22  communicated both in order to fully investigate those
23  people and to be able to subsequently present evidence
24  of bias at trial if they are called as a witness, and
25  so we are seeking an instruction on how we should

Page 190

1   proceed on this matter.
2   And Mr. Gilliam, if you care to respond.
3   MR. GILLIAM:  Yes, thank you.
4   Judge Rutherford, I think we -- we agree
5   that he's entitled to ask questions about who
6   Ms. Carter communicated with.  Our objection is that he
7   is specifically -- is that Southwest's counsel is
8   specifically asking Ms. Carter to identify who the
9   persons were identified in the affidavit that she spoke
10  with, and our position is that, one, the court has
11  already ruled on it, that that -- that those
12  communications are collateral to these proceedings and
13  that they would not yield any sort of discoverable
14  evidence.
15  We also agree that defendant's counsel can
16  ask who Ms. Carter communicated with about Audrey Stone
17  outside of those issues that were the subject of the
18  motion for sanctions, but on no other matters.
19  MR. CORRELL:  And Your Honor, if I may add,
20  in asking Ms. Carter these questions, the response has
21  repeatedly been, "About what," and so I'm in a position
22  where in order to ask Ms. Carter these questions I have
23  to provide her context of the nature of the
24  conversations so I can ask her what else was discussed,
25  if anything.  And so I need to know the names of every

Page 191

1   person that she's been speaking to and, I mean, it --
2   she's out there as a non-attorney engaging with
3   potential fact witnesses and I feel like we should be
4   entitled to full discovery of that activity.
5   THE COURT:  And this is in relation to the
6   motion for sanctions that was decided by Judge Starr?
7   MR. GILLIAM:  Yes, Your Honor.
8   MR. CORRELL:  Correct.
9   THE COURT:  Is that what you reference,
10  Mr. Gilliam?
11  MR. GILLIAM:  Yes, Your Honor.
12  THE COURT:  And Southwest's counsel just
13  wants to know the names of the people that were -- that
14  she -- she spoke to --
15  MR. GILLIAM:  Correct.
16  THE COURT:  -- with respect to Audrey?
17  MR. CORRELL:  Yes, Your Honor.  What I am
18  attempting to determine is who did Ms. Carter
19  communicate with during the months of June and July of
20  2020 about Audrey Stone in any way, and then to examine
21  other than what information was provided about
22  Ms. Stone's whereabouts, what else was discussed,
23  because I think all of that is relevant to assessing
24  those individuals as potential witnesses as well as
25  potential biases they may have if they are called as

Page 192

1   witnesses.
2   MR. GILLIAM:  And Your Honor, we agree that
3   he can ask about the communications that pertain to
4   Audrey Stone as long as we can exclude any
5   communications about Audrey Stone's schedule and the
6   subject matter in the motions for sanctions.  We
7   submitted in camera briefs at one point and the court
8   denied their motion and decided against producing any
9   of that information.
10  MR. CORRELL:  And the way this came to a
11  head, Your Honor, is I am attempting to use Ms. Stone's
12  publicly or Ms. Stone's declaration that was not filed
13  in camera to say -- because when I first asked
14  Ms. Carter who she had spoken to about Ms. Stone in
15  June of 2020, she said nobody.  I then read to her the
16  language of her declaration which said on June 25th,
17  2020, I spoke to a Southwest flight attendant or
18  something to that effect, and then I was stopped from
19  asking her to identify that person, and then when I
20  tried to ask additional questions about the declaration
21  in terms of who else was she communicating with so that
22  I can find out what the other communications were,
23  there was an instruction not to answer and so I don't
24  know how I can not use her declaration submitted to the
25  court under oath to refresh her recollection and just

Page 193

1    be stuck with her saying, "I don't remember," when I
2    have a clearly impeaching document on that point.
3            MR. GILLIAM:  And Your Honor, we have
4    agreed that, yeah, it should refresh her recollection
5    that she should -- that she had communications, but she
6    shouldn't have to divulge who those specific -- the
7    identities of the specific people she spoke about in
8    that affidavit which was attached to her response to
9    the motions for sanctions.  And the people -- the court
10   asked Ms. Carter to identify that information in camera
11   and decided against releasing that information.
12           THE COURT:  Well, but I don't think the
13   question to Judge Starr was whether that information
14   should be released, was it?
15           MR. GILLIAM:  I think --
16           THE COURT:  Judge Starr did not have -- I
17   mean, the reason it was submitted in camera was in
18   connection with a different question and not whether
19   the defendant was trying to discover who she was
20   talking to about Ms. Stone's schedule.  This was -- it
21   was submitted to him in camera in connection with
22   something else, not with respect to fact discovery.
23           MR. GILLIAM:  No, but our argument was that
24   that information's collateral to these proceedings.
25   And I think his order did -- did ask plaintiff to

Page 194

1    address why that information should not be disclosed so
2    I think it was part of his order or his -- his, I
3    guess, order to address the issue.
4            MR. CORRELL:  I believe Judge Rutherford
5    was asking if you're meaning the September 2nd order,
6    Mr. Gilliam.
7            MR. GILLIAM:  I think it was the
8    September 2nd order.
9            THE COURT:  So I don't see that his order
10   says anything, it just says that the motion for
11   sanctions is denied and denied request for attorney's
12   fees.  It doesn't address -- even though the -- there
13   was a question presented whether Carter, Gilliam, and
14   anyone else associated with representing Carter should
15   be required to disclose who provided the confidential
16   information and disclose the documents, that was not --
17   it was just that he entered the order and denied
18   sanctions.
19           MR. GILLIAM:  Oh.  Your Honor, I think it
20   was actually earlier.  Let's see.  I think it was
21   earlier in August.  I'm looking through here.  Let's
22   see, this may be it, it may be document 113, Your
23   Honor, document number 113, it was dated July 30th.
24           THE COURT:  Is that an electronic order?
25           MR. GILLIAM:  Yes, Your Honor.  It orders

Page 195

1    Carter and Gilliam to submit affidavits to the court
2    for in camera inspection stating all facts surrounding
3    how they obtained the information at issue and an
4    accompanying brief explaining why any particular
5    information is privileged or should not be disclosed to
6    other parties on a different basis.
7            THE COURT:  I don't see any order where he
8    said that -- where Judge Starr has ruled that the
9    information that Southwest Airlines is seeking is not
10   discoverable.
11           MR. GILLIAM:  Well, he doesn't specifically
12   say it's not discoverable.
13           I'm sorry Your Honor?
14           THE COURT:  It sounds like Southwest is
15   asking Ms. Carter to identify a fact witness.
16           MR. GILLIAM:  Yes, and we agree that they
17   can -- they can ask her to identify, you know, who had
18   communications with Audrey Stone.  We have no objection
19   to that.  What we object to is just having her
20   specifically identify the identity of who gave her
21   information about Ms. Stone's schedule.
22           MR. CORRELL:  And again, Your Honor, the
23   way we ended up in this predicament is I started with
24   that question, I was told "no one," and then when I
25   attempted to use a sworn statement submitted to a

Page 196

1    federal court, I was told I wasn't allowed to do that
2    even though that statement directly contradicted the
3    testimony of "no one."
4            MR. GILLIAM:  And I think it's fair that it
5    could be used to refresh her memory as to having
6    communications, but I don't think that she has to
7    disclose who she had those communications with on that
8    particular subject.  If it doesn't refresh her memory
9    as to who she had communications with in general about
10   Audrey Stone, then we -- we don't think that it -- that
11   she should have to divulge who she specifically talked
12   to about Stone's schedule.
13           THE COURT:  I'm sorry, Mr. Gilliam, I don't
14   understand.  Are you going to allow your client to
15   answer the first question that was posed to her that
16   sort of opened up this Pandora's box?
17           MR. GILLIAM:  Yes, I would allow her to
18   answer who did she have communications with about
19   Audrey Stone.  If the question is who did you discuss
20   Audrey Stone's schedule with, I would object.  And if
21   the question is who is the individual who's
22   identified -- who you spoke with that's identified in
23   your affidavit or alluded to in your affidavit, I would
24   object to that as well.  But I have no objection to
25   Mr. Correll asking who did she discuss Audrey Stone

Page 197

1    with.
2         THE COURT:  Mr. Correll, do you want to ask
3    the follow-up questions that Mr. Gilliam thinks you are
4    going to ask?
5         MR. CORRELL:  No, no, Your Honor.  Like I
6    said, the problem I ran into was --
7         THE COURT:  Okay.
8         MR. CORRELL:  -- the first answer was "no
9    one," and then when I presented the affidavit and said,
10   okay, well, you told the court you did so who did you
11   talk to, I was told I couldn't ask that question.  And
12   there's another paragraph, the next paragraph also
13   references communicating with people about Audrey Stone
14   and I -- I need to be able to ask who were you
15   communicating with about Audrey Stone.  I don't want to
16   follow up and say well, is this the person who gave you
17   X information.  And I'll -- if he wants to instruct her
18   not to answer about the scheduling aspect of it and she
19   says, well, there was nothing else, well, I mean, I
20   understand that it's admission by omission, but she
21   communicated with potential fact witnesses and if
22   that's all she talked to them about, I don't know how
23   to work around this, but I need to know that.
24        THE COURT:  And, Mr. Gilliam, that's what
25   you are going to instruct her not to answer?

Page 198

1         MR. GILLIAM:  Yeah, it's just that one
2    specific issue who -- who are the people that she
3    alludes to in her affidavit.  That's -- that's what I
4    do not want her to answer.  I am okay with her
5    answering who did you speak to Ms. Stone -- who did you
6    speak to about Ms. Stone.
7         MR. CORRELL:  I just don't know what to do,
8    Your Honor, when she says "no one" and I've got a sworn
9    statement that says she did.
10        THE COURT:  Well, I think as this has been
11   fleshed out a little bit, that Ms. Carter maybe want to
12   reconsider her answer "no one" and she may have -- on
13   hearing all of this or having the question explained to
14   her by her attorney will understand that she can say
15   someone and she can name the person that she talked to.
16   She can answer the question that you initially posed.
17        MR. CORRELL:  Understood, Your Honor, and
18   will carefully circumscribe the question to make sure
19   that I notify the witness that she is not to disclose
20   the substance of communications regarding Audrey
21   Stone's schedule specifically in response to any of my
22   questions.
23        THE COURT:  Okay.  I think -- I think
24   that's where it is.  I think the attorneys are getting
25   a step or two ahead of themselves.

Page 199

1         MR. GILLIAM:  It could be.
2         THE COURT:  Go back to square one.  It is
3    Friday.  It is the middle of a pandemic.  I do
4    appreciate the stress that everyone's under, but I feel
5    like in talking to you that maybe we could just have a
6    do over, a mulligan, and try again and see if we get
7    further.  I'm happy to stay on the line if you want to
8    ask these questions and let me listen for a little bit.
9         I also think that the attorneys have
10   reached a bit of an understanding.  You may be able to
11   continue without my assistance, but I'm happy to do
12   whatever it takes to get this completed today.
13        MR. CORRELL:  In the interest of
14   efficiency, Your Honor, if you could give me five
15   minutes on the line I think we can get through this and
16   cut you loose without having to bother you a second
17   time.
18        THE COURT:  Sure.  Sure.
19        MR. CORRELL:  Is that okay with you,
20   Mr. Gilliam?
21        MR. GILLIAM:  Yes, that is, that is.  I
22   appreciate that too, Your Honor.
23        THE COURT:  Of course.
24        MR. CORRELL:  And Mr. Hendrick, are we
25   still on the record?

Page 200

1         THE REPORTER:  Yes.
2    BY MR. CORRELL:
3         Q.    And Ms. Carter, you've had the benefit of
4    listening to all of our communications here.  So the
5    question to you is who did you communicate with in June
6    2020 about Audrey Stone?
7         A.    I -- it would be Dawn Wann.
8         Q.    Anyone else that you communicated with in
9    June 2020 about Audrey Stone?
10        A.    It may have been a friend of mine, Alyssa,
11   in passing, Alyssa.
12        Q.    Do you know what her last name is?
13        A.    I believe her new last name is Rosetti.
14        Q.    In your communications with Ms. Wann about
15   Audrey Stone in June of 2020, did you communicate about
16   anything having to do with the allegations in your
17   lawsuit -- or excuse me -- about Ms. Stone's role in
18   your lawsuit other than anything having to do with her
19   schedule?
20        A.    Repeat that?  I'm sorry.
21        Q.    It was a bad question.
22             Other than communicating with Ms. Wann
23   about Ms. Stone's schedule, which I do not know you did
24   or did not do, did you have any communications -- what
25   were -- what were your communications with Ms. Wann

Page 201

1    about concerning Ms. Stone?
2        A.    I just talked about her base, where she
3    might be based at.
4        Q.    Okay.  In communicating with Ms. Rosetti in
5    June of 2020 about Ms. Stone, other than communications
6    regarding Ms. Stone's whereabouts, what was the nature
7    of your communications with Ms. Rosetti?
8        A.    It was the same, it was about if she knew
9    where maybe she was based at.
10       Q.    In July of 2020, did you communicate with
11   anyone about Audrey Stone?
12       A.    No, I didn't communicate with anybody about
13   Audrey Stone.
14       Q.    When you say you don't know -- when you use
15   the word "communicate," what are you meaning there?
16       A.    I didn't talk to anybody or, you know,
17   communicate about Audrey Stone.
18           That -- are you talking about me now asking
19   again where she might be based?
20       Q.    No, ma'am.  So again, referencing your
21   declaration previously provided to the court, you told
22   the court you received "unsolicited information" from
23   two other people?
24       A.    Yes, I did.
25       Q.    Did you have any communications with them

Page 202

1    other than passively receiving unsolicited information?
2        A.    Correct.  I did receive some information
3    but it was from an anonymous source.
4        Q.    Did you have any communications back with
5    those individuals or did you just receive that
6    information and there was no further communication
7    about this?
8        A.    Absolutely, there was no more
9    communication.
10       Q.    Okay.
11           MR. CORRELL:  Judge Rutherford, I think
12   that exhausts this line of questioning and that was all
13   of the help we needed.
14           THE COURT:  All right.  Well, thank you
15   very much.  I'm glad you called me and have a good
16   weekend.
17           MR. CORRELL:  You too.  Thank you, Judge.
18           MR. GILLIAM:  Thank you.
19           THE COURT:  All right.  Good-bye.
20   BY MR. CORRELL:
21       Q.    So when the judge called, Ms. Carter, I
22   believe I had just introduced a new exhibit to you and
23   that would be Exhibit 12, I believe.  Do you have that
24   document in front of you?
25       A.    I do.

Page 203

1        Q.    Do you recognize that document?
2        A.    I do.
3        Q.    What is that document?
4        A.    That is a document to Jim Little who was
5    the international president of TWU at the time.
6        Q.    Why did you send this email?
7        A.    Well, let me re-read all of it.
8        Q.    Please take your time.
9        A.    Okay.  This had to do with the coup that
10   went on to remove Stacy Martin, Chris Click, Jerry
11   Lindermann, and Dawn Wann, and also Jana Deloache and
12   the rest of the board.
13       Q.    How many messages like this one did you
14   send to Mr. Little?
15       A.    I sent -- not like this but I sent some
16   messages to Jim Little about how he -- let's put it
17   this way:  I've known Jim Little for a long time.  He
18   used to be our liaison.  He was part of a trial that I
19   actually was a part of along with another board member
20   that was illegally removed, and this had happened again
21   with our duly elected president, vice president and so
22   on.
23       Q.    Did you get a response?
24       A.    Don't believe I got a response from him.
25       Q.    Do you -- were you expecting a response

Page 204

1    from him?
2        A.    Actually I would have hoped that he would
3    have responded because it was another -- taking out our
4    board members by international, and we had elected our
5    board members and there was no reason for
6    international -- we're supposed to have autonomy within
7    our local membership, and they came in and did the
8    exact opposite and took out our board members.
9           (Deposition Ex. 13 marked)
10   BY MR. CORRELL:
11       Q.    Next I am going to show you what will be
12   marked as Exhibit 13 to your deposition.
13       A.    Okay.
14       Q.    When you see that document, let me know.
15       A.    Okay.  Okay.
16       Q.    Do you recognize that document?
17       A.    I sure do.
18       Q.    What is that document?
19       A.    That is a document soliciting my vote for
20   Thom McDaniel for a delegate position.
21       Q.    Why did you send this email?
22       A.    Because I wanted him to know that I was not
23   going to be voting for him and he -- knows the
24   reason why.
25       Q.    What's the reason why?

Page 205

1  A.   I testified against him during Melissa
2  Smith's trial when they removed her illegally and she
3  won her trial.  Ever since then, Thom McDaniel has
4  basically threatened my job from there.
5  Q.   How did Thom McDaniel threaten your job?
6  A.   When I was -- this has been almost, what,
7  20 years ago, he removed a duly elected president
8  illegally, and I testified for her in that, and through
9  that entire time he has threatened my job.
10  Q.   How?  What did he do?
11  A.   What did he do?  He --
12  Q.   What did he do to threaten your personal
13  job?
14  A.   He told me that I need to basically watch
15  my back as time went on, that he --
16  Q.   When did he tell you that?
17  A.   I'm sorry?
18  Q.   When did he tell you to watch your back?
19  A.   It was during the trial of Melissa Smith.
20  Q.   Who was present besides you and
21  Mr. McDaniel?
22  A.   Nobody at that time because we were all
23  sitting out at the witness area.
24  Q.   And did you report Mr. McDaniel's comments
25  to anybody?

Page 206

1  A.   The only person that I reported that to
2  would have been Melissa Smith who was at that time
3  supposed to be our president, but he then went back and
4  they had a meeting and filed charges under Article 21
5  and removed her completely from being our union
6  president.
7  Q.   You said twenty years ago, this would have
8  been around the year 2000?
9  A.   Yes.  2000-2001.  I -- oh.  And then the
10  last trial for her, it took about three years and she
11  won her trial.  They removed her illegally.
12  Q.   So between 2000 and 2003, when did
13  Mr. McDaniel allegedly say, "Watch your back"?
14  A.   It was during the first portion of her --
15  I'm not sure if it was the arbitration -- not
16  arbitration -- mediation or if it was the actual trial.
17  I can't remember.  It was all -- I just don't remember
18  exactly when that was.
19  Q.   And in the more than 10 years between that
20  date and when you sent this email in 2013, other than
21  saying "watch your back" on one occasion, what else did
22  Mr. McDaniel do to threaten your job, if anything?
23  A.   I knew that he had spoken ill about me
24  through the union, in the union office, and during his
25  administration for about two and a half years I -- I

Page 207

1  was paying dues and they were coming out of my checking
2  account and I had proof of this, but every time I'd
3  call -- somehow or another during his administration I
4  kept getting emails from the union saying that if I
5  didn't come up with all of my dues, that I was gonna --
6  I could get fired because if you don't pay your dues
7  they can get you fired.  I had been paying my dues,
8  come -- come to find out after having a meeting with
9  John Parrott and also Michael Massoni, after this had
10  been going on for almost two years, found out I had
11  overpaid my dues.  And I don't know who all was behind
12  that, but it was very odd that my dues were not being
13  put in my specific -- showing that I had paid, when my
14  check had my name on it, my employee number, and, you
15  know, where I was based on it, and they were cashing my
16  checks because I had a whole reference sheet regarding
17  that from my bank, and even John Parrott couldn't
18  figure out why my dues were not showing up within my --
19  you know, under my name and so forth.  So I don't know
20  who was doing that, but it was very odd and it was
21  under his administration, Thom McDaniel's.
22  Q.   And --
23  A.   And I was also being trashed in the context
24  and I've got witnesses to that in the union office.
25  Q.   By whom?

Page 208

1  A.   Well, when Kent Hand was working in there,
2  basically Thom McDaniel's word for me because my last
3  name used to be Batts, that is my maiden name, he would
4  say that I was the bat-shit crazy woman out there
5  because I always was -- you know, when I'd go to union
6  meetings I would confront him on the things that the
7  union was or was not doing for its own membership or
8  spending our money doing certain things.  And his
9  leadership harmed many.
10  Q.   Were you still a union member at the time
11  you sent this email?
12  A.   In 2013?  I -- I can't see the date on
13  there.  I think I resigned my -- does that say eight or
14  five?  Because I can't see it.
15  Q.   I'm sorry.  It says August 3rd, 2013.
16  A.   Okay.  That is before I resigned.  I
17  believe it was in September of 2013 that I -- September
18  or October of 2013.  He was running for a delegate
19  position and so was I.
20  Q.   So why send him this email as opposed to
21  just not voting for him?  What were you hoping to
22  accomplish?
23  A.   I had asked him prior not to ever send me
24  anything.
25  Q.   I'd like you to scroll down to the very

Page 209

1 bottom of this document. Do you see where it says, "If
2 you wish to Unsubscribe from this candidate's emails,
3 please click on the following link: Unsubscribe"?
4 A. And I did that after I sent him my message.
5 Q. Why did you feel it necessary to send that
6 message if all you had to do was click the link and
7 unsubscribe?
8 A. Well, if you can go back and read some of
9 the things that he had said about me while I was
10 running for the delegate and then send me this email, I
11 wanted him to know that I knew basically about what he
12 was saying about me in a -- just as a no vote for him
13 and that we would be cancelling each other out.
14 He was trashing my name, along with Brian
15 Talbert, and Brian Talbert had said that, Charlene --
16 and he got my last name wrong, but Carter-Bettis, which
17 is supposed to be Batts, should not have anything to do
18 with TWU International and she will never hold a
19 position.
20 Q. Next I'd like to show you what will be
21 marked as Exhibit 14 to your deposition. Let me know
22 when you can see that.
23 A. Okay.
24 (Deposition Ex. 14 marked)
25 A. Okay. I've never seen this one before.

Page 210

1 I'm not sure -- yeah, that's from Brett Nevarez.
2 BY MR. CORRELL:
3 Q. So is this -- do you know if this is a
4 document that you collected and provided for production
5 or do you know if it came from somewhere else?
6 A. I -- you know what? I don't know where
7 this one came from to be quite honest with you.
8 Q. That's fine. That makes it a short exhibit
9 that we don't spend much more time on. I have a couple
10 more where I just need to know what the documents are
11 and that's what we're running through here. So...
12 A. Okay.
13 MR. GILLIAM: And counsel, did you get the
14 email that Jeff Jennings sent you?
15 MR. CORRELL: I did. What I'm planning to
16 do, if you don't mind, is I am going to finish this
17 last little piece and take a break to look at that and
18 wrap up, and then I should be done.
19 MR. GILLIAM: Sure.
20 (Deposition Ex. 15 marked)
21 BY MR. CORRELL:
22 Q. So next you should see Exhibit 15,
23 Ms. Carter.
24 A. Okay.
25 Q. Let me know when you can see that document.

Page 211

1 A. Yeah. I -- and I don't know who -- who
2 sent this document.
3 Q. Okay.
4 A. I mean I know it's Brian and that would be
5 Brian Talbert.
6 Q. Do you know who the typing is in the box
7 down here that is on the message that wasn't sent?
8 A. No, I don't.
9 Q. Okay. And you don't know where this came
10 from?
11 A. No, I do not.
12 Q. All right. Next we have Exhibit 16.
13 A. Okay.
14 (Deposition Ex. 16 marked)
15 BY MR. CORRELL:
16 Q. When you have that in front of you, let me
17 know.
18 A. Yes, this is from Mike Casper, this is not
19 one that I remember either. But he was a victim of
20 harassment.
21 Q. Who is Mike Casper?
22 A. He's a flight attendant at Southwest, or
23 was.
24 Q. Do you know, did he leave voluntarily or
25 was he terminated?

Page 212

1 A. No, he -- he left voluntarily. He just
2 took the early out.
3 Q. Do you contend that any aspect of the posts
4 that we've talked about today were the product of
5 someone else posting on your Facebook?
6 A. This didn't come from my Facebook.
7 Q. No, no, I understand that. I just want to
8 make sure that you're not also claiming that someone
9 else used a fake profile of yours or anything of that
10 nature.
11 A. No, it had happened to me a couple of
12 times, but this one was very egregious. This one --
13 yeah, this one -- this one was bad and they proved it
14 through the FBI that Jeanna and Mike were harmed
15 horribly. This was a fake conversation and -- and
16 still the company has not been able to let them know
17 exactly who did this. They got the -- they got the law
18 involved in this one. And yes, it has happened to me
19 and yes, it has happened to others.
20 Q. When did it happen to you?
21 A. Well, it was -- it was one I know of before
22 I got fired, but then there was another one after I got
23 fired and they either took the post from something else
24 prior to that and put it on another feed, because you
25 can capture these things and then paste them or they

Page 213

1    took my words from something else and recreated it.
2        Q.    To your knowledge --
3        A.    This isn't -- this isn't -- this isn't the
4    first time this has happened and this is -- this is the
5    problem with social media because some of it is not
6    true and these two people right here were harmed
7    horribly by this.
8        Q.    And my question to you, Ms. Carter, is do
9    you contend that any of the social media that was
10   presented to you during your fact-finding or your
11   step 2 was not your social media?
12       A.    No.  My -- what -- and I'm fessing up to
13   it, I -- yes, the stuff that was on my personal
14   Facebook page, my pro life stuff, yes, that was on
15   my -- my Facebook page.
16           (Deposition Exs. 17 and 18 marked)
17   BY MR. CORRELL:
18       Q.    Ms. Carter, I -- I will skip Exhibit 17
19   because that was accidental.  Exhibit 18 will be the
20   next one we look at.
21       A.    Okay.  Okay.  I cannot see those.  Let's
22   see.
23       Q.    And I think the best way to handle this,
24   just because I can't give you paper copies that would
25   be larger, is if you can control and zoom in a little

Page 214

1    bit you should be able to see -- I'm focused on the
2    first page here.
3        A.    Okay.
4        Q.    Do you -- first of all, is this a text
5    message from you?  It says "me" at the top, I don't
6    know who "me" is.
7        A.    No, this is not a text message from me.  I
8    can't -- I can't hardly read these.  I'm sorry.
9        Q.    And without getting into the substance of
10   it, do you recognize what program that information came
11   from or what system it came from?  I just have no idea
12   what this is.  It looks like it may be internal union
13   grievance materials --
14       A.    Okay.
15       Q.    -- and I'm trying to figure out where this
16   came from.
17       A.    I -- that I don't know.
18       Q.    Can you --
19       A.    This was actually being -- this was
20   actually being passed around and somebody sent this to
21   me and it was anonymous.
22       Q.    So you received this?
23       A.    Yeah, I received a -- yeah, I received
24   these two pieces of paper, but I don't know where they
25   came from.

Page 215

1        Q.    Well, when you say someone sent this to
2    you, did they actually send the messages to you or did
3    you just get the documents?
4        A.    No, this was on -- okay.  So on Facebook
5    Messenger, anybody can send you, I mean, anything on
6    Facebook Messenger, and it just happened to be one that
7    I clicked on to because it's like an email, and so I
8    clicked on to this and somebody, I don't know who sent
9    this to me, but it was being passed around with the
10   flight attendants.
11       Q.    Do you know why it was being passed around?
12       A.    The only reason I can think of is that --
13   okay.  In looking back at this one, I do believe Brett
14   was speaking about my case and some other people's
15   cases, which he wasn't supposed to be talking about,
16   and somebody turned him in.  I -- I don't know who
17   turned him in, but somebody turned him in.  I was
18   already gone by this point.
19       Q.    So you're talking --
20       A.    And it -- and it shows the -- it shows the
21   different treatment.  I -- I -- you know, different
22   treatment when it comes to Brett Nevarez and other
23   people.
24       Q.    Do you know why it has this format with
25   "Tuesday, July 16, 2019" at the top and time stamped?

Page 216

1        A.    No, I do not.
2        Q.    Is this something you personally collected
3    off of a website?
4        A.    No.  I can't get on any of those websites.
5    I'm blocked from all those.  I don't have a way to get
6    on any of those websites.  If you're speaking about,
7    you know, Southwest or -- and nobody can get on union
8    websites, so, I mean, I don't know where this came
9    from.
10       Q.    Okay.
11           MR. CORRELL:  Counsel, let's take a
12   15-minute break so I can look at those documents and
13   then if I don't have anything, I'll be passing the
14   witness.
15           MR. GILLIAM:  Okay.  Sounds good.
16           VIDEOGRAPHER:  We are going off the record
17   at 3 o'clock p.m.
18           (Break from 3:00 p.m. until 3:13 p.m.)
19           VIDEOGRAPHER:  We are going back on the
20   record at 3:13 p.m.
21   BY MR. CORRELL:
22       Q.    Ms. Carter, while we were off the record
23   your counsel indicated that you wanted to provide
24   additional clarification on Exhibit 18.  Can you please
25   go ahead and provide that information?

Page 217

1   A.   Yes.  Yes.  When it did say "me" on here,
2   that is from me.  That went to Dawn Wann.  So it was a
3   text message.  I couldn't read it, and this had been
4   being passed around.  So I did send it to Dawn since
5   she had been on the board before.
6   Q.   So make sure I understand kind of the
7   pathway here correctly, so you took this screenshot
8   from a website and then put it into a text message to
9   Ms. Wann?
10   A.   I didn't take the screenshot.  The
11   screenshot was actually sent to me, and I don't know if
12   it was anonymously sent to me on Facebook through
13   Messenger, and that's when -- and like I said, it was
14   being passed around, and then I sent it to Don that
15   evening.
16   Q.   Do you still have a copy of the anonymous
17   Facebook message that you received and passed around?
18   A.   No, I go through -- I go through my
19   Facebook thing because I get junk all the time on there
20   and just erase them so I just -- you can -- you can
21   erase them just like an email.
22   Q.   So you destroyed that document?
23   A.   Well, it's the text document right here,
24   but yeah, this is how it came to me.
25   Q.   Are there other email -- are there other

Page 218

1   messages you've received concerning disciplinary
2   matters at 556 that you received in Messenger?
3   A.   No, this is the only one, and I think it's
4   because it had -- the original post -- because I
5   remember the post that Brett Nevarez put out there and
6   he had referenced my case and so I think that's the
7   reason somebody sent this to me.
8   Q.   And when you say you received an anonymous
9   message through Messenger, who did it identify as
10   sending the message?
11   A.   It just always is a random, a random name,
12   like -- you know, it can be anybody.  I get messages
13   from -- and I know this sounds awful, but it's true,
14   it's almost like a dating site these days where if they
15   see your Facebook, they send you messages.  I've had
16   people ask me out on Facebook that I don't even know.
17   Q.   What was the random name on the message?
18   A.   I don't remember what this one is.  All I
19   know is that I clicked on it and it said, "For your
20   eyes," and I read it and this is what it said.
21   Q.   Did you respond to that message?
22   A.   No, I did not.
23   Q.   So you -- just so I understand your
24   testimony, you received an allegedly anonymous message
25   containing information from 556 about discipline.

Page 219

1   You --
2   A.   It wasn't -- I mean, I don't --
3   Q.   Let me -- I want to try and understand your
4   testimony, Ms. Carter.
5   A.   I'm sorry?
6   Q.   I want to make sure I understand your
7   testimony that we are clarifying here.
8   A.   Okay.
9   Q.   So you received an anonymous message
10   through Facebook Messenger from a person you didn't
11   know containing disciplinary information about, it
12   appears to be Chris Click, from a 556 system.  You took
13   that information, relayed it to Ms. Wann, but destroyed
14   the anonymous email?
15   A.   The -- it just has -- it just has a funky
16   name to it.  All it -- that's all it did.  I don't know
17   who sent this to me.  But I did -- yeah, I mean, it was
18   being passed around.  Somebody had put it also I think
19   out on ONE LUV at some point, and then they took it
20   down.  So I don't know who sent this.  All I know is
21   that it -- it was in response to a social media thing
22   that Brett Nevarez had put out, and it was showing my
23   case, I think it was Jerry Lindermann and Chris Click's
24   case, my friend Kent Hand's case which Brett Nevarez
25   had a nondisclosure to not talk about that case.

Page 220

1   Q.   To make it clear, the message you are
2   talking about was Mr. Nevarez talking about federal
3   lawsuits, correct, not internal disciplinary documents?
4   A.   Correct, they were federal lawsuits.
5   Q.   Whereas this appears to be internal
6   disciplinary documents from within the union, correct?
7   A.   I didn't know where the internal discipline
8   document came from.  I'm trying to tell you that.  All
9   I know is that somebody sent it to me, because it had
10   referenced to me and all the other people that he was
11   talking about.  And so I sent it to Dawn to find out,
12   you know, do you know anything about this and she said
13   no, she said she'd heard that it had been going around.
14   Q.   When did you receive this document via
15   Facebook Messenger?
16   A.   Oh gosh, it's been a long time ago.  I
17   don't even know --
18   Q.   Close in time when you sent it to Ms. Wann?
19   A.   I'm sorry?
20   Q.   Close in time to when you sent it to
21   Ms. Wann?
22   A.   It probably would have been within a few
23   days after I got a message, I mean, because I don't
24   check my messages daily on Facebook.
25   Q.   And how long after you sent this to

Page 221

1    Ms. Wann did you delete the Facebook Messenger message?
2    A.    I delete my Facebook Messenger messages
3    pretty much every day.
4    Q.    Well, it --
5    A.    If I get -- if I get on it.  You know, if
6    I'm looking at my messages I just go back and delete
7    them, otherwise it's just like a bunch of emails.
8    Q.    So are you under the understanding that you
9    have an obligation in connection with this lawsuit to
10   preserve documents and data concerning your case?
11   A.    I did.  This is a document.
12   Q.    Are there other documents of this nature
13   that were sent to you via Facebook Messenger that you
14   have destroyed?
15   A.    No.
16   Q.    Are there other communications about your
17   lawsuit -- are there communications about your lawsuit
18   that you received through Facebook Messenger that you
19   have destroyed?
20   A.    No.
21   Q.    Are there communications about Audrey Stone
22   that you received through Facebook Messenger that you
23   have destroyed?
24   A.    No.
25   Q.    So this is the one and only document that

Page 222

1    you have ever received having anything to do with this
2    case that you destroyed?
3    A.    That I destroyed?  I didn't know that I was
4    destroying it.  This is the document that I received.
5    Q.    Correction.  The Facebook message from the
6    anonymous sender is the only document you believe you
7    have destroyed that concerns --
8    A.    Yes.  Yes.
9    Q.    -- Southwest Airlines discipline --
10   A.    Yes, because I've given everything over to
11   my attorney.
12   Q.    And again, you couldn't tell me when you
13   got this relative to when you sent this to Ms. Wann.
14   So presumably you didn't delete it immediately because
15   you took time to send it to Ms. Wann, correct?
16   A.    No.  Whenever I looked at the message it
17   was -- you know, obviously I sent it on to her from the
18   time I got it.  But I'm saying I don't remember -- you
19   asked me when I had gotten that message, I don't really
20   remember exactly the date that I got this message, but
21   when I read it, yeah, I would have send it on to her to
22   ask her, hey, you know, what do you think of this?
23   Q.    Did she give you any responses to receiving
24   this information from you?
25   A.    She -- no.  She said that she had already

Page 223

1    seen it, that it had been being passed around on -- it
2    was either on ONE LUV -- it was somewhere on one of the
3    union Facebook pages.
4    Q.    Did you ever see it in any other location
5    besides the anonymous message that you received?
6    A.    It was in a thread I think, but that has
7    been -- that's been taken down.  So whoever is the
8    admin in that particular, you know, Facebook page or
9    whatever I think they had taken it done because I don't
10   know if that's -- I mean, I think Brett probably told
11   them to take it down at some point.
12   Q.    Okay.
13        MR. CORRELL:  Well, thank you for that
14   clarification Ms. Carter.  I pass the witness.
15        MR. GREENFIELD:  Am I up to bat here?
16        MR. GILLIAM:  Yes.
17              EXAMINATION
18   BY MR. GREENFIELD:
19   Q.    Okay.  While we're on Exhibit 18,
20   Ms. Carter -- and I'm sorry, my name is Adam Greenfield
21   and I'm one of the counsels for TWU Local 556 in this
22   matter.  Do you understand who I am and whom I
23   represent?
24   A.    Yes.
25   Q.    And do you understand that you are still

Page 224

1    under oath at this time?
2    A.    Yes.
3    Q.    Okay.  While we're on Exhibit 18, I would
4    request that through you and counsel work together, I
5    believe there's a download history function on your
6    Facebook.  If it's possible to produce that document or
7    retrieve that document and produce it in its native
8    format, I would ask that y'all do that.
9        MR. GILLIAM:  We will look into it.
10   A.    Yeah, because I've never heard of anything
11   like that.
12   BY MR. GREENFIELD:
13   Q.    Okay.  I will do my best to send some
14   instructions on how to do that to your counsel for your
15   counsel to share with you.
16   A.    Okay.
17       MR. GILLIAM:  Please do.  Yes.
18       MR. GREENFIELD:  Okay.  Thank you, guys.
19   BY MR. GREENFIELD:
20   Q.    Ms. Carter, is it my understanding that as
21   part of your lawsuit you believe that Audrey Stone
22   tried to get you fired from your position at Southwest
23   Airlines?
24   A.    Did she try to get me fired?
25   Q.    That she tried to do that.

Page 225

1    A.    Yeah, she tried to get me fired and she
2    did.
3    Q.    Okay.  And why do you believe that, why do
4    you think she did that?
5        MR. GILLIAM:  Objection.  Calls for
6    speculation but go ahead and answer.
7    A.    Because I was dissenting against what they
8    were doing as the union and that I had issues with -- I
9    was a recall person, I also opted out.  There was
10   much hate for the people that had opted out and much
11   hate for the people that were supporting the recall.
12   BY MR. GREENFIELD:
13   Q.    Okay.  So you believe that Ms. Stone tried
14   to get you fired from Southwest Airlines because you
15   were an objector, you opted out of the union, and
16   because you took a stance in the recall effort, is that
17   fair?
18   A.    That is correct.
19   Q.    Okay.  And when did you become an objector?
20   A.    I became an objector in 2013.
21   Q.    Okay.  And what does that mean to you that
22   you are an objector?
23   A.    The objector means that I still pay dues to
24   the local, that the only thing that doesn't get taken
25   out of my check which I would get a refund back to or

Page 226

1    from was international and that had to do with,
2    quote-unquote, supposed political purposes.  Okay?
3        The reason I opted out or was an objector
4    was because I didn't support the things that TWU
5    International, AFL-CIO, and our local at the time were
6    supporting.
7        Another reason that I was an objector was
8    because of the coup that went on again to remove our
9    duly elected representatives.  This had happened twice
10   once with Melissa Smith and then again with Chris
11   Click, Jerry Lindermann, and Stacy Martin.  Okay?
12   There was no reason to remove these duly elected
13   representatives.
14       And then on top of that -- but my dues
15   still paid for local stuff that they did, so I still
16   paid full dues, I got a check back from international
17   every quarter for about $27 and change, and then I
18   couldn't go to any union meetings and I couldn't vote
19   on anything.  But my voice still stood as they're still
20   collecting my dues.
21       I was called a scab.  I was -- they -- they
22   passed around and entire list of all of us that had --
23   were that the ones that were the objectors and the
24   recall people.  We were all the ones that were targeted
25   by Audrey Stone and her administration and the people

Page 227

1    that supported her, and were all the ones that were
2    turned in for all kinds of -- all kinds of things.  So
3    this was a way for her to get me fired.
4    Q.    Okay.  Thank you for that, Ms. Carter.
5        What I'd like to focus on out of that
6    testimony is that in 2013 when you became an objector,
7    you were no longer a member of the union, correct?
8    A.    I'm an objector but I still pay dues.
9    Q.    Okay.  But as part of that, you are not
10   allowed to vote, correct?
11   A.    I just said that, yes, not allowed a vote.
12   Q.    And you're not allowed to attend union
13   meetings?
14   A.    Correct.
15   Q.    And that has been since 2003?
16   A.    Correct -- '13.
17   Q.    Okay.  Since 2013.  Excuse me.
18       Now as far as the recall efforts go, there
19   was a petition, correct, are you aware of that?
20   A.    Oh yes.  Yes.
21   Q.    And you aren't actually allowed to be a
22   part of that petition or sign that petition as an
23   objector, correct?
24   A.    No, I wasn't able to sign the petition, but
25   I can still voice my opinion on that petition.

Page 228

1    Q.    Oh, when you say voice your petition, in
2    what way?
3    A.    I supported the people that were recalling
4    our board and was vocal about it.
5    Q.    Okay.  And what information are you basing
6    your account of that Ms. Stone would be aware that you
7    were part of the recall efforts if you weren't actually
8    able to sign that petition?
9    A.    Because they had a list of all the people
10   that were talking about the recall.
11   Q.    Who had a list?
12   A.    The union.
13   Q.    Who at the union?
14   A.    The actual -- the actual people within the
15   union such as Audrey, Brett, Cuyler.  They -- they had
16   a whole list that was made up of all the people that
17   were the objectors that they passed around to the
18   membership and the recall people.
19   Q.    Is this a document you have seen?
20   A.    It is a document, yes, that I have seen.
21   It was posted on all of the Facebook pages that we were
22   all connected to within that time period.
23   Q.    Do you have this document?
24   A.    I believe I've given it to my attorneys,
25   yes.

Page 229

1      Q.    And you provided it to your counsel?
2      A.    I believe he's got it, yes.
3      Q.    Okay.  And do you know who created this
4    document?
5      A.    I know at one point Don Shipman had done
6    it, and then I believe that Brett Nevarez and Brian
7    Talbert wanted the names distributed and they talked
8    about this.
9      Q.    All right.  Who is Don Shipman?
10     A.    Don Shipman was someone else I don't
11   remember what all he did for the union.  I think he was
12   part of the negotiating team at one point, along with
13   Brett Nevarez and Audrey Stone.
14     Q.    Okay.  And so what is the basis of your
15   testimony that Don Shipman created -- created this
16   document?
17     A.    It was -- it was just common knowledge that
18   he was the one who ended up -- not creating it but was
19   passing things around.
20     Q.    I'm sorry.  Can you repeat that?  I'm
21   sorry, I had to switch off of my headphones.
22     A.    That's okay.  I don't -- I don't think he
23   was the one that like per se created it.  I think a lot
24   of them just, you know, created the names that they
25   knew.  He was the one who actually started to

Page 230

1    distribute it at some point and then it became common
2    knowledge of who all we were.
3      Q.    All right.  And where was this document
4    distributed?
5      A.    On every Facebook page that flight
6    attendants were a part of.
7      Q.    Okay.  And have you produced any evidence
8    or documentation to your attorneys that Don Shipman was
9    creating and distributing this information?
10     A.    I didn't say he was the one that created
11   it.  I said that he was one that had been, you know,
12   distributing.  But there were others that were
13   distributing this information.  I do believe it is in
14   some of the information that I sent to my attorneys
15   regarding this, yes.
16     Q.    Okay.  And same for Brett Nevarez, what is
17   your basis for your testimony that he created any of
18   these documents?
19     A.    He spoke about the passing around the
20   information.
21     Q.    All right.  When did he speak about it?
22     A.    That he needed to make sure that all of --
23   that -- that the membership should be aware of what he
24   called scabs.
25     Q.    Okay.  And when did he say that?

Page 231

1      A.    You know what?  I don't remember.  It had
2    to have been back in -- I can't -- I -- I don't
3    remember the date.  I just know it's been going on for
4    a while.
5      Q.    Did you personally hear him say that?
6      A.    I personally was threatened by Brett
7    Nevarez.
8      Q.    Okay.  I appreciate that but my question
9    was a little bit different.  I was asking if you had
10   personally heard Brett Nevarez speak about the topic
11   that we are discussing right now.
12     A.    About the recallers and the objectors, just
13   seeing it on different messages that he was, you know,
14   on Facebook.
15     Q.    Okay.  But nothing you personally
16   witnessed?
17     A.    Not -- not in that context, no.
18     Q.    Okay.  And same goes for Mr. Brian Talbert
19   what evidence or information, if any, do you have that
20   Mr. Talbert was creating lists, those lists?
21     A.    I didn't say he created them.  He was
22   distributing them, let's put it that way.
23     Q.    And what is your basis for saying that
24   Mr. Talbert was distributing these lists?
25     A.    It was common knowledge throughout the

Page 232

1    entire flight attendant group because it was on
2    different web pages, it was on different flight
3    attendant Facebook pages.
4      Q.    Okay.  Do you have any personal knowledge
5    of Mr. Talbert distributing that information?
6      A.    Not personal on that, but again, him
7    threatening me, yes.
8      Q.    All right.  While we're on those subjects,
9    in what way did Mr. Talbert threaten you?
10     A.    Well, the recall people -- or I'm sorry.
11   The objectors through a text message -- or not text
12   message.  I'm sorry.  On a Facebook post that was
13   distributed and then also the one that he called for an
14   execution, that would be the one that was regarding all
15   of the -- us as objectors -- and Greg Hofer was the
16   leader of that objector team basically.  And then he
17   had put out, Brian Talbert, that I should never -- and
18   I've got that -- that Charlene Carter should never hold
19   any position within the union and so on and so forth.
20   I've also got other communication from Brian Talbert
21   when I asked him to cease and desist of trashing my
22   name, and I've turned that over to my attorneys as
23   well.
24     Q.    Okay.  Did you ever -- this is what you
25   were referring to earlier I believe in which you,

Page 233

1  yourself, turned Mr. Talbert in to the company for a
2  violation of the social media policy; is that correct?
3      A.  He is the only one I ever, ever turned in,
4  ever, at Southwest Airlines.  We just didn't do that
5  back in the day.  But when he called for an execution
6  of one of them or any of them, and especially Greg
7  Hofer, it either meant a physical execution or it meant
8  an execution on taking your job away, turning someone
9  in.
10     Q.  Okay.  And did you ever discuss that post
11 with Mr. Talbert?
12     A.  The post that I discussed with Mr. Talbert
13 and we went back and forth was the one where he was
14 trashing me when I was running for delegate back in
15 2013, and he had said that I should never hold any
16 position at all, and I basically was being warned or
17 put on notice or whatever, I can't remember exactly the
18 wording of it, and that the reason for it was because I
19 had used the word "decertify."
20     Q.  Okay.  And when was that?
21     A.  That would have been back in I want to say
22 2013.  That's when it really started, them speaking and
23 trashing my name.
24     Q.  Okay.  And the post, what specifically --
25 what specific violation was it that you turned

Page 234

1  Mr. Talbert in for into Southwest Airlines for?
2      A.  It would have been a direct threat because
3  he called for an execution.
4      Q.  Okay.  And when was that?
5      A.  That would have been -- would have been
6  someone -- somewhere around in 2013 because it was when
7  we were all opting out.
8      Q.  Okay.
9      A.  I do believe.
10     Q.  All right.  And -- and you did this -- did
11 you ever ask to have a meeting with the union and
12 Mr. Talbert to discuss that post?
13     A.  No, I did not have a meeting with
14 Mr. Talbert.  I did have a conversation personally with
15 Mr. Talbert, but I didn't have a meeting with him.
16     Q.  Did you ever request anyone in the union
17 to -- that Mr. Talbert be disciplined for that post?
18     A.  No, because I contacted him directly.
19     Q.  Okay.  Any reason why you didn't raise that
20 to the executive board or anyone else in power at the
21 union?
22     A.  Because it was common knowledge that he was
23 being protected by the union and Audrey was able to
24 keep him from getting in trouble.
25     Q.  Okay.  But you made no attempts; is that

Page 235

1  correct?
2      A.  Personally I did not.  I think there may
3  have been some others that did.
4      Q.  Okay.
5      A.  Actually I think there was a letter though,
6  I -- correct me.  Okay.  Because there's some --
7  there's been so much that has gone on within this
8  union.  I think we all did sign on to a letter that
9  went to the union in regards to this.  I think all of
10 us signed on to -- there may have been a petition if I
11 remember correctly.  I'd have to look back.  I can't
12 now -- I can't remember.  I'm pretty sure we did
13 contact the union.  Not her -- not as an individual but
14 I think it was a -- it was a conglomeration of us,
15 trying to protect our names.
16     Q.  Okay.  But you don't remember specifically
17 one way or the other?
18     A.  I -- I'm pretty sure we did.  I just don't
19 have -- I know it was like a little form letter thing
20 that we were all, you know, trying to send out to -- I
21 don't know it's been so long ago that was back in 2000
22 and I think '13, but I do remember that we -- you know,
23 and the only reason that we were sending the letters to
24 the company was because of the fact that it
25 said "execution" on it.  We were all afraid that he

Page 236

1  would get one of us fired or -- you know, Greg Hofer
2  was actually I think afraid of him at one point.
3      Q.  Okay.  And you say get you fired.
4  Mr. Talbert is not in management at Southwest Airlines,
5  is he, or was he at that time?
6      A.  He's not in management, but he was on a lot
7  of committees and he worked alongside our VP of
8  in-flight.
9      Q.  Okay.  But it's your testimony that
10 Mr. Talbert would have the power to get you terminated?
11     A.  If he turns in something, a social media
12 violation of some sort, yeah, he could.
13     Q.  Okay.  Well, that would -- you would still
14 have to have violated the social media policy of some
15 sort, is that right, I mean, for Southwest to terminate
16 you?
17     A.  The only way that Southwest gets any of
18 this information is if somebody is turned in.
19     Q.  Okay.  But you would still -- for Southwest
20 to terminate you would still have had to violate their
21 social media policy, correct?
22     A.  Depending upon who you are.
23     Q.  Okay.  And what line do you separate there?
24     A.  Well, I mean, you can look at this being
25 that Brett Nevarez violated social media policy, but

Page 237

1    yet he didn't get -- I mean, it even says in this
2    letter right here -- that he didn't get any kind of
3    discipline, that they just had to have a meeting with
4    him.
5        Q.    Do you know if Brett Nevarez is still an
6    employee of Southwest Airlines?
7        A.    He is.
8        Q.    Okay.  Now, do you think that that line
9    that you are describing falls on whether you are an
10   objector or not?
11           MR. GILLIAM:  Objection, vague.  You can
12   answer.
13       A.    You mean as in being harmed by the union
14   and the company?
15   BY MR. GREENFIELD:
16       Q.    Yes, ma'am.
17       A.    Yes, it has direct relation to being an
18   objector.
19       Q.    Why do you think Southwest Airlines holds
20   some sort of bias against objectors?
21           MR. GILLIAM:  Objection.  Calls for
22   speculation.  You can answer.
23       A.    Honestly that I don't know.
24   BY MR. GREENFIELD:
25       Q.    Okay.  Well, you would agree that generally

Page 238

1    if anyone's at odds, it's the union and the company, is
2    that correct, traditionally?
3        A.    Traditionally, but that wasn't what was
4    happening under Audrey's administration.
5        Q.    Okay.  But Southwest's administration
6    hadn't changed, had it?
7            MR. GILLIAM:  Objection, vague.
8        A.    When you say administration you mean as in
9    the people that work there?
10   BY MR. GREENFIELD:
11       Q.    Well, yeah, I'm trying to understand how
12   those two ideas jive, that, you know, generally I think
13   the company -- most companies would prefer not to have
14   a unionized workforce.  So I'm trying to understand why
15   you think the company would hold an animus against
16   somebody who doesn't want to be a part of the union.
17       A.    Because during the contract negotiations we
18   were the loudest and Southwest Airlines wanted the
19   contract signed.
20       Q.    Okay.
21       A.    And so -- and we know that Audrey and them
22   were selling us a bad contract and we were very vocal
23   on it, and that was one of the other reasons that we
24   decided to opt out and then also call for recall, and
25   we were also -- all the ones that were doing there were

Page 239

1    the ones that were really harmed.
2        Q.    Okay.  And at that time, around 2013,
3    that's what we're talking about, correct?
4        A.    It went from 2013 all the way till the time
5    Audrey and them left office.
6        Q.    Okay.  But you opted out in 2013?
7        A.    Correct.
8        Q.    Along with approximately a hundred others,
9    is that about right?
10       A.    Correct.
11       Q.    Okay.  Are -- do you have any evidence
12   today that any of those other individuals have been
13   singled out for termination or retribution or is it
14   just you?
15       A.    No, there was quite a few.
16       Q.    Okay.  Who else?
17       A.    Jeanna Jackson, Greg Hofer, Mike Casper,
18   Kent Hand, Diane Cavanaugh, or -- she goes by Amy
19   Thompson.  Those are just a few off the top of my head
20   right now.
21       Q.    Okay.  And were all those individuals --
22       A.    Holly, Holly Immamovic.  She was the
23   loudest when it came to the contract signing.
24       Q.    Okay.  And is it -- it's your contention
25   that none of those -- that those individuals were

Page 240

1    terminated for an unlawful basis as well?
2        A.    They were targeted.
3        Q.    Well, that's a little bit different than my
4    question is that they were terminated for an unlawful
5    basis or not.
6        A.    Some of them were.  Some of them were given
7    30-day suspensions.  Some of them were given extra
8    30-day suspensions, and others were not.
9        Q.    Okay.  Who was not?
10       A.    For -- for -- for I would say even worse
11   violations than -- the whole social media policy became
12   a way for them to target certain people.
13       Q.    All right.  Who was traded -- who was
14   treated more favorably than you regarding the social
15   media --
16       A.    One particular, I would say Rickey Span who
17   called for the death of Jeanna Jackson and she was the
18   main recall supporter.  She had turned that in and the
19   company did nothing.
20       Q.    Okay.  Anyone else?
21       A.    Well, Brian Talbert got fired, but he got
22   his job back pretty quickly without a nondisclosure
23   after threatening an execution.
24       Q.    Anyone else?
25       A.    Well, I gave all that information.  I

Page 241

1    don't -- you know, at the moment can't recall a bunch
2    of other people.  I know that Josh Rosenberg, there was
3    Casey Rittner, there was, oh, Bill Holcomb, and he was
4    part of the negotiating team.  He actually put out
5    there about a passenger, which was very sexually
6    harming to a passenger.
7        Q.    Okay.  Anyone else?
8        A.    There's others, I just can't remember all
9    the names.
10       Q.    Okay.  So your testimony is that Rickey
11   Span was treated more favorably than you in regard to,
12   specifically, the implementation of Southwest's social
13   media policy; is that correct?
14       A.    That is correct.
15       Q.    All right.  Now, do you know who turned
16   Rickey Span in for this social media violation?
17       A.    I do.  Jeanna Jackson, because he called
18   death upon her when she came to -- or when she was
19   supposed to turn in the recall petition.
20       Q.    Okay.  And specifically you say wished
21   death upon her.  What did he -- what did he post or
22   say?
23       A.    He made a video and threatened her.
24       Q.    In what -- in what way?
25       A.    I turned it over to my attorneys.  I think

Page 242

1    that they can probably send it to you.
2        Q.    Have you seen it?
3        A.    I have.
4        Q.    Okay.  And so in what way did he threaten
5    Jeanna Jackson?
6        A.    He said for the -- and I can't quote him
7    specifically, but it had to do with turning over the --
8    the recall positions, there will be -- there -- death
9    will come upon you and the recall.
10       Q.    All right.  While we're on the recall
11   petition, did you ever review the finding -- there was
12   a committee formed to review the recall petition, are
13   you aware of that?
14       A.    A committee to what?  I'm sorry?
15       Q.    Review the recall petition.  Are you aware
16   of that?
17       A.    Yes.
18       Q.    Okay.  And did you ever review any of their
19   findings?
20       A.    Yes, I did.
21       Q.    Okay.  And are you aware that some of their
22   findings included forged -- forgery signatures, fraud,
23   and not enough signatures to actually support a recall,
24   are you aware of that?
25       A.    Yes, I am aware of that.

Page 243

1        Q.    Okay.  Let's go on to Brian Talbert.  You
2    are the one who turned him in, correct?
3        A.    No, I was -- it was many, many people that
4    turned him in, but yes, I did, I was one of them, yes,
5    because I knew that that was -- he was coming after the
6    objectors.
7        Q.    All right.  Do you have any personal
8    knowledge of any other individuals turning in
9    Mr. Talbert for social media violations?
10       A.    I don't know the list, but I know that
11   there was quite a few.
12       Q.    Okay.  Do you have any personal knowledge
13   of any individuals turning in Mr. Talbert?
14       A.    Well, I know that Greg Hofer did because he
15   came after him specifically.
16       Q.    Okay.  How do you know that Mr. Hofer
17   turned in Mr. Talbert for the violations?
18       A.    Because he spoke to me about it after he
19   found out that Brian was back out online.
20       Q.    Okay.  And he told you that, "I turned" --
21   words to the effect that, "I turned in Brian Talbert
22   for violation of social media policy"?
23       A.    Yes.
24       Q.    Okay.  But you didn't witness it
25   personally?

Page 244

1        A.    No, I didn't witness it.
2        Q.    Okay.  What about Josh Rosenberg, do you
3    know who turned in Mr. Rosenberg for violation of the
4    social media policy?
5        A.    No, I do not.
6        Q.    Okay.  And do you know what he was turned
7    in for?
8        A.    He had posted on his Facebook page, it was
9    during the contract negotiations, with a gun pointed
10   and underneath it saying, "Gary, sign now" or "Gary"
11   something or another.  So that's Gary Kelly, our CEO,
12   with a gun above it stating, "Gary, sign now."
13       Q.    Okay.  And was Mr. Rosenberg an objector?
14       A.    No, he was not.  But he believe is still
15   working at Southwest Airlines.
16       Q.    Do you know if -- do you know what sort of
17   agreement Mr. Rosenberg was offered to retain his
18   employment?
19       A.    No, I do not.
20       Q.    Do you know if Mr. Rosenberg was offered a
21   last chance agreement?
22       A.    I do not.
23       Q.    Okay.  What about Mr. Talbert?  You
24   actually said Mr. Talbert was terminated at some point.
25       A.    Yes, he was.  Actually he's been terminated

Page 245

1    a couple of times.  And I think all for social media.
2    The first time I do know that through testimony from
3    the past or stuff that we just did, what, two weeks
4    ago, that -- and even in my arbitration, the first
5    violation that he had with the post, he was brought
6    back within I believe two weeks and he did not have to
7    sign a nondisclosure.
8        Q.    How do you know that?
9        A.    It was in the testimony given.
10       Q.    Do you have any personal knowledge of what
11   Mr. Talbert signed?
12       A.    I don't have personal knowledge.
13       Q.    Okay.  Now, Mr. Talbert was ultimately
14   fired for social media violations, correct?
15       A.    He -- no, he's still with the company.
16       Q.    Okay.  And do you know if he's been offered
17   a last chance agreement?
18       A.    It was said no, he had not been offered a
19   last chance agreement.  He didn't have to sign anything
20   to come back.
21       Q.    Okay.  And what about Casey Rittner, do you
22   know who turned him in for violations of social media?
23       A.    That I do not know.
24       Q.    And do you know why, what's the basis --
25       A.    I believe it's the same thing, with a gun

Page 246

1    pointed to Gary Kelly or with Gary Kelly, I think it
2    was the same type of thing as Josh Rosenberg.
3        Q.    Okay.  And what about Bill Holcomb?
4        A.    Bill Holcomb was -- I don't think he was
5    terminated.  I don't know what kind of punishment he
6    got.  But he was the one who posted on his personal
7    Facebook page about a passenger, that there was a
8    banana peel that was on the floor and he made a very
9    sexual derogatory comment about the female passenger.
10       Q.    Okay.  And do you know if Mr. Holcomb was
11   terminated?
12       A.    No, he was not.
13       Q.    Do you know if he received a last chance
14   agreement?
15       A.    I don't believe he did.
16       Q.    Okay.  And why do you think Mr. Holcomb was
17   treated more favorably than you?
18       A.    Because he was on the negotiating team,
19   working with Audrey and Brett.
20       Q.    Okay.  Now, I believe your testimony
21   earlier today was that Ms. Stone was not permitted to
22   turn you in to Southwest Airlines because it violated
23   the union constitution and bylaws; is that correct?
24       A.    They take an oath, yes, to not harm a
25   member.

Page 247

1        Q.    Not harm a member, that's right.  And at
2    the time she turned you in, you were not a member; is
3    that correct?
4        A.    I was a dues payor.
5        Q.    You were not a member of the union,
6    correct?
7        A.    I'm sorry?
8        Q.    You were not a member of the union,
9    correct?
10       A.    Correct.
11       Q.    Okay.  And so why do you think that she
12   then violated that portion of the union constitution
13   and bylaws?
14       A.    I'm not sure why she did since I was still
15   paying her salary.
16       Q.    Now, that's -- that's an interesting way to
17   phrase that.  Let's talk about "allocation by budget."
18   Are you familiar with that term?
19       A.    Allocation by -- it -- I know I was paying
20   dues to the union still.
21       Q.    Okay.  And do you have any idea what your
22   union dues specifically go towards?
23       A.    It goes for the everyday workings of our
24   union and their salaries.
25       Q.    Would you be surprised to find out that as

Page 248

1    an objector you are aware that you are entitled to
2    representation in the grievance process, correct?
3        A.    Yes.
4        Q.    And you received that, correct?
5        A.    Yes.
6        Q.    Okay.  And on CBA negotiations, correct?
7        A.    Correct.
8        Q.    Okay.  And your money goes to basically
9    collective bargaining and negotiations, correct?
10       A.    Correct.
11       Q.    Are you aware that your money does not go
12   to anything else other than those issues?
13       A.    I thought that all of our money also paid
14   their salaries.
15       Q.    Okay.  Now, would that be -- would that
16   surprise to you find that out?
17       A.    Yeah, it would.  It would surprise me to
18   find that out.
19       Q.    Okay.  Now, you also believe you, despite
20   your dues only going to CBA issues and negotiation
21   issues, you believe you should have a say in how the
22   union uses its money; isn't that right?
23       A.    If I'm paying them, yes.
24       Q.    Well, for other reasons, such as what
25   you've deemed to be political speech, supporting the

Page 249

1    women's march, things of that nature?
2         MR. GILLIAM:  Objection.  Is there --
3    sorry.  I didn't hear a question.
4         A.    When I'm paying full dues to my local, I'm
5    pretty sure they're using my dues for -- just like they
6    would have been if I would have been not an objector.
7    BY MR. GREENFIELD:
8         Q.    And you --
9         A.    Since I'm paying the -- since I'm paying
10   the full amount, except for what international sends
11   back to me for not using it in international for their
12   political purposes.
13        Q.    Okay.  And what are you basing that on?
14        A.    That's what I was told.
15        Q.    Who told you that?
16        A.    The union.
17        Q.    Who at the union told you that?
18        A.    When I was talking with Beth Ross, anybody
19   that is in the -- and Dawn Wann, she was in the union,
20   she used to be a board member.  I've asked her where
21   our money goes.
22        Q.    Okay --
23        A.    So I was paying full members dues except
24   for what they would send to international for political
25   purposes, and that was a $7 and something a month for

Page 250

1    the quarter, so it would come up to 27 something
2    dollars every quarter that I got a check back from
3    international, not local.
4         Q.    Okay.  So you're of the opinion that the
5    local union spends money on, et cetera, political
6    speech, of the money that you pay to them?
7         A.    It all gets put into one account, does it
8    not?
9         Q.    What are you basing that testimony on?
10        A.    How our union dues were also collected
11   prior to me opting out.
12        Q.    You actually don't have any personal
13   knowledge about where your union dues are being paid,
14   correct, or what you pay?
15        A.    They support everything that the union
16   local does.
17        Q.    That wasn't my question, ma'am.  My
18   question was that you don't actually have any personal
19   knowledge about where the money is being spent, do you?
20        A.    Only when we get the LM2s and if you go in
21   and you ask for how the money is being spent.
22        Q.    Okay.
23        A.    But that money is all collected from
24   everybody that pays the dues.
25        Q.    So you --

Page 251

1         A.    That's their -- that's their working
2    capital.
3         Q.    So based on your reviewing LM2s, you were
4    able to discern how your money was being used; is that
5    correct?  Is that your testimony today?
6         A.    I would say members' money is being used,
7    yes.
8         Q.    I'm asking about your personal funds that
9    you are contributing.
10        A.    My personal funds?  I don't know how much
11   exactly has been used out of my money to be able to
12   support these things.
13        Q.    Okay.  Thank you.
14             Now it's also your opinion that the union
15   is spending money to support Planned Parenthood; is
16   that correct?
17        A.    Yes.
18        Q.    Okay.  What is your basis of that
19   testimony?
20        A.    Through our union dues -- well, they went
21   to the march, and then all the way up through TWU
22   International, and all the way up to the AFL-CIO, they
23   make contributions to Planned Parenthood and I've given
24   that documentation to my attorney.
25        Q.    You've given documentation that shows TWU

Page 252

1    Local 556 donating money to Planned Parenthood?
2         A.    Through our dues that go all the way up to
3    international, yes.
4         Q.    Well your dues you just said don't go up to
5    international, correct?
6         A.    No, they still collect a certain part of
7    it, they just can't use it, supposedly, for political
8    purposes.
9         Q.    So you -- your testimony --
10        A.    Like political candidates, and this is what
11   I was told, or certain PACs.
12        Q.    So the basis of your testimony is that you
13   believe that they are using it in the way that you have
14   not allowed them to do?
15             MR. GILLIAM:  Objection, vague.
16        A.    Yeah, I'm not understanding your question.
17   BY MR. GREENFIELD:
18        Q.    Well, your understanding is that your
19   contributions do not go up to any sort of political
20   speech process; is that correct?
21        A.    As in political, as in a politician, as in
22   a senator or a congressman, yes.
23        Q.    So you don't believe contributions to
24   Planned Parenthood in any way is political speech?
25             MR. GILLIAM:  Objection to the extent it

63  (Pages 249 to 252)

Page 253

1    calls for a legal conclusion.  You can answer.
2        A.    I don't -- I don't know.  I honestly don't
3    know.
4    BY MR. GREENFIELD:
5        Q.    Okay.
6        A.    I don't know why international would be
7    sending money to Planned Parenthood.  I have no idea.
8        Q.    Okay.  Well, it's fair to say that if they
9    are doing what they told you, they're not sending any
10   of your dues that you pay, correct?
11       A.    International?
12       Q.    Well, your money gets refunded by
13   international, isn't that -- wasn't that your
14   testimony?
15       A.    $7 a month for, you know, a quarter, a
16   $27 check.  That is for political as in PACs.  This is
17   what I was told.  Political as in when it comes to
18   politicians.
19       Q.    Okay.  So if it doesn't go to a PAC or to a
20   specific politician, you believe TWU International can
21   use your dues for whatever they like and that they're
22   doing that?
23       A.    Correct.
24       Q.    You described the removal of office of
25   Chris Click and Jerry Lindermann and others as a coup,

Page 254

1    correct?
2        A.    Mm-hmm.  And it was written about.
3        Q.    You realize that there -- are you aware of
4    a federal -- of a court case against them that upheld
5    the remove -- their removal?
6        A.    Yes, I do.
7        Q.    Okay.  And you still think it's a coup?
8        A.    It was an orchestrated -- it was
9    orchestrated.
10       Q.    Result --
11       A.    They were -- they were removed -- yeah, I
12   do believe that it was still a coup, yes.
13       Q.    Excuse me, Ms. Carter.  And this
14   orchestration extends all the way up to the state and
15   federal court system?
16       A.    I believe that that was a little bit
17   different, that was over property of what the union,
18   that -- that Stacy Martin, they sued him for a laptop I
19   do believe.
20       Q.    Now, Ms. Carter, do you believe that even
21   though you are not a union member, do you think you
22   should still have say on how -- on union operations?
23       A.    If I'm paying still union dues to the
24   local, I believe that I should still have a voice about
25   where the money gets spent, yes.

Page 255

1        Q.    Okay.  What is your basis for saying that
2    Planned Parenthood was the main contributor of finances
3    to the women's march in DC?
4        A.    They were the headline sponsor of the
5    march, and I've sent that information on to my
6    attorney.
7        Q.    What is your basis, have you seen any of
8    the financials?
9        A.    I haven't seen the financials.  I just know
10   that they were the ones that called for the march, them
11   and some woman by the name of Sarsour or whatever her
12   last name was.  But Planned Parenthood was the main
13   sponsor of the women's march.
14       Q.    And what is your basis for that testimony?
15       A.    The information that they had put out,
16   Planned Parenthood.
17       Q.    Okay.  And what information is that?
18       A.    That they were the ones that created or
19   that called for the march.  I sent this all to my
20   attorney.
21       Q.    So fair to say that your basis for that
22   testimony is documentation that has been turned over to
23   your attorneys?
24       A.    Yes.
25       Q.    Is there any basis to that opinion?

Page 256

1        A.    I'm sorry?
2        Q.    Is there any other basis for that opinion?
3        A.    The other basis?
4        Q.    Is there any other basis for that opinion?
5    Other than the documentation you've turned over to your
6    attorneys.
7        A.    The rest of the march was basically all
8    about productive rights so Planned Parenthood.
9        Q.    Did you attend the march?
10       A.    I left the day that the march was starting.
11       Q.    Okay.  So what is your basis for forming
12   the opinion about what occurred at the march?
13       A.    Because I was there while the women were
14   coming in to the march and the signs that they were
15   holding and it was basically a pro abortion versus pro
16   choice.  For the most part I'd say 98 percent of the
17   march was that way.
18       Q.    Okay.  And again you weren't at the march,
19   were you?
20       A.    I was in DC in the same areas.  I left that
21   day.
22       Q.    Okay.  So to answer my question, you didn't
23   attend the march, correct?
24       A.    I did not attend the march, no, I did not.
25       Q.    So the foundation of your testimony that

Page 257

1    you are providing is not based on any personal
2    knowledge, is it?
3        A.    Personal knowledge to see them coming in to
4    the march, yes.
5        Q.    You -- no -- you --
6        A.    Marching, no.
7        Q.    I'm asking specifically about the march
8    itself.
9        A.    No, except for what I saw on television
10   after I got home.
11       Q.    Okay.  When did you hire Mr. Gilliam as
12   your attorney?
13       A.    I sought them out when I got my last chance
14   agreement.
15           MR. GILLIAM:  I'm going to instruct the
16   client not to divulge any attorney-client
17   communication.
18           MR. GREENFIELD:  I'm just -- I'm just
19   trying to figure out when you retained your attorney.
20           MR. GILLIAM:  I would not -- I would -- I
21   would say that that's also delving into attorney-client
22   privilege.
23           MR. CORRELL:  It absolutely is not,
24   Counsel.
25           MR. GREENFIELD:  When you were retained?

Page 258

1    Yeah, how?
2            MR. CORRELL:  That's not a communication
3    between the lawyer and the client.  He's -- we're
4    allowed to know the date of retention.
5            MR. GILLIAM:  You can know -- you can --
6    you can tell them when you -- you retained me, but
7    don't reveal any communications that we had.
8            THE WITNESS:  Honestly I don't even know
9    what the date was that I retained you guys.
10   BY MR. GREENFIELD:
11       Q.    Okay.  Was it before your termination?
12       A.    No.
13       Q.    Okay.  In Exhibit 3, and we can pull it up
14   or not, you mentioned in the 2015 timeline an attorney
15   and you say, "My attorney says this is blatant
16   discrimination."
17           Who are you talking about?
18       A.    That was a family attorney that I had been
19   sending stuff to that Brian Talbert was threatening me
20   with, and told him to either cease and desist or I
21   would -- you know, because he was -- basically it was
22   character assassination, and once I told him that I was
23   sending this to my attorney he stopped.
24       Q.    The messages you sent to Ms. Stone, why did
25   you send them to her on her personal Facebook page?

Page 259

1        A.    It was the way that we communicated.
2    Her -- her whole Facebook page at the very beginning,
3    and you can still look it up, it says, "Audrey Stone
4    TWU."  She changed that name after she turned me in.
5    That was the way she communicated to the membership
6    when she was running for president and she had all of
7    the stuff that, you know, her team was doing or was --
8    was going to do and so on and so forth, that's how we
9    communicated, and then through Messenger, there was
10   Messenger -- or communication through other board
11   members online through Facebook and Messenger.
12       Q.    And I'm talking specifically about
13   Ms. Stone, you describe it as "the way we
14   communicated."  Did Ms. Stone ever communicate with you
15   personally via Facebook Messenger?
16       A.    It -- she didn't communicate with me at all
17   ever.  Even if you called the office she wouldn't
18   return your call.
19       Q.    Are you aware of Ms. Stone having a email
20   in her capacity as the union president?
21       A.    Yes, and I sent her emails as well.
22       Q.    Okay.  And have you turned those over to
23   your counsel for production?
24       A.    I did.  I did.
25       Q.    And when was the last email you sent

Page 260

1    Ms. Stone to her union email?
2        A.    When they -- I do believe it was right
3    before I was turned in, it had to do with, they don't
4    like the National Right to Work Foundation and I have
5    supported the National Right to Work Foundation, gosh,
6    probably since 2009-2010, and they are considered what
7    they -- the union likes to say are union busters, and
8    for me, that they protect union -- I guess I should --
9    for me what I understand for them is that they protect
10   the members from the abuses of unions.
11       Q.    Okay.  And in -- per your testimony you
12   became an objector in 2013, correct?
13       A.    That is correct.
14       Q.    All right.  And you were terminated in
15   2017?
16       A.    That is correct.
17       Q.    So your testimony is that it took Ms. Stone
18   four years to find a way to retaliate against you to
19   terminate you; is that correct?
20       A.    That there -- the -- yes, it took her until
21   then finally was able -- because why didn't she ever
22   return a call or communicate if it was so blatant that
23   she, you know, claims that I was harassing her.  I
24   wasn't harassing her.  I didn't like how the union was
25   doing things and spending our money and she never

Page 261

1   once -- and she could have blocked me if she wanted to,
2   but she never once communicated to me even to ask me to
3   stop or can we sit down and talk about the issues that
4   you do not like, which, as far as I'm concerned a good
5   leader would have done.  That's what I would have done.
6   I would not have harmed somebody to turn them in and
7   got them fired even with these Facebook messages.  And
8   if I didn't like it I would have blocked her.
9        Q.    Okay.  And do you think Jerry Lindermann
10   and Chris -- do you think Jerry Lindermann was a good
11   leader of the union?
12        A.    Jerry Lindermann was our accountant or
13   whatever, he -- he had taken over John Parrott's
14   position and as far as I knew, yes, they claim that he
15   was supposedly stealing -- I think they said the same
16   thing about Melissa Smith back in the day -- stealing
17   money which was not true.
18        Q.    You describe it as not true, but are aware
19   of a civil judgment against former -- the gentleman
20   that you describe as "removed in a coup" for
21   misappropriation of union funds and property?
22        A.    Are you talking about Stacy Martin or are
23   you talking about Jerry Lindermann?
24        Q.    Stacy Martin.  Excuse me.
25        A.    Stacy Martin, the reason that they took him

Page 262

1   to court was because he had a laptop, and they sued him
2   over a laptop they said belonged to the union.
3        Q.    I understand that's your opinion.  Are you
4   aware that there is a civil judgment for
5   misappropriation of union funds and property against
6   Mr. Martin?
7        A.    And that would have been the laptop, and
8   yes, I do.
9        Q.    And you believe that also was a conspiracy?
10        A.    No, I don't believe that's a conspiracy.
11        Q.    Oh, you -- you believe that that was -- is
12   true?
13        A.    I believe that he still had the laptop.  I
14   don't know per se all of the -- the -- which is really
15   odd for a union to sue a member.
16        Q.    And, Ms. Carter, my questions are a little
17   different.  You are aware that a civil judgment exists,
18   yes?
19        A.    And I believe he paid that civil judgment,
20   correct?
21        Q.    My question is you are aware that that
22   exists?
23        A.    Yes, I did, I -- I answered that.
24        Q.    But you -- you still believe that removal
25   was a coup and that that was inappropriate and a

Page 263

1   conspiracy, correct?
2             MR. GILLIAM:  Objection.  Compound.
3        A.    The laptop -- and I'm gonna answer this.
4   The laptop was the way to go after him after they had
5   removed him from the -- from his position.
6   BY MR. GREENFIELD:
7        Q.    Okay.
8             THE WITNESS:  You can't have dinner yet.
9   BY MR. GREENFIELD:
10        Q.    You described earlier that most that were
11   vocal against her administration were turned in in
12   regard to Audrey Stone.
13        A.    Yes.
14        Q.    There -- what is your basis for that
15   testimony?  I mean there was -- there were thousands of
16   signatures on the recall petition in your opinion,
17   correct?
18        A.    It was -- it had to do with the most vocal.
19        Q.    Okay.  And you don't believe signing a
20   petition to recall her presidency is a vocal objection
21   to her administration?
22        A.    Not everybody is on Facebook, I guess, and
23   their -- their way of being able to harm people was
24   through social media.
25        Q.    Okay.  And are you aware of any other

Page 264

1   objectors and/or people who opposed her administration
2   who were treated unfairly, can you please list those
3   people for me?
4        A.    I could probably get you a list, but I
5   don't have a list per se right now.  The ones that I
6   have mentioned are the ones that I do recall.  But I
7   think I could probably get a list.
8        Q.    Yes, that would be great.  Please.  Please
9   provide that.
10             But as you sit here today --
11        A.    I may -- I may have turned some of that
12   over to my attorney.
13        Q.    As you sit here today, there's no one else
14   you can remember that you haven't discussed already?
15        A.    Not -- not right at the moment, no.  I
16   cannot recall.
17        Q.    Are you aware of any other objectors that
18   you believe Ms. Stone tried to get fired other than
19   yourself?
20        A.    Holly Immamovic.
21        Q.    You believe Ms. Stone tried to get Holly
22   Immamovic fired?
23        A.    She did get her fired.
24        Q.    Okay.  What is your basis for that
25   testimony?

Page 265

1      A.    On who she told me who turned her in.
2      Q.    Okay.  It's your testimony that Audrey
3   Stone turned Holly Immamovic in for a social media
4   violation?
5      A.    Yes.
6      Q.    Okay.  And how do you -- and that's based
7   on Ms. Immamovic told you that, correct?
8      A.    Yes.
9      Q.    Okay.  Do you have any personal knowledge
10  that Ms. Stone turned Ms. Immamovic in for a social
11  media violation?
12     A.    No.
13     Q.    Anyone else that you believe Ms. Stone
14  tried to get fired?
15     A.    Jeanna Jackson.
16     Q.    What is your evidence that Ms. Stone tried
17  to get Jeanna Jackson fired?
18     A.    She was one who turned Jeanna in on a
19  violation.
20     Q.    On a social media violation?
21     A.    I believe so, yes.
22     Q.    And what is your basis for -- for that
23  testimony?
24     A.    Jeanna told me.
25     Q.    Did Jeanna tell you how she found that out?

Page 266

1      A.    Through her -- I believe her fact-finding
2   meeting.
3      Q.    Okay.  Are you -- and how did Ms. Immamovic
4   find out that Ms. Stone allegedly turned her in for
5   social media violations?
6      A.    That I do not know.
7      Q.    Are you claiming as part of your lawsuit
8   that the union did not represent you properly during
9   the fact-finding meeting?
10     A.    During the fact-finding meeting?  Chris
11  Sullivan was amazing.
12     Q.    And he was provided to you by the union,
13  correct?
14     A.    Yes.  But I wouldn't have been there if
15  Audrey hadn't turned me in.
16     Q.    All right.  That wasn't my question.  I
17  appreciate that, Ms. Carter.
18           My question was, Mr. Sullivan was there on
19  behalf of the union to represent you, correct?
20     A.    Chris Sullivan was there on behalf of the
21  union on his -- yes, to represent me.
22     Q.    And did an amazing job?
23     A.    He did, yes.
24     Q.    All right.  And what about step 2?
25     A.    Step 2, Beth Ross and Becky Parker.  I did

Page 267

1   all of my step 2.
2      Q.    Are you claiming as part of your lawsuit
3   that the union did not represent you properly during
4   your step 2 hearing?
5      A.    I represented myself for the most part in
6   my step 2.  I did all of the research and brought forth
7   all of the information.  Becky and Beth did not.  They
8   were just there as representatives.
9      Q.    Okay.  And that's -- I appreciate you
10  elaborating.  My question is a little bit different.
11  Are you claiming as part of this lawsuit that the union
12  did not properly represent you during your step 2
13  hearing?
14     A.    They were there and represented me, yes.
15     Q.    Okay.  That's still not answering my
16  question, ma'am.  My question is as part of this
17  lawsuit are you claiming that the union did not
18  represent you properly during your step 2 hearing?
19     A.    They represented me properly, both Becky
20  and Beth.
21     Q.    And you previously testified that the
22  process was fair and complete, correct?
23     A.    With --
24           MR. GILLIAM:  The --
25           THE WITNESS:  Go ahead.

Page 268

1   BY MR. GREENFIELD:
2      Q.    Is that correct -- was fair and complete?
3           MR. GILLIAM:  Objection, vague.
4      A.    Within my second step meeting, yes.
5   BY MR. GREENFIELD:
6      Q.    Okay.  And that it was Southwest who made
7   the decision to terminate you, correct?
8      A.    I believe it was Ed Schneider.
9      Q.    Okay.  And do you have any evidence that
10  the union made the decision to terminate you?
11     A.    No.
12     Q.    Okay.  Are you claiming as part of this
13  case that the union discriminated against you during
14  your grievance process?
15     A.    Can you repeat that?
16     Q.    Yeah.  Are you claiming as part of your
17  lawsuit that the union is discriminating --
18  discriminated against you during your grievance process
19  in either the fact-finding or step 2 hearing?
20     A.    No, neither on those two.
21     Q.    Okay.  Now are you claiming that the union
22  didn't represent you properly because of your religious
23  beliefs at the step 2 or fact-finding meeting?
24     A.    Neither on those two.
25     Q.    Are you aware of any other individuals who

Page 269

1  have -- who allegedly haven't been treated properly by
2  the union because of their religious beliefs?
3      A.   Any other people?  I'm sorry?  Can you
4  repeat that?
5      Q.   Yes, ma'am.  Any -- any -- are you aware of
6  any other individuals who are -- who haven't been
7  treated properly --
8          MR. CLOUTMAN:  I lost completely my TV set.
9      A.   He -- I heard -- I heard somebody else over
10  you.
11          Have I heard anybody else being not being
12  represented equally, is that --
13  BY MR. GREENFIELD:
14      Q.   Yes.  Are you aware of any individuals who
15  haven't been treated properly because of their
16  religious beliefs by the union?
17      A.   I don't have any information on that.
18      Q.   Okay.  Are you claiming that the union
19  didn't -- didn't provide you some sort of
20  accommodation?
21      A.   That the union afforded me some
22  accommodation.
23      Q.   Are you claiming as part of your lawsuit
24  that the union didn't provide you with a religious
25  accommodation?

Page 270

1      A.   No, they did not.
2      Q.   They did not provide you a religious
3  accommodation?
4      A.   They did not provide me a religious
5  accommodation.
6      Q.   Did you request a religious accommodation
7  from the union?
8      A.   I didn't know I had to.
9      Q.   So the answer to my question is no, you did
10  not request a religious accommodation from the union?
11      A.   Correct.
12      Q.   Okay.  Are you aware of any other
13  individuals that the union has not accommodated -- who
14  has not -- not provided a religious accommodation?
15      A.   I do not have that knowledge.
16      Q.   Okay.  Are you aware if you filed an EEOC
17  charge for religious discrimination against the union?
18      A.   Yes, I did.
19      Q.   Okay.  And you provided that documentation?
20      A.   Yes, I did.
21          THE WITNESS:  I can't do it right now.  I
22  know.  I know.
23  BY MR. GREENFIELD:
24      Q.   Is it your testimony that -- when was
25  the -- okay.  Let me take a step back.

Page 271

1          When was the last time you communicated
2  with Mr. Chris Click regarding anything related to your
3  case?
4      A.   I can't recall.  I think we just answered
5  all of these questions.  I don't remember.  It's been a
6  while.  It's probably been over a year ago.
7      Q.   Okay.  And if Mr. Click was to testify
8  otherwise, would that be a lie or inaccurate
9  information?
10      A.   I would imagine it would be the accurate
11  information.  I just don't remember exactly when the
12  last time I talked to him was.  I haven't talked to him
13  in a long time.
14      Q.   Have you talked to him about your lawsuit?
15          MR. GILLIAM:  Objection, asked and
16  answered.
17  BY MR. GREENFIELD:
18      Q.   You can answer.
19      A.   I'm sorry?
20      Q.   Have you ever discussed the factual basis
21  of your lawsuit with Mr. Click?
22          MR. GILLIAM:  Objection, asked and
23  answered.
24      A.   Not the --
25          MR. GILLIAM:  You can answer.

Page 272

1      A.   Not the factual basis.  He knows my lawsuit
2  is going on.  He knows about the lawsuit.  He's read
3  the lawsuit.
4  BY MR. GREENFIELD:
5      Q.   Have you communicated with Mr. Click via
6  text message about the lawsuit?
7      A.   Only when it became public knowledge, yes.
8      Q.   You did communicate with mister -- and when
9  do you believe that it became public knowledge?  What
10  does that mean?
11      A.   That would have been back in -- gosh,
12  whenever it was filed.  I don't remember the date right
13  off the top of my head.
14      Q.   Okay.  And what did you discuss with
15  Mr. Click via text message?
16      A.   Just the fact that it had been filed and
17  then he read it.
18      Q.   And have you provided those text messages
19  between Mr. Click and your -- and yourself to your
20  counsel?
21      A.   I've provided all of my text messages and
22  my emails and so forth, my attorneys have all of that.
23  I turned that over almost two years ago, a year ago,
24  whenever it was.
25      Q.   Did you delete any conversations, text

Page 273

```
1    conversations between you and Mr. Click regarding
2    anything to do with your lawsuit?
3        A.   No, I did not.
4        Q.   Do you have text messages that counter that
5    opinion is what would be -- how would you feel about
6    that?
7        A.   If I had what?  I'm sorry.
8        Q.   If Mr. Click has text messages that
9    contradict that?
10       A.   Then I don't remember --
11           MR. GILLIAM:  Can you --
12           THE WITNESS:  I'm sorry?
13           MR. GREENFIELD:  I'll move on.
14           All right.  If I can just have a couple of
15   minutes off I think I should be able to wrap up.
16           VIDEOGRAPHER:  We are going off the record
17   at 4:28 p.m.
18           (Break from 4:28 p.m. until 4:33 p.m.)
19           VIDEOGRAPHER:  We are going back on the
20   record at 4:33 p.m.
21           MR. GREENFIELD:  All right.  Ms. Carter,
22   we're getting ready to wrap up and turn it over to your
23   attorney for any questions he has.  I just have a
24   couple more and I really do want to thank you for your
25   time today.  I know it's a really long day and so I
```

Page 274

```
1    appreciate you being here.
2    BY MR. GREENFIELD:
3        Q.   The last kind of thing I want to talk about
4    is you have a claim for damages against the union in
5    this lawsuit similar to what Mr. Correll asked you
6    about in regard to Southwest Airlines as well.
7            What is it that you believe the union is
8    responsible for for any damages you may be seeking at
9    trial?
10       A.   I can't really put a number on that at the
11   moment.  Like I said, my 20-year career, you can't put
12   a number on that.
13       Q.   Okay.  You understand that the union can't
14   get your job back for you, correct?
15       A.   The union is what created my job loss.
16       Q.   Okay.  But you understand ultimately
17   Southwest Airlines is your employer, correct -- was
18   your employer, correct?
19       A.   Yes.
20       Q.   Okay.  And so being able to get you your
21   position back there is outside of the union's hands,
22   you understand that?
23       A.   I understand that at this point, but they
24   were the ones that actually created this and got my job
25   taken away from me.
```

Page 275

```
1        Q.   I appreciate how you feel, I understand,
2    Ms. Carter, I appreciate that.
3            And so essentially the emotional damages at
4    center that you discussed with Mr. Correll earlier, is
5    there anything that you would attribute to your
6    termination that we haven't discussed?
7        A.   No.
8        Q.   And you believe the union is in part
9    responsible as well as Southwest for those damages,
10   correct?
11       A.   Correct.
12       Q.   Okay.  And do you believe we should share
13   that burden jointly or how do you -- or do you think
14   one of us is more responsible than the other here?
15           MR. GILLIAM:  Objection to the extent it
16   calls for a legal conclusion.  You can answer it if you
17   can.
18       A.   I think you both share a responsibility in
19   it.
20   BY MR. GREENFIELD:
21       Q.   Okay.  All right.  Is there anything
22   related to what you're trying to recover in this
23   lawsuit against the union that was not discussed
24   earlier in regard to Southwest?
25       A.   No.
```

Page 276

```
1            MR. GREENFIELD:  Okay.  At this time I'll
2    reserve the rest of my questions for the time of trial
3    and pass the witness to you, Mr. Gilliam.
4            MR. GILLIAM:  I -- sorry.  I have no
5    questions.
6            VIDEOGRAPHER:  Okay.  We are going off the
7    record at 4:36 p.m.
8                       -o0o-
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 277

CHANGES AND SIGNATURE

1
2  WITNESS: CHARLENE CARTER
3  DATE: November 20, 2020
4  Page/Line   Change        Reason
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 278

1      I, CHARLENE CARTER, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5      _____
       CHARLENE CARTER
6
7  STATE OF _____)
8  COUNTY OF _____)
9
10     Before me _____ on this day
11 personally appeared CHARLENE CARTER, known to me (or
12 proved to me on the oath of _____ or
13 through _____ (description of identity card
14 or other document)) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that he executed the same for the purposes and
17 consideration therein expressed.
18     Given under my hand and seal of office this
19 _____ day of _____, _____.
20
21
       _____
       Notary Public in and for the
22     State of _____
23
24
25

Page 279

1         REPORTER'S CERTIFICATION
2       DEPOSITION OF CHARLENE CARTER
3           November 20, 2020
4      I, Joseph D. Hendrick, Notary Public and
5  Certified Shorthand Reporter in the State of Texas,
6  hereby certify to the following:
7      That the Witness, CHARLENE CARTER, was duly
8  sworn by the officer and that the transcript of the
9  oral deposition is a true record of the testimony given
10 by the witness;
11     I further certify that pursuant to FRCP
12 Rule 30(f)(1) that the signature of the deponent:
13        X    was requested by the deponent or
14 a party before the completion of the deposition and is
15 to be returned within 30 days from date of receipt of
16 the transcript;
17     _____ was not requested by the
18 deponent or a party before the completion of the
19 deposition;
20     I further certify that the amount of time
21 used by each party is as follows:
22   Mathew B. Gilliam - 00:00:00
23   Michael A. Correll - 04:54:50
24   Adam S. Greenfield - 01:08:13
25   Edward B. Cloutman III - 00:00:00

Page 280

1      I further certify that I am neither counsel
2  for, related to, nor employed by any of the parties or
3  attorneys in the action in which this proceeding was
4  taken;
5      Further, I am not a relative or employee of
6  any attorney of record, nor am I financially or
7  otherwise interested in the outcome of the action.
8      Subscribed and sworn to on this date:
9  December 8, 2020.
10
11
12
13
14
15
16
17        <%12550,Signature%>
          Joseph D. Hendrick, CSR #947
18        Expiration Date: 04/30/2021
          Notary Comm. Exp. 01/13/23
19        Veritext Legal Solutions
          Firm Registration No. 571
20        300 Throckmorton Street, Ste. 1600
          Fort Worth, TX  76102
21        Telephone (800) 336-4000
22
23
24
25

```
 1    Mbg@nrtw.org
 2              December 9, 2020
 3    RE: Carter, Charlen v. Southwest Airline Co & Transport
 4    DEPOSITION OF: Charlene Carter (# 4341722)
 5       The above-referenced witness transcript is
 6    available for read and sign.
 7       Within the applicable timeframe, the witness
 8    should read the testimony to verify its accuracy. If
 9    there are any changes, the witness should note those
10    on the attached Errata Sheet.
11       The witness should sign and notarize the
12    attached Errata pages and return to Veritext at
13    errata-tx@veritext.com.
14       According to applicable rules or agreements, if
15    the witness fails to do so within the time allotted,
16    a certified copy of the transcript may be used as if
17    signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
```