

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Dallas Division

| | § | |
|---|---|---|
| | § | |
| **CHARLENE CARTER,** | § | **Civil Case No. 3:17-cv-02278-X** |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **SOUTHWEST AIRLINES CO., AND** | § | |
| **TRANSPORT WORKERS UNION OF** | § | |
| **AMERICA,** | § | |
| **LOCAL 556,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## JOINT PRETRIAL ORDER

Southwest Airlines Co. ("Southwest"), the Transport Workers Union of America, Local

556 ("Local 556"), and Charlene Carter ("Carter") file this Joint Pretrial Order pursuant to Local

Rule 16.4 and the May 24, 2022 Amended Scheduling Order issued by this Court.

A.   **Summary of the Claims and Defenses of Each Party**

1.   **Carter's claims against Southwest and Southwest's defenses**

a.   RLA Retaliation Claim

Carter claims that Southwest retaliated against her in violation of the Railway Labor Act,

45 U.S.C. § 151, *et seq.* (the "RLA"), by terminating her employment for exercising RLA-

protected rights under 45 U.S.C. §§ 152, Third & Fourth. Carter disagrees with Southwest's

contention that employees must demonstrate whether "animus was a substantial or motivating

factor in plaintiff's termination," and argues that misstates Fifth Circuit precedent in *Roscello v.*

*Southwest Airlines Co.*, which holds that an employee *demonstrates* animus by showing her

1

protected activity was a substantial or motivating factor for her adverse employment action. 726 F.2d 217, 222 (5th Cir. 1984) (citation omitted).

Southwest contends that it did not terminate Carter's employment based on her union opposition or other conduct protected by the RLA, but because she sent graphic photos and videos of aborted fetuses and depictions of female genitalia to fellow employee and Local 556 President Audrey Stone.  Southwest contends that such conduct by Carter violated several Southwest policies and that Carter's union, or anti-union activity, had nothing to do with the termination of her employment.  Southwest further contends that at no time did it harbor anti-union animus and, therefore, such animus could not have been a substantial or motivating factor in the decision to terminate Carter's employment.

b.    Title VII Religious Discrimination Claim

Carter claims that Southwest violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*, by firing Carter for observing her religious beliefs and practices, and by refusing to accommodate her religious observances, beliefs, and practices. Carter argues that Southwest cannot raise an undue hardship defense in this case because it failed to make any accommodation efforts and cannot establish that any possible accommodation would have imposed an undue hardship on its business.

Southwest contends there is no evidence that Southwest terminated Carter based on her religion, or that Southwest treated her less favorably than similarly situated non-Christian employees.  Southwest further contends that Carter's failure to accommodate claim fails because she did not exhaust her administrative remedies in relation to that claim.  Even if Carter had exhausted her administrative remedies, there is no evidence Southwest was aware of Carter's purported need for an accommodation.  But, even if Carter had satisfied a *prima facie* case of

2

failure to accommodate, the accommodations Plaintiff contends should have been provided would have imposed more than a *de minimis* burden on Southwest's business operations and Carter's co-workers and thus would impose an undue hardship on Southwest.

### 2.   **Carter's claims against Local 556 and Local 556's defenses**

#### a.   RLA Retaliation Claim

Carter claims that Local 556 retaliated against her in violation of the RLA when Local 556's President, Audrey Stone, caused Carter's termination for exercising her RLA-protected rights.

Local 556 contends that it is not Carter's employer and did not cause her termination, but instead, actively resisted it on her behalf. Carter's harassment of then 556 president, Audrey Stone, was reported to SWA in her individual capacity as a coworker of Mrs. Carter. All employees of Southwest Airlines, including Audrey Stone, have the right to be free of harassment from a fellow Southwest employee under Southwest's policies and Federal law. Plaintiff's discharge came as a direct result of Southwest's investigation and review of Mrs. Carter's aggressive and traumatic harassment of a coworker, and not b/c of any previous anti-union expression, in which she was free to engage per the Union bylaws, Southwest policy, and Federal Law.

#### b.   Duty of Fair Representation Claim

Carter also claims that Local 556 breached the duty of fair representation it owed Carter by acting arbitrarily, discriminatorily and in bad faith, and causing her to be fired.

Local 556 contends that it is not Carter's employer and could not cause her termination, but instead, actively resisted it on her behalf by successfully representing Carter in her grievance proceeding against Southwest. Audrey Stone, former Local 556 President and Southwest employee, reported Carter's harassment to Southwest in her individual capacity. Ms. Stone has

3

the same right to be free from coworker harassment as does any and all Southwest employees. Nevertheless, when SWA took disciplinary action against the Plaintiff for her harassment of a coworker, 556 successfully represented Plaintiff in her grievance proceeding against Southwest. This representation was not just fair, but so effective that Southwest offered to withdraw Carter's termination. Carter refused the offer, filing suit against Local 556 and Southwest before she even completed arbitral proceedings.

c.    Title VII Religious Discrimination Claim

Carter also claims that Local 556 violated Title VII by attempting to cause and causing Southwest to discriminate against her—and fire her—for her religious observances, beliefs, and practices, by discriminating against Carter because of her religious beliefs and practices, and by also refusing to accommodate Carter's religious observances, beliefs, and practices.

Carter further claims that President Stone was acting in her official capacity as Local 556 President when she reported Carter's Facebook videos and messages to Southwest.

Local 556 contends that it is not Carter's employer and could not exercise an adverse employment action against the Plaintiff under any circumstances. Indeed, Local 556 did not cause Carter's termination, but instead, actively resisted it on her behalf. Similarly, Local 556 cannot provide a reasonable religious workplace accommodation as they do not employ Carter nor is Carter a member of Local 556. Mrs. Carter's conduct that led to her disciplinary hearing and ultimate termination was her aggressive and traumatic harassment of a coworker, not due to any anti-Christian animus held by Local 556 or Southwest. Plaintiff has produced no evidence to demonstrate that any similarly situated non-Christian employee—who also harassed a co-worker—was treated differently than Mrs. Carter by either Local 556 or Southwest. Even when accepting *arguendo* that Carter's harassment of a co-worker had a religious basis, Carter has

4

produced no evidence that she ever asked Southwest to make a Religious Accommodation so that Carter could continue to harass coworkers.

**B.      Statement of Stipulated Facts**

The parties stipulate to the below facts, which are set forth individually numbered paragraphs, and which require no proof.

1.      Charlene Carter is a Christian who believes that abortion is the taking of a human life contrary to the teachings of the Bible and the will of God.

2.      Carter was hired as a Flight Attendant by Southwest in 1996.

3.      TWU Local 556 is the local Union representing flight attendants working at Southwest Airlines.

4.      Local 556 served as Carter's exclusive bargaining representative throughout her tenure with Southwest.

5.      For several years, Carter objected to certain decisions by and the leadership of Local 556's leadership through email messages and Facebook postings.

6.      In September 2013, Carter resigned her membership with Local 556 and was an agency fee paying non-member objector until her termination in 2017.

7.      Starting in early 2015, Carter began sending messages to Stone, discussing Carter's status as a Union objector. These emails and messages continued through the termination of Carter's employment by Southwest.

8.      From 2015 through 2017, Carter continued in various efforts opposing the union and the union's then-president, Audrey Stone. Carter supported a recall campaign, and posted and sent messages on social media expressing her disapproval of the union and union leadership. Carter sent many direct messages to Stone, to which Stone never responded.

5

9.     In January of 2017, members of Local 556, including President Stone, attended a union sponsored Women's Committee meeting in Washington D.C.

10.    On January 21, 2017, certain members of Local 556 attended the Women's March on Washington, D.C.

11.    On February 14, 2017, Carter sent Local 556 President Audrey Stone private messages via Facebook Messenger.

12.    President Stone never sent Carter responses to the private messages.

13.    On February 22, 2017, President Stone reported Carter's emails and Facebook Messages to Stone's base manager, Suzanne Stephenson ("Stephenson"), in Las Vegas, Nevada.

14.    On March 7, 2017, Southwest held a fact-finding meeting with Carter as part of its investigation of President Stone's Complaint.

15.    On March 14, 2017, Southwest sent Carter a Termination Notice.

**C.     List of Contested Issues of Fact**

-    **Plaintiff's Contested Issues of Fact**

1.    **RLA Claims**

   a.    Whether Carter's RLA-protected activities were a substantial or motivating factor for firing her

   b.    Whether Carter's RLA-protected activities were a substantial or motivating factor for President Stone's decision causing her to be fired

2.    **DFR Claims**

   a.    Whether Local 556 can rebut the presumption that it acted arbitrarily, discriminatorily, and in bad faith by showing that disciplining Carter for union

dissident speech was done in good faith, based on rational considerations, and were linked in some way to its need to represent its constituency as a whole.

b. Whether Local 556 acted arbitrarily, discriminatorily, or in bad faith

1. Whether Local 556's decision was arbitrary because it was not (1) based upon relevant permissible union factors which excludes the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) a rational result of the consideration of those factors; and (3) inclusive of fair and impartial consideration of the interests of all employees.

2. Whether Local 556 engaged in invidious treatment in the decision affecting Carter's employment.

3. Whether Local 556 acted without honest purpose and judgment, or acted with hostility or discrimination towards an employee. Union conduct that "evince[s] a purpose to intentionally harm" employees subject to the union's exclusive representation is per se bad faith conduct.

3. **Title VII Claims**

a. **Carter's Title VII claim against SWA**

1. Whether Southwest fired Carter for her religious beliefs, observances, or practices

a. Whether Carter's religious beliefs, observances, or practice was a motivating factor for Southwest's termination of her employment

b. Whether Carter's religious beliefs, observances, or practices were a "but for" cause for Southwest's termination of her employment

7

2. Whether Southwest unlawfully discriminated against Carter by failing to accommodate Carter's religious observances, beliefs, and practices.

**b. Carter's Title VII claim against Local 556**

1. Whether Local 556 caused or attempted to cause Southwest to discriminate against Carter's religious beliefs, observances, or practices

   a. Whether Carter's religious beliefs, observances, or practices was a motivating factor for Local 556's termination of her employment

   b. Whether Carter's religious beliefs, observances, or practices were a "but for" cause for Local 556's termination of her employment

2. Whether Local 556 discriminated against Carter's religious beliefs, observances, or practices

3. Whether Carter's need for a religious accommodation was a motivating factor for President Stone's attempts to cause Southwest to discipline Carter

4. Whether Local 556 President Audrey Stone acted in her official union capacity when she reported Carter for discipline

   a. Whether Local 556 can rebut the presumption that President Stone acted in her official capacity with compelling evidence

   b. Whether Audrey Stone was acting within the scope of her general authority as Local 556 president when she reported Carter to Southwest for Carter's Facebook videos and messages expressing disapproval with the union's activities and participation in the Women's March.

5. Carter's damages

8

- **Southwest's Contentions of Fact**

    1. Did Southwest terminate Carter's employment based on her opposition to union activities or practices or other conduct protected by the RLA?

    2. Did Carter's conduct of sending photographs and videos of aborted fetuses to a fellow employee violate Southwest's policies?

    3. Did Southwest terminate Carter's employment based on her religious beliefs or practices?

    4. Was Carter's failure to accept Southwest's offer of reinstatement at the close of the step 2 hearing process reasonable and/or justified?

- **Local 556's Contentions of Fact**

    1. Whether or not Local 556 was able to influence Southwest's decision to terminate Carter's employment?

    2. Whether or not Local 556 was able to influence Southwest's decision to terminate Carter's employment because of her religion, opposition to union activities, or practices or other conduct protected by the RLA?

    3. Whether or not Plaintiff can draw a causal connection from her alleged "protected" speech to her termination?

    4. Whether or not Plaintiff can provide evidence that the Union treated comparators, non-Christians and/or Christians holding differing views from her on the issue of abortion, more favorably.

    5. Whether or not Carter ever requested any sort of religious accommodation from Local 556.

9

6.  Whether Local 556 acted arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process.

7.  Whether Carter has proven that the union acted with a motive to harm her and that its conduct seriously undermined the integrity of the grievance process contributing to the outcome of the proceedings.

**D.**   **List of Contested Issues of Law**

-   **Carter's Contentions of Law**

1.  Whether Carter's RLA retaliation claim requires her to prove that her protected activity was a substantial or motivating factor for her termination, as she contends, or whether it requires her to prove that "animus was a motivating factor for her termination" as Defendants contend.

2.  Whether the *Wright Line* burden-shifting framework applies here where Carter engaged in RLA-protected activity and was fired for the same activity, not different unprotected activity.

3.  Whether Carter's RLA-protected activity opposing her union can lose its protection even if it is "vulgar, offensive, abusive, threatening, or harassing."

4.  Whether Defendants can defend Carter's termination under Title VII by asserting her purported social media policy violation as their defense if the alleged social media policy violation was an expression of her religious beliefs.

5.  Whether the "undue hardship" defense in a Title VII claim for failure to accommodate religious beliefs includes all hardships that are "more than *de minimis*."

US_ACTIVE-167478115

6. Whether Carter may demonstrate that Southwest fired her "because of" her "religion" by showing that her religious observances, beliefs, or practices was a "motivating factor" for her termination, or, whether Carter must prove that it was a "but for" cause as Southwest argues.

7. Whether Southwest can raise an undue hardship defense when it fired Carter without initiating any efforts to accommodate, when it failed to demonstrate there was no possible accommodation it could have made short of firing Carter, or when Southwest made no investigation into possible accommodations it could have made.

8. ~~Whether punitive damages are recoverable under the RLA where the plaintiff was not represented by a union.~~

9. Carter contends that Defendants' "contested issues of law" are no longer "contested" because the Court has already resolved them. To the extent the Court still considers such issues contested, Carter incorporates by reference the legal issues raised in the parties' motions for summary judgment. For a more comprehensive discussion of the contested legal issues, Carter references and incorporates the legal issues discussed in the objections discussed in her objections to Defendants' proposed jury charges.

- **Southwest Contentions of Law**

1. Does Carter have a private right of action under the RLA?

2. Does Carter's claim under the RLA constitute a post-certification "minor dispute?"

11

3. Does the arbitrator's ruling in connection with Carter's grievance under the applicable collective bargaining agreement have preclusive effect on Carter's claims under the RLA?

4. Did Carter's conduct of sending photographs and videos of aborted fetuses to a fellow employee constitute protected activity under the RLA?

5. Did Southwest violate Title VII by failing to accommodate Carter's religious belief or practice?

6. Did suspending its policies in connection with Carter's conduct of sending photographs and videos of aborted fetuses to a fellow employee constitute an undue burden on Southwest?

7. Did Carter adequately mitigate her damages?

- **Local 556's Contentions of Law**

1. Can Local 556 be held liable for Carter's termination and damages without a showing of a joint employer relationship with Southwest or other influence over Southwest's decision to terminate Carter?

2. Can Local 556 violate Title VII by failing to accommodate Carter's religious belief or practice, when they are not her employer nor is she a Union member?

3. Would depriving Audrey Stone the ability to report harassment in the workplace violate her Civil Rights?

4. Did Carter's conduct of sending photographs and videos of aborted fetuses to a fellow employee constitute protected activity under the RLA?

5. Does Carter have a private right of action under the RLA?

6. Does Carter's claim under the RLA constitute a post-certification "minor dispute?"

12

7. Does the arbitrator's ruling in connection with Carter's grievance under the applicable collective bargaining agreement have preclusive effect on Carter's claims under the RLA?

8. Did Carter adequately mitigate her damages?

### E.    Estimate of the Length of Trial

Carter's counsel believes that 7 days are needed to try the case. Southwest and Local 556's counsel believe that 5 days are needed to try the case.

### F.    List of Any Additional Matters that Might Aid in the Disposition of the Case

Carter, Local 556, and Southwest are unaware of any additional matters that might aid in the disposition of the case.

### G.    List of Witnesses Who May be Called by Each Party in Its Case in Chief

1.    **Plaintiff's Witnesses**

2.

| Name | Summary of Testimony | Whether Deposed | Testimony at Trial |
|---|---|---|---|
| Charlene Carter | Charlene Carter is the Plaintiff. She will testify about her activities opposing the union, her religious beliefs and practices, and her social media activities. Carter will also testify about Southwest's disciplinary investigation. She will also testify about her claims and damages. | Yes | Probable |
| Jeanna Jackson | Jeanna Jackson was a Southwest flight attendant who led the effort to recall the Local 556 Executive Board, including Local 556 President Audrey Stone. She will testify about the Recall Effort, Local 556 officers' and members' reporting her for discipline, and | No | Probable |

13

| | Southwest's disciplinary investigations in which she was involved. | | |
|---|---|---|---|
| Mike Sims | Mike Sims was Defendant Southwest's Director of Inflight Relations. He will testify about Southwest's investigation that led to Carter's termination and the decision to terminate Carter's employment. | Yes | Probable |
| Ed Schneider | Ed Schneider was Defendant Southwest's Denver Base Manager, and Charlene Carter's supervisor. He will testify about Southwest's investigation that led to Carter's termination and the decision to terminate Carter's employment. | Yes | Probable |
| Audrey Stone | Audrey Stone was Defendant Local 556's President. She will testify about how the union responded to social media discipline during her tenure, preparations and planning for the Women's March event, the union's participation in the Women's March, and social media activity regarding the Women's March. Stone will also testify about reporting Charlene Carter's Facebook videos and messages to Southwest, and her participation in Southwest's investigation of Charlene Carter. | Yes | Probable |

14

| Jessica Parker | Jessica Parker was Defendant Local 556's Working Women's Committee Chair and Executive Board Member. She will testify about the union's participation in the Women's March, preparations and planning for the Women's March, the union's participation in the Women's March, and social media activity regarding the Women's March. | Yes | Probable |
| --- | --- | --- | --- |
| John Parrott | John Parrott was Defendant Local 556's Treasurer. He will testify about the union's preparations and planning for the Women's March, including the financing of the Women's March. | Yes | Probable |
| Maureen Emlet | Maureen Emlet was Defendant Southwest's Labor Relations Manager. She will testify about Southwest's investigation that led to Carter's termination and the decision to terminate Carter's employment. She will also testify about Local 556 officials' and members' reporting other Recall supporters for discipline and Southwest's investigations of those reports. | Yes | Possible |
| Meggan Jones | Meggan Jones was Defendant Southwest's Assistant Base Manager in Denver, Colorado. She will testify about Southwest's investigation that led to Carter's termination. | Yes | Possible |
| Denise Gutierrez | Denise Gutierrez was Defendant Southwest's Employee Relations investigator. She will testify about Southwest's investigation that led to Carter's termination and the decision to terminate Carter's employment. She will also testify about Local 556 officials' and members' reporting | Yes | Possible |

15

| | | | |
|---|---|---|---|
| | other Recall supporters for discipline and Southwest's investigations of those reports. | | |
| Brett Nevarez | Brett Nevarez was Defendant Local 556's Second Vice President. He will testify about employees' social media activities, including his own, union members' and officials' reporting other Recall supporters for discipline, and his involvement in Carter's disciplinary investigation. | No | Possible |
| Brian Talburt | Brian Talburt was a Southwest flight attendant and a Local 556 member. He will testify about employees' social media activities, including his own, and reporting other Recall supporters for discipline. | No | Possible |
| Edie Barnett | Edie Barnett was a Southwest Airlines HR Manager. She will testify about her involvement in the Carter investigation, and her involvement in flight attendants' social media policy issues at Southwest, including those related to the Recall. | No | Possible |
| Melissa Burdine | Melissa Burdine was a Southwest Airlines Labor Relations Manager. She will testify about her involvement in the Carter investigation, and her involvement in flight attendants' social media policy issues at Southwest, including those related to the Recall. | No | Possible |
| Brendon Conlon | Brendon Conlon was Southwest Airlines Senior Director of Labor Relations. He will testify about his involvement in the Carter investigation, and his involvement in flight attendants' social media policy issues at Southwest, including those related to the Recall. | No | Possible |

16

| | | | |
|---|---|---|---|
| Sonya Lacore | Sonya Lacore was Southwest's Vice President of In-Flight. She will testify about receiving President Audrey Stone's complaint about Carter, her involvement in the Carter investigation, and her involvement in flight attendants' social media policy issues at Southwest, including those related to the Recall. | No | Possible |
| Naomi Hudson | Naomi Hudson was Southwest's Senior Director of Labor Relations. She will testify about receiving President Audrey Stone's complaint about Carter, her involvement in the Carter investigation, her involvement in flight attendants' social media policy issues at Southwest, including those related to the Recall. | No | Possible |
| Linda Rutherford | Linda Rutherford was Senior VP of Corporate Communications for Southwest Airlines. She will testify about her involvement in the Carter investigation, and her involvement in flight attendants' social media policy issues at Southwest, including those related to the Recall. | No | Possible |
| Tammy Shaffer | Tammy Shaffer was a Southwest Airlines Labor Relations Manager. She will testify about her involvement in the Carter investigation, and her involvement in flight attendants' social media policy issues at Southwest, including those related to the Recall. | No | Possible |
| Nancy Kleburne | Nancy Kleburne was a Southwest Airlines employee and member of Southwest's Accommodations and Career Transitions Team. She will testify about her involvement in the Carter investigation, and | No | Possible |

| | her involvement in flight attendants' social media policy issues at Southwest, including those related to the Recall. | | |
|---|---|---|---|

### 3.    Local 556's witnesses

| Witness Name | Narrative summary of testimony | Whether Witness was Deposed | Witness Appearance at Trial |
|---|---|---|---|
| Charlene Carter | Charlene Carter is the Plaintiff.  She will testify about her correspondence and interactions with Audrey Stone, the representation she received from the Union during the grievance procedure, her AFO history, the recall petition, and her post Southwest work history and damages. | Yes | Probable |
| Audrey Stone | Audrey Stone is a current Southwest flight attendant and the former president of Local 556. Stone has knowledge of the complaints to Southwest about Carter's conduct towards her, specifically Carter sending her videos and photographs including videos of aborted fetuses. | Yes | Probable |
| Mike Sims | Mike Sims was the director of inflight services for Southwest at the time of Carter's termination from employment' Sims presided over the step 2 grievance hearing and affirmed the decision to terminate Carter's employment.  Sims also has knowledge of the "last chance agreement" offered to Carter to reinstate her employment at Southwest and the arbitration hearing following the step 2 grievance hearing. Mike Sims also has knowledge pertaining to the Union's ability to impact Southwest's decision to terminate Plaintiff. | Yes | Probable |

### 4.    Southwest's witnesses

18

| Witness Name | Narrative summary of testimony | Whether Witness was Deposed | Witness Appearance at Trial |
|---|---|---|---|
| Ed Schneider | Ed Schneider was the base manager of the Denver base to which Carter reported at the time of her termination from employment with Southwest; Mr. Schneider was the primary decision maker as to Carter's termination, and has knowledge of the investigation and fact finding leading up to that decision, as well as the Southwest policies that Carter violated. | Yes | Probable |
| Meggan Jones | Meggan Jones was the assistant base manager of the Denver base at the time of Carter's termination; Ms. Jones participated in the investigation and fact-finding leading up to Carter's termination from employment. | Yes | Probable |
| Denise Guiterrez | Denise Guiterrez was the Southwest human resources employee who supervised Ed Schneider in connection with the investigation and fact-finding leading up to the decision to terminate Carter's employment; Guiterrez also has knowledge of the Southwest policies Carter violated. | Yes | Probable |
| Maureen Emlet | Maureen Emlet was the Southwest human | Yes | Probable |

19

| Witness Name | Narrative summary of testimony | Whether Witness was Deposed | Witness Appearance at Trial |
|---|---|---|---|
| | resources employee who supervised Ed Schneider in connection with the investigation and fact-finding leading up to the decision to terminate Carter's employment; Emlet also has knowledge of the Southwest policies Carter violated. | | |
| Audrey Stone | Audrey Stone is a current Southwest flight attendant and the former president of the local Southwest flight attendant union.  Stone has knowledge of the complaints to Southwest about Carter's conduct towards her, specifically Carter sending her videos and photographs including videos of aborted fetuses. | Yes | Probable |
| Mike Sims | Mike Sims was the director of inflight services for Southwest at the time of Carter's termination from employment' Sims presided over the step 2 grievance hearing and affirmed the decision to terminate Carter's employment.  Sims also has knowledge of the "last chance agreement" offered to Carter to reinstate her | Yes | Probable |

20

US_ACTIVE-167478115

| Witness Name | Narrative summary of testimony | Whether Witness was Deposed | Witness Appearance at Trial |
|---|---|---|---|
| | employment at Southwest and the arbitration hearing following the step 2 grievance hearing. | | |

9. **Joint proposed jury charge**

The Parties were unable to reach agreement on the Proposed Jury Charge and Interrogatories. For the portions of the Proposed Jury Charge where the Parties could reach agreement, the Parties have appended Exhibit 1. For the portions of the Proposed Jury Charge where the Parties could not agree, the Parties have appended exhibits outlining their positions on what those portions of the charge should contain, along with their proposed jury interrogatories. (Carter's as Exhibit 2, Defendants' as Exhibit 3).

10. **Status of settlement negotiations as of the date of the Pretrial Order**

Throughout this lawsuit the Parties' repeated settlement attempts have been unsuccessful. Initially, pursuant to the Court's April 17, 2018 Order Setting Status Conference (ECF 38), the Parties conferred about settlement prospects and mediation, but could not reach any agreements about settlement, and did not conduct mediation at that time. On June 14, 2021, the Parties held mediation during which they engaged in settlement negotiations for more than eight hours with the Honorable Karen Willcutts serving as mediator. The Parties were not successful in reaching a settlement of the claims. Following mediation, Carter's and Local 556's counsel again discussed settlement prospects on or about July 6, 2021. Carter's and Southwest's counsel discussed settlement prospects again on August 17, 2021. Despite these discussions, the Parties have not

21

been able to reach any agreements. At this juncture, there are no outstanding offers or settlement demands.

11. **Each party's proposed voir dire questions:**

a. **Plaintiff's Proposed Voir Dire Questions[1]**

1. Do you know any of the following?
   a. Hon. Judge Brantley Starr;
   b. Anyone on the Court's staff;
   c. Charlene Carter;
   d. anyone that works for Southwest Airlines;
   e. anyone that works with or is a member of Transport Workers Union of America Local 556 ("Local 556);
   f. Audrey Stone, former President of Local 556;
   g. Brett Nevarez, former Second Vice President of Local 556;
   h. Edie Barnett, Southwest Airlines HR Manager;
   i. Hector Barrera, Southwest Airlines employee
   j. Melissa Burdine, Southwest Airlines labor relations manager;
   k. Nancy Cleburn, Southwest Airlines employee;
   l. Brendon Conlon, Southwest Airlines senior director of labor relations;
   m. Tom Crabtree, Southwest Airlines employee
   n. Maureen Emlet, Southwest Airlines employee;
   o. Melissa Ford, Southwest Airlines director of corporate communications;
   p. Lisa Goode, Southwest Airlines employee;
   q. Brianna Grant, Southwest Airlines senior manager of labor relations;
   r. Denise Gutierrez, Southwest Airlines employee relations leader;
   s. Naomi Hudson, Southwest Airlines senior director employee relations;
   t. Meggan Jones, Southwest Airlines employee;
   u. Dave Kissman, Southwest employee
   v. Sonya Lacore, Southwest Airlines employee;
   w. Lucetta Larabee, Southwest Airlines employee;
   x. Rachel Loudermilk, Southwest Airlines employee;
   y. Dustin Moore, Southwest Airlines employee;
   z. Brian Ridgeway; Southwest Airlines employee
   aa. Linda Rutherford, Southwest Airlines senior VP of corporate communications;
   bb. Ed Schneider, Southwest Airlines employee;
   cc. Tammy Shafer, Southwest Airlines employee;
   dd. Michael Sims, Southwest Airlines employee;
   ee. Suzanne Stephenson, Southwest Airlines base manager;

---

[1] The questions proposed are in no particular order and are meant to include relevant follow-up questions depending on responses. These questions are also subject to the Court's rulings on *limine* issues.

US_ACTIVE-167478115

ff. Brooks Thomas, Southwest Airlines media team member;

gg. Matthew Gilliam, an attorney for Ms. Carter;

hh. Anyone works for the National Right to Work Legal Defense Foundation, a nonprofit charitable organization in Springfield Virginia;

ii. Jason Winford, an attorney for Ms. Carter;

jj. Anyone who works for Jenkens & Watkins, a law firm in Dallas, Texas;

kk. Bobby Pryor, an attorney for Ms. Carter;

ll. Matthew Hill, an attorney for Ms. Carter;

mm.  anyone who works at Pryor & Bruce, a law firm in Rockwall, Texas;

nn. Paulo McKeeby, an attorney for Southwest Airlines;

oo. Brian Morris, an attorney for Southwest Airlines;

pp. anyone that works at Reed Smith, a law firm in Dallas;

qq. Michael Correll, a former attorney for Southwest Airlines;

rr. Michelle Gehrke, a former attorney for Southwest Airlines;

ss. Adam Greenfield, an attorney for Local 556;

tt. Edward Cloutman, an attorney for Local 556;

uu. any attorneys or anyone that works at Cloutman & Greenfield, a law firm in Dallas.

2. Do any of you do business with or closely associate with anyone that does business with Southwest Airlines?

3. Do any of you do business with or closely associate with anyone that does business with the Transport Workers Union of America Local 556, which I will refer to as "Local 556"?

4. Do any of you do business with or closely associate with anyone that does business with any local of the Transport Workers Union?

5. How many of you are familiar with Southwest Airlines?  How many of you regularly fly on Southwest Airlines?  How many of you have a positive view of Southwest Airlines? Does anyone have a view of Southwest Airlines that are such that it would be difficult for you to return a verdict against Southwest Airlines?

6. How many of you are familiar with Local 556?  Of those familiar with Local 556, do you have a positive view of Local 556?  Does anyone have a view of Local 556 that would be difficult for you to return a verdict against Local 556?

7. How many of you are familiar with the Transport Workers Union?  Of those familiar with the Transport Workers Union, do you have a positive view of that union?  Does anyone have a view of the Transport Workers Union that that would be difficult for you to return a verdict against its Local 556?

US_ACTIVE-167478115

8. Do any of you have strong opinions about labor unions – and, by that, I mean a view which might make Ms. Carter have an extra burden in terms of convincing you of the wrongs committed against her?

9. How many of you have been a member of a union or had a family member in a union?

10. This case will involve persons expressing their views about abortion. Is there anyone here that feels strongly about abortion such that you will not support a political party or vote for a political candidate based on your view about abortion? Is there anyone here that views abortion so strongly that it would make it more difficult for you to believe the testimony of someone with a differing view as to abortion? Is there anyone here that views abortion so strongly that it would make it more difficult for you to return a verdict in favor of someone who feels differently about abortion than you?

11. Is there anyone that has had close family members that had differing views on abortion such that it has caused difficulties in discussing abortion with those family members without arguing? How have you continued to deal with the subject of abortion among those family members at home?

12. This case will involve persons expressing their views about Planned Parenthood and the Women's March on Washington, D.C. Is there anyone here that feels so strongly about Planned Parenthood or the Women's March that it would make it more difficult to return a verdict in favor of someone who feels differently?

13. Is there anyone here that feels so strongly about the U.S. Supreme Court's recent decision on abortion in *Dobbs v. Jackson Women's Health Organization* and its impact on *Roe v. Wade* that it would make it more difficult to return a verdict in favor of someone who feels differently?

14. This case will involve viewing a video which depicts an aborted child or fetus depending on your definition. Because of that, is there anyone that says this is just not the kind of case for whatever reason?

15. Has anyone attended a rally, march or protest relating to (i) abortion; (ii) religion; (iii) women's rights, (iv) union activity; (v) Hillary Clinton; or (v) Donald Trump?

16. When speaking to power about an important issue and trying to affect that issue – like when you write your congressperson – when trying to convince such person that, for instance, abortion is wrong, do you think free speech should permit you to raise that issue and send along a video that shows what it looks like?

17. This case involves discrimination against a person based on their religion without an accommodation being offered. Does anyone have such strong views of religion or religious people that discussions with family or friends about religion sometimes becomes

24

argumentative?  Does anyone have such strong views against religion or religious people that it would make it more difficult for you to protect a person from religious discrimination and return a verdict in favor of someone who feels differently about religion than you do?

18. This case will involve persons expressing their views about Donald Trump and Hillary Clinton.  Is there anyone here that feels strongly about either of these persons such that you will not vote for a political candidate based on their feelings about one of these people?  Is there anyone that has views about either of these persons such that it would make it more difficult for you to believe the testimony of someone with a differing view?

19. Have any of you ever volunteered to work for or donated to a political candidate?  If so, what did you do, and who was the candidate?

20. On a scale of 1 to 10 with 10 being no infringement on such right at all and 1 being any limitation at all, please score yourself on freedom of speech.  How many are 8 to 10?  How many are 5-7?  How many are 1-4?

21. On a scale of 1 to 10 with 10 being no infringement on such right at all and 1 being any limitation at all, please score yourself on freedom of religion.  How many are 8 to 10?  How many are 5-7?  How many are 1-4?

22. A right to work state is a state in which you do not have to be a union member to get a job.  Is there anyone here opposed to right to work states or laws?

23. Is there anyone here that does not believe in a person's right to go to court to seek redress?

24. Other than a divorce proceeding, how many of you have been a plaintiff in a lawsuit?  Explain.

25. Other than a divorce proceeding, how many of you have been a defendant in a lawsuit?  Explain.

26. Other than a divorce proceeding, how many of you have been a witness in a lawsuit or a deposition?  Explain.

27. How many of you have ever made a formal complaint at work or with an agency like the Texas Workforce Commission, the EEOC, the Department of Labor, or OSHA?  Explain.

28. How many of you have ever been fired or laid off from a job unfairly?  Explain.

29. Follow up questions based on juror cards.

US_ACTIVE-167478115

30. Punitive damages are a means by which a jury can punish a defendant to discourage them and others from engaging in bad behavior in the future. Is there anyone here of the view that they could not fairly consider punitive damages as an award?

31. How many of you are currently in a management position? Explain.

### b. Local 556's proposed questions

A. Knowledge of Parties, witnesses, and counsel –

1. The Plaintiff in this case is Charlene Carter. Do any of you know Mrs. Carter? If so, how do you know her? And for how long have you known her?

        a. If so, who?
        b. If so, was it a positive, negative, or neutral experience?

2. The Defendants in this case are Southwest Airlines and Transportation Union Workers of America, Local 556, The Union. Have you, any family member, or any close friend ever been employed by Southwest Airlines or been a member of The Union?

3. The attorneys representing Charlene Carter are _____; The attorneys representing Southwest Airlines are _____; I, Adam Greenfield, along with co-counsel Edward Cloutman III, we are representing The Union. Has anyone had any dealings with any of the lawyers in this case?

4. Do any of you know _____? [List the witnesses expected to be called in this matter.]

B. Juror Responsibility and Knowledge

Folks, jurors have certain rights. It's important for you to exercise these rights when necessary. So I need to ask you about them.

**First,** you have the fight to hear all the testimony. **Every word**. So if you don't hear something a witness says, will you all be comfortable raising your hand and telling the judge, "Your Honor, I did not hear what the witness said. Could you ask her to repeat it?"

**Second,** and even more important: You have the right to clearly understand the law. You have the right to know that every other juror clearly and correctly understands the law. You have the right to know that you are on a jury in which every juror is following the law. So during deliberations, if there's anything about the law you don't understand, or if there's any disagreement among you about the law, or if anyone is refusing to follow the law the judge gives you, will you be comfortable asking your foreperson to knock on the door and tell the bailiff you need the judge to come explain that part of the law again?

**Finally,** us lawyers get ahead of ourselves sometimes because we've been to the Court house so often. Does anyone have any questions about who any of the individuals are that are

present today?

C.  Get to Know Each Other

Alright, now that were through that, you lucky folks who get selected for the jury, we will be spending a few days together, so I would like to spend a few minutes getting to know y'all a bit.. I'll break the ice... As I told you earlier, my name is Adam Greenfield. I'm a Dallas native, born and raised in the greater Lakewood area of East Dallas, and am a father of three children under 5 years old.

1.  Does anyone on the jury have children currently living with them?
    a.  We will return to this topic, as I am well aware of the troubles that can come up when trying to coordinate little people.

Back to me. Unfortunately, it's not very exciting. When I'm not lawyering and being a Dad, I really like to let my mind rest by watching some TV, my guilty pleasures sorta speak.

Now, My wife and I, when were together, we all really like The Voice. Admittedly, I haven't seen this season because I have a new baby.

2.  Any of y'all voice fans?

When were apart I like sports and outdoors?

3.  Any of y'all watch the NBA or basketball?
4.  Any hunter and fisherman out there, maybe some Duck Dynasty fans?

Now my wife, she's from Pennsylvania. And when she's alone she either goes for laughs or murder mystery.

5.  Do we have anyone from up that way? Or outside of the Metroplex?
6.  Do we have any fans of CSI or NCIS?
7.  What about the lighter side of things? Family Guy? The Office re-runs? Maybe It's Always Sunny in Philadelphia

8.  Now, I haven't heard from everyone, so what about y'all, does anyone have any guilty pleasure shows they like to watch after a long day?

D.  Experience as Employee/Employer

1.  Do any of you have work experience in (1) the airline industry? (2) Human Resources or employee benefits? If so, what is your experience?

2.  Do any of you own your own business?
    a.  How many people do you employ?

27

3. Have any of you worked in company management or a supervisory role?
   a. What was your role?
   b. Did you ever receive a complaint from an employee concerning any kind of discrimination?
      i. What was the outcome, how did you react?
      ii. Will that experience affect your ability to consider the evidence in this case?

4. Does anyone have any training or background in the laws against workplace discrimination?

5. Do any of you have any feeling one way or the other concerning laws prohibiting discrimination in employment?  Are those laws necessary?

6. Do you think discrimination exists in the workplace?

7. Has anyone here ever believed that you were the target of some type of discrimination at work?

   a. What were the circumstances?
   b. Did you complain about it, and if so, did you suffer any consequences for making your complaint?

8. Have any of you or someone close to you been fired, laid off, or otherwise lost a meaningful job in the last few years? If so, did you consider the circumstances to be improper or unfair?

9. Does anyone believe that employment policies are not always applied equally among employees? If yes, please explain.

10. Does anyone believe that employees who have been at a company for a long time deserve a bit of leniency when they violate company policies? If yes, please explain.

11. Do any of you think that, in a dispute at work, employers generally do not give their employees enough of the benefit of the doubt? If yes, please explain.

12. Have you or any of your family or close friends been subject to treatment on the job that you considered to be unfair? If yes, please explain.

13. Have you or any of your family or close friends been subject to treatment on the job that you considered to be discriminatory? If yes, please explain.

14. Have you or any of your family or close friends ever been disciplined or discharged for violating a company policy or a work rule? If yes, please explain.

15. Does anyone here feel that large corporations get away with too much in today's business world? What about Unions? If yes, please explain.

28

16. Does anyone here feel that large corporations are not regulated enough by the government? What about Unions? If yes, please explain.

17. Does anyone here think that business laws are designed more in favor of the employers and less in favor of employees? If yes, please explain.

18. Does anyone here think that people file lawsuits when they do not get what they want?

19. Does anyone here think that people cannot take responsibility for their actions and blame others, and that sometimes leads to filing a lawsuit?

20. Has anyone ever filed a lawsuit before? If so, please explain. What was the nature and outcome of the dispute?

21. Has anyone ever filed a complaint at your workplace against your employer, or had a workplace complaint filed against you? If so, please explain.

22. Has or is anyone here a member of a labor union? If so, which one(s)? Was the experience positive or negative? Please explain.

23. Has anyone here worked for a law firm? If so, which one(s)? What is or was your job? How would you describe the experience?

24. Do any of you believe that people should resolve problems without filing a lawsuit?

25. Do you think people turn to courts too often to resolve their problems?

E. Burden of proof:

Unlike a criminal case, in trials like this, jurors make their decisions on the basis of whether one side is more likely right than wrong. Some folks think "more likely right than wrong" is not quite fair--because it makes things a little too easy on one side or the other.

1. "How many of you are a little closer to the folks who feel that 'more likely right than wrong' [hands] might be a little unfair, or a little too easy for one side or the other?"

2. And how many of you might be a little closer to the folks who think it's OK?"

3. And how many of you think you might be somewhere in the middle?

    a.    Follow up individually.

Now, I had to ask about this because in this case, you will be required to make all your decisions on the basis of whether one side is more likely right or wrong [hands].

29

We expect to show you far more than that. But by the end of the trial, even if someone has doubts, and even if someone thinks we're only more likely right than wrong [hands] on a question, you will be required to decide that question in our favor.

**All the attorneys and our Honorable Judge** agree that you have to base all your decisions on whether one side is more likely right than wrong [hands].

**And Judge Starr** will tell you that "more likely right than wrong" [hands] is the law.

Then say: "So, Mr._____ [choose a juror who had trouble with this], what trouble would you have, even a little, making your decisions on the basis of just whether we're more likely right than wrong [hands], not whether we give you total proof?"

F.  Damages

Now, I believe that at the end of the day we will have shown you that we are more likely than not correct.

1.  Do you have any opinion one way or the other about financially compensating someone for losses that that person has suffered?

2.  Who thinks that the amount of money awarded in some lawsuits is way too large, such as people getting millions of dollars for spilled coffee?

3.  Who here knows what punitive damages are?

4.  How many of you have looked for work in the past three years?

      b.     How long did you look before you were able to find a new job?
      c.     Are you still looking?
      d.     What did you do to look for a new job?
      e.     Did you look in the same industry?

5.  Do you think it is easy to get another job after losing one?

6.  Do you think someone who lost a job for a just cause should be compensated?

A FEW FINAL WRAP UP QUESTIONS FOR EVERYONE:

G.  Miscellaneous

1.  Is there any reason—be it a religious, moral, personal, business, or other conviction that you may have—that might, in your opinion, prevent you from rendering a fair and impartial verdict based upon all of the evidence in this case?  If so, please explain.

US_ACTIVE-167478115

2.  Do any of you have scheduling or child care concerns that the Court and the attorneys should know about?

3.  Is there anything else that the Court or the attorneys in this case should know about?

### c.    Southwest's proposed questions

1.  Has anyone here ever been involuntarily terminated from a job? If so, can you please describe the circumstances of your termination?

2.  Is anyone here currently or have you ever been a member of a union? If so, which one?

3.  Have you ever served in any leadership position in a union?

4.  Does anyone here have a positive view of unions generally speaking?

5.  Have you donated to any non-profit or religious organizations? If so, when, which ones?

6.  Which television news, newspapers, and news-related websites, if any, do you most regularly watch or read?

7.  Which cable news, newspapers, and new-related websites, if any, do you feel are the most trustworthy?

8.  Does anyone here regularly post on any social media websites? Which ones?

9.  Does anyone here routinely engage in discussions of political, public policy, or religious issues on social media?

10.  Has anyone here ever been temporarily or permanently suspended from any social media website? If so, please explain what led to your ban.

11.  Has anyone here ever faced any negative consequence(s) in your personal or professional life for your activity on social media?

12.  Has anyone here ever been reprimanded or disciplined at work for something you posted on social media?

13.  Has anyone here ever been reprimanded or disciplined at work for comments you made regarding religion or politics?

14.  Has anyone here ever felt that you were unfairly prevented from sharing your political, religious, or cultural views in the workplace?

15.  Does anyone here feel a duty to share your religious beliefs and views with others as work and elsewhere?

16.  Does anyone here believe an employer should ensure employees are free from religious communications from their co-workers at the workplace?

17.  Does anyone here believe individuals should have a right to express their religious views and preferences with co-workers at the workplace?

31

18. Does anyone here believe an employer should NOT be able to terminate an employee due to social medial activity s/he engages in during non-work hours?

19. Has anyone here ever participated in a political rally or protest? If so, which ones and when?

20. Does anyone here have strong opinions about the recently-leaked Supreme Court opinion addressing abortion and the continuing viability of *Roe v. Wade*?

21. Has anyone here ever had a negative experience with Southwest Airlines that might impact your ability to be a fair and impartial juror?

22. Does anyone here believe that employment policies are not always applied equally among employees? If yes, please explain.

23. Does anyone here believe that employees who have been at a company for a long time deserve a bit of leniency when they violate company policies? If yes, please explain.

24. Does anyone here think that, in a dispute a work, that employers generally do not give their employees enough of the benefit of the doubt? If yes, please explain.

25. Has anyone here ever been subject to treatment on the job that you considered to be unfair? If yes, please explain.

26. Has anyone here ever been subject to treatment on the job that you considered to be discriminatory? If yes, please explain.

27. Has anyone here ever been subject to treatment on the job that you considered to be harassment? If yes, please explain.

28. Has anyone here ever been subject to treatment on the job that you considered to be done in retaliation? If yes, please explain.

29. Has anyone here ever been subjected to a hostile work environment? If yes, please explain.

30. Has anyone here ever been involved in a serious dispute with your employer, either over salary, bonus, benefits, or anything else? If yes, please explain.

31. Are any of you here currently responsible for hiring and firing employees at work? If yes, please explain.

32. Have any of you ever worked in a human resources department or been responsible for that aspect of a business? If yes, please explain.

33. Has anyone here ever been treated inappropriately by a co-worker or supervisor but been afraid to admit or complain about it? If yes, please explain.

34. Has anyone here ever been responsible for drafting or modifying employment policies? If yes, please explain.

35. Is there anyone here who may have difficulty viewing Southwest Airlines, which is a corporation, and the plaintiff, Ms. Carter who is an individual, as equals in the eyes of the law? If yes, please explain.

32

36.   Has anyone here ever protested or boycotted the services or products of a corporation or company? If yes, please explain.

37.   Does anyone here feel that corporations get away with too much in today's business world? If yes, please explain.

38.   Has anyone here ever filed a lawsuit or been part of a class-action lawsuit? If yes, please explain.

39.   Has or does anyone here work for a law firm? If so, which one (s)? What is (was) your job?

40.   Does anyone here think that business laws are designed more in favor of the employers and less in favor of employees? If yes, please explain.

12.   **Trial briefs**

Carter, Southwest, and Local 556 agree that trial briefs are not necessary as the parties' legal positions have been extensively briefed in the parties' dispositive motion briefing.


IT IS SO ORDERED.

Date: ___6/16/2022___

33

Dated:  June 9, 2022                    Respectfully submitted,

                                        */s/ Paulo B. McKeeby*
                                        Paulo B. McKeeby
                                        State Bar No. 00784571
                                        Brian K. Morris
                                        State Bar No. 24108707
                                        **REED SMITH LLP**
                                        2850 N. Harwood Street
                                        Suite 1500
                                        Dallas, Texas 75201
                                        Phone: 469-680-4200
                                        Facsimile: 469-680-4299
                                        pmckeeby@reedsmith.com
                                        bmorris@reedsmith.com

                                        **ATTORNEYS FOR DEFENDANT
                                        SOUTHWEST AIRLINES CO.**


                                        */s/ Adam S. Greenfield*
                                        Adam S. Greenfield
                                        State Bar No. 24075494
                                        **CLOUTMAN & GREENFIELD, PLLC**
                                        3301 Elm Street
                                        Dallas, Texas 75226
                                        Phone:  214.642.7486
                                        Facsimile:  214.939.9229
                                        agreenfield@candglegal.com

                                        Edward B. Cloutman, III
                                        State Bar No. 04411000
                                        **LAW OFFICES OF EDWARD CLOUTMAN, III**
                                        3301 Elm Street
                                        Dallas, TX 75226
                                        Phone:  214.939.9222
                                        Facsimile:  214.939.9229

                                        **ATTORNEYS FOR DEFENDANT
                                        TWU LOCAL 556**

34

*/s/ Matthew B. Gilliam*
Matthew B. Gilliam (*admitted pro hac vice*)
New York Bar No. 5005996
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Phone: 703.321.8510
Facsimile: 703.321.9319
mbg@nrtw.org

Bobby G. Pryor
State Bar No. 16373720
bpryor@pryorandbruce.com
Matthew D. Hill, Of Counsel
State Bar No. 24032296
mhill@pryorandbruce.com
PRYOR & BRUCE
302 N. San Jacinto
Rockwall, TX 75087
Telephone: (972) 771-3933
Facsimile: (972) 771-8343

**ATTORNEYS FOR PLAINTIFF
CHARLENE CARTER**

35