## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER,           )
                           )
        Plaintiff,         )
                           )
VS.                        ) CIVIL ACTION
                           )
SOUTHWEST AIRLINES CO.,    ) NO.: 3:17-cv-02278-X
AND TRANSPORT WORKERS      )
UNION OF AMERICA, LOCAL    )
556,                       )
                           )
        Defendants         )

----------------------------------

VIDEOCONFERENCE ORAL AND VIDEOTAPED DEPOSITION OF
BRENDAN CONLON
JUNE 28, 2022

----------------------------------

VIDEOCONFERENCE ORAL AND VIDEOTAPED
DEPOSITION OF BRENDAN CONLON, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered
cause on June 28, 2022, from 9:04 a.m. to 10:02
a.m., via Zoom Videoconference before Melody A.
Monk, CSR in and for the State of Texas, reported

## Page 2

1   by machine shorthand, with the witness located in
2   Dallas, Texas, pursuant to the Federal Rules of
3   Civil Procedure, and the provisions stated on the
4   record or attached hereto.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1    A P P E A R A N C E S
2    (All parties appearing via Zoom Videoconference)
3
     FOR THE PLAINTIFF:
4
         MATTHEW D. HILL
5        Pryor & Bruce
         302 North San Jacinto
6        Rockwall, Texas 75087
         972.771.3933
7        Mhill@pryorandbruce.com
8        MATTHEW B. GILLIAM
         National Right to Work Legal Defense
9          Foundation, Inc.
         8001 Braddock Road, Suite 600
10       Springfield, Virginia 22160
         703.321.8510
11       Mbg@nrtw.org
12
     FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
13
         JOSEPH MAMMONE
14       Reed Smith
         2850 North Harwood Street
15       Suite 1500
         Dallas, Texas 75201
16       Jmammone@reedsmith.com
17
     FOR THE DEFENDANT TRANSPORT WORKERS UNION OF
18   AMERICA:
19       EDWARD B. CLOUTMAN, III
         Law Offices of Edward Cloutman III
20       3301 Elm Street
         Dallas, Texas 75226
21       214.232.9015
         Ecloutman@lawoffices.email
22
23
24
25

## Page 4

1        ADAM S. GREENFIELD
         Cloutman & Greenfield, PLLC
2        3301 Elm Street
         Dallas, Texas 75226
3        Agreenfield@candglegal.com
4
     ALSO PRESENT:
5        Lisa Block, Videographer
         Chris Maberry
6        Charlene Carter
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Page 5

INDEX

PAGE

Appearances....................................... 2

BRENDAN CONLON
    EXAMINATION BY MR. HILL................... 6
    EXAMINATION BY MR. GREENFIELD.............44

Witness's Signature Page...................... 48

Reporter's Certificate Page................... 51

EXHIBITS
NO.  DESCRIPTION                          PAGE
6 - Agreement between Southwest Airlines co.
And The Flight Attendants in the Service of
Southwest Airlines Co. As Represented by the
Transport Workers Union of America, AFL-CIO
Effective June 1, 2013 to October 31, 2018..... 8
22 - Posts.....................................25
21 - February 24, 2017 Email...................33
138 - Southwest Airlines Co. 2021 Annual
Report to Shareholders........................42

---

Page 6

THE VIDEOGRAPHER:  We are going on the
record June 28, 2022 for the deposition of Brendan
Conlon in a case styled Charlene Carter versus
Southwest Airlines Company and Transport Workers
Union of America, Local 556, Civil Case
3:17-cv-02278-X, in the United States District
Court for the Northern District of Texas, Dallas
Division.  The time is approximately 9:04 a.m.

        Will counsel state their appearances,
locations, and agreements or stipulations for the
record.  Following will the court reporter please
swear in the witness.

        MR. HILL:  Matt Hill and Matt Gilliam
for plaintiff, Charlene Carter.  We're -- I'm in
Rockwall, and Mr. Gilliam is in Virginia.

        MR. MAMMONE:  Joseph Mammone for
defendant Southwest Airlines Co.  I'm in Dallas,
Texas.

        MR. CLOUTMAN:  Ed Cloutman for
Transport Workers Union, Local 556.  I'm in
Dallas.

        MR. GREENFIELD:  And Adam Greenfield
for Transport Workers Union, Local 556, and I'm in
Dallas as well.

        (Discussion off the record).

---

Page 7

            BRENDAN CONLON,
having been first duly sworn, testified as
follows:
            EXAMINATION
BY MR. HILL:
    Q.  Mr. Conlon, can you introduce yourself for
the jury?
    A.  Sure.  My name is Brendan Conlon.
    Q.  And what was your position at Southwest in
2017?
    A.  In 2017, I was the senior director of crew
operations in the inflight department, and in June
of that year, I moved over into the labor
relations department as a senior director.
    Q.  And what did you do as senior director of
labor rel -- labor relations?
    A.  My primary focus was on the negotiation of
a new collective bargaining agreement for flight
attendants.
    Q.  And had you been involved in the
negotiation of collective bargaining agreements
even before that transfer to, to labor relations?
    A.  Yes.
    Q.  What had been your role previous to that
transfer and the negotiation of the collective

---

Page 8

bargaining agreement?
    A.  I'm sorry, can you restate the question?
    Q.  Before your transfer to la -- labor
relations, what was your role in the negotiation
of the collective bargaining agreement?
    A.  I was a member of the negotiating team for
the company.
    Q.  At some point did you become the chief
negotiator for that agreement?
    A.  Yes, when I transitioned to the labor
relations department.
    Q.  And so that was in June of 2 -- 2017,
right?
    A.  That's correct.
    Q.  I'm going to show you a document that's
been marked as Trial Exhibit 6.
        (Exhibit 6 marked).
    Q.  Do you recognize Trial Exhibit 6?
    A.  Yes, I see flight attendant collective
bargaining agreement.
    Q.  And were you one of the negotiators of
this agreement?
    A.  Yes.
    Q.  It was in effect from 2013 to 2018, right?
    A.  That's correct.

MELODY MONK REPORTING
888.988.5317

Brendan Conlon

## Page 9

1    Q. And, in fact, is, is this your signature
2  that appears on this agreement on page 20 -- 229
3  of the document?
4    A. Yes.
5    Q. Now --
6       MR. CLOUTMAN: Matt, this is Ed. May
7  I interrupt one second?  On the collective
8  bargaining termination date, that's the date by
9  which it -- the contract may be open for further
10  negotiations.  Under the Railway Labor Act,
11  contracts do not expire, they simply become
12  amended.
13    Q. Now, these names on this list, are these
14  all -- that are all -- that on this signature
15  page, are these all the people that were involved
16  in the negotiation of that agreement?
17    A. There, there may have been a few more
18  expert -- or subject matter experts that, that
19  partook in negotiations, but these were the
20  responsible parties to the agreement.
21    Q. These are the primary negotiators, right?
22    A. Yes.
23    Q. And so among those people that were
24  primarily involved in negotiating this agreement
25  are -- include Naomi Hudson, right?

## Page 10

1    A. That's correct.
2    Q. It included Sonya Lacore?
3    A. Well, Sonya was the vice president of
4  cabin services.  She, she wasn't a regular
5  participant in negotiations.
6    Q. Okay.  Would -- it also included Audrey
7  Stone, right?
8    A. Yes.
9    Q. And, and what was Audrey Stone's role?
10    A. She's the president and lead negotiator
11  for TWU Local 556.
12    Q. So she was your counterpart when you were
13  the lead negotiator; is that right?
14    A. Well, I wasn't the lead negotiator for
15  this agreement.
16    Q. Okay.
17    A. Naomi Hudson --
18    Q. You were involved in negotiating this
19  agreement; is that true?
20    A. I'm hart -- I'm sorry, say again?
21    Q. You were heavily involved in the
22  negotiation of this agreement, right?
23    A. Correct.
24    Q. Was Ms. Hudson the lead negotiator?
25    A. Yes.

## Page 11

1    Q. Okay.  So you -- how long does negotiation
2  of, of one of these collective bargaining
3  agreements -- or, well, let's talk specifically
4  about this one.  How long did the negotiation of
5  this collective bargaining agreement take?
6    A. If I remember correctly, it took several
7  years.
8    Q. And during that time, how often would you,
9  would you meet with the union?
10    A. We'd meet regularly, maybe once a month.
11  It just depends on agreed-upon dates.
12    Q. In addition to that, would you have
13  informal meetings with union leaders?
14    A. Yes.
15    Q. And what would you discuss in those
16  informal meetings?
17    A. It, it depends on what the meeting was
18  about.
19    Q. Among the things that you would discuss
20  are the the, the relationship between Southwest and
21  the union, right?
22    A. I don't remember a conversation about the
23  relationship between the two parties, no.
24    Q. You, you did try to maintain a good
25  relationship with the union, right?

## Page 12

1    A. Yeah, we always try and maintain a good
2  working relationship with the union, yes.
3    Q. Why is that important?
4    A. Well, for several reasons.  I mean, it's
5  always good to have a, a good working
6  relationship.  You can get more done by having a
7  good working relationship.
8    Q. And what would you do to cultivate that
9  good working relationship?
10    A. I mean, you would meet, you'd talk, you'd
11  collaborate, you would just try and work through
12  issues.
13    Q. Where there were things that you could do
14  that would, that would advance Southwest and the
15  union's joint goals, you would try and do those
16  things, right?
17    A. I think that depends on what that is.
18  I -- I'd need more context.
19    Q. So part of what you -- what, what you
20  needed to do was develop a good relationship
21  between the negotiators on Southwest's side and
22  the negotiators on the union's side, right?
23    A. Yeah, that's always good to have a, a good
24  relationship.
25    Q. Did you ever have informal dinners or, or

3 (Pages 9 to 12)

Brendan Conlon

## Page 13

1    outside-of-work meetings with, with union leaders?
2        A.   Yeah, we would have dinners with the union
3    leaders.
4        Q.   And Southwest would sponsor those dinners,
5    right?
6        A.   Actually, if I remember correctly, we
7    would split the costs.
8        Q.   Okay.   You consider Southwest -- are you a
9    union-friendly company?
10       A.   I do.
11       Q.   Specifically was the relationship with
12   Audrey Stone an important, an important thing to
13   have for the -- for Southwest?
14       A.   Yes, as, as lead negotiator and president
15   of Local 556, that, that would be important.
16       Q.   Because she would be the, the, the tip of
17   the spear, let's say, in, in trying to find
18   solutions that Southwest and the union could come
19   to in, in negotiating their collective bargaining
20   agreement, right?
21       A.   I don't know that I would frame it that
22   way because she had a team that she worked with.
23       Q.   Okay.   What's your opinion of Audrey
24   Stone?
25       A.   I don't know that my -- I have an opinion.

## Page 14

1    I haven't thought about it.
2        Q.   Do you think she was good at her job as
3    president?
4        A.   Again, that's hard to know because I'm not
5    a union leader and, I mean, from, from my
6    perspective, we worked well together.
7        Q.   Did you personally get along with her
8    well?
9        A.   I have a good working relationship with
10   her.
11       Q.   You, you like her as a person?
12       A.   I don't know that I agree or disagree with
13   that.
14       Q.   Did -- okay.   So who, who do you report --
15   who did you report to once you be -- took over as
16   the labor relations manager -- I'm sorry, labor
17   relations senior director?
18       A.   I reported to the president -- or vice --
19   I'm sorry, vice president of labor relations,
20   Russell McCrady.
21       Q.   And who reported to you?
22       A.   I didn't have anybody that reported to me
23   in that position.
24       Q.   Was Naomi Hudson a peer of yours in that
25   position?

## Page 15

1        A.   Actually, yes, she was a peer.   And there
2    was a period of time that I forgot about right
3    before Naomi retired that she did report to me.
4        Q.   Okay.   La -- the pur -- the primary
5    purpose of labor relations is negotiating with the
6    union, right?
7        A.   That's the primary purpose, yes.
8        Q.   Is there anything -- other function that
9    labor relations has?
10       A.   Yes.   Sometimes -- it wasn't me --
11   sometimes trying to find resolutions to
12   grievances.
13       Q.   Anything else?
14       A.   In my role, and based on my prior
15   experience, I would engage in conversations with
16   the union about the operation.
17       Q.   And engage in conversation about the
18   operation, what does that mean?
19       A.   Just how the operation is running and what
20   impact, if any, it may have on flight attendants.
21       Q.   Okay.   You wouldn't get involved in
22   individual employee complaints; is that right?
23       A.   No, not me.
24       Q.   And labor relations generally wouldn't,
25   wouldn't, wouldn't get involved in employ -- in,

## Page 16

1    in, in investigating employee complaints, right?
2        A.   That's correct.
3        Q.   And that would include labor relations
4    wouldn't get involved in anything involving the
5    enforcement of the social media policy?
6        A.   Yeah, I, I was -- I wasn't involved in
7    anything in that regard.
8        Q.   And labor -- not just you, but labor
9    relations generally?
10            MR. MAMMONE:   Objection, calls for a
11   hypothetical.
12       A.   I'm not aware of any involvement from a
13   labor relations employee in that.
14       Q.   My question is a little bit different.
15   I'm asking about what the role of labor relations
16   should have been, what -- as what the correct
17   function of labor relations at Southwest Airlines
18   was.   If labor relations is doing what it's
19   supposed to be doing, it's not investigating the
20   social media policy, is it?
21       A.   Yeah, I don't know.   I don't know the
22   answer to that.
23       Q.   And labor relations is also not, not, not
24   investigat -- not, not involved in enforcing the
25   bullying policy, right?

4 (Pages 13 to 16)

Brendan Conlon

---

Page 17

1     A. That would be the same answer. I, I, I
2  don't know.
3     Q. You don't know?
4     A. No.
5     Q. You don't know if that's, if that's
6  employee relations or labor relations that's
7  supposed to do those things?
8     A. No, I don't know.
9     Q. But you certainly know you had no role in
10 them?
11    A. That's correct.
12    Q. Should you have been doing something?
13          MR. MAMMONE:  Objection, calls for a
14 hypothetical.
15    A. Yeah, I don't know.  I'd need more
16 context.
17    Q. No, no, the que -- you don't need context
18 at all on this.  I'm, I'm simply asking:  Is there
19 something you should have been doing trying to
20 figure out if anybody was violating the social
21 media policy at Southwest?
22          MR. MAMMONE:  Same objection.
23    A. Yeah, as I said, I, I would need more
24 context on a situation.
25    Q. So you don't know what your job was, you

---

Page 18

1  don't know whether that -- whether it involved
2  that or not?
3          MR. MAMMONE:  Objection,
4  argumentative.
5          You can answer.
6     A. Yeah, I stated what my primary
7  responsibilities were.
8     Q. Okay.  Let's take a quick look at that, at
9  that collective bargaining agreement again.  It's
10 Exhibit 6.
11         I've highlighted the nondiscrimination
12 policy in that collective bargaining agreement.
13 It says, All employees shall be free to engage in
14 lawful union activities or to refrain from such
15 activities.
16         Do you recognize that?
17    A. Yes.
18    Q. That was part of the collective bargaining
19 agreement that, that you were one of the
20 signatories that agreed to on behalf of Southwest,
21 right?
22    A. That's correct.
23    Q. And anytime that, that an employee was
24 involved in union activities, they were free to do
25 that as long as it was lawful, right?

---

Page 19

1          MR. MAMMONE:  Objection, calls for a
2  hypothetical.
3     A. Well, the language reads that they shall
4  be free to engage in lawful union activities.
5     Q. Or refrain from such activities, right?
6     A. That's what the language says, yes.
7     Q. And so as long as what they're doing is
8  lawful, they're free to engage in those acti --
9  those union activities, right?
10         MR. MAMMONE:  Objection, calls for
11 speculation.
12    A. And the language reads that they're -- all
13 employees shall be free to engage in lawful union
14 activities or to refrain from such activities.
15    Q. Okay.  Let's take a look at the scope.  It
16 says -- I might have to move -- it says, Employees
17 covered by this agreement shall being governed by
18 all company rules, regulations, and orders
19 previously or hereinafter issued by proper
20 authorities of the company which are not in
21 conflict with the terms and conditions of this
22 agreement and have been made available to
23 the affected employees and the union prior to
24 becoming effective.
25         Do you see that?

---

Page 20

1     A. Yes, I see it.
2     Q. And do you understand that, that when it
3  talks about employees covered, covered by this
4  agreement, that it includes both union members and
5  objectors?
6     A. It covers all flight attendants.
7     Q. It covers all flight attendants,
8  regardless of whether they object to, to the union
9  or not, right?
10    A. That's correct.  I apologize for the
11 phone.
12    Q. And one thing that it says here is that
13 they're, they're all to be governed by company
14 rules that are not in conflict with the terms and
15 conditions of the agreement, of this agreement,
16 right?
17    A. That's correct.
18    Q. And so they're, they're not to be governed
19 by company rules that do conflict with this
20 agreement; this agreement trumps, right?
21          MR. MAMMONE:  Objection, calls for a
22 legal conclusion.
23    A. The language just says, which are not in
24 conflict with the terms and conditions of this
25 agreement.

---

MELODY MONK REPORTING
888.988.5317

Page 21

1      Q.  You're, you're one of the signatories of
2  this agreement, right?
3      A.  Yes.
4      Q.  And, and you knew what you were agreeing
5  to when you signed it, right?
6      A.  Yes.  This language --
7      Q.  And --
8      A.  -- right here is part of it, yep.
9      Q.  Yeah.  And when you agreed to it, what you
10  understood is that this collective bargaining
11  agreement is -- controls over other policies of
12  Southwest, right?
13      A.  Controls over terms and conditions that
14  may be in conflict with it.
15      Q.  Okay.  Good.
16          When did you first become aware of the
17  effort to recall Audrey Stone and her team?
18      A.  I, I don't remember.
19      Q.  You recall that at some point you became
20  aware of that, right?
21      A.  Yes, I vaguely remember it.
22      Q.  What was your reaction when you became
23  aware of the recall effort?
24      A.  I don't think I had a reaction.
25      Q.  You had been negotiating with this woman,

Page 22

1  right?
2      A.  I'd been negotiating with the TWU
3  Local 556 negotiating team.
4      Q.  And, and she had been their lead
5  negotiator, right?
6      A.  Yes, she was the lead negotiator.
7      Q.  And you've told me you had a good working
8  relationship with her, right?
9      A.  That's correct.
10      Q.  And yet you had no opinion at all about
11  the fact that the, the union was trying to recall
12  her?
13      A.  No, not that I remember.
14      Q.  Did you view that as a good thing?
15      A.  I don't have an opinion on it.
16      Q.  You didn't want her recalled, did you,
17  this person that you had a good relationship with,
18  right?
19      A.  Again, I didn't have an opinion on it.
20      Q.  So you didn't care one way or another the
21  -- whether this person you had a good relationship
22  with, that you had been negotiating with for a
23  couple of years, continued to -- continued in that
24  role?
25      A.  Not that I remember.

Page 23

1      Q.  Did you have any opinion of the recall
2  leaders?
3      A.  Don't even know who they, who they are.
4      Q.  Do you have any concerns about what would
5  happen if Ms. Stone was replaced by someone else
6  as, at -- as the head nego -- head negotiator for
7  the union?
8      A.  No, I would work with whoever is in the
9  lead position for the -- and the team for the
10  union.
11      Q.  Well, all things equal, you'd rather work
12  with somebody you've been working with before,
13  right?
14          MR. MAMMONE:  Objection, misstates the
15  testimony.
16          You can answer.
17      A.  Not necessarily.  I don't, don't have an
18  opinion on that.
19      Q.  So you, you would be just fine if, if
20  every few months we replaced the lead negotiator
21  and you had to start from scratch with that
22  person; is that your position?
23      A.  I would work with whoever is on their
24  negotiating team.
25      Q.  Of course you'd work with whoever was

Page 24

1  there, but your preference is to work with the
2  person you have a relationship with, right?
3      A.  No, as I stated, I don't, don't have a
4  preference on that.
5      Q.  You've already told me that you -- that
6  you've made efforts to try and build that
7  relationship, including going to dinners with the
8  union, right?
9      A.  Yeah, I worked on, on having a
10  relationship with, with the entire negotiating
11  team.
12      Q.  And that relationship was important?
13      A.  Yes, it was important.
14      Q.  And yet your testimony, I, I just want to
15  make sure I understand it correctly, is despite
16  that relationship being important, it did not
17  matter to you whether those people you had a
18  relationship were recalled and you had to start
19  entirely new relationships with new people?
20          MR. MAMMONE:  Objection, asked and
21  answered.
22          You can answer.
23      A.  I believe what I said is I would work with
24  whoever was in that position for the union.
25      Q.  You're not answering the question.  The

MELODY MONK REPORTING
888.988.5317

Page 25

1    question is:  What -- whether you had a
2    preference.
3              MR. MAMMONE:  Same objection.
4         A.  I believe I stated I didn't have an
5    opinion on that.
6         Q.  Okay.  I direct your attention to
7    Southwest Exhibit 22 -- I'm sorry, Trial
8    Exhibit 22.
9              (Exhibit 22 marked).
10        Q.  And the page I'm gonna show you is
11   Page SWA 7464.
12             Do you recognize this e-mail?
13        A.  No, not yet.
14        Q.  I can scroll down.
15        A.  Hang on one second.
16        Q.  Okay.
17        A.  Okay.  I don't, I don't remember it.
18        Q.  Who is, is -- do you know who Kevin Allen
19   is?
20        A.  Yes.
21        Q.  Who is Kevin Allen?
22        A.  He is a member of the labor administration
23   team.  He's on the -- or was on the company
24   negotiating team.
25        Q.  Okay.  Is Juan Suarez also on the company

Page 26

1    negotiating team?
2         A.  He was back then.
3         Q.  Okay.  Was Naomi Hudson also on the
4    negotiating team?
5         A.  Yes.
6         Q.  Was Joe Harris on the negotiating team?
7         A.  Yes.
8         Q.  Was Patrick Scheirer on the negotiating
9    team?
10        A.  Yes.
11        Q.  Adam Carlisle?
12        A.  Yeah, Adam was.
13        Q.  And Jim Jordan, was he also on the
14   negotiating team?
15        A.  If I remember correctly, Jim was, yep.
16        Q.  Okay.  So, so if I understand correctly,
17   the people that, that Kevin Allen, one of the
18   negotiating team members, decided to send this
19   e-mail to were Naomi Hudson, Brendan Conlon, Juan
20   Suarez, Joe Harris, Patrick Scheirer, Adam
21   Carlisle, and Jim Jordan, all of whom were on the
22   negotiating team, right?
23        A.  That's correct.
24        Q.  Would this e-mail have been of any
25   importance to you at the time you received it in

Page 27

1    2015?
2         A.  Yeah, it would be important to understand
3    what's happening with the union negotiating team.
4         Q.  And why is that important?
5         A.  To understand who we may be negotiating
6    with.
7         Q.  And that's important because you need to
8    have a relationship with those people, right?
9         A.  I believe I, said it was important to
10   have a working relationship, yes.
11        Q.  And, in fact, around this time Southwest
12   had negotiated a collective bargaining agreement
13   that was rejected by the flight attendants; is
14   that right?
15        A.  Yeah, we had negotiated a tentative
16   agreement.
17        Q.  A tentative agreement that was subject to
18   approval by the, the union membership, right, or
19   by the employees that were -- the governing
20   employees?
21        A.  That's correct.
22        Q.  And, and the employees had, in fact -- oh,
23   and let me make -- let me clear up this point.
24   The, the person, the lead negotiator with whom you
25   had negotiated that tentative agreement for the

Page 28

1    union was Audrey Stone, right?
2         A.  That's correct.
3         Q.  And had you been satisfied with that, had
4    -- was Southwest satisfied with that agreement,
5    that, that tentative agreement?
6         A.  Yes.
7         Q.  Southwest was ready to enter into that
8    tentative agreement, right, if the, if the -- if
9    it was approved?
10        A.  Well, we did enter into the tentative
11   agreement.
12        Q.  That's right.
13             And you were prepared to be bound by
14   it if it was approved, right?
15        A.  Yes, if it was ratified, yes.
16        Q.  Yes.
17             And, in fact, it wasn't ratified,
18   right?
19        A.  That's correct.
20        Q.  In fact, it was rejected by 87 percent of
21   the flight attendants; is that right?
22        A.  I don't remember the percentage.
23        Q.  So the negotiation, the negotiation team
24   that had negotiated this agr -- this tentative
25   agreement with you that was rejected by the flight

MELODY MONK REPORTING
888.988.5317

Brendan Conlon

| Page 29 |
| --- |

1  attendants was now in danger of recall; is that
2  right?
3        A. I believe so.
4        Q. And when the flight attendants rejected
5  that tentative agreement, did you expect that the
6  eventual agreement that, that that flight
7  attendants might ratify would not be as favorable
8  as the one you previously reached?
9        A. Well, we would have -- we needed to go
10 back to the negotiating table to figure that out.
11       Q. Right. So you, you had to go back to the
12 negotiating table, and the union would be asking
13 for at least different things than it asked for
14 before; is that right?
15       A. Possibly.
16       Q. And, and now you're looking at a change in
17 the -- at a possible change in the leadership at
18 of the union; is that what you understood from
19 this e-mail?
20       A. If there was a recall, that could happen.
21       Q. And would you view that as a good thing or
22 a bad thing?
23       A. Something we would have to work through.
24       Q. It was gonna require more work if, if
25 there was a recall; is that right?

| Page 30 |
| --- |

1        MR. MAMMONE: Objection, it calls --
2  hypothetical.
3        Q. You can answer.
4        A. It, it would require forming relationships
5  again and then working with whoever was in that
6  position.
7        Q. Starting from scratch, right?
8        MR. MAMMONE: Same objection.
9        You can answer.
10       A. I think some of that depends on would
11 there be any members left or -- it, it just really
12 depends.
13       Q. Did you ever have any discussions about
14 the social media policy with the union?
15       A. Not that I remember.
16       Q. Did you ever have any discussions about
17 the bullying policy with the union?
18       A. Not that I remember.
19       Q. Did -- do you recall any discussions of
20 individual violations of either of those policies
21 with the union?
22       A. No.
23       Q. Let's see. Did you ever learn about a
24 complaint that was made by Audrey Stone about
25 Charlene Carter?

| Page 31 |
| --- |

1        A. I'm sorry, can you restate the question,
2  do I remember?
3        Q. Did you ever learn.
4        MR. MAMMONE: Objection, vague as to
5  time.
6        You can answer.
7        A. Yeah, I, I don't remember.
8        Q. Well, you've certainly learned about it as
9  of today, right?
10       A. Learned of what? A --
11       Q. A complaint made by Audrey Stone about
12 Charlene Carter.
13       A. What I do know is what you're telling me.
14 That's all I know.
15       Q. You -- you've never, before this
16 conversation that we're having right now during
17 this deposition, heard that there was a complaint
18 made by Audrey Stone about Charlene Carter?
19       A. Not that I remember.
20       Q. Do you know who Charlene Carter is?
21       A. I know the name. That's it. I've never
22 met Charlene.
23       Q. Do you know that she's a former Southwest
24 Airlines employee?
25       A. I do know that.

| Page 32 |
| --- |

1        Q. Do you know that she was terminated?
2        A. Yes, I do know that.
3        Q. Do you know that she filed a lawsuit
4  against Southwest Airlines and Local 556?
5        A. I didn't know about Local 556, but I know
6  about the one against the company.
7        Q. You're aware that you're testifying in
8  that lawsuit, and that's why we're on this Zoom
9  call right now, right?
10       A. Yes.
11       Q. So have you ever learned why she was
12 terminated?
13       A. No, I can't say that I have.
14       Q. Okay. Let me show you a document. Well,
15 first of all, before I show you the document, let
16 me ask you this. There are certain e-mail
17 addresses at Southwest Airlines that go to
18 multiple employees; is that right?
19       A. There are distribution groups.
20       Q. Right.
21       Is one of those distribution groups
22 the inflight labor relations mailbox?
23       A. I don't know.
24       Q. Do you know if you are included in the
25 inflight labor relations mailbox?

8 (Pages 29 to 32)

Page 33

1    A. I don't know.
2    Q. I am going to show you a document that has
3  been marked as Exhibit 21, hopefully.
4        (Exhibit 21 marked).
5    Q. Who is Maureen Emlet?
6    A. Maureen Emlet is a retired Southwest
7  Airlines employee.
8    Q. Okay. So I'm showing you a document
9  that's been marked as, as Trial Exhibit 21. And
10 this is Page SWA006351. Do you recognize this
11 e-mail?
12   A. No.
13   Q. Do you believe you ever received this
14 e-mail?
15   A. No.
16   Q. Have you ever received e-mails such as
17 this about individual flight attendant comments
18 made on social media?
19   A. Not that I remember.
20   Q. If someone said, said that you'd
21 discrim -- that, that, that they'd been
22 discriminated against because of their religion,
23 what would you tell them to do?
24        MR. MAMMONE: Objection, calls for a
25 hypothetical.

Page 34

1        You can answer.
2    A. I would refer them to employee relations.
3    Q. Employee relations is who you would, you
4  would refer them to, right? Not, not, not anyone
5  else?
6        MR. MAMMONE: Same objection.
7    A. Yeah, I would refer them to employee
8  relations.
9    Q. Do you know what the accommodations in
10 career transition team is?
11   A. I've heard of it, but I don't know exactly
12 what they do.
13   Q. And so if someone complained to you that
14 they've discriminated against because of their
15 religion, you would not send them to that team; is
16 that right?
17        MR. MAMMONE: Objection, calls for a
18 hypothetical.
19   A. Yeah, I would send them to employee
20 relations.
21   Q. And you certainly wouldn't send them to
22 labor relations, right?
23        MR. MAMMONE: Objection, calls for a
24 hypothetical.
25   A. I would refer them to employee relations.

Page 35

1    Q. And -- but la -- and, and, and labor
2  relations shouldn't have any role in that, right?
3        MR. MAMMONE: Same objection.
4    A. Yeah, I don't know. I, I think it
5  depends.
6    Q. What did you do to prepare for this
7  deposition?
8    A. I didn't do anything.
9    Q. Did you meet with anyone?
10   A. I met with Joey and Chris.
11   Q. Joey is Mr. Ma -- Mammone?
12   A. That's correct.
13   Q. And who is Chris, Maberry?
14   A. Chris Maberry.
15   Q. Okay. And he's Southwest's in-house
16 counsel?
17   A. That's correct.
18   Q. Is that right?
19        MR. MAMMONE: Object to form.
20   Q. What -- did you review any documents?
21   A. No.
22   Q. Okay. What's your home address?
23   A. 720 Moss Glen Drive, Prosper, Texas 75078.
24   Q. We're going to trial in this case next
25 week. Are you going to be in town for trial?

Page 36

1    A. No, I'm not.
2    Q. Where are you gonna be?
3    A. I'm gonna be in Jamaica.
4    Q. And when do you leave for Jamaica?
5    A. I leave on Friday.
6    Q. And when do you return?
7    A. On the 8th of July.
8    Q. Would you be available to testify after
9  the 8th of July?
10   A. Possibly.
11   Q. There -- there's no conflict that you're
12 aware of after that time?
13   A. No personal conflict of -- I may have work
14 conflicts.
15   Q. But you're not aware of any, sitting here
16 right now?
17   A. I mean, my calendar is full for that
18 following week beginning the 11th of July.
19   Q. With your normal meetings, right?
20   A. Yes, with work meetings.
21        MR. HILL: Let's take a short break,
22 and then I'm gonna come back and hope to wrap this
23 up quick.
24        THE VIDEOGRAPHER: Going off the
25 record at 9:43.

9 (Pages 33 to 36)

Page 37

1      (Recess).
2          THE VIDEOGRAPHER:  We are back on the
3  record with Clip 2 at 9:51.
4          MR. HILL:  Is Lisa back?
5          THE VIDEOGRAPHER:  Oh, did you not
6  hear me go back on the record?
7          THE REPORTER:  I did, Lisa.
8          THE VIDEOGRAPHER:  Oh, okay.  I have
9  us back on the record with Clip 2 at 9:51.
10     Q.  I'm gonna share another document with you.
11  This is also a part of Exhibit 21 that we looked
12  at earlier.  But it's a different e-mail.
13         Do you recognize -- so this is
14  Exhibit 21, Page 6551.  Do you recognize this
15  e-mail, Mr. Conlon?
16     A.  No, I don't remember it.
17     Q.  Is that your e-mail -- I'm sorry, is that
18  your name in the cc?
19     A.  Yes.
20     Q.  And a number of these names that are in
21  the To are a part of that negotiating team that
22  we, that we identified before, aren't they?
23     A.  I'm sorry, could you say again?  In the To
24  field?
25     Q.  A num -- yeah, a number of the names that

Page 38

1  are in the To are a part of that negotiating team;
2  is that right?
3     A.  That's correct.
4     Q.  Now, this e-mail says that -- informs you
5  that there are pickets that are going on at the
6  union office the following day having posters that
7  say Audrey Must Go and Missing.
8         Did this e-mail have any significance
9  to you?
10    A.  Not that I remember.
11    Q.  The fact that there were people picketing
12  the union leader, the union president, did that
13  affect your job at -- in labor relations?
14        MR. MAMMONE:  Objection, calls for a
15  hypothetical.
16        You can answer.
17    A.  Picketing, I mean, picketing didn't affect
18  my job.
19    Q.  Discord between the union leadership and
20  the membership didn't affect your job?
21        MR. MAMMONE:  Objection, calls for a
22  hypothetical.
23        You can answer.
24    A.  No, I don't think so.
25    Q.  The -- was discord between the union

Page 39

1  leadership and, and its membership one of the
2  reasons that the, that the collective -- that the
3  tentative collective bargaining agreement wasn't
4  approved?
5          MR. MAMMONE:  Objection, calls for
6  speculation.
7     A.  Yeah, I don't know.
8     Q.  Did you feel like that after it wasn't
9  approved that there was more discord between the,
10  the membership and the, and the union leadership?
11    A.  No, I don't know.
12    Q.  Okay.  So when -- well, let me ask you
13  this, first of all.  We took a break a minute ago.
14  Did you talk to anyone during the break?
15    A.  I talked to Joey Mammone.
16    Q.  You talked to Sou -- Southwest's lawyer.
17  And what did you say to Mr. Mammone?
18        MR. MAMMONE:  Objection, pri -- calls
19  for pri -- privileged communications.
20        Do not answer.
21        MR. HILL:  That's not privileged under
22  Hall during a deposition.
23    Q.  And did he say anything to you?
24        MR. MAMMONE:  Objection, calls for
25  privileged communications.

Page 40

1          Do not answer.
2     Q.  When there's a recall -- I'm sorry, when
3  there was a recall, did that affect Southwest
4  financially at all?
5          MR. MAMMONE:  Objection, calls for
6  speculation.  Incomplete hypothetical.
7          You may answer.
8     A.  I don't know.
9     Q.  When the contract was rejected, did --
10  and, and you had to go back and renegotiate the
11  collective bargaining agreement, did that affect
12  Southwest financially at all?
13        MR. MAMMONE:  Same objection.
14    A.  I don't know.
15    Q.  Did Southwest end up giving a more
16  favorable collective bargaining agreement to the
17  union after the tentative one was rejected?
18        MR. MAMMONE:  Objection, vague.
19    A.  I don't think so.
20    Q.  Was it eventually approved?
21    A.  A second TA was approved.
22    Q.  A second TA, tentative agreement, is that
23  what we're -- is that what TA means?
24    A.  That's correct.
25    Q.  Okay.  So you -- so after the first

10 (Pages 37 to 40)

Page 41

1  tentative agreement was rejected, you went back
2  and you renegotiated and you put different terms
3  into a new tentative agreement; is that right?
4      A. That's correct.
5      Q. And a -- and after the 87/13 rejection of
6  the first one, what happened with the second one?
7      A. It was ratified.
8      Q. Do you recall what the vote was?
9      A. No.
10     Q. And, and, and is your contention there was
11 nothing more favorable about that second tentative
12 agreement for the flight attendants than what was
13 in the first one that they rejected?
14         MR. MAMMONE: Objection, vague.
15     A. Yeah, I don't remember all the specific
16 terms.
17     Q. Do you remember it -- whether there were
18 any specific terms that were more favorable for
19 the flight attendants?
20         MR. MAMMONE: Same objection.
21     A. Off the top of my head, I, I don't.
22     Q. So is it your contention that the flight
23 attendants rejected the first one and then
24 approved the second one, and, and you don't have
25 any good reason to figure out why there might have

Page 42

1  been a difference in their, in their views on
2  those things?
3      A. Well, they preferred the second one
4  because they ratified it.
5      Q. The, the -- oh, they -- I'm sorry, I, I
6  missed your answer there. They preferred the
7  second one because they ratified it, right, is
8  what -- is that -- did I understand you to say
9  that correctly?
10     A. Correct. That's what I said.
11     Q. Okay. And so what you're telling me is
12 that, at least in their view, there were some
13 terms that were more favorable to them than the
14 previous agreement?
15         MR. MAMMONE: Objection, asked and
16 answered.
17     A. Not necessarily.
18     Q. I'm gonna show you a document that's been
19 labeled as Trial Exhibit 138.
20         (Exhibit 138 marked).
21     Q. Do you ever look at Southwest's securities
22 filings?
23     A. Not regularly.
24     Q. But you're, you're aware of Southwest's
25 general performance in terms of its operating --

Page 43

1  operations, right?
2      A. That's correct.
3         MR. MAMMONE: Objection, vague.
4      Q. Now, this --
5         THE REPORTER: I'm sorry, what was
6  that?
7      Q. This is Trial Exhibit 139.
8         THE REPORTER: I'm sorry, no.
9         Mr. Mammone, what did you say?
10        MR. MAMMONE: Objection, vague.
11        THE REPORTER: Thank you.
12     Q. Yeah, the -- this, this, this is the
13 annual report for 2021 for Southwest. And it says
14 that they had a net profit of 977 million. Is
15 that consistent with your understanding of how
16 much net profit Southwest made in, in 2021, in, in
17 the year 2021?
18     A. I have no idea.
19     Q. Okay.
20        MR. HILL: Okay. I don't have
21 anything further.
22        MR. MAMMONE: We have no questions for
23 the witness. Southwest has no questions for the
24 witness.
25        MR. GREENFIELD: The union has a few

Page 44

1  brief questions.
2         EXAMINATION
3  BY MR. GREENFIELD:
4      Q. Are you ready to proceed?
5         MR. HILL: I am.
6      Q. Okay. Mr. Conlon, can you hear me?
7      A. Yeah, I've got you, Adam.
8      Q. Oh, okay. My name is Adam Greenfield, and
9  I'm one of the attorneys here on behalf of the
10 union.
11        Do you understand who I am and whom I
12 represent?
13     A. Yes, I do.
14     Q. Okay. To give you a little bit of
15 background on this case, Charlene Carter is
16 alleging that in this lawsuit that the company and
17 the union worked together to get her fired. Do
18 you understand that?
19     A. I understand what you just told me.
20     Q. Okay. Very good.
21        Did you personally ever work with
22 anyone at the union to get Ms. Carter fired?
23     A. No.
24     Q. Are you aware of anyone at Southwest
25 Airlines that worked with the union to get

Brendan Conlon

---

Page 45

1    Ms. Carter fired?
2        A. No.
3        Q. Okay. I'd like to briefly discuss the
4    collective bargaining negotiations that were
5    mentioned earlier. Is that all right?
6        A. Sure.
7        Q. Okay. During negotiations is it fair to
8    say that Southwest Airlines was trying to get the
9    best deal it could for the company; is that
10   correct?
11       A. That's correct.
12       Q. And fair to say that the union was trying
13   to negotiate the best deal they could do for their
14   constituents; is that correct?
15       A. Yes.
16       Q. And were those negotiations ever
17   contentious?
18       A. There were moments.
19       Q. Moments of conflict?
20       A. Disagreement.
21       Q. Disagreement?
22          Do you ever remember anyone raising
23   their voices or yelling during those negotiations?
24       A. Not specifically.
25       Q. Okay. And if I remember correctly, you

---

Page 46

1    stated you didn't have an opinion on who was the
2    union's negotiating team, correct, or who was on
3    the team?
4        MR. HILL: Objection, form.
5        A. That's correct. I would work with whoever
6    represented the union.
7        Q. Basically you needed to just play within
8    the rules of the game; whoever was over there, you
9    were going to negotiate the best deal you could
10   for the company, correct?
11       A. That's correct.
12       MR. HILL: Objection, leading.
13       MR. GREENFIELD: All right. That's
14   it. I have no more questions. And I'll, and I'll
15   reserve --
16       MR. HILL: I don't have anything
17   further.
18       MR. GREENFIELD: -- the rest for
19   trial.
20       THE VIDEOGRAPHER: We're going off the
21   record at 10:02.
22       THE REPORTER: Okay. Signature?
23   Mr. Mammone?
24       MR. MAMMONE: We'll reserve the right
25   for Mr. Conlon to review and sign.

---

Page 47

1        THE REPORTER: And does anyone want to
2    purchase a copy?
3        MR. GREENFIELD: Yes, please.
4        MR. CLOUTMAN: The union does. One
5    condensed copy.
6        MR. MAMMONE: Southwest will take a
7    copy as well.
8        THE REPORTER: All right. Thanks,
9    everyone.
10       (Deposition concluded at 10:02 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 48

1        CHANGES AND SIGNATURE
2    WITNESS NAME: BRENDAN CONLON DATE: JUNE 28, 2022
3    PAGELINE    CHANGE        REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

---

MELODY MONK REPORTING
888.988.5317

Page 49

```
 1  _____
 2  _____
 3       I, BRENDAN CONLON, have read the foregoing
 4  deposition and hereby affix my signature that same
 5  is true and correct, except as noted above.
 6
 7
 8
 9
          _____
10            BRENDAN CONLON
11
12
13
14  THE STATE OF _____)
15  COUNTY OF _____)
16
17       Before me, _____, on
18  this day personally appeared BRENDAN CONLON, known
19  to me (or proved to me under oath or through
20  _____) (description of
21  identity card or other document)) to be the person
22  whose name is subscribed to the foregoing
23  instrument and acknowledged to me that they
24  executed the same for the purposes and
25  consideration therein expressed.
```

Page 50

```
 1       Given under my hand and seal of office
 2  this _____ day of _____,
 3  _____.
 4
 5
 6
          _____
            NOTARY PUBLIC IN AND FOR
 7          THE STATE OF _____
            COMMISSION EXPIRES: _____
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 51

```
 1       IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
 2              DALLAS DIVISION
 3  CHARLENE CARTER,      )
                          )
 4       Plaintiff,       )
                          )
 5  VS.                   ) CIVIL ACTION
                          )
 6                        ) NO.: 3:17-cv-02278-X
    SOUTHWEST AIRLINES CO.,  )
 7  TRANSPORT WORKERS UNION  )
    OF AMERICA, LOCAL 556,   )
 8                        )
         Defendants.        )
 9
10       REPORTER'S CERTIFICATION
11     DEPOSITION OF BRENDAN CONLON
12            JUNE 28, 2022
13
14       I, Melody A. Monk, Certified Shorthand
15  Reporter in and for the State of Texas, hereby
16  certify to the following:
17       That the witness, BRENDAN CONLON, was duly
18  sworn by the officer and that the transcript of
19  the oral deposition is a true record of the
20  testimony given by the witness;
21       That the deposition transcript was submitted
22  on July 1, 2022 to the witness or to the attorney
23  for the witness for examination, signature and
24  return to me by August 1, 2022;
25       That the amount of time used by each party at
```

Page 52

```
 1  the deposition is as follows:
 2  MATTHEW D. HILL.....00 HOUR(S):54 MINUTE(S)
    ADAM S. GREENFIELD.....00 HOUR(S):03 MINUTE(S)
 3
 4       That pursuant to information given to the
 5  deposition officer at the time said testimony was
 6  taken, the following includes counsel for all
 7  parties of record:
 8  FOR THE PLAINTIFF:
 9       MATTHEW D. HILL
         Pryor & Bruce
10       302 North San Jacinto
         Rockwall, Texas 75087
11       972.771.3933
         Mhill@pryorandbruce.com
12
         MATTHEW B. GILLIAM
13       National Right to Work Legal Defense
             Foundation, Inc.
14       8001 Braddock Road, Suite 600
         Springfield, Virginia 22160
15       703.321.8510
         Mbg@nrtw.org
16
17  FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
18       JOSEPH MAMMONE
         Reed Smith
19       2850 North Harwood Street
         Suite 1500
20       Dallas, Texas 75201
         Jmammone@reedsmith.com
21
22
23
24
25
```

MELODY MONK REPORTING
888.988.5317

Brendan Conlon

Page 53

1   FOR THE DEFENDANT TRANSPORT WORKERS UNION OF
    AMERICA:
2
    EDWARD B. CLOUTMAN, III
3   Law Offices of Edward Cloutman III
    3301 Elm Street
4   Dallas, Texas 75226
    214.232.9015
5   Ecloutman@lawoffices.email
6
    ADAM S. GREENFIELD
7   Cloutman & Greenfield, PLLC
    3301 Elm Street
8   Dallas, Texas 75226
    Agreenfield@candglegal.com
9
10      That $_____ is the deposition officer's
11  charges to the Plaintiff for preparing the
12  original deposition transcript and any copies of
13  exhibits;
14      I further certify that I am neither counsel
15  for, related to, nor employed by any of the
16  parties or attorneys in the action in which this
17  proceeding was taken, and further that I am not
18  financially or otherwise interested in the outcome
19  of the action.
20      Certified to me this 29th day of June,
21  2022.
22
23
24      _____
        Melody A. Monk, RPR
25      Texas CSR No. 3613

Page 54

1
    MELODY MONK REPORTING
2   Firm Registration No. 10821
    1999 McKinney Avenue, No. 1404
3   Dallas, Texas 75201
    888.988.5317 (phone and fax)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

14  (Pages 53 to 54)

Brendan Conlon

## A

**a.m** 1:23,24 6:8
47:10
**above-styled**
1:22
**accommodati...**
34:9
**acknowledged**
49:23
**Act** 9:10
**acti** 19:8
**action** 1:5 51:5
53:16,19
**activities** 18:14
18:15,24 19:4
19:5,9,14,14
**Adam** 4:1 6:22
26:11,12,20
44:7,8 52:2
53:6
**addition** 11:12
**address** 35:22
**addresses** 32:17
**administration**
25:22
**advance** 12:14
**affect** 38:13,17
38:20 40:3,11
**affix** 49:4
**AFL-CIO** 5:12
**ago** 39:13
**agr** 28:24
**agree** 14:12
**agreed** 18:20
21:9
**agreed-upon**
11:11
**agreeing** 21:4
**agreement** 5:11
7:18 8:1,5,9,20
8:22 9:2,16,20
9:24 10:15,19
10:22 11:5
13:20 18:9,12
18:19 19:17,22

20:4,15,15,20
20:20,25 21:2
21:11 27:12,16
27:17,25 28:4
28:5,8,11,25
29:5,6 39:3
40:11,16,22
41:1,3,12
42:14
**agreements** 6:10
7:21 11:3
**Agreenfield@...**
4:3 53:8
**Airlines** 1:6 3:12
5:11,12,14 6:4
6:17 16:17
31:24 32:4,17
33:7 44:25
45:8 51:6
52:17
**alleging** 44:16
**Allen** 25:18,21
26:17
**amended** 9:12
**America** 1:7
3:18 5:12 6:5
51:7 53:1
**amount** 51:25
**annual** 5:14
43:13
**answer** 16:22
17:1 18:5
23:16 24:22
30:3,9 31:6
34:1 38:16,23
39:20 40:1,7
42:6
**answered** 24:21
42:16
**answering** 24:25
**anybody** 14:22
17:20
**anytime** 18:23
**apologize** 20:10
**appearances** 5:2

6:9
**appeared** 49:18
**appearing** 3:2
**appears** 9:2
**approval** 27:18
**approved** 28:9
28:14 39:4,9
40:20,21 41:24
**approximately**
6:8
**argumentative**
18:4
**asked** 24:20
29:13 42:15
**asking** 16:15
17:18 29:12
**attached** 24:20
**attendant** 8:19
33:17
**attendants** 5:11
7:19 15:20
20:6,7 27:13
28:21 29:1,4,7
41:12,19,23
**attention** 25:6
**attorney** 51:22
**attorneys** 44:9
53:16
**Audrey** 10:6,9
13:12,23 21:17
28:1 30:24
31:11,18 38:7
**August** 51:24
**authorities**
19:20
**available** 19:22
36:8
**Avenue** 54:2
**aware** 16:12
21:16,20,23
32:7 36:12,15
42:24 44:24

## B

**B** 3:8,19 52:12

53:2
**back** 26:2 29:10
29:11 36:22
37:2,4,6,9
40:10 41:1
**background**
44:15
**bad** 29:22
**bargaining** 7:18
7:21 8:1,5,20
9:8 11:2,5
13:19 18:9,12
18:18 21:10
27:12 39:3
40:11,16 45:4
**based** 15:14
**Basically** 46:7
**becoming** 19:24
**beginning** 36:18
**behalf** 18:20
44:9
**believe** 24:23
25:4 27:9 29:3
33:13
**best** 45:9,13
46:9
**bit** 16:14 44:14
**Block** 4:5
**bound** 28:13
**Braddock** 3:9
52:14
**break** 36:21
39:13,14
**Brendan** 1:13
1:20 5:4 6:2
7:1,8 26:19
48:2 49:3,10
49:18 51:11,17
**brief** 44:1
**briefly** 45:3
**Bruce** 3:5 52:9
**build** 24:6
**bullying** 16:25
30:17

## C

**C** 3:1
**cabin** 10:4
**calendar** 36:17
**call** 32:9
**calls** 16:10 17:13
19:1,10 20:21
30:1 33:24
34:17,23 38:14
38:21 39:5,18
39:24 40:5
**card** 49:21
**care** 22:20
**career** 34:10
**Carlisle** 26:11
26:21
**Carter** 1:3 4:6
6:3,14 30:25
31:12,18,20
44:15,22 45:1
51:3
**case** 6:3,5 35:24
44:15
**cause** 1:23
**cc** 37:18
**certain** 32:16
**certainly** 17:9
31:8 34:21
**Certificate** 5:7
**CERTIFICA...**
51:10
**Certified** 51:14
53:20
**certify** 51:16
53:14
**change** 29:16,17
48:3
**CHANGES** 48:1
**charges** 53:11
**Charlene** 1:3
4:6 6:3,14
30:25 31:12,18
31:20,22 44:15
51:3
**chief** 8:8

Brendan Conlon

Page 56

**Chris** 4:5 35:10
35:13,14
**Civil** 1:5 2:3 6:5
51:5
**clear** 27:23
**Clip** 37:3,9
**Cloutman** 3:19
3:19 4:1 6:19
6:19 9:6 47:4
53:2,3,7
**collaborate**
12:11
**collective** 7:18
7:21,25 8:5,19
9:7 11:2,5
13:19 18:9,12
18:18 21:10
27:12 39:2,3
40:11,16 45:4
**come** 13:18
36:22
**comments** 33:17
**COMMISSION**
50:7
**communicatio...**
39:19,25
**company** 6:4 8:7
13:9 19:18,20
20:13,19 25:23
25:25 32:6
44:16 45:9
46:10
**complained**
34:13
**complaint** 30:24
31:11,17
**complaints**
15:22 16:1
**concerns** 23:4
**concluded** 47:10
**conclusion**
20:22
**condensed** 47:5
**conditions** 19:21
20:15,24 21:13

**conflict** 19:21
20:14,19,24
21:14 36:11,13
45:19
**conflicts** 36:14
**Conlon** 1:13,20
5:4 6:3 7:1,6,8
26:19 37:15
44:6 46:25
48:2 49:3,10
49:18 51:11,17
**consider** 13:8
**consideration**
49:25
**consistent** 43:15
**constituents**
45:14
**contention**
41:10,22
**contentious**
45:17
**context** 12:18
17:16,17,24
**continued** 22:23
22:23
**contract** 9:9
40:9
**contracts** 9:11
**controls** 21:11
21:13
**conversation**
11:22 15:17
31:16
**conversations**
15:15
**copies** 53:12
**copy** 47:2,5,7
**correct** 8:14,25
10:1,23 16:2
16:16 17:11
18:22 20:10,17
22:9 26:23
27:21 28:2,19
35:12,17 38:3
40:24 41:4

42:10 43:2
45:10,11,14
46:2,5,10,11
49:5
**correctly** 11:6
13:6 24:15
26:15,16 42:9
45:25
**costs** 13:7
**counsel** 6:9
35:16 52:6
53:14
**counterpart**
10:12
**COUNTY** 49:15
**couple** 22:23
**course** 23:25
**court** 1:1 6:7,11
51:1
**covered** 19:17
20:3,3
**covers** 20:6,7
**crew** 7:11
**CSR** 1:25 53:25
**cultivate** 12:8

**D**

**D** 3:4 52:2,9
**Dallas** 1:2 2:2
3:15,20 4:2 6:7
6:17,21,24
51:2 52:20
53:4,8 54:3
**danger** 29:1
**date** 9:8,8 48:2
**dates** 11:11
**day** 38:6 49:18
50:2 53:20
**deal** 45:9,13
46:9
**decided** 26:18
**defendant** 3:12
3:17 6:17
52:17 53:1
**Defendants** 1:8

51:8
**Defense** 3:8
52:13
**department**
7:12,14 8:11
**depends** 11:11
11:17 12:17
30:10,12 35:5
**deposition** 1:12
1:20 6:2 31:17
35:7 39:22
47:10 49:4
51:11,19,21
52:1,5 53:10
53:12
**description** 5:10
49:20
**despite** 24:15
**develop** 12:20
**difference** 42:1
**different** 16:14
29:13 37:12
41:2
**dinners** 12:25
13:2,4 24:7
**direct** 25:6
**director** 7:11,14
7:15 14:17
**disagree** 14:12
**Disagreement**
45:20,21
**discord** 38:19,25
39:9
**discrim** 33:21
**discriminated**
33:22 34:14
**discuss** 11:15,19
45:3
**Discussion** 6:25
**discussions**
30:13,16,19
**distribution**
32:19,21
**District** 1:1,1
6:6,7 51:1,1

**Division** 1:2 6:8
51:2
**document** 8:15
9:3 32:14,15
33:2,8 37:10
42:18 49:21
**documents**
35:20
**doing** 16:18,19
17:12,19 19:7
**Drive** 35:23
**duly** 1:21 7:2
51:17

**E**

**E** 3:1,1
**e-mail** 25:12
26:19,24 29:19
32:16 33:11,14
37:12,15,17
38:4,8
**e-mails** 33:16
**earlier** 37:12
45:5
**Ecloutman@l...**
3:21 53:5
**Ed** 6:19 9:6
**Edward** 3:19,19
53:2,3
**effect** 8:24
**effective** 5:13
19:24
**effort** 21:17,23
**efforts** 24:6
**either** 30:20
**Elm** 3:20 4:2
53:3,7
**Email** 5:14
**Emlet** 33:5,6
**employ** 15:25
**employed** 53:15
**employee** 15:22
16:1,13 17:6
18:23 31:24
33:7 34:2,3,7

34:19,25
**employees** 18:13
19:13,16,23
20:3 27:19,20
27:22 32:18
**enforcement**
16:5
**enforcing** 16:24
**engage** 15:15,17
18:13 19:4,8
19:13
**enter** 28:7,10
**entire** 24:10
**entirely** 24:19
**equal** 23:11
**eventual** 29:6
**eventually** 40:20
**exactly** 34:11
**examination** 5:5
5:5 7:4 44:2
51:23
**executed** 49:24
**Exhibit** 8:16,17
8:18 18:10
25:7,8,9 33:3,4
33:9 37:11,14
42:19,20 43:7
**exhibits** 5:9
53:13
**expect** 29:5
**experience**
15:15
**expert** 9:18
**experts** 9:18
**expire** 9:11
**EXPIRES** 50:7
**expressed** 49:25

**F**
**fact** 9:1 22:11
27:11,22 28:17
28:20 38:11
**fair** 45:7,12
**favorable** 29:7
40:16 41:11,18

42:13
**fax** 54:3
**February** 5:14
**Federal** 2:2
**feel** 39:8
**field** 37:24
**figure** 17:20
29:10 41:25
**filed** 32:3
**filings** 42:22
**financially** 40:4
40:12 53:18
**find** 13:17 15:11
**fine** 23:19
**fired** 44:17,22
45:1
**Firm** 54:2
**first** 7:2 21:16
32:15 39:13
40:25 41:6,13
41:23
**flight** 5:11 7:18
8:19 15:20
20:6,7 27:13
28:21,25 29:4
29:6 33:17
41:12,19,22
**focus** 7:17
**following** 6:11
36:18 38:6
51:16 52:6
**follows** 7:3 52:1
**foregoing** 49:3
49:22
**forgot** 15:2
**form** 35:19 46:4
**former** 31:23
**forming** 30:4
**Foundation** 3:9
52:13
**frame** 13:21
**free** 18:13,24
19:4,8,13
**Friday** 36:5
**full** 36:17

**function** 15:8
16:17
**further** 9:9
43:21 46:17
53:14,17

**G**
**game** 46:8
**general** 42:25
**generally** 15:24
16:9
**Gilliam** 3:8 6:13
6:15 52:12
**give** 44:14
**given** 50:1 51:20
52:4
**giving** 40:15
**Glen** 35:23
**go** 29:9,11 32:17
37:6 38:7
40:10
**goals** 12:15
**going** 6:1 8:15
24:7 33:2
35:24,25 36:24
38:5 46:9,20
**gonna** 25:10
29:24 36:2,3
36:22 37:10
42:18
**good** 11:24 12:1
12:5,5,7,9,20
12:23,23 14:2
14:9 21:15
22:7,14,17,21
29:21 41:25
44:20
**governed** 19:17
20:13,18
**governing** 27:19
**Greenfield** 4:1,1
5:5 6:22,22
43:25 44:3,8
46:13,18 47:3
52:2 53:6,7

**grievances**
15:12
**groups** 32:19,21

**H**
**Hall** 39:22
**hand** 50:1
**Hang** 25:15
**happen** 23:5
29:20
**happened** 41:6
**happening** 27:3
**hard** 14:4
**Harris** 26:6,20
**hart** 10:20
**Harwood** 3:14
52:19
**head** 23:6,6
41:21
**hear** 37:6 44:6
**heard** 31:17
34:11
**heavily** 10:21
**hereinafter**
19:19
**hereto** 2:4
**highlighted**
18:11
**Hill** 3:4 5:5 6:13
6:13 7:5 36:21
37:4 39:21
43:20 44:5
46:4,12,16
52:2,9
**home** 35:22
**hope** 36:22
**hopefully** 33:3
**HOUR(S):03**
52:2
**HOUR(S):54**
52:2
**Hudson** 9:25
10:17,24 14:24
26:3,19
**hypothetical**

16:11 17:14
19:2 30:2
33:25 34:18,24
38:15,22 40:6

**I**
**idea** 43:18
**identified** 37:22
**identity** 49:21
**III** 3:19,19 53:2
53:3
**impact** 15:20
**importance**
26:25
**important** 12:3
13:12,12,15
24:12,13,16
27:2,4,7,9
**in-house** 35:15
**include** 9:25
16:3
**included** 10:2,6
32:24
**includes** 20:4
52:6
**including** 24:7
**Incomplete** 40:6
**INDEX** 5:1
**individual** 15:22
30:20 33:17
**inflight** 7:12
32:22,25
**informal** 11:13
11:16 12:25
**information**
52:4
**informs** 38:4
**instance** 1:21
**instrument**
49:23
**interested** 53:18
**interrupt** 9:7
**introduce** 7:6
**investigat** 16:24
**investigating**

Page 58

16:1,19
**involved** 7:20
9:15,24 10:18
10:21 15:21,25
16:4,6,24 18:1
18:24
**involvement**
16:12
**involving** 16:4
**issued** 19:19
**issues** 12:12

**J**

**Jacinto** 3:5
52:10
**Jamaica** 36:3,4
**Jim** 26:13,15,21
**Jmammone@...**
3:16 52:20
**job** 14:2 17:25
38:13,18,20
**Joe** 26:6,20
**Joey** 35:10,11
39:15
**joint** 12:15
**Jordan** 26:13,21
**Joseph** 3:13
6:16 52:18
**Juan** 25:25
26:19
**July** 36:7,9,18
51:22
**June** 1:14,23
5:13 6:2 7:12
8:12 48:2
51:12 53:20
**jury** 7:7

**K**

**Kevin** 25:18,21
26:17
**knew** 21:4
**know** 13:21,25
14:4,12 16:21
16:21 17:2,3,5

17:8,9,15,25
18:1 23:3
25:18 31:13,14
31:20,21,23,25
32:1,2,3,5,5,23
32:24 33:1
34:9,11 35:4
39:7,11 40:8
40:14
**known** 49:18

**L**

**la** 8:3 15:4 35:1
**labeled** 42:19
**labor** 7:13,16,16
7:22 8:3,10
9:10 14:16,16
14:19 15:5,9
15:24 16:3,8,8
16:13,15,17,18
16:23 17:6
25:22 32:22,25
34:22 35:1
38:13
**Lacore** 10:2
**language** 19:3,6
19:12 20:23
21:6
**Law** 3:19 53:3
**lawful** 18:14,25
19:4,8,13
**lawsuit** 32:3,8
44:16
**lawyer** 39:16
**lead** 10:10,13,14
10:24 13:14
22:4,6 23:9,20
27:24
**leader** 14:5
38:12
**leaders** 11:13
13:1,3 23:2
**leadership** 29:17
38:19 39:1,10
**leading** 46:12

**learn** 30:23 31:3
**learned** 31:8,10
32:11
**leave** 36:4,5
**left** 30:11
**legal** 3:8 20:22
52:13
**let's** 11:3 13:17
18:8 19:15
30:23 36:21
**Lisa** 4:5 37:4,7
**list** 9:13
**little** 16:14
44:14
**Local** 1:7 6:5,20
6:23 10:11
13:15 22:3
32:4,5 51:7
**located** 2:1
**locations** 6:10
**long** 11:1,4
18:25 19:7
**look** 18:8 19:15
42:21
**looked** 37:11
**looking** 29:16

**M**

**Ma** 35:11
**Maberry** 4:5
35:13,14
**machine** 2:1
**mailbox** 32:22
32:25
**maintain** 11:24
12:1
**Mammone** 3:13
6:16,16 16:10
17:13,22 18:3
19:1,10 20:21
23:14 24:20
25:3 30:1,8
31:4 33:24
34:6,17,23
35:3,11,19

38:14,21 39:5
39:15,17,18,24
40:5,13,18
41:14,20 42:15
43:3,9,10,22
46:23,24 47:6
52:18
**manager** 14:16
**marked** 8:16,17
25:9 33:3,4,9
42:20
**Matt** 6:13,13 9:6
**matter** 9:18
24:17
**MATTHEW** 3:4
3:8 52:2,9,12
**Maureen** 33:5,6
**Mbg@nrtw.org**
3:11 52:15
**McCrady** 14:20
**McKinney** 54:2
**mean** 12:4,10
14:5 15:18
36:17 38:17
**means** 40:23
**media** 16:5,20
17:21 30:14
33:18
**meet** 11:9,10
12:10 35:9
**meeting** 11:17
**meetings** 11:13
11:16 13:1
36:19,20
**Melody** 1:24
51:14 53:24
54:1
**member** 8:6
25:22
**members** 20:4
26:18 30:11
**membership**
27:18 38:20
39:1,10
**mentioned** 45:5

**met** 31:22 35:10
**Mhill@pryor...**
3:7 52:11
**million** 43:14
**minute** 39:13
**MINUTE(S)**
52:2,2
**missed** 42:6
**Missing** 38:7
**misstates** 23:14
**moments** 45:18
45:19
**Monk** 1:25
51:14 53:24
54:1
**month** 11:10
**months** 23:20
**Moss** 35:23
**move** 19:16
**moved** 7:13
**multiple** 32:18

**N**

**N** 3:1
**name** 7:8 31:21
37:18 44:8
48:2 49:22
**names** 9:13
37:20,25
**Naomi** 9:25
10:17 14:24
15:3 26:3,19
**National** 3:8
52:13
**necessarily**
23:17 42:17
**need** 12:18
17:15,17,23
27:7
**needed** 12:20
29:9 46:7
**nego** 23:6
**negotiate** 45:13
46:9
**negotiated** 27:12

negotiating 8:6
  9:24 10:18
  13:19 15:5
  21:25 22:2,3
  22:22 23:24
  24:10 25:24
  26:1,4,6,8,14
  26:18,22 27:3
  27:5 29:10,12
  37:21 38:1
  46:2
negotiation 7:17
  7:21,25 8:4
  9:16 10:22
  11:1,4 28:23
  28:23
negotiations
  9:10,19 10:5
  45:4,7,16,23
negotiator 8:9
  10:10,13,14,24
  13:14 22:5,6
  23:6,20 27:24
negotiators 8:21
  9:21 12:21,22
neither 53:14
net 43:14,16
never 31:15,21
new 7:18 24:19
  24:19 41:3
nondiscrimin...
  18:11
normal 36:19
North 3:5,14
  52:10,19
Northern 1:1
  6:7 51:1
NOTARY 50:6
noted 49:5
num 37:25
number 37:20
  37:25
numbered 1:22

**O**

oath 49:19
object 20:8
  35:19
objection 16:10
  17:13,22 18:3
  19:1,10 20:21
  23:14 24:20
  25:3 30:1,8
  31:4 33:24
  34:6,17,23
  35:3 38:14,21
  39:5,18,24
  40:5,13,18
  41:14,20 42:15
  43:3,10 46:4
  46:12
objectors 20:5
October 5:13
office 38:6 50:1
officer 51:18
  52:5
officer's 53:10
Offices 3:19
  53:3
oh 27:22 37:5,8
  42:5 44:8
okay 10:6,16
  11:1 13:8,23
  14:14 15:4,21
  18:8 19:15
  21:15 25:6,16
  25:17,25 26:3
  26:16 32:14
  33:8 35:15,22
  37:8 39:12
  40:25 42:11
  43:19,20 44:6
  44:8,14,20
  45:3,7,25
  46:22
once 11:10
  14:15
open 9:9
operating 42:25
operation 15:16

15:18,19
operations 7:12
  43:1
opinion 13:23
  13:25 22:10,15
  22:19 23:1,18
  25:5 46:1
oral 1:12,19
  51:19
orders 19:18
original 53:12
outcome 53:18
outside-of-work
  13:1

**P**

P 3:1,1
page 5:1,6,7,10
  9:2,15 25:10
  25:11 33:10
  37:14
PAGELINE
  48:3
part 12:19 18:18
  21:8 37:11,21
  38:1
participant 10:5
parties 3:2 9:20
  11:23 52:7
  53:16
partook 9:19
party 51:25
Patrick 26:8,20
peer 14:24 15:1
people 9:15,23
  24:17,19 26:17
  27:8 38:11
percent 28:20
percentage
  28:22
performance
  42:25
period 15:2
person 14:11
  22:17,21 23:22

24:2 27:24
  49:21
personal 36:13
personally 14:7
  44:21 49:18
perspective 14:6
phone 20:11
  54:3
picketing 38:11
  38:17,17
pickets 38:5
plaintiff 1:4,21
  3:3 6:14 51:4
  52:8 53:11
play 46:7
please 6:11 47:3
PLLC 4:1 53:7
point 8:8 21:19
  27:23
policies 21:11
  30:20
policy 16:5,20
  16:25 17:21
  18:12 30:14,17
position 7:9
  14:23,25 23:9
  23:22 24:24
  30:6
possible 29:17
Possibly 29:15
  36:10
posters 38:6
Posts 5:13
preference 24:1
  24:4 25:2
preferred 42:3,6
prepare 35:6
prepared 28:13
preparing 53:11
PRESENT 4:4
president 10:3
  10:10 13:14
  14:3,18,19
  38:12
previous 7:24

42:14
previously 19:19
  29:8
pri 39:18,19
primarily 9:24
primary 7:17
  9:21 15:4,7
  18:6
prior 15:14
  19:23
privileged 39:19
  39:21,25
Procedure 2:3
proceed 44:4
proceeding
  53:17
produced 1:20
profit 43:14,16
proper 19:19
Prosper 35:23
proved 49:19
provisions 2:3
Pryor 3:5 52:9
PUBLIC 50:6
pur 15:4
purchase 47:2
purpose 15:5,7
purposes 49:24
pursuant 2:2
  52:4
put 41:2

**Q**

que 17:17
question 8:2
  16:14 24:25
  25:1 31:1
questions 43:22
  43:23 44:1
  46:14
quick 18:8 36:23

**R**

R 3:1
Railway 9:10

raising 45:22
ratified 28:15,17
  41:7 42:4,7
ratify 29:7
reached 29:8
reaction 21:22
  21:24
read 49:3
reads 19:3,12
ready 28:7 44:4
really 30:11
reason 41:25
  48:3
reasons 12:4
  39:2
recall 21:17,19
  21:23 22:11
  23:1 29:1,20
  29:25 30:19
  40:2,3 41:8
recalled 22:16
  24:18
received 26:25
  33:13,16
Recess 37:1
recognize 8:18
  18:16 25:12
  33:10 37:13,14
record 2:4 6:2
  6:11,25 36:25
  37:3,6,9 46:21
  51:19 52:7
Reed 3:14 52:18
refer 34:2,4,7,25
refrain 18:14
  19:5,14
regard 16:7
regardless 20:8
Registration
  54:2
regular 10:4
regularly 11:10
  42:23
regulations
  19:18

rejected 27:13
  28:20,25 29:4
  40:9,17 41:1
  41:13,23
rejection 41:5
rel 7:16
related 53:15
relations 7:14
  7:16,22 8:4,11
  14:16,17,19
  15:5,9,24 16:3
  16:9,13,15,17
  16:18,23 17:6
  17:6 32:22,25
  34:2,3,8,20,22
  34:25 35:2
  38:13
relationship
  11:20,23,25
  12:2,6,7,9,20
  12:24 13:11
  14:9 22:8,17
  22:21 24:2,7
  24:10,12,16,18
  27:8,10
relationships
  24:19 30:4
religion 33:22
  34:15
remember 11:6
  11:22 13:6
  21:18,21 22:13
  22:25 25:17
  26:15 28:22
  30:15,18 31:2
  31:7,19 33:19
  37:16 38:10
  41:15,17 45:22
  45:25
renegotiate
  40:10
renegotiated
  41:2
replaced 23:5,20
report 5:15

14:14,15 15:3
  43:13
reported 1:25
  14:18,21,22
reporter 6:11
  37:7 43:5,8,11
  46:22 47:1,8
  51:15
Reporter's 5:7
  51:10
REPORTING
  54:1
represent 44:12
represented
  5:12 46:6
require 29:24
  30:4
reserve 46:15,24
resolutions
  15:11
responsibilities
  18:7
responsible 9:20
rest 46:18
restate 8:2 31:1
retired 15:3
  33:6
return 36:6
  51:24
review 35:20
  46:25
right 3:8 8:13,24
  9:21,25 10:7
  10:13,22 11:21
  11:25 12:16,22
  13:5,20 15:2,6
  15:22 16:1,25
  18:21,25 19:5
  19:9 20:9,16
  20:20 21:2,5,8
  21:12,20 22:1
  22:5,8,18
  23:13 24:2,8
  26:22 27:8,14
  27:18 28:1,8

28:12,14,18,21
  29:2,11,14,25
  30:7 31:9,16
  32:9,9,18,20
  34:4,16,22
  35:2,18 36:16
  36:19 38:2
  41:3 42:7 43:1
  45:5 46:13,24
  47:8 52:13
Road 3:9 52:14
Rockwall 3:6
  6:15 52:10
role 7:24 8:4
  10:9 15:14
  16:15 17:9
  22:24 35:2
RPR 53:24
rules 2:2 19:18
  20:14,19 46:8
running 15:19
Russell 14:20

––––––––
S
––––––––
S 3:1 4:1 52:2
  53:6
San 3:5 52:10
satisfied 28:3,4
says 18:13 19:6
  19:16,16 20:12
  20:23 38:4
  43:13
Scheirer 26:8,20
scope 19:15
scratch 23:21
  30:7
scroll 25:14
seal 50:1
second 9:7 25:15
  40:21,22 41:6
  41:11,24 42:3
  42:7
securities 42:21
see 8:19 19:25
  20:1 30:23

send 26:18
  34:15,19,21
senior 7:11,14
  7:15 14:17
Service 5:11
services 10:4
share 37:10
Shareholders
  5:15
short 36:21
shorthand 2:1
  51:14
show 8:15 25:10
  32:14,15 33:2
  42:18
showing 33:8
side 12:21,22
sign 46:25
signatories
  18:20 21:1
signature 5:6
  9:1,14 46:22
  48:1 49:4
  51:23
signed 21:5
significance
  38:8
simply 9:11
  17:18
sitting 36:15
situation 17:24
Smith 3:14
  52:18
social 16:5,20
  17:20 30:14
  33:18
solutions 13:18
somebody 23:12
Sonya 10:2,3
sorry 8:2 10:20
  14:16,19 25:7
  31:1 37:17,23
  40:2 42:5 43:5
  43:8
Sou 39:16

**Southwest** 1:6 3:12 5:11,12 5:14 6:4,17 7:9 11:20 12:14 13:4,8,13,18 16:17 17:21 18:20 21:12 25:7 27:11 28:4,7 31:23 32:4,17 33:6 40:3,12,15 43:13,16,23 44:24 45:8 47:6 51:6 52:17
**Southwest's** 12:21 35:15 39:16 42:21,24
**spear** 13:17
**specific** 41:15,18
**specifically** 11:3 13:11 45:24
**speculation** 19:11 39:6 40:6
**split** 13:7
**sponsor** 13:4
**Springfield** 3:10 52:14
**start** 23:21 24:18
**Starting** 30:7
**state** 1:25 6:9 49:14 50:7 51:15
**stated** 2:3 18:6 24:3 25:4 46:1
**States** 1:1 6:6 51:1
**stipulations** 6:10
**Stone** 10:7 13:12 13:24 21:17 23:5 28:1 30:24 31:11,18

**Stone's** 10:9
**Street** 3:14,20 4:2 52:19 53:3 53:7
**styled** 6:3
**Suarez** 25:25 26:20
**subject** 9:18 27:17
**submitted** 51:21
**subscribed** 49:22
**Suite** 3:9,15 52:14,19
**supposed** 16:19 17:7
**sure** 7:8 24:15 45:6
**SWA** 25:11
**SWA006351** 33:10
**swear** 6:12
**sworn** 1:22 7:2 51:18

**T**
**TA** 40:21,22,23
**table** 29:10,12
**take** 11:5 18:8 19:15 36:21 47:6
**taken** 1:22 52:6 53:17
**talk** 11:3 12:10 39:14
**talked** 39:15,16
**talks** 20:3
**team** 8:6 13:22 21:17 22:3 23:9,24 24:11 25:23,24 26:1 26:4,6,9,14,18 26:22 27:3 28:23 34:10,15 37:21 38:1

46:2,3
**tell** 33:23
**telling** 31:13 42:11
**tentative** 27:15 27:17,25 28:5 28:8,10,24 29:5 39:3 40:17,22 41:1 41:3,11
**terminated** 32:1 32:12
**termination** 9:8
**terms** 19:21 20:14,24 21:13 41:2,16,18 42:13,25
**testified** 7:2
**testify** 36:8
**testifying** 32:7
**testimony** 23:15 24:14 51:20 52:5
**Texas** 1:1,25 2:2 3:6,15,20 4:2 6:7,18 35:23 51:1,15 52:10 52:20 53:4,8 53:25 54:3
**Thank** 43:11
**Thanks** 47:8
**they'd** 33:21
**thing** 13:12 20:12 22:14 29:21,22
**things** 11:19 12:13,16 17:7 23:11 29:13 42:2
**think** 12:17 14:2 21:24 30:10 35:4 38:24 40:19
**thought** 14:1
**time** 6:8 11:8

15:2 26:25 27:11 31:5 36:12 51:25 52:5
**tip** 13:16
**today** 31:9
**told** 22:7 24:5 44:19
**top** 41:21
**town** 35:25
**transcript** 51:18 51:21 53:12
**transfer** 7:22,25 8:3
**transition** 34:10
**transitioned** 8:10
**Transport** 1:6 3:17 5:12 6:4 6:20,23 51:7 53:1
**trial** 8:16,18 25:7 33:9 35:24,25 42:19 43:7 46:19
**true** 10:19 49:5 51:19
**trumps** 20:20
**try** 11:24 12:1 12:11,15 24:6
**trying** 13:17 15:11 17:19 22:11 45:8,12
**two** 11:23
**TWU** 10:11 22:2

**U**
**understand** 20:2 24:15 26:16 27:2,5 42:8 44:11,18,19
**understanding** 43:15
**understood** 21:10 29:18

**union** 1:7 3:17 5:12 6:5,20,23 11:9,13,21,25 12:2 13:1,2,18 14:5 15:6,16 18:14,24 19:4 19:9,13,23 20:4,8 22:11 23:7,10 24:8 24:24 27:3,18 28:1 29:12,18 30:14,17,21 38:6,12,12,19 38:25 39:10 40:17 43:25 44:10,17,22,25 45:12 46:6 47:4 51:7 53:1
**union's** 12:15,22 46:2
**union-friendly** 13:9
**United** 1:1 6:6 51:1

**V**
**vague** 31:4 40:18 41:14 43:3,10
**vaguely** 21:21
**versus** 6:3
**vice** 10:3 14:18 14:19
**Videoconfere...** 1:12,19,24 3:2
**Videographer** 4:5 6:1 36:24 37:2,5,8 46:20
**VIDEOTAPED** 1:12,19
**view** 22:14 29:21 42:12
**views** 42:1
**violating** 17:20
**violations** 30:20

Brendan Conlon

**Virginia** 3:10
  6:15 52:14
**voices** 45:23
**vote** 41:8
**VS** 1:5 51:5

**W**
**want** 22:16
  24:14 47:1
**wasn't** 10:4,14
  15:10 16:6
  28:17 39:3,8
**way** 13:22 22:20
**We'll** 46:24
**we're** 6:14 31:16
  32:8 35:24
  40:23 46:20
**week** 35:25
  36:18
**went** 41:1
**witness** 1:21 2:1
  6:12 43:23,24
  48:2 51:17,20
  51:22,23
**Witness's** 5:6
**woman** 21:25
**work** 3:8 12:11
  23:8,11,23,25
  24:1,23 29:23
  29:24 36:13,20
  44:21 46:5
  52:13
**worked** 13:22
  14:6 24:9
  44:17,25
**Workers** 1:6
  3:17 5:12 6:4
  6:20,23 51:7
  53:1
**working** 12:2,5
  12:7,9 14:9
  22:7 23:12
  27:10 30:5
**wouldn't** 15:21
  15:24,25,25

16:4 34:21
**wrap** 36:22

**X**

**Y**
**yeah** 12:1,23
  13:2 16:6,21
  17:15,23 18:6
  21:9 24:9
  26:12 27:2,15
  31:7 34:7,19
  35:4 37:25
  39:7 41:15
  43:12 44:7
**year** 7:13 43:17
**years** 11:7 22:23
**yelling** 45:23
**yep** 21:8 26:15

**Z**
**Zoom** 1:24 3:2
  32:8

**0**
**00** 52:2,2

**1**
**1** 5:13 51:22,24
**10:02** 1:23 46:21
  47:10
**10821** 54:2
**11th** 36:18
**138** 5:14 42:19
  42:20
**139** 43:7
**1404** 54:2
**1500** 3:15 52:19
**1999** 54:2

**2**
**2** 5:2 8:12 37:3,9
**20** 9:2
**2013** 5:13 8:24
**2015** 27:1
**2017** 5:14 7:10

7:11 8:12
**2018** 5:13 8:24
**2021** 5:14 43:13
  43:16,17
**2022** 1:14,23 6:2
  48:2 51:12,22
  51:24 53:21
**21** 5:14 33:3,4,9
  37:11,14
**214.232.9015**
  3:21 53:4
**22** 5:13 25:7,8,9
**22160** 3:10
  52:14
**229** 9:2
**24** 5:14
**25** 5:13
**28** 1:14,23 6:2
  48:2 51:12
**2850** 3:14 52:19
**29th** 53:20

**3**
**3:17-cv-02278...**
  1:6 6:6 51:6
**302** 3:5 52:10
**31** 5:13
**33** 5:14
**3301** 3:20 4:2
  53:3,7
**3613** 53:25

**4**
**42** 5:15
**44** 5:5
**48** 5:6

**5**
**51** 5:7
**556** 1:7 6:5,20
  6:23 10:11
  13:15 22:3
  32:4,5 51:7

**6**
**6** 5:5,11 8:16,17

8:18 18:10
**600** 3:9 52:14
**6551** 37:14

**7**
**703.321.8510**
  3:10 52:15
**720** 35:23
**7464** 25:11
**75078** 35:23
**75087** 3:6 52:10
**75201** 3:15
  52:20 54:3
**75226** 3:20 4:2
  53:4,8

**8**
**8** 5:13
**8001** 3:9 52:14
**87** 28:20
**87/13** 41:5
**888.988.5317**
  54:3
**8th** 36:7,9

**9**
**9:04** 1:23 6:8
**9:43** 36:25
**9:51** 37:3,9
**972.771.3933**
  3:6 52:11
**977** 43:14