## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER,        )
                        )
        Plaintiff,      )
                        )
VS.                     ) CIVIL ACTION
                        )
SOUTHWEST AIRLINES CO., ) NO.: 3:17-cv-02278-X
AND TRANSPORT WORKERS   )
UNION OF AMERICA, LOCAL )
556,                    )
                        )
        Defendants.     )

----------------------------------

VIDEOCONFERENCE ORAL DEPOSITION OF
MELISSA BURDINE
JUNE 28, 2022

----------------------------------

VIDEOCONFERENCE ORAL DEPOSITION OF MELISSA
BURDINE, produced as a witness at the instance of
the Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on June 28, 2022,
from 4:32 p.m. to 5:42 p.m., via Zoom
Videoconference, before Melody A. Monk, CSR in and
for the State of Texas, reported by machine

## Page 2

```
 1    shorthand, with the witness in Frisco, Texas,
 2    pursuant to the Federal Rules of Civil Procedure,
 3    and the provisions stated on the record or
 4    attached hereto.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              A P P E A R A N C E S
 2        (All parties appearing via Zoom Videoconference)
 3
      FOR THE PLAINTIFF:
 4
          MATTHEW D. HILL
 5        Pryor & Bruce
          302 North San Jacinto
 6        Rockwall, Texas 75087
          972.771.3933
 7        Mhill@pryorandbruce.com
 8        MATTHEW B. GILLIAM
          National Right to Work Legal Defense
 9          Foundation, Inc.
          8001 Braddock Road, Suite 600
10        Springfield, Virginia 22160
          703.321.8510
11        Mbg@nrtw.org
12
      FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
13
          BRIAN MORRIS
14        PAULO B. MCKEEBY
          Reed Smith
15        2850 North Harwood Street
          Suite 1500
16        Dallas, Texas 75201
          Jmammone@reedsmith.com
17        Pmckeeby@reedsmith.com
18
      FOR THE DEFENDANT TRANSPORT WORKERS UNION OF
19    AMERICA:
20        EDWARD B. CLOUTMAN, III
          Law Offices of Edward Cloutman III
21        3301 Elm Street
          Dallas, Texas 75226
22        214.232.9015
          Ecloutman@lawoffices.email
23
24
25
```

## Page 4

```
 1
          ADAM S. GREENFIELD
 2        Cloutman & Greenfield, PLLC
          3301 Elm Street
 3        Dallas, Texas 75226
          Agreenfield@candglegal.com
 4
 5
      ALSO PRESENT:
 6
          Charlene Carter
 7        Lauren Armstrong
          Chris Maberry
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Melissa Burdine

---

Page 5

                    INDEX
                                    PAGE
1
2    Appearances...................................... 2
3
4    MELISSA BURDINE
5       EXAMINATION BY MR. HILL.................. 6
        EXAMINATION BY MR. GREENFIELD.............47
6       EXAMINATION BY MR. HILL..................52
7    Witness's Signature Page..................... 57
8    Reporter's Certificate Page.................. 60
9
10

                   EXHIBITS
11
     NO.  DESCRIPTION                      PAGE
12
     6 - Agreement between Southwest Airlines Co.
13   And The Flight Attendants in the Service of
     Southwest Airlines Co. As Represented by the
14   Transport Workers Union of America, AFL-CIO
     effective June 1, 2013 to October 31, 2018.....21
15   119 - April 6, 2017 Email.......................23
     21 - February 24, 2017 Email...................25
16   40 - Privileged and Confidential
     Reinstatement Settlement and Last Chance
17   Agreement......................................29
18
19
20
21
22
23
24
25

---

Page 6

1          THE REPORTER:  We are going on the
2    record June 28, 2022 for the deposition of Melissa
3    Burdine in a case styled Charlene Carter versus
4    Southwest Airlines Company and Transport Workers
5    Union of America, Local 556, Civil Case No.
6    3:17-cv-02278-X in the United States District
7    Court for the Northern District of Texas, Dallas
8    Division.  The time is approximately 4:32 p.m.
9          Will counsel state their appearances
10   and agreements or stipulations for the record.
11         MR. HILL:  Matt Hill and Matt Gilliam
12   for Charlene Carter.
13         MR. MORRIS:  Hello, Brian Morris for
14   Melissa Burdine.
15         MR. GREENFIELD:  Adam Greenfield on
16   behalf of Transport Workers Local Union 556 and
17   Edward Cloutman, III, as well.
18         MR. CLOUTMAN:  Here.
19         (Discussion off the record).
20             MELISSA BURDINE,
21   having been first duly sworn, testified as
22   follows:
23            EXAMINATION
24   BY MR. HILL:
25   Q.  Ms. Burdine, could I get you to, to

---

Page 7

1    introduce yourself for the jury?
2    A.  Yes, my name is Melissa Burdine, and I
3    formerly served as a labor manager for Southwest
4    Airlines.
5    Q.  When did you stop serving as a labor
6    manager for Southwest Airlines?
7    A.  My last day with Southwest was
8    September 30th of 2020.
9    Q.  Why did you leave?
10   A.  Due to -- Southwest offered some, like,
11   packages, due to COVID, just due to overall
12   performance and slowed business, I would say.
13   Q.  Okay.  So did you voluntarily leave
14   Southwest?
15   A.  I did.
16   Q.  Now, when you said "labor manager," is
17   that another -- was that sometimes referred to as
18   a labor relations manager?
19   A.  Yes.  That is correct.
20   Q.  Is there any difference between those two
21   titles?
22   A.  No.
23   Q.  What did you do as a labor relations
24   manager?
25   A.  I did a number of things that included

---

Page 8

1    support inflight -- first, I'll clarify that I
2    supported inflight, the department inflight
3    specifically, for Southwest Airlines' labor
4    relations department.  And with that, that means
5    support base leaders with the review of
6    terminations, disciplinary actions, work and
7    conduct rules, contractual, you know, questions,
8    concerns.  Also within that role, I also attended
9    Step 2 hearings, which was a part of the grievance
10   or appeal process.  And just to name a few.  I, I
11   would --
12   Q.  Okay.
13   A.  -- I would summarize it as such.
14   Q.  A couple of things I want to ask about in
15   particular.  One of the things that you did as a
16   labor relations manager was to ensure that
17   Southwest complied with the collective bargaining
18   agreement, right?
19   A.  Yes, that is correct.
20   Q.  Another thing that you did as a labor
21   relations manager is you regularly interacted with
22   the union, right?
23   A.  What -- can you define regularly?
24   Q.  As part of your regular job, you would
25   interact with the union?

MELODY MONK REPORTING
888.988.5317

Page 9

1      A. Yes. That would be an accurate statement.
2      Q. And would you have discussions with the
3  union about various topics?
4      A. We would discuss grievances, appeals,
5  contract interpretation, things of that nature.
6      Q. And who at the union would you have these
7  discussions with?
8      A. It depended on who handled the case.
9      Q. Okay. So would it be -- who handled the
10  case, is that usually like a union representative
11  or, or at what level are you dealing?
12      A. I can't remember what level, to be honest
13  with you. I -- there would be different -- just
14  bear with me as I refresh my memory. They --
15  there's different union reps that handled
16  different grievances, so a lot of times they would
17  be assigned to someone different every time. So
18  whoever, whoever was assigned to, I guess, by the
19  union, whoever was handling the case, that's
20  typically who I would interact with.
21      Q. Did you ever deal with Audrey Stone?
22      A. Occasionally.
23      Q. What would you deal with Audrey Stone
24  about?
25      A. It would be more in a group setting,

Page 10

1  meaning Southwest Airlines and TWU 556 would have
2  a meeting. It's a meeting, I believe, that was --
3  that's enforced by the contract, if I recall
4  correctly, to talk about open grievances and
5  appeals, and so they would come with a list of
6  specific cases to talk about. And that would be
7  really my only exposure to Audrey Stone, would be
8  through that process.
9      Q. Did you have any personal interaction with
10  Ms. Stone?
11      A. No.
12      Q. What -- and, and as, as a labor relations
13  manager, what role did you have in employee
14  discipline?
15      A. I would collaborate with inflight base
16  managers with Southwest Airlines to review higher
17  level disciplines, such as terminations, 30-day
18  suspensions.
19      Q. So your role as labor relations manager is
20  once the discipline had been decided, you would
21  deal with it?
22      MR. MORRIS: Objection, misstates
23  testimony.
24      Q. I'm just trying to understand. Is that
25  accurate?

Page 11

1      A. Can you repeat the question, sir?
2      Q. Is your role as a labor relations manager
3  that only once discipline had been decided you
4  would deal with it?
5      A. I would not describe it like that, no.
6      Q. Okay. At what point would you become
7  involved in employee discipline?
8      A. Prior to the, prior to the issuance of
9  discipline, typically, and I'm speaking in general
10  terms.
11      Q. Okay.
12      A. Typically it really depends on the leader,
13  to be honest with you. Some leaders will reach
14  out when they're investigating a, a case. Some
15  leaders will reach out once they've already had
16  what we call the fact-finding meeting to try to
17  determine what's the best recourse.
18      Q. Do you get involved in those
19  investigations?
20      MR. MORRIS: Objection, vague and
21  ambiguous.
22      Q. You can answer.
23      A. So on the -- with regard to fact-finding
24  meetings and those -- like the investigations that
25  happen prior to the termination, I, I guess

Page 12

1  depending on what you mean by involvement. Like
2  was I the hands-on investigator? Is that your
3  question?
4      Q. Well, that's a good, that's a good
5  question. Did you, did you -- were you involved
6  in any hands-on investigation of, of employee --
7  of employees -- employee conduct to determine
8  whether it merited discipline?
9      A. In a general sense, I guess I would say
10  I -- it would be more like I reviewed the
11  investigation. So I would have reviewed the base
12  leader's investigation that they conducted and,
13  and this is, again, generally speaking. There
14  would be times where additional questions may be
15  asked or where we may have things that come up as
16  a result of, of my review of their investigation,
17  if you will.
18      Q. But the base leader, they would handle the
19  actual investigation; is that right?
20      A. That's correct. I would say they --
21      Q. Would --
22      A. -- lead the investigation.
23      Q. They would lead the investigation.
24      Okay. And was employee relations also
25  involved in those investigations?

3 (Pages 9 to 12)

Melissa Burdine

---

**Page 13**

1        MR. MORRIS:  Objection, vague and
2    ambiguous.
3        You can, you can answer.
4        A.  Employee relations would be involved in
5    some investigations.  It depends on what the case
6    is, yes.  I would say they are very heavily
7    involved in the investigation, and if they are,
8    typically as a labor manager, I would also
9    collaborate with employee relations as well, prior
10   to any type of disciplinary action being decided
11   on.
12       Q.  Maureen Emlet?
13       A.  I'm sorry?
14       THE REPORTER:  I'm sorry, Matt, what
15   did you say?
16       Q.  Who is Maureen Emult?
17       A.  Maureen Emlet?
18       Q.  Emlet, yes, sorry.
19       A.  She was also a labor manager.
20       Q.  So she had the same job you did?
21       A.  She did.
22       Q.  Are there occasions where the two of you
23   would work together on the same issue?
24       A.  Yes.
25       Q.  And why would that happen?

---

**Page 14**

1        A.  For a number of reasons.  Our work was
2    collaborative.  There would be times where Maureen
3    may work on a -- or maybe I work on a termination,
4    and she may end up taking the Step 2 hearing, just
5    depending on schedules, vacation time,
6    availability.  We would typically try to keep each
7    other abreast of what's going on with our bases.
8        Q.  Who is Charlene Carter?
9        A.  Charlene was at the time a Southwest
10   Airlines flight attendant.
11       Q.  Did you have any role in her
12   investigation?
13       A.  To be honest, I don't remember.
14       Q.  You don't remember whether you were
15   involved in Ms. Carter's investigation at all?
16       MR. MORRIS:  Objection, asked and
17   answered.
18       Q.  You can answer.
19       A.  No, not that I remember.  I do remember --
20   one thing that I remember prior to Ms. Carter's
21   termination would be reviewing the, the videos,
22   but that's all I can remember in terms of
23   pretermination, my involvement.
24       Q.  Okay.  When you say "the videos," what are
25   you talking about?

---

**Page 15**

1        A.  There were social media -- some social
2    media videos of aborted babies, if I recall
3    correctly.
4        Q.  How did you come to review those?
5        A.  With Maureen Emlet.
6        Q.  Is Maureen Emlet who forwarded those to
7    you?
8        A.  No, we sat by side and watched them.
9        Q.  Why were you, why were you reviewing these
10   videos?
11       A.  As labor managers, we would often
12   collaborate on best practices.  So if, if I had to
13   name something under typical circumstances,
14   because I don't remember like specifically what
15   our discussion was that day, that's how I would
16   have to answer it.
17       Q.  Do you recall anything that Ms. Emlet told
18   you about those videos?
19       A.  No, I do not.
20       Q.  Do you recall anything that Ms. Emlet told
21   you about Ms. Carter?
22       A.  No, I do not.
23       Q.  Do you recall anything that you might have
24   told Ms. Emlet about Ms. Carter?
25       A.  No, sir, I do not.

---

**Page 16**

1        Q.  And nothing about the videos?
2        A.  No, I do not recall any specific
3    information.
4        Q.  What was your reaction to the videos?
5        A.  I don't remember, to be honest with you.
6        Q.  Other than Ms. Emlet, is there anyone that
7    you communicated with about Charlene Carter?
8        A.  At what point?
9        Q.  Right now we'll talk about pretermination.
10       A.  I don't remember.
11       Q.  After her -- after Ms. Carter's
12   termination, was there anyone that you
13   communicated with about Charlene Carter?
14       A.  Yes.
15       Q.  Who?
16       A.  Mike Sims.
17       Q.  Anyone else?
18       A.  Currently that's the only person I, I
19   remember.  If we're speaking about like between
20   the, I guess, the termination and the Step 2
21   hearing or maybe around that time, that's who I
22   remember talking to, would be Mike Sims.  And, and
23   I really don't remember at what point, if that was
24   at the Step 2 hearing.  But I do remember him
25   being at the Step 2 hearing.

---

Melissa Burdine

---

Page 17

1 　　 Q. Okay. Let me clarify one thing real
2 quick. You were a labor relations manager for
3 Southwest Airlines throughout the year 2017,
4 right?
5 　　 A. I believe so, yes.
6 　　 Q. Do you recall Mr. Sims' reaction to
7 Ms. Carter's testimony at the Step 2 hearing?
8 　　 A. And what do you mean by reaction?
9 　　 Q. Do you recall anything that he said to you
10 about her testimony?
11 　　 A. No, I do not.
12 　　 Q. Did you have any reaction to her testimony
13 at the Step 2 hearing?
14 　　 A. Not that I recall.
15 　　 Q. Before Charlene Carter was terminated, did
16 you have any belief as to whether or not she
17 should be terminated?
18 　　 A. I don't remember, to be honest with you.
19 　　 Q. At -- after you attended the Step 2
20 hearing, did you have any belief as to whether
21 Ms. Carter should be terminated?
22 　　 A. I don't -- to be honest with you, I don't
23 remember what, what my belief may have been at the
24 time.
25 　　 Q. Okay. Have you ever talked to Ed

---

Page 18

1 Schneider about Charlene Carter?
2 　　 A. I don't remember.
3 　　 Q. What is the role of the labor relations
4 manager at the Step 2 hearing?
5 　　 A. We typically take notes on the --
6 　　 Q. Is that all?
7 　　 A. At the Step 2 hearing, yes.
8 　　 Q. Yes, ma'am.
9 　　 A. We, we can ask questions, if we have
10 questions, but typically we take notes.
11 　　 Q. So at Ms. Carter's Step 2 hearing, did you
12 have any questions?
13 　　 A. I don't remember.
14 　　 Q. Mike Sims says after that Step 2 hearing
15 he discussed Ms. Carter's situation with you and
16 that you agreed she should be terminated. Do you
17 recall that?
18 　　 A. I recall after the Step 2 hearing talking
19 to Mr. Sims. I don't remember the conversation.
20 　　 Q. Is it possible you told him that she
21 should be terminated?
22 　　 A. It is possible.
23 　　 Q. Is it possible you told him she shouldn't
24 be terminated?
25 　　 A. I would say anything is possible, but just

---

Page 19

1 in remembering the, the circumstances of her
2 violation, I don't know that I would have said
3 that.
4 　　 Q. When you say "the circumstances of her
5 violation," what, what are those circumstances?
6 　　 A. Just the -- so if, if we can go back to
7 the -- just the termination, Ms. Carter, she had
8 sent very just graphic, egregious social media
9 posts to another flight attendant over and over
10 again. And so just in thinking about the
11 violation itself, and I believe that -- I'm trying
12 to remember. I believe that her violations may
13 have been -- and I, and I won't speak, you know,
14 adamantly, but I believe they may have been also
15 substantiated as harassment by employee relations.
16 And if so, I -- in my recommendations I do try my
17 best to be consistent in, in accordance with, you
18 know, work and conduct rules. So that's why I say
19 that I don't think I would have said I don't think
20 she should have been terminated.
21 　　 Q. The social media posts that you're, that
22 you're describing, are these posts that objected
23 to the union's role in supporting or promoting
24 abortion?
25 　　 A. I don't remember that.

---

Page 20

1 　　 Q. You recall it was an aborted fetus that
2 you were looking at, right?
3 　　 A. I do recall that, uh-huh.
4 　　 Q. Do you recall why there was an aborted
5 fetus that she was sending?
6 　　 A. No.
7 　　 Q. In what context?
8 　　 A. I don't.
9 　　 Q. So your recollection is just she was
10 sending aborted fetuses, and you don't recall
11 anything else about the nature of her
12 communications?
13 　　 A. No, I don't think I do.
14 　　 Q. Do you believe that anything that
15 Ms. Carter did was unlawful?
16 　　　 MR. MORRIS: Objection, calls for a
17 legal conclusion. Calls for speculation.
18 　　　 You can, you can answer.
19 　　 A. I, I don't know the answer to that
20 question.
21 　　 Q. You don't have any opinion on whether
22 anything she did was unlawful, right?
23 　　 A. I, I don't know that any -- if anything
24 she did was unlawful.
25 　　 Q. You don't have any reason to believe that

---

MELODY MONK REPORTING
888.988.5317

Page 21

1    anything she did was unlawful, do you?
2         MR. MORRIS:  Same objection.
3         You can answer.
4         A.  Are you asking if I currently think that
5    or if, if that's what I thought --
6         Q.  If you ever had any, if you ever had any
7    belief that anything that she did -- any, any
8    reason to believe that anything she did might be
9    unlawful?
10        A.  I don't -- honestly, I don't, I just don't
11   remember.  I -- there's -- I cannot, I cannot
12   honestly testify today that I made any legal
13   conclusions.  That's not my, my, my expertise, I
14   guess.
15        Q.  Unlawfulness was not a consideration in
16   your supporting the recommendation to terminate
17   Ms. Carter, right?
18        A.  I don't remember.
19        Q.  I'm going to direct your attention to a
20   document.  This is Exhibit 6.
21             (Exhibit 6 marked).
22        Q.  And it is the collective bargaining
23   agreement.  I will scroll to the top so you can
24   see the beginning of the document.
25        Do you recognize this document?

Page 22

1         A.  Yes.
2         Q.  Is that the collective bargaining
3    agreement that was effective during 2017?
4         A.  Yes, it appears to be.
5         Q.  I'm going to direct you to Article I on
6    nondiscrimination where it says:  All employees
7    shall be free to engage in lawful union activities
8    or refrain from such activities.
9         Do you see that?
10        A.  I do see that.
11        Q.  Now, you told us earlier one of your roles
12   at Southwest was to ensure that the collective
13   bargaining agreement was followed.  Did you
14   understand that as long as employees were engaging
15   in lawful union activities, that, that they were
16   not to be -- that they were not prohibited from
17   doing that?
18        MR. MORRIS:  Objection, incomplete
19   hypothetical.
20        A.  That's what the -- that's what it says in
21   the contract.
22        Q.  And yet you didn't consider the
23   unlawfulness in making your recommendation, right?
24        A.  I don't remember.
25        Q.  I want to direct your attention to

Page 23

1    Exhibit 119.
2             (Exhibit 119 marked).
3         Q.  That's Trial Exhibit 119.  Do you
4    recognize this document?
5         A.  It appears to be an e-mail from me to Mike
6    Sims.
7         Q.  And does that e-mail attach your notes
8    from Charlene Carter's Step 2 hearing?
9         A.  I'm sorry, can you go back so I can finish
10   reading the e-mail?
11        Q.  Sure.
12        A.  Okay.  Thank you.
13        Q.  Does that e-mail forward to Mike Sims your
14   notes from Charlene Carter's Step 2 hearing?
15        A.  That's what it states there, yes.
16        Q.  And then are these your notes that follow,
17   attached to that e-mail?
18        A.  Those do look like my notes, yes.
19        Q.  You took notes during the meeting; is that
20   right?
21        A.  Yes.
22        Q.  And then you sent this e-mail soon after
23   the meeting, right?
24        A.  That is correct.
25        Q.  You were at that meeting and witnessed the

Page 24

1    testimony?
2         A.  I did.
3         Q.  And this was a regular task of yours,
4    preparing notes for Step 2 grievances and sending
5    e-mails like this, right?
6         A.  Yes.
7         Q.  Who is Brian Talburt?
8         A.  I believe -- forgive me, because I'm --
9    the name sounds familiar.  I believe he might be a
10   flight attendant.
11        Q.  He is or was.
12        Did you become aware at some point
13   that Mr. Talburt was pulling social media posts
14   regarding certain flight attendants?
15        A.  Who?
16        Q.  Mr. Talburt, this flight attendant, was he
17   pulling social media posts of other flight
18   attendants?
19        MR. MORRIS:  Objection, calls for
20   speculation.
21        Q.  The question is whether you ever learned
22   of him doing that.
23        A.  I don't remember.  I don't remember, to be
24   honest with you.
25        Q.  Did you ever learn of anyone pulling

Melissa Burdine

---

Page 25

1   social media posts of flight attendants as part of
2   any investigation?
3       A.  I do remember flight attendants would turn
4   in other flight attendants' social media posts,
5   yes.
6       Q.  Do you recall any specific incidents of
7   those?
8       A.  Not off the top of my head, although I do
9   know that that happened.
10      Q.  Okay.  I want to direct your attention to
11  Exhibit 21, and Exhibit 21 includes a number of
12  documents.
13          The page that I'm gonna direct you to
14  is labeled 5680, Southwest Airlines, SWA 5680.
15  And now I'll share the screen with you.
16          (Exhibit 21 marked).
17      Q.  So this e-mail from Julie O'Grady that's
18  then forwarded along to -- by, by Ms. Emlet, do
19  you recognize that e-mail?
20      A.  No.
21      Q.  Do you recall receiving that e-mail?
22      A.  No.
23      Q.  Who is Julie O'Grady?
24      A.  She was one of the employee relations
25  investigators.

---

Page 26

1       Q.  Okay.  Is there some function you have in
2   labor regulations that would make someone send to
3   you an e-mail about another employee's social
4   media posts?
5       A.  Can you repeat the question?
6       Q.  Is there something about your role in
7   labor relations that would make it make sense for
8   someone to send you an e-mail about employees'
9   social media posts?
10      A.  Yes, we would get messages like I, like I
11  explained earlier, where people would turn in --
12  you know, flight attendants would turn in other
13  flight attendants' social media posts.
14      Q.  Okay.  Were you aware of any, any
15  particular flight attendants targeting specific
16  groups of Southwest employees in, in retrieving
17  social media posts?
18      A.  No, not that I remember.
19      Q.  I'm going to direct your attention to
20  another e-mail.  This is another e-mail that was
21  sent to you by Ms. O'Grady.  And it's some
22  conclusions based on social media posts.
23          Do you recall seeing this e-mail?
24      A.  I see the e-mail.  I see that I'm copied
25  on the e-mail, but I don't remember the e-mail,

---

Page 27

1   no.
2       Q.  Do you recall anyone targeting union
3   objectors' social media posts?
4       A.  No, I do not.
5       Q.  If someone did that, would that be
6   appropriate?
7           MR. MORRIS:  Objection, incomplete
8   hypothetical, vague and ambiguous.
9       A.  I would, I would need more information.
10      Q.  Is it -- should Southwest's labor
11  relations department be investigating complaints
12  brought by flight attendants about other flight
13  attendants' social media based on the, the flight
14  attendants with the social media being union
15  objectors?
16          THE REPORTER:  I'm sorry, based on the
17  what, Matt?
18      Q.  Based on the, the flight attendants whose
19  social media is being reviewed being union
20  objectors.
21          MR. MORRIS:  Same objection.
22      A.  It's, it's hard to speak hypothetically,
23  Mr. Hill.  But, generally speaking, I would -- as
24  a labor manager, if a social media post was turned
25  in to me, I -- in transparency, I don't recall a

---

Page 28

1   time where I would have ever gone to see or go to
2   research, you know, if you are a -- I think the
3   term you used was a union objector or not.  I
4   would be looking at the social media post, the
5   content of the social media post, if it was sent
6   to another flight attendant, and if it violated
7   the work and conduct rules or the social media
8   policy, I believe it is -- what it was at the
9   time.
10      Q.  Okay.  I want to direct your attention to
11  a different page of the same Exhibit 21.  It's
12  Page 4483, the first page of the exhibit.
13          And do you see that -- this e-mail
14  from Ms. O'Grady to a group of people, including
15  yourself?
16      A.  Can you -- oh, hold on.  Let me move the
17  pictures here.
18      Q.  Yeah, there's a little button in the
19  pictures that you can push, the little minimize
20  button, and it makes it so that it just goes in
21  the corner and you can see.
22      A.  Oh, thank you.  Can you scroll up just a
23  little bit?
24      Q.  Yes, ma'am.
25      A.  There you go.  Okay.  Thank you.  Is there

---

MELODY MONK REPORTING
888.988.5317

Page 29

1   a way for me to zoom in on this?  I appreciate
2   that.  Thank you.
3          Okay.  Can you scroll down?  Yeah, I
4   just -- I don't, I don't remember these exact
5   e-mails.
6          Q.  Do you remember anything about this
7   situation?
8          A.  No, I don't.
9          Q.  Okay.  I'm going to direct your attention
10  to Trial Exhibit 40.
11         (Exhibit 40 marked).
12         Q.  Do you recognize Trial Exhibit 40?
13         A.  That looks like a last-chance agreement
14  that I would have drafted during my tenure as a
15  labor relations manager.
16         Q.  Okay.  And did this involve Charlene
17  Carter?
18         A.  Yes.
19         Q.  And let's be clear.  So Ms. Carter was
20  terminated, right?
21         A.  Yes.
22         Q.  And then after the termination, there was
23  this Step 2 grievance hearing, right?
24         A.  Yes.
25         Q.  And after the Step 2 grievance hearing,

Page 30

1   did Southwest make a decision to offer her this
2   last-chance agreement?
3          A.  I cannot -- just in transparency, I, I
4   cannot remember the conversations that, that
5   surrounded the last-chance agreement.  So when you
6   say Southwest, I -- if I did draft the last-chance
7   agreement, then Mike Sims would have communicated
8   back to me that this was inflight's decision, to
9   offer the last-chance agreement.
10         Q.  Were you involved in the decision to issue
11  the last-chance agreement?
12         A.  I would have sent Mike Sims a, like a, a
13  recap of -- from the Step 2 hearing that would
14  have included my recommendation, but I don't
15  remember what that would have been at this time.
16         Q.  Is that the same as the notes we looked at
17  before on Exhibit 119?
18         A.  It referenced the notes that I sent him in
19  that e-mail that you just showed me.  It said --
20         Q.  Yes, ma'am.
21         A.  It said in that e-mail, but I'll -- the
22  labor recap was to follow, that's what I was
23  talking about, would have been that -- the -- I
24  guess whatever e-mail I probably sent him after
25  that.

Page 31

1          Q.  You would have sent him a subsequent
2   e-mail about it?
3          A.  Uh-huh.  I would have.
4          Q.  Okay.
5          A.  Well, to -- it's typical -- well, let me,
6   let me just say this.  That's typical
7   circumstances, Mr. Hill.  I would have sent him an
8   e-mail.  It could have been a phone conversation.
9   I, I just -- I honestly don't remember.  But, but
10  prior to drafting this last chance of --
11  last-chance agreement, I would have had a
12  conversation with Mr. Sims prior to drafting this.
13  Does that make sense?
14         Q.  Okay.
15         A.  Does that help?
16         Q.  It does.  And the fact that, that your
17  name's on this letter and it looks like one that
18  you drafted, does that, does that confirm to you
19  that you did indeed draft this last-chance
20  agreement?
21         A.  Yes.
22         Q.  Okay.  So I want to talk to you about a
23  few things in the last-chance agreement.
24         The last-chance agreement brings the
25  employee back into their position, but it does so

Page 32

1   and makes them give up some rights, right?
2          A.  What kind of rights?  What do you mean by
3   give up rights?
4          Q.  Well, let's talk about some of those
5   rights.
6          And I'm gonna direct your attention to
7   this, this last-chance agreement that you drafted.
8   One of the things that it says is that as part of
9   her coming back, You will receive no back pay.
10         Do you see where that I have that
11  highlighted?
12         A.  Yes.
13         Q.  The second bullet?
14         So for all the time that she had been
15  out, she wouldn't get any compensation for that;
16  is that true?
17         A.  Yes.  That's true.
18         Q.  All the pay that, that -- from the time
19  she was terminated until she accepted the
20  last-chance agreement, if she accepted it, it
21  would have been gone and she would not get that
22  back?
23         A.  If I recall correctly, just with all due
24  respect, I don't think she worked, but, yes, that
25  would be an accurate statement.

MELODY MONK REPORTING
888.988.5317

Melissa Burdine

---

Page 33

1  Q.  Well, she didn't work after she was
2  terminated, right?
3      A.  During her tenure, she very rarely worked
4  while she was with -- while she was a flight
5  attendant.  Flight attendants can give away their
6  trips that they're awarded.  And like they have
7  this whole trip trade system, and if I recall
8  correctly, I believe Ms. Carter, again, with all
9  due respect, was one of those that would give away
10  all her trips and, and choose not to work.  But
11  what you're saying is -- would be accurate if, I
12  guess if, if she, if she did work, because
13  there's, like a look-back period.  I don't
14  remember exactly what that for, for back pay,
15  back pay purposes, if you will.
16      Q.  You --
17      A.  So --
18      Q.  There -- there's nothing you can tell us
19  that, that convinced you that Ms. Carter would not
20  have worked at any point during the time that she
21  was terminated, right?
22      A.  Can you repeat the question?
23      Q.  There's nothing, there's, there's nothing
24  that you can point to that makes you believe that
25  Ms. Carter wouldn't have done any work at all

---

Page 34

1  during the time that she was terminated; is that
2  right?
3      A.  I don't know that I understand the
4  question.
5      Q.  I'm, I'm asking, is there anything that
6  you know that you can tell us about that makes you
7  believe that she wouldn't have done any work
8  during the time that she was terminated?
9      A.  The days leading up to her termination.
10  Are you asking do I have, like, evidence of her
11  not working in the days leading up to her
12  termination?
13      Q.  No, I'm asking, other than, other than the
14  fact -- other than your general knowledge of how
15  much she worked before, there's nothing you can
16  tell us that made -- that convinces you that she
17  wouldn't have done any work during that time,
18  right?
19      A.  I'm, I'm just -- all I'm saying is that
20  I -- as a part of my, kind of my process back
21  then, I remember, in reviewing termination
22  grievances in preparation for the Step 2, or
23  sometimes it may be after the Step 2, I would look
24  at maybe the employee file, how often they worked,
25  you know, what their, would their tenure is, what

---

Page 35

1  their attendance is, things like that.
2          And so I just remember that she was,
3  she was one of those that just -- they -- she
4  would give her trips away.  That doesn't reflect
5  negatively, that's her right.  It's her
6  contractual right as a flight attendant.  So I'm
7  just stating that I don't know that even if, even
8  if Mr. Sims made the decision to say, I'd like to
9  offer her back pay or if, if that came up, I don't
10  know what back pay could have been offered.
11  That's all I'm saying.
12      Q.  Okay.  Are there certain circumstances
13  where employees are offered back pay in connection
14  with a last-chance agreement?
15      A.  To my recollection, it was very rare,
16  Mr. Hill, in my tenure.
17      Q.  But in Ms. Carter's circumstances, you
18  didn't offer the back pay?
19      A.  No.
20      Q.  And if she wanted to recover back pay, she
21  couldn't accept the last-chance agreement, right?
22      A.  I -- that's very hypothetical.  It would
23  depend on the circumstances.  She could -- there
24  were times where flight attendants would work
25  through their union rep to come back with a

---

Page 36

1  counteroffer, meaning, you know, will you consider
2  this if -- will you consider a last-chance
3  agreement that does include back pay, if you will.
4  So ...
5      Q.  I'm only focused on what it is that you
6  actually offered her.  In the offer that you made
7  her, you chose not to give her back pay, right?
8      A.  No back pay was offered, that is correct.
9      Q.  If she accepted the agreement, she
10  wouldn't -- if she accepted the agreement you
11  presented she wouldn't receive any pay for the
12  time that she was, she was terminated?
13      A.  Assuming that this is the only agreement
14  that I drafted, looking at this agreement that we
15  have here on the screen, I would say that is an
16  accurate statement.  She would not have received
17  back pay if she would have signed it.
18      Q.  You're not aware of any other agreement
19  that you drafted for her, right?
20      A.  Not that I recall, but, again, I, I, I
21  would draft these settlement agreements, and
22  sometimes they would change depending on, you
23  know, what the union may have negotiated on, on
24  the grievant's behalf.  So I can't speak to her
25  specifically because I don't remember, but in

---

9 (Pages 33 to 36)

Melissa Burdine

Page 37

1    looking at this one --
2      Q.  Yeah.  Her --
3      A.  -- it's --
4      Q.  If she accepted this last-chance
5    agreement, she would have also had to accept a
6    30-day suspension, wouldn't she?
7      A.  That is the offer, that her termination
8    would be reduced to a 30-day suspension.
9      Q.  In addition, and we'll -- I'll point your
10   attention to a few bullet points down where I have
11   another highlight.  In addition, if she accepted
12   this last-chance agreement:  Any future violation
13   of Southwest's bullying and hazing policy or
14   social media policy or harassment, sexual
15   harassment, discrimination retaliation policy
16   would result in termination, right?
17     A.  That is what this agreement is offering,
18   yes.
19     Q.  And, and this agreement would remain in
20   her file for 24 months after she executed it,
21   right?
22     A.  If she signed it.
23     Q.  And that could be used for future
24   discipline consideration, right?
25     A.  What do you mean by used for future

Page 38

1    discipline?
2      Q.  Well, her file is what people used to, to
3    evaluate whether or not a subsequent disciplinary
4    action is reasonable, right?
5      A.  Again, that would be hypothetical.  I --
6    it could or could not be, yeah, it could or could
7    not be reviewed if, if something came up again,
8    hypothetically.  I, I, I can't say explicitly,
9    but, sure.
10     Q.  Part of accepting this last-chance
11   agreement would have meant that her grievance was
12   withdrawn and dismissed, right?
13     A.  Can you repeat that question?
14     Q.  Part of -- if, if Ms. Carter had accepted
15   this last-chance agreement, her grievance would
16   have withdrawn and dismissed, right?
17     A.  That's what it states.
18     Q.  So she couldn't have taken any further
19   action based on her grievance, right?
20     A.  It would withdraw the grievance,
21   meaning -- yes -- meaning that I guess it would no
22   longer exist.  It would have resolved the --
23     Q.  Right.
24     A.  -- grievance.  Yes, if she would --
25     Q.  Yes.

Page 39

1      A.  -- have signed it, yes, that's what it
2    says.
3      Q.  She could no longer get relief on that
4    grievance; this is, this is it, this is all she
5    gets, right?
6      A.  It looks like that's what it states.  I, I
7    mean, I feel like we're speaking hypothetically,
8    but --
9      Q.  Well, we're just talking about the
10   agreement that you drafted and gave to her and,
11   and asked her to sign.  And so I'm just wanting to
12   make sure I understand what the agreement means,
13   and I'm asking you to help me understand that.
14   And so, finally, the last thing that she had to do
15   in this part of the last-chance agreement is
16   release all of her legal claims that she might
17   have against Southwest, right?
18     A.  If she signed it, yes.
19     Q.  And, and in order, in order to be
20   reinstated, she would have had to sign it, right?
21     A.  Yes.  That is correct.
22     Q.  Okay.  So attached to that last-chance
23   agreement was this legal document, this
24   confidential settlement and release of claims,
25   right?

Page 40

1      A.  Yes.
2      Q.  And if she wanted to accept the
3    last-chance agreement, she also had to sign this
4    document, right?
5      A.  Yes.
6      Q.  And you understood that document to
7    release any claims that she might have against
8    Southwest Airlines, didn't you, had she signed it?
9      A.  Yes.
10     Q.  And she had to sign this legal document in
11   order to be reinstated to her job, too, didn't
12   she?
13     A.  She didn't have to.  No.  I, I would not
14   agree with that.  I would just say that it was, it
15   was her choice if, if she wanted to accept the
16   last-chance agreement, she could -- that's most
17   certainly her choice to do so, which would also
18   come with the Exhibit A, the release of, release
19   of claims, which is something that is typically
20   offered as part of a last-chance agreement.
21     Q.  I think maybe you didn't understand my
22   question.  In order to be reinstated, she would
23   have had to sign this legal document releasing all
24   her claims, right?
25     A.  She -- no.  She wouldn't have --

10 (Pages 37 to 40)

Melissa Burdine

---

Page 41

1      Q. In order to be reinstated?
2      A. No, she wouldn't have to sign it. Again,
3   that's -- it's hypothetical. If the union or
4   Charlene -- if there was a question about, you
5   know, the, the release of claims, the Exhibit A, I
6   think is what we would refer to it as, if she, if
7   she wanted to negotiate or, or say, hey, can I
8   sign the last-chance agreement without the release
9   of claims, she could have asked for that. I don't
10  remember if she did or not. And that would --
11  that's not mandatory, if you will --
12     Q. But that wasn't what you offered --
13     A. -- but that's what was offered --
14     Q. What, what, what you --
15     A. -- as the --
16     Q. -- offered her, the only way for her to be
17  restated, based on what you offered her, was to
18  sign this legal document releasing all her claims,
19  right?
20     A. Yes, that's what's offered. That was what
21  was offered.
22     Q. We're going to take a short break. I'm
23  going to come in and -- come back and, and
24  hopefully close out quickly.
25     A. Okay.

---

Page 42

1         THE REPORTER: Off the record.
2      (Recess).
3         THE REPORTER: Back on the record.
4      Q. Just a couple of more questions for you,
5   Ms. Burdine.
6         If someone told you that they had been
7   discriminated against because of their religion,
8   what would you tell them to do?
9         MR. MORRIS: Objection, incomplete
10  hypothetical.
11     A. I -- discriminated against because of
12  their religion?
13     Q. Yes.
14     A. If, if it was a current employee, I would
15  -- trying to remember the the, the Southwest Airlines
16  process. So bear with me. I believe I would
17  refer them to employee relations for an
18  investigation. I may even -- yeah, hypothetically
19  speaking, I would refer it for an investigation
20  for, for an employee, yes.
21     Q. Do you know what the accommodations and
22  career transition team is?
23     A. Yes.
24     Q. What is that?
25     A. That team at Southwest Airlines would --

---

Page 43

1   if you can just bear with me. I'm -- I may not
2   remember a hundred percent, but they would review
3   different accommodations for employees due to like
4   ADA disability, things like that. That's all I
5   can think -- remember off the top of my head. I'm
6   sorry.
7      Q. Is that also known as the ACT team?
8      A. Yes, it was, it was called the ACT team.
9      Q. And did they -- would you have -- if
10  someone said that they were discriminated against
11  based on their religion, you wouldn't have sent
12  them to that team, would you?
13        MR. MORRIS: Objection, incomplete
14  hypothetical.
15     A. I don't remember, Mr. Hill. I -- I'm, I'm
16  working in a different capacity now where the
17  departments are structured a little different, so
18  I can't remember exactly how it worked at, at
19  Southwest Airlines. So I'm -- I really can't
20  answer your question. I'm sorry. I don't, I
21  don't remember.
22     Q. You weren't aware of any role that the ACT
23  team had with respect to religion, were you?
24     A. I don't remember.
25     Q. What did you do to prepare for this

---

Page 44

1   deposition?
2      A. I had a call with the attorney, Brian
3   Morris, and Paulo.
4      Q. And what did you discuss on that call?
5         MR. MORRIS: I'm going to object.
6   That calls for privileged communications.
7   Instruct the witness --
8         MR. HILL: You instruct on that
9   privilege?
10        MR. MORRIS: -- not to answer.
11        THE REPORTER: I'm sorry, Mr. Morris,
12  what did you say?
13        MR. MORRIS: Sure. I objected as it
14  calls for privileged communications and I will
15  instruct the witness not to answer.
16     Q. Did you review any documents in
17  preparation for this deposition?
18     A. Yes.
19     Q. What did you review?
20     A. The Step 2 notes that you showed me on the
21  screen.
22     Q. Anything else?
23     A. I'm trying to remember. There may have
24  been another document, but I'm -- I -- gosh, this
25  is escaping me.

---

11 (Pages 41 to 44)

Page 45

1    Q. If there was another document, you don't
2  know what it is?
3    A. Gosh, I'm sorry. My -- I just, I just
4  drew a blank. I reviewed the Step 2 notes from
5  2017, and, gosh, why am I drawing a blank. There
6  was something else provided, but I don't remember
7  what it was.
8    Q. Okay. Are you, are you going to be in
9  town during the weeks of July 5th and July 11th?
10   A. I'll be out of town a portion of that.
11 And then the latter part of the week, I will --
12 I'll be in town, but I do have some, some other
13 child care obligations that I've committed to.
14   Q. Okay. Whose child?
15   A. Well, I -- my sister's, in short.
16   Q. Okay. And, and your travel, when are you
17 going to be traveling?
18   A. I will be traveling starting tomorrow.
19 And I will be back in town on the 5th, which is
20 actually on my way back, I'll be getting my, my
21 niece.
22   Q. Okay.
23   A. She's in my --
24   Q. Is there -- your sister's daughter?
25   A. Uh-huh, that's right.

Page 46

1    Q. And how long will the niece be staying
2  with you?
3    A. The whole week.
4    Q. The whole week of July 5th?
5    A. Yes, the whole week -- it's undetermined
6  if she's gonna need me to keep her through that
7  mid next week or if, if I'll be taking her back.
8    Q. Is there anyone else available to care for
9  your niece during that week?
10   A. No.
11   Q. And in the following week, is there anyone
12 else available to care for your niece, the week of
13 July 11th?
14   A. Not while I have her, no.
15   Q. But you may not have her during that week?
16   A. That part hasn't been a hundred percent
17 nailed down yet in terms of, you know, am I gonna
18 keep her through, through the, the first half of
19 that week or if I'm taking her back on the
20 weekend. But currently, tentatively, I may be
21 taking her back on the 12th.
22   Q. Did you receive a subpoena for trial on
23 the 5th?
24   A. No, I did not.
25   Q. Did you receive a subpoena for this

Page 47

1  deposition?
2    A. No.
3    Q. We had a break a few minutes ago, and I
4  think your lawyers are gonna say something, so
5  give them a chance to do so. Did you meet -- did,
6  did you speak with anyone during the break that we
7  had a few minutes ago?
8    A. Like who? Like my husband or -- no.
9    Q. Anyone.
10   A. No.
11   Q. You didn't speak with any of the attorneys
12 either?
13   A. No.
14       MR. HILL: I don't have anything
15 further.
16       MR. MORRIS: Okay. I don't, I don't
17 have any questions.
18       MR. GREENFIELD: Adam Greenfield
19 speaking, I have a few.
20            EXAMINATION
21 BY MR. GREENFIELD:
22   Q. Hi, Ms. Burdine. My name is Adam
23 Greenfield, and I'm one of the attorneys
24 representing TWU Local 556 in this matter.
25       Can you hear me all right?

Page 48

1    A. I can.
2    Q. Do you understand who I am and who I
3  represent?
4    A. Yes, I do.
5    Q. Okay. To give you a little bit of
6  background, Charlene Carter is alleging as part of
7  this lawsuit that Southwest Airlines and the union
8  worked together to get Ms. Carter fired from her
9  job as a flight attendant. You understand that?
10   A. I hear what you're saying, yes. I
11 understand what you're saying. I don't agree.
12   Q. Okay. You don't agree?
13   A. No, I do not agree.
14   Q. Okay. Can the union tell you how to
15 discipline an employee?
16   A. No.
17   Q. Can the union tell anyone at Southwest
18 Airlines how to discipline employees?
19   A. Well, can I, can I say the union can tell
20 us respectfully what, what they believe is
21 appropriate, but we make our decisions on, on our
22 own within Southwest Airlines' inflight leadership
23 and, of course, the, the labor relations
24 department.
25   Q. Sure. And when you say that, are, are you

Melissa Burdine

Page 49

1  referring to the union advocating on behalf of the
2  employees' behalf as part of the Step 1, Step 2,
3  and potential arbitration process?
4      A. Any, any official forms of grievances,
5  grievance matters, that would be what I'm, what
6  I'm speaking to, yes.
7      Q. Okay. And, and did anyone at the union
8  ever try to pressure you into any recommendation
9  you made about Southwest Airlines' ultimate
10 decision to fire Charlene Carter?
11     A. No, not that I recall.
12     Q. Okay. And to your knowledge, did anyone
13 at the union have any influence over the decision
14 to fire Charlene Carter?
15     A. Not that I am aware, no.
16     Q. Okay. And to your knowledge, are, are you
17 aware of anyone at the union having any say or
18 influence on Southwest Airlines' decision to
19 discipline or terminate any flight attendant?
20     A. No.
21     Q. Did the union negotiate on Ms. Carter's
22 behalf to reduce her termination to a 30-day
23 suspension?
24     A. I don't remember explicitly, but typically
25 that can happen, yes, as a part of grievance, and

Page 50

1  it can --
2      Q. Can you -- I'm sorry. Can you explain
3  that process a little bit, how, how that would,
4  how that would play out after, let's say, a Step 2
5  hearing?
6      A. Yes. And I, I don't want to, I don't want
7  to draw a picture that this happened in
8  Ms. Carter's case because I just -- I honestly
9  don't remember all those conversations, but in, in
10 typical circumstances, I -- following the Step 2
11 hearing, a number of things could happen. It's
12 not really cookie cutter, but typically we'll hear
13 from the union, sometimes they want to provide
14 additional documents that the grievant may have
15 provided them. They may have talked to the
16 grievant about any, you know, settlement offers
17 that we made. They may ask for something
18 different. I mean, just general grievance talk,
19 if you will, if they have newer, additional
20 information, sometimes they may reach out, but,
21 again, that's -- I'm, I'm speaking in more like
22 typical terms.
23         Those grievance meetings that I
24 referenced earlier, sometimes things will come up
25 again. You know, off the top of my head that

Page 51

1  would be some of the communications that we would
2  have through the, the official channel.
3      Q. Thank you.
4         And did the union represent Ms. Carter
5  at her Step 2 hearing?
6      A. Yes.
7      Q. Okay. And, and do you remember who did
8  that?
9      A. I -- again, I did see the Step 2 notes,
10 and it -- according to the notes, it said it was
11 Becky Parker, and I believe Beth Ross may have
12 also been there.
13     Q. Okay.
14     A. I, I -- there were two, there were two
15 representatives, which is pretty standard.
16 Sometimes there's one, but typically there's two.
17     Q. Okay. And the last-chance agreement was
18 offered after the conclusion of the Step 2
19 hearing; is that correct?
20     A. Yes. It was after the Step 2 hearing. So
21 the -- whoever is the designee, in this case, it
22 was Mike Sims, he would have ten days to make a
23 decision and, and respond. And so ...
24     Q. Okay.
25     A. That would be following Step 2 hearing.

Page 52

1         MR. GREENFIELD: I have no more
2  questions for you. Thank you so much.
3         MR. HILL: I have a couple of
4  follow-ups on that.
5              EXAMINATION
6  BY MR. HILL:
7      Q. You said the union didn't push for
8  terminations of employees, I believe. Are you
9  aware that in this case Audrey Stone is the one
10 who made the report regarding Ms. Carter?
11     A. I am aware of that.
12     Q. And so in this case, the union did make a
13 report seeking discipline of an employee, right?
14         MR. GREENFIELD: Objection, form.
15         MR. MORRIS: Objection, misstates
16 testimony.
17     A. I -- I'm answering the question, right?
18         I don't know what Audrey Stone
19 thought when, when she sent us the post. Audrey
20 Stone was a flight attendant, and as I mentioned
21 before, we would often get flight attendants that
22 would turn in other flight attendants. And I
23 really can't speculate what they think might
24 happen. The -- from my standpoint, I would review
25 whatever was submitted and see if it violated our

13 (Pages 49 to 52)

Page 53

1    policies, work and conduct rules, and things like
2    -- of that nature.
3        Q.  You understood that Ms. Stone was the
4    union president, right?
5        A.  Yes, I do know that Ms. Stone was the
6    union president.
7        Q.  And you understood that she was filing a
8    report on one of the employees that was
9    represented by the union, even though she was not
10   a union member, right?
11       A.  What do you mean by filing a report?  You
12   mean --
13       Q.  She --
14       A.  -- when she turned in the, the messages?
15       Q.  That's right.
16       A.  I, I do understand that she was a flight
17   attendant who was currently acting as the
18   president.  And she did turn in another flight
19   attendant that, that was sending messages.
20       Q.  Okay.  You talked about what happens
21   generally after Step 2 hearings where the union
22   might provide additional information and seek less
23   punishment.  Are you aware that that happened in
24   Ms. Carter's case?
25       A.  I -- honestly, I can't remember.

Page 54

1        Q.  Okay.  So what -- you, you weren't
2    testifying that that happened with Ms. Carter?
3        A.  I was not.  I was saying in -- this isn't,
4    this isn't cookie cutter.  This isn't what
5    happened every time, happens in every case, but
6    that can happen, yes.
7        Q.  If it didn't happen with Ms. Carter, the
8    union was not acting as proactively as they do on
9    behalf of some other union members, right?
10           MR. GREENFIELD:  Objection, form.
11       A.  I, I really can't say what the union ...
12       Q.  Maybe there's a better way to ask this.
13       A.  I can't say what they did or didn't do.  I
14   really can't even remember if, if -- you know,
15   what the conversations were after Ms. Carter's
16   termination and subsequent to the Step 2 hearing.
17   They may or may not have reached out.  I, I just
18   honestly don't remember.
19       Q.  The union sometimes pushes for less
20   punishment after the Step 2 hearing, right?
21       A.  Yes.  That is.
22       Q.  And it did, and it did -- and, and, to
23   your knowledge, you don't remember if they did
24   that here?
25       A.  Well, in the Step 2 hearing, the union

Page 55

1    members typically advocate for the, the flight
2    attendant.  I'm trying to remember if the notes
3    stated whether or not, you know, there was -- if,
4    if they provide any, any explanations on
5    Ms. Carter's behalf.  We could probably review
6    those real quick if you'd like, but ...
7        Q.  Sitting here, you're not aware of anything
8    they did?
9        A.  I'm sorry?
10       Q.  Sitting here, you're not aware of anything
11   they did, right --
12           MR. GREENFIELD:  Objection, form.
13       Q.  -- to seek less punishment?
14       A.  I just don't remember.  I, I don't
15   remember if they did or did not.  But they --
16           MR. HILL:  I don't have anything
17   further.
18           THE WITNESS:  Okay.
19           MR. MORRIS:  All right.  I don't have
20   any questions.
21           THE REPORTER:  Okay.  Signature?  Do
22   you want her to read and sign?
23           MR. HILL:  Brian?
24           MR. MORRIS:  Sorry.  Excuse me, I
25   didn't quite understand that.  What was that?

Page 56

1            MR. MCKEEBY:  Yes, read and sign.
2            THE REPORTER:  Do you want her to read
3    and sign?
4            MR. MCKEEBY:  Yes.
5            MR. MORRIS:  Yes.
6            THE REPORTER:  Does anyone want to
7    purchase a copy?
8            MR. MCKEEBY:  A condensed, same as the
9    others.
10           MR. GREENFIELD:  Same for the union.
11           (Deposition concluded at 5:42 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

14 (Pages 53 to 56)

Melissa Burdine

Page 57

1             CHANGES AND SIGNATURE
2    WITNESS NAME: MELISSA BURDINEDATE: JUNE 28, 2022
3    PAGELINE    CHANGE      REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Page 58

1    _____
2    _____
3           I, MELISSA BURDINE, have read the
4    foregoing deposition and hereby affix my signature
5    that same is true and correct, except as noted
6    above.
7
8
9
10
11           _____
11           MELISSA BURDINE
12
13
14
15   THE STATE OF _____)
16   COUNTY OF _____)
17
18       Before me, _____, on
19   this day personally appeared MELISSA BURDINE,
20   known to me (or proved to me under oath or through
21   _____) (description of
22   identity card or other document)) to be the person
23   whose name is subscribed to the foregoing
24   instrument and acknowledged to me that they
25   executed the same for the purposes and

Page 59

1    consideration therein expressed.
2         Given under my hand and seal of office
3    this _____ day of _____,
4    _____.
5
6
7           _____
8           NOTARY PUBLIC IN AND FOR
8           THE STATE OF _____
             COMMISSION EXPIRES: _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 60

1         IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2                DALLAS DIVISION
3    CHARLENE CARTER,        )
                             )
4         Plaintiff,  )
                             )
5    VS.                ) CIVIL ACTION
                             )
6                      ) NO.: 3:17-cv-02278-X
     SOUTHWEST AIRLINES CO.,  )
7    AND TRANSPORT WORKERS    )
     UNION OF AMERICA, LOCAL )
8    556,                )
                             )
9         Defendant. )
                             )
10
11        REPORTER'S CERTIFICATION
12        DEPOSITION OF MELISSA BURDINE
13             JUNE 28, 2022
14
15       I, Melody A. Monk, Certified Shorthand
16   Reporter in and for the State of Texas, hereby
17   certify to the following:
18       That the witness, MELISSA BURDINE, was duly
19   sworn by the officer and that the transcript of
20   the oral deposition is a true record of the
21   testimony given by the witness;
22       That the deposition transcript was submitted
23   on July 1, 2022 to the witness or to the attorney
24   for the witness for examination, signature and
25   return to me by August 1, 2022;

15 (Pages 57 to 60)

Melissa Burdine

---

## Page 61

```
 1      That the amount of time used by each party at
 2   the deposition is as follows:
 3   MATT HILL.....00 HOUR(S):58 MINUTE(S)
     ADAM GREENFIELD.....00 HOUR(S):05 MINUTE(S)
 4
 5      That pursuant to information given to the
 6   deposition officer at the time said testimony was
 7   taken, the following includes counsel for all
 8   parties of record:
 9   FOR THE PLAINTIFF:
10      MATTHEW D. HILL
        Pryor & Bruce
11      302 North San Jacinto
        Rockwall, Texas 75087
12      972.771.3933
        Mhill@pryorandbruce.com
13
        MATTHEW B. GILLIAM
14      National Right to Work Legal Defense
           Foundation, Inc.
15      8001 Braddock Road, Suite 600
        Springfield, Virginia 22160
16      703.321.8510
        Mbg@nrtw.org
17
18   FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
19      BRIAN MORRIS
        PAULO B. MCKEEBY
20      Reed Smith
        2850 North Harwood Street
21      Suite 1500
        Dallas, Texas 75201
22      Jmammone@reedsmith.com
        Pmckeeby@reedsmith.com
23
24
25
```

---

## Page 62

```
 1   FOR THE DEFENDANT TRANSPORT WORKERS UNION OF
     AMERICA:
 2
 3      EDWARD B. CLOUTMAN, III
        Law Offices of Edward Cloutman III
 4      3301 Elm Street
        Dallas, Texas 75226
 5      214.232.9015
        Ecloutman@lawoffices.email
 6
 7      ADAM S. GREENFIELD
        Cloutman & Greenfield, PLLC
 8      3301 Elm Street
        Dallas, Texas 75226
 9      Agreenfield@candglegal.com
10
11      That $_____ is the deposition officer's
12   charges to the Plaintiff for preparing the
13   original deposition transcript and any copies of
14   exhibits;
15      I further certify that I am neither counsel
16   for, related to, nor employed by any of the
17   parties or attorneys in the action in which this
18   proceeding was taken, and further that I am not
19   financially or otherwise interested in the outcome
20   of the action.
21      Certified to by me this 30th day of June,
22   2022.
23
24
25   _____
```

---

## Page 63

```
 1         Texas CSR No. 3613
           Expiration Date:  10/21/2022
 2
     MELODY MONK REPORTING
 3   Firm Registration No. 10821
     1999 McKinney Avenue, No. 1404
 4   Dallas, Texas 75201
     888.988.5317 (phone and fax)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

MELODY MONK REPORTING
888.988.5317

| **A** | | | |
|---|---|---|---|
| **aborted** 15:2 20:1,4,10 | 48:11,12,13 | **appeal** 8:10 | 22:25 25:10 |
| **abortion** 19:24 | **agreed** 18:16 | **appeals** 9:4 10:5 | 26:19 28:10 |
| **above-styled** 1:22 | **agreement** 5:12 | **appearances** 5:2 | 29:9 32:6 |

**A**

**aborted** 15:2
  20:1,4,10
**abortion** 19:24
**above-styled**
  1:22
**abreast** 14:7
**accept** 35:21
  37:5 40:2,15
**accepted** 32:19
  32:20 36:9,10
  37:4,11 38:14
**accepting** 38:10
**accommodati...**
  42:21 43:3
**accurate** 9:1
  10:25 32:25
  33:11 36:16
**acknowledged**
  58:24
**ACT** 43:7,8,22
**acting** 53:17
  54:8
**action** 1:5 13:10
  38:4,19 60:5
  62:17,20
**actions** 8:6
**activities** 22:7,8
  22:15
**actual** 12:19
**ADA** 43:4
**Adam** 4:1 6:15
  47:18,22 61:3
  62:7
**adamantly**
  19:14
**addition** 37:9,11
**additional** 12:14
  50:14,19 53:22
**advocate** 55:1
**advocating** 49:1
**affix** 58:4
**AFL-CIO** 5:14
**ago** 47:3,7
**agree** 40:14

48:11,12,13
**agreed** 18:16
**agreement** 5:12
  5:17 8:18
  21:23 22:3,13
  29:13 30:2,5,7
  30:9,11 31:11
  31:20,23,24
  32:7,20 35:14
  35:21 36:3,9
  36:10,13,14,18
  37:5,12,17,19
  38:11,15 39:10
  39:12,15,23
  40:3,16,20
  41:8 51:17
**agreements** 6:10
  36:21
**Agreenfield @ ...**
  4:3 62:9
**Airlines** 1:6 3:12
  5:12,13 6:4 7:4
  7:6 10:1,16
  14:10 17:3
  25:14 40:8
  42:15,25 43:19
  48:7,18 60:6
  61:18
**Airlines'** 8:3
  48:22 49:9,18
**alleging** 48:6
**ambiguous**
  11:21 13:2
  27:8
**America** 1:7
  3:19 5:14 6:5
  60:7 62:1
**amount** 61:1
**answer** 11:22
  13:3 14:18
  15:16 20:18,19
  21:3 43:20
  44:10,15
**answered** 14:17
**answering** 52:17

**appeal** 8:10
**appeals** 9:4 10:5
**appearances** 5:2
  6:9
**appeared** 58:19
**appearing** 3:2
**appears** 22:4
  23:5
**appreciate** 29:1
**appropriate**
  27:6 48:21
**approximately**
  6:8
**April** 5:15
**arbitration** 49:3
**Armstrong** 4:7
**Article** 22:5
**asked** 12:15
  14:16 39:11
  41:9
**asking** 21:4 34:5
  34:10,13 39:13
**assigned** 9:17,18
**Assuming** 36:13
**attach** 23:7
**attached** 2:4
  23:17 39:22
**attendance** 35:1
**attendant** 14:10
  19:9 24:10,16
  28:6 33:5 35:6
  48:9 49:19
  52:20 53:17,19
  55:2
**attendants** 5:13
  24:14,18 25:1
  25:3 26:12,15
  27:12,14,18
  33:5 35:24
  52:21,22
**attendants'** 25:4
  26:13 27:13
**attended** 8:8
  17:19
**attention** 21:19

22:25 25:10
  26:19 28:10
  29:9 32:6
  37:10
**attorney** 44:2
  60:23
**attorneys** 47:11
  47:23 62:17
**Audrey** 9:21,23
  10:7 52:9,18
  52:19
**August** 60:25
**availability** 14:6
**available** 46:8
  46:12
**Avenue** 63:3
**awarded** 33:6
**aware** 24:12
  26:14 36:18
  43:22 49:15,17
  52:9,11 53:23
  55:7,10

**B**

**B** 3:8,14,20
  61:13,19 62:2
**babies** 15:2
**back** 19:6 23:9
  30:8 31:25
  32:9,9,22
  33:14,15 34:20
  35:9,10,13,18
  35:20,25 36:3
  36:7,8,17
  41:23 42:3
  45:19,20 46:7
  46:19,21
**background**
  48:6
**bargaining** 8:17
  21:22 22:2,13
**base** 8:5 10:15
  12:11,18
**based** 26:22
  27:13,16,18

38:19 41:17
  43:11
**bases** 14:7
**bear** 9:14 42:16
  43:1
**Becky** 51:11
**beginning** 21:24
**behalf** 6:16
  36:24 49:1,2
  49:22 54:9
  55:5
**belief** 17:16,20
  17:23 21:7
**believe** 10:2
  17:5 19:11,12
  19:14 20:14,25
  21:8 24:8,9
  28:8 33:8,24
  34:7 42:16
  48:20 51:11
  52:8
**best** 11:17 15:12
  19:17
**Beth** 51:11
**better** 54:12
**bit** 28:23 48:5
  50:3
**blank** 45:4,5
**Braddock** 3:9
  61:15
**break** 41:22
  47:3,6
**Brian** 3:13 6:13
  24:7 44:2
  55:23 61:19
**brings** 31:24
**brought** 27:12
**Bruce** 3:5 61:10
**bullet** 32:13
  37:10
**bullying** 37:13
**Burdine** 1:13,20
  5:4 6:3,14,20
  6:25 7:2 42:5
  47:22 58:3,11

58:19 60:12,18
**BURDINEDA...**
57:2
**business** 7:12
**button** 28:18,20

**C**

**C** 3:1
**call** 11:16 44:2,4
**called** 43:8
**calls** 20:16,17
24:19 44:6,14
**capacity** 43:16
**card** 58:22
**care** 45:13 46:8
46:12
**career** 42:22
**Carter** 1:3 4:6
6:3,12 14:8
15:21,24 16:7
16:13 17:15,21
18:1 19:7
20:15 21:17
29:17,19 33:8
33:19,25 38:14
48:6,8 49:10
49:14 51:4
52:10 54:2,7
60:3
**Carter's** 14:15
14:20 16:11
17:7 18:11,15
23:8,14 35:17
49:21 50:8
53:24 54:15
55:5
**case** 6:3,5 9:8,10
9:19 11:14
13:5 50:8
51:21 52:9,12
53:24 54:5
**cases** 10:6
**cause** 1:22
**certain** 24:14
35:12

**certainly** 40:17
**Certificate** 5:8
**CERTIFICA...**
60:11
**Certified** 60:15
62:21
**certify** 60:17
62:15
**chance** 5:16
31:10 47:5
**change** 36:22
57:3
**CHANGES** 57:1
**channel** 51:2
**charges** 62:12
**Charlene** 1:3
4:6 6:3,12 14:8
14:9 16:7,13
17:15 18:1
23:8,14 29:16
41:4 48:6
49:10,14 60:3
**child** 45:13,14
**choice** 40:15,17
**choose** 33:10
**chose** 36:7
**Chris** 4:7
**circumstances**
15:13 19:1,4,5
31:7 35:12,17
35:23 50:10
**Civil** 1:5 2:2 6:5
60:5
**claims** 39:16,24
40:7,19,24
41:5,9,18
**clarify** 8:1 17:1
**clear** 29:19
**close** 41:24
**Cloutman** 3:20
3:20 4:2 6:17
6:18 62:2,3,7
**collaborate**
10:15 13:9
15:12

**collaborative**
14:2
**collective** 8:17
21:22 22:2,12
**come** 10:5 12:15
15:4 35:25
40:18 41:23,23
50:24
**coming** 32:9
**COMMISSION**
59:8
**committed**
45:13
**communicated**
16:7,13 30:7
**communicatio...**
20:12 44:6,14
51:1
**Company** 6:4
**compensation**
32:15
**complaints**
27:11
**complied** 8:17
**concerns** 8:8
**concluded** 56:11
**conclusion**
20:17 51:18
**conclusions**
21:13 26:22
**condensed** 56:8
**conduct** 8:7 12:7
19:18 28:7
53:1
**conducted** 12:12
**confidential**
5:16 39:24
**confirm** 31:18
**connection**
35:13
**consider** 22:22
36:1,2
**consideration**
21:15 37:24
59:1

**consistent** 19:17
**content** 28:5
**context** 20:7
**contract** 9:5
10:3 22:21
**contractual** 8:7
35:6
**conversation**
18:19 31:8,12
**conversations**
30:4 50:9
54:15
**convinced** 33:19
**convinces** 34:16
**cookie** 50:12
54:4
**copied** 26:24
**copies** 62:13
**copy** 56:7
**corner** 28:21
**correct** 7:19
8:19 12:20
23:24 36:8
39:21 51:19
58:5
**correctly** 10:4
15:3 32:23
33:8
**counsel** 6:9 61:7
62:15
**counteroffer**
36:1
**COUNTY** 58:16
**couple** 8:14 42:4
52:3
**course** 48:23
**Court** 1:1 6:7
60:1
**COVID** 7:11
**CSR** 1:24 63:1
**current** 42:14
**currently** 16:18
21:4 46:20
53:17
**cutter** 50:12

54:4

**D**

**D** 3:4 61:10
**Dallas** 1:2 3:16
3:21 4:3 6:7
60:2 61:21
62:4,8 63:4
**Date** 63:1
**daughter** 45:24
**day** 7:7 15:15
58:19 59:3
62:21
**days** 34:9,11
51:22
**deal** 9:21,23
10:21 11:4
**dealing** 9:11
**decided** 10:20
11:3 13:10
**decision** 30:1,8
30:10 35:8
49:10,13,18
51:23
**decisions** 48:21
**Defendant** 3:12
3:18 60:9
61:18 62:1
**Defendants** 1:8
**Defense** 3:8
61:14
**define** 8:23
**department** 8:2
8:4 27:11
48:24
**departments**
43:17
**depend** 35:23
**depended** 9:8
**depending** 12:1
14:5 36:22
**depends** 11:12
13:5
**deposition** 1:12
1:19 6:2 44:1

44:17 47:1
56:11 58:4
60:12,20,22
61:2,6 62:11
62:13
**describe** 11:5
**describing** 19:22
**description** 5:11
58:21
**designee** 51:21
**determine** 11:17
12:7
**difference** 7:20
**different** 9:13
9:15,16,17
28:11 43:3,16
43:17 50:18
**direct** 21:19
22:5,25 25:10
25:13 26:19
28:10 29:9
32:6
**disability** 43:4
**disciplinary** 8:6
13:10 38:3
**discipline** 10:14
10:20 11:3,7,9
12:8 37:24
38:1 48:15,18
49:19 52:13
**disciplines**
10:17
**discriminated**
42:7,11 43:10
**discrimination**
37:15
**discuss** 9:4 44:4
**discussed** 18:15
**discussion** 6:19
15:15
**discussions** 9:2
9:7
**dismissed** 38:12
38:16
**District** 1:1,1

6:6,7 60:1,1
**Division** 1:2 6:8
60:2
**document** 21:20
21:24,25 23:4
39:23 40:4,6
40:10,23 41:18
44:24 45:1
58:22
**documents**
25:12 44:16
50:14
**doing** 22:17
24:22
**draft** 30:6 31:19
36:21
**drafted** 29:14
31:18 32:7
36:14,19 39:10
**drafting** 31:10
31:12
**draw** 50:7
**drawing** 45:5
**drew** 45:4
**due** 7:10,11,11
32:23 33:9
43:3
**duly** 1:21 6:21
60:18

─────────── E ───────────
**E** 3:1,1
**e-mail** 23:5,7,10
23:13,17,22
25:17,19,21
26:3,8,20,20
26:23,24,25,25
28:13 30:19,21
30:24 31:2,8
**e-mails** 24:5
29:5
**earlier** 22:11
26:11 50:24
**Ecloutman@l...**
3:22 62:5

**Ed** 17:25
**Edward** 3:20,20
6:17 62:2,3
**effective** 5:14
22:3
**egregious** 19:8
**either** 47:12
**Elm** 3:21 4:2
62:3,8
**Email** 5:15,15
**Emlet** 13:12,17
13:18 15:5,6
15:17,20,24
16:6 25:18
**employed** 62:16
**employee** 10:13
11:7 12:6,7,24
13:4,9 19:15
25:24 31:25
34:24 42:14,17
42:20 48:15
52:13
**employee's** 26:3
**employees** 12:7
22:6,14 26:16
35:13 43:3
48:18 52:8
53:8
**employees'** 26:8
49:2
**Emult** 13:16
**enforced** 10:3
**engage** 22:7
**engaging** 22:14
**ensure** 8:16
22:12
**escaping** 44:25
**evaluate** 38:3
**evidence** 34:10
**exact** 29:4
**exactly** 33:14
43:18
**examination** 5:5
5:5,6 6:23
47:20 52:5

60:24
**Excuse** 55:24
**executed** 37:20
58:25
**exhibit** 21:20,21
23:1,2,3 25:11
25:11,16 28:11
28:12 29:10,11
29:12 30:17
40:18 41:5
**exhibits** 5:10
62:14
**exist** 38:22
**expertise** 21:13
**Expiration** 63:1
**EXPIRES** 59:8
**explain** 50:2
**explained** 26:11
**explanations**
55:4
**explicitly** 38:8
49:24
**exposure** 10:7
**expressed** 59:1

─────────── F ───────────
**fact** 31:16 34:14
**fact-finding**
11:16,23
**familiar** 24:9
**fax** 63:4
**February** 5:15
**Federal** 2:2
**feel** 39:7
**fetus** 20:1,5
**fetuses** 20:10
**file** 34:24 37:20
38:2
**filing** 53:7,11
**finally** 39:14
**financially**
62:19
**finish** 23:9
**fire** 49:10,14
**fired** 48:8

**Firm** 63:3
**first** 6:21 8:1
28:12 46:18
**flight** 5:13 14:10
19:9 24:10,14
24:16,17 25:1
25:3,4 26:12
26:13,15 27:12
27:12,13,18
28:6 33:4,5
35:6,24 48:9
49:19 52:20,21
52:22 53:16,18
55:1
**focused** 36:5
**follow** 23:16
30:22
**follow-ups** 52:4
**followed** 22:13
**following** 46:11
50:10 51:25
60:17 61:7
**follows** 6:22
61:2
**foregoing** 58:4
58:23
**forgive** 24:8
**form** 52:14
54:10 55:12
**formerly** 7:3
**forms** 49:4
**forward** 23:13
**forwarded** 15:6
25:18
**Foundation** 3:9
61:14
**free** 22:7
**Frisco** 2:1
**function** 26:1
**further** 38:18
47:15 55:17
62:15,18
**future** 37:12,23
37:25

**G**

**general** 11:9
  12:9 34:14
  50:18
**generally** 12:13
  27:23 53:21
**getting** 45:20
**Gilliam** 3:8 6:11
  61:13
**give** 32:1,3 33:5
  33:9 35:4 36:7
  47:5 48:5
**given** 59:2 60:21
  61:5
**go** 19:6 23:9
  28:1,25
**goes** 28:20
**going** 6:1 14:7
  21:19 22:5
  26:19 29:9
  41:22,23 44:5
  45:8,17
**gonna** 25:13
  32:6 46:6,17
  47:4
**good** 12:4,4
**gosh** 44:24 45:3
  45:5
**graphic** 19:8
**Greenfield** 4:1,2
  5:5 6:15,15
  47:18,18,21,23
  52:1,14 54:10
  55:12 56:10
  61:3 62:7,7
**grievance** 8:9
  29:23,25 38:11
  38:15,19,20,24
  39:4 49:5,25
  50:18,23
**grievances** 9:4
  9:16 10:4 24:4
  34:22 49:4
**grievant** 50:14
  50:16

**grievant's** 36:24
**group** 9:25
  28:14
**groups** 26:16
**guess** 9:18 11:25
  12:9 16:20
  21:14 30:24
  33:12 38:21

**H**

**half** 46:18
**hand** 59:2
**handle** 12:18
**handled** 9:8,9
  9:15
**handling** 9:19
**hands-on** 12:2,6
**happen** 11:25
  13:25 49:25
  50:11 52:24
  54:6,7
**happened** 25:9
  50:7 53:23
  54:2,5
**happens** 53:20
  54:5
**harassment**
  19:15 37:14,15
**hard** 27:22
**Harwood** 3:15
  61:20
**hazing** 37:13
**head** 25:8 43:5
  50:25
**hear** 47:25
  48:10 50:12
**hearing** 14:4
  16:21,24,25
  17:7,13,20
  18:4,7,11,14
  18:18 23:8,14
  29:23,25 30:13
  50:5,11 51:5
  51:19,20,25
  54:16,20,25

**hearings** 8:9
  53:21
**heavily** 13:6
**Hello** 6:13
**help** 31:15 39:13
**hereto** 2:4
**hey** 41:7
**Hi** 47:22
**higher** 10:16
**highlight** 37:11
**highlighted**
  32:11
**Hill** 3:4 5:5,6
  6:11,11,24
  27:23 31:7
  35:16 43:15
  44:8 47:14
  52:3,6 55:16
  55:23 61:3,10
**hold** 28:16
**honest** 9:12
  11:13 14:13
  16:5 17:18,22
  24:24
**honestly** 21:10
  21:12 31:9
  50:8 53:25
  54:18
**hopefully** 41:24
**HOUR(S):05**
  61:3
**HOUR(S):58**
  61:3
**hundred** 43:2
  46:16
**husband** 47:8
**hypothetical**
  22:19 27:8
  35:22 38:5
  41:3 42:10
  43:14
**hypothetically**
  27:22 38:8
  39:7 42:18

**I**

**identity** 58:22
**III** 3:20,20 6:17
  62:2,3
**incidents** 25:6
**include** 36:3
**included** 7:25
  30:14
**includes** 25:11
  61:7
**including** 28:14
**incomplete**
  22:18 27:7
  42:9 43:13
**INDEX** 5:1
**inflight** 8:1,2,2
  10:15 48:22
**inflight's** 30:8
**influence** 49:13
  49:18
**information**
  16:3 27:9
  50:20 53:22
  61:5
**instance** 1:20
**instruct** 44:7,8
  44:15
**instrument**
  58:24
**interact** 8:25
  9:20
**interacted** 8:21
**interaction** 10:9
**interested** 62:19
**interpretation**
  9:5
**introduce** 7:1
**investigating**
  11:14 27:11
**investigation**
  12:6,11,12,16
  12:19,22,23
  13:7 14:12,15
  25:2 42:18,19
**investigations**

  11:19,24 12:25
  13:5
**investigator**
  12:2
**investigators**
  25:25
**involve** 29:16
**involved** 11:7,18
  12:5,25 13:4,7
  14:15 30:10
**involvement**
  12:1 14:23
**issuance** 11:8
**issue** 13:23
  30:10

**J**

**Jacinto** 3:5
  61:11
**Jmammone@...**
  3:16 61:22
**job** 8:24 13:20
  40:11 48:9
**Julie** 25:17,23
**July** 45:9,9 46:4
  46:13 60:23
**June** 1:14,22
  5:14 6:2 57:2
  60:13 62:21
**jury** 7:1

**K**

**keep** 14:6 46:6
  46:18
**kind** 32:2 34:20
**know** 8:7 19:2
  19:13,18 20:19
  20:23 25:9
  26:12 28:2
  34:3,6,25 35:7
  35:10 36:1,23
  41:5 42:21
  45:2 46:17
  50:16,25 52:18
  53:5 54:14

55:3
**knowledge**
  34:14 49:12,16
  54:23
**known** 43:7
  58:20

——————— **L** ———————

**labeled** 25:14
**labor** 7:3,5,16
  7:18,23 8:3,16
  8:20 10:12,19
  11:2 13:8,19
  15:11 17:2
  18:3 26:2,7
  27:10,24 29:15
  30:22 48:23
**last-chance**
  29:13 30:2,5,6
  30:9,11 31:11
  31:19,23,24
  32:7,20 35:14
  35:21 36:2
  37:4,12 38:10
  38:15 39:15,22
  40:3,16,20
  41:8 51:17
**Lauren** 4:7
**Law** 3:20 62:3
**lawful** 22:7,15
**lawsuit** 48:7
**lawyers** 47:4
**lead** 12:22,23
**leader** 11:12
  12:18
**leader's** 12:12
**leaders** 8:5
  11:13,15
**leadership** 48:22
**leading** 34:9,11
**learn** 24:25
**learned** 24:21
**leave** 7:9,13
**legal** 3:8 20:17
  21:12 39:16,23

40:10,23 41:18
  61:14
**let's** 29:19 32:4
  50:4
**letter** 31:17
**level** 9:11,12
  10:17
**list** 10:5
**little** 28:18,19,23
  43:17 48:5
  50:3
**Local** 1:7 6:5,16
  47:24 60:7
**long** 22:14 46:1
**longer** 38:22
  39:3
**look** 23:18 34:23
**look-back** 33:13
**looked** 30:16
**looking** 20:2
  28:4 36:14
  37:1
**looks** 29:13
  31:17 39:6
**lot** 9:16

——————— **M** ———————

**ma'am** 18:8
  28:24 30:20
**Maberry** 4:7
**machine** 1:25
**making** 22:23
**manager** 7:3,6
  7:16,18,24
  8:16,21 10:13
  10:19 11:2
  13:8,19 17:2
  18:4 27:24
  29:15
**managers** 10:16
  15:11
**mandatory**
  41:11
**marked** 21:21
  23:2 25:16

29:11
**Matt** 6:11,11
  13:14 27:17
  61:3
**matter** 47:24
**matters** 49:5
**MATTHEW** 3:4
  3:8 61:10,13
**Maureen** 13:12
  13:16,17 14:2
  15:5,6
**Mbg@nrtw.org**
  3:11 61:16
**MCKEEBY**
  3:14 56:1,4,8
  61:19
**McKinney** 63:3
**mean** 12:1 17:8
  32:2 37:25
  39:7 50:18
  53:11,12
**meaning** 10:1
  36:1 38:21,21
**means** 8:4 39:12
**meant** 38:11
**media** 15:1,2
  19:8,21 24:13
  24:17 25:1,4
  26:4,9,13,17
  26:22 27:3,13
  27:14,19,24
  28:4,5,7 37:14
**meet** 47:5
**meeting** 10:2,2
  11:16 23:19,23
  23:25
**meetings** 11:24
  50:23
**Melissa** 1:13,19
  5:4 6:2,14,20
  7:2 57:2 58:3
  58:11,19 60:12
  60:18
**Melody** 1:24
  60:15 63:2

**member** 53:10
**members** 54:9
  55:1
**memory** 9:14
**mentioned**
  52:20
**merited** 12:8
**messages** 26:10
  53:14,19
**Mhill@pryor...**
  3:7 61:12
**mid** 46:7
**Mike** 16:16,22
  18:14 23:5,13
  30:7,12 51:22
**minimize** 28:19
**MINUTE(S)**
  61:3,3
**minutes** 47:3,7
**misstates** 10:22
  52:15
**Monk** 1:24
  60:15 63:2
**months** 37:20
**Morris** 3:13
  6:13,13 10:22
  11:20 13:1
  14:16 20:16
  21:2 22:18
  24:19 27:7,21
  42:9 43:13
  44:3,5,10,11
  44:13 47:16
  52:15 55:19,24
  56:5 61:19
**move** 28:16

——————— **N** ———————

**N** 3:1
**nailed** 46:17
**name** 7:2 8:10
  15:13 24:9
  47:22 57:2
  58:23
**name's** 31:17

**National** 3:8
  61:14
**nature** 9:5 20:11
  53:2
**need** 27:9 46:6
**negatively** 35:5
**negotiate** 41:7
  49:21
**negotiated** 36:23
**neither** 62:15
**newer** 50:19
**niece** 45:21 46:1
  46:9,12
**nondiscrimin...**
  22:6
**North** 3:5,15
  61:11,20
**Northern** 1:1
  6:7 60:1
**NOTARY** 59:7
**noted** 58:5
**notes** 18:5,10
  23:7,14,16,18
  23:19 24:4
  30:16,18 44:20
  45:4 51:9,10
  55:2
**number** 7:25
  14:1 25:11
  50:11
**numbered** 1:22

——————— **O** ———————

**O'Grady** 25:17
  25:23 26:21
  28:14
**oath** 58:20
**object** 44:5
**objected** 19:22
  44:13
**objection** 10:22
  11:20 13:1
  14:16 20:16
  21:2 22:18
  24:19 27:7,21

42:9 43:13
52:14,15 54:10
55:12
**objector** 28:3
**objectors** 27:15
27:20
**objectors'** 27:3
**obligations**
45:13
**Occasionally**
9:22
**occasions** 13:22
**October** 5:14
**offer** 30:1,9 35:9
35:18 36:6
37:7
**offered** 7:10
35:10,13 36:6
36:8 40:20
41:12,13,16,17
41:20,21 51:18
**offering** 37:17
**offers** 50:16
**office** 59:2
**officer** 60:19
61:6
**officer's** 62:11
**Offices** 3:20
62:3
**official** 49:4
51:2
**oh** 28:16,22
**Okay** 7:13 8:12
9:9 11:6,11
12:24 14:24
17:1,25 23:12
25:10 26:1,14
28:10,25 29:3
29:9,16 31:4
31:14,22 35:12
39:22 41:25
45:8,14,16,22
47:16 48:5,12
48:14 49:7,12
49:16 51:7,13

51:17,24 53:20
54:1 55:18,21
**once** 10:20 11:3
11:15
**open** 10:4
**opinion** 20:21
**oral** 1:12,19
60:20
**order** 39:19,19
40:11,22 41:1
**original** 62:13
**outcome** 62:19
**overall** 7:11

---

**P**

**P** 3:1,1
**p.m** 1:23,23 6:8
56:11
**packages** 7:11
**page** 5:1,7,8,11
25:13 28:11,12
28:12
**PAGELINE**
57:3
**Parker** 51:11
**part** 8:9,24 25:1
32:8 34:20
38:10,14 39:15
40:20 45:11
46:16 48:6
49:2,25
**particular** 8:15
26:15
**parties** 3:2 61:8
62:17
**party** 61:1
**Paulo** 3:14 44:3
61:19
**pay** 32:9,18
33:14,15 35:9
35:10,13,18,20
36:3,7,8,11,17
**people** 26:11
28:14 38:2
**percent** 43:2

46:16
**performance**
7:12
**period** 33:13
**person** 16:18
58:22
**personal** 10:9
**personally** 58:19
**phone** 31:8 63:4
**picture** 50:7
**pictures** 28:17
28:19
**Plaintiff** 1:4,21
3:3 60:4 61:9
62:12
**play** 50:4
**PLLC** 4:2 62:7
**Pmckeeby@r...**
3:17 61:22
**point** 11:6 16:8
16:23 24:12
33:20,24 37:9
**points** 37:10
**policies** 53:1
**policy** 28:8
37:13,14,15
**portion** 45:10
**position** 31:25
**possible** 18:20
18:22,23,25
**post** 27:24 28:4
28:5 52:19
**posts** 19:9,21,22
24:13,17 25:1
25:4 26:4,9,13
26:17,22 27:3
**potential** 49:3
**practices** 15:12
**preparation**
34:22 44:17
**prepare** 43:25
**preparing** 24:4
62:12
**PRESENT** 4:5
**presented** 36:11

**president** 53:4,6
53:18
**pressure** 49:8
**pretermination**
14:23 16:9
**pretty** 51:15
**prior** 11:8,8,25
13:9 14:20
31:10,12
**privilege** 44:9
**privileged** 5:16
44:6,14
**proactively** 54:8
**probably** 30:24
55:5
**Procedure** 2:2
**proceeding**
62:18
**process** 8:10
10:8 34:20
42:16 49:3
50:3
**produced** 1:20
**prohibited**
22:16
**promoting**
19:23
**proved** 58:20
**provide** 50:13
53:22 55:4
**provided** 45:6
50:15
**provisions** 2:3
**Pryor** 3:5 61:10
**PUBLIC** 59:7
**pulling** 24:13,17
24:25
**punishment**
53:23 54:20
55:13
**purchase** 56:7
**purposes** 33:15
58:25
**pursuant** 2:2
61:5

**push** 28:19 52:7
**pushes** 54:19

---

**Q**

**question** 11:1
12:3,5 20:20
24:21 26:5
33:22 34:4
38:13 40:22
41:4 43:20
52:17
**questions** 8:7
12:14 18:9,10
18:12 42:4
47:17 52:2
55:20
**quick** 17:2 55:6
**quickly** 41:24
**quite** 55:25

---

**R**

**R** 3:1
**rare** 35:15
**rarely** 33:3
**reach** 11:13,15
50:20
**reached** 54:17
**reaction** 16:4
17:6,8,12
**read** 55:22 56:1
56:2 58:3
**reading** 23:10
**real** 17:1 55:6
**really** 10:7
11:12 16:23
43:19 50:12
52:23 54:11,14
**reason** 20:25
21:8 57:3
**reasonable** 38:4
**reasons** 14:1
**recall** 10:3 15:2
15:17,20,23
16:2 17:6,9,14
18:17,18 20:1

20:3,4,10 25:6
25:21 26:23
27:2,25 32:23
33:7 36:20
49:11
**recap** 30:13,22
**receive** 32:9
36:11 46:22,25
**received** 36:16
**receiving** 25:21
**Recess** 42:2
**recognize** 21:25
23:4 25:19
29:12
**recollection** 20:9
35:15
**recommendati...**
21:16 22:23
30:14 49:8
**recommendati...**
19:16
**record** 2:3 6:2
6:10,19 42:1,3
60:20 61:8
**recourse** 11:17
**recover** 35:20
**reduce** 49:22
**reduced** 37:8
**Reed** 3:14 61:20
**refer** 41:6 42:17
42:19
**referenced**
30:18 50:24
**referred** 7:17
**referring** 49:1
**reflect** 35:4
**refrain** 22:8
**refresh** 9:14
**regard** 11:23
**regarding** 24:14
52:10
**Registration**
63:3
**regular** 8:24
24:3

**regularly** 8:21
8:23
**regulations** 26:2
**reinstated** 39:20
40:11,22 41:1
**Reinstatement**
5:16
**related** 62:16
**relations** 7:18
7:23 8:4,16,21
10:12,19 11:2
12:24 13:4,9
17:2 18:3
19:15 25:24
26:7 27:11
29:15 42:17
48:23
**release** 39:16,24
40:7,18,18
41:5,8
**releasing** 40:23
41:18
**relief** 39:3
**religion** 42:7,12
43:11,23
**remain** 37:19
**remember** 9:12
14:13,14,19,19
14:20,22 15:14
16:5,10,19,22
16:23,24 17:18
17:23 18:2,13
18:19 19:12,25
21:11,18 22:24
24:23,23 25:3
26:18,25 29:4
29:6 30:4,15
31:9 33:14
34:21 35:2
36:25 41:10
42:15 43:2,5
43:15,18,21,24
44:23 45:6
49:24 50:9
51:7 53:25

54:14,18,23
55:2,14,15
**remembering**
19:1
**rep** 35:25
**repeat** 11:1 26:5
33:22 38:13
**report** 52:10,13
53:8,11
**reported** 1:25
**Reporter** 6:1
13:14 27:16
42:1,3 44:11
55:21 56:2,6
60:16
**Reporter's** 5:8
60:11
**REPORTING**
63:2
**represent** 48:3
51:4
**representative**
9:10
**representatives**
51:15
**represented**
5:13 53:9
**representing**
47:24
**reps** 9:15
**research** 28:2
**resolved** 38:22
**respect** 32:24
33:9 43:23
**respectfully**
48:20
**respond** 51:23
**restated** 41:17
**result** 12:16
37:16
**retaliation** 37:15
**retrieving** 26:16
**return** 60:25
**review** 8:5 10:16
12:16 15:4

43:2 44:16,19
52:24 55:5
**reviewed** 12:10
12:11 27:19
38:7 45:4
**reviewing** 14:21
15:9 34:21
**right** 3:8 8:18,22
12:19 16:9
17:4 20:2,22
21:17 22:23
23:20,23 24:5
29:20,23 32:1
33:2,21 34:2
34:18 35:5,6
35:21 36:7,19
37:16,21,24
38:4,12,16,19
38:23 39:5,17
39:20,25 40:4
40:24 41:19
45:25 47:25
52:13,17 53:4
53:10,15 54:9
54:20 55:11,19
61:14
**rights** 32:1,2,3,5
**Road** 3:9 61:15
**Rockwall** 3:6
61:11
**role** 8:8 10:13,19
11:2 14:11
18:3 19:23
26:6 43:22
**roles** 22:11
**Ross** 51:11
**rules** 2:2 8:7
19:18 28:7
53:1

**S**
**S** 3:1 4:1 62:7
**San** 3:5 61:11
**sat** 15:8
**saying** 33:11

34:19 35:11
48:10,11 54:3
**says** 18:14 22:6
22:20 32:8
39:2
**schedules** 14:5
**Schneider** 18:1
**screen** 25:15
36:15 44:21
**scroll** 21:23
28:22 29:3
**seal** 59:2
**second** 32:13
**see** 21:24 22:9
22:10 26:24,24
28:1,13,21
32:10 51:9
52:25
**seeing** 26:23
**seek** 53:22 55:13
**seeking** 52:13
**send** 26:2,8
**sending** 20:5,10
24:4 53:19
**sense** 12:9 26:7
31:13
**sent** 19:8 23:22
26:21 28:5
30:12,18,24
31:1,7 43:11
52:19
**September** 7:8
**served** 7:3
**Service** 5:13
**serving** 7:5
**setting** 9:25
**settlement** 5:16
36:21 39:24
50:16
**sexual** 37:14
**share** 25:15
**short** 41:22
45:15
**shorthand** 2:1
60:15

showed 30:19
  44:20
side 15:8
sign 39:11,20
  40:3,10,23
  41:2,8,18
  55:22 56:1,3
signature 5:7
  55:21 57:1
  58:4 60:24
signed 36:17
  37:22 39:1,18
  40:8
Sims 16:16,22
  18:14,19 23:6
  23:13 30:7,12
  31:12 35:8
  51:22
Sims' 17:6
sir 11:1 15:25
sister's 45:15,24
Sitting 55:7,10
situation 18:15
  29:7
slowed 7:12
Smith 3:14
  61:20
social 15:1,1
  19:8,21 24:13
  24:17 25:1,4
  26:3,9,13,17
  26:22 27:3,13
  27:14,19,24
  28:4,5,7 37:14
soon 23:22
sorry 13:13,14
  13:18 23:9
  27:16 43:6,20
  44:11 45:3
  50:2 55:9,24
sounds 24:9
Southwest 1:6
  3:12 5:12,13
  6:4 7:3,6,7,10
  7:14 8:3,17

10:1,16 14:9
  17:3 22:12
  25:14 26:16
  30:1,6 39:17
  40:8 42:15,25
  43:19 48:7,17
  48:22 49:9,18
  60:6 61:18
Southwest's
  27:10 37:13
speak 19:13
  27:22 36:24
  47:6,11
speaking 11:9
  12:13 16:19
  27:23 39:7
  42:19 47:19
  49:6 50:21
specific 10:6
  16:2 25:6
  26:15
specifically 8:3
  15:14 36:25
speculate 52:23
speculation
  20:17 24:20
Springfield 3:10
  61:15
standard 51:15
standpoint
  52:24
starting 45:18
state 1:25 6:9
  58:15 59:8
  60:16
stated 2:3 55:3
statement 9:1
  32:25 36:16
states 1:1 6:6
  23:15 38:17
  39:6 60:1
stating 35:7
staying 46:1
Step 8:9 14:4
  16:20,24,25

17:7,13,19
  18:4,7,11,14
  18:18 23:8,14
  24:4 29:23,25
  30:13 34:22,23
  44:20 45:4
  49:2,2 50:4,10
  51:5,9,18,20
  51:25 53:21
  54:16,20,25
stipulations
  6:10
Stone 9:21,23
  10:7,10 52:9
  52:18,20 53:3
  53:5
stop 7:5
Street 3:15,21
  4:2 61:20 62:3
  62:8
structured
  43:17
styled 6:3
submitted 52:25
  60:22
subpoena 46:22
  46:25
subscribed
  58:23
subsequent 31:1
  38:3 54:16
substantiated
  19:15
Suite 3:9,15
  61:15,21
summarize 8:13
support 8:1,5
supported 8:2
supporting
  19:23 21:16
sure 23:11 38:9
  39:12 44:13
  48:25
surrounded
  30:5

suspension 37:6
  37:8 49:23
suspensions
  10:18
SWA 25:14
sworn 1:21 6:21
  60:19
system 33:7

_____ T _____
take 18:5,10
  41:22
taken 1:21 38:18
  61:7 62:18
Talburt 24:7,13
  24:16
talk 10:4,6 16:9
  31:22 32:4
  50:18
talked 17:25
  50:15 53:20
talking 14:25
  16:22 18:18
  30:23 39:9
targeting 26:15
  27:2
task 24:3
team 42:22,25
  43:7,8,12,23
tell 33:18 34:6
  34:16 42:8
  48:14,17,19
ten 51:22
tentatively
  46:20
tenure 29:14
  33:3 34:25
  35:16
term 28:3
terminate 21:16
  49:19
terminated
  17:15,17,21
  18:16,21,24
  19:20 29:20

32:19 33:2,21
  34:1,8 36:12
termination
  11:25 14:3,21
  16:12,20 19:7
  29:22 34:9,12
  34:21 37:7,16
  49:22 54:16
terminations 8:6
  10:17 52:8
terms 11:10
  14:22 46:17
  50:22
testified 6:21
testify 21:12
testifying 54:2
testimony 10:23
  17:7,10,12
  24:1 52:16
  60:21 61:6
Texas 1:1,25 2:1
  3:6,16,21 4:3
  6:7 60:1,16
  61:11,21 62:4
  62:8 63:1,4
thank 23:12
  28:22,25 29:2
  51:3 52:2
thing 8:20 14:20
  17:1 39:14
things 7:25 8:14
  8:15 9:5 12:15
  31:23 32:8
  35:1 43:4
  50:11,24 53:1
think 19:19,19
  20:13 21:4
  28:2 32:24
  40:21 41:6
  43:5 47:4
  52:23
thinking 19:10
thought 21:5
  52:19
time 6:8 9:17

14:5,9 16:21
17:24 28:1,9
30:15 32:14,18
33:20 34:1,8
34:17 36:12
54:5 61:1,6
**times** 9:16 12:14
14:2 35:24
**titles** 7:21
**today** 21:12
**told** 15:17,20,24
18:20,23 22:11
42:6
**tomorrow** 45:18
**top** 21:23 25:8
43:5 50:25
**topics** 9:3
**town** 45:9,10,12
45:19
**trade** 33:7
**transcript** 60:19
60:22 62:13
**transition** 42:22
**transparency**
27:25 30:3
**Transport** 1:6
3:18 5:14 6:4
6:16 60:7 62:1
**travel** 45:16
**traveling** 45:17
45:18
**trial** 23:3 29:10
29:12 46:22
**trip** 33:7
**trips** 33:6,10
35:4
**true** 32:16,17
58:5 60:20
**try** 11:16 14:6
19:16 49:8
**trying** 10:24
19:11 42:15
44:23 55:2
**turn** 25:3 26:11
26:12 52:22

53:18
**turned** 27:24
53:14
**two** 7:20 13:22
51:14,14,16
**TWU** 10:1 47:24
**type** 13:10
**typical** 15:13
31:5,6 50:10
50:22
**typically** 9:20
11:9,12 13:8
14:6 18:5,10
40:19 49:24
50:12 51:16
55:1

---

**U**

**uh-huh** 20:3
31:3 45:25
**ultimate** 49:9
**understand**
10:24 22:14
34:3 39:12,13
40:21 48:2,9
48:11 53:16
55:25
**understood** 40:6
53:3,7
**undetermined**
46:5
**union** 1:7 3:18
5:14 6:5,16
8:22,25 9:3,6
9:10,15,19
22:7,15 27:2
27:14,19 28:3
35:25 36:23
41:3 48:7,14
48:17,19 49:1
49:7,13,17,21
50:13 51:4
52:7,12 53:4,6
53:9,10,21
54:8,9,11,19

54:25 56:10
60:7 62:1
**union's** 19:23
**United** 1:1 6:6
60:1
**unlawful** 20:15
20:22,24 21:1
21:9
**unlawfulness**
21:15 22:23
**usually** 9:10

---

**V**

**vacation** 14:5
**vague** 11:20
13:1 27:8
**various** 9:3
**versus** 6:3
**Videoconfere...**
1:12,19,24 3:2
**videos** 14:21,24
15:2,10,18
16:1,4
**violated** 28:6
52:25
**violation** 19:2,5
19:11 37:12
**violations** 19:12
**Virginia** 3:10
61:15
**voluntarily** 7:13
**VS** 1:5 60:5

---

**W**

**want** 8:14 22:25
25:10 28:10
31:22 50:6,6
50:13 55:22
56:2,6
**wanted** 35:20
40:2,15 41:7
**wanting** 39:11
**wasn't** 41:12
**watched** 15:8
**way** 29:1 41:16

45:20 54:12
**we'll** 16:9 37:9
50:12
**we're** 16:19 39:7
39:9 41:22
**week** 45:11 46:3
46:4,5,7,9,11
46:12,15,19
**weekend** 46:20
**weeks** 45:9
**weren't** 43:22
54:1
**withdraw** 38:20
**withdrawn**
38:12,16
**witness** 1:20 2:1
44:7,15 55:18
57:2 60:18,21
60:23,24
**Witness's** 5:7
**witnessed** 23:25
**work** 3:8 8:6
13:23 14:1,3,3
19:18 28:7
33:1,10,12,25
34:7,17 35:24
53:1 61:14
**worked** 32:24
33:3,20 34:15
34:24 43:18
48:8
**Workers** 1:6
3:18 5:14 6:4
6:16 60:7 62:1
**working** 34:11
43:16
**wouldn't** 32:15
33:25 34:7,17
36:10,11 37:6
40:25 41:2
43:11

---

**X**

---

**Y**

**yeah** 28:18 29:3
37:2 38:6
42:18
**year** 17:3

---

**Z**

**zoom** 1:23 3:2
29:1

---

**0**

**00** 61:3,3

---

**1**

**1** 5:14 49:2
60:23,25
**10/21/2022** 63:1
**10821** 63:3
**119** 5:15 23:1,2
23:3 30:17
**11th** 45:9 46:13
**12th** 46:21
**1404** 63:3
**1500** 3:15 61:21
**1999** 63:3

---

**2**

**2** 5:2 8:9 14:4
16:20,24,25
17:7,13,19
18:4,7,11,14
18:18 23:8,14
24:4 29:23,25
30:13 34:22,23
44:20 45:4
49:2 50:4,10
51:5,9,18,20
51:25 53:21
54:16,20,25
**2013** 5:14
**2017** 5:15,15
17:3 22:3 45:5
**2018** 5:14
**2020** 7:8
**2022** 1:14,22 6:2
57:2 60:13,23
60:25 62:22

| | |
|---|---|
| **21** 5:14,15 25:11<br>25:11,16 28:11<br>**214.232.9015**<br>3:22 62:4<br>**22160** 3:10<br>61:15<br>**23** 5:15<br>**24** 5:15 37:20<br>**25** 5:15<br>**28** 1:14,22 6:2<br>57:2 60:13<br>**2850** 3:15 61:20<br>**29** 5:17 | 21:20,21<br>**60** 5:8<br>**600** 3:9 61:15 |
| | **7** |
| **3**<br>**3:17-cv-02278...**<br>1:6 6:6 60:6<br>**30-day** 10:17<br>37:6,8 49:22<br>**302** 3:5 61:11<br>**30th** 7:8 62:21<br>**31** 5:14<br>**3301** 3:21 4:2<br>62:3,8<br>**3613** 63:1 | **703.321.8510**<br>3:10 61:16<br>**75087** 3:6 61:11<br>**75201** 3:16<br>61:21 63:4<br>**75226** 3:21 4:3<br>62:4,8 |
| | **8** |
| | **8001** 3:9 61:15<br>**888.988.5317**<br>63:4 |
| | **9** |
| **4**<br>**4:32** 1:23 6:8<br>**40** 5:16 29:10,11<br>29:12<br>**4483** 28:12<br>**47** 5:5 | **972.771.3933**<br>3:6 61:12 |
| **5**<br>**5:42** 1:23 56:11<br>**52** 5:6<br>**556** 1:7 6:5,16<br>10:1 47:24<br>60:8<br>**5680** 25:14,14<br>**57** 5:7<br>**5th** 45:9,19 46:4<br>46:23 | |
| **6**<br>**6** 5:5,12,15 | |