

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER,      )
                      )
   Plaintiff,         )
                      )
VS.                   ) CIVIL ACTION
                      )
SOUTHWEST AIRLINES CO., ) NO.: 3:17-cv-02278-X
AND TRANSPORT WORKERS )
UNION OF AMERICA, LOCAL )
556,                  )
                      )
   Defendants.        )

-----------------------------------

VIDEOCONFERENCE ORAL AND VIDEOTAPED DEPOSITION OF
BRIAN TALBURT
JULY 3, 2022

-----------------------------------

VIDEOCONFERENCE ORAL AND VIDEOTAPED DEPOSITION
OF BRIAN TALBURT, produced as a witness at the
instance of the Plaintiff, and duly sworn, was
taken in the above-styled and numbered cause on
July 3, 2022, from 4:13 p.m. to 7:33 p.m., via
Zoom Videoconference, before Melody A. Monk, CSR
in and for the State of Texas, reported by machine
shorthand, with the witness located in

**Page 2**

1    Albuquerque, New Mexico, pursuant to the Federal
2    Rules of Civil Procedure, and the provisions
3    stated on the record or attached hereto.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1    APPEARANCES
2    (All parties appearing via Zoom Videoconference)
3
4    FOR THE PLAINTIFF:
5       BOBBY G. PRYOR
        Pryor & Bruce
        302 North San Jacinto
6       Rockwall, Texas 75087
        972.771.3933
7       Bpryor@pryorandbruce.com
8       MATTHEW B. GILLIAM
        National Right to Work Legal Defense
9       Foundation, Inc.
        8001 Braddock Road, Suite 600
10      Springfield, Virginia 22160
        703.321.8510
11      Mbg@nrtw.org
12
13   FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
14      PAULO B. MCKEEBY
        BRIAN MORRIS
15      Reed Smith
        2850 North Harwood Street
16      Suite 1500
        Dallas, Texas 75201
17      Pmckeeby@reedsmith.com
18
19   FOR THE DEFENDANT TRANSPORT WORKERS UNION OF
     AMERICA:
20
        EDWARD B. CLOUTMAN, III
21      Law Offices of Edward Cloutman III
        3301 Elm Street
22      Dallas, Texas 75226
        214.232.9015
23      Ecloutman@lawoffices.email
24
25

**Page 4**

1       ADAM S. GREENFIELD
        Cloutman & Greenfield, PLLC
2       3301 Elm Street
        Dallas, Texas 75226
3       Agreenfield@candglegal.com
4
5    ALSO PRESENT:
        Charlene Carter
        Lisa Block, Videographer
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Brian Talburt

Page 5

1                    INDEX
                                    PAGE
2      Appearances.....................................  2
3
4      BRIAN TALBURT
5         EXAMINATION BY MR. PRYOR...................  7
          EXAMINATION BY MR. CLOUTMAN..............148
6         EXAMINATION BY MR. MORRIS................149
          EXAMINATION BY MR. PRYOR.................150
7
8      Reporter's Certificate Page...................  157
9
10                   EXHIBITS
11     NO.  DESCRIPTION                          PAGE
12     1 - Privileged & Confidential Settlement and
           Reinstatement Agreement......................156
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1          THE VIDEOGRAPHER:  We're going on the
2    record July 3rd, 2022 for the deposition of Brian
3    Talburt in a case styled Charlene Carter versus
4    Southwest Airline Company and Transport Workers
5    Union of America, Local 556, Civil Case No.
6    3:17-cv-02278-X in the United States District
7    Court for the Northern District of Texas, Dallas
8    Division.
9          The time is approximately 4:13 p.m.
10   Will counsel state their appearances, locations,
11   and agreements or stipulations for the record;
12   following will the court reporter please swear in
13   the witness.
14         MR. PRYOR:  Bobby Pryor for the
15   plaintiff, Charlene Carter, along with Matt
16   Gilliam.  We're in Rockwall, Texas.
17         MR. MCKEEBY:  Paulo McKeeby for
18   defendant Southwest Airlines.  I am in Dallas,
19   Texas, along with Brian Morris, also from my law
20   firm, who also represents Southwest Airlines.
21         MR. GREENFIELD:  Adam Greenfield on
22   behalf of Transport Workers Union, Local 556,
23   along with Edward Cloutman, III, and we are in
24   Dallas, Texas as well.
25         BRIAN TALBURT,

Page 7

1    having been first duly sworn, testified as
2    follows:
3                    EXAMINATION
4    BY MR. PRYOR:
5       Q.  State your name, please.
6       A.  Brian Talburt.
7       Q.  Mr. Talburt, my name is Bobby Pryor.  I
8    represent Charlene Carter.
9           Who have you spoken to about your
10   deposition?
11      A.  Southwest attorney Paulo, and, and Adam
12   Greenfield and Ed Cloutman.
13      Q.  So -- I'm sorry, Paulo McKee?
14      A.  Yes.  Yes.
15      Q.  And who else?
16      A.  Adam Greenfield and Ed Cloutman.
17      Q.  Are any of those attorneys your attorney?
18      A.  No.
19      Q.  Tell me about your conversations with
20   Paulo, the attorney for Southwest.
21      A.  Basically him just advising me of this
22   deposition and the specifics of it and the details
23   of it, and to basically just tell the truth.
24      Q.  What were the specifics and the details?
25      A.  Well, to be on the Zoom call at 2 -- 4

Page 8

1    o'clock Central Time today, as we are.
2       Q.  Anything else?
3       A.  No.
4       Q.  Tell me about your conversation with the
5    two attorneys for Local 556.
6       A.  Similar conversation, just a question
7    whether my participation was mandatory or not.
8       Q.  Tell me about that.
9       A.  Basically they advised me that I was
10   ordered by the court to be here.  Therefore, I'm
11   here.
12      Q.  Did you have any substantive discussions
13   with any of these attorneys about your deposition?
14      A.  No.
15      Q.  Have you had substantive discussions with
16   anyone about your deposition?
17      A.  No.
18      Q.  Has anyone shown you any documents?
19      A.  No.
20      Q.  What have you done to prepare for your
21   deposition?
22      A.  Very little.  Just basically being here.
23      Q.  Very little, can you define what that
24   would be?
25      A.  Well, I, I briefly read over some prior

                                2  (Pages 5 to 8)

## Page 9

1    depositions, so I have a, a vague idea of what the
2    line of questioning is.
3         Q.  What depositions did you read over to get
4    a vague idea of what the questions would be?
5         A.  A deposition given some time ago from TWU
6    president Audrey Stone.
7         Q.  How did you get a copy of that deposition?
8         A.  It was provided to me by somebody.
9         Q.  Who?
10        A.  Pardon me?
11        Q.  Who?
12        A.  Somebody sent me a link to a, to a website
13   that I could see that.
14        Q.  Did you not understand the question, sir?
15        A.  Yes, I understood the question.
16        Q.  Would, would you answer it?
17        A.  I'm sorry?
18        Q.  Answer it, please.
19        A.  A, a coworker sent me a link.
20        Q.  Okay.  Well, we're working our way to the
21   name of a human being.  Could you answer that for
22   me?
23        A.  A person, a gentleman named Casey Rittner.
24        Q.  Who is that?
25        A.  A coworker.

## Page 10

1         Q.  And how did you happen to receive this
2    from your coworker Stacey Rigger (sic)?
3         A.  Via, via online site.
4         Q.  How did he --
5         A.  A me -- a me -- a message.
6         Q.  How did you know to have a communication
7    with Mr. Rigger such that you would get a copy of
8    a deposition in this case?
9         A.  It was something that was discussed quite
10   some time ago when this first happened two years
11   ago.
12        Q.  Who was it discussed with, Rigger?
13        A.  Yes.
14        Q.  Who else?
15        A.  That's all.
16        Q.  And are you aware that there's a
17   confidentiality order in this agreement prior to
18   reading that deposition?
19        A.  I'm sorry, I don't, I don't understand the
20   question.
21        Q.  Well, do you know what a confidentiality
22   order is?
23        A.  Of course.
24        Q.  Okay.  Are you aware that there's a
25   confidentiality order in this case which would

## Page 11

1    cover portions, if not all, of Ms. Stone's
2    deposition?
3         A.  No.
4         Q.  And how did Mr. Rigger happen to have a
5    copy of Ms. Stone's deposition?
6         A.  I, I -- my understanding was basically
7    just fishing, looking for information.  It's
8    public inform -- it is public information.
9         Q.  So the, the deposition was published, is
10   what you're saying?
11        A.  That's correct.
12        Q.  That's what Mr. Rigger told you?
13        A.  Correct.
14        Q.  And do you know why Mr. Rigger was fishing
15   for this deposition?
16        A.  Just curiosity.
17        Q.  Is Mr. Rigger associated with Local 556?
18        A.  No.
19        Q.  Does he work for Southwest Airlines?
20        A.  Yes.
21        Q.  What's his position?
22        A.  Flight attendant.
23        Q.  So he's, he -- is he an objector?
24        A.  No.
25        Q.  Why is he not a member of the --

## Page 12

1         A.  Not that I -- not, not, not that I know
2    of.
3         Q.  Okay.  I thought I asked if he was with
4    Local 556.  I think there's only two options.
5    You're a member or you're --
6         A.  Well, my --
7         Q.  -- not.
8         A.  Well, my unders -- my, my understanding of
9    the question was whether he served in an official
10   capacity.  He does not serve in an official
11   capacity; yes, he's a member of TWU 556.
12        Q.  Okay.  All right.  So Mr. Rittner is a
13   union supporter; you agree with that?
14        A.  He's a member of 55 -- TWU Local 556.
15        Q.  Okay.  That wasn't my question, was it?
16        A.  I, I don't know whether he's a supporter
17   or not.  He's a member of TWU 556.  So --
18        Q.  It --
19        A.  -- you'd have to define what's, what's,
20   what's, what's a supporter.
21        Q.  Let me --
22        A.  He's a member.
23        Q.  Go ahead.  He's a member.
24            Okay.  So it would be helpful if you
25   would answer the question that I ask.  I had

3 (Pages 9 to 12)

Page 13

1  already asked you if he was a member, and then I
2  asked you if he was a spor -- a supporter, and you
3  told me again that he was a member.  If you don't
4  understand a word, you're more than welcome to
5  ask.  But would you please answer the question
6  that you're asked.
7           MR. GREENFIELD:  I'll go ahead and
8  object to the form of the question at this time.
9           You may go ahead and, and answer.
10     A.  I think I answered the question.  Did I
11  not?
12     Q.  No, you didn't.  You answered it by saying
13  he was a member, and I asked if he was a
14  supporter.
15     A.  I, I --
16     Q.  Now you've answered it.  You've
17  subsequently answered it after I asked it three
18  times.
19           So you're -- you understand you're
20  under oath today, true?
21     A.  Correct.
22     Q.  You're gonna answer the que -- the
23  questions truthfully?
24     A.  Yes.
25     Q.  Will you answer the questions without

Page 14

1  evasion?
2     A.  I will answer the questions that you ask
3  me, yes.
4     Q.  That wasn't what I asked.  You're being
5  evasive about whether --
6     A.  Sir --
7     Q.  -- or not you will answer questions
8  without evasion.
9     A.  Sir, I was not in the least bit evasive to
10  you.  I misunderstood your intent.  The way you
11  asked the question, how my brain processed the
12  question was did he serve as a official capacity
13  with TWU 556.  He does not serve as a official
14  capacity to my knowledge.  Yes, he is a member of
15  TWU 556.
16     Q.  Will you answer my questions without
17  evasion?
18     A.  Yes, sir.
19     Q.  A union supporter would be someone that
20  pays their dues, supports the leadership in their
21  efforts, goes to meetings, assists leadership.
22  Did Mr. Rittner fall into any of those categories?
23     A.  The only information that I know about him
24  is he's a member of TWU 556.  I don't, I don't
25  know whether he does any of those other things or

Page 15

1  not.
2     Q.  Do you know whether or not he has turned
3  in to Southwest Airlines members of recall efforts
4  against certain leadership of the union?
5     A.  I have no idea.
6     Q.  Have you done that?
7     A.  Done -- yes.  I'm, I'm sorry, have I
8  turned in who?
9     Q.  Well, what did you think you were saying
10  yes to under oath?
11     A.  Have I turned in people, members of TWU.
12  That's what I understood you asked.
13     Q.  Did you speak to anyone about your trial
14  subpoena?
15     A.  The attorneys, yes.
16     Q.  Who did you speak to about your trial
17  subpoena?
18     A.  Adam Greenfield, Ed Cloutman, and, and
19  Paulo.
20     Q.  Tell me about each of those conversations.
21     A.  I called both of them to find out whether
22  my testimony was, was mandatory, whether I was
23  required to be here or not, basically the
24  specifics of it, what time we would be meeting and
25  so forth.

Page 16

1     Q.  Why were you trying to avoid service of
2  the subpoena in this case?
3     A.  Because I don't really feel that I have
4  any role in this, and I'm aware of --
5     Q.  Did --
6     A.  Go ahead.
7     Q.  Do you know what the law is in regard to
8  trying to avoid a subpoena, sir?
9     A.  That's why I'm here.
10     Q.  No.  That, that --
11           MR. PRYOR:  Object, nonresponsive.
12     Q.  You're here because you've been
13  subpoenaed.  I'm asking you, do you know what the
14  consequences are of trying to avoid service of a
15  subpoena?
16     A.  I wasn't necessarily avoiding service of a
17  subpoena.
18     Q.  So when you told us, yes, you were
19  avoiding service of the subpoena a few minutes
20  ago, you now, in the span of 40 seconds, changed
21  your mind; is that right?
22     A.  I didn't -- I, I don't recall saying I
23  avoided a subpoena.  I avoid -- I was hoping to
24  avoid not being here.
25     Q.  You realize that this is being recorded,

## Page 17

1  the words will be played for the jury, and what
2  you're telling the jury, you'll rest your
3  credibility on this, is you did not say yes to the
4  question of whether or not you were attempting to
5  avoid a subpoena; is that right?
6         MR. GREENFIELD: Objection, form. The
7  record speaks for itself.
8         MR. PRYOR: It sure does.
9  Q. But you can still answer.
10 A. Repeat the question, please.
11 Q. You would allow your credibility to this
12 jury to rest on you saying that you did not answer
13 the question, yes, that you were avoiding a
14 subpoena; is that right?
15        MR. MCKEEBY: Object to form.
16 A. What is the specific question, please?
17 Q. No, you've already answered it, sir. Now
18 you've changed your answer.
19 A. No --
20 Q. Are you denying your change?
21 A. No, I have not changed my answer.
22        (Discussion off the record).
23 Q. Now, were you a supporter of Audrey Stone,
24 both when she ran for union leadership and while
25 she was in union leadership?

## Page 18

1  A. Yes, I supported her in her campaign.
2  Q. Well, did you support her in her -- while
3  she was a leader?
4  A. In most, in most situations, yes.
5  Q. What have you done as a union member?
6  Tell us about your activity as a union member.
7  A. Other than attending many meetings, I ran
8  for office. My -- probably my second year at
9  Southwest, which would have been 38 years ago;
10 never ran for another position. Have done some
11 volunteer work at contract negotiation time in
12 terms of lounge education and mobilization
13 efforts.
14 Q. Anything else?
15 A. I participated in a get-out-to-vote effort
16 back in 20 -- I don't remember what the year the
17 election was. 2015 perhaps.
18 Q. Anything else?
19 A. I participated in a scheduling committee
20 probably 12, 13 years ago, perhaps.
21 Q. Anything else?
22 A. Not that I can think of off the top of my
23 head.
24 Q. It would be fair to say that you believe
25 that you've just given a list of, of all of your

## Page 19

1  major activities as a member of Local 556,
2  correct?
3  A. I've given you a list of the activities
4  that I can remember participating in, in 40 years
5  of service, yes.
6  Q. What did you do as a member of CAN?
7  A. Basically that was a lounge education and
8  a lounge -- and a mobilization effort for a
9  contract negotiation.
10 Q. That's -- stands for Contract Action
11 Network?
12 A. Correct.
13 Q. When were you a part of CAN?
14 A. That would have been for our first
15 tentative agreement for our contract that
16 ultimately was settled in 2015, I guess. So I'm
17 guessing that would have been 2013.
18 Q. Was that for the contract that was
19 ultimately rejected and then a new contract done?
20 A. Correct.
21 Q. Tell me about your relationship with
22 management of Southwest Airlines.
23 A. I --
24        MR. MCKEEBY: Object to the form of
25 the question.

## Page 20

1         I'm sorry, you can answer. I just
2  lodged an objection, but please answer.
3  A. In 40 years of service, obviously I've,
4  I've -- known a number of people over the years,
5  have had a reasonable cordial relationship with
6  various members of management.
7  Q. Who?
8  A. Speci -- I mean, I -- that would be
9  hard -- you want me to go through a list of
10 everybody throughout my career?
11 Q. Well, I mean, senior members of
12 management. How about that?
13 A. Current or past?
14 Q. Well, from 2012 to 2017.
15 A. Okay. I worked closely with Mike Hafner,
16 then vice president. I worked closely with Sonya
17 Lacore; at that time that was a senior director.
18 I've had a reasonable -- a cordial relationship
19 with former senior director Naomi Hudson. That's,
20 that's pretty much it in terms of any, any type of
21 relationship other than -- when I say
22 relationship, they're all business relationships,
23 of course, but on a more than a day-to-day ir --
24 on more of a day-to-day basis, I guess. When I
25 was working with them, I worked on a couple of

5 (Pages 17 to 20)

Page 21

1  projects that brought me to Dallas, so I was there
2  quite a bit.
3      Q. What about Mike Van de Ven?
4      A. I, I have no relationship with him.
5      Q. Are you currently employed by Southwest
6  Airlines?
7      A. Yes, I am.
8      Q. And what's your position?
9      A. I'm a flight attendant.
10     Q. You're still a member of Local 556?
11     A. Yes.
12     Q. And did you have issues with Southwest's
13 social media policy in 2014?
14     A. Issues meaning what? We've -- I always
15 had issue with their social media policy, yes.
16     Q. Okay. What's your issue --
17     A. I have any --
18     Q. What's your issue with the social media
19 policy?
20     A. It's very, very broad reaching, very, very
21 vague, and very, very invasive of personal rights.
22     Q. Do you think there should be a social
23 media policy at Southwest?
24     A. Yes.
25     Q. Okay. And -- but you just don't think

Page 22

1  that this one's a good one?
2      A. I don't think the application of their
3  social media policy is, is, is well executed.
4      Q. And what was your personal encounter with
5  that policy in 2014?
6      A. I was targeted by a number of flight
7  attendants, misrepresented my, my, my, my words,
8  presented to management in a very, very
9  inaccurate and false manner, and subsequently
10 terminated two times.
11     Q. What were the words that were
12 misrepresented?
13     A. Speaking metaphorically, which I often do,
14 I used the term "a public execution," which is a
15 frequently used expression, much like a public
16 hanging. My intent was quite clear. And it was
17 represented as though -- or misrepresented by --
18 I, I honestly don't know who, I've been led to
19 believe a group of people who targeted me as a
20 union supporter, turned it in and presented it in
21 a manner that I was threatening to kill somebody.
22 And to this day that's still often, often
23 discussed and believed by many people. Clearly
24 use -- using that type of expression is not an
25 intent to kill somebody. Nor is a public

Page 23

1  execution a single person going out and killing
2  somebody, even if that was their intent.
3      Q. Who told you that someone thought that you
4  were threatening to kill someone? Who told you
5  that?
6      A. I believe it -- that's the way it was
7  presented with me with the meeting that I had with
8  the company.
9      Q. So someone at that meeting told you that
10 someone thought you were actually threatening to
11 kill someone?
12     A. That's correct.
13     Q. And do you recall that the words that you
14 used were: Screenshots have been retained and
15 would be dealt with by a responsible party, I
16 assure you. Transvestite is a great target BTW,
17 far too stupid to know what she has gotten into.
18 Someone friend the fool and keep an eye out. We
19 need one company execution to end this nonsense.
20         Is that accurate in terms of what you
21 said, sir?
22     A. It, it -- to me it doesn't -- you're
23 reading it, so I'm going to assume it is. I --
24 that's not quite as I repre -- as I remember it.
25     Q. Okay. How, how do you remember it? I'm

Page 24

1  happy to send this to you if you want, if you'd
2  like to read it. I mean, I, I can --
3      A. That's not what -- is that --
4      Q. -- assure you I read it word for word, but
5  you tell me that's not what it says.
6      A. I, I didn't say that.
7      Q. Okay. All right. So, first of all, when
8  you say, Screenshots have been retained and will
9  be dealt with by a responsible party, I assure
10 you, do you recall what you were talking about?
11     A. To be honest, no.
12     Q. Okay. Then it says, The transvestite is a
13 great target BTW. I assume that means by the way.
14 Surely you recall that?
15     A. To be honest with you, no.
16     Q. So you were calling a transvestite and you
17 don't recall who you were talking about?
18     A. I, I don't, I don't know who, to be honest
19 with you, no. Can, can, can we mention how many
20 years ago this was --
21     Q. Yes. It was 2 --
22     A. -- so we have a context?
23     Q. Sept -- September 28, 2014.
24     A. Okay.
25     Q. Okay?

MELODY MONK REPORTING
888.988.5317

Page 25

1    A. So eight years ago, okay.
2    Q. It was eight years ago, but I don't know,
3 some things you kind of remember, but --
4    A. Yeah, I don't.
5    Q. -- you don't remember?
6    A. Yeah, I don't remember that.
7    Q. Okay.  Fair enough.
8        It says, We need one company execution
9 to end this nonsense.
10    A. Okay.
11    Q. What did you mean when you said one
12 company execution to end this nonsense?
13    A. The context of that comment was, was
14 referencing social media.  I remember there was a
15 post that was made regarding a large group of
16 Muslims in a hotel where a, a -- a wedding at a
17 hotel.  And somebody was afraid of the Muslims,
18 and it turned into in a large -- this was on a, a,
19 a Facebook flight attendant page, as I remember.
20 There was a discussion about -- it turned into a
21 large Muslim-bashing thread.  And one of the --
22 the person who brought it to my attention was
23 married to a Muslim and took the comment very,
24 very seriously and was very, very offended.  And
25 this was in the midst of a very challenging time

Page 26

1 with our union.  And she was basically -- was very
2 offended and contemplating whether to turn it in
3 for management for discrimination.  And that's
4 where that comment came from.
5    Q. Okay.  You were --
6    A. So I was referencing one -- I -- my, my
7 reference was one public execution, meaning if one
8 person was terminated, everybody else would run
9 for cover and it would stop the, the, the, the
10 barrage of, of social media attacks.
11    Q. And the comment about the transvestite had
12 something to do with that, did it?
13    A. I -- I'm not, I'm not sure who that -- I'm
14 going to be honest with you, I don't know who that
15 was.  I, I don't know of any transvestites at
16 Southwest, so I'm not sure who it was referencing.
17    Q. It's not me referencing, it's you.
18    A. I, I understand that.
19    Q. Okay.  All right.  What -- is it fair to
20 say that both you and your union representative --
21 by the way, who was your union representative?
22    A. Representative when?
23    Q. At your hearing regarding this charge.
24    A. Well, the initial hearing would have been
25 Thom McDaniel, our former union president.  He was

Page 27

1 at my initial meeting.
2    Q. And then in your Step 2?
3    A. That would have been Becky Parker and
4 Audrey Stone and Barbara Fitsz -- Fitzhugh --
5    Q. Did you go to arbitration --
6    A. -- I think was her name.
7    Q. I'm sorry, did you go to arbitration or
8 did it stop at Step 2?
9    A. It stopped at Step 2.
10    Q. Okay.  And it would be fair to say that
11 both you, Ms. Stone, Mr. McDaniel -- and I'm
12 sorry, what was Becky's last name?
13    A. Parker.
14    Q. -- Becky Parker, all of you argued that
15 your communications were protected because you
16 were involved in union activities, correct?
17    A. That, that, that point was brought up,
18 yes.
19    Q. I didn't ask if the point was brought up.
20 I said you argued it, Mr. McDaniel argued it,
21 Ms. Stone argued it, and Ms. Parker argued it,
22 correct?
23        MR. GREENFIELD: Objection, form.
24        You can answer.
25    A. My understanding is we didn't really

Page 28

1 discuss that aspect that much.  It was basically
2 just the, the, the misrepresentation of my actual
3 comment.  I, I don't really remember discussing
4 the issue about -- on this particular case whether
5 it was union ac -- sanctioned union activity or
6 not.
7    Q. What happened with this charge?
8    A. Ultimately after the Step 2, they, they
9 reduced it to a 30-day suspension, which I served.
10 I was asked to sign a ...
11    Q. You say reduced it; what, what happened
12 first -- what was the first action taken?
13    A. The first action, I was terminated.
14    Q. So you were terminated, and then how did
15 you get reinstated?
16    A. Well, through the, the, the grievance
17 process, I was entitled to a Step 2 meeting with
18 the company.  It was intended to be with the vice
19 president or his designee, it's usually his
20 designee, as it was in this particular case.  You
21 basically discuss why you felt why the decision
22 that was, that was rendered on the local level was
23 incor -- was, was not just, and, and then they,
24 they make their -- ultimately make their decision
25 on a higher level.

7 (Pages 25 to 28)

Page 29

1  Q. So you, you think at Step 2 you convinced
2  them to change their mind?
3  A. I, I don't know. Do I think I convinced
4  them? They basically heard my wording and, and my
5  intent, which was pretty clear, and I would like
6  to believe that calmer minds prevailed.
7  Q. What was Audrey Stone's position in 2014
8  when she represented you in your social media
9  policy hearing?
10  A. She was union president.
11  Q. And before that, you were represented by
12  the president, Mr. McDaniel?
13  A. Former president. He was a shop steward.
14  Q. Okay. At the time he was a shop steward?
15  A. Correct.
16  Q. When you say that Ms. Stone was junior
17  president, who was president?
18  A. I'm sorry, I don't understand.
19  Q. Okay. Well, maybe I misunderstood. In
20  2014, what was Ms. Stone's position of leadership
21  with Local 556?
22  A. Local union president.
23  Q. Okay. So she was president?
24  A. Yes.
25  Q. All right. I heard junior in there

Page 30

1  somewhere.
2      Okay. So you were reinstated, and
3  then did you have a -- another encounter with the
4  social media policy?
5  A. Yes.
6  Q. When was that?
7  A. That would have been --
8  Q. I can suggest a --
9  A. -- spring through --
10  Q. -- time frame, if it helps.
11  A. Well, it was going to be spring, March or
12  April of the, the following year.
13  Q. I was going to say March of 2015.
14  A. Okay. Correct.
15  Q. Okay. And at that time, what was the
16  complaint that Southwest Airlines was dealing with
17  regarding you?
18  A. I was in -- participated in a small
19  private closed group of union loyalists during
20  election time for our local elections. There was
21  a group of 17 people in there, people that I knew,
22  all of which very well. It was a closed group, it
23  was a private group. And there was free
24  discussion in there. In there, there was a
25  question raised about a particular person as to

Page 31

1  whether -- I believe there's -- a question was,
2  was asked whether he was pretending to be stupid,
3  is he stupid or just pretending to be so, as I
4  remember. And I referenced a prior comment that I
5  had made that everybody in that group would have
6  known what I was talking about in a prior
7  situation, and I -- my response to that was, well,
8  based on my failed adopt a fucktard initiative,
9  which was something that was -- had occurred many
10  years prior, that everybody in there knew what I
11  was talking about, that should answer your
12  question.
13      So I was terminated for using the word
14  "fucktard," but, again, the same -- presumably the
15  same group of people that targeted me crafted
16  that -- took that word and presented it as though
17  I was -- my understanding was discriminating
18  against people with learning disabilities because,
19  of course, according to them, the word "fucktard"
20  is a derivative of the "retard," and I guess a
21  retard would fall into a protected class. So I
22  was terminated for harassing and discriminating
23  against employees with learning disabilities,
24  which is certainly quite a stretch from the word
25  "fucktard."

Page 32

1  Q. Okay.
2      MR. PRYOR: Melody, would you allow
3  the screen to be shared?
4      (Discussion off the record.)
5  Q. And, Mr. Talburt, can you see a document
6  on the screen?
7  A. Yes.
8  Q. And are you able to see where it says,
9  Well, Sherry, you know how successfully my adopt a
10  fucktard initiative was. That should answer your
11  question?
12      Is that the --
13  A. Yes.
14  Q. -- post you're -- is that the post you
15  were talking about?
16  A. That -- that's the comment that I made
17  that I was terminated for, yes.
18  Q. And this was a private group on Facebook?
19  A. Correct.
20  Q. And was it report -- referred to as core
21  team?
22  A. Core group, core, core group I think is
23  what it was called.
24  Q. Okay. Core group?
25      And it was a, a group of people that

MELODY MONK REPORTING
888.988.5317

Page 33

1  were supporting, among others, the candidacy of
2  Audrey Stone for union president?
3      A.  Her slate, correct.
4      Q.  Okay.  And you were a member of that
5  group?
6      A.  Correct.
7      Q.  Okay.  And were -- was action taken
8  against you by the company as a result of this
9  post?
10     A.  Yes.
11     Q.  And what happened this time?
12     A.  I was terminated.
13     Q.  And at this fact-finding meeting and at --
14 I don't know if I'm sharing a document.  Can you
15 see a new document?
16     A.  No.
17     Q.  Okay.  I'll have to get that one out.
18         At your -- at this fact-finding
19 meeting -- and did this also go to a Step 2?
20     A.  No.
21     Q.  So at the Step 1, who represented you?
22     A.  Brett Nevarez.
23     Q.  And was it argued at this meeting -- at
24 this hearing, by you and Brett Nevarez, that your
25 actions were protected from, among other reasons,

Page 34

1  that you were engaged in union activity, in fact,
2  in -- engaged in activity relating to an election?
3      A.  Yes.
4          MR. GREENFIELD:  Objection, form.
5          MR. PRYOR:  What's the object to form?
6          MR. GREENFIELD:  It's incomplete, it's
7  vague, and it's -- it just paints an incomplete
8  picture of what was actually occurring.
9      Q.  At this meeting, did you argue that your
10 union activities should be protected from
11 Southwest's social media policy?
12     A.  Yes.
13     Q.  And Mr. Nevarez supported that argument on
14 behalf of the leadership of Local 556, correct?
15     A.  He supported that argument.  Presumably
16 the rest would be accurate as well.
17     Q.  And who was president at that time of the
18 Local 556?
19     A.  Audrey Stone.
20     Q.  Now, at that hearing, do you recall what
21 you said?  So that's kind of an unfair question.
22 That was how many years ago?
23         Let me see if I can show you a
24 transcript.
25         MR. MCKEEBY:  Is that an objection to

Page 35

1  your own question?
2          MR. PRYOR:  It is.
3          MR. MCKEEBY:  I'll sustain that one.
4          MR. PRYOR:  But I'll try again.  Let
5  me see if I can find the document.  Hang on.
6          Who made that objection?
7          MR. MCKEEBY:  That is McKeeby, sir.
8          MR. PRYOR:  I have got to remember who
9  to keep track of here.  Give me just a second,
10 sir.
11     Q.  Okay.  Let me see if I can show this
12 document.
13         Okay.  Can you see a document on the
14 screen, sir?
15     A.  Yes.
16     Q.  Do you see where it says March 25, 2015?
17     A.  Yes.
18     Q.  Does that appear to be the -- somebody's
19 notes of your either hearing or interview with
20 Southwest Airlines regarding the charge you were
21 just telling us about?
22     A.  Yes, it appears to be.
23     Q.  Okay.  And let's go down to -- let's see
24 if this refreshes your recollection as to what he
25 said.

Page 36

1          It says -- can you see my cursor, by
2  the way?
3      A.  Yes.
4      Q.  Oh, good.  Then maybe you can kind of
5  follow.  This is where I'm reading from.
6      A.  Uh-huh.
7      Q.  BT, that's you, right?
8      A.  Uh-huh.
9      Q.  There was no intent to insult, only to try
10 to get more votes for our side.  This was election
11 related and private.  I just want all of this to
12 stop.  They are trying to get me fired.
13         Do you recall saying words to that
14 effect at the hearing in 2015?
15     A.  I, I don't recall making that statement,
16 but I probably did.  And I'm, I'm not denying that
17 I did.
18     Q.  Okay.  Would it be consistent with either
19 your recollection or how you felt at that time, as
20 you sit here today?
21     A.  I, I think so.
22     Q.  Okay.  Then it says -- who is TT?
23     A.  Ted Thornton, the assistant base manager.
24     Q.  Okay.  And then you were asked the
25 question, Do you feel comfortable coming to us

Brian Talburt

---

Page 37

1  locally?  We will help.
2       And your response is, I wouldn't want
3  my worst enemy to have to go through this.  I
4  don't want to turn anybody in.
5       Do you see that?
6  A.  Yes.  Yes, I do.
7  Q.  And would that be consistent with your
8  recollection or how you recall feeling at that
9  time?
10  A.  I, I don't recall that, but obviously I
11  said it.
12  Q.  Okay.  Well, do you disagree that -- with
13  your comment that I don't want to turn anybody in?
14  A.  Obviously I made that statement.
15  Q.  Do you agree that in 2015 you told
16  Southwest Airlines management in regard to
17  potential complaints under the social media policy
18  that you don't want to turn anybody in?
19  A.  Apparently I said that, yes.
20  Q.  Okay.  I'm going to get the hang of this
21  documented out thing in a minute.
22       Did you ever engage in -- and I think
23  you've answered this before, but it's a little bit
24  more specific.  Did you ever engage in an effort
25  to target union member opponents of Stone's and

---

Page 38

1  her slate, recall petition members, or objectors
2  of Local 556?
3  A.  You would, you would have to define the
4  word "target."
5  Q.  Okay.  So other -- what did you do then in
6  re -- by the way, what do you think target means?
7  You don't recall using that word, do you?
8  A.  I, I don't -- I may or may not have.
9  Q.  Well, that covers the universe, doesn't
10  it?  Did you use the word or not?
11  A.  I, I -- I'm sure I've used that word
12  before.
13  Q.  Okay.  Then tell us -- tell the jury how
14  you would define target in regard to targeting
15  union member opponents to Stone and her slate,
16  union member opponents acting in favor of a
17  recall, and union objectors.  How would you use
18  the word "target" in regard to those three classes
19  of people?
20  A.  I, I, I guess basically trying to isolate
21  or identify them.
22  Q.  Okay.  So all you did to target them was
23  just to find out who they are; is that your sworn
24  testimony?
25  A.  I didn't say that, no.

---

Page 39

1  Q.  Oh, wait.  I thought you just told -- you
2  answered my question what did you do, and you told
3  me, oh, I guess I just identified who they are.
4       That's not what you said then, right?
5  You're changing it?
6       MR. GREENFIELD:  Objection, form --
7  A.  No, I'm not changing it.
8       MR. GREENFIELD:  -- vague.
9       MR. PRYOR:  Okay.
10       MR. GREENFIELD:  The record speaks for
11  itself.
12       MR. PRYOR:  It does.  And we'll be
13  happy to allow it to be played to the jury.
14  Q.  Sir, can you tell me, is all you did to
15  target those groups is to just find out who they
16  were?
17  A.  No, I, I didn't, I didn't say that, and
18  that's not what I did.
19  Q.  Okay.  So tell us what you did.
20  A.  The only thing I -- what I can think of
21  that I did was probably be turning in social media
22  violations, their public comments that were made,
23  usually that were inaccurate or offensive.
24  Q.  And so when you told Southwest Airlines
25  you don't want to turn anyone in for social media

---

Page 40

1  violations, this is a nightmare, changed your
2  mind?
3  A.  Yes.
4  Q.  Why did you change your mind?
5  A.  After years of abuse, harassment, and
6  targeting by the same people over and over, I
7  guess basically I had had enough.
8  Q.  So how long after March 25, 2015 did you
9  change your mind?  You must have --
10  A.  I have --
11  Q.  -- taken a while?  It wasn't a few --
12  A.  I, I haven't any --
13  Q.  -- it wasn't a few days, was it?
14  A.  I haven't any --
15       MR. MCKEEBY:  Objection, compound.
16  Q.  Was it a few days, a few weeks, a few
17  months, or years?
18  A.  Haven't any idea.  That was eight years
19  ago.
20  Q.  So what did you do then, to target these
21  groups?
22  A.  Sent to management certain social media
23  posts that would have been incriminating.
24  Q.  Who assisted you with that?
25  A.  Assisted.

---

MELODY MONK REPORTING
888.988.5317

Page 41

```
 1              MR. MCKEEBY: Object to the form.
 2       A. I, I don't, I don't know that anybody
 3   assisted me. I would have just forwarded it to
 4   somebody.
 5       Q. Who was aware of your activities at
 6   Local 556?
 7              By the way, have you seen the
 8   documents relating to this?
 9       A. I -- no, I haven't. I haven't seen any
10   documents.
11       Q. Okay. Who are the persons at Local 556
12   that were aware of your activities?
13       A. I, I, I couldn't tell you right now. That
14   was eight years ago.
15       Q. So are you swearing under oath you never
16   had a conversation or informed Audrey Stone about
17   this?
18       A. I, I am not, not denying that. And I'm,
19   I'm not confirming it. I do not recall having had
20   that conversation with Audrey, particularly Audrey
21   because she had very little to do with social
22   media and would not in any way, shape, or form
23   condone any of that activity.
24       Q. Condone what activity?
25       A. Anything that I would have done.
```

Page 42

```
 1       Q. She would not have condoned what you did?
 2       A. She would not have condoned anything that
 3   I had done, no.
 4       Q. Why not?
 5       A. Because that's just not how she operates.
 6       Q. Who else at Local 556 would have known of
 7   your activities?
 8       A. I don't know.
 9       Q. So Brett Nevarez was not aware?
10       A. Perhaps.
11       Q. So you turned in how many people to
12   Southwest Airlines?
13       A. I haven't any idea.
14       Q. How did you identify the people who were
15   opponents of Audrey Stone and her slate or recall
16   petition supporters or union objectors?
17       A. I'm sorry, repeat the question, please.
18       Q. Yes. How did you identify those three
19   classes of people?
20       A. Anybody that would have been turned in
21   would have had nothing do with being an objector.
22   I, I don't even know -- we, we -- the names of the
23   objectors were not public or, or never disclosed
24   unless they identified themselves.
25       Q. You knew Charlene Carter was an objector?
```

Page 43

```
 1       A. I, I believe I did, yes.
 2       Q. And you turned her in as well, correct?
 3       A. To be honest with you, I don't remember
 4   that at all.
 5       Q. Who do you remember turning in?
 6       A. The only pers -- particular person that I
 7   can remember turning in would have been Jeanna
 8   Jackson. I'm not saying that that's an inclusive
 9   list, but that's the only person that comes to
10   mind at this moment. Again, this is eight years
11   ago.
12       Q. What about Mike Casper?
13       A. More than likely Mike Casper, given an
14   opportunity, I would have, yes.
15       Q. And why Mike Casper, if you had been given
16   the opportunity?
17       A. Mike Casper was an adver -- has been an
18   adversary for many years, causing a great deal of
19   dysfunction and destruction to both Southwest and
20   TWU.
21       Q. And so you would have targeted Ms. Jackson
22   and, if given the opportunity, Mr. Casper. Anyone
23   else?
24       A. When you say "targeted," I don't know that
25   I necessarily agree with the term you're using.
```

Page 44

```
 1   Did I turn them in using -- turn in their words to
 2   Southwest, yes.
 3       Q. Okay. Well, I'll, I'll tell you that I do
 4   include that within the use of target. Do you
 5   have a problem with that?
 6       A. No.
 7       Q. Okay. And what was your nickname for
 8   Mr. Casper?
 9       A. I, I don't know. I didn't really have
10   one.
11       Q. You never referred to him as a ghost scab?
12       A. Oh, certainly I probably would have used
13   those words, yes.
14       Q. Any other nicknames?
15       A. Not that come to mind.
16       Q. So when you say that Audrey Stone did not
17   or would not have supported what you were doing,
18   is it your belief that she thought, like when you
19   were charged, that their activities were protected
20   union speech?
21              MR. GREENFIELD: Objection, form.
22       Q. Is that how you understood it?
23       A. I, I, I don't know what she would have
24   thought.
25       Q. Okay. I thought you were telling us you
```

MELODY MONK REPORTING
888.988.5317

Page 45

```
 1    did.  You knew she would object, but you don't
 2    know why she would object to what you were doing;
 3    is that what you're now telling us?
 4            MR. GREENFIELD:  Objection, form.
 5        A.  Audrey would have objected to me -- to, to
 6    me turning in screenshots, I believe.
 7        Q.  And why, why do you believe that she would
 8    object to you turning in union members?
 9        A.  Because she's a union president.
10        Q.  And the union should not be turning in
11    union members to management, correct, according
12    to --
13        A.  If --
14        Q.  -- Ms. Stone?
15            MR. GREENFIELD:  Objection, form.
16        A.  I, I, I, I would not have heard those
17    words from her, but as union president, I believe
18    that she would not condone me having done what I
19    had done.
20        Q.  Would she go --
21        A.  Audrey did not par -- Aud -- Audrey did
22    not participate in social media in any way, shape,
23    or form.
24        Q.  Are you, are you sure about that?
25        A.  Pretty sure.
```

Page 46

```
 1        Q.  You haven't seen her posts on the core
 2    team Facebook page?
 3        A.  For -- if, if, if, if she was in there for
 4    a very, very brief time.  And, again, let's talk
 5    about what we consider social media.  Right now
 6    we're in a, in a, in a, a Zoom meeting with one,
 7    two, three, four, five, six, seven of us; is this
 8    considered social media?  I don't consider this
 9    social media, any more than I considered the core
10    group social media.
11            We were a close, private group of
12    people.  That was our virtual conference room.  As
13    flight attendants that are all over the country,
14    working all different hours, all different days,
15    we don't have the ability to assemble in the, in
16    the union hall.  We don't -- so Facebook provides
17    virtual conference rooms, is how I viewed the core
18    group.  So I never considered it a social media
19    violation because it wasn't social media.
20        Q.  It wasn't social --
21        A.  Any more than I --
22        Q.  Go ahead, I'm sorry.
23        A.  -- any more than I considered this group
24    right now social media.
25        Q.  One of the reasons you didn't consider it
```

Page 47

```
 1    social media, it was private, it was supposed to
 2    be a, a set group of people?
 3        A.  Correct.
 4        Q.  And do you know if Ms. Stone agreed with
 5    you about that?
 6        A.  I -- we never discussed that.
 7        Q.  What was the result -- first of all, who
 8    at Southwest management did you talk to about
 9    targeting these three groups?
10            MR. MCKEEBY:  Object to the form of
11    the question.
12            You can answer.
13        A.  I, I -- whoever I sent them to.  I don't
14    know whether it was the social media violation
15    department or a, a vice president, director,
16    base man -- probably not base manager, I doubt
17    that I would have included them.
18        Q.  You don't recall who you sent it to?
19        A.  No.
20        Q.  How did you decide who to send it to?
21    Maybe that will help us narrow it down.
22        A.  Probably the people that I would have had
23    some -- the closer -- more of a working
24    relationship with and felt more comfortable with.
25        Q.  And what -- who would fall within that
```

Page 48

```
 1    group?
 2        A.  Possibly our, our -- I don't believe Sonya
 3    Lacore would have been vice president at that
 4    point.  I think she was a director.  Mike Sims
 5    would have been a director.
 6        Q.  And who would the director have been at
 7    that point?  Is that Hafner?
 8        A.  What I just said, so -- no, I, I believe
 9    Sonya Lacore would have been a director at that
10    point --
11        Q.  Okay.
12        A.  -- as would have been Mike Sims.
13        Q.  Okay.  So you, you think you would have
14    spoken to either Ms. Lacore or Mr. Sims or both?
15        A.  Probably not spoken.  Probably would have
16    forwarded an e-mail.
17        Q.  As you sit here today, you don't recall
18    any conversations?
19        A.  No.  Nothing comes to mind, no.
20        Q.  Earlier you said that Mike Casper caused
21    dysfunction and disruption.  What did he do to
22    cause dysfunction and disruption?
23        A.  Probably 20 plus years ago, he started,
24    before the, the current platforms of social media
25    existed, something on Yahoo, using Yahoo, it was
```

12 (Pages 45 to 48)

Page 49

1   called a Yahoo groups, and with he being a fairly
2   senior employee, a fairly well spoken employee,
3   and a fairly well written employee, I think he
4   gathered or got more respect than was probably
5   deserving. He'd always be a malcontent. I, on
6   the other hand, consider myself as well as others
7   supportive of the company, and he, through
8   spreading misinformation and lies to thousands --
9   well, at that time it was probably 2,000 people,
10  it was, in my opinion, was very damaging.
11      Q. That was 20 years ago. What since then?
12      A. Well, then he would have, he would have --
13  once the, the newer technology came along, he
14  would have participated in that, Facebook,
15  different flight attendant Facebook groups.
16      Q. You said he would have. Did he?
17      A. Yes.
18      Q. And can you give us any specifics of the
19  dysfunction and disruption he caused in that
20  regard? What did he say?
21      A. Well, I can't tell you specifically. I, I
22  don't know. Generally contract time would have
23  been an appropriate time, union officer election
24  time would have been appropriate time,
25  particularly at contract time, when he would be

Page 50

1   misrepresenting the details of our contracts to
2   thousands of people.
3       Q. And that would --
4       A. And I don't --
5       Q. -- have been what? What year was that?
6       A. I don't know. My last dealing with Mike
7   Casper was probably in, I'm guessing, 2012 or '13,
8   to my -- to the best of my knowledge.
9       Q. Let me show you another document. This is
10  Trial Exhibit 146. Let's skip to the begin --
11  beginning of this e-mail thread. Try and make it
12  a little bigger, see if that helps.
13      A. I see -- I --
14      Q. Can you see this?
15      A. Can you scroll it up a little bit? My
16  phone's blocking it.
17      Q. I can. I can.
18      A. Okay.
19      Q. I put my cursor by where I'm --
20      A. Uh-huh.
21      Q. Okay. You're not -- sir, you're not on
22  this e-mail, and I'm asking you about this to see
23  whether or not you happen to have seen this e-mail
24  or recall seeing it or if you recall any
25  discussions about it. And you get -- you

Page 51

1   understand my preamble here?
2       A. Yes.
3       Q. And this is an e-mail from Audrey Stone to
4   Sonya Lacore, and it says, Head's up, we have a
5   movement of objectors, those that resigned from
6   their union membership and receive a small
7   reimbursement of their dues, and the board agreed
8   a nonmember of 556 cannot represent TWU 556.
9           And there's more. But the point is,
10  she's contacting Sonya Lacore, saying that the
11  union wants the objectors off of any joint
12  Southwest Airlines union committee.
13          Okay? You understand so that so far?
14      A. I did.
15      Q. Do you recall anything about that?
16      A. I, I never -- I've never seen the e-mail.
17  I remember vaguely the circumstances -- the
18  situation.
19      Q. Okay. Tell me what you recall about the
20  circumstances.
21      A. Well, I, too, was on a joint committee of
22  TWU and Southwest Airlines, and it's just -- and
23  the fact that it's a, a nonmember of a union
24  certainly would not participate in a union event.
25  And particularly somebody that would be an

Page 52

1   objector had, has denounced their, their
2   membership to the union.
3       Q. Do you recall anything else?
4       A. No.
5       Q. Do you recall whether or not Southwest
6   Airlines took any action to ensure that those
7   objectors, in fact, were not on committees?
8       A. I, I don't know how it played -- I, I know
9   that he was -- did not continue from what I, from
10  what I heard just through the grapevine, did not
11  continue on that committee. I, I know nothing
12  about the mechanics or how it happened.
13      Q. Okay. Did you exchange e-mails on a
14  regular basis with Sonya Lacore?
15      A. Yes.
16      Q. And what time period would that have been?
17      A. Probably 2013 through, I, I don't know,
18  20 -- I -- probably wherever she became vice
19  president or shortly, shortly thereafter, I would
20  guess.
21      Q. Okay. And what prior --
22      A. I mean, I, I con -- I continued to have
23  e-mails with her over the years of various topics.
24      Q. And that, that was gonna be my next
25  question.

13 (Pages 49 to 52)

Page 53

1      What, what were the topics of your
2  discussions?
3      A.  Just whatever current event, whatever
4  needed to be discussed.  I mean, nothing, nothing
5  specific.
6      Q.  And Ms. Lacore, what was her position at
7  Southwest Airlines?
8      A.  Most of the time when I dealt with her
9  more regularly, she was a, a director.
10     Q.  A director of what?
11     A.  Director of inflight.
12     Q.  And explain to the jury what, what that
13 means, to be director of inflight.
14     A.  I don't really know what the role is, to
15 be honest with you.  It's a notch below a vice
16 president and one notch above a manager.  So --
17     Q.  It just --
18     A.  -- I don't know what her specific duties
19 were.
20         I, I worked with her on a couple of
21 projects that she was basically the liaison or
22 oversaw what we were doing.  So that's when I had
23 most of my contact with her.
24     Q.  When you say she was overseeing what you
25 were doing, what do you mean?

Page 54

1      A.  We worked on a project for a new galley
2  for our airplane and, and modifying a, a existing
3  galley, so we were in Dallas for a couple of,
4  couple of months on a full-time basis doing that.
5      Q.  Okay.
6      A.  And she was, for the most part, our, our
7  contact person.
8      Q.  When was that?
9      A.  That would have been 2013, I think.  2013,
10 2014.
11     Q.  And these e-mail communications with
12 Ms. Lacore, do you still have them?
13     A.  I, I don't ever delete e-mails.  I'm sure
14 they're somewhere in my, in my folder.
15     Q.  Do you have a folder that's dedicated to
16 Ms. Lacore?
17     A.  No.  I have an e-mail that -- I have a, a
18 e-mail box that probably has 300,000 e-mails in it
19 that's never are categorized or organized.  It's a
20 mess.
21     Q.  Okay.  You have a search function, though,
22 don't you?
23     A.  Yes.
24     Q.  Okay.  All right.  Let's look at another
25 document.

Page 55

1      Can you see what's marked Exhibit 141
2  on the screen?
3      A.  Yes.
4      Q.  Okay.  And, and I'm gonna try and center
5  that a little bit.  Is that big enough for you or
6  should I make it a little bigger?
7      A.  Where am I -- where do you want me to
8  start reading?  So my final installment on --
9      Q.  I -- I'll show you where my cursor is, and
10 that's where we're gonna start.  But --
11     A.  Okay.
12     Q.  -- I'm just basically asking can you read
13 this document on your --
14     A.  Yes.  Yes.
15     Q.  -- on your computer?
16         Okay.  All right.  So this is an
17 e-mail from you to Sonya Lacore dated April 29,
18 2014, correct?
19     A.  Uh-huh.
20     Q.  Yes?
21     A.  Yes.
22     Q.  And you sent this to her private e-mail,
23 correct?
24     A.  Apparently so, yes.
25     Q.  And then it says, So my final installment

Page 56

1  on this subject.  Shipman stepped up to the plate.
2         Does that ring a bell as to what you
3  were talking about?
4      A.  No, I have no idea.
5      Q.  Okay.  The next sentence says, It is
6  maddening trying to reason with these sheeple.
7  The issue becomes the tumor.  I hate to give
8  credit for anything, Casper really was the first
9  legitimate cancerous tumor that had any
10 significant reach, with 1,000 members, but in a
11 relatively inactive site.  He could be contained.
12         Did you write those words?
13     A.  Yes.
14     Q.  And so you're telling a senior manager of
15 Southwest that Mike Casper is a tumor, a cancerous
16 tumor, correct?
17     A.  Yes.
18     Q.  And that he could be contained, correct?
19     A.  Yes.
20     Q.  Did Ms. Lacore ever report you to
21 Southwest Airlines for violating any company
22 policies as a result of this communication?
23         MR. MCKEEBY:  Object to the form of
24 the question.
25         You can answer.

Brian Talburt

Page 57

```
 1        A.  I'm not seeing what policy you're talking
 2   about, but not to my knowledge.
 3        Q.  You don't think this violates any
 4   Southwest Airlines policies?
 5        A.  No.
 6        Q.  Then you say -- Now with FB and twen --
 7   and FB is Facebook?
 8        A.  Yes.
 9        Q.  Now with Facebook and 24/7 reach, the
10   characters become more relevant.  Corliss
11   particularly is something we have not seen before
12   and is incredibly dangerous.
13             Who is Corliss?
14        A.  A Southwest flight attendant.
15        Q.  So now you're identifying another
16   Southwest Airlines employee and referring to her
17   as incredibly dangerous, correct?
18        A.  Correct.
19        Q.  You say, The attitude she spawns is NW
20   airlines in the '80s.  People listen and people
21   react.
22             What are you referring to when you say
23   she spawns is Northwest Airlines in the '80s?
24        A.  Northwest Airlines was notorious for
25   having very poor labor management regulations.
```

Page 58

```
 1        Q.  They had a lot of --
 2        A.  And histor -- and, and historically at
 3   Southwest Airlines we did not have that.
 4        Q.  Okay.  And so you were warning Ms. Lacore
 5   that Corliss spawns an attitude of union problems
 6   with management, in your opinion?
 7        A.  Right.
 8        Q.  Did you say --
 9        A.  In my opinion, correct.
10        Q.  Did you say right?  I'm sorry.
11        A.  In, in my opinion, correct.
12        Q.  Okay.  And then you said, I am all about
13   targeted assassinations, correct?
14        A.  That's what I said.
15        Q.  And did Ms. Lacore report you, to your
16   knowledge, to Southwest management for any of the
17   words that you've used that we've read so far in
18   this e-mail?
19        A.  Not to my knowledge.
20        Q.  Okay.  And you know that targeted
21   assassinations gets you in trouble because you got
22   in trouble about that, didn't you?
23        A.  That would have been -- I'm looking at the
24   timeline.  Apparently so, yes.
25        Q.  Okay.  So you felt comfortable --
```

Page 59

```
 1        A.  Again, I get --
 2        Q.  I'm sorry --
 3        A.  Again --
 4        Q.  -- finish your answer.
 5        A.  Again, metaphorically speaking.
 6        Q.  I understand your, your defense of the
 7   terms.  What I'm pointing out is you've been
 8   disciplined for this language, and you felt
 9   comfortable using it with a senior member of
10   inflight management at Southwest Airlines,
11   correct?
12        A.  Correct.
13        Q.  Then it says, I am sure with her dreadful
14   work history, there could be opportunity.
15             And are you there talking about
16   exactly what you mean, as you tell us by targeted
17   assassinations, you're not suggesting you're going
18   to assassinate Ms. Corliss, you're suggesting that
19   taking advantage of her dreadful work history
20   would be the opportunity to get her terminated,
21   correct?
22        A.  Ap -- apparently, yes.
23        Q.  Then you say, She will play very well to
24   the heavy inner city minority crowd coming onboard
25   soon.  She will be their voice.  She will be a
```

Page 60

```
 1   huge threat in our upcoming election as well.  She
 2   plays very well to her crowd and has as much
 3   support as anyone I have seen in the past.
 4             You wrote those words, and you sent
 5   them to Sonya Lacore, correct?
 6        A.  Appears so, yes.
 7        Q.  When you say "appears so," what -- why do
 8   you say "appears so"?  Can you not read?
 9        A.  No, I can read very well.  So, yes, I did.
10        Q.  Okay.  Well, then what do you mean appears
11   so, if you can read?
12        A.  I don't recall having sent it to this
13   e-mail, but obviously I did.
14        Q.  Okay.  So when you said these wor -- by
15   the way, is Ms. Corliss African-American?
16        A.  Yes, she is.
17        Q.  And so what you're suggesting to a senior
18   manager at Southwest Airlines is that you target
19   an African-American female who might end up in
20   leadership at the union, correct?
21        A.  No.  I, I -- Af -- her being
22   African-American has nothing to do with it.
23        Q.  No, no, I -- we'll let the jury decide
24   what your words mean in that regard.
25             Listen to my question carefully.  You
```

Brian Talburt

Page 61

1    are telling her about Ms. Corliss, who is an
2    African-American, and you were telling her
3    Southwest Airlines should target for
4    assassination, and by that you mean termination,
5    Ms. Corliss, because she will play very heavy to
6    the inner city minority crowd and will be a huge
7    threat in our upcoming election as well; isn't
8    that correct?
9        A. Yes.
10       Q. Now, when you say "our upcoming election
11   as well," you're referring to the election
12   upcoming in -- I was going to say 2015, but this
13   says 2014.
14          Was the election in 2014 or were you
15   talking about the 2015?
16       A. I would have been talking about the
17   upcoming 2015. I'm not real sure why I would have
18   referenced that as upcoming, because it would have
19   been a year away. Well, it would have been ten
20   months away.
21       Q. I guess it takes time to target people,
22   maybe you needed to get ahead of the game. Could
23   that be it?
24          MR. GREENFIELD: Objection to the
25   form.

Page 62

1        Q. You can answer.
2        A. I don't know what I was thinking.
3        Q. Okay. The -- and as far as you know,
4    Ms. Lacore did not report you to Southwest
5    Airlines for violation of any Southwest policies
6    as a result of this, correct?
7        A. Not that I'm aware of.
8        Q. Do you think that your words here are
9    racist?
10       A. No.
11       Q. Didn't you say -- I'm gonna skip down to
12   the next paragraph -- well, no, let me go to the
13   last sentence here.
14          You're talking about Sam Wilkins, and
15   then you say, Everybody loves her, but then you
16   say, Well, everyone except the haters.
17          And that's a capital H. Who is
18   haters?
19       A. The opposition to the current
20   administration.
21       Q. So union members who oppose the current
22   union leadership?
23       A. Not necessarily oppose but are, are vocal
24   and public.
25       Q. Well, let, let me try it another way.

Page 63

1    Your haters is not someone's last name; haters is
2    a group of anyone that's a union member that's not
3    supporting the Stone slate of candidates?
4        A. It's not a matter of supporting them,
5    whether they support them, it's what they do
6    publicly, and particularly in terms of spreading
7    mis -- mistrusts and misinformation.
8        Q. Okay. Well, let me try it with that
9    definition then. When you're referring to haters
10   in this e-mail to Ms. Lacore, you're referring to
11   union members who, in your opinion, are spreading
12   untruthful information about the current
13   leadership of the union, correct?
14       A. Correct.
15       Q. And by the way, you don't define the word
16   "haters" in this e-mail, do you?
17       A. No.
18       Q. And yet you feel comfortable enough using
19   it with Ms. Lacore without a definition. Is it
20   fair to assume you felt she would understand
21   exactly what you were talking about?
22       A. I would assume that she would probably
23   know that I was talking to people that were not
24   supportive of the current administration.
25       Q. Okay. And by the way, that's -- the

Page 64

1    definition that you just gave the word "haters" is
2    the definition I originally -- you tried to say,
3    well, I'm really just talking about people that
4    spread untruthful information, but unfortunately,
5    you've now defined it to say what you're actually
6    talking about is anybody that doesn't support the
7    current administration; isn't that what you just
8    told the jury?
9        A. No, that's --
10          MR. MCKEEBY: Object to the form of
11   the question.
12       A. That's not what I said. I said and takes
13   and, and spreads mistruths publicly.
14       Q. No, sir. Just now, you said that she
15   would know, that Ms. Lacore would know, we'll put
16   these words up for the jury. Here's your chance
17   to see if you can tell the truth under oath. Did
18   you tell -- did you say that she would understand
19   that haters meant anyone that was opposed to the
20   current union administration? You can answer.
21       A. If that's what I said, that's not entirely
22   what I meant.
23       Q. So --
24       A. What I meant wa -- Sonya, Sonya would be
25   well aware of the people that were extremely vocal

MELODY MONK REPORTING
888.988.5317

Page 65

1    publicly about our, our current administration.
2    There was no secret about that.
3        Q.  The next paragraph says, Social media is
4    by far the major source of reach and must be used
5    to our advantage.
6            Those are words you used?
7        A.  Yes.
8        Q.  And then you go down to the next
9    paragraph, Cancer is a dangerous thing and must
10    being eradicated whenever possible or it spreads.
11            By the way, if you go back up to that
12    first paragraph, the cancer example you gave was
13    as to Mr. Casper, right?
14        A.  Yes.
15        Q.  And is that what you're referring to here
16    or are you talking about a larger group of people?
17        A.  Well, I'm talking about a movement.
18    Casper would have been a pioneer in that movement.
19        Q.  You said, I would highly encourage
20    targeting people, and a one-day detective with a,
21    with a video camera is a very cheap investment.
22            Is that the recommendation you were
23    making to Ms. Lacore?
24        A.  Apparently so, yes.
25        Q.  Okay.  When you say "apparently," what do

Page 66

1    you mean?
2        A.  I don't remember having made that comment,
3    but it's here, so obviously I did.
4        Q.  Okay.  You, you don't disagree that that's
5    what you wrote?
6        A.  No.
7        Q.  Then when -- then you say, While I have
8    sent this to a personal e-mail -- I'm going to
9    stop right there on that phrase.  You have
10    intentionally sent this to her personal e-mail
11    instead of her business e-mail so it would be less
12    likely to be discovered, correct?
13        A.  Correct.
14        Q.  And are you knowledgeable enough to know
15    that when there's an SEC investigation or a
16    Department of Labor investigation or a lawsuit
17    where documents are demanded of Southwest Airlines
18    or the union, that any e-mails would be picked up,
19    and you were trying to avoid that?
20        A.  No, not, not, not at all.  First of all --
21        Q.  Well --
22        A.  -- to answer your que --
23        Q.  Wait, let me get --
24        A.  -- to answer your --
25        Q.  -- let me get to ask a question, so we, we

Page 67

1    have a, a question for your answer.
2            What were you trying to avoid by
3    sending it to her personal e-mail?
4        A.  The, the filters that it may go through at
5    headquarters.  As opposed to not going directly to
6    her, I don't -- you don't know who read things at
7    headquarters.
8        Q.  Why would you be concerned about someone
9    reading this?
10        A.  It was a --
11        Q.  If you're not doing anything wrong, why
12    are you concerned?
13        A.  It wa -- it was a personal, personal
14    communication between two people.
15        Q.  All communications between two people fall
16    within that definition, sir.  Why are you avoiding
17    sending this through the company e-mail?
18            MR. GREENFIELD:  Objection, form.
19        A.  I think I answered the question.
20        Q.  So then you say --
21        A.  If I send, if I send an e-mail, if I send
22    an e-mail currently to a vice president, I don't
23    know how many people -- at that time I don't
24    believe she was a vice president, but I don't know
25    who filters the e-mail before it gets to that

Page 68

1    person.
2        Q.  Do you see --
3        A.  And I -- for that reason, that reason, I,
4    I, I prefer not to use company communication.
5        Q.  And, by the way, would you be surprised
6    there was no filter at all, sir?  You know so much
7    about Ms. Lacore, she's your pen pal, and you're
8    telling us under oath there was -- there were
9    people that would be filtering her e-mails; is
10    that your testimony?
11            MR. MCKEEBY:  Object to the form of
12    the question and the characterization.
13            You may answer.
14        A.  I don't know whether there were filters or
15    not.
16        Q.  So you didn't know if there were filters,
17    but out of an abundance of caution about these
18    unknown filters, you were sending this to her
19    personal e-mail address, correct?
20        A.  Correct.
21        Q.  By the way, you sent other e-mails that
22    she was on to her business address.  Why would you
23    choose some to go to her business e-mail and
24    others like this go to her personal e-mail?
25        A.  I don't know.

17 (Pages 65 to 68)

Page 69

1   Q.  You have no idea?
2   A.  No.
3   Q.  You did that, but you don't know why,
4   correct?
5   A.  I don't know why I did something in April
6   of 2014, correct.
7   Q.  No, I didn't ask it that way, but at any
8   time can you tell us why you would send one e-mail
9   to her business address and another to her
10  personal address?  Pick any time period from the
11  beginning of time to this very moment.
12  A.  To be honest with you, probably for --
13      MR. GREENFIELD:  Objection, form.
14  A.  -- the same reason that I, I have multiple
15  e-mail set up myself for no particular reason.  I
16  haven't any idea why I receive e-mail from
17  Southwest Airlines on one particular account
18  versus another.
19  Q.  And, and you can't think of any reason
20  about this e-mail that it's sensitive and
21  therefore you would want to keep it a secret,
22  correct?
23  A.  Correct.
24  Q.  And yet let's see what you say.
25      I certainly am not awaiting comments

Page 70

1   on topics of above.  I totally get the paper trial
2   thing, and nobody can be trusted.
3       Did I read that right?
4   A.  Yes.
5   Q.  And so you're worried about your -- you've
6   told us now.  You couldn't remember, but now
7   you've told us in what you wrote; you didn't want
8   a paper trail about these communications, did you?
9   A.  I didn't want to put -- basically this was
10  a one-sided communication, was not intended nor
11  expected to be -- I didn't want her to think that
12  a reply was to be expected.  Obviously I'm using
13  some inflammatory -- some colorful language, and I
14  would not expect her in her position to respond to
15  that.  So I was basically sharing my thoughts with
16  her.  Nothing more.
17  Q.  And when you say, I totally get the paper
18  trial thing, aren't you, in fact, referring to you
19  don't want a paper trial to be discovered by
20  others --
21  A.  No, I didn't want --
22  Q.  -- regarding this ca -- I'm sorry?
23  A.  Sorry.  I didn't want her to think that
24  she would -- that I would be expecting an e-mail
25  because I would not expect her to respond to me,

Page 71

1   in her position to respond to me.  Again, this is
2   me sharing my thoughts with her, nothing more.  I
3   would never expect her to have responded or
4   commented, particularly -- well, commented on
5   that, period.  And she never did, to my knowledge.
6   Q.  Well, because you told her not to.  Let's
7   have this conversation off --
8   A.  No.
9   Q.  -- off record?
10  A.  No.  I, I was telling her, and, and I've
11  had many communications with her over the years
12  on, on various topics where I don't ex -- I don't
13  expect a re -- I don't have an ego that needs a
14  reply to every communication that I send to her.
15  If I have an idea or a thought, I don't need --
16  she's a busy person, she's got a lot -- she
17  probably gets hundred of e-mails a day, and I
18  don't expect a reply or need a reply.
19  Q.  Do, do a lot of people at Southwest
20  Airlines have access to her personal e-mail?
21  A.  I wouldn't have any --
22  Q.  To your knowledge?
23  A.  I wouldn't have any idea.
24  Q.  But you did, right?
25  A.  Apparently, yes.

Page 72

1   Q.  And then it says, Talk to you soon and
2   hope we can get together soon.
3       Did you?
4   A.  Yes.
5       MR. MCKEEBY:  Did she say that or did
6   they get together?  Object to form.
7   A.  I'm just reading from your e-mail, sir.
8   A.  Well, I, I worked with her quite a lot on,
9   on -- which is what I was referring to.  We worked
10  very closely on a couple of projects.
11  Q.  Do you recall having conversations with
12  her about the subject matter of this e-mail?
13  A.  No.
14  Q.  Have you seen Ms. Lacore's deposition?
15  A.  No.
16  Q.  And before --
17      MR. MCKEEBY:  Bobby, can we take a,
18  can we take a break in a minute, if you're done
19  with this document?
20      MR. PRYOR:  Sure.  Any -- anytime --
21  by the way, sure.  Anytime anyone needs a break,
22  that's fine.
23      MR. GREENFIELD:  Well, let, let me
24  just, let me just take this as a moment for one
25  second.  Ms. Court Reporter, what, what is the

18  (Pages 69 to 72)

Page 73

1 time of the deposition at?
2 THE VIDEOGRAPHER: This is Lisa, and
3 we've used 1 hour and 19 minutes.
4 MR. GREENFIELD: Okay. Then at this
5 time, the TWU Local 556, we object to the
6 continuance of this deposition and move to strike
7 any additional to -- testimony. It is now 5:32 on
8 the Sunday night before the 4th of July. The
9 plaintiff has known of their belief that
10 Mr. Talburt was a -- was relevant to this case
11 since March 29th, 2019, when he was listed as a
12 potential witness in their initial disclosures.
13 Plaintiff had well over two years to dep -- depose
14 Mr. Talburt, but failed to do so until long after
15 the close of discovery on July 5th, 2021. The
16 court limited depositions of Southwest witnesses
17 to one hour. We believe the court intended to or
18 should have limited this deposition to the same
19 one-hour time period.
20 MR. PRYOR: Is that what you wanted to
21 break for or are you actually wanting a break?
22 MR. GREENFIELD: No, that, that was
23 me. Mr. McKeeby asked for the break. But
24 objection --
25 MR. PRYOR: Okay. All right.

Page 74

1 MR. GREENFIELD: We were at a breaking
2 point, so I wanted to lodge my objection at that
3 time, but I didn't want to interrupt you while you
4 were --
5 MR. PRYOR: I understand.
6 MR. GREENFIELD: -- in the middle of a
7 document, Mr. Pryor.
8 MR. PRYOR: Okay. I'll going back to
9 share screen then.
10 MR. MCKEEBY: Well, I really want a
11 break because I need to use the restroom.
12 MR. PRYOR: Oh, okay. Let's take a
13 break.
14 THE VIDEOGRAPHER: Going off the
15 record at 5:33.
16 (Recess.)
17 THE VIDEOGRAPHER: We are back on the
18 record with Clip 2 at 5:38.
19 Q. Mr. Talburt, let's go back to Trial
20 Exhibit 141. And, and now I'm at the top of that
21 document. Can you see the e-mail between yourself
22 and Audrey Stone?
23 A. Yes.
24 Q. And you're telling her, So this is part of
25 a thread between Sonya and I re a Facebook post re

Page 75

1 not taking fourth when asked as routine.
2 What are you talking about there?
3 A. So in our contract in 2007, perhaps, prior
4 to that time, anytime that there was a deadheading
5 crew of flight attendants, they -- the company
6 would block two seats, and one seat the jump --
7 the third flight attendant would be required to
8 sit in the jump seat. And in that contract it was
9 changed, and we were provided three blocked seats
10 as opposed to two blocked seats. So I'm assuming
11 what that dealt with was when they negotiated
12 that, and that's confirmed by our negotiating
13 team, they were under the -- they believed, and,
14 again, this is a, good -- and this points to
15 much of the misinformation and dysfunction of our
16 union that I have alluded to in the past, they
17 believed, as I was told, the flight attendants
18 would, quote/unquote, do the right thing in the
19 case of an oversold flight and take the jump seat.
20 We are getting paid for that. And they and the
21 company both believe that that to be case.
22 Once that was signed into ink, that
23 became a, a joke, and flight attendants basically
24 because of social media, in my opinion, were, were
25 discouraged from ever taking the jump seat, thus

Page 76

1 denying the company an opportunity for additional
2 revenue and possibly leaving people behind at the
3 gate. So I'm sure that's what I was referring to.
4 Q. Okay. And then --
5 A. And, and --
6 Q. Go ahead. Were you done?
7 A. I, I was gonna say and, and now, in
8 reading the last sentence there in the first
9 paragraph where it says, not only no, but hell no,
10 if a ticket agent were to ask a flight attendant
11 to take jump, they take the jump seat on oversold
12 flight, they would be very compatative -- combata
13 -- combatative (sic) over, over that request.
14 Q. So you say, I had developed a very close
15 working relationship with Sonya, and this subject
16 was something we had talked about. Note, once
17 again using the targeted assassination metaphor
18 and being quite clear about what I was referring
19 to. As indicated on the bottom, I did not receive
20 nor expect to receive a rely, as is always the
21 case when talking, quote, off the record in a
22 print environment.
23 I want to go back and ask you
24 questions about that.
25 A. Uh-huh.

Brian Talburt

Page 77

1    Q.  You sent this to Ms. Stone; one of the
2  reasons to point out in the e-mail below, you
3  used targeted assassination metaphor, and at
4  another point in time you'd got in trouble for it,
5  but here, this shows you had used it before with
6  senior management, not gotten in trouble, and it
7  was clear you were talking about terminating
8  someone's job, not killing someone; is that
9  accurate?
10   A.  Not necessarily terminating somebody's
11  job, but basically being held accountable, yes.
12   Q.  Other than that, either terminating their
13  job or holding them accountable, my statement was
14  an accurate summary?
15   A.  Yes.
16   Q.  And then it says about talking off the
17  record, what do you mean by that?  Isn't that what
18  I was asking you about before, that you don't want
19  a record of this?
20   A.  Yes.  Ob -- ob -- obviously you asked me a
21  question earlier, and I, I, through this
22  unfortunate process, have learned that obviously
23  people like yourself have access, ac -- access to
24  private information.
25   Q.  So because I have access to private

Page 78

1  information, that's unfair to you and you have to
2  tell the truth?
3    A.  No, that's, that's not what I'm saying at
4  all.  We shouldn't -- it -- in my obvious naive
5  way of thinking would have never thought that we
6  would have even had to discuss it.
7    Q.  So in your naive way of thinking, in fact,
8  you told Ms. Stone that the reason you did this
9  communication the way you did with Ms. Lacore was
10  to keep it off the record; you even put quotes
11  around it, true?
12   A.  Yes, apparently.  Yes.
13   Q.  Let's get a different document.
14       By the way, you sent this to her, to
15  Ms. Stone five months later?
16   A.  Okay.
17   Q.  You didn't send it to her at the time,
18  right?
19   A.  That's what the dates say, yes.
20   Q.  Let me show you another trial exhibit.
21  Okay.  I don't know if I just called up a document
22  you can see or not.  Is it -- I can make it bigger
23  if it's on there.
24   A.  I, I -- yeah, I --
25   Q.  Okay.  This is Trial Exhibit 26.  Are you

Page 79

1  able to read this?  Should I make it a little
2  bigger?
3    A.  No, I'm, I'm fine.
4    Q.  Okay.  And this is an e-mail from you to
5  whom?
6    A.  I don't know.  I don't see it.
7    Q.  Okay.  Let me scroll up.  Do you know if
8  you sent this to Audrey Stone, and her response
9  was Not relevant?
10   A.  Okay.
11   Q.  I'm, I'm asking you if you agree that's
12  what's ha -- I, I, I think it is, but I need to
13  tell me that's what you think as well.
14   A.  That's, that's what it looks like, yes.
15   Q.  Okay.  All right.  So at the bottom,
16  there's something that says from Mike Hafner to
17  Brian, and that's you, right?
18   A.  I'm sorry, where are we looking at?
19   Q.  Okay.  Can you see my cursor?
20   A.  Yes, it's over here.
21   Q.  Okay.  So if you go to the bottom, on
22  August 16th, 2013, at 6:21 a.m., it appears that
23  you received an e-mail from Mike Hafner that was
24  also sent to Matthew, and I don't know how to
25  pronounce the last name.  Do you see that?

Page 80

1    A.  No.  I'm sorry, I don't see what you're,
2  you're pointing to.
3    Q.  Okay.  So you see my cursor?
4    A.  Move it.
5    Q.  So go to the very bottom.  See where it
6  says Trial Exhibit 26?
7    A.  Oh, yes.  Yeah, my phone is blocking it.
8  I can't see it.
9    Q.  Okay.
10   A.  You have to scroll up.
11   Q.  All right.  Fair enough.
12       And if you look to the left of that,
13  you see where it's an e-mail from Mike Hafner that
14  you're carbon copied on at --
15   A.  Okay.
16   Q.  -- 6:21 a.m.?
17   A.  Yes.
18   Q.  And I, I don't have anything else about
19  that e-mail, but if you look at the e-mail above,
20  are you able to tell us any recollection you have
21  of what Mr. Hafner was sending you?  If it helps,
22  the subject line says Re: Facebook.
23   A.  Okay.
24   Q.  Do you recall what Mr. Hafner was
25  communicating to you in that e-mail?

20  (Pages 77 to 80)

Page 81

1    A. I, I don't know.  I mean, I know what
2  my -- I know what the e-mail is about, but I don't
3  know what Hafner was responding, no.
4    Q. Okay.  So -- and, and at that time
5  Mr. Hafner was in what position, 2013?
6    A. He would have been, he would have been the
7  vice president of inflight services.
8    Q. And that's a member of senior management
9  of Southwest Airlines?
10    A. Yes.
11    Q. And you write to Ms. Stone, I found this.
12  It really has nothing to do with the topic at
13  hand.
14       And, by the way, she seems to confirm
15  that in her response.  Do you remember what the
16  topic at hand was?
17    A. No.
18    Q. Then -- okay.  Then you go on to say, but
19  it is an illustration of casual, behind-the-scene
20  conversations we have and particularly re social
21  media.
22       That's what you wrote, correct?  Do I
23  need to make it bigger?
24    A. No, no, I'm just --
25    Q. You agree that that's what you wrote?

Page 82

1    A. Yes.
2    Q. And then you write, I along with Mike and
3  Sonya had a meeting last summer with VdV to
4  discuss social media as a tool.
5       Did you write that?
6    A. Yes.
7    Q. And is Mike, Mike Sims?
8    A. No, Mike Hafner.
9    Q. Oh, I'm sorry.  Mike Hafner.
10       And is Sonya, Sonya Lacore?
11    A. Yes.
12    Q. And that's the same Sonya Lacore in the
13  last e-mail we looked at that you were talking
14  about using social media to target assassinations,
15  and, again, to hold them accountable, such as
16  otherwise hold them accountable, such as
17  Ms. Corliss and Mr. Casper?
18    A. This, this particular e-mail is a
19  completely different context and a completely
20  different -- a comple -- totally different angle
21  than what that e-mail said.
22    Q. And, and that, that wasn't my question.
23  And we can, we can certainly talk about that
24  question.
25       But my question is:  This is the same

Page 83

1  Sonya Lacore you were talking to in that previous
2  e-mail marked Trial Exhibit 141 about targeting
3  for assassination union members such as Mr. Casper
4  and Ms. Corliss, correct?
5    A. The same person, yes.
6    Q. And then it says, had a meeting last
7  summer with VdV.
8       I think I read that.  Who is VdV?
9    A. Mike Van de Ven.
10    Q. Okay.  And Van de, Van de Vere?
11    A. Van de Ven.
12    Q. Van de Ven.
13       And that's the person you told us
14  before you, you didn't, didn't know?
15    A. I never told you I didn't know him.
16    Q. Or you didn't have any relationship with
17  him?
18    A. I have no, I have no personal relationship
19  with him, yes.
20    Q. But you were --
21    A. I've had one meeting, I've, I've had one
22  meeting with him in his 35 years here, and this is
23  what that's referencing.
24    Q. Okay.  Well, when you said "personal
25  relationship," at the beginning you told us you

Page 84

1  didn't have personal relationships with these
2  people, you had business relationships.  And so I
3  assume when you were telling us you didn't have a
4  relationship with Van de Ven, that you were saying
5  you didn't have a business relationship.  Is that
6  still your testimony?
7    A. I don't really consider having one
8  30-minute meeting with somebody having a
9  relationship.
10    Q. Okay.  I'm not saying I would --
11    A. I had one -- I had --
12    Q. All right.  I'm not saying I would either.
13  I'm asking --
14    A. Okay.
15    Q. -- you, is it still your testimony or does
16  this refresh your recollection?
17    A. I said I had no relationship with Mike Van
18  de Ven earlier, yes.  And I still maintain I have
19  no relationship with Mike Van de Ven.
20    Q. You say, You are immediately discredited
21  as being an over -- overpaid executive.  You in
22  this world need warriors, another word I use
23  frequently as I did on the fateful post, to help
24  to deliver the message.  He was very
25  interested/intrigued.

21 (Pages 81 to 84)

Brian Talburt

Page 85

1     Okay.  Let's, let's cover those, those
2  sentences.  When you say, as I did on the fateful
3  post, what are you talking about?
4     A. I don't know.
5     Q. It's not about the post, post that used
6  targeted assassinations and to terminate them?
7     A. No, I --
8     Q. It's not the --
9     A. -- I don't think so.
10    Q. It's not the fucktard that you got
11 terminated for?
12    A. Oh, that's probably what it was.  Looking
13 at the dates, yeah.
14    Q. Okay.  Have we not talked about the
15 fucktard one yet?  I thought we had.
16    A. Yeah, we did.
17    Q. Okay.  All right.  And then it says, to
18 help deliver the message.  He was very
19 interested/intrigued.
20        How did he express to you his interest
21 and intrigue?
22    A. Interested in that he wanted to have a --
23 he wanted to discuss it further, which we
24 discussed in a 30-minute meeting.
25    Q. What do you dis -- recall about that

Page 86

1  30-minute meeting?
2     A. It had nothing to do with --
3     Q. I understand, it was, it was eight years
4  ago.
5     A. Yeah.  Oh, no, I remember this meeting
6  quite well.  It had nothing to do with targeted
7  assassinations.  It had nothing to do with
8  targeting anybody.  It had -- it was simply
9  proposing and my rec -- my suggestion, which was
10 not adopted, and this is one employee's
11 suggestion, that, first of all, social media is
12 the most powerful form of communication known to
13 mankind, and when used effectively, it can be
14 very, very -- or -- it can be very, very
15 effective.  And my recommendation to him was to
16 have a, group of -- we had a similar effort
17 within our union during contract time, where we
18 had certain people that were basically overseeing
19 various Facebook pages and delivering a message
20 that was appropriate to be delivered.  And that
21 was my recommendation with Mike Van de Ven, that
22 was a very, very difficult time, we were in
23 contract negotiations, horrible misinformation was
24 being spread, and my recommendation to him was
25 have some trusted employees basically spreading

Page 87

1  accurate inf -- information.  If -- for example,
2  if Brian Talburt gets on Facebook and delivers a
3  message, it's only going to be -- it's gonna be,
4  be immediately discredited.  If a group of people
5  are, are working in tandem to deliver the message,
6  it would be a much more form of -- much more
7  effective means of communication and delivering a
8  message and reinforcing the message that each was,
9  was, was stating.
10    Q. Let's look at another exhibit.  It's gonna
11 be Trial Exhibit 19.  And this is a President's
12 Message dated April 20, 2015.
13        Do you recognize Ms. Stone's picture
14 there?
15    A. Of course.
16    Q. And do you recall this President's
17 Message?  Feel free --
18    A. Can you --
19    Q. -- to read as much of it as you can.  If
20 you need me to scroll up or down, just let me
21 know.
22    A. Yeah, yeah, scroll, scroll up some more,
23 please.
24    Q. Okay.  I want to talk to you about here
25 and then down at the bottom.  But whenever you're

Page 88

1  ready, I'll, I'll read to you the parts I have
2  questions about.
3     A. Okay.  Go ahead.
4     Q. Okay.  So a President's Message is
5  something that the president of Local 556 sends
6  out to all the union members, correct?
7     A. Yes.
8     Q. And this is one that was sent out by
9  Ms. Stone in -- April 20 of 2015?
10    A. Yes.
11    Q. Based on this document?
12    A. Okay.
13    Q. And in it, she says -- I'm gonna read
14 right here.  Do you see where my cursor is?
15    A. Yes.
16    Q. Your union has been addressing the
17 Southwest Airlines social media policy for a long
18 time.  We have been bringing forward your concerns
19 around the lack of clear guidelines on a policy
20 that is both vague and undefined.  We have
21 witnessed inconsistencies around the way the
22 policy is applied and the often subjuc --
23 subjective stance that Southwest management has
24 displayed in administering the policy.
25        Do you recall that?

Page 89

```
 1       A.  Yes.
 2       Q.  And that was also your opinion, correct?
 3       A.  Yes, of course.
 4       Q.  And it was the opinion, as far as you
 5   know, of all of the leadership of the union in
 6   2015, of Local 556?
 7           MR. GREENFIELD:  Objection, form.
 8       A.  I, I, I don't know.  I, I can't speak for
 9   all of them, but --
10       Q.  Okay.
11       A.  -- one would assume so.
12       Q.  Well, could you, from conversations with
13   Brett Nevarez, tell me whether or not you
14   understood that to be his opinion as well?
15       A.  Yes.
16       Q.  And, and it was, correct?
17       A.  My -- that's my understanding, yes.
18       Q.  And that's your understanding from
19   conversations with Mr. Nevarez?
20       A.  Yes.
21       Q.  And that was also the -- your
22   understanding of Bill Holcomb's opinion, based on
23   your conversations with him, correct?
24       A.  Yes.
25       Q.  And it certainly was the opinion of
```

Page 90

```
 1   Ms. Stone; she not only wrote this, but that was
 2   your -- also your understanding from her from your
 3   dealings with her?
 4       A.  Yes.
 5       Q.  And tell me other members of management of
 6   the Local 556 at that time.
 7       A.  You -- those are really the only people
 8   that I'm really close -- have, have --
 9       Q.  Okay.
10       A.  -- have any kind of a relationship with.
11       Q.  Okay.  Let's go down to the bottom.  It
12   says, On a personal note, however, please know
13   that the social media issues management
14   investigated and the resulting discipline
15   Southwest Airlines issued did not arise out of
16   something management simply uncovered or stumbled
17   upon.  They are not generally monitoring our
18   sites.  Instead, these cases come about as our
19   flight attendants are turning each other in.
20   These latest investigations have been the result
21   of flight attendant complaints.  I am asking that
22   we please consider stopping any back-and-forth
23   fighting on social media.
24           That was your understanding in April
25   of 2015 as to Ms. Stone's opinion in this regard,
```

Page 91

```
 1   correct?
 2       A.  Yes.
 3       Q.  And that was also your opinion, correct?
 4       A.  Yes.
 5       Q.  And based on your conversations with other
 6   members of the management or the union or officers
 7   of the union, Mr. Nevarez and Mr. Holcomb, that
 8   was also their opinion, correct?
 9       A.  Yes.
10       Q.  And among other things, it's the desire of
11   the union that Southwest Airlines not be involved
12   in union activities at all, that the union should
13   control those activities, correct?
14       A.  Yes.
15       Q.  Did you assist Mr. Nevarez in any of his
16   duties or activities on behalf of the union?
17       A.  Just we did some work --
18           MR. GREENFIELD:  Objection, form.
19       A.  -- together on it.
20       Q.  What work did you do with or for
21   Mr. Nevarez?
22       A.  We just did some CAN leader, some
23   mobilization efforts during our contract time.
24           THE WITNESS:  If you could excuse me
25   one second, I need to turn the air-conditioning
```

Page 92

```
 1   down in my room.
 2           MR. PRYOR:  Sure.  Anytime you need to
 3   go, let me know.
 4           THE WITNESS:  Okay.
 5       Q.  Okay.  And I'm, I'm sorry, I didn't quite
 6   understand the work that you did with Mr. Nevarez.
 7   Do you mind repeating your answer?
 8       A.  I was -- when I was on the CAN, CAN leader
 9   committee, we basically just passed out
10   information to, to flight attendants during
11   contract negotiation time.
12       Q.  Any other joint activities with
13   Mr. Nevarez and yourself, where you were assisting
14   him, that you can recall?
15       A.  Not that I can recall, no.
16       Q.  I'm going to show you what I've marked for
17   your deposition as Trial Exhibit 21 and probably
18   Trial Exhibit 21-E because I'm referring to
19   specific pages within Trial Exhibit 21.
20           And can you see this document?
21       A.  Yes.
22       Q.  And you're -- you were not on this
23   document.  This is an --
24       A.  Okay.
25       Q.  -- e-mail referring to information that
```

23 (Pages 89 to 92)

Page 93

1   you sent.
2      A. That I sent?
3      Q. Yes. And I -- I'll get to those e-mails
4   as well. But I -- I'll ask you specific questions
5   about people.
6         Do you --
7      A. Okay.
8      Q. -- recall that you turned in -- I think
9   you've told us yes to this -- Jeanna Jackson for,
10  in your opinion, violating social media policy?
11     A. Yes.
12     Q. And was Ms. Jackson a member of the union?
13     A. At some point she was, yes.
14     Q. Well, she was a member of the union in
15  January of 2017, wasn't she?
16     A. Okay.
17     Q. As far as you know, you were turning in a
18  union member, correct?
19     A. Okay.
20     Q. Is okay an agreement with my statement?
21     A. Yes. It --
22     Q. And what you did to turn her and others
23  in, is you went on to people that you thought were
24  opposed to the current union leadership, and you
25  went on to their social media sites and dug and

Page 94

1   dug, looking for any potential violations of what
2   you considered to be an interpretation of
3   Southwest's social media policy?
4      A. That's inaccurate.
5      Q. Okay. Make it accurate for me.
6      A. I -- things, things were made public,
7   things were shared. I, I, I don't know -- I, I
8   couldn't tell you where any particular thing came
9   from, but to suggest actually -- I, I wouldn't
10  even -- I don't think I even have access to her
11  Facebook page.
12     Q. To whose Face -- oh, to Ms. Jackson's?
13     A. Jeanna Jackson, yes.
14     Q. So you're sa -- you're saying that you
15  went on --
16     A. And I --
17     Q. Go ahead.
18     A. I'm sorry. And I don't believe that
19  anything that I would have had access to would
20  have come from her own personal knowledge. More
21  than likely a flight attendant page somewhere.
22     Q. Okay. Like Fusion or One Luv?
23     A. Yeah, exactly.
24     Q. Okay. So you went on to various websites
25  then, not just necessarily the personal social

Page 95

1   media of these individuals, you went on to chat
2   groups, One Luv, Fusion, flight attendant chat
3   groups, looking for information against these
4   individuals so you could report them to Southwest
5   Airlines because you didn't like their, in your
6   opinion, antiunion activities?
7      A. That -- that's, that's completely
8   inaccurate, no.
9      Q. What's inaccurate about that?
10     A. To suggest that I'm scouring pages trying
11  to dig up things, that's absolutely false. Second
12  of all, it isn't their, their -- necessarily their
13  objection to the the, the current union, it's the
14  misinformation, lies, and innuendos that they
15  spread.
16     Q. So you're, you're looking for -- by the
17  way, did you report anyone, anyone that was sup --
18  supplying any lies or misinformation that
19  supported the current union leadership?
20     A. Well, they probably wouldn't have been
21  spreading lies and misinformation if they
22  supported the current administration, would they?
23     Q. Okay. Well, that's -- I guess that's your
24  testimony, that no one of the current union
25  leadership and none of their supporters ever said

Page 96

1   anything inaccurate, and if they had, you would
2   have reported them, too, right?
3         MR. GREENFIELD: Objection, form.
4   Compound question.
5      A. First of all, they wouldn't have -- they
6   would not have posted inaccurate information, much
7   like this, this other group has. So that, that
8   would be a mute point.
9      Q. If anyone supporting Ms. Stone had posted
10  anything accurate, you surely would have reported
11  them to Southwest Airlines' management as well,
12  correct?
13     A. Well, they probably wouldn't -- as I said
14  before, they probably wouldn't have posted
15  something inaccurate or lies or innuendos if they
16  supported Ms. Stone.
17     Q. But if they had, just take that
18  hypothetical for me that all of these Stone
19  supporters, not just somehow one of them said
20  something somewhat inaccurate, you would have
21  reported them, too, right?
22     A. I, I don't know.
23     Q. Really, you don't know? You weren't
24  looking to target anything --
25     A. It's a hyp -- it's a hyp -- it's a --

24 (Pages 93 to 96)

Page 97

1    Q. -- other than opposition -- sorry. Is
2  that really your testimony?
3    A. It's a hypothetical question.
4    Q. It's not hypothetical. Are you telling me
5  that you were trying to look at websites about
6  this election, and you were fairly and willing to
7  report anyone, even up to and including Audrey
8  Stone, if you saw something inaccurate, or, or
9  were you looking to report people that were
10  opposed --
11      MR. GREENFIELD: Object --
12    Q. -- to the current union leadership?
13      MR. GREENFIELD: Objection.
14    A. I was looking, I was looking to report
15  people that repeatedly spread lies and mistruths.
16    Q. And it just so happened all of them were
17  opponents of the leadership that you supported,
18  correct?
19    A. Yes.
20    Q. And so Jeanna Jackson was one. She was
21  one of the people you reported. And she was,
22  among other things, part of the recall effort of
23  Ms. Stone, Mr. Nevarez, Mr. Holcomb, and
24  Mr. Parrott, true?
25    A. Correct.

Page 98

1    Q. And you reported Beverly Belanger,
2  correct?
3    A. I don't know.
4    Q. You don't recall?
5    A. No.
6    Q. So you don't recall if you reported
7  Michelle Foley, Charlene Carter, Greg Hofer,
8  correct?
9      MR. GREENFIELD: Objection, form.
10    A. Okay.
11    Q. You don't recall that you reported those
12  people, correct?
13    A. I -- apparently I did. I don't deny that
14  I did.
15    Q. So would -- I -- I'm not trying to
16  convince you. I have these documents that --
17    A. Uh-huh.
18    Q. -- are e-mails -- let me just finish --
19  that say this information was received from Brian
20  Talburt. These are from --
21    A. Right.
22    Q. -- people at Southwest Airlines. I can
23  show you several more --
24    A. Okay.
25    Q. -- that say that. And let me see if your

Page 99

1  name's in this one. I'll find one with your name
2  in it, if it helps you. Give me just a second.
3      Okay. Let's look at 21-B. Okay. Is
4  21-B on your screen?
5    A. Yes.
6    Q. It says, Deborah Edwards and I received
7  the attached e-mails from Brian containing
8  additional social media posts. We can review this
9  information and determine next steps.
10      That's part of these e-mails, and
11  there are several more that also refer to it. Do
12  you have any doubt that these are the people that
13  you --
14    A. Okay.
15    Q. -- reported?
16      MR. GREENFIELD: Objection, form.
17    A. No.
18    Q. Okay. So let me just get an answer to
19  these questions then. And I'll combine these.
20      Is it fair to say that you reported in
21  February, on or around February 27, 2017 -- and I
22  do think I have an e-mail later, if you want it,
23  we can get the exact date, but that's the time
24  frame -- in the time frame of February 27, 2017,
25  you reported to Southwest Airlines management for

Page 100

1  what you believed to be violations of social media
2  policy the following persons: Jeanna Jackson,
3  Beverly Belanger, Michelle Foley, Charlene Bates,
4  Greg Hofer, Molly Kearney, Rick Rivera, Mike
5  Casper; would that be accurate?
6    A. Yes.
7    Q. And then I'm gonna go ahead -- and I
8  stopped on these, you also reported Radar Love and
9  Leesa Skygirl, and I assume those are not anyone's
10  actual names, but do you know who those
11  individuals are?
12    A. Actually, I don't, but ...
13    Q. Okay. You reported people, you didn't
14  know who they were, but their posts told you that
15  they should be reported?
16    A. Okay.
17    Q. Well, I'm just asking you that.
18    A. Yes.
19    Q. Is that your assumption?
20      Yes?
21    A. Yes.
22    Q. Okay. Now, I want to go back to each of
23  these people. And I don't know as to each of
24  them, I'll try and ask it this way, but if we need
25  to go through each one, that's fine as well.

25 (Pages 97 to 100)

Page 101

1    Are all of these persons who were
2  supporting at that time -- that had supported the
3  recall petition?
4    A. I, I don't know.  I, I --
5    Q. Oh, okay.  Let's see, you know --
6    A. Certainly Jean -- certainly Jeanna
7  Jackson, yes.
8    Q. Okay.  And Jeanna Jackson also opposed the
9  current union leadership?
10    A. Yes.
11    Q. Okay.  And Beverly Belanger, she was
12  involved in the recall or opposed to the current
13  union leadership?
14    A. I, I don't remember.  To be honest with
15  you, I don't even remember who that is.
16    Q. Okay.  What about Michelle Foley do you
17  recall?
18    A. The only thing I remember about Michelle
19  Foley is she was a friend of Jeanna Jackson.
20    Q. Do you believe that you were turning in
21  people that were opposed to the union and that you
22  were turning them in because they were spreading
23  misinformation about the union?
24    A. Misinformation that would have -- I'm
25  going to have to -- my, my AirPods are dying.

Page 102

1  I've gotta get a headset.  Hang on just a second.
2    Q. Yeah.  Do you want to take a quick break
3  or ...
4    A. Okay.  Can you hear me?
5    Q. Yes.
6    A. I --
7    Q. You have, you have your AirPods on?  Can
8  you hear me?
9    A. I don't hear you.
10    Q. Yeah, I'm having a little trouble hearing
11  you.
12    A. Hang on.  I, I can't, I can't hear
13  anything.
14    (Discussion off the record.)
15    MR. PRYOR:  Let's go off the record
16  and see if we can get that technical difficulty
17  taken care of.  Thank you, Melody.
18    THE VIDEOGRAPHER:  Going off the
19  record at 6:13.
20    (Recess.)
21    THE VIDEOGRAPHER:  We are back on the
22  record with Clip 3 at 6:16.
23    Q. Okay.  I'm going to show you a couple of
24  more e-mails relating to this.  One is Trial
25  Exhibit 21-A.  We'll see if I can share that.

Page 103

1    You are not on -- can, you can see
2  Trial Exhibit 21-A?
3    A. Yes.
4    Q. And you're not on this e-mail, but I'm
5  gonna ask you if you know anything about it.
6    It says it's from Julie O'Grady, Good
7  afternoon, and I'm gonna go to the second-to-last
8  sentence -- well, actually, let me go to the
9  first.  After doing some additional research on
10  the information Brian forwarded to us on
11  Wednesday, I did not see any additional
12  information to investigate from an employee
13  relations standpoint.
14    And as a longtime employee of
15  Southwest Airlines, are you able to interpret that
16  for us?
17    A. No.
18    Q. I'm sorry?
19    A. I don't know what this is about.
20    Q. And I -- I'm having a very hard time
21  hearing you.
22    A. I don't know what that's about.
23    Q. Okay.  And then it says, Deborah is
24  getting clarification from Brian to find out where
25  he got the thread we are going to discuss with

Page 104

1  flight attendants Hofer and Rivera.
2    Do you recall having discussions with
3  anyone at Southwest Airlines management about
4  Hofer and Rivera?
5    A. No.
6    Q. You don't recall if, in fact, the charges
7  you brought against Hofer and Rivera resulted in
8  further action?
9    A. I, I haven't any idea.
10    Q. I'm sorry?
11    A. I don't -- I don't know, and I don't know
12  what the charges were.
13    Q. Okay.  Well, the charges you brought were
14  violations of social media policy, right?
15    A. Well, of course, but I don't know what
16  the, the topic was.
17    Q. Okay.  And then let's look at 21-C.  Can
18  you see Exhibit 21-C?
19    A. Yes.
20    Q. And you're not on this e-mail, but it's
21  about the additional information in the subject
22  line it says you provided.
23    Tammy, There are more posts from
24  Brian.  I think he is going through all, all his
25  archived files and digging up everything he can.

Page 105

1 ER is working with the bases and Brian.
2 Did you have any conversation with
3 anyone at Southwest Airlines that would inform
4 that e-mail?
5 A. I -- not that I'm aware of.
6 Q. Okay. So at least according to Ms. Emlet,
7 she thinks you're going through all of your
8 archived files, digging things up, and that you
9 are going to be working with the bases -- ER is
10 going to be working with the bases and you; that's
11 a fair interpretation of what we're reading here?
12 A. How I'm reading it is they're going to
13 seek fur -- further clarification on something
14 that I provided them.
15 Q. Okay. ER is employee relations?
16 A. I believe so.
17 Q. And bases is the management at the various
18 bases?
19 A. Yes.
20 Q. And Brian is you?
21 A. Yes.
22 Q. And so employee relations, which is part
23 of the management of Southwest Airlines, is gonna
24 work with you and bases about this information
25 that you've been providing, according to this

Page 106

1 e-mail, right?
2 A. The way that she structured that, that
3 statement, I don't agree with that. It's not that
4 they're working with me per se, you're making
5 it -- you're portraying it as some grand
6 conspiracy, and it's not that at all.
7 Q. Well, I --
8 A. I'm going to, I'm going to assume that if
9 I provided them something, they would ask for
10 clarification.
11 Q. Well, you know, it's interesting you call
12 it a grand conspiracy by me simply using the
13 actual words of the e-mail. The actual words of
14 the e-mail to you evidence a grand conspiracy
15 based on what you just testified to, correct?
16 A. I, I don't agree with that, no.
17 Q. You just said those words make it sound
18 like a grand conspiracy.
19 A. The way that --
20 Q. Is that what you told us?
21 A. The way that you're framing the words,
22 yes.
23 Q. I'm framing the words?
24 A. Yes.
25 Q. How do -- what do you mean framing the

Page 107

1 words?
2 A. You're suggesting that I'm working with
3 the company on something. I'm not. I send them
4 something, and I'm assuming -- because I know
5 nothing about this, but I'm assuming they're just
6 going to, if they need to, get clarification from
7 me.
8 Q. Sir, I wasn't suggesting anything. I was
9 reading exactly what the e-mail said. The only
10 suggestion is from the e-mail.
11 A. Okay.
12 Q. You think I said anything contrary to what
13 the e-mail says that led you to say you're making
14 it sound like a grand conspiracy?
15 A. Okay.
16 Q. Do you have an answer?
17 MR. MORRIS: Was there a question?
18 MR. PRYOR: Yes.
19 MR. MORRIS: I didn't catch it. I
20 just caught -- there was a wind up, and I didn't
21 catch the actual question.
22 Q. Are you gonna answer the question, sir?
23 A. What, what was the question?
24 Q. The question was: Did I do -- you said
25 you're making this sound like a grand conspiracy,

Page 108

1 and my question to you, when you've told me I'm
2 making it sound like a grand conspiracy, did I do
3 anything other than read the actual words of the
4 e-mail?
5 A. Yes, you read the words and read the --
6 Q. No, did I do anything else, did I add to
7 the words to make it --
8 A. No.
9 Q. -- sound like a, a conspiracy, or did I
10 simply read the words?
11 A. You read the words.
12 Q. Let's look at 21-U. Can you see 21-U on
13 your screen?
14 A. Yes.
15 Q. And this is an e-mail from you to Mike
16 Sims and Sonya Lacore, correct?
17 A. Yes.
18 Q. And, by the way, for this e-mail to Sonya
19 Lacore, you used her business e-mail, correct?
20 A. I don't know. It doesn't show the e-mail
21 address there.
22 Q. You, you don't know from it saying Sonya
23 Lacore; her personal one is not different, you
24 don't recall that?
25 A. No.

27 (Pages 105 to 108)

Page 109

1    Q. Okay. So you -- what about Mike Sims, did
2  you send it to his business address or his home
3  address?
4    A. I, I, I don't know. It only has the name
5  there. I, I don't, I don't think I have a
6  personal address for him.
7    Q. Okay. So you, you only sent to Mike Sims'
8  business address; you may or may not send it to
9  Sonya Lacore's business address, correct?
10   A. Correct.
11   Q. And here, do you recall this e-mail, When
12  does it stop?
13   A. Yes.
14   Q. And this is you complaining very heavily
15  about Jeanna Jackson and the social media policy
16  should be utilized to terminate her --
17   A. Yes.
18   Q. -- true?
19   A. Yes.
20      THE REPORTER: I'm, I'm sorry, Bobby,
21  I'm really having trouble hearing the witness.
22      MR. PRYOR: I know, and I am too, sir,
23  and I -- I'm sorry that, that we're having to do
24  these things by Zoom. But -- and I'm not
25  suggesting you shout, but if you can hold whatever

Page 110

1  speak -- you're speaking into closer, it would be
2  very helpful.
3      (Discussion off the record).
4    Q. Okay. Let's look at Trial Exhibit 27.
5    A. Are you there?
6      THE VIDEOGRAPHER: Uh-oh. Did we lose
7  him?
8      MR. PRYOR: Mr. Talburt, are you
9  there?
10      Let's go off the record and see if we
11  can find him.
12      THE VIDEOGRAPHER: Going off the
13  record at 6:25.
14      (Recess).
15      THE VIDEOGRAPHER: We're back on the
16  record with Clip 4 at 6:27.
17   Q. Okay. Sir, I want to go back to -- that's
18  not it. Let me see if I can find what I'm looking
19  for. Okay. Here it is.
20      The exhibit we were previously talking
21  about, 21-U, which you acknowledge was an e-mail
22  you sent to Sonya Lacore to Mike Sims urging that
23  Ms. Jackson be terminated for violations of the
24  Southwest social media policy, you also carbon
25  copied Ms. Stone on that e-mail, correct?

Page 111

1    A. I, I don't -- did I?
2    Q. Did you?
3    A. I, I don't know.
4    Q. It says president at TWU 556?
5    A. Okay. I'm, I'm not seeing that here.
6  That's why I'm, I'm not, I'm not disputing that.
7  I just don't see it.
8    Q. Okay. Do you know who
9  president@twu556.org would be?
10   A. Yes.
11   Q. Who?
12   A. It would be Audrey Stone.
13   Q. Okay. So you did include Ms. Stone on
14  this e-mail where you were urging that the social
15  media policy be utilized to terminate a union
16  employee?
17   A. Okay.
18   Q. Hold on one sec.
19      Now, let's go back to -- what -- okay.
20  All right. I'm gonna show you Exhibit 27, and
21  this is an e-mail that you are on.
22      Do you see this, sir?
23   A. No, there's nothing there yet.
24   Q. Oh, sorry. Let me share screen.
25      Okay. Do you see Exhibit 27?

Page 112

1    A. Uh-huh.
2    Q. And at the top of this, it says from Brian
3  Talburt to Audrey Stone, October 13, 2014,
4  correct?
5    A. Yes.
6    Q. By the way, I -- before going into this
7  exhibit, let me go back and ask you about the
8  reports that you made in February of 2017 of the
9  numerous individuals that you previously
10  identified. So you understand what I'm talking
11  about now?
12   A. Yes.
13   Q. And are you aware that Audrey Stone, one
14  or two days in the same time frame that you were
15  sending those individuals who were members of the
16  union to Southwest Airlines for what you said were
17  social media policy violations, at the time you
18  were doing that, Audrey Stone made a complaint
19  against Charlene Carter. Are you aware of that?
20   A. I -- I've heard that, yes.
21   Q. Okay. So --
22   A. But I don't know what the date was or the
23  time was.
24   Q. And did, did Ms. Stone talk to you about
25  that before she did it?

Brian Talburt

Page 113

1    A. No.
2    Q. And so it was just an incredible
3  coincidence that you sent all of these people for
4  investigation that were opposing the union at the
5  same time that Ms. Stone also reported Ms. Carter
6  for social media policy violations, correct?
7    A. I, I can't comment on that because I don't
8  know.
9    Q. You don't think it's a coincidence, do
10 you?
11   A. I, I have no idea.
12   Q. So you don't know if it's a coincidence or
13 not?
14      THE REPORTER: I'm sorry, Bobby, I
15 didn't get an answer.
16   A. Yes, yes, I believe a coincidence.
17   Q. I'm sorry?
18   A. Yes, I believe it would likely be a
19 coincidence.
20   Q. Okay. I was going to say it had to be one
21 or the other; you either knew or it's a
22 coincidence, and so you're saying it's a
23 coincidence, right?
24   A. I, I, I have no knowledge of it, so I'm
25 assuming it's a coincidence.

Page 114

1    Q. Okay. Let's go back to Exhibit 27. Okay.
2  Let's go back to Exhibit 27, and I'm showing you
3  the top of this, and we're gonna have to go to the
4  bottom of this e-mail string just to help your
5  recollection. It says Re: Casper and Hofer rant.
6      Do you see that?
7    A. Yes.
8    Q. Do you recall this?
9    A. No.
10   Q. Okay. Let's go to the beginning of this.
11 This is -- okay. See where my cursor is?
12   A. Yes.
13   Q. It says From: Tina, To, and it's marked
14 out?
15   A. Okay.
16   Q. And this subject matter is Casper and
17 Hofer rant.
18      Do you know who Tina is?
19   A. I, I -- not, not to -- not for sure. I'm
20 -- likely Tina Coffee.
21   Q. Tina Coffee?
22   A. That -- that's the only Tina that I can
23 think of.
24   Q. Well, we can go up and see if any shows
25 any more. I don't see that name again. But Tina

Page 115

1  Coffee is -- who is Tina Coffee?
2    A. She was a board member.
3    Q. Okay. All right. And Tina is sending an
4  e-mail to someone that says, Someone sent this to
5  me. Sorry I sent it to your personal e-mail, but
6  I'm, I'm on my mom's computer right now. Thought
7  you might want to see it. Personally, when they
8  said they were going to have the CAN team show how
9  much we make compared to other airlines, I
10 expected this type of conspiracy theory.
11      Then it goes on. It's basically
12 saying that -- disagrees with whatever this e-mail
13 below that's written by someone that apparently is
14 opposed to the contract. Do you recall that?
15   A. I -- no.
16   Q. And you can't tell that from looking at
17 the portions of the e-mail I've shown you, true?
18   A. I mean, I have an idea what the subject
19 matter is. But I don't, I don't recall the
20 e-mails. I don't know anything about these
21 e-mails.
22   Q. Okay. Well, let's see if some other
23 things can remind you.
24      And this says to Brian from Trudy and
25 Brett Nevarez, although it says Luv, Brett. Do

Page 116

1  you -- that might be a joint personal e-mail
2  address for Brett and his wife; is that correct?
3    A. Yes, I think so.
4    Q. And that was not sent on the union e-mail
5  address for some reason, apparently, right?
6    A. I, I don't know.
7    Q. You don't know?
8      THE REPORTER: I'm sorry, I didn't
9  hear, I didn't hear an answer.
10   A. I, I don't know.
11   Q. It says, Leg breaking time for Casper the
12 ghost scab.
13      Do you recall earlier telling me that
14 that was one of the nicknames that you had for
15 Mr. Casper?
16   A. That, that was a term comp -- that was --
17 he was -- how he was frequently referenced, yes.
18   Q. Okay. And apparently by other members of
19 the leadership of Local 556, correct?
20   A. I, I don't know. Brett would be the only
21 person that I would -- that probably would ever
22 have used that.
23   Q. Okay. So at, at least one member of the
24 leadership of Local 556 was also referring, in
25 addition to yourself, was referring to Mr. Casper

29 (Pages 113 to 116)

Page 117

1   as the ghost scab, correct?
2       A. Yes.
3       Q. A scab is a very derogatory term to use
4   regarding a union member, correct?
5       A. I don't know that it's necessarily
6   derogatory. It's a term that -- to reference
7   somebody that, that does not -- that -- the
8   conventional wisdom has crossed the picket line,
9   but in our particular case, I'm, I'm assuming it's
10  somebody that opposed our union.
11      Q. So you're telling us that the use of the
12  term "scab" is not derogatory, right?
13      A. I, I think it's a pretty common term.
14      Q. I didn't ask you if it was a common term.
15  Will you answer my question?
16      A. Is it derogatory, I don't, I don't --
17  it's, it's what -- it's just a common term to, to
18  describe a person like that.
19      Q. And it's not derogatory, correct?
20      A. It's what they are.
21      Q. I -- once again, sir, I'd like you to
22  answer my question.
23      A. Okay.
24      Q. And by the way, what, what, what picket
25  line did Mr. Casper cross?

Page 118

1       A. Well, that, that -- no, no picket line.
2       Q. Okay. You just swore under oath what scab
3   meant. You then said it described exactly what he
4   was, and, in fact, he never did?
5       A. Okay.
6       Q. You don't have a problem not telling the
7   truth, do you?
8       A. That's --
9       Q. You just swore to that.
10          MR. GREENFIELD: Objection, form.
11      Q. You said he was a scab, and you said it's
12  not derogatory; is that still your testimony?
13      A. It's a term to use des -- to describe
14  somebody that basically abandons their union.
15  That's the conte -- context of what it's being
16  used as.
17      Q. So now you've changed your definition of
18  scab. So you've changed your definition of scab,
19  you said he was a scab, then you said he wasn't,
20  now you're telling us that scab doesn't mean
21  crossed picket lines, it means just opposed to the
22  union, right? That's now what that means,
23  correct?
24          MR. GREENFIELD: Objection, form,
25  mischaracterizes testimony. And it's

Page 119

1   argumentative.
2       Q. You can answer.
3       A. What's the question?
4       Q. The question is: You have changed your
5   definition of scab, before you told us it meant
6   someone crossing a picket line, what I've always
7   heard it meant, but, in fact, now you're telling
8   us what it means is someone that's opposed to the
9   union.
10      A. Okay.
11      Q. Correct?
12      A. Correct.
13      Q. So Jeanna Jackson is a scab, in your
14  opinion?
15      A. You said that.
16      Q. I asked your opinion. You said anyone
17  opposed to the union. You considered her --
18  anyone you think is opposed to the union is a
19  scab, and apparently this Mr. Nevarez by the way,
20  he knew that Mike Casper had never crossed a
21  picket line, he's using the word scab, right?
22          MR. GREENFIELD: Objection, form.
23      A. I, I can't speak for what Brett thought or
24  what his intentions were.
25      Q. Okay. You can speak to Mr. Nevarez

Page 120

1   saying, Leg breaking time for Casper the ghost
2   scab. That's what he wrote to you, correct?
3       A. Yes.
4       Q. Did you turn him in for a violation of
5   Southwest policy for that?
6       A. I did not.
7       Q. Why not?
8       A. Well, I don't really see a violation of a
9   social media policy, that's, again, a metaphor.
10  Leg breaking time, clearly he did not mean he was
11  going to go break Mike Casper's leg. He's, he's
12  referencing old time union mentality.
13      Q. Where in my question did I say it violated
14  social media policy at Southwest?
15      A. You asked me if I turned it in.
16      Q. I did; did you turn him in for a violation
17  of any Southwest policies. I didn't limit it to
18  social media.
19      A. I'm sorry. No, I did not.
20      Q. And then someone responded, He is such an
21  ass.
22          Who is that response from?
23      A. I don't know.
24      Q. You don't know who Rocky Mountain is?
25      A. No.

Page 121

1    Q. Although Rocky Mountain sent it to you,
2  correct?
3    A. It would appear so, yes.
4    Q. And when he said, He is such an ass, do
5  you know who he's referring to?
6    A. Well, if it's, if it's replying to the
7  comment below, I'm assuming he means Casper.
8    Q. Okay. I just wanted to make sure you
9  didn't think he meant Mr. Nevarez. You, you --
10   A. No.
11   Q. -- think it's referring to Mr. Casper.
12 Yes?
13   A. That's -- I -- that's how I would
14 interpret it.
15   Q. Okay. Then, you then include Audrey Stone
16 in this communication in which Mr. Casper's being
17 referred to as an ass and a ghost scab, correct?
18   A. Okay.
19   Q. Is that a yes?
20   A. Yes.
21   Q. And you say, A couple of things about this
22 thread. Please delete Brett's comment about leg
23 breaking.
24      Is that what you said?
25   A. Yes.

Page 122

1    Q. Why are you wanting to delete that?
2    A. To be honest, I don't know. I don't know
3  where, where, where I was going with that.
4    Q. So you don't know why you would send this
5  to the president of the union and then tell her to
6  be sure and delete the leg breaking comment,
7  correct?
8    A. Yes.
9    Q. And then it says, Also this was a private
10 e-mail between Mike and I.
11      Who's Mike?
12   A. I don't know.
13   Q. I take this step very seriously and would
14 hate to breach a confidence he obviously had in me
15 based on the long-term relationship we've
16 developed.
17      You're talking about a Mike and member
18 of management at Southwest Airlines, correct?
19   A. I -- to be honest, I don't know.
20   Q. Well, if you look further down, don't you
21 refer to exactly that? Is that -- you're, you're
22 saying you don't recall who Mike is. Tell us the
23 name of anyone in Southwest management that you
24 had a -- let's see how you describe it -- a, a
25 long-term relationship with. Name all the Mikes

Page 123

1  in management at Southwest that you had a
2  long-term relationship with.
3    A. That would on -- Mike Hafner would be the
4  only one that that would be.
5    Q. Okay. So if, if someone reading this
6  e-mail thinks, hey, you're disclosing things about
7  your conversations with Mr. Hafner and don't want
8  to get back to him, they think that's a member of
9  Southwest management, the only one it could be is
10 Mr. Hafner, correct?
11   A. Yes.
12      MR. GREENFIELD: Objection, form.
13   Q. And Mr. Hafner at that time was senior
14 management, the head of inflight, right?
15   A. In 2014, yes.
16   Q. Then you say, He is a great person that I
17 believe. With all that said, at the end of the
18 day, we are talking about my job and my life, my
19 family. I cannot hold back anything that may be
20 deemed necessary.
21      What are you talking about there?
22   A. I haven't any idea.
23   Q. Ah, so you don't recall that it's
24 something so important it involved your job, your
25 life, and your family?

Page 124

1    A. I'm, I'm assuming I'm talking about the
2  company.
3    Q. Okay. What do you mean then?
4    A. As I've alluded to before, the amount of
5  misinformation that was being spewed on social
6  media by certain parties.
7    Q. Then you say -- I'm trying to help you.
8  You see my cursor?
9    A. Yes.
10   Q. Okay. It says, This is just an
11 illustration of the types of conversations I had
12 with senior Southwest management re dealing with
13 problem people, and in this case specifically
14 Hofer and Casper.
15      That's what you wrote, right?
16   A. Yes.
17   Q. And so you've been talking to senior
18 management about targeting people, such as
19 specifically Hofer and Casper, using social media,
20 right?
21   A. I'm sorry, targeting, targeting them on
22 social media --
23   Q. Okay. Well, you can take away the word
24 "targeted," but you're talking about dealing --
25 let's see what word you used, problem -- dealing

31 (Pages 121 to 124)

Page 125

1    with problem people.  You were talking with senior
2    members of management at Southwest Airlines about
3    dealing with people such as Hofer and Casper by
4    use of social media policy, correct?
5        A.  Yes.
6        Q.  And that would include Mr. Hafner,
7    correct?
8        A.  Yes.
9        Q.  That would include Ms. Lacore, correct?
10       A.  Yes.
11       Q.  That would include Naomi Hudson, correct?
12       A.  Yes.
13       Q.  And did any of those people report you for
14   any violation of any Southwest policy as a result
15   of those communications?
16       A.  I don't know.  Not to my knowledge.
17           MR. GREENFIELD:  Bobby, if I may
18   step -- this is Adam Greenfield speaking.  If I
19   may step in for a moment.
20           MR. PRYOR:  Yes.
21           MR. GREENFIELD:  I don't want to break
22   up your flow, but you seemed like you were at a
23   pause for a moment.
24           MR. PRYOR:  I am.
25           MR. GREENFIELD:  Ed, Ed Cloutman is

Page 126

1    going to step in for me for a second.  Due to
2    family medical reasons, I need to step away and
3    help my wife with bedtime with my children, so I
4    apologize.  I will be back as soon as I can, but
5    Ed will take over in the meantime.
6           At this time I would like to also
7    renew my objection and, and move to strike any
8    testimony at this point.  But please go ahead.
9           MR. CLOUTMAN:  I'm here.  Go ahead.
10          MR. PRYOR:  And that's, that's fine
11   for Ed obviously to come on.
12          (Mr. Greenfield exits).
13       Q.  Let's see if there was anything else in
14   Exhibit 27.  I want to go to a, a sentence here
15   towards the end of your e-mail.  And I'm moving my
16   cursor around.  Can you see that, Mr. Talburt?
17       A.  Yes.
18       Q.  And it says, So what I'm saying is if we
19   have to use this type of evidence to secure my
20   job, then we have to do what we have to do.
21          Are you referring to that if you have
22   to reveal that Southwest management has
23   involved in targeting opponents of the current
24   union management, that you'll do it if you have to
25   in order to save your job?

Page 127

1        A.  No, that's not it at all.
2        Q.  And when it says, Rocky Mountain e-mail is
3    Mike's personal e-mail, does that now tell you who
4    Rocky Mountain is?
5        A.  Yes.
6        Q.  That's Mike Hafner, correct?
7        A.  Yes.
8        Q.  And Mike Hafner is the one that wrote, He
9    is such an ass, referring to Casper the ghost
10   scab, correct?
11       A.  Yes.
12       Q.  Let me show you Trial Exhibit 29.  And the
13   front cover in the center of that picture is
14   Ms. Stone, correct?
15       A.  Yes.
16       Q.  Okay.  Who are the other people, if, if
17   you know?
18       A.  From left to right, Tyler Thompson --
19       Q.  Oh, wait.  Right here is Mr. Thompson?
20       A.  Yes.
21       Q.  Okay.  And who is this?
22       A.  John Parrott.  Sam Wilkins, Crystal Reven,
23   Todd Gage, Brett Nevarez.
24       Q.  And then are you able to see these posts
25   here?

Page 128

1        A.  Yes.
2        Q.  And it says, Click is getting agitated.  I
3    think he may private message his way into big
4    troubles for himself.
5           And then two posts down, you say, We
6    can only hope.
7           And then someone says, Go to Click's
8    screenshots and save them, or screenshot his
9    posts.
10          Do you recall this?
11       A.  I, I, I don't recall it, but obviously it
12   happened.
13       Q.  And is this another effort to use social
14   media to target a union member that didn't agree
15   with current membership or current leadership?
16       A.  It would appear so.
17       Q.  When you say "it would appear so," is that
18   a yes?
19       A.  It means it appears so.  I have no
20   recollection of it, but it's on the screen and the
21   names are there, so I'm assuming it's accurate.
22       Q.  Okay.  You're not denying that you wrote
23   that and that that's the way you recall that and
24   that's the import of what you're reading?
25       A.  Yes.

32 (Pages 125 to 128)

Page 129

1    Q. Go to Trial Exhibit 20 -- sorry, we just
2  did that one.
3         Let me go to 60 -- Trial Exhibit 68.
4  This is a document authored by Audrey Stone to
5  Suzanne, Suzanne Stephenson, Naomi Hudson, Sonya
6  Lacore. Have you ever seen this document before?
7  Take your time with it, if you want. I can tell
8  you that it's the e-mail in which Ms. Stone
9  complained of Ms. Carter.
10    A. No, I've never seen it.
11    Q. Okay. You can see, however, that on this
12  e-mail it's sent to Naomi Hudson, correct?
13    A. Yes.
14    Q. And that's one of the people that you've
15  identified that you were talking with senior
16  management at Southwest Airlines about using the
17  social media policy to deal with problem
18  employees, correct? I've used the exact language
19  I asked you before, sir. Are you gonna change it
20  or are you gonna agree?
21    A. I guess I'll agree.
22    Q. Okay. And then the same question as to
23  Sonya Lacore, correct?
24    A. Yes.
25         MR. PRYOR: Stop sharing. I'm going

Page 130

1  take a five-minute break, sir, if that's okay with
2  you.
3         THE WITNESS: Okay. Do we have a --
4  do you have a -- an estimate on how long this is
5  gonna be?
6         MR. PRYOR: You know, I -- I'm looking
7  here, and I hate giving estimates, but I want to
8  hopefully be done in another hour. You can't hold
9  me to that, but on the other hand, maybe if it's
10  shorter, you can't hold me to that either.
11         THE WITNESS: Well --
12         THE VIDEOGRAPHER: Going off the
13  record at 6:51.
14         (Recess.)
15         THE VIDEOGRAPHER: We are back on the
16  record with Clip 5 at 6:58.
17    Q. Okay. That's not it. Not it. Let me get
18  the document I'm looking for. Ah, here we go.
19         Share screen. Okay. Okay.
20  Mr. Talburt, you might recall I told you earlier
21  that I did have copies of the e-mail where you
22  actually forwarded information about the union
23  opponents that you were reporting.
24         Do you recall that?
25    A. Yes.

Page 131

1    Q. Okay. Here's an e-mail marked February
2  22nd, it says from Brian to Julie O'Grady and
3  Deborah Edwards.
4         Do you see that?
5    A. Yes.
6    Q. And you recall those as being the people
7  on the e-mails internally that you weren't on that
8  were discussing the information you sent?
9    A. I, I don't recall, but, yes.
10    Q. Oh, okay. But let's -- let me show you
11  what's attached to it. You can see it's Greg
12  Hofer --
13    A. Uh-huh.
14    Q. -- Jeanna Jackson?
15    A. Uh-huh.
16    Q. I'm gonna, I'm gonna scroll through this,
17  and if you would just look at it and --
18    A. Yeah, I'm --
19    Q. -- is this --
20    A. I remember this.
21    Q. You believe, you believe this is the
22  information, or at least part of the information
23  you sent to Ms. O'Grady?
24    A. Yes.
25    Q. Okay. So this, this document with its

Page 132

1  attachments, I'm gonna just go right through it.
2  I know you can't see all this, but I just want to
3  make sure there's nothing at the end that -- okay.
4  You, you believe that on February 22nd, 2017 this
5  is part of the information you sent to Southwest
6  Airlines complaining about the union opponents
7  that you thought were sending misinformation?
8    A. That -- yes, that -- this was, this was
9  more than that, however.
10    Q. Okay. What, what more was it?
11    A. This was basically harassing somebody that
12  had a, a known disability. He had a -- he very
13  openly disclosed a medical condition he had of
14  severe depression that involved shock treatments,
15  and he did that as a public service announcement
16  to people to basically let them know about the
17  treatment and the condition and basically to help
18  other people, and, in turn, they took that
19  information and clowned him, calling him Kookie
20  and, and I don't remember what else was in there,
21  but it was, it was, it was an awful thread for
22  somebody that --
23    Q. And --
24    A. -- did not, that did not deserve it.
25    Q. And --

Page 133

1    A. And that's --
2    Q. And that's not the only thing in these
3  complaints, though, is it?
4    A. I --
5    Q. That I -- it looks like -- you're saying
6  that's all this is?
7    A. Well, this is -- I mean, I, I say that,
8  right now, in fact, here we're calling him Kookie,
9  Koochie is even crazier, and, again, he's --
10  his --
11    Q. So where it says, Supposedly there is a
12  scab list circulating with 70 names on it, anyone
13  seen it, that's about Kookie?
14    A. No.
15    Q. So these -- all these -- so someone can
16  read the posts and see whether or not they're
17  about Kookie or whether or not it's something to
18  do with scab lists, for instance?
19    A. Okay.
20    Q. Correct?
21    A. Yes. Apparently that's there as well.
22    Q. Okay. All right. Let's see. Trial
23  Exhibit 70?
24    A. So let, let me, let me clarify something.
25    Q. Sure.

Page 134

1    A. If, if I sent that post in, it would
2  strictly be because of the part about Kookie and
3  Koochie and, and how they were clowning him. That
4  would have been the purpose of that, that thread
5  being sent in.
6    Q. So this is an e-mail from you to wnstew79.
7  Do you know who that is?
8    A. No.
9    Q. Chris, Sam, the reason I am forwarding is
10  to illustrate their strategy of bullying and
11  creating a hostile work environment.
12    And that's you writing to Chris?
13    A. Chris. Sam, the reason I -- I don't -- I,
14  I don't know.
15    Q. Okay. And then on February 22nd, you're
16  sending an e-mail to Ms. O'Grady and Ms. Edwards
17  again, I'm looking through my files and forwarding
18  you any threads I have that come from the page we
19  discussed about the same time frame.
20    And do you know what that's about?
21    A. No.
22    Q. And if you look at the attachments, and
23  I'll go slowly and scroll through it for you; if
24  I'm going too fast, let me know.
25    A. No.

Page 135

1    Q. Are you able to tell what --
2    A. No, I have, I have no idea.
3    Q. Okay. So you're not denying -- it says
4  Jeanna Jackson, She's full of hot air, that's a
5  post from Jeanna Jackson based on this document,
6  true?
7    A. Yeah, I, I don't know. I, I don't know
8  what this is about. You have to understand --
9    Q. Okay.
10    A. -- there, there were hundreds of these
11  things.
12    Q. So if you -- one of the things you can
13  identify Exhibit 70 as, is a document that you
14  sent to management at Southwest Airlines, and you
15  sent these attachments --
16    A. Okay.
17    Q. -- correct?
18    A. Yes.
19    Q. Yes?
20    A. Yes.
21    Q. Okay. All right. Let's make sure I've
22  got them all then.
23    Here's another one, February 22nd,
24  2017. By the way, that's the same day that Audrey
25  Stone made her complaint against Ms. Carter, the

Page 136

1  very day, do you recall from when we looked at
2  that?
3    A. Yes.
4    Q. And so -- and that's just a coincidence as
5  well, right?
6    A. I, I, I don't know anything about it. I
7  don't know.
8    Q. Okay. The Trial Exhibit 71, you, again,
9  are forwarding various posts on social media
10  against the individuals -- involving the
11  individuals that you turned in that you thought
12  were violating Southwest Airlines social media
13  policy, correct?
14    A. Okay.
15    Q. Yes?
16    A. Yes.
17    Q. Okay. And Exhibit 72 is more of the same,
18  again, on February 22nd, 2017, and I'll scroll
19  through so you can see it. Is my statement
20  correct?
21    A. Okay. I don't have any recollection of
22  it, but apparently so.
23    Q. Okay. You don't dispute that this was
24  from you and that you sent it to Southwest
25  Airlines management and that it had these posts to

Page 137

1  it? It's consistent, certainly, with your
2  recollection that you were turning in people that
3  you thought were spreading misinformation,
4  correct?
5      A. Yes.
6      Q. All right. So you, you believe that you
7  sent Exhibit 72, even though you don't recall all
8  the specifics right now?
9      A. Yes.
10     Q. Okay. That's -- I think that covers the
11 ones that you did.
12         Okay. I'm gonna have you identify a
13 few more documents, and then we'll try and wrap
14 this up for you. Let me find -- hold on. I don't
15 think I have any more questions about these
16 documents, I just want to make sure you identify
17 them.
18         Okay. This is Exhibit 21-M, and this
19 is Brian to Mike Sims. Here's the latest attempt.
20 Having surrogates contact people to send this
21 e-mail to on her behalf. Funny I didn't realize
22 how much she loved Thom.
23         And then you go on: But some -- But
24 sweet how wonderful everything was and how
25 wonderful our corrupt union was before Audrey.

Page 138

1          This is a communication in which you
2  sent this e-mail to Mike Sims regarding Jeanna
3  Jackson and the e-mail below, correct?
4      A. Yes.
5      Q. And let's look at Exhibit 21-P. This is
6  from you, and I'm not sure who all it's to, but
7  certainly it's -- it includes Audrey Stone. Do
8  you -- Recall being careful. Julie, As a
9  follow-up to our conversation yesterday, I am
10 including the following recent posts. A further
11 example of the public encouragement and
12 endorsement of retaliatory practices of Jeanna
13 Jackson and company.
14         So this is February 23rd, 2017, one
15 day after Ms. Stone made her complaint against
16 Ms. Carter, you're sending this to Julie at
17 Southwest Airlines management, correct?
18     A. I sent that e-mail on that date, yes.
19     Q. And you sent it to Julie, correct?
20     A. Yes.
21     Q. I know it's blacked out, but it's clearly
22 talking about Julie O'Grady?
23     A. Okay.
24     Q. You think so, too?
25     A. Yes.

Page 139

1      Q. Okay. And then you attach what you're
2  referring to in the e-mail, correct?
3      A. Yes.
4      Q. Okay. Just a few more. One, two -- about
5  five more.
6          Okay. This is to Brian from Deborah,
7  and below that is the e-mail that we just talked
8  about, and this one is from Deborah to you saying,
9  Thank you for sending these to us, Brian.
10         Wow, it's very difficult to interpret
11 the rest, but she acknowledges that you sent the
12 information, correct?
13     A. Yes.
14     Q. And you're -- you may not remember this
15 specifically, but you're not denying that this was
16 the e-mail that you received from her, correct?
17     A. I am not denying it, no.
18     Q. You think it is, right; you have no reason
19 to dispute it?
20     A. Correct.
21     Q. Okay. Let's look at 21-R. Okay. This is
22 a much longer e-mail. And I'm not going to go
23 through it with you, but what I would like you to
24 do, and you're welcome to read it, but the -- I'd
25 like you to tell me -- can you identify this as an

Page 140

1  e-mail, just like we did before, that you sent to
2  Julie on February 26th, 2017 and carbon copied
3  Audrey Stone? And I will go just as slow as you
4  want me to. Do you agree with that statement?
5      A. Yes.
6      Q. Let's go to -- I just have one more, I
7  have T, 21-T, and, again, is this an e-mail that
8  you sent on March 1, 2017, and included Audrey
9  Stone on, and it just says Folks, so I, I can't
10 represent to you who it went to, unless you can
11 recall. But you agree that you did send this
12 e-mail to Ms. Stone? And if you recall who else,
13 please tell us.
14     A. Yes.
15     Q. And do you recall who Folks are?
16     A. No.
17     Q. Okay. Let's look at 21-U. And that's the
18 e-mail May 15th from you to it looks like Mike --
19 well, you tell me, is that Mike Sims or is that
20 Mike Hafner?
21     A. Mike Sims.
22     Q. Okay. Did you send this e-mail marked
23 Trial Exhibit 21-U to Mr. Sims and then received
24 the Thank you, Brian response from Mr. Sims?
25     A. Yes.

35 (Pages 137 to 140)

Brian Talburt

Page 141

1    Q. And he says, e will, presumably that's we
2  will review your concerns.
3         Do you see that?
4    A. Yes.
5    Q. And did they have further -- did he have
6  further conversations with you about that, that
7  you recall?
8    A. No.
9    Q. You're not saying they didn't happen,
10 you're just saying you don't recall, correct?
11   A. I don't believe they happened.
12   Q. Okay. And let's identify 21-V. And this
13 is an e-mail that you sent on July 2nd, 2017, to
14 Mike and Julie and carbon copied Audrey Stone,
15 correct? Correct?
16   A. Yes.
17   Q. Okay. And then this is the last one. And
18 by the way, Mike is Mike Sims and Julie is Julie
19 O'Grady?
20   A. Yes.
21   Q. And I could be wrong, but I think this is
22 the last one. Trial Exhibit 21-W, this is an
23 e-mail string from you to Audrey Stone, that
24 includes the e-mails below, and you say, Why in
25 the hell did I not find the targeted assassination

Page 142

1  comments three years ago when would have been
2  useful?
3         Do you see that?
4    A. Yes.
5    Q. Do you recall what you're talking about?
6    A. I'm assuming somebody used that -- I, I,
7  I, I don't know. I can only --
8    Q. Okay.
9    A. -- speculate. I don't know.
10   Q. All right. You can identify 21-W as an
11 e-mail that, that you sent to Ms. Stone?
12   A. Yes.
13   Q. Now --
14   A. I'm assuming it -- it's referencing one
15 of my termination cases where I was looking for
16 evidence of similar behavior.
17   Q. Yeah, I -- were you referring to, when you
18 used targeted assassinations in your communication
19 with Ms. Lacore, there were no consequences?
20   A. No.
21   Q. The wish you had found that?
22   A. No, the public execution comment.
23   Q. Oh, the -- okay. The -- these e-mails
24 where you are including Ms. Stone on the
25 communications where you're talking about the

Page 143

1  union employees that you've turned in and the
2  information that you have, did you have any
3  conversations with her about that?
4    A. No, never.
5    Q. And you told us that she would be opposed
6  to that. Did you see any e-mails from her saying
7  she was opposed to that?
8    A. No, but I just -- just from, just from
9  knowing her.
10   Q. If, if someone included you on a half a
11 dozen e-mails doing something I thought was wrong,
12 and I'm leader of the local union, I'd say
13 something. But that's not the way Ms. Stone does
14 things?
15   A. I don't know.
16   Q. You know for sure that she never told you
17 don't do that, you know for sure she never sent
18 you an e-mail saying don't do that, correct?
19   A. Oh, Audrey, Audrey often told me to, to
20 not engage in social media.
21   Q. Well, that wasn't my question. I'm
22 talking about the e-mails that you carbon copied
23 her on, where you were including her on your
24 communications with Southwest management about
25 union members that you had turned in that you

Page 144

1  thought were opponents spreading misinformation.
2    A. And the question again?
3    Q. She never said anything to you about don't
4  do that, or send you an e-mail saying don't do
5  that, correct?
6    A. I'm sure at some point she would have told
7  me, and I, I, I don't have any recollection of the
8  exact time, but I'm sure she's told me on more
9  than one occasion to not engage in management.
10   Q. Well, in this situation she didn't, did
11 she?
12   A. Not -- well, not that I've seen.
13   Q. Did you have conversations with Brett
14 Nevarez about these people you were turning in to
15 Southwest Airlines?
16   A. More than likely.
17   Q. And was he supportive of your efforts or
18 did he tell you to stop?
19   A. He, he would not be supportive of my
20 efforts, no.
21   Q. And he told you he was not; is that your
22 testimony?
23   A. Yes.
24   Q. And what did you do in response to that?
25   A. Nothing.

36 (Pages 141 to 144)

Page 145

1  Q. You continued doing what you were doing?
2  A. Yes.
3  Q. Okay. You were a core team member, and
4  I'm just gonna ask you if you agree that you made
5  these comments on the core team -- what would you
6  call it, Facebook group, does that identify it for
7  you?
8  A. Yes.
9  Q. You used the term "haters"?
10  A. Yes.
11  Q. You at one point said, Is the old bag his
12  mother?
13  A. I don't, I don't recall that.
14  Q. Did you say, Win for my fucktard project?
15  A. Yes.
16  Q. Did you say, spewing bullshit and it's
17  acceptable collateral damage?
18  A. I don't recall if I said that.
19  Q. The haters are misinformed and ignorant?
20  A. Likely.
21  Q. Go the fuck away?
22  A. Do what?
23  Q. One of your comments was go the fuck away?
24  A. Okay.
25  Q. Are you agreeing or disagreeing with that?

Page 146

1  A. Likely.
2  Q. Okay. Now, your first termination, when
3  you went to -- it -- was the first termination
4  was, was it fucktard?
5  A. Public execution.
6  Q. Okay. Public execution. Oh, we read
7  that. Okay. The public execution. And when you
8  went to Step 2, that was changed to a 30-day
9  suspension, correct?
10  A. Yes.
11  Q. And then your second encounter with the
12  social media policy personally, that was for the
13  fucktard?
14  A. Yes, although I still dispute that, the
15  fact that it was social media, but that's what
16  they contended.
17  Q. Okay. I, I -- I'm not --
18  A. Okay.
19  Q. -- taking a position on that. That --
20  that's -- that was Southwest's position, right?
21  A. Yes.
22  Q. And you were terminated again, correct?
23  A. Yes.
24  Q. And, yet again, you were reinstated,
25  correct?

Page 147

1  A. Yes.
2  Q. And you were reinstated this time because
3  a union representative was not present?
4  A. I'm sorry?
5  Q. Why were you reinstated the second time
6  after being terminated?
7  A. I, I -- presumably because I shouldn't
8  have been terminated to begin with because the
9  charges were absolutely preposterous.
10  Q. That's your understanding, that they then
11  -- they just changed their mind after terminating
12  you?
13  A. I, I, I don't know. I wasn't privy to
14  that. All I was privy to is the settlement.
15  Q. Okay. And I know you told me who
16  represented you the first time, and if you did for
17  the second, I'm sorry. Who represented you on
18  behalf of the union the second time?
19  A. Brett Nevarez.
20  Q. Sir, do you plan on appearing as a witness
21  at trial in this matter?
22  A. Am I?
23  Q. Yes.
24  A. No, no, I do not.
25  Q. And if I asked you to appear at trial and

Page 148

1  testify personally to the jury in this matter, you
2  would say no?
3  A. Yes.
4  Q. And if Southwest Airlines asked you, would
5  your answer be any different?
6  A. No.
7  Q. And if the union asked you, would your
8  answer be any different?
9  A. No.
10  MR. PRYOR: Thank you for responding
11  to my questions.
12  I pass the witness.
13  MR. MORRIS: Ed, do you want to go
14  ahead?
15  MR. CLOUTMAN: I have a few, if you
16  don't mind.
17  MR. MORRIS: Go ahead.
18  EXAMINATION
19  BY MR. CLOUTMAN:
20  Q. Mr. Talburt, this is Ed Cloutman. We've
21  at least talked on the phone. I'm not sure we've
22  ever met. Do you know who I am and who I
23  represent?
24  A. Yes, sir.
25  Q. Okay. Firstly, are you now holding any

37 (Pages 145 to 148)

Brian Talburt

Page 149

1    office with the executive board or a principal
2    officer of TWU Local 556?
3        A. No.
4        Q. Have you ever held such a position?
5        A. No.
6        Q. Have you, have you represented yourself to
7    speak on behalf of TWU Local 556 as its officer or
8    representative to any third party?
9        A. Never.
10           MR. CLOUTMAN: Thank you. I have no
11   other questions.
12           MR. MORRIS: I, I just have a couple
13   of questions.
14           EXAMINATION
15   BY MR. MORRIS:
16       Q. I represent Southwest. You had referenced
17   earlier about your -- first termination, that
18   it was changed to a 30-day suspension, and in the
19   course of that discussion, you said -- you
20   referred to a settlement agreement. Did I hear
21   that correctly?
22       A. Yes.
23       Q. And what is that referring to?
24       A. Well, I, I basically was faced with a
25   choice. I felt that, I felt that it was an unjust

Page 150

1    termination to begin with, the charges, as were
2    the second one, were absolutely outrageous.
3    However, I had to make a decision. I was given a
4    choice of either accepting a 30-day suspension, or
5    the termination would stand and we would proceed
6    to the next level, which would be arbitration. So
7    I chose to take the 30-day -- had I been issued a
8    30-day suspension initially, I would have fought
9    it to the end. Once you lose your job, you, you
10   obviously have no more leverage, and so my choice
11   became I either take the settlement or I take the
12   termination and then go to arbitration. So I took
13   the, I took the settlement, which was basically --
14   the, the settlement was the 30-day suspension, as
15   well as agreeing to not pursue legal activ --
16   action against Southwest Airlines.
17           MR. MORRIS: Okay. Thank you, that's
18   all I have.
19           MR. PRYOR: Okay. I want to see if I
20   can show you the settlement agreement. It will
21   take me just a second to find it. Hang on.
22           EXAMINATION
23   BY MR. PRYOR:
24       Q. All right. Sir?
25       A. Yes.

Page 151

1        Q. Let me see if I can show you that
2    agreement. Am I sharing the screen?
3        A. Yes.
4        Q. Okay. Is this document a document that is
5    your reinstatement agreement on April 15 of 2015
6    with Southwest Airlines? I'll scroll down to the
7    bottom, and see your signature there. Is that it?
8        A. Yeah, scroll back to the first page.
9        Q. Okay.
10       A. Yes.
11       Q. Okay. And I'm gonna refer to this as -- I
12   have no idea what -- how we're able to do this
13   right now, but I'll refer to this as to the
14   Southwest April 15, 2015 agreement. And that's
15   the exhibit I'm currently referring to. We'll
16   obviously make it available to counsel and the
17   court reporter.
18           And if you go through this agreement,
19   there's nothing in this agreement that says this
20   is your last chance, correct?
21       A. I mean, I think that's -- one would assume
22   that, but --
23       Q. You, you assume this was a last-chance
24   letter?
25       A. Well, having been terminated two times, I

Page 152

1    think I, I -- I don't really think there would be
2    a third chance.
3        Q. Okay. The letter itself didn't say that,
4    though, does it?
5        A. No.
6        Q. Okay. And you're reinstated with no loss
7    of seniority, correct?
8        A. Correct.
9        Q. Your termination is reduced to a written
10   warning, not a suspension, correct?
11       A. Yes.
12       Q. And, in fact, they are going to pay you
13   for the trips that you were pulled from, correct?
14       A. Yes.
15       Q. And what you're doing is you're agreeing
16   to not sue Southwest Airlines, right, is that the
17   next one?
18       A. Well, let, let me ask -- let me, let me
19   say, follow up on your question to me, where it
20   doesn't say it.
21       Q. Sure.
22       A. Why -- based on this settlement and the
23   outrageous reason that I was terminated, I was
24   terminated from employment for using the term --
25   and I didn't even direct it at an individual, I

38 (Pages 149 to 152)

Page 153

1  used a term which everybody in that, that room
2  meant -- knew what I meant, operation fucktard.
3  Is that -- would any reasonable person consider
4  that a grounds for termination, and I'm assuming
5  that this particular settlement was a recognition
6  of how outrageous that accusation was, so why
7  would they give me a last-chance agreement on
8  something like that when they did something that
9  is just absolutely outrageous to begin with.
10     Q. Okay. And, sir, you're -- that's the
11  point I'm making in terms of what this agreement
12  says. This document, this April 15, 2015
13  reinstatement agreement is not a last-chance
14  agreement, as you understand what a last-chance
15  agreement is --
16     A. Why, why --
17     Q. -- agree?
18     A. Again back to my question, why, why would
19  I, why would I be obligated to sign a last-chance
20  agreement for something that never should have
21  happened to begin with?
22     Q. I -- I'm, I'm not here to answer your
23  questions, but I would appreciate you answering
24  mine.
25         Would you agree with me that this

Page 154

1  April 15, 2015 reinstatement agreement between you
2  and Southwest is not a, is not a last-chance
3  agreement, nor do you think it should have been?
4     A. Correct. Yes, I agree with that.
5     MR. PRYOR: Okay. All right. Pass
6  the witness.
7     MR. MORRIS: I have no questions.
8     THE VIDEOGRAPHER: Anyone else?
9     MR. CLOUTMAN: I have no questions.
10  Thank you.
11     THE VIDEOGRAPHER: Going off the
12  record at 7:28.
13     MR. PRYOR: Thank you, everyone.
14     THE REPORTER: Before we go -- okay.
15  No one get off, no one get off. Bobby, can you
16  take that down just real quick so I can see.
17     MR. PRYOR: Yes. Let me stop sharing.
18     THE REPORTER: Thank you. Doe anyone
19  want to purchase a copy?
20     MR. CLOUTMAN: Yes, the union does.
21  Condensed only.
22     MR. MORRIS: We'll have the same.
23     (Discussion off the record).
24     THE REPORTER: Okay. Okay. Back on
25  the record.

Page 155

1     MR. PRYOR: Okay. After a discussion
2  off the record, counsel have agreed that it is not
3  necessary for the court reporter to mark any of
4  the exhibits discussed in the deposition to the
5  deposition with one exception, which I'll discuss
6  in a moment. I will, however, I will, however,
7  send the exhibits that were discussed to counsel
8  for defendants, as well as the court reporter.
9  The one exception is what was referred to in the
10  testimony as April 15, '20 -- boy.
11     MR. CLOUTMAN: '15.
12     MR. PRYOR: Is it '15? 2015. That
13  document will be attached to the deposition and
14  marked Exhibit 1 Talburt by the court reporter.
15  Counsel, have I stated our agreement accurately?
16     MR. CLOUTMAN: Yes.
17     MR. MORRIS: Yes.
18     MR. PRYOR: Okay. Great. Then I
19  think we're done. Thank you, Madam Court
20  Reporter, and thank you, Videographer.
21     MR. CLOUTMAN: Thank you, Mr. Talburt.
22     THE REPORTER: Okay.
23         What about reading and signing?
24     MR. CLOUTMAN: He doesn't have counsel
25  in the case, so I don't know how we're going to do

Page 156

1  that.
2     MR. PRYOR: You get to read and sign
3  your deposition. Typically a deposition is
4  admitted at trial if it's -- without signature if
5  it's shortly before trial. But you certainly can
6  waive signature. We don't have -- you don't have
7  a, you don't have an attorney here, so it's just
8  going to be up to you. You're entitled to read
9  the deposition, make sure this court reporter
10  doesn't mistranscribe anything you said. I will
11  point out we do have a video version, but if you
12  want her to send you a copy and you want to read
13  and sign it, she'll be happy to.
14     THE WITNESS: Not necessary.
15     (Exhibit 1 marked).
16     (Deposition concluded at 7:33 p.m.)
17     (Signature waived).
18
19
20
21
22
23
24
25

Page 157

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 2                 DALLAS DIVISION
 3     CHARLENE CARTER,        )
                               )
 4        Plaintiff,  )
                               )
 5     VS.           ) CIVIL ACTION
                               )
 6                   ) NO.: 3:17-cv-02278-X
       SOUTHWEST AIRLINES CO.,  )
 7     AND TRANSPORT WORKERS   )
       UNION OF AMERICA, LOCAL )
 8     556,                    )
                               )
 9                             )
       Defendants.      )
10
11            REPORTER'S CERTIFICATION
12            DEPOSITION OF BRIAN TALBURT
13                  JULY 3, 2022
14
15       I, Melody A. Monk, Certified Shorthand
16     Reporter in and for the State of Texas, hereby
17     certify to the following:
18       That the witness, BRIAN TALBURT, was duly
19     sworn by the officer and that the transcript of
20     the oral deposition is a true record of the
21     testimony given by the witness;
22       That the witness waived signature;
23       That the amount of time used by each party at
24     the deposition is as follows:
25       BOBBY G. PRYOR.....02 HOUR(S):54 MINUTE(S)
```

Page 158

```
 1     EDWARD B. CLOUTMAN, III....0 HOUR(S):01 MINUTE(S)
 2       That pursuant to information given to the
 3     deposition officer at the time said testimony was
 4     taken, the following includes counsel for all
 5     parties of record:
 6     FOR THE PLAINTIFF:
 7       BOBBY G. PRYOR
         Pryor & Bruce
 8       302 North San Jacinto
         Rockwall, Texas 75087
 9       972.771.3933
         Bpryor@pryorandbruce.com
10
         MATTHEW B. GILLIAM
11         National Right to Work Legal Defense
           Foundation, Inc.
12       8001 Braddock Road, Suite 600
         Springfield, Virginia 22160
13       703.321.8510
         Mbg@nrtw.org
14
15     FOR THE DEFENDANTS SOUTHWEST AIRLINES CO.:
16       PAULO B. MCKEEBY
         BRIAN MORRIS
17       Reed Smith
         2850 North Harwood Street
18       Suite 1500
         Dallas, Texas 75201
19       Pmckeeby@reedsmith.com
20
21     FOR THE DEFENDANT TRANSPORT WORKERS UNION OF
       AMERICA:
22
         EDWARD B. CLOUTMAN, III
23       Law Offices of Edward Cloutman III
         3301 Elm Street
24       Dallas, Texas 75226
         214.232.9015
25       Ecloutman@lawoffices.email
```

Page 159

```
 1       ADAM S. GREENFIELD
 2       Cloutman & Greenfield, PLLC
         3301 Elm Street
 3       Dallas, Texas 75226
         Agreenfield@candglegal.com
 4
 5       That $_____ is the deposition officer's
 6     charges to the Plaintiff for preparing the
 7     original deposition transcript and any copies of
 8     exhibits;
 9       I further certify that I am neither counsel
10     for, related to, nor employed by any of the
11     parties or attorneys in the action in which this
12     proceeding was taken, and further that I am not
13     financially or otherwise interested in the outcome
14     of the action.
15       Certified to by me this 4th day of July, 2022.
16
17
18
         Melody A. Monk, RPR
19       Texas CSR No. 3613
         Expiration Date:  10/21/2022
20
       MELODY MONK REPORTING
21     Firm Registration No. 10821
       1999 McKinney Avenue, No. 1404
22     Dallas, Texas 75201
       888.988.5317 (phone and fax)
23
24
25
```

Page 160

**A**

**a.m** 79:22 80:16
**abandons**
  118:14
**ability** 46:15
**able** 32:8 79:1
  80:20 103:15
  127:24 135:1
  151:12
**above-styled**
  1:21
**absolutely** 95:11
  147:9 150:2
  153:9
**abundance**
  68:17
**abuse** 40:5
**ac** 28:5 77:23
**acceptable**
  145:17
**accepting** 150:4
**access** 71:20
  77:23,23,25
  94:10,19
**account** 69:17
**accountable**
  77:11,13 82:16
**accurate** 23:20
  34:16 77:9,14
  87:1 94:5
  96:10 100:5
  128:21
**accurately**
  155:15
**accusation**
  153:6
**acknowledge**
  110:21
**acknowledges**
  139:11
**acting** 38:16
**action** 1:5 19:10
  28:12,13 33:7
  52:6 104:8
  150:16 157:5

159:11,14
**actions** 33:25
**activ** 150:15
**activities** 19:1,3
  27:16 34:10
  41:5,12 42:7
  44:19 91:12,13
  91:16 92:12
  95:6
**activity** 18:6
  28:5 34:1,2
  41:23,24
**actual** 28:2
  100:10 106:13
  106:13 107:21
  108:3
**Adam** 4:1 6:21
  7:11,16 15:18
  125:18 159:1
**add** 108:6
**addition** 116:25
**additional** 73:7
  76:1 99:8
  103:9,11
  104:21
**address** 68:19
  68:22 69:9,10
  108:21 109:2,3
  109:6,8,9
  116:2,5
**addressing**
  88:16
**administering**
  88:24
**administration**
  62:20 63:24
  64:7,20 65:1
  95:22
**admitted** 156:4
**adopt** 31:8 32:9
**adopted** 86:10
**advantage** 59:19
  65:5
**adver** 43:17
**adversary** 43:18

**advised** 8:9
**advising** 7:21
**Af** 60:21
**afraid** 25:17
**African-Amer...**
  60:15,19,22
  61:2
**afternoon** 103:7
**agent** 76:10
**agitated** 128:2
**ago** 9:5 10:10,11
  16:20 18:9,20
  24:20 25:1,2
  34:22 40:19
  41:14 43:11
  48:23 49:11
  86:4 142:1
**agree** 12:13
  37:15 43:25
  79:11 81:25
  106:3,16
  128:14 129:20
  129:21 140:4
  140:11 145:4
  153:17,25
  154:4
**agreed** 47:4 51:7
  155:2
**agreeing** 145:25
  150:15 152:15
**agreement** 5:12
  10:17 19:15
  93:20 149:20
  150:20 151:2,5
  151:14,18,19
  153:7,11,13,14
  153:15,20
  154:1,3 155:15
**agreements** 6:11
**Agreenfield @ ...**
  4:3 159:3
**Ah** 123:23
  130:18
**ahead** 12:23
  13:7,9 16:6

46:22 61:22
  76:6 88:3
  94:17 100:7
  126:8,9 148:14
  148:17
**air** 135:4
**air-conditioning**
  91:25
**Airline** 6:4
**airlines** 1:6 3:13
  6:18,20 11:19
  15:3 19:22
  21:6 30:16
  35:20 37:16
  39:24 42:12
  51:12,22 52:6
  53:7 56:21
  57:4,16,20,23
  57:24 58:3
  59:10 60:18
  61:3 62:5
  66:17 69:17
  71:20 81:9
  88:17 90:15
  91:11 95:5
  98:22 99:25
  103:15 104:3
  105:3,23
  112:16 115:9
  122:18 125:2
  129:16 132:6
  135:14 136:12
  136:25 138:17
  144:15 148:4
  150:16 151:6
  152:16 157:6
  158:15
**Airlines'** 96:11
**airplane** 54:2
**AirPods** 101:25
  102:7
**Albuquerque**
  2:1
**allow** 17:11 32:2
  39:13

**alluded** 75:16
  124:4
**America** 1:7
  3:19 6:5 157:7
  158:21
**amount** 124:4
  157:23
**angle** 82:20
**announcement**
  132:15
**answer** 9:16,18
  9:21 12:25
  13:5,9,22,25
  14:2,7,16 17:9
  17:12,18,21
  20:1,2 27:24
  31:11 32:10
  47:12 56:25
  59:4 62:1
  64:20 66:22,24
  67:1 68:13
  92:7 99:18
  107:16,22
  113:15 116:9
  117:15,22
  119:2 148:5,8
  153:22
**answered** 13:10
  13:12,16,17
  17:17 37:23
  39:2 67:19
**answering**
  153:23
**antiunion** 95:6
**anybody** 37:4,13
  37:18 41:2
  42:20 64:6
  86:8
**anyone's** 100:9
**anytime** 72:20
  72:21 75:4
  92:2
**Ap** 59:22
**apologize** 126:4
**apparently**

Brian Talburt

37:19 55:24
58:24 59:22
65:24,25 71:25
78:12 98:13
115:13 116:5
116:18 119:19
133:21 136:22
**appear** 35:18
121:3 128:16
128:17 147:25
**appearances** 5:2
6:10
**appearing** 3:2
147:20
**appears** 35:22
60:6,7,8,10
79:22 128:19
**application** 22:2
**applied** 88:22
**appreciate**
153:23
**appropriate**
49:23,24 86:20
**approximately**
6:9
**April** 30:12
55:17 69:5
87:12 88:9
90:24 151:5,14
153:12 154:1
155:10
**arbitration** 27:5
27:7 150:6,12
**archived** 104:25
105:8
**argue** 34:9
**argued** 27:14,20
27:20,21,21
33:23
**argument** 34:13
34:15
**argumentative**
119:1
**asked** 12:3 13:1
13:2,6,13,17

14:4,11 15:12
28:10 31:2
36:24 73:23
75:1 77:20
119:16 120:15
129:19 147:25
148:4,7
**asking** 16:13
50:22 55:12
77:18 79:11
84:13 90:21
100:17
**aspect** 28:1
**ass** 120:21 121:4
121:17 127:9
**assassinate**
59:18
**assassination**
61:4 76:17
77:3 83:3
141:25
**assassinations**
58:13,21 59:17
82:14 85:6
86:7 142:18
**assemble** 46:15
**assist** 91:15
**assistant** 36:23
**assisted** 40:24
40:25 41:3
**assisting** 92:13
**assists** 14:21
**associated** 11:17
**assume** 23:23
24:13 63:20,22
84:3 89:11
100:9 106:8
151:21,23
**assuming** 75:10
107:4,5 113:25
117:9 121:7
124:1 128:21
142:6,14 153:4
**assumption**
100:19

**assure** 23:16
24:4,9
**attach** 139:1
**attached** 2:3
99:7 131:11
155:13
**attachments**
132:1 134:22
135:15
**attacks** 26:10
**attempt** 137:19
**attempting** 17:4
**attendant** 11:22
21:9 25:19
49:15 57:14
75:7 76:10
90:21 94:21
95:2
**attendants** 22:7
46:13 75:5,17
75:23 90:19
92:10 104:1
**attending** 18:7
**attention** 25:22
**attitude** 57:19
58:5
**attorney** 7:11,17
7:20 156:7
**attorneys** 7:17
8:5,13 15:15
159:11
**Aud** 45:21
**Audrey** 9:6
17:23 27:4
29:7 33:2
34:19 41:16,20
41:20 42:15
44:16 45:5,21
45:21 51:3
74:22 79:8
97:7 111:12
112:3,13,18
121:15 129:4
135:24 137:25
138:7 140:3,8

141:14,23
143:19,19
**August** 79:22
**authored** 129:4
**available** 151:16
**Avenue** 159:21
**avoid** 16:1,8,14
16:23,24 17:5
66:19 67:2
**avoided** 16:23
**avoiding** 16:16
16:19 17:13
67:16
**awaiting** 69:25
**aware** 10:16,24
16:4 41:5,12
42:9 62:7
64:25 105:5
112:13,19
**awful** 132:21

**B**

**B** 3:8,14,20
158:1,10,16,22
**back** 18:16
65:11 74:8,17
74:19 76:23
100:22 102:21
110:15,17
111:19 112:7
114:1,2 123:8
123:19 126:4
130:15 151:8
153:18 154:24
**back-and-forth**
90:22
**bag** 145:11
**Barbara** 27:4
**barrage** 26:10
**base** 36:23 47:16
47:16
**based** 31:8
88:11 89:22
91:5 106:15
122:15 135:5

152:22
**bases** 105:1,9,10
105:17,18,24
**basically** 7:21
7:23 8:9,22
11:6 15:23
19:7 26:1 28:1
28:21 29:4
38:20 40:7
53:21 55:12
70:9,15 75:23
77:11 86:18,25
92:9 115:11
118:14 132:11
132:16,17
149:24 150:13
**basis** 20:24
52:14 54:4
**Bates** 100:3
**Becky** 27:3,14
**Becky's** 27:12
**bedtime** 126:3
**beginning** 50:11
69:11 83:25
114:10
**behalf** 6:22
34:14 91:16
137:21 147:18
149:7
**behavior** 142:16
**behind-the-sc...**
81:19
**Belanger** 98:1
100:3 101:11
**belief** 44:18 73:9
**believe** 18:24
22:19 23:6
29:6 31:1 43:1
45:6,7,17 48:2
48:8 67:24
73:17 75:21
94:18 101:20
105:16 113:16
113:18 123:17
131:21,21

132:4 137:6
141:11
**believed** 22:23
75:13,17 100:1
**bell** 56:2
**best** 50:8
**Beverly** 98:1
100:3 101:11
**big** 55:5 128:3
**bigger** 50:12
55:6 78:22
79:2 81:23
**Bill** 89:22
**bit** 14:9 21:2
37:23 50:15
55:5
**blacked** 138:21
**block** 4:5 75:6
**blocked** 75:9,10
**blocking** 50:16
80:7
**board** 51:7
115:2 149:1
**Bobby** 3:4 6:14
7:7 72:17
109:20 113:14
125:17 154:15
157:25 158:7
**bottom** 76:19
79:15,21 80:5
87:25 90:11
114:4 151:7
**box** 54:18
**boy** 155:10
**Bpryor@pryo...**
3:7 158:9
**Braddock** 3:9
158:12
**brain** 14:11
**breach** 122:14
**break** 72:18,21
73:21,21,23
74:11,13 102:2
120:11 125:21
130:1

**breaking** 74:1
116:11 120:1
120:10 121:23
122:6
**Brett** 33:22,24
42:9 89:13
115:25,25
116:2,20
119:23 127:23
144:13 147:19
**Brett's** 121:22
**Brian** 1:13,19
3:14 5:4 6:2,19
6:25 7:6 79:17
87:2 98:19
99:7 103:10,24
104:24 105:1
105:20 112:2
115:24 131:2
137:19 139:6,9
140:24 157:12
157:18 158:16
**brief** 46:4
**briefly** 8:25
**bringing** 88:18
**broad** 21:20
**brought** 21:1
25:22 27:17,19
104:7,13
**Bruce** 3:5 158:7
**BT** 36:7
**BTW** 23:16
24:13
**bullshit** 145:16
**bullying** 134:10
**business** 20:22
66:11 68:22,23
69:9 84:2,5
108:19 109:2,8
109:9
**busy** 71:16

─────────
**C**
─────────
**C** 3:1
**ca** 70:22

**call** 7:25 106:11
145:6
**called** 15:21
32:23 49:1
78:21
**calling** 24:16
132:19 133:8
**calmer** 29:6
**camera** 65:21
**campaign** 18:1
**cancer** 65:9,12
**cancerous** 56:9
56:15
**candidacy** 33:1
**candidates** 63:3
**capacity** 12:10
12:11 14:12,14
**capital** 62:17
**carbon** 80:14
110:24 140:2
141:14 143:22
**care** 102:17
**career** 20:10
**careful** 138:8
**carefully** 60:25
**Carter** 1:3 4:5
6:3,15 7:8
42:25 98:7
112:19 113:5
129:9 135:25
138:16 157:3
**case** 6:3,5 10:8
10:25 16:2
28:4,20 73:10
75:19,21 76:21
117:9 124:13
155:25
**cases** 90:18
142:15
**Casey** 9:23
**Casper** 43:12,13
43:15,17,22
44:8 48:20
50:7 56:8,15
65:13,18 82:17

83:3 100:5
114:5,16
116:11,15,25
117:25 119:20
120:1 121:7,11
124:14,19
125:3 127:9
**Casper's** 120:11
121:16
**casual** 81:19
**catch** 107:19,21
**categories** 14:22
**categorized**
54:19
**caught** 107:20
**cause** 1:21 48:22
**caused** 48:20
49:19
**causing** 43:18
**caution** 68:17
**center** 55:4
127:13
**Central** 8:1
**certain** 15:4
40:22 86:18
124:6
**certainly** 31:24
44:12 51:24
69:25 82:23
89:25 101:6,6
137:1 138:7
156:5
**Certificate** 5:8
**CERTIFICA...**
157:11
**Certified** 157:15
159:15
**certify** 157:17
159:9
**challenging**
25:25
**chance** 64:16
151:20 152:2
**change** 17:20
29:2 40:4,9

129:19
**changed** 16:20
17:18,21 40:1
75:9 118:17,18
119:4 146:8
147:11 149:18
**changing** 39:5,7
**characterizati...**
68:12
**characters**
57:10
**charge** 26:23
28:7 35:20
**charged** 44:19
**charges** 104:6
104:12,13
147:9 150:1
159:6
**Charlene** 1:3
4:5 6:3,15 7:8
42:25 98:7
100:3 112:19
157:3
**chat** 95:1,2
**cheap** 65:21
**children** 126:3
**choice** 149:25
150:4,10
**choose** 68:23
**chose** 150:7
**Chris** 134:9,12
134:13
**circulating**
133:12
**circumstances**
51:17,20
**city** 59:24 61:6
**Civil** 1:5 2:2 6:5
157:5
**clarification**
103:24 105:13
106:10 107:6
**clarify** 133:24
**class** 31:21
**classes** 38:18

Brian Talburt

42:19
**clear** 22:16 29:5
76:18 77:7
88:19
**clearly** 22:23
120:10 138:21
**Click** 128:2
**Click's** 128:7
**Clip** 74:18
102:22 110:16
130:16
**close** 46:11
73:15 76:14
90:8
**closed** 30:19,22
**closely** 20:15,16
72:10
**closer** 47:23
110:1
**Cloutman** 3:20
3:21 4:1 5:5
6:23 7:12,16
15:18 125:25
126:9 148:15
148:19,20
149:10 154:9
154:20 155:11
155:16,21,24
158:1,22,23
159:2
**clowned** 132:19
**clowning** 134:3
**Coffee** 114:20
114:21 115:1,1
**coincidence**
113:3,9,12,16
113:19,22,23
113:25 136:4
**collateral**
145:17
**colorful** 70:13
**combata** 76:12
**combative**
76:13
**combine** 99:19

**come** 44:15
90:18 94:20
126:11 134:18
**comes** 43:9
48:19
**comfortable**
36:25 47:24
58:25 59:9
63:18
**coming** 36:25
59:24
**comment** 25:13
25:23 26:4,11
28:3 31:4
32:16 37:13
66:2 113:7
121:7,22 122:6
142:22
**commented** 71:4
71:4
**comments** 39:22
69:25 142:1
145:5,23
**committee** 18:19
51:12,21 52:11
92:9
**committees** 52:7
**common** 117:13
117:14,17
**communicating**
80:25
**communication**
10:6 56:22
67:14 68:4
70:10 71:14
78:9 86:12
87:7 121:16
138:1 142:18
**communicatio...**
27:15 54:11
67:15 70:8
71:11 125:15
142:25 143:24
**comp** 116:16
**company** 6:4

23:8,19 25:8
25:12 28:18
33:8 49:7
56:21 67:17
68:4 75:5,21
76:1 107:3
124:2 138:13
**compared** 115:9
**compatative**
76:12
**complained**
129:9
**complaining**
109:14 132:6
**complaint** 30:16
112:18 135:25
138:15
**complaints**
37:17 90:21
133:3
**comple** 82:20
**completely**
82:19,19 95:7
**compound**
40:15 96:4
**computer** 55:15
115:6
**con** 52:22
**concerned** 67:8
67:12
**concerns** 88:18
141:2
**concluded**
156:16
**Condensed**
154:21
**condition**
132:13,17
**condone** 41:23
41:24 45:18
**condoned** 42:1,2
**conference**
46:12,17
**confidence**
122:14

**Confidential**
5:12
**confidentiality**
10:17,21,25
**confirm** 81:14
**confirmed** 75:12
**confirming**
41:19
**consequences**
16:14 142:19
**consider** 46:5,8
46:25 49:6
84:7 90:22
153:3
**considered** 46:8
46:9,18,23
94:2 119:17
**consistent** 36:18
37:7 137:1
**conspiracy**
106:6,12,14,18
107:14,25
108:2,9 115:10
**contact** 53:23
54:7 137:20
**contacting** 51:10
**contained** 56:11
56:18
**containing** 99:7
**conte** 118:15
**contemplating**
26:2
**contended**
146:16
**context** 24:22
25:13 82:19
118:15
**continuance**
73:6
**continue** 52:9,11
**continued** 52:22
145:1
**contract** 18:11
19:9,10,15,18
19:19 49:22,25

75:3,8 86:17
86:23 91:23
92:11 115:14
**contracts** 50:1
**contrary** 107:12
**control** 91:13
**conventional**
117:8
**conversation** 8:4
8:6 41:16,20
71:7 105:2
138:9
**conversations**
7:19 15:20
48:18 72:11
81:20 89:12,19
89:23 91:5
123:7 124:11
141:6 143:3
144:13
**convince** 98:16
**convinced** 29:1
29:3
**copied** 80:14
110:25 140:2
141:14 143:22
**copies** 130:21
159:7
**copy** 9:7 10:7
11:5 154:19
156:12
**cordial** 20:5,18
**core** 32:20,22,22
32:22,24 46:1
46:9,17 145:3
145:5
**Corliss** 57:10,13
58:5 59:18
60:15 61:1,5
82:17 83:4
**correct** 11:11,13
13:21 19:2,12
19:20 23:12
27:16,22 29:15
30:14 32:19

Brian Talburt

33:3,6 34:14
43:2 45:11
47:3 55:18,23
56:16,18 57:17
57:18 58:9,11
58:13 59:11,12
59:21 60:5,20
61:8 62:6
63:13,14 66:12
66:13 68:19,20
69:4,6,22,23
81:22 83:4
88:6 89:2,16
89:23 91:1,3,8
91:13 93:18
96:12 97:18,25
98:2,8,12
106:15 108:16
108:19 109:9
109:10 110:25
112:4 113:6
116:2,19 117:1
117:4,19
118:23 119:11
119:12 120:2
121:2,17 122:7
122:18 123:10
125:4,7,9,11
127:6,10,14
129:12,18,23
133:20 135:17
136:13,20
137:4 138:3,17
138:19 139:2
139:12,16,20
141:10,15,15
143:18 144:5
146:9,22,25
151:20 152:7,8
152:10,13
154:4
**correctly** 149:21
**corrupt** 137:25
**counsel** 6:10
151:16 155:2,7

155:15,24
158:4 159:9
**country** 46:13
**couple** 20:25
53:20 54:3,4
72:10 102:23
121:21 149:12
**course** 10:23
20:23 31:19
87:15 89:3
104:15 149:19
**court** 1:1 6:7,12
8:10 72:25
73:16,17
151:17 155:3,8
155:14,19
156:9 157:1
**cover** 11:1 26:9
85:1 127:13
**covers** 38:9
137:10
**coworker** 9:19
9:25 10:2
**crafted** 31:15
**crazier** 133:9
**creating** 134:11
**credibility** 17:3
17:11
**credit** 56:8
**crew** 75:5
**cross** 117:25
**crossed** 117:8
118:21 119:20
**crossing** 119:6
**crowd** 59:24
60:2 61:6
**Crystal** 127:22
**CSR** 1:23
159:19
**curiosity** 11:16
**current** 20:13
48:24 53:3
62:19,21 63:12
63:24 64:7,20
65:1 93:24

95:13,19,22,24
97:12 101:9,12
126:23 128:15
128:15
**currently** 21:5
67:22 151:15
**cursor** 36:1
50:19 55:9
79:19 80:3
88:14 114:11
124:8 126:16

---

## D

**Dallas** 1:2 3:16
3:22 4:2 6:7,18
6:24 21:1 54:3
157:2 158:18
158:24 159:3
159:22
**damage** 145:17
**damaging** 49:10
**dangerous** 57:12
57:17 65:9
**date** 99:23
112:22 138:18
159:19
**dated** 55:17
87:12
**dates** 78:19
85:13
**day** 22:22 71:17
123:18 135:24
136:1 138:15
159:15
**day-to-day**
20:23,24
**days** 40:13,16
46:14 112:14
**de** 21:3 83:9,10
83:10,11,12
84:4,18,19
86:21
**deadheading**
75:4
**deal** 43:18

129:17
**dealing** 30:16
50:6 124:12,24
124:25 125:3
**dealings** 90:3
**dealt** 23:15 24:9
53:8 75:11
**Deborah** 99:6
103:23 131:3
139:6,8
**decide** 47:20
60:23
**decision** 28:21
28:24 150:3
**dedicated** 54:15
**deemed** 123:20
**defendant** 3:13
3:19 6:18
158:21
**defendants** 1:8
155:8 157:9
158:15
**defense** 3:8 59:6
158:11
**define** 8:23
12:19 38:3,14
63:15
**defined** 64:5
**definition** 63:9
63:19 64:1,2
67:16 118:17
118:18 119:5
**delete** 54:13
121:22 122:1,6
**deliver** 84:24
85:18 87:5
**delivered** 86:20
**delivering** 86:19
87:7
**delivers** 87:2
**demanded** 66:17
**denounced** 52:1
**deny** 98:13
**denying** 17:20
36:16 41:18

76:1 128:22
135:3 139:15
139:17
**dep** 73:13
**department**
47:15 66:16
**depose** 73:13
**deposition** 1:12
1:18 6:2 7:10
7:22 8:13,16
8:21 9:5,7 10:8
10:18 11:2,5,9
11:15 72:14
73:1,6,18
92:17 155:4,5
155:13 156:3,3
156:9,16
157:12,20,24
158:3 159:5,7
**depositions** 9:1
9:3 73:16
**depression**
132:14
**derivative** 31:20
**derogatory**
117:3,6,12,16
117:19 118:12
**des** 118:13
**describe** 117:18
118:13 122:24
**described** 118:3
**DESCRIPTI...**
5:11
**deserve** 132:24
**deserving** 49:5
**designee** 28:19
28:20
**desire** 91:10
**destruction**
43:19
**details** 7:22,24
50:1
**detective** 65:20
**determine** 99:9
**developed** 76:14

122:16
**different** 46:14
46:14 49:15
78:13 82:19,20
82:20 108:23
148:5,8
**difficult** 86:22
139:10
**difficulty** 102:16
**dig** 95:11
**digging** 104:25
105:8
**direct** 152:25
**directly** 67:5
**director** 20:17
20:19 47:15
48:4,5,6,9 53:9
53:10,11,13
**dis** 85:25
**disabilities**
31:18,23
**disability**
132:12
**disagree** 37:12
66:4
**disagreeing**
145:25
**disagrees** 115:12
**discipline** 90:14
**disciplined** 59:8
**disclosed** 42:23
132:13
**disclosing** 123:6
**disclosures**
73:12
**discouraged**
75:25
**discovered**
66:12 70:19
**discovery** 73:15
**discredited**
84:20 87:4
**discriminating**
31:17,22
**discrimination**

26:3
**discuss** 28:1,21
78:6 82:4
85:23 103:25
155:5
**discussed** 10:9
10:12 22:23
47:6 53:4
85:24 134:19
155:4,7
**discussing** 28:3
131:8
**discussion** 17:22
25:20 30:24
32:4 102:14
110:3 149:19
154:23 155:1
**discussions** 8:12
8:15 50:25
53:2 104:2
**displayed** 88:24
**dispute** 136:23
139:19 146:14
**disputing** 111:6
**disruption**
48:21,22 49:19
**District** 1:1,1
6:6,7 157:1,1
**Division** 1:2 6:8
157:2
**document** 32:5
33:14,15 35:5
35:12,13 50:9
54:25 55:13
72:19 74:7,21
78:13,21 88:11
92:20,23 129:4
129:6 130:18
131:25 135:5
135:13 151:4,4
153:12 155:13
**documented**
37:21
**documents** 8:18
41:8,10 66:17

98:16 137:13
137:16
**Doe** 154:18
**doing** 44:17 45:2
53:22,25 54:4
67:11 103:9
112:18 143:11
145:1,1 152:15
**doubt** 47:16
99:12
**dozen** 143:11
**dreadful** 59:13
59:19
**Due** 126:1
**dues** 14:20 51:7
**dug** 93:25 94:1
**duly** 1:20 7:1
157:18
**duties** 53:18
91:16
**dying** 101:25
**dysfunction**
43:19 48:21,22
49:19 75:15

---

**E**

**e** 3:1,1 141:1
**e-mail** 48:16
50:11,22,23
51:3,16 54:11
54:17,18 55:17
55:22 58:18
60:13 63:10,16
66:8,10,11
67:3,17,21,22
67:25 68:19,23
68:24 69:8,15
69:16,20 70:24
71:20 72:7,12
74:21 77:2
79:4,23 80:13
80:19,19,25
81:2 82:13,18
82:21 83:2
92:25 99:22

103:4 104:20
105:4 106:1,13
106:14 107:9
107:10,13
108:4,15,18,19
108:20 109:11
110:21,25
111:14,21
114:4 115:4,5
115:12,17
116:1,4 122:10
123:6 126:15
127:2,3 129:8
129:12 130:21
131:1 134:6,16
137:21 138:2,3
138:18 139:2,7
139:16,22
140:1,7,12,18
140:22 141:13
141:23 142:11
143:18 144:4
**e-mails** 52:13,23
54:13,18 66:18
68:9,21 71:17
93:3 98:18
99:7,10 102:24
115:20,21
131:7 141:24
142:23 143:6
143:11,22
**earlier** 48:20
77:21 84:18
116:13 130:20
149:17
**Ecloutman@l...**
3:23 158:25
**Ed** 7:12,16
15:18 125:25
125:25 126:5
126:11 148:13
148:20
**education** 18:12
19:7
**Edward** 3:20,21

6:23 158:1,22
158:23
**Edwards** 99:6
131:3 134:16
**effect** 36:14
**effective** 86:15
87:7
**effectively** 86:13
**effort** 18:15 19:8
37:24 86:16
97:22 128:13
**efforts** 14:21
15:3 18:13
91:23 144:17
144:20
**ego** 71:13
**eight** 25:1,2
40:18 41:14
43:10 86:3
**either** 35:19
36:18 48:14
77:12 84:12
113:21 130:10
150:4,11
**election** 18:17
30:20 34:2
36:10 49:23
60:1 61:7,10
61:11,14 97:6
**elections** 30:20
**Elm** 3:21 4:2
158:23 159:2
**Emlet** 105:6
**employed** 21:5
159:10
**employee** 49:2,2
49:3 57:16
103:12,14
105:15,22
111:16
**employee's**
86:10
**employees** 31:23
86:25 129:18
143:1

employment
152:24
encounter 22:4
30:3 146:11
encourage 65:19
encouragement
138:11
endorsement
138:12
enemy 37:3
engage 37:22,24
143:20 144:9
engaged 34:1,2
ensure 52:6
entirely 64:21
entitled 28:17
156:8
environment
76:22 134:11
ER 105:1,9,15
eradicated
65:10
estimate 130:4
estimates 130:7
evasion 14:1,8
14:17
evasive 14:5,9
event 51:24 53:3
everybody 20:10
26:8 31:5,10
62:15 153:1
evidence 106:14
126:19 142:16
ex 71:12
exact 99:23
129:18 144:8
exactly 59:16
63:21 94:23
107:9 118:3
122:21
EXAMINATI...
5:5,5,6,6 7:3
148:18 149:14
150:22
example 65:12

87:1 138:11
exception 155:5
155:9
exchange 52:13
excuse 91:24
executed 22:3
execution 22:14
23:1,19 25:8
25:12 26:7
142:22 146:5,6
146:7
executive 84:21
149:1
exhibit 50:10
55:1 74:20
78:20,25 80:6
83:2 87:10,11
92:17,18,19
102:25 103:2
104:18 110:4
110:20 111:20
111:25 112:7
114:1,2 126:14
127:12 129:1,3
133:23 135:13
136:8,17 137:7
137:18 138:5
140:23 141:22
151:15 155:14
156:15
exhibits 5:10
155:4,7 159:8
existed 48:25
existing 54:2
exits 126:12
expect 70:14,25
71:3,13,18
76:20
expected 70:11
70:12 115:10
expecting 70:24
Expiration
159:19
explain 53:12
express 85:20

expression
22:15,24
extremely 64:25
eye 23:18

_____ F _____

Face 94:12
Facebook 25:19
32:18 46:2,16
49:14,15 57:7
57:9 74:25
80:22 86:19
87:2 94:11
145:6
faced 149:24
fact 34:1 51:23
52:7 70:18
78:7 104:6
118:4 119:7
133:8 146:15
152:12
fact-finding
33:13,18
failed 31:8 73:14
fair 18:24 25:7
26:19 27:10
63:20 80:11
99:20 105:11
fairly 49:1,2,3
97:6
fall 14:22 31:21
47:25 67:15
false 22:9 95:11
family 123:19
123:25 126:2
far 23:17 51:13
58:17 62:3
65:4 89:4
93:17
fast 134:24
fateful 84:23
85:2
favor 38:16
fax 159:22
FB 57:6,7

February 99:21
99:21,24 112:8
131:1 132:4
134:15 135:23
136:18 138:14
140:2
Federal 2:1
feel 16:3 36:25
63:18 87:17
feeling 37:8
felt 28:21 36:19
47:24 58:25
59:8 63:20
149:25,25
female 60:19
fighting 90:23
files 104:25
105:8 134:17
filter 68:6
filtering 68:9
filters 67:4,25
68:14,16,18
final 55:8,25
financially
159:13
find 15:21 35:5
38:23 39:15
99:1 103:24
110:11,18
137:14 141:25
150:21
fine 72:22 79:3
100:25 126:10
finish 59:4 98:18
fired 36:12
firm 6:20 159:21
first 7:1 10:10
19:14 24:7
28:12,12,13
47:7 56:8
65:12 66:20
76:8 86:11
96:5 103:9
146:2,3 147:16
149:17 151:8

Firstly 148:25
fishing 11:7,14
Fitsz 27:4
Fitzhugh 27:4
five 46:7 78:15
139:5
five-minute
130:1
flight 11:22 21:9
22:6 25:19
46:13 49:15
57:14 75:5,7
75:17,19,23
76:10,12 90:19
90:21 92:10
94:21 95:2
104:1
flow 125:22
folder 54:14,15
Foley 98:7 100:3
101:16,19
Folks 140:9,15
follow 36:5
152:19
follow-up 138:9
following 6:12
30:12 100:3
138:10 157:17
158:4
follows 7:2
157:24
fool 23:18
form 13:8 17:6
17:15 19:24
27:23 34:4,5
39:6 41:1,22
44:21 45:4,15
45:23 47:10
56:23 61:25
64:10 67:18
68:11 69:13
72:6 86:12
87:6 89:7
91:18 96:3
98:9 99:16

118:10,24
119:22 123:12
**former** 20:19
26:25 29:13
**forth** 15:25
**forward** 88:18
**forwarded** 41:3
48:16 103:10
130:22
**forwarding**
134:9,17 136:9
**fought** 150:8
**found** 81:11
142:21
**Foundation** 3:9
158:11
**four** 46:7
**fourth** 75:1
**frame** 30:10
99:24,24
112:14 134:19
**framing** 106:21
106:23,25
**free** 30:23 87:17
**frequently** 22:15
84:23 116:17
**friend** 23:18
101:19
**front** 127:13
**fuck** 145:21,23
**fucktard** 31:8
31:14,19,25
32:10 85:10,15
145:14 146:4
146:13 153:2
**full** 135:4
**full-time** 54:4
**function** 54:21
**Funny** 137:21
**fur** 105:13
**further** 85:23
104:8 105:13
122:20 138:10
141:5,6 159:9
159:12

**Fusion** 94:22
95:2

### G

**G** 3:4 157:25
158:7
**Gage** 127:23
**galley** 54:1,3
**game** 61:22
**gate** 76:3
**gathered** 49:4
**generally** 49:22
90:17
**gentleman** 9:23
**get-out-to-vote**
18:15
**getting** 75:20
103:24 128:2
**ghost** 44:11
116:12 117:1
120:1 121:17
127:9
**Gilliam** 3:8 6:16
158:10
**give** 35:9 49:18
56:7 99:2
153:7
**given** 9:5 18:25
19:3 43:13,15
43:22 150:3
157:21 158:2
**giving** 130:7
**go** 12:23 13:7,9
16:6 20:9 27:5
27:7 33:19
35:23 37:3
45:20 46:22
62:12 65:8,11
67:4 68:23,24
74:19 76:6,23
79:21 80:5
81:18 88:3
90:11 92:3
94:17 100:7,22
100:25 102:15

103:7,8 110:10
110:17 111:19
112:7 114:1,2
114:3,10,24
120:11 126:8,9
126:14 128:7
129:1,3 130:18
132:1 134:23
137:23 139:22
140:3,6 145:21
145:23 148:13
148:17 150:12
151:18 154:14
**goes** 14:21
115:11
**going** 6:1 23:1
23:23 26:14
30:11,13 37:20
59:17 61:12
66:8 67:5 74:8
74:14 87:3
92:16 101:25
102:18,23
103:25 104:24
105:7,9,10,12
106:8,8 107:6
110:12 112:6
113:20 115:8
120:11 122:3
126:1 129:25
130:12 134:24
139:22 152:12
154:11 155:25
156:8
**gonna** 13:22
52:24 55:4,10
62:11 76:7
87:3,10 88:13
100:7 103:5,7
105:23 107:22
111:20 114:3
129:19,20
130:5 131:16
131:16 132:1
137:12 145:4

151:11
**good** 22:1 36:4
75:14 103:6
**gotta** 102:1
**gotten** 23:17
77:6
**grand** 106:5,12
106:14,18
107:14,25
108:2
**grapevine** 52:10
**great** 23:16
24:13 43:18
123:16 155:18
**Greenfield** 4:1,1
6:21,21 7:12
7:16 13:7
15:18 17:6
27:23 34:4,6
39:6,8,10
44:21 45:4,15
61:24 67:18
69:13 72:23
73:4,22 74:1,6
89:7 91:18
96:3 97:11,13
98:9 99:16
118:10,24
119:22 123:12
125:17,18,21
125:25 126:12
159:1,2
**Greg** 98:7 100:4
131:11
**grievance** 28:16
**grounds** 153:4
**group** 22:19
25:15 30:19,21
30:22,23 31:5
31:15 32:18,22
32:22,24,25
33:5 46:10,11
46:18,23 47:2
48:1 63:2
65:16 86:16

87:4 96:7
145:6
**groups** 39:15
40:21 47:9
49:1,15 95:2,3
**guess** 19:16
20:24 31:20
38:20 39:3
40:7 52:20
61:21 95:23
129:21
**guessing** 19:17
50:7
**guidelines** 88:19

### H

**H** 62:17
**ha** 79:12
**Hafner** 20:15
48:7 79:16,23
80:13,21,24
81:3,5 82:8,9
123:3,7,10,13
125:6 127:6,8
140:20
**half** 143:10
**hall** 46:16
**hand** 49:6 81:13
81:16 130:9
**hang** 35:5 37:20
102:1,12
150:21
**hanging** 22:16
**happen** 10:1
11:4 50:23
141:9
**happened** 10:10
28:7,11 33:11
52:12 97:16
128:12 141:11
153:21
**happy** 24:1
39:13 156:13
**harassing** 31:22
132:11

harassment 40:5
hard 20:9
  103:20
Harwood 3:15
  158:17
hate 56:7 122:14
  130:7
haters 62:16,18
  63:1,1,9,16
  64:1,19 145:9
  145:19
head 18:23
  123:14
Head's 51:4
headquarters
  67:5,7
headset 102:1
hear 102:4,8,9
  102:12 116:9,9
  149:20
heard 29:4,25
  45:16 52:10
  112:20 119:7
hearing 26:23
  26:24 29:9
  33:24 34:20
  35:19 36:14
  102:10 103:21
  109:21
heavily 109:14
heavy 59:24
  61:5
held 77:11 149:4
hell 76:9 141:25
help 37:1 47:21
  84:23 85:18
  114:4 124:7
  126:3 132:17
helpful 12:24
  110:2
helps 30:10
  50:12 80:21
  99:2
hereto 2:3
hey 123:6

higher 28:25
highly 65:19
histor 58:2
historically 58:2
history 59:14,19
Hofer 98:7
  100:4 104:1,4
  104:7 114:5,17
  124:14,19
  125:3 131:12
Holcomb 91:7
  97:23
Holcomb's
  89:22
hold 82:16
  109:25 111:18
  123:19 130:8
  130:10 137:14
holding 77:13
  148:25
home 109:2
honest 24:11,15
  24:18 26:14
  43:3 53:15
  69:12 101:14
  122:2,19
honestly 22:18
hope 72:2 128:6
hopefully 130:8
hoping 16:23
horrible 86:23
hostile 134:11
hot 135:4
hotel 25:16,17
hour 73:3,17
  130:8
HOUR(S):01
  158:1
HOUR(S):54
  157:25
hours 46:14
Hudson 20:19
  125:11 129:5
  129:12
huge 60:1 61:6

human 9:21
hundred 71:17
hundreds
  135:10
hyp 96:25,25
hypothetical
  96:18 97:3,4

——— I ———
idea 9:1,4 15:5
  40:18 42:13
  56:4 69:1,16
  71:15,23 104:9
  113:11 115:18
  123:22 135:2
  151:12
identified 39:3
  42:24 112:10
  129:15
identify 38:21
  42:14,18
  135:13 137:12
  137:16 139:25
  141:12 142:10
  145:6
identifying
  57:15
ignorant 145:19
III 3:20,21 6:23
  158:1,22,23
illustrate 134:10
illustration
  81:19 124:11
immediately
  84:20 87:4
import 128:24
important
  123:24
inaccurate 22:9
  39:23 94:4
  95:8,9 96:1,6
  96:15,20 97:8
inactive 56:11
include 44:4
  111:13 121:15

125:6,9,11
included 47:17
  140:8 143:10
includes 138:7
  141:24 158:4
including 97:7
  138:10 142:24
  143:23
inclusive 43:8
incomplete 34:6
  34:7
inconsistencies
  88:21
incor 28:23
incredible 113:2
incredibly 57:12
  57:17
incriminating
  40:23
INDEX 5:1
indicated 76:19
individual
  152:25
individuals 95:1
  95:4 100:11
  112:9,15
  136:10,11
inf 87:1
inflammatory
  70:13
inflight 53:11,13
  59:10 81:7
  123:14
inform 11:8
  105:3
information
  11:7,8 14:23
  63:12 64:4
  77:24 78:1
  87:1 92:10,25
  95:3 96:6
  98:19 99:9
  103:10,12
  104:21 105:24
  130:22 131:8

131:22,22
  132:5,19
  139:12 143:2
  158:2
informed 41:16
initial 26:24
  27:1 73:12
initially 150:8
initiative 31:8
  32:10
ink 75:22
inner 59:24 61:6
innuendos 95:14
  96:15
installment 55:8
  55:25
instance 1:20
  133:18
insult 36:9
intended 28:18
  70:10 73:17
intent 14:10
  22:16,25 23:2
  29:5 36:9
intentionally
  66:10
intentions
  119:24
interest 85:20
interested 85:22
  159:13
interested/intr...
  84:25 85:19
interesting
  106:11
internally 131:7
interpret 103:15
  121:14 139:10
interpretation
  94:2 105:11
interrupt 74:3
interview 35:19
intrigue 85:21
invasive 21:21
investigate

103:12
**investigated**
90:14
**investigation**
66:15,16 113:4
**investigations**
90:20
**investment**
65:21
**involved** 27:16
91:11 101:12
123:24 126:23
132:14
**involving**
136:10
**ir** 20:23
**isolate** 38:20
**issue** 21:15,16
21:18 28:4
56:7
**issued** 90:15
150:7
**issues** 21:12,14
90:13

**J**

**Jacinto** 3:5
158:8
**Jackson** 43:8,21
93:9,12 94:13
97:20 100:2
101:7,8,19
109:15 110:23
119:13 131:14
135:4,5 138:3
138:13
**Jackson's** 94:12
**January** 93:15
**Jean** 101:6
**Jeanna** 43:7
93:9 94:13
97:20 100:2
101:6,8,19
109:15 119:13
131:14 135:4,5

138:2,12
**job** 77:8,11,13
123:18,24
126:20,25
150:9
**John** 127:22
**joint** 51:11,21
92:12 116:1
**joke** 75:23
**Julie** 103:6
131:2 138:8,16
138:19,22
140:2 141:14
141:18,18
**July** 1:14,22 6:2
73:8,15 141:13
157:13 159:15
**jump** 75:6,8,19
75:25 76:11,11
**junior** 29:16,25
**jury** 17:1,2,12
38:13 39:13
53:12 60:23
64:8,16 148:1

**K**

**Kearney** 100:4
**keep** 23:18 35:9
69:21 78:10
**kill** 22:21,25
23:4,11
**killing** 23:1 77:8
**kind** 25:3 34:21
36:4 90:10
**knew** 30:21
31:10 42:25
45:1 113:21
119:20 153:2
**know** 10:6,21
11:14 12:1,16
14:23,25 15:2
16:7,13 22:18
23:17 24:18
25:2 26:14,15
29:3 32:9

33:14 41:2
42:8,22 43:24
44:9,23 45:2
47:4,14 49:22
50:6 52:8,8,11
52:17 53:14,18
58:20 62:2,3
63:23 64:15,15
66:14 67:6,23
67:24 68:6,14
68:16,25 69:3
69:5 78:21
79:6,7,24 81:1
81:1,2,3 83:14
83:15 85:4
87:21 89:5,8
90:12 92:3
93:17 94:7
96:22,23 98:3
100:10,14,23
101:4,5 103:5
103:19,22
104:11,11,15
106:11 107:4
108:20,22
109:4,22 111:3
111:8 112:22
113:8,12
114:18 115:20
116:6,7,10,20
117:5 120:23
120:24 121:5
122:2,2,4,12
122:19 125:16
127:17 130:6
132:2,16 134:7
134:14,20,24
135:7,7 136:6
136:7 138:21
142:7,9 143:15
143:16,17
147:13,15
148:22 155:25
**knowing** 143:9
**knowledge**

14:14 50:8
57:2 58:16,19
71:5,22 94:20
113:24 125:16
**knowledgeable**
66:14
**known** 20:4 31:6
42:6 73:9
86:12 132:12
**Koochie** 133:9
134:3
**Kookie** 132:19
133:8,13,17
134:2

**L**

**labor** 57:25
66:16
**lack** 88:19
**Lacore** 20:17
48:3,9,14 51:4
51:10 52:14
53:6 54:12,16
55:17 56:20
58:4,15 60:5
62:4 63:10,19
64:15 65:23
68:7 78:9
82:10,12 83:1
108:16,19,23
110:22 125:9
129:6,23
142:19
**Lacore's** 72:14
109:9
**language** 59:8
70:13 129:18
**large** 25:15,18
25:21
**larger** 65:16
**last-chance**
151:23 153:7
153:13,14,19
154:2
**latest** 90:20

137:19
**law** 3:21 6:19
16:7 158:23
**lawsuit** 66:16
**leader** 18:3
91:22 92:8
143:12
**leadership** 14:20
14:21 15:4
17:24,25 29:20
34:14 60:20
62:22 63:13
89:5 93:24
95:19,25 97:12
97:17 101:9,13
116:19,24
128:15
**learned** 77:22
**learning** 31:18
31:23
**leaving** 76:2
**led** 22:18 107:13
**Leesa** 100:9
**left** 80:12 127:18
**leg** 116:11 120:1
120:10,11
121:22 122:6
**legal** 3:8 150:15
158:11
**legitimate** 56:9
**let's** 35:23,23
46:4 50:10
54:24 69:24
71:6 74:12,19
78:13 85:1,1
87:10 90:11
99:3 101:5
102:15 104:17
108:12 110:4
110:10 111:19
114:1,2,10
115:22 122:24
124:25 126:13
131:10 133:22
135:21 138:5

Brian Talburt

140:17 141:12
**letter** 151:24
  152:3
**level** 28:22,25
  150:6
**leverage** 150:10
**liaison** 53:21
**lies** 49:8 95:14
  95:18,21 96:15
  97:15
**life** 123:18,25
**limit** 120:17
**limited** 73:16,18
**line** 9:2 80:22
  104:22 117:8
  117:25 118:1
  119:6,21
**lines** 118:21
**link** 9:12,19
**Lisa** 4:5 73:2
**list** 18:25 19:3
  20:9 43:9
  133:12
**listed** 73:11
**listen** 57:20
  60:25
**lists** 133:18
**little** 8:22,23
  37:23 41:21
  50:12,15 55:5
  55:6 79:1
  102:10
**local** 1:7 6:5,22
  8:5 11:17 12:4
  12:14 19:1
  21:10 28:22
  29:21,22 30:20
  34:14,18 38:2
  41:6,11 42:6
  73:5 88:5 89:6
  90:6 116:19,24
  143:12 149:2,7
  157:7
**locally** 37:1
**located** 1:25

**locations** 6:10
**lodge** 74:2
**lodged** 20:2
**long** 40:8 73:14
  88:17 130:4
**long-term**
  122:15,25
  123:2
**longer** 139:22
**longtime** 103:14
**look** 54:24 80:12
  80:19 87:10
  97:5 99:3
  104:17 108:12
  110:4 122:20
  131:17 134:22
  138:5 139:21
  140:17
**looked** 82:13
  136:1
**looking** 11:7
  58:23 79:18
  85:12 94:1
  95:3,16 96:24
  97:9,14,14
  110:18 115:16
  130:6,18
  134:17 142:15
**looks** 79:14
  133:5 140:18
**lose** 110:6 150:9
**loss** 152:6
**lot** 58:1 71:16,19
  72:8
**lounge** 18:12
  19:7,8
**Love** 100:8
**loved** 137:22
**loves** 62:15
**loyalists** 30:19
**Luv** 94:22 95:2
  115:25

─────────
**M**
**machine** 1:24

**Madam** 155:19
**maddening** 56:6
**maintain** 84:18
**major** 19:1 65:4
**making** 36:15
  65:23 106:4
  107:13,25
  108:2 153:11
**malcontent** 49:5
**man** 47:16
**management**
  19:22 20:6,12
  22:8 26:3
  37:16 40:22
  45:11 47:8
  57:25 58:6,16
  59:10 77:6
  81:8 88:23
  90:5,13,16
  91:6 96:11
  99:25 104:3
  105:17,23
  122:18,23
  123:1,9,14
  124:12,18
  125:2 126:22
  126:24 129:16
  135:14 136:25
  138:17 143:24
  144:9
**manager** 36:23
  47:16 53:16
  56:14 60:18
**mandatory** 8:7
  15:22
**mankind** 86:13
**manner** 22:9,21
**March** 30:11,13
  35:16 40:8
  73:11 140:8
**mark** 155:3
**marked** 55:1
  83:2 92:16
  114:13 131:1
  140:22 155:14

156:15
**married** 25:23
**Matt** 6:15
**matter** 63:4
  72:12 114:16
  115:19 147:21
  148:1
**Matthew** 3:8
  79:24 158:10
**Mbg@nrtw.org**
  3:11 158:13
**McDaniel** 26:25
  27:11,20 29:12
**McKee** 7:13
**McKeeby** 3:14
  6:17,17 17:15
  19:24 34:25
  35:3,7,7 40:15
  41:1 47:10
  56:23 64:10
  68:11 72:5,17
  73:23 74:10
  158:16
**McKinney**
  159:21
**mean** 20:8,11
  24:2 25:11
  52:22 53:4,25
  59:16 60:10,24
  61:4 66:1
  77:17 81:1
  106:25 115:18
  118:20 120:10
  124:3 133:7
  151:21
**meaning** 21:14
  26:7
**means** 24:13
  38:6 53:13
  82:15 87:7
  118:21,22
  119:8 121:7
  128:19
**meant** 64:19,22
  64:24 118:3

119:5,7 121:9
  153:2,2
**mechanics** 52:12
**media** 21:13,15
  21:18,23 22:3
  25:14 26:10
  29:8 30:4
  34:11 37:17
  39:21,25 40:22
  41:22 45:22
  46:5,8,9,10,18
  46:19,24 47:1
  47:14 48:24
  65:3 75:24
  81:21 82:4,14
  86:11 88:17
  90:13,23 93:10
  93:25 94:3
  95:1 99:8
  100:1 104:14
  109:15 110:24
  111:15 112:17
  113:6 120:9,14
  120:18 124:6
  124:19,22
  125:4 128:14
  129:17 136:9
  136:12 143:20
  146:12,15
**medical** 126:2
  132:13
**meeting** 15:24
  23:7,9 27:1
  28:17 33:13,19
  33:23 34:9
  46:6 82:3 83:6
  83:21,22 84:8
  85:24 86:1,5
**meetings** 14:21
  18:7
**Melody** 1:23
  32:2 102:17
  157:15 159:18
  159:20
**member** 11:25

12:5,11,14,17
12:22,23 13:1
13:3,13 14:14
14:24 18:5,6
19:1,6 21:10
33:4 37:25
38:15,16 59:9
63:2 81:8
93:12,14,18
115:2 116:23
117:4 122:17
123:8 128:14
145:3
**members** 15:3
15:11 20:6,11
38:1 45:8,11
56:10 62:21
63:11 83:3
88:6 90:5 91:6
112:15 116:18
125:2 143:25
**membership**
51:6 52:2
128:15
**mentality**
120:12
**mention** 24:19
**mess** 54:20
**message** 10:5
84:24 85:18
86:19 87:3,5,8
87:8,12,17
88:4 128:3
**met** 148:22
**metaphor** 76:17
77:3 120:9
**metaphorically**
22:13 59:5
**Mexico** 2:1
**Michelle** 98:7
100:3 101:16
101:18
**middle** 74:6
**midst** 25:25
**Mike** 20:15 21:3

43:12,13,15,17
48:4,12,20
50:6 56:15
79:16,23 80:13
82:2,7,7,8,9
83:9 84:17,19
86:21 100:4
108:15 109:1,7
110:22 119:20
120:11 122:10
122:11,17,22
123:3 127:6,8
137:19 138:2
140:18,19,20
140:21 141:14
141:18,18
**Mike's** 127:3
**Mikes** 122:25
**mind** 16:21 29:2
40:2,4,9 43:10
44:15 48:19
92:7 147:11
148:16
**minds** 29:6
**mine** 153:24
**minority** 59:24
61:6
**minute** 37:21
72:18
**MINUTE(S)**
157:25 158:1
**minutes** 16:19
73:3
**mis** 63:7
**mischaracteri...**
118:25
**misinformation**
49:8 63:7
75:15 86:23
95:14,18,21
101:23,24
124:5 132:7
137:3 144:1
**misinformed**
145:19

**misrepresenta...**
28:2
**misrepresented**
22:7,12,17
**misrepresenting**
50:1
**mistranscribe**
156:10
**mistruths** 63:7
64:13 97:15
**misunderstood**
14:10 29:19
**mobilization**
18:12 19:8
91:23
**modifying** 54:2
**Molly** 100:4
**mom's** 115:6
**moment** 43:10
69:11 72:24
125:19,23
155:6
**monitoring**
90:17
**Monk** 1:23
157:15 159:18
159:20
**months** 40:17
54:4 61:20
78:15
**Morris** 3:14 5:6
6:19 107:17,19
148:13,17
149:12,15
150:17 154:7
154:22 155:17
158:16
**mother** 145:12
**Mountain**
120:24 121:1
127:2,4
**move** 73:6 80:4
126:7
**movement** 51:5
65:17,18

**moving** 126:15
**multiple** 69:14
**Muslim** 25:23
**Muslim-bashi...**
25:21
**Muslims** 25:16
25:17
**mute** 96:8

## N

**N** 3:1
**naive** 78:4,7
**name** 7:5,7 9:21
27:6,12 63:1
79:25 99:1
109:4 114:25
122:23,25
**name's** 99:1
**named** 9:23
**names** 42:22
100:10 128:21
133:12
**Naomi** 20:19
125:11 129:5
129:12
**narrow** 47:21
**National** 3:8
158:11
**necessarily**
16:16 43:25
62:23 77:10
94:25 95:12
117:5
**necessary**
123:20 155:3
156:14
**need** 23:19 25:8
71:15,18 74:11
79:12 81:23
84:22 87:20
91:25 92:2
100:24 107:6
126:2
**needed** 53:4
61:22

**needs** 71:13
72:21
**negotiated** 75:11
**negotiating**
75:12
**negotiation**
18:11 19:9
92:11
**negotiations**
86:23
**neither** 159:9
**Network** 19:11
**Nevarez** 33:22
33:24 34:13
42:9 89:13,19
91:7,15,21
92:6,13 97:23
115:25 119:19
119:25 121:9
127:23 144:14
147:19
**never** 18:10
41:15 42:23
44:11 46:18
47:6 51:16,16
54:19 71:3,5
78:5 83:15
118:4 119:20
129:10 143:4
143:16,17
144:3 149:9
153:20
**new** 2:1 19:19
33:15 54:1
**newer** 49:13
**nickname** 44:7
**nicknames**
44:14 116:14
**night** 73:8
**nightmare** 40:1
**nonmember**
51:8,23
**nonresponsive**
16:11
**nonsense** 23:19

25:9,12
**North** 3:5,15
  158:8,17
**Northern** 1:1
  6:7 157:1
**Northwest** 57:23
  57:24
**notch** 53:15,16
**note** 76:16 90:12
**notes** 35:19
**notorious** 57:24
**number** 20:4
  22:6
**numbered** 1:21
**numerous** 112:9
**NW** 57:19

**O**

**o'clock** 8:1
**O'Grady** 103:6
  131:2,23
  134:16 138:22
  141:19
**oath** 13:20 15:10
  41:15 64:17
  68:8 118:2
**ob** 77:20,20
**object** 13:8
  16:11 17:15
  19:24 34:5
  41:1 45:1,2,8
  47:10 56:23
  64:10 68:11
  72:6 73:5
  97:11
**objected** 45:5
**objection** 17:6
  20:2 27:23
  34:4,25 35:6
  39:6 40:15
  44:21 45:4,15
  61:24 67:18
  69:13 73:24
  74:2 89:7
  91:18 95:13

96:3 97:13
98:9 99:16
118:10,24
119:22 123:12
126:7
**objector** 11:23
  42:21,25 52:1
**objectors** 38:1
  38:17 42:16,23
  51:5,11 52:7
**obligated** 153:19
**obvious** 78:4
**obviously** 20:3
  37:10,14 60:13
  66:3 70:12
  77:20,22
  122:14 126:11
  128:11 150:10
  151:16
**occasion** 144:9
**occurred** 31:9
**occurring** 34:8
**October** 112:3
**offended** 25:24
  26:2
**offensive** 39:23
**office** 18:8 149:1
**officer** 49:23
  149:2,7 157:19
  158:3
**officer's** 159:5
**officers** 91:6
**Offices** 3:21
  158:23
**official** 12:9,10
  14:12,13
**oh** 36:4 39:1,3
  44:12 74:12
  80:7 82:9
  85:12 86:5
  94:12 101:5
  111:24 127:19
  131:10 142:23
  143:19 146:6
**okay** 9:20 10:24

12:3,12,15,24
20:15 21:16,25
23:25 24:7,12
24:24,25 25:1
25:7,10 26:5
26:19 27:10
29:14,19,23
30:2,14,15
32:1,24 33:4,7
33:17 35:11,13
35:23 36:18,22
36:24 37:12,20
38:5,13,22
39:9,19 41:11
44:3,7,25
48:11,13 50:18
50:21 51:13,19
52:13,21 54:5
54:21,24 55:4
55:11,16 56:5
58:4,12,20,25
60:10,14 62:3
63:8,25 65:25
66:4 73:4,25
74:8,12 76:4
78:16,21,25
79:4,7,10,15
79:19,21 80:3
80:9,15,23
81:4,18 83:10
83:24 84:10,14
85:1,14,17
87:24 88:3,4
88:12 89:10
90:9,11 92:4,5
92:24 93:7,16
93:19,20 94:5
94:22,24 95:23
98:10,24 99:3
99:3,14,18
100:13,16,22
101:5,8,11,16
102:4,23
103:23 104:13
104:17 105:6

105:15 107:11
107:15 109:1,7
110:4,17,19
111:5,8,13,17
111:19,25
112:21 113:20
114:1,1,10,11
114:15 115:3
115:22 116:18
116:23 117:23
118:2,5 119:10
119:25 121:8
121:15,18
123:5 124:3,10
124:23 127:16
127:21 128:22
129:11,22
130:1,3,17,19
130:19 131:1
131:10,25
132:3,10
133:19,22
134:15 135:3,9
135:16,21
136:8,14,17,21
136:23 137:10
137:12,18
138:23 139:1,4
139:6,21,21
140:17,22
141:12,17
142:8,23 145:3
145:24 146:2,6
146:7,17,18
147:15 148:25
150:17,19
151:4,9,11
152:3,6 153:10
154:5,14,24,24
155:1,18,22
**old** 120:12
  145:11
**onboard** 59:24
**once** 49:13
  75:22 76:16

117:21 150:9
**one's** 22:1
**one-day** 65:20
**one-hour** 73:19
**one-sided** 70:10
**ones** 137:11
**online** 10:3
**openly** 132:13
**operates** 42:5
**operation** 153:2
**opinion** 49:10
  58:6,9,11
  63:11 75:24
  89:2,4,14,22
  89:25 90:25
  91:3,8 93:10
  95:6 119:14,16
**opponents** 37:25
  38:15,16 42:15
  97:17 126:23
  130:23 132:6
  144:1
**opportunity**
  43:14,16,22
  59:14,20 76:1
**oppose** 62:21,23
**opposed** 64:19
  67:5 75:10
  93:24 97:10
  101:8,12,21
  115:14 117:10
  118:21 119:8
  119:17,18
  143:5,7
**opposing** 113:4
**opposition**
  62:19 97:1
**options** 12:4
**oral** 1:12,18
  157:20
**order** 10:17,22
  10:25 126:25
**ordered** 8:10
**organized** 54:19
**original** 159:7

originally 64:2
outcome 159:13
outrageous
  150:2 152:23
  153:6,9
overpaid 84:21
oversaw 53:22
overseeing
  53:24 86:18
oversold 75:19
  76:11

**P**

P 3:1,1
p.m 1:22,22 6:9
  156:16
page 5:1,8,11
  25:19 46:2
  94:11,21
  134:18 151:8
pages 86:19
  92:19 95:10
paid 75:20
paints 34:7
pal 68:7
paper 70:1,8,17
  70:19
par 45:21
paragraph
  62:12 65:3,9
  65:12 76:9
Pardon 9:10
Parker 27:3,13
  27:14,21
Parrott 97:24
  127:22
part 19:13 54:6
  74:24 97:22
  99:10 105:22
  131:22 132:5
  134:2
participate
  45:22 51:24
participated
  18:15,19 30:18

49:14
participating
  19:4
participation
  8:7
particular 28:4
  28:20 30:25
  43:6 69:15,17
  82:18 94:8
  117:9 153:5
particularly
  41:20 49:25
  51:25 57:11
  63:6 71:4
  81:20
parties 3:2
  124:6 158:5
  159:11
parts 88:1
party 23:15 24:9
  149:8 157:23
pass 148:12
  154:5
passed 92:9
Paulo 3:14 6:17
  7:11,13,20
  15:19 158:16
pause 125:23
pay 152:12
pays 14:20
pen 68:7
people 15:11
  20:4 22:19,23
  30:21,21 31:15
  31:18 32:25
  38:19 40:6
  42:11,14,19
  46:12 47:2,22
  49:9 50:2
  57:20,20 61:21
  63:23 64:3,25
  65:16,20 67:14
  67:15,23 68:9
  71:19 76:2
  77:23 84:2

86:18 87:4
  90:7 93:5,23
  97:9,15,21
  98:12,22 99:12
  100:13,23
  101:21 113:3
  124:13,18
  125:1,3,13
  127:16 129:14
  131:6 132:16
  132:18 137:2
  137:20 144:14
period 52:16
  69:10 71:5
  73:19
pers 43:6
person 9:23 23:1
  25:22 26:8
  30:25 43:6,9
  54:7 68:1
  71:16 83:5,13
  116:21 117:18
  123:16 153:3
personal 21:21
  22:4 66:8,10
  67:3,13,13
  68:19,24 69:10
  71:20 83:18,24
  84:1 90:12
  94:20,25
  108:23 109:6
  115:5 116:1
  127:3
personally 115:7
  146:12 148:1
persons 41:11
  100:2 101:1
petition 38:1
  42:16 101:3
phone 80:7
  148:21 159:22
phone's 50:16
phrase 66:9
Pick 69:10
picked 66:18

picket 117:8,24
  118:1,21 119:6
  119:21
picture 34:8
  87:13 127:13
pioneer 65:18
plaintiff 1:4,20
  3:3 6:15 73:9
  73:13 157:4
  158:6 159:6
plan 147:20
plate 56:1
platforms 48:24
play 59:23 61:5
played 17:1
  39:13 52:8
plays 60:2
please 6:12 7:5
  9:18 13:5
  17:10,16 20:2
  42:17 87:23
  90:12,22
  121:22 126:8
  140:13
PLLC 4:1 159:2
plus 48:23
Pmckeeby@r...
  3:17 158:19
point 27:17,19
  48:4,7,10 51:9
  74:2 77:2,4
  93:13 96:8
  126:8 144:6
  145:11 153:11
  156:11
pointing 59:7
  80:2
points 75:14
policies 56:22
  57:4 62:5
  120:17
policy 21:13,15
  21:19,23 22:3
  22:5 29:9 30:4
  34:11 37:17

57:1 88:17,19
  88:22,24 93:10
  94:3 100:2
  104:14 109:15
  110:24 111:15
  112:17 113:6
  120:5,9,14
  125:4,14
  129:17 136:13
  146:12
poor 57:25
portions 11:1
  115:17
portraying
  106:5
position 11:21
  18:10 21:8
  29:7,20 53:6
  70:14 71:1
  81:5 146:19,20
  149:4
possible 65:10
possibly 48:2
  76:2
post 25:15 32:14
  32:14 33:9
  74:25 84:23
  85:3,5,5 134:1
  135:5
posted 96:6,9,14
  99:8 100:14
  104:23 127:24
  128:5,9 133:16
  136:9,25
  138:10
potential 37:17
  73:12 94:1
powerful 86:12
practices 138:12
preamble 51:1
prefer 68:4
prepare 8:20
preparing 159:6
preposterous

147:9
**present** 4:4
147:3
**presented** 22:8
22:20 23:7
31:16
**president** 9:6
20:16 26:25
28:19 29:10,12
29:13,17,17,22
29:23 33:2
34:17 45:9,17
47:15 48:3
52:19 53:16
67:22,24 81:7
88:5 111:4
122:5
**President's**
87:11,16 88:4
**president@tw...**
111:9
**presumably**
31:14 34:15
141:1 147:7
**pretending** 31:2
31:3
**pretty** 20:20
29:5 45:25
117:13
**prevailed** 29:6
**previous** 83:1
**previously**
110:20 112:9
**principal** 149:1
**print** 76:22
**prior** 8:25 10:17
31:4,6,10
52:21 75:3
**private** 30:19,23
32:18 36:11
46:11 47:1
55:22 77:24,25
122:9 128:3
**Privileged** 5:12
**privy** 147:13,14

**probably** 18:8
18:20 36:16
39:21 44:12
47:16,22 48:15
48:15,23 49:4
49:9 50:7
52:17,18 54:18
63:22 69:12
71:17 85:12
92:17 95:20
96:13,14
116:21
**problem** 44:5
118:6 124:13
124:25 125:1
129:17
**problems** 58:5
**Procedure** 2:2
**proceed** 150:5
**proceeding**
159:12
**process** 28:17
77:22
**processed** 14:11
**produced** 1:19
**project** 54:1
145:14
**projects** 21:1
53:21 72:10
**pronounce**
79:25
**proposing** 86:9
**protected** 27:15
31:21 33:25
34:10 44:19
**provided** 9:8
75:9 104:22
105:14 106:9
**provides** 46:16
**providing**
105:25
**provisions** 2:2
**Pryor** 3:4,5 5:5
5:6 6:14,14 7:4
7:7 16:11 17:8

32:2 34:5 35:2
35:4,8 39:9,12
72:20 73:20,25
74:5,7,8,12
92:2 102:15
107:18 109:22
110:8 125:20
125:24 126:10
129:25 130:6
148:10 150:19
150:23 154:5
154:13,17
155:1,12,18
156:2 157:25
158:7,7
**public** 11:8,8
22:14,15,25
26:7 39:22
42:23 62:24
94:6 132:15
138:11 142:22
146:5,6,7
**publicly** 63:6
64:13 65:1
**published** 11:9
**pulled** 152:13
**purchase** 154:19
**purpose** 134:4
**pursuant** 2:1
158:2
**pursue** 150:15
**put** 50:19 64:15
70:9 78:10

———————

**Q**

———————

**que** 13:22 66:22
**question** 8:6
9:14,15 10:20
12:9,15,25
13:5,8,10
14:11,12 17:4
17:10,13,16
19:25 30:25
31:1,12 32:11
34:21 35:1

36:25 39:2
42:17 47:11
52:25 56:24
60:25 64:11
66:25 67:1,19
68:12 77:21
82:22,24,25
96:4 97:3
107:17,21,22
107:23,24
108:1 117:15
117:22 119:3,4
120:13 129:22
143:21 144:2
152:19 153:18
**questioning** 9:2
**questions** 9:4
13:23,25 14:2
14:7,16 76:24
88:2 93:4
99:19 137:15
148:11 149:11
149:13 153:23
154:7,9
**quick** 102:2
154:16
**quite** 10:9 21:2
22:16 23:24
31:24 72:8
76:18 86:6
92:5
**quote** 76:21
**quote/unquote**
75:18
**quotes** 78:10

———————

**R**

———————

**R** 3:1
**racist** 62:9
**Radar** 100:8
**raised** 30:25
**ran** 17:24 18:7
18:10
**rant** 114:5,17
**reach** 56:10 57:9

65:4
**reaching** 21:20
**react** 57:21
**read** 8:25 9:3
24:2,4 55:12
58:17 60:8,9
60:11 67:6
70:3 79:1 83:8
87:19 88:1,13
108:3,5,5,10
108:11 133:16
139:24 146:6
156:2,8,12
**reading** 10:18
23:23 36:5
55:8 67:9 72:7
76:8 105:11,12
107:9 123:5
128:24 155:23
**ready** 88:1
**real** 61:17
154:16
**realize** 16:25
137:21
**really** 16:3
27:25 28:3
44:9 53:14
56:8 64:3
74:10 81:12
84:7 90:7,8
96:23 97:2
109:21 120:8
152:1
**reason** 56:6 68:3
68:3 69:14,15
69:19 78:8
116:5 134:9,13
139:18 152:23
**reasonable** 20:5
20:18 153:3
**reasons** 33:25
46:25 77:2
126:2
**rec** 86:9
**recall** 15:3 16:22

24:17 34:20
36:13,15 37:8
37:10 38:1,7
38:17 41:19
42:15 47:18
48:17 50:24,24
51:15,19 52:3
52:5 60:12
72:11 80:24
85:25 87:16
88:25 92:14,15
93:8 97:22
98:4,6,11
101:3,12,17
104:2,6 108:24
109:11 114:8
115:14,19
116:13 122:22
123:23 128:10
128:11,23
130:20,24
131:6,9 136:1
137:7 138:8
140:11,12,15
141:7,10 142:5
145:13,18
**receive** 10:1
51:6 69:16
76:19,20
**received** 79:23
98:19 99:6
139:16 140:23
**Recess** 74:16
102:20 110:14
130:14
**recognition**
153:5
**recognize** 87:13
**recollection**
35:24 36:19
37:8 80:20
84:16 114:5
128:20 136:21
137:2 144:7
**recommendati...**

65:22 86:15,21
86:24
**record** 2:3 6:2
6:11 17:7,22
32:4 39:10
71:9 74:15,18
76:21 77:17,19
78:10 102:14
102:15,19,22
110:3,10,13,16
130:13,16
154:12,23,25
155:2 157:20
158:5
**recorded** 16:25
**reduced** 28:9,11
152:9
**Reed** 3:15
158:17
**refer** 99:11
122:21 151:11
151:13
**reference** 26:7
117:6
**referenced** 31:4
61:18 116:17
149:16
**referencing**
25:14 26:6,16
26:17 83:23
120:12 142:14
**referred** 32:20
44:11 121:17
149:20 155:9
**referring** 57:16
57:22 61:11
63:9,10 65:15
70:18 72:9
76:3,18 92:18
92:25 116:24
116:25 121:5
121:11 126:21
127:9 139:2
142:17 149:23
151:15

**refresh** 84:16
**refreshes** 35:24
**regard** 16:7
37:16 38:14,18
49:20 60:24
90:25
**regarding** 25:15
26:23 30:17
35:20 70:22
117:4 138:2
**Registration**
159:21
**regular** 52:14
**regularly** 53:9
**regulations**
57:25
**reimbursement**
51:7
**reinforcing** 87:8
**reinstated** 28:15
30:2 146:24
147:2,5 152:6
**reinstatement**
5:12 151:5
153:13 154:1
**rejected** 19:19
**related** 36:11
159:10
**relating** 34:2
41:8 102:24
**relations** 103:13
105:15,22
**relationship**
19:21 20:5,18
20:21,22 21:4
47:24 76:15
83:16,18,25
84:4,5,9,17,19
90:10 122:15
122:25 123:2
**relationships**
20:22 84:1,2
**relatively** 56:11
**relevant** 57:10
73:10 79:9

**rely** 76:20
**remember** 18:16
19:4 23:24,25
25:3,5,6,14,19
28:3 31:4 35:8
43:3,5,7 51:17
66:2 70:6
81:15 86:5
101:14,15,18
131:20 132:20
139:14
**remind** 115:23
**rendered** 28:22
**renew** 126:7
**repeat** 17:10
42:17
**repeatedly**
97:15
**repeating** 92:7
**reply** 70:12
71:14,18,18
**replying** 121:6
**report** 32:20
56:20 58:15
62:4 95:4,17
97:7,9,14
125:13
**reported** 1:24
96:2,10,21
97:21 98:1,6
98:11 99:15,20
99:25 100:8,13
100:15 113:5
**reporter** 6:12
72:25 109:20
113:14 116:8
151:17 154:14
154:18,24
155:3,8,14,20
155:22 156:9
157:16
**Reporter's** 5:8
157:11
**reporting**
130:23 159:20

**reports** 112:8
**repre** 23:24
**represent** 7:8
51:8 140:10
148:23 149:16
**representative**
26:20,21,22
147:3 149:8
**represented**
22:17 29:8,11
33:21 147:16
147:17 149:6
**represents** 6:20
**request** 76:13
**required** 15:23
75:7
**research** 103:9
**resigned** 51:5
**respect** 49:4
**respond** 70:14
70:25 71:1
**responded** 71:3
120:20
**responding** 81:3
148:10
**response** 31:7
37:2 79:8
81:15 120:22
140:24 144:24
**responsible**
23:15 24:9
**rest** 17:2,12
34:16 139:11
**restroom** 74:11
**result** 33:8 47:7
56:22 62:6
90:20 125:14
**resulted** 104:7
**resulting** 90:14
**retained** 23:14
24:8
**retaliatory**
138:12
**retard** 31:20,21
**reveal** 126:22

Brian Talburt

Page 176

**Reven** 127:22
**revenue** 76:2
**review** 99:8
141:2
**Rick** 100:4
**Rigger** 10:2,7,12
11:4,12,14,17
**right** 3:8 12:12
16:21 17:5,14
24:7 26:19
29:25 36:7
39:4 41:13
46:5,24 54:24
55:16 58:7,10
65:13 66:9
70:3 71:24
73:25 75:18
78:18 79:15,17
80:11 84:12
85:17 88:14
96:2,21 98:21
104:14 106:1
111:20 113:23
115:3,6 116:5
117:12 118:22
119:21 123:14
124:15,20
127:18,19
132:1 133:8,22
135:21 136:5
137:6,8 139:18
142:10 146:20
150:24 151:13
152:16 154:5
158:11
**rights** 21:21
**ring** 56:2
**Rittner** 9:23
12:12 14:22
**Rivera** 100:4
104:1,4,7
**Road** 3:9 158:12
**Rockwall** 3:6
6:16 158:8
**Rocky** 120:24

121:1 127:2,4
**role** 16:4 53:14
**room** 46:12 92:1
153:1
**rooms** 46:17
**routine** 75:1
**RPR** 159:18
**Rules** 2:2
**run** 26:8

——————
**S**
**S** 3:1 4:1 159:1
**sa** 94:14
**Sam** 62:14
127:22 134:9
134:13
**San** 3:5 158:8
**sanctioned** 28:5
**save** 126:25
128:8
**saw** 97:8
**saying** 11:10
13:12 15:9
16:22 17:12
36:13 43:8
51:10 78:3
84:4,10,12
94:14 108:22
113:22 115:12
120:1 122:22
126:18 133:5
139:8 141:9,10
143:6,18 144:4
**says** 24:5,12
25:8 32:8
35:16 36:1,22
51:4 55:25
56:5 59:13
61:13 65:3
72:1 76:9
77:16 79:16
80:6,22 83:6
85:17 88:13
90:12 99:6
103:6,23

104:22 107:13
111:4 112:2
114:5,13 115:4
115:24,25
116:11 122:9
124:10 126:18
127:2 128:2,7
131:2 133:11
135:3 140:9
141:1 151:19
153:12
**scab** 44:11
116:12 117:1,3
117:12 118:2
118:11,18,18
118:19,20
119:5,13,19,21
120:2 121:17
127:10 133:12
133:18
**scheduling**
18:19
**scouring** 95:10
**screen** 32:3,6
35:14 55:2
74:9 99:4
108:13 111:24
128:20 130:19
151:2
**screenshot**
128:8
**screenshots**
23:14 24:8
45:6 128:8
**scroll** 50:15 79:7
80:10 87:20,22
87:22 131:16
134:23 136:18
151:6,8
**se** 106:4
**search** 54:21
**seat** 75:6,8,19,25
76:11
**seats** 75:6,9,10
**sec** 66:15 111:18

**second** 18:8 35:9
72:25 91:25
95:11 99:2
102:1 126:1
146:11 147:5
147:17,18
150:2,21
**second-to-last**
103:7
**seconds** 16:20
**secret** 65:2
69:21
**secure** 126:19
**see** 9:13 32:5,8
33:15 34:23
35:5,11,13,16
35:23 36:1
37:5 50:12,13
50:14,22 55:1
64:17 68:2
69:24 74:21
78:22 79:6,19
79:25 80:1,3,5
80:8,13 88:14
92:20 98:25
101:5 102:16
102:25 103:1
103:11 104:18
108:12 110:10
110:18 111:7
111:22,25
114:6,11,24,25
115:7,22 120:8
122:24 124:8
124:25 126:13
126:16 127:24
129:11 131:4
131:11 132:2
133:16,22
136:19 141:3
142:3 143:6
150:19 151:1,7
154:16
**seeing** 50:24
57:1 111:5

**seek** 105:13
**seen** 41:7,9 46:1
50:23 51:16
57:11 60:3
72:14 129:6,10
133:13 144:12
**send** 24:1 47:20
67:21,21,21
69:8 71:14
78:17 107:3
109:2,8 122:4
137:20 140:11
140:22 144:4
155:7 156:12
**sending** 67:3,17
68:18 80:21
112:15 115:3
132:7 134:16
138:16 139:9
**sends** 88:5
**senior** 20:11,17
20:19 49:2
56:14 59:9
60:17 77:6
81:8 123:13
124:12,17
125:1 129:15
**seniority** 152:7
**sensitive** 69:20
**sent** 9:12,19
40:22 47:13,18
55:22 60:4,12
66:8,10 68:21
77:1 78:14
79:8,24 88:8
93:1,2 109:7
110:22 113:3
115:4,5 116:4
121:1 129:12
131:8,23 132:5
134:1,5 135:14
135:15 136:24
137:7 138:2,18
138:19 139:11
140:1,8 141:13

142:11 143:17
sentence 56:5
   62:13 76:8
   103:8 126:14
sentences 85:2
Sept 24:23
September
   24:23
seriously 25:24
   122:13
serve 12:10
   14:12,13
served 12:9 28:9
service 16:1,14
   16:16,19 19:5
   20:3 132:15
services 81:7
set 47:2 69:15
settled 19:16
settlement 5:12
   147:14 149:20
   150:11,13,14
   150:20 152:22
   153:5
seven 46:7
severe 132:14
shape 41:22
   45:22
share 74:9
   102:25 111:24
   130:19
shared 32:3 94:7
sharing 33:14
   70:15 71:2
   129:25 151:2
   154:17
she'll 156:13
sheeple 56:6
Sherry 32:9
Shipman 56:1
shock 132:14
shop 29:13,14
shorter 130:10
shorthand 1:25
   157:15

shortly 52:19,19
   156:5
shout 109:25
show 34:23
   35:11 50:9
   55:9 78:20
   92:16 98:23
   102:23 108:20
   111:20 115:8
   127:12 131:10
   150:20 151:1
showing 114:2
shown 8:18
   115:17
shows 77:5
   114:24
sic 10:2 76:13
side 36:10
sign 28:10
   153:19 156:2
   156:13
signature 151:7
   156:4,6,17
   157:22
signed 75:22
significant
   56:10
signing 155:23
similar 8:6
   86:16 142:16
simply 86:8
   90:16 106:12
   108:10
Sims 48:4,12,14
   82:7 108:16
   109:1 110:22
   137:19 138:2
   140:19,21,23
   140:24 141:18
Sims' 109:7
single 23:1
sir 9:14 14:6,9
   14:18 16:8
   17:17 23:21
   35:7,10,14

39:14 50:21
   64:14 67:16
   68:6 72:7
   107:8,22
   109:22 110:17
   111:22 117:21
   129:19 130:1
   147:20 148:24
   150:24 153:10
sit 36:20 48:17
   75:8
site 10:3 56:11
sites 90:18 93:25
situation 31:7
   51:18 144:10
situations 18:4
six 46:7
skip 50:10 62:11
Skygirl 100:9
slate 33:3 38:1
   38:15 42:15
   63:3
slow 140:3
slowly 134:23
small 30:18 51:6
Smith 3:15
   158:17
social 21:13,15
   21:18,22 22:3
   25:14 26:10
   29:8 30:4
   34:11 37:17
   39:21,25 40:22
   41:21 45:22
   46:5,8,9,10,18
   46:19,20,24
   47:1,14 48:24
   65:3 75:24
   81:20 82:4,14
   86:11 88:17
   90:13,23 93:10
   93:25 94:3,25
   99:8 100:1
   104:14 109:15
   110:24 111:14

112:17 113:6
   120:9,14,18
   124:5,19,22
   125:4 128:13
   129:17 136:9
   136:12 143:20
   146:12,15
somebody 9:8
   9:12 22:21,25
   23:2 25:17
   41:4 51:25
   84:8 117:7,10
   118:14 132:11
   132:22 142:6
somebody's
   35:18 77:10
someone's 63:1
   77:8
somewhat 96:20
Sonya 20:16
   48:2,9 51:4,10
   52:14 55:17
   60:5 64:24,24
   74:25 76:15
   82:3,10,10,12
   83:1 108:16,18
   108:22 109:9
   110:22 129:5
   129:23
soon 59:25 72:1
   72:2 126:4
sorry 7:13 9:17
   10:19 15:7
   20:1 27:7,12
   29:18 42:17
   46:22 58:10
   59:2 70:22,23
   79:18 80:1
   82:9 92:5
   94:18 97:1
   103:18 104:10
   109:20,23
   111:24 113:14
   113:17 115:5
   116:8 120:19

124:21 129:1
   147:4,17
sound 106:17
   107:14,25
   108:2,9
source 65:4
Southwest 1:6
   3:13 6:4,18,20
   7:11,20 11:19
   15:3 18:9
   19:22 21:5,23
   26:16 30:16
   35:20 37:16
   39:24 42:12
   43:19 44:2
   47:8 51:12,22
   52:5 53:7
   56:15,21 57:4
   57:14,16 58:3
   58:16 59:10
   60:18 61:3
   62:4,5 66:17
   69:17 71:19
   73:16 81:9
   88:17,23 90:15
   91:11 95:4
   96:11 98:22
   99:25 103:15
   104:3 105:3,23
   110:24 112:16
   120:5,14,17
   122:18,23
   123:1,9 124:12
   125:2,14
   126:22 129:16
   132:5 135:14
   136:12,24
   138:17 143:24
   144:15 148:4
   149:16 150:16
   151:6,14
   152:16 154:2
   157:6 158:15
Southwest's
   21:12 34:11

94:3 146:20
**span** 16:20
**spawns** 57:19,23
58:5
**speak** 15:13,16
89:8 110:1
119:23,25
149:7
**speaking** 22:13
59:5 110:1
125:18
**speaks** 17:7
39:10
**Speci** 20:8
**specific** 17:16
37:24 53:5,18
92:19 93:4
**specifically**
49:21 124:13
124:19 139:15
**specifics** 7:22,24
15:24 49:18
137:8
**speculate** 142:9
**speech** 44:20
**spewed** 124:5
**spewing** 145:16
**spoken** 7:9
48:14,15 49:2
**spor** 13:2
**spread** 64:4
86:24 95:15
97:15
**spreading** 49:8
63:6,11 86:25
95:21 101:22
137:3 144:1
**spreads** 64:13
65:10
**spring** 30:9,11
**Springfield** 3:10
158:12
**Stacey** 10:2
**stance** 88:23
**stand** 150:5

**standpoint**
103:13
**stands** 19:10
**start** 55:8,10
**started** 48:23
**state** 1:24 6:10
7:5 157:16
**stated** 2:3
155:15
**statement** 36:15
37:14 77:13
93:20 106:3
136:19 140:4
**States** 1:1 6:6
157:1
**stating** 87:9
**step** 27:2,8,9
28:8,17 29:1
33:19,21
122:13 125:18
125:19 126:1,2
146:8
**Stephensen**
129:5
**stepped** 56:1
**steps** 99:9
**steward** 29:13
29:14
**stipulations**
6:11
**Stone** 9:6 17:23
27:4,11,21
29:16 33:2
34:19 38:15
41:16 42:15
44:16 45:14
47:4 51:3 63:3
74:22 77:1
78:8,15 79:8
81:11 88:9
90:1 96:9,16
96:18 97:8,23
110:25 111:12
111:13 112:3
112:13,18,24

113:5 121:15
127:14 129:4,8
135:25 138:7
138:15 140:3,9
140:12 141:14
141:23 142:11
142:24 143:13
**Stone's** 11:1,5
29:7,20 37:25
87:13 90:25
**stop** 26:9 27:8
36:12 66:9
109:12 129:25
144:18 154:17
**stopped** 27:9
100:8
**stopping** 90:22
**strategy** 134:10
**Street** 3:15,21
4:2 158:17,23
159:2
**stretch** 31:24
**strictly** 134:2
**strike** 73:6
126:7
**string** 114:4
141:23
**structured**
106:2
**stumbled** 90:16
**stupid** 23:17
31:2,3
**styled** 6:3
**subject** 56:1
72:12 76:15
80:22 104:21
114:16 115:18
**subjective** 88:23
**subjuc** 88:22
**subpoena** 15:14
15:17 16:2,8
16:15,17,19,23
17:5,14
**subpoenaed**
16:13

**subsequently**
13:17 22:9
**substantive** 8:12
8:15
**successfully**
32:9
**sue** 152:16
**suggest** 30:8
94:9 95:10
**suggesting** 59:17
59:18 60:17
107:2,8 109:25
**suggestion** 86:9
86:11 107:10
**Suite** 3:9,16
158:12,18
**summary** 77:14
**summer** 82:3
83:7
**Sunday** 73:8
**sup** 95:17
**supplying** 95:18
**support** 18:2
60:3 63:5 64:6
**supported** 18:1
34:13,15 44:17
95:19,22 96:16
97:17 101:2
**supporter** 12:13
12:16,20 13:2
13:14 14:19
17:23 22:20
**supporters**
42:16 95:25
96:19
**supporting** 33:1
63:3,4 96:9
101:2
**supportive** 49:7
63:24 144:17
144:19
**supports** 14:20
**supposed** 47:1
**Supposedly**
133:11

**sure** 17:8 26:13
26:16 38:11
45:24,25 54:13
59:13 61:17
72:20,21 76:3
92:2 114:19
121:8 122:6
132:3 133:25
135:21 137:16
138:6 143:16
143:17 144:6,8
148:21 152:21
156:9
**surely** 24:14
96:10
**surprised** 68:5
**surrogates**
137:20
**suspension** 28:9
146:9 149:18
150:4,8,14
152:10
**sustain** 35:3
**Suzanne** 129:5,5
**swear** 6:12
**swearing** 41:15
**sweet** 137:24
**swore** 118:2,9
**sworn** 1:20 7:1
38:23 157:19

**T**

**T** 140:7
**take** 72:17,18,24
74:12 75:19
76:11,11 96:17
102:2 122:13
124:23 126:5
129:7 130:1
150:7,11,11,21
154:16
**taken** 1:21 28:12
33:7 40:11
102:17 158:4
159:12

**takes** 61:21
  64:12
**Talburt** 1:13,19
  5:4 6:3,25 7:6
  7:7 32:5 73:10
  73:14 74:19
  87:2 98:20
  110:8 112:3
  126:16 130:20
  148:20 155:14
  155:21 157:12
  157:18
**talk** 46:4 47:8
  72:1 82:23
  87:24 112:24
**talked** 76:16
  85:14 139:7
  148:21
**talking** 24:10,17
  31:6,11 32:15
  56:3 57:1
  59:15 61:15,16
  62:14 63:21,23
  64:3,6 65:16
  65:17 75:2
  76:21 77:7,16
  82:13 83:1
  85:3 110:20
  112:10 122:17
  123:18,21
  124:1,17,24
  125:1 129:15
  138:22 142:5
  142:25 143:22
**Tammy** 104:23
**tandem** 87:5
**target** 23:16
  24:13 37:25
  38:4,6,14,18
  38:22 39:15
  40:20 44:4
  60:18 61:3,21
  82:14 96:24
  128:14
**targeted** 22:6,19

31:15 43:21,24
  58:13,20 59:16
  76:17 77:3
  85:6 86:6
  124:24 141:25
  142:18
**targeting** 38:14
  40:6 47:9
  65:20 83:2
  86:8 124:18,21
  124:21 126:23
**te** 73:7
**team** 32:21 46:2
  75:13 115:8
  145:3,5
**technical** 102:16
**technology**
  49:13
**Ted** 36:23
**tell** 7:19,23 8:4,8
  15:20 18:6
  19:21 24:5
  38:13,13 39:14
  39:19 41:13
  44:3 49:21
  51:19 59:16
  64:17,18 69:8
  78:2 79:13
  80:20 89:13
  90:5 94:8
  115:16 122:5
  122:22 127:3
  129:7 135:1
  139:25 140:13
  140:19 144:18
**telling** 17:2
  35:21 44:25
  45:3 56:14
  61:1,2 68:8
  71:10 74:24
  84:3 97:4
  116:13 117:11
  118:6,20 119:7
**ten** 61:19
**tentative** 19:15

**term** 22:14
  43:25 116:16
  117:3,6,12,13
  117:14,17
  118:13 145:9
  152:24 153:1
**terminate** 85:6
  109:16 111:15
**terminated**
  22:10 26:8
  28:13,14 31:13
  31:22 32:17
  33:12 59:20
  85:11 110:23
  146:22 147:6,8
  151:25 152:23
  152:24
**terminating**
  77:7,10,12
  147:11
**termination**
  61:4 82:15
  142:15 146:2,3
  149:17 150:1,5
  150:12 152:9
  153:4
**terms** 18:12
  20:20 23:20
  59:7 63:6
  153:11
**testified** 7:1
  106:15
**testify** 148:1
**testimony** 15:22
  38:24 68:10
  73:7 84:6,15
  95:24 97:2
  118:12,25
  126:8 144:22
  155:10 157:21
  158:3
**Texas** 1:1,24 3:6
  3:16,22 4:2 6:7
  6:16,19,24
  157:1,16 158:8

158:18,24
  159:3,19,22
**thank** 102:17
  139:9 140:24
  148:10 149:10
  150:17 154:10
  154:13,18
  155:19,20,21
**theory** 115:10
**thing** 37:21
  39:20 65:9
  70:2,18 75:18
  94:8 101:18
  133:2
**things** 14:25
  25:3 67:6
  91:10 94:6,6,7
  95:11 97:22
  105:8 109:24
  115:23 121:21
  123:6 135:11
  135:12 143:14
**think** 12:4 13:10
  15:9 18:22
  21:22,25 22:2
  27:6 29:1,3
  32:22 36:21
  37:22 38:6
  39:20 48:4,13
  49:3 54:9 57:3
  62:8 67:19
  69:19 70:11,23
  79:12,13 83:8
  85:9 93:8
  94:10 99:22
  104:24 107:12
  109:5 113:9
  114:23 116:3
  117:13 119:18
  121:9,11 123:8
  128:3 137:10
  137:15 138:24
  139:18 141:21
  151:21 152:1,1
  154:3 155:19

**thinking** 62:2
  78:5,7
**thinks** 105:7
  123:6
**third** 75:7 149:8
  152:2
**Thom** 26:25
  137:22
**Thompson**
  127:18,19
**Thornton** 36:23
**thought** 12:3
  23:3,10 39:1
  44:18,24,25
  71:15 78:5
  85:15 93:23
  115:6 119:23
  132:7 136:11
  137:3 143:11
  144:1
**thoughts** 70:15
  71:2
**thousands** 49:8
  50:2
**thread** 25:21
  50:11 74:25
  103:25 121:22
  132:21 134:4
**threads** 134:18
**threat** 60:1 61:7
**threatening**
  22:21 23:4,10
**three** 13:17
  38:18 42:18
  46:7 47:9 75:9
  142:1
**ticket** 76:10
**time** 6:9 8:1 9:5
  10:10 13:8
  15:24 18:11
  20:17 25:25
  29:14 30:10,15
  30:20 33:11
  34:17 36:19
  37:9 46:4 49:9

49:22,23,24,24
49:25 52:16
53:8 61:21
67:23 69:8,10
69:11 73:1,5
73:19 74:3
75:4 77:4
78:17 81:4
86:17,22 88:18
90:6 91:23
92:11 99:23,24
101:2 103:20
112:14,17,23
113:5 116:11
120:1,10,12
123:13 126:6
129:7 134:19
144:8 147:2,5
147:16,18
157:23 158:3
**timeline** 58:24
**times** 13:18
  22:10 151:25
**Tina** 114:13,18
  114:20,21,22
  114:25 115:1,3
**today** 8:1 13:20
  36:20 48:17
**Todd** 127:23
**told** 11:12 13:3
  16:18 23:3,4,9
  37:15 39:1,2
  39:24 64:8
  70:6,7 71:6
  75:17 78:8
  83:13,15,25
  93:9 100:14
  106:20 108:1
  119:5 130:20
  143:5,16,19
  144:6,8,21
  147:15
**tool** 82:4
**top** 18:22 74:20
  112:2 114:3

**topic** 81:12,16
  104:16
**topics** 52:23
  53:1 70:1
  71:12
**totally** 70:1,17
  82:20
**track** 35:9
**trail** 70:8
**transcript** 34:24
  157:19 159:7
**Transport** 1:6
  3:19 6:4,22
  157:7 158:21
**transvestite**
  23:16 24:12,16
  26:11
**transvestites**
  26:15
**treatment**
  132:17
**treatments**
  132:14
**trial** 15:13,16
  50:10 70:1,18
  70:19 74:19
  78:20,25 80:6
  83:2 87:11
  92:17,18,19
  102:24 103:2
  110:4 127:12
  129:1,3 133:22
  136:8 140:23
  141:22 147:21
  147:25 156:4,5
**tried** 64:2
**trips** 152:13
**trouble** 58:21,22
  77:4,6 102:10
  109:21
**troubles** 128:4
**Trudy** 115:24
**true** 13:20 78:11
  97:24 109:18
  115:17 135:6

157:20
**trusted** 70:2
  86:25
**truth** 7:23 64:17
  78:2 118:7
**truthfully** 13:23
**try** 35:4 36:9
  50:11 55:4
  62:25 63:8
  100:24 137:13
**trying** 16:1,8,14
  36:12 38:20
  56:6 66:19
  67:2 95:10
  97:5 98:15
  124:7
**TT** 36:22
**tumor** 56:7,9,15
  56:16
**turn** 26:2 37:4
  37:13,18 39:25
  44:1,1 91:25
  93:22 120:4,16
  132:18
**turned** 15:2,8,11
  22:20 25:18,20
  42:11,20 43:2
  93:8 120:15
  136:11 143:1
  143:25
**turning** 39:21
  43:5,7 45:6,8
  45:10 90:19
  93:17 101:20
  101:22 137:2
  144:14
**twen** 57:6
**two** 8:5 10:10
  12:4 22:10
  46:7 67:14,15
  73:13 75:6,10
  112:14 128:5
  139:4 151:25
**TWU** 9:5 12:11
  12:14,17 14:13

14:15,24 15:11
  43:20 51:8,22
  73:5 111:4
  149:2,7
**Tyler** 127:18
**type** 20:20 22:24
  115:10 126:19
**types** 124:11
**Typically** 156:3

_____

**U**

**Uh-huh** 36:6,8
  50:20 55:19
  76:25 98:17
  112:1 131:13
  131:15
**Uh-oh** 110:6
**ultimately** 19:16
  19:19 28:8,24
**uncovered** 90:16
**undefined** 88:20
**unders** 12:8
**understand** 9:14
  10:19 13:4,19
  26:18 29:18
  51:1,13 59:6
  63:20 64:18
  74:5 86:3 92:6
  112:10 135:8
  153:14
**understanding**
  11:6 12:8
  27:25 31:17
  89:17,18,22
  90:2,24 147:10
**understood** 9:15
  15:12 44:22
  89:14
**unfair** 34:21
  78:1
**unfortunate**
  77:22
**unfortunately**
  64:4
**union** 1:7 3:19

6:5,22 12:13
  14:19 15:4
  17:24,25 18:5
  18:6 22:20
  26:1,20,21,25
  27:16 28:5,5
  29:10,22 30:19
  33:2 34:1,10
  37:25 38:15,16
  38:17 42:16
  44:20 45:8,9
  45:10,11,17
  46:16 49:23
  51:6,11,12,23
  51:24 52:2
  58:5 60:20
  62:21,22 63:2
  63:11,13 64:20
  66:18 75:16
  83:3 86:17
  88:6,16 89:5
  91:6,7,11,12
  91:12,16 93:12
  93:14,18,24
  95:13,19,24
  97:12 101:9,13
  101:21,23
  111:15 112:16
  113:4 116:4
  117:4,10
  118:14,22
  119:9,17,18
  120:12 122:5
  126:24 128:14
  130:22 132:6
  137:25 143:1
  143:12,25
  147:3,18 148:7
  154:20 157:7
  158:21
**United** 1:1 6:6
  157:1
**universe** 38:9
**unjust** 149:25
**unknown** 68:18

Brian Talburt

untruthful
63:12 64:4
upcoming 60:1
61:7,10,12,17
61:18
urging 110:22
111:14
use 22:24 38:10
38:17 44:4
68:4 74:11
84:22 117:3,11
118:13 125:4
126:19 128:13
useful 142:2
usually 28:19
39:23
utilized 109:16
111:15

_____

V
vague 9:1,4
21:21 34:7
39:8 88:20
vaguely 51:17
Van 21:3 83:9
83:10,10,11,12
84:4,17,19
86:21
various 20:6
52:23 71:12
86:19 94:24
105:17 136:9
VdV 82:3 83:7,8
Ven 21:3 83:9
83:11,12 84:4
84:18,19 86:21
Vere 83:10
version 156:11
versus 6:3 69:18
vice 20:16 28:18
47:15 48:3
52:18 53:15
67:22,24 81:7
video 65:21
156:11

Videoconfere...
1:12,18,23 3:2
Videographer
4:5 6:1 73:2
74:14,17
102:18,21
110:6,12,15
130:12,15
154:8,11
155:20
VIDEOTAPED
1:12,18
viewed 46:17
violated 120:13
violates 57:3
violating 56:21
93:10 136:12
violation 46:19
47:14 62:5
120:4,8,16
125:14
violations 39:22
40:1 94:1
100:1 104:14
110:23 112:17
113:6
Virginia 3:10
158:12
virtual 46:12,17
vocal 62:23
64:25
voice 59:25
volunteer 18:11
votes 36:10
VS 1:5 157:5

_____

W
wa 64:24 67:13
wait 39:1 66:23
127:19
waive 156:6
waived 156:17
157:22
want 20:9 24:1
36:11 37:2,4

37:13,18 39:25
55:7 69:21
70:7,9,11,19
70:21,23 74:3
74:10 76:23
77:18 87:24
99:22 100:22
102:2 110:17
115:7 123:7
125:21 126:14
129:7 130:7
132:2 137:16
140:4 148:13
150:19 154:19
156:12,12
wanted 73:20
74:2 85:22,23
121:8
wanting 73:21
122:1
wants 51:11
warning 58:4
152:10
warriors 84:22
wasn't 12:15
14:4 16:16
40:11,13 46:19
46:20 82:22
93:15 107:8
118:19 143:21
147:13
way 9:20 14:10
23:6 24:13
26:21 36:2
38:6 41:7,22
45:22 60:15
62:25 63:15,25
65:11 68:5,21
69:7 72:21
78:5,7,9,14
81:14 88:21
95:17 100:24
106:2,19,21
108:18 112:6
117:24 119:19

128:3,23
135:24 141:18
143:13
we'll 39:12
60:23 64:15
102:25 137:13
151:15 154:22
we're 6:1,16
9:20 46:6
55:10 105:11
109:23 110:15
114:3 133:8
151:12 155:19
155:25
we've 21:14
58:17 73:3
122:15 148:20
148:21
website 9:12
websites 94:24
97:5
wedding 25:16
Wednesday
103:11
weeks 40:16
welcome 13:4
139:24
went 93:23,25
94:15,24 95:1
140:10 146:3,8
weren't 96:23
131:7
wife 116:2 126:3
Wilkins 62:14
127:22
willing 97:6
Win 145:14
wind 107:20
wisdom 117:8
wish 142:21
witness 1:19,25
6:13 73:12
91:24 92:4
109:21 130:3
130:11 147:20

148:12 154:6
156:14 157:18
157:21,22
witnessed 88:21
witnesses 73:16
wnstew79 134:6
wonderful
137:24,25
wor 60:14
word 13:4 24:4
24:4 31:13,16
31:19,24 38:4
38:7,10,11,18
63:15 64:1
84:22 119:21
124:23,25
wording 29:4
words 17:1 22:7
22:11 23:13
36:13 44:1,13
45:17 56:12
58:17 60:4,24
62:8 64:16
65:6 106:13,13
106:17,21,23
107:1 108:3,5
108:7,10,11
work 3:8 11:19
18:11 59:14,19
91:17,20 92:6
105:24 134:11
158:11
worked 20:15
20:16,25 53:20
54:1 72:8,9
Workers 1:6
3:19 6:4,22
157:7 158:21
working 9:20
20:25 46:14
47:23 76:15
87:5 105:1,9
105:10 106:4
107:2
world 84:22

**worried** 70:5
**worst** 37:3
**wouldn't** 37:2
　71:21,23 94:9
　95:20 96:5,13
　96:14
**Wow** 139:10
**wrap** 137:13
**write** 56:12
　81:11 82:2,5
**writing** 134:12
**written** 49:3
　115:13 152:9
**wrong** 67:11
　141:21 143:11
**wrote** 60:4 66:5
　70:7 81:22,25
　90:1 120:2
　124:15 127:8
　128:22

**X**

**Y**

**Yahoo** 48:25,25
　49:1
**yeah** 25:4,6
　78:24 80:7
　85:13,16 86:5
　87:22,22 94:23
　102:2,10
　131:18 135:7
　142:17 151:8
**year** 18:8,16
　30:12 50:5
　61:19
**years** 10:10 18:9
　18:20 19:4
　20:3,4 24:20
　25:1,2 31:10
　34:22 40:5,17
　40:18 41:14
　43:10,18 48:23
　49:11 52:23
　71:11 73:13

83:22 86:3
142:1
**yesterday** 138:9

**Z**

**Zoom** 1:23 3:2
　7:25 46:6
　109:24

**0**

**0** 158:1
**02** 157:25

**1**

**1** 5:12 33:21
　73:3 140:8
　155:14 156:15
**1,000** 56:10
**10/21/2022**
　159:19
**10821** 159:21
**12** 18:20
**13** 18:20 50:7
　112:3
**1404** 159:21
**141** 55:1 74:20
　83:2
**146** 50:10
**148** 5:5
**149** 5:6
**15** 151:5,14
　153:12 154:1
　155:10,11,12
**150** 5:6
**1500** 3:16
　158:18
**156** 5:12
**157** 5:8
**15th** 140:18
**16th** 79:22
**17** 30:21
**19** 73:3 87:11
**1999** 159:21

**2**

**2** 5:2 7:25 24:21

27:2,8,9 28:8
28:17 29:1
33:19 74:18
146:8
**2,000** 49:9
**20** 18:16 48:23
　49:11 52:18
　87:12 88:9
　129:1 155:10
**2007** 75:3
**2012** 20:14 50:7
**2013** 19:17
　52:17 54:9,9
　79:22 81:5
**2014** 21:13 22:5
　24:23 29:7,20
　54:10 55:18
　61:13,14 69:6
　112:3 123:15
**2015** 18:17
　19:16 30:13
　35:16 36:14
　37:15 40:8
　61:12,15,17
　87:12 88:9
　89:6 90:25
　151:5,14
　153:12 154:1
　155:12
**2017** 20:14
　93:15 99:21,24
　112:8 132:4
　135:24 136:18
　138:14 140:2,8
　141:13
**2019** 73:11
**2021** 73:15
**2022** 1:14,22 6:2
　157:13 159:15
**21** 92:17,19
**21-A** 102:25
　103:2
**21-B** 99:3,4
**21-C** 104:17,18
**21-E** 92:18

**21-M** 137:18
**21-P** 138:5
**21-R** 139:21
**21-T** 140:7
**21-U** 108:12,12
　110:21 140:17
　140:23
**21-V** 141:12
**21-W** 141:22
　142:10
**214.232.9015**
　3:22 158:24
**22160** 3:10
　158:12
**22nd** 131:2
　132:4 134:15
　135:23 136:18
**23rd** 138:14
**24/7** 57:9
**25** 35:16 40:8
**26** 78:25 80:6
**26th** 140:2
**27** 99:21,24
　110:4 111:20
　111:25 114:1,2
　126:14
**28** 24:23
**2850** 3:15
　158:17
**29** 55:17 127:12
**29th** 73:11
**2nd** 141:13

**3**

**3** 1:14,22 102:22
　157:13
**3:17-cv-02278...**
　1:6 6:6 157:6
**30-day** 28:9
　146:8 149:18
　150:4,7,8,14
**30-minute** 84:8
　85:24 86:1
**300,000** 54:18
**302** 3:5 158:8

**3301** 3:21 4:2
　158:23 159:2
**35** 83:22
**3613** 159:19
**38** 18:9
**3rd** 6:2

**4**

**4** 7:25 110:16
**4:13** 1:22 6:9
**40** 16:20 19:4
　20:3
**4th** 73:8 159:15

**5**

**5** 130:16
**5:32** 73:7
**5:33** 74:15
**5:38** 74:18
**55** 12:14
**556** 1:7 6:5,22
　8:5 11:17 12:4
　12:11,14,17
　14:13,15,24
　19:1 21:10
　29:21 34:14,18
　38:2 41:6,11
　42:6 51:8,8
　73:5 88:5 89:6
　90:6 111:4
　116:19,24
　149:2,7 157:8
**5th** 73:15

**6**

**6:13** 102:19
**6:16** 102:22
**6:21** 79:22 80:16
**6:25** 110:13
**6:27** 110:16
**6:51** 130:13
**6:58** 130:16
**60** 129:3
**600** 3:9 158:12
**68** 129:3

**7**

**7** 5:5
**7:28** 154:12
**7:33** 1:22 156:16
**70** 133:12,23
  135:13
**703.321.8510**
  3:10 158:13
**71** 136:8
**72** 136:17 137:7
**75087** 3:6 158:8
**75201** 3:16
  158:18 159:22
**75226** 3:22 4:2
  158:24 159:3

**8**

**8001** 3:9 158:12
**80s** 57:20,23
**888.988.5317**
  159:22

**9**

**972.771.3933**
  3:6 158:9