Case 3:17-cv-02278-X   Document 356-2   Filed 08/09/22   Page 1 of 5   PageID 10188
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 812..815

Page 812

1  A.  Yes.
2  Q.  And if anyone wanted to tell their union
3  president -- forget your views on abortion -- but if
4  you wanted to tell your union president, Don't spend
5  our money on organizations that support this, and
6  you wanted to protect a baby's life, can you think
7  of a more effective means of doing it?  You have
8  cried every time you have talked about it.  What is
9  more effective?
10 A.  I don't think it was effective. I think it was
11 harassment and disturbing.
12 Q.  It didn't change your view about abortion, did
13 it?
14         MR. GREENFIELD:  Objection, your Honor,
15 relevance.
16         THE COURT:  Sustained.
17         MR. PRYOR:  They asked her -- okay.
18 BY MR. PRYOR:
19 Q.  It didn't change your view that a woman should
20 get to decide whether or not to have an abortion?
21         MR. McKEEBY:  Objection, asked and
22 answered.
23         MR. GREENFIELD:  Object to relevance.
24         THE COURT:  Yeah, I will sustain that one.
25

Page 813

1  BY MR. PRYOR:
2  Q.  Can you tell me a more effective means of
3  trying to tell someone that abortion is taking a
4  life than that -- I'm not saying you have to agree
5  with it -- can you think of a more effective means
6  of trying to convince someone that abortion is
7  taking a life than the actual video of the life that
8  is being taken?
9         MR. GREENFIELD:  Objection, relevance as
10 well.
11        THE COURT:  I will allow that.
12        THE WITNESS:  It was only effective in
13 upsetting me.
14 BY MR. PRYOR:
15 Q.  I'm not asking --
16 A.  -- making me feel harassed.  It is not that I
17 think it is an effective tool.  I don't think that
18 should be utilized.
19 Q.  You don't think that -- can you tell us a more
20 effective means of doing it to convince someone --
21 something better than actual video, of me sitting
22 here and telling you statistics or anatomy lessons?
23 What is more effective than the video?
24        MR. GREENFIELD:  Objection, your Honor,
25 asked and answered.

Page 814

1         MR. PRYOR:  I'm looking for an answer.
2  She hasn't answered it.
3         THE COURT:  I will let you ask it this one
4  last time.
5         THE WITNESS:  Conversation would be more
6  effective.
7         MR. PRYOR:  Thank you.
8         THE COURT:  Okay.  Mr. Greenfield, round
9  two.
10        MR. GREENFIELD:  No more questions, your
11 Honor.
12        THE COURT:  Okay.  Mr. McKeeby.
13        MR. McKEEBY:  I will be quick.
14            RECROSS EXAMINATION
15 BY MR. McKEEBY:
16 Q.  Ms. Stone, do you recall yesterday when
17 Ms. Carter's counsel criticized you for not
18 responding to the historical Facebook messages
19 regarding -- they characterized as union activity?
20        MR. PRYOR:  Object to ad hominem comments
21 and mischaracterizations.
22        THE COURT:  Can you rephrase it?
23        MR. McKEEBY:  I think I know what
24 ad hominem is, and I -- oh, union counsel.  I see.
25 I get it now.  No, that wasn't it.  I didn't even

Page 815

1  notice that.
2         Let me start again.
3         MR. PRYOR:  Call me American Airlines
4  Counsel.
5  BY MR. McKEEBY:
6  Q.  Former counsel for American Airlines questioned
7  you yesterday and criticized you for not responding
8  to his client's historical emails, Facebook
9  messages.
10        MR. PRYOR:  Now -- I'm sorry.  I am
11 objecting to mischaracterization.  That is not what
12 I did.
13        THE COURT:  I think he's going after the
14 word "criticized."
15        Is that correct?  Is there any word other
16 than "criticized" you can use to stop the objection?
17        MR. McKEEBY:  Sure.
18 BY MR. McKEEBY:
19 Q.  Counsel for Ms. Carter yesterday questioned
20 your failure to respond to his client's historical
21 emails, text messages -- excuse me -- Facebook
22 messages about union activity.
23     Do you recall that?
24 A.  Yes.
25 Q.  And today he's saying you should have blocked

Case 3:17-cv-02278-X   Document 356-2   Filed 08/09/22   Page 2 of 5   PageID 10189
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 4 July 08, 2022                Pages 1262..1265

Page 1262

1  BY MR. PRYOR:
2  Q.  And you have been involved in this issue.
3      Have you seen anything, in your opinion, more
4  effective to explain what abortion is?
5  A.  No, I haven't.  As a matter of fact, there is a
6  whole group out there right now that -- it is not a
7  group, it is an organization -- that actually is
8  going up to people and asking questions about
9  abortion, and do -- you know, are you for it, are
10 you against it?  And let me show you what happens.
11     And a lot of times, people, when they see
12 things like this, yeah, they are -- they had no
13 idea -- a lot of people don't understand what really
14 goes on and how big that baby really is and how much
15 it is formed in just a short amount of time.  And it
16 is a baby.  It is not just a clump of cells.
17     I mean, we can say the same thing for a little
18 puppy dog.  I have got sonogram pictures of puppies
19 and I have got sonogram pictures of babies, and they
20 look a lot alike at the same stages.
21 Q.  So when you sent the communications to Audrey
22 Stone TWU, did you believe you were speaking to your
23 union?
24 A.  Yes.  It had everything to do with the march.
25 Q.  When you sent your video to Audrey Stone TWU,

Page 1263

1  did you believe you were also expressing your
2  religious beliefs?
3  A.  Yes.  I told God that I would never, ever stop
4  fighting for life.
5  Q.  And we have just a few minutes, so I'm going to
6  skip for now the fact-finding meetings.
7      But did you ever in your wildest dreams think
8  that your 21-year employer would fire you for
9  exercising your union rights?
10 A.  No.
11 Q.  Did you ever in your wildest dreams believe
12 that Southwest Airlines would fire you for
13 expressing your religious beliefs?
14 A.  No.
15 Q.  Do you remember where you were when the job you
16 loved for 21 years and the company you helped build
17 called you and told you what the results of your
18 fact-finding hearing was?
19     MR. McKEEBY:  Objection, leading.
20     THE COURT:  I will sustain that.  You can
21 rephrase.
22 BY MR. PRYOR:
23 Q.  Tell us about how you found out about the
24 results and what happened.
25 A.  Well, it was almost 5:00, and they wait until

Page 1264

1  the very last minute of the very last day to call
2  you.  And --
3  Q.  Were you waiting for it?
4  A.  Yeah, I was waiting for it.  I was waiting for
5  one or the other, you know, either I was fired or I
6  wasn't.
7      And they literally wait until 5:00.  And the
8  phone finally rang and it was Ed Schneider, and he
9  read the letter that you put up, my -- the letter
10 that I was fired, and read it out loud to me.
11 And --
12 Q.  What was your reaction?
13 A.  Well, my husband was standing there.  And he,
14 you know, he asked me if I had any questions, and I
15 said no.  And I had Beth Ross on the other side,
16 because the union person was on the phone with me.
17 And I just fell to my -- I fell to the ground and
18 started crying.
19 Q.  Did you pray?
20 A.  Yeah, I did.
21     MR. PRYOR:  Your Honor, this is a good
22 time to break for the week.
23     Thank you, ma'am.
24     THE COURT:  Sounds good to me.
25     Okay.  So the same three instructions.

Page 1265

1  You can only talk to your fellow jurors and court
2  personnel, but not about this case; don't talk to
3  anyone else; and don't do any research about the
4  case.
5      We will see you back here at 8:45
6  tomorrow.
7      All rise for the jury.
8      Sorry.  You've got the weekend off.
9  Congratulations.  We don't have the weekend off, but
10 y'all do.  We will see you on Monday.
11     (The jurors exited the courtroom.)
12     THE COURT:  Okay.  So you can leave the
13 witness box, but don't leave the courtroom.  I need
14 five minutes to finish up my research.
15     And then can we come back and talk about
16 witness instructions?
17     MR. McKEEBY:  Your Honor, that's fine.
18     THE COURT:  I think it is an open question
19 because I have to figure out Schneider and Stone,
20 all at the same time.  So the next five minutes,
21 don't talk about the case.  But you may be able to
22 after that.
23     MR. HILL:  I think they are actually
24 different answers, under Geders.
25     THE COURT:  What's that?

Case 3:17-cv-02278-X   Document 356-2   Filed 08/09/22   Page 3 of 5   PageID 10190
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Pages 1298..1301

Page 1298

1 fact that I had so much stress in the
2 fight-and-flight response that it caused my blood
3 pressure to rise to an extreme level, and my heart
4 was doing racing and then stopping and then racing
5 and stopping. It was just constant.
6        And physiology in your body, it changes
7 you. I was later diagnosed just by, from my
8 counselor, because I had to go to some counseling
9 for this, with a mild case of PTSD.
10 BY MR. PRYOR:
11 Q.  Posttraumatic stress disorder associated with
12 losing your job?
13 A.  Yeah. After 20 years --
14        MR. McKEEBY: Objection, leading, and it
15 also is asking the witness to render essentially an
16 expert opinion as to the causation of this PTSD.
17        THE COURT: Sidebar.
18        (Thereupon, the following proceedings were
19    had at sidebar:)
20        THE COURT: Now state your objection.
21        MR. McKEEBY: My objection is that he's
22 asking her to link her PTSD to her employment. That
23 is something that an expert can do, but she is a lay
24 witness and she can't do that.
25        And moreover, it's hearsay, because she's

Page 1299

1 talking about what a doctor told her about that
2 issue.
3        So it should be excluded on both of those
4 grounds, particularly the first.
5        MR. GREENFIELD: I would like to add in
6 also a hearsay objection that she's saying these
7 things as if they are true, but not -- not any sort
8 of mental impression or how she acted or actions she
9 took because of the information.
10        MR. PRYOR: PTSD, I simply defined what
11 the term meant. The other is her understanding of
12 her condition and what caused it.
13        It's totally appropriate. If they want to
14 cross-examine her, they can.
15        THE COURT: I think it is offered for its
16 truth is the problem. So right now we are on to
17 damages, so it's a prove-up on damages. So I will
18 strike that.
19        MR. PRYOR: Okay.
20        (Thereupon, the sidebar was concluded and
21    the following proceedings were held in open
22    court:)
23        THE COURT: Okay. So I am sustaining that
24 objection, striking that last question and answer.
25

Page 1300

1 BY MR. PRYOR:
2 Q.  Did you understand that your condition was
3 stress-related?
4 A.  Yes.
5 Q.  Did you ever have a walking stroke before being
6 terminated by Southwest Airlines?
7 A.  No. I never knew what it was.
8 Q.  Did you -- did anyone ever tell you that you
9 had posttraumatic stress disorder until you were
10 terminated from American Airlines -- Southwest
11 Airlines?
12 A.  No.
13 Q.  And did you have to go on medication?
14 A.  I did. Blood pressure.
15 Q.  Blood pressure medication?
16    Okay. Now, you talked about the impact on your
17 family, your daughter, your own health.
18    Is there any amount of money we could offer you
19 to risk your life for this? If we said, Hey, we
20 will give you this money to go through this again?
21 A.  No, not at all.
22 Q.  If I offered you a million bucks, you would
23 take it?
24 A.  To go through this again?
25 Q.  Yes.

Page 1301

1 A.  No.
2 Q.  Let me ask about, did you try and get a job
3 while -- after you got fired?
4 A.  I did, but I was also working on a business
5 venture as well. So I applied to Jet Blue, Delta,
6 and United. I had an interview with United. And
7 they turned me down. And then Delta never sent me
8 the link for the online video, and we still to this
9 day don't know why that happened.
10 Q.  Did you apply with Frontier as well?
11 A.  I did.
12 Q.  Let me show you Exhibits --
13        MR. PRYOR: We move for the admission of
14 Exhibit 130 and Exhibit 42.
15        THE COURT: 130 and 42. Any objections to
16 130 or 42?
17        MR. GREENFIELD: None from the Union, your
18 Honor.
19        MR. McKEEBY: No objection.
20        THE COURT: Okay. They are admitted into
21 evidence and we are publishing.
22        (The referred-to documents were admitted
23    into evidence as Trial Exhibits 130 and 42.)
24 BY MR. PRYOR:
25 Q.  Ma'am, is Exhibit 130 a copy of your W-2?

Page 1398

1  correct?
2  A.  Yes.
3  Q.  And your take-home pay that year was $18,598?
4  A.  Correct.
5  Q.  And this goes back to the issue that you raised
6  with Mr. Pryor that you weren't working -- you can
7  take those off -- you weren't working full-time.
8  A.  No, at that time I couldn't.  My husband was --
9  he was having to work more so on -- because I just
10 couldn't trust him with my daughter being at home at
11 that age.
12 Q.  And let me talk a little bit about your efforts
13 to seek other employment.
14     When you were -- I think you -- I don't
15 remember -- I'm getting them mixed up, too, in terms
16 of what you said today versus these other
17 proceedings, so my apologies if I blur some of this.
18     But there was something called Project Purpose
19 that you were affiliated with in 2017?
20 A.  That's correct.  And that's when I was in
21 St. Louis.  I homeschooled my daughter for the
22 last -- well, it's now been nine years.  She's
23 graduated.
24     But I had a program that I was actually
25 implementing, and it had to do with the school

Page 1399

1  systems in St. Louis and partly Aurora, Colorado, in
2  some of the poorer school districts.  And it was an
3  after-school -- it started out as an after-school
4  program, and we were partnering with some churches
5  also in St. Louis.
6  Q.  And you actually started working for Project
7  Purpose in January of 2017, before you left
8  Southwest, correct?
9  A.  We started the project, but I wasn't working
10 for them.  I was writing -- I was actually getting
11 the curriculum together for that.
12 Q.  Right.  And this was -- and then you actually
13 started working for them after your separation from
14 Southwest Airlines, fair?
15 A.  Yeah.  It became more of a -- yeah, it became
16 more of a -- yeah.  A job.  Yes.
17 Q.  Right.  But it was a not-for-profit in --
18 well --
19 A.  Correct.  It was a not-for-profit.  We hadn't
20 gotten our 501(c)(3) yet, so we were just actually
21 scouting for who we were going to partner up with in
22 St. Louis and partly Aurora, Colorado, in some
23 schools and churches.
24 Q.  Right.  And you did not receive a salary from
25 Project Purpose for 2017?

Page 1400

1  A.  No, I did not.  As a matter of fact, I spent
2  money for that project.
3  Q.  And because you were involved in this Project
4  Purpose, you did not -- you'd agree with me that you
5  did not seek paying employment at all in 2017,
6  correct?
7  A.  I had put out resumés, but resumés were just to
8  the airlines, and then later on I got called by the
9  airlines.
10 Q.  But that didn't happen in 2017, did it?
11 A.  No.  No.  Unfortunately.
12 Q.  That was later?
13 A.  Yes, it was later.  I think it was in '18 when
14 I started getting calls.
15 Q.  And you indicated that you submitted
16 applications at four airlines?
17 A.  Uh-huh.  At my husband's airline.  He's a
18 captain for Frontier.  And then it was Jet Blue.
19 Never heard from Jet Blue.  And then Delta and
20 United.
21 Q.  And I think you've indicated -- and I know this
22 was in your deposition -- that you have done some
23 Pilates instruction?
24 A.  Yes.  That was later on.  Yes.
25 Q.  How much, approximately, did you earn and over

Page 1401

1  what period of time?
2  A.  Well, I finished class and COVID hit and they
3  closed all of the Pilates studios.
4  Q.  Are you still doing that?
5  A.  I'm doing it, but it's only part-time, and it's
6  mainly in my house.  I have a Pilates studio in my
7  home.
8  Q.  How much have you earned from that?
9      Let's start with maybe 2021, how much did you
10 earn, approximately?
11 A.  Well, '21 was pretty much a no-go because of
12 COVID.  I would say maybe 5, $6,000.  Maybe.
13 Q.  In 2022?
14 A.  No, not in '22.  Well, '21 into '22.  So give
15 or take, it would be about, maybe, 5,000, maybe.
16 That is a stretch.
17 Q.  I just want to make sure I understand.  That's
18 in 2021 or is that for both years?
19 A.  Well, it would be both years right now.
20 Q.  Am I right that since your separation from
21 Southwest, other than the four airline applications
22 that you've submitted, you have not applied for any
23 other paying employment?
24 A.  No, I didn't.  No, I didn't.  There was another
25 project, though.  I don't know if you saw that.  But

Case 3:17-cv-02278-X   Document 356-2   Filed 08/09/22   Page 5 of 5   PageID 10192
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Pages 1402..1405

Page 1402

1  it was called Divine Intervention, after Project
2  Purpose.
3  Q.  I did see that.  That's another not-for-profit
4  that you were associated with?
5  A.  Yes.  And we did -- we ended up -- it's
6  basically the same thing except that we -- there
7  were two partners.  We branched off from what
8  Project Purpose was, and we were working with
9  actually several places in St. Louis.  We weren't
10 really working again working in Aurora.
11     We did get our 501(c)(3), but there were some
12 issues with -- how should I put this? -- there were
13 some issues between what the two visions were and
14 they didn't coincide, and so I stepped away from
15 that.
16     And I spent money in that as well.
17 Q.  You did not receive any income for --
18 A.  No.
19 Q.  -- work at Divine Intervention?
20 A.  No, I did not.
21 Q.  I'm flipping through these pages.  That's good
22 news for you.
23     Ms. Carter, do you regret your decision not to
24 accept Southwest's offer of reinstatement?
25 A.  No, I don't, for the same reasons that I have

Page 1403

1  explained.
2  Q.  If Southwest wanted to get rid of you because
3  you were a union objector, does it make sense that
4  they would offer your job back?
5  A.  I'm not sure, except the fact that I had
6  presented them with so much evidence.
7     Honestly, Mike Sims knows and we had talked
8  about this off the record.  He said that Southwest
9  shouldn't have gotten involved in union business.
10 Q.  And --
11 A.  He used to be in the union.  He was one of --
12 he actually worked in the union at one point.
13 Q.  I understand that.
14     But my question for you is, why would Southwest
15 have offered you a job back if it was trying to
16 target you and get rid of you because you were an
17 objector?
18     MR. PRYOR:  Object, just asked and
19 answered.
20     MR. McKEEBY:  I didn't get an answer.
21     THE COURT:  I will allow this question to
22 be answered.
23     THE WITNESS:  Honestly, I think they knew
24 that they had messed up and that they were going to
25 make sure that I stayed quiet about it.

Page 1404

1  BY MR. McKEEBY:
2  Q.  And the same question about your religious
3  beliefs.  If Southwest had some objection to your
4  religious beliefs, why would they have offered you a
5  job back?
6  A.  Again, I think they knew they had messed up and
7  they wanted -- they didn't want me to talk about it
8  at all.
9  Q.  So instead --
10 A.  And you can tell, they were taking away my
11 right to come back and sue them for this.
12     Before I signed this, I read over it and over
13 it and over it.  There was a point that I did think
14 that I was going to take it.  But, again, I talked
15 to Beth Ross, and Beth Ross said, This is an
16 egregious settlement and, you know, other people are
17 getting turned in, Charlene.
18     So I -- I -- my personal feeling was I'm going
19 to get targeted again and I'm going to lose my job,
20 and then I won't have any recourse.
21     MR. McKEEBY:  Pass the witness.
22     THE COURT:  Thank you, Mr. McKeeby.
23     Okay.  Mr. Greenfield, you may question
24 the witness.
25

Page 1405

1           CROSS-EXAMINATION
2  BY MR. GREENFIELD:
3  Q.  Good afternoon, Ms. Carter.
4  A.  Good afternoon.
5  Q.  Do you recognize who I am?
6  A.  Yes, I do.
7  Q.  Who am I?
8  A.  You are Adam Greenfield.
9  Q.  Okay.  And what is my job?
10 A.  You are representing the Union.
11 Q.  Yes, ma'am.  Yes, ma'am, I do so proudly.
12     Your case has been going on for a handful of
13 years at this point, is that fair?
14 A.  Yes, it has, five, a little over five.
15 Q.  So we've had the opportunity to meet each
16 other?
17 A.  Yeah.  The first time I met you was coming in
18 to court.  We were talking about your cute socks.
19 Q.  I remember the exact day.  And you and I
20 believe Ms. Dawn Juan were putting on your shoes.
21 A.  Yes.  They were Christmas socks.
22 Q.  Yes, ma'am.
23     And how would you describe our interactions,
24 you and I?
25 A.  You're an attorney and I'm the plaintiff.