UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLENE CARTER, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:17-cv-2278-X |
| TRANSPORT WORKERS UNION | § | |
| OF AMERICA, LOCAL 556, and | § | |
| SOUTHWEST AIRLINES CO., | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Bags fly free with Southwest. But free speech didn't fly at all with Southwest in this case. Charlene Carter—a pro-life Christian—worked as a Southwest Airlines Co. ("Southwest") flight attendant for over two decades. After Carter expressed her pro-life beliefs to her union president, Southwest fired Carter. A jury found that Southwest and the flight attendants' union, Transport Workers Union Local 556 ("Local 556"), discriminated against Carter for her protected speech about religion and unions, and it awarded her compensatory and punitive damages. Carter now moves for entry of judgment on that verdict. [Doc. No. 351].

For reasons more fully explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Carter's motion. Regarding money, Carter is entitled to the jury's monetary award, as modified by federal law caps on punitive and compensatory damages. Specifically, the Court awards Carter $300,000 in compensatory and punitive damages from Southwest, $300,000 in compensatory and punitive damages

1

from Local 556, $150,000 jointly and severally from Southwest and Local 556 for back pay, and $60,180.82 jointly and severally from Southwest and Local 556 in prejudgment interest.

The jury also awarded front (or future) pay, but Carter would rather have her job back. The Court reinstates Carter to her former position, which is the remedy that Title VII prefers over front pay. Southwest may "wanna get away" from Carter because she might continue to express her beliefs, but the jury found that Southwest unlawfully terminated Carter for her protected expressions. If the Court opted for front pay over reinstatement, the Court would complete Southwest's unlawful scheme. Reinstatement is appropriate.

The remaining issue is what would happen if, after Carter's reinstatement, Southwest fires her again over her protected speech. Title VII and the Railway Labor Act account for this with injunctive relief. Carter asks for an injunction under Title VII for religious speech and one under the Railway Labor Act for union speech. Title VII calls for broad injunctions to restrain employers from harming others like they harmed a prevailing plaintiff. As the Fifth Circuit put it, a plaintiff in a "Title VII suit takes on the mant[le] of the sovereign" with the purpose of "eliminat[ing] discrimination and recompens[ing] those who have suffered from it."[1] Our founders ensured that government doesn't discriminate against the religious exercise of Americans, and Congress made sure in Title VII that companies don't discriminate against the religious exercise of their employees. So Carter now takes on the mantle

---

[1] *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 373 (5th Cir. 1981) (cleaned up).

of the sovereign to protect the religious exercises of Southwest flight attendants. Under Title VII, the Court enjoins Southwest and Local 556 from violating the religious speech of Southwest flight attendants. And the Court also requires Southwest and Local 556 to notify their flight attendants of this Title VII injunction that now applies to them. The Railway Labor Act calls for narrower injunctions, so the Court enjoins Southwest and Local 556 from violating Carter's protected union speech.

## I. Factual Background

In 2017, a flock of Southwest flight attendants descended upon Washington, D.C. for the so-called "Women's March" protesting President Donald J. Trump. Those flight attendants were also Local 556 members, and one—Audrey Stone—was the union's president. During the march, they carried signage emblazoned with Southwest's logo. Carter, a pro-life Christian, objected to the flight attendants' purported representation of Local 556, Southwest, and, by extension, herself—especially given Planned Parenthood's sponsorship of the protest. To voice her objection, Carter sent Stone several private Facebook messages, some of which contained videos of aborted babies. In one of those messages, Carter said, "[t]his is what you supported during your Paid Leave with others at the Women's MARCH."[2]

Stone filed a complaint against Carter with Southwest. After a hearing, Southwest fired Carter, saying that when Carter messaged Stone, she was

---

[2] Doc. No. 80 at 12.

"identifiable as a Southwest Airlines Employee and represented our Company in a manner that is disparaging to Southwest Flight Attendants."[3]

Carter sued, alleging that (1) Local 556 had breached its duty of fair representation, (2) Southwest and Local 556 had retaliated against Carter for exercising her protected rights under the Railway Labor Act ("RLA"), and (3) Southwest and Local 556 had discriminated against Carter for her religious beliefs and practices under Title VII.  A jury found for Carter on each claim, awarding her $150,000 for lost wages and benefits, $500,000 for pain and suffering, and $3,800,000 in punitive damages.

Carter now moves for judgment on that verdict.[4]

## II.  Analysis

Carter seeks (A) reinstatement, (B) backpay, (C) prejudgment interest, (D) compensatory and punitive damages, (E) declaratory relief, and (F) injunctive relief.  Except for declaratory relief, the Court **GRANTS** each form of relief.

### A.  Reinstatement

Carter asks the Court to reinstate her as a Southwest flight attendant with full seniority and benefits.[5]  When a company wrongfully terminates an employee,

---

[3] Doc. No. 80-5 at 2.

[4] *See* FED. R. CIV. PROC. 58(a) (recognizing that, after a jury verdict, the Court must enter judgment "in a separate document").

[5] Alternatively, Carter requests front pay.  Because the Court grants reinstatement, it need not reach the issue of front pay.  In addition, Southwest argues in passing that reinstatement would disturb the finality of an arbitration decision.  Doc. No. 355 at 10, 20.  But Southwest merely recycles a failed argument the Court already rejected.  *See* Doc. No. 232 at 16 ("The arbitrator found simply that Southwest had 'just cause' . . . to terminate Carter's employment, while Carter's claims in this suit—Title VII and Railway Labor Act claims—involve markedly different legal standards.").

reinstatement is "the preferred equitable remedy under Title VII."[6]  Courts should grant reinstatement "in all but the unusual cases"[7] because it "restores not just the financial benefits of a job but also the psychological benefits of work."[8]  To determine whether reinstatement is appropriate, courts consider factors including (1) "whether positions now exist comparable to the plaintiff's former position," (2) "whether reinstatement would require an employer to displace an existing employee," (3) "whether the plaintiff has changed careers," and (4) "whether animosity exists between the plaintiff and [her] former employer."[9]

Southwest doesn't contest that those first two factors favor Carter.  First, comparable positions exist because Southwest still employs flight attendants. Second, reinstatement would not displace existing employees as Southwest recently experienced "an acute staffing shortfall" and struggled to "hire enough staff to keep up with a return in travel demand."[10]  Local 556 has even "implored Southwest to hire more staff."[11]  "[E]xisting vacancies" are not wanting.[12]

On the third factor, Southwest agrees that Carter has not "formally changed careers."[13]  Regardless, Southwest maintains—in a solitary footnote—that "this

---

[6] *Bogan v. MTD Consumer Grp.*, 919 F.3d 332, 336 (5th Cir. 2019); *see also* 42 U.S.C. § 2000e-5(g)(1) (allowing reinstatement).

[7] *Garza v. Brownsville Indep. Sch. Dist.*, 700 F.2d 253, 255 (5th Cir. 1983).

[8] *Bogan*, 919 F.3d at 336 (cleaned up).

[9] *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 489 (5th Cir. 2007).

[10] Doc. No. 351 at 11 (cleaned up).

[11] *Id.* at 12 (cleaned up).

[12] *Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1254 (5th Cir. 1995).

[13] Doc. No. 355 at 7 n.1.

factor weighs against reinstatement" because Carter's attempts "to secure employment with other airlines" have been, in Southwest's estimation, "modest."[14] But that's irrelevant. The test is not whether Carter successfully maintained her old career but instead whether she affirmatively "changed careers."[15]

Southwest next attempts to concoct a career change by citing Carter's volunteer work. During her employment with Southwest, Carter began volunteering at non-profit entities that help children in poor school districts, and she continues to do so now.[16] Although Southwest apparently prefers that its wrongfully terminated, former flight attendants not provide educations to underserved children, that won't fly here. Courts find career changes where plaintiffs seek new lines of paid employment—not where they volunteer.[17] The Court declines Southwest's invitation to manufacture a career change out of volunteer work.

Fourth, Southwest contends that animosity "***alone*** strongly mitigates [*sic*] against reinstatement" because "contentious litigation . . . ha[s] irreparably harmed the parties' relationships."[18] Courts are wary of putting too much stock in animosity because animosity "is a natural by-product of lawsuits, often even more so for ones

---

[14] *Id.*

[15] *Palasota*, 499 F.3d at 489.

[16] *See* Doc. No. 356-2 at 4–5. Carter has also earned a relatively small sum of money as a part-time Pilates instructor. *Id.* at 4. Southwest rightfully doesn't contend that Carter's Pilates stint constitutes a career change.

[17] *See, e.g., Bogan*, 919 F.3d at 335 (finding a career change where the plaintiff sought reinstatement as a "machinist" but had gone "to school for a degree in social work").

[18] Doc. No. 355 at 11 (emphasis added).

alleging discrimination."[19]  For good reason, then, courts usually rely on animosity concerns as the cherry on top of other factors militating against reinstatement—not as the sole basis for avoiding reinstatement.[20]  Thus, Southwest's near-exclusive reliance on animosity foreshadows a flimsy case against reinstatement from the get-go.

For animosity to militate against reinstatement, it "must rise to the level at which the parties' relationship is 'irreparably damaged'" such that reinstatement would likely "disrupt the workplace."[21]  Southwest alleges irreconcilable animosity based on Carter's (a) trial-related communications, (b) policy critiques, (c) professional relationships, and (d) political views.  The Court takes each category in turn.

### a.  Trial-Related Communications

Southwest decries two communications about the instant case.  First, Carter posted an article about her case on Facebook, criticized Southwest's supposed greed, and accused Southwest and Local 566 of "[c]olluding."[22]  Second, Carter joined a Facebook group dedicated to disseminating transcripts from her trial.[23]  Southwest

---

[19] *Bogan*, 919 F.3d at 338.

[20] *See, e.g.*, *Anderson v. City of McComb*, No. 5:13CV263TSL-MTP, 2015 WL 11439036, at *1 (S.D. Miss. Mar. 19, 2015) (concluding that "reinstatement [was] not feasible" and noting that this finding was "***further bolstered*** by the parties' history of animosity" (emphasis added)); *Bogan*, 919 F.3d at 337 (recognizing that the district court relied on "two [other factors] that [] counsel against reinstatement"); *Palasota*, 499 F.3d at 490 (considering hostility only after acknowledging the presence of "numerous other factors suggesting that reinstatement is not feasible").

[21] *Bogan*, 919 F.3d at 338–39.

[22] Doc. No. 356-1 at 22.

[23] *Id.* at 36.  Although Southwest notes other flight attendants' statements, the Court declines to impute those to Carter.  Doc. No. 355 at 9 n.7.

contends—without citing any specific statements—that Carter used that group "as a platform to make accusations regarding Southwest, its leaders, and her former co-workers."[24]   Southwest also insinuates that Carter may have distributed trial materials to that group.[25]  Those communications can't show the requisite animosity for two reasons.

First, Carter's comments evince empathy and affection—not animosity—towards her former colleagues.  For instance, in a comment on the Facebook group, Carter supports a flight attendant who was concerned about racial discrimination.[26]  Likewise, in her Facebook post about her case, Carter describes former Southwest leaders whom she "admired" and "loved working" for.[27]

Second, where Carter criticizes Southwest's conduct, she does so in relation to the "evidence in Court" and "my case."[28]  But that animosity concerning Carter's own case is precisely the sort that is "common to litigation" and, therefore, cannot prevent reinstatement lest "reinstatement [] cease to be a remedy except in cases where the defendant felt like reinstating the plaintiff."[29]

---

[24] Doc. No. 355 at 9.

[25] *Id*. at 9 n.6.  *But see Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 417 (5th Cir. 2021) ("The public's right of access to judicial records is a fundamental element of the rule of law." (cleaned up)).

[26] Doc. No. 356-1 at 43 (telling the flight attendant that "[no] one should ever[] be discriminated for anything at [Southwest Airlines]").

[27] *Id*. at 22.

[28] *Id*. at 43, 44; *see also id*. at 22 (decrying "what they did to me" in the instant case).

[29] *Bogan*, 919 F.3d at 338 (cleaned up).

### b. Policy Critiques

Southwest next points to two communications in which Carter criticized particular policies of Southwest and Local 556. First, in a Facebook post, Carter criticized Southwest's COVID-19 vaccine mandate and said that she hoped Southwest's management team would get "BLASTED for what they are doing."[30] Second, in another post, Carter asserted that Local 556 used union dues to support organ harvesting, sexual abuse, and sex trafficking.[31] Those communications can't show the requisite animosity for three reasons.

First, Carter's comments once again evince empathy and affection—not animosity—towards many of her former colleagues. For instance, Carter described the flight attendants who resisted the vaccine mandate as "great employees."[32]

Second, Southwest's concern with Carter's objection to union spending is misplaced because, as Southwest acknowledges, flight attendants "have the right to disagree [with] or complain about [their] union."[33] The Supreme Court has long held that the RLA prohibits unions from "forcing employees, over their objection, to support political causes which they oppose."[34] Carter previously acted as a "nonmember objector" in Local 556, meaning that she objected to the union's use of her compelled fees to support "political, ideological, and other nonbargaining

---

[30] Doc. No. 356-1 at 32.

[31] *Id.* at 34.

[32] *Id.* at 32.

[33] Tr. Trans. at 1682:3–4.

[34] *Baisley v. Int'l Ass'n of Machinists & Aerospace Workers*, 983 F.3d 809, 810 (5th Cir. 2020) (quoting *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 764 (1961)).

spending."[35]  The Court cannot refuse to reinstate her because she might exercise her federal rights again.

Third, contrary to Southwest's contention, Carter's criticism of Southwest's vaccine mandate doesn't evince "a generalized antipathy towards Southwest."[36]  It reflects disagreement with a particular policy.  Southwest cites no case in which an employee's disagreement with a company's policy irreparably damaged the parties' relationship.  In fact, if opposition to Southwest's vaccine mandate irreparably damaged an employee's relationship with Southwest to such a degree that continued employment would disrupt the workplace, then Southwest should have fired every flight attendant who disagreed with its vaccine mandate.  It didn't, so Southwest cries wolf.

Southwest counters by citing a case in which a court gleaned animosity from "two [negative] social media posts."[37]  Specifically, in *Hunter v. Town of Mocksville*, 897 F.3d 538 (4th Cir. 2018), a plaintiff seeking reinstatement as a police officer described his city as a "crooked [expletive] hole of a town."[38]  *Hunter* doesn't control the Court's analysis for four reasons.  First, *Hunter* is an out-of-circuit authority. Second, *Hunter* applied an abuse-of-discretion standard of review, so it only decided whether the district court relied on "a recognized barrier to reinstatement" and whether any "record evidence" supported that conclusion—not whether the district

---

[35] Doc. No. 80 at 4.

[36] Doc. No. 355 at 8.

[37] Doc. No. 355 at 9 (quoting *Hunter v. Town of Mocksville*, 897 F.3d 538, 562 (4th Cir. 2018)).

[38] *Hunter*, 897 F.3d at 562.

court got it right.[39]  Third, the *Hunter* district court was particularly concerned with the plaintiff's criticism of the town due to "the elevated need for trust among law enforcement department personnel."[40]  There is no "elevated need" for a flight attendant to profess undying loyalty to her airline.  Fourth, the plaintiff in *Hunter* described his town as a "crooked [expletive] hole."[41]  There is no evidence that Carter has referred to Southwest as a "crooked [expletive] of an airline."

### c.  Relationships

Southwest next notes that three employees who investigated Carter's conduct still work at Southwest: Ed Schneider, Meggan Jones, and Michael Sims.  But their testimony at trial didn't oppose reinstatement.  Jones testified that Carter "had always been very friendly" and never caused "problems or . . . concerns" before this case where the jury found she was exercising her federal rights.[42]  Schneider testified that he was "[d]efinitely" "heavy-handed" in firing Carter.[43]  Sims described Carter as "a long-term employee" with "a good employee record."[44]  In fact, Southwest previously agreed to reinstate Carter[45] in order to, as Sims put it, "give [Carter]

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] Tr. Trans. at 1675:21–25.

[43] *Id.* at 1141:21–22.

[44] *Id.* at 1718:9–10.

[45] Tr. Ex. 40.

another chance."[46]  In short, this is not a case where Carter's superiors would rather "shut [the business] down" than reinstate her.[47]

Next, Southwest avers that Carter and "a significant number of current flight attendants" harbor animosity, and that allowing Carter to "work side by side" with these flight attendants "could compromise the safety of the operation."[48]  That argument—pregnant with insinuation but barren of facts—leaves the Court with more questions than answers: Who are these faceless flight attendants?  Southwest doesn't identify them.  Would they fly the same routes as Carter?  Southwest doesn't say.  How, exactly, would Carter compromise safety?  Southwest remains mum.  Has Carter ever endangered her passengers previously?  Crickets.[49]

And rightfully so.  Carter has never received discipline,[50] so there's no reason to think she'd throw down at thirty-thousand feet.  In short, Southwest has given the Court no reason to find that Carter and her fellow flight attendants harbor the sort of relational animosity that is "likely to disrupt the workplace."[51]

### d. Political Views

Lastly, Southwest decries Carter's "controversial" Facebook posts about "George Floyd; transgender issues; COVID-19 conspiracy theories; alleged

---

[46] Tr. Trans. at 1718:11, 1719:9–11.

[47] *Schaeffer v. Warren Cnty.*, No. 3:14-CV-945-DPJ-FKB, 2017 WL 5709640, at *6 (S.D. Miss. Nov. 27, 2017), *aff'd*, 744 F. App'x 871 (5th Cir. 2018) (per curiam).

[48] Doc. No. 355 at 11.

[49] The Court is confident that, if there is a specific list of employees Carter simply cannot work alongside, then Southwest can structure an accommodation to prevent any conflict.

[50] Doc. No. 352-1 at 1.  Obviously, that excludes the instant case.

[51] *Bogan*, 919 F.3d at 338.

manipulation of COVID-19 death numbers; and the alleged evils of George Soros, Bill Gates, and Anthony Fauci."[52]   Southwest may "wanna get away" from flight attendants with whom it disagrees politically, but that won't fly in this motion.[53]

Perhaps Southwest missed the point of the jury verdict, so the Court must state it again.  The problem in this case was not speech.  The problem was intolerance of speech.  In reinstating Carter, the Court is not concerned with Carter's future speech.  The Court is concerned with how Southwest will treat her because of her future speech.

Given the Court's concern with how Southwest will treat Carter over her future political speech, what is a Court to do?  Reinstate or not?  There is only one viable option.  Southwest unlawfully fired Carter because of her speech.  If the Court refuses to reinstate her, the Court would complete Southwest's unlawful scheme.  But courts are charged with righting wrongs, not completing them.

The Court **ORDERS** that Charlene Carter be reinstated as a Southwest flight attendant with full seniority and benefits.[54]

---

[52] Doc. No. 355 at 9 n.5.  Those all appear to be important topics of civil discourse, so the Court is puzzled about why such topics should be out-of-bounds for upstanding Southwest flight attendants.

[53] *Cf.* Doc. No. 80 at 5 ("They really do not want anyone to say anything that is against their agenda at all . . . .").

[54] Southwest promises the Court that it will "treat Carter just like every other employee" and "will follow its established policies and practices governing the workplace."  Doc. No. 355 at 11 n.8. And Southwest argues that "no court, administrative body, or factfinder has found [its policies] to be unlawful."  *Id.*  This is curious.  Southwest clung to its policies during trial.  The jury found that Southwest violated federal law.  So whether or not Southwest followed its policies, it violated federal law.  But even as it earnestly recommits to following the same policies that got it in trouble with the jury, Southwest never commits to following federal law.  Southwest misses the point again.  It's not about following company policy.  It's about following federal law.

### B. Back Pay

For Title VII purposes, lost wages and benefits ("back pay") don't count as compensatory damages, so the Court considers them separately.[55]  The jury found that $150,000 would compensate Carter for her lost wages and benefits due to each Defendant's unlawful conduct.[56]  And "[w]hen a plaintiff [] suffer[s] a single or indivisible injury," each defendant generally is "jointly and severally liable for the entire amount of damages."[57]  Accordingly, Carter requests $150,000 from Southwest and Local 556 jointly and severally.  Southwest agrees.

Local 556 counters that the jury did not find a "joint enterprise" between Southwest and Local 556.[58]  Under the "joint enterprise" theory, multiple entities can constitute a plaintiff's "employer" for Title VII purposes if they "represent a single, integrated enterprise."[59]  The "joint enterprise" theory is inapposite for two reasons.

Procedurally, Local 556's "joint enterprise" argument challenges the merits of Carter's Title VII claims.[60]  Such challenges are appropriate in a defendant's post-

---

[55] 42 U.S.C. § 1981a(b)(2) ("Compensatory damages awarded under this section shall not include backpay [or] interest on backpay."); *see, e.g.*, *Johnson v. Sw. Rsch. Inst.*, 384 F. Supp. 3d 722, 728 (W.D. Tex. 2019) ("Back pay and interest on back pay are not considered compensatory damages under Title VII.").

[56] Doc. No. 348 at 13, 24.

[57] *Jackson v. City of St. Louis*, 220 F.3d 894, 897 (8th Cir. 2000) (cleaned up); *see also Aldrich v. Thomson McKinnon Sec., Inc.*, 756 F.2d 243, 248 (2d Cir. 1985) ("The jury should be asked . . . what amount of damages the plaintiff has suffered.  Damages in this amount can then be awarded, jointly and severally, against each defendant found liable.").

[58] Doc. No. 357 at 3.  Local 556 also argues about the sufficiency of the evidence.  *Id.* at 6.  The Court disregards that argument because it is appropriate for post-judgment motions.

[59] *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983).

[60] *See Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 928 (9th Cir. 2003) (recognizing that the "joint employer" test "does not determine joint *liability* . . . but instead determines whether a defendant *can meet the statutory criteria* of an 'employer' for Title VII applicability").

judgment motions—not in its response to a motion for judgment.  Substantively, Carter didn't need to show that Local 556 was her "employer" because Title VII provides an independent cause of action against "labor organization[s]."[61]

The Court finds that Southwest and Local 556 are jointly and severally liable to Carter for $150,000 in back pay and **ORDERS** the Defendants to pay Carter this amount.

### C. Prejudgment Interest

Carter seeks prejudgment interest on the jury's $150,000 back pay award.[62] "[T]here is a strong presumption in favor of awarding pre-judgment interest"[63] to account for "the time value of money," and, consequently, to "make the plaintiff whole."[64]

Southwest asserts that Carter is not entitled to prejudgment interest. Although Carter seeks prejudgment interest on her ***backpay*** award, Southwest points to her other awards—the ***compensatory*** and ***punitive*** awards—arguing that those awards are so substantial that Carter is already made whole by receiving an amount of compensatory and punitive awards "far in excess of what [Carter] would

---

[61] *See* Doc. No. 80 at 29 (alleging claims against Local 556 under 42 U.S.C. § 2000e-2(c) and against Southwest under 42 U.S.C. § 2000e-2(a)); *see also, e.g.*, 42 U.S.C. § 2000e-2(c)(3) (prohibiting a "labor organization" from "caus[ing] or attempt[ing] to cause an employer to discriminate against an individual"); 42 U.S.C. § 2000e-2(a)(1) (prohibiting an "employer" from "discharg[ing] any individual . . . because of such individual's . . . religion").

[62] Because "[b]ack pay and ***interest on back pay*** are not considered compensatory damages under Title VII," Title VII's damages cap doesn't apply to this award.  *Johnson*, 384 F. Supp. 3d at 728 (emphasis added).

[63] *United States v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001).

[64] *Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 372 (5th Cir. 2002).

have earned had she remained employed."[65]  But Southwest cites no case suggesting that a wrongfully terminated employee's punitive-damages award bars prejudgment interest on a back-pay award.  Nor could it.  Courts often award prejudgment interest on other awards—even with punitive damages on the books.[66]  And as to Southwest's contention that this amount exceeds what her pay would have been, Southwest was free to put on evidence of what her pay would have been at trial.  It didn't.  And in any event, Southwest also cites no evidence to support its assertion now—just like it raised nothing on this issue at trial.

Next, the Court must determine the appropriate amount of prejudgment interest.  To ascertain this amount, courts must determine (1) the award on which the court is assessing interest, (2) the relevant time period, and (3) the appropriate interest rate.[67]  The relevant award is the jury's $150,000 back pay award, and the relevant time period is the number of days between Carter's termination and this judgment.[68]  Thus, Southwest agrees that "the only issue . . . is the appropriate prejudgment interest rate."[69]

---

[65] Doc. No. 355 at 17.

[66] *See, e.g.*, *Dunbar Med. Sys. Inc. v. Gammex Inc.*, 216 F.3d 441, 455 (5th Cir. 2000) (awarding "pre-judgment interest . . . assessed on only the compensatory damages portion of [the] award").

[67] *See, e.g.*, *Thomas*, 297 F.3d at 372.

[68] *See Thomas*, 297 F.3d at 372 ("District courts generally should calculate interest on back pay . . . based on the date of the adverse employment action."); *Kostic v. Tex. A & M Univ. at Commerce*, No. 3:10-CV-2265-M, 2015 WL 4775398, at *2 (N.D. Tex. Aug. 13, 2015) (calculating the appropriate time period for prejudgment interest by measuring "[t]he number of days that have passed since December 9, 2010, and the date of this Order"); *Stanton v. Jarvis Christian Coll.*, No. 6:18-CV-479-JDK-JDL, 2020 WL 5269439, at *1 (E.D. Tex. Aug. 27, 2020) (awarding "pre-judgment interest . . . from the date Jarvis terminated her employment . . . through the date of Judgment"), *aff'd*, No. 20-40581, 2022 WL 738617 (5th Cir. Mar. 11, 2022).

[69] Doc. No. 365 at 3.

16

"No federal statute specifies what rate of prejudgment interest applies when a plaintiff prevails on a claim under Title VII."[70]  And where federal law is silent on the prejudgment interest rate, "state law is an appropriate source of guidance."[71]  The Texas Supreme Court has made clear that "prejudgment interest accrues at the rate for postjudgment interest."[72]  And under Texas law, postjudgment interest accrues at "the prime rate as published by . . . the Federal Reserve System on the date of computation."[73]  Because the Federal Reserve's prime interest rate is currently 7.00%, that's the appropriate prejudgment interest rate.[74]  Defendants raise two objections.

First, they contend that the Court should "apply the post-judgment rate set forth [in] 28 U.S.C. § 1961," which is currently 4.75%.[75]  But the Fifth Circuit "has already rejected" the argument that courts ought to apply 28 U.S.C. § 1961 to determine "awards of prejudgment interest."[76]

Second, Defendants argue the Court should apply the average prime rate between Carter's termination and judgment.[77]   Here's why that would help

---

[70] *Autry v. Ahern Rentals, Inc.*, No. EP-19-CV-00154-DCG, 2022 WL 4491085, at *2 (W.D. Tex. Sept. 26, 2022).

[71] *U.S. for Use & Benefit of Canion v. Randall & Blake*, 817 F.2d 1188, 1193 (5th Cir. 1987).

[72] *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998).

[73] Tex. Fin. Code § 304.003(c)(1).

[74] *Selected Interest Rates (Daily)*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM https://www.federalreserve.gov/releases/h15/ (last visited Dec. 5, 2022).

[75] Doc. No. 365 at 4.

[76] *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991).

[77] *See, e.g.*, *Stanton*, 2020 WL 5269439, at *1 (employing "the average prime rate between [] termination . . . and the date of judgment").

Defendants: Since Carter moved for judgment, in the face of soaring inflation, the Federal Reserve has increased the prime rate from 4.75% to 7.00%—the highest rate in years.  Because Defendants balk at the December 2022 prime rate, they hope to cherry-pick lower interest rates from better economic times.  They complain that "applying the December 2022 rate would" improperly "punish" them and premise Carter's award "on an interest rate environment that did not exist during the relevant time period."[78]

Defendants equivocate on "the relevant time period," characterizing it as "the time [period during which] Carter would have received the back pay."[79]  But that's wrong.  "Prejudgment interest . . . convert[s] time-of-[injury] damages into time-of-judgment damages"—not time-of-back-pay damages.[80]  Artificially reducing the prime rate would effectively deprive Carter of "the time value of money."[81]  To ensure that its judgment makes Carter whole, the Court thus exercises its discretion to follow the myriad courts that determine the prime rate "[a]s of the date of th[eir] Memorandum Opinion."[82]

---

[78] Doc. No. 365 at 2, 4.

[79] *Id.* at 4.

[80] Anthony E. Rothschild, *Prejudgment Interest: Survey and Suggestion*, 77 Nw. U.L. Rev. 192, 192 (1982); *see also W. Virginia v. United States*, 479 U.S. 305, 311 n.2 (1987) (requiring that prejudgment interest compensate a plaintiff "for the loss of use of money due as damages from the time the claim accrues ***until judgment is entered***" (emphasis added)).

[81] *Thomas*, 297 F.3d at 372.

[82] *Autry*, 2022 WL 4491085, at *3.

Carter requests approximately \$22,649 in prejudgment interest.[83]  She gets to that number by "multiplying the monthly back pay owed . . . , the number of days between March 14, 2017 and each date when the Federal Reserve increased the prime rate . . . , and the prejudgment interest rate for the applicable period."[84]  But the proper equation the law mandates is much simpler: Damages (D) multiplied by the interest rate (R) multiplied by the time (in years) since termination (T): (D x R x T).[85]  The back pay award here is \$150,000.  The prime rate is 7.0%.  There have been 2,092 days (approximately 5.73 years) between Carter's termination on March 14, 2017 and the date of this judgment on December 5, 2022.  Multiplying those numbers results in \$60,180.82.[86]

---

[83] As explained below, Carter's prejudgment-interest math is wrong.  Can the Court order more prejudgment interest than she requested?  Sure.  The Court is under a legal duty to correctly calculate prejudgment interest based on the rates the law specifies.  While the Court asked for the parties' input, the Court didn't have to have that input and isn't bound by it.

[84] Doc. No. 363 at 4.

[85] *See Autry*, 2022 WL 4491085, at *4 (multiplying a \$100,000 award by a 6.25 interest rate by 1,204 days to get a prejudgment-interest amount of \$20,616.44); *Johnson*, 384 F. Supp. 3d at 727 (multiplying a \$150,000 award by a 5.5% interest rate by 2,470 days to get a prejudgment-interest amount of \$55,828.77).  Some courts get to the same number another way—by determining the daily interest rate and multiplying that number times the relevant number of days.  *See Cont'l Cas. Co. v. Macon Inc.*, No. 4:20-CV-086-A, 2020 WL 6437667, at *1 (N.D. Tex. June 24, 2020) ("Five percent of \$527,053.00 is \$26,352.65.  The daily interest is \$26,352.65 divided by 365 days, or \$72.19 . . . .  The number of days between August 18, 2019 and June 22, 2020 is 309 days.  Because the pre-judgment interest increased by \$72.19 daily during the accrual period, the total pre-judgment interest due is \$72.19 times 309 days, totaling \$22,306.71"); *Kostic*, 2015 WL 4775398, at *2 ("[T]he amount of prejudgment interest per day is \$41.10.  The number of days that have passed since December 9, 2010, and the date of this Order, August 13, 2015, including December 9, 2010, but not including August 13, 2015, is 1708 days.  1708 multiplied by \$41.10 is \$70,198.80.").

[86] Here's the equation: (150,000 x 0.07 x 5.73150685) = 60,180.82.  In the alternative format, the Court could find the daily interest and multiply it times the number of days between Carter's termination and this judgment:  7% of 150,000 is 10,500.  The daily interest is 10,500 divided by 365, which equals 28.7671233.  And 28.7671233 times 2,092 days equals 60,180.82.  Whether we call it six or a half dozen, the amount is and must be the same under either the yearly or daily equation.

19

The Court finds that Defendants are jointly and severally liable to Carter for $60,180.82 in prejudgment interest and **ORDERS** them to pay her that amount.

### D. Compensatory and Punitive Damages

The jury awarded Carter $500,000 in compensatory damages for past and future pain and suffering that both Defendants caused. The jury also awarded Carter $3,800,000 in punitive damages—$300,000 from Local 556 and $3,500,000 from Southwest. But Title VII caps the amount of punitive and compensatory damages from an employer with "more than 500 employees" to "$300,000."[87]   Because Southwest has over 500 employees and Local 556 has over 500 members, Carter requests $300,000 from Southwest and another $300,000 from Local 556. Although Southwest agrees, Local 556 raises three objections.

First, Local 556 contends that the Court must identify which portions of the $300,000 award are compensatory and which are punitive. Tellingly, Local 556 doesn't cite any authority requiring such apportionment. And contrary to Local 556's position, courts in this Circuit haven't apportioned such capped awards.[88]

Second, Local 556 contends—again sans authority—that the Court should assess compensatory and punitive damages jointly and severally, so that Local 556 and Southwest share a single $300,000 award. But the jury assessed separate punitive damages awards for Southwest and Local 556, so the Court can't impose those separate awards jointly and severally.

---

[87] 42 U.S.C. § 1981a(b)(3).

[88] *See, e.g.*, *Johnson*, 384 F. Supp. 3d at 727 (reducing compensatory damages and prejudgment interest to $300,000 without apportioning each award).

Third, Local 556 contends that it should only have to pay $50,000 in compensatory and punitive damages—not $300,000. Here's its rationale: Title VII caps damages at $300,000 for an entity with "more than 500 employees," but it caps damages at $50,000 for an entity with "more than 14 and fewer than 101 employees."[89] Although Local 556 has more than 500 ***members***, it has fewer than 100 ***employees***.[90] Thus, the argument goes, because Title VII's damages cap hinges on the number of ***employees***, Local 556 is entitled to the lower $50,000 cap.

Although Local 556's statutory interpretation initially appears plausible, its Achilles' heel is its failure to consider the statutory context.[91] Here's the relevant context: In general, entities are subject to Title VII only if they meet a threshold number of participants. For instance, Title VII assesses a union by "the number of its ***members***"—only unions with "fifteen or more" members are subject to Title VII.[92] Similarly, Title VII assesses a corporate employer by its number of ***employees***—only employers with "fifteen or more employees" are subject to Title VII.[93]

Unsurprisingly, then, Title VII's incremental damages cap stops at entities with fifteen or more employees.[94] Title VII doesn't cap damages for entities with fewer than fifteen employees for a simple reason—***Title VII doesn't apply to***

---

[89] 42 U.S.C. § 1981a(b)(3)(A), (b)(3)(D).

[90] *See* Doc. No. 352-3 at 2; Doc. No. 357 at 6.

[91] *See West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2607 (2022) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (cleaned up)).

[92] 42 U.S.C. § 2000e(e) (emphasis added).

[93] 42 U.S.C. § 2000e(b).

[94] 42 U.S.C. § 1981a(b)(3)(A) (capping damages for entities with "more than 14" employees).

***entities with fewer than fifteen participants***.  Such a cap would be extraneous.
Thus, although the damages-cap provision uses "employee"—and not "member"—
every court that's addressed the issue has concluded that "[i]t makes no sense to use
the numbers of employees as the criterion for damages caps in union cases."[95]  And
the Equal Employment Opportunity Commission has likewise concluded that the
statute's use of "employee," instead of a broader term, may have been a "drafting
error."[96]  In short, Title VII's damages cap applies based on a union's number of
members.  Local 556 has more than 500 members, so it's subject to the $300,000
damages cap.

Even assuming, for argument's sake, that Title VII caps a union's damages
based on its number of employees, Local 556 would obtain only a pyrrhic victory.  Title
VII provides no damages cap for entities with fewer than fifteen employees.[97]  And,
as Local 556 admits, it "currently employs four (4) full time individuals."[98]  Thus, if

---

[95] *Dowd v. United Steelworkers of Am., Loc. No. 286*, 253 F.3d 1093, 1100 (8th Cir. 2001); *accord Stelly v. W. Gulf Mar. Ass'n*, 407 F. Supp. 3d 673, 687 (S.D. Tex. 2019) (adopting *Dowd*'s reasoning).

[96] *Enforcement Guidance: Compensatory and Punitive Damages Available Under § 102 of the Civil Rights Act of 1991*, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, https://www.eeoc.gov/laws/guidance/enforcement-guidance-compensatory-and-punitive-damages-available-under-sec-102-cra (last visited Nov. 27, 2022).  Although the Commission has nevertheless suggested that courts should cap damages based on a union's number of employees, Doc. No. 357 at 5, the Court need not defer to that interpretation because, "in enacting Title VII, [Congress] did not confer upon the [Commission] authority to promulgate rules or regulations."  *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976).

[97] *See generally* 42 U.S.C. § 1981a; *see also Dowd*, 253 F.3d at 1100 ("[I]f § 1981a(b) is read with absolute literalness, there would be no damages cap in this case.").

[98] Doc. No. 357-1 at 1.  Although Local 556 attempts to inflate that number by referencing "forty five (45) people who are either on part time or full time 'pulls' from flying duties to work in the Union office," it doesn't aver that any of those workers are Local 556 employees.  *Id.* at 2.

the Court were to accept Local 556's own interpretation, Local 556 wouldn't enjoy *any* damages cap: Instead, it would owe Carter $800,000—not $50,000.

Local 556's self-own[99] aside, Carter admits she only seeks $300,000 from Local 556 for compensatory and punitive damages—which the law allows her to recover. Accordingly, the Court **ORDERS** Local 556 to pay Carter $300,000 in compensatory and punitive damages and **ORDERS** Southwest to pay Carter $300,000 in compensatory and punitive damages.

### E. Declaratory Judgment

The jury found that (1) Defendants violated the RLA by terminating Carter, (2) Defendants violated Title VII by discriminating against her and failing to accommodate her, and (3) Local 556 breached its duty of fair representation. Carter now seeks a declaratory judgment restating each of those propositions.

A declaratory judgment is appropriate where it (1) "will serve a useful purpose in . . . settling [] legal relations" and (2) "will . . . afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."[100] A declaratory judgment doesn't "serve a 'useful purpose' when a fact-finder has already settled the legal relations in issue."[101] For instance, when a plaintiff's proposed declaratory judgment

---

[99] *Self-Own*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/self-own (last visited Nov. 27, 2022) (defining "self-own" as "a statement or an act in which you unintentionally embarrass yourself").

[100] *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 523 (5th Cir. 2016).

[101] *Id.* (cleaned up).

merely "restate[d] . . . the jury verdict," the court "in its discretion decline[d] to enter" that declaratory judgment.[102]

The Court wholeheartedly agrees with court concerns about useless declaratory judgments.  In America, the people are the only true source of authority to govern.  And "We the People" reserved their right to decide civil cases such as this under the Seventh Amendment.  The Court is a mere magistrate, a servant of We the People.  And the Constitution rightly calls such magistrates "inferior."[103]  The Court cannot add any importance to the verdict of We the People by stating their verdict as a declaratory judgment of the Court.

Accordingly, the Court **DENIES** Carter's request for a declaratory judgment.

### F.  Injunctive Relief

Lastly, Carter requests various forms of injunctive relief.  "[I]n the wake of a Title VII violation," it is well established that "injunctive relief is mandatory . . . absent clear and convincing proof of no reasonable probability of further noncompliance with the law."[104]  Although the general rule is that "the moving party must satisfy the court that relief is needed,"[105] that rule flips in the Title VII context: "The burden of negating that probability [of further noncompliance] lies with the defendants."[106]

---

[102] *Wojcik v. Costco Wholesale Corp.*, No. 3:13-CV-2314-D, 2016 WL 304872, at *6 (N.D. Tex. Jan. 26, 2016) (Fitzwater, J.).

[103] U.S. CONST. art. III, § 1.

[104] *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 469–70 (5th Cir. 2013) (en banc) (cleaned up); *accord James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 354–55 (5th Cir. 1977).

[105] *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

[106] *E.E.O.C. v. Rogers Bros., Inc.*, 470 F.2d 965, 967 (5th Cir. 1972).

Ironically, instead of negating the probability of noncompliance, Southwest itself has demonstrated a likelihood of noncompliance.  Southwest advises the Court that it continues to troll Carter's Facebook page to find "controversial" posts.[107]  It warns that, should the Court reinstate Carter, she may again engage in the same— protected—conduct "that led to her termination."[108]  Although Southwest promises to "follow its established policies and practices"[109] with Carter, those are the precise "company policies and rules" it previously cited as the basis for firing Carter.[110]  In short, Southwest's brief effectively provides a blueprint for how to fire Carter again.

Although Southwest promises to "treat Carter just like every other employee" at Southwest,[111] its "[p]rotestations o[f] repentance and reform timed to . . . blunt the force of a lawsuit offer insufficient assurance that the practice sought to be enjoined will not be repeated."[112]  Southwest has only fueled the Court's concern that it will again attempt to violate the law *vis-à-vis* Carter.

Southwest counters by citing one case in which the Fifth Circuit said that, "to pursue an injunction . . . , the plaintiff[] must allege a likelihood of future violations of [its] rights by the defendant[s], not simply future effects from past violations."[113] And it claims that Carter has failed to make such an allegation in her complaint.  But

---

[107] Doc. No. 355 at 9 n.5.

[108] *Id.* at 10.

[109] *Id.* at 11 n.8.

[110] Doc. No. 80 at 18.

[111] Doc. No. 355 at 11 n.8.

[112] *James*, 559 F.2d at 354–55 (cleaned up).  It's also not clear that Southwest's agreement to treat Carter "like every other employee" is an assurance it will comply with the law.  *See id.* at 355.

[113] *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563 (5th Cir. 1998) (cleaned up).

that case is doubly distinguishable.   First, the plaintiff there did not "seek employment . . . again" with his old employer—but the Court has already required Southwest to reinstate Carter.[114]   Second, that case involved a motion for summary judgment where the Fifth Circuit found a dearth of standing.[115]   It did not occur in the wake of a jury verdict, where "[t]he burden of negating th[e] probability [of noncompliance] lies with the defendants."[116]   But more fundamentally, Southwest has ably shown it intends to closely monitor Carter in the future (as it has already been doing for the purpose of fighting reinstatement).   So even under the incorrect legal standard Southwest articulates, protecting Carter from future violations would almost certainly require imposing an injunction.

Next, the Court must decide on the appropriate injunctive relief.   The Court may not issue a general "'obey the law' injunction[]."[117]   Instead, Federal Rule of Civil Procedure 65(d)(1)(A)–(C) requires the Court to "(A) state the reasons why it issued [the injunction]; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."   That "specificity requirement is not unwieldy," and the Court

---

[114] *Id.*; *see also Gordon v. JKP Enterprises Inc.*, No. 01-20420, 2002 WL 753496, at *7 (5th Cir. Apr. 9, 2002) (recognizing that "the facts do not warrant injunctive relief" where the plaintiffs "do not seek reinstatement" and thus "have shown no [] way in which they would benefit from the injunction").

[115] *Armstrong*, 141 F.3d at 563–64.

[116] *Rogers Bros.*, 470 F.2d at 967.

[117] *Payne v. Travenol Lab'ys, Inc.*, 565 F.2d 895, 898 (5th Cir. 1978).

only must provide enough detail "so that those enjoined will know what conduct the court has prohibited."[118]

Carter asks the Court for three types of injunctions: She asks the Court to (1) enjoin Southwest and Local 556 "from engaging in any of the activities that . . . the jury found to be unlawful," (2) "order Southwest and Local 556 to institute . . . policies, practices, and programs which provide equal employment opportunities . . . and which eradicate the effects of their . . . unlawful employment practices," and (3) "order other affirmative relief necessary to eradicate the effects of Southwest's and Local 556's unlawful employment practices."[119]  The Court examines each in turn.

First, Carter asks the Court to enjoin Defendants' unlawful conduct. Southwest requests a narrow injunction that applies only to Carter, saying that Carter "lacks standing to request injunctive relief as to alleged harm to others."[120] Southwest is correct that the Court's injunction must "redress the particular injuries [Carter] alleges."[121]  But Southwest is wrong to say that the Court's injunction cannot apply to Southwest's treatment of other similar employees.  As the Fifth Circuit has made clear, "[a]n individual who brings a Title VII suit takes on the mant[le] of the sovereign" with the purpose of "eliminat[ing] discrimination and recompens[ing] those who have suffered from it."[122]  Thus, "[i]njunctive relief which benefits non-

---

[118] *Meyer*, 661 F.2d at 373.

[119] Doc. No. 351 at 17–18.

[120] Doc. No. 355 at 20.

[121] *James*, 254 F.3d at 564.

[122] *Meyer*, 661 F.2d at 373 (cleaned up).

parties may sometimes be proper even where the suit is not brought as a Rule 23 class action."[123]  In short, "in Title VII cases, once the judicial machinery has been set in train, the proceeding takes on a public character in which remedies are devised to vindicate the policies of the Act, not merely to afford private relief to the employee."[124]

Throughout this case—and especially in their briefing regarding the instant motion—Defendants have repeatedly failed to appreciate the problem with their conduct involving Carter.  The jury found the Defendants were grossly intolerant of their flight attendants' speech in violation of federal law.  And, even now, their lawyers continue to hunt for "controversial" social-media posts from Carter instead of pondering their own mistakes and planning a future life free of them.  But Southwest's eyes aren't just on Carter.  They appear to be monitoring other flight attendants as well, especially regarding a Facebook group with 1,600 members dedicated to sharing transcripts and depositions from this trial.[125]  Because Southwest has only doubled down on its speech suppression since the jury's verdict, justice requires the Court to enjoin that unlawful conduct.  And the policies of Title VII require the Court to prohibit that conduct more broadly, especially when Defendants appear poised to repeat it with other flight attendants.[126]

---

[123] *Id.* at 374; *see also Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir. 1984) (recognizing that "classwide injunctive relief may be appropriate in an individual action").

[124] *Gordon*, 2002 WL 753496, at *7 (cleaned up); *see also E.E.O.C. v. Serv. Temps*, No. 3:08-CV-1552-D, 2010 WL 5108733, at *4 (N.D. Tex. Dec. 9, 2010) (Fitzwater, J.) (recognizing that, in Title VII actions, courts have "broad discretion to craft an injunction that will ensure the employer's compliance with the law" (cleaned up)), *aff'd sub nom. E.E.O.C. v. Serv. Temps Inc.*, 679 F.3d 323 (5th Cir. 2012).

[125] *See* Doc. No. 355 at 9 (Southwest response brief expressing concern about the Facebook group).

[126] *See, e.g., Serv. Temps*, 2010 WL 5108733, at *5 (enjoining an employer "from discriminating against ***any employee***" even where "this case involves only one discriminatory act against one

Accordingly, the Court **ENJOINS** Defendants from discriminating against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion.[127] The Court **ENJOINS** Defendants from failing to reasonably accommodate Southwest flight attendants' sincerely held religious beliefs, practices, and observances. Lastly, the Court **ENJOINS** Defendants from discriminating against Carter for exercising her rights, under the RLA, to resign from membership in Local 556 and to object to the forced payment of political and other nonchargeable union expenses, including—but not limited to—objections to union expenditures contained in social media posts.[128]

Second, Carter asks the Court to require Southwest to institute ill-defined "policies, practices, and programs" to remedy discrimination.[129] Because Carter doesn't explain exactly what policies she requests, Defendants would not "know what conduct the court has prohibited" based on such an injunction.[130] The Court declines to issue it. For the same reason, the Court also declines Carter's request to issue an

---

potential employee by one manager" (emphasis added)); *Abrams v. Baylor Coll. of Med.*, 581 F. Supp. 1570, 1580 (S.D. Tex. 1984) (enjoining a defendant, in a case involving discrimination against two individual plaintiffs, "from excluding qualified Jews from the King Faisal rotation program").

[127] *See Meyer*, 661 F.2d at 374 (recognizing, in the Title VII context, that "[i]njunctive relief which benefits non-parties may sometimes be proper").

[128] *See Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 207 (1944) (recognizing that the RLA "contemplates resort to the usual judicial remed[y] of injunction"). Because there is a lack of authority demonstrating that RLA injunctions can broaden to nonparties like Title VII injunctions can, the Court opts to have the RLA injunction only cover Carter.

[129] Doc. No. 351 at 18.

[130] *Meyer*, 661 F.2d at 373.

injunction "which eradicates the effects of [the Defendants'] past . . . unlawful employment practices."[131]

Third, Carter requests "other affirmative relief necessary to eradicate the effects of Southwest's and Local 556's unlawful employment practices."[132] This time she provides examples. She asks the Court to require Local 556 to post the jury's verdict and this judgment "at the union hall for a 60-day period" and "issue it electronically to all union members."[133] Likewise, she wants Southwest to post the verdict and judgment "on company bulletin boards for a 60-day period" and to "email the same to all flight attendants."[134] She also requests that "Southwest and Local 556 [] inform Southwest flight attendants of their Title VII and RLA rights under Section 152 (Third) and (Fourth), and notify them of Southwest's accommodation policy."[135]

Because the Court has enjoined Defendants' unlawful conduct against all Southwest flight attendants and Local 556 members under Title VII, the Court finds that Carter's proposed injunctions are fitting "to vindicate the policies of" Title VII.[136] Accordingly, the Court **ORDERS** Local 556 to post the jury's verdict and the accompanying Final Judgment in conspicuous places at the union hall for a 60-day

---

[131] Doc. No. 351 at 18.

[132] *Id.* at 17–18.

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Gordon*, 2002 WL 753496, at *7 (cleaned up).

period and issue them electronically to all union members.[137]   The Court likewise **ORDERS** Southwest to post the jury's verdict and the accompanying Final Judgment on company bulletin boards for a 60-day period and issue them electronically to all Southwest flight attendants.[138]   The Court **ORDERS** Southwest and Local 556 to inform Southwest flight attendants that, under Title VII, they may not discriminate against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion.

## III.  Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Carter's motion for judgment.   Specifically, the Court **ORDERS** that (1) Charlene Carter shall be reinstated as a Southwest flight attendant with full seniority and benefits, (2) Southwest and Local 556 are jointly and severally liable to Carter for $150,000 in back pay and $60,180.82 in prejudgment interest, (3) Local 556 must pay Carter $300,000 in compensatory and punitive damages, and (4) Southwest must pay Carter $300,000 in compensatory and punitive damages.   The Court **ENJOINS** both defendants as described above.   The Court will enter a separate Final Judgment.

---

[137] *See Serv. Temps*, 2010 WL 5108733, at *5 (ordering a discriminatory employer to "post copies of the notice [to employees] in conspicuous places in each of the offices that [the employer] operates").

[138] *Id.*

**IT IS SO ORDERED** this 5th day of December, 2022.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE