1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF TEXAS
2
                      CASE NO. 3:17-cv-02278-X
3

4

5   ----------------------------------------x

6   CHARLENE CARTER,

7                           Plaintiff,

8   v.

9   SOUTHWEST AIRLINES CO. and
    TRANSPORT WORKERS OF AMERICA,
10  LOCAL 566,

11                          Defendants.

12

13  ----------------------------------------x

14

15

16                  TRANSCRIPT OF THE TRIAL

17          BEFORE THE HONORABLE BRANTLEY STARR

18              UNITED STATES DISTRICT JUDGE

19

20              V O L U M E   2

21

22                    Dallas, Texas

23                    July 6, 2022

24                     8:38 a.m.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 2 July 06, 2022                        Pages 205..208

Page 205

```
 1  A P P E A R A N C E S :
 2
     FOR THE PLAINTIFFS:
 3
          NATIONAL RIGHT TO WORK FOUNDATION INC.
 4              8001 Braddock Street
                Suite 600
 5              Springfield, Virginia  22160
          BY:  MATTHEW B. GILLIAM, ESQ.
 6              mgb@nrtw.org
 7
 8       PRYOR & BRUCE
                302 North San Jacinto
 9              Rockwall, Texas 75087
          BY:  BOBBY G. PRYOR, ESQ.
10              MATTHEW D. HILL, ESQ.
                bpryor@pryorandbruce.com
11              mhill@pryorandbruce.com
12
13
14
15  FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
16       REED SMITH, LLP
                2850 North Harwood
17              Suite 1500
                Dallas, Texas  75201
18       BY:  PAULO B. McKEEBY, ESQ.
                BRIAN K. MORRIS, ESQ.
19              pmckeeby@reedsmith.com
                bmorris@reedsmith.com
20
21
22
23
24
25
```

Page 206

```
 1  For the Defendant Union 566:
 2
 3       CLOUTMAN & GREENFIELD, PLLC
                3301 Elm Street
 4              Dallas, TX 75226
          BY:  ADAM S. GREENFIELD, ESQ.
 5              EDWARD B. CLOUTMAN, III, ESQ.
                agreenfield@candglegal.com
 6              crawfish11@prodigy.net
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 207

```
 1  COURT REPORTER:  MS. KELLI ANN WILLIS, RPR, CRR, CSR
                     United States Court Reporter
 2                   1100 Commerce Street
                     Room 1528
 3                   Dallas, Texas  75242
                     livenotecrr@gmail.com
 4
 5          Proceedings reported by mechanical
 6  stenography and transcript produced by computer.
 7
 8                    * * * *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 208

```
 1              I N D E X
 2
 3  Jury sworn ................................. 241
 4  Stipulations ............................... 247
 5
 6  Opening Statement by Mr. Pryor ............. 249
 7  Opening Statement by Mr. McKeeby ........... 279
 8  Opening Statement by Mr. Greenfield ........ 300
 9
10
11
12              W I T N E S S E S
13  AUDREY STONE
14     Direct Examination by Mr. Pryor ......... 309
15
16
17
18
19
20
21
22
23
24
25
```

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 3 of 642   PageID 10944
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 2 July 06, 2022                      Pages 209..212

Page 209

EXHIBITS

Plaintiff's Exhibit 6 .................. 314
Plaintiff's Exhibit 24 ................. 319
Plaintiff's Exhibit 146 ................ 328
Plaintiff's Exhibit 25 ................. 342
Plaintiff's Exhibit 26 ................. 354
Plaintiff's Exhibit 27 ................. 360
Plaintiff's Exhibit 140 ............... 401
Plaintiff's Exhibit 141 ............... 406
Plaintiff's Exhibit 29 ................. 423
Plaintiff's Exhibit 30 ................. 433
Plaintiff's Exhibit 23 ................. 449
Plaintiff's Exhibit 52 ................. 453
Plaintiff's Exhibit 56 ................. 463
Plaintiff's Exhibit 19 ................. 481
Plaintiff's Exhibit 66 ................. 489

---

Page 210

1  -- P R O C E E D I N G S --
2         - o -
3         THE COURT SECURITY OFFICER:  All rise.
4         THE COURT:  You can be seated.
5         Okay.  We are on Day 2 of trial, Day 1 of
6  evidence, and 3:17-cv-2278.  That's Carter versus
7  Transport Workers Union Local 556 and Southwest.
8         Let's do appearances.  First for Carter.
9         MR. GILLIAM:  Matthew Gilliam for
10 Plaintiff Charlene Carter, along with Matt Hill and
11 Bobby Pryor.
12        THE COURT:  Thank you.
13        And for Southwest?
14        MR. McKEEBY:  Paulo McKeeby for Defendant
15 Southwest, and Brian Morris is going through
16 security, or was a moment ago.
17        THE COURT:  We all are at some point.  So
18 I'm sorry, double security.  I tried to warn the
19 jury, right?  Double security is an unwelcome thing
20 to wake up to.
21        Okay.  And then for the Union.
22        MR. GREENFIELD:  Adam Greenfield on behalf
23 of the Union, with Ed Cloutman, III.
24        And we have a new face here.  This is
25 Michael Masoni, our corporate representative.

---

Page 211

1         THE COURT:  Great to meet you.  Thanks for
2  being here.
3         MR. GILLIAM:  Your Honor, I'm sorry.
4  Ms. Meggan Jones is our corporate representative,
5  who is also here.
6         THE COURT:  Ms. Jones, thank you for being
7  here.
8         MR. GILLIAM:  For Plaintiff, I should
9  probably say Charlene Carter is with us here.
10        THE COURT:  She's here in the front row.
11        Thank you, Ms. Carter.
12        So let me say first off, we are trying to
13 push out the Talburt and Parker rulings on depo
14 designations right now.
15        I know that is not what y'all expected
16 timeline-wise, and I apologize for the delay on my
17 end.
18        So I'm not sure what that does to the mix
19 of things, but as soon as we give you those rulings,
20 then y'all do what you need to do.
21        MR. HILL:  I can adjust pretty much on the
22 fly.
23        THE COURT:  Okay.  Well, I appreciate
24 that.
25        That is very kind of you to accommodate my

---

Page 212

1  delay.  So thank you for your patience.  I
2  appreciate that.
3         So we will get those out to you here this
4  morning as soon as we can.  We are finishing those
5  up and pushing them out on the docket.
6         Okay.  So I have the -- I have the
7  explanation of last night from 6:30 and from 8:30.
8  So I have gone through those, and I figured we
9  should just talk through them at the top.
10        So what I wanted to do is maybe pick up
11 with Exhibit No. 15.
12        I will just say this.  I think Mr. Frye
13 was going to email y'all and see if we could get an
14 updated exhibit list.  I know there were some
15 exhibits that were added to the mix that we got over
16 email.  I don't know that we have an updated exhibit
17 list itself.
18        And so I don't know if one party is
19 keeping the list, but if we could get an updated
20 list on the docket and then one in Word form, that
21 would help, because once we start admitting
22 exhibits, I'm going to be the keeper of the Word
23 document, and then I log in what date it was
24 admitted into evidence, what witness it came in
25 with.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 4 of 642   PageID 10945
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 213..216

Page 213

1 And so I will take your Word document, add
2 a few columns, and then start keeping tabs of it on
3 the bench.
4 So if whoever has the pen on the exhibit
5 list could get me an updated copy, that would be
6 great.
7 MR. McKEEBY: We will.
8 THE COURT: Great. Thank you very much.
9 Okay. So I have Exhibit 15 as the first
10 one with objections to talk about.
11 I think that Southwest was the first to
12 get their objections in, so I will go through the
13 ones y'all did first. But any time we are on an
14 exhibit, I will talk about everyone's objections to
15 that exhibit. All right?
16 And then once we finish Southwest, we will
17 come back to the ones that the Union had unique
18 objections to.
19 So I guess Exhibit 15 is the first one
20 that we had objections to. And I think -- well,
21 that's -- sorry. That was Union only.
22 The first one that Southwest and the Union
23 had objections to is 21, I think 21 and 22.
24 So this is emails regarding the recall
25 campaign. And Southwest was making relevance, undue

Page 214

1 prejudice, jury confusion objections.
2 Union was making similar objections.
3 I guess this also gets to the point of
4 similarly-situated or non-similarly situated
5 employees, a limine issue that I addressed
6 previously.
7 So let me ask Southwest or Union, whoever
8 wants to go first, if you want to talk about your
9 objection. I have read that objection, I have read
10 the response that Carter had from the status report.
11 So if there is anything you want to add on
12 21, let me have at it.
13 MR. McKEEBY: Nothing to add specifically
14 to 21. I think they are going to be the same
15 argument for most of these exhibits from Southwest's
16 perspective, is that the Court ruled that the fact
17 that the Union or Union leadership reported
18 employees could be admissible as to the duty of fair
19 representation claim.
20 But the ultimate resolution of those
21 complaints, how Southwest may or may not have
22 disciplined particular employees, was outside the
23 scope of relevant discovery, would result in
24 prejudice, and require us to have to marshal
25 evidence about people who weren't parties to this

Page 215

1 case, former employees or employees, and that was
2 the holding on the motion in limine.
3 So, again, as long as this type of
4 evidence is limited to the claims against the Union,
5 that is fine.
6 There should be a limiting instruction,
7 though, when the evidence does come in, that limits
8 the relevance, or the jury's consideration, rather,
9 of the evidence to those claims so that they are not
10 asking, Okay, well, what happened to this guy, Greg
11 Hover, who got turned in, and why wasn't he -- why
12 aren't we hearing about whether or not he was fired
13 or not?
14 That's what I want to avoid. That was the
15 design of the motion in limine, or the purpose of
16 the motion in limine.
17 THE COURT: Understood.
18 Anything for the Union to add to that?
19 MR. GREENFIELD: It's just a very similar
20 line of argument.
21 If we look at Exhibit 21, and we can look
22 at page 6, is where there is a list of individuals.
23 To start, we have a Gina Jackson, Beverly
24 Belanger, Miche Foley, Ms. Carter, a Mr. HofeHover,
25 Ms. Kearney, Mr. Rivera. It goes on. And there are

Page 216

1 additional witnesses or additional individuals that
2 will come up in the same respect.
3 Just to echo what Mr. Mckeeby was saying,
4 it puts us in a position to try and explain all of
5 these things to the jury and it really creates a
6 trial within a trial on all of these different
7 individuals.
8 THE COURT: I understand.
9 I guess my question is how similar is it?
10 Because, obviously, from the limine rulings that
11 Mr. McKeeby pointed out, there are things in the ZIP
12 code that I think are fine as to the Union, right,
13 and the duty of fair representation claim. That is
14 not to say that the whole universe is fine.
15 So the question is, where do you draw the
16 line?
17 Can I hear your argument, Mr. Gilliam, on,
18 is this close enough as to where it comes as to for
19 the Union?
20 MR. GILLIAM: Yes. I think they all come
21 in as to the Union on both the duty of fair
22 representation claim and the RLA retaliation claim
23 against the Union.
24 I think they are all covered by the
25 Court's prior rulings on the motion in limine.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 217..220

Page 217

1    THE COURT:  Well, that was my view as
2 well.
3    So what I'm trying to do is make sure that
4 I keep tabs on exhibits that come in really Union
5 only, right?  And so to make sure I give the
6 limiting instruction on those.
7    So I'm going to make a note of these as we
8 talk about them.  We may not get to cover all of
9 these before the jury gets here.
10    So if there are others that are in this
11 bucket that are basically union-only exhibits, if
12 you could just ask for a sidebar, flag that for me,
13 or just say "limiting instruction, your Honor," then
14 that will flag for me that this is the Union-only
15 bucket.  It is not applicable to Southwest.
16    MR. GILLIAM:  Your Honor, I will say there
17 are some communications where Brian Talbert -- they
18 had some communications with Southwest senior V.P.
19 Sonya Lacore and forwarded that to Ms. Stone.
20    And they are relevant in two respects.
21    Not only are they relevant to Ms. Stone
22 and her knowledge of what Brian Talbert was doing
23 and his activities, but they are also relevant not
24 for Southwest's discipline of Mr. Talbert, but they
25 are relevant for Southwest's knowledge and awareness

Page 218

1 of what Mr. Talbert was doing and saying.
2    THE COURT:  Which exhibit are we talking
3 about?
4    MR. GILLIAM:  I think specifically this
5 may be 141.
6    THE COURT:  Okay.
7    MR. GREENFIELD:  Your Honor, while we're
8 pulling that up, if I may, I think the issue with
9 Brian Talbert in some of these initial documents
10 that we are looking at right now is that it does get
11 to -- it starts to get very attenuated.
12    We are talking about, they are trying to
13 make an argument binding the Union because of the
14 actions of an executive board member.
15    Mr. Talbert was not -- he was not an agent
16 of the Union, he's just a rank-and-file member of
17 the Union.
18    So they are trying to -- which leads into
19 our 403 argument about it being confusing to the
20 jury about what actually can and cannot bind the
21 Union.  One may be able to, and one absolutely
22 cannot.
23    THE COURT:  Sure.
24    Well, I don't know that that means it
25 doesn't come in.  I think it is a great

Page 219

1 cross-examination point.
2    MR. GREENFIELD:  Thank you.
3    MR. GILLIAM:  I can address that as well,
4 your Honor.
5    We've cited case law in our response to
6 the Union's motion in limine, and we believe that
7 the theory that applies here is one that was
8 established under a case called Communication
9 Workers.  It's a National Labor Relations Board
10 case.
11    THE COURT:  Well, I think it already comes
12 in.  So we have a lot to get to.  I just want to
13 make sure I use our time as efficiently as possible.
14    So let's just go in order to keep things
15 simple.  So we already laid out some framework.  We
16 will get to 141 here in a little bit.
17    For 21, I'm overruling the objections, but
18 I will bring it down with a limiting instruction
19 that it's applied to the Union only, not as to
20 Southwest.
21    22 is the next one we have both Southwest
22 and Union objections to.  These are emails regarding a
23 recall campaign.
24    So any brief argument that Southwest or
25 Union wants to make from this, and I will hear a

Page 220

1 Carter response.
2    MR. GILLIAM:  Your Honor, it is the same
3 position as with 21.
4    THE COURT:  Understood.
5    Anything to add from the Union?
6    MR. GREENFIELD:  I think we have multiple
7 layers of hearsay issues.  We are looking at
8 multiple Facebook posts, Facebook documents.  And so
9 they are out-of-court statements being offered for
10 the truth of the matter asserted and they violate --
11    THE COURT:  What is the hearsay response?
12    MR. GILLIAM:  On the hearsay response,
13 they are not really being offered for the truth of
14 the matter asserted, they are being offered for
15 Southwest's knowledge of President Stone struggling
16 with a recall campaign.
17    All right.  Then I do have something else
18 to say about that because that again goes to the
19 heart of our motion in limine.
20    The fact that some senior executive who
21 had nothing to do with Ms. Carter's termination got
22 an email in 2013 about the recall election has
23 nothing to do with Ms. Carter's claims regarding her
24 termination in 2017.
25    What they want to do is get this in front

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 2 July 06, 2022                           Pages 221..224

Page 221

1 of the jury, and say, you know, Look, Southwest
2 should have reported this claim or should have
3 reported this issue back in 2013.
4        But again, Sonya Lacore was not a
5 decision-maker with respect to Ms. Carter's
6 termination, she was not involved in the
7 investigation.  She was copied on a couple of
8 documents.
9        THE COURT:  Understood.
10       So my ruling on this one is I think it
11 fits within a hearsay exception.  However, I do
12 think it still has a limiting instruction that comes
13 in with it.
14       MR. GILLIAM:  Your Honor, may I respond?
15       THE COURT:  So it comes in as to Union but
16 not as to Southwest.
17       MR. GILLIAM:  I think it is relevant to
18 Southwest.
19       THE COURT:  How so?
20       MR. GILLIAM:  Because this exhibit has
21 nothing to do with employee discipline or
22 comparators at all.  It has nothing to do with
23 employee discipline or similarly-situated
24 comparators.
25       It is an email where Southwest senior

Page 222

1 management is talking about Stone's struggles with
2 the recall campaign.
3        So it's not about employee discipline at
4 all.  It's about Southwest's knowledge and their
5 reaction to the recall campaign and Ms. Stone's --
6 the opposition she's dealing with.
7        THE COURT:  20-second response,
8 Mr. McKeeby.
9        MR. McKEEBY:  What does that have to do
10 with Ms. Carter's termination four years later?  It
11 is irrelevant.
12       MR. GILLIAM:  Motive, your Honor.
13       MR. McKEEBY:  But these aren't
14 decision-makers.  That's why the motive, if it were
15 a decision-maker, then it might be relevant to
16 motive.  But Ms. Lacore had nothing to do with that
17 decision, and therefore, it's irrelevant and
18 prejudicial, and that is why it should be kept out,
19 as the Court has already ruled.
20       MR. GILLIAM:  On the complaint.
21       THE COURT:  I'm not convinced on relevance
22 as to Southwest.  So I will still stick to my course
23 and say it fits within hearsay exceptions, but it is
24 still limited as to Union only, not as to Southwest.
25       MR. GREENFIELD:  Your Honor, just so we

Page 223

1 are clear, when you say "limiting," we would ask for
2 a limiting instruction that the posts, as presented
3 by Mr. Gilliam, are not being offered for the truth,
4 and we would ask for that instruction to the jury.
5        THE COURT:  I saw that request, and I have
6 never done that before.  And I will tell you why.
7        You are asking me to tell them what is
8 going on with a legal side show.  I just don't do
9 that.  I could say, Well, this is present state
10 mental impression, right?  What on earth is that?
11       So I get your request, but -- you can
12 bring that up if you want to in cross, but I don't
13 signal to them.  I try not to even tell them what my
14 rulings are, right?  If we're over here at a
15 sidebar, I don't even tell them what I ruled, much
16 less why.
17       So I get your point, but I have never done
18 that before, I'm not going to start, because I think
19 it starts injecting a legal debate into the factual
20 resolution that they are getting to.
21       The next one I have is 23.
22       So 22, I overruled the objections, but it
23 will come in with a limiting instruction.
24       23.  Any argument from -- well, sorry.  I
25 said I would cover Southwest first.  That is Union

Page 224

1 only.
2        Scrolling down to Southwest.
3        I have Southwest, next one as the batch at
4 68 to 72.
5        MR. McKEEBY:  It is actually 31.  But that
6 is a different basis.  I don't know how the Court
7 wants to cover it.
8        THE COURT:  I will go back to 31.  What
9 argument do you want to make on 31?
10       MR. McKEEBY:  It is similar argument, but
11 this is different in that it is a statement from a
12 employee or former employee about her social media
13 experience, violations, and discipline.
14       She says in the fourth paragraph, "Each
15 time I was turned in, management would tell me that
16 I was not receiving discipline, but not -- to tread
17 lightly when posting, and reminded me of the very
18 strict social media policy that had been implemented
19 by management."
20       Again, so it has nothing to do with
21 Ms. Carter.  It is a statement by a different
22 employee about her situation, and it is going to
23 confuse the jury and is irrelevant for the reasons
24 that are set forth in our motion in limine.
25       And this one is different in that it

Page 225

1  doesn't even relate, appear to relate to a complaint
2  from the Union or the Union leadership.  So this one
3  shouldn't be admitted at all.
4        That's my argument.
5        THE COURT:  Okay.  Then Union also has
6  arguments.
7        Anything you want to make in addition to
8  those arguments?
9        MR. GREENFIELD:  We would echo the
10 relevance argument, but also that this is hearsay.
11 They also have Ms. Jeanna Jackson listed
12 on their witness list.  If they would like to call
13 her up and talk about these things, they are
14 certainly able to do that.
15       This is an out-of-court statement being
16 offered for its truth.
17       THE COURT:  What is the response on 31?
18       MR. GILLIAM:  On 31, Jeanna Jackson was
19 the leader of the recall campaign, and we have
20 evidence showing that she was being reported by
21 Union actors throughout this time period.
22       And again, it is relevant to both
23 Southwest's knowledge of the recall efforts going on
24 and to their retaliatory motive for Carter's RLA
25 claims against Southwest, as well as against the

Page 226

1  Union.
2        It's also relevant to the DFR claims as to
3  how the Union was responding to Ms. Jackson and how
4  various Union actors were reporting her for
5  discipline.
6        THE COURT:  What about hearsay?
7        MR. GILLIAM:  On hearsay, it is -- they
8  are mental impressions.  We can call Ms. Jackson to
9  verify this information.  It's not really introduced
10 for the truth of the matters asserted.
11       THE COURT:  So my ruling on this one is I
12 get its relevance and I think it is relevant.
13       The problem is hearsay.  If this is
14 present tense mental impression, then everything is.
15       It's a really long letter, right?  You
16 could put her on the stand and she could talk about
17 it.  If she doesn't remember it, you could use it to
18 refresh.
19       I think it is certainly a topic you can
20 get into, but in this form I think it is hearsay.
21       So I will sustain the objection from
22 Southwest and the Union on hearsay grounds on
23 Exhibit 31.
24       Okay.  So are we now to 68 to 72,
25 Mr. McKeeby?

Page 227

1        MR. McKEEBY:  57 is another one that I
2  raised.  It's just a newspaper article.  I don't
3  understand the relevance and think it is hearsay.
4        THE COURT:  Understood.
5        Anything to add from the Union?
6        It looks like relevance and hearsay are
7  your two objections, Mr. Greenfield.
8        MR. GREENFIELD:  Correct, your Honor.
9        THE COURT:  So relevance and hearsay for
10 57?
11       MR. GILLIAM:  Yes, your Honor.
12       We think it comes in as a party admission
13 by TWU as to why members were there in Washington,
14 DC.  They were there to participate in the march.
15       And so it's also relevant as to showing
16 why the Union was attending the -- why they were
17 there at the time they were there and that they were
18 there to attend the march.
19       MR. GREENFIELD:  Your Honor, if I may
20 provide a response to that.
21       THE COURT:  Briefly.
22       MR. GREENFIELD:  This is not a Local 556
23 document.  This is a document from a publication by
24 the International Union, which is not a party to
25 this case.  It is hearsay.

Page 228

1        THE COURT:  What is the response from
2  Carter to that?
3        MR. GILLIAM:  TWU is their parent union.
4  They are Transport Workers Union of America, Local
5  556.  And it is -- the article was talking about TWU
6  locals taking action nationwide.
7        THE COURT:  Response to the TWU as a
8  parent argument, Mr. Greenfield?
9        MR. GREENFIELD:  Well, your Honor, they
10 are not a party to this case.  While we are a local,
11 they are very separate.  Hence, why you see some of
12 the issues with separation of dues and money that go
13 to the different organizations.
14       They are different entities, and they are
15 asking about an article which we don't have an
16 author to.  We don't know who wrote this.  We can't
17 test its veracity, for all of the reasons that we
18 exclude hearsay documents.
19       THE COURT:  Understood.
20       Okay.  My ruling on this one, number 57,
21 is I will go ahead and sustain that hearsay
22 objection.  I think, given that it is a parent, I
23 still don't think I can get there without piercing
24 the corporate veil, so to speak.
25       So I'm not going to do that in this

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 8 of 642   PageID 10949
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                          Pages 229..232

Page 229

1  context without a showing of commingling in the
2  organizations functioning as one.
3        Okay.  What objection are we to next?
4  Mr. McKeeby.
5        MR. McKEEBY:  68 through 72 fall under the
6  same -- I can't resist -- bucket as 21 and 22.
7        They are, again, directly covered by the
8  Court's ruling on our motion in limine, and to the
9  extent admissible, should be admitted with a
10 limiting instruction.
11       THE COURT:  Understood.
12       Any additional argument, Mr. Greenfield,
13 on that bucket, 68 to 72?
14       MR. GREENFIELD:  It just goes into even
15 further more tangential Facebook posts.  So we just
16 renew our relevance and hearsay objections.
17       THE COURT:  Understood.
18       My leaning on this one is to allow them
19 in, tangential though they are, and just remind you
20 of the clock and efficiency, right?  And efficient
21 presentation.  People get bogged down in exhibits
22 all of the time that have marginal relevance, and
23 that is where they kill themselves on the time
24 clock.
25       So I will let it in, 68 through 72, but I

Page 230

1  will do so with a limiting instruction.  So I'm
2  making a note of that, to bring that up every time
3  such an exhibit is offered and admitted into
4  evidence.
5        Okay, Mr. McKeeby, we are through 72.
6  Where are we at now?
7        MR. McKEEBY:  132.
8        And that's another -- it's a relevance
9  objection.  But, again, this one doesn't appear to
10 even relate to a report by the Union, so I'm not
11 sure it should come in at all.
12       And so for the reasons raised in our
13 motion in limine, relevance, prejudice, misleading
14 the jury -- or confusing the jury, I should say, it
15 should not be admitted.
16       THE COURT:  Understood.
17       Anything to add from the Union?
18       MR. GREENFIELD:  Depending on who they
19 bring this in through, it is also hearsay, your
20 Honor.
21       In addition, it's talking about
22 information that they have gathered about potential
23 witness reports, et cetera, which then leads us to
24 the best evidence argument.
25       If there are actual reports of these

Page 231

1  individuals, for example, Ms. Stone and Ricci Spand
2  making complaints to the company, if those were
3  actually done or done properly, or specifically who
4  they were done by, we should just look at that
5  evidence.
6        THE COURT:  All right.  Response from
7  Carter.
8        MR. GILLIAM:  Yes.  It's relevant because
9  it's President Stone and Shop Steward Ricci Spand
10 reporting the recall leader, Jeanna Jackson.  So it
11 shows motive, plan, intent, knowledge, opportunity.
12       So it's also an exception to hearsay and
13 directly relevant to Carter's DFR and retaliation
14 claims against the Union.
15       THE COURT:  Yes.  Okay.  I will do the
16 same as I did for 21 through 22, the other bucket.
17 So I will admit it with a limiting instruction.
18       MR. GREENFIELD:  Your Honor, may I have a
19 ruling on the best evidence argument as well?
20       THE COURT:  Lay out your best evidence
21 argument.
22       MR. GREENFIELD:  Okay.
23       THE COURT:  Go for it.
24       MR. GREENFIELD:  Thank you.
25       THE COURT:  Sorry.  Can you lay out your

Page 232

1  best evidence argument?
2        MR. GREENFIELD:  Yes, your Honor.
3        So I think the problem is that we have
4  risk of confusion here.  It's saying flight
5  attendants Audrey Stone and Ricci Spand alleging
6  retaliation from several other flight attendants.
7        We don't know who to attribute that to.
8  We don't know whether it was Ms. Stone, Ms. Spand,
9  and what capacity and who those retaliation
10 complaints were against.
11       And we should just look at those
12 complaints, if those actually exist, and who they
13 exist against.
14       And I think that's very important,
15 especially for Ms. Stone, because they are trying to
16 pass her actions off for all of the Union and they
17 are trying to create an argument of a pattern of
18 turning in AFO's objectors.
19       Who they are turning in would be directly
20 relevant to that.  Maybe they are turning in people
21 who have nothing to do with their argument.  But
22 that is what they are trying to conflate.
23       And so if those complaints exist, that's
24 the evidence we should be looking at.
25       THE COURT:  So I understand the argument,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 9 of 642   PageID 10950
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 2 July 06, 2022                    Pages 233..236

Page 233

1 but I overrule those, because usually the best
2 evidence arguments don't put to the actual trial
3 exhibit that's the best evidence.
4        So if they did, then that gets my
5 attention.  But to the extent that it doesn't, that
6 is my understanding of the flaw in the argument.
7        So I will overrule that best evidence
8 argument as well.
9        So I will admit this, 132, with a limiting
10 instruction.
11       Mr. McKeeby, are we to 140?
12       MR. McKEEBY:  140, 141, and 146 fall into
13 the same category, and a familiar one that Southwest
14 objects for the grounds set forth in its motion in
15 limine.
16       And to the extent those documents are
17 admissible, they should be admitted with a limiting
18 instruction.
19       THE COURT:  And relevance, prejudice,
20 hearsay are the additional arguments that you are
21 making, Mr. Greenfield?
22       MR. GREENFIELD:  Yes, your Honor.
23       THE COURT:  Okay.
24       So response.
25       MR. GILLIAM:  The same response as to 21,

Page 234

1 22, 132.  These are -- these involve Stone and other
2 Union actors complaining to the company about
3 non-member objectors, and also, Mr. Talburt
4 complaining about the recall leader, Jeanna Jackson,
5 and go to the Union's retaliatory motive and DFR
6 claims.
7        MR. GREENFIELD:  Your Honor, if I may, on
8 146, I believe it is a little bit different.
9        THE COURT:  Okay.  What I will do is let
10 me go ahead and rule on 140 and 141.
11       I will have my same rulings as the prior
12 buckets with 21 and 22.  I will admit with a
13 limiting instruction.
14       But let's carve out 146 and hit me with
15 your additional 146 argument.
16       MR. GREENFIELD:  Your Honor, if we
17 ultimately just pause for a brief moment, I know
18 that the rule has been invoked in this case, and I
19 have seen a witness enter at this time.
20       THE COURT:  All righty.
21       Is anyone in here in the courtroom who is
22 a witness in the case?
23       MR. GILLESPIE:  Your Honor, Ms. Stone is
24 here, and I didn't realize there was testimony
25 taking place.

Page 235

1        THE COURT:  Okay.  There is no testimony
2 taking place.  There is legal argument.  But we are
3 talking about exhibits, and so we're basically
4 functioning as if we are at a sidebar.
5        So at a sidebar, I don't let the witnesses
6 hear what is going on and come over here.
7        So I would appreciate it if you would go
8 back out to the hall or find some other place.
9        If y'all need to coordinate to talk
10 timing, I will be happy to excuse a lawyer out to
11 the hall to talk through timing.
12       MR. GILLESPIE:  Thank you.
13       THE COURT:  Mr. Greenfield.
14       MR. GREENFIELD:  Yes, your Honor.
15       THE COURT:  Okay.  Now 146.
16       I don't know what anyone looks like, so I
17 appreciate y'all patrolling the rule.  I'm the only
18 one facing them, but I'm the only one who doesn't
19 know who they are.
20       MR. GREENFIELD:  Out of the corner of my
21 eye I was able to catch that.
22       THE COURT:  Very good.
23       MR. GREENFIELD:  I think 146 is a little
24 bit different in regards to the other documents we
25 have talked about.

Page 236

1        If you look at page 6, what Ms. Stone is
2 requesting is that the company take objectors off of
3 joint committees between 556 and the Union, joint
4 union company committees.
5        There is nothing illegal about that.
6        And, again, I think they are just using it
7 for prejudicial purposes.  If that action is not
8 illegal, then it is irrelevant and it is prejudicial
9 to confuse the jury that this is another action of
10 retaliation, when it is not.
11       THE COURT:  What's your response on the
12 additional 146 argument on legality?
13       MR. GILLIAM:  Well, I think that, again,
14 it shows that Stone is turning in non-member
15 objectors, just like Ms. Carter.  Ms. Carter was a
16 non-member objector.
17       And it shows Ms. Stone's efforts to get
18 the company to act against non-member objectors in
19 this case, taking them off of joint union and
20 employee committees.  So, again, it's -- that's -- I
21 think it is relevant for those reasons.
22       MR. GREENFIELD:  And, your Honor, to be
23 clear, she's not turning anyone in here.  All she's
24 doing is reaching out to the company.
25       If you look at page 6, it is just her and

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 10 of 642   PageID 10951
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 237..240

Page 237

1 Ms. Stone asking the company to coordinate to take
2 non-members off of joint committees.
3        They objected to the union.  They gave up
4 their voice.  They don't get to serve on joint
5 committees between the union and the company any
6 longer.  That is all Ms. Stone is trying to do.
7 There is no complaint existing in this document.
8        THE COURT:  So I get your point.  I don't
9 think it rises to the level of unfair prejudice.  I
10 think it is a point to bring up on cross to diffuse
11 the value of their exhibit.
12        So I will overrule the objection, I will
13 let it in, and I will include the limiting
14 instruction on 146.
15        Okay.  So let's go back up to, at the top.
16 Let me ask...
17        Our jurors are here.  So let me say for
18 the objections I didn't get to, Mr. Greenfield, of
19 yours, what you can do is, to save time, if you want
20 to, you can say "same objections as earlier."
21        I have a leaning on what I would do with
22 them.  If you want to argue them at sidebar, that is
23 perfectly fine.  You may call as many sidebars as
24 you want.  But the sidebars that anyone loses, the
25 time goes to them.  So keep that in mind.

Page 238

1        So if you just say, "Objection, same
2 objections as this morning," I know what I'm going
3 to do on them, right?
4        And there may be some that I call a
5 sidebar because I want more argument on them but I
6 have researched them all and so I have a leaning.
7        So I can still be efficient even though we
8 haven't gotten to yours this morning, but call a
9 sidebar.  If you really want to argue one to me.
10        Does that make sense?
11        MR. GREENFIELD:  Yes, your Honor.
12        Thank you.
13        THE COURT:  Okay.  As far as opening, are
14 we doing --
15        MR. PRYOR:  I have a point about opening.
16        THE COURT:  Yes.
17        MR. PRYOR:  You ordered Southwest to
18 provide us the demonstrative evidence they were
19 going to use in opening.
20        It is not demonstrative evidence.  It is
21 evidence.  They are attempting to display to the
22 jury the pictures of the fetuses.  That is not in
23 evidence yet.  This is opening; it is not evidence.
24 And they are displaying their actual wording of
25 their policies and their policies, it is not

Page 239

1 demonstrative, it is evidence.  It is inappropriate.
2        THE COURT:  Understood.
3        Response from Southwest?
4        MR. McKEEBY:  Your Honor, I'm not asking
5 for it to be admitted during the opening, obviously,
6 but if these are exhibits that are listed in the
7 documents that plaintiff's counsel provided and they
8 should be raised with the jury during opening.
9 There is nothing wrong with that.
10        I'm not asking it to be admitted,
11 obviously, but the jury is going to hear about the
12 policies.  There is no reason they can't see the
13 policy during the opening.
14        THE COURT:  Is there anything that you're
15 showing the jury that they have not asked to admit
16 today?
17        MR. McKEEBY:  No.
18        THE COURT:  Okay.  I will allow it.
19        But I want you to preface it with a caveat
20 that this is not evidence.  This is what we expect
21 the evidence that will be admitted will show to you.
22        MR. PRYOR:  Your Honor, given that ruling,
23 we would like to play some of the video depositions
24 during opening.
25        That's -- it's your ruling, your Honor.

Page 240

1 You are saying evidence is admitted.  We would like
2 to play evidence for the jury as well.
3        THE COURT:  No.  No one can, right?  To
4 play video depo.  You can say, we expect you will
5 hear from this witness.
6        MR. PRYOR:  But it's not as effective as
7 showing the jury the testimony itself just as it's
8 not as effective for him to say --
9        THE COURT:  No.
10        MR. PRYOR:  Okay.  I tried.
11        THE COURT:  Any other issues with opening?
12        Okay.  So what is the order?  You're
13 going, and then defense.  Who is going first?  Have
14 y'all arm wrestled over that?
15        MR. McKEEBY:  We have not arm wrestled.
16        THE COURT:  Okay.
17        MR. McKEEBY:  I'm happy to go first.
18        THE COURT:  Okay.  That works.  McKeeby,
19 then Greenfield.  Okay.  Got it.  That's our run of
20 show.
21        We'll bring them in.  We'll swear them in.
22 I will give them the standard instructions I need to
23 and then we will open, open, open, and then we'll
24 probably take our morning break and then call our
25 first witness.  Fair?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                    Pages 241..244

Page 241

1    MR. PRYOR:  Okay.
2    THE COURT:  Okay.
3    You can take a -- how about we do this?
4 We're going to take a five-minute break for y'all's
5 sake.  You can reset, use the bathroom, if you need
6 to.
7    We are going to line up them up, tell them
8 how the first run goes, and then I will back in five
9 minutes and we will get going.
10    THE COURT SECURITY OFFICER:  All rise.
11    (Recess.)
12    THE COURT SECURITY OFFICER:  All rise.
13    THE COURT:  Okay.  Let's bring them in.
14    THE COURT SECURITY OFFICER:  All rise for
15 the jury.
16    (The jurors entered the courtroom.)
17    THE COURT:  All right.  Now, Mr. Frye is
18 going to swear you in as jurors.
19    (The jurors were sworn.)
20    THE COURT:  Okay.  The United States
21 District Court, in and for the Northern District of
22 Texas is now in session.
23    The Honorable United States District Judge
24 Brantley Starr presiding.
25    All those having business with this Court,

Page 242

1 draw near and you shall be heard.
2    Please be seated.
3    THE COURT:  Okay.  Well, thank you for
4 being here.
5    I will say before I give you our starting
6 instructions, that our second president, John Adams,
7 said that the right to vote and a trial by jury are
8 the heart and lungs of American democracy.
9    So thank you for being the lungs of
10 American democracy.  We appreciate you serving in
11 this capacity.
12    You now have been sworn in as the jury to
13 try this case.  As the judge, I will decide all
14 questions of law and procedure.  As the jury, you
15 are the judges of the facts.
16    At the end of the trial, I will instruct
17 you on the rules of law that you must apply to the
18 facts as you find them.
19    You may take notes during this trial.  Do
20 not allow your note-taking to distract you from
21 listening to the testimony.  Your notes are an aid
22 to your memory.
23    If your memory should later be different
24 from your notes, you should rely on your memory.
25    Do not be unduly influenced by the notes

Page 243

1 of other jurors.  The jurors' notes are not entitled
2 to any greater weight than each juror's recollection
3 of the testimony.
4    Until this trial is over, do not discuss
5 this case with anyone and do not permit anyone to
6 discuss this case in your presence.
7    This includes your spouse, children,
8 relatives, friends, coworkers, and people with whom
9 you commute to court each day.
10    During your jury service, you must not
11 communicate any information about this case by any
12 means, by conversation or with tools of technology.
13    For example, do not talk face-to-face or
14 use any electronic device or media, such as a phone,
15 computer, the Internet, or any Internet or messaging
16 service, or any other way to communicate with anyone
17 any information about this case, until after I
18 accept your verdict or excuse you as jurors.
19    Do not even discuss this case with other
20 jurors until the end of the case when you retire to
21 deliberate.
22    It is unfair to discuss the case before
23 all the evidence is in because you may become an
24 advocate for one side or another.
25    The parties, the witnesses, the attorneys

Page 244

1 and persons associated with the case are not allowed
2 to communicate with you.  And you may not speak with
3 anyone else in or around the courthouse other than
4 your fellow jurors or court personnel.
5    Do not make any independent investigation
6 of this case.  You must rely solely on what you see
7 and hear in this courtroom.
8    Do not try to learn anything about the
9 case from any other source.  In particular, you may
10 not use any electronic device or media, such as
11 telephone, cell phone, smart phone, or computer to
12 research any issue touching on this case.
13    Do not go online or read any newspaper
14 account of this trial, or listen to any radio or
15 television newscast about it.
16    Do not visit or view any place discussed
17 in this case and do not use Internet programs or
18 other devices to search for or view any place
19 discussed in the testimony.
20    In sum, you may not research any
21 information about this case, the law, or the people
22 involved, including the parties, the witnesses, the
23 lawyers, or me, your judge, until after you have
24 been excused as jurors.
25    There are some issues of law or procedure

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 245..248

Page 245

1 I must decide that the attorneys and I must discuss.
2 These issues are not part of what you must decide.
3 They are not properly discussed in your presence.
4         To avoid having you leave the courtroom
5 and to save time, I may discuss these issues with
6 the attorneys at the bench over here at the side,
7 outside of your hearing.
8         I will press a button; it will turn on
9 white noise, and then we will try to whisper loud
10 enough for us to hear but not for y'all to hear.
11        When I confer with the attorneys at the
12 bench, please don't listen to what we are
13 discussing.  If the discussions require more time, I
14 may have to have you leave the courtroom until the
15 lawyers and I can resolve those legal issues.
16        I will try to keep these interruptions as
17 few and as brief as possible.
18        The trial will now begin and lawyers for
19 each party will make an opening statement.  Opening
20 statements are intended to assist you in
21 understanding the significance of the evidence they
22 expect to be presented.  But the opening statements
23 are not evidence.
24        After the opening statements, the
25 Plaintiff will present her case through witness

Page 246

1 testimony and documentary or other evidence.
2         Next, the Defendants will have an
3 opportunity to present their cases.
4         The Plaintiff may then present rebuttal
5 evidence.
6         After all the evidence is introduced, I
7 will instruct you on the law that applies to this
8 case.
9         The lawyers will then make their closing
10 arguments.  Closing arguments are not evidence, but
11 rather the attorneys' interpretations of what the
12 evidence has shown or not shown.
13        And, finally, you will go to the jury room
14 to deliberate to reach a verdict.
15        Keep an open mind during the entire trial.
16 Do not decide the case until you have heard all the
17 evidence, my instructions, and the closing
18 arguments.
19        Before we do opening statements, what I
20 want do is read some stipulations to you.
21        Those stipulations are just agreements
22 among the parties.  Lawyers can do this with their
23 clients to make sure that it streamlines the case
24 and gives you agreements that they have reached in
25 advance that no one needs to prove here in court and

Page 247

1 these lawyers have done that in this case.
2         So there are a total of, I believe, 15
3 stipulations.  I'm going to read them to you now.
4 You don't have to write them all down because I will
5 include them in the jury charge that I give to you
6 at the end of the case that includes the relevant,
7 but I will read them for you now.
8         (Discussion off the record.)
9         THE COURT:  All right.
10        We are making the jump to hyperspace.
11        Here we go.
12        Stipulation 1:  Charlene Carter is a
13 Christian who believes that abortion is the taking
14 of a human life contrary to the teachings of the
15 Bible and the will of God.
16        No. 2:  Carter was hired as a flight
17 attendant by Southwest in 1996.
18        No. 3:  TWU Local 556 is the local union
19 representing flight attendants working at Southwest
20 Airlines.
21        No. 4:  Local 556 served as Carter's
22 exclusive bargaining representative throughout her
23 tenure with Southwest.
24        5:  For several years Carter objected to
25 certain decisions by and the leadership of Local

Page 248

1 556's leadership, email messages, and Facebook
2 postings.
3         6:  In September 2013, Carter resigned her
4 membership with Local 556 and was an agency
5 fee-paying non-member objector until her termination
6 in 2017.
7         7:  Starting in early 2015, Carter began
8 sending messages to Stone discussing Carter's status
9 as a Union objector.
10        These emails and messages continued for
11 the termination of Carter's employment by Southwest.
12        8:  From 2015 through 2017, Carter
13 continued in various efforts opposing the Union and
14 the Union's then president Audrey Stone.
15        Carter supported a recall campaign and
16 posted and sent messages on social media expressing
17 her disapproval of the Union and Union leadership.
18        Carter sent many direct messages to Stone
19 to which Stone never responded.
20        9:  In January of 2017, members of Local
21 556, including President Stone, attended a
22 union-sponsored Women's Committee Meeting in
23 Washington, DC.
24        10:  On January 21st, 2017, certain
25 members of Local 556 attended the Women's March in

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                           Vol 2 July 06, 2022                              Pages 249..252

Page 249

1 Washington, DC.
2        11: On February 14th, 2017, Carter sent
3 Local 556 President Audrey Stone private messages
4 via Facebook Messenger.
5        12: President Stone never sent Carter
6 responses to the private messages.
7        13: On February 22nd, 2017, President
8 Stone reported Carter's emails and Facebook messages
9 to Stone's base manager, Suzanne Stephensen, in Las
10 Vegas, Nevada.
11        14: On March 7, 2017, Southwest held a
12 fact-finding meeting with Carter as part of its
13 investigation of President Stone's complaint.
14        15: On March 14th, 2017, Southwest sent
15 Carter a termination notice.
16        That ends the stipulations. So with that,
17 we are now going to move to the opening statements
18 by the lawyers.
19        Mr. Pryor will open for the Plaintiff
20 Carter.
21        MR. PRYOR: Thank you, your Honor.
22        In 1983, Charlene Carter was 19 years old,
23 and she had a problem. She was living with her
24 boyfriend in Lake Dallas, Texas. Her parents had
25 disowned her because she was living out of wedlock.

Page 250

1 Her father called her a whore.
2        Her boyfriend was going to college. She
3 had been going to college, but she quit in order to
4 take two jobs to put her boyfriend through college.
5        She was pregnant and she had no support.
6 She waited a day after finding out to tell her
7 boyfriend, and he didn't want a child. He didn't
8 want to get married. He was in a fraternity, he was
9 going to school. And so she was left on her own.
10        A tough decision for a 19-year-old.
11        By the way, we are talking about
12 Charlene's story as it relates to her beliefs and
13 her exercise of her religious freedom here. I'm not
14 trying to convince anyone of anything. I just hope
15 you can respect her experience.
16        So at 19 she goes to see her doctor.
17 She's nine-and-a-half weeks pregnant.
18        She goes home, she pulls out the Yellow
19 Pages, and she looks for the number for Planned
20 Parenthood.
21        She goes there. And she goes there with
22 every intention of getting an abortion if she gets
23 answers that she's really hoping to hear from them.
24        She goes there, and they tell her that
25 that's not a baby, it's a zygote. Don't worry about

Page 251

1 it. And she accepts that answer.
2        In her heart she will tell you she knew it
3 wasn't right for her, but she accepted it and she
4 had the abortion.
5        And it was devastating for her. She was
6 depressed for years.
7        To deal with the depression, she married
8 her boyfriend. And she will tell you, walking down
9 the aisle, she was thinking about the fact that he
10 had not supported her when she had the abortion.
11        But she married him because the guy you
12 sleep with is the guy you are supposed to marry.
13 And the depression then does go away.
14        She finally, after years, she goes to a
15 church, and at this church -- again, I'm not
16 preaching to you, this is her experience.
17        But at this church, she's at a women's
18 Bible study, and it is basically an auditorium full
19 of women and then they will break into smaller
20 groups.
21        And the speaker stood up and talked about
22 something she had never heard talked about in
23 church.
24        The speaker talked to her about God's
25 love, God's forgiveness, and then the speaker asked

Page 252

1 anyone that's had an abortion to stand up.
2        There was not a rush of people to stand
3 up. Charlene had been carrying this for years. She
4 stood up and another stood up. And then the speaker
5 talked about people affected by abortion.
6 Eventually, everyone in the auditorium is standing
7 up and they pray.
8        And Charlene felt God's love, she felt his
9 forgiveness, and she felt his guidance that she use
10 her experience to help others and to save babies.
11        And that is what she's done.
12        By the way, she's not out or has ever been
13 protesting in front of a Planned Parenthood office.
14 That is not her. She's helping women that were in
15 the same situation she was when she was 19 years
16 old.
17        That's to inform you about her religious
18 belief and how she exercised it and got fired for
19 it.
20        Now, there is another aspect of her life
21 that is involved in this case, and that is her
22 union.
23        And that begins in 1996. She goes to work
24 for Southwest Airlines. She's very excited about
25 it.

Page 253

1    She had a son by then.
2         By the way, I should mention that before
3 she had her son, she was pregnant as well and lost
4 that baby.  And the reason I mention it is because
5 she lost the baby because of complications from her
6 abortion.
7         That was part of the guilt she was
8 carrying.  But, you know, she felt God's forgiveness
9 for that.  She moved on and is helping people.
10        But when she went to work in 1996, she was
11 very excited.  She went to work as a flight
12 attendant.
13        And Charlene, it's the perfect job for
14 her.  She's a people person, she likes helping
15 people, she's a smiling person.  She's like what you
16 remember from Southwest in the Herb Kelleher days.
17 She was the perfect employee for that position.
18        In fact, let me fast forward.
19        21 years, from 1996 to 2017, 21 years,
20 she's a flight attendant for Southwest Airlines.
21 How many times was she given a verbal warning, a
22 written warning, a 30-day suspension, a probation?
23        You name whatever penalty they have.
24 Nothing.  She was an absolutely stellar flight
25 attendant and gave all of her efforts, as did many

Page 254

1 other people, to make Southwest Airlines the
2 successful airline it is today.
3         But she had problems with her union.
4         And I want to talk to you just for a
5 minute.  The judge explained it during voir dire.
6 Let me cover it again.
7         The relationship between Southwest
8 Airlines, a union, and its employee.
9         So this is Southwest Airlines, this is the
10 Union and this is Charlene.
11        So Southwest Airlines and the Union have a
12 Collective Bargaining Agreement.  By law, the only
13 one that can deal with Southwest Airlines regarding
14 employees' benefits, salary, work conditions is the
15 Union.
16        So it is the Union and Southwest.
17        Charlene cannot talk to Southwest about,
18 Hey, I want you to pay me more money.  I want better
19 work conditions.  It is the union that does that.
20        As a result of that, the law says, Union,
21 you have to look after that employee because that
22 employee can't do it.  We give that responsibility
23 to you.
24        You have a fiduciary duty to that
25 employee.  It is the highest obligation under the

Page 255

1 law.  You cannot do anything against the interest of
2 that employee.  That is the relationship.
3         So Charlene, she pays her dues.  She's not
4 terribly active in the union.  In the year 2000, she
5 thought the union was focused way too much on
6 national things and politics instead of
7 concentrating on what she thought a union should be
8 doing, better work conditions, better pay.
9         And a candidate ran, a young lady, I think
10 it was Melissa Smith, ran, and Charlene was very
11 excited about that candidacy.  Melissa Smith wins.
12        And Charlene then finds out a hard truth
13 about her union.  Melissa Smith is kicked out.
14        So Melissa Smith gets elected by the
15 voters, and the seniors at the national and
16 international kicked Melissa Smith out.
17        And this becomes a pattern.  You will hear
18 more about it.  And this pattern is, they always
19 have an excuse.  You know, you kept that laptop two
20 weeks too long, or you didn't turn in this
21 reimbursement slip.
22        By the way, some of the excuses, they are
23 mostly petty, but some of them turned out to be
24 completely false.
25        Charlene's view is that they had

Page 256

1 disenfranchised the voters, and this person that was
2 going to come in and make the union better gets
3 kicked out.
4         This happens again in 2013.  And this is a
5 whole slate of candidates, five candidates for every
6 officer position in the Local 556.
7         All five of the candidates that Charlene
8 supports get voted in.  What happens to them?  I can
9 tell you, they are all kicked out within less than a
10 year.
11        And who do they put in power?  The ones
12 that lost.  The vast majority voted for by the
13 people get kicked out, and the ones that lost are
14 put in the offices.  One of those is Audrey Stone.
15 She's the president of the union at this point.
16        And so Charlene -- by the way, Audrey
17 Stone is going to be the one that is going to
18 complain and get Charlene fired.  The Union
19 president.
20        Charlene starts complaining to her union.
21 You heard the stipulation, sending emails, sending
22 Facebook messages.  And she's -- it is always
23 precipitated by something.
24        I'm upset that they kicked out these
25 candidates.  I'm upset that you're improperly

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 2 July 06, 2022                      Pages 257..260

Page 257

1 negotiating for us on a Collective Bargaining
2 Agreement.  It's not good enough.
3       By the way, a Collective Bargaining
4 Agreement that was rejected by 87 percent of the
5 flight attendants.  So it is not like Charlene is
6 just a rabble rouser.  She's just not happy with
7 what her union is doing.
8       And she communicates that to the Union.
9 And there were a couple of ways.  One is email
10 messages, but the other is Facebook messages.
11      Charlene had received Facebook messages
12 from her Union president, Audrey Stone, TWU,
13 Transportation Workers Union.
14      Ms. Stone used this Facebook page to send
15 out campaign information and seek support, tell
16 people to support the Collective Bargaining
17 Agreement, you name it.
18      And Charlene would respond, and say, No, I
19 disagree with that.  And she responded on Facebook
20 message.
21      And interestingly, they are going to stand
22 up and tell you that really that's Audrey Stone's
23 personal Facebook message, that's not the Union.
24      For years she communicated with her like
25 that, and now they are going to tell you that, Oh,

Page 258

1 that wasn't really the Union that was handling that
2 communication.
3       My client, Ms. Carter, doesn't know
4 Ms. Stone.  She doesn't -- she doesn't know hardly
5 anything about her other than her union activities.
6       The only reason she's communicating with
7 her is to express her views about what the Union is
8 doing.  She's not a Facebook friend.
9       So troubles continue.  And you will hear
10 about them.  There was a recall petition.  This
11 became a problem.
12      After the Collective Bargaining Agreement
13 was rejected, a lot of flight attendants decided
14 they wanted to get a recall petition to get rid of
15 these five people that were not initially elected.
16      It's Audrey Stone, Bill Holcomb, John
17 Parrott, Brett Nevarez.  There may be another name.
18      And Charlene supported that, and that put
19 a target on her back.
20      By the way, the recall petition was signed
21 by more than 50 percent of the flight attendants.
22 When they sent it to the Union to then have a recall
23 vote, the Union said, your petition is not good
24 enough.
25      The Union appointed some people to review

Page 259

1 the petition and say it wasn't good enough.
2       Who were the people that appointed them?
3 Audrey Stone, Bill Holcomb, John Parrott, Brett
4 Nevarez.
5       It would be like if I could pick the jury
6 in this case, not that I don't like you guys, but if
7 I could pick my relatives or something, it might be
8 a little more easy case.
9       So this is what Charlene is doing.  She's
10 complaining about all of this.  And it's not
11 obscene.  She's not using curse words.  She's using
12 strong language trying to get her point across.
13      I think what you are doing is not moral.
14 I think what you are doing is corrupt.  This is
15 terrible.  Those kind of things.
16      Absolutely appropriate protected union
17 speech.
18      Brings us to 2017, the year she's going to
19 get fired.
20      In January of 2017, her union decides to
21 spend money for a bunch of people to go up to
22 Washington, DC.  And one of the things they did
23 while they were there is they participated in a
24 Women's March.
25      That March was sponsored by Planned

Page 260

1 Parenthood.  And you can imagine Charlene's reaction
2 to her dues being used for that.
3       And I should say something about her dues.
4       At this point in time, she was an
5 objector.  And an objector is, she quit the union at
6 some point.  And you would think, Oh, so therefore,
7 she no longer has any interest in any of this.
8       No.  That relationship we talked about is
9 unchanged by her being an objector.  Being an
10 objector says, I quit the Union.
11      By the way, she still has to pay dues by
12 law.  She's only represented by the Union still.
13 The Union still has that fiduciary obligation.
14      Well, then what's the point of quitting?
15 There's two points.
16      One is, from the Union standpoint, she
17 can't vote anymore, and then the other is she gets a
18 small reimbursement for all of the political
19 activities they are involved in.  Her money doesn't
20 have to go for that.  Now, she's still paying the
21 salaries of people that are going to these events.
22      So that's the point of an objector.  It
23 certainly makes the Union upset with you if you are
24 an objector, but it doesn't change the legal
25 relationship.

Page 261

1    You will hear, we believe, instructions
2 from the Court saying they still had that fiduciary
3 obligation to her.
4    So the Union posts pictures of the March,
5 and it's people holding up signs from Local 556,
6 saying, "Pro choice." It is sponsored by Planned
7 Parenthood. She's very upset about it.
8    By the way, it also has pictures of
9 Southwest Airlines' emblem. They wrote, "Southwest
10 Airlines" while they are marching down the street.
11 See if, wherever they talk to you about nexus, what
12 kind of nexus there was. And I will talk about
13 nexus in a minute.
14    Southwest Airlines complains about her
15 Facebook page. We will talk about how Southwest
16 Airlines dealt with the Women's March.
17    Charlene got fired. So Charlene sends a
18 complaint, and she sends it -- where does she send
19 it? Does she send it to every union member? She
20 could have. She didn't. Does she send it to
21 everyone at Southwest? She could have but didn't.
22    She sent a private Facebook message. That
23 means only one person can see it. And that is her
24 Union president. And she sends it to her Union
25 president to try and tell her, what you are doing is

Page 262

1 wrong.
2    She's trying to make her point as she's
3 allowed to, with her Union president, to say, Don't
4 spend our money like this. And she said, What you
5 are doing supports murder. Is that strong. That
6 kind of strong speech is absolutely appropriate.
7    Southwest Airlines will tell you, Well,
8 that is over the top for us.
9    Well, that speech wasn't to Southwest
10 Airlines, it was to her Union president. She didn't
11 send it to people at Southwest Airlines.
12    They'll say, Well, she was a flight
13 attendant.
14    Now, Ms. Stone was a flight attendant.
15 She was a flight attendant that hadn't been on a
16 plane as a flight attendant in years, but they can
17 still say that. She was receiving that
18 communication as Union president.
19    There is a video, and it shows an aborted
20 fetus or baby, depending on how you look at it, and
21 it's moving.
22    She sent another video -- or another post
23 that Southwest complains about, that is pictures of
24 three ladies' faces in -- I'm sorry for this
25 language, but here we go -- vagina hats or pussy

Page 263

1 hats, anatomically correct hats that were worn by
2 people at the march that was being supported by her
3 Union.
4    She was upset about that, and she sent
5 that to Ms. Stone, president of the Union, and said,
6 Look what you are supporting. There were children
7 at this March. This is inappropriate.
8    And so she makes her complaint. She's
9 exercising her union right to complain to her union.
10 She's exercising her religious freedom to express
11 her views about life.
12    And Audrey Stone turns her in to the
13 company on February 22, 2017. It is an interesting
14 date, as it turns out. February 22, 2017.
15    And she complains to Southwest Airlines
16 saying that this -- Charlene has violated the
17 company's social media policy.
18    She acknowledges that it's union speech,
19 she acknowledges that it relates to religion, and
20 yet she is still complaining.
21    She has that fiduciary obligation, but
22 she's still complaining. She's trying to get
23 Charlene fired.
24    What else was going on? Let me tell you
25 about the social media policy of Southwest Airlines.

Page 264

1    And by the way, look at the actions of
2 Charlene. They weren't actions at her job, they
3 were actions dealing with her union.
4    But Southwest will tell you that it's on
5 the job because you sent it to a flight attendant.
6 They ignore the fact that she's the Union president.
7    So Charlene has sent this information.
8    What else is going on with the social
9 media policy?
10    In 2015, Audrey Stone, president of the
11 union, writes a message to all flight attendants,
12 including Charlene, saying, "Southwest's social
13 media policy is terrible. We are applying it
14 subjectively. They are using it to go after people
15 and not other people. This policy is terrible. We
16 are going to try and get Southwest to get rid of it
17 or change it.
18    "And, by the way, don't be reporting
19 people under this policy. You don't know what is
20 going to happen. We will handle these things on our
21 own."
22    That is what Audrey Stone said.
23    As a matter of fact, Audrey Stone defended
24 employees that had violations of the social media
25 policy, including an employee that called other

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 265..268

Page 265

1 employees "fucktard" and an employee that said
2 somebody should be killed.
3        I mean, a variety of just pretty strong --
4 and what was the defense?  The defense was, they
5 were engaging in union activities, spirited passion,
6 election communications.
7        But that apparently doesn't work when
8 you're opposed to the union -- by the way, the
9 people she was defending were always union
10 supporters.
11       So, by the way, also at this time, the
12 Union is communicating with Southwest management.
13 Senior Southwest management, not somebody down here.
14 Somebody up here.  Like the second, third top
15 executives at Southwest Airlines.
16       And what are they saying?  They are
17 saying, You know, we really should use this social
18 media policy to target some people, get rid of these
19 employees we don't like.  We should target them.
20       Okay, wait a minute.  I didn't say it
21 right.  They said, Target for assassination.  It is
22 that strong.  It is stronger than what I said.  They
23 are going to target these employees for
24 assassination.
25       Most of them are people involved in the

Page 266

1 recall, as Ms. Carter was.  One is a union member,
2 not an officer yet.  I don't even think she was in
3 the recall petition.  And they are targeting her
4 because they think she could be a leader in the
5 future that could threaten the current leadership of
6 the union, and we need to get rid of her.  And they
7 are telling that to Southwest management.
8        Who is she?  She's someone that they say,
9 Well, she could appeal to certain members of the
10 union, and we need to stop that.
11       Why did they say that?  She was
12 Africa-American.
13       This is going on.  This is what Charlene
14 is faced with on February 22, 2017.
15       So also on February 22, 2017, that very
16 same day, the Union, one of the insiders of her
17 team, files a bunch of dossiers.  They went through
18 the social media of all of the recall supporter
19 leaders they could find, and they sent it to
20 Southwest and said, These are -- these are people
21 that should be punished under the social media
22 policy.
23       This is the Union using the social media
24 policy.  And they had talked about it with Mike
25 Hafner, the senior guy I was telling you about.

Page 267

1 They talked about it with Sonya Lacore, another
2 senior person at Southwest Airlines.
3        By the way, on February 22, 2017, Sonya
4 Lacore sends out a "read before you fly" to every
5 flight attendant.
6        And what does she talk about?  She talks
7 about social media policy and workplace bullying,
8 the two policies they fired Charlene on.
9        It is just coincidence it all happened on
10 February 22, 2017.
11       Southwest investigates this, and Ed
12 Schneider is the person they say made the decision.
13       And you will see his notes.  He
14 acknowledges she's engaged in exercising her
15 religious beliefs.  He acknowledges she's engaged in
16 union activity.  No accommodation is given for that.
17       I'm going to mention accommodation for a
18 moment, and I think the judge will instruct you on
19 this.
20       When you are dealing with a religious
21 belief claim, the employee doesn't have to ask for
22 an accommodation, the company has to give it.
23       Charlene didn't know to use the word
24 "accommodation" when she went and met with them, but
25 she told them about her beliefs and why she felt she

Page 268

1 needed to do this.
2        And they didn't say anything about
3 accommodation, never granted her one, never talked
4 about the fact that there should be some
5 understanding that what she was doing was union
6 activity and religious belief.
7        No, they wanted to fire Charlene, and they
8 did.
9        Okay.  I want to talk a little bit about
10 what Southwest and the Union might talk to you
11 about.  And we think this is a lot of misdirection,
12 but this is not -- you will be able to follow this.
13       They can -- I think they will try to
14 confuse this, but it won't work.
15       Okay.  One thing they will say, no
16 evidence.  Charlene doesn't have any evidence we
17 were intentionally discriminating against her
18 because of her religious belief.  We were just
19 trying to enforce our social media policy.
20       They will say, Do you know if Ed Schneider
21 discriminated against you?
22       And she will say, No, except that I got
23 fired.
24       And so what they are saying is, Oh, so you
25 don't know what Ed Schneider was thinking.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                                    Pages 269..272

Page 269

1    That is not the way it works.  You can't
2  sue someone for what they are thinking.  You could
3  all be thinking really horrible things about me
4  right now, I would never know.  And that is the same
5  in this situation.  What you sue people for are
6  their actions, and their actions reveal their
7  thoughts.
8    But you don't really need their thoughts.
9    They fired her because she exercised her
10  union rights.  They fired her because she exercised
11  her religious beliefs.
12    They will say, Well, this was over the
13  top.
14    There is no over-the-top exception to free
15  speech.  There are numerous exceptions to free
16  speech.  And the same thing for religious belief and
17  union activity.
18    Illegal conduct.  Defamation.  Libel.  So
19  there are all kind of things.  But otherwise, your
20  free speech, your religious freedoms, you should be
21  able to exercise them.
22    By the way, she didn't do it at work.  She
23  did it on her personal Facebook page.
24    So by the way, this over the top, this is
25  really graphic, they're going to show you a picture

Page 270

1  of this baby or fetus in opening, and it makes the
2  point of what's the best way to communicate your
3  position.
4    In our country, when something bad
5  happens, we all get upset.  When something bad
6  happens and it's on video, things change.
7    And Charlene wanted change, and she wanted
8  to change her union.  And they want to take away her
9  right to use the most effective speech possible.
10    I think they will try and distance
11  themselves from some people that had these
12  communications with upper Southwest management.
13    One of them is an officer of the Union,
14  Mr. Nevarez.  The other one is Brian Talburt, who
15  was in her inner circle.
16    You will see that she was -- they were
17  acting on behalf of the Union.
18    They will say, Well, we didn't fire all of
19  these recall -- all these recall people that came
20  in, we didn't fire them.
21    You know, that is -- well, they fired
22  Charlene.  They reprimanded Jeanna Jackson, one of
23  the recall people.  They reprimanded Greg Hofer.
24  You don't have to get them all, you get enough, you
25  will get the desired result of making these people

Page 271

1  shut up.
2    Okay, nexus.  I want to talk to you about
3  nexus.
4    So they say, Okay.  So maybe Charlene was
5  engaged in union activity when she sent that to her
6  Union president.  Maybe that was religious activity.
7  But she posted that video on her personal Facebook
8  page, and people could get confused and think that
9  she was actually speaking on behalf of Southwest
10  Airlines.
11    And because of that, there is a nexus, and
12  we fire her for violating our social media policy.
13    Let's look at the nexus.
14    By the way, that nexus, let's see what
15  evidence they put on about all of the people at the
16  Women's March, there is no doubt about nexus.  It
17  was posted the next day, says Southwest Airlines.
18  They didn't do that, but they fired Charlene.
19    So here is the nexus.  They have a rule
20  that wherever it's social media policy, Okay.  We
21  will look back about 18 months.  Not about.  18
22  months.
23    And so they go to Charlene's Facebook page
24  and they are looking for a nexus, something that
25  would say she's acting on behalf of Southwest

Page 272

1  Airlines.  They can't find it.
2    And there is -- Denise Gutierrez sends an
3  email saying, What do I do?  I can't find it.
4    What do they do?  Let's just go a little
5  bit past 18 months.  Let's go a year.  Oh, no, let's
6  another year.  Let's go another year.
7    They go years back, three, four -- I think
8  one of them is five years, to say, Ah, this is the
9  connection to Southwest Airlines.
10    So what do they find, three, four years
11  ago, from this post?  She is standing in a cockpit
12  of Southwest Airlines in her uniform.  So that
13  picture --
14    By the way, you can't do it.  You'd have
15  to scroll for 15 or 20 minutes really working at it
16  to get there.  And that is telling the world that
17  that Charlene Carter is taking a position on behalf
18  of Southwest Airlines such that people would be
19  confused.
20    So we've got to fire you for that.
21    Okay.  I have two others.
22    One is -- I'm not sure when this picture
23  was, but it doesn't show anything.  One of them is
24  her standing with friends and she's getting her
25  picture taken and she's wearing a lanyard, she's got

Page 273

1 this thing around, it's this little plastic thing
2 that's got something in it.
3        And they say, We know that is a Southwest
4 Airlines lanyard.
5        You can blow it up.  The world is not
6 going to know it.  You can't tell anything from it.
7 This is the straws they are grasping at to look for
8 a nexus to fire someone that was opposed to the
9 Union.
10        So they had one other where she has her
11 Southwest Airlines sticker, I don't know how many
12 years ago this one was, and an emblem under it that
13 relates to support for America and Israel that she
14 started wearing after 9/11.  It was absolutely no
15 problem with her company.
16        But they are going to use that now from
17 years ago to say, We are going to fire you today for
18 this.
19        So there is no nexus, and she's entitled
20 to post on her personal Facebook page.
21        They will say, Well, Charlene was an
22 objector.  There is nothing Audrey Stone, president
23 of the Union, can do to her because she's not in the
24 Union.  So the only thing she can do is go to
25 Southwest Airlines and ask for help.

Page 274

1        Well, first of all, it wasn't an
2 employment communication, so she shouldn't be going
3 to Southwest Airlines.
4        And Audrey Stone, president of the Union,
5 reported other people that weren't objectors, like
6 Jeanna Jackson.
7        What did she report Jeanna Jackson for?
8        This is -- it is hard to -- you can't make
9 this up.
10        Jeanna Jackson told union members, Our
11 Union president is bringing charges against union
12 members.
13        Something you would want to know if you
14 were a union member about your president.
15        And the president of the union reports her
16 for that and Southwest Airlines reprimands her.
17 Takes the charges.  So she -- she is reporting these
18 people for other reasons.
19        You can take people to the police.  She
20 says that Charlene threatened her.  You read these.
21        Charlene was upset that Ms. Stone was the
22 president and continued to be paid and not have to
23 work at American Airlines, and she was constantly
24 complaining about the salary, constantly, a few
25 times.

Page 275

1        So at the end of one of her posts, she
2 says, basically, I can't wait for the recall
3 petition to be successful.  Can't wait to see you
4 online.
5        That's a common phrase, "see you online,"
6 among flight attendants.
7        And it was saying, I'm going to be glad
8 that you are no longer being paid and you have to
9 work like the rest of us.
10        Audrey Stone is going to tell you that was
11 a threat.  I will show you documents from Audrey
12 Stone where she uses that phrase, and I don't think
13 she was intending to threaten people.
14        They could block her.
15        The other thing that the Union could have
16 done is, they could have banned her.  And that would
17 be significant to Charlene.  She wants to go back
18 there.  She wants to go back to her job.  She wants
19 to go back to her union some day.  She still wants
20 her union to start doing union things and not all of
21 these other things.
22        And when that happens, she looks
23 forward -- she will still pay dues, but she looks
24 forward to being a member.
25        So there are a lot of things they can do.

Page 276

1        They will say, Charlene didn't know
2 Ms. Stone's beliefs, she didn't know Ed Schneider's
3 beliefs, and so why would she be sending these
4 things to them?
5        That is the point.  She's sending it to
6 the Union president.  She's not -- not that she's
7 not interested, but the point is not is what Audrey
8 Stone's personal opinion, what as president of the
9 union are you doing regarding this issue?
10        All right.  We are on a clock here, by the
11 way, and I know it's hard being preached to for so
12 long.  I'm almost done.
13        Damages.  Charlene has been out of a job
14 for five years.  She tried to get a job at other
15 airlines.  It was difficult.  She didn't get hired.
16 And part of it was during COVID.  So there is
17 reasons.
18        They will say -- by the way, that is back
19 pay.  They should have been paying her for the past
20 five years.
21        And they will tell you, Well, those last
22 couple of years she didn't work very much.  She only
23 worked four or five flights.
24        Which is perfectly appropriate under the
25 Collective Bargaining Agreement.  But let's see if

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 20 of 642   PageID 10961
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                    Pages 277..280

Page 277

1 they tell you why she didn't.
2        Okay.  So she's -- but she's more than
3 ready, willing and able to go back to work full
4 time, wants to get her job back.  She's suffered
5 emotional distress because of this.  She had to go
6 to counseling.  We will tell you about all of that.
7        I think that is all very important.  I
8 think she's entitled to a significant amount of
9 money here.
10       But Charlene wants you to protect her
11 religious freedom.  You don't have to agree with
12 her, but protect her rights.  She wants you to
13 protect her rights and others that want to complain
14 about their union and effect change.  That is what
15 she wants protection from.
16       If, at the conclusion of this, you think
17 that these actors over here did what I have been
18 talking to you about, we are going to ask you to
19 award punitive damages.  It is going to take a
20 significant amount of money to get these people to
21 change.
22       Thank you.
23       THE COURT:  Thank you, Mr. Pryor.
24       MR. McKEEBY:  Sidebar.
25       (Thereupon, the following proceedings were

Page 278

1 had at sidebar:)
2        THE COURT:  I was just making sure.
3        MR. McKEEBY:  I'm sorry.
4        THE COURT:  Good to go?  Do you need a
5 sidebar?
6        MR. GREENFIELD:  Brief objections.
7        His reference to fiduciary duty, duty
8 being the highest obligation in the law, it's not
9 the case.  There is lots of legal standards that are
10 higher than fiduciary obligation.
11       And making reference to a free speech
12 claim does not exist in this case.  He's talking
13 about specific free speech.  There is no government
14 entity, there is no free speech claim.
15       THE COURT:  What I can say is, Everything
16 you've heard is lawyer argument.  Remember, the
17 evidence is yet to come in, and as to the law, I
18 will give you the law at the end of the case.
19       Any objection to that?  I will say that
20 and then give you the baton.
21       (Thereupon, the sidebar was concluded and
22       the following proceedings were held in open
23       court:)
24       THE COURT:  Okay.  Just a brief reminder
25 before Mr. McKeeby goes, is everything you heard was

Page 279

1 not evidence, it was a preview of the evidence they
2 expect; and any references to the law, remember, I
3 will give you the relevant law at the end of the
4 case.
5        With that, Mr. McKeeby is going to open
6 for Southwest Airlines.
7        MR. McKEEBY:  Thank you.
8        Good to see everyone and good to see you
9 without the plexiglass today.
10       My name is Paulo McKeeby, and I represent
11 Southwest Airlines.
12       There was a lot of discussion yesterday
13 and today, as well, about religious freedom.
14       And religious freedom is important to
15 Southwest.  It is important to anyone.  And that
16 involves the right to pray to the God of your
17 choosing.  It involves the right, in some
18 circumstances, to express your religious beliefs.
19       But freedom of religion also involves the
20 freedom to be free from others forcing their
21 religious beliefs on you, particularly when that is
22 done in a harassing, bullying, intimidating manner,
23 as was the case with Ms. Carter and her
24 communication to Ms. Stone.
25       And particularly, they have talked about

Page 280

1 free speech and freedom of religion.  We are talking
2 about the workplace here.  We are talking about
3 communications between one employee and another
4 employee.
5        They want to talk about Ms. Stone as the
6 president of the Union.  She was the president of
7 the Union, but she was also a flight attendant, a
8 fellow employee of Ms. Carter, who was entitled to
9 the benefits of Southwest's policies just as much as
10 any other employee was, including Ms. Carter.
11       Ms. Carter was not terminated for the
12 beliefs in her mind about her religion, which
13 Southwest -- we are not saying that those aren't
14 valid or that she didn't sincerely believe those
15 beliefs.  She was terminated for what she did.
16       She was terminated for her conduct, and
17 that conduct was sending videos of aborted fetuses
18 or babies, depending on your perspective, to a
19 co-employee.  That is not acceptable and that is why
20 Ms. Carter was terminated.
21       She won't accept responsibility for her
22 conduct.  That is partly why we are here today.
23       But Southwest had a responsibility as
24 well, and that responsibility was to protect its
25 employees from that kind of conduct.  And that's why

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                        Pages 281..284

Page 281

1 Ms. Carter was terminated.
2        Let me introduce some of the other folks
3 at my table. Brian Morris is here. He's my
4 colleague at my law firm.
5        Meggan Jones is with Southwest Airlines.
6 She's our corporate representative.
7        You will hear from her later in the case
8 as a witness.
9        Also, you will see Chris Maberry. He's
10 Southwest's in-house counsel.
11       And Lauren Bobis-Armstrong is also with
12 Southwest's legal department.
13       And last, but definitely not least, is
14 Kate McKinney, our technical person. And I
15 introduce her now because I would like her to
16 commence the PowerPoint.
17       Let's talk about what the evidence will
18 show in this case.
19       First, the evidence will show that Ms.
20 Carter was terminated for violating multiple
21 Southwest policies.
22       And this is what she did to violate those
23 policies. These are still photographs of the videos
24 that Ms. Carter sent to Ms. Stone. We will show you
25 the videos during the course of the evidence, but

Page 282

1 these are the still shots.
2        This is what she sent to Ms. Stone. This
3 is what she posted on her Facebook page.
4        Let's talk about Southwest's social media
5 policy.
6        Obviously, you can't read the policy, but
7 I have highlighted a couple terms.
8        Content that can be disrespectful,
9 malicious, harassing violates the social media
10 policy; and also, content that could be viewed as
11 damaging to Southwest's public perception.
12       We will talk about that in just a moment.
13       And the policy makes clear that violations
14 of the policy can result in termination.
15       There is going to be no dispute that
16 Ms. Carter was aware of this policy. All employees
17 receive this policy. All employees sign off on this
18 policy. It tells employees what the expectations
19 are with respect to social media posting.
20       Let's talk about that middle bullet, the
21 content being viewed as damaging, could be viewed as
22 damaging to the public perception.
23       On Ms. Carter's Facebook post were
24 pictures like this of her in her Southwest uniform.
25 Like this. Referencing the company's CEO, former

Page 283

1 CEO and founder.
2        So clearly someone who viewed, a member of
3 the public who viewed her Facebook page, could see
4 that she was an employee of Southwest Airlines and
5 could see the videos that you are going to be shown
6 in this case.
7        And Southwest had the legitimate
8 contention under its social media policy that that
9 harmed its reputation, it harmed its public
10 perception, and yes, it was a factor in her
11 termination.
12       Let's also talk about Southwest's bullying
13 and hazing policy. That's another workplace policy
14 where bullying and hazing is defined as malicious
15 and unwelcome or severe mistreatment that harms,
16 intimidates, offends, or humiliates an employee.
17 And it also includes the concept of cyberbullying.
18 So it incorporates to some degree the social media
19 policy.
20       And it also, like the social media policy,
21 specifically warns employees, we take this seriously
22 at Southwest. And you are going to hear about
23 Southwest's culture of respect amongst its employees
24 and how important that is to Southwest.
25       And so employees are warned, Look, if you

Page 284

1 bully and haze your coworkers, it could result in
2 discipline up to and including termination.
3        The evidence will also show that Southwest
4 did not terminate Ms. Carter because of her
5 religious beliefs.
6        As you are all aware, Southwest is a large
7 company. They run an airline. They are not in the
8 business of discriminating against employees because
9 of their religion. They frankly don't care in terms
10 of religious beliefs because they know that they
11 have a diverse workforce and they are going to have
12 employees of all different faiths among its
13 workforce.
14       You will hear from the employees who
15 participated in the investigation of Ms. Stone's
16 complaints and you will hear about the religious
17 views of those individuals.
18       From Ed Schneider, from Maureen Emlet.
19 Those people are Christian, just like Ms. Carter,
20 and they also have similar views regarding abortion
21 as Ms. Carter.
22       You will hear from those witnesses, and
23 you should ask yourself, are these people really
24 going to take action against Ms. Carter based on
25 what is in her mind? No.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 285..288

Page 285

1    The termination was based on her conduct,
2  what she did with respect to sending those videos to
3  Ms. Stone.
4    The evidence will also show that
5  Ms. Carter was not terminated based on her
6  opposition to the Union.  You are going to hear, and
7  you have already heard, a lot about the historic
8  dispute between Ms. Carter and perhaps others and
9  the Union.  And what you have to understand, first
10 of all, is that Southwest and the Union are
11 separate.
12   That's one reason why the Union has
13 separate counsel and is a different party in this
14 case.  The Union has different bylaws, the Union has
15 different guidelines, the Union has different
16 leadership, different payroll.  They are not the
17 same as Southwest Airlines.
18   And when the Union wants to do something,
19 like, oh, by the way, go on a Women's March in
20 Washington, they don't ask Southwest to sponsor or
21 approve that because it's separate from Southwest.
22 They do it.
23   So Southwest didn't have a dog in that
24 fight or a role in their -- in their participation
25 in the Women's March other than to provide them

Page 286

1  transportation, which Southwest is contractually
2  obligated to do under the Collective Bargaining
3  Agreement.
4    Southwest simply did not have a dog in the
5  fight with respect to Ms. Carter's disputes with the
6  Union, as the evidence will show.
7    And moreover, just as the people who were
8  involved in the decision to ultimately terminate her
9  employment, they had no idea of Ms. Carter's
10 religious beliefs.  They also did not know about
11 Ms. Carter's disputes with the Union until the
12 investigation.
13   The people who conducted the
14 investigation, Mr. Schneider, the Denver-based
15 manager, he didn't -- he had never met, had never
16 spoken to Audrey Stone, the union president.  He had
17 motivation to protect her or to treat her
18 differently than anyone else, any other employee.
19   And, again, Ms. Carter wasn't someone
20 that, frankly, Mr. Schneider had to think about
21 because she wasn't working.  She took three flights
22 during the year prior to her termination.
23   Southwest got involved in this dispute and
24 in Ms. Carter's dispute with the Union when
25 Ms. Stone, the Union president -- I think you are

Page 287

1  going to hear every time from counsel for
2  Ms. Carter, every time they refer to Ms. Stone, you
3  are going to hear "the Union president" -- she was
4  also a fellow employee.  Do not forget about that.
5    Ed Schneider didn't forget about that when
6  he conducted the investigation, and Southwest didn't
7  become involved in this until Ms. Stone made her
8  complaint.  And when that happened, that triggered a
9  process.
10   So the evidence will also show that
11 Southwest conducted a fair and thorough
12 investigation.  It was a three-week investigation
13 involving multiple different departments and
14 different people from whom you will hear during the
15 course of this trial.
16   You will hear from Maureen Emlet in labor
17 relations; you will hear from Ms. Jones, the
18 assistant base manager at the time; and you'll hear
19 from Denise Gutierrez in employee relations, all of
20 whom who had a role in the investigation and
21 ultimate decision with respect to Ms. Carter's
22 termination.
23   Ms. Carter had the opportunity to tell her
24 side of the story during the investigation.  This
25 wasn't just a matter of the company talking to

Page 288

1  Ms. Stone, the company talked to Ms. Carter, first,
2  in what will be referred to as a fact-finding
3  meeting over which Mr. Schneider presided.
4    And he asked Ms. Carter, Why did you do
5  this?  What is your side of the story?
6    And Ms. Carter was given that opportunity.
7    And then there was something that you will
8  hear about called a Step 2 hearing.  It gave
9  Ms. Carter the opportunity to, again, tell her side
10 of the story, to yet another layer of Southwest
11 management.  This time a gentleman by the name of
12 Michael Sims who you'll hear from.
13   MR. PRYOR:  May I approach?  I have an
14 objection.
15   THE COURT:  Same objection we discussed
16 previously?
17   MR. PRYOR:  This is -- we haven't gotten
18 to that one yet but...
19   THE COURT:  Okay.  Hold on.  Sidebar, no
20 speaking objections.
21   (Thereupon, the following proceedings were
22   had at sidebar:)
23   THE COURT:  Better be good.
24   MR. PRYOR:  I thought you were about the
25 last call.  I'm talking about what he's talking

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 2 July 06, 2022                        Pages 289..292

Page 289

1  about now.
2        Step 2 is not her opportunity to be heard
3  on this.  And you gave a limine that they could talk
4  about the Union did its job in Step 2 but Step 2 is
5  not part of this case nor is the arbitration.
6        MR. GREENFIELD:  Which is absolutely
7  directly related to --
8        THE COURT:  What number do you think?
9        MR. PRYOR:  I'm sorry?
10       THE COURT:  What limine number do you
11  think I limined it out?
12       MR. PRYOR:  I have to --
13       THE COURT:  Can you go find it?
14       MR. PRYOR:  I can find it.  I wasn't aware
15  that limined.  I will look.  I will look.  Thirty
16  seconds.
17
18       MR. McKEEBY:  Your Honor, it is part of
19  the process.  It is part of the investigation.
20       THE COURT:  So I limined out the
21  arbitration ruling itself.
22       MR. PRYOR:  Twelve.
23       THE COURT:  I have got it.
24       Yeah, okay.
25       I didn't limine that out.  What I limined

Page 290

1  out was the actual arbitration ruling and any
2  testimony that gets in depth discussions of the
3  arbitration agreement.  The last chance agreement,
4  Step 2 still comes in for the purpose under 408.
5        MR. PRYOR:  Maybe I misunderstood.
6        The Step 2 and arbitration had everything
7  to do with the claims that she's making here.  That
8  is what he's arguing, that she had her chance to
9  raise these issues, that is not where she had the
10  chance.  This is where she had --
11       MR. GREENFIELD:  You can argue that.
12       THE COURT:  You can clean that up and
13  obviously at some point later on in the proceeding
14  when we have the arbitration agreement that does not
15  come in.  I can tell the arbitrator is looking at
16  different issues than you are looking at here.
17       MR. PRYOR:  You are overruling my
18  objection?
19       THE COURT:  Well, you shouldn't have this
20  objection now.
21       So what I can do, at the end, I can say,
22  look, you will hear from me more fully at the end of
23  the case.
24       MR. PRYOR:  Okay.  Well, I have another
25  conference after.  I just need to make a record on

Page 291

1  it.
2        THE COURT:  I think you already have.
3        MR. PRYOR:  Okay.  I didn't get a ruling.
4        THE COURT:  I'm overruling your objection.
5        MR. PRYOR:  Okay.  That's fine.
6        THE COURT:  What I'm going to say at the
7  end of this, I'm going to say, well, the facts and
8  law, you haven't heard any of the facts and the law
9  you will hear from me.
10       MR. PRYOR:  I'm not trying to be
11  difficult.  I wanted to make sure.
12       THE COURT:  I understand.
13       (Thereupon, the sidebar was concluded and
14       the following proceedings were held in open
15       court:)
16       THE COURT:  Okay.  Sorry, Mr. McKeeby.
17  You can continue.
18       MR. McKEEBY:  Thank you, your Honor.
19       So where was I?  The Step 2 hearing
20  presided over by Michael Sims, whom you will hear
21  from.
22       Another opportunity for Ms. Carter to tell
23  her side of the story to another member of
24  Southwest's executive team.
25       Mr. Sims agreed with the decision of

Page 292

1  Mr. Schneider to terminate Ms. Carter's employment
2  based on her conduct.  Based on the videos that she
3  sent to Ms. Stone and based on her other conduct.
4        And normally, that would be the end of my
5  presentation and I would shuffle back to my table
6  and sit down.  But this case is different for
7  another reason.
8        At the end of the Step 2 hearing, Mr. Sims
9  had a decision to make.  He had different options.
10  And he'll tell you about those options when he gets
11  on the witness stand.
12       He could either uphold the termination
13  without reservation, he could rescind the
14  termination or he could adopt a middle ground.
15       Now, during the Step 2 hearing, Ms. Carter
16  said, I love the company.  I love Southwest.  I love
17  my job.  What I want is my job back, and she
18  appeared for the first time in this process, she
19  appeared remorseful, she appeared to recognize that
20  she had stepped over the line by sending those
21  graphic videos to Ms. Stone.
22       Because of all of that and because she was
23  a long-term employee, Mr. Sims said, you know what,
24  let's give her a second chance.  Let's go ahead and
25  give her her job back.

Page 293

1   And that was presented to Ms. Carter by
2   Mr. Sims at the end of the Step 2 hearing.
3        Now, you're probably asking yourself,
4   well, okay, what are we doing here then?
5        Ms. Carter turned down the offer of
6   reinstatement.
7        And so the last thing the evidence will
8   show, ladies and gentlemen, is that Ms. Carter quit
9   on Southwest by refusing that offer.
10       She's going to have an explanation for why
11  she did that.  She's going to talk about the
12  conditions that were associated with the last chance
13  agreement that she was presented, that a document
14  would be in her file for two years, that, ladies and
15  gentlemen, required her to comply with Southwest's
16  policies.
17       That is what she had to do, comply with
18  Southwest's policies.
19       She gave up her right to backpay for the
20  few weeks that the investigation occurred when she
21  wouldn't have been flying anyway.  That was no
22  concession.  She wasn't going to be flying during
23  that period anyway.
24       Mike Sims fully expected Ms. Carter to
25  say, thank you, I will take my job back because that

Page 294

1   is what she said during the Step 2 hearing.  I love
2   the company.  I want my job back.
3        And Mr. Sims said, you know what?  Look,
4   she's showing some remorse, she wants her job back,
5   I will give her the chance.  And he's shocked when
6   he founds out through the union that it wasn't good
7   enough for Ms. Carter.  It is another example of her
8   unwilling to accept responsibility for her actions
9   and for her conduct.
10       So to summarize very briefly, Ms. Carter
11  was not -- was terminated because she violated
12  company policy by sending those videos, as well as
13  other conduct that we will talk about.
14       Southwest did not terminate Ms. Carter
15  because of her religious beliefs.  There will be no
16  evidence before you that any of these decision
17  makers thought less of Ms. Carter because she was a
18  Christian.  They were Christians too.
19       And they did not terminate Ms. Carter
20  because of her longstanding dispute with the Union.
21       The Southwest employees involved in this
22  decision frankly didn't care.  They deal with the
23  union.  They don't care who the union leadership is.
24       Mr. Schneider, who will you hear from, who
25  was the primary original decision maker after the

Page 295

1   fact finding meeting, had never spoken to Audrey
2   Stone prior to that investigation.
3        And you will hear about the investigation
4   that it was thorough and that it was fair and it
5   gave the opportunity for Ms. Carter to be heard on
6   two occasions during the fact finding meeting and
7   during the Step 2 hearing.
8        And then, finally, you will have to ask
9   yourself, why did Ms. Carter not accept that job
10  that she said she wanted.
11       Thank you, ladies and gentlemen.
12       THE COURT:  Thank you, Mr. McKeeby.
13       MR. POSTMAN:  Can we do our objections?
14       THE COURT:  Yes.
15       (Thereupon, the following proceedings were
16  had at sidebar:)
17       MR. PRYOR:  Your Honor, in addition to the
18  objection previously raised, we object to the
19  mention of the last chance agreement.  It is not a
20  mitigation of damages, which is, as the Court's
21  limine ruling.
22       Now, mitigation of damages does not
23  require -- you don't have to mitigate if it requires
24  you to give up your rights.  She had to give up her
25  rights of free speech, or religion, her union

Page 296

1   activities, backpay, release the company.  That is
2   not a mitigation of damages document.
3        And I have not been able to address it
4   because if I raised it first, I waive it.  All
5   right.  And it being talked about in openings is
6   inappropriate.  It is inappropriate evidence.
7        The other objection is Rule 404(a)(1),
8   talking about Southwest Airlines's employees
9   religious beliefs.  404(a)(1) specifically says,
10  Character evidence is not permitted to show what you
11  did here as a trade of what you did for something
12  else.  That is what he's arguing.
13       Those are my additional objections.
14       THE COURT:  Response?
15       MR. McKEEBY:  Your Honor, on the last
16  chance agreement, I mean, the issue of
17  reasonableness is obviously critical to mitigation,
18  so if having to give up her rights made the refusal
19  to accept the offer reasonable, then that is
20  something that they can put in through their
21  witness.
22       Ms. Carter can say, Here's why I didn't
23  sign it.  I thought it was unreasonable.  I didn't
24  want to give up my rights.  And the jury --
25       MR. PRYOR:  Which is claiming --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 297..300

Page 297

1        THE COURT: Understood.
2        I think it comes up under 408. I think he
3  still has a path to argue that. I don't think it
4  is, as a matter of law, points that there is failure
5  to mitigate.
6        MR. PRYOR: So I think it is a matter of
7  law point and I don't think it is a gray area. But
8  we can't raise it ourselves to respond to it until
9  they do it in evidence.
10       THE COURT: Sure.
11       MR. GREENFIELD: Your Honor, if I may add
12  to that because I think that last chance agreement
13  is directly related to the DFR claims against the ^^
14       THE COURT: I've already ruled on it,
15  so --
16       MR. GREENFIELD: Okay.
17       THE COURT: -- I'm sticking to my ruling
18  on the 404.
19       Is there any argument you want to make in
20  response to 404 character evidence? Actually, I
21  don't know that I fully understood your 404
22  argument.
23       MR. PRYOR: I'm sorry?
24       THE COURT: I don't know that I fully
25  understood your 404 argument. What are you saying ^

Page 298

1  is the purpose --
2        MR. PRYOR: What he has said, he repeated,
3  several employees, he said they're Christians, they
4  wouldn't do this.
5        MR. McKEEBY: Yes.
6        MR. PRYOR: They are pro life. They
7  wouldn't do this.
8        Now, in Rule 404(a)(1) says, you can't use
9  character evidence in that manner.
10       THE COURT: Well, I'm going to give the
11  same instruction that I gave, which is, everything
12  you heard is not facts or law, you will hear that
13  from me at the end of the case.
14       MR. PRYOR: I take it you're overruling
15  all my objections.
16       THE COURT: No.
17       I'm actually saying the way I'm going to
18  deal with your second objection is to say that
19  everything you've heard, right, the words that came
20  out of his mouth are not evidence. 404 is evidence.
21  Right?
22       So what I'm saying is, if that comes in,
23  in a future form, we'll have to deal with it under
24  404.
25       Here I just say, not evidence, everything

Page 299

1  you just heard.
2        So I'm overruling the last chance
3  agreement argument. I'm going to deal with it in a
4  curative instruction.
5        MR. GREENFIELD: Your Honor, one last
6  thing.
7        After opening statements, is there a way
8  to move the podium? I can only see half of the
9  jurors.
10       THE COURT: We will be taking a break
11  after you do your opening, we can adjust the podium
12  if we need to, but it is still tethered to the floor
13  with wires, so we will figure that out. Okay. So
14  we will go back and I'll give my instruction.
15       (Thereupon, the sidebar was concluded and
16       the following proceedings were held in open
17       court:)
18       THE COURT: Okay. As Mr. Greenfield
19  approaches, I'm going to give you the same
20  instruction that I gave after Mr. Pryor opened,
21  which is everything you heard is not evidence. It
22  is a preview of what evidence might be.
23       It's also not the law. You can only hear
24  the law from me, and that will only come to you at
25  the end of the case.

Page 300

1        With that, Mr. Greenfield, you can
2  approach the podium and give your opening on behalf
3  of Local 556.
4        MR. GREENFIELD: I can lean.
5        THE COURT: Okay.
6        MR. GREENFIELD: I can be here.
7        As much as I would like to roam, I can
8  stay put.
9        Good morning, everyone. It is good to see
10  y'all again.
11       To remind you, my name is Adam Greenfield,
12  along with my co-counsel, Edward Cloutman, III, and
13  our corporate representative, Michael Masoni.
14       We are here on behalf of Transport Workers
15  Union, Local 556.
16       You also will see an associate, Daniel
17  Dailey, from Kingdom Litigators, in the gallery.
18  You might have seen him during jury selection.
19       He will be helping me out with various
20  computer things because he's just better at that
21  than I am, so...
22       You have heard a lot about the contentious
23  issues between the Union and Ms. Carter and
24  Southwest.
25       We will hear a lot of about that during

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                         Pages 301..304

Page 301

1 the evidence so I don't want to dive into all of
2 that and rehash it at this point.
3        What I would like to focus on is what
4 Ms. Carter's counsel wanted to focus on.  Actions.
5 So let's start with actions.
6        This is a case about someone who wants to
7 be able to say whatever she wants, whenever she
8 wants, however she wants to say it.
9        And look, I understand that kind of desire
10 for personal freedom.  I do.  I think a lot of us
11 do.  It can be a pretty natural human feeling.
12       But there are places that exist in most of
13 our lives where we understand that our actions may
14 have consequences, there's a certain level of
15 respect between folks is required.
16       Work is one of those places for a lot of
17 us.
18       At work, where employees are being paid by
19 a company for their work as part of a huge team,
20 like the Southwest flight attendants, you are not
21 solely an individual with your own agenda.
22       How you speak to folks you work with
23 matters.
24       What you say to them or about them
25 matters.

Page 302

1        How you say it matters.
2        And if an employee makes folks she works
3 with feel traumatized or threatened by her
4 communication, we expect that you jurors will find
5 that federal law does not protect her from the
6 consequences of her actions.
7        Now, this case is also about employee
8 rights.
9        And as I have said, you have heard already
10 a complicated story that will get more layered as we
11 go forward about the competing rights of Southwest
12 employees in the workplace.
13       You will hear about some of these issues
14 that stem way back to 2013.  We expect that the
15 evidence will show you that some of these issues
16 that arose earlier come from issues of fraud, and
17 theft, and that is why some of these Union officials
18 were kicked out of office.
19       You will hear, we believe the evidence
20 will show that the recall petition that they have
21 mentioned is also rife with fraud.  Signatures of
22 dead people included.
23       But I don't want to get bogged down there.
24 I don't want to talk about Ms. Carter.
25       Charlene Carter's right to speak her mind

Page 303

1 under Southwest Airlines' social media policy and
2 the other side of it, Audrey Stone's right to not be
3 harassed and threatened by a coworker.
4        Yes, she was president of the Union.  Yes,
5 she was always a flight attendant, an employee of
6 Southwest Airlines.
7        I want you to listen to how those rights
8 came into conflict and the steps folks took in
9 pursuit of those rights.
10       Counsel for Southwest talked a bit about
11 that process, fact finding meeting, Step 2 process.
12       Ms. Carter was represented by Union
13 individuals during all of those steps.
14       We expect the evidence to show from
15 Ms. Carter's mouth that she felt the Union
16 represented her excellently during that time period.
17       Plaintiff brings this suit alleging that
18 all other parties involved have conspired against
19 her to violate her rights.  And that the assertions
20 or protections of anybody else's rights, like the
21 rights of Ms. Stone, are purely for show.
22       I want you to ask yourselves what Charlene
23 Carter would have been happy with.  Short of Audrey
24 Stone continuing to endure her cyberbullying while
25 saying nothing.  What would have satisfied

Page 304

1 Ms. Carter?
2        This is a case about someone who wants to
3 be able to say whatever she wants, whenever she
4 wants, however she wants to say it.
5        We expect the evidence will show that
6 Charlene Carter has been as vocally critical of the
7 Union as she could have possibly been, for years,
8 before her termination.
9        And she was never reported to Southwest
10 Airlines.  I want you to listen for how the
11 plaintiff explains her claim that she was retaliated
12 against for her anti-Union speech when all of her
13 previous anti-Union speech went unreported.
14       We expect the evidence will show that it
15 was not until this specifically traumatic and
16 threatening communication that Ms. Stone reported
17 the plaintiff to Southwest Airlines.
18       A line had been crossed.
19       I want you to listen for what the
20 plaintiff claims Ms. Stone should have done instead.
21       I want you think to about what options
22 Ms. Stone had, given that Ms. Carter wasn't a member
23 of the Union, and her harassing conduct only seemed
24 to be escalating.
25       She objected to the Union.  She gave up

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                    Pages 305..308

Page 305

1 her voice in certain respects.
2        As pointed out by Ms. Carter's counsel,
3 she couldn't vote in elections, she couldn't go to
4 membership meetings.
5        So did Ms. Stone have to just stay quiet
6 and accept being harassed?  Being bullied?
7        I want you to listen to whether plaintiff
8 offers you any answer other than she has the right
9 to say whatever, however and whenever.
10       We expect that the evidence will show that
11 Ms. Stone was acting in her individual capacity,
12 exercising her federally protected rights to be free
13 from coworker harassment.
14       Ms. Carter is not the only employee whose
15 rights deserve to be protected today.
16       But more than anything else, I want you to
17 think about whether the plaintiff's theory of the
18 case makes sense, whether they meet their burden of
19 proving that it is more likely than not that every
20 single person you hear from, from the Union or
21 Southwest Airlines, are lying and are actually
22 involved in one huge conspiracy against Charlene
23 Carter.
24       Because that is what it takes.  This was
25 what plaintiff is arguing.  Make no mistakes.  This

Page 306

1 case is about someone who wants to be able to say
2 whatever they want, whenever they want, and however
3 they want to.
4        Thank you.
5        THE COURT:  Thank you, Mr. Greenfield.
6        Sidebar?
7        (Thereupon, the following proceedings were
8        had at sidebar:)
9        MR. PRYOR:  Raise the same objection
10 regarding the comments regarding Step 2.
11       THE COURT:  Understood and overruled.
12       And I will give the instruction what you
13 heard is not evidence, I just give that after
14 everyone, all right?  And then I will give them
15 their first break and then let's go ahead and put
16 the first witness on the stand during the break.
17       (Thereupon, the sidebar was concluded and
18       the following proceedings were held in open
19       court:)
20       THE COURT:  Okay.
21       Same thing that I have told you after
22 everyone's opening, everything you heard is not
23 evidence, right?  And the law comes from me at the
24 end of the case.
25       So you're about to hear some evidence.

Page 307

1        We're going to take our morning break, get
2 our first witness on the stand, bring you back in
3 and then you're going to start hearing evidence.
4        So with that, we'll all rise for the jury.
5        I'll give you the same three instructions:
6 Don't talk to anyone in the courthouse other than
7 your jurors and court personnel, and only talk to
8 them not about the case.  And don't do any research
9 on the case.
10       Thank you.
11       (The jurors exited the courtroom.)
12       THE COURT:  Okay.  We should have them
13 back in 10 minutes at 10:46, so let's endeavor to be
14 back here a minute or two before that, then we can
15 put our first witness on the stand.
16       Who will that first witness be?
17       MR. PRYOR:  Audrey Stone.
18       THE COURT:  Okay, got it.  So we can go
19 ahead and bring her in.
20       Are there any issues we should talk about
21 with the witness not in the room?
22       MR. GILLIAM:  Not that I know of.
23       MR. McKEEBY:  Not from Southwest.
24       MR. GREENFIELD:  Same here, your Honor.
25       THE COURT:  We are trying to tilt that

Page 308

1 podium.  I'm sorry.  It's a big, old podium.  Right?
2 It is substantial.
3        So if you need to like move your chair or
4 that table a little bit, we can do that, too.  We
5 don't care.  Everything is moveable to the extent
6 the wires permit.
7        MR. GREENFIELD:  Can I kind of give you
8 a --
9        THE COURT:  You have permission to slide
10 as you see fit.
11       MR. GREENFIELD:  Thank you, your Honor.
12       THE COURT:  Okay.  We will see you in
13 about eight minutes.
14       Thank you.
15       (Recess.)
16       THE COURT SECURITY OFFICER:  All rise.
17       THE COURT:  Okay.  Let's bring in the
18 jury.
19       (The jurors entered the courtroom.)
20       THE COURT:  Okay.  You can be seated.
21       And Carter can call its first witness.
22       MR. HILL:  First witness.
23       MR. PRYOR:  At this time Charlene Carter
24 calls Audrey Stone.
25       THE COURT:  All right.  Ms. Stone, you are

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 28 of 642   PageID 10969
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 309..312

Page 309

1  in the box already.  Thank you for being here.
2       If you could stand up and Mr. Frye will
3  administer the oath.
4       (AUDREY STONE was duly sworn by the
5  Clerk.)
6       THE COURT:  Okay.  You can take a seat.
7  And I have the same questions of every witness,
8  which is, I'm going to ask for some separation
9  between questions and answers.  That way if anyone
10  has an objection to the question, I can rule on it
11  before you answer.
12       If I sustain an objection, that means you
13  don't have to answer the question.  If I overrule
14  the objection, it means you can go ahead and answer
15  the question.
16       That also let's us keep a clean record for
17  the appellant proceedings, because if two people at
18  the same time, we can't write it down.
19       With that, you can proceed.
20       DIRECT EXAMINATION
21  BY MR. PRYOR:
22  Q.  Good morning.
23  A.  Good morning.
24  Q.  Would you state your name?
25  A.  Audrey Stone.

Page 310

1  Q.  Would you speak up?
2  A.  Audrey Stone.
3  Q.  Ms. Stone, were you Union president of Local
4  556 starting sometime in January '13?
5  A.  No.
6  Q.  When were you president?
7  A.  Starting in June 2013.
8  Q.  Can you move the microphone closer to you?
9       THE COURT:  I'm turning it up, too.
10  BY MR. PRYOR:
11  Q.  When were you president?
12  A.  Beginning in June 2013.
13  Q.  June 2013.
14       And as Union president and a union member, it
15  was important to you that Southwest Airlines not
16  interfere with union activities, true?
17  A.  It depends.
18  Q.  So there were some union activities that you
19  wanted Southwest Airlines to interfere with?
20  A.  No.  Not union activities.
21  Q.  All right.
22       That was my question, ma'am.  What was the
23  problem?
24  A.  I'm sorry.  I didn't understand your question.
25  Q.  You didn't understand it.  I said it very

Page 311

1  clearly.  That is your explanation?
2  A.  Yes, sir.
3  Q.  Okay.
4       Tell me your confusion again.
5  A.  My confusion was about Southwest and union
6  activities and what that meant.  And I should have
7  taken more time to --
8  Q.  I'll repeat it exactly again.  See if you
9  understand it this time.
10       As Union president and union member, it was
11  important to you that Southwest Airlines not
12  interfere with union activities, true?
13  A.  If they were protected union activities, yes.
14  Q.  Okay.  What is an unprotected union activity?
15  A.  There are things that members could choose to
16  do on their own that wouldn't be sanctioned by the
17  union that would not be considered protected union
18  activity.
19  Q.  Well, you just defined something that is not
20  union activity.
21       Tell me a union activity that you could engage
22  in that Southwest Airlines, you think it would be
23  appropriate for them to interfere with.
24  A.  If it is an official union activity, it
25  wouldn't be.

Page 312

1       But, again, there are situations where a member
2  may choose to do something and say they are doing it
3  on behalf of the union but it is not union
4  sanctioned.
5  Q.  So a union member communicating you -- with you
6  about union activities, that is union activity,
7  right?
8  A.  If they are a member, yes.
9  Q.  What if they are not a member?  What if they're
10  an objector or opt out, that doesn't get protection
11  from your Union?
12  A.  No, that is not correct.  It just wouldn't be a
13  member communicating with the union.
14  Q.  Okay.
15       So let's talk about members, first of all, and
16  members communicating with the Union about union
17  activities.
18       You want Southwest to not be involved in that,
19  true?  Or not interfere with it?
20  A.  Could you repeat your question, please?
21  Q.  What did you hear?
22  A.  I heard Union and Southwest involvement, isn't
23  that true.
24  Q.  Okay.  Answer your question then.  I will
25  listen to your answer.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 313..316

Page 313

1 A.  Can you not repeat your question?
2 Q.  I have to repeat my question and your question
3 that you heard.
4     You are under oath today, true?
5 A.  Yes, sir.
6 Q.  You agree to answer your questions truthfully
7 and without evasion?
8 A.  Yes, sir.
9 Q.  From this point forward, will you do that?
10 A.  Yes, sir.
11 Q.  Okay.
12    So as Union president, it was important that
13 when a union member is engaging in communications
14 with its union regarding union activities, that
15 Southwest Airlines not interfere, true?
16 A.  Yes.
17 Q.  And it is also, if I put the word "opt out
18 person or "objector, your answer would still be the
19 same, true?
20 A.  If it is a union activity, yes.
21 Q.  That was the question, ma'am.  It presumed
22 union activity.  Why did you need to add it for an
23 objector?
24 A.  I didn't.  I made a statement earlier about
25 sometimes people pretending or acting on behalf of

Page 314

1 the union and it not actually being union
2 activities.
3 Q.  Did -- were you the lead negotiator for a
4 Collective Bargaining Agreement with Southwest
5 Airlines?
6 A.  Yes.
7     MR. PRYOR:  Let's look at Exhibit 6.
8     I'm going to give you a couple of pages
9 from that.
10     THE COURT:  Is this for the witness only
11 or are you moving it into evidence?
12     MR. PRYOR:  I'm sorry, your Honor?
13     THE COURT:  Is this for the witness only
14 or are you moving its admission into evidence?
15     MR. PRYOR:  I will move for its admission,
16 sure.
17     THE COURT:  Okay.  Number 6.  Do we have
18 an objection to 6?
19     MR. McKEEBY:  No objection.
20     MR. GREENFIELD:  No objection.
21     THE COURT:  Okay.  6 is in evidence.
22     (The referred-to document was admitted
23     into evidence as Plaintiff's Exhibit 6.)
24     THE COURT:  You can publish to the witness
25 and the jury.

Page 315

1 BY MR. PRYOR:
2 Q.  Let's look at the first page.
3     Do you recognize Exhibit 6 as the Collective
4 Bargaining Agreement between Southwest Airlines and
5 your union?
6 A.  Yes.
7 Q.  Now let's look at page SWA 07.
8     I'm going to read the first -- you negotiated
9 this, so this is your agreement, right?
10 A.  Yes.
11 Q.  And you say, "No employee covered by this
12 agreement will be interfered with, restrained,
13 coerced or discriminated against by the company or
14 the union because of membership in the union."
15     Then you say, "All employees shall be free to
16 engage in lawful union activities or to refrain from
17 such activities."  True?
18 A.  Yes.  That is the language in the contract.
19 Q.  So employees are free to engage in lawful union
20 activities.
21     Let's go to page 011.
22     In paragraph 2, it says, "Employees covered by
23 this agreement shall be governed by all company
24 rules, regulations, and orders previously or
25 hereinafter issued by proper authorities of the

Page 316

1 company which are not in conflict with the terms of
2 this agreement."
3     So all of the employees are covered by employee
4 policies unless they are in conflict with the terms
5 of this agreement.  True?
6 A.  Yes.
7 Q.  Now, let's go back to what we just read before
8 on 07.
9     "All employees shall be free to engage in
10 lawful union activities or refrain from such
11 activities."
12     So if an employee is engaged in lawful union
13 activities, Southwest Airlines' policies don't
14 apply.
15     That's your understanding, true?
16 A.  Yes.
17 Q.  You ran for Union president in 2013?
18 A.  No.
19 Q.  When did you run?
20 A.  For president?
21 Q.  Yes.
22 A.  2015.
23 Q.  Oh, that is right.  You ran for first or
24 second -- what office did you run for in 2013?
25 A.  I didn't run for any office in 2013.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 2 July 06, 2022                         Pages 317..320

Page 317

1  Q.  When were you -- when were you running that you
2  were defeated and then put in the office?
3  A.  The election of 2012.
4  Q.  2012.
5      So in 2012, what office were you running for?
6  A.  First vice president.
7  Q.  You were running for first vice president.  And
8  were you elected?
9  A.  No.
10  Q.  And in fact, an entire another slate of -- you
11  were in one slate of candidates and there was
12  another slate of candidates, true?
13  A.  Yes.
14  Q.  And the other slate of candidates was elected?
15  A.  Yes.
16  Q.  And then a couple, what, two or three of those
17  were kicked out of their office?
18  A.  Three were removed from their position.
19  Q.  So three were removed from office.
20      Who removed them?
21  A.  The executive board, the governing body of the
22  local union.
23  Q.  The executive board of the union.
24      So the executive board removed the three people
25  that were elected and then two others resigned?

Page 318

1  A.  The two that resigned, resigned before the
2  removals of the other three.
3  Q.  So in any event, those five are out and you get
4  put into what position?
5  A.  The first vice president.
6  Q.  And then you ended up going to president
7  because that position was vacated?
8  A.  Once the president was removed, yes.
9  Q.  Okay.  And I'm sorry, I'm having trouble
10  hearing you.
11  A.  Once the president was removed from office,
12  yes.
13  Q.  Okay.
14      MR. PRYOR:  Let's look at Exhibit 24.
15      And I will move for its admission.
16      THE COURT:  Okay.  24.  Any objection?
17      I have nothing on file for 24.
18      MR. PRYOR:  Are you talking to me, your
19  Honor?
20      THE COURT:  I'm asking if there is a --
21  was 24 on the list for today?
22      Let me ask them.  I have no written
23  objection to 24.
24      So anything from Southwest or Union for
25  24?

Page 319

1      MR. GREENFIELD:  No, your Honor.
2      MR. McKEEBY:  No objection.
3      THE COURT:  Okay.  24 is in evidence.  You
4  can publish.
5      (The referred-to document was admitted
6      into evidence as Plaintiff's Exhibit 24.)
7  BY MR. PRYOR:
8  Q.  Let me show you Exhibit 24.
9      I'm going to start at the beginning of this
10  email string.  It's the last page.
11      By the way, it looks like it's pretty easy to
12  see these on the screen, but if you ever need a hard
13  copy of a document, just ask me, I will bring it up
14  to you.
15      Some of these emails, it might be easier at
16  times, so feel free to ask.
17      So this is an email from Charlene Carter to
18  John Parrott.
19      Who is John Parrott?
20  A.  He was the treasurer of the executive board and
21  the local union at that time.
22  Q.  He was on your team, right?
23  A.  Yes.
24  Q.  And the subject matter is "COPE."
25      Tell us what COPE is.

Page 320

1  A.  COPE is Committee on Political Education.
2  Q.  I'm sorry?
3  A.  COPE is the Committee on Political Education.
4  Q.  So it's the committee that spends union money
5  on political activities, true?
6  A.  Yes.
7  Q.  And Charlene Carter objected to her union dues
8  being used for those type of activities, true?
9  A.  I don't know if she objected about her union
10  dues.
11      The deduction that is referenced in this email
12  was a voluntary deduction that she would have had to
13  sign up for.
14  Q.  Okay.
15  A.  It was separate from union dues.
16  Q.  So she says to Mr. Parrott, "I" -- I think it
17  should say it -- "has come to my attention that in
18  my paycheck, there is a deduction coming out for
19  COPE, and I would like to stop this from being
20  deducted ASAP."
21      Do you see that?
22  A.  Yes, sir.
23  Q.  You were aware of her request, true?
24  A.  When I received this email, yes.
25  Q.  Okay.  You became aware of her saying, "I don't

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 2 July 06, 2022                     Pages 321..324

Page 321

1 want to pay for these political activities," right?
2 A.  Yes.
3 Q.  Okay.  And that is her right as a union member
4 to say she doesn't want to do that, true?
5 A.  Yes.
6 Q.  So do you respect the rights of your members?
7 A.  Yes.
8 Q.  Okay.  Let's see your respect.
9     Then Mr. Parrott says -- he sends an email to
10 you and he says, "Ha.  She has been supporting the
11 thing she despises this entire time."
12     Do you recall that?
13 A.  I see it here.  I don't recall it --
14 Q.  You don't recall --
15 A.  -- back then.
16 Q.  -- the treasurer, one of your team members, is
17 belittling the request from a union member that
18 doesn't want to do this, and as a matter of fact,
19 he's belittling it even more so because you designed
20 her paycheck so that it wouldn't reveal she was
21 paying for these COPE activities and she did it for
22 years --
23        MR. McKEEBY:  Objection, argumentative.
24        THE COURT:  Sustained.
25        Please rephrase.

Page 322

1 BY MR. PRYOR:
2 Q.  Are you aware that her paycheck was designed to
3 avoid revealing to her that she was paying for these
4 political activities?
5 A.  No, I don't have anything to do with how
6 Southwest Airlines lines up any payroll deductions.
7 Q.  Okay.  You swear the Union had nothing -- it's
8 your testimony, under oath, that the Union had
9 nothing to do with that?
10 A.  I don't have any knowledge or part of how the
11 payroll deductions are set up between the Union and
12 Southwest Airlines.
13 Q.  Forget any knowledge.
14     Do you have any knowledge that there was an
15 arrangement with the Union to conceal from
16 Ms. Carter how her funds were being used?
17 A.  No, absolutely not.
18 Q.  You have no knowledge of that?
19 A.  No.
20 Q.  And then up above, the next email says -- by
21 the way, did you respond to this email and say,
22 "Hey, she's entitled to do that.  You shouldn't be
23 making fun of her and being happy that she's been
24 paying for something she despises."
25     Did you say that?

Page 323

1 A.  No.
2 Q.  Why not?
3 A.  I had no idea she'd been volunteering to COPE
4 until this, and she was probably paying in more than
5 the money she was getting back after she had opted
6 out.
7     And it was an informational email that was sent
8 to four of us, and I didn't comment at all on it.
9 Q.  Ma'am, I didn't ask you about Ms. Carter's
10 request.
11     I asked you about Mr. Parrott's email to you
12 belittling Ms. Carter and her request and being
13 thrilled that she's been supporting things she
14 despises this entire time.
15     She's exercising her union right.
16     This is what you get.
17     As Union president, did you tell Mr. Parrott,
18 Hey, that is inappropriate?
19        MR. McKEEBY:  Objection.  Again, this is
20 argument, not a question.
21        THE COURT:  I will allow that one.
22        THE WITNESS:  No.
23 BY MR. PRYOR:
24 Q.  Why not?
25 A.  I just didn't comment on it.

Page 324

1 Q.  So if somebody does something clearly
2 inappropriate on your leadership team and you don't
3 comment, you don't comment because you agree?
4 A.  No.
5 Q.  Oh.  Then why didn't you comment?
6 A.  I just chose not to comment at all on the
7 thread.
8 Q.  Well, let's look at the next one.
9     Then there is an email from Cuyler Thompson.
10     Who is Cuyler Thompson?
11 A.  He was the recording secretary for the Union at
12 the time.
13 Q.  And he sends you an email as well, correct?
14 A.  It was an email thread going to everyone.  It
15 wasn't just sent to me directly.
16 Q.  Did he send it to you?
17 A.  He sent it to all of us.
18 Q.  Did he send it to you?
19 A.  Yes, I was one of the people he sent it to.
20 Q.  And so he's very comfortable sending belittling
21 comments about a union member to the president.  He
22 said, "This just made my morning."  True?
23 A.  Yes.
24 Q.  And I'm sure you responded to this one and
25 said, Hey, come on, that is not the way we treat our

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 32 of 642   PageID 10973
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 2 July 06, 2022                    Pages 325..328

Page 325

1 members.
2     Is that what you said?
3 A.  No.
4 Q.  As a matter of fact, your only response was to
5 talk about your Queso dip, right?
6 A.  Yes.
7 Q.  But it doesn't end there, does it?
8     Can you tell us who Brett Nevarez is?
9 A.  He was the second vice-president of our union.
10 Q.  He's also an officer of the union, and he
11 responds, "Yum to the Queso dip."  But then he says,
12 "So typical.  Batshit dipshit cannot read her
13 paycheck."
14     He's referring to Ms. Carter, isn't he?
15 A.  Yes.
16 Q.  And did you respond to this?
17 A.  No.
18 Q.  Is that appropriate?
19 A.  No.
20 Q.  It is inappropriate.  You are willing to come
21 in to court today and say it was inappropriate.
22     But back in 2013, when there wasn't a jury in
23 the room, did you say it was inappropriate?
24 A.  No.
25 Q.  Why not?

Page 326

1 A.  I just chose not to comment at all on the
2 communication.
3 Q.  You commented, you talked about your Queso dip.
4 You chose not to comment on inappropriate behavior
5 by your officers because you routinely engaged in it
6 as well?
7 A.  That is not true.
8 Q.  And then you received another email.  This was
9 from Mr. Gage.
10     So we are now covering all your officers,
11 aren't we?
12     He's another officer, right?
13 A.  Yes.
14 Q.  So we got the whole team.
15     Now the Union and the whole leadership team
16 says, "I wish you could give her a list of all of
17 the campaigns she has donated to in the last 17
18 years," exclamation point.  "Her head would
19 explode."
20     Is that appropriate?
21 A.  No.
22 Q.  And what was your response to that?
23 A.  I didn't have one.
24 Q.  You certainly knew who Charlene Carter was in
25 2013, didn't you?

Page 327

1 A.  Yes.
2 Q.  And you knew she objected to your team being
3 put in place in place of the elected leaders, true?
4 A.  Yes.
5 Q.  And you certainly knew she opposed the
6 political activities that your union was involved in
7 and didn't want her dues going there, true?
8 A.  Yes.
9     MR. PRYOR:  I can't close the big one.
10     MR. GREENFIELD:  Counsel, did you say 146?
11     MR. PRYOR:  146.  Sorry.
12     MR. GREENFIELD:  That's all right.
13     MR. PRYOR:  Let me make sure it is the
14 right one.  It is.
15     We move for the admission of Exhibit 146.
16     THE COURT:  Same objections as earlier?
17     MR. McKEEBY:  Yes, your Honor.
18     THE COURT:  So I am admitting 146, but I
19 will tell the jury, there is a batch of exhibits
20 that I'm admitting, but they're only as to one
21 defendant, not the other.
22     So this is one of those exhibits.  So it
23 is admissible and relevant only as to the Union not
24 as to Southwest Airlines.  So please consider it in
25 that regard.  I will make that note on the exhibit

Page 328

1 list that you will also have back in the jury room.
2     So 146 is admitted as to the Union.
3     (The referred-to document was admitted
4 into evidence as Plaintiff's Exhibit 146.)
5     MR. PRYOR:  Your Honor, may I approach?
6     (Thereupon, the following proceedings were
7 had at sidebar:)
8     MR. PRYOR:  First of all, let me say
9 making a record on these sidebars is costing me time
10 to make a record.  I understand your rulings.
11     THE COURT:  So do so briefly.  You just
12 cost yourself five seconds.
13     MR. PRYOR:  We object to the Court's
14 limiting instruction.  It's relevant to our claims
15 against Southwest.
16     THE COURT:  Understood.  I will give you a
17 running objection on that for all of the buckets at
18 once.  I'm including with the limiting instruction
19 as to the Union only.
20     MR. McKEEBY:  Your Honor, not to quibble,
21 but I will, when you give the limiting instruction,
22 I think you should say "relevant to the claims
23 against the Union, not relevant to the claims
24 against Southwest."
25     I think just to say "relevant to

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 329..332

Page 329

1 Southwest" doesn't adequately communicate.
2          THE COURT:  I will clean that up.
3          MR. PRYOR:  I appreciate the running
4 objection.
5          THE COURT:  You bet.
6          (Thereupon, the sidebar was concluded and
7      the following proceedings were held in open
8      court:)
9          THE COURT:  Okay.  Just to clean up my
10 wording.  This exhibit and the ones that are like it
11 later on that I'll give this disclaimer on are
12 relevant to the claims against the Union and are not
13 relevant to the claims against Southwest.
14          With that, 146 is in evidence with the
15 limitation that I just gave you.
16          You can proceed.
17          MR. PRYOR:  Okay.  Let's go to the
18 beginning of this email string.
19          And there it is.
20 BY MR. PRYOR:
21 Q.  Okay.  This is an email from you to Sonya
22 Lacore, true?
23 A.  Yes.
24 Q.  And it's back in January of 2014.  True?
25 A.  Yes.

Page 330

1 Q.  Who is Sonya Lacore?
2 A.  At the time she was a director in inflight for
3 Southwest Airlines.
4 Q.  Is that pretty high up at Southwest?
5 A.  It is below -- yes, it is below vice president.
6 Q.  Okay.  But it is high up in management.  She's
7 not a low-level employee?
8 A.  Correct.
9 Q.  Okay.
10      And what is "inflight"?
11 A.  "Inflight" is the term that Southwest Airlines
12 uses to describe the department that oversees the
13 flight attendant work group.
14 Q.  The what?
15 A.  The flight attendant work group.
16 Q.  Okay.
17      And that is 15,000 or more employees?
18 A.  Yes.
19 Q.  And you send an email to Ms. Lacore, true?
20 A.  Yes.
21 Q.  And it says, "Heads up.  We have a movement of
22 objectors, those that resign their union membership
23 and receive a small reimbursement of their dues, and
24 the board agreed that a non-member of 556 cannot
25 represent TWU 556 on any 556 committee."

Page 331

1      What you are talking about there is there are
2 joint committees between Southwest Airlines and the
3 Union, and any objectors to the Union you want off
4 the committees?
5 A.  Yes, if it is a joint union committee.
6 Q.  I'm sorry?
7 A.  Yes, if it is a joint union committee.
8 Q.  Objectors are also entitled to be represented
9 by the union, aren't they, by law?
10 A.  Yes.
11 Q.  And were you aware of whether or not this was
12 even a legal request you were making?
13      Was it legal to kick the objectors off the
14 committees, if you know?
15 A.  Yes, based on our understanding of RTW
16 international constitution and our bylaws that state
17 someone who has opted out of the union cannot attend
18 a membership meeting, cannot vote on any union
19 matters, and completely lose their voice to
20 participate in any union activity.
21      So under that, you cannot then serve on a union
22 committee if you cannot participate in union
23 activities.
24 Q.  I understand you're telling me your
25 International Union rules, and I appreciate that

Page 332

1 very much.
2      That doesn't happen, however, to be the law of
3 the land.
4      I'm asking you, legally --
5          MR. GREENFIELD:  Objection, your Honor.
6          THE COURT:  So I'll put a pin in this,
7 that all of the law will come from me at the end of
8 the case.
9          So if a lawyer ever tells you, that is not
10 the law, then wait to hear the law from me.
11          With that, you can proceed.
12 BY MR. PRYOR:
13 Q.  Well, let me ask that question that your
14 counsel wants to ask.
15      So do you think that the International Union is
16 the law of the United States of America?
17 A.  No.
18 Q.  Okay.  Let me ask you about the law of the
19 United States of America.
20      Did you have any understanding as to whether or
21 not what you were requesting was even legal?
22 A.  I'm not an attorney and I'm not allowed to talk
23 about anything that is attorney-client privilege.
24 Q.  So you did speak to an attorney about whether
25 or not this was legal, but you just aren't going to

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 2 July 06, 2022                         Pages 333..336

Page 333

1 tell us what he or she said?
2 A.  Yes.
3 Q.  Okay.  And did you proceed forward knowing that
4 in fact what you were requesting was illegal?
5 A.  No.
6        MR. GREENFIELD:  Same objection, your
7 Honor.
8 BY MR. PRYOR:
9 Q.  So you had advice --
10       MR. PRYOR:  I'm sorry, what was the
11 objection?
12       THE COURT:  The objection was on framing a
13 legal conclusion.
14       So I will allow you to ask that question.
15 BY MR. PRYOR:
16 Q.  Tell me the name of the attorney you spoke to.
17 A.  Ed Cloutman.
18 Q.  This gentleman right over here?
19 A.  Yes, sir.
20 Q.  And the Union attorney told you this was a
21 legal request?
22       MR. GREENFIELD:  Objection, your Honor.
23 Ms. Stone has clearly testified that there is
24 attorney-client privilege existing.
25       THE COURT:  Sustained.

Page 334

1 BY MR. PRYOR:
2 Q.   Then it says, "The board agreed."
3     When you say "the board" in this email, who is
4 the board?
5 A.   The executive board is the governing body of
6 the Union, of Local 556.
7 Q.   So these people that were ridiculing Ms. Carter
8 in the emails that we looked at first, that is who
9 they are?
10 A.   They are some members of the executive board.
11 Q.   Certainly that group.
12     Who are we missing?
13 A.   The executive board had 17 flight attendants on
14 it.
15 Q.   Oh, I don't want all of them.
16     So all 17 of them agreed?
17 A.   Yes.
18 Q.   And then it says, "Kent Hand on CISM, and we
19 instructed Eileen to let him know he couldn't serve.
20 He's trying to cause her problems."
21     And the problems he was causing her is he
22 didn't want to resign from the committee.
23     Is that the problem?
24 A.   He was very aggressive when she spoke with him,
25 and she was very upset after the conversation and

Page 335

1 very rattled.
2 Q.  So you send this to -- by the way, you say,
3 "Sorry to bring more Union drama your way."
4     What is the "more" referring to?
5 A.   This was six months after we had just had what
6 I think anyone would call Union drama when two
7 officers resigned and the other three were removed
8 from their positions.  Our Union had been in
9 upheaval in 2013.
10     And it was widely known with Southwest and
11 other unions that we had had a very dramatic year
12 with the Union, and it was right on the heels of
13 that.
14 Q.  And not only that, it led to a movement of
15 objectors, people who were in the union, that were
16 so upset that they resigned.  They still paid dues,
17 they are still entitled to be represented, but they
18 resigned?
19 A.  Yes.
20 Q.  And then let's look at Ms. Lacore's response.
21     She says, "I'm sorry you are having to deal
22 with it.  Let me know if there is anything I can do
23 to assist."
24     That is part of what she said, right?
25 A.  Yes.

Page 336

1 Q.   And why did you send this to her to begin with?
2 You thought Southwest should be the one to take
3 against a union objector?
4 A.  No, absolutely not.
5     All of the joint committees between Southwest
6 and the Union have a liaison from both the Southwest
7 side and the Union side that will coordinate with
8 the committee, that work on budgets, who is going to
9 pay what.
10     And at the time, Sonya Lacore was the liaison
11 for Southwest for the critical incident stress
12 management committee.
13 Q.   So you weren't asking Southwest Airlines to
14 remove these people from the committee, correct?
15 That was something the union would do?
16 A.  Correct.  I was just informing them that he
17 could no longer serve on that union committee
18 because he was a non-member.
19 Q.   And then you respond to her and say, when she
20 says, "What can Southwest Airlines do to assist
21 you?"
22     You then say, "You may want to leave your
23 directors" -- I assume that means let -- "let your
24 directors and base managers know as well that any
25 non-member of TWU may not be a representative of

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X      Vol 2 July 06, 2022      Pages 337..340

Page 337

1 Local 556. This would apply to meetings as well."
2    You are not asking her to make sure they are
3 not on there?
4 A.   No.
5 Q.   Then what was the point of telling her that?
6 A.   Because we had discussed that if -- a flight
7 attendant always has the right, we allow them to
8 take in any representative that they would like, if
9 Southwest Airlines members and management are
10 calling them in for any investigation or meeting.
11    However, if it is not someone that is an actual
12 union representative that has been trained to be a
13 union representative to represent someone in a
14 meeting, then they are just simply there as support
15 and not an actual representative, an agent of the
16 union.
17    And, again, someone that had opted out of the
18 union cannot serve in a union capacity to officially
19 represent someone in a meeting with Southwest
20 Airlines.
21 Q.   So you know that objectors had to file a
22 lawsuit for their rights to be protected, to be
23 represented on joint committees?
24      MR. GREENFIELD: Objection, your Honor.
25 Lack of foundation.

Page 338

1      THE COURT: Sustained.
2 BY MR. PRYOR:
3 Q.   Do you know?
4    I'm trying to lay the foundation.
5    He doesn't have the answer, ma'am. I'm asking
6 for your testimony.
7    Are you aware? All you have to do is tell the
8 truth.
9 A.   I am aware that there was a lawsuit filed, yes.
10 Q.   What was so difficult and why did you have to
11 look over here to answer my question?
12 A.   Because, sir, he raised an objection. Judge
13 Starr said "sustained," and I was just for a second
14 trying to remember if that meant I needed to answer.
15 This is my first time testifying in court, so it
16 just took me a second to process that.
17 Q.   I understand that process.
18    I'm just wondering why you needed to look at
19 the Union table to process that.
20 A.   I looked at the Union table because he raised
21 an objection and stood up.
22 Q.   Are you being represented by counsel today?
23 A.   Yes.
24 Q.   So do you know what happened with that lawsuit
25 that had to be filed because of the action you took

Page 339

1 with Southwest Airlines?
2      MR. GREENFIELD: Objection, your Honor.
3    Anything that stems from this discussion
4 is related to --
5      THE COURT: Sidebar if you want to phrase
6 it.
7    (Thereupon, the following proceedings were
8    had at sidebar:)
9      MR. GREENFIELD: Mr. Cloutman is going to
10 join us for the conversation. He was a part of
11 this.
12      THE COURT: Understood.
13      MR. CLOUTMAN: May I speak?
14      THE COURT: Sure. Yeah, you may speak.
15      MR. CLOUTMAN: There was a lawsuit filed,
16 and it was the subject of a confidential settlement.
17 We can't get into the terms of who shot John at all
18 about the terms of the settlement. I think counsel
19 knows that.
20      MR. PRYOR: First of all, I don't know
21 that, but I accept it --
22      MR. CLOUTMAN: Now you do.
23      MR. PRYOR: I was going to say, I accept
24 your representation, but I don't accept that it
25 overrules evidence in a federal court proceeding.

Page 340

1 That is not confidential from this proceeding.
2      MR. CLOUTMAN: Yes, it is. It absolutely
3 is. It's been filed in federal court and approved
4 by a federal judge.
5      THE COURT: Well, I'm not going to bust it
6 up, but I will let you ask if you know the outcome,
7 right? And if her answer is there was a settlement
8 that was confidential and remains confidential, it
9 is what it is.
10      MR. PRYOR: I will just do that.
11      MR. GREENFIELD: Can we instruct the
12 witness on that?
13      THE COURT: I will instruct the witness --
14 well, you ask the question, and I will say that the
15 witness can answer this question.
16      MR. PRYOR: So I ask broad-based, and then
17 you will limit with your instruction?
18      THE COURT: Correct.
19    (Thereupon, the sidebar was concluded and
20    the following proceedings were held in open
21    court:)
22      THE COURT: Okay. You can ask your next
23 question, then I will give an instruction to the
24 witness, and then you can answer.
25    How about that?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 36 of 642   PageID 10977
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 341..344

BY MR. PRYOR:
Q.  Ma'am, isn't it true that you do know what
happened, what the outcome of that lawsuit was, and
the illegality of your actions?  True?
    THE COURT:  So I will tell the witness
that the witness can answer if you know of a
settlement but you cannot reveal the contents of
that settlement.
    THE WITNESS:  All I know is that there was
a settlement done through the insurance company.  I
don't know any details of what that looked like.  I
wasn't a part of that.
    MR. PRYOR:  Okay.  Thank you.
    Exhibit 25.  We move for its admission.
    THE COURT:  25.  I see the objections from
this morning.
    Does the Union need a sidebar?  I know
what I'm going to do with 25.
    MR. GREENFIELD:  I'm pulling the document
up right now, if I may have a moment.
    THE COURT:  You bet.
    MR. GREENFIELD:  If we could have a
sidebar, your Honor.
    THE COURT:  You may.
    (Thereupon, the following proceedings were

had at sidebar:)
    MR. GREENFIELD:  I would just like to know
what your Honor is planning on doing before we --
    THE COURT:  I think a couple of hearsay
exceptions apply, so I plan on overruling the
hearsay objection.
    MR. GREENFIELD:  Thank you.
    (Thereupon, the sidebar was concluded and
the following proceedings were held in open
court:)
    THE COURT:  All right.  I'm admitting 25
into evidence over the objection.
    You can publish it to the jury.
    (The referred-to document was admitted
into evidence as Plaintiff's Exhibit 25.)
BY MR. PRYOR:
Q.  Let's look at Exhibit 25, the second page.
    Do you want to see the first page before the
second page so you can see what this --
    Do you recognize this or do you want to see the
first page?
A.  I don't have anything on my screen yet.
Q.  I'm sorry?
A.  I don't have anything on my screen yet.
Q.  There's nothing on your screen?

    MR. PRYOR:  Let's get 25 on there.
    Can you hand me Exhibit 25?
    THE COURT:  It is up now.
BY MR. PRYOR:
Q.  Okay.  There is the first page.
    Let me show you -- let's go to the second page.
    And this -- did you want a copy of this?
A.  I can see it now, thank you.
Q.  Okay.  So can you tell me what this second page
is?
A.  It looks like a post that Ms. Carter made
somewhere.
Q.  That is right.  It is a post that Ms. Carter
made.
    And she says, among other things, "I am so mad
at the past really.  I am just so tired of the same
old stuff from this union being thought about with
Thom McDaniel."
    Then goes on to say, "And that is, I am a
non-member objector.  I would love to start the card
drive to get rid of TWU."
    So Ms. Carter has made a post somewhere that
she's upset with her union and she wants a card
drive to get rid of TWU, right?
A.  Yes.

Q.  And "getting rid of TWU," another phrase for
that is decertification, right?
A.  Yes.
Q.  By the way, are you aware that one of your
officers previously threatened Ms. Carter when she
said there should be decertification?
A.  Threatened?  No.
Q.  Yes.
    Tell her that she would be kicked out of the
union and lose her job?
A.  No.
Q.  You are not aware that Cuyler Thompson did
that?
A.  No.
Q.  All right.
    Do you know how this post of Ms. Carter's ends
up being in an email from Brian to you?
    MR. PRYOR:  Next page.
BY MR. PRYOR:
Q.  This is from Brian to -- is that to you or is
it to Brett Nevarez?
    MR. PRYOR:  Do we have an unredacted
version?
BY MR. PRYOR:
Q.  Eventually, in any event, it ends finding its

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 2 July 06, 2022                     Pages 345..348

Page 345

1 way to you, right?
2 A.   It went to -- it looks like it was forwarded to
3 me along with four other people.
4 Q.   Okay.  Well, when Southwest or the Union
5 produced this, they blacked out these things.
6       I don't know who the "to" is.  Do you?
7 A.   The "to" on my document says "Audrey Stone" --
8 at the very top --
9 Q.   I'm talking about below where it is blacked
10 out.
11       Is that some kind of state secret as well?
12 A.   I don't know.  I don't know who it was sent out
13 to.
14 Q.   In any event, you received this.
15       And who is Brian?
16 A.   A flight attendant at Southwest.
17 Q.   Is that it?
18       Is that all you can tell us about him?
19       Tell us about Mr. Talburt, ma'am.
20 A.   He's a long-time very senior flight attendant
21 at Southwest Airlines.
22 Q.   Okay.
23       How about his union activity?
24       You didn't mention that, so I will ask.
25 A.   He was very supportive of our administration

Page 346

1 when we were in office.
2 Q.   Very supportive.  Wouldn't you put that in all
3 caps?
4       That is an understatement, right?
5 A.   I don't know that it is an understatement.  I
6 just -- he was -- he was supportive.
7 Q.   Hmm.
8       So he was just supportive.
9       Did you have a core team?
10 A.   Yes.
11 Q.   And you had a core team that had a secret
12 Facebook page, correct?
13 A.   A private Facebook page.
14 Q.   The actual setting is secret, isn't it, ma'am?
15       There is public, private and secret.  You are
16 telling me it wasn't secret?
17 A.   I didn't set it up, and I'm not Facebook savvy.
18 I did not know it went private and secret.  I just
19 knew that it was a --
20 Q.   But wait.  No, no.  You just told us under oath
21 it was private.  Now you are telling us you don't
22 know if it was private or not?
23 A.   No, no, no.  I said I knew it was private.  I
24 don't understand the different settings between
25 private and secret and what that looks like in

Page 347

1 Facebook.
2 Q.   But it was your understanding that no one could
3 get on that Facebook page except your core team
4 members?
5 A.   It was only people that were -- that were on --
6 would have been -- had to have been added by an
7 admin.
8 Q.   That's right.
9       And it was during your campaign and it was your
10 inner circle, true?
11 A.   No.  There were actually flight attendants on
12 there that I did not know well at all.
13 Q.   That weren't supporting you?
14 A.   There were flight attendants that had personal
15 relationships with other people on my team that may
16 have been supporting them, but again, weren't people
17 that -- it wasn't just my inner circle.  There were
18 people I did not know well.
19 Q.   Mr. Talburt certainly knew you, right?  You
20 knew him.
21 A.   Yes.
22 Q.   And you also appointed him to the CAN
23 committee, right?
24 A.   Yes.
25 Q.   And that's the committee that is supposed to

Page 348

1 keep flight attendants informed about the efforts of
2 the union in the collective bargaining process?
3 A.   Yes.
4 Q.   That was an important position, wasn't it?
5       Is it unimportant?
6 A.   No, it was an important role.
7 Q.   Is there some reason you are hesitant to praise
8 all of the work that this very supportive member of
9 your core team was involved in?
10 A.   No.
11 Q.   Okay.  Well, then, why can't you tell us, he's
12 a great guy, he supported me?
13 A.   I -- I already stated that he was a big
14 supporter throughout my administration.
15 Q.   So Mr. Talburt sends you this post of
16 Ms. Carter's.
17       Do you know how he got it?
18 A.   I don't.
19 Q.   You don't know where it came from?
20 A.   No.
21 Q.   And then Mr. Nevarez, I think -- what did you
22 say -- he was second vice president at the Union?
23 A.   Yes.
24 Q.   He sends an email to you, and to others,
25 including Mr. Parrott, "Cuyler's favorite is

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 349..352

Page 349

1 threatening to decert now that she is not a member
2 and cannot be charged.  I'm contacting legal counsel
3 and will keep you advised."
4      What did you understand that to mean?
5 A.  I understood it to mean that he was going to be
6 checking with legal counsel on if there were any
7 ramifications regarding someone that had already
8 opted out that was trying to decert, because under
9 our TW international constitution, decertification,
10 you can have charges brought against you within the
11 Union for attempting to decertify.
12     But when you are not a member, there was a
13 question of what did that even mean and, you know,
14 could you bring even charges against somebody that
15 was a non-member.
16 Q.  Well, let's not forget the first sentence.  And
17 I will get to the second one.
18     "Cuyler's favorite is threatening to decert now
19 that she is not a member and cannot be charged."
20     Cuyler Thompson, the person that I've told
21 you -- you say you don't know -- threatened
22 Ms. Carter when she was a union member, and her
23 favorite -- I'm still over here, ma'am.
24        MR. PRYOR:  Do you need something?
25        MR. GREENFIELD:  Yes.  I would like to

Page 350

1 make an objection.  He keeps testifying about facts
2 not in evidence about this threat.
3        THE COURT:  I will sustain that.
4 BY MR. PRYOR:
5 Q.  So, Mr. Cuyler -- or Mr. Nevarez is referencing
6 that Mr. Cuyler's favorite thing is threatening
7 members that mention decertification, but now that
8 Ms. Carter is not a member, she cannot be charged.
9     Isn't that what is being said there?
10 A.  No.  This email does not say Cuyler is
11 threatening.
12 Q.  What is it talking about then?
13 A.  It sounds like Cuyler's favorite, referring to
14 Ms. Carter, that she's threatening to decert now.
15 Q.  And she's not a member and cannot be charged.
16     So the threatening that cannot be charged
17 doesn't then fit, does it?  If it is talking about
18 her favorite.
19 A.  No.  That she's Cuyler's favorite.
20 Q.  Why is it mentioning -- oh, I see.
21     You are saying that Ms. Carter is Cuyler's
22 favorite.
23 A.  Yes.  There is nothing in here about Cuyler
24 threatening anyone.
25 Q.  Okay.  So they were close friends?

Page 351

1 A.  No.
2 Q.  Wait.  It just says that she's Cuyler's
3 favorite.
4 A.  I believe he was being sarcastic.
5 Q.  Oh, okay.
6     And then it says, "I'm contacting legal
7 counsel."
8     So you are contacting legal counsel because
9 Ms. Carter has posted something that is related to
10 her union stating that she's fed up with them and
11 you need a better union, let's just rid of this one.
12     And so you are seeking legal counsel and what
13 you can do against her, in February of 2014, right?
14 A.  I wasn't.
15 Q.  I'm sorry?
16 A.  I said I wasn't.  Brett said he was going to.
17 Q.  Oh, I'm sorry.  Of course.  You told Brett
18 Nevarez to stop.
19     You got an email saying that, right?
20 A.  No.
21 Q.  Oh, I thought you -- okay.  Did you disagree
22 with him?
23 A.  No.  I thought contacting legal counsel for
24 advice was the appropriate thing to do.
25 Q.  Okay.  What action was taken?

Page 352

1 A.  There was no action taken.
2 Q.  You sure wanted to, though, right?
3 A.  No.
4 Q.  You didn't?
5     Is that what you are saying, you didn't want to
6 take action against her?
7     Then why were you seeking legal counsel to take
8 action against her?  Those don't make sense.
9 A.  Any time any comments about decertification
10 came up, we sought the guidance of TW international
11 and legal counsel as leaders of the union.
12 Q.  I just want to make sure I understand.
13     You didn't want to take legal action against
14 her, and when Mr. Nevarez suggested, let's check
15 with legal counsel and see what we can do, you
16 didn't agree with that?
17 A.  That is not what I said.  I said I thought it
18 was a good idea for him to seek legal counsel's
19 advice on what, if anything, needed to be done.
20 Q.  So you wanted to do something?
21 A.  No.  I wanted to see if there was something we
22 should be doing as leaders of the union.
23 Q.  Something you might be required to do, is that
24 what you were worried about?
25 A.  Yes.  Under the constitution and our bylaws,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 39 of 642   PageID 10980
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 353..356

Page 353

1 there is a lot of things leaders of the Union are
2 required to do.
3 Q.  Against an objector that thinks the Union
4 should be decertified, there is a lot of things in
5 the constitution?
6 A.  No.  In general, as union leaders, and there
7 are responsibilities when it comes to something
8 regarding decertification.  Our TWU constitution
9 speaks to it.
10       MR. PRYOR:  Let's look at Exhibit 26.
11       We move for its admission.
12       Don't display it yet.
13       MR. McKEEBY:  No objection from Southwest.
14       THE COURT:  Pending Union's written
15 objection, I'm happy to rule, unless you want to a
16 sidebar.
17       MR. GREENFIELD:  Very briefly.
18       (Thereupon, the following proceedings were
19       had at sidebar:)
20       MR. GREENFIELD:  I just didn't get what
21 your basis for the hearsay objection was on the
22 first one, and I wanted to make sure I preserved the
23 record as to what -- I presume you are going to have
24 an exception --
25       THE COURT:  All I have to do is overrule

Page 354

1 it.  I don't have to say which ground.
2       But I think there is a hearsay exception
3 that applies.  I can't remember which one, that
4 Carter argued in its status report, but I thought
5 that exception applied.
6       Relevance, I will say it's marginal
7 relevance at best.  If you want to use it, you may
8 burn your time.  But you may understand it better
9 than I do.
10       So I'll overrule the objection.
11       MR. PRYOR:  I'm worried about your list of
12 time now.  I thought it was relevant.
13       (Thereupon, the sidebar was concluded and
14       the following proceedings were held in open
15       court:)
16       THE COURT:  Okay.  I'm admitting 26 over
17 objection.
18       You can publish to the jury.
19       (The referred-to document was admitted
20       into evidence as Plaintiff's Exhibit 26.)
21 BY MR. PRYOR:
22 Q.  All right.  Let's look at Exhibit 26.
23       And this is an email from Brian Talburt, the --
24 I'm not sure how to characterize him now.
25       A good supporter of yours, right?

Page 355

1 A.  Yes.
2 Q.  And he seems to email you stuff.
3       Is that part of his role, to gather information
4 and send it to you?
5 A.  No.  I received emails from a lot of members
6 every single day.
7 Q.  Just like this one, right?
8 A.  Yes.
9 Q.  Okay.  So Mr. Talburt is saying that "While it
10 has nothing to with the topic at hand, it's an
11 illustration of casual behind-the-scenes
12 conversations we have and particularly regarding
13 social media.
14       "I, along with Mike and Sonya, had a meeting
15 last summer with VDV to discuss social media as a
16 tool."
17       Who is Mike?
18 A.  I am assuming, based on the bottom of the
19 original message, Mike Hafner.
20       There's numerous Mikes at Southwest, but since
21 Mike Hafner's name is below, I'm assuming that is
22 who he's referring to.
23       And at that time he would have been, if it is
24 Mike Hafner, the vice president of inflight for
25 Southwest.

Page 356

1 Q.  By the way, you make a really good point.
2       There is an original message from Mike Hafner,
3 and he's the head of inflight at Southwest Airlines,
4 right?
5 A.  Yes.
6 Q.  Where is his email?
7 A.  I don't know.
8 Q.  Have you seen it?
9 A.  No.
10 Q.  It's not here, is it?
11 A.  It's not displayed on the screen that I'm
12 looking at, no.
13 Q.  We are more than happy to allow that be
14 produced at any time.
15       MR. GREENFIELD:  Objection, your Honor.
16       This is their own exhibit.  There is no
17 evidence that something wasn't produced, and I don't
18 appreciate that insinuation to the jury.
19       THE COURT:  I will strike that.
20       You can proceed.
21 BY MR. PRYOR:
22 Q.  And Mike Hafner, and then Sonya -- is that
23 again Sonya Lacore?
24 A.  I would assume so, yes.
25 Q.  I'm sorry?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 357..360

Page 357

1  A.  I would assume so, yes.
2  Q.  Okay.  Were there a lot of other Sonyas that
3  you dealt with at Southwest Airlines in management?
4  A.  In management, no.
5  Q.  And who is VDV?
6  A.  I'm not certain.
7  Q.  Okay.  And if it turns out to be someone that
8  everyone recognizes as the COO of Southwest
9  Airlines, you are telling us, as Union president in
10 2014, that would be a shock to you?
11 A.  Yes.
12 Q.  Okay.
13 A.  Not that VDV --
14 Q.  That is fine.  It is shocking to you.  We will
15 recall.
16     Are you changing that?
17 A.  No, I wasn't finished.
18     He's referencing a meeting that took place.
19 I'm not certain I was even president yet because
20 he's referencing a meeting that took place the
21 previous summer, which was around the time the
22 changeover was happening in our union.
23 Q.  That wasn't my question.
24     My question was who is VDV, and you said you
25 don't know.

Page 358

1  A.  I'm not sure.
2  Q.  Oh.
3  A.  I didn't have a conversation.  It could have
4  been Mike Van de Ven.  I don't know.
5  Q.  What is that name again?
6  A.  Mike Van de Ven.
7  Q.  Mike Van de Ven?
8     And what was his position at Southwest
9  Airlines?
10     THE COURT:  We've got to keep more
11 separation between questions and answers to keep a
12 clean record.
13     You can answer, if you know.
14     THE WITNESS:  At the time he was one of
15 the executive officers.  I think he was the chief
16 operating officer.
17 BY MR. PRYOR:
18 Q.  Okay.  When you told me you were not going to
19 be evasive at the beginning of our conversation, I
20 asked you about who VDV is, and you said you are not
21 sure.
22 A.  I'm not 100 percent sure.  I am making
23 assumptions because I wasn't a part of the meeting
24 and I did not have a conversation with Brian about
25 this meeting.

Page 359

1  Q.  There must be lots of other VDVs, right, just
2  like there must be a lot of other Sonyas.
3     You don't know who he's talking about.  You
4  can't be sure.  Right?
5  A.  I'm assuming.
6  Q.  Well, you are assuming after I forced you to.
7  You wouldn't assume it before, would you?
8     Are you being evasive?
9  A.  No.
10     MR. PRYOR:  Let's look at exhibit --
11 BY MR. PRYOR:
12 Q.  By the way, why are you being -- well, why are
13 you reluctant to say that Brian Talburt is having
14 behind-the-scenes conversations with senior
15 management of Southwest Airlines about using social
16 media as a tool?
17     Why would you be concerned about that?
18 A.  You asked me about knowing about it, and I was
19 trying to explain that I did not know about this
20 meeting and I wasn't a part of it and I didn't
21 participate in it, so I don't have intimate
22 knowledge about this.
23 Q.  Okay.
24     And it's your testimony, under oath, and your
25 credibility can be viewed in this context, that you

Page 360

1  weren't trying to be evasive about knowing who VDV
2  is, true?
3  A.  Yes.  I was not trying to be evasive.
4  Q.  All right.
5     MR. PRYOR:  Let's look at Exhibit 27.
6     And we move for its admission.
7     THE COURT:  I have Union objections from
8  this morning.
9     Anything from Southwest?
10     MR. McKEEBY:  No objection from Southwest.
11     THE COURT:  I know my ruling.
12     Do you want a sidebar?
13     MR. GREENFIELD:  No, your Honor.
14     THE COURT:  I will overrule on two hearsay
15 exception grounds and admit it into evidence.
16     You can publish 27.
17     (The referred-to document was admitted
18 into evidence as Plaintiff's Exhibit 27.)
19 BY MR. PRYOR:
20 Q.  Ma'am, do you want a hard copy of this email
21 string?
22     It is several pages long.
23     Do you recognize it?
24 A.  Yes.
25 Q.  Okay.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 2 July 06, 2022                  Pages 361..364

Page 361

1 A.  What is up here?
2 Q.  Let's go to the beginning of this email.
3      And it's forwarding a very long dissertation by
4 someone, apparently Mike Casper -- oh, yes, it is
5 Mike Casper -- with a whole host of complaints about
6 Local 556.
7      Do you see that?
8      I'm happy to read them if you want me to read
9 all of his complaints.
10     Okay.  I will try a few.
11     "Hold the executive board and the rest of the
12 residents of our union accountable.  A resounding no
13 vote is an acceptable thing.
14     "11 of those 15 positions, the incumbents were
15 not reelected by a very wide margin.  It wasn't even
16 close.  Many of these incumbents were entrenched for
17 years and years."
18     It goes on.
19     "The new executive board went about their way
20 and assumed their positions with high hopes and then
21 they were kicked out."
22     Do you want me to read more, or do you accept
23 that Mr. Casper was writing and complaining about
24 Local 556?
25     Would that be accurate?

Page 362

1 A.  Yes.
2 Q.  Okay.  That's union activity, right?
3 A.  He's expressing his opinion about union
4 activity.
5 Q.  No, no.  Him expressing his opinion is union
6 activity, true?
7 A.  I think so.
8 Q.  You think so.
9      As union president, someone is expressing their
10 opinion about the union to another union member, and
11 you think so, you don't know so, that that is
12 protected union activity, right?
13 A.  I guess I'm stuck on activity and being
14 actually union activity taking action, and
15 conversations between members, expressing their
16 views about a union, yes, that would be --
17 Q.  Well, if we are talking about being stuck, I'm
18 stuck on a union president that isn't willing to say
19 that a union member has the right to object to her
20 union and it be union activity.
21 A.  Yes.
22 Q.  You said, "I think so."
23     MR. PRYOR:  All right.  So let's go to --
24 it is page 98.
25     MR. GREENFIELD:  Page 98?  Okay.  I

Page 363

1 thought we were talking about another exhibit.  I'm
2 sorry.
3      MR. PRYOR:  We are on that page.
4 BY MR. PRYOR:
5 Q.  Okay.  So this is from Tina.  And who is Tina?
6 A.  Tina Coffee was a board member at that time.
7 Q.  How were you able to recognize Tina and tell us
8 who Tina was?
9      There's got to be other Tinas there.
10     Are you sure it's the right Tina?  You weren't
11 sure about VDV.
12 A.  The previous screen had her initials on it and
13 she was a board member, so I worked very closely
14 with her.
15 Q.  So a board member is forwarding this to
16 someone.  It says it is to -- do you see on page 99?
17     It might be better if you had a copy.
18     MR. PRYOR:  Can I approach the witness,
19 your Honor?
20     THE COURT:  You may.
21     MR. McKEEBY:  Thank you.
22 BY MR. PRYOR:
23 Q.  Where it says "to" -- oh, there it is right
24 there.
25     Who is it being forwarded to?

Page 364

1 A.  I'm not sure.
2 Q.  Okay.
3      THE COURT:  We can't hear you if you are
4 not at a mic.
5 BY MR. PRYOR:
6 Q.  Do you know why the name of who that was
7 forwarded to is blacked out?
8 A.  No.
9 Q.  All right.  Let's go back to, then your board
10 member then sends it to Brian Talburt.
11     Is that right?
12 A.  No.
13 Q.  Mr. Nevarez sends it?
14 A.  It looks like it was a Rocky Mountain that sent
15 it to Mr. Talburt, if I'm reading it correctly.
16 Q.  Okay.  We will get to Rocky Mountain.
17     I'm talking about the one right above where it
18 says, "Leg-breaking time for Casper the Ghost scab."
19     That was written by Mr. Nevarez, correct?
20 A.  Yes.
21 Q.  And you received this email string, correct?
22     Surely you remember someone threatening to
23 break the leg and calling someone a scab.
24 A.  Yes.
25 Q.  By the way, "scab" is a very derogatory term to

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 365..368

Page 365

1 a union member or a union supporter, true?
2 A.   "Scab" is a term used to describe someone who
3 has opted out of the union or who crosses a picket
4 line.
5 Q.   So "scab" is not a derogatory term to you as
6 former union president, right?
7     It's just a descriptive term --
8 A.   Yes.
9 Q.   -- as opposed to saying someone crossing a
10 picket line.
11     That scab is not a negative derivation of that,
12 right?
13 A.   It's a descriptive term to describe behavior
14 that is -- someone that has voluntarily chosen to
15 not support the union or opt out of the union.
16 Q.   Okay.  But it is not a derogatory term, right?
17 A.   It is not complimentary --
18 Q.   Well, wait a minute.
19 A.   -- but it is a descriptive word.
20 Q.   So as a union member, you are sitting here
21 telling this jury that referring to someone as scab,
22 scab is not really negative.  It's not positive,
23 it's not negative.  Right?
24 A.   I'm saying it is a fact of a description of
25 somebody, the actual definition of it.

Page 366

1 Q.   Okay.  Listen to my question.  I'm going to
2 give you your chance.
3     Is using the term "scab" to refer to someone a
4 negative term?
5 A.   Somebody could consider it negative, yes.
6 Q.   Okay.
7     How many questions did it take me to get you to
8 admit the basic fact that "scab" is a negative term?
9 Tell me.  I think it is four or five.
10     Why was that so hard?
11     Because your second vice president is referring
12 to a member of the union as a scab, right?
13 A.   Someone that has opted out of the union isn't a
14 member.
15 Q.   Are you telling me Mike Casper had opted out?
16 A.   I don't know if he had opted out at this point.
17 Q.   Then let's just stick with what you do know.
18     Mike Casper represents himself as a union
19 member at this time.  You can read what he writes.
20     You are telling me, maybe he wasn't?  But
21 listen --
22 A.   He opted out at one point and he was not a
23 member.
24 Q.   But whether he had opted out or not, he never
25 crossed a picket line, did he?

Page 367

1 A.   Not to my knowledge.
2 Q.   Okay.  So this is just -- just more negative
3 connotation about anyone that opposes union
4 leadership, true?
5 A.   We just have different opinions on what the
6 definition of "scab" is.
7 Q.   Oh, I thought we came to an agreement.
8     It turns out once again now it went from being
9 positive, neutral, negative, now it is positive
10 again?
11 A.   No.  I'm just saying that someone that hasn't
12 crossed a picket line, that's not the only
13 definition of somebody that can be a "scab."
14 Q.   So when you received this email where your
15 second vice president refers to leg-breaking time
16 for Casper the Ghost scab for having the temerity to
17 object to his union's activities, what did you do?
18 A.   I spoke to Brett.
19 Q.   You did?
20 A.   Yes.
21 Q.   You spoke to who?
22 A.   Brett.  Mr. Nevarez.
23 Q.   And you told Brett, Don't do that?
24 A.   I told him he shouldn't be even making jokes
25 like that and shouldn't be talking that way about

Page 368

1 anyone.
2 Q.   Isn't, in fact, what you told him is, Don't put
3 it in writing?
4 A.   I told him he shouldn't be talking, period,
5 that way.
6 Q.   Let me just get an answer to my question.
7     Didn't you, in fact -- have you spoken to
8 Mr. Nevarez recently?
9 A.   No.
10 Q.   Didn't you, in fact, tell him he shouldn't be
11 putting that type of thing in writing?
12 A.   I always told my team that anything they put in
13 writing, they needed to be prepared that it should
14 be something they would be comfortable with the
15 public seeing, and if they weren't, don't put it in
16 writing.  That was what I told everyone in Union
17 work.
18 Q.   All right.
19     So by the way, those previous emails we looked
20 at, did you tell Mr. Nevarez back then, and
21 Mr. Thompson and whoever else was making fun of
22 Charlene, and the fact they misused her dues, did
23 you tell them, Hey, don't put that kind of stuff in
24 writing, that's improper?
25 A.   No.  And they didn't misuse her union dues.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 2 July 06, 2022                                        Pages 369..372

Page 369

1 Q.  You just told us, whenever they do something
2 improper in writing, you told us that was improper
3 at the time.  You said, Yeah, they shouldn't have
4 said that.
5       Surely you told them, Don't put that in
6 writing, and yet here we go again, here it is.
7       Are they just not listening to you?
8 A.  I don't control Mr. Nevarez.
9 Q.  So Mr. Nevarez writes, "Leg-breaking time for
10 Casper the Ghost scab."
11       Then someone responds and says, "He is such an
12 ass."
13       And that is talking about Mr. Casper.
14       Do you see this email?
15 A.  Yes.
16 Q.  And who is Rocky Mountain?
17 A.  I don't know.
18 Q.  You don't know that Rocky Mountain is the
19 personal email address of Mr. Hafner, one of the top
20 people at Southwest Airlines?
21       MR. GREENFIELD:  Objection, your Honor.
22 Lack of foundation.
23       THE COURT:  Sustained.
24       THE WITNESS:  I did not utilize Southwest
25 leaders' personal email addresses.  I didn't have

Page 370

1 them.  My communication with Southwest leadership
2 was always through their WNCO email, company email
3 addresses.
4 BY MR. PRYOR:
5 Q.  So you don't know who Rocky Mountain is?
6 A.  No.
7 Q.  Would it shock you that a member of management
8 of Southwest Airlines would agree with leg-breaking
9 time for Casper the Ghost scab by saying, "He's such
10 an ass"?
11 A.  Yes.
12 Q.  I will stick with shocking.
13       All right.
14       MR. PRYOR:  Let's go to page 97.
15 BY MR. PRYOR:
16 Q.  And this an email from Brian.
17       And Brian Talburt's your supporter, a person
18 you appoint to committees, a person who sends you
19 information, right?
20 A.  Yes.
21 Q.  And he says, "Audrey, a couple of things about
22 this thread.  Please delete Brett's comment about
23 leg-breaking."
24       Do you see that?
25 A.  Yes.

Page 371

1 Q.  Do you know why he said that?
2 A.  Because it wasn't appropriate for Brett to say
3 that.
4 Q.  Well, would deleting it be the thing to do
5 about an inappropriate comment, or would it be to
6 keep a record of it and take appropriate action?
7 A.  Anything that is out on social media that is
8 inappropriate, my advice to people is always first
9 to delete it if they are made aware that it is
10 something that they shouldn't have posted.
11 Q.  So this communication about leg breaking and
12 he's such an ass, you agreed that it should be
13 deleted?
14 A.  I believe in my conversation with Brett, I told
15 him he should delete it.
16 Q.  And then he goes on to say, "There is a private
17 email between Mike and I.  I take this stuff very
18 seriously."
19       Do you know that Mike is Mike Hafner?
20 A.  I'm assuming so, just based off of you saying
21 that that was who Rocky Mountain was.  I had no -- I
22 did not know that.
23 Q.  Okay.  So you now assume Rocky Mountain is
24 Mr. Hafner?
25 A.  Based off of what you stated.

Page 372

1 Q.  Okay.  Based on me telling you?
2 A.  Yes.
3 Q.  Oh, no.  You don't have to accept that.  I will
4 tell you that, but I don't want your testimony --
5 A.  I don't know who -- I don't know who Rocky
6 Mountain is.
7 Q.  Okay.  All right.
8 A.  I don't know who that email address belongs to.
9       And again, there were a number of Mikes in
10 Southwest leadership --
11 Q.  Okay.
12 A.  -- then and now on the inflight side.
13 Q.  I recall you telling me you would be shocked
14 that it was Mr. Hafner.
15       You don't have to accept what I'm saying about
16 it.  We will see if another witness can testify
17 about that.
18       So it says, based -- tell you what -- well, I
19 was going to ask you to assume it was Mr. Hafner so
20 you could interpret what is being said here, but I
21 actually don't want you to do that.
22       In context, do you know what Mr. Talburt is
23 saying when he says, "I would hate to breach a
24 confidence he obviously had in me based on the
25 long-term relationship we developed.  He's a great

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 373..376

Page 373

1 person."
2     And then it goes on.
3     So he's revealing something to you that he
4 wants to make sure doesn't become public, at least
5 that much is clear, right?
6         MR. GREENFIELD:  Objection, your Honor,
7 calls for speculation.
8         THE COURT:  I will only allow her to
9 answer if she has personal knowledge.
10        THE WITNESS:  I don't.
11 BY MR. PRYOR:
12 Q.  Do you have an understanding -- how did you
13 interpret this email when you received it?
14 A.  That Brian was sharing it with me.  That he was
15 concerned about breaching a confidence.  But he goes
16 on to say, at the end of the day, he was talking
17 about his job, and he didn't want to hold anything
18 back that he believed, you know, could be helpful.
19 Q.  Okay.  So would you agree with me that what
20 this email is saying is that I'm having confidential
21 communications with senior members of Southwest
22 Airlines's management, and I want to keep it
23 confidential, I don't want to get anybody in
24 trouble, but if push comes to shove and it is my job
25 and my family, I will do what I have to do.

Page 374

1     Is that fair?
2 A.  Yes.
3 Q.  Okay.  Let's go back up to the top of page 98.
4     I'm going to read a part of what he says here.
5     He says, "This is just an illustration of the
6 types of conversations I have had with senior
7 Southwest management re dealing with problem people,
8 and in this case specifically, Hafner and Casper."
9     Did I read that correctly?
10 A.  Yes.
11 Q.  And Hafner and Casper are both union members?
12 A.  No.
13 Q.  Which one is not?
14 A.  Greg Hafner.
15 Q.  Is he an objector?
16 A.  Yes.
17 Q.  Okay.  So we are talking about an objector and
18 a union member, and Brian Talbut is telling you,
19 I'm having these secret conversations with Southwest
20 senior management about how to deal with these
21 problem people, true?
22 A.  Yes.
23 Q.  I'm sure, when you saw that, you would say,
24 That is totally inappropriate.
25     Is that how you reacted?

Page 375

1 A.  No.
2 Q.  It is totally inappropriate, isn't it?
3 A.  For a flight attendant to have conversations
4 with Southwest leaders, no, that is not
5 inappropriate.
6 Q.  Was that my question, ma'am?
7     Of course it's not.
8     You can talk to anybody you want.
9     It's inappropriate to have a conversation with
10 Southwest senior management about trying to deal
11 with people, an objector and a union member that are
12 problematic?
13 A.  Yes, that is inappropriate.
14 Q.  Okay.  That was my question.
15     You are still telling me under oath you are not
16 trying to be evasive, right?
17 A.  No, sir, I'm not.
18 Q.  You really thought my question was, is it okay
19 for a flight attendant to talk to a member of senior
20 management?
21     That is how you answered my question, and that
22 wasn't being evasive, right?
23 A.  No, sir, I was not trying to be evasive.
24 Q.  And then there is an email above that on
25 page 97.

Page 376

1     It says -- this is from you -- "Brian, thanks
2 for sending.  Will go through when done with the
3 negotiations.  Anything you have where you have used
4 'public execution' in writing?"
5     Is that -- so you are sending an email to Brian
6 trying to find out whether or not he's used the term
7 "public execution" in writing, right?
8 A.  Yes.
9 Q.  Okay.  You were representing him for making
10 comments about executing people?
11 A.  No.  I was assisting our grievance specialist
12 in his grievance where he had made comments about a
13 public execution and had stated repeatedly that he
14 did not mean really executing somebody, and that he
15 had had numerous conversations with people,
16 including Southwest leaders, explaining what he
17 meant.
18     Which is why I was asking him if there was
19 anything in writing that depicted what he was really
20 trying to say, to defend that it was not him
21 actually literally saying somebody needed to be
22 publically executed.
23 Q.  I'm not saying --
24        THE COURT:  Did you have an objection?
25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 45 of 642   PageID 10986
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 377..380

Page 377

1 BY MR. PRYOR:
2 Q.  -- he was actually talking about public
3 execution.
4        THE COURT:  Hold on.  Hold on.
5    Do you need a sidebar?
6        MR. GREENFIELD:  Yes, your Honor.
7        (Thereupon, the following proceedings were
8    had at sidebar:)
9        MR. GREENFIELD:  Sorry, Mr. Pryor, to
10 interrupt your flow.
11       Because of my vantage point, I caught
12 another witness who has entered the courtroom.  I
13 know we've invoked the rule, so I just wanted to
14 make the Court aware of it.
15    It is Mr. Parrott.
16       THE COURT:  Who is he?
17       MR. GREENFIELD:  Mr. John Parrott.
18       THE COURT:  Okay.  Kevin --
19       MR. GREENFIELD:  John Parrott is here.
20       THE COURT:  Okay.
21       MR. GREENFIELD:  He's our next witness, I
22 think.
23       I just wanted to be able to get him out,
24 if you didn't want to him to hear what was going on.
25       THE COURT:  So we need to take a lunch

Page 378

1 break and get the witness out, but you have got a
2 live question.
3        Or do you have a live question?
4        Did she give you a satisfactory answer?
5        If you another question or two, I'll --
6        MR. PRYOR:  I can break any time.  This is
7 a great time.
8        THE COURT:  Okay.
9        Then let me call our lunch break now.  You
10 can pick back up and jump back to that question, if
11 you want to, after lunch, and then we'll get the
12 witness out of the room.
13       MR. PRYOR:  Thank you, your Honor.
14       MR. GREENFIELD:  Can we have some sort
15 of -- something to the jury that I'm not trying to
16 put the kibosh on what is happening here, just that
17 there was some protocol --
18       MR. PRYOR:  It is a witness.
19       MR. GREENFIELD:  -- that had to be talked
20 about?
21       Thank you, your Honor.
22       (Thereupon, the sidebar was concluded and
23    the following proceedings were held in open
24    court:)
25       THE COURT:  Okay.  We had to talk about a

Page 379

1 witness issue; it is not anyone's fault.  But I
2 notice that it is after noon, and so we should give
3 y'all your lunch break.
4        So I'm going to ask that we pause the
5 action here.  We will pick back up with Ms. Stone's
6 testimony after lunch.
7        So let's take an hour lunch break.  It's
8 12:07.  We will be back here at 1:07, and then we
9 will back on the record.
10       Same three instructions as always.  You
11 can only talk to your fellow jurors, just not about
12 the case.  Don't talk to anyone else in the
13 courthouse and don't do any research on the case.
14       All rise for the jury.
15       (The jurors exited the courtroom.)
16       THE COURT:  All right.
17       Ms. Stone, you're free to leave the
18 witness stand.
19       But now that you are a witness, you are a
20 ward of the Court.  That means you are with me, and
21 so you are not supposed to talk to a lawyer or
22 anyone else about the case until I excuse you from
23 your testimony in this case.
24       Does that make sense?
25       (Thereupon, the witness exited the

Page 380

1 courtroom.)
2        THE COURT:  Okay.  Any other issues anyone
3 has that they want to bring up now?
4        Okay.  Let's be back in here maybe at five
5 minutes, so 1:02 is our target time.  We can handle
6 anything that comes up in the meantime.
7        And then we will bring you in after we
8 have handled any legal issues and then continue with
9 your testimony.
10       MR. GREENFIELD:  And your Honor, just
11 maybe for the information of the witness, why we
12 took the break.
13       THE COURT:  Yes.  We took the break
14 because a witness came into the room.  So witnesses
15 can't be in the room because we have invoked the
16 rule in this case, which means witnesses have to sit
17 out in the hall unless you've got special
18 dispensation to sit at the counsel table.
19       So witnesses can't be in the room.
20       Okay.  With that, we will take our break.
21 We will see you at 1:02.
22       (Recess.)
23       (In chambers.)
24       THE COURT:  Hello.  I'm Brantley.  You are
25 not in trouble.  Don't worry.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 46 of 642   PageID 10987
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 381..384

Page 381

1       I need to ask you a couple of questions
2 because I know the lawyers will ask me, because I
3 have to tell them what you wrote me.
4       So I know you say you didn't know
5 Charlene, if y'all went to high school together, you
6 didn't know her.
7       JUROR NO. 8:  Right.
8       THE COURT:  Do you know anything about
9 her?
10      JUROR NO. 8:  I just kind of --
11 whenever -- I kept saying I kind of -- she looked
12 familiar.  I was thinking maybe it was from around
13 town.  Because I worked at the bank.  I was thinking
14 maybe.
15      And then today whenever they said that she
16 was from Lake Dallas, it started kind of clicking.
17 And then I saw her maiden name in one of the
18 documents that was on there.  And I was, yeah, that
19 is her, I think.
20      THE COURT:  Was it Gale?
21      JUROR NO. 8:  Batt.
22      THE COURT:  Batt.
23      JUROR NO. 8:  And she was an upper
24 classman.  So I really don't know -- I might know
25 the group of girls she hung around with.  We weren't

Page 382

1 friends.
2       THE COURT:  Okay.
3       JUROR NO. 8:  And I don't really know any
4 more that, that I recall anyway.
5       THE COURT:  Yes.  Okay.
6       And let me ask you sort of like the
7 questions we asked yesterday.
8       Is there anything you told me about that
9 or anything that you know of about her would that
10 keep you from being impartial in this case?
11      JUROR NO. 8:  No.
12      THE COURT:  Okay.  Got it.
13      So I will go tell them.  They may want to
14 ask you the same questions, ask you some different
15 ones.  We will try to clean that all up as soon as
16 we can and get back rolling.
17      Thank you for telling me.  You did the
18 absolute right thing.
19      JUROR NO. 8:  And if they ask me why I was
20 in here, am I allowed to tell them?  Or no?
21      THE COURT:  How about, don't tell them.
22 Just tell them it is a judicial issue and the judge
23 will take care of it.
24      I'm sorry.
25      JUROR NO. 8:  It is okay.  I just wanted

Page 383

1 to know.
2       THE COURT:  You are right.  It is a tough
3 question.  Thank you.
4       (Recess.)
5       (In the courtroom.)
6       THE COURT SECURITY OFFICER:  All rise.
7       THE COURT:  You can be seated.
8       It wouldn't be day 2 of trial if we didn't
9 have a strange jury issue.
10      So here it is, strange jury issue of the
11 day.  Hopefully, the only we will get in trial.
12      We have a juror who wrote me a note.  It
13 is Juror No. 8.  Sonia Freeman is her name.  She
14 sits in the back corner.
15      And Mr. Frye, you can go ahead and hand
16 out the note she wrote me.  And I will read it to
17 you so it is in the record.
18      She says, "Not sure, but may have went to
19 high school with Charlene.  I was at Lake Dallas
20 High School 1981 to 1985.  Did not know her, if so,
21 but wanted to disclose this, if so."  Signed, Sonia
22 Freeman.
23      MR. PRYOR:  Can we inquire of my client?
24      THE COURT:  Yes, you may.
25      MR. PRYOR:  What was the year?

Page 384

1       THE COURT:  The year was 1981 to 1985,
2 lake Dallas High School.
3       (Pa.)use
4       THE COURT:  Do you know anything yet?  Was
5 she at Lake Dallas High School?
6       MR. PRYOR:  She was at Lake Dallas High
7 School between 1981 and 1985.  She graduated in
8 1983.  She does not recognize the juror.
9       THE COURT:  Okay.  And so what I will say
10 is, I knew when I got this note, y'all might have
11 some other questions.  I went ahead and asked her
12 some of the questions I knew y'all would want to
13 ask, and then y'all may have others.
14      I asked her, Well, did you hear anything
15 about Charlene?  And she said, No.  She thought --
16 if this is the same person -- that Charlene was an
17 upper classman.  And that math checks out, because
18 Sonia graduated in '85; you in '83.
19      She said she may have known some friends
20 in the same group that your group of friends, but
21 she didn't really know you specifically.  Didn't
22 have any recollections of anything anyone ever said
23 about you.
24      I asked her two other questions.  One,
25 Based on your knowledge of her, but not really

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 47 of 642   PageID 10988
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                      Pages 385..388

Page 385

1 knowing her, could you be fair and impartial?  She
2 said without hesitation, Yes.
3          Two is, I asked, Well, why did you
4 disclose that today?
5          And she said she could see you more
6 closely today.  You can see from the distance, she's
7 a lot closer to you today, Ms. Carter, than she was
8 yesterday in jury selection.  And she your maiden
9 name on some of the documents that we've gone
10 through in evidence this morning.
11         So I don't think she was genuinely trying
12 to lay behind the log, but she's closer to you and
13 she saw your maiden name, so that triggered a
14 memory.
15     So my question is, do y'all want to ask her
16 further questions?  Because I have no problem if
17 anyone wants to ask her further questions.
18         MR. McKEEBY:  Can I confer briefly with my
19 client?
20         THE COURT:  You may.  Yep.  How about
21 this, I can put on the white noise, Mr. McKeeby.
22         (Discussion off the record.)
23         THE COURT:  Okay.  What do you think?
24         MR. McKEEBY:  I think counsel for the
25 Union, as well as myself, would like to ask a couple

Page 386

1 of follow-up questions, but --
2          THE COURT:  That sounds fine by me.  And
3 then I will let y'all ask any follow-up questions.
4 We'll go Southwest, Union and then Carter.
5          MR. PRYOR:  Sure.
6          THE COURT:  Okay.  Let's bring her in.
7          She asked me, Well, can I tell the other
8 jurors what it is about?  I said, No.
9          And this is sort of like criminal defense
10 cases with multiple defendants, right?  Like, you
11 leave the room, Oh, are you talking to the cops?
12 Who are you talking to?
13         MR. McKEEBY:  Should I take the podium
14 or --
15         THE COURT:  You can take the podium.  And
16 I have asked --
17         (The juror entered the courtroom.)
18         THE COURT:  Okay.  Welcome back,
19 Ms. Freeman.  Thank you.  You're under oath as a
20 juror.  We're not going to seat you in the witness
21 box.
22         Oh, can we just give her a handheld mic?
23 Yeah, we're not used to having you talk.  I'm sorry.
24         Okay.  So, Ms. Freeman, I told them what
25 our exchange was, and then I gave them the option of

Page 387

1 asking -- I gave them the option of asking you some
2 questions.  So Southwest, then the Union, then
3 Carter is going to ask you questions very briefly.
4          JUROR 8:  Okay.
5          THE COURT:  Go for it.
6          MR. McKEEBY:  Okay.
7          Hi, Ms. Freeman.  Just a couple of
8 questions to -- about the issue that you raised.
9          Did you know any of -- did you hear
10 anything or know anything about Ms. Carter in terms
11 of, you know, what she did activities-wise or
12 classes she took while you were in school together?
13         JUROR 8:  No.
14         MR. McKEEBY:  Did you know any of her
15 friends?
16         JUROR 8:  If I did, I don't remember.  I
17 mean, I don't recall.
18         JUROR 8:  And I'm assuming, since you did
19 the right thing and raised the issue voluntarily,
20 that you can commit to everyone at this trial that,
21 notwithstanding, that you had some overlap in high
22 school with Ms. Carter, or may have, that you can
23 keep your commitment to be fair and impartial to all
24 of the parties; is that fair?
25         JUROR 8:  Yes.

Page 388

1          MR. McKEEBY:  Including my client,
2 obviously --
3          JUROR 8:  Yes.
4          MR. McKEEBY:  -- Southwest Airlines?
5          JUROR 8:  Yes.
6          MR. McKEEBY:  Okay.  That is all.
7          THE COURT:  Okay.  Thank you, Mr. McKeeby.
8 Mr. Greenfield, you can ask questions.
9          MR. GREENFIELD:  Yes.  I know Lake Dallas
10 is a growing area at this point in time.
11         JUROR 8:  Yes.
12         MR. GREENFIELD:  In the '80s, I'm
13 presuming it was pretty small?
14         JUROR 8:  Yes, it was smaller.
15         MR. GREENFIELD:  How big was your
16 graduating class?
17         JUROR 8:  I think a hundred.
18         MR. GREENFIELD:  A hundred.
19         Do you have any older brothers or sisters?
20         JUROR 8:  Not from the school district.
21         MR. GREENFIELD:  All right.  And did you
22 personally have any extracurricular activities that
23 you took part in while you were at Lake Dallas?
24         JUROR 8:  I was a manager on drill team,
25 and that -- but I didn't interact with her, I don't

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 48 of 642   PageID 10989
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                    Pages 389..392

Page 389

1 believe.
2        MR. GREENFIELD: I'm sorry, say that last
3 part.
4        JUROR 8: I don't think I interacted with
5 her. I mean, we had different friend groups.
6        MR. GREENFIELD: So you said you were on
7 the drill team. You think she might have been.
8 But you didn't interact with her?
9        JUROR 8: I think -- she was an
10 upperclassman, and I believe she might have been on
11 the drill team before I was.
12       MR. GREENFIELD: Okay. That is all.
13 Thank you so much.
14       THE COURT: Thank you, Mr. Greenfield.
15 Okay, Mr. Pryor, you can ask questions.
16       MR. PRYOR: I'm impressed with all of you
17 that can remember high school. It has been too long
18 ago for me.
19       And I'm disappointed, I mentioned Lake
20 Dallas in my opening and that doesn't -- that didn't
21 ring a bell with you?
22       JUROR 8: No. No. I didn't even hear it.
23 No, I heard it today, and I didn't hear it
24 yesterday.
25       MR. PRYOR: No worries.

Page 390

1        Okay. So if -- I just want you to
2 understand, if the Judge decides that you continue
3 to sit on this jury, that is a decision that no one
4 thinks that there is anything about your past that
5 makes you anything but the same juror we thought you
6 were before, impartial.
7        You deliberate just as you would have
8 before. You don't have to feel like, gee, because I
9 recognize her from high school, that means I have to
10 somehow give more favor to one side or another. You
11 are just the same juror you always were if you
12 continue to sit, right?
13       JUROR 8: Yes. And I only recognized her
14 because you said Lake Dallas today, and that kind of
15 drew my attention. And then I started thinking --
16       MR. PRYOR: Oh, okay, good.
17       JUROR 8: -- did I know her last name?
18 And then I seen her maiden name in a document, and
19 then I was like, yes, I recognize that. But that is
20 the only way I recognized her.
21       MR. PRYOR: I think we all find that very
22 understandable. Thank you.
23       JUROR 8: Uh-huh.
24       THE COURT: Okay. Any further questions?
25       Okay. You are excused as a sort of

Page 391

1 witness. You can go back to the jury room.
2        (The Juror exited the courtroom.)
3        THE COURT: Okay. So any concerns with
4 this juror participating as a juror?
5        MR. GREENFIELD: I have concerns, your
6 Honor. I have concerns.
7        THE COURT: Okay. Talk to me.
8        MR. GREENFIELD: It was a small town at
9 the time. It's close. I know they don't -- she
10 doesn't have any specific
11       THE COURT: Can you grab that mic?
12       MR. GREENFIELD: Yes. I apologize.
13 I know she doesn't have any specific
14 recollections. She does think maybe they were on
15 the drill team together, different class points. I
16 can't imagine I wouldn't have struck her if I didn't
17 know that. If I would have had this information, I
18 would have used one of my strikes on this witness.
19       THE COURT: Against her.
20       And would have not used a strike on who?
21       MR. GREENFIELD: Well --
22       THE COURT: Struck her instead of someone
23 else?
24       MR. GREENFIELD: We pooled strikes with
25 Southwest, as you know. I think if we would have

Page 392

1 known that as a team, we would have used one of them
2 on 21. I can't -- I don't want to speak for them,
3 but I would have pushed.
4        MR. McKEEBY: I mean, I think it would
5 have been a cause strike at that point.
6        I mean, there is enough concern about --
7 about bias that -- I understand she sat up there and
8 said she was impartial, and I credit her. And I'm
9 sure she's being as truthful as she can be.
10       But, I mean, I would have asked that that
11 be a cause strike, quite frankly. I don't know what
12 the Court would have done. But I have the same
13 concerns, I guess. But I don't really understand, I
14 have not been in this situation before --
15       THE COURT: Sure.
16       MR. McKEEBY: -- and really know what is
17 behind door No. 1.
18       So to suggest how strongly I should object
19 to this, because I don't want a mistrial, but --
20       MR. GREENFIELD: And your Honor, if I may,
21 a little bit more transparency.
22       The last individual we decided about
23 striking as a group was between Juror No. 8 and
24 Juror No. 21.
25       Ultimately, we decided on 8, which was

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 49 of 642   PageID 10990
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 2 July 06, 2022                        Pages 393..396

Page 393

1 also struck by the plaintiffs. But she was our
2 other consideration. And if -- that would have been
3 her, if I would known that information.
4        THE COURT: And that is helpful for me to
5 know. That is why I asked.
6        Okay. So you wouldn't have used a strike
7 on -- you gave me a number, and I appreciate that.
8        Okay. Let me ask Carter's thoughts.
9        MR. PRYOR: Unless there was an
10 intentional misrepresentation on her part, once
11 she's seated on the jury, it is a question of
12 whether or not she has done something that indicates
13 a bias.
14        I don't think anyone here is saying she
15 was lying during voir dire. And so now, given she's
16 properly seated, has she shown any bias? I don't
17 think she has.
18        In terms of the exercise of their strikes,
19 I don't know what the law is on that. I don't know.
20        THE COURT: Understood.
21        Well, okay. Any last thoughts?
22        MR. McKEEBY: None that wouldn't just be
23 repetitive of what I said.
24        I mean, I just have concerns that -- I
25 mean, again, if I would have known this, we would

Page 394

1 have certainly addressed the strikes differently.
2        THE COURT: Understood.
3        Well, what I will tell you is, I don't
4 think I've seen enough from what she said to kick
5 her on a cause basis, if we were to put ourselves
6 24-hours ago.
7        What I would say is, I'm sympathetic to
8 the notion of this late-breaking knowledge is
9 something that we all should have known yesterday.
10 We didn't because the Lake Dallas wasn't enough of a
11 trigger for her, but the maiden name was, combined
12 with Lake Dallas.
13        So I get that. She was not laying behind
14 the log. I don't think she's lying about being
15 impartial. But I'm taking your statement at face
16 value that you would have struck her instead of No.
17 8.
18        Does that make sense?
19        So because of that, what I need to do is
20 kick her off the jury at this point. We still have
21 a plus one. We still go on with a jury of 7. We
22 can't get below 6, right? And so we've lost
23 50 percent of our margin that I was hoping to keep
24 throughout the case.
25        And so it is incumbent on all of us --

Page 395

1 most importantly, the jury -- to not lose anyone
2 else.
3        Does that make sense?
4        So again, I don't think she's biased or
5 partial in some way. But because we did deprive you
6 of the ability to have that knowledge when using
7 your peremptories -- and you are saying that you
8 would have used a peremptory on her -- I think I
9 have to credit that at this point.
10        So what I will do -- I guess the question
11 is how to break that to the jury.
12        I can do it cryptically, right, and bring
13 in all of the jury, and say, It's come to our
14 attention, through Juror No. 8, that an issue has
15 arisen that I think meets the legal test for me to
16 excuse her from her service as juror, and not say
17 anything beyond that.
18        They are not supposed to talk about the
19 case, right? And so earlier, the things she told me
20 indicates that no one else has an idea what note she
21 wrote. And so she's just off. She gathers her
22 things and leaves, and then she's excused as a
23 juror.
24        Any issue with that as the protocol on how
25 I orchestrate this?

Page 396

1        Okay. I will do it.
2        And we will limp along with one reserve
3 and see if that can get us across the finish line.
4        So, sorry. Got to buckle up on Day 2 of
5 trial. That is when the curveballs really happen
6 with the jurors.
7        But let's bring them in, and I will excuse
8 Juror 8.
9        THE COURT SECURITY OFFICER: All rise for
10 the jury.
11        (The jurors entered the courtroom.)
12        THE COURT: Okay. You can be seated.
13        Okay. So sorry for the delay.
14        We had to have a discussion with Juror No.
15 8. And Juror No. 8 brought an issue to my
16 attention.
17        I'm not going to tell you what it is
18 because it doesn't matter.
19        But there is a reason she brought it to my
20 attention that meets the test for me excluding her
21 as a juror.
22        Because of that, then, I'm excusing you
23 Juror No. 8, as a juror.
24        We still have enough to keep going. We
25 will miss having you here because this is a good

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 50 of 642   PageID 10991
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 397..400

Page 397

1 group.  I can tell from hearing conversation in the
2 hall.  It is a collegial group.  I know they are
3 going to serve admirably as a jury.
4        I'm sorry that you can't be a part of it,
5 but I appreciate you bringing the matter to my
6 attention.  I thank for your service yesterday and
7 today.
8        Mr. Frye can still get you a certificate,
9 so don't leave just yet.  He can go back and make
10 sure you get your certificate and are covered for
11 yesterday and today. We will all rise for you, then,
12 as you walk out.
13        (The excused juror exited the courtroom.)
14        THE COURT:  Okay.  Now we can be seated.
15        And Ms. Stone, you are still under oath.
16        And so I believe, Mr. Pryor, you were
17 still asking questions, so you can resume your line
18 of questioning, sir.
19 BY MR. PRYOR:
20 Q.  Ms. Stone, let's go back to Exhibit 27.
21      It should be on your screen in a second.
22      There we go.
23      All right.  We had talked about Mr. Talburt's
24 email to you about deleting the broken leg comment.
25        MR. PRYOR:  The next page, Matt.

Page 398

1 BY MR. PRYOR:
2 Q.  And then that you would be shocked if the Mike
3 referred to was Mike Hafner, the member of senior
4 management, that that was Rocky Mountain.
5      Do you recall that?
6 A.  Yes, sir.
7 Q.  Okay.
8        MR. PRYOR:  Let's go back to the last
9 paragraph of Brian's email to you.
10        No, go back.
11        No.  Leave it alone.  There you go.
12 Thanks.
13 BY MR. PRYOR:
14 Q.  And he says, "So what I'm saying is, if we have
15 to use this type of evidence to secure my job, then
16 we have to do what we have to do."
17        THE COURT:  One moment.
18        I have got to unmute their jury screens
19 right quick.
20        MR. PRYOR:  Every time I look on the
21 screen, it is somewhere else.
22        THE COURT:  Okay.  There we go.
23 BY MR. PRYOR:
24 Q.  All right.  Then the next sentence is, "Please
25 just keep my thoughts in mind.  BTW" -- presumably,

Page 399

1 by the way -- "the Rocky Mountain email is Mike's
2 personal email.  I do not like using company email
3 for obvious reasons."
4      Do you see that?
5 A.  Yes, sir.
6 Q.  Does that tell you who Mike is?
7 A.  No.
8 Q.  Okay.  And where he says, "I do not like using
9 company email for obvious reasons," do you know what
10 he's talking about there?
11 A.  No.
12 Q.  Even though he had just told you that they are
13 talking about using social media to target people,
14 including Haffer and Casper.  And that doesn't tell
15 you he wants to keep those kinds of communications
16 off company emails for obvious reasons?
17      You didn't read that in context?
18 A.  He already said he wanted to keep it
19 confidential.
20 Q.  It sounds like he's reiterating that point or
21 is there something else he's wanting to keep secret,
22 too?
23 A.  I don't know if there is something else.
24 Q.  So when you got this email, did you point out
25 that it is inappropriate?  Did you respond and say,

Page 400

1 That is inappropriate, we can't be targeting people
2 using social media and the assistance of Southwest
3 senior management?
4 A.  No.
5 Q.  Instead, you responded and talked about, Did
6 you ever use public execution in public, right?
7 A.  Yes.
8 Q.  Okay.
9        MR. PRYOR:  Let's look at Exhibit 140.
10        We move for the admission of Exhibit 140.
11        MR. McKEEBY:  This is another one with the
12 limiting instruction.
13        THE COURT:  Understood.  Same objections
14 as this morning, otherwise, for Southwest and Union?
15        MR. McKEEBY:  Correct.
16        MR. GREENFIELD:  Yes, your Honor.
17        THE COURT:  Okay.  So on 140, I'm
18 admitting it with the same limiting instruction I
19 gave you earlier.
20        This document No. 140 is relevant to the
21 claims against the Union, not relevant to the claims
22 against Southwest.
23        It is admitted.
24        You can publish.
25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 51 of 642   PageID 10992
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 401..404

Page 401

1      (The referred-to document was admitted in
2   Evidence as Plaintiff's Exhibit 140.)
3 BY MR. PRYOR:
4 Q.  Do you recognize this document?
5 A.  No.
6 Q.  Do you need a hard copy of it?
7 A.  No, sir, but if I can just have a moment to
8 read through it.
9 Q.  Okay.  Could you bring the microphone closer to
10 your mouth?  And I will bring you a hard copy, if
11 you want.  It is hard for him to know where to
12 scroll.  He's -- it is hard for him to know where I
13 want him to scroll.
14      Let me know when you are ready and I can ask
15 you a question.
16 A.  Okay.  I have just skimmed it.
17 Q.  Okay.  I will point to specific things you can
18 look at.  If you think I'm taking it out of context,
19 you can read more.
20      So this is Mr. Talburt, Brian Talburt, your
21 supporter, who's emailing Sonya Lacore, senior
22 manager at Southwest Airlines, and Mike Hafner,
23 senior manager at Southwest Airlines, right?
24 A.  Yes.
25 Q.  Who is Jamie Willard?

Page 402

1 A.  She was also in a leadership position at
2 Southwest Airlines for inflight.
3 Q.  And he again is communicating with senior
4 management at Southwest Airlines, it looks like, at
5 least in terms of specifics, complaining about
6 Mr. Casper and that social media could be utilized
7 to deal with that.
8      Is that fair about the general context?
9 A.  Yes.  I think so.
10 Q.  Okay.  And I can't remember between Casper and
11 Hafner, was Mr. Hafner, in 2014, an objector or a
12 union member?
13 A.  I don't know.
14 Q.  Okay.  But it wouldn't matter in terms of the
15 Union's obligation to look after him, right?
16 A.  Correct.
17 Q.  And so when you got this email from Brian, in
18 October 13 of 2014, were you president then?
19 October?
20 A.  Yes.  When the email was sent, yes.
21 Q.  You get an email -- yet another email talking
22 about targeting a union member or union objector
23 using social media.
24      Your response was what?
25 A.  I don't -- I don't think I wrote -- I don't

Page 403

1 recall writing anything back to Brian.
2      The conversation -- the email and the
3 conversations took place way before I was in a
4 leadership position.
5      Actually, I wasn't even working for the Union
6 when this email took place.
7      And I had had conversations with Brian
8 eventually of just stop sending me things because I
9 had a very busy job.  And getting emails like this
10 just wasn't -- there wasn't anything for me to do
11 with that.  I wasn't a part of the conversations and
12 asked him to just stop.
13 Q.  Well, you know, as -- if I was an objector in
14 the union, I might think there were some things you
15 could do.
16      How about contact Southwest management and say,
17 Don't use social media policy to target my members
18 and objectors?  How about doing that?
19 A.  I had numerous conversations with members of
20 Southwest Airlines management about the social media
21 policy and what I thought was inappropriate
22 discipline being leveled for both members and
23 non-members.
24 Q.  Okay.  Listen to my question.
25      Did you have a conversation with them when you

Page 404

1 said to them, Quit discussing with union members
2 about using social media policy to target union
3 members we don't like?  Anything like that?
4 A.  No.  I never had a conversation with anybody in
5 management about specific members.
6 Q.  You looked at several emails that raised those
7 issues and you never disavowed them to the
8 management of Southwest Airlines saying, Don't do
9 that?
10 A.  No.
11      MR. PRYOR:  Let's look at Exhibit 141.
12 BY MR. PRYOR:
13 Q.  By the way, do you think you should have?  Do
14 you think that you should have done that?
15 A.  I didn't believe it was -- that I had any
16 control over the conversations that management chose
17 to have with an employee.  A private conversation.
18 And I did have numerous conversations with leaders
19 about the social media policy.
20 Q.  Oh, I am aware that you have, and we are going
21 to talk about it.
22      But you had no conversation with them
23 disavowing this type of back-door conversations and
24 efforts, even though it was against objectors and
25 union members, your union had an obligation to,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 52 of 642   PageID 10993
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 2 July 06, 2022                          Pages 405..408

Page 405

1 true?
2 A.  I did not have conversations, no.
3 Q.  Was there something not true about my
4 statement, you couldn't say true?
5 A.  It is true.
6 Q.  Okay.  That is what I was expecting to hear,
7 not a limitation.  It is true.
8       MR. PRYOR:  Let's look at Exhibit 141.
9 Exhibit 141.
10      THE COURT:  Is it admitted?
11      MR. PRYOR:  Oh, I didn't offer it.  I
12 apologize.
13      THE COURT:  It's on the monitor.  You can
14 show it to the witness.
15      MR. PRYOR:  May I --
16      THE COURT:  Are you moving for its
17 admission?
18      MR. PRYOR:  I'm sorry?
19      THE COURT:  Are you moving for its
20 admission?
21      MR. PRYOR:  Yes, I am, Your Honor.
22      THE COURT:  Okay.
23      MR. PRYOR:  That's what they were waiting
24 on.  I should have said --
25      THE COURT:  Same objections as earlier,

Page 406

1 limiting?
2       MR. McKEEBY:  Correct.  With the request
3 for the limiting instruction.
4       THE COURT:  Okay.  I'm overruling the
5 earlier objections, and I will admit it with the
6 same limiting instruction, this one applies to the
7 claims against the Union, not to the claims against
8 Southwest.
9       We are publishing.
10      (The referred-to document was admitted in
11 Evidence as Plaintiff's Exhibit 141.)
12 BY MR. PRYOR:
13 Q.  Okay.  This is an email.  The first one is from
14 Brian Talburt to Sonya Lacore.
15      And we know who they are, right?
16 A.  Yes.
17 Q.  And he says, "So my final installment on this
18 subject."
19      Did you see any of the other installments?
20 A.  No, not to my recollection.
21 Q.  Okay.  And then it says -- I'm going to read
22 parts of it.  You are welcome to read any parts of
23 it you want.
24      "The issue becomes the tumor.  While I hate to
25 give him credit for anything, Casper really was the

Page 407

1 first legitimate cancer or tumor -- cancerous tumor
2 that had any significant reach with 1,000 members.
3 But in a relatively insightful way, he could be
4 contained."
5       And Casper, again, is talking about Mike
6 Casper?
7 A.  Yes, I assume so.
8 Q.  And he's referring to him as a "cancerous
9 tumor."  Yes?
10 A.  No.  I read that he's referring to issues
11 becoming the tumor.
12 Q.  He was really the first legitimate cancerous
13 tumor.
14      So do you know what nouns and pronouns and
15 adjectives are?
16 A.  I do.  I was looking at the sentence above.
17 Q.  And so you are saying that what they are
18 referring to is what he's doing is, as opposed to,
19 "The first legitimate cancerous tumor"?
20      That doesn't refer to Mike Casper?
21 A.  I see that now.  I was reading the sentence
22 right above it --
23 Q.  Okay.
24 A.  -- where it said, "The issue becomes the
25 tumor."

Page 408

1 Q.  Oh, no, I'm not disagreeing about that one.
2 A.  Okay.
3 Q.  Okay.  So we agree that, "The first cancerous
4 tumor" is, according to this email, Mike Casper?
5 A.  When I read the whole sentence, I think he was
6 talking about the forum that was set up by Casper.
7 Q.  Okay.  All right.  That is the way you read it
8 at the time, too, right?
9 A.  Yes.
10 Q.  And then it says, "He could be contained."
11      Do you know what that is referring to?
12 A.  No.
13 Q.  Then it says -- skipping a sentence -- it says,
14 "Corliss, particularly, is something we have not
15 seen before and is incredibly dangerous.  The
16 attitude she spans is NW Airlines in the 19 -- in
17 the '80s.  People listen, and people react" -- I'm
18 going to read keeping, and then I'll ask you
19 questions -- "I am all about targeted
20 assassinations.  I'm sure with her dreadful work
21 history, there could be opportunities.  She will
22 play very well to the heavy, inner-city minority
23 crowd coming on board soon.  She will be the voice.
24 She will be a huge threat in our upcoming election
25 as well.  She plays very well to her crowd."

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                  Vol 2 July 06, 2022                      Pages 409..412

Page 409

1  Did you disavow any of those statements at any
2  time?
3  A.  I spoke to Brian and I told him he needed to
4  stop having conversations and sending stuff in
5  emails, that people in Southwest management were in
6  a leadership position, they were not his friends,
7  they were not his buddies, even if he thought that
8  because of his tenure as an employee.
9  Q.  Ma'am, that is pretty convenient when you are
10 sitting here in front of a jury.
11     This was sent as an email to you in writing, in
12 a communication.
13     Did you ever -- can you point to one piece of
14 email from you, anything in writing, disavowing the
15 actions of your supporter, who is sending this to
16 you, feels very comfortable sending this to you,
17 talking about trying to eliminate a potential
18 candidate against your leadership?
19 A.  He sent this to me as indication of the
20 conversations using phrases like "targeted
21 assassination" that he had had with members of
22 management.  That was why he sent that to me, as
23 documentation.
24     He sent me a lot of things during this time.
25 And most of them, I did not respond to.

Page 410

1  We had a conversation about a slew of the
2  emails that he sent.  But, no, I -- there is no --
3  not anything in writing.
4  Q.  I was waiting for all of that information you
5  just gave us for the answer, and you finally
6  answered it at the end.
7     Nothing, right?
8  A.  No.  Not besides what has been presented.
9  Q.  What do you mean "besides"?
10     There is nothing from you here disavowing this.
11 A.  I'm sorry.  In other documents that were sent,
12 I think around the same day, there were just
13 comments that I had replied to.  Not disavowing.
14 Q.  Who is Corliss?
15 A.  She is a flight attendant for Southwest.
16 Q.  Is she African-American?
17 A.  Yes.
18 Q.  And it is very clear that Ms. Lacore and
19 Mr. Talburt -- and you, by being included on this
20 email -- are being informed that "she's a danger to
21 your leadership and now is the time for a targeted
22 assassination, maybe we can use her dreadful work
23 history to get rid of her."
24     Isn't that what is being said?
25 A.  That is not how I -- I didn't participate in

Page 411

1  that conversation and that was not what I took from
2  this.
3  Q.  Oh, okay.
4     Well, let's read it again together so we can
5  see how you took it.
6     "Corliss particularly is something we have not
7  seen before and is incredibly dangerous."
8     So he must be talking about -- did she carry
9  guns?  Did she know judo?  What -- how did you take
10 that?
11 A.  That it was Brian just spewing off at the mouth
12 about flight attendants that he didn't support and
13 he didn't want to see in a leadership position.
14 Q.  Ma'am, does it cause you any concern that your
15 supporter feels very comfortable sending something
16 to you, knowing there will be no repercussions, when
17 he's talking about taking adverse action against
18 someone because of their race, not just because they
19 are a union member?
20     That doesn't bother you?
21 A.  I don't agree with what you said, and I don't
22 think her race had anything to do with how Brian
23 felt about her.
24 Q.  You don't think this is about race?
25 A.  No, sir.

Page 412

1  Q.  So when he said, "She's incredibly dangerous,
2  she's going to play very well with the heavy
3  inner-city minority crowd," he's not talking about
4  her race?
5     He's talking about what?  She's packing a gun?
6     That is not how you, as union president, read
7  this?
8  A.  No.
9  Q.  I just want to be sure, very clear.
10     You think there is nothing --
11     MR. GREENFIELD:  Objection, your Honor.
12 This is the third time.  He's asking the same
13 question.
14     THE COURT:  I will sustain that.
15     MR. PRYOR:  I didn't hear that.
16     THE COURT:  I will sustain that.  It is
17 duplicative, cumulative, repetitive.
18     MR. PRYOR:  Asked and answered, is that
19 the -- was that the objection?
20     THE COURT:  Yes.  That's another way to
21 say it.
22     MR. PRYOR:  I'm trying to hear.
23 BY MR. PRYOR:
24 Q.  And then, Mr. Talburt sends you an email.  And
25 he's talking about the close relationship he's dealt

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 54 of 642   PageID 10995
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 2 July 06, 2022                    Pages 413..416

Page 413

1  with Sonya Lacore.
2     Do you see that?
3  A.  Yes.
4  Q.  And you represented Brian, or you helped the
5  grievance committee with him.
6     You know for a fact that no one at Southwest
7  Airlines senior management reported Mr. Lacore for
8  any company violation for making these kind of
9  statements to senior management?
10  A.  Did you say Mr. Lacore?
11  Q.  What was your question?
12  A.  Did you say Mr. Lacore?
13  Q.  I can't hear what you are saying.
14  A.  Did you say Mr. Lacore?
15  Q.  I should have said Ms. Lacore.
16     But other than that --
17  A.  Can you repeat your question?
18  Q.  Yes.
19     You know for a fact that Ms. Lacore did not
20  report Mr. Talburt for any company violation for
21  threatening someone both because they were a union
22  member that might threaten your leadership, or
23  because she's African-American and there was no
24  report?
25     MR. GREENFIELD:  Objection.  Relevance.

Page 414

1     MR. McKEEBY:  Well --
2     THE COURT:  I will sustain that.
3     MR. PRYOR:  May we approach?
4     THE COURT:  You may.
5     (Thereupon, the following proceedings were
6     had at sidebar:)
7     MR. PRYOR:  It doesn't matter that
8  Ms. Lacore didn't report it?
9     THE COURT:  Well, Lacore is Southwest, not
10  Union.
11     MR. McKEEBY:  She is, yes.  It doesn't
12  matter that she didn't report it.  She's not a
13  decision maker.  This is a motion in limine.
14     THE COURT:  It's not a fair representation
15  claim as to Lacore.
16     MR. McKEEBY:  Exactly.
17     THE COURT:  Lacore is not a leader.
18     MR. PRYOR:  But we have claims against
19  Southwest Airlines that this relates to.
20     MR. McKEEBY:  No.  Because Ms. Lacore had
21  nothing to with the termination decision of
22  Ms. Carter, and that is the whole basis of our
23  motion in limine.  They are just trying to slime
24  Ms. Lacore by making her look bad for not reporting
25  this supposed --

Page 415

1     THE COURT:  I will sustain it.
2     MR. PRYOR:  Let --- can I just respond?
3  Because that is just not accurate on the facts.
4     On February 22nd, 2017, when she
5  reported -- when this -- when Ms. Stone reported
6  Ms. Carter, she included on her report, her
7  complaint, even though you are not supposed to --
8  she was supposed to have been just the base
9  manager -- she sent it to Sonya Lacore.
10     We absolutely believe Sonya Lacore is
11  involved.  And Mike Sims testified he brought the
12  termination letter in to Sonya Lacore.  You can't
13  act like Sonya Lacore wasn't involved in this.
14     MR. McKEEBY:  Sure I can.  She wasn't.
15     I mean, you have seen the summary judgment
16  proof.  She was not a decision maker.  She was
17  copied -- Ms. Stone decided to copy her on a
18  complaint.  But she was not involved, and therefore,
19  she's not relevant, and it shouldn't come in.  It's
20  just --
21     MR. PRYOR:  Yes.
22     THE COURT:  I haven't heard anything that
23  makes me change my mind.  Let's continue.
24     (Thereupon, the sidebar was concluded and
25     the following proceedings were held in open

Page 416

1     court:)
2  BY MR. PRYOR:
3  Q.  Did you report Brian Talburt to Southwest
4  Airlines for violations of Southwest's policy as a
5  result of receiving this email, saying that he's
6  wanting to target people for assassination -- and
7  clearly he means talking about getting them fired,
8  I'm not saying he's trying to kill them -- because
9  they are a threat to your leadership and because
10  she's African-American?  Did you report any of that
11  to Southwest Airlines?
12  A.  No.
13  Q.  Why not?  You supported it.  You didn't report
14  it because you supported it?
15  A.  I didn't support it.
16  Q.  Absolutely, ma'am.  You got emails on this, you
17  didn't respond and say, No, no, we can't do stuff
18  like that.  I have shown you half a dozen.  Not one
19  word from you other than support and offering queso
20  dip.  That is it.
21     MR. GREENFIELD:  Objection, your Honor.
22  Counsel is just testifying.
23     THE COURT:  Sustained.
24  BY MR. PRYOR:
25  Q.  Not one thing did you do, right?  Not one

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 55 of 642  PageID 10996
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 2 July 06, 2022                Pages 417..420

Page 417

1 thing?
2        MR. GREENFIELD: Objection, your Honor,
3 that is a compound question.
4        THE COURT: I think it is sufficiently
5 clear. He's asked the question. You can answer, if
6 you have knowledge.
7        THE WITNESS: I already said that I, at
8 some point, spoke to Brian and told him to stop
9 sending me stuff.
10 BY MR. PRYOR:
11 Q. Ma'am, what you told us was, without the
12 benefit of anything in writing, that you told him,
13 Don't be writing this stuff down, and then there is
14 more and then there is more.
15     And then there is some from Brett Nevarez and
16 Cuyler Thompson. You named them. Your whole team
17 is doing this and you never do a thing. You say,
18 I'm always telling them don't put that in writing or
19 that's not right, and yet they keep doing it.
20        MR. GREENFIELD: Objection, your Honor.
21 He continues to testify. He's misrepresenting the
22 evidence. If he has a question, he should just ask.
23        MR. PRYOR: It is a combination of her
24 evidence and I'm letting her comment on.
25        THE COURT: I will allow this one. You

Page 418

1 can answer.
2        THE WITNESS: I don't --
3 BY MR. PRYOR:
4 Q. What was your answer?
5 A. I don't have control over other people's
6 actions and what they choose to email me or send me
7 or forward me.
8 Q. So all of this was done over your strenuous
9 objection that you have no record of, and they kept
10 doing it, kept -- by the way, kept including you on
11 the emails that you are saying, I told them not to
12 do and that it was wrong, and yet they keep sending
13 it to you. And you don't have any negative response
14 to them. That is what happened, right?
15 A. That is based off of what you -- what is
16 displayed here. There are a lot of people that I
17 wish I could have had them stop emailing me when I
18 was in that position and it wasn't an option.
19 Q. We are not talking about any people. We are
20 talking about your leadership team.
21     The team that you ran on a ticket with. The
22 team that is on your executive board meeting. The
23 ones you deal with all of the time.
24     Your inside core, Facebook, secret group.
25        MR. GREENFIELD: Objection, your Honor,

Page 419

1 also mischaracterizing testimony. The testimony is
2 actually clear that --
3        THE COURT: Sustained.
4        MR. GREENFIELD: -- Mr. Talburt is not.
5        THE COURT: Sustained. Rephrase.
6 BY MR. PRYOR:
7 Q. You didn't do anything, did you? You don't
8 want to answer?
9 A. I'm sorry. I thought I have answered that.
10 Q. Let's look at exhibit -- did you think all of
11 these emails that were sent to personal addresses
12 would end up in court some day?
13     That wasn't the point -- that kind of defeats
14 the point of sending it to the personal emails,
15 right?
16        MR. GREENFIELD: Objection, your Honor,
17 calls for speculation. There hasn't been a single
18 email from Ms. Stone from a personal --
19        MR. PRYOR: Your Honor, speaking
20 objections --
21        THE COURT: If you get two or three words
22 in, then you are speaking and need a sidebar. I
23 will sustain that objection.
24 BY MR. PRYOR:
25 Q. She's speculating -- you have to speculate

Page 420

1 about your own opinion as to why these were sent to
2 personal email addresses, ma'am.
3        THE COURT: Counsel, I didn't sustain it
4 on that basis. You haven't put the email into the
5 record yet.
6        MR. PRYOR: I'm sorry, Your Honor?
7        THE COURT: You haven't put the email into
8 the record yet. That was the basis I was thinking
9 of when I sustained the objection. You might want
10 to move for its admission first.
11 BY MR. PRYOR
12 Q. Okay. Well, the one we were just talking about
13 was sent to personal email addresses, Rocky
14 Mountain, Sonya Lacore's personal email address.
15     Did you see that? Do you see where it says
16 sonyalacore@gmail?
17 A. Yes.
18 Q. That is her personal email address, right?
19 A. Yes. I would assume so.
20 Q. And before, Rocky Mountain. That is the
21 personal email address of Mr. Hafner, right?
22 A. I don't know if that is the personal email
23 address of Mr. Hafner. I've already stated I'm not
24 sure whose personal email address that is.
25        MR. PRYOR: Let's look at Exhibit 29.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 56 of 642   PageID 10997
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 421..424

Page 421

1        MR. GREENFIELD:  Your Honor, may we have a
2  sidebar on 29?
3        THE COURT:  On 29?  Sure.
4        (Thereupon, the following proceedings were
5        had at sidebar:)
6        MR. GREENFIELD:  29 is literally just
7  Facebook posts.  They are not tied to a company
8  email or anything like that.  It is the definition
9  of hearsay.
10        THE COURT:  Response.
11        MR. PRYOR:  She's on it.  She knows
12  exactly what it is.  She can identify it.  I have no
13  problem getting it in through her.
14        MR. GREENFIELD:  It does not make it an
15  out-of-court statement that you are offering for the
16  truth of the matter asserted.  And there is
17  several -- there is numerous --
18        THE COURT:  I think the response needs to
19  ask her what it was, so I was inclined to overrule
20  the hearsay objection based on the facts.
21        MR. GREENFIELD:  Okay.
22        MR. PRYOR:  This is a post that is on her
23  core team group that she's testified about, and she
24  was on it, received it, and can identify it.
25        THE COURT:  And that is why I'm inclined

Page 422

1  to overrule the objection.
2        MR. GREENFIELD:  And I don't want to have
3  to object again to this situation, but he keeps
4  referring to these as "her core team," things like
5  that.  That is just not the case.  He keeps trying
6  to identify a personal nature to these things that
7  are not owned by her.
8        MR. PRYOR:  That is absolutely wrong.
9  She's answered the question.  She knows what her
10  core team is.
11        MR. GREENFIELD:  And that is not what she
12  said.
13        MR. PRYOR:  Well, she's answered the
14  question.
15        MR. GREENFIELD:  Not like that, though.
16        THE COURT:  I think you can address that
17  on cross to the extent you think there is an
18  exploitation there.
19        MR. GREENFIELD:  Sure.
20        (Thereupon, the sidebar was concluded and
21        the following proceedings were held in open
22        court:)
23        THE COURT:  All right.  I have overruled
24  the objection to No. 29.  It is in evidence and we
25  can publish to the jury.

Page 423

1        THE COURT:  29 is admitted.
2        (Thereupon, the document was admitted in
3        Evidence as Plaintiff's Exhibit 29.)
4  BY MR. PRYOR:
5  Q.  In Exhibit No. 29, this -- these are some
6  posts -- let me show you the next two pages as
7  well -- some posts from your core team talking about
8  Mr. Glick.
9        It is not that page, it is the one before.
10        Let me try it this way:  Do you recognize this
11  as being part of the secret Facebook page for your
12  core team?
13  A.  I think so.
14  Q.  Okay.  And Mr. Nevarez and Mr. Talburt are
15  talking about, Click is getting agitated.  I think
16  he may private message his way into big troubles for
17  himself.
18        And then Brian Talburt says, "We can only
19  hope."
20        And Mr. Click was someone that was -- had run
21  for office.  And was he the one that was elected and
22  got kicked out and you were put in, or is that
23  someone else?
24  A.  He was one of the officers that was removed,
25  yes.

Page 424

1  Q.  Okay.  So someone who was an officer, but got
2  kicked out, and you got put in.  Your team is
3  looking for a way to get him in trouble using
4  private messages, right?
5  A.  I don't think they are looking to get him in
6  trouble.  I think they are just wanting to be aware
7  of anything that he's sending that was harassment.
8  Q.  Okay.  Is that really -- it says, Thanks for
9  the screen shot.  And then it says -- Brett Nevarez
10  says, "Anybody else get private messages from Click,
11  please screen shot and save for posterity.  I think
12  he may private message his way into big troubles for
13  himself."
14        That is not your team plotting against yet
15  another union member to use social media to get them
16  in trouble?  That is not what your team is doing on
17  your core team secret website?
18  A.  I don't think they were plotting to get someone
19  in trouble, no.
20  Q.  So you think they were doing good things, they
21  thought they were going to save it for prosperity,
22  they could send it to his wife, and they could put
23  it on a picture frame?  Is that what they were
24  talking about?
25  A.  That is not what I said.

Page 425

1 Q.  Well, you said you didn't think they were
2 plotting against him.  I'm just trying to think,
3 what is -- if that is not plotting against him, what
4 is?
5        Can I have an answer?
6 A.  Chris was very, very outspoken and there were
7 legal issues that he was involved in against the
8 union, active cases at that time.  So anything
9 related to that, we --
10 Q.  We what?  We wanted to keep a record of, right?
11 A.  I can't talk about anything that was
12 attorney-client privilege.
13 Q.  Go ahead.
14 A.  I don't have anything else to say, other than
15 Mr. Click had a lawsuit against the union at the
16 time of this post.
17 Q.  Okay.  Let me summarize what you have told us.
18 First you said, "No, they weren't doing this to get
19 him in trouble.  They were just thinking he might
20 get himself in trouble."
21     Then when I read, well, wait a minute, what
22 about this, save for posterity, we can only hope,
23 then you decided, well, there are these legal
24 problems with Mr. Click, and so actually we were
25 gathering this information.  Do you see how those

Page 426

1 two things are different?
2 A.  There were so many lawsuits that involved
3 Mr. Click, and I'm trying to get the time frames
4 straight in my mind between -- a short time frame
5 that he was involved in.
6     And --- there was still active lawsuits and I
7 didn't remember that when we first looked at this.
8 Q.  Do you see the two different answers you have
9 given under oath to the same question?
10 A.  I didn't give two different answers, I'm trying
11 to further explain based on remembering and looking
12 at the time frame.
13 Q.  So you are explaining your memory, and your
14 memory was they weren't gathering information, and
15 then your memory became they are gathering
16 information?
17 A.  No.  I said I did not believe they were
18 gathering information to target them.
19 Q.  Oh, let's go back to -- they were gathering
20 information to help him.  There seems only to be a
21 couple of choices unless they just wanted souvenirs.
22 A.  I have already stated that is not what I
23 thought.
24 Q.  Which was it?  Tell us what you thought.  You
25 thought they were gathering the information to help

Page 427

1 him or hurt him?  How about that?
2 A.  Neither.
3 Q.  So they were gathering information, then, for
4 no reason at all?
5 A.  No.
6 Q.  By the way, the fact that Mr. Click had
7 lawsuits against his union, he had objections to
8 things you guys were doing, too.  That doesn't allow
9 the union to target him, does it?
10 A.  No.
11 Q.  But you did?
12 A.  No.
13 Q.  By the way, your core secret team became public
14 at some point, didn't it?
15 A.  Screen shots from it were made public, yes.
16 Q.  Okay.  So somebody took screen shots and it
17 became public what you guys were trying to do in
18 secret, correct?
19 A.  Screen shots of the conversations happening in
20 the group were made public.
21 Q.  Conversations you wanted to keep secret became
22 public?
23 A.  Yes.
24 Q.  And your team members, including yourself, on
25 these communications, referred to anybody that was

Page 428

1 opposed to your union leadership as "haters,"
2 correct?
3 A.  That was a term people used.  I don't see
4 anything in front of me with that.
5 Q.  No, I'm not -- if you want them, we can -- we
6 can gather as many as you would like, ma'am.  You
7 issued a public apology for it, didn't you?
8 A.  I issued a public apology for anybody that was
9 hurt by anything that came out in those screen
10 shots.
11 Q.  Well, let's see how well you recall.
12     Your core team members on communications on
13 your secret website that you were involved in,
14 strings of conversations that you were on, referred
15 to union people that were opposed to your leadership
16 as "haters," true?
17 A.  Yes.
18 Q.  It referred to your opponents as "fucktards,"
19 correct?
20 A.  No.
21 Q.  Are you sure?
22 A.  My recollection of that phrase being used was
23 not about an opponent.
24 Q.  It was never used -- as a matter of fact,
25 Mr. Talburt bragged about it on your core team

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 58 of 642   PageID 10999
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 429..432

Page 429

1 website when he said he converted someone, that his
2 fucktard strategy must have worked. You don't
3 recall that?
4 A. I did not say that the word "fuckard" wasn't
5 used. I corrected the way you said it was used.
6 Q. Oh, what was the better use of "fucktard"?
7 A. You said it was about opposition and the
8 election. And he called another flight attendant a
9 "fucktard," based on my recollection.
10 Q. And your recollection isn't that he called the
11 opponents in general "fucktards" or that Mr. Nevarez
12 did?
13 A. No.
14 Q. And what about referring to your opponents as
15 "spewing bullshit"?
16 A. I don't recall if that was said --
17 Q. That's not the kind of thing you recall because
18 there was so much "spewing bullshit" that you
19 wouldn't remember? That would stick out in my mind
20 unless it was common place that all kinds of things
21 were being said like that.
22      MR. McKEEBY: Objection, asked and
23 answered.
24      THE COURT: Sustained.
25

Page 430

1 BY MR. PRYOR:
2 Q. Did you, at any time, with any of your core
3 team members, on your secret Facebook
4 communications, ever reprimand anyone for the
5 language that they used and the characterizations
6 that they made and the actions they proposed?
7 A. Not to my recollection.
8 Q. And your administration negotiated a Collective
9 Bargaining Agreement?
10 A. There was a negotiating team that negotiated a
11 Collective Bargaining Agreement under my
12 administration.
13 Q. There was a what?
14 A. There was a negotiating team that negotiated a
15 Collective Bargaining Agreement under my
16 administration.
17 Q. Okay. Under your administration, this
18 negotiating team, who was the head of the
19 negotiating team?
20 A. I was.
21 Q. And did you propose a Collective Bargaining
22 Agreement to your members?
23 A. The executive board sent a Collective
24 Bargaining Agreement out to our members.
25 Q. And was it accepted or rejected by your

Page 431

1 membership?
2 A. The first one was rejected.
3 Q. Was it a close vote?
4 A. No.
5 Q. And, in fact, your members rejected it by
6 87 percent, correct?
7 A. Yes.
8 Q. And there was the feeling that your membership
9 was too close with management of Southwest Airlines,
10 in order to protect your team, as opposed to a good
11 Collective Bargaining Agreement?
12      Do you want me to rephrase it?
13 A. I didn't -- I didn't understand the question.
14 Q. Okay. I'll try it again.
15      The thinking was, that your team was too
16 concerned about people like Ms. Corless or
17 Mr. Casper, people that were opposed to your
18 leadership, and that you were more interested in
19 working with management at Southwest Airlines to
20 defeat your opponents than to negotiate a good
21 Collective Bargaining Agreement?
22 A. No.
23      MR. GREENFIELD: Objection, your Honor,
24 calls for speculation. He's asking about the
25 thinking.

Page 432

1      THE COURT: I will sustain that.
2 BY MR. PRYOR:
3 Q. And as a result, there was a recall petition?
4 A. As a result of the failed tentative agreement,
5 yes.
6 Q. I'm sorry?
7 A. As a result of the failed tentative agreement,
8 yes.
9 Q. Okay. So a bunch of flight attendants wanted
10 to recall you. I guess they didn't have a reason?
11 It wasn't because you were too cozy with management?
12 A. There was a reason --
13      MR. GREENFIELD: Objection, your Honor,
14 same, speculation.
15      THE COURT: Sustained.
16 BY MR. PRYOR:
17 Q. Let me rephrase.
18      There was a recall petition after your failed
19 Collective Bargaining Agreement, correct?
20 A. Yes.
21      MR. PRYOR: Let's look at Exhibit 30.
22      I move for the admission of Exhibit 30.
23 I'm sorry.
24      THE COURT: Okay, 30. Objection -- same
25 objections as this morning? From Union, none from

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 59 of 642   PageID 11000
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 433..436

Page 433

1 Southwest?
2        MS. GREEN:  Give me one moment, your
3 Honor.
4        Yes, your Honor.
5        THE COURT:  All right.  I will overrule
6 those and allow you to publish Exhibit No. 30.
7        (The referred-to document was admitted in
8        Evidence as Plaintiff's Exhibit 30.)
9 BY MR. PRYOR:
10 Q.  Okay.  And this is a form of the recall
11 petition, ma'am, Exhibit 30?
12 A.  Yes.  It appears to be.
13 Q.  And the people that they want to recall are
14 Audrey Stone, president; first vice president, Todd
15 Gage; second vice president, Brett Nevarez;
16 recording secretary, Kyler Thompson; financial
17 secretary, John Perri; and it looks like member at
18 large, Sam Wilkins; member at large, Crystal Riven;
19 and DEBM, Andrea Gannet.
20     And then the other names on there.
21     Is that correct?
22 A.  Yes.
23 Q.  By the way, what is a DEBM?
24 A.  Domicile Executive Board Member.
25 Q.  And that is someone that is voted locally in

Page 434

1 the Dallas area to represent the local and some
2 board?
3 A.  Dallas would be one example.  Every domicile
4 has a DEBM representing them on the executive board.
5 Q.  Was Crystal for the Dallas area?
6 A.  No.
7 Q.  Who was Dallas, do you recall?
8 A.  B.R. Ricks.
9 Q.  Who?
10 A.  B.R. Ricks.
11 Q.  Did you ever remove a DEBM from the Dallas
12 area?
13 A.  The executive board did.
14 Q.  And were you on the executive board?
15 A.  I was.  But as the chair of the meeting, I did
16 not vote unless there was a tie.
17 Q.  And this elected Dallas DEBM was removed and
18 someone else was put in, correct?
19 A.  Correct.
20 Q.  Was that DEBM ever reinstated?
21 A.  Yes.
22 Q.  And so, in fact, what the board did was, they
23 took an elected official, someone else that is in
24 Charlene's area, and kick them out, because they
25 don't like them, said, came up with an excuse, and

Page 435

1 that excuse turned out to be false and they were put
2 back, is that what happened?
3 A.  That is not correct.
4 Q.  It wasn't an excuse?
5 A.  No.
6 Q.  Did their reason turn out to be rejected?
7 A.  No.  The reason that he was reinstated was the
8 process by which it was done.
9        MR. PRYOR:  Let's look at Exhibit 22-0.
10        MR. HILL:  Repeat that, please, Bobby.
11        MR. PRYOR:  I'm sorry?
12        MR. HILL:  Repeat that, please.
13        MR. PRYOR:  22-0.  And, Your Honor, she's
14 not on this document.  And I'm going to ask if she's
15 familiar with it.  I can cover.
16        THE COURT:  We will keep the jury screens
17 muted.  What document are you talking about?
18        MR. PRYOR:  22-O.
19        THE COURT:  Document 22, page O?
20        MR. PRYOR:  22-O, as in the letter "O."
21        We have A through X, I think, on 22.  And
22 this is 22-O.  And, actually, don't publish it yet.
23        MR. GREENFIELD:  Do you have the page
24 numbers for 22?  Or is this in addition?
25        MR. PRYOR:  7470.

Page 436

1        MR. GREENFIELD:  7470.
2 BY MR. PRYOR
3 Q.  I'm just going to ask you if you are familiar
4 with this
5        MR. McKEEBY:  Your Honor, we needed a
6 limiting instruction on this document.
7        MR. GREENFIELD:  Is this before the jury
8 right now?
9        THE COURT:  It is not.
10 BY MR. PRYOR:
11 Q.  Ma'am, are you familiar with trial Exhibit 22-0
12 or the facts that are discussed in there?
13 A.  I am not familiar with this document at all,
14 no.
15 Q.  Let me -- I won't offer it as an exhibit at
16 this time.
17     But did you have conversations with Naomi
18 Hudson informing her about the recall petition?
19 A.  Yes.
20 Q.  And why were you having discussions with
21 Southwest Airlines about the recall petition?
22 A.  Naomi Hudson was the lead negotiator for
23 Southwest at that time.  We were having regular
24 discussions.  The tentative agreement had just
25 failed, and it was part of a conversation regarding

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 60 of 642   PageID 11001
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 437..440

Page 437

1 us regrouping, the negotiating team, and everything
2 that was going on following that rejected tentative
3 agreement, of which she had been the lead for on the
4 Southwest side.
5 BY MR. PRYOR:
6 Q.   You weren't seeking her assistance in keeping
7 your team intact, were you?
8 A.   No.
9 Q.   And did you tell her you would continue to keep
10 her informed of the inner workings of your union?
11 A.   No.  Not -- it wasn't about the inner workings,
12 it was about the kind of reset that both teams were
13 doing following the rejected tentative agreement.
14 Q.   Did you represent Brett Nevarez in a mandatory
15 meeting?
16 A.   Yes.
17 Q.   What was he charged with?
18 A.   He wasn't charged with anything.
19 Q.   What was he called in to the mandatory meeting
20 for?
21 A.   He was called in to have a discussion about a
22 post he had made on social media.
23 Q.   And what were the posts?
24 A.   He was answering questions and speaking about
25 one of the lawsuits that the union was engaged in

Page 438

1 with the former officers that were removed.
2 Q.   And you defended him and said he was engaged in
3 union activity, correct?
4 A.   I didn't even defend him.  I was there as his
5 representative.  They had told him advance no
6 discipline would be issued and it was just to have a
7 conversation.
8 Q.   In that conversation you said he was engaged in
9 protected union activity?
10 A.   No.  We stated that what he had posted was
11 public fact because the lawsuits were public in
12 nature.  And Southwest Airlines agreed that there
13 was nothing in violation of any of the work rules,
14 but cautioned him to be careful to not say anything
15 that could be construed in violation or something
16 that wasn't public information.
17 Q.   And you never said he was engaged in protected
18 union activity, correct?
19 A.   I don't recall if I used those specific
20 phrases.
21 Q.   Well, I'm not asking for a direct quote.
22      But did you or did you not tell Southwest
23 Airlines he was engaged in union activity and they
24 shouldn't be involved in that?
25 A.   I don't -- I don't remember using those words.

Page 439

1 Especially because we knew in advance that there was
2 not going to be any discipline issued and it was
3 just a conversation.
4 Q.   A conversation or not, you told them during
5 that meeting what he was doing was protected union
6 activity.
7      MR. GREENFIELD:  Objection, your Honor,
8 asked and answered, and he's testifying.
9      THE COURT:  Sustained.
10 BY MR. PRYOR:
11 Q.   So what about Mr. Talburt, did you represent
12 him in a hearing?
13 A.   I assisted in his representation in a hearing.
14 Q.   I'm sorry?
15 A.   I assisted in his representation in a hearing.
16 Q.   And when you assisted Mr. Talburt, did you say
17 he was engaged in protected union activity?
18 A.   I don't remember if I used those exact words.
19 Q.   Okay.  When we talked about not being
20 evasive -- I'm not trying to quote you, I wasn't
21 there.  But the import of one of the things you told
22 them was Mr. Talburt was engaged in protected union
23 activity?
24 A.   For Talburt, that theme was probably discussed
25 in his meeting.  I just --

Page 440

1 Q.   Given that you are now saying yes to that, why
2 were you playing the game of, I don't recall those
3 exact words?  Is that an evasive answer?
4 A.   No, sir.  I feel like you are trying to get me
5 to say that I made that statement to Southwest
6 numerous times.  And I cannot go back and tell you
7 what words I used in any of those meetings that took
8 place years ago.
9 Q.   I absolutely don't deny that you said it all of
10 the time.  If that is what you think I'm trying to
11 get you to not say.
12 A.   No, sir, that is not what I said.
13 Q.   And what had Mr. Talburt done that you were
14 defending him for?
15 A.   Um, it was, as part of his appeal process, on a
16 grievance following his termination for social
17 media.
18 Q.   And what had he done on social media that got
19 him terminated?
20 A.   He had called another flight attendant a
21 "fucktard."
22 Q.   And he was reinstated?
23 A.   He was.
24      MR. McKEEBY:  Your Honor --
25 Q.   And what about Bill --

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 61 of 642   PageID 11002
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                Vol 2 July 06, 2022                                Pages 441..444

Page 441

1       THE COURT: Hold on.
2       MR. McKEEBY: Objection, relevance.
3       THE COURT: Sidebar.
4       (Thereupon, the following proceedings were
5    had at sidebar:)
6       MR. McKEEBY: Your Honor, he ran roughshod
7 over your motion in limine ruling in opening
8 statements and I stood there and took it.  And here
9 he is doing it again here.
10      The discipline of other employees is not
11 relevant and I shouldn't have to get witnesses up to
12 testify about it.  You have already ruled on that.
13 And objection, relevance, prejudice.
14      MR. PRYOR: I was not running roughshod
15 over your motion in limine.  I am absolutely within
16 bounds.  She was involved in these meetings.  She
17 took positions protecting her team members.  I have
18 shown she didn't take that those actions for others.
19 It goes right into the theory of our case and it is
20 relevant.
21      MR. McKEEBY: That part is fine.
22      MR. PRYOR: Where did I go over?
23      MR. McKEEBY: You went over when you
24 talked about what the ultimate disciplines --
25      THE COURT: Exactly, exactly.  That's

Page 442

1 where you went over.
2       MR. PRYOR: But she opened the door when
3 she said he was terminated.  And, in fact, he got
4 reinstated.  He doesn't have to sign a last-chance
5 agreement -- not that I'm going to be able to say
6 that yet.  So I need to be able to respond to the
7 answers she gave.
8       MR. GREENFIELD: And, Your Honor, I have a
9 404(b) objection.  She's talking about past
10 practices to fall in line with what she was doing
11 with other people.  She's talking about
12 representation of one individual --
13      No, they're --
14      MR. GREENFIELD: -- every single
15 individual at 15,000 --
16      THE COURT: I think you can ask this
17 question and no farther.  I think as of now, she's
18 only opened the door to terminated but then
19 reinstated.
20      MR. PRYOR: Fair enough.
21      THE COURT: Got it?
22      (Thereupon, the sidebar was concluded and
23    the following proceedings were held in open
24    court:)
25      THE COURT: Okay.  You can reask that

Page 443

1 question we discussed.
2 BY MR. PRYOR:
3 Q.  Mr. Talburt was reinstated, correct?
4 A.  Yes.
5 Q.  And he was represented in part by you, who, at
6 the time, you were negotiating a union contract with
7 Southwest Airlines, right?
8 A.  Yes.
9 Q.  And Bill Holcomb, someone else was on your
10 team, was charged with social media policy, and he
11 was someone that you took care of while you were
12 negotiating the CBA agreement?
13 A.  I -- I never -- what do you mean "took care
14 of"?  I never represented Bill.
15 Q.  Well, by "took care of," he was charged with
16 something pretty serious, typically at Southwest
17 Airlines and passenger shaming, wasn't he?
18 A.  I don't recall what Bill's social media
19 complaint was.  I don't --
20 Q.  I didn't say social media.  I said passenger
21 shaming.
22 A.  I don't recall Bill having an issue with
23 passenger shaming.
24 Q.  Okay.  Maybe it is someone else.  If I'm wrong,
25 I apologize.

Page 444

1       But did you or did you not meet with Naomi
2 Hudson at a time when Bill Holcomb, on your
3 negotiating team, was charged with violation of
4 social media policy?  And you asked Naomi Hudson to
5 get rid of that charge and she refused.  And you
6 went to Mike Hafner and asked him to, and he did.
7 A.  No.  That is not an accurate representation.
8 Q.  You didn't do that?
9 A.  No.
10 Q.  You didn't meet with Mike Hafner and say, "We
11 need these social media policy violations to go
12 away," and within 24 hours, they went away?
13 A.  That is not what you stated earlier.
14 Q.  Tell me, did you or did you not talk to
15 Mr. Hafner about social media policy employees that
16 were charged --
17 A.  I did.
18 Q.  -- and after you met with him, at a time when
19 you are negotiating the CBA, within 24 hours, maybe
20 48, those charges are gone?
21      MR. GREENFIELD: Objection, your Honor,
22 compound question.
23      THE COURT: Sustained.
24      MR. McKEEBY: My objection is to relevance
25 based on what we just discussed.  He's talking

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 445..448

Page 445

1  about -- well.
2        THE COURT:  I will sustain that as well.
3  BY MR. PRYOR:
4  Q.  Ma'am, did you have a conversation with
5  Mr. Hafner about getting social media charges
6  removed from some of your team members at a time you
7  were negotiating the CBA?
8  A.  I had a meeting with Mike Hafner to discuss
9  getting discipline removed for all of the flight
10 attendants that currently had discipline on their
11 record for a social media violation.  One of whom
12 was a team member of mine at the time.  Some who had
13 no involvement with union.  Some that I didn't know.
14 And some that were non-members of the union.
15 Q.  And one of them was Bill Holcomb?
16 A.  Yes.
17 Q.  And within 48 hours, that was resolved?
18       MR. McKEEBY:  Your Honor, same objection.
19       THE COURT:  Sustained.  Counsel, please
20 refrain.
21       MR. PRYOR:  I apologize, I'm not
22 understanding.  Can I approach?
23       THE COURT:  You bet.
24       (Thereupon, the following proceedings were
25    had at sidebar:)

Page 446

1        MR. PRYOR:  She gets the charges dismissed
2  and I can't discuss that?  If I can't, I understand.
3  But that is not -- I'm missing the distinction.  I'm
4  not talking about a punishment they received.  They
5  got off completely.
6        THE COURT:  So I think this was
7  Southwest's limine point one, which I granted.  So
8  Southwest handles this -- I mean, y'all redirected
9  it to say, no, what we are really looking at is
10 union fair representation, right?  So what did she
11 say to Southwest?  Sure, that is fair game.  What
12 did Southwest do?  Those are the questions you keep
13 asking and those are the subject of limine point
14 one.
15       MR. PRYOR:  Okay.  Then, you are right.  I
16 did ask that question.
17       I believe it is relevant -- and it doesn't
18 matter if I believe it is relevant.  If I thought
19 you had ruled I couldn't do that, I won't do it.
20       But she got her team members -- she
21 treated them differently than other people.  She
22 went in and met with Hafner and got Holcomb and
23 Talburt charges dismissed.  That's what she -- now,
24 she keeps saying --
25       MR. McKEEBY:  Everything is fine until the

Page 447

1  charge is dismissed; correct?
2        MR. GREENFIELD:  Correct.  She already
3  testified --
4        THE COURT:  Yeah, until the outcome of
5  the -- Southwest decided, right?  You can ask what
6  she did on her behalf.  That is not the subject
7  of -- what is the subject is, what is Southwest's
8  ruling, then, because we don't have comparators.
9  That's not what --
10       MR. PRYOR:  And so Southwest colluding
11 with her in order to get a better Collective
12 Bargaining Agreement doesn't show that she's not
13 adequately representing my client?
14       THE COURT:  Well, you got plenty of things
15 to talk about.  It is just the last question that
16 wasn't --
17       MR. PRYOR:  All right.  I think I
18 understand it now.  I won't violate it.
19       THE COURT:  Understood.  Thank you.
20       (Thereupon, the sidebar was concluded and
21    the following proceedings were held in open
22    court:)
23       THE COURT:  Okay.  You can ask a new
24 question.
25

Page 448

1  BY MR. PRYOR:
2  Q.  Did your core team sexually harass someone
3  because they were gay?
4  A.  No.
5  Q.  You don't have any recollection of that?  You
6  don't recall defending them?
7  A.  Someone for -- no.  Somebody sexually harassing
8  somebody because they were gay?  No, I don't recall
9  that.
10 Q.  I don't know if you're trying to split hairs
11 with me, but it would seem pretty easy to me, either
12 you did or you didn't sexually harass --
13 A.  I don't -- I don't recall that.
14 Q.  You don't recall it?  Did it happen --
15 something -- I remember I didn't murder somebody at
16 lunch.  Do you remember whether or not your team
17 members sexually harassed someone because they were
18 gay on your core team member site?
19 A.  One of my team members made a comment about
20 another flight attendant.  He was investigated.  But
21 the flight attendant that made the comment was gay.
22 So I don't -- so no, not to my knowledge.
23 Q.  And so what was the comment, then?  What was
24 the comment they were investigated for?
25 A.  I don't recall the details of the comment.  It

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 63 of 642   PageID 11004
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 449..452

1 was something -- it was something not nice about
2 another flight attendant.  I think it may have been
3 about their appearance.
4 Q.  And I'm sure that you took action against that
5 core team member that said something not nice about
6 the flight attendant?  Oh, no, wait, you didn't,
7 right?  Oh, no, you defended them?
8 A.  Is that a question?
9 Q.  Yes.  Did you defend them as opposed to
10 reprimand them, how about that?
11 A.  I defended all of the flight attendants that
12 had social media violations at that time.
13       MR. PRYOR:  Exhibit 23.  We move for its
14 admission.  23.
15       THE COURT:  23, I have Union objections
16 from this morning.
17       MR. McKEEBY:  No objection.
18       THE COURT:  No from Southwest.  Okay.
19       Anything else to add to Union from this
20 morning?
21       Okay.  I will overrule the Union
22 objections and we can publish 23.
23       (The referred-to document was admitted in
24       Evidence as Plaintiff's Exhibit 23.)
25

1 BY MR. PRYOR:
2 Q.  Ma'am, is this one of your -- Exhibit 23 one of
3 your president's messages to flight attendants?
4 A.  Yes.
5 Q.  And I just want to make sure I get this into
6 evidence.
7       You acknowledge that the contract you
8 negotiated was -- it missed the mark, and as team
9 leader you own that, and that you were the lead
10 negotiator?  True?
11 A.  Yes.
12       MR. PRYOR:  Let's look at -- I think it is
13 134.  Let me check, before you put it up.
14 Q.  Ma'am --
15       MR. PRYOR:  I'm not offering it at this
16 point.
17 BY MR. PRYOR:
18 Q.  For the recall petition, you were president at
19 the time, correct?
20 A.  Yes.
21 Q.  The recall verification committee, who
22 appointed the recall verification committee?
23 A.  The executive board.
24 Q.  The executive board includes Audrey Stone, one
25 of the people to be recalled, correct?

1 A.  Yes.
2 Q.  And it includes Brett Nevarez, one of the
3 people to be recalled, correct?
4 A.  Yes.
5 Q.  And it included John Parrott, one of the people
6 to be recalled, correct?
7 A.  Yes.
8       MR. PRYOR:  52.  Let's look at Trial
9 Exhibit 52.  We will move for its admission.
10       THE COURT:  52?  I don't have any
11 objections to 52.
12       MR. McKEEBY:  It wasn't listed, but I
13 don't think I have any objection.
14       MR. PRYOR:  It wasn't in our report last
15 night.
16       THE COURT:  It is not on the last night
17 list.  I can call a break and see if they have an
18 objection at the break.  How about that?
19       Okay.  I'm going to call the first
20 afternoon break.  We will do a ten-minute break.
21 We'll see you back here at 2:38.  Same three
22 instructions:  Only talk to your fellow jurors and
23 court personnel, just not about the case; don't talk
24 to anyone else; and don't do any research.
25       All rise for the jury.

1       (The jurors exited the courtroom.)
2       THE COURT:  Okay.  Same instructions to
3 you.  You can take your break, but you just can't
4 talk to anyone about the case.
5       Any issues we need to talk about?  So
6 y'all look at 52, and then we will come back a few
7 minutes early and then see if y'all have objections
8 to 52.  Sounds good.  See you in a minute.
9
10       MR. GREENFIELD:  What time, Judge?
11       THE COURT:  So we are back here at maybe
12 2:36.  Sound good?
13       MR. GREENFIELD:  Thank you.
14       THE COURT:  See you in a few.
15       (Recess.)
16       THE COURT SECURITY OFFICER:  All rise.
17       THE COURT:  Is there anything to say about
18 52?
19       MR. McKEEBY:  No objection.
20       No objection.  Yeah, no objection.  There
21 is another issue, but it is not -- we can handle it
22 later.
23       THE COURT:  Okay.  That works.  Okay.
24 Let's bring in the jury.
25       (The jurors entered the courtroom.)

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 2 July 06, 2022                    Pages 453..456

Page 453

1        THE COURT:  Thank you.  You can be seated.
2        Okay.  I have admitted Exhibit 52 into
3  evidence.
4        And you can proceed, Mr. Pryor.
5        (The referred-to document was admitted in
6     Evidence as Plaintiff's Exhibit 52.)
7  BY MR. PRYOR:
8  Q.  Now, I'm looking at Exhibit 52.  It is a
9  January 10, January 12 -- it will be up on the
10  screen in a minute, I hope -- TWU Local 556
11  executive board meeting synopsis.
12      Do you see that?
13  A.  Yes, sir.
14  Q.  And you were at that meeting?
15  A.  Yes.
16      MR. PRYOR:  And let's go to the next page.
17  BY MR. PRYOR:
18  Q.  Under Working Women's Committee, at the bottom.
19  Do you see it?
20  A.  Yes.
21  Q.  Lori worked with Working Women's Committee
22  Chair, Jessica Parker, on coordination of meetings
23  and events during the Women's March on Washington on
24  January 21.  Lori procured a TWU Local 556 WWC
25  banner that will be used at the march and future

Page 454

1  events.
2        And is that what happened?
3  A.  Yes.
4  Q.  Did the banner say "Southwest Airlines" on it?
5  A.  Yes.  I believe it said the "Union of Southwest
6  Flight Attendants."
7        MR. PRYOR:  Your Honor, can I approach?
8        THE COURT:  Yes.
9        (Thereupon, the following proceedings were
10     had at sidebar:)
11      MR. PRYOR:  I'm going to ask if Southwest
12  Airlines ever took any action against them for using
13  Southwest Airlines's name on that banner and at the
14  march.  And I think I can, but I'm a little worried
15  because I truly don't want to do what I'm not
16  supposed to.
17      THE COURT:  Sure.  And it is not another
18  employee, an employee discipline situation, so I
19  don't think it is in limine point 1.
20      MR. McKEEBY:  Exactly.  No, I think that
21  is a fair question.
22      THE COURT:  Thank you for asking.  This
23  time is on me.
24      MR. PRYOR:  And I hope I can say it right.
25      (Thereupon, the sidebar was concluded and

Page 455

1     the following proceedings were held in open
2     court:)
3        THE COURT:  Okay.  You can ask that
4  question that we were thinking of.
5        MR. PRYOR:  Thank you, Your Honor.
6  BY MR. PRYOR:
7  Q.  Ma'am, to your knowledge, did Southwest
8  Airlines, at any time, take any action against
9  anyone with the union for utilizing Southwest
10  Airlines's name at that march?
11  A.  No, not to my knowledge.
12      MR. PRYOR:  Let's look at Exhibit 53.
13      Your Honor, we move for the admission of
14  Exhibit 53.
15      MR. McKEEBY:  No objection from Southwest.
16      THE COURT:  Okay.  I have yours from this
17  morning.
18      MR. GREENFIELD:  And if we can approach on
19  that.
20      THE COURT:  You can approach on that.
21      (Thereupon, the following proceedings were
22     had at sidebar:)
23      MR. PRYOR:  I was worried I wasn't going
24  to get my mileage in today.
25      MR. GREENFIELD:  I was too.

Page 456

1        THE COURT:  Okay.  Argument?
2        MR. GREENFIELD:  Yes.  First of all, your
3  Honor, the document is altered.  It is highlighted.
4  We don't know where it came from.  It is incomplete.
5  It is a partial list of potential sponsors.  We
6  don't know the veracity of who the sponsors or where
7  the document came from.
8        It is just wholly inappropriate.  It is a
9  piece of evidence we don't know where it came from,
10  it has been altered, and it is a partial document.
11      THE COURT:  You address those.
12      MR. PRYOR:  I don't know what he means
13  abut authored.  This --
14      MR. GREENFIELD:  It's got, like, purple
15  highlighting --
16      MR. PRYOR:  Oh, that --
17      MR. GREENFIELD:  -- and yellow highlighter
18  on it.
19      MR. PRYOR:  I'll have to look at it.
20      MR. GREENFIELD:  Well, highlighting
21  planned Parenthood specifically, which again, we
22  think is just intended to inflame the jury.
23      MR. PRYOR:  Or intended to show them what
24  I want to talk about.  But I don't -- frankly don't
25  know what is on the exhibit other than it is a

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 457..460

Page 457

1 document I think that she has recognized and can
2 identify as the document that shows who the sponsors
3 of the Women's March was.  That is the reason I'm
4 offering it.  I can limit it to to the first page, I
5 guess, although there is --
6        MR. GREENFIELD:  That is the problem, it
7 is a partial document.  It is just one page showing
8 a handful of the sponsors of the --
9        MR. PRYOR:  It shows the premier sponsors.
10 There are two premier sponsors.
11        THE COURT:  You can ask her that.
12        MR. PRYOR:  Okay.
13        THE COURT:  And if she doesn't know, you
14 can use it to refresh her recollection without it
15 coming into evidence.  But I do have concerns, given
16 the alterations of the --
17        MR. PRYOR:  Fair enough.  Absolutely.
18        THE COURT:  So you have got a path
19 forward.
20        MR. PRYOR:  Okay.
21        THE COURT:  Any other concerns?
22        MR. McKEEBY:  No.  Well, I will go back
23 and look at the document.
24        MR. PRYOR:  I may look at it, too.
25        THE COURT:  Got it.

Page 458

1        (Thereupon, the sidebar was concluded and
2    the following proceedings were held in open
3    court:)
4        MR. PRYOR:  Can I get a copy of
5 Exhibit 53?
6        MR. PRYOR:  May I approach the witness,
7 your Honor?
8        THE COURT:  You may.
9 BY MR. PRYOR:
10 Q.  Ma'am, can you identify the first page of
11 Exhibit 53?
12 A.  It looks like it is --
13 Q.  Well, hang on.  I want to be careful here.
14    Is this a document that you have seen before,
15 how about that?
16 A.  No.
17 Q.  Is this a document that is consistent with
18 your recollection regarding who the sponsors of the
19 Women's March was?  Were?  Are?  It is one of those.
20 A.  No.  There is names on here I have not even
21 heard of.
22 Q.  Well, does it refresh your recollection as to
23 Planned Parenthood?  Or do you need it refreshed?
24 A.  I'm aware that Planned Parenthood had a part in
25 the march, yes.

Page 459

1 Q.  Well, there is having a part in the march and
2 then there is the premier sponsor, the major
3 sponsor.
4    Are you aware that Planned Parenthood was one
5 of the two premier sponsors of the Women's March?
6        MR. GREENFIELD:  Objection, your Honor.
7 He's testifying if she's aware that they were.
8 There's been --
9        THE COURT:  Sustained.  Hold on.  No
10 speaking objections.  Sustained.  You can rephrase
11 it.
12 BY MR. PRYOR:
13 Q.  Ma'am, do you know who the premier sponsors of
14 the Women's March were?
15 A.  According to this, Planned Parenthood and
16 something called NRDC.
17 Q.  As you sit here today, you are telling us that
18 you sent Local 556 to a march without knowing who
19 the premier sponsors were?
20 A.  I didn't -- I did not know -- I'm still not
21 familiar with who NRDC is.
22 Q.  Let's try Planned Parenthood.
23    Do you know who they are?
24 A.  Yes.
25 Q.  And you knew when you went to the Women's March

Page 460

1 that Planned Parenthood was one of the major
2 sponsors of the march?
3 A.  Yes.
4 Q.  Do you know what a "pink out" is?
5 A.  No.
6 Q.  You never heard of a "pink out" in connection
7 with the Women's March on Southwest Airlines's
8 flights?
9 A.  Yes.
10 Q.  Tell us what it is.
11 A.  I believe it is referring to, there were flight
12 attendants that changed the lights on our newer
13 aircraft that have different colored light settings
14 and changed them to pink on some of the flights
15 going in and out of the Baltimore/Washington area.
16 Q.  And is that consistent with Southwest
17 Airlines's policies, that the flight attendants can
18 make decisions to choose a political cause and do
19 something on the plane for it?
20 A.  No.
21 Q.  And so you believe they violated policy?
22 A.  The flight attendants that did that?  Yes.
23 Q.  Do you know if anyone lost their job?
24 A.  I don't know.  I don't believe so.
25 Q.  I was going to say, don't you think you would

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 66 of 642   PageID 11007
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 461..464

Page 461

1 have heard if someone lost their job?
2 A.  I don't think so.
3 Q.  You don't think so, you would have heard, or
4 you don't think so, no one lost their job?
5 A.  I don't think anyone lost their job.
6 Q.  Okay.  So far, the only person that lost their
7 job that we have talked about is Charlene Carter,
8 right?
9 A.  That lost their job at Southwest Airlines?
10 Q.  That we have talked about today.  These
11 employees that --
12          THE COURT:  Counsel, will you approach?
13          MR. PRYOR:  Sorry.
14          (Thereupon, the following proceedings were
15     had at sidebar:)
16          MR. PRYOR:  I made it about 20 minutes --
17          THE COURT:  I give up.  I'm just -- I'm
18 done.
19          MR. GREENFIELD:  Now we are in the thick
20 of it.  Now she's got to talk about it.
21          MR. McKEEBY:  I don't think she has to
22 talk about it.
23          MR. GREENFIELD:  She does.
24          THE COURT:  How about I go tell the jury
25 that I have said, based on my prior rulings in this

Page 462

1 case, that how Southwest disciplined other employees
2 is not relevant to this okay case?
3          MR. PRYOR:  Yes, your Honor, I deserve
4 that.
5          THE COURT:  Okay.
6          (Thereupon, the sidebar was concluded and
7     the following proceedings were held in open
8     court:)
9          THE COURT:  Okay.  So I will tell the
10 jury, I have had a prior ruling in this case that
11 how Southwest treated other people is not relevant
12 to this employment lawsuit.  So I have cut that
13 segment of the world out, so y'all don't have to
14 hear about how they treated anyone else.
15          With that, you can ask a new question, if
16 you have one.
17          MR. PRYOR:  Thanks, Your Honor.
18          And I apologize for asking the question.
19 I understand that ruling, your Honor.  I appreciate
20 that.
21 BY MR. PRYOR:
22 Q.  Okay.  Let's go to Exhibit 56.
23     And we move for the introduction of Exhibit 56.
24          THE COURT:  All right.  I have morning
25 objections from the union and none from Southwest.

Page 463

1 I know what I'm going to rule on this.  Need a
2 sidebar or are you okay?
3          MR. GREENFIELD:  If you already have your
4 decision made, Your Honor, I don't think we need to.
5          THE COURT:  Pictures aren't hearsay.
6 There is one exception, but it is not in this case.
7 So I will allow them into evidence and 56 can come
8 in over the objection.
9          (The referred-to document was admitted in
10     Evidence as Plaintiff's Exhibit 56.)
11 BY MR. PRYOR:
12 Q.  Let's look at AP -- page AP31.
13     Well, first of all, let's look on the first
14 page.
15     Exhibit 56, these are some pictures from some
16 or all of the people that attended the Working
17 Women's March in Washington DC?
18 A.  No.
19 Q.  What is it?
20 A.  It is a photograph of the people that attended
21 the TWU Local 556 Working Women's Committee Meeting
22 held in conjunction with TWU International in DC.
23 Q.  Okay.  And for that meeting up there in
24 conjunction with this march, the union paid for all
25 of these people to go up there, right?

Page 464

1 A.  No.  I believe all of the flight attendants
2 volunteered their time for that meeting, with the
3 exception of me, and I was on a salary as part of my
4 position.
5 Q.  What about the hotels and airfare?
6 A.  The airfare was provided by Southwest Airlines,
7 per our Collective Bargaining Agreement, that says
8 Southwest will provide travel for union business.
9 And the hotels were paid for by the union out of the
10 Working Women's Committee budget.
11 Q.  It was paid for by the union?
12 A.  The hotels, yes.
13 Q.  And I'm missing -- you are just going to have
14 to pull this closer to your mouth for me.  I
15 couldn't hear the last part.  It was paid for by the
16 union, what?
17 A.  The hotels were paid for by the union out of
18 the Working Women's Committee meeting -- Working
19 Women's Committee budget.
20 Q.  And who funded that budget?
21 A.  Budgets were funded through union dues.
22 Q.  So in other words, the union paid for it?
23 A.  Yes.
24 Q.  Okay.  And by the way, it says on that banner
25 "Southwest Airlines," right?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 2 July 06, 2022                                        Pages 465..468

Page 465

1  A.  Yes.  Our logo always includes that.
2  Q.  And that was the banner that was carried in the
3  March?
4  A.  Yes.
5  Q.  Okay.
6        MR. PRYOR:  Let's look at AP31.
7  BY MR. PRYOR:
8  Q.  Are you in this picture?
9  A.  Yes.
10  Q.  You are part of the march?
11  A.  Yes.  I was there for part of the march.
12  Q.  Okay.  Let's look at 32.
13      And under -- by the way, these are Facebook
14  posts on, what, the union's Facebook page?
15  A.  Yes, part of it is.  And then it looks like
16  someone shared the post from the Union's Facebook
17  page.
18  Q.  By the way, the Union Facebook page, you can't
19  put comments on?
20  A.  That is correct.  It was a one-sided
21  communication avenue.
22  Q.  And this is a picture posted on the Union
23  Facebook page about the march that says, My body, my
24  choice, correct?
25  A.  Yes.

Page 466

1  Q.  Let's look at 43, I think -- not 43, 49.  Look
2  at 49.
3      And this, again, is on the Union Facebook page
4  with pictures from the march and pictures of flight
5  attendants in their uniforms on a Southwest Airlines
6  flight, correct?
7  A.  I'm assuming so.  I can't tell -- this document
8  doesn't have a header like the first one did that
9  shows where it was posted.
10  Q.  So you are questioning as to whether or not
11  it's on some other social media site or the union?
12  A.  Right.  I just -- I just can't determine that.
13  It just uploads.  It doesn't show where it is being
14  displayed.
15  Q.  Okay.  Someone is posting pictures of people in
16  Southwest Airlines's uniforms at the time of the
17  march, either a few days before or a few days after,
18  along with pictures of people at the Women's March,
19  true?
20        MR. GREENFIELD:  Objection, your Honor,
21  lack of foundation.
22        THE WITNESS:  Yes.
23        MR. GREENFIELD:  We don't know where these
24  pictures came from, who posted them.
25        THE COURT:  I will allow it.  I will allow

Page 467

1  it.  She can answer if she has knowledge.
2  BY MR. PRYOR:
3  Q.  Your answer was yes, ma'am?
4  A.  That they were posted somewhere, yes.
5  Q.  I understand you are not sure where they were
6  posted, at least this picture.
7      Now, as a result of this, you received
8  communications on Audrey Stone TWU Facebook page,
9  you received a Facebook message from Charlene
10  Carter?
11  A.  At the time of the March, I do not believe my
12  Facebook was designated Audrey Stone TWU.  It had
13  been at one point in the past.  I received messages
14  from Charlene Carter shortly following this via
15  instant messenger on Facebook.
16  Q.  And it was to a Facebook page that was Audrey
17  Stone TWU, correct?
18  A.  No.  That is what I just said, I do not believe
19  it was labeled Audrey Stone TWU at the point that
20  she communicated with me following the march, that
21  it was just Audrey Stone.
22  Q.  Would you be surprised that you didn't change
23  it until after the complaint you filed against
24  Charlene?
25  A.  I don't remember when I changed it.

Page 468

1  Q.  You can swear under oath, though.  It was not
2  Audrey Stone TWU at the time that you sent it?
3  A.  That is not what I said.  I said I did not
4  think it was Audrey Stone TWU, that I believed it
5  was just Audrey Stone.  I knew I had changed it at
6  some point.
7  Q.  You did.
8      If it was Audrey Stone TWU at the time Charlene
9  Carter sent her Facebook message to you, does that
10  change your opinion about whether or not you should
11  have reported something received from a union
12  member?
13  A.  No.
14  Q.  So even if it came to Audrey Stone TWU, it is
15  still inappropriate and the union should take
16  action?
17  A.  I still believe that it would have been
18  inappropriate and that Southwest Airlines should
19  take action in investigating.
20  Q.  You certainly used Audrey Stone TWU Facebook
21  page for union activities, true?
22  A.  At points during my presidency, yes.
23  Q.  By the way, at some point, did you send out an
24  email to all of these people, or a Facebook message
25  to all of these people that you have been sending

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 469..472

Page 469

1 Facebook messages to about union activities, Audrey
2 Stone TWU, did you ever send out something saying,
3 That is no longer Audrey Stone TWU, that is now my
4 personal Facebook page?  Did you ever do that?
5 A.  No.  I did not often use Facebook as a vehicle
6 for communicating with members.
7 Q.  Now, but you did.  You used it to communicate
8 with Facebook members, including Charlene Carter?
9 A.  I said I didn't often use it.  And I did not
10 use it to communicate with Charlene Carter.
11 Charlene Carter utilized my Facebook to communicate
12 with me.  It was a one-way communication.
13 Q.  You never sent out a blast Facebook message
14 encouraging flight attendants to support -- or to
15 oppose right-to-work laws?
16 A.  No.
17 Q.  You never sent any message from your Audrey
18 Stone TWU saying, Support my Candacey?
19 A.  Facebook messages?
20 Q.  Yes.
21 A.  Yes.
22 Q.  From Audrey Stone TWU?
23 A.  I made posts, I didn't send messages --
24 Q.  Okay.  Posts --
25 A.  -- via Facebook to members.

Page 470

1 Q.  Let me try it again.
2     Did you use Audrey Stone TWU Facebook to make
3 posts to members of the union?
4 A.  If they were a friend of mine on Facebook, yes.
5 Q.  You -- and who-all were your friends?  You
6 didn't have access to all of the flight attendants,
7 it was only a select few friends?
8 A.  I never had -- my Facebook was not a public
9 account.
10 Q.  I didn't ask if it was public.
11     Did you use it to send messages to flight
12 attendants in connection with your campaign for
13 union president?
14 A.  If they were a Facebook friend of mine, or on a
15 group that I was a member of.  But to the general
16 membership, no.
17 Q.  So how many flight attendants did you send
18 these to, do you suppose?  Are we talking 5?  50?
19 100?
20 A.  Which post?
21 Q.  The post -- let's just use "Support your
22 Candidacy"?
23 A.  I don't recall how many Facebook friends I had
24 during the election in 2015.
25 Q.  And in fact, didn't you set up a different

Page 471

1 Facebook account for your family activities as
2 opposed to Audrey Stone TWU?
3 A.  I initially did.  And then quickly into my
4 presidency, I realized that I just didn't have time
5 to stay abreast via Facebook and that that wasn't
6 going to be a communication tool that I used
7 primarily.
8 Q.  I hear what you want to say, but is my
9 statement correct?
10 A.  Yes.
11 Q.  And by the way, that other Facebook account,
12 what was it called?
13 A.  Audrey Stone.
14 Q.  And what is your understanding of whether or
15 not it violates Facebook rules to have two Facebook
16 pages for the same person?
17 A.  I don't know anything about --
18     MR. McKEEBY:  Objection.
19     THE COURT:  Sustained.
20 BY MR. PRYOR:
21 Q.  You had two Facebook pages, one of them was
22 Audrey Stone, one of them was Audrey Stone TWU;
23 correct?
24 A.  Yes.
25 Q.  Now, when you received a communication from

Page 472

1 Charlene Carter, you were at the airport getting
2 ready to get on a flight?
3 A.  When I received one of the communications from
4 Charlene Carter, yes.
5 Q.  The message that you ended up filing a
6 complaint against her for?
7 A.  Yes.
8 Q.  Can you bring that closer to your mouth, lean
9 forward?
10 A.  Yes.
11 Q.  And when you got this message, you clicked on
12 the message for it to play?
13 A.  I opened Facebook Messenger, and her message
14 was at the top as the most recent message.  And when
15 I opened the message, the video started playing.
16 Q.  So the way Facebook Messenger works is, you
17 open it, but you then you click on the video, if you
18 want to watch it, it doesn't automatically play.
19     Do you understand that?
20     MR. GREENFIELD:  Objection.  The witness
21 is testifying -- or, excuse me -- counsel is
22 testifying.
23     THE COURT:  I will allow you to rephrase
24 it.
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 473..476

Page 473

1 BY MR. PRYOR:
2 Q.  Isn't it correct that you had to click on the
3 video for it to play?  That is the way Facebook
4 Messenger works?
5 A.  When I opened it, to pull the message up, it --
6 Q.  Is it upsetting, ma'am, because you think you
7 saw a life?  If it is not a life, why are you upset?
8 A.  I am upset because it was the most graphic,
9 disturbing image I have seen.
10 Q.  What is disturbing about it?  Is it because it
11 shows a baby?  It makes the point she was trying to
12 make about what you were doing with that march, that
13 is why you are crying?
14 A.  That is not correct.
15 Q.  So you are not crying because it was a baby.
16 Explain to me why it is graphic and upsetting if it
17 is not?  What's -- then if it is nothing, what is
18 upsetting about it?
19 A.  I didn't say it was nothing.
20 Q.  Okay.  It is something.  Okay.
21       So let me just see if I understand.  You are
22 telling us that that video started playing without
23 you asking it to, without you clicking on it.
24 A.  When I opened it, I may have inadvertently hit
25 play.  It all happened so fast.  I was horrified.  I

Page 474

1 was about to board a flight in Denver.  And I opened
2 it -- I was watching Facebook, and the next thing I
3 know, it was playing.
4 Q.  Okay.  So you may have inadvertently clicked
5 play.
6       And did you read the message before you clicked
7 play vertently or inadvertently?
8 A.  No, I stopped.  I stopped it.  And I did not
9 read any further at that moment.
10 Q.  How many seconds did you watch the video before
11 you stopped it?
12 A.  I don't remember exactly how many seconds it
13 was.
14 Q.  Okay.  But it was seconds?  You didn't watch it
15 for very long, it was too upsetting to you, correct?
16 A.  Correct.
17 Q.  Would you say three seconds?  How long before
18 you realized, I don't want to watch this, if it is
19 so graphic?  Was it two seconds?
20       MR. GREENFIELD:  Objection, your Honor.
21       MR. GILLIAM:  Three seconds?
22       MR. GREENFIELD:  Asked and answered, she
23 said she doesn't remember.
24       And it is my understanding that there is
25 the law, but there is also the language in the

Page 475

1 contract under Article III that ultimately Southwest
2 can decide what is or isn't a violation of their
3 policy regardless of what kind of activity it is.
4 BY MR. PRYOR:
5 Q.  Oh, let's look at that.  Article III is going
6 to say that?  That is your testimony under oath,
7 ma'am?
8 A.  No, sir.  I'm saying that is my understanding.
9 Q.  No, no, let's look at it.
10       MR. PRYOR:  May I approach?
11       THE COURT:  You may.
12 BY MR. PRYOR:
13 Q.  In the contract you negotiated you swore to
14 under oath that says illegal activity is all you can
15 do when someone is engaged in union activity.  Go,
16 give to me.
17 A.  That is not what I stated.
18 Q.  Article III.  Common on, you just swore to it.
19 It is different than what you swore to this morning?
20 A.  I did not swear to what you just stated.
21 Q.  Are you wanting to withdraw what you said?  In
22 fact, you cannot report a union member engaged in
23 legal union activity and you did.  Right?
24       MR. GREENFIELD:  Objection, your Honor,
25 asking for a legal conclusion again.

Page 476

1       THE COURT:  I will allow it.
2       THE WITNESS:  I do not believe that I
3 violated the law by bringing my concerns forward to
4 Southwest Airlines.
5 BY MR. PRYOR:
6 Q.  You want to go ahead and answer my question
7 now?
8       I understand what you want to say.
9       You told us, Article III, it says it.
10       No.  Article III doesn't say that.  You know
11 it.
12       You know that you reported someone to the
13 company for engaging in legal union activity to
14 retaliate against her because she was on the recall
15 petition.
16 A.  No.  Absolutely not.  I did not do anything to
17 retaliate against Charlene Carter.  And I do not
18 believe that what she did in the totality of
19 everything she sent in that batch was protected
20 union activity.
21       No one.
22 Q.  So the video was so upsetting, it is outside
23 union activity, when -- what about religious
24 activity, when her religious beliefs are that that
25 is murder?  You don't have to agree with her.  And

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 70 of 642  PageID 11011
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 477..480

Page 477

1 I'm not up here taking a position either.  But she
2 believes it and her religion tells her to confront
3 that, and speak truth to the situation.
4      And it must have spoken to you in a way because
5 you cry about it.
6      MR. McKEEBY:  Objection, testifying,
7 foundation as to Ms. Carter's belief.
8      THE COURT:  Sustained.
9 BY MR. PRYOR:
10 Q.  Isn't that why you cried about it, ma'am?
11      THE COURT:  I sustained that.  Can you ask
12 a new question free standing?
13      MR. PRYOR:  I will.  I will, let me get my
14 notes back.
15 Q.  You don't want to talk to us about Article III,
16 ma'am?
17 A.  I have repeatedly said that the way you are
18 repeating my comment about Article III is incorrect.
19 Q.  We are doing a daily transcript.  Maybe we will
20 show that to the jury in closing if we have that.
21 You are okay with that?
22      MR. GREENFIELD:  Can we have a sidebar?
23      THE COURT:  Sustained.
24 BY MR. PRYOR:
25 Q.  Ma'am, let's look at exhibit -- I think it is

Page 478

1 66.
2 BY MR. PRYOR:
3 Q.  Did you watch the George Floyd video?
4      MR. GREENFIELD:  Objection, your Honor,
5 relevance.
6      THE COURT:  Sustained.
7 BY MR. PRYOR:
8 Q.  Do you believe that a video is an effective
9 means of showing someone what is really happening
10 and effect change?
11 A.  I think it depends on the circumstance.
12 Q.  Okay.  How about in the situation of George
13 Floyd, then?
14      MR. GREENFIELD:  Objection, Your Honor.
15      MR. PRYOR:  She just raised it --
16      THE COURT:  I will allow it.
17      MR. PRYOR:  I missed the ruling.
18      THE COURT:  I will allow it.
19 BY MR. PRYOR:
20 Q.  So how about the George Floyd video, then?  By
21 the way, I'm not -- it is the most disturbing thing
22 I have ever seen.  Did it disturb you?
23 A.  I didn't watch all of it.
24 Q.  I'm sorry?
25 A.  I didn't watch all of it.

Page 479

1 Q.  I understand.
2      What you did watch, did it disturb you?
3 A.  Yes.
4 Q.  And, you know, I think we have heard in this
5 country before, about African-American men being
6 victimized by police, that --
7      MR. GREENFIELD:  Objection, your Honor
8 he's testifying.
9      THE COURT:  You have got to let him finish
10 his question first.
11 BY MR. PRYOR:
12 Q.  -- but that video changed America, didn't it?
13      MR. GREENFIELD:  Objection, Your Honor,
14 he's testifying.  Move to strike.  There is
15 foundation for anything he's saying.
16      THE COURT:  I will sustain that.  You can
17 ask -- the last part of your question you can ask.
18 BY MR. PRYOR:
19 Q.  Okay.  It changed America, didn't it, the
20 video?  Thank God someone videoed it.  And it was
21 terrible.
22 A.  I don't feel like I could speak to whether or
23 not that changed America.
24 Q.  So it was terrible, so no one should have had
25 the freedom to post that video and change America,

Page 480

1 right?  Didn't change you, apparently.
2      MR. GREENFIELD:  Objection, your Honor.
3 Argumentative.
4      THE COURT:  Sustained.
5 BY MR. PRYOR:
6 Q.  Did it have an impact on you?
7 A.  Yes.
8 Q.  Do you believe it changed America?
9 A.  No.
10      MR. PRYOR:  Let's look at Exhibit 66.
11 BY MR. PRYOR:
12 Q.  By the way, before 66, let's look at
13 Exhibit 19.
14      MR. PRYOR:  Move to admit Exhibit 19.
15      THE COURT:  I don't have anything
16 objection-wise on 19.  Anything on 19?
17      MR. GREENFIELD:  I'm sorry, this is what
18 number?
19      MR. PRYOR:  Nineteen.
20      THE COURT:  Nineteen.
21      MR. McKEEBY:  No objection.
22      THE COURT:  Any from the union to 19?
23      MR. GREENFIELD:  I'm pulling it up right
24 now, your Honor.
25      MR. PRYOR:  It is the president's message.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 481..484

Page 481

1        MR. GREENFIELD:  No objection, Your Honor.
2        THE COURT:  All right.  Nineteen is
3   admitted.  We will publish to the jury.
4        (The referred-to document was admitted in
5   Evidence as Plaintiff's Exhibit 19.)
6   BY MR. PRYOR:
7   Q.   Let me show you the first page of Exhibit 19
8   and ask you if you can identify this document.  And
9   if you would like a hard copy, I can bring you one.
10       Do you recognize it?
11  A.   Yes.
12  Q.   Okay.  This is a president's message you sent
13  out to all of the flight attendants, correct?
14  A.   Yes, all of the flight attendants that we had
15  email addresses on file for.
16  Q.   Okay.  That is 14-, 15,000?
17  A.   Probably, at that time.
18  Q.   You sent it to basically your entire union
19  membership, to the best of your ability?
20  A.   Yes.
21  Q.   And in this, there is a president's message.
22  And it says, I address social media, as I recognize
23  this is an issue that has the potential to affect
24  the vast majority of our work group, whether you are
25  on Facebook, Twitter, LinkedIn or any other social

Page 482

1   media platform.  I am pleased that over the last
2   month, Southwest Airlines has finally taken us
3   seriously.
4        You wrote that?
5   A.   Yes.
6   Q.   Your union has been addressing Southwest
7   Airlines's social media policy for a long time.  We
8   have been bringing forward your concerns around lack
9   of clear guidance on a policy that is both vague and
10  undefined.  We have witnessed inconsistencies around
11  the way the policy is applied and the often
12  subjective stance that Southwest management has
13  displayed in administering the policy.
14       Is that what you wrote?
15  A.   Yes.
16  Q.   By the way, where did you mention in here, oh,
17  by the way, we are also having these off-the-record
18  conversations with Southwest Airlines's management
19  about using the social media policy to target union
20  members and objectors?  Do you cover that in here?
21       MR. GREENFIELD:  Objection, Your Honor
22  he's just testifying.
23       THE COURT:  Sustained.
24       MR. PRYOR:  What was the basis of the
25  objection?

Page 483

1        THE COURT:  It was lawyer testifying.
2        MR. PRYOR:  Okay.  Let me try it another
3   way.
4   BY MR. PRYOR:
5   Q.   Did you include in this message anything about
6   the emails we have seen where you know that your
7   second vice-president, one of your core team
8   members, is having conversations with senior
9   management of American Airlines about -- Southwest
10  Airlines, sorry; I used to represent American --
11  Southwest Airlines about using social media to
12  target union members and objectors?
13  A.   My second vice president, I don't believe, was
14  having conversations with members of Southwest
15  Airlines' management about targeting objectors.
16  Q.   You don't recall testifying about the emails
17  earlier that we talked about?
18  A.   The emails that I have seen that involve
19  Southwest management were from Brian Talburt, who
20  was not the second vice president.
21  Q.   Well, wait.  We saw an email from Rocky
22  Mountain, who is Mike Hafner, that said, Yeah, he's
23  an ass --
24       MR. GREENFIELD:  Objection, Your Honor.
25

Page 484

1   BY MR. PRYOR:
2   Q.   -- do you recall that?
3        MR. GREENFIELD:  Again, lack of
4   foundation, and no evidence introduced in that
5   regard.
6        MR. PRYOR:  No, she identified it.
7        THE COURT:  I think she did.  She can
8   answer it.
9        THE WITNESS:  I don't know who Rocky
10  Mountain is and I'm not looking at that right now.
11  I believe it was a forward that Talburt sent to
12  Brett.
13  BY MR. PRYOR:
14  Q.   I'm not saying it wasn't forwarded to you,
15  ma'am.  I'm saying you knew these discussions were
16  going on.
17       As a matter of fact, you told us that you had
18  conversations with him about how improper that
19  was -- although there is nothing in writing -- but
20  you told us verbally you did.  Now you are telling
21  us you didn't know anything about it?  I thought you
22  coached him?
23  A.   Sir, your question, the way I heard it, was
24  about conversations that both Mr. Talburt and
25  Mr. Nevarez were having privately with members of

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 72 of 642   PageID 11013
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 485..488

Page 485

1 Southwest Airlines's management.  And I am stating I
2 do not believe that to be factual.
3 Q.  What is not factual about it?
4 A.  That I do not believe Mr. Nevarez was having
5 private conversations with members of Southwest
6 Airlines's management regarding targeting any
7 members.
8 Q.  Well, how about emails, then?  If you don't
9 think he had conversations, what about the email
10 where he talks about targeting Mike Casper and he
11 sends it to Rocky Mountain, and Rocky Mountain says,
12 He's an ass?
13       MR. GREENFIELD:  Objection, your Honor,
14 asked and answered.  She's testified --
15       THE COURT:  Sustained.
16 BY MR. PRYOR:
17 Q.  So it is your testimony you coached these
18 people about these improper activities.  And then
19 when you wrote this president's message, you didn't
20 include anything about it, is that fair?
21 A.  Yes.
22 Q.  So you are telling the members, This is a
23 terrible social media policy, and yet over here, you
24 know in fact you are trying to make improper use of
25 the social media policy, and you don't disclose that

Page 486

1 in your president's message?
2 A.  That is not correct.
3 Q.  So you write, Over the past several weeks, I
4 met with various Southwest Airlines leaders,
5 including our vice president of cabin services, Mike
6 Hafner, right?
7 A.  Yes.
8 Q.  Okay.  And you aren't sure that that is the
9 Mike Hafner that Mr. Talburt is talking about?
10       MR. GREENFIELD:  Objection, asked and
11 answered.
12       THE COURT:  Sustained.
13 BY MR. PRYOR:
14 Q.  Do you recall the email where he talks about it
15 is Mike's personal email address, we like to keep
16 these discussions off the record?  You don't recall
17 that?
18       MR. GREENFIELD:  Objection, asked and
19 answered.
20       THE COURT:  Sustained.
21       MR. PRYOR:  What was the objection?
22       THE COURT:  Asked and answered.
23       MR. PRYOR:  Oh, fair enough.
24 BY MR. PRYOR:
25 Q.  Okay.  Then you say, Your voices and your

Page 487

1 issues have been strongly expressed by your union.
2 We have heard you.  Over the last weeks, we have
3 been working towards seeking resolution on
4 outstanding grievances, challenges -- challenging
5 the discipline to flight attendants for alleged
6 violations of social media policy.  We have been
7 making progress.
8     Did you write that?
9 A.  Yes.
10 Q.  And then you say, On a personal note, however,
11 please know that the social media issues management
12 investigated and the resulting discipline Southwest
13 Airlines issued did not arise out of something
14 management simply uncovered or stumbled upon.  They
15 are not generally monitoring our sites.
16     Instead, these cases come about as our own
17 flight attendants are turning each other in.  These
18 latest investigations have been the result of flight
19 attendant complaints.  I am asking that we please
20 consider stopping any back and forth fighting on
21 social media.
22     We are not always going to agree with one
23 another, but please recognize that your fellow
24 employees are entitled to their own thoughts and
25 opinions.  If we have a problem, let's work it out

Page 488

1 as professionals that we are.  Please respect one
2 another.
3     Is that what you wrote?
4 A.  Yes.
5 Q.  Did you mean it?
6 A.  Yes.
7 Q.  And then on February 22nd, 2017, you sent a
8 complaint regarding Ms. Carter to Southwest
9 Airlines, true?
10 A.  Yes.
11 Q.  And you complained about the social media
12 policy that we just read your president's message
13 about, true?
14 A.  Yes.
15       MR. PRYOR:  Move for the admission of
16 Exhibit 66.
17       THE COURT:  Sixty-six, I don't have an
18 objection to.
19       MR. McKEEBY:  No objection.
20       MR. GREENFIELD:  Give me one second.
21       I do not.
22       THE COURT:  Okay.  Sixty-six is in.  We
23 will publish.
24
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                    Pages 489..492

Page 489

1       (The referred-to document was admitted in
2    Evidence as Plaintiff's Exhibit 66.)
3 BY MR. PRYOR:
4 Q.   This is what you sent to Suzanne Stevenson,
5 correct?
6 A.   Yes.
7 Q.   And who is Suzanne Stevenson?
8 A.   At the time, she was the Las Vegas based
9 manager.
10 Q.   Okay.  And a base manager is your kind of local
11 supervisor out of where your base -- where you fly
12 out of or where you live?
13 A.   It is -- it is the managers, the top person.
14 They are above the supervisors in that domicile.  It
15 is the top person in the domicile that you are based
16 out of.
17 Q.   The top person in your domicile, that is who
18 you report complaints about other employees
19 regarding violation of company policy?
20 A.   It is one of the people you can report it to,
21 yes.
22 Q.   Well, isn't that typically who you would report
23 it to, base manager?
24 A.   There are some flight attendants that report it
25 to a supervisor.  There are some flight attendants

Page 490

1 that report directly to labor relations, a
2 complaint.  Some that do employee relations.  Some
3 that do all three departments.
4 Q.   What is the standard -- go ahead.  Are you
5 done?  What is the standard policy?  You report to
6 base manager?
7 A.   Actually, no.  In our Southwest policy, it
8 outlines a list of people that you should report
9 harassment to, and a manager is one of the many
10 positions listed as an option.
11 Q.   And one of the people you should report to,
12 then, is Suzanne Stevenson, base manager?
13 A.   Yes.
14 Q.   Now, on that list, it doesn't say you should
15 report it to the head of in-flight, does it?
16 A.   Actually, it does.  It says, Or the vice
17 president.
18 Q.   So you are required to report all complaints to
19 the head of in-flight?
20 A.   I didn't say you are required.  It is one of
21 the positions people listed under the Southwest
22 Airlines Harassment Policy.
23 Q.   The policy is, any time you see a violation,
24 you can report it to anyone in management.  But it
25 is unusual to include in your complaint the head of

Page 491

1 in-flight?
2 A.   I don't think so.  There were -- I have seen
3 many, many times -- I wouldn't send anything just to
4 one person of this nature.
5       Throughout the course of my union career, I saw
6 things fall through the cracks, balls get dropped,
7 because it went to one individual, and it wasn't
8 seen.  And since I went to the base manager, I
9 wasn't going to cc someone in a lower position than
10 hers.
11 Q.   Well, you are not required to cc someone.  But
12 did you think Suzanne Stevenson was going to drop
13 the ball on this?
14 A.   I always counseled flight attendants that if it
15 was something important, they needed to cc someone
16 on written communication they sent to make sure that
17 it had the eyes on it that they intended for it to.
18 Q.   And you just happened to send it to Sonya
19 Lacore, the person at in-flight, that you had
20 received emails about her conversations with
21 Mr. Talburt, about targeted assassinations of people
22 like Ms. Coreless and Mr. Casper, true?
23 A.   Yes.
24 Q.   And so you included Sonya Lacore.  You also
25 included Naomi Hudson, who is on the labor relations

Page 492

1 negotiating team for Southwest Airlines, right?
2 A.   She was on the Southwest Airlines negotiating
3 team.  Her position at Southwest Airlines was also
4 director of labor relations.
5 Q.   So your head of the negotiating team for the
6 union, and you decide to include someone on
7 Southwest Airlines's side of the negotiating team in
8 a complaint against another employee, right?
9 A.   Yes.  I included her because she was the
10 director of labor relations, and labor relations is
11 involved in any investigation of complaints that is
12 brought forward to Southwest Airlines.
13 Q.   So you write this email -- yeah, it is an
14 email.  And you say, several things.  You say, Below
15 you will see Facebook messages that were sent to me
16 last week by Southwest Airlines flight attendant
17 Charlene Carter.  It is in regards to a TWU Local
18 556 Women's Committee meeting.  That is what you
19 said, right?
20 A.   Yes.
21 Q.   It is relating to a union activity according to
22 your own words, correct?
23 A.   Yes.
24 Q.   And then you say that, I participated in last
25 month in a march that I voluntarily participated in

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 2 July 06, 2022                              Pages 493..496

Page 493

1  a few days later.
2     You say, This message contains two graphic
3  videos of an alleged aborted fetus and makes
4  reference to murder, as well as political and
5  religious comments.
6     That is what you wrote?  True?
7  A.  Yes.
8  Q.  And so, so far, you have acknowledged it is
9  union activity, you have acknowledged it is
10 political activity, and you have acknowledged it is
11 religious activity.  True?
12 A.  Yes.
13 Q.  It says, I believe these to be a violation of
14 the social media policy.  Correct?
15 A.  Yes.
16 Q.  The policy that you had said shouldn't be
17 utilized against flight attendants, and that
18 shouldn't be reported by flight attendants, true?
19 A.  I had said that, yes.
20 Q.  You also say, I find it obscene and violent, as
21 well as threatening in nature.
22     So the obscene and violent, is that -- are
23 those the videos of the baby?  The fetus?
24 A.  The obscene part -- part of her message, I took
25 as a threat.

Page 494

1  Q.  Okay.  Let's talk about the threat.
2     The threat was, she can't wait to see you
3  online, right?
4  A.  Yes.
5  Q.  And that was a threat?
6  A.  There was nothing about any of the messages
7  that she had sent --
8  Q.  Well --
9  A.  May I finish?  There were nothing that were
10 friendly, and there had already been conversations
11 taking place on social media about what the flight
12 attendants were going to do to me when I came back
13 online, and that I would need to travel with body
14 guards.  So yes, I took that as a threat.
15 Q.  So those other things you are talking about,
16 those weren't from Charlene Carter, were they?
17 A.  The other ones were not.
18 Q.  And in fact, in the previous messages you had
19 received from Charlene, she constantly was telling
20 you, she doesn't think you should be a full-time
21 paid member of the union and she's looking forward
22 after the recall petition to you going back online
23 as a flight attendant, isn't that correct?  Is it
24 correct, ma'am?
25     MR. McKEEBY:  Objection, talking about

Page 495

1  documents that are not in evidence.
2     THE COURT:  Sustained.
3  BY MR. PRYOR:
4  Q.  From your recollection, the communications she
5  received -- you received from her, she's telling
6  you, she doesn't think you should be union president
7  and she can't wait for you not continue to be paid
8  with her union dues, and she can't wait to see you
9  back online.  That is the context, isn't it?
10 A.  That is not the context that I took that
11 message.
12 Q.  So you don't think that is the context?
13 A.  No.
14 Q.  And so you took that phrase that you used
15 yourself many times as a threat, true?
16 A.  Yes.
17 Q.  And so did you report her to the police?
18 A.  No, I did not report her.
19 Q.  No, you reported her to Southwest Airlines, not
20 the police, for a threat, true?
21 A.  Yes.
22 Q.  In the next paragraph, you say, I'm fearful to
23 return to my job as a line flying -- line flying
24 flight attendant due to repeated personal attacks
25 and threats made both via social media, as well as

Page 496

1  altercations that occurred face-to-face while I have
2  been on a Southwest Airlines plane.
3     None of those involved Charlene Carter, these
4  are other attacks and threats that you are talking
5  about?
6  A.  Yes.
7  Q.  And you included them in your complaint against
8  Charlene Carter, correct?
9  A.  Yes, because I viewed her comment as a threat.
10 Q.  I'm sorry?
11 A.  Yes, because I viewed her comment toward me as
12 a threat.
13 Q.  No, I understand you are saying, I will see you
14 online as a threat.
15     But you then talk about personal attacks and
16 threats and being -- face-to-face encounters on the
17 airplane, you are talking about other things you
18 were dealing with, correct?
19 A.  Yes.
20 Q.  And you included that in your complaint against
21 Charlene Carter?
22 A.  Yes.
23 Q.  And then you go on to say, I am personally pro
24 choice.  But then you go on to say, However, I
25 believe in equality and individual rights, and will

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 75 of 642    PageID 11016
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 497..500

Page 497

1 continue to support causes and events that promote
2 fundamental rights.
3     Because what you are saying is, you are pro
4 choice?
5 A.  No.  I immediately sent another email when I
6 realized I had mistyped.
7 Q.  Ma'am, you are going to have to hold the
8 microphone to your mouth.
9 A.  No.  I immediately sent a second email when I
10 went back and reread what I had typed.  And I said I
11 was personally -- personally pro life.
12 Q.  Are you finished with your answer?
13 A.  Yes.
14 Q.  In fact, what you wrote was, that you are
15 personally pro choice.  You may believe abortion
16 involves a life, but you are pro choice.  Let a
17 woman decide what to do with what is inside her
18 body.  That is your position?
19     MR. GREENFIELD:  Objection, your Honor,
20 asked and answered.
21     THE COURT:  I will allow this
22 clarification question.
23     THE WITNESS:  There is another piece that
24 isn't displayed right now that I'm speaking to,
25 because I mistyped that on my personal beliefs.

Page 498

1 BY MR. PRYOR:
2 Q.  It says, I am personally pro choice, is that
3 what you wrote?
4 A.  It is, and I corrected it immediately after
5 sending this email.
6 Q.  And you corrected it by saying, I am personally
7 pro life, but I believe in women having a choice,
8 true?
9 A.  Yes.  That I don't believe anyone else has the
10 right to dictate what should happen to another
11 woman.
12 Q.  Fair enough.  But that is the definition of pro
13 choice, ma'am.  That is not pro life.  That is pro
14 choice.
15     MR. GREENFIELD:  Objection, Your Honor,
16 he's testifying again.
17     THE COURT:  Sustained.
18 BY MR. PRYOR:
19 Q.  Do you understand that pro choice means exactly
20 what you just said?  What you believe, that let a
21 woman -- and I'm not debating you about it -- nut
22 let a woman decide what to do with her body?  That
23 is pro choice.  People who are pro life say that
24 woman doesn't have that choice.  That is not you,
25 you are not pro life, you are pro choice.

Page 499

1     MR. GREENFIELD:  Same objection,
2     THE COURT:  Sustained.
3 BY MR. PRYOR:
4 Q.  You just told us you thought pro choice means
5 that a women should get to decide what to do with
6 her body.  Is that what you believe?
7     MR. GREENFIELD:  Objection, your Honor,
8 asked and answered.
9     THE COURT:  Sustained.
10     MR. PRYOR:  What was the objection?
11     THE COURT:  Asked and answered.
12     MR. PRYOR:  Well, Your Honor, if I could,
13 she's now tried to backtrack on what she said and so
14 I'm trying to clarify.  I'd ask --
15     THE COURT:  I think it was clear.
16     MR. PRYOR:  Okay.  All right.  I will move
17 on.
18 BY MR. PRYOR:
19 Q.  Ma'am, attached to that exhibit, is the video
20 that you found disturbing.  It is the next page.
21 I'm not going to play the video.  I'm going to read
22 the -- what is said before playing the video.
23     It says, This is what you supported during your
24 paid leave with others at the Washington March in
25 DC.  You truly are despicable in so many ways.  By

Page 500

1 the way, the recall is going to happen, and you are
2 limited in the days you will be living off of all of
3 the Southwest Airlines flight attendants.  Can't
4 wait to see you back online.
5     Isn't she, in fact, exercising her union right
6 to object to the union and to tell you she thinks
7 you are doing something awful and that you -- she
8 can't wait to see you, Quit living off Southwest
9 Airlines and going back on line, and that is what
10 you are calling a threat?
11     MR. GREENFIELD:  Objection, Your Honor,
12 compound question.
13     THE COURT:  I will allow it.
14     THE WITNESS:  It is not how I took those
15 messages.
16 BY MR. PRYOR:
17 Q.  I'm asking you if I said anything that is
18 incorrect?
19 A.  Yes.
20 Q.  What did I say incorrect?
21 A.  I did not believe that the way that she sent
22 those, what she sent, the comments she sent, I did
23 not believe that was her exercising union protected
24 speech, and simply saying that I -- that she was
25 ready for me to be back on line.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 501..504

Page 501

1 Q.  Ma'am, is this the video you watched two or
2 three seconds of?  Or was it the other one?
3      MR. GREENFIELD:  Objection, your Honor,
4 mischaracterizes the testimony, previous testimony.
5      THE COURT:  I think it was a question.
6 I'm fine with your question and her answer, if she
7 has an answer to your question.
8 BY MR. PRYOR:
9 Q.  Go ahead, ma'am.
10 A.  Yes.
11 Q.  This is the video?
12 A.  I believe so.
13 Q.  I'm sorry?
14 A.  Yes, I believe so.
15 Q.  Okay.  And it is the effectiveness -- I
16 understand it is disturbing.  Bad things are
17 disturbing.
18      It is the effectiveness of the video that is
19 upsetting.  True?
20 A.  No.
21 Q.  So it is not effective.  That is not what is
22 offensive.  What is offensive?
23 A.  That is not what I said.
24 Q.  You just said no, so then the other side of
25 that has got to be that it is not offensive.

Page 502

1      It is upsetting because it is effective, true?
2 A.  It is disturbing.
3 Q.  Okay.  It is disturbing because it is
4 effective.
5 A.  No one should be sent that.
6 Q.  So you feel that way.  And some people might
7 feel no one should take my money and support
8 something like that.  That is equally upsetting to
9 someone else.
10      And to speak to power, to speak to her
11 president of her union to get that message across,
12 is no different than what you are saying.
13      MR. GREENFIELD:  Objection, your Honor,
14 he's testifying, he's talking about what some people
15 may think.
16      THE COURT:  I will sustain that.  You can
17 rephrase it.
18 BY MR. PRYOR:
19 Q.  Let me go back to my question.  And I will
20 still wait for an answer.
21      This video was disturbing to you, because it
22 was effective?
23      MR. GREENFIELD:  Objection, your Honor,
24 asked and answered.  He's being argumentative.
25      MR. PRYOR:  She's not answered.

Page 503

1      THE COURT:  There is no answer yet.
2      MR. PRYOR:  I'm sorry, Your Honor?
3      THE COURT:  There is no answer yet.  I
4 will let her answer if she can.
5      THE WITNESS:  If "being effective" means
6 upsetting me terribly, of being subjected to
7 horrific images, being called a murderer, if that is
8 what your definition of effective is, yes, it was
9 effective for that.
10 BY MR. PRYOR:
11 Q.  Let's test that.  First of all, she didn't call
12 a murder.  She said you were supporting murder.  And
13 it is not even in this message, but okay.
14      She said you supported murder whenever you give
15 money to an organization that does something like
16 this.  That is what she said.  She didn't call you a
17 murderer.
18      MR. GREENFIELD:  Objection, your Honor,
19 he's testifying about what someone --
20      MR. PRYOR:  She testified.  I'm testing
21 her testimony.
22      THE COURT:  I will allow this question.
23      THE WITNESS:  Our union has not supported
24 abortion or Planned Parenthood by giving money or
25 union dues.

Page 504

1 BY MR. PRYOR:
2 Q.  Did your union support the march of Planned
3 Parenthood?
4      MR. McKEEBY:  Objection, that
5 mischaracterizes.  It is not the march of Planned
6 Parenthood.
7      MR. PRYOR:  I will rephrase.
8      THE COURT:  Sustained.
9 BY MR. PRYOR:
10 Q.  Did you support -- did the union support the
11 Women's March that was sponsored -- the premier
12 sponsor being Planned Parenthood?
13      MR. GREENFIELD:  Objection, your Honor,
14 again, mischaracterizes testimony that --
15      THE COURT:  I will allow it based on my
16 recollection of the testimony.
17      THE WITNESS:  Yes.
18 BY MR. PRYOR:
19 Q.  If you thought someone was doing something that
20 was murder, would you try and stop it?
21      Is that a hard question?
22 A.  I didn't say that a woman who makes a choice to
23 have an abortion is murder.
24 Q.  Listen to me question.  We are not even talking
25 about abortion right now.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 505..508

Page 505

1      If you think someone is doing something that is
2  murder, would you do something to try and stop it?
3          MR. GREENFIELD: Objection, your Honor,
4  relevance.
5          MR. PRYOR: Seems clearly relevant.
6          THE COURT: I will sustain it.
7  BY MR. PRYOR:
8  Q.  If you thought someone was engaging in conduct
9  that you could have -- first of all let's try this.
10 Someone is using your money to murder someone. You
11 got the hypothetical?
12 A.  Yes.
13 Q.  Would you say, Quit using my money to murder
14 someone? Would you do that?
15         MR. GREENFIELD: Objection, your Honor,
16 relevance.
17         MR. PRYOR: Seems on all fours.
18         THE COURT: I will sustain that objection.
19         MR. PRYOR: I'm sorry, did you sustain?
20         THE COURT: I did.
21         MR. PRYOR: Okay. All right. Your Honor,
22 I don't want to quibble with your ruling, but I'm
23 going try again. But if I -- if it's the whole area
24 --
25         THE COURT: Do you need a sidebar?

Page 506

1          MR. PRYOR: I'm sorry?
2          THE COURT: Do we need a sidebar?
3          MR. PRYOR: Yes, your Honor.
4          (Thereupon, the following proceedings were
5      had at sidebar:)
6          MR. PRYOR: I am so trying to be good
7  because I realize --
8          THE COURT: I get it. My concern here is,
9  it is speculation as to her, not at all as to
10 Carter. When Carter takes the stand, these are all
11 fair game, right? But asking any other witness,
12 Well, if you were in her shoes with her view of
13 life, wouldn't you believe it is protecting --
14         MR. PRYOR: This is not my question. My
15 question is her. I'm not wanting her to put herself
16 in Carter shoes. I'm wanting her to put her in her
17 shoes. If you were in a situation where you thought
18 someone was doing something, wouldn't you take
19 drastic action? That's my point.
20         THE COURT: I will allow you to ask it if
21 you clean up the phraseology.
22         MR. PRYOR: I'm going to try. I'm not
23 very good at this.
24         THE COURT: You can ask her as her, not
25 her as Carter. All right?

Page 507

1          MR. PRYOR: Absolutely. That is what I
2  meant.
3          THE COURT: Okay.
4          (Thereupon, the sidebar was concluded and
5      the following proceedings were held in open
6      court:)
7          THE COURT: All right. I will let you
8  reframe that question.
9  BY MR. PRYOR:
10 Q.  Okay. Ms. Stone, let me very clear. I'm
11 talking to you about you, okay? Not about
12 Ms. Carter, not about anyone else. You, the
13 president of the Local 556 at the time.
14         MR. GREENFIELD: Objection, your Honor.
15 Her or her as the -- may we sidebar on that?
16         THE COURT: If you want to.
17         (Thereupon, the following proceedings were
18      had at sidebar:)
19         MR. PRYOR: I think I get both, but okay.
20         MR. GREENFIELD: That is exactly what we
21 are talking about. Now you are talking about two
22 separate -- her as an agent of the union, that
23 combine the union, or her personally?
24         MR. PRYOR: Yeah, I want both.
25         THE COURT: Okay.

Page 508

1          MR. PRYOR: Of course.
2          MR. GREENFIELD: Then separate them out.
3          THE COURT: As long as you ask the
4  separate questions, then it is fine.
5          MR. PRYOR: Okay. I thought I said as her
6  profession. Okay. All right.
7          (Thereupon, the sidebar was concluded and
8      the following proceedings were held in open
9      court:)
10         THE COURT: Okay. You can proceed.
11         You may want to reask it, because I think
12 we all forgot.
13         MR. PRYOR: Yes.
14 BY MR. PRYOR:
15 Q.  Ma'am, if, as president of the Local 556 you
16 believe -- I'm talking about you now -- if you
17 believe -- and not in the situation of abortion, we
18 don't have to put it in that context -- if you
19 believe your union funds were being utilized for
20 murder, would you do something? Would you try and
21 take strong action to stop it?
22 A.  Yes.
23 Q.  And would you personally, if you thought your
24 money was being used to perpetrate murder, would you
25 say, Quit spending my money that way, and do it in

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 2 July 06, 2022                     Pages 509..512

Page 509

1 as forceful and an effective manner -- legal, of
2 course -- that you can?  Would you do that?
3        MR. GREENFIELD:  Objection, compound
4 question.
5        THE COURT:  Can you split it up?
6        MR. PRYOR:  I'm sorry, it was --
7        THE COURT:  Compound.  Can you split it
8 up?
9        MR. PRYOR:  Okay.  I will break it down.
10 BY MR. PRYOR:
11 Q.  So would you, if you thought your money was
12 being used to perpetrate murder -- you got the
13 example so far?
14 A.  Yes.
15 Q.  Would you, first of all, say, Stop spending my
16 money on murder?  Would you do that?
17 A.  Yes.
18 Q.  And would you, in the most effective means that
19 you could within the law, try and convince them to
20 stop doing that?
21 A.  Not if it is the way she did it.
22 Q.  Well, I didn't put it in the context of
23 abortion.  I understand what you want to say about
24 abortion.
25      But let's say that it is -- union money is

Page 510

1 going to Bangladesh and -- at a shoe factory and
2 little children are making shoes and they are --
3 several die every week.
4      Would you send a video and say, Look at these
5 conditions, look at this poor dying child?  Would
6 you do everything you could to save that child?
7        MR. GREENFIELD:  Objection, relevance to
8 children in Bangladesh, Your Honor.
9        MR. PRYOR:  She wanted an example, I gave
10 her one.
11        THE COURT:  I will allow it.
12 BY MR. PRYOR
13 Q.  I can give you more.
14 A.  I don't know what I would do in that situation.
15 Q.  You would not do everything you could to save
16 that child in Bangladesh, would you?  You wouldn't
17 show a video to someone to stop them from murdering
18 that child because it is too offensive, right?
19 A.  I wouldn't harass or threaten another person.
20 Q.  I'm asking about my example, ma'am.  In my
21 example, you are not going to use a video to save
22 that child because it offends your sensibilities
23 more that murder does, correct?
24 A.  I don't understand -- I don't understand the
25 question, that -- that last part of comparing that

Page 511

1 it offends me more than murder.
2 Q.  Since this the video you watched -- and it is
3 graphic.  And by the way, when this was posted on
4 her Facebook page, she put "graphic video" and so
5 you could decide to use it or not.
6      With Facebook Messenger, you already have to
7 decide.  It doesn't just start playing, but you say
8 you inadvertently clicked on it --
9        MR. McKEEBY:  Objection.
10 Q.  -- but that certainly was your inadvertence not
11 her intention.  She sent you something --
12        THE COURT:  Hold on.  We have got an
13 objection.
14        MR. McKEEBY:  I think I might have
15 several, but the one I got to up to say was
16 irrelevant -- excuse me -- hearsay.  He's testifying
17 about documents that are not in evidence.
18        THE COURT:  Sustained.
19        Start a new question.
20        MR. PRYOR:  Okay.  I can't even remember
21 the -- the -- okay.
22 BY MR. PRYOR:
23 Q.  The video that you received, you clicked on it
24 inadvertently, true?
25 A.  Yes.

Page 512

1 Q.  The video that was sent to you was sent to you
2 as a private message to Audrey Stone TWU, true?
3 A.  It was sent to me as a private message on
4 Facebook via messenger.  I have already said I don't
5 recall if it was Audrey Stone or Audrey Stone TWU at
6 that time.
7 Q.  It doesn't matter which to you, correct?  In
8 terms of the actions you took?
9        THE COURT:  Counsel, can I ask, can we
10 take our last break for the day right quick, and
11 then we will come back?
12        MR. PRYOR:  Yes.  Believe it or not, I'm
13 going to wrap up, I hope.
14        THE COURT:  So if you have got
15 five minutes or less?
16        MR. PRYOR:  Oh, I can't commit to that.
17        THE COURT:  Okay.  That's fine.  Then
18 let's take our last break.  Same three instructions:
19 Only talk to your fellow jurors, just not about the
20 case; don't talk to anyone else other than fellow
21 jurors or courthouse personnel; and don't do any
22 research about the case.
23      We'll see you in five minutes at 4:15.
24 All rise.
25      (The jurors exited the courtroom.)

Page 513

1    THE COURT:  And I have one question for
2 folks before witness is out of the room -- not about
3 the witness, just about other witnesses.
4    So you can go ahead and leave, Ms. Stone.
5 And then we will take our break right
6 quick.
7    (The witness exited the courtroom.)
8    THE COURT:  So my question for y'all is on
9 depo designations and order of witnesses in the
10 future.  I know we have gotten the rulings back on
11 objections to depo designations from Talburt and
12 Parker.  We are still working on Conlan, Sims,
13 Rutherford, Klenurne, Burdine.
14    What I'm asking is, triaging.  Who do you
15 think is next up?  I know Conlan was on a list for
16 today.  Obviously, we probably won't get to Conlan.
17 But who should we work on in order of prioritization
18 as far as getting written rulings back to y'all on
19 objections within your page line designations?
20    MR. PRYOR:  Your Honor, you are asking
21 us -- you have currently have done Talburt, and he
22 will be our next witness.
23    THE COURT:  Okay.
24    MR. PRYOR:  We don't have Mr. Nevarez.
25 After that we anticipate Mr. Parrott, a live

Page 514

1 witness.  Then we will read from the deposition of
2 Ms. Parker.
3    THE COURT:  Uh-huh.  Which we have on
4 file.
5    MR. PRYOR:  Okay.  I need to consult with
6 counsel.  I think it is important the time we are
7 spending with this witness for our case.  And I'm --
8 but I'm also mindful of our time limit.  And I
9 cannot tell the Court that we will not cut Conlan.
10 But if we were going to call him, he would be our
11 next witness.
12    THE COURT:  Okay.  So I have already
13 internally prioritized Conlan.  I'm just trying to
14 make sure Conlan is the right person to do next.
15 But have you got two or three others for me to
16 prioritize after Conlan?
17    MR. PRYOR:  I anticipate at least four
18 live witnesses after -- or five, even -- after
19 Conlan before you would get to Kleburne and Burdine.
20 And I think those are relatively short deposition
21 excerpts, and those are the only ones left.
22    THE COURT:  Okay.  So Sims and Rutherford,
23 we should not turn to?
24    MR. PRYOR:  Sims -- oh, your Honor, we
25 probably -- we designated Sims, but we have the

Page 515

1 opportunity to call him live.
2    THE COURT:  Okay.  Got it.  So Sims is
3 live.  And then Rutherford, are we thinking
4 Rutherford is last on priority or Rutherford will be
5 live?
6    MR. PRYOR:  I'm sorry?  They are saying
7 yes.  Kleburne and Burdine are the last two.
8    Okay.  And then Rutherford, what is the
9 Rutherford status, live or not priority?
10    MR. GILLIAM:  No, it would be by
11 deposition, if we get to her.
12    THE COURT:  Okay.  So we will put
13 Rutherford as the fourth depo to get to.  So I have
14 got Conlan, Kleburne, Burdine and Rutherford as the
15 depo designation objections to get to my
16 prioritization order.  Okay.  Thank you for helping
17 clarify that for me.
18    And then we can talk about Nevarez at the
19 end of the day.  Sound good?
20    MR. PRYOR:  Sure.
21    THE COURT:  Okay.  Now, let's take our
22 break, and we will see y'all at 4:15.
23    MR. GREENFIELD:  Your Honor, may we have a
24 brief sidebar before we break?
25    THE COURT:  Do we need a sidebar?  I mean,

Page 516

1 everyone is out.
2    MR. PRYOR:  What are we doing?
3    MR. GREENFIELD:  I would just prefer not
4 to be in front of the full gallery, but --
5    THE COURT:  Okay.  That's fine.
6    (Thereupon, the following proceedings were
7    had at sidebar:)
8    MR. GREENFIELD:  I don't want to object
9 the flow of counsel, but -- and I have tried to be
10 respectful, but his consistent use of sidebars and
11 testifying during his examinations, I find to be
12 abusive of proper cross-examination rules.  And I am
13 going to feel compelled to object more if he
14 continues to do it.  I have tried to give him
15 leeway, but I feel like it is getting worse and
16 worse, your Honor.
17    MR. PRYOR:  Let me say, this is obviously
18 a pivotal witness.  And it is a witness with a bent,
19 and I'm entitled to challenge this witness and I
20 think we have.  I don't think I have crossed the
21 line.  I do know that I have had several long
22 questions that the Court has sustained objections
23 on.  I can think of two or three.  But I'm not sure
24 what the point is being made here.  If I ask an
25 objectional question, I expect an objection.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 517..520

Page 517

1    THE COURT: I will say this, there is
2 always a fine line because you have to lead an
3 adverse witness, but you also cannot testify.
4        This also has the interesting implications
5 of being a key witness that is also going first.
6 All right? And so I'm trying to draw the line where
7 I draw it. Anytime you have had a three-line lead
8 up --
9        MR. PRYOR: Fair enough.
10       THE COURT: -- before you ask the question
11 mark, then, holy cow, I'm granting that, right?
12 Does that make sense?
13       MR. PRYOR: It does.
14       I just try to draw the line there.
15       MR. PRYOR: And, you know, part of it is
16 the heat of the battle. And I do recognize that the
17 questions need to -- I thought the questions, when I
18 summarized testimony and then got her to answer,
19 were fair.
20       And I think you allowed a couple of those.
21 But then certainly, there are ones that -- I get it.
22 And I appreciate that the Court sustained those.
23 And I'm not intending to violate a rule.
24       THE COURT: I'm not moving the line. I'm
25 not trying to get on to you for objecting. And the

Page 518

1 ones I think crossed the line, I sustained the
2 objection on.
3        MR. PRYOR: Sure.
4        THE COURT: So I think we are going to
5 keep plotting the course where we are plotting it
6 and the chips fall where they fall.
7        MR. PRYOR: Okay.
8        THE COURT: We will see you back here.
9        MR. GREENFIELD: That is why I wanted to
10 do it.
11       THE COURT: I appreciate that.
12       MR. PRYOR: I just say this for purposes
13 of warning, I'm going to play the video next.
14       THE COURT: Right into the break.
15       MR. GREENFIELD: Does the witness need to
16 watch this again?
17       MR. PRYOR: She doesn't have to watch it.
18       MR. McKEEBY: I'm going to play it for
19 her, if he doesn't.
20       MR. PRYOR: So, your Honor, she's
21 testified that she --
22       THE COURT: I can't make her open her
23 eyes, right? But if she looks away, then, you know,
24 I can't -- and the same thing with the jury, I can't
25 force them to keep their eyes on it.

Page 519

1        MR. PRYOR: I'm not -- I think that, given
2 the nature of this case, I have to do this. She's
3 testified she watched about three seconds of it.
4 I'm going to play three seconds.
5        MR. GREENFIELD: That is also not her
6 testimony.
7        MR. PRYOR: I believe it is.
8        THE COURT: A few seconds.
9        MR. PRYOR: She said as soon as she
10 realized what it was, she stopped it. That's
11 probably less than three -- three seconds is much
12 longer than that. I gave her the benefit. I think
13 she agreed.
14       THE COURT: I understand.
15       MR. PRYOR: Okay. I'm just letting
16 everyone know.
17       THE COURT: Question, do you want me to
18 forecast for the jury when we come back in? Or do
19 you want to the one --
20       MR. PRYOR: Yes. No, I think we -- we
21 should. I will do it in a preamble to my question,
22 but the Court doing it is fine.
23       THE COURT: Well, I'm going to tell the
24 jury, look, this is a question I asked, there are
25 going to be pictures, there are going to be videos.

Page 520

1 The video that you see cued up is --
2        MR. PRYOR: Will be a short clip.
3        THE COURT: -- before the day is over.
4        MR. PRYOR: It will just be the clip to
5 the extent she watched it.
6        THE COURT: I'll do it. That is my job.
7 Thank you.
8        (Recess.)
9        MR. GREENFIELD: He's intending to -- what
10 I heard is, to play what he thinks she watched, a
11 portion. If we are going to play the video, I think
12 we need to play the whole video. We don't know how
13 much she watched or not. She couldn't even recall
14 how much it was. So if we are going to play, lets
15 play the whole video.
16       MR. PRYOR: That is absolutely wrong. And
17 I, first of all, can play whatever I want. And
18 second of all, she said seconds. The video is over
19 three minutes long.
20       THE COURT: I think you're entitled to --
21       MR. PRYOR: I understand what he's trying
22 to do.
23       THE COURT: -- play all of it if you want
24 to.
25       MR. PRYOR: Okay. If he wants to do it in

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 81 of 642   PageID 11022
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                                    Vol 2 July 06, 2022
                                                                   Pages 521..524

Page 521

1  his case, we will be sure and talk about that.
2          THE COURT:  Appreciate that.
3          MR. GREENFIELD:  That's fine.
4          THE COURT:  Thank you.
5          (Recess.)
6          THE COURT SECURITY OFFICER:  All rise.
7          THE COURT:  Okay.  Anything before we get
8  the jury?  I will give that disclaimer when they
9  come in.  So you can bring them in.
10         (The jurors entered the courtroom.)
11         THE COURT:  All righty.  Thank you.  You
12 can be seated.
13         And, Mr. Pryor, you can approach the
14 podium.
15         While you do, I will remind the jury that
16 during jury selection yesterday, we talked about
17 this case can touch on sensitive topics like
18 abortion, that there are going to be graphic images,
19 videos.  Y'all saw the Facebook message with the
20 video queued up.
21         I understand from Mr. Pryor we are going
22 to play at least a few opening seconds of that
23 video.  So I am just warning you of that in advance.
24 It's part of the evidence.  The lawyers are entitled
25 to put it on, and so I'm letting them.

Page 522

1          So, Mr. Pryor, with that, you can continue
2  your questioning.
3          MR. PRYOR:  And just a couple of preamble
4  questions to that.
5  BY MR. PRYOR:
6  Q.  Ma'am, you previously told us you accidentally
7  hit play, and the moment you realized that it was
8  something you considered so offensive, you stopped
9  watching it, and you estimated that to be a few
10 seconds.  Is that fair?
11 A.  I thought I said I didn't recall how long, how
12 many seconds I watched it, but that I didn't finish
13 watching the video.
14 Q.  I understood you to say you realized
15 immediately it was offensive and stopped watching.
16 Is that fair?
17 A.  Quickly, yes.
18 Q.  Okay.  I'm going to play three seconds of the
19 video that you watched.  Three seconds is (snapping
20 fingers).  That is a long time if you are looking at
21 something and immediately realize it's offensive and
22 stop watching, true?
23 A.  I didn't say three seconds.
24        I don't recall.  I've testified repeatedly, I
25 don't know how long I watched it.  It was long

Page 523

1  enough to become upset, stopped watching it, and
2  have to go to the women's restroom to pull myself
3  together before I could board the flight I was
4  supposed to be on.
5  Q.  One of the things I wrote down, you told us you
6  immediately realized that it was offensive.  What
7  does "immediately" mean?
8          Are you trying to make us watch more of the
9  video than you watched, ma'am?
10 A.  I am not.  Southwest and the Union have argued
11 over the definition of "immediately" in the past,
12 and that is what is going through my mind.
13 Q.  I'm just asking you what "immediately" meant to
14 you sitting in the airport, you looked at it, and
15 immediately realized it was offensive and stopped
16 watching.
17         MR. GREENFIELD:  Objection, your Honor,
18 asked and answered.
19         THE COURT:  Sustained.
20 BY MR. PRYOR:
21 Q.  Is three seconds an unfair estimate?
22 A.  I don't know how many seconds it was playing.
23 Q.  All right.  Ma'am, you've seen this video.  And
24 I'm not asking -- I don't need you to watch it to
25 authenticate it if you do not want to watch it.

Page 524

1          It's part of the evidence in this case, and so
2  I'm going to play three seconds of this video.
3          (Thereupon, the video clip was played.)
4  BY MR. PRYOR:
5  Q.  Now, you were also sent a -- I'm looking for
6  the -- you know, when you sent your complaint, you
7  didn't include the Facebook message about the hats.
8  Did you?
9  A.  I don't -- I don't think originally.  I think
10 it was just the -- the still screen shots of the
11 video.
12 Q.  Okay.  So your email doesn't mention the
13 pictures of the women in the hats, and it is not
14 attached to Exhibit 66.
15         Do you know whether or not, at the time you
16 made your complaint, you even included the message
17 about the hats?
18 A.  In the original complaint, again, I don't
19 believe so.
20 Q.  Okay.
21 A.  It was provided later.
22 Q.  You don't think you included that, correct?
23 A.  Correct.
24 Q.  Subsequently, Southwest Airlines asked you to
25 send more information, didn't they?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                          Pages 525..528

Page 525

1 A.   Yes.  They asked me to send anything that she
2 had sent.
3 Q.   At that point, you included the message with
4 the pictures of the hats, true?
5 A.   I believe so.
6 Q.   By the way, when Southwest Airlines asked you
7 to go back and find messages from Ms. Carter, did
8 they tell you to only go back 18 months?
9 A.   I don't recall a specific time frame.  I think
10 they requested that I send any communication that I
11 had received via Facebook to the best of my ability.
12 Q.   Did you only send Facebook communications?
13 A.   I don't recall if, at that point, anybody asked
14 if there had been any communication through union
15 channels.  I know at some point I was asked that.  I
16 don't recall if it was at the initial -- in that
17 first, that first conversation.
18 Q.   Did you object to sending communications from
19 Ms. Carter that were union activity?
20        MR. GREENFIELD:  Objection, your Honor,
21 vague.
22        THE COURT:  Sustained.
23        Can you reframe it?
24 BY MR. PRYOR:
25 Q.   Did you review the communication -- first of

Page 526

1 all, when Ms. Carter sent you communications, did
2 you even read them?
3 A.   Not all of them, no.
4 Q.   Which ones did you read?
5 A.   I couldn't even tell you which ones I read,
6 there were so many.
7 Q.   And so at some point, did you stop reading
8 them?
9 A.   Yes.
10 Q.   And of the ones that you read, she was
11 complaining about things that you or the union were
12 doing, correct?
13 A.   Not always.
14        MR. GREENFIELD:  Vague, lacks specificity.
15        THE COURT:  I will allow it.
16 BY MR. PRYOR:
17 Q.   You are going to tell us that we are going to
18 see an email or a Facebook communication from her
19 where she's not talking about a complaint about the
20 union, true?
21 A.   To my recollection, she sent things quoting --
22 quoting someone, like somebody's, like, hierarchy
23 levels.  There were memes, there were pictures.
24 Some of the stuff was campaign related.  Some if it
25 was complaining about the union.  It was a variety

Page 527

1 of things.
2 Q.   We will go through them, and you can point to
3 the ones that don't relate to her complaints about
4 the union, okay?  Because there are going to be a
5 lot, right, from what you just swore to.
6 A.   I didn't say there were a lot.  I said there
7 were a lot of messages.
8 Q.   I must have misunderstood.
9        Let's look at -- I think it's Exhibit 15.
10        MR. PRYOR:  I move for its admission.
11        THE COURT:  This is 15?
12 BY MR. PRYOR:
13 Q.   So this is an email --
14        THE COURT:  Hold on.
15        I've got Union prior objections to 15.  I
16 can rule on those unless you want a sidebar.
17        MR. PRYOR:  What is the objection?
18        THE COURT:  Hearsay.
19        MR. GREENFIELD:  I think that falls under
20 a previous ruling you found on that, your Honor, so
21 I don't need a sidebar.
22        THE COURT:  Okay.  So I will overrule
23 those objections.  15 is in evidence and we can
24 publish.
25

Page 528

1        (The referred-to document was admitted
2        into evidence as Plaintiff's Exhibit 15.)
3 BY MR. PRYOR:
4 Q.   So Exhibit 15 is an email from you on
5 February 25th, 2017.
6        By the way, let's back up for a minute.
7        On February 22nd, the day that you made your
8 complaint, it's your testimony you didn't know
9 anything about other complaints being made about
10 other union members by the union to Southwest
11 Airlines?
12 A.   At that time, no.
13 Q.   At that time?
14 A.   No.  I don't remember other complaints.
15 Q.   You don't remember.
16        When do you remember becoming aware of it?
17 A.   I became aware of things if I heard chatter in
18 the grievance office, if someone brought forward a
19 question to me.
20 Q.   Chatter.  How about emails?
21 A.   Sometimes it was emails from people.
22 Q.   We are going to look at some documents, ma'am.
23        I'm asking you now, do you remember that in
24 February of 2017, in the time period in which you
25 made your complaint against Ms. Carter, that your

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                              Pages 529..532

Page 529

1 union cohorts were making complaints against recall
2 petitioners including Ms. Carter?
3 A.  I don't remember.
4         MR. GREENFIELD:  Objection, your Honor.
5 He's testifying.  Lack of foundation.
6         THE COURT:  I will sustain.
7 BY MR. PRYOR:
8 Q.  Are you saying at some point you became aware
9 of it?
10        MR. GREENFIELD:  Objection, your Honor,
11 same.
12        THE COURT:  I will allow it.
13        THE WITNESS:  There were numerous time
14 periods where social media activity was high and
15 there were a lot of investigations going on.  I
16 don't know about any specific investigations that
17 you are -- I don't know what you are asking about.
18 BY MR. PRYOR:
19 Q.  As union president, if one of your core team
20 members gathered information on the Internet about
21 half a dozen or more union members that were part of
22 the recall petition against your administration,
23 gathered all that up and reported them to American
24 Airlines for social media violations, you are
25 telling us you are not aware of that at any time

Page 530

1 until right now?
2         MR. GREENFIELD:  Objection, your Honor.
3 Lack of foundation.  Aware of it until right now?
4 Thee's been no evidence.
5         THE COURT:  I will allow it.
6         MR. McKEEBY:  Can they at least get the
7 right airline?  For Southwest.
8         MR. PRYOR:  Did I say American Air?
9         THE COURT:  Old habits.
10        MR. PRYOR:  I represented American
11 Airlines for about 10 years in another life.  And I
12 apologize.  I apologize to Southwest or American,
13 I'm not sure who I'm offending, and I greatly
14 apologize.
15 BY MR. PRYOR:
16 Q.  Let me ask the question again.
17        Are you telling us you never became aware that
18 in February of 2017, that your core team members
19 were reporting recall petitioners to Southwest
20 Airlines for violations of social media policy after
21 having scoured the Internet looking for violations?
22        MR. GREENFIELD:  Objection, your Honor,
23 compound.
24 BY MR. PRYOR:
25 Q.  Did you ever become aware of that?

Page 531

1         THE COURT:  Objection?
2         MR. GREENFIELD:  Compound, your Honor.
3         THE COURT:  I will allow that.
4         You can answer.
5         THE WITNESS:  There were flight attendants
6 that reported things to Southwest that I
7 did not know about that they didn't talk to me about
8 in advance that I would eventually become aware of
9 through a variety of means.
10        I cannot right now recall specifics about
11 other people reporting flight attendants at this
12 exact same time.
13 BY MR. PRYOR:
14 Q.  Is that your way of saying you don't remember?
15 A.  Correct.  I don't -- I don't recall every
16 social media case and when it happened, nor was I
17 dialed in.
18 Q.  I'm talking about the people that were opposing
19 you, trying to recall you, that your core team
20 members gathered information against them and
21 reported them to Southwest Airlines.
22        I'm not talking about all types of different --
23 I'm talking about this specific instance.  And you
24 wouldn't remember the union reporting over half a
25 dozen union members?

Page 532

1         MR. GREENFIELD:  Objection, your Honor,
2 asked and answered.
3         THE COURT:  Sustained.
4 BY MR. PRYOR:
5 Q.  I take it you don't.
6         MR. GREENFIELD:  I renew my objection.
7         THE COURT:  I sustained it.
8         MR. PRYOR:  Let's look at Exhibit 15.
9 BY MR. PRYOR:
10 Q.  And you sent this to Denise Gutierrez at
11 Southwest Airlines along with Suzanne Stephensen, Ed
12 Schneider, and Brett Nevarez, correct?
13 A.  Yes.
14 Q.  And you say that "These are screen shots of
15 every message Charlene Carter has sent me via
16 Facebook."  True?
17 A.  Yes.
18 Q.  Okay.  Let's look at them.
19        The next page.  Well, this may work.
20        "Well, Audrey, it looks like you have stepped
21 in dog poo" --
22        By the way, this is March 4, 2015.
23        You got the time frame?
24 A.  Yes.
25 Q.  "Well, Audrey, it looks you all have stepped in

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 533..536

Page 533

1 dog poo big time.  Funny how that happens when there
2 is little to no integrity with our leadership in
3 TWU.  No one is buying your apology except maybe
4 your hardcore followers."
5     Isn't she talking about the apology that you
6 made regarding the core team members?
7        MR. GREENFIELD:  Objection, speculation.
8 BY MR. PRYOR:
9 Q.  Is that the context?
10        THE COURT:  I will allow her to answer if
11 she has personal knowledge.
12        THE WITNESS:  I'm assuming so.
13 BY MR. PRYOR:
14 Q.  I'm sorry?
15 A.  I said I'm assuming so.
16 Q.  Okay.
17     But in any event, you issued an apology for all
18 of the horrible things that were said by your core
19 team members on your secret core team Facebook, and
20 Ms. Carter is calling you on it.  She's Facebook
21 messaging you about it and says she's not buying it.
22     That's complaining to her union, that's union
23 activity.
24     Do you agree?
25 A.  Yes.

Page 534

1 Q.  Okay.  Well, let's keep looking.
2     So it says on the next page -- and you can read
3 any excerpts you want, by the way.
4     The next page is "I have experienced the hate
5 before from a few of your board members and staunch
6 supporters, along with threats that are being
7 brought against me for saying the word 'decertify,'
8 even though Brett, who made that threat, did try and
9 decertify from TWU years ago."
10     I think earlier I said Cuyler Thompson, so it
11 must have been Brett Nevarez.
12     But nonetheless, this is a union member
13 communicating with you again about the hateful words
14 that were used on your core team and is complaining
15 about it and about her personal experience with the
16 union.
17     That's union activity that's protected, in your
18 opinion, true?
19        MR. GREENFIELD:  I would like, your Honor,
20 to object to this portion as hearsay without an
21 instruction to the jury that this is not being asked
22 for for the truth of the matter asserted, that
23 these --
24        THE COURT:  If you've got a speaking
25 objection, you can go for it at sidebar if you want

Page 535

1 to.  I think I know what it is.
2        MR. GREENFIELD:  I apologize.
3        THE COURT:  So I will overrule that
4 objection.  You can continue.
5 BY MR. PRYOR:
6 Q.  You can answer.
7 A.  Yes.
8 Q.  Union activity, ma'am?
9 A.  Yes.
10 Q.  And you believe it is protected union activity,
11 that she's entitled to do that, true?
12 A.  This, yes.
13 Q.  Okay.  Let's go to the next page.
14     It says, "Vote everyone out of office the next
15 election cycle.  Pray that happens from a member who
16 still pays dues, just objects to paying for the TWU
17 liberal political stuff and the sheer disrespect you
18 show to members that do not agree with you."
19     Once again, that's union communication,
20 complaining about her union, and you believe it's
21 protected, true?
22 A.  Well, it's inaccurate.  She wasn't a member at
23 this point.
24 Q.  You can disagree with her, ma'am.  I'm not
25 saying you have to agree with a single things she

Page 536

1 says.  I'm saying you agree that it is union
2 activity and she has the right to say it?
3 A.  Sure.
4 Q.  Sure.  But you send it to Southwest Airlines
5 for them to take action against her.  You know it is
6 protected, you are the union president, and you send
7 it to Southwest Airlines.  Didn't you?
8        MR. GREENFIELD:  Objection, your Honor,
9 mischaracterizes.
10     Can I approach?
11        THE COURT:  I will sustain that.
12 BY MR. PRYOR:
13 Q.  Did you, in fact, intentionally send to
14 Southwest Airlines protected activity of Ms. Carter
15 for them to take action against her?
16 A.  No.
17 Q.  So you didn't expect them to take action for
18 this, right?
19 A.  I sent this to comply with their request that I
20 send messages.
21 Q.  You are a union president, ma'am.  You can say
22 no to a request that you gather union activity and
23 send it to the management of Southwest Airlines to
24 take action against a union member for engaging in
25 protected union activity.  You could have done that,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 85 of 642   PageID 11026
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Pages 537..540

Page 537

1 true?
2        MR. McKEEBY:  Objection --
3        THE COURT:  Hold on.
4        MR. McKEEBY:  -- foundation, and it talks
5 about the intent of Southwest Airlines, or the
6 question does.
7        MR. PRYOR:  I'm talking about her.
8        THE COURT:  Hold on.
9        I will overrule that.  You can answer the
10 question.
11        THE WITNESS:  I could have refused to send
12 any additional messages, yes.
13 BY MR. PRYOR:
14 Q.  And if you wanted to protect a union member's
15 protected union communications, you would have done
16 that, wouldn't you?
17 A.  I was trying to protect myself from being
18 harassed further.
19 Q.  You were trying to protect yourself by sending
20 union-protected activity to Southwest Airlines about
21 a union member.  That is protecting yourself?
22 Violate your union obligations to protect yourself?
23     Do you have an answer or can I go on?
24        MR. GREENFIELD:  Objection, your Honor.
25 Assuming facts not in evidence about certain

Page 538

1 obligations, that's something that should be in the
2 province of the jury.
3        THE COURT:  I will sustain.
4        I sustained.  New question.
5        MR. PRYOR:  Okay.
6 BY MR. PRYOR:
7 Q.  Let's look at the next page.
8    It says, "Hmm.  Didn't you say in your apology
9 letter that the group where all of the hate was
10 spewed was started by your supporters?"
11    Once again, she's talking about union activity
12 and complaining about what her union is doing.  And
13 that is protected union activity, true?
14 A.  Yes.
15 Q.  Yes?
16 A.  Yes.
17 Q.  And then the next page.  "Talking
18 disrespectfully about members, but y'all allowed it
19 to happen.  That sure says a lot about the true
20 character of each of you."
21    Again, she's complaining about her union,
22 right?
23 A.  Yes.
24 Q.  I'm sorry, I can't hear you.
25 A.  Yes.

Page 539

1 Q.  And the next page says, "I opted out of this
2 union.  It has been going on a long time.  I should
3 know, since I have all of the transcripts from
4 Melissa Smith's trial that I testified.  You are all
5 a product of what is wrong with our union."
6    Once again she's complaining about her union,
7 right?
8 A.  Yes.
9 Q.  And, in fact, she's talking about a current
10 event.  She's complaining about the core team
11 publications that came out showing improper activity
12 for which you apologized and she's complaining
13 about, true?
14 A.  Yes.
15 Q.  These didn't come out of the blue.  There was
16 an event that precipitated it, true?
17 A.  Yes.
18 Q.  And when she talks about Melissa Smith, she's
19 talking about Melissa Smith that got kicked out of
20 office in 2000 by the union after being elected by
21 the members, and she's upset about it, true?
22        MR. GREENFIELD:  Objection, your Honor.
23 He's testifying.  There's been no evidence
24 presented.
25        THE COURT:  Sustained.

Page 540

1 BY MR. PRYOR:
2 Q.  Do you know that that is what she's referring
3 to?  Is that how you understand the context of what
4 she's saying?
5 A.  Talking about Melissa Smith's trial.  Yes, I
6 don't know anything about -- I mean, I wasn't even
7 working at Southwest at that time.
8 Q.  It certainly is her complaining to her union
9 about a current event, true?
10 A.  Melissa Smith's trial?
11 Q.  No, about the context of it.  Saying, this is
12 why I opted out, because of all of the horrible
13 things that you guys are doing.
14    And it is in the context of it coming out about
15 what all your core team members were saying about
16 fellow flight attendants that are union members.
17        MR. GREENFIELD:  Objection, your Honor.
18 He's testifying and lack of foundation.  Again,
19 about what all her union --
20        THE COURT:  I will allow this one.
21        THE WITNESS:  It's what the message
22 started out as.
23 BY MR. PRYOR:
24 Q.  Well, it certainly is still talking about union
25 activity, true?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 86 of 642   PageID 11027
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 2 July 06, 2022                        Pages 541..544

Page 541

1 A.  Yes.
2 Q.   And then the next page.  "Corruption at its
3 best.  You should be proud of yourselves."
4      She's got a picture of your core team there.
5 That is part of your core team.  Oh, there you are,
6 Audrey Stone.  Oh.  That says "Audrey Stone, TWU."
7 What is that?  What is that?
8 A.   A Facebook.
9 Q.   Oh.  So you are using -- I thought you didn't
10 use Audrey Stone, TWU.
11 A.   That's not what I said.
12 Q.   Oh, I thought it was very rare.  It turns out
13 you used it on the core team, right?
14 A.   I never said that.
15 Q.   So you never used it on the core team or you
16 did?
17 A.   I utilized it some on the core team.  I never
18 said that I didn't use it.
19 Q.   Okay.  So once again, this is a current event,
20 complaint about her union from Ms. Carter to the
21 president of her union, true?
22 A.   Yes.
23 Q.   And, in fact, it was sent to Audrey Stone, TWU,
24 right?  That is what you had at the time.
25 A.   Yes.  This was right afterwards and I hadn't

Page 542

1 changed it yet.
2 Q.   By the way, she was an objector.  Frankly, even
3 if she wasn't an objector, you could have blocked
4 her if you wanted to, right?  Get someone to block
5 her if you don't know how.  But you know you can
6 block people.
7 A.   Yes.
8 Q.   And you chose not to because she's sending you
9 union complaints, and as union president, you
10 shouldn't turn a blind eye to that, whether it is
11 from an objector or a member, right?
12 A.   I chose not to block her at that time.  It's
13 something I regret.
14 Q.   And then the next page, there is your core team
15 member again.  She's talking about she's now read a
16 lot of these horrible things that were said there,
17 and she's upset, and she says, "I see you and your
18 board.  Such a shame.  Moral bankruptcy."
19      And then she sends you an article explaining to
20 you what morals are, right, in the context of her
21 telling you, our union lacks morals.  That is her
22 exercising her union right, true?
23 A.   Yes.
24 Q.   And that goes on for a few pages.  And then --
25      By the way, then there are some blank pages.

Page 543

1 Do you know why there are blank pages?
2 A.   No.  It looks like there were photos on the
3 left that aren't being loaded or displayed.
4 Q.   Do you know what those were or are?
5 A.   No, I don't recall.
6 Q.   Let's go to the next page that has some writing
7 on it.
8      Then it says -- it's -- I don't know how to
9 tell you what.  It's the page after that one.
10      It says, "This came from a friend of mine in
11 Denver who also had the pleasure of the disrespect
12 from a few of this unelected board."
13      When she says "unelected board," she's talking
14 about your officer team, correct?
15 A.   I assume so.
16 Q.   Okay.  I understand there are a few other
17 unelected boards in the history of your local union.
18 But this, in the time frame that we are talking
19 about, was referring to you and your board, correct?
20      You don't have to assume.  You understand that.
21 A.   Members of my board.  It wasn't the whole
22 board.
23 Q.   Now, she's complaining once again about the
24 unelected board, okay, and praying that you will be
25 voted out.  She's talking now about that she hopes

Page 544

1 you get voted out.
2      That is a union activity, she's entitled to
3 suppress her opinion, and it's topical, given what
4 had just happened.  Do you agree?
5 A.   Yes.
6 Q.   And you sent it to Southwest Airlines for them
7 to take action.  That was your intent in sending it?
8 A.   No.  I sent it to Southwest Airlines at their
9 request as part of their investigation.
10 Q.   No, ma'am.  Just a moment ago you said, "I sent
11 it to protect myself."  That's what you said.
12      No, no.  But now you are telling me, no, I did
13 it because I was ordered to.  Which is it?
14 A.   I said earlier it was at their request, and I
15 felt like I had been harassed with that last batch
16 of things she had sent me, and this was sent at
17 their request as part of that.
18 Q.   Do you feel like you are being harassed today?
19 A.   This entire process has absolutely made me feel
20 like I've been harassed.
21 Q.   Do you feel like I'm harassing you by
22 confronting you with evidence and making you respond
23 to it?
24 A.   Oh, I think you have been very aggressive and
25 twisted my words throughout today.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 87 of 642   PageID 11028
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                      Vol 2 July 06, 2022                                   Pages 545..548

Page 545

1  Q.  Which words?  Tell me a word I twisted.  You
2  get to rephrase it.  Let's go for it.
3         MR. GREENFIELD:  Objection, your Honor.
4         THE COURT:  Sustained.
5  BY MR. PRYOR:
6  Q.  What words have I twisted?
7         MR. GREENFIELD:  Objection, your Honor.
8  It's the same question.
9         THE COURT:  I will allow this one
10  question.
11         THE WITNESS:  One of the exhibits earlier,
12  you were twisting the words to say that Cuyler had
13  threatened her, versus the actual sentence that was
14  in the exhibit.
15  BY MR. PRYOR:
16  Q.  Fair enough.
17      It turns out I was wrong.  It wasn't your
18  secretary officer that threatened Ms. Carter, it was
19  the vice president, Brett Nevarez, that threatened
20  her.  I apologize for my mistake.
21         MR. GREENFIELD:  Objection, your Honor.
22  Lack of foundation.  That evidence has not been
23  presented at any point during this trial.
24         MR. PRYOR:  It is what she just said.  She
25  said it should have been Nevarez, not Cuyler.

Page 546

1         THE COURT:  I'll overrule the objection.
2  Ask a new question.
3  BY MR. PRYOR:
4  Q.  Let's look at the next page.
5      And she's forwarding you something that someone
6  had sent that's -- she says that she wants to vote
7  you out of office so we can bring back truth,
8  transparency, integrity and unity.
9      And she has included in this string, it's not
10  from her, but someone posted "Fucktard.  I voted
11  Brett Nevarez because he respects me."
12      That is a commentary on the "fucktard" language
13  used about flight attendants in the core team, true?
14  A.  Yes.
15  Q.  And so once again, she's pointing out with a
16  visual the improper activity of her union, in her
17  opinion, true?
18  A.  Yes.
19  Q.  Let's look at the next page.
20      By the way, I keep looking for -- you told me
21  that none -- I can keep going through all of this.
22  It all relates to union activity, ma'am.
23  A.  I never said none.
24  Q.  I thought you did.  I thought you said there
25  were memes.  I thought you said there were things

Page 547

1  unrelated.
2      In fact, isn't it your testimony that every
3  communication you received from Ms. Carter related
4  to her complaints about the union?
5  A.  No, I do not believe some of these things --
6  Q.  Let's keep looking then.  So far we have seen
7  topical, timely, complaints about her union.  True?
8  A.  No.  I don't think it's timely.  I don't think
9  bringing up a trial, a union event that took place
10  22 years ago is timely.
11  Q.  So she's raising it as an example of the
12  continued corruption of her union in regard to
13  something that had just occurred, and she's saying,
14  wow, this is typical.  This is -- you guys have done
15  this before.
16      And you are saying that is not topical, to
17  raise that issue?
18         MR. GREENFIELD:  Objection, your Honor.
19  He's testifying about what Carter was intending with
20  these messages.
21         THE COURT:  Hold on.  Hold on.  Speaking
22  objections.
23         MR. GREENFIELD:  Sorry, your Honor.
24         MR. PRYOR:  I'm testing her answer.
25         THE COURT:  I will allow this question.

Page 548

1         THE WITNESS:  I didn't say it wasn't
2  topical.  I said I didn't think it was timely.
3  BY MR. PRYOR:
4  Q.  So let's look at the next page.  It says, "This
5  is what radical unions like TWU use to get their
6  way, smart things being used by this unelected
7  board.  But people are waking up to the tactics and
8  some day the chickens will come home to roost.
9  Praying to God it comes sooner than later."
10      Once again, she's talking about her complaints
11  about the union, true?
12  A.  Yes.
13  Q.  And then she says "radical unions," and then
14  she gives you examples from Alinsky as to what the
15  rules for radicals are to further make her point
16  that her radical union is not representing her.
17      Do you see it?
18  A.  I see some of it.
19  Q.  I can bring you a copy of this exhibit if you
20  want.
21      That is what she's doing, right?
22      I can read it.
23  A.  I'm looking at it.
24  Q.  Okay.  Is that what she's doing?
25  A.  Would you repeat the question, please?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                          Pages 549..552

Page 549

1  Q.  Yes. She's telling that you what you guys are
2  doing is radicalizing the union, and then she's
3  giving you examples of what radicalization means
4  through the rules that she's going through.
5       It is relating to her complaints about her
6  union, to show that what you are doing is
7  radicalizing the union.
8       You don't have to agree with her, but that is
9  what she is doing.
10 A.  I don't. I think that's what she was intending
11 to do.
12 Q.  You think what?
13 A.  I said I don't agree. I think that is what she
14 was intending to do.
15 Q.  Okay. I understand you don't agree with her,
16 but she's complaining to her union about being
17 radicalized and giving examples of what
18 radicalization means, right?
19 A.  Yes.
20 Q.  All right. Then let's go to the page that
21 says, "My attorney called it blatant discrimination.
22 I wonder who on the EB called in this favor for
23 Brian."
24      You know what this one is about, don't you?
25 A.  I think so.

Page 550

1  Q.  You don't?
2  A.  I said I think so.
3  Q.  Okay.
4       And what happened is Brian Talburt violates
5  social media policy and he doesn't lose his job.
6  And she's saying that is blatant discrimination.
7       Your core team member gets off the hook --
8       MR. McKEEBY:  Objection, your Honor,
9  relevance.
10      THE COURT:  Hold on. Sustained.
11      MR. PRYOR:  To the complaint being made?
12 Okay.
13 BY MR. PRYOR:
14 Q.  What do you understand this to be about? Is it
15 relating to her complaints about the union and union
16 members and how some are treated differently than
17 others, in her opinion?
18 A.  That is what she's claiming, yes.
19 Q.  Is she allowed to raise that complaint?
20 A.  She can, yes.
21 Q.  And in fact it's timely, it's talking about an
22 event that just happened, true?
23 A.  Yes.
24 Q.  So far we have seen timely complaints about the
25 union.

Page 551

1       Let's look at the next page.
2       She's saying, "Hmm. It looks like there is
3  another group that is not happy with TWU. TWU Local
4  577 is now attempting to decertify. This letter
5  below from Local 577, contract negotiators, they
6  quit."
7       She's pointing out that the transportation
8  workers union that she's complaining about, that
9  other people are complaining too, and she gives you
10 an example. True?
11 A.  Yes.
12 Q.  It sounds like union activity, doesn't it?
13 A.  Yes.
14 Q.  So that goes on for a couple of pages.
15      Let's see where the next thing is.
16      Let's look at the page -- it's hard to read.
17 It looks like SWA 612. It looks like that is where
18 we pick up.
19      And she says, "Hey, where did Mr. Talburt go?
20 Will there be another favor called in? And to think
21 you condoned his behavior, along with Brett and the
22 rest, really shows your lack of morals. Praying
23 that changes."
24      Once again she's complaining about her union,
25 right?

Page 552

1  A.  She's talking about someone -- a flight
2  attendant's investigation, and complaining about, I
3  guess two of us involved with the union. So yes.
4  Q.  So let's see. She's complaining about
5  Mr. Talburt, your core team member, who is involved
6  in the inappropriate communications that she's
7  complaining about. Brett Nevarez, an officer, the
8  same thing, and she's sending it to you.
9       And you are telling us that is not complaining
10 about the union, this is talking about something
11 completely unrelated.
12 A.  That is not what I just said.
13 Q.  So it is union related, correct?
14 A.  Yes.
15 Q.  And then, lo and behold, the next page, she
16 says, "Well, well, well. Brian is back and so many
17 more."
18      MR. PRYOR:  Your Honor, may I approach?
19      THE COURT:  You may.
20      (Thereupon, the following proceedings were
21 had at sidebar:)
22      MR. PRYOR:  Your Honor, I would ask --
23 give whatever limiting instruction you want.
24      But my client is sending her -- these are
25 the messages they fired her for. She's sending a

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 89 of 642   PageID 11030
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 2 July 06, 2022                     Pages 553..556

Page 553

1  union complaint saying -- let me finish -- that,
2  hey, what Brett Nevarez is doing, he had been
3  charged with something, and she predicts, oh, yes,
4  he will get off.  And sure enough, that is what her
5  next text says.  He gets off.
6       That is the substance of her opinion and
7  what she's writing --
8       THE COURT:  You're very loud right now.
9       MR. PRYOR:  Okay.  I apologize.
10      THE COURT:  You only have to be picked up
11 by the mic, not by the jury.
12      MR. PRYOR:  I'm sorry.  It's not my
13 intent.
14      THE COURT:  Understood.
15      I mean, so I think it's already come in,
16 right, against my wishes.
17      MR. PRYOR:  If it came in against your
18 wishes, I will not --
19      THE COURT:  So I mean I'm not inclined to
20 bring it up to a fifth time.  The jury has already
21 heard it, that he got reinstated.  So I think
22 they've heard it.  I don't think we need to --
23      MR. PRYOR:  I will not say it again then.
24      If it came in over your ruling, I also
25 want to mention --

Page 554

1       THE COURT:  This is a good stopping
2  point --
3       MR. PRYOR:  Okay.  I'm done.
4       THE COURT:  With it being 5:00, are we
5  near a breaking point?
6       MR. PRYOR:  Sure, you can stop any time.
7  But I'm going to finish in another -- I don't want
8  to say 30 more minutes, but I have got some more
9  time with her.
10      THE COURT:  Can you finish by 5:10?
11      MR. PRYOR:  No, sir.
12      THE COURT:  Then let's break here and come
13 back tomorrow at 9:00.
14      MR. PRYOR:  Yes.
15      (Thereupon, the sidebar was concluded and
16    the following proceedings were held in open
17    court:)
18      THE COURT:  It is 5:00, so we are going to
19 let y'all go.
20      So we will come back here at 8:45 in the
21 morning, get on the record, and going by 9:00.
22      So same instructions as always.  Only talk
23 to your fellow jurors and court personnel, just not
24 about the case.  Don't talk to anyone else.  And
25 please keep an open mind and don't do any research

Page 555

1  on the case.
2       All rise for the jury.
3       (The jurors exited the courtroom.)
4       THE COURT:  All right.  You are excused,
5  but you still can't talk to anyone about the case.
6       I'm sorry that we are carrying you over to
7  tomorrow.  We will see you tomorrow at 9:00.  Thank
8  you, Ms. Stone.
9       Okay.  I will wait and we will take up any
10 other issues y'all have once she's out.
11      (The witness exited the courtroom.)
12      THE COURT:  All righty.
13      Anything we should talk about?  I know
14 Nevarez.  Any peep on Nevarez?
15      MR. McKEEBY:  No.  We sent him another
16 communication today.
17      THE COURT:  Okay.  I guess the deadline is
18 tonight at 11:59.
19      MR. GREENFIELD:  And a joint one last
20 night as well.
21      THE COURT:  Right.  Nothing.
22      So here is my read on a path forward on
23 Nevarez.  So I think what I would need to do next is
24 set a show cause order out.  It's awkward to send a
25 show cause setting a hearing for someone who is

Page 556

1  beyond 100 miles.  I could do it, or say, in the
2  alternative, explain in writing your delay if you
3  choose not to show at the hearing and do it in sworn
4  form.
5       The problem is, once I have a failure to
6  respond to a show cause order, the next remedy is a
7  motion for contempt.  But then if he's not within
8  100 miles, I would have to transfer to a judge who
9  is within 100 miles of him.  All right.  And we see
10 what that judge does on their timelines.
11      So my request will be, let me know at
12 8:30 in the morning if there has been any
13 development on Nevarez.  I will draft a show cause
14 order.
15      And then if I do it and he fails to
16 respond tonight and fails to respond to the time I
17 set in the show cause order, then I will ask if
18 Carter wants to file an appropriate motion and have
19 me transfer it to a judge wherever he's at.
20      And then I need information from Southwest
21 and the Union on where Nevarez would be at, right?
22 Because I don't know who to transfer it to if I
23 don't know his schedule.
24      MR. CLOUTMAN:  He lives in Las Cruces, New
25 Mexico.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 2 July 06, 2022                        Pages 557..560

Page 557

1    THE COURT:  Las Cruces, New Mexico.  Okay.
2    MR. CLOUTMAN:  I believe there is a
3  district court sitting there, or Albuquerque.  He
4  rotates through there.
5    THE COURT:  Okay.  Any thoughts, comments
6  on that course of action?
7    MR. PRYOR:  I have a comment.  To me, it
8  is two issues.
9    Certainly Mr. Nevarez, I agree that's the
10  procedure that has to be followed with a
11  miscellaneous proceeding, but there is also the
12  issue of the order to Southwest Airlines and the
13  Local 556.
14    They have control of this person.  They
15  should have produced him.  I understand they are
16  saying, We can't get ahold of him.
17    Well, that is pretty convenient about a
18  witness that has got a lot of bad testimony to give
19  in this case, and we would ask for our relief in
20  that regard.
21    THE COURT:  I understand.
22    And my point is we are not there yet.  I'm
23  still trying to obtain his testimony.
24    And if another judge can secure his
25  attendance via a marshal and some shackles, if there

Page 558

1  is a judge within 100 miles of him and the judge
2  issues a contempt ruling, then the marshals will
3  take that out and bring him in, in leg irons.  And
4  so he could sit for a depo there or for live
5  testimony by Teams there, right?
6    So we are still looking at securing his
7  testimony.  The question is how do we do that?
8    If we can't, then I need to look at
9  alternate remedies.  I need to look at do I assume
10  the questions that you asked him would be answered
11  the way that you would want them answered.
12    I haven't thought through that yet because
13  I'm not there yet.
14    MR. PRYOR:  Thank you.
15    MR. McKEEBY:  There will be the
16  opportunity to argue that, I trust.
17    THE COURT:  Of course.  Absolutely.
18    Okay.  Any other issues?  I have got my
19  prioritization on depo designations and who is up
20  next.  So we are looking at Conlon and Kleburne and
21  Burdine and Rutherford.
22    MR. GOTTFRIED:  Your Honor, we have
23  out-of-town witnesses, and I don't know exactly
24  their schedules in terms of the duration of their
25  stay in Dallas.

Page 559

1    But I would like to get a better sense of,
2  in particular, when they intend to call Ms. Emlet
3  and Mr. Schneider.
4    And I guess also generally, maybe a bit
5  more precision as to the witnesses.  Last night we
6  got a -- email indicated that they would be
7  calling today, I think, six different witnesses, and
8  we are not even through one.
9    So I would ask that they give us a little
10  bit better notice and specifically tell us with
11  respect to these out-of-town witnesses when they
12  intend to call them.  They need to be done this week
13  if at all possible.
14    THE COURT:  Understood.
15    What can y'all tell us at this point in
16  time, especially as it relates to the
17  out-of-towners?
18    I know when it comes to in-towners, I put
19  the burden on y'all for 6:00 at night.  We're not
20  far from that, so you will have to tell us soon.
21    But on the out-of-towners, what can you
22  tell us as far as the run of show and when you can
23  expect to call them?
24    MR. PRYOR:  We gave them our list of
25  witnesses in order; that is still the case.

Page 560

1    I don't have the email in front of me.
2    But we will call Mr. Talburt after
3  Ms. Stone.  We would then call Mr. Nevarez, although
4  that does not appear likely.
5    We will then call Mr. Parrott.  Then
6  Parker, by deposition.  Conlon, possibly by video.
7  Possibly Mr. Sims.
8    And that may be after I talk to the Court
9  about time.  And if there is not going to be time,
10  then we may cut Mr. Sims.
11    Mr. Schneider will be called.  That would
12  be the next witness.
13    Basically giving our trial strategy away
14  here to try and satisfy that request.  That is
15  pretty far down the line.
16    THE COURT:  So is Hamlet on the list?  I'm
17  just trying to think.  So Schneider and Hamlet are
18  the two out-of-towners you are asking about.
19    MR. McKEEBY:  Emlet and Schneider.
20    THE COURT:  Emlet.  Sorry.
21    MR. PRYOR:  Emlet is on the list.
22    After Schneider, I anticipate it will be
23  Ms. Hudson and then Ms. Emlet.
24    THE COURT:  So the question is, are they
25  off the hook?  Can they leave town for a day or two,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 91 of 642   PageID 11032
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                      Pages 561..564

Page 561

1 or how fast do you expect to go, assuming that we
2 don't have Nevarez here.  And I don't know the
3 answer to that.
4        Can I ask a question right quick on
5 cleanup?  Conlon, you said by video.  Are we talking
6 live video Teams or video depo?
7        MR. PRYOR:  Live video.  Video deposition.
8 I'm sorry.
9        THE COURT:  Video depo.  Got it.
10       I'm just making sure, because Conlon is
11 the first on my list to go through page/line
12 objections.  If it was a live video, then we scrap
13 the page/line.  So I'm just making sure it is a
14 video depo.
15       Well, I'm trying to figure out if there is
16 a day off for Emlet and Schneider tomorrow.  That is
17 what I'm trying to figure out.
18       I don't know the answer to that.  If these
19 witnesses are super efficient, then sure, right?  If
20 we skip Nevarez and the Parker depo is quick,
21 then --
22       MR. PRYOR:  As we said in our motion
23 regarding more time, our two long witnesses are
24 Ms. Stone and Ms. Carter, which we anticipate they
25 would take half of our case.

Page 562

1        The rest we would like more time with, but
2 obviously, it is what the Court gives us.
3        THE COURT:  Understood.
4        Okay.  So do you all anticipate getting to
5 Schneider or Emlet tomorrow?  That's my question.
6        I mean, y'all can't forecast what they are
7 going to spend on cross.
8        MR. GILLIAM:  I would say Emlet is
9 unlikely.  I would say Schneider is --
10       THE COURT:  Possibly by the end of the
11 day?
12       MR. PRYOR:  I would think Schneider at the
13 end of the day or the next morning.
14       THE COURT:  Sure.
15       MR. GREENFIELD:  Your Honor, while John
16 Parrott came up, is there any way we can make him
17 available via phone call?  He is local.  He sat here
18 all day patiently, and it was pretty clear he wasn't
19 going to go.  We only caught him in the hall at that
20 last break, to say, Hey, you can get out of here.
21       Is there any way we can make that notice
22 via phone call so he doesn't have to be here at
23 9 a.m. tomorrow?
24       THE COURT:  So Talburt is going next after
25 Stone?

Page 563

1        MR. PRYOR:  Yes.
2        THE COURT:  Sure.  I mean, I would assume
3 we wouldn't get to Parrott until like 10, 10:30.
4        MR. PRYOR:  I'm very hopeful to finish
5 after another hour or less with Ms. Stone.
6        THE COURT:  And we still have got cross,
7 wide-open cross.
8        MR. PRYOR:  I don't know how long that is
9 going to take.  If they want to do their case cross,
10 that's fine.
11       How long are you going to take?
12       MR. GREENFIELD:  I would presume that
13 Stone alone will take us into the afternoon, your
14 Honor.
15       THE COURT:  Sure.
16       MR. PRYOR:  I didn't hear.  How long?
17       MR. GREENFIELD:  I presume -- at least,
18 based on my anticipation, I can't speak for
19 Southwest -- that depending on when you wrap up
20 Stone, it will probably get us to lunchtime by the
21 time the two of us are done will be my guess.
22       MR. PRYOR:  Oh.  So we may not get to
23 Schneider tomorrow then if you are going to take
24 that long.
25       Okay.  I don't know.

Page 564

1        Well, do you think you will be done by
2 noon?
3        MR. GREENFIELD:  I can't possibly make
4 that representation.
5        MR. GILLIAM:  We are trying to give you
6 some of our forecast.
7        THE COURT:  How about this.
8        MR. GREENFIELD:  You guys took all day
9 with one witness and you said you might call six.
10       THE COURT:  Tell Parrott to be here by
11 12:30.  We can break for lunch.  If we need to break
12 for an early lunch at 11:30 when we finish with the
13 final round of examination on Stone, so be it, and
14 then Parrott can be here 12:30, and then we can pick
15 up and go.
16       Does that make sense?
17       MR. PRYOR:  That's fine.  I don't think we
18 will get to --
19       THE COURT:  All right.  And Schneider is
20 probably off tomorrow.  Emlet is probably off
21 tomorrow.  Got it.
22       Anything else?
23       When you send your emails at 6:00 and
24 8:00, can you also copy Ms. Silver on it, not just
25 Mr. Frye?  The law clerks work all sorts of hours

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                  Vol 2 July 06, 2022                                  Pages 565..566

Page 565

1  because they are FSLA exempt.
2         So her email, if you don't have it handy,
3  is savannah_silver@txnd.uscourts.gov.
4         All right.  See y'all in the morning at
5  8:30.
6         THE COURT SECURITY OFFICER:  All rise.
7         (Proceedings adjourned at 5:14 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 566

1              C E R T I F I C A T E
2
3         I, Kelli Ann Willis, RPR, CRR, CSR
4  certify that the foregoing is a transcript from the
5  record of the proceedings in the foregoing entitled
6  matter.
7         I further certify that the transcript
8  fees format comply with those prescribed by the
9  Court and the Judicial Conference of the United
10  States.
11         This 7th day of July 2022.
12
13         s/ Kelli Ann Willis
           Official Court Reporters
14         Northern District of Texas
           Dallas Division
15
16
17
18
19
20
21
22
23
24
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                           Vol 2 July 06, 2022                          Index: (pa.)use..68

**(**

**(pa.)use** 384:3

**0**

**011** 315:21

**07** 315:7 316:8

**1**

**1** 210:5 247:12 392:17 454:19

**1,000** 407:2

**10** 248:24 307:13 453:9 530:11 563:3

**100** 358:22 470:19 556:1,8, 9 558:1

**10:30** 563:3

**10:46** 307:13

**11** 249:2 361:14

**11:30** 564:12

**11:59** 555:18

**12** 249:5 453:9

**12:07** 379:8

**12:30** 564:11,14

**13** 249:7 310:4 402:18

**132** 230:7 233:9 234:1

**134** 450:13

**14** 249:11

**14-** 481:16

**140** 233:11,12 234:10 400:9,10,17,20 401:2

**141** 218:5 219:16 233:12 234:10 404:11 405:8,9 406:11

**146** 233:12 234:8,14,15 235:15,23 236:12 237:14 327:10,11,15,18 328:2,4 329:14

**14th** 249:2,14

**15** 212:11 213:9,19 247:2 249:14 272:15 361:14 527:9,11,15,23 528:2,4 532:8

**15,000** 330:17 442:15 481:16

**17** 326:17 334:13,16

**18** 271:21 272:5 525:8

**19** 249:22 250:16 252:15 408:16 480:13,14,16,22 481:5,7

**19-year-old** 250:10

**1981** 383:20 384:1,7

**1983** 249:22 384:8

**1985** 383:20 384:1,7

**1996** 247:17 252:23 253:10,19

**1:02** 380:5,21

**1:07** 379:8

**2**

**2** 210:5 247:16 288:8 289:2, 4 290:4,6 291:19 292:8,15 293:2 294:1 295:7 303:11 306:10 315:22 383:8 396:4

**20** 272:15 461:16

**20-second** 222:7

**2000** 255:4 539:20

**2012** 317:3,4,5

**2013** 220:22 221:3 248:3 256:4 302:14 310:7,12,13 316:17,24,25 325:22 326:25 335:9

**2014** 329:24 351:13 357:10 402:11,18

**2015** 248:7,12 264:10 316:22 470:24 532:22

**2017** 220:24 248:6,12,20, 24 249:2,7,11,14 253:19 259:18,20 263:13,14 266:14,15 267:3,10 415:4 488:7 528:5,24 530:18

**21** 213:23 214:12,14 215:21 219:17 220:3 229:6

**231**:16 233:25 234:12 253:19 392:2,24 453:24

**21st** 248:24

**22** 213:23 219:21 223:22 229:6 231:16 234:1,12 263:13,14 266:14,15 267:3,10 435:19,21,24 547:10

**22-0** 435:9 436:11

**22-O** 435:13,18,20,22

**22nd** 249:7 415:4 488:7 528:7

**23** 223:21,24 449:13,14,15, 22,24 450:2

**24** 318:14,16,17,21,23,25 319:3,6,8 444:12,19

**24-hours** 394:6

**25** 341:14,15,18 342:11,15, 17 343:1,2

**25th** 528:5

**26** 353:10 354:16,20,22

**27** 360:5,16,18 397:20

**29** 420:25 421:2,3,6 422:24 423:1,3,5

**2:36** 452:12

**2:38** 451:21

**3**

**3** 247:18

**30** 432:21,22,24 433:6,8,11 554:8

**30-day** 253:22

**31** 224:5,8,9 225:17,18 226:23

**32** 465:12

**3:17-cv-2278** 210:6

**4**

**4** 247:21 532:22

**403** 218:19

**404** 297:18,20,21,25 298:20,24

**404(a)(1)** 296:7,9 298:8

**404(b)** 442:9

**408** 290:4 297:2

**43** 466:1

**48** 444:20 445:17

**49** 466:1,2

**4:15** 512:23 515:22

**5**

**5** 247:24 470:18

**50** 258:21 394:23 470:18

**52** 451:8,9,10,11 452:6,8, 18 453:2,6,8

**53** 455:12,14 458:5,11

**556** 210:7 227:22 228:5 236:3 247:18,21 248:4,21, 25 249:3 256:6 261:5 300:3,15 310:4 330:24,25 334:6 337:1 361:6,24 453:10,24 459:18 463:21 492:18 507:13 508:15 557:13

**556's** 248:1

**56** 462:22,23 463:7,10,15

**57** 227:1,10 228:20

**577** 551:4,5

**5:00** 554:4,18

**5:10** 554:10

**5:14** 565:7

**6**

**6** 215:22 236:1,25 248:3 314:7,17,18,21,23 315:3 394:22

**612** 551:17

**66** 478:1 480:10,12 488:16 489:2 524:14

**68** 224:4 226:24 229:5,13, 25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 94 of 642   PageID 11035
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 2 July 06, 2022                    Index: 6:00..advised

**6:00** 559:19 564:23

**6:30** 212:7

---

**7**

**7** 248:7 249:11 394:21

**72** 224:4 226:24 229:5,13, 25 230:5

**7470** 435:25 436:1

---

**8**

**8** 248:12 381:7,10,21,23 382:3,11,19,25 383:13 387:4,13,16,18,25 388:3,5, 11,14,17,20,24 389:4,9,22 390:13,17,23 392:23,25 394:17 395:14 396:8,15,23

**80s** 388:12 408:17

**83** 384:18

**85** 384:18

**87** 257:4 431:6

**8:00** 564:24

**8:30** 212:7 556:12 565:5

**8:45** 554:20

---

**9**

**9** 248:20 562:23

**9/11** 273:14

**97** 370:14 375:25

**98** 362:24,25 374:3

**99** 363:16

**9:00** 554:13,21 555:7

---

**A**

**a.m.** 562:23

**ability** 395:6 481:19 525:11

**aborted** 262:19 280:17 493:3

**abortion** 247:13 250:22 251:4,10 252:1,5 253:6

284:20 497:15 503:24 504:23,25 508:17 509:23, 24 521:18

**abreast** 471:5

**absolute** 382:18

**absolutely** 218:21 253:24 259:16 262:6 273:14 289:6 322:17 336:4 340:2 415:10 416:16 422:8 440:9 441:15 457:17 476:16 507:1 520:16 544:19 558:17

**abusive** 516:12

**abut** 456:13

**accept** 243:18 280:21 294:8 295:9 296:19 305:6 339:21,23,24 361:22 372:3,15

**acceptable** 280:19 361:13

**accepted** 251:3 430:25

**accepts** 251:1

**access** 470:6

**accidentally** 522:6

**accommodate** 211:25

**accommodation** 267:16, 17,22,24 268:3

**account** 244:14 470:9 471:1,11

**accountable** 361:12

**accurate** 361:25 415:3 444:7

**acknowledge** 450:7

**acknowledged** 493:8,9, 10

**acknowledges** 263:18,19 267:14,15

**act** 236:18 415:13

**acting** 270:17 271:25 305:11 313:25

**action** 228:6 236:7,9 284:24 338:25 351:25 352:1,6,8,13 362:14 371:6 379:5 411:17 449:4 454:12 455:8 468:16,19 506:19 508:21 536:5,15,17,24

544:7 557:6

**actions** 218:14 232:16 264:1,2,3 269:6 294:8 301:4,5,13 302:6 341:4 409:15 418:6 430:6 441:18 512:8

**active** 255:4 425:8 426:6

**activities** 217:23 258:5 260:19 265:5 296:1 310:16,18,20 311:6,12,13 312:6,17 313:14 314:2 315:16,17,20 316:10,11,13 320:5,8 321:1,21 322:4 327:6 331:23 367:17 388:22 468:21 469:1 471:1 485:18

**activities-wise** 387:11

**activity** 267:16 268:6 269:17 271:5,6 311:14,18, 20,21,24 312:6 313:20,22 331:20 345:23 362:2,4,6, 12,13,14,20 438:3,9,18,23 439:6,17,23 475:3,14,15, 23 476:13,20,23,24 492:21 493:9,10,11 525:19 529:14 533:23 534:17 535:8,10 536:2,14,22,25 537:20 538:11,13 539:11 540:25 544:2 546:16,22 551:12

**actors** 225:21 226:4 234:2 277:17

**actual** 230:25 233:2 238:24 290:1 337:11,15 346:14 365:25 545:13

**Adam** 210:22 300:11

**Adams** 242:6

**add** 213:1 214:11,13 215:18 220:5 227:5 230:17 297:11 313:22 449:19

**added** 212:15 347:6

**addition** 225:7 230:21 295:17 435:24

**additional** 216:1 229:12 233:20 234:15 236:12 296:13 537:12

**address** 219:3 296:3 369:19 372:8 420:14,18, 21,23,24 422:16 456:11 481:22 486:15

**addressed** 214:5 394:1

**addresses** 369:25 370:3 419:11 420:2,13 481:15

**addressing** 482:6

**adequately** 329:1 447:13

**adjectives** 407:15

**adjourned** 565:7

**adjust** 211:21 299:11

**admin** 347:7

**administer** 309:3

**administering** 482:13

**administration** 345:25 348:14 430:8,12,16,17 529:22

**admirably** 397:3

**admissible** 214:18 229:9 233:17 327:23

**admission** 227:12 314:14, 15 318:15 327:15 341:14 353:11 360:6 400:10 405:17,20 420:10 432:22 449:14 451:9 455:13 488:15 527:10

**admit** 231:17 233:9 234:12 239:15 360:15 366:8 406:5 480:14

**admitted** 212:24 225:3 229:9 230:3,15 233:17 239:5,10,21 240:1 314:22 319:5 328:2,3 342:14 354:19 360:17 400:23 401:1 405:10 406:10 423:1,2 433:7 449:23 453:2,5 463:9 481:3,4 489:1 528:1

**admitting** 212:21 327:18, 20 342:11 354:16 400:18

**adopt** 292:14

**advance** 246:25 438:5 439:1 521:23 531:8

**adverse** 411:17 517:3

**advice** 333:9 351:24 352:19 371:8

**advised** 349:3

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 95 of 642   PageID 11036

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022            Index: advocate..arrangement

**advocate** 243:24

**affect** 481:23

**affected** 252:5

**AFO's** 232:18

**Africa-american** 266:12

**African-american** 410:16 413:23 416:10 479:5

**afternoon** 451:20 563:13

**agency** 248:4

**agenda** 301:21

**agent** 218:15 337:15 507:22

**aggressive** 334:24 544:24

**agitated** 423:15

**agree** 277:11 313:6 324:3 352:16 370:8 373:19 408:3 411:21 476:25 487:22 533:24 535:18,25 536:1 544:4 549:8,13,15 557:9

**agreed** 291:25 330:24 334:2,16 371:12 438:12 519:13

**agreement** 254:12 257:2, 4,17 258:12 276:25 286:3 290:3,14 293:13 295:19 296:16 297:12 299:3 314:4 315:4,9,12,23 316:2,5 367:7 430:9,11,15,22,24 431:11,21 432:4,7,19 436:24 437:3,13 442:5 443:12 447:12 464:7

**agreements** 246:21,24

**ahead** 228:21 234:10 292:24 306:15 307:19 309:14 383:15 384:11 425:13 476:6 490:4 501:9 513:4

**ahold** 557:16

**aid** 242:21

**Air** 530:8

**aircraft** 460:13

**airfare** 464:5,6

**airline** 254:2 284:7 530:7

**airlines** 247:20 252:24 253:20 254:1,8,9,11,13 261:10,14,16 262:7,10,11 263:15,25 265:15 267:2 271:10,17 272:1,9,12,18 273:4,11,25 274:3,16,23 276:15 279:6,11 281:5 283:4 285:17 303:6 304:10,17 305:21 310:15, 19 311:11,22 313:15 314:5 315:4 322:6,12 327:24 330:3,11 331:2 336:13,20 337:9,20 339:1 345:21 356:3 357:3,9 358:9 359:15 369:20 370:8 388:4 401:22,23 402:2,4 403:20 404:8 408:16 413:7 414:19 416:4,11 431:9,19 436:21 438:12,23 443:7,17 454:4, 12 455:8 461:9 464:6,25 466:5 468:18 476:4 482:2 483:9,10,11 486:4 487:13 488:9 490:22 492:1,2,3,12, 16 495:19 496:2 500:3,9 524:24 525:6 528:11 529:24 530:11,20 531:6,21 532:11 536:4,7,14,23 537:5,20 544:6,8 557:12

**Airlines'** 261:9 303:1 316:13 483:15

**Airlines's** 296:8 373:22 454:13 455:10 460:7,17 466:16 482:7,18 485:1,6 492:7

**airplane** 496:17

**airport** 472:1 523:14

**aisle** 251:9

**Albuquerque** 557:3

**Alinsky** 548:14

**alleged** 487:5 493:3

**alleging** 232:5 303:17

**allowed** 244:1 262:3 332:22 382:20 517:20 538:18 550:19

**alterations** 457:16

**altercations** 496:1

**altered** 456:3,10

**alternate** 558:9

**alternative** 556:2

**America** 228:4 273:13 332:16,19 479:12,19,23,25 480:8

**American** 242:8,10 274:23 483:9,10 529:23 530:8,10, 12

**amount** 277:8,20

**anatomically** 263:1

**Andrea** 433:19

**answering** 437:24

**answers** 250:23 309:9 358:11 426:8,10 442:7

**anti-union** 304:12,13

**anticipate** 513:25 514:17 560:22 561:24 562:4

**anticipation** 563:18

**anymore** 260:17

**anyone's** 379:1

**Anytime** 517:7

**AP** 463:12

**AP31** 463:12 465:6

**apologize** 211:16 391:12 405:12 443:25 445:21 462:18 530:12,14 535:2 545:20 553:9

**apologized** 539:12

**apology** 428:7,8 533:3,5, 17 538:8

**apparently** 265:7 361:4 480:1

**appeal** 266:9 440:15

**appearance** 449:3

**appearances** 210:8

**appeared** 292:18,19

**appears** 433:12

**appellant** 309:17

**applicable** 217:15

**applied** 219:19 354:5 482:11

**applies** 219:7 246:7 354:3

**alternative** 406:6

**apply** 242:17 316:14 337:1 342:5

**applying** 264:13

**appoint** 370:18

**appointed** 258:25 259:2 347:22 450:22

**approach** 288:13 300:2 328:5 363:18 414:3 445:22 454:7 455:18,20 458:6 461:12 475:10 521:13 536:10 552:18

**approaches** 299:19

**approve** 285:21

**approved** 340:3

**arbitration** 289:5,21 290:1,3,6,14

**arbitrator** 290:15

**area** 297:7 388:10 434:1,5, 12,24 460:15 505:23

**argue** 237:22 238:9 290:11 297:3 558:16

**argued** 354:4 523:10

**arguing** 290:8 296:12 305:25

**argument** 214:15 215:20 216:17 218:13,19 219:24 223:24 224:9,10 225:4,10 228:8 229:12 230:24 231:19,21 232:1,17,21,25 233:6,8 234:15 235:22 236:12 238:5 278:16 297:19,22,25 299:3 323:20 456:1

**argumentative** 321:23 480:3 502:24

**arguments** 225:6,8 233:2, 20 246:10,18

**arise** 487:13

**arisen** 395:15

**arm** 240:14,15

**arose** 302:16

**arrangement** 322:15

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 96 of 642   PageID 11037
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 2 July 06, 2022                    Index: article..begins

**article** 227:2 228:5,15 475:1,5,18 476:9,10 477:15,18 542:19

**ASAP** 320:20

**aspect** 252:20

**ass** 369:12 370:10 371:12 483:23 485:12

**assassination** 265:21,24 409:21 410:22 416:6

**assassinations** 408:20 491:21

**asserted** 220:10,14 226:10 421:16 534:22

**assertions** 303:19

**assist** 245:20 335:23 336:20

**assistance** 400:2 437:6

**assistant** 287:18

**assisted** 439:13,15,16

**assisting** 376:11

**associate** 300:16

**assume** 336:23 356:24 357:1 359:7 371:23 372:19 407:7 420:19 543:15,20 558:9 563:2

**assumed** 361:20

**assuming** 355:18,21 359:5,6 371:20 387:18 466:7 533:12,15 537:25 561:1

**assumptions** 358:23

**attached** 499:19 524:14

**attacks** 495:24 496:4,15

**attempting** 238:21 349:11 551:4

**attend** 227:18 331:17

**attendance** 557:25

**attendant** 247:17 253:12, 20,25 262:13,14,15,16 264:5 267:5 280:7 303:5 330:13,15 337:7 345:16,20 375:3,19 410:15 429:8 440:20 448:20,21 449:2,6 487:19 492:16 494:23

**attendant's** 552:2

**attendants** 232:5,6 247:19 257:5 258:13,21 264:11 275:6 301:20 334:13 347:11,14 348:1 411:12 432:9 445:10 449:11 450:3 454:6 460:12,17,22 464:1 466:5 469:14 470:6,12,17 481:13,14 487:5,17 489:24,25 491:14 493:17, 18 494:12 500:3 531:5,11 540:16 546:13

**attended** 248:21,25 463:16,20

**attending** 227:16

**attention** 233:5 320:17 390:15 395:14 396:16,20 397:6

**attenuated** 218:11

**attitude** 408:16

**attorney** 332:22,24 333:16,20 549:21

**attorney-client** 332:23 333:24 425:12

**attorneys** 243:25 245:1,6, 11

**attorneys'** 246:11

**attribute** 232:7

**auditorium** 251:18 252:6

**audrey** 232:5 248:14 249:3 256:14,16 257:12,22 258:16 259:3 263:12 264:10,22,23 273:22 274:4 275:10,11 276:7 286:16 295:1 303:2,23 307:17 308:24 309:4,25 310:2 345:7 370:21 433:14 450:24 467:8,12,16,19,21 468:2,4,5,8,14,20 469:1,3, 17,22 470:2 471:2,13,22 512:2,5 532:20,25 541:6, 10,23

**authenticate** 523:25

**author** 228:16

**authored** 456:13

**authorities** 315:25

**automatically** 472:18

**avenue** 465:21

**avoid** 215:14 245:4 322:3

**award** 277:19

**aware** 282:16 284:6 289:14 320:23,25 322:2 331:11 338:7,9 344:4,12 371:9 377:14 404:20 424:6 458:24 459:4,7 528:16,17 529:8,25 530:3,17,25 531:8

**awareness** 217:25

**awful** 500:7

**awkward** 555:24

—————————————

**B**

**B.R.** 434:8,10

**babies** 252:10 280:18

**baby** 250:25 253:4,5 262:20 270:1 473:11,15 493:23

**back** 213:17 221:3 224:8 235:8 237:15 241:8 258:19 271:21 272:7 275:17,18,19 276:18 277:3,4 292:5,17, 25 293:25 294:2,4 299:14 302:14 307:2,13,14 316:7 321:15 323:5 325:22 328:1 329:24 364:9 368:20 373:18 374:3 378:10 379:5,8,9 380:4 382:16 383:14 386:18 391:1 397:9,20 398:8,10 403:1 426:19 435:2 440:6 451:21 452:6,11 457:22 477:14 487:20 494:12,22 495:9 497:10 500:4,9,25 502:19 512:11 513:10,18 518:8 519:18 525:7,8 528:6 546:7 552:16 554:13,20

**back-door** 404:23

**backpay** 293:19 296:1

**backtrack** 499:13

**bad** 270:4,5 414:24 501:16 557:18

**ball** 491:13

**balls** 491:6

**Baltimore/washington** 460:15

**Bangladesh** 510:1,8,16

**bank** 381:13

**bankruptcy** 542:18

**banned** 275:16

**banner** 453:25 454:4,13 464:24 465:2

**bargaining** 247:22 254:12 257:1,3,16 258:12 276:25 286:2 314:4 315:4 348:2 430:9,11,15,21,24 431:11, 21 432:19 447:12 464:7

**base** 249:9 287:18 336:24 415:8 489:10,11,23 490:6, 12 491:8

**based** 284:24 285:1,5 292:2,3 331:15 355:18 371:20,25 372:1,18,24 384:25 418:15 421:20 426:11 429:9 444:25 461:25 489:8,15 504:15 563:18

**basic** 366:8

**basically** 217:11 235:3 251:18 275:2 481:18 560:13

**basis** 224:6 353:21 394:5 414:22 420:4,8 482:24

**batch** 224:3 327:19 476:19 544:15

**bathroom** 241:5

**baton** 278:20

**Batshit** 325:12

**Batt** 381:21,22

**battle** 517:16

**began** 248:7

**begin** 245:18 336:1

**beginning** 310:12 319:9 329:18 358:19 361:2

**begins** 252:23

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                    Index: behalf..campaign

**behalf** 210:22 270:17 271:9,25 272:17 300:2,14 312:3 313:25 447:6

**behavior** 326:4 365:13 551:21

**behind-the-scenes** 355:11 359:14

**behold** 552:15

**Belanger** 215:24

**belief** 252:18 267:21 268:6,18 269:16 477:7

**beliefs** 250:12 267:15,25 269:11 276:2,3 279:18,21 280:12,15 284:5,10 286:10 294:15 296:9 476:24 497:25

**believed** 373:18 468:4

**believes** 247:13 477:2

**belittling** 321:17,19 323:12 324:20

**bell** 389:21

**belongs** 372:8

**bench** 213:3 245:6,12

**benefit** 417:12 519:12

**benefits** 254:14 280:9

**bent** 516:18

**bet** 329:5 341:21 445:23

**Beverly** 215:23

**bias** 392:7 393:13,16

**biased** 395:4

**Bible** 247:15 251:18

**big** 308:1 327:9 348:13 388:15 423:16 424:12 533:1

**Bill** 258:16 259:3 440:25 443:9,14,22 444:2 445:15

**Bill's** 443:18

**bind** 218:20

**binding** 218:13

**bit** 219:16 234:8 235:24 268:9 272:5 303:10 308:4 392:21 559:4,10

**blacked** 345:5,9 364:7

**blank** 542:25 543:1

**blast** 469:13

**blatant** 549:21 550:6

**blind** 542:10

**block** 275:14 542:4,6,12

**blocked** 542:3

**blow** 273:5

**blue** 539:15

**board** 218:14 219:9 317:21,23,24 319:20 330:24 334:2,3,4,5,10,13 361:11,19 363:6,13,15 364:9 408:23 418:22 430:23 433:24 434:2,4,13, 14,22 450:23,24 453:11 474:1 523:3 534:5 542:18 543:12,13,19,21,22,24 548:7

**boards** 543:17

**Bobby** 210:11 435:10

**Bobis-armstrong** 281:11

**body** 317:21 334:5 465:23 494:13 497:18 498:22 499:6

**bogged** 229:21 302:23

**bother** 411:20

**bottom** 355:18 453:18

**bounds** 441:16

**box** 309:1 386:21

**boyfriend** 249:24 250:2,4, 7 251:8

**bragged** 428:25

**Brantley** 241:24 380:24

**breach** 372:23

**breaching** 373:15

**break** 240:24 241:4 251:19 299:10 306:15,16 307:1 364:23 378:1,6,9 379:3,7 380:12,13,20 395:11 451:17,18,20 452:3 509:9 512:10,18 513:5 515:22,24 518:14 554:12 562:20

564:11

**breaking** 371:11 554:5

**Brett** 258:17 259:3 325:8 344:21 351:16,17 367:18, 22,23 371:2,14 417:15 424:9 433:15 437:14 451:2 484:12 532:12 534:8,11 545:19 546:11 551:21 552:7 553:2

**Brett's** 370:22

**Brian** 210:15 217:17,22 218:9 270:14 281:3 344:17,20 345:15 354:23 358:24 359:13 364:10 370:16,17 373:14 374:18 376:1,5 401:20 402:17 403:1,7 406:14 409:3 411:11,22 413:4 416:3 417:8 423:18 483:19 549:23 550:4 552:16

**Brian's** 398:9

**briefly** 227:21 294:10 328:11 353:17 385:18 387:3

**bring** 219:18 223:12 230:2, 19 237:10 240:21 241:13 307:2,19 308:17 319:13 335:3 349:14 380:3,7 386:6 395:12 396:7 401:9, 10 452:24 472:8 481:9 521:9 546:7 548:19 553:20 558:3

**bringing** 274:11 397:5 476:3 482:8 547:9

**brings** 259:18 303:17

**broad-based** 340:16

**broken** 397:24

**brothers** 388:19

**brought** 349:10 396:15,19 415:11 492:12 528:18 534:7

**BTW** 398:25

**bucket** 217:11,15 229:6,13 231:16

**buckets** 234:12 328:17

**buckle** 396:4

**buddies** 409:7

**budget** 464:10,19,20

**budgets** 336:8 464:21

**bullet** 282:20

**bullied** 305:6

**bullshit** 429:15,18

**bully** 284:1

**bullying** 267:7 279:22 283:12,14

**bunch** 259:21 266:17 432:9

**burden** 305:18 559:19

**Burdine** 513:13 514:19 515:7,14 558:21

**burn** 354:8

**business** 241:25 284:8 464:8

**bust** 340:5

**busy** 403:9

**button** 245:8

**buying** 533:3,21

**bylaws** 285:14 331:16 352:25

---

**C**

**cabin** 486:5

**call** 225:12 226:8 237:23 238:4,8 240:24 288:25 308:21 335:6 378:9 451:17,19 503:11,16 514:10 515:1 559:2,12,23 560:2,3,5 562:17,22 564:9

**called** 219:8 250:1 264:25 288:8 429:8,10 437:19,21 440:20 459:16 471:12 503:7 549:21,22 551:20 560:11

**calling** 337:10 364:23 500:10 533:20 559:7

**calls** 308:24 373:7 419:17 431:24

**campaign** 213:25 219:23 220:16 222:2,5 225:19

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 98 of 642   PageID 11039
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                  Index: campaigns..claim

248:15 257:15 347:9
470:12 526:24

**campaigns** 326:17

**cancer** 407:1

**cancerous** 407:1,8,12,19
408:3

**Candacey** 469:18

**candidacy** 255:11 470:22

**candidate** 255:9 409:18

**candidates** 256:5,7,25
317:11,12,14

**capacity** 232:9 242:11
305:11 337:18

**caps** 346:3

**card** 343:20,23

**care** 284:9 294:22,23 308:5
382:23 443:11,13,15

**career** 491:5

**careful** 438:14 458:13

**carried** 465:2

**carry** 411:8

**carrying** 252:3 253:8
555:6

**Carter** 210:6,8,10 211:9,11
214:10 215:24 220:1
224:21 228:2 231:7 236:15
247:12,16,24 248:3,7,12,
15,18 249:2,5,12,15,20,22
258:3 266:1 272:17 279:23
280:8,10,11,20 281:1,20,
24 282:16 284:4,19,21,24
285:5,8 286:19 287:2,23
288:1,4,6,9 291:22 292:15
293:1,5,8,24 294:7,10,14,
17,19 295:5,9 296:22
300:23 302:24 303:12,23
304:1,6,22 305:14,23
308:21,23 319:17 320:7
322:16 323:12 325:14
326:24 334:7 343:11,13,22
344:5 349:22 350:8,14,21
351:9 354:4 385:7 386:4
387:3,10,22 414:22 415:6
461:7 467:10,14 468:9
469:8,10,11 472:1,4
476:17 488:8 492:17
494:16 496:3,8,21 506:10,

16,25 507:12 525:7,19
526:1 528:25 529:2 532:15
533:20 536:14 541:20
545:18 547:3,19 556:18
561:24

**Carter's** 220:21,23 221:5
222:10 225:24 231:13
247:21 248:8,11 249:8
282:23 286:5,9,11,24
287:21 292:1 301:4 302:25
303:15 305:2 323:9 344:16
348:16 393:8 477:7

**carve** 234:14

**case** 215:1 219:5,8,10
227:25 228:10 234:18,22
236:19 242:13 243:5,6,11,
17,19,20,22 244:1,6,9,12,
17,21 245:25 246:8,16,23
247:1,6 252:21 259:6,8
278:9,12,18 279:4,23
281:7,18 283:6 285:14
289:5 290:23 292:6 298:13
299:25 301:6 302:7 304:2
305:18 306:1,24 307:8,9
332:8 374:8 379:12,13,22,
23 380:16 382:10 394:24
395:19 422:5 441:19
451:23 452:4 462:1,2,10
463:6 512:20,22 514:7
519:2 521:1,17 524:1
531:16 554:24 555:1,5
557:19 559:25 561:25
563:9

**cases** 246:3 386:10 425:8
487:16

**Casper** 361:4,5,23 364:18
366:15,18 367:16 369:10,
13 370:9 374:8,11 399:14
402:6,10 406:25 407:5,6,
20 408:4,6 431:17 485:10
491:22

**casual** 355:11

**catch** 235:21

**category** 233:13

**caught** 377:11 562:19

**causing** 334:21

**cautioned** 438:14

**caveat** 239:19

**CBA** 443:12 444:19 445:7

**cell** 244:11

**CEO** 282:25 283:1

**certificate** 397:8,10

**cetera** 230:23

**chair** 308:3 434:15 453:22

**challenge** 516:19

**challenges** 487:4

**challenging** 487:4

**chambers** 380:23

**chance** 290:3,8,10 292:24
293:12 294:5 295:19
296:16 297:12 299:2 366:2

**change** 260:24 264:17
270:6,7,8 277:14,21
415:23 467:22 468:10
478:10 479:25 480:1

**changed** 460:12,14
467:25 468:5 479:12,19,23
480:8 542:1

**changeover** 357:22

**changing** 357:16

**channels** 525:15

**character** 296:10 297:20
298:9 538:20

**characterizations** 430:5

**characterize** 354:24

**charge** 247:5 444:5 447:1

**charged** 349:2,19 350:8,
15,16 437:17,18 443:10,15
444:3,16 553:3

**charges** 274:11,17
349:10,14 444:20 445:5
446:1,23

**Charlene** 210:10 211:9
247:12 249:22 252:3,8
253:13 254:10,17 255:3,
10,12 256:7,16,18,20
257:5,11,18 258:18 259:9
261:17 263:16,23 264:2,7,
12 266:13 267:8,23 268:7,
16 270:7,22 271:4,18
272:17 273:21 274:20,21
275:17 276:1,13 277:10
302:25 303:22 304:6
305:22 308:23 319:17

320:7 326:24 368:22 381:5
383:19 384:15,16 461:7
467:9,14,24 468:8 469:8,
10,11 472:1,4 476:17
492:17 494:16,19 496:3,8,
21 532:15

**Charlene's** 250:12 255:25
260:1 271:23 434:24

**chatter** 528:17,20

**check** 352:14 450:13

**checking** 349:6

**checks** 384:17

**chickens** 548:8

**chief** 358:15

**child** 250:7 510:5,6,16,18,
22

**children** 243:7 263:6
510:2,8

**chips** 518:6

**choice** 261:6 465:24
496:24 497:4,15,16 498:2,
7,13,14,19,23,24,25 499:4
504:22

**choices** 426:21

**choose** 311:15 312:2
418:6 460:18 556:3

**choosing** 279:17

**chose** 324:6 326:1,4
404:16 542:8,12

**chosen** 365:14

**Chris** 281:9 425:6

**Christian** 247:13 284:19
294:18

**Christians** 294:18 298:3

**church** 251:15,17,23

**circle** 270:15 347:10,17

**circumstance** 478:11

**circumstances** 279:18

**CISM** 334:18

**cited** 219:5

**claim** 214:19 216:13,22
221:2 267:21 278:12,14

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 99 of 642   PageID 11040

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Index: claiming..concession

**claiming** 296:25 550:18

**claims** 215:4,9 220:23
225:25 226:2 231:14 234:6
290:7 297:13 304:20
328:14,22,23 329:12,13
400:21 406:7 414:18

**clarification** 497:22

**clarify** 499:14 515:17

**class** 388:16 391:15

**classes** 387:12

**classman** 381:24 384:17

**clean** 290:12 309:16 329:2,
9 358:12 382:15 506:21

**cleanup** 561:5

**clear** 223:1 236:23 282:13
373:5 410:18 412:9 417:5
419:2 482:9 499:15 507:10
562:18

**Clerk** 309:5

**clerks** 564:25

**click** 423:15,20 424:10
425:15,24 426:3 427:6
472:17 473:2

**clicked** 472:11 474:4,6
511:8,23

**clicking** 381:16 473:23

**client** 258:3 383:23 385:19
388:1 447:13 552:24

**clients** 246:23

**clip** 520:2,4 524:3

**clock** 229:20,24 276:10

**close** 216:18 327:9 350:25
361:16 391:9 412:25
431:3,9

**closely** 363:13 385:6

**closer** 310:8 385:7,12
401:9 464:14 472:8

**closing** 246:9,10,17
477:20

**Cloutman** 210:23 300:12
333:17 339:9,13,15,22
340:2 556:24 557:2

**co-counsel** 300:12

**co-employee** 280:19

**coached** 484:22 485:17

**cockpit** 272:11

**code** 216:12

**coerced** 315:13

**Coffee** 363:6

**cohorts** 529:1

**coincidence** 267:9

**colleague** 281:4

**collective** 254:12 257:1,3,
16 258:12 276:25 286:2
314:4 315:3 348:2 430:8,
11,15,21,23 431:11,21
432:19 447:11 464:7

**college** 250:2,3,4

**collegial** 397:2

**colluding** 447:10

**colored** 460:13

**columns** 213:2

**combination** 417:23

**combine** 507:23

**combined** 394:11

**comfortable** 324:20
368:14 409:16 411:15

**commence** 281:16

**comment** 323:8,25 324:3,
5,6 326:1,4 370:22 371:5
397:24 417:24 448:19,21,
23,24,25 477:18 496:9,11
557:7

**commentary** 546:12

**commented** 326:3

**comments** 306:10 324:21
352:9 376:10,12 410:13
465:19 493:5 500:22 557:5

**commingling** 229:1

**commit** 387:20 512:16

**commitment** 387:23

**committee** 248:22 320:1,
3,4 330:25 331:5,7,22

**committees** 236:3,4,20
237:2,5 331:2,4,14 336:5
337:23 370:18

**common** 275:5 429:20
475:18

**communicate** 243:11,16
244:2 270:2 329:1 469:7,
10,11

**communicated** 257:24
467:20

**communicates** 257:8

**communicating** 258:6
265:12 312:5,13,16 402:3
469:6 534:13

**communication** 219:8
258:2 262:18 274:2 279:24
302:4 304:16 326:2 370:1
371:11 409:12 465:21
469:12 471:6,25 491:16
525:10,14,25 526:18
535:19 547:3 555:16

**communications** 217:17,
18 265:6 270:12 280:3
313:13 373:21 399:15
427:25 428:12 430:4 467:8
472:3 495:4 525:12,18
526:1 537:15 552:6

**commute** 243:9

**company** 231:2 234:2
236:2,4,18,24 237:1,5
263:13 267:22 273:15
284:7 287:25 288:1 292:16
294:2,12 296:1 301:19
315:13,23 316:1 341:10
370:2 399:2,9,16 413:8,20
421:7 476:13 489:19

**company's** 263:17 282:25

**comparators** 221:22,24
447:8

**comparing** 510:25

**compelled** 516:13

**competing** 302:11

**complain** 256:18 263:9
277:13

**complained** 488:11

**complaining** 234:2,4
256:20 259:10 263:20,22
274:24 361:23 402:5
526:11,25 533:22 534:14
535:20 538:12,21 539:6,
10,12 540:8 543:23 549:16
551:8,9,24 552:2,4,7,9

**complains** 261:14 262:23
263:15

**complaint** 222:20 225:1
237:7 249:13 261:18 263:8
287:8 415:7,18 443:19
467:23 472:6 488:8 490:2,
25 492:8 496:7,20 524:6,
16,18 526:19 528:8,25
541:20 550:11,19 553:1

**complaints** 214:21 231:2
232:10,12,23 284:16
361:5,9 487:19 489:18
490:18 492:11 527:3
528:9,14 529:1 542:9
547:4,7 548:10 549:5
550:15,24

**completely** 255:24 331:19
446:5 552:11

**complicated** 302:10

**complications** 253:5

**complimentary** 365:17

**comply** 293:15,17 536:19

**compound** 417:3 444:22
500:12 509:3,7 530:23
531:2

**computer** 243:15 244:11
300:20

**conceal** 322:15

**concentrating** 255:7

**concept** 283:17

**concern** 392:6 411:14
506:8

**concerned** 359:17 373:15
431:16

**concerns** 391:3,5,6
392:13 393:24 457:15,21
476:3 482:8

**concession** 293:22

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 100 of 642   PageID 11041
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 2 July 06, 2022                          Index: concluded..court

**concluded** 278:21 291:13
299:15 306:17 329:6
340:19 342:8 354:13
378:22 415:24 422:20
442:22 447:20 454:25
458:1 462:6 507:4 508:7
554:15

**conclusion** 277:16 333:13
475:25

**conditions** 254:14,19
255:8 293:12 510:5

**condoned** 551:21

**conduct** 269:18 280:16,
17,22,25 285:1 292:2,3
294:9,13 304:23 505:8

**conducted** 286:13 287:6,
11

**confer** 245:11 385:18

**conference** 290:25

**confidence** 372:24 373:15

**confidential** 339:16
340:1,8 373:20,23 399:19

**conflate** 232:22

**conflict** 303:8 316:1,4

**confront** 477:2

**confronting** 544:22

**confuse** 224:23 236:9
268:14

**confused** 271:8 272:19

**confusing** 218:19 230:14

**confusion** 214:1 232:4
311:4,5

**conjunction** 463:22,24

**Conlan** 513:12,15,16
514:9,13,14,16,19 515:14

**Conlon** 558:20 560:6
561:5,10

**connection** 272:9 460:6
470:12

**connotation** 367:3

**consequences** 301:14
302:6

**consideration** 215:8

393:2

**considered** 311:17 522:8

**consistent** 458:17 460:16
516:10

**conspiracy** 305:22

**conspired** 303:18

**constantly** 274:23,24
494:19

**constitution** 331:16 349:9
352:25 353:5,8

**construed** 438:15

**consult** 514:5

**contact** 403:16

**contacting** 349:2 351:6,8,
23

**contained** 407:4 408:10

**contempt** 556:7 558:2

**content** 282:8,10,21

**contention** 283:8

**contentious** 300:22

**contents** 341:7

**context** 229:1 359:25
372:22 399:17 401:18
402:8 495:9,10,12 508:18
509:22 533:9 540:3,11,14
542:20

**continue** 258:9 291:17
380:8 390:2,12 415:23
437:9 495:7 497:1 522:1
535:4

**continued** 248:10,13
274:22 547:12

**continues** 417:21 516:14

**continuing** 303:24

**contract** 315:18 443:6
450:7 475:1,13 551:5

**contractually** 286:1

**contrary** 247:14

**control** 369:8 404:16
418:5 557:14

**convenient** 409:9 557:17

**conversation** 243:12
334:25 339:10 358:3,19,24
371:14 375:9 397:1 403:2,
25 404:4,17,22 410:1
411:1 436:25 438:7,8
439:3,4 445:4 525:17

**conversations** 355:12
359:14 362:15 374:6,19
375:3 376:15 403:3,7,11,
19 404:16,18,23 405:2
409:4,20 427:19,21 428:14
436:17 482:18 483:8,14
484:18,24 485:5,9 491:20
494:10

**converted** 429:1

**convince** 250:14 509:19

**convinced** 222:21

**COO** 357:8

**coordinate** 235:9 237:1
336:7

**coordination** 453:22

**COPE** 319:24,25 320:1,3,
19 321:21 323:3

**copied** 221:7 415:17

**cops** 386:11

**copy** 213:5 319:13 343:7
360:20 363:17 401:6,10
415:17 458:4 481:9 548:19
564:24

**core** 346:9,11 347:3 348:9
418:24 421:23 422:4,10
423:7,12 424:17 427:13
428:12,25 430:2 448:2,18
449:5 483:7 529:19 530:18
531:19 533:6,18,19 534:14
539:10 540:15 541:4,5,13,
15,17 542:14 546:13 550:7
552:5

**Coreless** 491:22

**Corless** 431:16

**Corliss** 408:14 410:14
411:6

**corner** 235:20 383:14

**corporate** 210:25 211:4
228:24 281:6 300:13

**correct** 227:8 263:1
312:12 324:13 330:8

336:14,16 340:18 346:12
364:19,21 400:15 402:16
406:2 427:18 428:2,19
431:6 432:19 433:21
434:18,19 435:3 438:3,18
443:3 447:1,2 450:19,25
451:3,6 465:20,24 466:6
467:17 471:9,23 473:2,14
474:15,16 481:13 486:2
489:5 492:22 493:14
494:23,24 496:8,18 510:23
512:7 524:22,23 526:12
531:15 532:12 543:14,19
552:13

**corrected** 429:5 498:4,6

**correctly** 364:15 374:9

**corrupt** 259:14

**corruption** 541:2 547:12

**cost** 328:12

**costing** 328:9

**counsel** 239:7 281:10
285:13 287:1 301:4 303:10
305:2 327:10 332:14
338:22 339:18 349:2,6
351:7,8,12,23 352:7,11,15
380:18 385:24 416:22
420:3 445:19 461:12
472:21 512:9 514:6 516:9

**counsel's** 352:18

**counseled** 491:14

**counseling** 277:6

**country** 270:4 479:5

**couple** 221:7 257:9 276:22
282:7 314:8 317:16 342:4
370:21 381:1 385:25 387:7
426:21 517:20 522:3
551:14

**court** 210:3,4,12,17 211:1,
6,10,23 213:8 214:16
215:17 216:8 217:1 218:2,
6,23 219:11 220:4,11
221:9,15,19 222:7,19,21
223:5 224:6,8 225:5,17
226:6,11 227:4,9,21 228:1,
7,19 229:11,17 230:16
231:6,15,20,23,25 232:25
233:19,23 234:9,20 235:1,
13,15,22 236:11 237:8
238:13,16 239:2,14,18

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 101 of 642    PageID 11042

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Index: Court's..decertification

240:3,9,11,16,18 241:2,10,
12,13,14,17,20,21,25
242:3 243:9 244:4 246:25
247:9 261:2 277:23 278:2,
4,15,23,24 288:15,19,23
289:8,10,13,20,23 290:12,
19 291:2,4,6,12,15,16
295:12,14 296:14 297:1,
10,14,17,24 298:10,16
299:10,17,18 300:5 306:5,
11,19,20 307:7,12,18,25
308:9,12,16,17,20,25
309:6 310:9 314:10,13,17,
21,24 318:16,20 319:3
321:24 323:21 325:21
327:16,18 328:11,16
329:2,5,8,9 332:6 333:12,
25 338:1,15 339:5,12,14,
25 340:3,5,13,18,21,22
341:5,15,21,24 342:4,10,
11 343:3 350:3 353:14,25
354:15,16 356:19 358:10
360:7,11,14 363:20 364:3
369:23 373:8 376:24
377:4,14,16,18,20,25
378:8,24,25 379:16,20
380:2,13,24 381:8,20,22
382:2,5,12,21 383:2,6,7,24
384:1,4,9 385:20,23 386:2,
6,15,18 387:5 388:7
389:14 390:24 391:3,7,11,
19,22 392:12,15 393:4,20
394:2 396:9,12 397:14
398:17,22 400:13,17
405:10,13,16,19,22,25
406:4 412:14,16,20 414:2,
4,9,14,17 415:1,22 416:1,
23 417:4,25 419:3,5,12,21
420:3,7 421:3,10,18,25
422:16,22,23 423:1 429:24
432:1,15,24 433:5 435:16,
19 436:9 439:9 441:1,3,25
442:16,21,24,25 444:23
445:2,19,23 446:6 447:4,
14,19,22,23 449:15,18
451:10,16,23 452:2,11,14,
16,17,23 453:1 454:8,17,
22 455:2,3,16,20 456:1,11
457:11,13,18,21,25 458:3,
8 459:9 461:12,17,24
462:5,8,9,24 463:5 466:25
471:19 472:23 475:11
476:1 477:8,11,23 478:6,
16,18 479:9,16 480:4,15,
20,22 481:2 482:23 483:1
484:7 485:15 486:12,20,22

488:17,22 495:2 497:21
498:17 499:2,9,11,15
500:13 501:5 502:16
503:1,3,22 504:8,15 505:6,
18,20,25 506:2,8,20,24
507:3,6,7,16,25 508:3,9,10
509:5,7 510:11 511:12,18
512:9,14,17 513:1,8,23
514:3,9,12,22 515:2,12,21,
25 516:5,22 517:1,10,22,
24 518:4,8,11,14,22 519:8,
14,17,22,23 520:3,6,20,23
521:2,4,6,7,11 523:19
525:22 526:15 527:11,14,
18,22 529:6,12 530:5,9
531:1,3 532:3,7 533:10
534:24 535:3 536:11
537:3,8 538:3 539:25
540:20 545:4,9 546:1
547:21,25 550:10 552:19
553:8,10,14,19 554:1,4,10,
12,17,18,23 555:4,12,17,
21 557:1,3,5,21 558:17
559:14 560:8,16,20,24
561:9 562:2,3,10,14,24
563:2,6,15 564:7,10,19
565:6

**Court's** 216:25 229:8
295:20 328:13

**courthouse** 244:3 307:6
379:13 512:21

**courtroom** 234:21 241:16
244:7 245:4,14 307:11
308:19 377:12 379:15
380:1 383:5 386:17 391:2
396:11 397:13 452:1,25
512:25 513:7 521:10
555:3,11

**cover** 217:8 223:25 224:7
254:6 435:15 482:20

**covered** 216:24 229:7
315:11,22 316:3 397:10

**covering** 326:10

**COVID** 276:16

**cow** 517:11

**coworker** 303:3 305:13

**coworkers** 243:8 284:1

**cozy** 432:11

**cracks** 491:6

**create** 232:17

**creates** 216:5

**credibility** 359:25

**credit** 392:8 395:9 406:25

**cried** 477:10

**criminal** 386:9

**critical** 296:17 304:6
336:11

**cross** 223:12 237:10
422:17 562:7 563:6,7,9

**cross-examination**
219:1 516:12

**crossed** 304:18 366:25
367:12 516:20 518:1

**crosses** 365:3

**crossing** 365:9

**crowd** 408:23,25 412:3

**Cruces** 556:24 557:1

**cry** 477:5

**crying** 473:13,15

**cryptically** 395:12

**Crystal** 433:18 434:5

**cued** 520:1

**culture** 283:23

**cumulative** 412:17

**curative** 299:4

**current** 266:5 539:9 540:9
541:19

**curse** 259:11

**curveballs** 396:5

**cut** 462:12 514:9 560:10

**Cuyler** 324:9,10 344:12
349:20 350:5,10,23 417:16
534:10 545:12,25

**Cuyler's** 348:25 349:18
350:6,13,19,21 351:2

**cyberbullying** 283:17
303:24

**cycle** 535:15

**D**

**Dailey** 300:17

**daily** 477:19

**Dallas** 249:24 381:16
383:19 384:2,5,6 388:9,23
389:20 390:14 394:10,12
434:1,3,5,7,11,17 558:25

**damages** 276:13 277:19
295:20,22 296:2

**damaging** 282:11,21,22

**danger** 410:20

**dangerous** 408:15 411:7
412:1

**Daniel** 300:16

**date** 212:23 263:14

**day** 210:5 243:9 250:6
266:16 271:17 275:19
355:6 373:16 383:8,11
396:4 410:12 419:12
512:10 515:19 520:3 528:7
548:8 560:25 561:16
562:11,13,18 564:8

**days** 253:16 466:17 493:1
500:2

**DC** 227:14 248:23 249:1
259:22 463:17,22 499:25

**de** 358:4,6,7

**dead** 302:22

**deadline** 555:17

**deal** 251:7 254:13 294:22
298:18,23 299:3 335:21
374:20 375:10 402:7
418:23

**dealing** 222:6 264:3
267:20 374:7 496:18

**dealt** 261:16 357:3 412:25

**debate** 223:19

**debating** 498:21

**DEBM** 433:19,23 434:4,11,
17,20

**decert** 349:1,8,18 350:14

**decertification** 344:2,6

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 102 of 642   PageID 11043

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                    Index: decertified..displayed

349:9 350:7 352:9 353:8

**decertified** 353:4

**decertify** 349:11 534:7,9 551:4

**decide** 242:13 245:1,2 246:16 475:2 492:6 497:17 498:22 499:5 511:5,7

**decided** 258:13 392:22,25 415:17 425:23 447:5

**decides** 259:20 390:2

**decision** 222:17 250:10 267:12 286:8 287:21 291:25 292:9 294:16,22,25 390:3 414:13,21 415:16 463:4

**decision-maker** 221:5 222:15

**decision-makers** 222:14

**decisions** 247:25 460:18

**deducted** 320:20

**deduction** 320:11,12,18

**deductions** 322:6,11

**Defamation** 269:18

**defeat** 431:20

**defeated** 317:2

**defeats** 419:13

**defend** 376:20 438:4 449:9

**defendant** 210:14 327:21

**defendants** 246:2 386:10

**defended** 264:23 438:2 449:7,11

**defending** 265:9 440:14 448:6

**defense** 240:13 265:4 386:9

**defined** 283:14 311:19

**definition** 365:25 367:6,13 421:8 498:12 503:8 523:11

**degree** 283:18

**delay** 211:16 212:1 396:13 556:2

**delete** 370:22 371:9,15

**deleted** 371:13

**deleting** 371:4 397:24

**deliberate** 243:21 246:14 390:7

**democracy** 242:8,10

**demonstrative** 238:18,20 239:1

**Denise** 272:2 287:19 532:10

**Denver** 474:1 543:11

**Denver-based** 286:14

**deny** 440:9

**department** 281:12 330:12

**departments** 287:13 490:3

**depending** 230:18 262:20 280:18 563:19

**depends** 310:17 478:11

**depicted** 376:19

**depo** 211:13 240:4 513:9, 11 515:13,15 558:4,19 561:6,9,14,20

**deposition** 514:1,20 515:11 560:6 561:7

**depositions** 239:23

**depressed** 251:6

**depression** 251:7,13

**deprive** 395:5

**depth** 290:2

**derivation** 365:11

**derogatory** 364:25 365:5, 16

**describe** 330:12 365:2,13

**description** 365:24

**descriptive** 365:7,13,19

**deserve** 305:15 462:3

**design** 215:15

**designated** 467:12 514:25

**designation** 515:15

**designations** 211:14 513:9,11,19 558:19

**designed** 321:19 322:2

**desire** 301:9

**desired** 270:25

**despicable** 499:25

**despises** 321:11 322:24 323:14

**details** 341:11 448:25

**determine** 466:12

**devastating** 251:5

**developed** 372:25

**development** 556:13

**device** 243:14 244:10

**devices** 244:18

**DFR** 226:2 231:13 234:5 297:13

**dialed** 531:17

**dictate** 498:10

**die** 510:3

**differently** 286:18 394:1 446:21 550:16

**difficult** 276:15 291:11 338:10

**diffuse** 237:10

**dip** 325:5,11 326:3 416:20

**dipshit** 325:12

**dire** 254:5 393:15

**direct** 248:18 309:20 438:21

**directly** 229:7 231:13 232:19 289:7 297:13 324:15 490:1

**director** 330:2 492:4,10

**directors** 336:23,24

**disagree** 257:19 351:21 535:24

**disagreeing** 408:1

**disappointed** 389:19

**disapproval** 248:17

**disavow** 409:1

**disavowed** 404:7

**disavowing** 404:23 409:14 410:10,13

**discipline** 217:24 221:21, 23 222:3 224:13,16 226:5 284:2 403:22 438:6 439:2 441:10 445:9,10 454:18 487:5,12

**disciplined** 214:22 462:1

**disciplines** 441:24

**disclaimer** 329:11 521:8

**disclose** 383:21 385:4 485:25

**discovery** 214:23

**discriminated** 268:21 315:13

**discriminating** 268:17 284:8

**discrimination** 549:21 550:6

**discuss** 243:4,6,19,22 245:1,5 355:15 445:8 446:2

**discussed** 244:16,19 245:3 288:15 337:6 436:12 439:24 443:1 444:25

**discussing** 245:13 248:8 404:1

**discussion** 247:8 279:12 339:3 385:22 396:14 437:21

**discussions** 245:13 290:2 436:20,24 484:15 486:16

**disenfranchised** 256:1

**dismissed** 446:1,23 447:1

**disowned** 249:25

**dispensation** 380:18

**display** 238:21 353:12

**displayed** 356:11 418:16 466:14 482:13 497:24 543:3

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 103 of 642   PageID 11044
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                                    Vol 2 July 06, 2022
Index: displaying..end

displaying 238:24

dispute 282:15 285:8 286:23,24 294:20

disputes 286:5,11

disrespect 535:17 543:11

disrespectful 282:8

disrespectfully 538:18

dissertation 361:3

distance 270:10 385:6

distinction 446:3

distract 242:20

distress 277:5

district 241:21,23 388:20 557:3

disturb 478:22 479:2

disturbing 473:9,10 478:21 499:20 501:16,17 502:2,3,21

dive 301:1

diverse 284:11

docket 212:5,20

doctor 250:16

document 212:23 213:1 227:23 237:7 293:13 296:2 314:22 319:5,13 328:3 341:19 342:14 345:7 354:19 360:17 390:18 400:20 401:1,4 406:10 423:2 433:7 435:14,17,19 436:6,13 449:23 453:5 456:3,7,10 457:1,2,7,23 458:14,17 463:9 466:7 481:4,8 489:1 528:1

documentary 246:1

documentation 409:23

documents 218:9 220:8 221:8 228:18 233:16 235:24 239:7 275:11 381:18 385:9 410:11 495:1 511:17 528:22

dog 285:23 286:4 532:21 533:1

domicile 433:24 434:3 489:14,15,17

donated 326:17

door 392:17 442:2,18

dossiers 266:17

double 210:18,19

doubt 271:16

dozen 416:18 529:21 531:25

draft 556:13

drama 335:3,6

dramatic 335:11

drastic 506:19

draw 216:15 242:1 517:6, 7,14

dreadful 408:20 410:22

drew 390:15

drill 388:24 389:7,11 391:15

drive 343:21,24

drop 491:12

dropped 491:6

due 495:24

dues 228:12 255:3 260:2, 3,11 275:23 320:7,10,15 327:7 330:23 335:16 368:22,25 464:21 495:8 503:25 535:16

duly 309:4

duplicative 412:17

duration 558:24

duty 214:18 216:13,21 254:24 278:7

dying 510:5

_____

E
_____

earlier 237:20 302:16 313:24 327:16 395:19 400:19 405:25 406:5 444:13 483:17 534:10 544:14 545:11

early 248:7 452:7 564:12

earth 223:10

easier 319:15

easy 259:8 319:11 448:11

EB 549:22

echo 216:3 225:9

Ed 210:23 267:11 268:20, 25 276:2 284:18 287:5 333:17 532:11

Education 320:1,3

Edward 300:12

effect 277:14 478:10

effective 240:6,8 270:9 478:8 501:21 502:1,4,22 503:5,8,9 509:1,18

effectiveness 501:15,18

efficiency 229:20

efficient 229:20 238:7 561:19

efficiently 219:13

efforts 225:23 236:17 248:13 253:25 348:1 404:24

Eileen 334:19

elected 255:14 258:15 317:8,14,25 327:3 423:21 434:17,23 539:20

election 220:22 265:6 317:3 408:24 429:8 470:24 535:15

elections 305:3

electronic 243:14 244:10

eliminate 409:17

else's 303:20

email 212:13,16 220:22 221:25 248:1 257:9 272:3 319:10,17 320:11,24 321:9 322:20,21 323:7,11 324:9, 13,14 326:8 329:18,21 330:19 334:3 344:17 348:24 350:10 351:19 354:23 355:2 356:6 360:20 361:2 364:21 367:14 369:14,19,25 370:2,16 371:17 372:8 373:13,20 375:24 376:5 397:24 398:9 399:1,2,9,24 402:17,20,21

403:2,6 406:13 408:4 409:11,14 410:20 412:24 416:5 418:6 419:18 420:2, 4,7,13,14,18,21,22,24 421:8 468:24 481:15 483:21 485:9 486:14,15 492:13,14 497:5,9 498:5 524:12 526:18 527:13 528:4 559:6 560:1 565:2

emailing 401:21 418:17

emails 213:24 219:22 248:10 249:8 256:21 319:15 334:8 355:5 368:19 399:16 403:9 404:6 409:5 410:2 416:16 418:11 419:11,14 483:6,16,18 485:8 491:20 528:20,21 564:23

emblem 261:9 273:12

Emlet 284:18 287:16 559:2 560:19,20,21,23 561:16 562:5,8 564:20

emotional 277:5

employee 221:21,23 222:3 224:12,22 236:20 253:17 254:8,21,22,25 255:2 264:25 265:1 267:21 280:3,4,8,10 283:4,16 286:18 287:4,19 292:23 302:2,7 303:5 305:14 315:11 316:3,12 330:7 404:17 409:8 454:18 490:2 492:8

employees 214:5,18,22 215:1 264:24 265:1,19,23 280:25 282:16,17,18 283:21,23,25 284:8,12,14 294:21 296:8 298:3 301:18 302:12 315:15,19,22 316:3,9 330:17 441:10 444:15 461:11 462:1 487:24 489:18

employees' 254:14

employment 248:11 274:2 286:9 292:1 462:12

encounters 496:16

encouraging 469:14

end 211:17 242:16 243:20 247:6 275:1 278:18 279:3 290:21,22 291:7 292:4,8

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 104 of 642   PageID 11045
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022        Index: endeavor..extracurricular

293:2 298:13 299:25
306:24 325:7 332:7 373:16
410:6 419:12 515:19
562:10,13

endeavor 307:13

ended 318:6 472:5

ends 249:16 344:16,25

endure 303:24

enforce 268:19

engage 311:21 315:16,19
316:9

engaged 267:14,15 271:5
316:12 326:5 437:25
438:2,8,17,23 439:17,22
475:15,22

engaging 265:5 313:13
476:13 505:8 536:24

enter 234:19

entered 241:16 308:19
377:12 386:17 396:11
452:25 521:10

entire 246:15 317:10
321:11 323:14 481:18
544:19

entities 228:14

entitled 243:1 273:19
277:8 280:8 322:22 331:8
335:17 487:24 516:19
520:20 521:24 535:11
544:2

entity 278:14

entrenched 361:16

equality 496:25

equally 502:8

escalating 304:24

established 219:8

estimate 523:21

estimated 522:9

evasion 313:7

evasive 358:19 359:8
360:1,3 375:16,22,23
439:20 440:3

event 318:3 344:25 345:14

533:17 539:10,16 540:9
541:19 547:9 550:22

events 260:21 453:23
454:1 497:1

eventually 252:6 344:25
403:8 531:8

everyone's 213:14 306:22

evidence 210:6 212:24
214:25 215:4,7,9 225:20
230:4,24 231:5,19,20
232:1,24 233:2,3,7 238:18,
20,21,23 239:1,20,21
240:1,2 243:23 245:21,23
246:1,5,6,10,12,17 268:16
271:15 278:17 279:1
281:17,19,25 284:3 285:4
286:6 287:10 293:7 294:16
296:6,10 297:9,20 298:9,
20,25 299:21,22 301:1
302:15,19 303:14 304:5,14
305:10 306:13,23,25 307:3
314:11,14,21,23 319:3,6
328:4 329:14 339:25
342:12,15 350:2 354:20
356:17 360:15,18 385:10
398:15 401:2 406:11
417:22,24 422:24 423:3
433:8 449:24 450:6 453:3,
6 456:9 457:15 463:7,10
481:5 484:4 489:2 495:1
511:17 521:24 524:1
527:23 528:2 530:4 537:25
539:23 544:22 545:22

exact 439:18 440:3 531:12

examination 309:20
564:13

examinations 516:11

examples 548:14 549:3,17

excellently 303:16

exception 221:11 231:12
269:14 353:24 354:2,5
360:15 463:6 464:3

exceptions 222:23 269:15
342:5

excerpts 514:21 534:3

exchange 386:25

excited 252:24 253:11
255:11

exclamation 326:18

exclude 228:18

excluding 396:20

exclusive 247:22

excuse 235:10 243:18
255:19 379:22 395:16
396:7 434:25 435:1,4
472:21 511:16

excused 244:24 390:25
395:22 397:13 555:4

excuses 255:22

excusing 396:22

executed 376:22

executing 376:10,14

execution 376:4,7,13
377:3 400:6

executive 218:14 220:20
291:24 317:21,23,24
319:20 334:5,10,13 358:15
361:11,19 418:22 430:23
433:24 434:4,13,14
450:23,24 453:11

executives 265:15

exempt 565:1

exercise 250:13 269:21
393:18

exercised 252:18 269:9,
10

exercising 263:9,10
267:14 305:12 323:15
500:5,23 542:22

exhibit 212:11,14,16
213:4,9,14,15,19 215:21
218:2 221:20 226:23 230:3
233:3 237:11 314:7,23
315:3 318:14 319:6,8
327:15,25 328:4 329:10
341:14 342:15,17 343:2
353:10 354:20,22 356:16
359:10 360:5,18 363:1
397:20 400:9,10 401:2
404:11 405:8,9 406:11
419:10 420:25 423:3,5
432:21,22 433:6,8,11
435:9 436:11,15 449:13,24
450:2 451:9 453:2,6,8
455:12,14 456:25 458:5,11

462:22,23 463:10,15
477:25 480:10,13,14
481:5,7 488:16 489:2
499:19 524:14 527:9
528:2,4 532:8 545:14
548:19

exhibits 212:15,22 214:15
217:4,11 229:21 235:3
239:6 327:19,22 545:11

exist 232:12,13,23 278:12
301:12

existing 237:7 333:24

exited 307:11 379:15,25
391:2 397:13 452:1 512:25
513:7 555:3,11

expect 239:20 240:4
245:22 279:2 302:4,14
303:14 304:5,14 305:10
516:25 536:17 559:23
561:1

expectations 282:18

expected 211:15 293:24

expecting 405:6

experience 224:13 250:15
251:16 252:10 534:15

experienced 534:4

explain 216:4 359:19
426:11 473:16 556:2

explained 254:5

explaining 376:16 426:13
542:19

explains 304:11

explanation 212:7 293:10
311:1

explode 326:19

exploitation 422:18

express 258:7 263:10
279:18

expressed 487:1

expressing 248:16 362:3,
5,9,15

extent 229:9 233:5,16
308:5 422:17 520:5

extracurricular 388:22

**eye** 235:21 542:10

**eyes** 491:17 518:23,25

---

**F**

**face** 210:24 394:15

**face-to-face** 243:13 496:1,16

**Facebook** 220:8 229:15 248:1 249:4,8 256:22 257:10,11,14,19,23 258:8 261:15,22 269:23 271:7,23 273:20 282:3,23 283:3 346:12,13,17 347:1,3 418:24 421:7 423:11 430:3 465:13,14,16,18,23 466:3 467:8,9,12,15,16 468:9,20, 24 469:1,4,5,8,11,13,19,25 470:2,4,8,14,23 471:1,5, 11,15,21 472:13,16 473:3 474:2 481:25 492:15 511:4,6 512:4 521:19 524:7 525:11,12 526:18 532:16 533:19,20 541:8

**faced** 266:14

**faces** 262:24

**facing** 235:18

**fact** 214:16 220:20 251:9 253:18 264:6,23 268:4 295:1,6 303:11 317:10 321:18 325:4 333:4 365:24 366:8 368:2,7,10,22 413:6, 19 427:6 428:24 431:5 434:22 438:11 442:3 470:25 475:22 484:17 485:24 494:18 497:14 500:5 536:13 539:9 541:23 547:2 550:21

**fact-finding** 249:12 288:2

**factor** 283:10

**factory** 510:1

**facts** 242:15,18 291:7,8 298:12 350:1 415:3 421:20 436:12 537:25

**factual** 223:19 485:2,3

**failed** 432:4,7,18 436:25

**fails** 556:15,16

**failure** 297:4 556:5

**fair** 214:18 216:13,21 240:25 287:11 295:4 374:1 385:1 387:23,24 402:8 414:14 442:20 446:10,11 454:21 457:17 485:20 486:23 498:12 506:11 517:9,19 522:10,16 545:16

**faiths** 284:12

**fall** 229:5 233:12 442:10 491:6 518:6

**falls** 527:19

**false** 255:24 435:1

**familiar** 233:13 381:12 435:15 436:3,11,13 459:21

**family** 373:25 471:1

**farther** 442:17

**fast** 253:18 473:25 561:1

**father** 250:1

**fault** 379:1

**favor** 390:10 549:22 551:20

**favorite** 348:25 349:18,23 350:6,13,18,19,22 351:3

**fearful** 495:22

**February** 249:2,7 263:13, 14 266:14,15 267:3,10 351:13 415:4 488:7 528:5, 7,24 530:18

**fed** 351:10

**federal** 302:5 339:25 340:3,4

**federally** 305:12

**fee-paying** 248:5

**feel** 302:3 319:16 390:8 440:4 479:22 502:6,7 516:13,15 544:18,19,21

**feeling** 301:11 431:8

**feels** 409:16 411:15

**fellow** 244:4 280:8 287:4 379:11 451:22 487:23 512:19,20 540:16 554:23

**felt** 252:8,9 253:8 267:25

303:15 411:23 544:15

**fetus** 262:20 270:1 493:3, 23

**fetuses** 238:22 280:17

**fiduciary** 254:24 260:13 261:2 263:21 278:7,10

**fight** 285:24 286:5

**fighting** 487:20

**figure** 299:13 561:15,17

**figured** 212:8

**file** 293:14 318:17 337:21 481:15 514:4 556:18

**filed** 338:9,25 339:15 340:3 467:23

**files** 266:17

**filing** 472:5

**final** 406:17 564:13

**finally** 246:13 251:14 295:8 410:5 482:2

**financial** 433:16

**find** 235:8 242:18 266:19 272:1,3,10 289:13,14 302:4 376:6 390:21 493:20 516:11 525:7

**finding** 250:6 295:1,6 303:11 344:25

**finds** 255:12

**fine** 215:5 216:12,14 237:23 291:5 357:14 386:2 441:21 446:25 501:6 508:4 512:17 516:5 517:2 519:22 521:3 563:10 564:17

**fingers** 522:20

**finish** 213:16 396:3 479:9 494:9 522:12 553:1 554:7, 10 563:4 564:12

**finished** 357:17 497:12

**finishing** 212:4

**fire** 268:7 270:18,20 271:12 272:20 273:8,17

**fired** 215:12 252:18 256:18 259:19 261:17 263:23 267:8 268:23 269:9,10

270:21 271:18 416:7 552:25

**firm** 281:4

**fit** 308:10 350:17

**fits** 221:11 222:23

**five-minute** 241:4

**flag** 217:12,14

**flaw** 233:6

**flight** 232:4,6 247:16,19 253:11,20,24 257:5 258:13,21 262:12,14,15,16 264:5,11 267:5 275:6 280:7 301:20 303:5 330:13,15 334:13 337:6 345:16,20 347:11,14 348:1 375:3,19 410:15 411:12 429:8 432:9 440:20 445:9 448:20,21 449:2,6,11 450:3 454:6 460:11,17,22 464:1 466:4,6 469:14 470:6,11,17 472:2 474:1 481:13,14 487:5,17,18 489:24,25 491:14 492:16 493:17,18 494:11,23 495:24 500:3 523:3 531:5, 11 540:16 546:13 552:1

**flights** 276:23 286:21 460:8,14

**floor** 299:12

**flow** 377:10 516:9

**Floyd** 478:3,13,20

**fly** 211:22 267:4 489:11

**flying** 293:21,22 495:23

**focus** 301:3,4

**focused** 255:5

**Foley** 215:24

**folks** 281:2 301:15,22 302:2 303:8 513:2

**follow** 268:12

**follow-up** 386:1,3

**followers** 533:4

**force** 518:25

**forced** 359:6

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 106 of 642   PageID 11047

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                      Vol 2 July 06, 2022                          Index: forceful..Greenfield

**forceful** 509:1

**forcing** 279:20

**forecast** 519:18 562:6 564:6

**forget** 287:4,5 322:13 349:16

**forgiveness** 251:25 252:9 253:8

**forgot** 508:12

**form** 212:20 226:20 298:23 433:10 556:4

**forum** 408:6

**forward** 253:18 275:23,24 302:11 313:9 333:3 418:7 457:19 472:9 476:3 482:8 484:11 492:12 494:21 528:18 555:22

**forwarded** 217:19 345:2 363:25 364:7 484:14

**forwarding** 361:3 363:15 546:5

**found** 499:20 527:20

**foundation** 337:25 338:4 369:22 466:21 477:7 479:15 484:4 529:5 530:3 537:4 540:18 545:22

**founder** 283:1

**founds** 294:6

**fours** 505:17

**fourth** 224:14 515:13

**frame** 424:23 426:4,12 525:9 532:23 543:18

**frames** 426:3

**framework** 219:15

**framing** 333:12

**frankly** 284:9 286:20 294:22 392:11 456:24 542:2

**fraternity** 250:8

**fraud** 302:16,21

**free** 269:14,15,20 278:11, 13,14 279:20 280:1 295:25 305:12 315:15,19 316:9

319:16 379:17 477:12

**freedom** 250:13 263:10 277:11 279:13,14,19,20 280:1 301:10 479:25

**freedoms** 269:20

**Freeman** 383:13,22 386:19,24 387:7

**friend** 258:8 389:5 470:4, 14 543:10

**friendly** 494:10

**friends** 243:8 272:24 350:25 382:1 384:19,20 387:15 409:6 470:5,7,23

**front** 211:10 220:25 252:13 409:10 428:4 516:4 560:1

**Frye** 212:12 241:17 309:2 383:15 397:8 564:25

**FSLA** 565:1

**fuckard** 429:4

**fucktard** 265:1 429:2,6,9 440:21 546:10,12

**fucktards** 428:18 429:11

**full** 251:18 277:3 516:4

**full-time** 494:20

**fully** 290:22 293:24 297:21, 24

**fun** 322:23 368:21

**functioning** 229:2 235:4

**fundamental** 497:2

**funded** 464:20,21

**funds** 322:16 508:19

**Funny** 533:1

**future** 266:5 298:23 453:25 513:10

----

**G**

----

**Gage** 326:9 433:15

**Gale** 381:20

**gallery** 300:17 516:4

**game** 440:2 446:11 506:11

**Gannet** 433:19

**gather** 355:3 428:6 536:22

**gathered** 230:22 529:20, 23 531:20

**gathering** 425:25 426:14, 15,18,19,25 427:3

**gathers** 395:21

**gave** 237:3 253:25 288:8 289:3 293:19 295:5 298:11 299:20 304:25 329:15 386:25 387:1 393:7 400:19 410:5 442:7 510:9 519:12 559:24

**gay** 448:3,8,18,21

**gee** 390:8

**general** 353:6 402:8 429:11 470:15

**generally** 487:15 559:4

**gentleman** 288:11 333:18

**gentlemen** 293:8,15 295:11

**genuinely** 385:11

**George** 478:3,12,20

**Ghost** 364:18 367:16 369:10 370:9

**GILLESPIE** 234:23 235:12

**Gilliam** 210:9 211:3,8 216:17,20 217:16 218:4 219:3 220:2,12 221:14,17, 20 222:12,20 223:3 225:18 226:7 227:11 228:3 231:8 233:25 236:13 307:22 474:21 515:10 562:8 564:5

**Gina** 215:23

**girls** 381:25

**give** 211:19 217:5 240:22 242:5 247:5 254:22 267:22 278:18,20 279:3 292:24,25 294:5 295:24 296:18,24 298:10 299:14,19 300:2 306:12,13,14 307:5 308:7 314:8 326:16 328:16,21 329:11 340:23 366:2 378:4 379:2 386:22 390:10 406:25 426:10 433:2 461:17 475:16 488:20

503:14 510:13 516:14 521:8 552:23 557:18 559:9 564:5

**giving** 503:24 549:3,17 560:13

**glad** 275:7

**Glick** 423:8

**God** 247:15 279:16 479:20 548:9

**God's** 251:24,25 252:8 253:8

**good** 235:22 257:2 258:23 259:1 278:4 279:8 288:23 294:6 300:9 309:22,23 352:18 354:25 356:1 390:16 396:25 424:20 431:10,20 452:8,12 506:6, 23 515:19 554:1

**GOTTFRIED** 558:22

**governed** 315:23

**governing** 317:21 334:5

**government** 278:13

**grab** 391:11

**graduated** 384:7,18

**graduating** 388:16

**granted** 268:3 446:7

**granting** 517:11

**graphic** 269:25 292:21 473:8,16 474:19 493:2 511:3,4 521:18

**grasping** 273:7

**gray** 297:7

**great** 211:1 213:6,8 218:25 348:12 372:25 378:7

**greater** 243:2

**greatly** 530:13

**GREEN** 433:2

**Greenfield** 210:22 215:19 218:7 219:2 220:6 222:25 225:9 227:7,8,19,22 228:8, 9 229:12,14 230:18 231:18,22,24 232:2 233:21,22 234:7,16 235:13,14,20,23 236:22

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 107 of 642   PageID 11048
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 2 July 06, 2022                    Index: Greg..held

237:18 238:11 240:19
278:6 289:6 290:11
297:11,16 299:5,18 300:1,
4,6,11 306:5 307:24 308:7,
11 314:20 319:1 327:10,12
332:5 333:6,22 337:24
339:2,9 340:11 341:19,22
342:2,7 349:25 353:17,20
356:15 360:13 362:25
369:21 373:6 377:6,9,17,
19,21 378:14,19 380:10
388:8,9,12,15,18,21 389:2,
6,12,14 391:5,8,12,21,24
392:20 400:16 412:11
413:25 416:21 417:2,20
418:25 419:4,16 421:1,6,
14,21 422:2,11,15,19
431:23 432:13 435:23
436:1,7 439:7 442:8,14
444:21 447:2 452:10,13
455:18,25 456:2,14,17,20
457:6 459:6 461:19,23
463:3 466:20,23 472:20
474:20,22 475:24 477:22
478:4,14 479:7,13 480:2,
17,23 481:1 482:21 483:24
484:3 485:13 486:10,18
488:20 497:19 498:15
499:1,7 500:11 501:3
502:13,23 503:18 504:13
505:3,15 507:14,20 508:2
509:3 510:7 515:23 516:3,
8 518:9,15 519:5 520:9
521:3 523:17 525:20
526:14 527:19 529:4,10
530:2,22 531:2 532:1,6
533:7 534:19 535:2 536:8
537:24 539:22 540:17
545:3,7,21 547:18,23
555:19 562:15 563:12,17
564:3,8

**Greg** 215:10 270:23
374:14

**grievance** 376:11,12
413:5 440:16 528:18

**grievances** 487:4

**ground** 292:14 354:1

**grounds** 226:22 233:14
360:15

**group** 330:13,15 334:11
381:25 384:20 392:23
397:1,2 418:24 421:23
427:20 470:15 481:24

538:9 551:3

**groups** 251:20 389:5

**growing** 388:10

**guards** 494:14

**guess** 213:19 214:3 216:9
362:13 392:13 395:10
432:10 457:5 552:3 555:17
559:4 563:21

**guidance** 252:9 352:10
482:9

**guidelines** 285:15

**guilt** 253:7

**gun** 412:5

**guns** 411:9

**Gutierrez** 272:2 287:19
532:10

**guy** 215:10 251:11,12
266:25 348:12

**guys** 259:6 427:8,17
540:13 547:14 549:1 564:8

———————————

## H

**Ha** 321:10

**habits** 530:9

**Haffer** 399:14

**Hafner** 266:25 355:19,24
356:2,22 369:19 371:19,24
372:14,19 374:8,11,14
398:3 401:22 402:11
420:21,23 444:6,10,15
445:5,8 446:22 483:22
486:6,9

**Hafner's** 355:21

**hairs** 448:10

**half** 299:8 416:18 529:21
531:24 561:25

**hall** 235:8,11 380:17 397:2
562:19

**Hamlet** 560:16,17

**hand** 334:18 343:2 355:10
383:15

**handful** 457:8

**handheld** 386:22

**handle** 264:20 380:5
452:21

**handled** 380:8

**handles** 446:8

**handling** 258:1

**handy** 565:2

**hang** 458:13

**happen** 264:20 332:2
396:5 448:14 498:10 500:1
538:19

**happened** 215:10 267:9
287:8 338:24 341:3 418:14
435:2 454:2 473:25 491:18
531:16 544:4 550:4,22

**happening** 357:22 378:16
427:19 478:9

**happy** 235:10 240:17
257:6 303:23 322:23
353:15 356:13 361:8 551:3

**harass** 448:2,12 510:19

**harassed** 303:3 305:6
448:17 537:18 544:15,18,
20

**harassing** 279:22 282:9
304:23 448:7 544:21

**harassment** 305:13 424:7
490:9,22

**hard** 255:12 274:8 276:11
319:12 360:20 366:10
401:6,10,11,12 481:9
504:21 551:16

**hardcore** 533:4

**harmed** 283:9

**harms** 283:15

**hate** 372:23 406:24 534:4
538:9

**hateful** 534:13

**haters** 428:1,16

**hats** 262:25 263:1 524:7,
13,17 525:4

**haze** 284:1

**hazing** 283:13,14

**he'll** 292:10

**head** 326:18 356:3 430:18
490:15,19,25 492:5

**header** 466:8

**Heads** 330:21

**hear** 216:17 219:25 235:6
239:11 240:5 244:7 245:10
250:23 255:17 258:9 261:1
281:7 283:22 284:14,16,22
285:6 287:1,3,14,16,17,18
288:8,12 290:22 291:9,20
294:24 295:3 298:12
299:23 300:25 302:13,19
305:20 306:25 312:21
332:10 364:3 377:24
384:14 387:9 389:22,23
405:6 412:15,22 413:13
462:14 464:15 471:8
538:24 563:16

**heard** 242:1 246:16 251:22
256:21 278:16,25 285:7
289:2 291:8 295:5 298:12,
19 299:1,21 300:22 302:9
306:13,22 312:22 313:3
389:23 415:22 458:21
460:6 461:1,3 479:4
484:23 487:2 520:10
528:17 553:21,22

**hearing** 215:12 245:7
288:8 291:19 292:8,15
293:2 294:1 295:7 307:3
318:10 397:1 439:12,13,15
555:25 556:3

**hearsay** 220:7,11,12
221:11 222:23 225:10
226:6,7,13,20,22 227:3,6,
9,25 228:18,21 229:16
230:19 231:12 233:20
342:4,6 353:21 354:2
360:14 421:9,20 463:5
511:16 527:18 534:20

**heart** 220:19 242:8 251:2

**heat** 517:16

**heavy** 408:22 412:2

**heels** 335:12

**held** 249:11 278:22 291:14
299:16 306:18 329:7
340:20 342:9 354:14
378:23 415:25 422:21
442:23 447:21 455:1 458:2

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 108 of 642   PageID 11049
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 2 July 06, 2022                Index: helped..includes

462:7 463:22 507:5 508:8
554:16

**helped** 413:4

**helpful** 373:18 393:4

**helping** 252:14 253:9,14
300:19 515:16

**Herb** 253:16

**hereinafter** 315:25

**hesitant** 348:7

**hesitation** 385:2

**hey** 254:18 322:22 323:18
324:25 368:23 551:19
553:2 562:20

**hierarchy** 526:22

**high** 330:4,6 361:20 381:5
383:19,20 384:2,5,6
387:21 389:17 390:9
529:14

**higher** 278:10

**highest** 254:25 278:8

**highlighted** 282:7 456:3

**highlighter** 456:17

**highlighting** 456:15,20

**Hill** 210:10 211:21 308:22
435:10,12

**hired** 247:16 276:15

**historic** 285:7

**history** 408:21 410:23
543:17

**hit** 234:14 473:24 522:7

**Hmm** 346:7 538:8 551:2

**Hofehover** 215:24

**Hofer** 270:23

**Holcomb** 258:16 259:3
443:9 444:2 445:15 446:22

**hold** 288:19 361:11 373:17
377:4 441:1 459:9 497:7
511:12 527:14 537:3,8
547:21 550:10

**holding** 215:2 261:5

**holy** 517:11

**home** 250:18 548:8

**Honor** 211:3 217:13,16
218:7 219:4 220:2 221:14
222:12,25 227:8,11,19
228:9 230:20 231:18 232:2
233:22 234:7,16,23 235:14
236:22 238:11 239:4,22,25
249:21 289:18 291:18
295:17 296:15 297:11
299:5 307:24 308:11
314:12 318:19 319:1
327:17 328:5,20 332:5
333:7,22 337:24 339:2
341:23 342:3 356:15
360:13 363:19 369:21
373:6 377:6 378:13,21
380:10 391:6 392:20
400:16 405:21 412:11
416:21 417:2,20 418:25
419:16,19 420:6 421:1
431:23 432:13 433:3,4
435:13 436:5 439:7 440:24
441:6 442:8 444:21 445:18
454:7 455:5,13 456:3
458:7 459:6 462:3,17,19
463:4 466:20 474:20
475:24 478:4,14 479:7,13
480:2,24 481:1 482:21
483:24 485:13 497:19
498:15 499:7,12 500:11
501:3 502:13,23 503:2,18
504:13 505:3,15,21 506:3
507:14 510:8 513:20
514:24 515:23 516:16
518:20 523:17 525:20
527:20 529:4,10 530:2,22
531:2 532:1 534:19 536:8
537:24 539:22 540:17
545:3,7,21 547:18,23
550:8 552:18,22 558:22
562:15 563:14

**Honorable** 241:23

**hook** 550:7 560:25

**hope** 250:14 423:19
425:22 453:10 454:24
512:13

**hopeful** 563:4

**hopes** 361:20 543:25

**hoping** 250:23 394:23

**horrible** 269:3 533:18
540:12 542:16

**horrific** 503:7

**horrified** 473:25

**host** 361:5

**hotels** 464:5,9,12,17

**hour** 379:7 563:5

**hours** 444:12,19 445:17
564:25

**Hover** 215:11

**Hudson** 436:18,22 444:2,4
491:25 560:23

**huge** 301:19 305:22
408:24

**human** 247:14 301:11

**humiliates** 283:16

**hundred** 388:17,18

**hung** 381:25

**hurt** 427:1 428:9

**hyperspace** 247:10

**hypothetical** 505:11

---

**I**

**idea** 286:9 323:3 352:18
395:20

**identified** 484:6

**identify** 421:12,24 422:6
457:2 458:10 481:8

**ignore** 264:6

**III** 210:23 300:12 475:1,5,
18 476:9,10 477:15,18

**illegal** 236:5,8 269:18
333:4 475:14

**illegality** 341:4

**illustration** 355:11 374:5

**image** 473:9

**images** 503:7 521:18

**imagine** 260:1 391:16

**immediately** 497:5,9
498:4 522:15,21 523:6,7,
11,13,15

**impact** 480:6

**impartial** 382:10 385:1
387:23 390:6 392:8 394:15

**implemented** 224:18

**implications** 517:4

**import** 439:21

**important** 232:14 277:7
279:14,15 283:24 310:15
311:11 313:12 348:4,6
491:15 514:6

**importantly** 395:1

**impressed** 389:16

**impression** 223:10
226:14

**impressions** 226:8

**improper** 368:24 369:2
484:18 485:18,24 539:11
546:16

**improperly** 256:25

**in-flight** 490:15,19 491:1,
19

**in-house** 281:10

**in-towners** 559:18

**inaccurate** 535:22

**inadvertence** 511:10

**inadvertently** 473:24
474:4,7 511:8,24

**inappropriate** 239:1
263:7 296:6 323:18 324:2
325:20,21,23 326:4 371:5,
8 374:24 375:2,5,9,13
399:25 400:1 403:21 456:8
468:15,18 552:6

**incident** 336:11

**inclined** 421:19,25 553:19

**include** 237:13 247:5
483:5 485:20 490:25 492:6
524:7

**included** 302:22 410:19
415:6 451:5 491:24,25
492:9 496:7,20 524:16,22
525:3 546:9

**includes** 243:7 247:6
283:17 450:24 451:2 465:1

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 109 of 642   PageID 11050
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                            Vol 2 July 06, 2022                    Index: including..John

**including** 244:22 248:21 264:12,25 280:10 284:2 328:18 348:25 376:16 388:1 399:14 418:10 427:24 469:8 486:5 529:2

**incomplete** 456:4

**inconsistencies** 482:10

**incorporates** 283:18

**incorrect** 477:18 500:18, 20

**incredibly** 408:15 411:7 412:1

**incumbent** 394:25

**incumbents** 361:14,16

**independent** 244:5

**indication** 409:19

**individual** 301:21 305:11 392:22 442:12,15 491:7 496:25

**individuals** 215:22 216:1, 7 231:1 284:17 303:13

**inflame** 456:22

**inflight** 330:2,10,11 355:24 356:3 372:12 402:2

**influenced** 242:25

**inform** 252:17

**information** 226:9 230:22 243:11,17 244:21 257:15 264:7 355:3 370:19 380:11 391:17 393:3 410:4 425:25 426:14,16,18,20,25 427:3 438:16 524:25 529:20 531:20 556:20

**informational** 323:7

**informed** 348:1 410:20 437:10

**informing** 336:16 436:18

**initial** 218:9 525:16

**initially** 258:15 471:3

**initials** 363:12

**injecting** 223:19

**inner-city** 408:22 412:3

**inquire** 383:23

**inside** 418:24 497:17

**insiders** 266:16

**insightful** 407:3

**insinuation** 356:18

**installment** 406:17

**installments** 406:19

**instance** 531:23

**instant** 467:15

**instruct** 242:16 246:7 267:18 340:11,13

**instructed** 334:19

**instruction** 215:6 217:6, 13 219:18 221:12 223:2,4, 23 229:10 230:1 231:17 233:10,18 234:13 237:14 298:11 299:4,14,20 306:12 328:14,18,21 340:17,23 400:12,18 406:3,6 436:6 534:21 552:23

**instructions** 240:22 242:6 246:17 261:1 307:5 379:10 451:22 452:2 512:18 554:22

**insurance** 341:10

**intact** 437:7

**integrity** 533:2 546:8

**intend** 559:2,12

**intended** 245:20 456:22, 23 491:17

**intending** 275:13 517:23 520:9 547:19 549:10,14

**intent** 231:11 537:5 544:7 553:13

**intention** 250:22 511:11

**intentional** 393:10

**intentionally** 268:17 536:13

**interact** 388:25 389:8

**interacted** 389:4

**interest** 255:1 260:7

**interested** 276:7 431:18

**interesting** 263:13 517:4

**interestingly** 257:21

**interfere** 310:16,19 311:12,23 312:19 313:15

**interfered** 315:12

**internally** 514:13

**international** 227:24 255:16 331:16,25 332:15 349:9 352:10 463:22

**Internet** 243:15 244:17 529:20 530:21

**interpret** 372:20 373:13

**interpretations** 246:11

**interrupt** 377:10

**interruptions** 245:16

**intimate** 359:21

**intimidates** 283:16

**intimidating** 279:22

**introduce** 281:2,15

**introduced** 226:9 246:6 484:4

**introduction** 462:23

**investigated** 448:20,24 487:12

**investigates** 267:11

**investigating** 468:19

**investigation** 221:7 244:5 249:13 284:15 286:12,14 287:6,12,20,24 289:19 293:20 295:2,3 337:10 492:11 544:9 552:2

**investigations** 487:18 529:15,16

**invoked** 234:18 377:13 380:15

**involve** 234:1 483:18

**involved** 221:6 244:22 252:21 260:19 265:25 286:8,23 287:7 294:21 303:18 305:22 312:18 327:6 348:9 415:11,13,18 425:7 426:2,5 428:13 438:24 441:16 492:11

496:3 552:3,5

**involvement** 312:22 445:13

**involves** 279:16,17,19 497:16

**involving** 287:13

**irons** 558:3

**irrelevant** 222:11,17 224:23 236:8 511:16

**Israel** 273:13

**issue** 214:5 218:8 221:3 244:12 276:9 296:16 379:1 382:22 383:9,10 387:8,19 395:14,24 396:15 406:24 407:24 443:22 452:21 481:23 547:17 557:12

**issued** 315:25 428:7,8 438:6 439:2 487:13 533:17

**issues** 220:7 228:12 240:11 244:25 245:2,5,15 290:9,16 300:23 302:13, 15,16 307:20 380:2,8 404:7 407:10 425:7 452:5 487:1,11 555:10 557:8 558:2,18

---

**J**

**Jackson** 215:23 225:11,18 226:3,8 231:10 234:4 270:22 274:6,7,10

**Jamie** 401:25

**January** 248:20,24 259:20 310:4 329:24 453:9,24

**Jeanna** 225:11,18 231:10 234:4 270:22 274:6,7,10

**Jessica** 453:22

**job** 253:13 264:2,5 275:18 276:13,14 277:4 289:4 292:17,25 293:25 294:2,4 295:9 344:10 373:17,24 398:15 403:9 460:23 461:1,4,5,7,9 495:23 520:6 550:5

**jobs** 250:4

**John** 242:6 258:16 259:3 319:18,19 339:17 377:17,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 110 of 642   PageID 11051
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 2 July 06, 2022                    Index: join..leadership

19 433:17 451:5 562:15

**join** 339:10

**joint** 236:3,19 237:2,4
331:2,5,7 336:5 337:23
555:19

**jokes** 367:24

**Jones** 211:4,6 281:5
287:17

**judge** 241:23 242:13
244:23 254:5 267:18
338:12 340:4 382:22 390:2
452:10 556:8,10,19 557:24
558:1

**judges** 242:15

**judgment** 415:15

**judicial** 382:22

**judo** 411:9

**jump** 247:10 378:10

**June** 310:7,12,13

**juror** 381:7,10,21,23 382:3,
11,19,25 383:12,13 384:8
386:17,20 387:4,13,16,18,
25 388:3,5,11,14,17,20,24
389:4,9,22 390:5,11,13,17,
23 391:2,4 392:23,24
395:14,16,23 396:8,14,15,
21,23 397:13

**juror's** 243:2

**jurors** 237:17 241:16,18,
19 243:1,18,20 244:4,24
299:9 302:4 307:7,11
308:19 379:11,15 386:8
396:6,11 451:22 452:1,25
512:19,21,25 521:10
554:23 555:3

**jurors'** 243:1

**jury** 210:19 214:1 216:5
217:9 218:20 221:1 223:4
224:23 230:14 236:9
238:22 239:8,11,15 240:2,
7 241:15 242:7,12,14
243:10 246:13 247:5 259:5
296:24 300:18 307:4
308:18 314:25 325:22
327:19 328:1 342:13
354:18 356:18 365:21
378:15 379:14 383:9,10
385:8 390:3 391:1 393:11

394:20,21 395:1,11,13
396:10 397:3 398:18
409:10 422:25 435:16
436:7 451:25 452:24
456:22 461:24 462:10
477:20 481:3 518:24
519:18,24 521:8,15,16
534:21 538:2 553:11,20
555:2

**jury's** 215:8

## K

**Kate** 281:14

**Kearney** 215:25

**keeper** 212:22

**keeping** 212:19 213:2
408:18 437:6

**Kelleher** 253:16

**Kent** 334:18

**Kevin** 377:18

**key** 517:5

**kibosh** 378:16

**kick** 331:13 394:4,20
434:24

**kicked** 255:13,16 256:3,9,
13,24 302:18 317:17 344:9
361:21 423:22 424:2
539:19

**kill** 229:23 416:8

**killed** 265:2

**kind** 211:25 259:15 261:12
262:6 269:19 280:25 301:9
308:7 345:11 368:23
381:10,11,16 390:14 413:8
419:13 429:17 437:12
475:3 489:10

**kinds** 399:15 429:20

**Kingdom** 300:17

**Kleburne** 514:19 515:7,14
558:20

**Klenurne** 513:13

**knew** 251:2 326:24 327:2,5
346:19,23 347:19,20
384:10,12 439:1 459:25

468:5 484:15

**knowing** 333:3 359:18
360:1 385:1 411:16 459:18

**knowledge** 217:22,25
220:15 222:4 225:23
231:11 322:10,13,14,18
359:22 367:1 373:9 384:25
394:8 395:6 417:6 448:22
455:7,11 467:1 533:11

**Kyler** 433:16

## L

**labeled** 467:19

**labor** 219:9 287:16 490:1
491:25 492:4,10

**lack** 337:25 369:22 466:21
482:8 484:3 529:5 530:3
540:18 545:22 551:22

**lacks** 526:14 542:21

**Lacore** 217:19 221:4
222:16 267:1,4 329:22
330:1,19 336:10 356:23
401:21 406:14 410:18
413:1,7,10,12,14,15,19
414:8,9,15,17,20,24 415:9,
10,12,13 491:19,24

**Lacore's** 335:20 420:14

**ladies** 293:8,14 295:11

**ladies'** 262:24

**lady** 255:9

**laid** 219:15

**lake** 249:24 381:16 383:19
384:2,5,6 388:9,23 389:19
390:14 394:10,12

**land** 332:3

**language** 259:12 262:25
315:18 430:5 474:25
546:12

**lanyard** 272:25 273:4

**laptop** 255:19

**large** 284:6 433:18

**Las** 249:9 489:8 556:24
557:1

**last-chance** 442:4

**late-breaking** 394:8

**latest** 487:18

**Lauren** 281:11

**law** 219:5 242:14,17
244:21,25 246:7 254:12,20
255:1 260:12 278:8,17,18
279:2,3 281:4 291:8 297:4,
7 298:12 299:23,24 302:5
306:23 331:9 332:2,7,10,
16,18 393:19 474:25 476:3
509:19 564:25

**lawful** 315:16,19 316:10,
12

**laws** 469:15

**lawsuit** 337:22 338:9,24
339:15 341:3 425:15
462:12

**lawsuits** 426:2,6 427:7
437:25 438:11

**lawyer** 235:10 278:16
332:9 379:21 483:1

**lawyers** 244:23 245:15,18
246:9,22 247:1 249:18
381:2 521:24

**lay** 231:20,25 338:4 385:12

**layer** 288:10

**layered** 302:10

**layers** 220:7

**laying** 394:13

**lead** 314:3 436:22 437:3
450:9 517:2,7

**leader** 225:19 231:10
234:4 266:4 414:17 450:9

**leaders** 266:19 327:3
352:11,22 353:1,6 375:4
376:16 404:18 486:4

**leaders'** 369:25

**leadership** 214:17 225:2
247:25 248:1,17 266:5
285:16 294:23 324:2
326:15 367:4 370:1 372:10
402:1 403:4 409:6,18
410:21 411:13 413:22
416:9 418:20 428:1,15
431:18 533:2

**leads** 218:18 230:23

**lean** 300:4 472:8

**leaning** 229:18 237:21 238:6

**learn** 244:8

**leave** 245:4,14 336:22 379:17 386:11 397:9 398:11 499:24 513:4 560:25

**leaves** 395:22

**led** 335:14

**leeway** 516:15

**left** 250:9 514:21 543:3

**leg** 364:23 371:11 397:24 558:3

**leg-breaking** 364:18 367:15 369:9 370:8,23

**legal** 223:8,19 235:2 245:15 260:24 278:9 281:12 331:12,13 332:21, 25 333:13,21 349:2,6 351:6,8,12,23 352:7,11,13, 15,18 380:8 395:15 425:7, 23 475:23,25 476:13 509:1

**legality** 236:12

**legally** 332:4

**legitimate** 283:7 407:1,12, 19

**lets** 520:14

**letter** 226:15 415:12 435:20 538:9 551:4

**letting** 417:24 519:15 521:25

**level** 237:9 301:14

**leveled** 403:22

**levels** 526:23

**liaison** 336:6,10

**Libel** 269:18

**liberal** 535:17

**life** 247:14 252:20 263:11 298:6 473:7 497:11,16 498:7,13,23,25 506:13 530:11

**light** 460:13

**lightly** 224:17

**lights** 460:12

**likes** 253:14

**limine** 214:5 215:2,15,16 216:10,25 219:6 220:19 224:24 229:8 230:13 233:15 289:3,10,25 295:21 414:13,23 441:7,15 446:7, 13 454:19

**limined** 289:11,15,20,25

**limit** 340:17 457:4 514:8

**limitation** 329:15 405:7

**limited** 215:4 222:24 500:2

**limiting** 215:6 217:6,13 219:18 221:12 223:1,2,23 229:10 230:1 231:17 233:9,17 234:13 237:13 328:14,18,21 400:12,18 406:1,3,6 436:6 552:23

**limits** 215:7

**limp** 396:2

**lines** 322:6

**Linkedin** 481:25

**list** 212:14,17,19,20 213:5 215:22 225:12 318:21 326:16 328:1 354:11 451:17 456:5 490:8,14 513:15 559:24 560:16,21 561:11

**listed** 225:11 239:6 451:12 490:10,21

**listen** 244:14 245:12 303:7 304:10,19 305:7 312:25 366:1,21 403:24 408:17 504:24

**listening** 242:21 369:7

**literally** 376:21 421:6

**Litigators** 300:17

**live** 378:2,3 489:12 513:25 514:18 515:1,3,5,9 558:4 561:6,7,12

**lives** 301:13 556:24

**living** 249:23,25 500:2,8

**lo** 552:15

**loaded** 543:3

**local** 210:7 227:22 228:4, 10 247:18,21,25 248:4,20, 25 249:3 256:6 261:5 300:3,15 310:3 317:22 319:21 334:6 337:1 361:6, 24 434:1 453:10,24 459:18 463:21 489:10 492:17 507:13 508:15 543:17 551:3,5 557:13 562:17

**locally** 433:25

**locals** 228:6

**log** 212:23 385:12 394:14

**logo** 465:1

**long** 215:3 226:15 255:20 276:12 360:22 361:3 389:17 474:15,17 482:7 508:3 516:21 520:19 522:11,20,25 539:2 561:23 563:8,11,16,24

**long-term** 292:23 372:25

**long-time** 345:20

**longer** 237:6 260:7 275:8 336:17 469:3 519:12

**longstanding** 294:20

**looked** 334:8 338:20 341:11 368:19 381:11 404:6 426:7 523:14

**Lori** 453:21,24

**lose** 331:19 344:10 395:1 550:5

**loses** 237:24

**lost** 253:3,5 256:12,13 394:22 460:23 461:1,4,5,6, 9

**lot** 219:12 258:13 268:11 275:25 279:12 285:7 300:22,25 301:10,16 353:1,4 355:5 357:2 359:2 385:7 409:24 418:16 527:5,6,7 529:15 538:19 542:16 557:18

**lots** 278:9 359:1

**loud** 245:9 553:8

**love** 251:25 252:8 292:16 294:1 343:20

**low-level** 330:7

**lower** 491:9

**lunch** 377:25 378:9,11 379:3,6,7 448:16 564:11, 12

**lunchtime** 563:20

**lungs** 242:8,9

**lying** 305:21 393:15 394:14

---

**M**

**Maberry** 281:9

**mad** 343:15

**made** 267:12 287:7 296:18 313:24 324:22 343:11,14, 22 371:9 376:12 427:15,20 430:6 437:22 440:5 448:19,21 461:16 463:4 469:23 495:25 516:24 524:16 528:7,9,25 533:6 534:8 544:19 550:11

**maiden** 381:17 385:8,13 390:18 394:11

**major** 459:2 460:1

**majority** 256:12 481:24

**make** 217:3,5,7 218:13 219:13,25 224:9 225:7 238:10 244:5 245:19 246:9,23 254:1 256:2 262:2 274:8 290:25 291:11 292:9 297:19 305:25 327:13,25 328:10 337:2 350:1 352:8,12 353:22 356:1 373:4 377:14 379:24 394:18 395:3 397:9 421:14 450:5 460:18 470:2 473:12 485:24 491:16 514:14 517:12 518:22 523:8 548:15 562:16,21 564:3,16

**maker** 294:25 414:13 415:16

**makers** 294:17

**makes** 260:23 263:8 270:1 282:13 302:2 305:18 390:5

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 112 of 642   PageID 11053
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                Index: making..messaging

415:23 473:11 493:3
504:22

**making** 213:25 214:2
230:2 231:2 233:21 247:10
270:25 278:2,11 290:7
322:23 328:9 331:12
358:22 367:24 368:21
376:9 413:8 414:24 487:7
510:2 529:1 544:22
561:10,13

**malicious** 282:9 283:14

**management** 222:1
224:15,19 265:12,13 266:7
270:12 288:11 330:6
336:12 337:9 357:3,4
359:15 370:7 373:22
374:7,20 375:10,20 398:4
400:3 402:4 403:16,20
404:5,8,16 409:5,22 413:7,
9 431:9,19 432:11 482:12,
18 483:9,15,19 485:1,6
487:11,14 490:24 536:23

**manager** 249:9 286:15
287:18 388:24 401:22,23
415:9 489:9,10,23 490:6,9,
12 491:8

**managers** 336:24 489:13

**mandatory** 437:14,19

**manner** 279:22 298:9
509:1

**march** 227:14,18 248:25
249:11,14 259:24,25
261:4,16 263:2,7 271:16
285:19,25 453:23,25
454:14 455:10 457:3
458:19,25 459:1,5,14,18,
25 460:2,7 463:17,24
465:3,10,11,23 466:4,17,
18 467:11,20 473:12
492:25 499:24 504:2,5,11
532:22

**marching** 261:10

**margin** 361:15 394:23

**marginal** 229:22 354:6

**mark** 450:8 517:11

**married** 250:8 251:7,11

**marry** 251:12

**marshal** 214:24 557:25

**marshals** 558:2

**Masoni** 210:25 300:13

**math** 384:17

**Matt** 210:10 397:25

**matter** 220:10,14 264:23
287:25 297:4,6 319:24
321:18 325:4 396:18 397:5
402:14 414:7,12 421:16
428:24 446:18 484:17
512:7 534:22

**matters** 226:10 301:23,25
302:1 331:19

**Matthew** 210:9

**Maureen** 284:18 287:16

**Mcdaniel** 343:18

**Mckeeby** 210:14 213:7
214:13 216:3,11 222:8,9,
13 224:5,10 226:25 227:1
229:4,5 230:5,7 233:11,12
239:4,17 240:15,17,18
277:24 278:3,25 279:5,7,
10 289:18 291:16,18
295:12 296:15 298:5
307:23 314:19 319:2
321:23 323:19 327:17
328:20 353:13 360:10
363:21 385:18,21,24
386:13 387:6,14 388:1,4,6,
7 392:4,16 393:22 400:11,
15 406:2 414:1,11,16,20
415:14 429:22 436:5
440:24 441:2,6,21,23
444:24 445:18 446:25
449:17 451:12 452:19
454:20 455:15 457:22
461:21 471:18 477:6
480:21 488:19 494:25
504:4 511:9,14 518:18
530:6 537:2,4 550:8
555:15 558:15 560:19

**Mckinney** 281:14

**means** 218:24 243:12
261:23 309:12,14 336:23
379:20 380:16 390:9 416:7
456:12 478:9 498:19 499:4
503:5 509:18 531:9 549:3,
18

**meant** 311:6 338:14
376:17 507:2 523:13

**meantime** 380:6

**media** 224:12,18 243:14
244:10 248:16 263:17,25
264:9,13,24 265:18
266:18,21,23 267:7 268:19
271:12,20 282:4,9,19
283:8,18,20 303:1 355:13,
15 359:16 371:7 399:13
400:2 402:6,23 403:17,20
404:2,19 424:15 437:22
440:17,18 443:10,18,20
444:4,11,15 445:5,11
449:12 466:11 481:22
482:1,7,19 483:11 485:23,
25 487:6,11,21 488:11
493:14 494:11 495:25
529:14,24 530:20 531:16
550:5

**meet** 211:1 305:18 444:1,
10

**meeting** 248:22 249:12
288:3 295:1,6 303:11
331:18 337:10,14,19
355:14 357:18,20 358:23,
25 359:20 418:22 434:15
437:15,19 439:5,25 445:8
453:11,14 463:21,23
464:2,18 492:18

**meetings** 305:4 337:1
440:7 441:16 453:22

**meets** 395:15 396:20

**Meggan** 211:4 281:5

**Melissa** 255:10,11,13,14,
16 539:4,18,19 540:5,10

**member** 218:14,16 261:19
266:1 274:14 275:24 283:2
291:23 304:22 310:14
311:10 312:1,5,8,9,13
313:13 321:3,17 324:21
348:8 349:1,12,19,22
350:8,15 362:10,19 363:6,
13,15 364:10 365:1,20
366:12,14,19,23 370:7
374:18 375:11,19 398:3
402:12,22 411:19 413:22
424:15 433:17,18,24
445:12 448:18 449:5
468:12 470:15 475:22
494:21 534:12 535:15,22
536:24 537:21 542:11,15
550:7 552:5

**member's** 537:14

**members** 227:13 248:20,
25 266:9 274:10,12 311:15
312:15,16 321:6,16 325:1
334:10 337:9 347:4 350:7
355:5 362:15 373:21
374:11 403:17,19,22
404:1,3,5,25 407:2 409:21
427:24 428:12 430:3,22,24
431:5 441:17 445:6 446:20
448:17,19 469:6,8,25
470:3 482:20 483:8,12,14
484:25 485:5,7,22 528:10
529:20,21 530:18 531:20,
25 533:6,19 534:5 535:18
538:18 539:21 540:15,16
543:21 550:16

**membership** 248:4 305:4
315:14 330:22 331:18
431:1,8 470:16 481:19

**memes** 526:23 546:25

**memory** 242:22,23,24
385:14 426:13,14,15

**men** 479:5

**mental** 223:10 226:8,14

**mention** 253:2,4 267:17
295:19 345:24 350:7
482:16 524:12 553:25

**mentioned** 302:21 389:19

**mentioning** 350:20

**message** 257:20,23
261:22 264:11 355:19
356:2 423:16 424:12 467:9
468:9,24 469:13,17 472:5,
11,12,13,14,15 473:5
474:6 480:25 481:12,21
483:5 485:19 486:1 488:12
493:2,24 495:11 502:11
503:13 512:2,3 521:19
524:7,16 525:3 532:15
540:21

**messages** 248:1,8,10,16,
18 249:3,6,8 256:22
257:10,11 424:4,10 450:3
467:13 469:1,19,23 470:11
492:15 494:6,18 500:15
525:7 527:7 536:20 537:12
547:20 552:25

**messaging** 243:15 533:21

**messenger** 249:4 467:15 472:13,16 473:4 511:6 512:4

**met** 267:24 286:15 444:18 446:22 486:4

**Mexico** 556:25 557:1

**mic** 364:4 386:22 391:11 553:11

**Michael** 210:25 288:12 291:20 300:13

**Miche** 215:24

**microphone** 310:8 401:9 497:8

**middle** 282:20 292:14

**Mike** 266:24 293:24 355:14,17,19,21,24 356:2, 22 358:4,6,7 361:4,5 366:15,18 371:17,19 398:2,3 399:6 401:22 407:5,20 408:4 415:11 444:6,10 445:8 483:22 485:10 486:5,9

**Mike's** 399:1 486:15

**Mikes** 355:20 372:9

**milage** 455:24

**miles** 556:1,8,9 558:1

**mind** 237:25 246:15 280:12 284:25 302:25 398:25 415:23 426:4 429:19 523:12 554:25

**mindful** 514:8

**mine** 445:12 470:4,14 543:10

**minority** 408:22 412:3

**minute** 254:5 261:13 265:20 307:14 365:18 425:21 452:8 453:10 528:6

**minutes** 241:9 272:15 307:13 308:13 380:5 452:7 461:16 512:15,23 520:19 554:8

**miscellaneous** 557:11

**mischaracterizes** 501:4 504:5,14 536:9

**mischaracterizing** 419:1

**misdirection** 268:11

**misleading** 230:13

**misrepresentation** 393:10

**misrepresenting** 417:21

**missed** 450:8 478:17

**missing** 334:12 446:3 464:13

**mistake** 545:20

**mistakes** 305:25

**mistreatment** 283:15

**mistrial** 392:19

**mistyped** 497:6,25

**misunderstood** 290:5 527:8

**misuse** 368:25

**misused** 368:22

**mitigate** 295:23 297:5

**mitigation** 295:20,22 296:2,17

**mix** 211:18 212:15

**moment** 210:16 234:17 267:18 282:12 341:20 398:17 401:7 433:2 474:9 522:7 544:10

**money** 228:12 254:18 259:21 260:19 262:4 277:9,20 320:4 323:5 502:7 503:15,24 505:10,13 508:24,25 509:11,16,25

**monitor** 405:13

**monitoring** 487:15

**month** 482:2 492:25

**months** 271:21,22 272:5 335:5 525:8

**moral** 259:13 542:18

**morals** 542:20,21 551:22

**morning** 212:4 238:2,8 240:24 300:9 307:1 309:22,23 324:22 341:16 360:8 385:10 400:14 432:25 449:16,20 455:17 462:24 475:19 554:21

**556:12 562:13 565:4**

**Morris** 210:15 281:3

**motion** 215:2,15,16 216:25 219:6 220:19 224:24 229:8 230:13 233:14 414:13,23 441:7,15 556:7,18 561:22

**motivation** 286:17

**motive** 222:12,14,16 225:24 231:11 234:5

**Mountain** 364:14,16 369:16,18 370:5 371:21,23 372:6 398:4 399:1 420:14, 20 483:22 484:10 485:11

**mouth** 298:20 303:15 401:10 411:11 464:14 472:8 497:8

**move** 249:17 299:8 308:3 310:8 314:15 318:15 327:15 341:14 353:11 360:6 400:10 420:10 432:22 449:13 451:9 455:13 462:23 479:14 480:14 488:15 499:16 527:10

**moveable** 308:5

**moved** 253:9

**movement** 330:21 335:14

**moving** 262:21 314:11,14 405:16,19 517:24

**multiple** 220:6,8 281:20 287:13 386:10

**murder** 262:5 448:15 476:25 493:4 503:12,14 504:20,23 505:2,10,13 508:20,24 509:12,16 510:23 511:1

**murderer** 503:7,17

**murdering** 510:17

**muted** 435:17

**N**

**named** 417:16

**names** 433:20 458:20

**Naomi** 436:17,22 444:1,4 491:25

**national** 219:9 255:6,15

**nationwide** 228:6

**natural** 301:11

**nature** 422:6 438:12 491:4 493:21 519:2

**needed** 268:1 338:14,18 352:19 368:13 376:21 409:3 436:5 491:15

**negative** 365:11,22,23 366:4,5,8 367:2,9 418:13

**negotiate** 431:20

**negotiated** 315:8 430:8, 10,14 450:8 475:13

**negotiating** 257:1 430:10, 14,18,19 437:1 443:6,12 444:3,19 445:7 492:1,2,5,7

**negotiations** 376:3

**negotiator** 314:3 436:22 450:10

**negotiators** 551:5

**neutral** 367:9

**Nevada** 249:10

**Nevarez** 258:17 259:4 270:14 325:8 344:21 348:21 350:5 351:18 352:14 364:13,19 367:22 368:8,20 369:8,9 417:15 423:14 424:9 429:11 433:15 437:14 451:2 484:25 485:4 513:24 515:18 532:12 534:11 545:19,25 546:11 552:7 553:2 555:14,23 556:13,21 557:9 560:3 561:2,20

**newer** 460:12

**newscast** 244:15

**newspaper** 227:2 244:13

**nexus** 261:11,12,13 271:2, 3,11,13,14,16,19,24 273:8, 19

**nice** 449:1,5

**night** 212:7 451:15,16 555:20 559:5,19

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 114 of 642   PageID 11055

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 2 July 06, 2022        Index: nine-and-a-half..opportunity

nine-and-a-half 250:17

Nineteen 480:19,20 481:2

noise 245:9 385:21

non-member 234:3
236:14,16,18 248:5 330:24
336:18,25 343:20 349:15

non-members 237:2
403:23 445:14

non-similarly 214:4

nonetheless 534:12

noon 379:2 564:2

Northern 241:21

note 217:7 230:2 327:25
383:12,16 384:10 395:20
487:10

note-taking 242:20

notes 242:19,21,24,25
243:1 267:13 477:14

notice 249:15 379:2
559:10 562:21

notion 394:8

notwithstanding 387:21

nouns 407:14

NRDC 459:16,21

number 228:20 250:19
289:8,10 314:17 372:9
393:7 480:18

numbers 435:24

numerous 269:15 355:20
376:15 403:19 404:18
421:17 440:6 529:13

nut 498:21

NW 408:16

───────────────

O

oath 309:3 313:4 322:8
346:20 359:24 375:15
386:19 397:15 426:9 468:1
475:6,14

object 295:18 328:13
362:19 367:17 392:18
422:3 500:6 516:8,13
525:18 534:20

objected 237:3 247:24
304:25 320:7,9 327:2

objecting 517:25

objection 214:9 226:21
228:22 229:3 230:9 237:12
238:1 278:19 288:14,15
290:18,20 291:4 295:18
296:7 298:18 306:9
309:10,12,14 314:18,19,20
318:16,23 319:2 321:23
323:19 328:17 329:4 332:5
333:6,11,12,22 337:24
338:12,21 339:2 342:6,12
350:1 353:13,15,21
354:10,17 356:15 360:10
369:21 373:6 376:24
412:11,19 413:25 416:21
417:2,20 418:9,25 419:16,
23 420:9 421:20 422:1,24
429:22 431:23 432:13,24
439:7 441:2,13 442:9
444:21,24 445:18 449:17
451:13,18 452:19,20
455:15 459:6 463:8 466:20
471:18 472:20 474:20
475:24 477:6 478:4,14
479:7,13 480:2,21 481:1
482:21,25 483:24 485:13
486:10,18,21 488:18,19
494:25 497:19 498:15
499:1,7,10 500:11 501:3
502:13,23 503:18 504:4,13
505:3,15,18 507:14 509:3
510:7 511:9,13 516:25
518:2 523:17 525:20
527:17 529:4,10 530:2,22
531:1 532:1,6 533:7
534:25 535:4 536:8 537:2,
24 539:22 540:17 545:3,7,
21 546:1 547:18 550:8

objection-wise 480:16

objectional 516:25

objections 213:10,12,14,
18,20,23 214:1,2 219:17,
22 223:22 227:7 229:16
237:18,20 238:2 278:6
288:20 295:13 296:13
298:15 327:16 341:15
360:7 400:13 405:25 406:5
419:20 427:7 432:25
449:15,22 451:11 452:7
459:10 462:25 513:11,19
515:15 516:22 527:15,23

547:22 561:12

objector 236:16 248:5,9
260:5,9,10,22,24 273:22
312:10 313:18,23 336:3
343:20 353:3 374:15,17
375:11 402:11,22 403:13
542:2,3,11

objectors 232:18 234:3
236:2,15,18 274:5 330:22
331:3,8,13 335:15 337:21
403:18 404:24 482:20
483:12,15

objects 233:14 535:16

obligated 286:2

obligation 254:25 260:13
261:3 263:21 278:8,10
402:15 404:25

obligations 537:22 538:1

obscene 259:11 493:20,
22,24

obtain 557:23

obvious 399:3,9,16

occasions 295:6

occurred 293:20 496:1
547:13

October 402:18,19

off-the-record 482:17

offending 530:13

offends 283:16 510:22
511:1

offensive 501:22,25
510:18 522:8,15,21 523:6,
15

offer 293:5,9 296:19
405:11 436:15

offered 220:9,13,14 223:3
225:16 230:3

offering 416:19 421:15
450:15 457:4

offers 305:8

office 252:13 302:18
316:24,25 317:2,5,17,19
318:11 346:1 423:21
528:18 535:14 539:20
546:7

officer 210:3 241:10,12,14
256:6 266:2 270:13 308:16
325:10 326:12 358:16
383:6 396:9 424:1 452:16
521:6 543:14 545:18 552:7
565:6

officers 326:5,10 335:7
344:5 358:15 423:24 438:1

offices 256:14

official 311:24 434:23

officially 337:18

officials 302:17

older 388:19

one-sided 465:20

one-way 469:12

online 244:13 275:4,5
494:3,13,22 495:9 496:14
500:4

open 240:23 246:15
249:19 278:22 279:5
291:14 299:16 306:18
329:7 340:20 342:9 354:14
378:23 415:25 422:21
442:23 447:21 455:1 458:2
462:7 472:17 507:5 508:8
518:22 554:16,25

opened 299:20 442:2,18
472:13,15 473:5,24 474:1

opening 238:13,15,19,23
239:5,8,13,24 240:11
245:19,22,24 246:19
249:17 270:1 299:7,11
300:2 306:22 389:20 441:7
521:22

openings 296:5

operating 358:16

opinion 276:8 362:3,5,10
420:1 468:10 534:18 544:3
546:17 550:17 553:6

opinions 367:5 487:25

opponent 428:23

opponents 428:18
429:11,14 431:20

opportunities 408:21

opportunity 231:11 246:3
287:23 288:6,9 289:2

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 115 of 642   PageID 11056
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022

Index: oppose..permit

291:22 295:5 515:1 558:16

**oppose** 469:15

**opposed** 265:8 273:8 327:5 365:9 407:18 428:1, 15 431:10,17 449:9 471:2

**opposes** 367:3

**opposing** 248:13 531:18

**opposition** 222:6 285:6 429:7

**opt** 312:10 313:17 365:15

**opted** 323:5 331:17 337:17 349:8 365:3 366:13,15,16, 22,24 539:1 540:12

**option** 386:25 387:1 418:18 490:10

**options** 292:9,10 304:21

**orchestrate** 395:25

**order** 219:14 240:12 250:3 431:10 447:11 513:9,17 515:16 555:24 556:6,14,17 557:12 559:25

**ordered** 238:17 544:13

**orders** 315:24

**organization** 503:15

**organizations** 228:13 229:2

**original** 294:25 355:19 356:2 524:18

**originally** 524:9

**out-of-court** 220:9 225:15 421:15

**out-of-town** 558:23 559:11

**out-of-towners** 559:17,21 560:18

**outcome** 340:6 341:3 447:4

**outlines** 490:8

**outspoken** 425:6

**outstanding** 487:4

**over-the-top** 269:14

**overlap** 387:21

**overrule** 233:1,7 237:12 309:13 353:25 354:10 360:14 421:19 422:1 433:5 449:21 527:22 535:3 537:9 546:1

**overruled** 223:22 306:11 422:23

**overrules** 339:25

**overruling** 219:17 290:17 291:4 298:14 299:2 342:5 406:4

**oversees** 330:12

**owned** 422:7

---

**P**

**p.m.** 565:7

**packing** 412:5

**page/line** 561:11,13

**pages** 250:19 314:8 360:22 423:6 471:16,21 542:24,25 543:1 551:14

**paid** 274:22 275:8 301:18 335:16 463:24 464:9,11, 15,17,22 494:21 495:7 499:24

**paragraph** 224:14 315:22 398:9 495:22

**parent** 228:3,8,22

**Parenthood** 250:20 252:13 260:1 261:7 456:21 458:23,24 459:4,15,22 460:1 503:24 504:3,6,12

**parents** 249:24

**Parker** 211:13 453:22 513:12 514:2 560:6 561:20

**Parrott** 258:17 259:3 319:18,19 320:16 321:9 323:17 348:25 377:15,17, 19 451:5 513:25 560:5 562:16 563:3 564:10,14

**Parrott's** 323:11

**part** 245:2 249:12 253:7 276:16 289:5,18,19 301:19 322:10 335:24 339:10 341:12 355:3 358:23

359:20 374:4 388:23 389:3 393:10 397:4 403:11 423:11 436:25 440:15 441:21 443:5 458:24 459:1 464:3,15 465:10,11,15 479:17 493:24 510:25 517:15 521:24 524:1 529:21 541:5 544:9,17

**partial** 395:5 456:5,10 457:7

**participate** 227:14 331:20, 22 359:21 410:25

**participated** 259:23 284:15 492:24,25

**participating** 391:4

**participation** 285:24

**parties** 214:25 243:25 244:22 246:22 303:18 387:24

**partly** 280:22

**parts** 406:22

**party** 212:18 227:12,24 228:10 245:19 285:13

**pass** 232:16

**passenger** 443:17,20,23

**passion** 265:5

**past** 272:5 276:19 343:16 390:4 442:9 467:13 486:3 523:11

**path** 297:3 457:18 555:22

**patience** 212:1

**patiently** 562:18

**patrolling** 235:17

**pattern** 232:17 255:17,18

**Paulo** 210:14 279:10

**pause** 234:17 379:4

**pay** 254:18 255:8 260:11 275:23 276:19 321:1 336:9

**paycheck** 320:18 321:20 322:2 325:13

**paying** 260:20 276:19 321:21 322:3,24 323:4 535:16

**payroll** 285:16 322:6,11

**pays** 255:3 535:16

**peep** 555:14

**pen** 213:4

**penalty** 253:23

**Pending** 353:14

**people** 214:25 229:21 232:20 243:8 244:21 252:2,5 253:9,14,15 254:1 256:13 257:16 258:15,25 259:2,21 260:21 261:5 262:11 263:2 264:14,15,19 265:9,18,25 266:20 269:5 270:11,19,23,25 271:8,15 272:18 274:5,18,19 275:13 277:20 284:19,23 286:7,13 287:14 302:22 309:17 313:25 317:24 324:19 334:7 335:15 336:14 345:3 347:5,15,16,18 369:20 371:8 374:7,21 375:11 376:10,15 399:13 400:1 408:17 409:5 416:6 418:16,19 428:3,15 431:16,17 433:13 442:11 446:21 450:25 451:3,5 462:11 463:16,20,25 466:15,18 468:24,25 485:18 489:20 490:8,11,21 491:21 498:23 502:6,14 528:21 531:11,18 542:6 548:7 551:9

**people's** 418:5

**percent** 257:4 258:21 358:22 394:23 431:6

**perception** 282:11,22 283:10

**peremptories** 395:7

**peremptory** 395:8

**perfect** 253:13,17

**perfectly** 237:23 276:24

**period** 225:21 293:23 303:16 368:4 528:24

**periods** 529:14

**permission** 308:9

**permit** 243:5 308:6

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 116 of 642   PageID 11057
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 2 July 06, 2022                    Index: permitted..practices

**permitted** 296:10

**perpetrate** 508:24 509:12

**Perri** 433:17

**person** 253:14,15 256:1 261:23 267:2,12 281:14 305:20 313:18 349:20 370:17,18 373:1 384:16 461:6 471:16 489:13,15,17 491:4,19 510:19 514:14 557:14

**personal** 257:23 269:23 271:7 273:20 276:8 301:10 347:14 369:19,25 373:9 399:2 419:11,14,18 420:2, 13,14,18,21,22,24 422:6 469:4 486:15 487:10 495:24 496:15 497:25 533:11 534:15

**personally** 388:22 496:23 497:11,15 498:2,6 507:23 508:23

**personnel** 244:4 307:7 451:23 512:21 554:23

**persons** 244:1

**perspective** 214:16 280:18

**petition** 258:10,14,20,23 259:1 266:3 275:3 302:20 432:3,18 433:11 436:18,21 450:18 476:15 494:22 529:22

**petitioners** 529:2 530:19

**petty** 255:23

**phone** 243:14 244:11 562:17,22

**photograph** 463:20

**photographs** 281:23

**photos** 543:2

**phrase** 275:5,12 339:5 344:1 428:22 495:14

**phraseology** 506:21

**phrases** 409:20 438:20

**pick** 212:10 259:5,7 378:10 379:5 551:18 564:14

**picked** 553:10

**picket** 365:3,10 366:25 367:12

**picture** 269:25 272:13,22, 25 424:23 465:8,22 467:6 541:4

**pictures** 238:22 261:4,8 262:23 282:24 463:5,15 466:4,15,18,24 519:25 524:13 525:4 526:23

**piece** 409:13 456:9 497:23

**piercing** 228:23

**pin** 332:6

**pink** 460:4,6,14

**pivotal** 516:18

**place** 234:25 235:2,8 244:16,18 327:3 357:18,20 403:3,6 429:20 440:8 494:11 547:9

**places** 301:12,16

**plaintiff** 210:10 211:8 245:25 246:4 249:19 303:17 304:11,17,20 305:7,25

**plaintiff's** 239:7 305:17 314:23 319:6 328:4 342:15 354:20 360:18 401:2 406:11 423:3 433:8 449:24 453:6 463:10 481:5 489:2 528:2

**plaintiffs** 393:1

**plan** 231:11 342:5

**plane** 262:16 460:19 496:2

**planned** 250:19 252:13 259:25 261:6 456:21 458:23,24 459:4,15,22 460:1 503:24 504:2,5,12

**planning** 342:3

**plastic** 273:1

**platform** 482:1

**play** 239:23 240:2,4 408:22 412:2 472:12,18 473:3,25 474:5,7 499:21 518:13,18 519:4 520:10,11,12,14,15, 17,23 521:22 522:7,18 524:2

**played** 524:3

**playing** 440:2 472:15 473:22 474:3 499:22 511:7 523:22

**plays** 408:25

**pleased** 482:1

**pleasure** 543:11

**plenty** 447:14

**plexiglass** 279:9

**plotting** 424:14,18 425:2,3 518:5

**podium** 299:8,11 300:2 308:1 386:13,15 521:14

**point** 210:17 214:3 219:1 223:17 237:8,10 238:15 256:15 259:12 260:4,6,14, 22 262:2 270:2 276:5,7 290:13 297:7 301:2 313:9 326:18 337:5 356:1 366:16,22 377:11 388:10 392:5 394:20 395:9 399:20,24 401:17 409:13 417:8 419:13,14 427:14 446:7,13 450:16 454:19 467:13,19 468:6,23 473:11 506:19 516:24 525:3,13,15 526:7 527:2 529:8 535:23 545:23 548:15 554:2,5 557:22 559:15

**pointed** 216:11 305:2

**pointing** 546:15 551:7

**points** 260:15 297:4 391:15 468:22

**police** 274:19 479:6 495:17,20

**policies** 238:25 239:12 267:8 280:9 281:21,23 293:16,18 316:4,13 460:17

**policy** 224:18 239:13 263:17,25 264:9,13,15,19, 25 265:18 266:22,24 267:7 268:19 271:12,20 282:5,6, 10,13,14,16,17,18 283:8, 13,19,20 294:12 303:1 403:17,21 404:2,19 416:4 443:10 444:4,11,15 460:21 475:3 482:7,9,11,13,19 485:23,25 487:6 488:12

489:19 490:5,7,22,23 493:14,16 530:20 550:5

**political** 260:18 320:1,3,5 321:1 322:4 327:6 460:18 493:4,10 535:17

**politics** 255:6

**poo** 532:21 533:1

**pooled** 391:24

**poor** 510:5

**portion** 520:11 534:20

**position** 216:4 220:3 253:17 256:6 270:3 272:17 317:18 318:4,7 348:4 358:8 402:1 403:4 409:6 411:13 418:18 464:4 477:1 491:9 492:3 497:18

**positions** 335:8 361:14,20 441:17 490:10,21

**positive** 365:22 367:9

**possibly** 304:7 560:6,7 562:10 564:3

**post** 262:22 272:11 273:20 282:23 343:11,13,22 344:16 348:15 421:22 425:16 437:22 465:16 470:20,21 479:25

**posted** 248:16 271:7,17 282:3 351:9 371:10 438:10 465:22 466:9,24 467:4,6 511:3 546:10

**posterity** 424:11 425:22

**posting** 224:17 282:19 466:15

**postings** 248:2

**POSTMAN** 295:13

**posts** 220:8 223:2 229:15 261:4 275:1 421:7 423:6,7 437:23 465:14 469:23,24 470:3

**potential** 230:22 409:17 456:5 481:23

**power** 256:11 502:10

**Powerpoint** 281:16

**practices** 442:10

**praise** 348:7

**pray** 252:7 279:16 535:15

**praying** 543:24 548:9 551:22

**preached** 276:11

**preaching** 251:16

**preamble** 519:21 522:3

**precipitated** 256:23 539:16

**precision** 559:5

**predicts** 553:3

**preface** 239:19

**prefer** 516:3

**pregnant** 250:5,17 253:3

**prejudice** 214:1,24 230:13 233:19 237:9 441:13

**prejudicial** 222:18 236:7,8

**premier** 457:9,10 459:2,5, 13,19 504:11

**prepared** 368:13

**presence** 243:6 245:3

**present** 223:9 226:14 245:25 246:3,4

**presentation** 229:21 292:5

**presented** 223:2 245:22 293:1,13 410:8 539:24 545:23

**preserved** 353:22

**presided** 288:3 291:20

**presidency** 468:22 471:4

**president** 220:15 231:9 242:6 248:14,21 249:3,5,7, 13 256:15,19 257:12 261:24,25 262:3,10,18 263:5 264:6,10 271:6 273:22 274:4,11,14,15,22 276:6,8 280:6 286:16,25 287:3 303:4 310:3,6,11,14 311:10 313:12 316:17,20 317:6,7 318:5,6,8,11 323:17 324:21 330:5 348:22 355:24 357:9,19 362:9,18 365:6 366:11

367:15 402:18 412:6 433:14,15 450:18 470:13 483:13,20 486:5 490:17 495:6 502:11 507:13 508:15 529:19 536:6,21 541:21 542:9 545:19

**president's** 450:3 480:25 481:12,21 485:19 486:1 488:12

**presiding** 241:24

**press** 245:8

**presume** 353:23 563:12, 17

**presumed** 313:21

**presuming** 388:13

**pretending** 313:25

**pretty** 211:21 265:3 301:11 319:11 330:4 388:13 409:9 443:16 448:11 557:17 560:15 562:18

**preview** 279:1 299:22

**previous** 304:13 357:21 363:12 368:19 494:18 501:4 527:20

**previously** 214:6 288:16 295:18 315:24 344:5 522:6

**primarily** 471:7

**primary** 294:25

**prior** 216:25 234:11 286:22 295:2 461:25 462:10 527:15

**prioritization** 513:17 515:16 558:19

**prioritize** 514:16

**prioritized** 514:13

**priority** 515:4,9

**private** 249:3,6 261:22 346:13,15,18,21,22,23,25 371:16 404:17 423:16 424:4,10,12 485:5 512:2,3

**privately** 484:25

**privilege** 332:23 333:24 425:12

**pro** 261:6 298:6 496:23

497:3,11,15,16 498:2,7,12, 13,19,23,25 499:4

**probation** 253:22

**problem** 226:13 232:3 249:23 258:11 273:15 310:23 334:23 374:7,21 385:16 421:13 457:6 487:25 556:5

**problematic** 375:12

**problems** 254:3 334:20,21 425:24

**procedure** 242:14 244:25 557:10

**proceed** 309:19 329:16 332:11 333:3 356:20 453:4 508:10

**proceeding** 290:13 339:25 340:1 557:11

**proceedings** 277:25 278:22 288:21 291:14 295:15 299:16 306:7,18 309:17 328:6 329:7 339:7 340:20 341:25 342:9 353:18 354:14 377:7 378:23 414:5 415:25 421:4 422:21 441:4 442:23 445:24 447:21 454:9 455:1,21 458:2 461:14 462:7 506:4 507:5,17 508:8 516:6 552:20 554:16 565:7

**process** 287:9 289:19 292:18 303:11 338:16,17, 19 348:2 435:8 440:15 544:19

**procured** 453:24

**produced** 345:5 356:14,17 557:15

**product** 539:5

**profession** 508:6

**professionals** 488:1

**programs** 244:17

**progress** 487:7

**promote** 497:1

**pronouns** 407:14

**proof** 415:16

**proper** 315:25 516:12

**properly** 231:3 245:3 393:16

**propose** 430:21

**proposed** 430:6

**prosperity** 424:21

**protect** 277:10,12,13 280:24 286:17 302:5 431:10 537:14,17,19,22 544:11

**protected** 259:16 305:12, 15 311:13,17 337:22 362:12 438:9,17 439:5,17, 22 476:19 500:23 534:17 535:10,21 536:6,14,25 537:15 538:13

**protecting** 441:17 506:13 537:21

**protection** 277:15 312:10

**protections** 303:20

**protesting** 252:13

**protocol** 378:17 395:24

**proud** 541:3

**prove** 246:25

**provide** 227:20 238:18 285:25 464:8

**provided** 239:7 464:6 524:21

**province** 538:2

**proving** 305:19

**Pryor** 210:11 238:15,17 239:22 240:6,10 241:1 249:19,21 277:23 288:13, 17,24 289:9,12,14,22 290:5,17,24 291:3,5,10 295:17 296:25 297:6,23 298:2,6,14 299:20 306:9 307:17 308:23 309:21 310:10 314:7,12,15 315:1 318:14,18 319:7 322:1 323:23 327:9,11,13 328:5, 8,13 329:3,17,20 332:12 333:8,10,15 334:1 338:2 339:20,23 340:10,16 341:1,13 342:16 343:1,4 344:18,19,22,24 349:24 350:4 353:10 354:11,21

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 118 of 642    PageID 11059
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                      Index: public..read

356:21 358:17 359:10,11
360:5,19 362:23 363:3,4,
18,22 364:5 370:4,14,15
373:11 377:1,9 378:6,13,
18 383:23,25 384:6 386:5
389:15,16,25 390:16,21
393:9 397:16,19,25 398:1,
8,13,20,23 400:9 401:3
404:11,12 405:8,11,15,18,
21,23 406:12 412:15,18,
22,23 414:3,7,18 415:2,21
416:2,24 417:10,23 418:3
419:6,19,24 420:6,11,25
421:11,22 422:8,13 423:4
430:1 432:2,16,21 433:9
435:9,11,13,18,20,25
436:2,10 437:5 439:10
441:14,22 442:2,20 443:2
445:3,21 446:1,15 447:10,
17 448:1 449:13 450:1,12,
15,17 451:8,14 453:4,7,16,
17 454:7,11,24 455:5,6,12,
23 456:12,16,19,23 457:9,
12,17,20,24 458:4,6,9
459:12 461:13,16 462:3,
17,21 463:11 465:6,7
467:2 471:20 473:1 475:4,
10,12 476:5 477:9,13,24
478:2,7,15,17,19 479:11,
18 480:5,10,11,14,19,25
481:6 482:24 483:2,4
484:1,6,13 485:16 486:13,
21,23,24 488:15 489:3
495:3 498:1,18 499:3,10,
12,16,18 500:16 501:8
502:18,25 503:2,10,20
504:1,7,9,18 505:5,7,17,
19,21 506:1,3,6,14,22
507:1,9,19,24 508:1,5,13,
14 509:6,9,10 510:9,12
511:20,22 512:12,16
513:20,24 514:5,17,24
515:6,20 516:2,17 517:9,
13,15 518:3,7,12,17,20
519:1,7,9,15,20 520:2,4,
16,21,25 521:13,21 522:1,
3,5 523:20 524:4 525:24
526:16 527:10,12,17 528:3
529:7,18 530:8,10,15,24
531:13 532:4,8,9 533:8,13
535:5 536:12 537:7,13
538:5,6 540:1,23 545:5,15,
24 546:3 547:24 548:3
550:11,13 552:18,22
553:9,12,17,23 554:3,6,11,
14 557:7 558:14 559:24

560:21 561:7,22 562:12
563:1,4,8,16,22 564:17

**public** 282:11,22 283:3,9
346:15 368:15 373:4
376:4,7,13 377:2 400:6
427:13,15,17,20,22 428:7,
8 438:11,16 470:8,10

**publically** 376:22

**publication** 227:23

**publications** 539:11

**publish** 314:24 319:4
342:13 354:18 360:16
400:24 422:25 433:6
435:22 449:22 481:3
488:23 527:24

**publishing** 406:9

**pull** 464:14 473:5 523:2

**pulling** 218:8 341:19
480:23

**pulls** 250:18

**punished** 266:21

**punishment** 446:4

**punitive** 277:19

**purely** 303:21

**purple** 456:14

**purpose** 215:15 290:4
298:1

**purposes** 236:7 518:12

**pursuit** 303:9

**push** 211:13 373:24

**pushed** 392:3

**pushing** 212:5

**pussy** 262:25

**put** 226:16 233:2 250:4
256:11,14 258:18 271:15
296:20 300:8 306:15
307:15 313:17 317:2 318:4
327:3 332:6 346:2 368:2,
12,15,23 369:5 378:16
385:21 394:5 417:18
420:4,7 423:22 424:2,22
434:18 435:1 450:13
465:19 506:15,16 508:18
509:22 511:4 515:12

521:25 559:18

**puts** 216:4

**putting** 368:11

**Q**

**queso** 325:5,11 326:3
416:19

**question** 216:9,15 309:10,
13,15 310:22,24 312:20,24
313:1,2,21 323:20 332:13
333:14 338:11 340:14,15,
23 349:13 357:23,24 366:1
368:6 375:6,14,18,21
378:2,3,5,10 383:3 385:15
393:11 395:10 401:15
403:24 412:13 413:11,17
417:3,5,22 422:9,14 426:9
431:13 442:17 443:1
444:22 446:16 447:15,24
449:8 454:21 455:4
462:15,18 476:6 477:12
479:10,17 484:23 497:22
500:12 501:5,6,7 502:19
503:22 504:21,24 506:14,
15 507:8 509:4 510:25
511:19 513:1,8 516:25
517:10 519:17,21,24
528:19 530:16 537:6,10
538:4 545:8,10 546:2
547:25 548:25 558:7
560:24 561:4 562:5

**questioning** 397:18
466:10 522:2

**questions** 242:14 309:7,9
313:6 358:11 366:7 381:1
382:7,14 384:11,12,24
385:16,17 386:1,3 387:2,3,
8 388:8 389:15 390:24
397:17 408:19 437:24
446:12 508:4 516:22
517:17 522:4 558:10

**queued** 521:20

**quibble** 328:20 505:22

**quick** 398:19 512:10 513:6
561:4,20

**quickly** 471:3 522:17

**quiet** 305:5

**quit** 250:3 260:5,10 293:8
404:1 500:8 505:13 508:25

551:6

**quitting** 260:14

**quote** 438:21 439:20

**quoting** 526:21,22

**R**

**rabble** 257:6

**race** 411:18,22,24 412:4

**radical** 548:5,13,16

**radicalization** 549:3,18

**radicalized** 549:17

**radicalizing** 549:2,7

**radicals** 548:15

**radio** 244:14

**raise** 290:9 297:8 306:9
547:17 550:19

**raised** 227:2 230:12 239:8
295:18 296:4 338:12,20
387:8,19 404:6 478:15

**raising** 547:11

**ramifications** 349:7

**ran** 255:9,10 316:17,23
418:21 441:6

**rank-and-file** 218:16

**rare** 541:12

**rattled** 335:1

**reach** 246:14 407:2

**reached** 246:24

**reaching** 236:24

**react** 408:17

**reacted** 374:25

**reaction** 222:5 260:1

**read** 214:9 244:13 246:20
247:3,7 267:4 274:20
282:6 315:8 316:7 325:12
361:8,22 366:19 374:4,9
383:16 399:17 401:8,19
406:21,22 407:10 408:5,7,
18 411:4 412:6 425:21
474:6,9 488:12 499:21
514:1 526:2,4,5,10 534:2

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 119 of 642   PageID 11060
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                    Index: reading..remorse

542:15 548:22 551:16 555:22

**reading** 364:15 407:21 526:7

**ready** 277:3 401:14 472:2 500:25

**realize** 234:24 506:7 522:21

**realized** 471:4 474:18 497:6 519:10 522:7,14 523:6,15

**reask** 442:25 508:11

**reason** 239:12 253:4 258:6 285:12 292:7 348:7 396:19 427:4 432:10,12 435:6,7 457:3

**reasonable** 296:19

**reasonableness** 296:17

**reasons** 224:23 228:17 230:12 236:21 274:18 276:17 399:3,9,16

**rebuttal** 246:4

**recall** 213:24 219:23 220:16,22 222:2,5 225:19, 23 231:10 234:4 248:15 258:10,14,20,22 266:1,3, 18 270:19,23 275:2 302:20 321:12,13,14 357:15 372:13 382:4 387:17 398:5 403:1 428:11 429:3,16,17 432:3,10,18 433:10,13 434:7 436:18,21 438:19 440:2 443:18,22 448:6,8, 13,14,25 450:18,21,22 470:23 476:14 483:16 484:2 486:14,16 494:22 500:1 512:5 520:13 522:11,24 525:9,13,16 529:1,22 530:19 531:10, 15,19 543:5

**recalled** 450:25 451:3,6

**receive** 282:17 330:23

**received** 257:11 320:24 326:8 345:14 355:5 364:21 367:14 373:13 421:24 446:4 467:7,9,13 468:11 471:25 472:3 491:20 494:19 495:5 511:23 525:11 547:3

**receiving** 224:16 262:17 416:5

**recent** 472:14

**recently** 368:8

**Recess** 241:11 308:15 380:22 383:4 452:15 520:8 521:5

**recognize** 292:19 315:3 342:20 360:23 363:7 384:8 390:9,19 401:4 423:10 481:10,22 487:23 517:16

**recognized** 390:13,20 457:1

**recognizes** 357:8

**recollection** 243:2 406:20 428:22 429:9,10 430:7 448:5 457:14 458:18,22 495:4 504:16 526:21

**recollections** 384:22 391:14

**record** 247:8 290:25 309:16 328:9,10 353:23 358:12 371:6 379:9 383:17 385:22 418:9 420:5,8 425:10 445:11 486:16 554:21

**recording** 324:11 433:16

**redirected** 446:8

**reelected** 361:15

**refer** 287:2 366:3 407:20

**reference** 278:7,11 493:4

**referenced** 320:11

**references** 279:2

**referencing** 282:25 350:5 357:18,20

**referred** 288:2 398:3 427:25 428:14,18

**referred-to** 314:22 319:5 328:3 342:14 354:19 360:17 401:1 406:10 433:7 449:23 453:5 463:9 481:4 489:1 528:1

**referring** 325:14 335:4 350:13 355:22 365:21 366:11 407:8,10,18 408:11 422:4 429:14 460:11 540:2

543:19

**refers** 367:15

**refrain** 315:16 316:10 445:20

**reframe** 507:8 525:23

**refresh** 226:18 457:14 458:22

**refreshed** 458:23

**refusal** 296:18

**refused** 444:5 537:11

**refusing** 293:9

**regard** 327:25 484:5 547:12 557:20

**regret** 542:13

**regrouping** 437:1

**regular** 436:23

**regulations** 315:24

**rehash** 301:2

**reimbursement** 255:21 260:18 330:23

**reinstated** 434:20 435:7 440:22 442:4,19 443:3 553:21

**reinstatement** 293:6

**reiterating** 399:20

**rejected** 257:4 258:13 430:25 431:2,5 435:6 437:2,13

**relate** 225:1 230:10 527:3

**related** 289:7 297:13 339:4 351:9 425:9 526:24 547:3 552:13

**relates** 250:12 263:19 273:13 414:19 546:22 559:16

**relating** 492:21 549:5 550:15

**relations** 219:9 287:17,19 490:1,2 491:25 492:4,10

**relationship** 254:7 255:2 260:8,25 372:25 412:25

**relationships** 347:15

**relatives** 243:8 259:7

**release** 296:1

**relevance** 213:25 215:8 222:21 225:10 226:12 227:3,6,9 229:16,22 230:8, 13 233:19 354:6,7 413:25 441:2,13 444:24 478:5 505:4,16 510:7 550:9

**relevant** 214:23 217:20, 21,23,25 221:17 222:15 225:22 226:2,12 227:15 231:8,13 232:20 236:21 247:6 279:3 327:23 328:14,22,23,25 329:12,13 354:12 400:20,21 415:19 441:11,20 446:17,18 462:2,11 505:5

**relief** 557:19

**religion** 263:19 279:19 280:1,12 284:9 295:25 477:2

**religious** 250:13 252:17 263:10 267:15,20 268:6,18 269:11,16,20 271:6 277:11 279:13,14,18,21 284:5,10, 16 286:10 294:15 296:9 476:23,24 493:5,11

**reluctant** 359:13

**rely** 242:24 244:6

**remains** 340:8

**remedies** 558:9

**remedy** 556:6

**remember** 226:17 253:16 278:16 279:2 338:14 354:3 364:22 387:16 389:17 402:10 426:7 429:19 438:25 439:18 448:15,16 467:25 474:12,23 511:20 528:14,15,16,23 529:3 531:14,24

**remembering** 426:11

**remind** 229:19 300:11 521:15

**reminded** 224:17

**reminder** 278:24

**remorse** 294:4

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 120 of 642   PageID 11061
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                    Index: remorseful..roost

remorseful 292:19

removals 318:2

remove 336:14 434:11

removed 317:18,19,20,24 318:8,11 335:7 423:24 434:17 438:1 445:6,9

renew 229:16 532:6

repeat 311:8 312:20 313:1, 2 413:17 435:10,12 548:25

repeated 298:2 495:24

repeatedly 376:13 477:17 522:24

repeating 477:18

repercussions 411:16

repetitive 393:23 412:17

rephrase 321:25 419:5 431:12 432:17 459:10 472:23 502:17 504:7 545:2

replied 410:13

report 214:10 230:10 274:7 354:4 413:20,24 414:8,12 415:6 416:3,10, 13 451:14 475:22 489:18, 20,22,24 490:1,5,8,11,15, 18,24 495:17,18

reported 214:17 221:2,3 225:20 249:8 274:5 304:9, 16 413:7 415:5 468:11 476:12 493:18 495:19 529:23 531:6,21

reporting 226:4 231:10 264:18 274:17 414:24 530:19 531:11,24

reports 230:23,25 274:15

represent 279:10 330:25 337:13,19 434:1 437:14 439:11 483:10

representation 214:19 216:13,22 339:24 414:14 439:13,15 442:12 444:7 446:10 564:4

representative 210:25 211:4 247:22 281:6 300:13 336:25 337:8,12,13,15 438:5

represented 260:12 303:12,16 331:8 335:17 337:23 338:22 413:4 443:5,14 530:10

representing 247:19 376:9 434:4 447:13 548:16

represents 366:18

reprimand 430:4 449:10

reprimanded 270:22,23

reprimands 274:16

reputation 283:9

request 223:5,11 320:23 321:17 323:10,12 331:12 333:21 406:2 536:19,22 544:9,14,17 556:11 560:14

requested 525:10

requesting 236:2 332:21 333:4

require 214:24 245:13 295:23

required 293:15 301:15 352:23 353:2 490:18,20 491:11

requires 295:23

reread 497:10

rescind 292:13

research 244:12,20 307:8 379:13 451:24 512:22 554:25

researched 238:6

reservation 292:13

reserve 396:2

reset 241:5 437:12

residents 361:12

resign 330:22 334:22

resigned 248:3 317:25 318:1 335:7,16,18

resist 229:6

resolution 214:20 223:20 487:3

resolve 245:15

resolved 445:17

resounding 361:12

respect 216:2 221:5 250:15 282:19 283:23 285:2 286:5 287:21 301:15 321:6,8 488:1 559:11

respectful 516:10

respects 217:20 305:1 546:11

respond 221:14 257:18 297:8 322:21 325:16 336:19 399:25 409:25 415:2 416:17 442:6 544:22 556:6,16

responded 248:19 257:19 324:24 400:5

responding 226:3

responds 325:11 369:11

response 214:10 219:5 220:1,11,12 222:7 225:17 227:20 228:1,7 231:6 233:24,25 236:11 239:3 296:14 297:20 325:4 326:22 335:20 402:24 418:13 421:10,18

responses 249:6

responsibilities 353:7

responsibility 254:22 280:21,23,24 294:8

rest 275:9 361:11 551:22 562:1

restrained 315:12

restroom 523:2

result 214:23 254:20 270:25 282:14 284:1 416:5 432:3,4,7 467:7 487:18

resulting 487:12

resume 397:17

retaliate 476:14,17

retaliated 304:11

retaliation 216:22 231:13 232:6,9 236:10

retaliatory 225:24 234:5

retire 243:20

return 495:23

reveal 269:6 321:20 341:7

revealing 322:3 373:3

review 258:25 525:25

Ricci 231:1,9 232:5

Ricks 434:8,10

rid 258:14 264:16 265:18 266:6 343:21,24 344:1 351:11 410:23 444:5

ridiculing 334:7

rife 302:21

right-to-work 469:15

rights 269:10 277:12,13 295:24,25 296:18,24 302:8,11 303:7,9,19,20,21 305:12,15 321:6 337:22 496:25 497:2

righty 234:20 521:11 555:12

ring 389:21

rise 210:3 241:10,12,14 307:4 308:16 379:14 383:6 396:9 397:11 451:25 452:16 512:24 521:6 555:2 565:6

rises 237:9

risk 232:4

Riven 433:18

Rivera 215:25

RLA 216:22 225:24

roam 300:7

Rocky 364:14,16 369:16, 18 370:5 371:21,23 372:5 398:4 399:1 420:13,20 483:21 484:9 485:11

role 285:24 287:20 348:6 355:3

rolling 382:16

room 246:13 307:21 325:23 328:1 378:12 380:14,15,19 386:11 391:1 513:2

roost 548:8

rotates 557:4

roughshod 441:6,14

round 564:13

rouser 257:6

routinely 326:5

row 211:10

RTW 331:15

rule 234:10,18 235:17
271:19 296:7 298:8 309:10
353:15 377:13 380:16
463:1 517:23 527:16

ruled 214:16 222:19
223:15 297:14 441:12
446:19

rules 242:17 315:24
331:25 438:13 471:15
516:12 548:15 549:4

ruling 221:10 226:11
228:20 229:8 231:19
239:22,25 289:21 290:1
291:3 295:21 297:17
360:11 441:7 447:8
462:10,19 478:17 505:22
527:20 553:24 558:2

rulings 211:13,19 216:10,
25 223:14 234:11 328:10
461:25 513:10,18

run 240:19 241:8 284:7
316:19,24,25 423:20
559:22

running 317:1,5,7 328:17
329:3 441:14

rush 252:2

Rutherford 513:13 514:22
515:3,4,8,9,13,14 558:21

——————————

S

sake 241:5

salaries 260:21

salary 254:14 274:24
464:3

Sam 433:18

sanctioned 311:16 312:4

sarcastic 351:4

sat 392:7 562:17

satisfactory 378:4

satisfied 303:25

satisfy 560:14

savannah_silver@txnd.
uscourts.gov. 565:3

save 237:19 245:5 252:10
424:11,21 425:22 510:6,
15,21

savvy 346:17

scab 364:18,23,25 365:2,5,
11,21,22 366:3,8,12 367:6,
13,16 369:10 370:9

schedule 556:23

schedules 558:24

Schneider 267:12 268:20,
25 284:18 286:14,20 287:5
288:3 292:1 294:24 532:12
559:3 560:11,17,19,22
561:16 562:5,9,12 563:23
564:19

Schneider's 276:2

school 250:9 381:5
383:19,20 384:2,5,7
387:12,22 388:20 389:17
390:9

scope 214:23

scoured 530:21

scrap 561:12

screen 319:12 342:22,24,
25 356:11 363:12 397:21
398:21 424:9,11 427:15,
16,19 428:9 453:10 524:10
532:14

screens 398:18 435:16

scroll 272:15 401:12,13

Scrolling 224:2

search 244:18

seat 309:6 386:20

seated 210:4 242:2 308:20
383:7 393:11,16 396:12
397:14 453:1 521:12

seconds 289:16 328:12
474:10,12,14,17,19,21
501:2 519:3,4,8,11 520:18
521:22 522:10,12,18,19,23
523:21,22 524:2

secret 345:11 346:11,14,
15,16,18,25 374:19 399:21
418:24 423:11 424:17
427:13,18,21 428:13 430:3
533:19

secretary 324:11 433:16,
17 545:18

secure 398:15 557:24

securing 558:6

security 210:3,16,18,19
241:10,12,14 308:16 383:6
396:9 452:16 521:6 565:6

seek 257:15 352:18

seeking 351:12 352:7
437:6 487:3

segment 462:13

select 470:7

selection 300:18 385:8
521:16

send 257:14 261:18,19,20
262:11 324:16,18 330:19
335:2 336:1 355:4 418:6
424:22 468:23 469:2,23
470:11,17 491:3,18 510:4
524:25 525:1,10,12 536:4,
6,13,20,23 537:11 555:24
564:23

sending 248:8 256:21
276:3,5 280:17 285:2
292:20 294:12 324:20
376:2,5 403:8 409:4,15,16
411:15 417:9 418:12
419:14 424:7 468:25 498:5
525:18 537:19 542:8 544:7
552:8,24,25

sends 261:17,18,24 267:4
272:2 321:9 324:13
348:15,24 364:10,13
370:18 412:24 485:11
542:19

senior 217:18 220:20
221:25 265:13 266:25
267:2 345:20 359:14
373:21 374:6,20 375:10,19

398:3 400:3 401:21,23
402:3 413:7,9 483:8

seniors 255:15

sense 238:10 305:18
352:8 379:24 394:18 395:3
517:12 559:1 564:16

sensibilities 510:22

sensitive 521:17

sentence 349:16 398:24
407:16,21 408:5,13 545:13

separate 228:11 285:11,
13,21 320:15 507:22
508:2,4

separation 228:12 309:8
358:11

September 248:3

serve 237:4 331:21 334:19
336:17 337:18 397:3

served 247:21

service 243:10,16 395:16
397:6

services 486:5

serving 242:10

session 241:22

set 224:24 233:14 322:11
346:17 408:6 470:25
555:24 556:17

setting 346:14 555:25

settings 346:24 460:13

settlement 339:16,18
340:7 341:7,8,10

severe 283:15

sexually 448:2,7,12,17

shackles 557:25

shame 542:18

shaming 443:17,21,23

shared 465:16

sharing 373:14

she'd 323:3

sheer 535:17

shock 357:10 370:7

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 122 of 642    PageID 11063

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 2 July 06, 2022                    Index: shocked..Southwest

**shocked** 294:5 372:13 398:2

**shocking** 357:14 370:12

**shoe** 510:1

**shoes** 506:12,16,17 510:2

**Shop** 231:9

**short** 303:23 426:4 514:20 520:2

**shortly** 467:14

**shot** 339:17 424:9,11

**shots** 282:1 427:15,16,19 428:10 524:10 532:14

**shove** 373:24

**show** 223:8 239:21 240:20 269:25 272:23 275:11 281:18,19,24 284:3 285:4 286:6 287:10 293:8 296:10 302:15,20 303:14,21 304:5,14 305:10 319:8 343:6 405:14 423:6 447:12 456:23 466:13 477:20 481:7 510:17 535:18 549:6 555:24,25 556:3,6,13,17 559:22

**showing** 225:20 227:15 229:1 239:15 240:7 294:4 457:7 478:9 539:11

**shown** 246:12 283:5 393:16 416:18 441:18

**shows** 231:11 236:14,17 262:19 457:2,9 466:9 473:11 551:22

**shuffle** 292:5

**shut** 271:1

**side** 223:8 243:24 245:6 287:24 288:5,9 291:23 303:2 336:7 372:12 390:10 437:4 492:7 501:24

**sidebar** 217:12 223:15 235:4,5 237:22 238:5,9 277:24 278:1,5,21 288:19, 22 291:13 295:16 299:15 306:6,8,17 328:7 329:6 339:5,8 340:19 341:17,23 342:1,8 353:16,19 354:13 360:12 377:5,8 378:22 414:6 415:24 419:22

**421:**2,5 422:20 441:3,5 442:22 445:25 447:20 454:10,25 455:22 458:1 461:15 462:6 463:2 477:22 505:25 506:2,5 507:4,15, 18 508:7 515:24,25 516:7 527:16,21 534:25 552:21 554:15

**sidebars** 237:23,24 328:9 516:10

**sign** 282:17 296:23 320:13 442:4

**signal** 223:13

**Signatures** 302:21

**signed** 258:20 383:21

**significance** 245:21

**significant** 275:17 277:8, 20 407:2

**signs** 261:5

**Silver** 564:24

**similar** 214:2 215:19 216:9 224:10 284:20

**similarly-situated** 214:4 221:23

**simple** 219:15

**simply** 286:4 337:14 487:14 500:24

**Sims** 288:12 291:20,25 292:8,23 293:2,24 294:3 415:11 513:12 514:22,24, 25 515:2 560:7,10

**sincerely** 280:14

**single** 305:20 355:6 419:17 442:14 535:25

**sir** 311:2 313:5,8,10 320:22 333:19 338:12 375:17,23 397:18 398:6 399:5 401:7 411:25 440:4,12 453:13 475:8 484:23 554:11

**sisters** 388:19

**sit** 292:6 380:16,18 390:3, 12 459:17 558:4

**site** 448:18 466:11

**sites** 487:15

**sits** 383:14

**sitting** 365:20 409:10 523:14 557:3

**situated** 214:4

**situation** 224:22 252:15 269:5 392:14 422:3 454:18 477:3 478:12 506:17 508:17 510:14

**situations** 312:1

**Sixty-six** 488:17,22

**skimmed** 401:16

**skip** 561:20

**skipping** 408:13

**slate** 256:5 317:10,11,12, 14

**sleep** 251:12

**slew** 410:1

**slide** 308:9

**slime** 414:23

**slip** 255:21

**small** 260:18 330:23 388:13 391:8

**smaller** 251:19 388:14

**smart** 244:11 548:6

**smiling** 253:15

**Smith** 255:10,11,13,14,16 539:18,19

**Smith's** 539:4 540:5,10

**snapping** 522:19

**social** 224:12,18 248:16 263:17,25 264:8,12,24 265:17 266:18,21,23 267:7 268:19 271:12,20 282:4,9, 19 283:8,18,20 303:1 355:13,15 359:15 371:7 399:13 400:2 402:6,23 403:17,20 404:2,19 424:15 437:22 440:16,18 443:10, 18,20 444:4,11,15 445:5, 11 449:12 466:11 481:22, 25 482:7,19 483:11 485:23,25 487:6,11,21 488:11 493:14 494:11 495:25 529:14,24 530:20

**531:**16 550:5

**solely** 244:6 301:21

**somebody's** 526:22

**son** 253:1,3

**Sonia** 383:13,21 384:18

**Sonya** 217:19 221:4 267:1, 3 329:21 330:1 336:10 355:14 356:22,23 401:21 406:14 413:1 415:9,10,12, 13 420:14 491:18,24

**sonyalacore@gmail** 420:16

**Sonyas** 357:2 359:2

**sooner** 548:9

**sort** 378:14 382:6 386:9 390:25

**sorts** 564:25

**sought** 352:10

**Sound** 452:12 515:19

**sounds** 350:13 386:2 399:20 452:8 551:12

**source** 244:9

**Southwest** 210:7,13,15 213:11,16,22,25 214:7,21 217:15,18 219:20,21,24 221:1,16,18,25 222:22,24 223:25 224:2,3 225:25 226:22 233:13 238:17 239:3 247:17,19,23 248:11 249:11,14 252:24 253:16, 20 254:1,7,9,11,13,16,17 261:9,14,15,21 262:7,9,11, 23 263:15,25 264:4,16 265:12,13,15 266:7,20 267:2,11 268:10 270:12 271:9,17,25 272:9,12,18 273:3,11,25 274:3,16 279:6,11,15 280:13,23 281:5,21 282:24 283:4,7, 22,24 284:3,6 285:10,17, 20,21,23 286:1,4,23 287:6, 11 288:10 292:16 293:9 294:14,21 296:8 300:24 301:20 302:11 303:1,6,10 304:9,17 305:21 307:23 310:15,19 311:5,11,22 312:18,22 313:15 314:4 315:4 316:13 318:24

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 123 of 642   PageID 11064

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                          Index: Southwest's..stopped

322:6,12 327:24 328:15,24
329:1,13 330:3,4,11 331:2
335:10 336:2,5,6,11,13,20
337:9,19 339:1 345:4,16,
21 353:13 355:20,25 356:3
357:3,8 358:8 359:15
360:9,10 369:20,24 370:1,
8 372:10 373:21 374:7,19
375:4,10 376:16 386:4
387:2 388:4 391:25 400:2,
14,22 401:22,23 402:2,4
403:16,20 404:8 406:8
409:5 410:15 413:6 414:9,
19 416:3,11 431:9,19
433:1 436:21,23 437:4
438:12,22 440:5 443:7,16
446:8,11,12 447:5,10
449:18 454:4,5,11,13
455:7,9,15 460:7,16 461:9
462:1,11,25 464:6,8,25
466:5,16 468:18 475:1
476:4 482:2,6,12,18 483:9,
11,14,19 485:1,5 486:4
487:12 488:8 490:7,21
492:1,2,3,7,12,16 495:19
496:2 500:3,8 523:10
524:24 525:6 528:10
530:7,12,19 531:6,21
532:11 536:4,7,14,23
537:5,20 540:7 544:6,8
556:20 557:12 563:19

**Southwest's** 214:15
217:24,25 220:15 222:4
225:23 264:12 280:9
281:10,12 282:4,11
283:12,23 291:24 293:15,
18 416:4 446:7 447:7

**souvenirs** 426:21

**Spand** 231:1,9 232:5,8

**spans** 408:16

**speak** 228:24 244:2
301:22 302:25 310:1
332:24 339:13,14 392:2
477:3 479:22 502:10
563:18

**speaker** 251:21,24,25
252:4

**speaking** 271:9 288:20
419:19,22 437:24 459:10
497:24 534:24 547:21

**speaks** 353:9

**special** 380:17

**specialist** 376:11

**specific** 278:13 391:10,13
401:17 404:5 438:19 525:9
529:16 531:23

**specifically** 214:13 218:4
231:3 283:21 296:9 304:15
374:8 384:21 456:21
559:10

**specificity** 526:14

**specifics** 402:5 531:10

**speculate** 419:25

**speculating** 419:25

**speculation** 373:7 419:17
431:24 432:14 506:9 533:7

**speech** 259:17 262:6,9
263:18 269:15,16,20 270:9
278:11,13,14 280:1 295:25
304:12,13 500:24

**spend** 259:21 262:4 562:7

**spending** 508:25 509:15
514:7

**spends** 320:4

**spewed** 538:10

**spewing** 411:11 429:15,18

**spirited** 265:5

**split** 448:10 509:5,7

**spoke** 333:16 334:24
367:18,21 409:3 417:8

**spoken** 286:16 295:1
368:7 477:4

**sponsor** 285:20 459:2,3
504:12

**sponsored** 259:25 261:6
504:11

**sponsors** 456:5,6 457:2,8,
9,10 458:18 459:5,13,19
460:2

**spouse** 243:7

**stance** 482:12

**stand** 226:16 252:1,2
257:21 292:11 306:16
307:2,15 309:2 379:18

506:10

**standard** 240:22 490:4,5

**standards** 278:9

**standing** 252:6 272:11,24
477:12

**standpoint** 260:16

**Starr** 241:24 338:13

**start** 212:21 213:2 215:23
223:18 275:20 301:5 307:3
319:9 343:20 511:7,19

**started** 273:14 381:16
390:15 472:15 473:22
538:10 540:22

**starting** 242:5 248:7
310:4,7

**starts** 218:11 223:19
256:20

**state** 223:9 309:24 331:16
345:11

**stated** 348:13 371:25
376:13 420:23 426:22
438:10 444:13 475:17,20

**statement** 224:11,21
225:15 245:19 313:24
394:15 405:4 421:15 440:5
471:9

**statements** 220:9 245:20,
22,24 246:19 249:17 299:7
409:1 413:9 441:8

**States** 241:20,23 332:16,
19

**stating** 351:10 485:1

**status** 214:10 248:8 354:4
515:9

**staunch** 534:5

**stay** 300:8 305:5 471:5
558:25

**stellar** 253:24

**stem** 302:14

**stems** 339:3

**Step** 288:8 289:2,4 290:4,6
291:19 292:8,15 293:2
294:1 295:7 303:11 306:10

**Stephensen** 249:9 532:11

**stepped** 292:20 532:20,25

**steps** 303:8,13

**Stevenson** 489:4,7 490:12
491:12

**Steward** 231:9

**stick** 222:22 366:17 370:12
429:19

**sticker** 273:11

**sticking** 297:17

**stipulation** 247:12 256:21

**stipulations** 246:20,21
247:3 249:16

**Stone** 217:19,21 220:15
231:1,9 232:5,8,15 234:1,
23 236:1,14 237:1,6 248:8,
14,18,19,21 249:3,5,8
256:14,17 257:12,14
258:4,16 259:3 262:14
263:5,12 264:10,22,23
273:22 274:4,21 275:10,12
279:24 280:5 281:24 282:2
285:3 286:16,25 287:2,7
288:1 292:3,21 295:2
303:21,24 304:16,20,22
305:5,11 307:17 308:24,25
309:4,25 310:2,3 333:23
345:7 379:17 397:15,20
415:5,17 419:18 433:14
450:24 467:8,12,17,19,21
468:2,4,5,8,14,20 469:2,3,
18,22 470:2 471:2,13,22
507:10 512:2,5 513:4
541:6,10,23 555:8 560:3
561:24 562:25 563:5,13,20
564:13

**Stone's** 222:1,5 236:17
249:9,13 257:22 276:2,8
284:15 303:2 379:5

**stood** 251:21 252:4 338:21
441:8

**stop** 266:10 320:19 351:18
403:8,12 409:4 417:8
418:17 504:20 505:2
508:21 509:15,20 510:17
522:22 526:7 554:6

**stopped** 474:8,11 519:10
522:8,15 523:1,15

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 124 of 642   PageID 11065
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 2 July 06, 2022                    Index: stopping..talking

**stopping** 487:20 554:1

**story** 250:12 287:24 288:5, 10 291:23 302:10

**straight** 426:4

**strange** 383:9,10

**strategy** 429:2 560:13

**straws** 273:7

**streamlines** 246:23

**street** 261:10

**strenuous** 418:8

**stress** 336:11

**strict** 224:18

**strike** 356:19 391:20 392:5,11 393:6 479:14

**strikes** 391:18,24 393:18 394:1

**striking** 392:23

**string** 319:10 329:18 360:21 364:21 546:9

**strings** 428:14

**strong** 259:12 262:5,6 265:3,22 508:21

**stronger** 265:22

**strongly** 392:18 487:1

**struck** 391:16,22 393:1 394:16

**struggles** 222:1

**struggling** 220:15

**stuck** 362:13,17,18

**study** 251:18

**stuff** 343:17 355:2 368:23 371:17 409:4 416:17 417:9,13 526:24 535:17

**stumbled** 487:14

**subject** 319:24 339:16 406:18 446:13 447:6,7

**subjected** 503:6

**subjective** 482:12

**subjectively** 264:14

**Subsequently** 524:24

**substance** 553:6

**substantial** 308:2

**successful** 254:2 275:3

**sue** 269:2,5

**suffered** 277:4

**sufficiently** 417:4

**suggest** 392:18

**suggested** 352:14

**suit** 303:17

**sum** 244:20

**summarize** 294:10 425:17

**summarized** 517:18

**summary** 415:15

**summer** 355:15 357:21

**super** 561:19

**supervisor** 489:11,25

**supervisors** 489:14

**support** 250:5 257:15,16 273:13 337:14 365:15 411:12 416:15,19 469:14, 18 470:21 497:1 502:7 504:2,10

**supported** 248:15 251:10 258:18 263:2 348:12 416:13,14 499:23 503:14, 23

**supporter** 266:18 348:14 354:25 365:1 370:17 401:21 409:15 411:15

**supporters** 265:10 534:6 538:10

**supporting** 263:6 321:10 323:13 347:13,16 503:12

**supportive** 345:25 346:2, 6,8 348:8

**supports** 256:8 262:5

**suppose** 470:18

**supposed** 251:12 347:25 379:21 395:18 414:25 415:7,8 454:16 523:4

**suppress** 544:3

**Surely** 364:22 369:5

**surprised** 467:22

**suspension** 253:22

**sustain** 226:21 228:21 309:12 350:3 412:14,16 414:2 415:1 419:23 420:3 432:1 445:2 479:16 502:16 505:6,18,19 529:6 536:11 538:3

**sustained** 321:24 333:25 338:1,13 369:23 416:23 419:3,5 420:9 429:24 432:15 439:9 444:23 445:19 459:9,10 471:19 477:8,11,23 478:6 480:4 482:23 485:15 486:12,20 495:2 498:17 499:2,9 504:8 511:18 516:22 517:22 518:1 523:19 525:22 532:3,7 538:4 539:25 545:4 550:10

**Suzanne** 249:9 489:4,7 490:12 491:12 532:11

**SWA** 315:7 551:17

**swear** 240:21 241:18 322:7 468:1 475:20

**swore** 475:13,18,19 527:5

**sworn** 241:19 242:12 309:4 556:3

**sympathetic** 394:7

**synopsis** 453:11

─────────

**T**

**table** 281:3 292:5 308:4 338:19,20 380:18

**tabs** 213:2 217:4

**tactics** 548:7

**takes** 274:17 305:24 506:10

**taking** 228:6 234:25 235:2 236:19 247:13 272:17 299:10 362:14 394:15 401:18 411:17 477:1 494:11

**Talbert** 211:13 217:17,22, 24 218:1,9,15 234:3

270:14 345:19 347:19 348:15 354:23 355:9 359:13 364:10,15 372:22 374:18 401:20 406:14 410:19 412:24 413:20 416:3 419:4 423:14,18 428:25 439:11,16,22,24 440:13 443:3 446:23 483:19 484:11,24 486:9 491:21 513:11,21 550:4 551:19 552:5 560:2 562:24

**Talburt's** 370:17 397:23

**talk** 212:9 213:10,14 214:8 217:8 225:13 226:16 235:9,11 243:13 254:4,17 261:11,12,15 267:6 268:9, 10 271:2 280:5 281:17 282:4,12,20 283:12 289:3 293:11 294:13 302:24 307:6,7,20 312:15 325:5 332:22 375:8,19 378:25 379:11,12,21 386:23 391:7 395:18 404:21 425:11 444:14 447:15 451:22,23 452:4,5 456:24 461:20,22 477:15 494:1 496:15 512:19,20 515:18 521:1 531:7 554:22,24 555:5,13 560:8

**talked** 235:25 251:21,22, 24 252:5 260:8 266:24 267:1 268:3 279:25 288:1 296:5 303:10 326:3 378:19 397:23 400:5 439:19 441:24 461:7,10 483:17 521:16

**talking** 218:2,12 222:1 228:5 230:21 235:3 250:11 277:18 278:12 280:1,2 287:25 288:25 296:8 318:18 331:1 345:9 350:12,17 359:3 362:17 363:1 364:17 367:25 368:4 369:13 373:16 374:17 377:2 386:11,12 399:10,13 402:21 407:5 408:6 409:17 411:8,17 412:3,5,25 416:7 418:19,20 420:12 423:7,15 424:24 435:17 442:9,11 444:25 446:4 470:18 486:9 494:15,25 496:4,17 502:14 504:24 507:11,21 508:16 526:19 531:18,22,23 533:5 537:7 538:11,17 539:9,19

540:5,24 542:15 543:13,
18,25 548:10 550:21
552:1,10 561:5

**talks** 267:6 485:10 486:14
537:4 539:18

**tangential** 229:15,19

**target** 258:19 265:18,19,
21,23 380:5 399:13 403:17
404:2 416:6 426:18 427:9
482:19 483:12

**targeted** 408:19 409:20
410:21 491:21

**targeting** 266:3 400:1
402:22 483:15 485:6,10

**teachings** 247:14

**team** 266:17 291:24
301:19 319:22 321:16
324:2 326:14,15 327:2
346:9,11 347:3,15 348:9
368:12 388:24 389:7,11
391:15 392:1 417:16
418:20,21,22 421:23
422:4,10 423:7,12 424:2,
14,16,17 427:13,24
428:12,25 430:3,10,14,18,
19 431:10,15 437:1,7
441:17 443:10 444:3
445:6,12 446:20 448:2,16,
18,19 449:5 450:8 483:7
492:1,3,5,7 529:19 530:18
531:19 533:6,19 534:14
539:10 540:15 541:4,5,13,
15,17 542:14 543:14
546:13 550:7 552:5

**teams** 437:12 558:5 561:6

**technical** 281:14

**technology** 243:12

**telephone** 244:11

**television** 244:15

**telling** 266:7,25 272:16
331:24 337:5 346:16,21
357:9 365:21 366:15,20
372:1,13 374:18 375:15
382:17 417:18 459:17
473:22 484:20 485:22
494:19 495:5 529:25
530:17 542:21 544:12
549:1 552:9

**tells** 282:18 332:9 477:2

**temerity** 367:16

**ten-minute** 451:20

**tense** 226:14

**tentative** 432:4,7 436:24
437:2,13

**tenure** 247:23 409:8

**term** 330:11 364:25 365:2,
5,7,13,16 366:3,4,8 376:6
428:3

**terminate** 284:4 286:8
292:1 294:14,19

**terminated** 280:11,15,16,
20 281:1,20 285:5 294:11
440:19 442:3,18

**termination** 220:21,24
221:6 222:10 248:5,11
249:15 282:14 283:11
284:2 285:1 286:22 287:22
292:12,14 304:8 414:21
415:12 440:16

**terms** 282:7 284:9 316:1,4
339:17,18 387:10 393:18
402:5,14 512:8 558:24

**terrible** 259:15 264:13,15
479:21,24 485:23

**terribly** 255:4 503:6

**test** 228:17 395:15 396:20
503:11

**testified** 333:23 415:11
421:23 447:3 485:14
503:20 518:21 519:3
522:24 539:4

**testify** 372:16 417:21
441:12 517:3

**testifying** 338:15 350:1
416:22 439:8 459:7
472:21,22 477:6 479:8,14
482:22 483:1,16 498:16
502:14 503:19 511:16
516:11 529:5 539:23
540:18 547:19

**testimony** 234:24 235:1
240:7 242:21 243:3 244:19
246:1 290:2 322:8 338:6
359:24 372:4 379:6,23
380:9 419:1 475:6 485:17

501:4 503:21 504:14,16
517:18 519:6 528:8 547:2
557:18,23 558:5,7

**testing** 503:20 547:24

**tethered** 299:12

**Texas** 241:22 249:24

**text** 553:5

**Thee's** 530:4

**theft** 302:17

**theme** 439:24

**theory** 219:7 305:17
441:19

**thick** 461:19

**thing** 210:19 268:15
269:16 273:1,24 275:15
293:7 299:6 306:21 321:11
350:6 351:24 361:13
368:11 371:4 382:18
387:19 416:25 417:1,17
429:17 474:2 478:21
518:24 551:15 552:8

**things** 211:19 216:5,11
219:14 225:13 255:6
259:15,22 264:20 269:3,19
270:6 275:20,21,25 276:4
300:20 311:15 323:13
343:15 345:5 353:1,4
370:21 395:19,22 401:17
403:8,14 409:24 422:4,6
424:20 426:1 427:8 429:20
439:21 447:14 491:6
492:14 494:15 496:17
501:16 523:5 526:11,21
527:1 528:17 531:6 533:18
535:25 540:13 542:16
544:16 546:25 547:5 548:6

**thinking** 251:9 268:25
269:2,3 381:12,13 390:15
420:8 425:19 431:15,25
455:4 515:3

**thinks** 353:3 390:4 500:6
520:10

**Thirty** 289:15

**Thom** 343:18

**Thompson** 324:9,10
344:12 349:20 368:21
417:16 433:16 534:10

**thought** 255:5,7 288:24
294:17 296:23 336:2
343:17 351:21,23 352:17
354:4,12 363:1 367:7
375:18 384:15 390:5
403:21 409:7 419:9 424:21
426:23,24,25 446:18
484:21 499:4 504:19 505:8
506:17 508:5,23 509:11
517:17 522:11 541:9,12
546:24,25 558:12

**thoughts** 269:7,8 393:8,21
398:25 487:24 557:5

**thread** 324:7,14 370:22

**threat** 275:11 350:2 408:24
416:9 493:25 494:1,2,5,14
495:15,20 496:9,12,14
500:10 534:8

**threaten** 266:5 275:13
413:22 510:19

**threatened** 274:20 302:3
303:3 344:5,7 349:21
545:13,18,19

**threatening** 304:16 349:1,
18 350:6,11,14,16,24
364:22 413:21 493:21

**threats** 495:25 496:4,16
534:6

**three-line** 517:7

**three-week** 287:12

**thrilled** 323:13

**ticket** 418:21

**tie** 434:16

**tied** 421:7

**tilt** 307:25

**time** 213:13 219:13 224:15
225:21 227:17 229:22,23
230:2 234:19 237:19,25
245:5,13 260:4 265:11
277:4 287:1,2,18 288:11
292:18 303:16 308:23
309:18 311:7,9 319:21
321:11 323:14 324:12
328:9 330:2 336:10 338:15
352:9 354:8,12 355:23
356:14 357:21 358:14
363:6 364:18 366:19
367:15 369:3,9 370:9

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 126 of 642   PageID 11067

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                     Vol 2 July 06, 2022        Index: timeline-wise..understanding

378:6,7 380:5 388:10
391:9 398:20 408:8 409:2,
24 410:21 412:12 418:23
425:8,16 426:3,4,12 430:2
436:16,23 440:10 443:6
444:2,18 445:6,12 449:12
450:19 452:10 454:23
455:8 464:2 466:16 467:11
468:2,8 471:4 481:17
482:7 489:8 490:23 507:13
512:6 514:6,8 522:20
524:15 525:9 528:12,13,24
529:13,25 531:12 532:23
533:1 539:2 540:7 541:24
542:12 543:18 553:20
554:6,9 556:16 559:16
560:9 561:23 562:1 563:21

**timeline-wise** 211:16

**timelines** 556:10

**timely** 547:7,8,10 548:2
550:21,24

**times** 253:21 274:25
319:16 440:6 491:3 495:15

**timing** 235:10,11

**Tina** 363:5,6,7,8,10

**Tinas** 363:9

**tired** 343:16

**today** 239:16 254:2 273:17
279:9,13 280:22 305:15
313:4 318:21 325:21
338:22 381:15 385:4,6,7
389:23 390:14 397:7,11
455:24 459:17 461:10
513:16 544:18,25 555:16
559:7

**Todd** 433:14

**told** 267:25 274:10 306:21
333:20 346:20 349:20
351:17 358:18 367:23,24
368:2,4,12,16 369:1,2,5
371:14 382:8 386:24
395:19 399:12 409:3
417:8,11,12 418:11 425:17
438:5 439:4,21 476:9
484:17,20 499:4 522:6
523:5 546:20

**tomorrow** 554:13 555:7
561:16 562:5,23 563:23
564:20,21

**tonight** 555:18 556:16

**tool** 355:16 359:16 471:6

**tools** 243:12

**top** 212:9 237:15 262:8
265:14 269:13,24 345:8
369:19 374:3 472:14
489:13,15,17

**topic** 226:19 355:10

**topical** 544:3 547:7,16
548:2

**topics** 521:17

**total** 247:2

**totality** 476:18

**totally** 374:24 375:2

**touch** 521:17

**touching** 244:12

**tough** 250:10 383:2

**town** 381:13 391:8 560:25

**trade** 296:11

**trained** 337:12

**transcript** 477:19

**transcripts** 539:3

**transfer** 556:8,19,22

**transparency** 392:21
546:8

**Transport** 210:7 228:4
300:14

**transportation** 257:13
286:1 551:7

**traumatic** 304:15

**traumatized** 302:3

**travel** 464:8 494:13

**tread** 224:16

**treasurer** 319:20 321:16

**treat** 286:17 324:25

**treated** 446:21 462:11,14
550:16

**triaging** 513:14

**trial** 210:5 216:6 233:2
242:7,16,19 243:4 244:14

245:18 246:15 287:15
383:8,11 387:20 396:5
436:11 451:8 539:4 540:5,
10 545:23 547:9 560:13

**trigger** 394:11

**triggered** 287:8 385:13

**trouble** 318:9 373:24
380:25 424:3,6,16,19
425:19,20

**troubles** 258:9 423:16
424:12

**true** 310:16 311:12 312:19,
23 313:4,15,19 315:17
316:5,15 317:12 320:5,8,
23 321:4 324:22 326:7
327:3,7 329:22,24 330:19
341:2,4 347:10 360:2
362:6 365:1 367:4 374:21
405:1,3,4,5,7 428:16
450:10 466:19 468:21
488:9,13 491:22 493:6,11,
18 495:15,20 498:8 501:19
502:1 511:24 512:2 522:22
525:4 526:20 532:16
534:18 535:11,21 537:1
538:13,19 539:13,16,21
540:9,25 541:21 542:22
546:13,17 547:7 548:11
550:22 551:10

**trust** 558:16

**truth** 220:10,13 223:3
225:16 226:10 255:12
338:8 421:16 477:3 534:22
546:7

**truthful** 392:9

**truthfully** 313:6

**tumor** 406:24 407:1,9,11,
13,19,25 408:4

**turn** 245:8 255:20 435:6
514:23 542:10

**turned** 215:11 224:15
255:23 293:5 435:1

**turning** 232:18,19,20
236:14,23 310:9 487:17

**turns** 263:12,14 357:7
367:8 541:12 545:17

**TW** 349:9 352:10

**Twelve** 289:22

**twisted** 544:25 545:1,6

**twisting** 545:12

**Twitter** 481:25

**TWU** 227:13 228:3,5,7
247:18 257:12 330:25
336:25 343:21,24 344:1
353:8 453:10,24 463:21,22
467:8,12,17,19 468:2,4,8,
14,20 469:2,3,18,22 470:2
471:2,22 492:17 512:2,5
533:3 534:9 535:16 541:6,
10,23 548:5 551:3

**type** 215:3 320:8 368:11
398:15 404:23

**typed** 497:10

**types** 374:6 531:22

**typical** 325:12 547:14

**typically** 443:16 489:22

---

## U

**Uh-huh** 390:23 514:3

**ultimate** 214:20 287:21
441:24

**ultimately** 234:17 286:8
392:25 475:1

**unchanged** 260:9

**uncovered** 487:14

**undefined** 482:10

**understand** 216:8 227:3
232:25 285:9 291:12
301:9,13 310:24,25 311:9
328:10 331:24 338:17
346:24 349:4 352:12 354:8
390:2 392:7,13 431:13
446:2 447:18 462:19 467:5
472:19 473:21 476:8 479:1
496:13 498:19 501:16
509:23 510:24 519:14
520:21 521:21 540:3
543:16,20 549:15 550:14
557:15,21

**understandable** 390:22

**understanding** 233:6
245:21 268:5 316:15

331:15 332:20 347:2
373:12 445:22 471:14
474:24 475:8

**understatement** 346:4,5

**understood** 215:17 220:4
221:9 227:4 228:19
229:11,17 230:16 239:2
297:1,21,25 306:11 328:16
339:12 349:5 393:20 394:2
400:13 447:19 522:14
553:14 559:14 562:3

**undue** 213:25

**unduly** 242:25

**unelected** 543:12,13,17,
24 548:6

**unfair** 237:9 243:22 523:21

**uniform** 272:12 282:24

**uniforms** 466:5,16

**unimportant** 348:5

**union** 210:7,21,23 213:17,
21,22 214:2,7,17 215:4,18
216:12,19,21,23 217:4
218:13,16,17,21 219:19,
22,25 220:5 221:15 222:24
223:25 225:2,5,21 226:1,3,
4,22 227:5,16,24 228:3,4
230:10,17 231:14 232:16
234:2 236:3,4,19 237:3,5
247:18 248:9,13,17 252:22
254:3,8,10,11,15,16,19,20
255:4,5,7,13 256:2,15,18,
20 257:7,8,12,13,23 258:1,
5,7,22,23,25 259:16,20
260:5,10,12,13,16,23
261:4,19,24 262:3,10,18
263:3,5,9,18 264:3,6,11
265:5,8,9,12 266:1,6,10,
16,23 267:16 268:5,10
269:10,17 270:8,13,17
271:5,6 273:9,23,24 274:4,
10,11,14,15 275:15,19,20
276:6,9 277:14 280:6,7
285:6,9,10,12,14,15,18
286:6,11,16,24,25 287:3
289:4 294:6,20,23 295:25
300:15,23 302:17 303:4,
12,15 304:7,23,25 305:20
310:3,14,16,18,20 311:5,
10,12,13,14,17,20,21,24
312:3,5,6,11,13,16,22
313:12,13,14,20,22 314:1

315:5,14,16,19 316:10,12,
17 317:22,23 318:24
319:21 320:4,7,9,15 321:3,
17 322:7,8,11,15 323:15,
17 324:11,21 325:9,10
326:15 327:6,23 328:2,19,
23 329:12 330:22 331:3,5,
7,9,17,18,20,21,22,25
332:15 333:20 334:6
335:3,6,8,12,15 336:3,6,7,
15,17 337:12,13,16,18
338:19,20 341:17 343:17,
23 344:10 345:4,23 348:2,
22 349:11,22 351:10,11
352:11,22 353:1,3,6 357:9,
22 360:7 361:12 362:2,3,5,
9,10,12,14,16,18,19,20
365:1,3,6,15,20 366:12,13,
18 367:3 368:16,25
374:11,18 375:11 385:25
386:4 387:2 400:14,21
402:12,22 403:5,14 404:1,
2,25 406:7 411:19 412:6
413:21 414:10 424:15
425:8,15 427:7,9 428:1,15
432:25 437:10,25 438:3,9,
18,23 439:5,17,22 443:6
445:13,14 446:10 449:15,
19,21 454:5 455:9 462:25
463:24 464:8,9,11,16,17,
21,22 465:18,22 466:3,11
468:11,15,21 469:1 470:3,
13 475:15,22,23 476:13,
20,23 480:22 481:18
482:6,19 483:12 487:1
491:5 492:6,21 493:9
494:21 495:6,8 500:5,6,23
502:11 503:23,25 504:2,10
507:22,23 508:19 509:25
523:10 525:14,19 526:11,
20,25 527:4,15 528:10
529:1,19,21 531:24,25
533:22 534:12,16,17
535:8,10,19,20 536:1,6,21,
22,24,25 537:14,15,21,22
538:11,12,13,21 539:2,5,6,
20 540:8,16,19,24 541:20,
21 542:9,21,22 543:17
544:2 546:16,22 547:4,7,9,
12 548:11,16 549:2,6,7,16
550:15,25 551:8,12,24
552:3,10,13 553:1 556:21

**union's** 219:6 234:5
248:14 353:14 367:17
402:15 465:14,16

**union-only** 217:11,14

**union-protected** 537:20

**union-sponsored** 248:22

**unions** 335:11 548:5,13

**unique** 213:17

**United** 241:20,23 332:16,
19

**unity** 546:8

**universe** 216:14

**unmute** 398:18

**unprotected** 311:14

**unreasonable** 296:23

**unredacted** 344:22

**unrelated** 547:1 552:11

**unreported** 304:13

**unusual** 490:25

**unwelcome** 210:19
283:15

**unwilling** 294:8

**upcoming** 408:24

**updated** 212:14,16,19
213:5

**upheaval** 335:9

**uphold** 292:12

**uploads** 466:13

**upper** 270:12 381:23
384:17

**upperclassman** 389:10

**upset** 256:24,25 260:23
261:7 263:4 270:5 274:21
334:25 335:16 343:23
473:7,8 523:1 539:21
542:17

**upsetting** 473:6,16,18
474:15 476:22 501:19
502:1,8 503:6

**utilize** 369:24

**utilized** 402:6 469:11
493:17 508:19 541:17

**utilizing** 455:9

---

**V**

**V.P.** 217:18

**vacated** 318:7

**vagina** 262:25

**vague** 482:9 525:21
526:14

**valid** 280:14

**Van** 358:4,6,7

**vantage** 377:11

**variety** 265:3 526:25 531:9

**vast** 256:12 481:24

**VDV** 355:15 357:5,13,24
358:20 360:1 363:11

**VDVS** 359:1

**Vegas** 249:10 489:8

**vehicle** 469:5

**veil** 228:24

**Ven** 358:4,6,7

**veracity** 228:17 456:6

**verbal** 253:21

**verbally** 484:20

**verdict** 243:18 246:14

**verification** 450:21,22

**verify** 226:9

**version** 344:23

**versus** 210:6 545:13

**vertently** 474:7

**vice** 317:6,7 318:5 330:5
348:22 355:24 366:11
367:15 433:14,15 483:13,
20 486:5 490:16 545:19

**vice-president** 325:9
483:7

**victimized** 479:6

**video** 239:23 240:4
262:19,22 270:6 271:7
472:15,17 473:3,22 474:10
476:22 478:3,8,20 479:12,
20,25 499:19,21,22 501:1,
11,18 502:21 510:4,17,21

511:2,4,23 512:1 518:13
520:1,11,12,15,18 521:20,
23 522:13,19 523:9,23
524:2,3,11 560:6 561:5,6,
7,9,12,14

**videoed** 479:20

**videos** 280:17 281:23,25
283:5 285:2 292:2,21
294:12 493:3,23 519:25
521:19

**view** 217:1 244:16,18
255:25 506:12

**viewed** 282:10,21 283:2,3
359:25 496:9,11

**views** 258:7 263:11
284:17,20 362:16

**violate** 220:10 281:22
303:19 447:18 517:23
537:22

**violated** 263:16 294:11
460:21 476:3

**violates** 282:9 471:15
550:4

**violating** 271:12 281:20

**violation** 413:8,20 438:13,
15 444:3 445:11 475:2
489:19 490:23 493:13

**violations** 224:13 264:24
282:13 416:4 444:11
449:12 487:6 529:24
530:20,21

**violent** 493:20,22

**visit** 244:16

**visual** 546:16

**vocally** 304:6

**voice** 237:4 305:1 331:19
408:23

**voices** 486:25

**voir** 254:5 393:15

**voluntarily** 365:14 387:19
492:25

**voluntary** 320:12

**volunteered** 464:2

**volunteering** 323:3

**vote** 242:7 258:23 260:17
305:3 331:18 361:13 431:3
434:16 535:14 546:6

**voted** 256:8,12 433:25
543:25 544:1 546:10

**voters** 255:15 256:1

---

## W

**wait** 265:20 275:2,3 332:10
346:20 351:2 365:18
425:21 449:6 483:21 494:2
495:7,8 500:4,8 502:20
555:9

**waited** 250:6

**waiting** 405:23 410:4

**waive** 296:4

**wake** 210:20

**waking** 548:7

**walk** 397:12

**walking** 251:8

**wanted** 212:10 258:14
268:7 270:7 291:11 295:10
301:4 310:19 352:2,20,21
353:22 377:13,23 382:25
383:21 399:18 425:10
426:21 427:21 432:9 510:9
518:9 537:14 542:4

**wanting** 399:21 416:6
424:6 475:21 506:15,16

**ward** 379:20

**warn** 210:18

**warned** 283:25

**warning** 253:21,22 518:13
521:23

**warns** 283:21

**Washington** 227:13
248:23 249:1 259:22
285:20 453:23 463:17
499:24

**watch** 472:18 474:10,14,
18 478:3,23,25 479:2
518:16,17 523:8,24,25

**watched** 501:1 511:2
519:3 520:5,10,13 522:12,

19,25 523:9

**watching** 474:2 522:9,13,
15,22 523:1,16

**ways** 257:9 499:25

**wearing** 272:25 273:14

**website** 424:17 428:13
429:1

**wedlock** 249:25

**week** 492:16 510:3 559:12

**weeks** 250:17 255:20
293:20 486:3 487:2

**weight** 243:2

**whisper** 245:9

**white** 245:9 385:21

**who-all** 470:5

**wholly** 456:8

**whore** 250:1

**wide** 361:15

**wide-open** 563:7

**widely** 335:10

**wife** 424:22

**Wilkins** 433:18

**Willard** 401:25

**wins** 255:11

**wires** 299:13 308:6

**wishes** 553:16,18

**withdraw** 475:21

**witnessed** 482:10

**witnesses** 216:1 235:5
243:25 244:22 284:22
380:14,16,19 441:11
513:3,9 514:18 558:23
559:5,7,11,25 561:19,23

**WNCO** 370:2

**woman** 497:17 498:11,21,
22,24 504:22

**women** 251:19 252:14
498:7 499:5 524:13

**women's** 248:22,25
251:17 259:24 261:16
271:16 285:19,25 453:18,

21,23 457:3 458:19 459:5,
14,25 460:7 463:17,21
464:10,18,19 466:18
492:18 504:11 523:2

**wondering** 338:18

**word** 212:20,22 213:1
267:23 313:17 365:19
416:19 429:4 534:7 545:1

**wording** 238:24 329:10

**words** 259:11 298:19
419:21 438:25 439:18
440:3,7 464:22 492:22
534:13 544:25 545:1,6,12

**work** 252:23 253:10,11
254:14,19 255:8 265:7
268:14 269:22 274:23
275:9 276:22 277:3
301:16,18,19,22 330:13,15
336:8 348:8 368:17 408:20
410:22 438:13 481:24
487:25 513:17 532:19
564:25

**worked** 276:23 363:13
381:13 429:2 453:21

**workers** 210:7 219:9
228:4 257:13 300:14 551:8

**workforce** 284:11,13

**working** 247:19 272:15
286:21 403:5 431:19
453:18,21 463:16,21
464:10,18 487:3 513:12
540:7

**workings** 437:10,11

**workplace** 267:7 280:2
283:13 302:12

**works** 240:18 269:1 302:2
452:23 472:16 473:4

**world** 272:16 273:5 462:13

**worn** 263:1

**worried** 352:24 354:11
454:14 455:23

**worries** 389:25

**worry** 250:25 380:25

**worse** 516:15,16

**wow** 547:14

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 2 July 06, 2022                    Index: wrap..zygote

**wrap** 512:13 563:19

**wrestled** 240:14,15

**write** 247:4 309:18 486:3
487:8 492:13

**writes** 264:11 366:19
369:9

**writing** 361:23 368:3,11,
13,16,24 369:2,6 376:4,7,
19 403:1 409:11,14 410:3
417:12,13,18 484:19 543:6
553:7 556:2

**written** 253:22 318:22
353:14 364:19 491:16
513:18

**wrong** 239:9 262:1 418:12
422:8 443:24 520:16 539:5
545:17

**wrote** 228:16 261:9 381:3
383:12,16 395:21 402:25
482:4,14 485:19 488:3
493:6 497:14 498:3 523:5

**WWC** 453:24

-------------------------
              **Y**
-------------------------

**y'all** 211:15,20 212:13
213:13 235:9,17 240:14
245:10 300:10 379:3 381:5
384:10,12,13 385:15 386:3
446:8 452:6,7 462:13
513:8,18 515:22 521:19
538:18 554:19 555:10
559:15,19 562:6 565:4

**y'all's** 241:4

**year** 255:4 256:10 259:18
272:5,6 286:22 335:11
383:25 384:1

**years** 222:10 247:24
249:22 251:6,14 252:3,15
253:19 257:24 262:16
272:7,8,10 273:12,17
276:14,20,22 293:14 304:7
321:22 326:18 361:17
440:8 530:11 534:9 547:10

**yellow** 250:18 456:17

**yesterday** 279:12 382:7
385:8 389:24 394:9 397:6,
11 521:16

**young** 255:9

**Yum** 325:11

-------------------------
              **Z**
-------------------------

**ZIP** 216:11

**zygote** 250:25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 130 of 642   PageID 11071
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022

1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
2
                   CASE NO. 3:17-cv-02278-X
3

4

5  ----------------------------------------x

6  CHARLENE CARTER,

7                       Plaintiff,

8  v.

9  SOUTHWEST AIRLINES CO. and
   TRANSPORT WORKERS OF AMERICA,
10 LOCAL 566,

11                      Defendants.

12

13 ----------------------------------------x

14

15

16            TRANSCRIPT OF THE TRIAL

17      BEFORE THE HONORABLE BRANTLEY STARR

18         UNITED STATES DISTRICT JUDGE

19

20          V O L U M E   3

21

22              Dallas, Texas

23             July 7, 2022

24              8:38 a.m.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                            Vol 3 July 07, 2022                            Pages 568..571

```
                                          Page 568
1  A P P E A R A N C E S :
2
    FOR THE PLAINTIFFS:
3
         NATIONAL RIGHT TO WORK FOUNDATION INC.
4            8001 Braddock Street
             Suite 600
5            Springfield, Virginia  22160
         BY:  MATTHEW B. GILLIAM, ESQ.
6            mgb@nrtw.org
7
8        PRYOR & BRUCE
             302 North San Jacinto
9            Rockwall, Texas 75087
         BY:  BOBBY G. PRYOR, ESQ.
10           MATTHEW D. HILL, ESQ.
             bpryor@pryorandbruce.com
11           mhill@pryorandbruce.com
12
13
14
15  FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
16       REED SMITH, LLP
             2850 North Harwood
17           Suite 1500
             Dallas, Texas  75201
18       BY:  PAULO B. McKEEBY, ESQ.
             BRIAN K. MORRIS, ESQ.
19           pmckeeby@reedsmith.com
             bmorris@reedsmith.com
20
21
22
23
24
25
```

```
                                          Page 569
1  For the Defendant Union 566:
2
3        CLOUTMAN & GREENFIELD, PLLC
             3301 Elm Street
4            Dallas, TX 75226
         BY:  ADAM S. GREENFIELD, ESQ.
5            EDWARD B. CLOUTMAN, III, ESQ.
             agreenfield@candglegal.com
6            crawfish11@prodigy.net
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                          Page 570
1  COURT REPORTER:  MS. KELLI ANN WILLIS, RPR, CRR, CSR
                     United States Court Reporter
2                    1100 Commerce Street
                     Room 1528
3                    Dallas, Texas  75242
                     livenotecrr@gmail.com
4
5        Proceedings reported by mechanical
6  stenography and transcript produced by computer.
7
8                    * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                          Page 571
1                  I N D E X
2
3             W I T N E S S E S
4  AUDREY STONE
5    Cont. Direct Examination by Mr. Pryor ......... 595
6    Cross-Examination by Mr. Greenfield ........... 676
7    Cross-Examination by Mr. McKeeby .............. 768
8    Redirect Examination by Mr. Pryor ............. 792
9    Recross Examination by Mr. McKeeby ............ 814
10   Proffered Testimony ........................... 818
11
12
13  EDWARD SCHNEIDER
14     Direct Examination by Mr. Pryor ............. 867
15
16
17
18
19
20
21
22
23
24
25
```

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 132 of 642   PageID 11073
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 572..575

Page 572

```
 1
 2              E X H I B I T S
 3
 4   Trial Exhibit 15-A ................. 598
 5   Trial Exhibit 106-A ................ 601
 6   Trial Exhibit 65 ................... 616
 7   Trial Exhibit 34 ................... 622
 8   Trial Exhibit 21-Q ................. 644
 9   Trial Exhibit 21-R ................. 644
10   Trial Exhibit 21-T ................. 651
11   Trial Exhibit 21-U ................. 657
12   Trial Exhibit 21-V ................. 660
13   Trial Exhibit 21-X ................. 672
14   Trial Exhibit 134 .................. 720
15   Trial Exhibit 67 ................... 749
16   Trial Exhibit 47 ................... 778
17   Trial Exhibit 94 ................... 780
18   Trial Exhibit 49 ................... 790
19   Trial Exhibit 21-O ................. 794
20   Trial Exhibit 21-C ................. 851
21   Trial Exhibit 71 ................... 866
22   Trial Exhibit 72 ................... 866
23   Trial Exhibit 21-M ................. 866
24   Trial Exhibit 21-W ................. 866
25
```

Page 573

```
 1            -- P R O C E E D I N G S --
 2
 3        THE COURT SECURITY OFFICER:  All rise.
 4        THE COURT:  Thank you.
 5        You can be seated.
 6        Okay.  So Day 3 of trial.
 7        Let's go ahead and do appearances for
 8  Carter.
 9        MR. GILLIAM:  Matthew Gilliam for
10  Plaintiff, Charlene Carter, along with Matt Hill and
11  Bobby Pryor.
12        THE COURT:  Thank you.
13        And how about Southwest next?
14        MR. McKEEBY:  Paulo McKeeby on behalf of
15  Southwest, with Brian Morris and company
16  representative Meggan Jones.
17        THE COURT:  Thank you.
18        And how about the Union?
19        MR. GREENFIELD:  Adam Greenfield and
20  Edward Cloutman, III on behalf of TWU, Local 556.
21        We are expecting our corporate
22  representative, Mr. Michael Masoni.  The line down
23  in security was a little extra long this morning.
24        THE COURT:  Sorry to hear that.  It is
25  challenging on days like this.
```

Page 574

```
 1        We were supposed to be one of three trials
 2  going on in the courthouse right now, and so we are
 3  fortunate that not all of them went.  But still,
 4  even if there is more than one or one plus
 5  sentencings, it results in quite a line at security.
 6        So thank y'all for being here timely and
 7  getting through it, and no worries if someone else
 8  is stuck.
 9        Okay.  So I know we didn't have new
10  objections last night.
11        What I wanted to talk about right quick is
12  time clock, see if there is anything on Nevarez we
13  should talk about, and then talk about any exhibits
14  we didn't get to yesterday morning so we can
15  minimize sidebar time and inefficiencies there.
16        Okay.  On time clock, I think we sent out
17  the nightly update.  We will keep doing that.  We
18  will send y'all every night the latest exhibit list
19  that I've been keeping track of, as well as the time
20  clock.
21        What I wanted to say on the time clock is,
22  for Team Carter, I know you told me, Mr. Pryor, that
23  your goal is to use about half your time on Stone
24  and your client.
25        MR. PRYOR:  That's what we anticipate.
```

Page 575

```
 1        THE COURT:  If you use the other hour that
 2  you predicted on Stone, then you will have used half
 3  your time just on Stone and opening.
 4        So I'm expressing concern.  And so what I
 5  want to do is just plot this out in advance.
 6  Remember my standard for when I give you more time
 7  is you have used your time efficiently and you have
 8  a compelling need for more.
 9        What I would say, the first day
10  presentation, if you ask for more time right now, I
11  would say no, and here is why.
12        The inefficiencies I saw, I think you have
13  reached a long time ago the point of diminishing
14  returns on Stone with regard to what in the Facebook
15  messages she sent was union speak.
16        She said yes to all of them.  I think once
17  you get too deep, you have reached the economic
18  point of diminishing returns.
19        I talk to juries every time after trial,
20  and they say, Why did they say the same thing over
21  and over again, always, when even I time every
22  trial.
23        And so I think the jury is getting tired
24  of this.  And so you are actually, for each one of
25  those questions now, you are taking time away from
```

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 133 of 642   PageID 11074
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                                      Vol 3 July 07, 2022
Pages 576..579

Page 576

1 your client to ask her, Well, what about page 23 in
2 this packet, is that union speech?
3        She said yes to all of them, right?
4 You've made your point.
5        Other things. I think we have had a lot
6 of asked and answered objections that I have
7 sustained over here from the Defendants' side.
8        And I get that you may need to make your
9 point repeatedly. I usually only sustain those if I
10 get to a third and a fourth time, right? If you
11 circling back time three, time four.
12       I realize it's an important witness, you
13 may need to make a point more than once.
14       And the last inefficiency I'd point out
15 is, your style with this witness is combative and
16 that is fine. I give people free rein to pick
17 whatever style they want. But with this witness,
18 I'm not sure it is particularly helpful from an
19 efficiency standpoint.
20       MR. PRYOR: Right.
21       THE COURT: I realize your need to pick
22 your style, and that is fine. But that is your
23 choice. I don't know that it is an efficient time
24 choice with this particular witness.
25       MR. PRYOR: Your Honor, if I could just

Page 577

1 respond to one comment.
2        THE COURT: You may.
3        MR. PRYOR: I accept everything you are
4 saying.
5        Going through the documents, each
6 communication, I tried to get her to say they were
7 all union-related activities so I could -- we have
8 our record that it's all protected activity -- and
9 she would not.
10       We have a daily. She did not. She
11 refused to say that. She said, no, she thought some
12 things were unrelated, and there were memes and
13 there were -- I did not get that definitive
14 testimony, at least I don't think I did, based on --
15 you think I did. She absolutely did not. I have to
16 go through it to establish that it was protected
17 activity and through her own testimony as the Union
18 president.
19       We think it is significant, and I,
20 unfortunately, have more to do.
21       As I have gone along, I have asked her, Do
22 you want to agree? And she won't.
23       And it is important to our case, both from
24 a directed verdict standpoint, on appeal, to this
25 jury, that we establish all the communications fall

Page 578

1 within a protected category.
2        So I accept all of your criticism, or your
3 comments, but I will tell you my view of the
4 evidence and why I have to do that.
5        THE COURT: I understand that.
6        So the only thing I would say in response
7 to that is, perhaps I didn't view her equivocation
8 on that point in the same way that you did.
9        MR. PRYOR: Okay.
10       THE COURT: But I would say, from an
11 efficiency standpoint, you can ask her, Is there
12 anything else in this packet that you think crossed
13 that line and is not union speech, right?
14       I think where she has drawn the line, at
15 least in my view, is she thought that, you know, the
16 video and the commenting online, that crossed the
17 line into a threat, and in her view, is no longer
18 union speech or protected speech.
19       And so pulling away all of her testimony,
20 that is what I view as the whole packet, union
21 speech except for those two things.
22       MR. PRYOR: I thought that would be an
23 objectionable question, but I like it, so I will
24 definitely --
25       THE COURT: In the interest of time, I put

Page 579

1 y'all on a clock. If someone objects to it, you may
2 have to give her a couple of minutes to thumb
3 through the packet.
4        MR. PRYOR: I'm happy to.
5        THE COURT: If you want to give her a few
6 minutes to thumb through the packet, that is fine by
7 me.
8        MR. PRYOR: I'm going to do that first
9 thing, your Honor.
10       THE COURT: That is fine.
11       Okay. So I would just like to preview for
12 people in advance what I'm thinking on the clock and
13 why, and I will do the same thing once we see more
14 time being used from Southwest and the Union,
15 because I want people to use their time efficiency.
16 I want to give them more if they use it wisely, but
17 I have got to be a good steward of time.
18       Unfortunately, y'all are one of many cases
19 that we inherited that were almost trial ready when
20 I came on the bench in 2019.
21       And then with COVID and not many people
22 wanting to try their cases in COVID, I tried
23 everyone who was willing to try during COVID.
24       We have now this crushing backlog, right,
25 that is ready for trial. So I have got four civil

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                      Vol 3 July 07, 2022                                      Pages 580..583

Page 580

1 that are ready in go in August.
2       So we had another that wanted to go next
3 week.  We moved them to August so we would have more
4 time for this trial.
5       But we are really trying to deal with the
6 pandemic and the aftermath of it.
7       So I'm not trying to be a jerk, I want to
8 give everyone the time they want to have, but
9 everyone wants a lot of time and everyone wants to
10 try their case now.  I'm trying to juggle that.
11       So any update on Brett Nevarez?  I assume
12 y'all did not have a happy late-night depo last
13 night?  No communication, I assume.
14       MR. McKEEBY:  I'm being signaled that
15 there has been no communication.
16       MR. GREENFIELD:  Me either.
17       THE COURT:  So what I can do is, I have a
18 draft of a show cause order that says, You have now
19 violated a couple of my court orders.  I have at the
20 bottom of that draft language asking y'all to send
21 that order as soon as I file it jointly by email to
22 Mr. Nevarez.
23       Seeing if y'all can serve it on
24 Mr. Nevarez.  I don't know if you have a process
25 server and if we can get location information, that

Page 581

1 would work to get that in his hands.
2       I think that is a predicate to any motion
3 for sanctions or contempt that would get filed from
4 Carter.
5       I will say, from Carter, I know we have
6 the certificate of no show that you filed from the
7 deposition.  I don't know that we have the trial
8 subpoena or the affidavit from the server on that.
9       And so if you file a motion on the heels
10 of my show cause, then we may need to paper up the
11 record in those two regards to have a motion that is
12 transferable to New Mexico.
13       Does that make sense?
14       So my show cause would set a hearing for
15 tomorrow morning before trial.  He would going to
16 show to that either.  Or it lets him respond by
17 affidavit before the date of the hearing.  Or it
18 lets him do the depo before the date of the hearing
19 to avoid any need for the hearing.
20       It's a choose your own adventure.  Show up
21 to the hearing and explain why you violated these
22 orders, or do the depo, or explain under oath in
23 writing why you did it.
24       I think none of those three options would
25 probably happen, given what we have seen now.  And

Page 582

1 so the most likely outcome is that Carter files
2 emergency motion for sanctions that then I
3 immediately transfer to New Mexico.
4       Thoughts on that path?
5       MR. McKEEBY:  That sounds fine to me.
6       I just -- I would want to make one point
7 of clarification, that the emails the last two days
8 have gone from Southwest in-house counsel to
9 Mr. Nevarez, not me.  Just so that if that comes up,
10 there is no confusion.  And Union's counsel has been
11 copied on those emails.
12       THE COURT:  Got it.  And I'm fine with
13 that approach, too, for service of this.
14       When I say "counsel for Southwest," I'm
15 fine with that being in-house counsel, if that makes
16 sense.
17       MR. GREENFIELD:  We sent out a joint one
18 with in-house.
19       THE COURT:  Okay.  That is great by me.
20 I'm not going to tell y'all that it has got to be
21 out-house counsel, as they are sometimes referred
22 to, or in-house.  But that is fine by me.  In-house
23 or outside counsel is fine.
24       So we have got that drafted.  I'm going to
25 ask our staff to docket that this morning.

Page 583

1       I know we docketed the Conlon page/line
2 designation objections, and we are working on
3 Kleburne.  We should have Kleburne out shortly.  So
4 we will keep those rolling out.
5       And I think in order we looked at next are
6 Burdine, Rutherford and Lacore.
7       And so sorry for the rolling production.
8       MR. McKEEBY:  One other issue on the
9 Talburt designations.
10       THE COURT:  Yes.
11       MR. McKEEBY:  We had objections on the
12 same relevance grounds as the Court has heard before
13 that were raised in our motion in limine.
14       I think some of those were denied even in
15 the context where Mr. Talburt talks about the
16 discipline that he received.  And it is no one's
17 fault, but it is --
18       THE COURT:  Have you got specific -- well,
19 can you give me specifics?  So I'm happy to
20 reconsider anything I have done.  But if you can
21 give me specific ones -- and by email is fine,
22 right?  We may be going, and I may look at that last
23 note again.
24       MR. McKEEBY:  Okay.  I will have
25 Mr. Morris look at that.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 135 of 642   PageID 11076
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 3 July 07, 2022                        Pages 584..587

Page 584

1    But I will also say that it's not -- it's
2 complicated because it's sort of comments that are
3 intertwined with other testimony that probably is
4 relevant and should come in.
5    So I just think as a practical matter -- I
6 guess I will reserve the right to change my mind on
7 this -- but as a practical matter, it may be that a
8 limiting instruction is the more appropriate vehicle
9 than to try to excise two sentences out of a video
10 clip.
11    THE COURT:  You can edit videos in a very
12 awkward fashion.
13    But all that is to say, I have already
14 sort of spilled the beans with the jury here, and so
15 that may be the easiest course, is to let it in.
16 But let me tell the jury, Hey, this was a depo.
17 I've cut out some of this, as you already know, so
18 please ignore the Southwest stuff.
19    MR. McKEEBY:  I will look more closely at
20 the specific pages that I'm talking about.
21    But I just wanted to give you and the reps
22 of the parties a heads up that I think the more
23 likely request is going to be to stand up and say,
24 Judge, we would like the limiting instruction here.
25    THE COURT:  Understood.  That helps.

Page 585

1    We will look for the specific page/line by
2 email from y'all and take another look at that.
3    MR. PRYOR:  Your Honor, in that regard,
4 that actually was on my list to raise, too, after
5 our discussion yesterday.
6    I asked this -- I didn't do his
7 designations.  I asked this morning, and I was told
8 that there are portions of his testimony that
9 mentions that he was terminated and then reinstated,
10 things like that.
11    And I certainly recall asking him at
12 deposition.
13    And if we need to adjust the video, let us
14 know.  He is our next witness, but we probably won't
15 get to him until after lunch.  This guy is pretty
16 amazing at that.
17    The second is Exhibit 15, the next
18 document that Charlene communicated with Ms. Stone
19 about, says, "Well, well, well.  Brian has now been
20 reinstated, just like I predicted."
21    And I, yesterday, was discussing I thought
22 I should be able to talk about that, and I think you
23 said no.  That's fine.
24    That document is in evidence and we may
25 need to redact it or something.  But I -- I want to

Page 586

1 be able to get her to say it's protected activity.
2    Now, if the question that you have
3 suggested works, I won't have to go into those
4 details with her.  But if it doesn't -- I don't want
5 to say anything about Talburt being terminated is my
6 point.  It is right there in the document that I'm
7 talking to her about.  And it will be on the screen.
8 So I want to be correct.
9    THE COURT:  Sure.  Understood.
10    Southwest?
11    MR. McKEEBY:  Again, I mean, at some
12 level, it has to come in to some degree.  So I think
13 just the repetition of the limiting instruction,
14 rather than confusing the jury about whiting out a
15 portion of the Facebook message, is the better
16 course, quite frankly.  And that's what I would
17 suggest.
18    THE COURT:  I think that is -- so we are
19 all on the same page.  I mean, I think that is the
20 wisest course of action.
21    I've already let the cat out of the bag,
22 so to speak, with that, and the jury has already
23 heard some of that.
24    So what I will do is, when you put the
25 document up on the screen, can you just give me a

Page 587

1 look, and then I will tell them, Hey, I have told
2 y'all before some of this stuff on how Southwest
3 treats its employees stays out of the case, but some
4 of it's already in the exhibits, so we are not going
5 to white them out.  But keep in mind, that is not
6 really a part of the case, how Southwest treated
7 other employees.
8    MR. PRYOR:  Okay.  And so what we are
9 talking about is redacting it then, when we send it
10 to the jury, take it out?  Is that --
11    THE COURT:  I think we are talking about
12 we don't redact it, but I tell them --
13    MR. PRYOR:  Oh, a limiting instruction.
14    THE COURT:  I give the jury a limiting
15 instruction that says, "Do not consider this."
16    I think juries do see an online portal of
17 boxes, right?  But when we redact personal emails
18 and things, they go, what is behind that?
19    And the short answer is it is nothing, it
20 is irrelevant.
21    Okay.  So anything else we should talk
22 about before we jump into exhibits?
23    MR. GREENFIELD:  We can wait until
24 afternoon.
25    THE COURT:  Can we get that mic a little

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                          Vol 3 July 07, 2022                                    Pages 588..591

Page 588

1 closer to you?
2        MR. GREENFIELD: We can wait until
3 afternoon.
4        THE COURT: Okay. Anything else,
5 pre-exhibit, that we should cover?
6        So for exhibits, I'm going back to my list
7 from yesterday, and the first one I have that we did
8 not cover either in the morning session or rule on
9 at trial was Exhibit No. 34.
10       Mr. Greenfield, tell me if I'm wrong on
11 that.
12       34 is the first on my list to talk about
13 this morning.
14       MR. GREENFIELD: I see 34, and I'm pulling
15 up the exhibit right now, your Honor.
16       THE COURT: Got it.
17       MR. GREENFIELD: I know which way this is
18 leaning, but I will maintain my relevance objection.
19       THE COURT: I appreciate that.
20       What I want to do is, sometimes I will
21 signal y'all why I'm doing what I'm doing. I don't
22 do that as a means to try to bully you into pulling
23 down your objections, so we can still efficiently do
24 this, just in the manner that you did.
25       So, yeah, I think it is relevant, but I

Page 589

1 appreciate you still preserving your objection in an
2 efficient way. I think we can all handle this in a
3 very similar manner.
4        So I will overrule the relevance objection
5 on the record here for 34.
6        Okay. So the next one I have,
7 Mr. Greenfield, is 53, a Women's March, Planned
8 Parenthood newsletter.
9        I see you as having relevance, prejudice
10 and hearsay, and best evidence objections there.
11       I'm happy to hear anything you want to say
12 and I'm happy to hear Carter's response.
13       MR. GREENFIELD: Your Honor, this is a
14 document that we talked about at sidebar yesterday.
15 I think -- I don't know if opposing
16 counsel intends to revisit this document or submit
17 it later. But I think they kind of worked around to
18 get the information that they needed out of it, but
19 I'm not going to try his case for him.
20       But I maintain my objections on it.
21       THE COURT: That is a good question.
22       So do you think you are going to try to
23 admit 53 today, or what is your plan?
24       MR. PRYOR: I don't think we have a
25 sponsoring witness for that. She didn't identify

Page 590

1 it.
2        THE COURT: Got it.
3        So what I will say is I'll just not rule
4 on it right now because it's not a plan to offer
5 with a sponsoring witness as of yet. If we need to
6 revisit it, we can.
7        MR. PRYOR: I think I tried yesterday and
8 failed.
9        THE COURT: I don't have 53 on my list,
10 and I do recall us talking about it at sidebar.
11       56.
12       And by the way, every day they are just
13 going to tap me on the shoulder or do something when
14 we have got our full jury, and then we will break in
15 our action so that we can bring in the jury.
16       I let in 56 yesterday.
17       I sustained 57.
18       Which I think takes us to 59, if I'm
19 right.
20       Mr. Greenfield, is 59 next on your list?
21       MR. GREENFIELD: Yes, your Honor.
22       MR. GILLIAM: Your Honor, I thought that
23 was withdrawn.
24       MR. GREENFIELD: Which one?
25       I think 59 is duplicative of 56.

Page 591

1        THE COURT: 56.
2        MR. GILLIAM: I apologize.
3        MR. GREENFIELD: Is that right?
4        THE COURT: So if you don't intend to
5 offer 59, we won't talk about it.
6        MR. GILLIAM: I think it is duplicative.
7        THE COURT: And 56 came into evidence.
8        MR. GILLIAM: Right.
9        THE COURT: So I will just note it as
10 withdrawn and then move on to the next one.
11       64 I have down as next. I've got Union
12 objections on hearsay.
13       The jurors are all here. And I will say,
14 jurors are here, despite car trouble for one juror,
15 and he still got here on time. So our seven are
16 holding strong, they are trying to not get down to
17 six, and I appreciate that. So we will keep you
18 posted.
19       Thank you, Mr. Gillespie, for getting
20 Ms. Stone. You can go ahead and bring her in. I'll
21 ask her before the jury gets here, make sure she
22 kept my instruction not to talk anyone about the
23 case. Then we will bring in the jury and get going.
24       Sound good?
25       MR. GILLESPIE: Yes, your Honor.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 137 of 642   PageID 11078
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 3 July 07, 2022                      Pages 592..595

Page 592

1       THE COURT:  So while she comes in, 64,
2 anything you want to tell me on 64?
3       MR. GREENFIELD:  It was just the same
4 thing about the limiting instruction that we
5 discussed yesterday, so I don't think we need to
6 revisit it.  But I will maintain my objection as to
7 wanting that limiting instruction -- request, excuse
8 me.
9       THE COURT:  Understood.
10      And so what I will do on that -- and I'll
11 just say, I get the point, and I would love it from
12 an ideal nature if I could always say, this document
13 is not being offered for its truth, but it would
14 double the time of trial, because most all of these
15 documents come in under some hearsay exception or
16 not hearsay.
17      So I will just say I'm overruling the
18 objection and the limiting instruction request.
19      MR. GREENFIELD:  The same goes for 65,
20 your Honor.
21      THE COURT:  For 65.
22      Okay.  I will do the same thing for 65 as
23 for 64 then.  I will overrule that request.
24      And we have handled 68 through 72.
25      And we got it done.  We struck the landing

Page 593

1 just when we needed to.  So thank you y'all for your
2 efficiency this morning.  I appreciate it.
3       MR. PRYOR:  I get that extra time?
4       THE COURT:  Well, actually, like any time
5 we make up more time, that gives me more time at the
6 end to give out if we've had an efficient
7 presentation, right?
8       MR. PRYOR:  Bring them in, Judge.
9       (The witness entered the courtroom.)
10      THE COURT:  Ms. Stone, welcome back.
11      Before I bring in the jury, I just need to
12 ask you, did you talk to anyone about the case?
13      THE WITNESS:  No.
14      THE COURT:  Okay.  Thank you for keeping
15 my instruction.
16      So we can bring in the jury.
17      MR. GREENFIELD:  Your Honor, I'm sorry, I
18 did have one more issue before we start.
19      THE COURT:  Kevin, can you go tell Randy
20 to hold?
21      MR. GREENFIELD:  I just have a personal
22 request that after Plaintiffs close with Ms. Stone,
23 that I be given a five-minute break to go make a
24 phone call.  My two-year-old suffered a severe arm
25 break last night and is in surgery this morning.

Page 594

1 He's out of surgery, but not out of -- but not awake
2 and out of anesthesia.  And I would like to make a
3 call to check on him.
4       THE COURT:  Absolutely.  So after you
5 finish with Stone, I will break, and then go do your
6 thing.  And stay out as long as you need to.
7       I'm sorry to hear that.  That is rough.
8       MR. GREENFIELD:  Thank you, your Honor.
9       THE COURT:  Okay.  We are ready.
10      THE COURT SECURITY OFFICER:  All rise for
11 the jury.
12      (The jurors entered the courtroom.)
13      THE COURT:  All right.  Thank you.  You
14 can be seated.
15      All right.  Mr. Pryor, you can continue
16 your examination of Ms. Stone.
17      THE COURT:  Ms. Stone, you're still under
18 oath.  We don't need to swear you in again unless
19 you feel like you need another oath.
20      Feel good?
21      THE WITNESS:  (Nods head.)
22      Okay.  Let's go for it.
23      Mr. Pryor, you can continue.
24
25

Page 595

1       DIRECT EXAMINATION - CONTINUED
2 BY MR. PRYOR:
3 Q.   Good morning, Ms. Stone [sic].
4 A.   Good morning.
5 Q.   Yesterday we were talking about Exhibit 15 and
6 whether or not all of Ms. Stone's [sic]
7 communications were protected union activity.  And
8 we made it through this page right here, 612.
9       I'm going to give you this exhibit.
10      It has been suggested to me by someone wiser
11 than myself that maybe instead of having to go
12 through each of these and have me read them to you,
13 just have you look at it and tell us any pages that
14 you think do not relate to Charlene Stone [sic]
15 exercising her protected union activity, that she's
16 sending this in connection with communicating to her
17 union about a complaint or concern.
18      Okay?
19      Do you understand the question?
20      THE COURT:  Mr. McKeeby.
21      MR. McKEEBY:  Objection to the use of the
22 term "protected activity."  It calls for a legal
23 conclusion.
24      THE COURT:  Okay.  Overruled.  I will
25 allow the question.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                       Vol 3 July 07, 2022                  Pages 596..599

Page 596

1      You can approach.
2 BY MR. PRYOR:
3 Q.  Here is the document.
4      And I will tell you, there are some pages that
5 are blurred and I can't read them, and I'm not
6 expecting you, if it is blurred, to read the blur.
7      But those that you can read, if there is
8 something that doesn't relate to Ms. Carter
9 complaining about her union, let me know.
10 A.  Just for clarification, I heard you say
11 "Ms. Stone's communication," and I also heard you
12 say "Charlene Stone."
13 Q.  Okay. I'm able to mess up any names,
14 apparently. American Airlines, Southwest Airlines.
15      I'm talking about Charlene sending
16 communications to the president of her union, and is
17 there something in here that doesn't tie into her
18 complaint about her union.
19 A.  I'm not able to read some of these either.
20 Q.  I will tell you what. The ones that you can't
21 read, let me give you a marker, and just kind of
22 slash across the pages that you can't read. And
23 there's quite a few.
24      The ones that you can't read, just put a slash
25 across it.

Page 597

1 A.  (Witness complies.)
2 Q.  When you get to the page that says "Trial
3 Exhibit 15," you can stop, because we've covered
4 everything else.
5 A.  Is that going to be on the bottom, or where
6 should I be looking for that?
7 Q.  I couldn't hear you.
8 A.  Is that going to be on the bottom? Where would
9 I find that?
10 Q.  I will just take that part away from you. Here
11 is what we have covered so far.
12      Did you see anything that you did not consider
13 to be protected union activity?
14 A.  Of the pages that I can read everything on it
15 clearly, no. There's a number of pages, quite a
16 few, where I can't read everything.
17 Q.  It's almost a third of them, I'm sure.
18      I'm going to identify for the record, if you
19 will confirm for me, the ones -- that one, could you
20 read that? You are better -- I'm not trying to talk
21 you into it. I just couldn't read it.
22      Okay. You could read a little, is what you're
23 saying?
24 A.  I can make out some words.
25 Q.  Fair enough. You are entitled to read the

Page 598

1 whole thing. The same thing on this one. But it is
2 totally up to you. If you can read that, that is
3 great.
4      Okay. I think that's the only one. You can
5 leave that one up if you can read it.
6 A.  Yeah, I can make that one out.
7 Q.  So we want to identify for the record the ones
8 that you have marked yellow. And when you marked it
9 yellow --
10      THE COURT: We can file this on the docket
11 if you want to, just to save time.
12      MR. PRYOR: Thank you. We will do that.
13 Let me mark this, then, as Exhibit 15-A.
14      THE COURT: Any objection to 15-A?
15      MR. PRYOR: Move for the admission of
16 15-A.
17      MR. McKEEBY: No objection.
18      MR. GREENFIELD: No objection, your Honor.
19      THE COURT: Okay. I will admit 15-A.
20      (The referred-to document was admitted
21 into evidence as Plaintiff's Exhibit 15-A.)
22      MR. PRYOR: I will hand this to the Court
23 so I don't walk away with it.
24      THE COURT: Thank you.
25      We will color scan it.

Page 599

1 BY MR. PRYOR:
2 Q.  Ma'am, let's take a look at Exhibit 6 and --
3      MR. PRYOR: I'm sorry. It is not Exhibit
4 6. I told you guys the wrong number.
5      106, Counsel.
6 BY MR. PRYOR:
7 Q.  I'm only going to show you two pages of that.
8      MR. GREENFIELD: I'm sorry, Counsel, 106,
9 not 6?
10      MR. PRYOR: 106, pages 5712 through -14.
11      MR. McKEEBY: Your Honor, 106 is not
12 listed.
13      MR. PRYOR: Okay. I can show you what it
14 is.
15      May we approach, Judge?
16      THE COURT: You may.
17      (Thereupon, the following proceedings were
18 had at sidebar:)
19      MR. PRYOR: This was -- this should have
20 been listed for Mr. Schneider, who is testifying
21 tomorrow. But there are two pages of it, a
22 collection of information put together by Southwest
23 during its investigation.
24      There are two pages of it, or three pages
25 of it are communications from Audrey Stone to

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 139 of 642   PageID 11080
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 600..603

Page 600

1 Charlene telling her about the right to work.  It is
2 one of the things that she complained about.
3         And also, she testified she didn't send
4 things to Charlene.  It goes to both of those
5 issues.  It is not a surprise to them; they have it
6 outlined.  I don't know why it wasn't on our list.
7 I apologize.
8         THE COURT:  Understood.
9         Let me propose and ask their response.
10        Any objection to those two pages coming in
11 conditionally and then you pull it up with Schneider
12 tomorrow?
13        MR. PRYOR:  Yes.
14        MR. McKEEBY:  No objection.
15        MR. GREENFIELD:  Can I see the two pages?
16        MR. PRYOR:  I'm going to give this to the
17 witness, too, those pages.
18        What page number?  Is 5712, 13 and 14?  Is
19 that --
20        MR. PRYOR:  This will be 106A, I guess.
21        THE COURT:  We can conditionally admit
22 106, those pages, tomorrow.  It will all connect up.
23        MR. PRYOR:  I will just show her these two
24 pages.
25        THE COURT:  Sounds great.

Page 601

1         (Thereupon, the sidebar was concluded and
2   the following proceedings were held in open
3   court:)
4         THE COURT:  All right.  So I'm admitting
5 pages 5712, 5713, and 5714 of document number 106.
6         (The referred-to document was admitted
7   into evidence as Plaintiff's Exhibit 106-A.)
8         THE COURT:  You can show them to the
9 witness.
10        It is conditionally admitted.  We will
11 connect it up tomorrow.
12 BY MR. PRYOR:
13 Q.  Can you identity this page of Exhibit 106,
14 SWA 5712, as a communication you sent as president
15 of the Union to Charlene Carter regarding taking
16 action on the national right-to-work legislation?
17 A.  It was a communication sent by our COPE
18 committee.  I was the chairperson and Matt Hettich
19 was my co-chairperson.  And it was sent to all
20 flight attendants whose email addresses we had on
21 file, including Charlene Carter.
22 Q.  And let's see the next page so you can
23 identify, that is part of the communication that was
24 sent to Charlene?
25 A.  Yes.

Page 602

1 Q.  And in fact, at the top, it says, "Hi.  My name
2 is Charlene Carter, and I'm a member of the
3 Transport Workers Union, Local 556."
4    And it goes on to tell her what to say in order
5 to object to this right-to-work law, correct?
6 A.  Yes.
7 Q.  And let's just look at the next page to make
8 sure you have identified the entire communication.
9     And there is your picture at the end?
10 A.  Yes.
11 Q.  Okay.  Thank you.
12     Did you speak to Sonya Lacore at any time about
13 your complaint against Ms. Carter?
14 A.  No.
15        MR. PRYOR:  Your Honor, may I approach to
16 provide the witness a document to refresh her
17 recollection?
18        THE COURT:  Yes, you may.
19        MR. PRYOR:  It's not on the point I just
20 asked about.
21        THE COURT:  Okay.  Then you need to set a
22 predicate first.
23        MR. PRYOR:  Okay.
24 BY MR. PRYOR:
25 Q.  Ma'am, were you interviewed by Southwest

Page 603

1 Airlines after you made your complaint against
2 Charlene?
3 A.  Yes.
4 Q.  And did you, during that interview, state that
5 Charlene was anti-union?
6 A.  When they asked me questions about who she was,
7 what kind of relationship I had with her, I said
8 that she had been very outspoken about my
9 administration and had opted out of our union.
10     I don't know that I used the word "anti-union,"
11 but I did say she had been outspoken against our
12 administration.
13        MR. PRYOR:  Your Honor, may I now approach
14 the witness to refresh her recollection?
15        THE COURT:  Yes.
16        MR. PRYOR:  Exhibit 39.
17 BY MR. PRYOR:
18 Q.  I'll hand you a copy of Exhibit 39.
19     I don't think it's in evidence, but I'm just
20 identifying it for the record.
21     I'll ask you to go to the third page.
22     See where it says, "What do you think would
23 cause" --
24        MS. GREEN:  Objection, your Honor.  He's
25 reading from a document that is not in evidence.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                          Vol 3 July 07, 2022                              Pages 604..607

Page 604

1    THE COURT:  Sustained.
2    MR. PRYOR:  Can I approach to identify?
3    THE COURT:  You may.
4 BY MR. PRYOR:
5 Q.  This page right here, do you see that?  Does
6 that refresh your recollection as to whether or not
7 you said she was anti-union?
8    MR. GREENFIELD:  I'm sorry.  Counsel, can
9 you please show me the part of the exhibit that you
10 are reading from?
11    Can you please show me part of the
12 document so I can review it?
13    The part of the document that you are
14 looking at.
15    Thank you.
16    MR. PRYOR:  The third page.
17    MR. GREENFIELD:  Thank you.
18 BY MR. PRYOR:
19 Q.  Does that refresh your recollection now that
20 you told Southwest Airlines that Ms. Carter was
21 anti-union?
22    MR. GREENFIELD:  Objection, your Honor.
23 Counsel is testifying.
24    THE COURT:  I will allow the question.
25    THE WITNESS:  I don't recall using those

Page 605

1 exact words, and there's other things in here that
2 it says I said that are not accurate.
3 BY MR. PRYOR:
4 Q.  Let's go to the second page of that document
5 and see if it refreshes your recollection of the
6 document.
7    I have to be careful how I do this.
8    MR. GREENFIELD:  Counsel, can you please
9 show me the section?
10    MR. PRYOR:  The second page.
11    MR. GREENFIELD:  Thank you.
12    THE COURT:  And we can mute this from the
13 jury's screen if you want to show it on your screen.
14 It's up to you.
15    We can mute the jury screen so that we are
16 just showing the document --
17    MR. PRYOR:  They have it but that is fine.
18    MR. GREENFIELD:  Just so everyone sees where
19 you are at, if that's easier.
20    MR. PRYOR:  Sure.  Let's do that.
21    THE COURT:  Okay.  Jury screens are muted.
22 You can publish.
23    MR. HILL:  What exhibit is it?
24    MR. PRYOR:  It is the second page of
25 Exhibit 39.

Page 606

1 BY MR. PRYOR:
2 Q.  Ma'am, does it refresh your recollection that
3 not only did you say she's anti-union, you said
4 she's very anti-union.
5    MR. GREENFIELD:  Objection, your Honor.
6 Counsel is again reading from a document not in
7 evidence.
8    THE COURT:  Sustained.  I will strike that
9 question.
10 BY MR. PRYOR:
11 Q.  Does it refresh your recollection regarding
12 what you said as to her union activity?
13 A.  I have already stated that I know I answered
14 questions that she was not supportive, had for a
15 long time not been supportive of the union, was
16 against our administration.  I don't recall the
17 exact words I used.  And, again, there are --
18 Q.  Let me try it again.
19    Do you recall telling them not once, twice, but
20 multiple times that she's anti-union?
21    MR. GREENFIELD:  Objection, Your Honor.
22 Counsel is continuing to --
23    MR. PRYOR:  I'm asking for her
24 recollection now.
25

Page 607

1 BY MR. PRYOR:
2 Q.  Has your recollection been refreshed as to
3 whether or not you told Southwest Airlines
4 repeatedly that Charlene Carter was --
5    MR. GREENFIELD:  Objection, your Honor.
6 Asked and answered as well.
7    THE COURT:  You've got to finish your
8 question first, and then give the objection, and
9 then I'll rule on it.
10    So ask your question.
11 BY MR. PRYOR:
12 Q.  Does it refresh your recollection, after
13 looking at this document -- by the way, what is this
14 document?
15 A.  It looks like it is a Southwest Airlines
16 document of someone that they had taking notes of
17 the phone call.
18 Q.  And does it refresh your recollection that you
19 repeatedly told them, the reason Charlene was --
20    MR. GREENFIELD:  Objection, your Honor.
21 Again, he's talking --
22    THE COURT:  You have got to let him
23 finish.
24 BY MR. PRYOR:
25 Q.  -- was sending these communications to you was

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 141 of 642   PageID 11082
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Pages 608..611

Page 608

1 because she was anti-union?
2        THE COURT:  You can answer.
3        THE WITNESS:  I don't know what words I
4 used.  I know I described her as not being friendly
5 towards the union administration for a long time.
6 BY MR. PRYOR:
7 Q.  And you explained that that's why you
8 understood she sent you these messages, true?
9 A.  No.  I actually answered -- when I was
10 repeatedly asked why she would have sent me the
11 videos, I repeatedly said, I don't -- I don't know
12 why I was asked about my opinions on abortion, if I
13 ever had conversations with her about it, and I
14 stated over and over, I don't know.  I have not ever
15 had conversations.
16 Q.  It is on the screen.  Let's look on this
17 document.
18      Are you telling me that when you were asked,
19 "What do you think would cause her to send the
20 message," you didn't repeatedly say, "She's
21 anti-union"?
22        MR. GREENFIELD:  Objection, your Honor.
23        THE COURT:  Sustained.
24 BY MR. PRYOR:
25 Q.  Does it refresh your recollection that, in

Page 609

1 fact, what you told Southwest Airlines was the
2 reason she sent you the message is that she's --
3        THE COURT:  Counsel, this document is not
4 in the record, so we can't pull from it.
5        MR. PRYOR:  I'm sorry?
6        THE COURT:  This document is not in
7 evidence, so we can't pull from it.  It can only be
8 used to refresh.
9        MR. PRYOR:  I thought that was the way I
10 phrased my question.  Did I not?
11        THE COURT:  But then you started talking
12 about specifics in the document.  That's where you
13 cross the line.
14        MR. PRYOR:  I will not refer to the
15 document.
16 BY MR. PRYOR:
17 Q.  You have now reviewed a portion of this
18 document, correct?
19 A.  Yes.
20 Q.  Does this refresh your recollection that when
21 you were asked, "Why do you think Charlene sent
22 these messages to you," your answer was --
23        MR. GREENFIELD:  Objection.
24 BY MR. PRYOR:
25 Q.  -- "She was anti-union"?

Page 610

1        MR. GREENFIELD:  Objection, your Honor.
2 It is asking what she was asked based on the
3 document.
4        THE COURT:  Sustained.
5        MR. PRYOR:  Another way to do it I'm going
6 to try.  I don't mean to step on the ruling.
7 BY MR. PRYOR:
8 Q.  Ma'am, has your recollection been refreshed
9 that you told Southwest Airlines the reason you
10 received these messages from Charlene Carter is
11 because she's anti-union?
12        MR. GREENFIELD:  Objection, your Honor.
13 Counsel is again testifying about --
14        THE COURT:  Sustained.
15      Do we need a sidebar?
16        MR. PRYOR:  Yeah, I do.
17      (Thereupon, the following proceedings were
18      had at sidebar:)
19        MR. PRYOR:  I don't know where I'm messing
20 up.
21        THE COURT:  Well, so I think the thing is
22 you can't lead with a refresh.  If you are reading a
23 refresh, you are pulling from the document itself.
24 That is not evidence.
25        MR. PRYOR:  I will ask it not leading.

Page 611

1        THE COURT:  What did you tell them?
2      But the other problem is, this document
3 was Southwest's notes and not hers, so she can fight
4 this all day long, like she has.
5      You have to ask open-ended questions:
6 Does this refresh what you told them?  And the
7 answer it is, it is.
8        MR. PRYOR:  Thank you.  I wish I
9 understood the rules of evidence.  I said refreshed
10 and used my time.
11        THE COURT:  It is all good.
12        MR. PRYOR:  Thank you.
13      (Thereupon, the sidebar was concluded and
14      the following proceedings were held in open
15      court:)
16        THE COURT:  You can proceed.
17 BY MR. PRYOR:
18 Q.  Ma'am, has your recollection been refreshed as
19 to what you told Southwest Airlines regarding the
20 reason Ms. Carter sent you the messages that you
21 were complaining about?
22 A.  As I have already stated, I don't know what my
23 exact words were.
24      I answered questions about her long-time
25 history of being against the union and expressing

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 3 July 07, 2022                        Pages 612..615

Page 612

1 that and not being happy with our administration.
2 Q.  Is it fair to say that you did not read most of
3 the messages that were sent to you from 2015 to 2017
4 from Ms. Carter?
5 A.  At the time I had this phone call?
6 Q.  No.  From 2015 to 2017.
7     I'm not sure what phone call.
8     Are you talking about when you looked at the
9 messages on your phone?
10 A.  No.  You were just asking me about the notes
11 from this phone call I had with Southwest.
12 Q.  Right.  I'm not asking you about this document.
13    I don't know if there is a way to do it.  I
14 have difficulty with that.
15    So my question to you is, is it fair to say
16 that you did not read most of the messages you
17 received from 2015 to 2017 from Ms. Carter?
18 A.  There were many of them that I had not looked
19 at prior to me reporting the last -- the videos to
20 Southwest.
21 Q.  Are you able to tell us if it's most or not
22 most that you didn't read?
23 A.  I don't know how many.  There were so many
24 messages, and I did not keep track of what I read.
25 Q.  Did you tell Southwest Airlines that you didn't

Page 613

1 read them?
2 A.  I know I told them that there were -- that
3 there were messages I had not read.
4 Q.  Did you tell Southwest Airlines that you wanted
5 them to keep it a secret that you, as Union
6 president, were reporting a union member or a union
7 objector?
8 A.  Keep it a secret?  No.
9     Any report that goes to Southwest Airlines,
10 however, is supposed to be handled in a
11 professional, confidential manner when they are
12 doing an investigation.
13 Q.  Did you ask Southwest Airlines to keep that
14 information from flight attendants?
15    MR. GREENFIELD:  Objection, your Honor,
16 asked and answered.
17    THE COURT:  Sustained.
18 BY MR. PRYOR:
19 Q.  And did you talk to Southwest Airlines about
20 what you believed was a threat from another flight
21 attendant when you were interviewed about your
22 complaint against Ms. Carter?
23    If you are looking to refresh your
24 recollection, it's the last two pages.
25 A.  Yes.

Page 614

1 Q.  And did you tell them that it was determined
2 that there was -- those were not legitimate
3 screenshots, that those were false screenshots, the
4 complaint you had against the flight attendant?
5 A.  No.
6 Q.  If you look at the last page, does that refresh
7 your recollection?
8 A.  I didn't tell them they were false screenshots.
9 I didn't report those.
10    And these notes refer to me saying Jeanna
11 Jackson and Mike Hafner, and that was not who the
12 screenshot in question was -- was discussed.  That
13 is incorrect.
14 Q.  Did you tell Southwest Airlines that your base
15 manager pulled you aside and said it was determined
16 that there were false screenshots?
17 A.  Yes, the base manager said that.
18 Q.  Okay.  And you have evidence to say the base
19 manager was wrong?
20    MR. GREENFIELD:  Objection, your Honor.
21 The testimony calls for hearsay.
22    THE COURT:  I will allow her to answer
23 only if she has personal knowledge.
24    THE WITNESS:  I only know what was
25 reported to me by my base manager.

Page 615

1 BY MR. PRYOR:
2 Q.  And your base manager told you that that
3 complaint you were making was based upon a false
4 screenshot, true?
5 A.  I did not make that complaint.
6 Q.  Well, what were you being told?  Why were you
7 talking to the base manager about it if it wasn't
8 your complaint?
9     I thought it was supposed to be confidential
10 when people made complaints.
11    MR. McKEEBY:  Objection, compound.
12    THE COURT:  Can you split it up?
13    MR. PRYOR:  Sure.
14 BY MR. PRYOR:
15 Q.  Did you just tell us a few minutes ago that
16 when somebody makes a complaint, it is supposed to
17 be confidential?
18 A.  Yes.
19 Q.  And did you talk to a base manager about
20 someone else's complaint about a flight attendant
21 with false screenshots?
22 A.  The base manager approached me because that
23 screenshot went viral.  It was posted on other
24 flight attendant airline pages.  It was all over the
25 place.  Everyone was talking about it.  And I was

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                              Pages 616..619

Page 616

1 specifically named in the post.
2    So my base manager pulled me aside to say that
3 the investigation had been closed out and that they
4 did not believe that it was a -- not a real
5 conversation, that it had been generated.
6 Q.  All right.  Let's look at Exhibit 65.
7    I'm going to hand you a copy.
8       THE COURT:  Are you moving for this?
9       MR. PRYOR:  Yes, I move for the admission
10 of 65.
11      THE COURT:  Okay.  Morning objections.
12      Okay.  I have overruled those, so it is
13 admitted.
14      You can publish.
15      (The referred-to document was admitted
16   into evidence as Plaintiff's Exhibit 65.)
17 BY MR. PRYOR:
18 Q.  I have the same question about this I did about
19 Exhibit 15.
20   Is there anything in here that doesn't relate
21 to Ms. Carter raising her complaints about her
22 union?
23   If there are, tell me the page and we will talk
24 about it.
25      MR. GREENFIELD:  Objection, your Honor.

Page 617

1 There is no evidence that this is part of a
2 complaint.
3       MR. PRYOR:  Have I got the wrong exhibit?
4 I thought we did 66 yesterday.
5       THE COURT:  You did 66 yesterday, and we
6 are on 65 today.
7       MR. PRYOR:  This has other items in it
8 that 66 does not.
9       THE COURT:  Understood.
10      You can ask.
11 BY MR. PRYOR:
12 Q.  Is there anything in Exhibit 65 that is not
13 Ms. Carter talking about her complaints about her
14 union?
15      MR. GREENFIELD:  Again, objection, your
16 Honor.
17      There's been no foundation that this is
18 any sort of complaint.
19      THE COURT:  I think it is an okay question
20 for him to ask.
21      THE WITNESS:  I don't know what this --
22 what some of this is.  Some of this I haven't seen.
23 BY MR. PRYOR:
24 Q.  Ma'am, you have to bring the microphone to your
25 mouth for me.

Page 618

1 A.  I don't know what some of this is.  I have not
2 seen a lot of this ever before.
3 Q.  Okay.  The first two pages we have talked about
4 before.
5    She's complaining about her union and what she
6 thinks is them supporting murder by supporting a
7 Planned Parenthood March.
8    Do you see those two?
9 A.  Yes.
10 Q.  And that is her complaining about her union,
11 correct?
12 A.  I disagree that what she sent was complaining
13 about her union.
14 Q.  So when it says, "TWU, AFL-CIO, and 556 are
15 supporting this murder," that's not her -- that
16 sounds like a pretty strong complaint about her
17 union.
18      MR. GREENFIELD:  Objection, your Honor.  I
19 don't know where counsel is reading from that.
20      MR. PRYOR:  The first page of the exhibit.
21      MR. GREENFIELD:  Thank you.
22      MR. HILL:  I just highlighted it.
23      MR. PRYOR:  Okay.  It's on the screen.
24      MR. GREENFIELD:  Thank you.
25      THE WITNESS:  I don't believe we were

Page 619

1 supporting murders or the images depicted in that
2 video.
3 BY MR. PRYOR:
4 Q.  Union members are allowed to have a difference
5 of opinion, objectors are allowed to have a
6 difference of opinion and raise those, correct?
7 A.  Yes.
8 Q.  I didn't ask you if you agreed with her.  We
9 know you don't.  But it doesn't change the fact that
10 she's complaining about her union, correct?
11 A.  Again, I don't believe that's complaining about
12 the union in that depiction.
13 Q.  So just to make sure, where it says, "The union
14 is supporting murder," that is not a complaint about
15 the union?
16      MR. McKEEBY:  Objection, asked and
17 answered.
18      THE COURT:  Sustained.
19 BY MR. PRYOR:
20 Q.  Let's go to the third page.
21   And this is the anatomically correct hats and
22 she's complaining about the union supporting this
23 and using our money for this, stealing from our dues
24 for things like this.
25   That's Charlene Carter complaining about her

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 144 of 642   PageID 11085
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 620..623

Page 620

1  union, correct?
2  A.  What she wrote is, yes.
3  Q.  What she wrote what?
4  A.  What she wrote, yes.
5  Q.  Okay.  The picture, the picture doesn't
6  exemplify her complaint about what her union did?
7  A.  No, I don't believe it does.
8  Q.  So she's saying, These are the kind of things
9  that were at the March that you were supporting, and
10  here is a picture of it, and you don't think that is
11  related to her union activity and actions should be
12  taken against a union member that would do something
13  like that?
14        MR. McKEEBY:  Objection, asked and
15  answered.  Compound.
16        THE COURT:  Sustained.
17  BY MR. PRYOR:
18  Q.  Do you believe the pictures are part of her
19  union activity or not?
20        MR. GREENFIELD:  Objection, your Honor,
21  asked and answered.
22        THE COURT:  Sustained.
23        MR. PRYOR:  Your Honor, she said the
24  words.  I haven't been able to get her testimony on
25  the pictures.

Page 621

1        THE COURT:  I thought she answered that.
2        MR. PRYOR:  Okay.
3  BY MR. PRYOR:
4  Q.  Is there anything else in this document that
5  you looked at that you have seen before?
6        I handed you a copy of it.  You can flip
7  through it.
8  A.  After the fourth page, I don't know what any of
9  this is, and it is not things I recall ever seeing
10  before.
11  Q.  Okay.  Let's look at Exhibit 34.
12        MR. PRYOR:  I move for the admission of
13  Exhibit 34.
14        THE COURT:  All right.  34.
15        Morning objections from Union.
16        MR. GREENFIELD:  Yes, sir.
17        THE COURT:  Okay.  I've overruled those,
18  so I will allow 34 in.
19        You can publish.
20        MR. McKEEBY:  I'm sorry, was 65 admitted?
21        THE COURT:  65 is admitted --
22        MR. McKEEBY:  Thank you, your Honor.
23        THE COURT:  -- and now 34 is admitted.
24
25

Page 622

1        (The referred-to document was admitted
2        into evidence as Plaintiff's Exhibit 34.)
3  BY MR. PRYOR:
4  Q.  I direct your attention to the last page of
5  Exhibit 34.
6        First of all, what is Exhibit 34?  That's Unity
7  Magazine.
8  A.  It's a communication that is published on
9  behalf of the union by our communications
10  department, usually four times a year.  Or at that
11  time, four times a year.
12        MR. PRYOR:  Let's go to the last page.
13  BY MR. PRYOR:
14  Q.  Do you see where it says, "Yippee ki-yay, and I
15  will see you online"?
16        Is that what you wrote?
17  A.  Yes.
18        MR. PRYOR:  We move for the admission of
19  21-Q, an unredacted version.
20        While you are looking, also 21-P.
21        THE COURT:  All right.  I have -- so I
22  have 21 as a whole.  I know the objections on 21 as
23  a whole.
24        MR. PRYOR:  There is an updated exhibit
25  list, your Honor, that has 21-A through it looks

Page 623

1  like X.
2        This is a specific couple of pages.
3        THE COURT:  Let's sidebar right quick.
4        (Thereupon, the following proceedings were
5        had at sidebar:)
6        MR. PRYOR:  This says email 21-A through E
7  on it, so I don't have --
8        We are trying to keep the rest of it
9  secret.  Now it is out.  I have no idea why.
10        MR. McKEEBY:  I don't know what they are.
11        MR. PRYOR:  You don't?
12        THE COURT:  Subparts of 21.
13        MR. McKEEBY:  Show them to me.  I just
14  don't remember right now.
15        MR. PRYOR:  21 is a bunch of emails that
16  are related to the investigation.
17        THE COURT:  Sure.
18        MR. PRYOR:  These are a couple of emails
19  that she's on, she's not on everything.  We
20  divided --
21        THE COURT:  She can't sponsor everything.
22        MR. PRYOR:  I'm only offering things she
23  can sponsor.  She's on the emails.
24        THE COURT:  I recall 21 globally, that we
25  talked about 21, and the issue was limiting

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 145 of 642   PageID 11086
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Pages 624..627

Page 624

1 instruction. This comes in as to Union, not
2 Southwest. I know there are other objections that I
3 overruled.
4        MR. PRYOR: If you haven't seen the
5 document, it is -- you have seen it. You just don't
6 know which one I'm referring to.
7        It is about Audrey Stone being included on
8 Brian Talburt complaints about Jeanna Jackson.
9        MR. McKEEBY: I object.
10       THE COURT: Can we agree all 21 subparts,
11 we will do the same thing, right?
12       I'm going to overrule the Union objections
13 but let him --
14       MR. GREENFIELD: I forwarded the Bates
15 numbers.
16       MR. PRYOR: Sure. I will get that to you.
17 I'm thinking for a second what else is in it.
18       Well, if something gets offered and I
19 think that the running objection doesn't apply or
20 the instruction, I will say something.
21       The fact that Brian Talburt brings a
22 complaint against Jeanna Jackson, I'm on board with
23 this because I understand -- I understand the
24 ruling.
25       I will not talk about what actually

Page 625

1 happened to Ms. Jackson. These emails don't say.
2        A limiting instruction is not necessarily
3 in my view.
4        THE COURT: Okay. I will give the
5 colloquial instruction on all of 21. I'm admitting
6 21 --
7        MR. PRYOR: O and P right now. There may
8 be --
9        THE COURT: Right now I'm admitting O and
10 P.
11       Say it again.
12       MR. PRYOR: I will.
13       (Thereupon, the sidebar was concluded and
14       the following proceedings were held in open
15       court:)
16       MR. PRYOR: Your Honor, I have to come
17 back up.
18       (Thereupon, the following proceedings were
19       had at sidebar:)
20       MR. GILLIAM: Your Honor, my co-counsel
21 wants to use a document that you ordered to be
22 sealed.
23       MR. GREENFIELD: I can't hear.
24       MR. GILLIAM: We removed the names on the
25 emails. So he's going to reference a document that

Page 626

1 you ordered to be redacted as a result of our motion
2 to file under seal. And just the addresses, in some
3 cases, the addresses identify who the recipient was
4 or who is cc'd.
5        And so I think Mr. Pryor would like to use
6 the document with that unredacted, even though you
7 ordered it to be redacted. He wants to use the
8 unredacted version to help identify who the
9 recipients are.
10       THE COURT: Okay. I can't remember the
11 redaction order.
12       Can you refresh my recollection on what we
13 ordered on redactions?
14       MR. GILLIAM: Yes. It was mainly
15 addresses --
16       THE COURT: Sure.
17       MR. GILLIAM: -- of opposing --
18       MR. McKEEBY: Whose addresses?
19       MR. GILLIAM: Brett Nevarez's address.
20       MR. McKEEBY: Maybe not the best example.
21       Who else?
22       MR. GILLIAM: Well, I mean, he's one of
23 the recipients.
24       MR. McKEEBY: I frankly don't care about
25 his address.

Page 627

1        Generally, I don't think it is appropriate
2 for Southwest Airlines employees' addresses to be in
3 the record.
4        MR. GILLIAM: The main thing is we want to
5 establish who the recipients were.
6        THE COURT: We can stipulate one of the
7 recipients was Nevarez. Do we have to reveal the
8 email address to --
9        MR. McKEEBY: I can stipulate to it.
10       THE COURT: Like why reveal the email?
11       We all know it is Brett Nevarez. We can
12 stipulate it was Brett Nevarez.
13       You can say, The parties have stipulated
14 it was Brett Nevarez.
15       MR. GILLIAM: He's probably not the only
16 example.
17       MR. PRYOR: It is one thing, the email.
18       What was the basis for marking out names?
19       MR. GILLIAM: Well, in many cases, the
20 email address is the only thing that is there.
21       THE COURT: Don't --
22       MR. GILLIAM: Other examples.
23       MR. PRYOR: The ones that got unredacted,
24 that wasn't --
25       MR. GILLIAM: To clarify, Brett Nevarez

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 146 of 642   PageID 11087
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                          Pages 628..631

Page 628

1 isn't the only example. We also have some Southwest
2 management employees, Julie O'Grady, Mike Sims.
3 They are WNCO addresses, email addresses.
4        It might make it easier if Mr. Pryor would
5 show Mr. McKeeby and Mr. Greenfield and your Honor
6 the document.
7        THE COURT: For the first one, can we
8 agree on the stipulation going forward, maybe we try
9 to agree in advance to the jury? There are five
10 stipulations. We added to the 15 that say these
11 exhibits went to these people. We are not showing
12 the people.
13        MR. GREENFIELD: Can we make it clarified
14 on the stipulation that it was emailed to them, not
15 necessarily that they received it? Just because I
16 think there is a difference.
17        THE COURT: Sure. Emailed to this person.
18        MR. GREENFIELD: Yes.
19        THE COURT: That is fine. Go back and say
20 which one you are doing, and then say, The parties
21 have stipulated that this email was sent to Brett
22 Nevarez. And then I will give the limiting
23 instruction.
24        MR. PRYOR: I have no idea who it was.
25        MR. GILLIAM: You have the unredacted

Page 629

1 version. Just don't use the unredacted. Use the
2 redacted.
3        MR. PRYOR: I'm not in charge of the
4 computer.
5        (Thereupon, the sidebar was concluded and
6    the following proceedings were held in open
7    court:)
8        THE COURT: Sorry about that.
9 Housekeeping. But I think we got a path forward.
10        Okay. So which one are you moving to
11 introduce into evidence?
12        MR. PRYOR: We would move for the
13 admission 21-Q.
14        Your Honor, the unredacted version of this
15 is -- has some changes to it.
16        I will come back up.
17        (Thereupon, the following proceedings were
18    had at sidebar:)
19        THE COURT: Kevin, move the jury monitors
20 right quick. They may already be. They are.
21        MR. PRYOR: If you look at the unredacted
22 version and then look at this, this is
23 incomprehensible. The unredacted version is -- that
24 is the same document, but I have had that issue
25 before.

Page 630

1        This looks like the same document.
2        So I can't even question her, really,
3 about what it actually says.
4        THE COURT: It sounds like we need to take
5 a break and redact it again.
6        MR. PRYOR: Tell me what you would like.
7 Just pull off the personal email that -- redact the
8 letter K or the letter W, like we did there?
9        THE COURT: Let's take a quick break, you
10 can call in and check in, and we will redact it on
11 the fly.
12        (Thereupon, the sidebar was concluded and
13    the following proceedings were held in open
14    court:)
15        THE COURT: I'm calling a morning break so
16 we can do some redactions of the next exhibit.
17        I have asked for redacting personal email
18 addresses, just so that they are not floating around
19 in court records everywhere.
20        So we have got one problem with an exhibit
21 we need to redact on the fly.
22        I'm going to give y'all a morning break
23 right quick. Sorry that it's earlier than planned.
24 And then we will see if we can power through until
25 lunch after that.

Page 631

1        So let's take a 10-minute break. So let's
2 be back here at 9:58.
3        Yesterday I said it was going to be a
4 five-minute break, when it was ten.
5        And then the same three instructions as
6 always. Only talk to your fellow jurors and court
7 personnel, don't talk to anyone about the case, and
8 don't do any research about the case.
9        We will see you in ten minutes.
10        THE COURT SECURITY OFFICER: All rise for
11 the jury.
12        (The jurors exited the courtroom.)
13        THE COURT: You can leave, just don't talk
14 to anyone about the case.
15        (The witness exited the courtroom.)
16        (Recess.)
17        THE COURT SECURITY OFFICER: All rise.
18        THE COURT: Before we bring in the jury,
19 are we good to go on 21-Q?
20        MR. PRYOR: There are several 21s, but --
21        COURT REPORTER: I can't hear you.
22        THE COURT: Okay.
23        MR. PRYOR: My first exhibit will be 21-P.
24        THE COURT: 21-P is what you are going to
25 move for, and then I give them a global disclaimer

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 147 of 642   PageID 11088
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                     Pages 632..635

Page 632

1 on all 21 subparts.  They might have information
2 that is Southwest excluded, right?  It's information
3 usable against the Union but not against Southwest.
4        Claims against the Union, not claims
5 against Southwest.  I'm trying to keep it straight.
6        MR. GREENFIELD:  Your Honor, I would just
7 like to see the final redacted copy or what it is
8 that is planning to be introduced.  I haven't seen
9 it yet.
10       THE COURT:  We've got the jury screens
11 muted.  You can pull it up.
12       MR. PRYOR:  He wants to make sure it is
13 done correctly.
14       THE COURT:  I think it was personal emails
15 and addresses that we were redacting.
16       MR. GILLIAM:  Show personal emails and
17 addresses on the screen, not to the jury.
18       MR. PRYOR:  Keep going.  It is RSP 66.
19 It's 21-P.
20       MR. HILL:  This is 21-P.
21       MR. PRYOR:  Oh, it is.  Actually, not
22 mine, but okay, I will roll with it.
23       MR. GREENFIELD:  Now, are those going to
24 remain redacted and we are stipulating that that is
25 who it was sent to?

Page 633

1        MR. GILLIAM:  That is my understanding.
2        MR. GREENFIELD:  Okay.  So it is going to
3 remain redacted to the jury, and your Honor is going
4 to make a stipulation that --
5        THE COURT:  So what will the jury see?
6        MR. GREENFIELD:  That's what I'm trying to
7 find out.
8        MR. PRYOR:  No.  I object to that.  The
9 jury needs to know who these people are when they
10 get this exhibit.  And you can -- certainly you can
11 mark out Brian's, but Julie O'Grady, leave her name
12 in and then take out the "@."  The same thing with
13 B-R-E.  The same thing with N-E-V-I-N-C.
14       I don't even think this needs to be
15 redacted at all.  There is nothing top secret about
16 their email addresses.
17       THE COURT:  Personal, yes, but WNCO, no,
18 right?
19       So personal email addresses, I ordered
20 this on the round of briefing and unsealing, so we
21 can't re-litigate that.
22       But so, for example, the AOL email
23 addresses, the MSN email address, and the Hotmail
24 address should be redacted.  The WNCO, Julie O'Grady
25 should not be.

Page 634

1        MR. PRYOR:  Well, can we -- I'm sorry for
2 interrupting.
3        Can we leave out everything before the
4 "@" -- and leave in everything before at?  That
5 doesn't tell their email address.
6        THE COURT:  Are y'all okay with that?
7        MR. PRYOR:  How does NEVINC --
8        THE COURT:  I'm getting -- hold on.  I'm
9 getting head nods.
10       Are we okay with redacting the AOL?
11       MR. McKEEBY:  Yes.
12       THE COURT:  Sounds fair.
13       So can we redact the domain name?
14       MR. PRYOR:  The MSN.com.
15       MR. HILL:  Sure.  That is not an immediate
16 process, but I can -- I can get back there and do
17 it.
18       MR. PRYOR:  Your Honor, before making this
19 exhibit available to the jury, we will make sure
20 that the redactions are as you have indicated.
21       I would like to just roll on then.  I will
22 ask questions, and she will have to accept my
23 representation as to who it is from.  If not, I can
24 show her the unredacted version.
25       THE COURT:  Or we can have the

Page 635

1 stipulation.  I think we are all in agreement on who
2 these folks are tied to, right?  And we can give
3 stipulations back to the jury that say, On
4 Exhibit 21-P, the following people received the
5 email.
6        MR. PRYOR:  Okay.  I will state that I can
7 represent to her who sent it, who received it, who
8 is on the cc.  And if I get it wrong, they can
9 certainly tell me.  It's right in front of me.
10       THE COURT:  Understood.
11       Okay.  Are we ready to bring in the jury,
12 and then we will try to get a thumbs up whenever we
13 get a publishable redacted version with domain names
14 off?
15       MR. PRYOR:  I will live with the old one
16 if I have to, just to get us moving.
17       THE COURT:  Your point is well taken.
18       The prefix doesn't matter as much as
19 withholding some of the information.
20       Okay.  Let's bring them in.
21       (The jurors entered the courtroom.)
22       THE COURT:  All righty.  You can be
23 seated, and Mr. Pryor, you can continue.
24       MR. PRYOR:  Thank you, your Honor.
25       We move for the admission of Exhibit 21-P.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 148 of 642   PageID 11089
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 636..639

Page 636

1    THE COURT: 21-P.
2        On the prior objections on 21-P, my ruling
3 on those is, I'm overruling the Union objections on
4 21-P, but I am sustaining an objection to an extent
5 from Southwest.
6        All of the 21 subparts that you are going
7 to hear from are for use in the claims against the
8 Union but not the claims against Southwest.
9        That may matter for some exhibits more
10 than others, but I will just say that globally.
11       For 21 anything, those are useful for the
12 claims against the Union, not useful for the claims
13 against Southwest.
14       I will let you publish it when y'all are
15 ready when those redactions are completed.  Just
16 give me a thumbs when they are, and I will make sure
17 I unmute the jury screens.
18       MR. PRYOR: Thank you, your Honor.
19       I'm going to trust my co-counsel to put it
20 on the right screen.  And if not, it's not.  It's
21 him.
22       THE COURT: No pressure.  No pressure.
23       MR. PRYOR: 21-P, please.
24       MR. GREENFIELD: Counsel, may I have a --
25

Page 637

1 BY MR. PRYOR:
2 Q.  You have identified 21-P is an email that you
3 are carbon-copied on from Brian Talburt.
4        MR. GREENFIELD: Counsel, do you have a
5 Bates number?
6        MR. PRYOR: What is that?
7        MR. GREENFIELD: A Bates number for the
8 page?
9        MR. PRYOR: It is 66, APP 66, and it
10 pretty much goes from there.
11       MR. GREENFIELD: I understand.
12       May we conference, your Honor?
13       THE COURT: Sure.
14       (Thereupon, the following proceedings were
15   had at sidebar:)
16       MR. GILLIAM: I have a feeling --
17       THE COURT: The summary judgment record
18 filing.
19       MR. GREENFIELD: And I don't have a
20 problem with that.
21       I just don't know where to look within 21
22 because the Bates numbers for 21 don't align with
23 this 21-P.  They are different.  Unless it is
24 somewhere --
25       MR. PRYOR: This is the way it is.  RSP

Page 638

1 66.
2        MR. GREENFIELD: I understand.
3        THE COURT: How am I going to keep the
4 jury muted on all of 21?
5        You show it to us, and then y'all can make
6 your objection based on what you are seeing.
7        MR. GREENFIELD: I'm just trying to
8 understand where it is within 21.  That is fine.  I
9 just want to know where it is in the document.
10       THE COURT: Agreed.
11       (Thereupon, the sidebar was concluded and
12   the following proceedings were held in open
13   court:)
14       THE COURT: Okay.  You can proceed.
15 BY MR. PRYOR:
16 Q.  And you identified 21-P is an email that you
17 received from Brian Talburt?
18 A.  Yes.
19 Q.  Let's look at the second page.
20       And this is a post -- it's attaching a post
21 from Jeanna Jackson, who is a union member?
22 A.  Yes.
23 Q.  And her post says, "This recall is happening,
24 it is real and it is valid.  If it wasn't, then all
25 of the anti-recall people would not be fighting so

Page 639

1 hard to discredit the recall or any or all of its
2 supporters.
3   "From here on out, please be careful what you
4 post.  The usual suspects are on the hunt to get
5 anyone and everyone in trouble with the principal's
6 office.  There are tattletales on every group page
7 who like to keep the pot stirred, so just please be
8 mindful of the rules:  No names, no initials, no
9 name calling.  We are all allowed to have a
10 dissenting opinion from those who are in office at
11 556.  That is a fact.
12   "I will continue to only post facts that have
13 been confirmed and can be backed up.  Come at me as
14 you will, but we -- I/we have the truth on our side.
15 Feel free to PM or text me any information you deem
16 important.  This recall is happening."
17       That is what the document says, right?
18 A.  Yes.
19 Q.  Do you agree that's protected union activity?
20 A.  Yes.
21 Q.  All right.  Let's go to the first page.
22       By the way, she's saying she's predicting that
23 your team is going to take posts and charge people,
24 and so be careful.
25       That is one of the things she's saying, right?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 149 of 642   PageID 11090
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 640..643

Page 640

1  MR. GREENFIELD: Objection, your Honor.
2 Counsel is testifying as to what his inference from
3 the document is.
4      THE COURT: I will allow it.
5      THE WITNESS: She doesn't say "my team."
6 I think she used the words "the usual suspects."
7 And I don't know who she is referring to there.
8 BY MR. PRYOR:
9 Q.  So who is she trying to recall?  You, right?
10 A.  I, along with most of the rest of the executive
11 board.
12 Q.  So she's saying, the people that are trying to
13 discredit us is your team.
14     You don't see that when she's talking about the
15 people that she's trying to recall?
16     MR. GREENFIELD: Objection, your Honor.
17 Counsel is testifying as to his interpretation of
18 what the document says.
19     THE COURT: I will allow it.
20     THE WITNESS: She says "the usual
21 suspects."  I don't know who she's speaking of
22 there.
23 BY MR. PRYOR:
24 Q.  Okay.  Let's just be clear here, it's a recall
25 petition against your administration, and you don't

Page 641

1 know who she's talking about, fair?
2 A.  Correct.
3 Q.  Let's go to the first page of this exhibit and
4 see what is being said about this protected union
5 activity.
6     This is Brian, and he's sending this email to
7 Julie O'Grady at Southwest Airlines, okay?
8     You can accept that representation.  Counsel
9 agree.
10     I see it is blacked out on your screen.
11     Do you accept that?
12 A.  Yes.
13 Q.  And it's carbon-copied to you and Brett
14 Nevarez.
15     I know that's blacked out, but I can represent
16 that to you as well.
17     Do you accept that?
18 A.  Yes.
19 Q.  So two officers of the union, both who are
20 subject of a recall, send a communication to
21 Southwest Airlines.
22     Who is Julie O'Grady?
23 A.  I don't know what her title was.
24 Q.  She's at Southwest Airlines, right?
25 A.  I believe so, yes.

Page 642

1 Q.  Look down below.
2     Do you know who Edgar Ma is?
3 A.  There is a flight attendant named Edgar
4 Maynard.
5 Q.  Okay.  Is that one of your supporters?
6 A.  Yes.
7 Q.  That's one of the usual suspects, isn't it?
8 A.  I don't know if that is who Jeanna was talking
9 about.
10 Q.  So this email to Julie O'Grady says, "Julie, as
11 a follow-up to our conversation yesterday, I am
12 including the following recent posts.
13     "A further example of the public encouragement
14 and endorsement of retaliatory practices of Jeanna
15 Jackson and company.  Sincerely, Brian Talburt."
16     That's what he wrote to you and sent to you as
17 president of the Union, isn't it?
18 A.  That is what he wrote and sent to Julie and
19 cc'd me on.
20 Q.  And you've told us that Ms. Jackson in this
21 post was engaged in protected union activity, and
22 Mr. Talburt is telling Southwest Airlines that it is
23 an example of retaliatory practices of Jeanna
24 Jackson, true?
25 A.  Yes.

Page 643

1 Q.  And you are on that email.  And I'm sure there
2 is going to be an email from you saying, Wait a
3 minute, Julie.  That is wrong.  That is protected
4 activity.
5     Did you do that?
6 A.  No.
7 Q.  You are on this email, president of the Union.
8 Southwest Airlines receives it.  The president of
9 the Union is on there and being told that this other
10 union member is doing something inappropriate, and
11 you are on the email and say nothing.  True?
12     MR. GREENFIELD: Objection, your Honor.
13     MR. McKEEBY: Objection, asked and
14 answered.
15     THE COURT: Sustained.
16 BY MR. PRYOR:
17 Q.  Did you take any action to disavow the effort
18 in this email to have charges brought against a
19 union member who was engaging in protected activity?
20     MR. McKEEBY: Objection, asked and
21 answered, and mischaracterizes the testimony -- or
22 the email.
23     MR. PRYOR: This is broader.  I asked --
24     MR. GREENFIELD: Your Honor, objection
25 that he's testifying as to a legal opinion -- a

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 150 of 642  PageID 11091
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 644..647

Page 644

1 legal fact.  He's saying that it was in fact
2 protected activity.
3          MR. PRYOR:  First of all --
4          THE COURT:  I'll overrule on the legal
5 fact.  You did broaden it.
6          I'll let her answer the question.
7 BY MR. PRYOR:
8 Q.  You can answer.
9 A.  Can you repeat the question?
10 Q.  Did you take any action to disavow this email
11 that you are on trying to charge a union member with
12 Southwest Airlines for engaging in protected union
13 activity?
14 A.  No.
15          MR. PRYOR:  Let's look at 21-Q.
16          I move for the admission of 21-Q.
17          THE COURT:  Same objections on 21-Q?
18          Okay.  So I will admit 21-Q.
19          The same limiting instruction.  Everything
20 in 21 is for use in the claims against the Union and
21 not in the claims against Southwest.
22          You can publish.
23          (The referred-to document was admitted
24    into evidence as Plaintiff's Exhibit 21-Q.)
25          MR. PRYOR:  I was hoping for the

Page 645

1 unredacted version.  It's easier to read.
2          We don't have that?  If we don't, I will
3 just read this and we will see how we do on it.
4 Maybe we can work through it without the unredacted.
5 BY MR. PRYOR:
6 Q.  This is in an email in response to the email we
7 just looked at from Deborah Edwards at Southwest
8 Airlines.  And you are on it, Julie O'Grady is on
9 it, Mr. Talburt is on it.
10     Do you accept those representations?
11 A.  Yes.
12 Q.  And --
13          MR. PRYOR:  Oh, that's the same one I
14 have.
15 BY MR. PRYOR:
16 Q.  Who is Deborah Edwards at Southwest Airlines?
17 A.  At the time she was the Phoenix base manager,
18 which is where Mr. Talburt was based.
19 Q.  Okay.  Can you pull your mic closer to you and
20 tell me what you just said?
21     You are not willing to do that?
22 A.  At the time she was the Phoenix base manager,
23 which is where Mr. Talburt was based.
24 Q.  Okay.  So this is a report to the base manager,
25 and she's -- she was on the email below.

Page 646

1     I didn't mention her name.
2     And she says, in response to the email, "Thank
3 you for sending these to us, Brian.  We will look
4 into this."
5     True?
6 A.  Yes.
7 Q.  And did you, in response to this email, tell
8 Southwest Airlines, You shouldn't be looking into
9 this against Ms. Jackson, the person trying to
10 recall me, because she's engaged in protected
11 activity?
12 A.  No.
13 Q.  Did you take any action to tell Southwest
14 Airlines that this was inappropriate?
15 A.  No.
16          MR. PRYOR:  Let's look at Exhibit 21-R.
17 BY MR. PRYOR:
18 Q.  By the way, the date of that is February 23rd,
19 correct?
20 A.  Yes.
21 Q.  That's one day after you had reported Charlene
22 Carter for social media violation, true?
23 A.  Yes.
24 Q.  All right.
25          MR. PRYOR:  Let's look at 21-R.

Page 647

1          I move for the admission of 21-R.
2          THE COURT:  Okay.  Same objections?
3          Okay.  Same ruling for me.  I'm overruling
4 the objections other than giving the limiting
5 instruction on 21-R.
6          This is another 21 that's useful for the
7 claims against the Union but not for the claims
8 against Southwest.
9          You can publish.
10          (The referred-to document was admitted
11    into evidence as Plaintiff's Exhibit 21-R.)
12 BY MR. PRYOR:
13 Q.  You were included on the email that is Exhibit
14 21-R, true?
15 A.  Yes.
16 Q.  And along with -- I think I have something that
17 tells me.
18     Who else is on 21-R?
19     So you are on it, Mr. Talburt is on it, and
20 Julie O'Grady at Southwest Airlines is on it.
21     Do you accept that?
22 A.  My version is blacked out on who else was cc'd.
23 Q.  No, I'm asking you to accept my representation.
24     Counsel have agreed.  If I get it wrong, they
25 will tell me.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                      Pages 648..651

Page 648

1 A.  Okay.  Yes.
2 Q.  Okay.
3     So you know this is going to Southwest Airlines
4 when you receive it.
5     And it is yet again a complaint by Mr. Talburt
6 to Southwest Airlines about Jeanna Jackson, true?
7 A.  I'm reading it.  One moment.
8 Q.  Okay.  Just let me know.
9 A.  Jeanna Jackson appears to be one of the flight
10 attendants he is complaining about.
11        THE COURT:  Hold on.  Is there an
12 objection?
13        MR. McKEEBY:  It's not an objection.  It
14 is a request for a more specific limiting
15 instruction, given some of the language in this
16 document, particularly about other employee
17 discipline.
18        You've given that instruction in the past,
19 but because this document is directly addressed to
20 that issue, I would request a little bit more
21 specificity in the instruction.
22        THE COURT:  Sure.  I will give it and then
23 I will ask Mr. Greenfield.
24        Okay.  So y'all know what I've talked
25 about earlier how Southwest disciplined any employee

Page 649

1 is not relevant to the claims in this lawsuit.
2        There are some exhibits that have that in
3 anyways, and we are not going to redact those out
4 because it is next to information that is relevant.
5        So I will just ask you to disregard
6 information as to Southwest, I mean how Southwest
7 treated any employee discipline-wise.
8        Thank you.
9        MR. GREENFIELD:  Sorry, your Honor.  I was
10 just preparing for a sidebar.
11        THE COURT:  Okay.  Do you need a sidebar?
12        MR. GREENFIELD:  No.  I thought we were
13 heading that way.
14        THE COURT:  Okay.  Got it.
15        MR. GREENFIELD:  My apologies.
16        THE COURT:  I think we channeled in code.
17        Did I satisfy your concerns?
18        MR. McKEEBY:  Yes, your Honor.
19        THE COURT:  Okay.  We are good to go.
20        Now you can proceed.
21        MR. PRYOR:  Thank you, your Honor.
22 BY MR. PRYOR:
23 Q.  Let me make sure I understood your answer.
24     This is yet again another email from
25 Mr. Talburt.

Page 650

1     At least in part, one of the people he's
2 complaining about again is Jeanna Jackson, correct?
3 A.  Yes.
4 Q.  Does he complain about others, did you notice?
5 A.  Yes.
6 Q.  Did he complain about other flight attendants?
7 A.  Yes.
8 Q.  Did he complain about other flight attendants
9 that are union members?
10 A.  I don't know because I don't know who else he's
11 talking about.
12 Q.  And he's reporting this to Southwest Airlines
13 for them to take action.  He's requesting action,
14 right?
15     Did you read the last paragraph?
16 A.  I'm assuming he's requesting that they take
17 action because he's complaining about various times
18 he feels like he's been harassed and retaliated
19 against.
20 Q.  I want to go back to Exhibit 21-P.  That is
21 where it had the post from Jeanna Jackson that was
22 reported to Southwest Airlines.
23     And in it she predicts that, you know what,
24 this group of -- this group of usual suspects, they
25 will be charging us for our efforts in this recall.

Page 651

1 So be careful.
2     And in fact, her post about be careful, be
3 polite, don't say anything wrong, she gets reported
4 for that, and you are on the email doing it.
5     Is that right?
6 A.  I was cc'd on the email that was sent in.
7 Q.  Okay.  My statement is correct, though, isn't
8 it?  I'm happy to say it again.
9 A.  Yes.
10 Q.  Yes, my statement is correct.  Right?
11 A.  Yes.
12        MR. PRYOR:  Let's look at Exhibit 21-T.
13        THE COURT:  Same objections on 21-T?
14        All right.  Same ruling from me.
15        I'm overruling Union objections on
16 allowing it in under a limiting instruction.
17        This is useful for the claims against the
18 Union, not useful for the claims against Southwest.
19        You can publish Exhibit 21-T.
20        (The referred-to document was admitted
21        into evidence as Plaintiff's Exhibit 21-T.)
22 BY MR. PRYOR:
23 Q.  This is another email that you are on, dated
24 March 1st, along with Deborah Edwards, the base
25 manager, and management at Southwest Airlines,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 152 of 642   PageID 11093
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Pages 652..655

Page 652

1 yourself, and Mr. Talburt, correct?
2 A.  Yes.
3 Q.  And this is, once again, a complaint about
4 Jeanna Jackson and others?
5 A.  I don't see Jeanna's name anywhere.
6 Q.  Let's look at the attachment.
7     By the way, you really don't know who he's
8 talking about here, right?
9     Let's blow this up.
10 A.  I would be making assumptions without any other
11 context of what I just read.
12 Q.  Okay.  This is the attachment to the email.
13     Do you see where it says "Jeanna Jackson"?
14 A.  Yes, I do.
15 Q.  And she's talking about the recall effort.  And
16 it's not so blurred that I can't read it, but I'm
17 happy to read it for you.
18     But I will let you read it and tell us, do you
19 agree, again, that this is protected union activity?
20     MR. GREENFIELD:  Your Honor, I would like
21 to object.
22     I think a sidebar would be appropriate.
23     THE COURT:  Okay.
24     (Thereupon, the following proceedings were
25     had at sidebar:)

Page 653

1     MR. GREENFIELD:  There is a fine line that
2 counsel is walking on in what he continues to call
3 protected activity versus what she believes is
4 protected activity.
5     Defining something as protected activity
6 or not is a legal conclusion.
7     What she believes is protected union
8 speech, I believe, is a improper way --
9     THE COURT:  I'm fine with that.  It calls
10 for a legal conclusion, what she's used, what she
11 just talked about.
12     MR. GREENFIELD:  I don't believe there is
13 in evidence that she used -- I don't know what that
14 means.
15     MR. PRYOR:  She absolutely -- I will ask
16 that question that way.
17     THE COURT:  I agree.
18     MR. PRYOR:  It is her job.
19     THE COURT:  I agree with yours.
20     MR. PRYOR:  Because she is Union
21 president.
22     (Thereupon, the sidebar was concluded and
23     the following proceedings were held in open
24     court:)
25     THE COURT:  All right.  You can tweak that

Page 654

1 like we talked about and ask it again.
2     MR. PRYOR:  I will.
3 BY MR. PRYOR:
4 Q.  Let me read this.  Read along with me.  Let's
5 make sure that we agree what this says, okay?
6     Because it is a little blurred, but I think it
7 is readable.  If there is something I read that is
8 wrong, just go ahead and stop me, okay?
9 A.  Okay.
10 Q.  This is from Jeanna Jackson, TWU 556.
11     She's a union member, right?
12 A.  Yes.
13 Q.  "It appears our little recall that could is
14 having a profound effect on this union and not in
15 this president or someone's favor."
16     Is that -- EB, is that the executive board?
17 A.  Yes.
18 Q.  "Panic has set in at the amount of power.  In
19 all of the" --
20     MR. PRYOR:  Make it a little smaller.
21 Maybe I can read that.  Yes.  So it won't be quite
22 as blurred.  Smaller, not bigger.  Not quite as big.
23     That actually may have helped.
24 BY MR. PRYOR:
25 Q.  Okay.

Page 655

1     "Panic has set in at the amount of power.  Our
2 voices have discussed outrage and shock, actually
3 have.
4     "With that being said, that panic is creating a
5 fight or fight affect that is affecting us.  This
6 leadership is doing everything they can to stay in
7 power, even stooping so low as to turning
8 dues-paying members in for perceived SMVs."
9     Do you think that is social media violations?
10 A.  Yes.
11 Q.  In fact, that's what was going on, wasn't it?
12     You had done it, Brian Talburt had done it,
13 Mr. Nevarez was involved in it, true?
14     MR. GREENFIELD:  Objection, your Honor.
15     THE COURT:  I will allow it.
16     THE WITNESS:  Mr. Talburt was not in
17 leadership, and to my knowledge, Mr. Nevarez had not
18 turned anything in.
19 BY MR. PRYOR:
20 Q.  Well, you had turned in Ms. Carter and you were
21 involved in the emails turning in Ms. Jackson.
22     That much is true, right?
23 A.  I was cc'd on them, yes.
24 Q.  I'm sorry?
25 A.  I was cc'd on them.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 153 of 642   PageID 11094
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 656..659

Page 656

1 Q.  I understand.  That is involved.  You received
2 it.  You are the Union president.  You were involved
3 to the extent that you were informed of it and the
4 Union president took no action to disavow it.
5       MR. GREENFIELD:  Objection, your Honor.
6 Counsel is testifying.
7       THE COURT:  I will allow it.
8       THE WITNESS:  Yes.
9 BY MR. PRYOR:
10 Q.  And you say, "They are having their minions
11 turn in members to management for any type of
12 discussion that they do not agree with and claiming
13 they are offended, which in turn creates an FF
14 meeting."
15       Fact-finding meeting.
16       That means Southwest is going to investigate
17 them, true?
18 A.  Yes.
19 Q.  In fact, you are even on the email where they
20 take this communication, complaining about that
21 activity, and turning her in for that.  True?
22 A.  Yes.
23 Q.  "The president and executive board are
24 violating yet another bylaw, the one that says
25 members are allowed to have a dissenting opinion

Page 657

1 from that of the Union without fear of reprisal or
2 lack of representation.
3       "I attach a screenshot of the actual bylaw.
4 Please read the whole paragraph."
5       I can read on.  I think we can see it.
6       But it is clear that in your belief and
7 understanding as president of Local 556, this is
8 protected union activity.  True?
9 A.  Yes.
10 Q.  And so when we go to the email where she's
11 being reported for engaging in this protected
12 activity, you once again are included as president
13 of the Union and take no action to disavow or inform
14 Southwest Airlines you disagree with the information
15 on which you are carbon-copied, true?
16 A.  Yes.
17       MR. PRYOR:  Let's look at Exhibit 21-U.
18 I move for the admission of 21-U.
19       THE COURT:  Okay.  Same objections, same
20 ruling.  21-U is in, but limited to the claims
21 against the Union, not the claims against Southwest.
22 You can publish.
23       (The referred-to document was admitted
24       into evidence as Plaintiff's Exhibit 21-U.)
25

Page 658

1 BY MR. PRYOR:
2 Q.  21-U is an email from Brian Talburt on
3 May 15th.  He includes Mike Sims and Sonya Lacore.
4       And Sonya Lacore is the one he was having the
5 discussions with about using social media policy to
6 target union members that he didn't like.
7       Do you recall that?
8 A.  I recall that there was an email that he had
9 had with Sonya complaining.
10 Q.  And you know, when we say it was his email, you
11 were forwarded that email and took no action, as I
12 remember, correct?
13 A.  Yes.
14 Q.  And you were also on this email where it says
15 "President at TWU 556."
16       That is you?
17 A.  Yes.
18 Q.  And once again, he's trying to get the company
19 to take action against Jeanna Jackson, the head of
20 the recall petition, true?
21 A.  Yes.
22 Q.  And he's specifically talking about using the
23 social media policy and even puts in a portion of
24 the policy itself, right?
25 A.  I'm still reading.  I haven't gotten to that

Page 659

1 part.
2 Q.  I'm sorry?
3 A.  I'm still reading.
4 Q.  Oh, okay.
5 A.  Can you ask your question again, please?
6 Q.  Yes.
7       Once again, this is, it looks like, maybe a
8 month and a half later, you are included on
9 communications where there are efforts by Brian
10 Talburt with the president of the Union on the email
11 where he's once again trying to get the company to
12 take action against Jeanna Jackson.
13 A.  Yes.
14 Q.  And at the top, I will tell you that
15 carbon-copy is not just you, Audrey Stone, but it is
16 also Brett Nevarez, who was also an officer of the
17 Union, true?
18 A.  Yes.
19 Q.  And who is Mr. Sims at Southwest Airlines?
20 A.  He, at the time, and still now, is the director
21 of -- was in inflight for base operations, I
22 believe.
23 Q.  And so he responds, "Thank you, Brian.  We will
24 review your concerns."
25       And you had no response to that, true?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 154 of 642   PageID 11095
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 3 July 07, 2022                    Pages 660..663

Page 660

1 A. Yes.
2      MR. PRYOR: Let's look at 2-V.
3      MR. GREENFIELD: 21-V?
4      MR. PRYOR: I'm sorry.
5      I move for the admission of 21-V.
6      THE COURT: 21-V.
7      Same objections, same ruling. So I'm
8 overruling the objections, admitting it in for the
9 linted purpose of the claims against the Union, not
10 against Southwest.
11     You can publish.
12     (The referred-to document was admitted
13     into evidence as Plaintiff's Exhibit 21-V.)
14 BY MR. PRYOR:
15 Q. And so this is an email, and I think we will be
16 able to, before it goes to the jury room at the
17 conclusion of the trial, be able to take out enough
18 of the black marks that they will know who these
19 people are so I don't have to remember it right now.
20     But I will represent to you, this is an email
21 from Brian Talburt to Mike Sims, carbon-copied Juan
22 Suarez and Deborah Edwards and Sonya Lacore, a name
23 we have heard before.
24     Those are all Southwest people?
25 A. Yes.

Page 661

1 Q. And it also includes Brett Nevarez and
2 yourself, the officers of Local 556, true?
3 A. Yes.
4 Q. And now it is July, and more complaints about
5 Ms. Jackson, true?
6 A. I'm still reading.
7 Q. Okay. Do you see it is about Ms. Jackson now?
8 A. Yes.
9 Q. Once again, this is an email that senior
10 officers of Local 556 are on where you have another
11 complaint about Ms. Jackson to Southwest Airlines,
12 true?
13 A. Yes.
14 Q. You took no action to disavow that either, did
15 you?
16 A. No.
17 Q. And to your knowledge, at any time did any
18 member of the officer team at Local 556 take any
19 action to correct this -- these reports to Southwest
20 Airlines against Ms. Jackson for engaging in
21 protected union activity, as you understand it?
22 A. No.
23     But I will also add, he references again in
24 this feeling harassed and being retaliated against,
25 and you can't do that even under the guise of

Page 662

1 protected union activity.
2 Q. The harassment was that she was engaging in a
3 recall petition.
4      What harassment?
5      Have you seen any evidence of harassment in any
6 of the attachments?
7 A. In this particular exhibit, he's specifically
8 speaking about a physical address of another flight
9 attendant being published to 1,000 people.
10 Q. Okay.
11 A. I don't see the post. I don't know what he's
12 referencing.
13     All I have is what is in front of me.
14 Q. He makes some allegations, I see that.
15     But in terms of evidence that you are aware of
16 to support any of this, did you ask to see any
17 evidence or documentation to support anything that
18 would justify you, as Union president, not
19 responding to these emails and saying, quit picking
20 on a union member for engaging in union activity?
21 A. I saw a number of social media posts during
22 this time that were harassing and retaliatory in
23 nature towards various members.
24 Q. So where are they?
25     We would be happy to talk to you about them,

Page 663

1 ma'am, or is this some more evidence that you don't
2 have?
3      MR. GREENFIELD: Objection, your Honor.
4      The witness is here to answer questions,
5 not produce evidence.
6      THE COURT: Sustained.
7      I sustained it. You need to ask a new
8 question.
9 BY MR. PRYOR:
10 Q. Where are these posts?
11     We have got lots of posts here. We've got lots
12 of evidence here.
13     MR. GREENFIELD: Objection.
14 BY MR. PRYOR:
15 Q. Please point to a post. We will be happy to
16 discuss it.
17     THE COURT: I will allow that.
18     THE WITNESS: I didn't put together the
19 exhibits. I don't know what exhibits Southwest or
20 the Union are preparing to bring in.
21     I know for a fact that there were numerous
22 posts on social media that were investigated
23 regarding harassment and retaliatory behavior and
24 that there were flight attendants disciplined for
25 those posts.

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 155 of 642    PageID 11096
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 664..667

Page 664

1 BY MR. PRYOR:
2 Q.  Let's talk about that.
3     In fact, isn't what happened is, your union
4 leadership gathered as much social media information
5 as you could about your opponents, and you sent it
6 to Southwest Airlines and reported it, some of it
7 going back five years?
8     Isn't that what you did?
9     Is that what you are talking about?
10 A.  No.
11 Q.  You didn't do that?  You had nothing to do with
12 that, that is your sworn testimony?
13      MR. GREENFIELD:  Objection, your Honor,
14 asked and answered.
15      THE COURT:  Sustained.
16 BY MR. PRYOR:
17 Q.  Did you have anything to do with that?
18      MR. GREENFIELD:  Objection, your Honor,
19 asked and answered.
20      THE COURT:  Sustained.
21 BY MR. PRYOR:
22 Q.  Let me try another.  I didn't hear an answer to
23 my question, so I will broaden it.
24     Is it fair to say that you were aware of
25 complaints being made to Southwest Airlines about

Page 665

1 recall petition supporters?
2 A.  Yes.
3 Q.  And in fact, did you and Rickie Spand bring
4 allegations against several union member flight
5 attendants to Southwest Airlines in that regard?
6 A.  I can't speak to what Rickie Spand brought
7 forward.  He and I didn't have conversations about
8 it.
9     I brought forward concerns of retaliation to
10 Southwest after I had reported Ms. Carter.
11 Q.  And in fact, you brought, in addition to
12 everything -- the emails you were on, you also
13 brought a complaint against Jeanna Jackson, true?
14 A.  Yes.
15 Q.  Let me approach and show you Exhibit 132 to see
16 if this refreshes your recollection.
17     The underlined that I'm referring to --
18      THE COURT:  We can't hear you if you are
19 not talking into a mic, Mr. Pryor.
20      MR. PRYOR:  I'm directing her attention to
21 that.  Directing her attention to that.
22 BY MR. PRYOR:
23 Q.  Ma'am, I'm going to have you review
24 Exhibit 132, and specifically the information I
25 underlined for you.

Page 666

1     I will ask you, do you recall that, in fact,
2 that you and Rickie Spand brought several complaints
3 against flight attendants?
4 A.  As I already stated, I don't know what Rickie
5 Spand brought forward.  I don't know what his
6 complaints were.
7     I know what mine was.
8 Q.  And you are telling us it was only against
9 Jeanna Jackson that you brought a complaint?
10 A.  No, that's not what I stated.
11 Q.  Okay.  So who in addition to Ms. Carter and
12 Ms. Jackson did you bring complaints against?
13 A.  I believe the other one was Chris Click.
14 Q.  I'm sorry, who?
15 A.  Chris Click.
16 Q.  That is right, Chris Click.  That's the guy
17 that was elected president that got kicked out and
18 you ended up being president, right?
19 A.  He wasn't elected president.
20 Q.  I'm sorry?
21 A.  He was not elected president.
22 Q.  What was he elected?
23 A.  First vice president.
24 Q.  Okay.  So that was the first vice president
25 that got kicked out.

Page 667

1     Were you then put in as first vice president
2 and then promoted to president?
3 A.  I was put in first vice president per our
4 bylaws, and due to succession in our bylaws, I
5 eventually moved up to the presidency once the
6 president was removed from office.
7 Q.  So you are reporting a recall petition
8 supporter, a previous political opponent to the
9 company, and they are both union members, right?
10 A.  Yes.
11 Q.  Is it fair to say that you never reported a
12 union member that was a supporter of yours at any
13 time for anything they did?  True?
14 A.  Yes, because I never felt harassed or
15 retaliated against by a union supporter.
16 Q.  You don't have to turn in violations of company
17 policy that you see, just only when you are
18 harassed?
19 A.  I have the right, if I feel like I'm being
20 harassed or retaliated against, to report that per
21 Southwest Airlines policy.
22      MR. PRYOR:  May I approach, your Honor?
23      THE COURT:  You may.
24      (Thereupon, the following proceedings were
25 had at sidebar:)

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 3 July 07, 2022                        Pages 668..671

Page 668

1        MR. PRYOR:  Would it violate the limine
2 instruction to ask her what happened to Ms. Jackson?
3        I would like to make an offer of proof on
4 it outside the presence of the jury, if I'm not
5 allowed to ask.  I don't know what her answer would
6 be.
7        THE COURT:  At the next break.
8        MR. PRYOR:  Thank you.
9        (Thereupon, the sidebar was concluded and
10       the following proceedings were held in open
11       court:)
12 BY MR. PRYOR:
13 Q.  Is it your understanding that Local 556 has an
14 affirmative duty to accommodate employees' religious
15 beliefs?
16       MR. GREENFIELD:  Objection, your Honor.
17 Asking for a legal opinion as to --
18       MR. PRYOR:  She's president of the Union
19 and has obligations --
20       MR. GREENFIELD:  -- accommodating a
21 religious --
22       THE COURT:  Hold on.  No speaking
23 objections and no speaking responses.
24       I will allow her to answer the question if
25 she has personal knowledge.

Page 669

1        THE WITNESS:  The only discussion or
2 knowledge I ever had while president about religious
3 accommodations was with an attorney and protected
4 under attorney-client privilege.
5 BY MR. PRYOR:
6 Q.  As president of the Union, you had no
7 understanding, apart from a privilege conversation
8 with your attorney, regarding the Union's
9 obligations to accommodate religious beliefs of its
10 members or objectors?
11 A.  It came up once during my entire
12 administration.
13 Q.  When did you have this conversation with an
14 attorney?
15 A.  I don't recall at what point it was during the
16 presidency -- during my presidency.  I just remember
17 what prompted the conversation.
18 Q.  What prompted it?
19 A.  For the inflight training flight attendant
20 candidates, the Union both spoke at training and
21 then hosted a union-sponsored dinner for the flight
22 attendant candidates.
23       And there was a flight attendant candidate who
24 had approached our treasurer at the time to ask
25 about not joining the union due to his religious

Page 670

1 beliefs.
2        I wasn't a part of that conversation.  The
3 treasurer came to me, and it was not something that
4 we had ever dealt -- I had never dealt with before,
5 he had never dealt with before, so we immediately
6 sought legal counsel.
7 Q.  What was the religious belief involved?
8 A.  That he was a Christian and -- again, to my
9 knowledge, I didn't personally speak to the flight
10 attendant -- and that his belief in the Bible, he
11 was not allowed to join a union.
12 Q.  So he said he couldn't join?
13 A.  That was his request.  That based off of his
14 religious Christian beliefs, he did not want to join
15 the union, which would not take place until after
16 you actually successfully complete probation.
17 Q.  All he has to do is opt out.  Was he wanting to
18 not pay dues as well?
19 A.  Correct.  He was not requesting to opt out or
20 be an agency fee.  He was requesting to pay zero
21 dues upon completion of probation.
22 Q.  Okay.  And did the union accept or reject that
23 accommodation request?
24 A.  The accommodation request was never formally
25 made.  He did not complete probation with Southwest

Page 671

1 Airlines.
2 Q.  So he never qualified even to be a union member
3 then?
4 A.  Correct.
5 Q.  Okay.
6        So since that time, having talked to your
7 attorney and understanding your duties in regard to
8 protecting religious views and accommodations for
9 them, have you provided any religious
10 accommodations?
11 A.  No.  There was nothing that came up outside of
12 that.
13       MR. PRYOR:  Let me look at my notes.
14       We move for the admission of 21-X.
15       THE COURT:  21-X.
16       MR. McKEEBY:  So I'm not sure I really
17 understand the exhibit.
18       Let's just go with it.
19       MR. GREENFIELD:  Are we talking about
20 21-X?
21       THE COURT:  21-X.
22       MR. GREENFIELD:  Can we have it pulled up
23 on the screens outside the jury?
24       THE COURT:  We have got the jury screens
25 muted.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                          Pages 672..675

Page 672

1        Can you pull up 21-X on the screen.
2        Now that you can see it, any other
3   objections to raise on 21-X?
4        MR. McKEEBY:  Southwest has the same
5   limiting instruction request.
6        MR. GREENFIELD:  No objection, your Honor.
7        THE COURT:  Okay.  I will overrule those
8   prior objections we discussed, and I will include
9   this with the same limiting instruction.
10       These are for the claims against the Union
11  and not for the claims against Southwest.
12       21-X is in.
13       You can publish.
14       (The referred-to document was admitted
15       into evidence as Plaintiff's Exhibit 21-X.)
16  BY MR. PRYOR:
17  Q.  Can you identify 21-X as an email that you are
18  on, carbon-copied on, Brett Nevarez is carbon-copied
19  on, it is sent from Rickie Spand?
20       And that is one of your inner-circle people?
21  A.  No.
22       It was sent from Rickie Spand and the entire
23  executive board was copied on it.  He was not anyone
24  I would consider in my inner circle.
25  Q.  He was what?

Page 673

1   A.  He was not someone I would consider in my inner
2   circle.
3        There was points he was very outspoken against
4   me and my administration.
5   Q.  So Rickie Spand would not be someone in support
6   of your leadership, true?
7   A.  Many times over the course of my administration
8   he was not in support of my leadership.
9   Q.  How about in March of '27 [sic], was he on your
10  side then?
11  A.  It appears so, yes.
12  Q.  And he's sending to Suzanne Stephenson another
13  complaint about Jeanna Jackson and her recall
14  propaganda, true?
15  A.  Yes.
16  Q.  And you are on this, right?
17  A.  Yes.
18  Q.  Did you review it to see if it involved
19  protected union activity to see whether or not maybe
20  you should tell Suzanne Stephenson, Hey, there is
21  nothing wrong with that?
22  A.  No.
23  Q.  Is that a good example of how you performed
24  your duties as president of Local 556 in 2017?
25  A.  Can you repeat the question?

Page 674

1   Q.  Yes.
2        Is that a good example of how you performed
3   your duties as president of the union in 2017?
4   A.  No, that is not -- that is -- I don't believe
5   that not responding to this is representative of how
6   I did my job as president.
7   Q.  So do you think now, you know what, I should
8   have, as Union president, exercised that fiduciary
9   duty to my member and make sure that Southwest
10  Airlines is not confused that this is union
11  activity?
12       Did you think to do that?
13  A.  No.  I did not get involved when a flight
14  attendant brought something forward to Southwest
15  management as a concern, or any part of those
16  conversations that they chose to have with
17  leadership.
18  Q.  Well, ma'am, you are involved because you are
19  on the email.
20       If you are going to say, Hey, the fact that I'm
21  on there means nothing, why wouldn't you then
22  respond to Southwest Airlines -- yes, to Southwest
23  Airlines, and say, Hey, I'm not involved in this.
24  I'm not, as Union president, even going to comment,
25  as opposed to, it looks like the leadership of the

Page 675

1   Union is on here and is either in support or
2   remaining silent.
3        MR. McKEEBY:  Objection, asked and
4   answered, compound.
5        THE COURT:  Sustained.
6   BY MR. PRYOR:
7   Q.  You don't think you, as a good Union president,
8   should have taken action in regard to any of these
9   emails where reports are being made against your
10  political opponents?
11  A.  No.
12       MR. PRYOR:  Thank you.
13       THE COURT:  Any further questions?
14       Any further questions?
15       MR. PRYOR:  I'm sorry, your Honor.
16       Other than what we just sidebarred about,
17  I have no further questions at this time.
18       THE COURT:  Sure.
19       I take that subject to, we can go ahead
20  and start cross-examination of the witness.
21       Do we know who wants to go first?
22       MR. GREENFIELD:  I will, your Honor.
23       THE COURT:  Okay.  Go for it.
24       Go ahead, Mr. Greenfield.
25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 158 of 642   PageID 11099
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                     Pages 676..679

Page 676

1                    CROSS-EXAMINATION
2  BY MR. GREENFIELD:
3  Q.  Good morning, Ms. Stone.
4  A.  Good morning.
5  Q.  Counsel for the Plaintiff talked a lot about
6  the words that were sent and whether those were
7  protected activity; is that correct?
8  A.  Yes.
9  Q.  And did you testify that the words you saw
10 were, in your opinion, protected activity?  Is that
11 correct?
12 A.  Yes.
13 Q.  Okay.  I would like to talk a little bit about
14 the actions and the manner that went along with
15 those words.
16     In your opinion, if someone would have sent you
17 a horse head that was chopped off a horse with the
18 words on it, "We are going to recall you from
19 president, Audrey Stone," would the words themselves
20 be protected activity, in your opinion?
21 A.  The words, yes.
22 Q.  What about the manner in which it was sent?
23 A.  No.
24 Q.  Okay.  What if the words that were protected
25 activity about recalling you included liable or

Page 677

1  slander?  Do you think, along with when those are
2  coupled together, that is still, in your view, was
3  protected activity?
4  A.  Is there an example, just so I understand what
5  your idea of slander is?
6  Q.  Yes.
7      And let's just move on to fraud for
8  specificity's sake.
9      Do you remember the recall petition that has
10 been discussed at length by counsel?
11 A.  Yes.
12       MR. GREENFIELD:  Can you pull up Exhibit
13 No. 134.
14 BY MR. GREENFIELD:
15 Q.  Before we get into the specifics of the
16 document -- before we get into the specifics of the
17 document, what is your memory of the outcome of a
18 review of the recall petition?
19 A.  That the recall petition was essentially deemed
20 unsuccessful and invalid because it contained a
21 number of fraudulent entries, forged signatures,
22 signatures of flight attendants who had -- who were
23 no longer with us, or there were white out, there
24 were expired signatures, white out on documents
25 where they just changed the date by a year.

Page 678

1  Duplicate signatures.
2      A list of reasons where the recall fell very
3  short of reaching the number needed, um, for it to
4  even to be considered, um, valid.
5  Q.  Did you consider the recall petition to be a
6  fraudulent document?
7        MR. PRYOR:  Objection, leading.
8        THE COURT:  Sustained.
9  BY MR. GREENFIELD:
10 Q.  What were your opinions of the recall petition?
11 A.  My opinion of the recall petition, um, was that
12 even the basis that it was started under, which was
13 a change in the duty day, contractual duty day, the
14 proposed change in the tentative agreement that was
15 rejected, I didn't believe that was even a basis for
16 a recall petition that a negotiated, agreed-upon
17 change in the contract wasn't a valid basis.
18     But the Union ultimately decided the Union
19 would do their due diligence and look into it, and
20 conducted a very lengthy, thorough examination of
21 the findings to determine whether or not what was
22 presented even met the criteria needed under our
23 bylaws, separate from whether or not the reason for
24 the recall was a valid reason.
25 Q.  And who made that decision to review the recall

Page 679

1  petition?
2  A.  The executive board.
3  Q.  Now, my understanding is that your testimony
4  yesterday, and/or earlier today, was that the recall
5  petition came about because of the failed tentative
6  agreement on the first CBA; is that correct?
7  A.  Yes.
8  Q.  Okay.  Do you remember any of the board members
9  who voted against that tentative agreement No. 1?
10 A.  Yes.
11 Q.  Who are those board members, if you can recall?
12 A.  They were Jessica Parker --
13       MR. PRYOR:  Object on lack of foundation.
14       THE COURT:  I'll allow it.
15       Ask the question.  She can answer.
16       THE WITNESS:  Jessica Parker, David
17 Jackson, Donna Keith, and BR Ricks.  Those were the
18 four board members not named on the recall petition.
19 BY MR. GREENFIELD:
20 Q.  Okay.  Now, what steps, in your recollection,
21 did the executive board set up to review this recall
22 petition?
23 A.  The steps set up were that there was going to
24 be a committee formed, and that for obvious reasons,
25 no one that was named on the recall would serve on

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 680..683

Page 680

1 that committee or have any conversations.
2     Our typical Union process, and I think I even
3 spoke a little bit yesterday, is that our committees
4 have a liaison that serves as the go-between between
5 a committee and the executive board, who is the
6 governing body of the union.
7     So it was also agreed upon that the liaison to
8 the committee that was going to be reviewing it
9 could also not be a board member that was named on
10 the recall.
11     So the committee was set up with three of the
12 four board members who were not named and who do not
13 vote to send a tentative agreement out, and the
14 liaison was a board member who had come onto the
15 board since then and had not had any part of the
16 vote of the TA, and he was made the liaison for the
17 committee.
18     And they worked with legal counsel throughout
19 the process to ensure proper verification.
20 BY MR. GREENFIELD:
21 Q.  Okay.  So my understanding is the executive
22 board decided that a committee should be named to
23 review the petition; is that correct?
24     MR. PRYOR:  Object, leading.
25     THE COURT:  Sustained.

Page 681

1 BY MR. GREENFIELD:
2 Q.  Was a committee formed?
3 A.  Yes.
4 Q.  And who were the committee members who reviewed
5 the recall petition?
6 A.  Jessica Parker, Donna Keith and John DiPippa.
7 Q.  Ms. Parker opposed the first Collective
8 Bargaining Agreement?
9 A.  Yes.
10 Q.  And Ms. Keith opposed the first Collective
11 Bargaining Agreement?
12 A.  Yes.
13 Q.  And what about Mr. DiPippa?
14 A.  Yes.  And I'm sorry, I may not have listed him
15 earlier.
16 Q.  And were those individuals named in the recall
17 petition themselves?
18 A.  No, they were not.
19 Q.  Can you identify this document?
20 A.  Yes.
21 Q.  And about a quarter way down the page, it has,
22 bolded, "Findings."
23     Do you see where I'm at?
24 A.  Yes.
25 Q.  "Entries found not valid fell into the

Page 682

1 following categories."
2     Did I read that correctly?
3 A.  Yes.
4 Q.  "130 no employee numbers.  442 with no dates
5 associated to the entry.  19 with no dates, no
6 employee numbers."
7     And let's just go down a little bit more.
8     36 were filed by -- were signed by members in
9 bad standing; is that correct?
10 A.  Yes.
11 Q.  49 were either signed by individuals who were
12 no longer with the company, who had quit and/or were
13 deceased; is that correct?
14     MR. PRYOR:  Object, leading.
15     THE COURT:  Sustained.
16     MR. GREENFIELD:  Did I read that
17 correctly?
18     MR. PRYOR:  Object, leading, based on the
19 previous question.
20     THE COURT:  I will allow it.
21 BY MR. GREENFIELD:
22 Q.  Did I read that correctly?
23 A.  Yes.
24 Q.  There were 504 duplicate signatures.
25     Did I read that correctly?

Page 683

1     MR. PRYOR:  Object, leading.
2     THE WITNESS:  Yes.
3 BY MR. GREENFIELD:
4 Q.  Only 15 agency fee objectors signed it,
5 correct?
6     MR. PRYOR:  Object, leading.
7     THE COURT:  It's fine.
8     THE WITNESS:  Yes.
9 BY MR. GREENFIELD:
10 Q.  "88 signatures did not match the employee
11 numbers."
12     Did I read that correct?
13 A.  Yes.
14 Q.  "115 signatures were either altered or the date
15 expired and year changed from year 2015 to 2016."
16     Did I read that correctly?
17 A.  Yes.
18 Q.  "1,612 issues of there being a white-out or the
19 date expired and year change from 2015 to 2016."
20     Did I read that correctly?
21 A.  Yes.
22 Q.  And why was -- why would that matter that the
23 date was changed from 2015 to 2016, if it mattered
24 at all?
25 A.  The language in our bylaws is specific to a

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                        Pages 684..687

Page 684

1 time frame, and I believe it's recall -- the first
2 signature to when it's turned in, it has to be
3 within, I believe, a 12-month time period.
4 Otherwise, the signatures expire and can't -- cannot
5 be counted as a valid signature on the recall
6 petition.
7 Q.  Okay.  In total, how many invalid entries do
8 you see?
9 A.  3,503.
10 Q.   And how many were required for a valid recall
11 petition of the board?
12      Let me ask it a different way.
13 A.   50 percent plus one of the membership, I
14 believe, is the -- I don't know the number, but I
15 believe that's the statistic needed.
16 Q.  Okay.
17 A.  The percentage.
18 Q.  Do you have a recollection about how many
19 members of the union there were?
20 A.  At this point, there were I think over 15,000.
21 Q.  So if my math is correct, that would require
22 7,001 signatures for a valid recall petition?
23 A.  Correct.
24 Q.  At the end of examination, the name Chris Click
25 was brought up.

Page 685

1      Do you remember -- did you testify that you
2 filed a complaint with Southwest Airlines against
3 Chris Click?
4 A.  Yes.
5 Q.  And what was the nature of that?
6 A.  He had -- he was posting on social media and I
7 believe using my specific name and talking about me
8 in relation to turning in Ms. Carter.
9 Q.  And why did you turn him in for that?
10 A.  Because employees are supposed to be protected
11 under the Southwest Airlines policy to be able to
12 bring a complaint forward and not be subjected to
13 retaliation.
14      And it was one of my concerns and why it took
15 me many days between receiving the videos and
16 sending the complaint to Southwest, because I was
17 scared of being retaliated against.
18 Q.  Now, it was discussed that Mr. Click was -- was
19 Mr. Click removed from office at any point?
20 A.  Yes.
21 Q.  Okay.  And who are the other individuals who
22 were removed from office?
23      Do you remember their names?
24 A.  Jerry Lindemann, who was treasurer, and Stacy
25 Martin, who was president.

Page 686

1 Q.  And in what year did that occur?
2 A.  2013.
3 Q.  Okay.  Can you explain to the jury the
4 circumstances as to how and why those individuals
5 were removed from office, if you know?
6      MR. PRYOR:  Object, lack of foundation.
7 Request to voir dire the witness.
8      MR. GREENFIELD:  I asked --
9      (Thereupon, the following proceedings were
10  had at sidebar:)
11      THE COURT:  Why would you need to voir
12 dire the witness?
13      MR. PRYOR:  He can't do it, if he's not
14 going to establish a foundation.
15      MR. GREENFIELD:  I asked if she knew.
16      MR. PRYOR:  You asked what were the
17 circumstances.
18      MR. GREENFIELD:  If she knew.
19      THE COURT:  You need a foundation for
20 answering the question.
21      MR. PRYOR:  I didn't hear -- I guess I
22 still object on foundation.
23      He should find the basis of what she
24 knows.  Is it double, triple hearsay?  Does he want
25 to know her opinion?  That is a different question.

Page 687

1 I think we need more foundation.  That is just my
2 objection.
3      THE COURT:  I understand.  I think it is
4 not offered for its truth, it is just offered for
5 the state of mind.
6      (Thereupon, the sidebar was concluded and
7 the following proceedings were held in open
8 court:)
9      THE COURT:  Okay.  You can proceed and
10 reask that question.
11 BY MR. GREENFIELD:
12 Q.  Ms. Stone, if you have personal knowledge about
13 the circumstances -- let me just ask, do you have
14 any personal knowledge about the circumstances under
15 which Mr. Lindemann, Click and Martin were removed
16 from the executive board?
17 A.  Yes, based off of that information that the
18 Union published to the membership and put out.  I
19 wasn't a part of the process.
20 Q.  Okay.  And what is your understanding of why
21 they were removed?
22 A.  There were questions about money and funds and
23 the way they were being utilized.
24      There was a presentation that they put together
25 depicting expenditures, attributing it to certain

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 161 of 642   PageID 11102
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 3 July 07, 2022                         Pages 688..691

Page 688

1 board members.  It was shown at some membership
2 meetings, not the others.
3     We are required to present the same information
4 at all membership meetings.  A membership meeting is
5 one long meeting that you go to in each domicile to
6 have an opportunity for the members in each domicile
7 to come and stay abreast of union business.
8     So it was a combination of factors.  And
9 ultimately it was deemed that some of their actions,
10 while in leadership position, were a violation of
11 our -- not only bylaws, but our TWU International
12 Constitution.
13 Q.  Are you aware of any additional actions that
14 the Union took against those individuals?
15 A.  Yes.
16 Q.  What are those?
17 A.  The Union filed a lawsuit because during the
18 time -- under our constitution, there -- just like
19 with Southwest -- there is an investigation, a due
20 process.  Someone is not just removed.
21     And so they were suspended and were not allowed
22 to act in their leadership positions during that
23 time.
24     They ignored that.  Actually broke into the
25 Union office.  Sent Union communications out to the

Page 689

1 membership with false information in it.  And they
2 continued to spend Union dues and continued to act
3 as if they were still in their positions.
4     And the lawsuit filed was to try to recover the
5 money that they illegally spent during that time, as
6 well as to return Union property that the gentlemen
7 were in possession of that they had not turned over
8 upon their removals.
9 Q.  And did that -- do you know if that lawsuit was
10 presented to a jury or not?
11 A.  I know it went to trial.  I believe it was a
12 jury trial.
13 Q.  And do you remember the result of that trial?
14 A.  The Union --
15     MR. PRYOR:  Object, your Honor.  It calls
16 for a legal conclusion.
17     We need more information about what the
18 charges were and what was done.
19     THE COURT:  Hold on.  That's a speaking
20 objection.  If you want a sidebar, you can.
21     MR. PRYOR:  Okay.
22     (Thereupon, the following proceedings were
23 had at sidebar:)
24     MR. PRYOR:  Results of a jury trial is way
25 ambiguous as to what she's testifying about.

Page 690

1     MR. GREENFIELD:  It is a matter of public
2 record.
3     THE COURT:  The judgment was --
4     MR. GREENFIELD:  I would be happy to ask.
5 I have the document if the judge would like judicial
6 notice.
7     MR. PRYOR:  As an exhibit?
8     MR. GREENFIELD:  No.  I have the document.
9     MR. PRYOR:  A document.  Fine.
10     Let me see it.
11     MR. GREENFIELD:  Sure.
12     MR. McKEEBY:  We are staying up here.
13     THE COURT:  Wise.
14     (Discussion off the record.)
15     MR. GREENFIELD:  Amended Judge Tonya
16 Parker.  I know her.
17     MR. PRYOR:  Let me see it.
18     How much is it?  Where is Click?  Stacy
19 Martin?
20     MR. GREENFIELD:  Well, I will be specific,
21 if you would.
22     MR. PRYOR:  Can I see this?
23     THE COURT:  $17,000.
24     You are wanting to do -- what are you
25 wanting?

Page 691

1     MR. GREENFIELD:  I would like to ask her
2 about it.  If she doesn't recall, I would like to
3 ask the Court to take judicial notice that a
4 judgment was entered for $17,570 against Stacy
5 Martin.
6     MR. PRYOR:  For what?  That is a judgment
7 of 17,000.
8     MR. GREENFIELD:  Their entire case is
9 predicated upon the ability to tie protected
10 activity to actions.
11     What these supporters were doing were
12 spotting fraud.  They were spotting illegal
13 activity.  Their protected activity is lost at that
14 point.  At least in the --
15     I can ask her what she believes.
16     MR. PRYOR:  First of all, if you think the
17 centerpiece of it is cause, it is not.  But in any
18 event, the recall petition, what you guys were doing
19 to people trying to recall, the $17,000, what's it
20 for?  Against Stacy Martin?  It's only relevant if
21 somebody comes in and says what it is for and
22 somehow ties --
23     THE COURT:  She talked about the scope of
24 the lawsuit, right?
25     So I think he can get into judgment.  If

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                     Pages 692..695

Page 692

1 you want to pick it apart on cross, redirect, I
2 think that is fine.
3          MR. GREENFIELD: I have the charge to the
4 jury as well.
5          THE COURT: You can bring it in.
6          (Thereupon, the sidebar was concluded and
7     the following proceedings were held in open
8     court:)
9          THE COURT: You can proceed,
10 Mr. Greenfield.
11          MR. PRYOR: I have another objection, too,
12 if I can make it up here. I can state it shortly.
13          THE COURT: Let's state it shortly.
14          MR. PRYOR: Okay. I'll wait for the
15 question.
16          THE COURT: Okay. Go for it.
17          You can ask that question now,
18 Mr. Greenfield.
19 BY MR. GREENFIELD:
20 Q.  There was a lawsuit brought, and to be fair, do
21 you remember if any of Mr. Lindemann, Mr. Click or
22 Mr. Martin were eventually dismissed from the
23 lawsuit?
24          MR. PRYOR: Was that a yes or no question?
25 I couldn't hear it.

Page 693

1          MR. GREENFIELD: I asked if she remembered
2 if anyone was dismissed from the lawsuit.
3          MR. PRYOR: Object, leading. Object,
4 relevance. Object, prejudice. Object, lack of
5 foundation.
6          THE COURT: I will allow it.
7          THE WITNESS: I believe that Mr. Click and
8 Mr. Lindemann, yes, I believe they were dismissed.
9 BY MR. GREENFIELD:
10 Q.  Leaving the former president, Mr. Martin, in
11 the suit?
12 A.  Yes.
13 Q.  And if you do have a recollection at all or
14 have personal knowledge, what was the result?
15          MR. PRYOR: Object, compound, so I can
16 form an objection.
17          THE COURT: I don't think it's compound.
18          MR. PRYOR: Okay. Then I object, lack of
19 foundation. Object, relevance and prejudice.
20          THE COURT: Overruled.
21          You can answer.
22          MR. PRYOR: I thought he said belief or
23 personal knowledge, which I thought was two
24 different things.
25          THE COURT: Recollection or personal

Page 694

1 knowledge, which I think is the same thing.
2          So you can answer the question if you have
3 a recollection or personal knowledge of the result
4 of the suit.
5          THE WITNESS: The result was that
6 Mr. Martin was ordered, I think by the judge, to
7 return any personal property that he had and he was
8 also ordered to -- there was a monetary amount that
9 he was required to pay back the Union to reimburse
10 the money that they had spent during their
11 suspensions.
12 BY MR. GREENFIELD:
13 Q.  And do you remember the amount of that money?
14 A.  I don't remember the exact amount.
15 Q.  If I brought you a document to refresh your
16 recollection, would that help?
17 A.  Yes.
18          MR. GREENFIELD: May I approach?
19          THE COURT: You may.
20 BY MR. GREENFIELD:
21 Q.  Did that help refresh your recollection?
22 A.  Yes.
23 Q.  And do you remember what that amount was now?
24          MR. PRYOR: Object, your Honor, to
25 foundation, relevance, prejudice.

Page 695

1          And let's see if we wait five minutes and
2 see if it refreshes her recollection.
3          THE COURT: I'll overrule those
4 objections.
5          She can answer.
6          THE WITNESS: $17,530.01, I believe.
7 BY MR. GREENFIELD:
8 Q.  That is the amount of money that a jury found
9 that Mr. Martin had inappropriately spent on the
10 Union's behalf?
11          MR. PRYOR: Object, mischaracterizes
12 testimony. Object, leading.
13          THE COURT: I will allow it.
14          THE WITNESS: Yes.
15          MR. GREENFIELD: I have asked our tech
16 person to pull up Exhibit 6, which is the Collective
17 Bargaining Agreement between the Union and TWU,
18 Local 556.
19          THE COURT: It is already in, so we are
20 publishing.
21          MR. GREENFIELD: Thank you.
22 BY MR. GREENFIELD:
23 Q.  I believe there was a discussion yesterday
24 about Article III; is that correct?
25 A.  Yes.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 163 of 642   PageID 11104
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 696..699

Page 696

1 Q.   Okay.  And can you read silently, as I read
2 below:  "The right to manage and direct the working
3 forces subject to the provisions of this agreement
4 is vested and retained by the company."
5       Did I read that correctly?
6 A.   Yes.
7 Q.   Is that the provision you were trying to recall
8 yesterday?
9       MR. PRYOR:  Object, leading.
10      THE COURT:  I will allow that.
11      THE WITNESS:  Yes, as well as some of the
12 language above in No. 2 where it states, "Employees
13 covered by this agreement shall be governed by all
14 company rules, regulations, and orders previously or
15 hereafter issued by proper authorities of the
16 company."
17      Do you want me to keep reading?
18 Q.   That will be fine.  Thank you.
19      I would like to go a little bit back in time
20 now.
21      When did you first become a flight attendant at
22 Southwest Airlines?
23 A.   June 28, 2004.  18 years ago.
24 Q.   And when you became a flight attendant, did you
25 make a decision to be a part of the Union?

Page 697

1 A.   It's a requirement upon -- to be a Southwest
2 flight attendant, it is -- you are a member of the
3 Union upon successful completion of probation unless
4 you voluntarily choose to opt out.
5 Q.   And what were your personal feelings about
6 joining the Union?
7 A.   I was excited.  I didn't know anything about a
8 union.  Growing up in East Texas, I hadn't been
9 exposed to it.
10      Someone early on told me to learn the contract,
11 to understand it, and know what my rights were,
12 because they would not always be offered to me.  And
13 that there wasn't going to be Southwest reminding
14 me, you know, on some of the contractual provisions
15 that I could exercise.
16      So I started reading and learning about the
17 contract and the Union, you know, as a new
18 experience, as part of my journey with Southwest.
19 Q.   And at some point, we know you became president
20 of the Union.
21      When did you become involved with the Union
22 separate from just being a member?
23 A.   In I think the end of 2005, maybe early 2006,
24 somewhere in that time frame, another flight
25 attendant and I wrote a book called "Contract

Page 698

1 Quickies."
2      The contract is very long.  It is -- a lot of
3 it is legalese, it does not really include examples,
4 and it is difficult for flight attendants to
5 understand.
6      I thought it would be helpful if there was kind
7 of a more flight attendant-friendly guide that used
8 real-life examples to help explain some of the parts
9 of the contract that really affect us every day when
10 we are working.
11      So we wrote this little book.  I was -- I knew
12 an officer at the time for the Union, you know, was
13 talking to him about it.
14      And it came on the Union's radar when the book
15 was -- you know, we were selling it for $10.
16      When we started selling it, that's -- the Union
17 started, you know, recruiting me to get officially
18 involved, because I was already doing work to
19 educate our membership on my own.
20      I officially became a shop steward in 2006.
21 Q.   And what were your duties as a shop steward?
22 A.   My duties were assisting our domicile executive
23 board member in the base on anything they needed.
24 They were the elected representative on the
25 executive board.

Page 699

1      But, you know, whether it was lounge and
2 helping them with lounge mobilizations where we
3 would go out and talk to flight attendants about
4 current events or hot topics, particularly during
5 negotiations.
6      Another responsibility was to represent flight
7 attendants in any mandatory meetings with members of
8 Southwest Airlines's management.
9      That included representing them not only in the
10 meeting, documenting the meetings, submitting those
11 to the Union.  Sort of general shop steward
12 responsibilities.
13 Q.   Did you hold any other positions outside of
14 shop steward before your presidency?
15 A.   Yes.
16 Q.   What else?
17 A.   During the tentative agreement rollout of a
18 contract in 2009, I was on what at the time was
19 called the contract action team.
20      In the base, later on in my -- the same thing
21 that later on in my administration we referred to as
22 CAN.
23      But that spending time in the bases, kind of the
24 liaison between the negotiating team and
25 rank-and-file flight attendants, to help them

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 164 of 642   PageID 11105
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                    Pages 700..703

Page 700

1 understand the changes in the contract, make sure
2 everyone is making an educated vote, direct them to
3 negotiating team members if they needed to be.
4     I also became the Baltimore domicile executive
5 board member in 2008.
6     Also was the co-chairperson and chairperson of
7 our education committee.
8     I worked with our grievance team on Board of
9 Adjustments and arbitration work, which was
10 grievances that the Union was taking forward in
11 representation of memberships, of actually putting
12 those cases on in front of either Board of
13 Adjustment or an arbitrator.
14 Q.   That will suffice.  That's all right.
15     Did you hold any other offices or positions in
16 between that and becoming president?
17 A.   I continued to hold the position of shop
18 steward throughout my Southwest career.  I'm still a
19 shop steward.
20     And then I also held the title -- held the
21 position of first vice president briefly before
22 assuming the presidency.
23 Q.   Okay.  Why did you run for office?
24 A.   Advocacy is -- is work I'm passionate about.
25     Prior to Southwest, I worked in the children's

Page 701

1 mental health field and was an advocate for children
2 and adolescents who struggled with mental health
3 issues, as well as working with their families.
4     Union work was a different work group, but to
5 me, it was still about advocating for the --
6 advocating for people, and I have always been
7 passionate about education.
8     So I had started doing union work, really
9 enjoyed the work and thought I could make a
10 difference, and that is ultimately why I decided to
11 run.
12 Q.   Okay.  And when you ultimately became president
13 of the Union, did Southwest Airlines present you any
14 paperwork related to you becoming president?
15 A.   No.
16 Q.   Did they ask you to sign anything that said,
17 when you became president, that you had to give up
18 your rights as an employee?
19     MR. PRYOR:  Object, leading.
20     THE COURT:  I will sustain that one.
21     Can you rephrase?
22     MR. GREENFIELD:  Yes, your Honor.
23 BY MR. GREENFIELD:
24 Q.   Did you ever sign any documents that
25 relinquished your rights as an employee of Southwest

Page 702

1 Airlines?
2     MR. PRYOR:  Same objection
3     THE COURT:  That one's good.
4     Overruled.
5     THE WITNESS:  No.
6 BY MR. GREENFIELD:
7 Q.   Were you ever under the impression that when
8 you became president, you relinquished your rights
9 as a Southwest employee?
10     MR. PRYOR:  Object, leading.
11     THE COURT:  I will overrule that.
12     You can answer.
13     THE WITNESS:  No.
14 BY MR. GREENFIELD:
15 Q.   Okay.  We've talked -- I found this out for the
16 first time today about your book.
17     Are you an attorney?
18 A.   No.
19 Q.   Do you find, to this day, portions of the
20 Collective Bargaining Agreement difficult for you to
21 work through?
22     MR. PRYOR:  Object, leading.
23     THE COURT:  I will allow that.
24     THE WITNESS:  Yes.
25

Page 703

1 BY MR. GREENFIELD:
2 Q.   And when you were -- let me take a step back.
3     At some point when you became president, you
4 also became lead negotiator for the CBA, correct?
5     MR. PRYOR:  Object, leading.
6     THE COURT:  I will allow that.
7     THE WITNESS:  Yes.
8 BY MR. GREENFIELD:
9 Q.   Did you do that yourself or were you a member
10 of a team doing that negotiation?
11 A.   I was a member of a 5 percent negotiating team.
12     Under our bylaws, the president is also lead
13 negotiator.  So I had four other team members.
14 Q.   So as I understand it, when you became
15 president per the bylaws, you became lead
16 negotiator?
17 A.   Yes.
18 Q.   And on that team, on your negotiating team,
19 were there any legal representatives to help you?
20 A.   Yes.
21 Q.   And who was that?
22 A.   We had -- we had two that represented us
23 throughout our contract negotiations, both through a
24 labor firm out of Miami, Phillips and Richard.
25     Mark Richard was our primary attorney at the

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 165 of 642   PageID 11126
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                                      Vol 3 July 07, 2022                                    Pages 704..707

Page 704

1 bargaining table, and then one of his associates,
2 Jeff Bott, also assisted at times.
3 Q.   And who made the decision to bring them on to
4 the negotiating team?
5 A.   Mr. Richard had been the Union's attorney for
6 contract negotiations since before I worked for
7 Southwest Airlines.  He had already at that time
8 worked with the Union to negotiate two different
9 industry-leading contracts.
10      And when I came onto the team as lead
11 negotiator, they had already been prepping and
12 working on negotiations.
13      So it was already decided that he would
14 continue that role that he had been serving for many
15 years.
16 Q.   So when you came on to work on the negotiating
17 team, negotiations had already been ongoing?
18 A.   They had not been ongoing, but preparation for
19 them had been going on, because our contract became
20 amendable June 1st, 2013, and there is work that you
21 have to do to prepare before you actually just sit
22 down and start negotiating with Southwest Airlines.
23      A lot of research, behind-the-scenes work.
24      And the negotiating team had already started
25 that process under the president that was -- that

Page 705

1 was removed.
2      The timing of those removals and the changeover
3 in leadership happened just before our contract
4 became amendable, and we were due to start
5 negotiations early in June.  So there, again, had
6 been work that was behind the scenes, had been
7 performed by the negotiating team prior to my
8 arrival.
9 Q.   Are you aware if the attorneys you just
10 mentioned were advising the negotiating team before
11 you joined?
12      MR. PRYOR:  Object, leading.
13      THE COURT:  I will allow that.
14      THE WITNESS:  I -- I know that they had
15 spoken.  I know that there had been conversations
16 that happened, that had happened prior, just as
17 preparation.
18      I also forgot to mention that our -- at
19 the time our TW International rep, representative
20 Garry Drummond, was also assisting the negotiating
21 team.
22 BY MR. GREENFIELD:
23 Q.   Very good.
24      Before you joined the Union, did you understand
25 what a union was and what a union did?

Page 706

1 A.   Not well.  I had a general sense that a union,
2 you know, was to help workers' rights.
3      The union -- the then-union administration,
4 when I was in Southwest training, did a little
5 exercise for the candidates that was very
6 illustrative to me and stuck with me.  Really kind
7 of the lightbulb going off exactly in real life what
8 a union can do for people.
9 Q.   Can you elaborate on that?
10 A.   Um, our then-president at the time was speaking
11 to the class in the front of the room, and he asked
12 us all to stand up, and he said he was going to ask
13 a series of questions.  And we didn't need to answer
14 out loud, but if our personal answer to any of the
15 questions was no, we needed to sit down.
16      And he started asking questions, like, um, are
17 you under 5'7 in height?  Are you over 5'10?  Do you
18 wear contacts or glasses?  Do you wear glasses?
19      And he's going through and more people sit
20 down.
21      And he said, Are you male?
22      Eventually it got really personal and he asked
23 about weight.  Do you weigh over I think it was
24 130 pounds.
25      And by the end -- age, too, I think was

Page 707

1 another -- I don't remember all of them.
2      But by the end, I think there was one person
3 left standing in my -- in my class.  At the time it
4 started with I think around 75 people.
5      And his comment was that, prior to the Union
6 being on property at Southwest Airlines, the only
7 person in that room that would have even been
8 qualified or eligible to apply to be a flight
9 attendant under their standards was that one person
10 left standing.
11      I never forgot that.
12      And the -- what a union means, it goes so far
13 beyond even negotiating rates of pay, that it opened
14 doors for people to do careers they never thought
15 were possible, especially because I was one of those
16 people sitting down.
17      Married was another question that I forgot.
18 Children.
19      And it is an exercise that I used during my
20 presidency when I spoke to the new-hire classes,
21 because I was that person sitting in the room that
22 really just had a kind of overview of unions but
23 didn't really understand what being a member of a
24 union meant or how it pertained to me even having
25 the opportunity to be in that room.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 708..711

Page 708

1 Q.  Okay.  I would like to turn to the specifics
2 of --
3         THE COURT:  I'm wondering about breaking
4 for lunch a few minutes early because we gave you
5 your morning break so early that y'all may be ready
6 for lunch.
7         So are you okay now that I have totally
8 interrupted your flow, Mr. Greenfield, for me to
9 call that lunch break?
10        MR. GREENFIELD:  If I said no -- of
11 course, your Honor.  It is okay if you do.
12        THE COURT:  Okay.
13        So the same instructions as always.  You
14 can only talk to your fellow jurors and court
15 personnel, just not about the case, and please don't
16 do any research about the case.
17        We will see you in one hour, at 12:53.
18        All rise for the jury.
19        (The jurors exited the courtroom.)
20        THE COURT:  Before you leave the stand, I
21 will just say, can we do the voir dire questions at
22 the end?
23        We have been on the record so long.
24        MR. PRYOR:  That is fine.
25        THE COURT:  Okay.

Page 709

1         So they were asking to ask you questions
2 about a topic I've said the jury doesn't need to
3 hear about, but the lawyers are entitled to ask you
4 a couple of questions about one of those topics.
5         So let's come back at basically 55 minutes
6 from now.  We will let you ask those questions, and
7 then we will bring in the jury and keep rolling with
8 your questions, Mr. Greenfield.
9         So you are free to leave the stand.  Still
10 can't talk to anyone about the case.
11        (Thereupon, the witness exited the
12 courtroom.)
13        THE COURT:  So anything anyone else has
14 that we need to talk about now?
15        Okay.  Good to go.
16        Thank you.
17        (Recess.)
18        THE COURT SECURITY OFFICER:  All rise.
19        THE COURT:  Thank you.  You can be seated.
20        All right.  And just a heads up, we are
21 going to email y'all the current trial clock as of
22 the lunch break.
23        So this relates back to what I mentioned
24 earlier, Ms. Stone, there are things that I cut out
25 of this case, like what did Southwest do to any

Page 710

1 employee.  But there are times when a lawyer will
2 have a question that I don't let in front of the
3 jury, but it is appropriate for me to let them ask
4 you that question when the jury is not in the room.
5         So I will let you ask that question on
6 Jeanna Jackson.
7         MR. PRYOR:  Thank you, Your Honor.  For
8 clarification, this is not jury time, right?
9         THE COURT:  This is not jury time, yeah,
10 that's correct.  But you can't go beyond the scope
11 we talked about.
12        MR. PRYOR:  Fair enough.
13        THE COURT:  You can't ask anything you
14 want to.
15        MR. PRYOR:  This will be very short.
16 BY MR. PRYOR:
17 Q.  Ma'am, do you know what happened in regard to
18 any investigation by Southwest Airlines into Jeanna
19 Jackson as to any punishment she received?
20 A.  I know that she was suspended, I believe twice,
21 following some sort of social media complaint and
22 violation and investigation.
23 Q.  Was that as a result of a complaint that you
24 brought or Mr. Talburt or any other union member
25 that you know of?

Page 711

1 A.  I do not believe it was result of a complaint I
2 brought.  I am not certain who brought forward the
3 complaints that resulted in those suspensions.
4         MR. PRYOR:  That ends our offer.
5         THE COURT:  Thank you.  I appreciate that.
6 Anything else before we bring in the jury?
7         MR. PRYOR:  Yes, your Honor.
8         THE COURT:  What have you got?
9         MR. PRYOR:  Your Honor, plaintiffs would
10 request additional jury time.
11        And from our conversation this morning,
12 when you were saying that you thought that I didn't
13 need to go through each of the documents, I told you
14 my recollection was I tried to do it globally and
15 she wouldn't let me.
16        The transcript shows on page 525, it says, Did
17 you receive the communications -- first of all, when
18 Ms. Carter sent you the communications, did you read
19 them?
20        Not all of them.
21        Which ones did you read?
22        I couldn't even tell you which ones I read,
23 there were so many.
24        "QUESTION:  At some point, did you stop reading
25 them?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 3 July 07, 2022                         Pages 712..715

Page 712

1    "ANSWER: Yes."
2       In the ones that you read, she was complaining
3  about things you or the union were doing, correct?
4       So I tried to ask it globally.
5       and her answer was, Not always.
6       Then I said, You are going to tell us that we
7  are going to have go and see an email or Facebook
8  communication from her where she's not talking about
9  a complaint to the union, true?
10      So I tried again to get her to go with me on
11 it.
12       THE COURT:  I get that.  What's your
13 request?
14       So you are saying that you had to ask
15 additional minutes that you hoped to not have to
16 ask?  How much extra time do you think you burned on
17 that?
18       MR. PRYOR:  No.  No, no.  I'm responding
19 to your comment this morning.  Not because of this,
20 no.  We need quite a bit more additional time for
21 other reasons.  I'm saying, you felt like this
22 morning, that if we requested additional time, that
23 you would not be amenable.
24       You know, I'm not saying I'm the most
25 efficient attorney that ever tried a case, but the

Page 713

1  example you gave, I was doing what I had to do to
2  show protected union activity.  That is our burden
3  to the jury for every one of these communications.
4  And I tried to do it globally.
5       So and you certainly came up with a better
6  solution, although she still took over five minutes
7  this morning, sitting and reading -- which is fine.
8  I think that actually went quicker.
9       But, your Honor, at this point, this was a
10 key witness, it was central to this case, and we
11 think that the time spent with her was valuable to
12 prove our case.
13       We don't think that we wasted such time
14 that the Court should deny the time for additional
15 request.
16       We have 15 witnesses and we are -- we have
17 been spending the lunch hour trying to figure what
18 we can cut.  We can cut some witnesses.  I think
19 that it -- it doesn't afford our client the trial
20 that she's entitled, but I certainly wouldn't rise
21 it to the level of saying that it denies her a trial
22 or is incomprehensible to a jury.
23       However, if we are held to the current
24 timeline, it will.  We will not be able to -- we are
25 going to have to cut crucial witnesses and crucial

Page 714

1  testimony that we think denies our client a trial if
2  the Court stays with the current time limit.
3       We would request additional time.  Like I
4  say, we are willing to cut witnesses that fall
5  outside -- that we would like to have, but that fall
6  outside, really, the due process aspect of the
7  trial.
8       So we need additional time, and I'm making
9  the request now, because we are going to have to
10 make those decisions now.
11       THE COURT:  I understand your request.
12 I'm going to deny it at this point in time and I
13 will say on the record why.
14       What I was trying to preview this morning,
15 what my rationale was, I will say in the last trial
16 I had, the Government asked for more time when they
17 had three hours on the clock.  And I said, It is too
18 early.  Let's see how you use your three hours.
19 They used them wisely and didn't need more time.
20       At this point, when you got over five
21 hours left, I think that you still have time to
22 adjust.  I haven't seen the adjustments.  I know at
23 the start of the day, you said you'd spend an hour,
24 and you spent more.  And so I need to see you
25 adjusting to the efficiency curve.

Page 715

1       By that, I don't mean cutting witnesses, I
2  mean cutting questions.  What do you want the jury a
3  week from now to really understand that that witness
4  said.  Right?  They will probably have three or four
5  takeaways from each witness.  What are they going to
6  say?
7       Most witnesses can be done in half hour,
8  45 minutes.  I know this witness was crucial.  I
9  don't think crucial warrants over six hours.
10       So all of that to say, I get your request,
11 and I am inclined to try to find more time to give
12 you, but I can't give you the full measure of time
13 you seek.  And I think whatever time I decide to
14 give you, it is premature for me say at this point
15 in time what that amount would be.
16       MR. PRYOR:  Your Honor, to respond to your
17 "you want to see," respectfully, I was trying to
18 allow you to see that this morning.  There were
19 additional issues that came up, but I certainly
20 truncated or I thought was more concise.  The Court
21 is the one that -- the opinion that matters.
22       We have decided to, at this point, with no
23 additional time being offered, not call Mr. Parrott,
24 not call Ms. Parker, not call Mr. Conlon.  We
25 believe those witnesses are important to this case,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 168 of 642   PageID 11109
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                    Pages 716..719

Page 716

1  but because of the Court's ruling, we cannot call
2  them.
3        Mr. Sims we will hold in abeyance in terms
4  of the order of witnesses, and at this point put him
5  to the end, hoping that we have additional time or
6  that there is time remaining.
7        We would still call, then, after that, in
8  order, Mr. Schneider, Ms. Hudson, Ms. Lacore,
9  probably cutting Ms. Emlet, and we have cut back the
10 designations on Mr. Talburt substantially.  And we
11 will share those cutbacks with counsel -- we have
12 done them at the lunch hour -- so that we are
13 cutting his time back.
14       And we are --
15       THE COURT:  For any witness --
16       MR. PRYOR:  -- Ms. Carter.
17       THE COURT:  Understood.  And for any
18 witness who we have by depo, you are free to do
19 that.
20       MR. MORRIS:  I'm sorry?
21       THE COURT:  You are free to do that for
22 any witness who we have by depo.  Right?  If there
23 are three or four things you want the jury to take
24 away from that witness, you are fine to cut it down
25 to those things.

Page 717

1        Which is what I've seen lawyers do in the
2  past.
3        MR. PRYOR:  We will cut them all.  And
4  Mr. Talburt's is being cut right now.  He's our next
5  witness.  So we will -- we cut it substantially.
6        So we are trying very hard.  And I respect
7  the Court's opinion.  I want you to see that we were
8  trying to respond to your concerns, and I still
9  believe we will need additional time --
10       THE COURT:  Understood.  And I will still
11 entertain that request.  All right?  And I am still
12 trying to crunch numbers on my end to see what we
13 have to give.
14       MR. PRYOR:  Thank you, Your Honor
15       MR. McKEEBY:  And I'm not sure if I heard
16 Ms. Lacore, I know I did not hear Ms. Schaffer in
17 that recitation.  Can either or both of them be
18 released from their trial subpoenas?
19       MR. PRYOR:  No.  We -- if I didn't say
20 Ms. Lacore, I meant to.  I would say we are still
21 doing Mr. Schneider.  Mr. Schneider is a witness
22 that, unfortunately, will take some time.
23 Ms. Hudson and Ms. Lacore can be shorter, but we
24 need them.  And Emlet, at this point, again, without
25 additional time, we would cut.

Page 718

1        THE COURT:  Well, and I'm not -- I don't
2  think you should cut any trial subpoenas, right?
3        MR. PRYOR:  No.  I don't -- I'm just
4  telling the Court -- no, no, no, let me be clear.
5        If I get more time, I want all of these
6  witnesses.
7        THE COURT:  I get that.
8        MR. PRYOR:  If I have enough time.  But
9  under the time constraints that we currently have,
10 those witnesses that we think should be called, we
11 cannot call.
12       THE COURT:  Understood.  Mr. Greenfield.
13       MR. GREENFIELD:  Mr. Parrott is dutifully
14 waiting in the hall again most of this day.  Can we
15 release him, then?
16       THE COURT:  I can't release someone from a
17 trial subpoena -- I should say, I'm not going to
18 release someone from a trial subpoena.
19       MR. GREENFIELD:  Not from a subpoena, Your
20 Honor, just as a witness today.
21       MR. PRYOR:  Yeah.  And I'm unwilling to
22 release him from the subpoena, but I'm willing to
23 let him leave the courtroom now, and be on a one- or
24 two-hour call, if that works.
25       MR. GREENFIELD:  It does.  Thank you.

Page 719

1        THE COURT:  All right.  Let's bring in the
2  jury.  I want to make sure we maximize our time with
3  them, because that gives me more time to give you at
4  the end.  If we spend all our day in sidebar with
5  them out of the room, then I have no more time to
6  give.
7        THE COURT SECURITY OFFICER:  All rise for
8  the jury.
9        (The jurors entered the courtroom.)
10       THE COURT:  Thank you.  You can be seated.
11       And, Mr. Greenfield, you can continue.
12       CROSS-EXAMINATION - CONTINUED
13       MR. GREENFIELD:  Your Honor, before the
14 break, we discussed Exhibit No. 134, as did
15 plaintiff in their examination of Ms. Stone.  But I
16 don't believe it was ever offered into evidence.  We
17 would like to do that at this time.
18       THE COURT:  Okay.  134.  Any objection to
19 134 coming into evidence from Carter -- or from
20 Southwest?
21       MR. McKEEBY:  No objection from Southwest.
22       MR. PRYOR:  No objection.
23       THE COURT:  Okay.  134 is in.  We will
24 publish.
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                    Pages 720..723

Page 720

1        (The referred-to document was admitted in
2    Evidence as Trial Exhibit 134.)
3  BY MR. GREENFIELD:
4  Q.   Ms. Stone, welcome back from lunch.  You
5  understand you are still under oath at this time?
6  A.   Yes, sir.
7  Q.   Okay.  Now that we have all eaten lunch and are
8  probably going to be a little bit sleepy, I'm going
9  to go ahead and ask you some boring questions and
10  hope everyone doesn't fall asleep.
11       I would like to talk to you just a little bit
12  about unions and union operations in general.
13       Can you tell the jury a little bit about the
14  structure of TWU Local 556, as a union?
15  A.   Our structure is initially governed by the TWU
16  international constitution, which it states that a
17  local elected executive board will be the governing
18  body of the local union.
19       The executive board is made up of flight
20  attendants.  The size is determined based on the
21  size of the membership.  So the larger the
22  membership, potentially the larger -- there is a
23  formula used to determine how many -- the size of
24  the executive board.
25       During my administration, the executive board

Page 721

1  was made up of 17 flight attendants.
2       That is who made, you know, decisions overall
3  about the running of the union.  But then within our
4  Local 556 bylaws, which were voted on by the
5  membership, there are different duties assigned to
6  the various board members.
7       Some are very specific, like the president is
8  responsible for staffing the union office, with
9  executive board approval, down to listing
10  responsibilities of the treasurer, for his or her
11  day-to-day job.
12       We also had flight attendants who were what we
13  would call on a full-time union pull.  Which means
14  they are still considered a Southwest Airlines
15  flight attendant, but they are working in a
16  full-time capacity for the union.
17       They worked seven days a week, actually, in our
18  union office, answering phone calls, filing
19  grievances on behalf of the membership, the
20  day-to-day direct contact in membership questions.
21       Then we also had various committees, I think
22  over 20, that were comprised of flight attendants.
23  The committees, I think I mentioned earlier,
24  education committee responsible for helping educate
25  our flight attendants on hot topics, contractual

Page 722

1  issues.
2       We talked about the negotiating committee.  And
3  a few joint committees within Southwest.
4       So primarily, all flight attendants that are
5  doing the day-to-day business, we had a -- one, when
6  I started, and then it grew to, I believe, three,
7  non-flight attendant staff working in our union
8  office.
9       An IT person.  We had someone -- basically, it
10  is the check and balances for payroll, who is not a
11  flight attendant.
12       And then we also, we had two -- actually, four,
13  by the time I left -- non-flight attendant staff
14  positions.
15       But outside of those four people, union
16  leadership, committee involvement are made up flight
17  attendants who are union members.  So I will stop
18  there.
19  Q.   I think everyone is still awake.  Thank you,
20  Ms. Stone.
21       I would like to talk to you about two specific
22  items that you brought up a second ago, and I would
23  like to start with the executive board.
24       How does the executive board of the union come
25  into position?

Page 723

1  A.   Currently, under our bylaws, executive board
2  elections are held every three years.  The entire
3  executive board is up for reelection at the same
4  time.  We don't have staggered elections.  So all
5  active members have an opportunity to participate
6  and vote.
7       The domicile executive board member positions
8  are only voted on by the members into those
9  respective domiciles, or we call them bases, where
10  we are stationed out of for work.
11       Any national board position or officer is voted
12  on by the entire membership body, regardless of
13  where they are based.
14       And then we have language in our bylaws that
15  dictate in the event somewhere in the three-year
16  election cycle there becomes a vacancy on the
17  executive board, how that process works to fill the
18  vacancy until the next election, under that process.
19       If the vacancy occurs in the first half of the
20  term, which is the first 18 months, then the
21  position is offered to the next highest vote getter
22  for that position, in the -- in the previous
23  election.
24       Under our bylaws, in the second half of the 18
25  months of the term, then the executive board is

Page 724

1 responsible for -- responsible for appointing the
2 vacancy for that position.
3 Q.  Thank you.
4     And that process you just described as far as
5 vacancies, et cetera, was that at play when you
6 became president the first time around?
7 A.  Yes.
8 Q.  Okay.  And is that how you ultimately became
9 president?
10 A.  Yes.
11 Q.  Okay.  And at some point, you ran for
12 reelection.  I believe you said after a three-year
13 term?
14 A.  It was roughly just under two years after I
15 became president.  I became president in 2013,
16 approximately one year into that term.
17     And I ran for -- I ran in the election in early
18 2015 for the president position.
19 Q.  And what did the membership decide on your
20 reelection campaign?
21 A.  I was voted in as president.
22 Q.  Okay, thank you.
23     You talked about voting and voting for
24 executive boards.  Are all union members allowed to
25 vote?

Page 725

1 A.  All union members are allowed to vote, yes.
2 Q.  Is there any group of individuals that are
3 flight attendants of Southwest Airlines that are not
4 allowed to vote?
5 A.  Yes.
6 Q.  Who is that group?
7 A.  Two groups.  Probationaries.  So any flight
8 attendant that is currently on probation under our
9 Southwest Airlines contract.  A flight attendant is
10 on probation their first six months of employment
11 after successfully completing training.  And because
12 they don't actually become a full member until the
13 completion of probation, they are not allowed to
14 vote in an election.  Or if they do, their vote is
15 removed or not counted.
16     And then, anyone who is no longer a member of
17 the union because they have chosen to opt out of the
18 union, they are not allowed to vote in any or
19 participate in any union election.
20 Q.  And are those individuals referred to as AFOs,
21 or objectors, as we heard earlier?  Is that what you
22 are describing?
23 A.  Yes.  All of the same group of people,
24 different terms.
25 Q.  So what is an objector, Ms. Stone?

Page 726

1 A.  An objector is someone who has chosen to opt
2 out of the union.  Our agency -- it is called agency
3 fee policy is set by TW International.  They
4 determine, for the people that have opted out of the
5 union, what percentage of their union dues are going
6 to be refunded to them each year.
7     They do the calculations, and send it to all of
8 the locals as to what that -- they handle that
9 piece.  But it is whatever percentage of union dues
10 was not spent directly on -- basically, membership
11 representation.
12     That could be the day-to-day running of the
13 union office, contract negotiations, anything
14 related to that.
15     The pieces that are excluded and refunded back
16 are, for example, charitable donations.  That falls
17 outside the scope of direct member representation.
18     And so that is one of the categories that they
19 utilize to determine the percentage of dues that is
20 refunded to an agency fee payor or someone who has
21 opted out, or an objector.
22 Q.  Are there any specific rights that agency fee
23 objectors lose when they opt out of the union, as
24 far as their participation in union activities?
25 A.  Yes.

Page 727

1 Q.  What are those?  Sorry.
2 A.  By choosing to opt out, they completely lose
3 their voice in terms of getting to participate in --
4 not only the election, they can't attend any kind of
5 union meeting.  Whether it is a membership meeting,
6 a special meeting held, you are not allowed to
7 participate at all in any of the activities of the
8 union.
9 Q.  Okay.  Now, to tie that back to what you
10 discussed as far as the structure of the union, you
11 discussed grievances.  Okay?
12     Are -- tell me broadly about the grievance
13 process at Southwest Airlines in relationship to the
14 union's role.
15 A.  We have a lot of contract language in Article
16 19 and 20 that go through both side's
17 responsibilities.  We have time frames associated
18 with all grievances that are outlined in the
19 contract.
20     Any time a flight attendant has either a
21 question about whether they might have a grievance,
22 or believe they have a grievance, then they are
23 directed to contact the union office, speak to one
24 of our flight attendants there that works in the
25 union office.  And if a flight attendant chooses to

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 3 July 07, 2022                        Pages 728..731

Page 728

1 file a grievance, then the union should file it --
2 should file a grievance on the flight attendant's
3 behalf.
4     We file grievances from everyone.  Someone who
5 has opted out of the union, it does not preclude
6 them from having union representation for the union
7 answering contract questions they may have or from
8 filing a grievance.  We still have a responsibility
9 to file a grievance and represent them, if they
10 request union representation.
11     The contract outlines next steps of the
12 grievance process, and again, time frames of how --
13 when a flight attendant has a responsibility to even
14 notify and file a grievance, as well as on the
15 opposite side, how long Southwest has to
16 investigate, respond, et cetera.  Whether it is a
17 contractual grievance or a discipline case that has
18 been initiated by Southwest Airlines.
19 Q.  From a 5,000-foot view, can you take us through
20 the steps of the grievance process if a complaint
21 had been filed against a flight attendant, and the
22 union's role in that representation through that
23 grievance process?
24 A.  Just to clarify, so, like a potential
25 discipline grievance?

Page 729

1 Q.  Yes.  Perfect.
2 A.  Okay.  We would find out about it if the flight
3 attendant contacted the union office and said that
4 Southwest Airlines is calling them in for what is
5 commonly referred as a "fact-finding meeting."
6     Fact-finding meetings can result in discipline.
7 We always encourage people to take any
8 representation into those meetings.
9     We have -- any flight attendant working in the
10 grievance office could set that up, but we -- at
11 least under my administration -- tended to have
12 people whose kind of primary job was that, who know
13 who the shop stewards are on the base.  That -- if
14 the flight attendant specifically requested a
15 certain shop steward or the domicile executive board
16 member, then the person working in the office would
17 start working on seeing is that person available,
18 could that request be accommodated, when is
19 Southwest wanting the meeting to be held.
20     The union office will also coordinate if the
21 meeting time or date needs to be shifted to
22 accommodate everybody's schedule.
23     The union office will coordinate with the shop
24 steward or domicile executive board member that is
25 going to be representing them on the details as we

Page 730

1 know them at that time, whatever the flight
2 attendant has been told.
3     And then whoever is assigned to be their
4 representative should be making contact with them in
5 advance of the meeting, trying to find out from the
6 flight attendant, is there any additional
7 information, is there -- do you know what this could
8 be about, trying to get as ready as possible sitting
9 down with the flight attendant.  And then that
10 representative accompanies the flight attendant into
11 the meeting.
12     They are, I believe, always held on Southwest
13 property.  And Southwest usually has somebody
14 conducting the meeting, leading the meeting, as well
15 as somebody taking notes.
16     Whoever the union's representative is, is
17 responsible to take notes, as well as be the
18 advocate, when needed, for the flight attendant
19 during the meeting.
20     And part of their job is to make sure that
21 Southwest is abiding by the language of the contract
22 and conducting what should be a fair and thorough
23 meeting, as part of the investigation process,
24 outlined in our contract.
25     Once the meeting concludes, the representative

Page 731

1 should submit their notes back to the union office,
2 so that the union has a record of what happened in
3 that meeting, so that the union knows when the
4 deadline is for Southwest Airlines to issue a
5 decision in the case.
6     Because if they fail to meet that time frame,
7 then it is -- it is over, and they can't come back
8 later and try to issue discipline for that
9 infraction.
10     If they issue discipline, the flight attendant
11 has the option to grieve that discipline under the
12 Collective Bargaining Agreement.
13     And if they grieve it at that point, it would
14 then -- the case would be turned over to someone
15 that we call -- I believe they are still called a
16 grievance specialist.
17     So it is someone whose primary job working in
18 the union office is to file grievances and work on
19 those.
20     Under my administration, it tended to be a
21 rotation.  We had a grievance chairperson, who
22 oversaw the grievance specialist, and she kept track
23 of case loads.  So when a grievance came in, looking
24 to see, it was kind of like who was next to take --
25 to take a case, the availability to take a case.

Page 732

1  That is how cases were assigned, in terms of who was
2  going to be handling it.
3      And then once the grievance specialist has it,
4  the next step in the process would be working with
5  Southwest Airlines to schedule what is called a Step
6  2 hearing, which is the first -- well, second piece,
7  I guess, in the appeal process, if you look at
8  filing the grievance -- filing the grievance itself
9  is the first step in appealing a decision Southwest
10  made.
11      Then the second step would be what is called a
12  Step 2 hearing, where grievance specialists, union
13  reps could accompany the flight attendant to another
14  meeting of Southwest management.  But the person
15  hearing the meeting is not going to be somebody from
16  that base, and it is somebody that is in a higher
17  position then whoever made the decision to issue
18  discipline.
19      Step 2 process, Southwest has the option to
20  agree to the grievance, deny the grievance, or offer
21  a settlement, you know, which could be accepting
22  parts of the agreement, not others.
23      After a Step 2 hearing, if -- if a discipline
24  is not removed and a flight attendant wishes to
25  continue through the grievance process, then the

Page 733

1  next step would be for the case to come before the
2  executive board of the union, as the final governing
3  body of the union.
4      The grievance specialist would put together a
5  packet full of all of the information, the notes
6  from the two meetings that happened so far.  Any
7  relevant information or documentation the flight
8  attendant has been able to provide, whatever
9  Southwest Airlines has utilized in determining their
10  decision for discipline.
11      And then the case comes before the executive
12  board.
13      The flight attendant has the right at any point
14  in this process to withdraw their grievance if they
15  don't want to continue.
16      The case comes before the executive board.  The
17  executive board hears the case, votes on the merits
18  of the case.
19      Voting members of the executive board are
20  everyone present except the chairperson in the
21  meeting.  I think I mentioned yesterday, as the
22  president, I was almost always also required to be
23  the chairperson of the meeting.  Only, though, in
24  cases of a tie.
25      The executive board, once they make a vote, it

Page 734

1  is either going to continue the grievance through
2  the process, or that the grievance, they don't
3  believe, has enough merit to stand up to continuing
4  through the process to go all the way to either a
5  Board of Adjustment or an arbitration hearing.
6      In a discipline case, if the executive board
7  votes not to proceed, the flight attendant still has
8  the right to continue on through the grievance
9  process, but they would need to release the union
10  and continue on, on their own.
11      In a contractual case, a flight attendant
12  wouldn't have the option to continue fighting a
13  contractual case without the union's representation.
14      And then if it goes all the way to a hearing of
15  either a Board of Adjustment or an arbitration.
16  Arbitration is the last step.
17      MR. PRYOR:  Your Honor, we object.
18  Approach or state my objection?
19      THE COURT:  You can state in code or
20  approach.
21      MR. PRYOR:  Limine.
22      THE COURT:  I will sustain that.  If you
23  want to approach, you can.
24      MR. GREENFIELD:  That is all right.  I
25  would rather keep moving.

Page 735

1      THE COURT:  Thank you.
2  BY MR. GREENFIELD:
3  Q.  Ms. Stone, thank you for the thorough
4  explanation of the process.  I think everyone is
5  still awake during our lesson on union -- the finer
6  points of it.
7      I'm going to try to boil it down and be a bit
8  more concise.  Please tell me if I'm wrong.
9      If a complaint is filed, a fact-finding meeting
10  occurs, is that correct?
11  A.  If -- if Southwest Airlines, either through a
12  complaint or something that a member of Southwest
13  leadership witnessed, Southwest can, yes, initiate a
14  fact-finding meeting.
15  Q.  Okay.  And the union provides representation at
16  that fact-finding meeting?
17  A.  Yes.  If the flight attendant requests us.
18  Q.  Okay.
19  A.  We do sometimes have flight attendants that
20  don't call.  We don't know -- there could be
21  meetings that we are not aware of.
22  Q.  And the flight attendant has the ability to
23  select their own representation?
24  A.  Not to select.  They can make a request.
25  Q.  Okay.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 173 of 642   PageID 11114
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                          Pages 736..739

Page 736

1 A.  If there is somebody in particular -- and I
2 can't speak to how it is done now.  During my
3 administration, we tried to accommodate those
4 requests as best we could.
5     But a lot of times, they required getting an
6 extension from Southwest based on schedules.  So,
7 again, as best we could, but we could never
8 guarantee that someone would have a -- it was in our
9 policy.  It was out of our control, because it had
10 to be an agreement by Southwest, too, if there was
11 an extension.
12 Q.  And based on your personal knowledge, do you
13 know if Charlene Carter was afforded union
14 representation at her fact-finding meeting?
15 A.  It is my understanding that she did have
16 representation at her meeting, yes.
17 Q.  And if an individual is not happy with the --
18 okay.  Let me take that back.
19     Does Southwest ever exert a punishment on a
20 flight attendant after a fact-finding meeting?
21 A.  Yes.  They can issue discipline following the
22 results of the fact-finding.
23 Q.  And if, it is my understanding, that if the
24 flight attendant disagrees with that punishment,
25 they can then take it to the Step 2 hearing you were

Page 737

1 discussing?
2     MR. PRYOR:  Object, leading.
3     THE COURT:  Sustained.
4 BY MR. GREENFIELD:
5 Q.  What would be the process if a flight attendant
6 disagreed with the result of the fact-finding
7 meetings -- of the fact-finding meeting?
8 A.  They would let the union office know that they
9 wanted to grieve it, that they wanted to file a
10 grievance.
11     And then the union office would formally file
12 that grievance on behalf of the flight attendant,
13 which requires a process of notifying Southwest
14 Airlines.
15     And then at that point, they would work to set
16 up and coordinate the second step in the grievance
17 process, which would be the Step 2 hearing with a
18 higher number of Southwest Airlines's management,
19 would have a chance to look at that case and could
20 choose to overturn the decision made at the base
21 level.
22 Q.  Based on your personal knowledge, do you know
23 if Charlene Carter took place in a Step 2 on this
24 process?
25 A.  Yes.

Page 738

1 Q.  And are you aware whether or not she was
2 provided union representation?
3 A.  Yes.
4 Q.  So even though you turned her in to the
5 company, the union still provided her representation
6 at the fact-finding meeting and the Step 2 process,
7 is that correct?
8     MR. PRYOR:  Objection, asked and answered.
9 Object, leading.
10     THE COURT:  Sustained.
11 BY MR. GREENFIELD:
12 Q.  Are you aware if Ms. Carter received union
13 representation at the Step 2 meeting?
14     MR. PRYOR:  Object, asked and answered.
15     THE COURT:  I will allow that.
16     THE WITNESS:  Yes, she did.
17 BY MR. GREENFIELD:
18 Q.  I would like to turn our attention to union
19 communications.
20     Did you have a specific email address for
21 yourself as president of the union?
22 A.  Yes.
23 Q.  Okay.  What was that?
24 A.  You could utilize either president at
25 TWU556.org or astone@TWU556.org, which was the

Page 739

1 standard for all of our board members, either the
2 title or their first initial and last name.
3 Q.  And did you receive messages from membership,
4 email messages, on those two accounts.
5 A.  Yes.  Regularly.
6 Q.  Was there a platform that membership was given
7 to know that those two accounts existed.
8 A.  Just to clarify, it was the same account.  You
9 could just utilize either email address.  It all
10 went to the same place.
11     And, yes, that email address, I think, was --
12 is at the bottom -- my contact information in my
13 auto reply, it contained my email address, as well
14 as my union phone number.
15     And I think any publication or communication,
16 like a president's message that went out, also had
17 contact information in it as well.
18 Q.  Did you ever receive emails from your
19 membership on your president's email accounts?
20 A.  Yes.
21 Q.  How frequently?
22 A.  Daily.  And that doesn't even really describe
23 sometimes the volume of email that I received on a
24 daily basis just to that account.
25     And I was also on numerous other distribution

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 174 of 642   PageID 11115
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Pages 740..743

Page 740

1 groups, within our union, that were funneling to the
2 same inbox as well.
3 Q.  Let's discuss that volume.
4      How many emails are we talking about per day
5 that you were receiving to those email addresses?
6 A.  Sometimes over 100.
7 Q.  Can you please describe your -- if -- if you
8 had any emotions tied to trying to respond to all of
9 those emails in any given day.
10 A.  It was overwhelming.  I did not have -- I did
11 not have an assistant-type role, who vetted,
12 fielded, or even organized my inbox.  The only
13 person that did that was -- was me.
14      And at numerous points during my presidency,
15 particularly when we were in active contract
16 negotiations with Southwest Airlines, the volume of
17 emails that came in between me, being the president,
18 me, being an executive board member, and me, being
19 the lead negotiator, not even touching the grievance
20 staff that I was responsible for, and responsible
21 for assisting in the day-to-day operations of our
22 union..
23      It was overwhelming isn't even accurate for how
24 impossible some days it felt, to not let things fall
25 through the cracks, something that needed to be

Page 741

1 responded to responding because it was just -- it
2 was too much.
3 Q.  Outside of issues brought to you by membership,
4 what sort of issues were you dealing with as the
5 president of the union that would come to that sort
6 of email?
7 A.  As my job as the president?
8 Q.  Yeah.  Let's kind of talk about it from a
9 priority sense.
10      Were there things that came across that you had
11 to prioritize during review of your emails in any
12 given day?
13 A.  Yes.  Particularly, I would say, anything that
14 was time sensitive, which could frequently be
15 communications from anyone in Southwest Airlines
16 leadership.  Again, especially when we were in
17 contract negotiations.
18      There were times that, as the chair of the
19 executive board, there were times where the
20 executive board would be conducting a vote on a
21 matter via email, and I was responsible for keeping
22 up with the time frames, the vote counts,
23 participation.
24      So there was always -- I always had to
25 prioritize because there were things that were very

Page 742

1 time sensitive, either through -- through our
2 policies and procedures, or through responding to
3 something that was currently going on.
4      And it is also the airline industry, and it is
5 a 365-day-a-year operation.  Our members are out
6 working 365 days of the year.  So it doesn't -- it
7 is not a job where it ends at 5.
8      And if there is an emergency that happens, that
9 is obviously going to take priority over anything
10 else going on.
11 Q.  Now, when you are talking about emergencies, in
12 the airline industry, what sort of emergencies are
13 you talking about.
14 A.  Aircraft incident.
15 Q.  Okay.
16 A.  And that could be a number of things.
17      It could be -- it could be an inadvertent --
18 anything from an inadvertent mass deployment to what
19 happened with Flight 1380 in April of 2018.
20 Q.  I don't want to get too far into that, but can
21 you please tell the jury what you are referring to
22 with Flight 1380, because I myself am not precisely
23 sure.
24 A.  As simple as possible, during flight at
25 altitude, there was a -- I don't know if I'm

Page 743

1 using -- almost a rupture in the aircraft, caused a
2 rapid decompression, and a passenger sitting where
3 that hole occurred was sucked out of the aircraft.
4      The plane made an emergency landing and that
5 passenger ended up passing away.
6 Q.  While we were on those email communications,
7 the complaint you filed with Southwest Airlines
8 against Charlene Carter, did you turn her in for
9 anything that she sent to your union president's
10 email?
11      MR. PRYOR:  Object, leading.
12      MR. GREENFIELD:  I asked if she did or
13 not.
14      THE COURT:  I will allow this one.
15      THE WITNESS:  No.
16 BY MR. GREENFIELD:
17 Q.  All right.  I would like to talk to you about
18 complaints in general now.
19      If a union member want to lodge a complaint
20 against a fellow union member, is there a way to do
21 that internally within the union?
22 A.  Yes.
23 Q.  Can you explain how that -- how that authority
24 exists?
25 A.  Under our TWU international constitution, which

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 175 of 642  PageID 11116
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 744..747

Page 744

1 I have mentioned, international is the -- lack of a
2 better word, supreme authority of the union, and
3 then there is the local that has to operate
4 underneath the constitution and within that
5 framework.
6     The constitution outlines the internal
7 procedure, which is essentially, it is called filing
8 charges against a member.
9     It -- keeping it short, it outlines the
10 procedures that would take place for those to be
11 vetted to see if it warrants further action, which
12 could take place either via a trial, a union trial,
13 or by the vote of a -- or be dealt with through the
14 membership body at a membership meeting.
15 Q.  Does that apply to board members as well,
16 executive board members?
17 A.  Yes.  There are procedures outlined in there
18 that refers specifically to charges being filed
19 against an executive board member.  Either from a
20 member or from a member of the executive board.
21 Q.  Okay.
22 A.  It is similar, just a little bit different, if
23 they are a board member.
24 Q.  And if a union member wanted to lodge a
25 complaint against a non-union member or an objector,

Page 745

1 can they use that same process, that internal
2 process?
3 A.  No.
4 Q.  Why not?
5 A.  Because it is member to member.  If -- if -- if
6 that process occurs, and the flight attendant is
7 found guilty of violating whatever the alleged --
8 whatever they were accused of, then the constitution
9 outlines what could happen to that person, including
10 making them a member in bad standing.
11     And if you have already opted out of the union,
12 you are not a member anyway.  So you can't have --
13 you can't have anything levied against you.  A
14 member in bad standing, for instance, can't come to
15 a union meeting or can't vote.
16     But if you have opted out of the union, you
17 have already lost that right anyway.  So there isn't
18 an additional punishment that could be handed out.
19 Q.  As a non-union member, an objector, was there
20 any mechanism for you to bring any sort of internal
21 charges against Charlene Carter?
22 A.  No.
23 Q.  I would like to talk about your specific
24 complaint that you filed against Charlene Carter,
25 okay?

Page 746

1     But before we talk about that, during opening
2 statements, which you were not here, we heard about
3 Ms. Carter's experience about some of the posts she
4 sent you.
5     And I'm sorry to ask you this, but do you
6 yourself have any life experiences tied to abortion?
7 A.  No.
8 Q.  You mentioned earlier today that you did work
9 representing at-risk youth or -- I don't want to put
10 words in your mouth.  Can you remind the jury what
11 I'm referring to?
12 A.  I worked at an outpatient child and adolescent
13 mental health clinic in east Texas.  I held various
14 roles in that.  But I provided skills training to
15 children and teenagers, and I taught parenting
16 skills in the home, to a variety of different --
17 different -- children that were experiencing a
18 variety of mental health reasons and diagnoses.
19 Q.  Did any part of your work there or experience
20 there shape your views and experiences on the issue
21 of abortion?
22 A.  Yes.
23 Q.  Can you please explain that to the jury?
24     MR. PRYOR:  Your Honor, we object.
25     THE COURT:  I will allow it.

Page 747

1     MR. PRYOR:  Can I state the objection or
2 do you want me to do it later?
3     THE COURT:  You can state your basis in
4 code or go for it at a sidebar.
5     MR. PRYOR:  I just need it on the record.
6     THE COURT:  Well, you need to state your
7 basis in code or do it at a sidebar.
8     MR. PRYOR:  The relevance of Rule 404.
9     THE COURT:  Understood.  I will allow it.
10 You can answer the question.
11     THE WITNESS:  Part of that job, I -- I had
12 always believed that the general idea of abortion
13 was wrong.  That even in the case of an unwanted
14 pregnancy, a woman should look at all other options,
15 choose another option, like adoption if they weren't
16 in a position to keep that child.
17     And in the course of my almost five years
18 in that role, I worked with two different kiddos who
19 were the product of an incestuous rape.
20     One, it was --
21     MR. PRYOR:  Your Honor, now I object to
22 narrative.
23     THE COURT:  I will let you finish the
24 answer, but it can't be too long of an answer.
25     THE WITNESS:  After working with both of

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 176 of 642   PageID 11117
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                        Pages 748..751

Page 748

1 those children and their mothers, my views shifted.
2         Because while I -- I had never been in the
3 situation they were in, and it opened my eyes to
4 situations women could find themselves in.
5         And both of these women didn't have access
6 to resources and it was a family member in their
7 home, a relative that was raping them repeatedly
8 from a very young age.
9         And I did not believe that I or anyone
10 else have the right to tell those women or any other
11 woman in that situation that they had to carry that
12 baby.
13 BY MR. GREENFIELD:
14 Q.  Thank you, Ms. Stone.
15      And I'm going to get off this topic as quickly
16 as I can.
17      There was discussions yesterday about your
18 personal beliefs, and I just want to make them
19 clear.
20         MR. GREENFIELD:  Can you please pull up
21 Exhibit 66?
22 BY MR. GREENFIELD:
23 Q.  I'm looking at the middle of the page.
24         MR. GREENFIELD:  I would like to offer
25 this exhibit into evidence.

Page 749

1      It's 67.
2         THE COURT:  So I will ask if there is any
3 objection from Southwest or Carter to 67?
4         MR. McKEEBY:  No objection.
5         MR. HILL:  No.
6 BY MR. GREENFIELD
7 Q.  I would like you to look at the middle of the
8 page.  There's an email --
9         THE COURT:  Hold on.
10        -- from Carter on 67.
11        MR. PRYOR:  I'm sorry?
12        MR. HILL:  No objection.
13        MR. PRYOR:  No objection.
14        THE COURT:  Okay.  Sixty-seven is in.  We
15 will publish.
16        (The referred-to document was admitted in
17     Evidence as Trial Exhibit 67.)
18 BY MR. GREENFIELD:
19 Q.  I would like to direct you to the middle of the
20 page.  There is an email from you to Suzanne
21 Stevenson.  If you could please read quietly while I
22 read aloud.
23      Suzanne, part of my message was cut --
24        THE COURT:  Can we have the witness --
25        MR. GREENFIELD:  Oh, I apologize.

Page 750

1         THE COURT:  -- just -- since it is not a
2 hostile witness?
3         MR. GREENFIELD:  Yes.
4 BY MR. GREENFIELD:
5 Q.  Please, Ms. Stone?
6         THE COURT:  And she could read aloud into
7 the record if you want.  I prefer it to come from
8 you instead of you since it is not a hostile
9 witness.
10        MR. GREENFIELD:  Yes, Your Honor.
11        THE WITNESS:  Suzanne, part of my message
12 was cut.  It should have said, quote, "I am
13 personally pro life, but I support others right to
14 pro choice and don't believe I have the right to
15 tell them what to do with their body.  And to be
16 sent messages that reference me as a murderer
17 couldn't be further from the truth.  My apologies as
18 I have edited and cut and pasted and agonized for
19 days.  Again, thank you for your attention, Audrey."
20 Q.  The messages -- and I'm talking about the first
21 three that you turned in to Ms. Carter to for
22 Southwest Airlines -- do you know what I'm referring
23 to?
24 A.  Yes.
25 Q.  Did you feel physically threatened by those --

Page 751

1 any of those posts?
2         MR. PRYOR:  Object, leading.
3         MR. GREENFIELD:  I just asked --
4         THE COURT:  I will allow it.
5         THE WITNESS:  Yes.
6 BY MR. GREENFIELD:
7 Q.  And I believe the line that we have seen
8 repeatedly is that "I can't wait until you go back
9 on line."  Was there --
10        MR. GREENFIELD:  I apologize, your Honor.
11      I apologize, counsel.
12 BY MR. GREENFIELD:
13 Q.  What part of those messages, if any, made you
14 feel physically threatened?
15        MR. PRYOR:  Object, leading.
16        THE COURT:  I will allow that.
17        THE WITNESS:  I took her comment that she
18 couldn't wait to see me back on line as a threat
19 because of other conversations that had just
20 recently been going on about what the flight
21 attendants -- specifically, the flight attendants
22 that had voted against the tentative agreement --
23 what they were going to do to me when I came back on
24 line.  Comments that I would need to travel with
25 body guards.  And comments about them fighting over

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 3 July 07, 2022                    Pages 752..755

Page 752

1 who was going to get to me first.  Including with
2 depictions of weapons.
3        So at that point in my presidency, I was
4 terrified.  I had people working in the grievance
5 team who were afraid to come to work.  Because some
6 of the social media posts had been specific about me
7 and some were general to the union and contained
8 weapons.
9        Just prior to that, I had had a
10 negotiating team member, as we were preparing to go
11 on the road to roll out the second negotiated
12 tentative agreement, to roll it out for ratification
13 vote, typically members of the negotiating team
14 travel to all of the domiciles to have an
15 opportunity for the members to come in and sit
16 face-to-face and answer -- have a negotiating team
17 go over changes in the contract.  I had a
18 negotiating team member tell me that he didn't want
19 to go to the ratification meetings because he was
20 afraid of being hit by --
21        MR. PRYOR:  Object to hearsay and
22 narrative.
23        THE COURT:  Yeah, pretense, I will allow
24 it.
25        THE WITNESS:  Because he was afraid of

Page 753

1 being hit by a stray bullet meant for me.
2        We had also already arranged to have
3 police and/or security guards present at all of
4 those ratification meetings.
5        And we had already instituted a policy to
6 have signs placed at all of the places that those
7 were held that you could not bring weapons in.
8 Because we had had flight attendants reach out and
9 express concern about attending a membership
10 meeting, as a union member, because of the violent
11 posts and comments that were circulating.
12        So yes, I took that as a threat.
13 BY MR. GREENFIELD:
14 Q.  Did you ever, was there ever an instance -- let
15 me walk that back a little bit.
16        You mentioned an issue with targeting and,
17 bullets, et cetera.
18 A.  I'm sorry, can you repeat that?
19 Q.  Yes, ma'am.
20        You mentioned an instance with bullets,
21 targeting, et cetera.
22        Were there any instances where firearms were
23 brought to union member meetings?
24 A.  Yes.
25 Q.  Can you please talk about that?

Page 754

1        MR. PRYOR:  Your Honor, relevance.
2        THE COURT:  I will allow it.
3        THE WITNESS:  We, at times, did
4 simultaneous meetings.  Because ten days of meetings
5 was two full business weeks.  So calendar reasons,
6 we sometimes split up.  I had two vice presidents,
7 recording secretary, other officers and board
8 members that would fill in as recording secretary.
9        So during one of the time periods that we
10 were running membership meetings in two different
11 bases at the same time -- so I'm chairing a
12 membership meeting on the East Coast, one of my vice
13 presidents is chairing a membership meeting on the
14 West Coast -- there was a meeting that I was not
15 chairing, where a member came.
16        And it was discovered at some point during
17 the meeting that he had a gun, a gun tucked in his
18 pants.
19        It was after that, that we started posting
20 signs on the doors that, regardless of any state
21 laws, weapons were not allowed at a membership
22 meeting.
23        We had also had -- where we had to seek
24 assistance from Southwest Airlines to take
25 precaution for a membership meeting that was being

Page 755

1 held in Houston on an airport property because of a
2 flight attendant that was in the grievance process,
3 a threatening voicemail she had left on one of the
4 staff members -- on what she -- she was going to
5 show up to the meeting and --
6        MR. PRYOR:  Okay.  Once again, your Honor,
7 narrative and relevance.
8        THE COURT:  I will allow a narrative in
9 this format.
10        You can answer.
11        THE WITNESS:  Her intent to physically
12 cause me harm at the union meeting because of the
13 way the executive board had voted on her grievance,
14 my recording secretary, who was going to be
15 traveling with me to that meeting, said --
16 especially given the climate we were in -- we needed
17 to take this seriously --
18        MR. PRYOR:  Objection, hearsay.
19        THE COURT:  You have got to wait to let
20 her finish.  You can move to strike if I grant your
21 objection, but you have to let her finish her
22 answer.
23        THE WITNESS:  And because the meeting was
24 being held on airport property right down the hall
25 from the Southwest Airlines flight attendant lounge,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 178 of 642   PageID 11119
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 756..759

Page 756

1 I reached out to Southwest Airlines to let them know
2 about the threat, and worked with the Houston
3 Southwest Airlines base manager at the time, and he
4 worked with the local airport authorities to ensure
5 that that individual did not even gain access to the
6 restricted area.
7 BY MR. GREENFIELD:
8 Q.   Do you recall any of the -- what you describe
9 as threats to you personally, do you recall any of
10 the flight attendants who you believe threatened you
11 personally?
12       MR. PRYOR:  Object, relevance.  Object
13 prejudice.  Doesn't relate to anything Ms. Carter
14 did.
15       THE COURT:  I will allow it.  You can
16 answer.
17       THE WITNESS:  Yes.
18 BY MR. GREENFIELD:
19 Q.   Can you please provide those names?
20 A.   Robert Picket was one of them.  Jeanna Jackson
21 was one of them.  Polly Momovich (sp).  And the one
22 I was just speaking of in Houston, I believe her
23 name was Rebecca, but I don't recall the last name.
24 I'm sorry.
25       But that is what I can recall right now.

Page 757

1 Q.   Thank you.
2    Ms. Carter's counsel talked to you about "an
3 exhibit where you used the term see you back on
4 line."  Do you see a difference in the way that you
5 used it and the way that Ms. Carter used it?
6       MR. PRYOR:  Object, leading.
7       THE COURT:  I will allow this.
8       THE WITNESS:  Yes.  There -- at least the
9 full last year of -- or probably sometime during the
10 last year of my presidency, I made it very clear to
11 my team members and to anyone in the membership who
12 asked me, that I would not be seeking reelection
13 because of everything I had been through.  No job
14 was worth it.
15       And so then the narrative amongst a number
16 of flight attendants who had been very open in not
17 supporting me, saying that I was never going to go
18 back to being a flight attendant, that I didn't care
19 about them, because I was never going to go back to
20 do the job, because I had a job waiting for me
21 either at TW International or at Southwest
22 management.
23       So there had been a lot of comments about
24 me not going back on line.  So I ended my last
25 presidency message with what I had said all along, I

Page 758

1 am a flight attendant and the only job I have lined
2 up to go back to after I complete this term is my
3 flight attendant job.
4 BY MR. GREENFIELD:
5 Q.   And I would like to talk about a little bit
6 about that timing.
7    What was the separation in time of when you
8 made your complaint about Ms. Carter and when you
9 would be going back on line as just a rank and file
10 flight attendant?
11 A.   I had, I believe, around 14 months left on my
12 term.  The complaint was made early in 2017 and my
13 term ran through April 30th of 2018.
14 Q.   Thank you.
15    Do you have any relationship with Charlene
16 Carter?
17 A.   No.
18 Q.   Had you ever spoken with Charlene Carter?
19 A.   Not directly.  She attended one membership
20 meeting, to my recollection, a couple of weeks after
21 I became president.  She was one of the members in
22 attendance.
23    To my knowledge, that was the first time I had
24 ever even been -- that I was aware that I have been
25 in a room with her.

Page 759

1 Q.   Do you have any recollection of any of the
2 messages you received from Ms. Carter asking you
3 about your views about abortion?
4 A.   No.
5 Q.   And the three posts that led to the complaint
6 you filed against Ms. Carter, do any of those posts
7 have any requests about Ms. Carter wanting to have a
8 conversation about your views on abortion?
9       MR. PRYOR:  Object, leading.
10       THE COURT:  I will allow it.
11       THE WITNESS:  No.
12 BY MR. GREENFIELD:
13 Q.   Did you interpret anything within those posts
14 as Ms. Carter wanting to have a conversation with
15 you about abortion?
16 A.   No.  Nothing that she had sent me had ever
17 appeared to be encouraging to have a conversation or
18 a dialogue.
19 Q.   Ms. Stone, did the local union ever donate to
20 Planned Parenthood?
21 A.   No.
22       MR. PRYOR:  I'm sorry, I didn't hear the
23 question.
24       MR. GREENFIELD:  I asked if the local
25 union ever donated to Planned Parenthood.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 179 of 642   PageID 11120
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 760..763

Page 760

1      MR. PRYOR:  Has the local union?
2      MR. GREENFIELD:  Ever donated to Planned
3 Parenthood.
4      MR. PRYOR:  Okay.
5 BY MR. GREENFIELD:
6 Q.  The answer to that was no?
7 A.  Correct.  No.
8      MR. GREENFIELD:  If I may have a moment to
9 just discuss with my co-counsel.  I will be right
10 back.
11     THE COURT:  You may.
12 BY MR. GREENFIELD:
13 Q.  Ms. Stone, there has been lots of discussions
14 about communications you received from Brian
15 Talbert.
16    Do you remember those?
17 A.  Yes.
18 Q.  Was Mr. Talbert ever an executive board member?
19 A.  No.
20 Q.  Was Mr. Talbert ever an agent of the union?
21     MR. PRYOR:  Object, calls for a legal
22 conclusion.
23     THE COURT:  I will allow her to answer if
24 she has personal knowledge.
25

Page 761

1 BY MR. GREENFIELD:
2 Q.  Did you believe Mr. Talbert to ever be an agent
3 of the union?
4 A.  No.
5 Q.  There was discussions about Mr. Talbert on a
6 CAN team, I believe.
7 A.  Yes.
8 Q.  Can you please remind the jury what the CAN
9 was?
10 A.  Usually during any rollout of a tentative
11 agreement on the contract, after the negotiations,
12 there is more people needed than just the
13 negotiating team and the executive board to make
14 sure we are there and available to answer any
15 questions our members have about such an important
16 vote.
17    Through, I think, at least all of the contract
18 rollouts in my time at Southwest Airlines, the union
19 will ask for either, like, people that have shown
20 interest, people that have emailed the negotiating
21 team and say, Hey, what can I do to help?
22    And bring them in to help them help us make
23 sure that flight attendants understand what they are
24 voting on, understand what is going on in
25 negotiations.

Page 762

1    Sometimes it is put in place before you even
2 reach the agreement, because there is lot of
3 activity with the negotiations of the contract
4 actions at work.  That was one of those type of
5 committees.
6    Flight attendants that had expressed interest
7 or volunteered to assist the negotiating team.
8 We -- one -- one of their duties sometimes was
9 following a negotiating session with Southwest
10 Airlines.  The day following, all the domiciles
11 would have someone from the contract action network
12 there.
13    A lot of times, the negotiating team would
14 split up to go with them, it would be something we
15 would publicize in advance, that they would be in
16 the lounge to help answer any questions that you may
17 have.
18    Sometimes it was simply making people aware
19 where to find updates on our website of the chart of
20 where we were in the negotiating process.
21    So he was a -- he was a member that assisted
22 with that project.
23 Q.  And did any actions Mr. Talbert took have the
24 ability to bind the union in any sort of
25 negotiation?

Page 763

1 A.  No.
2      MR. PRYOR:  Object, leading.  Object,
3 calls for a legal conclusion.
4      THE COURT:  I will allow her to answer if
5 she has personal knowledge.
6 BY MR. GREENFIELD:
7 Q.  Do you have personal knowledge of that,
8 Ms. Stone?
9 A.  Yes.  And the answer is no.
10 Q.  It was discussed earlier that, at some point,
11 you represented Mr. Talbert or played a role in a
12 fact-finding or Step 2 -- regarding Mr. Talbert.
13 And I don't want to go further because I would just
14 like to you clarify, because I don't remember myself
15 exactly your role in that?
16 A.  As I mentioned earlier, sometimes flight
17 attendants would make special requests of who they
18 wanted involved in their representation.
19 Mr. Talbert asked, I think his grievance specialist,
20 if I could assist for his Step 2 hearing, the second
21 step in this appeal process.
22    And as I mentioned, normally the grievance
23 specialist, and then our grievance chairperson,
24 would normally attend the meeting.  It was never
25 just the grievance specialist.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 180 of 642   PageID 11121
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                          Vol 3 July 07, 2022                                          Pages 764..767

Page 764

1   And so there were times, including
2 Mr. Talburt's, where, upon a flight attendant's
3 request, I attended in lieu of the grievance
4 chairperson. I accompanied the specialist.
5 Q.   Were there any other instances where you were
6 requested by flight attendants to engage in that
7 process?  If so, tell us if you remember any
8 specifics.
9 A.   Yes.  Towards the very end of my term, a
10 Dallas-based flight attendant, who had been in
11 initial training with me in 2004 -- so 14 years
12 later -- we had not seen each other, we hadn't
13 actually spoken -- but he was called in for a
14 fact-finding meeting in the Dallas base.
15   And when he reached out to the union, he asked
16 them if he could speak to me, because he wanted me
17 to be involved in his -- in his process.
18   I did not attend his fact-finding meeting.  He
19 had representation for that.  But when Southwest
20 Airlines issued discipline, I attended his Step 2
21 hearing.
22 Q.   Do you remember any specific time frame around
23 when you had been asked to represent Mr. Talburt in
24 that process?
25 A.   I think it was -- I think it was early 2015.

Page 765

1 Q.   Okay.
2 A.   I'm not 100 percent certain.
3 Q.   I understand.
4 A.   I'm sorry, it is just a lot of history that
5 I --
6 Q.   Certainly, Ms. Stone.
7   MR. GREENFIELD:  Please pull up
8 Exhibit 26.
9 BY MR. GREENFIELD:
10 Q.   Ms. Stone, this is Exhibit 26.  It is one of
11 the emails that had been discussed from Brian
12 Talburt to you.
13   Is that -- do you recognize this document?
14 A.   Yes.
15 Q.   All right.
16   What date was this sent to you?
17 A.   October 13th, 2014.
18 Q.   Okay.  This is Exhibit 27.  Another email.
19   Can you please tell us the date on that?
20 A.   October 13, 2014.
21 Q.   This is another email from Brian Talburt.  Can
22 you tell us the email date on that?
23 A.   October 13th, 2014.
24 Q.   The same question, Ms. Stone.
25 A.   October 13th, 2014.

Page 766

1 Q.   Do you have any recollection if Mr. Talbut was
2 sending you these emails in relationship to his Step
3 2 or his grievance process?
4   MR. PRYOR:  Objection, leading.
5   THE COURT:  I will allow it.
6   THE WITNESS:  Yes, and -- yes.  Because he
7 had received discipline for using a phrase that
8 was -- I believe it was the public -- it had
9 something to do with the public execution phrase
10 that was referenced in one of those emails.
11 BY MR. GREENFIELD:
12 Q.   Okay.  And at this point, you were -- you were
13 part of the representation team in the grievance
14 process?
15 A.   Yes.
16 Q.   Would it be appropriate for a member of the
17 grievance team to take information provided to them
18 as part of the grievance and turn that information
19 over to Southwest Airlines?
20 A.   Would you repeat the question?  I just want to
21 make sure I'm understanding.
22 Q.   Yes.  If information was given to you as part
23 of a defense on the grievance team, would that be
24 appropriate basis for you to turn that employee in
25 for any sort of violation of company policy?

Page 767

1   MR. PRYOR:  Object, leading.
2   THE COURT:  I will allow it.
3   THE WITNESS:  There were times, when in
4 the defense of someone, in order to accurately
5 represent that flight attendant, especially when it
6 was a complaint or a situation that involved two
7 different flight attendants fighting or differing
8 opinions, there were numerous times where, in the
9 grievance process, something would be brought
10 forward that was needed in the defense of our
11 current client, but could open the door for
12 Southwest to then have new knowledge and information
13 to investigate someone else.
14 BY MR. GREENFIELD:
15 Q.   Do you have any understanding, based on this
16 time frame that we are looking at, why Mr. Talbut
17 would have sent you these emails?
18 A.   Because he was in the grievance process
19 following discipline he received.
20 Q.   Okay.
21   MR. GREENFIELD:  One moment.
22   Do we have Exhibit 15-A, the physical
23 copy, available?
24   I just wanted to make sure I had the right
25 thing, your Honor.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 181 of 642   PageID 11122
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 768..771

Page 768

1 BY MR. GREENFIELD:
2 Q.  Ms. Carter's counsel asked you several
3 questions about that stack of documents right there.
4     Do you remember those?
5 A.  Yes.
6 Q.  Is it fair to say, generally, you said that the
7 contents of the writings in those posts, you believe
8 them to be protected activity, correct?
9 A.  Yes.  The ones that I could read.
10 Q.  Did you turn in Ms. Carter at any point after
11 receiving any of those messages?
12 A.  Prior to February 2017, no.
13     MR. GREENFIELD:  Thank you.
14     I pass the witness, your Honor.
15     THE COURT:  All right.  Mr. McKeeby.
16     CROSS-EXAMINATION
17 BY MR. McKEEBY:
18 Q.  Hello, Ms. Stone.
19 A.  Hello.
20 Q.  Yesterday you indicated you were represented by
21 counsel.  Who did you mean?
22 A.  Mr. Joe Gillespi.
23 Q.  And is he here today in the courtroom?
24 A.  Yes, sir, he is.
25 Q.  You understand I represent Southwest Airlines,

Page 769

1 correct?
2 A.  Yes, sir.
3     MR. McKEEBY:  Can we pull Exhibit 66?
4     And this has been admitted.
5 BY MR. McKEEBY:
6 Q.  This is your complaint?
7 A.  Yes -- not in its entirety.  There is, I
8 believe, a second page.
9 Q.  Okay.  The page where you -- you mean the page
10 where you clarify the -- your political views on
11 abortion, is that what you are talking about?
12 A.  That one, but there is -- the document that I'm
13 looking at doesn't finish the last sentence, so I
14 still think there is a second page to this.
15 Q.  Okay.  There -- you can go to the next page,
16 662.  Is that what you mean?
17 A.  Yes.
18 Q.  Okay.  So back to 661, please.
19     Can you read for the jury the first sentence of
20 the second paragraph that begins with "The
21 messages."
22 A.  "The messages contain two graphic videos of an
23 alleged aborted fetus and make references to murder
24 as well as political and religious comments."
25     The first two are the actual messages she sent

Page 770

1 me and the bottom two are the links that they came
2 from.
3     MR. McKEEBY:  Okay.  If you could pull
4 66.3.
5 BY MR. McKEEBY:
6 Q.  That is one of the two messages you reference,
7 correct?
8 A.  Yes.
9 Q.  And that is part -- or at least that is a still
10 shot of the video that -- a snippet of which was
11 shown to you yesterday, correct?
12 A.  Yes.
13 Q.  And -- by the way, who is this woman, a
14 woman -- do you know who Samina Shah is?
15 A.  No, sir.
16 Q.  Can you read the text below her name?
17 A.  Aborted baby alive, even after the abortion.
18 This is the reason abortion is murder and -- I don't
19 know what that last word it.
20 Q.  It cuts off.  Okay.
21     Did you understand that Ms. Carter authored
22 that or did you know one way or the other?
23 A.  I don't -- I don't know.
24 Q.  Okay.  But that is part of what she sent you?
25 A.  Yes.

Page 771

1     MR. McKEEBY:  And if we can go to 66.5.
2 BY MR. McKEEBY:
3 Q.  Is this a still shot of the second video?
4 A.  Yes, sir.
5 Q.  And what is the reference below about
6 Democrats?  Can you read that?
7 A.  Hashtag Democrats, this is what you support,
8 question mark, if it is dot, dot, dot.
9 Q.  Did --
10     MR. McKEEBY:  You can take it down.
11 BY MR. McKEEBY:
12 Q.  Did you watch this video as well?
13 A.  I did eventually watch it, yes.
14 Q.  When did you watch it?
15 A.  I think it was a day or two after.  I mean it
16 was the next day after I had seen part of the first
17 one.
18     MR. McKEEBY:  You can take it down.
19 BY MR. McKEEBY:
20 Q.  So a day or two after you watched part of the
21 first one.  Where were you when you watched the
22 second one?
23 A.  I was in -- I was in a hotel room, the room I
24 was staying in at the conference center out of
25 Baltimore-Washington International Airport.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 182 of 642   PageID 11859
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                          Vol 3 July 07, 2022                                          Pages 772..775

Page 772

1 Q. Okay. The first video you watched at the
2 airport, is that correct?
3 A. Part of it.
4 Q. Part of it.
5     Was the amount that you saw during the trial
6 yesterday, was that representative of the amount of
7 time that you viewed --
8 A. Roughly. I know there was a lot of how many
9 seconds. I don't -- and I don't recall. And I --
10 Q. You said that.
11 A. Yes. I ---
12 Q. Okay.
13 A. It was enough to see the images and understand
14 what they were, and to have to go pull myself
15 together.
16 Q. I will bet Mr. Pryor was going to ask you this
17 question, but I will ask you first: Why did you go
18 back and watch the second video?
19 A. Because I felt like I needed to see exactly
20 what she sent me.
21 Q. Okay. So you talked about --
22     MR. PRYOR: I'm sorry. Was the witness
23 finished with her answer?
24 BY MR. McKEEBY:
25 Q. I understand the witness to be finished. Do

Page 773

1 you have more to say?
2 A. No, sir.
3 Q. Thank you.
4     You talked about earlier today, I think, of a
5 telephone conversation with representatives of
6 Southwest Airlines after you made the complaint
7 about Ms. Carter, correct?
8 A. Yes.
9 Q. And who was on that call?
10 A. Ed Schneider, who was the Denver-based manager,
11 which is where Ms. Carter was based. I believe
12 Suzanne Stephenson, the Las Vegas-based manager.
13 Denise Guttierez, from employee relations at
14 Southwest Airlines. And at some point, after they
15 notified me that I could have a union rep present,
16 and if I wanted one, I -- Brett Nevarez joined me on
17 the call.
18 Q. Okay. How long was the call?
19 A. It felt like forever. It was -- maybe 15ish
20 minutes; I don't, I don't ---
21 Q. Now, did you have an understanding that
22 Mr. Schneider was the base manager for Denver?
23 A. Yes.
24 Q. What was your understanding of why he was on
25 the call?

Page 774

1 A. Because that is the base where Ms. Carter was
2 at the time.
3 Q. Okay.
4 A. So he was the highest leadership in the Denver
5 base, her base.
6 Q. And you reported it to Las Vegas?
7 A. Yes. I reported it to my base manager.
8 Q. That was Miss Stevenson?
9 A. Yes.
10 Q. Prior to that telephone call, had you had any
11 interactions with Mr. Schneider before?
12 A. I had met him. I had met, at points or
13 another, most of in-flight managers, a lot of
14 supervisors. I hadn't been based in Denver. I
15 never directly worked with -- I can't recall a
16 situation where I directly worked with him, but I
17 had met him through the nature of my position.
18 Q. What about Ms. Guttierez, had you met her
19 before?
20 A. I had not -- no, I had never met her. I mean,
21 I think that may have been the first time I had ever
22 spoken to her on the phone.
23 Q. Who did most of the talking during that phone
24 call?
25 A. Most of it was Mrs. Guttierez asking me

Page 775

1 questions.
2 Q. Okay. Did she ask you if you had ever spoken
3 to Ms. Carter about abortion?
4 A. Yes.
5 Q. What did you say in response?
6 A. I told her I had not.
7 Q. Did Mr. Guttierez ask you what you wanted
8 Southwest Airlines to do about it?
9 A. She asked something in that vein or what my
10 purpose of reporting this was. And I think I -- to
11 the best of my recollection, listed that I wanted it
12 to stop. That I -- I -- I didn't want this to
13 happen again.
14 Q. Were you concerned that -- I'm sorry. I didn't
15 mean to cut you off, if I did.
16 A. I don't remember if I said it at that point.
17 One of -- one of my biggest concerns was that those
18 messages were going to be sent to another flight
19 attendant that was at that Working Women's Committee
20 meeting, and also attended the march.
21 Q. Did you ask Ms. Guttierez or tell Ms. Guttierez
22 you thought Ms. Carter could be fired for what she
23 did?
24     MR. PRYOR: Object, leading.
25     THE COURT: I will allow it.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 183 of 642   PageID 11124
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 776..779

Page 776

1       THE WITNESS:  No.  I did not.
2 BY MR. McKEEBY:
3 Q.  Was that your desire?
4 A.  No.  It was to make it stop and to not have her
5 harass anybody else in the ugly way I had been
6 harassed.
7 Q.  When you pulled up the video at the airport,
8 was that -- what device were you using?  Was that a
9 laptop or something else?
10 A.  My personal -- it was my cell phone.
11 Q.  Your cell phone.
12      And was there any audio associated with the
13 video at the airport?
14 A.  To my recollection, yes.
15 Q.  What do you recall hearing?
16 A.  The comment that you had me read underneath one
17 of them about -- that said something about the baby
18 still being alive.  There was -- my recollection,
19 there was somebody in the background making comments
20 along those lines, Look, it is still moving.
21 Q.  Thank you.
22      You told Mr. Greenfield about your personal
23 beliefs regarding abortion a few minutes ago,
24 correct?
25 A.  Yes.

Page 777

1 Q.  Had you ever discussed those views with
2 Ms. Carter?
3 A.  No.
4 Q.  Did she ever ask you what your views on
5 abortion were prior to sending those videos?
6 A.  No.
7 Q.  Did she ever discuss Planned Parenthood with
8 you?
9 A.  No.
10 Q.  Did she ever discuss the Women's March in
11 Washington with you prior to sending those videos?
12 A.  No.
13 Q.  I will change the subject and we can talk about
14 pink hats.
15      MR. McKEEBY:  Can you pull up Exhibit 47,
16 please?
17      MR. McKEEBY:  Southwest would move to
18 admit 47.
19      THE COURT:  Forty-seven.  Any objection
20 from union or Carter to 47?
21      MR. PRYOR:  Just one second.
22      THE COURT:  You bet.
23      MR. PRYOR:  No objection.
24      THE COURT:  Mr. Greenfield?
25      MR. GREENFIELD:  No, your Honor.

Page 778

1       THE COURT:  Okay.  Forty-seven is in.  We
2 will publish.
3       (The referred-to document was admitted in
4       Evidence as Trial Exhibit 47.)
5 BY MR. McKEEBY:
6 Q.  Can you describe to the jury what this is?
7 A.  It is one of the messages that were sent in the
8 batch that Ms. Carter sent me along with the two
9 videos that we discussed.
10 Q.  And did you send this at some point to
11 Southwest as well?
12 A.  Yes.
13 Q.  And did you understand that these addresses are
14 intended to depict female genitalia?
15 A.  Yes.
16 Q.  Did you wear a hat like that when you marched
17 in Washington?
18 A.  No.
19 Q.  Do you know of any Southwest Airlines's
20 employee/flight attendant who marched with you in
21 Washington wore a hat like that or a headdress?  I'm
22 not sure what it is.
23 A.  No, not the ones -- not anyone I saw.
24 Q.  And let me clarify.
25      How about anybody at all at the march, did you

Page 779

1 see anyone wearing a hat like this?
2 A.  No.
3 Q.  Did you wear a hat at the march?
4 A.  Yes.
5 Q.  Did you -- where did you get that hat?
6 A.  Some of the ladies had knitted -- knitted hats.
7 It was January in DC.  It was cold.  And they had
8 knitted and distributed them to all of the ladies
9 who volunteered to stay for the march.
10 Q.  Okay.  Did you -- when you say "the ladies,"
11 were those fellow flight attendants?
12 A.  Yes.  People that attended the Working Women's
13 Committee meeting earlier that week.
14      MR. McKEEBY:  Can we pull Exhibit 56,
15 which I think is in evidence.
16      THE COURT:  Fifty-six is in.  You can
17 publish.
18      MR. McKEEBY:  Publish 56.
19      And can we go to 56.8?
20 BY MR. McKEEBY:
21 Q.  Do you recognize yourself in that picture?
22 A.  Yes.
23 Q.  Where are you?
24 A.  I'm on the far right.
25 Q.  And are those the hats that you were talking

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 184 of 642   PageID 11125
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                    Pages 780..783

Page 780

1 about?
2 A. Yes.
3 Q. This is what you wore in Washington?
4 A. Yes.
5 Q. Are these all fellow flight attendants depicted
6 here?
7 A. Yes.
8      MR. McKEEBY: Go to Exhibit 94. I will
9 move to admit 94.
10      THE COURT: Any objection to 94?
11      MR. PRYOR: No objection.
12      MR. GREENFIELD: If I can have one moment,
13 your Honor.
14      THE COURT: You may.
15      MR. GREENFIELD: No objection from the
16 Union.
17      THE COURT: All right. Ninety-four is in.
18 You can publish.
19      (The referred-to document was admitted in
20      Evidence as Trial Exhibit 94.)
21 BY MR. McKEEBY:
22 Q. Ms. Stone, what is this document?
23 A. During the initial phone call with Southwest
24 Airlines that we spoke about earlier, I was asked if
25 Ms. Carter had ever sent me any other communications

Page 781

1 via on Facebook and I answered yes. And I was asked
2 to send -- send them all to Southwest Airlines.
3      And I think this was one of them, to my
4 recollection. There were so many, I think that I
5 had to send them in batches.
6 Q. So this is another batch of those historical
7 emails that Southwest asked you to provide?
8 A. Facebook messages.
9 Q. I'm sorry. Facebook messages.
10 A. Yes.
11 Q. I don't think counsel went over these with you.
12 And I'm not going to ask you if they are protected,
13 or union activity. I just kind of want to know what
14 they are.
15      So, I mean, if you are okay with that, I'm
16 going to go through a couple of these.
17      94.2. The blue mark is by something
18 referencing carpet bombing again.
19      Can you describe to the jury what that is
20 about? If you know.
21 A. I'm not certain exactly what she meant by
22 "carpet bombing."
23      I know that the -- this thread was implying
24 that if we didn't like how election results turned
25 out, that we would just somehow get rid of that --

Page 782

1 you know, get rid of that person, overturn the
2 election.
3 Q. But this is an email that Ms. Carter --
4 sorry -- a Facebook message that Ms. Carter sent to
5 you?
6 A. Yes.
7 Q. And so the next page, we have an appearance by
8 Albert Einstein. Do you know what this post is
9 about or message is about?
10 A. She says that is how she feels about me and
11 the rest of the board, pure evil.
12 Q. Did you understand at the time or do you
13 understand now, the relevance to the, I guess, quote
14 from Albert Einstein?
15 A. I -- his quote references evil.
16 Q. Okay.
17 A. But outside of that, I don't.
18 Q. The next page, 94.4. It looks like this
19 involves something about the residence of the
20 representative in Denver.
21      Do you have a sense of what that was about?
22 A. Yes. A discussion yesterday about the elected
23 Dallas domicile executive board member. It was
24 regarding the actual address of where domicile
25 executive board members reside.

Page 783

1 Q. Why was that significant?
2 A. Because the Dallas domicile executive board
3 member that was removed -- similar to the way the
4 union had removed another domicile executive board
5 member in the past, who did not actually live, not
6 only in the town, but in the state, where they
7 represented.
8      She was trying -- I'm assuming to say that the
9 Denver rep -- I don't -- I actually -- I don't
10 understand because the Denver rep does not live in
11 Dallas, that is true. The Denver rep lives in
12 Denver.
13      The -- one of the other former -- Andrea, I'm
14 assuming she refers to the former Dallas domicile
15 executive board member, Andrea Garnett, whose
16 physical address isn't Dallas proper. It is west
17 of -- of Dallas, as I'm sure many people's addresses
18 in here are.
19      It goes on to talk about me, and that is just
20 false information. I lived in Baltimore when I was
21 the Baltimore domicile executive board member.
22 Q. If you go to 94.7. There is a reference in the
23 second message about, Hoping that people file
24 charges against you.
25      Do you recall that message?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 185 of 642   PageID 11126
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Pages 784..787

Page 784

1  A.  Yes.
2  Q.  What is it about?
3  A.  I believe filing charges against -- against the
4  board in a similar way that Mr. Greenfield had me
5  walk through if there is a process within the union
6  that a member could file charges against another
7  member.
8  Q.  Now, there is more in here, but I will let the
9  jury decide if they want to wade through this.
10     Did you report any of these communications from
11  Ms. Carter to Southwest Airlines?
12  A.  Prior to them requesting them as --
13  Q.  Yes.  At the time that they were sent, did you
14  complain to Southwest Airlines about any of these
15  messages?
16  A.  No.  I did not.
17  Q.  Well, why not?
18  A.  There were a lot of people unhappy with things.
19  And a lot of flight attendants that sent me, even
20  through official union channels, angry, ugly
21  comments.
22     And I knew that part of my job in being in a
23  leadership position, especially being the top leader
24  in the hierarchy of our local union, that their --
25  that was part of the job, was dealing with angry and

Page 785

1  unhappy people.  And that there were always going to
2  be angry and unhappy people in the membership for a
3  variety of reasons.  And that I needed to work as
4  best I could to just work it out as much as I could
5  and focus on doing the business of the union and
6  working.
7  Q.  I'm sorry.  And working?
8  A.  Yes.
9  Q.  Can you tell the jury a bit about the Women's
10  Committee, what is that?
11  A.  It was actually established by
12  TW International, with the exception of -- at the
13  time, our local -- most of the local unions within
14  TW International -- TW stands for Transport Workers
15  Union -- most of those unions are incredibly male
16  dominated.
17     Airline mechanics, train drivers, bus
18  operators.  We were the only one whose demographic
19  was the opposite, primarily women.
20     So TW International had formed a committee to
21  try to help the members in the various TW locals
22  focus on issues that were specifically affecting
23  women because I think they felt like they didn't
24  have a lot of that representation in their
25  workplace.

Page 786

1     So it started through -- through them.  And
2  then was formed as -- at some point along the way, a
3  Local 556 committee.
4  Q.  Was that one of the joint committees that we
5  heard some testimony about earlier?
6  A.  No.  It was not a joint committee.
7  Q.  It was an exclusive Local 556 committee?
8  A.  Yes.
9  Q.  And was there a committee meeting, a Women's
10  Committee meeting, in Washington in January of 2017?
11  A.  Yes, there was.
12  Q.  What was the purpose of that meeting?
13  A.  The meeting was held at TW International
14  headquarters, in conjunction with the then
15  TW International Working Women's Committee
16  chairperson, who was also a TW 556 member and
17  Southwest flight attendant.
18     She was working full time for the international
19  union.  I'm sorry, she has since passed away.
20     So we went and worked with our local
21  chairperson to coordinate that meeting in DC to
22  bring in a number of speakers to talk to our flight
23  attendants who were in attendance.
24     One of our speakers was Liz Shuler, who is now
25  the president of AFL-CIO.

Page 787

1     Working America was one of the groups that we
2  spoke with.
3     And it was also to try to build up our local
4  committee.  And prior to that, we had not had people
5  show interest.
6     Every three years, as part of the election
7  cycle, we take letters of interest for the committee
8  chairperson's position, and there was one year that
9  nobody even submitted for the chairperson position
10  of our local committee.  So I ended up taking it on,
11  amongst my other duties, because nobody was
12  interested.
13     And we had had -- the chairperson at that time
14  had a number of flight attendants reach out asking
15  about the committee.  There seemed to be a general
16  interest.
17     So it was to kind of help really build that and
18  see what the committee could be doing on behalf of
19  our members.
20  Q.  Was there a particular day of the week that
21  that committee meeting was held?
22  A.  I believe that committee meeting -- I'm not a
23  hundred percent -- I believe it was on Thursday.
24  Q.  And when was the Women's March?
25  A.  A Saturday.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 186 of 642   PageID 11127
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Pages 788..791

Page 788

1 Q.  And what was the connection between the Women's
2 Committee meeting on perhaps the Thursday, and the
3 Women's March on Saturday?
4 A.   Initially, I guess some of the -- some of the
5 flight attendants had reached out to the chairperson
6 of the committee showing interest in going to the
7 Women's March and asking if our union had talked
8 about that.
9     She came to me and asked me -- asked me about
10 it.  And I said that I didn't believe going to the
11 march was official union business.  That if she
12 wanted to work with TW International, and actually
13 host a meeting and conduct -- you know, have an
14 agenda and conduct union business, and if people in
15 attendance chose to stay over and volunteer their
16 time, they could do that.
17     She was working on some of the volunteer
18 opportunities for the flight attendants to do while
19 we were in DC.  But that is ultimately what
20 happened.
21 Q.  Okay.  Did you attend the entire march?
22 A.  No, I did not.
23 Q.  Did you see Ms. Carter when you were in
24 Washington?
25 A.  No.

Page 789

1 Q.  Did you later have an understanding that she
2 was in Washington?
3 A.  I --
4     MR. PRYOR:  Object, limine issue.
5     MR. McKEEBY:  This is a yes or no.  She
6 doesn't sound like she knows.
7     THE COURT:  Yeah.  You can answer yes or
8 no.
9     THE WITNESS:  I don't remember.
10 BY MR. McKEEBY:
11 Q.  Ms. Stone, we had not met face to face before
12 this trial, had we?
13 A.  No.
14 Q.  We had a Zoom call, I think it was last week,
15 prior to the trial, did we not?
16 A.  Yes.
17 Q.  And your attorney, Mr. Gillespie, was on that
18 call?
19 A.  Yes.
20 Q.  And I told you during that call I was going to
21 do something that I didn't want to do, did I not?
22 A.  Yes.
23 Q.  Okay.  I would like to pull the second video,
24 Number 49, and publish it, and enter it as an
25 exhibit.

Page 790

1     THE COURT:  Any objection to 49 that is
2 not in evidence yet?
3     MR. PRYOR:  Object to the playing of the
4 video beyond what she says she viewed.
5     THE COURT:  I understand that objection.
6 Any other objection to 49?
7     MR. GREENFIELD:  No, your Honor.
8     THE COURT:  Okay.  I will overrule that
9 objection.  And 49 is in evidence and you can
10 publish as much of which it as you wish.
11     (The referred-to document was admitted in
12     Evidence as Trial Exhibit 49.)
13     MR. McKEEBY:  Okay.  Go ahead.
14     (Thereupon, the video clip was played.)
15     MR. McKEEBY:  You can turn it off.
16 BY MR. McKEEBY:
17 Q.  I saw that you turned your eyes and I
18 understand that.
19     Did you see enough to recognize that as the
20 video?
21 A.  Yes.
22 Q.  During the phone call that you mentioned with
23 Mr. Schneider and Ms. Guttierez, did they ask you
24 about the impact of those videos on you?
25 A.  Yes, I believe so.

Page 791

1 Q.  And did you tell them?
2 A.  Yes.
3     MR. McKEEBY:  I have no further questions,
4 Your Honor.
5     Thank you, Ms. Stone.  I'm sorry to have
6 done that.
7     THE COURT:  Thank you.
8     It is time for our afternoon break.  So
9 what I will do, is I will call it now.
10     Then we can reset, and you can ask
11 questions round two, Mr. Pryor.
12     Same instructions:  You can talk to your
13 fellow jurors, court personnel about this case.
14 Don't talk to anyone else.  Don't do any research
15 about the case.
16     All rise for the jury.
17     We will see you in 10 minutes at 3:02.
18     (The jurors exited the courtroom.)
19     THE COURT:  You are excused.  You just
20 can't talk to anyone about the case.
21     Can we get Exhibit 15-A back from you?  We
22 need to color scan that, and then we will give
23 everyone a copy of it.
24     My apologies.
25     No, that's fine.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 792..795

Page 792

1    Anything we need to take up before the
2 break?  Okay.  We are in recess, we will see you at
3 3:02.
4    (Recess.)
5    THE COURT SECURITY OFFICER:  All rise.
6    THE COURT:  Anything before we bring in
7 the jury?  Okay.
8    Let us bring them in.
9    And, Mr. Pryor, you can go ahead to the
10 podium.  I just want to shave down as much time as
11 possible.
12    And by the way, so when we finish round
13 two, I have got to ask if anyone has a round three.
14 I recommend you don't use a round three for shot
15 clock reasons, but I will ask if anyone had a round
16 three.
17    MR. McKEEBY:  You mean with this witness?
18    THE COURT:  Yes.
19    (The jurors entered the courtroom.)
20    THE COURT:  Okay.  You can be seated.
21    Okay.  Mr. Pryor, round two.  It is your
22 chance.
23    REDIRECT EXAMINATION
24 BY MR. PRYOR:
25 Q.  Ms. Stone, would you be surprised that if I

Page 793

1 sent you a bloody horse head that said, "I'm for the
2 recall petition," that that would be a crime?
3    If I have killed a horse, I have cut it up and
4 I have put its bloody carcass in your house with a
5 message, that is a crime, right?
6    MR. McKEEBY:  Object, it requires a lay
7 person to give a legal conclusion.
8    THE COURT:  I will let her answer, if she
9 has personal knowledge.
10    THE WITNESS:  I don't know if killing a
11 horse and cutting off its head is a crime.
12 BY MR. PRYOR:
13 Q.  When asked for your personal knowledge and
14 beliefs about a variety of other laws that counsel
15 asked you about, you knew the answer.
16    But you can't tell me that killing a horse and
17 putting a bloody horse in your house with a message
18 that you have no idea?
19    MR. McKEEBY:  Objection, asked and
20 answered.  And I don't know what part of it --
21    THE COURT:  Sustained.
22 BY MR. PRYOR:
23 Q.  So Jeanna Jackson.  Let's look at 21-O.
24    21-O, I can bring it up to you.  Here.
25    THE COURT:  I'm not sure O is.  It's just

Page 794

1 for the witness?
2    MR. PRYOR:  Yes -- well, no, it is for
3 everyone.  I just don't want to wait for the --
4    THE COURT:  I understand.  You can
5 approach the witness, that is fine.
6    MR. PRYOR:  I'm not terribly patient when
7 on the clock.
8    THE COURT:  I appreciate that.
9    MR. PRYOR:  But I will wait.
10    THE COURT:  I have got the jury screens
11 muted, so you can show it to everyone but the jury.
12    MR. PRYOR:  Well, I move for the admission
13 of 21-O.
14    THE COURT:  21-O, same objections as to
15 the other 21 exhibits from Union and Southwest?
16    Okay.  So 21-O, I will admit over
17 objection and say it is limited to the claims
18 against the Union; it is not relevant to the claims
19 against Southwest.  And you can publish 21-O.
20    (The referred-to document was admitted in
21    Evidence as Trial Exhibit 21-O.)
22 BY MR. PRYOR:
23 Q.  There it is.
24    So this -- do you recognize this document as a
25 document that talks about charges being brought by

Page 795

1 the union against Jeanna Jackson?
2 A.  Yes.
3 Q.  And Jeanna Jackson is the one that we saw
4 numerous emails that you were on where attempted
5 charges were repeatedly brought to the attention of
6 Southwest Airlines?  That's the same person, right?
7    MR. GREENFIELD:  I'm sorry, objection,
8 your Honor.
9    THE COURT:  Basis?
10    MR. GREENFIELD:  This is outside the scope
11 of either mine of Mr. McKeeby's examination of
12 Ms. Stone in regard to charges brought by the union.
13 Neither of us talked about that.
14    MR. PRYOR:  They absolutely talked about
15 Jeanna Jackson --
16    THE COURT:  Can you explain what you mean
17 by that and -- in re-asking your question?
18    MR. PRYOR:  Okay.
19    THE COURT:  Explain what you mean by
20 "charges brought."
21    MR. PRYOR:  Oh, by charge -- oh.
22 BY MR. PRYOR:
23 Q.  I can read it.  The union has examined the
24 charges and found them to be proper.
25    Charges are being brought against Jeanna

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 3 July 07, 2022                      Pages 796..799

Page 796

1 Jackson by the union.
2    Do you understand that?
3 A.  Charges are brought about from a member of the
4 union against another member.
5 Q.  Okay.
6 A.  It is not the union itself that brings charges.
7 Q.  Okay.  So do you recall who brought the charges
8 against Jeanna Jackson?
9       MR. GREENFIELD:  Objection, Your Honor.  I
10 renew my scope objection, and also would like to
11 assert relevance.
12       THE COURT:  I think it is close enough.
13 Proceed.
14       MR. MORRIS:  I'm sorry?
15       THE COURT:  I think it is close enough.
16 Proceed.
17       You can answer.
18       THE WITNESS:  I don't remember who brought
19 charges against Jeanna.
20 BY MR. PRYOR:
21 Q.  Do you recall that, in fact, this says that,
22 The charges were found sufficient to require a trial
23 for Sister Jackson.
24       Did that happen?
25       You don't know?

Page 797

1 A.  I believe there was a trial, yes.
2 Q.  You believe there was a trial and you know the
3 result, don't you?
4 A.  I do not -- this isn't a document I have looked
5 at since 2017.  I don't recall the details of this.
6 Q.  I didn't ask you the details.  I asked you, was
7 there a trial?
8 A.  I think so.
9 Q.  You don't think so, you know so?
10       MR. GREENFIELD:  Objection, asked and
11 answered.
12       MR. PRYOR:  I'm testing her answer.  She
13 absolutely knows.
14       THE COURT:  Test it once.
15 BY MR. PRYOR:
16 Q.  Did you know?
17 A.  I think there was a trial.
18 Q.  So this person you had been on emails where you
19 had been trying to get the company to do something
20 against her for months, the union -- your union has
21 a trial, and you only think there was a trial?
22 Right?
23       MR. GREENFIELD:  Objection, your Honor,
24 asked and answered.
25       THE COURT:  Sustained.

Page 798

1 BY MR. PRYOR:
2 Q.  And this trial that you think occurred, you
3 also know the results of that trial that you think
4 occurred, don't you?
5 A.  Yes.
6 Q.  Okay.  So I just want to make sure we are
7 clear.  You weren't sure there was a trial, but you
8 are sure of what the result of the trial was, right?
9 A.  Yes, sir.
10 Q.  And that is pretty interesting, don't you
11 think?
12       MR. GREENFIELD:  Objection, your Honor,
13 argumentative.  Sidebar.
14       THE COURT:  Sustained.
15 BY MR. PRYOR:
16 Q.  And the result was that she was put on some
17 type of suspension that prevented her from running
18 for office in the next election, true?
19 A.  No.  It is not a suspension under the
20 TW International constitution.
21       As I mentioned earlier, one of the results of a
22 trial, if the members find a member to be guilty
23 and -- of the charges presented, one of the
24 disciplines or impact to that can be that they are
25 made a member in bad standing, which means they

Page 799

1 can't attend union meetings, they can't hold a union
2 position and they couldn't run for office.
3 Q.  I'm sorry, I used the wrong phrase.
4    But the point is, that the charges' result --
5 or the result of the trial was she didn't qualify to
6 run for the next election because she was in bad
7 standing?
8       MR. GREENFIELD:  Objection, your Honor.
9 If we can have a sidebar, please.
10       THE COURT:  You may.
11       (Thereupon, the following proceedings were
12    had at sidebar:)
13       MR. GREENFIELD:  I would like to renew my
14 scope objection at this time.  I believe we now are
15 outside of it.  We are talking about a document --
16 excuse me -- a document from November 2016.  This
17 was well after Carter's termination and it is what
18 Ms. Carter was terminated for and the reasons why
19 she was terminated, after she was gone.
20       THE COURT:  Jeanna Jackson can be within
21 the scope.
22       MR. PRYOR:  Exactly.  Jeanna -- they
23 raised Jeanna Jackson, acting like she had little or
24 no involvement in it.  And I'm entitled to now
25 follow up on what -- I talked about all her

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                    Pages 800..803

Page 800

1 complaints about Jeanna Jackson. They followed up.
2 Now I'm following on what they did. I'm showing,
3 no, there is even more.
4        THE COURT: I will let you do it. I think
5 it is a really crummy use of your time. You are
6 taking time away from your client.
7        MR. PRYOR: If you think it is a crummy
8 use of our time --
9        THE COURT: Every question you are asking
10 is a question you are not going to ask your client
11 when she's on the stand. You are making it all
12 about this one witness.
13        Again, if you want to do it, I think it is
14 of marginal value. I get it. That is why I put the
15 time clock on you. You can choose to do more
16 important things.
17        MR. PRYOR: I'm past the representing my
18 client. And I understand your opinion of our case,
19 but I'm the one that is charged with presenting it.
20 I know you are charged with judging it. I believe
21 it is important. I will get away from it as quickly
22 as possible, but I am concerned that you don't see
23 it as terribly relevant.
24        THE COURT: Go forth.
25        (Thereupon, the sidebar was concluded and

Page 801

1 the following proceedings were held in open
2 court:)
3        THE COURT: You can proceed.
4 BY MR. PRYOR:
5 Q.  You told me the Southwest Airlines
6 Investigating Committee that -- you said you didn't
7 say that you wanted -- that you wanted Charlene
8 Carter fired, you said that you just wanted it to
9 stop.
10        The only thing she ever did was send you
11 messages, correct?
12 A.  Yes.
13 Q.  And if you -- if that is all you wanted, all
14 you had to do was block her, true?
15 A.  Could have stopped the message coming to my
16 Facebook. I was concerned about her sending those
17 images to other flight attendants that had been in
18 attendance with me, one of whom --
19 Q.  You wanted to stop her.
20        And by the way --
21 A.  May I finish?
22        THE COURT: You may finish.
23 BY MR. PRYOR:
24 Q.  She never said --
25        THE COURT: Hold on. She can finish.

Page 802

1        MR. PRYOR: Oh, I thought she was
2 finished. Go ahead.
3        THE WITNESS: One of whom was very visibly
4 pregnant at the march. And blocking Charlene would
5 not have prohibited her from turning around and
6 sending that to any of the other women that were
7 with me.
8 BY MR. PRYOR:
9 Q.  So Charlene sends these communication to her
10 union president. Every message she ever sent you,
11 she sent to you in a private message, not for anyone
12 else. No one could else open it. True?
13 A.  Via Facebook, yes.
14 Q.  Okay. So every Facebook message she sent was
15 to you, and it was private.
16        Do you have anything to tell this jury that she
17 sent those messages to anyone else?
18 A.  I never stated that. I said I was worried
19 about that.
20 Q.  So you were worried about that, but it
21 certainly wasn't something that had ever occurred.
22 And you could have blocked her? Right?
23        MR. GREENFIELD: Objection, your Honor,
24 lack of foundation as to Ms. Stone's knowledge about
25 what Ms. Carter sent to any other individual.

Page 803

1        THE COURT: I will overrule that.
2 BY MR. PRYOR:
3 Q.  You can answer.
4 A.  I don't know. I don't know if she had ever
5 communicated with any of the women that there were.
6 Q.  So what I'm asking, ma'am, is to your
7 knowledge -- to your knowledge -- did Charlene
8 Carter send any of the messages she sent to you to
9 anyone else?
10 A.  No, not to my knowledge.
11 Q.  Counsel asked you if Charlene Carter knows your
12 views on abortion, and I can't remember the other
13 questions. But what she was sending you was
14 complaints about her union, she didn't want her
15 union spending money on a march that was sponsored
16 by Planned Parenthood. It wouldn't matter what your
17 views on abortion were for that, would it?
18 A.  Can you repeat the question, please?
19 Q.  Yes.
20        Your views on abortion are not relevant to what
21 the Union -- what Charlene Carter viewed as the
22 Union spending money going to a Women's March
23 sponsored by Planned Parenthood, and her dues money
24 was being used for that. That was her complaint.
25 Your views on abortion don't affect that, right?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Pages 804..807

Page 804

1      MR. McKEEBY:  Objection, this is argument.
2      THE COURT:  I will allow that.
3      MR. GREENFIELD:  Your Honor, if I may
4  object, counsel is inserting --
5      THE COURT:  No speaking objections.  What
6  is your basis?
7      MR. GREENFIELD:  Counsel is testifying
8  with legal conclusion.
9      THE COURT:  That is fine.  I will overrule
10  that.  You can answer the question.
11  BY MR. PRYOR:
12  Q.  You can answer.
13  A.  The Union didn't spend union dues on the march.
14  Q.  That wasn't my question, was it, ma'am?
15  A.  It was in the question you asked me.
16  Q.  I'm talking about Charlene's concern, whether
17  she was right or wrong about the Union spending
18  money.
19      Although, you answered my question yesterday
20  that 20 women went up there on the Union's nickel,
21  but, gee, not for the march.  Well, that is not the
22  way Charlene viewed it.  But we can set aside that
23  debate.
24      From Charlene's view, the union was spending
25  money on that march, and that is what she was

Page 805

1  complaining to you about.
2      Your views on abortion do not relate to that
3  complaint, true?
4      MR. McKEEBY:  Same objection, this is
5  argument.
6      THE COURT:  I will sustain this one.
7  BY MR. PRYOR:
8  Q.  Does your view of abortion relate to Charlene
9  Carter objecting to dues money being spent on the
10  Women's March, in her opinion?
11      MR. McKEEBY:  Same objection, and asked
12  and answered.
13      THE COURT:  I will allow this one.
14      MR. PRYOR:  Thanks, Judge.
15      THE WITNESS:  No.
16  BY MR. PRYOR:
17  Q.  Now, ma'am, let's up put up Exhibit 47 they
18  showed you a few minutes ago.
19      This is the anatomically correct hats.  And you
20  were asked the question of, Did you wear this hat?
21      You said no.
22      You were asked the question of, Did you see
23  anyone at the march wearing this hat?
24      You said, No.
25      But in fact, you know, because you testified

Page 806

1  yesterday, that you found out that, in fact, women
2  were wearing those hats at the march that your union
3  participated in, true?
4  A.  No, sir, that is not what I recall saying.  I
5  recall you talking about these images being from
6  women at the march.
7  Q.  Are you telling me, as you sit here today, that
8  you don't know that there were groups of women
9  wearing anatomically correct hats at the Women's
10  March?  Whether you saw them or not, you found out
11  that that, in fact, happened.
12  A.  After the march, yes, I did find that out.
13  Q.  Okay.  And Charlene was complaining about that
14  occurring at a march that her union was at and she
15  thought it reflected bad on the union.
16      That is her complaint, right?
17  A.  Yes.
18  Q.  Let's look at Exhibit 94.
19      I'm going to hand you a hard copy of this.
20      MR. PRYOR:  May I approach?
21      THE COURT:  You may.
22  BY MR. PRYOR:
23  Q.  I'm going to ask you the same question I asked
24  you about Exhibit 15 today.  And that is, can you
25  look through this and tell me if there is any

Page 807

1  communication in here that you don't think is part
2  of Ms. Carter's rights to object to her union?  Or
3  complain to her union?  If you find a page, be sure
4  and tell me, and we will talk about it.
5  A.  All of her messages are complaining about the
6  union.  All of the written text.
7  Q.  Is there anything in there that you think is
8  not protected union activity on the part of
9  Ms. Carter?
10  A.  I don't believe that sending me videos of dead
11  babies is protected union activity.
12  Q.  Now, we can talk about that all you want,
13  ma'am -- and we are getting ready to -- but in this
14  exhibit, is there anything that is not
15  union-protected activity?
16  A.  These are in this exhibit, the comment I just
17  made.  And I just answered that I do not believe
18  that is protected union activity.
19  Q.  Which pages?
20  A.  The very back.  4264.
21  Q.  4264.
22      Okay.  Other than 4264, are there any other
23  communications in Exhibit 94 that you consider not
24  to be union-protected activity?
25  A.  I don't know what the last page is.  It is

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 191 of 642   PageID 11132
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 3 July 07, 2022                        Pages 808..811

Page 808

1 referencing -- so I don't think the last page is
2 either, what I can see on it.
3 Q.   The page talking about, Seek God now in prayer?
4 You don't know if that is related to union activity
5 or not?
6 A.   No.
7 Q.   Anything else?
8 A.   No, not that I see.
9 Q.   As to that last page, 4267, you don't recall
10 that the communication from Ms. Carter about Alveda
11 King and her opposition to abortion was relating to
12 her complaints regarding Planned Parenthood and the
13 Union's association with it at the march?
14 A.   No.  One of the exhibits that had a bunch of
15 stuff about King, I said that I had never seen that
16 before.
17 Q.   Okay.  Let's talk about the videos.
18      So you told me this morning -- or yesterday,
19 that one of the videos that you accidentally clicked
20 on to view was two or three seconds.  And we watched
21 that this morning, right?
22 A.   I never said I watched it for two or three
23 seconds.  I said I watched part of it when it
24 automatically started playing, which videos in
25 Facebook can do.

Page 809

1 Q.   Okay.  Wait.  Facebook Messenger, you're
2 telling me now -- do you recall yesterday telling us
3 that you clicked on it inadvertently and that is
4 what made it start?
5 A.   You kept asking me questions about videos not
6 automatically playing, and I would have had to have
7 hit play.  And I answered that I must have
8 inadvertently hit it.
9      But there are times -- Facebook plays videos
10 without you going in and hitting play.
11 Q.   Your testimony is, you have gone on to Facebook
12 Messenger, opened it up, and the video was playing
13 before you click on the video?
14 A.   No.  I'm talking about within Facebook.  I
15 don't believe I have ever received other videos in
16 Facebook Messenger besides the one Ms. Carter sent.
17 Q.   I'm just trying to get an answer to my
18 question.  It is your testimony that that can happen
19 on Facebook Messenger?
20 A.   No, sir.  I am saying that within Facebook,
21 videos can automatically play.
22 Q.   And I'm asking about Facebook Messenger, which
23 is where you received this video.
24      You accidentally clicked on it, was what made
25 it play, true?

Page 810

1 A.   I am still saying I don't know if I
2 inadvertently hit play.  My recollection, as I have
3 said over and over, was that it started playing when
4 I opened that thread with Ms. Carter in it.
5 Q.   Did you tell the Southwest investigating
6 committee that you looked at the message, saw what
7 it was about, didn't have time to look at the video,
8 and then clicked later?
9 A.   No.  That is not what I stated to them.
10 Q.   And today, you tell us that you immediately
11 stopped playing the video, the first video, and
12 then -- I don't know, was it the next day that you
13 go to your hotel room and you decide you do want to
14 watch the second video, and you click on it and
15 watch it?
16 A.   What I stated is that I saw enough of the first
17 video.  I instantly became upset.  I stopped playing
18 it.  Removed myself from the boarding area until I
19 pulled myself together.
20      And then, yes, later on -- I believe it was the
21 next day -- I went back in and watched everything in
22 its entirety, and read the accompanying text
23 messages.
24 Q.   So knowing what it was about, you made the
25 voluntary decision to watch these videos, true?

Page 811

1 A.   At that point, yes.
2 Q.   And were you doing it at that point because you
3 wanted to see what happens to an unborn baby during
4 an abortion?  Or because you wanted to use it to
5 bring charges against Ms. Carter?
6 A.   Neither.  I wanted to know exactly what had
7 been sent to me, why it had been sent to me, what --
8 where this was coming from.
9 Q.   Okay.  Well, the messages told you why it was
10 sent to you.  And you could also look on the caption
11 below the video to see where it came from.  But you
12 also wanted to see what was in the video, true?
13      MR. GREENFIELD:  Objection, your Honor,
14 counsel is testifying.
15      THE COURT:  I will allow that.
16      THE WITNESS:  I had no idea why those
17 videos had been sent to me at the time I opened it
18 and started watching it.
19 BY MR. PRYOR:
20 Q.   So you watched the video, and you saw a baby
21 moving, true?
22 A.   In one of them.  It looked -- it appeared as if
23 the baby was moving.
24 Q.   It appeared that the baby was alive.  Movement
25 indicates life, true?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Pages 812..815

Page 812

1 A.  Yes.
2 Q.  And if anyone wanted to tell their union
3 president -- forget your views on abortion -- but if
4 you wanted to tell your union president, Don't spend
5 our money on organizations that support this, and
6 you wanted to protect a baby's life, can you think
7 of a more effective means of doing it?  You have
8 cried every time you have talked about it.  What is
9 more effective?
10 A.  I don't think it was effective.  I think it was
11 harassment and disturbing.
12 Q.  It didn't change your view about abortion, did
13 it?
14        MR. GREENFIELD:  Objection, your Honor,
15 relevance.
16        THE COURT:  Sustained.
17        MR. PRYOR:  They asked her -- okay.
18 BY MR. PRYOR:
19 Q.  It didn't change your view that a woman should
20 get to decide whether or not to have an abortion?
21        MR. McKEEBY:  Objection, asked and
22 answered.
23        MR. GREENFIELD:  Object to relevance.
24        THE COURT:  Yeah, I will sustain that one.
25

Page 813

1 BY MR. PRYOR:
2 Q.  Can you tell me a more effective means of
3 trying to tell someone that abortion is taking a
4 life than that -- I'm not saying you have to agree
5 with it -- can you think of a more effective means
6 of trying to convince someone that abortion is
7 taking a life than the actual video of the life that
8 is being taken?
9        MR. GREENFIELD:  Objection, relevance as
10 well.
11        THE COURT:  I will allow that.
12        THE WITNESS:  It was only effective in
13 upsetting me.
14 BY MR. PRYOR:
15 Q.  I'm not asking --
16 A.  -- making me feel harassed.  It is not that I
17 think it is an effective tool.  I don't think that
18 should be utilized.
19 Q.  You don't think that -- can you tell us a more
20 effective means of doing it to convince someone --
21 something better than actual video, of me sitting
22 here and telling you statistics or anatomy lessons?
23 What is more effective than the video?
24        MR. GREENFIELD:  Objection, your Honor,
25 asked and answered.

Page 814

1        MR. PRYOR:  I'm looking for an answer.
2 She hasn't answered it.
3        THE COURT:  I will let you ask it this one
4 last time.
5        THE WITNESS:  Conversation would be more
6 effective.
7        MR. PRYOR:  Thank you.
8        THE COURT:  Okay.  Mr. Greenfield, round
9 two.
10        MR. GREENFIELD:  No more questions, your
11 Honor.
12        THE COURT:  Okay.  Mr. McKeeby.
13        MR. McKEEBY:  I will be quick.
14             RECROSS EXAMINATION
15 BY MR. McKEEBY:
16 Q.  Ms. Stone, do you recall yesterday when
17 Ms. Carter's counsel criticized you for not
18 responding to the historical Facebook messages
19 regarding -- they characterized as union activity?
20        MR. PRYOR:  Object to ad hominem comments
21 and mischaracterizations.
22        THE COURT:  Can you rephrase it?
23        MR. McKEEBY:  I think I know what
24 ad hominem is, and I -- oh, union counsel.  I see.
25 I get it now.  No, that wasn't it.  I didn't even

Page 815

1 notice that.
2        Let me start again.
3        MR. PRYOR:  Call me American Airlines
4 Counsel.
5 BY MR. McKEEBY:
6 Q.  Former counsel for American Airlines questioned
7 you yesterday and criticized you for not responding
8 to his client's historical emails, Facebook
9 messages.
10        MR. PRYOR:  Now -- I'm sorry.  I am
11 objecting to mischaracterization.  That is not what
12 I did.
13        THE COURT:  I think he's going after the
14 word "criticized."
15        Is that correct?  Is there any word other
16 than "criticized" you can use to stop the objection?
17        MR. McKEEBY:  Sure.
18 BY MR. McKEEBY:
19 Q.  Counsel for Ms. Carter yesterday questioned
20 your failure to respond to his client's historical
21 emails, text messages -- excuse me -- Facebook
22 messages about union activity.
23        Do you recall that?
24 A.  Yes.
25 Q.  And today he's saying you should have blocked

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 193 of 642   PageID 11134
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 816..819

Page 816

1 his client.  Did you understand that?
2 A.  Yes.
3 Q.  Do you find that a little bit, oh,
4 contradictory?
5 A.  Yes.
6 Q.  Have you ever blocked anyone on Facebook
7 before?
8 A.  I have now.
9        MR. McKEEBY:  No other questions.
10        THE COURT:  Round three?  Limited scope to
11 round two.
12        MR. PRYOR:  No.
13        THE COURT:  Okay.  That means we are done
14 with you as a witness.  I no longer have to tell
15 you, you can't talk to anyone about the case.  I can
16 excuse you from the courtroom, but all witnesses are
17 subject to the right to recall.
18        It doesn't always happen, but occasionally
19 it does, so be on standby.  We may need your
20 testimony back if something else happens during the
21 trial.
22        So thank you for being here.
23        Thank you for your testimony, Ms. Stone.
24        Okay, Carter can call the next witness.
25        MR. PRYOR:  At this time we call, by video

Page 817

1 deposition, Brian Talburt.
2        Have you already explained video
3 depositions?  I can't remember.
4        THE COURT:  I'm about to while you queue
5 up the Talburt video.
6        So I will tell the jury, there are legal
7 reasons why a witness might not be able to be here
8 in person.  I don't have limitless power to draw
9 people in who are beyond my geographic radius.
10        So this next witness meets that test for
11 being unavailable.  They had him on a deposition,
12 which means they took his sworn testimony earlier in
13 the course of this case.  And then I have reviewed
14 that.
15        And we are going to play the relevant
16 portions of that deposition for you.  You are
17 supposed to treat that deposition, that video depo,
18 the same as if that person were live, sitting here
19 on the stand.
20        I also need to say one more thing, which
21 is there are some snippets of testimony here that go
22 to an issue I have talked to you about earlier on
23 Southwest, and maybe Southwest disciplining
24 something, or claims on how Southwest treated
25 somebody.  I told y'all that is not relevant to

Page 818

1 these claims against Southwest.
2        Some of those are intertwined with this
3 depo and we can't separate it out because it is
4 not a live witness on the stand.  So you will hear
5 some of that.  Please ignore that.  That is my
6 limiting instruction to you.
7        With that, you can queue up Talburt and
8 go.
9        (Thereupon, the video clip was played and
10        transcribed as follows:)
11        E X A M I N A T I O N
12 BY MR. PRYOR:
13 Q.  State your name, please.
14 A.  Brian Talburt.
15 Q.  Mr. Talburt, my name is Bobby Pryor.  I
16 represent Charlene Carter.  Who have you --
17        THE REPORTER:  Mr. Talburt, please let the
18 attorneys finish before you give an answer.
19 BY MR. PRYOR:
20 Q.  Were you a supporter of Audrey Stone both when
21 she ran for union leadership and while she was in
22 union leadership?
23 A.  Yes.  I supported her in her campaign.
24 Q.  Well, did you support her in her -- while she
25 was a leader?

Page 819

1 A.  In most -- in most situations, yes.
2 Q.  What did you do as a member of CAN?
3 A.  Basically, that was lounge education and a
4 lounge -- and a mobilization effort for contract
5 negotiations.
6 Q.  That stands for Contract Action Network?
7 A.  Correct.
8 Q.  When were you part of CAN?
9 A.  Oh, that would have been for our first
10 tentative agreement for a contract that ultimately
11 was settled in 2015, I guess.  So I'm guessing that
12 would have been 2013.
13 Q.  Are you currently employed by Southwest
14 Airlines?
15 A.  Yes, I am.
16 Q.  And what is your position?
17 A.  I'm a flight attendant.
18 Q.  Are you still a member of Local 556?
19 A.  Yes.
20 Q.  And your -- at this fact-finding meeting -- and
21 did this also go to a Step 2?
22 A.  No.
23 Q.  So then at Step 1, who represented you?
24 A.  Brett Nevarez.
25 Q.  And was it argued at this meeting, at this

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 820..823

Page 820

1  hearing by you and Brett Nevarez, that your actions
2  were protected from, among other reasons, that you
3  were engaged in union activity, in fact, engaged in
4  activity relating to an election?
5  A.  Yes.
6         MR. GREENFIELD:  Object to form.
7         It is incomplete, it is vague, and it's --
8  it just paints an incomplete picture.
9         THE COURT:  You can ignore the part where
10 they talk about objections.
11 Q.  At this meeting, did you argue that your union
12 activities should be protected from Southwest's
13 social media policy?
14 A.  Yes.
15 Q.  And Mr. Nevarez supported that argument on
16 behalf of the leadership of Local 556, correct?
17 A.  He supported that argument.  Presumably the
18 rest would be accurate as well.
19 Q.  And who was president at that time of the Local
20 556?
21 A.  Audrey Stone.
22 Q.  Now, did you ever engage -- and I think you
23 have answered this before, but it is a little bit
24 more specific -- did you ever engage in an effort to
25 target union member opponents of Stone's and her

Page 821

1  slate, recall petition members or objectors of Local
2  556?
3  A.  You would have to define the word "target."
4  Q.  Okay.  Then tell us -- tell the jury how you
5  would define "target" in regard to targeting union
6  member opponents to Stone and her slate, union
7  member opponents acting in favor of a recall, and
8  union objectors.
9         How would you use the word "target" in regard
10 to those three classes of people?
11 A.  I -- I -- if -- I guess basically trying to
12 isolate or identify them.
13 Q.  All right.  So can you tell me, is all you did
14 to target those groups is just to find out who they
15 were?
16 A.  No, I didn't.  I didn't say that and that is
17 not what I did.
18 Q.  So tell us what you did.
19 A.  The only thing that -- what I can think of that
20 I did, would probably be turning in social media
21 violations for public comments that were made,
22 usually, that were inaccurate or offensive.
23 Q.  So when you told Southwest Airlines you don't
24 want to turn anyone in for social media violations,
25 this is a nightmare, changed your mind?

Page 822

1  A.  Yes.
2  Q.  So what did you do, then, to target these
3  groups?
4  A.  Sent them to management, certain social media
5  posts that would have been incriminating.
6  Q.  Who assisted you with that?
7  A.  Assisted?
8         MR. McKEEBY:  Object to the form.
9         THE WITNESS:  I don't know that anybody
10 assisted me.  I would have just forwarded it to
11 somebody.
12 BY MR. PRYOR:
13 Q.  How did you identify those three classes of
14 people?
15 A.  Anybody that would have been turned would have
16 nothing to do with being an objector.  I don't even
17 know who -- the names of the objectors were not
18 public, or never disclosed, until they identified
19 themselves.
20 Q.  Who do you remember turning in?
21 A.  The only person that I can remember turning in
22 would have been Jeanna Jackson.  I'm not saying that
23 is an inclusive list, but that is the only person
24 that comes to mind at this moment.  Again, this is
25 eight years ago.

Page 823

1  Q.  What about Mike Casper?
2  A.  More than likely, Mike Casper.  Given an
3  opportunity, I would have, yes.
4  Q.  And why Mike Casper, if you had been given the
5  opportunity?
6  A.  Mike Casper was an -- has been an adversary for
7  many years, causing a great deal of dysfunction and
8  destruction to both Southwest and TWU.
9  Q.  And so you would have targeted Ms. Jackson, and
10 if given the opportunity, Mr. Casper.
11        Anybody else?
12 A.  When you say "targeted," I don't know that I
13 necessarily agree with the term you're using.
14        Did I turn them in using -- turn in their words
15 to Southwest?  Yes.
16 Q.  What was the result -- first of all, who at
17 Southwest management did you talk to about targeting
18 these three groups?
19 A.  Whoever I sent them to.  I don't know whether
20 it was the social media violations department or a
21 vice president, director, base man -- probably not
22 the base manager.  I doubt that I would have
23 included them.
24 Q.  You don't recall who you sent it to?
25 A.  No.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 195 of 642   PageID 11136
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Pages 824..827

Page 824

1  Q.  How did you decide who to send it to?  Maybe
2  that will help us narrow it down.
3  A.  Probably the people that I would have had
4  some -- the closer -- more of a working relationship
5  with, and felt more comfortable with.
6  Q.  And what -- who would fall within that group?
7  A.  Possibly our -- I don't believe Sonya Lacore
8  would have been vice president at that point; I
9  think she was a director.
10     Mike Simms would have been a director.
11  Q.  And who would the director have been at that
12  point, Hafner?
13  A.  I would just say -- so -- I believe Sonya
14  Lacore would have been a director at that point, as
15  would have been Mike Sims.
16  Q.  Okay.  So you think you would have spoken to
17  either Ms. Lacore or Mr. Sims or both?
18  A.  Probably not spoken, probably would have
19  forwarded an email.
20  Q.  Did you exchange emails on a regular basis with
21  Sonya Lacore?
22  A.  Yes.
23  Q.  And what time period would that have been?
24  A.  Probably 2013 through -- I don't know.
25  Probably whenever she became vice president or

Page 825

1  shortly -- shortly thereafter, I would guess.
2     I mean, I continued to have emails with her
3  over the years of various topics.
4  Q.  And Ms. Lacore, what was her position at
5  Southwest Airlines?
6  A.  Most of the time when I dealt with her more
7  regularly, she was a director.
8  Q.  Director of what?
9  A.  Director of in-flight.
10  Q.  And explain to the jury what -- what that
11  means, to be director of in-flight?
12  A.  I don't really know what the role is, to be
13  honest with you.  It is one notch below a vice
14  president and one notch above a manager.  So I don't
15  know what her specific duties were.
16     I worked with her on a couple of projects that
17  she was basically the liaison or oversaw what we
18  were doing.  So that's when I had most of my contact
19  with her.
20  Q.  All right.  So this is an email from you to
21  Sonya Lacore dated April 29, 2014, correct?
22     (The videotaped testimony of the witness
23     was paused.)
24     MR. HILL:  Exhibit 141 displayed.  Trial
25  Exhibit 141.

Page 826

1     THE COURT:  Thank you.
2     (The videotaped testimony of the witness
3  was played.)
4  BY MR. PRYOR:
5  Q.  And you sent this to her private email,
6  correct?
7  A.  Apparently so, yes.
8  Q.  With Facebook and 24/7 reach, the characters
9  become more relevant.  Corliss particularly is
10  something that we not seen before, and it is
11  incredibly dangerous.
12     Who is Corliss?
13  A.  A Southwest flight attendant.
14  Q.  So now you are identifying another Southwest
15  Airlines employee in referring to her as "incredibly
16  dangerous," correct?
17  A.  Correct.
18  Q.  You say, "The attitude she spawns is TW
19  Airlines in the '80s.  People listen and people
20  react."
21     What are you referring to when you say, "She
22  spawns Northwest Airlines in the '80s"?
23  A.  Northwest Airlines was notorious for having
24  very poor labor management relations.
25  Q.  And they had a --

Page 827

1  A.  And history -- and historically, at Southwest
2  Airlines, we did not have that.
3  Q.  Okay.  So you were warning Ms. Lacore that
4  Corliss spawns an attitude of union problems with
5  management, in your opinion?
6  A.  Right.
7  Q.  Did you say --
8  A.  In my opinion, correct.
9  Q.  Did you say "right"?
10  A.  In my opinion, correct.
11  Q.  And then you said, "I am all about targeted
12  assassinations," correct?
13  A.  That's what I said.
14  Q.  And did Ms. Lacore report to you, to your
15  knowledge, to Southwest management for any of the
16  words that you have -- that we've read so far in
17  this email?
18  A.  Not to my knowledge.
19  Q.  And you know that targeted assassinations gets
20  you in trouble, because you got in trouble about
21  that, didn't you?
22  A.  That would have been -- I'm looking at the
23  timeline.  Apparently so, yes.
24  Q.  I understand your defense of the terms.  What
25  I'm pointing out is, you've been disciplined for

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Pages 828..831

Page 828

1 this language, and you felt comfortable using it
2 with a senior member of in-flight management at
3 Southwest Airlines, correct?
4 A.   Correct.
5 Q.   It says, I am sure with her dreadful work
6 history, there could be opportunity.
7      Are you there talking about exactly what you
8 mean, as you tell us about "targeted
9 assassinations"?  You're not suggesting that you are
10 going to assassinate Ms. Corliss, you're suggesting
11 that taking advantage of her dreadful work history
12 could be the opportunity to get -- I don't know --
13 A.   Apparently, yes.
14 Q.   Then you say, She will play very well to the
15 heavy, inner-city minority crowd coming on board
16 soon.  She will be their voice.  She will be a huge
17 threat in our upcoming election as well.  She plays
18 very well to her crowd and has as much support as
19 anyone I have seen in the past.
20      You wrote those words and you sent them to
21 Sonya Lacore, correct?
22 A.   It appears so, yes.
23 Q.   Okay.  And you know Ms. Lacore did not report
24 you to Southwest Airlines for violation of any
25 Southwest policies as a result of this, correct?

Page 829

1 A.   Not that I'm aware of.
2 Q.   Do you think that your words here are racist?
3 A.   No.
4 Q.   Didn't you say -- I'm going to skip down to the
5 next paragraph -- well, no, let me go to the last
6 sentence here.
7      You're talking about Sam Wilkins.  And then you
8 say, Everybody loves her.  But then you say, Well,
9 everyone except the Haters.
10      And that is a capital "H."
11      Who is haters?
12 A.   The opposition to the current administration.
13 Q.   So union members who oppose the current union
14 leadership?
15 A.   Not necessarily oppose, but are vocal and
16 public.
17 Q.   No, sir.  Just now, you said that she would
18 know, that Ms. Lacore would know.  We'll put these
19 words up for the jury.  Here's your chance to see if
20 you can tell the truth under oath.
21      Did you tell -- say that she would understand
22 that haters meant anyone that was opposed to the
23 current union administration?
24      You can answer.
25 A.   I said that's not entirely what I meant.

Page 830

1 Q.   So --
2 A.   What I meant was -- Sonya -- Sonya would be
3 well aware of the people that were extremely vocal
4 publicly about our current administration.  There
5 was no secret about that.
6 Q.   The next paragraph says, Social media is, by
7 far, the major source of reach and must be used to
8 our advantage.
9      Are those the words that you used?
10 A.   Yes.
11 Q.   And then you go down to the next paragraph.
12 Cancer is a dangerous thing and must be eradicated
13 wherever possible before it spreads.
14      By the way, if you go back up to that first
15 paragraph, the cancer example you gave us as to
16 Mr. Casper, right?
17 A.   Yes.
18 Q.   And is that what you're referring to here or
19 are you talking about a larger group of people?
20 A.   Well, I'm talking about a movement.  Casper
21 would have been a pioneer in that movement.
22 Q.   You said, I would highly encourage targeting
23 people, and a one-day detective with a video camera
24 is a very cheap investment.
25      Is that a recommendation that you were making

Page 831

1 to Ms. Lacore?
2 A.   Apparently so, yes.
3 Q.   What were you trying to avoid by sending it to
4 her personal email?
5 A.   The filters that it may go through at
6 headquarters as opposed to not going directly to
7 her.  I don't know who reads things at headquarters.
8 Q.   Why would you be concerned about someone
9 reading this?  If you are not doing anything wrong,
10 why are you concerned?
11 A.   It was a personal -- personal communication
12 between two people.
13 Q.   And so you are worried about your -- you have
14 told us now.  You couldn't remember, but now you
15 told us in what you wrote.  You didn't want a paper
16 trail about these communications, did you?
17 A.   I didn't want to put -- basically, this was a
18 one-sided communication.  It was not intended, nor
19 expected to be -- I didn't want her to think that a
20 reply was to be expected.
21      Obviously, I'm using some inflammatory, some
22 colorful language and I would not expect her in her
23 position to respond to that.  So I was basically
24 sharing my thoughts with her.  Nothing more.
25 Q.   You sent this to Ms. Stone; one of the reasons

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Pages 832..835

Page 832

1 was to point out that in that email below, you used
2 the "targeted assassinations" metaphor.
3    And at another point in time, you got no
4 trouble.  But here, this shows that you had used it
5 before with senior management.  Not gotten in
6 trouble.  And it was clear that you were talking
7 about terminating someone's job, not killing
8 someone, is that accurate?
9 A.  Not necessarily terminating somebody's job, but
10 basically being held accountable, yes.
11 Q.  Other than that, either terminating their job
12 or holding them accountable, my statement was an
13 accurate summary?
14 A.  Yes.
15 Q.  So in your naive way of thinking, in fact, you
16 told Ms. Stone that the reason you did this
17 communication the way you did with Ms. Lacore was to
18 keep it off the record.  You even put quotes on
19 around it, true?
20 A.  Yes.  Apparently, yes.
21    MR. McKEEBY:  This is trial Exhibit 26.
22    MR. HILL:  Trial Exhibit 26 is being
23 displayed.
24    THE WITNESS:  Could you make this a little
25 bigger?

Page 833

1 BY MR. PRYOR:
2 Q.  Let me scroll up.  Do you know if you sent this
3 to Audrey Stone and her response was "Not relevant"?
4 A.  Okay.
5 Q.  I'm asking you if you agree that is what is --
6 I think it is, but I need you to tell me that's what
7 you think as well.
8 A.  That's what it looks like, yes.
9 Q.  Okay.  All right.
10    So at the bottom, there is something that says
11 from Mike Hafner to Brian, and that's you, right?
12 A.  I'm sorry.  Where are we looking at?
13 Q.  Can you see my cursor?  If you look at the
14 bottom, on August 16th, 2013 at 6:21 a.m., it
15 appears that you received an email from Mike Hafner
16 that was also sent to Matthew -- and I don't know
17 how to pronounce his last name.
18    At the very bottom, do you see where it says
19 "Trial Exhibit 26"?
20 A.  Oh, yes.  Yeah.  My phone is blocking it.  I
21 can't see it.
22 Q.  Okay, fair enough.
23    And if you look to the left of that, you see it
24 is an email from Mike Hafner that you're carbon
25 copied on?  At 6:21 a.m.?

Page 834

1 A.  Yes.
2 Q.  And I don't have anything else about that
3 email.
4    But if you look at the email above, are you
5 able to tell us any recollection you have of what
6 Mr. Hafner was sending you?  If it helps, the
7 subject line says, "Re: Facebook."
8 A.  Okay.
9 Q.  Do you recall what Mr. Hafner was communicating
10 to you in that email?
11 A.  I -- I don't know.  I mean, I know what -- I
12 know what the email is about, but I don't know what
13 Hafner was responding to, no.
14 Q.  So then at that time Mr. Hafner was in what
15 position?
16 A.  In 2013, he would have been the vice president
17 of in-flight services.
18 Q.  And that's a member of senior management of
19 Southwest Airlines?
20 A.  Yes.
21 Q.  Okay.  Then you go on to say, But it is an
22 illustration of casual, behind-the-scene
23 conversations we have, and particularly social
24 media.  That's what you wrote, correct?
25    Do I need to make it bigger?

Page 835

1 A.  No.  No.  I'm just --
2 Q.  Do you agree that that is what you wrote?
3 A.  Yes.
4 Q.  And then you write, I, along with Mike and
5 Sonya, had a meeting last summer with VdV to discuss
6 social media as a tool.
7    Did you write that?
8 A.  Yes.
9 Q.  And is "Mike," Mike Sims?
10 A.  No.  Mike Hafner.
11 Q.  Oh, I'm sorry.  Mike Hafner.
12    And is "Sonya," Sonya Lacore?
13 A.  Yes.
14 Q.  And that's the same Sonya Lacore as the last
15 email we were looking at that you were talking about
16 using social media to target assassination.
17    Again, to you that means termination or
18 otherwise hold them accountable, such as Ms. Corliss
19 and Mr. Casper?
20 A.  This particular email is a completely different
21 context and a completely different -- totally
22 different angle than what that email said.
23 Q.  And that -- that wasn't my question.
24    We can certainly talk about that question.
25    But my question is, this is the same Sonya

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 198 of 642   PageID 11139
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                    Pages 836..839

Page 836

1 Lacore you were talking to in that previous email
2 marked trial Exhibit 141, about targeting for
3 assassination union members such as Mr. Casper and
4 Ms. Corliss, correct?
5 A.  The same person, yes.
6 Q.  And then it says, Had a meeting last summer
7 with VdV.  I think I read that.  Who is VdV?
8 A.  Mike Van de Ven.
9 Q.  Van de Ven?
10 A.  Van de Ven.
11 Q.  Your union has been addressing Southwest
12 Airlines social media policy for a long time.  We
13 have been bringing forward your concerns around the
14 lack of clear guidelines on a policy that is both
15 vague and undefined.
16     We have witnessed inconsistencies around the
17 way that the policy is applied, and it is often a
18 subjective stance that Southwest management has
19 displayed in administering the policy.
20     Do you recall that?
21 A.  Yes.
22 Q.  And that was also your opinion, correct?
23 A.  Yes, of course.
24 Q.  And it was the opinion, as far as you know, of
25 all of the leadership of the Union in 2015, of Local

Page 837

1 556?
2 A.  I don't know.  I can't speak for all of them.
3 But one would assume so.
4 Q.  Okay.  So could you, from conversations with
5 Brett Nevarez, tell me whether or not you understood
6 that to be his opinion as well?
7 A.  Yes.  That was my understanding, yes.
8     (The videotaped testimony of the witness
9     was paused.)
10     MR. HILL:  Let the record reflect that
11 what is displayed on the screen right now is trial
12 Exhibit 19.
13     (The videotaped testimony of the witness
14     was resumed.)
15 BY MR. PRYOR:
16 Q.  And that's your conversation with Mr. Nevarez?
17 A.  Yes, yes.
18 Q.  And that is also your understanding of
19 Holcomb's opinion based on your conversations with
20 him?
21 A.  Yes.
22 Q.  It certainly was the opinion of Ms. Stone, she
23 not only wrote this, but that was also your -- your
24 understanding from her from your dealings with her?
25 A.  Yes.

Page 838

1 Q.  Let's go down to the bottom.  It says, On a
2 personal note, however, please note that social
3 media issues management investigated and the
4 resulting discipline Southwest Airlines issued did
5 not arise out of something management simply
6 uncovered or stumbled upon.
7     You are not generally monitoring our sites.
8 Instead, these cases come about as our own flight
9 attendants are turning each other in.
10     These latest investigations have been as a
11 result of flight attendant complaints.  I am asking
12 that we please consider stopping any back-and-forth
13 fighting on social media.
14     That was your understanding in April of 2015 as
15 to Ms. Stone's opinion in this regard, correct?
16 A.  Yes.
17 Q.  And that was also your opinion, correct?
18 A.  Yes.
19     (The videotaped testimony of the witness
20     was paused.)
21     MR. HILL:  Let the record reflect Exhibit
22 21-A is displayed.  We are moving to 21-C, I see.
23     (The videotaped testimony of the witness
24     was resumed.)
25

Page 839

1 BY MR. PRYOR:
2 Q.  And then let's look at Exhibit 21-C.
3 A.  Yes.
4 Q.  You are not on this email, but it is about the
5 additional information.  In the subject line, it
6 says you provided Tammy.  There are more posts from
7 Brian.  I think he's going through all of -- all of
8 his archived files and digging up everything he can.
9 ER is working with the bases and Brian.
10     Did you have any conversations with anyone at
11 Southwest Airlines that would inform that email?
12 A.  I'm not aware of.
13 Q.  So according to Ms. Emlet, she thinks you are
14 going through all of the archived files, digging
15 things up, and that you are going to be working with
16 the bases, ER is going to be working with the bases
17 and you.  That's a fair interpretation of what we
18 are reading here?
19 A.  How I'm reading it is they are going to seek
20 further clarification on something that I provided
21 them.
22 Q.  ER is "Employee Relations"?
23 A.  I believe so.
24 Q.  And "Bases" is the management at the various
25 bases?  And Brian is you?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                           Pages 840..843

Page 840

1  A.  Yes.
2  Q.  So --
3       MR. HILL:  Let me explain what is going on
4  here as far as the sound.  Mr. Talburt's headphones
5  ran out of battery part way through the deposition.
6  And he replaced them with a set of headphones that
7  were extremely poor.  We will get back to better
8  sound later, but it is really difficult to hear them
9  a little bit.  You can kind of read the transcript.
10 BY MR. McKEEBY:
11 Q.  So employee relations, which is part of the
12 management of Southwest Airlines, is going to work
13 with you and the bases about this information that
14 you've been providing, according to this email,
15 right?
16 A.  The way that she structured that, that
17 statement, I don't agree with that, it's not that
18 they are working with me, per se.  You are making
19 it -- you are portraying it as some grand
20 conspiracy, and it's not that at all.
21 Q.  Well --
22 A.  I'm going to -- I'm going to assume that if I
23 provided them something, they would ask for
24 clarification.
25 Q.  Look at 21-U.

Page 841

1       (The videotaped testimony of the witness
2  was paused.)
3       MR. HILL:  21-U is being displayed.
4       (The videotaped testimony of the witness
5  was resumed.)
6  BY MR. PRYOR:
7  Q.  Can you see 21-U on your screen?
8  A.  Yes.
9  Q.  And this is an email from you to Mike Sims and
10 Sonya Lacore, correct?
11 A.  Yes.
12 Q.  And here, do you recall this email?  When does
13 it stop?
14 A.  Yes.
15 Q.  And this is you complaining very heavily about
16 Jeanna Jackson, and the social media policy should
17 be utilized to terminate her?
18 A.  Yes.
19 Q.  True?
20 A.  Yes.
21 Q.  Then the exhibit we were previously talking
22 about, 21-U, you acknowledge it was an email you
23 sent to Sonya Lacore, to Mike Sims urging that
24 Mr. Jones be terminated for violation of the
25 Southwest social media policy.

Page 842

1       You also carbon copied Ms. Stone on that email,
2  correct?
3  A.  I don't -- did I?
4  Q.  It says president@TWU556.  You were --
5  A.  I'm not seeing that there.  That's why I'm
6  not -- I'm not disputing that, I just don't see it.
7  Q.  Do you know who president@TWU556.org would be?
8  A.  Yes.
9  Q.  Who?
10 A.  It would be Audrey Stone.
11 Q.  Okay.  So you did include Ms. Stone on this
12 email where you were urging that the social media
13 policy be utilized to terminate a union employee?
14 A.  Okay.
15 Q.  Sorry.  Let me share screen.
16       MR. HILL:  Let the record reflect that
17 trial Exhibit 27 is now displayed.
18 BY MR. McKEEBY:
19 Q.  Do you see Exhibit 27?
20 A.  Uh-huh.
21 Q.  At the top of this, it says it is Brian Talburt
22 to Audrey Stone, October 13, 2014, correct?
23 A.  Yes.
24 Q.  By the way, I -- before going into this
25 exhibit, let me go back and ask you about the

Page 843

1  reports you made in February of 2017 of the numerous
2  individuals that you previously identified.
3       Do you understand what I'm talking about now?
4  A.  Yes.
5  Q.  And are you aware that Audrey Stone, one or two
6  days in the same time frame that you were sending
7  those individuals who were members of the Union to
8  Southwest Airlines for what you said were social
9  media policy violations, at the same time you were
10 doing that, Audrey Stone made a complaint against
11 Charlene Carter.
12       Are you aware of that?
13 A.  I've heard that, yes.
14 Q.  Okay.
15 A.  But I don't know what the date and time was.
16 Q.  Did Ms. Stone talk to you about that before she
17 did it?
18 A.  No.
19 Q.  So it was just an incredible coincidence that
20 you sent all of these people for investigation that
21 were opposing the Union at the same time that
22 Ms. Stone also reported Ms. Carter for social media
23 policy violations, correct?
24 A.  I can't comment on that because I don't know.
25 Q.  And this says, To:  Brian, From:  Trudy and

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 844..847

Page 844

1 Brett Nevarez, although it says, Love Brett.
2     That might be a joint personal email address
3 for Brett and his wife, is that correct?
4 A.  Yes, I think so.
5 Q.  And that was not sent on the Union email
6 address for some reason, apparently, right?
7 A.  I don't know.
8 Q.  You don't know?
9 A.  I don't know.
10 Q.  It says, leg-breaking time for Casper the ghost
11 scab.  Did you tell me earlier that that was one of
12 the nicknames that you had for Mr. Casper?
13 A.  It was a term -- that was he was -- how he was
14 frequently referred.
15 Q.  Okay.  And, apparently by other members of the
16 leadership of Local 556, correct?
17 A.  I don't know.  Brett would be the only person
18 that I would -- that probably would have used that.
19 Q.  So at least one member of the leadership of
20 Local 556 was also referring to -- in addition to
21 yourself was referring to Mr. Casper as the ghost
22 scab, correct?
23 A.  Yes.
24 Q.  You can speak to Mr. Nevarez, saying,
25 leg-breaking time for Casper, the ghost scab.

Page 845

1     That's what he wrote to you, correct?
2 A.  Yes.
3 Q.  Did you turn him in for a violation of the
4 Southwest policy for that?
5 A.  I did not.
6 Q.  Why not?
7 A.  Well, I don't really see a violation of the
8 social media policy.  That's, again, a metaphor,
9 leg-breaking time.  Clearly, he did not mean he was
10 going to break Mike Casper's leg.  He's -- he's
11 referencing old-time union mentality.
12 Q.  Did you turn him in for a violation of any
13 Southwest policies?  I didn't limit it to social
14 media.
15 A.  I'm sorry.  No, I did not.
16 Q.  Although Rocky Mountain sent it to you,
17 correct?
18 A.  It would appear so, yes.
19 Q.  At the end, when he said, He is such an ass, do
20 you know who he's referring to?
21 A.  Well, if it's -- if it's replying to the
22 comment below, I'm assuming he means Casper.
23 Q.  Then -- you then include Audrey Stone in this
24 communication in which Mr. Casper is being referred
25 to as an ass and a ghost scab, correct?

Page 846

1 A.  Okay.
2 Q.  Is that a yes?
3 A.  Yes.
4 Q.  And you say, A couple of things about this
5 thread.  Please delete Brett's comment about
6 leg-breaking.  Is that what you said?
7 A.  Yes.
8 Q.  Why are you wanting to delete that?
9 A.  To be honest --
10     (The videotaped testimony of the witness
11     was paused.)
12     THE COURT:  Mr. Hill, can I ask, we're
13 about 20 minutes overdue for our last break of the
14 day.  Do we know how much is left of the video?
15     MR. HILL:  I would guess, like, in a --
16 just a few minutes range.
17     THE COURT:  Okay.  Let's go ahead and try
18 and finish up, and then we will break between
19 witnesses.  You can keep playing it.
20     MR. HILL:  Scroll a second.  Six, 7, 8
21 minutes.
22     THE COURT:  Okay.  Let's take our break
23 now.  And so same instructions as always:  You can
24 only talk to your fellow jurors and court personnel;
25 don't talk to anyone about the case; and don't do

Page 847

1 any research about the case.
2     And we will see you back here in
3 10 minutes, at 4:24.
4     THE COURT SECURITY OFFICER:  All rise for
5 the jury.
6     (The jurors exited the courtroom.)
7     THE COURT:  Okay.  Before we take our
8 break, when we come back and get the jury in, can
9 y'all move to admit 21-C, which is not in yet?  It's
10 the only one that hasn't been already been admitted.
11     And then I can ask, Same objections, gibe
12 my ruling to let it in with a limiting instruction,
13 and then we will keep moving.
14     I will keep track of anything that has not
15 been admitted yet.  We can do that at the end if
16 there is anything new that comes in.
17     And I forgot, too, to give the disclaimer
18 that when you see words on a transcript, they are
19 not evidence, like the video and the audio are.  I
20 will give that disclaimer when they come back in --
21 which is awfully amusing because it is the best
22 thing they have, given that there are some excerpts
23 from the bad headphones.
24     Any questions on that regard?
25     MR. McKEEBY:  No.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 201 of 642   PageID 11142
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 848..851

Page 848

1    MR. PRYOR:  No questions, Your Honor, but
2 I have an issue.
3    THE COURT:  Yes.
4    MR. PRYOR:  Our next witness, because we
5 cut people, we let counsel know as soon as we did
6 cut them -- is Mr. Schneider, and I don't -- is he
7 here?
8    Never mind, it's not an issue.  He is
9 here.
10    THE COURT:  Awesome.  We will see y'all in
11 eight minutes.
12    MR. McKEEBY:  I have an issue.
13    THE COURT:  You have an issue?
14    MR. McKEEBY:  Well, Ms. Lacore --
15    THE REPORTER:  I need you to get to a
16 microphone.
17    MR. McKEEBY:  Excuse me.  Ms. Lacore,
18 witness Sonya Lacore, is going to be out of town
19 next week, so she will need to be called tomorrow to
20 the extent Carter is -- Ms. Carter and her counsel
21 plan to call her.
22    MR. GILLIAM:  We will call her tomorrow.
23    THE COURT:  Sounds great.  All right.  See
24 y'all in seven minutes.  Court is in recess.
25

Page 849

1    (Recess.)
2    THE COURT SECURITY OFFICER:  All rise.
3    THE COURT:  Anything else before we bring
4 in the jury?  We can go ahead and bring in
5 Mr. Schneider and have him walking in while they are
6 walking in.  Is that all right?
7    Are you calling Schneider now?
8    MR. McKEEBY:  Yes.  We already did, Your
9 Honor.
10    THE COURT:  Let's do it.
11    THE REPORTER:  Don't they have eight more
12 minutes of the video?
13    THE COURT:  Oh, I'm sorry, video, eight
14 more minutes.  I blanked on that.  Do the eight
15 minutes.  I'm going to admit 21-C when they are in.
16 We can bring them in.  I will admit 21-C over object
17 limiting, give the disclaimer on transcript, and
18 then we will do that.
19    And then we will bring in Schneider.  How
20 about that?  And if someone wants to go out into the
21 hall to bring in Schneider.  I just want to minimize
22 the dead time so we have as much time for y'all as
23 we can.
24    Does that make sense?
25    MR. McKEEBY:  Thank you, Your Honor.

Page 850

1    MR. PRYOR:  Thanks.
2    MR. GREENFIELD:  You guys got that joint
3 email out to the -- as the witness has gone out on
4 behalf of the parties.
5    THE COURT:  Thank you.  I appreciate that.
6    MR. HILL:  Hunting on his way.
7    THE COURT:  Hunting, okay.  Happy Hunting.
8    (Discussion off the record.)
9    (The jurors entered the courtroom.)
10    THE COURT:  Thank you.  Y'all can be
11 seated.
12    Okay.  Mr. Hill, are y'all moving to admit
13 21-C?
14    MR. HILL:  We are indeed.
15    THE COURT:  Okay.  And same objections.
16 So I will overrule the objections, admit
17 21-C, which is the only exhibit you have seen on the
18 video that was not already admitted, with the same
19 instruction I gave on all the other subparts of 21,
20 which is it is for use against the Union's claims
21 but not for use against Southwest's claims.
22    I also need to give you a disclaimer I
23 think I should have done before we played the video
24 the first time.
25    The disclaimer is, the evidence you are

Page 851

1 getting from this video deposition is the audio, and
2 the video that you are seeing.
3    We put the words of the transcript on the
4 bottom as a helpful aid to you, but if you hear
5 something different than the words you see on the
6 transcript, you are supposed to trust what you see
7 on the video and what you hear with your ears.
8    Just like I told you with notes, right,
9 the notes can't override what you see and what you
10 hear.  The same disclaimer there.
11    With that, you can keep playing our last
12 eight minutes, Mr. Hill, thank you.
13    (The referred-to document was admitted in
14    Evidence as Trial Exhibit 21-C.)
15    (The videotaped testimony of the witness
16    was resumed.)
17 BY MR. PRYOR:
18 Q.  To the present?
19 A.  Yes.
20 Q.  And then it says, Also, this was a private
21 email between Mike and I?
22    Who is "Mike"?
23 A.  I don't know.
24 Q.  I take this step very seriously, and would hate
25 to breach a confidence he obviously had in me based

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                    Pages 852..855

Page 852

1 on a long-time relationship we have developed.
2      You are talking about a Mike and a member of
3 the management of Southwest Airlines, correct?
4 A.  To be honest, I don't know.
5 Q.  Well, if you look further down, don't you refer
6 to exactly that?  Is that -- you are saying you
7 don't recall who "Mike" is.
8      Tell us the name of anyone in Southwest
9 management that you had a -- let's see how you
10 describe it -- a long-term relationship.  Name all
11 the Mikes in management at Southwest that you had a
12 long-term relationship with.
13 A.  That would be Mike Hafner, would be the only
14 one that would be.
15 Q.  So it says, This is just an illustration of the
16 types of conversations I had with senior Southwest
17 management, re: deal with problem people, and in
18 this case, specifically Hafner and Casper.
19      That's what you wrote, right?
20 A.  Yes.
21 Q.  So you've been talking to senior management
22 about targeting people such as, specifically, Hafner
23 and Casper using social media, right?
24 A.  I'm sorry, "targeting" -- "targeting" them on
25 social media?

Page 853

1 Q.  Well, you can take away the word "targeted."
2 But we are talking about dealing -- let's -- what
3 word you used -- problem dealing with problem
4 people.
5      You were talking with senior members of
6 management at Southwest Airlines about dealing with
7 people such as Hafner and Casper by use of the
8 social media policy, correct?
9 A.  Yes.
10 Q.  That would include Mr. Hafner, correct?
11 A.  Yes.
12 Q.  That would include Ms. Lacour, correct?
13 A.  Yes.
14 Q.  That would include Naomi Hudson?
15 A.  Yes.
16 Q.  And did any of those people report up for any
17 violation of any Southwest policy as a result of
18 those communications?
19 A.  I don't know.  Not to my knowledge.
20 Q.  And when it says the Rocky Mountain email, that
21 is Mike's personal email, does that now tell you who
22 Rocky Mountain is?
23 A.  Yes.
24 Q.  That's Mike Hafner, correct?
25 A.  Yes.

Page 854

1 Q.  And Mike Hafner is the one that wrote, He is
2 such an ass, referring to Casper, the ghost scab,
3 correct?
4 A.  Yes.
5 Q.  Let me show you Trial Exhibit 29.
6      And the front cover of the center of that
7 picture is Ms. Stone, correct?
8 A.  Yes.
9 Q.  Who are the other people, if you know?
10 A.  From left, Cuyler Thompson.
11 Q.  Oh, right here is Mr. Thompson?
12 A.  Yes.
13 Q.  And who is this?
14 A.  John Parrott.  Sam Wilkins.  Crystal Revenge,
15 Todd Gain, Brett Nevarez.
16 Q.  And then are you able to see these posts here?
17 A.  Yes.
18 Q.  And it says, Click is getting agitated.  I
19 think he may have private messaged in his way into
20 big troubles for himself.
21      And then two posts down, you say, We can only
22 hope.
23      And then someone says, Go to Click's screen
24 shots and save them or screen shot this posts.
25      Do you recall this?

Page 855

1 A.  I -- I don't recall it, but obviously it
2 happened.
3 Q.  And this is another effort to use social media
4 to target a union member that didn't agree with your
5 current membership or current leadership?
6 A.  It would appear so.
7 Q.  When you say "it would appear so," is than a
8 yes?
9 A.  It means it appears so.  I have no recollection
10 of it, but it's on the screen and the names are
11 there, so I'm assuming it's accurate.
12 Q.  Okay.  You are not denying that you wrote that
13 and that's the way that you recall that and that's
14 the import of what you're reading?
15 A.  Yes.
16 Q.  Let me go to 60, trial Exhibit 60.
17      This is a document authored by Audrey Stone to
18 Suzanne, Suzanne Stephenson, Naomi Hudson, Sonya
19 Lacore.
20      Have you ever seen this document before?  Take
21 your time with it, if you want.
22      I can tell you that that's the email in which
23 Ms. Stone complained of Ms. Carter.
24 A.  No, I have never seen it.
25 Q.  Okay.  You can, however, that on this email,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 203 of 642   PageID 11144
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Pages 856..859

Page 856

1 it's sent to Naomi Hudson, correct?
2 A.  Yes.
3 Q.   And that's one of the people that you've
4 identified that you were talking with this senior
5 management at Southwest Airlines about using the
6 social media policy to deal with problem employees,
7 correct?
8       I've used the exact language I asked you
9 before, sir.  Are you going to change it or are you
10 going to agree?
11 A.  I guess I'll agree.
12 Q.  Okay.  And then the same question as to Sonya
13 Lacore, correct?
14 A.  Yes.
15 Q.  Here's another one.  February 22nd, 2017.
16      By the way, that's the same day that Audrey
17 Stone made her complaint against Ms. Carter, the
18 very day?  Do you recall whether we looked at that?
19 A.  Yes.
20 Q.  So -- and so -- and that's just a coincidence
21 as well, right?
22 A.  I -- I don't know anything about it.  I don't
23 know.
24 Q.  Okay.  The trial Exhibit 71, again, you are
25 forwarding various posts on social media against

Page 857

1 some of the individuals -- are involving the
2 individuals that you turned in that you thought were
3 violating Southwest Airlines's social media policy,
4 correct?
5 A.  Okay.
6 Q.  Yes?
7 A.  Yes.
8 Q.  Okay.  And then 72 is more of the same.  Again,
9 on February 22nd, 2017?
10      MR. HILL:  Now displaying Exhibit 72.  I'm
11 not going to -- probably going to stop and announce
12 it, if it actually -- if Mr. Pryor's question says,
13 Here is 71, here is 72 -- unless you tell me
14 otherwise, Judge.
15      THE COURT:  That is a fine protocol.
16      MR. HILL:  Great.
17      THE WITNESS:  I don't have any
18 recollection of it, but apparently so.
19 BY MR. PRYOR:
20 Q.   You don't dispute that this was from you and
21 that you sent it to Southwest Airlines management
22 and that it had these posts to it?  It's consistent,
23 certainly, with your recollection that you were
24 turning in people you thought were spreading
25 misinformation, correct?

Page 858

1 A.  Yes.
2 Q.  All right.  So you believe that you sent
3 Exhibit 72, even though you don't recall the
4 specifics right now?
5 A.  Yes.
6 Q.  Okay.  That's -- I think that covers the ones
7 that you did.  I'm going to have you identify a few
8 more documents, and then we'll stop and wrap this up
9 for you.
10      Hold on.  I don't think I have any more
11 questions about these documents, I just want to make
12 sure you identify them.
13      This is Exhibit 21-M and this is Brian to Mike
14 Sims.  Here is the latest attempt.  Having
15 surrogates contact people to send this email to on
16 her behalf.  Funny, I didn't realize how much she
17 loved Tom.  And then you go on.
18      But some -- but sweet how wonderful everything
19 was and how wonderful our corrupt union was before
20 Audrey.
21      This is a communication in which you sent this
22 email to Mike Sims regarding Jeanna Jackson in the
23 email below, correct?
24 A.  Yes.
25 Q.  And let's look at Exhibit 21-P.

Page 859

1      This is from you, and I'm not sure who-all it's
2 to, but certainly its -- it includes Audrey Stone.
3      Do you recall being careful, Julie.  As a
4 follow-up to our conversation yesterday, I am
5 including the following recent posts.  A further
6 example of the public encouragement and endorsement
7 of retaliatory practices that Jeanna Jackson and
8 company.
9      So this is February 23rd, 2017, one day after
10 Ms. Stone made her complaint against Ms. Carter,
11 you're sending this to Julie at Southwest Airlines
12 management, correct?
13 A.  I sent that email on that date, yes.
14 Q.  And you sent it to Julie?
15 A.  Yes.
16 Q.  I know its blacked out, but it's clearly
17 talking about Julie O'Grady.
18 A.  Okay.
19 Q.  You think so?
20 A.  Yes.
21 Q.  And then you attach what you're referring to in
22 the email, correct?
23 A.  Yes.
24 Q.  Okay.  Just a few more.
25      One, two, about five more.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Pages 860..863

Page 860

1    Okay.  This is to Brian from Debra.  And below
2 that?
3        (The videotaped testimony of the witness
4    was paused.)
5        MR. HILL:  21-Q is now displayed on the
6 scene.
7        (The videotaped testimony of the witness
8    was resumed.)
9 BY MR. PRYOR:
10 Q.  This is one from Debra to you saying, thank you
11 for sending these to us, Brian.  Wow, its very
12 difficult to interpret the rest, but she
13 acknowledges that you sent the information, correct?
14 A.  Yes.
15 Q.  And your -- you may not remember this
16 specifically, but you're not denying that this was
17 the email that you received from her, correct?
18 A.  I am not denying it, no.
19 Q.  You think it is, right?  You have no reason to
20 dispute it?
21 A.  Correct.
22 Q.  Okay.  Let's look at 21-R.
23    Okay.  This is a much longer email.  And I'm
24 not going to go through it with you.
25        (The videotaped testimony of the witness

Page 861

1    was paused.)
2        MR. HILL:  Because you couldn't hear Mr.
3 Pryor, that is 21-R that is not displayed on the
4 screen.
5        (The videotaped testimony of the witness
6    was resumed.)
7 BY MR. PRYOR:
8 Q.  I'm not going to go through it with you, but
9 what I would like you to do, that and your welcome
10 to read it.
11    This is an email that you just we did before
12 that you sent to Julie on February 26th, 2017 and
13 carbon copied Audrey Stone.  And I will just go as
14 slow as you want me to.
15    Do you agree with that statement?
16 A.  Yes.
17 Q.  Let's go to -- I just have one more.  I have T,
18 21-T.  And, again, this is an email that you sent on
19 March 1, 2017, and included Audrey Stone on, and it
20 just says, folks -- so I, I can't represent to you
21 who it went to, unless you can recall.
22    But do you agree that you did send this to
23 email to Ms. Stone?  And if you recall who else,
24 please tell us.
25 A.  Yes.

Page 862

1 Q.  Do you recall who "folks" are?
2 A.  No.
3 Q.  Okay.  Let's look at 21-U.
4    That is the email May 15th, from you to -- it
5 looks like Mike.  Well, you tell me, is that Mike
6 Sims or is that Mike Hafner?
7 A.  Mike Sims.
8 Q.  Did you send this email marked Trial Exhibit
9 21-U to Mr. Sims and then you received the thank-you
10 Brian response from Mr. Sims?
11 A.  Yes.
12 Q.  And he says, he will, presumably that we will
13 review your concerns?  Do you see that?
14 A.  Yes.
15 Q.  All right.
16    Let's identify 21-V.  And this is an email that
17 you sent on July 2nd, 2017 to Mike and Julie and
18 carbon copied Audrey Stone, correct?  Correct?
19 A.  Yes.
20 Q.  And then this is the last one.
21    And by the way, "Mike" is Mike Sims, and Julie
22 is Julie O'Grady?
23 A.  Yes.
24 Q.  And I could be wrong, but I think this is the
25 last one.  Trial Exhibit 21-W.  This is an email

Page 863

1 string from you to Audrey Stone that includes the
2 emails between you and it says, Why in the hell did
3 I not find the targeted assassination comments three
4 years ago when it would have been useful?
5    Do you see that?
6 A.  Yes.
7 Q.  Do you recall what you were talking about?
8 A.  I'm assuming somebody used that -- I -- I -- I
9 don't know.  I can only guess, speculate.  I don't
10 know.
11 Q.  All right.
12    You can identify 21-W as an email that, that
13 you sent to Ms. Stone?
14 A.  Yes.
15 Q.  Now --
16 A.  I'm assuming it's referencing one of my
17 termination cases where I was looking for evidence
18 of similar behavior.
19 Q.  Yes.  Were you referring to when you used
20 "targeted assassinations" in your communication with
21 Ms. Lacore?
22 A.  No.
23 Q.  You wish you had found that?
24        (The videotaped testimony of the witness
25    was concluded.)

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 205 of 642    PageID 11146
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Pages 864..867

Page 864

1    MR. PRYOR: That was almost a videotape
2 deposition.
3    Your Honor, that is the end of the offer,
4 I think. There are exhibits we need to offer.
5    THE COURT: So I clocked exhibits 71, 72
6 and 21-M as potential exhibits we need to address
7 that were referenced that came up in the transcript
8 that are not in evidence.
9    MR. PRYOR: We offer them at this time.
10    THE COURT: Okay. So, Counsel, let's look
11 at 71, 72 and 21-M. We have talked about all of
12 those in a morning context.
13    Is there anything else you want to add to
14 what you have said to those three exhibits from our
15 morning sessions?
16    MR. GREENFIELD: No, your Honor.
17    THE COURT: Anything from Southwest?
18    MR. McKEEBY: Can I just have one second
19 to look at it?
20    THE COURT: You may.
21    MR. McKEEBY: Seventy-one, we have no
22 objection.
23    THE COURT: Okay.
24    MR. McKEEBY: Seventy-two, no objection.
25    And 21-M, I think, is the limiting

Page 865

1 instruction.
2    THE COURT: Understood. And I have in my
3 notes I'm going to put the same limiting on all
4 three.
5    MR. McKEEBY: Okay.
6    THE COURT: Okay. So what I will do is,
7 I'll overrule the objections we talked about before
8 y'all came in the room. And then I'm going to give
9 the same limiting instruction, as with all of the 21
10 exhibits, these are for use in the claims against
11 the Union, not for use in the claims against
12 Southwest. So they are all admitted; after the
13 fact, published.
14    MR. HILL: Your Honor, just to make sure
15 that I don't miss submitting something for
16 admission, let me tell you the ones that I also show
17 as being introduced.
18    THE COURT: Okay.
19    MR. HILL: But I think maybe are already
20 on the list. But if they are not, I want to
21 introduce them.
22    THE COURT: Okay. Please say them.
23    MR. HILL: 21-U. 21-P -- these are all
24 21s, until I say otherwise -- Q, R, T, U, V, W.
25    Okay. So V is already in. W is not in.

Page 866

1 And W was referenced in the --
2    MR. HILL: It was.
3    THE COURT: Okay. U is in. V is in. T
4 is in. So we need to talk about W.
5    So you are moving for the admission of
6 21-W.
7    Any difference from the other 21
8 objections from Southwest to the Union?
9    MR. McKEEBY: No, no difference.
10    THE COURT: Okay. So the same ruling on
11 21-W. It is in. It is for use in the claims
12 against the Union, not in the claims against
13 Southwest.
14    (The referred-to documents were admitted
15    in Evidence as Trial Exhibits 71, 72, 21-M, and
16    21-W.)
17    With that, call your next witness. Let's
18 see what we can squeeze in.
19    MR. PRYOR: Ed Schneider, your Honor.
20    THE COURT: You may do so.
21    (The witness entered the courtroom.)
22    THE COURT: Mr. Schneider, come on down,
23 and you may approach the witness box.
24    I'm sorry it is so late in the day, but we
25 want to utilize the rest of our time to hear what

Page 867

1 you have to say.
2    So you can approach, but before you make
3 yourself comfortable, can you raise your right hand?
4 And Mr. Frye is going to give you the oath.
5    (EDWARD SCHNEIDER was duly sworn by the
6    Clerk.)
7    THE COURT: Now you can make yourself
8 comfortable. It's a tight box, you can't really get
9 comfortable.
10    And I'm just going to ask for y'all to
11 have separation between questions and answers so we
12 can keep a clean record.
13    You can proceed.
14    DIRECT EXAMINATION
15 BY MR. PRYOR:
16 Q.  Will you state your name, sir?
17 A.  Edward Schneider.
18 Q.  Mr. Schneider, we have never met before,
19 correct?
20 A.  Correct.
21 Q.  My name is Bobby Pryor. I represent Charlene
22 Carter.
23    Do you recognize her in the courtroom?
24 A.  I do.
25 Q.  And how are you employed?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                    Pages 868..871

Page 868

1  A.  I work for Southwest Airlines.
2  Q.  What do you do for Southwest Airlines?
3  A.  I'm the manager of the Denver in-flight base.
4  Q.  Can you tell us what protected union activity
5  is?
6  A.  Freedom of speech --
7       MR. McKEEBY:  Objection, calls for legal
8  conclusion.
9       THE COURT:  I will allow him to answer,
10 only if he has personal knowledge.
11      THE WITNESS:  I don't have personal
12 knowledge of it.  I just know --
13 BY MR. PRYOR:
14 Q.  What is your understanding of what protected
15 union activity list?
16      MR. McKEEBY:  Same objection.
17      THE COURT:  I will overrule it and let him
18 answer.
19      THE WITNESS:  They are allowed to have
20 speech towards the union, possibly, that --
21 BY MR. PRYOR:
22 Q.  Possibly what?
23 A.  That is all I know.  That is all I know.
24 Q.  All you know is that they are allowed to have
25 speech that possibly?  Is that your answer?

Page 869

1  A.  No.  That they can show their opinions.
2  Q.  Okay.  And when you say it is -- that is
3  protected speech, what do you mean?
4  A.  I don't know the definition of that.
5  Q.  You don't know what you mean?
6  A.  I'm sorry.  You're going to have to rephrase.
7  Q.  I asked what you meant when you said, Speech
8  toward the union.
9  A.  I know that when they have disputes or
10 disagree, they are allowed to say those things to
11 union.
12 Q.  And what are "those things"?  Their
13 disagreements?
14 A.  Yes.
15 Q.  So they are allowed to express disagreements
16 with each other.
17      And when you say "allowed," what does that
18 mean?  In regard to the Southwest policy they are
19 allowed?
20 A.  I don't know what it would pertain to.
21 Q.  So you don't know if a union person is engaging
22 in that protected speech you talked about, how that
23 relates to Southwest policy, true?
24 A.  I'm saying I don't know the details.
25 Q.  Okay.  Well, tell us what you do know.  I

Page 870

1  didn't ask about details.  I asked what you know.
2       MR. McKEEBY:  Objection, argumentative.
3       THE COURT:  I will let him answer.
4       THE WITNESS:  As I stated, if they
5  disagree with something to do with the Union, they
6  can share their disagreement.  That is as much as I
7  know about it.
8  BY MR. PRYOR:
9  Q.  That wasn't what I asked you, you already
10 answered that question.
11      I'm asking you how that relates to the
12 Southwest policy?  Southwest has policies, the Union
13 has protective activities.
14      Do you know anything about the relationship
15 between those two?
16 A.  The Union and the company is completely
17 separate.
18 Q.  And what about if I'm a union member and I want
19 to send a strong objection to my union president,
20 and I do that, and then the Union president
21 complains to Southwest Airlines, does that violate
22 Southwest policy?
23 A.  It depends on what it is.
24 Q.  Okay.  So it is not --
25      THE COURT:  There was an objection, so let

Page 871

1  me hear that.
2       MR. McKEEBY:  Objection, no predicate,
3  foundation.  I don't know what the question meant.
4       MR. PRYOR:  He seemed to.
5       THE COURT:  I will allow it to stand.
6  BY MR. PRYOR:
7  Q.  All right.
8       So you have no guidance from Southwest Airlines
9  in your position as to the relationship between
10 protected speech involving the Union and Southwest
11 Airlines's policies, true?
12 A.  It depends on what it is.
13 Q.  I'm asking about the direction you received
14 from Southwest Airlines to explain to you about
15 union-protected activity as it relates to Southwest
16 policies.
17      Have you received any training on that?
18 A.  I would have to look at them on an individual
19 basis and make a determination.
20 Q.  I'm going to ask you focus on my question.
21      Are you ready for it?
22 A.  Is that a question?  Yes.  I'm ready for it.
23 Q.  Okay.  Have you received any training -- you
24 got that part of the question?
25 A.  I do.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 872..875

Page 872

1 Q.  Any training about what union-protected
2 activity is and how that would relate to Southwest
3 Airlines' policies?
4 A.  The only training we get is through experience
5 of seeing certain things happen, and be able to tell
6 one way or the other.  But it -- like I stated, it
7 would depend on what the issue at hand was.  And I
8 can't answer the question without knowing
9 specifically --
10 Q.  I'm not asking you about specifics.  I was
11 asking you about your training, sir.  We will be
12 getting into specifics.
13     So the training you have is your experience.
14     Tell us about your experience.
15 A.  What experience are you indicating?  At
16 Southwest Airlines?  My experience working for the
17 company?  Or what?
18 Q.  The experience you just testified about.  You
19 said -- I said, What training have you had about
20 union-protected activity and Southwest policies and
21 how those interact.
22     And you said, No training, experience.
23     Tell me about your experience.
24 A.  I have worked for the company for 20 -- almost
25 28 years, and I have been a leader in this company

Page 873

1 since 2004.
2 Q.  I haven't heard anything about your experience
3 with understanding what protected-union activity and
4 Southwest policies.  That is my question.
5 A.  Once again, if it was something that happened,
6 I cannot give you generalizations if I have been
7 trained specifically on something unless I know what
8 you are talking about.
9 Q.  So you don't even know enough about these two
10 subject matters to know if you have had training on
11 it, true?
12 A.  I don't know the answer to that.
13 Q.  Tell me what protected religious activity is.
14 Surely they trained you on that.
15 A.  Protected religious is speech that reflects on
16 religion in the workplace.
17 Q.  And what training have you received from
18 Southwest Airlines in regard to how to handle
19 someone that is claiming they have religious beliefs
20 that are interacting with Southwest policy?
21 A.  We go through required training once a year on
22 different aspects involving that.  And we go through
23 scenarios, similar to those.
24 Q.  Give us one example.
25 A.  Of?

Page 874

1 Q.  You just told me you get yearly training on
2 this and they give you examples.
3     Give us one.
4 A.  So if somebody is offended by something and
5 they bring it to us, the protocol for what we are
6 supposed to do with that.
7 Q.  You do what?
8 A.  What the protocol would be on how we are
9 supposed to handle that.
10 Q.  What is the protocol?
11 A.  We have a department called Employee Relations
12 that handles those type of issues.
13 Q.  Okay.
14 A.  And I would work with them, if it were
15 something that was involving that.
16 Q.  At any time, to your knowledge, has Employee
17 Relations or you, yourself, in your 28-years,
18 offered a religious accommodation without it being
19 specifically asked for?
20 A.  I have not.
21 Q.  Do you know, of all your involvement in
22 28 years with employee relations, has that been
23 done?
24 A.  I don't, sir.
25 Q.  You can't recall any, true?

Page 875

1 A.  I can't recall a certain instance of it.
2 Q.  You can?
3     Tell us about it.
4 A.  I said I can't recall a certain instance of
5 that happening.
6 Q.  Okay.  Did you consider that Charlene Carter
7 was engaged in protected union activity as part of
8 your investigation?
9 A.  I know that Charlene Carter was speaking to the
10 Union or sending messages to union members
11 indicating that she was not happy with them.
12 Q.  Did you believe she was engaging in
13 protected-union activity?
14     MR. McKEEBY:  Same objection about calling
15 for a legal conclusion.
16     MR. PRYOR:  It is his belief.
17     THE COURT:  He can answer if he has
18 personal knowledge.
19     THE WITNESS:  I don't have personal
20 knowledge of that.
21 BY MR. PRYOR:
22 Q.  I'm asking about your belief.  You have
23 personal knowledge of your belief about protected
24 activity of the Union?
25     MR. McKEEBY:  Same objection, your Honor.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 208 of 642   PageID 11149
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                        Pages 876..879

Page 876

1 He's asking for a legal conclusion of a lay witness
2 as to what is protected and --
3         MR. PRYOR:  If we are having speaking --
4         THE COURT:  I will let him answer, if he
5 has personal knowledge.
6         MR. McKEEBY:  He has already testified he
7 does not.
8         MR. PRYOR:  This -- no.  He's testified he
9 had a belief.  And he testified he believed he knew
10 what --
11        THE COURT:  I will let him answer this
12 question, if he has personal knowledge.
13 BY MR. PRYOR:
14 Q.  So when you -- you were in charge of the
15 investigation of Ms. Carter, correct?
16 A.  Yes.
17 Q.  Did you believe she was engaged in any union
18 protected activity?
19 A.  There was a history of her sharing her opinions
20 to the Union.
21 Q.  Did you believe those communications were
22 protected?
23 A.  To me, they seemed harassing, to some extent.
24 But it could be -- it is just the history there is
25 all I reflected on.  I didn't use that as any reason

Page 877

1 to make a decision in that case.
2 Q.  Have you read your notes before you prepared
3 the termination letter?
4 A.  I did.
5 Q.  And you are telling me you didn't consider
6 those communications as part of your decision to
7 terminate her?
8 A.  I stated that I didn't consider whether that
9 was free -- speech -- protected speech or not.
10 Q.  Oh, no, I'm totally agreeing.  You didn't think
11 of it as protected speech, you just thought of it as
12 harassing, true?
13 A.  I thought of it as her disagreeing with the
14 Union several times.
15 Q.  I thought you said it was harassing?
16 A.  They seemed to be in nature.
17 Q.  You considered those communications in your
18 decision to terminate, but did not consider those
19 decisions protected union activity, true?
20 A.  I can't say that.
21 Q.  Okay.  What can you say?  So you did think it
22 was protected activity.  I thought you told us it
23 wasn't?
24 A.  I'm not sure what you are asking.
25 Q.  Her communications that you looked at, that you

Page 878

1 considered in your termination, you did that, right?
2 A.  I didn't necessarily consider her statements
3 that she made to the Union in my decision.  Her
4 termination was for what she posted on Facebook and
5 the messages that she sent to a Southwest employee,
6 the pictures and videos of the aborted baby.
7 Q.  Again, we will be able to look at some
8 documents tomorrow, but I want to make sure we
9 remember what you just told us.
10     You did not consider anything for her
11 termination except the abortion videos and the
12 vagina hat pictures, would that be fair?
13        MR. McKEEBY:  Objection.
14        THE WITNESS:  No, it's not.
15        MR. McKEEBY:  What else -- what else was
16 there.
17        THE COURT:  He asked a question at the
18 end, and I will let him answer he question.
19 BY MR. PRYOR:
20 Q.  What else was there?  You just told us pictures
21 and video.
22     What else was there?
23 A.  She was terminated for the bullying/hazing
24 policy and the social media policy.
25 Q.  Okay.  And what did you consider for that?  I

Page 879

1 thought you told me it was the videos and the
2 pictures; it wasn't these maybe harassing union
3 comments.
4     Was it the Union harassing comments, too?
5 A.  It was for the -- she crossed the line when she
6 posted those videos, and pictures, and sent them
7 to a Southwest employee.  That is what I was trying
8 to say.  And that is what I used as my basis for her
9 termination.
10     The comments and statements that she made to
11 the Union, just showed a history of her having a --
12 that motivation to send things to the Union.
13 Q.  So you considered those three things for
14 terminating Ms. Carter, what you considered to be
15 the harassing communications with the Union -- what
16 do you want to call it?
17 A.  All I'm saying is, that for -- for
18 bullying/hazing, there was a history of her having
19 disputes with the Union.  And the crossing line was
20 the videos and the pictures of the aborted baby.
21 Q.  Were the written communications where she was
22 complaining about her union, that you went back
23 years to look at, were those -- did you consider any
24 of those to be bullying?
25        MR. GREENFIELD:  Objection, your Honor,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 209 of 642   PageID 11150
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                          Pages 880..883

Page 880

1 asked and answered at least a few times at this
2 point.
3         THE COURT:  I will allow this one.
4         THE WITNESS:  Only as a history, that was
5 it.
6 BY MR. PRYOR:
7 Q.   So it was not a violation of Southwest policy?
8 A.   The history that she had with the Union.
9 Q.   The history with the Union, was it a violation
10 of any Southwest policy?
11 A.   Not on its own merits, no.
12 Q.   Well, what other merits would it be?
13 A.   The history of it would be pictures and videos
14 and Facebook posts, and the private message to
15 another Southwest employee.
16 Q.   Without the sending of the video to Audrey
17 Stone of the abortion and the pictures of the vagina
18 hats and her posts on her personal Facebook page --
19 her posts on her personal Facebook page, without
20 those three things, she would not have been found in
21 violation of any Southwest policy, true?
22 A.   Most likely.
23 Q.   What is most likely?  What are we missing?
24 A.   Because I used everything that was given to me.
25 These things were sent to me; I didn't ask for them.

Page 881

1 They were offered to me as factual things that
2 happened in the past, and I considered everything
3 that was given to me.
4         The one thing, the egregious thing that she
5 did, though, was sending the pictures and the
6 videos.
7 Q.   I just -- if you are not done, go ahead.
8 A.   And posting on Facebook.
9 Q.   I'm comfortable with whatever answer you give
10 me, but I am not comfortable with you having it both
11 ways.
12       Was it the videos, the pictures --
13         MR. McKEEBY:  Objection.
14         THE COURT:  Sustained.  You can ask your
15 question.
16       I will strike it.
17       You can ask your question now.
18 BY MR. PRYOR:
19 Q.   The video, the picture, and the Facebook posts,
20 were those the basis of the termination?  Or was it
21 also the -- what you called the harassing
22 communications with the Union?  Was it all of that
23 or was it just some of it?
24         MR. McKEEBY:  Objection, asked and
25 answered.

Page 882

1         THE COURT:  I will allow him to answer
2 this.
3         THE WITNESS:  It was the posted pictures
4 on the Facebook page, the videos, the private
5 message sent to an employee, and the bullying and
6 hazing policy.
7       Also, the part of it was the nexus to the
8 workplace, where she was identifiable on Facebook as
9 a Southwest employee when she did these things.
10 BY MR. PRYOR:
11 Q.   The bullying, what you said about the bullying,
12 was that the communications with the union that you
13 thought were a little too harsh?
14 A.   It was the videos and pictures of the aborted
15 baby being posted on Facebook and being sent as a
16 private message.  That is what I'm trying to portray
17 here.
18 Q.   Okay.  What I'm not hearing is the -- it may
19 have provided you background, but the communications
20 with the Union that you thought might have gone over
21 the top, other than the -- what you have just
22 mentioned, were not part of your termination
23 decision?
24 A.   I never said that the video -- or the
25 communication was over the top.  I just said that

Page 883

1 that was history between her and the Union.
2 Q.   But that wasn't part of your termination
3 decision?  Those weren't factoring into your
4 termination decision?
5         MR. McKEEBY:  Objection, asked and
6 answered.
7         THE COURT:  I will let you answer it one
8 last time.
9         MR. PRYOR:  I'm sorry.  I still haven't
10 gotten it.  It is just me.
11         MR. McKEEBY:  He's answered.
12 BY MR. PRYOR:
13 Q.   Go ahead.
14 A.   It was the history, I was sent all of this
15 information.  I considered the extent of the
16 information in my decision making.
17       The thing that crossed line, though, was the
18 videos and pictures posted and sent in private
19 message, and the other pictures of genitalia and
20 things.
21 Q.   Did you consider the abortion video Facebook
22 message that was sent to be protected religious
23 activity?
24         MR. McKEEBY:  Object to the form again.
25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 210 of 642   PageID 11151
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Pages 884..887

Page 884

1 BY MR. PRYOR:
2 Q.  From your belief?
3        MR. McKEEBY:  It is calling for a legal
4 conclusion.
5        MR. PRYOR:  He was the decision maker.
6        THE COURT:  I will allow him to answer, if
7 he has personal knowledge.
8 BY MR. PRYOR:
9 Q.  My question is, did you consider whether or not
10 this was protected religious activity?
11      How about that?  Did you even consider that?
12      MR. McKEEBY:  Same objection.
13      THE COURT:  I will allow it.
14      THE WITNESS:  It was all part of my
15 investigation.  I looked at all of the information
16 that was given to me, and I considered every aspect
17 of it.
18      And the conclusion that I came to was
19 based on, overall, the video, the pictures, that
20 were posted and sent in private message.
21      I don't know any other way to say it to
22 you.
23 Q.  I'm going to object to the responsiveness and I
24 just ask you to focus on my question.
25 A.  Okay.

Page 885

1 Q.  Did you consider the speech or the
2 communication, that Facebook communication with the
3 abortion, the communication and the abortion video,
4 to be religious activity at all?
5 A.  I pictured it -- I mean, I decided on it
6 because of the egregiousness of it.  Whether it was
7 religious or not, it was the egregious act of
8 sending it to somebody, posting it on Facebook,
9 while being depicted as a Southwest employee.
10 Q.  It is he whether or not.  Did you consider it
11 to be religious activity?
12 A.  I didn't consider it to any extent to be
13 religious activity.
14 Q.  Okay.  And then what about the union activity,
15 did you consider that Facebook post to be union
16 activity at all?  Was that part of your
17 consideration?
18      MR. McKEEBY:  Objection, asked and
19 answered.  Again, calling for a legal conclusion.
20      THE COURT:  He split this one out, so I
21 will ask the witness to answer.
22      THE WITNESS:  Can you say that one more
23 time?
24 BY MR. PRYOR:
25 Q.  Yes.  You already told us you didn't consider

Page 886

1 it religious.
2      Now I'm asking you, did you consider that
3 Facebook post to be part of her union activity?
4 A.  I considered it to be her opinion on abortion.
5      MR. PRYOR:  Object to responsiveness.  I
6 didn't ask you about that.
7 BY MR. PRYOR:
8 Q.  Did you consider, as part of your termination
9 decision, whether or not that Facebook message post
10 was part of her union activity?
11 A.  No, I did not.
12      MR. PRYOR:  All right.  This is a good
13 place to break for the day, unless you would just
14 like to go on.
15      THE COURT:  I think it is.  Thank you for
16 pointing that out.
17      So the same instructions as always:  You
18 can always talk to your fellows jurors and court
19 personnel, just not about the case.  You can't talk
20 to anyone else.  And please don't do any research
21 about the case.
22      We will see y'all at 8:45 tomorrow to
23 start at 9:00.  Thank you for patience today.
24      All rise for the jury.
25      (The jurors exited the courtroom.)

Page 887

1      THE COURT:  Okay.
2      And, Mr. Schneider, you are what we call a
3 hold-over witness.  So that means you can leave the
4 stand and the courthouse, but you can't talk to
5 anyone about the case until your testimony is over.
6 Understood?
7      THE WITNESS:  Yes.
8      THE COURT:  Okay.  Thank you for coming
9 here today.  Sorry about you being a hold-over
10 witness.  I know it is an inconvenience.
11      Okay.  After he leaves, I will ask if
12 y'all if anything else we should talk about.
13      (The witness exited the courtroom.)
14      MR. PRYOR:  I hope the Court recalls that
15 when we had that conference and you suggested that
16 maybe I should move on to another line of
17 questioning, that I did.
18      THE COURT:  I do.  And what I will say is,
19 I have crunched some math this afternoon.  I'm
20 feeling charitable after seeing the faster cutdown
21 Talbert depo and you are going to punch more
22 quickly.
23      So now let me just lay all my cards out
24 here with y'all.  So the trial I had going next
25 week, I pushed to August.  I'm supposed to fly out

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 211 of 642   PageID 11152
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                         Pages 888..891

Page 888

1  on a Southwest plane on Thursday -- don't hold up
2  the flight or do anything with the flight, I'm a
3  normal passenger -- to a conference in Utah.
4       I had originally hoped the jury could get
5  this case early on Wednesday.  But I think what I
6  can do is phone a friend for a favor and see if
7  another judge can cover jury notes, or deliberation
8  and taking a verdict.
9       And the jury gets the case at the end of
10  the day Wednesday.  That frees up more time on
11  Wednesday for us to finish the evidence, have a
12  formal charge conference, read the jury charge,
13  close, close.
14       With that, I have come up with a bucket of
15  six hours.  I am begrudgingly giving three to you
16  and reserving back, if the need arises, giving an
17  hour and a half to each of you because of prolonging
18  their presentation, if that makes sense.  I'm giving
19  it to you more out of a charitable gift, than
20  anything else.
21       MR. PRYOR:  I am turning cartwheels in
22  head.  We will make good use of that time.  Thank
23  you, Your Honor.
24       THE COURT:  I appreciate that.  I don't
25  know which judge would cover yet.  I need to start

Page 889

1  making those requests, and I will start doing that
2  now.  All of the judges in the courthouse are
3  smarter than me, so I promise it will be an upgrade.
4       But I will still be available by phone --
5  as long as I'm not in the air, I will be available
6  by phone.  And my clerks have worked on this case.
7       The biggest thing I fear is a jury note
8  about the jury charge, right, and a new judge comes
9  in.  That is a scenario I would like to avoid.  But
10  I'm not, you know, out of cell range, and so I will
11  still be available.
12       So all that to say, yeah, I think that
13  is -- I think that is what I can do move some things
14  around.
15       I do need y'alls commitment to help me
16  keep trains on time.  And we were doing a pretty
17  good job today, but there were sometimes a 10-minute
18  break became a 15.  To the extent we can keep them
19  all, that is where my math lines up.
20       If we start taking 15, 20-minute breaks
21  then that -- the math just doesn't work out anymore.
22  there.
23       So it is a mutual agreement to have me
24  keep trains on time with y'all, and then me give
25  y'all all of the time we can possibly squeeze in.

Page 890

1       Make sense?
2       So I'm not giving you your hour and a half
3  yet, but I'm holding it in reserve.  It is like the
4  helicopters with a use in war fuel reserve.  All
5  right?  If we need to get there, we will do it.
6       MR. McKEEBY:  But you are giving him three
7  hours?
8       THE COURT:  I'm giving him three hours.
9  And I'm holding back, out of the additional time I'm
10  giving, an hour and a half that I can give y'all if
11  the need arises, because his presentation is now
12  longer.  And equitably, yours should be too.
13       I hope you won't need it, but if you do,
14  it's there.
15       Does that make sense?
16       MR. McKEEBY:  We are definitely done
17  Wednesday, at close of business.
18       THE COURT:  Yeah, we got to be.  Right?
19  We got to get this case to the jury at the close of
20  business Wednesday.
21       Now, if they stay to deliberate all night
22  or whatever, you know, it is what it is.  They can
23  do what they want to do.
24       And at some point near the end, I will
25  have to tell them there is going to be another

Page 891

1  person in a robe up here older and wiser than I am
2  if it gets past Wednesday.  But I don't need to tell
3  them that yet.
4       Nevarez, nothing from Nevarez, right?
5       MR. McKEEBY:  No, we have advised --
6       MR. GREENFIELD:  No, Judge.
7       MR. McKEEBY:  -- counsel that I think we
8  already covered where he is and they are attempting
9  to serve him.
10       THE COURT:  Well, I appreciate your
11  cooperation in that.
12       MR. HILL:  Where we hope he is.  We know
13  where he landed; we think he's going home.  But --
14  and that is where we are headed, to his home.
15  But that is where we are.
16       THE COURT:  Where in the World is Carmen
17  San Diego?  It sounds like that the old show that my
18  kids still watch on TV.
19       So tomorrow morning, our 8:30 time -- you
20  know, I've styled it also as a show-cause hearing.
21  We will see if he shows up.  I assume Southwest will
22  know in advance if he is showing up because he will
23  be flying standby.
24       MR. McKEEBY:  Perhaps.
25       Your Honor, and just for purposes of the

Page 892

1  record, I would like to object to the extension of
2  time. I don't think it is warranted.
3          Southwest prepared the case based on the
4  time limits set, and based on the denial of their
5  request for additional time. And I think it is more
6  than sufficient time to try this case in the
7  allotment originally provided. So Southwest
8  objects.
9          THE COURT: I understand, and I share a
10 lot of your sentiments. What I will say is, that
11 there are lot of unique attributes to this case, and
12 so I'm trying my best to accommodate everyone's
13 concerns.
14         I will say, going from 12 to 15, is not
15 the 26 that you wanted, but I think we can squeeze
16 it out.
17         So I appreciate your objection. I will
18 overrule it. But that is also, understand, I'm
19 giving you all we have. There is not another well
20 we can dip into.
21         MR. McKEEBY: Question, scheduling-wise,
22 on the jury charge, does the Court have a sense of
23 when we might be discussing that?
24         THE COURT: So I appreciate you bringing
25 it up.

Page 893

1          The first thing is, I need to get
2  interrogatories to you, right? I gave you the jury
3  instructions; I still need to get you the questions.
4  So we are working on that.
5          My request would be, can we think about
6  maybe Monday morning starting at 8:00, which hurts,
7  instead of 8:30, and have a discussion informally on
8  the charge. It could be off the record.
9          I will say, if y'all have thoughts this
10 weekend that -- I never want to deprive people of
11 time to argue on the jury charge, especially in an
12 informal charge conference. But we will still get
13 the jury around 9, even if we don't have exhibit
14 objections to get to.
15         If anyone has deep, weighty thoughts and
16 cases, you can file something on the docket and I
17 promise I will read it, right? So you can file
18 whatever you want to that goes after the charge that
19 I have given y'all, if that makes sense.
20         And so I will take that into
21 consideration, in addition to whatever you tell me
22 Monday at 8:00 at an informal charge conference.
23         And those two things combined can give me
24 all I need to know, so that the formal charge
25 conference, when the jury is angry at us -- so that

Page 894

1  it can be as streamlined as possible.
2          So Monday at 8, is that all right?
3          MR. McKEEBY: That works.
4          THE COURT: I'm sorry in advance.
5          Sorry. I should set a deadline for when
6  you file something in time for me to read it.
7          So can I ask by Sunday at 5, you file
8  anything in writing you want to that attacks my jury
9  charge and says where I'm wrong.
10         And that gives me time to read -- if you
11 file it, you know, Monday morning at 7:45, I just
12 won't have time to read it or think about it
13 beforehand. But I will be up on Sunday working on
14 your stuff anyway. So I will read that too.
15         Okay. So tonight, 6:00, 8:00, we have
16 more designations due and objections due?
17         MR. GILLIAM: Yes.
18         THE COURT: Okay. Anything else we need
19 to talk about?
20         Okay. Efficiency really did pick up.
21 Thank you. And that is in large part why I gave you
22 the additional time.
23         It has been efficient on your end today,
24 too. And I appreciate that. It has been
25 remarkable, so thank you for moving the ball

Page 895

1  forward.
2          With that, I guess I will see y'all
3  tomorrow at 8:30.
4          Thank you.
5          (Proceedings adjourned at 5:19 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 896

```
 1           C E R T I F I C A T E

 2

 3           I, Kelli Ann Willis, RPR, CRR, CSR

 4 certify that the foregoing is a transcript from the

 5 record of the proceedings in the foregoing entitled

 6 matter.

 7           I further certify that the transcript

 8 fees format comply with those prescribed by the

 9 Court and the Judicial Conference of the United

10 States.

11       This 8th day of July 2022.

12

13           s/ Kelli Ann Willis

             Official Court Reporters

14           Northern District of Texas

             Dallas Division

15

16

17

18

19

20

21

22

23

24

25
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                                    Index: $10..53

**$**

**$10** 698:15

**$17,000** 690:23 691:19

**$17,530.01** 695:6

**$17,570** 691:4

**-**

**-14** 599:10

**1**

**1** 679:9 819:23 861:19

**1,000** 662:9

**1,612** 683:18

**10** 791:17 847:3

**10-minute** 631:1 889:17

**100** 740:6 765:2

**106** 599:5,8,10,11 600:22 601:5,13

**106-A** 601:7

**106A** 600:20

**115** 683:14

**12** 892:14

**12-month** 684:3

**12:53** 708:17

**13** 600:18 765:20 842:22

**130** 682:4 706:24

**132** 665:15,24

**134** 677:13 719:14,18,19, 23 720:2

**1380** 742:19,22

**13th** 765:17,23,25

**14** 600:18 758:11 764:11

**141** 825:24,25 836:2

**15** 585:17 595:5 597:3 616:19 628:10 683:4 713:16 806:24 889:18,20 892:14

**15,000** 684:20

**15-A** 598:13,14,16,19,21 767:22 791:21

**15ish** 773:19

**15th** 658:3 862:4

**16th** 833:14

**17** 721:1

**17,000** 691:7

**18** 696:23 723:20,24

**19** 682:5 727:16 837:12

**1st** 651:24 704:20

**2**

**2** 696:12 732:6,12,19,23 736:25 737:17,23 738:6,13 763:12,20 764:20 766:3 819:21

**2-V** 660:2

**20** 721:22 727:16 804:20 846:13 872:24

**20-minute** 889:20

**2004** 696:23 764:11 873:1

**2005** 697:23

**2006** 697:23 698:20

**2008** 700:5

**2009** 699:18

**2013** 686:2 704:20 724:15 819:12 824:24 833:14 834:16

**2014** 765:17,20,23,25 825:21 842:22

**2015** 612:3,6,17 683:15,19, 23 724:18 764:25 819:11 836:25 838:14

**2016** 683:15,19,23 799:16

**2017** 612:3,6,17 673:24 674:3 758:12 768:12 786:10 797:5 843:1 856:15 857:9 859:9 861:12,19 862:17

**2018** 742:19 758:13

**2019** 579:20

**21** 622:22 623:12,15,24,25 624:10 625:5,6 632:1 636:6,11 637:21,22 638:4, 8 644:20 647:6 794:15 850:19 865:9 866:7

**21-0** 794:13,19

**21-A** 622:25 623:6 838:22

**21-C** 838:22 839:2 847:9 849:15,16 850:13,17 851:14

**21-M** 858:13 864:6,11,25 866:15

**21-O** 793:23,24 794:14,16, 21

**21-P** 622:20 631:23,24 632:19,20 635:4,25 636:1, 2,4,23 637:2,23 638:16 650:20 858:25 865:23

**21-Q** 622:19 629:13 631:19 644:15,16,17,18,24 860:5

**21-R** 646:16,25 647:1,5,11, 14,18 860:22 861:3

**21-T** 651:12,13,19,21 861:18

**21-U** 657:17,18,20,24 658:2 840:25 841:3,7,22 862:3,9 865:23

**21-V** 660:3,5,6,13 862:16

**21-W** 862:25 863:12 866:6, 11,16

**21-X** 671:14,15,20,21 672:1,3,12,15,17

**21s** 631:20 865:24

**22nd** 856:15 857:9

**23** 576:1

**23rd** 646:18 859:9

**24/7** 826:8

**26** 765:8,10 832:21,22 833:19 892:15

**26th** 861:12

**27** 673:9 765:18 842:17,19

**28** 696:23 872:25 874:22

**28-years** 874:17

**29** 825:21 854:5

**2nd** 862:17

**3**

**3** 573:6

**3,503** 684:9

**30th** 758:13

**34** 588:9,12,14 589:5 621:11,13,14,18,23 622:2, 5,6

**36** 682:8

**365** 742:6

**365-day-a-year** 742:5

**39** 603:16,18 605:25

**3:02** 791:17 792:3

**4**

**404** 747:8

**4264** 807:20,21,22

**4267** 808:9

**442** 682:4

**45** 715:8

**47** 777:15,18,20 778:4 805:17

**49** 682:11 789:24 790:1,6, 9,12

**4:24** 847:3

**5**

**5** 703:11 742:7 894:7

**5'10** 706:17

**5'7** 706:17

**5,000-foot** 728:19

**50** 684:13

**504** 682:24

**525** 711:16

**53** 589:7,23 590:9

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 215 of 642   PageID 11156
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                 Vol 3 July 07, 2022                    Index: 55..adjusting

**55** 709:5

**556** 573:20 602:3 618:14 639:11 654:10 657:7 658:15 661:2,10,18 668:13 673:24 695:18 720:14 721:4 786:3,7,16 819:18 820:16,20 821:2 837:1 844:16,20

**56** 590:11,16,25 591:1,7 779:14,18

**56.8** 779:19

**57** 590:17

**5712** 599:10 600:18 601:5, 14

**5713** 601:5

**5714** 601:5

**59** 590:18,20,25 591:5

**5:19** 895:5

---

**6**

**6** 599:2,4,9 695:16

**60** 855:16

**612** 595:8

**64** 591:11 592:1,2,23

**65** 592:19,21,22 616:6,10, 16 617:6,12 621:20,21

**66** 617:4,5,8 632:18 637:9 638:1 748:21 769:3

**66.3** 770:4

**66.5** 771:1

**661** 769:18

**662** 769:16

**67** 749:1,3,10,17

**68** 592:24

**6:00** 894:15

**6:21** 833:14,25

---

**7**

**7** 846:20

**7,001** 684:22

**71** 856:24 857:13 864:5,11 866:15

**72** 592:24 857:8,10,13 858:3 864:5,11 866:15

**75** 707:4

**7:45** 894:11

---

**8**

**8** 846:20 894:2

**80s** 826:19,22

**88** 683:10

**8:00** 893:6,22 894:15

**8:30** 891:19 893:7 895:3

**8:45** 886:22

---

**9**

**9** 893:13

**94** 780:8,9,10,20 806:18 807:23

**94.2** 781:17

**94.4** 782:18

**94.7** 783:22

**9:00** 886:23

**9:58** 631:2

---

**A**

**a.m.** 833:14,25

**abeyance** 716:3

**abiding** 730:21

**ability** 691:9 735:22 762:24

**aborted** 769:23 770:17 878:6 879:20 882:14

**abortion** 608:12 746:6,21 747:12 759:3,8,15 769:11 770:17,18 775:3 776:23 777:5 803:12,17,20,25 805:2,8 808:11 811:4 812:3,12,20 813:3,6 878:11 880:17 883:21 885:3 886:4

**abreast** 688:7

**absolutely** 577:15 594:4 653:15 795:14 797:13

**accept** 577:3 578:2 634:22 641:8,11,17 645:10 647:21,23 670:22

**accepting** 732:21

**access** 748:5 756:5

**accidentally** 808:19 809:24

**accommodate** 668:14 669:9 729:22 736:3 892:12

**accommodated** 729:18

**accommodating** 668:20

**accommodation** 670:23, 24 874:18

**accommodations** 669:3 671:8,10

**accompanied** 764:4

**accompanies** 730:10

**accompany** 732:13

**accompanying** 810:22

**account** 739:8,24

**accountable** 832:10,12 835:18

**accounts** 739:4,7,19

**accurate** 605:2 740:23 820:18 832:8,13 855:11

**accurately** 767:4

**accused** 745:8

**acknowledge** 841:22

**acknowledges** 860:13

**act** 688:22 689:2 885:7

**acting** 799:23 821:7

**action** 586:20 590:15 601:16 643:17 644:10 646:13 650:13,17 656:4 657:13 658:11,19 659:12 661:14,19 675:8 699:19 744:11 762:11 819:6

**actions** 620:11 676:14 688:9,13 691:10 762:4,23

820:1

**active** 723:5 740:15

**activities** 577:7 726:24 727:7 820:12 870:13

**activity** 577:8,17 586:1 595:7,15,22 597:13 606:12 620:11,19 639:19 641:5 642:21 643:4,19 644:2,13 646:11 652:19 653:3,4,5 656:21 657:8,12 661:21 662:1,20 673:19 674:11 676:7,10,20,25 677:3 691:10,13 713:2 762:3 768:8 781:13 807:8,11,15, 18,24 808:4 814:19 815:22 820:3,4 868:4,15 871:15 872:2,20 873:3,13 875:7, 13,24 876:18 877:19,22 883:23 884:10 885:4,11, 13,14,16 886:3,10

**actual** 657:3 769:25 782:24 813:7,21

**ad** 814:20,24

**Adam** 573:19

**add** 661:23 864:13

**added** 628:10

**addition** 665:11 666:11 844:20 893:21

**additional** 688:13 711:10 712:15,20,22 713:14 714:3,8 715:19,23 716:5 717:9,25 730:6 745:18 839:5 890:9 892:5 894:22

**address** 626:19,25 627:8, 20 633:23,24 634:5 662:8 738:20 739:9,11,13 782:24 783:16 844:2,6 864:6

**addressed** 648:19

**addresses** 601:20 626:2, 3,15,18 627:2 628:3 630:18 632:15,17 633:16, 19,23 740:5 778:13 783:17

**addressing** 836:11

**adjourned** 895:5

**adjust** 585:13 714:22

**adjusting** 714:25

**Adjustment** 700:13 734:5, 15

**adjustments** 700:9 714:22

**administering** 836:19

**administration** 603:9,12 606:16 608:5 612:1 640:25 669:12 673:4,7 699:21 706:3 720:25 729:11 731:20 736:3 829:12,23 830:4

**admission** 598:15 616:9 621:12 622:18 629:13 635:25 644:16 647:1 657:18 660:5 671:14 794:12 865:16 866:5

**admit** 589:23 598:19 600:21 644:18 777:18 780:9 794:16 847:9 849:15,16 850:12,16

**admitted** 598:20 601:6,10 616:13,15 621:20,21,23 622:1 644:23 647:10 651:20 657:23 660:12 672:14 720:1 749:16 769:4 778:3 780:19 790:11 794:20 847:10,15 850:18 851:13 865:12 866:14

**admitting** 601:4 625:5,9 660:8

**adolescent** 746:12

**adolescents** 701:2

**adoption** 747:15

**advance** 575:5 579:12 628:9 730:5 762:15 891:22 894:4

**advantage** 828:11 830:8

**adventure** 581:20

**adversary** 823:6

**advised** 891:5

**advising** 705:10

**Advocacy** 700:24

**advocate** 701:1 730:18

**advocating** 701:5,6

**affect** 655:5 698:9 803:25

**affecting** 655:5 785:22

**affidavit** 581:8,17

**affirmative** 668:14

**afford** 713:19

**afforded** 736:13

**AFL-CIO** 618:14 786:25

**AFOS** 725:20

**afraid** 752:5,20,25

**aftermath** 580:6

**afternoon** 587:24 588:3 791:8 887:19

**age** 706:25 748:8

**agency** 670:20 683:4 726:2,20,22

**agenda** 788:14

**agent** 760:20 761:2

**agitated** 854:18

**agonized** 750:18

**agree** 577:22 624:10 628:8,9 639:19 641:9 652:19 653:17,19 654:5 656:12 732:20 813:4 823:13 833:5 835:2 840:17 855:4 856:10,11 861:15,22

**agreed** 619:8 638:10 647:24 680:7

**agreed-upon** 678:16

**agreeing** 877:10

**agreement** 635:1 678:14 679:6,9 680:13 681:8,11 695:17 696:3,13 699:17 702:20 731:12 732:22 736:10 751:22 752:12 761:11 762:2 819:10 889:23

**ahead** 573:7 591:20 654:8 675:19,24 720:9 790:13 792:9 802:2 846:17 849:4 881:7 883:13

**aid** 851:4

**air** 889:5

**aircraft** 742:14 743:1,3

**airline** 615:24 742:4,12 785:17

**Airlines** 596:14 603:1 604:20 607:3,15 609:1 610:9 611:19 612:25 613:4,9,13,19 614:14 627:2 641:7,21,24 642:22 643:8 644:12 645:8,16 646:8,14 647:20 648:3,6 650:12,22 651:25 657:14 659:19 661:11,20 664:6,25 665:5 667:21 671:1 674:10,22,23 685:2,11 696:22 701:13 702:1 704:7,22 707:6 710:18 721:14 725:3,9 727:13 728:18 729:4 731:4 732:5 733:9 735:11 737:14 740:16 741:15 743:7 750:22 754:24 755:25 756:1,3 761:18 762:10 764:20 766:19 768:25 773:6,14 775:8 780:24 781:2 784:11,14 795:6 801:5 815:3,6 819:14 821:23 825:5 826:15,19, 22,23 827:2 828:3,24 834:19 836:12 838:4 839:11 840:12 843:8 852:3 853:6 856:5 857:21 859:11 868:1,2 870:21 871:8,14 872:16 873:18

**Airlines'** 872:3

**Airlines's** 699:8 737:18 778:19 857:3 871:11

**airport** 755:1,24 756:4 771:25 772:2 776:7,13

**Albert** 782:8,14

**align** 637:22

**alive** 770:17 776:18 811:24

**allegations** 662:14 665:4

**alleged** 745:7 769:23

**allotment** 892:7

**allowed** 619:4,5 639:9 656:25 668:5 670:11 688:21 724:24 725:1,4,13, 18 727:6 754:21 868:19,24 869:10,15,17,19

**allowing** 651:16

**aloud** 749:22 750:6

**altered** 683:14

**altitude** 742:25

**Alveda** 808:10

**amazing** 585:16

**ambiguous** 689:25

**amenable** 712:23

**amendable** 704:20 705:4

**Amended** 690:15

**America** 787:1

**American** 596:14 815:3,6

**amount** 654:18 655:1 694:8,13,14,23 695:8 715:15 772:5,6

**amusing** 847:21

**anatomically** 619:21 805:19 806:9

**anatomy** 813:22

**and/or** 679:4 682:12 753:3

**Andrea** 783:13,15

**anesthesia** 594:2

**angle** 835:22

**angry** 784:20,25 785:2 893:25

**announce** 857:11

**answering** 686:20 721:18 728:7

**answers** 867:11

**anti-recall** 638:25

**anti-union** 603:5,10 604:7,21 606:3,4,20 608:1, 21 609:25 610:11

**anticipate** 574:25

**anymore** 889:21

**AOL** 633:22 634:10

**apologies** 649:15 750:17 791:24

**apologize** 591:2 600:7 749:25 751:10,11

**APP** 637:9

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 217 of 642   PageID 11158
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022          Index: apparently..back-and-forth

**apparently** 596:14 826:7 827:23 828:13 831:2 832:20 844:6,15 857:18

**appeal** 577:24 732:7 763:21

**appealing** 732:9

**appearance** 782:7

**appearances** 573:7

**appeared** 759:17 811:22, 24

**appears** 648:9 654:13 673:11 828:22 833:15 855:9

**applied** 836:17

**apply** 624:19 707:8 744:15

**appointing** 724:1

**approach** 582:13 596:1 599:15 602:15 603:13 604:2 665:15 667:22 694:18 734:18,20,23 794:5 806:20 866:23 867:2

**approached** 615:22 669:24

**approval** 721:9

**approximately** 724:16

**April** 742:19 758:13 825:21 838:14

**arbitration** 700:9 734:5, 15,16

**arbitrator** 700:13

**archived** 839:8,14

**area** 756:6 810:18

**argue** 820:11 893:11

**argued** 819:25

**argument** 804:1 805:5 820:15,17

**argumentative** 798:13 870:2

**arise** 838:5

**arises** 888:16 890:11

**arm** 593:24

**arranged** 753:2

**arrival** 705:8

**Article** 695:24 727:15

**asleep** 720:10

**aspect** 714:6 884:16

**aspects** 873:22

**ass** 845:19,25 854:2

**assassinate** 828:10

**assassination** 835:16 836:3 863:3

**assassinations** 827:12, 19 828:9 832:2 863:20

**assert** 796:11

**assigned** 721:5 730:3 732:1

**assist** 762:7 763:20

**assistance** 754:24

**assistant-type** 740:11

**assisted** 704:2 762:21 822:6,7,10

**assisting** 698:22 705:20 740:21

**associates** 704:1

**association** 808:13

**assume** 580:11,13 837:3 840:22 891:21

**assuming** 650:16 700:22 783:8,14 845:22 855:11 863:8,16

**assumptions** 652:10

**astone@twu556.org** 738:25

**at-risk** 746:9

**attach** 657:3 859:21

**attaching** 638:20

**attachment** 652:6,12

**attachments** 662:6

**attacks** 894:8

**attempt** 858:14

**attempted** 795:4

**attempting** 891:8

**attend** 727:4 763:24 764:18 788:21 799:1

**attendance** 758:22 786:23 788:15 801:18

**attendant** 613:21 614:4 615:20,24 642:3 662:9 669:19,22,23 670:10 674:14 696:21,24 697:2,25 707:9 721:15 722:7,11,13 725:8,9 727:20,25 728:13, 21 729:3,9,14 730:2,6,9, 10,18 731:10 732:13,24 733:8,13 734:7,11 735:17, 22 736:20,24 737:5,12 745:6 755:2,25 757:18 758:1,3,10 764:10 767:5 775:19 778:20 786:17 819:17 826:13 838:11

**attendant's** 728:2 764:2

**attendant-friendly** 698:7

**attendants** 601:20 613:14 648:10 650:6,8 663:24 665:5 666:3 677:22 698:4 699:3,7,25 720:20 721:1, 12,22,25 722:4,17 725:3 727:24 735:19 751:21 753:8 756:10 757:16 761:23 762:6 763:17 764:6 767:7 779:11 780:5 784:19 786:23 787:14 788:5,18 801:17 838:9

**attended** 758:19 764:3,20 775:20 779:12

**attending** 753:9

**attention** 622:4 665:20,21 738:18 750:19 795:5

**attitude** 826:18 827:4

**attorney** 669:3,8,14 671:7 702:17 703:25 704:5 712:25 789:17

**attorney-client** 669:4

**attorneys** 705:9 818:18

**attributes** 892:11

**attributing** 687:25

**audio** 776:12 847:19 851:1

**Audrey** 599:25 624:7 659:15 676:19 750:19 818:20 820:21 833:3

842:10,22 843:5,10 845:23 855:17 856:16 858:20 859:2 861:13,19 862:18 863:1 880:16

**August** 580:1,3 833:14 887:25

**authored** 770:21 855:17

**authorities** 696:15 756:4

**authority** 743:23 744:2

**auto** 739:13

**automatically** 808:24 809:6,21

**availability** 731:25

**avoid** 581:19 831:3 889:9

**awake** 594:1 722:19 735:5

**aware** 662:15 664:24 688:13 705:9 735:21 738:1,12 758:24 762:18 829:1 830:3 839:12 843:5, 12

**Awesome** 848:10

**awkward** 584:12

---

**B**

---

**B-R-E** 633:13

**babies** 807:11

**baby** 748:12 770:17 776:17 811:3,20,23,24 878:6 879:20 882:15

**baby's** 812:6

**back** 576:11 588:6 593:10 625:17 628:19 629:16 631:2 634:16 635:3 650:20 664:7 694:9 696:19 703:2 709:5,23 716:9,13 720:4 726:15 727:9 731:1,7 736:18 751:8,18,23 753:15 757:3,18,19,24 758:2,9 760:10 769:18 772:18 791:21 807:20 810:21 816:20 830:14 840:7 842:25 847:2,8,20 879:22 888:16 890:9

**back-and-forth** 838:12

backed 639:13

background 776:19
882:19

backlog 579:24

bad 682:9 745:10,14
798:25 799:6 806:15
847:23

bag 586:21

balances 722:10

ball 894:25

Baltimore 700:4 783:20,
21

Baltimore-washington
771:25

bargaining 681:8,11
695:17 702:20 704:1
731:12

base 614:14,17,18,25
615:2,7,19,22 616:2
645:17,22,24 651:24
659:21 698:23 699:20
729:13 732:16 737:20
756:3 764:14 773:22
774:1,5,7 823:21,22 868:3

based 577:14 610:2 615:3
638:6 645:18,23 670:13
682:18 687:17 720:20
723:13 736:6,12 737:22
767:15 773:11 774:14
837:19 851:25 884:19
892:3,4

bases 699:23 723:9
754:11 839:9,16,24,25
840:13

basically 709:5 722:9
726:10 819:3 821:11
825:17 831:17,23 832:10

basis 627:18 678:12,15,17
686:23 739:24 747:3,7
766:24 795:9 804:6 824:20
871:19 879:8 881:20

batch 778:8 781:6

batches 781:5

Bates 624:14 637:5,7,22

battery 840:5

beans 584:14

begins 769:20

begrudgingly 888:15

behalf 573:14,20 622:9
695:10 721:19 728:3
737:12 787:18 820:16
850:4 858:16

behavior 663:23 863:18

behind-the-scene 834:22

behind-the-scenes
704:23

belief 657:6 670:7,10
693:22 875:16,22,23 876:9
884:2

beliefs 668:15 669:9
670:1,14 748:18 776:23
793:14 873:19

believed 613:20 747:12
876:9

believes 653:3,7 691:15

bench 579:20

bet 772:16 777:22

Bible 670:10

big 654:22 854:20

bigger 654:22 832:25
834:25

biggest 775:17 889:7

bind 762:24

bit 648:20 676:13 680:3
682:7 696:19 712:20
720:8,11,13 735:7 744:22
753:15 758:5 785:9 816:3
820:23 840:9

black 660:18

blacked 641:10,15 647:22
859:16

blanked 849:14

block 801:14

blocked 802:22 815:25
816:6

blocking 802:4 833:20

bloody 793:1,4,17

blow 652:9

blue 781:17

blur 596:6

blurred 596:5,6 652:16
654:6,22

board 624:22 640:11
654:16 656:23 672:23
679:2,8,11,18,21 680:5,9,
12,14,15,22 684:11 687:16
688:1 698:23,25 700:5,8,
12 720:17,19,24,25 721:6,
9 722:23,24 723:1,3,7,11,
17,25 729:15,24 733:2,12,
16,17,19,25 734:5,6,15
739:1 740:18 741:19,20
744:15,16,19,20,23 754:7
755:13 760:18 761:13
782:11,23,25 783:2,4,15,
21 784:4 828:15

boarding 810:18

boards 724:24

Bobby 573:11 818:15
867:21

body 680:6 720:18 723:12
733:3 744:14 750:15
751:25

boil 735:7

bolded 681:22

bombing 781:18,22

book 697:25 698:11,14
702:16

boring 720:9

Bott 704:2

bottom 580:20 597:5,8
739:12 770:1 833:10,14,18
838:1 851:4

box 866:23 867:8

boxes 587:17

BR 679:17

breach 851:25

break 590:14 593:23,25
594:5 630:5,9,15,22 631:1,
4 668:7 708:5,9 709:22
719:14 791:8 792:2 845:10
846:13,18,22 847:8 886:13
889:18

breaking 708:3

breaks 889:20

Brett 580:11 626:19
627:11,12,14,25 628:21
641:13 659:16 661:1
672:18 773:16 819:24
820:1 837:5 844:1,3,17
854:15

Brett's 846:5

Brian 573:15 585:19 624:8,
21 637:3 638:17 641:6
642:15 646:3 655:12 658:2
659:9,23 660:21 760:14
765:11,21 817:1 818:14
833:11 839:7,9,25 842:21
843:25 858:13 860:1,11
862:10

Brian's 633:11

briefing 633:20

briefly 700:21

bring 590:15 591:20,23
593:8,11,16 617:24 631:18
635:11,20 663:20 665:3
666:12 685:12 692:5 704:3
709:7 711:6 719:1 745:20
753:7 761:22 786:22
792:6,8 793:24 811:5
849:3,4,16,19,21 874:5

bringing 836:13 892:24

brings 624:21 796:6

broaden 644:5 664:23

broader 643:23

broadly 727:12

broke 688:24

brought 643:18 665:6,9,
11,13 666:2,5,9 674:14
684:25 692:20 694:15
710:24 711:2 722:22 741:3
753:23 767:9 794:25
795:5,12,20,25 796:3,7,18

bucket 888:14

build 787:3,17

bullet 753:1

bullets 753:17,20

bully 588:22

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 219 of 642   PageID 11160
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 3 July 07, 2022                        Index: bullying..child

**bullying** 879:24 882:5,11

**bullying/hazing** 878:23 879:18

**bunch** 623:15 808:14

**burden** 713:2

**Burdine** 583:6

**burned** 712:16

**bus** 785:17

**business** 688:7 722:5 754:5 785:5 788:11,14 890:17,20

**bylaw** 656:24 657:3

**bylaws** 667:4 678:23 683:25 688:11 703:12,15 721:4 723:1,14,24

**C**

**calculations** 726:7

**calendar** 754:5

**call** 593:24 594:3 607:17 612:5,7,11 630:10 653:2 708:9 715:23,24 716:1,7 718:11,24 721:13 723:9 731:15 735:20 773:9,17, 18,25 774:10,24 780:23 789:14,18,20 790:22 791:9 815:3 816:24,25 848:21,22 866:17 879:16 887:2

**called** 697:25 699:19 718:10 726:2 731:15 732:5,11 744:7 764:13 848:19 874:11 881:21

**calling** 630:15 639:9 729:4 849:7 875:14 884:3 885:19

**calls** 595:22 614:21 653:9 689:15 721:18 760:21 763:3 868:7

**camera** 830:23

**campaign** 724:20 818:23

**cancer** 830:12,15

**candidate** 669:23

**candidates** 669:20,22 706:5

**capacity** 721:16

**capital** 829:10

**caption** 811:10

**car** 591:14

**carbon** 833:24 842:1 861:13 862:18

**carbon-copied** 637:3 641:13 657:15 660:21 672:18

**carbon-copy** 659:15

**carcass** 793:4

**cards** 887:23

**care** 626:24 757:18

**career** 700:18

**careers** 707:14

**careful** 605:7 639:3,24 651:1,2 859:3

**Carmen** 891:16

**carpet** 781:18,22

**carry** 748:11

**Carter** 573:8,10 574:22 581:4,5 582:1 596:8 601:15,21 602:2,13 604:20 607:4 610:10 611:20 612:4,17 613:22 616:21 617:13 619:25 646:22 655:20 665:10 666:11 685:8 711:18 716:16 719:19 736:13 737:23 738:12 743:8 745:21,24 749:3,10 750:21 756:13 757:5 758:8,16,18 759:2,6, 7,14 768:10 770:21 773:7, 11 774:1 775:3,22 777:2, 20 778:8 780:25 782:3,4 784:11 788:23 799:18 801:8 802:25 803:8,11,21 805:9 807:9 808:10 809:16 810:4 811:5 815:19 816:24 818:16 843:11,22 848:20 855:23 856:17 859:10 867:22 875:6,9 876:15 879:14

**Carter's** 589:12 746:3 757:2 768:2 799:17 807:2 814:17

**cartwheels** 888:21

**case** 577:23 580:10 587:3, 6 589:19 591:23 593:12 631:7,8,14 691:8 708:15, 16 709:10,25 712:25 713:10,12 715:25 728:17 731:5,14,23,25 733:1,11, 16,17,18 734:6,11,13 737:19 747:13 791:13,15, 20 800:18 816:15 817:13 846:25 847:1 852:18 877:1 886:19,21 887:5 888:5,9 889:6 890:19 892:3,6,11

**cases** 579:18,22 626:3 627:19 700:12 732:1 733:24 838:8 863:17 893:16

**Casper** 823:1,2,4,6,10 830:16,20 835:19 836:3 844:10,12,21,25 845:22,24 852:18,23 853:7 854:2

**Casper's** 845:10

**casual** 834:22

**cat** 586:21

**categories** 682:1 726:18

**category** 578:1

**caused** 743:1

**causing** 823:7

**CBA** 679:6 703:4

**cc'd** 626:4 642:19 647:22 651:6 655:23,25

**cell** 776:10,11 889:10

**center** 771:24 854:6

**centerpiece** 691:17

**central** 713:10

**certificate** 581:6

**cetera** 724:5 728:16 753:17,21

**chair** 741:18

**chairing** 754:11,13,15

**chairperson** 601:18 700:6 731:21 733:20,23 763:23 764:4 786:16,21 787:9,13 788:5

**chairperson's** 787:8

**challenging** 573:25

**chance** 737:19 792:22 829:19

**change** 584:6 619:9 678:13,14,17 683:19 777:13 812:12,19 856:9

**changed** 677:25 683:15, 23 821:25

**changeover** 705:2

**channeled** 649:16

**channels** 784:20

**characterized** 814:19

**characters** 826:8

**charge** 629:3 639:23 644:11 692:3 795:21 876:14 888:12 889:8 892:22 893:8,11,12,18,22, 24 894:9

**charged** 800:19,20

**charges** 643:18 689:18 744:8,18 745:21 783:24 784:3,6 792:25 795:5,12, 20,24,25 796:3,6,7,19,22 798:23 811:5

**charges'** 799:4

**charging** 650:25

**charitable** 726:16 887:20 888:19

**Charlene** 573:10 585:18 595:14 596:12,15 600:1,4 601:15,21,24 602:2 603:2, 5 607:4,19 609:21 610:10 619:25 646:21 736:13 737:23 743:8 745:21,24 758:15,18 801:7 802:4,9 803:7,11,21 804:22 805:8 806:13 818:16 843:11 867:21 875:6,9

**Charlene's** 804:16,24

**chart** 762:19

**cheap** 830:24

**check** 594:3 630:10 722:10

**child** 746:12 747:16

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 220 of 642   PageID 11161
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Index: children..concerned

**children** 701:1 707:18 746:15,17 748:1

**children's** 700:25

**choice** 576:23,24 750:14

**choose** 581:20 697:4 737:20 747:15 800:15

**chooses** 727:25

**choosing** 727:2

**chopped** 676:17

**chose** 674:16 788:15

**chosen** 725:17 726:1

**Chris** 666:13,15,16 684:24 685:3

**Christian** 670:8,14

**circle** 672:24 673:2

**circling** 576:11

**circulating** 753:11

**circumstances** 686:4,17 687:13,14

**civil** 579:25

**claiming** 656:12 873:19

**claims** 632:4 636:7,8,12 644:20,21 647:7 649:1 651:17,18 657:20,21 660:9 672:10,11 794:17,18 817:24 818:1 850:20,21 865:10,11 866:11,12

**clarification** 582:7 596:10 710:8 839:20 840:24

**clarified** 628:13

**clarify** 627:25 728:24 739:8 763:14 769:10 778:24

**class** 706:11 707:3

**classes** 707:20 821:10 822:13

**clean** 867:12

**clear** 640:24 657:6 718:4 748:19 757:10 798:7 832:6 836:14

**Clerk** 867:6

**clerks** 889:6

**click** 666:13,15,16 684:24 685:3,18,19 687:15 690:18 692:21 693:7 809:13 810:14 854:18

**Click's** 854:23

**clicked** 808:19 809:3,24 810:8

**client** 574:24 576:1 713:19 714:1 767:11 800:6,10,18 816:1

**client's** 815:8,20

**climate** 755:16

**clinic** 746:13

**clip** 584:10 790:14 818:9

**clock** 574:12,16,20,21 579:1,12 709:21 714:17 792:15 794:7 800:15

**clocked** 864:5

**close** 593:22 796:12,15 888:13 890:17,19

**closed** 616:3

**closely** 584:19

**closer** 588:1 645:19 824:4

**Cloutman** 573:20

**co-chairperson** 601:19 700:6

**co-counsel** 625:20 636:19 760:9

**Coast** 754:12,14

**code** 649:16 734:19 747:4, 7

**coincidence** 843:19 856:20

**cold** 779:7

**collection** 599:22

**Collective** 681:7,10 695:16 702:20 731:12

**colloquial** 625:5

**color** 598:25 791:22

**colorful** 831:22

**combative** 576:15

**combination** 688:8

**combined** 893:23

**comfortable** 824:5 828:1 867:3,8,9 881:9,10

**comment** 577:1 674:24 707:5 712:19 751:17 776:16 807:16 843:24 845:22 846:5

**commenting** 578:16

**comments** 578:3 584:2 751:24,25 753:11 757:23 769:24 776:19 784:21 814:20 821:21 863:3 879:3,4,10

**commitment** 889:15

**committee** 601:18 679:24 680:1,5,8,11,17,22 681:2,4 700:7 721:24 722:2,16 775:19 779:13 785:10,20 786:3,6,7,9,10,15 787:4,7, 10,15,18,21,22 788:2,6 801:6 810:6

**committees** 680:3 721:21, 23 722:3 762:5 786:4

**commonly** 729:5

**communicated** 585:18 803:5

**communicating** 595:16 834:9

**communication** 577:6 580:13,15 596:11 601:14, 17,23 602:8 622:8 641:20 656:20 712:8 739:15 802:9 807:1 808:10 831:11,18 832:17 845:24 858:21 863:20 882:25 885:2,3

**communications** 577:25 595:7 596:16 599:25 607:25 622:9 659:9 688:25 711:17,18 713:3 738:19 741:15 743:6 760:14 780:25 784:10 807:23 831:16 853:18 876:21 877:6,17,25 879:15,21 881:22 882:12,19

**company** 573:15 642:15 658:18 659:11 667:9,16 682:12 696:4,14,16 738:5 766:25 797:19 859:8

870:16 872:17,24,25

**compelling** 575:8

**complain** 650:4,6,8 784:14 807:3

**complained** 600:2 855:23

**complaining** 596:9 611:21 618:5,10,12 619:10,11,22,25 648:10 650:2,17 656:20 658:9 712:2 805:1 806:13 807:5 841:15 879:22

**complains** 870:21

**complaint** 595:17 596:18 602:13 603:1 613:22 614:4 615:3,5,8,16,20 617:2,18 618:16 619:14 620:6 624:22 648:5 652:3 661:11 665:13 666:9 673:13 685:2,12,16 710:21,23 711:1 712:9 728:20 735:9, 12 743:7,19 744:25 745:24 758:8,12 759:5 767:6 769:6 773:6 803:24 805:3 806:16 843:10 856:17 859:10

**complaints** 615:10 616:21 617:13 624:8 661:4 664:25 666:2,6,12 711:3 743:18 800:1 803:14 808:12 838:11

**complete** 670:16,25 758:2

**completed** 636:15

**completely** 727:2 835:20, 21 870:16

**completing** 725:11

**completion** 670:21 697:3 725:13

**complicated** 584:2

**complies** 597:1

**compound** 615:11 620:15 675:4 693:15,17

**comprised** 721:22

**computer** 629:4

**concern** 575:4 595:17 674:15 753:9 804:16

**concerned** 775:14 800:22

801:16 831:8,10

**concerns** 649:17 659:24
665:9 685:14 717:8 775:17
836:13 862:13 892:13

**concise** 715:20 735:8

**concluded** 601:1 611:13
625:13 629:5 630:12
638:11 653:22 668:9 687:6
692:6 800:25 863:25

**concludes** 730:25

**conclusion** 595:23 653:6,
10 660:17 689:16 760:22
763:3 793:7 804:8 868:8
875:15 876:1 884:4,18
885:19

**conditionally** 600:11,21
601:10

**conduct** 788:13,14

**conducted** 678:20

**conducting** 730:14,22
741:20

**conference** 637:12
771:24 887:15 888:3,12
893:12,22,25

**confidence** 851:25

**confidential** 613:11
615:9,17

**confirm** 597:19

**confirmed** 639:13

**confused** 674:10

**confusing** 586:14

**confusion** 582:10

**conjunction** 786:14

**Conlon** 583:1 715:24

**connect** 600:22 601:11

**connection** 595:16 788:1

**consideration** 885:17
893:21

**considered** 678:4 721:14
877:17 878:1 879:13,14
881:2 883:15 884:16 886:4

**consistent** 857:22

**conspiracy** 840:20

**constitution** 688:12,18
720:16 743:25 744:4,6
745:8 798:20

**constraints** 718:9

**contact** 721:20 727:23
730:4 739:12,17 825:18
858:15

**contacted** 729:3

**contacts** 706:18

**contained** 677:20 739:13
752:7

**contempt** 581:3

**contents** 768:7

**context** 583:15 652:11
835:21 864:12

**continue** 594:15,23
635:23 639:12 704:14
719:11 732:25 733:15
734:1,8,10,12

**continued** 595:1 689:2
700:17 719:12 825:2

**continues** 653:2

**continuing** 606:22 734:3

**contract** 678:17 697:10,
17,25 698:2,9 699:18,19
700:1 703:23 704:6,19
705:3 725:9 726:13
727:15,19 728:7,11
730:21,24 740:15 741:17
752:17 761:11,17 762:3,11
819:4,6,10

**contracts** 704:9

**contractual** 678:13
697:14 721:25 728:17
734:11,13

**contradictory** 816:4

**control** 736:9

**conversation** 616:5
642:11 669:7,13,17 670:2
711:11 759:8,14,17 773:5
814:5 837:16 859:4

**conversations** 608:13,15
665:7 674:16 680:1 705:15
751:19 834:23 837:4,19
839:10 852:16

**convince** 813:6,20

**cooperation** 891:11

**coordinate** 729:20,23
737:16 786:21

**COPE** 601:17

**copied** 582:11 672:23
833:25 842:1 861:13
862:18

**copy** 603:18 616:7 621:6
632:7 767:23 791:23
806:19

**Corliss** 826:9,12 827:4
828:10 835:18 836:4

**corporate** 573:21

**correct** 586:8 602:5
609:18 618:11 619:6,10,21
620:1 641:2 646:19 650:2
651:7,10 652:1 658:12
661:19 670:19 671:4
676:7,11 679:6 680:23
682:9,13 683:5,12 684:21,
23 695:24 703:4 710:10
712:3 735:10 738:7 760:7
768:8 769:1 770:7,11
772:2 773:7 776:24 801:11
805:19 806:9 815:15 819:7
820:16 825:21 826:6,16,17
827:8,10,12 828:3,4,21,25
834:24 836:4,22 838:15,17
841:10 842:2,22 843:23
844:3,16,22 845:1,17,25
852:3 853:8,10,12,24
854:3,7 856:1,7,13 857:4,
25 858:23 859:12,22
860:13,17,21 862:18
867:19,20 876:15

**correctly** 632:13 682:2,17,
22,25 683:16,20 696:5

**corrupt** 858:19

**counsel** 582:8,10,14,15,
21,23 589:16 599:5,8
604:8,23 605:8 606:6,22
609:3 610:13 618:19
636:24 637:4 640:2,17
641:8 647:24 653:2 656:6
670:6 676:5 677:10 680:18
716:11 751:11 757:2
768:2,21 781:11 793:14
803:11 804:4,7 811:14
814:17,24 815:4,6,19

848:5,20 864:10 891:7

**counted** 684:5 725:15

**counts** 741:22

**couple** 579:2 580:19
623:2,18 709:4 758:20
781:16 825:16 846:4

**coupled** 677:2

**court** 573:3,4,12,17,24
575:1 576:21 577:2 578:5,
10,25 579:5,10 580:17,19
582:12,19 583:10,12,18
584:11,25 586:9,18
587:11,14,25 588:4,16,19
589:21 590:2,9 591:1,4,7,9
592:1,9,21 593:4,10,14,19
594:4,9,10,13,17 595:20,
24 598:10,14,19,22,24
599:16 600:8,21,25 601:3,
4,8 602:18,21 603:15
604:1,3,24 605:12,18,21
606:8 607:7,22 608:2,23
609:3,6,11 610:4,14,21
611:1,11,15,16,19 613:17
614:22 615:12 616:8,11
617:5,9,19 619:18 620:16,
22 621:1,14,17,21,23
622:21 623:3,12,17,21,24
624:10 625:4,9,15 626:10,
16 627:6,10,21 628:7,17,
19 629:7,8,19 630:4,9,14,
15,19 631:6,10,13,17,18,
21,22,24 632:10,14 633:5,
17 634:6,8,12,25 635:10,
17,22 636:1,22 637:13,17
638:3,10,13,14 640:4,19
643:15 644:4,17 647:2
648:11,22 649:11,14,16,19
651:13 652:23 653:9,17,
19,24,25 655:15 656:7
657:19 660:6 663:6,17
664:15,20 665:18 667:23
668:7,11,22 671:15,21,24
672:7 675:5,13,18,23
678:8 679:14 680:25
682:15,20 683:7 686:11,19
687:3,8,9 689:19 690:3,13,
23 691:3,23 692:5,8,9,13,
16 693:6,17,20,25 694:19
695:3,13,19 696:10 701:20
702:3,11,23 703:6 705:13
708:3,12,14,20,25 709:13,
18,19 710:9,13 711:5,8
712:12 713:14 714:2,11

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 222 of 642   PageID 11163

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Index: Court's..department

715:20 716:15,17,21
717:10 718:1,4,7,12,16
719:1,7,10,18,23 734:19,
22 735:1 737:3 738:10,15
743:14 746:25 747:3,6,9,
23 749:2,9,14,24 750:1,6
751:4,16 752:23 754:2
755:8,19 756:15 757:7
759:10 760:11,23 763:4
766:5 767:2 768:15 775:25
777:19,22,24 778:1 779:16
780:10,14,17 789:7 790:1,
5,8 791:7,13,19 792:5,6,
18,20 793:8,21,25 794:4,8,
10,14 795:9,16,19 796:12,
15 797:14,25 798:14
799:10,20 800:4,9,24
801:2,3,22,25 803:1 804:2,
5,9 805:6,13 806:21
811:15 812:16,24 813:11
814:3,8,12,22 815:13
816:10,13 817:4 820:9
826:1 846:12,17,22,24
847:4,7 848:3,10,13,23,24
849:2,3,10,13 850:5,7,10,
15 857:15 864:5,10,17,20,
23 865:2,6,18,22 866:3,10,
20,22 867:7 868:9,17
870:3,25 871:5 875:17
876:4,11 878:17 880:3
881:14 882:1 883:7 884:6,
13 885:20 886:15,18
887:1,8,14,18 888:24
890:8,18 891:10,16 892:9,
22,24 894:4,18

**Court's** 716:1 717:7

**courthouse** 574:2 887:4
889:2

**courtroom** 593:9 594:12
631:12,15 635:21 708:19
709:12 718:23 719:9
768:23 791:18 792:19
816:16 847:6 850:9 866:21
867:23 886:25 887:13

**cover** 588:5,8 854:6 888:7,
25

**covered** 597:3,11 696:13
891:8

**covers** 858:6

**COVID** 579:21,22,23

**cracks** 740:25

**creates** 656:13

**creating** 655:4

**cried** 812:8

**crime** 793:2,5,11

**criteria** 678:22

**criticism** 578:2

**criticized** 814:17 815:7,
14,16

**cross** 609:13 692:1

**cross-examination**
675:20 676:1 719:12
768:16

**crossed** 578:12,16 879:5
883:17

**crossing** 879:19

**crowd** 828:15,18

**crucial** 713:25 715:8,9

**crummy** 800:5,7

**crunch** 717:12

**crunched** 887:19

**crushing** 579:24

**Crystal** 854:14

**current** 699:4 709:21
713:23 714:2 767:11
829:12,13,23 830:4 855:5

**cursor** 833:13

**curve** 714:25

**cut** 584:17 709:24 713:18,
25 714:4 716:9,24 717:3,4,
5,25 718:2 749:23 750:12,
18 775:15 793:3 848:5,6

**cutbacks** 716:11

**cutdown** 887:20

**cuts** 770:20

**cutting** 715:1,2 716:9,13
793:11

**Cuyler** 854:10

**cycle** 723:16 787:7

**D**

**daily** 577:10 739:22,24

**Dallas** 764:14 782:23
783:2,11,14,16,17

**Dallas-based** 764:10

**dangerous** 826:11,16
830:12

**date** 581:17,18 646:18
677:25 683:14,19,23
729:21 765:16,19,22
843:15 859:13

**dated** 651:23 825:21

**dates** 682:4,5

**David** 679:16

**day** 573:6 575:9 590:12
611:4 646:21 678:13 698:9
702:19 714:23 718:14
719:4 740:4,9 741:12
762:10 771:15,16,20
787:20 810:12,21 846:14
856:16,18 859:9 866:24
886:13 888:10

**day-to-day** 721:11,20
722:5 726:12 740:21

**days** 573:25 582:7 685:15
721:17 740:24 742:6
750:19 754:4 843:6

**DC** 779:7 786:21 788:19

**de** 836:8,9,10

**dead** 807:10 849:22

**deadline** 731:4 894:5

**deal** 580:5 823:7 852:17
856:6

**dealing** 741:4 784:25
853:2,3,6

**dealings** 837:24

**dealt** 670:4,5 744:13 825:6

**debate** 804:23

**Deborah** 645:7,16 651:24
660:22

**Debra** 860:1,10

**deceased** 682:13

**decide** 715:13 724:19
784:9 810:13 812:20 824:1

**decided** 678:18 680:22
701:10 704:13 715:22
885:5

**decision** 678:25 696:25
704:3 731:5 732:9,17
733:10 737:20 810:25
877:1,6,18 878:3 882:23
883:3,4,16 884:5 886:9

**decisions** 714:10 721:2
877:19

**decompression** 743:2

**deem** 639:15

**deemed** 677:19 688:9

**deep** 575:17 893:15

**Defendants'** 576:7

**defense** 766:23 767:4,10
827:24

**define** 821:3,5

**Defining** 653:5

**definition** 869:4

**definitive** 577:13

**degree** 586:12

**delete** 846:5,8

**deliberate** 890:21

**deliberation** 888:7

**Democrats** 771:6,7

**demographic** 785:18

**denial** 892:4

**denied** 583:14

**denies** 713:21 714:1

**Denise** 773:13

**Denver** 773:22 774:4,14
782:20 783:9,10,11,12
868:3

**Denver-based** 773:10

**deny** 713:14 714:12
732:20

**denying** 855:12 860:16,18

**department** 622:10

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 223 of 642   PageID 11164
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                               Vol 3 July 07, 2022                    Index: depend..drivers

**depend** 872:7

**depends** 870:23 871:12

**depict** 778:14

**depicted** 619:1 780:5
885:9

**depicting** 687:25

**depiction** 619:12

**depictions** 752:2

**deployment** 742:18

**depo** 580:12 581:18,22
584:16 716:18,22 817:17
818:3 887:21

**deposition** 581:7 585:12
817:1,11,16,17 840:5
851:1 864:2

**depositions** 817:3

**deprive** 893:10

**describe** 739:22 740:7
756:8 778:6 781:19 852:10

**describing** 725:22

**designation** 583:2

**designations** 583:9 585:7
716:10 894:16

**desire** 776:3

**destruction** 823:8

**details** 586:4 729:25
797:5,6 869:24 870:1

**detective** 830:23

**determination** 871:19

**determine** 678:21 720:23
726:4,19

**determined** 614:1,15
720:20

**determining** 733:9

**developed** 852:1

**device** 776:8

**diagnoses** 746:18

**dialogue** 759:18

**dictate** 723:15

**Diego** 891:17

**difference** 619:4,6 628:16
701:10 757:4 866:7,9

**differing** 767:7

**difficult** 698:4 702:20
840:8 860:12

**difficulty** 612:14

**digging** 839:8,14

**diligence** 678:19

**diminishing** 575:13,18

**dinner** 669:21

**dip** 892:20

**Dipippa** 681:6,13

**dire** 686:7,12 708:21

**direct** 595:1 622:4 696:2
700:2 721:20 726:17
749:19 867:14

**directed** 577:24 727:23

**directing** 665:20,21

**direction** 871:13

**directly** 648:19 726:10
758:19 774:15,16 831:6

**director** 659:20 823:21
824:9,10,11,14 825:7,8,9,
11

**disagree** 618:12 657:14
869:10 870:5

**disagreed** 737:6

**disagreeing** 877:13

**disagreement** 870:6

**disagreements** 869:13,15

**disagrees** 736:24

**disavow** 643:17 644:10
656:4 657:13 661:14

**discipline** 583:16 648:17
728:17,25 729:6 731:8,10,
11 732:18,23 733:10 734:6
736:21 764:20 766:7
767:19 838:4

**discipline-wise** 649:7

**disciplined** 648:25 663:24
827:25

**disciplines** 798:24

**disciplining** 817:23

**disclaimer** 631:25 847:17,
20 849:17 850:22,25
851:10

**disclosed** 822:18

**discovered** 754:16

**discredit** 639:1 640:13

**discuss** 663:16 740:3
760:9 777:7,10 835:5

**discussed** 592:5 614:12
655:2 672:8 677:10 685:18
719:14 727:10,11 763:10
765:11 777:1 778:9

**discussing** 585:21 737:1
892:23

**discussion** 585:5 656:12
669:1 690:14 695:23
782:22 850:8 893:7

**discussions** 658:5 748:17
760:13 761:5

**dismissed** 692:22 693:2,8

**displayed** 825:24 832:23
836:19 837:11 838:22
841:3 842:17 860:5 861:3

**displaying** 857:10

**dispute** 857:20 860:20

**disputes** 869:9 879:19

**disputing** 842:6

**disregard** 649:5

**dissenting** 639:10 656:25

**distributed** 779:8

**distribution** 739:25

**disturbing** 812:11

**divided** 623:20

**docket** 582:25 598:10
893:16

**docketed** 583:1

**document** 585:18,24
586:6,25 589:14,16 592:12
596:3 598:20 601:5,6
602:16 603:25 604:12,13
605:4,6,16 606:6 607:13,

14,16 608:17 609:3,6,12,
15,18 610:3,23 611:2
612:12 616:15 621:4 622:1
624:5 625:21,25 626:6
628:6 629:24 630:1 638:9
639:17 640:3,18 644:23
647:10 648:16,19 651:20
657:23 660:12 672:14
677:16,17 678:6 681:19
690:5,8,9 694:15 720:1
749:16 765:13 769:12
778:3 780:19,22 790:11
794:20,24,25 797:4
799:15,16 851:13 855:17,
20

**documentation** 662:17
733:7

**documenting** 699:10

**documents** 577:5 592:15
677:24 701:24 711:13
768:3 858:8,11 866:14
878:8

**domain** 634:13 635:13

**domicile** 688:5,6 698:22
700:4 723:7 729:15,24
782:23,24 783:2,4,14,21

**domiciles** 723:9 752:14
762:10

**dominated** 785:16

**donate** 759:19

**donated** 759:25 760:2

**donations** 726:16

**Donna** 679:17 681:6

**door** 767:11

**doors** 707:14 754:20

**dot** 771:8

**double** 592:14 686:24

**doubt** 823:22

**draft** 580:18,20

**drafted** 582:24

**draw** 817:8

**drawn** 578:14

**dreadful** 828:5,11

**drivers** 785:17

**Drummond** 705:20

**due** 667:4 669:25 678:19 688:19 705:4 714:6 894:16

**dues** 619:23 670:18,21 689:2 726:5,9,19 803:23 804:13 805:9

**dues-paying** 655:8

**duly** 867:5

**duplicate** 678:1 682:24

**duplicative** 590:25 591:6

**duties** 671:7 673:24 674:3 698:21,22 721:5 762:8 787:11 825:15

**dutifully** 718:13

**duty** 668:14 674:9 678:13

**dysfunction** 823:7

———————————

**E**

**earlier** 630:23 648:25 679:4 681:15 709:24 721:23 725:21 746:8 763:10,16 773:4 779:13 780:24 786:5 798:21 817:12,22 844:11

**early** 697:10,23 705:5 708:4,5 714:18 724:17 758:12 764:25 888:5

**ears** 851:7

**easier** 605:19 628:4 645:1

**easiest** 584:15

**east** 697:8 746:13 754:12

**eaten** 720:7

**EB** 654:16

**economic** 575:17

**Ed** 773:10 866:19

**Edgar** 642:2,3

**edit** 584:11

**edited** 750:18

**educate** 698:19 721:24

**educated** 700:2

**education** 700:7 701:7

**721:24 819:3**

**edward** 573:20 867:5,17

**Edwards** 645:7,16 651:24 660:22

**effect** 654:14

**effective** 812:7,9,10 813:2, 5,12,17,20,23 814:6

**efficiency** 576:19 578:11 579:15 593:2 714:25 894:20

**efficient** 576:23 589:2 593:6 712:25 894:23

**efficiently** 575:7 588:23

**effort** 643:17 652:15 819:4 820:24 855:3

**efforts** 650:25 659:9

**egregious** 881:4 885:7

**egregiousness** 885:6

**Einstein** 782:8,14

**elaborate** 706:9

**elected** 666:17,19,21,22 698:24 720:17 782:22

**election** 723:16,18,23 724:17 725:14,19 727:4 781:24 782:2 787:6 798:18 799:6 820:4 828:17

**elections** 723:2,4

**eligible** 707:8

**else's** 615:20

**email** 580:21 583:21 585:2 601:20 623:6 627:8,10,17, 20 628:3,21 630:7,17 633:16,19,22,23 634:5 635:5 637:2 638:16 641:6 642:10 643:1,2,7,11,18,22 644:10 645:6,25 646:2,7 647:13 649:24 651:4,6,23 652:12 656:19 657:10 658:2,8,10,11,14 659:10 660:15,20 661:9 672:17 674:19 709:21 712:7 738:20 739:4,9,11,13,19, 23 740:5 741:6,21 743:6, 10 749:8,20 765:18,21,22 782:3 824:19 825:20 826:5 827:17 831:4 832:1

**833:15,24 834:3,4,10,12 835:15,20,22 836:1 839:4, 11 840:14 841:9,12,22 842:1,12 844:2,5 850:3 851:21 853:20,21 855:22, 25 858:15,22,23 859:13,22 860:17,23 861:11,18,23 862:4,8,16,25 863:12**

**emailed** 628:14,17 761:20

**emails** 582:7,11 587:17 623:15,18,23 625:1,25 632:14,16 655:21 662:19 665:12 675:9 739:18 740:4,9,17 741:11 765:11 766:2,10 767:17 781:7 795:4 797:18 815:8,21 824:20 825:2 863:2

**emergencies** 742:11,12

**emergency** 582:2 742:8 743:4

**Emlet** 716:9 717:24 839:13

**emotions** 740:8

**employed** 819:13 867:25

**employee** 648:16,25 649:7 682:4,6 683:10 701:18,25 702:9 710:1 766:24 773:13 826:15 839:22 840:11 842:13 874:11,16,22 878:5 879:7 880:15 882:5,9 885:9

**employee/flight** 778:20

**employees** 587:3,7 628:2 685:10 696:12 856:6

**employees'** 627:2 668:14

**employment** 725:10

**encourage** 729:7 830:22

**encouragement** 642:13 859:6

**encouraging** 759:17

**end** 593:6 602:9 684:24 697:23 706:25 707:2 708:22 716:5 717:12 719:4 764:9 845:19 847:15 864:3 878:18 888:9 890:24 894:23

**ended** 666:18 743:5 757:24 787:10

**endorsement** 642:14 859:6

**ends** 711:4 742:7

**engage** 764:6 820:22,24

**engaged** 642:21 646:10 820:3 875:7 876:17

**engaging** 643:19 644:12 657:11 661:20 662:2,20 869:21 875:12

**enjoyed** 701:9

**ensure** 680:19 756:4

**enter** 789:24

**entered** 593:9 594:12 635:21 691:4 719:9 792:19 850:9 866:21

**entertain** 717:11

**entire** 602:8 669:11 672:22 691:8 723:2,12 788:21

**entirety** 769:7 810:22

**entitled** 597:25 709:3 713:20 799:24

**entries** 677:21 681:25 684:7

**entry** 682:5

**equitably** 890:12

**equivocation** 578:7

**ER** 839:9,16,22

**eradicated** 830:12

**essentially** 677:19 744:7

**establish** 577:16,25 627:5 686:14

**established** 785:11

**event** 691:18 723:15

**events** 699:4

**eventually** 667:5 692:22 706:22 771:13

**everybody's** 729:22

**everyone's** 892:12

**evidence** 578:4 585:24 589:10 591:7 598:21 601:7 603:19,25 606:7 609:7 610:24 611:9 614:18

616:16 617:1 622:2 629:11
644:24 647:11 651:21
653:13 657:24 660:13
662:5,15,17 663:1,5,12
672:15 719:16,19 720:2
748:25 749:17 778:4
779:15 780:20 790:2,9,12
794:21 847:19 850:25
851:14 863:17 864:8
866:15 888:11

**evil** 782:11,15

**exact** 605:1 606:17 611:23
694:14 856:8

**examination** 594:16
595:1 678:20 684:24
719:15 792:23 795:11
814:14 867:14

**examined** 795:23

**examples** 627:22 698:3,8
874:2

**exception** 592:15 785:12

**excerpts** 847:22

**exchange** 824:20

**excise** 584:9

**excited** 697:7

**excluded** 632:2 726:15

**exclusive** 786:7

**excuse** 592:7 799:16
815:21 816:16 848:17

**excused** 791:19

**execution** 766:9

**executive** 640:10 654:16
656:23 672:23 679:2,21
680:5,21 687:16 698:22,25
700:4 720:17,19,24,25
721:9 722:23,24 723:1,3,7,
17,25 724:24 729:15,24
733:2,11,16,17,19,25
734:6 740:18 741:19,20
744:16,19,20 755:13
760:18 761:13 782:23,25
783:2,4,15,21

**exemplify** 620:6

**exercise** 697:15 706:5
707:19

**exercised** 674:8

**exercising** 595:15

**exert** 736:19

**exhibit** 574:18 585:17
588:9,15 595:5,9 597:3
598:13,21 599:2,3 601:7,
13 603:16,18 604:9
605:23,25 616:6,16,19
617:3,12 618:20 621:11,13
622:2,5,6,24 630:16,20
631:23 633:10 634:19
635:4,25 641:3 644:24
646:16 647:11,13 650:20
651:12,19,21 657:17,24
660:13 662:7 665:15,24
671:17 672:15 677:12
690:7 695:16 719:14 720:2
748:21,25 749:17 757:3
765:8,10,18 767:22 769:3
777:15 778:4 779:14
780:8,20 789:25 790:12
791:21 794:21 805:17
806:18,24 807:14,16,23
825:24,25 832:21,22
833:19 836:2 837:12
838:21 839:2 841:21
842:17,19,25 850:17
851:14 854:5 855:16
856:24 857:10 858:3,13,25
862:8,25 893:13

**exhibits** 574:13 587:4,22
588:6 628:11 636:9 649:2
663:19 794:15 808:14
864:4,5,6,14 865:10
866:15

**existed** 739:7

**exists** 743:24

**exited** 631:12,15 708:19
709:11 791:18 847:6
886:25 887:13

**expect** 831:22

**expected** 831:19,20

**expecting** 573:21 596:6

**expenditures** 687:25

**experience** 697:18 746:3,
19 872:4,13,14,15,16,18,
22,23 873:2

**experiences** 746:6,20

**experiencing** 746:17

**expire** 684:4

**expired** 677:24 683:15,19

**explain** 581:21,22 686:3
698:8 743:23 746:23
795:16,19 825:10 840:3
871:14

**explained** 608:7 817:2

**explanation** 735:4

**exposed** 697:9

**express** 753:9 869:15

**expressed** 762:6

**expressing** 575:4 611:25

**extension** 736:6,11 892:1

**extent** 636:4 656:3 848:20
876:23 883:15 885:12
889:18

**extra** 573:23 593:3 712:16

**extremely** 830:3 840:7

**eyes** 748:3 790:17

**F**

**face** 789:11

**face-to-face** 752:16

**Facebook** 575:14 586:15
712:7 781:1,8,9 782:4
801:16 802:13,14 808:25
809:1,9,11,14,16,19,20,22
814:18 815:8,21 816:6
826:8 834:7 878:4 880:14,
18,19 881:8,19 882:4,8,15
883:21 885:2,8,15 886:3,9

**fact** 602:1 609:1 619:9
624:21 639:11 644:1,5
651:2 655:11 656:19
663:21 664:3 665:3,11
666:1 674:20 796:21
805:25 806:1,11 820:3
832:15 865:13

**fact-finding** 656:15 729:5,
6 735:9,14,16 736:14,20,
22 737:6,7 738:6 763:12
764:14,18 819:20

**factoring** 883:3

**factors** 688:8

**facts** 639:12

**factual** 881:1

**fail** 731:6

**failed** 590:8 679:5

**failure** 815:20

**fair** 597:25 612:2,15 634:12
641:1 664:24 667:11
692:20 710:12 730:22
768:6 833:22 839:17
878:12

**fall** 577:25 714:4,5 720:10
740:24 824:6

**falls** 726:16

**false** 614:3,8,16 615:3,21
689:1 783:20

**families** 701:3

**family** 748:6

**fashion** 584:12

**faster** 887:20

**fault** 583:17

**favor** 654:15 821:7 888:6

**fear** 657:1 889:7

**February** 646:18 768:12
843:1 856:15 857:9 859:9
861:12

**fee** 670:20 683:4 726:3,20,
22

**feel** 594:19,20 639:15
667:19 750:25 751:14
813:16

**feeling** 637:16 661:24
887:20

**feelings** 697:5

**feels** 650:18 782:10

**fell** 678:2 681:25

**fellow** 631:6 708:14
743:20 779:11 780:5
791:13 846:24

**fellows** 886:18

**felt** 667:14 712:21 740:24
772:19 773:19 785:23
824:5 828:1

female 778:14

fetus 769:23

FF 656:13

fiduciary 674:8

field 701:1

fielded 740:12

Fifty-six 779:16

fight 611:3 655:5

fighting 638:25 734:12
751:25 767:7 838:13

figure 713:17

file 580:21 581:9 598:10
601:21 626:2 728:1,2,4,9,
14 731:18 737:9,11 758:9
783:23 784:6 893:16,17
894:6,7,11

filed 581:3,6 682:8 685:2
688:17 689:4 728:21 735:9
743:7 744:18 745:24 759:6

files 582:1 839:8,14

filing 637:18 721:18 728:8
732:8 744:7 784:3

fill 723:17 754:8

filters 831:5

final 632:7 733:2

find 597:9 633:7 686:23
702:19 715:11 729:2 730:5
748:4 762:19 798:22
806:12 807:3 816:3 821:14
863:3

findings 678:21 681:22

fine 576:16,22 579:6,10
582:5,12,15,22,23 583:21
585:23 605:17 628:19
638:8 653:1,9 683:7 690:9
692:2 696:18 708:24 713:7
716:24 791:25 794:5 804:9
857:15

finer 735:5

finish 594:5 607:7,23
747:23 755:20,21 769:13
792:12 801:21,22,25
818:18 846:18 888:11

finished 772:23,25 802:2

firearms 753:22

fired 775:22 801:8

firm 703:24

five-minute 593:23 631:4

flight 601:20 613:14,20
614:4 615:20,24 642:3
648:9 650:6,8 662:8
663:24 665:4 666:3
669:19,21,23 670:9 674:13
677:22 696:21,24 697:2,24
698:4,7 699:3,6,25 707:8
720:19 721:1,12,15,22,25
722:4,11,16 725:3,7,9
727:20,24,25 728:2,13,21
729:2,9,14 730:1,6,9,10,18
731:10 732:13,24 733:7,13
734:7,11 735:17,19,22
736:20,24 737:5,12
742:19,22,24 745:6
751:20,21 753:8 755:2,25
756:10 757:16,18 758:1,3,
10 761:23 762:6 763:16
764:2,6,10 767:5,7 775:18
779:11 780:5 784:19
786:17,22 787:14 788:5,18
801:17 819:17 826:13
838:8,11 888:2

flip 621:6

floating 630:18

flow 708:8

fly 630:11,21 887:25

flying 891:23

focus 785:5,22 871:20
884:24

folks 635:2 861:20 862:1

follow 799:25

follow-up 642:11 859:4

forces 696:3

forever 773:19

forged 677:21

forget 812:3

forgot 705:18 707:11,17
847:17

form 693:16 820:6 822:8
883:24

formal 888:12 893:24

formally 670:24 737:11

format 755:9

formed 679:24 681:2
785:20 786:2

formula 720:23

fortunate 574:3

Forty-seven 777:19 778:1

forward 628:8 629:9
665:7,9 666:5 674:14
685:12 700:10 711:2
767:10 836:13 895:1

forwarded 624:14 658:11
822:10 824:19

forwarding 856:25

found 681:25 695:8 702:15
745:7 795:24 796:22
806:1,10 863:23 880:20

foundation 617:17 679:13
686:6,14,19,22 687:1
693:5,19 694:25 802:24
871:3

fourth 576:10 621:8

frame 684:1 697:24 731:6
764:22 767:16 843:6

frames 727:17 728:12
741:22

framework 744:5

frankly 586:16 626:24

fraud 677:7 691:12

fraudulent 677:21 678:6

free 576:16 639:15 709:9
716:18,21 877:9

Freedom 868:6

frees 888:10

frequently 739:21 741:14
844:14

friend 888:6

friendly 608:4

front 635:9 662:13 700:12
706:11 710:2 854:6

Frye 867:4

fuel 890:4

full 590:14 715:12 725:12
733:5 754:5 757:9 786:18

full-time 721:13,16

funds 687:22

funneling 740:1

Funny 858:16

_____

G

gain 756:5 854:15

Garnett 783:15

Garry 705:20

gathered 664:4

gave 708:4 713:1 830:15
850:19 893:2 894:21

gee 804:21

general 699:11 706:1
720:12 743:18 747:12
752:7 787:15

generalizations 873:6

generally 627:1 768:6
838:7

generated 616:5

genitalia 778:14 883:19

gentlemen 689:6

geographic 817:9

getter 723:21

ghost 844:10,21,25 845:25
854:2

gibe 847:11

gift 888:19

Gillespi 768:22

Gillespie 591:19,25
789:17

Gilliam 573:9 590:22
591:2,6,8 625:20,24
626:14,17,19,22 627:4,15,
19,22,25 628:25 632:16
633:1 637:16 848:22
894:17

give 575:6 576:16 579:2,5,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 227 of 642   PageID 11168
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Index: giving..hear

16 580:8 583:19,21 584:21
586:25 587:14 593:6 595:9
596:21 600:16 607:8 625:4
628:22 630:22 631:25
635:2 636:16 648:22
701:17 715:11,12,14
717:13 719:3,6 791:22
793:7 818:18 847:17,20
849:17 850:22 865:8 867:4
873:6,24 874:2,3 881:9
889:24 890:10 893:23

**giving** 647:4 888:15,16,18
890:2,6,8,10 892:19

**glasses** 706:18

**global** 631:25

**globally** 623:24 636:10
711:14 712:4 713:4

**go-between** 680:4

**goal** 574:23

**God** 808:3

**good** 579:17 589:21
591:24 594:20 595:3,4
611:11 631:19 649:19
673:23 674:2 675:7 676:3,
4 702:3 705:23 709:15
886:12 888:22 889:17

**governed** 696:13 720:15

**governing** 680:6 720:17
733:2

**Government** 714:16

**grand** 840:19

**grant** 755:20

**graphic** 769:22

**great** 582:19 598:3 600:25
823:7 848:23 857:16

**GREEN** 603:24

**Greenfield** 573:19 580:16
582:17 587:23 588:2,10,
14,17 589:7,13 590:20,21,
24 591:3 592:3,19 593:17,
21 594:8 598:18 599:8
600:15 604:8,17,22 605:8,
11 606:5,21 607:5,20
608:22 609:23 610:1,12
613:15 614:20 616:25
617:15 618:18,21,24
620:20 621:16 624:14

625:23 628:5,13,18 632:6,
23 633:2,6 636:24 637:4,7,
11,19 638:2,7 640:1,16
643:12,24 648:23 649:9,
12,15 652:20 653:1,12
655:14 656:5 660:3 663:3,
13 664:13,18 668:16,20
671:19,22 672:6 675:22,24
676:2 677:12,14 678:9
679:19 680:20 681:1
682:16,21 683:3,9 686:8,
15,18 687:11 690:1,4,8,11,
15,20 691:1,8 692:3,10,18,
19 693:1,9 694:12,18,20
695:7,15,21,22 701:22,23
702:6,14 703:1,8 705:22
708:8,10 709:8 718:12,13,
19,25 719:11,13 720:3
734:24 735:2 737:4
738:11,17 743:12,16
748:13,20,22,24 749:6,18,
25 750:3,4,10 751:3,6,10,
12 753:13 756:7,18 758:4
759:12,24 760:2,5,8,12
761:1 763:6 765:7,9
766:11 767:14,21 768:1,13
776:22 777:24,25 780:12,
15 784:4 790:7 795:7,10
796:9 797:10,23 798:12
799:8,13 802:23 804:3,7
811:13 812:14,23 813:9,24
814:8,10 820:6 850:2
864:16 879:25 891:6

**grew** 722:6

**grievance** 700:8 727:12,
21,22 728:1,2,8,9,12,14,
17,20,23,25 729:10
731:16,21,22,23 732:3,8,
12,20,25 733:4,14 734:1,2,
8 737:10,12,16 740:19
752:4 755:2,13 763:19,22,
23,25 764:3 766:3,13,17,
18,23 767:9,18

**grievances** 700:10 721:19
727:11,18 728:4 731:18

**grieve** 731:11,13 737:9

**grounds** 583:12

**group** 639:6 650:24 701:4
725:2,6,23 824:6 830:19

**groups** 725:7 740:1 787:1
806:8 821:14 822:3 823:18

**Growing** 697:8

**guarantee** 736:8

**guards** 751:25 753:3

**guess** 584:6 600:20
686:21 732:7 782:13 788:4
819:11 821:11 825:1
846:15 856:11 863:9 895:2

**guessing** 819:11

**guidance** 871:8

**guide** 698:7

**guidelines** 836:14

**guilty** 745:7 798:22

**guise** 661:25

**gun** 754:17

**Guttierez** 773:13 774:18,
25 775:7,21 790:23

**guy** 585:15 666:16

**guys** 599:4 691:18 850:2

---

## H

**Hafner** 614:11 824:12
833:11,15,24 834:6,9,13,
14 835:10,11 852:13,18,22
853:7,10,24 854:1 862:6

**half** 574:23 575:2 659:8
715:7 723:19,24 888:17
890:2,10

**hall** 718:14 755:24 849:21

**hand** 598:22 603:18 616:7
806:19 867:3 872:7

**handed** 621:6 745:18

**handle** 589:2 726:8 873:18
874:9

**handled** 592:24 613:10

**handles** 874:12

**handling** 732:2

**hands** 581:1

**happen** 581:25 745:9
775:13 796:24 809:18
816:18 872:5

**happened** 625:1 664:3
668:2 705:3,16 710:17

731:2 733:6 742:19 788:20
806:11 855:2 873:5 881:2

**happening** 638:23 639:16
875:5

**happy** 579:4 580:12
583:19 589:11,12 612:1
651:8 652:17 662:25
663:15 690:4 736:17 850:7
875:11

**harass** 776:5

**harassed** 650:18 661:24
667:14,18,20 776:6 813:16

**harassing** 662:22 876:23
877:12,15 879:2,4,15
881:21

**harassment** 662:2,4,5
663:23 812:11

**hard** 639:1 717:6 806:19

**harm** 755:12

**harsh** 882:13

**Hashtag** 771:7

**hat** 778:16,21 779:1,3,5
805:20,23 878:12

**hate** 851:24

**haters** 829:9,11,22

**hats** 619:21 777:14 779:6,
25 805:19 806:2,9 880:18

**hazing** 882:6

**head** 594:21 634:9 658:19
676:17 793:1,11 888:22

**headdress** 778:21

**headed** 891:14

**heading** 649:13

**headphones** 840:4,6
847:23

**headquarters** 786:14
831:6,7

**heads** 584:22 709:20

**health** 701:1,2 746:13,18

**hear** 573:24 589:11,12
594:7 597:7 625:23 631:21
636:7 664:22 665:18
686:21 692:25 709:3

717:16 759:22 818:4 840:8
851:4,7,10 861:2 866:25
871:1

**heard** 583:12 586:23
596:10,11 660:23 717:15
725:21 746:2 786:5 843:13
873:2

**hearing** 581:14,17,18,19,
21 732:6,12,15,23 734:5,
14 736:25 737:17 763:20
764:21 776:15 820:1
882:18 891:20

**hears** 733:17

**hearsay** 589:10 591:12
592:15,16 614:21 686:24
752:21 755:18

**heavily** 841:15

**heavy** 828:15

**heels** 581:9

**height** 706:17

**held** 601:2 611:14 625:14
629:6 630:13 638:12
653:23 668:10 687:7 692:7
700:20 713:23 723:2 727:6
729:19 730:12 746:13
753:7 755:1,24 786:13
787:21 801:1 832:10

**helicopters** 890:4

**hell** 863:2

**helped** 654:23

**helpful** 576:18 698:6 851:4

**helping** 699:2 721:24

**helps** 584:25 834:6

**Hettich** 601:18

**Hey** 584:16 587:1 673:20
674:20,23 761:21

**hierarchy** 784:24

**higher** 732:16 737:18

**highest** 723:21 774:4

**highlighted** 618:22

**highly** 830:22

**Hill** 573:10 605:23 618:22
632:20 634:15 749:5,12
825:24 832:22 837:10

838:21 840:3 841:3 842:16
846:12,15,20 850:6,12,14
851:12 857:10,16 860:5
861:2 865:14,19,23 866:2
891:12

**historical** 781:6 814:18
815:8,20

**historically** 827:1

**history** 611:25 765:4
827:1 828:6,11 876:19,24
879:11,18 880:4,8,9,13
883:1,14

**hit** 752:20 753:1 809:7,8
810:2

**hitting** 809:10

**Holcomb's** 837:19

**hold** 593:20 634:8 648:11
668:22 689:19 699:13
700:15,17 716:3 749:9
799:1 801:25 835:18
858:10 888:1

**hold-over** 887:3,9

**holding** 591:16 832:12
890:3,9

**hole** 743:3

**home** 746:16 748:7
891:13,14

**hominem** 814:20,24

**honest** 825:13 846:9 852:4

**Honor** 576:25 579:9 585:3
588:15 589:13 590:21,22
591:25 592:20 593:17
594:8 598:18 599:11
602:15 603:13,24 604:22
606:5,21 607:5,20 608:22
610:1,12 613:15 614:20
616:25 617:16 618:18
620:20,23 621:22 622:25
625:16,20 628:5 629:14
632:6 633:3 634:18 635:24
636:18 637:12 640:1,16
643:12,24 649:9,18,21
652:20 655:14 656:5 663:3
664:13,18 667:22 668:16
672:6 675:15,22 689:15
694:24 701:22 708:11
710:7 711:7,9 713:9
715:16 717:14 718:20
719:13 734:17 746:24

747:21 750:10 751:10
754:1 755:6 767:25 768:14
777:25 780:13 790:7 791:4
795:8 796:9 797:23 798:12
799:8 802:23 804:3 811:13
812:14 813:24 814:11
848:1 849:9,25 864:3,16
865:14 866:19 875:25
879:25 888:23 891:25

**hope** 720:10 854:22
887:14 890:13 891:12

**hoped** 712:15 888:4

**hoping** 644:25 716:5
783:23

**horse** 676:17 793:1,3,11,
16,17

**host** 788:13

**hosted** 669:21

**hostile** 750:2,8

**hot** 699:4 721:25

**hotel** 771:23 810:13

**Hotmail** 633:23

**hour** 575:1 708:17 713:17
714:23 715:7 716:12
888:17 890:2,10

**hours** 714:17,18,21 715:9
888:15 890:7,8

**house** 793:4,17

**Housekeeping** 629:9

**Houston** 755:1 756:2,22

**Hudson** 716:8 717:23
853:14 855:18 856:1

**huge** 828:16

**hundred** 787:23

**hunt** 639:4

**Hunting** 850:6,7

**hurts** 893:6

_____

**I**

**I/we** 639:14

**idea** 623:9 628:24 677:5
747:12 793:18 811:16

**ideal** 592:12

**identifiable** 882:8

**identified** 602:8 637:2
638:16 822:18 843:2 856:4

**identify** 589:25 597:18
598:7 601:23 604:2 626:3,
8 672:17 681:19 821:12
822:13 858:7,12 862:16
863:12

**identifying** 603:20 826:14

**identity** 601:13

**ignore** 584:18 818:5 820:9

**lll** 573:20 695:24

**illegal** 691:12

**illegally** 689:5

**illustration** 834:22 852:15

**illustrative** 706:6

**images** 619:1 772:13
801:17 806:5

**immediately** 582:3 670:5
810:10

**impact** 790:24 798:24

**implying** 781:23

**import** 855:14

**important** 576:12 577:23
639:16 715:25 761:15
800:16,21

**impossible** 740:24

**impression** 702:7

**improper** 653:8

**in-flight** 774:13 825:9,11
828:2 834:17 868:3

**in-house** 582:8,15,18,22

**inaccurate** 821:22

**inadvertent** 742:17,18

**inadvertently** 809:3,8
810:2

**inappropriate** 643:10
646:14

**inappropriately** 695:9

**inbox** 740:2,12

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 229 of 642   PageID 11170
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Index: incestuous..job

incestuous 747:19

incident 742:14

inclined 715:11

include 672:8 698:3 842:11 845:23 853:10,12, 14

included 624:7 647:13 657:12 659:8 676:25 699:9 823:23 861:19

includes 658:3 661:1 859:2 863:1

including 601:21 642:12 745:9 752:1 764:1 859:5

inclusive 822:23

incomplete 820:7,8

incomprehensible 629:23 713:22

inconsistencies 836:16

inconvenience 887:10

incorrect 614:13

incredible 843:19

incredibly 785:15 826:11, 15

incriminating 822:5

indicating 872:15 875:11

individual 736:17 756:5 802:25 871:18

individuals 681:16 682:11 685:21 686:4 688:14 725:2,20 843:2,7 857:1,2

industry 742:4,12

industry-leading 704:9

inefficiencies 574:15 575:12

inefficiency 576:14

inference 640:2

inflammatory 831:21

inflight 659:21 669:19

inform 657:13 839:11

informal 893:12,22

informally 893:7

information 580:25 589:18 599:22 613:14 632:1,2 635:19 639:15 649:4,6 657:14 664:4 665:24 687:17 688:3 689:1,17 730:7 733:5,7 739:12,17 766:17,18,22 767:12 783:20 839:5 840:13 860:13 883:15,16 884:15

informed 656:3

infraction 731:9

inherited 579:19

initial 739:2 764:11 780:23

initially 720:15 788:4

initials 639:8

initiate 735:13

initiated 728:18

inner-circle 672:20

inner-city 828:15

inserting 804:4

instance 745:14 753:14,20 875:1,4

instances 753:22 764:5

instantly 810:17

instituted 753:5

instruction 584:8,24 586:13 587:13,15 591:22 592:4,7,18 593:15 624:1, 20 625:2,5 628:23 644:19 647:5 648:15,18,21 651:16 668:2 672:5,9 818:6 847:12 850:19 865:1,9

instructions 631:5 708:13 791:12 846:23 886:17 893:3

intend 591:4

intended 778:14 831:18

intends 589:16

intent 755:11

interact 872:21

interacting 873:20

interactions 774:11

interest 578:25 761:20 762:6 787:5,7,16 788:6

interested 787:12

interesting 798:10

internal 744:6 745:1,20

internally 743:21

international 688:11 705:19 720:16 726:3 743:25 744:1 757:21 771:25 785:12,14,20 786:13,15,18 788:12 798:20

interpret 759:13 860:12

interpretation 640:17 839:17

interrogatories 893:2

interrupted 708:8

interrupting 634:2

intertwined 584:3 818:2

interview 603:4

interviewed 602:25 613:21

introduce 629:11 865:21

introduced 632:8 865:17

invalid 677:20 684:7

investigate 656:16 728:16 767:13

investigated 663:22 838:3

investigating 801:6 810:5

investigation 599:23 613:12 616:3 623:16 688:19 710:18,22 730:23 843:20 875:8 876:15 884:15

investigations 838:10

investment 830:24

involved 655:13,21 656:1, 2 670:7 673:18 674:13,18, 23 697:21 698:18 763:18 764:17 767:6

involvement 722:16 799:24 874:21

involves 782:19

involving 857:1 871:10 873:22 874:15

irrelevant 587:20

isolate 821:12

issue 583:8 593:18 623:25 629:24 648:20 731:4,8,10 732:17 736:21 746:20 753:16 789:4 817:22 848:2,8,12,13 872:7

issued 696:15 764:20 838:4

issues 600:5 683:18 701:3 715:19 722:1 741:3,4 785:22 838:3 874:12

items 617:7 722:22

---

## J

Jackson 614:11 624:8,22 625:1 638:21 642:15,20,24 646:9 648:6,9 650:2,21 652:4,13 654:10 655:21 658:19 659:12 661:5,7,11, 20 665:13 666:9,12 668:2 673:13 679:17 710:6,19 756:20 793:23 795:1,3,15 796:1,8,23 799:20,23 800:1 822:22 823:9 841:16 858:22 859:7

January 779:7 786:10

Jeanna 614:10 624:8,22 638:21 642:8,14,23 648:6, 9 650:2,21 652:4,13 654:10 658:19 659:12 665:13 666:9 673:13 710:6,18 756:20 793:23 795:1,3,15,25 796:8,19 799:20,22,23 800:1 822:22 841:16 858:22 859:7

Jeanna's 652:5

Jeff 704:2

jerk 580:7

Jerry 685:24

Jessica 679:12,16 681:6

job 653:18 674:6 721:11 729:12 730:20 731:17

741:7 742:7 747:11
757:13,20 758:1,3 784:22,
25 832:7,9,11 889:17

**Joe** 768:22

**John** 681:6 854:14

**join** 670:11,12,14

**joined** 705:11,24 773:16

**joining** 669:25 697:6

**joint** 582:17 722:3 786:4,6
844:2 850:2

**jointly** 580:21

**Jones** 573:16 841:24

**journey** 697:18

**Juan** 660:21

**judge** 584:24 593:8 599:15
690:5,15 694:6 805:14
857:14 888:7,25 889:8
891:6

**judges** 889:2

**judging** 800:20

**judgment** 637:17 690:3
691:4,6,25

**judicial** 690:5 691:3

**juggle** 580:10

**Julie** 628:2 633:11,24
641:7,22 642:10,18 643:3
645:8 647:20 859:3,11,14,
17 861:12 862:17,21,22

**July** 661:4 862:17

**jump** 587:22

**June** 696:23 704:20 705:5

**juries** 575:19 587:16

**juror** 591:14

**jurors** 591:13,14 594:12
631:6,12 635:21 708:14,19
719:9 791:13,18 792:19
846:24 847:6 850:9
886:18,25

**jury** 575:23 577:25 584:14,
16 586:14,22 587:10,14
590:14,15 591:21,23
593:11,16 594:11 605:15,
21 628:9 629:19 631:11,18

632:10,17 633:3,5,9
634:19 635:3,11 636:17
638:4 660:16 668:4
671:23,24 686:3 689:10,
12,24 692:4 695:8 708:18
709:2,7 710:3,4,8,9 711:6,
10 713:3,22 715:2 716:23
719:2,8 720:13 742:21
746:10,23 761:8 769:19
778:6 781:19 784:9 785:9
791:16 792:7 794:10,11
802:16 817:6 821:4 825:10
829:19 847:5,8 849:4
886:24 888:4,7,9,12 889:7,
8 890:19 892:22 893:2,11,
13,25 894:8

**jury's** 605:13

**justify** 662:18

## K

**keeping** 574:19 593:14
741:21 744:9

**Keith** 679:17 681:6,10

**Kevin** 593:19 629:19

**key** 713:10

**ki-yay** 622:14

**kicked** 666:17,25

**kiddos** 747:18

**kids** 891:18

**killed** 793:3

**killing** 793:10,16 832:7

**kind** 589:17 596:21 603:7
620:8 698:6 699:23 706:6
707:22 727:4 729:12
731:24 741:8 781:13
787:17 840:9

**King** 808:11,15

**Kleburne** 583:3

**knew** 686:15,18 698:11
784:22 793:15 876:9

**knitted** 779:6,8

**knowing** 810:24 872:8

**knowledge** 614:23 655:17
661:17 668:25 669:2 670:9
687:12,14 693:14,23

694:1,3 736:12 737:22
758:23 760:24 763:5,7
767:12 793:9,13 802:24
803:7,10 827:15,18 853:19
868:10,12 874:16 875:18,
20,23 876:5,12 884:7

## L

**labor** 703:24 826:24

**lack** 657:2 679:13 686:6
693:4,18 744:1 802:24
836:14

**Lacore** 583:6 602:12
658:3,4 660:22 716:8
717:16,20,23 824:7,14,17,
21 825:4,21 827:3,14
828:21,23 829:18 831:1
832:17 835:12,14 836:1
841:10,23 848:14,17,18
855:19 856:13 863:21

**Lacour** 853:12

**ladies** 779:6,8,10

**landed** 891:13

**landing** 592:25 743:4

**language** 580:20 648:15
683:25 696:12 723:14
727:15 730:21 828:1
831:22 856:8

**laptop** 776:9

**large** 894:21

**larger** 720:21,22 830:19

**Las** 773:12 774:6

**late** 866:24

**late-night** 580:12

**latest** 574:18 838:10
858:14

**law** 602:5

**laws** 754:21 793:14

**lawsuit** 649:1 688:17
689:4,9 691:24 692:20,23
693:2

**lawyer** 710:1

**lawyers** 709:3 717:1

**lay** 793:6 876:1 887:23

**lead** 610:22 703:4,12,15
704:10 740:19

**leader** 784:23 818:25
872:25

**leadership** 655:6,17 664:4
673:6,8 674:17,25 688:10,
22 705:3 722:16 735:13
741:16 774:4 784:23
818:21,22 820:16 829:14
836:25 844:16,19 855:5

**leading** 610:25 678:7
680:24 682:14,18 683:1,6
693:3 695:12 696:9 701:19
702:10,22 703:5 705:12
730:14 737:2 738:9 743:11
751:2,15 757:6 759:9
763:2 766:4 767:1 775:24

**leaning** 588:18

**learn** 697:10

**learning** 697:16

**leave** 598:5 631:13 633:11
634:3,4 708:20 709:9
718:23 887:3

**leaves** 887:11

**Leaving** 693:10

**led** 759:5

**left** 707:3,10 714:21 722:13
755:3 758:11 833:23
846:14 854:10

**leg** 845:10

**leg-breaking** 844:10,25
845:9 846:6

**legal** 595:22 643:25 644:1,
4 653:6,10 668:17 670:6
680:18 689:16 703:19
760:21 763:3 793:7 804:8
817:6 868:7 875:15 876:1
884:3 885:19

**legalese** 698:3

**legislation** 601:16

**legitimate** 614:2

**length** 677:10

**lengthy** 678:20

**lesson** 735:5

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 231 of 642   PageID 11172
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                                    Vol 3 July 07, 2022                                           Index: lessons..Matt

**lessons** 813:22

**lets** 581:16,18

**letter** 630:8 877:3

**letters** 787:7

**level** 586:12 713:21 737:21

**levied** 745:13

**liable** 676:25

**liaison** 680:4,7,14,16
699:24 825:17

**lieu** 764:3

**life** 706:7 746:6 750:13
811:25 812:6 813:4,7

**lightbulb** 706:7

**limine** 583:13 668:1
734:21 789:4

**limit** 714:2 845:13

**limited** 657:20 794:17
816:10

**limiting** 584:8,24 586:13
587:13,14 592:4,7,18
623:25 625:2 628:22
644:19 647:4 648:14
651:16 672:5,9 818:6
847:12 849:17 864:25
865:3,9

**limitless** 817:8

**limits** 892:4

**Lindemann** 685:24
687:15 692:21 693:8

**lined** 758:1

**lines** 776:20 889:19

**links** 770:1

**linted** 660:9

**list** 574:18 585:4 588:6,12
590:9,20 600:6 622:25
678:2 822:23 865:20
868:15

**listed** 599:12,20 681:14
775:11

**listen** 826:19

**listing** 721:9

**live** 635:15 783:5,10

**lived** 783:20

**lives** 783:11

**Liz** 786:24

**loads** 731:23

**local** 573:20 602:3 657:7
661:2,10,18 668:13 673:24
695:18 720:14,17,18 721:4
744:3 756:4 759:19,24
760:1 784:24 785:13
786:3,7,20 787:3,10
819:18 820:16,19 821:1
836:25 844:16,20

**locals** 726:8 785:21

**location** 580:25

**lodge** 743:19 744:24

**long** 573:23 575:13 594:6
606:15 608:5 611:4 688:5
698:2 708:23 728:15
747:24 773:18 836:12
889:5

**long-term** 852:10,12

**long-time** 611:24 852:1

**longer** 578:17 677:23
682:12 725:16 816:14
860:23 890:12

**looked** 583:5 612:8,18
621:5 645:7 797:4 810:6
811:22 856:18 877:25
884:15

**lose** 726:23 727:2

**lost** 691:13 745:17

**lot** 576:5 580:9 618:2 676:5
698:2 704:23 727:15 736:5
757:23 762:2,13 765:4
772:8 774:13 784:18,19
785:24 892:10,11

**lots** 663:11 760:13

**loud** 706:14

**lounge** 699:1,2 755:25
762:16 819:3,4

**love** 592:11 844:1

**loved** 858:17

**loves** 829:8

**low** 655:7

**lunch** 585:15 630:25
708:4,6,9 709:22 713:17
716:12 720:4,7

---

**M**

**Ma** 642:2

**made** 576:4 595:8 603:1
615:10 664:25 670:25
675:9 678:25 680:16 704:3
720:19 721:1,2 722:16
732:10,17 737:20 743:4
751:13 757:10 758:8,12
773:6 798:25 807:17
809:4,24 810:24 821:21
843:1,10 856:17 859:10
878:3 879:10

**Magazine** 622:7

**main** 627:4

**maintain** 588:18 589:20
592:6

**major** 830:7

**make** 576:8,13 581:13
582:6 591:21 593:5,23
594:2 597:24 598:6 602:7
615:5 619:13 628:4,13
632:12 633:4 634:19
636:16 638:5 649:23
654:5,20 668:3 674:9
692:12 696:25 700:1 701:9
714:10 719:2 730:20
733:25 735:24 748:18
761:13,22 763:17 766:21
767:24 769:23 776:4 798:6
832:24 834:25 849:24
858:11 865:14 867:2,7
871:19 877:1 878:8 888:22
890:1,15

**maker** 884:5

**makes** 582:15 615:16
662:14 888:18 893:19

**making** 615:3 634:18
652:10 700:2 714:8 730:4
745:10 762:18 776:19
800:11 813:16 830:25
840:18 883:16 889:1

**male** 706:21 785:15

**man** 823:21

**manage** 696:2

**management** 628:2
651:25 656:11 674:15
699:8 732:14 737:18
757:22 822:4 823:17
826:24 827:5,15 828:2
832:5 834:18 836:18
838:3,5 839:24 840:12
852:3,9,11,17,21 853:6
856:5 857:21 859:12

**manager** 614:15,17,19,25
615:2,7,19,22 616:2
645:17,22,24 651:25 756:3
773:10,12,22 774:7 823:22
825:14 868:3

**managers** 774:13

**mandatory** 699:7

**manner** 588:24 589:3
613:11 676:14,22

**march** 589:7 618:7 620:9
651:24 673:9 775:20
777:10 778:25 779:3,9
787:24 788:3,7,11,21
802:4 803:15,22 804:13,
21,25 805:10,23 806:2,6,
10,12,14 808:13 861:19

**marched** 778:16,20

**marginal** 800:14

**mark** 598:13 633:11
703:25 771:8 781:17

**marked** 598:8 836:2 862:8

**marker** 596:21

**marking** 627:18

**marks** 660:18

**Married** 707:17

**Martin** 685:25 687:15
690:19 691:5,20 692:22
693:10 694:6 695:9

**Masoni** 573:22

**mass** 742:18

**match** 683:10

**math** 684:21 887:19
889:19,21

**Matt** 573:10 601:18

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                Vol 3 July 07, 2022                    Index: matter..mischaracterizes

**matter** 584:5,7 635:18 636:9 683:22 690:1 741:21 803:16

**mattered** 683:23

**matters** 715:21 873:10

**Matthew** 573:9 833:16

**maximize** 719:2

**Maynard** 642:4

**Mckeeby** 573:14 580:14 582:5 583:8,11,24 584:19 586:11 595:20,21 598:17 599:11 600:14 615:11 619:16 620:14 621:20,22 623:10,13 624:9 626:18, 20,24 627:9 628:5 634:11 643:13,20 648:13 649:18 671:16 672:4 675:3 690:12 717:15 719:21 749:4 768:15,17 769:3,5 770:3,5 771:1,2,10,11,18,19 772:24 776:2 777:15,17 778:5 779:14,18,20 780:8, 21 789:5,10 790:13,15,16 791:3 792:17 793:6,19 804:1 805:4,11 812:21 814:12,13,15,23 815:5,17, 18 816:9 822:8 832:21 840:10 842:18 847:25 848:12,14,17 849:8,25 864:18,21,24 865:5 866:9 868:7,16 870:2 871:2 875:14,25 876:6 878:13,15 881:13,24 883:5,11,24 884:3,12 885:18 890:6,16 891:5,7,24 892:21 894:3

**Mckeeby's** 795:11

**means** 588:22 653:14 656:16 674:21 707:12 721:13 798:25 812:7 813:2,5,20 816:13 817:12 825:11 835:17 845:22 855:9 887:3

**meant** 707:24 717:20 753:1 781:21 829:22,25 830:2 869:7 871:3

**measure** 715:12

**mechanics** 785:17

**mechanism** 745:20

**media** 646:22 655:9 658:5,

23 662:21 663:22 664:4 685:6 710:21 752:6 820:13 821:20,24 822:4 823:20 830:6 834:24 835:6,16 836:12 838:3,13 841:16,25 842:12 843:9,22 845:8,14 852:23,25 853:8 855:3 856:6,25 857:3 878:24

**meet** 731:6

**meeting** 656:14,15 688:4, 5 699:10 727:5,6 729:5,19, 21 730:5,11,14,19,23,25 731:3 732:14,15 733:21,23 735:9,14,16 736:14,16,20 737:7 738:6,13 744:14 745:15 753:10 754:12,13, 14,17,22,25 755:5,12,15, 23 758:20 763:24 764:14, 18 775:20 779:13 786:9, 10,12,13,21 787:21,22 788:2,13 819:20,25 820:11 835:5 836:6

**meetings** 688:2,4 699:7, 10 729:6,8 733:6 735:21 737:7 752:19 753:4,23 754:4,10 799:1

**meets** 817:10

**Meggan** 573:16

**member** 602:2 613:6 620:12 638:21 643:10,19 644:11 654:11 661:18 662:20 665:4 667:12 671:2 674:9 680:9,14 697:2,22 698:23 700:5 703:9,11 707:23 710:24 723:7 725:12,16 726:17 729:16, 24 735:12 740:18 743:19, 20 744:8,19,20,23,24,25 745:5,10,12,14,19 748:6 752:10,18 753:10,23 754:15 760:18 762:21 766:16 782:23 783:3,5,15, 21 784:6,7 786:16 796:3,4 798:22,25 819:2,18 820:25 821:6,7 828:2 834:18 844:19 852:2 855:4 870:18

**members** 619:4 650:9 655:8 656:11,25 658:6 662:23 667:9 669:10 679:8,11,18 680:12 681:4 682:8 684:19 688:1,6 699:7 700:3 703:13 721:6

722:17 723:5,8 724:24 725:1 733:19 739:1 742:5 744:15,16 752:13,15 754:8 755:4 757:11 758:21 761:15 782:25 785:21 787:19 798:22 821:1 829:13 836:3 843:7 844:15 853:5 875:10

**membership** 684:13 687:18 688:1,4 689:1 698:19 720:21,22 721:5, 19,20 723:12 724:19 726:10 727:5 739:3,6,19 741:3 744:14 753:9 754:10,12,13,21,25 757:11 758:19 785:2 855:5

**memberships** 700:11

**memes** 577:12

**memory** 677:17

**mental** 701:1,2 746:13,18

**mentality** 845:11

**mention** 646:1 705:18

**mentioned** 705:10 709:23 721:23 733:21 744:1 746:8 753:16,20 763:16,22 790:22 798:21 882:22

**mentions** 585:9

**merit** 734:3

**merits** 733:17 880:11,12

**mess** 596:13

**message** 586:15 608:20 609:2 739:16 749:23 750:11 757:25 782:4,9 783:23,25 793:5,17 801:15 802:10,11,14 810:6 880:14 882:5,16 883:19,22 884:20 886:9

**messaged** 854:19

**messages** 575:15 608:8 609:22 610:10 611:20 612:3,9,16,24 613:3 739:3, 4 750:16,20 751:13 759:2 768:11 769:21,22,25 770:6 775:18 778:7 781:8,9 784:15 801:11 802:17 803:8 807:5 810:23 811:9 814:18 815:9,21,22 875:10 878:5

**Messenger** 809:1,12,16, 19,22

**messing** 610:19

**met** 678:22 774:12,17,18, 20 789:11 867:18

**metaphor** 832:2 845:8

**Mexico** 581:12 582:3

**Miami** 703:24

**mic** 587:25 645:19 665:19

**Michael** 573:22

**microphone** 617:24 848:16

**middle** 748:23 749:7,19

**Mike** 614:11 628:2 658:3 660:21 823:1,2,4,6 824:10, 15 833:11,15,24 835:4,9, 10,11 836:8 841:9,23 845:10 851:21,22 852:2,7, 13 853:24 854:1 858:13,22 862:5,6,7,17,21

**Mike's** 853:21

**Mikes** 852:11

**mind** 584:6 587:5 687:5 821:25 822:24 848:8

**mindful** 639:8

**mine** 632:22 666:7 795:11

**minimize** 574:15 849:21

**minions** 656:10

**minority** 828:15

**minute** 643:3

**minutes** 579:2,6 615:15 631:9 695:1 708:4 709:5 712:15 713:6 715:8 773:20 776:23 791:17 805:18 846:13,16,21 847:3 848:11,24 849:12,14,15 851:12

**mischaracterization** 815:11

**mischaracterizations** 814:21

**mischaracterizes** 643:21 695:11

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 233 of 642   PageID 11174
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022          Index: misinformation..objection

**misinformation** 857:25

**missing** 880:23

**mobilization** 819:4

**mobilizations** 699:2

**moment** 648:7 760:8 767:21 780:12 822:24

**Momovich** 756:21

**Monday** 893:6,22 894:2,11

**monetary** 694:8

**money** 619:23 687:22 689:5 694:10,13 695:8 803:15,22,23 804:18,25 805:9 812:5

**monitoring** 838:7

**monitors** 629:19

**month** 659:8

**months** 723:20,25 725:10 758:11 797:20

**morning** 573:23 574:14 581:15 582:25 585:7 588:8,13 593:2,25 595:3,4 616:11 621:15 630:15,22 676:3,4 708:5 711:11 712:19,22 713:7 714:14 715:18 808:18,21 864:12, 15 891:19 893:6 894:11

**Morris** 573:15 583:25 716:20 796:14

**mothers** 748:1

**motion** 581:2,9,11 582:2 583:13 626:1

**motivation** 879:12

**Mountain** 845:16 853:20, 22

**mouth** 617:25 746:10

**move** 591:10 598:15 616:9 621:12 622:18 629:12,19 631:25 635:25 644:16 647:1 657:18 660:5 671:14 677:7 755:20 777:17 780:9 794:12 847:9 887:16 889:13

**moved** 580:3 667:5

**movement** 811:24 830:20,

21

**moving** 616:8 629:10 635:16 734:25 776:20 811:21,23 838:22 847:13 850:12 866:5 894:25

**MSN** 633:23

**Msn.com.** 634:14

**multiple** 606:20

**murder** 618:6,15 619:14 769:23 770:18

**murderer** 750:16

**murders** 619:1

**mute** 605:12,15

**muted** 605:21 632:11 638:4 671:25 794:11

**mutual** 889:23

---

# N

**N-E-V-I-N-C** 633:13

**naive** 832:15

**named** 616:1 642:3 679:18,25 680:9,12,22 681:16

**names** 596:13 625:24 627:18 635:13 639:8 685:23 756:19 822:17 855:10

**Naomi** 853:14 855:18 856:1

**narrative** 747:22 752:22 755:7,8 757:15

**narrow** 824:2

**national** 601:16 723:11

**nature** 592:12 662:23 685:5 774:17 877:16

**necessarily** 625:2 628:15 823:13 829:15 832:9 878:2

**needed** 589:18 593:1 678:3,22 684:15 698:23 700:3 706:15 730:18 740:25 755:16 761:12 767:10 772:19 785:3

**negotiate** 704:8

**negotiated** 678:16 752:11

**negotiating** 699:24 700:3 703:11,18 704:4,16,22,24 705:7,10,20 707:13 722:2 752:10,13,16,18 761:13,20 762:7,9,13,20

**negotiation** 703:10 762:25

**negotiations** 699:5 703:23 704:6,12,17 705:5 726:13 740:16 741:17 761:11,25 762:3 819:5

**negotiator** 703:4,13,16 704:11 740:19

**network** 762:11 819:6

**Nevarez** 574:12 580:11, 22,24 582:9 627:7,11,12, 14,25 628:22 641:14 655:13,17 659:16 661:1 672:18 773:16 819:24 820:1,15 837:5,16 844:1, 24 854:15 891:4

**Nevarez's** 626:19

**NEVINC** 634:7

**new-hire** 707:20

**newsletter** 589:8

**nexus** 882:7

**nickel** 804:20

**nicknames** 844:12

**night** 574:10,18 580:13 593:25 890:21

**nightly** 574:17

**nightmare** 821:25

**Ninety-four** 780:17

**nods** 594:21 634:9

**non-flight** 722:7,13

**non-union** 744:25 745:19

**normal** 888:3

**Northwest** 826:22,23

**notch** 825:13,14

**note** 583:23 591:9 838:2 889:7

**notes** 607:16 611:3 612:10 614:10 671:13 730:15,17 731:1 733:5 851:8,9 865:3 877:2 888:7

**notice** 650:4 690:6 691:3 815:1

**notified** 773:15

**notify** 728:14

**notifying** 737:13

**notorious** 826:23

**November** 799:16

**number** 597:15 599:4 600:18 601:5 637:5,7 662:21 677:21 678:3 684:14 737:18 739:14 742:16 757:15 786:22 787:14 789:24

**numbers** 624:15 637:22 682:4,6 683:11 717:12

**numerous** 663:21 739:25 740:14 767:8 795:4 843:1

---

# O

**O'GRADY** 628:2 633:11, 24 641:7,22 642:10 645:8 647:20 859:17 862:22

**oath** 581:22 594:18,19 720:5 829:20 867:4

**object** 602:5 624:9 633:8 652:21 679:13 680:24 682:14,18 683:1,6 686:6, 22 689:15 693:3,4,15,18, 19 694:24 695:11,12 696:9 701:19 702:10,22 703:5 705:12 734:17 737:2 738:9,14 743:11 746:24 747:21 751:2,15 752:21 756:12 757:6 759:9 760:21 763:2 767:1 775:24 789:4 790:3 793:6 804:4 807:2 812:23 814:20 820:6 822:8 849:16 883:24 884:23 886:5 892:1

**objecting** 805:9 815:11

**objection** 588:18 589:1,4 592:6,18 595:21 598:14, 17,18 600:10,14 603:24

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 234 of 642   PageID 11175
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022              Index: objectionable..paints

604:22 606:5,21 607:5,8, 20 608:22 609:23 610:1,12 613:15 614:20 615:11 616:25 617:15 618:18 619:16 620:14,20 624:19 636:4 638:6 640:1,16 643:12,13,20,24 648:12,13 655:14 656:5 663:3,13 664:13,18 668:16 672:6 675:3 678:7 687:2 689:20 692:11 693:16 702:2 719:18,21,22 734:18 738:8 747:1 749:3,4,12,13 755:18,21 766:4 777:19,23 780:10,11,15 790:1,5,6,9 793:19 794:17 795:7 796:9,10 797:10,23 798:12 799:8,14 802:23 804:1 805:4,11 811:13 812:14,21 813:9,24 815:16 864:22,24 868:7,16 870:2,19,25 871:2 875:14,25 878:13 879:25 881:13,24 883:5 884:12 885:18 892:17

**objectionable** 578:23

**objections** 574:10 576:6 583:2,11 588:23 589:10,20 591:12 616:11 621:15 622:22 624:2,12 636:2,3 644:17 647:2,4 651:13,15 657:19 660:7,8 668:23 672:3,8 695:4 794:14 804:5 820:10 847:11 850:15,16 865:7 866:8 893:14 894:16

**objector** 613:7 725:25 726:1,21 744:25 745:19 822:16

**objectors** 619:5 669:10 683:4 725:21 726:23 821:1,8 822:17

**objects** 579:1 892:8

**obligations** 668:17 669:9

**obvious** 679:24

**occasionally** 816:18

**occur** 686:1

**occurred** 743:3 798:2,4 802:21

**occurring** 806:14

**occurs** 723:19 735:10 745:6

**October** 765:17,20,23,25 842:22

**offended** 656:13 874:4

**offensive** 821:22

**offer** 590:4 591:5 668:3 711:4 732:20 748:24 864:3,4,9

**offered** 592:13 624:18 687:4 697:12 715:23 719:16 723:21 874:18 881:1

**offering** 623:22

**office** 639:6,10 667:6 685:19,22 686:5 688:25 700:23 721:8,18 722:8 726:13 727:23,25 729:3, 10,16,20,23 731:1,18 737:8,11 798:18 799:2

**officer** 573:3 594:10 631:10,17 659:16 661:18 698:12 709:18 719:7 723:11 792:5 847:4 849:2

**officers** 641:19 661:2,10 754:7

**offices** 700:15

**official** 784:20 788:11

**officially** 698:17,20

**old-time** 845:11

**older** 891:1

**one's** 583:16 702:3

**one-** 718:23

**one-day** 830:23

**one-sided** 831:18

**ongoing** 704:17,18

**online** 578:16 587:16 622:15

**open** 601:2 611:14 625:14 629:6 630:13 638:12 653:23 668:10 687:7 692:7 757:16 767:11 801:1 802:12

**open-ended** 611:5

**opened** 707:13 748:3 809:12 810:4 811:17

**opening** 575:3 746:1

**operate** 744:3

**operation** 742:5

**operations** 659:21 720:12 740:21

**operators** 785:18

**opinion** 619:5,6 639:10 643:25 656:25 668:17 676:10,16,20 678:11 686:25 715:21 717:7 800:18 805:10 827:5,8,10 836:22,24 837:6,19,22 838:15,17 886:4

**opinions** 608:12 678:10 767:8 869:1 876:19

**opponent** 667:8

**opponents** 664:5 675:10 820:25 821:6,7

**opportunities** 788:18

**opportunity** 688:6 707:25 723:5 752:15 823:3,5,10 828:6,12

**oppose** 829:13,15

**opposed** 674:25 681:7,10 829:22 831:6

**opposing** 589:15 626:17 843:21

**opposite** 728:15 785:19

**opposition** 808:11 829:12

**opt** 670:17,19 697:4 725:17 726:1,23 727:2

**opted** 603:9 726:4,21 728:5 745:11,16

**option** 731:11 732:19 734:12 747:15

**options** 581:24 747:14

**order** 580:18,21 583:5 602:4 626:11 716:4,8 767:4

**ordered** 625:21 626:1,7,13 633:19 694:6,8

**orders** 580:19 581:22 696:14

**organizations** 812:5

**organized** 740:12

**originally** 888:4 892:7

**out-house** 582:21

**outcome** 582:1 677:17

**outlined** 600:6 727:18 730:24 744:17

**outlines** 728:11 744:6,9 745:9

**outpatient** 746:12

**outrage** 655:2

**outspoken** 603:8,11 673:3

**overdue** 846:13

**override** 851:9

**overrule** 589:4 592:23 624:12 644:4 672:7 695:3 702:11 790:8 803:1 804:9 850:16 865:7 868:17 892:18

**overruled** 595:24 616:12 621:17 624:3 693:20 702:4

**overruling** 592:17 636:3 647:3 651:15 660:8

**oversaw** 731:22 825:17

**overturn** 737:20 782:1

**overview** 707:22

**overwhelming** 740:10,23

**P**

**p.m.** 895:5

**packet** 576:2 578:12,20 579:3,6 733:5

**page/line** 583:1 585:1

**pages** 584:20 595:13 596:4,22 597:14,15 599:7, 10,21,24 600:10,15,17,22, 24 601:5 613:24 615:24 618:3 623:2 807:19

**paints** 820:8

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 235 of 642   PageID 11176
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 3 July 07, 2022                              Index: pandemic..point

**pandemic** 580:6

**panic** 654:18 655:1,4

**pants** 754:18

**paper** 581:10 831:15

**paperwork** 701:14

**paragraph** 650:15 657:4
769:20 829:5 830:6,11,15

**Parenthood** 589:8 618:7
759:20,25 760:3 777:7
803:16,23 808:12

**parenting** 746:15

**Parker** 679:12,16 681:6,7
690:16 715:24

**Parrott** 715:23 718:13
854:14

**part** 587:6 597:10 601:23
604:9,11,13 617:1 620:18
650:1 659:1 670:2 674:15
680:15 687:19 696:25
697:18 730:20,23 746:19
747:11 749:23 750:11
751:13 766:13,18,22
770:9,24 771:16,20 772:3,
4 784:22,25 787:6 793:20
807:1,8 808:23 819:8
820:9 840:5,11 871:24
875:7 877:6 882:7,22
883:2 884:14 885:16
886:3,8,10 894:21

**participate** 723:5 725:19
727:3,7

**participated** 806:3

**participation** 726:24
741:23

**parties** 584:22 627:13
628:20 850:4

**parts** 698:8 732:22

**pass** 768:14

**passed** 786:19

**passenger** 743:2,5 888:3

**passing** 743:5

**passionate** 700:24 701:7

**past** 648:18 717:2 783:5
800:17 828:19 881:2 891:2

**pasted** 750:18

**path** 582:4 629:9

**patience** 886:23

**patient** 794:6

**Paulo** 573:14

**paused** 825:23 837:9
838:20 841:2 846:11 860:4
861:1

**pay** 670:18,20 694:9
707:13

**payor** 726:20

**payroll** 722:10

**people** 576:16 579:12,15,
21 615:10 628:11,12 633:9
635:4 638:25 639:23
640:12,15 650:1 660:19,24
662:9 672:20 691:19 701:6
706:8,19 707:4,14,16
722:15 725:23 726:4
729:7,12 752:4 761:12,19,
20 762:18 779:12 783:23
784:18 785:1,2 787:4
788:14 817:9 821:10
822:14 824:3 826:19
830:3,19,23 831:12 843:20
848:5 852:17,22 853:4,7,
16 854:9 856:3 857:24
858:15 893:10

**people's** 783:17

**perceived** 655:8

**percent** 684:13 703:11
765:2 787:23

**percentage** 684:17 726:5,
9,19

**Perfect** 729:1

**performed** 673:23 674:2
705:7

**period** 684:3 824:23

**periods** 754:9

**person** 628:17 646:9
695:16 707:2,7,9,21 722:9
729:16,17 732:14 740:13
745:9 782:1 793:7 795:6
797:18 817:8,18 822:21,23
836:5 844:17 869:21 891:1

**personal** 587:17 593:21

614:23 630:7,17 632:14,16
633:17,19 668:25 687:12,
14 693:14,23,25 694:3,7
697:5 706:14,22 736:12
737:22 748:18 760:24
763:5,7 776:10,22 793:9,
13 831:4,11 838:2 844:2
853:21 868:10,11 875:18,
19,23 876:5,12 880:18,19
884:7

**personally** 670:9 750:13
756:9,11

**personnel** 631:7 708:15
791:13 846:24 886:19

**pertain** 869:20

**pertained** 707:24

**petition** 640:25 658:20
662:3 665:1 667:7 677:9,
18,19 678:5,10,11,16
679:1,5,18,22 680:23
681:5,17 684:6,11,22
691:18 793:2 821:1

**Phillips** 703:24

**Phoenix** 645:17,22

**phone** 593:24 607:17
612:5,7,9,11 721:18
739:14 774:22,23 776:10,
11 780:23 790:22 833:20
888:6 889:4,6

**phrase** 766:7,9 799:3

**phrased** 609:10

**physical** 662:8 767:22
783:16

**physically** 750:25 751:14
755:11

**pick** 576:16,21 692:1
894:20

**Picket** 756:20

**picking** 662:19

**picture** 602:9 620:5,10
779:21 820:8 854:7 881:19

**pictured** 885:5

**pictures** 620:18,25 878:6,
12,20 879:2,6,20 880:13,
17 881:5,12 882:3,14
883:18,19 884:19

**piece** 726:9 732:6

**pieces** 726:15

**pink** 777:14

**pioneer** 830:21

**place** 615:25 670:15
737:23 739:10 744:10,12
762:1 886:13

**places** 753:6

**plaintiff** 573:10 676:5
719:15

**Plaintiff's** 598:21 601:7
616:16 622:2 644:24
647:11 651:21 657:24
660:13 672:15

**plaintiffs** 593:22 711:9

**plan** 589:23 590:4 848:21

**plane** 743:4 888:1

**planned** 589:7 618:7
630:23 759:20,25 760:2
777:7 803:16,23 808:12

**planning** 632:8

**platform** 739:6

**play** 724:5 809:7,10,21,25
810:2 817:15 828:14

**played** 763:11 790:14
818:9 826:3 850:23

**playing** 790:3 808:24
809:6,12 810:3,11,17
846:19 851:11

**plays** 809:9 828:17

**plot** 575:5

**PM** 639:15

**podium** 792:10

**point** 575:13,18 576:4,9,
13,14 578:8 582:6 586:6
592:11 602:19 635:17
663:15 669:15 684:20
685:19 691:14 697:19
703:3 711:24 713:9
714:12,20 715:14,22 716:4
717:24 724:11 731:13
733:13 737:15 752:3
754:16 763:10 766:12
768:10 773:14 775:16
778:10 786:2 799:4 811:1,

2 824:8,12,14 832:1,3
880:2 890:24

**pointing** 827:25 886:16

**points** 673:3 735:6 740:14
774:12

**police** 753:3

**policies** 742:2 828:25
845:13 870:12 871:11,16
872:3,20 873:4

**policy** 658:5,23,24 667:17,
21 685:11 726:3 736:9
753:5 766:25 820:13
836:12,14,17,19 841:16,25
842:13 843:9,23 845:4,8
853:8,17 856:6 857:3
869:18,23 870:12,22
873:20 878:24 880:7,10,21
882:6

**polite** 651:3

**political** 667:8 675:10
769:10,24

**Polly** 756:21

**poor** 826:24 840:7

**portal** 587:16

**portion** 586:15 609:17
658:23

**portions** 585:8 702:19
817:16

**portray** 882:16

**portraying** 840:19

**position** 688:10 700:17,21
722:25 723:11,21,22
724:2,18 732:17 747:16
774:17 784:23 787:8,9
799:2 819:16 825:4 831:23
834:15 871:9

**positions** 688:22 689:3
699:13 700:15 722:14
723:7

**possession** 689:7

**possibly** 824:7 868:20,22,
25 889:25

**post** 616:1 638:20,23
639:4,12 642:21 650:21
651:2 662:11 663:15 782:8
885:15 886:3,9

**posted** 591:18 615:23
878:4 879:6 882:3,15
883:18 884:20

**posting** 685:6 754:19
881:8 885:8

**posts** 639:23 642:12
662:21 663:10,11,22,25
746:3 751:1 752:6 753:11
759:5,6,13 768:7 822:5
839:6 854:16,21,24 856:25
857:22 859:5 880:14,18,19
881:19

**pot** 639:7

**potential** 728:24 864:6

**potentially** 720:22

**pounds** 706:24

**power** 630:24 654:18
655:1,7 817:8

**practical** 584:5,7

**practices** 642:14,23 859:7

**prayer** 808:3

**pre-exhibit** 588:5

**precaution** 754:25

**precisely** 742:22

**preclude** 728:5

**predicate** 581:2 602:22
871:2

**predicated** 691:9

**predicted** 575:2 585:20

**predicting** 639:22

**predicts** 650:23

**prefer** 750:7

**prefix** 635:18

**pregnancy** 747:14

**pregnant** 802:4

**prejudice** 589:9 693:4,19
694:25 756:13

**premature** 715:14

**preparation** 704:18
705:17

**prepare** 704:21

**prepared** 877:2 892:3

**preparing** 649:10 663:20
752:10

**prepping** 704:11

**presence** 668:4

**present** 688:3 701:13
733:20 753:3 773:15
851:18

**presentation** 575:10
593:7 687:24 888:18
890:11

**presented** 678:22 689:10
798:23

**presenting** 800:19

**preserving** 589:1

**presidency** 667:5 669:16
699:14 700:22 707:20
740:14 752:3 757:10,25

**president** 577:18 596:16
601:14 613:6 642:17
643:7,8 653:21 654:15
656:2,4,23 657:7,12
658:15 659:10 662:18
666:17,18,19,21,23,24
667:1,2,3,6 668:18 669:2,6
673:24 674:3,6,8,24 675:7
676:19 685:25 693:10
697:19 700:16,21 701:12,
14,17 702:8 703:3,12,15
704:25 721:7 724:6,9,15,
18,21 733:22 738:21,24
740:17 741:5,7 758:21
786:25 802:10 812:3,4
820:19 823:21 824:8,25
825:14 834:16 870:19,20

**president's** 739:16,19
743:9

**president@twu556**
842:4

**president@twu556.org**
842:7

**presidents** 754:6,13

**pressure** 636:22

**pretense** 752:23

**pretty** 585:15 618:16
637:10 798:10 889:16

**prevented** 798:17

**preview** 579:11 714:14

**previous** 667:8 682:19
723:22 836:1

**previously** 696:14 841:21
843:2

**primarily** 722:4 785:19

**primary** 703:25 729:12
731:17

**principal's** 639:5

**prior** 612:19 636:2 672:8
700:25 705:7,16 707:5
752:9 768:12 774:10
777:5,11 784:12 787:4
789:15

**prioritize** 741:11,25

**priority** 741:9 742:9

**private** 802:11,15 826:5
851:20 854:19 880:14
882:4,16 883:18 884:20

**privilege** 669:4,7

**pro** 750:13,14

**probation** 670:16,21,25
697:3 725:8,10,13

**Probationaries** 725:7

**problem** 611:2 630:20
637:20 852:17 853:3 856:6

**problems** 827:4

**procedure** 744:7

**procedures** 742:2 744:10,
17

**proceed** 611:16 638:14
649:20 687:9 692:9 734:7
796:13,16 801:3 867:13

**proceedings** 599:17
601:2 610:17 611:14 623:4
625:14,18 629:6,17 630:13
637:14 638:12 652:24
653:23 667:24 668:10
686:9 687:7 689:22 692:7
799:11 801:1 895:5

**process** 580:24 634:16
680:2,19 687:19 688:20
704:25 714:6 723:17,18
724:4 727:13 728:12,20,23

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 237 of 642   PageID 11178
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 3 July 07, 2022                    Index: produce..question

730:23 732:4,7,19,25
733:14 734:2,4,9 735:4
737:5,13,17,24 738:6
745:1,2,6 755:2 762:20
763:21 764:7,17,24 766:3,
14 767:9,18 784:5

**produce** 663:5

**product** 747:19

**production** 583:7

**professional** 613:11

**profound** 654:14

**prohibited** 802:5

**project** 762:22

**projects** 825:16

**prolonging** 888:17

**promise** 889:3 893:17

**promoted** 667:2

**prompted** 669:17,18

**pronounce** 833:17

**proof** 668:3

**propaganda** 673:14

**proper** 680:19 696:15
783:16 795:24

**property** 689:6 694:7
707:6 730:13 755:1,24

**propose** 600:9

**proposed** 678:14

**protect** 812:6

**protected** 577:8,16 578:1,
18 586:1 595:7,15,22
597:13 639:19 641:4
642:21 643:3,19 644:2,12
646:10 652:19 653:3,4,5,7
657:8,11 661:21 662:1
669:3 673:19 676:7,10,20,
24 677:3 685:10 691:9,13
713:2 768:8 781:12 807:8,
11,18 820:2,12 868:4,14
869:3,22 871:10 873:13,15
875:7,23 876:2,18,22
877:9,11,19,22 883:22
884:10

**protected-union** 873:3
875:13

**protecting** 671:8

**protective** 870:13

**protocol** 857:15 874:5,8,
10

**prove** 713:12

**provide** 602:16 733:8
756:19 781:7

**provided** 671:9 738:2,5
746:14 766:17 839:6,20
840:23 882:19 892:7

**providing** 840:14

**provision** 696:7

**provisions** 696:3 697:14

**Pryor** 573:11 574:22,25
576:20,25 577:3 578:9,22
579:4,8 585:3 587:8,13
589:24 590:7 593:3,8
594:15,23 595:2 596:2
598:12,15,22 599:1,3,6,10,
13,19 600:13,16,20,23
601:12 602:15,19,23,24
603:13,16,17 604:2,4,16,
18 605:3,10,17,20,24
606:1,10,23 607:1,11,24
608:6,24 609:5,9,14,16,24
610:5,7,16,19,25 611:8,12,
17 613:18 615:1,13,14
616:9,17 617:3,7,11,23
618:20,23 619:3,19
620:17,23 621:2,3,12
622:3,12,13,18,24 623:6,
11,15,18,22 624:4,16
625:7,12,16 626:5 627:17,
23 628:4,24 629:3,12,21
630:6 631:20,23 632:12,
18,21 633:8 634:1,7,14,18
635:6,15,23,24 636:18,23
637:1,6,9,25 638:15 640:8,
23 643:16,23 644:3,7,15,
25 645:5,13,15 646:16,17,
25 647:12 649:21,22
651:12,22 653:15,18,20
654:2,3,20,24 655:19
656:9 657:17 658:1 660:2,
4,14 663:9,14 664:1,16,21
665:19,20,22 667:22
668:1,8,12,18 669:5
671:13 672:16 675:6,12,15
678:7 679:13 680:24
682:14,18 683:1,6 686:6,
13,16,21 689:15,21,24

690:7,9,17,22 691:6,16
692:11,14,24 693:3,15,18,
22 694:24 695:11 696:9
701:19 702:2,10,22 703:5
705:12 708:24 710:7,12,
15,16 711:4,7,9 712:18
715:16 716:16 717:3,14,19
718:3,8,21 719:22 734:17,
21 737:2 738:8,14 743:11
746:24 747:1,5,8,21
749:11,13 751:2,15 752:21
754:1 755:6,18 756:12
757:6 759:9,22 760:1,4,21
763:2 766:4 767:1 772:16,
22 775:24 777:21,23
780:11 789:4 790:3 791:11
792:9,21,24 793:12,22
794:2,6,9,12,22 795:14,18,
21,22 796:20 797:12,15
798:1,15 799:22 800:7,17
801:4,23 802:1,8 803:2
804:11 805:7,14,16
806:20,22 811:19 812:17,
18 813:1,14 814:1,7,20
815:3,10 816:12,25
818:12,15,19 822:12 826:4
833:1 837:15 839:1 841:6
848:1,4 850:1 851:17
857:19 860:9 861:3,7
864:1,9 866:19 867:15,21
868:13,21 870:8 871:4,6
875:16,21 876:3,8,13
878:19 880:6 881:18
882:10 883:9,12 884:1,5,8
885:24 886:5,7,12 887:14
888:21

**Pryor's** 857:12

**public** 642:13 690:1 766:8,
9 821:21 822:18 829:16
859:6

**publication** 739:15

**publicize** 762:15

**publicly** 830:4

**publish** 605:22 616:14
621:19 636:14 644:22
647:9 651:19 657:22
660:11 672:13 719:24
749:15 778:2 779:17,18
780:18 789:24 790:10
794:19

**publishable** 635:13

**published** 622:9 662:9
687:18 865:13

**publishing** 695:20

**pull** 600:11 609:4,7 630:7
632:11 645:19 672:1
677:12 695:16 721:13
748:20 765:7 769:3 770:3
772:14 777:15 779:14
789:23

**pulled** 614:15 616:2
671:22 776:7 810:19

**pulling** 578:19 588:14,22
610:23

**punch** 887:21

**punishment** 710:19
736:19,24 745:18

**pure** 782:11

**purpose** 660:9 775:10
786:12

**purposes** 891:25

**pushed** 887:25

**put** 578:25 586:24 596:24
599:22 636:19 663:18
667:1,3 687:18,24 716:4
733:4 746:9 762:1 793:4
798:16 800:14 805:17
829:18 831:17 832:18
851:3 865:3

**puts** 658:23

**putting** 700:11 793:17

---

### Q

**qualified** 671:2 707:8

**qualify** 799:5

**quarter** 681:21

**question** 578:23 586:2
589:21 595:19,25 604:24
606:9 607:8,10 609:10
612:15 614:12 616:18
617:19 630:2 644:6,9
653:16 659:5 663:8 664:23
668:24 673:25 679:15
682:19 686:20,25 687:10
692:15,17,24 694:2 707:17
710:2,4,5 711:24 727:21
747:10 759:23 765:24

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 238 of 642   PageID 11179

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                    Index: questioned..redactions

766:20 771:8 772:17
795:17 800:9,10 803:18
804:10,14,15,19 805:20,22
806:23 809:18 835:23,24,
25 856:12 857:12 870:10
871:3,20,22,24 872:8
873:4 876:12 878:17,18
881:15,17 884:9,24 892:21

**questioned** 815:6,19

**questioning** 887:17

**questions** 575:25 603:6
606:14 611:5,24 634:22
663:4 675:13,14,17 687:22
706:13,15,16 708:21
709:1,4,6,8 715:2 720:9
721:20 728:7 761:15
762:16 768:3 775:1 791:3,
11 803:13 809:5 814:10
816:9 847:24 848:1 858:11
867:11 893:3

**queue** 817:4 818:7

**quick** 574:11 623:3 629:20
630:9,23 814:13

**quicker** 713:8

**Quickies** 698:1

**quickly** 748:15 800:21
887:22

**quietly** 749:21

**quit** 662:19 682:12

**quote** 750:12 782:13,15

**quotes** 832:18

——————————
R
——————————

**racist** 829:2

**radar** 698:14

**radius** 817:9

**raise** 585:4 619:6 672:3
867:3

**raised** 583:13 799:23

**raising** 616:21

**ran** 724:11,17 758:13
818:21 840:5

**Randy** 593:19

**range** 846:16 889:10

**rank** 758:9

**rank-and-file** 699:25

**rape** 747:19

**rapid** 743:2

**raping** 748:7

**rates** 707:13

**ratification** 752:12,19
753:4

**rationale** 714:15

**re-asking** 795:17

**re-litigate** 633:21

**reach** 753:8 762:2 787:14
826:8 830:7

**reached** 575:13,17 756:1
764:15 788:5

**reaching** 678:3

**react** 826:20

**read** 595:12 596:5,6,7,19,
21,22,24 597:14,16,20,21,
22,25 598:2,5 612:2,16,22,
24 613:1,3 645:1,3 650:15
652:11,16,17,18 654:4,7,
21 657:4,5 682:2,16,22,25
683:12,16,20 696:1,5
711:18,21,22 712:2
749:21,22 750:6 768:9
769:19 770:16 771:6
776:16 795:23 810:22
827:16 836:7 840:9 861:10
877:2 888:12 893:17
894:6,10,12,14

**readable** 654:7

**reading** 603:25 604:10
606:6 610:22 618:19 648:7
658:25 659:3 661:6 696:17
697:16 711:24 713:7 831:9
839:18,19 855:14

**reads** 831:7

**ready** 579:19,25 580:1
594:9 635:11 636:15 708:5
730:8 807:13 871:21,22

**real** 616:4 638:24 706:7

**real-life** 698:8

**realize** 576:12,21 858:16

**reask** 687:10

**reason** 607:19 609:2 610:9
611:20 678:23,24 770:18
832:16 844:6 860:19
876:25

**reasons** 678:2 679:24
712:21 746:18 754:5 785:3
792:15 799:18 817:7 820:2
831:25

**Rebecca** 756:23

**recall** 585:11 590:10
604:25 606:16,19 621:9
623:24 638:23 639:1,16
640:9,15,24 641:20 646:10
650:25 652:15 654:13
658:7,8,20 662:3 665:1
666:1 667:7 669:15 673:13
676:18 677:9,18,19 678:2,
5,10,11,16,24,25 679:4,11,
18,21,25 680:10 681:5,16
684:1,5,10,22 691:2,18,19
696:7 756:8,9,23,25 772:9
774:15 776:15 783:25
793:2 796:7,21 797:5
806:4,5 808:9 809:2
814:16 815:23 816:17
821:1,7 823:24 834:9
836:20 841:12 852:7
854:25 855:1,13 856:18
858:3 859:3 861:21,23
862:1 863:7 874:25 875:1,
4

**recalling** 676:25

**recalls** 887:14

**receive** 648:4 711:17
739:3,18

**received** 583:16 610:10
612:17 628:15 635:4,7
638:17 656:1 710:19
738:12 739:23 759:2
760:14 766:7 767:19
809:15,23 833:15 860:17
862:9 871:13,17,23 873:17

**receives** 643:8

**receiving** 685:15 740:5
768:11

**recent** 642:12 859:5

**recently** 751:20

**recess** 631:16 709:17
792:2,4 848:24 849:1

**recipient** 626:3

**recipients** 626:9,23 627:5,
7

**recitation** 717:17

**recognize** 765:13 779:21
790:19 794:24 867:23

**recollection** 602:17
603:14 604:6,19 605:5
606:2,11,24 607:2,12,18
608:25 609:20 610:8
611:18 613:24 614:7
626:12 665:16 679:20
684:18 693:13,25 694:3,
16,21 695:2 711:14 758:20
759:1 766:1 775:11
776:14,18 781:4 810:2
834:5 855:9 857:18,23

**recommend** 792:14

**recommendation** 830:25

**reconsider** 583:20

**record** 577:8 581:11 589:5
597:18 598:7 603:20 609:4
627:3 637:17 690:2,14
708:23 714:13 731:2 747:5
750:7 832:18 837:10
838:21 842:16 850:8
867:12 892:1 893:8

**recording** 754:7,8 755:14

**records** 630:19

**recover** 689:4

**RECROSS** 814:14

**recruiting** 698:17

**redact** 585:25 587:12,17
630:5,7,10,21 634:13
649:3

**redacted** 626:1,7 629:2
632:7,24 633:3,15,24
635:13

**redacting** 587:9 630:17
632:15 634:10

**redaction** 626:11

**redactions** 626:13 630:16
634:20 636:15

**redirect** 692:1 792:23

**reelection** 723:3 724:12, 20 757:12

**refer** 609:14 614:10 852:5

**reference** 625:25 750:16 770:6 771:5 783:22

**referenced** 766:10 864:7 866:1

**references** 661:23 769:23 782:15

**referencing** 662:12 781:18 808:1 845:11 863:16

**referred** 582:21 699:21 725:20 729:5 844:14 845:24

**referred-to** 598:20 601:6 616:15 622:1 644:23 647:10 651:20 657:23 660:12 672:14 720:1 749:16 778:3 780:19 790:11 794:20 851:13 866:14

**referring** 624:6 640:7 665:17 742:21 746:11 750:22 826:15,21 830:18 844:20,21 845:20 854:2 859:21 863:19

**refers** 744:18 783:14

**reflect** 837:10 838:21 842:16

**reflected** 806:15 876:25

**reflects** 873:15

**refresh** 602:16 603:14 604:6,19 606:2,11 607:12, 18 608:25 609:8,20 610:22,23 611:6 613:23 614:6 626:12 694:15,21

**refreshed** 607:2 610:8 611:9,18

**refreshes** 605:5 665:16 695:2

**refunded** 726:6,15,20

**refused** 577:11

**regard** 575:14 585:3 665:5 671:7 675:8 710:17 795:12

**821:5,9** 838:15 847:24 869:18 873:18

**regular** 824:20

**regularly** 739:5 825:7

**regulations** 696:14

**reimburse** 694:9

**rein** 576:16

**reinstated** 585:9,20

**reject** 670:22

**rejected** 678:15

**relate** 595:14 596:8 616:20 756:13 805:2,8 872:2

**related** 620:11 623:16 701:14 726:14 808:4

**relates** 709:23 869:23 870:11 871:15

**relating** 808:11 820:4

**relation** 685:8

**relations** 773:13 826:24 839:22 840:11 874:11,17, 22

**relationship** 603:7 727:13 758:15 766:2 824:4 852:1, 10,12 870:14 871:9

**relative** 748:7

**release** 718:15,16,18,22 734:9

**released** 717:18

**relevance** 583:12 588:18 589:4,9 693:4,19 694:25 747:8 754:1 755:7 756:12 782:13 796:11 812:15,21 813:9

**relevant** 584:4 588:25 649:1,4 691:20 733:7 794:18 800:23 803:20 817:15,25 826:9 833:3

**religion** 873:16

**religious** 668:14,21 669:2, 9,25 670:7,14 671:8,9 769:24 873:13,15,19 874:18 883:22 884:10 885:4,7,11,13 886:1

**relinquished** 701:25 702:8

**remain** 632:24 633:3

**remaining** 675:2 716:6

**remarkable** 894:25

**remember** 575:6 623:14 626:10 658:12 660:19 669:16 677:9 679:8 685:1, 23 689:13 692:21 694:13, 14,23 707:1 760:16 763:14 764:7,22 768:4 775:16 789:9 796:18 803:12 817:3 822:20,21 831:14 860:15 878:9

**remembered** 693:1

**remind** 746:10 761:8

**reminding** 697:13

**removals** 689:8 705:2

**removed** 625:24 667:6 685:19,22 686:5 687:15,21 688:20 705:1 725:15 732:24 783:3,4 810:18

**renew** 796:10 799:13

**rep** 705:19 773:15 783:9, 10,11

**repeat** 644:9 673:25 753:18 766:20 803:18

**repeatedly** 576:9 607:4,19 608:10,11,20 748:7 751:8 795:5

**repetition** 586:13

**rephrase** 701:21 814:22 869:6

**replaced** 840:6

**reply** 739:13 831:20

**replying** 845:21

**report** 613:9 614:9 645:24 667:20 784:10 827:14 828:23 853:16

**reported** 614:25 646:21 650:22 651:3 657:11 664:6 665:10 667:11 774:6,7 843:22

**REPORTER** 631:21 818:17 848:15 849:11

**reporting** 612:19 613:6 650:12 667:7 775:10

**reports** 661:19 675:9 843:1

**represent** 635:7 641:15 660:20 699:6 728:9 764:23 767:5 768:25 818:16 861:20 867:21

**representation** 634:23 641:8 647:23 657:2 700:11 726:11,17 728:6,10,22 729:8 734:13 735:15,23 736:14,16 738:2,5,13 763:18 764:19 766:13 785:24

**representations** 645:10

**representative** 573:16,22 674:5 698:24 705:19 730:4,10,16,25 772:6 782:20

**representatives** 703:19 773:5

**represented** 703:22 763:11 768:20 783:7 819:23

**representing** 699:9 729:25 746:9 800:17

**reprisal** 657:1

**reps** 584:21 732:13

**request** 584:23 592:7,18, 23 593:22 648:14,20 670:13,23,24 672:5 686:7 711:10 712:13 713:15 714:3,9,11 715:10 717:11 728:10 729:18 735:24 764:3 892:5 893:5

**requested** 712:22 729:14 764:6

**requesting** 650:13,16 670:19,20 784:12

**requests** 735:17 736:4 759:7 763:17 889:1

**require** 684:21 796:22

**required** 684:10 688:3 694:9 733:22 736:5 873:21

**requirement** 697:1

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 240 of 642   PageID 11181

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                    Index: requires..secretary

**requires** 737:13 793:6

**research** 631:8 704:23 708:16 791:14 847:1 886:20

**reserve** 584:6 890:3,4

**reserving** 888:16

**reset** 791:10

**reside** 782:25

**residence** 782:19

**resources** 748:6

**respect** 717:6

**respectfully** 715:17

**respective** 723:9

**respond** 577:1 581:16 674:22 715:16 717:8 728:16 740:8 815:20 831:23

**responded** 741:1

**responding** 662:19 674:5 712:18 741:1 742:2 814:18 815:7 834:13

**responds** 659:23

**response** 578:6 589:12 600:9 645:6 646:2,7 659:25 775:5 833:3 862:10

**responses** 668:23

**responsibilities** 699:12 721:10 727:17

**responsibility** 699:6 728:8,13

**responsible** 721:8,24 724:1 730:17 740:20 741:21

**responsiveness** 884:23 886:5

**rest** 623:8 640:10 782:11 820:18 860:12 866:25

**restricted** 756:6

**result** 626:1 689:13 693:14 694:3,5 710:23 711:1 729:6 737:6 797:3 798:8, 16 799:4,5 823:16 828:25 838:11 853:17

**resulted** 711:3

**resulting** 838:4

**results** 574:5 689:24 736:22 781:24 798:3,21

**resumed** 837:14 838:24 841:5 851:16 860:8 861:6

**retained** 696:4

**retaliated** 650:18 661:24 667:15,20 685:17

**retaliation** 665:9 685:13

**retaliatory** 642:14,23 662:22 663:23 859:7

**return** 689:6 694:7

**returns** 575:14,18

**reveal** 627:7,10

**Revenge** 854:14

**review** 604:12 659:24 665:23 673:18 677:18 678:25 679:21 680:23 741:11 862:13

**reviewed** 609:17 681:4 817:13

**reviewing** 680:8

**revisit** 589:16 590:6 592:6

**Richard** 703:24,25 704:5

**Rickie** 665:3,6 666:2,4 672:19,22 673:5

**Ricks** 679:17

**rid** 781:25 782:1

**right-to-work** 601:16 602:5

**rights** 697:11 701:18,25 702:8 706:2 726:22 807:2

**righty** 635:22

**rise** 573:3 594:10 631:10, 17 708:18 709:18 713:20 719:7 791:16 792:5 847:4 849:2 886:24

**road** 752:11

**robe** 891:1

**Robert** 756:20

**Rocky** 845:16 853:20,22

**role** 704:14 727:14 728:22 740:11 747:18 763:11,15 825:12

**roles** 746:14

**roll** 632:22 634:21 752:11, 12

**rolling** 583:4,7 709:7

**rollout** 699:17 761:10

**rollouts** 761:18

**room** 660:16 706:11 707:7, 21,25 710:4 719:5 758:25 771:23 810:13 865:8

**rotation** 731:21

**rough** 594:7

**roughly** 724:14 772:8

**round** 633:20 791:11 792:12,13,14,15,21 814:8 816:10,11

**RSP** 632:18 637:25

**rule** 588:8 590:3 607:9 747:8

**rules** 611:9 639:8 696:14

**ruling** 610:6 624:24 636:2 647:3 651:14 657:20 660:7 716:1 847:12 866:10

**run** 700:23 701:11 799:2,6

**running** 624:19 721:3 726:12 754:10 798:17

**rupture** 743:1

**Rutherford** 583:6

---

**S**

---

**sake** 677:8

**Sam** 829:7 854:14

**Samina** 770:14

**San** 891:17

**sanctions** 581:3 582:2

**satisfy** 649:17

**Saturday** 787:25 788:3

**save** 598:11 854:24

**scab** 844:11,22,25 845:25 854:2

**scan** 598:25 791:22

**scared** 685:17

**scenario** 889:9

**scenarios** 873:23

**scene** 860:6

**scenes** 705:6

**Schaffer** 717:16

**schedule** 729:22 732:5

**schedules** 736:6

**scheduling-wise** 892:21

**Schneider** 599:20 600:11 716:8 717:21 773:10,22 774:11 790:23 848:6 849:5,7,19,21 866:19,22 867:5,17,18 887:2

**scope** 691:23 710:10 726:17 795:10 796:10 799:14,21 816:10

**screen** 586:7,25 605:13,15 608:16 618:23 632:17 636:20 641:10 672:1 837:11 841:7 842:15 854:23,24 855:10 861:4

**screens** 605:21 632:10 636:17 671:23,24 794:10

**screenshot** 614:12 615:4, 23 657:3

**screenshots** 614:3,8,16 615:21

**scroll** 833:2 846:20

**seal** 626:2

**sealed** 625:22

**seated** 573:5 594:14 635:23 709:19 719:10 792:20 850:11

**seconds** 772:9 808:20,23

**secret** 613:5,8 623:9 633:15 830:5

**secretary** 754:7,8 755:14

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 241 of 642   PageID 11182

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                Index: section..somebody's

**section** 605:9

**security** 573:3,23 574:5 594:10 631:10,17 709:18 719:7 753:3 792:5 847:4 849:2

**seek** 715:13 754:23 808:3 839:19

**seeking** 757:12

**sees** 605:18

**select** 735:23,24

**selling** 698:15,16

**send** 574:18 580:20 587:9 600:3 608:19 641:20 680:13 726:7 778:10 781:2,5 801:10 803:8 824:1 858:15 861:22 862:8 870:19 879:12

**sending** 595:16 596:15 607:25 641:6 646:3 673:12 685:16 766:2 777:5,11 801:16 802:6 803:13 807:10 831:3 834:6 843:6 859:11 860:11 875:10 880:16 881:5 885:8

**sends** 802:9

**senior** 661:9 828:2 832:5 834:18 852:16,21 853:5 856:4

**sense** 581:13 582:16 706:1 741:9 782:21 849:24 888:18 890:1,15 892:22 893:19

**sensitive** 741:14 742:1

**sentence** 769:13,19 829:6

**sentences** 584:9

**sentencings** 574:5

**sentiments** 892:10

**separate** 678:23 697:22 818:3 870:17

**separation** 758:7 867:11

**series** 706:13

**serve** 580:23 679:25 891:9

**server** 580:25 581:8

**serves** 680:4

**service** 582:13

**services** 834:17

**serving** 704:14

**session** 588:8 762:9

**sessions** 864:15

**set** 581:14 602:21 654:18 655:1 679:21,23 680:11 726:3 729:10 737:15 804:22 840:6 892:4 894:5

**settled** 819:11

**settlement** 732:21

**Seventy-one** 864:21

**Seventy-two** 864:24

**severe** 593:24

**Shah** 770:14

**shape** 746:20

**share** 716:11 842:15 870:6 892:9

**sharing** 831:24 876:19

**shave** 792:10

**shifted** 729:21 748:1

**shock** 655:2

**shop** 698:20,21 699:11,14 700:17,19 729:13,15,23

**short** 587:19 678:3 710:15 744:9

**shorter** 717:23

**shortly** 583:3 692:12,13 825:1

**shot** 770:10 771:3 792:14 854:24

**shots** 854:24

**shoulder** 590:13

**show** 580:18 581:6,10,14, 16,20 599:7,13 600:23 601:8 604:9,11 605:9,13 623:13 628:5 632:16 634:24 638:5 665:15 713:2 755:5 787:5 794:11 854:5 865:16 869:1 891:17

**show-cause** 891:20

**showed** 805:18 879:11

**showing** 605:16 628:11 788:6 800:2 891:22

**shown** 688:1 761:19 770:11

**shows** 711:16 832:4 891:21

**Shuler** 786:24

**sic** 595:3,6,14 673:9

**side** 576:7 639:14 673:10 728:15

**side's** 727:16

**sidebar** 574:15 589:14 590:10 599:18 601:1 610:15,18 611:13 623:3,5 625:13,19 629:5,18 630:12 637:15 638:11 649:10,11 652:22,25 653:22 667:25 668:9 686:16 687:8 689:20,23 692:6 719:4 747:4,7 798:13 799:9,12 800:25

**sidebarred** 675:16

**sign** 701:16,24

**signal** 588:21

**signaled** 580:14

**signature** 684:2,5

**signatures** 677:21,22,24 678:1 682:24 683:10,14 684:4,22

**signed** 682:8,11 683:4

**significant** 577:19 783:1

**signs** 753:6 754:20

**silent** 675:2

**silently** 696:1

**similar** 589:3 744:22 783:3 784:4 863:18 873:23

**Simms** 824:10

**simple** 742:24

**simply** 762:18 838:5

**Sims** 628:2 658:3 659:19 660:21 716:3 824:15,17 835:9 841:9,23 858:14,22

862:6,7,9,10,21

**simultaneous** 754:4

**Sincerely** 642:15

**sir** 621:16 720:6 768:24 769:2 770:15 771:4 773:2 798:9 806:4 809:20 829:17 856:9 867:16 872:11 874:24

**Sister** 796:23

**sit** 704:21 706:15,19 752:15 806:7

**sites** 838:7

**sitting** 707:16,21 713:7 730:8 743:2 813:21 817:18

**situation** 748:3,11 767:6 774:16

**situations** 748:4 819:1

**Sixty-seven** 749:14

**size** 720:20,21,23

**skills** 746:14,16

**skip** 829:4

**slander** 677:1,5

**slash** 596:22,24

**slate** 821:1,6

**sleepy** 720:8

**slow** 861:14

**smaller** 654:20,22

**smarter** 889:3

**SMVS** 655:8

**snippet** 770:10

**snippets** 817:21

**social** 646:22 655:9 658:5, 23 662:21 663:22 664:4 685:6 710:21 752:6 820:13 821:20,24 822:4 823:20 830:6 834:23 835:6,16 836:12 838:2,13 841:16,25 842:12 843:8,22 845:8,13 852:23,25 853:8 855:3 856:6,25 857:3 878:24

**solution** 713:6

**somebody's** 832:9

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                  Vol 3 July 07, 2022                    Index: someone's..Stephenson

someone's 654:15 832:7

Sonya 602:12 658:3,4,9 660:22 824:7,13,21 825:21 828:21 830:2 835:5,12,14, 25 841:10,23 848:18 855:18 856:12

sort 584:2,14 617:18 699:11 710:21 741:4,5 742:12 745:20 762:24 766:25

sought 670:6

sound 591:24 789:6 840:4, 8

sounds 582:5 600:25 618:16 630:4 634:12 848:23 891:17

source 830:7

Southwest 573:13,15 579:14 582:8,14 584:18 586:10 587:2,6 596:14 599:22 602:25 604:20 607:3,15 609:1 610:9 611:19 612:11,20,25 613:4,9,13,19 614:14 624:2 627:2 628:1 632:2,3, 5 636:5,8,13 641:7,21,24 642:22 643:8 644:12,21 645:7,16 646:8,13 647:8, 20 648:3,6,25 649:6 650:12,22 651:18,25 656:16 657:14,21 659:19 660:10,24 661:11,19 663:19 664:6,25 665:5,10 667:21 670:25 672:4,11 674:9,14,22 685:2,11,16 688:19 696:22 697:1,13,18 699:8 700:18,25 701:13,25 702:9 704:7,22 706:4 707:6 709:25 710:18 719:20,21 721:14 722:3 725:3,9 727:13 728:15,18 729:4,19 730:12,13,21 731:4 732:5,9,14,19 733:9 735:11,12,13 736:6,10,19 737:13,18 740:16 741:15 743:7 749:3 750:22 754:24 755:25 756:1,3 757:21 761:18 762:9 764:19 766:19 767:12 768:25 773:6,14 775:8 777:17 778:11,19 780:23 781:2,7 784:11,14 786:17 794:15,

19 795:6 801:5 810:5 817:23,24 818:1 819:13 821:23 823:8,15,17 825:5 826:13,14 827:1,15 828:3, 24,25 834:19 836:11,18 838:4 839:11 840:12 841:25 843:8 845:4,13 852:3,8,11,16 853:6,17 856:5 857:3,21 859:11 864:17 865:12 866:8,13 868:1,2 869:18,23 870:12, 21,22 871:8,10,14,15 872:2,16,20 873:4,18,20 878:5 879:7 880:7,10,15, 21 882:9 885:9 888:1 891:21 892:3,7

Southwest's 611:3 820:12 850:21

sp 756:21

Spand 665:3,6 666:2,5 672:19,22 673:5

spawns 826:18,22 827:4

speak 575:15 586:22 602:12 665:6 670:9 727:23 736:2 764:16 837:2 844:24

speakers 786:22,24

speaking 640:21 662:8 668:22,23 689:19 706:10 756:22 804:5 875:9 876:3

special 727:6 763:17

specialist 731:16,22 732:3 733:4 763:19,23,25 764:4

specialists 732:12

specific 583:18,21 584:20 585:1 623:2 648:14 683:25 685:7 690:20 721:7 722:21 726:22 738:20 745:23 752:6 764:22 820:24 825:15

specifically 616:1 658:22 662:7 665:24 729:14 744:18 751:21 785:22 852:18,22 860:16 872:9 873:7 874:19

specificity 648:21

specificity's 677:8

specifics 583:19 609:12 677:15,16 708:1 764:8

858:4 872:10,12

speculate 863:9

speech 576:2 578:13,18, 21 653:8 868:6,20,25 869:3,7,22 871:10 873:15 877:9,11 885:1

spend 689:2 714:23 719:4 804:13 812:4

spending 699:23 713:17 803:15,22 804:17,24

spent 689:5 694:10 695:9 713:11 714:24 726:10 805:9

spilled 584:14

split 615:12 754:6 762:14 885:20

spoke 669:20 680:3 707:20 780:24 787:2

spoken 705:15 758:18 764:13 774:22 775:2 824:16,18

sponsor 623:21,23

sponsored 803:15,23

sponsoring 589:25 590:5

spotting 691:12

spreading 857:24

spreads 830:13

squeeze 866:18 889:25 892:15

stack 768:3

Stacy 685:24 690:18 691:4,20

staff 582:25 722:7,13 740:20 755:4

staffing 721:8

staggered 723:4

stance 836:18

stand 584:23 706:12 708:20 709:9 734:3 800:11 817:19 818:4 871:5 887:4

standard 575:6 739:1

standards 707:9

standby 816:19 891:23

standing 682:9 707:3,10 745:10,14 798:25 799:7

standpoint 576:19 577:24 578:11

stands 785:14 819:6

start 593:18 675:20 704:22 705:4 714:23 722:23 729:17 809:4 815:2 886:23 888:25 889:1,20

started 609:11 678:12 697:16 698:16,17 701:8 704:24 706:16 707:4 722:6 754:19 786:1 808:24 810:3 811:18

starting 893:6

state 603:4 635:6 687:5 692:12,13 734:18,19 747:1,3,6 754:20 783:6 818:13 867:16

stated 606:13 608:14 611:22 666:4,10 802:18 810:9,16 870:4 872:6 877:8

statement 651:7,10 832:12 840:17 861:15

statements 746:2 878:2 879:10

states 696:12 720:16

stationed 723:10

statistic 684:15

statistics 813:22

stay 594:6 655:6 688:7 779:9 788:15 890:21

staying 690:12 771:24

stays 587:3 714:2

stealing 619:23

step 610:6 703:2 732:4,5,9, 11,12,19,23 733:1 734:16 736:25 737:16,17,23 738:6,13 763:12,20,21 764:20 766:2 819:21,23 851:24

Stephenson 673:12,20 773:12 855:18

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 243 of 642  PageID 11184
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 3 July 07, 2022                        Index: steps..talk

**steps** 679:20,23 728:11,20

**Stevenson** 749:21 774:8

**steward** 579:17 698:20,21 699:11,14 700:18,19 729:15,24

**stewards** 729:13

**stipulate** 627:6,9,12

**stipulated** 627:13 628:21

**stipulating** 632:24

**stipulation** 628:8,14 633:4 635:1

**stipulations** 628:10 635:3

**stirred** 639:7

**Stone** 574:23 575:2,3,14 585:18 591:20 593:10,22 594:5,16,17 595:3,14 596:12 599:25 624:7 659:15 676:3,19 687:12 709:24 719:15 720:4 722:20 725:25 735:3 748:14 750:5 759:19 760:13 763:8 765:6,10,24 768:18 780:22 789:11 791:5 792:25 795:12 814:16 816:23 818:20 820:21 821:6 831:25 832:16 833:3 837:22 842:1,10,11,22 843:5,10, 16,22 845:23 854:7 855:17,23 856:17 859:2,10 861:13,19,23 862:18 863:1,13 880:17

**Stone's** 595:6 596:11 802:24 820:25 838:15

**stooping** 655:7

**stop** 597:3 654:8 711:24 722:17 775:12 776:4 801:9,19 815:16 841:13 857:11 858:8

**stopped** 801:15 810:11,17

**stopping** 838:12

**straight** 632:5

**stray** 753:1

**streamlined** 894:1

**strike** 606:8 755:20 881:16

**string** 863:1

**strong** 591:16 618:16 870:19

**struck** 592:25

**structure** 720:14,15 727:10

**structured** 840:16

**struggled** 701:2

**stuck** 574:8 706:6

**stuff** 584:18 587:2 808:15 894:14

**stumbled** 838:6

**style** 576:15,17,22

**styled** 891:20

**Suarez** 660:22

**subject** 641:20 675:19 696:3 777:13 816:17 834:7 839:5 873:10

**subjected** 685:12

**subjective** 836:18

**submit** 589:16 731:1

**submitted** 787:9

**submitting** 699:10 865:15

**subparts** 623:12 624:10 632:1 636:6 850:19

**subpoena** 581:8 718:17, 18,19,22

**subpoenas** 717:18 718:2

**substantially** 716:10 717:5

**successful** 697:3

**successfully** 670:16 725:11

**succession** 667:4

**sucked** 743:3

**suffered** 593:24

**suffice** 700:14

**sufficient** 796:22 892:6

**suggest** 586:17

**suggested** 586:3 595:10

887:15

**suggesting** 828:9,10

**suit** 693:11 694:4

**summary** 637:17 832:13

**summer** 835:5 836:6

**Sunday** 894:7,13

**supervisors** 774:14

**support** 662:16,17 673:5,8 675:1 750:13 771:7 812:5 818:24 828:18

**supported** 818:23 820:15, 17

**supporter** 667:8,12,15 818:20

**supporters** 639:2 642:5 665:1 691:11

**supporting** 618:6,15 619:1,14,22 620:9 757:17

**supportive** 606:14,15

**supposed** 574:1 613:10 615:9,16 685:10 817:17 851:6 874:6,9 887:25

**supreme** 744:2

**Surely** 873:14

**surgery** 593:25 594:1

**surprise** 600:5

**surprised** 792:25

**surrogates** 858:15

**suspects** 639:4 640:6,21 642:7 650:24

**suspended** 688:21 710:20

**suspension** 798:17,19

**suspensions** 694:11 711:3

**sustain** 576:9 701:20 734:22 805:6 812:24

**sustained** 576:7 590:17 604:1 606:8 608:23 610:4, 14 613:17 619:18 620:16, 22 643:15 663:6,7 664:15, 20 675:5 678:8 680:25 682:15 737:3 738:10 793:21 797:25 798:14

812:16 881:14

**sustaining** 636:4

**Suzanne** 673:12,20 749:20,23 750:11 773:12 855:18

**SWA** 601:14

**swear** 594:18

**sweet** 858:18

**sworn** 664:12 817:12 867:5

──────────

**T**

**TA** 680:16

**table** 704:1

**takeaways** 715:5

**takes** 590:18

**taking** 575:25 601:15 607:16 700:10 730:15 787:10 800:6 813:3,7 828:11 888:8 889:20

**Talburt** 583:9,15 586:5 624:8,21 637:3 638:17 642:15,22 645:9,18,23 647:19 648:5 649:25 652:1 655:12,16 658:2 659:10 660:21 710:24 716:10 760:15,18,20 761:2,5 762:23 763:11,12,19 764:23 765:12,21 766:1 767:16 817:1,5 818:7,14, 15,17 842:21 887:21

**Talburt's** 717:4 764:2 840:4

**talk** 574:11,13 575:19 585:22 587:21 588:12 591:5,22 593:12 597:20 613:19 615:19 616:23 624:25 631:6,7,13 662:25 664:2 676:13 699:3 708:14 709:10,14 720:11 722:21 741:8 743:17 745:23 746:1 753:25 758:5 777:13 783:19 786:22 791:12,14, 20 807:4,12 808:17 816:15 820:10 823:17 835:24 843:16 846:24,25 866:4 886:18,19 887:4,12 894:19

**talked** 589:14 618:3
623:25 648:24 653:11
654:1 671:6 676:5 691:23
702:15 710:11 722:2
724:23 757:2 772:21 773:4
788:7 795:13,14 799:25
812:8 817:22 864:11 865:7
869:22

**talking** 584:20 586:7
587:9,11 590:10 595:5
596:15 607:21 609:11
612:8 615:7,25 617:13
640:14 641:1 642:8 650:11
652:8,15 658:22 664:9
665:19 671:19 685:7
698:13 712:8 740:4
742:11,13 750:20 769:11
774:23 779:25 799:15
804:16 806:5 808:3 809:14
828:7 829:7 830:19,20
832:6 835:15 836:1 841:21
843:3 852:2,21 853:2,5
856:4 859:17 863:7 873:8

**talks** 583:15 794:25

**Tammy** 839:6

**tap** 590:13

**target** 658:6 820:25 821:3,
5,9,14 822:2 835:16 855:4

**targeted** 823:9,12 827:11,
19 828:8 832:2 853:1
863:3,20

**targeting** 753:16,21 821:5
823:17 830:22 836:2
852:22,24

**tattletales** 639:6

**taught** 746:15

**team** 574:22 639:23 640:5,
13 661:18 699:19,24
700:3,8 703:10,11,13,18
704:4,10,17,24 705:7,10,
21 752:5,10,13,16,18
757:11 761:6,13,21 762:7,
13 766:13,17,23

**tech** 695:15

**teenagers** 746:15

**telephone** 773:5 774:10

**telling** 600:1 606:19
608:18 642:22 666:8 718:4
806:7 809:2 813:22 877:5

**tells** 647:17

**ten** 631:4,9 754:4

**tended** 729:11 731:20

**tentative** 678:14 679:5,9
680:13 699:17 751:22
752:12 761:10 819:10

**term** 595:22 723:20,25
724:13,16 757:3 758:2,12,
13 764:9 823:13 844:13

**terminate** 841:17 842:13
877:7,18

**terminated** 585:9 586:5
799:18,19 841:24 878:23

**terminating** 832:7,9,11
879:14

**termination** 799:17
835:17 863:17 877:3
878:1,4,11 879:9 881:20
882:22 883:2,4 886:8

**terms** 662:15 716:3 725:24
727:3 732:1 827:24

**terribly** 794:6 800:23

**terrified** 752:4

**test** 797:14 817:10

**testified** 600:3 805:25
872:18 876:6,8,9

**testify** 676:9 685:1

**testifying** 599:20 604:23
610:13 640:2,17 643:25
656:6 689:25 804:7 811:14

**testimony** 577:14,17
578:19 584:3 585:8 614:21
620:24 643:21 664:12
679:3 695:12 714:1 786:5
809:11,18 816:20,23
817:12,21 825:22 826:2
837:8,13 838:19,23 841:1,
4 846:10 851:15 860:3,7,
25 861:5 863:24 887:5

**testing** 797:12

**Texas** 697:8 746:13

**text** 639:15 770:16 807:6
810:22 815:21

**thank-you** 862:9

**then-president** 706:10

**then-union** 706:3

**thing** 575:20 578:6 579:9,
13 592:4,22 594:6 598:1
610:21 624:11 627:4,17,20
633:12,13 694:1 699:20
767:25 801:10 817:20
821:19 830:12 847:22
881:4 883:17 889:7 893:1

**things** 576:5 577:12
578:21 585:10 587:18
600:2,4 605:1 619:24
620:8 621:9 623:22 639:25
693:24 709:24 712:3
716:23,25 740:24 741:10,
25 742:16 784:18 800:16
831:7 839:15 846:4
869:10,12 872:5 879:12,13
880:20,25 881:1 882:9
883:20 889:13 893:23

**thinking** 579:12 624:17
832:15

**thinks** 618:6 839:13

**Thompson** 854:10,11

**thought** 577:11 578:15,22
585:21 590:22 609:9 615:9
617:4 621:1 649:12
693:22,23 698:6 701:9
707:14 711:12 715:20
775:22 802:1 806:15
857:2,24 877:11,13,15,22
879:1 882:13,20

**thoughts** 582:4 831:24
893:9,15

**thread** 781:23 810:4 846:5

**threat** 578:17 613:20
751:18 753:12 756:2
828:17

**threatened** 750:25 751:14
756:10

**threatening** 755:3

**threats** 756:9

**three-year** 723:15 724:12

**thumb** 579:2,6

**thumbs** 635:12 636:16

**Thursday** 787:23 788:2
888:1

**tie** 596:17 691:9 727:9

733:24

**tied** 635:2 740:8 746:6

**ties** 691:22

**tight** 867:8

**time** 574:12,15,16,19,21,23
575:3,6,7,10,13,19,21,25
576:10,11,23 578:25
579:14,15,17 580:4,8,9
591:15 592:14 593:3,4,5
598:11 602:12 606:15
608:5 611:10 612:5 622:11
645:17,22 659:20 661:17
662:22 667:13 669:24
671:6 675:17 684:1,3
688:18,23 689:5 696:19
697:24 698:12 699:18,23
702:16 704:7 705:19
706:10 707:3 710:8,9
711:10 712:16,20,22
713:11,13,14 714:2,3,8,12,
16,19,21 715:11,12,13,15,
23 716:5,6,13 717:9,22,25
718:5,8,9 719:2,3,5,17
720:5 722:13 723:4 724:6
727:17,20 728:12 729:21
730:1 731:6 741:14,22
742:1 754:9,11 756:3
758:7,23 761:18 764:22
767:16 772:7 774:2,21
782:12 784:13 785:13
786:18 787:13 788:16
791:8 792:10 799:14
800:5,6,8,15 810:7 811:17
812:8 814:4 816:25 820:19
824:23 825:6 832:3 834:14
836:12 843:6,9,15,21
844:10,25 845:9 849:22
850:24 855:21 864:9
866:25 874:16 883:8
885:23 888:10,22 889:16,
24,25 890:9 891:19 892:2,
4,5,6 893:11 894:6,10,12,
22

**timeline** 713:24 827:23

**timely** 574:6

**times** 606:20 622:10,11
650:17 673:7 704:2 710:1
736:5 741:18,19 754:3
762:13 764:1 767:3,8
809:9 877:14 880:1

**timing** 705:2 758:6

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 245 of 642   PageID 11186
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Index: tired..union

**tired** 575:23

**title** 641:23 700:20 739:2

**today** 589:23 617:6 679:4 702:16 718:20 746:8 768:23 773:4 806:7,24 810:10 815:25 886:23 887:9 889:17 894:23

**Todd** 854:15

**told** 574:22 585:7 587:1 599:4 604:20 607:3,19 609:1 610:9 611:6,19 613:2 615:2,6 642:20 643:9 697:10 711:13 730:2 775:6 776:22 789:20 801:5 808:18 811:9 817:25 821:23 831:14,15 832:16 851:8 874:1 877:22 878:9, 20 879:1 885:25

**Tom** 858:17

**tomorrow** 581:15 599:21 600:12,22 601:11 848:19, 22 878:8 886:22 891:19 895:3

**tonight** 894:15

**Tonya** 690:15

**tool** 813:17 835:6

**top** 602:1 633:15 659:14 784:23 842:21 882:21,25

**topic** 709:2 748:15

**topics** 699:4 709:4 721:25 825:3

**total** 684:7

**totally** 598:2 708:7 835:21 877:10

**touching** 740:19

**town** 783:6 848:18

**track** 574:19 612:24 731:22 847:14

**trail** 831:16

**train** 785:17

**trained** 873:7,14

**training** 669:19,20 706:4 725:11 746:14 764:11 871:17,23 872:1,4,11,13, 19,22 873:10,17,21 874:1

**trains** 889:16,24

**transcribed** 818:10

**transcript** 711:16 840:9 847:18 849:17 851:3,6 864:7

**transfer** 582:3

**transferable** 581:12

**Transport** 602:3 785:14

**travel** 751:24 752:14

**traveling** 755:15

**treasurer** 669:24 670:3 685:24 721:10

**treat** 817:17

**treated** 587:6 649:7 817:24

**treats** 587:3

**trial** 573:6 575:19,22 579:19,25 580:4 581:7,15 588:9 592:14 597:2 660:17 689:11,12,13,24 709:21 713:19,21 714:1,7,15 717:18 718:2,17,18 720:2 744:12 749:17 772:5 778:4 780:20 789:12,15 790:12 794:21 796:22 797:1,2,7, 17,21 798:2,3,7,8,22 799:5 816:21 825:24 832:21,22 833:19 836:2 837:11 842:17 851:14 854:5 855:16 856:24 862:8,25 866:15 887:24

**trials** 574:1

**triple** 686:24

**trouble** 591:14 639:5 827:20 832:4,6

**troubles** 854:20

**Trudy** 843:25

**true** 608:8 615:4 642:24 643:11 646:5,22 647:14 648:6 655:13,22 656:17,21 657:8,15 658:20 659:17,25 661:2,5,12 665:13 667:13 673:6,14 712:9 783:11 798:18 801:14 802:12 805:3 806:3 809:25 810:25 811:12,21,25 832:19 841:19 869:23 871:11

873:11 874:25 877:12,19 880:21

**truncated** 715:20

**trust** 636:19 851:6

**truth** 592:13 639:14 687:4 750:17 829:20

**tucked** 754:17

**turn** 656:11,13 667:16 685:9 708:1 738:18 743:8 766:18,24 768:10 790:15 821:24 823:14 845:3,12

**turned** 655:18,20 684:2 689:7 731:14 738:4 750:21 781:24 790:17 822:15 857:2

**turning** 655:7,21 656:21 685:8 802:5 821:20 822:20,21 838:9 857:24 888:21

**TV** 891:18

**TW** 705:19 726:3 757:21 785:12,14,20,21 786:13, 15,16 788:12 798:20 826:18

**tweak** 653:25

**two-hour** 718:24

**two-year-old** 593:24

**TWU** 573:20 618:14 654:10 658:15 688:11 695:17 720:14,15 743:25 823:8

**TWU556.ORG** 738:25

**type** 656:11 762:4 798:17 874:12

**types** 852:16

**typical** 680:2

**typically** 752:13

---

**U**

**ugly** 776:5 784:20

**Uh-huh** 842:20

**ultimately** 678:18 688:9 701:10,12 724:8 788:19 819:10

**unavailable** 817:11

**unborn** 811:3

**uncovered** 838:6

**undefined** 836:15

**underlined** 665:17,25

**underneath** 744:4 776:16

**understand** 578:5 595:19 624:23 637:11 638:2,8 656:1 661:21 671:17 677:4 687:3 697:11 698:5 700:1 703:14 705:24 707:23 714:11 715:3 720:5 761:23,24 765:3 768:25 770:21 772:13,25 778:13 782:12,13 783:10 790:5,18 794:4 796:2 800:18 816:1 827:24 829:21 843:3 892:9,18

**understanding** 633:1 657:7 668:13 669:7 671:7 679:3 680:21 687:20 736:15,23 766:21 767:15 773:21,24 789:1 837:7,18, 24 838:14 868:14 873:3

**understood** 584:25 586:9 592:9 600:8 608:8 611:9 617:9 635:10 649:23 716:17 717:10 718:12 747:9 837:5 865:2 887:6

**unhappy** 784:18 785:1,2

**union** 573:18 575:15 576:2 577:17 578:13,18,20 579:14 591:11 595:7,15,17 596:9,16,18 597:13 601:15 602:3 603:9 606:12,15 608:5 611:25 613:5,6 616:22 617:14 618:5,10, 13,17 619:4,10,12,13,15, 22 620:1,6,11,12,19 621:15 622:9 624:1,12 632:3,4 636:3,8,12 638:21 639:19 641:4,19 642:17,21 643:7,9,10,19 644:11,12, 20 647:7 650:9 651:15,18 652:19 653:7,20 654:11,14 656:2,4 657:1,8,13,21 658:6 659:10,17 660:9 661:21 662:1,18,20 663:20 664:3 665:4 667:9,12,15 668:18 669:6,20,25 670:11,15,22 671:2 672:10

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 246 of 642   PageID 11187
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                    Index: union's..wait

673:19 674:3,8,10,24
675:1,7 678:18 680:2,6
684:19 687:18 688:7,14,
17,25 689:2,6,14 694:9
695:17 696:25 697:3,6,8,
17,20,21 698:12,16 699:11
700:10 701:4,8,13 704:8
705:24,25 706:1,3,8 707:5,
12,24 710:24 712:3,9
713:2 720:12,14,18 721:3,
8,13,16,18 722:7,15,17,24
724:24 725:1,17,18,19
726:2,5,9,13,23,24 727:5,
8,10,23,25 728:1,5,6,10
729:3,20,23 731:1,2,3,18
732:12 733:2,3 734:9
735:5,15 736:13 737:8,11
738:2,5,12,18,21 739:14
740:1,22 741:5 743:9,19,
20,21 744:2,12,24 745:11,
15,16 752:7 753:10,23
755:12 759:19,25 760:1,20
761:3,18 762:24 764:15
773:15 777:20 780:16
781:13 783:4 784:5,20,24
785:5,15 786:19 788:7,11,
14 794:15,18 795:1,12,23
796:1,4,6 797:20 799:1
802:10 803:14,15,21,22
804:13,17,24 806:2,14,15
807:2,3,6,8,11,18 808:4
812:2,4 814:19,24 815:22
818:21,22 820:3,11,25
821:5,6,8 827:4 829:13,23
836:3,11,25 842:13 843:7,
21 844:5 845:11 855:4
858:19 865:11 866:8,12
868:4,15,20 869:8,11,21
870:5,12,16,18,19,20
871:10 875:7,10,24
876:17,20 877:14,19 878:3
879:2,4,11,12,15,19,22
880:8,9 881:22 882:12,20
883:1 885:14,15 886:3,10

**union's** 582:10 669:8
695:10 698:14 704:5
727:14 728:22 730:16
734:13 804:20 808:13
850:20

**union-protected** 807:15,
24 871:15 872:1,20

**union-related** 577:7

**union-sponsored** 669:21

**unions** 707:22 720:12
785:13,15

**unique** 892:11

**Unity** 622:6

**unmute** 636:17

**unredacted** 622:19 626:6,
8 627:23 628:25 629:1,14,
21,23 634:24 645:1,4

**unrelated** 577:12

**unsealing** 633:20

**unsuccessful** 677:20

**unwanted** 747:13

**unwilling** 718:21

**upcoming** 828:17

**update** 574:17 580:11

**updated** 622:24

**updates** 762:19

**upgrade** 889:3

**upset** 810:17

**upsetting** 813:13

**urging** 841:23 842:12

**usable** 632:3

**usual** 639:4 640:6,20
642:7 650:24

**Utah** 888:3

**utilize** 726:19 738:24
739:9 866:25

**utilized** 687:23 733:9
813:18 841:17 842:13

────────────

**V**

**vacancies** 724:5

**vacancy** 723:16,18,19
724:2

**vagina** 878:12 880:17

**vague** 820:7 836:15

**valid** 638:24 678:4,17,24
681:25 684:5,10,22

**valuable** 713:11

**Van** 836:8,9,10

**variety** 746:16,18 785:3
793:14

**Vdv** 835:5 836:7

**Vegas** 774:6

**Vegas-based** 773:12

**vehicle** 584:8

**vein** 775:9

**Ven** 836:8,9,10

**verdict** 577:24 888:8

**verification** 680:19

**version** 622:19 626:8
629:1,14,22,23 634:24
635:13 645:1 647:22

**versus** 653:3

**vested** 696:4

**vetted** 740:11 744:11

**vice** 666:23,24 667:1,3
700:21 754:6,12 823:21
824:8,25 825:13 834:16

**video** 578:16 584:9 585:13
619:2 770:10 771:3,12
772:1,18 776:7,13 789:23
790:4,14,20 809:12,13,23
810:7,11,14,17 811:11,12,
20 813:7,21,23 816:25
817:2,5,17 818:9 830:23
846:14 847:19 849:12,13
850:18,23 851:1,2,7
878:21 880:16 881:19
882:24 883:21 884:19
885:3

**videos** 584:11 608:11
612:19 685:15 769:22
777:5,11 778:9 790:24
807:10 808:17,19,24
809:5,9,15,21 810:25
811:17 878:6,11 879:1,6,
20 880:13 881:6,12 882:4,
14 883:18

**videotape** 864:1

**view** 578:3,7,15,17,20
625:3 677:2 728:19 804:24
805:8 808:20 812:12,19

**viewed** 772:7 790:4
803:21 804:22

**views** 671:8 746:20 748:1
759:3,8 769:10 777:1,4
803:12,17,20,25 805:2
812:3

**violate** 668:1 870:21

**violated** 580:19 581:21

**violating** 656:24 745:7
857:3

**violation** 646:22 688:10
710:22 766:25 828:24
841:24 845:3,7,12 853:17
880:7,9,21

**violations** 655:9 667:16
821:21,24 823:20 843:9,23

**violent** 753:10

**viral** 615:23

**visibly** 802:3

**vocal** 829:15 830:3

**voice** 727:3 828:16

**voicemail** 755:3

**voices** 655:2

**voir** 686:7,11 708:21

**volume** 739:23 740:3,16

**voluntarily** 697:4

**voluntary** 810:25

**volunteer** 788:15,17

**volunteered** 762:7 779:9

**vote** 680:13,16 700:2
723:6,21 724:25 725:1,4,
14,18 733:25 741:20,22
744:13 745:15 752:13
761:16

**voted** 679:9 721:4 723:8,
11 724:21 751:22 755:13

**votes** 733:17 734:7

**voting** 724:23 733:19
761:24

────────────

**W**

**wade** 784:9

**wait** 587:23 588:2 643:2
692:14 695:1 751:8,18

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 247 of 642   PageID 11188
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                    Index: waiting..Zoom

755:19 794:3,9 809:1

**waiting** 718:14 757:20

**walk** 598:23 753:15 784:5

**walking** 653:2 849:5,6

**wanted** 574:11,21 580:2
584:21 613:4 737:9 744:24
763:18 764:16 767:24
773:16 775:7,11 788:12
801:7,8,13,19 811:3,4,6,12
812:2,4,6 892:15

**wanting** 579:22 592:7
670:17 690:24,25 729:19
759:7,14 846:8

**war** 890:4

**warning** 827:3

**warranted** 892:2

**warrants** 715:9 744:11

**Washington** 777:11
778:17,21 780:3 786:10
788:24 789:2

**wasted** 713:13

**watch** 771:12,13,14
772:18 810:14,15,25
891:18

**watched** 771:20,21 772:1
808:20,22,23 810:21
811:20

**watching** 811:18

**ways** 881:11

**weapons** 752:2,8 753:7
754:21

**wear** 706:18 778:16 779:3
805:20

**wearing** 779:1 805:23
806:2,9

**website** 762:19

**Wednesday** 888:5,10,11
890:17,20 891:2

**week** 580:3 715:3 721:17
779:13 787:20 789:14
848:19 887:25

**weekend** 893:10

**weeks** 754:5 758:20

**weigh** 706:23

**weight** 706:23

**weighty** 893:15

**west** 754:14 783:16

**white** 587:5 677:23,24

**white-out** 683:18

**whiting** 586:14

**who-all** 859:1

**wife** 844:3

**Wilkins** 829:7 854:14

**Wise** 690:13

**wisely** 579:16 714:19

**wiser** 595:10 891:1

**wisest** 586:20

**wishes** 732:24

**withdraw** 733:14

**withdrawn** 590:23 591:10

**withholding** 635:19

**witnessed** 735:13 836:16

**witnesses** 713:16,18,25
714:4 715:1,7,25 716:4
718:6,10 816:16 846:19

**WNCO** 628:3 633:17,24

**woman** 747:14 748:11
770:13,14 812:19

**women** 748:4,5,10 785:19,
23 802:6 803:5 804:20
806:1,6,8

**Women's** 589:7 775:19
777:10 779:12 785:9
786:9,15 787:24 788:1,3,7
803:22 805:10 806:9

**wonderful** 858:18,19

**wondering** 708:3

**word** 603:10 744:2 770:19
815:14,15 821:3,9 853:1,3

**words** 597:24 605:1
606:17 608:3 611:23
620:24 640:6 676:6,9,15,
18,19,21,24 746:10 823:14
827:16 828:20 829:2,19
830:9 847:18 851:3,5

**wore** 778:21 780:3

**work** 581:1 600:1 645:4
698:18 700:9,24 701:4,8,9
702:21 704:16,20,23 705:6
723:10 731:18 737:15
746:8,19 752:5 762:4
785:3,4 788:12 828:5,11
840:12 868:1 874:14
889:21

**worked** 589:17 680:18
700:8,25 704:6,8 721:17
746:12 747:18 756:2,4
774:15,16 786:20 825:16
872:24 889:6

**Workers** 602:3 785:14

**workers'** 706:2

**working** 583:2 696:2
698:10 701:3 704:12
721:15 722:7 729:9,16,17
731:17 732:4 742:6 747:25
752:4 775:19 779:12
785:6,7 786:15,18 787:1
788:17 824:4 839:9,15,16
840:18 872:16 893:4
894:13

**workplace** 785:25 873:16
882:8

**works** 586:3 718:24
723:17 727:24 894:3

**World** 891:16

**worried** 802:18,20 831:13

**worries** 574:7

**worth** 757:14

**Wow** 860:11

**wrap** 858:8

**write** 835:4,7

**writing** 581:23 894:8

**writings** 768:7

**written** 807:6 879:21

**wrong** 588:10 599:4
614:19 617:3 635:8 643:3
647:24 651:3 654:8 673:21
735:8 747:13 799:3 804:17
831:9 862:24 894:9

**wrote** 620:2,3,4 622:16
642:16,18 697:25 698:11

828:20 831:15 834:24
835:2 837:23 845:1 852:19
854:1 855:12

---

**Y**

**y'all** 574:6,18 579:1,18
580:12,20,23 582:20 585:2
587:2 588:21 593:1 630:22
634:6 636:14 638:5 648:24
708:5 709:21 817:25 847:9
848:10,24 849:22 850:10,
12 865:8 867:10 886:22
887:12,24 889:24,25
890:10 893:9,19 895:2

**y'alls** 889:15

**year** 622:10,11 677:25
683:15,19 686:1 724:16
726:6 742:6 757:9,10
787:8 873:21

**yearly** 874:1

**years** 664:7 696:23 704:15
723:2 724:14 747:17
764:11 787:6 822:25 823:7
825:3 863:4 872:25 874:22
879:23

**yellow** 598:8,9

**yesterday** 574:14 585:5,
21 588:7 589:14 590:7,16
592:5 595:5 617:4,5 631:3
642:11 679:4 680:3 695:23
696:8 733:21 748:17
768:20 770:11 772:6
782:22 804:19 806:1
808:18 809:2 814:16
815:7,19 859:4

**Yippee** 622:14

**young** 748:8

**youth** 746:9

---

**Z**

**Zoom** 789:14

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 248 of 642   PageID 11189
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022

1                   UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS
2
                     CASE NO. 3:17-cv-02278-X
3

4

5  -----------------------------------------x

6  CHARLENE CARTER,

7                      Plaintiff,

8  v.

9  SOUTHWEST AIRLINES CO. and
   TRANSPORT WORKERS OF AMERICA,
10 LOCAL 566,

11                     Defendants.

12

13 -----------------------------------------x

14

15

16            TRANSCRIPT OF THE TRIAL

17       BEFORE THE HONORABLE BRANTLEY STARR

18          UNITED STATES DISTRICT JUDGE

19

20             V O L U M E   4

21

22              Dallas, Texas

23              July 8, 2022

24              8:42 a.m.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                    Pages 898..901

```
                                          Page 898
 1  A P P E A R A N C E S :
 2
    FOR THE PLAINTIFFS:
 3
        NATIONAL RIGHT TO WORK FOUNDATION INC.
 4          8001 Braddock Street
            Suite 600
 5          Springfield, Virginia  22160
        BY:  MATTHEW B. GILLIAM, ESQ.
 6          mgb@nrtw.org
 7
 8      PRYOR & BRUCE
            302 North San Jacinto
 9          Rockwall, Texas 75087
        BY:  BOBBY G. PRYOR, ESQ.
10          MATTHEW D. HILL, ESQ.
            bpryor@pryorandbruce.com
11          mhill@pryorandbruce.com
12
13
14
15  FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
16      REED SMITH, LLP
            2850 North Harwood
17          Suite 1500
            Dallas, Texas  75201
18      BY:  PAULO B. McKEEBY, ESQ.
            BRIAN K. MORRIS, ESQ.
19          pmckeeby@reedsmith.com
            bmorris@reedsmith.com
20
21
22
23
24
25
```

```
                                          Page 899
 1  For the Defendant Union 566:
 2
 3      CLOUTMAN & GREENFIELD, PLLC
            3301 Elm Street
 4          Dallas, TX 75226
        BY:  ADAM S. GREENFIELD, ESQ.
 5          EDWARD B. CLOUTMAN, III, ESQ.
            agreenfield@candglegal.com
 6          crawfish11@prodigy.net
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                          Page 900
 1  COURT REPORTER:  MS. KELLI ANN WILLIS, RPR, CRR, CSR
                     United States Court Reporter
 2                   1100 Commerce Street
                     Room 1528
 3                   Dallas, Texas  75242
                     livenotecrr@gmail.com
 4
 5       Proceedings reported by mechanical
 6  stenography and transcript produced by computer.
 7
 8                   * * * *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                          Page 901
 1                 I N D E X
 2
 3    Show Cause Hearing ..................... 910
 4
 5            W I T N E S S E S
 6
 7  EDWARD SCHNEIDER
 8    Cont. Direct Examination by Mr. Pryor .....  922
 9    Cross-Examination by Mr. Greenfield ....... 1133
10
11  SONYA LACORE
12    Direct Examination by Mr. Pryor ........... 1167
13    Cross-Examination by Mr. McKeeby .......... 1170
14    Cross-Examination by Mr. Greenfield ....... 1173
15
16  CHARLENE CARTER
17    Direct Examination by Mr. Pryor ........... 1175
18
19
20
21
22
23
24
25
```

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 250 of 642   PageID 11191
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Pages 902..905

Page 902

1
2              E X H I B I T S
3
4     Trial Exhibit 21-E .................  977
5     Trial Exhibit 13  .................  996
6     Trial Exhibit 74 .................. 1051
7     Trial Exhibit 89 .................. 1073
8     Trial Exhibit 90 .................. 1085
9     Trial Exhibit 92 .................. 1095
10    Trial Exhibit 98 .................. 1100
11    Trial Exhibit 111 ................. 1113
12    Trial Exhibit 115 ................. 1118
13    Trial Exhibit 64 .................. 1125
14    Trial Exhibit 107 ................. 1126
15    Trial Exhibit 138 ................. 1170
16
17
18
19
20
21
22
23
24
25

Page 903

1         -- P R O C E E D I N G S --
2                   -o-
3         THE COURT SECURITY OFFICER:  All rise.
4         THE COURT:  Thank you, you can be seated.
5    Okay.  So we are on day --
6    (Discussion off the record.)
7         THE COURT:  Okay.  We are on the record
8 for Day 4.  Let's knock out appearances right quick.
9    For Carter, Mr. Gilliam.
10        MR. GILLIAM:  Matthew Gilliam for
11 Plaintiff Charlene Carter, along with Matt Hill, and
12 Bobby Pryor will be returning shortly.
13        THE COURT:  Understood.
14        Okay.  And for Southwest.
15        MR. McKEEBY:  Paulo McKeeby with Brian
16 Morris.
17        THE COURT:  Okay.  Thank you.
18        And then how about for the Union.
19        MR. GREENFIELD:  Adam Greenfield and
20 Edward Cloutman III, and Mr. Mike Masoni just walked
21 in.
22        THE COURT:  Very good.  Thank you.
23        And full disclosure, I walked in at the
24 same time as Mr. Greenfield, asked him how his son
25 was doing, got an update.  We didn't talk about

Page 904

1 anything else.
2         If anyone wants to voir dire me, I'm happy
3 to sit for questions.  I will go swear myself in and
4 sit over there.
5         But any time I say more than two or three
6 words to y'all, I will self-disclose and tell
7 everyone anything that happened.  Fair enough?
8         Okay.  So the first item of business is
9 Brett Nevarez.  I understand we don't have him here
10 but we have a phone number.  I don't know if anyone
11 knows his temperature on willingness to sit for a
12 depo or testify remotely for trial.
13         Does anyone know anything about Nevarez
14 other than we have a phone number?
15        MR. GREENFIELD:  I spoke with him.
16        I don't know is the answer to the question
17 after speaking with him.
18        THE COURT:  Sure.  Understood.
19        What I thought I would do is tell him,
20 Look, I had a show cause hearing for you.  I
21 understand you are not here.  I have had multiple
22 court orders for you to sit for a depo.
23        I can compel you to sit for a depo.  I
24 can't be the one to compel you to travel here, but I
25 will drop everything if you want to do the depo or

Page 905

1 testify remotely for trial.
2         What I don't know is, on those options,
3 the trial option could be, Hey, the jury is here at
4 9.  Will you go live at 9 and pause Schneider or
5 will you go right after Schneider?
6         I don't know, of the available trial
7 options, what y'all think.  So can you illuminate my
8 thinking on the trial versus depo, and if trial, is
9 it pausing Schneider, going now, or is it waiting to
10 complete Schneider, or is it another option at some
11 other time?
12        So what are y'all thinking on Nevarez and
13 the choose-your-own adventure?
14        MR. HILL:  So we would like to -- we're
15 sort of being presented with this for the first
16 time.  We would like to discuss it amongst counsel
17 to try and reach a conclusion.
18        MR. PRYOR:  We can discuss it.  But we
19 have talked about our additional time.  We would
20 prefer a deposition of him so we can determine what
21 to use.
22        It would be more efficient for us to have
23 a deposition than have him live at trial, but if
24 live at trial is the only option, I guess we will
25 take that option.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                  Vol 4 July 08, 2022                          Pages 906..909

Page 906

1      THE COURT:  Well, what I can do, so now
2   it's almost like I'm an FBI hostage negotiator, but
3   what I can do is say, Look, if you will sit for a
4   depo tonight, then I will drop the whole thing as a
5   judge.  I won't refer a sanctions motion.
6      MR. PRYOR:  That's very generous of you,
7   your Honor.  Again, he's ignored three subpoenas
8   that we spent a lot of money serving on him.
9      THE COURT:  Yeah.  Well --
10     MR. PRYOR:  But it's a tradeoff.  We'll
11  take it.
12     THE COURT:  I should say, I will drop my
13  attempt to punish him myself.  You know, that's
14  separate and apart from if you seek monetary
15  sanctions from him.
16     MR. PRYOR:  Okay.
17     THE COURT:  But I guess I should choose my
18  words carefully.
19     So I won't throw him in jail for punitive
20  contempt for violating multiple court orders.  Does
21  that make sense?
22     I care more about getting someone's
23  testimony than punishing one.  So if I can get it
24  eventually, that is my goal.
25     Okay.  So how about I give a pause right

Page 907

1   quick, make sure y'all are all comfortable with
2   that.  I'm going to put on the white noise.  You can
3   talk amongst yourselves if that's a preferred course
4   of action I will pitch tonight.  Because I think
5   sooner is better than later with anyone who has
6   shown an inability to comply.
7      (Discussion off the record.)
8      THE COURT:  Okay.  Back on the record.
9      MR. PRYOR:  Your Honor, we really
10  appreciate this opportunity.  We were really
11  dreading the weekend.  So tonight would be awesome
12  for that deposition.
13     THE COURT:  Okay.  So I will pitch
14  tonight.  Is there a start time that you are going
15  to propose?
16     MR. HILL:  8:00 Central.
17     THE COURT:  8 p.m. Central.  Okay.  That
18  is 7 p.m. his time?
19     MR. HILL:  Yes.
20     MR. McKEEBY:  Is there a limitation?
21     THE COURT:  So I have limited it to an
22  hour and a half.  So I would keep that limit.
23     MR. GREENFIELD:  Your Honor, being
24  hopeful, if we are able to set this deposition for
25  tonight, can we extend the briefing deadline that's

Page 908

1   due at 9 p.m?  Because I was really going to need
2   time this evening to complete that.
3      THE COURT:  Yes.  So that's for the
4   question on protected conduct, question of law, if
5   so or if not, how do you --
6      MR. GREENFIELD:  Yes, your Honor.
7      THE COURT:  Yes.  So how about we push
8   that 24 hours?
9      MR. GREENFIELD:  That would be wonderful.
10  Thank you.
11     THE COURT:  Got it.
12     Okay.  So any other thoughts before we
13  call Mr. Nevarez?  So we are not seeking his live
14  testimony, we are seeking for him to sit for an hour
15  and a half depo at 8 p.m. Central, 7 p.m. New Mexico
16  time tonight.
17     Mr. Frye, can we try to dial up
18  Mr. Nevarez?
19     I will tell you while we are dialing him
20  up, sometimes he can hear me better than we all can
21  hear him.  If that happens, our break glass in case
22  of emergency is I'm going to say, We're going to
23  call you back from a different line.
24     Then I will ask one lawyer from each side
25  to come with me into my conference room where it is

Page 909

1   just a normal speakerphone on the conference table.
2   Does that make sense?
3      So if we have trouble hearing him and
4   can't really communicate effectively, then I will
5   just say we are calling him back, and y'all think
6   who you want to send.
7      Hello.  Is this Mr. Nevarez?
8      MR. NEVAREZ:  Yes.
9      THE COURT:  Okay.  Very good.  Sorry,
10  Mr. Nevarez.  This is Judge Brantley Starr in
11  Dallas, Texas.  We have you on speakerphone in a
12  courtroom, and so sometimes that can be difficult
13  for you to hear us or us to hear you.  I just want
14  make sure that you can hear us all right.
15     MR. NEVAREZ:  Very well.
16     You are going to turn up volume on the
17  speakerphone?
18     THE COURT:  Okay.  What we are going to
19  do, we are going to call you from a different line.
20  So give us two minutes, and then we will call you
21  from a different phone line.
22     THE WITNESS:  Okay.
23     THE COURT:  Thank you, sir.
24     Okay.  That is our cue.  Whoever the
25  designee is, come on back with me.

Page 910

1       (Recess.)
2       (In chambers.)
3         S H O W   C A U S E   H E A R I N G
4       THE COURT:  Hello.
5       Mr. Nevarez, it is Brantley Starr again.
6       MR. NEVAREZ:  Oh, yeah.
7       THE COURT:  Is that better?
8       MR. NEVAREZ:  It is very clear.  Now I can
9  hear you.
10       THE COURT:  Very good.
11       So we are my conference I have a lawyer
12  for each of the parties and in this lawsuit with me
13  so everyone is listening in to it and we are on the
14  record.  We record everything we do in our court
15  proceedings.
16       So, Mr. Nevarez, as you probably know by
17  now, I set a show cause hearing for your failure to
18  comply with my orders to sit for a deposition.
19       I need to ask you, have you got a copy of
20  that order I entered yesterday saying that we need
21  to visit today at 8:30?
22       MR. NEVAREZ:  Yes.
23       THE COURT:  Okay.  What I am going to tell
24  you is I have the power to ask a judge in New Mexico
25  to send the marshals out to get you in handcuffs to

Page 911

1  sit for a deposition, but I don't like using that.
2       MR. NEVAREZ:  Right.
3       THE COURT:  My goal get you to talk at a
4  deposition so that we can use that for a trial.
5       Does that make sense?
6       So while I have the power to do that or
7  the power to seek punitive contempt to sit you in
8  jail some period of time for your failure to follow
9  court orders, I'm more concerned with just hearing
10  what you have to say at a deposition.
11       MR. NEVAREZ:  Okay.
12       THE COURT:  My request is this.  I will
13  not seek any punitive contempt, any jail time; I
14  will not seek the marshals come out and get you, if
15  you can commit to me that you will sit for a video
16  deposition tonight at 7:00, your time, that is
17  limited to an hour and a half.
18       Would you be amenable to that?
19       MR. NEVAREZ:  Yes.  Reluctantly.
20       THE COURT:  Understood.  And I don't think
21  anyone has ever wanted to sit for a deposition in
22  their life.  So I get your reluctance, generally.
23  I'm sure you have specific as well.
24       What I will do, then, is I will hold off
25  on referring this matter to judge in Las Cruces, so

Page 912

1  the marshals don't come out after you.
2       What I want to do is to say that I'm going
3  to ask the lawyers, before we start on trial this
4  morning, get the jury in here, if they could send
5  you an email with instructions for how to log on
6  tonight at 7:00, your time; 8:00, our time, to sit
7  for a video deposition.
8       You will just need to make sure you have a
9  web cam and a microphone.  And then the flat form
10  they there use Zoom or some other platform, any
11  exhibits that they need to put in front of you will
12  be visible on that platform.  So you don't need
13  anything other than a computer with a webcam and
14  microphone.
15       Does that make sense?
16       MR. NEVAREZ:  Yes.
17       THE COURT:  Any other questions that the
18  lawyers have that they want to ask me?
19       MR. PRYOR:  We need the email address.
20       THE COURT:  Mr. Nevarez, what email
21  address can you give us?
22       MR. NEVAREZ:  Nevinc@msn.com.
23       Nancy, Edward, Victor, I-N-C@msn.com.
24       MR. PRYOR:  It looks like the judge got
25  it.  I couldn't understand it.

Page 913

1       THE COURT:  Nevinc@msn.com?
2       MR. NEVAREZ:  Correct.
3       THE COURT:  Very good.
4       Other questions?
5       MR. PRYOR:  Your phone number?
6       MR. NEVAREZ:  (575)496-6784.
7       MR. PRYOR:  Sir, you do have a computer
8  with a webcam?
9       MR. NEVAREZ:  Yes.
10       MR. PRYOR:  Thank you.
11       THE COURT:  All right.
12       Any other questions?
13       Okay.  So I will stand down.
14       MR. NEVAREZ:  Are you asking me or the
15  lawyers?
16       THE COURT:  That is a great question, Mr.
17  Nevarez.
18       So I was asking the lawyers here.
19       Mr. Nevarez, do you have any other
20  questions?
21       MR. NEVAREZ:  Yes.  I want to know why I
22  wasn't deposed when I was in office.  This has been
23  going five years.  They have had opportunity in
24  2017, 2018, and discovery has been closed.
25       I don't understand why depositions are

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 253 of 642   PageID 11194
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 914..917

Page 914

1 required.
2       THE COURT:  Well, I understand that.
3       MR. NEVAREZ:  This is toward the end of
4 it.
5       THE COURT:  I understand that.  I have
6 looked another enough to limit your depo.  I would
7 normally depositions are allowed to go six hours.
8       Because of the circumstances you have just
9 said, I'm saying that this maxes out at an hour and
10 a half, does that make sense.
11      MR. NEVAREZ:  Ninety minutes.
12      THE COURT:  Yes.  That's correct.
13      MR. NEVAREZ:  Okay.  And why is it allowed
14 during the trial when they have had discovery for
15 five years?
16      THE COURT:  The jury has a fact-finding
17 duty and they would like to hear from you because
18 your name has come up a lot during this trial.
19      MR. NEVAREZ:  This was the jury's idea,
20 not --
21      THE COURT:  So my job is to listen for the
22 jury, right?  I'm not slanted for one party or
23 another.  But the jury is entitled to hear the
24 evidence.  There are several depositions.  You are
25 not the only one, Mr. Nevarez.  There are several

Page 915

1 depositions of short duration that I have allowed in
2 the runup to trial.
3       This is not the only trial I have done.  I
4 have it done it probably, half the trials I have
5 had, at the late-breaking stage, everyone realizes
6 there is testimony that the jury should probably
7 hear from.  So it is unfortunately a common
8 occurrence.
9       And you are not the only one in this trial
10 it is happening, but I am limiting it to one fourth
11 of the time normally allowed.
12      MR. PRYOR:  Can I make an additional
13 comment given the questions?
14      THE COURT:  You may.
15      MR. PRYOR:  Mr. Nevarez, this is Bobby
16 Pryor, I'm counsel for Ms. Carter.
17      The judge has told you, it is a 90-minute
18 deposition.  And then judge will of course correct
19 me it I'm wrong, just so you understand, that means
20 90 minutes on the record, that doesn't include
21 breaks.
22      No. 2, it doesn't include if you are
23 stalling or trying to delay and run out the clock on
24 a deposition.
25      Otherwise certainly that limitation

Page 916

1 applies, and we will follow it.
2       THE COURT:  That's correct.
3       So if you sit there and think for 27
4 minutes about an answer, then that 27 minutes
5 doesn't really count.  If you think for 10 seconds,
6 then we will keep the clock on 10 seconds.
7       Any other questions?
8       MR. NEVAREZ:  No.
9       THE COURT:  All right.  Thank you, Mr.
10 Nevarez.  I know this isn't pleasant or easy.  I
11 appreciate your willingness to help out.  I will
12 stand down for now on the assurances that you will
13 be at 7 p.m. on the platform of they send you over
14 email in the next few minutes.
15      So that concludes the show cause hearing.
16      And I will just see what happens from
17 tonight's deposition.
18      Thank you everyone.
19      Court is in recess.
20      (Recess.)
21      THE COURT SECURITY OFFICER:  All rise.
22      THE COURT:  Okay.  Anything before we get
23 the jury?
24      MR. McKEEBY:  I do have one thing I would
25 like to raise, your Honor.

Page 917

1       THE COURT:  Go for it.
2       MR. McKEEBY:  I would like to re-urge the
3 objection that I've been making with regard to
4 questions that contemplate witnesses asking whether
5 something is protected union activity.  I have been
6 objecting on the basis of it being a legal
7 conclusion and I think that is an accurate and fair
8 objection, but I also think it's a problem of
9 vagueness as well in the sense that --
10      THE COURT:  I'm right there with you.
11      So I think that if someone has dealt with
12 it, it is not a valid legal conclusion objection,
13 but do we know what we mean by protected activity?
14      So I will ask you -- when you split it
15 apart later on, religion, union speech, I think that
16 helped clarify.
17      Are we talking about the same thing?
18      MR. McKEEBY:  Not exactly, I don't think.
19 I think it should be more than that.  When you say
20 "union-protected activity," does that mean protected
21 activity under the Railway Labor Act, protected
22 activity under some other law, protected activity
23 under Southwest policies, or protected because it
24 is, you know -- and, in fact, it is not always
25 union-protected activity, sometimes it's

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 254 of 642  PageID 11195
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                    Pages 918..921

Page 918

1 union-related activity.
2        Does that mean it's related because of the
3 law, does that mean it's related because
4 conceptually or factually there is some connection
5 with the conduct or the message and the union?
6        The problem is that the witnesses don't
7 understand because the question is not clear, in
8 addition to calling for a legal conclusion, and it
9 is extremely prejudicial because it is going to
10 track language presumably in the -- in the charge.
11       And I think that that is something we need
12 to raise or we can discuss on Monday.
13       But the charge needs to be super clear.
14 Hey, I'm telling you what is protected activity, not
15 the witnesses.  And we can discuss that on Monday.
16       But the problem with these witnesses is
17 they don't know what they are answering because the
18 question is ambiguous and it needs more context.
19       Because I can tell you, if the witnesses
20 are asked, Is that protected conduct under the
21 Railway Labor Act, they are going to say, I don't
22 know what you are talking about.
23       And that is what the question is designed
24 to evoke, I think.  So I think the question is
25 ambiguous, vague, in addition to calling for a legal

Page 919

1 conclusion, and that is -- I wanted to re-urge that
2 this morning.
3        THE COURT:  So I get your point.
4        I wouldn't make him go so granular as to
5 start saying "protected union activity under the
6 Railway Labor Act," right?  At some point it is so
7 granular that we will spend all our time clarifying.
8        I would appreciate if you could get their
9 definition, what's their understanding of what's
10 protected, or if they don't have one, like Schneider
11 didn't at first, then you go and start breaking it
12 up, right?  Was this religious?  Was this union?
13       And I know you will still have an
14 objection of that being too vague, but I think at
15 some point, if they haven't given you a definition
16 of protected, then you need to define it in some way
17 for them and then ask him if it is that.
18       Does that make sense?
19       MR. PRYOR:  I hear what you are saying,
20 your Honor.
21       This is the decision-maker.  This is the
22 person that should have known these things, taken
23 them into account.
24       And they can redirect and try and
25 rehabilitate; but for me to have to tell him what it

Page 920

1 is, he should already know.  And I should be able to
2 ask it in any variety of manner.
3        And to define for him under RLA what he
4 should already know, no, I object to having to do
5 that.
6        THE COURT:  So I think you have already
7 granulated it in religion and union with him, and
8 you actually got traction.
9        So, I mean, if he asks a question of
10 another witness that is the broad protected activity
11 and we don't have a foundation, raise the objection
12 and I will rule on it then, and we will do the
13 choose your own adventure.
14       So I take your point and I think your
15 point is valid.  We will see it come up with future
16 witnesses and figure out what we do with it then.
17       MR. PRYOR:  Thank you, your Honor.
18       THE COURT:  All right.  And exhibits, I
19 know what I'm going to do on all the exhibit
20 objections, but if you want a sidebar when you are
21 raising your objection, just ask for one.  Otherwise
22 I will rule on it here and we won't have a sidebar.
23 All right.
24       THE COURT SECURITY OFFICER:  All rise for
25 the jury.

Page 921

1        (The jurors entered the courtroom.)
2        THE COURT:  Thank you.  You can be seated.
3 Okay.  We can bring Mr. Schneider back in.
4        MR. PRYOR:  Your Honor, I feel my time
5 ticking away.
6        THE COURT:  He's walking quickly.  You're
7 good.
8        Welcome back, Mr. Schneider.  You can come
9 on and approach that witness box.
10       (The witness entered the courtroom.)
11       THE COURT:  We already gave you the oath
12 yesterday.  I don't need to give it to you again
13 today.  I did ask you yesterday if you would give me
14 the courtesy of not talking to anyone about the
15 case.
16       THE WITNESS:  You did.
17       THE COURT:  So can you tell me, did you
18 talk to anyone about the case?
19       THE WITNESS:  I did not.
20       THE COURT:  Okay.  Thank you for
21 complying.
22       And Mr. Pryor, you can continue your
23 questions.  I will just remind y'all, keep some
24 space between questions and answers, answers and
25 questions.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 4 July 08, 2022                  Pages 922..925

Page 922

1       DIRECT EXAMINATION - CONTINUED
2 BY MR. PRYOR:
3 Q.  Mr. Schneider, who did you talk to about your
4 testimony yesterday?
5 A.  Nobody.
6 Q.  What does that RLA mean to you?
7 A.  Railway Labor Act.
8 Q.  What does that mean in terms of how you did
9 your job in regard to the investigation of the
10 claims against Ms. Carter?
11 A.  To do a full investigation and give the --
12 Q.  I'm going to apologize to you, and I'm going to
13 correct this, hopefully in the next hour.
14     I don't have my hearing aids on.  I noticed it
15 this morning whenever the judge first started
16 speaking.  So you are going to have talk into that
17 microphone for me.
18     THE COURT:  Can you repeat that question?
19     MR. PRYOR:  Yes.
20 BY MR. PRYOR:
21 Q.  I've forgotten the question, so I may have to
22 ask a different one.  But if you will just speak
23 into the microphone, I will appreciate it.
24 A.  Okay.
25 Q.  So what does "Railway Labor Act" mean to you in

Page 923

1 connection with your investigation of claims against
2 Ms. Carter?  Into the microphone.
3     MR. McKEEBY:  Objection.
4     THE COURT:  I will allow it.
5     THE WITNESS:  I don't know an answer for
6 that question.  I don't know what you mean.
7 BY MR. PRYOR:
8 Q.  You'll have to say it a little bit louder for
9 me.
10 A.  I don't know what you mean.
11 Q.  Okay.  Well, I asked you what RLA meant, and
12 you told me Railway Labor Act.
13     Maybe I should -- let me ask a foundational
14 question.
15     Did anything about your understanding of RLA
16 come into play in regard to your investigation of
17 the claims against Ms. Carter?
18 A.  What I know about the RLA is that airlines and
19 transportation fall under that guidance, I guess, to
20 some extent, and we are held to that.
21     But beyond that, I don't know it thoroughly
22 enough to be able to answer that question.
23 Q.  Therefore, given that that is your
24 understanding of the RLA, it didn't come into play
25 at all in regard to your investigation of

Page 924

1 Ms. Carter, true?
2 A.  Not specifically.
3 Q.  Well, how generally, then, sir?
4 A.  Only, like I said, that we are held -- that's
5 what an overseeing entity -- it's over the airlines
6 and transportation in general.  And we abide by some
7 of those guidelines on there.  Specifically how they
8 pertain to this case is what I'm saying I can't
9 answer that exactly.
10 Q.  Okay.  Great.
11     Tell us the guidelines that came into play in
12 your investigation of Ms. Carter.
13 A.  That we give Ms. Carter due process and I
14 conduct a thorough investigation into the
15 allegations.
16 Q.  Anything else?
17 A.  No.
18 Q.  Anything about, if she's engaged in union
19 activity, that it's protected?
20 A.  I don't know anything about union protected.
21 Q.  You don't know anything about protected union
22 activity under the RLA; that's not part of what you
23 understand of the RLA?
24 A.  I'm just saying that I don't know what that
25 means as far as protected speech or activity.

Page 925

1 Q.  All right.  I get it.  You don't know what
2 protected speech is or what protected union activity
3 is, true?
4     MR. McKEEBY:  Objection, asked and
5 answered.
6     THE COURT:  I will allow it this last
7 time.
8     THE WITNESS:  I don't know.
9 BY MR. PRYOR:
10 Q.  You don't know if you don't know, or you don't
11 know what protected speech, protected union activity
12 is?
13 A.  I don't know what protected speech, protected
14 union activity would be.  I'm for the company, and
15 as far as the Union goes, that's under their realm.
16 Q.  Okay.  Did you seek any advice of counsel or
17 anyone in regard to that issue before terminating
18 Ms. Carter?
19 A.  What issue are you talking about specifically?
20 Q.  The issue of whether or not there were
21 protections she was entitled to under the RLA that
22 you were not providing.
23     MR. McKEEBY:  Objection, calls for
24 attorney-client privilege.
25     THE COURT:  No, I don't think this one

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 256 of 642   PageID 11197
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                              Pages 926..929

Page 926

1 does.  He can answer.
2         THE WITNESS:  I do not know that, if it
3 was -- I did not specifically --
4 BY MR. PRYOR:
5 Q.  You don't know what you asked?
6 A.  I did not specifically ask somebody about the
7 Railway Labor Act.
8 Q.  But did you say you didn't specifically ask?
9 Is that what you said?
10 A.  I did not ask anybody about the RLA.
11 Q.  You didn't ask at all.
12        I just want to make sure there wasn't a
13 general --
14        THE COURT:  Separation between questions
15 and answers.  You're talking over each other.
16        MR. PRYOR:  I apologize, your Honor.
17 BY MR. PRYOR:
18 Q.  What does an 18-month look-back mean to you?
19 A.  It means that we can look back in an employee's
20 record for 18 months to see any prior information
21 from that that may pertain to the case.
22 Q.  And do you -- is that the guideline or rule
23 that you follow when looking at complaints?
24 A.  That is one of the requirements, that we can
25 only go back 18 months.

Page 927

1 Q.  Okay.  You know you went back more than 18
2 months in regard to Ms. Carter, though, don't you?
3 A.  How so?
4 Q.  I'm sorry?
5 A.  How so?
6 Q.  You don't know, do you?
7        Did you go back more than 18 months in order to
8 terminate Ms. Carter?
9 A.  I'm not sure what you are asking as far as 18
10 months for what?  Into what area?
11 Q.  Let's try it this way:  Did you look at any
12 information that you relied upon to terminate
13 Ms. Carter that was older than 18 months?  The
14 limit.  You just said it was the requirement.
15 A.  There is information that was given to me that
16 was more than 18 months, but I didn't consider
17 anything more than 18 months.
18 Q.  Are you sure of that?
19 A.  In my decision?
20 Q.  No.  Are you sure that you did not -- yes.
21        Are you sure you did not consider as part of
22 your decision to terminate Ms. Carter information
23 more than 18 months old that you specifically relied
24 upon?
25 A.  I did not rely upon anything more than 18

Page 928

1 months prior to that that was pertinent to the
2 investigation.
3 Q.  Did you rely upon information from her Facebook
4 page to provide a nexus in order to say there was a
5 social media policy violation?
6 A.  Social media?  It possibly could have gone back
7 more than 18 months.  I don't know the -- I don't
8 remember the specific dates.
9 Q.  I thought you said 18 months was -- required
10 that -- you didn't say it was a guideline, you said
11 that was the requirement.  You can't go back more
12 than 18 months.
13        And, in fact, you did try and create a nexus
14 between Ms. Carter's Facebook and Southwest
15 Airlines, true?
16 A.  In my understanding, the 18 months goes to play
17 for any past discipline or anything in the file.
18 Q.  So wait.  So before, I gave you every
19 opportunity to explain it.  You said you can't go
20 back more than 18 months to look at anything, and
21 now you are telling us, No, no, it is limited to
22 discipline.
23        MR. McKEEBY:  Objection, misstates
24 testimony.  Argumentative.
25        MR. PRYOR:  I'm happy to read it.

Page 929

1        THE COURT:  Well, let's do that.
2        Do you want to go back?
3        MR. PRYOR:  I'm sorry?
4        THE COURT:  You offered to read it.  I
5 think there is a question on whether you are
6 accurately stating.
7        MR. PRYOR:  It was two questions ago,
8 maybe three.
9 BY MR. PRYOR:
10 Q.  Sir, what is the 18-month requirement?
11 A.  We can't consider anything in their file more
12 than 18 months.
13 Q.  Anything in their file.  That wouldn't include
14 the Facebook posts that you gathered and put into
15 her file?
16 A.  No.
17 Q.  So you can go back forever?
18 A.  In certain -- when we are looking at Facebook
19 and we are looking at nexus to the workplace, it is
20 not the same thing.
21 Q.  You were the person that decided to terminate
22 Charlene Carter, according to Southwest Airlines.
23 A.  Yes.
24 Q.  Southwest Airlines gave you that
25 responsibility?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                                    Pages 930..933

Page 930

1  A.  Is that a question?
2  Q.  Did anyone at Southwest Airlines tell you that
3  if it involves union activity that is not on the job
4  and it is not illegal, that you shouldn't take
5  action against them?
6  A.  No.
7  Q.  As you sit here today, has anyone ever told you
8  that?
9  A.  They have told me that I cannot consider
10  anything in their file past 18 months.
11  Q.  I'm not asking about the 18 months now, sir,
12  but thank you for volunteering that.
13      So you were told that you shouldn't have gone
14  back more than 18 months in the Facebook page, true?
15  A.  No.
16  Q.  Well, what did you just mean when you said
17  you -- since she was terminated, you've been told
18  you can't go back more than 18 months?
19  A.  On anything in the file, the employee's file.
20  Q.  That is what you already told us.
21      So why would they be telling that again after
22  Ms. Carter was terminated?
23  A.  I don't know what you mean on that.
24  Q.  Who is "they," by the way?
25  A.  That's the company and Southwest Airlines.

Page 931

1  Q.  Could you put a name on it for us?
2  A.  Well, labor relations oversees that.
3  Q.  So that is not really a name either.  When I
4  mean a name, I mean a human being.
5  A.  In this particular case, I talked to Maureen
6  Emlet.
7  Q.  Ms. Emlet.
8      Who else?
9  A.  About this issue or in general?
10  Q.  About this issue.  This issue after you
11  terminated Ms. Carter to tell you that -- did anyone
12  tell you that if it is union activity and it is not
13  on the job, that you shouldn't be taking action
14  unless the activity is illegal?
15  A.  No one told me that.
16  Q.  But Ms. Emlet told you what about the 18
17  months?
18  A.  No.  You asked me who I referred to, and I said
19  labor relations, and specifically Maureen Emlet.
20  Q.  When I asked you if you'd spoken to someone
21  after Ms. Carter was terminated about this issue,
22  and you said yes, someone has spoken to you about
23  this union activity issue, did I misunderstand?
24      MR. McKEEBY:  Objection, vague.
25      THE COURT:  I will allow it.

Page 932

1      THE WITNESS:  I didn't speak to anybody
2  after the termination.
3  BY MR. PRYOR:
4  Q.  Was Ms. Carter on the job when she sent her
5  communications to Ms. Stone?
6  A.  She was an active flight attendant for
7  Southwest Airlines.
8  Q.  Did you understand my question?
9  A.  No.
10  Q.  Okay.  Do you promise not to be evasive today?
11  A.  I'm sorry?  I didn't think I was being evasive.
12  Q.  Did Ms. Carter -- we've got Southwest Airlines
13  employees here today.  If one of them is sitting in
14  the -- if they are off work today sitting in the
15  gallery, are they on the job?
16  A.  No.
17  Q.  Okay.  Then I will ask you again, was
18  Ms. Carter on the job when she sent the
19  communications that she sent to Ms. Stone?
20  A.  I'm not aware of where she was when she sent
21  those.
22  Q.  It didn't matter to you, did it?
23  A.  No.  It didn't.
24  Q.  Okay.  So you are not even aware if she was on
25  the job or not?

Page 933

1      MR. McKEEBY:  Objection, asked and
2  answered.
3      THE COURT:  Sustained.
4      MR. PRYOR:  Make sure, given his previous
5  answer.
6      MR. McKEEBY:  Objection, asked and
7  answered.
8      THE COURT:  Sustained.
9      The first one is clear.
10      MR. PRYOR:  Okay.
11  BY MR. PRYOR:
12  Q.  So you knew that she either was on the job or
13  wasn't and didn't ask, is that fair?
14      MR. McKEEBY:  Objection, asked and
15  answered.
16      THE COURT:  Sustained.
17      MR. PRYOR:  I can't summarize his
18  testimony?
19      THE COURT:  Not on something as discrete
20  as that when the answer is clear.  Save that for
21  closing argument.
22      MR. PRYOR:  Okay.
23  BY MR. PRYOR:
24  Q.  Do you know if Ms. Stone was on the job at the
25  time that she received the communication?

Page 934

1 A.  From what I recall with her discussion, yes.
2 Q.  What makes you think she was on the job at the
3 time she received it?
4 A.  There was a statement made that she received it
5 as she walked down the jetway to the aircraft and it
6 affected her.
7 Q.  Do you know what she was actually doing?
8 A.  No, sir.
9 Q.  So you don't know that she was on the job, do
10 you?
11 A.  Not specifically.  I know that she was going to
12 the aircraft.
13 Q.  She was actually traveling on union business,
14 but you don't know that, do you?
15 A.  No, I do not.
16 Q.  So you don't know if she was on the job or not,
17 true?
18 A.  No.
19 Q.  True?  That would take a yes if it's true.
20 A.  Yes, that is true.
21 Q.  Okay.  If an employee -- I'm going to give you
22 a hypothetical, okay?
23    If at any time you are misunderstanding what
24 I'm saying, feel free to raise your hand.
25 A.  Okay.

Page 935

1 Q.  An employee of Southwest Airlines emails you
2 and tells you, Hey, you know what, I want to use the
3 social media policy to target two people that might
4 be opponents of the upcoming elections for the
5 union, and I want to support the current union
6 membership, and I want to use the social media
7 policy to get them fired.
8    Okay.  You got the example so far?
9 A.  Vaguely, yes.
10 Q.  Okay.
11    You are sitting at your computer, you open up
12 that email.  What do you do?
13    MR. McKEEBY:  Objection, vague.  What
14 email?
15    THE COURT:  I will allow it.
16    THE WITNESS:  The email was sent to me, is
17 that what you are saying?
18 BY MR. PRYOR:
19 Q.  That was the hypothetical, sir.  That was the
20 whole point.  I even said you opened it up sitting
21 at your desk.  You didn't understand that?
22 A.  Okay.  So I would possibly reach out to them
23 and have a discussion about what their intent was.
24 Q.  So you would possibly reach out.  So you might
25 not even do that.

Page 936

1 A.  I would have to get details, or if it was more
2 information in the email.
3 Q.  So if you got more details that verified
4 exactly what I just told you, that this employee is
5 wanting to target for assassination, termination,
6 two other employees using the social media policy,
7 all you would do is possibly reach out, true?
8    MR. McKEEBY:  Objection, vague and --
9 vague.
10    THE COURT:  I will allow it.
11    THE WITNESS:  I'm not sure what you mean
12 when you say "assassination or termination."  Is it
13 both or --
14 BY MR. PRYOR:
15 Q.  You don't know what -- target for assassination
16 in this context means get them fired.
17 A.  I'm sorry.  I didn't understand that.
18 Q.  You what?
19 A.  I didn't understand that.
20 Q.  Okay.  I have now told you.
21    So you still, knowing all of that, would only
22 possibly reach out to the employee, true?
23 A.  If that were the case specifically, I would
24 reach out to the employee, yes, and possibly
25 employee relations.

Page 937

1 Q.  I'm having a little trouble with the word
2 "possibly."
3    So you've got an employee that threatens to
4 target for assassination, which I will agree means
5 terminate another employee, for invalid grounds
6 using social media policy, and you would only
7 possibly report it to employee relations?
8    MR. McKEEBY:  Objection, calls for
9 speculation.
10    And moreover, if it means termination,
11 let's use the word "termination" instead of
12 "assassination."
13    THE COURT:  I will allow the question.
14    THE WITNESS:  It would depend on the
15 information I find out.  That's why I said possibly.
16 I would talk to the person first, find out
17 specifically.  Emails can be misread.
18 BY MR. PRYOR:
19 Q.  Sure.
20 A.  So I would find out details.  And that's why I
21 mean possibly reach out to employee relations.
22 Q.  Let me tell you that the employee, when you
23 call him or her, verifies 100 percent that, yes, I'm
24 going to try and use social media policy to fire
25 some people that really there is no basis for firing

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 259 of 642   PageID 11200
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                          Pages 938..941

Page 938

1 them.  And they tell you that.  They verify what is
2 in the email.
3      Now what do you do?
4 A.  I would have a discussion with them and try to
5 dissuade them from doing so, and let them know the
6 ramifications of doing something like that.
7 Q.  But that's all you would do, right?  You
8 wouldn't report a target assassination threat like
9 that to employee relations, right?
10      MR. McKEEBY:  Objection,
11 mischaracterization.  Also speculation.
12      MR. PRYOR:  I'm entitled to get a little
13 sarcastic with the witness.
14      THE COURT:  I will allow the question.
15      THE WITNESS:  I would if it indicated the
16 need to do so.
17 BY MR. PRYOR:
18 Q.  Okay.  I'm sorry, you would if they didn't back
19 off what they told you, is that what you said?
20 A.  If I didn't come to some reconciliation, yes.
21 Q.  So if you weren't able to talk them out of it,
22 you would report them to employee relations, true?
23 A.  Yes.
24 Q.  By the way, let's assume that you did talk them
25 out of it.  You then would not report it to employee

Page 939

1 relations?
2 A.  Once again, it would depend on the statements
3 they made and what was indicated to me.
4 Q.  I just told you every single statement they
5 made.
6      Now, with those facts, if you called the
7 employee, and the employee says -- finds out you're
8 upset about it and says, Oh, I changed my mind, you
9 would not report that to employee relations, true?
10 A.  I can't say that within 100 percent.  I mean,
11 it would -- it would depend on what was --
12 Q.  Say within 99 percent then.
13      MR. McKEEBY:  Objection --
14      THE WITNESS:  I don't know.
15      THE COURT:  Sustained.
16 BY MR. PRYOR:
17 Q.  98 percent?
18      MR. McKEEBY:  Objection, asked and
19 answered.
20      THE COURT:  Sustained.
21 BY MR. PRYOR:
22 Q.  In February of 2017, at the same time you
23 received Charlene Carter, the complaint regarding
24 Charlene Carter, did anyone make you aware that
25 other members of the Union were reporting other

Page 940

1 members of the Union supporting a recall for
2 violations of the social media policy?
3 A.  I found that out during the investigation.
4 Q.  What did you find out during the investigation
5 about that?
6 A.  There was a statement written, I'm pretty sure
7 it was by Ms. Carter, that there is a vote, and
8 people are voting to oust the Union leadership.
9 Q.  That's all you learned?
10 A.  Yes.
11 Q.  Did you look into that?
12 A.  No.
13 Q.  Did you ever speak to Sonya Lacore about it?
14 A.  No.
15 Q.  Sonya Lacore was notified of Ms. Stone's
16 complaint at the time Ms. Stone made the complaint,
17 true?
18 A.  Say that once again.
19 Q.  Sonya Lacore was notified of the complaint made
20 by Ms. Stone against Ms. Carter at the time it was
21 made in February of 2017?
22      MR. GREENFIELD:  Objection, your Honor,
23 lack of foundation, and because of that it calls for
24 speculation.
25      THE COURT:  Sustained.

Page 941

1      Can you back up?
2 BY MR. PRYOR:
3 Q.  Do you recall the complaint that Ms. Stone
4 filed?
5 A.  Yes.
6 Q.  Do you know who was included on that complaint,
7 among others, Sonya Lacore?
8 A.  I don't recall today.
9 Q.  Well, I'm going to go ahead and let you assume
10 that Sonya Lacore was notified on that complaint.  I
11 will show it to you in a little while, okay?
12      You got what you are assuming?
13 A.  Yes.
14 Q.  And if Ms. Lacore was aware of information that
15 in fact, at this same time she was aware that an
16 employee in the Union supporting Ms. Stone was
17 reporting people, actually the very same day, for
18 violations of social media policy, would you expect
19 her to have told you that?
20      MR. GREENFIELD:  Objection, your Honor,
21 still lack of foundation.  If he would like the
22 witness to assume something, he can --
23      THE COURT:  Hold on.  That is a speaking
24 objection.  You can ask for a sidebar if you need
25 it.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Pages 942..945

Page 942

1        I will overrule that.
2        You can answer.
3        THE WITNESS: I don't know.
4 BY MR. PRYOR:
5 Q.  You wouldn't want to know that, would you?
6 That would be information you wouldn't want as part
7 of your fair and impartial investigation, right?
8 A.  I don't understand the question.
9 Q.  Do you not understand what "fair and impartial"
10 is?  What did you miss?
11 A.  The entire question.
12 Q.  Really.
13     So you would not want to know that, in fact,
14 the Union, with the knowledge of Ms. Stone, who is
15 making the complaint on February 22, 2017, were also
16 bringing social media policy violations against
17 other recall supporters like Ms. Carter, you
18 wouldn't want to know that, would you?
19        MR. McKEEBY:  Objection, vague,
20 foundation.
21        THE COURT:  I will allow it.
22        THE WITNESS:  That was not part of my
23 investigation on the information I received on
24 Ms. Carter.
25

Page 943

1 BY MR. PRYOR:
2 Q.  You wouldn't want to know that, right?  You
3 don't think that's relevant, right?
4 A.  If it was relevant, I would want to know it,
5 yes.
6 Q.  How would you know if it is relevant if
7 somebody doesn't tell you about it?
8 A.  If somebody doesn't tell me about it, then I
9 wouldn't know about it.
10 Q.  Okay.  So let's go back to my question.
11     If Ms. Lacore was aware of that, would you have
12 expected her to have informed you, since she was on
13 the complaint?
14 A.  I would expect Ms. Lacore to take whatever
15 action she deems necessary.  I can't speculate what
16 that would be.
17 Q.  If she deemed necessary to keep it a secret
18 from you, that is okay with you?
19 A.  She would have to make that decision.
20 Q.  Sorry?
21 A.  That would be a decision she would make.  I'm
22 not sure what you mean by that.
23 Q.  Well, I'm just saying, if I was -- wouldn't you
24 want that type of information to evaluate the
25 validity of Ms. Stone's complaints or were you not

Page 944

1 interested in that?
2 A.  I would like any information that relates to
3 the investigation.
4        MR. PRYOR:  Let's look at Exhibit 66.
5        THE COURT:  It is in.  You can publish.
6 BY MR. PRYOR:
7 Q.  It will be on the screen in front of you.
8     If you ever need a hard copy -- I can provide
9 you a hard copy at any time, but I've kind of been
10 pulling things in and out of folders.  If you need
11 it, I think I can get it for you.  It should be on
12 your screen any minute now.
13     Any hour now.
14 A.  It's a blank screen right now.
15     I've got a waterfall.
16 Q.  Patience is not a virtue I own.
17     I'm on the verge of handing you a hard copy.
18        MR. McKEEBY:  Given that that appears to
19 be your reality, what document are we talking about?
20        THE COURT:  66.
21        MR. PRYOR:  There we go.
22 BY MR. PRYOR:
23 Q.  Okay.  Here is Exhibit 66.
24     And you are not on this email, but it was
25 forwarded to you, correct?

Page 945

1 A.  I don't know for sure.  I'm not sure what this
2 is.  I only see the top paragraph.
3 Q.  You don't recognize this, right?  You don't
4 recognize her complaint?
5 A.  I would have to see farther down.  I don't -- I
6 only see the beginning of it.
7 Q.  So you need to see the one that was forwarded
8 to you, right?
9 A.  If I remember right, this looks familiar to the
10 one that was sent to me.
11 Q.  When's the last time you reviewed the
12 complaint?
13 A.  Within the past week.
14 Q.  I'm sorry?
15 A.  Within the past week.
16 Q.  When is the last time you reviewed Audrey
17 Stone's complaint?
18        MR. McKEEBY:  Objection, asked and
19 answered.
20        THE COURT:  I will allow this
21 clarification.
22        THE WITNESS:  For a specific day?  Friday.
23 I mean --
24 BY MR. PRYOR:
25 Q.  This past Friday, true?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 261 of 642   PageID 11202
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 946..949

Page 946

1 A.  Yes.
2 Q.  Okay.  This past Friday you reviewed it, and
3 you can't tell us that you received this document,
4 true?
5 A.  This one wasn't addressed to me.
6 Q.  You didn't look at this?
7 A.  I looked at a version of this that was
8 forwarded to me.
9 Q.  That's the point I'm making, sir.  This
10 document was forwarded to you, true?
11 A.  There it is, the whole thing.  Yes.
12 Q.  Is that a yes?
13 A.  This one was sent to me.
14 Q.  I just need to know if you said yes.
15 A.  Yes, this one was sent to me.
16 Q.  Okay.  So I appreciate you taking five minutes
17 to answer something about a document you looked at
18 on Friday.
19       MR. McKEEBY:  Objection, improper argument
20 of counsel.
21       THE COURT:  Sustained.
22 BY MR. PRYOR:
23 Q.  Now, this is from Audrey Stone, true?
24 A.  Yes.
25 Q.  And it's sent to Suzanne Stephenson?

Page 947

1 A.  Yes.
2 Q.  That's the base manager in Las Vegas?
3 A.  Yes.
4 Q.  And it is also sent to Naomi Hudson, someone
5 with labor relations and management at Southwest
6 Airlines?
7 A.  Yes.
8 Q.  And it was sent to Sonya Lacore, and she was --
9 I'm not sure of her title, but she was high up in
10 in-flight, true?
11 A.  True.
12 Q.  Would Sonya Lacore, would you expect her to be
13 involved in the investigation?
14 A.  Not at her level.  She would be aware of it,
15 but she wouldn't be involved with the investigation.
16 Q.  So you can't think of a reason why Audrey Stone
17 would include Sonya Lacore on here, could you?
18       MR. GREENFIELD:  Objection, your Honor,
19 calls for speculation.
20       THE COURT:  I will allow him to answer, if
21 he has personal knowledge.
22       THE WITNESS:  I don't know why she sent
23 it.
24 BY MR. PRYOR:
25 Q.  Do you have any understanding at all as to why

Page 948

1 someone senior in in-flight would be included on
2 Audrey Stone's complaint sent to her base manager?
3       MR. GREENFIELD:  Objection, asked and
4 answered.  And it's lack of foundation, which calls
5 for speculation.
6       THE COURT:  I will sustain on foundation.
7       MR. PRYOR:  Which was sustained, your
8 Honor?
9       THE COURT:  Foundation.
10 BY MR. PRYOR:
11 Q.  Sir, you received complaints from employees
12 about other employees?
13 A.  Yes.
14 Q.  You understand the process at Southwest
15 Airlines about how that is done?
16 A.  How what is done?
17 Q.  How complaints are handled.
18 A.  Yes.
19 Q.  And you have been there 28 years, and for at
20 least a significant part of that time, you have been
21 handling complaints?
22 A.  Yes.
23 Q.  And I'm asking you, based on your understanding
24 of the process at Southwest Airlines, can you think
25 of a reason why it would be necessary to have Sonya

Page 949

1 Lacore on the complaint?
2       MR. GREENFIELD:  Objection, again, lack of
3 foundation, which calls for speculation.
4       And I would be happy to sidebar to flesh
5 that out, if you need me to.
6       THE COURT:  If you want a sidebar, I will
7 let you.
8       MR. GREENFIELD:  I don't think I do.
9       THE COURT:  So I will overrule on lack of
10 foundation.  I will allow him to answer based on the
11 speculation objection, if he has personal knowledge.
12       THE WITNESS:  I don't have personal
13 knowledge of why it was sent to her.
14 BY MR. PRYOR:
15 Q.  I'm not asking about your personal knowledge,
16 I'm asking about your personal knowledge of the
17 practices and policies of Southwest Airlines.
18       Now, there's your knowledge.  Within that
19 knowledge, can you think of a reason why Sonya
20 Lacore should be on this complaint?
21       MR. McKEEBY:  Objection, asked and
22 answered.
23       THE COURT:  I will allow it.
24       MR. GREENFIELD:  Your Honor, I would renew
25 my foundation objection.  And if -- and it's

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Pages 950..953

Page 950

1 irrelevant for the purposes of --
2        THE COURT:  No speaking objections,
3 though.
4        Sustained on irrelevant.
5        MR. PRYOR:  Your Honor, I object to the
6 continuous objections to try and assist this witness
7 in not answering questions.
8        THE COURT:  I'm overruling the objections.
9        You can answer the question.
10       THE WITNESS:  This was sent by Audrey
11 Stone.
12 BY MR. PRYOR:
13 Q.  Um-hmm.
14 A.  I don't know why she included the people that
15 she did in the email.
16 Q.  That wasn't my question, was it?
17      I understand what you want to answer, sir, but
18 you are under oath to answer the questions I ask
19 you.
20       MR. GREENFIELD:  Objection, argumentative.
21 BY MR. PRYOR:
22 Q.  Would you answer my question?
23       THE COURT:  Sustained.
24       Ask the question.
25

Page 951

1 BY MR. PRYOR:
2 Q.  I did.  Would you answer it?
3 A.  You'll have to repeat that.  I don't know what
4 the question is then.
5 Q.  Let's do it again.  This is another five
6 minutes to get a basic fact from you.
7        MR. GREENFIELD:  Objection, your Honor, to
8 the sidebar --
9        MR. PRYOR:  You've got -- your
10 knowledge --
11       THE COURT:  Sustained.
12       Please ask the question.
13 BY MR. PRYOR:
14 Q.  -- your 28 years of knowledge about Southwest
15 Airlines's process.  Have you got it so far?  Your
16 knowledge.  No one else's, yours.
17 A.  Yes.
18 Q.  Within that knowledge, take that vast knowledge
19 and tell us any explanation you can come up with for
20 why Sonya Lacore has to be on this complaint.
21       MR. GREENFIELD:  Objection, your Honor, to
22 the relevance then.
23       THE COURT:  I will allow it.
24       THE WITNESS:  I don't know why she is on
25 this email.

Page 952

1        MR. PRYOR:  Object, nonresponsive.
2 BY MR. PRYOR:
3 Q.  Once again, sir, did I ask you why Audrey Stone
4 included it on there?
5      What is your education?
6 A.  Generally?
7 Q.  What is your education, sir?
8 A.  I have a bachelor's degree in aviation.
9 Q.  Okay.  I'm just trying to see if you understand
10 the difference between me asking you what Audrey
11 Stone did and what you understand based on your
12 knowledge.
13      Do you see the difference?
14 A.  I don't see the difference.
15 Q.  Okay.  So I'm going to try it again, and don't
16 tell me, I don't know what Audrey Stone was
17 thinking, because I'm not asking you that.
18       MR. GREENFIELD:  Objection.
19       MR. McKEEBY:  Objection.  He's not --
20       THE COURT:  Sustained.
21       Just ask the question.
22       MR. PRYOR:  I'm sorry?
23       THE COURT:  Sustained.
24       Ask the question.
25

Page 953

1 BY MR. PRYOR:
2 Q.  You got your 28 years of experience, and you've
3 handled complaints during a lot of that 28 years.
4      And tell me, based on your knowledge and
5 understanding and belief about Southwest's policies,
6 a reason you could come up with, when you saw this,
7 on why Sonya Lacore should be on this complaint?
8 A.  I don't know the answer to that question.
9 Q.  You can't think of a reason, can you?
10       MR. McKEEBY:  Objection, asked and
11 answered.
12       MR. PRYOR:  I'm exploring his answer.
13       THE COURT:  I will allow this one.
14       THE WITNESS:  Can you repeat the question?
15 BY MR. PRYOR:
16 Q.  You can't think of a reason, can you?
17 A.  Sonya Lacore is the vice president of in-flight
18 who oversees all employees and flight attendants of
19 Southwest Airlines.  So I don't even know why she
20 would be included on that specifically because there
21 is more people below her in the chain of command.
22 Q.  Okay.
23 A.  So.
24 Q.  I appreciate you finally getting to the answer.
25 You can't think of a reason.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 263 of 642   PageID 11204
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 4 July 08, 2022                      Pages 954..957

Page 954

1   But how about the fact that Audrey Stone was
2 aware that Sonya Lacore had been talking with people
3 at the Union about targeting people for social media
4 violations?  Would that be a reason?
5        MR. McKEEBY:  Objection, foundation.
6        THE COURT:  Sustained.
7 BY MR. PRYOR:
8 Q.  Let's look at:  "Dear Suzanne.  Below you will
9 see Facebook messages that were sent to me last week
10 by Southwest Airlines flight attendant Charlene
11 Carter.  It is in regards to a TWU Local 556 Women's
12 Committee Meeting that I participated in last month
13 and a march that I voluntarily participated in a few
14 days later."
15      Did I read that correctly for you?
16 A.  Yes.
17 Q.  You know that the complaint involves Charlene
18 Carter complaining to her union, right off the bat,
19 true?
20 A.  Yes.
21 Q.  Okay.  So it didn't take days of investigation,
22 you knew in the second sentence of the complaint
23 that this involved union activity, right?
24      That's okay, you already told us.  You can say
25 it again.

Page 955

1 A.  It says that it involves -- regards TWU Local
2 556.
3 Q.  Sir, you just told us you knew it involved
4 union activity.  All I have added now is you knew
5 right away because it is in the second sentence.
6 Are you changing your answer?
7        MR. McKEEBY:  Objection.  He's not
8 changing his answer.
9        THE COURT:  Sustained.
10        MR. PRYOR:  Your Honor, I did not hear the
11 objection.  I heard "sustained," but I didn't hear
12 the objection.
13        MR. McKEEBY:  Let me make a formal
14 objection.
15        Objection, mischaracterizes testimony,
16 argumentative.
17        THE COURT:  I will sustain that.
18 BY MR. PRYOR:
19 Q.  Did you know when you read the second sentence
20 of this complaint that it involved Charlene Carter
21 engaging in union activity?
22        MR. McKEEBY:  Objection, asked and
23 answered.
24        THE COURT:  I will allow this.
25

Page 956

1 BY MR. PRYOR:
2 Q.  You can answer, I think.
3        THE COURT:  Yes.
4        THE WITNESS:  Yes.  The ---
5 BY MR. PRYOR:
6 Q.  And then, even more so, she goes on to say, "Up
7 until December, I chaired RTW committee, which works
8 with TWU international to collectively help build
9 future women leaders and address women issues."
10      Again, talking about that union activity, true?
11        MR. McKEEBY:  Again, your Honor, object as
12 vague for the reasons discussed.
13        THE COURT:  I will allow this.  I will
14 allow it.  You can answer.
15        MR. PRYOR:  I object to the constant
16 objection.  There is nothing vague.  I read what the
17 agreement says.
18        THE COURT:  I can't control him any more
19 than I can control you, and everyone has been very
20 active today.
21      Can you answer the question or do you need
22 him to repeat it?
23        THE WITNESS:  No, I can answer.
24        THE COURT:  Okay.  Thank you.
25        THE WITNESS:  It does state details about

Page 957

1 the union, yes.
2 BY MR. PRYOR:
3 Q.  Details about union activity, true?
4      Did you want to leave out the word "activity"
5 for a reason?
6 A.  No.
7 Q.  Why did you leave it out of your answer?
8      You repeated my question but you left that word
9 out, as opposed to answering it directly.
10        MR. McKEEBY:  Objection, argumentative.
11        THE COURT:  I will allow it.
12        THE WITNESS:  I was just trying to be
13 brief in my explanation.
14 BY MR. PRYOR:
15 Q.  Then why did you leave it out?
16      Instead of just saying yes, you repeated my
17 question and left out a word, "activity."
18      And that was just an accident, okay?  Right?
19        MR. McKEEBY:  Objection.  This is legal
20 argument or some kind of argument.
21        THE COURT:  I will allow it.
22        THE WITNESS:  It was not intentional.
23 BY MR. PRYOR:
24 Q.  Okay.  Then let's try it again.
25      You knew, in reading this sentence, that it

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 264 of 642   PageID 11205
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 958..961

Page 958

1 involved union activity, the complaint, true?
2 A.  Yes.
3 Q.  It says, "The messages contain two graphic
4 videos of an alleged aborted fetus and make
5 references to murder as well as political and
6 religious comments."
7    Is it correct to say that you knew by the time
8 you read the second paragraph that this complaint
9 involved political speech and religious activity.
10 True?
11 A.  I don't know about the activity.  It says
12 "religious comments."
13 Q.  So you don't think "religious comments"
14 involves religious activity?
15 A.  I'm just being specific is all.  Because you
16 asked me about activity last time.  I'm just trying
17 to be clear.
18 Q.  I'm asking you to interpret what you read.
19    Did you believe it involved religious activity
20 and political activity, given she's telling you it
21 is involving political and religious comments?
22        MR. McKEEBY:  Object to -- object to the
23 characterization of what the document says.
24        THE COURT:  I will sustain that.
25

Page 959

1 BY MR. PRYOR:
2 Q.  Do political and religious comments involve
3 activity?  Or can you have comments without
4 activity?
5        MR. McKEEBY:  Objection, vague.
6        THE COURT:  I will allow it.
7        THE WITNESS:  I would take it for what it
8 says, that it was political and religious comments.
9 BY MR. PRYOR:
10 Q.  Okay.  So when it says comments, can you think
11 of any way to make a political comment or a
12 religious comment without that falling within the
13 definition -- you have got a college degree --
14 within the definition of "activity"?
15        MR. GREENFIELD:  Objection, relevance.
16        THE COURT:  I will allow it.
17        THE WITNESS:  Emails, like I said before,
18 can be misrepresented.  So I would take for what it
19 says specifically, religious comments.
20        MR. PRYOR:  Object to the responsiveness.
21 BY MR. PRYOR:
22 Q.  That it not the question I asked.
23 A.  I'm missing the question then.  I'm sorry.
24 Q.  I'm asking you to close your eyes to this
25 document, all you want.

Page 960

1    The question is:  Tell us, is there any way to
2 interpret the phrase "political and religious
3 comments" in a way that it would not involve
4 activity?
5        MR. McKEEBY:  Objection, vague.
6 BY MR. GILLIAM:
7 Q.  In a vacuum.  Forget this complaint.
8    Any example in the entire world that you come
9 up with.  I can't wait to hear it.
10        THE COURT:  I will allow.
11        THE WITNESS:  I wouldn't relate the two.
12 I would take I can what it says.
13 BY MR. GILLIAM:
14 Q.  Of course, you wouldn't be able to; it involves
15 activity, true?
16        MR. McKEEBY:  Objection, argumentative.
17        Asked and answered.
18 BY MR. PRYOR:
19 Q.  Go ahead.
20 A.  It involves comments.
21        THE COURT:  Hold on.  What is your second
22 objection?
23        MR. PRYOR:  I don't remember.
24        THE COURT:  I think asked and answered, is
25 what you said?

Page 961

1        MR. McKEEBY:  I think asked and answerer,
2 but there was another.  That is the one I don't
3 remember.
4        THE COURT:  I will sustain on asked and
5 answered.
6        MR. McKEEBY:  Thank you.
7        THE COURT:  Not on vague.
8        MR. PRYOR:  What it is sustained on?
9        THE COURT:  Asked and answered.
10        MR. PRYOR:  Did the Court have to come up
11 with the objection?  I mean, I'm fine either way.
12        THE COURT:  The realtime is down.  He said
13 it, but you were talking over him.  So I thought he
14 said asked and answered.
15        MR. PRYOR:  I'm sorry, your Honor.
16 BY MR. PRYOR:
17 Q.  All right.  Then it says, "I found the messages
18 to be incredibly disturbing and believe it to be a
19 violation of social media policy."
20    Do you see that?
21 A.  No.  It is below the screen.
22    There.
23 Q.  Hang on.
24    Do you see it now?
25 A.  Yes, I do.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 4 July 08, 2022                    Pages 962..965

Page 962

1   MR. PRYOR: Okay.
2   THE STENOGRAPHER: I have to restart.
3   THE COURT: Hold on. We are going to have
4   to restart the writer.
5   MR. PRYOR: Let's look at 19.
6   THE COURT: We can't. We have to restart
7   the writer. Can we take a quick break while we
8   restart? I'm sorry to do our morning break early
9   twice, but we got to do it reboot.
10   Same instructions as always. Only talk to
11  your fellow jurors and court personnel, don't talk
12  to anyone about the case, and don't do any research
13  about the case.
14   We will see you in 10 minutes at 10:00.
15   THE COURT SECURITY OFFICER: All rise for
16  the jury.
17   (The jurors exited the courtroom.)
18   THE COURT: And same for you, you can
19  leave the box but you can't talk to anyone about the
20  case, Mr. Schneider.
21   Any questions? Issues that anyone wants
22  to talk about?
23   We are off the record.
24
25

Page 963

1   (Recess.)
2   THE COURT SECURITY OFFICER: All rise.
3   THE COURT: Okay. Anything else?
4   All right. Let's get the jury.
5   I will say, we may try to do lunch on the
6   early side, not do another break but do lunch sort
7   of in the 11:30 to 11:45 range, if that makes sense.
8   I try to not stay on the record for more
9   than -- I mean, two hours is pushing it. I try to
10  do less than that. Does that make sense?
11   So whoever has got the mic at that time,
12  think through 11:30 to 11:45 as a break time.
13   MR. PRYOR: I can't stand up that long.
14  That's great.
15   (The jurors entered the courtroom.)
16   MR. PRYOR: I wish that was a joke.
17   THE COURT: Okay. You can be seated.
18   Mr. Pryor, you can continue. We are back
19  on the record. Thanks for bearing with us.
20  BY MR. PRYOR:
21  Q. Mr. Schneider, when you do an investigation, is
22  evaluating the credibility of witnesses part of what
23  you do?
24  A. No, not specifically their credibility. You
25  mean as far as their standing with the company, or

Page 964

1   what part of that? I don't quite understand.
2   Q. You don't consider credibility?
3   A. Can you explain what you mean by "credibility."
4   Q. No.
5   A. Okay.
6   Q. You don't know what credibility means?
7   A. Well, my understanding of credibility is their
8   standing in the company. Is that what you are -- or
9   their overall in life?
10  Q. Sir, when you interview a witness, do you
11  consider whether or not they are telling you the
12  truth or telling you a lie?
13  A. Yes.
14  Q. Okay. Let's go with that definition of
15  credibility, okay? Do you do that?
16  A. Do I do that? What is that?
17  Q. When you are doing an investigation and you are
18  interviewing a witness, do you consider their
19  credibility?
20  A. I do consider the fact whether they are telling
21  the truth.
22  Q. What about if they are telling a lie, do you
23  consider that?
24  A. Yes. Truth or lies.
25  Q. Okay. But that is not what you view as

Page 965

1   credibility. I just want to make sure we don't use
2   the wrong term.
3   A. If that's the definition for "credibility" you
4   want to use, then yes, I can use that.
5   Q. I'm not giving you a definition of
6   "credibility," sir. You have already given us one.
7   I'm just making sure that you don't consider
8   the credibility of witnesses the way you defined the
9   word "credibility." True?
10   MR. McKEEBY: Objection, asked and
11  answered.
12   THE COURT: Sustained.
13  BY MR. PRYOR:
14  Q. Let's look at Exhibit 19.
15   Have you ever seen this document before?
16  A. I don't recall this document.
17  Q. I will represent to you this is a President's
18  Message written and authored by Audrey Stone.
19   You know who that is, right?
20  A. Yes.
21  Q. Let's go to the next page.
22   She says, among other things, "In regard to the
23  social media policy, we have witnessed
24  inconsistencies around the way the policy is applied
25  and the often subjective stance that Southwest

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 4 July 08, 2022                        Pages 966..969

Page 966

1 management has displayed in administering the
2 policy."
3     I'm going to skip down to the last paragraph on
4 that page.
5     It says, "On a personal note, however, please
6 know that the social media issues management
7 investigated, and the resulting discipline Southwest
8 Airlines issues did not arise out of something
9 management simply uncovered or stumbled upon.  They
10 are not generally monitoring our sites.
11     "Instead, these cases come about as our own
12 flight attendants are turning each other in.  These
13 latest investigations have been the result of flight
14 attendant complaints.
15     "I am asking that we please consider stopping
16 any back-and-forth fighting on social media.  We are
17 not always going to agree with one another, but
18 please recognize that your fellow employees are
19 entitled to their own thoughts and opinions.  If we
20 have a problem, let's work it out as the
21 professionals that we are.  Please respect one
22 another."
23     Would that be consistent with Ms. Stone filing
24 a complaint against another flight attendant using
25 the social media policy?

Page 967

1 A.  Are you asking me if that is what she did, or
2 is this --
3 Q.  No, I'm asking you to evaluate.  You now have
4 two pieces of evidence.  You are an investigator.
5 Tell us, is that consistent?
6 A.  She's asking employees to be nice to each other
7 and considerate.
8 Q.  I'm not asking you -- we all know what it said,
9 sir, and you obviously misstated what it said.
10     I'm asking you a question.  Is this document
11 consistent with filing a complaint against another
12 flight attendant under the social media policy?
13     You are the investigator.  Are those things
14 consistent?
15     MR. GREENFIELD:  Your Honor --
16     MR. McKEEBY:  Objection, argumentative,
17 vague.
18     THE COURT:  Hold on.
19     MR. GREENFIELD:  And argumentative, and
20 objection to the sidebars as well, your Honor.
21     THE COURT:  You've got to do one at a
22 time.
23     So please restate your objection.
24     MR. McKEEBY:  Objection, argumentative,
25 vague.

Page 968

1     MR. GREENFIELD:  Argumentative, and the
2 sidebars within his commentary.
3     THE COURT:  I will sustain on the sidebar.
4     Can you reask it?
5     MR. PRYOR:  Sustain on who?
6     THE COURT:  You had sidebar commentary in
7 your question.  Can you go ahead and reask a plain
8 question.
9     MR. PRYOR:  Can I just say ignore the
10 sidebar?  It's hard for me not to sidebar.
11     Okay.  I will do better.
12 BY MR. PRYOR:
13 Q.  Sir, here comes the question.
14     Exhibit 19, which I just read to you where
15 Ms. Stone -- you know what we read.  And you know
16 that she has then filed a complaint against another
17 flight attendant under the social media policy.
18     Are those things consistent with one another or
19 inconsistent?
20 A.  I don't know the exact message she was trying
21 to portray in her memo here, but I would say the
22 egregiousness of a flight attendant turning
23 something in on social media would have something to
24 do with it.  I'm not sure that's what she was
25 referring to in her memo, though.

Page 969

1 Q.  So I didn't hear the answer.  Is it consistent
2 or inconsistent?
3 A.  I cannot say that.
4 Q.  Okay.  Would you have -- in determining
5 credibility or truthfulness or falseness of a
6 witness during your investigation, would you have
7 considered this information if it had been given to
8 you?
9 A.  No.
10 Q.  Why not?
11 A.  It wasn't part of my investigation of what was
12 the crux of the investigation.
13 Q.  So you would not have considered evidence that
14 would have shown that a key witness was being
15 inconsistent, true?
16     MR. McKEEBY:  Objection --
17     MR. GREENFIELD:  Objection,
18 mischaracterizes.
19     THE COURT:  Sustained.
20 BY MR. PRYOR:
21 Q.  Would you have considered evidence that would
22 indicate one of the witnesses you are talking to
23 might not be telling you the whole truth?
24 A.  If I had information that proved that, that
25 would be good to have, yes.

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 267 of 642  PageID 11208
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 970..973

Page 970

1  Q.  Okay.
2  A.  I'm not saying this does, though.
3  Q.  As a matter of fact, you are saying this does
4  not, true?
5  A.  I'm saying that I don't know what her point was
6  for sure that she was making here, and that the
7  information that was given to me about social media
8  and what was posted were probably not the same
9  thing.
10  Q.  When she says, "Don't report each other for
11  social media violations," that's ambiguous to you?
12  A.  Does it specifically say that?
13        MR. McKEEBY:  Objection, mischaracterizes
14  the --
15        MR. PRYOR:  Well, I can read it again.
16        THE COURT:  I will allow it.
17  BY MR. PRYOR:
18  Q.  You don't think it says that?
19        THE COURT:  I will allow the question.
20  I'm overruling the objection.
21        MR. PRYOR:  I'm rephrasing the question
22  now.  I don't remember what it was.
23        THE COURT:  Sure.  You can ask it again.
24        MR. PRYOR:  You were apparently
25  considering an objection.  I didn't hear --

Page 971

1        THE COURT:  I overruled the objection.
2        But at this point, I don't know that he
3  knows the question.
4        So you can ask the old question --
5        MR. PRYOR:  Since either one of us know
6  the question --
7        THE COURT:  -- or a new question.  It is
8  up to you.
9  BY MR. PRYOR:
10  Q.  It says in Exhibit 19, "I'm asking that we
11  please consider stopping any back-and-forth fighting
12  over social media."
13        And she before that has said, "What's happening
14  is flight attendants are reporting each other."
15        And then she's saying, "Let's be professional.
16  Let's respect each other's opinions."
17        And that's not -- you don't interpret that as
18  her saying, Let's not report things under the social
19  media policy.  That thing is a mess.  You don't see
20  it that way?
21  A.  No.
22  Q.  You do not?
23  A.  I do not.
24  Q.  And how do you see it?
25  A.  My interpretation is that she's talking about

Page 972

1  the back and forth on social media.
2  Q.  Exactly.
3        What was this?  What was this complaint?
4  A.  This was turning in somebody for posting
5  something and sending specific Facebook messages to
6  her.
7  Q.  Wait.  What is the difference?
8  A.  My interpretation is that she's talking about
9  on social media itself where people comment back and
10  forth.
11  Q.  Okay.
12  A.  And they're possibly not being nice about it.
13  Q.  Okay.  How is that not this?
14  A.  Because this is something that she turned in
15  that somebody posted directly to her on a private
16  message.
17  Q.  That's your answer?
18  A.  Yes.
19  Q.  That's your distinction?
20  A.  Yes.
21  Q.  Okay.
22  A.  I'm saying that I can't say what she's
23  portraying here exactly, if it is the same thing, to
24  warrant if she was being honest or not.
25  Q.  Let's look back at Exhibit -- let me ask you

Page 973

1  something I asked earlier.  I want to clarify and
2  make sure I understood your answer.
3        When I asked you, were you aware that people in
4  the Union were reporting other people in the Union
5  for social media policy targeting recall petition
6  supporters at the same time as Ms. Stone brought
7  this complaint against Ms. Carter, you were not
8  aware of that?
9  A.  That was a long question, but I think I got the
10  gist of it.  No.
11  Q.  And if you had been aware of it, you would have
12  considered that in your evaluation of the witnesses
13  and the evidence, true?
14  A.  I can't say that.
15  Q.  Well, so you have got Ms. Stone -- you knew, by
16  the way, that Ms. Carter was a recall supporter?
17  A.  A recall supporter?  Of the --
18  Q.  Yes.
19  A.  Yes.  She gave me that information in the
20  meeting.
21  Q.  So you knew that Ms. Carter was a recall
22  supporter, and a social media complaint was being
23  brought against her by the president of the Union.
24        You knew that much, right?
25  A.  Yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                            Vol 4 July 08, 2022                                            Pages 974..977

Page 974

1 Q.  Would it have been important to know that, in
2 fact, the Union also had a member bringing charges
3 against other recall supporters for violations of
4 social media policy?
5        MR. McKEEBY:  Objection, calls for --
6 BY MR. PRYOR:
7 Q.  Would you have wanted to know that in order to
8 determine credibility?
9        MR. McKEEBY:  Objection, foundation, calls
10 for speculation.
11       THE COURT:  I will sustain on foundation.
12 BY MR. PRYOR:
13 Q.  Would you have wanted to know --
14       MR. PRYOR:  I'm trying to understand the
15 foundation issue, so I'm trying to create the
16 foundation.
17 BY MR. PRYOR:
18 Q.  Would you have wanted to know that information
19 if there was this big conspiracy going on to target
20 recall petitioners using social media policy?
21       MR. McKEEBY:  Same objection as to
22 vagueness.
23       THE COURT:  I will sustain on foundation.
24       You've got to back up and set the
25 foundation first and then ask it.  I don't think

Page 975

1 this is a topic we have covered yet enough to
2 warrant the question.
3 BY MR. PRYOR:
4 Q.  I wish I understand and I wish I had heard you,
5 so I'm going to try anyway.
6       Sir, you understand Audrey Stone was bringing a
7 social media policy violation against a fellow union
8 member or objector and using social media policy
9 when you received a copy of Exhibit 66, Ms. Stone's
10 complaint, true?
11 A.  Yes.
12 Q.  And if at that same time you became aware that,
13 in fact, that same union leadership that Ms. Stone
14 was involved with were bringing charges against
15 other recall petition supporters for social media
16 policy and that this was a plan, would you have
17 wanted to know that?
18 A.  That was not part of my investigation, and that
19 is not something that pertained to what I was
20 investigating.
21 Q.  So you would not have wanted to know that,
22 true?
23 A.  True.
24 Q.  Were you aware of that?
25       MR. McKEEBY:  Objection, asked and

Page 976

1 answered, I think.
2       THE COURT:  I will allow it.
3       THE WITNESS:  Was I aware of what?  The
4 fact that -- I don't understand the question.
5 BY MR. PRYOR:
6 Q.  Were you aware that charges were being filed
7 against other recall supporters for violations of
8 social media policy at the same time Ms. Carter was
9 charged?
10 A.  I was not aware of that.
11       MR. PRYOR:  Okay.  Let's look at 21-E.
12       MR. GREENFIELD:  Your Honor, if I may ask
13 to see this document.
14       THE COURT:  21-E is not in evidence yet.
15 We will keep the screen muted.
16       MR. PRYOR:  Oh, it may not be.  It is
17 getting ready to be.  I offered 21-E.
18       MR. GREENFIELD:  I just want to see what
19 you're talking about before --
20       THE COURT:  And I've got the jury screens
21 muted so you can bring up 21-E.
22       MR. GREENFIELD:  I don't know that I have
23 an objection.  I just want to see what you are
24 talking about, Mr. Pryor.  Thank you.
25       MR. PRYOR:  Don't put it to the jury yet.

Page 977

1       MR. HILL:  It's not.
2       MR. PRYOR:  Okay.  I offer 21-E.
3       THE COURT:  All right.  I will ask if
4 there are objections other than the normal 21
5 objections.
6       MR. McKEEBY:  The normal 21 objections.
7       MR. GREENFIELD:  Normal.
8       THE COURT:  Okay.  So I will overrule the
9 normal objections, let in 21-E with a limiting
10 instruction that it's for use in the claims against
11 the Union, not for use in the claims against in
12 Southwest.
13       We can publish.
14       (The referred-to document was admitted
15     into evidence as Plaintiff's Exhibit 21-E.)
16 BY MR. PRYOR:
17 Q.  Let's look at 21-E.
18       MR. GREENFIELD:  Your Honor, if I may make
19 another objection at sidebar then.
20       THE COURT:  Okay.  We need to mute it
21 then.
22       (Thereupon, the following proceedings were
23     had at sidebar:)
24       MR. GREENFIELD:  Your Honor, if this
25 document is only being used for evidence against the

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 269 of 642   PageID 11210
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 978..981

Page 978

1 Union, then how it affected Mr. Schneider's decision
2 to terminate then makes this line of questioning
3 irrelevant.
4        THE COURT:  So you've got an objection to
5 the question, not to the exhibit.
6        MR. GREENFIELD:  To the -- well, no.  To
7 the exhibit now based on this use.  It is being
8 presented in a different use case.
9        The limiting instruction that you just
10 gave to the jury is that this evidence is not to be
11 used against Southwest, right?  So that is what this
12 document is going to be used against, that he
13 believed this conspiracy existed.
14        MR. PRYOR:  First of all, it goes to
15 credibility.  He just said he wasn't aware of
16 anything like that.  He wasn't aware of other
17 complaints about social media policy.
18        He's on the email that shows there are 12
19 people, that charges are being served against them
20 for violations of social media policy.
21        MR. GREENFIELD:  I don't believe that was
22 his testimony.
23        THE COURT:  So I will let you ask it.
24        I think what I'm chiefly concerned about,
25 it can't be used in the claims against Southwest,

Page 979

1 right?  And we can't have Southwest discipline
2 coming into the case.  So this is early enough to
3 where I will let it in, but again, you can --
4        MR. PRYOR:  I have, from the first day of
5 trial, I still feel bad because I think I stepped on
6 a limine.  And you ruled and you limited and I
7 appreciate it.  I have not violated it since and I
8 won't here.  I understand the ruling.
9        THE COURT:  Okay.  I will let you do it.
10        (Thereupon, the sidebar was concluded and
11    the following proceedings were held in open
12    court:)
13        THE COURT:  I have admitted 21-E, and you
14 can proceed with your questions.
15 BY MR. PRYOR:
16 Q.  Who is Julie O'Grady?
17 A.  She's a senior investigator for employee
18 relations.
19 Q.  Okay.  And do you see your name on this email?
20 A.  Yes.
21 Q.  It says, "After reviewing the attached
22 information, below it are the names of flight
23 attendants, the time and date of comments in 2014,
24 and the comment they made on social media that could
25 be perceived as retaliatory."

Page 980

1        Do you see that?
2 A.  Yes.
3 Q.  You received this on February 27th while you
4 were doing your investigation of Ms. Carter.  True?
5 A.  Yes.
6 Q.  And did you become aware that this was
7 information supplied by Brian Talburt, a supporter
8 of Ms. Stone?
9 A.  No.
10 Q.  Are you sure of that?
11 A.  Was I aware of --
12 Q.  Yes.  You don't recall being on an email where
13 they said this was -- Brian Talburt is bringing all
14 this -- gathering all this -- scouring the Internet
15 for this information?
16 A.  I don't recall at this time that that was
17 something I was aware of.
18 Q.  At what time do you recall it?
19        You said, "I don't recall at this time."  I
20 don't know what that means other than there must be
21 some other time that you do recall it.
22 A.  I don't recall being aware of this.
23 Q.  What did you mean by "at this time"?
24 A.  Right now, today.
25 Q.  Why did you feel the need to clarify that?

Page 981

1        Were you concerned there is a document that
2 would show something else?
3 A.  I don't understand that questioning.
4 Q.  What do you not understand?
5        I'm testing the credibility of your answer
6 because I don't believe it.  If you are asking me a
7 question.
8        MR. McKEEBY:  Objection to the argument --
9        MR. PRYOR:  He asked me.
10        MR. GREENFIELD:  Objection --
11        THE COURT:  Hold on.  We can't talk over
12 each other.
13        What's the objection again?
14        MR. McKEEBY:  Argumentative.
15        MR. GREENFIELD:  And objection to the
16 continued use of sidebars.
17        THE COURT:  I will sustain on both bases.
18 BY MR. PRYOR:
19 Q.  If you look at Exhibit 21-E, it refers to
20 Jeanna Jackson and potential social media policy
21 violations by Jeanna Jackson.
22        Do you see that?
23 A.  No, sir.  It must be below -- it must be below
24 the screen.
25 Q.  I can give you a hard copy or something.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Pages 982..985

Page 982

1  A.  Okay.
2  Q.  If we need to blow that up for you, let me
3  know.
4  A.  I'm good.
5  Q.  Do you see it now?
6  A.  Yes.  I see the name Jeanna Jackson.
7  Q.  Do you see that charges are being brought as to
8  Jeanna Jackson for potential violation of social
9  media policy, true?
10  A.  Yes.
11  Q.  Do you know who Jeanna Jackson is?
12  A.  I've heard of her.
13  Q.  Tell us what you've heard.
14  A.  She's a Dallas-based flight attendant.
15  Q.  That's all you know, right?
16  A.  Yes.
17  Q.  You don't know that she was the leader of the
18  recall petition against Ms. Stone and her
19  administration?
20  A.  I may have found that out during the
21  investigation.
22  Q.  Okay.  You may have.  Did you or didn't you?
23  A.  I remember the name and being associated with
24  the recall.
25  Q.  So you received an email telling you that

Page 983

1  charges are being brought against Jeanna Jackson for
2  potential violation of social media policy.  Who did
3  you think was bringing those charges?
4        MR. McKEEBY:  Objection, mischaracterizes.
5  There is nothing about charges in this document.
6        THE COURT:  I will allow you to rephrase
7  "charges" and ask the same question.
8        MR. PRYOR:  Am I rephrasing?
9        THE COURT:  Yes.
10        MR. PRYOR:  Okay.
11  BY MR. PRYOR:
12  Q.  Sir, is it correct that you were aware, during
13  the time you were investigating claims against
14  Ms. Carter for social media policy by the president
15  of the Union, that Jeanna Jackson was also being
16  investigated for potential social media policy
17  violations?  True?
18  A.  Yes.
19  Q.  Who brought those complaints?
20  A.  I'm not aware.
21  Q.  Did you ever become aware?
22  A.  I don't recall that.
23  Q.  Well, if you had become aware, wouldn't you
24  have included that in your investigation?
25  A.  This was not part of my investigation and I

Page 984

1  didn't include it.
2  Q.  So you were aware that -- you knew she was a
3  recall petition supporter?  Did you know that?
4  A.  Who is "she"?
5  Q.  Jeanna Jackson.
6  A.  Yes.  I found out in my investigation.
7  Q.  Okay.  What about these others?  Did you find
8  out, in fact, every single one of them is a recall
9  supporter?
10  A.  I don't see the others.
11  Q.  Well, let's show you the rest of them.
12        MR. GREENFIELD:  Objection, lack of
13  foundation to his testimony about who these
14  individuals are.  There is nothing being presented
15  to the Court on that.
16        THE COURT:  I will allow you to ask.
17  BY MR. PRYOR:
18  Q.  How about Beverly Belanger?  Do you know she's
19  a recall supporter?
20  A.  No.
21        MR. GREENFIELD:  Objection, your Honor.
22  He's offering --
23  BY MR. PRYOR:
24  Q.  Did you inquire?
25        MR. GREENFIELD:  Excuse me.

Page 985

1        Objection, your Honor.  He's offering
2  testimony that has not been presented to the Court.
3        THE COURT:  Well, lawyers can't offer
4  testimony, so I'll tell the witnesses [sic],
5  everything you hear out a lawyer's mouth is not
6  testimony, it is not evidence.
7        You can ask your question.
8        MR. PRYOR:  Okay.  I just want to see, was
9  the objection that there's no foundation that these
10  are recall petition supporters?
11        THE COURT:  There has been testimony on
12  who the recall supporters have been in this case.
13        You can ask if he knows if someone is a
14  recall supporter.
15  BY MR. PRYOR:
16  Q.  Do you know whether or not Michelle Foley was a
17  recall petition supporter?
18  A.  No.
19  Q.  What about Charlene Bates Carter?
20  A.  Through this investigation.
21  Q.  Do you know whether or not Charlene Bates
22  Carter was a recall petition supporter?
23  A.  Yes.
24  Q.  So you know, at a minimum, two people on this
25  list that are recall petition supporters, and social

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 271 of 642   PageID 11212
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                  Pages 986..989

Page 986

1  media policy violations are being investigated,
2  true?
3  A.  Yes.
4  Q.  What about Greg Hofer?  Do you know if he's a
5  recall petition supporter?
6  A.  No.
7  Q.  You don't know?
8  A.  I don't know.
9  Q.  And by the way, did you ask?
10 A.  No.
11 Q.  Why were you included on this email, I wonder?
12      MR. McKEEBY:  Objection.  Is that a
13 question?
14      MR. PRYOR:  Yes.  It's just another way to
15 ask a question, yes.
16      THE COURT:  I will allow it.
17      MR. GREENFIELD:  Well, then I would object
18 to the lack of foundation, and it calls for
19 speculation because if he didn't send it, he
20 wouldn't know why.
21      THE COURT:  Overrule on foundation.
22      As to speculation, you can only answer if
23 you have personal knowledge.
24      THE WITNESS:  I don't have personal
25 knowledge of this.

Page 987

1  BY MR. PRYOR:
2  Q.  Do you have any understanding from your 28
3  years of experience with Southwest Airlines why you
4  would be included on this email?
5  A.  Only that Charlene Bates at the time was
6  Denver-based.
7  Q.  So someone wanted you to be aware of this
8  knowing that you were investigating Charlene Carter,
9  true?
10      MR. McKEEBY:  Objection, foundation.
11      MR. PRYOR:  It's what his answer was.  Now
12 I'm --
13      THE COURT:  I will allow the question.
14      MR. GREENFIELD:  Then I would object to
15 speculation because it is now asking what he knew in
16 that regard or why he was -- again, why he was --
17      THE COURT:  Hold on.  That's a speaking
18 objection.
19      I will overrule the objection and only
20 allow him to answer if he has personal knowledge.
21      THE WITNESS:  I don't have personal
22 knowledge as to why.
23 BY MR. PRYOR:
24 Q.  Okay.  Let's go back to my question.
25      From your 28 years of experience, do you have

Page 988

1  any understanding as to why it would be that you
2  were included on this email?
3      You know how the structure works at Southwest
4  Airlines.
5      This isn't your investigation, is it?  No one
6  asked you to investigate these people, did they?
7      MR. GREENFIELD:  Objection, compound
8  question.  Multiple questions.
9      MR. McKEEBY:  And objection, asked and
10 answered.
11      THE COURT:  Okay.  Sustained.
12      Break it up, and we will see if there is
13 another objection.
14 BY MR. PRYOR:
15 Q.  Did anyone ask you to do the investigation of
16 the persons listed in this email?
17 A.  Only the one that was assigned to my base in
18 Denver.
19 Q.  Well, what was assigned to you, Ms. Carter?
20 A.  Yes.
21 Q.  And if you look at the page where Ms. Carter is
22 listed, it says, "Charlene Bates Carter, Jeanna
23 Jackson, I agree.  We need to expose each and every
24 one of them to their hypocrisy and nastiness."
25      That's what you were asked to investigate?

Page 989

1  A.  Those comments, yes.
2  Q.  You were asked to investigate those comments?
3  A.  Not me particularly.  It was sent to me, but I
4  have people in my base that do that.
5      But, yes, those comments are what they are
6  referring to in the message of the email.
7  Q.  What did you do in regard to investigating
8  those comments?
9      By the way, were those comments sent to Audrey
10 Stone?
11 A.  I don't know that.
12 Q.  So you, therefore, must have gathered
13 information about these comments, since you viewed
14 this email as saying you are to investigate this,
15 right?
16 A.  At the time this happened, I had somebody else
17 on my team handle this.
18 Q.  Okay.  So who did you have investigate -- by
19 the way, this is not a complaint by Audrey Stone,
20 true?
21 A.  I don't recall it being from Audrey Stone.
22 Q.  Well, do you see anything in this email, have
23 you ever seen anything saying that Audrey Stone was
24 bringing this specific complaint against Ms. Carter?
25 A.  I can only see one portion of this, so I don't

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Pages 990..993

Page 990

1 know.
2 Q.  What do you want to see?
3        MR. PRYOR:  Give me the exhibit.  I will
4 give him the whole thing.  It's in the boxes.
5 BY MR. PRYOR:
6 Q.  So did you -- I assume, since you were told to
7 investigate this complaint, we are going to see when
8 you interviewed Ms. Carter, you asked her about
9 these specific comments in this email, because how
10 else could you investigate it, right?
11 A.  I don't recall that part of it.
12 Q.  Sir, let me hand you --
13        MR. PRYOR:  May I approach?
14        THE COURT:  You may.
15 BY MR. PRYOR:
16 Q.  I'm going to hand you Exhibit 21-E.
17     Because you were to investigate the comments on
18 the second page that Ms. Carter's -- that are
19 attributed to Ms. Carter.
20     If you were asked to investigate that, when you
21 interviewed Ms. Carter, you certainly would have
22 asked her about those comments, true?
23        MR. McKEEBY:  Objection, mischaracterizes.
24 Objection, compound.
25        MR. GREENFIELD:  And objection on our end,

Page 991

1 vague.  We don't know which investigation he's
2 talking about at this point or which --
3        THE COURT:  Hold on.  That is speaking.
4 Sustained.
5        Can you break it up, clarify it?
6        MR. PRYOR:  What was the --
7        THE COURT:  Compound and vague is what I
8 sustained on.
9        MR. PRYOR:  Okay.  I will break it up.
10 BY MR. PRYOR:
11 Q.  You have told us that you were on this email
12 because you were tasked with investigating these
13 comments regarding Ms. Carter -- that are attributed
14 to Ms. Carter, true?
15 A.  Yes.
16 Q.  Okay.  So, therefore, when you interviewed
17 Ms. Carter as part of your investigation, you asked
18 her about these comments, true?
19        MR. McKEEBY:  Objection.
20        MR. GREENFIELD:  Objection, your Honor,
21 vague.  Which investigation are we referring to?
22        THE COURT:  I will allow it.
23        THE WITNESS:  These were two separate
24 investigations.
25

Page 992

1 BY MR. PRYOR:
2 Q.  Okay.  And you didn't do the separate
3 investigation?
4 A.  I don't remember.
5 Q.  Who did the separate investigation?
6 A.  I don't remember.  That was five years ago.
7 Q.  Well, a lot of things were five years ago.
8     Did you assign this to someone?
9 A.  Most likely, yes.
10 Q.  You have no recollection of doing that?
11 A.  I don't at this ---
12 Q.  Do you know that Ms. Carter was never
13 interviewed about this?
14 A.  I don't know that.
15 Q.  Well, you assigned it to someone to
16 investigate.  How can they investigate it without
17 interviewing Ms. Carter?
18 A.  There is not a time frame on this.
19 Q.  So maybe she will get a notice in a week or so
20 from now?
21        MR. McKEEBY:  Objection, argumentative.
22        THE COURT:  Sustained.
23 BY MR. PRYOR:
24 Q.  There is no time frame?
25        MR. McKEEBY:  Objection.

Page 993

1        THE COURT:  He asked if there is no time
2 frame.  What's your objection?
3        MR. McKEEBY:  I was objecting to the first
4 question.  I don't understand the second one.
5        THE COURT:  I sustained that.
6        So the second question is:  There is no
7 time frame.  You can answer.
8 BY MR. PRYOR:
9 Q.  So the time frame is still running; it could
10 happen at any time, right?
11 A.  Ms. Carter doesn't work for the company
12 anymore.
13 Q.  Well, so up until the time she was terminated,
14 they could have investigated this claim?
15 A.  Yes.
16 Q.  And do you know that, in fact, it never
17 occurred?
18 A.  I don't know that.
19 Q.  So you were tasked with doing this, and you
20 didn't take that task seriously enough to find out
21 if it was done?
22 A.  Not in the time frame before she was
23 terminated.
24 Q.  So you thought that since you terminated her,
25 that you didn't have to worry about this one

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 273 of 642   PageID 11214
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 994..997

Page 994

1  anymore, true?
2  A.  It may have been worked on, I don't know.  I
3  don't remember.
4  Q.  You don't remember who you assigned it to.  You
5  think that it wasn't investigated because you fired
6  her before this investigation would be completed?
7       MR. McKEEBY:  Objection, mischaracterizes
8  testimony.
9       THE COURT:  I will allow it.
10 BY MR. PRYOR:
11 Q.  You can answer.
12 A.  I don't remember the details of this.
13 Q.  Well, you remember the detail that you were
14 assigned the investigation of this claim.
15    By the way, where in this email does it say you
16 were assigned this investigation?
17 A.  It states that it was sent to me.
18 Q.  I understand.  It was sent to a lot of people.
19    Where does it say, Oh, by the way, Ed, you are
20 the one that needs to investigate Ms. Carter?  It
21 doesn't say that, does it?
22 A.  Not specifically.
23 Q.  What does it generally say then?
24 A.  It says my name on the "to" for the email.
25 Q.  So you are supposed to know from that that you

Page 995

1  are the one that is supposed to investigate this?
2  A.  Farther down it says, "Please work with labor
3  relations and your HR business partner."
4     So I would assume by this email that they mean
5  my team look into this.
6  Q.  All right.  Let's go back to Exhibit 66.
7     Ms. Stone is saying, "I find the messages to be
8  incredibly disturbing and to be a violation of the
9  social media policy."  Right?
10 A.  Yes, that's what it says.
11 Q.  "I find it obscene and violent as well as
12 threatening in nature."  Correct?
13 A.  Yes.  That's what it says.
14 Q.   Then it says, "I also believe it is a violation
15 of the workplace bullying and hazing policy under
16 cyberbullying."  Right?
17 A.  Yes.
18 Q.  And tell me where the cyberbullying policy is.
19 Is there one?
20 A.  The workplace bullying and hazing policy refers
21 to cyberbullying.
22 Q.  Workplace bullying is cyberbullying?  Yes?
23 A.  Cyberbullying could be workplace bullying and
24 hazing policy.
25 Q.  Let's look at the -- let's look at that

Page 996

1  cyberbullying policy.
2     Let me figure out which exhibit it is.
3     MR. HILL:  15.
4     MR. PRYOR:  Someone says 15.
5     MR. HILL:  13?
6     MR. PRYOR:  Whichever one it is.
7     THE COURT:  It is not in yet.
8     MR. GREENFIELD:  Can we mute the jury?
9     MR. PRYOR:  Is it in evidence?
10    THE COURT:  No.
11    MR. PRYOR:  We offer Exhibit 13.
12    THE COURT:  13.  Objections to 13?
13    MR. McKEEBY:  No objection.
14    MR. GREENFIELD:  No objection.
15    THE COURT:  Okay.  13 is in.  We will
16 unmute it for the jury to see.
17    (The referred-to document was admitted
18    into evidence as Plaintiff's Exhibit 13.)
19    MR. PRYOR:  Let's blow that up a little
20 bit.
21 BY MR. PRYOR:
22 Q.  Can you see it, sir?
23 A.  I do, yes.
24 Q.  Okay.  Show me where the cyberbullying is so we
25 can talk about that.

Page 997

1     You told us it's in here.  Just point to it for
2  me.
3  A.  This may not be the latest version of it.
4  Q.  I'm sorry?
5  A.  This may not be the latest version of it.
6  Q.  Well, sir, you see April 16, 2015?  This was
7  the policy in place at the time you investigated
8  Ms. Carter.  You don't know that?
9     MR. McKEEBY:  Objection, foundation.
10    THE COURT:  Sustained.
11    You've got to ask him.
12 BY MR. PRYOR:
13 Q.  You think there is another version of this?
14 A.  I don't know.  I know that cyberbullying was
15 part of our workplace bullying and hazing policy.
16 Q.  Okay.  So this is what we asked Southwest
17 Airlines.  Give us your policy.  This is what they
18 gave us.
19    MR. GREENFIELD:  Objection --
20 BY MR. PRYOR:
21 Q.  You are telling us there is something else.
22    MR. GREENFIELD:  Objection, your Honor,
23 testimony, and it's talking about --
24    THE COURT:  Sustained.
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Pages 998..1001

Page 998

1 BY MR. PRYOR:
2 Q.  So at least as to this, there is nothing in
3 here about cyberbullying, correct?
4 A.  I haven't read the whole thing.
5 Q.  Read it.
6 A.  I don't see it specifically listed in this one.
7 Q.  But it's your sworn testimony there was a
8 workplace bullying cyber -- what did you call it,
9 cyber --
10 A.  What it referred to in the other letter.
11 Q.  Cyberbullying policy that you considered in
12 terminating Ms. Carter, true?
13 A.  Not a cyberbullying policy.
14 Q.  Oh.  A cyberbullying non-policy.  Is that what
15 you considered?
16 A.  No.
17 Q.  What did you consider?
18 A.  I considered the totality of the workplace
19 bullying and hazing policy.
20 Q.  Did you look at and consider a written
21 cyberbullying policy in deciding to terminate
22 Ms. Carter, as you have already testified, or does
23 this change your opinion?
24 A.  I don't know of a cyberbullying policy.  I know
25 cyberbullying was referred to.

Page 999

1 Q.  You just told us a few minutes ago that she
2 violated a cyberbullying policy, and I said, Where
3 is it?
4    And you said, It's in the workplace bullying
5 policy.
6    And it is not there, right, at least not this
7 document, true?
8 A.  True.
9 Q.  Okay.  So are you standing by your testimony
10 that you absolutely did consider a written
11 cyberbullying policy in regard to terminating
12 Ms. Carter, as you initially testified?
13 A.  When you refer to "cyberbullying policy," I'm
14 only talking about the workplace bullying and hazing
15 policy which contained a cyberbullying --
16 Q.  Okay.  Great.  Tell us once again, then, where
17 it is.  It's right here in front of you.  Where is
18 it?
19 A.  It's not on this page.
20 Q.  But you are telling us there is one.  You are
21 certain because you considered it in terminating
22 Ms. Carter, true?
23 A.  I considered the totality of the workplace
24 bullying and hazing.
25 Q.  Did you consider the written cyberbullying

Page 1000

1 policy contained within the workplace bullying and
2 hazing policy that you've told us about?
3 A.  No.
4 Q.  Is there one?
5 A.  I stated that there is not a cyberbullying
6 policy.  I have stated that the workplace bullying
7 and hazing policy had a comment about cyberbullying
8 in it.
9 Q.  Okay.  But this one doesn't?
10 A.  Correct.
11 Q.  And when you terminated Ms. Carter, you were
12 looking at a workplace bullying policy that included
13 a comment about cyberbullying, true?
14 A.  No, I don't know that for sure.  I don't
15 remember.  Because what you are saying is that the
16 previous letter that was up referred to
17 cyberbullying, and I wasn't aware of that.
18 Q.  Sir, I'm just asking you to pick a story and we
19 can talk about it.  Which one are you going with?
20    MR. McKEEBY:  Objection, argumentative.
21 Sidebar.
22    THE COURT:  Sustained.
23    MR. PRYOR:  He's told several stories.
24 I'm entitled to call him on it.
25    THE COURT:  You can ask.  Just rephrase

Page 1001

1 it.
2 BY MR. PRYOR:
3 Q.  All right.  So we can agree that this phantom
4 cyberbullying policy is not in this document, right?
5    MR. McKEEBY:  Objection to the sidebar
6 about the phantom policy.
7    MR. PRYOR:  It wasn't sidebar, it was
8 sarcasm, and I'm allowed.
9    THE COURT:  I will allow this question.
10 BY MR. PRYOR:
11 Q.  You can answer.  It's not in here, is it?
12 A.  The cyberbullying statement is not in here,
13 correct.
14 Q.  But while we are here, though, let's see what
15 is here.
16    It says "workplace bullying."  Do you see that?
17 A.  Yes.
18 Q.  The policy is not bullying, the policy is
19 workplace bullying.
20    Let me give you an example.  Two flight
21 attendants.  You got my example so far?
22 A.  Yes.
23 Q.  They go to Cabo on vacation.  I'm making this
24 up as I go.  They go to Cabo on vacation.
25    One of them is walking down an aisle and the

Page 1002

1 other one is coming towards them in an aisle, and
2 one of the flight attendants refuses to get out of
3 the way.
4      You got the example so far?
5 A.  Yes.
6 Q.  The flight attendant that can't get around that
7 flight attendant files a complaint with Southwest
8 Airlines because it violates the workplace bullying
9 policy.
10     Does it?
11     MR. McKEEBY:  Object to the incomplete
12 hypothetical.
13     THE COURT:  I will allow him to answer to
14 the extent he can.
15 BY MR. PRYOR:
16 Q.  Do you have to look at the policy to see if
17 that violates it?
18     Go ahead.  You can answer.
19 A.  I'm not sure on that one.  I would have to have
20 more details on it.
21 Q.  I have given you every detail you need, sir.
22     First of all, let's start with the basic.  They
23 are on vacation in Cabo.  Are they at the workplace?
24     MR. McKEEBY:  Objection, incomplete
25 hypothetical.  I don't know if we are talking about

Page 1003

1 a plane or on the beach.  Objection.
2     MR. PRYOR:  I just said they were in a
3 hallway.
4     These objections to try and protect the
5 witness's lying is inappropriate.
6     THE COURT:  Hold on, Counsel.
7     I will strike that.
8     MR. PRYOR:  It's absolutely --
9     THE COURT:  I will strike that.
10     Okay.  Ask the question again.  Complete
11 the hypothetical.
12 BY MR. PRYOR:
13 Q.  Did I make it clear to you, sir, that they were
14 not at work in my example?
15 A.  You didn't state that.  So now I know, yes.
16 Q.  A hallway on vacation in Cabo is work?
17 A.  I don't know which hallway you are talking
18 about.
19 Q.  Okay.  All right.  It's the Hilton.
20 A.  Okay.
21 Q.  You got it?
22 A.  Yes.
23 Q.  Is that clear enough for you?
24     Can you answer my question now?
25 A.  State the question one more time.

Page 1004

1 Q.  Flight attendants are walking down an aisle
2 towards each other at the Hilton.  One of them
3 refuses to get out of the way of the other one.
4     The other person then files a complaint with
5 Southwest Airlines.
6     Would that violate the workplace bullying
7 policy?
8 A.  One of the statements in here is "blocking
9 one's path," and so that would be considered as
10 possibly violating the workplace bullying hazing
11 policy.
12 Q.  So that would violate Southwest policy even
13 though it is not in the workplace.
14 A.  We would have to investigate it to know if it
15 violated.
16 Q.  What?
17 A.  We would have to investigate it to see if it
18 violated or not on that.  To be specific.
19 Q.  I will try it another way.
20     Does the workplace bullying policy require it
21 to involve the workplace, as stated in the title?
22 A.  I would assume it would have to refer to the
23 workplace or something to take place that has to do
24 with work.
25 Q.  If you assume it has to take place in the

Page 1005

1 workplace, what was your problem with saying, no,
2 the policy wouldn't apply to the flight attendants
3 in Cabo?
4 A.  I don't know your question on that one.
5 Q.  You didn't understand, even though I repeated
6 it over and over.
7     So, by the way, knowing whether or not it is in
8 the workplace is important, isn't it?  Because it's
9 a workplace bullying policy, right?  So that's
10 important?  It's right there in the title.  Yeah?
11     You can say yes.
12 A.  I would have to investigate to know the
13 specifics on it.  Yes, it does say "workplace" on
14 it, to answer your question.
15 Q.  Is it important to determine a workplace
16 bullying violation to determine whether or not the
17 violation took place in the workplace?
18 A.  It would have to do with work, yes.
19 Q.  No, not work, workplace.  There is a
20 difference.
21     Would it have to involve the workplace as
22 stated in the policy?
23     MR. McKEEBY:  Objection, argumentative.
24     THE COURT:  I will allow it.
25     THE WITNESS:  As stated here, it does,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Pages 1006..1009

Page 1006

1  yes.
2  BY MR. PRYOR:
3  Q.   And, in fact, this is the policy that you
4  terminated Ms. Carter for, and you told us you
5  didn't even ask if it occurred in the workplace and
6  you didn't care.  It didn't matter to you, right?
7        MR. McKEEBY:  Objection, compound.
8        THE COURT:  Sustained.
9  BY MR. PRYOR:
10  Q.   You didn't even ask Ms. Carter because it
11  didn't matter to you if the activity took place in
12  the workplace?  True?
13        MR. McKEEBY:  Objection, compound.
14        THE COURT:  I will overrule that one.
15  BY MR. PRYOR:
16  Q.   You testified to it earlier, sir.  What are you
17  going to do?
18  A.   If it has to do between --
19        MR. GREENFIELD:  Objection, your Honor, to
20  the continued sidebar.
21  BY MR. PRYOR:
22  Q.   It has to do with what?
23        THE COURT:  I will allow you to answer the
24  question.
25

Page 1007

1  BY MR. PRYOR:
2  Q.   It has to do with what?
3  A.   If it has to do with the workplace, yes.
4  Q.   That wasn't my question.  Of course it has to
5  do with the workplace.
6        You didn't determine whether or not Ms. Carter
7  was even at the workplace.
8  A.   I did not.
9  Q.   And it's crucial to firing someone for
10  violating the workplace bullying policy that you
11  fired her for violating the workplace bullying
12  policy, true?
13        MR. McKEEBY:  Objection, he's testifying,
14  argumentative.
15        THE COURT:  I will allow it.
16        THE WITNESS:  I fired her for violation of
17  the workplace hazing and bullying policy, yes.
18  BY MR. PRYOR:
19  Q.   Now I have another question for you.  I wish I
20  could remember it.
21        All right.  I remember what it was.
22        You went through a couple of drafts of the
23  termination letter for Ms. Carter, didn't you?
24  A.   I believe so, yes.
25  Q.   Yes.  And you were running it by those same

Page 1008

1  people that were investigating all of the other
2  recall petition people, didn't you?
3  A.   Which people are you referring to?
4  Q.   Some of the people on this Exhibit 21.  It's
5  sitting in front of you.
6        MR. GREENFIELD:  Objection, your Honor,
7  lack of foundation, and calls for --
8  BY MR. PRYOR:
9  Q.   You sent it to --
10        MR. GREENFIELD:  Excuse me.
11        THE COURT:  Hold on.  I've got an
12  objection.
13        MR. GREENFIELD:  Objection, your Honor,
14  lack of foundation, and then calls for speculation.
15        THE COURT:  I will let you back up and set
16  the foundation.
17        MR. PRYOR:  Okay.  Ask again?
18        THE COURT:  Yes.
19        MR. PRYOR:  Fix it?
20  BY MR. PRYOR:
21  Q.   Sir, did you send drafts of the termination
22  letter of Ms. Carter to anyone on Exhibit 21-E?
23        And I will specifically refer you to Maureen
24  Emlet.
25  A.   Yes.

Page 1009

1  Q.   You did send it to her, right?
2  A.   Yes.
3  Q.   And when you sent it to her, you guys were
4  trying to figure out to get Ms. Carter, and you took
5  out the word "workplace" from "bullying," didn't
6  you?
7  A.   I don't recall.
8  Q.   You wouldn't do that, would you?
9  A.   Not intentionally, no.
10  Q.   It just so happens that in your draft you took
11  out the word "workplace."  That's just an accident,
12  right?
13  A.   I don't remember when I made that that I
14  intentionally took it out for any reason.
15  Q.   Who told you you wouldn't get away with that
16  and made you put it back in?
17        MR. McKEEBY:  Objection, foundation,
18  speculation.
19  BY MR. PRYOR:
20  Q.   Anyone?
21        THE COURT:  Hold on.  There is an
22  objection.  I've got to rule on it.
23        I will overrule.
24        He can answer if he has personal
25  knowledge.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 277 of 642   PageID 11218
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                Pages 1010..1013

Page 1010

1        THE WITNESS:  Restate the question.
2 BY MR. PRYOR:
3 Q.  Yes.
4    Who told you, you are not going to get away
5 with taking out the word "workplace," you have got
6 to put it back in?
7 A.  Nobody.
8 Q.  So it's your testimony, if such an error
9 occurred -- we will look at some documents in a
10 bit -- if such an error occurred, you are the one
11 that fixed it, right?
12 A.  I don't recognize that there was an error.  The
13 first draft was simply something that needed to be
14 proofread.
15 Q.  Let's go back to Exhibit 66.
16    Let's see if I can figure out where I was.
17    Oh.  Let's go to the fourth paragraph.  "While
18 I hold a current position."
19    "While I hold a current position within my
20 union."
21    So once again, you are being told this involves
22 the Union, true?
23        MR. McKEEBY:  Objection, the document
24 speaks for itself.
25        MR. PRYOR:  He received it and interpreted

Page 1011

1 it.
2        THE COURT:  I will allow him to answer.
3        THE WITNESS:  It states that she holds a
4 current position in the Union, yes.
5 BY MR. PRYOR:
6 Q.  And did you need someone to tell you what that
7 position was?
8 A.  For Audrey, no.
9 Q.  What was her position?
10 A.  President of TWU Local 556.
11 Q.  So you knew that, right?
12 A.  Yes.
13 Q.  She goes on to talk about repeated personal
14 attacks and threats made both via social media and
15 face-to-face.
16    You know from your interview that's not
17 referring to Charlene Carter, true?
18 A.  I don't know that.
19 Q.  I'm sorry?
20 A.  I don't know that.
21 Q.  You don't what?
22 A.  I don't know that.
23 Q.  After you interviewed her, did you find out
24 that she's talking about other purported flight
25 attendants doing that, not Charlene Carter?

Page 1012

1 Charlene Carter didn't face-to-face with her, true?
2 A.  But it says "made via social media as well as
3 altercations face-to-face."
4 Q.  I wasn't talking about that.  I'm asking about
5 the face-to-face now.  Did you think I was asking
6 about the others?
7    I said there was no face-to-face.  So you don't
8 answer that, you point to something else.  Why would
9 you do that, sir, if you are not trying to be
10 evasive?
11        MR. GREENFIELD:  Objection.  Objection,
12 your Honor, argumentative.  He's badgering the
13 witness.
14        THE COURT:  Sustained.
15        MR. PRYOR:  He's being evasive.  I'm
16 entitled to call him on it.
17        THE COURT:  You can rephrase it.
18        You can rephrase it.
19 BY MR. PRYOR:
20 Q.  Sir, did I ask you about whether or not
21 Ms. Carter is the one that caused an altercation
22 face-to-face?
23 A.  No.
24 Q.  I didn't ask you that.
25 A.  I didn't understand the question when you first

Page 1013

1 said it.  That's what I read what it said.
2    And no, Ms. Carter did not do anything
3 face-to-face.
4 Q.  Okay.  I know -- we all know that.  But what
5 I'm trying to figure out is when I asked you that,
6 you answered something else, if you are not trying
7 to be evasive.
8 A.  I'm trying --
9        MS. GREEN:  Objection, your Honor.
10        THE COURT:  Sustained.
11        MR. GREENFIELD:  It's still argumentative.
12        MR. McKEEBY:  And move to strike.
13 BY MR. PRYOR:
14 Q.  So as a matter of fact --
15        MR. McKEEBY:  He's repeatedly referring to
16 the witness as evasive, as lying, and that needs to
17 be stricken from the record.  He can make those
18 arguments in closing.
19        THE COURT:  I will strike the last
20 reference.
21        MR. McKEEBY:  Thank you.
22        THE COURT:  You may proceed.
23 BY MR. PRYOR:
24 Q.  You, in fact, concluded that Ms. Carter made no
25 threat at all to Ms. Stone, true?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 278 of 642   PageID 11219
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1014..1017

Page 1014

1 A.  I don't recall that.
2 Q.  So Audrey Stone tells you she thinks she's
3 being threatened by Charlene Carter.  That's part of
4 her complaint.
5     And you don't recall your conclusion as to
6 whether or not Ms. Stone was threatened, true?
7 A.  There were things that were stated on social
8 media that could be perceived as threatening, yes.
9 Q.  Did you conclude there was a threat as a result
10 of your investigation?
11 A.  I questioned her in the fact-finding as a
12 statement that she made that referred to "can't wait
13 until you get back online."  And to me, that seemed
14 like it could have been a veiled threat, so I
15 inquired to her about it.
16 Q.  Did you conclude it was a veiled threat?
17 A.  Her statement was that she didn't want her to
18 be a president anymore and she wanted her to be a
19 flight attendant.
20 Q.  Do you understand my question was what was your
21 conclusion, sir?
22 A.  It could have been a threat.
23 Q.  Okay.  So that's going to be in your report
24 then.  If you concluded it could have been a threat,
25 surely that will be in your report, right?

Page 1015

1 A.  Which report are you referring to?
2 Q.  Your conclusion, your investigation notes, and
3 the termination.  Surely you terminated her for
4 threatening an employee.
5 A.  "Threatening" is a general term.  To what was
6 stated specifically -- I don't know if I can answer
7 your question specifically whether she threatened
8 her.
9 Q.  Well, let's try this.
10    The harassment policy at Southwest Airlines
11 prohibits an employee in the workplace from
12 threatening another employee.
13    Do you understand that?
14 A.  Yes.
15 Q.  And there was a complaint by Ms. Stone.  Did
16 you conclude that, in fact, Ms. Carter threatened
17 Ms. Stone and fired her for it?
18 A.  There were many things that I terminated her
19 for, not specifically that one that stands out.  I
20 didn't put that in the letter specifically.
21 Q.  Oh.  So you did fire her for that, you just
22 didn't put it in the letter, is that fair?
23 A.  No, that's not what I said.
24 Q.  Well, then did you conclude it or not, sir?
25    That was part of your investigation, that

Page 1016

1 part of the charge.  Did you fire her for
2 threatening Ms. Stone?
3 A.  Not specifically.
4 Q.  Generally.  Did you fire her for threatening
5 Ms. Stone?
6 A.  I fired her for violation of those policies.
7     MR. PRYOR:  Objection, nonresponsive.
8     THE WITNESS:  So if you are trying to say
9 that I fired her for threatening, I can't say yes
10 because I can't recall specific --
11 BY MR. PRYOR:
12 Q.  You can't recall whether or not you concluded
13 she threatened, and you fired her for threatening?
14 Is that what you are telling us?
15    You may or may not have fired Ms. Carter for
16 threatening Ms. Stone?
17 A.  That was part of the investigation is what I'm
18 saying, are the comments that were made.  They may
19 have been deemed as threatening, but I fired her for
20 violation of those policies.
21    You are asking me if I fired her for
22 threatening.
23 Q.  I am.
24 A.  So no, not specifically.
25 Q.  Well, you keep saying "not specifically," and I

Page 1017

1 say, what does that mean, "not specifically"?
2    Is this just some way not to answer?
3    Did you generally fire her for threatening
4 Ms. Stone --
5     MR. GREENFIELD:  Objection --
6 BY MR. PRYOR:
7 Q.  -- generally, specifically, whatever phrase you
8 want to use.
9     MR. GREENFIELD:  Objection.
10    MR. McKEEBY:  Objection, asked and
11 answered.
12    THE COURT:  I will allow it.
13 BY MR. PRYOR:
14 Q.  Go ahead.
15 A.  No.
16 Q.  Okay.  Wow.  Why did it take so long to get
17 there?  I asked you four or five times.
18    MR. GREENFIELD:  Objection, argumentative.
19    MR. McKEEBY:  Objection, your Honor.
20    THE COURT:  Sustained.
21 BY MR. PRYOR:
22 Q.  Sir, did I ask you that question over and over
23 and over and you would not answer?
24    MR. McKEEBY:  Objection, argumentative.
25    MR. GREENFIELD:  Same objection, your

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 279 of 642   PageID 11220
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                 Vol 4 July 08, 2022                 Pages 1018..1021

Page 1018

1  Honor.
2          THE COURT:  Sustained.
3          Counsel, you got your answer.  Next
4  question.
5  BY MR. PRYOR:
6  Q.  All right.  So at least at the end of the day,
7  we know that you did not fire Ms. Carter for
8  threatening Ms. Stone.
9  A.  Correct.
10 Q.  Let's go to -- by the way, are you on Facebook
11 Messenger?
12 A.  No.
13 Q.  In 2017, were you on Facebook Messenger?
14 A.  No.
15 Q.  Do you know how Facebook Messenger works?
16 A.  Through the investigation, yes, I learned quite
17 a bit about Facebook.
18 Q.  I couldn't understand your answer.
19 A.  Yes, through the investigation, I learned quite
20 a bit about Facebook.
21 Q.  Okay.  Good.
22     So you learned that Facebook Messenger, when
23 you open it up, only plays a video if you ask it to?
24 Or did you not?
25 A.  If you ask it to or if you --

Page 1019

1  Q.  You have to click on it.
2  A.  If you click on it, yes.
3  Q.  Okay.
4     So we can agree that a video sent by Facebook
5  manager [sic], when you open it up, you can see the
6  message, you can see whatever the beginning picture
7  of the video is, but that video is not going to play
8  unless you click on it, true?
9  A.  I don't recall if it starts right away when you
10 open up Facebook or not.  I can't say that
11 specifically.
12 Q.  I thought you just told us that Facebook
13 Messenger only plays a video after you click on it.
14     You are now saying something different?
15     That was 20 seconds ago.
16 A.  Some videos that I have seen -- I don't know if
17 Facebook is this way -- you open -- you open it up
18 and it starts playing.
19     I don't know if Facebook specifically has to be
20 clicked on.  I know that some pictures -- I don't
21 use it enough to know this right offhand.
22 Q.  You raised a whole host of issues now.
23     So before when you said it only plays when you
24 click on it, what did you mean?
25         MR. McKEEBY:  Objection, mischaracterizes

Page 1020

1  testimony.  That's not what he said.
2          THE COURT:  I will allow it.
3          THE WITNESS:  There are versions that you
4  have to click on, yes.
5  BY MR. PRYOR:
6  Q.  Is there a version of Facebook Messenger that
7  the algorithm allows it to play without you clicking
8  on it, to your knowledge?
9  A.  I'm saying I do not know that for sure.
10 Q.  Well, did you know it in 2017 when you made
11 your decision to terminate Ms. Carter?
12 A.  If I recall, those messages needed to be
13 clicked on.
14 Q.  Okay.  So when you investigated Ms. Carter, one
15 of your conclusions was that video is only going to
16 play if Ms. Stone clicks on it, true?
17 A.  True.
18 Q.  Do you know whether or not this Facebook page
19 was a Facebook page dedicated to Audrey Stone, TWU?
20 A.  I know it was Audrey Stone's Facebook page.
21 That is what I know.
22 Q.  I'm sorry?
23 A.  I know it is Audrey Stone's Facebook page.  I
24 do not know for sure that it was associated with TWU
25 or whatever you just said.

Page 1021

1  Q.  When you say you don't know for sure it was
2  Audrey Stone, TWU, does that mean you were aware of
3  it and unsure, or this is new information?
4  A.  I don't know the question.  I'm not following
5  you on that somehow.
6  Q.  Here we go.
7     Did you know at the time you investigated
8  Ms. Carter whether or not the Facebook page she sent
9  the message to was a Facebook page dedicated to
10 Audrey Stone, TWU?
11     Did you know that?
12 A.  No.
13 Q.  Would it have been important to you?
14 A.  No.
15 Q.  No.  Because it doesn't matter to you if it
16 involves union activity, right?
17         MR. McKEEBY:  Object to the form of the
18 question.  Again the vagueness.
19         THE COURT:  I will allow it.
20 BY MR. PRYOR:
21 Q.  It didn't matter.
22 A.  It mattered that it was Audrey Stone's Facebook
23 page.
24 Q.  Okay.  That wasn't my question, was it, sir?
25     Why don't you answer what I ask you instead of

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022              Pages 1022..1025

Page 1022

1 what you want to say?
2        MR. GREENFIELD:  Objection, your Honor,
3 sidebars.
4        MR. PRYOR:  He continuously is not
5 answering the question.  I'm entitled to ask him why
6 he's not, your Honor.
7        MR. GREENFIELD:  Objection, your Honor,
8 and I move to strike.
9        THE COURT:  I will strike that.
10       You can ask the question.  You can ask
11 your question.
12 BY MR. PRYOR:
13 Q.  Sir, that's not what I asked you.
14     I asked you whether or not it was important to
15 you that it was an Audrey Stone, TWU, Facebook page
16 or not, not if it was important that it was an
17 Audrey Stone Facebook page.
18     You got the difference now?  Do you understand?
19 A.  No.
20 Q.  You don't understand.
21 A.  You asked me two questions.  I'm answering the
22 first one that said if it mattered to me.
23 Q.  If you will just answer what I'm asking, we
24 won't have to go back and forth.
25       MR. McKEEBY:  Objection.

Page 1023

1        MR. GREENFIELD:  Objection, your Honor.
2 The sidebars continue.
3        THE COURT:  Sustained.
4        I don't think he knows the foundation.  I
5 think you've got to set the foundation.  I don't
6 think he knows the foundation.
7        MR. PRYOR:  Okay.  May I approach?
8        THE COURT:  You may.
9        (Thereupon, the following proceedings were
10       had at sidebar:)
11       MR. PRYOR:  If I'm being chastised, I want
12 to know.  I'm sorry.
13       THE COURT:  I will wait for that.
14       MR. PRYOR:  I'll fix it.
15       THE COURT:  I don't know that he knows she
16 has two separate Facebook accounts, one listed TWU
17 that is Union, and one that is personal.  We covered
18 that with Stone.
19       MR. PRYOR:  Fair enough.  We did.
20       THE COURT:  We haven't covered that with
21 him yet.  So he might not know, or he might have
22 forgotten, since 2017.
23       MR. GREENFIELD:  Your Honor, continued
24 sidebars.  It is after every question, it is after
25 every comment.  He will not stop.

Page 1024

1        THE COURT:  And that's why I want to get
2 him on to --
3        MR. PRYOR:  I shall.
4        THE COURT:  Right now we are not
5 communicating together, and that's why I'm not ready
6 to let the record reflect that he's a liar, because
7 I think that there is a miscommunication.
8        MR. PRYOR:  Okay.  Well, I'm --
9        THE COURT:  I'm trying to point out what
10 our communication is.  We haven't told him there are
11 two, like a TWU and a personal.
12       If you clear that up, he's probably not
13 going to be evasive.  Got it?
14       MR. PRYOR:  Yes, sir.
15       (Thereupon, the sidebar was concluded and
16       the following proceedings were held in open
17       court:)
18       THE COURT:  Okay.  You can set that
19 predicate we talked about.
20       MR. PRYOR:  Let's see if we can clear this
21 up.
22 BY MR. PRYOR:
23 Q.  The Facebook page that Ms. Carter sent her
24 Facebook messages to, what was the name, the full
25 name on that Facebook page, to your knowledge?

Page 1025

1 A.  Audrey Stone.
2 Q.  If, in fact, it was Audrey Stone, TWU, would
3 that have impacted your investigation and
4 conclusions?
5 A.  No.
6 Q.  Okay.  So it didn't matter if it was sent to --
7 intended to be sent to her union president, true?
8 A.  No.
9 Q.  In fact, Ms. Carter told you she was sending it
10 to her union president, that that is why she was
11 sending it, true?
12 A.  I don't know if she said that specifically.  I
13 don't remember that.
14 Q.  When we go through the interview notes that you
15 took, are you going to be surprised to see that?
16 A.  I'm saying I just didn't recall that it said
17 that specifically.  It may have.
18 Q.  Do you know whether or not the message was sent
19 to a public or private Facebook message account?
20 A.  It was private.
21 Q.  What does that mean?
22 A.  That the public can't see it.  It's to a
23 specific person.
24 Q.  So you know that it was sent to the Union
25 president, true?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                                    Pages 1026..1029

Page 1026

1  A.   It was sent to Audrey Stone.
2  Q.   Audrey Stone was the Union president, true?
3  A.   Yes.
4  Q.   You know that union activity is being talked
5  about, true?
6  A.   Yes.
7  Q.   So let me go with my question again.
8      Is it accurate to say that Charlene Carter sent
9  her message to Audrey Stone, who was also the
10 president of the Local 556?
11 A.   Yes.
12 Q.   And so she sent this message to her president
13 and she sent it in a manner in which only the
14 president could see it, true?
15 A.   Yes.
16 Q.   And the only way that president could view that
17 message, or at least the video, was to click on it?
18 A.   Yes.
19 Q.   By the way, she could have made it public,
20 couldn't she?
21 A.   The message?
22 Q.   When you are sending something to someone's
23 Facebook message account, you get to decide --
24 actually both places -- you certainly have a role in
25 whether or not it is going to be public or private,

Page 1027

1  true?
2  A.   I don't know it that well to say that.
3  Q.   So if a union member sends a Facebook message
4  to their union president and says, You are a
5  terrible candidate, you suck, to you, that violates
6  Southwest policy, true?
7  A.   I wouldn't necessarily say that.
8  Q.   Why not?  You said it doesn't matter if it went
9  to the Union president.
10     Can employees tell other employees, You suck,
11 and Southwest say, Oh, that's okay?
12     I can be more violent if you want me to.  How
13 far do I have to go?
14 A.   The egregiousness of the message is taken into
15 consideration.
16 Q.   So would "You suck" -- one employee sends a
17 message to another employee saying, "You suck,"
18 would that violate policy?
19 A.   If that happened, the employee would have to
20 turn that in and we would conduct an investigation
21 on it.
22 Q.   It may or may not be found guilty of policy?
23 A.   Correct.
24 Q.   And the more severe the language, the more
25 likely it is to be a violation, I would assume?

Page 1028

1  A.   You can assume that, yes.
2  Q.   So let's go back to my example then.
3      A union member sends a communication to her
4  union president, uses some vile language, "you
5  suck," however much you want to escalate that, and
6  that's a violation of Southwest policy?
7  A.   It would be investigated.
8  Q.   And depending on how vile the language is, it
9  could be a violation?
10 A.   It could be, yes.
11 Q.   You terminated Ms. Carter for sending the
12 abortion video and the comments associated with it
13 to Ms. Stone.  That's one of the reasons, true?
14 A.   Along with others, yes.
15 Q.   I said "one of the reasons."  You understand
16 what "one" is?
17 A.   Yes.
18 Q.   Okay.  Another reason was the Facebook message
19 post that had the pictures with the anatomically
20 correct vagina hats, true?
21 A.   Yes.
22 Q.   And the third reason is she posted an abortion
23 video on her public personal Facebook account which
24 you determined to have a nexus to Southwest
25 Airlines, true?

Page 1029

1  A.   Yes.
2  Q.   Any other reason?
3  A.   There were statements made in the letter that
4  referred to our social media policy and bullying and
5  hazing policy, and possibly the harassment policy
6  due to the female genitalia.
7  Q.   So what was actually concluded is it was
8  possibly a violation, but it wasn't determined to be
9  a violation, right?
10     MR. McKEEBY:  Objection, vague.
11     MR. PRYOR:  Just repeating what he said.
12     THE COURT:  I will allow it.
13     THE WITNESS:  It was determined to be a
14 violation of that.
15 BY MR. PRYOR:
16 Q.   It was not determined to be a violation, it was
17 determined that it could have been, but that wasn't
18 the reason for the termination, is that fair?
19 A.   Correct, yes.
20 Q.   Okay.  So let's go back.
21     We've got these three reasons here that but for
22 these three, she would not have been terminated
23 based on the conclusions of that investigation,
24 true?
25 A.   That is a possibility.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 282 of 642   PageID 11223
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                        Pages 1030..1033

Page 1030

1 Q.  Not a possibility, sir.  I'm asking, isn't that
2 true?
3 A.  If you take out all three of them, is that the
4 question?
5 Q.  Yes.
6 A.  Yes, if you take out all three of them, then
7 most likely not terminated.
8 Q.  Not even most likely.  She wouldn't have been
9 terminated because those were the only conclusions.
10     Why do you have a problem agreeing with that?
11 A.  I'm agreeing with it.
12 Q.  Okay.  "Most likely" and "possibly," that's not
13 agreeing, that's hedging.
14     MR. McKEEBY:  Objection.
15 BY MR. PRYOR:
16 Q.  So I would appreciate you --
17     MR. GREENFIELD:  Objection, your Honor, to
18 the sidebars.
19     THE COURT:  Sustained.  I will strike it.
20     You can ask your question.
21 BY MR. PRYOR:
22 Q.  So these are the three reasons that she was
23 terminated, and without those three, she would not
24 have been terminated, true?
25 A.  Yes.

Page 1031

1 Q.  Okay.
2     MR. PRYOR:  Let's look at exhibit -- I
3 think it is 62.  It's actually Exhibit 68.
4     Let me look at the next page and see if
5 there is anything else.
6     Actually, let me talk about the last
7 paragraph of Exhibit 66.
8 BY MR. PRYOR:
9 Q.  I can read it.
10     "I am personally pro choice, and to be sent
11 messages that reference me as a murderer couldn't be
12 further from the truth."
13     Do you see that?
14 A.  Yes, I do.
15 Q.  Did it matter to your investigation whether or
16 not Ms. Stone was pro choice?
17 A.  No.
18 Q.  Ms. Carter was complaining about the way her
19 union was spending money, true?
20 A.  She made that complaint.
21 Q.  And she wasn't complaining or it didn't matter
22 whether or not Ms. Stone was pro choice or pro life,
23 true?
24 A.  Ms. Carter stated that she did not know what
25 Audrey Stone was.

Page 1032

1 Q.  I didn't ask that.  I said it didn't matter.
2 You just told us it didn't matter.
3 A.  Can you restate the question then?
4 Q.  It didn't matter to your investigation whether
5 or not Ms. Stone was pro choice or pro life?
6 A.  No.
7 Q.  And the reason is because Ms. Carter was
8 complaining about her union, not about Ms. Stone,
9 true?  It didn't involve Ms. Stone's personal views.
10 A.  From what I remember, she was complaining about
11 both, Ms. Stone and the Union.
12 Q.  What was she complaining about Ms. Stone?
13     Oh, her not being a good president of the
14 Union?  Yes?
15 A.  Among other things.
16 Q.  Okay.  What other thing?
17 A.  She didn't think she was using -- I mean, she
18 thought that the pro march -- or the march in
19 Washington was not used -- the money was used in a
20 wrong way.
21 Q.  So once again, every complaint she's making is
22 about her union or the actions of her union
23 president, true?  That you are aware of.
24 A.  Yes.
25 Q.  So it's union activity she's complaining about,

Page 1033

1 not Ms. Stone personally, about the things she's
2 doing as president of the Union, true?
3     MR. McKEEBY:  Object to
4 mischaracterization.
5     THE COURT:  I will allow it.
6 BY MR. PRYOR:
7 Q.  That's what you just told us.
8 A.  Say it one more time.
9     I want to make sure I get your questions
10 correct.  I'm not intentionally trying to be
11 evasive.  I'm just trying to understand the
12 questions when you say them.
13 Q.  I'm taking the answer you just gave us, sir,
14 and I will try it again.
15 A.  Okay.
16 Q.  Isn't it correct that all of Ms. Carter's
17 complaints that you reviewed as part of your
18 investigation involved her complaints about her
19 union or her union president and how she was doing
20 her job?
21 A.  You say "all," and not all of them --
22 Q.  Every single one is what I'm saying, not an
23 exception at all.
24     If you know of an exception, we are going to
25 talk about it.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 283 of 642   PageID 11224
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1034..1037

Page 1034

1 A.  Yes.
2 Q.  Okay.  What is the exception?
3 A.  You just asked me a question if everything
4 was --
5 Q.  You're agreeing with my -- okay.
6 A.  You are confusing me.
7 Q.  I'm asking the positive or negative.
8    Are you agreeing that every single complaint
9 that Ms. Carter made in the messages that she sent
10 to Ms. Stone that were part of your investigation
11 involved her complaints about the Union or the
12 activities of Ms. Stone as the president of the
13 Union?  Do you agree with that?
14 A.  I would say she was making those complaints
15 about the Union and Audrey Stone personally.
16 Q.  Okay.  What personal aspect of Ms. Stone,
17 outside of her being president, do you recall her
18 making?
19    Saying "You're corrupt," she's talking about
20 her corruption as Union president.
21    Saying, "I think you are doing a lousy job" is
22 talking about her being Union president.
23       MR. GREENFIELD:  Objection.
24       MR. McKEEBY:  Objection, your Honor.
25       MR. GREENFIELD:  Objection.  He's

Page 1035

1 continuing to testify.
2       THE COURT:  Sustained.
3 BY MR. PRYOR:
4 Q.  Can you recall -- I'll rephrase.
5    Can you recall any part of your investigation
6 that revealed a comment to Ms. Stone whether --
7 about her or the Union that could be separated and
8 say, You know, that's talking about Audrey Stone
9 outside her job as Union president.
10    Can you think of something like that?
11 A.  No.
12 Q.  So the only thing you know of is complaints
13 about Ms. Stone as Union president, in that context?
14 A.  From only the complaints, yes.
15 Q.  And you reviewed this stuff Friday?
16       MR. McKEEBY:  Objection, vague.  I don't
17 know what "this stuff" means.
18       THE COURT:  Sure.  You can ask it again.
19 Clear it up what you mean by "this stuff."
20       MR. PRYOR:  Rephrase.
21       THE COURT:  Yes.
22 BY MR. PRYOR:
23 Q.  You reviewed the documents relating to your
24 investigation as recently as Friday, right?
25 A.  Yes, some of them.

Page 1036

1 Q.  And so you've looked at all of this, and so you
2 know it all relates to complaints about Ms. Stone as
3 president or complaints about the Union, right?
4 A.  See, I interpret them differently.  They all
5 reflect the Union, but they also kind of reflect
6 Ms. Stone also personally.
7 Q.  Tell us the ones that somehow are to Ms. Stone
8 unassociated with her role as president.
9 A.  I don't know specific ones right now offhand.
10 Q.  Okay.  Well, when you reviewed it on Friday,
11 you saw some, right?
12 A.  I don't remember reviewing that document
13 specifically where she made those complaints.
14    I reviewed a lot of different things.  I tried
15 to remember everything.
16    What I'm saying is that I don't remember every
17 detail.
18 Q.  We will go through the documents.
19    On the three, on the three categories of
20 documents that you terminated Ms. Carter for and
21 would not have terminated her or taken action
22 otherwise -- you got the question so far?
23 A.  Yes.
24 Q.  None of those three involved any personal
25 attack on Ms. Stone; they all involved her role as

Page 1037

1 president of the Union, true?
2 A.  As I stated, it depends on how you take those
3 accusations.  They could be referred to her
4 personally, they could be referred to the Union
5 only.  It's how you interpret them.
6 Q.  Sir, does Southwest Airlines afford any
7 protection to a union member engaging in
8 union-activity communications, any at all?
9 A.  We protect all of our employees.
10 Q.  How do you protect an employee communicating
11 with her union president?
12       MR. McKEEBY:  Objection, vague.
13       THE COURT:  I will allow it.
14       THE WITNESS:  It just depends on what is
15 stated.  If it's something that is egregious enough
16 that we would look into it and it was brought
17 forward to us.
18 BY MR. PRYOR:
19 Q.  So any statement that you see that you believe
20 violates Southwest policy you take action on?
21 A.  Yes.
22 Q.  There is no protection from any interpretation
23 of Southwest's policy in regard to those actions?
24       MR. McKEEBY:  Objection, vague.
25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 284 of 642   PageID 11225
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Pages 1038..1041

Page 1038

1 BY MR. PRYOR:
2 Q.  They are not protected.  There is no special
3 class for union activity.  That's crazy, right?
4        MR. McKEEBY:  Objection, vague and
5 compound.
6        THE COURT:  I will sustain on compound.
7 BY MR. PRYOR:
8 Q.  Do you find it ironic that the Union is here
9 fighting against protecting union activity, union
10 communications, and Ms. Carter is not --
11       MR. GREENFIELD:  Objection, your Honor,
12 sidebars.  He's making argument again.  I would ask
13 that you instruct him to stop this.
14       THE COURT:  Sustained.
15       MR. PRYOR:  I will withdraw it.
16       Okay.  Going back to Exhibit 66.
17       All right.  Let's go to the next page.
18 Let's see if there is anything else on there.
19       Okay, just scroll down.
20       I know this is not instantaneous to do
21 this.  I appreciate it.  I just want everything to
22 happen like that.
23       Go to the next page.
24       Okay.  I want to read this.
25

Page 1039

1 BY MR. PRYOR:
2 Q.  This is from -- this is one of the -- we've
3 been using the phrase "buckets," by the way.  I'm
4 going to use this.
5        We've got three buckets.  One bucket that you
6 fired her for is this communication, true?
7 A.  You have to be more specific.  I don't know
8 what "this communication" is.  This particular page?
9 Q.  I'm showing it to you right now.
10       This is the communication that was sent by
11 Ms. Carter to Ms. Stone on her Facebook Messenger,
12 which we say was Audrey Stone, TWU, but that doesn't
13 matter to you, so we won't bother with that.
14       This is one of the three things you terminated
15 Ms. Carter for, this communication right here.
16       MR. McKEEBY:  Objection, mischaracterizes
17 evidence.
18       MR. PRYOR:  I'm sorry?
19       THE COURT:  I will allow it.
20       THE WITNESS:  Yes.
21 BY MR. PRYOR:
22 Q.  Okay.  And it says, "This is what you supported
23 during your paid leave with others at the Women's
24 March in DC.  You are truly despicable in so many
25 ways.  By the way, the recall is going to happen."

Page 1040

1        Let's just stop right there.
2        So "the recall is going to happen."
3        Was she referring to recalling Audrey Stone as
4 an individual from something?
5        Is there any way to say, oh, you are talking
6 about Audrey Stone in an individual hat, or is this
7 clearly talking about Audrey Stone with her
8 president of the Union hat on?
9 A.  I believe it's president.
10 Q.  Okay.  So this communication we know was
11 referring to Audrey Stone as president of the Union.
12 Fair enough?
13 A.  It refers to the recall of the president, yes.
14 Q.  Okay.
15       "Can't wait to see you back online."
16       That's the portion that I think you eventually
17 agreed concluded was not a threat, right?
18 A.  I never concluded that completely.  It's what
19 she said in the fact-finding.
20 Q.  Well, let's state it that way.
21       You did not conclude that that was a threat and
22 you did not fire her because of making a threat.  Is
23 that fair?
24 A.  Yes.
25 Q.  Okay.

Page 1041

1        All right.  So let's go to the next page.
2        By the way, would you agree with me that
3 Ms. Carter is complaining about her union and how
4 they are spending her money on something she thinks
5 is murder?  Do you agree with that?
6 A.  Yes.
7 Q.  Do you want to look at it again?
8        MR. GREENFIELD:  He answered the question.
9 BY MR. PRYOR:
10 Q.  What was the answer?
11 A.  Yes.
12 Q.  Okay.  Let's look at the next document.
13       And it starts out, "TWU, AFL-CIO, and 556 are
14 supporting this murder."
15       Would you agree this is talking about her
16 complaining about her union?
17 A.  Yes.
18 Q.  And do you see anything personal to Ms. Stone
19 outside of complaints about the union?
20 A.  On that sentence, no.
21 Q.  Okay.  So this is Bucket 2.  This is the second
22 of the three reasons that you terminated Ms. Carter.
23 And this again is specifically involving complaints
24 about the Union or Audrey Stone as Union president,
25 not individually.  True?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 285 of 642   PageID 11226
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1042..1045

Page 1042

1  A.  Yes.
2  Q.  Okay.  Then let's go to -- I don't know if it
3  is going to be -- she, by the way -- when she -- you
4  can take that off.
5      When she made her complaint, Ms. Stone, she --
6  that's all she included that she sent you.  In that
7  February 22nd, 2017 complaint, that's all she
8  complained about, right?
9  A.  At the time, yes.
10 Q.  Oh, did she change her complaint?
11 A.  We interviewed her.
12 Q.  I'm not talking about "we."
13     Did Ms. Stone broaden at any time her
14 complaint?  Did she say, Now I want you to terminate
15 her for this document?  Anything like that?
16 A.  Not that I'm aware of.
17 Q.  Forget any words.
18     Did she broaden her complaint in any way or did
19 you broaden it?
20 A.  I don't understand the question because
21 you're --
22 Q.  Here is the question.  We got a third bucket
23 coming up as the reason you terminated her, and that
24 is the anatomically correct hats, right?  That's the
25 third bucket.

Page 1043

1  A.  Okay.
2  Q.  I'm not looking for an okay, I'm looking for an
3  agreement.  Is that a yes?
4  A.  Yes.
5  Q.  Yes.
6      And Ms. Stone was not making a complaint about
7  that communication, nor did she ever, true?
8  A.  True, outside of just supplying the pictures of
9  it.
10 Q.  There is no "outside of."
11     You asked her to supply all communications with
12 Ms. Carter, true?
13 A.  Yes.
14 Q.  And included in that communication, a list of
15 that packet of communications, her complying with
16 your request, was that message with that picture,
17 true?
18 A.  Yes.
19 Q.  And you decided that was a violation, true?
20 A.  Our employee relations department did, yes.
21 Q.  That's right.
22     Actually, you didn't conclude that, did you,
23 the employee relations department did.
24 A.  Yes.
25 Q.  And, in fact, you concluded that those first

Page 1044

1  two buckets violated the harassment policy, didn't
2  you?
3  A.  What are the buckets again?
4  Q.  The buckets are the two videos that show the
5  aborted fetus.
6  A.  Just those two.  Okay.  I didn't know what --
7  Q.  You thought that was harassment, but, in fact,
8  employee relations had to tell you, no, it is not,
9  true?
10 A.  I only sent it as a possible violation.  They
11 determined whether it was or not through the
12 investigation.
13 Q.  They told you it was not, true?
14 A.  The pictures and video of the unborn fetuses
15 were determined not to be because it didn't violate
16 any of the classes.
17 Q.  That's right.  Those two videos, employee
18 relations specifically told you that does not
19 violate the harassment policy of Southwest Airlines.
20 Didn't they?
21 A.  Yes.
22 Q.  And nonetheless, you put in the letter that it
23 possibly violated it, didn't you?
24 A.  No.  You are missing part of her letter that
25 she sent to me.  She did say that it was partially

Page 1045

1  supported as a violation because of the genitalia.
2  Q.  Okay.  It is your testimony -- they put this in
3  writing, you know.  Have you seen it?
4  A.  What is in writing?
5  Q.  Employee relations responded in writing to you.
6  A.  Correct.
7  Q.  You reviewed it last week, right?
8      MR. McKEEBY:  Object to a question about a
9  document that is not provided to the witness.  He's
10 testifying to its content.  That's not proper.
11     THE COURT:  Sustained.
12 BY MR. PRYOR:
13 Q.  Did employee relations tell you it was not a
14 violation of Southwest Airlines's harassment policy?
15 A.  They indicated to me on the letter that you are
16 referring to that it was a partial violation of the
17 policy.
18 Q.  No, I'm asking about the two videos.  I know
19 what they concluded about the hats.  We are now
20 talking about the two videos.
21 A.  Okay.
22 Q.  They told you that did not violate Southwest
23 Airlines's harassment policy, didn't they?
24 A.  Those two videos, yes.
25     MR. PRYOR:  Let's look at 65, maybe.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 286 of 642   PageID 11227
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1046..1049

Page 1046

1        Go to page -- I want to be clear about the
2 question I was asking.
3 BY MR. PRYOR:
4 Q.  What I'm talking about two videos, one of the
5 videos was sent to Audrey Stone, we say TWU,
6 Facebook Messenger, right?
7 A.  Yes.
8 Q.  And the other video wasn't sent there, it was
9 posted on Charlene Carter's personal Facebook page?
10 A.  Yes.
11 Q.  Okay.  Those are the two buckets, and then this
12 picture right here is the third bucket?
13 A.  I'm sorry.  To me, it seems like your buckets
14 are changing.  So I'm trying to keep your buckets --
15 Q.  Three buckets for why you told us you fired
16 her.
17        THE COURT:  Hold on.
18        Separation.
19        Okay.  Now you can go.
20 BY MR. PRYOR:
21 Q.  Do we have to go through this again?
22     I thought we agreed there are three buckets you
23 fired her for.  This is the third one.
24 A.  My understanding was that the buckets were the
25 hazing and bullying policy, the social media policy,

Page 1047

1 and possibly the harassment policy.  I thought those
2 were the three buckets that we started out with.
3 And you were just talking about these within those.
4 Q.  I was asking you what you relied upon to find a
5 violation of those policies, and you told me it was
6 those three things.  Without those three things you
7 would not have terminated her.
8        Do you recall telling me that?
9 A.  Okay.
10 Q.  Okay.  So those are the three buckets I'm
11 talking about.  This is the third one which we
12 haven't shown you yet, but now we are, true?
13 A.  Yes.
14 Q.  And this once again is talking about her
15 complaints about the Union.
16     "How are you going to code this an LM2?  The
17 recall is going to happen."
18     Once again, there is nothing personal in this
19 third bucket either about Ms. Stone, it's
20 complaining about her union, and to the extent you
21 would try and find anything about Ms. Stone, it
22 would be about her activity as the president of that
23 union, although I don't even see that.
24        MR. McKEEBY:  Objection, compound.
25 Objection, argumentative.

Page 1048

1        THE COURT:  Sustained.
2        MR. GREENFIELD:  Objection, your Honor.
3 He continues to testify.  I would ask you to --
4        THE COURT:  You can break it up and reask
5 the question.
6 BY MR. PRYOR:
7 Q.  This third bucket relates exclusively to
8 Ms. Carter's complaint about her union, true?
9 A.  Yes.
10        MR. PRYOR:  Let's scroll on until you get
11 to get APP 88.  See if you recognize this.
12        It might help if you had a copy of this.
13        Can I have 65?
14        THE WITNESS:  It's pretty large on here.
15 BY MR. PRYOR:
16 Q.  I'm sorry?
17 A.  It's pretty large on here as far as seeing it.
18 Q.  It's what?
19 A.  I can see it.
20 Q.  Well, I didn't know if you wanted to see the
21 whole thing.
22     This was part of the communications that you
23 looked at?
24 A.  It was given to me, yes.  Yes.
25 Q.  Okay.  And did you fire her for this

Page 1049

1 communication?
2 A.  No.
3 Q.  Did you take any action at all against her or
4 consider this as part of the reason for terminating
5 her?
6 A.  No.
7 Q.  Do you believe it's appropriate for a union
8 member to talk to her union president about her
9 complaints about Planned Parenthood in this context?
10 It is okay for her to do that, right?
11 A.  To complain to the union about Planned
12 Parenthood, is that the question you are asking me?
13 Q.  Yes.  So what Ms. Carter is doing is she
14 complaining about that they went to this march
15 sponsored by Planned Parenthood.
16     You knew that.  She told you that.
17 A.  I didn't know that it was supported by Planned
18 Parenthood.  She made the statement in the meeting,
19 but everything I saw was that it was a women's march
20 supporting women's rights.
21 Q.  You didn't know that it was sponsored by
22 Planned Parenthood?
23 A.  Ms. Carter said that in the fact-finding.
24 Q.  That's what I'm asking.  You knew her complaint
25 was it was a march supported by Planned Parenthood,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 287 of 642   PageID 11228
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1050..1053

Page 1050

1 true?
2 A.  Yes.
3 Q.  And she wanted to communicate her concerns
4 about Planned Parenthood to her union, true?
5 A.  True.
6 Q.  And are you complaining in any way that she did
7 that by, for instance, this document right here?
8 A.  No.
9 Q.  Do you know what eugenics is?
10 A.  No.
11 Q.  You didn't look into that?
12      MR. McKEEBY:  Asked and answered.
13 Objection.
14 BY MR. PRYOR:
15 Q.  Did you look into --
16      THE COURT:  Sustained.
17 BY MR. PRYOR:
18 Q.  -- whether or not eugenics was raised as an
19 issue between Ms. Carter and her union about Planned
20 Parenthood?
21      MR. GREENFIELD:  Objection, your Honor,
22 relevance, and 403.
23      THE COURT:  I will allow the answer to the
24 question.
25      THE WITNESS:  No.

Page 1051

1 BY MR. PRYOR:
2 Q.  And you don't know what it is?
3 A.  No.
4      MR. PRYOR:  Let's look at Exhibit 74.
5 BY MR. PRYOR:
6 Q.  Okay.  Do you recognize --
7      MR. PRYOR:  Is it in evidence?
8      THE COURT:  It's not.
9      MR. PRYOR:  I offer Exhibit 74.
10      THE COURT:  Okay.  74.  Any objections on
11 Exhibit 74?
12      MR. GREENFIELD:  One moment, your Honor.
13      THE COURT:  Yes.
14      MR. GREENFIELD:  No.
15      MR. McKEEBY:  No objection from Southwest.
16      MR. GREENFIELD:  No objections.
17      THE COURT:  Okay.  74 is in evidence.  We
18 will publish.
19      (The referred-to document was admitted
20      into evidence as Plaintiff's Exhibit 74.)
21 BY MR. PRYOR:
22 Q.  Do you recognize this document?
23 A.  Yes.
24 Q.  I'm sorry?
25 A.  Yes.

Page 1052

1 Q.  Did you review this document last week?
2 A.  Yes.
3 Q.  So you were not only familiar with it at the
4 time, you have refreshed your recollection as we sit
5 here, right?
6 A.  Yes.
7 Q.  And you sent this document to Meggan Jones and
8 Dave Kissman?
9 A.  And --
10 Q.  Yes?
11 A.  Yes.
12 Q.  And Meggan Jones is an attorney for Southwest
13 Airlines.
14 A.  No.
15 Q.  What is she?
16 A.  She, at the time, was my assistant base
17 manager.
18 Q.  What?
19 A.  At the time she was my assistant base manager.
20 Q.  Okay.  I thought there was a lawyer on here
21 somewhere.  Was there a lawyer involved in the
22 investigation who sat in on the interviews?  No
23 lawyers?
24 A.  No.
25 Q.  Who is Dave Kissman?

Page 1053

1 A.  He's my immediate leader.
2 Q.  And you sent this to employee relations, right?
3 A.  Correct.
4 Q.  And employee relations' job, among other
5 things, I assume, is to determine whether or not
6 there are any protected rights that should be looked
7 at after any investigation, true?
8 A.  Yes.
9 Q.  And, in fact, you sent this to them and said,
10 Let me know your thoughts on protected categories.
11 A.  Yes.
12 Q.  And we will get to what they told you in a
13 second, but from your knowledge, are religious
14 beliefs a protected category?
15 A.  Yes.
16 Q.  To your knowledge, is political speech a
17 protected category?
18 A.  I don't know that.
19 Q.  To your knowledge, is union activity a
20 protected category?
21 A.  I don't know that.
22 Q.  And so when you spoke to employee relations,
23 what did they tell you about protected categories?
24 A.  In this particular case or in general?
25 Q.  In this particular case.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 4 July 08, 2022                    Pages 1054..1057

Page 1054

1  A.   After the investigation, you mean in the letter
2  that was sent to me?
3  Q.   They didn't talk to you about protected
4  categories until the investigation was over?
5  A.   No.  I'm trying to figure out when, what place
6  in time you are talking about did they talk to me --
7  Q.   Every moment -- every moment from the time you
8  sent this email to right now.
9  A.   Yes, they've talked to me about protected
10  categories.
11  Q.   When did they talk to you?
12  A.   I don't recall dates.
13  Q.   Did they talk to you before the investigation
14  was concluded?
15  A.   They talked to me about this case and if it
16  violated or not.  I don't remember if they talked to
17  me about protected categories during this
18  investigation.
19  Q.   Okay.  So to your recollection, the person that
20  made the termination decision and the person in
21  charge of this investigation, you have no
22  recollection of employee relations at Southwest
23  Airlines ever telling you anything about protected
24  categories prior to your termination decision, true?
25        MR. McKEEBY:  Objection, asked and

Page 1055

1  answered.
2        THE COURT:  I will allow it.
3        THE WITNESS:  They have talked to me about
4  that in the past if you are talking about all
5  encumbrance of when they may have talked to me.
6        But I'm trying to determine if it's a
7  specific moment when you are asking me if they
8  talked to me about protected categories, because
9  that is just general --
10  BY MR. PRYOR:
11  Q.   Sir, I made it specific to Ms. Carter.
12        You asked me, in general or this case.  I said
13  this case.
14        Now you are going back to general.
15        Do you want to watch my question?  Here we go.
16  You ready?
17  A.   Yes.
18  Q.   On February 23rd, you asked, specifically about
19  this investigation, Hey, employee relations.  Let me
20  know your thoughts about protected categories.
21        And they never spoke to you specifically about
22  this case and protected categories prior to you
23  making your termination decision, true?
24  A.   No --
25  Q.   Okay.

Page 1056

1  A.   -- they did talk to me.
2  Q.   When did they talk to you about Ms. Carter or
3  Ms. Stone's protected categories?
4  A.   While we were doing the investigation, employee
5  relations partnered with me on this investigation
6  and we did the interviews together.
7  Q.   I know you did.  Tell me about protected -- I
8  know they were involved.  That wasn't my question.
9        What did they tell you about protected
10  categories?
11  A.   They told me that the genitalia pictures --
12  Q.   That what?
13  A.   The genitalia pictures of the faces did violate
14  the protected category of sexual -- if that's what
15  you are asking.
16  Q.   Did they call sexual harassment a protected
17  category?  Is that what they told you?
18  A.   Sexual harassment?
19  Q.   I thought you just said that.  Sexual
20  harassment.
21  A.   Harassment, sexual harassment in the harassment
22  policy.
23  Q.   Okay.  And they told you that's a protected
24  category, sexual harassment?
25  A.   They said it violated that, yes.

Page 1057

1  Q.   Violated a policy, right?
2  A.   Correct.
3  Q.   Okay.  I'm asking about protected categories.
4        What did they tell you about protected
5  categories?
6  A.   I would have to have the document in front of
7  me.  I don't remember specifically.
8  Q.   You don't recall generally, do you?
9  A.   I don't recall generally what?
10  Q.   Well, you are saying specifically, and I'm
11  making sure that you are not recalling something
12  generally.
13        Did they generally tell you about a protected
14  category?
15  A.   Yes.
16  Q.   What did they tell you?
17  A.   They told me that it violated one of the
18  protected categories.
19  Q.   The genitalia picture violated a protected
20  category, true?
21  A.   Yes.
22  Q.   Did they tell you about any other protected
23  categories that you should consider as part of your
24  investigation prior to making your termination
25  decision?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1058..1061

Page 1058

1  A.   Not that I recall.
2  Q.   You considered no other protected categories
3  other than genitalia and how it might violate a
4  sexual harassment policy; that's the only protected
5  category you considered in your investigation prior
6  to making your termination decision?
7  A.   Yes.
8  Q.   So it is fair to say that there was no
9  consideration given to Ms. Carter's religious
10  beliefs in regard to your investigation or
11  termination decision, true?
12  A.   True.
13  Q.   And it's also fair to say that no consideration
14  was given to her union activity in regard to your
15  termination decision or investigation?
16  A.   Yes.
17       MR. PRYOR:  Let's see.  82.
18  BY MR. PRYOR:
19  Q.   So let's look at Exhibit 76.  I think this
20  confirms your recollection.  It's on the screen.
21       So the email at the top, just below it is the
22  one that you sent to employee relations saying, Let
23  me know your thoughts on protected categories.
24       And above it is their response, true?
25  A.   Yes.

Page 1059

1  Q.   And when they responded to your inquiry about
2  protected categories, they don't say anything about
3  protected categories, do they?
4  A.   No.
5       MR. PRYOR:  82.
6  BY MR. PRYOR:
7  Q.   Let's look at Exhibit 82.  That's
8  February 23rd.  Trying to keep a little timeline
9  here.
10       Let's look at Exhibit 82.
11       THE COURT:  Counsel, we have been on the
12  record for about an hour 45.  Are you okay if we
13  break now a little early for lunch?
14       MR. PRYOR:  Are you asking if this is a
15  good time for lunch?
16       THE COURT:  Yes.
17       MR. PRYOR:  My back is killing me.  I
18  would love to sit down.
19       THE COURT:  Okay.  So before we bring up
20  82, we will take our lunch break a little early in
21  light of the early morning break.
22       So the same three instructions.  You can
23  only talk to yourselves and court staff, just not
24  about the case.  Don't talk to anyone else and don't
25  do any research or anything like that on the case.

Page 1060

1  Keep an open mind.
2       All rise for the jury.
3       See you back here at 12:45.
4       (The jurors exited the courtroom.)
5       THE COURT:  Mr. Schneider, you can leave
6  the stand.  You just can't talk to anyone about the
7  case.  Thank you, sir.
8       (The witness exited the courtroom.)
9       THE COURT:  Okay.  So can I just say one
10  thing?  Housekeeping-wise, I know we are to 82.  I'm
11  not going to ask for objections on that, we can do
12  that right before lunch.
13       But also, 76, we never unmuted the jury
14  screens because 76 is not in evidence.  So if you
15  want to bring 76 in, then housekeeping-wise, think
16  about that.  Because 76 is not in and the jury did
17  not see 76.
18       MR. PRYOR:  We ask --
19       THE COURT:  Okay.  Do y'all know 76?
20       MR. PRYOR:  I can pop it back up.
21       THE COURT:  Let's pop it back up, and I
22  going to look in my notes for anything on 76.
23       I don't have a written objection on 76.
24       MR. McKEEBY:  No objection to 76.
25       THE COURT:  Any objection from the Union

Page 1061

1  on 76?
2       MR. GREENFIELD:  No, your Honor.
3       THE COURT:  So what I will do is when we
4  come back on the record, can you move for admission
5  when the jury is here on 76.
6       I will show it to them, and you can say, I
7  talked to the witness about this, but you didn't see
8  it because it wasn't in evidence then.  It is now.
9  Here is the document he saw that you are now seeing.
10       And then we will move back to 82.
11       Sound good?
12       Any other issues that we have to talk about?
13       MR. GREENFIELD:  If I may sidebar, your
14  Honor.
15       THE COURT:  Sidebar here?
16       MR. GREENFIELD:  Yes.
17       (Thereupon, the following proceedings were
18  had at sidebar:)
19       MR. GREENFIELD:  Your Honor, the continued
20  sidebars and argumentative nature of his questions,
21  I'm personally aghast at the lack of courtroom
22  decorum.
23       I do not believe he's complying with the
24  rules of professionalism or with Dondi, which is a
25  requirement of this Court.  I don't even believe

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Pages 1062..1065

Page 1062

1  he's even read the case, which is a requirement of
2  this Court.
3       I would just like to ask you to instruct
4  him to stop.
5       THE COURT:  Response.
6       MR. PRYOR:  Your Honor, in response, you
7  have sustained a few objections, but many you have
8  not.
9       This is a witness, in my opinion, that is
10 trying not to answer the questions.  And so, yeah,
11 there is a little hand-to-hand combat.
12      They've over-objected and raised --
13 they've been -- their objections have been overruled
14 as much as they have been sustained.  So I don't
15 think we are into that category.
16      And I certainly know what Dondi is and I'm
17 not violating it.
18      They can object, the Court can rule.  If
19 they want to make a motion, make a motion.  But I
20 don't think there's anything like that --
21      MR. GREENFIELD:  I'm talking about the
22 repeated sidebars and argumentative comments that
23 are clearly not appropriate.
24      THE COURT:  So I will say this.  I think
25 we do need to dial down the rhetoric.

Page 1063

1       MR. PRYOR:  I will.
2       THE COURT:  On specific objections to
3  questions, I'm giving all of you leeway, but that is
4  the one area we do need to dial down.
5       I think part of the issue is there is
6  oftentimes a lack of communication, and I think what
7  you're perceiving from the witness as lying --
8       MR. PRYOR:  You are right.
9       THE COURT:  -- and evasion is he's not a
10 lawyer, and he does not have the same familiarity
11 with this case and the rules of evidence that we now
12 have.
13      When I was in private practice in the
14 appellate section of the AG's office, we would
15 always call our first mood the mood of rage because
16 you are angry that anyone can see the case
17 differently than you.  We would rip our panelists'
18 heads off for even asking a question.
19      And I think you are all at the point of
20 rage because you are so steeped in the case.  So
21 that's why we would have a second mood.  We would
22 call that the mood of reason.  We now understand why
23 you might have a lack of understanding of what I'm
24 saying, let me clarify that for you.
25      So I would like us to all get this

Page 1064

1  afternoon to the point of reason rather than the
2  point of rage that we are at now.
3       Does that make sense?
4       MR. PRYOR:  Yes.  And there is a specific
5  example, when I came up and you told me we were
6  talking past each other, and you were exactly right.
7       And I will, as counsel says -- he used
8  dial back.  I will.  And, however, there are times
9  when the witness -- I have to fight with him.  But I
10 certainly acknowledge --
11      THE COURT:  I will agree to do that.
12      I will say this afternoon there might be
13 times where he will evade you intentionally, but I
14 don't think he's doing it all the time.
15      So I think we need to give him the benefit
16 of the doubt, not have a lawyer characterizing him
17 as a liar or evasive.  But if it really counts and
18 you can see and everyone knows he's evading you --
19      MR. PRYOR:  Okay.  I will make --
20      MR. GREENFIELD:  And if I may make it
21 abundantly clear, Mr. Pryor can interrogate the
22 witness in whatever form he wants to.  If he wants
23 to dial it up, fine.  I don't care.  That's not my
24 issue.  My issue is the repeated use of sidebars.
25 He won't stop.

Page 1065

1       THE COURT:  Understood.  Sidebars should
2  be --
3       MR. PRYOR:  I hear counsel's comments.  I
4  have seen some sustained and some overruled.  And I
5  will take into consideration counsel's comments and
6  the Court's.
7       MR. GREENFIELD:  I'm not talking about the
8  argumentative objections.
9       MR. PRYOR:  I appreciate that.
10      MR. GREENFIELD:  It has been happening for
11 three days, Mr. Pryor.
12      MR. PRYOR:  All right.  So I have a
13 sidebar issue as well.  It doesn't matter if it's on
14 the record or not.
15      I want the Court to know that we are
16 mindful that you gave us three more hours and we are
17 going to make good use of that.
18      We have made a decision to spend more time
19 with Mr. Schneider, and we are either cutting or
20 shortening substantially other witnesses.
21      I didn't want the Court to think, wow,
22 we've got three more hours.  We are going crazy.
23      We are doing that, and we will still leave
24 time for our cross and closing.  And I think there
25 is every chance we will close the evidence on

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 291 of 642   PageID 11232
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Pages 1066..1069

Page 1066

1 Monday, if not Monday morning.  It depends on today.
2 But that's --
3        THE COURT:  Can I ask, are there any of
4 the deposition page/line designation objections we
5 are working that we shouldn't?
6        We are going to keep working on all of
7 them --
8        MR. PRYOR:  That's a really good question.
9        THE COURT:  How about tell me -- at the
10 end of the lunch break, tell me if there are any --
11        MR. PRYOR:  We will.
12        THE COURT:  -- you say, We are just not
13 going to pursue this written deposition coming in.
14        And I know you are saving back some time
15 for Nevarez who we haven't --
16        MR. PRYOR:  That's right.
17        MR. McKEEBY:  And question as to witnesses
18 today, who do I need to have here?
19        MR. PRYOR:  As we've talked about, we
20 anticipate calling Ms. Lacore after this witness.
21        MR. McKEEBY:  Do I need to have any other
22 witness here other than Ms. Lacore?
23        MR. PRYOR:  You do not.
24        THE COURT:  What about the Union?
25        MR. PRYOR:  It means that we either think

Page 1067

1 we're going to finish with Lacore or put on video
2 depositions or put on Ms. Carter.
3        MR. GILLIAM:  And to answer your question,
4 probably --
5        MR. PRYOR:  So I'm trying to be very open
6 about it and appreciative of the time we got.  I
7 didn't want you to think we're going crazy.
8        THE COURT:  Is there a video depo you're
9 contemplating today that we don't have rulings back
10 to you on?
11        MR. GILLIAM:  I will have to look at my
12 notes.  Kleburne is the one we are contemplating.
13        THE COURT:  Okay.
14        MR. GILLIAM:  I can't remember if --
15        MR. PRYOR:  So, no, we are good.
16        THE COURT:  Got it.
17        Okay.  We will see y'all after lunch.
18        (Thereupon, the sidebar was concluded and
19 the following proceedings were held in open
20 court:)
21        THE COURT:  Now we are in recess.
22        THE COURT SECURITY OFFICER:  All rise.
23        (Recess.)
24        THE COURT SECURITY OFFICER:  All rise.
25        THE COURT:  Anything we need to talk

Page 1068

1 about?  I know we're going to do housekeeping on
2 what, 76?  76.  And then you are going to come back
3 to 82.  So you will move for the admission of 76, I
4 will enter it, then you will show it to the jury,
5 and then we will move on to 82.  Got it?
6        Okay.  Let's bring them in.
7        (The jurors entered the courtroom.)
8        Okay.  You can be seated.
9        Mr. Pryor, you can continue.
10        MR. PRYOR:  Thank you, your Honor.  At
11 this time, we offer into evidence Exhibit 76, and
12 ask it that be displayed to the jury.
13        THE COURT:  Okay.  Seventy-six, I have
14 considered objections.  It is coming in.
15 Seventy-six is admitted into evidence.
16        And I will just say, this is a document
17 that the witness saw earlier but y'all didn't see.
18 So we are going to put it on the screen so you can
19 see what the witness saw earlier.
20        MR. PRYOR:  And my apologies for not
21 getting that into evidence and on the screen timely.
22 BY MR. PRYOR:
23 Q.  Sir, did you make any inquiries into whether
24 Charlene Carter needed a religious accommodation?
25 A.  No.

Page 1069

1 Q.  Has anyone at Southwest Airlines ever told you
2 that part of your job is to consider whether or not
3 a person would need a religious accommodation?
4 A.  No.
5 Q.  To your knowledge, was this incident involving
6 Ms. Carter reported to ACT?
7 A.  No, it was not by me.
8 Q.  And what is ACT?
9 A.  The Accommodations and Career Transition Team
10 for Southwest Airlines.
11 Q.  And that is the team that, if there is an
12 accommodation consideration to be made, that is the
13 team that makes it?
14 A.  Correct.  Ms. Carter would have to take it to
15 them and they would determine if their accommodation
16 was approved.
17 Q.  And it is your testimony that Ms. Carter has to
18 raise that issue with ACT, true?
19 A.  Yes.
20 Q.  And did Ms. Carter's Facebook post that you
21 reviewed cause Southwest Airlines any financial harm
22 before she was terminated?
23 A.  Not that I'm aware of.
24 Q.  Did Southwest Airlines -- let's start with you.
25        Did you ever discuss with Ms. Carter whether

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 4 July 08, 2022                Pages 1070..1073

Page 1070

1 she would be willing to post a disclaimer on her
2 Facebook page that her posts do not necessarily
3 represent the views of Southwest Airlines?
4 A.   No.
5 Q.   Could you have done that?
6 A.   I haven't done that in the past.
7 Q.   I didn't ask if you had.  But that is something
8 you could have considered or done because you were
9 the one in charge?
10      Right?
11 A.   I don't know the answer to that question
12 because I have never had to do that.
13 Q.   So there were limitations that Southwest
14 Airlines placed on you in terms of what you could do
15 to Ms. Carter?
16 A.   I am just saying that I have never done it
17 before.
18 Q.   I understand that.  You have told us that.
19      I'm asking you, that is something that you
20 could have considered and could have done if you
21 thought it was appropriate?
22 A.   I would have to take it through our legal team
23 to make sure.
24 Q.   Okay.
25      And if your legal team told you you could do

Page 1071

1 it, that would be something, then, that you would
2 consider?
3 A.   Yes.
4 Q.   But you didn't do that; you didn't consider it,
5 right?
6 A.   Correct.
7 Q.   Did you or anyone to your knowledge at
8 Southwest Airlines ever ask Ms. Carter if she would
9 remove Facebook posts that it considered to be a
10 nexus to the workplace?
11 A.   Not that I'm aware of.
12 Q.   And that also is something that you could have
13 done if you had chosen to, true?
14 A.   Yes.
15 Q.   If you wanted to accommodate her union
16 activities or religious beliefs, you could have
17 considered that, right?
18      MR. McKEEBY:  Objection to the argument.
19      THE COURT:  I'll allow it.
20      THE WITNESS:  Can you repeat the question?
21 BY MR. PRYOR:
22 Q.   Yes.  If you wanted to take into consideration
23 Ms. Carter's religious beliefs or union activities
24 that were being complained about, that is something
25 you could have considered doing, just asking to

Page 1072

1 remove the nexus from her Facebook page?
2      MR. McKEEBY:  Objection, foundation.
3      THE COURT:  I'll allow it.
4      THE WITNESS:  I could have.
5 BY MR. PRYOR:
6 Q.   And to your knowledge -- first of all, you know
7 you didn't, you did not do that?
8 A.   No, I did not.
9 Q.   And to your knowledge, no one else at Southwest
10 Airlines did that, correct?
11 A.   No.  Not during the short time that the
12 investigation took place, because she was terminated
13 after that.  And there wasn't time.
14 Q.   And in fact, the action that was taken was
15 action that you took; it was your decision and your
16 action, not anyone else's in that regard, true?
17 A.   In regard to the termination?
18 Q.   The termination, and the manner in which you
19 did it?
20 A.   Yes.
21 Q.   Did you have any communications with Naomi
22 Hudson before contacting Audrey Stone about her
23 complaint?
24 A.   No.
25      MR. PRYOR:  Okay.  Let's go to Exhibit 82.

Page 1073

1      THE COURT:  Okay.  Jury screens are muted.
2      MR. PRYOR:  Actually, I don't need
3 Exhibit 82.  You just answered that.
4      Let's go to Exhibit 89.  I move for the
5 admission of Exhibit 89.
6      THE COURT:  Eighty-nine.  Any objections
7 on 89?
8      MR. McKEEBY:  No objection.
9      THE COURT:  Any from the union?
10      MR. GREENFIELD:  No objection, your Honor.
11      THE COURT:  Okay.  Eighty-nine is in.  We
12 will publish.
13      (The referred-to document was admitted in
14      Evidence as Trial Exhibit 89.)
15 BY MR. PRYOR:
16 Q.   Okay.  Mr. Schneider, do you recognize
17 Exhibit 89 as your notes of the interview from your
18 fact-finding team of Audrey Stone?
19 A.   Yes.
20 Q.   Let's go to the second page.  DG, who is DG?
21 A.   Denise Guttierez.
22 Q.   Okay.  And about a third of the way down the
23 page, it says, Great, tell me first the individual
24 that sent the message.
25      Do you see where I'm at?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1074..1077

Page 1074

1 A.  Yes.
2 Q.  I'm going to read part of that, and feel free
3 to read it all.
4      It is a flight attendant in Denver.  Since 2008
5 when I was on the board, she has not been union
6 friendly.  It goes on to say, in 2013, when I came
7 in as president, through Facebook, she has sent me
8 various messages.  I have ignored them and have not
9 had a relationship with her.  She is very
10 anti-union.
11     Correct?
12 A.  That is what it states, yes.
13 Q.  Do you recall that your notes are consistent
14 with what you recall actually happening?
15 A.  Are you asking if my notes are accurate, is
16 that what you are asking?
17 Q.  To the best of your ability, you were writing
18 down what was said?
19 A.  Yes.
20 Q.  And what we know from this answer is that
21 communications between Ms. Carter and Ms. Stone
22 began after Ms. Stone became president of the Union,
23 right?
24 A.  Yes.  It says 2008, and then in 2013, when she
25 became president.

Page 1075

1 Q.  So is that a yes?
2 A.  Yes.
3 Q.  And you know that she's telling you that she
4 believes Ms. Carter's very anti-union?
5 A.  That is the statement she made, yes.
6 Q.  And did you actually find out from Ms. Carter
7 that she's not anti-union, she was just anti this
8 administration of Local 556 under Ms. Stone?
9 A.  To some extent, yes.  The Union in general,
10 too, though.
11 Q.  Then down below that, it says, What do you
12 think would cause her to send the message?  Her
13 answer was, I have never had a conversation with
14 her, she's anti-union.
15     Once again, this answer is emphasizing this
16 relates to the Union, right?
17 A.  It states she's anti-union, yes.
18 Q.  Well, why would she send you the message?
19 She's telling you in the answer, is because she's
20 anti-union.  That is telling you it is activity
21 related to the Union, right?
22     MR. GREENFIELD:  Objection, lack of
23 foundation, calls for speculation.
24     THE COURT:  I'll allow him to answer if he
25 has personal knowledge.

Page 1076

1     THE WITNESS:  I don't have personal
2 knowledge why she would do that.
3 BY MR. PRYOR:
4 Q.  You don't have an understanding of what she
5 told you when she said, She sent me the message
6 because she's anti-union?  You didn't understand
7 that?
8     MR. GREENFIELD:  Objection, misreading the
9 document.
10     THE COURT:  Sustained.
11 BY MR. PRYOR:
12 Q.  Why do you think -- what do you think would
13 cause her to send the message?  Part of the answer
14 is, "She's anti-union, right," right?
15     MR. McKEEBY:  Objection, foundation.
16     THE COURT:  I'll allow it.
17     THE WITNESS:  That is what it states here,
18 yes.  That's what she said.
19 BY MR. PRYOR:
20 Q.  Did you disagree with what she told you?
21 A.  I didn't agree or disagree.
22 Q.  So you didn't consider this at all?
23 A.  The anti-union part?  I considered it.  But I
24 didn't at that time agree or disagree with her.
25 Q.  She has sent messages in the past that I have

Page 1077

1 ignored.
2     Do you see that?
3 A.  Yes.
4 Q.  Did you investigate which messages she reviewed
5 and which ones she did not?
6 A.  Only the ones that she sent to us.
7 Q.  Okay.  And of those, did you go through with
8 her and ask her which ones she read and which ones
9 she did not?
10 A.  No.
11 Q.  It says, I was on a ski trip with people from
12 Denver last Wednesday.  I asked them not to tag or
13 post anything on Facebook.  I went on Facebook to
14 check and there was a message from her.  I opened
15 the message and it had a video that I couldn't look
16 at because I was in the Denver airport.  I read the
17 text and closed it out.  I couldn't look at the
18 video in the airport.
19     Did I read that right?
20 A.  That is what it states, yes.
21 Q.  And once again, you have written down what you
22 believe accurately reflects what you were told?
23 A.  Correct.
24 Q.  And what you were told is, not that Ms. Stone
25 opened up the video in the airport and started

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 294 of 642   PageID 11235
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Pages 1078..1081

Page 1078

1  crying when she read the video and missed a plane,
2  but what you were told was, she could not open the
3  video in the airport and all she could do was read
4  the message associated with the video, correct?
5  A.  Yeah.  Just -- it states that she was in the
6  Denver airport and couldn't open it.  It doesn't
7  state why.  I don't know.
8  Q.  She read the message.  She knew what it was
9  about and she didn't watch the video at that time.
10 Later, she made the conscious decision to go in and
11 view the video, knowing what it was going to be
12 about?
13       MR. McKEEBY:  Objection, foundation,
14 speculation.
15       THE COURT:  I will overrule.
16       You can answer if you have personal
17 knowledge.
18       MR. GREENFIELD:  Then, objection, I would
19 like to, on top of that, then, make a hearsay
20 objection.
21       THE COURT:  I will overrule that.
22       THE WITNESS:  I don't know what she was
23 thinking, what she thought the video was.
24 BY MR. PRYOR:
25 Q.  Fair enough.

Page 1079

1        You know that she didn't view it until after
2  she read the message associated with it and after
3  she left the airport, some time later, she then
4  decided to view the video, based on what she told
5  you?
6  A.  It doesn't state that specifically here.
7  Q.  Well, it says, I couldn't look at the video in
8  the airport.
9        Did she tell you at some point she viewed the
10 video?
11       MR. GREENFIELD:  Objection, your Honor.
12       May we approach?
13       THE COURT:  Yes.
14       (Thereupon, the following proceedings were
15       had at sidebar:)
16       MR. GREENFIELD:  I think now we are
17 crossing clearly over to hearsay.  She's saying
18 based on what she told you --
19       THE COURT:  Party opponent?
20       MR. GREENFIELD:  Audrey Stone?
21       THE COURT:  Sure.  She's the union
22 president, the Union's a party, party opponent.
23       MR. PRYOR:  Absolutely.  Certainly at the
24 time.
25       THE COURT:  Sure.  And effect on him.  I

Page 1080

1  mean, I think there are two ways around --
2        MR. PRYOR:  But no, it is also because
3  he's -- the investigator made the decision, his
4  knowledge.
5        THE COURT:  Sure.  It is her statement's
6  impression on him.  So, I mean, I think there are
7  two ways for this.
8        (Thereupon, the sidebar was concluded and
9        the following proceedings were held in open
10       court:)
11       THE COURT:  Okay.  You can ask.
12 BY MR. PRYOR:
13 Q.  Do you remember the question?
14 A.  No, sir.
15 Q.  Okay.
16       So based on what you wrote, and what you
17 recall, based on what you wrote or however you
18 recall, you know that she didn't view the video at
19 the airport.  She reviewed it somewhere else because
20 she couldn't view it at the airport, true?
21 A.  I don't recall her saying that she viewed it
22 after -- I don't know when that was.
23 Q.  You don't know that she ever viewed the video?
24 She didn't tell you she viewed it?
25 A.  I don't recall whether she said it or not.

Page 1081

1  Q.  One of the things you know for sure is that she
2  told you when she got -- what she refers to here as
3  the text and closed it out, I couldn't look at the
4  video at the airport.  True?
5  A.  Yes.
6  Q.  And she told you that she was on a ski trip
7  with some people from Denver at the time.  True?
8  A.  Yes.
9  Q.  That is different than saying, I was going on a
10 union trip to Baltimore, isn't it?
11 A.  It is different, yes.
12 Q.  So on the next page, she talks about, towards
13 the bottom, that -- What is your interpretation,
14 Can't wait until you get back on line.  She says,
15 I'm full-time for the Union, I know there has been a
16 recall to try to get the majority of the board
17 ousted.
18       So you were aware of the recall effort, true?
19 A.  Yes.  I don't see that on my screen, though.
20 It is not down that far.
21       MR. PRYOR:  I'm sorry, I can bring you
22 this page.  Do you want to accept my representation
23 or I can bring it to you?
24       THE WITNESS:  Either way.
25

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 295 of 642  PageID 11236
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1082..1085

Page 1082

1 BY MR. PRYOR:
2 Q.  You are okay with that?
3 A.  Yes.
4 Q.  All right.  Let's see if we can find -- it is
5 the next page.
6     Oh, here it is, it is at the bottom here.  Do
7 you see where it says, I know there has been a
8 recall to try to get the majority of the board
9 ousted?  It is the last one.
10 A.  Yes, I see it.
11 Q.  All right.  Let's go to the next page.
12     So, she was asked by DG, what do you want
13 Southwest to do?
14     That is the next page.
15     Towards the -- again, the top third, do you see
16 where it says, "what do you want Southwest to do?"
17 A.  Yes.
18 Q.  And it says, make Charlene and Chris Click
19 stop.  Tell those flight attendants not to talk
20 about me or the Union president trying to get flight
21 attendants fired.  They need to protect me.
22     Is that what she said, to the best of your
23 recollection?
24 A.  Yes.
25 Q.  And she's talking about protecting herself from

Page 1083

1 these flight attendants, true?  Getting herself
2 protected from these flight attendants?
3 A.  It states that -- it seems that she's --
4 Q.  There's nothing in here about what I really
5 want is to protect other flight attendants, right?
6     MR. McKEEBY:  He didn't allow the witness
7 to finish.
8     THE COURT:  Yes, you can finish your
9 answer.
10     MR. PRYOR:  Oh, I'm sorry.  Were you not
11 finished?
12 A.  No.
13 BY MR. PRYOR:
14 Q.  Okay.  Finish.
15 A.  It states that those flight attendants, and it
16 talks about to get flight attendants fired, that is
17 general.  I don't know what she's referring to
18 exactly.
19 Q.  Okay.  But she's talking about, make Charlene
20 and Chris Click stop.  She says that.
21     By the way, stop what?  Do you recall?
22 A.  No.
23 Q.  And it says, tell those flight attendants, and
24 the only flight attendants mentioned would be those,
25 Charlene and Chris?

Page 1084

1 A.  Yes.  I would assume so now, reading it.
2 Q.  So tell those flight attendants not to talk
3 about me or the Union president trying to get flight
4 attendants fired.
5     So "me" is her and "union president" is her,
6 right?
7 A.  Yes.
8 Q.  And so she's saying, tell them not talk about
9 Audrey Stone or Audrey Stone, president of the
10 Union, right?
11 A.  Yes.
12 Q.  And it says, "they need to protect me."  Once
13 again, my question to you is, in her answer to, what
14 do you want Southwest to do, she didn't say anything
15 about, well, really I'm -- she didn't tearfully say,
16 I'm doing this to protect other flight attendants,
17 especially one that might be pregnant.  Nothing like
18 that, right?
19     MR. GREENFIELD:  Objection, your Honor,
20 lack of foundation, speculation, and now he's
21 testifying as to what --
22     THE COURT:  Hold on.  That is a speaking
23 objection.
24     I'll allow it.
25     MR. PRYOR:  I'm comparing it --

Page 1085

1 BY MR. PRYOR:
2 Q.  You can answer.
3 A.  Can you say the question one more time.
4 Q.  Yeah.  She didn't tell you anything about, I'm
5 not worried about me, I want you to protect other
6 flight attendants, especially one that might be
7 pregnant.  She didn't tell you that, did she?
8 A.  No.
9 Q.  Okay.
10     MR. PRYOR:  Let's go to Exhibit 90.
11     I'm sorry, your Honor, may I move -- I
12 move for the admission of Exhibit 90.
13     THE COURT:  All right.  Any objection to
14 90?
15     MR. McKEEBY:  No objection.
16     THE COURT:  Any from the Union?
17     MR. GREENFIELD:  One moment, your Honor.
18     None, your Honor.
19     THE COURT:  It is admitted.  We are
20 publishing.
21     (The referred-to document was admitted in
22     Evidence as Trial Exhibit 90.)
23 BY MR. PRYOR:
24 Q.  So it is Exhibit 90, there is an email from
25 Ms. Emlet, and you are in the lower email,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 296 of 642   PageID 11237
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1086..1089

Page 1086

1 Mr. Schneider.  And it says here the documents that
2 create the nexus from her Facebook page.  I'm
3 summarizing.
4      I will show you those pictures.
5      That's the -- go to the next page.
6           MR. PRYOR:  Do you want me to just hand
7 him a hard copy or --
8           MR. HILL:  I'm about to drag it over.
9           MR. PRYOR:  Okay.
10 BY MR. PRYOR:
11 Q.  Okay.  Here we go.  I'm going to show you a
12 series of pictures and ask you if you recognize
13 these as the nexus that was used on her Facebook
14 page as part of one of your buckets to terminate
15 Ms. Carter.
16      Do you recognize this first one?
17 A.  I have seen it in the past, yes.
18 Q.  Is this one of the documents that you relied
19 upon as a nexus on her Facebook page to associate
20 her abortion video with Southwest Airlines?
21 A.  It shows her with a Southwest badge on, yes.
22 Q.  Okay.  The answer is yes, and it is because it
23 shows a Southwest badge?
24 A.  Yes.
25 Q.  Okay.  Can you tell from looking at it that it

Page 1087

1 is a Southwest badge?
2 A.  Not here.  If you zoomed in, you might be able
3 to.
4 Q.  Okay, let's blow it up.  Make it a little
5 smaller, see if will ever focus in.
6      Have you ever seen a version of this Facebook
7 post that shows anything other than a blurred
8 lanyard?
9 A.  No.  I have not.
10 Q.  So -- by the way, do you know how long ago this
11 was from the time that the abortion video was
12 posted?
13 A.  No, I don't.
14 Q.  Would it matter to you, in order -- by the way,
15 a nexus is, there is some relationship between the
16 offensive post, or what be might be viewed as an
17 offensive post, and Southwest Airlines because
18 somebody going to Charlene's Facebook page could be
19 confused that maybe she's representing Southwest
20 Airlines and that affects Southwest Airlines' brand?
21           MR. GREENFIELD:  Objection, your Honor.
22 Counsel is testifying as to --
23           THE COURT:  Sustained.
24           MR. GREENFIELD:  What he believes the
25 nexus is.

Page 1088

1 BY MR. PRYOR:
2 Q.  So, your Honor, am I entitled to lead the
3 witness on this issue?
4           THE COURT:  I think you need to ask what
5 the nexus is.
6           MR. PRYOR:  So I can't lead him on this
7 issue.  Okay.
8           THE COURT:  You can lead him to nexus, but
9 your definition was too long.  It amounted to you
10 testifying.
11 BY MR. PRYOR:
12 Q.  What is nexus?
13 A.  Anything that indicates that the employee is
14 employed by Southwest Airlines or has an interest in
15 Southwest Airlines.
16 Q.  So anything on a Facebook page that shows you
17 are related somehow to Southwest Airlines creates a
18 nexus with whatever the offensive post is?
19 A.  The thought process -- I'm sorry.
20 Q.  Let me try it again.
21      Is the concept, that Southwest Airlines doesn't
22 want anybody posting something that someone might
23 think, hey, that is Southwest Airlines's position?
24 Is that the brand issue?
25 A.  Yes.

Page 1089

1 Q.  Okay.
2      So is it -- this picture can't do that, right?
3 A.  No.
4 Q.  Even though this is listed as one of the
5 reasons for the nexus?
6 A.  We listed the whole package that was given to
7 us, that had anything to do with Southwest Airlines.
8 Q.  Okay.  And -- but this one would not support a
9 nexus, true?
10 A.  Not if you can't see the badge or Southwest in
11 it.
12 Q.  Well, you have already told us that you can't,
13 right?
14 A.  Say it again.
15 Q.  You have already told us that you can't see it?
16 A.  You can't see it clearly, no.
17 Q.  You can't see it unclearly.  You can't tell at
18 all, true?
19 A.  It depends.  If somebody has flown on Southwest
20 Airlines or seen an employee with a badge, they
21 could make out that that looks like a Southwest
22 badge possibly.  That is all it's saying.
23 Q.  And that is your basis for nexus?
24 A.  No.  I'm saying that this, including all of the
25 other pictures with it, was nexus.

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 297 of 642  PageID 11238
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1090..1093

Page 1090

1 Q.  This is one of them, right?  This is part of
2 the nexus?
3 A.  It could be.  It wasn't my specific one that I
4 said to her indicated that she was employed by
5 Southwest Airlines.
6 Q.  Does it matter that it was -- a picture was
7 years ago?  Can you really say there is a nexus from
8 a picture over three years ago with a post -- is
9 that a nexus?
10     MR. McKEEBY:  Objection, compound.
11     THE COURT:  Sustained.
12     MR. GREENFIELD:  And lack of foundation as
13 to the timing of this photo.
14     THE COURT:  Sustained.
15 BY MR. PRYOR:
16 Q.  Is there a nexus between a post today and a
17 post over 60 months ago?
18 A.  If there is something on the Facebook page that
19 indicates that they are an employee of Southwest
20 Airlines, then the nexus could be made.
21 Q.  And is that the way Southwest Airlines
22 typically enforces that policy, they go back years?
23 Scroll down those pages for half an hour and say,
24 boom, there is the nexus?
25 A.  It means there is visibility to that

Page 1091

1 information.  And if somebody was offended by what
2 it said, they may do a little more research and the
3 information is there.
4 Q.  So someone is going to see Ms. Carter's post
5 opposing abortion, and it is immediately going to
6 enter into their mind, you know what I'm going to
7 do, I'm going to go back five years to see whether
8 or not there is any reference to Southwest Airlines,
9 is that what you are telling us?
10     MR. McKEEBY:  Objection, foundation,
11 speculation.
12     MR. PRYOR:  Responding to his answer.
13     THE COURT:  Hold on.  I will sustain that.
14 BY MR. PRYOR:
15 Q.  Is it reasonable to believe that someone could
16 look at Charlene Carter's Facebook page where she
17 posts an abortion video, and then scrolls back over
18 three-and-a-half years to find a picture of her
19 husband in a Southwest Airlines uniform, and that is
20 going to tell the world Charlene Carter is
21 representing Southwest Airlines's position on
22 abortion?  Is that reasonable?
23 A.  If they were to look at all of the pictures
24 that were in the investigation.
25 Q.  Okay.  I just want to make sure.

Page 1092

1     You say that is reasonable, correct?
2 A.  In today's world, there is a lot of passion out
3 there surrounding abortion, and people are very
4 motivated.  And that is a possibility.
5 Q.  And did anyone do that, other than your team?
6 Anyone?  Did anyone complain?
7     MR. GREENFIELD:  Objection -- objection,
8 your Honor.  He changed his question.  I will
9 withdraw my --
10     MR. McKEEBY:  What is the question?
11 BY MR. PRYOR:
12 Q.  Did anyone do that other than your team to try
13 and fire Ms. Carter?
14     MR. McKEEBY:  Objection to the
15 characterization.
16     THE COURT:  I'll allow it.
17     THE WITNESS:  Are you asking if someone
18 did that to fire Ms. Carter, is that your question?
19 BY MR. PRYOR:
20 Q.  I know the answer to that.  That is not my
21 question.
22     My question is, do you know of anyone other
23 than your team that went back more than three years
24 to try and find a connection to Southwest Airlines
25 on Ms. Carter's Facebook page?  Anyone?

Page 1093

1     MR. McKEEBY:  Objection, foundation.
2     THE COURT:  I'll allow it.
3     THE WITNESS:  I'm not aware of that.  But
4 they may not come and tell me that.  It is a
5 perception that they would make on their own if they
6 did.  And that is what we are concerned about.
7 BY MR. PRYOR:
8 Q.  You are concerned with what?
9 A.  Anything -- no, I'm saying that if somebody
10 made the perception that this person's video had
11 anything to do with Southwest Airlines.
12 Q.  And you believed that it was reasonable to
13 believe that someone would go back years and
14 associate a picture with somehow Charlene Carter's
15 representing Southwest Airlines' position on
16 abortion, true?  That could happen, right?
17 A.  I answered that question.  Yes.
18 Q.  What was your answer?
19 A.  That there is a possibility.  With all of the
20 passion out there with abortion and the rights,
21 then -- people do a lot of things like that.
22 Q.  So if I picture -- put a picture of myself
23 going to church, and three years ago, I posted a
24 picture me wearing a Southwest Airlines uniform, I
25 could be fired.  I'm representing Southwest

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 298 of 642   PageID 11239
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Pages 1094..1097

Page 1094

1 Airlines's position on religion, Southwest Airlines
2 doesn't want me doing that, do they?  You should
3 fire me.
4        MR. McKEEBY:  Objection, incomplete
5 hypothetical.
6        MR. GREENFIELD:  Objection, your Honor,
7 and proposing a false equivalency.
8        THE COURT:  I'll allow it.
9        THE WITNESS:  I don't know whether that
10 would or not.
11 BY MR. PRYOR:
12 Q.   It is a possibility, though, right?  Isn't that
13 what you say, "possibility"?
14 A.   I think it is a possibility that somebody could
15 make the perception that -- that is true.
16        MR. PRYOR:  Exhibit 92.  I offer Exhibit
17 92 into evidence.
18        THE COURT:  Ninety-two.  Any objections to
19 92?
20        MR. McKEEBY:  No objection.
21        THE COURT:  All right.  How about the
22 Union?
23        MR. GREENFIELD:  I can only see part of
24 that, so give me one moment, your Honor.
25 Ninety-two?  No, your Honor.

Page 1095

1        THE COURT:  Okay.  It is admitted.  We are
2 publishing.
3        (The referred-to document was admitted in
4     Evidence as Trial Exhibit 92.)
5 BY MR. PRYOR:
6 Q.   This is an email from Ms. Carter to you saying,
7 thank you -- you had contacted her about an
8 interview, I believe, true?
9 A.   A fact-finding meeting, yes.
10 Q.   Okay.  And it says, thank you, Mr. Schneider.
11 I will call first thing Monday morning and ask for
12 the extension.  I think she was on vacation at the
13 time?
14 A.   Out of town, yes.
15 Q.   This is all very new to me.  I have never been
16 called in for anything in 20 years, and never had to
17 use the Union before, so thanks for the help.
18    In turn, did you look at her record to see if
19 she had a record at Southwest Airlines?
20 A.   Yes.
21 Q.   Did she have a clean record at Southwest
22 Airlines?
23 A.   Yes.
24 Q.   Did you take that into consideration as a
25 possibility in regard to whether or not to provide

Page 1096

1 an accommodation or maybe not think about the
2 possibility of some deranged person going back five
3 years on a Facebook page?
4        MR. McKEEBY:  Objection.
5        THE WITNESS:  I don't follow the question.
6        MR. PRYOR:  Let's --
7        THE COURT:  Hold on.
8        MR. PRYOR:  I withdraw the question.
9        THE COURT:  Okay.
10        MR. McKEEBY:  Okay.
11        MR. PRYOR:  Let's look at exhibit -- that
12 is not it either.  I will get there.
13 BY MR. PRYOR:
14 Q.   Do you recall in her interview, Ms. Stone
15 telling you that there were no pro choice activities
16 by the Union?
17 A.   Did I tell her there were no pro choice?
18 Q.   She told you during the interview -- let me go
19 back to her interview notes.  Let me find them.
20    Do you recall asking her whether or not the
21 Union had taken any positions on abortion and her
22 telling you that they had not?
23 A.   I vaguely remember that.
24 Q.   You don't?  I'm sorry?
25 A.   I vaguely remember that.

Page 1097

1 Q.   Okay.
2    Let's look at Exhibit 56.
3    And it's AP32, which is like the fourth or
4 fifth page.
5 Q.   Do you know who Jessica Parker is?
6 A.   Yes, I do.
7 Q.   She's a union member?
8 A.   She was.
9 Q.   By the way, were you a union member?
10 A.   During this investigation?
11 Q.   No.  During your tenure at Southwest Airlines?
12 A.   Yes.
13 Q.   Were you in an official position or just a
14 paying dues member?
15 A.   I was a paying dues member.
16 Q.   That is all?
17 A.   Yes.
18 Q.   Okay.  I was just trying to find out if you
19 were an officer.
20 A.   No.
21 Q.   Okay.  So this is a post from the Women's March
22 by TWU Local 556.
23    Do you see where it says, "My body, my choice"?
24 A.   Yes.
25 Q.   Is that consistent with what you were told by

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                         Pages 1098..1101

Page 1098

1 Ms. Stone?
2 A.  That they don't have a stand on it?
3 Q.  That they didn't do any pro choice activities
4 at the march.
5 A.  Yes, I do.
6 Q.  It is consistent or inconsistent?
7 A.  I don't believe that they -- I saw anything
8 indicating that they were pro choice or pro life.
9 Q.  Well, what does this tell you?
10     This is the TWU Local 556 post from the Women's
11 March, "My body, my choice."
12     You don't know what that means?
13 A.  I'm not completely familiar with it.  I'm sure
14 it has something to do, if you are saying so, with
15 abortion.
16 Q.  So you don't know.  The person investigating
17 doesn't know what "my body, my choice" means?
18 A.  No.  All I'm saying is that I don't know if
19 that is a union member holding it up or not.
20 Q.  Oh, no.  I'm -- the Union -- it is posted on
21 the Union Facebook.
22 A.  Okay.
23 Q.  That is the Union taking a position about the
24 march and pro choice.
25 A.  Okay.

Page 1099

1 Q.  That was -- that is what I meant by my
2 question.
3     MR. McKEEBY:  I object, he's testifying
4 about what the union --
5     THE COURT:  Well, rephrase it and ask a
6 question.
7 BY MR. PRYOR:
8 Q.  And so, therefore, understanding that, is that
9 consistent or inconsistent with what Ms. Stone told
10 you?
11     MR. McKEEBY:  Well, same objection.  You
12 didn't correct the --
13     THE COURT:  Yes.  Can you back up and ask
14 your last question as a question.  You are making a
15 statement and he said okay.  But can you ask it in
16 question form.
17     MR. PRYOR:  I will.
18 BY MR. PRYOR:
19 Q.  Do you recall telling us your recollection is
20 that Ms. Stone told you that there were no pro
21 choice activities on the part of the Union in regard
22 to the Women's March, true?
23 A.  I said I vaguely remember.  I don't remember
24 the details of what was said.
25 Q.  I will take your vague recollection.

Page 1100

1 A.  Okay.
2 Q.  But in fact, January 26, 2017, the local union
3 posts from the Women's March a poster saying, "My
4 body, my choice"?  Based on this document, right?
5 A.  It shows a picture saying that statement, yes.
6 Q.  Is that consistent or inconsistent with what
7 she told you?
8 A.  I would say that it is inconsistent, if this is
9 specifically what it means.
10     MR. PRYOR:  Can you tell me the exhibit?
11 Ninety-eight.  Let's look at Exhibit 98.
12     Is it in evidence?
13     THE COURT:  It is not.
14     MR. PRYOR:  I offer Exhibit 98.
15     THE COURT:  Ninety-eight, any objection?
16     MR. McKEEBY:  No objection from Southwest.
17     THE COURT:  Okay.  How about the Union?
18     MR. GREENFIELD:  None, your Honor.
19     THE COURT:  Okay.  It is admitted.  We are
20 publishing.
21     (The referred-to document was admitted in
22     Evidence as Trial Exhibit 98.)
23 BY MR. PRYOR:
24 Q.  Mr. Schneider, are these the interview notes of
25 the interview of Charlene Carter in regard to your

Page 1101

1 investigation?
2 A.  Yes.
3 Q.  And as with the notes regarding Ms. Stone's
4 interview, you believe that these are accurate?
5 A.  Yes.
6 Q.  Let's look at a couple things.
7     Who is Eddie Barnett?
8 A.  That is the HR VP human resource business
9 person for Southwest Airlines.
10 Q.  It says here, he says, this is my first case
11 involving the guidelines for employees which
12 includes the social media policy, and is the main
13 reason I'm on the call.
14     Do you see that?
15 A.  Yes.
16 Q.  Do you know if that is accurate?
17 A.  If she said it, then it must be accurate.
18 Q.  If she said it, it must be true?
19 A.  Correct.
20 Q.  You know her.  You would believe her if she
21 said it?
22 A.  Yes.
23 Q.  You don't know whether or not she opined
24 regarding whether or not posts on Facebook of core
25 team members of Audrey Stone violated social media

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 300 of 642   PageID 11241
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 4 July 08, 2022                      Pages 1102..1105

Page 1102

1 policy?
2          MR. McKEEBY:  Objection, foundation, I
3 don't know what --
4          MR. PRYOR:  I'm creating a foundation.
5          THE COURT:  I'll allow it.
6          THE WITNESS:  Okay.  I did not follow your
7 question.
8 BY MR. PRYOR:
9 Q.  Yes.
10     Do you know whether or not Eddie Barnett was
11 involved in Southwest Airlines's decision whether or
12 not to take action against core team members?
13         MR. PRYOR:  Hang on.  Can I approach, your
14 Honor?
15         THE COURT:  You may.
16         (Thereupon, the following proceedings were
17     had at sidebar:)
18         MR. PRYOR:  I just want to make sure I'm
19 not violating.  I'm just asking whether or not we
20 believe Eddie Barnett said in regard to the core
21 team members that it did not violate Southwest's
22 policy because it was union-protected activity and
23 not illegal.  I'm not going to ask him that.
24         MR. McKEEBY:  I'm trying to understand.
25 I'm confused.

Page 1103

1          MR. PRYOR:  I'm telling my basis for
2 asking the question.
3          The question is, do you know whether or
4 not Eddie Barnett was involved in Southwest
5 Airlines's decision in regard to what action to
6 take, if any, against core team members making posts
7 on the core team member Facebook page?  I'm not
8 asking what punishment.  I am asking --
9          MR. McKEEBY:  I don't think I care.  That
10 question is okay.
11         THE COURT:  Yeah, I think that question is
12 okay.
13         MR. PRYOR:  That is as far as I'll go.
14         MR. McKEEBY:  I appreciate that.
15         The next one is not, I think we are all on
16 the same page.
17         MR. PRYOR:  Well, I'm done after that one.
18         MR. GREENFIELD:  Your Honor, while we are
19 here, so we don't have to come back and I don't have
20 to object and bother the jury again, I will have a
21 foundation argument objection if he doesn't set up
22 that he has some sort of knowledge about the core
23 team investigation.
24         MR. PRYOR:  Me?
25         MR. GREENFIELD:  Yeah.

Page 1104

1          MR. PRYOR:  I will take the stand.
2          MR. GREENFIELD:  I just --
3          MR. PRYOR:  No, I'm willing to.
4          MR. GREENFIELD:  He has to ask --
5          THE COURT:  He is asking you to ask that
6 question first, do you have knowledge about core
7 team.
8          MR. PRYOR:  Oh, that is not near as much
9 fun.
10         MR. McKEEBY:  I will put you up there.
11         MR. PRYOR:  Wait, if I have to do that --
12 you are making me do that?
13         THE COURT:  I don't give advisory rulings.
14         MR. PRYOR:  Okay.  Good.  All right.
15         THE COURT:  So you can ask the question.
16         (Thereupon, the sidebar was concluded and
17     the following proceedings were held in open
18     court:)
19         THE COURT:  Okay.  You can ask your
20 question.
21 BY MR. PRYOR:
22 Q.  Sir, do you know whether or not Eddie Barnett
23 was involved in Southwest Airlines's decision
24 whether or not to take action against any persons
25 making posts on what was referred to as a core team

Page 1105

1 Facebook page in support of Audrey Stone?
2 A.  I do not know that.
3 Q.  Okay.  Let's look at Exhibit 98.
4      And the question is, do you see where it says,
5 the first is a picture of an unborn infant, why were
6 these posted on your Facebook page?
7      Do you see that?
8 A.  I haven't found it yet, no.
9 Q.  Where that cursor is?
10 A.  Yes.
11 Q.  And Charlene's response is, I'm Christian.  I'm
12 a conservative and I'm pro life.
13      You understood that at the time?
14 A.  Yes.
15 Q.  Let's go to the next page.  And again, Ed says,
16 she made the statement, I just want to know what she
17 means by that.  And then Charlene says, I had an
18 abortion, I regret every bit of it, so I work with
19 other pro life groups.  And for me as a Christian.
20 Again, she's telling this involves her religious
21 belief, true?
22 A.  True.
23 Q.  Let's go to page 4.
24      This is talking about a button she wore
25 relating to Israel.

Page 1106

1    By the way, do you know anything about that
2 button?
3 A.  As part of the investigation, yes.
4 Q.  Okay.  Do you recall that that is something she
5 started wearing after 911 without any objection from
6 Southwest Airlines?
7        MR. GREENFIELD:  Objection, your Honor.
8 He's testifying, lack of foundation.
9        THE COURT:  I'll allow it.
10       THE WITNESS:  I had never seen her wearing
11 that, so I don't know how long she had been wearing
12 it or if she even wore it.
13 BY MR. PRYOR:
14 Q.  The answer is you don't know?  Did you inquire?
15 Did you inquire?
16 A.  It shows it on the picture.
17 Q.  And from years ago, correct?
18 A.  I don't know the date.
19 Q.  Well, do you know that she told you she had
20 been wearing it for years, without objection from
21 Southwest Airlines?  Until now, apparently?
22 A.  Okay.
23 Q.  And the part I'm reading, it is in the middle,
24 it says, my love for that country through my
25 Christian, you know, beliefs, my belief system.

Page 1107

1    She's again telling you she's exercising her
2 religious beliefs, true?
3 A.  Yes.
4 Q.  And if you look at the bottom of page 5, you
5 can read from there and then read the next, and then
6 into the next page.
7    Do you see where it says, she's our union
8 president?
9    Do you see that?  Towards the bottom?
10 A.  Who is saying it, Charlene?
11 Q.  She is our union president?
12 A.  Oh.
13 Q.  And then on the next page -- and the poor
14 person taking notes must have been -- who took the
15 notes?
16 A.  Meggan Jones.
17 Q.  The lady over here?
18 A.  Yes.  That is her.
19 Q.  She goes on -- and you don't have to read it
20 all -- she goes on and explains that she's opposed
21 to her union being involved in this march, right?
22 A.  Yes.
23 Q.  And then she says, if you go down, says, they
24 support Planned Parenthood.  They march right
25 alongside with them.

Page 1108

1    Do you see that?
2 A.  Not yet.  Is it near the top?
3    Oh, down there.  Okay.
4 Q.  Do you see where it says "they support Planned
5 Parenthood, they march right along with them"?
6 A.  Right.
7 Q.  Does that refresh your recollection as opposed
8 to what you told us this morning, you don't recall
9 anything about Planned Parenthood?
10 A.  I was not aware that it was Planned Parenthood.
11 As far as I knew, it was a Women's March for women's
12 rights.
13 Q.  She was telling you that the march was
14 supported by Planned Parenthood, and that is what
15 she objected to.
16    And you missed that point entirely?
17 A.  No.  She stated that.
18 Q.  Okay.
19    And you --
20 A.  I didn't see the evidence for it.
21 Q.  Well, did you ask for evidence?  Did you
22 disagree with it?
23 A.  She showed pictures of the Union banner, but I
24 didn't see any Planned Parenthood symbols on any of
25 the -- or the Union pictures or banners.

Page 1109

1 Q.  Did you see pictures of the Union marching with
2 Southwest Airlines' name on their banner?
3 A.  The local TWU 556 of Southwest flight
4 attendants was written on there, yes.
5 Q.  And was any action taken for the posts from
6 that march that said pro life and having a nexus to
7 Southwest Airlines?  Not five years ago, but 30
8 minutes ago?
9        MR. McKEEBY:  Objection, foundation.
10 Facts not in evidence.
11       THE COURT:  Sustained.
12       MR. PRYOR:  What is not in evidence?
13       MR. McKEEBY:  I will tell you what is not
14 in evidence.  I'm not sure if --
15       THE COURT:  Sidebar.
16       MR. McKEEBY:  Not comfortable responding
17 to counsel.
18       THE COURT:  Sidebar.
19       (Thereupon, the following proceedings were
20       had at sidebar:)
21       MR. McKEEBY:  Well, your question said
22 that there was a picture of a sign that said
23 Southwest Airlines and pro choice.
24       MR. PRYOR:  No, I didn't.
25       MR. McKEEBY:  Yes, you did.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 302 of 642   PageID 11243
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Pages 1110..1113

Page 1110

1      MR. PRYOR:  No.  Repeat it.  I didn't.  I
2  am a little bit tired of being accused of things I
3  didn't do.  Read it.
4      MR. McKEEBY:  Okay.  If I misheard that --
5  that is what I heard.
6      THE COURT:  That is what I heard, too.
7      MR. PRYOR:  Okay.  Well, let me -- that is
8  not what I said.
9      I will rephrase it, then.
10     THE COURT:  Okay.
11     (Thereupon, the sidebar was concluded and
12     the following proceedings were held in open
13     court:)
14  BY MR. PRYOR:
15  Q.  You are aware that there was a banner at the
16  march used by Local 556 that said Southwest
17  Airlines, true?
18  A.  It said TWU 556, the meeting of Southwest
19  Airlines flight attendants.
20  Q.  So associated with Southwest Airlines, right?
21  That is your brand?
22  A.  That is associated with the Union of Southwest
23  Airlines.
24  Q.  So if you say "union," then it doesn't matter,
25  right?

Page 1111

1  A.  I don't know.  I'm just stating what it said.
2  That is all I'm saying.
3  Q.  And I showed you earlier a picture from the
4  march that referenced pro choice, true?
5  A.  No.  It said "My body, my choice," it said.
6  Q.  All right.
7      So I'm going to represent to you, since you
8  don't know, that that is a pro choice position on
9  abortion.
10     Now, you got these two things, you have
11  Southwest Airlines -- and it is on the post, it is
12  on the same Facebook post the same day as the post
13  that says pro choice.
14     You got it?
15     MR. McKEEBY:  Objection, this is argument
16  again.
17     THE COURT:  I'll allow this.
18  BY MR. PRYOR
19  Q.  So you have got these two facts.  So is that a
20  nexus?  Or does it have to be five years ago to be a
21  nexus?
22  A.  I didn't see it on the same page, if that is
23  what you are asking me.
24  Q.  So it has to be on the same page?
25  A.  No.  I'm trying to clarify your question.  You

Page 1112

1  said, if they are on the same page, and I'm just
2  trying to clarify what page you are talking about.
3  Q.  The page I showed -- the Facebook page I showed
4  you earlier that says, pro choice?
5  A.  That said, "My body, my choice"?
6  Q.  That's right.
7  A.  Yes.
8  Q.  And on that same Facebook page, I don't know,
9  you may have to scroll for two seconds to get to
10  it -- there is the banner that says Southwest
11  Airlines, you are aware of that?
12  A.  If it is on there, yes.
13  Q.  And I'm saying, which is a closer nexus to
14  taking a position on abortion on behalf of Southwest
15  Airlines, that post that is within a few seconds of
16  each other, or one that is three, four, five years
17  apart?
18  A.  As far as -- if it is going to result in
19  discipline, it the egregiousness of the post-type
20  thing.  That is a stand.  And I'm not investigating
21  that.
22  Q.  Which is a closer nexus?
23  A.  Closer how?
24  Q.  Closer in time.  How about that?
25  A.  Probably if it is on the same -- in the same

Page 1113

1  day, that is closer.
2  Q.  Probably?
3  A.  I don't know when the other posts were.  I
4  don't have dates and times of every post.
5  Q.  I told you to assume it was in the same day,
6  within seconds, but that is okay.  It is only
7  possible that that one is closer in time than five
8  years.
9      I will accept your answer and move on.
10     MR. PRYOR:  Exhibit 111.  And I offer into
11  evidence Trial Exhibit 111.
12     THE COURT:  111.  Any objections to 111?
13     MR. McKEEBY:  No objections from
14  Southwest.
15     THE COURT:  How about from the union?
16     MR. GREENFIELD:  No, your Honor.
17     THE COURT:  Okay.  111 is in.  We are
18  publishing.
19     (The referred-to document was admitted in
20     Evidence as Trial Exhibit 111.)
21  BY MR. PRYOR:
22  Q.  You are familiar with Exhibit 111 in some
23  emails, some you authored and some you received?
24  A.  Yes.
25  Q.  Let's start at the bottom one.  Denise

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 303 of 642   PageID 11244
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1114..1117

Page 1114

1 Guttierez, she's with employee relations?
2 A.  Is that a question?  Yes, she is.
3 Q.  Let's go to the second page, at the top.
4      And it says, while the videos depicting
5 abortion are considered to be offensive, they do not
6 violate the company's harassment, sexual harassment,
7 discrimination and retaliation policy, but they
8 should be addressed.
9      That is what they told you, isn't it?
10 A.  Yes.
11 Q.  So did you agree with them?  Or did it matter?
12 A.  I agreed with them.
13 Q.  Okay.  So two of the three the buckets, two of
14 them didn't violate any harassment policies, right?
15 A.  Correct.
16 Q.  And then it says, however, the images of women
17 dressed as vaginas do violate the aforementioned
18 policy due to their sexual nature.
19      So they concluded that the vagina pictures
20 violated the policy, true?
21 A.  Yes.
22 Q.  And then you respond, I have attached the
23 termination letter.  Do you want me to add
24 harassment policy?  True?
25 A.  Yes.

Page 1115

1 Q.  And this is your draft letter attached.  And it
2 says, under the reasons for termination, one,
3 Southwest Airlines's social media policy, right?
4 A.  I don't see it on here.
5 Q.  I'll get the letter for you; it's the
6 attachment.
7 A.  Okay.  Yes.  It does say "social media policy."
8 Q.  And then it says, "bullying policy."  They
9 don't have a bullying policy at Southwest Airlines,
10 do they?
11 A.  It is depicting the same policy.  But that was
12 something that needed to be edited.
13 Q.  I understand.
14      Do they have a bullying policy at Southwest
15 Airlines?  As opposed to a workplace bullying
16 policy?
17 A.  It is semantics, but it is referring to the
18 same thing.
19 Q.  There is no reason that you were wanting to
20 leave out "workplace" though, right?
21 A.  No.
22 Q.  And under the third one, it says, workplace
23 rules 3.0.0.  And that did not find its way into the
24 final termination letter, correct?
25 A.  It refers to it in part.

Page 1116

1 Q.  Does it reference this policy as being a basis
2 for termination?
3 A.  Not specifically, no.
4 Q.  Does "not specifically" mean no or is this
5 another where you think generally, it might?
6 A.  No.  If we look at the letter, there is a
7 statement in there that references --
8 Q.  3.0.0?
9 A.  It doesn't say it specifically.  I have to
10 read -- look at the letter again to know for sure,
11 the final termination letter.
12 Q.  It doesn't specifically say 3.0.0, but
13 generally says it?
14 A.  It says it could violate other areas.  And I
15 don't know specifically the wording.
16 Q.  I'm not asking about could.  I'm trying to ask
17 about the policies that were part of the termination
18 in 3.0.0 were not part of the determination
19 decision, true?
20 A.  True.
21 Q.  And, in fact, the harassment policy was not
22 included either, was it?
23 A.  Once again, it referred to, it could have been
24 violated.  It doesn't specifically say it was.
25 Q.  It doesn't generally say it was; it says it

Page 1117

1 could.
2 A.  Correct.
3 Q.  It doesn't anywhere say she was fired for
4 harassment policy, true?
5 A.  Other than referencing it in there?
6 Q.  Referencing that it could have --
7 A.  Correct.
8 Q.  -- but that is not the reason.  You gave two
9 reasons --
10 A.  Correct.
11 Q.  -- workplace bullying and social media policy?
12 A.  Yes.
13 Q.  Workplace bullying that you don't know took
14 place at the workplace and social media policy, is
15 that fair?
16 A.  Correct.
17 Q.  Why was harassment not included?
18 A.  Because it was partially a violation, and we
19 didn't want to put something in there that was
20 partially violated because it wouldn't be as strong
21 as the other two.
22      MR. PRYOR:  Okay.  Let's look at Exhibit
23 115.  I move for its admission.  It may already be
24 in.  I don't know.
25      THE COURT:  115.  It is in.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 304 of 642   PageID 11245
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1118..1121

Page 1118

1      So I will ask, any objections?
2         MR. McKEEBY:  No objections from
3  Southwest.
4         MR. GREENFIELD:  None, your Honor.
5         THE COURT:  Okay.  115 is in.  We are
6  publishing.
7         MR. PRYOR:  Yes.
8         (The referred-to document was admitted in
9      Evidence as Trial Exhibit 115.)
10  BY MR. PRYOR:
11  Q.  Let's look at the final version.  It says in
12  the second paragraph, during the meeting you
13  admitted you posted graphic videos of aborted
14  fetuses on Facebook and sent those videos in a
15  private Facebook message to another Southwest flight
16  attendant.
17      Is that what it says?
18  A.  Yes.
19  Q.  Why doesn't it reference that it was sent to
20  her as union president, as you have told us?
21  A.  We are protecting one of our employees.
22  Q.  I understand.  But you have told us as to all
23  three buckets, you understood she was sending it to
24  Audrey Stone and the Union complaining about union
25  activity.

Page 1119

1  Q.  Do you understand -- I understand Audrey Stone
2  is a flight attendant, although, she wasn't working
3  as a flight attendant at the time, was she?
4         MR. McKEEBY:  Objection, compound.
5         MR. PRYOR:  I will remove it.
6  BY MR. PRYOR:
7  Q.  Was she working as a flight attendant at time
8  any of these posts were sent to her?
9  A.  She was still an employee of Southwest
10  Airlines, but she was doing union business, yes.
11  Q.  She was not acting as a flight attendant at the
12  time she received any of these posts, true?
13  A.  It is loosely how you say "she was acting as a
14  flight attendant."  She was still an active flight
15  attendant who is certified.
16  Q.  Under that definition, she will be a flight
17  attendant until she dies.
18      I'm asking you --
19         MR. GREENFIELD:  Objection, your Honor, to
20  the sidebars continuing.
21         THE COURT:  Sustained.
22         MR. PRYOR:  I withdraw that.
23  BY MR. PRYOR:
24  Q.  So she was not acting as a flight attendant at
25  the time she received any of these messages that she

Page 1120

1  received from Charlene Carter, true?
2  A.  True.  In the sense of the word.
3  Q.  But she was acting as union president, true?
4  A.  Yes.
5  Q.  You don't mention that here, correct?
6  A.  Correct.
7  Q.  And then it says, in the next paragraph,
8  Charlene, when you posted the graphic videos and
9  pictures on Facebook, you were identifiable as a
10  Southwest Airlines employee and represented our
11  company and a manager, disparaging flight
12  attendants, as well as to all Southwest employees.
13      That is what you wrote?
14  A.  Yes.
15  Q.  And the post you are referring to are the posts
16  we talked about earlier that were years before?
17  A.  The posts of the aborted fetus?
18  Q.  No.  The post that you say she represented --
19  you say that, you were identifiable as a Southwest
20  Airlines employee and represented our company.
21      So those posts from years ago, you are saying
22  she was representing Southwest Airlines in regard to
23  those abortion videos that are three, four years
24  apart?
25  A.  Yes.

Page 1121

1  Q.  Then you say, although your posts and messages
2  may have been made and/or sent outside of work, so
3  you are acknowledging here, you knew it did not take
4  place in the workplace, right?
5  A.  I said may have been.
6  Q.  May have been made or sent.  That about covers
7  the gambit.  By saying "may," you think that they
8  actually did occur in the workplace?
9  A.  I'm not saying it did or didn't.  I'm just
10  saying it could have.  And -- or it might have been
11  outside, but it still represented the company.
12  Q.  Well, not workplace, then.
13         MR. McKEEBY:  Objection; that is argument.
14         THE COURT:  You can ask it as a question.
15  BY MR. PRYOR:
16  Q.  It is not workplace, then, is it?
17  A.  What is not workplace?
18  Q.  If she's not doing it in the workplace, it is
19  not workplace?
20  A.  It is not workplace, correct.
21  Q.  And she was terminated, in part, for violating
22  the workplace bullying/hazing policy, right?
23  A.  Yes.
24  Q.  Do you know that Southwest Airlines, as part of
25  its agreement with the Union, tracks Southwest

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1122..1125

Page 1122

1 Airlines's reprimanding of employees?  You have to
2 keep a record of it and the Union gets it?
3 A.   Okay.
4 Q.   You don't know that?
5 A.   I'm not following the question.  I was --
6 Q.   I'm saying, do you accept what I'm telling you
7 so far?  That your company keeps a record of every
8 kind of employee that gets a punishment, and they
9 say, here is how many social media policies we had
10 this year, here is how many 30-day suspensions we
11 had?
12 A.   Yes.
13 Q.   You know they do that?
14 A.   Yes.
15 Q.   And do you know that they are required to,
16 right?
17 A.   I know they do.  I don't know about the
18 requirement.
19 Q.   And they have all kind of categories, including
20 workplace bullying and hazing policy and social
21 media and sexual harassment.  They keep all of that?
22 A.   Okay.
23 Q.   Right?  Are you aware of that?
24 A.   I have seen some stats on that.  I'm not aware
25 of how detailed the collection of that is.

Page 1123

1 Q.   Do you know that there is not a single lawyer
2 in the history of Southwest Airlines of anyone being
3 terminated or reprimanded for a violation of the
4 mission statement?
5 A.   No, I wasn't aware of that.
6 Q.   And in fact, you include -- they don't even
7 keep a record of that.  You are not aware of that?
8        MR. GREENFIELD:  Objection, your Honor,
9 lack of foundation.
10       THE COURT:  Sustained.
11 BY MR. PRYOR:
12 Q.   Are you aware of whether or not the company
13 keeps track of purported violations of the company's
14 mission statement?
15 A.   No.
16 Q.   But you include mission statement in your
17 termination letter, true?
18 A.   True.
19 Q.   Had you ever done that before ever?
20 A.   It seems like we have referred to it in the
21 past.
22 Q.   Have you ever, to your recollection -- let's go
23 back that.
24      Have you ever terminated anyone prior to this
25 for violation of social media policy?

Page 1124

1 A.   Yes.
2 Q.   Who?
3 A.   Or no -- you said for -- terminated violation?
4        MR. PRYOR:  I withdraw the question.
5 BY MR. PRYOR:
6 Q.   It is fair to say you have never, as of the
7 time of terminating Charlene Carter, never
8 terminated anyone for violation of the company's
9 social media policy?
10       THE COURT:  I'm not aware of that.
11       MR. McKEEBY:  Objection.  Objection,
12 relevance.  Prejudice.  Motion in limine.
13       THE COURT:  Limine.
14       MR. McKEEBY:  I'm sorry?
15       THE COURT:  It is limine.
16       MR. PRYOR:  Sustained?
17       THE COURT:  Yes.
18 BY MR. PRYOR:
19 Q.   There is nothing in the termination letter
20 referring to Charlene Carter having threatened
21 Ms. Stone, correct?
22 A.   No.
23       MR. PRYOR:  Let's look at Exhibit 64.  I
24 move to introduce Exhibit 64.
25       THE COURT:  Sixty-four.

Page 1125

1        MR. PRYOR:  They are calling it up.
2        THE COURT:  Okay.  Objections -- prior
3 objections?
4        MR. McKEEBY:  Sorry.  No objections.
5        MR. GREENFIELD:  None, your Honor.
6        THE COURT:  Sixty-four is in.  We can
7 publish.
8        (The referred-to document was admitted in
9 Evidence as Trial Exhibit 64.)
10 BY MR. PRYOR:
11 Q.   And can you identify Exhibit 64 as what you
12 understood Charlene Carter to have posted on her
13 Facebook page that is one of the three buckets that
14 she was terminated for?
15 A.   Yes.
16       MR. PRYOR:  And let's look at Exhibit 107.
17       MR. GILLIAM:  Move for admission.
18       MR. PRYOR:  I move for the introduction
19 admission of Exhibit 107.
20       THE COURT:  107.
21       Any objections to 107?
22       MR. McKEEBY:  No objection from Southwest.
23       THE COURT:  How about the Union?
24       MR. GREENFIELD:  None, your Honor.
25       THE COURT:  Okay.  107 is in.  We are

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 306 of 642   PageID 11247
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022              Pages 1126..1129

Page 1126

1  publishing.
2       (The referred-to document was admitted in
3  Evidence as Trial Exhibit 107.)
4  BY MR. PRYOR:
5  Q.  Can you identify Exhibit 107?
6  A.  Yes.
7  Q.  Are these your -- tell me what it is.
8  A.  It is a summary of my investigation sent to
9  labor relations and employee relations, and HR VP.
10  Q.  And in the first paragraph you say, she stated
11  that Charlene Carter has been making comments that
12  indicated she was not union friendly since 2008.
13  Audrey Stone became president of TWU in 2013, and
14  she stated Charlene has been sending her messages
15  since that time, before there were any issues due to
16  abortion or women's rights.  True?
17  A.  That is what it states, yes.
18  Q.  I'm looking for a particular sentence.
19     Here we go, one, two -- in the third paragraph,
20  it says "In our fact-finding meeting with Charlene
21  she openly admitted to sending Facebook messages to
22  Audrey for at least the past two years.  She latched
23  on to the Women's March and abortion issues as her
24  defense, stating it was her values as a Christian,
25  but the harassment has been going on much longer."

Page 1127

1  Q.  Do you see that?
2  A.  Yes.
3  Q.  What harassment?
4  A.  The continuous messages sent to Audrey Stone.
5  Q.  So the messages that were sent by Charlene
6  Carter complaining about her union is what you are
7  referring to as the harassment?
8  A.  Yes.
9  Q.  It says, Charlene has been barraging Audrey
10  with Facebook messages, rantings since March 2015,
11  has incessantly called her morally bankrupt, no
12  integrity, corrupt and inept.
13     Do you see that?
14  A.  She just got it up.  Yes, I see it at the
15  bottom.
16  Q.  And you considered her union communications to
17  be her incessantly doing those things?
18  A.  Yes.
19  Q.  Then on the next page, you once again refer to
20  it as a bullying and hazing policy, don't you?  It's
21  coming up.
22  A.  Yes.
23  Q.  Did you not realize that it had to take place
24  in the workplace?
25  A.  On the final letter I did.

Page 1128

1  Q.  Were you aware of it at the time that you took
2  the actions that you did against Ms. Carter?
3  A.  You mean as far as placing the word "workplace"
4  in it or what are you asking?
5  Q.  I'm asking whether or not you thought it was a
6  bullying and hazing policy or a workplace bullying
7  and hazing policy?
8  A.  The workplace bullying and hazing policy could
9  be referring to our workplace policy.  It involves
10  all of our employees.  It doesn't -- they may not
11  specifically mean it has to happen in the workplace.
12  It is a workplace bullying and hazing, it covers all
13  employees.
14  Q.  But whether they are in the workplace or not,
15  right?
16  A.  I don't know because --
17  Q.  You don't know?
18  A.  -- there are two different opinions on there.
19  I mean, you are saying -- you are making it that it
20  is specifically in the workplace only, but --
21  Q.  I'm just reading what your policy says, sir.
22  But you're telling me that "workplace" is really
23  kind of an optional word there, right?
24       MR. McKEEBY:  Objection, mischaracterizes.
25       THE COURT:  Sustained.

Page 1129

1  BY MR. PRYOR:
2  Q.  You are saying that the workplace bullying and
3  hazing policy doesn't necessarily just apply to the
4  workplace?  True?
5  A.  I'm saying that it covers all employees towards
6  each other.  That is what I'm saying.
7  Q.  Does it require the activity to be at the
8  workplace or not?
9  A.  I -- I think that it can be in the workplace.
10  It has to do with covering our employees, more than
11  anything.
12  Q.  Okay.  Is it limited to the workplace as stated
13  in the policy or not?
14       MR. McKEEBY:  Objection, asked and
15  answered.
16       THE COURT:  I'll allow it.
17       THE WITNESS:  I don't know whether that is
18  stated in there or not, that it has to be in the
19  workplace.
20  BY MR. PRYOR:
21  Q.  It says "workplace bullying."
22  A.  Right.
23  Q.  That is what I mean when I say it's at the top
24  in bold and it is in the statement itself.
25     So where it says "workplace bullying," what it

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 307 of 642   PageID 11248
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 4 July 08, 2022              Pages 1130..1133

Page 1130

1 really means is workplace, and we're also going to
2 be big brother everywhere else, right?
3        MR. McKEEBY:  Object to the
4 characterization.
5        MR. PRYOR:  It seems fair.
6        THE COURT:  I'll allow it.
7 BY MR. PRYOR:
8 Q.  Go ahead.  You can answer.
9 A.  It covers the workplace and it covers how we
10 treat each other in the workplace.  It could be
11 harassing.  It could be an event that we sponsor.
12 There is different facets of it that could be true.
13        MR. PRYOR:  Let's look at Exhibit 98.
14        THE WITNESS:  Matt, can you show me where
15 that is at?
16 BY MR. PRYOR:
17 Q.  Do you recognize this is as your interview
18 notes or interview notes of Ms. Carter?  We talked
19 about them earlier.
20 A.  Yes.
21        MR. McKEEBY:  Can we wait until one lawyer
22 is at the podium?
23        MR. PRYOR:  Sure.
24        MR. McKEEBY:  I'm asking the judge, but --
25        THE COURT:  Yes.  We can.  We can wait to

Page 1131

1 ask questions until we are down to one.
2 BY MR. PRYOR:
3 Q.  Got it.  Let's go to page 2.
4     In response to a question, Ed says, it affects
5 people when they see it.  What is being depicted on
6 the video?
7     And according to the notes of the meeting that
8 you think are accurate, she said, it is an abortion,
9 it is a baby.  People say it is just cells; that is
10 not just a tissue, it is a baby.  It shows someone
11 who made the same mistake that I did and they need
12 to understand, they need to know that it is a life
13 and not just a bunch of tissue.  That is my stance.
14     Do you see that?
15 A.  Yes.
16 Q.  That is what she told you?
17 A.  Yes.
18 Q.  Did you consider that in your termination
19 decision?
20 A.  Consider what?  Her stand?
21 Q.  Her telling you why she did that?
22 A.  Yes.
23 Q.  What consideration did you give it?
24 A.  That that is her stand and that is where her
25 belief is.

Page 1132

1 Q.  But that was -- that belief was not taken into
2 consideration in regard to the termination?
3        MR. McKEEBY:  Objection, asked and
4 answered.
5        THE COURT:  Sustained.
6 BY MR. PRYOR:
7 Q.  So your -- what you told me earlier is that the
8 videos were offensive and that is why you terminated
9 her.
10     Those three buckets.  Right?
11 A.  Yes.
12 Q.  All right.
13        MR. PRYOR:  Pass the witness.
14        THE COURT:  All right.  So who is going to
15 ask questions first?  Is it you, Mr. McKeeby, or
16 you, Mr. Greenfield?
17        MR. McKEEBY:  Southwest intends to reserve
18 its questions until its case-in-chief.
19        THE COURT:  Understood.
20     Mr. Greenfield.
21        MR. GREENFIELD:  I will go ahead and ask
22 now.
23        THE COURT:  You will go now?  Okay.
24
25

Page 1133

1              CROSS-EXAMINATION
2 BY MR. GREENFIELD:
3 Q.  Good morning, Mr. Schneider.
4 A.  Good morning.
5 Q.  My name is Adam Greenfield and I represent the
6 Union.  Have we ever met before?
7 A.  I don't believe so.
8 Q.  I don't believe so either.  It is nice to meet
9 you.
10     Have you found many of counsel's questions
11 confusing today?
12 A.  Yes.
13        MR. PRYOR:  Object, leading.
14        MR. GREENFIELD:  This is not my witness.
15        MR. PRYOR:  He's certainly not adverse.
16     This is an employee of Southwest --
17        THE COURT:  I don't think that is a
18 sufficient question.  I know he can't lead him, but
19 he's got to move up a different topic and set up a
20 topic.  I think that is fine.
21        MR. McKEEBY:  There is a technical issue.
22        THE COURT:  We are pulling your feed, but
23 are you displaying anything right now?
24     Okay.  It is not pulling it up.
25     There it is.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 308 of 642   PageID 11249
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                 Pages 1134..1137

Page 1134

1        Is this in evidence?
2        MR. GREENFIELD:  Yes.
3   BY MR. GREENFIELD:
4   Q.   Mr. Schneider, this is Exhibit 56.  Do you
5   remember opposing counsel asking you about this
6   document?
7   A.   Yes.
8   Q.   Okay.
9        At the top of this page, it has -- it looks
10  like a post from Jessica Parker shared TWU Local
11  556's video, is that correct?
12  A.   Yes.
13  Q.   And what did Ms. Parker write?
14  A.   Why we marched.
15  Q.   All right.  Now, on the picture, there is a
16  statement there as well.
17       Can you identify what that statement says?
18  A.   Equal pay.
19  Q.   Okay.  Well, I'm specifically talking about the
20  comment that was added to the photo.
21  A.   Women make only 80 cents for every dollar.
22       MR. GREENFIELD:  Thank you.  You can take
23  it down.
24  BY MR. GREENFIELD:
25  Q.   I would like to talk to you about a couple

Page 1135

1   things today, your duty to investigate and the
2   decision you made to terminate Charlene Carter.
3   Okay?
4   A.   Yes.
5   Q.   Let's start with the duty to investigate.
6        All employees have a right to be free from
7   bullying and harassment in the workplace, correct?
8   A.   Yes.
9   Q.   And to be free from threats of physical
10  violence?
11  A.   Yes.
12  Q.   And if an employee brings you a complaint of
13  that nature, either of those, you have a duty to
14  investigate that, correct?
15  A.   Yes.
16  Q.   Now, I would like to go back to the
17  hypothetical that opposing counsel raised, and I
18  would like to complete that.
19       Let's go back to Cabo.  Do you remember Cabo?
20  A.   Yes.
21  Q.   Do you remember the hallway in Cabo?
22  A.   Yes.
23  Q.   Now, I would like to add on to that
24  hypothetical.
25       Let's say that one flight attendant says, I'm

Page 1136

1   going to kick your butt the next time I see you back
2   on line.
3        Okay?
4   A.   Yes.
5   Q.   Now, is that a threat?  If that was brought to
6   you, you would have a duty to investigate?
7   A.   Yes.
8   Q.   Okay.  Now, did that threat happen in the
9   workplace?
10  A.   No.
11  Q.   But it would affect the workplace, correct?
12       MR. PRYOR:  Objection, leading.
13       THE WITNESS:  Correct.
14       THE COURT:  Sustained.
15       MR. GREENFIELD:  I will move on, your
16  Honor.
17  BY MR. GREENFIELD:
18  Q.   What is your understanding -- and I'm not
19  calling for a legal conclusion here -- but what is
20  your understanding legally could occur if you didn't
21  investigate an employee of Southwest Airlines's
22  legitimate complaint?
23       MR. PRYOR:  Object, lack of foundation,
24  especially given that he says he is not a lawyer
25  every time I asked a question.

Page 1137

1        THE COURT:  I'll allow it.
2   BY MR. GREENFIELD:
3   Q.   Would you like me to ask it again?
4   A.   Yes, please.
5   Q.   What is your understanding legally could occur
6   if you didn't investigate an employee legitimate
7   complaint?
8   A.   I would be held --
9        MR. PRYOR:  Objection, lack of foundation.
10       THE COURT:  I'll allow it.
11  BY MR. GREENFIELD:
12  Q.   Would you like me to ask it again, sir?
13  A.   No.  I would be held responsible for not
14  following through and investigating something that
15  could be a violation of one of our policies.
16  Q.   Is it your brief that that could open up the
17  company to liability?
18  A.   Yes.
19       MR. PRYOR:  Object, leading.
20       THE COURT:  Sustained.
21  BY MR. GREENFIELD:
22  Q.   And Ms. Stone does not give up her rights as a
23  flight attendant when she -- or as an employee of
24  Southwest Airlines when she becomes president of the
25  Union, does she?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 309 of 642   PageID 11250
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                         Pages 1138..1141

Page 1138

1      MR. PRYOR:  Object, leading.
2      THE COURT:  Hold on.
3      MR. GREENFIELD:  I'm asking whether she
4 does or not.
5      THE COURT:  Hold on.  Yes, I will sustain
6 that.
7 BY MR. GREENFIELD:
8 Q.  Do you know whether Ms. Stone gives up her
9 right as a flight attendant, an employee of
10 Southwest Airlines, when she becomes a union
11 president?
12 A.  She does not.
13 Q.  And in fact, at that time period, are you aware
14 whether or not Ms. Stone, the president of the Union
15 at that time, actually had a requirement to fly?
16 Did you know whether or not she had that or not?
17      MR. PRYOR:  Object, lack of foundation.
18      THE COURT:  I'll allow it.
19      THE WITNESS:  I do not know that for sure.
20 BY MR. GREENFIELD:
21 Q.  At any point in your tenure at Southwest, are
22 you aware of whether presidents had a flying
23 requirement during their term?
24 A.  Yes.
25 Q.  Does that help refresh your recollection as to

Page 1139

1 whether Ms. Stone had that requirement?
2 A.  She did.  I just don't know the requirement,
3 hour or days.
4 Q.  You don't know the specificity?
5 A.  Correct.
6 Q.  But you do understand that she did have a
7 requirement to fly during that time period?
8 A.  Yes, she did.
9 Q.  Back to your duty to investigate.
10      Did Audrey Stone's complaint trigger your duty
11 to investigate?
12 A.  Yes.
13      MR. GREENFIELD:  Can you pull up Exhibit
14 89?  The next page.
15 BY MR. GREENFIELD:
16 Q.  Now, if you look down the page, there is a line
17 that says -- and correct me if I read this wrong --
18 Ed, do you have a note taker?
19      Do you see where I'm at?
20 A.  Yes.
21 Q.  Okay.  And what is your response?
22 A.  Yes, it is Janet Ray.
23 Q.  So these aren't actually your notes, correct?
24 A.  She took the notes and transcribed them and
25 then sent them to me, and I verified that they were

Page 1140

1 the correct notes.
2 Q.  But you didn't take these notes down, did you?
3 A.  Correct.
4 Q.  Okay.  And are you aware that Ms. Stone
5 testified that she thought there were errors in the
6 notes taken in this document?  Are you aware of
7 that?
8      MR. PRYOR:  Object, lack of foundation.
9 He obviously is subject to the rule and would not be
10 aware of that.
11      THE COURT:  Sustained.
12      MR. PRYOR:  Also mischaracterizes what the
13 testimony was.
14      THE COURT:  I have already ruled on your
15 first objection, so you can ask a new question.
16 BY MR. GREENFIELD:
17 Q.  Would you be surprised if Ms. Stone disagreed
18 with the contents of these notes?
19      MR. PRYOR:  Object, lack of foundation.
20 Object to the relevance of his surprise at Ms. Stone
21 realizing that this information came out.
22      THE COURT:  I'll allow it.
23      THE WITNESS:  Yes.
24 BY MR. GREENFIELD:
25 Q.  That would surprise you?

Page 1141

1 A.  Yes.
2 Q.  Now, is it fair to say that what we are looking
3 at is a Southwest Airlines record of words taken,
4 not by you, from words spoken by Audrey Stone that
5 you are now being asked to testify about, is that
6 fair?
7      MR. PRYOR:  Objection, asked and answered.
8      THE WITNESS:  Yes.
9      MR. GREENFIELD:  I don't believe I have
10 asked that question.
11      THE COURT:  Hold on.
12      I'll allow that.
13 BY MR. GREENFIELD:
14 Q.  Mr. Schneider, does this sound a little bit
15 like the telephone game to you?
16 A.  It does, yes.
17 Q.  I would like to move on to your decision to
18 terminate Charlene Carter.
19 A.  Okay.
20 Q.  Do you believe that your decision was
21 heavy-handed?
22 A.  Yes.  Definitely.
23 Q.  And in fact, the company walked back from that
24 decision, isn't that correct?
25 A.  What does that mean?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 310 of 642   PageID 11251
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 4 July 08, 2022                         Pages 1142..1145

Page 1142

1        MR. PRYOR: Leading.
2        THE COURT: Sustained. Ask a new
3 question.
4        MR. GREENFIELD: Yes, your Honor.
5 BY MR. GREENFIELD:
6 Q.  Is it your understanding that the company
7 reduced the punishment to Ms. Carter?
8        MR. PRYOR: Still object to lack of
9 foundation and leading.
10       MR. GREENFIELD: I'm asking if it is his
11 understanding.
12       THE COURT: I'll allow this.
13       THE WITNESS: I didn't know it was
14 reduced.
15       MR. PRYOR: Hang on. Your Honor, may I
16 approach?
17       THE COURT: You may.
18       (Thereupon, the following proceedings were
19    had at sidebar:)
20       THE COURT: Last chance, Step 2.
21       MR. PRYOR: Your Honor, I now understand
22 what he's asking. I object on the last chance
23 letter as not being proper mitigation because it was
24 not unfettered. She had to give up rights, and,
25 therefore, it cannot be mitigation.

Page 1143

1        MR. GREENFIELD: I'm not asking for
2 purposes of mitigation.
3        MR. PRYOR: Well, okay. Then it is very
4 prejudicial.
5        MR. GREENFIELD: Well, it goes to the DFR
6 claim. It goes to what the Union has done to
7 represent. And so if -- the Union believes -- the
8 Union argued and represented Ms. Carter at those
9 Step 2 hearings and got that termination reduced to
10 a 30-day suspension.
11       MR. PRYOR: That is absolutely false.
12 Mike Sims testified he made that decision unfettered
13 on his own without anyone consulting him or him
14 thinking --
15       THE COURT: We're too loud.
16       MR. PRYOR: -- it was him.
17       MR. GREENFIELD: It was a product of union
18 -- the offer was a product --
19       MR. PRYOR: Put on some evidence, then,
20 because that is not what Mr. Sims said. That letter
21 is inappropriate --
22       MR. GREENFIELD: Mr. Sims has not
23 testified about it.
24       MR. ENIS: I know. You have no
25 foundation.

Page 1144

1        THE COURT: So what I will say is, I
2 address in writing why I think it goes to
3 mitigation, why mitigation is a question for the
4 jury, not a question for me. And I think I agreed
5 earlier that a jury could see maybe it is not
6 mitigation. But that is up to them, not up to me.
7        The question now is, is you are saying it
8 is not for mitigation, because mitigation is really
9 your thing.
10       Then where are we at? That is what I'm
11 trying to figure out.
12       MR. GREENFIELD: Well, I still think it
13 goes to the DFR claims. I don't disagree that the
14 termination potentially -- the Union doesn't
15 necessarily agree.
16       THE COURT: You are claiming a DFR, that
17 it is turning her in? Is there any other factual
18 basis for the DFR claim?
19       MR. PRYOR: For the DFR claim?
20       THE COURT: Right.
21       MR. PRYOR: Yes. They reported her.
22       THE COURT: And that is what I said.
23       My question was, is there anything else?
24 Because if your only argument for the DFR claim is
25 they reported her, anything after reporting her, I'm

Page 1145

1 not sure is relevant.
2        MR. PRYOR: Well, can --
3        THE COURT: If it was another purpose,
4 another way. I know mitigation is another purpose,
5 if you are telling me this is. I don't see how that
6 is relevant to the DFR claims.
7        MR. GREENFIELD: Well, it goes -- they
8 want to say that is the -- I'll wait.
9        MR. PRYOR: Excuse me. I'll just listen,
10 and he probably can respond better than me. Sorry,
11 your Honor.
12       MR. GREENFIELD: Our duty of fair
13 representation, whether we -- that goes -- factors
14 into. It is a built-in. The entire thing is a
15 collective bargaining checks and balance system.
16       Even if Ms. Stone turned her in, the
17 actions of the Union were to fight for her to get
18 her job back. It is a built-in checks and balances
19 system, and that goes directly to the DFR claim.
20       MR. GILLIAM: It's incorrect, your Honor.
21 It's totally irrelevant. The duty of fair
22 representation violation allegation in this case is
23 the fact that Ms. Stone turned her in, in the first
24 place.
25       MR. GREENFIELD: Your Honor, you have

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 311 of 642   PageID 11252
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Pages 1146..1149

Page 1146

1 already ruled on your motion in limine that the
2 fact-finding meeting -- our representation at the
3 fact-finding meeting, at the Step 2 hearing are
4 already relevant. You have already ruled on that.
5        MR. PRYOR: That is not what he's
6 offering.
7        THE COURT: Okay. Let's call our break.
8 And I need to go back and refresh. You need to
9 point me to in the amended limine order that
10 controls the case, the page.
11        So can you go do that before we break?
12 And I'm going to look for that, too. Anyone who
13 finds it, let me know.
14        I know what I said on mitigation. I don't
15 know what I said on DFR and the timeline post
16 reporting. Does that make sense?
17        MR. GREENFIELD: We may be able to
18 shortcut this.
19        THE COURT: What's that?
20        MR. GREENFIELD: Can I ask Mr. Schneider
21 whether or not he's aware of the reduction from a
22 termination to a 30-day suspension? And I will move
23 on after that.
24        MR. PRYOR: I have no objection to that
25 being asked outside the presence of the jury.

Page 1147

1        THE COURT: Okay. Well, here's the thing,
2 we are going to kick the jury out for the break.
3 You can ask him that question, just to see if we
4 still need to look up the amended limine order and
5 we can do it. Understood?
6        So jury goes out. You ask that question.
7 And then we kick him off the stand. And then we
8 figure out where in the limine order we need to look
9 at, if we need to look at it.
10        MR. GREENFIELD: Yes, your Honor.
11 Understood.
12        (Thereupon, the sidebar was concluded and
13        the following proceedings were held in open
14        court:)
15        THE COURT: Okay. We are going to take
16 our break because we have got to track down a legal
17 issue. So first break is going to happen now.
18 Let's come back at 2:30, 11 minutes.
19        So same three instructions; you can only
20 talk to your fellow jurors and court personnel,
21 don't talk to anyone else, and don't do any research
22 about the case. We will see you at 2:30.
23        All rise.
24        (The jurors exited the courtroom.)
25        THE COURT: Hold on, Mr. Schneider. We

Page 1148

1 need to ask him one more question while the jury is
2 out before he takes his break.
3        So, Mr. Pryor, you can go ahead and ask
4 from counsel table -- or, sorry, it is you,
5 Mr. Greenfield, the question you wanted to ask him.
6        MR. GREENFIELD: Yes.
7        ^P R O F F E R
8 BY MR. GREENFIELD:
9 Q. Are you aware of whether Ms. Carter's
10 termination was reduced to a 30-day suspension?
11 A. I know that it was offered.
12        MR. GREENFIELD: Okay.
13        Your Honor, is that an acceptable question
14 to ask? Or is there an objection to that question?
15        MR. PRYOR: He said he's not aware of it.
16        THE COURT: Well, I think that is a
17 question for him.
18        MR. HILL: It was offered.
19        MR. PRYOR: What was the question?
20        MR. HILL: It was offered, but not
21 accepted.
22        THE COURT: The answer was, it was
23 offered, not accepted.
24        MR. HILL: Are you aware that she was
25 offered a reduction to the 30-day suspension?

Page 1149

1        MR. PRYOR: And what was his answer?
2        THE COURT: It was offered, not accepted.
3        MR. PRYOR: So he's aware of it?
4        THE COURT: Yes.
5        MR. PRYOR: Okay.
6        THE COURT: So I think you can take your
7 break now. And then we still have to talk after you
8 leave the courtroom.
9        (The witness exited the courtroom.)
10        THE COURT: Okay. So he's out of the
11 room. So the question is, do we still need to track
12 down the limine ruling?
13        So what is your position now,
14 Mr. Greenfield?
15        MR. GREENFIELD: I haven't be able to find
16 it or looked for it in this time period.
17        But if I also may expand the relevancy
18 argument?
19        THE COURT: You can say whatever you want
20 to at this point.
21        MR. GREENFIELD: Sure. The plaintiffs
22 have consistently held that a conspiracy exists
23 between the parties, and that the Union worked with
24 Southwest Airlines to facilitate the termination of
25 Charlene Carter. Okay?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 312 of 642   PageID 11253
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 4 July 08, 2022                    Pages 1150..1153

Page 1150

1    To be able to attack their theme of the
2  case, we need to be able to show the efforts the
3  Union made and the steps it went through to show
4  that this isn't a conspiracy, which includes us
5  working on her behalf to get this last chance
6  agreement.
7         THE COURT:  Understood.  I will look at
8  the limine ruling.  I will consider that argument.
9         Anything that y'all want to say?
10        MR. GILLIAM:  Can we have a response to
11 that?
12        THE COURT:  Yes.
13        MR. GILLIAM:  Okay.  That is not the
14 theory of the case at all.  We allege a duty of fair
15 representation violation against the Union; we
16 represent an NRLA retaliation claim against the
17 Union, and a Title VII violation carried against the
18 Union.  We don't allege any sort of conspiracy
19 theory.
20        What we allege is that the Union violated
21 the duty of fair representation when Local 556
22 President, Audrey Stone, turned in Ms. Carter and
23 tried to get her fired.  That is the basic theory of
24 the case.  The Union's representation after that is
25 totally irrelevant.

Page 1151

1         MR. GREENFIELD:  Your Honor, if I could
2  add a stipulation to that, please, because they have
3  spent days putting on testimony that they think
4  union members are cozying up to Southwest Airlines.
5  That is their -- that is what they --
6         MR. GILLIAM:  No.  Our theory is that
7  union -- is that union actors are turning in other
8  flight attendants, their opponents, union officers,
9  and their agents are turning in --
10        MR. GREENFIELD:  And working with
11 Southwest Airlines.
12        THE COURT:  I understand.
13        MR. GILLIAM:  That evidence is limited.
14        MR. GREENFIELD:  There's been three days'
15 worth of evidence on it.
16        THE COURT:  I will look at it over the
17 break.  I do remember telling at one point,
18 Mr. Pryor, he couldn't get into evidence and he
19 said, I can't claim collusion?  And my thought that
20 I didn't say on the record is, it is not a criminal
21 case with a conspiracy allegation.  But I need to
22 think about it more, right?
23        MR. McKEEBY:  But I would also ask that
24 you think about it when you listen to the testimony
25 of the next witness and my objection to her

Page 1152

1  testimony, Ms. Lacore.
2         THE COURT:  Ms. Lacore?
3         MR. McKEEBY:  It will just be a preview.
4         THE COURT:  Understood.
5         MR. GREENFIELD:  Even something they put
6  on with Brian Talburt, they even talked about
7  conspiracy with that witness, that they played for
8  the jury yesterday.
9         THE COURT:  So we now have a six-minute
10 break.  I will see y'all back here in six minutes.
11        THE COURT SECURITY OFFICER:  All rise.
12        (Recess.)
13        THE COURT SECURITY OFFICER:  All rise.
14        THE COURT:  Okay.  Limine ruling, first
15 full paragraph of page 3 of the second amended
16 limine order.  We have had so much flying around, it
17 is hard to remember.
18        Okay.  So we are talking about the
19 arbitration proceedings, but last chance Step 2 are
20 still in the same bucket in my mind.
21        So the fact of Carter's representation
22 and -- by Local 556 and Local 556 being able to
23 negotiate a last chance agreement are relevant, at
24 least to Carter's duty of fair representation claim.
25        So I adopted your argument that you made.

Page 1153

1  I haven't seen a reason to change that argument.  So
2  I'm letting you ask that question.
3         MR. GREENFIELD:  Thank you, your Honor.
4         MR. PRYOR:  And, your Honor, to make our
5  record, when he asks the question, I would like to,
6  the first time, fully state in a sidebar all of our
7  issues, in addition to what we have said in the
8  limine, and ask for a running objection.
9         THE COURT:  Okay.  So I have no problem
10 with that, but how about state it now.  We're on the
11 record.  Sidebar is the same as here.
12        MR. PRYOR:  Well, I'm not an appellate
13 lawyer, but I always kind of feel like there has got
14 to be a question pending in front of a jury that I
15 object to.  But if the Court is instructing me that
16 you want me to do it this way, I will do it this
17 way.
18        THE COURT:  Well, I mean, if we can do it
19 that way.  So that is the entire premise of our
20 morning session, right?  Everything we do in the
21 morning session is a relayed-back principle.
22        But if you want to wait for a question and
23 then come over to sidebar, we can do that.
24        MR. PRYOR:  I would appreciate that.
25        THE COURT:  That is fine.  Let's bring

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 313 of 642   PageID 11254
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1154..1157

Page 1154

1 them in.
2          MR. GREENFIELD: Your Honor, if I may, we
3 may be able to shortcut that situation as well.  I
4 believe Mr. Pryor has agreed -- and as you have
5 ruled earlier -- that this also certainly pertains
6 to mitigation.
7          Counsel and I work on these directs and
8 crosses together, and my sageful counterparts have
9 entertained me that I have missed part of the boat
10 on that.  And it absolutely does pertain to
11 mitigation as well.
12          Our efforts in representing her after her
13 termination should be considered by the jury, in
14 terms of if a jury was to decide to, in theory,
15 penalize us for our actions, we should be -- our
16 actions post termination should be considered.
17          THE COURT: I understand that.  Okay.  We
18 can bring them in.
19          (The jurors entered the courtroom.)
20          THE COURT: Mr. Greenfield, you can go
21 ahead and approach the podium.
22          Thank you.  You can be seated.
23          And, Mr. Greenfield, you can continue.
24 BY MR. GREENFIELD:
25 Q.  Mr. Schneider?

Page 1155

1 A.  Yes.
2 Q.  I will instruct you to not abuse our court
3 reporter's ears with the microphone.
4 A.  I'm sorry.  She told me to move it away when I
5 stand up.  And I move it back, and it creaks.
6 Q.  Okay.
7          Before we took our afternoon break, I was
8 asking you about how you felt about your own
9 decision to terminate Ms. Carter.
10          Do you remember those questions?
11 A.  Yes, I do.
12 Q.  Okay.
13          And do you have any personal knowledge about
14 whether Southwest Airlines decided to reduce
15 Ms. Carter's termination in any way?
16          MR. PRYOR: Your Honor, we object, ask to
17 approach.
18          THE COURT: You may.
19          (Thereupon, the following proceedings were
20          had at sidebar:)
21          MR. PRYOR: And I realize, while walking
22 up here, this question might be a question early.
23 He's going into the issue -- but I certainly -- I
24 think he's raising the issue of the last chance
25 agreement.

Page 1156

1          Does the Court understand that is what is
2 going on?  I want to make sure I'm --
3          THE COURT: I do.
4          MR. PRYOR: Okay.  We object to that as
5 settlement discussions.  It violates Rule 408.  It
6 is prejudicial; it doesn't relate to after acquired
7 evidence; it is not evidence of mitigation.  It is
8 not relevant; and for all of the other reasons
9 raised in our motion in limine response or our
10 motion.
11          We would ask the Court for a continuing
12 objection.  And if it is okay with the Court, when
13 he actually gets into the meat of it, I might say,
14 same objections we raised before so I get it one
15 more time on the record, make sure I have got it
16 with the right question.
17          And then I will be satisfied with a
18 continuing objection, if the Court permits it.
19          THE COURT: Understood.  I will grant you
20 your running objection in the interest of time, and
21 I have put you on a clock.
22          What I will say is I have understood your
23 arguments, and I will overrule them for the reasons
24 stated on page 3 of the limine order, mostly on
25 mitigation and relevance to the DFR.

Page 1157

1          MR. PRYOR: Okay.
2          MR. GREENFIELD: Thank you, your Honor.
3 And may I request that all of this not be taxed
4 against the Union's time?
5          THE COURT: Correct.
6          (Thereupon, the sidebar was concluded and
7          the following proceedings were held in open
8          court:)
9 BY MR. GREENFIELD:
10 Q.  Mr. Schneider?
11          THE COURT: Sorry.
12          MR. GREENFIELD: Thank you, your Honor.
13 BY MR. GREENFIELD:
14 Q.  Mr. Schneider, just so we are clear and the
15 jury is clear, are you aware or have any personal
16 knowledge of whether Southwest Airlines offered
17 Ms. Carter a reduction from termination to anything
18 else?
19          MR. PRYOR: Your Honor, we object on the
20 running objection we just discussed.
21          THE COURT: I will grant you that running
22 objection and overrule it.  You can answer the
23 question.
24          THE WITNESS: Yes.
25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 314 of 642   PageID 11255
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Pages 1158..1161

Page 1158

1 BY MR. GREENFIELD:
2 Q.  And what was that?
3 A.  The possibility of coming back to work for
4 Southwest Airlines.
5 Q.  Was she offered a suspension?
6 A.  I believe it did include a suspension.
7 Q.  And based on the timing of efforts, would that
8 have been essentially a time served suspension?
9 A.  Yes, it would have.
10 Q.  So if Ms. Carter would have accepted that, she
11 could have returned to work the very next day.  Is
12 that --
13      MR. PRYOR:  Object, leading.
14      THE COURT:  Yes.
15      I'll allow it.
16      THE WITNESS:  Yes, I did.
17 BY MR. GREENFIELD:
18 Q.  Would she have been able to return to work the
19 very next day?
20 A.  Yes.
21 Q.  Mr. Schneider, are you an attorney?
22 A.  No.
23 Q.  Do you understand the intricacy laws of Title
24 VII, Discrimination, Civil Rights Act of 1964?
25 A.  Basically.

Page 1159

1 Q.  Okay.  What are your basic understandings?
2 A.  That everyone is afforded equal rights,
3 especially in employment and different --
4 Q.  Okay.  Would you consider yourself an expert on
5 that matter?
6 A.  No.
7 Q.  I don't envy you, I think your job is tough.
8      Do you think you have ever made any mistakes in
9 the workplace?
10 A.  I'm sure I have.
11 Q.  In this matter and investigating these claims,
12 did you give your best efforts?
13 A.  Absolutely, yes.
14 Q.  Okay.  I would like to completely focus on this
15 decision to terminate.
16      Does the Union have any power to control your
17 investigation leading up to the termination?
18 A.  No.
19 Q.  What would you say if the Union tried to do
20 that?
21 A.  I would let them know that it is my
22 responsibility to investigate this, and I don't need
23 their assistance to do so.
24 Q.  Did that happen in the case of Charlene Carter?
25 A.  No.

Page 1160

1 Q.  Did the Union influence your decision in any
2 way to terminate Ms. Carter?
3 A.  No.  Not at all.
4 Q.  So this was solely the decision of Southwest
5 Airlines?
6 A.  Yes.
7 Q.  And for clarity's sake, you believe Ms. Stone's
8 complaint to be a legitimate one, yes?
9      MR. PRYOR:  Object, leading.
10      THE WITNESS:  Yes.
11 BY MR. GREENFIELD:
12 Q.  That you had a duty to investigate?
13      THE COURT:  Hold on.
14      MR. PRYOR:  Object to leading.
15      THE COURT:  Sustained.
16      You need to ask a new question.
17 BY MR. GREENFIELD:
18 Q.  That you had a duty to investigate?
19 A.  Yes.
20      MR. GREENFIELD:  Give me one moment.
21      We pass the witness, your Honor.
22      THE COURT:  All right.  Round two,
23 Mr. Pryor.
24      MR. PRYOR:  Nothing further, your Honor.
25      THE COURT:  Okay.  So you are excused as a

Page 1161

1 witness for now, but we will need your testimony
2 when Southwest calls its case.  So I'm going to ask
3 you to still not talk to anyone about the case in
4 the meantime because you will be back as a witness
5 again.  We know it.
6      With that, you can leave the courtroom.
7 You are free to go.  Thank you for your testimony.
8      MR. McKEEBY:  Your Honor, can I have a
9 sidebar?
10      THE COURT:  You may have a sidebar.
11      (The witness exited the courtroom.)
12      (Thereupon, the following proceedings were
13 had at sidebar:)
14      MR. McKEEBY:  There is no prohibition on
15 my talking to them, is there?
16      THE COURT:  So, yeah, we should talk
17 through that.  So if I know you are going to call
18 him back, but he's left the witness stand, is he
19 still under orders to not talk?
20      I think I -- well, so I know I have
21 authority, even in a criminal case, for someone who
22 is a holdover witness on the stand to not talk to
23 anyone.
24      What I don't know is for what reason is he
25 going to be recalled?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 315 of 642   PageID 11256
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Pages 1162..1165

Page 1162

1       MR. McKEEBY:  He's just any other witness
2 in my case.  I can talk to -- there's no -- I can
3 talk to him.  There's no rule preventing --
4       THE COURT:  How about this:  Can you have
5 someone give me a case on it?  I'm assuming you are
6 right, but before I change my instruction, I would
7 like to know.  If you can find me a case, then I
8 will lift the instruction by the end of the day.
9       Does that make sense?
10      MR. PRYOR:  I have the same issue, by the
11 way.  I'm going to put Ms. Carter on.  I don't think
12 we are going to finish her today.
13      MR. McKEEBY:  Absolutely, you can talk to
14 her.
15      THE COURT:  Well, actually, no, if someone
16 is a holdover on the stand --
17      MR. PRYOR:  So I lose no matter what.
18      THE COURT:  Well, and that is what I told
19 Schneider, right?  Last night and what I told two
20 different witnesses.
21      The question is, if you hold over because
22 you have left the stand that another witness is on,
23 are you then under a duty to not talk about the
24 case?
25      MR. PRYOR:  I guess I'm not seeing the

Page 1163

1 distinction, but I look forward to seeing the case,
2 see what it says.
3       THE COURT:  So all this to say, I won't
4 lift the instruction yet.  Send me a case, and I'm
5 happy to lift it by the end day.  Assuming I'm
6 wrong, once a witness leaves the stand that you know
7 will return, they're no longer under a duty to not
8 talk about it.
9       MR. GREENFIELD:  Your Honor, just for my
10 own clarification, I just don't understand the basis
11 of why --
12      MR. PRYOR:  It is the rule.
13      MR. GREENFIELD:  What rule?
14      MR. PRYOR:  Invoking the rule.  Once you
15 take the stand in a case, you can't talk to anyone
16 about their testimony.
17      THE COURT:  Talking to your lawyer, and
18 your lawyer tells you everything that every other
19 thing a witness said.
20      MR. GREENFIELD:  Well, he's allowed to
21 cross-examine on it, if they spoke during the break;
22 not the advice that was given, but he can ask them
23 that.  And that's persuasive -- I'm just not aware
24 of --
25      MR. PRYOR:  It's a different issue.

Page 1164

1       THE COURT:  The Supreme Court has said
2 that once a witness takes the stand, they are a ward
3 of the court, of me.  I can make them sleep at my
4 house, if I want to, to make even a criminal
5 defendant who has the express Fifth Amendment right
6 to counsel.
7       And so your question needs to get informed
8 by the Supreme Court case.  But that may not hold
9 true if someone is excused as a witness for now, but
10 we will need him back, right?  Another witness is on
11 the stand.
12      So I'm saying, I don't know that case.
13 There may be an exception to the Supreme Court's
14 ward of the court --
15      MR. GREENFIELD:  This is just my -- this
16 is just my decency.  I'm just trying -- I just -- I
17 literally --
18      MR. PRYOR:  I never had this.  This is
19 interesting.
20      THE COURT:  I get that you can
21 cross-examine on it, but is he still a ward of the
22 court when we know he's coming back, but another
23 witness is on the stand?  I don't know.
24      So leave my ruling in place for now, but
25 I'm happy to have any authority to talk me out it.

Page 1165

1       Does that make sense?  I'm happy to have
2 any authority --
3       MR. PRYOR:  No, this is fascinating -- no,
4 no, I think she obviously can.
5       THE COURT:  I had to research it for a
6 criminal case.
7       MR. PRYOR:  But I would like some
8 clarification by the end of the day, but it is
9 interesting, and I'm glad this is on Southwest's
10 time.
11      THE COURT:  I'm going to put it on my time
12 because I genuinely don't know.
13      MR. PRYOR:  As long as it's not mine, I
14 don't care.
15      THE COURT:  I'm professing ignorance.
16 Okay.
17      MR. McKEEBY:  So in terms of the process,
18 you want a briefing or just --
19      THE COURT:  Can you just send me a case
20 and a parenthetical over email to Mr. Frye and
21 Ms. Silver?  That's great.
22      MR. GREENFIELD:  Okay.
23      THE COURT:  You don't need to do a brief,
24 but just send me a case and a parenthetical.
25      MR. PRYOR:  I can ask Matt to look for a

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 316 of 642   PageID 11257
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                    Pages 1166..1169

Page 1166

1  case.
2         THE COURT:  Okay.  So we are done with
3  this witness.  Are you calling -- who are you
4  calling next?
5         MR. PRYOR:  Ms. Lacore.
6         THE COURT:  Okay.  Go for it.
7         (Thereupon, the sidebar was concluded and
8    the following proceedings were held in open
9    court:)
10        MR. PRYOR:  Your Honor, at this time,
11 Ms. Carter calls Sonya Lacore.
12        THE COURT:  Okay.  You may do so.  We can
13 bring her in.
14        (The witness entered the courtroom.)
15        THE COURT:  Hello, Ms. Lacore.  You can
16 come on up, and the witness box is over here.
17        Before you sit down, I'm going to ask you
18 to raise your right hand, and Mr. Frye is going to
19 swear you in.
20        (SONIA LACOUR was duly sworn by the
21   Clerk.)
22        THE COURT:  Okay.  You can take a seat
23 now.
24        And you can come on up, Mr. Pryor.
25        And so I will just ask you, Ms. Lacore and

Page 1167

1  Mr. Pryor, if y'all can keep some separation between
2  his questions and your answers, and answers and
3  questions, so if there are any objections, I can
4  rule on those before you answer.
5         THE WITNESS:  Okay.
6         THE COURT:  You can proceed, Mr. Pryor.
7         DIRECT EXAMINATION
8  BY MR. PRYOR:
9  Q.  Good afternoon, Ms. Lacore.
10     Would you state your name for the record?
11 A.  Sonya Lacore.
12 Q.  How are you employed?
13 A.  I work for Southwest Airlines.
14 Q.  Can you identify Exhibit 141, previously
15 admitted into evidence?  It will be on the screen in
16 just a minute.
17 A.  And where is the screen?  Oh.
18 Q.  Can you identify this document as an email at
19 the bottom that you received from Brian Talburt?
20 A.  Yes.
21 Q.  What was your position with Southwest Airlines
22 at the time this email was sent to you?
23 A.  I believe at that time I was the senior
24 director of the strategy for in-flight.
25 Q.  This was sent to your personal email address?

Page 1168

1  A.  Yes, it appears so.
2  Q.  Did you understand the Casper referred to in
3  this email was an opponent of the Union leadership
4  of Audrey Stone?
5         MR. McKEEBY:  Your Honor, this is, I
6  think, in evidence, but with the limiting
7  instruction, which I would ask the Court repeat.
8         THE COURT:  Yes.  Okay.  So I let in this
9  exhibit with the limiting instruction that is for
10 use in the claims against the union, not in the
11 claims against Southwest.
12        Okay.  So you can reask that question so
13 she remembers what it is, Mr. Pryor.
14 BY MR. PRYOR:
15 Q.  I will restate it.
16     Mr. Casper was someone that Mr. Talburt viewed
17 as an opponent of the Union he supported?
18 A.  I really don't recall that.  I'm guessing that
19 that is what he was thinking, but I'm not sure.
20 This was a long time ago.
21 Q.  We went over this in your deposition.  You
22 recalled the context of this.  He was complaining
23 about another union member, right?
24 A.  Yes.
25 Q.  And you also understand he was warning you

Page 1169

1  about Ms. Corliss, true?
2  A.  I understand that is what he's saying in this
3  email.
4  Q.  And you understood Ms. Corliss to be an
5  African-American potential leader of the Union,
6  true?  Based on what he's telling you?
7  A.  I know that is what he was telling me.  I
8  didn't understand that she would be a potential
9  union leader at that time.
10 Q.  You did not respond in writing to this email,
11 true?
12 A.  I don't remember if I did.  I don't -- I don't
13 know.
14 Q.  You have not gone back and looked?
15 A.  No, sir.  I don't use this email address at
16 all.
17 Q.  You did not bring any charges against
18 Mr. Talburt or otherwise complain about him to the
19 company?
20 A.  Not in this instance, no, sir.
21 Q.  And when you received a copy of Audrey Stone's
22 complaint against Ms. Carter, did you inform anyone
23 of the communications that you had received about
24 using social media policy to target union opponents?
25 A.  I don't recall.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 317 of 642   PageID 11258
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1170..1173

Page 1170

1 Q.  Is that the kind of thing you would forget?
2 A.  I have a lot of emails that come my way, so it
3 is possible I would forget.
4        MR. PRYOR:  Your Honor, we move for the
5 admission of Exhibit 148.
6        MR. HILL:  138, sorry.
7        MR. PRYOR:  I'm sorry, 138.
8        THE COURT:  138.  All right.  I will ask
9 if there are any objections on 138.
10        MR. McKEEBY:  No objection.
11        THE COURT:  All right.  Any from the
12 Union?
13        MR. GREENFIELD:  On 138?
14        THE COURT:  138.
15        MR. GREENFIELD:  No, your Honor.
16        THE COURT:  All right.  138 is in, we will
17 publish.
18        (The referred-to document was admitted in
19    Evidence as Plaintiff's Exhibit 138.)
20        MR. PRYOR:  Pass the witness.
21        THE COURT:  Southwest.
22        MR. McKEEBY:  Can you pull up 141?
23              CROSS-EXAMINATION
24 BY MR. McKEEBY:
25 Q.  Ms. Lacore, did you take any action in

Page 1171

1 connection with the email sent to you by
2 Mr. Talburt?
3        MR. PRYOR:  Object, asked and answered.
4        THE COURT:  He can ask it.
5        THE WITNESS:  I don't recall.
6 BY MR. McKEEBY:
7 Q.  Who is Mr. Talburt?
8 A.  A Phoenix flight attendant.
9 Q.  And is he someone with whom you communicated on
10 occasion?
11 A.  Yes, sir, on occasion.  He would -- actually,
12 frequently, write to many of us at Southwest.
13 Q.  And can you generally describe the topics that
14 he would communicate with you about?
15 A.  Brian, he was passionate about a lot of topics.
16 So it could be anything from how upset he was about
17 crew scheduling, other people, how he didn't think
18 we were doing a good job as leaders.
19    So it was a variety of topics.  And again,
20 frequent.
21 Q.  Would he ever contact you via text message?
22 A.  Yes, he did.
23 Q.  About the same type of topics?
24 A.  Yes, sir.
25 Q.  Did you ever take any action to prevent him

Page 1172

1 from contacting you via text message?
2 A.  I did.
3    It became excessive.  And I -- and overly
4 passionate.  And so I let him know that he could
5 communicate with me via company email in a
6 professional manner, and I blocked him from my text.
7 Q.  You blocked him from your -- I'm sorry, I
8 didn't hear --
9 A.  From my text.  From my phone.
10 Q.  Ms. Lacore, did you have any involvement in the
11 decision to terminate Ms. Carter's employment?
12 A.  No, I did not.
13 Q.  Were you consulted in connection with that
14 decision?
15 A.  I was told afterwards with the letter.
16 Q.  You were copied on the letter?
17 A.  Copied on -- yes, sir.
18 Q.  And when you say "the letter," you mean the
19 termination letter?
20 A.  That's correct.
21 Q.  Did you -- were you engaged in the
22 investigation of Ms. Stone's complaint about
23 Ms. Carter?
24 A.  No, sir, I was not.
25        MR. McKEEBY:  No further questions.

Page 1173

1        THE COURT:  Mr. Greenfield.
2              ^CROSS-EXAMINATION
3 BY MR. GREENFIELD:
4 Q.  Ms. Lacore, hi.  I'm Adam Greenfield, and I
5 represent the Union.
6    Do you understand who I am?
7 A.  I do.
8 Q.  You said you played no role in the decision to
9 terminate Ms. Carter, is that correct?
10 A.  That is correct.
11 Q.  So the Union did not exert any pressure on you
12 to terminate Ms. Carter, did they?
13 A.  No, sir.
14        MR. PRYOR:  Object, leading.
15        THE COURT:  I'll allow it.
16        MR. GREENFIELD:  No more questions.  Pass
17 the witness.
18        THE COURT:  Round two, Mr. Pryor.
19              REDIRECT EXAMINATION
20 BY MR. PRYOR:
21 Q.  Did you refer to Mr. Talburt as your pen pal?
22 A.  I guess at that time he wrote.
23    We use that term loosely at Southwest if people
24 write us a lot.
25 Q.  Is that a yes?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 318 of 642   PageID 11259
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                              Pages 1174..1177

Page 1174

1 A.  That would be yes.  He was a frequent pen pal
2 at the time.
3 Q.  Did you block him after you received the email
4 communication talking about working with Southwest
5 to utilize the social media policy to get rid of
6 Mr. Casper and Ms. Corliss?
7 A.  I blocked him after he wrote a really rude,
8 vile text to me, and it was not related to that.
9 Q.  So how long after you received the one where
10 he's talking about getting rid of these people did
11 you block him?
12 A.  I don't recall.
13 Q.  It was years, wasn't it?
14 A.  I don't recall.
15 Q.  Okay.  And Audrey Stone spoke to you about her
16 complaint against Ms. Carter, correct?
17 A.  She mentioned it in passing.
18 Q.  Okay.
19       MR. PRYOR:  Thank you.
20       THE COURT:  Round two, Mr. McKeeby.
21       MR. McKEEBY:  No round two.
22       THE COURT:  Round two?
23       MR. GREENFIELD:  No, your Honor.
24       THE COURT:  Okay.  That means no round
25 three.

Page 1175

1       Okay.  So that means you are excused as a
2 witness, so thank you for your testimony.  Thank you
3 for coming in.  You can leave the courtroom.
4       THE WITNESS:  Thank you.
5       (The witness exited the courtroom.)
6       THE COURT:  Okay.  Next witness,
7 Mr. Pryor.
8       MR. PRYOR:  Your Honor, at this time we
9 call Charlene Carter.
10       THE COURT:  Okay.  Ms. Carter, you can
11 take the stand.  And we will have you raise your
12 right hand and take the oath while you are en route.
13 You know the routine.
14       (CHARLENE CARTER was duly sworn by the
15 Clerk.)
16       THE COURT:  Okay.  You can take a seat and
17 remember my request for space between questions and
18 answers.  You can proceed, Mr. Pryor.
19             DIRECT EXAMINATION
20 BY MR. PRYOR:
21 Q.  Good afternoon.
22 A.  Hello.  Sorry.
23 Q.  And would you state your name for the jury.
24 A.  Yes.  My name is Charlene Carter.
25 Q.  Would you tell the jury a little bit about

Page 1176

1 yourself today, married, kids, whatever?
2 A.  Yeah.  Well, I will start back, I'm from --
3 originally from California.  I was born there, and
4 moved to Texas when I was 12.
5 Q.  Okay.  I'm going to stop you, because that is
6 not -- I meant today.
7    Are you married -- are you married with kids?
8 Don't go back to your beginning life.
9 A.  Oh, I'm sorry.  Yes, I'm married, and I have
10 two beautiful children.
11 Q.  Okay.  And a grandchild?
12 A.  I do.
13 Q.  Okay.  All right.
14    So I am going to ask you about your background,
15 and specifically as it relates to your religious
16 beliefs because those are at issue here, do you
17 understand?
18 A.  Yes.
19 Q.  Okay.
20    And let's go back now, then, to -- boy -- I'm
21 going to ask when you were born because it -- I want
22 to be able to tie an age to it, if you are okay with
23 that?
24 A.  I'm fine with that.
25 Q.  Okay.  So where were you born, when you were

Page 1177

1 born?
2 A.  I was born in Burbank, California, in 1965.
3 Q.  Okay.  And tell us about your parents.
4 A.  My parents were both born there in California.
5 My dad was kind of abusive.  My mom, she held
6 everything together.  She worked real hard.  She
7 worked from the time I was born.  My dad kind of was
8 a free -- I guess what I would say, he didn't really
9 like to work a whole lot.  And my mom kind of kept
10 things together.
11 Q.  And in terms of your family's faith or beliefs,
12 if they had any as you were growing up in
13 California, what was that?
14 A.  Well, we really didn't have faith in the house.
15 My grandmother would take us to church when we were
16 little.  She was Catholic.  And we would go to, you
17 know, to church like Christmas, Easter, Mother's
18 Day, that kind of thing.
19    But we never -- we never really prayed, or we
20 never had, you know, much religion in our household.
21 Not in my household growing up with my dad in my
22 home.  We never had a Bible in the house.
23 Q.  Okay.  And at some point, did you move from
24 California?
25 A.  Yes.  My dad finally decided that he was going

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                      Pages 1178..1181

Page 1178

1 to start pursuing a career.  And when he did, he got
2 transferred to Texas, in the Dallas area.
3 Q.   And how old were you then?
4 A.   I was 12.
5 Q.   And tell us about when you moved to Texas, when
6 you were 12.  Did you go to school in Texas?  Did
7 you have --
8 A.   I did.
9 Q.   -- how did that affect your faith?
10 A.   We moved to the Corinth area, Lake Dallas area.
11 And I grew up in Lake Dallas High School.  I was on
12 drill team.
13 Q.   We found that out from --
14 A.   Yeah.
15 Q.   I don't know if I can mention it, sorry.
16      You were on the drill team, you were going to
17 high school?
18 A.   Uh-huh.
19 Q.   What was your faith at that time?
20 A.   It was still kind of the same.  You know, we
21 went to church every now and then, but it was always
22 my mom and my sister and I.  It was never my dad.
23      And again, that was usually Christmastime,
24 Easter, Mother's Day, that kind of stuff.  It
25 wasn't -- it wasn't a whole lot -- like I said,

Page 1179

1 there wasn't a whole lot of faith in my house, you
2 know, as in there just wasn't.
3 Q.   And did you date?
4 A.   I did.  My last year of my high school, I met a
5 gentleman -- well, I shouldn't call him a
6 gentleman -- a young boy.  He had just graduated.  I
7 knew of him, I didn't know him, you know,
8 specifically.  But we ended up dating, and actually
9 he became my first husband.
10 Q.   So we can put a name with that, tell me, what
11 is his first name?
12 A.   His name is Dana.
13 Q.   Dana?
14 A.   Dana, Uh-huh.
15 Q.   You dated him in high school.  And then what
16 did you do after you graduated high school?
17 A.   Well, I graduated early.  I wanted out of high
18 school, to be quite honest with you.  I was ready to
19 kind of get on with my life.
20 Q.   How do you graduate early?
21 A.   I had enough credits and I went to summer
22 school.
23 Q.   Okay.  So you graduated in?
24 A.   In January of '83.
25 Q.   Okay.  And what did you do in January of '83?

Page 1180

1 A.   In January of '83 -- well, my parents moved
2 away, basically, at that same point.  So they moved
3 to Colorado.  My dad got a job in Colorado.  And
4 they left between, I would say, January and maybe
5 March is when they, you know, continued or finished
6 their move.
7      And I ended up -- not homeless, but I -- at
8 that time I had two jobs.  And I ended up going into
9 and living with my boyfriend's parents.
10 Q.   Okay.
11 A.   And I was going to school at the time.  I had
12 just started college.  I was going to TWU, Texas
13 Woman's University.
14 Q.   So you were holding down two jobs and that is
15 how you were able to go to TWU?
16 A.   Yes.  Well, and my grandmother, she had paid
17 for the first semester of school.  Yes.
18 Q.   What about your parents?
19 A.   No.  My parents didn't pay for school.  They
20 thought that was my responsibility.
21 Q.   And then what happens -- by the way, you said
22 you were living with your boyfriend's parents.
23 A.   Yes.
24 Q.   Did they put a time period on you?
25 A.   They did.  It was six months.  And I found an

Page 1181

1 apartment in Denton.  I was living in a little
2 efficiency.
3      I was working at a restaurant, and then I was
4 at a call center in the evening.  And it kind of was
5 between the time that I would go to class.  Because
6 I had a full-time schedule at Texas Woman's
7 University at that time.  I wanted to become an
8 OB-GYN.
9 Q.   And were you living with anyone?
10 A.   No, not at that time.
11 Q.   Okay.
12 A.   Not at that time.
13 Q.   So you are living in an efficiency, holding
14 down two jobs, and trying to go to school full time?
15 A.   Yes.
16 Q.   All right.  So how does that work out?  What
17 happens?
18 A.   It doesn't work out well, because just, you
19 know, trying to keep your grades up and, you know,
20 going back between two jobs, and then I was dating
21 my -- like I said, my boyfriend at that time, and we
22 were pretty serious.
23      We ended up moving in together.
24 Q.   When was that?  Of this timeline, you started
25 school --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1182..1185

Page 1182

1 A.   Yeah, that would have been probably -- it would
2 have been a year.  Because I was in his apartment --
3 or, sorry -- his parents' home for six months, and
4 then I lived in my apartment for about six months,
5 and then I moved in with him.
6 Q.   So 1984 --
7 A.   Yes.
8 Q.   -- approximately.
9      And did your parents have a reaction to that?
10 A.   My dad did.
11 Q.   What?
12 A.   He had always told me -- well, first of all, he
13 always told me if I dated a boy and I came home
14 pregnant, to pack my bags and move out.
15      So when he found out that Dana and I were
16 living together -- because I didn't, you know, come
17 right out and tell him that -- when he found out, he
18 didn't really want a whole lot to do with me and he
19 called me a whore.
20 Q.   And what did that do in terms of you going to
21 school -- not that, the fact that you are now living
22 with your boyfriend, what happens with going to
23 school?
24 A.   Well, going to school kind of had dropped back.
25 And I -- at one point, I just finally quit, because

Page 1183

1 I was trying to help him go to school at the same
2 time, and I was working the two jobs.  And
3 eventually, I got pregnant.
4 Q.   Tell me about finding out you were pregnant.
5      By the way, were you going to school at the
6 time or was that when you --
7 A.   No.  This was right after I had dropped out.  I
8 had dropped out.  I had gone to school almost two
9 years, and I knew I wasn't going to be able to
10 continue to do what I was doing.
11 Q.   Did you try not to get pregnant?
12 A.   Yeah.  I had been on several different birth
13 control pills, and the birth control pills just made
14 me sick.  To this day, I still can't take them.
15 Q.   And so tell me about finding out you were
16 pregnant.
17 A.   Ah, well, I -- I didn't really want to believe
18 that is what it was, but I knew since I had missed.
19 And, you know, went to my doctor, because I started
20 feeling bad, and I was tired, and the whole
21 nine yards.  And a friend of mine said, you probably
22 need to go to the doctor.
23      So I went to the doctor and he confirmed it, I
24 was pregnant, and I was about nine-and-a-half to 10
25 weeks pregnant at that time.

Page 1184

1 Q.   And so did you contact your parents for
2 assistance?
3 A.   No, I did not.
4 Q.   Why not?
5 A.   I didn't even tell them I was pregnant because
6 I knew that that wasn't going to work.  I mean, they
7 never sent me any money anyway.  I mean, they
8 weren't paying for anything.  When I moved out, I
9 moved out.
10 Q.   Who did you reach out to?
11 A.   Well, and I didn't even tell Dana for a couple
12 of days.  I just -- I couldn't bring myself to doing
13 it, because he was in a fraternity, he was going to
14 school.  And I knew that that was one -- you know,
15 something that he did not want -- I mean, he didn't
16 want to get married yet.
17      When I eventually told him, he said that we
18 can't tell -- you know, obviously, I can't tell my
19 parents, and he said, he wasn't going to tell his
20 parents.
21      So and he wasn't going to quit school.  And, of
22 course, I didn't want him to quit school.  That
23 wasn't, you know, on the radar for me.  And there
24 wasn't really anybody to go to for me, so we talked
25 about it.  And we argued about it.  And finally, I

Page 1185

1 said I would get an abortion.
2 Q.   And what did you do to make that happen?
3 A.   Back then, you got into the Yellow Pages and
4 you searched out under abortion, basically, or
5 healthcare, I can't even remember.  I don't remember
6 that.
7      But I found Planned Parenthood and called them
8 up.
9 Q.   And what happened next?
10 A.   Ah, within about, I would say, three days,
11 because I was still torn --
12 Q.   What were you torn about?
13 A.   Going and getting an abortion.
14 Q.   What were your religious views at that time, if
15 they played into this?
16 A.   At that time I had somewhat -- you know, I
17 believed in God, I knew God was there, I just -- I
18 struggled.  I struggled.  I was afraid that if I did
19 this, he would hate me and that I would never be
20 forgiven.  But I was afraid not to go and do it
21 because -- I just didn't know what to do.  I was
22 afraid.  And there wasn't the resources back then
23 that there are now.  There were just not.
24 Q.   And were you looking for information from
25 Planned Parenthood in that regard?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 321 of 642   PageID 11262
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 4 July 08, 2022                    Pages 1186..1189

Page 1186

1 A.  Yes.
2 Q.  What were you looking for?
3 A.  To get an abortion.
4 Q.  Were you looking for answers to questions?
5 A.  Yes, I was.
6 Q.  What questions did you have?
7 A.  Well, when we walked into Planned Parenthood,
8 they separated my boyfriend and I.  And he was in
9 the -- a waiting room.  And the lady in the front
10 took me back and I sat in an office with one of the
11 nurses.
12      And -- because I wanted to know, first of all,
13 how far along I really was, because my doctor said I
14 was about 9 to 10 weeks.  And, you know, they had --
15 eventually did an examination in there too, and they
16 said that was about right.
17      But before that, I wanted to find out -- again,
18 there wasn't a whole lot back then that you could
19 pull on Internet.  We didn't have Internet.  This
20 was like 1985, '84, '85.
21      And I asked them, you know, how -- at a
22 10 week, what does it look like?  And she said,
23 Well, really and truly, there -- you know, there is
24 not much there, it is -- you know, it is just this
25 little tiny zygote, is what they called it, and, you

Page 1187

1 know, there's -- it is not formed yet.
2      And I asked her, I said, okay, I mean, I know
3 that there is something going on, but she assured me
4 that the baby couldn't feel any pain.  And that kind
5 of settled my -- my apprehension, I guess, at that
6 time.
7 Q.  Did you get the answers you really wanted to
8 hear at that time?
9 A.  Not really.  Not really.  But I didn't know
10 what to do.
11 Q.  Did you find out that those answers turned out
12 not to be accurate?
13 A.  Later on, yeah, I did.
14 Q.  But at the time, did you then make the decision
15 to go forward with the abortion?
16 A.  I did.
17 Q.  Did they tell you about whether or not there
18 would be complications?
19 A.  No, not really, because we didn't discuss that.
20 I want people to know what goes on in Planned
21 Parenthood.  Because Planned Parenthood does not
22 tell you the truth.
23 Q.  Okay.  Let me just interrupt you -- and I
24 apologize for that, but I want to make sure that we
25 understand, this is your story from your experience.

Page 1188

1 A.  Yes.
2 Q.  Okay.  Go ahead.  Tell us.
3 A.  So I decided to have this abortion.  I went,
4 the lady took me back to the examining room.  Put me
5 on the table.  Gave me a small sedative.
6      And she said I would start feeling a little bit
7 woozy, you know, just I would still be awake, but it
8 would kind of keep me calm.
9      And then the doctor came in, and he said
10 that -- he kind of explained the situation, what was
11 going to be going on, and he examined me and he
12 said, yeah, you are about 10 weeks along.  He could
13 tell.  He could tell.
14      And then he told me how the procedure would go.
15      And all I remember was to the left of me was a
16 suctioning container, it was this round machine-type
17 thing.
18      And he said, you won't feel a whole lot because
19 they have numbed me down there and basically kind of
20 dilated me and then started up the suctioning
21 machine.
22 Q.  Did you feel it?
23 A.  Yeah.
24 Q.  Did you feel the baby leave your body?
25 A.  I didn't -- it was a lot of pulling and a lot

Page 1189

1 of -- it was quite a bit of pain.  But I -- it was
2 kind of like -- I would say if you have really bad
3 monthly cycles, it would be like cramping.
4 Q.  And then what?
5 A.  Well, I could hear the suctioning machine, and
6 from there it was just -- it took place.
7      And then after that, he had to take something
8 and clean the rest out and make sure he got all of
9 the baby -- the parts out.
10 Q.  He had to do what?
11 A.  He had to make sure he had everything out.
12 Q.  Did he?
13 A.  He said he did.
14 Q.  Did you see anything?
15 A.  No.
16 Q.  Did you try to look or did you close your eyes?
17 A.  At one point I tried to look, but after what I
18 saw in the suctioning container, I just couldn't do
19 it anymore.  I knew what I had done at that point.
20 Q.  What did you see?
21 A.  A lot of blood and little parts.
22 Q.  Parts of what?
23 A.  Of a baby.
24 Q.  How did you react to that?
25 A.  I just started crying.  I just started crying.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Pages 1190..1193

Page 1190

1 And I knew at that point I had made the worst
2 decision of my life.
3 Q.   What happened next?
4 A.   They take you back to a room and let you kind
5 of wear down the anesthesia and they kind of make
6 sure that you are, you know, stable enough to go
7 home.  I was back there probably, what, 30 minutes,
8 maybe 45 minutes, for the local to kind of wear off.
9 And I started throwing up, bleeding pretty heavily,
10 crying a lot.
11     And then the nurse came back and said, You are
12 ready to go and I'm going to take you up to your
13 boyfriend.  And then I went home.
14 Q.   After that, were you able to put it behind you?
15 A.   No.
16 Q.   How so?
17 A.   Because I knew I had just made the worst
18 decision of my life, and it was -- I had just taken
19 the life of my little baby.
20     And I went home, and got into an argument with
21 my boyfriend.  And a really good friend came over
22 and stayed with me the rest of the night and he went
23 and stayed with his parents.  And from there --
24 Q.   Was the argument about the abortion?
25 A.   Yes.

Page 1191

1 Q.   What was the argument?
2 A.   It was over.  I was angry.  I was mad.  I was
3 sad.  I was disgusted with him, I was disgusted with
4 myself.  And I -- I didn't want to see him.  I
5 didn't want to be around him anymore.  I just
6 didn't -- I couldn't.  I didn't want to be around
7 myself at that point.
8 Q.   When you left Planned Parenthood, did they tell
9 you whether or not you -- there were any problems
10 with the procedure?
11 A.   No.  They did not, no.
12 Q.   What happens next?  You make up with your
13 boyfriend?  I'm not trying to lead you.
14 A.   No.  No.  What happened next was, for the
15 next -- well, until he and I got married, I was
16 basically in a very depressive state, angry, didn't
17 like him, didn't like myself.  I searched out some
18 counseling.  I started searching out churches.
19 Q.   How did you feel about your relationship with
20 God after the abortion?
21 A.   I thought he basically hated me.  And I could
22 see why.  I could see why.
23 Q.   So what did you do?  You told us you got
24 married.  Why did you get married?
25 A.   So fast forward --

Page 1192

1 Q.   Let me interrupt myself.
2 A.   That's okay.
3 Q.   It sounded like you were mad at your boyfriend,
4 you didn't think he supported you.
5     Why did you marry him?
6 A.   We had dated for five years.  And we had lived
7 together.  And he was my first and only.  And how I
8 was raised is, if you sleep with somebody -- and,
9 you know, we had been together five years.  I mean,
10 it was basically the next step.
11     And so we were supposed -- we were going to get
12 married.
13 Q.   Were you able to put your depression and
14 thoughts about the abortion away on your wedding
15 day?
16 A.   No.  I knew when I was walking down that aisle
17 that it probably wouldn't last.  I was still angry.
18 I was still upset.  I was still sad.
19     I was still -- but I, honestly, I just figured
20 since we had been together for five years and we had
21 gone through this, maybe we would, you know, come
22 back to a relationship.  I really honestly don't
23 know what I was thinking back then.  I made some
24 stupid decisions.
25 Q.   Welcome to life.

Page 1193

1     So was your relationship with parents such at
2 that point that you could tell them about the
3 abortion?
4 A.   No.  I didn't tell me parents until a lot
5 later.  And that was after my son was born.
6 Q.   Okay.  Well, let me -- after you got married,
7 did that help you deal with the depression you were
8 suffering from?
9 A.   No.  It actually got worse.
10     And so we got married.  And then we bought a
11 house.  And he was still going to school, still in
12 his fraternity.  And I started working a full-time
13 job to help us, you know, get by and so forth and
14 him go to school.
15     About two years into our marriage, I got
16 pregnant again.  And that that pregnancy resulted in
17 an ectopic pregnancy.
18 Q.   Tell us what that is.
19 A.   It is when the baby is forming inside the
20 fallopian tube.
21     And then I went and saw my OB-GYN -- well, go
22 back.  The way that I found this out was that I
23 started hemorrhaging.
24     And so they immediately -- when I got to the
25 hospital, they immediately put me in a room.  And

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                          Pages 1194..1197

Page 1194

1  the doctor came in, and that is when they found out
2  that the baby was in the tube.
3      And later finding out, after I lost that one --
4  because they had to do an emergency surgery to take
5  the baby out of the tube -- he told me that I might
6  lose that one side.  That devastated me.  I thought,
7  you know, that this was my punishment for having an
8  abortion before that, and that I probably would
9  never have kids.
10  Q.  Did the doctor tell you that it had anything to
11  do with your abortion?
12  A.  Yes, he did.
13  Q.  What?
14  A.  He said there was scar tissue down between the
15  fallopian tube going into the uterus.
16  Q.  From the abortion?
17  A.  Yes.
18  Q.  And so now you have lost two children because
19  of your decision to have an abortion in your mind.
20      Are they children to you now?
21  A.  Oh, yeah.  Yeah.  My babies, yes.
22  Q.  So how are you dealing with this now?
23      And by the way, tell me how you feel about your
24  relationship with God and your husband and how it
25  affects all of that.

Page 1195

1  A.  Well, the husband part, it really -- it started
2  to deteriorate some again.
3      I, for myself, I had to get some help, because
4  I was in a major depression, especially after that
5  one.
6      So like I said, I was -- before that, I was
7  actually seeking churches, I was seeking some
8  counseling.  I had found a church in Denton called
9  Denton Bible.  I started going there.  That started
10  to kind of help because I started meeting some
11  people.
12      But you know, I still wasn't back until -- what
13  helped me was when I finally got pregnant with my
14  son.
15  Q.  Tell us about that.
16  A.  At that time, I was flying for American
17  Airlines.  I was a flight attendant for them.  I had
18  gone to work for them and worked in corporate.
19  Q.  And was that okay with your husband?
20  A.  No.  Not -- not the flying part.
21      I had worked in corporate for about a year and
22  a half, and then I decided I wanted to go to
23  in-flight.  And so I did.
24      And I was based in New York.  And no, my
25  husband did not like that at all.

Page 1196

1      My husband was pretty controlling.  He wanted
2  to know where I was all of the time.
3      I basically married my dad.
4  Q.  Okay.  Did you have to quit that job?
5  A.  Yeah, I did.  And it was due to the fact that I
6  got pregnant with my son.
7  Q.  Okay.  And how did that pregnancy go?
8  A.  That pregnancy went great.
9  Q.  Good.  Your son was born.
10      And did that relieve your depression from the
11  abortions -- or the abortion and the second lost
12  child?
13  A.  It told me that what I needed to do was -- the
14  depression, yes.  It started to go away.  But I knew
15  I needed something more.  I knew that he had
16  forgiven me, because I had asked for that, for God
17  to forgive me.  But I hadn't forgiven myself.
18      So through that time period when my son was
19  little, I still carried that guilt around.  And I
20  got closer to God through that time period.  And I
21  actually raised my son at church.
22  Q.  Did you have an experience at church where you
23  were able to forgive yourself?
24  A.  I did.  And that is fast forward.
25  Q.  I don't want to fast forward.  This is your day

Page 1197

1  in court, ma'am.  We set aside some time, so I'm not
2  trying to rush you.
3  A.  No, I loved being a mom.  Loved being a mom.
4  My husband and I, we still had issues, and it had a
5  lot to do with the controlling part and the
6  abortion.  I was still angry at him.  I didn't let
7  go of the anger for a long time.
8      My husband -- my first husband and I, we got
9  divorced when my son was two.
10  Q.  What happens next?
11  A.  What happens next is that I actually decided I
12  wanted to fly again.  And so I had already applied
13  twice before at Southwest Airlines, and did not get
14  the position.
15      So I decided to try for a third time.  And the
16  third time was the charm.  And I got on at Southwest
17  in 1996.
18  Q.  Okay.  And I do want to talk about your
19  Southwest Airlines union activities, and to the
20  extent they overlap here, if you want to talk about
21  that, that is fine.
22      I'm really tracking your -- where you -- your
23  religious faith develops that affects this lawsuit.
24  A.  Okay.  So I started going to Denton Bible, like
25  I said.  And then I found another church, and it was

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 4 July 08, 2022                    Pages 1198..1201

Page 1198

1 called Fellowship, Fellowship Church in Grapevine.
2      And at the time, it was not very big, so I
3 started taking my son there, and took him to the
4 little kids church and went to the services on
5 Sunday.
6      I found out that there was a women's group, and
7 I started feeling like I needed to get more involved
8 in -- in the church and meeting people and so forth.
9      And at this point, I was also dating someone
10 new.  And I wanted -- I wanted that relationship to
11 be more so in a more faith-based relationship.
12      So we started going to church together.  And
13 taking my son.  And then there was a women's group.
14 The first time that I really stepped out, the whole
15 auditorium was full of women.  And Lisa Young, who
16 is Ed Young's wife, she was the one who put this on.
17      And the first speaker was a beautiful young
18 lady, and it was -- the whole subject was on hot
19 topics, what most churches don't discuss.
20      And they felt that this was something that the
21 women's group could do and do a Bible study on.
22      So the first hot topic was on abortion.
23 Q.  What happened?
24 A.  Well, I couldn't believe it.  Because I had
25 been searching -- for me, I couldn't forgive myself.

Page 1199

1 And I knew that in order to follow God and really
2 believe in what he says, you don't just forgive
3 others, you also have to forgive yourself for the
4 things that you have done.
5      And that was what all this particular women's
6 group was about.  It was forgiving yourself for the
7 things that you have done in your past that you were
8 ashamed of, and the first one was on abortion.
9      And it floored me on -- when they said, um, if
10 this -- if -- we want all women to stand up if it
11 has affected you, your family, your friends, you
12 personally, or you have just known somebody at work
13 that has had this happen, that they had had an
14 abortion.
15      And the amount of women that stood up in that
16 auditorium, I was like, I'm finally not alone.
17 Q.  Did you stand up?
18 A.  I did.
19 Q.  And what happened next?
20 A.  Well, that was -- most of us were crying,
21 because most of us had not ever -- well, a lot of us
22 hadn't, I hadn't, I hadn't really told the story a
23 whole lot.  There was only a few of my friends that
24 knew, and then obviously my ex.  I hadn't even told
25 my boyfriend now at the time.

Page 1200

1      It was -- it was so real, and how many people
2 it had affected, and how they react.  And it -- most
3 of those women had had an abortion that were in my
4 group.
5      So we -- we -- after the main speaker, we all
6 go off into our small Bible groups, okay?
7      Anyway, the six or eight women that were
8 sitting around our table -- or my table, that we
9 were at, I think maybe two, it was just a family
10 member that it had affected or a friend, but the
11 rest of them, they had had an abortion.  And we were
12 all about -- not the same age, but pretty close --
13 because I'm 57.  And 65, you can do the math.  I'm
14 57.
15      And I just couldn't believe how many women it
16 had affected and how they all felt.  And what all
17 they went through.  And how many, too, in the group
18 could not have children after the fact.
19      And then -- and some family members that had
20 lost women in their family, or, you know, a sister,
21 or whatever, to depression from it.  And they took
22 their own life.
23      I -- it was all an experience for me.  I had no
24 idea that, you know, that everybody felt like me, I
25 guess.

Page 1201

1      And so for me, on that day, when -- and it was
2 all on forgiveness for yourself.
3      I finally felt like I had been forgiven by God.
4 Q.  Did you pray?
5 A.  Oh, yeah.
6 Q.  Tell me about it.
7 A.  And I haven't stopped since.
8      I just asked him, I said, I need to know -- I
9 mean, over the years, I kept saying, I'm so sorry,
10 I'm so sorry, I'm so sorry for what I have done.
11      I have taken, you know, this little baby, I'm
12 praying that he or she is in heaven.
13      I just wanted him to forgive me, but I needed
14 to forgive myself.  And if he would just -- I just
15 need to feel like I can move on.
16      And it took a long time, but I just felt him
17 move inside me.  And it was, like, God just said, it
18 is done, it is over, it is okay.
19      And I just let go of it from there on out.  But
20 I made a promise to him what that happened.  And I
21 said -- and this is one of the things that when I
22 was at the group -- I said I will never, ever, if I
23 can help it, let this happen to another young girl,
24 woman ever again, that I will do whatever I can to
25 save another baby in the womb.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                          Vol 4 July 08, 2022                                          Pages 1202..1205

Page 1202

1  Q.  And what did you do in that regard?
2  A.  I got involved in -- it was called -- well, it
3  was a group of ladies that did a whole plethora of
4  things, but one of them was called The Exodus Group.
5       And it was all about women and children, and
6  then abortion.  So it was kind of a collective.
7  Q.  Were you going out and protesting at Planned
8  Parenthood?
9  A.  No, I have never protested at Planned
10  Parenthood.
11  Q.  What did Exodus do, and what did you do with
12  Exodus?
13  A.  Well, we partnered up with a pregnancy center.
14  It was in -- I want to say it was in Keller.  It may
15  have been Grapevine, I can't remember.  A small
16  little place.
17       We donated our time, we donated funds, we
18  donated -- and then things for babies, when these
19  young girls or ladies would come in that couldn't
20  afford things for their baby, if they decided they
21  wanted to keep their baby, we helped them.
22       We gave them resources, especially for young
23  moms.  And that would have been me.  So we had girls
24  anywhere from, I would say, 15 on up.
25  Q.  Did you talk to them?

Page 1203

1  A.  Yeah.  There was a couple of us that would
2  donate our time and actually -- because these girls,
3  a lot of times, they are still torn.  They don't
4  know if that is what they want to go and do.
5       So now you can seek out these places.  I mean,
6  there are so many avenues now that they can go to
7  instead of just going to a Planned Parenthood or
8  another abortion facility.
9       I'm going to tell you, abortion facilities do
10  not advertise these pregnancy centers.
11       We have actually tried through some
12  organizations to get them to put those things in
13  these abortion facilities, but they refuse.
14       So, yeah, I told them my experience.  I told
15  them what I went through.  I told them what the
16  experience was like in that room when I had that
17  abortion.
18       I told them, you know, everything that I felt,
19  and you may carry this for the rest of your life.
20  It is going to be something that is going to stay
21  with you forever.  It's never going to go away.
22  Q.  So girls that, nonetheless, decided to have an
23  abortion, did you still love them?
24  A.  Oh, yes.  Yes.  I mean, I would hope somebody
25  would have loved me then.

Page 1204

1  Q.  And even though you think it's taking a life,
2  are you judging them in any way?
3  A.  No, I'm not.  I'm not judging them.
4  Q.  So anything else you want to tell us about your
5  work at Exodus Group?
6  A.  It was the most beautiful thing to watch, that
7  these girls that had -- especially the younger
8  ones -- and a lot of them didn't have the support of
9  their families, either.
10       It kind of moved on to other things, though,
11  too.  And let me explain that.
12       So not only would we take care of the girls and
13  help them and then prepare them for their little
14  babies, we also had a housing apartment place that
15  we had in Dallas that, through the church and
16  through this pregnancy center, had purchased.
17       And so what they would do is they would
18  actually house these young girls in an apartment and
19  help them get on their feet and help them realize
20  that this isn't the end of their lives.
21       These choices -- even if they gave their babies
22  up, we also helped with placing them with certain
23  adoption agencies if they wanted to go that route.
24       But the most beautiful thing for me to watch
25  was when those younger girls -- and that would have

Page 1205

1  been around my age -- that didn't have that support,
2  how, when they went to the Exodus house that we had,
3  or the apartment building, to see them with their
4  little babies and know that they were going to
5  thrive with their children and their life wasn't
6  going to stop.
7       We were going to try and help them any way we
8  could so that they could go to school, so that they
9  could get a job, so that they had daycare for those
10  babies.
11       That right there, for me, I wished -- if I
12  would have known that there were avenues like that
13  when I was younger, I would have gone and sought
14  them.  But I just -- I didn't know.
15  Q.  And has abortion and your view of that and how
16  to deal with that, did that continue on through
17  present day?
18  A.  Yes, it has.
19       And just to add to that, now I have a beautiful
20  daughter with my boyfriend, who I was telling you
21  about, my second -- he's my husband of 24 years now.
22  And I have beautiful -- she's now 19 and going to
23  college.  Beautiful young lady.  And I also have a
24  grandbaby.
25  Q.  And what about your relationship with God?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                          Pages 1206..1209

Page 1206

1 A.  My relationship with God is everything that
2 sustains me, guides me, keeps me whole.
3     And it's why I'm here today.
4 Q.  I want to move on and talk about the Union and
5 Southwest Airlines, but I don't want to leave it if
6 there is something else in this event in your life
7 that you are talking about and God and abortion that
8 we haven't mentioned.
9 A.  I just know that I have been forgiven and I
10 want to do as much as I can to help somebody else.
11     And I just want to make this clear, though,
12 too.  I don't preach my religion or my Christianity,
13 my belief in Jesus, okay, I don't shove that onto
14 anybody else.
15     Do I hold that close and do I say, you know,
16 things out loud?  Yes, I do.
17     But I'm never going to deny Him after all of
18 the things that He's done for me through this time
19 period, from that moment that I had when I took a
20 life.  I know He's forgiven me.
21 Q.  All right.  I appreciate that.
22     And I -- I wanted you to have that opportunity
23 so people could understand the things that happened
24 in 2017, okay?
25     Now I want to talk about you and Southwest

Page 1207

1 Airlines.  So I think you said you started a job at
2 Southwest Airlines in 1996.
3     How did that come about?
4 A.  Well, like I said, I had flown for American,
5 and after I had my son, I really wanted to go back
6 to flying.  But before I got on with American, I had
7 actually applied once, and then -- well, twice,
8 because the third time was when I got on.
9     I got the job.
10 Q.  How did you get it?
11 A.  I had to, you know, apply, and we went to
12 the -- the way it was done before was you actually
13 went and had a group interview and then you had a
14 one-on-one interview, which I really wish they would
15 get back to.  I don't know if that is what they do.
16     But it was a one-on-one.  It was a very good
17 conversation with the leader, and then you got to
18 meet the people in the group when, you know, you are
19 interviewing.  It's just an exciting time.
20     I got the job, and then I ended up having to
21 take a drug test and they do a background test and
22 all of that stuff.  And then they okayed me for
23 class.
24 Q.  Let me ask you, did they provide health
25 benefits to you?

Page 1208

1 A.  Not during -- not during -- they don't pay you
2 or anything like that before you go to training or
3 in training.  But when you get there, yes.
4 Q.  When you start the job.
5     Was that important to you?
6 A.  Oh, yes.  Yes.  Because at that time I didn't
7 have insurance.  My husband at the time, ex-husband,
8 then, he was working on his own, so he had his own
9 company, and we didn't have insurance to take care
10 of my son at that time.
11     So, yes, it was very important for me to go
12 back to a company, because we were divorced now,
13 back to a company that I knew I had those health
14 benefits for him.
15 Q.  And then is there some kind of training?  You
16 said it, but I --
17 A.  Yeah.  So for us back then, I believe it was
18 six weeks of training.  Pretty intense training
19 actually back then.
20     I didn't stay at the hotel at that time because
21 I still had my -- you know, I had my son, so I went
22 home every night and took care of him and studied
23 and came back during the day.
24     But then finally got on line and I --
25 Q.  Getting on line means?

Page 1209

1 A.  It means that you get your wings and you go on
2 a -- I forget what they called it back then.  I
3 think it's an OE now or an IOE, whatever it was back
4 then.
5     So you go on a training flight.  And back then
6 it was like -- I did eight legs for the day.  So it
7 was the Texas eight leg day.
8 Q.  Having worked at American as a flight
9 attendant, did you know you enjoyed being a flight
10 attendant, or did you find it --
11 A.  I loved it.  I loved it.
12 Q.  What did you love about it?
13 A.  I absolutely loved it.
14     Well, I'm a people person.  I like being around
15 people.  I don't thrive very well not having contact
16 with others.
17     I loved being on the airplane, I loved serving
18 the people on the airplane, I loved meeting the
19 people on the airplane.  I flew with some wonderful
20 people crew-wise, both cockpit crew, flight crew.
21     It was just -- it was, you know -- and you
22 don't have -- I mean you set the tone when you are
23 on the airplane.  You get to -- it's like your
24 little work atmosphere.  It's your office.
25     And for me, I loved flying C.  So because --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                Vol 4 July 08, 2022                                Pages 1210..1213

Page 1210

1 Q.  Flying what?
2 A.  Flying C.  Position C at Southwest.
3 Q.  I have no idea that that is.
4 A.  So that's the overwing -- overwing window exit
5 area.
6 Q.  Maybe everybody else understands.  I have been
7 on a plane before, but --
8 A.  Okay.  So you know where the emergency exit row
9 is?
10 Q.  I do.
11 A.  Okay.  So that was my favorite place to fly.
12 Q.  Okay.  Got it.
13 A.  And the reason being was because when people
14 are getting on, we don't have a seating chart or
15 whatever on Southwest, it's open seating.  And so a
16 lot of the times, you know, especially families
17 would come back towards the back.  And so, you know,
18 the kids and the families and make them comfortable.
19     But I get to meet a lot of these people because
20 they are having to pass me.  You know, you get to
21 say hello, and so on and so forth.
22     I flew A quite a bit at the beginning, loved
23 that, but C, I just -- you got to build this rapport
24 with people that were sitting right around you, you
25 know.  And it's really interesting, the world is

Page 1211

1 really small.
2 Q.  How so?
3 A.  I would meet people -- we would get to talking,
4 you know, as people are getting seated, and I'm
5 sitting over at the overwing, and you would hear a
6 conversation, you know, behind you or the people in
7 front of you, and they would say something about
8 something that either they worked at or somebody
9 they knew or -- it was just -- I would be like, oh,
10 my gosh, I didn't know you know -- like my neighbor,
11 or just -- it was a small world.
12     And it's really a great world, to be quite
13 honest with you, out there.  I loved -- it's
14 actually a better world than you think when you are
15 up in the airplane.
16 Q.  Okay.
17 A.  No, seriously, going from coast to coast.
18 Q.  It's not always my experience on the plane, but
19 okay.
20 A.  I did.  I loved it.
21 Q.  So how did you feel about Southwest Airlines as
22 a company then?
23 A.  Oh, my gosh.  It was the best company to work
24 for.
25 Q.  Better than American Airlines?

Page 1212

1 A.  Yes.
2 Q.  Oh, come on now.
3 A.  You weren't just a number.
4     On American I knew where I stood.  I was a
5 number.
6 Q.  I'm joking about that.  I'm not saying anything
7 bad about American.
8 A.  No, I'm not saying anything bad about American.
9 it was just a different culture.
10 Q.  Okay.  Tell me about how you felt about
11 Southwest Airlines when you went to work there.
12 A.  Well, Southwest Airlines was -- our CEO back
13 then and our president was Herb Kelleher, who was
14 just the most amazing person to work for.  Amazing.
15 He was a people person.  He would get on our
16 flights.  I had him on --
17 Q.  He did?
18 A.  Oh, yes, I had him on several flights out of
19 Dallas.
20     What was funny, too, is I had him on a flight
21 on an old 200 one time that he came back -- I know.
22 You don't know what I'm --
23 Q.  I have no idea what that is.
24 A.  The oldest airplanes that we had, the little
25 200s.

Page 1213

1     And so we had --
2 Q.  All old.
3 A.  No, they are not.  There's new ones now.
4     But the club seating in the back of the 200,
5 okay?
6     So he came -- so there was a club seating, a
7 bulkhead, and then you had the club seating in the
8 overwing, a bulkhead, and then you had the -- it
9 really wasn't first class, but it kind of looked
10 like first class up in the front.
11     So, but I usually worked in the back.  So, you
12 know, being C, I would be in the back.
13     Well, I would -- you know, I was back in the
14 back one afternoon, and I knew Herb was there,
15 because, first of all, he says hello to everybody
16 and hugs everybody.  And, unfortunately, you can't
17 even do that anymore, which I think is pretty crazy.
18     But anyway, he'd get on the airplane, and he
19 would remember your name.  He may have only met you
20 one time.
21 Q.  You have got a nametag, ma'am.
22 A.  Yes, I do know that.  But he would know.  He
23 would know you.  He'd be like, Oh, yeah, I saw you
24 at blah, blah, blah, whatever.
25     Anyway, so he would get up in the cockpit --

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 328 of 642   PageID 11269
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1214..1217

Page 1214

1 now, this was, you know, still in the '90s, right?
2 But he would get up there and start smoking in the
3 cockpit. Those were his airplanes. And he would
4 hang out with the pilots.
5     But then, once we got up in the air, he would
6 come back.
7     So one time that I had him on the airplane, he
8 came back to the very back and he was going to help
9 put ice in the, you know, cups, and, I mean, he was
10 helping us -- and pass out peanuts and everything
11 else.
12     My one question to him was, so in the old 200s,
13 you'd come back to where the galley is and there was
14 this door, this like accordion door thing that held
15 all of our peanuts, all of our drinks, all of our
16 ice and everything.
17     But when you are taking off -- and, of course,
18 we used to get out of our seats when we were still,
19 you know, taking off, we weren't even at
20 10,000 feet, I mean, as soon -- especially if you're
21 going to Texas, you know, all throughout Texas.
22     So as soon as those wheels get up off the
23 ground, you're like, boom, gotta go. So you're back
24 in the back, you are trying to hold all of the cups
25 and glasses and everything, and you're trying to put

Page 1215

1 stuff on your galley, right?
2     He comes back -- and I'm doing, you know,
3 trying to do the same thing, you know, trying to get
4 my stuff on my tray and everything and get the
5 peanuts ready, because I know that he's probably
6 going to come back and serve peanuts.
7 Q.  I miss the peanut days. Go ahead.
8 A.  Yeah.
9     Well, anyway, he rounds the corner and he goes,
10 Hey, ladies, how is it going?
11     And we are like, Hey Herb, you know. And we're
12 getting hugs and whatever.
13     And I go -- and so he starts doing his stuff
14 with, you know, wanting to help with the ice and the
15 cups and everything. And he goes, I'm going to pass
16 out the peanuts. He goes, So let's go up.
17     So I was, you know, going to help him pass out
18 the peanuts from the middle section on back. But
19 before I did that, I go, Hey Herb, I have one
20 question for you.
21     And he goes, Yeah, what is that?
22     And I go, Who designed this galley with this
23 door that you got to like open up and everything
24 falls out at you when you are, you know, trying to
25 set your galley up. I mean, Coke cans and peanuts

Page 1216

1 and your cups and everything.
2     And he just laughed and he goes, I guess you
3 just have to go back to the drawing -- something to
4 do with the drawing board at Southwest Airlines.
5     And I go, Is there somebody I can talk to up
6 there?
7     He goes, I don't think so. We are stuck with
8 these.
9 Q.  I've been asking you this so that the jury can
10 understand that you truly loved your job. Is that
11 fair to say?
12 A.  Yeah, I did. I loved -- I loved my job. I
13 did.
14 Q.  Okay. And in 1996, after you cleared your -- I
15 forget what you called it -- after you got on
16 line --
17 A.  Uh-huh.
18 Q.  -- at that point in time, are you required to
19 join a union?
20 A.  Oh, you're required to join that union before
21 you even graduate. I mean it's the day of
22 graduation.
23     The union comes in. And I'm going to say this.
24 They never gave us the option. They never said, you
25 can opt out of this union. Never said that.

Page 1217

1 Q.  You know it now?
2 A.  Oh, I know it now, yes, I do.
3 Q.  We will get to that.
4     But whenever you joined in 1996, was that
5 explained to you?
6 A.  It was part of the employment. You had to be
7 in the union. We are a closed shop. So you don't
8 have the luxury to say, you know what, I don't want
9 to be any part of this at all.
10     So, yeah, the union comes in. You -- I
11 guess -- I can't remember what all we did back then,
12 but I know we had to sign something.
13     And I was actually -- it was interesting, you
14 all were talking about COPE. When I went through
15 class, COPE was explained to us that it was
16 something there to help flight attendants.
17 Q.  What is COPE?
18 A.  It's the political action fund stuff that
19 they -- yeah.
20 Q.  What did they tell you COPE was?
21 A.  It was to help us as flight attendants. They
22 never really said that it was a political-type
23 thing. It was there to help us in our jobs and so
24 on and so forth.
25     I thought it was, believe it or not, I thought

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 4 July 08, 2022                    Pages 1218..1221

Page 1218

1 it was like one of those catastrophic fund-type
2 things that you put your money into, so I did the
3 two dollars every paycheck.
4 Q. So wait.
5     In addition to your union dues, you signed up
6 for more because you thought it was to help flight
7 attendants?
8 A. Yes. I did.
9 Q. Okay. That's 1996.
10 A. Yes.
11 Q. Do you recall seeing those emails earlier in
12 the trial about how happy your union was your head
13 would explode when you finally found out what COPE
14 was?
15 A. Yes, I did.
16 Q. How did that make you feel?
17 A. Not too good. Not especially since, you know,
18 it's the Union leadership making fun of, you know, a
19 member. I wouldn't think that that's, you know,
20 appropriate. They work for us. I mean, they are --
21 they are there for us.
22 Q. Okay. Well, let's go back to 1996 when they
23 are telling you, from your understanding, is that
24 COPE is to help the flight attendants. They don't
25 explain that it's actually for a bunch of political

Page 1219

1 causes that you may or may not agree with.
2 A. No. As a matter of fact, they tell you that
3 they stay out of politics. I was told that over and
4 over again.
5 Q. And so in 1996, were you anti-union?
6 A. No, I was not anti-union. I didn't know much
7 about the union at that time, but I wasn't
8 anti-union.
9 Q. In terms of how you think a union should
10 operate, are you anti-union?
11 A. No. I know why unions are there, I know
12 exactly why. Some are very, very good unions and
13 others are not.
14 Q. 1996, you joined the union. Tell me about your
15 union activities.
16 A. I went to -- well, at first I didn't go to a
17 whole lot of meetings at the very beginning, only
18 because I had a little boy at home, I was single, I
19 was flying to Chicago. You name it.
20 Q. Can I ask you about that? How are you a flight
21 attendant and a single mom, how does that work?
22 A. Well, whenever I flew, my son would go to his
23 daddy's house. So my ex and I, we ended up becoming
24 friends, basically, in raising our son together
25 basically. I mean, it's -- we lived near each

Page 1220

1 other. We made sure that both parents were there
2 for him. We didn't separate him very much from
3 either one of us.
4     So when I was flying, he was with his daddy,
5 and then when I came back into town, he was with me.
6 Q. Okay. So not a lot of time for union meetings?
7 A. No, not at that time. He was little.
8 Q. Okay. And so at what point -- tell me your
9 view of your union in 1996, 1997, 1998.
10 A. Well, that was when --
11 Q. Did you have a lot of knowledge?
12 A. Not a whole lot. I mean, I knew what they were
13 doing. I mean, I knew what they were there for, you
14 know.
15     That was back in the day of Paul Sweeten. I
16 had heard some good things and then some bad things
17 of the leadership.
18     But I -- the first union real membership that I
19 was like, wow, this is really messed up, was I had
20 come to Dallas, it was when we were going through
21 contract time, or contract negotiations.
22 Q. When is this?
23 A. Oh, gosh. You know what, I don't even remember
24 what year. It was --
25 Q. If you're going past 2000, you're ahead of me.

Page 1221

1 A. No, no, it was not past 2000.
2 Q. Go ahead.
3 A. It was sometime '96, '97, '98. I don't
4 remember when that contract was, when it was signed
5 in. Those years just kind of go together.
6     But I came to a union meeting here in Dallas,
7 and it was Paul Sweeten and his team, Garry
8 Drummond, and a ton of flight attendants, a ton of
9 flight attendants.
10     And they were discussing, you know, pay raises,
11 working conditions, you name it.
12 Q. That sounds good, right?
13 A. Yeah, it sounds good, until you're told by
14 Garry Drummond, who is TWU International -- and let
15 me tell you something, and I'm just going to be
16 really frank, he was drunk, he was drunk that night.
17 Q. Okay.
18 A. It was absolutely -- I just thought, wow, this
19 is what we have?
20 Q. Okay. Wait.
21 A. This is our main negotiator who is working with
22 our local to get our contract signed?
23 Q. And he's there to sell the contract?
24 A. Yes.
25 Q. What happens?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 4 July 08, 2022                                        Pages 1222..1225

Page 1222

1  A.  Well, first of all, he tells us, That's the
2  best you are going to get.
3      And we were all going, well, wait a minute.  I
4  mean, you really haven't taken much of what the
5  flight attendants wanted in and really negotiated
6  it.
7      There was a lot of, you know, back and forth.
8  I was not impressed, not impressed at all.
9      And so that's when I really started getting
10 more involved.  And that contract was, in fact,
11 good.
12 Q.  What happens next as it relates to your
13 relationship with your -- first of all, all of this
14 time you are paying dues and you are paying COPE,
15 right?
16 A.  Yes.
17 Q.  You are still thinking COPE is that
18 catastrophic fund --
19 A.  Yeah, I thought it was there to help flight
20 attendants.
21 Q.  Did you know other flight attendants that
22 thought the same thing?
23 A.  I knew of a couple, but I didn't really discuss
24 the COPE part of the union.  I mean, it just -- I
25 didn't discuss what came out of my paycheck.

Page 1223

1  Q.  So you just thought you were doing something
2  good to help flight attendants.
3  A.  Yes.
4  Q.  So after this experience with the contract in
5  the '97, '98 time period, what happens next
6  regarding your knowledge about your union or
7  activity?
8  A.  Okay.  So after that bad contract, and a lot of
9  people were upset about that, they really wanted new
10 union leadership.  And so there was a lady who had
11 been here for quite some time, her name was Melissa
12 Smith, and she was running on -- what her ticket was
13 called was clean sweep.
14     And so at first she was running by herself,
15 okay, and then Thom McDaniel, Cindy Ritner -- there
16 were quite a few other people -- Stacy Martin and
17 some others decided that they -- they talked to her,
18 and they ended up running, I believe, as a slate,
19 okay.
20 Q.  Did you support that slate?
21 A.  Oh, yeah.  Because I liked Melissa's -- she
22 wanted to go in there, she wanted a good contract.
23 She wanted to work for the flight attendants.  She
24 wanted to make sure the money was being spent
25 correctly within the office.  Because we were pretty

Page 1224

1  broke back then.  There wasn't a whole lot of money
2  left after the last contract negotiations.
3      So, yeah, I supported her.  I believed in her.
4  Q.  Okay.  What happened next?
5  A.  Well, she got into office and I --
6  Q.  She got elected?
7  A.  Yes, she did, by a pretty big margin.  She got
8  elected and people were finally happy again and
9  hoping to see some changes.
10 Q.  This is for the Local 556, correct?
11 A.  Correct.
12 Q.  So this is good news?
13 A.  Yes, it is good news.
14 Q.  How long was it good news?
15 A.  Not very long.
16 Q.  What happened?
17 A.  You know, and I don't know exactly the time
18 period, but I would say within the first year she
19 was removed.
20 Q.  What was your understanding of why she was
21 removed?
22 A.  Well, I know from testifying for her, the
23 reason that they removed her was due to false
24 accusations against her.
25 Q.  Okay.  What were the accusations?

Page 1225

1  A.  Well, they were claiming, Thom McDaniel and
2  team, were claiming that she had embezzled money out
3  of TWU, and they were really pretty much trashing
4  her name through the system.
5  Q.  What happened?
6  A.  Well, what really happened was Stacy Martin had
7  had an incident at work, and it involved a young
8  lady that was working in the office, and he mooned
9  her, okay?
10 Q.  In the office?
11 A.  In the office, yes.
12     And the lady complained to Melissa.
13     And Melissa felt it was her duty, which it was,
14 because she was the president and also the person
15 that hired the office staff and so forth, so she's
16 their boss.
17     She ended up -- because this woman had
18 complained to her, had filed EEOC charges, I guess,
19 or an EEOC complaint.
20 Q.  And what happened?
21 A.  And she actually went to legal to speak about
22 that.  And that is -- that's what they said -- that
23 would be in TWU, I believe in International.
24     And they said, yes, you should be doing this,
25 okay?

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 331 of 642    PageID 11272
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                    Pages 1226..1229

Page 1226

1    So fast forward.  Stacy Martin decides she's
2  going to file charges on her because Thom, Cindy,
3  and all of the rest of them wanted her gone.
4  Q.   How did you end up getting involved in this?
5  A.   Because I had flown with Thom and I had flown
6  with Stacy Martin and I had flown with -- who was
7  the other one?  Karen Amos.
8      I hadn't flown with Cindy Ritner, but I knew
9  the scuttlebutt, let's put that it way.
10 Q.   How did flying with them make you a witness?
11 A.   The witness part of it was due to the fact that
12 I saw what they did to her in union meetings.  Oh,
13 yeah.  It was -- union meetings can get very heated.
14 A lot of words can be said, a lot of bad words can
15 be said, things can be shared there.
16     And the board treated her, along with Paul
17 Sweeten's team, like she was dog meat.
18 Q.   She was the president of the local union?
19 A.   Yes.
20 Q.   And what kind of trial did you testify in?
21 A.   Well, they removed her from office.
22 Q.   Who is "they"?
23 A.   Well, if my recollection has it correctly, they
24 filed charges on her, okay?  So she was fighting
25 these charges, which is like a trial, I think you

Page 1227

1  heard about that before.  They filed charges on her.
2      Well, they removed her from her position at
3  that time, so Thom McDaniel ended up stepping into
4  the president's position.
5      While she was fighting these charges, okay, the
6  board had a board meeting, and the board decided to
7  charge her under Article 21, which is removal of an
8  officer.
9      So here she's fighting these charges over here,
10 okay, that are made up.  Then what they do is they
11 have their union board remove her under Article 21.
12     So from there she loses the trial, per se,
13 through the Union, but then she filed a lawsuit.
14 Q.   Okay.
15 A.   And when she filed that lawsuit, I had known
16 all these people, flown with all these people, knew
17 the back story of all of this stuff, knew how she
18 had been treated in these meetings, along with she
19 didn't embezzle money.
20 Q.   What happened at the trial?
21 A.   I testified for her.
22 Q.   Do you know the result?
23 A.   Yes.  She won.  She won a judgment against the
24 Union for treating her the way that they did.  Two
25 hundred and something thousand dollars.  $270,000, I

Page 1228

1  think is what it was.
2  Q.   So if I understand correctly, in 2000, elected
3  Union president, your candidate, wins, and then,
4  from your understanding, is improperly removed and
5  actually gets a judgment against the Union for what
6  they did?
7  A.   Correct.  And they didn't put -- they were
8  supposed to put her back in office and they did not.
9  And they continued the lie out on line for years.
10     And Southwest did nothing about it.
11 Q.   Southwest has a relationship with the Union,
12 from your --
13 A.   Oh, and let me back up a minute.
14     MR. McKEEBY:  Objection, leading.
15     THE WITNESS:  Let me back up.  I want to
16 be able to speak about this.
17     So Southwest Airlines, when Melissa became
18 president she was --
19     MR. McKEEBY:  Your Honor --
20     THE WITNESS:  -- pretty good friends --
21 I'm sorry.
22     MR. McKEEBY:  Objection.  I don't think
23 there is a question that is being responded to.
24     THE COURT:  Okay.  Ask your question and
25 then you can answer.

Page 1229

1  BY MR. PRYOR:
2  Q.   Tell me what you wanted to say about Southwest
3  Airlines in that regard.
4  A.   Okay.  So Melissa had been at Southwest for
5  quite some time before I got on there.  She was --
6  she was, I believe, a four-digit number.  So she had
7  been there quite a long time.
8  Q.   I don't know what a four-digit --
9  A.   Well, a four-digit number meant she was kind
10 of -- not an original, but she was way up in
11 seniority, okay?
12     And she knew Colleen pretty well.  I mean,
13 they -- she had worked with Colleen Barrett, who was
14 our president.  Loved Colleen.
15     She was our culture, and they've lost that
16 culture.  I loved that culture.  It was -- it was
17 totally different than it is now.
18     But anyway, when she became president, Colleen
19 came to her and they had a meeting and she said, We
20 can no longer be seen together out of, you know,
21 office areas or whatever.  Because they were
22 friends, and she had done other things with Colleen
23 throughout the years and so forth.
24     So anyway, she said that Union business is
25 Union business and Southwest business is Southwest

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 332 of 642    PageID 11273
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Pages 1230..1233

Page 1230

1  business, and the two don't mingle and we stay out
2  of Union business.
3  Q.  You like that?
4  A.  Yes.
5  Q.  When was that?
6  A.  That was back in 2000 or whenever she was --
7  whenever she was --
8       MR. PRYOR:  Any time.
9       THE COURT:  I'm going to ask if we can
10  take our last break for the day, just a 10-minute
11  break, and then come back.
12       MR. PRYOR:  My back is killing me.
13       THE COURT:  Okay.  Same instructions as
14  always, jury.  You can talk to your fellow jurors
15  and court personnel, just not about the case.  You
16  can't talk to anyone else.  And don't do any
17  research.
18       We will see you back here in 10 minutes at
19  4:17.
20       All rise for the jury.
21       (The jurors exited the courtroom.)
22       THE COURT:  You can't talk to anyone about
23  the case while you are a witness.
24       (The witness exited the courtroom.)
25       THE COURT:  Okay.  Anyone have anything to

Page 1231

1  bring up?
2       MR. McKEEBY:  I haven't been able to give
3  the assignment yet, so --
4       THE COURT:  Okay.  We can give assignment.
5       We're looking for the question of whether
6  a witness who has left the stand but will be
7  recalled later can be told to not talk to anyone
8  about the case.
9       MR. McKEEBY:  I appreciate that.
10       THE COURT:  So the search continues for
11  all of us.
12       All right.  We will take our break and I
13  will see y'all back here at 4:17.
14       (Recess.)
15       THE COURT SECURITY OFFICER:  All rise.
16       THE COURT:  We are still looking.  So
17  first one wins a prize.
18       Okay.  So are we ready for the jury?
19       MR. PRYOR:  Were we going to find out the
20  answer or we are going to do that later?
21       THE COURT:  What is that?
22       MR. PRYOR:  The rule issue.  I didn't know
23  if --
24       THE COURT:  We are still looking.  So I
25  just said first person who finds out gets a Twix

Page 1232

1  candy bar.
2       MR. HILL:  Rule 615 on its face, I think
3  pretty clearly it applies to Mr. Schneider.
4       It says, "At the party's request, the
5  Court must order witnesses excluded so they cannot
6  hear other witnesses testify."
7       Mr. McKeeby has already told us that he
8  intends to recall Mr. Schneider.  Mr. Schneider
9  remains a witness, and therefore, is excluded from
10  the courtroom.
11       MR. PRYOR:  I don't think -- maybe that's
12  the issue.  I don't know.
13       MR. HILL:  Did I misunderstand the issue?
14       THE COURT:  Well, it might be.  I know
15  there is a Supreme Court case saying once a witness
16  has left the stand overnight but is coming back the
17  nest day for their testimony where they're the next
18  witness on the stand, yes, they can be instructed to
19  not talk to anyone.
20       The question is, if they left the witness
21  box and another one comes in, then are they
22  discharged from their duty to refrain from talking
23  about the case.
24       MR. HILL:  Okay.  I'm all for it.
25       THE COURT:  So you still have a facial

Page 1233

1  argument.
2       MR. GREENFIELD:  Your Honor, is there a
3  more recent case that you are aware of?
4       MR. PRYOR:  I should have explained it a
5  little better.
6       MR. GREENFIELD:  I apologize, Ms. Willis,
7  for the 12th time.
8       Is there a more recent case on point that
9  you are aware of other than Geders v. U.S. in '76?
10       THE COURT:  Give me that citation.
11       MR. GREENFIELD:  Yes, your Honor.
12       Okay.  425 U.S. 80, 96, Supreme Court,
13  1330.  It's a '76 Supreme Court case.
14       THE COURT:  What's that -- sorry.  What's
15  the citation, the first page of that case?
16       MR. GREENFIELD:  425 U.S. 80.
17       THE COURT:  8-0.
18       MR. GREENFIELD:  Yes.  And what I'm
19  looking at in the synopsis is that the Supreme
20  Court, Mr. Chief Justice Burger, held that the trial
21  court's order preventing defendant from consulting
22  his counsel about anything during a 17-hour
23  overnight recess in the trial between his direct and
24  cross-examination deprive defendant of his right to
25  the assistance of counsel guaranteed by the Sixth

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 333 of 642   PageID 11274
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Pages 1234..1237

Page 1234

1  Amendment.
2      And that was -- that decision was reversed
3  and remanded.
4      THE COURT:  Okay.  So we are all looking
5  for anything more recent than that.
6      All right.  Jury.
7      MR. GREENFIELD:  Your Honor, based on that
8  case, I believe it says that it is acceptable for
9  counsel to be able to address this witness.
10     (The jurors entered the courtroom.)
11     THE COURT:  Okay.  You can take a seat.
12     Mr. Pryor, you can continue.
13  BY MR. PRYOR:
14  Q.  Okay.  Ms. Carter, I did want you to give the
15  jury your background with your union and how it
16  affects the activities that you have been involved
17  in, but I might want to move you a little bit
18  quicker, okay?  And I understand there is apparently
19  a lot.  I appreciate explaining that experience in
20  2000.
21     Are we skipping over anything that you think is
22  terribly significant before we get to 2013?
23  A.  No.  No.
24  Q.  From 2000 to 2013, did you continue to be a
25  union member?

Page 1235

1  A.  Yes.  I did.
2  Q.  Even after all of that stuff and Melissa and
3  testifying against the Union, all of that stuff you
4  talked about, why did you stay a union member?
5  A.  Because I didn't know I could opt out.
6  Q.  So you are still paying dues and you are still
7  paying COPE.
8  A.  Yes.
9  Q.  So we are -- by 2017, we are 17 years into
10  paying COPE.
11  A.  Yes.
12  Q.  So how active were you in the union from 2000
13  to 2013?
14  A.  I had gone to several union meetings, but they
15  were sporadic.  Some in Dallas, and then eventually
16  when I moved to -- well, I think I went to one or
17  two, maybe, in Phoenix.  I'm trying to think.
18  Because I don't know if that was -- that may have
19  been when Audrey was in office.  I can't remember.
20     I didn't go to that many union meetings --
21  yeah, union meetings.  For one, usually they were on
22  a date that I was flying, which was hard, and at
23  that time, you know, if you wanted to go to another
24  base, you had to get on the airplane and go there.
25     I was always hoping that they would do them

Page 1236

1  electronically as in a union meeting being there in
2  person, but yet still having the ability, which I
3  think we were getting to, in 2012, and then that got
4  shut down.
5  Q.  So from 2000 to let's say 2012, you weren't
6  terribly active but still a dues-paying member?
7  A.  Yes.  Yes.
8  Q.  What happened in 2012-2013?
9  A.  Well, it was another slate that was put in, and
10  that would have another election.
11  Q.  Okay.  Tell me about the slate that you
12  supported.
13  A.  Okay.  So -- which is interesting because it
14  involved Stacy Martin, who had harmed Melissa back
15  in the day.
16  Q.  Wait.  The mooner?
17  A.  Yes.
18  Q.  Okay.  Go ahead.
19  A.  So it was Stacy Martin, Chris Click, Jannah
20  Dalak, Don Juan, and I can't think of who all the
21  other people were.  Because there is executive board
22  members that sit, you know, like the president and
23  so forth.  Jerry Lindemann, was the other one.  He
24  was our treasurer.
25     And then we have executive board members that

Page 1237

1  are the domicile board members.  I can't remember
2  who all was the domicile board members.
3     But, yeah, we voted in the main people were the
4  ones that we wanted in.
5  Q.  Okay.  Is that the Click group?
6  A.  Yes, it sure is.
7  Q.  So why did you support the Click group?
8  A.  Well, because I liked Jannah Dalak, Don Juan.
9  I didn't know Jerry Lindemann all that well.  But we
10  needed a change.  And then --
11  Q.  Why did you need a change?
12  A.  Well, because some people had been in there for
13  such a long time.  I mean, it's kind of like the
14  government.  You kind of got to start having some
15  term limits.
16     So anyway, so I trusted -- and I also trusted
17  Chris Click.  Chris Click and I had had many
18  discussions because at first he didn't really know
19  about what Melissa was all about.  And so we had had
20  discussions.  He wasn't actually a fan of hers for a
21  while.
22     So anyway, fast forward to 2012, whenever it
23  was, the election.  They got elected in.
24     And before -- let me back up.  So Stacy Martin
25  was a part of that trial.  I had to call --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1238..1241

Page 1238

1  Q.  What trial?
2  A.  Well, the trial for Melissa.
3  Q.  So you are going back to 2000 on me?
4  A.  Yeah, I'm just --
5  Q.  I'm on a time clock.
6  A.  I know.  I know.
7       So Stacy Martin helped remove Melissa.  Fast
8  forward.  I had to talk to Stacy before I could vote
9  for him --
10 Q.  Okay.
11 A.  -- and make sure -- I had to really, I guess,
12 trust him per se.  So I actually called him at home
13 and we had a long conversation.
14 Q.  Okay.
15 A.  So I voted for that entire slate.
16 Q.  All right.  And does that slate get elected?
17 A.  Yes.
18 Q.  And what happens?
19 A.  Pretty much the same thing that happened the
20 last time with Melissa.
21 Q.  Tell us your understanding of what happened
22 this time.
23 A.  Well, supposedly I'm hearing --
24 Q.  Pretty short?
25 A.  -- it's embezzling again, money, this, that and

Page 1239

1  the other.
2       But I can tell you this.
3       MR. GREENFIELD:  Objection, your Honor.
4  Lack of foundation.  Unless that's laid, it's
5  hearsay testimony.
6       THE COURT:  I will allow it as effect on
7  listener.
8       You may proceed.
9       THE WITNESS:  Okay.
10      Well, they just testified for it
11 yesterday.  They said something to do with money or
12 something.  Anyway.
13 BY MR. PRYOR:
14 Q.  Tell us what your understanding is.
15 A.  Okay.  So you go back to -- okay.  Now I've
16 lost my train of thought.
17 Q.  In 2013, what happened with the Click slate
18 that got elected?
19 A.  Okay.  So the people that don't like us as
20 opt-outers or --
21 Q.  Wait a minute.  Were you an out-opter at that
22 time?
23 A.  No, not yet.  Not yet.
24      What I'm talking about, the people that keep
25 turning people in right now, like Brian Talburt and

Page 1240

1  so forth.
2  Q.  Um-hmm.
3  A.  Okay.  Those people kept filing charges against
4  Chris Click, Stacy Martin.  I think it was pretty
5  much Stacy Martin for the most part, and Chris
6  Click, okay.  They kept filing charges on them.  And
7  they were constantly badgering them.  All right?
8       They could never really do the union work.
9  Q.  They are in office, but from your
10 understanding, they are being barraged with
11 complaints by --
12 A.  Yes.
13 Q.  -- the older group.
14 A.  Yes.  And we all knew this.
15 Q.  The losing group.
16 A.  Yes, absolutely.
17 Q.  All right.  What happened?
18 A.  So eventually I don't know what all happened to
19 actually have International come in and then remove
20 them again, but they got removed.
21 Q.  So once again the elected officials are removed
22 by International?
23 A.  Correct.  Three of them.  It was Chris Click,
24 Jerry Lindemann, and Stacy Martin.  And Stacy Martin
25 was our president.

Page 1241

1  Q.  And who takes over?
2  A.  At that time they put in Audrey, and I think
3  Audrey became the first vice president.  And I don't
4  know how all that -- the other person that I guess
5  had come in second for president either didn't want
6  it -- I don't know.
7       But then she got moved up to president.
8  Q.  So did Audrey run for office?
9  A.  Against that slate, yes.
10 Q.  And did she win?
11 A.  No.
12 Q.  So she lost, and the people that were elected
13 are kicked out?
14 A.  Correct.  All of the people that were in there
15 after the fact were the slate that had been not
16 voted in.
17 Q.  And how did you feel about that, your union?
18 A.  It was just another slap in the face for the
19 people that voted them in.
20 Q.  And what did you decide to do?
21 A.  I went to one of my last union meetings.  It
22 was in 2013, it was in Denver.  And Greg Hofer and I
23 had come up with -- several of us, actually -- bylaw
24 changes, because it was bylaw change time.
25      So I went there to represent for Denver and

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1242..1245

Page 1242

1 make some bylaw changes.
2 Q.   What changes were you trying to make?
3 A.   Well, some of the wording in some of them and
4 just different things that helped govern our, you
5 know, union.
6 Q.   Okay.
7 A.   And at that time I was able to read all of the
8 horrible things, because I had the floor at that
9 time, all of the horrible things that those people
10 had said and what they were doing to remove those
11 people in the union office.  Which I was pretty glad
12 to do.
13     Now, go back.  I was a union member.  I was
14 reading their stuff.  It had all kinds of nasty
15 things in it that they had said about Stacy and all
16 of them and how they removed them.
17     And I didn't get turned in for that because
18 when you are at a union meeting, the company can't
19 do anything about that.
20 Q.   All right.  At the meeting did anything happen?
21 Did anyone threaten you?
22 A.   Yes.
23 Q.   What happened?
24 A.   At the end of the meeting, I was walking out --
25 or I got up, my friend Kim Hensley and I were

Page 1243

1 getting up, and then I was going over to talk to
2 Chris Sullivan, who ended up being my representative
3 when I got fired.
4     I was walking, you know, out of the room or
5 whatever, and Cuyler Thompson turned and he goes,
6 Ms. Carter, Ms. Carter, if you ever say the word, if
7 I hear of it again that you say the word
8 "decertify" -- now, I'm paraphrasing right now
9 because I don't know exactly how his phrasing was --
10 I will file charges against you.
11     And then I turned and Brett Nevarez was
12 standing right behind me.  He's a pretty tall guy,
13 he's a big guy.  And he said, or I will do it.
14 Q.   And after that, how did you feel about your
15 union?
16 A.   I was disgusted with them and I opted out.
17 Q.   Tell us what -- I know the jury has heard it,
18 but I want to get your understanding of what "opting
19 out" meant.
20 A.   Okay.  So a fee-based flight attendant, or an
21 objector, what happens is, I still have to pay union
22 dues out of my paycheck every month, okay?  And I
23 pay the exact same amount as everybody else.
24     I don't get to go to union meetings, I don't
25 get to vote contract if there is a contract coming

Page 1244

1 up, okay.
2     So I don't have a voice there, okay?  But I
3 still have a voice within my local.
4     But I can't, like I said, I can't go to the
5 union meetings and actually participate.
6     The portion that -- so I paid the full dues,
7 and every three months -- so it's every quarter --
8 the international -- this is what I'm told -- the
9 international part that they don't take out for
10 political purposes is refunded back in a check.
11     So within that quarter I usually got about a
12 27, $28 check that International would send back to
13 me, but the local still takes out everything that
14 they need from my paycheck.
15 Q.   Did you do it for $27?
16 A.   Did I do it for $27?
17 Q.   Right.
18 A.   Yeah, I did.  We were hoping to get more
19 members because people were pretty darn fed up.  I
20 forget what the number was, it was like 100 and
21 something.
22     But a lot of people were afraid to object and
23 opt out because of the way we had been being
24 treated.
25 Q.   Is the reason you wanted the $27 you didn't

Page 1245

1 want the union to spend the money on --
2 A.   Yeah, I didn't want International using the
3 money --
4     But, you know, the thing is, we don't know
5 where all of that money goes.  Okay.  So when --
6 when Audrey was saying, We don't pay Planned
7 Parenthood, okay, our union dues are taken every
8 month.  Then a portion of that, and it's a big
9 portion of it, goes to International, which is TWU
10 International.  Okay?
11     But we fall under also the AFL-CIO.  Then some
12 of those dues go to the AFL-CIO, and they fund
13 Planned Parenthood.  So my dues do go to fund
14 Planned Parenthood.
15 Q.   And so you opted out.  And so now, at least in
16 theory, they do not.
17 A.   That's a good question.
18 Q.   Now, it still goes to salaries of people that
19 are involved.
20 A.   Correct.
21         MR. GREENFIELD:  Objection, your Honor.
22         THE WITNESS:  It goes to all of it.  So
23 my --
24         MR. GREENFIELD:  Objection, your Honor.
25 He's leading the witness.

Page 1246

1    THE COURT:  I will sustain that.  More
2 open-ended.
3         THE WITNESS:  Okay.
4 BY MR. PRYOR:
5 Q.  Now, after you opted out, how were you able to
6 raise your concerns with your union since you
7 weren't someone that could go to a meeting?
8         MR. GREENFIELD:  Objection, your Honor.
9 He's still leading the witness.
10        THE COURT:  I'll allow that one.
11        THE WITNESS:  The only way to speak my
12 voice, okay, was to call them, okay, which I had
13 tried calling Audrey a couple of times.  She doesn't
14 return calls.  She just -- and half the time she was
15 never there.  We never saw her.  Well, I never saw
16 her anyway.
17        But she was -- we even had a whole thing
18 about one time where she was missing.
19        The next thing is I can either email her,
20 but then, when she was running, she had put a
21 Facebook page together that said "Audrey Stone,
22 TWU."  And the whole page was designed on when she
23 was running.  So she was putting things on that page
24 the entire time that she was running.
25        And then people were asking questions

Page 1247

1 about her slate and people were asking questions
2 about the union and so forth.  So she used that
3 platform as her union page.
4         We also had a page which was connected to
5 the Union on Facebook, but they shut it down to
6 where you couldn't anymore ask questions, or you
7 couldn't comment, that's what it was.  They could
8 put stuff on there, but you couldn't comment on it
9 anymore.  So they kind of censored us.
10        So my only way was either email -- because
11 she never returned phone calls -- or on her
12 Messenger.
13        So for me, when I was online, if I had --
14 if I had seen something, because we are in all of
15 these little Facebook -- and they are all private.
16 She tries to claim that they are not, but they are
17 all private, those -- and they are all
18 union-activity related.
19        So I would get a lot of the information
20 either from flying or on these Facebook pages.  So
21 one is Fusion, one is One Love, one is Sassy Stew.
22 I mean, there's a plethora of them, okay?
23        So when I would see something, you know,
24 that I didn't like and I knew what was going on, I
25 messaged her, which is, I had every right to do

Page 1248

1 BY MR. PRYOR:
2 Q.  And did you message her regarding events or you
3 just were sending her a message every day?
4 A.  No.  The first message from me was when I found
5 out that they had the core group going on.
6         So all those screen shots of how they had
7 talked about -- and now, granted, Audrey was an
8 admin on that page as well, okay?  So there were
9 certain people that were listed.  She was an
10 administrator.
11 Q.  The name of her admin on that?
12 A.  It was Audrey Stone TWU.
13 Q.  Okay.  Go ahead.
14 A.  Okay.  So anyway, it was all of their group.
15 And, you know, I don't have any problem with that.
16 If that is what they want, that is fine.
17        But the way they were talking about the rest of
18 the members was very derogatory.
19        One of my friends, Steven Hobbs, they were
20 actually talking sexual stuff about him, sexually
21 harassing him, and he's a gay man.
22        I just -- it blew my mind that they were
23 getting away with -- oh, and then you have got, you
24 know, the fucktard, you know -- they were -- they
25 were making fun of and saying such nasty things

Page 1249

1 about members.  And it was getting passed around
2 finally.
3         Somebody, I don't know who it was in their core
4 group, got ahold of it, and then we got ahold of it.
5 Q.  And did you --
6         THE COURT:  Hold on.  Objection?
7         MR. McKEEBY:  Yeah, just -- objection, can
8 we return to the question-and-answer form, as
9 opposed to the narrative, non-responsive.
10        MR. PRYOR:  I will ask a question.
11        THE COURT:  Yes, please do.
12 BY MR. PRYOR:
13 Q.  After finding out and seeing the messages of
14 the core team members, did you send messages to
15 Audrey Stone TWU?
16 A.  Yes.  That was my first message to her, because
17 they had been turned in to management and I was so
18 glad somebody finally caught them.
19 Q.  And was this -- what year was this?
20 A.  It had to have been '15.  2015.
21 Q.  And was there an election going on?
22 A.  Oh, yes.
23 Q.  Were you involved in that?
24 A.  Yes, I was.
25 Q.  You couldn't vote?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1250..1253

Page 1250

1 A.  No, I couldn't vote, because I had already
2 opted out.  But I was -- you know, if friends or
3 whatever would call me and ask me questions about
4 the slate, the other people that were running, yes,
5 I was involved in that.
6      You know, if they had questions.
7 Q.  Did you ever Facebook message Audrey Stone TWU
8 about the removal of the Click team?
9 A.  Yes, I did.
10 Q.  And why did you do that?
11 A.  Because they were -- well, first of all, Jerry
12 and Chris should have been put back in office.  If
13 they had a problem with -- and, you know -- and
14 unfortunately, Janna and Don, who I adore, they
15 decided to resign.
16      So at that point, all of the other -- I think
17 most of everybody from that other slate came in, so
18 now they had control of the Union.
19      Ask that question again, what was the --
20 Q.  I think you have answered it.
21 A.  Okay.
22 Q.  So you did message about that.  You messaged --
23 you told us about the -- the core team
24 communications.
25 A.  Yes.  And can I say something about that?

Page 1251

1 Q.  Well, I have to ask you a question.
2      Tell me what you have to say about the core
3 team message.
4      MR. GREENFIELD:  Objection, calls for a
5 narrative.
6      MR. PRYOR:  I'm not sure if it does.
7      THE COURT:  I will let her answer.
8      THE WITNESS:  Okay.  So the core team
9 were -- and every one of -- pretty -- I think every
10 one of their board members were on there, along with
11 the -- oh, what do you call it?  The -- well, all of
12 the board members.  So the domicile board members
13 and so forth were on there, and then some of the
14 other friends of theirs.
15      And Brian Talburt was one of them.  And he
16 actually was, at one point, a shop stew.  So when
17 they say he didn't have any relation to the union,
18 he was actually a shop stew.
19      So the core team actually -- and which I
20 agree, we should have freedom of speech.  I am not
21 against anybody speaking freely online at all.  The
22 problem was, is the core team -- the people on the
23 core team had been turning -- obviously, you have
24 seen that with Brian -- had been turning all of us
25 in for the same types of -- what?  Conversations

Page 1252

1 about the union, not -- some maybe hate speech or
2 whatever, but it is protected union speech on One
3 Love, Sassy Stew, all of these other ones, but they
4 were taking those screen shots and they were turning
5 it into the company, and the company was going after
6 them for social media.
7      But are the core team, when they got
8 turned in -- and there was a two-day meeting --
9      MR. GREENFIELD:  Objection, your Honor,
10 again, can we return to --
11      THE COURT:  We need to get a more concrete
12 question and answer.
13      THE WITNESS:  Okay.
14 BY MR. PRYOR:
15 Q.  And let me interrupt you -- and I appreciate
16 it.  Is it fair to say you are passionate about
17 this?
18 A.  Yes.  Because it is a double standard.
19 Q.  So I'm going to move forward a little bit.  I'm
20 not saying we won't come back and let you tell us
21 about that.
22 A.  Okay.
23 Q.  But in the 2015 time frame, was there a
24 Collective Bargaining Agreement to be voted on?
25 A.  Yes, there was.

Page 1253

1 Q.  And is that the Collective Bargaining Agreement
2 that was negotiated by the Audrey Stone team?
3 A.  Yes.
4 Q.  And what was your feeling about that?
5 A.  Well, the TA that they brought to all of us --
6 Q.  What is TA?
7 A.  Tentative agreement.
8 Q.  Okay.  So it is not a CBA yet?
9 A.  Right.  Now, I got to read it.  I didn't get to
10 vote.  So -- but yes, the TA.
11      That TA took us backwards from what we had,
12 what we already had, okay, that we had negotiated
13 over years of different contracts.  They were
14 literally taking away a lot of what we -- what we
15 had negotiated.
16      So the contract, the TA was -- and we couldn't
17 figure out why.  Why -- I mean, because eventually
18 you are going to have to come back out on line and
19 fly this -- or are you going to come back out and
20 fly this?  Okay?
21 Q.  "Fly this," meaning, you are going to have to
22 make the money that we are making?
23 A.  Yeah -- well, and go through the new -- you
24 know, scheduling, or vacation point system, you name
25 it.  Whatever was negotiated within that contract

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                    Pages 1254..1257

Page 1254

1 took us back instead of forward.
2     And on top of that, they also took away the
3 fact that it was going to be a bonus now instead of
4 retro pay.  Where before, we had always gotten retro
5 pay from the date that that old contract expired.
6 And from that time period until the new contract,
7 okay, was ratified, you would get that new raise,
8 okay, all the way back to when that contract was
9 ready to be ratified.
10 Q.   That is a big deal?
11 A.   Oh, it is a huge deal.  Because on top of not
12 getting the money that you would have gotten with
13 the retro pay -- which we had always gotten
14 before -- the bonus was now going to be taxed at a
15 bonus rate.
16     So when the people actually -- so -- and so the
17 first contract that -- everybody said no.  It was an
18 87 percent.  They -- nobody -- everybody thought
19 that they were working with the company, basically.
20 And they were done.
21         MR. GREENFIELD:  Objection, your Honor.
22 She's testifying to what other people believe at
23 this point.
24         THE COURT:  I will allow it.  Keep going.
25

Page 1255

1 BY MR. PRYOR:
2 Q.   Let me -- and I get that -- your issues with
3 the TA, and that is really what I was asking about.
4     And did you communicate with your -- even as an
5 objector -- your union about your objections about
6 those issues?
7 A.   Yes.
8 Q.   And was this an important issue to you --
9 A.   Yes.
10 Q.   -- your contract with Southwest Airlines?
11 A.   It is our livelihood.  It is our -- it is our
12 safety on the airplane.  It is our vacation time.
13 It is the point system.  It is -- yeah, it is -- I
14 mean, it is -- it is what we now will be, you know,
15 governed by as flight attendants.  It is what --
16 yeah, it is our -- it is our work rules.
17 Q.   And so you raised those issues as well?
18 A.   Yes.
19 Q.   I'm going to move to 2017.
20 A.   Okay.
21 Q.   And there may be more.  And we will be back on
22 Monday.  Sorry, but we will.
23     The -- in 2017, did your union get involved in
24 something that upset you?
25 A.   Well, they had gotten involved in quite a few

Page 1256

1 things, but yes, they did.
2 Q.   Okay.  I'm talking about in January of 2017.
3 A.   Yes.
4 Q.   And tell me how you became aware -- first of
5 all, what you were upset about and how you became
6 aware of it.
7 A.   Well, how I became aware of it was -- so the
8 march had already gone on.  And I found out about it
9 through One Love, which is one of our sites, and
10 also through the Unity Magazine, that they had been
11 to this march.
12 Q.   And what was upsetting you about -- I mean, you
13 believe in women's rights, don't you?  You believe
14 in every women's rights --
15 A.   Yes, I do.  I am a woman.
16 Q.   What is your problem?
17 A.   The main sponsor for that march -- and it had
18 been televised and it had been talked about, so I
19 don't know how anybody couldn't have known -- but it
20 was Planned Parenthood who arranged that march along
21 with -- there was another lady, I can't think of her
22 name -- but she was a big woman's, you know,
23 activist or whatever.
24     But Planned Parenthood was the main sponsor of
25 the march.

Page 1257

1 Q.   And how did you feel about your union being
2 associated with that?  And when I say "your union,"
3 I know you are an opt out, but you are still a dues
4 payor?
5 A.   Yes.  So my money paid for that.
6 Q.   And that is still the only way that you can be
7 represented to the company for a TA or a CBA?
8 A.   Correct.
9 Q.   See how I learned these initials?
10 A.   Yeah.  So, first of all, I'm just going to
11 leave my Christian value -- or, you know, not my
12 Christian value system, but the abortion part, just
13 by -- in one bucket.  I mean, you were just saying
14 buckets.
15 Q.   Okay.  All right.
16 A.   Okay.  So one bucket is we are professionals.
17 Okay?  That is how I view my job.  I'm a
18 professional.  I dress professionally.  When I get
19 on the airplane, you know, I present myself as, you
20 know, professional.
21     They went to this march, and they were
22 wearing -- and they were called, and excuse my
23 language -- but it was called the Pussyhat Project.
24     And it was in reference to Trump making a
25 derogatory statement, and that was how that whole

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 4 July 08, 2022                    Pages 1258..1261

Page 1258

1 Pussyhat Project came to be.  Okay?
2      And these women went to the women's meeting,
3 and they are actually in the pictures at the women's
4 meeting knitting these pussyhats.
5      And no, they are not just kitty cat ears, it is
6 supposed to be the women's genital area.
7      And this has been told to me also by one of
8 their board members.  Okay?
9      So they go to this march, not only are they
10 supporting something that half, if not more than
11 half of the membership, a lot of them are men, a lot
12 of us are Christians, or -- you know, it is not the
13 whole group.  They didn't represent all of us.  But
14 that is what they claimed.
15     And they went to that march and they wore those
16 hats.  Now, if I want to be respected as a woman and
17 really have women's rights, and be valued as a
18 woman, there is no way I would wear that hat.
19 Because it is supposed to resemble or -- yeah.
20 Q.   Okay.  That is your personal view of that.  And
21 you expressed that view?
22 A.   Yes.
23 Q.   And you sent a communication, we have all seen.
24 And we have just got a few more minutes.
25 A.   Yes, I did.

Page 1259

1 Q.   But I want to get to a couple things, we will
2 come back to it Monday morning, judge allowing.
3      So you complained about that.  Did you also
4 complain about Planned Parenthood?
5 A.   Yes, I did.
6 Q.   And you sent a video?
7 A.   Yes.
8 Q.   And in what manner -- did you send it to the
9 public, what did you do?
10 A.   No.  I sent -- so through that whole time
11 period, of course, a lot of things were being shared
12 on Facebook.  And I came across several articles
13 about the Women's March, and the things that went on
14 there, and who was -- make a long story short, the
15 things that, you know -- there was pro people there
16 and pro choice people there, pro life and pro
17 choice.
18     And some of those pro life places are what I am
19 on, okay, so I'm hooked to them.  Those were some of
20 the videos on some of the things that I had found.
21     And for me, if I would have seen those before I
22 went in to do what I did, I never would have done
23 it.
24 Q.   And why did you send it -- well, first of all,
25 when you sent it to Audrey Stone TWU, who were you

Page 1260

1 sending it to?
2 A.   Audrey Stone TWU, my union president.
3 Q.   And why were you sending it to your union
4 president?
5 A.   Because she is the leader of the Union that
6 also sat on the women's committee and planned this
7 march, and she led the march to DC.
8 Q.   Did you want dues spent on anything to do with
9 that?
10 A.   No.  I didn't want anything being spent on it.
11 They can go and they can march all they want.  But
12 not on my dime.
13 Q.   So that is one of the reasons.
14     But then did you also want to -- there to be an
15 understanding about what abortion was?
16 A.   Yes.
17 Q.   And did you include a video?
18 A.   Yes, I did.
19 Q.   Was it sent privately?
20 A.   Yes, it was.
21 Q.   Could it only be opened up voluntarily?
22     MR. McKEEBY:  Object to form, leading.
23     THE COURT:  Yep, can you rephrase.
24 BY MR. PRYOR:
25 Q.   Did you send it in a manner where it would pop

Page 1261

1 up and you couldn't avoid it or would you have to
2 voluntarily decide to look at it after having seen
3 the subject matter?
4      MR. McKEEBY:  Same objection.
5      THE COURT:  I'll allow that form.
6      THE WITNESS:  No.  You had to actually
7 click on these, both of the videos you had to click
8 on them.
9 BY MR. PRYOR:
10 Q.   Were you doing that to try and have some impact
11 on protecting unborn children?
12     MR. GREENFIELD:  Objection, your Honor
13 leading.
14     THE COURT:  I'll allow it.
15     THE WITNESS:  I wanted her to understand
16 that what she supported at that march, that was the
17 main -- it was all about, you know, pro choice and
18 women's right and you name it.  But the main portion
19 of it, was, you -- my body, my choice.  Okay?  And
20 that is what she marched in.  I helped pay for it.
21     There is lot of us that didn't like that.
22 And I felt like, you know what, the only way that I
23 can express what you just helped or marched with,
24 was sending those.
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1262..1265

Page 1262

1 BY MR. PRYOR:
2 Q.   And you have been involved in this issue.
3      Have you seen anything, in your opinion, more
4 effective to explain what abortion is?
5 A.   No, I haven't.  As a matter of fact, there is a
6 whole group out there right now that -- it is not a
7 group, it is an organization -- that actually is
8 going up to people and asking questions about
9 abortion, and do -- you know, are you for it, are
10 you against it?  And let me show you what happens.
11     And a lot of times, people, when they see
12 things like this, yeah, they are -- they had no
13 idea -- a lot of people don't understand what really
14 goes on and how big that baby really is and how much
15 it is formed in just a short amount of time.  And it
16 is a baby.  It is not just a clump of cells.
17     I mean, we can say the same thing for a little
18 puppy dog.  I have got sonogram pictures of puppies
19 and I have got sonogram pictures of babies, and they
20 look a lot alike at the same stages.
21 Q.   So when you sent the communications to Audrey
22 Stone TWU, did you believe you were speaking to your
23 union?
24 A.   Yes.  It had everything to do with the march.
25 Q.   When you sent your video to Audrey Stone TWU,

Page 1263

1 did you believe you were also expressing your
2 religious beliefs?
3 A.   Yes.  I told God that I would never, ever stop
4 fighting for life.
5 Q.   And we have just a few minutes, so I'm going to
6 skip for now the fact-finding meetings.
7      But did you ever in your wildest dreams think
8 that your 21-year employer would fire you for
9 exercising your union rights?
10 A.   No.
11 Q.   Did you ever in your wildest dreams believe
12 that Southwest Airlines would fire you for
13 expressing your religious beliefs?
14 A.   No.
15 Q.   Do you remember where you were when the job you
16 loved for 21 years and the company you helped build
17 called you and told you what the results of your
18 fact-finding hearing was?
19     MR. McKEEBY:  Objection, leading.
20     THE COURT:  I will sustain that.  You can
21 rephrase.
22 BY MR. PRYOR:
23 Q.   Tell us about how you found out about the
24 results and what happened.
25 A.   Well, it was almost 5:00, and they wait until

Page 1264

1 the very last minute of the very last day to call
2 you.  And --
3 Q.   Were you waiting for it?
4 A.   Yeah, I was waiting for it.  I was waiting for
5 one or the other, you know, either I was fired or I
6 wasn't.
7      And they literally wait until 5:00.  And the
8 phone finally rang and it was Ed Schneider, and he
9 read the letter that you put up, my -- the letter
10 that I was fired, and read it out loud to me.
11 And --
12 Q.   What was your reaction?
13 A.   Well, my husband was standing there.  And he,
14 you know, he asked me if I had any questions, and I
15 said no.  And I had Beth Ross on the other side,
16 because the union person was on the phone with me.
17 And I just fell to my -- I fell to the ground and
18 started crying.
19 Q.   Did you pray?
20 A.   Yeah, I did.
21     MR. PRYOR:  Your Honor, this is a good
22 time to break for the week.
23     Thank you, ma'am.
24     THE COURT:  Sounds good to me.
25     Okay.  So the same three instructions.

Page 1265

1 You can only talk to your fellow jurors and court
2 personnel, but not about this case; don't talk to
3 anyone else; and don't do any research about the
4 case.
5      We will see you back here at 8:45
6 tomorrow.
7      All rise for the jury.
8      Sorry.  You've got the weekend off.
9 Congratulations.  We don't have the weekend off, but
10 y'all do.  We will see you on Monday.
11     (The jurors exited the courtroom.)
12     THE COURT:  Okay.  So you can leave the
13 witness box, but don't leave the courtroom.  I need
14 five minutes to finish up my research.
15     And then can we come back and talk about
16 witness instructions?
17     MR. McKEEBY:  Your Honor, that's fine.
18     THE COURT:  I think it is an open question
19 because I have to figure out Schneider and Stone,
20 all at the same time.  So the next five minutes,
21 don't talk about the case.  But you may be able to
22 after that.
23     MR. HILL:  I think they are actually
24 different answers, under Geders.
25     THE COURT:  What's that?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 341 of 642   PageID 11282
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Pages 1266..1269

Page 1266

1      MR. HILL: I think they are actually
2 different answers under Geders.
3      THE COURT: Yes. And that is not the
4 latest case on the issue. So I will send y'all
5 Harry v. Leak. That is another one to look at.
6 That is 488 U.S. 272 from 1989.
7      MR. McKEEBY: Can you say that cite again?
8      THE COURT: It is 488 U.S. 272.
9      MR. McKEEBY: And just as a practical
10 observation, I mean, if the rule is that I can't
11 talk to Mr. Schneider in this context, I mean, what
12 would prevent plaintiff from calling all of the key
13 defense witnesses, asking them -- getting them sworn
14 in, asking them their name and address, and then
15 dismissing them, and then, you know, I couldn't talk
16 to -- you know, defense counsel can't talk to the
17 witnesses. That can't be the rule.
18      THE COURT: I see your point.
19      MR. GREENFIELD: Your Honor.
20      THE COURT: Okay. Give me five minutes.
21      MR. GREENFIELD: Well, hold -- and may I
22 just offer -- I haven't had a chance to look at
23 this, but an associate brought me U.S. v. Torres, it
24 is a Fifth Circuit case. 997 F.3d 624, 2021 case.
25      THE COURT: All right. We will see y'all

Page 1267

1 in five minutes.
2      (Recess.)
3      THE COURT SECURITY OFFICER: All rise.
4      THE COURT: Okay. You can be seated.
5      Let me tell you, after looking at all of
6 the cases, my tentative leaning on each witness that
7 we are talking about, Carter and Schneider, and then
8 y'all can tell me why I'm wrong and talk me off my
9 position.
10      Okay. So for Carter, I'm looking at the
11 cases we all talked about, and in addition, I'm
12 looking at a case Potashnick versus Port City
13 Construction. Potashnick is P-O-T-A-S-H-N-I-C-K.
14      That citation is 609 F.2d 1101. It's
15 Fifth Circuit from 1980. It talked about the
16 general principles of Geders being applicable in
17 civil cases as well, largely due to the Seventh
18 Amendment right to a jury trial dating back to
19 Biblical times of sequestering witnesses. So they
20 seem to think it is a pretty old notion, pretty old
21 practice, notwithstanding Rule 16.
22      So basically, what I'm thinking about is
23 obviously the principles of Geders cross apply when
24 it is a civil litigant, and Potashnick is making it
25 clear it is a civil litigant who is a party

Page 1268

1 litigant. Right? And Carter is a party litigant.
2      So I think the gist of what I gather from
3 Potashnick is, I'm probably not able to sideline her
4 from talking at a break as significant as a weekend
5 from talking to counsel.
6      I have concerns about coaching. But I
7 think the way Potashnick, Geders, and the later
8 Supreme Court case I gave you talks about when you
9 have a heightened interest, like in a criminal case
10 for a criminal defendant or a civil party litigant
11 with a Seventh Amendment rights, that that right
12 warrants in favor of the ability to talk to counsel,
13 with cross-examination being the remedy for concerns
14 about coaching.
15      Does that make sense? So you can talk to
16 your client, but they get to cross-examine on Monday
17 everything, you know, you talked about. Right?
18 Can't disclose privilege, but they can get as close
19 as they can to ferret out what was talked about.
20      Using the same framework, the tough thing
21 for me to figure out is, who is Schneider? Does
22 that make sense? So Southwest could be a litigant
23 with someone who has an agent or an officer who has
24 the same Seventh Amendment interest that Carter
25 does.

Page 1269

1      So the million dollar question becomes,
2 who is Schneider? He's not the 30(b)(6). In
3 Potashnick, in footnote 12, it talks about the
4 president and CEO of that corporation being the
5 officer or agent, notwithstanding whether or not
6 they were a 30(b)(6).
7      So we know it is broader than 30(b)(6).
8      So I guess my question is, who is
9 Schneider? So I don't have -- I don't have a
10 definitive answer on Schneider. If he was a
11 30(b)(6), I would say have at it. He's under the
12 same position as Carter over the weekend. I don't
13 know the answer as we sit here right now.
14      MR. PRYOR: I don't believe he was a
15 30(b)(6). He's not a designated representative.
16 He's not an officer. Not a controlled person. I
17 haven't read the case, your Honor, but he's a
18 witness. And he's a -- I don't know if he's a
19 base -- I think he's a base manager.
20      THE COURT: And Southwest can talk to me
21 about whether my tentative leaning on the cases is
22 wrong or not and then facts about Schneider.
23      And y'all talk to me about Carter too.
24 Right? If I'm wrong on Carter, tell me I'm wrong on
25 Carter.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 342 of 642   PageID 11283
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Pages 1270..1273

Page 1270

1        MR. McKEEBY:  Well, I mean, Schneider is a
2  base manager of the Denver base and he's the
3  decision maker in the case.  And I don't -- I think
4  Potashnick doesn't -- I agree, it talks in terms of
5  a party, so it may not be applicable.
6        But I don't think there is any other
7  contrary case law -- that I have found, anyway -- to
8  suggest that we couldn't talk to him over a weekend
9  break.  Particularly given his importance in the
10  case.
11        And again, I go back to the argument that
12  I made before we broke, that if that were the rule,
13  then the litigant could effectively deprive counsel
14  from talking to their key witnesses by calling them
15  during their case in chief and asking them a couple
16  of simple questions, and -- after they were sworn
17  in.  And then they would be barred from talking to
18  them at any point during the case, prior to putting
19  them on the stand, and that just can't be -- can't
20  be the rule.
21        THE COURT:  Well, I think that is why that
22  person is normally designated as a corporate rep.
23  Right?  That person with the most acute concern
24  there, if that makes sense.
25        MR. McKEEBY:  Well, it doesn't, I mean,

Page 1271

1  because there are -- you know, may be multiple
2  critical witnesses that may not be a corporate rep,
3  where you can only designate one corporate rep.
4        And so, you know, as such, they could
5  effectively bar communications between counsel and
6  these witnesses simply by calling them to the stand
7  and asking a few questions.  And depriving the
8  client of the ability to communicate with their --
9        THE COURT:  I know your argument as a
10  general concern.  I don't think that that has
11  happened in this case.
12        MR. McKEEBY:  I'm not suggesting -- I'm
13  suggesting that is why it can't be the rule
14  because of that potentially absurd result.
15        THE COURT:  I understand that.
16        I don't see that result in this case.
17        But -- okay.  So any other arguments on
18  Schneider, factually or legally?
19        MR. McKEEBY:  And I have another argument,
20  your Honor.
21        I mean, this is a -- for Southwest
22  purposes, an employment case in which the critical
23  decision is the termination of Ms. Carter's
24  employment.  So he's acting as the agent.  He's the
25  decision maker and he's acting as the agent for

Page 1272

1  Southwest as to that decision.
2        So in that sense, he is a party, every bit
3  as much as a corporate officer may or may not be,
4  like Sonya Lacore, who didn't have anything to do
5  with the decision.  He's the agent as to the
6  decision at issue in the case.
7        THE COURT:  Understood.  Why is he not
8  your corporate rep, then?
9        MR. McKEEBY:  Because he lives in Denver.
10        THE COURT:  Okay.  Response.
11        MR. PRYOR:  Yeah.  The response is, he was
12  the decision maker in the underlying facts in 2017.
13  I haven't read the case, judge.  Based on what you
14  were saying, it sounds like it's talking about
15  someone involved in the litigation that is a control
16  person, or corporate rep, or something like that.
17        I mean, Mr. Schneider has not been a
18  player in this litigation.  He was -- I guess he was
19  deposed.  He was deposed and he took the stand.  He
20  was a witness.
21        And he certainly, according to them, is
22  the one that made the decision to terminate her.
23  And if that is all it takes for a base manager --
24  he's not a senior manager in the company -- to fire
25  someone, and that case there applies to him, okay.

Page 1273

1  But it didn't sound like it.
2        THE COURT:  Understood.  So, I mean, my
3  view of this -- and I see the argument that he was
4  the decision maker in this case -- I think from
5  Potashnick, I'm looking at it as a party as a whole
6  and the party's rights as a whole.
7        I think what I would say is, I would allow
8  any corporate rep to then slide out from the pretty
9  restrictive officer or agent kind of notion, right?
10  And say, okay, name that person your corporate rep
11  and they get immune from the operation of the rule
12  and the restraint from talking about the case, but I
13  don't think I can get there with him.  I think I
14  could if he were named the corporate rep.  I just --
15  I can't.
16        So I won't lift my restriction.  I don't
17  know where Carter is.  So I feel like under
18  Potashnick, Geders, I need to lift restriction on
19  Carter, but knowing full way you can cross exam to
20  the fullest extent any information on their
21  discussions.
22        MR. PRYOR:  Your Honor, in regard to
23  cross-examination about communications with an
24  attorney?  That is the spirit of that case, is they
25  are allowed to ask about communications with the

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 343 of 642   PageID 11284
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                    Pages 1274..1277

Page 1274

1  counsel?
2          THE COURT:  Well, you can go read Geders
3  over the weekend.  So it -- that sounds like your
4  homework.  Right?
5          Geders contemplates it, Potashnick
6  contemplates it.  They say that there is this
7  balance, courts hate coaching of witnesses, and
8  there is a right to counsel under the Fifth
9  Amendment for criminal cases, under the Seventh
10 Amendment for civil cases.
11         And how we balance that out is, if it is a
12 party litigant or a criminal defendant, we let them
13 talk to their counsel, but let the other side
14 cross-examine them on what coaching occurred.
15         All right?  So we are all going to have to
16 figure out where that line is.  Obviously, we can't
17 compel her to disclose truly privileged information.
18         But if I ask somebody, did you talk to
19 your lawyer, what did you talk about, that is not
20 privileged, right, it is just not.  Everyone thinks
21 that it is.  But when you do a privilege log, all of
22 that stuff is in the privilege log, and the
23 privilege log is not privileged.
24         MR. PRYOR:  But what did you talk about?
25 You don't get really into the specifics of that.

Page 1275

1          THE COURT:  What did your lawyer tell you
2  is off limits.  We all know that.  So the question
3  is, what did you talk about, and how granular you
4  can go.  That is the question.
5          MR. McKEEBY:  Your Honor, a couple of
6  points.  One is, I have spoken -- because I
7  recognize now that Mr. Jones also, I think, resides
8  in Colorado, so, I mean, there were other decisions
9  in connection with --
10         THE COURT:  Sure.  It is always a
11 multi-factor analysis.
12         MR. McKEEBY:  It is a multi-factored
13 assessment.
14         But I would also like some guidance.  I
15 mean, is -- can I speak to him just generally
16 about -- not about the case or about what witnesses
17 talk about, but just about, you know, the things
18 that I would recommend in terms of testimony and
19 witness presentation and that kind of thing or are
20 you saying I just can't talk to this witness at all?
21         I mean, if I -- I think if I don't talk to
22 him about, you know, the substance of any evidence
23 that has come in or go over documents and things
24 like that, I should at least be able to talk to him
25 about the rules of being a good witness and, you

Page 1276

1  know, when to volunteer information and not
2  volunteer information, and that type of thing.  But
3  I want to make sure that the Court is comfortable
4  with that.
5          THE COURT:  I can say one thing and ask
6  for any comments on the other side.
7          The takeaway I got from reading all of the
8  cases is there is a middle ground approach between
9  you can talk anything but cross-examination on
10 coaching; you can talk about nothing; and then the
11 middle ground approach, which was useful really only
12 with some of these heightened interest cases is, an
13 instruction that someone can talk about general
14 trial strategy and scheduling of other witnesses.
15         And I don't know that that is the case
16 with Schneider.  I mean, it sounds like what you are
17 wanting to talk with Schneider about is how he can
18 be a good witness.
19         MR. McKEEBY:  Yes.
20         THE COURT:  And it is mild coaching,
21 right?  It is not here is how you should answer this
22 question.
23         MR. McKEEBY:  Of course.  Of course.
24         THE COURT:  But it is general decorum.  So
25 I'm not accusing you of anything unethical there.

Page 1277

1  But I haven't seen anything that lets me carve that
2  description out from the cases.
3          Now, if I'm wrong and you find something
4  concrete that gives me that, file something.  I'm
5  paying attention to the docket this weekend.  I'm
6  working like a lawyer.  So file something and we
7  will take a look at it.
8          Any comments from Carter?
9          MR. PRYOR:  One thing I do know is what
10 the rule requires when you invoke the rule and what
11 he discussed would violate the rule, in our view.
12         THE COURT:  Understood.  Which is why I
13 don't know authority that would let me, right?
14 Perhaps there is a case that says, oh, that really
15 doesn't violate 615.  I understand that.
16         There might always be a case out there,
17 which I oftentimes dig for cases and don't just rely
18 on the face of the rule.  And this exercise is a
19 great demonstration of that.
20         Okay.  So can y'all tell your client that
21 I am now lifting the rule because it is a weekend.
22 She's a civil party litigant with a heightened
23 interest under the Seventh Amendment that means when
24 I get as far as a weekend, right?  Where we are even
25 beyond the Geders 17 hours, I feel I'm outside of my

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Pages 1278..1280

Page 1278

1 authority, if I ask her to not talk about the case.
2 But there is a right to cross-examination.  Exactly
3 how far that will go, we will find out on Monday.
4          MR. PRYOR:  Okay.  We will do that.
5          THE COURT:  Other issues, you've got a
6 depo to get to in two and a half hours.  I hope.
7          Can there be some sort of notice, even if
8 just by email, if the depo actually happens?
9          MR. PRYOR:  Yes.
10          MR. HILL:  To Kevin?
11          THE COURT:  Kevin and Savannah.
12          Right.  So I guess -- so it would be on
13 Sunday, then, that we have 6 p.m. disclosures of
14 what is going to happen the next day and 8 p.m.
15 response.
16          But I understand baton handoff will happen
17 Monday.  So I guess the question is, then Sunday, at
18 6 p.m. y'all need to disclose who y'all would call,
19 right?  Because it will be a day of evidence for one
20 of you.
21          So I guess arm wrestle and figure out
22 which one of you wants to present a case first.
23 Again, I don't have any problems if y'all
24 intermingle and you take turns presenting a witness.
25 That is fine by me.

Page 1279

1          But if y'all are going to time on Monday,
2 we need some disclosures Sunday night on what y'all
3 expect to get to on Monday.  But I won't baby-sit
4 y'all and say who has to go first.
5          Okay.  Anything else?  I gave a 24-hour
6 extension on briefing to me on protected activity in
7 the jury charge.
8          And then we talked about Monday at 8, we
9 will show up.  I know that hurts, but if you file
10 anything on jury charge that persuades, obviously I
11 need that by Sunday at five, so I can read it.
12          MR. HILL:  Will they let us up the
13 elevator?
14          THE COURT:  I certainly hope so.  I don't
15 think there is much line of security at 8:00.
16          Other questions?
17          Okay.  We will see y'all Monday morning at
18 8:00 and see you through filings and emails before
19 then.
20          Thanks, y'all.
21          THE COURT SECURITY OFFICER:  All rise.
22          (Proceedings concluded at 5:34 p.m.)
23
24
25

Page 1280

1               C E R T I F I C A T E
2
3          I, Kelli Ann Willis, RPR, CRR, CSR
4 certify that the foregoing is a transcript from the
5 record of the proceedings in the foregoing entitled
6 matter.
7          I further certify that the transcript
8 fees format comply with those prescribed by the
9 Court and the Judicial Conference of the United
10 States.
11          This 9th day of July 2022.
12
13          s/ Kelli Ann Willis
             Official Court Reporters
14          Northern District of Texas
             Dallas Division
15
16
17
18
19
20
21
22
23
24
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                        Index: $27..7:00

**$**

**$27** 1244:15,16,25

**$270,000** 1227:25

**$28** 1244:12

**-**

**-o-** 903:2

**1**

**10** 916:5,6 962:14 1183:24
1186:14,22 1188:12
1230:18

**10,000** 1214:20

**10-minute** 1230:10

**100** 937:23 939:10 1244:20

**107** 1125:16,19,20,21,25
1126:3,5

**10:00** 962:14

**11** 1147:18

**1101** 1267:14

**111** 1113:10,11,12,17,20,
22

**115** 1117:23,25 1118:5,9

**11:30** 963:7,12

**11:45** 963:7,12

**12** 978:18 1176:4 1178:4,6
1269:3

**12:45** 1060:3

**12th** 1233:7

**13** 996:5,11,12,15,18

**1330** 1233:13

**138** 1170:6,7,8,9,13,14,16,
19

**141** 1167:14 1170:22

**148** 1170:5

**15** 996:3,4 1202:24
1249:20

**16** 997:6 1267:21

**17** 1235:9 1277:25

**17-hour** 1233:22

**18** 926:20,25 927:1,7,9,13,
16,17,23,25 928:7,9,12,16,
20 929:12 930:10,11,14,18
931:16

**18-month** 926:18 929:10

**19** 962:5 965:14 968:14
971:10 1205:22

**1964** 1158:24

**1965** 1177:2

**1980** 1267:15

**1984** 1182:6

**1985** 1186:20

**1989** 1266:6

**1996** 1197:17 1207:2
1216:14 1217:4 1218:9,22
1219:5,14 1220:9

**1997** 1220:9

**1998** 1220:9

**2**

**2** 915:22 1041:21 1131:3
1142:20 1143:9 1146:3
1152:19

**20** 1019:15 1095:16

**200** 1212:21 1213:4

**2000** 1220:25 1221:1
1228:2 1230:6 1234:20,24
1235:12 1236:5 1238:3

**2008** 1074:4,24 1126:12

**200s** 1212:25 1214:12

**2012** 1236:3,5 1237:22

**2012-2013** 1236:8

**2013** 1074:6,24 1126:13
1234:22,24 1235:13
1239:17 1241:22

**2014** 979:23

**2015** 997:6 1127:10
1249:20 1252:23

**2017** 913:24 939:22 940:21
942:15 1018:13 1020:10

1023:22 1042:7 1100:2
1206:24 1235:9 1255:19,
23 1256:2 1272:12

**2018** 913:24

**2021** 1266:24

**21** 977:4,6 1008:4 1227:7,
11 1263:16

**21-E** 976:11,14,17,21
977:2,9,15,17 979:13
981:19 990:16 1008:22

**21-year** 1263:8

**22** 942:15

**22nd** 1042:7

**23rd** 1055:18 1059:8

**24** 908:8 1205:21

**24-hour** 1279:5

**26** 1100:2

**27** 916:3,4 1244:12

**272** 1266:6,8

**27th** 980:3

**28** 948:19 951:14 953:2,3
987:2,25

**2:30** 1147:18,22

**3**

**3** 1152:15 1156:24

**3.0.0** 1115:23 1116:8,12,18

**30** 1109:7 1190:7

**30(b)(6)** 1269:2,6,7,11,15

**30-day** 1122:10 1143:10
1146:22 1148:10,25

**4**

**4** 903:8 1105:23

**403** 1050:22

**408** 1156:5

**425** 1233:12,16

**45** 1059:12 1190:8

**488** 1266:6,8

**4:17** 1230:19 1231:13

**5**

**5** 1107:4

**556** 954:11 955:2 1011:10
1026:10 1041:13 1075:8
1097:22 1098:10 1109:3
1110:16,18 1150:21
1152:22 1224:10

**556's** 1134:11

**56** 1097:2 1134:4

**57** 1200:13,14

**575 496-6784** 913:6

**5:00** 1263:25 1264:7

**5:34** 1279:22

**6**

**6** 1278:13,18

**60** 1090:17

**609** 1267:14

**615** 1232:2 1277:15

**62** 1031:3

**624** 1266:24

**64** 1124:23,24 1125:9,11

**65** 1045:25 1048:13
1200:13

**66** 944:4,20,23 975:9 995:6
1010:15 1031:7 1038:16

**68** 1031:3

**7**

**7** 907:18 908:15 916:13

**74** 1051:4,9,10,11,17,20

**76** 1058:19 1060:13,14,15,
16,17,19,22,23,24 1061:1,
5 1068:2,3,11 1233:9,13

**7:00** 911:16 912:6

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 346 of 642   PageID 11287
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Index: 8..afraid

**8**

**8** 907:17 908:15 1278:14
1279:8

**8-0** 1233:17

**80** 1134:21 1233:12,16

**82** 1058:17 1059:5,7,10,20
1060:10 1061:10 1068:3,5
1072:25 1073:3

**83** 1179:24,25 1180:1

**84** 1186:20

**85** 1186:20

**87** 1254:18

**88** 1048:11

**89** 1073:4,5,7,14,17
1139:14

**8:00** 907:16 912:6 1279:15,
18

**8:30** 910:21

**8:45** 1265:5

**9**

**9** 905:4 908:1 1186:14

**90** 915:20 1085:10,12,14,
22,24

**90-minute** 915:17

**90s** 1214:1

**911** 1106:5

**92** 1094:16,17,19 1095:4

**96** 1221:3 1233:12

**97** 1221:3 1223:5

**98** 939:17 1100:11,14,22
1105:3 1130:13 1221:3
1223:5

**99** 939:12

**997** 1266:24

**A**

**abide** 924:6

**ability** 1074:17 1236:2
1268:12 1271:8

**aborted** 958:4 1044:5
1118:13 1120:17

**abortion** 1028:12,22
1086:20 1087:11 1091:5,
17,22 1092:3 1093:16,20
1096:21 1098:15 1105:18
1111:9 1112:14 1114:5
1120:23 1126:16,23
1131:8 1185:1,4,13 1186:3
1187:15 1188:3 1190:24
1191:20 1192:14 1193:3
1194:8,11,16,19 1196:11
1197:6 1198:22 1199:8,14
1200:3,11 1202:6 1203:8,
9,13,17,23 1205:15 1206:7
1257:12 1260:15 1262:4,9

**abortions** 1196:11

**absolutely** 999:10 1003:8
1079:23 1143:11 1154:10
1159:13 1162:13 1209:13
1221:18 1240:16

**absurd** 1271:14

**abundantly** 1064:21

**abuse** 1155:2

**abusive** 1177:5

**accept** 1081:22 1113:9
1122:6

**acceptable** 1148:13
1234:8

**accepted** 1148:21,23
1149:2 1158:10

**accident** 957:18 1009:11

**accommodate** 1071:15

**accommodation** 1068:24
1069:3,12,15 1096:1

**Accommodations**
1069:9

**accordion** 1214:14

**account** 919:23 1025:19
1026:23 1028:23

**accounts** 1023:16

**accurate** 917:7 1026:8
1074:15 1101:4,16,17
1131:8 1187:12

**accurately** 929:6 1077:22

**accusations** 1037:3
1224:24,25

**accused** 1110:2

**accusing** 1276:25

**acknowledge** 1064:10

**acknowledging** 1121:3

**acquired** 1156:6

**Act** 917:21 918:21 919:6
922:7,25 923:12 926:7
1069:6,8,18 1158:24

**acting** 1119:11,13,24
1120:3 1271:24,25

**action** 907:4 930:5 931:13
943:15 1036:21 1037:20
1049:3 1072:14,15,16
1102:12 1103:5 1104:24
1109:5 1170:25 1171:25
1217:18

**actions** 1032:22 1037:23
1128:2 1145:17 1154:15,
16

**active** 932:6 956:20
1119:14 1235:12 1236:6

**activist** 1256:23

**activities** 1034:12
1071:16,23 1096:15
1098:3 1099:21 1197:19
1219:15 1234:16

**activity** 917:5,13,20,21,22,
25 918:1,14 919:5 920:10
924:19,22,25 925:2,11,14
930:3 931:12,14,23 954:23
955:4,21 956:10 957:3,4,
17 958:1,9,11,14,16,19,20
959:3,4,14 960:4,15
1006:11 1021:16 1026:4
1032:25 1038:3,9 1047:22
1053:19 1058:14 1075:20
1102:22 1118:25 1129:7
1223:7 1279:6

**actors** 1151:7

**acute** 1270:23

**Adam** 903:19 1133:5
1173:4

**add** 1114:23 1135:23
1151:2 1205:19

**added** 955:4 1134:20

**addition** 918:8,25 1153:7
1218:5 1267:11

**additional** 905:19 915:12

**address** 912:19,21 956:9
1144:2 1167:25 1169:15
1234:9 1266:14

**addressed** 946:5 1114:8

**admin** 1248:8,11

**administering** 966:1

**administration** 982:19
1075:8

**administrator** 1248:10

**admission** 1061:4 1068:3
1073:5 1085:12 1117:23
1125:17,19 1170:5

**admitted** 977:14 979:13
996:17 1051:19 1068:15
1073:13 1085:19,21
1095:1,3 1100:19,21
1113:19 1118:8,13 1125:8
1126:2,21 1167:15
1170:18

**adopted** 1152:25

**adoption** 1204:23

**adore** 1250:14

**adventure** 905:13 920:13

**adverse** 1133:15

**advertise** 1203:10

**advice** 925:16 1163:22

**advisory** 1104:13

**affect** 1136:11 1178:9

**affected** 934:6 978:1
1199:11 1200:2,10,16

**affects** 1087:20 1131:4
1194:25 1197:23 1234:16

**afford** 1037:6 1202:20

**afforded** 1159:2

**AFL-CIO** 1041:13 1245:11,
12

**aforementioned** 1114:17

**afraid** 1185:18,20,22

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 347 of 642   PageID 11288
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022        Index: African-american..argumentative

1244:22

**African-american** 1169:5

**afternoon** 1064:1,12 1155:7 1167:9 1175:21 1213:14

**AG's** 1063:14

**age** 1176:22 1200:12 1205:1

**agencies** 1204:23

**agent** 1268:23 1269:5 1271:24,25 1272:5 1273:9

**agents** 1151:9

**aghast** 1061:21

**agree** 937:4 966:17 988:23 1001:3 1019:4 1034:13 1041:2,5,15 1064:11 1076:21,24 1114:17 1144:15 1219:1 1251:20 1270:4

**agreed** 1040:17 1046:22 1114:12 1144:4 1154:4

**agreeing** 1030:10,11,13 1034:5,8

**agreement** 956:17 1043:3 1121:25 1150:6 1152:23 1155:25 1252:24 1253:1,7

**ahead** 941:9 960:19 968:7 1002:18 1017:14 1130:8 1132:21 1148:3 1154:21 1188:2 1215:7 1220:25 1221:2 1236:18 1248:13

**ahold** 1249:4

**aids** 922:14

**air** 1214:5

**aircraft** 934:5,12

**airlines** 923:18 924:5 928:15 929:22,24 930:2,25 932:7,12 935:1 947:6 948:15,24 949:17 953:19 954:10 966:8 987:3 988:4 997:17 1002:8 1004:5 1015:10 1028:25 1037:6 1044:19 1052:13 1054:23 1069:1,10,21,24 1070:3,14 1071:8 1072:10 1086:20 1087:17,20 1088:14,15,17, 21 1089:7,20 1090:5,20,21

1091:8,19 1092:24 1093:11,24 1094:1 1095:19,22 1097:11 1101:9 1106:6,21 1109:7, 23 1110:17,19,20,23 1111:11 1112:11,15 1115:9,15 1119:10 1120:10,20,22 1121:24 1123:2 1137:24 1138:10 1141:3 1149:24 1151:4,11 1155:14 1157:16 1158:4 1160:5 1167:13,21 1195:17 1197:13,19 1206:5 1207:1,2 1211:21, 25 1212:11,12 1216:4 1228:17 1229:3 1255:10 1263:12

**Airlines'** 1087:20 1093:15 1109:2

**Airlines's** 951:15 1045:14, 23 1088:23 1091:21 1094:1 1102:11 1103:5 1104:23 1115:3 1122:1 1136:21

**airplane** 1209:17,18,19,23 1211:15 1213:18 1214:7 1235:24 1255:12 1257:19

**airplanes** 1212:24 1214:3

**airport** 1077:16,18,25 1078:3,6 1079:3,8 1080:19,20 1081:4

**aisle** 1001:25 1002:1 1004:1 1192:16

**algorithm** 1020:7

**alike** 1262:20

**allegation** 1145:22 1151:21

**allegations** 924:15

**allege** 1150:14,18,20

**alleged** 958:4

**allowed** 914:7,13 915:1,11 1001:8 1163:20 1273:25

**allowing** 1259:2

**alongside** 1107:25

**altercation** 1012:21

**altercations** 1012:3

**amazing** 1212:14

**ambiguous** 918:18,25 970:11

**amenable** 911:18

**amended** 1146:9 1147:4 1152:15

**Amendment** 1164:5 1234:1 1267:18 1268:11, 24 1274:9,10 1277:23

**American** 1195:16 1207:4, 6 1209:8 1211:25 1212:4, 7,8

**Amos** 1226:7

**amount** 1199:15 1243:23 1262:15

**amounted** 1088:9

**analysis** 1275:11

**anatomically** 1028:19 1042:24

**and/or** 1121:2

**anesthesia** 1190:5

**anger** 1197:7

**angry** 1063:16 1191:2,16 1192:17 1197:6

**answerer** 961:1

**answering** 918:17 950:7 957:9 1022:5,21

**answers** 921:24 926:15 1167:2 1175:18 1186:4 1187:7,11 1265:24 1266:2

**anti** 1075:7

**anti-union** 1074:10 1075:4,7,14,17,20 1076:6, 14,23 1219:5,6,8,10

**anticipate** 1066:20

**anymore** 993:12 994:1 1014:18 1189:19 1191:5 1213:17 1247:6,9

**AP32** 1097:3

**apartment** 1181:1 1182:2, 4 1204:14,18 1205:3

**apologies** 1068:20

**amazing** ...

**apologize** 922:12 926:16 1187:24 1233:6

**APP** 1048:11

**apparently** 970:24 1106:21 1234:18

**appearances** 903:8

**appears** 944:18 1168:1

**appellate** 1063:14 1153:12

**applicable** 1267:16 1270:5

**applied** 965:24 1197:12 1207:7

**applies** 916:1 1232:3 1272:25

**apply** 1005:2 1129:3 1207:11 1267:23

**appreciative** 1067:6

**apprehension** 1187:5

**approach** 921:9 990:13 1023:7 1079:12 1102:13 1142:16 1154:21 1155:17 1276:8,11

**approved** 1069:16

**approximately** 1182:8

**April** 997:6

**arbitration** 1152:19

**area** 927:10 1063:4 1178:2, 10 1210:5 1258:6

**areas** 1116:14 1229:21

**argued** 1143:8 1184:25

**argument** 933:21 946:19 957:20 981:8 1038:12 1071:18 1103:21 1111:15 1121:13 1144:24 1149:18 1150:8 1152:25 1153:1 1190:20,24 1191:1 1233:1 1270:11 1271:9,19 1273:3

**argumentative** 928:24 950:20 955:16 957:10 967:16,19,24 968:1 981:14 992:21 1000:20 1005:23 1007:14 1012:12 1013:11 1017:18,24 1047:25 1061:20 1062:22 1065:8

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 348 of 642   PageID 11289

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 4 July 08, 2022                    Index: argumentive..barraging

**argumentive** 960:16

**arguments** 1013:18
1156:23 1271:17

**arise** 966:8

**arm** 1278:21

**arranged** 1256:20

**Article** 1227:7,11

**articles** 1259:12

**ashamed** 1199:8

**asks** 920:9 1153:5

**aspect** 1034:16

**assassination** 936:5,12,
15 937:4,12 938:8

**assessment** 1275:13

**assign** 992:8

**assigned** 988:17,19
992:15 994:4,14,16

**assignment** 1231:3,4

**assist** 950:6

**assistance** 1159:23
1184:2 1233:25

**assistant** 1052:16,19

**associate** 1086:19
1093:14 1266:23

**assume** 938:24 941:9,22
990:6 995:4 1004:22,25
1027:25 1028:1 1053:5
1084:1 1113:5

**assuming** 941:12 1162:5
1163:5

**assurances** 916:12

**assured** 1187:3

**atmosphere** 1209:24

**attached** 979:21 1114:22
1115:1

**attachment** 1115:6

**attack** 1036:25 1150:1

**attacks** 1011:14

**attempt** 906:13

**attendant** 932:6 954:10
966:14,24 967:12 968:17,

22 982:14 1002:6,7
1014:19 1074:4 1118:16
1119:2,3,7,11,14,15,17,24
1135:25 1137:23 1138:9
1171:8 1195:17 1209:9,10
1219:21 1243:20

**attendants** 953:18 966:12
971:14 979:23 1001:21
1002:2 1004:1 1005:2
1011:25 1082:19,21
1083:1,2,5,15,16,23,24
1084:2,4,16 1085:6 1109:4
1110:19 1120:12 1151:8
1217:16,21 1218:7,24
1221:8,9 1222:5,20,21
1223:2,23 1255:15

**attention** 1277:5

**attorney** 1052:12 1158:21
1273:24

**attorney-client** 925:24

**attributed** 990:19 991:13

**auditorium** 1198:15
1199:16

**Audrey** 945:16 946:23
947:16 948:2 950:10
952:3,10,16 954:1 965:18
975:6 989:9,19,21,23
1011:8 1014:2 1020:19,20,
23 1021:2,10,22 1022:15,
17 1025:1,2 1026:1,2,9
1031:25 1034:15 1035:8
1039:12 1040:3,6,7,11
1041:24 1046:5 1072:22
1073:18 1079:20 1084:9
1101:25 1105:1 1118:24
1119:1 1126:13,22 1127:4,
9 1139:10 1141:4 1150:22
1168:4 1169:21 1174:15
1235:19 1241:2,3,8 1245:6
1246:13,21 1248:7,12
1249:15 1250:7 1253:2
1259:25 1260:2 1262:21,
25

**authored** 965:18 1113:23

**authority** 1161:21 1164:25
1165:2 1277:13 1278:1

**avenues** 1203:6 1205:12

**aviation** 952:8

**avoid** 1261:1

**awake** 1188:7

**aware** 932:20,24 939:24
941:14,15 943:11 947:14
954:2 973:3,8,11 975:12,
24 976:3,6,10 978:15,16
980:6,11,17,22 983:12,20,
21,23 984:2 987:7 1000:17
1021:2 1032:23 1042:16
1069:23 1071:11 1081:18
1093:3 1108:10 1110:15
1112:11 1122:23,24
1123:5,7,12 1124:10
1128:1 1138:13,22 1140:4,
6,10 1146:21 1148:9,15,24
1149:3 1157:15 1163:23
1233:3,9 1256:4,6,7

**awesome** 907:11

────────────

**B**

**babies** 1194:21 1202:18
1204:14,21 1205:4,10
1262:19

**baby** 1131:9,10 1187:4
1188:24 1189:9,23
1190:19 1193:19 1194:2,5
1201:11,25 1202:20,21
1262:14,16

**baby-sit** 1279:3

**bachelor's** 952:8

**back** 907:8 908:23 909:5,
25 921:3,8 926:19,25
927:1,7 928:6,11,20 929:2,
17 930:14,18 938:18 941:1
943:10 963:18 972:1,9,25
974:24 987:24 995:6
1008:15 1009:16 1010:6,
15 1014:13 1022:24
1028:2 1029:20 1038:16
1040:15 1055:14 1059:17
1060:3,20,21 1061:4,10
1064:8 1066:14 1067:9
1068:2 1081:14 1090:22
1091:7,17 1092:23
1093:13 1096:2,19
1099:13 1103:19 1123:23
1135:16,19 1136:1 1139:9
1141:23 1145:18 1146:8
1147:18 1152:10 1155:5
1158:3 1161:4,18 1164:10,
22 1169:14 1176:2,8,20
1181:20 1182:24 1185:3,

22 1186:10,18 1188:4
1190:4,7,11 1192:22,23
1193:22 1195:12 1207:5,
15 1208:12,13,17,19,23
1209:2,3,5 1210:17
1212:12,21 1213:4,11,12,
13,14 1214:6,8,13,23,24
1215:2,6,18 1216:3
1217:11 1218:22 1220:5,
15 1222:7 1224:1 1227:17
1228:8,13,15 1230:6,11,
12,18 1231:13 1232:16
1236:14 1237:24 1238:3
1239:15 1242:13 1244:10,
12 1250:12 1252:20
1253:18,19 1254:1,8
1255:21 1259:2 1265:5,15
1267:18 1270:11

**back-and-forth** 966:16
971:11

**background** 1176:14
1207:21 1234:15

**backwards** 1253:11

**bad** 979:5 1183:20 1189:2
1212:7,8 1220:16 1223:8
1226:14

**badge** 1086:21,23 1087:1
1089:10,20,22

**badgering** 1012:12
1240:7

**bags** 1182:14

**balance** 1145:15 1274:7,
11

**balances** 1145:18

**Baltimore** 1081:10

**bankrupt** 1127:11

**banner** 1108:23 1109:2
1110:15 1112:10

**banners** 1108:25

**bar** 1232:1 1271:5

**bargaining** 1145:15
1252:24 1253:1

**Barnett** 1101:7 1102:10,20
1103:4 1104:22

**barraged** 1240:10

**barraging** 1127:9

**barred** 1270:17

**Barrett** 1229:13

**base** 947:2 948:2 988:17 989:4 1052:16,19 1235:24 1269:19 1270:2 1272:23

**based** 948:23 949:10 952:11 953:4 978:7 1029:23 1079:4,18 1080:16,17 1100:4 1158:7 1169:6 1195:24 1234:7 1272:13

**bases** 981:17

**basic** 951:6 1002:22 1150:23 1159:1

**basically** 1158:25 1180:2 1185:4 1188:19 1191:16, 21 1192:10 1196:3 1219:24,25 1254:19 1267:22

**basis** 917:6 937:25 1089:23 1103:1 1116:1 1144:18 1163:10

**bat** 954:18

**Bates** 985:19,21 987:5 988:22

**baton** 1278:16

**beach** 1003:1

**bearing** 963:19

**beautiful** 1176:10 1198:17 1204:6,24 1205:19,22,23

**began** 1074:22

**beginning** 945:6 1019:6 1176:8 1210:22 1219:17

**behalf** 1112:14 1150:5

**Belanger** 984:18

**belief** 953:5 1105:21 1106:25 1131:25 1132:1 1206:13

**beliefs** 1053:14 1058:10 1071:16,23 1106:25 1107:2 1176:16 1177:11 1263:2,13

**believed** 978:13 1093:12 1185:17 1224:3

**believes** 1075:4 1087:24

1143:7

**benefit** 1064:15

**benefits** 1207:25 1208:14

**Beth** 1264:15

**Beverly** 984:18

**Bible** 1177:22 1195:9 1197:24 1198:21 1200:6

**Biblical** 1267:19

**big** 974:19 1130:2 1198:2 1224:7 1243:13 1245:8 1254:10 1256:22 1262:14

**birth** 1183:12,13

**bit** 923:8 996:20 1010:10 1018:17,20 1105:18 1110:2 1141:14 1175:25 1188:6 1189:1 1210:22 1234:17 1252:19 1272:2

**blah** 1213:24

**blank** 944:14

**bleeding** 1190:9

**blew** 1248:22

**block** 1174:3,11

**blocked** 1172:6,7 1174:7

**blocking** 1004:8

**blood** 1189:21

**blow** 982:2 996:19 1087:4

**blurred** 1087:7

**board** 1074:5 1081:16 1082:8 1216:4 1226:16 1227:6,11 1236:21,25 1237:1,2 1251:10,12 1258:8

**boat** 1154:9

**Bobby** 903:12 915:15

**body** 1097:23 1098:11,17 1100:4 1111:5 1112:5 1188:24 1261:19

**bold** 1129:24

**bonus** 1254:3,14,15

**boom** 1090:24 1214:23

**born** 1176:3,21,25 1177:1, 2,4,7 1193:5 1196:9

**boss** 1225:16

**bother** 1039:13 1103:20

**bottom** 1081:13 1082:6 1107:4,9 1113:25 1127:15 1167:19

**bought** 1193:10

**box** 921:9 962:19 1166:16 1232:21 1265:13

**boxes** 990:4

**boy** 1176:20 1179:6 1182:13 1219:18

**boyfriend** 1181:21 1182:22 1186:8 1190:13, 21 1191:13 1192:3 1199:25 1205:20

**boyfriend's** 1180:9,22

**brand** 1087:20 1088:24 1110:21

**Brantley** 909:10 910:5

**break** 908:21 962:7,8 963:6,12 988:12 991:5,9 1048:4 1059:13,20,21 1066:10 1146:7,11 1147:2, 16,17 1148:2 1149:7 1151:17 1152:10 1155:7 1163:21 1230:10,11 1231:12 1264:22 1268:4 1270:9

**breaking** 919:11

**breaks** 915:21

**Brett** 904:9 1243:11

**Brian** 903:15 980:7,13 1152:6 1167:19 1171:15 1239:25 1251:15,24

**briefing** 907:25 1165:10 1279:6

**bring** 921:3 976:21 1059:19 1060:15 1068:6 1081:21,23 1153:25 1154:18 1166:13 1169:17 1184:12 1231:1

**bringing** 942:16 974:2 975:6,14 980:13 983:3 989:24

**brings** 1135:12

**broad** 920:10

**broaden** 1042:13,18,19

**broader** 1269:7

**broke** 1224:1 1270:12

**brother** 1130:2

**brought** 973:6,23 982:7 983:1,19 1037:16 1136:5 1253:5 1266:23

**bucket** 1039:5 1041:21 1042:22,25 1046:12 1047:19 1048:7 1152:20 1257:13,16

**buckets** 1039:3,5 1044:1, 3,4 1046:11,13,14,15,22, 24 1047:2,10 1086:14 1114:13 1118:23 1125:13 1132:10 1257:14

**build** 956:8 1210:23 1263:16

**building** 1205:3

**built-in** 1145:14,18

**bulkhead** 1213:7,8

**bullying** 995:15,20,22,23 997:15 998:8,19 999:4,14, 24 1000:1,6,12 1001:16, 18,19 1002:8 1004:6,10,20 1005:9,16 1007:10,11,17 1009:5 1029:4 1046:25 1115:8,9,14,15 1117:11,13 1122:20 1127:20 1128:6,8, 12 1129:2,21,25 1135:7

**bullying/hazing** 1121:22

**bunch** 1131:13 1218:25

**Burbank** 1177:2

**Burger** 1233:20

**business** 904:8 934:13 995:3 1101:8 1119:10 1229:24,25 1230:1,2

**butt** 1136:1

**button** 1105:24 1106:2

**bylaw** 1241:23,24 1242:1

---

**C**

---

**Cabo** 1001:23,24 1002:23

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 350 of 642   PageID 11291

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                    Index: California..choice

1003:16 1005:3 1135:19, 21

**California** 1176:3 1177:2, 4,13,24

**call** 908:13,23 909:19,20 937:23 998:8 1000:24 1012:16 1056:16 1063:15, 22 1095:11 1101:13 1146:7 1161:17 1175:9 1179:5 1181:4 1237:25 1246:12 1250:3 1251:11 1264:1 1278:18

**called** 939:6 1095:16 1127:11 1182:19 1185:7 1186:25 1195:8 1198:1 1202:2,4 1209:2 1216:15 1223:13 1238:12 1257:22, 23 1263:17

**calling** 909:5 918:8,25 1066:20 1125:1 1136:19 1166:3,4 1246:13 1266:12 1270:14 1271:6

**calls** 925:23 937:8 940:23 947:19 948:4 949:3 974:5, 9 986:18 1008:7,14 1075:23 1161:2 1166:11 1246:14 1247:11 1251:4

**calm** 1188:8

**cam** 912:9

**candidate** 1027:5 1228:3

**candy** 1232:1

**cans** 1215:25

**care** 906:22 1006:6 1064:23 1103:9 1165:14 1204:12 1208:9,22

**career** 1069:9 1178:1

**carefully** 906:18

**carried** 1150:17 1196:19

**carry** 1203:19

**Carter** 903:9,11 915:16 922:10 923:2,17 924:1,12, 13 925:18 927:2,8,13,22 929:22 930:22 931:11,21 932:4,12,18 939:23,24 940:7,20 942:17,24 954:11,18 955:20 973:7, 16,21 976:8 980:4 983:14 985:19,22 987:8 988:19,

21,22 989:24 990:8,19,21 991:13,14,17 992:12,17 993:11 994:20 997:8 998:12,22 999:12,22 1000:11 1006:4,10 1007:6, 23 1008:22 1009:4 1011:17,25 1012:1,21 1013:2,24 1014:3 1015:16 1016:15 1018:7 1020:11, 14 1021:8 1024:23 1025:9 1026:8 1028:11 1031:18, 24 1032:7 1034:9 1036:20 1038:10 1039:11,15 1041:3,22 1043:12 1049:13,23 1050:19 1055:11 1056:2 1067:2 1068:24 1069:6,14,17,25 1070:15 1071:8 1074:21 1075:6 1086:15 1091:20 1092:13,18 1095:6 1100:25 1120:1 1124:7,20 1125:12 1126:11 1127:6 1128:2 1130:18 1135:2 1141:18 1142:7 1143:8 1149:25 1150:22 1155:9 1157:17 1158:10 1159:24 1160:2 1162:11 1166:11 1169:22 1172:23 1173:9, 12 1174:16 1175:9,10,14, 24 1234:14 1243:6 1267:7, 10 1268:1,24 1269:12,23, 24,25 1273:17,19 1277:8

**Carter's** 928:14 990:18 1033:16 1046:9 1048:8 1058:9 1069:20 1071:23 1075:4 1091:4,16 1092:25 1093:14 1148:9 1152:21, 24 1155:15 1172:11 1271:23

**carve** 1277:1

**case** 908:21 921:15,18 924:8 926:21 931:5 936:23 962:12,13,20 978:8 979:2 985:12 1053:24,25 1054:15 1055:12,13,22 1059:24,25 1060:7 1062:1 1063:11,16,20 1101:10 1145:22 1146:10 1147:22 1150:2,14,24 1151:21 1159:24 1161:2,3,21 1162:2,5,7,24 1163:1,4,15 1164:8,12 1165:6,19,24 1166:1 1230:15,23 1231:8 1232:15,23 1233:3,8,13,15

1234:8 1265:2,4,21 1266:4,24 1267:12 1268:8, 9 1269:17 1270:3,7,10,15, 18 1271:11,16,22 1272:6, 13,25 1273:4,12,24 1275:16 1276:15 1277:14, 16 1278:1,22

**case-in-chief** 1132:18

**cases** 966:11 1267:6,11,17 1269:21 1274:9,10 1276:8, 12 1277:2,17

**Casper** 1168:2,16 1174:6

**cat** 1258:5

**catastrophic** 1218:1 1222:18

**categories** 1036:19 1053:10,23 1054:4,10,17, 24 1055:8,20,22 1056:3,10 1057:3,5,18,23 1058:2,23 1059:2,3 1122:19

**category** 1053:14,17,20 1056:14,17,24 1057:14,20 1058:5 1062:15

**Catholic** 1177:16

**caught** 1249:18

**caused** 1012:21

**CBA** 1253:8 1257:7

**cells** 1131:9 1262:16

**censored** 1247:9

**center** 1181:4 1202:13 1204:16

**centers** 1203:10

**Central** 907:16,17 908:15

**cents** 1134:21

**CEO** 1212:12 1269:4

**certified** 1119:15

**chain** 953:21

**chaired** 956:7

**chambers** 910:2

**chance** 1065:25 1142:20, 22 1150:5 1152:19,23 1155:24 1266:22

**change** 998:23 1042:10

1153:1 1162:6 1237:10,11 1241:24

**changed** 938:8 1092:8

**changing** 955:6,8 1046:14

**characterization** 958:23 1092:15 1130:4

**characterizing** 1064:16

**charge** 918:10,13 1016:1 1054:21 1070:9 1227:7 1279:7,10

**charged** 976:9

**charges** 974:2 975:14 976:6 978:19 982:7 983:1, 3,5,7 1169:17 1225:18 1226:2,24,25 1227:1,5,9 1240:3,6 1243:10

**charlene** 903:11 929:22 939:23,24 954:10,17 955:20 985:19,21 987:5,8 988:22 1011:17,25 1012:1 1014:3 1026:8 1046:9 1068:24 1082:18 1083:19, 25 1091:16,20 1093:14 1100:25 1105:17 1107:10 1120:1,8 1124:7,20 1125:12 1126:11,14,20 1127:5,9 1135:2 1141:18 1149:25 1159:24 1175:9, 14,24

**Charlene's** 1087:18 1105:11

**charm** 1197:16

**chart** 1210:14

**chastised** 1023:11

**check** 1077:14 1244:10,12

**checks** 1145:15,18

**Chicago** 1219:19

**chief** 1233:20 1270:15

**chiefly** 978:24

**child** 1196:12

**children** 1176:10 1194:18, 20 1200:18 1202:5 1205:5 1261:11

**choice** 1031:10,16,22 1032:5 1096:15,17 1097:23 1098:3,8,11,17,24

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 351 of 642   PageID 11292
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 4 July 08, 2022              Index: choices..complaint

1099:21 1100:4 1109:23
1111:4,5,8,13 1112:4,5
1259:16,17 1261:17,19

**choices** 1204:21

**choose** 906:17 920:13

**choose-your-own**
905:13

**chosen** 1071:13

**Chris** 1082:18 1083:20,25
1236:19 1237:17 1240:4,5,
23 1243:2 1250:12

**Christian** 1105:11,19
1106:25 1126:24 1257:11,
12

**Christianity** 1206:12

**Christians** 1258:12

**Christmas** 1177:17

**Christmastime** 1178:23

**church** 1093:23 1177:15,
17 1178:21 1195:8
1196:21,22 1197:25
1198:1,4,8,12 1204:15

**churches** 1191:18 1195:7
1198:19

**Cindy** 1223:15 1226:2,8

**Circuit** 1266:24 1267:15

**circumstances** 914:8

**citation** 1233:10,15
1267:14

**cite** 1266:7

**City** 1267:12

**civil** 1158:24 1267:17,24,
25 1268:10 1274:10
1277:22

**claim** 993:14 994:14
1143:6 1144:18,19,24
1145:19 1150:16 1151:19
1152:24 1247:16

**claimed** 1258:14

**claiming** 1144:16 1225:1,2

**claims** 922:10 923:1,17
977:10,11 978:25 983:13
1144:13 1145:6 1159:11
1168:10,11

**clarification** 945:21
1163:10 1165:8

**clarify** 917:16 973:1
980:25 991:5 1063:24
1111:25 1112:2

**clarifying** 919:7

**clarity's** 1160:7

**class** 1038:3 1181:5
1207:23 1213:9,10
1217:15

**classes** 1044:16

**clean** 1095:21 1189:8
1223:13

**clear** 910:8 918:7,13
933:9,20 958:17 1003:13,
23 1024:12,20 1035:19
1046:1 1064:21 1157:14,
15 1206:11 1267:25

**cleared** 1216:14

**Clerk** 1166:21 1175:15

**click** 1019:1,2,8,13,24
1020:4 1026:17 1082:18
1083:20 1236:19 1237:5,7,
17 1239:17 1240:4,6,23
1250:8 1261:7

**clicked** 1019:20 1020:13

**clicking** 1020:7

**clicks** 1020:16

**client** 1268:16 1271:8
1277:20

**clock** 915:23 916:6
1156:21 1238:5

**close** 959:24 1065:25
1189:16 1200:12 1206:15
1268:18

**closed** 913:24 1077:17
1081:3 1217:7

**closer** 1112:13,22,23,24
1113:1,7 1196:20

**closing** 933:21 1013:18
1065:24

**Cloutman** 903:20

**club** 1213:4,6,7

**clump** 1262:16

**coaching** 1268:6,14
1274:7,14 1276:10,20

**coast** 1211:17

**cockpit** 1209:20 1213:25
1214:3

**code** 1047:16

**Coke** 1215:25

**collection** 1122:25

**collective** 1145:15 1202:6
1252:24 1253:1

**collectively** 956:8

**Colleen** 1229:12,13,14,18,
22

**college** 959:13 1180:12
1205:23

**collusion** 1151:19

**Colorado** 1180:3 1275:8

**combat** 1062:11

**comfortable** 907:1
1109:16 1210:18 1276:3

**command** 953:21

**comment** 915:13 959:11,
12 972:9 979:24 1000:7,13
1023:25 1035:6 1134:20
1247:7,8

**commentary** 968:2,6

**comments** 958:6,12,13,21
959:2,3,8,10,19 960:3,20
979:23 989:1,2,5,8,9,13
990:9,17,22 991:13,18
1016:18 1028:12 1062:22
1065:3,5 1126:11 1276:6
1277:8

**commit** 911:15

**committee** 954:12 956:7
1260:6

**common** 915:7

**communicate** 909:4
1050:3 1171:14 1172:5
1255:4 1271:8

**communicated** 1171:9

**communicating** 1024:5
1037:10

**communication** 933:25
1024:10 1028:3 1039:6,8,
10,15 1040:10 1043:7,14
1049:1 1063:6 1174:4
1258:23

**communications** 932:5,
19 1037:8 1038:10
1043:11,15 1048:22
1072:21 1074:21 1127:16
1169:23 1250:24 1262:21
1271:5 1273:23,25

**company** 925:14 930:25
963:25 964:8 993:11
1120:11,20 1121:11
1122:7 1123:12 1137:17
1141:23 1142:6 1169:19
1172:5 1208:9,12,13
1211:22,23 1242:18
1252:5 1254:19 1257:7
1263:16 1272:24

**company's** 1114:6
1123:13 1124:8

**comparing** 1084:25

**compel** 904:23,24 1274:17

**complain** 1049:11 1092:6
1169:18 1259:4

**complained** 1042:8
1071:24 1225:12,18
1259:3

**complaining** 954:18
1031:18,21 1032:8,10,12,
25 1041:3,16 1047:20
1049:14 1050:6 1118:24
1127:6 1168:22

**complaint** 939:23 940:16,
19 941:3,6,10 942:15
943:13 945:4,12,17 948:2
949:1,20 951:20 953:7
954:17,22 955:20 958:1,8
960:7 966:24 967:11
968:16 972:3 973:7,22
975:10 989:19,24 990:7
1002:7 1004:4 1014:4
1015:15 1031:20 1032:21
1034:8 1042:5,7,10,14,18
1043:6 1048:8 1049:24
1072:23 1135:12 1136:22
1137:7 1139:10 1160:8
1169:22 1172:22 1174:16
1225:19

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 352 of 642   PageID 11293

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Index: complaints..counsel

**complaints** 926:23 943:25 948:11,17,21 953:3 966:14 978:17 983:19 1033:17,18 1034:11,14 1035:12,14 1036:2,3,13 1041:19,23 1047:15 1049:9 1240:11

**complete** 905:10 908:2 1003:10 1135:18

**completed** 994:6

**completely** 1040:18 1098:13 1159:14

**complications** 1187:18

**comply** 907:6 910:18

**complying** 921:21 1043:15 1061:23

**compound** 988:7 990:24 991:7 1006:7,13 1038:5,6 1047:24 1090:10 1119:4

**computer** 912:13 913:7 935:11

**concept** 1088:21

**conceptually** 918:4

**concern** 1270:23 1271:10

**concerned** 911:9 978:24 981:1 1093:6,8

**concerns** 1050:3 1246:6 1268:6,13

**conclude** 1014:9,16 1015:16,24 1040:21 1043:22

**concluded** 979:10 1013:24 1014:24 1016:12 1024:15 1029:7 1040:17, 18 1043:25 1045:19 1054:14 1067:18 1080:8 1104:16 1110:11 1114:19 1147:12 1157:6 1166:7 1279:22

**concludes** 916:15

**conclusion** 905:17 917:7, 12 918:8 919:1 1014:5,21 1015:2 1136:19

**conclusions** 1020:15 1025:4 1029:23 1030:9

**concrete** 1252:11 1277:4

**conditions** 1221:11

**conduct** 908:4 918:5,20 924:14 1027:20

**conference** 908:25 909:1 910:11

**confirmed** 1183:23

**confirms** 1058:20

**confused** 1087:19 1102:25

**confusing** 1034:6 1133:11

**Congratulations** 1265:9

**connected** 1247:4

**connection** 918:4 923:1 1092:24 1171:1 1172:13 1275:9

**conscious** 1078:10

**conservative** 1105:12

**considerate** 967:7

**consideration** 1027:15 1058:9,13 1065:5 1069:12 1071:22 1095:24 1131:23 1132:2

**considered** 969:7,13,21 973:12 998:11,15,18 999:21,23 1004:9 1058:2,5 1068:14 1070:8,20 1071:9, 17,25 1076:23 1114:5 1127:16 1154:13,16

**consistent** 966:23 967:5, 11,14 968:18 969:1 1074:13 1097:25 1098:6 1099:9 1100:6

**consistently** 1149:22

**conspiracy** 974:19 978:13 1149:22 1150:4,18 1151:21 1152:7

**constant** 956:15

**constantly** 1240:7

**Construction** 1267:13

**consulted** 1172:13

**consulting** 1143:13 1233:21

**contact** 1171:21 1184:1 1209:15

**contacted** 1095:7

**contacting** 1072:22 1172:1

**contained** 999:15 1000:1

**container** 1188:16 1189:18

**contemplate** 917:4

**contemplates** 1274:5,6

**contemplating** 1067:9,12

**contempt** 906:20 911:7,13

**content** 1045:10

**contents** 1140:18

**context** 918:18 936:16 1035:13 1049:9 1168:22 1266:11

**continue** 921:22 963:18 1023:2 1068:9 1154:23 1183:10 1205:16 1234:12, 24

**continued** 922:1 981:16 1006:20 1023:23 1061:19 1180:5 1228:9

**continues** 1048:3 1231:10

**continuing** 1035:1 1119:20 1156:11,18

**continuous** 950:6 1127:4

**continuously** 1022:4

**contract** 1220:21 1221:4, 22,23 1222:10 1223:4,8,22 1224:2 1243:25 1253:16, 25 1254:5,6,8,17 1255:10

**contracts** 1253:13

**contrary** 1270:7

**control** 956:18,19 1159:16 1183:13 1250:18 1272:15

**controlled** 1269:16

**controlling** 1196:1 1197:5

**controls** 1146:10

**conversation** 1075:13 1207:17 1211:6 1238:13

**Conversations** 1251:25

**COPE** 1217:14,15,17,20

1218:13,24 1222:14,17,24 1235:7,10

**copied** 1172:16,17

**copy** 910:19 944:8,9,17 975:9 981:25 1048:12 1086:7 1169:21

**core** 1101:24 1102:12,20 1103:6,7,22 1104:6,25 1248:5 1249:3,14 1250:23 1251:2,8,19,22,23 1252:7

**Corinth** 1178:10

**Corliss** 1169:1,4 1174:6

**corner** 1215:9

**corporate** 1195:18,21 1270:22 1271:2,3 1272:3, 8,16 1273:8,10,14

**corporation** 1269:4

**correct** 913:2 914:12 915:18 916:2 922:13 944:25 958:7 983:12 995:12 998:3 1000:10 1001:13 1018:9 1027:23 1028:20 1029:19 1033:10, 16 1042:24 1045:6 1053:3 1057:2 1069:14 1071:6 1072:10 1074:11 1077:23 1078:4 1092:1 1099:12 1101:19 1106:17 1114:15 1115:24 1117:2,7,10,16 1120:5,6 1121:20 1124:21 1134:11 1135:7,14 1136:11,13 1139:5,17,23 1140:1,3 1141:24 1157:5 1172:20 1173:9,10 1174:16 1224:10,11 1228:7 1240:23 1241:14 1245:20 1257:8

**correctly** 954:15 1223:25 1226:23 1228:2

**corrupt** 1034:19 1127:12

**corruption** 1034:20

**counsel** 905:16 915:16 925:16 946:20 1003:6 1018:3 1059:11 1064:7 1087:22 1109:17 1134:5 1135:17 1148:4 1154:7 1164:6 1233:22,25 1234:9 1266:16 1268:5,12 1270:13 1271:5 1274:1,8,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 353 of 642   PageID 11294
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Index: counsel's..Dalak

13

**counsel's** 1065:3,5
1133:10

**counseling** 1191:18
1195:8

**count** 916:5

**counterparts** 1154:8

**country** 1106:24

**counts** 1064:17

**couple** 1007:22 1101:6
1134:25 1184:11 1203:1
1222:23 1246:13 1259:1
1270:15 1275:5

**court** 903:3,4,7,13,17,22
904:18,22 906:1,9,12,17,
20 907:8,13,17,21 908:3,7,
11 909:9,18,23 910:4,7,10,
14,23 911:3,9,12,20
912:17,20 913:1,3,11,16
914:2,5,12,16,21 915:14
916:2,9,19,21,22 917:1,10
919:3 920:6,18,24 921:2,6,
11,17,20 922:18 923:4
925:6,25 926:14 929:1,4
931:25 933:3,8,16,19
935:15 936:10 937:13
938:14 939:15,20 940:25
941:23 942:21 944:5,20
945:20 946:21 947:20
948:6,9 949:6,9,23 950:2,
8,23 951:11,23 952:20,23
953:13 954:6 955:9,17,24
956:3,13,18,24 957:11,21
958:24 959:6,16 960:10,
21,24 961:4,7,9,10,12
962:3,6,11,15,18 963:2,3,
17 965:12 967:18,21
968:3,6 969:19 970:16,19,
23 971:1,7 974:11,23
976:2,14,20 977:3,8,20
978:4,23 979:9,12,13
981:11,17 983:6,9 984:15,
16 985:2,3,11 986:16,21
987:13,17 988:11 990:14
991:3,7,22 992:22 993:1,5
994:9 996:7,10,12,15
997:10,24 1000:22,25
1001:9 1002:13 1003:6,9
1005:24 1006:8,14,23
1007:15 1008:11,15,18
1009:21 1011:2 1012:14,
17 1013:10,19,22 1017:12,

20 1018:2 1020:2 1021:19
1022:9 1023:3,8,13,15,20
1024:1,4,9,17,18 1029:12
1030:19 1033:5 1035:2,18,
21 1037:13 1038:6,14
1039:19 1045:11 1046:17
1048:1,4 1050:16,23
1051:8,10,13,17 1055:2
1059:11,16,19,23 1060:5,
9,19,21,25 1061:3,15,25
1062:2,5,18,24 1063:2,9
1064:11 1065:1,15,21
1066:3,9,12,24 1067:8,13,
16,20,21,22,24,25 1068:13
1071:19 1072:3 1073:1,6,
9,11 1075:24 1076:10,16
1078:15,21 1079:13,19,21,
25 1080:5,10,11 1083:8
1084:22 1085:13,16,19
1087:23 1088:4,8 1090:11,
14 1091:13 1092:16
1093:2 1094:8,18,21
1095:1 1096:7,9 1099:5,13
1100:13,15,17,19 1102:5,
15 1103:11 1104:5,13,15,
18,19 1106:9 1109:11,15,
18 1110:6,10,13 1111:17
1113:12,15,17 1117:25
1118:5 1119:21 1121:14
1123:10 1124:10,13,15,17,
25 1125:2,6,20,23,25
1128:25 1129:16 1130:6,
25 1132:5,14,19,23
1133:17,22 1136:14
1137:1,10,20 1138:2,5,18
1140:11,14,22 1141:11
1142:2,12,17,20 1143:15
1144:1,16,20,22 1145:3
1146:7,19 1147:1,14,15,
20,25 1148:16,22 1149:2,
4,6,10,19 1150:7,12
1151:12,16 1152:2,4,9,11,
13,14 1153:9,15,18,25
1154:17,20 1155:2,18
1156:1,3,11,12,18,19
1157:5,8,11,21 1158:14
1160:13,15,22,25 1161:10,
16 1162:4,15,18 1163:3,17
1164:1,3,8,14,20,22
1165:5,11,15,19,23
1166:2,6,9,12,15,22
1167:6 1168:7,8 1170:8,
11,14,16,21 1171:4
1173:1,15,18 1174:20,22,
24 1175:6,10,16 1197:1
1228:24 1230:9,13,15,22,

25 1231:4,10,15,16,21,24
1232:5,14,15,25 1233:10,
12,13,14,17,20 1234:4,11
1239:6 1246:1,10 1249:6,
11 1251:7 1252:11
1254:24 1260:23 1261:5,
14 1263:20 1264:24
1265:1,12,18,25 1266:3,8,
18,20,25 1267:3,4 1268:8
1269:20 1270:21 1271:9,
15 1272:7,10 1273:2
1274:2 1275:1,10 1276:3,
5,20,24 1277:12 1278:5,11
1279:14,21

**court's** 1065:6 1164:13
1233:21

**courtesy** 921:14

**courtroom** 909:12 921:1,
10 962:17 963:15 1060:4,8
1061:21 1068:7 1147:24
1149:8,9 1154:19 1161:6,
11 1166:14 1175:3,5
1230:21,24 1232:10
1234:10 1265:11,13

**courts** 1274:7

**covered** 975:1 1023:17,20

**covering** 1129:10

**covers** 1121:6 1128:12
1129:5 1130:9

**cozying** 1151:4

**cramping** 1189:3

**crazy** 1038:3 1065:22
1067:7 1213:17

**creaks** 1155:5

**create** 928:13 974:15
1086:2

**creates** 1088:17

**creating** 1102:4

**credibility** 963:22,24
964:2,3,6,7,15,19 965:1,3,
6,8,9 969:5 974:8 978:15
981:5

**credits** 1179:21

**crew** 1171:17 1209:20

**crew-wise** 1209:20

**criminal** 1151:20 1161:21

1164:4 1165:6 1268:9,10
1274:9,12

**critical** 1271:2,22

**cross** 1065:24 1267:23
1273:19

**cross-examination**
1133:1 1170:23 1173:2
1233:24 1268:13 1273:23
1276:9 1278:2

**cross-examine** 1163:21
1164:21 1268:16 1274:14

**crosses** 1154:8

**crossing** 1079:17

**Cruces** 911:25

**crucial** 1007:9

**crux** 969:12

**crying** 1078:1 1189:25
1190:10 1199:20 1264:18

**cue** 909:24

**culture** 1212:9 1229:15,16

**cups** 1214:9,24 1215:15
1216:1

**current** 935:5 1010:18,19
1011:4

**cursor** 1105:9

**cutting** 1065:19

**Cuyler** 1243:5

**cyber** 998:8,9

**cyberbullying** 995:16,18,
21,22,23 996:1,24 997:14
998:3,11,13,14,21,24,25
999:2,11,13,15,25 1000:5,
7,13,17 1001:4,12

**cycles** 1189:3

---

**D**

**dad** 1177:5,7,21,25
1178:22 1180:3 1182:10
1196:3

**daddy** 1220:4

**daddy's** 1219:23

**Dalak** 1236:20 1237:8

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Index: Dallas..disagree

**Dallas** 909:11 1178:2,10, 11 1204:15 1212:19 1220:20 1221:6 1235:15

**Dallas-based** 982:14

**Dana** 1179:12,13,14 1182:15 1184:11

**darn** 1244:19

**date** 979:23 1106:18 1179:3 1235:22 1254:5

**dated** 1179:15 1182:13 1192:6

**dates** 928:8 1054:12 1113:4

**dating** 1179:8 1181:20 1198:9 1267:18

**daughter** 1205:20

**Dave** 1052:8,25

**day** 903:5,8 941:17 945:22 979:4 1018:6 1111:12 1113:1,5 1158:11,19 1162:8 1163:5 1165:8 1177:18 1178:24 1183:14 1192:15 1196:25 1201:1 1205:17 1208:23 1209:6,7 1216:21 1220:15 1230:10 1232:17 1236:15 1248:3 1264:1 1278:14,19

**daycare** 1205:9

**days** 954:14,21 1065:11 1139:3 1151:3 1184:12 1185:10 1215:7

**days'** 1151:14

**DC** 1039:24 1260:7

**deadline** 907:25

**deal** 1193:7 1205:16 1254:10,11

**dealing** 1194:22

**dealt** 917:11

**Dear** 954:8

**December** 956:7

**decency** 1164:16

**decertified** 1243:8

**decide** 1026:23 1154:14 1241:20 1261:2

**decided** 929:21 1043:19 1079:4 1155:14 1177:25 1188:3 1195:22 1197:11, 15 1202:20 1203:22 1223:17 1227:6 1250:15

**decides** 1226:1

**deciding** 998:21

**decision** 927:19,22 943:19,21 978:1 1020:11 1054:20,24 1055:23 1057:25 1058:6,11,15 1065:18 1072:15 1078:10 1080:3 1102:11 1103:5 1104:23 1116:19 1131:19 1135:2 1141:17,20,24 1143:12 1155:9 1159:15 1160:1,4 1172:11,14 1173:8 1187:14 1190:2,18 1194:19 1234:2 1270:3 1271:23,25 1272:1,5,6,12, 22 1273:4

**decision-maker** 919:21

**decisions** 1192:24 1275:8

**decorum** 1061:22 1276:24

**dedicated** 1020:19 1021:9

**deemed** 943:17 1016:19

**deems** 943:15

**defendant** 1164:5 1233:21,24 1268:10 1274:12

**defense** 1126:24 1266:13, 16

**define** 919:16 920:3

**defined** 965:8

**definition** 919:9,15 959:13,14 964:14 965:3,5 1088:9 1119:16

**definitive** 1269:10

**degree** 952:8 959:13

**delay** 915:23

**demonstration** 1277:19

**Denise** 1073:21 1113:25

**Denton** 1181:1 1195:8,9 1197:24

**Denver** 988:18 1074:4

1077:12,16 1078:6 1081:7 1241:22,25 1270:2 1272:9

**Denver-based** 987:6

**deny** 1206:17

**department** 1043:20,23

**depend** 937:14 939:2,11

**depending** 1028:8

**depends** 1037:2,14 1066:1 1089:19

**depicted** 1131:5

**depicting** 1114:4 1115:11

**depo** 904:12,22,23,25 905:8 906:4 908:15 914:6 1067:8 1278:6,8

**deposed** 913:22 1272:19

**deposition** 905:20,23 907:12,24 910:18 911:1,4, 10,16,21 912:7 915:18,24 916:17 1066:4,13 1168:21

**depositions** 913:25 914:7,24 915:1 1067:2

**depression** 1192:13 1193:7 1195:4 1196:10,14 1200:21

**depressive** 1191:16

**deprive** 1233:24 1270:13

**depriving** 1271:7

**deranged** 1096:2

**derogatory** 1248:18 1257:25

**describe** 1171:13

**description** 1277:2

**designate** 1271:3

**designated** 1269:15 1270:22

**designation** 1066:4

**designed** 918:23 1215:22 1246:22

**designee** 909:25

**desk** 935:21

**despicable** 1039:24

**detail** 994:13 1002:21 1036:17

**detailed** 1122:25

**details** 936:1,3 937:20 956:25 957:3 994:12 1002:20 1099:24

**deteriorate** 1195:2

**determination** 1116:18

**determine** 905:20 974:8 1005:15,16 1007:6 1053:5 1055:6 1069:15

**determined** 1028:24 1029:8,13,16,17 1044:11, 15

**determining** 969:4

**devastated** 1194:6

**develops** 1197:23

**DFR** 1143:5 1144:13,16,18, 19,24 1145:6,19 1146:15 1156:25

**DG** 1073:20 1082:12

**dial** 908:17 1062:25 1063:4 1064:8,23

**dialing** 908:19

**dies** 1119:17

**difference** 952:10,13,14 972:7 1005:20 1022:18

**differently** 1036:4 1063:17

**difficult** 909:12

**dig** 1277:17

**dilated** 1188:20

**dime** 1260:12

**dire** 904:2

**direct** 922:1 1167:7 1175:19 1233:23

**directly** 957:9 972:15 1145:19

**director** 1167:24

**directs** 1154:7

**disagree** 1076:20,21,24 1108:22 1144:13

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 355 of 642   PageID 11296
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Index: disagreed..employee

**disagreed** 1140:17

**discharged** 1232:22

**discipline** 928:17,22 966:7 979:1 1112:19

**disclaimer** 1070:1

**disclose** 1268:18 1274:17 1278:18

**disclosure** 903:23

**disclosures** 1278:13 1279:2

**discovery** 913:24 914:14

**discrete** 933:19

**discrimination** 1114:7 1158:24

**discuss** 905:16,18 918:12, 15 1069:25 1187:19 1198:19 1222:23,25

**discussed** 956:12 1157:20 1277:11

**discussing** 1221:10

**discussion** 903:6 907:7 934:1 935:23 938:4

**discussions** 1156:5 1237:18,20 1273:21

**disgusted** 1191:3 1243:16

**dismissing** 1266:15

**disparaging** 1120:11

**displayed** 966:1 1068:12

**displaying** 1133:23

**dissuade** 938:5

**distinction** 972:19 1163:1

**disturbing** 961:18 995:8

**divorced** 1197:9 1208:12

**docket** 1277:5

**doctor** 1183:19,22,25 1186:13 1188:9 1194:1,10

**document** 944:19 946:3, 10,17 958:23 959:25 965:15,16 967:10 976:13 977:14,25 978:12 981:1 983:5 996:17 999:7 1001:4 1010:23 1036:12 1041:12

1042:15 1045:9 1050:7 1051:19,22 1052:1,7 1057:6 1061:9 1068:16 1073:13 1076:9 1085:21 1095:3 1100:4,21 1113:19 1118:8 1125:8 1126:2 1134:6 1140:6 1167:18 1170:18

**documents** 1010:9 1035:23 1036:18,20 1086:1,18 1275:23

**dog** 1226:17 1262:18

**dollar** 1134:21 1269:1

**dollars** 1218:3 1227:25

**domicile** 1237:1,2 1251:12

**Don** 1236:20 1237:8 1250:14

**donate** 1203:2

**donated** 1202:17,18

**Dondi** 1061:24 1062:16

**door** 1214:14 1215:23

**double** 1252:18

**doubt** 1064:16

**draft** 1009:10 1010:13 1115:1

**drafts** 1007:22 1008:21

**drag** 1086:8

**drawing** 1216:3,4

**dreading** 907:11

**dreams** 1263:7,11

**dress** 1257:18

**dressed** 1114:17

**drill** 1178:12,16

**drinks** 1214:15

**drop** 904:25 906:4,12

**dropped** 1182:24 1183:7,8

**drug** 1207:21

**Drummond** 1221:8,14

**drunk** 1221:16

**due** 908:1 924:13 1029:6 1114:18 1126:15 1196:5

1224:23 1226:11 1267:17

**dues** 1097:14,15 1218:5 1222:14 1235:6 1243:22 1244:6 1245:7,12,13 1257:3 1260:8

**dues-paying** 1236:6

**duly** 1166:20 1175:14

**duration** 915:1

**duty** 914:17 1135:1,5,13 1136:6 1139:9,10 1145:12, 21 1150:14,21 1152:24 1160:12,18 1162:23 1163:7 1225:13 1232:22

---

**E**

**earlier** 973:1 1006:16 1068:17,19 1111:3 1112:4 1120:16 1130:19 1132:7 1144:5 1154:5 1218:11

**early** 962:8 963:6 979:2 1059:13,20,21 1155:22 1179:17,20

**ears** 1155:3 1258:5

**Easter** 1177:17 1178:24

**easy** 916:10

**ectopic** 1193:17

**Ed** 994:19 1105:15 1131:4 1139:18 1198:16 1264:8

**Eddie** 1101:7 1102:10,20 1103:4 1104:22

**edited** 1115:12

**education** 952:5,7

**Edward** 903:20 912:23

**EEOC** 1225:18,19

**effect** 1079:25 1239:6

**effective** 1262:4

**effectively** 909:4 1270:13 1271:5

**efficiency** 1181:2,13

**efficient** 905:22

**effort** 1081:18

**efforts** 1150:2 1154:12

**dues** 1097:14,15 1218:5

**1158:7 1159:12**

**egregious** 1037:15

**egregiousness** 968:22 1027:14 1112:19

**Eighty-nine** 1073:6,11

**elected** 1224:6,8 1228:2 1237:23 1238:16 1239:18 1240:21 1241:12

**election** 1236:10 1237:23 1249:21

**elections** 935:4

**electronically** 1236:1

**elevator** 1279:13

**else's** 951:16 1072:16

**email** 912:5,19,20 916:14 935:12,14,16 936:2 938:2 944:24 950:15 951:25 978:18 979:19 982:10 982:25 986:11 987:4 988:2,16 989:6,14,22 990:9 991:11 994:15,24 995:4 1054:8 1058:21 1085:24,25 1095:6 1165:20 1167:18,22,25 1168:3 1169:3,10,15 1171:1 1172:5 1174:3 1246:19 1247:10 1278:8

**emails** 935:1 937:17 959:17 1113:23 1170:2 1218:11 1279:18

**embezzle** 1227:19

**embezzled** 1225:2

**embezzling** 1238:25

**emergency** 908:22 1194:4 1210:8

**Emlet** 931:6,7,16,19 1008:24 1085:25

**emphasizing** 1075:15

**employed** 1088:14 1090:4 1167:12

**employee** 934:21 935:1 936:4,22,24,25 937:3,5,7, 21,22 938:9,22,25 939:7,9 941:16 979:17 1015:4,11, 12 1027:16,17,19 1037:10 1043:20,23 1044:8,17

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 356 of 642   PageID 11297
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022          Index: employee's..Facebook

**1045:**5,13 1053:2,4,22 1054:22 1055:19 1056:4 1058:22 1088:13 1089:20 1090:19 1114:1 1119:9 1120:10,20 1122:8 1126:9 1133:16 1135:12 1136:21 1137:6,23 1138:9

**employee's** 926:19 930:19

**employees** 932:13 936:6 948:11,12 953:18 966:18 967:6 1027:10 1037:9 1101:11 1118:21 1120:12 1122:1 1128:10,13 1129:5,10 1135:6

**employer** 1263:8

**employment** 1159:3 1172:11 1217:6 1271:22,24

**en** 1175:12

**encumbrance** 1055:5

**end** 914:3 990:25 1018:6 1066:10 1162:8 1163:5 1165:8 1204:20 1226:4 1242:24

**ended** 1179:8 1180:7,8 1181:23 1207:20 1219:23 1223:18 1225:17 1227:3 1243:2

**enforces** 1090:22

**engaged** 924:18 1172:21

**engaging** 955:21 1037:7

**ENIS** 1143:24

**enjoyed** 1209:9

**enter** 1068:4 1091:6

**entered** 910:20 921:1,10 963:15 1068:7 1154:19 1166:14 1234:10

**entertained** 1154:9

**entire** 942:11 960:8 1145:14 1153:19 1238:15 1246:24

**entitled** 914:23 925:21 938:12 966:19 1000:24 1012:16 1022:5 1088:2

**entity** 924:5

**envy** 1159:7

**equal** 1134:18 1159:2

**equivalency** 1094:7

**error** 1010:8,10,12

**errors** 1140:5

**escalate** 1028:5

**essentially** 1158:8

**eugenics** 1050:9,18

**evade** 1064:13

**evading** 1064:18

**evaluate** 943:24 967:3

**evaluating** 963:22

**evaluation** 973:12

**evasion** 1063:9

**evasive** 932:10,11 1012:10,15 1013:7,16 1024:13 1033:11 1064:17

**evening** 908:2 1181:4

**event** 1130:11 1206:6

**events** 1248:2

**eventually** 906:24 1040:16 1183:3 1184:17 1186:15 1235:15 1240:18 1253:17

**evidence** 914:24 967:4 969:13,21 973:13 976:14 977:15,25 978:10 985:6 996:9,18 1039:17 1051:7,17,20 1060:14 1061:8 1063:11 1065:25 1068:11,15,21 1073:14 1085:22 1094:17 1095:4 1100:12,22 1108:20,21 1109:10,12,14 1113:11,20 1118:9 1125:9 1126:3 1134:1 1143:19 1151:13,15,18 1156:7 1167:15 1168:6 1170:19 1275:22 1278:19

**evoke** 918:24

**ex-husband** 1208:7

**exact** 968:20 1243:23

**exam** 1273:19

**examination** 922:1

1167:7 1173:19 1175:19 1186:15

**examined** 1188:11

**examining** 1188:4

**exception** 1033:23,24 1034:2 1164:13

**excessive** 1172:3

**exciting** 1207:19

**excluded** 1232:5,9

**exclusively** 1048:7

**excuse** 984:25 1008:10 1145:9 1257:22

**excused** 1160:25 1164:9 1175:1

**executive** 1236:21,25

**exercise** 1277:18

**exercising** 1107:1 1263:9

**exert** 1173:11

**exhibit** 920:19 944:4,23 965:14 968:14 971:10 972:25 975:9 977:15 978:5,7 981:19 990:3,16 995:6 996:2,11,18 1008:4,22 1010:15 1031:2,3,7 1038:16 1051:4,9,11,20 1058:19 1059:7,10 1068:11 1072:25 1073:3,4,5,14,17 1085:10,12,22,24 1094:16 1095:4 1096:11 1097:2 1100:10,11,14,22 1105:3 1113:10,11,20,22 1117:22 1118:9 1124:23,24 1125:9,11,16,19 1126:3,5 1130:13 1134:4 1139:13 1167:14 1168:9 1170:5,19

**exhibits** 912:11 920:18

**existed** 978:13

**exists** 1149:22

**exit** 1210:4,8

**exited** 962:17 1060:4,8 1147:24 1149:9 1161:11 1175:5 1230:21,24 1265:11

**Exodus** 1202:4,11,12 1204:5 1205:2

**expand** 1149:17

**expect** 941:18 943:14 947:12 1279:3

**expected** 943:12

**experience** 953:2 987:3,25 1187:25 1196:22 1200:23 1203:14,16 1211:18 1223:4 1234:19

**expert** 1159:4

**expired** 1254:5

**explain** 928:19 964:3 1204:11 1218:25 1262:4

**explained** 1188:10 1217:5,15 1233:4

**explaining** 1234:19

**explains** 1107:20

**explanation** 951:19 957:13

**explode** 1218:13

**exploring** 953:12

**expose** 988:23

**express** 1164:5 1261:23

**expressed** 1258:21

**expressing** 1263:1,13

**extend** 907:25

**extension** 1095:12 1279:6

**extent** 923:20 1002:14 1047:20 1075:9 1197:20 1273:20

**extremely** 918:9

**eyes** 959:24 1189:16

**F**

**F.2d** 1267:14

**F.3d** 1266:24

**face** 1232:2 1241:18 1277:18

**face-to-face** 1011:15 1012:1,3,5,7,22 1013:3

**Facebook** 928:3,14 929:14,18 930:14 954:9

972:5 1018:10,13,15,17, 20,22 1019:4,10,12,17,19 1020:6,18,19,20,23 1021:8,9,22 1022:15,17 1023:16 1024:23,24,25 1025:19 1026:23 1027:3 1028:18,23 1039:11 1046:6,9 1069:20 1070:2 1071:9 1072:1 1074:7 1077:13 1086:2,13,19 1087:6,18 1088:16 1090:18 1091:16 1092:25 1096:3 1098:21 1101:24 1103:7 1105:1,6 1111:12 1112:3,8 1118:14,15 1120:9 1125:13 1126:21 1127:10 1246:21 1247:5, 15,20 1250:7 1259:12

**faces** 1056:13

**facets** 1130:12

**facial** 1232:25

**facilitate** 1149:24

**facilities** 1203:9,13

**facility** 1203:8

**fact** 917:24 928:13 941:15 942:13 951:6 954:1 964:20 970:3 974:2 975:13 976:4 984:8 993:16 1006:3 1013:14,24 1015:16 1025:2,9 1043:25 1044:7 1053:9 1072:14 1100:2 1116:21 1123:6 1138:13 1141:23 1145:23 1152:21 1182:21 1196:5 1200:18 1219:2 1222:10 1226:11 1241:15 1254:3 1262:5

**fact-finding** 914:16 1014:11 1040:19 1049:23 1073:18 1095:9 1126:20 1146:2,3 1263:6,18

**factors** 1145:13

**facts** 939:6 1109:10 1111:19 1269:22 1272:12

**factual** 1144:17

**factually** 918:4 1271:18

**failure** 910:17 911:8

**fair** 904:7 917:7 933:13 942:7,9 1015:22 1023:19 1029:18 1040:12,23

1058:8,13 1078:25 1117:15 1124:6 1130:5 1141:2,6 1145:12,21 1150:14,21 1152:24 1216:11 1252:16

**faith** 1177:11,14 1178:9,19 1179:1 1197:23

**faith-based** 1198:11

**fall** 923:19 1245:11

**falling** 959:12

**fallopian** 1193:20 1194:15

**falls** 1215:24

**false** 1094:7 1143:11 1224:23

**falseness** 969:5

**familiar** 945:9 1052:3 1098:13 1113:22

**familiarity** 1063:10

**families** 1204:9 1210:16, 18

**family** 1199:11 1200:9,19, 20

**family's** 1177:11

**fan** 1237:20

**farther** 945:5 995:2

**fascinating** 1165:3

**fast** 1191:25 1196:24,25 1226:1 1237:22 1238:7

**favor** 1268:12

**favorite** 1210:11

**FBI** 906:2

**February** 939:22 940:21 942:15 980:3 1042:7 1055:18 1059:8

**fed** 1244:19

**fee-based** 1243:20

**feed** 1133:22

**feel** 921:4 934:24 979:5 980:25 1074:2 1153:13 1187:4 1188:18,22,24 1191:19 1194:23 1201:15 1211:21 1218:16 1241:17 1243:14 1257:1 1273:17

1277:25

**feeling** 1183:20 1188:6 1198:7 1253:4

**feet** 1204:19 1214:20

**fell** 1264:17

**fellow** 962:11 966:18 975:7 1147:20 1230:14 1265:1

**Fellowship** 1198:1

**felt** 1155:8 1198:20 1200:16,24 1201:3,16 1203:18 1212:10 1225:13 1261:22

**female** 1029:6

**ferret** 1268:19

**fetus** 958:4 1044:5 1120:17

**fetuses** 1044:14 1118:14

**fight** 1064:9 1145:17

**fighting** 966:16 971:11 1038:9 1226:24 1227:5,9 1263:4

**figure** 920:16 996:2 1009:4 1010:16 1013:5 1054:5 1144:11 1147:8 1253:17 1265:19 1268:21 1274:16 1278:21

**figured** 1192:19

**file** 928:17 929:11,13,15 930:10,19 1226:2 1243:10 1277:4,6 1279:9

**filed** 941:4 968:16 976:6 1225:18 1226:24 1227:1, 13,15

**files** 1002:7 1004:4

**filing** 966:23 967:11 1240:3,6

**filings** 1279:18

**final** 1115:24 1116:11 1118:11 1127:25

**finally** 953:24 1177:25 1182:25 1184:25 1195:13 1199:16 1201:3 1208:24 1218:13 1224:8 1249:2,18 1264:8

**financial** 1069:21

**find** 937:15,16,20 940:4 984:7 993:20 995:7,11 1011:23 1038:8 1047:4,21 1075:6 1082:4 1091:18 1092:24 1096:19 1097:18 1115:23 1149:15 1162:7 1186:17 1187:11 1209:10 1231:19 1277:3 1278:3

**finding** 1183:4,15 1194:3 1249:13

**finds** 939:7 1146:13 1231:25

**fine** 961:11 1064:23 1133:20 1153:25 1176:24 1197:21 1248:16 1265:17 1278:25

**finish** 1067:1 1083:7,8,14 1162:12 1265:14

**finished** 1083:11 1180:5

**fire** 937:24 1015:21 1016:1, 4 1017:3 1018:7 1040:22 1048:25 1092:13,18 1094:3 1263:8,12 1272:24

**fired** 935:7 936:16 994:5 1007:11,16 1015:17 1016:6,9,13,15,19,21 1039:6 1046:15,23 1082:21 1083:16 1084:4 1093:25 1117:3 1150:23 1243:3 1264:5,10

**firing** 937:25 1007:9

**fix** 1008:19 1023:14

**fixed** 1010:11

**flat** 912:9

**flesh** 949:4

**flew** 1209:19 1210:22 1219:22

**flight** 932:6 953:18 954:10 966:12,13,24 967:12 968:17,22 971:14 979:22 982:14 1001:20 1002:2,6,7 1004:1 1005:2 1011:24 1014:19 1074:4 1082:19, 20 1083:1,2,5,15,16,23,24 1084:2,3,16 1085:6 1109:3 1110:19 1118:15 1119:2,3, 7,11,14,16,24 1120:11

1135:25 1137:23 1138:9
1151:8 1171:8 1195:17
1209:5,8,9,20 1212:20
1217:16,21 1218:6,24
1219:20 1221:8,9 1222:5,
19,21 1223:2,23 1243:20
1255:15

**flights** 1212:16,18

**floor** 1242:8

**floored** 1199:9

**flown** 1089:19 1207:4
1226:5,6,8 1227:16

**fly** 1138:15 1139:7 1197:12
1210:11 1253:19,20,21

**flying** 1138:22 1152:16
1195:16,20 1207:6
1209:25 1210:1,2 1219:19
1220:4 1226:10 1235:22
1247:20

**focus** 1087:5 1159:14

**folders** 944:10

**Foley** 985:16

**follow** 911:8 916:1 926:23
1096:5 1102:6 1199:1

**footnote** 1269:3

**forever** 929:17 1203:21

**forget** 960:7 1042:17
1170:1,3 1209:2 1216:15
1244:20

**forgive** 1196:17,23
1198:25 1199:2,3 1201:13,
14

**forgiven** 1185:20 1196:16,
17 1201:3 1206:9,20

**forgiveness** 1201:2

**forgiving** 1199:6

**forgotten** 922:21 1023:22

**form** 912:9 1021:17
1064:22 1099:16 1249:8
1260:22 1261:5

**formal** 955:13

**formed** 1187:1 1262:15

**forming** 1193:19

**forward** 1037:17 1163:1
1187:15 1191:25 1196:24,
25 1226:1 1237:22 1238:8
1252:19 1254:1

**forwarded** 944:25 945:7
946:8,10

**found** 940:3 961:17 982:20
984:6 1027:22 1105:8
1133:10 1178:13 1180:25
1182:15,17 1185:7
1193:22 1194:1 1195:8
1197:25 1198:6 1218:13
1248:4 1256:8 1259:20
1263:23 1270:7

**foundation** 920:11 940:23
941:21 942:20 948:4,6,9
949:3,10,25 954:5 974:9,
11,15,16,23,25 984:13
985:9 986:18,21 987:10
997:9 1008:7,14,16
1009:17 1023:4,5,6 1072:2
1075:23 1076:15 1078:13
1084:20 1090:12 1091:10
1093:1 1102:2,4 1103:21
1106:8 1109:9 1123:9
1136:23 1137:9 1138:17
1140:8,19 1142:9 1143:25
1239:4

**foundational** 923:13

**four-digit** 1229:6,8,9

**fourth** 915:10 1010:17
1097:3

**frame** 992:18,24 993:2,7,9,
22 1252:23

**framework** 1268:20

**frank** 1221:16

**fraternity** 1184:13
1193:12

**free** 934:24 1074:2 1135:6,
9 1161:7 1177:8

**freedom** 1251:20

**freely** 1251:21

**frequent** 1171:20 1174:1

**frequently** 1171:12

**Friday** 945:22,25 946:2,18
1035:15,24 1036:10

**friend** 1183:21 1190:21

1200:10 1242:25

**friendly** 1074:6 1126:12

**friends** 1199:11,23
1219:24 1228:20 1229:22
1248:19 1250:2 1251:14

**front** 912:11 944:7 999:17
1008:5 1057:6 1153:14
1186:9 1211:7 1213:10

**Frye** 908:17 1165:20
1166:18

**fucktard** 1248:24

**full** 903:23 922:11 1024:24
1152:15 1181:14 1198:15
1244:6 1273:19

**full-time** 1081:15 1181:6
1193:12

**fullest** 1273:20

**fully** 1153:6

**fun** 1104:9 1218:18
1248:25

**fund** 1217:18 1222:18
1245:12,13

**fund-type** 1218:1

**funds** 1202:17

**funny** 1212:20

**Fusion** 1247:21

**future** 920:15 956:9

_____

**G**

**gallery** 932:15

**galley** 1214:13 1215:1,22,
25

**gambit** 1121:7

**game** 1141:15

**Garry** 1221:7,14

**gather** 1268:2

**gathered** 929:14 989:12

**gathering** 980:14

**gave** 921:11 928:18 929:24
973:19 978:10 997:18
1033:13 1065:16 1117:8
1188:5 1202:22 1204:21

1216:24 1268:8 1279:5

**gay** 1248:21

**Geders** 1233:9 1265:24
1266:2 1267:16,23 1268:7
1273:18 1274:2,5 1277:25

**general** 924:6 926:13
931:9 1015:5 1053:24
1055:9,12,14 1075:9
1083:17 1267:16 1271:10
1276:13,24

**generally** 911:22 924:3
952:6 966:10 994:23
1016:4 1017:3,7 1057:8,9,
12,13 1116:5,13,25
1171:13 1275:15

**generous** 906:6

**genital** 1258:6

**genitalia** 1029:6 1045:1
1056:11,13 1057:19
1058:3

**gentleman** 1179:5,6

**genuinely** 1165:12

**Gilliam** 903:9,10 960:6,13
1067:3,11,14 1125:17
1145:20 1150:10,13
1151:6,13

**girl** 1201:23

**girls** 1202:19,23 1203:2,22
1204:7,12,18,25

**gist** 973:10 1268:2

**give** 906:25 909:20 912:21
921:12,13 922:11 924:13
934:21 981:25 990:3,4
997:17 1001:20 1064:15
1094:24 1104:13 1131:23
1137:22 1142:24 1159:12
1160:20 1162:5 1231:2,4
1233:10 1234:14 1266:20

**giving** 965:5 1063:3

**glad** 1165:9 1242:11
1249:18

**glass** 908:21

**glasses** 1214:25

**goal** 906:24 911:3

**God** 1185:17 1191:20
1194:24 1196:16,20

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 359 of 642   PageID 11300
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Index: good..head

1199:1 1201:3,17 1205:25
1206:1,7 1263:3

**good** 903:22 909:9 910:10
913:3 921:7 969:25 982:4
1018:21 1032:13 1059:15
1061:11 1065:17 1066:8
1067:15 1104:14 1133:3,4
1167:9 1171:18 1175:21
1190:21 1196:9 1207:16
1218:17 1219:12 1220:16
1221:12,13 1222:11
1223:2,22 1224:12,13,14
1228:20 1245:17 1264:21,
24 1275:25 1276:18

**gosh** 1211:10,23 1220:23

**gotta** 1214:23

**govern** 1242:4

**governed** 1255:15

**government** 1237:14

**grades** 1181:19

**graduate** 1179:20 1216:21

**graduated** 1179:6,16,17,
23

**graduation** 1216:22

**grandbaby** 1205:24

**grandchild** 1176:11

**grandmother** 1177:15
1180:16

**grant** 1156:19 1157:21

**granted** 1248:7

**granular** 919:4,7 1275:3

**granulated** 920:7

**Grapevine** 1198:1
1202:15

**graphic** 958:3 1118:13
1120:8

**great** 913:16 924:10
963:14 999:16 1073:23
1165:21 1196:8 1211:12
1277:19

**GREEN** 1013:9

**Greenfield** 903:19,24
904:15 907:23 908:6,9
940:22 941:20 947:18

948:3 949:2,8,24 950:20
951:7,21 952:18 959:15
967:15,19 968:1 969:17
976:12,18,22 977:7,18,24
978:6,21 981:10,15
984:12,21,25 986:17
987:14 988:7 990:25
991:20 996:8,14 997:19,22
1006:19 1008:6,10,13
1012:11 1013:11 1017:5,9,
18,25 1022:2,7 1023:1,23
1030:17 1034:23,25
1038:11 1041:8 1048:2
1050:21 1051:12,14,16
1061:2,13,16,19 1062:21
1064:20 1065:7,10
1073:10 1075:22 1076:8
1078:18 1079:11,16,20
1084:19 1085:17 1087:21,
24 1090:12 1092:7 1094:6,
23 1100:18 1103:18,25
1104:2,4 1106:7 1113:16
1118:4 1119:19 1123:8
1125:5,24 1132:16,20,21
1133:2,5,14 1134:2,3,22,
24 1136:15,17 1137:2,11,
21 1138:3,7,20 1139:13,15
1140:16,24 1141:9,13
1142:4,5,10 1143:1,5,17,
22 1144:12 1145:7,12,25
1146:17,20 1147:10
1148:5,6,8,12 1149:14,15,
21 1151:1,10,14 1152:5
1153:3 1154:2,20,23,24
1157:2,9,12,13 1158:1,17
1160:11,17,20 1163:9,13,
20 1164:15 1165:22
1170:13,15 1173:1,3,4,16
1174:23 1233:2,6,11,16,18
1234:7 1239:3 1245:21,24
1246:8 1251:4 1252:9
1254:21 1261:12 1266:19,
21

**Greg** 986:4 1241:22

**grew** 1178:11

**ground** 1214:23 1264:17
1276:8,11

**grounds** 937:5

**group** 1198:6,13,21
1199:6 1200:4,17 1201:22
1202:3,4 1204:5 1207:13,
18 1237:5,7 1240:13,15
1248:5,14 1249:4 1258:13

1262:6,7

**groups** 1105:19 1200:6

**growing** 1177:12,21

**guaranteed** 1233:25

**guess** 905:24 906:17
923:19 1162:25 1173:22
1177:8 1187:5 1200:25
1216:2 1217:11 1225:18
1238:11 1241:4 1269:8
1272:18 1278:12,17,21

**guessing** 1168:18

**guidance** 923:19 1275:14

**guideline** 926:22 928:10

**guidelines** 924:7,11
1101:11

**guides** 1206:2

**guilt** 1196:19

**guilty** 1027:22

**Guttierez** 1073:21 1114:1

**guy** 1243:12,13

**guys** 1009:3

---

## H

**half** 907:22 908:15 911:17
914:10 915:4 1090:23
1195:22 1246:14 1258:10,
11 1278:6

**hallway** 1003:3,16,17
1135:21

**hand** 934:24 990:12,16
1086:6 1166:18 1175:12

**hand-to-hand** 1062:11

**handcuffs** 910:25

**handing** 944:17

**handle** 989:17

**handled** 948:17 953:3

**handling** 948:21

**handoff** 1278:16

**hang** 961:23 1102:13
1142:15 1214:4

**happen** 993:10 1038:22

1039:25 1040:2 1047:17
1093:16 1128:11 1136:8
1147:17 1159:24 1185:2
1199:13 1201:23 1242:20
1278:14,16

**happened** 904:7 989:16
1027:19 1185:9 1190:3
1191:14 1198:23 1199:19
1201:20 1206:23 1224:4,
16 1225:5,6,20 1227:20
1236:8 1238:19,21
1239:17 1240:17,18
1242:23 1263:24 1271:11

**happening** 915:10 971:13
1065:10 1074:14

**happy** 904:2 928:25 949:4
1163:5 1164:25 1165:1
1218:12 1224:8

**harassing** 1130:11
1248:21

**harassment** 1015:10
1029:5 1044:1,7,19
1045:14,23 1047:1
1056:16,18,20,21,24
1058:4 1114:6,14,24
1116:21 1117:4,17
1122:21 1126:25 1127:3,7
1135:7

**hard** 944:8,9,17 968:10
981:25 1086:7 1152:17
1177:6 1235:22

**harm** 1069:21

**harmed** 1236:14

**Harry** 1266:5

**hat** 1040:6,8 1258:18

**hate** 1185:19 1252:1
1274:7

**hated** 1191:21

**hats** 1028:20 1042:24
1045:19 1258:16

**hazing** 995:15,20,24
997:15 998:19 999:14,24
1000:2,7 1004:10 1007:17
1029:5 1046:25 1122:20
1127:20 1128:6,7,8,12
1129:3

**head** 1218:12

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 360 of 642   PageID 11301
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                    Index: heads..impressed

**heads** 1063:18

**health** 1207:24 1208:13

**healthcare** 1185:5

**hear** 908:20,21 909:13,14
910:9 914:17,23 915:7
919:19 955:10,11 960:9
969:1 970:25 985:5 1065:3
1172:8 1187:8 1189:5
1211:5 1232:6 1243:7

**heard** 955:11 975:4
982:12,13 1110:5,6
1220:16 1227:1 1243:17

**hearing** 904:20 909:3
910:17 911:9 916:15
922:14 1146:3 1238:23
1263:18

**hearings** 1143:9

**hearsay** 1078:19 1079:17
1239:5

**heated** 1226:13

**heaven** 1201:12

**heavily** 1190:9

**heavy-handed** 1141:21

**hedging** 1030:13

**heightened** 1268:9
1276:12 1277:22

**held** 923:20 924:4 979:11
1024:16 1067:19 1080:9
1104:17 1110:12 1137:8,
13 1147:13 1149:22
1157:7 1166:8 1177:5
1214:14 1233:20

**helped** 917:16 1195:13
1202:21 1204:22 1238:7
1242:4 1261:20,23
1263:16

**helping** 1214:10

**hemorrhaging** 1193:23

**Hensley** 1242:25

**Herb** 1212:13 1213:14
1215:11,19

**hey** 905:3 918:14 935:2
1055:19 1088:23 1215:10,
11,19

**high** 947:9 1178:11,17

1179:4,15,16,17

**Hill** 903:11 905:14 907:16,
19 977:1 996:3,5 1086:8
1148:18,20,24 1170:6
1232:2,13,24 1265:23
1266:1 1278:10 1279:12

**Hilton** 1003:19 1004:2

**hired** 1225:15

**history** 1123:2

**Hobbs** 1248:19

**Hofer** 986:4 1241:22

**hold** 911:24 941:23 960:21
962:3 967:18 981:11
987:17 991:3 1003:6
1008:11 1009:21 1010:18,
19 1046:17 1084:22
1091:13 1096:7 1138:2,5
1141:11 1147:25 1160:13
1162:21 1164:8 1206:15
1214:24 1249:6 1266:21

**holding** 1098:19 1180:14
1181:13

**holdover** 1161:22 1162:16

**holds** 1011:3

**home** 1177:22 1182:3,13
1190:7,13,20 1208:22
1219:18 1238:12

**homeless** 1180:7

**homework** 1274:4

**honest** 972:24 1179:18
1211:13

**honestly** 1192:19,22

**Honor** 906:7 907:9,23
908:6 916:25 919:20
920:17 921:4 926:16
940:22 941:20 947:18
948:8 949:24 950:5 951:7,
21 955:10 956:11 961:15
967:15,20 976:12 977:18,
24 984:21 985:1 991:20
997:22 1006:19 1008:6,13
1012:12 1013:9 1017:19
1018:1 1022:2,6,7 1023:1,
23 1030:17 1034:24
1038:11 1048:2 1050:21
1051:12 1061:2,14,19
1062:6 1068:10 1073:10
1079:11 1084:19 1085:11,

17,18 1087:21 1088:2
1092:8 1094:6,24,25
1100:18 1102:14 1103:18
1106:7 1113:16 1118:4
1119:19 1123:8 1125:5,24
1136:16 1142:4,15,21
1145:11,20,25 1147:10
1148:13 1151:1 1153:3,4
1154:2 1155:16 1157:2,12,
19 1160:21,24 1161:8
1163:9 1166:10 1168:5
1170:4,15 1174:23 1175:8
1228:19 1233:2,11 1234:7
1239:3 1245:21,24 1246:8
1252:9 1254:21 1261:12
1264:21 1265:17 1266:19
1269:17 1271:20 1273:22
1275:5

**hooked** 1259:19

**hope** 1203:24 1278:6
1279:14

**hopeful** 907:24

**hoping** 1224:9 1235:25
1244:18

**horrible** 1242:8,9

**hospital** 1193:25

**host** 1019:22

**hostage** 906:2

**hot** 1198:18,22

**hotel** 1208:20

**hour** 907:22 908:14 911:17
914:9 922:13 944:13
1059:12 1090:23 1139:3

**hours** 908:8 914:7 963:9
1065:16,22 1277:25
1278:6

**house** 1164:4 1177:14,22
1179:1 1193:11 1204:18
1205:2 1219:23

**household** 1177:20,21

**housekeeping** 1068:1

**housekeeping-wise**
1060:10,15

**housing** 1204:14

**HR** 995:3 1101:8 1126:9

**Hudson** 947:4 1072:22

**huge** 1254:11

**hugs** 1213:16 1215:12

**human** 931:4 1101:8

**hundred** 1227:25

**hurts** 1279:9

**husband** 1091:19 1179:9
1194:24 1195:1,19,25
1196:1 1197:4,8 1205:21
1208:7 1264:13

**hypocrisy** 988:24

**hypothetical** 934:22
935:19 1002:12,25
1003:11 1094:5 1135:17,
24

I

**l-n-c@msn.com.** 912:23

**ice** 1214:9,16 1215:14

**idea** 914:19 1200:24
1210:3 1212:23 1262:13

**identifiable** 1120:9,19

**identify** 1125:11 1126:5
1134:17 1167:14,18

**ignorance** 1165:15

**ignore** 968:9

**Ill** 903:20

**illegal** 930:4 931:14
1102:23

**illuminate** 905:7

**images** 1114:16

**immediately** 1091:5
1193:24,25

**immune** 1273:11

**impact** 1261:10

**impacted** 1025:3

**impartial** 942:7,9

**importance** 1270:9

**important** 974:1 1005:8,
10,15 1021:13 1022:14,16
1208:5,11 1255:8

**impressed** 1222:8

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                           Vol 4 July 08, 2022                    Index: impression..Israel

**impression** 1080:6

**improper** 946:19

**improperly** 1228:4

**in-flight** 947:10 948:1
953:17 1167:24 1195:23

**inability** 907:6

**inappropriate** 1003:5
1143:21

**incessantly** 1127:11,17

**incident** 1069:5 1225:7

**include** 915:20,22 929:13
947:17 984:1 1123:6,16
1158:6 1260:17

**included** 941:6 948:1
950:14 952:4 953:20
983:24 986:11 987:4 988:2
1000:12 1042:6 1043:14
1116:22 1117:17

**includes** 1101:12 1150:4

**including** 1089:24
1122:19

**incomplete** 1002:11,24
1094:4

**inconsistencies** 965:24

**inconsistent** 968:19
969:2,15 1098:6 1099:9
1100:6,8

**incorrect** 1145:20

**incredibly** 961:18 995:8

**indicating** 1098:8

**individual** 1040:4,6
1073:23

**individually** 1041:25

**individuals** 984:14

**inept** 1127:12

**infant** 1105:5

**influence** 1160:1

**inform** 1169:22

**information** 926:20
927:12,15,22 928:3 936:2
937:15 941:14 942:6,23
943:24 944:2 969:7,24
970:7 973:19 974:18

979:22 980:7,15 989:13
1021:3 1091:1,3 1140:21
1185:24 1247:19 1273:20
1274:17 1276:1,2

**informed** 943:12 1164:7

**initially** 999:12

**initials** 1257:9

**inquire** 984:24 1106:14,15

**inquired** 1014:15

**inquiries** 1068:23

**inquiry** 1059:1

**inside** 1193:19 1201:17

**instance** 1050:7 1169:20

**instantaneous** 1038:20

**instruct** 1038:13 1062:3
1155:2

**instructed** 1232:18

**instructing** 1153:15

**instruction** 977:10 978:9
1162:6,8 1163:4 1168:7,9
1276:13

**instructions** 912:5 962:10
1059:22 1147:19 1230:13
1264:25 1265:16

**insurance** 1208:7,9

**integrity** 1127:12

**intended** 1025:7

**intends** 1132:17 1232:8

**intense** 1208:18

**intent** 935:23

**intentional** 957:22

**intentionally** 1009:9,14
1033:10 1064:13

**interest** 1088:14 1156:20
1268:9,24 1276:12
1277:23

**interested** 944:1

**interesting** 1164:19
1165:9 1210:25 1217:13
1236:13

**intermingle** 1278:24

**international** 956:8
1221:14 1225:23 1240:19,
22 1244:8,9,12 1245:2,9,
10

**Internet** 980:14 1186:19

**interpret** 958:18 960:2
971:17 1036:4 1037:5

**interpretation** 971:25
972:8 1037:22 1081:13

**interpreted** 1010:25

**interrogate** 1064:21

**interrupt** 1187:23 1192:1
1252:15

**interview** 964:10 1011:16
1025:14 1073:17 1095:8
1096:14,18,19 1100:24,25
1101:4 1130:17,18
1207:13,14

**interviewed** 990:8,21
991:16 992:13 1011:23
1042:11

**interviewing** 964:18
992:17 1207:19

**interviews** 1052:22
1056:6

**intricacy** 1158:23

**introduce** 1124:24

**introduction** 1125:18

**invalid** 937:5

**investigate** 988:6,25
989:2,14,18 990:7,10,17,
20 992:16 994:20 995:1
1004:14,17 1005:12
1077:4 1135:1,5,14
1136:6,21 1137:6 1139:9,
11 1159:22 1160:12,18

**investigated** 966:7
983:16 986:1 993:14 994:5
997:7 1020:14 1021:7
1028:7

**investigating** 975:20
983:13 987:8 989:7 991:12
1008:1 1098:16 1112:20
1137:14 1159:11

**investigation** 922:9,11
923:1,16,25 924:12,14
928:2 940:3,4 942:7,23

944:3 947:13,15 954:21
963:21 964:17 969:6,11,12
975:18 980:4 982:21
983:24,25 984:6 985:20
988:5,15 991:1,17,21
992:3,5 994:6,14,16
1014:10 1015:2,25
1016:17 1018:16,19
1025:3 1027:20 1029:23
1031:15 1032:4 1033:18
1034:10 1035:5,24
1044:12 1052:22 1053:7
1054:1,4,13,18,21 1055:19
1056:4,5 1057:24 1058:5,
10,15 1072:12 1091:24
1097:10 1101:1 1103:23
1106:3 1126:8 1159:17
1172:22

**investigations** 966:13
991:24

**investigator** 967:4,13
979:17 1080:3

**invoke** 1277:10

**Invoking** 1163:14

**involve** 959:2 960:3
1004:21 1005:21 1032:9

**involved** 947:13,15 954:23
955:3,20 958:1,9,19
975:14 1033:18 1034:11
1036:24,25 1052:21
1056:8 1102:11 1103:4
1104:23 1107:21 1198:7
1202:2 1222:10 1225:7
1226:4 1234:16 1236:14
1245:19 1249:23 1250:5
1255:23,25 1262:2
1272:15

**involvement** 1172:10

**involves** 930:3 954:17
955:1 958:14 960:14,20
1010:21 1021:16 1105:20
1128:9

**involving** 958:21 1041:23
1069:5 1101:11

**IOE** 1209:3

**ironic** 1038:8

**irrelevant** 950:1,4 978:3
1145:21 1150:25

**Israel** 1105:25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 362 of 642   PageID 11303
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Index: issue..lawyer

**issue** 925:17,19,20 931:9, 10,21,23 974:15 1050:19 1063:5 1064:24 1065:13 1069:18 1088:3,7,24 1133:21 1147:17 1155:23, 24 1162:10 1163:25 1176:16 1231:22 1232:12, 13 1255:8 1262:2 1266:4 1272:6

**issues** 956:9 962:21 966:6,8 1019:22 1061:12 1126:15,23 1153:7 1197:4 1255:2,6,17 1278:5

**item** 904:8

---

### J

**Jackson** 981:20,21 982:6, 8,11 983:1,15 984:5 988:23

**jail** 906:19 911:8,13

**Janet** 1139:22

**Janna** 1250:14

**Jannah** 1236:19 1237:8

**January** 1100:2 1179:24, 25 1180:1,4 1256:2

**Jeanna** 981:20,21 982:6,8, 11 983:1,15 984:5 988:22

**Jerry** 1236:23 1237:9 1240:24 1250:11

**Jessica** 1097:5 1134:10

**Jesus** 1206:13

**jetway** 934:5

**job** 914:21 922:9 930:3 931:13 932:4,15,18,25 933:12,24 934:2,9,16 1033:20 1034:21 1035:9 1053:4 1069:2 1145:18 1159:7 1171:18 1180:3 1193:13 1196:4 1205:9 1207:1,9,20 1208:4 1216:10,12 1257:17 1263:15

**jobs** 1180:8,14 1181:14,20 1183:2 1217:23

**join** 1216:19,20

**joined** 1217:4 1219:14

**joke** 963:16

**joking** 1212:6

**Jones** 1052:7,12 1107:16 1275:7

**Juan** 1236:20 1237:8

**judge** 906:5 909:10 910:24 911:25 912:24 915:17,18 922:15 1130:24 1259:2 1272:13

**judging** 1204:2,3

**judgment** 1227:23 1228:5

**Julie** 979:16

**jurors** 921:1 962:11,17 963:15 1060:4 1068:7 1147:20,24 1154:19 1230:14,21 1234:10 1265:1,11

**jury** 905:3 912:4 914:16, 22,23 915:6 916:23 920:25 962:16 963:4 976:20,25 978:10 996:8,16 1060:2, 13,16 1061:5 1068:4,12 1073:1 1103:20 1144:4,5 1146:25 1147:2,6 1148:1 1152:8 1153:14 1154:13, 14 1157:15 1175:23,25 1216:9 1230:14,20 1231:18 1234:6,15 1243:17 1265:7 1267:18 1279:7,10

**jury's** 914:19

**Justice** 1233:20

---

### K

**Karen** 1226:7

**Kelleher** 1212:13

**Keller** 1202:14

**Kevin** 1278:10,11

**key** 969:14 1266:12 1270:14

**kick** 1136:1 1147:2,7

**kicked** 1241:13

**kids** 1176:1,7 1194:9

1198:4 1210:18

**killing** 1059:17 1230:12

**Kim** 1242:25

**kind** 944:9 957:20 1036:5 1122:8,19 1128:23 1153:13 1170:1 1177:5,7, 9,18 1178:20,24 1179:19 1181:4 1182:24 1187:4 1188:8,10,19 1189:2 1190:4,5,8 1195:10 1202:6 1204:10 1208:15 1213:9 1221:5 1226:20 1229:9 1237:13,14 1247:9 1273:9 1275:19

**kinds** 1242:14

**Kissman** 1052:8,25

**kitty** 1258:5

**Kleburne** 1067:12

**knew** 933:12 954:22 955:3, 4 957:25 958:7 973:15,21, 24 984:2 987:15 1011:11 1049:16,24 1078:8 1108:11 1121:3 1179:7 1183:9,18 1184:6,14 1185:17 1189:19 1190:1, 17 1192:16 1196:14,15 1199:1,24 1208:13 1211:9 1212:4 1213:14 1220:12, 13 1222:23 1226:8 1227:16,17 1229:12 1240:14 1247:24

**knitting** 1258:4

**knock** 903:8

**knowing** 936:21 987:8 1005:7 1078:11 1273:19

**knowledge** 942:14 947:21 949:11,13,15,16,18,19 951:10,14,16,18 952:12 953:4 986:23,25 987:20,22 1009:25 1020:8 1024:25 1053:13,16,19 1069:5 1071:7 1072:6,9 1075:25 1076:2 1078:17 1080:4 1103:22 1104:6 1155:13 1157:16 1220:11 1223:6

---

### L

**labor** 917:21 918:21 919:6

922:7,25 923:12 926:7 931:2,19 947:5 995:2 1126:9

**lack** 940:23 941:21 948:4 949:2,9 984:12 986:18 1008:7,14 1061:21 1063:6, 23 1075:22 1084:20 1090:12 1106:8 1123:9 1136:23 1137:9 1138:17 1140:8,19 1142:8 1239:4

**Lacore** 940:13,15,19 941:7,10,14 943:11,14 947:8,12,17 949:1,20 951:20 953:7,17 954:2 1066:20,22 1067:1 1152:1, 2 1166:5,11,15,25 1167:9, 11 1170:25 1172:10 1173:4 1272:4

**LACOUR** 1166:20

**ladies** 1202:3,19 1215:10

**lady** 1107:17 1186:9 1188:4 1198:18 1205:23 1223:10 1225:8,12 1256:21

**laid** 1239:4

**Lake** 1178:10,11

**language** 918:10 1027:24 1028:4,8 1257:23

**lanyard** 1087:8

**large** 1048:14,17

**largely** 1267:17

**Las** 911:25 947:2

**latched** 1126:22

**late-breaking** 915:5

**latest** 966:13 997:3,5 1266:4

**laughed** 1216:2

**law** 908:4 917:22 918:3 1270:7

**laws** 1158:23

**lawsuit** 910:12 1197:23 1227:13,15

**lawyer** 908:24 910:11 1052:20,21 1063:10 1064:16 1130:21 1136:24 1153:13 1163:17,18

1274:19 1275:1

**lawyer's** 985:5

**lawyers** 912:3,18 913:15,
18 985:3 1052:23

**lead** 1088:2,6,8 1133:18
1191:13

**leader** 982:17 1053:1
1169:5,9 1207:17 1260:5

**leaders** 956:9 1171:18

**leadership** 940:8 975:13
1168:3 1218:18 1220:17
1223:10

**leading** 1133:13 1136:12
1137:19 1138:1 1142:1,9
1158:13 1159:17 1160:9,
14 1173:14 1228:14
1245:25 1246:9 1260:22
1261:13 1263:19

**Leak** 1266:5

**leaning** 1267:6 1269:21

**learned** 940:9 1018:16,19,
22 1257:9

**leave** 957:4,7,15 962:19
1039:23 1060:5 1065:23
1115:20 1149:8 1161:6
1164:24 1175:3 1188:24
1206:5 1257:11 1265:12,
13

**leaves** 1163:6

**led** 1260:7

**leeway** 1063:3

**left** 957:8,17 1079:3
1161:18 1162:22 1180:4
1188:15 1191:8 1224:2
1231:6 1232:16,20

**leg** 1209:7

**legal** 917:6,12 918:8,25
957:19 1070:22,25
1136:19 1147:16 1225:21

**legally** 1136:20 1137:5
1271:18

**legitimate** 1136:22 1137:6
1160:8

**legs** 1209:6

**lets** 1277:1

**letter** 998:10 1000:16
1007:23 1008:22 1015:20,
22 1029:3 1044:22,24
1045:15 1054:1 1114:23
1115:1,5,24 1116:6,10,11
1123:17 1124:19 1127:25
1142:23 1143:20 1172:15,
16,18,19 1264:9

**letting** 1153:2

**level** 947:14

**liability** 1137:17

**liar** 1024:6 1064:17

**lie** 964:12,22 1228:9

**lies** 964:24

**life** 911:22 964:9 1031:22
1032:5 1098:8 1105:12,19
1109:6 1131:12 1176:8
1179:19 1190:2,18,19
1192:25 1200:22 1203:19
1204:1 1205:5 1206:6,20
1259:16,18 1263:4

**lift** 1162:8 1163:4,5
1273:16,18

**lifting** 1277:21

**light** 1059:21

**limine** 979:6 1124:12,13,
15 1146:1,9 1147:4,8
1149:12 1150:8 1152:14,
16 1153:8 1156:9,24

**limit** 907:22 914:6 927:14

**limitation** 907:20 915:25

**limitations** 1070:13

**limited** 907:21 911:17
928:21 979:6 1129:12
1151:13

**limiting** 915:10 977:9
978:9 1168:6,9

**limits** 1237:15 1275:2

**Lindemann** 1236:23
1237:9 1240:24

**Lisa** 1198:15

**list** 985:25 1043:14

**listed** 988:16,22 998:6
1023:16 1089:4,6 1248:9

**listen** 914:21 1145:9
1151:24

**listener** 1239:7

**listening** 910:13

**literally** 1164:17 1253:14
1264:7

**litigant** 1267:24,25 1268:1,
10,22 1270:13 1274:12
1277:22

**litigation** 1272:15,18

**live** 905:4,23,24 908:13

**lived** 1182:4 1192:6
1219:25

**livelihood** 1255:11

**lives** 1204:20 1272:9

**living** 1180:9,22 1181:1,9,
13 1182:16,21

**LM2** 1047:16

**local** 954:11 955:1 1011:10
1026:10 1075:8 1097:22
1098:10 1100:2 1109:3
1110:16 1134:10 1150:21
1152:22 1190:8 1221:22
1224:10 1226:18 1244:3,
13

**log** 912:5 1274:21,22,23

**long** 963:13 973:9 1017:16
1087:10 1088:9 1106:11
1165:13 1168:20 1174:9
1197:7 1201:16 1224:14,
15 1229:7 1237:13
1238:13 1259:14

**longer** 1126:25 1163:7
1229:20

**look-back** 926:18

**looked** 914:6 946:7,17
1036:1 1048:23 1053:6
1149:16 1169:14 1213:9

**loosely** 1019:13 1173:23

**lose** 1162:17 1194:6

**loses** 1227:12

**losing** 1240:15

**lost** 1194:3,18 1196:11
1200:20 1229:15 1239:16

1241:12

**lot** 906:8 914:18 953:3
992:7 994:18 1036:14
1092:2 1093:21 1170:2
1171:15 1173:24 1177:9
1178:25 1179:1 1182:18
1186:18 1188:18,25
1189:21 1190:10 1193:4
1197:5 1199:21,23 1203:3
1204:8 1210:16,19
1219:17 1220:6,11,12
1222:7 1223:8 1224:1
1226:14 1234:19 1244:22
1247:19 1253:14 1258:11
1259:11 1261:21 1262:11,
13,20

**loud** 1143:15 1206:16
1264:10

**louder** 923:8

**lousy** 1034:21

**love** 1059:18 1106:24
1203:23 1209:12 1247:21
1252:3 1256:9

**loved** 1197:3 1203:25
1209:11,13,17,18,25
1210:22 1211:13,20
1216:10,12 1229:14,16
1263:16

**lower** 1085:25

**lunch** 963:5,6 1059:13,15,
20 1060:12 1066:10
1067:17

**luxury** 1217:8

**lying** 1003:5 1013:16
1063:7

---

**M**

---

**machine** 1188:21 1189:5

**machine-type** 1188:16

**mad** 1191:2 1192:3

**made** 934:4 939:3,5
940:16,19,21 979:24
1009:13,16 1011:14
1012:2 1013:24 1014:12
1016:18 1020:10 1026:19
1029:3 1031:20 1034:9
1036:13 1042:5 1049:18

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 364 of 642   PageID 11305
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Index: Magazine..member

1054:20 1055:11 1065:18 1069:12 1075:5 1078:10 1080:3 1090:20 1093:10 1105:16 1121:2,6 1131:11 1135:2 1143:12 1150:3 1152:25 1159:8 1183:13 1190:1,17 1192:23 1201:20 1220:1 1227:10 1270:12 1272:22

**Magazine** 1256:10

**main** 1101:12 1200:5 1221:21 1237:3 1256:17, 24 1261:17,18

**major** 1195:4

**majority** 1081:16 1082:8

**make** 906:21 907:1 909:2, 14 911:5 912:8,15 914:10 915:12 919:4,18 926:12 933:4 939:24 943:19,21 955:13 958:4 959:11 963:10 965:1 973:2 977:18 1003:13 1013:17 1033:9 1062:19 1064:3,19,20 1065:17 1068:23 1070:23 1078:19 1082:18 1083:19 1087:4 1089:21 1091:25 1093:5 1094:15 1102:18 1134:21 1146:16 1153:4 1156:2,15 1162:9 1164:3,4 1165:1 1185:2 1187:14,24 1189:8,11 1190:5 1191:12 1206:11 1210:18 1218:16 1223:24 1226:10 1238:11 1242:1,2 1253:22 1259:14 1268:15,22 1276:3

**maker** 1270:3 1271:25 1272:12 1273:4

**makes** 934:2 963:7 978:2 1069:13 1270:24

**making** 917:3 942:15 946:9 965:7 970:6 1001:23 1032:21 1034:14,18 1038:12 1040:22 1043:6 1055:23 1057:11,24 1058:6 1099:14 1103:6 1104:12,25 1126:11 1128:19 1218:18 1248:25 1253:22 1257:24 1267:24

**man** 1248:21

**management** 947:5 966:1,6,9 1249:17

**manager** 947:2 948:2 1019:5 1052:17,19 1120:11 1269:19 1270:2 1272:23,24

**manner** 920:2 1026:13 1072:18 1172:6 1259:8 1260:25

**march** 954:13 1032:18 1039:24 1049:14,19,25 1097:21 1098:4,11,24 1099:22 1100:3 1107:21, 24 1108:5,11,13 1109:6 1110:16 1111:4 1126:23 1127:10 1180:5 1256:8,11, 17,20,25 1257:21 1258:9, 15 1259:13 1260:7,11 1261:16 1262:24

**marched** 1134:14 1261:20,23

**marching** 1109:1

**margin** 1224:7

**marriage** 1193:15

**married** 1176:1,7,9 1184:16 1191:15,24 1192:12 1193:6,10 1196:3

**marry** 1192:5

**marshals** 910:25 911:14 912:1

**Martin** 1223:16 1225:6 1226:1,6 1236:14,19 1237:24 1238:7 1240:4,5, 24

**Masoni** 903:20

**math** 1200:13

**Matt** 903:11 1130:14 1165:25

**matter** 911:25 932:22 970:3 1006:6,11 1013:14 1021:15,21 1025:6 1027:8 1031:15,21 1032:1,2,4 1039:13 1065:13 1087:14 1090:6 1110:24 1114:11 1159:5,11 1162:17 1219:2 1261:3 1262:5

**mattered** 1021:22 1022:22

**Matthew** 903:10

**Maureen** 931:5,19

1008:23

**maxes** 914:9

**Mcdaniel** 1223:15 1225:1 1227:3

**Mckeeby** 903:15 907:20 916:24 917:2,18 923:3 925:4,23 928:23 931:24 933:1,6,14 935:13 936:8 937:8 938:10 939:13,18 942:19 944:18 945:18 946:19 949:21 952:19 953:10 954:5 955:7,13,22 956:11 957:10,19 958:22 959:5 960:5,16 961:1,6 965:10 967:16,24 969:16 970:13 974:5,9,21 975:25 977:6 981:8,14 983:4 986:12 987:10 988:9 990:23 991:19 992:21,25 993:3 994:7 996:13 997:9 1000:20 1001:5 1002:11, 24 1005:23 1006:7,13 1007:13 1009:17 1010:23 1013:12,15,21 1017:10,19, 24 1019:25 1021:17 1022:25 1029:10 1030:14 1033:3 1034:24 1035:16 1037:12,24 1038:4 1039:16 1045:8 1047:24 1050:12 1051:15 1054:25 1060:24 1066:17,21 1071:18 1072:2 1073:8 1076:15 1078:13 1083:6 1085:15 1090:10 1091:10 1092:10,14 1093:1 1094:4, 20 1096:4,10 1099:3,11 1100:16 1102:2,24 1103:9, 14 1104:10 1109:9,13,16, 21,25 1110:4 1111:15 1113:13 1118:2 1119:4 1121:13 1124:11,14 1125:4,22 1128:24 1129:14 1130:3,21,24 1132:3,15,17 1133:21 1151:23 1152:3 1161:8,14 1162:1,13 1165:17 1168:5 1170:10,22,24 1171:6 1172:25 1174:20,21 1228:14,19,22 1231:2,9 1232:7 1249:7 1260:22 1261:4 1263:19 1265:17 1266:7,9 1270:1,25 1271:12,19 1272:9 1275:5, 12 1276:19,23

**meaning** 1253:21

**means** 915:19 924:25 926:19 936:16 937:4,10 964:6 980:20 1035:17 1066:25 1090:25 1098:12, 17 1100:9 1105:17 1130:1 1174:24 1175:1 1208:25 1209:1 1277:23

**meant** 923:11 1099:1 1176:6 1229:9 1243:19

**meantime** 1161:4

**meat** 1156:13 1226:17

**media** 928:5,6 935:3,6 936:6 937:6,24 940:2 941:18 942:16 954:3 961:19 965:23 966:6,16,25 967:12 968:17,23 970:7,11 971:12,19 972:1,9 973:5, 22 974:4,20 975:7,8,15 976:8 978:17,20 979:24 981:20 982:9 983:2,14,16 986:1 995:9 1011:14 1012:2 1014:8 1029:4 1046:25 1101:12,25 1115:3,7 1117:11,14 1122:9,21 1123:25 1124:9 1169:24 1174:5 1252:6

**meet** 1133:8 1207:18 1210:19 1211:3

**meeting** 954:12 973:20 1049:18 1095:9 1110:18 1118:12 1126:20 1131:7 1146:2,3 1195:10 1198:8 1209:18 1221:6 1227:6 1229:19 1236:1 1242:18, 20,24 1246:7 1252:8 1258:2,4

**meetings** 1219:17 1220:6 1226:12,13 1227:18 1235:14,20,21 1241:21 1243:24 1244:5 1263:6

**Meggan** 1052:7,12 1107:16

**Melissa** 1223:11 1225:12, 13 1228:17 1229:4 1235:2 1236:14 1237:19 1238:2,7, 20

**Melissa's** 1223:21

**member** 974:2 975:8 1027:3 1028:3 1037:7

Case 3:17-cv-02278-X Document 387-1 Filed 01/02/23 Page 365 of 642 PageID 11306
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                    Index: members..needed

1049:8 1097:7,9,14,15 1098:19 1103:7 1168:23 1200:10 1218:19 1234:25 1235:4 1236:6 1242:13

**members** 939:25 940:1 1101:25 1102:12,21 1103:6 1151:4 1200:19 1236:22,25 1237:1,2 1244:19 1248:18 1249:1, 14 1251:10,12 1258:8

**membership** 935:6 1220:18 1258:11

**memo** 968:21,25

**men** 1258:11

**mention** 1120:5 1178:15

**mentioned** 1083:24 1174:17 1206:8

**mess** 971:19

**message** 918:5 965:18 968:20 972:16 989:6 1019:6 1021:9 1025:18,19 1026:9,12,17,21,23 1027:3,14,17 1028:18 1043:16 1073:24 1075:12, 18 1076:5,13 1077:14,15 1078:4,8 1079:2 1118:15 1171:21 1172:1 1248:2,3,4 1249:16 1250:7,22 1251:3

**messaged** 1247:25 1250:22

**messages** 954:9 958:3 961:17 972:5 995:7 1020:12 1024:24 1031:11 1034:9 1074:8 1076:25 1077:4 1119:25 1121:1 1126:14,21 1127:4,5,10 1249:13,14

**messed** 1220:19

**Messenger** 1018:11,13, 15,22 1019:13 1020:6 1039:11 1046:6 1247:12

**met** 1133:6 1179:4 1213:19

**Mexico** 908:15 910:24

**mic** 963:11

**Michelle** 985:16

**microphone** 912:9,14 922:17,23 923:2 1155:3

**middle** 1106:23 1215:18 1276:8,11

**Mike** 903:20 1143:12

**mild** 1276:20

**million** 1269:1

**mind** 939:8 1060:1 1091:6 1152:20 1194:19 1248:22

**mindful** 1065:16

**mine** 1165:13 1183:21

**mingle** 1230:1

**minimum** 985:24

**minute** 944:12 1167:16 1222:3 1228:13 1239:21 1264:1

**minutes** 909:20 914:11 915:20 916:4,14 946:16 951:6 962:14 999:1 1109:8 1147:18 1152:10 1190:7,8 1230:18 1258:24 1263:5 1265:14,20 1266:20 1267:1

**mischaracterization** 938:11 1033:4

**mischaracterizes** 955:15 969:18 970:13 983:4 990:23 994:7 1019:25 1039:16 1128:24 1140:12

**miscommunication** 1024:7

**misheard** 1110:4

**misread** 937:17

**misreading** 1076:8

**misrepresented** 959:18

**missed** 1078:1 1108:16 1154:9 1183:18

**missing** 959:23 1044:24 1246:18

**mission** 1123:4,14,16

**misstated** 967:9

**misstates** 928:23

**mistake** 1131:11

**mistakes** 1159:8

**misunderstand** 931:23

**misunderstanding** 934:23

**misunderstood** 1232:13

**mitigation** 1142:23,25 1143:2 1144:3,6,8 1145:4 1146:14 1154:6,11 1156:7, 25

**mom** 1177:5,9 1178:22 1197:3 1219:21

**moment** 1051:12 1054:7 1055:7 1085:17 1094:24 1160:20 1206:19

**moms** 1202:23

**Monday** 918:12,15 1066:1 1095:11 1255:22 1259:2 1265:10 1268:16 1278:3, 17 1279:1,3,8,17

**monetary** 906:14

**money** 906:8 1031:19 1032:19 1041:4 1184:7 1218:2 1223:24 1224:1 1225:2 1227:19 1238:25 1239:11 1245:1,3,5 1253:22 1254:12 1257:5

**monitoring** 966:10

**month** 954:12 1243:22 1245:8

**monthly** 1189:3

**months** 926:20,25 927:2, 7,10,13,16,17,23 928:1,7, 9,12,16,20 929:12 930:10, 11,14,18 931:17 1090:17 1180:25 1182:3,4 1244:7

**mood** 1063:15,21,22

**mooned** 1225:8

**mooner** 1236:16

**morally** 1127:11

**morning** 912:4 919:2 922:15 962:8 1059:21 1066:1 1095:11 1108:8 1133:3,4 1153:20,21 1259:2 1279:17

**Morris** 903:16

**Mother's** 1177:17 1178:24

**motion** 906:5 1062:19 1124:12 1146:1 1156:9,10

**motivated** 1092:4

**mouth** 985:5

**move** 1013:12 1022:8 1061:4,10 1068:3,5 1073:4 1085:11,12 1113:9 1117:23 1124:24 1125:17, 18 1133:19 1136:15 1141:17 1146:22 1155:4,5 1170:4 1177:23 1180:6 1182:14 1201:15,17 1206:4 1234:17 1252:19 1255:19

**moved** 1176:4 1178:5,10 1180:1,2 1182:5 1184:8,9 1204:10 1235:16 1241:7

**moving** 1181:23

**multi-factor** 1275:11

**multi-factored** 1275:12

**multiple** 904:21 906:20 988:8 1271:1

**murder** 958:5 1041:5,14

**murderer** 1031:11

**mute** 977:20 996:8

**muted** 976:15,21 1073:1

---

**N**

**named** 1273:14

**names** 979:22

**nametag** 1213:21

**Nancy** 912:23

**Naomi** 947:4 1072:21

**narrative** 1249:9 1251:5

**nastiness** 988:24

**nasty** 1242:14 1248:25

**nature** 995:12 1061:20 1114:18 1135:13

**necessarily** 1027:7 1070:2 1129:3 1144:15

**needed** 1010:13 1020:12 1068:24 1115:12 1196:13, 15 1198:7 1201:13

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 366 of 642    PageID 11307

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                Vol 4 July 08, 2022                    Index: negative..oftentimes

1237:10

**negative** 1034:7

**negotiate** 1152:23

**negotiated** 1222:5 1253:2, 12,15,25

**negotiations** 1220:21 1224:2

**negotiator** 906:2 1221:21

**neighbor** 1211:10

**nest** 1232:17

**Nevarez** 904:9,13 905:12 908:13,18 909:7,8,10,15 910:5,6,8,16,22 911:2,11, 19 912:16,20,22 913:2,6,9, 14,17,19,21 914:3,11,13, 19,25 915:15 916:8,10 1066:15 1243:11

**Nevinc@msn.com** 913:1

**Nevinc@msn.com.** 912:22

**news** 1224:12,13,14

**nexus** 928:4,13 929:19 1028:24 1071:10 1072:1 1086:2,13,19 1087:15,25 1088:5,8,12,18 1089:5,9, 23,25 1090:2,7,9,16,20,24 1109:6 1111:20,21 1112:13,22

**nice** 967:6 972:12 1133:8

**night** 1162:19 1190:22 1208:22 1221:16 1279:2

**nine-and-a-half** 1183:24

**Ninety** 914:11

**Ninety-eight** 1100:11,15

**Ninety-two** 1094:18,25

**noise** 907:2

**non-policy** 998:14

**non-responsive** 1249:9

**nonetheless** 1044:22 1203:22

**nonresponsive** 952:1 1016:7

**normal** 909:1 977:4,6,7,9

**note** 966:5 1139:18

**notes** 1015:2 1025:14 1060:22 1067:12 1073:17 1074:13,15 1096:19 1100:24 1101:3 1107:14, 15 1130:18 1131:7 1139:23,24 1140:1,2,6,18 1141:3

**notice** 992:19 1278:7

**noticed** 922:14

**notified** 940:15,19 941:10

**notion** 1267:20 1273:9

**notwithstanding** 1267:21 1269:5

**NRLA** 1150:16

**numbed** 1188:19

**number** 904:10,14 913:5 1212:3,5 1229:6,9 1244:20

**nurse** 1190:11

**nurses** 1186:11

_____

## O

**O'GRADY** 979:16

**oath** 921:11 950:18 1175:12

**OB-GYN** 1181:8 1193:21

**object** 920:4 950:5 952:1 956:11,15 958:22 959:20 986:17 987:14 1002:11 1021:17 1033:3 1045:8 1062:18 1099:3 1103:20 1130:3 1133:13 1136:23 1137:19 1138:1,17 1140:8, 19,20 1142:8,22 1153:15 1155:16 1156:4 1157:19 1158:13 1160:9,14 1171:3 1173:14 1244:22 1260:22

**objected** 1108:15

**objecting** 917:6 993:3

**objection** 917:3,8,12 919:14 920:11,21 923:3 925:4,23 928:23 931:24 933:1,6,14 935:13 936:8 937:8 938:10 939:13,18 940:22 941:20,24 942:19

945:18 946:19 947:18 948:3 949:2,11,21,25 950:20 951:7,21 952:18,19 953:10 954:5 955:7,11,12, 14,15,22 956:16 957:10,19 959:5,15 960:5,16,22 961:11 965:10 967:16,20, 23,24 969:16,17 970:13, 20,25 971:1 974:5,9,21 975:25 976:23 977:19 978:4 981:8,10,13,15 983:4 984:12,21 985:1,9 986:12 987:10,18,19 988:7,9,13 990:23,24,25 991:19,20 992:21,25 993:2 994:7 996:13,14 997:9,19, 22 1000:20 1001:5 1002:24 1003:1 1005:23 1006:7,13,19 1007:13 1008:6,12,13 1009:17,22 1010:23 1012:11 1013:9 1016:7 1017:5,9,10,18,19, 24,25 1019:25 1022:2,7,25 1023:1 1029:10 1030:14, 17 1034:23,24,25 1035:16 1037:12,24 1038:4,11 1039:16 1047:24,25 1048:2 1050:13,21 1051:15 1054:25 1060:23, 24,25 1071:18 1072:2 1073:8,10 1075:22 1076:8, 15 1078:13,18,20 1079:11 1084:19,23 1085:13,15 1087:21 1090:10 1091:17 1092:7,14 1093:1 1094:4, 6,20 1096:4 1099:11 1100:15,16 1102:2 1103:21 1106:5,7,20 1109:9 1111:15 1119:4,19 1121:13 1123:8 1124:11 1125:22 1128:24 1129:14 1132:3 1136:12 1137:9 1140:15 1141:7 1146:24 1148:14 1151:25 1153:8 1156:12,18,20 1157:20,22 1170:10 1228:14,22 1239:3 1245:21,24 1246:8 1249:6,7 1251:4 1252:9 1254:21 1261:4,12 1263:19

**objections** 920:20 950:2, 6,8 977:4,5,6,9 996:12 1003:4 1051:10,16 1060:11 1062:7,13 1063:2 1065:8 1066:4 1068:14 1073:6 1094:18 1113:12,

13 1118:1,2 1125:2,3,4,21 1156:14 1167:3 1170:9 1255:5

**objector** 975:8 1243:21 1255:5

**obscene** 995:11

**observation** 1266:10

**occasion** 1171:10,11

**occur** 1121:8 1136:20 1137:5

**occurred** 993:17 1006:5 1010:9,10 1274:14

**occurrence** 915:8

**OE** 1209:3

**offended** 1091:1

**offensive** 1087:16,17 1088:18 1114:5 1132:8

**offer** 977:2 985:3 996:11 1051:9 1068:11 1094:16 1100:14 1113:10 1143:18 1266:22

**offered** 929:4 976:17 1148:11,18,20,23,25 1149:2 1157:16 1158:5

**offering** 984:22 985:1 1146:6

**offhand** 1019:21 1036:9

**office** 913:22 1063:14 1186:10 1209:24 1223:25 1224:5 1225:8,10,11,15 1226:21 1228:8 1229:21 1235:19 1240:9 1241:8 1242:11 1250:12

**officer** 903:3 916:21 920:24 962:15 963:2 1067:22,24 1097:19 1152:11,13 1227:8 1231:15 1267:3 1268:23 1269:5,16 1272:3 1273:9 1279:21

**officers** 1151:8

**official** 1097:13

**officials** 1240:21

**oftentimes** 1063:6 1277:17

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 367 of 642   PageID 11308
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 4 July 08, 2022                      Index: okayed..peanut

**okayed** 1207:22

**older** 927:13 1240:13

**oldest** 1212:24

**one's** 1004:9

**one-on-one** 1207:14,16

**online** 1014:13 1040:15 1247:13 1251:21

**open** 935:11 979:11 1018:23 1019:5,10,17 1024:16 1060:1 1067:5,19 1078:2,6 1080:9 1104:17 1110:12 1137:16 1147:13 1157:7 1166:8 1210:15 1215:23 1265:18

**open-ended** 1246:2

**opened** 935:20 1077:14,25 1260:21

**openly** 1126:21

**operate** 1219:10

**operation** 1273:11

**opined** 1101:23

**opinion** 998:23 1062:9 1262:3

**opinions** 966:19 971:16 1128:18

**opponent** 1079:19,22 1168:3,17

**opponents** 935:4 1151:8 1169:24

**opportunity** 907:10 913:23 928:19 1206:22

**opposed** 957:9 1107:20 1108:7 1115:15 1249:9

**opposing** 1091:5 1134:5 1135:17

**opt** 1216:25 1235:5 1244:23 1257:3

**opt-outers** 1239:20

**opted** 1243:16 1245:15 1246:5 1250:2

**opting** 1243:18

**option** 905:3,10,24,25 1216:24

**optional** 1128:23

**options** 905:2,7

**order** 910:20 927:7 928:4 974:7 1087:14 1146:9 1147:4,8 1152:16 1156:24 1199:1 1232:5 1233:21

**orders** 904:22 906:20 910:18 911:9 1161:19

**organization** 1262:7

**organizations** 1203:12

**original** 1229:10

**originally** 1176:3

**other's** 971:16

**oust** 940:8

**ousted** 1081:17 1082:9

**out-opter** 1239:21

**over-objected** 1062:12

**overlap** 1197:20

**overly** 1172:3

**overnight** 1232:16 1233:23

**overrule** 942:1 949:9 977:8 986:21 987:19 1006:14 1009:23 1078:15, 21 1156:23 1157:22

**overruled** 971:1 1062:13 1065:4

**overruling** 950:8 970:20

**overseeing** 924:5

**oversees** 931:2 953:18

**overwing** 1210:4 1211:5 1213:8

---

**P**

**P-O-T-A-S-H-N-I-C-K** 1267:13

**p.m.** 907:17,18 908:1,15 916:13 1278:13,14,18 1279:22

**pack** 1182:14

**package** 1089:6

**packet** 1043:15

**page/line** 1066:4

**pages** 1090:23 1185:3 1247:20

**paid** 1039:23 1180:16 1244:6 1257:5

**pain** 1187:4 1189:1

**pal** 1173:21 1174:1

**panelists'** 1063:17

**paragraph** 945:2 958:8 966:3 1010:17 1031:7 1118:12 1120:7 1126:10, 19 1152:15

**paraphrasing** 1243:8

**parenthetical** 1165:20,24

**Parenthood** 1049:9,12,15, 18,22,25 1050:4,20 1107:24 1108:5,9,10,14,24 1185:7,25 1186:7 1187:21 1191:8 1202:8,10 1203:7 1245:7,13,14 1256:20,24 1259:4

**parents** 1177:3,4 1180:1, 9,18,19,22 1182:9 1184:1, 19,20 1190:23 1193:1,4 1220:1

**parents'** 1182:3

**Parker** 1097:5 1134:10,13

**part** 924:22 927:21 942:6, 22 948:20 963:22 964:1 969:11 975:18 983:25 990:11 991:17 997:15 1014:3 1015:25 1016:1,17 1033:17 1034:10 1035:5 1044:24 1048:22 1049:4 1057:23 1063:5 1069:2 1074:2 1076:13,23 1086:14 1090:1 1094:23 1099:21 1106:3,23 1115:25 1116:17,18 1121:21,24 1154:9 1195:1, 20 1197:5 1217:6,9 1222:24 1226:11 1237:25 1240:5 1244:9 1257:12

**partial** 1045:16

**partially** 1044:25 1117:18, 20

**participate** 1244:5

**participated** 954:12,13

**parties** 910:12 1149:23

**partner** 995:3

**partnered** 1056:5 1202:13

**parts** 1189:9,21,22

**party** 914:22 1079:19,22 1267:25 1268:1,10 1270:5 1272:2 1273:5 1274:12 1277:22

**party's** 1232:4 1273:6

**pass** 1132:13 1160:21 1170:20 1173:16 1210:20 1214:10 1215:15,17

**passed** 1249:1

**passing** 1174:17

**passion** 1092:2 1093:20

**passionate** 1171:15 1172:4 1252:16

**past** 928:17 930:10 945:13, 15,25 946:2 1055:4 1064:6 1070:6 1076:25 1086:17 1123:21 1126:22 1199:7 1220:25 1221:1

**path** 1004:9

**Patience** 944:16

**Paul** 1220:15 1221:7 1226:16

**Paulo** 903:15

**pause** 905:4 906:25

**pausing** 905:9

**pay** 1134:18 1180:19 1208:1 1221:10 1243:21, 23 1245:6 1254:4,5,13 1261:20

**paycheck** 1218:3 1222:25 1243:22 1244:14

**paying** 1097:14,15 1184:8 1222:14 1235:6,7,10 1277:5

**payor** 1257:4

**peanut** 1215:7

**peanuts** 1214:10,15 1215:5,6,16,18,25

**pen** 1173:21 1174:1

**penalize** 1154:15

**pending** 1153:14

**people** 935:3 937:25 940:8 941:17 950:14 953:21 954:2,3 972:9 973:3,4 978:19 985:24 988:6 989:4 994:18 1008:1,2,3,4 1077:11 1081:7 1092:3 1093:21 1131:5,9 1171:17 1173:23 1174:10 1187:20 1195:11 1198:8 1200:1 1206:23 1207:18 1209:14, 15,18,19,20 1210:13,19,24 1211:3,4,6 1212:15 1223:9,16 1224:8 1227:16 1236:21 1237:3,12 1239:19,24,25 1240:3 1241:12,14,19 1242:9,11 1244:19,22 1245:18 1246:25 1247:1 1248:9 1250:4 1251:22 1254:16, 22 1259:15,16 1262:8,11, 13

**perceived** 979:25 1014:8

**perceiving** 1063:7

**percent** 937:23 939:10,12, 17 1254:18

**perception** 1093:5,10 1094:15

**period** 911:8 1138:13 1139:7 1149:16 1180:24 1196:18,20 1206:19 1223:5 1224:18 1254:6 1259:11

**permits** 1156:18

**person** 919:22 929:21 937:16 1004:4 1025:23 1054:19,20 1069:3 1096:2 1098:16 1101:9 1107:14 1209:14 1212:14,15 1225:14 1231:25 1236:2 1241:4 1264:16 1269:16 1270:22,23 1272:16 1273:10

**person's** 1093:10

**personal** 947:21 949:11,

12,15,16 966:5 986:23,24 987:20,21 1009:24 1011:13 1023:17 1024:11 1028:23 1032:9 1034:16 1036:24 1041:18 1046:9 1047:18 1075:25 1076:1 1078:16 1155:13 1157:15 1167:25 1258:20

**personally** 1031:10 1033:1 1034:15 1036:6 1037:4 1061:21 1199:12

**personnel** 962:11 1147:20 1230:15 1265:2

**persons** 988:16 1104:24

**persuades** 1279:10

**persuasive** 1163:23

**pertain** 924:8 926:21 1154:10

**pertained** 975:19

**pertains** 1154:5

**pertinent** 928:1

**petition** 973:5 975:15 982:18 984:3 985:10,17, 22,25 986:5 1008:2

**petitioners** 974:20

**phantom** 1001:3,6

**Phoenix** 1171:8 1235:17

**phone** 904:10,14 909:21 913:5 1172:9 1247:11 1264:8,16

**photo** 1090:13 1134:20

**phrase** 960:2 1017:7 1039:3

**phrasing** 1243:9

**physical** 1135:9

**pick** 1000:18

**picture** 1019:6 1043:16 1046:12 1057:19 1089:2 1090:6,8 1091:18 1093:14, 22,24 1100:5 1105:5 1106:16 1109:22 1111:3 1134:15

**pictures** 1019:20 1028:19 1043:8 1044:14 1056:11, 13 1086:4,12 1089:25

1091:23 1108:23,25 1109:1 1114:19 1120:9 1258:3 1262:18,19

**pieces** 967:4

**pills** 1183:13

**pilots** 1214:4

**pitch** 907:4,13

**place** 997:7 1004:23,25 1005:17 1006:11 1054:5 1072:12 1117:14 1121:4 1127:23 1145:24 1164:24 1189:6 1202:16 1204:14 1210:11

**places** 1026:24 1203:5 1259:18

**placing** 1128:3 1204:22

**plain** 968:7

**plaintiff** 903:11 1266:12

**Plaintiff's** 977:15 996:18 1051:20 1170:19

**plaintiffs** 1149:21

**plan** 975:16

**plane** 1003:1 1078:1 1210:7 1211:18

**planned** 1049:9,11,15,17, 22,25 1050:4,19 1107:24 1108:4,9,10,14,24 1185:7, 25 1186:7 1187:20,21 1191:8 1202:7,9 1203:7 1245:6,13,14 1256:20,24 1259:4 1260:6

**platform** 912:10,12 916:13 1247:3

**play** 923:16,24 924:11 928:16 1019:7 1020:7,16

**played** 1152:7 1173:8 1185:15

**player** 1272:18

**playing** 1019:18

**plays** 1018:23 1019:13,23

**pleasant** 916:10

**plethora** 1202:3 1247:22

**podium** 1130:22 1154:21

**point** 919:3,6,15 920:14,15 935:20 946:9 970:5 971:2 991:2 997:1 1012:8 1024:9 1063:19 1064:1,2 1079:9 1108:16 1138:21 1146:9 1149:20 1151:17 1177:23 1180:2 1182:25 1189:17, 19 1190:1 1191:7 1193:2 1198:9 1216:18 1220:8 1233:8 1250:16 1251:16 1253:24 1254:23 1255:13 1266:18 1270:18

**points** 1275:6

**policies** 917:23 949:17 953:5 1016:6,20 1047:5 1114:14 1116:17 1122:9 1137:15

**policy** 928:5 935:3,7 936:6 937:6,24 940:2 941:18 942:16 961:19 965:23,24 966:2,25 967:12 968:17 971:19 973:5 974:4,20 975:7,8,16 976:8 978:17, 20 981:20 982:9 983:2,14, 16 986:1 995:9,15,18,20, 24 996:1 997:7,15,17 998:11,13,19,21,24 999:2, 5,11,13,15 1000:1,2,6,7,12 1001:4,6,18 1002:9,16 1004:7,11,12,20 1005:2,9, 22 1006:3 1007:10,12,17 1015:10 1027:6,18,22 1028:6 1029:4,5 1037:20, 23 1044:1,19 1045:14,17, 23 1046:25 1047:1 1056:22 1057:1 1058:4 1090:22 1101:12 1102:1, 22 1114:7,18,20,24 1115:3,7,8,9,11,14,16 1116:1,21 1117:4,11,14 1121:22 1122:20 1123:25 1124:9 1127:20 1128:6,7, 8,9,21 1129:3,13 1169:24 1174:5

**political** 958:5,9,20,21 959:2,8,11 960:2 1053:16 1217:18 1218:25 1244:10

**political-type** 1217:22

**politics** 1219:3

**poor** 1107:13

**pop** 1060:20,21 1260:25

**Port** 1267:12

**portion** 989:25 1040:16 1244:6 1245:8,9 1261:18

**portray** 968:21

**portraying** 972:23

**position** 1010:18,19 1011:4,7,9 1088:23 1091:21 1093:15 1094:1 1097:13 1098:23 1111:8 1112:14 1149:13 1167:21 1197:14 1210:2 1227:2,4 1267:9 1269:12

**positions** 1096:21

**positive** 1034:7

**possibility** 1029:25 1030:1 1092:4 1093:19 1094:12,13,14 1095:25 1096:2 1158:3

**possibly** 928:6 935:22,24 936:7,22,24 937:2,7,15,21 972:12 1004:10 1029:5,8 1030:12 1044:23 1047:1 1089:22

**post** 1028:19 1069:20 1070:1 1077:13 1087:7,16,17 1088:18 1090:8,16,17 1091:4 1097:21 1098:10 1111:11,12 1112:15 1113:4 1120:15,18 1134:10 1146:15 1154:16

**post-type** 1112:19

**posted** 970:8 972:15 1028:22 1046:9 1087:12 1093:23 1098:20 1105:6 1118:13 1120:8 1125:12

**poster** 1100:3

**posting** 972:4 1088:22

**posts** 929:14 1070:2 1071:9 1091:17 1100:3 1101:24 1103:6 1104:25 1109:5 1113:3 1119:8,12 1120:15,17,21 1121:1

**Potashnick** 1267:12,13,24 1268:3,7 1269:3 1270:4 1273:5,18 1274:5

**potential** 981:20 982:8 983:2,16 1169:5,8

**potentially** 1144:14 1271:14

**power** 910:24 911:6,7 1159:16

**practical** 1266:9

**practice** 1063:13 1267:21

**practices** 949:17

**pray** 1201:4 1264:19

**prayed** 1177:19

**praying** 1201:12

**preach** 1206:12

**predicate** 1024:19

**prefer** 905:20

**preferred** 907:3

**pregnancy** 1193:16,17 1196:7,8 1202:13 1203:10 1204:16

**pregnant** 1084:17 1085:7 1182:14 1183:3,4,11,16, 24,25 1184:5 1193:16 1195:13 1196:6

**Prejudice** 1124:12

**prejudicial** 918:9 1143:4 1156:6

**premise** 1153:19

**prepare** 1204:13

**presence** 1146:25

**present** 1205:17 1257:19 1278:22

**presentation** 1275:19

**presented** 905:15 978:8 984:14 985:2

**presenting** 1278:24

**president** 953:17 973:23 983:14 1011:10 1014:18 1025:7,10,25 1026:2,10, 12,14,16 1027:4,9 1028:4 1032:13,23 1033:2,19 1034:12,17,20,22 1035:9, 13 1036:3,8 1037:1,11 1040:8,9,11,13 1041:24 1047:22 1049:8 1074:7,22, 25 1079:22 1082:20 1084:3,5,9 1107:8,11

**1118:20** 1120:3 1126:13 1137:24 1138:11,14 1150:22 1212:13 1225:14 1226:18 1228:3,18 1229:14,18 1236:22 1240:25 1241:3,5,7 1260:2,4 1269:4

**president's** 965:17 1227:4

**presidents** 1138:22

**pressure** 1173:11

**pretty** 940:6 1048:14,17 1181:22 1190:9 1196:1 1200:12 1208:18 1213:17 1223:25 1224:7 1225:3 1228:20 1229:12 1232:3 1238:19,24 1240:4 1242:11 1243:12 1244:19 1251:9 1267:20 1273:8

**prevent** 1171:25 1266:12

**preventing** 1162:3 1233:21

**preview** 1152:3

**previous** 933:4 1000:16

**previously** 1167:14

**principle** 1153:21

**principles** 1267:16,23

**prior** 926:20 928:1 1054:24 1055:22 1057:24 1058:5 1123:24 1125:2 1270:18

**private** 972:15 1025:19,20 1026:25 1063:13 1118:15 1247:15,17

**privately** 1260:19

**privilege** 925:24 1268:18 1274:21,22,23

**privileged** 1274:17,20,23

**prize** 1231:17

**pro** 1031:10,16,22 1032:5, 18 1096:15,17 1098:3,8,24 1099:20 1105:12,19 1109:6,23 1111:4,8,13 1112:4 1259:15,16,18 1261:17

**problem** 917:8 918:6,16 966:20 1005:1 1030:10

**1153:9** 1248:15 1250:13 1251:22 1256:16

**problems** 1191:9 1278:23

**procedure** 1188:14 1191:10

**proceed** 979:14 1013:22 1167:6 1175:18 1239:8

**proceedings** 910:15 977:22 979:11 1023:9 1024:16 1061:17 1067:19 1079:14 1080:9 1102:16 1104:17 1109:19 1110:12 1142:18 1147:13 1152:19 1155:19 1157:7 1161:12 1166:8 1279:22

**process** 924:13 948:14,24 951:15 1088:19 1165:17

**product** 1143:17,18

**professing** 1165:15

**professional** 971:15 1172:6 1257:18,20

**professionalism** 1061:24

**professionally** 1257:18

**professionals** 966:21 1257:16

**prohibition** 1161:14

**prohibits** 1015:11

**Project** 1257:23 1258:1

**promise** 932:10 1201:20

**proofread** 1010:14

**proper** 1045:10 1142:23

**propose** 907:15

**proposing** 1094:7

**protect** 1003:4 1037:9,10 1082:21 1083:5 1084:12, 16 1085:5

**protected** 908:4 917:5,13, 20,21,22,23 918:14,20 919:5,10,16 920:10 924:19,20,21,25 925:2,11, 13 1038:2 1053:6,10,14, 17,20,23 1054:3,9,17,23 1055:8,20,22 1056:3,7,9, 14,16,23 1057:3,4,13,18, 19,22 1058:2,4,23 1059:2,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 370 of 642   PageID 11311

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Index: protecting..question

3 1083:2 1252:2 1279:6

**protecting** 1038:9
1082:25 1118:21 1261:11

**protection** 1037:7,22

**protections** 925:21

**protested** 1202:9

**protesting** 1202:7

**proved** 969:24

**provide** 928:4 944:8
1095:25 1207:24

**provided** 1045:9

**providing** 925:22

**Pryor** 903:12 905:18
906:6,10,16 907:9 912:19,
24 913:5,7,10 915:12,15,
16 919:19 920:17 921:4,22
922:2,19,20 923:7 925:9
926:4,16,17 928:25 929:3,
7,9 932:3 933:4,10,11,17,
22,23 935:18 936:14
937:18 938:12,17 939:16,
21 941:2 942:4 943:1
944:4,6,21,22 945:24
946:22 947:24 948:7,10
949:14 950:5,12,21 951:1,
9,13 952:1,2,22 953:1,12,
15 954:7 955:10,18 956:1,
5,15 957:2,14,23 959:1,9,
20,21 960:18,23 961:8,10,
15,16 962:1,5 963:13,16,
18,20 965:13 968:5,9,12
969:20 970:15,17,21,24
971:5,9 974:6,12,14,17
975:3 976:5,11,16,24,25
977:2,16 978:14 979:4,15
981:9,18 983:8,10,11
984:17,23 985:8,15 986:14
987:1,11,23 988:14 990:3,
5,13,15 991:6,9,10 992:1,
23 993:8 994:10 996:4,6,9,
11,19,21 997:12,20 998:1
1000:23 1001:2,7,10
1002:15 1003:2,8,12
1006:2,9,15,21 1007:1,18
1008:8,17,19,20 1009:19
1010:2,25 1011:5 1012:15,
19 1013:13,23 1016:7,11
1017:6,13,21 1018:5
1020:5 1021:20 1022:4,12
1023:7,11,14,19 1024:3,8,
14,20,22 1029:11,15

1030:15,21 1031:2,8
1033:6 1035:3,20,22
1037:18 1038:1,7,15
1039:1,18,21 1041:9
1045:12,25 1046:3,20
1048:6,10,15 1050:14,17
1051:1,4,5,7,9,21 1055:10
1058:17,18 1059:5,6,14,17
1060:18,20 1062:6 1063:1,
8 1064:4,19,21 1065:3,9,
11,12 1066:8,11,16,19,23,
25 1067:5,15 1068:9,10,
20,22 1071:21 1072:5,25
1073:2,15 1076:3,11,19
1078:24 1079:23 1080:2,
12 1081:21 1082:1
1083:10,13 1084:25
1085:1,10,23 1086:6,9,10
1088:1,6,11 1090:15
1091:12,14 1092:11,19
1093:7 1094:11,16 1095:5
1096:6,8,11,13 1099:7,17,
18 1100:10,14,23 1102:4,
8,13,18 1103:1,13,17,24
1104:1,3,8,11,14,21
1106:13 1109:12,24
1110:1,7,14 1111:18
1113:10,21 1117:22
1118:7,10 1119:5,6,22,23
1121:15 1123:11 1124:4,5,
16,18,23 1125:1,10,16,18
1126:4 1129:1,20 1130:5,
7,13,16,23 1131:2 1132:6,
13 1133:13,15 1136:12,23
1137:9,19 1138:1,17
1140:8,12,19 1141:7
1142:1,8,15,21 1143:3,11,
16,19 1144:19,21 1145:2,9
1146:5,24 1148:3,15,19
1149:1,3,5 1151:18
1153:4,12,24 1154:4
1155:16,21 1156:4 1157:1,
19 1158:13 1160:9,14,23,
24 1162:10,17,25 1163:12,
14,25 1164:18 1165:3,7,
13,25 1166:5,10,24
1167:1,6,8 1168:13,14
1170:4,7,20 1171:3
1173:14,18,20 1174:19
1175:7,8,18,20 1229:1
1230:8,12 1231:19,22
1232:11 1233:4 1234:12,
13 1239:13 1246:4 1248:1
1249:10,12 1251:6
1252:14 1255:1 1260:24
1261:9 1262:1 1263:22

1264:21 1269:14 1272:11
1273:22 1274:24 1277:9
1278:4,9

**public** 1025:19,22
1026:19,25 1028:23
1259:9

**publish** 944:5 977:13
1051:18 1073:12 1125:7
1170:17

**publishing** 1085:20
1095:2 1100:20 1113:18
1118:6 1126:1

**pull** 1139:13 1170:22
1186:19

**pulling** 944:10 1133:22,24
1188:25

**punish** 906:13

**punishing** 906:23

**punishment** 1103:8
1122:8 1142:7 1194:7

**punitive** 906:19 911:7,13

**puppies** 1262:18

**puppy** 1262:18

**purchased** 1204:16

**purported** 1011:24
1123:13

**purpose** 1145:3,4

**purposes** 950:1 1143:2
1244:10 1271:22

**pursue** 1066:13

**pursuing** 1178:1

**push** 908:7

**pushing** 963:9

**Pussyhat** 1257:23 1258:1

**pussyhats** 1258:4

**put** 907:2 912:11 929:14
931:1 976:25 1009:16
1010:6 1015:20,22
1044:22 1045:2 1067:1,2
1068:18 1093:22 1104:10
1117:19 1143:19 1152:5
1156:21 1162:11 1165:11
1179:10 1180:24 1188:4
1190:14 1192:13 1193:25

1198:16 1203:12 1214:9,
25 1218:2 1226:9 1228:7,8
1236:9 1241:2 1246:20
1247:8 1250:12 1264:9

**putting** 1151:3 1246:23
1270:18

---

## Q

**quarter** 1244:7,11

**question** 904:16 908:4
913:16 918:7,18,23,24
920:9 922:18,21 923:6,14,
22 929:5 930:1 932:8
937:13 938:14 942:8,11
943:10 950:9,16,22,24
951:4,12 952:21,24 953:8,
14 956:21 957:8,17
959:22,23 960:1 967:10
968:7,8,13 970:19,21
971:3,4,6,7 973:9 975:2
976:4 978:5 981:7 983:7
985:7 986:13,15 987:13,24
988:8 993:4,6 1001:9
1003:10,24,25 1005:4,14
1006:24 1007:4,19 1010:1
1012:25 1014:20 1015:7
1017:22 1018:4 1021:4,18,
24 1022:5,10,11 1023:24
1026:7 1030:4,20 1032:3
1034:3 1036:22 1041:8
1042:20,22 1045:8 1046:2
1048:5 1049:12 1050:24
1055:15 1056:8 1063:18
1066:8,17 1067:3 1070:11
1071:20 1080:13 1084:13
1085:3 1092:8,10,18,22
1093:17 1096:5,8 1099:2,
6,14,16 1102:7 1103:2,3,
10,11 1104:6,15,20 1105:4
1109:21 1111:25 1114:2
1121:14 1122:5 1124:4
1131:4 1133:18 1136:25
1140:15 1141:10 1142:3
1144:3,4,7,23 1147:3,6
1148:1,5,13,14,17,19
1149:11 1153:2,5,14,22
1155:22 1156:16 1157:23
1160:16 1162:21 1164:7
1168:12 1214:12 1215:20
1228:23,24 1231:5
1232:20 1245:17 1249:10
1250:19 1251:1 1252:12
1265:18 1269:1,8 1275:2,4

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 371 of 642   PageID 11312
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 4 July 08, 2022          Index: question-and-answer..refresh

1276:22 1278:17

**question-and-answer**
1249:8

**questioned** 1014:11

**questioning** 978:2 981:3

**questions** 904:3 912:17
913:4,12,20 915:13 916:7
917:4 921:23,24,25 926:14
929:7 950:7,18 962:21
979:14 988:8 1022:21
1033:9,12 1061:20
1062:10 1063:3 1131:1
1132:15,18 1133:10
1155:10 1167:2,3 1172:25
1173:16 1175:17 1186:4,6
1246:25 1247:1,6 1250:3,6
1262:8 1264:14 1270:16
1271:7 1279:16

**quick** 903:8 907:1 962:7

**quicker** 1234:18

**quickly** 921:6

**quit** 1182:25 1184:21,22
1196:4

---

**R**

---

**radar** 1184:23

**rage** 1063:15,20 1064:2

**Railway** 917:21 918:21
919:6 922:7,25 923:12
926:7

**raise** 916:25 918:12
920:11 934:24 1069:18
1166:18 1175:11 1246:6
1254:7

**raised** 1019:22 1050:18
1062:12 1135:17 1156:9,
14 1192:8 1196:21
1255:17

**raises** 1221:10

**raising** 920:21 1155:24
1219:24

**ramifications** 938:6

**rang** 1264:8

**range** 963:7

**rantings** 1127:10

**rapport** 1210:23

**rate** 1254:15

**ratified** 1254:7,9

**Ray** 1139:22

**re-urge** 917:2 919:1

**reach** 905:17 935:22,24
936:7,22,24 937:21
1184:10

**react** 1189:24 1200:2

**reaction** 1182:9 1264:12

**read** 928:25 929:4 954:15
955:19 956:16 958:8,18
968:14,15 970:15 998:4,5
1013:1 1031:9 1038:24
1062:1 1074:2,3 1077:8,
16,19 1078:1,3,8 1079:2
1107:5,19 1110:3 1116:10
1139:17 1242:7 1253:9
1264:9,10 1269:17
1272:13 1274:2 1279:11

**reading** 957:25 1084:1
1106:23 1128:21 1242:14
1276:7

**ready** 976:17 1024:5
1055:16 1179:18 1190:12
1215:5 1231:18 1254:9

**real** 1177:6 1200:1 1220:18

**reality** 944:19

**realize** 1127:23 1155:21
1204:19

**realizes** 915:5

**realizing** 1140:21

**realm** 925:15

**realtime** 961:12

**reask** 968:4,7 1048:4
1168:12

**reason** 947:16 948:25
949:19 953:6,9,16,25
954:4 957:5 1009:14
1028:18,22 1029:2,18
1032:7 1042:23 1049:4
1063:22 1064:1 1101:13
1115:19 1117:8 1153:1
1161:24 1210:13 1224:23
1244:25

**reasonable** 1091:15,22
1092:1 1093:12

**reasons** 956:12 1028:13,
15 1029:21 1030:22
1041:22 1089:5 1115:2
1117:9 1156:8,23 1260:13

**reboot** 962:9

**recall** 934:1 940:1 941:3,8
942:17 965:16 973:5,16,
17,21 974:3,20 975:15
976:7 980:12,16,18,19,21,
22 982:18,24 983:22
984:3,8,19 985:10,12,14,
17,22,25 986:5 989:21
990:11 1008:2 1009:7
1014:1,5 1016:10,12
1019:9 1020:12 1025:16
1034:17 1035:4,5 1039:25
1040:2,13 1047:8,17
1054:12 1057:8,9 1058:1
1074:13,14 1080:17,18,21,
25 1081:16,18 1082:8
1083:21 1096:14,20
1099:19 1106:4 1108:8
1168:18 1169:25 1171:5
1174:12,14 1218:11
1232:8

**recalled** 1161:25 1168:22
1231:7

**recalling** 1040:3 1057:11

**received** 933:25 934:3,4
939:23 942:23 946:3
948:11 975:9 980:3 982:25
1010:25 1113:23 1119:12,
25 1120:1 1167:19
1169:21,23 1174:3,9

**recent** 1233:3,8 1234:5

**recently** 1035:24

**recess** 910:1 916:19,20
963:1 1067:21,23 1152:12
1231:14 1233:23 1267:2

**recognize** 945:3,4 966:18
1010:12 1048:11 1051:6,
22 1073:16 1086:12,16
1130:17 1275:7

**recollection** 992:10
1052:4 1054:19,22
1058:20 1082:23 1099:19,
25 1108:7 1123:22
1138:25 1226:23

**recommend** 1275:18

**reconciliation** 938:20

**record** 903:6,7 907:7,8
910:14 915:20 926:20
962:23 963:8,19 1013:17
1024:6 1059:12 1061:4
1065:14 1095:18,19,21
1122:2,7 1123:1,7 1141:3
1151:20 1153:5,11
1156:15 1167:10

**redirect** 919:24 1173:19

**reduce** 1155:14

**reduced** 1142:7,14 1143:9
1148:10

**reduction** 1146:21
1148:25 1157:17

**refer** 906:5 999:13 1004:22
1008:23 1127:19 1173:21

**reference** 1013:20
1031:11 1091:8 1116:1
1118:19 1257:24

**referenced** 1111:4

**references** 958:5 1116:7

**referencing** 1117:5,6

**referred** 931:18 998:10,25
1000:16 1014:12 1029:4
1037:3,4 1104:25 1116:23
1123:20 1168:2

**referred-to** 977:14 996:17
1051:19 1073:13 1085:21
1095:3 1100:21 1113:19
1118:8 1125:8 1126:2
1170:18

**referring** 911:25 968:25
989:6 991:21 1008:3
1011:17 1013:15 1015:1
1040:3,11 1045:16
1083:17 1115:17 1120:15
1124:20 1127:7 1128:9

**refers** 981:19 995:20
1040:13 1081:2 1115:25

**reflect** 1024:6 1036:5

**reflects** 1077:22

**refrain** 1232:22

**refresh** 1108:7 1138:25
1146:8

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 372 of 642   PageID 11313
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Index: refreshed..results

**refreshed** 1052:4

**refunded** 1244:10

**refuse** 1203:13

**refuses** 1002:2 1004:3

**regard** 917:3 922:9 923:16,25 925:17 927:2 965:22 987:16 989:7 999:11 1037:23 1058:10, 14 1072:16,17 1095:25 1099:21 1100:25 1102:20 1103:5 1120:22 1132:2 1185:25 1202:1 1229:3 1273:22

**regret** 1105:18

**rehabilitate** 919:25

**relate** 960:11 1156:6

**related** 918:2,3 1075:21 1088:17 1174:8 1247:18

**relates** 944:2 1036:2 1048:7 1075:16 1176:15 1222:12

**relating** 1035:23 1105:25

**relation** 1251:17

**relations** 931:2,19 936:25 937:7,21 938:9,22 939:1,9 947:5 979:18 995:3 1043:20,23 1044:8,18 1045:5,13 1053:2,22 1054:22 1055:19 1056:5 1058:22 1114:1 1126:9

**relations'** 1053:4

**relationship** 1074:9 1087:15 1191:19 1192:22 1193:1 1194:24 1198:10, 11 1205:25 1206:1 1222:13 1228:11

**relayed-back** 1153:21

**relevance** 951:22 959:15 1050:22 1124:12 1140:20 1156:25

**relevancy** 1149:17

**relevant** 943:3,4,6 1145:1, 6 1146:4 1152:23 1156:8

**relied** 927:12,23 1047:4 1086:18

**relieve** 1196:10

**religion** 917:15 920:7 1094:1 1177:20 1206:12

**religious** 919:12 958:6,9, 12,13,14,19,21 959:2,8,12, 19 960:2 1053:13 1058:9 1068:24 1069:3 1071:16, 23 1105:20 1107:2 1176:15 1185:14 1197:23 1263:2,13

**reluctance** 911:22

**Reluctantly** 911:19

**rely** 927:25 928:3 1277:17

**remains** 1232:9

**remanded** 1234:3

**remedy** 1268:13

**remember** 928:8 945:9 960:23 961:3 970:22 982:23 992:4,6 994:3,4,12, 13 1000:15 1007:20,21 1009:13 1025:13 1032:10 1036:12,15,16 1054:16 1057:7 1067:14 1080:13 1096:23,25 1099:23 1134:5 1135:19,21 1151:17 1152:17 1155:10 1169:12 1175:17 1185:5 1188:15 1202:15 1213:19 1217:11 1220:23 1221:4 1235:19 1237:1 1263:15

**remembers** 1168:13

**remind** 921:23

**remotely** 904:12 905:1

**removal** 1227:7 1250:8

**remove** 1071:9 1072:1 1119:5 1227:11 1238:7 1240:19 1242:10

**removed** 1224:19,21,23 1226:21 1227:2 1228:4 1240:20,21 1242:16

**renew** 949:24

**rep** 1270:22 1271:2,3 1272:8,16 1273:8,10,14

**repeat** 922:18 951:3 953:14 956:22 1071:20 1110:1 1168:7

**repeated** 957:8,16 1005:5 1011:13 1062:22 1064:24

**repeatedly** 1013:15

**repeating** 1029:11

**rephrase** 983:6 1000:25 1012:17,18 1035:4,20 1099:5 1110:9 1260:23 1263:21

**rephrasing** 970:21 983:8

**report** 937:7 938:8,22,25 939:9 970:10 971:18 1014:23,25 1015:1

**reported** 1069:6 1144:21, 25

**reporter's** 1155:3

**reporting** 939:25 941:17 971:14 973:4 1144:25 1146:16

**represent** 965:17 1070:3 1111:7 1133:5 1143:7 1150:16 1173:5 1241:25 1258:13

**representation** 1081:22 1145:13,22 1146:2 1150:15,21,24 1152:21,24

**representative** 1243:2 1269:15

**represented** 1120:10,18, 20 1121:11 1143:8 1257:7

**representing** 1087:19 1091:21 1093:15,25 1120:22 1154:12

**reprimanded** 1123:3

**reprimanding** 1122:1

**request** 911:12 1043:16 1157:3 1175:17 1232:4

**require** 1004:20 1129:7

**required** 914:1 928:9 1122:15 1216:18,20

**requirement** 927:14 928:11 929:10 1061:25 1062:1 1122:18 1138:15, 23 1139:1,2,7

**requirements** 926:24

**requires** 1277:10

**research** 962:12 1059:25 1091:2 1147:21 1165:5 1230:17 1265:3,14

**resemble** 1258:19

**reserve** 1132:17

**resides** 1275:7

**resign** 1250:15

**resource** 1101:8

**resources** 1185:22 1202:22

**respect** 966:21 971:16

**respected** 1258:16

**respond** 1114:22 1145:10 1169:10

**responded** 1045:5 1059:1 1228:23

**responding** 1091:12 1109:16

**response** 1058:24 1062:5, 6 1105:11 1131:4 1139:21 1150:10 1156:9 1272:10, 11 1278:15

**responsibility** 929:25 1159:22 1180:20

**responsible** 1137:13

**responsiveness** 959:20

**rest** 984:11 1189:8 1190:22 1200:11 1203:19 1226:3 1248:17

**restart** 962:2,4,6,8

**restate** 967:23 1010:1 1032:3 1168:15

**restaurant** 1181:3

**restraint** 1273:12

**restriction** 1273:16,18

**restrictive** 1273:9

**result** 966:13 1014:9 1112:18 1227:22 1271:14, 16

**resulted** 1193:16

**resulting** 966:7

**results** 1263:17,24

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 373 of 642   PageID 11314

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Index: retaliation..separated

**retaliation** 1114:7 1150:16

**retaliatory** 979:25

**retro** 1254:4,13

**return** 1158:18 1163:7 1246:14 1249:8 1252:10

**returned** 1158:11 1247:11

**returning** 903:12

**revealed** 1035:6

**reversed** 1234:2

**review** 1052:1

**reviewed** 945:11,16 946:2 1033:17 1035:15,23 1036:10,14 1045:7 1069:21 1077:4 1080:19

**reviewing** 979:21 1036:12

**rhetoric** 1062:25

**rid** 1174:5,10

**rights** 1049:20 1053:6 1093:20 1108:12 1126:16 1137:22 1142:24 1158:24 1159:2 1256:13,14 1258:17 1263:9 1268:11 1273:6

**rip** 1063:17

**rise** 903:3 916:21 920:24 962:15 963:2 1060:2 1067:22,24 1147:23 1152:11,13 1230:20 1231:15 1265:7 1267:3 1279:21

**Ritner** 1223:15 1226:8

**RLA** 920:3 922:6 923:11, 15,18,24 924:22,23 925:21 926:10

**role** 1026:24 1036:8,25 1173:8

**room** 908:25 1149:11 1186:9 1188:4 1190:4 1193:25 1203:16 1243:4

**Ross** 1264:15

**round** 1160:22 1173:18 1174:20,21,22,24 1188:16

**rounds** 1215:9

**route** 1175:12 1204:23

**routine** 1175:13

**row** 1210:8

**RTW** 956:7

**rude** 1174:7

**rule** 920:12,22 926:22 1009:22 1062:18 1140:9 1156:5 1162:3 1163:12,13, 14 1167:4 1231:22 1232:2 1266:10,17 1267:21 1270:12,20 1271:13 1273:11 1277:10,11,18,21

**ruled** 979:6 1140:14 1146:1,4 1154:5

**rules** 1061:24 1063:11 1115:23 1255:16 1275:25

**ruling** 979:8 1149:12 1150:8 1152:14 1164:24

**rulings** 1067:9 1104:13

**run** 915:23 1241:8

**running** 993:9 1007:25 1153:8 1156:20 1157:20, 21 1223:12,14,18 1246:20, 23,24 1250:4

**runup** 915:2

**rush** 1197:2

---

**S**

**sad** 1191:3 1192:18

**safety** 1255:12

**sageful** 1154:8

**sake** 1160:7

**salaries** 1245:18

**sanctions** 906:5,15

**sarcasm** 1001:8

**sarcastic** 938:13

**Sassy** 1247:21 1252:3

**sat** 1052:22 1186:10 1260:6

**satisfied** 1156:17

**Savannah** 1278:11

**save** 933:20 1201:25

**saving** 1066:14

**scar** 1194:14

**schedule** 1181:6

**scheduling** 1171:17 1253:24 1276:14

**Schneider** 905:4,5,9,10 919:10 921:3,8 922:3 962:20 963:21 1060:5 1065:19 1073:16 1086:1 1095:10 1100:24 1133:3 1134:4 1141:14 1146:20 1147:25 1154:25 1157:10, 14 1158:21 1162:19 1232:3,8 1264:8 1265:19 1266:11 1267:7 1268:21 1269:2,9,10,22 1270:1 1271:18 1272:17 1276:16, 17

**Schneider's** 978:1

**school** 1178:6,11,17 1179:4,15,16,18,22 1180:11,17,19 1181:14,25 1182:21,23,24 1183:1,5,8 1184:14,21,22 1193:11,14 1205:8

**scouring** 980:14

**screen** 944:7,12,14 961:21 976:15 981:24 1058:20 1068:18,21 1081:19 1167:15,17 1248:6 1252:4

**screens** 976:20 1060:14 1073:1

**scroll** 1038:19 1048:10 1090:23 1112:9

**scrolls** 1091:17

**scuttlebutt** 1226:9

**search** 1231:10

**searched** 1185:4 1191:17

**searching** 1191:18 1198:25

**seat** 1166:22 1175:16 1234:11

**seated** 903:4 921:2 963:17 1068:8 1154:22 1211:4 1267:4

**seating** 1210:14,15 1213:4,6,7

**seats** 1214:18

**seconds** 916:5,6 1019:15 1112:9,15 1113:6

**secret** 943:17

**section** 1063:14 1215:18

**security** 903:3 916:21 920:24 962:15 963:2 1067:22,24 1152:11,13 1231:15 1267:3 1279:15, 21

**sedative** 1188:5

**seek** 906:14 911:7,13,14 925:16 1203:5

**seeking** 908:13,14 1195:7

**self-disclose** 904:6

**sell** 1221:23

**semantics** 1115:17

**semester** 1180:17

**send** 909:6 910:25 912:4 916:13 986:19 1008:21 1009:1 1075:12,18 1076:13 1163:4 1165:19, 24 1244:12 1249:14 1259:8,24 1260:25 1266:4

**sending** 972:5 1025:9,11 1026:22 1028:11 1118:23 1126:14,21 1248:3 1260:1, 3 1261:24

**sends** 1027:3,16 1028:3

**senior** 948:1 979:17 1167:23 1272:24

**seniority** 1229:11

**sense** 906:21 909:2 911:5 912:15 914:10 917:9 919:18 963:7,10 1064:3 1120:2 1146:16 1162:9 1165:1 1268:15,22 1270:24 1272:2

**sentence** 954:22 955:5,19 957:25 1041:20 1126:18

**separate** 906:14 991:23 992:2,5 1023:16 1220:2

**separated** 1035:7 1186:8

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 4 July 08, 2022          Index: separation..Southwest

**separation** 926:14 1046:18 1167:1

**sequestering** 1267:19

**series** 1086:12

**serve** 1215:6

**served** 978:19 1158:8

**services** 1198:4

**serving** 906:8 1209:17

**session** 1153:20,21

**set** 907:24 910:17 974:24 1008:15 1023:5 1024:18 1103:21 1133:19 1197:1 1209:22 1215:25

**settled** 1187:5

**settlement** 1156:5

**Seventh** 1267:17 1268:11, 24 1274:9 1277:23

**Seventy-six** 1068:13,15

**severe** 1027:24

**sexual** 1056:14,16,18,19, 21,24 1058:4 1114:6,18 1122:21 1248:20

**sexually** 1248:20

**shared** 1134:10 1226:15 1259:11

**shop** 1217:7 1251:16,18

**short** 915:1 1072:11 1238:24 1259:14 1262:15

**shortcut** 1146:18 1154:3

**shortening** 1065:20

**shortly** 903:12

**shots** 1248:6 1252:4

**shove** 1206:13

**show** 904:20 910:17 916:15 941:11 981:2 984:11 996:24 1044:4 1061:6 1068:4 1086:4,11 1130:14 1150:2,3 1262:10 1279:9

**showed** 1108:23 1111:3 1112:3

**showing** 1039:9

**shown** 907:6 969:14 1047:12

**shows** 978:18 1086:21,23 1087:7 1088:16 1100:5 1106:16 1131:10

**shut** 1236:4 1247:5

**sic** 985:4 1019:5

**sick** 1183:14

**side** 908:24 963:6 1194:6 1264:15 1274:13 1276:6

**sidebar** 920:20,22 941:24 949:4,6 951:8 968:3,6,10 977:19,23 979:10 1000:21 1001:5,7 1006:20 1023:10 1024:15 1061:13,15,18 1065:13 1067:18 1079:15 1080:8 1102:17 1104:16 1109:15,18,20 1110:11 1142:19 1147:12 1153:6, 11,23 1155:20 1157:6 1161:9,10,13 1166:7

**sidebars** 967:20 968:2 981:16 1022:3 1023:2,24 1030:18 1038:12 1061:20 1062:22 1064:24 1065:1 1119:20

**sideline** 1268:3

**sign** 1109:22 1217:12

**signed** 1218:5 1221:4,22

**significant** 948:20 1234:22 1268:4

**Silver** 1165:21

**simple** 1270:16

**simply** 966:9 1010:13 1271:6

**Sims** 1143:12,20,22

**single** 939:4 984:8 1033:22 1034:8 1123:1 1219:18,21

**sir** 909:23 913:7 924:3 929:10 930:11 934:8 935:19 946:9 948:11 950:17 952:3,7 955:3 964:10 965:6 967:9 968:13 975:6 981:23 983:12 990:12 996:22 997:6 1000:18 1002:21 1003:13

1006:16 1008:21 1012:9, 20 1014:21 1015:24 1017:22 1021:24 1022:13 1024:14 1030:1 1033:13 1037:6 1055:11 1060:7 1068:23 1080:14 1104:22 1128:21 1137:12 1169:15, 20 1171:11,24 1172:17,24 1173:13

**sister** 1178:22 1200:20

**sit** 904:3,4,11,22,23 906:3 908:14 910:18 911:1,7,15, 21 912:6 916:3 930:7 1052:4 1059:18 1166:17 1236:22 1269:13

**sites** 966:10 1256:9

**sitting** 932:13,14 935:11, 20 1008:5 1200:8 1210:24 1211:5

**situation** 1154:3 1188:10

**six-minute** 1152:9

**Sixth** 1233:25

**Sixty-four** 1124:25 1125:6

**ski** 1077:11 1081:6

**skip** 966:3 1263:6

**skipping** 1234:21

**slanted** 914:22

**slap** 1241:18

**slate** 1223:18,20 1236:9,11 1238:15,16 1239:17 1241:9,15 1247:1 1250:4, 17

**sleep** 1164:3 1192:8

**slide** 1273:8

**small** 1188:5 1200:6 1202:15 1211:1,11

**smaller** 1087:5

**Smith** 1223:12

**smoking** 1214:2

**social** 928:5,6 935:3,6 936:6 937:6,24 940:2 941:18 942:16 954:3 961:19 965:23 966:6,16,25 967:12 968:17,23 970:7,11 971:12,18 972:1,9 973:5,

22 974:4,20 975:7,8,15 976:8 978:17,20 979:24 981:20 982:8 983:2,14,16 985:25 995:9 1011:14 1012:2 1014:7 1029:4 1046:25 1101:12,25 1115:3,7 1117:11,14 1122:9,20 1123:25 1124:9 1169:24 1174:5 1252:6

**solely** 1160:4

**someone's** 906:22 1026:22

**son** 903:24 1193:5 1195:14 1196:6,9,18,21 1197:9 1198:3,13 1207:5 1208:10, 21 1219:22,24

**SONIA** 1166:20

**sonogram** 1262:18,19

**Sonya** 940:13,15,19 941:7, 10 947:8,12,17 948:25 949:19 951:20 953:7,17 954:2 1166:11 1167:11 1272:4

**sooner** 907:5

**sort** 905:15 963:6 1103:22 1150:18 1278:7

**sought** 1205:13

**sound** 1061:11 1141:14 1273:1

**sounded** 1192:3

**sounds** 1221:12,13 1264:24 1272:14 1274:3 1276:16

**Southwest** 903:14 917:23 928:14 929:22,24 930:2,25 932:7,12 935:1 947:5 948:14,24 949:17 951:14 953:19 954:10 965:25 966:7 977:12 978:11,25 979:1 987:3 988:3 997:16 1002:7 1004:5,12 1015:10 1027:6,11 1028:6,24 1037:6,20 1044:19 1045:14,22 1051:15 1052:12 1054:22 1069:1, 10,21,24 1070:3,13 1071:8 1072:9 1082:13,16 1084:14 1086:20,21,23 1087:1,17,19,20 1088:14,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 375 of 642   PageID 11316

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                    Index: Southwest's..Stone

15,17,21,23 1089:7,10,19,
21 1090:5,19,21 1091:8,
19,21 1092:24 1093:11,15,
24,25 1094:1 1095:19,21
1097:11 1100:16 1101:9
1102:11 1103:4 1104:23
1106:6,21 1109:2,3,7,23
1110:16,18,20,22 1111:11
1112:10,14 1113:14
1115:3,9,14 1118:3,15
1119:9 1120:10,12,19,22
1121:24,25 1123:2
1125:22 1132:17 1133:16
1136:21 1137:24 1138:10,
21 1141:3 1149:24 1151:4,
11 1155:14 1157:16
1158:4 1160:4 1161:2
1167:13,21 1168:11
1170:21 1171:12 1173:23
1174:4 1197:13,16,19
1206:5,25 1207:2 1210:2,
15 1211:21 1212:11,12
1216:4 1228:10,11,17
1229:2,4,25 1255:10
1263:12 1268:22 1269:20
1271:21 1272:1

**Southwest's** 953:5
1037:23 1102:21 1165:9

**space** 921:24 1175:17

**speak** 922:22 932:1
940:13 1225:21 1228:16
1246:11 1275:15

**speaker** 1198:17 1200:5

**speakerphone** 909:1,11,
17

**speaking** 904:17 922:16
941:23 950:2 987:17 991:3
1084:22 1251:21 1262:22

**speaks** 1010:24

**special** 1038:2

**specific** 911:23 928:8
945:22 958:15 972:5
989:24 990:9 1004:18
1016:10 1025:23 1036:9
1039:7 1055:7,11 1063:2
1064:4 1090:3

**specifically** 924:2,7
925:19 926:3,6,8 927:23
931:19 934:11 936:23
937:17 953:20 959:19
963:24 970:12 994:22

998:6 1008:23 1015:6,7,
19,20 1016:3,24,25
1017:1,7 1019:11,19
1025:12,17 1036:13
1041:23 1044:18 1055:18,
21 1057:7,10 1079:6
1100:9 1116:3,4,9,12,15,
24 1128:11,20 1134:19
1176:15 1179:8

**specificity** 1139:4

**specifics** 1005:13 1274:25

**speculate** 943:15

**speculation** 937:9 938:11
940:24 947:19 948:5
949:3,11 974:10 986:19,22
987:15 1008:14 1009:18
1075:23 1078:14 1084:20
1091:11

**speech** 917:15 924:25
925:2,11,13 958:9 1053:16
1251:20 1252:1,2

**spend** 919:7 1065:18
1245:1

**spending** 1031:19 1041:4

**spent** 906:8 1151:3
1223:24 1260:8,10

**spirit** 1273:24

**split** 917:14

**spoke** 904:15 1053:22
1055:21 1163:21 1174:15

**spoken** 931:20,22 1141:4
1275:6

**sponsor** 1130:11 1256:17,
24

**sponsored** 1049:15,21

**sporadic** 1235:10

**stable** 1190:6

**Stacy** 1223:16 1225:6
1226:1,6 1236:14,19
1237:24 1238:7,8 1240:4,
5,24 1242:15

**staff** 1059:23 1225:15

**stage** 915:5

**stages** 1262:20

**stalling** 915:23

**stance** 965:25 1131:13

**stand** 913:13 916:12
963:13 1060:6 1098:2
1104:1 1112:20 1131:20,
24 1147:7 1155:5 1161:18,
22 1162:16,22 1163:6,15
1164:2,11,23 1175:11
1199:10,17 1231:6
1232:16,18 1270:19
1271:6 1272:19

**standard** 1252:18

**standing** 963:25 964:8
999:9 1243:12 1264:13

**stands** 1015:19

**Starr** 909:10 910:5

**start** 907:14 912:3 919:5,
11 1002:22 1069:24
1113:25 1135:5 1176:2
1178:1 1188:6 1208:4
1214:2 1237:14

**started** 922:15 1047:2
1077:25 1106:5 1180:12
1181:24 1183:19 1188:20
1189:25 1190:9 1191:18
1193:12,23 1195:1,9,10
1196:14 1197:24 1198:3,7,
12 1207:1 1222:9 1264:18

**starts** 1019:9,18 1041:13
1215:13

**state** 956:25 1003:15,25
1040:20 1078:7 1079:6
1153:6,10 1167:10
1175:23 1191:16

**stated** 1000:5,6 1004:21
1005:22,25 1014:7 1015:6
1031:24 1037:2,15
1108:17 1126:10,14
1129:12,18 1156:24

**statement** 934:4 939:4
940:6 1001:12 1014:12,17
1037:19 1049:18 1075:5
1099:15 1100:5 1105:16
1116:7 1123:4,14,16
1129:24 1134:16,17
1257:25

**statement's** 1080:5

**statements** 939:2 1004:8
1029:3

**states** 994:17 1011:3
1074:12 1075:17 1076:17
1077:20 1078:5 1083:3,15
1126:17

**stating** 929:6 1111:1
1126:24

**stats** 1122:24

**stay** 963:8 1203:20
1208:20 1219:3 1230:1
1235:4

**stayed** 1190:22,23

**steeped** 1063:20

**STENOGRAPHER** 962:2

**step** 1142:20 1143:9
1146:3 1152:19 1192:10

**Stephenson** 946:25

**stepped** 979:5 1198:14

**stepping** 1227:3

**steps** 1150:3

**Steven** 1248:19

**stew** 1247:21 1251:16,18
1252:3

**stipulation** 1151:2

**Stone** 932:5,19 933:24
940:16,20 941:3,16 942:14
946:23 947:16 950:11
952:3,11,16 954:1 965:18
966:23 968:15 973:6,15
975:6,13 980:8 982:18
989:10,19,21,23 995:7
1013:25 1014:2,6 1015:15,
17 1016:2,5,16 1017:4
1018:8 1020:16,19 1021:2,
10 1022:15,17 1023:18
1025:1,2 1026:1,2,9
1028:13 1031:16,22,25
1032:5,8,11,12 1033:1
1034:10,12,15,16 1035:6,
8,13 1036:2,6,7,25
1039:11,12 1040:3,6,7,11
1041:18,24 1042:5,13
1043:6 1046:5 1047:19,21
1072:22 1073:18 1074:21,
22 1075:8 1077:24
1079:20 1084:9 1096:14
1098:1 1099:9,20 1101:25
1105:1 1118:24 1119:1
1124:21 1126:13 1127:4

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 376 of 642   PageID 11317
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                                    Vol 4 July 08, 2022                              Index: Stone's..talked

1137:22 1138:8,14 1139:1
1140:4,17,20 1141:4
1145:16,23 1150:22
1168:4 1174:15 1246:21
1248:12 1249:15 1250:7
1253:2 1259:25 1260:2
1262:22,25 1265:19

**Stone's** 940:15 943:25
945:17 948:2 975:9
1020:20,23 1021:22
1032:9 1056:3 1101:3
1139:10 1160:7 1169:21
1172:22

**stood** 1199:15 1212:4

**stop** 1023:25 1038:13
1040:1 1062:4 1064:25
1082:19 1083:20,21
1176:5 1205:6 1263:3

**stopped** 1201:7

**stopping** 966:15 971:11

**stories** 1000:23

**story** 1000:18 1187:25
1199:22 1227:17 1259:14

**strategy** 1167:24 1276:14

**stricken** 1013:17

**strike** 1003:7,9 1013:12,19
1022:8,9 1030:19

**strong** 1117:20

**structure** 988:3

**struggled** 1185:18

**stuck** 1216:7

**studied** 1208:22

**study** 1198:21

**stuff** 1035:15,17,19
1178:24 1207:22 1215:1,4,
13 1217:18 1227:17
1235:2,3 1242:14 1247:8
1248:20 1274:22

**stumbled** 966:9

**stupid** 1192:24

**subject** 1140:9 1198:18
1261:3

**subjective** 965:25

**subpoenas** 906:7

**substance** 1275:22

**substantially** 1065:20

**suck** 1027:5,10,16,17
1028:5

**suctioning** 1188:16,20
1189:5,18

**suffering** 1193:8

**sufficient** 1133:18

**suggest** 1270:8

**suggesting** 1271:12,13

**Sullivan** 1243:2

**summarize** 933:17

**summarizing** 1086:3

**summary** 1126:8

**summer** 1179:21

**Sunday** 1198:5 1278:13,
17 1279:2,11

**super** 918:13

**supplied** 980:7

**supply** 1043:11

**supplying** 1043:8

**support** 935:5 1089:8
1105:1 1107:24 1108:4
1204:8 1205:1 1223:20
1237:7

**supported** 1039:22
1045:1 1049:17,25
1108:14 1168:17 1192:4
1224:3 1236:12 1261:16

**supporter** 973:16,17,22
980:7 984:3,9,19 985:14,
17,22 986:5

**supporters** 942:17 973:6
974:3 975:15 976:7
985:10,12,25

**supporting** 940:1 941:16
1041:14 1049:20 1258:10

**supposed** 994:25 995:1
1192:11 1228:8 1258:6,19

**supposedly** 1238:23

**Supreme** 1164:1,8,13
1232:15 1233:12,13,19
1268:8

**surely** 1014:25 1015:3

**surgery** 1194:4

**surprise** 1140:20,25

**surprised** 1025:15
1140:17

**surrounding** 1092:3

**suspension** 1143:10
1146:22 1148:10,25
1158:5,6,8

**suspensions** 1122:10

**sustain** 948:6 955:17
958:24 961:4 968:3,5
974:11,23 981:17 1038:6
1091:13 1138:5 1246:1
1263:20

**sustained** 933:3,8,16
939:15,20 940:25 946:21
948:7 950:4,23 951:11
952:20,23 954:6 955:9,11
961:8 965:12 969:19
988:11 991:4,8 992:22
993:5 997:10,24 1000:22
1006:8 1012:14 1013:10
1017:20 1018:2 1023:3
1030:19 1035:2 1038:14
1045:11 1048:1 1050:16
1062:7,14 1065:4 1076:10
1087:23 1090:11,14
1109:11 1119:21 1123:10
1124:16 1128:25 1132:5
1136:14 1137:20 1140:11
1142:2 1160:15

**sustains** 1206:2

**Suzanne** 946:25 954:8

**swear** 904:3 1166:19

**sweep** 1223:13

**Sweeten** 1220:15 1221:7

**Sweeten's** 1226:17

**sworn** 998:7 1166:20
1175:14 1266:13 1270:16

**symbols** 1108:24

**synopsis** 1233:19

**system** 1106:25 1145:15,
19 1225:4 1253:24
1255:13 1257:12

---

**T**

**TA** 1253:5,6,10,11,16
1255:3 1257:7

**table** 909:1 1148:4 1188:5
1200:8

**tag** 1077:12

**takeaway** 1276:7

**taker** 1139:18

**takes** 1148:2 1164:2
1241:1 1244:13 1272:23

**taking** 931:13 946:16
1010:5 1033:13 1098:23
1107:14 1112:14 1198:3,
13 1204:1 1214:17,19
1252:4 1253:14

**Talburt** 980:7,13 1152:6
1167:19 1168:16 1169:18
1171:2,7 1173:21 1239:25
1251:15

**talk** 903:25 907:3 911:3
921:18 922:3,16 937:16
938:21,24 962:10,11,19,22
981:11 996:25 1000:19
1011:13 1031:6 1033:25
1049:8 1054:3,6,11,13
1056:1,2 1059:23,24
1060:6 1061:12 1067:25
1082:19 1084:2,8 1134:25
1147:20,21 1149:7 1161:3,
16,19,22 1162:2,3,13,23
1163:8,15 1164:25
1197:18,20 1202:25
1206:4,25 1216:5 1230:14,
16,22 1231:7 1232:19
1238:8 1243:1 1265:1,2,
15,21 1266:11,15,16
1267:8 1268:12,15
1269:20,23 1270:8
1274:13,18,19,24 1275:3,
17,20,21,24 1276:9,10,13,
17 1278:1

**talked** 905:19 931:5
1024:19 1026:4 1054:9,15,
16 1055:3,5,8 1061:7
1066:19 1120:16 1130:18
1152:6 1184:24 1223:17
1235:4 1248:7 1256:18
1267:11,15 1268:17,19
1279:8

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 377 of 642  PageID 11318
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022                    Index: talking..throwing

**talking** 917:17 918:22 921:14 925:19 926:15 944:19 954:2 956:10 961:13 969:22 971:25 972:8 976:19,24 991:2 997:23 999:14 1002:25 1003:17 1011:24 1012:4 1034:19,22 1035:8 1040:5,7 1041:15 1042:12 1045:20 1046:4 1047:3,11,14 1054:6 1055:4 1062:21 1064:6 1065:7 1082:25 1083:19 1105:24 1112:2 1134:19 1152:18 1161:15 1163:17 1174:4,10 1206:7 1211:3 1217:14 1232:22 1239:24 1248:17,20 1256:2 1267:7 1268:4,5 1270:14,17 1272:14 1273:12

**talks** 1081:12 1083:16 1268:8 1269:3 1270:4

**tall** 1243:12

**target** 935:3 936:5,15 937:4 938:8 974:19 1169:24

**targeting** 954:3 973:5

**task** 993:20

**tasked** 991:12 993:19

**taxed** 1157:3 1254:14

**team** 989:17 995:5 1069:9,11,13 1070:22,25 1073:18 1092:5,12,23 1101:25 1102:12,21 1103:6,7,23 1104:7,25 1178:12,16 1221:7 1225:2 1226:17 1249:14 1250:8,23 1251:3,8,19,22,23 1252:7 1253:2

**tearfully** 1084:15

**technical** 1133:21

**telephone** 1141:15

**televised** 1256:18

**telling** 918:14 928:21 930:21 958:20 964:11,12,20,22 969:23 982:25 997:21 999:20 1016:14 1047:8 1054:23 1075:3,19,20 1091:9 1096:15,22 1099:19 1103:1 1105:20

1107:1 1108:13 1122:6 1128:22 1131:21 1145:5 1151:17 1169:6,7 1205:20 1218:23

**tells** 935:2 1014:2 1163:18 1222:1

**temperature** 904:11

**tentative** 1253:7 1267:6 1269:21

**tenure** 1097:11 1138:21

**term** 965:2 1015:5 1138:23 1173:23 1237:15

**terminate** 927:8,12,22 929:21 937:5 978:2 998:21 1020:11 1042:14 1086:14 1135:2 1141:18 1155:9 1159:15 1160:2 1172:11 1173:9,12 1272:22

**terminated** 930:17,22 931:11,21 993:13,23,24 1000:11 1006:4 1015:3,18 1028:11 1029:22 1030:7,9,23,24 1036:20,21 1039:14 1041:22 1042:23 1047:7 1069:22 1072:12 1121:21 1123:3,24 1124:3,8 1125:14 1132:8

**terminating** 925:17 998:12 999:11,21 1049:4 1124:7

**termination** 932:2 936:5,12 937:10,11 1007:23 1008:21 1015:3 1029:18 1054:20,24 1055:23 1057:24 1058:6,11,15 1072:17,18 1114:23 1115:2,24 1116:2,11,17 1123:17 1124:19 1131:18 1132:2 1143:9 1144:14 1146:22 1148:10 1149:24 1154:13,16 1155:15 1157:17 1159:17 1172:19 1271:23

**terms** 922:8 1070:14 1154:14 1165:17 1177:11 1182:20 1219:9 1270:4 1275:18

**terrible** 1027:5

**terribly** 1234:22 1236:6

**test** 1207:21

**testified** 998:22 999:12 1006:16 1140:5 1143:12,23 1227:21 1239:10

**testify** 904:12 905:1 1035:1 1048:3 1141:5 1226:20 1232:6

**testifying** 1007:13 1045:10 1084:21 1087:22 1088:10 1099:3 1106:8 1224:22 1235:3 1254:22

**testimony** 906:23 908:14 915:6 922:4 928:24 933:18 955:15 978:22 984:13 985:2,4,6,11 994:8 997:23 998:7 999:9 1010:8 1020:1 1045:2 1069:17 1140:13 1151:3,24 1152:1 1161:1,7 1163:16 1175:2 1232:17 1239:5 1275:18

**testing** 981:5

**Texas** 909:11 1176:4 1178:2,5,6 1180:12 1181:6 1209:7 1214:21

**text** 1077:17 1081:3 1171:21 1172:1,6,9 1174:8

**theme** 1150:1

**theory** 1150:14,19,23 1151:6 1154:14 1245:16

**thing** 906:4 916:24 917:17 929:20 946:11 970:9 971:19 972:23 990:4 998:4 1032:16 1035:12 1048:21 1060:10 1095:11 1112:20 1115:18 1144:9 1145:14 1147:1 1163:19 1170:1 1177:18 1188:17 1204:6,24 1214:14 1215:3 1217:23 1222:22 1238:19 1245:4 1246:17,19 1262:17 1268:20 1275:19 1276:2,5 1277:9

**things** 919:22 944:10 965:22 967:13 968:18 971:18 992:7 1014:7 1015:18 1032:15 1033:1 1036:14 1039:14 1047:6 1053:5 1081:1 1093:21 1101:6 1110:2 1111:10 1127:17 1135:1 1177:10

1199:4,7 1201:21 1202:4,18,20 1203:12 1204:10 1206:16,18,23 1218:2 1220:16 1226:15 1229:22 1242:4,8,9,15 1246:23 1248:25 1256:1 1259:1,11,13,15,20 1262:12 1275:17,23

**thinking** 905:8,12 952:17 1078:23 1143:14 1168:19 1192:23 1222:17 1267:22

**thinks** 1014:2 1041:4 1274:20

**Thom** 1223:15 1225:1 1226:2,5 1227:3

**Thompson** 1243:5

**thought** 904:19 928:9 961:13 993:24 1019:12 1032:18 1044:7 1046:22 1047:1 1052:20 1056:19 1070:21 1078:23 1088:19 1128:5 1140:5 1151:19 1180:20 1191:21 1194:6 1217:25 1218:6 1221:18 1222:19,22 1223:1 1239:16 1254:18

**thoughts** 908:12 966:19 1053:10 1055:20 1058:23 1192:14

**thousand** 1227:25

**threat** 938:8 1013:25 1014:9,14,16,22,24 1040:17,21,22 1136:5,8

**threaten** 1242:21

**threatened** 1014:3,6 1015:7,16 1016:13 1124:20

**threatening** 995:12 1014:8 1015:4,5,12 1016:2,4,9,13,16,19,22 1017:3 1018:8

**threatens** 937:3

**threats** 1011:14 1135:9

**three-and-a-half** 1091:18

**thrive** 1205:5 1209:15

**throw** 906:19

**throwing** 1190:9

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Index: ticket..tube

**ticket** 1223:12

**ticking** 921:5

**tie** 1176:22

**time** 903:24 904:5 905:11, 16,19 907:14,18 908:2,16 911:8,13,16 912:6 915:11 919:7 921:4 925:7 933:25 934:3,23 939:22 940:16,20 941:15 944:9 945:11,16 948:20 958:7,16 963:11,12 967:22 973:6 975:12 976:8 979:23 980:16,18,19,21,23 983:13 987:5 989:16 992:18,24 993:1,7,9,10,13, 22 997:7 1003:25 1021:7 1033:8 1042:9,13 1052:4, 16,19 1054:6,7 1059:15 1064:14 1065:18,24 1066:14 1067:6 1068:11 1072:11,13 1076:24 1078:9 1079:3,24 1081:7 1085:3 1087:11 1095:13 1105:13 1112:24 1113:7 1119:3,7,12,25 1124:7 1126:15 1128:1 1136:1,25 1138:13,15 1139:7 1149:16 1153:6 1156:15, 20 1157:4 1158:8 1165:10, 11 1166:10 1167:22,23 1168:20 1169:9 1173:22 1174:2 1175:8 1177:7 1178:19 1180:8,11,24 1181:5,7,10,12,14,21 1183:2,6,25 1185:14,16 1187:6,8,14 1195:16 1196:2,18,20 1197:1,7,15, 16 1198:2,14 1199:25 1201:16 1202:17 1203:2 1206:18 1207:8,19 1208:6, 7,10,20 1212:21 1213:20 1214:7 1216:18 1219:7 1220:6,7,21 1222:14 1223:5,11 1224:17 1227:3 1229:5,7 1230:8 1233:7 1235:23 1237:13 1238:5, 20,22 1239:22 1241:2,24 1242:7,9 1246:14,18,24 1252:23 1254:6 1255:12 1259:10 1262:15 1264:22 1265:20 1279:1

**timeline** 1059:8 1146:15 1181:24

**timely** 1068:21

**times** 1017:17 1064:8,13 1113:4 1203:3 1210:16 1246:13 1262:11 1267:19

**timing** 1090:13 1158:7

**tiny** 1186:25

**tired** 1110:2 1183:20

**tissue** 1131:10,13 1194:14

**title** 947:9 1004:21 1005:10 1150:17 1158:23

**today** 910:21 921:13 930:7 932:10,13,14 941:8 956:20 980:24 1066:1,18 1067:9 1090:16 1133:11 1135:1 1162:12 1176:1,6 1206:3

**today's** 1092:2

**told** 915:17 923:12 930:7, 9,13,17,20 931:15,16 936:4,20 938:19 939:4 941:19 954:24 955:3 990:6 991:11 997:1 999:1 1000:2,23 1006:4 1009:15 1010:4,21 1019:12 1024:10 1025:9 1032:2 1033:7 1044:13,18 1045:22 1046:15 1047:5 1049:16 1053:12 1056:11, 17,23 1057:17 1064:5 1069:1 1070:18,25 1076:5, 20 1077:22,24 1078:2 1079:4,18 1081:2,6 1089:12,15 1096:18 1097:25 1099:9,20 1100:7 1106:19 1108:8 1113:5 1114:9 1118:20,22 1131:16 1132:7 1155:4 1162:18,19 1172:15 1182:12,13 1184:17 1188:14 1191:23 1194:5 1196:13 1199:22,24 1203:14,15,18 1219:3 1221:13 1231:7 1232:7 1244:8 1250:23 1258:7 1263:3,17

**tomorrow** 1265:6

**ton** 1221:8

**tone** 1209:22

**tonight** 906:4 907:4,11,14, 25 908:16 911:16 912:6

**tonight's** 916:17

**top** 945:2 1058:21 1078:19 1082:15 1108:2 1114:3 1129:23 1134:9 1254:2,11

**topic** 975:1 1133:19,20 1198:22

**topics** 1171:13,15,19,23 1198:19

**torn** 1185:11,12 1203:3

**Torres** 1266:23

**totality** 998:18 999:23

**totally** 1145:21 1150:25 1229:17

**tough** 1159:7 1268:20

**town** 1095:14 1220:5

**track** 918:10 1123:13 1147:16 1149:11

**tracking** 1197:22

**tracks** 1121:25

**traction** 920:8

**tradeoff** 906:10

**train** 1239:16

**training** 1208:2,3,15,18 1209:5

**transcribed** 1139:24

**transferred** 1178:2

**Transition** 1069:9

**transportation** 923:19 924:6

**trashing** 1225:3

**travel** 904:24

**traveling** 934:13

**tray** 1215:4

**treasurer** 1236:24

**treat** 1130:10

**treated** 1226:16 1227:18 1244:24

**treating** 1227:24

**trial** 904:12 905:1,3,6,8,23, 24 911:4 912:3 914:14,18 915:2,3,9 979:5 1073:14 1085:22 1095:4 1100:22

**true** 924:1 925:3 928:15 930:14 934:17,19,20 936:7,22 938:22 939:9 940:17 945:25 946:4,10,23 947:10,11 954:19 956:10 957:3 958:1,10 960:15 965:9 969:15 970:4 973:13 975:10,22,23 980:4 982:9 983:17 986:2 987:9 989:20 990:22 991:14,18 994:1 998:12 999:7,8,22 1000:13 1006:12 1007:12 1010:22 1011:17 1012:1 1013:25 1014:6 1019:8 1020:16,17 1025:7,11,25 1026:2,5,14 1027:1,6 1028:13,20,25 1029:24 1030:2,24 1031:19,23 1032:9,23 1033:2 1037:1 1039:6 1041:25 1043:7,8,12,17,19 1044:9,13 1047:12 1048:8 1050:1,4,5 1053:7 1054:24 1055:23 1057:20 1058:11, 12,24 1069:18 1071:13 1072:16 1080:20 1081:4,7, 18 1083:1 1089:9,18 1093:16 1094:15 1095:8 1099:22 1101:18 1105:21, 22 1107:2 1110:17 1111:4 1114:20,24 1116:19,20 1117:4 1119:12 1120:1,2,3 1123:17,18 1126:16 1129:4 1130:12 1164:9 1169:1,6,11

**Trump** 1257:24

**trust** 1238:12

**trusted** 1237:16

**truth** 964:12,21,24 969:23 1031:12 1187:22

**truthfulness** 969:5

**tube** 1193:20 1194:2,5,15

**turn** 909:16 1027:20
1095:18

**turned** 972:14 1145:16,23
1150:22 1187:11 1242:17
1243:5,11 1249:17 1252:8

**turning** 966:12 968:22
972:4 1144:17 1151:7,9
1239:25 1251:23,24
1252:4

**turns** 1278:24

**Twix** 1231:25

**two-day** 1252:8

**TWU** 954:11 955:1 956:8
1011:10 1020:19,24
1021:2,10 1022:15
1023:16 1024:11 1025:2
1039:12 1041:13 1046:5
1097:22 1098:10 1109:3
1110:18 1126:13 1134:10
1180:12,15 1221:14
1225:3,23 1245:9 1246:22
1248:12 1249:15 1250:7
1259:25 1260:2 1262:22,
25

**type** 943:24 1171:23
1276:2

**types** 1251:25

**typically** 1090:22

---

### U

**U.S.** 1233:9,12,16 1266:6,
8,23

**Uh-huh** 1178:18 1179:14
1216:17

**Um-hmm** 950:13 1240:2

**unassociated** 1036:8

**unborn** 1044:14 1105:5
1261:11

**unclearly** 1089:17

**uncovered** 966:9

**underlying** 1272:12

**understand** 904:9,21
912:25 913:25 914:2,5
915:19 918:7 924:23 932:8
935:21 936:17,19 942:8,9

948:14 950:17 952:9,11
964:1 974:14 975:4,6
976:4 979:8 981:3,4 993:4
994:18 1005:5 1012:25
1014:20 1015:13 1018:18
1022:18,20 1028:15
1033:11 1042:20 1063:22
1070:18 1076:6 1102:24
1115:13 1118:22 1119:1
1131:12 1139:6 1142:21
1151:12 1154:17 1156:1
1158:23 1163:10 1168:2,
25 1169:2,8 1173:6
1176:17 1187:25 1206:23
1216:10 1228:2 1234:18
1261:15 1262:13 1271:15
1277:15 1278:16

**understanding** 919:9
923:15,24 928:16 947:25
948:23 953:5 964:7 987:2
988:1 1046:24 1063:23
1076:4 1099:8 1136:18,20
1137:5 1142:6,11 1218:23
1224:20 1228:4 1238:21
1239:14 1240:10 1243:18
1260:15

**understandings** 1159:1

**understands** 1210:6

**understood** 903:13
904:18 911:20 973:2
1065:1 1105:13 1118:23
1125:12 1132:19 1147:5,
11 1150:7 1152:4 1156:19,
22 1169:4 1272:7 1273:2
1277:12

**unethical** 1276:25

**unfettered** 1142:24
1143:12

**uniform** 1091:19 1093:24

**union** 903:18 917:5,15
918:5 919:5,12 920:7
924:18,20,21 925:2,11,14,
15 930:3 931:12,23 934:11
935:5 939:25 940:1,8
941:16 942:14 954:3,18,23
955:4,21 956:10 957:1,3
958:1 973:4,23 974:2
975:7,13 977:11 978:1
983:15 1010:20,22 1011:4
1021:16 1023:17 1025:7,
10,24 1026:2,4 1027:3,4,9
1028:3,4 1031:19 1032:8,

11,14,22,25 1033:2,19
1034:11,13,15,20,22
1035:7,9,13 1036:3,5
1037:1,4,7,11 1038:3,8,9
1040:8,11 1041:3,16,19,24
1047:15,20,23 1048:8
1049:7,8,11 1050:4,19
1053:19 1058:14 1060:25
1066:24 1071:15,23
1073:9 1074:5,22 1075:9,
16,21 1079:21 1081:10,15
1082:20 1084:3,5,10
1085:16 1094:22 1095:17
1096:16,21 1097:7,9
1098:19,20,21,23 1099:4,
21 1100:2,17 1107:7,11,21
1108:23,25 1109:1
1110:22,24 1113:15
1118:20,24 1119:10
1120:3 1121:25 1122:2
1125:23 1126:12 1127:6,
16 1133:6 1137:25
1138:10,14 1143:6,7,8,17
1144:14 1145:17 1149:23
1150:3,15,17,18,20
1151:4,7,8 1159:16,19
1160:1 1168:3,10,17,23
1169:5,9,24 1170:12
1173:5,11 1197:19 1206:4
1216:19,20,23,25 1217:7,
10 1218:5,12,18 1219:7,9,
14,15 1220:6,9,18 1221:6
1222:24 1223:6,10
1226:12,13,18 1227:11,13,
24 1228:3,5,11 1229:24,25
1230:2 1234:15,25 1235:3,
4,12,14,20,21 1236:1
1240:8 1241:17,21 1242:5,
11,13,18 1243:15,21,24
1244:5 1245:1,7 1246:6
1247:2,3,5 1250:18
1251:17 1252:1,2 1255:5,
23 1257:1,2 1260:2,3,5
1262:23 1263:9 1264:16

**Union's** 1079:22 1150:24
1157:4

**union-activity** 1037:8
1247:18

**union-protected** 917:20,
25 1102:22

**union-related** 918:1

**unions** 1219:11,12

**Unity** 1256:10

**University** 1180:13
1181:7

**unmute** 996:16

**unmuted** 1060:13

**unsure** 1021:3

**upcoming** 935:4

**update** 903:25

**upset** 939:8 1171:16
1192:18 1223:9 1255:24
1256:5

**upsetting** 1256:12

**uterus** 1194:15

**utilize** 1174:5

---

### V

**vacation** 1001:23,24
1002:23 1003:16 1095:12
1253:24 1255:12

**vacuum** 960:7

**vagina** 1028:20 1114:19

**vaginas** 1114:17

**vague** 918:25 919:14
931:24 935:13 936:8,9
942:19 956:12,16 959:5
960:5 961:7 967:17,25
991:1,7,21 1029:10
1035:16 1037:12,24
1038:4 1099:25

**vaguely** 935:9 1096:23,25
1099:23

**vagueness** 917:9 974:22
1021:18

**valid** 917:12 920:15

**validity** 943:25

**valued** 1258:17

**values** 1126:24

**variety** 920:2 1171:19

**vast** 951:18

**Vegas** 947:2

**veiled** 1014:14,16

**verge** 944:17

**verified** 936:3 1139:25

**verifies** 937:23

**verify** 938:1

**version** 946:7 997:3,5,13 1020:6 1087:6 1118:11

**versions** 1020:3

**versus** 905:8 1267:12

**vice** 953:17 1241:3

**Victor** 912:23

**video** 911:15 912:7 1018:23 1019:4,7,13 1020:15 1026:17 1028:12, 23 1044:14 1046:8 1067:1, 8 1077:15,18,25 1078:1,3, 4,9,11,23 1079:4,7,10 1080:18,23 1081:4 1086:20 1087:11 1091:17 1093:10 1131:6 1134:11 1259:6 1260:17 1262:25

**videos** 958:4 1019:16 1044:4,17 1045:18,20,24 1046:4,5 1114:4 1118:13, 14 1120:8,23 1132:8 1259:20 1261:7

**view** 964:25 1026:16 1078:11 1079:1,4 1080:18, 20 1205:15 1220:9 1257:17 1258:20,21 1273:3 1277:11

**viewed** 989:13 1079:9 1080:21,23,24 1087:16 1168:16

**views** 1032:9 1070:3 1185:14

**VII** 1150:17 1158:24

**vile** 1028:4,8 1174:8

**violate** 1004:6,12 1027:18 1044:15,19 1045:22 1056:13 1058:3 1102:21 1114:6,14,17 1116:14 1277:11,15

**violated** 979:7 999:2 1004:15,18 1044:1,23 1054:16 1056:25 1057:1, 17,19 1101:25 1114:20 1116:24 1117:20 1150:20

**violates** 1002:8,17 1027:5 1037:20 1156:5

**violating** 906:20 1004:10 1007:10,11 1062:17 1102:19 1121:21

**violation** 928:5 961:19 975:7 982:8 983:2 995:8, 14 1005:16,17 1007:16 1016:6,20 1027:25 1028:6, 9 1029:8,9,14,16 1043:19 1044:10 1045:1,14,16 1047:5 1117:18 1123:3,25 1124:3,8 1137:15 1145:22 1150:15,17

**violations** 940:2 941:18 942:16 954:4 970:11 974:3 976:7 978:20 981:21 983:17 986:1 1123:13

**violence** 1135:10

**violent** 995:11 1027:12

**virtue** 944:16

**visibility** 1090:25

**visible** 912:12

**visit** 910:21

**voice** 1244:2,3 1246:12

**voir** 904:2

**volume** 909:16

**voluntarily** 954:13 1260:21 1261:2

**volunteer** 1276:1,2

**volunteering** 930:12

**vote** 940:7 1238:8 1243:25 1249:25 1250:1 1253:10

**voted** 1237:3 1238:15 1241:16,19 1252:24

**voting** 940:8

**VP** 1101:8 1126:9

---

**W**

**wait** 928:18 960:9 972:7 1014:12 1023:13 1040:15 1081:14 1104:11 1130:21, 25 1145:8 1153:22 1218:4 1221:20 1222:3 1236:16

1239:21 1263:25 1264:7

**waiting** 905:9 1186:9 1264:3,4

**walked** 903:20,23 934:5 1141:23 1186:7

**walking** 921:6 1001:25 1004:1 1155:21 1192:16 1242:24 1243:4

**wanted** 911:21 919:1 974:7,13,18 975:17,21 987:7 1014:18 1048:20 1050:3 1071:15,22 1148:5 1179:17 1181:7 1186:12, 17 1187:7 1195:22 1196:1 1197:12 1198:10 1201:13 1202:21 1204:23 1206:22 1207:5 1222:5 1223:9,22, 23,24 1226:3 1229:2 1235:23 1237:4 1244:25 1261:15

**wanting** 936:5 1115:19 1215:14 1276:17

**ward** 1164:2,14,21

**warning** 1168:25

**warrant** 972:24 975:2

**warrants** 1268:12

**Washington** 1032:19

**watch** 1055:15 1078:9 1204:6,24

**waterfall** 944:15

**ways** 1039:25 1080:1,7

**wear** 1190:5,8 1258:18

**wearing** 1093:24 1106:5, 10,11,20 1257:22

**web** 912:9

**webcam** 912:13 913:8

**wedding** 1192:14

**Wednesday** 1077:12

**week** 945:13,15 954:9 992:19 1045:7 1052:1 1186:22 1264:22

**weekend** 907:11 1265:8,9 1268:4 1269:12 1270:8 1274:3 1277:5,21,24

**weeks** 1183:25 1186:14 1188:12 1208:18

**wheels** 1214:22

**When's** 945:11

**Whichever** 996:6

**white** 907:2

**whore** 1182:19

**wife** 1198:16

**wildest** 1263:7,11

**willingness** 904:11 916:11

**Willis** 1233:6

**win** 1241:10

**window** 1210:4

**wings** 1209:1

**wins** 1228:3 1231:17

**wished** 1205:11

**withdraw** 1038:15 1092:9 1096:8 1119:22 1124:4

**witness's** 1003:5

**witnessed** 965:23

**witnesses** 917:4 918:6,15, 16,19 920:16 963:22 965:8 969:22 973:12 985:4 1065:20 1066:17 1162:20 1232:5,6 1266:13,17 1267:19 1270:14 1271:2,6 1274:7 1275:16 1276:14

**woman** 1201:24 1225:17 1256:15 1258:16,18

**woman's** 1180:13 1181:6 1256:22

**womb** 1201:25

**women** 956:9 1114:16 1134:21 1198:15 1199:10, 15 1200:3,7,15,20 1202:5 1258:2

**women's** 954:11 1039:23 1049:19,20 1097:21 1098:10 1099:22 1100:3 1108:11 1126:16,23 1198:6,13,21 1199:5 1256:13,14 1258:2,3,6,17 1259:13 1260:6 1261:18

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                           Vol 4 July 08, 2022                         Index: won..zygote

**won** 1227:23

**wonderful** 908:9 1209:19

**woozy** 1188:7

**word** 937:1,11 957:4,8,17 965:9 1009:5,11 1010:5 1120:2 1128:3,23 1243:6,7

**wording** 1116:15 1242:3

**words** 904:6 906:18 1042:17 1141:4 1226:14

**wore** 1105:24 1106:12 1258:15

**work** 932:14 966:20 993:11 995:2 1003:14,16 1004:24 1005:18,19 1105:18 1121:2 1154:7 1158:3,11,18 1167:13 1177:9 1181:16,18 1184:6 1195:18 1199:12 1204:5 1209:24 1211:23 1212:11, 14 1218:20 1219:21 1223:23 1225:7 1240:8 1255:16

**worked** 994:2 1149:23 1177:6,7 1195:18,21 1209:8 1211:8 1213:11 1229:13

**working** 1066:5,6 1119:2, 7 1150:5 1151:10 1174:4 1181:3 1183:2 1193:12 1208:8 1221:11,21 1225:8 1254:19 1277:6

**workplace** 929:19 995:15, 20,22,23 997:15 998:8,18 999:4,14,23 1000:1,6,12 1001:16,19 1002:8,23 1004:6,10,13,20,21,23 1005:1,8,9,13,15,17,19,21 1006:5,12 1007:3,5,7,10, 11,17 1009:5,11 1010:5 1015:11 1071:10 1115:15, 20,22 1117:11,13,14 1121:4,8,12,16,17,18,19, 20,22 1122:20 1127:24 1128:3,6,8,9,11,12,14,20, 22 1129:2,4,8,9,12,19,21, 25 1130:1,9,10 1135:7 1136:9,11 1159:9

**works** 956:7 988:3 1018:15

**world** 960:8 1091:20 1092:2 1210:25 1211:11, 12,14

**worried** 1085:5

**worry** 993:25

**worse** 1193:9

**worst** 1190:1,17

**worth** 1151:15

**wow** 1017:16 1065:21 1220:19 1221:18

**wrestle** 1278:21

**write** 1134:13 1171:12 1173:24

**writer** 962:4,7

**writing** 1045:3,4,5 1074:17 1144:2 1169:10

**written** 940:6 965:18 998:20 999:10,25 1060:23 1066:13 1077:21 1109:4

**wrong** 915:19 965:2 1032:20 1139:17 1163:6 1267:8 1269:22,24 1277:3

**wrote** 1080:16,17 1120:13 1173:22 1174:7

---

## Y

**y'all** 904:6 905:7,12 907:1 909:5 921:23 1060:19 1067:17 1068:17 1150:9 1152:10 1167:1 1231:13 1265:10 1266:4,25 1267:8 1269:23 1277:6,20 1278:18,23 1279:1,2,4,17, 20

**yards** 1183:21

**year** 1122:10 1179:4 1182:2 1195:21 1220:24 1224:18 1249:19

**years** 913:23 914:15 948:19 951:14 953:2,3 987:3,25 992:6,7 1090:7,8, 22 1091:7,18 1092:23 1093:13,23 1095:16 1096:3 1106:17,20 1109:7 1111:20 1112:16 1113:8 1120:16,21,23 1126:22

1174:13 1183:9 1192:6,9, 20 1193:15 1201:9 1205:21 1221:5 1228:9 1229:23 1235:9 1253:13 1263:16

**Yellow** 1185:3

**yesterday** 910:20 921:12, 13 922:4 1152:8 1239:11

**York** 1195:24

**young** 1179:6 1198:15,17 1201:23 1202:19,22 1204:18 1205:23 1225:7

**Young's** 1198:16

**younger** 1204:7,25 1205:13

---

## Z

**Zoom** 912:10

**zoomed** 1087:2

**zygote** 1186:25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 382 of 642   PageID 11323
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022

1                     UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF TEXAS
2
                        CASE NO. 3:17-cv-02278-X
3

4

5   ----------------------------------------x

6   CHARLENE CARTER,

7                         Plaintiff,

8   v.

9   SOUTHWEST AIRLINES CO. and
    TRANSPORT WORKERS OF AMERICA,
10  LOCAL 566,

11                        Defendants.

12

13  ----------------------------------------x

14

15

16                  TRANSCRIPT OF THE TRIAL

17          BEFORE THE HONORABLE BRANTLEY STARR

18              UNITED STATES DISTRICT JUDGE

19

20              V O L U M E   5

21

22                      Dallas, Texas

23                      July 11, 2022

24                       9:02 a.m.

25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 383 of 642   PageID 11324
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Pages 1282..1285

Page 1282

```
 1  A P P E A R A N C E S:
 2
    FOR THE PLAINTIFFS:
 3
         NATIONAL RIGHT TO WORK FOUNDATION INC.
 4            8001 Braddock Street
              Suite 600
 5            Springfield, Virginia  22160
         BY:  MATTHEW B. GILLIAM, ESQ.
 6            mgb@nrtw.org
 7
 8       PRYOR & BRUCE
              302 North San Jacinto
 9            Rockwall, Texas 75087
         BY:  BOBBY G. PRYOR, ESQ.
10            MATTHEW D. HILL, ESQ.
              bpryor@pryorandbruce.com
11            mhill@pryorandbruce.com
12
13
14
15  FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
16       REED SMITH, LLP
              2850 North Harwood
17            Suite 1500
              Dallas, Texas  75201
18       BY:  PAULO B. McKEEBY, ESQ.
              BRIAN K. MORRIS, ESQ.
19            pmckeeby@reedsmith.com
              bmorris@reedsmith.com
20
21
22
23
24
25
```

Page 1283

```
 1  For the Defendant Union 566:
 2
 3       CLOUTMAN & GREENFIELD, PLLC
              3301 Elm Street
 4            Dallas, TX 75226
         BY:  ADAM S. GREENFIELD, ESQ.
 5            EDWARD B. CLOUTMAN, III, ESQ.
              agreenfield@candglegal.com
 6            crawfish11@prodigy.net
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 1284

```
 1  COURT REPORTER:  MS. KELLI ANN WILLIS, RPR, CRR, CSR
                     United States Court Reporter
 2                   1100 Commerce Street
                     Room 1528
 3                   Dallas, Texas  75242
                     livenotecrr@gmail.com
 4
 5       Proceedings reported by mechanical
 6  stenography and transcript produced by computer.
 7
 8                      * * * *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 1285

```
 1                    I N D E X
 2       Informal Charge Conference (off the record)
 3
 4              W I T N E S S E S
 5  CHARLENE CARTER
 6       Cont. Direct Examination by Mr. Pryor ...... 1288
 7       Cross-Examination by Mr. McKeeby ........... 1307
 8       Cross-Examination by Mr. Greenfield ........ 1405
 9
10  BRETT NEVARES
11       Via Zoom deposition ........................ 1481
12
13  MAUREEN EMLET
14       Direct Examination by Mr. McKeeby .......... 1511
15       Cross-Examination by Mr. Greenfield ........ 1551
16
17  NAOMI HUDSON
18       Direct Examination by Mr. McKeeby .......... 1558
19       Cross-Examination by Mr. Greenfield ........ 1571
20
21  ED SCHNEIDER
22       Direct Examination by Mr. McKeeby ......... 1573
23       Cross-Examination by Mr. Greenfield ........ 1607
24
25
```

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 384 of 642   PageID 11325
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Pages 1286..1289

Page 1286

1

2                    E X H I B I T S

3

4    Trial Exhibit 38  ................... 1295

5    Trial Exhibit 130 ................... 1301

6    Trial Exhibit 42  ................... 1301

7    Trial Exhibit 126 ................... 1306

8    Trial Exhibit 127 ................... 1306

9    Trial Exhibit 128 ................... 1306

10   Trial Exhibit 129 ................... 1306

11   Trial Exhibit 118 ................... 1313

12   Trial Exhibit 40  ................... 1327

13   Trial Exhibit 2   ................... 1392

14   Trial Exhibit 83  ................... 1516

15   Trial Exhibit 44  ................... 1524

16   Trial Exhibit 11  ................... 1533

17   Trial Exhibit 7   ................... 1536

18   Trial Exhibit 9   ................... 1543

19   Trial Exhibit 16  ................... 1546

20   Trial Exhibit 103 ................... 1592

21

22

23

24

25

Page 1287

1              - P R O C E E D I N G S -

2        (Informal charge conference off the

3  record.)

4        THE COURT:  You can be seated.  Except for

5  you, Mr. Pryor, you've got nowhere to sit.

6        Okay.  So now we are on the record.  We

7  are in Day 5 of trial.  Let's do lightning round of

8  appearances right quick just to start off the day.

9        MR. GILLIAM:  Bobby Pryor, Matt Gilliam,

10  and Matt Hill for Plaintiff Charlene Carter.

11        THE COURT:  Thank you.

12        MR. McKEEBY:  Paulo McKeeby and Brian

13  Morris for Defendant Southwest Airlines.

14        THE COURT:  Thank you.

15        MR. GREENFIELD:  Adam Greenfield and

16  Edward Cloutman III on behalf of TW Local 566.  We

17  also have our corporate representative, Michael

18  Massoni, at the table.

19        THE COURT:  Thank you.

20        So, now, in our off-the-record informal

21  charge conference, Mr. Greenfield, you raised the

22  issue of a request for leave to add an affirmative

23  defense.  Can you make that request on the record

24  for us?

25        MR. GREENFIELD:  Yes, your Honor.

Page 1288

1        We make a request to add in an affirmative

2  defense on the issue of undue hardship on behalf of

3  the Union pertaining to religious accommodation

4  rights.

5        We believe there is no undue prejudice

6  caused by adding in this affirmative defense.  In

7  fact, discovery has been ongoing throughout the

8  trial, and we believe, thus, adding an affirmative

9  defense causes no prejudice at this point.

10        THE COURT:  Understood.

11        So I will say that out of consistency,

12  since I did not allow a late amendment to seek

13  punitive damages under the RLA claim from the

14  plaintiff, then out of consistency I will overrule

15  your request for this affirmative defense.

16        With that, we can bring in the jury.

17        THE COURT SECURITY OFFICER:  All rise for

18  the jury.

19        (The jurors entered the courtroom.)

20        THE COURT:  Thank you.  You can be seated.

21        Okay.  Mr. Pryor, you can continue to

22  question the witness.

23        DIRECT EXAMINATION (continued)

24  BY MR. PRYOR:

25  Q.  Good morning, ladies and gentlemen.

Page 1289

1        Good morning, Ms. Carter.

2  A.  Good morning.

3  Q.  Ms. Carter, when we spoke last on Friday, you

4  had received a call from Mr. Schneider informing you

5  that you were terminated.

6        Do you recall that?

7  A.  Yes, I do.

8  Q.  I want to back up to the fact-finding meeting

9  that has been talked about in this matter where the

10  claims against you were investigated by Southwest

11  Airlines.

12        Do you recall that?

13  A.  Yes, I do.

14  Q.  In the fact-finding meeting, did you inform

15  Southwest Airlines of your religious beliefs?

16  A.  I did.  I told them I was a Christian.

17  Q.  Did you tell them how that related to you

18  sending the videos and the communications that you

19  did?

20  A.  Yes, I did.

21  Q.  Did you tell them it was related?

22  A.  Yes, I did.  I told them that the reason -- I

23  mean, it was just because the Union spent the money,

24  but also because of my religious beliefs.

25  Q.  Did you tell them about your communications in

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1290..1293

Page 1290

1 regard to union activity?
2 A.  Yes, I did.
3 Q.  What did you tell them?
4 A.  Well, I told them that everything that I had
5 sent was only to my union president and after what
6 they had done and gone to the Women's March.
7 Q.  And they've talked about some Facebook posts as
8 a nexus.
9     With the exception of the lanyard, which the
10 jury can decide if that can be read or not, but with
11 the exception of that, were there any Facebook posts
12 even within 18 months that remotely mentioned
13 Southwest Airlines?
14 A.  No.  And the thing is, is they had to go in and
15 search my pictures.  They're not even posts -- I
16 mean, you would have to search forever.
17     But they actually went in and searched my
18 pictures to find a nexus.
19 Q.  Were these pictures more than three years old?
20 A.  Yes, they were.
21 Q.  Were some more than five years old?
22 A.  I believe four, going into five, yes.
23 Q.  At any time did Southwest Airlines offer to
24 accommodate your union activity or religious
25 beliefs?

Page 1291

1 A.  No.
2 Q.  At any time did they, for instance, offer, if
3 you will take off these nexus posts on Facebook
4 regarding Southwest, then you can post regarding
5 your religious beliefs?
6     MR. McKEEBY:  Object to leading.
7     THE COURT:  I'll allow it.
8     THE WITNESS:  No.
9 BY MR. PRYOR:
10 Q.  At any time did they offer you any
11 accommodation regarding your union activity?
12 A.  No.  As a matter of fact, they just called her
13 a flight attendant.  They never even said her name.
14     I knew who I sent them to, and it was only one
15 person.
16 Q.  By the way, the communications that you engaged
17 in with your union and your union president and your
18 post on your Facebook page, did you do those at the
19 workplace?
20 A.  No.
21 Q.  Did you send them to anyone at their workplace?
22 A.  No, I did not.
23 Q.  Counsel in opening, I think one of the
24 questions was about that you think you can just say
25 whatever you want.

Page 1292

1     Are you asking this jury to allow you to engage
2 in illegal speech?
3 A.  No, not in illegal speech, no.
4 Q.  So you recognize limitations?
5 A.  Yes.
6 Q.  As a matter of fact, you recognize limitations
7 had you been communicating in the workplace as
8 opposed to not?
9     MR. McKEEBY:  Objection, leading.
10     THE COURT:  Sustained.
11 BY MR. PRYOR:
12 Q.  Do you have -- do you believe you should have
13 unfettered rights in the workplace to engage in
14 certain speech?
15 A.  In the workplace, there are certain things
16 that, you know -- I mean, I don't go around harming
17 people at the workplace.  I never have.
18 Q.  Ma'am, there is -- we've got a continuing
19 objection on this in responding to the questions
20 raised about that you were offered your job back.
21     Do you recall --
22 A.  Yes.
23 Q.  -- in opening, questions of Mr. Schneider?
24 A.  Yes.
25 Q.  Were you offered your job back in a manner in

Page 1293

1 which you could engage in free speech and religious
2 speech on your Facebook?
3 A.  No.  And then -- so let me back up.
4     They said they were going to reduce it in time
5 served for 30 days, or a 30-day suspension.
6     They also gave me what is called a last-chance
7 agreement.  And that last-chance agreement, first of
8 all, would put a bad letter, which, you know, I was
9 a good employee.  But they were going to put a bad
10 letter in my file for 24 months, which exceeded,
11 even in our contract, which was 18 months.
12     They also wanted me to sign an NDA,
13 non-disclosure, for the Union and for the company,
14 and they also wanted to strip my rights away if I
15 ever had any other issues to sue them, the company,
16 and the Union.
17     So what they really wanted me to do is just
18 stay quiet.
19     And now looking back, when I was called in on
20 that day -- and I'm so thankful I didn't sign it --
21 because Brian Talburt was already turning others in.
22 My name was on that list.
23     So I know of another employee that they did
24 this to, and she was about to go back out on line,
25 and they --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Pages 1294..1297

Page 1294

1      MR. McKEEBY:  Objection, foundation.
2      She's talking about another employee.  I
3 don't know how she knows --
4      MR. PRYOR:  It's her understanding.
5      THE COURT:  Sustained.  She can clarify.
6 BY MR. PRYOR:
7 Q.  Okay.  Go ahead.  You can finish.
8 A.  Okay.  So --
9      MR. McKEEBY:  No.  I mean, there needs to
10 be a foundation laid as to how she knows about this
11 other employee.
12     THE WITNESS:  She's a friend.
13     THE COURT:  I will let you ask the
14 foundation question.
15 BY MR. PRYOR:
16 Q.  Okay.  I've got limited time here.
17     Where did this understanding come from that you
18 have regarding how this last-chance agreement would
19 be dealt with?  Did you have a union rep?
20 A.  I did.
21 Q.  And what were you told?
22 A.  She basically said it would be like a death
23 sentence if I signed it again, or if I signed it.
24 Q.  Not only that, you weren't willing to give up
25 your rights to engage in union complaints and

Page 1295

1 freedom of religion?
2 A.  Correct.
3      MR. PRYOR:  Move for the admission of
4 Exhibit 38.
5      THE COURT:  38.  Any objection to 38?
6      MR. McKEEBY:  No objection from Southwest.
7      MR. GREENFIELD:  One moment, your Honor.
8 No objection, your Honor.
9      THE COURT:  Okay.  38 is in.  We will
10 publish.
11     (The referred-to document was admitted
12     into evidence as Trial Exhibit 38.)
13     MR. PRYOR:  I ask to publish it to the
14 jury, your Honor.
15     THE COURT:  It is published.
16     MR. PRYOR:  Okay.  Thank you.
17 BY MR. PRYOR:
18 Q.  Ma'am, let me ask you a little bit about your
19 damage claim.
20 A.  Okay.
21 Q.  I think you were crying on your floor with your
22 husband praying when you found out you had been
23 terminated.
24     MR. McKEEBY:  Objection, leading.
25     MR. PRYOR:  I'm laying the predicate for

Page 1296

1 where we left off.
2      THE COURT:  You can do it.
3 BY MR. PRYOR:
4 Q.  Is that where we were?
5 A.  Yes, that is correct.
6 Q.  And again, I have limited time, but that point
7 in 2017 to now, has that caused stress in your life?
8 A.  It has caused so much stress in my life, but
9 what really gets me is my daughter.
10 Q.  And the impact on your family has an impact on
11 you?
12 A.  Correct.
13 Q.  Okay.  What is a walking stroke?
14 A.  So that's when you don't have -- my blood
15 pressure was spiking so high and it was going -- I
16 can't even explain it.  But I wasn't getting enough
17 oxygen to my brain even though I was -- I didn't
18 pass out.
19     But I had -- my doctor called it I was in a
20 fight-and-flight response in a constant manner.  I
21 wasn't eating, I wasn't sleeping.
22     I mean, my job meant everything to me.  It was
23 my career.  It was the way I provided for my family
24 along with my husband.  And on top of that, I loved
25 my job.

Page 1297

1      But I ended up in the hospital.  I was on
2 another -- I had another venture, which I knew I had
3 to do after I lost my job.  And I ended up in the
4 emergency room.  I have six hours that I cannot
5 recall, and I thought I had been drugged.
6      So I was able -- my husband told me, he said,
7 "You've got to get to the hospital.  You are not
8 talking" -- I was on the phone with him.  I was in
9 St. Louis, Missouri.
10     This was between the time that I had my job
11 taken away from me and my second step meeting, and I
12 was preparing for all of that as well.
13     I went to dinner with a business partner, and
14 he said I just keep repeating, repeating, repeating,
15 repeating everything that I was saying, and he
16 thought it was really odd.
17     But I drove myself back to the -- I don't even
18 remember driving back to the hotel.
19     So I got to the hospital.  They drug tested me.
20 They did an MRI.  But he just said it's --
21     MR. McKEEBY:  Objection, hearsay.
22     MR. PRYOR:  It's her understanding, your
23 Honor.
24     THE COURT:  I'll allow it.
25     THE WITNESS:  He said it was due to the

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 387 of 642   PageID 11328
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1298..1301

Page 1298

1 fact that I had so much stress in the
2 fight-and-flight response that it caused my blood
3 pressure to rise to an extreme level, and my heart
4 was doing racing and then stopping and then racing
5 and stopping.  It was just constant.
6          And physiology in your body, it changes
7 you.  I was later diagnosed just by, from my
8 counselor, because I had to go to some counseling
9 for this, with a mild case of PTSD.
10 BY MR. PRYOR:
11 Q.  Posttraumatic stress disorder associated with
12 losing your job?
13 A.  Yeah.  After 20 years --
14          MR. McKEEBY:  Objection, leading, and it
15 also is asking the witness to render essentially an
16 expert opinion as to the causation of this PTSD.
17          THE COURT:  Sidebar.
18          (Thereupon, the following proceedings were
19          had at sidebar:)
20          THE COURT:  Now state your objection.
21          MR. McKEEBY:  My objection is that he's
22 asking her to link her PTSD to her employment.  That
23 is something that an expert can do, but she is a lay
24 witness and she can't do that.
25          And moreover, it's hearsay, because she's

Page 1299

1 talking about what a doctor told her about that
2 issue.
3          So it should be excluded on both of those
4 grounds, particularly the first.
5          MR. GREENFIELD:  I would like to add in
6 also a hearsay objection that she's saying these
7 things as if they are true, but not -- not any sort
8 of mental impression or how she acted or actions she
9 took because of the information.
10          MR. PRYOR:  PTSD, I simply defined what
11 the term meant.  The other is her understanding of
12 her condition and what caused it.
13          It's totally appropriate.  If they want to
14 cross-examine her, they can.
15          THE COURT:  I think it is offered for its
16 truth is the problem.  So right now we are on to
17 damages, so it's a prove-up on damages.  So I will
18 strike that.
19          MR. PRYOR:  Okay.
20          (Thereupon, the sidebar was concluded and
21          the following proceedings were held in open
22          court:)
23          THE COURT:  Okay.  So I am sustaining that
24 objection, striking that last question and answer.
25

Page 1300

1 BY MR. PRYOR:
2 Q.  Did you understand that your condition was
3 stress-related?
4 A.  Yes.
5 Q.  Did you ever have a walking stroke before being
6 terminated by Southwest Airlines?
7 A.  No.  I never knew what it was.
8 Q.  Did you -- did anyone ever tell you that you
9 had posttraumatic stress disorder until you were
10 terminated from American Airlines -- Southwest
11 Airlines?
12 A.  No.
13 Q.  And did you have to go on medication?
14 A.  I did.  Blood pressure.
15 Q.  Blood pressure medication?
16     Okay.  Now, you talked about the impact on your
17 family, your daughter, your own health.
18     Is there any amount of money we could offer you
19 to risk your life for this?  If we said, Hey, we
20 will give you this money to go through this again?
21 A.  No, not at all.
22 Q.  If I offered you a million bucks, you would
23 take it?
24 A.  To go through this again?
25 Q.  Yes.

Page 1301

1 A.  No.
2 Q.  Let me ask about, did you try and get a job
3 while -- after you got fired?
4 A.  I did, but I was also working on a business
5 venture as well.  So I applied to Jet Blue, Delta,
6 and United.  I had an interview with United.  And
7 they turned me down.  And then Delta never sent me
8 the link for the online video, and we still to this
9 day don't know why that happened.
10 Q.  Did you apply with Frontier as well?
11 A.  I did.
12 Q.  Let me show you Exhibits --
13          MR. PRYOR:  We move for the admission of
14 Exhibit 130 and Exhibit 42.
15          THE COURT:  130 and 42.  Any objections to
16 130 or 42?
17          MR. GREENFIELD:  None from the Union, your
18 Honor.
19          MR. McKEEBY:  No objection.
20          THE COURT:  Okay.  They are admitted into
21 evidence and we are publishing.
22          (The referred-to documents were admitted
23          into evidence as Trial Exhibits 130 and 42.)
24 BY MR. PRYOR:
25 Q.  Ma'am, is Exhibit 130 a copy of your W-2?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 388 of 642   PageID 11329
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1302..1305

Page 1302

1          MR. PRYOR:  It looks like 2012.  I'm not
2   sure how far it's going to go.  Keep scrolling.
3          THE WITNESS:  Yes, those are my W-2s.
4          MR. PRYOR:  And is that 130?
5          MR. HILL:  130, yes, sir.
6          MR. PRYOR:  Then let's look at 42.  There
7   it is.
8   BY MR. PRYOR:
9   Q.  There's some additional years of W-2 and
10   earning summaries?
11   A.  Yes.
12   Q.  Now, a couple of years before you were
13   terminated, you didn't fly as much as you usually
14   did, true?
15   A.  True.
16   Q.  Can you explain to us why?
17   A.  When we moved to Denver, my husband had -- he
18   had been sober for six years, and when we moved to
19   Denver, I started flying more.  And I was going to
20   fly more because my daughter was a little bit older.
21   But as soon as we got there, the drinking started
22   again pretty heavily.
23       One of my very first trips -- I actually was on
24   a trip with a friend of mine who is in the audience,
25   Kim Hensley -- and came back that night to my home

Page 1303

1   being all lit up and both garage doors open and the
2   car door to his car in his garage open.
3       And I thought, Oh, my gosh.  I mean, something
4   happened, okay?
5       I walked into the house, and the dog is
6   running -- I have a 120-pound bloodhound, and she's
7   just running all over the house.  Lights are all on
8   in the house, the TV is blaring, and my husband is
9   drunk, just wasted, on the couch.
10       My daughter at that time was nine -- because
11   we've been in Denver now 10 years -- she was nine.
12       And I'm like, Where is -- where is Hannah?
13       Well, she's upstairs.
14       And that was the first time I knew I could not
15   leave Hannah alone at home with my husband while I
16   flew.
17   Q.  Okay.  And has that situation gotten to the
18   point that, in fact, you can fly?
19          MR. McKEEBY:  Objection, leading.
20          THE COURT:  I'll allow it.
21          THE WITNESS:  It got to the point where,
22   no, I couldn't leave her, because it happened
23   several times.
24   BY MR. PRYOR:
25   Q.  Now.

Page 1304

1   A.  Oh, now?
2   Q.  Charlene, I just don't have time to go through
3   everything you went to.  The jury --
4   A.  She's 19 and going off to college.
5   Q.  Okay.  So let me go back.  Before you were
6   terminated, did you have every intention of both
7   working full-time and making Southwest Airlines your
8   career?
9   A.  Yes.
10   Q.  And you are able to work full-time?
11   A.  Yes.
12   Q.  You would like to do that?
13   A.  Yes.
14   Q.  When were you able to go back full-time?
15   A.  When?
16   Q.  Yes.
17   A.  Tomorrow.
18   Q.  I'm sorry?
19   A.  I could go back tomorrow.
20   Q.  Okay.  Let me ask you about the Union's duty of
21   fair representation to you.
22       You liked Chris, the gentleman that was at the
23   fact-finding meeting, he's from the Union?
24   A.  Yes.
25   Q.  And do you think, however, though, that the

Page 1305

1   Union reporting you to cause the fact-finding
2   meeting was a fair representation of you?
3   A.  Yes.
4   Q.  Do you think it was a fair representation of
5   them --
6   A.  No, no.
7   Q.  -- to report you?
8       Listen to my question.  Understand we are not
9   talking about Chris now, we are talking about the
10   report that was made.
11       Do you think that the Union was giving you fair
12   representation when they reported you?
13   A.  No.
14          MR. PRYOR:  Pass the witness.
15          Before I do that, I would like to offer
16   Exhibits 126, 127, 128 and 129.  They are medical
17   bills and counseling bills.
18          THE COURT:  So 126, 127, 128 and 129 is
19   what you are offering?
20          MR. PRYOR:  Yes.
21          THE COURT:  Okay.  Any objection on those
22   exhibits?
23          MR. McKEEBY:  No objection.
24          MR. GREENFIELD:  No, your Honor.
25          THE COURT:  Okay.  So they are admitted.

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 389 of 642  PageID 11330
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1306..1309

Page 1306

1      (The referred-to documents were admitted
2  into evidence as Trial Exhibits 126 through
3  129.)
4      THE COURT:  Do you want to flash them
5  right quick for the jury?
6  BY MR. PRYOR:
7  Q.  And while they are showing those, you went to
8  counseling, ma'am?
9  A.  Yes, I did.
10  Q.  Why did you go to counseling?
11  A.  Well, because I was having struggles about
12  losing my job, and on top of that, now my husband
13  was drinking even more because of the marriage --
14  you know, this caused so many issues with my
15  marriage and it caused so many issues especially
16  with my daughter.  She had to see this and she had
17  to go through all of this.  I lost five years with
18  her doing this.
19  Q.  And the struggles that you had with your
20  husband when he was dealing with the drinking issue,
21  did the problems that you were dealing with from not
22  having your job and having been fired by Southwest
23  Airlines, did that make it better or worse?
24  A.  Worse.
25  Q.  All right.  Thank, you ma'am.

Page 1307

1      MR. PRYOR:  Pass the witness.
2      THE COURT:  Okay.  Mr. McKeeby.
3      MR. McKEEBY:  Thank you, Your Honor.
4      CROSS-EXAMINATION
5  BY MR. McKEEBY:
6  Q.  Good morning, Ms. Stone -- Ms. Carter.
7  A.  Good morning.
8  Q.  Let's talk about the Step 2 hearing.  When I
9  use that term, you know what I'm referring to?
10  A.  I do.
11  Q.  And that was -- at the time of the Step 2
12  hearing, I think we're talking about mid March of
13  2017, is that fair?
14  A.  I believe so.  It was March or April.  I don't
15  remember when the second step was.  It was a little
16  while.
17  Q.  You know what, I don't remember either.  We
18  might show you some documents.
19      Here is the question, though:  At the time of
20  the Step 2 hearing, you had already received the
21  termination decision from Mr. Schneider?
22  A.  Correct.
23  Q.  And so the Step 2 hearing was an opportunity
24  for you essentially to appeal that decision, is that
25  fair?

Page 1308

1  A.  Correct.
2      MR. PRYOR:  Object, limine, your Honor.
3      THE COURT:  I'll allow it.
4      MR. PRYOR:  And continuing objection.
5      THE COURT:  I will allow that continuing
6  objection.
7  BY MR. McKEEBY:
8  Q.  Describe for the jury what the Step 2 hearing
9  looked like.
10  A.  Well, the Step 2 hearing looked like -- I had
11  Becky Parker, who was a representative for the Union
12  for grievances, and then I my liaison, Beth Ross,
13  with me.
14      It was Mike Sims across the table from me, and
15  then I can't remember who he had sitting there
16  taking notes.  It may have been Edie Barnett.  I
17  just don't remember.
18  Q.  I've been calling it, and I think we have in
19  this case, a hearing.  But you weren't under oath or
20  anything like that, were you?
21  A.  No.
22      MR. PRYOR:  Your Honor, can we approach?
23      THE COURT:  You may.
24      (Thereupon, the following proceedings were
25      had at sidebar:)

Page 1309

1      MR. PRYOR:  Your Honor, the question he
2  asked was:  You had a chance to appeal your
3  termination.  That's the Step 2 process.
4      That's not the issues that are in front of
5  the jury today, and I think it's confusing to them.
6  I think it needs a limiting instruction to the jury
7  that Step 2 is not the issues we are about here
8  today.  I would ask for that.
9      THE COURT:  I understand.  So I will let
10  you bring that up on redirect.
11      MR. PRYOR:  She's not a lawyer, and I have
12  very limited time.  Southwest has gotten about 30
13  limiting instructions from the Court.
14      THE COURT:  I think you asked earlier a
15  question of her that she answered, which was:  Did
16  they consider your religious claims or your union
17  speech claims?  I think she can answer that again
18  with one sentence.
19      Now, do I need to put it in the jury
20  charge?  That's another question.
21      MR. PRYOR:  I think the jury needs it in
22  context, but I appreciate it.  You're overruling my
23  request?
24      THE COURT:  I am.
25      MR. PRYOR:  Thank you, your Honor.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Pages 1310..1313

Page 1310

1    (Thereupon, the sidebar was concluded and
2    the following proceedings were held in open
3    court:)
4        THE COURT:  You can proceed.
5 BY MR. McKEEBY:
6 Q.   Did you have any -- you mentioned the name Mike
7 Sims.  Had you met Mr. Sims before the Step 2
8 hearing?
9 A.   Yes, I know Mike Sims from years ago.
10 Q.   What do you think of him?
11 A.   He's a nice guy.  He used to work for the
12 Union.  He actually was a flight attendant.
13 Q.   And you would agree with me that he was fair to
14 you during the hearing, was he not?
15 A.   They all were fair to me.
16 Q.   And he gave you the chance during the Step 2
17 hearing for you to tell your side of the story?
18 A.   Correct.
19 Q.   I mean, do you remember in your deposition you
20 made the statement that Mr. Sims was amazing?
21 A.   I mean, he listened to me.  I had a huge case
22 that I put in front of him.
23 Q.   And part of that case involved you presenting
24 documents to Mr. Sims, correct?
25 A.   That is correct.

Page 1311

1 Q.   And there were quite a number of documents that
2 you submitted to him at the beginning of that
3 hearing, correct?
4 A.   Yes, because I had to make my case.
5 Q.   You had to make your case.
6 A.   Uh-huh.
7 Q.   Because you wanted your job back, correct?
8 A.   Yes.
9 Q.   That was your goal at the Step 2 hearing was to
10 get your job back?
11 A.   Yes, sir.
12 Q.   And you came prepared with a packet of
13 documents that the Union assisted you in compiling,
14 fair?
15 A.   No, the Union didn't do any of that work.  I
16 did it all on my own.
17 Q.   Did it all on your own.  Fair enough.
18        MR. McKEEBY:  I would like to bring up
19 Exhibit 118.
20        This is the first page.  Let's go to the
21 next page.
22        MR. PRYOR:  Is this in evidence?
23        THE COURT:  This is muted from the jury.
24 So just raising it with the witness for now.
25

Page 1312

1 BY MR. McKEEBY:
2 Q.   Does this look like at least the first part of
3 the packet?
4        MR. PRYOR:  Object to improper use of a
5 document that's not in evidence.  He's not asking to
6 refresh her recollection.
7        MR. McKEEBY:  I've got to establish --
8        THE COURT:  You can set the predicate.
9 BY MR. McKEEBY:
10 Q.   Does this look like the packet of documents
11 that you provided to Mr. Sims at the Step 2 hearing?
12 A.   It is, but it says "Audrey Stone" on it.
13 Before it said "Audrey Stone, TWU."
14 Q.   Okay.  If I told you that this packet of
15 documents was -- hold on -- 148 pages, would you
16 agree?
17 A.   I don't know how many pages it was.
18 Q.   I'm not going to make you count them.  It will
19 be into evidence, and the jury can do so if it
20 chooses.
21    But I think you did tell me that you and
22 Mr. Sims, at the Step 2 hearing, went through page
23 by page of these documents that you had assembled,
24 correct?
25 A.   It wasn't page by page, but it was -- I had

Page 1313

1 them clipped together and I presented that
2 information to him.  Because there were several
3 things that were in each of those packets.  And I
4 was able to explain what was in those packets, and
5 he said that he would take a further review of that
6 after our meeting.
7 Q.   Let's go through a few of those things.
8        MR. McKEEBY:  But before I do, I move to
9 admit 118.
10        THE COURT:  Objections from -- well, last
11 night, I should say?
12        MR. PRYOR:  Your Honor, we object on
13 foundation, hearsay, and our continuing objection
14 under Step 2 and undue prejudice regarding the
15 characterization of this.
16        THE COURT:  Understood.
17        I will overrule those objections and admit
18 118.  We can publish to the jury.
19        (The referred-to document was admitted
20        into evidence as Trial Exhibit 118.)
21 BY MR. McKEEBY:
22 Q.   Let's move to page 118.10.  I just want to ask
23 you about a few of these that I don't think we've
24 talked about before, and just if you can tell me
25 what they are.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022                          Pages 1314..1317

Page 1314

1        MR. McKEEBY:  So 118.110 would be the one
2  I would want you to pull up first.
3  BY MR. McKEEBY:
4  Q.  What is this about?
5       First of all, this is an email from you to
6  someone named Jim Little?
7  A.  Yes.  Jim Little was our executive -- well, he
8  used to be our liaison, and I dealt with him during
9  Melissa Smith's trial.  Jim Little ended up being
10  the international president of TWU.
11  Q.  So he's someone who is above the Local 556
12  level, the defendants in this case, correct?
13  A.  That is correct.
14  Q.  So in this case, you are reaching out to him
15  about a complaint that you have regarding someone by
16  the name of Don Shipman?
17  A.  Yes.  This is back in 2013 when everything
18  started to fall apart with our union.
19  Q.  I understand.  We have been looking at some old
20  documents during this case.
21       MR. McKEEBY:  Why don't we go to 118-112.
22  BY MR. McKEEBY:
23  Q.  It looks like another complaint to the
24  international, Mr. Little, about Don Shipman, is
25  that fair?

Page 1315

1  A.  That is correct.
2       MR. McKEEBY:  How about 118-116.
3  BY MR. McKEEBY:
4  Q.  Just take a second to look that.  It looks like
5  another email from you to Mr. Little of the
6  international?
7  A.  Yes.  It's because they came in and removed our
8  elected officials again.
9  Q.  So here you are complaining again to the
10  international union, correct?
11  A.  Correct.
12       MR. McKEEBY:  Okay.  We can take that
13  down.
14  BY MR. McKEEBY:
15  Q.  During the Step 2 meeting with Mr. Sims -- by
16  the way, Mr. Sims hasn't appeared before the jury in
17  this case yet, has he?
18  A.  He had a deposition, but not in here.
19  Q.  During the Step 2 hearing, you told Mr. Sims
20  that you loved your job.
21  A.  I still do.
22  Q.  And you told him that?
23  A.  Yes.
24  Q.  And you told him that you loved Southwest,
25  didn't you?

Page 1316

1  A.  Yes.  I love the company that I started out
2  with, yes.
3  Q.  And your objective at that Step 2 hearing was
4  to get your job back?
5       MR. PRYOR:  Object, asked and answered.
6       MR. McKEEBY:  You can answer.
7       Or wait.  I'm sorry.
8       THE COURT:  I'll allow it.
9       THE WITNESS:  Yes.
10  BY MR. McKEEBY:
11  Q.  And you told him that, didn't you?
12  A.  Told him --
13       MR. PRYOR:  Object, asked and answered.
14  BY MR. McKEEBY:
15  Q.  Told Mr. Sims that?
16       THE COURT:  I'll allow it.
17       MR. PRYOR:  Object, asked and answered.
18       THE WITNESS:  That I wanted my job?
19  BY MR. McKEEBY:
20  Q.  Yes.
21  A.  Yes.
22  Q.  You also told him during the Step 2 hearing
23  that you could have made a better choice regarding
24  Audrey?
25  A.  Yes, I could.  I could have taken those into

Page 1317

1  her office and talked to her.  Although she doesn't
2  respond to us, she never took my calls.  I mean, she
3  was pretty non-responsive as a union president.
4  Q.  I understand all of that.
5       But you didn't say all of that to Mr. Sims.
6  What you told Mr. Sims is, I could have made a
7  better choice regarding Audrey?
8       MR. PRYOR:  Object, improper use of
9  whatever he's referring to, he has to show her.
10       THE COURT:  No speaking.  You can ask for
11  a sidebar if you want to.
12       MR. PRYOR:  No.
13       MR. McKEEBY:  I will tell you what.  I
14  will do exactly what counsel suggests.  Let me go
15  ahead and pull up but don't introduce Exhibit 119.
16       MR. PRYOR:  It's not for -- object to, if
17  he's offering it.
18       You can show the witness --
19       MR. McKEEBY:  I am going to show the
20  witness.
21       MR. PRYOR:  He can make faces if he wants
22  to.
23       THE COURT:  Hold on, Counsel.
24       Okay.  You can set the predicate with the
25  witness.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022                        Pages 1318..1321

Page 1318

1       MR. McKEEBY:  I'm headed this way, but --
2       THE COURT:  You can set the predicate with
3   the witness.
4       MR. McKEEBY:  Okay.  I'm sorry.
5       MR. PRYOR:  I'm simply asking the witness
6   be treated fairly.
7       MR. McKEEBY:  I'm going try to treat --
8       THE COURT:  You can ask the predicate to
9   the witness.
10      MR. McKEEBY:  Incredible to hear that
11  coming from Mr. Pryor.
12      But I will move on and ask that the
13  witness look at page 119-point -- hold on -- 15.
14  BY MR. McKEEBY:
15  Q.  I will represent to you that these are the
16  notes from the Step 2 hearing, and I understand that
17  you haven't seen these before.
18      But at the very bottom, it says, "I could have
19  made" --
20      MR. PRYOR:  Object, improper use of a
21  document not in evidence.  Improper impeachment.  He
22  hasn't established an inconsistency or allowed her
23  to comment on it.
24      THE COURT:  Sustained.
25      MR. McKEEBY:  She said she wasn't sure

Page 1319

1   that she remembered that.
2       THE COURT:  Sidebar.
3       (Thereupon, the following proceedings were
4   had at sidebar:)
5       MR. McKEEBY:  I think that is an
6   inconsistency.
7       THE COURT:  She couldn't remember what?
8       MR. McKEEBY:  She couldn't remember if she
9   said, "I should have made a better choice regarding
10  Audrey."
11      MR. PRYOR:  She absolutely said she could
12  make a better choice.
13      THE COURT:  I thought she admitted that
14  she could have by talking in person.
15      MR. PRYOR:  Yes.  So how is -- and this is
16  someone else's notes.
17      (Thereupon, the sidebar was concluded and
18      the following proceedings were held in open
19      court:)
20      THE COURT:  All right.  I will sustain
21  that.  You can ask a new question.
22  BY MR. McKEEBY:
23  Q.  Did you also tell Mr. Sims during the Step 2
24  hearing that this has nothing to do with Southwest,
25  it's between you and the Union, or words to that

Page 1320

1   effect?
2       MR. PRYOR:  Once again, your Honor --
3       THE COURT:  No speaking objection, just
4   code.
5       THE WITNESS:  I meant that --
6       THE COURT:  Hold on.
7       MR. PRYOR:  Step 2 issue.  The very nature
8   of this question mischaracterizes the Step 2
9   hearing.
10      THE COURT:  Okay.  I will allow the
11  question.
12      THE WITNESS:  Can you ask that question
13  again?
14      THE COURT:  You can ask the question
15  again, Mr. McKeeby.
16      MR. McKEEBY:  I could if I could remember
17  it.
18      THE COURT:  I can read it back.
19      Did you also tell Mr. Sims during the
20  Step 2 hearing that this has nothing to do with
21  Southwest, it is between you and the Union, or words
22  to that effect?
23      You can answer.
24      THE WITNESS:  Okay.  What I meant in my
25  Step 2 meeting was when I sent that information to

Page 1321

1   my union president that it had nothing to do with
2   Southwest Airlines, it wasn't done at Southwest
3   Airlines, Southwest Airlines brought me in for a
4   fact-finding meeting and they now are involved.
5   BY MR. McKEEBY:
6   Q.  And you also said during the Step 2 hearing
7   that you would not do it again, you wouldn't send
8   messages like that again, did you not?
9   A.  I don't recall that.  You are going to have to
10  show that to me.
11  Q.  Well, I'm not going to do that.  I will do that
12  otherwise.
13  A.  If I could have gone to a union meeting, I
14  could have taken the exact same information, shown
15  that at the meeting, and I would have never been
16  turned in.
17      The way they did this was to use the social
18  media policy against me.  Because I was an objector,
19  I couldn't do the same as an actual member, but I
20  still paid dues.
21  BY MR. McKEEBY:
22  Q.  Well, you had a complaint -- Ms. Stone
23  complained to Southwest, correct?
24  A.  She's my union president, and yes, it was union
25  business.  It was absolutely something that had

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 393 of 642    PageID 11334
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 5 July 11, 2022                              Pages 1322..1325

Page 1322

1  nothing to do with Southwest.  It had never been
2  done like that before.
3  Q.   It had nothing to do with Southwest until
4  Ms. Stone made a complaint to Southwest, fair?
5  A.   Correct.  And then Southwest Airlines got into
6  union business.
7  Q.   And you don't think they should have done that?
8  A.   Absolutely not.
9  Q.   Even though Ms. Stone was a fellow flight
10 attendant?
11 A.   Sir, there is a difference between when she ran
12 for president, she became the union president.  She
13 knew that there were going to be complaints or good,
14 you know, accolades coming her way from members,
15 either way, it was dealt with in the union.  There
16 is a separation between the two, and it had always
17 been that way until Audrey Stone took over.
18 Q.   But she was a fellow employee, correct?
19        MR. PRYOR:  Objection.
20        THE COURT:  I will allow it.
21        THE WITNESS:  She was a fellow employee
22 before she took the hat on as our union president
23 and her union business of what she actually did with
24 our union dues.
25

Page 1323

1 BY MR. McKEEBY:
2 Q.   So is your testimony to the jury that because
3 she was not only a Southwest employee but a union
4 president, you could do anything you wanted with
5 respect to Ms. Stone?
6 A.   No, I'm not saying I would do anything I
7 wanted, but this had everything to do about union
8 business.  They took these women, they spent our
9 money, and I was complaining to my union president
10 in regards to that very thing.
11 Q.   Well, what couldn't you have done to Ms. Stone?
12 A.   What -- repeat that, please.
13 Q.   Let me change the question.
14        Is there any action you could have taken toward
15 Ms. Stone for which Southwest could have disciplined
16 you?  Or because she's a union president, you can
17 make any type of communication that you wanted to,
18 whether it violated Southwest policies or not.  Is
19 that your position?
20 A.   The communications that I had with my union
21 president would have been just like if I was at a
22 union meeting.  I could have taken the exact same
23 things and talked to that in the union meeting, and
24 Southwest could not have done a thing.
25        They used the social media policy.

Page 1324

1        Under -- because I'm an objector, I can't go to
2  a union meeting.  So instead, I voiced my concerns
3  about how my money was being spent.  And granted,
4  she had been using that Facebook page completely for
5  union business.
6  Q.   Let me ask a question.
7        MR. PRYOR:  I object to him interrupting
8  the witness's answer.
9        THE COURT:  I will let her finish the
10 answer briefly and then you can ask a new question.
11        MR. PRYOR:  Can you read the last
12 statement she made so she can now have it in
13 context?
14        THE COURT:  "So instead, I voiced my
15 concerns about how my money was being spent.  And
16 granted, she had been using that Facebook page
17 completely for union business."
18        THE WITNESS:  And, sir, I didn't post it
19 on her page.  It was a private message, just like an
20 email.  And I could have emailed it to her as well.
21 I just didn't have her email at that moment.
22 BY MR. McKEEBY:
23 Q.   So let me explore that a little bit.
24        Is it your position that if you had emailed
25 Ms. Stone at her Southwest email address, you

Page 1325

1  wouldn't have been disciplined?
2  A.   It wouldn't have been at her Southwest email
3  address, it would have been to the Union email
4  address.
5  Q.   Your contention is that had Ms. Stone
6  complained about these videos that you sent to her,
7  if they were sent through a Union email address,
8  your contention is you wouldn't have been
9  disciplined?
10 A.   I think that -- and I'm just going to back up.
11        Anything that has to do with union business,
12 union activity, union -- this had clearly been a
13 Union march.  We paid for it.  That gave me the
14 opportunity, at that point, to speak my dissent
15 towards that.
16        They didn't even give us an opportunity to say,
17 Please don't go, before they went.  They never
18 brought this to the membership until we saw it in
19 the minutes, and then it was on TWU's website, 556,
20 international's website, and also the AFL-CIO
21 website.
22 Q.   I get all that.  I understand all that.  I'm
23 representing Southwest Airlines, as I know you are
24 aware.
25        And my question then to you is, when Southwest

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 394 of 642   PageID 11335
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 5 July 11, 2022                    Pages 1326..1329

Page 1326

1 gets that complaint from what they regard to be a
2 co-employee, a fellow flight attendant, what would
3 you have them do, just ignore it?
4 A.  Again, I'm going to say it.  They never stepped
5 in union activity or business until Audrey Stone
6 took office.  They started turning us in under the
7 social media --
8 Q.  Can you answer my question?  Should they
9 have --
10        MR. PRYOR:  Object to the interrupting
11 again of the witness.  If he wants to make a
12 motion --
13        THE COURT:  Hold on.  Hold on.  Hold on.
14 I thought she was finished.
15        Do you have anything to add to that
16 answer?
17        THE WITNESS:  No, I don't.
18        THE COURT:  Okay.  You can ask your
19 question.
20        MR. McKEEBY:  Move to strike as
21 non-responsive.
22        MR. PRYOR:  Well, she hadn't finished her
23 answer.
24        THE COURT:  She finished her answer.  I
25 won't strike it as non-responsive.

Page 1327

1        You can ask your new question.
2 BY MR. McKEEBY:
3 Q.  Should Southwest have ignored the complaint of
4 Ms. Stone?  Is that your position?
5 A.  Yes.
6 Q.  Thank you.
7        MR. McKEEBY:  Let's go to Exhibit 40,
8 please.  Move to admit Exhibit 40.
9        MR. PRYOR:  Your Honor, we have a whole
10 host of objections.  I think we've raised them and
11 have a continuing objection.  I think they would
12 apply here.
13        THE COURT:  Understood.
14        I will overrule those objections and I'm
15 allowing Number 40 in.
16        You can publish.
17        MR. GREENFIELD:  No objection, your Honor.
18        MR. McKEEBY:  Admitted and published?
19        THE COURT:  Sorry.  I knew you had no
20 written objection.  So if you have any to add,
21 please let me know.
22        (The referred-to document was admitted
23        into evidence as Trial Exhibit 40.)
24        THE COURT:  Okay.  We are publishing.
25

Page 1328

1 BY MR. McKEEBY:
2 Q.  Can you identify this document, Ms. Carter?
3 A.  Yes, I can.  This is the last-chance agreement.
4 Q.  And we actually now have a date here.  It's
5 April 17, 2017.  Correct?
6 A.  Correct.
7 Q.  And I think, to be fair, the date that I had
8 asked you about previously was the Step 2 hearing.
9 If that's the date of the last-chance agreement,
10 what's your best guess as to when the Step 2 hearing
11 was, if you have one?
12 A.  I think it is 7 or 10 days after the -- the
13 Step 2 meeting is when they have to render a
14 decision.
15 Q.  Okay.  So then the Step 2 hearing would have
16 occurred probably 7 to 10 days prior to April 17?
17 A.  Correct.
18 Q.  How did you get this letter?
19 A.  It was sent to me in a package.
20 Q.  Was it sent directly from Southwest or was it
21 from the Union?  Or do you recall?
22 A.  You know what, I don't recall.
23 Q.  You reviewed the document?
24 A.  Uh-huh.
25 Q.  You reviewed it with your union representative?

Page 1329

1 A.  Yes.  I talked to Beth about it, and Parker --
2 I can't think of her name -- Becky Parker.
3 Q.  She's the union representative?
4 A.  She was at the time.  But Beth Ross was my
5 liaison.
6 Q.  Let's go over some of the terms here.  Let's
7 look at the first bullet.
8        That says the company will reinstate you, the
9 grievant, Charlene Carter, as a Denver-based flight
10 attendant with no loss of seniority, correct?
11 A.  Correct.
12 Q.  That means you were getting your job back if
13 you signed the agreement?
14 A.  Correct.
15 Q.  The next bullet say you will receive no back
16 pay.
17        Did you have an understanding of what that
18 meant?
19 A.  I did.
20 Q.  And that, in fact, meant that you would not get
21 any payment for the time that you missed prior to
22 had you signed the last-chance agreement, correct?
23 A.  Correct.
24 Q.  But that wasn't a big deal to you, was it,
25 because you weren't flying very much anyway, fair?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 5 July 11, 2022                          Pages 1330..1333

Page 1330

1  A.  I wouldn't say it's a big deal, but no, I
2  wasn't able to fly at that particular time.  I
3  was --
4  Q.  In fact, you hadn't flown at all in 2017?
5      MR. PRYOR:  Once again, object to him
6  absolutely stopping her from giving a full answer.
7      THE COURT:  You can finish what your prior
8  answer was.
9      THE WITNESS:  Okay, contractually, and
10 because of my seniority, I was able to bid my lines
11 every month and I was able to give my trips away.  I
12 never harmed Southwest Airlines by doing so.
13 BY MR. McKEEBY:
14 Q.  Right.  And you hadn't flown at all in calendar
15 year 2017 up to this point, had you?
16 A.  You know what, I don't recall.
17 Q.  Well, we will get to that later.
18 A.  Okay.
19 Q.  It says, the next bullet says that your
20 termination will be reduced to a 30-day suspension
21 beginning March 16th, correct?
22 A.  Correct.
23 Q.  And it was actually through and including the
24 date that had already passed, so you were getting
25 time served, so to speak, fair?

Page 1331

1  A.  That is what -- yeah, that is what they told
2  me.
3  Q.  Let's go to the sixth bullet down about the --
4  an exchange for the consideration.
5      This is the description of the document that
6  they asked you to sign in connection with this, so
7  some type of agreement, correct?
8  A.  That is correct.
9  Q.  You testified to that a bit when you were
10 questioned by Mr. Pryor, correct?
11 A.  Correct.
12 Q.  And the next bullet says that, in addition --
13     MR. McKEEBY:  Can you blow that part up?
14 BY MR. McKEEBY:
15 Q.  "In addition, you are required to comply with
16 all company policies and procedures, and any future
17 violation of the Southwest Airlines workplace
18 bullying and hazing policy, the social media policy,
19 or harassment, sexual harassment, discrimination or
20 retaliation policy would result in termination."
21     Do you see that?
22 A.  Correct.
23 Q.  You would agree with me that that is just a
24 requirement that would apply to any employee of
25 Southwest Airlines, they all had to comply with

Page 1332

1  those policies, fair?
2  A.  Yes.
3  Q.  And the next bullet is the one that starts with
4  "This agreement will remain."
5      So this is the one that I think you talked
6  about with Mr. Pryor a moment ago where it talks
7  about something being in your file for 24 months.
8      And you objected to that period of time, do I
9  understand that correctly?
10 A.  Yes.  For one.  This was the first time that --
11 and this is what Beth Ross told me.  She goes, We
12 have never done this before.  Usually it's an
13 18-month or less.  And she did tell me that it's
14 excessive.
15 Q.  Ms. Ross, your union representative, told you
16 that?
17 A.  Yes, she did.
18 Q.  So had it been the 18 months that you believed
19 it should have been, would you have signed the
20 agreement?  Is that why we are here, the difference
21 between 18 and 24 months?
22 A.  No.
23 Q.  You still wouldn't have signed it?
24 A.  No.  Because it was -- it was taking away my
25 rights as an individual to speak to my union.

Page 1333

1  Because they were going to come back at me, and we
2  have already seen that now within testimony, that
3  Brian Talburt was going to be turning us all in
4  again.
5  Q.  But that's speculation, isn't it?  You don't
6  know that he was going to turn you in.
7  A.  No, we all knew it as flight attendants.  We
8  all knew that this is what was going on.
9      Look at what he did to Jeanna Jackson.  And
10 she's here in the courtroom today.
11     MR. McKEEBY:  Your Honor --
12     THE COURT:  Let's stick to the questions.
13 BY MR. McKEEBY:
14 Q.  You also, I think, expressed concern -- and
15 maybe that's what you are expressing just now --
16 that you might be punished for something that
17 happened in the past.
18 A.  Correct.
19 Q.  But you had already provided Southwest with
20 that packet of documents that showed all of the
21 Facebook posts that you made in the past, right?
22 The packet of documents you provided to Mr. Sims,
23 you had already given him that, right?
24 A.  On my Facebook page or on Audrey's?
25 Q.  I'm talking about the packet of documents that

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 396 of 642  PageID 11337
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                    Pages 1334..1337

Page 1334

1 you provided to Mr. Sims. That showed the history
2 of your Facebook communications with Ms. Stone,
3 correct?
4 A. Yes. On Messenger, yes.
5 Q. Right. So Southwest had everything, right? Or
6 was there something else that you had posted that
7 you were worried that they might go back and find
8 and discipline you for?
9 A. No. And that's not what I'm talking about.
10 I'm talking about other -- and they were also
11 protected speech which we were getting turned in
12 for, because obviously it was protected for them in
13 the core group.
14     But he had gone back and he was turning people
15 in the day I got called in for this fact-finding
16 meeting. He was looking back and trying to harm
17 others. We knew this was going on because it had
18 been going on for quite some time, and they were
19 harming some really good people.
20 Q. Right. But if they went back to something that
21 had happened in the past, you could say, No, wait a
22 minute. This document protects me because it only
23 tells me I have to comply with the policies going
24 forward.
25 A. They would gotten me again if they found

Page 1335

1 something that they thought was egregious or they
2 didn't like. I'm telling you, they were firing
3 and -- Southwest Airlines --
4     MR. McKEEBY: Your Honor, limine.
5     THE COURT: I will say, so at this point I
6 need to cut off the answer and say that if your
7 counsel wants to ask you to supplement anything that
8 you're thinking of, that's fine. As long as you
9 have given an answer, then the next elaboration
10 needs to be in the next round of testimony.
11     MR. PRYOR: And maybe, your Honor, I
12 misunderstood the question. I thought it was an
13 open-ended question that allowed her to answer. He
14 asked. If I misunderstood, okay.
15     THE COURT: I will pause it now, and then
16 you can ask a new question.
17 BY MR. McKEEBY:
18 Q. You would agree with me that had Southwest
19 disciplined you for something you had done in the
20 past, you would have the right to grieve that,
21 correct?
22 A. No. I would have -- no. This right here said
23 if I broke another policy, which if, let's say they
24 found something in One Love or Sassy Stew or
25 whatever, all of the other little Facebook page

Page 1336

1 things that were private, that Brian had and he
2 turned in, this right here would have said, guess
3 what, in that 24-month period, you have now violated
4 again. I was not going to sign this.
5 Q. So your belief was that even if it happened in
6 the past, was a post that you had made prior to
7 April 17, 2017, Southwest could still discipline you
8 for that?
9 A. It was happening. Yes.
10 Q. And you raised those concerns with Mr. Sims, I
11 take it?
12 A. No. I raised those concerns with Beth Ross and
13 with --
14 Q. With Ms. Ross --
15     MR. PRYOR: Objection, your Honor.
16     THE WITNESS: She was my liaison.
17     MR. PRYOR: He is continuously
18 interrupting her answer. He knows what her answer
19 is.
20     THE COURT: Hold on. We've got to keep
21 separation between the end of the question and the
22 answer.
23 BY MR. McKEEBY:
24 Q. Who was Ms. Ross?
25 A. She was my liaison.

Page 1337

1     MR. PRYOR: No. Object, your Honor. That
2 was not the question. She was explaining what Beth
3 Ross told her, and he interrupted it.
4     THE COURT: You can finish your
5 explanation briefly on what Ms. Ross told you and
6 then define who Ms. Ross was.
7     THE WITNESS: Beth Ross was my liaison.
8 She's right there at the very top of that. She was
9 my grievance specialist.
10 BY MR. McKEEBY:
11 Q. Fair enough.
12     At no point did you request of Mr. Sims, the
13 person who you said was amazing and who was fair to
14 you, Hey, I would like to talk about some concerns I
15 have about this document?
16 A. I raised those with Becky Parker, and she said
17 this was the best I was going to get.
18 Q. And Becky Parker --
19 A. And she --
20 Q. I'm sorry.
21 A. She's the union grievance chair, and I was
22 going through her. I was told not to reach out to
23 anybody in the company when I was in my fact-finding
24 meeting and in my first first step meeting, that
25 this was to go through the Union.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 397 of 642   PageID 11338
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 5 July 11, 2022                    Pages 1338..1341

Page 1338

1  Q.  Mike Sims never told you not to contact him,
2  did he?
3  A.  No.  My union rep, though, was the one that I
4  was dealing with all of this.
5  Q.  But no --
6  A.  And I -- I raised those concerns with her.
7      She went to Mike Sims, I guess.  I do not know
8  that for a fact.  But she told me, This is the best
9  you are going to get, Charlene.  So I did raise
10  those concerns, but not personally with Mike Sims,
11  no, I did not.
12  Q.  And you could have?
13      MR. PRYOR:  Object.  Asked and answered.
14  She just explained why she couldn't.
15      THE COURT:  I'll allow it.
16  BY MR. McKEEBY:
17  Q.  You could have contacted Mr. Sims, you could
18  have disagreed with what the Union -- the advice
19  that the Union was giving you?  I mean, you are
20  suing them in this case.  Why couldn't you have
21  picked up the phone and contacted Mike Sims or sent
22  him an email saying, Look, I have got some real
23  concerns about this agreement and what it means.  I
24  would like to talk to you about it?
25      MR. PRYOR:  Object, asked and answered,

Page 1339

1  compound, argumentative.
2      THE WITNESS:  Because that's exactly --
3      THE COURT:  I'll allow it.
4      THE WITNESS:  Because that is exactly what
5  Becky Parker did for me.
6      And at this time, sir, I wasn't able to
7  get Mike Sims' number anyway.  I mean, I guess I
8  could have asked Becky.
9      But they were handling all of this.  At
10  that point I was fired.  I couldn't get online to
11  get Mike Sims' number.  And I'm not trying to be
12  evasive or anything like that.  But I was working
13  through my union.
14  BY MR. McKEEBY:
15  Q.  Understood.
16      I think you testified -- I forget if it was you
17  or Ms. Stone -- but how many -- well, I'll ask the
18  question.
19      How many times had you met Ms. Stone before
20  sending the abortion videos to her?
21  A.  One time.
22  Q.  That was in 2013?
23  A.  Correct.  At a union meeting.
24  Q.  Had you ever discuss Ms. Stone's view on
25  abortion?

Page 1340

1  A.  No.
2  Q.  Did you ever discussed her religious views?
3  A.  No.
4  Q.  Did you know if she had any -- you testified
5  Friday about your personal experience with abortion
6  and how deeply that impacted you.
7      Did you ever ask Ms. Stone if she had anything
8  similar in her past?
9  A.  No, I didn't.
10  Q.  Did you ever ask her if she had a family member
11  that had to deal with an abortion issue or a close
12  friend?
13  A.  No.  All of the stuff that I sent her had to do
14  with them going to the march.
15  Q.  Well, you sent her videos of aborted fetuses or
16  babies, depending on your perspective, is what you
17  said.
18  A.  And they marched for Planned Parenthood.
19  Q.  Okay.
20      And after you sent the videos to Ms. Stone, did
21  you make any effort to follow up with her with any
22  additional message?
23  A.  No, I did not.  As a matter of fact, she
24  actually sent me stuff regarding how she wanted us
25  and their committee to vote or to speak against the

Page 1341

1  national right-to-work foundation.
2  Q.  Right.  But you never reached out to her and
3  said, Hey, I would like to have a little bit more of
4  a dialogue.  I sent you those videos, I wanted to
5  make a point, and how I would like to talk to you a
6  little further about my intent.  Anything like that?
7  A.  No, because she had never even reached out to
8  me.
9  Q.  She had a history of not responding to you, I
10  think you testified to that, correct?
11  A.  To all of the things that I was concerned about
12  of them doing to our union, yes, she never reached
13  out.
14  Q.  And you never -- you didn't complain to the
15  international like you did on the Don Shipman and
16  other issues, you didn't reach out to them about
17  Ms. Stone, did you?  About the complaints that you
18  had with respect to Ms. Stone --
19  A.  Actually, I did.  I actually made two phone
20  calls to Mr. Samuelson and then Alex Garcia, and
21  neither one of them called me back.
22  Q.  Did you send them the videos?
23  A.  No, I didn't send them the videos, but they
24  knew that they had gone to the march.
25  Q.  In fact, the only person that you sent those

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 398 of 642   PageID 11339
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 5 July 11, 2022                Pages 1342..1345

Page 1342

1 videos to was Audrey Stone, correct?
2 A.  My union president, yes.
3 Q.  No other employee or anyone else at Southwest?
4 A.  No, sir.
5 Q.  The only one you sent them to was the person
6 who had ignored you over the past three years when
7 you were sending the other Facebook messages that we
8 have seen in this case, fair?
9 A.  I sent them --
10     MR. PRYOR:  Object, asked and answered.
11     THE COURT:  I'll allow it.
12     THE WITNESS:  I sent them to my union
13 president, yes, after the march.
14 BY MR. McKEEBY:
15 Q.  Now, you attended a fact-finding meeting as
16 well in the grievance process, fair?
17 A.  That was the first meeting, yes.
18 Q.  And that was the meeting with Mr. Schneider,
19 correct?
20 A.  It was a meeting with Mr. Schneider, Meggan
21 Jones, who is also here in the courtroom sitting
22 with you.  And it was Denise Gutierrez.  I can't
23 remember if it was Edie Barnett that was on the call
24 as well.  And then my union rep, Chris Sullivan,
25 yes.

Page 1343

1 Q.  Ms. Gutierrez, was she there in person or was
2 she on the phone?
3 A.  She was on the phone.
4     And we were told that she was an attorney when
5 we first got into the meeting.
6 Q.  Who told you that?
7 A.  I believe it was Ed Schneider.
8 Q.  You found out later that he may have been
9 mistaken about that?
10 A.  That is correct.
11 Q.  Any complaints about how Mr. Schneider treated
12 you during the fact-finding meeting?
13 A.  Not complete complaints, but I was pretty much
14 being -- there were questions being thrown at me
15 about how to use Facebook by Denise Gutierrez.  I
16 had questions from Ed Schneider.
17     My union rep pulled me out of that meeting
18 three times and he said, They are badgering you.
19     MR. McKEEBY:  Move to strike as hearsay.
20     MR. PRYOR:  Object.  He asked her what her
21 thoughts were.
22     THE COURT:  Hold on.
23     I will overrule that request.
24     MR. McKEEBY:  Okay.
25

Page 1344

1 BY MR. McKEEBY:
2 Q.  And you said Mr. Sullivan was your union
3 representation at the meeting?
4 A.  That is correct.
5 Q.  And Mr. Schneider asked you questions during
6 the meeting, I think you said.
7 A.  Yes, he did.
8 Q.  He talked to you about the social media policy
9 during the meeting, correct?
10 A.  That's the original claim that I was being
11 called in for, and then it became the other with
12 Audrey Stone.  But yes, social media.
13 Q.  Right.  And he talked to you about the bullying
14 and hazing policy, or the workplace bullying and
15 hazing policy, correct?
16 A.  I don't remember him talking about the
17 workplace bullying and hazing -- I don't remember
18 all of the conversation specifically.
19 Q.  But you did go over those policies?
20 A.  I don't remember going over the policies in the
21 meeting.
22 Q.  During the fact-finding meeting, Mr. Schneider
23 asked you why you sent the videos, the abortion
24 videos to Ms. Stone, correct?
25 A.  Let me clarify something.  Yes, he did ask

Page 1345

1 that, but I'm going to clarify something.
2     Those -- those videos that I sent, they were
3 from an abortion site or somebody else posting them.
4 But those are clearly babies, and I'm going to call
5 them babies, and they are no different than if
6 somebody had a preemie baby or a miscarriage.
7 Q.  I understand that's your view and I don't want
8 to argue with you about that.  I mean, I respect
9 your beliefs and Southwest respects your beliefs,
10 and I'm not here to debate those beliefs.
11     My question was, did Mr. Schneider ask you, Why
12 did you send those videos to Ms. Stone?
13 A.  Yes.  And I told him.
14 Q.  What did you tell him?
15 A.  I told him that I sent them because I'm a
16 Christian, and that my union president took about 20
17 women to the march in DC that was sponsored by
18 Planned Parenthood, and they also had a banner that
19 represented Southwest there at that march.
20 Q.  And you also told him that you were a
21 Christian, correct?
22 A.  That is correct.
23 Q.  And you also told him that abortion was a huge
24 issue for you?
25 A.  That is correct.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 399 of 642   PageID 11340
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1346..1349

Page 1346

1 Q.   And you also told Mr. Schneider that you do
2 whatever you can to get the word out, correct?
3 A.   To share my experience about -- yes.  About an
4 abortion, to save another life, or to help another
5 young girl or woman, yes.
6 Q.   Like Ms. Stone --
7 A.   Like I went through.
8 Q.   -- was she considering an abortion, as far as
9 you knew?
10 A.   Sir, again, those were sent in regards to the
11 Women's March.  I didn't send them to her as a
12 person, I sent them to her as my union president
13 that took these women, spent our dues money for
14 transportation, for hotel, for food, and for
15 whatever else, and they did not represent all of our
16 members going to this march.  We didn't even know.
17        MR. McKEEBY:  Your Honor, non-responsive.
18        THE COURT:  I will sustain that.  I will
19 strike it.
20        Your lawyer can ask you for any further
21 elaboration in the next round of testimony.
22        You can ask a new question.
23 BY MR. McKEEBY:
24 Q.   To come back to my question, and I don't think
25 you answered it, what you told Mr. Schneider was

Page 1347

1 that this was an important issue for you and you do
2 whatever you can to get the word out?
3 A.   That is correct.
4 Q.   But yet the only person you chose to send the
5 video, the only person you chose to get the word out
6 to was the person who had ignored you for the last
7 three years when you were sending Facebook messages
8 about other topics?
9 A.   No.  Actually, I also got called in for posting
10 those videos on my personal Facebook page, which
11 made no reference to Southwest or the Union.  But
12 the exact same videos on my personal page.  I had
13 been putting pro-life things on my page for years.
14 Q.   Understood.  That's a separate issue.
15        But the only Southwest-affiliated person who
16 you directed those abortion videos -- however you
17 want to characterize them -- the only person
18 affiliated with Southwest who you sent those videos
19 to was Audrey Stone, fair?
20 A.   My union president for going to that march,
21 yes.
22 Q.   Thank you.
23        And let's talk about your motivation in sending
24 that to her.  You talked about that today and Friday
25 as well, that you were -- you were upset that the

Page 1348

1 Union went on this Women's March that you contend
2 was sponsored by Planned Parenthood, fair?
3 A.   Yes.
4 Q.   That made you angry, didn't it?
5 A.   Not really angry.  It disgusted me and it made
6 me sad.
7 Q.   And you -- I'm sorry.  I'm sorry.
8        MR. PRYOR:  Your Honor, again --
9        MR. McKEEBY:  I thought she was finished.
10        THE COURT:  And he stopped.
11        MR. PRYOR:  After he interrupted.
12        THE COURT:  Counsel, you are not in charge
13 of the courtroom.
14        You can ask your next question.  Sorry.
15 You can finish your answer.  He had stopped.
16 BY MR. McKEEBY:
17 Q.   I thought you were finished.  I apologize.
18 Please go on.
19 A.   Now, disgusted, yes.  I thought it was a
20 disgusting way to represent a very professional
21 group of not just women, but also men, going to a
22 march like that.  It was political and it was also
23 Planned Parenthood spons- -- we all know what that
24 march was for.
25 Q.   You sent that video to Ms. Stone because you

Page 1349

1 wanted to provoke an emotional response in her, did
2 you not?
3 A.   No.
4 Q.   You wanted to shock her?
5 A.   No.
6 Q.   You saw Ms. Stone's response in this courtroom
7 where she was not able to look at the video and she
8 was sobbing.
9        Did you -- first of all, you saw that, right?
10 A.   I saw her up here, yes.  I don't know if she
11 actually looked at the video.  But yes, she was over
12 here crying.
13 Q.   Right.  And she cried at the arbitration that
14 you appeared in as well, right?
15 A.   Yes.
16 Q.   After the -- I'm sorry.
17        MR. PRYOR:  Object to reference to the
18 arbitration.
19        THE COURT:  Hold on.  Objection?
20        MR. PRYOR:  Limine issue, arbitration.
21        THE COURT:  Understood.
22        I will overrule that.  The fact of is
23 something that I have said we can discuss, but not
24 the specific substance.
25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 400 of 642   PageID 11341
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1350..1353

Page 1350

1 BY MR. McKEEBY:
2 Q.   There was an arbitration after the Step 2
3 hearing, correct?
4 A.   Yes.
5 Q.   At a hotel room here in Dallas, correct?
6 A.   Yes.
7 Q.   And Ms. Stone was at that hearing as a witness,
8 correct?
9        MR. PRYOR:  Your Honor, do I have a
10 continuing -- I think I do.
11       THE COURT:  You do.
12       MR. PRYOR:  Thank you.
13       THE COURT:  Thank you for asking.  Yes,
14 running objection.
15 BY MR. McKEEBY:
16 Q.   Ms. Stone was a witness at that hearing,
17 correct?
18 A.   Yes, she was.
19 Q.   The arbitration.
20 A.   Uh-huh.
21 Q.   And you were there during the entirety of the
22 arbitration?
23 A.   Yes.
24 Q.   And you were represented by counsel at that
25 arbitration?

Page 1351

1 A.   Yes.
2 Q.   And Ms. Stone had a similar reaction as she did
3 in this courtroom when those videos were played at
4 the arbitration; she was emotional, correct?
5 A.   Yes.
6 Q.   And that's precisely the response you wanted to
7 evoke when you sent those videos to her, is that not
8 true?
9 A.   No, that's not true.
10       MR. PRYOR:  Object, asked and answered.
11       THE COURT:  Overruled.
12 BY MR. McKEEBY:
13 Q.   So did you believe Ms. Stone in the courtroom
14 and at the arbitration, or do you think she was
15 playing it up for the jury?
16 A.   When she went to the march, she had to have
17 seen pro life on huge jumbotron screens of some of
18 the most horrific, sad abortion pictures, because I
19 knew people that were there.  So if that didn't
20 upset her, then how would this upset her?  Because
21 she took those women to that march.
22 Q.   So your testimony is that because she attended
23 the march, there would be no reason to think she
24 would be upset by videos of aborted fetuses/babies?
25 A.   Everybody is upset when they see something like

Page 1352

1 that, but it's the realization of what she went to
2 and she supported.
3 Q.   Everybody would be upset when they saw
4 something like that, is that your testimony?
5 A.   I believe -- I mean, it breaks my heart, yeah,
6 it breaks my heart, but the only way to get the
7 message across is for people to actually see what it
8 is.
9 Q.   After seeing Ms. Stone's reaction at the
10 arbitration in the hotel in Dallas or here in this
11 courtroom, do you have any regrets about what you
12 did?
13 A.   On a personal level, I'm sorry that it affected
14 her in such a way, yes.  But on a union level, maybe
15 she should have reached out to all of us as
16 dues-paying -- even though I'm an objector, we
17 helped pay for that.
18     Don't represent us as -- to me, when you wear
19 those pink -- and it's called the pink pussy hat
20 project -- you are not representing us as women that
21 I would think that most of our flight attendants
22 would want.
23 Q.   So you said a lot there, but I'm not sure that
24 I heard an answer to my question, which is do you
25 have any regrets about your conduct in sending those

Page 1353

1 videos of aborted babies to Ms. Stone?
2       MR. PRYOR:  Object, asked and answered.
3 She absolutely answered his question.  He's just
4 looking for a different answer.
5       THE COURT:  I'll allow it.
6       THE WITNESS:  To my union president that
7 took the money, and those women -- and I'm kind of
8 shocked with Southwest Airlines not --
9       MR. McKEEBY:  Your Honor --
10       THE WITNESS:  I would have done it again,
11 yes, because that's the only way that I could have
12 gotten my point across, that I do not ever want our
13 representatives as we pay them -- I mean, this had
14 nothing to with our jobs.  Nothing.
15 BY MR. McKEEBY:
16 Q.   You recognized some of the other attendees at
17 the Women's March who were Southwest flight
18 attendant pilots -- or, excuse me -- flight
19 attendants?
20 A.   I know pretty much all of them.
21 Q.   You didn't send any of them the videos, did
22 you?
23 A.   No.  They are not my president.
24 Q.   Now, I think you alluded to it in your answer
25 to my question.  But you would agree with me that

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 401 of 642   PageID 11342
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Pages 1354..1357

Page 1354

1 you objected to the march for other reasons other
2 than just your assessment that the marchers were
3 supporting a pro-choice position, correct?
4 A.   Reword that.  Or not reword.  Reask that again,
5 I'm sorry.
6 Q.   That's a fair request.
7 A.   I'm sorry.
8 Q.   That's all right.
9      You had problems with the other aspects of the
10 Women's March, too, that didn't have anything to do
11 with abortion, such as women's rights generally?
12         MR. PRYOR:  Object to the relevance.  It's
13 not anything she raised.
14         THE COURT:  No speaking objections.
15         I'll allow it.
16 BY MR. McKEEBY:
17 Q.   Let's go to -- well, I'm sorry.  You can answer
18 my question.
19 A.   Well, it is kind of funny because I am a woman.
20 Q.   I would agree.
21 A.   And did she respect my rights?
22 Q.   This isn't the setting for you to ask me
23 questions.
24 A.   I don't believe she respected our rights.
25 Going to that march, using our money, once again,

Page 1355

1 she didn't respect a lot of the membership by doing
2 that.
3 Q.   My question --
4 A.   And I'm a woman.
5 Q.   I understand that.
6      My question, though, Ms. Carter, is you
7 objected to not just the pro-choice aspect of that
8 march but to the march in general, to the fact that
9 they were marching on behalf of women rights
10 generally, is that fair?
11 A.   No, my biggest objection was regarding who they
12 were marching for and with, Planned Parenthood.
13         MR. McKEEBY:  Let's go to Exhibit 98, and
14 specifically 98.6, which is already in evidence.
15 And specifically 98.6.
16 BY MR. McKEEBY:
17 Q.   These are the fact-finding notes, Ms. Carter.
18 A.   Okay.
19 Q.   And the second portion where it talks about,
20 okay, our union went to the Women's March.
21         MR. McKEEBY:  Let me blow that up.
22         MR. PRYOR:  Your Honor, object to improper
23 impeachment.  This is someone else's notes.  He can
24 ask her her recollection of what she said, but to
25 impeach --

Page 1356

1         THE COURT:  Hold on.  That's speaking.
2         Yes, understood.  You can use it in the
3 manner that we just discussed, which is it's someone
4 else's notes, but you can address them with her.
5         MR. McKEEBY:  I'm sorry?
6         THE COURT:  They are someone else's notes,
7 but you can address them with her.
8         MR. McKEEBY:  I'm using them to impeach
9 her.  I think.
10 BY MR. McKEEBY:
11 Q.   All right.  The sentence that starts with "I
12 believe" that's about right over here.
13 A.   Yes, I see that.
14 Q.   "I believe we have women rights and no one is
15 stomping on them.  I believe we have the same rights
16 as men."  Correct?
17 A.   As a flight attendant, absolutely.  I have more
18 seniority and more rights -- not rights, but more --
19 because they were supposedly marching for pay and
20 things like that.
21      Due to my job, and this is what I'm referring
22 to, is I make more money than some men do as flight
23 attendants because of the seniority range.  I have
24 been at Southwest for almost right at 21 years.
25      And there is -- so this, for me, I have all

Page 1357

1 kind of rights as a woman at Southwest Airlines.  I
2 never complained about my job.
3 Q.   So this notion of flight attendants marching
4 for equal pay you thought was ridiculous, fair?
5 A.   In the -- when it comes to our job, and I would
6 have figured, since they were saying they were
7 representing flight attendants at this march, this
8 is kind of irrelevant on our part.
9 Q.   Let me go to the last sentence.  Does that
10 sound like something that you said?
11      "In 20 years I have never been in trouble.  I
12 don't try to hurt people.  I love my job."
13 A.   Yeah, I've never hurt anybody on my job.
14         MR. McKEEBY:  Let's go to lower on the
15 screen, if you can get rid of that.
16 BY MR. McKEEBY:
17 Q.   So Mr. Schneider, at least according to these
18 notes, indicates that he asked you if you knew for
19 sure that Audrey was supporting Planned Parenthood
20 or women's rights, correct?  Right here.  "Ed, do
21 you know for sure"?
22 A.   Yes.
23 Q.   Do you see that?
24      It is down further.
25 A.   Yes, I see it.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 402 of 642   PageID 11343
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1358..1361

Page 1358

1 Q.  And your response was "It was a whole plethora
2 of things.  It was sexual harassment, fair
3 treatment, equal pay.  We already get those things
4 under the Constitution."
5     That's what you were referring about earlier,
6 in terms of you don't believe there was any issue
7 with equal pay and these other issues, fair?
8     MR. PRYOR:  Object, mischaracterizes
9 testimony.  She just answered what she was referring
10 to as it related to equal pay.  He's trying to make
11 it --
12     THE COURT:  Hold on.  That's a speaking
13 objection.
14     I will overrule that.  You can answer.
15     THE WITNESS:  Okay.  Can you ask that
16 again?
17 BY MR. McKEEBY:
18 Q.  Yes.  I'm not sure if I can ask the exact
19 question again, but I will try to get close.
20     You were telling Mr. Schneider that you didn't
21 think any of these issues that were associated with
22 the march, sexual harassment, fair treatment, equal
23 pay, none of that was legitimate because you already
24 get those things under the Constitution, correct?
25 A.  I get those under my job and the Constitution.

Page 1359

1 Yes.  All -- I don't believe that I am without equal
2 rights at all.
3 Q.  And you disagreed with the Union and the flight
4 attendants marching in that march in support of
5 these issues, fair?
6 A.  When it comes to our jobs, this didn't have
7 anything to do with our jobs.  And that's what she
8 represents when she took the banner that says -- I
9 believe it's the representation of 556, Southwest
10 Airlines flight attendants or whatever on the
11 banner.  She was representing us at this march.
12 Q.  You also said during the fact-finding meeting
13 that one of your reasons for sending Ms. Stone the
14 videos was because you wanted to get her feedback on
15 her position about abortion, correct?  You wanted to
16 open up a dialogue?
17 A.  Can you show me that, where I wrote that, or
18 where I said it?
19 Q.  Sure.  I can show you from the notes.
20     It's 98.11.  If that refreshes your
21 recollection.  Again --
22     MR. PRYOR:  Hang on one second.  Counsel,
23 I need to find the document.
24     Where is it?  Go ahead.  Thank you.
25     THE WITNESS:  I see it.

Page 1360

1 BY MR. McKEEBY:
2 Q.  It says -- I guess this is actually
3 Ms. Gutierrez asking you -- "Are you familiar with
4 her stance on abortion?"
5     And you say, "No, I was trying to get feedback
6 on that."
7 A.  I was trying to get feedback on it.  They had
8 taken -- they had taken those women.
9 Q.  You were trying to get feedback from Ms. Stone?
10 A.  She could have replied to me.
11 Q.  By sending her videos of aborted babies, you
12 were hoping to get feedback from a person who had
13 ignored you for three years, is that your testimony?
14 A.  Well, I would have hoped at this point, because
15 it was such a hot topic, that she would have
16 responded.
17 Q.  And instead of responding, she made a complaint
18 to Southwest Airlines, fair?
19 A.  Correct.
20 Q.  Did you really expect her to respond to you
21 with that kind of dialogue when you sent those
22 videos?  Was that really your expectation?
23 A.  Honestly, yes.
24 Q.  Let's go to -- well, let's wait.
25     You also mention in your testimony that you

Page 1361

1 objected to the pink hats, correct?
2 A.  That is correct.
3 Q.  And your testimony, as I understand it, and I
4 will let you correct me if I'm mistaken, but you
5 believe those pink hats were designed to look like
6 female genitalia?
7 A.  The whole -- and I've got documentation on
8 that -- but, yes, that is exactly what it was
9 supposed to be.  And that was confirmed to me by
10 Jessica Parker.
11 Q.  And who is that?
12 A.  She was a union, I believe, shop steward at the
13 time.
14     MR. McKEEBY:  Let's pull 98 back and go to
15 98.7.  It sounds like a radio station.
16 BY MR. McKEEBY:
17 Q.  This is a dialogue between you and
18 Mr. Schneider and Ms. Gutierrez about the vagina
19 hats, correct?
20 A.  Uh-huh.  Yes.
21 Q.  And there is some discussion about what it
22 means.  Charlene, you say, "Yes, that's a pussy hat.
23 It is supposed to be a vagina."
24 A.  Uh-huh.
25 Q.  And Ed at some point says, "It's a knit

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                          Pages 1362..1365

Page 1362

1 stocking cap and it's pointed on the ends."
2     And then a few lines down you say, "It's a
3 vagina hat, no different from what I sent to her."
4     Do you see that?
5 A.  The whole reason that the women wore those hats
6 was due to a remark that President Trump at that
7 time had made about grabbing women, and that was
8 what this --
9     MR. McKEEBY:  Objection, non-responsive.
10     MR. PRYOR:  It is responsive.
11     THE COURT:  It's not.  Hold on.
12     MR. McKEEBY:  I just asked her what she
13 said in the document.
14     THE COURT:  I will sustain that objection.
15     Strike.  Jury, please disregard.
16     You can ask the question.
17 BY MR. McKEEBY:
18 Q.  I'm not trying to ask you about Mr. Trump, I'm
19 just saying that this document at least reflects
20 that you said, "It's a vagina hat.  It's no
21 different than what I sent to her."
22     Is that consistent with your recollection?
23 A.  Yes.
24 Q.  But that's not true, is it?
25     What you sent to Ms. Stone looked nothing like

Page 1363

1 the pink pussy hats that the --
2 A.  What I sent to Ms. Stone --
3 Q.  Hold on.  Let me finish my question --
4 A.  Okay.
5 Q.  -- and then I will let you talk.
6 A.  Okay.  Of course.
7 Q.  You would agree with me that what you sent to
8 Ms. Stone via Facebook Messenger showed pictures of
9 women in hats that were not at all like the hats
10 that the women in the Women's March wore?
11 A.  Not her specifically.  But if you will read
12 what I wrote her, I said, "I'm so glad this is not
13 the types of costumes that you wore and it was
14 just" -- I think "just the hats that you did wear,"
15 which I believed was degrading to us as women.
16 Q.  But you are saying here in the meeting that the
17 vagina hat is no different than what you sent to
18 her.  And by "her," you mean Ms. Stone.
19 A.  It was supposed to represent exactly that same
20 genitalia but in a little hat.  Yes.
21 Q.  Since you mentioned the message to Ms. Stone,
22 let's go ahead and pull that up.
23     MR. McKEEBY:  It's Exhibit 47.
24     THE COURT:  Its already in, so we have
25 unmuted the jury screens.

Page 1364

1     MR. McKEEBY:  Can we blow that up a little
2 bit so that she can see it?
3 BY MR. McKEEBY:
4 Q.  This is what we were talking about, correct?
5 A.  They didn't dress like that.
6 Q.  They did not dress like that, did they?
7 A.  No.
8 Q.  But this is what you sent Ms. Stone?
9 A.  That's correct.  And this was some of the
10 costumes that were there at the march.
11 Q.  But you don't know that any Southwest flight
12 attendant wore a costume like this, do you?
13 A.  Honestly, no, I don't know, because we only had
14 videos and short clips of just part of the march
15 from them.
16 Q.  But none of the pictures that we have shown in
17 this case, and specifically of women in pink hats,
18 show anything that looks like this?
19 A.  No.
20 Q.  And I understand you have an accommodation
21 claim in this lawsuit, and we will get to that in a
22 minute.
23     Is it your testimony or your position that
24 Southwest should have accommodated you by allowing
25 you to send photos like this to Ms. Stone?  Or does

Page 1365

1 that -- well, I will let you answer that question.
2 A.  First of all, I never knew you had to have an
3 accommodation for anything at Southwest.  I had
4 never heard of what they referred to me as the ACT
5 department.
6     And now, through testimony, I'm being told that
7 it should have gone through employee relations.
8 They didn't tell me that either.
9     But I specifically said, in my fact-finding
10 meeting, that I was a Christian and this is why, you
11 know, that I was totally against this march, and
12 then taking those women and going.
13 Q.  So let me get this straight, though.  Is it
14 your testimony and your position in this case that
15 sending these pictures to Ms. Stone was an
16 expression of your Christian faith?
17 A.  When they were wearing the actual knitted hats,
18 that was supposed to be a symbol and -- it was --
19 and I've got it in my information.  It's called the
20 Pussy Hat Project.  And no, it may not look just
21 like this, okay, exactly like this, but it was in
22 reference to exactly this.
23 Q.  But my question to you is a little bit
24 different, and it's as follows:  You are claiming in
25 this case that Southwest had some duty to reasonably

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 404 of 642   PageID 11345
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1366..1369

Page 1366

1 accommodate your religious beliefs.  Correct so far?
2 Do you understand that?
3 A.  When I heard the testimony the other day, they
4 did not consider it.
5       MR. McKEEBY:  Your Honor, this is a
6 yes-or-no question.
7 BY MR. McKEEBY:
8 Q.  I just want to know what your understanding is
9 of this position in this case.  Yes or no?
10      THE COURT:  Yes, and then you can
11 elaborate in the next round.  Thank you.
12      MR. PRYOR:  I object to the extent he's
13 trying to call for a legal conclusion about our
14 position in this case.  He wants to ask her facts --
15      THE COURT:  Hold on.  No speaking
16 objections.
17      I will allow the question.
18      You can answer.
19 BY MR. McKEEBY:
20 Q.  Should I repeat the question?
21 A.  Please.
22 Q.  I thought so.
23    It's your position in this case that Southwest
24 Airlines should have accommodated your religious
25 beliefs, fair?

Page 1367

1 A.  I told them I was a Christian, yes.
2 Q.  And is it your position that they should have
3 accommodated your religious beliefs by allowing you
4 to send this type of -- not this type -- this
5 photograph to Ms. Stone?  Is that part of your
6 accommodation claim?
7 A.  This picture was sent to my union president.
8 Southwest has never gotten involved in union
9 business.  If Audrey wanted to do something to me,
10 they've got counsel right over there, they could
11 have done something to me.
12 Q.  So Southwest should have allowed you to send
13 this picture to Ms. Stone, and they are wrong for
14 punishing you for doing so, is your position?
15 A.  Yes.
16 Q.  And you indicated -- you can now take it
17 down -- at the fact-finding meeting, and I think
18 perhaps in this case, that the fact that those women
19 were wearing the pink pussy hats was disgusting,
20 that's the word you used, correct?
21 A.  It was.  It didn't represent any of us as
22 women.
23 Q.  And this isn't disgusting?  This --
24 A.  Like I said, she took the women to this march,
25 and they were marching with women with -- I didn't

Page 1368

1 bring up the pussy hat part of it.  They wore the
2 hats that were supposed to be a symbol --
3      MR. McKEEBY:  Your Honor, non-responsive.
4      THE WITNESS:  I don't know how to answer
5 that question.
6 BY MR. McKEEBY:
7 Q.  Well, let me try and help you.
8      MR. PRYOR:  I object to him interrupting
9 her unless he gets a ruling from the Court.
10      MR. McKEEBY:  I'm not getting responses to
11 my questions.
12      THE COURT:  I think the answer was
13 sufficiently non-responsive to where now you can ask
14 the question again.
15      MR. McKEEBY:  Can you read the question?
16 I don't remember.
17      (Thereupon, the requested portion was read
18    back by the reporter as above recorded.)
19      MR. McKEEBY:  Thank you.
20 BY MR. McKEEBY:
21 Q.  I will ask it slightly differently.
22      You told us previously a moment ago that
23 the hats that the women wore in Washington were
24 disgusting.
25      Is this not disgusting to you, these

Page 1369

1 images?
2 A.  As a woman going to that march, yes, they would
3 have been disgusting.  Again, I sent them to my
4 union president who had taken those women to that
5 march, and this was union business.
6 Q.  And did you also send this photo to Ms. Stone
7 with the hope that she would respond to open up some
8 type of dialogue with you?
9 A.  Yes.  I was hoping for it.
10      MR. McKEEBY:  I'm looking for this, your
11 Honor.
12 BY MR. McKEEBY:
13 Q.  Now, you have said repeatedly in response to
14 some of my questions that it was wrong for Ms. Stone
15 to turn you in to Southwest Airlines, fair?
16 A.  Yes.
17 Q.  I mean, that's the heart of your complaint in
18 this case about the Union, that Ms. Stone, as
19 president of the Union, turned you in, and that
20 violated their duty of fair representation, fair?
21      MR. PRYOR:  Object to a legal conclusion
22 as what the main point of her legal case is.
23      THE COURT:  Sustained.
24 BY MR. McKEEBY:
25 Q.  Your claim against the Union is that they

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 5 July 11, 2022                    Pages 1370..1373

Page 1370

1 violated their duties to you by Ms. Stone turning
2 you in?
3 A.  Yes.
4 Q.  But it was okay for you to complain to
5 Southwest about other employees who you believe
6 violated the social media policy, was it not?
7 A.  I did that one time.
8       MR. PRYOR:  Objection, relevance.
9    I'm sorry, ma'am.
10      THE WITNESS:  That's okay.
11      MR. PRYOR:  Object to relevance, your
12 Honor.  In limine issue.
13      THE COURT:  Hold on just a second.
14   I will overrule.  You can answer.
15      THE WITNESS:  Okay.  The person that I
16 actually wrote with a bunch of other flight
17 attendants was against Brian Talburt, and he had
18 made reference to executing employees, which either
19 meant harming them in a physical way or harming them
20 by turning them in and getting them fired.
21      MR. McKEEBY:  And let's pull up Document
22 61.
23 BY MR. McKEEBY:
24 Q.  This is the complaint that you are talking
25 about, correct?

Page 1371

1       MR. PRYOR:  Your Honor, first of all, is
2 this in evidence?
3       THE COURT:  Sidebar.
4       (Thereupon, the following proceedings were
5       had at sidebar:)
6       THE COURT:  So it's not in evidence.
7    I understand your last limine issue she
8 was talking about Southwest disciplines somebody,
9 but now we are getting into 61, which is her
10 complaint against Talburt.
11   So I know you had objections.
12      MR. PRYOR:  I didn't ask for a sidebar.  I
13 can't afford them.
14   Our objection is --
15      THE COURT:  I'm asking for this on my
16 time.
17      MR. PRYOR:  I appreciate that.
18      THE COURT:  This is a morning session
19 issue we didn't get to.  Does that make sense?  This
20 is one of the close calls from last night.
21      MR. PRYOR:  We've raised these issues in
22 our limine.  This is an issue from long ago.  It is
23 not related to this case.
24   And she filed this as an objector because
25 she --

Page 1372

1       THE COURT:  Before that, it is time for
2 the morning break.  Can I kick them out and then
3 have -- let's come back a couple of minutes early on
4 the 10-minute recess.
5       Can I ask you where in the limine ruling
6 we talked about this?  Because I don't remember.
7       MR. PRYOR:  I hope I can, Judge, but I
8 know that Mr. Gilliam can.
9       THE COURT:  Okay.  So tell him we will
10 come back in eight minutes.
11      MR. PRYOR:  If I'm wrong, I apologize, but
12 I think it is there.
13      THE COURT:  It's fine.  We'll all look for
14 it.  No problem.
15      (Thereupon, the sidebar was concluded and
16      the following proceedings were held in open
17      court:)
18      THE COURT:  Okay.  We are going to take
19 our morning break and talk about a legal issue right
20 quick.  So let's do a 10-minute break.  We will come
21 back at 10:50.
22      So remember the same instructions.  You
23 can only talk to your fellow jurors and court
24 personnel just not about the case.  Don't talk to
25 anyone else and don't do any research about the

Page 1373

1 case.
2       We will see you in 10 minutes.
3       All rise.
4       (The jurors exited the courtroom.)
5       THE COURT:  And you can leave the stand.
6 You can't talk to anyone about the case in the short
7 break.  We will see you at 10:48 to talk about our
8 legal question.
9       All right.  We are in recess.
10      (Recess.)
11      THE COURT SECURITY OFFICER:  All rise.
12      THE COURT:  Thank you.  You can be seated.
13   Okay.  So I asked to look into the limine
14 issue.  I can tell you what my thoughts are on the
15 limine issue, but if you have a ready answer,
16 Mr. Gilliam, then you can lay it on me.
17      MR. GILLIAM:  I honestly don't think that
18 it's in the limine itself.
19      THE COURT:  I don't either.
20      MR. GILLIAM:  But it is part of our
21 objections that we made last night to exhibits.
22      THE COURT:  I will concur on that.
23   So let me tell y'all what I'm thinking on
24 61.
25   I'm thinking 61 stays out, and here is

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 406 of 642   PageID 11347
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Pages 1374..1377

Page 1374

1  why.  I'm trying to think of 61 in conjunction to
2  questions we had earlier on, for example, the equal
3  pay question.
4       The equal pay question came up in some of
5  the termination interviews.  It came up in some of
6  the signs that would say "Equal pay, pro choice, my
7  body, my choice."
8       And so because that was information that
9  you could see from that stack of exhibits was before
10 Southwest since making the termination, then its
11 relevance is higher even if it was not one of the
12 stated grounds for the termination.  So then
13 prejudice isn't going to outweigh the relevance.
14      Here I don't see in the materials I have
15 that this was information Southwest was looking at
16 when making the termination.  If it was, its
17 relevance shoots up.
18      So I don't think its relevance is very
19 high.  I think there is some prejudice there to
20 Carter if it comes in that outweighs whatever
21 marginal relevance there is.
22      Tell me if you think I'm wrong.
23      MR. McKEEBY:  I think you are wrong.
24      THE COURT:  Go for it.
25      MR. McKEEBY:  Two reasons, your Honor.

Page 1375

1       One is that they have suggested through
2  Ms. Stone and otherwise that the policy is
3  ambiguous, employees didn't understand it.
4       This shows that at least Ms. Carter
5  understood it well enough to report another
6  employee, A; and B, they have also suggested that --
7  that the company at some level was in league or
8  colluded with the Union to exclude and target and
9  reprimand -- again, I understand that the limine
10 ruling eliminated the actual discipline, but that
11 has kind of -- has been stepped over, maybe not
12 intentionally in every case.
13      But -- but what the evidence will show on
14 Southwest's side is that, look, there were objectors
15 turning in union leaders and union leaders turning
16 in objectors, and at some point Southwest just threw
17 up their hands and said, We have got to assess these
18 cases on their merit.
19      So the fact that Ms. Carter turned in a
20 union supporter is relevant as to that theme.  So I
21 think it should come in for that reason.
22      I also think it should come in to rebut
23 the notion that there is some ambiguity about the
24 social media policy that prevented Ms. Carter from
25 doing exactly what she did.

Page 1376

1       MR. GREENFIELD:  Your Honor, if I may.  I
2  don't have a specific objection on this point other
3  than a slightly different take on the relevancy
4  issue.
5       Ms. Carter has consistently testified that
6  Southwest should never get involved in union
7  business.  She is here turning in someone to
8  Southwest to get them involved in union business.
9       It goes to Ms. Carter's credibility, and
10 credibility is always relevant before the jury, your
11 Honor.
12      THE COURT:  Response.
13      MR. GILLIAM:  Yeah.  As for Southwest's
14 response, I don't think that it really addresses
15 your point.  In fact, I think that to the extent
16 their -- I think their relevance argument gets
17 into -- would have to get into matters of similarly
18 situated employee discipline that they themselves
19 limined.
20      As for Local 556's response, there is a
21 huge difference between a union president or other
22 union actor reporting a non-member objector or other
23 ordinary employee and an ordinary employee reporting
24 comments about a threat of execution or public
25 threat -- I'm sorry -- yeah, threat of public

Page 1377

1  execution against recall supporters.
2       THE COURT:  Understood.
3       MR. GREENFIELD:  If I may, your Honor.
4       THE COURT:  Briefly.
5       MR. GREENFIELD:  Ms. Carter has never
6  equivocated about when, who, and what type of
7  complaint should not be interfered with by Southwest
8  Airlines, whether it was from herself, another union
9  member, or another union president.  It goes to
10 credibility, your Honor.
11      THE COURT:  I understand that argument.
12      So I haven't heard -- I hear the
13 arguments.  I haven't heard anything that changes my
14 tentative ruling.  So I will stick with my tentative
15 ruling and keep 61 out.
16      So I'm ruling on the record that 61 is
17 overly prejudicial, it lacks relevance.
18      So I think this is sufficient here, but if
19 you want to offer it again when the jury is in the
20 box, you can do that, just like I let Mr. Pryor do
21 that earlier, at trial.
22      MR. GREENFIELD:  You Honor, may I have
23 some clarity a little bit more in-depth on this
24 topic?
25      I understand that the document is out.  Is

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 407 of 642   PageID 11348
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1378..1381

Page 1378

1 discussing Ms. Carter -- with Ms. Carter about
2 whether she turned anyone in for the social media
3 policy without going into specifics regarding
4 Mr. Talburt, is that acceptable?
5        MR. PRYOR:  It is the same issue.
6        THE COURT:  What are you asking for?
7        MR. PRYOR:  It is the same issue.
8        MR. GILLIAM:  Yeah, it is the same issue.
9 I don't think the issue is any different.  So I
10 would say, yes, it is out.
11       THE COURT:  But no one has moved for that
12 yet.  So he just suggested you move for that.
13       Are you moving for that?
14       MR. GILLIAM:  Yes.
15       THE COURT:  Basically a limine point on
16 this issue.
17       MR. GILLIAM:  So moved.
18       MR. GREENFIELD:  Your Honor, I find this
19 different.  This is exactly the bright line you've
20 drawn in your limine instructions, because we asked
21 for the same limine instructions that Southwest
22 requested on comparator evidence, et cetera.
23       It was granted for them and it was not for
24 us.  Hence, the consistent instruction that goes to
25 you may consider this evidence against the Union but

Page 1379

1 you may not consider this evidence against
2 Southwest.
3        So if all of those instances can be
4 considered against the Union, we also need to be
5 able to consider what Ms. Carter's actions were.
6        THE COURT:  I understand that, but I don't
7 think there is a reason for separation here.  That
8 separation for the evidence you are speaking of was
9 that it's not just not relevant to claims against
10 Southwest because there is no comparator claim.  It
11 is just a direct discrimination claim.  But it does
12 go to your duty of fair representation claim that
13 you have against the Union.
14       So I don't see the lack of congruence here
15 stemming from the claims.  I just think it's not
16 relevant.  It's overly prejudicial regarding both
17 parties.  So I don't think it comes in to either
18 party.
19       So what I understand your request to be is
20 that it's not just the exhibit, it's the discussion
21 about it that should stay out.
22       MR. GILLIAM:  Yes, your Honor.  So moved
23 to keep out any testimony.
24       THE COURT:  Okay.  I mean, you know my
25 underlying rationale, but is there any argument

Page 1380

1 Southwest or the Union wants to make that we should
2 allow discussion other than on the exhibit?
3        MR. GREENFIELD:  Just not the specifics.
4 If we want to talk about the specifics about -- and
5 I think it's already come out.  I think the door has
6 been opened and the jury has heard it, so I don't
7 know that we can put the cat back in the bag to a
8 certain extent.
9        But is it proper to inquire whether she
10 has made any complaints, period, against other
11 Southwest employees?  Because, again, I think that
12 does go to rebut her previous testimony.
13       THE COURT:  I recall previous testimony
14 covering no complaints were made against her.  If
15 I'm wrong on that, someone can point me to the page
16 and line.
17       MR. PRYOR:  We didn't raise this issue.
18       MR. GILLIAM:  The only thing we have is
19 another complaint against her.  There are no other
20 complaints that she's made.
21       THE COURT:  Sure.  So that wasn't my
22 recollection of the testimony.  My recollection was:
23 Were there any complaints made against you?
24       Things that came up in the prior
25 testimony.

Page 1381

1        MR. GREENFIELD:  Your Honor, I guess I
2 don't understand then where the differentiation
3 occurs as to why they can talk about all the
4 different claims and issues that Brian Talburt,
5 again, just a rank-and-file member of the Union, and
6 what his actions were, those have been discussed at
7 length, versus what Ms. Carter's actions were.
8        THE COURT:  That's correct.  It's a
9 different relevance and a different prejudice
10 analysis.
11       Okay.  So I will say this is a new limine
12 point, whatever limine we are under, to discuss,
13 about her prior complaints against other Southwest
14 employees.
15       I understand y'all don't like that, and so
16 I'll understand y'all as objecting to that.  I'm
17 overruling those objections.
18       MR. McKEEBY:  And I think, as a procedural
19 matter, I move for the admission of 61.  And you are
20 overruling that, so I don't think I need to do
21 anything else, so I'm not going to do anything else.
22       THE COURT:  Understood.
23       And I can say on the record when the jury
24 is back in, I sustained objections on 61.
25       Okay.  Let's bring them in.

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 408 of 642  PageID 11349
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1382..1385

Page 1382

1    (The jurors entered the courtroom.)
2    THE COURT:  Okay.  You can be seated.
3    I sustained that objection on Exhibit 61,
4 so you can ask a new question, Mr. McKeeby.
5    MR. McKEEBY:  Can you pull 47 back up?
6 BY MR. McKEEBY:
7 Q.  I know I asked you this question, but I don't
8 think I got a response.  If I did, I apologize.  But
9 I would ask again, was sending this message and this
10 photograph to Ms. Stone an expression of your
11 Christian beliefs?
12 A.  An expression of my Christian belief against
13 the march, yes, and against who she was marching
14 with.  This is what they marched with.  So yes.
15 Q.  So sending this photo to Ms. Stone was
16 consistent with your Christian beliefs?  Your
17 position?
18 A.  Consistent with my Christian beliefs on this
19 march, yes.
20 Q.  Let me go back to your accommodation claim here
21 briefly.
22    What is the accommodation that you are
23 requesting or would have requested that Southwest
24 make for you?
25 A.  I didn't know I had to make a request.  This

Page 1383

1 has become a back and forth between this request.
2    I am a Christian.  I stated it in my
3 fact-finding meeting, I think several times.  And
4 then I stated, I think, in my second step meeting.
5 Q.  I understand.  The jury wasn't at those, at
6 those meetings, so I'm asking you -- I know I'm
7 asking you to rehash issues that you've done on
8 several occasions, and I can see how that could be
9 tedious.
10    But the jury hasn't heard all of that, and I
11 think they need to hear what your request is of
12 Southwest in terms of what it should have done to
13 accommodate you and your religious beliefs.
14    MR. PRYOR:  Object, calls for a legal
15 conclusion as well.
16    THE COURT:  I'll allow it.
17    THE WITNESS:  I stated I was a Christian.
18 I was objecting to a march that my union had, and I
19 believe under Title VII, it affords me to speak to
20 that, and they did not give that to me.  I didn't
21 know I had to ask it.
22 BY MR. McKEEBY:
23 Q.  Right.  And you didn't ask it because you
24 didn't know is your testimony, correct?
25 A.  That is correct.

Page 1384

1 Q.  And there is -- you've, I think, since
2 discovered that there is a whole Southwest
3 department that deals with accommodation issues
4 called the ACT department?
5 A.  That's what I've heard through all of this and
6 what I've understood.  But then in retrospect,
7 everybody was saying it should have gone to employee
8 relations.  So I don't know if even Southwest knows
9 who it's supposed to actually go to.
10    MR. McKEEBY:  Object as non-responsive.
11    THE COURT:  Sustained.
12    MR. McKEEBY:  And move to strike.
13    THE COURT:  Granted.
14    So, jury, please disregard the last
15 sentence that was said.
16 BY MR. McKEEBY:
17 Q.  Isn't it a fact, Ms. Carter, that what you are
18 asking in this case is that Southwest's policies not
19 be applied to you?
20 A.  That is not what I said and that's not what I
21 am -- policies that we had at Southwest Airlines and
22 the line between the union and what I was talking to
23 my union president about, Southwest Airlines should
24 have stayed out of union business, and be dealt with
25 within the union.

Page 1385

1 Q.  And Southwest Airlines should have not applied
2 its policies to punish you for sending a fetus video
3 to Ms. Stone, even if it did violate Southwest
4 policies?
5    MR. PRYOR:  Object, compound.
6    THE COURT:  I'll allow it.
7    THE WITNESS:  It was union business.  I'm
8 going to just say it again.
9    Southwest Airlines really had no business
10 stepping in union activity.  They would -- if I
11 would have done this at a union meeting, exactly the
12 same, Southwest Airlines has no right to punish or,
13 you know, any policies.
14 BY MR. McKEEBY:
15 Q.  To discipline you?
16 A.  Correct.
17 Q.  Your position is that Southwest did not have
18 the right to discipline you for sending those
19 abortion videos to a co-employee, Ms. Stone?
20 A.  To my union president, no, they did not have
21 the right to do that.
22 Q.  So you acknowledge at least that sending the
23 videos violated the policies, they just shouldn't
24 have applied them to you.  That's your position,
25 correct?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 409 of 642   PageID 11350
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1386..1389

Page 1386

1    MR. PRYOR:  Object, mischaracterizes her
2 testimony.
3    MR. McKEEBY:  It's a question.
4    THE COURT:  I will allow the question.
5    THE WITNESS:  Ask it again.  I'm sorry.
6    MR. McKEEBY:  Can you read it back?
7    (Thereupon, the requested portion was read
8 back by the reporter as above recorded.)
9    MR. PRYOR:  Same objection.
10    THE COURT:  Overruled.  You can answer.
11    THE WITNESS:  The policies are workplace
12 policies.  This was not done at the workplace and
13 this also had to do with the union activities.
14    So, no, Southwest Airlines, I always --
15 when I was at work, always adhered to the policies
16 at work.  These --
17 BY MR. McKEEBY:
18 Q.  The -- I'm sorry.  I'm sorry.  I thought you
19 were finished.  Please finish.
20 A.  Well, these policies, first of all, was not
21 done at work.  Second of all, it was union business.
22    So, no, those policies should have not been --
23 I guess I didn't break those policies at that time.
24 Q.  Did you break any policies?
25 A.  Not with my union president.

Page 1387

1 Q.  And so what should Southwest have done to
2 accommodate you?  I don't understand.
3 A.  First of all, they should have never called me
4 in.  It should have been dealt with in the union.
5 Q.  Let's talk about what you said about your
6 workplace, okay?
7    You were a flight attendant, correct?
8 A.  Correct.
9 Q.  So what was your workplace, the actual plane?
10 Is that what you are saying?
11 A.  When I check in for my trip, okay, 30 minutes
12 prior to going to the gate, that is when I'm at
13 work.  And until I clock out and leave that airport,
14 when I leave, once we -- the trip is done, and I
15 think it's 30 minutes after we leave the plane and
16 everything else -- I can't remember now, it's been
17 so long, it's been five years -- then I'm off the
18 clock.
19 Q.  So by that it would have been a violation of
20 the workplace bullying and hazing policy for you to
21 send that video while you were on the plane, fair?
22 A.  Still, again, no.  That was to my union
23 president.  No.  I would have never sent those
24 things at work.  I would never -- I mean, I didn't
25 have that kind of --

Page 1388

1 Q.  So it's not that you --
2 A.  I don't understand -- I guess I don't
3 understand where you are going with this question.
4 Q.  Well, I'm trying to get an understanding of
5 what you mean by "workplace."  And it sounds like
6 it's not so much that -- that you sent it off the
7 clock or off hours, but that you sent the messages
8 to the union president is your issue, fair?
9    MR. PRYOR:  Object, mischaracterizes what
10 she just said.
11    THE COURT:  I will allow her to answer.
12    THE WITNESS:  Again, if I had not been an
13 objector, I could have taken this to a union
14 meeting.  Southwest could have never done anything
15 to me, said anything to me.  That's that line.
16    It's the same type of communication with
17 my union president.  It just happened to be through
18 like an email or messenger.  It was the same type of
19 communication that should have been kept within the
20 union compound.
21 BY MR. McKEEBY:
22 Q.  And the reason it wasn't kept within the union
23 compound is because Ms. Stone reached out to
24 Southwest, fair?
25 A.  Ms. Stone turned me in to Southwest.  She

Page 1389

1 should have kept this in the union realm.
2 Q.  And what is Southwest supposed to do?
3 A.  Stay out of it.
4    MR. PRYOR:  Object, asked and answered.
5    THE COURT:  Overruled.
6 BY MR. McKEEBY:
7 Q.  I will give you a hypothetical.  Your counsel
8 raised some hypothetical questions during his
9 examination of I think Ms. Stone.  I'm going to give
10 one to you.
11    Is it your position that you had the right to
12 send the abortion videos to every dues-paying union
13 member, flight attendant at Southwest?
14    MR. PRYOR:  Object, calls for a legal
15 conclusion.
16    THE COURT:  I'll allow it.
17    THE WITNESS:  The only person that I would
18 have ever sent that to would have been my union
19 president.  I would have not sent that to any other
20 member, which I didn't do.  And even the women
21 that -- the other ones that went, I didn't send it
22 to them.  She led the march, she is the one who was
23 responsible for taking them all to DC.
24 BY MR. McKEEBY:
25 Q.  I understand all of that.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 410 of 642   PageID 11351
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1390..1393

Page 1390

1    My question is a hypothetical.  I know you
2  didn't do it.  I'm not suggesting to the jury that
3  you sent it to anyone else other than Ms. Stone.
4  And you have testified to that.
5    My question is, if someone did that, let's say
6  it was someone else, some other union member, an
7  objector if you want, if that makes you more
8  comfortable, if they had sent that video to every
9  union-paying Southwest flight attendant, would that
10  have violated Southwest's policies?
11    MR. PRYOR:  Object.  It's a hypothetical
12  that's not the facts of this --
13    THE COURT:  You can come to sidebar if you
14  want.
15    MR. PRYOR:  It's an improper hypothetical,
16  given what she just said.
17    THE COURT:  That's a speaking objection.
18  You can come to sidebar if you want to speak.
19    MR. PRYOR:  Object to improper
20  hypothetical.
21    THE COURT:  Understood.
22    I will sustain that one.
23    MR. McKEEBY:  Let me go to Exhibit 2.
24  BY MR. McKEEBY:
25  Q.  Do you recognize this document?

Page 1391

1  A.  Yes, I do.
2    MR. McKEEBY:  Move to admit Exhibit 2.
3    THE COURT:  Any objections on 2?
4    MR. PRYOR:  We object to the admission of
5  this document for relevance.  And the -- if he wants
6  to ask her if it refreshes her recollection if she
7  says something inconsistent.  But this is a legal
8  document.
9    THE COURT:  Anything from the Union?
10    You can come to sidebar if you want.
11    MR. PRYOR:  No, I'm fine.  Can't afford
12  it.
13    THE COURT:  Anything from the Union on 2?
14    MR. McKEEBY:  I'm going to need a sidebar
15  if -- well, I might know if I'm going to need a
16  sidebar here briefly.
17    THE COURT:  Call a sidebar.
18    (Thereupon, the following proceedings were
19  had at sidebar:)
20    MR. McKEEBY:  This is an EEOC charge,
21  which is an administrative prerequisite -- I'm
22  sorry.
23    THE COURT:  Go for it.
24    MR. McKEEBY:  This is an EEOC charge,
25  which is an administrative prerequisite to her

Page 1392

1  filing a suit.  And so we have an issue of a
2  question of whether or not she properly exhausted
3  her administrative remedies as an affirmative
4  defense, given that she did not raise the
5  accommodation claim.
6    And secondly, it has language that --
7  that's relevant to her claim.  She talks about what
8  the basis of her claim is in that sworn document.
9  So I should be able to get into that.
10    MR. PRYOR:  That's two completely
11  different issues.
12    The first one the Court has already ruled
13  on, and the exhaustion of administrative remedies,
14  that's not an issue for this jury.  It's not an
15  issue that anyone has even submitted a question on.
16    The issue of whether or not there is
17  something in there factually that's inconsistent
18  with anything she said, if she says something
19  inconsistent, he can show it to her and talk to her
20  when he's laid that foundation.
21    But right now it's inadmissible.
22    THE COURT:  So I get your point on my
23  prior rulings on exhaustion.  My question is did
24  y'all make an objection?  I didn't see an objection
25  last night to 2.

Page 1393

1    MR. PRYOR:  I didn't ojbect, Judge, sorry,
2  but regards I'm raising it now.
3    I know that we have made this argument
4  before.  Actually, I will refer to Mr. Gilliam in
5  that regard.  We are raising it now if it hadn't
6  been raised before.  I apologize if it wasn't.  It
7  is still an appropriate objection.
8    THE COURT:  So I've got the intention
9  here.  But what I will say is this, I think failure
10  to exhaust is a legal question I've already ruled
11  on.
12    So to the extent you try to get into that,
13  it may cause me to have to clean it up with a jury
14  instruction on that for y'all.  But you didn't
15  object last night to 2, so I'm going to let 2 in.
16    Does that make sense?
17    MR. PRYOR:  Can I -- I don't know -- first
18  of all, let me just point out, I didn't ask for this
19  conference.  And second, can I look and see what we
20  objected to last night?
21    I'm sure you're right, Judge, I just
22  didn't look at it.
23    THE COURT:  You can look and see if you
24  objected.
25    MR. PRYOR:  Give me two seconds and I'll

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 411 of 642   PageID 11352
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Pages 1394..1397

Page 1394

1  just wave at you and say you're right as usual.
2           THE COURT:  We are keeping the sidebar on.
3       The music is still one.  We are taking
4  down one thing at counsel table.  We will be right
5  back with you in a moment.
6           (Thereupon, the sidebar was concluded and
7       the following proceedings were held in open
8       court:)
9           THE COURT:  So I will overrule the
10 objections to Exhibit 2.  They can come in on the
11 terms that we discussed.
12          (The referred-to document was admitted
13      into evidence as Trial Exhibit 2.)
14          THE COURT:  Mr. McKeeby:
15          MR. McKEEBY:  So is it admitted?
16          THE COURT:  It is admitted into evidence.
17 We are publishing.
18          MR. PRYOR:  We have a continuing
19 objection.
20          THE COURT:  You may.
21          MR. PRYOR:  Thank you.
22 BY MR. McKEEBY:
23 Q.  One question -- well, I shouldn't say that.
24      A few questions about the document.
25          MR. McKEEBY:  Number 3, if you could pull

Page 1395

1  that point up.
2  BY MR. McKEEBY:
3  Q.  This is quite a statement, Ms. Carter.  You
4  indicate that your employer -- and I will let the
5  Union ask you this question if they want to, but I'm
6  interested in the contention about Southwest
7  Airlines.  You contend that the company supports
8  abortion in this statement, correct?
9  A.  The company allowed their name to be on a
10 banner at that march, and that's what I'm referring
11 to.
12 Q.  How do you know that?
13 A.  Because I have pictures of it.  And it was --
14 Q.  How do you know the company had anything to do
15 with it?  These flight attendants marched in
16 Washington.  Do you know if they asked for the
17 company's permission to do that?
18 A.  No, I don't, but I would have figured that
19 Southwest Airlines would have been pretty upset if
20 that's the case.  Did they reprimand those flight
21 attendants?
22 Q.  That' not my question.  Do you have any
23 information to suggest that anyone at Southwest
24 Airlines authorized those flight attendants to carry
25 those banners?

Page 1396

1  A.  They carried it.
2  Q.  That's not my question, Ms. Carter.  My
3  question is --
4  A.  I have no idea.  I have no idea.  If they
5  asked, I have no idea.
6  Q.  All right.  You've answered my question --
7  A.  Okay.
8  Q.  -- and I will respectfully move on --
9  A.  Okay.
10 Q.  -- to some boring topics for just a minute.
11          MR. McKEEBY:  Let's go to Exhibit 42.
12          THE COURT:  This is in evidence, so the
13 jury can see it.
14          MR. McKEEBY:  I don't think -- is 42 in?
15          THE COURT:  42 is in.  It came in earlier
16 today.
17          MR. McKEEBY:  Okay.
18 BY MR. McKEEBY:
19 Q.  I just want to walk you through this briefly.
20      These reflect your earnings at Southwest?
21 A.  Uh-huh.
22 Q.  And would you agree with me that they reflect
23 an average of about $15,000 a year?
24 A.  Give or take, right, yes.
25 Q.  Okay.  Give or take.  So if it's for 2014 --

Page 1397

1  well, go ahead.  Let's read the exact amount.
2      Do you know how to read these to know what your
3  actual earnings at Southwest were for 2014?
4  A.  Well, I can't read it because I don't have my
5  glasses.
6  Q.  Okay.  If it says $16,581, does that sound
7  about right, in the ballpark?
8  A.  Yes.  And this is what I was discussing with
9  you about not being able to fly.
10 Q.  Right.  I just didn't think we got it into
11 evidence as cleanly as I might like it.
12      I understand you don't have to and shouldn't
13 care about my preferences.
14      But let me walk through, the next page is for
15 2015.  And I read this to reflect a take-home pay of
16 $17,700, is that fair?
17 A.  That is correct.
18 Q.  And then finally, 2016, which -- first of all,
19 that was your last full year of employment?
20 A.  '16?
21 Q.  2016.  You were terminated in the --
22 A.  Yeah.
23 Q.  -- spring of 2017?
24 A.  March '17.
25 Q.  So 2016 was the last year of your employment,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Pages 1398..1401

Page 1398

1 correct?
2 A.  Yes.
3 Q.  And your take-home pay that year was $18,598?
4 A.  Correct.
5 Q.  And this goes back to the issue that you raised
6 with Mr. Pryor that you weren't working -- you can
7 take those off -- you weren't working full-time.
8 A.  No, at that time I couldn't.  My husband was --
9 he was having to work more so on -- because I just
10 couldn't trust him with my daughter being at home at
11 that age.
12 Q.  And let me talk a little bit about your efforts
13 to seek other employment.
14     When you were -- I think you -- I don't
15 remember -- I'm getting them mixed up, too, in terms
16 of what you said today versus these other
17 proceedings, so my apologies if I blur some of this.
18     But there was something called Project Purpose
19 that you were affiliated with in 2017?
20 A.  That's correct.  And that's when I was in
21 St. Louis.  I homeschooled my daughter for the
22 last -- well, it's now been nine years.  She's
23 graduated.
24     But I had a program that I was actually
25 implementing, and it had to do with the school

Page 1399

1 systems in St. Louis and partly Aurora, Colorado, in
2 some of the poorer school districts.  And it was an
3 after-school -- it started out as an after-school
4 program, and we were partnering with some churches
5 also in St. Louis.
6 Q.  And you actually started working for Project
7 Purpose in January of 2017, before you left
8 Southwest, correct?
9 A.  We started the project, but I wasn't working
10 for them.  I was writing -- I was actually getting
11 the curriculum together for that.
12 Q.  Right.  And this was -- and then you actually
13 started working for them after your separation from
14 Southwest Airlines, fair?
15 A.  Yeah.  It became more of a -- yeah, it became
16 more of a -- yeah.  A job.  Yes.
17 Q.  Right.  But it was a not-for-profit in --
18 well --
19 A.  Correct.  It was a not-for-profit.  We hadn't
20 gotten our 501(c)(3) yet, so we were just actually
21 scouting for who we were going to partner up with in
22 St. Louis and partly Aurora, Colorado, in some
23 schools and churches.
24 Q.  Right.  And you did not receive a salary from
25 Project Purpose for 2017?

Page 1400

1 A.  No, I did not.  As a matter of fact, I spent
2 money for that project.
3 Q.  And because you were involved in this Project
4 Purpose, you did not -- you'd agree with me that you
5 did not seek paying employment at all in 2017,
6 correct?
7 A.  I had put out resumés, but resumés were just to
8 the airlines, and then later on I got called by the
9 airlines.
10 Q.  But that didn't happen in 2017, did it?
11 A.  No.  No.  Unfortunately.
12 Q.  That was later?
13 A.  Yes, it was later.  I think it was in '18 when
14 I started getting calls.
15 Q.  And you indicated that you submitted
16 applications at four airlines?
17 A.  Uh-huh.  At my husband's airline.  He's a
18 captain for Frontier.  And then it was Jet Blue.
19 Never heard from Jet Blue.  And then Delta and
20 United.
21 Q.  And I think you've indicated -- and I know this
22 was in your deposition -- that you have done some
23 Pilates instruction?
24 A.  Yes.  That was later on.  Yes.
25 Q.  How much, approximately, did you earn and over

Page 1401

1 what period of time?
2 A.  Well, I finished class and COVID hit and they
3 closed all of the Pilates studios.
4 Q.  Are you still doing that?
5 A.  I'm doing it, but it's only part-time, and it's
6 mainly in my house.  I have a Pilates studio in my
7 home.
8 Q.  How much have you earned from that?
9     Let's start with maybe 2021, how much did you
10 earn, approximately?
11 A.  Well, '21 was pretty much a no-go because of
12 COVID.  I would say maybe 5, $6,000.  Maybe.
13 Q.  In 2022?
14 A.  No, not in '22.  Well, '21 into '22.  So give
15 or take, it would be about, maybe, 5,000, maybe.
16 That is a stretch.
17 Q.  I just want to make sure I understand.  That's
18 in 2021 or is that for both years?
19 A.  Well, it would be both years right now.
20 Q.  Am I right that since your separation from
21 Southwest, other than the four airline applications
22 that you've submitted, you have not applied for any
23 other paying employment?
24 A.  No, I didn't.  No, I didn't.  There was another
25 project, though.  I don't know if you saw that.  But

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                   Vol 5 July 11, 2022                   Pages 1402..1405

Page 1402

1 it was called Divine Intervention, after Project
2 Purpose.
3 Q.   I did see that.  That's another not-for-profit
4 that you were associated with?
5 A.   Yes.  And we did -- we ended up -- it's
6 basically the same thing except that we -- there
7 were two partners.  We branched off from what
8 Project Purpose was, and we were working with
9 actually several places in St. Louis.  We weren't
10 really working again working in Aurora.
11     We did get our 501(c)(3), but there were some
12 issues with -- how should I put this? -- there were
13 some issues between what the two visions were and
14 they didn't coincide, and so I stepped away from
15 that.
16     And I spent money in that as well.
17 Q.   You did not receive any income for --
18 A.   No.
19 Q.   -- work at Divine Intervention?
20 A.   No, I did not.
21 Q.   I'm flipping through these pages.  That's good
22 news for you.
23     Ms. Carter, do you regret your decision not to
24 accept Southwest's offer of reinstatement?
25 A.   No, I don't, for the same reasons that I have

Page 1403

1 explained.
2 Q.   If Southwest wanted to get rid of you because
3 you were a union objector, does it make sense that
4 they would offer your job back?
5 A.   I'm not sure, except the fact that I had
6 presented them with so much evidence.
7     Honestly, Mike Sims knows and we had talked
8 about this off the record.  He said that Southwest
9 shouldn't have gotten involved in union business.
10 Q.   And --
11 A.   He used to be in the union.  He was one of --
12 he actually worked in the union at one point.
13 Q.   I understand that.
14     But my question for you is, why would Southwest
15 have offered you a job back if it was trying to
16 target you and get rid of you because you were an
17 objector?
18     MR. PRYOR:  Object, just asked and
19 answered.
20     MR. McKEEBY:  I didn't get an answer.
21     THE COURT:  I will allow this question to
22 be answered.
23     THE WITNESS:  Honestly, I think they knew
24 that they had messed up and that they were going to
25 make sure that I stayed quiet about it.

Page 1404

1 BY MR. McKEEBY:
2 Q.   And the same question about your religious
3 beliefs.  If Southwest had some objection to your
4 religious beliefs, why would they have offered you a
5 job back?
6 A.   Again, I think they knew they had messed up and
7 they wanted -- they didn't want me to talk about it
8 at all.
9 Q.   So instead --
10 A.   And you can tell, they were taking away my
11 right to come back and sue them for this.
12     Before I signed this, I read over it and over
13 it and over it.  There was a point that I did think
14 that I was going to take it.  But, again, I talked
15 to Beth Ross, and Beth Ross said, This is an
16 egregious settlement and, you know, other people are
17 getting turned in, Charlene.
18     So I -- I -- my personal feeling was I'm going
19 to get targeted again and I'm going to lose my job,
20 and then I won't have any recourse.
21     MR. McKEEBY:  Pass the witness.
22     THE COURT:  Thank you, Mr. McKeeby.
23     Okay.  Mr. Greenfield, you may question
24 the witness.
25

Page 1405

1           CROSS-EXAMINATION
2 BY MR. GREENFIELD:
3 Q.   Good afternoon, Ms. Carter.
4 A.   Good afternoon.
5 Q.   Do you recognize who I am?
6 A.   Yes, I do.
7 Q.   Who am I?
8 A.   You are Adam Greenfield.
9 Q.   Okay.  And what is my job?
10 A.   You are representing the Union.
11     Yes, ma'am.  Yes, ma'am, I do so proudly.
12     Your case has been going on for a handful of
13 years at this point, is that fair?
14 A.   Yes, it has, five, a little over five.
15 Q.   So we've had the opportunity to meet each
16 other?
17 A.   Yeah.  The first time I met you was coming in
18 to court.  We were talking about your cute socks.
19 Q.   I remember the exact day.  And you and I
20 believe Ms. Dawn Juan were putting on your shoes.
21 A.   Yes.  They were Christmas socks.
22 Q.   Yes, ma'am.
23     And how would you describe our interactions,
24 you and I?
25 A.   You're an attorney and I'm the plaintiff.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                          Vol 5 July 11, 2022                    Pages 1406..1409

Page 1406

1  Q.  Fair to say we are cordial?
2  A.  Yes.
3  Q.  And you were even kind enough earlier this week
4  to ask me about my family, when you knew we had had
5  some troubles earlier this week, is that right?
6  A.  Of course.
7  Q.  Pretty surface-level conversations, though, is
8  that fair?
9  A.  Yes.
10  Q.  Okay.
11      Now, over the next couple of days, this
12  afternoon and tomorrow, you and I are going to talk
13  about some pretty heavy things, okay?
14  A.  Uh-huh.
15  Q.  Personal things.  Things that many of us are
16  very passionate about, okay?
17  A.  Uh-huh.
18  Q.  I will make a promise to you, right here, that
19  I will remain respectful and cordial during that
20  time because we are going to be talking about
21  personal stuff, okay?
22  A.  Okay.
23  Q.  Can we try and do the same thing?
24  A.  Uh-huh.
25  Q.  Can I have that agreement?

Page 1407

1  A.  Of course.
2  Q.  Okay.  Thank you very much.
3      While I was sitting at counsel table, I heard
4  several times you describe Local 556 as "my union"
5  and the president as "my president" and doing things
6  like working through "my union."
7      But you weren't a union member, correct?
8  A.  I was an objector.
9  Q.  Okay.
10  A.  Still paid union dues.
11  Q.  Yes, ma'am.
12      And you were an objector as of 2013?
13  A.  That is correct.
14  Q.  Okay.
15      And as an objector, you gave up your rights to
16  go to membership meetings, correct?
17  A.  Correct.
18  Q.  And you also gave up your right to vote for the
19  executive boards and the political offices that were
20  changing, is that correct?
21  A.  That's correct.  But our vote had been taken
22  away so many times.
23  Q.  Yes, ma'am.  And my question was just a little
24  bit different.  But nonetheless, you gave up that
25  right to vote?

Page 1408

1  A.  That is correct.
2  Q.  Okay.  I would like to, before we get to
3  anything big, talk a little bit about some of the
4  stuff that Mr. McKeeby just left off talking about,
5  talking about some of the efforts you made after
6  your termination to get back to work, et cetera.
7      Okay?
8  A.  Uh-huh.
9  Q.  Well, even let's jump -- I take that back.
10  Let's jump to before you were terminated.
11  A.  Okay.
12  Q.  You were homeschooling your daughter, is that
13  correct?
14  A.  Yes.
15  Q.  Okay.  And what did that schedule look like?
16  A.  We were usually doing it about four hours a
17  day.  Homeschooling is a lot different than sending
18  your child to a regular school.  We had a little
19  community that we did it with, and then my husband
20  also helped out with homeschooling.
21  Q.  And what was your responsibility in that
22  homeschooling process?
23  A.  Well, with her it was pretty easy.  I mean, we
24  had everything laid out the night before.  The
25  curriculum that I used was very, very already set.

Page 1409

1  So she knew which booklets that she would need for
2  the day and which videos that she would need for the
3  day and so forth.
4      And then once a week we met as a community.
5  Q.  Yes, ma'am.  I'm a product of a small
6  Montessori school, growing up here, so I understand
7  what you speak of.
8      How many days a week were you in charge of her
9  homeschooling?
10  A.  Well, I mean, I was home.  But not -- not
11  really in charge per se, because we had laid
12  everything out for the week on Sunday.
13      So there was a Monday folder, or a Monday --
14  what I would consider not a folder, but like a --
15  something that she had all of her stuff already in.
16      Tuesday, Wednesday -- we only did four days of
17  class and then we had our fifth day at our
18  community.
19  Q.  So four days of class and then a fifth day with
20  the rest of the group?
21  A.  Correct.  She had -- I mean, those were her
22  responsibilities.  So I set everything out pretty
23  much on Sunday.
24  Q.  Uh-huh.
25  A.  And then if she had questions, she would either

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 5 July 11, 2022                        Pages 1410..1413

Page 1410

1 ask her daddy or she would call me.
2 Q.  Yes.
3 A.  When I was flying, she would -- when I did fly,
4 she did do those things.  Because Daddy usually
5 didn't know.
6 Q.  Yes, ma'am.
7      And I will stop beating around the bush at this
8 point.  I just want to know if that impacted the
9 amount of time you spent flying before you were
10 terminated?
11 A.  No, it didn't.  It didn't.
12      Let me explain something.  My husband is a
13 pilot, and so how we had structured it at the very
14 beginning is that because of my seniority in Denver,
15 I would fly either two days -- because I could bid
16 for those things or trade down to that or trip trade
17 with people -- I could fly a two-day or turns.  And
18 turns would have been perfect for me, except that I
19 would have to fly evening turns, for the most part,
20 and that is when everything kind of fell apart for
21 my husband.
22      Let me just give you a little heads-up on that.
23 Q.  If you can be brief, because I didn't exactly
24 ask.  I want to give you an opportunity --
25 A.  He had just gotten out of an 18-month program.

Page 1411

1 He's finally taken the steps to get well.  So I was
2 dealing with all of that.
3 Q.  I understand.  I commend his efforts.
4 A.  I do too.
5 Q.  Alcohol addiction is a lifelong journey.  I
6 understand that as well.
7      I'm just trying to be fair to you, so I just
8 wanted to know what was impacting -- because I have
9 heard testimony or I have heard discussions that you
10 weren't flying that much, that you were --
11 A.  Correct.  But that -- homeschooling had nothing
12 to do with --
13 Q.  Thank you.  I will move on from it then.
14 A.  Okay.
15 Q.  Now, we heard about Project Purpose.
16 A.  Uh-huh.
17 Q.  And your position there was the educational
18 director, correct?
19 A.  Correct.
20 Q.  Okay.  And you were also the educational
21 director at Divine Intervention, is that correct?
22 A.  Correct.
23 Q.  And as the educational director, you were there
24 to -- well, at Divine Intervention, you were
25 actually trying to implement an actual academy

Page 1412

1 school, correct?
2 A.  Correct.
3 Q.  And you were putting together all of the
4 curriculum?
5 A.  The curriculum actually from what I had
6 already.
7 Q.  Uh-huh.
8 A.  We were implementing pretty much what I had
9 used.
10 Q.  Okay.
11 A.  Because it was going to be more of a
12 homeschool-type environment at this academy.
13      And just let me tell you where this academy
14 was.  It was in the north side of St. Louis, near
15 Ferguson.
16 Q.  Ms. Carter, I do appreciate all of that.  As
17 you have heard from all of the attorneys, we are
18 under a bit of a time frame.
19 A.  Okay.  Yes.  I did put it all together, though,
20 yes.
21 Q.  Thank you.  Thank you.
22      And you got together all of the structure so
23 you could train the teachers, correct?
24 A.  Uh-huh, yeah.  It was everything was together.
25 Q.  Now, Ms. Carter, on your first day of

Page 1413

1 testimony, we heard a little bit about your
2 background and your education.
3      Do you have a teaching certificate yourself?
4 A.  No.  You don't have to have a teaching
5 certificate, though, to homeschool.
6 Q.  I didn't say you did.  I'm just asking if you
7 had one.
8 A.  No, I do not have a teaching certificate.
9 Q.  Do you have a bachelor's in education?
10 A.  No, I do not.
11 Q.  Are you a registered substitute teacher?
12 A.  I used to substitute years ago.  Yes, I did.
13 Q.  Very good.  Many years ago you substitute
14 taught?
15 A.  Yeah, I did a lot when my little boy -- my son
16 was a little boy.
17 Q.  I did it for half a year, and I found out that
18 middle-schoolers are terrorists.
19      I recommend it to nobody.
20 A.  I had little ones.
21 Q.  Okay.  All right.
22      Ms. Carter, I would like to walk through the
23 claims you are bringing against the Union.  I want
24 you, me, and the jury to all be on the same page so
25 we can actually talk about what this case is about.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                     Pages 1414..1417

Page 1414

1 Is that all right?
2 A.  Yes.
3 Q.  Okay.  You have a claim against the Union for a
4 breach of fiduciary duty.  Is that correct?
5 A.  Correct.
6 Q.  And how did the Union do that?  How did we
7 breach our duty to you?
8 A.  By turning me in to the company.
9 Q.  Okay.  So the moment Audrey Stone turned you
10 in, the Union breached our duty, is that right?
11 A.  Yes.
12 Q.  Okay.  But we didn't breach it at the
13 fact-finding meeting, correct?
14        MR. PRYOR:  Object to the extent it calls
15 for -- it does call for a legal conclusion as to
16 whether or not it was breached by the turning in is
17 a fact of the fact-finding.
18        THE COURT:  I will allow her to answer if
19 she has a basis to do so.
20 BY MR. GREENFIELD:
21 Q.  Do you believe we breached the duty in our
22 representation of you at the fact-finding meeting?
23 A.  Not Chris Sullivan, but the Union, yes.
24 Because I should have never had to go into that
25 fact-finding meeting.

Page 1415

1 Q.  Yes, ma'am.  I understand that you believe none
2 of the following should have ever happened.  I just
3 want to -- I just want to talk to you about what the
4 Union's role was at that point.  Is that all right?
5 Can we talk about that?
6 A.  Yes.  But the Union breached all of it.  I'm
7 going to say it.
8 Q.  The Union breached all of it?
9 A.  Yes.
10 Q.  So you believe we did not properly represent
11 you at your fact-finding meeting, is that your
12 testimony?
13        MR. PRYOR:  Object, asked and answered.
14        THE COURT:  I'll allow it.
15        THE WITNESS:  Chris Sullivan represented
16 me in that fact-finding meeting.  Yes, he did.
17 BY MR. GREENFIELD:
18 Q.  Okay.  And you chose Mr. Sullivan to represent
19 you?
20 A.  I did.
21 Q.  And the Union said, Yes, Mr. Sullivan can
22 represent you at your fact-finding meeting, correct?
23 A.  I don't know if he asked the Union.  I
24 didn't -- I asked him to represent me.  From there I
25 don't know what he did.

Page 1416

1 Q.  Nevertheless, he represented you?
2 A.  That is correct.
3 Q.  And you thought he did an excellent job?
4 A.  Chris did a great job.
5 Q.  Okay.
6     And then at the Step 2 hearing, the Union
7 provided you representation there as well, correct?
8        MR. PRYOR:  Object.  Continuing objection
9 on the Step 2.
10        THE COURT:  Understood.  I will give you a
11 continuing objection.
12        I will overrule it and you can answer the
13 question.
14        THE WITNESS:  Okay.
15        I had Becky Parker and Beth Ross at my
16 side.  I prepared everything for the second step,
17 neither one of them did the leg work.  They were
18 there sitting, one taking notes and the other one at
19 the very end pleading for my job.
20 BY MR. GREENFIELD:
21 Q.  Okay.  And did you select either Beth Ross or
22 Becky Parker to represent you at the Step 2 meeting?
23 A.  No, I didn't.  It was -- I think once I
24 got into the process, it was just somebody reached
25 out, or I -- I don't know how all of that started,

Page 1417

1 to be quite honest with you.
2     I had never used the Union before, so you are
3 going to have to forgive me on some of the memory as
4 well.
5 Q.  I understand.  Yes, ma'am.
6     And you felt they represented you fairly and
7 competently, is that correct?
8 A.  Beth did a really good job.  She couldn't
9 figure out why I was there, though, because it was
10 the union president that turned me in.
11 Q.  Okay.  I appreciate that.  My question was a
12 little bit different.  My question was --
13 A.  I know.  And I said yes, she represented me.
14 Q.  Thank you, ma'am.
15     And at the end of that Step 2 hearing, your
16 termination was reduced to a 30-day suspension?
17 A.  That is correct.
18 Q.  Time served?
19 A.  Correct.
20 Q.  But with the 24-month probation letter,
21 correct?
22 A.  There was a lot more than just the 24-month
23 probation letter.
24 Q.  But you took issue with that?
25 A.  That is one of the issues, yes.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 417 of 642   PageID 11358
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1418..1421

Page 1418

1 Q.  But we heard today that even if that was
2 reduced to 18 months, you still would not have
3 accepted, correct?
4 A.  No, I would not have.
5 Q.  Okay.  So just so we're clear, are you claiming
6 now that there was a breach of your -- of our duty
7 to you at the fact-finding meeting?
8 A.  A breach?
9      MR. PRYOR: Object, your Honor.  He asked
10 that question already, and she's answered it.  To
11 now look for a different answer --
12      THE COURT:  I think the answer is clear
13 enough now.
14      MR. McKEEBY:  I'm not clear because I
15 think I heard two different answers.  That's why I'm
16 asking again.
17      THE COURT:  Last time.
18      You can answer.
19      MR. PRYOR:  I'd also object it calls for a
20 legal conclusion, asked and answered.  She's told
21 him the breach.
22      THE COURT:  I will overrule and you can
23 answer this last time.
24      THE WITNESS:  Chris did a very good job
25 representing me, Chris Sullivan.

Page 1419

1      Again, he believed that I shouldn't have
2 been there because he knew who turned me in.
3 BY MS. GREEN:
4 Q.  Yes, ma'am, I understand what your recollection
5 of that conversation with Mr. Sullivan is.
6      My question is a little bit different.  My
7 question is, do you believe the Union breached our
8 duty to you in our representation at the
9 fact-finding meeting?
10      MR. PRYOR:  Your Honor, this has been
11 asked and answered.  She's going to -- how many
12 times does she have to explain?
13      THE COURT:  Hold on, Counsel.  That's a
14 speaking objection.
15      I will sustain it at this point in time.
16 BY MR. GREENFIELD:
17 Q.  Okay.  In regard to the Step 2 hearing, do you
18 believe that the Union breached their duty in our
19 representation of you at the Step 2 hearing?
20      MR. PRYOR:  Asked and answered twice.
21 He's recovering the same --
22      THE COURT:  That was his last time.
23      THE WITNESS:  I just told you that I did
24 all of the preparation of everything that I
25 submitted to Mike Sims.  Beth was to my right.  She

Page 1420

1 was actually taking notes.  Becky Parker was to my
2 left.
3      The only time Becky Parker said anything
4 was at the very end of the meeting, I do believe,
5 and that was to plead for my job.
6      I did most, 99 percent of the pleading in
7 my second step meeting.
8      So breach shouldn't have been there in the
9 first place.
10      Were they there sitting there to represent
11 me?  Yes.
12      MR. GREENFIELD:  Okay.  And I apologize to
13 do this, but I will have to object to
14 non-responsiveness and move to strike the testimony.
15 I asked her a very simple question about the breach
16 and she's talking about something else.
17      THE COURT:  I will reject your request to
18 strike as non-responsive.
19 BY MR. GREENFIELD:
20 Q.  Yes or no, Ms. Carter, do you believe the Union
21 breached their duty to you in our representation at
22 the Step 2 hearing?
23      MR. PRYOR:  Object, asked and answered.
24 Object to instructing a witness to answer a question
25 under oath, especially --

Page 1421

1      THE COURT:  I'll allow it.
2      THE WITNESS:  The whole representation, it
3 was a breach of duty of fair representation.
4 BY MR. GREENFIELD:
5 Q.  So that's a yes to my question, we did breach
6 in our representation?
7 A.  Yes, you did.
8 Q.  And we breached, and Ms. Stone, you believe,
9 breached that duty when she turned you in, right?
10 A.  President Stone?  Yes, I do.
11 Q.  Yes, I understand her to be the president.  We
12 have multiple presidents, and she's no longer, so
13 I'm going to call her Ms. Stone.
14      The current president is who, ma'am?
15 A.  Used to be a friend of mine, Lyn Montgomery.
16 Q.  Is she no longer the president of the Union?
17 A.  No, she's still in it.
18 Q.  She's just no longer a friend of yours?
19 A.  Well, I don't see her.  I mean, I'm not -- I
20 don't get to talk to her anymore.
21 Q.  Okay.  Well, I apologize.  I refer to her as
22 President Montgomery because I represent the Union
23 still, so that is why I refer to Audrey Stone or
24 President Stone as Ms. Stone.
25      But I will reflect to the jury, I understand

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1422..1425

Page 1422

1 that you believe her to be President Stone, okay?
2 A.  Uh-huh.
3 Q.  All right.
4       You believe you can say whatever you want to a
5 union member, isn't that correct?
6 A.  You just said union member.
7 Q.  Yes, ma'am.
8 A.  Union president or --
9 Q.  I'm asking --
10 A.  -- or a board?
11 Q.  I apologize.  I didn't mean to speak over you.
12       I asked you just about a union member.
13       You believe you can say whatever you want to a
14 fellow union member, isn't that correct?  Without
15 reprisal?
16 A.  When it's speaking about union business, yes.
17 Q.  And there is no limit to that, correct?
18 A.  There never has been even within our union
19 meetings.  It can get heated, things are -- you
20 know, words are said.  Have you ever been to a union
21 meeting?  Because they are pretty, pretty intense.
22 Q.  Ma'am, it's my day to ask questions, and you've
23 had a lot of time to dispute --
24 A.  Well, they can be pretty intense.
25 Q.  But I will --

Page 1423

1 A.  And yes, we can say whatever we want in those
2 union meetings.
3       So, yes, I do believe I can say what I need to
4 say to my union when it has to do with union
5 activities.
6 Q.  But you weren't allowed to go to union
7 meetings, were you?  You gave up that right,
8 correct?
9 A.  That is correct.  But I didn't give up my voice
10 to speak to the president or the executive board.
11 Q.  I understand, ma'am.  That was not my question.
12 A.  Okay.
13 Q.  I just asked if you gave up your right to go to
14 those meetings?
15 A.  Yes.
16 Q.  Okay.  And you also believe there is no limits
17 on what you can say to a union president, correct?
18 A.  When it has to do with union business, that is
19 correct.
20 Q.  No restraints?
21 A.  Never has been.
22 Q.  Okay.
23       I would like to talk about your claims of
24 retaliation under the Railway Labor Act.
25 A.  Uh-huh.

Page 1424

1 Q.  That's one most people don't hear every day.
2       What is your basis for your belief that we
3 retaliated against you in violation of the Railway
4 Labor Act?
5       MR. PRYOR:  Object, calls for a legal
6 conclusion, your Honor.
7       THE COURT:  I will allow her to answer if
8 she has a factual basis to do so.
9       THE WITNESS:  The Railway Labor Act gives
10 us the right to not have the company get involved in
11 any union business.  It also has for us, we have
12 actually a Bill of Rights, and the first one is
13 freedom of speech, and that has also got to do with
14 the Railway Labor Act.
15       Everything that they do within the
16 confines of the union is protected against the
17 company.
18       So that's how I understand it, and that's
19 how it had always been before, and there is a line
20 between the company and the Union when it comes to
21 union business.
22 BY MR. GREENFIELD:
23 Q.  Okay.  So --
24 A.  That protects it, the Railway Labor Act
25 protects that.

Page 1425

1 Q.  Yes, ma'am.  I understand that is your -- we
2 have now laid out your belief of what the act
3 covers, is that fair?
4 A.  Yes.  I know there is more to it, but yes.
5 Q.  Sure.  There is plenty to it, and I'm an
6 attorney.  I have to look at it myself to know
7 exactly what is in there.
8       But to be fair, to simplify it for the jury,
9 you believe the Union retaliated against you because
10 you were an objector, correct?
11 A.  Yes, because they were turning objectors in.
12 Q.  Okay.  And you believe the Union was
13 retaliating against you because you were a recall
14 supporter, is that correct?
15 A.  Yes.  And that's again -- they were going after
16 us recallers, yes.
17 Q.  I understand.
18       And again you say "we recallers."
19       You were not actually able to -- well, let me
20 ask you, did you sign the recall petition, ma'am?
21 A.  No, but I supported it and was very vocal about
22 it.
23 Q.  And you had given up your rights to recall?
24 A.  I didn't sign it, but I still didn't give up my
25 right to speak about it.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 419 of 642   PageID 11360
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1426..1429

Page 1426

1  Q.  Ma'am, I understand that.  At no point will you
2  hear me represent that you gave up your rights to
3  dissent against the Union.  You have my word, okay?
4  A.  Uh-huh.
5  Q.  My question is whether -- I'm trying to
6  understand the basis.
7      So we have that you believe the Union
8  retaliated against you because you are an objector,
9  right?
10 A.  Yes.
11 Q.  And because you were a recall supporter?
12 A.  Correct.
13 Q.  Is there any other basis?
14     MR. PRYOR:  Object, calls for a legal
15 conclusion.
16     THE COURT:  I'll allow it.
17     THE WITNESS:  Is there any other basis?
18 BY MR. GREENFIELD:
19 Q.  Yes, ma'am.
20 A.  I know that the big contention back then was
21 signing of the contract, and the people that were
22 against the contract were ridiculed as well.  And
23 there were some heated arguments regarding that as
24 well.
25 Q.  Okay.  So being an objector, being a recall

Page 1427

1  supporter, and opposing the signing of the first
2  tentative agreement.
3  A.  Yes.
4      MR. PRYOR:  Object, calls for a legal
5  conclusion, mischaracterizes testimony, and fails to
6  include what she mentioned earlier in the
7  deposition -- or in the testimony.
8      THE COURT:  It's a question, so I will
9  allow her to answer.
10 BY MR. GREENFIELD:
11 Q.  Am I missing anything other than those three
12 things of how you believe the Union retaliated
13 against you?
14 A.  The Union retaliated against me by turning me
15 in to the company and getting me fired.
16 Q.  Yes, ma'am.  I think we all understand that at
17 this point.  I'm just --
18 A.  So I'm not understanding -- I'm not
19 understanding more of your question.
20 Q.  Great.  Perfect.  I ask bad questions, I will
21 ask plenty more as we talk.  So I will try and back
22 that up and rephrase it for us.
23     I'm trying to understand your beliefs about
24 why.  I know that you believe turning you in, okay?
25 A.  Well, in my Christian rights, too, my Title VII

Page 1428

1  rights.
2  Q.  Sure.  And we will get to that.  We will get to
3  that.  I just want to talk about the RLA
4  specifically.  Okay?
5      Is there anything else other than we retaliated
6  against you -- that you allege Ms. Stone turned you
7  in because you were an objector, right?
8  A.  Oh, yeah.
9  Q.  A recall supporter?
10 A.  Yes.
11 Q.  And because you oppose signing of the contract?
12 A.  Those are some of the issues, yes.
13 Q.  Are there any other ones?  I just want the jury
14 to have a full understanding.  Are there any other
15 issues?
16 A.  Well, the other issues --
17     MR. PRYOR:  Wait.  Object, asked and
18 answered.  She mentioned others, and now they are
19 going back and adding some and taking some out --
20     THE COURT:  Hold on.  That's a speaking
21 objection.
22     MR. PRYOR:  Sorry.
23     THE COURT:  I will allow her to answer the
24 question.
25

Page 1429

1  BY MR. GREENFIELD:
2  Q.  Ms. Carter, I'm not trying to trick you.  I
3  just want --
4  A.  No, no, no.  It's okay.  But I don't -- you
5  know, I know that there is a complaint out there.  I
6  don't know what all is listed because I haven't read
7  it in a long time.
8      But I will tell you this.  I was objecting to
9  everything that they were spending my money on and I
10 didn't align with their political beliefs.
11     I do know that they had sent me who to vote
12 for, which I think is a private thing for each
13 member instead of us being told.  I highly objected
14 to that.
15     There's a whole slew of, I think, reasons.
16     Heck, I was asked who I voted for, and if I
17 voted for a certain candidate that didn't align,
18 Brett Nevarez says we shouldn't be in the union.
19 Q.  Thank you, Ms. Carter.
20     And we have talked about buckets a lot.
21 A.  Uh-huh.
22 Q.  Let's talk about buckets.
23     Can we put this in a fourth bucket of you had a
24 plethora of general dissent against the Union, and
25 you believe you were being retaliated against, is

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                            Vol 5 July 11, 2022                                    Pages 1430..1433

Page 1430

1 that fair?
2 A. Yes. Yes.
3 Q. Are you the only objector that was being
4 retaliated against?
5 A. No.
6 Q. Okay. Can you tell me all of the objectors you
7 are aware of that you believe were also being
8 retaliated against by the Union?
9 A. Well, there's quite a few. But the ones that I
10 do know personally --
11 Q. I wanted to know all of the ones that you
12 think, whether you know them personally.
13 A. Okay. Well, I don't know -- I know Michi
14 Foley. I know Jeanna Jackson, who is here in this
15 courtroom. I know Cheri Parnell. I don't know if
16 she was an objector, I can't remember. Yeah, she
17 was.
18    Kim Hensley, I'm not sure if she was an
19 objector, but she was one that was kind of
20 retaliated towards.
21    Mike Casper. Greg Hofer.
22    I know who else they retaliated against but she
23 wasn't an objector was Holly Imomovich. They harmed
24 her horribly.
25    I could go down a list. I have to have all

Page 1431

1 their names in front of me.
2    THE COURT: Hold on.
3    MR. PRYOR: Can the witness finish her
4 answer before the sidebar?
5    THE COURT: She can finish if she's got
6 more to complete.
7    MR. PRYOR: Take your time.
8    THE WITNESS: Beverly Belanger.
9    Gosh, I can't think of all of the names.
10 I know that there was a whole list that Brian also
11 sent in the day that I was being called in in my
12 fact-finding meeting, and that's a whole list of
13 people. But there is more to add to that.
14    They all got harmed at some point. They
15 either got a 30-day suspension -- they really went
16 after Jeanna Jackson.
17    THE COURT: Okay. Hold on. This is where
18 we need to talk at sidebar.
19    (Thereupon, the following proceedings were
20    had at sidebar:)
21    THE COURT: You can't let her finish to
22 that degree, right? You can't let her finish to
23 that degree. We are walking right into the limine
24 point on what Southwest did to people.
25    So she can complete her answer but not

Page 1432

1 violate the limine.
2    MR. PRYOR: I don't want her to violate
3 the limine. He asked for the names. She --
4    THE COURT: And then she gratuitously
5 volunteered --
6    MR. PRYOR: Well, then she's been -- okay.
7    THE COURT: She's been in the courtroom
8 for the limine discussions. She's heard that.
9    So now I need to go back and say, whatever
10 Southwest did to anybody does not matter to the
11 claims in this case.
12    MR. PRYOR: I agree with that.
13    MR. McKEEBY: I mean, I --
14    MR. PRYOR: Is that the reason for the
15 sidebar? I didn't even -- I was thinking of
16 something else.
17    MR. McKEEBY: Well, the reason for the
18 sidebar is that I think the question, frankly, was
19 phrased in a way to prompt her to provide answers
20 that violate the motion in limine. So I don't think
21 that -- I think you phrased --
22    MR. GREENFIELD: Guys, this is the
23 double-edged sword that I have been briefing the
24 entire time as part of my motion in limine, is that
25 once evidence is presented about certain testimony,

Page 1433

1 certain social media violations, I need to be able
2 to flesh out who she thinks is being retailiated
3 against. I need to be able to --
4    THE COURT: Well, as to the Union, yes.
5 But that's not the same as Southwest coming back
6 with ultimate dismissal.
7    So you can still ask your question on who
8 got turned in. That's separate and apart from what
9 Southwest did to those people. And that last
10 sentence is the one she said I find problematic.
11    MR. PRYOR: Your Honor, I'm comfortable
12 with telling her directly that she's not being asked
13 about that. I mean, I think she --
14    THE COURT: So I can do that. I can ask
15 the jury to disregard the last statement on what
16 Southwest did and then continue on, and then ask her
17 in the future if she's got information on that.
18 Don't volunteer that. That is something --
19    MR. McKEEBY: And I think you need to
20 explain why you are doing that by repeating the
21 limine instruction.
22    THE COURT: Right. I will.
23    MR. PRYOR: No objection, your Honor.
24    THE COURT: Sidebar.
25    (Thereupon, the sidebar was concluded and

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 421 of 642  PageID 11362
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1434..1437

Page 1434

1    the following proceedings were held in open
2 court:)
3        THE COURT:  Okay.  So I will ask the jury
4 to disregard the last part on what Southwest did to
5 anyone.  If you recall, I talked about this earlier.
6        What Southwest ultimately did to anyone is
7 not relevant to the types of claims that are in this
8 lawsuit as to Southwest.
9        Anyone who might have been reported to
10 Southwest from the Union, that might be relevant to
11 the claims against the Union, but I will ask the
12 witness, if you have information on what Southwest
13 did to anyone, I have carved that out of the
14 lawsuit, given the nature of the claims at this
15 point.
16        So, jury, please disregard that last
17 sentence.
18        Please refrain from getting into that,
19 Ms. Carter.
20        And you can proceed, Mr. Greenfield.
21        MR. GREENFIELD:  Thank you.
22 BY MR. GREENFIELD:
23 Q.   Ms. Carter, right now you and I are having a
24 conversation, is that correct?
25 A.   Correct.

Page 1435

1 Q.   And these are your friends and supporters
2 behind your attorneys?
3 A.   Those are all flight attendants at Southwest.
4 Yes.
5 Q.   Are they not your friends?
6 A.   Oh, yeah, they are friends and supporters and
7 workmates and people who got harmed by the Union.
8 Q.   That's what I'm saying, if they are just
9 friends and supporters, ma'am.  Is that right,
10 Ms. Carter?
11 A.   Yes.  I mean, I think you guys have friends and
12 supporters behind you, too.
13 Q.   I don't know a single other person in this
14 courtroom other than people who work for Southwest
15 Airlines.  I don't know anybody else here.  I will
16 represent that to the Court.
17        MR. PRYOR:  Your Honor, the objection is
18 who has supporters in the gallery, the irrelevance.
19 BY MR. GREENFIELD:
20 Q.   And here is why I bring it up, Ms. Carter.
21        MR. PRYOR:  Okay.  I still have an
22 objection to relevance.
23        THE COURT:  I don't see the relevance.
24        Mr. Greenfield, you can explain for me at
25 sidebar if you want.

Page 1436

1        MR. GREENFIELD:  I will absolutely move
2 on, your Honor.
3        THE COURT:  Okay.
4 BY MR. GREENFIELD:
5 Q.   We are having a conversation, correct?
6 A.   Correct.
7 Q.   I would like to ask you to talk to me.  I don't
8 believe there is any reason for you to be searching
9 over in that area, is that fair, with your eyes?
10        MR. PRYOR:  Your Honor, I object.  That
11 mischaracterizes --
12        THE WITNESS:  I'm not searching over in
13 that area.
14        MR. PRYOR:  He asked her to see who is in
15 the gallery and she looks, and then he acts like
16 it's improper?
17        THE COURT:  Sustained.
18 BY MR. GREENFIELD:
19 Q.   All right.
20        People you believe were retaliated against by
21 the Union are Michi Foley?
22 A.   Kent Hand, too.
23 Q.   Kent Hand.  Okay.  I'm just trying to get
24 everybody here.
25 A.   And he had to sue to get his job back as well.

Page 1437

1 Q.   Ma'am, if you could --
2        THE COURT:  That's a Southwest issue.
3 What Southwest did to anyone is --
4        THE WITNESS:  Oh, I'm sorry.
5        THE COURT:  -- not part of this lawsuit.
6        THE WITNESS:  I'm sorry.
7 BY MR. GREENFIELD:
8 Q.   Ma'am my, question is very simple.  I'm just
9 trying to understand who you believe was also being
10 retaliated against by the Union, okay?
11        We have Michi Foley, correct?
12 A.   Yes.
13 Q.   Jeanna Jackson?
14 A.   Yes.
15 Q.   Cheri Parnell?
16 A.   Yes.
17 Q.   Kim Hensley?
18 A.   Yes.
19 Q.   Mike Casper?
20 A.   Yes.
21 Q.   Greg Hofer?
22 A.   Yes.
23 Q.   Holly Imomovich?
24 A.   Yes.
25 Q.   Beverly Belanger?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 422 of 642   PageID 11363
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022          Pages 1438..1441

Page 1438

1 A.  Yes.
2 Q.  And Kent Hand?
3 A.  Yes.
4     And there's many more, I just don't know their
5 names on the top of my head.
6 Q.  There's many more --
7 A.  There was 100 of us, and we all had some kind
8 of issue.
9 Q.  There's 100 objectors.  Is it your testimony
10 that the Union took action to retaliate against all
11 100 of those individuals?
12 A.  I believe most of the ones that I just told you
13 about, we were the most vocal, and we were the ones
14 that were the most harmed.
15    But, yes, there were others that were harmed by
16 the Union.
17 Q.  My question is a little bit different, ma'am.
18    Are you claiming today that all 100 of those
19 objectors were also being retaliated against by the
20 Union?
21 A.  If they were an objector.
22 Q.  So yes.
23 A.  I don't know if they did, but yes, they went
24 after -- Brian Talburt states that he wants all
25 objectors.  I mean, he went after all of us.

Page 1439

1 Q.  Ma'am, my question is, do you have an
2 understanding or a belief --
3 A.  Yes, I do.
4 Q.  Do you have a basis for saying that all 100 --
5 A.  I have an understanding.
6     THE COURT:  Hold on.  Hold on.
7     Finish your question, and then you can
8 answer.
9 BY MR. GREENFIELD:
10 Q.  You have a basis for saying that all 100
11 objectors were being retaliated against by the
12 Union?  What is that basis?
13 A.  They put all of our names out on a list and
14 sent it around to all flight attendants so that they
15 could gather information and turn them in.  Yes.
16 And the Union did that.
17 Q.  We will come back to that.
18    Have you provided that documentation to your
19 attorneys, Ms. Carter?
20    MR. PRYOR:  Object to the extent he wants
21 to talk about communications with counsel.  He's
22 aware --
23    THE COURT:  Hold on.
24    Sustained.
25    You can bring it up at sidebar if you

Page 1440

1 want.
2 BY MR. GREENFIELD:
3 Q.  And it's your -- do you have specific knowledge
4 that all of the individuals that you did name, the
5 nine individuals, were all objectors?
6 A.  Yes.
7 Q.  You are sure about that?
8 A.  Pretty darn sure.  I know they were objectors
9 at one point.
10 Q.  And it is your testimony that Ms. Jeanna
11 Jackson, who is sitting over there in the gallery
12 right now, that she was an objector during that time
13 period?
14 A.  She was an objector prior to that, and I
15 believe she spent another $100 to become a member
16 again so that she could vote on the contract.
17    But she was the recall petition holder, and the
18 Union went after her with a vengeance.
19 Q.  Yes, ma'am.  And we will turn to that recall
20 right now.
21    As you testified earlier, you were being
22 retaliated against because you were a recall
23 supporter, correct?
24 A.  Yes, I was vocal about it, yes.
25 Q.  Okay.  And were all of the other recall

Page 1441

1 supporters being retaliated against as well?
2 A.  A lot of them, yeah.  We were.  We were all
3 being -- yes.
4 Q.  All of them?
5 A.  I don't know how many there were on the recall.
6 I don't know the exact number.  But, yes, most of
7 the ones that got harmed the worst were the most
8 that were speaking about it.
9 Q.  Now, is it fair to say that you believe the
10 recall petition to be a valid complaint?
11 A.  It was a very valid complaint.
12 Q.  You believe there to be no fraud associated
13 with that document?
14 A.  I don't believe that there was any fraud.  I
15 believe that the Union -- and I'm going to state
16 this now --
17 Q.  Uh-huh.
18 A.  It was like the -- what is it?  The fox
19 guarding the henhouse.  Whatever that is.  Where you
20 actually have the actual people that we didn't want
21 in there actually doing some of the counting of the
22 votes and going through these things.
23    So, I don't believe that that is the way it
24 should have been handled.
25 Q.  Fair to say you believe it's a conspiracy to

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 423 of 642   PageID 11364
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1442..1445

Page 1442

1  get --
2  A.  It's not a conspiracy.  We know it to be true.
3        MR. PRYOR:  Wait.  Object, your Honor, to
4  the relevance of going down this talking about the
5  recall petition.
6        THE COURT:  I'll allow it.
7        THE WITNESS:  We know it to be true, who
8  counted the votes.  She did everything she could to
9  make sure everything was on the up and up.  But when
10 you have the same people counting the votes as who
11 is in office or who is working with the Union, doing
12 the count, that is not a conspiracy, it is a
13 conflict of interest, and it doesn't look right, and
14 I don't think that that's the way it should have
15 been handled.
16 BY MR. GREENFIELD:
17 Q.  So you --
18 A.  So, no, I don't believe your findings, I don't.
19 Q.  So you believe the findings of the committee
20 that investigated the report --
21 A.  Uh-huh.
22 Q.  -- are false?
23 A.  I think a lot of them are, yes.
24 Q.  Well, it's either -- so you think it's
25 partially false or fully false?

Page 1443

1  A.  I think it's partially false, yes.
2  Q.  Okay.  What do you think did they make up,
3  ma'am?
4  A.  Honestly --
5        MR. PRYOR:  Relevance.
6        THE WITNESS:  I don't know.  I just know
7  that --
8        THE COURT:  I need to rule on the
9  objection first.
10       I will overrule.  You can answer.
11       THE WITNESS:  It -- it -- you shouldn't
12 have the same people counting the votes and looking
13 at these signatures as who is in the union
14 supporting the same people in the union that you are
15 actually recalling.  And that is the way it was
16 handled.
17 BY MR. GREENFIELD:
18 Q.  Okay.  And we will talk about -- we will go
19 into this in more depth, don't worry.
20       I'm just trying to get all of us on the same
21 page, okay?
22 A.  Uh-huh.
23 Q.  So you believe that it was improper and
24 fraudulent, correct?
25 A.  My personal --

Page 1444

1  Q.  The findings?
2  A.  My personal -- my personal view --
3  Q.  Yes, ma'am.
4  A.  -- not anybody else's, yes, I do.
5  Q.  And that's because the individuals who were on
6  the committee were biased of some sort, right?
7  A.  When you are working in and with a union, yes,
8  I do think that's a bias.
9  Q.  Okay.  And, again, we will talk about all of
10 that later.
11      Now, the third bucket was opposing signing of
12 the contract.
13 A.  That is correct.
14 Q.  Okay.  Are you aware that Donna Keith, a woman
15 named Donna Keith opposed signing the contract, the
16 first tentative agreement?
17      Do you know who Donna Keith is?
18 A.  I know who Donna Keith is.  I know she sits on
19 the board.  I don't know if she's a domicile rep.  I
20 can't remember what position that she -- that she
21 holds.
22 Q.  Uh-huh.
23 A.  But that was her personal -- if she signed
24 against the -- what was it -- you said the first
25 tentative agreement?

Page 1445

1  Q.  Yes, ma'am.
2  A.  Why would I need to know if she signed it or
3  not?
4  Q.  I'm asking if you're aware or not.
5  A.  No, I was not aware.
6  Q.  Were you in the courtroom when Ms. Stone
7  testified that Ms. Keith opposed the first tentative
8  agreement?
9  A.  Yes, but I didn't remember who it was that she
10 said.
11 Q.  Do you have any reason to believe that that
12 would be inaccurate?
13 A.  I'd have to look at the --
14       MR. PRYOR:  Object, foundation.
15       THE WITNESS:  I don't know.  Because I
16 would have to look at what the -- I mean who
17 actually signed for the TA.  I don't know if it's
18 true or not.  I don't have the paperwork in front of
19 me.
20       THE COURT:  Okay.  I'm overruling that
21 foundation objection to the last question.
22 BY MR. GREENFIELD:
23 Q.  And are you aware of whether or not Mr. John
24 DiPippa opposed the first tentative agreement?
25 A.  I don't know.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 424 of 642   PageID 11365
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1446..1449

Page 1446

1  Q.  Were you in the courtroom when Ms. Stone
2  testified that Mr. DiPippa opposed the signing of
3  the first tentative agreement?
4  A.  I don't remember who she spoke to.  I'm sorry.
5  I just don't remember.  And, you know -- and if you
6  say that's true, then that must be true.  I just
7  don't -- and I don't have the paperwork in front of
8  me.
9  Q.  And that's fair, Ms. Carter.  All I'm asking is
10 if you remember, that is all.
11 A.  Okay.
12 Q.  And Ms. Jessica Parker, are you aware whether
13 or not she opposed the signing of the first
14 tentative agreement?
15 A.  Well, I'm sure that Ms. Stone actually probably
16 testified for that, so I'm going to trust your
17 wording on this.  But, again, I don't have who
18 signed and who didn't in front of me, so I cannot
19 say with a shadow of a doubt whether they did or
20 not.  I can only take what she said here in the
21 courtroom.
22 Q.  Nor am I asking you to testify to anything that
23 you don't specifically know about, okay?
24     Are you aware of who served on the committee to
25 review the recall petition?

Page 1447

1  A.  I know they were union members and worked in
2  the union.  I don't recall who it was, the names per
3  se.  But I do know that they were.  And I'm sure
4  it's within those names that you just said because I
5  do know that Jessica Parker was part of it.  But
6  that doesn't have anything to do with the TA.
7      I objected with Jessica Parker doing some of
8  the things that she did.  She was at the Women's
9  March.  So, again --
10 Q.  Thank you, ma'am.  My question is a little bit
11 different.
12     Would it surprise you to find out that Jessica
13 Parker was on the committee to review?
14 A.  No, it wouldn't surprise met at all.
15 Q.  Would it surprise you that Donna Keith was on
16 the committee to review the recall?
17 A.  It wouldn't surprise me at all.
18 Q.  Would it surprise you that John DiPippa was on
19 there?
20 A.  It wouldn't surprise me at all.
21 Q.  Now, all of those individuals, I will represent
22 to you, through Ms. Stone, opposed the first
23 tentative agreement.
24 A.  The two don't have anything to do with each
25 other, not with -- not with the recall.

Page 1448

1  Q.  Okay.  But isn't it fair that -- and I believe
2  this was your testimony -- that the recall petition
3  was started after the first -- after the first
4  tentative agreement failed, correct?
5  A.  Correct.
6  Q.  And you believe that you were being retaliated
7  against by the Union for opposing that?
8  A.  That is correct.
9  Q.  Yet we have three committee members who opposed
10 the first tentative agreement who are reviewing the
11 recall petition.
12 A.  Did I put it --
13 Q.  You believe that the findings that they came up
14 with are fraudulent, is that fair?
15 A.  Did I say everybody on the board or did I say
16 as a collective the Union was going after us?
17 Q.  Ma'am, you testified that the -- I believe, and
18 correct me if I'm wrong, that the findings of the
19 committee reviewing the recall were fraudulent.
20 Isn't that true?
21 A.  I think they were, yes.  I do believe so.  I
22 believe so.
23     MR. PRYOR:  Object.  He's using her words
24 instead of -- he's using his words instead of hers.
25 He's mischaracterizing her testimony.  She didn't

Page 1449

1  say --
2      THE COURT:  Hold on.  Hold on.  That's a
3  speaking objection.
4      I will sustain that.
5      MR. GREENFIELD:  All right.
6  BY MR. GREENFIELD:
7  Q.  And then we have this fourth bucket of general
8  union dissent that we kind of agreed upon.
9      Is that pertaining to, for example, the
10 messages you sent to Ms. Stone's Facebook account
11 from 2015 to 2017, before the ones you were turned
12 in for?
13 A.  The dissent?
14 Q.  Is that what we are talking about?
15 A.  Yes.  It started -- yes, it started with what
16 they did in the core group and got away with.
17 Q.  And did Ms. Stone ever turn you in for any of
18 those posts?
19 A.  If my recollection is correct, she said she
20 didn't really read most of those.
21 Q.  Okay.  So she wouldn't have turned you in for
22 it, would she have?
23 A.  If she didn't read any of them, I don't think
24 she knew what they even said.
25 Q.  So we could agree, then, it would be impossible

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1450..1453

Page 1450

1 for her to file a complaint with you over something
2 she didn't read, is that fair?
3 A.   Yeah, if she hasn't seen them or read them.
4 Q.   Agreed.
5        You mentioned religious discrimination, so we
6 are on to our third complaint, so all of us can be
7 on the same page.
8        Yes, your Honor.
9        THE COURT:  Can I ask about a lunch break?
10 It's 12:10.  Is it okay timing-wise to take a
11 one-hour lunch break?
12        MR. GREENFIELD:  Of course.
13        THE COURT:  Okay.  Sorry about
14 interrupting your flow.
15        MR. GREENFIELD:  No problem.
16        THE COURT:  So the jury will come back at
17 1:11.
18        So the same three instructions.  You can
19 only talk to your fellow jurors or court personnel,
20 just not about this case.  You can't talk to anyone
21 else.  And don't do any research about the case.
22        We will see you in one hour.
23        All rise.
24        (The jurors exited the courtroom.)
25        THE COURT:  Before you leave, I need to

Page 1451

1 ask y'all, so this goes back to our discussion at
2 the end of the day Friday.
3        How long of a break can I tell someone
4 they cannot talk about the case?  My PA, similar
5 with a Seventh Amendment right or a Fifth Amendment
6 right, I cannot sideline an overnight break, but
7 something shorter that I can say, don't talk to
8 anyone about the case.
9        So my leaning is to ask you, do not talk
10 to anyone about the case in the one-hour lunch
11 break.
12        Anyone want to take a shot at me as to why
13 I'm wrong?
14        MR. PRYOR:  If he wants to instruct her
15 not to talk to anybody, that is fine.  One-hour
16 lunch break.
17        THE COURT:  Well, to not to talk to anyone
18 about the case.  I realize we put you all in small
19 rooms.  The best I can do is ask somebody to not
20 talk about the case, right?  I can't --
21        MR. PRYOR:  We are fine with it, but I did
22 want to talk to her again about the limine to make
23 sure we don't have that issue about Southwest
24 Airlines.  I think you made it clear, but it seemed
25 to come up even after you mentioned it.

Page 1452

1        THE COURT:  I'm fine with that as an
2 exception.  The limine and what Southwest did to
3 somebody is the only thing you can talk about
4 case-wise.  Is that all right?
5        I will note your objection.  I'll overrule
6 it because I think I'm safe at an hour even for
7 someone with Fifth or Seventh Amendment rights, but
8 not in overnight stay context.
9        All right.  So please don't talk to anyone
10 about the case except to the extent we just talked
11 about.  You can talk to your lawyers about the
12 motion in limine on Southwest and their treatment of
13 individuals.
14        Okay.  Anything else before y'all take
15 your break?
16        Okay we will see y'all back here at 1:10.
17 How about that?  One minute before the jury shows
18 up.  Thank you.
19        (Recess.)
20        THE COURT SECURITY OFFICER:  All rise.
21        THE COURT:  Thank you.
22        Mr. Frye is out because he's wrapping up
23 the time clock calculations.  I'm trying to give
24 y'all, you know, half-day calculations and then
25 end-of-the-day calculations so you know a closer to

Page 1453

1 accurate time where you stand.  So he will come back
2 in as soon as he's done with that.
3        Anything before we get the jury?
4        MR. GREENFIELD:  No.
5        THE COURT:  Let's bring them on in.
6        (The jurors entered the courtroom.)
7        THE COURT:  Okay.  You can be seated.  And
8 Mr. Greenfield, you can continue.
9 BY MR. GREENFIELD:
10 Q.   Hello, Ms. Carter.
11 A.   Hello.
12 Q.   All right.  Do you mind if we just kind of pick
13 right back up where we left off before lunch?
14 A.   Sure.
15 Q.   Okay.  And what we were doing before lunch, is
16 you and me the jury here, we're trying to get on the
17 same page as what you are claiming and how the union
18 has wronged you, okay?
19 A.   Uh-huh.
20 Q.   All right.
21        And we just finished talking about the Railway
22 Labor Act, and we talked about your claims of breach
23 of fiduciary duty against the union.
24        And now I'm turning to, you have claims against
25 the union for religious discrimination, and that the

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1454..1457

Page 1454

1 union discriminated against you because of your
2 religion?
3 A.  Correct.
4 Q.  Is that correct?
5 A.  Correct.
6 Q.  And how did the union do that, ma'am?
7         MR. PRYOR:  Object to the extent it calls
8 for a legal conclusion.
9 BY MR. GREENFIELD:
10 Q.  How do you believe the union did that?
11        THE COURT:  I will allow it to the extent
12 she has knowledge.
13        You can answer.
14        THE WITNESS:  I don't know how to
15 formulate the words correctly.
16        In the fact-finding notes that Audrey
17 Stone had sent -- or was talking with Ed Schneider
18 reflects that she's making reference to my Facebook
19 posts and my Christianity.  And I'm not exactly sure
20 why she would use such, you know -- what does my
21 Christianity have to do with my Facebook page, my
22 personal Facebook page?
23        I do believe that she went after me
24 because of the Women's March, because I'm an
25 objector, I object to everything that this union is

Page 1455

1 doing, and she didn't go to that march -- let's put
2 it this way, I have never seen the union go to a pro
3 life march.  Ever.
4         They represent everything else that is
5 political or a hot topic of some sort.  And they
6 don't make reference to any of our jobs per se.  I
7 think the union should be there specifically for our
8 jobs, our safety, the health of us on the airplane
9 and so forth.
10 BY MR. GREENFIELD:
11 Q.  And that is why you are an objector, right,
12 ma'am?
13 A.  Oh, that -- yeah, she --
14 Q.  I understand.
15 A.  Yes.
16 Q.  Okay.  So is it fair to say that you believe
17 the union discriminated against you through
18 Ms. Stone as the president, correct?
19 A.  Correct.
20 Q.  And the discrimination is found by her turning
21 you in for the post you sent her, correct?
22 A.  And speaking about my Christianity, yes.
23 Q.  Okay.  And that's --
24 A.  She mentions it.
25 Q.  Right.  And that is within those posts?

Page 1456

1 A.  In what posts?
2 Q.  Or -- I'm sorry -- within the Facebook messages
3 you sent her?
4 A.  I don't -- you know what?  I don't remember all
5 of the Facebook messages that I wrote to her.  But
6 she referenced it off of my personal page.
7 Q.  Okay.  Is there anything else in any other way
8 that the union discriminated against you because of
9 your religious beliefs, other than that?
10        MR. PRYOR:  Same objection as legal
11 conclusions.
12        THE COURT:  I will allow her to answer
13 based on her personal knowledge.
14        THE WITNESS:  That is a hard one to answer
15 specifically, but their actions prove what happened
16 to me.  She got me fired for my Christian belief on
17 my Facebook page.  Also, the fact that I was totally
18 against them going to that march, and, you know,
19 supporting Planned Parenthood.  I don't know how
20 much more I can say about --
21 BY MR. GREENFIELD:
22 Q.  Is if fair to say -- I'm sorry.  I didn't mean
23 to cut you off.
24 A.  That's okay.
25 Q.  Is it fair to say that it was the actions of

Page 1457

1 Ms. Stone?
2 A.  Ms. Stone as being the union president.  And
3 the union, when I went -- okay.
4 Q.  Yes, ma'am, I know.  We agree on that.  I don't
5 think -- I think we are all on the same page.
6         It is fair to say that it was that act of
7 Ms. Stone turning you in, that is where you believe
8 the discrimination lies, is that fair?
9 A.  Yes.
10 Q.  Okay.  Do you know if Ms. Stone is a Christian
11 as well?
12 A.  No, I do not.
13 Q.  Do you believe anyone else was treated better
14 than you -- do you believe any non-Christians were
15 treated better than you?
16 A.  I don't know -- because -- like, you know,
17 everybody has been trying to say I'm trying to shove
18 my religion down other people's throats.  Most
19 times, unless we know of our friends, we don't
20 really talk about that at work.  I mean, because it
21 is a subject that you usually, you know, when you
22 are on the airplane, you keep -- unless you know
23 somebody.
24        Will you ask that one more time, though, the
25 way you asked it.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                   Pages 1458..1461

Page 1458

1 Q.  Yes.  It wasn't -- I didn't do a really good
2 job.
3      And maybe I can put these two things side by
4 side and it will help us.
5      You claim that you were discriminated against
6 in part because you were an objector.  So we said
7 all of these other -- you had a list of some other
8 objectors that you felt were retaliated against?
9 A.  Uh-huh.
10 Q.  Do you feel like there were any other
11 Christians that the union was targeting or was it
12 just you?
13 A.  That, I don't have any knowledge of.  I don't.
14 You know, I know some of my friends that she did --
15 or they did go after are Christians, so, yes.  I
16 don't know if they displayed that, and if they knew
17 that specifically.  But, yes.
18 Q.  Are you aware of any non-Christians who were
19 treated more favorably than you by the union?
20 A.  Again, I don't know most of the objectors'
21 faith.  So I can't really say.  I don't know.
22 Q.  I understand.
23      And let's -- let's even not just say
24 "Christian," because I think to be fair, there is
25 probably different interpretations of how people

Page 1459

1 view Christianity, so I don't want to blanketly put
2 that on you.
3      Do you believe there is any individuals who
4 shared your religious beliefs who were also being
5 discriminated against by the union?
6 A.  Yes, I do.
7 Q.  Okay.  Who are those people?
8 A.  Jeanna Jackson.  Beverly Bellinger.  I know
9 Mike Casper, he was.  Knowledge-wise of other
10 people, I don't -- I honestly don't know.  Maybe
11 Michelle Foley, I think she falls into the same
12 camp.
13 Q.  Okay.  And can you point the jury to any
14 individuals who did not share your religious beliefs
15 who were being treated more favorably than you?
16 A.  Can I point my finger to them?
17 Q.  Yes.  Can you identify them, sorry, you know?
18 A.  Like I said, I don't know everybody's belief
19 systems.  I think that not only were there
20 Christians complaining about this, but there were
21 other members.  There's men that were talking
22 regarding this, that their union dues shouldn't have
23 been spent for this.  There's a -- we have a diverse
24 group, and they should represent all when they do
25 these things, not just a select group.

Page 1460

1      And really, they should stay out of political
2 stuff, because like I said, we are all a diverse
3 group.  They should be taking care of the contract,
4 our jobs, our safety, our health, anything that has
5 got to do with our specific jobs.  That is what the
6 union should be taking care of.  Period.
7 Q.  Yes, ma'am.  I think we understand that you
8 have a specific view as to what the union's role
9 should be, fair?
10 A.  Well, I think a lot of people do.  I mean, it
11 is -- you know, there are so many of us and we all
12 think differently.
13 Q.  I understand.  Absolutely.  I would completely
14 100 hundred percent agree with you the fact that --
15 well, let's just take a step back.  The union is
16 about 15,000 people?
17 A.  Give or take, yes.  I don't know what it is
18 now.
19 Q.  Just approximately.
20 A.  Yeah.
21 Q.  Fair to say within that group, there is people
22 of many different religions?
23 A.  Yes.
24 Q.  Many different races?
25 A.  Yes.

Page 1461

1 Q.  Different political beliefs?
2 A.  Yes.
3 Q.  Okay.  I would like to now kind of talk about
4 your last claim that you are bringing against the
5 union.
6      You have claimed that the union did not provide
7 you a religious accommodation, is that your
8 understanding as well?
9 A.  Yes.  I mean, they didn't -- they didn't even
10 take -- into -- especially when I went above -- when
11 I went towards the board, when I had to have my
12 meeting with the board.
13      Same argument.  You know, this was a union
14 president that turned me in.  I'm a Christian.  I
15 don't believe that our union dues -- all through
16 everything that I have said this whole time -- and I
17 actually spoke to Michael Massoni, he was the person
18 that was on the phone.  They chose not to take my
19 case, knowing that it was the union president that
20 turned me in.
21 Q.  You say he decided not to take your case?
22 A.  No, they did not take my case.  I had to bring
23 my own attorneys.
24 Q.  You are talking about the arbitration
25 proceeding?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 428 of 642   PageID 11369
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1462..1465

Page 1462

1  A.  Correct.
2  Q.  Okay.
3  A.  And they should have represented me knowing
4  that this was union business, and it was -- that
5  this was the president turned me in to the company.
6  They have a fiduciary -- a fiduciary responsibility
7  and they take an oath not to harm a member.
8      Now, I'm an objector, but I still pay the dues.
9  So -- so, I mean, I don't understand all of that.
10  It shouldn't be that way.  If I'm an objector, I
11  should be able to just say, you know what, I'm going
12  to take my dues and send it to another cause, if
13  that is the case, if they are not representing us
14  the correct way.
15  Q.  Yes, ma'am.  I think we all understand at this
16  point why you are an objector and your basis for
17  doing that.
18      I would like to turn us back to the concept of
19  the religious accommodation.
20      What, if any, accommodation did you want the
21  union to provide you?
22      MR. MORRIS:  Objection, she just answered.
23      THE COURT:  Sustained.
24      MR. GREENFIELD:  I -- maybe we can -- can
25  we sidebar, your Honor?

Page 1463

1      (Thereupon, the following proceedings were
2      had at sidebar:)
3      MR. GREENFIELD:  I don't mean to be
4  obstinate, but I honestly have no idea what she just
5  said, and I don't think the jury does either.
6      THE COURT:  She said they didn't provide
7  her a lawyer in the arbitration.
8      MR. PRYOR:  And she said they shouldn't
9  have reported her.  It's both in her answer.  She's
10  answered.
11      MR. GREENFIELD:  Okay.  But that is what
12  I'm trying to find clarity on.  I'm not trying to
13  belabor a point.  I'm not trying to ask and answer.
14  I just literally did not understand her answer.
15      THE COURT:  So do you want her to tell you
16  that you should have provided her a lawyer?  If you
17  want to ask that.
18      MR. GREENFIELD:  Okay.
19      And then can I wrap it up and say, is
20  there anything I'm missing?
21      THE COURT:  Sure.
22      MR. PRYOR:  My concern is, you keep asking
23  the same question.  She feels like, well, gee, I
24  guess I must not have answered it before.  It is
25  just not fair to the witness.

Page 1464

1      MR. GREENFIELD:  I have asked it -- I have
2  asked it one time.
3      MR. PRYOR:  Once is enough.
4      MR. GREENFIELD:  Mr. Pryor, you were up
5  here asking the same question five times.  I have
6  about 84 asked and answered.
7      MR. PRYOR:  I'm sure you objected.
8      THE COURT:  I'll let you ask.
9      (Thereupon, the sidebar was concluded and
10      the following proceedings were held in open
11      court:)
12      THE COURT:  Okay.  You can ask the
13  question we discussed.
14  BY MR. GREENFIELD:
15  Q.  Okay.  And I'm not trying to be obstinate here,
16  Ms. Carter.  I'm just trying to have some clarity.
17  And so I apologize if I'm -- if you feel like I'm
18  belaboring the point, okay?
19  A.  Uh-huh.
20  Q.  Okay.  My understanding, based on what you
21  said, was that you should have been provided an
22  accommodation in respect of the union should have
23  represented you at the arbitration?  Is that what
24  you are --
25      MR. PRYOR:  Let me object.

Page 1465

1  Mischaracterizes her testimony by not giving her
2  complete answer.
3  BY MR. GREENFIELD:
4  Q.  In part.  Is that what you are saying, in part?
5      THE COURT:  I will allow the reformulated
6  question.
7  BY MR. GREENFIELD:
8  Q.  Ms. Carter, I'm right here.
9  A.  I know that.  I am -- by turning me in, okay,
10  she went against my Christian value system.  And
11  yes, she -- you know what, if -- I'm just going to
12  do a hypothetical here for just second.  If I would
13  have been the union president --
14      MR. GREENFIELD:  Object to non-responsive,
15  Your Honor.  Her hypothetical doesn't --
16      THE COURT:  I think the question doesn't
17  call for it.  So I will stop the answer there.
18  BY MR. GREENFIELD:
19  Q.  And again, I'm not trying to cut you off.  I
20  really am not, but --
21  A.  Yes, I believe that -- I believe that they
22  should have recognized that I was a Christian.  I
23  don't know what accommodation --
24      MR. GREENFIELD:  Excuse me, your Honor,
25  objection, move to strike.  I haven't asked a

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022                          Pages 1466..1469

Page 1466

1  question.  She's just talking.
2          THE COURT:  Agreed.  So can you refocus
3  your question?
4          MR. GREENFIELD:  Yes, your Honor.
5  BY MR. GREENFIELD:
6  Q.  I'm not trying to be difficult, Ms. Carter.  I
7  am just trying to understand.
8      And I think based on what you just said, is
9  that the accommodation you were seeking was that
10 that Ms. Stone, President Stone, should not have
11 turned you in, and turning you in violated what you
12 believe to be your accommodation to be able to say
13 what you needed to say regarding your religion?  Is
14 that -- I don't want to put words in your mouth.  Is
15 that right?
16 A.  Yeah, I mean, she -- she turned me in.  She
17 knew I was a Christian, she saw it on my Facebook
18 page.
19     You know, it states in our contract -- or in
20 the constitution of the -- or the international
21 constitution, that you don't discriminate against
22 race, you don't discriminate against religion, and
23 so on.
24     And when she's making reference to my
25 Christianity on my Facebook page, that raises a

Page 1467

1  pretty good question.
2  Q.  I understand.  And we talked about that in
3  relationship to your religious discrimination
4  claims.  So I understand that.
5      But just so we are clear, so what you are
6  saying is, you should -- the accommodation that you
7  wanted the union to provide is that you could make
8  that communication to President Stone --
9  A.  Correct.
10 Q.  -- and not be turned in, is that correct?
11         MR. PRYOR:  Object, your Honor, this is
12 asked and answered.  She's answered it three times.
13 Now --
14         THE COURT:  I will sustain that.
15         MR. PRYOR:  -- he's wanting to
16 summarize --
17         THE COURT:  Hold on.  That is a speaking
18 objection.  I will sustain that.
19 BY MR. GREENFIELD:
20 Q.  Is that correct?
21         THE COURT:  No, I sustained it.  Got to
22 ask a new question.
23 BY MR. GREENFIELD:
24 Q.  Is there anything else that you believe the
25 union should have provided you as an accommodation?

Page 1468

1          MR. PRYOR:  Object to the extent it calls
2  for a legal conclusion and to the "anything else,"
3  given that she's answered this previously in other
4  context.
5          THE COURT:  I will allow the question.
6  You can answer.
7          THE WITNESS:  Whether I'm a Christian or
8  not, I believe she did go after my Christianity
9  because she spoke about on -- in to my supervisor
10 when she turned me in regard to my personal Facebook
11 page.
12         That means she went back to look for
13 something like that, and she referenced that.  So,
14 yes, I believe she discriminated against me when it
15 comes to being a Christian.  I do.
16 BY MR. GREENFIELD:
17 Q.  Yes, ma'am.
18     I don't dispute that that is what you are
19 alleging in this lawsuit.
20 A.  No, she shouldn't have turned me in.
21 Q.  Okay.  And my question was a little bit
22 different.
23     I want to know if there is anything else you
24 believe that the union should have accommodated you
25 in regards of pertaining to your religion, other

Page 1469

1  than that?
2          MR. PRYOR:  Again, object, asked and
3  answered.  Same objections.
4          MR. GREENFIELD:  I don't believe I ever
5  got an answer to this question.
6          THE COURT:  I will allow this one last
7  time, you can answer.
8          THE WITNESS:  You know, I don't even know
9  what an accommodation really is.  She should have
10 recognized that I was a Christian.  And I think that
11 she should have -- honestly, she should have -- she
12 should have -- well, she should have reached out to
13 members, period, with any kind of complaint.  But --
14 BY MR. GREENFIELD:
15 Q.  But you weren't a member, were you, Ms. Carter?
16 A.  I still paid dues.  I still -- she was sending
17 me things as -- as a union member.
18         MR. GREENFIELD:  Objection,
19 non-responsive.
20 BY MR. GREENFIELD
21 Q.  Ma'am, you were not a member --
22 A.  I answered that.  I'm telling you exactly how I
23 see it.  The union went after me -- she did -- for
24 my Christian beliefs.
25         MR. GREENFIELD:  Objection, your Honor,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1470..1473

Page 1470

1 non-responsive. Move to strike.
2         THE WITNESS: I don't know how to answer
3 it.
4         THE COURT: I will sustain that last one
5 of yours.
6 BY MR. GREENFIELD:
7 Q.  My question was pretty simple, Ms. Carter.
8       You were not a member, correct?
9 A.  I was an objector.
10 Q.  Okay.  And so your accommodation that you were
11 seeking was that you wanted to be able to say
12 whatever you wanted to, to a coworker, as long as it
13 pertained to your religious beliefs, is that
14 correct?
15 A.  I wanted an open dialogue and freedom of speech
16 to my union president, who still has an obligation,
17 because she's spending my dues, to protect me.  It
18 is still as an objector, she still has to protect
19 us.
20 Q.  I understand, Ms. Carter.  My question was a
21 little bit simple.
22      Do you agree that you wanted to be able to say
23 whatever you wanted to, to another coworker, as long
24 as it was related to your religion?
25 A.  Again, not just a coworker.  My union

Page 1471

1 president.  And yes.  I should have been able to
2 have that freedom to speak to her in -- just like if
3 I were in a union meeting, yes.
4 Q.  And say whatever you want?
5 A.  That is what happens in union meetings, yes.
6 Q.  Ma'am, was this a union meeting?
7 A.  It is the same context.  I was speaking to my
8 union president, just like it would have been if I
9 would have been in a union meeting.
10 Q.  But it was not a union meeting, correct?
11 A.  It was a private message, email, whatever you
12 want to call it, to my union president for the way
13 that they were spending our money, and they had gone
14 to that march, and the things that they spent, you
15 know, our dues money on.  So I don't know how much
16 more I can answer that for you.  I'm trying.
17 Q.  Just my simple question.
18 A.  Yes.  I believe that I should have an -- okay.
19 Q.  And maybe I can take a step back here.
20      My question was, this didn't occur in a
21 membership meeting, did it?
22 A.  No.  It didn't.
23 Q.  Okay.
24      MR. GREENFIELD: Your Honor, I would like
25 to reserve the rest of my time with Ms. Carter for

Page 1472

1 my case in chief, and I can pass the witness.
2       MR. PRYOR: For your case-in-chief?
3       MR. GREENFIELD: Yes.
4       MR. PRYOR: He's gone beyond direct, and
5 so he needs to ask her questions now.
6       THE COURT: Sidebar.
7       MR. PRYOR: Okay.
8       (Thereupon, the following proceedings were
9   had at sidebar:)
10      MR. PRYOR: Okay.
11      THE COURT: So you're arguing he exceeded
12 the scope, so he's got to go now?
13      MR. PRYOR: What?
14      THE COURT: You are arguing that he
15 exceeded scope, so he needs to go now?
16      MR. PRYOR: Oh, absolutely.  And I didn't
17 object --
18      THE COURT: What topics did he exceed the
19 scope on?
20      MR. PRYOR: The topics we were just
21 covering.  He went through every single RLA claim,
22 every single position.  I didn't do any of --
23      MR. GREENFIELD: Are you willing to
24 concede that you haven't proven those points?
25      MR. PRYOR: I have proven my points.  I

Page 1473

1 didn't ask for legal questions.  You went through
2 every one of the legal concepts over my objections.
3       MR. GREENFIELD: Every -- every single --
4 you are saying you didn't address anything about any
5 of those legal claims?
6       MR. PRYOR: I'm saying you exceeded the
7 scope of direct --
8       MR. GREENFIELD: I absolutely --
9       MR. PRYOR: -- about most of your --
10      MR. GREENFIELD: I absolutely did not.
11 All I did was walk her through her claims against
12 the -- I went very slowly, one, two, three, four --
13      MR. PRYOR: And I asked factual -- I'm
14 sorry, your Honor, I shouldn't speak.
15      THE COURT: It is fine.  You can say your
16 last statement.
17      MR. PRYOR: Nothing further.
18      THE COURT: I think it was sufficiently on
19 topic, right, there were questions that got more in
20 depth.  But I go topic by topic, not depth of the
21 question.  So I think it is sufficiently on step to
22 where I can't say that I'm boxing you out and you
23 have to ask other questions.
24      So I think you can reserve the rest of
25 your questions for your case in chief.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1474..1477

Page 1474

1    Which will take the baton back to you.
2        MR. PRYOR:  It will what?
3        THE COURT:  It will take the baton back to
4    you for round two of the questions on her.
5        MR. PRYOR:  Okay.
6        THE COURT:  Ready?
7        MR. PRYOR:  Yes, sir.
8        (Thereupon, the sidebar was concluded and
9        the following proceedings were held in open
10       court:)
11       THE COURT:  Okay.  So I will let you
12   reserve the remainder of your questions for your
13   case in chief, which means I need to now ask
14   Mr. Pryor if he wants to ask more questions at this
15   point.
16       MR. PRYOR:  Yes, your Honor.
17       REDIRECT EXAMINATION
18   BY MR. PRYOR:
19   Q.  Ms. Carter, the discussion about Step 2 process
20   and arbitration that you were involved in, those
21   were not part of your claims protecting your
22   religious activity.  That is what this case is
23   about?
24       MR. McKEEBY:  Objection, leading.
25       MR. PRYOR:  Your Honor, this is redirect.

Page 1475

1        THE COURT:  I will allow this.
2    BY MR. PRYOR:
3    Q.  You can answer.
4    A.  Correct.
5    Q.  And, in fact, the protection of your RLA rights
6    and your union activity rights, that is part of this
7    lawsuit, not part of the Step 2 and arbitration?
8    A.  Correct.
9    Q.  Let's look at Exhibit 118.  While he's calling
10   that up, let me ask you about, you were asked about
11   your W-2s and some other documents.  And if you were
12   working full time, how much would you be making?
13   A.  Give or take, if I -- 80 to 90 trips a month up
14   to 100, at my pay scale, I could make anywhere from
15   80- to $100,000 a year.
16   Q.  And would that include benefits or it would be
17   more with benefits?
18   A.  It would be more with benefits.
19   Q.  What do you estimate that to be with benefits?
20   A.  Well, there is profit sharing.  And then there
21   is a match of your 401(k).  And then they pay a
22   certain portion of our medical insurance.  And then
23   I believe they had been getting bonuses, I know,
24   through some of the time, a bonus for -- I don't
25   know if it was for -- I know there was a bonus for

Page 1476

1    the contract, but then there was a bonus after
2    companies got money or a tax break or something like
3    that.
4        MR. McKEEBY:  Your Honor, object, this is
5    beyond the scope of the --
6        MR. PRYOR:  He asked about W-2s, he asked
7    about --
8        THE COURT:  I will allow the topic.
9    BY MR. PRYOR:
10   Q.  And what do you estimate that to be?
11   A.  That is hard to estimate, because I mean, with
12   my 401 contribution and -- it -- that is hard.
13   Q.  Just give me a reasonable estimate.  Be more or
14   less than 20,000 a year?
15   A.  Oh, it would be more.
16   Q.  Okay.
17       So 80- to 100,000 in salary and more than
18   20,000 in benefits, correct?
19   A.  Yeah.  It -- well, with my 401 and the profit
20   sharing.
21   Q.  And from the time you were terminated -- if you
22   were put back in your job today, would you be able
23   to go back full time and earn that money?
24   A.  Oh, yes.  My daughter is going to college.
25   Q.  Okay.  Let's look at Exhibit 118.

Page 1477

1        Now, it said -- it says, "Audrey Stone invite
2    Audrey to Messenger" on this exhibit.
3        When you sent your message, what Facebook page
4    did you send it to?
5    A.  That is interesting.
6    Q.  That is why I'm asking.
7    A.  Yeah, it said -- well, and I said this before,
8    it said, Audrey Stone TWU.
9    Q.  And what does this say?
10   A.  This just says Audrey Stone.
11   Q.  Do you know why that is?
12   A.  She changed it.
13   Q.  Okay.  So after you sent -- when you sent it,
14   it was Audrey Stone TWU?
15   A.  That is correct.
16   Q.  And we saw that in the core team member
17   exhibit, it had Audrey Stone, TWU?
18   A.  That is correct.
19   Q.  And then after she brought this complaint, you
20   go back to print this out, what does it say?
21   A.  Well, I don't even -- I think my printouts, I
22   thought had the Audrey Stone TWU on it.
23   Q.  But the one that they have shown you says
24   Audrey Stone?
25   A.  Just Audrey Stone, yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 5 July 11, 2022                    Pages 1478..1481

Page 1478

1 Q.  Let's look at Exhibit 40.  And while they are
2 pulling up Exhibit 40, you were asked about -- can
3 you say anything -- do you recall me asking you on
4 direct -- and maybe you just aren't thinking of
5 this -- but that you can't engage in illegal speech,
6 can you?
7 A.  No.
8 Q.  You are not asking for that?
9 A.  No.
10 Q.  If you threaten to shoot somebody or you
11 commit -- say something illegal, you are not asking
12 for the protection for that, are you?
13 A.  No.
14 Q.  And you have already explained to us you are
15 not asking for unfettered communications in the
16 workplace, correct?
17 A.  Correct, yeah, no.
18 Q.  Okay.  Let's look at Exhibit 40.  And it
19 says -- if I can find the section -- in addition,
20 you are required to comply with all company policies
21 and procedures.
22     And at this point, you had been fired, right?
23 A.  Correct.
24 Q.  And you have been fired for posting on your
25 personal Facebook page?

Page 1479

1 A.  Correct.
2 Q.  Asked you about past posts.  I'm going to ask
3 you about future posts.  So if you posted something
4 in the future, your experience is you get fired?
5 A.  Correct.
6 Q.  You didn't want to do that?
7 A.  No.  Because I got --
8 Q.  And, in fact, you would give up your right to
9 sue them when they did fire you, right?
10 A.  Correct.
11 Q.  And look at that last line, if you do anything
12 in the future that they consider a violation, it
13 will result in termination.  Correct?
14 A.  Correct.
15     MR. PRYOR:  Thank you, ma'am.
16     Oh, wait, hang on one second.
17     Thank you.  Pass the witness.
18     THE COURT:  Okay.  Mr. McKeeby.  Round
19 two.
20     MR. McKEEBY:  I will reserve questions.
21     THE COURT:  All right.  Any round two
22 questions, Mr. Greenfield?
23     MR. GREENFIELD:  I will save them.
24     THE COURT:  Okay.  With that, I think you
25 are done for this round.  You can leave the stand.

Page 1480

1 You can return to your seat in the courtroom.
2     And let me ask who Carter is going to call
3 as her next witness?
4     MR. PRYOR:  Your Honor, at this time, we
5 call Brett Nevarez by video deposition.  I am told
6 this video is a real video deposition.
7     THE COURT:  Okay.  So hopefully it
8 actually will be video and not have audio that is in
9 and out.
10     MR. PRYOR:  And it is very short.
11     THE COURT:  Very short.  We have got it
12 cued up.
13     So what I will tell y'all is the same
14 thing I told y'all last time on depos.  Two things:
15 One is, if someone meets the test for being
16 unavailable legally, then I can allow their prior
17 recorded testimony under oath to be played to you
18 here in court, and this next witness does meet that
19 legal test.  You are to credit their testimony the
20 same as if you heard them sitting here on the stand,
21 saying the words they are going to say.
22     The second disclaimer is what I told you
23 part way through the last deposition, which is, you
24 might see the words on the bottom, the transcript.
25 Remember, that transcript is not the evidence.  The

Page 1481

1 evidence is the words you hear the witness say.  It
2 is the video you see.  The witness and their
3 non-verbal expressions.
4     So that is the evidence.  The transcript
5 is just a helpful assistant there for you.
6     With that, we can cue up the video and
7 play it.
8     (Thereupon, the video clip was played and
9     transcribed as follows:)
10     TESTIMONY OF BRETT NEVARES
11 BY MR. PRYOR:
12 Q.  Could you tell the jury what it was that your
13 position was with Southwest Airlines in 2000 -- I'm
14 sorry -- with the TWU Local 556 in 2017?
15 A.  I was also a negotiating team member.
16 Q.  What was your relationship with Audrey Stone?
17 A.  I was the second vice president.
18 Q.  You ran together -- well, did -- did you ever
19 run for election together?
20 A.  Yes.
21 Q.  Did you frequently work together?
22 A.  Yes.
23 Q.  Union business and in your flying, is that
24 right?
25 A.  Yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                   Pages 1482..1485

Page 1482

1 Q.  Did you consider her a good friend?
2 A.  I still do, yes.
3 Q.  Did you consider her a confidante?
4 A.  Yes.
5 Q.  Do you know whether she considered you a
6 confidante?
7 A.  Yes, I believe so.
8 Q.  Would she frequently consult you on important
9 decisions that she made?
10 A.  Yes.
11 Q.  Did she consult you when she received a message
12 from Charlene Carter that she eventually submitted a
13 complaint to Southwest about?
14 A.  Yes.
15 Q.  And what did you tell her?
16 A.  I told her that the video was offensive.
17 Q.  Did you suggest that she submit a complaint?
18 A.  Yes.
19 Q.  When she submitted the complaint, did you
20 understand her to be doing that in her role as union
21 president?
22 A.  She never discon -- I mean, she's the president
23 of the Union.  You can't separate the roles between
24 flight attendant and employee and president of the
25 union, in my opinion.

Page 1483

1 Q.  You supported her making that complaint in her
2 role as union president, right?
3 A.  Yes.
4        MR. HILL:  Your Honor, this is the
5 counter.
6        THE COURT:  Yes.
7        MR. HILL:  Can you tell the jury who is
8 asking?
9 BY MR. McKEEBY:
10 Q.  He is wearing his neck tie, and I have a couple
11 of questions for you.
12 A.  Okay.
13 Q.  You mentioned that when you met with Ms. Stone
14 in Baltimore, she was distraught.
15    Can you explain to the jury a little bit more
16 about what you meant by that?
17 A.  She was crying and could barely speak.  She
18 just handed me her phone and I -- I turned the video
19 on.
20 Q.  Had she received one or two videos at that
21 point or did you know?
22 A.  I -- I only watched a few seconds of one video.
23 That was enough for me to know I didn't want to
24 watch any more.
25 Q.  Do you know if there were two videos or --

Page 1484

1 A.  I don't know if there were two or if it was
2 sent twice.  Instant Message is very inconsistent.
3 Q.  Did you have to click on the video to make it
4 play?
5 A.  Yes.
6 Q.  And it was on her phone?
7 A.  Yes.
8 Q.  And she handed it to you and you observed it at
9 that meeting in Baltimore?
10 A.  Yes.
11 Q.  Did she indicate when she had received it?
12 A.  Earlier that day.
13 Q.  Did she indicate to you where she had viewed
14 it?
15 A.  Where she had?
16 Q.  Yes.  Where was she when she watched it, if she
17 indicated that to you?
18 A.  No.  I -- no.  I don't think she told me that.
19 I just assumed there at the facility.  We were at
20 the Maritime facility outside the
21 Baltimore-Washington airport.
22 Q.  I forget if Mr. Greenfield asked you this, but
23 have you ever turned in an employee, a Southwest
24 employee, for violation of the social media policy?
25 A.  No.

Page 1485

1 Q.  Have you ever been turned in for violating the
2 social media policy?
3 A.  Yes.
4 Q.  Who did that?
5 A.  I don't know.
6 Q.  What was the violation -- alleged violation?
7 A.  It was a Facebook post that was turned in to
8 management.
9 Q.  What did you post?
10 A.  I posted that Lynn was being discriminatory.  I
11 believed it to be union-protected speech.  That she
12 had posted some -- she behaved derogatorily in a
13 Dallas membership meeting.
14 Q.  Who was that?
15 A.  Lynn Montgomery, the president.
16 Q.  What does the concept of union-protected speech
17 mean to you?
18 A.  That management can't hold what's said in a
19 membership meeting against a member.
20     (Thereupon, the video clip concluded.)
21     MR. PRYOR:  That concludes it, your Honor.
22 And I must admit I'm losing faith in the quality of
23 these Zoom deposition offerings.  I thought it would
24 be better.  Slightly better.
25     THE COURT:  It is quite all right.  So

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 434 of 642   PageID 11375
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1486..1489

Page 1486

1  does Carter have another witness to call?
2         MR. PRYOR:  No, your Honor.
3         We would like to publish Exhibit 138.
4         THE COURT:  Yes, you can do so.  So I will
5  just tell the jury, there was a time where I
6  admitted Exhibit 138, but I don't think I had the
7  jury screens un-muted, and so that was my fault.  We
8  are going to un-mute the screens, we're showing you
9  Exhibit 138, so it doesn't surprise you when you
10 have access to it back in the jury room.
11        MR. PRYOR:  Thank you, your Honor.
12        Subject to rebuttal, Carter rests.
13        THE COURT:  Okay.  So what I will do is,
14 then, any time we get a party rest, then I have to
15 ask y'all to go take a break.  We have legal issues
16 that we have to talk about.  I wish that would have
17 come later, but there is no way to control these
18 things.
19        So I'm going to give y'all your early
20 afternoon break super early.  And so same
21 instructions:  Can't talk to anyone about the case,
22 you can only talk to your fellow jurors and court
23 personnel, just not about the case; and can't do any
24 research about the case.  With that, we will call
25 you back as soon as we are done with the legal

Page 1487

1  issues.
2         All rise for the jury.
3         (The jurors exited the courtroom.)
4         THE COURT:  Okay.  You can take a seat.
5  Okay.  So Defendants, Union, Southwest, anyone need
6  to make a motion at this point?
7         MR. McKEEBY:  Yes, your Honor.
8         Southwest would like to make a motion
9  under Rule 50 as a matter of law -- I'm sorry,
10 should I take the podium or --
11        THE COURT:  That's great.
12        MR. McKEEBY:  Yes, so let me just start
13 again.
14        Southwest makes a motion under Rule 50 for
15 judgment as a matter of law, and there is a
16 component of my motion that will be check the box,
17 but this isn't it.
18        Your Honor, we don't disagree that some
19 degree of protected activity, at least as the Court
20 has construed the RLA, has been introduced by
21 Ms. Carter.
22        The messages are sort of a combination of
23 communications embedded in other messages.  Some of
24 which involved things like the recall election,
25 involve things like how the union spends dues, and

Page 1488

1  otherwise expends its money, and about participation
2  in the Women's March.
3         And all of that goes to protected
4  activity, which is an element of the claim under the
5  RLA.
6         But what there is no evidence of, is that
7  any decision-maker at Southwest was motivated by any
8  of those things in deciding to terminate
9  Ms. Carter's employment.  There is not sufficient
10 evidence to go to the jury on the claim for that
11 reason.
12        As the Court recognized earlier today,
13 this is a novel claim that requires some proof that
14 Southwest would retaliate against someone based on
15 their objection to the union.
16        And I would respectfully submit that in
17 this case, while there is evidence of protected
18 conduct, again, as the Court construes the RLA --
19 and I will get to that in the second part of the
20 presentation -- but there is no evidence to support
21 the notion that the Southwest decision-makers
22 considered these things in terminating Ms. Carter's
23 employment.
24        The only thing that arguably has any
25 connection is the timing of Southwest's decision

Page 1489

1  relative to its discovery of the protected conduct.
2  But the court cases are pretty clear that timing is
3  not sufficient to establish a connection between
4  protected activity and retaliatory motive.
5  Particularly here, your Honor, because it is no
6  surprise that the -- Southwest's knowledge of the
7  RLA-protected activity came when it did.  It was
8  part of the investigation, part of the report of
9  Stone that provided that information.
10        So it was part and parcel of both the
11 complaint and the investigation.  So it doesn't have
12 the same -- the same inferential strength as in most
13 cases.  And I would cite to the Court to the
14 decision such as Strong v. University Healthcare
15 System, LLC, 482F.3d 802 at 808, that stand for the
16 proposition that proximity in time alone is not
17 sufficient to support retaliatory motive in
18 connection with protected conduct.
19        And there is no other evidence in the
20 record to support the notion that Ed Schneider or
21 anyone else at Southwest terminated Ms. Carter's
22 employment because she was a union objector, because
23 she participated in the recall collection, because
24 she complained about the Women's March or because
25 she complained about how dues' member money was

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1490..1493

Page 1490

1 spent.
2        This testimony about the reasons for the
3 termination have not been rebutted with any
4 evidence, other than speculation and conjecture, to
5 the point where we are talking about emails in 2013
6 that were sent by union loyalists to a Southwest
7 executive who wasn't even involved in the decision.
8 And the notion was that, well, you know, she didn't
9 stop and tell Mr. Schneider about this past history
10 four years ago, so that should create the inference
11 of retaliation to support this claims.
12        That is just not sufficient evidence to go
13 to a -- it is not evidence to go to a jury to
14 support the RLA claim.
15        And there is nothing else other than the
16 proximity in time. Again, that is not sufficient.
17        So that is the RLA claim.
18        And frankly, the -- the claims under Title
19 VII are even more tenuous. Because there is, again,
20 yes, she explained during the fact-finding meeting
21 that she was a Christian and that she opposed
22 abortion. We understand that.
23        And that creates some proximity in time
24 between Southwest's receipt of that information and
25 the termination decision.

Page 1491

1        But, again, that is not sufficient and
2 there is absolutely nothing in the record to connect
3 Ms. Carter's religious beliefs to her termination
4 from employment. No -- no comparators, no other
5 employees who were treated preferentially based on
6 the fact that they were non-Christians, no negative
7 comments about her religion, nothing like that.
8        The best that they can do is to point to
9 that Women's March, your Honor, and say, see,
10 Southwest terminated Ms. Carter because she talked
11 about her opposition to abortion, but they let those
12 women march in Washington and didn't discipline
13 them.
14        But, your Honor, there are -- those women
15 are not similarly situated to Ms. Stone for the
16 purposes of this -- excuse me, Ms. Carter -- for the
17 purposes of this case. They participated in a
18 general march regarding women's rights. They --
19 they -- there was no indication that they did
20 anything other than carry one banner that was put
21 into evidence that said in small letters, you know,
22 the flight attendants Local 556, Flight Attendants
23 of Southwest airlines.
24        The only -- they didn't carry signs that
25 said, we are pro choice and we're proud of it or

Page 1492

1 anything like that. The only sign that is in
2 evidence is a cardboard sign that the union posted
3 on its website, that said -- had three boxes, one of
4 which said "My body, my choice." But we don't know
5 if that is a Southwest Airlines employee or not. It
6 is -- there is no proof of that in the record.
7        And even if there were, it wouldn't matter
8 because that is politics; that is political speech.
9        What they would have to do, and the
10 inferential leap they want this jury to make, is
11 that all of the women who participated in that march
12 have different religious views than Ms. Carter. And
13 they don't have that evidence.
14        There were dozens of women in those
15 pictures. They want to let the jury infer that,
16 well, they are participating in a Women's March,
17 they, therefore, must be pro choice -- may be
18 reasonable so far, but still not in evidence. And
19 finally, they must not be Christian, therefore, they
20 are similarly situated and were treated disparately
21 to Ms. Carter. That is not a reasonable inference
22 that can support this claim and allow it to go to
23 this jury.
24        So for that reason, the discrimination
25 claims fails as a matter of law.

Page 1493

1        The accommodation claim, your Honor, I
2 would also like to address. The problem with
3 that -- I don't think it is distinct at all from the
4 religious discrimination claims because Ms. Carter
5 hasn't identified, really, what the accommodation
6 is.
7        Her testimony is vague, and there is no
8 indication that her religious beliefs conflicted
9 with any policy. When I asked her on cross if she
10 violated a policy, she said no, she said she didn't
11 violate any policy, which is a requirement to show
12 that you need an accommodation.
13        So I think at the end of the day, it is
14 not a claim that is distinct from her substantive
15 religious discrimination claim, and she otherwise
16 has not met the elements of a failure to accommodate
17 claim.
18        I would also submit that there is no
19 evidence to support instructing this jury on
20 punitive damages, at least with respect to the
21 claims against Southwest. There is no evidence of
22 malice or reckless disregard for the protected
23 rights of Ms. Carter under federal law.
24        And now to the check-the-box portion of my
25 presentation. This is from our motion for summary

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1494..1497

Page 1494

1 judgment, of course.
2       I would like to reurge the arguments
3 regarding the preclusive effect of the binding
4 arbitration agreement in this case, as presented to
5 the judge, and the Court, that Ms. Carter has no
6 private right of action under the RLA in this
7 context, given that she cannot show and has not
8 attempted to show union animus, as that concept is
9 considered by courts in this context; that this
10 court lacks jurisdiction over this dispute because
11 it is a post-certification minor dispute.
12      And, again, as to the religious
13 discrimination, that claim that she failed to
14 exhaust her administrative remedies, and, therefore,
15 cannot bring an accommodation claim against
16 Southwest Airlines.
17      Thank you, your Honor.
18      THE COURT:  Understood.  Thank you, Mr.
19 McKeeby.
20      Before I hear a response from Carter, can
21 I hear what motion you might have, Mr. Greenfield?
22 Because if you are chiming in adding on to some of
23 his motion, then I think I should just hear from
24 Carter all at once at the end.
25      MR. GREENFIELD:  Yes, your Honor.  Would

Page 1495

1 you like me to take the podium or --
2       THE COURT:  That is fine by me, if you
3 want to.
4       MR. GREENFIELD:  I don't need to.  I think
5 the arguments are very similar.  And so the union
6 would just echo the request for motion of directed
7 verdict regarding, again, the preclusive effect of
8 the arbitration.  And similarly, on the religious --
9 the religious discrimination claims, again, there
10 has been no -- Ms. Carter just took the stand, she
11 could not identify any individual that is a
12 non-Christian that she felt was treated more
13 favorably than she was.
14      And in regard to the reasonable
15 accommodation claim, the accommodation that
16 Ms. Carter requested was, in fact, to be able to say
17 whatever she wanted to, to Ms. Stone, as long as it
18 was tied to her religious beliefs, and that cannot
19 possibly be an accommodation.
20      And again, at this time, I would then ask
21 the Court if I could reapply for my affirmative
22 defense in regard to undue burden on that issue.
23      THE COURT:  Understood.
24      So I will overrule your request for undue
25 burden affirmative defense at this time for the

Page 1496

1 reasons I said earlier.
2       But I would like to hear from Carter on
3 the response to both of those motions from Southwest
4 and the Union.
5       MR. GILLIAM:  Yes.  I would like to come
6 here if I could because I have the podium in my way
7 and I can't see you.
8       THE COURT:  That is true.
9       MR. GILLIAM:  This makes it a little bit
10 easier.
11      It is notable that Southwest can't point
12 to any unprotected activity that Carter engaged in
13 in support of its motion.
14      What is clear here is that they fired her
15 for her Facebook videos and messages, both privately
16 sent to Stone and posted on her own personal
17 Facebook page.  All of those message were protected.
18 Southwest fired her for those messages.
19      So there is abundant evidence that
20 Southwest discriminated against her for her
21 religious beliefs and that they retaliated against
22 her for her protected activities, and the same with
23 the union on all three claims with the union.
24      They -- her protected activities were
25 clearly a motivated factor -- motivating factor

Page 1497

1 under the RLA retaliation claims, because they took
2 them into consideration.  Ed Schneider's
3 investigation summary notes, exhibit -- trial
4 Exhibit 107 reflect that.  He's summarizing what he
5 found, and what he found included both Ms. -- well,
6 he was reflecting on how Ms. Carter latched on to
7 her Christian beliefs in her fact-finding meeting,
8 and he -- he enumerated that as a factor.  He
9 enumerated all of her RLA-protected activities as a
10 factor.
11      So they want to say that, oh, we didn't
12 fire Ms. Carter for her protected activities, we
13 fired her because she violated the social media
14 policies.
15      But that is the point of protection.  The
16 point of RLA protection and Title VII's
17 protections is that she not be fired just because it
18 violates the social media policies.
19      I would also say, moving to the failure to
20 accommodate claim, is that Southwest was confronted
21 with Ms. Carter's religious beliefs at the
22 fact-finding hearing.  Ms. Carter told them
23 specifically that she was a Christian who has to get
24 the word out, who shares the word out.  That is her
25 observance and -- of her religious beliefs and her

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 437 of 642   PageID 11378
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                                    Vol 5 July 11, 2022                    Pages 1498..1501

Page 1498

1 practices.
2        Yet, what did Ed Schneider do with that
3 information?  He did nothing.  He knew that he could
4 have reported it to the ACT team, and employee
5 relations could have reported it to the ACT team.
6 But they didn't.  They recognized it was a protected
7 category, Mr. Schneider's testimony shows that, but
8 they did nothing.  They knowingly evaded their
9 obligation to make accommodation efforts for
10 Ms. Carter's religious belief.
11        What was the accommodation that Ms. Carter
12 needed?  It was to not be fired.  EEOC v.
13 Abercrombie and Fitch says that firing an employee
14 because of their religious beliefs or failing to
15 accommodate an employee because of their religious
16 beliefs is synonymous with religious discrimination.
17        Shifting to the union briefly here, so
18 again, there, it is similar.  The violation here of
19 the RLA, the RLA retaliation was that
20 President Stone turned Ms. Stone in, despite its
21 duty as the exclusive bargaining representative, to
22 treat all employees and protect all employees.
23        She turned Ms. Carter in, and in her
24 complaint, Exhibit 66, she's turning her in because
25 Ms. Carter sent her videos about a march she

Page 1499

1 participated in.
2        She talks about the Women's March.  She
3 says that the march that TWU participated in.  And
4 she turns her in for that.
5        She also turns her in for, quote, unquote,
6 "religious comments" she made.  And she gives these
7 posts that Ms. Carter sent her, these videos that
8 Ms. Carter sent her of -- of the aborted babies.
9        She, President Stone, enumerates all of
10 the policies that she thought that Ms. Carter had
11 violated.  She's -- she's taking these posts to
12 Southwest management as someone who engages
13 Southwest management ordinarily to negotiate
14 clemency for employees.
15        But rather than negotiate clemency for
16 employees, this time, in her official capacity,
17 she's trying to have the employee be fired.
18        As for the religious discrimination claim,
19 again, Exhibit 66, Ms. Stone's complaint is turning
20 Ms. Carter in explicitly for her religious comments.
21        Now, that is, per se, disparate treatment
22 from all other represented employees because the
23 union, how is it supposed to treat all non-Christian
24 employees?  Well, how does it treat all
25 non-Christians employees?  It doesn't turn them in,

Page 1500

1 it represents them.  But Ms. Stone is turning in
2 Ms. Carter because of her, quote, unquote,
3 "religious comments," and the videos of the aborted
4 babies.
5        Let me see just if I missed anything here
6 in my notes.
7        I guess I just reiterate, too, that these
8 Facebook videos and messages are all RLA-protected
9 activity.  She's talking about the recall.  She's
10 talking about how objector fees are being spent at
11 the Women's March.  She's talking -- Ms. Carter is
12 talking about what the union did, how it represented
13 employees at the Women's March.  She's talking about
14 a union event, and how they participated in the
15 union event, and she's criticizing the event, which
16 is her right.
17        So for all of those reasons, I oppose
18 their motion for directed verdict and I think the
19 Court should reject it.
20        THE COURT:  Thank you, Mr. Gilliam.
21        Okay.  So thank you for the arguments.
22 What I will do at this point is I will deny the
23 motions.  I never state my reasons why.  I wish I
24 could.  I have got plenty of reasons for that, but
25 it is unwise of me if I start going into the reasons

Page 1501

1 why I deny your motions.
2        So what I think I should do is let y'all
3 take a short break to regroup for the handing of the
4 baton over.
5        Who is going to go first?  It is you going
6 first, Mr. McKeeby?
7        MR. McKEEBY:  Yes.
8        THE COURT:  Okay.  So you can get your
9 witness ready.  Who are you going call to first?
10        MR. McKEEBY:  I am going to call Maureen
11 Emlet first.  And I'm kind of having to make some
12 decisions about witnesses somewhat on the fly, as I
13 know --
14        THE COURT:  Yes, sir.
15        MR. McKEEBY:  -- Carter's counsel as well.
16 We have got two other witnesses who will be here.  I
17 think I'm going to call the shorter witness first,
18 with the thought that we may or may not get -- that
19 would be Ms. Hudson.
20        THE COURT:  Okay.
21        MR. McKEEBY:  She would go after
22 Ms. Emlet, assuming she's here on time -- or here
23 when we need here.  And if she's not, then we will
24 call Mr. Schneider.
25        But those -- their order will depend on --

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 438 of 642   PageID 11379
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1502..1505

Page 1502

1  on kind of the length of things.
2          THE COURT:  All right.  That makes sense.
3  So what we can do is, then, let's go ahead and take
4  maybe an eight-minute break.  When we come back, if
5  you want to go ahead and have Ms. Emlet on the
6  stand, then that's fine.  You can be at the podium.
7  And then I will let you haul off and get started.
8          And then I will let Union question all of
9  these witnesses second.
10         And then we will go to you third,
11 Mr. Pryor, for examination of Southwest witnesses.
12         Does that make sense?
13         MR. PRYOR:  What are we doing?
14         THE COURT:  Okay.  Any other questions
15 before we take our eight-minute break?
16         Okay.  I will see y'all back here --
17         Yes?
18         MR. McKEEBY:  I do intend to introduce the
19 Exhibit 147 through Ms. Emlet.
20         THE COURT:  Through Emlet.
21         MR. McKEEBY:  Right.  So I don't know if
22 that is an issue we want to take up after the break
23 or now.
24         THE COURT:  Let's go ahead and try to talk
25 through it now.  So 147 is the exhibit that, on

Page 1503

1  Friday, you told them that you wanted to put into
2  evidence.
3          MR. McKEEBY:  Right.
4          THE COURT:  So tell me why you think it is
5  proper, and I will hear their objection.
6          MR. McKEEBY:  Sure.  I mean, it is --
7  basically, what happened was, that there are --
8  apparently unbeknownst to me until recently --
9  different versions of the bullying and hazing
10 policing policy.  And the document that we had as an
11 exhibit was not the same version of the policy that
12 Mr. Schneider used at the fact-finding meeting, in
13 which he considered in connection -- it is relevant
14 or it came up because of this -- the language about
15 cyberbullying.
16         That is not in the exhibit that we
17 provided to the Court and so -- it is in the actual
18 policy that Mr. Schneider went over with Ms. Carter
19 at the fact-finding meeting.  And it was simply a
20 matter of I didn't realize that there was a separate
21 version of the document.
22         And so once I found that out, realized
23 that, then I advised counsel for plaintiff that,
24 hey, we have got an older version that is the
25 exhibit.  The correct version is what is Exhibit

Page 1504

1  147, and we would ask that be allowed to use that.
2          And I understand that it may mean that
3  they need to question Mr. Schneider or Ms. Emlet
4  about the policy and cross-examine him about that.
5  And I don't think they should be, you know, punished
6  in terms of their time on that.  So I'm willing to,
7  you know, entertain that, certainly as -- as a
8  concession.
9          But that is the right policy and it should
10 be in front of the jury for them to make the, you
11 know, most informed decision that they can.
12         THE COURT:  Understood.  Response?
13         MR. PRYOR:  Your Honor, I have a document
14 I would like to mark for the Court to look at.
15 Should I call it Appendix 1 or how would you like
16 to -- I would like it to be part of the record.
17         THE COURT:  Part of this record, but not
18 part of the -- what the jury --
19         MR. PRYOR:  Correct, your Honor.
20         THE COURT:  Sure.  I'm happy for you to
21 mark it as Appendix 1, and then you can bring it up
22 to Mr. Frye -- yeah, let's call it Court Exhibit 1,
23 maybe.
24         MR. PRYOR:  I put Appendix 1 up here.
25         I'll have him rewrite Court Exhibit 1 on

Page 1505

1  it, and then --
2          May I approach, your Honor?
3          THE COURT:  You may.
4          MR. PRYOR:  It is an email we received
5  before the trial began in this case in which
6  Southwest Airlines listed their exhibits.
7          One of the exhibits they listed, and I
8  attached the exhibit, is Exhibit 13.  That is the
9  workplace bullying and hazing policy.
10         And prior to trial -- three days before
11 trial -- we had a few exhibits that we sought to
12 add, and Southwest and the union took the position
13 that was prejudicial.  We ended up being able to
14 utilize those exhibits.
15         This was an exhibit that was utilized at
16 trial, and was certainly a large part of my
17 examination of Mr. Schneider focusing on the
18 workplace issue in that policy.
19         And focusing on the fact there was nothing
20 about cyberbullying in it.
21         And I did this based on this is the policy
22 they put forward.  So I questioned about their
23 policy.  Now they are saying, no, it is the wrong
24 policy.  And it is highly prejudicial to us at this
25 point to now admit it after we have examined the

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 439 of 642   PageID 11380
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1506..1509

Page 1506

1  witness and the evidence has come in.
2         Counsel is telling you that, well, the
3  truth of it, it is -- there is a more updated
4  policy.  And I'm all for getting to the truth, but
5  their opportunity to do that came before they listed
6  their exhibits.  It certainly came at the time I was
7  questioning the witness about it, and they didn't
8  raise it then.  So changing the exhibit in the
9  middle of the trial we find prejudicial.
10        And, your Honor, I move for the admission
11 of Appendix 1.  I'm not even sure that -- I just
12 want to -- if you need authentication from me, I'm
13 more than happy to swear to it, is all I'm saying.
14        THE COURT:  I will admit this as Court
15 Exhibit 1 for the purposes of this hearing, not for
16 the purposes of jury evidence.
17        MR. PRYOR:  That's right.
18        THE COURT:  Okay.  So what I'm going to do
19 is, I'm going to think about this over our
20 eight-minute break, come back, and I will tell you
21 what I'm going to do with Exhibit 147 one way or
22 another.
23        MR. McKEEBY:  Can I raise one other issue,
24 your Honor?
25        THE COURT:  You may.

Page 1507

1         MR. McKEEBY:  The exhibit -- or, rather
2  the policy with the cyberbullying concept language
3  is set forth in the fact-finding meeting on -- at
4  Exhibit 198.15, where he goes over -- Mr. Schneider
5  goes over the policy with the plaintiff and
6  discusses --
7         MR. PRYOR:  What exhibit?
8         MR. McKEEBY:  It's 98.15.  98.15.  And
9  so it references -- he's quoting from the policy --
10        MR. PRYOR:  May I --
11        MR. McKEEBY:  Okay.  Yeah, sure, sure.
12        He's quoting from the policy that is at
13 147, and it references cyberbullying.  So it is in a
14 document that both sides admitted -- or requested as
15 an exhibit that was introduced already and
16 introduced through plaintiff's witnesses.
17        MR. PRYOR:  That --
18        MR. McKEEBY:  So this was already in --
19 this was in the record, and it is clear that he's
20 talking about this updated version of the policy.
21        So they can examine him and cross-examine
22 him about -- about the previous policy.  And advise
23 the jury on that, but the jury should hear the right
24 policy.
25        MR. PRYOR:  I understand the last

Page 1508

1  argument, but the argument he just made to support
2  it, I don't think does.  This is someone's
3  handwritten notes.  She's testified she doesn't
4  recall them going over this with -- with her at all.
5  She's testified they didn't talk to her about it.
6         Somebody's notes, and who wrote "including
7  cyberbullying" still doesn't state that that is what
8  the policy said.  They don't say that this is the
9  cyberbullying policy.  They are saying, you are
10 violating cyberbullying.
11        So I don't find someone's notes to
12 overcome what they have said their policy is, and
13 that we questioned their witness about.  I just
14 think it -- I get it, but it is just -- if we were
15 before trial, fine.  But during trial, after I have
16 questioned the witness with a document they listed
17 that is their policy, I have a problem with it.  Can
18 we correct it with some time and cross?  That I
19 think it is prejudicial.
20        MR. McKEEBY:  One other point, your Honor.
21 Counsel for Carter indicated that defendants,
22 plural, objected to the supplemental exhibits that
23 Ms. Carter tried to file -- or did file prior to
24 trial that the union did object, Southwest did not
25 object.  So I would like to point that point.

Page 1509

1         MR. PRYOR:  You did not object?
2         MR. McKEEBY:  I did not.
3         MR. PRYOR:  Okay.  I stand corrected,
4  then.  I see an objection from the union.  You
5  didn't join?
6         MR. McKEEBY:  No.
7         THE COURT:  Understood.  Okay.  I get the
8  arguments.  So let's come back at 2:26.  We will
9  tell the jury 2:26 is when we are coming back on.
10 And I will give y'all the ruling on 147 before we
11 put Emlet on the stand.
12        MR. McKEEBY:  Thank you.
13        THE COURT:  Well, you can put Emlet on the
14 stand.  I will give you the ruling.  That will be
15 fine.
16        THE COURT SECURITY OFFICER:  All rise.
17        (Recess.)
18        THE COURT SECURITY OFFICER:  All rise.
19        THE COURT:  Y'all can be seated.
20        Okay.  So here's my ruling on 147.  On
21 147, I'm more focused on good cause than prejudice.
22 Here is why:  Once we cross the threshold of trial
23 and we are into trial and it is an exhibit that we
24 have talked about with a witness already, then I am
25 fixated more on what good cause is, and then we get

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 440 of 642  PageID 11381
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                    Pages 1510..1513

Page 1510

1 to prejudice next.
2        I think page 15 of document number 98,
3 shows me that really Southwest was on notice back in
4 2017 of what the right policy was at the time that
5 it was being used with Ms. Carter.  So I don't see a
6 good cause basis to let it in at this point.
7        So part of this, I have been trying to
8 think of create ways separate and apart from, you
9 know, timing and not counting that against them, but
10 I really still can't get past the good cause
11 threshold.
12        So with that, I'm going to keep out
13 Exhibit 147.  You can still move for its admission
14 with the jury in the box.  That is totally fine.
15        MR. McKEEBY:  Okay.  Thank you, your
16 Honor.
17        THE COURT:  Okay.  So we should call in
18 the jury, and then we will stand up and swear you in
19 once the jury is here.  All rise for the jury.
20        (The jurors entered the courtroom.)
21        THE COURT:  All right.  You can be seated.
22        And now we pass the baton and the case
23 over to Southwest Airlines.
24        So, Mr. McKeeby, you can call your first
25 witness, which you have graciously already done for

Page 1511

1 me.
2        MR. McKEEBY:  Southwest calls Maureen
3 Emlet.
4        THE COURT:  Okay.  Ms. Emlet, can you
5 stand up?  And we are going to have Mr. Frye
6 administer the oath to you.
7        (MAUREEN EMLET was duly sworn by the
8 Clerk.)
9        THE COURT:  Okay.  So, Ms. Emlet, I'll
10 just ask for there to be some space between any
11 lawyer's questions of you and your answers.  And
12 then space -- they can afford the same courtesy,
13 space after your answer, before the question.  That
14 way, if there is an objection, I can rule on it
15 before you answer your question.
16        THE WITNESS:  Okay.
17        THE COURT:  Okay.  You may proceed.
18        DIRECT EXAMINATION
19 BY MR. McKEEBY:
20 Q.  Can you state your name for the record?
21 A.  Maureen Emlet.
22 Q.  Where do you reside, Ms. Emlet?
23 A.  Aurora, Colorado.
24 Q.  How are you currently employed?
25 A.  I'm retired from Southwest Airlines.

Page 1512

1 Q.  When did you retire?
2 A.  December 31st of 2019.
3 Q.  And when you worked for Southwest, where did
4 you reside?
5 A.  In multiple locations; my last residence was in
6 Dallas, Texas.
7 Q.  And how long a period of time did you work for
8 Southwest Airlines?
9 A.  Twenty-one years.
10 Q.  What was your position with Southwest Airlines
11 in -- I'm sorry, February of 2017?
12 A.  I was a manager of labor relations.
13 Q.  What did you do as a manager of labor
14 relations?
15 A.  My focus was on working with in flight group or
16 the flight attendant group.  I was responsible for
17 ensuring that the contract was being applied
18 correctly with the flight attendants as well as
19 different company policies.  I would work very
20 closely with base managers and base representatives
21 in determining whether or not any violations had
22 been -- been made or -- either on the flight
23 attendant side or the company side.
24 Q.  Okay.
25        You mentioned a couple of concepts there that I

Page 1513

1 want you to explain a bit more to the jury.
2        When you say "the contract was applied
3 properly," what contract do you mean?
4 A.  The Collective Bargaining Agreement between TWU
5 556 and Southwest Airlines.
6 Q.  And you indicated that you communicated or
7 coordinated with the base managers?  What is a base
8 manager?
9 A.  Southwest Airlines has several different bases,
10 or hubs, locations that flight attendants reside,
11 and their trips originate in or out of that
12 location.
13        It is called a base.  And the manager would be
14 responsible for overseeing the group of flight
15 attendants who were assigned to that base.
16 Q.  Thank you.
17        I think you also indicated something about a --
18 you said something about violations of policies.
19 Can you expand on that just a little bit?
20 A.  Yes.  In addition to the flight attendants
21 being held to abide by the contract and the flight
22 attendant work and conduct rules, there are also
23 company policies that apply to all employees of
24 Southwest Airlines.
25 Q.  Now, were there particular company policies

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 441 of 642   PageID 11382
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1514..1517

Page 1514

1 over which you had responsibility or oversight?
2 A.  Yes.  I had responsibility to make sure that
3 they were being enforced properly, including the
4 social media policy, the workplace bullying and
5 hazing policy, the mission statement; multiple
6 company policies.
7 Q.  Okay.  We will get to some of these policies
8 here directly.
9    Are you familiar -- well, before we get to
10 that, now, were you ever a flight attendant for
11 Southwest?
12 A.  Yes, I was.
13 Q.  For how long a period of time?
14 A.  Ten months.
15 Q.  When was that?
16 A.  In 1998 to '99.
17 Q.  Okay.  Were you a member of the union at that
18 time?
19 A.  Yes, I was.
20 Q.  Was that the Local 556?
21 A.  Yes.
22 Q.  All right.  Now I will transition.
23    Are you familiar with the plaintiff in this
24 case, Charlene Carter?
25 A.  Yes.

Page 1515

1 Q.  You recognize her?
2 A.  Yes.
3 Q.  How do you recognize her?
4 A.  I was involved at the arbitration for
5 Ms. Carter's claims.
6 Q.  When you say you were involved, were you a
7 witness?
8 A.  I was a witness, yes.
9 Q.  Were you cross-examined by her lawyer?
10 A.  Yes, I was.
11 Q.  Did you have some responsibility in connection
12 with Ms. Carter's -- or the complaints against
13 Ms. Carter?
14 A.  My responsibility began when I was first
15 notified of alleged violations, and during the
16 investigation process, prior to the determination
17 for the discipline for her violations.
18 Q.  And do you recall how you first became aware of
19 Ms. Carter's case?
20 A.  Yes.
21 Q.  Not the lawsuit, I'm talking about the
22 complaint.  How did you first become aware?
23 A.  I believe the first I knew of it was when our
24 employee relations specialist sent copies of videos
25 and screen shots that Ms. Carter had sent to

Page 1516

1 Ms. Audrey Stone.
2 Q.  Did you know who Ms. Stone was?
3 A.  Yes.
4 Q.  And who was she?
5 A.  She, at the time, was the union president for
6 Local 556.
7    MR. McKEEBY:  Can you pull up Exhibit 83?
8 Move to admit Exhibit 83.
9    THE COURT:  Eighty-three.  Any objections
10 on 83?
11    MR. HILL:  No objections.
12    THE COURT:  Okay.  83 is admitted and you
13 can publish.
14    MR. McKEEBY:  Okay.  So publishing to the
15 jury.
16    (The referred-to document was admitted in
17    Evidence as Trial Exhibit 83.)
18 BY MR. McKEEBY:
19 Q.  Where are you on this email, if you can take
20 a -- just a moment to -- I think I see you, but I
21 will let you direct me.
22 A.  My name is at the very top, from Maureen Emlet.
23 Q.  Okay.  Below it, do you see your name as well?
24 It looks like you got a message from Ms. Gutierrez?
25 A.  Yes.  Originally -- well, it is a whole email

Page 1517

1 thread.
2 Q.  Right.
3 A.  But just below the first paragraph, you can see
4 that Denise Gutierrez had sent the -- this email
5 thread to me.
6 Q.  Right.  And if you go to the next page, 83.2,
7 this is the second page of the thread, correct?
8 A.  Yes.
9 Q.  And do you understand that to be Ms. Stone's
10 complaint that was forwarded to you?
11 A.  Yes.
12 Q.  Okay.  Tell the jury who Denise Gutierrez is.
13 A.  She was one of the employee relations
14 investigators at the time.
15 Q.  And so you were in labor relations though,
16 correct?
17 A.  Yes.
18 Q.  Explain to the jury what the difference at
19 Southwest was between employee relations and labor
20 relations.
21 A.  Labor relations dealt with the Collective
22 Bargaining Agreement, that would be specific to that
23 work group.  So in my capacity, I worked mainly with
24 flight attendants and ensuring that their contract
25 was being upheld.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                  Pages 1518..1521

Page 1518

1    Employee relations dealt with cases of
2  discrimination and, I think, they had -- I think
3  they oversaw the social media policy.  I'm not sure
4  exactly which policies.
5    But they -- they would investigate to see
6  whether or not there was any violation of a
7  protected category.  And then I worked with the
8  bases to see if there was any -- any need or any
9  substance to the allegation that would result in
10 discipline.
11 Q.  So it doesn't look like Ms. Gutierrez said
12 anything to you in her email, but do you recall that
13 she forwarded you the videos?  Or not?
14 A.  Yes.  At first she called me, I believe that
15 morning, and then she forwarded to me the videos as
16 well as some screen shots and still shots.
17 Q.  And am I reading this correctly that you then
18 forwarded those to Ms. Shaffer and Ms. Grant?
19 A.  That's correct.
20 Q.  Let's talk about each of those individuals.
21    Who is Ms. Schaffer?
22 A.  Tammy Schaffer was my director of labor
23 relations at the time.  And Brianna Grant was the
24 senior manager.
25 Q.  And were you sending the -- did you forward the

Page 1519

1  videos to them as well as the chain?
2  A.  Yes, I did.
3  Q.  And why did you do that?
4  A.  There were a couple of reasons.  One,
5  Ms. Schaffer had asked that she be copied in and
6  notified of any potential social media violations.
7  Also, due to the seriousness of the content, I
8  wanted to make sure that my bosses were aware of --
9  of what was going on.
10 Q.  Okay.  And I guess maybe I didn't understand
11 your testimony.
12    Were those the two people to whom you reported
13 or -- is that why you call them your bosses?
14 A.  Yes.  So Brianna Grant was my direct boss, and
15 then Tammy Schaffer -- Brianna reported to Tammy.
16 Q.  And in your email, it looks like you have some
17 discussion about the crux of Audrey -- Audrey
18 participated in the Women's March in DC in January.
19 Do you see that part of the email?
20 A.  Yes.
21 Q.  Where did that come from.
22    You can take it down.
23 A.  That was from having conversation with
24 Ms. Gutierrez, and also reviewing the contents of
25 the emails -- I'm sorry, not emails -- but the

Page 1520

1  Facebook posts that were sent to me.
2  Q.  And did you also -- did you also review
3  Ms. Stone's complaint?
4  A.  I did.
5  Q.  Now, prior to being involved in the
6  investigation, had you ever met Charlene Carter?
7  A.  No.
8  Q.  Had you had any experience with her?
9  A.  No.
10 Q.  Did you watch the videos?
11 A.  I did.
12 Q.  Where were you when you watched the videos?
13 A.  I was at my desk in the office.
14 Q.  And is that in Dallas?
15 A.  Yes, it is the Southwest headquarters here in
16 Dallas.
17 Q.  Okay.  What was -- what was your reaction when
18 you watched the videos?
19 A.  I felt physically ill.  I had -- I had never
20 really received anything like that.  I actually -- I
21 had to get up from my desk and exit the building.
22 And I walked around the building several times
23 before I came back in.
24 Q.  How many laps did you do?
25 A.  I think I did two.  It is a pretty big

Page 1521

1  building.
2  Q.  Talking about the corporate headquarters?
3  A.  Yes.
4  Q.  Do you remember what you did when you returned
5  to your desk?
6  A.  Yes.  I reread the content that had been sent
7  to me and then forwarded it to my direct leaders.
8  Q.  And that is what you did in the document that
9  we just looked at?
10 A.  That's correct.
11 Q.  Those leaders being Ms. Schaffer and Ms. Grant?
12 A.  Yes.
13 Q.  Now, I think you have done this somewhat, did
14 you have involvement in the investigation of the
15 complaint?
16 A.  I did.
17 Q.  Can you describe generally for the jury what
18 you did in connection with the investigation, kind
19 of the steps that you took?
20 A.  Yes.  Once I received the content from
21 Ms. Gutierrez, I also went to Ms. Carter's Facebook
22 page to verify that this content did, in fact come
23 from that source.
24    I worked with Mr. Ed Schneider, who was
25 Ms. Carter's base manager at the time; and then, of

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 443 of 642   PageID 11384
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1522..1525

Page 1522

1 course, reviewed all of the documents and
2 investigations that he completed and sent to me for
3 review.
4 Q.   And what type of documents and investigations
5 did Mr. Schneider send to you?
6 A.   He sent me the fact-finding notes from
7 Ms. Carter's fact-finding meeting, he sent me the
8 notes from an interview that he had conducted with
9 Ms. Audrey Stone regarding these allegations, and he
10 sent me a synopsis of his investigation as well as
11 his recommendation of how he thought -- what he
12 thought the appropriate discipline would be.
13 Q.   And what was that recommendation?
14 A.   Termination.
15       THE COURT:  Hold on.  There was a hearsay
16 objection.
17       MR. HILL:  Yes.
18       THE COURT:  I will overrule that.
19 BY MR. McKEEBY:
20 Q.   It means you can answer.
21 A.   He recommended termination of employment for
22 Ms. Carter.
23 Q.   We will get back to that.
24       Did you review Ms. Carter's flight records in
25 connection with your investigation?

Page 1523

1 A.   Yes, I did.
2 Q.   Why did you do that?
3 A.   Because that was standard practice in any
4 investigation, would be to review the -- the file,
5 the employee file, of the flight attendant for the
6 previous 18 months of active duty, as well as their
7 attendance records.
8 Q.   And what did your -- what did your review of
9 those attendance records reveal with respect to
10 Ms. Carter?
11 A.   I found that Ms. Carter had not worked much
12 during the previous three years.
13 Q.   Was that significant at all or not?
14 A.   Well, it is not unheard of for flight
15 attendants to retain their employment, but give away
16 their trips.  But I thought it was significant that
17 Ms. Carter said that she loved her job, wanted to
18 keep her job, but it appeared that she really didn't
19 work very often.
20       MR. McKEEBY:  Let's pull Exhibit 44.  And
21 Southwest would move to admit Exhibit 44.
22       MR. HILL:  No objection.
23       MR. GREENFIELD:  No objection.
24       THE COURT:  Okay.  Forty-four is in.  You
25 can publish.

Page 1524

1       (The referred-to document was admitted in
2       Evidence as Trial Exhibit 44.)
3 BY MR. McKEEBY:
4 Q.   So are these the -- I know this is one page --
5 but are these the flight records that you
6 referenced?
7 A.   Yes.
8 Q.   So I will tell you that this exhibit has, well,
9 several pages.  But I would like you to kind of walk
10 through the jury so that they can understand the
11 documents -- or the document and what it means.  Is
12 this for, like, a particular month?
13 A.   Yes.  So if you look at the top left of the
14 document, you can see that the employee is Charlene
15 Carter, with her employee number, and she was based
16 in Denver.
17       And then just underneath that, in blue, it says
18 January 17, that is January of 2017.
19       If you continue across from where it says
20 "January 17th," you will see the original credit was
21 supposed to be 92.4 trips.  That is approximately
22 92 hours of flying time.
23       The projected was 0.  And that is because, if
24 you look at the actual calendar page itself, you
25 will see that there is nothing on any of those

Page 1525

1 dates.  That shows that Ms. Carter did not fly any
2 trips during the month of January in 2017.
3 Q.   Okay.  Why don't we go to the next page, 44.2.
4 And what I will do is walk through 2016, and if the
5 jury is interested, I will let them go through the
6 remainder of the document.
7       What does it say -- for what is this document,
8 44.2?
9 A.   This is February of 2017.  Her original trips
10 that she was assigned were -- had a credit of 84.8
11 trips.  However, she did not fly anything during the
12 month of February of 2017.
13 Q.   And I misspoke.  I thought this was 2016.
14 Let's go to the next page, which I think is, if I
15 understand how you are describing these documents,
16 44-point -- it is actually 44.4, I think, if I'm
17 understanding how you are reading the documents, is
18 where we start with 2016, is that correct?
19 A.   Yes, that's correct.
20       So now you can see in the blue, it says
21 January 16th, that is January of 2016.
22 Q.   And what did she do during January of 2016?
23 A.   She did not fly any trips during that month.
24 Q.   What does the "VA" stand for?
25 A.   Vacation.  She had one week of vacation at the

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1526..1529

Page 1526

1 end of December of 2015, and then January of 2016
2 begins.
3 Q.   Okay.  And then the next page, 44.5, is that
4 February of 2016?
5 A.   Yes, it is.
6 Q.   Did she take any trips during that month?
7 A.   No.
8 Q.   Is there another -- is that, the VA, the same
9 for vacation?
10 A.   Yes.  And so up at the top where it says
11 "Projected 26.25," that means she received pay for
12 the vacation days during that month.
13 Q.   I see.
14          MR. HILL:  Objection, on the basis of
15 optional completeness, as Mr. McKeeby skipped past
16 what is labeled as --
17          THE COURT:  Hold on.  That is a speaking
18 objection.  We can come to sidebar if you want.
19          MR. HILL:  No, thank you.
20          THE COURT:  I will overrule, you can
21 continue.
22 BY MR. McKEEBY:
23 Q.   The next page, I think is 44.6.  Is this for
24 March of 2016?
25 A.   Yes, it is.

Page 1527

1 Q.   And how many trips did Ms. Carter take during
2 that month?
3 A.   She flew one day.  If you see at the very
4 bottom of the calendar page, March 27 has those
5 initials on it.  That would be the identifier of the
6 trip that she flew.  And she received 7.10 trips for
7 pay.
8 Q.   What are the letters next to that trip?  Are
9 those airport designations or something else?
10 A.   No.  It just -- it denotes the name of the
11 line.  And also, if you look at the -- where it
12 says/FAC, she was the flight attendant in the C
13 position, which is the designation of what her
14 duties were on the aircraft.
15 Q.   I see.
16          Okay.  The next page, 44.7, appears to be April
17 of 2016.  It looks like there is more activity here.
18          How many trips did she take during April of
19 2016?
20 A.   Well, the trip that is on the top left, that
21 actually happened in March.  Then beginning
22 April 8th, she had vacation.  On April 19th and
23 on -- no, just on April 19th.  She flew a one-day
24 trip, which means she went out somewhere and came
25 back the same day.

Page 1528

1          And then it looks like on April 25th, she had a
2 one-day trip, but called in sick for it.  SLP,
3 stands for sick leave with pay.
4 Q.   I'm sorry, with pay?
5 A.   Yes.
6 Q.   And on 44.8, I think we are now into May.  What
7 does this show in terms of her activity during the
8 month of May of 2016?
9 A.   On May 23rd, she called in sick, and it says,
10 SLT.  That means she called in sick for training.
11          And then she had -- it looks like she left on
12 May 26th and returned home on May 27 for a two-day
13 trip.  And the MSY that is in that rectangle
14 underneath designates that she overnighted in
15 New Orleans.
16 Q.   And MSY is the airport designation for
17 New Orleans?
18 A.   New Orleans, yes.
19 Q.   The next page is 44.9.  We are up to June.
20 What did she do in June for Southwest?
21 A.   From June 8th through 14th, she had another
22 week of vacation.  And then the RTC, she took one
23 day of recurrent training in Colorado.  All flight
24 attendants are required to do a certain number of
25 hours of recurrent training every year.

Page 1529

1 Q.   By the way, how is it that she's getting so
2 much vacation, if she's not working?
3 A.   Because of her seniority, her vacation would
4 continue to accrue whether she worked or not.
5 Q.   Okay.
6          Exhibit 44.10.  What does this show?
7 A.   That is July of 2016.  And she was pulled from
8 a trip on July 9th, 10th and 11th for jury duty.
9 Q.   Okay.  So did she fly at all during that month?
10 A.   No, she did not.
11 Q.   What about the next page, 44.11, which looks
12 like August of 2016, did she fly during that month?
13 A.   No.  She had a week of vacation time, but no
14 flying.
15 Q.   And the next page is 44.12.  What about this
16 month?  What do those entries indicate?
17 A.   She did not fly any trips during the month of
18 September.  On September 1st, there is a designation
19 JS2.  That means she job shared with another flight
20 attendant.  So the Collective Bargaining Agreement
21 gives flight attendants the ability to bid for one
22 month's block of flying time, but split it with
23 another person.
24          So one of them would be responsible for the
25 first half of the month of trips and the other one

Case 3:17-cv-02278-X Document 387-1 Filed 01/02/23 Page 445 of 642 PageID 11386
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1530..1533

Page 1530

1 for the second half of the month of trips.
2 Q.  So do these entries indicate actual flying time
3 by Ms. Carter?
4 A.  There is no flying time in the month of
5 September.
6 Q.  What about October, on page 44.13?  Is there
7 any flying time for Ms. Carter during that month?
8 A.  No.
9 Q.  Is there vacation time?
10 A.  Yes, there is one week of vacation, but no
11 actual flying.
12 Q.  And 44.4 -- I'm sorry -- 14, takes us into
13 November.  Is there any activity on -- in that
14 month?
15 A.  There is no flying and no vacation in November
16 of '16.
17 Q.  And what about in December on 44.15?
18 A.  There is no flying in December.
19      MR. McKEEBY:  Okay.  You can take that
20 down.
21 BY MR. McKEEBY:
22 Q.  I think earlier you indicated that one of the
23 things that you did in connection with your role in
24 the investigation was to review Ms. Carter's
25 Facebook page?  Did I understand that correctly?

Page 1531

1 A.  Yes.
2 Q.  What was your purpose in doing so?
3 A.  One, I wanted to see -- to verify that the
4 screen shots and videos that had been sent to me
5 actually came from Ms. Carter's Facebook page.
6 Also, to see if she had identified herself as a
7 flight attendant on her Facebook page, a Southwest
8 Airlines flight attendant.
9 Q.  And why was that important?
10 A.  Because that would create a nexus to the
11 workplace.
12 Q.  Let me direct your attention to Exhibit 90, 90,
13 which I think is already in evidence.
14      MR. McKEEBY:  Is that correct, your Honor?
15      THE COURT:  That's correct.
16 BY MR. McKEEBY:
17 Q.  Exhibit 90 has already been published to the
18 jury.  What is this document?
19 A.  This is a document that originated from Denise
20 Gutierrez, and then I forwarded it to my leaders,
21 Tammy Schaffer and Brianna Grant.
22      I sent them the -- the videos and posts that
23 Ms. Gutierrez had sent to me.
24      In addition, I attached some posts that I
25 had -- some screen shots that I had taken from

Page 1532

1 Facebook that showed the connection between that
2 Ms. Carter's Facebook page and her being identified
3 as a Southwest Airlines flight attendant.
4 Q.  And where did you do that?  Is that something
5 that you did -- are those the attachments?
6 A.  Yes.
7 Q.  I'm sorry.  What are those -- what did you
8 understand those attachments to be?
9 A.  Off the top of my head, there were photos of
10 Ms. Carter in her Southwest Airlines uniform, there
11 were -- there was a photo of her, I believe she was
12 in street clothes, with her Southwest Airlines ID
13 around her neck.  And I think there were multiple
14 photos of her in the uniform and on the Southwest
15 Airlines's aircraft.
16 Q.  And is that what you mean by the phrase "nexus"
17 in this email -- and I think you mentioned it in
18 your testimony today?
19 A.  Yes.
20 Q.  And why was that important to Southwest?
21 A.  Because part of the social media policy also
22 specifies that the -- and it is in the mission
23 statement, I believe -- that the public image that a
24 flight attendant projects can enhance or harm the
25 public image of Southwest Airlines.

Page 1533

1 Q.  How would it enhance or harm the public image
2 of Southwest Airlines?
3 A.  Well, specific to Ms. Carter, she had the
4 abortion videos on her Facebook page.  So that could
5 be very offensive to any customers who were viewing
6 those posts.
7 Q.  I would like to spend a little bit of time
8 talking about some of the policies that you
9 referenced.
10      MR. McKEEBY:  Can we go to Exhibit No. 11?
11 BY MR. McKEEBY:
12 Q.  Do you recognize this document?
13 A.  Yes.
14      MR. McKEEBY:  I would like to move -- or
15 Southwest would move for the admission of
16 Exhibit 11.
17      MR. HILL:  Objection, relevance.
18      THE COURT:  All right.  I'm looking.  All
19 right.  Anything from the union?
20      MR. GREENFIELD:  No objection.
21      THE COURT:  I will overrule that, and
22 admit 11.  You can publish.
23      (The referred-to document was admitted in
24 Evidence as Trial Exhibit 11.)
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 5 July 11, 2022                  Pages 1534..1537

Page 1534

1 BY MR. McKEEBY:
2 Q.  Can you explain to the jury what this document
3 is?
4 A.  Yes, this is a page from the flight attendant
5 manual.  And it is a copy of the Southwest Airlines
6 mission statement.
7 Q.  And can you generally describe the mission
8 statement?
9 A.  Yes.  The beginning of the mission statement
10 discusses that we are dedicated to the highest
11 quality of customer service.  The second paragraph
12 is specific to external customers.  It talk -- well,
13 actually, the second paragraph, it states here, that
14 it is displayed in many different places.
15      And I think that the part that was specifically
16 pertinent to Ms. Carter's case is the last paragraph
17 here that says, we are committed to provide our
18 employees a stable work environment.  And then, when
19 you go down to the last line, it states, above all,
20 employees will be provided the same concern, respect
21 and caring attitude within the organization that
22 they are expected to share externally with every
23 Southwest customer.
24 Q.  And why was that particularly pertinent to
25 Ms. Carter's situation?

Page 1535

1 A.  Because the allegations that were brought
2 against her were of one employee reporting that she
3 had not been treated with respect or care, that she
4 had been attacked verbally.
5 Q.  Now, my understanding, and I think you
6 mentioned, is that Ms. Stone was the president of
7 the Union at the time.  Is that correct?
8 A.  Yes.
9 Q.  Did that matter to you in connection with your
10 role in the investigation?
11 A.  No.  It did not.  Ms. Carter --
12 Q.  Why not?  Why not?
13 A.  Ms. Carter was first and foremost an employee
14 of Southwest Airlines.
15 Q.  Did you Ms. Stone?
16 A.  I'm sorry, Ms. Stone.
17      As well as Ms. Carter.  But Ms. Stone was first
18 and foremost an employee of Southwest Airlines.  And
19 it says right there, we are committed to provide our
20 employees, not just one or two, but all of them.
21 Q.  And how do employees at Southwest Airlines have
22 access to this mission statement?
23 A.  The mission statement is posted in multiple
24 places.  It is posted in, of course, all of our
25 headquarters, at the different locations where --

Page 1536

1 where we fly, in the flight attendant lounges.  And
2 also it is -- this specific copy of the document is
3 found in the flight attendant annual, and each
4 flight attendant is required to carry that manual
5 with them.
6 Q.  Okay.  Carry it with them on the flights?
7 A.  Yes.
8 Q.  Let's go to trial Exhibit 7.
9      What is --
10      MR. McKEEBY:  Well, first of all,
11 Southwest moves to admit Trial Exhibit 7.
12      MR. HILL:  No objection.
13      THE COURT:  No objection to 7.
14      MR. HILL:  No objection.
15      MR. GREENFIELD:  No objection.
16      THE COURT:  Seven is in.
17      You can publish.
18      (The referred-to document was admitted in
19      Evidence as Trial Exhibit 7.)
20 BY MR. McKEEBY:
21 Q.  What is this?  Explain to the jury what this
22 document is.
23 A.  This is Southwest Airlines' policy concerning
24 harassment, sexual harassment, discrimination and
25 retaliation.

Page 1537

1      And basically, it outlines what is and is not
2 acceptable, as well as giving some examples of
3 unacceptable behavior concerning harassment, sexual
4 harassment, discrimination and retaliation.
5 Q.  Was this policy implicated in your
6 investigation of Ms. Carter's situation?
7 A.  Yes, it was.
8 Q.  How so?
9 A.  There were -- were multiple ways.  There were
10 certain screen shots that were sent that were of a
11 sexually offensive nature.  There were also what
12 Ms. Stone perceived to be as threats that Ms. Carter
13 sent to her.  And the content of the videos was
14 harassing and intimidating.
15 Q.  The first thing that you mentioned were the --
16 was that the vagina hats?
17 A.  Yes.
18      MR. McKEEBY:  Can you pull up Exhibit 47?
19 BY MR. McKEEBY:
20 Q.  Is this what you were talking about?
21 A.  Yes, it was.
22 Q.  And why was that potentially implicating the
23 policy that we just spoke about?
24 A.  Well, it is sexually harassing, it is sexually
25 explicit.  Even though they are hats, they are

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 447 of 642   PageID 11388
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 5 July 11, 2022                        Pages 1538..1541

Page 1538

1 intended to look like a woman's vagina.
2 Q.   And how do employees at Southwest have access
3 to the -- trial Exhibit 7, the harassment, sexual
4 harassment and discrimination policy?
5        MR. McKEEBY:  You can pull that down.
6        THE WITNESS:  All employees have access to
7 it on SWA life, which is our intranet, and then
8 flight attendants also have a copy of the policy in
9 their manual.
10 BY MR. McKEEBY:
11 Q.   What is the concept of cyberbullying?
12 A.   The concept of cyberbullying would be bullying
13 of one employee to another by the use of social
14 media.
15 Q.   Did you believe that concept was implicated in
16 connection with Ms. Stone's complaint about
17 Ms. Carter?
18 A.   Yes, I did.
19 Q.   How so?
20 A.   Because the complaints that -- or the videos
21 and text messages and other documents that
22 Ms. Carter sent to Ms. Stone were done via, I
23 believe, Facebook instant messaging.
24        MR. McKEEBY:  And at this time, we would
25 like to pull but not publish Exhibit 147.

Page 1539

1        MR. HILL:  Objection.  Same objection we
2 already stated.
3        THE COURT:  Understood.  Are you wanting
4 to show the witness or admit it into evidence?
5        MR. McKEEBY:  I would like to just show it
6 to the witness.
7        THE COURT:  Okay.  You can show it to the
8 witness.
9 BY MR. McKEEBY:
10 Q.   What is this document?
11        MR. HILL:  Objection, testifying from a
12 document.
13        THE COURT:  Sidebar.
14        (Thereupon, the following proceedings were
15        had at sidebar:)
16        THE COURT:  All right.
17        MR. HILL:  He's seeking to get the
18 document in through testimony instead of through the
19 document itself.  We have already got the bullying
20 policy that was in place at the time that Southwest
21 submitted.  That is the bullying policy they have go
22 to work from.  He can't sideline this by getting
23 this other policy in through testimony.
24        MR. McKEEBY:  I'm not going to have her
25 testify as to the contents.  I'm just going to

Page 1540

1 her describe the document, and I'm going to go to
2 the other document.
3        THE COURT:  All right.  I think that is
4 fine.
5        (Thereupon, the sidebar was concluded and
6        the following proceedings were held in open
7        court:)
8        THE COURT:  Okay.  You can proceed.
9 BY MR. McKEEBY:
10 Q.   Can you describe this document?
11 A.   Yes.  This is a portion of a policy.  At the
12 very top of that page, it states, guidelines for
13 employees, the policy and procedure handbook.
14        This is the handbook that is published on SWA
15 Life, our intranet, that all employees have access
16 to.  And it -- it has a copy of the workplace
17 bullying and hazing policy.
18 Q.   And can you tell when this policy was
19 implemented -- or when this version of the policy
20 was put in place?
21 A.   Yes.  So --
22        MR. HILL:  Objection, same objection.
23        THE COURT:  I will sustain this one.
24        MR. McKEEBY:  Let's pull Exhibit 13,
25 please.

Page 1541

1        THE COURT:  It is in.  We can publish.
2 BY MR. McKEEBY:
3 Q.   What is this document?
4 A.   This is an older version of the workplace
5 bullying and hazing policy.
6 Q.   How do you know it is an older vision?
7 A.   Because the revised date is older than the last
8 document that we just saw.
9 Q.   And apart from the language of the policy, can
10 you just generally describe to the jury what
11 Southwest's policy is with respect to bullying and
12 hazing?
13 A.   Yes.  It will not be tolerated in the
14 workplace.
15 Q.   How do employees have access to this policy?
16 A.   It is available on SWA Life.
17 Q.   Again, remind me what S W A life is?
18 A.   The internal -- it is the intranet.  So our
19 internal internet.
20 Q.   Who has access to that?
21 A.   Every employee has access to it.
22 Q.   You weren't here, but there was some testimony
23 about the fact that this is a workplace bullying and
24 hazing policy.
25        Do you see that?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022              Pages 1542..1545

Page 1542

1 A.  Yes.
2 Q.  What does "workplace" mean in that context?
3 A.  Anything that is associated with work, or the
4 employees of Southwest Airlines.
5 Q.  Well, what if an employee sends a threatening
6 message to another employee while they are at home,
7 not on a plane or not working, but to a co-employee
8 while they are home, does that implicate this policy
9 in your view?
10 A.  Absolutely.  In fact, especially in the case of
11 flight attendants, they are a very different
12 workforce.  They don't have an office.  Their office
13 is on the plane or at the hotel.  Many times they
14 are conducting work-like bidding for their trips
15 from home.  And the way that many flight attendants
16 choose to say connected is through social media.
17     When it is one -- one employee to another, they
18 are still coworkers, whether they are physically on
19 the aircraft or not.
20 Q.  And in your investigation of Ms. Carter's case,
21 did you come to any conclusion as to whether or not
22 Ms. Carter violated Southwest's bullying and hazing
23 policy?
24 A.  Yes.  I agreed with Mr. Schneider that this
25 policy had been violated.

Page 1543

1     MR. McKEEBY:  Let's go to Exhibit No. 9,
2 which I don't think has been published.  But
3 Southwest would move to admit trial Exhibit No. 9.
4     THE COURT:  All right.  Any objection to
5 No. 9?
6     MR. HILL:  No objection.
7     MR. GREENFIELD:  No objection, your Honor.
8     THE COURT:  Nine is in.
9     You can publish.
10     (The referred-to document was admitted in
11 Evidence as Trial Exhibit 9.)
12 BY MR. McKEEBY:
13 Q.  Can you explain to the jury what this document
14 is?
15 A.  Yes, this is are the Southwest Airlines
16 employee social media policy.
17     It outlines some -- well, first of all, it
18 gives the expectations of our employees.  And you
19 can see in the second paragraph, the italicized area
20 talks about the content that is in any way later
21 related to Southwest, reflects poorly upon Southwest
22 or impacts the workplace is a violation of the
23 policy, and may result in discipline up to and
24 including termination.
25     The document goes on to give some examples of

Page 1544

1 what is prohibited, and then some examples of social
2 media content that is acceptable.
3 Q.  Okay.  What would be -- what are the
4 consequences of violating this policy by an
5 employee?
6 A.  That it could result in discipline up to and
7 including termination.
8 Q.  And I didn't ask you that question in
9 connection with the previous document, the workplace
10 bullying and hazing policy.  What were the potential
11 consequences of violating that policy?
12 A.  Potential discipline up to and including
13 termination.
14 Q.  Now, does Southwest monitor, independent of any
15 complaint -- you indicated that you reviewed
16 Ms. Carter's Facebook posts, but does Southwest
17 monitor employee Facebook accounts?  Pages, I guess?
18 A.  No.  Not without some complaint being brought
19 against an individual.
20 Q.  In the section towards the bottom that says,
21 monitoring and reporting prohibited conduct, there
22 is language in the second sentence about what
23 employees should do when they become aware of social
24 media content of a certain nature.
25     What should employees do?

Page 1545

1 A.  It states that they should promptly and
2 accurately report such content to Southwest's social
3 media team.
4 Q.  And does Southwest have the expectation that
5 employees will do that?
6 A.  Yes.
7 Q.  And I forgot to ask you, how was this policy
8 made available to Southwest's employees?
9 A.  It is available on SWA Life, the intranet.
10 Q.  And did you come to an assessment as to whether
11 or not Ms. Carter's conduct violated this policy?
12 A.  Yes.  I agreed that her conduct did violate the
13 social media policy.
14 Q.  What are read before fly memorandums?
15 A.  Those are memos that are published with content
16 that is specific to the flight attendant workforce.
17 They are required to read all new read before flies
18 or RBFs, is the abbreviation for them, prior to
19 flying any trips.
20 BY MR. McKEEBY:
21 Q.  And has Southwest published those read before
22 fly memorandums regarding its social media policy?
23 A.  Yes, they have.
24 Q.  If you will go to Exhibit 16.
25     Is that one of those read before fly

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 449 of 642    PageID 11390
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 5 July 11, 2022                    Pages 1546..1549

Page 1546

1  memorandums?
2  A.   Yes.
3        MR. McKEEBY:  Southwest moves to admit
4  Trial Exhibit 16.
5        THE COURT:  No objection.
6        MR. GREENFIELD:  No objection.
7        THE COURT:  Sixteen is in.
8        You can publish.
9        (The referred-to document was admitted in
10       Evidence as Trial Exhibit 16.)
11  BY MR. McKEEBY:
12  Q.   So what does this say about Southwest's social
13  media policy?  It looks like an older document,
14  January of 2013.
15  A.   It is an older document.  As you said,
16  January 11th of 2013, and it states that the social
17  media policy was introduced and is applicable to all
18  Southwest employees, including members of the Board
19  of Directors and contractors.
20       It tells employees to familiarize themselves
21  with the policy, and puts them on notice that
22  mandatory acceptance of the policy would be required
23  beginning the 16th of January, in 2013.
24       Finally, it gives the -- well, actually, these
25  are specific to flight attendants, so it gives the

Page 1547

1  flight attendants the pathway to follow in order to
2  be able to find the entire social media policy.
3  Q.   And so maybe you said this and I missed it, but
4  to whom are these types of memorandums issued to?
5  A.   Read before flies are specific to the flight
6  attendant work group.
7  Q.   Okay.
8        And how are they distributed?
9  A.   I believe at the time that this one was
10  distributed, they were still paper copies.  And the
11  books of memos were kept in each flight attendant
12  lounge.  And then eventually we went electronic, and
13  they were all delivered electronically.
14        MR. McKEEBY:  Thank you.  You can take
15  that down now.
16  BY MR. McKEEBY
17  Q.   Did you make the decision to terminate
18  Ms. Carter's employment at Southwest?
19  A.   No, I did not.
20  Q.   Did you -- do you have a sense of who did?
21  A.   Yes.
22  Q.   And who was that?
23  A.   Mr. Ed Schneider.
24  Q.   And did you consult with him in connection with
25  your perspective on that decision?

Page 1548

1  A.   Yes, I did.
2  Q.   Can you explain to the jury what that involved?
3  A.   Yes.  As I stated earlier, Mr. Schneider sent
4  me all of the information that he had gathered
5  during his investigation, as well as all of the
6  documents he reviewed, the different department
7  representatives that he had consulted with and his
8  recommendation for termination of employment.
9  Q.   And did you agree with that recommendation?
10  A.   Yes.
11  Q.   Why?
12  A.   Because I believed that Ms. Carter's behavior
13  had violated multiple company policies.  I reviewed
14  our case history of other cases that had similar
15  violations, and I determined that what his
16  recommendation was, was in line with what we had and
17  consistent with what -- what discipline had been
18  issued in other similar cases.
19  Q.   Ms. Emlet, are you a religious person?
20  A.   I am.
21  Q.   What are your personal views regarding
22  abortion?
23        MR. HILL:  Objection, relevance.
24        THE COURT:  I will sustain that.
25        MR. McKEEBY:  Your Honor, sidebar.

Page 1549

1        (Thereupon, the following proceedings were
2        had at sidebar:)
3        THE COURT:  She wasn't the terminator.
4        MR. McKEEBY:  She consulted.  She
5  consulted and had input with Mr. Schneider, so I
6  think her views are relevant.  And that is part of
7  the motion in limine ruling that you issued about
8  perspectives of others that were involved in the
9  process, so I should be able to ask her that.
10        THE COURT:  Response.
11        MR. HILL:  In addition to being in
12  admissible, it is irrelevant because her religious
13  views aren't impactful on whether she made this --
14  whether she recommended this decision or approved
15  this decision.
16        It is also a 404 issue, character.  They
17  are trying to say that she wouldn't have issued --
18  she wouldn't have done what she did, if not for her
19  character.  She wouldn't have done something in
20  conformance with her character, by establishing
21  these character questions of her religion and her
22  assistance on abortion.
23        THE COURT:  Response to 404.
24        MR. McKEEBY:  I just don't think that is
25  why it is being used at all.  I mean, it is set

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 450 of 642  PageID 11391
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022              Pages 1550..1553

Page 1550

1 forth in our motion in limine.  And I think her
2 perspective and beliefs are relevant to the ultimate
3 decision because she had some role in communicating
4 and consulting with Mr. Schneider.
5       THE COURT:  Yeah, I think it is relevant,
6 but only because she had a consulting role.
7       MR. McKEEBY:  I'm not going to ask every
8 witness --
9       THE COURT:  Yeah, I think it's off limits.
10 So I get your objection.  I will overrule it for
11 this witness.
12       (Thereupon, the sidebar was concluded and
13       the following proceedings were held in open
14       court:)
15       THE COURT:  Okay.  You can reask that
16 question.
17 BY MR. McKEEBY:
18 Q.  Ms. Emlet what are your personal views
19 regarding abortion?
20 A.  I believe that abortion is wrong and I am pro
21 life.
22 Q.  What is the U.S. Conference of Catholic
23 Bishops?
24 A.  It is a collection of Catholic bishops that --
25 they confer on different issues that are pertinent

Page 1551

1 to the Catholic church.
2       I happen to have a connection with them because
3 they send emails, monthly emails.  I belong to a --
4 a universal prayer group that prays about pro life
5 issues.
6 Q.  What -- Ms. Carter, in this case, has said that
7 she sent those videos as an expression of her -- the
8 videos to Ms. Stone as an expression of her
9 religious beliefs.
10       Do you have a reaction to that?
11       MR. HILL:  Objection, relevance.
12       THE COURT:  I will allow that.
13       THE WITNESS:  I can understand how those
14 videos might reflect what Ms. Carter believes about
15 abortion, but I don't know how they connect to her
16 religious beliefs or why that would be something
17 that she would share with Ms. Stone.
18       MR. McKEEBY:  Pass the witness, your
19 Honor.
20       THE COURT:  All right.  Mr. Greenfield.
21           CROSS-EXAMINATION
22 BY MR. GREENFIELD:
23 Q.  Good afternoon, Ms. Emlet.
24 A.  Good afternoon.
25 Q.  My name is Adam Greenfield, and I'm one of the

Page 1552

1 attorneys who represents the union in this matter.
2       I have a few questions for you.
3       Do employees lose their rights at Southwest
4 Airlines when they become union members?
5 A.  No.  As a matter of fact, being a union member
6 generally gives them additional protection over
7 their personal work rights.
8 Q.  Did Audrey Stone lose her rights at Southwest
9 Airlines to be free from harassment when she became
10 the union president?
11 A.  Absolutely not.
12 Q.  Can you tell the jury a little bit about, in
13 your role, your duty to investigate, if any,
14 complaints?
15       MR. HILL:  Objection, calls for a legal
16 conclusion.
17       THE COURT:  Overruled.  You can answer.
18       THE WITNESS:  Prior to becoming a labor
19 relations manager, I was a base manager for many
20 years.  And in that role, I -- I would be involved
21 in investigating cases when allegations were brought
22 against flight attendants.
23       As a labor relations manager, my role was
24 to work with the base leaders and ensure that --
25 that we were applying the contract consistently, the

Page 1553

1 way that the contract was intended to be applied.
2 And also, that company policies were being followed.
3 BY MR. GREENFIELD:
4 Q.  Do you understand there to be any ramifications
5 if you failed to investigate a complaint?
6 A.  Certainly.  First of all, it would -- it would
7 create disparate treatment.  There could be legal
8 implications if a complaint was brought forward and
9 we did not investigate.
10       But also, it would have a terrible impact on
11 the rest of the workforce, when they see that some
12 people get away some things and other people are
13 held accountable.  We never know whether there is an
14 actual violation, until we complete an
15 investigation.
16 Q.  Based on your experience, would you have feared
17 potential legal ramifications from Ms. Stone, if you
18 had not investigated her complaints?
19 A.  My involvement didn't really involve fear of
20 legal ramifications.  My involvement was earlier on
21 in the investigation, usually, and was more focused
22 on what are we doing in accordance with the
23 Southwest policies, the Collective Bargaining
24 Agreement.
25       And then, if it goes further from there, are

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 451 of 642   PageID 11392
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 5 July 11, 2022              Pages 1554..1557

Page 1554

1 there any -- any legal ramifications?  For instance,
2 if Ms. Stone brought forward allegations of sexual
3 abuse or violation.  That then gets into the legal
4 territory.  But I'm not an attorney, so --
5 Q.  I understand.  Thank you, Ms. Emlet.
6     You mentioned policies.
7     Are you aware of any annual acknowledgement
8 requirement by flight attendants pertaining to
9 policies?
10 A.  Yes.
11 Q.  Can you describe what that is to the jury?
12 A.  Yes.  I would need to see the documents to tell
13 you exactly which policies, but I know that every
14 year, the flight attendants are required to -- they
15 are sent a notice via their laptops -- iPads that
16 they are issued, and the notice is to say that they
17 have read and agreed to comply with the different
18 policies, including the social media policy and I
19 believe the discrimination policy.
20 Q.  Are flight attendants allowed to continue
21 flying if they don't acknowledge those policies and
22 policy updates?
23 A.  They are not.
24 Q.  So in order for Ms. Carter to continue to fly,
25 she would have acknowledged the cyberbullying

Page 1555

1 policy, is that correct?
2 A.  That's correct.
3 Q.  Did the union exert any undue or unwanted
4 pressure during your investigation of Ms. Stone's
5 complaints against Ms. Carter?
6 A.  No.
7 Q.  Did the union exert any undue or unwanted
8 pressure in the decision to terminate Ms. Carter?
9 A.  No.
10     MR. McKEEBY:  Pass the witness.
11     THE COURT:  All right.
12     MR. HILL:  We don't have anything.
13     THE COURT:  What's that?
14     MR. HILL:  We don't have anything.
15     THE COURT:  Okay.  So there is no need for
16 a round two with this witness.
17     MR. McKEEBY:  I do have one question.
18     THE COURT:  Based on his?
19     MR. McKEEBY:  No.  I will do it with
20 another witness.
21     THE COURT:  That works.  So you are
22 excused as a witness.  Congratulations.  Thank you
23 for your testimony.
24     THE WITNESS:  Thank you.
25     THE COURT:  Who do you plan to call next,

Page 1556

1 Mr. McKeeby?
2     MR. McKEEBY:  I plan to call Ms. Hudson
3 next.
4     THE COURT:  Okay.  You may do so --
5 actually, why don't we take a break while you
6 resituate.  We will take our last break of the
7 afternoon.
8     Same instructions:  You can only talk to
9 your fellow jurors and court personnel, just not
10 about the case; can't talk to anyone else; and don't
11 do any research about the case.  We will see you in
12 10 minutes at 3:40.  All rise.
13     (The jurors exited the courtroom.)
14     MR. McKEEBY:  Housekeeping question, may
15 mass Ms. Emlet be excused?  She's --
16     THE COURT:  Yes.  Yes.  Any objections to
17 cutting her loose?
18     MR. HILL:  No objection.
19     THE COURT:  Okay.  Let's cut her loose.
20 That is fine.  And then if you want Ms. Hudson to be
21 on the stand at the end of the break, that's fine
22 too.
23     So we will be back here at 3:40 with
24 Hudson on the stand, you can be at the podium, and
25 we will rock and roll.  Thank you.  See you in nine

Page 1557

1 minutes.
2     (Recess.)
3     THE COURT SECURITY OFFICER:  All rise.
4     THE COURT:  Anything before we get the
5 jury?
6     MR. GILLIAM:  No.
7     THE COURT:  Okay.  Ms. Hudson, welcome.
8 Once they come in, then we will have you stand up,
9 and then Mr. Frye is going to give you the oath.
10     THE WITNESS:  Okay.
11     (The jurors entered the courtroom.)
12     THE COURT:  Okay.  You can be seated.
13     Mr. McKeeby, you called your next witness
14 already.  Can you tell the jury her name?
15     MR. McKEEBY:  Naomi Hudson.
16     THE COURT:  Okay.  Ms. Hudson, can you
17 raise your right hand, and Mr. Frye will swear you
18 in.
19     (NAOMI HUDSON was duly sworn by the
20 Clerk.)
21     THE COURT:  Now you can take a seat.  And
22 then I will say the same thing I do to every
23 witness, I'm just going to ask for some space
24 between questions from lawyers and your answers, and
25 then some space that they give you between your

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 452 of 642   PageID 11393
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1558..1561

Page 1558

1 answers and their questions.  That way, if there is
2 an objection, I can rule on the objection before you
3 launch into an answer.
4        THE WITNESS:  Okay.
5        THE COURT:  You can proceed, Mr. McKeeby.
6        MR. McKEEBY:  Thank you.
7            DIRECT EXAMINATION
8 BY MR. McKEEBY:
9 Q.  Can you state your full name for the jury
10 please?
11 A.  Naomi Hudson.
12 Q.  Where do you live, Mr. Hudson?
13 A.  Carrollton, Texas.
14 Q.  Are you currently employed?
15 A.  I am not.
16 Q.  Where were you previously employed?
17 A.  Southwest Airlines.
18 Q.  How long have you been retired?
19 A.  Two-and-a-half years.
20 Q.  I said retired.  Maybe I shouldn't assume that.
21 Are you retired?
22 A.  I am retired.
23 Q.  What did you do prior to your retirement at
24 Southwest Airlines?
25 A.  Twenty-eight years at Southwest Airlines.  And

Page 1559

1 my most recent position was a senior advisor.  But
2 immediately prior to that, I was senior director of
3 labor relations, including of the flight attendant
4 work group, we call it in flight services or cabin
5 services.
6 Q.  And was that your position, senior director of
7 labor relations -- excuse me -- in February of 2017?
8 A.  Yes.
9 Q.  And can you explain to the jury what you did as
10 the senior director of labor relations?
11 A.  Yes.
12 Q.  What was your job?
13 A.  I will.
14      Well, I was responsible for -- as the lead
15 negotiator for Collective Bargaining Agreement.  And
16 that is our contract, our work group contract with
17 our flight attendants.  I represented Southwest
18 Airlines of the negotiating team as a lead.  I also
19 oversaw the grievance -- any grievance process that
20 had to do with disputes between the company and the
21 union, any grievances filed typically by the union
22 against the company for either contractual
23 provisions or for discipline, up and including
24 termination.
25      I was the liaison and spokesperson for our

Page 1560

1 company in that particular regard, to make sure that
2 we addressed the grievances timely, in accordance to
3 our contract.
4      And what else did I do?  I oversaw a team of
5 people that were responsible for the daily operation
6 of the administration of the contract.  And I was a
7 company liaison between various work groups
8 responsible for -- by work groups, I mean different
9 divisions within the company that had questions
10 regarding our flight attendants and whether or not
11 we could propose certain things for them to do.  So
12 we interpreted the contract for our company.
13 Q.  The jury heard testimony before you from
14 Maureen Emlet.  Do you know Ms. Emlet?
15 A.  I do.
16 Q.  And what was her relationship professionally
17 with you in February of 2017?  Did she report to
18 you?
19 A.  Yes.  I'm trying to remember the dates, because
20 I went back and forth.
21      But in that time period, she would have -- she
22 was a manager, under my responsibilities.  But her
23 immediate boss would have been the director, and the
24 director reported to me.  So Maureen was one of my
25 managers.

Page 1561

1        MR. McKEEBY:  Okay.  Let me pull up
2 Exhibit 66, which is in evidence.
3        MR. PRYOR:  It is not on the list of
4 exhibits, object --
5        THE COURT:  Sixty-six is in already.
6        MR. PRYOR:  I thought we were supposed to
7 reveal the exhibits we were using --
8        THE COURT:  Sidebar, please.
9        MR. PRYOR:  If that is not the case, I'll
10 withdraw.
11        THE COURT:  Okay.  If it is already in, I
12 will let anyone talk about it.
13        MR. PRYOR:  Okay.
14 BY MR. McKEEBY:
15 Q.  Do you believe you are the same Naomi Hudson
16 who is listed on this email?
17 A.  Yes.
18 Q.  Do you remember getting this email?
19 A.  Didn't know I needed to bring my cheaters, but
20 hold on.
21 Q.  Okay.  Sorry.
22        THE COURT:  Thank you.
23 BY MR. McKEEBY
24 Q.  We have some assistance for you.
25 A.  Thank goodness.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 453 of 642   PageID 11394
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                 Pages 1562..1565

Page 1562

1    Yes.
2 Q.   And yes, you remember seeing this?
3 A.   Yes, I do.  I'm sorry.
4 Q.   Now, did you know -- I take it you knew
5 Ms. Stone prior to receiving the email?
6 A.   Yes.
7 Q.   And did you know Ms. Carter, who is in the
8 courtroom today, the person about whom Stone was
9 complaining?
10 A.   No, I'm afraid I didn't.
11 Q.   Okay.
12      Now, what actions would you have taken in
13 response to getting an email like this?
14 A.   Well, this type of -- and I recall it, I don't
15 remember the full context of this particular email,
16 but I do know that this is a complaint about
17 potential harassment and such.
18      And so we have another division within
19 Southwest Airlines that conducts investigations for
20 these types of -- for this type of activity --
21 potential activity or alleged activity.  And so I
22 would ensure that it is referred to them, in
23 addition that somebody from my team -- for example,
24 in Maureen's position -- that was aware of it, so
25 they can ensure that we are within our time frames?

Page 1563

1    Again, as outlined in our Collective Bargaining
2 Agreement.  But we would -- I would make sure that
3 the appropriate folks saw and were aware of this
4 complaint.
5 Q.   And by "appropriate folks," you mean people in
6 departments or --
7 A.   Yes.  The employee relations department, as
8 well as they call -- in my department, my division,
9 not a department -- but my division, of labor
10 relations.
11 Q.   And did you consult with Ms. Emlet in
12 connection with her involvement in this process?
13 A.   I don't recall specifically talking to her.  I
14 probably did.  But to be very specific, I don't
15 remember a specific conversation with her.
16      I'm sure I did, but I don't -- I can't swear
17 that I remember a conversation.
18 Q.   All right.
19      Did you what the -- did you have occasion to
20 watch the videos?
21 A.   I did.  Now, I don't know if it was two or one,
22 but I do recall seeing a video.
23 Q.   What was your reaction when you saw the video?
24 A.   I was a stunned, number one, shocked.  I think
25 pretty saddened and kind of disappointed.

Page 1564

1 Q.   Why were you saddened?
2 A.   Well, we all have our views about things, and
3 that is okay.  Nobody is trying to tell somebody
4 what to think.
5      But we have standards at Southwest Airlines,
6 and we have -- the company ensures that we are
7 treating each other with a measurement of respect
8 and care, and understanding that we are all
9 different.  Diverse work group to say the least, and
10 that is what we want.
11      So when it comes to certain things like this,
12 such graphic, such shocking egregiousness, it is
13 just not acceptable.
14 Q.   And did you have an opinion about the decision
15 to terminate Ms. Carter's employment?
16 A.   Yes.  I did have an opinion.
17 Q.   What was that, what was the opinion?
18 A.   The opinion is --
19      MR. PRYOR:  Object to relevance, Your
20 Honor, she wasn't -- lack of foundation, as to a
21 decision maker.
22      THE COURT:  Sustained.
23 BY MR. McKEEBY:
24 Q.   Let me --
25      MR. PRYOR:  And I apologize.  I'm not sure

Page 1565

1 if an answer got in, if it did, I would move to
2 strike.
3      THE COURT:  No, it didn't.
4      MR. PRYOR:  Okay.  I couldn't hear.
5 BY MR. McKEEBY:
6 Q.   Can you identify this document for the jury?
7 A.   Yes, I can.  That is a required reading.  We
8 call it read before fly at that time.  I think we
9 still -- have another term for it maybe now.
10      But it is a memo from me, it was Naomi Hudson,
11 senior director of labor relations.  And it is
12 regarding social media behavior and policy, and is a
13 reminder only to our -- to our flight attendant work
14 group about the responsibilities, and our
15 expectations as a company.
16 Q.   And this looks it was issued on October 12,
17 2016?
18 A.   Yes.
19 Q.   And do you recall the context of issuing this
20 memorandum or authoring it, I guess?
21 A.   Yes.  Again, reminding our employees of their
22 responsibilities.  And without reading it directly,
23 just that -- that social media is there.  It is
24 there as a tool.
25      And while we are not Pollyanna, we are not

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Pages 1566..1569

Page 1566

1 blind as a company and think that everything is all
2 roses, there is a certain line -- and there is no
3 specific direct line -- but we all know not to just
4 to be rude and hateful.  And just remember that
5 things that are posted on social media, no matter if
6 they are private, they -- they are forever there and
7 they can be passed on to others.
8       And we -- we have -- we can't allow our
9 employees to say something to another employee that
10 is going to impact their work life, not that, oh, I
11 don't like your orange dress today but -- or your
12 flowery jacket, whatever you have on today, but
13 something just so egregious and so gross, we don't
14 allow that type of behavior.  So we are just
15 reminding people of the policies and to definitely
16 review the policy.
17      And if you have questions, of course, you know,
18 we always welcome questions from our employees.  But
19 just as a reminder, that here is what -- we are
20 seeing a lot of reports, let's cut it out.
21 Q.  We are seeing a lot of reports, you said?
22 A.  From various people.  Yeah.  That's -- that
23 would have generated this particular memo.  Not
24 just, you know, I have nothing else to do, so I'm
25 just, you know, write a memo because today it is

Page 1567

1 Wednesday, or whatever day it was.  Probably
2 Tuesday.
3       But because things are going on.  And we have
4 to remind our employees about their behavior and our
5 expectations as a Southwest Airlines employee.  When
6 people sign up to work for Southwest Airlines -- and
7 not a perfect company by far -- but one of the best,
8 I'll tell you that.
9 Q.  What -- go ahead.  I'm sorry.
10 A.  No, but I will tell you, we have expectations.
11 We have high expectations of our employees.  Just
12 the same as our customers have high expectations of
13 the company.
14 Q.   And what are those expectations vis-a-vis
15 employees?
16 A.  Treat people courteous -- I'm sorry.  Do tell
17 me slow down, so I will do that.
18      THE COURT:  It is okay.
19      THE WITNESS:  Treat people with respect,
20 right people the way you would like to be treated.
21 And, you know, without giving the exact, but, you
22 know, we believe in customer service, we believe in
23 a high standard of customer service.
24      And we talk about internal customer
25 service no matter what we are teaching.  We teach it

Page 1568

1 in new hire, we teach it in every year recurrent
2 training, we teach it -- not just teach it, but we
3 talk about it, we engage our employees in what
4 customer service is.
5 BY MR. McKEEBY:
6 Q.  What does that concept of internal customer
7 service mean?
8 A.  It means that because I have a coworker, I'm
9 not going to treat that coworker rudely.  I wouldn't
10 want anybody to treat our paying customers rudely.
11 I am most certainly not going to treat anybody I
12 work with rudely either.  We just don't do that.  It
13 is not acceptable.
14 Q.  And does this document reflect that policy,
15 philosophy?
16 A.  It refers to the -- yeah, I think it does,
17 because southwest Airlines's policies may be found
18 in SWA Life, and that is exactly where we keep our
19 policies.
20 Q.  Let me direct your attention to the second to
21 last paragraph the first sentence, we must all
22 remember.
23 A.  Yeah, our mission statement.  Thank you for
24 pointing that out.
25 Q.  You are welcome.

Page 1569

1       What is the mission statement?
2 A.  It is -- I don't -- I can't quote it right now,
3 but it is to the highest standards of customer
4 service.  We are committed to that for our
5 customers, we are committed to that for our
6 employees.
7       And I will tell you this, some customers -- I
8 mean, a lot of companies have mission statements.
9 Southwest Airlines' mission statement to our
10 employees is equally important as it is to our
11 paying customers.  It just is.
12      And that is ingrained from the day we begin
13 working, the day we fly.  I used to be a corporate
14 recruiter from Southwest Airlines, so I can tell you
15 that I know that for a fact.  That is engrained in
16 applicants.  And we will let them know, if this does
17 not work out for you, this is not the right place,
18 because these are our expectations.
19 Q.  Understood.
20      I want to go up to the second paragraph, the
21 second line, that starts with, when negative
22 comments.  This talks about being detrimental to
23 Southwest brand, and yours as well.
24      What does that mean?
25 A.  Well, you know, we put on -- a lot of people --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                          Pages 1570..1573

Page 1570

1 not we, I take that back -- some people on Southwest
2 Airlines, they are proud to work for the company,
3 they will say their position, and they sometimes put
4 things about their work life. And that is great.
5 And we want to promote that. We want people to know
6 that our employees are not just the one -- the ones
7 behind the uniform, but they are human. They have
8 family, they have activities, travel, and all that
9 such.
10     But when you do something so gross -- for
11 example, this video -- and other things that are
12 just completely gross, that is a reflection on
13 Southwest Airlines. Even though it may be deemed
14 initially as private, not much is very private. In
15 fact, I'm not quite sure anything electronically is
16 private ever. But so it is a negative brand there.
17     But then also, I think about -- and I have
18 talked about this with some of my colleagues -- I
19 wonder about these people that would post something
20 so outrageous as -- I wonder if their family knows
21 that they do this. I mean, their brand, I wonder if
22 their members of their personal clubs or
23 organizations that they belong to, know that this
24 is, you know, the behavior.
25     So that is what we mean by brand, the company's

Page 1571

1 brand and the individual's brand.
2 Q.   And by individuals, you mean employees?
3 A.   Yes.
4        MR. McKEEBY: Pass the witness.
5        THE COURT: Okay. Mr. Greenfield.
6            CROSS-EXAMINATION
7 BY MR. GREENFIELD:
8 Q.   Hello, Ms. Hudson.
9 A.   Hello.
10 Q.   My name is Adam Greenfield, and I'm one of the
11 attorneys that represents Local 556 in this matter.
12 A.   Okay.
13 Q.   A few questions for you.
14     What Audrey Stone became president of the
15 Union, did she lose her rights to be free from
16 harassment as an employee of Southwest Airlines?
17 A.   No, of course not.
18 Q.   Are you aware of any instance in which the
19 union was able to influence how Southwest Airlines
20 conducted an investigation into an employee
21 complaint?
22 A.   No.
23 Q.   Are you aware of any instance in which the
24 union excerpted undue or unwanted that pressure in
25 the decision of Southwest Airlines to terminate an

Page 1572

1 employee?
2 A.   No.
3        MR. McKEEBY: Pass the witness, your
4 Honor.
5        THE COURT: All right. Mr. Pryor.
6        MR. PRYOR: No questions, your Honor.
7        THE COURT: No questions for this witness.
8     Okay. Any questions from Southwest
9 responsive to Mr. Greenfield's questions?
10        MR. McKEEBY: No, your Honor.
11        THE COURT: That means we are done with
12 your testimony. Thank you for coming in. You are
13 excused as a witness.
14        THE WITNESS: Okay, thank you.
15        THE COURT: Any issues with me excusing
16 her as a witness?
17        MR. PRYOR: Can be excused.
18        THE COURT: You may leave the courtroom.
19        THE WITNESS: Thank you. Okay. And can I
20 ask Southwest who the next witness is?
21        MR. McKEEBY: Yes, Ed Schneider.
22        THE COURT: Okay. You may call
23 Mr. Schneider back.
24        (The witness exited the courtroom.)
25        (The witness entered the courtroom.)

Page 1573

1        THE COURT: Okay. Mr. Schneider. You can
2 come back up here to the place you know all too
3 well. Because I let you out as witness last time, I
4 need to put you under oath again. So if you could
5 stay standing, and Mr. Frye will administer the
6 oath.
7        (ED SCHNEIDER was duly sworn by the
8     Clerk.)
9        THE COURT: Okay. And you know the
10 routine, I'm just asking for some space between
11 their questions and your answers, and your answers
12 and their questions so I can rule on objections.
13     You can continue -- well, you can start
14 again.
15        DIRECT EXAMINATION
16 BY MR. McKEEBY:
17 Q.   Okay. I think I'm going to probably cover some
18 stuff -- basic stuff that may have been covered
19 initially, but can you explain who you are to the
20 jury -- remind the jury who you are?
21 A.   My name is Ed Schneider. I am one of the --
22 the base manager for our Denver in flight team at
23 Southwest Airlines.
24 Q.   What does a base manager do?
25 A.   I oversee all of the operation of our in flight

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Pages 1574..1577

Page 1574

1 base, which is 2400 flight attendants that we have
2 in our base.  And I have a staff of 21 that I
3 oversee that takes care of those flight attendants
4 and their daily duties.
5 Q.   Who are the staff of 21, what kind of employees
6 are they?
7 A.   I have 13 supervisors and five coordinators and
8 three assistant base managers that help me run the
9 operation.
10 Q.   And I'm sorry if you -- I don't remember if you
11 mentioned this in your description.
12      Are you specific to in flight operations?
13 A.   Yes.
14 Q.   So do the flight attendants who report to
15 the -- or through the Denver base, I should say, do
16 they report through you?
17 A.   The supervisors are their immediate leader, and
18 then they report to me, yes.
19 Q.   So do you have, like, an office at the airport,
20 or where do you go when you go to work?
21 A.   Yes.  It is in the C concourse where Southwest
22 Airlines operation in the Denver base is located.
23 Q.   How long have you been employed with Southwest
24 Airlines?
25 A.   It will be 28 years this month.

Page 1575

1 Q.   And have you -- have you ever been a flight
2 attendant with Southwest?
3 A.   I have.  I flew as a flight attendant for
4 Southwest for eight and-a-half years.
5 Q.   During what period of time?
6 A.   1996 to 2004.
7 Q.   Excuse me.
8      During that time, were you a member of the
9 Union while you were a flight attendant?
10 A.   Yes, I was.
11 Q.   What did you do before working for Southwest?
12 A.   I worked for Delta Airlines, I worked in their
13 customer service department.
14 Q.   And what about prior to that?
15 A.   Prior to that, I worked for the university that
16 I went to, National University in San Diego and
17 attended college.
18 Q.   Were you in the military ever?
19 A.   I was.  I spent five years active duty in the
20 military and four years reserve.
21 Q.   What branch?
22 A.   Navy.
23 Q.   Now, I think we have established at some level
24 that you were involved in the investigation of
25 complaints made against Charlene Carter?

Page 1576

1 A.   Yes.
2 Q.   Now, did you know Ms. Carter prior to the
3 investigation based on your position as base manager
4 in Denver?
5 A.   No, I did not.  I was in Denver just a short
6 time before this.
7 Q.   When did you start in Denver?
8 A.   January of 2017.
9 Q.   And before that, where were you?
10 A.   Phoenix, Arizona.
11 Q.   So did you have -- had you made any impressions
12 of Ms. Carter prior to the investigation?
13 A.   Not that I'm aware of.
14      MR. McKEEBY:  Let's go to Exhibit 76.
15 This is in evidence.
16      THE COURT:  It is.  We have got the
17 screens un-muted.  The jury can see it.
18      MR. McKEEBY:  Thank you, your Honor.
19 BY MR. McKEEBY:
20 Q.   Is this email how you became aware of
21 Ms. Stone's complaints against Ms. Carter?
22 A.   Yes, part way down the email string, yes.
23 Q.   And if you could remind the jury who -- looks
24 like the original recipient of the email is Suzanne
25 Stephenson.

Page 1577

1      Who is that?
2 A.   She is -- she was the Las Vegas based manager
3 at the time.  And Ms. Stone was based in Las Vegas.
4 Q.   And then it looks like you forwarded the email
5 to employee relations DG, is that -- do I read that
6 correctly?
7 A.   Yes.
8 Q.   Who is DG?
9 A.   That is the entire employee relations group.  I
10 send it to the group and they can decide who the
11 investigator will be in their department.
12 Q.   And in your -- in your email to employee
13 relations, you indicate the images are graphic.
14 A.   Yes.
15 Q.   I take it that means you had seen the video?
16 A.   Yes.
17 Q.   Had you seen one or two videos at that point,
18 if you remember?
19 A.   I don't recall that early in the investigation
20 exactly when I saw both of them.
21 Q.   But it appears from this that you saw at least
22 one of the videos at this point?
23 A.   Yes, that is correct.
24 Q.   And at some point in the investigation, did you
25 see both of the videos?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 457 of 642   PageID 11398
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Pages 1578..1581

Page 1578

1  A.  Yes, I did.
2  Q.  And regardless of when exactly in time you saw
3  the videos, can you explain to the jury your
4  reaction when you -- when you viewed those?
5  A.  I was very disheartened as to why someone would
6  send these graphic images and videos to another
7  employee at Southwest Airlines.
8      It affected me, seeing those images, and I
9  couldn't imagine someone who may have gone through
10 something like that, viewing them at the same time.
11     And I thought they were very disturbing.
12 Q.  What do you mean someone who may have gone
13 through something like that?
14 A.  At the time, I wasn't aware if Ms. Stone would
15 have been through something like that or could have
16 been affected adversely by them.
17 Q.  And -- and did you have -- did you know
18 Ms. Stone prior to being involved in this case?
19 A.  I did not know her.  I knew she was the
20 president of the TWU Local 556.
21 Q.  Had you ever spoken to her?
22 A.  No.
23 Q.  What did you understand Ms. Gutierrez's role in
24 the investigation to be?
25 A.  Ms. Gutierrez is in charge of determining if a

Page 1579

1  harassment, sexual harassment -- any of those -- may
2  violate one of the protected categories.  And her --
3  she will let me know if she feels that was the case.
4  Q.  And did you involve any work groups other than
5  employee relations in the investigation?
6  A.  Yes.  I worked with labor relations also and
7  the human resource business partner.
8  Q.  Who is the human resources business parents?
9  A.  Edith Barnett.
10 Q.  And what was the role of the labor -- who was
11 the labor relations employee?
12 A.  Maureen Emlet.
13 Q.  Did you reach out to Ms. Emlet or did she reach
14 out to you or do you remember?
15 A.  I reached out to her.
16 Q.  What was your purpose in reaching out to
17 Ms. Emlet?
18 A.  I work with labor relations on all of our cases
19 to make sure that we are following the guidelines.
20 Q.  What guidelines do you mean?
21 A.  As far as giving the employee due process and
22 making sure they have their time to share whatever
23 information they have.
24 Q.  What is the context of due process mean to you
25 in that context?

Page 1580

1  A.  It means that someone is given the ability to
2  explain themselves or give details about what may or
3  may not have happened.
4  Q.  Since we are kind of on the topic, in
5  Mr. Pryor's examination of you, there was some
6  testimony about going back further than 18 months
7  with respect to some of Ms. Carter's Facebook posts,
8  do you recall that?
9      MR. PRYOR:  Object to improper direct,
10 that would have been appropriate cross-examination.
11     THE COURT:  That's a speaking objection.
12 I will allow it.
13 BY MR. McKEEBY:
14 Q.  What is the significance of the 18 months?
15 A.  We have rules that we cannot go back more than
16 18 months during a look back at a person's history,
17 to determine whether it is discipline or anything
18 that may have happened in that time frame.  We
19 cannot go back further than 18 months.
20 Q.  Meaning you can't back further than 18 months
21 for what purpose?
22 A.  For -- when we are looking at past history of
23 discipline, or discussions, anything that may have
24 happened with the flight attendant in the past 18
25 years [sic]?  With their work history.

Page 1581

1  Q.  Now did that apply to the review of
2  Ms. Carter's Facebook posts in connection with the
3  investigation?
4  A.  No, it did not.
5  Q.  Explain to the jury why not.
6  A.  The Facebook posts were just indicating a
7  history of what transpired on Facebook, and that
8  wasn't related to the investigation as far as her
9  work history and those things.
10 Q.  Now, did you interview Ms. Stone in connection
11 with your investigation?
12 A.  I did, yes.
13 Q.  What do you recall about that interview?
14 A.  She was affected about those images, and it --
15 it made her feel that she was being targeted.  And
16 she brought up the history of how it transpired and
17 things that have happened to her in the past, and
18 the march, and those type of things that happened.
19 Q.  When you say history of things that had
20 happened to her in the past, what do you mean?
21 A.  The Facebook messages that were sent to her.
22 And kept coming over the past year and a half to two
23 years.  And she was feeling that they progressively
24 were getting worse.
25 Q.  And you said you discussed the Women's March

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 5 July 11, 2022                              Pages 1582..1585

Page 1582

1 during Stone's interview.  Did I understand that
2 correctly?
3 A.  Yes.
4 Q.  What did Ms. Stone say about the Women's March?
5 A.  She said that Ms. Carter was upset about the
6 march.
7 Q.  And did you make any assessments -- I think you
8 alluded to this, but I want to make sure I'm
9 clear -- any assessments during that interview with
10 Ms. Stone on the impact of the videos on her
11 personally?
12 A.  Yes.  She was devastated by them.  She broke
13 down in the discussion with it, and I could tell it
14 affected her to a great extent.  And she was very
15 upset about it.
16 Q.  And I think you said that you reviewed Carter's
17 previous Facebook messages to Ms. Stone.  Do I
18 understand that correctly?
19 A.  Yes.
20 Q.  What was your purpose in reviewing those
21 messages?
22 A.  They were given to me, and I wanted to make
23 sure that I reviewed everything that was given to me
24 for evidence or indicating what may have happened in
25 the past.

Page 1583

1 Q.  Did you ask for those historical messages?
2 A.  When she mentioned them, in the meeting, yes, I
3 asked for those, if she was willing to share them.
4 Q.  You asked Ms. Stone?
5 A.  Yes.
6 Q.  And did she share them?
7 A.  Yes.  She did.
8 Q.  And if we go to Exhibit 94.  Let's go -- just
9 kind of flip through there, if you would.
10     Are these the --
11     THE COURT:  Ninety-four is in evidence and
12 the jury can see this.
13     MR. McKEEBY:  Yes, sorry.
14 BY MR. McKEEBY:
15 Q.  Are these the historical emails that you
16 reviewed?
17 A.  Yes.
18 Q.  And explain to the jury to what degree you
19 considered these emails in connection with your
20 decision to terminate Ms. Stone's employment?
21 A.  It wasn't considered to any great extent, just
22 the history of what had transpired between
23 Ms. Carter and Ms. Stone.  And the fact that there
24 had been prior messages sent, and it wasn't -- it
25 didn't involve the termination decision.  That was

Page 1584

1 all just the images and videos that were sent to
2 Ms. Stone.
3 Q.  I think you told Mr. Pryor that you regarded
4 the emails nonetheless as harassing, is that true?
5     MR. PRYOR:  I object to improper direct.
6 He's referring to my questioning, it should have
7 been on cross-examination.
8     THE COURT:  I'll allow it.
9 BY MR. McKEEBY:
10 Q.  Can you explain to the jury what you meant by
11 that term in connection with these emails -- I'm
12 sorry, Facebook messages?
13     MR. PRYOR:  I apologize, could I get the
14 question, I didn't hear the words used.
15     THE COURT:  You can reask it.
16     MR. PRYOR:  Thanks.
17     MR. McKEEBY:  Can you repeat it?  I'm
18 sorry.
19     (Thereupon, the requested portion was read
20 back by the reporter as above recorded.)
21 BY MR. McKEEBY:
22 Q.  And the term I meant was harassment.
23 A.  Yes.  The fact that they were telling her that
24 she's not fit to do the job, that she will be
25 removed, and there is a group that are going to make

Page 1585

1 sure that she's removed from office, and the fact
2 that it talked about her personally also, inept at
3 her job and those type of things.
4 Q.  And if you go to the first page of this
5 document, it looks like Ms. Stone is sending this to
6 Ms. Gutierrez?
7 A.  Yes.
8 Q.  And then is that you copied on the email?
9 A.  Yes, it is.
10     MR. McKEEBY:  Let's go to Exhibit 50.  And
11 I apologize, I think this is admitted.
12     THE COURT:  I can check.  Fifty is not.
13     MR. McKEEBY:  Move for -- to admit
14 Exhibit 50.
15     THE COURT:  Anything on 50 from union or
16 from Carter.
17     MR. PRYOR:  It is not on their list.
18     THE COURT:  All right.
19     MR. PRYOR:  And I think this is
20 duplicative of a variety of other exhibits too.
21     MR. McKEEBY:  I think it is in evidence in
22 another exhibit, and I just don't have it handy.
23     THE COURT:  All right.  I will let you
24 circle back to it at the end of the testimony.
25     MR. McKEEBY:  Okay.  Let's go to

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1586..1589

Page 1586

1 Exhibit 90.
2        THE COURT:  Any objection to 90?
3        MR. PRYOR:  Which exhibit?  Just a moment,
4 Your Honor.
5        THE COURT:  It is in.  So we are
6 published.  Sorry.  You can discuss it at will.
7 BY MR. McKEEBY:
8 Q.   What is Exhibit 90, Mr. Schneider?
9 A.   That is an email from Denise Gutierrez
10 initially on the string, and then Maureen Emlet
11 indicating evidence of nexus to the workplace
12 between Charlene Carter and Southwest.
13 Q.   What does that concept mean, nexus to the
14 workplace?
15 A.   It is something where, on Facebook, a person
16 publicly can see that the person is employed by
17 Southwest Airlines.
18 Q.   And did you access Ms. Carter's Facebook page
19 in connection with the investigation?
20 A.   I did not.
21 Q.   Did you have a Facebook account?
22 A.   I don't personally, no.  My wife has an account
23 and she shows me things sometimes.  But that is it.
24 Q.   So somebody else pulled the posts for you, I
25 take it?

Page 1587

1 A.   Yes, in my office.
2 Q.   And what did these nexus posts show you?
3 A.   One of them showed flight attendant wings with
4 her name on it.  One of them showed her in uniform
5 next to an aircraft, Southwest aircraft.
6        And others showed, I think it was a friend of
7 the family and her husband, possibly, in uniform.
8 And -- I'm trying to recall them all.  Those are the
9 ones I remember.
10 Q.   How about let's go to I think 90.8?
11 A.   Yes.  That was also one of them.
12 Q.   This is one of them?
13 A.   Yes.
14 Q.   What is the significance of this photograph?
15 A.   Herb Kelleher was our CEO in the initial time
16 with Southwest Airlines began service.  And it is
17 the Southwest colors on it, asking for Herb's -- to
18 get his old job back.
19 Q.   How does this -- does this link Ms. Carter to
20 Southwest?
21 A.   Herb Kelleher is a very popular person and well
22 known throughout the industry.  And the colors,
23 obviously, are indicative of Southwest Airlines, and
24 it talks about the company.
25 Q.   Well, it refers to, "our CEO," correct?

Page 1588

1 A.   Yes.
2 Q.   And what about the next page, is this exhibit
3 90.9, is that one of the images that you referenced
4 earlier in your testimony just now?
5 A.   Yes, it is.
6 Q.   What does it show?
7 A.   It shows Charlene Carter and her crew next to
8 the Southwest aircraft in the jetway.
9        MR. McKEEBY:  And let me go to the
10 another way, your Honor, to talk about those
11 other documents.
12        Let's go to Exhibit 74.
13        THE COURT:  It is in, so the jury can see
14 it.
15 BY MR. McKEEBY:
16 Q.   I think you -- this was a document that was
17 entered through you, if I'm not mistaken, this email
18 at the beginning of the chain, the top, we talked
19 about that earlier today, correct?
20 A.   Yes.
21 Q.   Okay.
22        What I want to talk about is on page 74.5.
23        Is that one of the public posts that you found
24 on Ms. Carter's Facebook page?
25 A.   Yes.

Page 1589

1 Q.   Did you conduct a fact-finding meeting with
2 Ms. Carter?
3 A.   Yes.
4 Q.   What -- what -- what does that -- explain to
5 the jury --
6        MR. McKEEBY:  You can go ahead and take
7 that down.
8 BY MR. McKEEBY:
9 Q.   -- what a fact-finding meeting is.
10 A.   A fact-finding meeting is what we set up with
11 the person who is alleged to have done something,
12 and we agree on a date and time with the employee
13 and their union.  And we conduct the meeting
14 face-to-face, and we give the employee time to
15 explain what happened during the alleged event.
16        And they can share and give testimony and give
17 any type of evidence they have available to the
18 investigator at that time, which would have been me.
19 Q.   And with respect to Ms. Carter's fact-finding,
20 who was in attendance?
21 A.   It was myself, Meggan Jones, the TWU
22 representative, Chris -- I can't remember his last
23 name.
24 Q.   Sullivan?
25 A.   Sullivan, yes, please.  Thank you.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 460 of 642   PageID 11401
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Pages 1590..1593

Page 1590

1  And Charlene Carter were in attendance in
2  person.  And we had Denise Gutierrez from employee
3  relations and Edie Barnett from human resource
4  business partner on the phone during the meeting.
5  They could ask questions and listen.
6  Q.  Was Ms. Gutierrez on the phone or was she there
7  in person?
8  A.  She was on the phone.
9  Q.  Where was the fact-finding held?
10  A.  In the in flight base in Denver.
11  Q.  And did Ms. Carter have the opportunity to tell
12  her side of the story during the fact-finding
13  meeting?
14  A.  Yes.
15  Q.  And did she do so?
16  A.  Yes, she did.
17  Q.  You mentioned Meggan Jones, is that her in the
18  courtroom?
19  A.  Yes.
20  Q.  What was her position?
21  A.  She was my note taker for that.
22  Q.  What was her job at the time?
23  A.  She is the assistant base manager for Denver in
24  flight.
25  Q.  And you indicated she was the note taker.  What

Page 1591

1  does that mean?
2  A.  During these meetings, the only way we can
3  record them is by taking notes.  And Meggan is very
4  adept as taking good notes and a very efficient
5  tyer -- typist, and did a great job of capturing the
6  notes on that.
7  Q.  Are those notes something you reviewed after
8  she finalized them?
9  A.  Yes.
10  Q.  And we will get to those in a minute.
11      Did you review any -- strike that.
12      Did Ms. Carter provide you with any documents
13  at the fact-finding meeting?
14  A.  Yes, she did.
15  Q.  Can you generally describe those documents for
16  the jury?
17  A.  They were documents that indicated the
18  participants in the Women's March and different
19  events associated with that.
20      And if I recall, there were other photos of her
21  transport for pro life.
22      I don't recall all of them at this time.
23  Q.  Okay.  Well, I'm going to help you.
24      MR. McKEEBY:  Let's pull up Exhibit 103.
25      And I don't believe this is in evidence,

Page 1592

1  so Southwest moves to admit Exhibit 103.
2      THE COURT:  103 any objection.
3      MR. PRYOR:  Just a moment.  I need to see
4  it.  This document is in a different Exhibit number
5  I guess already in evidence.  But it if it is just
6  the fact-finding notes, no objection, I guess,
7  again.
8      THE COURT:  Any from the union, any
9  objection to 103?
10      MR. GREENFIELD:  No, your Honor.
11      THE COURT:  All right.  103 is in.  You
12  can publish.
13      (The referred-to document was admitted in
14      Evidence as Trial Exhibit 103.)
15      THE COURT:  They're published to the jury.
16  BY MR. McKEEBY:
17  Q.  These are the fact finding notes, but if you go
18  to page -- well, let me start with your email.
19      MR. PRYOR:  Your Honor, is it more than
20  just the fact finding notes?
21      MR. McKEEBY:  It says in the email it is
22  the images as well.
23      MR. PRYOR:  I'm just going through --
24      MR. McKEEBY:  Information that Ms. Carter
25  brought to the meeting that he's testified to.

Page 1593

1      MR. PRYOR:  Okay.
2      THE COURT:  All right.  You can proceed.
3      MR. PRYOR:  I'm just going through the
4  document right now.
5      MR. McKEEBY:  Thank you.
6  BY MR. McKEEBY:
7  Q.  So explain to the jury what this email is.
8      MR. PRYOR:  Okay.  Wait.  Your Honor, it
9  is in evidence?  I still haven't had a chance do
10  scroll through the document.
11      THE COURT:  You had no objection to it.
12      MR. PRYOR:  Well, I had no objection when
13  I though it was a fact finding memo.  Now I found
14  out there is a lot of stuff attached to it, so I'm
15  scrolling through it -- no objection.
16      THE COURT:  Okay.  You can proceed.
17  BY MR. McKEEBY:
18  Q.  Mr. Schneider, so it looks like that there is a
19  combination of documents in 103.
20      Would you agree with that?
21  A.  Yes.
22  Q.  Can you identify what those categories of
23  documents are?
24  A.  I only see the front page, but when we are
25  conducting an investigation, we hold a fact-finding

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 461 of 642   PageID 11402
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Pages 1594..1597

Page 1594

1  meeting.  And before Denise Gutierrez can make her
2  decision on harassment policy, I send her the notes
3  also from the meeting so she can review and make her
4  decision.
5  Q.  All right.
6      Well, the fact -- the notes are already in
7  evidence in a different exhibit, and we will go over
8  those in a moment.
9      MR. McKEEBY:  At Exhibit No. 103.19, if
10 you could just kind of flip through those page by
11 page, so that the witness can see.
12     THE WITNESS:  These are the images that
13 were supplied to us, but unfortunately,
14 Ms. Gutierrez and Ms. Barnett were not in the room,
15 so they didn't get to see them.  So I wanted to make
16 sure that we sent the evidence to them that
17 Ms. Carter supplied for us.
18 BY MR. McKEEBY:
19 Q.  Okay.  I want to make sure I understand.
20     Ms. Carter handed you these documents during
21 the fact-finding meeting?
22 A.  Yes.
23 Q.  And you were sending them to that Ms. Emlet and
24 Ms. Gutierrez so that they would have access to what
25 Ms. Carter provided?

Page 1595

1  A.  Yes.
2  Q.  And did you review this information in
3  connection with the fact-finding?
4  A.  Yes, I did.
5  Q.  Did you ask questions of Ms. Carter during the
6  fact-finding?
7  A.  Yes, I did.
8  Q.  Was one of those questions of Ms. Carter why
9  she sent the messages to Ms. Stone?
10 A.  Yes.
11 Q.  And what do you recall her response being?
12 A.  She stated that she was pro life, and she
13 wanted to get this message out to everybody.  And at
14 one point, she indicated that the union was pro
15 choice, and she did not agree with that.
16     MR. McKEEBY:  Let's put the document back
17 up, if you would.  Can you go to 103.16.
18 BY MR. McKEEBY:
19 Q.  If I'm reading this correctly, it indicates
20 that Ms. Carter said she was hoping to get a
21 dialogue with Ms. Stone regarding the Women's March?
22 A.  Yes.
23 Q.  What was your reaction to that explanation?
24 A.  The images that were sent did not elicit open
25 conversation or dialogue.

Page 1596

1  Q.  That is a conclusion that you came to?
2  A.  Yes.
3  Q.  What is the basis of that conclusion?
4  A.  Because they were not questions, they were more
5  statements.
6  Q.  Did you question Ms. Carter's explanation in
7  that regard?
8  A.  I did.
9  Q.  Did you tell her that?
10 A.  I do not remember exactly if it was myself
11 asking that question.  It was asked in the meeting,
12 yes.
13 Q.  What question was asked during the meeting?
14 A.  Did she know the affiliation -- or what
15 Ms. Stone's standing on abortion was.
16 Q.  Was that important to you?
17 A.  To be sent these images and graphic videos to
18 someone and not knowing their background or what has
19 happened personally in their lives, yes, it was
20 important, because it could have been detrimental to
21 someone psychologically.
22 Q.  How so?  I just want you to expand on that a
23 little bit.
24 A.  My thought process is that not knowing the
25 background of Ms. Stone -- social media has a way of

Page 1597

1  affecting people.  And I know that -- I'm just going
2  to say suicide is a big thing out there, and people
3  can be affected by these type of social media
4  statements and videos and images.
5      And I think that is something that wasn't
6  considered when the videos and the images were sent.
7  Because she stated that she was simply trying to get
8  her message across and wasn't trying to have a
9  dialogue with Ms. Stone to find out what her
10 thoughts were on it or what her stand was on it.
11 She didn't know that information.
12 Q.  How would you describe Ms. Carter's --
13 Ms. Carter was there at the meeting, face-to-face,
14 correct?
15 A.  Yes.
16 Q.  And her union representative was there with her
17 in attendance?
18 A.  Yes.
19 Q.  How would you characterize Ms. Carter's
20 demeanor during the fact-finding?
21 A.  She was not regretful for doing -- sending
22 videos and the personal messages, she didn't seem
23 apologetic for it at all towards Ms. Stone, and
24 seemed to be justified for what she did.
25 Q.  Did she seem remorseful at all?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 5 July 11, 2022                    Pages 1598..1601

Page 1598

1 A.  No, not at all.
2 Q.  Did Carter make any claim during the
3 fact-finding meeting that she believed Southwest was
4 retaliating against her based on union protected
5 activities?
6 A.  Can you say that one more time.
7 Q.  Did Carter say, in the fact-finding meeting,
8 that she believed that Southwest was discriminating
9 against her because of her union-related activities?
10 A.  No, she did not.
11 Q.  Did Carter claim during the fact-finding
12 meeting that Southwest was taking action against her
13 based on her religious beliefs?
14 A.  No.
15 Q.  Now, you became aware, in connection with the
16 investigation, as I understand it, that Ms. Carter
17 had a history with the union, correct?
18 A.  Yes.
19 Q.  Now, did you know that prior to the
20 investigation?
21 A.  I did not.
22 Q.  Were you -- there has been some discussion in
23 this case about a recall election.
24      Do you know what that means?
25 A.  I know what it means through the investigation.

Page 1599

1 She explained that.
2 Q.  Were you not aware of the recall movement prior
3 to the investigation?
4 A.  I had heard rumors of it and knew very little
5 about what it involved.
6 Q.  Did you feel like the investigation was fair?
7 A.  Absolutely, yes.
8 Q.  Why do you think that?
9 A.  I looked at every shred of evidence we had and
10 considered everything that was given to me, and
11 testimony by Ms. Stone and Ms. Carter, looking at
12 the history of what had transpired, just to give
13 credit to everything that was given to me before I
14 made my decision.
15 Q.  After the fact-finding, what did you do in
16 terms of reaching that decision?
17 A.  I worked with Denise Gutierrez to learn if she
18 made the determination that it was a violation of
19 our harassment/sexual harassment policy.  I
20 discussed with Maureen Emlet to make sure that I was
21 within the guidelines of my decision.
22 Q.  What do you mean "guidelines of your decision"?
23 A.  Guidelines in labor as far as making this
24 decision, and historical, and anything that she
25 could share of cases that were similar or anything.

Page 1600

1 Q.  And the "she" in this context is Ms. Emlet?
2 A.  Yes, correct.
3 Q.  Okay.  Now, obviously, it sounds like you knew,
4 before, but during the investigation, you realized
5 that the person who was making the complaint was
6 president of the Union, Ms. Audrey Stone, correct?
7 A.  Yes.
8 Q.  Did that fact have an impact on the
9 investigation?
10 A.  No.  She was an employee of Southwest Airlines
11 and that is how I treated it.
12 Q.  Was she, in your view, entitled to the
13 protections of the policies of Southwest Airlines
14 like any other employee?
15 A.  Yes, 100 percent.
16 Q.  I think you've testified to this, but I will
17 ask again, just to lay a predicate.  Was it your
18 decision, Mr. Schneider, to terminate Ms. Carter's
19 employment?
20 A.  Yes, it was.
21 Q.  And can you tell the jury why you reached that
22 decision?
23 A.  The decision was based on, like I have said a
24 few times, the egregiousness of the videos and the
25 posts that were made and the personal messages that

Page 1601

1 were sent depicting a very graphic image, and one
2 that I considered affected Ms. Stone in a great way.
3      And it seemed that the escalation was there.
4 She crossed the line, basically, of just telling
5 Ms. Stone how she felt about her being president and
6 her duties.  And crossed the line as to what we
7 would do as a company and how we treat fellow
8 employees.
9      Southwest has a great culture, and our habits
10 have always been to take care of each other and
11 treat each other with kindness and caring, and this
12 gave none of that.  And it affected every part of
13 how she conducted herself.
14      And I was concerned that it was going to
15 possibly escalate.  And I -- in some way.  But just
16 the graphic nature of these videos is the reason why
17 she was terminated.
18 Q.  In the fact-finding, did Ms. Carter raise the
19 issue of requesting some type of accommodation?
20 A.  No, she did not.
21 Q.  If Southwest were to allow employees to make
22 these types of posts and send them to other
23 employees, what would be the impact on Southwest
24 Airlines in your view?
25 A.  If we allowed this --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Pages 1602..1605

Page 1602

1 Q.  If you allowed employees to send these types of
2 videos to co-employees, what would you say would be
3 the impact?
4 A.  As I stated earlier, there is a certain level
5 of disrespect when you send this type of video
6 graphic to another employee.  We would lose respect
7 for each other, we would lose the family-type feel
8 that Southwest Airlines has always been a proponent
9 of in how we treat each other.
10     And it would have an adverse affect on how we
11 work together and how we interacted as a group of
12 employees.
13 Q.  Now, did you consider any lesser form of
14 discipline, suspension or counseling or something
15 along those lines?
16 A.  I considered everything that was available as
17 far as discipline for it.  And due to the
18 egregiousness of this, termination was the right
19 choice in this.
20 Q.  And did Ms. Carter's opposition to union
21 leadership and her complaints about how the union
22 was spending union member dues have anything to do
23 with your decision?
24 A.  No.
25 Q.  What are your thoughts about the notion that

Page 1603

1 her status as a union objector would influence your
2 decision?
3 A.  It didn't influence my decision at all.  That
4 is a choice between the employee and their union.
5 The company doesn't get involved in that at all, and
6 I did not even consider that in my decision making.
7 Q.  And did you have -- did you have a personal
8 preference as to who the leaders of the Union would
9 be?
10 A.  I did not.
11 Q.  And I asked if you had ever met Stone.
12     Just to make sure we are clear, had you ever
13 interacted with her in connection with your
14 responsibilities as a base manager in either Denver
15 or Phoenix?
16 A.  No.
17 Q.  And did Ms. Carter being a Christian have
18 anything to do with your decision to terminate her
19 employment?
20 A.  No, not at all.
21 Q.  What are your religious beliefs, Mr. Schneider?
22 A.  I am also Christian.
23 Q.  What are your beliefs regarding abortion?
24     MR. PRYOR:  Relevance, Your Honor.
25     THE COURT:  Overruled.  You can answer.

Page 1604

1     MR. PRYOR:  Object on 404 and undue
2 prejudice.
3     THE COURT:  Overruled, you can answer.
4     THE WITNESS:  I am pro life.
5 BY MR. McKEEBY
6 Q.  What does that mean to you?
7 A.  It means that I do not agree with abortion and
8 I think that every life is sacred and we should
9 protect it to the greatest extent that we can.
10 Q.  How did you communicate the decision to
11 terminate Ms. Carter's employment to her?
12 A.  I called the union, TWU rep in Dallas, and I
13 told them that I was ready to render my decision.
14 They called Ms. Carter, and put it on conference
15 call, and I rendered my decision to both Ms. Carter
16 and the union.
17 Q.  And did you follow that up with a letter?
18 A.  Yes.  We are required to send the termination
19 letter the same day as the rendering.
20     MR. McKEEBY:  And I think we -- I think
21 that is in evidence as Exhibit 115.  Can we pull
22 that up?
23     THE COURT:  It is in evidence.  We are
24 showing the jury.
25     MR. McKEEBY:  Thank you.

Page 1605

1 BY MR. McKEEBY:
2 Q.  And is that the letter that you referenced?
3 A.  Yes, it is.
4 Q.  And did you write this letter?
5 A.  Yes, I did.
6 Q.  Did you run it by Ms. Emlet for her review and
7 comment?
8 A.  Yes.
9 Q.  And did she have some changes?
10 A.  They were minor changes.  I always like to have
11 them proofread to make sure that everything is
12 correct.
13 Q.  In the phone call where you informed Ms. Carter
14 of your decision, did anything stand out about that
15 call?
16 A.  No.
17 Q.  Is it brief?
18 A.  It was routine and very brief.  The union keeps
19 it brief also, and they discuss off line anything
20 after.
21 Q.  And the letter indicates that you determined
22 that Ms. Carter's conduct violated Southwest
23 policies.
24     What policies did you determine Ms. Carter's
25 conduct violated?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 464 of 642   PageID 11405
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                          Pages 1606..1609

Page 1606

1 A.   The workplace bully and hazing policy and the
2 social media policy.
3 Q.   And is that set forth in the document?
4 A.   Yes, it is.  It is bullet pointed.
5 Q.   And it also references that the conduct also
6 could be a violation of Southwest's policy
7 concerning harassment, sexual harassment,
8 discrimination and retaliation?
9 A.   Yes.
10 Q.   Was that based on what Ms. Gutierrez had
11 advised you during the course of the investigation?
12 A.   Yes.
13 Q.   So there are a couple of reasons in here.  Let
14 me ask you this question:  Had Ms. Carter only sent
15 the video images to Ms. Stone, her co-employee,
16 would you have still reached the decision to
17 terminate her employment?
18 A.   Yes.  That is what I was trying to say the
19 first day of testimony, that -- outside of all of
20 the peripheral questions that I was being asked,
21 that was the main reason why she was terminated.
22        MR. McKEEBY:  Okay.  I will pass the
23 witness.
24        THE COURT:  Okay, Mr. Greenfield.
25

Page 1607

1                  CROSS-EXAMINATION
2 BY MR. GREENFIELD:
3 Q.   Hello, Mr. Schneider, welcome back.
4 A.   Thank you.
5 Q.   How many times did you meet with Ms. Stone in
6 the course of your investigation?
7 A.   In the meeting, one time.
8 Q.   At any point during that meeting, did Ms. Stone
9 make any derogatory comments about Ms. Carter's
10 religion?
11 A.   No.
12 Q.   Did you gain any understanding as to
13 Ms. Stone's religion?
14 A.   No, I did not.
15 Q.   Okay.
16        And Ms. Carter?
17 A.   Not in the meeting with Ms. Stone.
18 Q.   Okay.
19        Did you ever come to information on whether
20 Ms. Stone was personally pro life or pro choice?
21        MR. PRYOR:  Object to relevance, object.
22 To --
23        THE COURT:  I'll allow it.
24        THE WITNESS:  In the meeting?  I didn't
25 ask that question, specifically.  I think she

Page 1608

1 volunteered at some point in the investigation that
2 she was pro choice.
3 BY MR. GREENFIELD:
4 Q.   Okay.
5        MR. GREENFIELD:  Can you pull up
6 exhibit 67 for me?  And if you can highlight the
7 middle portion for me just where it says "Suzanne."
8 BY MR. GREENFIELD:
9 Q.   Have you ever seen this email, Mr. Schneider?
10 A.   Yes.
11 Q.   Does that refresh your recollection as to
12 Ms. Stone's personal views?
13        MR. PRYOR:  Your Honor, there is no need
14 to refresh it.  He testified.
15        THE WITNESS:  I'm sorry.
16        MR. PRYOR:  It is improper use of a
17 document to refresh recollection that doesn't need
18 to be refreshed.
19        THE COURT:  So I will sustain that, but
20 this exhibit is already in evidence.  So that is not
21 a basis for me to keep it from the jury seeing it,
22 if that makes sense.  So I will sustain the
23 objection, but I'm not going to order the exhibit
24 pulled down.
25        MR. GREENFIELD:  Nonetheless, you can take

Page 1609

1 it down.
2        THE WITNESS:  Am I allowed to answer or is
3 that --
4        THE COURT:  I sustained the objection, so
5 I think the answer is already in the record from
6 your prior testimony.
7 BY MR. GREENFIELD:
8 Q.   Do you remember Ms. Stone discussing any other
9 employees with you during that meeting?
10 A.   Could you be a little more --
11 Q.   Sure.
12        MR. GREENFIELD:  Can you pull up
13 Exhibit 39, and to page 5.
14 BY MR. GREENFIELD:
15 Q.   Does this document refresh your recollection if
16 Ms. Stone spoke to you about a flight attendant
17 named Holly Imomovich?
18 A.   Yes, it does.
19 Q.   And did Ms. Stone express any concerns to you
20 about Ms. Imomovich?
21 A.   Yes, she did.
22 Q.   And what were those concerns?
23 A.   Pictures that were -- they were flight
24 attendants that had been terminated for specific
25 reasons.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 465 of 642   PageID 11406
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Pages 1610..1613

Page 1610

1 Q.  Okay.  Are you aware who, if anyone, turned
2 Ms. Imomovich into the company?
3 A.  I am not.
4        MR. PRYOR:  Sorry, Your Honor, could I
5 hear the question again?
6        THE COURT:  Can you restate the question?
7 Mr. Greenfield, can you restate that question?
8        MR. McKEEBY:  Yes, Your Honor.
9        THE COURT:  He didn't hear it.
10       MR. GREENFIELD:  Yes, your Honor.
11 BY MR. GREENFIELD:
12 Q.  Do you know who, if anyone, turned
13 Ms. Imomovich in to the company?
14       MR. PRYOR:  Okay.  Your Honor, I think I'm
15 going to have a sidebar.  Where is it at?
16       THE COURT:  Sidebar.
17       (Thereupon, the following proceedings were
18       had at sidebar:)
19       THE COURT:  Okay.  Objection?
20       MR. GILLIAM:  Yeah.  Your Honor this is
21 actually foreclosed by Southwest's limine, that they
22 want to talk about these other disciplinary cases,
23 and we haven't been able to respond to them because
24 of Southwest's limine.
25       So they want to go into detail about Holly

Page 1611

1 Imomovich's discipline, they want to go into detail
2 of Robert Hibbit's discipline, but we have not had
3 the opportunity to present any evidence to rebut
4 what they are going to say because we have been
5 limined out of it.
6        THE COURT:  So I understand that.
7        But the question at hand was who turned
8 them in to Southwest, which I view as different than
9 what did Southwest do to them.  So, yes, my guard is
10 up on this, but I don't think they have gotten to
11 the limine point of it yet.
12       MR. GREENFIELD:  I'll be very careful with
13 it, your Honor.
14       THE COURT:  Do I need to -- because he
15 said one reference earlier, they did talk about what
16 Southwest did to somebody.  Can I come out of this
17 and say, hey, whenever my instruction, we are not
18 supposed to tell what Southwest did to anybody, if
19 you need to turn someone in, that's -- that is --
20 are you okay with me saying that so the witness
21 hears it from me, and then we will proceed?
22       MR. GILLIAM:  Yes, your Honor.
23       MR. PRYOR:  Your Honor, it this a fair use
24 of conferring?  I'm just wondering about our time.
25       THE COURT:  Yes.  So I will take this one

Page 1612

1 on me because we got close, but not over the line,
2 so this one is on me.
3        MR. PRYOR:  Thank you.
4        (Thereupon, the sidebar was concluded and
5        the following proceedings were held in open
6        court:)
7        THE COURT:  Okay.  So what I will do is, I
8 will let you, in just a second, Mr. Greenfield, ask
9 your last question.  But for the jury's reminder --
10 and, Mr. Schneider, I don't know if I've said this
11 since you have been in the room -- I have carved out
12 any part of this case which involves how Southwest
13 disciplined an employee.  That is not relevant to
14 the claims against Southwest.
15       If someone turned in an employee to
16 Southwest, that is not Southwest discipline yet.
17 And that is relevant to this case.  So the question
18 that he asked you, I think is relevant.  And it is
19 one you can answer.
20       So can you ask this question again, but
21 don't get into any Southwest discipline as a result
22 of his question.  You can ask again, Ms. Greenfield.
23       MR. GREENFIELD:  Sure, I will be as
24 precise as I can.
25

Page 1613

1 BY MR. GREENFIELD:
2 Q.  And I think we heard your answer.  Are you
3 aware of who, if anyone, turned in Ms. Imomovich to
4 the company?
5        THE COURT:  Object, lack of foundation.  I
6 will allow him to answer if he has personal
7 knowledge.
8        THE WITNESS:  I don't know.
9 BY MR. GREENFIELD:
10 Q.  Okay.  And if you go down to page 6, the next
11 page, do you know if Ms. Stone ever turned in
12 Ms. Jeanna Jackson to the company?
13 A.  I don't recall that.
14 Q.  Based on these notes, what do you recall of
15 your conversation between you and Ms. Stone
16 regarding Ms. Jeanna Jackson?
17 A.  Yes, she did turn in Jeanna Jackson.
18 Q.  Based on this document, does it refresh your
19 recollection as to the reason why that may have
20 occurred?
21 A.  Because it depicted a screen shot of a picture
22 of a bullet in her head.
23 Q.  Now, you are the Denver-based manager, correct?
24 A.  Yes.
25 Q.  And I would imagine that your purview generally

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 466 of 642   PageID 11407
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Pages 1614..1617

Page 1614

1 is limited to employees who are based in Denver?
2 A.  Yes.
3 Q.  I have a few people that I want to ask you
4 about that you may not know about because they are
5 at other bases, but just in case.
6        MR. PRYOR:  Your Honor, for optional
7 completeness regarding his refreshed recollection,
8 can we point out --
9        THE COURT:  Sidebar.  Hold on.  Sidebar.
10       MR. PRYOR:  That is all.
11       THE COURT:  I didn't hear what you were
12 saying.  You can only speak in code.  And I'm not
13 treating you --
14       MR. PRYOR:  For optimal completeness, that
15 he point out the rest of -- that the allegation was
16 false.
17       THE COURT:  Okay.  I will sustain that.  I
18 will sustain that.  Can you ask him about the rest
19 of it?
20       MR. GREENFIELD:  I was trying to be
21 careful to not, but --
22 BY MR. GREENFIELD:
23 Q.  Your understanding is that the complaint was
24 related to a bullet, a picture of a bullet in
25 Ms. Stone's head, is that correct?

Page 1615

1 A.  Yes, that is correct.
2 Q.  And to be fair to everyone here, my
3 understanding, based on this document, is it your
4 understanding that that post was ultimate -- was a
5 fabrication?
6 A.  It was determined about that, yes.
7 Q.  And that was determined after an investigation,
8 correct?
9 A.  Yes.
10 Q.  But nothing wrong with the complaint in and of
11 itself?
12 A.  No.  Not at all.
13 Q.  Do you know a Michelle Foley?
14 A.  I have heard the name.
15 Q.  Do you know if she's still employed by the
16 company?
17 A.  I do not.
18 Q.  Do you know a Sherry Parnell Vincent?
19 A.  No.
20 Q.  Do you know a Kim Hensley?
21 A.  Yes.
22 Q.  Do you know if Kim -- I don't know if it's a
23 man or -- if Kim is still employed by the company?
24 A.  Yes.
25 Q.  She is?

Page 1616

1 A.  Yes.
2        MR. McKEEBY:  Pass the witness, your
3 Honor.
4        THE COURT:  Okay.  It is 5:01, so I'm
5 going to say we should break here for the day.  Same
6 three instructions as always:  You can only talk to
7 your fellow jurors and court personnel, just not
8 about this case; can't talk to anyone else; and
9 please don't do any research about the case.  We
10 will see you tomorrow morning at 8:45 to start on
11 the record at 9:00.  All rise for the jury.
12       (The jurors exited the courtroom.)
13       THE COURT:  Okay.  We seem to keep holding
14 you as an overnight witness, Mr. Schneider.  I'm
15 sorry for that.  But with that, I still have to ask
16 you to not talk to anyone about the case since you
17 are still a witness.
18       But you are free to leave the courtroom.
19 So you have your freedom at least; so there's that.
20       We will stick around after he's out of the
21 courtroom so I can ask -- see if y'all have got any
22 other questions we should address tonight.
23       (The witness exited the courtroom.)
24       THE COURT:  Okay.  So what-all do we need
25 to cover now?

Page 1617

1        MR. McKEEBY:  I need to suggest that I
2 will need some but probably not all of the extra
3 time.  I don't know exactly how much I will need,
4 but I will need more than -- at least, based on our
5 calculations of how far I have gone, I will need
6 some of it.
7        THE COURT:  Understood.  That makes sense.
8 And I held it in reserve, knowing that y'all might,
9 so that is fine.
10       I guess tonight at 6:00, we need to hear
11 who else you plan to get to tomorrow that you didn't
12 already designate for today.  You had Gutierrez on
13 the list today.  So we will hear any other witnesses
14 tomorrow.
15       And then we need to hear from you for who
16 you plan to get to tomorrow, Ms. Greenfield.
17       MR. GREENFIELD:  Yes, your Honor.
18       THE COURT:  So we will hear that at 6.  We
19 will hear their objections to your exhibits at 8.
20 And then I will say, I guess, you know, we might
21 rest, rest, close, close, close tomorrow.  And if we
22 do, that we should probably stick around whenever
23 that is and do the formal charge conference.  And we
24 can print the behemoth charge overnight because it
25 takes a while, right, and then bring the jury back

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 467 of 642   PageID 11408
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Pages 1618..1621

Page 1618

1 on Wednesday to have a reading of the charge. And
2 then closing argument, closing argument, closing
3 argument. Does that make sense?
4        I just don't know -- you know, I don't
5 know if we are going to finish tomorrow at 4:00,
6 tomorrow at 3, tomorrow at 5 or 6. We will see.
7 But the later we finish, the harder it will be to
8 have y'all stick around and do a formal charge
9 conference. So we will just play it by ear.
10       MR. McKEEBY: Point of clarification, can
11 we assume that closing arguments will be on
12 Wednesday at some point?
13       THE COURT: Yes. I don't think there is
14 any possibility for us to have closing argument
15 tomorrow, given that we still have got to do a
16 formal charge conference. I will try to get y'all
17 my next round of the jury charge by tomorrow at noon
18 at the latest. We are working on it right now. But
19 I can promise it by noon. I don't know if I can get
20 it to you earlier. I will if I can.
21       But yeah, so we may roll straight in from
22 the close of evidence to a formal charge conference
23 tomorrow. That is ideal.
24       Other questions?
25       Judge Kinkeade has graciously agreed to be

Page 1619

1 my stand-in, and he's older, wiser than I am, and
2 also funnier than I am. So he will be the stand-in
3 judge, so he's on duty for Thursday and Friday.
4        Now, he may -- because he doesn't live too
5 far from the courthouse, sort of be on standby,
6 like I let y'all -- usually, when the jury goes into
7 deliberations, I usually give you freedom to leave
8 the courthouse so as long as you are having somebody
9 15 minutes away or so. He might do the same, so we
10 will see. It is up to him at that point.
11       But I will still be on the phone and able
12 to talk through with him any jury notes or any other
13 issues that may come up that he's wondering about.
14       So prep for Judge Kinkeade to be your
15 judge. You can file your motion to reconsider every
16 ruling that Judge Scholer and I have ever ruled on
17 as soon as he takes the case over.
18       Anything else?
19       All right. Well, with that, we will see
20 y'all tomorrow at 8:45 -- 8:30. Sorry. And then we
21 will just see those filings tonight by email. Not
22 filings, emails, on what we are going to take up
23 tomorrow, what objections we have.
24       Thank y'all. We'll see you in the
25 morning.

Page 1620

1 Court is in recess.
2 THE COURT SECURITY OFFICER: All rise.
3 (Proceedings concluded at 5:06 p.m.)

Page 1621

```
1                    C E R T I F I C A T E
2
3        I, Kelli Ann Willis, RPR, CRR, CSR
4   certify that the foregoing is a transcript from the
5   record of the proceedings in the foregoing entitled
6   matter.
7        I further certify that the transcript
8   fees format comply with those prescribed by the
9   Court and the Judicial Conference of the United
10  States.
11        This 12th day of July, 2022.
12
13        s/ Kelli Ann Willis
          Official Court Reporters
14        Northern District of Texas
          Dallas Division
15
```

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 468 of 642   PageID 11409
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 5 July 11, 2022                          Index: $100..44.12

**$**

**$100** 1440:15

**$100,000** 1475:15

**$15,000** 1396:23

**$16,581** 1397:6

**$17,700** 1397:16

**$18,598** 1398:3

**$6,000** 1401:12

**0**

**0** 1524:23

**1**

**1** 1504:15,21,22,24,25
1506:11,15

**10** 1303:11 1328:12,16
1373:2 1556:12

**10-minute** 1372:4,20

**100** 1438:7,9,11,18 1439:4,
10 1460:14 1475:14
1600:15

**100,000** 1476:17

**103** 1591:24 1592:1,2,9,11,
14 1593:19

**103.16** 1595:17

**103.19** 1594:9

**107** 1497:4

**10:48** 1373:7

**10:50** 1372:21

**10th** 1529:8

**11** 1533:10,16,22,24

**115** 1604:21

**118** 1311:19 1313:9,18,20
1475:9 1476:25

**118-112** 1314:21

**118-116** 1315:2

**118.10** 1313:22

**118.110** 1314:1

**119** 1317:15

**119-point** 1318:13

**11th** 1529:8 1546:16

**12** 1565:16

**120-pound** 1303:6

**126** 1305:16,18 1306:2

**127** 1305:16,18

**128** 1305:16,18

**129** 1305:16,18 1306:3

**12:10** 1450:10

**13** 1505:8 1540:24 1574:7

**130** 1301:14,15,16,23,25
1302:4,5

**138** 1486:3,6,9

**14** 1530:12

**147** 1502:19,25 1504:1
1506:21 1507:13 1509:10,
20,21 1510:13 1538:25

**148** 1312:15

**14th** 1528:21

**15** 1318:13 1510:2 1619:9

**15,000** 1460:16

**16** 1397:20 1530:16
1545:24 1546:4,10

**16th** 1330:21 1525:21
1546:23

**17** 1328:5,16 1336:7
1397:24 1524:18

**17th** 1524:20

**18** 1290:12 1293:11
1332:18,21 1400:13
1418:2 1523:6 1580:6,14,
16,19,20,24

**18-month** 1332:13
1410:25

**19** 1304:4

**198.15** 1507:4

**1996** 1575:6

**1998** 1514:16

**19th** 1527:22,23

**1:10** 1452:16

**1:11** 1450:17

**1st** 1529:18

**2**

**2** 1307:8,11,20,23 1308:8,
10 1309:3,7 1310:7,16
1311:9 1312:11,22
1313:14 1315:15,19
1316:3,22 1318:16
1319:23 1320:7,8,20,25
1321:6 1328:8,10,13,15
1350:2 1390:23 1391:2,3,
13 1392:25 1393:15
1394:10,13 1416:6,9,22
1417:15 1419:17,19
1420:22 1474:19 1475:7

**20** 1298:13 1345:16
1357:11

**20,000** 1476:14,18

**2000** 1481:13

**2004** 1575:6

**2012** 1302:1

**2013** 1314:17 1339:22
1407:12 1490:5 1546:14,
16,23

**2014** 1396:25 1397:3

**2015** 1397:15 1449:11
1526:1

**2016** 1397:18,21,25
1525:4,13,18,21,22
1526:1,4,24 1527:17,19
1528:8 1529:7,12 1565:17

**2017** 1296:7 1307:13
1328:5 1330:4,15 1336:7
1397:23 1398:19 1399:7,
25 1400:5,10 1449:11
1481:14 1510:4 1512:11
1524:18 1525:2,9,12
1559:7 1560:17 1576:8

**2019** 1512:2

**2021** 1401:9,18

**2022** 1401:13

**21** 1356:24 1401:11,14

1574:2,5

**22** 1401:14

**23rd** 1528:9

**24** 1293:10 1332:7,21

**24-month** 1336:3 1417:20,
22

**2400** 1574:1

**25th** 1528:1

**26.25** 1526:11

**26th** 1528:12

**27** 1527:4 1528:12

**28** 1574:25

**2:26** 1509:8,9

**3**

**3** 1394:25 1618:6

**30** 1293:5 1309:12
1387:11,15

**30-day** 1293:5 1330:20
1417:16 1431:15

**31st** 1512:2

**38** 1295:4,5,9,12

**39** 1609:13

**3:40** 1556:12,23

**4**

**40** 1327:7,8,15,23 1478:1,
2,18

**401** 1476:12,19

**401(k)** 1475:21

**404** 1549:16,23 1604:1

**42** 1301:14,15,16,23
1302:6 1396:11,14,15

**44** 1523:20,21 1524:2

**44-point** 1525:16

**44.10** 1529:6

**44.11** 1529:11

**44.12** 1529:15

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 469 of 642   PageID 11410
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                          Index: 44.13..acts

**44.13** 1530:6

**44.15** 1530:17

**44.2** 1525:3,8

**44.4** 1525:16 1530:12

**44.5** 1526:3

**44.6** 1526:23

**44.7** 1527:16

**44.8** 1528:6

**44.9** 1528:19

**47** 1363:23 1382:5 1537:18

**482f.3d** 1489:15

**4:00** 1618:5

**5**

**5** 1287:7 1401:12 1609:13
1618:6

**5,000** 1401:15

**50** 1487:9,14 1585:10,14,
15

**501(c)(3)** 1399:20 1402:11

**556** 1314:11 1325:19
1359:9 1407:4 1481:14
1491:22 1513:5 1514:20
1516:6 1571:11 1578:20

**556's** 1376:20

**566** 1287:16

**5:01** 1616:4

**5:06** 1620:3

**6**

**6** 1613:10 1617:18 1618:6

**61** 1370:22 1371:9
1373:24,25 1374:1
1377:15,16 1381:19,24
1382:3

**66** 1498:24 1499:19 1561:2

**67** 1608:6

**6:00** 1617:10

**7**

**7** 1328:12,16 1536:8,11,13,
19 1538:3

**7.10** 1527:6

**74** 1588:12

**74.5** 1588:22

**76** 1576:14

**8**

**8** 1617:19

**80** 1475:13

**80-** 1475:15 1476:17

**802** 1489:15

**808** 1489:15

**83** 1516:7,8,10,12,17

**83.2** 1517:6

**84** 1464:6

**84.8** 1525:10

**8:30** 1619:20

**8:45** 1616:10 1619:20

**8th** 1527:22 1528:21

**9**

**9** 1543:1,3,5,11

**90** 1475:13 1531:12,17
1586:1,2,8

**90.8** 1587:10

**90.9** 1588:3

**92** 1524:22

**92.4** 1524:21

**94** 1583:8

**98** 1355:13 1361:14 1510:2

**98.11** 1359:20

**98.15** 1507:8

**98.6** 1355:14,15

**98.7** 1361:15

**99** 1420:6 1514:16

**9:00** 1616:11

**9th** 1529:8

**A**

**abbreviation** 1545:18

**Abercrombie** 1498:13

**abide** 1513:21

**ability** 1529:21 1580:1

**aborted** 1340:15 1351:24
1353:1 1360:11 1499:8
1500:3

**abortion** 1339:20,25
1340:5,11 1344:23 1345:3,
23 1346:4,8 1347:16
1351:18 1354:11 1359:15
1360:4 1385:19 1389:12
1395:8 1490:22 1491:11
1533:4 1548:22 1549:22
1550:19,20 1551:15
1596:15 1603:23 1604:7

**absolutely** 1319:11
1321:25 1322:8 1330:6
1353:3 1356:17 1436:1
1460:13 1472:16 1473:8,
10 1491:2 1542:10
1552:11 1599:7

**abundant** 1496:19

**abuse** 1554:3

**academy** 1411:25
1412:12,13

**accept** 1402:24

**acceptable** 1378:4 1537:2
1544:2 1564:13 1568:13

**acceptance** 1546:22

**accepted** 1418:3

**access** 1486:10 1535:22
1538:2,6 1540:15 1541:15,
20,21 1586:18 1594:24

**accolades** 1322:14

**accommodate** 1290:24
1366:1 1383:13 1387:2
1493:16 1497:20 1498:15

**accommodated** 1364:24

1366:24 1367:3 1468:24

**accommodation** 1288:3
1291:11 1364:20 1365:3
1367:6 1382:20,22 1384:3
1392:5 1461:7 1462:19,20
1464:22 1465:23 1466:9,
12 1467:6,25 1469:9
1470:10 1493:1,5,12
1494:15 1495:15,19
1498:9,11 1601:19

**accordance** 1553:22
1560:2

**account** 1449:10 1586:21,
22

**accountable** 1553:13

**accounts** 1544:17

**accrue** 1529:4

**accurate** 1453:1

**accurately** 1545:2

**acknowledge** 1385:22
1554:21

**acknowledged** 1554:25

**acknowledgement**
1554:7

**act** 1365:4 1384:4 1423:24
1424:4,9,14,24 1425:2
1453:22 1457:6 1498:4,5

**acted** 1299:8

**action** 1323:14 1438:10
1494:6 1598:12

**actions** 1299:8 1379:5
1381:6,7 1456:15,25
1562:12

**active** 1523:6 1575:19

**activities** 1386:13 1423:5
1496:22,24 1497:9,12
1570:8 1598:5,9

**activity** 1290:1,24 1291:11
1325:12 1326:5 1385:10
1474:22 1475:6 1487:19
1488:4 1489:4,7 1496:12
1500:9 1527:17 1528:7
1530:13 1562:20,21

**actor** 1376:22

**acts** 1436:15

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                     Index: actual..applicants

**actual** 1321:19 1365:17 1375:10 1387:9 1397:3 1411:25 1441:20 1503:17 1524:24 1530:2,11 1553:14

**Adam** 1287:15 1405:8 1551:25 1571:10

**add** 1287:22 1288:1 1299:5 1326:15 1327:20 1431:13 1505:12

**addiction** 1411:5

**adding** 1288:6,8 1428:19 1494:22

**addition** 1331:12,15 1478:19 1513:20 1531:24 1549:11 1562:23

**additional** 1302:9 1340:22 1552:6

**address** 1324:25 1325:3, 4,7 1356:4,7 1473:4 1493:2 1616:22

**addressed** 1560:2

**addresses** 1376:14

**adept** 1591:4

**adhered** 1386:15

**administer** 1511:6 1573:5

**administration** 1560:6

**administrative** 1391:21, 25 1392:3,13 1494:14

**admissible** 1549:12

**admission** 1295:3 1301:13 1381:19 1391:4 1506:10 1510:13 1533:15

**admit** 1313:9,17 1327:8 1391:2 1485:22 1505:25 1506:14 1516:8 1523:21 1533:22 1536:11 1539:4 1543:3 1546:3 1585:13 1592:1

**admitted** 1295:11 1301:20,22 1305:25 1306:1 1313:19 1319:13 1327:18,22 1394:12,15,16 1486:6 1507:14 1516:12, 16 1524:1 1533:23 1536:18 1543:10 1546:9 1585:11 1592:13

**adverse** 1602:10

**adversely** 1578:16

**advice** 1338:18

**advise** 1507:22

**advised** 1503:23 1606:11

**advisor** 1559:1

**affect** 1602:10

**affected** 1352:13 1578:8, 16 1581:14 1582:14 1597:3 1601:2,12

**affecting** 1597:1

**affiliated** 1347:18 1398:19

**affiliation** 1596:14

**affirmative** 1287:22 1288:1,6,8,15 1392:3 1495:21,25

**afford** 1371:13 1391:11 1511:12

**affords** 1383:19

**AFL-CIO** 1325:20

**afraid** 1562:10

**after-school** 1399:3

**afternoon** 1405:3,4 1406:12 1486:20 1551:23, 24 1556:7

**age** 1398:11

**agree** 1310:13 1312:16 1331:23 1335:18 1353:25 1354:20 1363:7 1396:22 1400:4 1432:12 1449:25 1457:4 1460:14 1470:22 1548:9 1589:12 1593:20 1595:15 1604:7

**agreed** 1449:8 1450:4 1466:2 1542:24 1545:12 1554:17 1618:25

**agreement** 1293:7 1294:18 1328:3,9 1329:13, 22 1331:7 1332:4,20 1338:23 1406:25 1427:2 1444:16,25 1445:8,24 1446:3,14 1447:23 1448:4, 10 1494:4 1513:4 1517:22 1529:20 1553:24 1559:15 1563:2

**ahead** 1294:7 1317:15 1359:24 1363:22 1397:1 1502:3,5,24 1567:9 1589:6

**aircraft** 1527:14 1532:15 1542:19 1587:5 1588:8

**airline** 1400:17 1401:21

**airlines** 1287:13 1289:11, 15 1290:13,23 1300:6,10, 11 1304:7 1306:23 1321:2, 3 1322:5 1325:23 1330:12 1331:17,25 1335:3 1353:8 1357:1 1359:10 1360:18 1366:24 1369:15 1377:8 1384:21,23 1385:1,9,12 1386:14 1395:7,19,24 1399:14 1400:8,9,16 1435:15 1451:24 1481:13 1491:23 1492:5 1494:16 1505:6 1510:23 1511:25 1512:8,10 1513:5,9,24 1531:8 1532:3,10,12,25 1533:2 1534:5 1535:14,18, 21 1542:4 1543:15 1552:4, 9 1558:17,24,25 1559:18 1562:19 1564:5 1567:5,6 1569:14 1570:2,13 1571:16,19,25 1573:23 1574:22,24 1575:12 1578:7 1586:17 1587:16, 23 1600:10,13 1601:24 1602:8

**Airlines'** 1536:23 1569:9

**Airlines's** 1532:15 1568:17

**airplane** 1455:8 1457:22

**airport** 1387:13 1484:21 1527:9 1528:16 1574:19

**Alcohol** 1411:5

**Alex** 1341:20

**align** 1429:10,17

**allegation** 1518:9 1614:15

**allegations** 1522:9 1535:1 1552:21 1554:2

**allege** 1428:6

**alleged** 1485:6 1515:15 1562:21 1589:11,15

**alleging** 1468:19

**allowed** 1318:22 1335:13 1367:12 1395:9 1423:6 1504:1 1554:20 1601:25 1602:1 1609:2

**allowing** 1327:15 1364:24 1367:3

**alluded** 1353:24 1582:8

**amazing** 1310:20 1337:13

**ambiguity** 1375:23

**ambiguous** 1375:3

**amendment** 1288:12 1451:5 1452:7

**American** 1300:10

**amount** 1300:18 1397:1 1410:9

**analysis** 1381:10

**and-a-half** 1575:4

**angry** 1348:4,5

**animus** 1494:8

**annual** 1536:3 1554:7

**answers** 1418:15 1432:19 1511:11 1557:24 1558:1 1573:11

**anymore** 1421:20

**apologetic** 1597:23

**apologies** 1398:17

**apologize** 1348:17 1372:11 1382:8 1393:6 1420:12 1421:21 1422:11 1456:3 1464:17 1564:25 1584:13 1585:11

**apparently** 1503:8

**appeal** 1307:24 1309:2

**appearances** 1287:8

**appeared** 1315:16 1349:14 1523:18

**appears** 1527:16 1577:21

**Appendix** 1504:15,21,24 1506:11

**applicable** 1546:17

**applicants** 1569:16

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 471 of 642   PageID 11412
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022              Index: applications..bases

**applications** 1400:16
1401:21

**applied** 1301:5 1384:19
1385:1,24 1401:22
1512:17 1513:2 1553:1

**apply** 1301:10 1327:12
1331:24 1513:23 1581:1

**applying** 1552:25

**approach** 1308:22 1505:2

**approved** 1549:14

**approximately** 1400:25
1401:10 1460:19 1524:21

**April** 1307:14 1328:5,16
1336:7 1527:16,18,22,23
1528:1

**arbitration** 1349:13,18,20
1350:2,19,22,25 1351:4,14
1352:10 1461:24 1463:7
1464:23 1474:20 1475:7
1494:4 1495:8 1515:4

**area** 1436:9,13 1543:19

**arguably** 1488:24

**argue** 1345:8

**arguing** 1472:11,14

**argument** 1376:16
1377:11 1379:25 1393:3
1461:13 1508:1 1618:2,3,
14

**argumentative** 1339:1

**arguments** 1377:13
1426:23 1494:2 1495:5
1500:21 1509:8 1618:11

**Arizona** 1576:10

**aspect** 1355:7

**aspects** 1354:9

**assembled** 1312:23

**assess** 1375:17

**assessment** 1354:2
1545:10

**assessments** 1582:7,9

**assigned** 1513:15
1525:10

**assistance** 1549:22

1561:24

**assistant** 1481:5 1574:8
1590:23

**assisted** 1311:13

**assume** 1558:20 1618:11

**assumed** 1484:19

**assuming** 1501:22

**attached** 1505:8 1531:24
1593:14

**attachments** 1532:5,8

**attacked** 1535:4

**attempted** 1494:8

**attendance** 1523:7,9
1589:20 1590:1 1597:17

**attendant** 1291:13
1310:12 1322:10 1326:2
1329:10 1353:18 1356:17
1364:12 1387:7 1389:13
1390:9 1482:24 1512:16,
23 1513:22 1514:10
1523:5 1527:12 1529:20
1531:7,8 1532:3,24 1534:4
1536:1,3,4 1545:16
1547:6,11 1559:3 1565:13
1575:2,3,9 1580:24 1587:3
1609:16

**attendants** 1333:7
1352:21 1353:19 1356:23
1357:3,7 1359:4,10
1370:17 1395:15,21,24
1435:3 1439:14 1491:22
1512:18 1513:10,15,20
1517:24 1523:15 1528:24
1529:21 1538:8 1542:11,
15 1546:25 1547:1
1552:22 1554:8,14,20
1559:17 1560:10 1574:1,3,
14 1609:24

**attended** 1342:15 1351:22
1575:17

**attendees** 1353:16

**attention** 1531:12 1568:20

**attitude** 1534:21

**attorney** 1343:4 1405:25
1425:6 1554:4

**attorneys** 1412:17 1435:2
1439:19 1461:23 1552:1

1571:11

**audience** 1302:24

**audio** 1480:8

**Audrey** 1312:12,13
1316:24 1317:7 1319:10
1322:17 1326:5 1342:1
1344:12 1347:19 1357:19
1367:9 1414:9 1421:23
1454:16 1477:1,2,8,10,14,
17,22,24,25 1481:16
1516:1 1519:17 1522:9
1552:8 1571:14 1600:6

**Audrey's** 1333:24

**August** 1529:12

**Aurora** 1399:1,22 1402:10
1511:23

**authentication** 1506:12

**authoring** 1565:20

**authorized** 1395:24

**average** 1396:23

**aware** 1325:24 1430:7
1439:22 1444:14 1445:4,5,
23 1446:12,24 1458:18
1515:18,22 1519:8
1544:23 1554:7 1562:24
1563:3 1571:18,23
1576:13,20 1578:14
1598:15 1599:2 1610:1
1613:3

## B

**babies** 1340:16 1345:4,5
1353:1 1360:11 1499:8
1500:4

**baby** 1345:6

**bachelor's** 1413:9

**back** 1289:8 1292:20,25
1293:3,19,24 1297:17,18
1302:25 1304:5,14,19
1311:7,10 1314:17 1316:4
1320:18 1325:10 1329:12,
15 1333:1 1334:7,14,16,20
1341:21 1346:24 1361:14
1368:18 1372:3,10,21
1380:7 1381:24 1382:5,20
1383:1 1386:6,8 1394:5
1398:5 1403:4,15 1404:5,

11 1408:6,9 1426:20
1427:21 1428:19 1432:9
1433:5 1436:25 1439:17
1450:16 1451:1 1452:16
1453:1,13 1460:15
1462:18 1468:12 1471:19
1474:1,3 1476:22,23
1477:20 1486:10,25
1502:4,16 1506:20 1509:8,
9 1510:3 1520:23 1522:23
1527:25 1556:23 1560:20
1570:1 1572:23 1573:2
1580:6,15,16,19,20
1584:20 1585:24 1587:18
1595:16 1607:3 1617:25

**background** 1413:2
1596:18,25

**bad** 1293:8,9 1427:20

**badgering** 1343:18

**bag** 1380:7

**ballpark** 1397:7

**Baltimore** 1483:14 1484:9

**Baltimore-washington**
1484:21

**banner** 1345:18 1359:8,11
1395:10 1491:20

**banners** 1395:25

**barely** 1483:17

**bargaining** 1498:21
1513:4 1517:22 1529:20
1553:23 1559:15 1563:1

**Barnett** 1308:16 1342:23
1579:9 1590:3 1594:14

**base** 1512:20 1513:7,13,15
1521:25 1552:19,24
1573:22,24 1574:1,2,8,15,
22 1576:3 1590:10,23
1603:14

**based** 1456:13 1464:20
1466:8 1488:14 1491:5
1505:21 1524:15 1553:16
1555:18 1576:3 1577:2,3
1598:4,13 1600:23
1606:10 1613:14,18
1614:1 1615:3 1617:4

**bases** 1513:9 1518:8
1614:5

**basic** 1573:18

**basically** 1294:22 1378:15 1402:6 1503:7 1537:1 1601:4

**basis** 1392:8 1414:19 1424:2,8 1426:6,13,17 1439:4,10,12 1462:16 1510:6 1526:14 1596:3 1608:21

**baton** 1474:1,3 1501:4 1510:22

**beating** 1410:7

**Becky** 1308:11 1329:2 1337:16,18 1339:5,8 1416:15,22 1420:1,3

**began** 1505:5 1515:14 1587:16

**begin** 1569:12

**beginning** 1311:2 1330:21 1410:14 1527:21 1534:9 1546:23 1588:18

**begins** 1526:2

**behalf** 1287:16 1288:2 1355:9

**behaved** 1485:12

**behavior** 1537:3 1548:12 1565:12 1566:14 1567:4 1570:24

**behemoth** 1617:24

**belabor** 1463:13

**belaboring** 1464:18

**Belanger** 1431:8 1437:25

**belief** 1336:5 1382:12 1424:2 1425:2 1439:2 1456:16 1459:18 1498:10

**beliefs** 1289:15,24 1290:25 1291:5 1345:9,10 1366:1,25 1367:3 1382:11, 16,18 1383:13 1404:3,4 1427:23 1429:10 1456:9 1459:4,14 1461:1 1469:24 1470:13 1491:3 1493:8 1495:18 1496:21 1497:7, 21,25 1498:14,16 1550:2 1551:9,16 1598:13 1603:21,23

**believed** 1332:18 1363:15 1419:1 1485:11 1548:12 1598:3,8

**believes** 1551:14

**Bellinger** 1459:8

**belong** 1551:3 1570:23

**benefits** 1475:16,17,18,19 1476:18

**Beth** 1308:12 1329:1,4 1332:11 1336:12 1337:2,7 1404:15 1416:15,21 1417:8 1419:25

**Beverly** 1431:8 1437:25 1459:8

**bias** 1444:8

**biased** 1444:6

**bid** 1330:10 1410:15 1529:21

**bidding** 1542:14

**big** 1329:24 1330:1 1408:3 1426:20 1520:25 1597:2

**biggest** 1355:11

**Bill** 1424:12

**bills** 1305:17

**binding** 1494:3

**bishops** 1550:23,24

**bit** 1295:18 1302:20 1324:23 1331:9 1341:3 1364:2 1365:23 1377:23 1398:12 1407:24 1408:3 1412:18 1413:1 1417:12 1419:6 1438:17 1447:10 1468:21 1470:21 1483:15 1496:9 1513:1,19 1533:7 1552:12 1596:23

**blanketly** 1459:1

**blaring** 1303:8

**blind** 1566:1

**block** 1529:22

**blood** 1296:14 1298:2 1300:14,15

**bloodhound** 1303:6

**blow** 1331:13 1355:21

1364:1

**blue** 1301:5 1400:18,19 1524:17 1525:20

**blur** 1398:17

**board** 1422:10 1423:10 1444:19 1448:15 1461:11, 12 1546:18

**boards** 1407:19

**Bobby** 1287:9

**body** 1298:6 1374:7 1492:4

**bonus** 1475:24,25 1476:1

**bonuses** 1475:23

**booklets** 1409:1

**books** 1547:11

**boring** 1396:10

**boss** 1519:14 1560:23

**bosses** 1519:8,13

**bottom** 1318:18 1480:24 1527:4 1544:20

**box** 1377:20 1487:16 1510:14

**boxes** 1492:3

**boxing** 1473:22

**boy** 1413:15,16

**brain** 1296:17

**branch** 1575:21

**branched** 1402:7

**brand** 1569:23 1570:16,21, 25 1571:1

**breach** 1414:4,7,12 1418:6,8,21 1420:8,15 1421:3,5 1453:22

**breached** 1414:10,16,21 1415:6,8 1419:7,18 1420:21 1421:8,9

**break** 1372:2,19,20 1373:7 1386:23,24 1450:9,11 1451:3,6,11,16 1452:15 1476:2 1486:15,20 1501:3 1502:4,15,22 1506:20 1556:5,6,21 1616:5

**breaks** 1352:5,6

**Brett** 1429:18 1480:5 1481:10

**Brian** 1287:12 1293:21 1333:3 1336:1 1370:17 1381:4 1431:10 1438:24

**Brianna** 1518:23 1519:14, 15 1531:21

**briefing** 1432:23

**briefly** 1324:10 1337:5 1377:4 1382:21 1391:16 1396:19 1498:17

**bright** 1378:19

**bring** 1288:16 1309:10 1311:18 1368:1 1381:25 1435:20 1439:25 1453:5 1461:22 1494:15 1504:21 1561:19 1617:25

**bringing** 1413:23 1461:4

**broke** 1335:23 1582:12

**brought** 1321:3 1325:18 1477:19 1535:1 1544:18 1552:21 1553:8 1554:2 1581:16 1592:25

**bucket** 1429:23 1444:11 1449:7

**buckets** 1429:20,22

**bucks** 1300:22

**building** 1520:21,22 1521:1

**bullet** 1329:7,15 1330:19 1331:3,12 1332:3 1606:4 1613:22 1614:24

**bully** 1606:1

**bullying** 1331:18 1344:13, 14,17 1387:20 1503:9 1505:9 1514:4 1538:12 1539:19,21 1540:17 1541:5,11,23 1542:22 1544:10

**bunch** 1370:16

**burden** 1495:22,25

**bush** 1410:7

**business** 1297:13 1301:4 1321:25 1322:6,23 1323:8

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 473 of 642   PageID 11414
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 5 July 11, 2022                    Index: cabin..choose

1324:5,17 1325:11 1326:5
1367:9 1369:5 1376:7,8
1384:24 1385:7,9 1386:21
1403:9 1422:16 1423:18
1424:11,21 1462:4
1481:23 1579:7,8 1590:4

## C

**cabin** 1559:4

**calculations** 1452:23,24,
25 1617:5

**calendar** 1330:14 1524:24
1527:4

**call** 1289:4 1342:23 1345:4
1366:13 1391:17 1410:1
1414:15 1421:13 1465:17
1471:12 1480:2,5 1486:1,
24 1501:9,10,17,24
1504:15,22 1510:17,24
1519:13 1555:25 1556:2
1559:4 1563:8 1565:8
1572:22 1604:15 1605:13,
15

**called** 1291:12 1293:6,19
1296:19 1334:15 1341:21
1344:11 1347:9 1352:19
1365:19 1384:4 1387:3
1398:18 1400:8 1402:1
1431:11 1513:13 1518:14
1528:2,9,10 1557:13
1604:12,14

**calling** 1308:18 1475:9

**calls** 1317:2 1341:20
1371:20 1383:14 1389:14
1400:14 1414:14 1418:19
1424:5 1426:14 1427:4
1454:7 1468:1 1511:2
1552:15

**camp** 1459:12

**candidate** 1429:17

**cap** 1362:1

**capacity** 1499:16 1517:23

**captain** 1400:18

**capturing** 1591:5

**car** 1303:2

**cardboard** 1492:2

**care** 1397:13 1460:3,6
1535:3 1564:8 1574:3
1601:10

**career** 1296:23 1304:8

**careful** 1611:12 1614:21

**caring** 1534:21 1601:11

**carried** 1396:1

**Carrollton** 1558:13

**carry** 1395:24 1491:20,24
1536:4,6

**Carter** 1287:10 1289:1,3
1307:6 1328:2 1329:9
1355:6,17 1374:20 1375:4,
19,24 1376:5 1377:5
1378:1 1384:17 1395:3
1396:2 1402:23 1405:3
1412:16,25 1413:22
1420:20 1429:2,19
1434:19,23 1435:10,20
1439:19 1446:9 1453:10
1464:16 1465:8 1466:6
1469:15 1470:7,20
1471:25 1474:19 1480:2
1482:12 1486:1,12
1487:21 1491:10,16
1492:12,21 1493:4,23
1494:5,20,24 1495:10,16
1496:2,12 1497:6,12,22
1498:11,23,25 1499:7,8,
10,20 1500:2,11 1503:18
1508:21,23 1510:5
1514:24 1515:13,25
1520:6 1522:22 1523:10,
11,17 1524:15 1525:1
1527:1 1530:3,7 1532:10
1533:3 1535:11,13,17
1537:12 1538:17,22
1542:22 1551:6,14
1554:24 1555:5,8 1562:7
1575:25 1576:2,12,21
1582:5 1583:23 1585:16
1586:12 1587:19 1588:7
1589:2 1590:1,11 1591:12
1592:24 1594:17,20,25
1595:5,8,20 1597:13
1598:2,7,11,16 1599:11
1601:18 1603:17 1604:14,
15 1605:13 1606:14
1607:16

**Carter's** 1376:9 1379:5
1381:7 1488:9,22 1489:21
1491:3 1497:21 1498:10

1501:15 1515:5,12,19
1521:21,25 1522:7,24
1530:24 1531:5 1532:2
1534:16,25 1537:6
1542:20 1544:16 1545:11
1547:18 1548:12 1564:15
1580:7 1581:2 1582:16
1586:18 1588:24 1589:19
1596:6 1597:12,19
1600:18 1602:20 1604:11
1605:22,24 1607:9

**carved** 1434:13 1612:11

**case** 1298:9 1308:19
1310:21,23 1311:4,5
1314:12,14,20 1315:17
1338:20 1342:8 1364:17
1365:14,25 1366:9,14,23
1367:18 1369:18,22
1371:23 1372:24 1373:1,6
1375:12 1384:18 1395:20
1405:12 1413:25 1432:11
1450:20,21 1451:4,8,10,
18,20 1452:10 1461:19,21,
22 1462:13 1472:1
1473:25 1474:13,22
1486:21,23,24 1488:17
1491:17 1494:4 1505:5
1510:22 1514:24 1515:19
1534:16 1542:10,20
1548:14 1551:6 1556:10,
11 1561:9 1578:18 1579:3
1598:23 1612:12,17
1614:5 1616:8,9,16
1619:17

**case-in-chief** 1472:2

**case-wise** 1452:4

**cases** 1375:18 1489:2,13
1518:1 1548:14,18
1552:21 1579:18 1599:25
1610:22

**Casper** 1430:21 1437:19
1459:9

**cat** 1380:7

**categories** 1579:2
1593:22

**category** 1498:7 1518:7

**Catholic** 1550:22,24
1551:1

**causation** 1298:16

**caused** 1288:6 1296:7,8
1298:2 1299:12 1306:14,
15

**CEO** 1587:15,25

**certificate** 1413:3,5,8

**cetera** 1378:22 1408:6

**chain** 1519:1 1588:18

**chair** 1337:21

**chance** 1309:2 1310:16
1593:9

**change** 1323:13

**changed** 1477:12

**changing** 1407:20 1506:8

**character** 1549:16,19,20,
21

**characterization** 1313:15

**characterize** 1347:17
1597:19

**charge** 1287:2,21 1309:20
1348:12 1391:20,24
1409:8,11 1578:25
1617:23,24 1618:1,8,16,
17,22

**Charlene** 1287:10 1304:2
1329:9 1338:9 1361:22
1404:17 1482:12 1514:24
1520:6 1524:14 1575:25
1586:12 1588:7 1590:1

**cheaters** 1561:19

**check** 1387:11 1487:16
1585:12

**check-the-box** 1493:24

**Cheri** 1430:15 1437:15

**chief** 1472:1 1473:25
1474:13

**child** 1408:18

**chiming** 1494:22

**choice** 1316:23 1317:7
1319:9,12 1374:6,7
1491:25 1492:4,17
1595:15 1602:19 1603:4
1607:20 1608:2

**choose** 1542:16

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 474 of 642   PageID 11415
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022              Index: chooses..concept

**chooses** 1312:20

**chose** 1347:4,5 1415:18 1461:18

**Chris** 1304:22 1305:9 1342:24 1414:23 1415:15 1416:4 1418:24,25 1589:22

**Christian** 1289:16 1345:16,21 1365:10,16 1367:1 1382:11,12,16,18 1383:2,17 1427:25 1456:16 1457:10 1458:24 1461:14 1465:10,22 1466:17 1468:7,15 1469:10,24 1490:21 1492:19 1497:7,23 1603:17,22

**Christianity** 1454:19,21 1455:22 1459:1 1466:25 1468:8

**Christians** 1458:11,15 1459:20

**Christmas** 1405:21

**church** 1551:1

**churches** 1399:4,23

**circle** 1585:24

**cite** 1489:13

**claim** 1288:13 1295:19 1344:10 1364:21 1367:6 1369:25 1379:10,11,12 1382:20 1392:5,7,8 1414:3 1458:5 1461:4 1472:21 1488:4,10,13 1490:14,17 1492:22 1493:1,14,15,17 1494:13,15 1495:15 1497:20 1499:18 1598:2, 11

**claimed** 1461:6

**claiming** 1365:24 1418:5 1438:18 1453:17

**claims** 1289:10 1309:16, 17 1379:9,15 1381:4 1413:23 1423:23 1432:11 1434:7,11,14 1453:22,24 1467:4 1473:5,11 1474:21 1490:11,18 1492:25 1493:4,21 1495:9 1496:23 1497:1 1515:5 1612:14

**clarification** 1618:10

**clarify** 1294:5 1344:25 1345:1

**clarity** 1377:23 1463:12 1464:16

**class** 1401:2 1409:17,19

**clean** 1393:13

**cleanly** 1397:11

**clear** 1418:5,12,14 1451:24 1467:5 1489:2 1496:14 1507:19 1582:9 1603:12

**clemency** 1499:14,15

**Clerk** 1511:8 1557:20 1573:8

**click** 1484:3

**clip** 1481:8 1485:20

**clipped** 1313:1

**clips** 1364:14

**clock** 1387:13,18 1388:7 1452:23

**close** 1340:11 1358:19 1371:20 1612:1 1617:21 1618:22

**closed** 1401:3

**closely** 1512:20

**closer** 1452:25

**closing** 1618:2,11,14

**clothes** 1532:12

**Cloutman** 1287:16

**clubs** 1570:22

**co-employee** 1326:2 1385:19 1542:7 1606:15

**co-employees** 1602:2

**code** 1320:4 1614:12

**coincide** 1402:14

**colleagues** 1570:18

**collection** 1489:23 1550:24

**collective** 1448:16 1513:4 1517:21 1529:20 1553:23

1559:15 1563:1

**college** 1304:4 1476:24 1575:17

**colluded** 1375:8

**Colorado** 1399:1,22 1511:23 1528:23

**colors** 1587:17,22

**combination** 1487:22 1593:19

**comfortable** 1390:8 1433:11

**commend** 1411:3

**comment** 1318:23 1605:7

**comments** 1376:24 1491:7 1499:6,20 1500:3 1569:22 1607:9

**commit** 1478:11

**committed** 1534:17 1535:19 1569:4,5

**committee** 1340:25 1442:19 1444:6 1446:24 1447:13,16 1448:9,19

**communicate** 1604:10

**communicated** 1513:6

**communicating** 1292:7 1550:3

**communication** 1323:17 1388:16,19 1467:8

**communications** 1289:18,25 1291:16 1323:20 1434:2 1439:21 1478:15 1487:23

**community** 1408:19 1409:4,18

**companies** 1476:2 1569:8

**company** 1293:13,15 1316:1 1329:8 1331:16 1337:23 1375:7 1395:7,9, 14 1414:8 1424:10,17,20 1427:15 1462:5 1478:20 1512:19,23 1513:23,25 1514:6 1548:13 1553:2 1559:20,22 1560:1,7,9,12 1564:6 1565:15 1566:1 1567:7,13 1570:2 1587:24 1601:7 1603:5 1610:2,13

1613:4,12 1615:16,23

**company's** 1395:17 1570:25

**comparator** 1378:22 1379:10

**comparators** 1491:4

**competently** 1417:7

**compiling** 1311:13

**complain** 1341:14 1370:4

**complained** 1321:23 1325:6 1357:2 1489:24,25

**complaining** 1315:9 1323:9 1459:20 1562:9

**complaint** 1314:15,23 1321:22 1322:4 1326:1 1327:3 1360:17 1369:17 1370:24 1371:10 1377:7 1380:19 1429:5 1441:10, 11 1450:1,6 1469:13 1477:19 1482:13,17,19 1483:1 1489:11 1498:24 1499:19 1515:22 1517:10 1520:3 1521:15 1538:16 1544:15,18 1553:5,8 1562:16 1563:4 1571:21 1600:5 1614:23 1615:10

**complaints** 1294:25 1322:13 1341:17 1343:11, 13 1380:10,14,20,23 1381:13 1515:12 1538:20 1552:14 1553:18 1555:5 1575:25 1576:21 1602:21

**complete** 1343:13 1431:6, 25 1465:2 1553:14

**completed** 1522:2

**completely** 1324:4,17 1392:10 1460:13 1570:12

**completeness** 1526:15 1614:7,14

**comply** 1331:15,25 1334:23 1478:20 1554:17

**component** 1487:16

**compound** 1339:1 1385:5 1388:20,23

**concede** 1472:24

**concept** 1462:18 1485:16

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 475 of 642   PageID 11416
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022                              Index: concepts..correct

1494:8 1507:2 1538:11,12, 15 1568:6 1586:13

**concepts** 1473:2 1512:25

**concern** 1333:14 1463:22 1534:20

**concerned** 1341:11 1601:14

**concerns** 1324:2,15 1336:10,12 1337:14 1338:6,10,23 1609:19,22

**concession** 1504:8

**concluded** 1299:20 1310:1 1319:17 1372:15 1394:6 1433:25 1464:9 1474:8 1485:20 1540:5 1550:12 1612:4 1620:3

**concludes** 1485:21

**conclusion** 1366:13 1369:21 1383:15 1389:15 1414:15 1418:20 1424:6 1426:15 1427:5 1454:8 1468:2 1542:21 1552:16 1596:1,3

**conclusions** 1456:11

**concourse** 1574:21

**concur** 1373:22

**condition** 1299:12 1300:2

**conduct** 1352:25 1488:18 1489:1,18 1513:22 1544:21 1545:11,12 1589:1,13 1605:22,25 1606:5

**conducted** 1522:8 1571:20 1601:13

**conducting** 1542:14 1593:25

**conducts** 1562:19

**confer** 1550:25

**conference** 1287:2,21 1393:19 1550:22 1604:14 1617:23 1618:9,16,22

**conferring** 1611:24

**confidante** 1482:3,6

**confines** 1424:16

**confirmed** 1361:9

**conflict** 1442:13

**conflicted** 1493:8

**conformance** 1549:20

**confronted** 1497:20

**confusing** 1309:5

**Congratulations** 1555:22

**congruence** 1379:14

**conjecture** 1490:4

**conjunction** 1374:1

**connect** 1491:2 1551:15

**connected** 1542:16

**connection** 1331:6 1488:25 1489:3,18 1503:13 1515:11 1521:18 1522:25 1530:23 1532:1 1535:9 1538:16 1544:9 1547:24 1551:2 1563:12 1581:2,10 1583:19 1584:11 1586:19 1595:3 1598:15 1603:13

**consequences** 1544:4,11

**consideration** 1331:4 1497:2

**considered** 1379:4 1482:5 1488:22 1494:9 1503:13 1583:19,21 1597:6 1599:10 1601:2 1602:16

**consistency** 1288:11,14

**consistent** 1362:22 1378:24 1382:16,18 1548:17

**consistently** 1376:5 1552:25

**conspiracy** 1441:25 1442:2,12

**constant** 1296:20 1298:5

**constitution** 1358:4,24,25 1466:20,21

**construed** 1487:20

**construes** 1488:18

**consult** 1482:8,11 1547:24

1563:11

**consulted** 1548:7 1549:4, 5

**consulting** 1550:4,6

**contact** 1338:1

**contacted** 1338:17,21

**contend** 1348:1 1395:7

**content** 1519:7 1521:6,20, 22 1537:13 1543:20 1544:2,24 1545:2,15

**contention** 1325:5,8 1395:6 1426:20

**contents** 1519:24 1539:25

**context** 1309:22 1324:13 1452:8 1468:4 1471:7 1494:7,9 1542:2 1562:15 1565:19 1579:24,25 1600:1

**continue** 1288:21 1433:16 1453:8 1524:19 1526:21 1529:4 1554:20,24 1573:13

**continued** 1288:23

**continuing** 1292:18 1308:4,5 1313:13 1327:11 1350:10 1394:18 1416:8, 11

**continuously** 1336:17

**contract** 1293:11 1426:21, 22 1428:11 1440:16 1444:12,15 1460:3 1466:19 1476:1 1512:17 1513:2,3,21 1517:24 1552:25 1553:1 1559:16 1560:3,6,12

**contractors** 1546:19

**contractual** 1559:22

**contractually** 1330:9

**contribution** 1476:12

**control** 1486:17

**conversation** 1344:18 1419:5 1434:24 1436:5 1519:23 1563:15,17 1595:25 1613:15

**conversations** 1406:7

**coordinated** 1513:7

**coordinators** 1574:7

**copied** 1519:5 1585:8

**copies** 1515:24 1547:10

**copy** 1301:25 1534:5 1536:2 1538:8 1540:16

**cordial** 1406:1,19

**core** 1334:13 1449:16 1477:16

**corporate** 1287:17 1521:2 1569:13

**correct** 1295:2 1296:5,12 1307:22 1308:1 1310:18, 24,25 1311:3,7 1312:24 1314:12,13 1315:1,10,11 1321:23 1322:5,18 1328:5, 6,17 1329:10,11,14,22,23 1330:21,22 1331:7,8,10, 11,22 1333:18 1334:3 1335:21 1339:23 1341:10 1342:1,19 1343:10 1344:4, 9,15,24 1345:21,22,25 1346:2 1347:3 1350:3,5,8, 17 1351:4 1354:3 1356:16 1357:20 1358:24 1359:15 1360:19 1361:1,2,4,19 1364:4,9 1366:1 1367:20 1370:25 1381:8 1383:24, 25 1385:16,25 1387:7,8 1395:8 1397:17 1398:1,4, 20 1399:8,19 1400:6 1407:7,13,16,17,20,21 1408:1,13 1409:21 1411:11,18,19,21,22 1412:1,2,23 1414:4,5,13 1415:22 1416:2,7 1417:7, 17,19,21 1418:3 1422:5, 14,17 1423:8,9,17,19 1425:10,14 1426:12 1434:24,25 1436:5,6 1437:11 1440:23 1443:24 1444:13 1448:4,5,8,18 1449:19 1454:3,4,5 1455:18,19,21 1462:1,14 1467:9,10,20 1470:8,14 1471:10 1475:4,8 1476:18 1477:15,18 1478:16,17,23 1479:1,5,10,13,14 1503:25 1504:19 1508:18 1517:7, 16 1518:19 1521:10 1525:18,19 1531:14,15 1535:7 1555:1,2 1577:23

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 476 of 642   PageID 11417
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Index: corrected..damage

1587:25 1588:19 1597:14
1598:17 1600:2,6 1605:12
1613:23 1614:25 1615:1,8

**corrected** 1509:3

**correctly** 1332:9 1454:15
1512:18 1518:17 1530:25
1577:6 1582:2,18 1595:19

**costume** 1364:12

**costumes** 1363:13
1364:10

**couch** 1303:9

**counsel** 1291:23 1317:14,
23 1335:7 1348:12
1350:24 1359:22 1367:10
1389:7 1394:4 1407:3
1419:13 1439:21 1501:15
1503:23 1506:2 1508:21

**counseling** 1298:8
1305:17 1306:8,10
1602:14

**counselor** 1298:8

**count** 1312:18 1442:12

**counted** 1442:8

**counter** 1483:5

**counting** 1441:21 1442:10
1443:12 1510:9

**couple** 1302:12 1372:3
1406:11 1483:10 1512:25
1519:4 1606:13

**court** 1287:4,11,14,19
1288:10,17,20 1291:7
1292:10 1294:5,13 1295:5,
9,15 1296:2 1297:24
1298:17,20 1299:15,22,23
1301:15,20 1303:20
1305:18,21,25 1306:4
1307:2 1308:3,5,23
1309:9,13,14,24 1310:3,4
1311:23 1312:8 1313:10,
16 1316:8,16 1317:10,23
1318:2,8,24 1319:2,7,13,
19,20 1320:3,6,10,14,18
1322:20 1324:9,14
1326:13,18,24 1327:13,19,
24 1330:7 1333:12 1335:5,
15 1336:20 1337:4
1338:15 1339:3 1342:11
1343:22 1346:18 1348:10,
12 1349:19,21 1350:11,13

1351:11 1353:5 1354:14
1356:1,6 1358:12 1362:11,
14 1363:24 1366:10,15
1368:9,12 1369:23
1370:13 1371:3,6,15,18
1372:1,9,13,17,18,23
1373:5,11,12,19,22
1374:24 1376:12 1377:2,4,
11 1378:6,11,15 1379:6,24
1380:13,21 1381:8,22
1382:2 1383:16 1384:11,
13 1385:6 1386:4,10
1388:11 1389:5,16
1390:13,17,21 1391:3,9,
13,17,23 1392:12,22
1393:8,23 1394:2,8,9,14,
16,20 1396:12,15 1403:21
1404:22 1405:18 1414:18
1415:14 1416:10 1418:12,
17,22 1419:13,22 1420:17
1421:1 1424:7 1426:16
1427:8 1428:20,23 1431:2,
5,17,21 1432:4,7 1433:4,
14,22,24 1434:2,3
1435:16,23 1436:3,17
1437:2,5 1439:6,23 1442:6
1443:8 1445:20 1449:2
1450:9,13,16,19,25
1451:17 1452:1,20,21
1453:5,7 1454:11 1456:12
1462:23 1463:6,15,21
1464:8,11,12 1465:5,16
1466:2 1467:14,17,21
1468:5 1469:6 1470:4
1472:6,11,14,18 1473:15,
18 1474:3,6,10,11 1475:1
1476:8 1479:18,21,24
1480:7,11,18 1483:6
1485:25 1486:4,13,22
1487:4,11,19 1488:12,18
1489:2,13 1494:5,10,18
1495:2,21,23 1496:8
1500:19,20 1501:8,14,20
1502:2,14,20,24 1503:4,17
1504:12,14,17,20,22,25
1505:3 1506:14,18,25
1509:7,13,16,18,19
1510:17,21 1511:4,9,17
1516:9,12 1522:15,18
1523:24 1526:17,20
1531:15 1533:18,21
1536:13,16 1539:3,7,13,16
1540:3,7,8,23 1541:1
1543:4,8 1546:5,7 1548:24
1549:3,10,23 1550:5,9,14,
15 1551:12,20 1552:17

1555:11,13,15,18,21,25
1556:4,9,16,19 1557:3,4,7,
12,16,21 1558:5 1561:5,8,
11,22 1564:22 1565:3
1567:18 1571:5 1572:5,7,
11,15,18,22 1573:1,9
1576:16 1580:11 1583:11
1584:8,15 1585:12,15,18,
23 1586:2,5 1588:13
1592:2,8,11,15 1593:2,11,
16 1603:25 1604:3,23
1606:24 1607:23 1608:19
1609:4 1610:6,9,16,19
1611:6,14,25 1612:6,7
1613:5 1614:9,11,17
1616:4,7,13,24 1617:7,18
1618:13 1620:1,2

**courteous** 1567:16

**courtesy** 1511:12

**courthouse** 1619:5,8

**courtroom** 1288:19
1333:10 1342:21 1348:13
1349:6 1351:3,13 1352:11
1373:4 1382:1 1430:15
1432:7 1435:14 1445:6
1446:1,21 1450:24 1453:6
1480:1 1487:3 1510:20
1556:13 1557:11 1562:8
1572:18,24,25 1590:18
1616:12,18,21,23

**courts** 1494:9

**cover** 1573:17 1616:25

**covered** 1573:18

**covering** 1380:14 1472:21

**covers** 1425:3

**COVID** 1401:2,12

**coworker** 1470:12,23,25
1568:8,9

**coworkers** 1542:18

**create** 1490:10 1510:8
1531:10 1553:7

**creates** 1490:23

**credibility** 1376:9,10
1377:10

**credit** 1480:19 1524:20
1525:10 1599:13

**crew** 1588:7

**cried** 1349:13

**criticizing** 1500:15

**cross** 1493:9 1508:18
1509:22

**cross-examination**
1307:4 1405:1 1551:21
1571:6 1580:10 1584:7
1607:1

**cross-examine** 1299:14
1504:4 1507:21

**cross-examined** 1515:9

**crossed** 1601:4,6

**crux** 1519:17

**crying** 1295:21 1349:12
1483:17

**cue** 1481:6

**cued** 1480:12

**culture** 1601:9

**current** 1421:14

**curriculum** 1399:11
1408:25 1412:4,5

**customer** 1534:11,23
1567:22,23,24 1568:4,6
1569:3 1575:13

**customers** 1533:5
1534:12 1567:12 1568:10
1569:5,7,11

**cut** 1335:6 1456:23
1465:19 1556:19 1566:20

**cute** 1405:18

**cutting** 1556:17

**cyberbullying** 1503:15
1505:20 1507:2,13 1508:7,
9,10 1538:11,12 1554:25

---

**D**

**daddy** 1410:1,4

**daily** 1560:5 1574:4

**Dallas** 1350:5 1352:10
1485:13 1512:6 1520:14,
16 1604:12

**damage** 1295:19

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 477 of 642   PageID 11418
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                Vol 5 July 11, 2022                    Index: damages..discon

**damages** 1288:13
1299:17 1493:20

**darn** 1440:8

**date** 1328:4,7,9 1330:24
1541:7 1589:12

**dates** 1525:1 1560:19

**daughter** 1296:9 1300:17
1302:20 1303:10 1306:16
1398:10,21 1408:12
1476:24

**Dawn** 1405:20

**day** 1287:7,8 1293:20
1301:9 1334:15 1366:3
1405:19 1408:17 1409:2,3,
17,19 1412:25 1422:22
1424:1 1431:11 1451:2
1484:12 1493:13 1527:3,
25 1528:23 1567:1
1569:12,13 1604:19
1606:19 1616:5

**days** 1293:5 1328:12,16
1406:11 1409:8,16,19
1410:15 1505:10 1526:12

**DC** 1345:17 1389:23
1519:18

**deal** 1329:24 1330:1
1340:11

**dealing** 1306:20,21 1338:4
1411:2

**deals** 1384:3

**dealt** 1294:19 1314:8
1322:15 1384:24 1387:4
1517:21 1518:1

**death** 1294:22

**debate** 1345:10

**December** 1512:2 1526:1
1530:17,18

**decide** 1290:10 1577:10

**decided** 1461:21

**deciding** 1488:8

**decision** 1307:21,24
1328:14 1402:23 1488:25
1489:14 1490:7,25
1504:11 1547:17,25
1549:14,15 1550:3 1555:8
1564:14,21 1571:25

1583:20,25 1594:2,4
1599:14,16,21,22,24
1600:18,22,23 1602:23
1603:2,3,6,18 1604:10,13,
15 1605:14 1606:16

**decision-maker** 1488:7

**decision-makers**
1488:21

**decisions** 1482:9 1501:12

**dedicated** 1534:10

**deemed** 1570:13

**deeply** 1340:6

**Defendant** 1287:13

**defendants** 1314:12
1487:5 1508:21

**defense** 1287:23 1288:2,6,
9,15 1392:4 1495:22,25

**define** 1337:6

**defined** 1299:10

**degrading** 1363:15

**degree** 1431:22,23
1487:19 1583:18

**deliberations** 1619:7

**delivered** 1547:13

**Delta** 1301:5,7 1400:19
1575:12

**demeanor** 1597:20

**Denise** 1342:22 1343:15
1517:4,12 1531:19 1586:9
1590:2 1594:1 1599:17

**denotes** 1527:10

**Denver** 1302:17,19
1303:11 1410:14 1524:16
1573:22 1574:15,22
1576:4,5,7 1590:10,23
1603:14 1614:1

**Denver-based** 1329:9
1613:23

**deny** 1500:22 1501:1

**department** 1365:5
1384:3,4 1548:6 1563:7,8,
9 1575:13 1577:11

**departments** 1563:6

**depend** 1501:25

**depending** 1340:16

**depicted** 1613:21

**depicting** 1601:1

**depos** 1480:14

**deposition** 1310:19
1315:18 1400:22 1427:7
1480:5,6,23 1485:23

**depth** 1443:19 1473:20

**derogatorily** 1485:12

**derogatory** 1607:9

**describe** 1308:8 1405:23
1407:4 1521:17 1534:7
1540:1,10 1541:10
1554:11 1591:15 1597:12

**describing** 1525:15

**description** 1331:5
1574:11

**designate** 1617:12

**designates** 1528:14

**designation** 1527:13
1528:16 1529:18

**designations** 1527:9

**designed** 1361:5

**desk** 1520:13,21 1521:5

**detail** 1610:25 1611:1

**details** 1580:2

**determination** 1515:16
1599:18

**determine** 1580:17
1605:24

**determined** 1548:15
1605:21 1615:6,7

**determining** 1512:21
1578:25

**detrimental** 1569:22
1596:20

**devastated** 1582:12

**DG** 1577:5,8

**diagnosed** 1298:7

**dialogue** 1341:4 1359:16

1360:21 1361:17 1369:8
1470:15 1595:21,25
1597:9

**Diego** 1575:16

**difference** 1322:11
1332:20 1376:21 1517:18

**differentiation** 1381:2

**differently** 1368:21
1460:12

**difficult** 1466:6

**dinner** 1297:13

**Dipippa** 1445:24 1446:2
1447:18

**direct** 1288:23 1379:11
1472:4 1473:7 1478:4
1511:18 1516:21 1519:14
1521:7 1531:12 1558:7
1566:3 1568:20 1573:15
1580:9 1584:5

**directed** 1347:16 1495:6
1500:18

**directly** 1328:20 1433:12
1514:8 1565:22

**director** 1411:18,21,23
1518:22 1559:2,6,10
1560:23,24 1565:11

**Directors** 1546:19

**disagree** 1487:18

**disagreed** 1338:18 1359:3

**disappointed** 1563:25

**disciplinary** 1610:22

**discipline** 1334:8 1336:7
1375:10 1376:18 1385:15,
18 1491:12 1515:17
1518:10 1522:12 1543:23
1544:6,12 1548:17
1559:23 1580:17,23
1602:14,17 1611:1,2
1612:16,21

**disciplined** 1323:15
1325:1,9 1335:19 1612:13

**disciplines** 1371:8

**disclaimer** 1480:22

**discon** 1482:22

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022                    Index: discovered..egregious

**discovered** 1384:2

**discovery** 1288:7 1489:1

**discriminate** 1466:21,22

**discriminated** 1454:1 1455:17 1456:8 1458:5 1459:5 1468:14 1496:20

**discriminating** 1598:8

**discrimination** 1331:19 1379:11 1450:5 1453:25 1455:20 1457:8 1467:3 1492:24 1493:4,15 1494:13 1495:9 1498:16 1499:18 1518:2 1536:24 1537:4 1538:4 1554:19 1606:8

**discriminatory** 1485:10

**discuss** 1339:24 1349:23 1381:12 1586:6 1605:19

**discussed** 1340:2 1356:3 1381:6 1394:11 1464:13 1581:25 1599:20

**discusses** 1507:6 1534:10

**discussing** 1378:1 1397:8 1609:8

**discussion** 1361:21 1379:20 1380:2 1451:1 1474:19 1519:17 1582:13 1598:22

**discussions** 1411:9 1432:8 1580:23

**disgusted** 1348:5,19

**disgusting** 1348:20 1367:19,23 1368:24,25 1369:3

**disheartened** 1578:5

**dismissal** 1433:6

**disorder** 1298:11 1300:9

**disparate** 1499:21 1553:7

**disparately** 1492:20

**displayed** 1458:16 1534:14

**dispute** 1422:23 1468:18 1494:10,11

**disputes** 1559:20

**disregard** 1362:15 1384:14 1433:15 1434:4, 16 1493:22

**disrespect** 1602:5

**dissent** 1325:14 1426:3 1429:24 1449:8,13

**distinct** 1493:3,14

**distraught** 1483:14

**distributed** 1547:8,10

**districts** 1399:2

**disturbing** 1578:11

**diverse** 1459:23 1460:2 1564:9

**Divine** 1402:1,19 1411:21, 24

**division** 1562:18 1563:8,9

**divisions** 1560:9

**doctor** 1296:19 1299:1

**document** 1295:11 1312:5 1313:19 1318:21 1327:22 1328:2,23 1331:5 1334:22 1337:15 1359:23 1362:13, 19 1370:21 1377:25 1390:25 1391:5,8 1392:8 1394:12,24 1441:13 1503:10,21 1504:13 1507:14 1508:16 1510:2 1516:16 1521:8 1524:1,11, 14 1525:6,7 1531:18,19 1533:12,23 1534:2 1536:2, 18,22 1539:10,12,18,19 1540:1,2,10 1541:3,8 1543:10,13,25 1544:9 1546:9,13,15 1565:6 1568:14 1585:5 1588:16 1592:4,13 1593:4,10 1595:16 1606:3 1608:17 1609:15 1613:18 1615:3

**documentation** 1361:7 1439:18

**documents** 1301:22 1306:1 1307:18 1310:24 1311:1,13 1312:10,15,23 1314:20 1333:20,22,25 1475:11 1522:1,4 1524:11 1525:15,17 1538:21 1548:6 1554:12 1588:11

1591:12,15,17 1593:19,23 1594:20

**dog** 1303:5

**domicile** 1444:19

**Don** 1314:16,24 1341:15

**Donna** 1444:14,15,17,18 1447:15

**door** 1303:2 1380:5

**doors** 1303:1

**double-edged** 1432:23

**doubt** 1446:19

**dozens** 1492:14

**drawn** 1378:20

**dress** 1364:5,6 1566:11

**drinking** 1302:21 1306:13, 20

**driving** 1297:18

**drove** 1297:17

**drug** 1297:19

**drugged** 1297:5

**drunk** 1303:9

**due** 1297:25 1356:21 1362:6 1519:7 1579:21,24 1602:17

**dues** 1321:20 1322:24 1346:13 1407:10 1459:22 1461:15 1462:8,12 1469:16 1470:17 1471:15 1487:25 1602:22

**dues'** 1489:25

**dues-paying** 1352:16 1389:12

**duly** 1511:7 1557:19 1573:7

**duplicative** 1585:20

**duties** 1370:1 1527:14 1574:4 1601:6

**duty** 1304:20 1365:25 1369:20 1379:12 1414:4,7, 10,21 1418:6 1419:8,18 1420:21 1421:3,9 1453:23 1498:21 1523:6 1529:8 1552:13 1575:19 1619:3

**E**

**ear** 1618:9

**earlier** 1309:14 1358:5 1374:2 1377:21 1396:15 1406:3,5 1427:6 1434:5 1440:21 1484:12 1488:12 1496:1 1530:22 1548:3 1553:20 1588:4,19 1602:4 1611:15 1618:20

**early** 1372:3 1486:19,20 1577:19

**earn** 1400:25 1401:10 1476:23

**earned** 1401:8

**earning** 1302:10

**earnings** 1396:20 1397:3

**easier** 1496:10

**easy** 1408:23

**eating** 1296:21

**echo** 1495:6

**ed** 1343:7,16 1357:20 1361:25 1454:17 1489:20 1497:2 1498:2 1521:24 1547:23 1572:21 1573:7, 21

**Edie** 1308:16 1342:23 1590:3

**Edith** 1579:9

**education** 1413:2,9

**educational** 1411:17,20, 23

**Edward** 1287:16

**EEOC** 1391:20,24 1498:12

**effect** 1320:1,22 1494:3 1495:7

**efficient** 1591:4

**effort** 1340:21

**efforts** 1398:12 1408:5 1411:3 1498:9

**egregious** 1335:1 1404:16 1566:13

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 479 of 642   PageID 11420
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022                Index: egregiousness..exchange

**egregiousness** 1564:12 1600:24 1602:18

**eight-minute** 1502:4,15 1506:20

**Eighty-three** 1516:9

**elaborate** 1366:11

**elaboration** 1335:9 1346:21

**elected** 1315:8

**election** 1481:19 1487:24 1598:23

**electronic** 1547:12

**electronically** 1547:13 1570:15

**element** 1488:4

**elements** 1493:16

**elicit** 1595:24

**eliminated** 1375:10

**else's** 1319:16 1355:23 1356:4,6 1444:4

**email** 1314:5 1315:5 1324:20,21,25 1325:2,3,7 1338:22 1388:18 1471:11 1505:4 1516:19,25 1517:4 1518:12 1519:16,19 1532:17 1561:16,18 1562:5,13,15 1576:20,22, 24 1577:4,12 1585:8 1586:9 1588:17 1592:18, 21 1593:7 1608:9 1619:21

**emailed** 1324:20,24

**emails** 1490:5 1519:25 1551:3 1583:15,19 1584:4, 11 1619:22

**embedded** 1487:23

**emergency** 1297:4

**Emlet** 1501:11,22 1502:5, 19,20 1504:3 1509:11,13 1511:3,4,7,9,21,22 1516:22 1548:19 1550:18 1551:23 1554:5 1556:15 1560:14 1563:11 1579:12, 13,17 1586:10 1594:23 1599:20 1600:1 1605:6

**emotional** 1349:1 1351:4

**employed** 1511:24 1558:14,16 1574:23 1586:16 1615:15,23

**employee** 1293:9,23 1294:2,11 1322:18,21 1323:3 1331:24 1342:3 1365:7 1375:6 1376:18,23 1384:7 1482:24 1484:23, 24 1492:5 1498:4,13,15 1499:17 1515:24 1517:13, 19 1518:1 1523:5 1524:14, 15 1535:2,13,18 1538:13 1541:21 1542:5,6,17 1543:16 1544:5,17 1563:7 1566:9 1567:5 1571:16,20 1572:1 1577:5,9,12 1578:7 1579:5,11,21 1589:12,14 1590:2 1600:10,14 1602:6 1603:4 1612:13,15

**employees** 1370:5,18 1375:3 1380:11 1381:14 1491:5 1498:22 1499:14, 16,22,24,25 1500:13 1513:23 1534:18,20 1535:20,21 1538:2,6 1540:13,15 1541:15 1542:4 1543:18 1544:23, 25 1545:5,8 1546:18,20 1552:3 1565:21 1566:9,18 1567:4,11,15 1568:3 1569:6,10 1570:6 1571:2 1574:5 1601:8,21,23 1602:1,12 1609:9 1614:1

**employer** 1395:4

**employment** 1298:22 1397:19,25 1398:13 1400:5 1401:23 1488:9,23 1489:22 1491:4 1522:21 1523:15 1547:18 1548:8 1564:15 1583:20 1600:19 1603:19 1604:11 1606:17

**end** 1336:21 1416:19 1417:15 1420:4 1451:2 1493:13 1494:24 1526:1 1556:21 1585:24

**end-of-the-day** 1452:25

**ended** 1297:1,3 1314:9 1402:5 1505:13

**ends** 1362:1

**enforced** 1514:3

**engage** 1292:1,13 1293:1 1294:25 1478:5 1568:3

**engaged** 1291:16 1496:12

**engages** 1499:12

**engrained** 1569:15

**enhance** 1532:24 1533:1

**ensure** 1552:24 1562:22, 25

**ensures** 1564:6

**ensuring** 1512:17 1517:24

**entered** 1288:19 1382:1 1453:6 1510:20 1557:11 1572:25 1588:17

**entertain** 1504:7

**entire** 1432:24 1547:2 1577:9

**entirety** 1350:21

**entitled** 1600:12

**entries** 1529:16 1530:2

**enumerated** 1497:8,9

**enumerates** 1499:9

**environment** 1412:12 1534:18

**equal** 1357:4 1358:3,7,10, 22 1359:1 1374:2,4,6

**equally** 1569:10

**equivocated** 1377:6

**escalate** 1601:15

**escalation** 1601:3

**essentially** 1298:15 1307:24

**establish** 1312:7 1489:3

**established** 1318:22 1575:23

**establishing** 1549:20

**estimate** 1475:19 1476:10, 11,13

**evaded** 1498:8

**evasive** 1339:12

**evening** 1410:19

**event** 1500:14,15 1589:15

**events** 1591:19

**eventually** 1482:12 1547:12

**everybody's** 1459:18

**evidence** 1295:12 1301:21,23 1306:2 1311:22 1312:5,19 1313:20 1318:21 1327:23 1355:14 1371:2,6 1375:13 1378:22,25 1379:1,8 1394:13,16 1396:12 1397:11 1403:6 1432:25 1480:25 1481:1,4 1488:6, 10,17,20 1489:19 1490:4, 12,13 1491:21 1492:2,13, 18 1493:19,21 1496:19 1503:2 1506:1,16 1516:17 1524:2 1531:13 1533:24 1536:19 1539:4 1543:11 1546:10 1561:2 1576:15 1582:24 1583:11 1585:21 1586:11 1589:17 1591:25 1592:5,14 1593:9 1594:7, 16 1599:9 1604:21,23 1608:20 1611:3 1618:22

**evoke** 1351:7

**exact** 1321:14 1323:22 1347:12 1358:18 1397:1 1405:19 1441:6 1567:21

**examination** 1288:23 1389:9 1474:17 1502:11 1505:17 1511:18 1558:7 1573:15 1580:5

**examine** 1507:21

**examined** 1505:25

**examples** 1537:2 1543:25 1544:1

**exceed** 1472:18

**exceeded** 1293:10 1472:11,15 1473:6

**excellent** 1416:3

**exception** 1290:9,11 1452:2

**excerpted** 1571:24

**excessive** 1332:14

**exchange** 1331:4

exclude 1375:8

excluded 1299:3

exclusive 1498:21

excuse 1353:18 1465:24 1491:16 1559:7 1575:7

excused 1555:22 1556:15 1572:13,17

excusing 1572:15

executing 1370:18

execution 1376:24 1377:1

executive 1314:7 1407:19 1423:10 1490:7

exert 1555:3,7

exhaust 1393:10 1494:14

exhausted 1392:2

exhaustion 1392:13,23

exhibit 1295:4,12 1301:14, 25 1311:19 1313:20 1317:15 1327:7,8,23 1355:13 1363:23 1379:20 1380:2 1382:3 1390:23 1391:2 1394:10,13 1396:11 1475:9 1476:25 1477:2,17 1478:1,2,18 1486:3,6,9 1497:3,4 1498:24 1499:19 1502:19, 25 1503:11,16,25 1504:22, 25 1505:8,15 1506:8,15,21 1507:1,4,7,15 1509:23 1510:13 1516:7,8,17 1523:20,21 1524:2,8 1529:6 1531:12,17 1533:10,16,24 1536:8,11, 19 1537:18 1538:3,25 1540:24 1543:1,3,11 1545:24 1546:4,10 1561:2 1576:14 1583:8 1585:10, 14,22 1586:1,3,8 1588:2, 10,12 1591:24 1592:1,4,14 1594:7,9 1604:21 1608:6, 20,23 1609:13

exhibits 1301:12,23 1305:16,22 1306:2 1373:21 1374:9 1505:6,7, 11,14 1506:6 1508:22 1561:4,7 1585:20 1617:19

exit 1520:21

exited 1373:4 1450:24 1487:3 1556:13 1572:24 1616:12,23

expand 1513:19 1596:22

expect 1360:20

expectation 1360:22 1545:4

expectations 1543:18 1565:15 1567:5,10,11,12, 14 1569:18

expected 1534:22

expends 1488:1

experience 1340:5 1346:3 1479:4 1520:8 1553:16

expert 1298:16,23

explain 1296:16 1302:16 1313:4 1410:12 1419:12 1433:20 1435:24 1483:15 1513:1 1517:18 1534:2 1536:21 1543:13 1548:2 1559:9 1573:19 1578:3 1580:2 1581:5 1583:18 1584:10 1589:4,15 1593:7

explained 1338:14 1403:1 1478:14 1490:20 1599:1

explaining 1337:2

explanation 1337:5 1595:23 1596:6

explicit 1537:25

explicitly 1499:20

explore 1324:23

express 1609:19

expressed 1333:14

expressing 1333:15

expression 1365:16 1382:10,12 1551:7,8

expressions 1481:3

extent 1366:12 1376:15 1380:8 1393:12 1414:14 1439:20 1452:10 1454:7, 11 1468:1 1582:14 1583:21 1604:9

external 1534:12

externally 1534:22

extra 1617:2

extreme 1298:3

eyes 1436:9

---

## F

fabrication 1615:5

face-to-face 1589:14 1597:13

Facebook 1290:7,11 1291:3,18 1293:2 1324:4, 16 1333:21,24 1334:2 1335:25 1342:7 1343:15 1347:7,10 1363:8 1449:10 1454:18,21,22 1456:2,5,17 1466:17,25 1468:10 1477:3 1478:25 1485:7 1496:15,17 1500:8 1520:1 1521:21 1530:25 1531:5,7 1532:1,2 1533:4 1538:23 1544:16,17 1580:7 1581:2, 6,7,21 1582:17 1584:12 1586:15,18,21 1588:24

faces 1317:21

facility 1484:19,20

fact 1288:7 1291:12 1292:6 1298:1 1303:18 1329:20 1330:4 1338:8 1340:23 1341:25 1349:22 1355:8 1367:18 1375:19 1376:15 1384:17 1400:1 1403:5 1414:17 1456:17 1460:14 1475:5 1479:8 1491:6 1495:16 1505:19 1521:22 1541:23 1542:10 1552:5 1569:15 1570:15 1583:23 1584:23 1585:1 1592:17, 20 1593:13 1594:6 1600:8

fact-finding 1289:8,14 1304:23 1305:1 1321:4 1334:15 1337:23 1342:15 1343:12 1344:22 1355:17 1359:12 1365:9 1367:17 1383:3 1414:13,17,22,25 1415:11,16,22 1418:7 1419:9 1431:12 1454:16 1490:20 1497:7,22 1503:12,19 1507:3 1522:6, 7 1589:1,9,10,19 1590:9, 12 1591:13 1592:6

1593:25 1594:21 1595:3,6 1597:20 1598:3,7,11 1599:15 1601:18

factor 1295:6 1497:8,10

facts 1366:14 1390:12

factual 1424:8 1473:13

factually 1392:17

failed 1448:4 1494:13 1553:5

failing 1498:14

fails 1427:5 1492:25

failure 1393:9 1493:16 1497:19

fair 1304:21 1305:2,4,11 1307:13,25 1310:13,15 1311:14,17 1314:25 1322:4 1328:7 1329:25 1330:25 1332:1 1337:11, 13 1342:8,16 1347:19 1348:2 1354:6 1355:10 1357:4 1358:2,7,22 1359:5 1360:18 1366:25 1369:15, 20 1379:12 1387:21 1388:8,24 1397:16 1399:14 1405:13 1406:1,8 1411:7 1421:3 1425:3,8 1430:1 1436:9 1441:9,25 1446:9 1448:1,14 1450:2 1455:16 1456:22,25 1457:6,8 1458:24 1460:9, 21 1463:25 1599:6 1611:23 1615:2

fairly 1318:6 1417:6

faith 1365:16 1458:21 1485:22

fall 1314:18

falls 1459:11

false 1442:22,25 1443:1 1614:16

familiar 1360:3 1514:9,23

familiarize 1546:20

family 1296:10,23 1300:17 1340:10 1406:4 1570:8,20 1587:7

family-type 1602:7

fault 1486:7

Case 3:17-cv-02278-X Document 387-1 Filed 01/02/23 Page 481 of 642 PageID 11422

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022          Index: favorably..friend

**favorably** 1458:19
1459:15 1495:13

**fear** 1553:19

**feared** 1553:16

**February** 1512:11 1525:9,
12 1526:4 1559:7 1560:17

**federal** 1493:23

**feedback** 1359:14 1360:5,
7,9,12

**feel** 1458:10 1464:17
1581:15 1599:6 1602:7

**feeling** 1404:18 1581:23

**feels** 1463:23 1579:3

**fees** 1500:10

**fell** 1410:20

**fellow** 1322:9,18,21
1326:2 1372:23 1422:14
1450:19 1486:22 1556:9
1601:7 1616:7

**felt** 1417:6 1458:8 1495:12
1520:19 1601:5

**female** 1361:6

**Ferguson** 1412:15

**fetus** 1385:2

**fetuses** 1340:15

**fetuses/babies** 1351:24

**fiduciary** 1414:4 1453:23
1462:6

**Fifty** 1585:12

**fight-and-flight** 1296:20
1298:2

**figure** 1417:9

**figured** 1357:6 1395:18

**file** 1293:10 1332:7 1450:1
1508:23 1523:4,5 1619:15

**filed** 1371:24 1559:21

**filing** 1392:1

**filings** 1619:21,22

**finalized** 1591:8

**finally** 1397:18 1411:1
1492:19 1546:24

**find** 1290:18 1334:7
1359:23 1378:18 1433:10
1447:12 1463:12 1478:19
1506:9 1508:11 1547:2
1597:9

**finding** 1592:17,20
1593:13

**findings** 1442:18,19
1444:1 1448:13,18

**fine** 1335:8 1372:13
1391:11 1451:15,21
1452:1 1473:15 1495:2
1502:6 1508:15 1509:15
1510:14 1540:4 1556:20,
21 1617:9

**finger** 1459:16

**finish** 1294:7 1324:9
1330:7 1337:4 1348:15
1363:3 1386:19 1431:3,5,
21,22 1439:7 1618:5,7

**finished** 1326:14,22,24
1348:9,17 1386:19 1401:2
1453:21

**fire** 1479:9 1497:12

**fired** 1301:3 1306:22
1339:10 1370:20 1427:15
1456:16 1478:22,24
1479:4 1496:14,18
1497:13,17 1498:12
1499:17

**firing** 1335:2 1498:13

**fit** 1584:24

**Fitch** 1498:13

**fixated** 1509:25

**flash** 1306:4

**flesh** 1433:2

**flew** 1303:16 1527:3,6,23
1575:3

**flies** 1545:17 1547:5

**flight** 1291:13 1310:12
1322:9 1326:2 1329:9
1333:7 1352:21 1353:17,
18 1356:17,22 1357:3,7
1359:3,10 1364:11
1370:16 1387:7 1389:13
1390:9 1395:15,20,24
1435:3 1439:14 1482:24

1491:22 1512:15,16,18,22
1513:10,14,20,21 1514:10
1517:24 1522:24 1523:5,
14 1524:5 1527:12
1528:23 1529:19,21
1531:7,8 1532:3,24 1534:4
1536:1,3,4 1538:8
1542:11,15 1545:16
1546:25 1547:1,5,11
1552:22 1554:8,14,20
1559:3,4,17 1560:10
1565:13 1573:22,25
1574:1,3,12,14 1575:1,3,9
1580:24 1587:3 1590:10,
24 1609:16,23

**flights** 1536:6

**flip** 1583:9 1594:10

**flipping** 1402:21

**floor** 1295:21

**flow** 1450:14

**flowery** 1566:12

**flown** 1330:4,14

**fly** 1302:13,20 1303:18
1330:2 1397:9 1410:3,15,
17,19 1501:12 1525:1,11,
23 1529:9,12,17 1536:1
1545:14,22,25 1554:24
1565:8 1569:13

**flying** 1302:19 1329:25
1410:3,9 1411:10 1481:23
1524:22 1529:14,22
1530:2,4,7,11,15,18
1545:19 1554:21

**focus** 1512:15

**focused** 1509:21 1553:21

**focusing** 1505:17,19

**folder** 1409:13,14

**Foley** 1430:14 1436:21
1437:11 1459:11 1615:13

**folks** 1563:3,5

**follow** 1340:21 1547:1
1604:17

**food** 1346:14

**foreclosed** 1610:21

**foremost** 1535:13,18

**forever** 1290:16 1566:6

**forget** 1339:16 1484:22

**forgive** 1417:3

**forgot** 1545:7

**form** 1602:13

**formal** 1617:23 1618:8,16,
22

**formulate** 1454:15

**Forty-four** 1523:24

**forward** 1334:24 1505:22
1518:25 1553:8 1554:2

**forwarded** 1517:10
1518:13,15,18 1521:7
1531:20 1577:4

**found** 1295:22 1334:25
1335:24 1343:8 1413:17
1455:20 1497:5 1503:22
1523:11 1536:3 1568:17
1588:23 1593:13

**foundation** 1294:1,10,14
1313:13 1341:1 1392:20
1445:14,21 1564:20
1613:5

**fourth** 1429:23 1449:7

**fox** 1441:18

**frame** 1412:18 1580:18

**frames** 1562:25

**frankly** 1432:18 1490:18

**fraud** 1441:12,14

**fraudulent** 1443:24
1448:14,19

**free** 1293:1 1552:9
1571:15 1616:18

**freedom** 1295:1 1424:13
1470:15 1471:2 1616:19
1619:7

**frequently** 1481:21
1482:8

**Friday** 1289:3 1340:5
1347:24 1451:2 1503:1
1619:3

**friend** 1294:12 1302:24
1340:12 1421:15,18
1482:1 1587:6

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 482 of 642   PageID 11423
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 5 July 11, 2022                    Index: friends..hands

**friends** 1435:1,5,6,9,11
1457:19 1458:14

**front** 1309:4 1310:22
1431:1 1445:18 1446:7,18
1504:10 1593:24

**Frontier** 1301:10 1400:18

**Frye** 1452:22 1504:22
1511:5 1557:9,17 1573:5

**full** 1330:6 1397:19
1428:14 1475:12 1476:23
1558:9 1562:15

**full-time** 1304:7,10,14
1398:7

**fully** 1442:25

**funnier** 1619:2

**funny** 1354:19

**future** 1331:16 1433:17
1479:3,4,12

---

**G**

---

**gain** 1607:12

**gallery** 1435:18 1436:15
1440:11

**garage** 1303:1,2

**Garcia** 1341:20

**gate** 1387:12

**gather** 1439:15

**gathered** 1548:4

**gave** 1293:6 1310:16
1325:13 1407:15,18,24
1423:7,13 1426:2 1601:12

**gee** 1463:23

**general** 1355:8 1429:24
1449:7 1491:18

**generally** 1354:11
1355:10 1521:17 1534:7
1541:10 1552:6 1591:15
1613:25

**generated** 1566:23

**genitalia** 1361:6 1363:20

**gentleman** 1304:22

**gentlemen** 1288:25

**get all** 1325:22 1443:20

**Gilliam** 1287:9 1372:8
1373:16,17,20 1376:13
1378:8,14,17 1379:22
1380:18 1393:4 1496:5,9
1500:20 1557:6 1610:20
1611:22

**girl** 1346:5

**give** 1294:24 1300:20
1325:16 1330:11 1383:20
1389:7,9 1393:25 1396:24,
25 1401:14 1410:22,24
1416:10 1423:9 1425:24
1452:23 1460:17 1475:13
1476:13 1479:8 1486:19
1509:10,14 1523:15
1543:25 1557:9,25 1580:2
1589:14,16 1599:12
1619:7

**giving** 1305:11 1330:6
1338:19 1465:1 1537:2
1567:21 1579:21

**glad** 1363:12

**glasses** 1397:5

**goal** 1311:9

**good** 1288:25 1289:1,2
1293:9 1307:6,7 1322:13
1334:19 1402:21 1405:3,4
1413:13 1417:8 1418:24
1458:1 1467:1 1482:1
1509:21,25 1510:6,10
1551:23,24 1591:4

**goodness** 1561:25

**gosh** 1303:3 1431:9

**grabbing** 1362:7

**graciously** 1510:25
1618:25

**graduated** 1398:23

**Grant** 1518:18,23 1519:14
1521:11 1531:21

**granted** 1324:3,16
1378:23 1384:13

**graphic** 1564:12 1577:13
1578:6 1596:17 1601:1,16
1602:6

**gratuitously** 1432:4

**great** 1416:4 1427:20
1487:11 1570:4 1582:14
1583:21 1591:5 1601:2,9

**greatest** 1604:9

**GREEN** 1419:3

**Greenfield** 1287:15,21,25
1295:7 1299:5 1301:17
1305:24 1327:17 1376:1
1377:3,5,22 1378:18
1380:3 1381:1 1404:23
1405:2,8 1414:20 1415:17
1416:20 1419:16 1420:12,
19 1421:4 1424:22
1426:18 1427:10 1429:1
1432:22 1434:20,21,22
1435:19,24 1436:1,4,18
1437:7 1439:9 1440:2
1442:16 1443:17 1445:22
1449:5,6 1452:9 1455:10
1456:21 1462:24 1463:3,
11,18 1464:1,4,14 1465:3,
7,14,18,24 1466:4,5
1467:19,23 1468:16
1469:4,14,18,20,25 1470:6
1471:24 1472:3,23 1473:3,
8,10 1479:22,23 1484:22
1494:21,25 1495:4
1523:23 1533:20 1536:15
1543:7 1546:6 1551:20,22,
25 1553:3 1571:5,7,10
1592:10 1606:24 1607:2
1608:3,5,8,25 1609:7,12,
14 1610:7,10,11 1611:12
1612:8,22,23 1613:1,9
1614:20,22 1617:16,17

**Greenfield's** 1572:9

**Greg** 1430:21 1437:21

**grievance** 1337:9,21
1342:16 1559:19

**grievances** 1308:12
1559:21 1560:2

**grievant** 1329:9

**grieve** 1335:20

**gross** 1566:13 1570:10,12

**grounds** 1299:4 1374:12

**group** 1334:13 1348:21
1409:20 1449:16 1459:24,
25 1460:3,21 1512:15,16
1513:14 1517:23 1547:6

1551:4 1559:4,16 1564:9
1565:14 1577:9,10
1584:25 1602:11

**groups** 1560:7,8 1579:4

**growing** 1409:6

**guard** 1611:9

**guarding** 1441:19

**guess** 1328:10 1336:2
1338:7 1339:7 1360:2
1381:1 1386:23 1388:2
1463:24 1500:7 1519:10
1544:17 1565:20 1592:5,6
1617:10,20

**guidelines** 1540:12
1579:19,20 1599:21,22,23

**Gutierrez** 1342:22 1343:1,
15 1360:3 1361:18
1516:24 1517:4,12
1518:11 1519:24 1521:21
1531:20,23 1578:25
1585:6 1586:9 1590:2,6
1594:1,14,24 1599:17
1606:10 1617:12

**Gutierrez's** 1578:23

**guy** 1310:11

**guys** 1432:22 1435:11

---

**H**

---

**habits** 1601:9

**half** 1413:17 1529:25
1530:1 1581:22

**half-day** 1452:24

**hand** 1436:22,23 1438:2
1557:17 1611:7

**handbook** 1540:13,14

**handed** 1483:18 1484:8
1594:20

**handful** 1405:12

**handing** 1501:3

**handled** 1441:24 1442:15
1443:16

**handling** 1339:9

**hands** 1375:17

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 483 of 642   PageID 11424
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Index: handwritten..Honor

**handwritten** 1508:3

**handy** 1585:22

**hang** 1359:22 1479:16

**Hannah** 1303:12,15

**happen** 1400:10 1551:2

**happened** 1301:9 1303:4, 22 1333:17 1334:21 1336:5 1388:17 1415:2 1456:15 1503:7 1527:21 1580:3,18,24 1581:17,18, 20 1582:24 1589:15 1596:19

**happening** 1336:9

**happy** 1504:20 1506:13

**harassing** 1537:14,24 1584:4

**harassment** 1331:19 1358:2,22 1536:24 1537:3, 4 1538:3,4 1552:9 1562:17 1571:16 1579:1 1584:22 1594:2 1599:19 1606:7

**harassment/sexual** 1599:19

**hard** 1456:14 1476:11,12

**harder** 1618:7

**hardship** 1288:2

**harm** 1334:16 1462:7 1532:24 1533:1

**harmed** 1330:12 1430:23 1431:14 1435:7 1438:14, 15 1441:7

**harming** 1292:16 1334:19 1370:19

**hat** 1322:22 1352:19 1361:22 1362:3,20 1363:17,20 1365:20 1368:1

**hateful** 1566:4

**hats** 1361:1,5,19 1362:5 1363:1,9,14 1364:17 1365:17 1367:19 1368:2, 23 1537:16,25

**haul** 1502:7

**hazing** 1331:18 1344:14, 15,17 1387:20 1503:9

**head** 1438:5 1532:9 1613:22 1614:25

**headed** 1318:1

**headquarters** 1520:15 1521:2 1535:25

**heads-up** 1410:22

**health** 1300:17 1455:8 1460:4

**Healthcare** 1489:14

**hear** 1318:10 1377:12 1383:11 1424:1 1426:2 1481:1 1494:20,21,23 1496:2 1503:5 1507:23 1565:4 1584:14 1610:5,9 1614:11 1617:10,13,15,18, 19

**heard** 1352:24 1365:4 1366:3 1377:12,13 1380:6 1383:10 1384:5 1400:19 1407:3 1411:9,15 1412:17 1413:1 1418:1,15 1432:8 1480:20 1560:13 1599:4 1613:2 1615:14

**hearing** 1307:8,12,20,23 1308:8,10,19 1310:8,14,17 1311:3,9 1312:11,22 1315:19 1316:3,22 1318:16 1319:24 1320:9, 20 1321:6 1328:8,10,15 1350:3,7,16 1416:6 1417:15 1419:17,19 1420:22 1497:22 1506:15

**hears** 1611:21

**hearsay** 1297:21 1298:25 1299:6 1313:13 1343:19 1522:15

**heart** 1298:3 1352:5,6 1369:17

**heated** 1422:19 1426:23

**heavily** 1302:22

**heavy** 1406:13

**Heck** 1429:16

**held** 1299:21 1310:2 1319:18 1372:16 1394:7

**Hofer** 1430:21 1437:21

**hold** 1312:15 1317:23 1318:13 1320:6 1326:13 1336:20 1343:22 1349:19 1356:1 1358:12 1362:11 1363:3 1366:15 1370:13 1419:13 1428:20 1431:2, 17 1439:6,23 1449:2 1467:17 1485:18 1522:15 1526:17 1561:20 1593:25

**held** 1299:21 1310:2 1319:18 1372:16 1394:7

**1434:1 1464:10 1474:9** 1513:21 1540:6 1550:13 1553:13 1590:9 1612:5 1617:8

**helped** 1352:17 1408:20

**helpful** 1481:5

**henhouse** 1441:19

**Hensley** 1302:25 1430:18 1437:17 1615:20

**Herb** 1587:15,21

**Herb's** 1587:17

**hey** 1300:19 1337:14 1341:3 1503:24 1611:17

**Hibbit's** 1611:2

**high** 1296:15 1374:19 1567:11,12,23

**higher** 1374:11

**highest** 1534:10 1569:3

**highlight** 1608:6

**highly** 1429:13 1505:24

**Hill** 1287:10 1302:5 1483:4, 7 1516:11 1522:17 1523:22 1526:14,19 1533:17 1536:12,14 1539:1,11,17 1540:22 1543:6 1548:23 1549:11 1551:11 1552:15 1555:12, 14 1556:18

**hire** 1568:1

**historical** 1583:1,15 1599:24

**history** 1334:1 1341:9 1490:9 1548:14 1580:16, 22,25 1581:7,9,16,19 1583:22 1598:17 1599:12

**hit** 1401:2

**1614:9**

**holder** 1440:17

**holding** 1616:13

**holds** 1444:21

**Holly** 1430:23 1437:23 1609:17 1610:25

**home** 1302:25 1303:15 1398:10 1401:7 1409:10 1528:12 1542:6,8,15

**homeschool** 1413:5

**homeschool-type** 1412:12

**homeschooled** 1398:21

**homeschooling** 1408:12, 17,20,22 1409:9 1411:11

**honest** 1417:1

**honestly** 1360:23 1364:13 1373:17 1403:7,23 1443:4 1459:10 1463:4 1469:11

**Honor** 1287:25 1295:7,8, 14 1297:23 1301:18 1305:24 1307:3 1308:2,22 1309:1,25 1313:12 1320:2 1327:9,17 1333:11 1335:4, 11 1336:15 1337:1 1346:17 1348:8 1350:9 1353:9 1355:22 1366:5 1368:3 1369:11 1370:12 1371:1 1374:25 1376:1,11 1377:3,10,22 1378:18 1379:22 1381:1 1418:9 1419:10 1424:6 1433:11, 23 1435:17 1436:2,10 1442:3 1450:8 1462:25 1465:15,24 1466:4 1467:11 1469:25 1471:24 1473:14 1474:16,25 1476:4 1480:4 1483:4 1485:21 1486:2,11 1487:7, 18 1489:5 1491:9,14 1493:1 1494:17,25 1504:13,19 1505:2 1506:10,24 1508:20 1510:16 1531:14 1543:7 1548:25 1551:19 1564:20 1572:4,6,10 1576:18 1586:4 1588:10 1592:10, 19 1593:8 1603:24 1608:13 1610:4,8,10,14,20 1611:13,22,23 1614:6

1616:3 1617:17

**hope** 1369:7 1372:7

**hoped** 1360:14

**hoping** 1360:12 1369:9 1595:20

**horribly** 1430:24

**horrific** 1351:18

**hospital** 1297:1,7,19

**host** 1327:10

**hot** 1360:15 1455:5

**hotel** 1297:18 1346:14 1350:5 1352:10 1542:13

**hour** 1450:22 1452:6

**hours** 1297:4 1388:7 1408:16 1524:22 1528:25

**house** 1303:5,7,8 1401:6

**Housekeeping** 1556:14

**hubs** 1513:10

**Hudson** 1501:19 1556:2, 20,24 1557:7,15,16,19 1558:11,12 1561:15 1565:10 1571:8

**huge** 1310:21 1345:23 1351:17 1376:21

**human** 1570:7 1579:7,8 1590:3

**hundred** 1460:14

**hurt** 1357:12,13

**husband** 1295:22 1296:24 1297:6 1302:17 1303:8,15 1306:12,20 1398:8 1408:19 1410:12,21 1587:7

**husband's** 1400:17

**hypothetical** 1389:7,8 1390:1,11,15,20 1465:12, 15

---

**I**

**ID** 1532:12

**idea** 1396:4,5 1463:4

**ideal** 1618:23

**identified** 1493:5 1531:6 1532:2

**identifier** 1527:5

**identify** 1328:2 1459:17 1495:11 1565:6 1593:22

**ignore** 1326:3

**Ill** 1287:16

**ill** 1520:19

**illegal** 1292:2,3 1478:5,11

**image** 1532:23,25 1533:1 1601:1

**images** 1369:1 1577:13 1578:6,8 1581:14 1584:1 1588:3 1592:22 1594:12 1595:24 1596:17 1597:4,6 1606:15

**imagine** 1578:9 1613:25

**immediately** 1559:2

**Imomovich** 1430:23 1437:23 1609:17,20 1610:2,13 1613:3

**Imomovich's** 1611:1

**impact** 1296:10 1300:16 1553:10 1566:10 1582:10 1600:8 1601:23 1602:3

**impacted** 1340:6 1410:8

**impactful** 1549:13

**impacting** 1411:8

**impacts** 1543:22

**impeach** 1355:25 1356:8

**impeachment** 1318:21 1355:23

**implement** 1411:25

**implemented** 1540:19

**implementing** 1398:25 1412:8

**implicate** 1542:8

**implicated** 1537:5 1538:15

**implicating** 1537:22

**implications** 1553:8

**important** 1347:1 1482:8 1531:9 1532:20 1569:10 1596:16,20

**impossible** 1449:25

**impression** 1299:8

**impressions** 1576:11

**improper** 1312:4 1317:8 1318:20,21 1355:22 1390:15,19 1436:16 1443:23 1580:9 1584:5 1608:16

**in-depth** 1377:23

**inaccurate** 1445:12

**inadmissible** 1392:21

**include** 1427:6 1475:16

**included** 1497:5

**including** 1330:23 1508:6 1514:3 1543:24 1544:7,12 1546:18 1554:18 1559:3, 23

**income** 1402:17

**inconsistency** 1318:22 1319:6

**inconsistent** 1391:7 1392:17,19 1484:2

**Incredible** 1318:10

**independent** 1544:14

**indicating** 1581:6 1582:24 1586:11

**indication** 1491:19 1493:8

**indicative** 1587:23

**individual** 1332:25 1495:11 1544:19

**individual's** 1571:1

**individuals** 1438:11 1440:4,5 1444:5 1447:21 1452:13 1459:3,14 1518:20 1571:2

**industry** 1587:22

**inept** 1585:2

**infer** 1492:15

**inference** 1490:10 1492:21

**inferential** 1489:12 1492:10

**influence** 1571:19 1603:1, 3

**inform** 1289:14

**informal** 1287:2,20

**information** 1299:9 1313:2 1320:25 1321:14 1365:19 1374:8,15 1395:23 1433:17 1434:12 1439:15 1489:9 1490:24 1498:3 1548:4 1579:23 1592:24 1595:2 1597:11 1607:19

**informed** 1504:11 1605:13

**informing** 1289:4

**ingrained** 1569:12

**initial** 1587:15

**initially** 1570:14 1573:19 1586:10

**initials** 1527:5

**input** 1549:5

**inquire** 1380:9

**instance** 1291:2 1554:1 1571:18,23

**instances** 1379:3

**instant** 1484:2 1538:23

**instruct** 1451:14

**instructing** 1420:24 1493:19

**instruction** 1309:6 1378:24 1393:14 1400:23 1433:21 1611:17

**instructions** 1309:13 1372:22 1378:20,21 1450:18 1486:21 1556:8 1616:6

**insurance** 1475:22

**intend** 1502:18

**intended** 1538:1 1553:1

**intense** 1422:21,24

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022                                    Index: intent..jury

intent 1341:6

intention 1304:6 1393:8

intentionally 1375:12

interacted 1602:11
1603:13

interactions 1405:23

interest 1442:13

interested 1395:6 1525:5

interesting 1477:5

interfered 1377:7

internal 1541:18,19
1567:24 1568:6

international 1314:10,24
1315:6,10 1341:15
1466:20

international's 1325:20

internet 1541:19

interpretations 1458:25

interpreted 1560:12

interrupted 1337:3
1348:11

interrupting 1324:7
1326:10 1336:18 1368:8
1450:14

Intervention 1402:1,19
1411:21,24

interview 1301:6 1522:8
1581:10,13 1582:1,9

interviews 1374:5

intimidating 1537:14

intranet 1538:7 1540:15
1541:18 1545:9

introduce 1317:15
1502:18

introduced 1487:20
1507:15,16 1546:17

investigate 1518:5
1552:13 1553:5,9

investigated 1289:10
1442:20 1553:18

investigating 1552:21

investigation 1489:8,11
1497:3 1515:16 1520:6
1521:14,18 1522:10,25
1523:4 1530:24 1535:10
1537:6 1542:20 1548:5
1553:15,21 1555:4
1571:20 1575:24 1576:3,
12 1577:19,24 1578:24
1579:5 1581:3,8,11
1586:19 1593:25 1598:16,
20,25 1599:3,6 1600:4,9
1606:11 1607:6 1608:1
1615:7

investigations 1522:2,4
1562:19

investigator 1577:11
1589:18

investigators 1517:14

invite 1477:1

involve 1487:25 1553:19
1579:4 1583:25

involved 1310:23 1321:4
1367:8 1376:6,8 1400:3
1403:9 1424:10 1474:20
1487:24 1490:7 1515:4,6
1520:5 1548:2 1549:8
1552:20 1575:24 1578:18
1599:5 1603:5

involvement 1521:14
1553:19,20 1563:12

involves 1612:12

ipads 1554:15

irrelevance 1435:18

irrelevant 1357:8 1549:12

issue 1287:22 1288:2
1299:2 1306:20 1320:7
1340:11 1345:24 1347:1,
14 1349:20 1358:6
1370:12 1371:7,19,22
1372:19 1373:14,15
1376:4 1378:5,7,8,9,16
1380:17 1388:8 1392:1,14,
15,16 1398:5 1417:24
1437:2 1438:8 1451:23
1495:22 1502:22 1505:18
1506:23 1549:16 1601:19

issued 1547:4 1548:18
1549:7,17 1554:16
1565:16

issues 1293:15 1306:14,
15 1309:4,7 1341:16
1358:7,21 1359:5 1371:21
1381:4 1383:7 1384:3
1392:11 1402:12,13
1417:25 1428:12,15,16
1486:15 1487:1 1550:25
1551:5 1572:15 1619:13

issuing 1565:19

italicized 1543:19

---

**J**

jacket 1566:12

Jackson 1333:9 1430:14
1431:16 1437:13 1440:11
1459:8 1613:12,16,17

January 1399:7 1519:18
1524:18,20 1525:2,21,22
1526:1 1546:14,16,23
1576:8

Jeanna 1333:9 1430:14
1431:16 1437:13 1440:10
1459:8 1613:12,16,17

Jessica 1361:10 1446:12
1447:5,7,12

Jet 1301:5 1400:18,19

jetway 1588:8

Jim 1314:6,7,9

job 1292:20,25 1296:22,25
1297:3,10 1298:12 1301:2
1306:12,22 1311:7,10
1315:20 1316:4,18
1329:12 1356:21 1357:2,5,
12,13 1358:25 1399:16
1403:4,15 1404:5,19
1405:9 1416:3,4,19 1417:8
1418:24 1420:5 1436:25
1458:2 1476:22 1523:17,
18 1529:19 1559:12
1584:24 1585:3 1587:18
1590:22 1591:5

jobs 1353:14 1359:6,7
1455:6,8 1460:4,5

John 1445:23 1447:18

join 1509:5

Jones 1342:21 1589:21
1590:17

journey 1411:5

JS2 1529:19

Juan 1405:20

judge 1372:7 1393:1,21
1494:5 1618:25 1619:3,14,
15,16

judgment 1487:15 1494:1

July 1529:7,8

jumbotron 1351:17

jump 1408:9,10

June 1528:19,20,21

jurisdiction 1494:10

jurors 1288:19 1372:23
1373:4 1382:1 1450:19,24
1453:6 1486:22 1487:3
1510:20 1556:9,13
1557:11 1616:7,12

jury 1288:16,18 1290:10
1292:1 1295:14 1304:3
1306:5 1308:8 1309:5,6,
19,21 1311:23 1312:19
1313:18 1315:16 1323:2
1351:15 1362:15 1363:25
1376:10 1377:19 1380:6
1381:23 1383:5,10
1384:14 1390:2 1392:14
1393:13 1396:13 1413:24
1421:25 1425:8 1428:13
1433:15 1434:3,16
1450:16 1452:17 1453:3,
16 1459:13 1463:5
1481:12 1483:7,15 1486:5,
7,10 1487:2 1488:10
1490:13 1492:10,15,23
1493:19 1504:10,18
1506:16 1507:23 1509:9
1510:14,18,19 1513:1
1516:15 1517:12,18
1521:17 1524:10 1525:5
1529:8 1531:18 1534:2
1536:21 1541:10 1543:13
1548:2 1552:12 1554:11
1557:5,14 1558:9 1559:9
1560:13 1565:6 1573:20
1576:17,23 1578:3 1581:5
1583:12,18 1584:10
1588:13 1589:5 1591:16
1592:15 1593:7 1600:24
1604:24 1608:21 1616:11
1617:25 1618:17 1619:6,

12

**jury's** 1612:9

**justified** 1597:24

## K

**keeping** 1394:2

**Keith** 1444:14,15,17,18 1445:7 1447:15

**Kelleher** 1587:15,21

**Kent** 1436:22,23 1438:2

**kick** 1372:2

**Kim** 1302:25 1430:18 1437:17 1615:20,22,23

**kind** 1353:7 1354:19 1357:1,8 1360:21 1375:11 1387:25 1406:3 1410:20 1430:19 1438:7 1449:8 1453:12 1461:3 1469:13 1501:11 1502:1 1521:18 1524:9 1563:25 1574:5 1580:4 1583:9 1594:10

**kindness** 1601:11

**Kinkeade** 1618:25 1619:14

**knew** 1291:14 1297:2 1300:7 1303:14 1322:13 1327:19 1333:7,8 1334:17 1341:24 1346:9 1351:19 1357:18 1365:2 1403:23 1404:6 1406:4 1409:1 1419:2 1449:24 1458:16 1466:17 1498:3 1515:23 1562:4 1578:19 1599:4 1600:3

**knit** 1361:25

**knitted** 1365:17

**knowing** 1461:19 1462:3 1596:18,24 1617:8

**knowingly** 1498:8

**knowledge** 1440:3 1454:12 1456:13 1458:13 1489:6 1613:7

**Knowledge-wise** 1459:9

## L

**labeled** 1526:16

**labor** 1423:24 1424:4,9,14, 24 1453:22 1512:12,13 1517:15,19,21 1518:22 1552:18,23 1559:3,7,10 1563:9 1565:11 1579:6,10, 11,18 1599:23

**lack** 1379:14 1564:20 1613:5

**lacks** 1377:17 1494:10

**ladies** 1288:25

**laid** 1294:10 1392:20 1408:24 1409:11 1425:2

**language** 1392:6 1503:14 1507:2 1541:9 1544:22

**lanyard** 1290:9

**laps** 1520:24

**laptops** 1554:15

**large** 1505:16

**Las** 1577:2,3

**last-chance** 1293:6,7 1294:18 1328:3,9 1329:22

**latched** 1497:6

**late** 1288:12

**latest** 1618:18

**launch** 1558:3

**law** 1487:9,15 1492:25 1493:23

**lawsuit** 1364:21 1434:8,14 1437:5 1468:19 1475:7 1515:21

**lawyer** 1309:11 1346:20 1463:7,16 1515:9

**lawyer's** 1511:11

**lawyers** 1452:11 1557:24

**lay** 1298:23 1373:16 1600:17

**laying** 1295:25

**lead** 1559:14,18

**leader** 1574:17

**leaders** 1375:15 1521:7,11 1531:20 1552:24 1603:8

**leadership** 1602:21

**leading** 1291:6 1292:9 1295:24 1298:14 1303:19 1474:24

**league** 1375:7

**leaning** 1451:9

**leap** 1492:10

**learn** 1599:17

**leave** 1287:22 1303:15,22 1373:5 1387:13,14,15 1450:25 1479:25 1528:3 1572:18 1616:18 1619:7

**led** 1389:22

**left** 1296:1 1399:7 1408:4 1420:2 1453:13 1524:13 1527:20 1528:11

**leg** 1416:17

**legal** 1366:13 1369:21,22 1372:19 1373:8 1383:14 1389:14 1391:7 1393:10 1414:15 1418:20 1424:5 1426:14 1427:4 1454:8 1456:10 1468:2 1473:1,2,5 1480:19 1486:15,25 1552:15 1553:7,17,20 1554:1,3

**legally** 1480:16

**legitimate** 1358:23

**length** 1381:7 1502:1

**lesser** 1602:13

**letter** 1293:8,10 1328:18 1417:20,23 1604:17,19 1605:2,4,21

**letters** 1491:21 1527:8

**level** 1298:3 1314:12 1352:13,14 1375:7 1575:23 1602:4

**liaison** 1308:12 1314:8 1329:5 1336:16,25 1337:7 1559:25 1560:7

**lies** 1457:8

**life** 1296:7,8 1300:19 1346:4 1351:17 1455:3 1538:7 1540:15 1541:16, 17 1545:9 1550:21 1551:4 1566:10 1568:18 1570:4 1591:21 1595:12 1604:4,8 1607:20

**lifelong** 1411:5

**lightning** 1287:7

**Lights** 1303:7

**limine** 1308:2 1335:4 1349:20 1370:12 1371:7, 22 1372:5 1373:13,15,18 1375:9 1378:15,20,21 1381:11,12 1431:23 1432:1,3,8,20,24 1433:21 1451:22 1452:2,12 1549:7 1550:1 1610:21,24 1611:11

**limined** 1376:19 1611:5

**limit** 1422:17

**limitations** 1292:4,6

**limited** 1294:16 1296:6 1309:12 1614:1

**limiting** 1309:6,13

**limits** 1423:16 1550:9

**lines** 1330:10 1362:2 1602:15

**link** 1298:22 1301:8 1587:19

**list** 1293:22 1430:25 1431:10,12 1439:13 1458:7 1561:3 1585:17 1617:13

**listed** 1429:6 1505:6,7 1506:5 1508:16 1561:16

**listen** 1305:8 1590:5

**listened** 1310:21

**lit** 1303:1

**literally** 1463:14

**live** 1558:12 1619:4

**lives** 1596:19

**LLC** 1489:15

**Local** 1287:16 1314:11

**located** 1574:22

**location** 1513:12

**locations** 1512:5 1513:10 1535:25

**long** 1335:8 1371:22 1387:17 1429:7 1451:3 1470:12,23 1495:17 1512:7 1514:13 1558:18 1574:23 1619:8

**longer** 1421:12,16,18

**looked** 1308:9,10 1349:11 1362:25 1521:9 1599:9

**loose** 1556:17,19

**lose** 1404:19 1552:3,8 1571:15 1602:6,7

**losing** 1298:12 1306:12 1485:22

**loss** 1329:10

**lost** 1297:3 1306:17

**lot** 1352:23 1355:1 1408:17 1413:15 1417:22 1422:23 1429:20 1441:2 1442:23 1460:10 1566:20,21 1569:8,25 1593:14

**Louis** 1297:9 1398:21 1399:1,5,22 1402:9 1412:14

**lounge** 1547:12

**lounges** 1536:1

**love** 1316:1 1335:24 1357:12

**loved** 1296:24 1315:20,24 1523:17

**lower** 1357:14

**loyalists** 1490:6

**lunch** 1450:9,11 1451:10, 16 1453:13,15

**Lyn** 1421:15

**Lynn** 1485:10,15

1376:20 1407:4 1481:14 1491:22 1514:20 1516:6 1571:11 1578:20

### M

**made** 1305:10 1310:20 1316:23 1317:6 1318:19 1319:9 1322:4 1324:12 1333:21 1336:6 1341:19 1347:11 1348:4,5 1360:17 1362:7 1370:18 1373:21 1380:10,14,20,23 1393:3 1408:5 1451:24 1482:9 1499:6 1508:1 1512:22 1545:8 1549:13 1575:25 1576:11 1581:15 1599:14, 18 1600:25

**main** 1369:22 1606:21

**make** 1287:23 1288:1 1306:23 1311:4,5 1312:18 1317:21 1319:12 1323:17 1326:11 1340:21 1341:5 1356:22 1358:10 1371:19 1380:1 1382:24,25 1392:24 1393:16 1401:17 1403:3,25 1406:18 1442:9 1443:2 1451:22 1455:6 1467:7 1475:14 1484:3 1487:6,8 1492:10 1498:9 1501:11 1502:12 1504:10 1514:2 1519:8 1547:17 1560:1 1563:2 1579:19 1582:7,8,22 1584:25 1594:1,3,15,19 1598:2 1599:20 1601:21 1603:12 1605:11 1607:9 1618:3

**maker** 1564:21

**makes** 1390:7 1487:14 1496:9 1502:2 1608:22 1617:7

**making** 1304:7 1374:10,16 1454:18 1466:24 1475:12 1483:1 1579:22 1599:23 1600:5 1603:6

**malice** 1493:22

**man** 1615:23

**management** 1485:8,18 1499:12,13

**manager** 1512:12,13 1513:8,13 1518:24 1521:25 1552:19,23 1560:22 1573:22,24 1576:3 1577:2 1590:23

1603:14 1613:23

**managers** 1512:20 1513:7 1560:25 1574:8

**mandatory** 1546:22

**manner** 1292:25 1296:20 1356:3

**manual** 1534:5 1536:4 1538:9

**march** 1290:6 1307:12,14 1325:13 1330:21 1340:14 1341:24 1342:13 1345:17, 19 1346:11,16 1347:20 1348:1,22,24 1351:16,21, 23 1353:17 1354:1,10,25 1355:8,20 1357:7 1358:22 1359:4,11 1363:10 1364:10,14 1365:11 1367:24 1369:2,5 1382:13, 19 1383:18 1389:22 1395:10 1397:24 1447:9 1454:24 1455:1,3 1456:18 1471:14 1488:2 1489:24 1491:9,12,18 1492:11,16 1498:25 1499:2,3 1500:11, 13 1519:18 1526:24 1527:4,21 1581:18,25 1582:4,6 1591:18 1595:21

**marched** 1340:18 1382:14 1395:15

**marchers** 1354:2

**marching** 1355:9,12 1356:19 1357:3 1359:4 1367:25 1382:13

**marginal** 1374:21

**Maritime** 1484:20

**mark** 1504:14,21

**marriage** 1306:13,15

**mass** 1556:15

**Massoni** 1287:18 1461:17

**match** 1475:21

**materials** 1374:14

**Matt** 1287:9,10

**matter** 1289:9 1291:12 1292:6 1340:23 1381:19 1400:1 1432:10 1487:9,15 1492:7,25 1503:20 1535:9 1552:1,5 1566:5 1567:25

1571:11

**matters** 1376:17

**maureen** 1501:10 1511:2, 7,21 1516:22 1560:14,24 1579:12 1586:10 1599:20

**Maureen's** 1562:24

**Mckeeby** 1287:12 1291:6 1292:9 1294:1,9 1295:6,24 1297:21 1298:14,21 1301:19 1303:19 1305:23 1307:2,3,5 1308:7 1310:5 1311:18 1312:1,7,9 1313:8,21 1314:1,3,21,22 1315:2,3,12,14 1316:6,10, 14,19 1317:13,19 1318:1, 4,7,10,14,25 1319:5,8,22 1320:15,16 1321:5,21 1323:1 1324:22 1326:20 1327:2,7,18 1328:1 1330:13 1331:13,14 1333:11,13 1335:4,17 1336:23 1337:10 1338:16 1339:14 1342:14 1343:19, 24 1344:1 1346:17,23 1348:9,16 1350:1,15 1351:12 1353:9,15 1354:16 1355:13,16,21 1356:5,8,10 1357:14,16 1358:17 1360:1 1361:14, 16 1362:9,12,17 1363:23 1364:1,3 1366:5,7,19 1368:3,6,10,15,19,20 1369:10,12,24 1370:21,23 1374:23,25 1381:18 1382:4,5,6 1383:22 1384:10,12,16 1385:14 1386:3,6,17 1388:21 1389:6,24 1390:23,24 1391:2,14,20,24 1394:14, 15,22,25 1395:2 1396:11, 14,17,18 1403:20 1404:1, 21,22 1408:4 1418:14 1432:13,17 1433:19 1474:24 1476:4 1479:18, 20 1483:9 1487:7,12 1494:19 1501:6,7,10,15,21 1502:18,21 1503:3,6 1506:23 1507:1,8,11,18 1508:20 1509:2,6,12 1510:15,24 1511:2,19 1516:7,14,18 1522:19 1523:20 1524:3 1526:15, 22 1530:19,21 1531:14,16 1533:10,11,14 1534:1

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 488 of 642   PageID 11429
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022              Index: Meaning..Montgomery

1536:10,20 1537:18,19 1538:5,10,24 1539:5,9,24 1540:9,24 1541:2 1543:1, 12 1545:20 1546:3,11 1547:14,16 1548:25 1549:4,24 1550:7,17 1551:18 1555:10,17,19 1556:1,2,14 1557:13,15 1558:5,6,8 1561:1,14,23 1564:23 1565:5 1568:5 1571:4 1572:3,10,21 1573:16 1576:14,18,19 1580:13 1583:13,14 1584:9,17,21 1585:10,13, 21,25 1586:7 1588:9,15 1589:6,8 1591:24 1592:16, 21,24 1593:5,6,17 1594:9, 18 1595:16,18 1604:5,20, 25 1605:1 1606:22 1610:8 1616:2 1617:1 1618:10

**Meaning** 1580:20

**means** 1329:12 1338:23 1361:22 1468:12 1474:13 1522:20 1524:11 1526:11 1527:24 1528:10 1529:19 1568:8 1572:11 1577:15 1580:1 1598:24,25 1604:7

**meant** 1296:22 1299:11 1320:5,24 1329:18,20 1370:19 1483:16 1584:10, 22

**measurement** 1564:7

**media** 1321:18 1323:25 1326:7 1331:18 1344:8,12 1370:6 1375:24 1378:2 1433:1 1484:24 1485:2 1497:13,18 1514:4 1518:3 1519:6 1532:21 1538:14 1542:16 1543:16 1544:2, 24 1545:3,13,22 1546:13, 17 1547:2 1554:18 1565:12,23 1566:5 1596:25 1597:3 1606:2

**medical** 1305:16 1475:22

**medication** 1300:13,15

**meet** 1405:15 1480:18 1607:5

**meeting** 1289:8,14 1297:11 1304:23 1305:2 1313:6 1315:15 1320:25 1321:4,13,15 1323:22,23

1324:2 1328:13 1334:16 1337:24 1339:23 1342:15, 17,18,20 1343:5,12,17 1344:3,6,9,21,22 1359:12 1363:16 1365:10 1367:17 1383:3,4 1385:11 1388:14 1414:13,22,25 1415:11,16, 22 1416:22 1418:7 1419:9 1420:4,7 1422:21 1431:12 1461:12 1471:3,6,9,10,21 1484:9 1485:13,19 1490:20 1497:7 1503:12, 19 1507:3 1522:7 1583:2 1589:1,9,10,13 1590:4,13 1591:13 1592:25 1594:1,3, 21 1596:11,13 1597:13 1598:3,7,12 1607:7,8,17, 24 1609:9

**meetings** 1383:6 1407:16 1422:19 1423:2,7,14 1471:5 1591:2

**meets** 1480:15

**Meggan** 1342:20 1589:21 1590:17 1591:3

**Melissa** 1314:9

**member** 1321:19 1340:10 1377:9 1381:5 1389:13,20 1390:6 1407:7 1422:5,6, 12,14 1429:13 1440:15 1462:7 1469:15,17,21 1470:8 1477:16 1481:15 1485:19 1489:25 1514:17 1552:5 1575:8 1602:22

**members** 1322:14 1346:16 1447:1 1448:9 1459:21 1469:13 1546:18 1552:4 1570:22

**membership** 1325:18 1355:1 1407:16 1471:21 1485:13,19

**memo** 1565:10 1566:23,25 1593:13

**memorandum** 1565:20

**memorandums** 1545:14, 22 1546:1 1547:4

**memory** 1417:3

**memos** 1545:15 1547:11

**men** 1348:21 1356:16,22 1459:21

**mental** 1299:8

**mention** 1360:25

**mentioned** 1290:12 1310:6 1363:21 1427:6 1428:18 1450:5 1451:25 1483:13 1512:25 1532:17 1535:6 1537:15 1554:6 1574:11 1583:2 1590:17

**mentions** 1455:24

**merit** 1375:18

**message** 1324:19 1340:22 1352:7 1363:21 1382:9 1471:11 1477:3 1482:11 1484:2 1496:17 1516:24 1542:6 1595:13 1597:8

**messages** 1321:8 1342:7 1347:7 1388:7 1449:10 1456:2,5 1487:22,23 1496:15,18 1500:8 1538:21 1581:21 1582:17, 21 1583:1,24 1584:12 1595:9 1597:22 1600:25

**messaging** 1538:23

**messed** 1403:24 1404:6

**messenger** 1334:4 1363:8 1388:18 1477:2

**met** 1310:7 1339:19 1405:17 1409:4 1447:14 1483:13 1493:16 1520:6 1603:11

**Michael** 1287:17 1461:17

**Michelle** 1459:11 1615:13

**Michi** 1430:13 1436:21 1437:11

**mid** 1307:12

**middle** 1506:9 1608:7

**middle-schoolers** 1413:18

**Mike** 1308:14 1310:6,9 1338:1,7,10,21 1339:7,11 1403:7 1419:25 1430:21 1437:19 1459:9

**mild** 1298:9

**military** 1575:18,20

**million** 1300:22

**mind** 1453:12

**mine** 1302:24 1421:15

**minor** 1494:11 1605:10

**minute** 1334:22 1364:22 1396:10 1452:17 1591:10

**minutes** 1325:19 1372:3, 10 1373:2 1387:11,15 1556:12 1557:1 1619:9

**miscarriage** 1345:6

**mischaracterizes** 1320:8 1358:8 1386:1 1388:9 1427:5 1436:11 1465:1

**mischaracterizing** 1448:25

**missed** 1329:21 1500:5 1547:3

**missing** 1427:11 1463:20

**mission** 1514:5 1532:22 1534:6,7,9 1535:22,23 1568:23 1569:1,8,9

**Missouri** 1297:9

**misspoke** 1525:13

**mistaken** 1343:9 1361:4 1588:17

**misunderstood** 1335:12, 14

**mixed** 1398:15

**moment** 1295:7 1324:21 1332:6 1368:22 1394:5 1414:9 1516:20 1586:3 1592:3 1594:8

**Monday** 1409:13

**money** 1289:23 1300:18, 20 1323:9 1324:3,15 1346:13 1353:7 1354:25 1356:22 1400:2 1402:16 1429:9 1471:13,15 1476:2, 23 1488:1 1489:25

**monitor** 1544:14,17

**monitoring** 1544:21

**Montessori** 1409:6

**Montgomery** 1421:15,22 1485:15

**month** 1330:11 1475:13
1524:12 1525:2,12,23
1526:6,12 1527:2 1528:8
1529:9,12,16,17,25
1530:1,4,7,14 1574:25

**month's** 1529:22

**monthly** 1551:3

**months** 1290:12 1293:10,
11 1332:7,18,21 1418:2
1514:14 1523:6 1580:6,14,
16,19,20

**morning** 1288:25 1289:1,2
1307:6,7 1371:18 1372:2,
19 1518:15 1616:10
1619:25

**Morris** 1287:13 1462:22

**motion** 1326:12 1432:20,
24 1452:12 1487:6,8,14,16
1493:25 1494:21,23
1495:6 1496:13 1500:18
1549:7 1550:1 1619:15

**motions** 1496:3 1500:23
1501:1

**motivated** 1488:7 1496:25

**motivating** 1496:25

**motivation** 1347:23

**motive** 1489:4,17

**mouth** 1466:14

**move** 1295:3 1301:13
1313:8,22 1318:12
1326:20 1327:8 1343:19
1378:12 1381:19 1384:12
1391:2 1396:8 1411:13
1420:14 1436:1 1465:25
1470:1 1506:10 1510:13
1516:8 1523:21 1533:14,
15 1543:3 1565:1 1585:13

**moved** 1302:17,18
1378:11,17 1379:22

**movement** 1599:2

**moves** 1536:11 1546:3
1592:1

**moving** 1378:13 1497:19

**MRI** 1297:20

**MSY** 1528:13,16

**multiple** 1421:12 1512:5
1514:5 1532:13 1535:23
1537:9 1548:13

**music** 1394:3

**muted** 1311:23

---

**N**

**named** 1314:6 1444:15
1609:17

**names** 1431:1,9 1432:3
1438:5 1439:13 1447:2,4

**naomi** 1557:15,19 1558:11
1561:15 1565:10

**national** 1341:1 1575:16

**nature** 1320:7 1434:14
1537:11 1544:24 1601:16

**Navy** 1575:22

**NDA** 1293:12

**neck** 1483:10 1532:13

**needed** 1466:13 1498:12
1561:19

**negative** 1491:6 1569:21
1570:16

**negotiate** 1499:13,15

**negotiating** 1481:15
1559:18

**negotiator** 1559:15

**NEVARES** 1481:10

**Nevarez** 1429:18 1480:5

**news** 1402:22

**nexus** 1290:8,18 1291:3
1531:10 1532:16 1586:11,
13 1587:2

**nice** 1310:11

**night** 1302:25 1313:11
1371:20 1373:21 1392:25
1393:15,20 1408:24

**Ninety-four** 1583:11

**no-go** 1401:11

**non-christian** 1495:12
1499:23

**non-christians** 1457:14
1458:18 1491:6 1499:25

**non-disclosure** 1293:13

**non-member** 1376:22

**non-responsive** 1317:3
1326:21,25 1346:17
1362:9 1368:3,13 1384:10
1420:18 1465:14 1469:19
1470:1

**non-responsiveness**
1420:14

**non-verbal** 1481:3

**nonetheless** 1407:24
1584:4 1608:25

**noon** 1618:17,19

**north** 1412:14

**not-for-profit** 1399:17,19
1402:3

**notable** 1496:11

**note** 1452:5 1590:21,25

**notes** 1308:16 1318:16
1319:16 1355:17,23
1356:4,6 1357:18 1359:19
1416:18 1420:1 1454:16
1497:3 1500:6 1508:3,6,11
1522:6,8 1591:3,4,6,7
1592:6,17,20 1594:2,6
1613:14 1619:12

**notice** 1510:3 1546:21
1554:15,16

**notified** 1515:15 1519:6

**notion** 1357:3 1375:23
1488:21 1489:20 1490:8
1602:25

**November** 1530:13,15

**number** 1311:1 1327:15
1339:7,11 1394:25 1441:6
1510:2 1524:15 1528:24
1563:24 1592:4

---

**O**

**oath** 1308:19 1420:25
1462:7 1480:17 1511:6
1557:9 1573:4,6

**object** 1291:6 1308:2
1312:4 1313:12 1316:5,13,
17 1317:8,16 1318:20
1324:7 1326:10 1330:5
1337:1 1338:13,25
1342:10 1343:20 1349:17
1351:10 1353:2 1354:12
1355:22 1358:8 1366:12
1368:8 1369:21 1370:11
1383:14 1384:10 1385:5
1386:1 1388:9 1389:4,14
1390:11,19 1391:4
1393:15 1403:18 1414:14
1415:13 1416:8 1418:9,19
1420:13,23,24 1424:5
1426:14 1427:4 1428:17
1436:10 1439:20 1442:3
1445:14 1448:23 1454:7,
25 1464:25 1465:14
1467:11 1468:1 1469:2
1472:17 1476:4 1508:24,
25 1509:1 1561:4 1564:19
1580:9 1584:5 1604:1
1607:21 1613:5

**objected** 1332:8 1354:1
1355:7 1361:1 1393:20,24
1429:13 1447:7 1464:7
1508:22

**objecting** 1381:16
1383:18 1429:8

**objection** 1292:9,19
1294:1 1295:5,6,8,24
1297:21 1298:14,20,21
1299:6,24 1301:19
1303:19 1305:21,23
1308:4,6 1313:13 1320:3
1322:19 1327:11,17,20
1336:15 1349:19 1350:14
1355:11 1358:13 1362:9,
14 1370:8 1371:14 1376:2
1382:3 1386:9 1390:17
1392:24 1393:7 1394:19
1404:3 1416:8,11 1419:14
1428:21 1433:23 1435:17,
22 1443:9 1445:21 1449:3
1452:5 1456:10 1462:22
1465:25 1467:18 1469:18,
25 1474:24 1488:15
1503:5 1509:4 1511:14
1522:16 1523:22,23
1526:14,18 1533:17,20
1536:12,13,14,15 1539:1,
11 1540:22 1543:4,6,7
1546:5,6 1548:23 1550:10

1551:11 1552:15 1556:18
1558:2 1580:11 1586:2
1592:2,6,9 1593:11,12,15
1608:23 1609:4 1610:19

**objections** 1301:15
1313:10,17 1327:10,14
1354:14 1366:16 1371:11
1373:21 1381:17,24
1391:3 1394:10 1469:3
1473:2 1516:9,11 1556:16
1573:12 1617:19 1619:23

**objective** 1316:3

**objector** 1321:18 1324:1
1352:16 1371:24 1376:22
1388:13 1390:7 1403:3,17
1407:8,12,15 1425:10
1426:8,25 1428:7 1430:3,
16,19,23 1438:21 1440:12,
14 1454:25 1455:11
1458:6 1462:8,10,16
1470:9,18 1489:22
1500:10 1603:1

**objectors** 1375:14,16
1425:11 1430:6 1438:9,19,
25 1439:11 1440:5,8
1458:8

**objectors'** 1458:20

**obligation** 1470:16 1498:9

**observance** 1497:25

**observed** 1484:8

**obstinate** 1463:4 1464:15

**occasion** 1563:19

**occasions** 1383:8

**occur** 1471:20

**occurred** 1328:16 1613:20

**occurs** 1381:3

**October** 1530:6 1565:16

**odd** 1297:16

**off-the-record** 1287:20

**offensive** 1482:16 1533:5
1537:11

**offer** 1290:23 1291:2,10
1300:18 1305:15 1377:19
1402:24 1403:4

**offered** 1292:20,25
1299:15 1300:22 1403:15

1404:4

**offering** 1305:19 1317:17

**offerings** 1485:23

**office** 1317:1 1326:6
1442:11 1520:13 1542:12
1574:19 1585:1 1587:1

**OFFICER** 1288:17
1373:11 1452:20 1509:16,
18 1557:3 1620:2

**offices** 1407:19

**official** 1499:16

**officials** 1315:8

**ojbect** 1393:1

**older** 1302:20 1503:24
1541:4,6,7 1546:13,15
1619:1

**one-day** 1527:23 1528:2

**one-hour** 1450:11
1451:10,15

**ongoing** 1288:7

**online** 1301:8 1339:10

**open** 1299:21 1303:1,2
1310:2 1319:18 1359:16
1369:7 1372:16 1394:7
1434:1 1464:10 1470:15
1474:9 1540:6 1550:13
1595:24 1612:5

**open-ended** 1335:13

**opened** 1380:6

**opening** 1291:23 1292:23

**operation** 1560:5 1573:25
1574:9,22

**operations** 1574:12

**opinion** 1298:16 1482:25
1564:14,16,17,18

**opportunity** 1307:23
1325:14,16 1405:15
1410:24 1506:5 1590:11
1611:3

**oppose** 1428:11 1500:17

**opposed** 1292:8 1444:15
1445:7,24 1446:2,13
1447:22 1448:9 1490:21

**opposing** 1427:1 1444:11
1448:7

**opposition** 1491:11
1602:20

**optimal** 1614:14

**optional** 1526:15 1614:6

**orange** 1566:11

**order** 1501:25 1547:1
1554:24 1608:23

**ordinarily** 1499:13

**ordinary** 1376:23

**organization** 1534:21

**organizations** 1570:23

**original** 1344:10 1524:20
1525:9 1576:24

**Originally** 1516:25

**originate** 1513:11

**originated** 1531:19

**Orleans** 1528:15,17,18

**outlined** 1563:1

**outlines** 1537:1 1543:17

**outrageous** 1570:20

**outweigh** 1374:13

**outweighs** 1374:20

**overcome** 1508:12

**overly** 1377:17 1379:16

**overnight** 1451:6 1452:8
1616:14 1617:24

**overnighted** 1528:14

**overrule** 1288:14 1313:17
1327:14 1343:23 1349:22
1358:14 1370:14 1394:9
1416:12 1418:22 1443:10
1452:5 1495:24 1522:18
1526:20 1533:21 1550:10

**Overruled** 1351:11
1386:10 1389:5 1552:17
1603:25 1604:3

**overruling** 1309:22
1381:17,20 1445:20

**oversaw** 1518:3 1559:19
1560:4

**oversee** 1573:25 1574:3

**overseeing** 1513:14

**oversight** 1514:1

**oxygen** 1296:17

---

**P**

**p.m.** 1620:3

**PA** 1451:4

**package** 1328:19

**packet** 1311:12 1312:3,10,
14 1333:20,22,25

**packets** 1313:3,4

**pages** 1312:15,17 1402:21
1524:9 1544:17

**paid** 1321:20 1325:13
1407:10 1469:16

**paper** 1547:10

**paperwork** 1445:18
1446:7

**paragraph** 1517:3
1534:11,13,16 1543:19
1568:21 1569:20

**parcel** 1489:10

**Parenthood** 1340:18
1345:18 1348:2,23
1355:12 1357:19 1456:19

**parents** 1579:8

**Parker** 1308:11 1329:1,2
1337:16,18 1339:5
1361:10 1416:15,22
1420:1,3 1446:12 1447:5,
7,13

**Parnell** 1430:15 1437:15
1615:18

**part** 1310:23 1312:2
1331:13 1357:8 1364:14
1367:5 1368:1 1373:20
1410:19 1432:24 1434:4
1437:5 1447:5 1458:6
1465:4 1474:21 1475:6,7
1480:23 1488:19 1489:8,
10 1504:16,17,18 1505:16
1510:7 1519:19 1532:21
1534:15 1549:6 1576:22
1601:12 1612:12

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                     Vol 5 July 11, 2022                          Index: part-time..points

**part-time** 1401:5

**partially** 1442:25 1443:1

**participants** 1591:18

**participated** 1489:23
1491:17 1492:11 1499:1,3
1500:14 1519:18

**participating** 1492:16

**participation** 1488:1

**parties** 1379:17

**partly** 1399:1,22

**partner** 1297:13 1399:21
1579:7 1590:4

**partnering** 1399:4

**partners** 1402:7

**party** 1379:18 1486:14

**pass** 1296:18 1305:14
1307:1 1404:21 1472:1
1479:17 1510:22 1551:18
1555:10 1571:4 1572:3
1606:22 1616:2

**passed** 1330:24 1566:7

**passionate** 1406:16

**past** 1333:17,21 1334:21
1335:20 1336:6 1340:8
1342:6 1479:2 1490:9
1510:10 1526:15 1580:22,
24 1581:17,20,22 1582:25

**pathway** 1547:1

**Paulo** 1287:12

**pause** 1335:15

**pay** 1329:16 1352:17
1353:13 1356:19 1357:4
1358:3,7,10,23 1374:3,4,6
1397:15 1398:3 1462:8
1475:14,21 1526:11
1527:7 1528:3,4

**paying** 1400:5 1401:23
1568:10 1569:11

**payment** 1329:21

**people** 1292:17 1334:14,
19 1351:19 1352:7
1357:12 1404:16 1410:17
1424:1 1426:21 1431:13,
24 1433:9 1435:7,14

**people's** 1457:18

**perceived** 1537:12

**percent** 1420:6 1460:14
1600:15

**perfect** 1410:18 1427:20
1567:7

**period** 1332:8 1336:3
1380:10 1401:1 1440:13
1460:6 1469:13 1512:7
1514:13 1560:21 1575:5

**peripheral** 1606:20

**permission** 1395:17

**person** 1291:15 1319:14
1337:13 1341:25 1342:5
1343:1 1346:12 1347:4,5,
6,15,17 1360:12 1370:15
1389:17 1435:13 1461:17
1529:23 1548:19 1562:8
1586:15,16 1587:21
1589:11 1590:2,7 1600:5

**person's** 1580:16

**personal** 1340:5 1347:10,
12 1352:13 1404:18
1406:15,21 1443:25
1444:2,23 1454:22 1456:6,
13 1468:10 1478:25
1496:16 1548:21 1550:18
1552:7 1570:22 1597:22
1600:25 1603:7 1608:12
1613:6

**personally** 1338:10
1430:10,12 1582:11
1585:2 1586:22 1596:19
1607:20

**personnel** 1372:24
1450:19 1486:23 1556:9
1616:7

**perspective** 1340:16
1547:25 1550:2

**perspectives** 1549:8

**pertained** 1470:13

**pertaining** 1288:3 1449:9
1468:25 1554:8

**pertinent** 1534:16,24
1550:25

**petition** 1425:20 1440:17
1441:10 1442:5 1446:25
1448:2,11

**philosophy** 1568:15

**Phoenix** 1576:10 1603:15

**phone** 1297:8 1338:21
1341:19 1343:2,3 1461:18
1483:18 1484:6 1590:4,6,8
1605:13 1619:11

**photo** 1369:6 1382:15
1532:11

**photograph** 1367:5
1382:10 1587:14

**photos** 1364:25 1532:9,14
1591:20

**phrase** 1532:16

**phrased** 1432:19,21

**physical** 1370:19

**physically** 1520:19
1542:18

**physiology** 1298:6

**pick** 1453:12

**picked** 1338:21

**picture** 1367:7,13 1613:21
1614:24

**pictures** 1290:15,18,19
1351:18 1363:8 1364:16
1365:15 1395:13 1492:15
1609:23

**Pilates** 1400:23 1401:3,6

**pilot** 1410:13

**pilots** 1353:18

**pink** 1352:19 1361:1,5
1363:1 1364:17 1367:19

**place** 1420:9 1539:20
1540:20 1569:17 1573:2

**places** 1402:9 1534:14
1535:24

**plaintiff** 1287:10 1288:14

1405:25 1503:23 1507:5
1514:23

**plaintiff's** 1507:16

**plan** 1555:25 1556:2
1617:11,16

**plane** 1387:9,15,21
1542:7,13

**Planned** 1340:18 1345:18
1348:2,23 1355:12
1357:19 1456:19

**play** 1481:7 1484:4 1618:9

**played** 1351:3 1480:17
1481:8

**playing** 1351:15

**plead** 1420:5

**pleading** 1416:19 1420:6

**plenty** 1425:5 1427:21
1500:24

**plethora** 1358:1 1429:24

**plural** 1508:22

**podium** 1487:10 1495:1
1496:6 1502:6 1556:24

**point** 1288:9 1296:6
1303:18,21 1325:14
1330:15 1335:5 1337:12
1339:10 1341:5 1353:12
1360:14 1361:25 1369:22
1375:16 1376:2,15
1378:15 1380:15 1381:12
1392:22 1393:18 1395:1
1403:12 1404:13 1405:13
1410:8 1415:4 1419:15
1426:1 1427:17 1431:14,
24 1434:15 1440:9
1459:13,16 1462:16
1463:13 1464:18 1474:15
1478:22 1483:21 1487:6
1490:5 1491:8 1496:11
1497:15,16 1500:22
1505:25 1508:20,25
1510:6 1577:17,22,24
1595:14 1607:8 1608:1
1611:11 1614:8,15
1618:10,12 1619:10

**pointed** 1362:1 1606:4

**pointing** 1568:24

**points** 1472:24,25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 492 of 642   PageID 11433
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022          Index: policies..proceedings

**policies** 1323:18 1331:16 1332:1 1334:23 1344:19, 20 1384:18,21 1385:2,4, 13,23 1386:11,12,15,20, 22,23,24 1390:10 1478:20 1497:14,18 1499:10 1512:19 1513:18,23,25 1514:6,7 1518:4 1533:8 1548:13 1553:2,23 1554:6, 9,13,18,21 1566:15 1568:17,19 1600:13 1605:23,24

**policing** 1503:10

**policy** 1321:18 1323:25 1331:18,20 1335:23 1344:8,14,15 1370:6 1375:2,24 1378:3 1387:20 1484:24 1485:2 1493:9,10, 11 1503:10,11,18 1504:4,9 1505:9,18,21,23,24 1506:4 1507:2,5,9,12,20,22,24 1508:8,9,12,17 1510:4 1514:4,5 1518:3 1532:21 1536:23 1537:5,23 1538:4, 8 1539:20,21,23 1540:11, 13,17,18,19 1541:5,9,11, 15,24 1542:8,23,25 1543:16,23 1544:4,10,11 1545:7,11,13,22 1546:13, 17,21,22 1547:2 1554:18, 19,22 1555:1 1565:12 1566:16 1568:14 1594:2 1599:19 1606:1,2,6

**political** 1348:22 1407:19 1429:10 1455:5 1460:1 1461:1 1492:8

**politics** 1492:8

**Pollyanna** 1565:25

**poorer** 1399:2

**poorly** 1543:21

**popular** 1587:21

**portion** 1355:19 1368:17 1386:7 1475:22 1493:24 1540:11 1584:19 1608:7

**position** 1323:19 1324:24 1327:4 1354:3 1359:15 1364:23 1365:14 1366:9, 14,23 1367:2,14 1382:17 1385:17,24 1389:11 1411:17 1444:20 1472:22 1481:13 1505:12 1512:10

1527:13 1559:1,6 1562:24 1570:3 1576:3 1590:20

**possibility** 1618:14

**possibly** 1495:19 1587:7 1601:15

**post** 1291:4,18 1324:18 1336:6 1455:21 1485:7,9 1570:19 1615:4

**post-certification** 1494:11

**posted** 1334:6 1479:3 1485:10,12 1492:2 1496:16 1535:23,24 1566:5

**posting** 1345:3 1347:9 1478:24

**posts** 1290:7,11,15 1291:3 1333:21 1449:18 1454:19 1455:25 1456:1 1479:2,3 1499:7,11 1520:1 1531:22, 24 1533:6 1544:16 1580:7 1581:2,6 1586:24 1587:2 1588:23 1600:25 1601:22

**posttraumatic** 1298:11 1300:9

**potential** 1519:6 1544:10, 12 1553:17 1562:17,21

**potentially** 1537:22

**practice** 1523:3

**practices** 1498:1

**prayer** 1551:4

**praying** 1295:22

**prays** 1551:4

**precise** 1612:24

**precisely** 1351:6

**preclusive** 1494:3 1495:7

**predicate** 1295:25 1312:8 1317:24 1318:2,8 1600:17

**preemie** 1345:6

**preference** 1603:8

**preferences** 1397:13

**preferentially** 1491:5

**prejudice** 1288:5,9

1313:14 1374:13,19 1381:9 1509:21 1510:1 1604:2

**prejudicial** 1377:17 1379:16 1505:13,24 1506:9 1508:19

**prep** 1619:14

**preparation** 1419:24

**prepared** 1311:12 1416:16

**preparing** 1297:12

**prerequisite** 1391:21,25

**present** 1611:3

**presentation** 1488:20 1493:25

**presented** 1313:1 1403:6 1432:25 1494:4

**presenting** 1310:23

**president** 1290:5 1291:17 1314:10 1317:3 1321:1,24 1322:12,22 1323:4,9,16,21 1342:2,13 1345:16 1346:12 1347:20 1353:6, 23 1362:6 1367:7 1369:4, 19 1376:21 1377:9 1384:23 1385:20 1386:25 1387:23 1388:8,17 1389:19 1407:5 1417:10 1421:10,11,14,16,22,24 1422:1,8 1423:10,17 1455:18 1457:2 1461:14, 19 1462:5 1465:13 1466:10 1467:8 1470:16 1471:1,8,12 1481:17 1482:21,22,24 1483:2 1485:15 1498:20 1499:9 1516:5 1535:6 1552:10 1571:14 1578:20 1600:6 1601:5

**presidents** 1421:12

**pressure** 1296:15 1298:3 1300:14,15 1555:4,8 1571:24

**pretty** 1302:22 1317:3 1343:13 1353:20 1395:19 1401:11 1406:7,13 1408:23 1409:22 1412:8 1422:21,24 1440:8 1467:1 1470:7 1489:2 1520:25 1563:25

**prevented** 1375:24

**previous** 1380:12,13 1507:22 1523:6,12 1544:9 1582:17

**previously** 1328:8 1368:22 1468:3 1558:16

**print** 1477:20 1617:24

**printouts** 1477:21

**prior** 1328:16 1329:21 1330:7 1336:6 1380:24 1381:13 1387:12 1392:23 1440:14 1480:16 1505:10 1508:23 1515:16 1520:5 1545:18 1552:18 1558:23 1559:2 1562:5 1575:14,15 1576:2,12 1578:18 1583:24 1598:19 1599:2 1609:6

**private** 1324:19 1336:1 1429:12 1471:11 1494:6 1566:6 1570:14,16

**privately** 1496:15

**pro** 1351:17 1374:6 1455:2 1491:25 1492:17 1550:20 1551:4 1591:21 1595:12, 14 1604:4 1607:20 1608:2

**pro-choice** 1354:3 1355:7

**pro-life** 1347:13

**probation** 1417:20,23

**problem** 1299:16 1372:14 1450:15 1493:2 1508:17

**problematic** 1433:10

**problems** 1306:21 1354:9

**procedural** 1381:18

**procedure** 1540:13

**procedures** 1331:16 1478:21

**proceed** 1310:4 1434:20 1511:17 1540:8 1558:5 1593:2,16 1611:21

**proceeding** 1461:25

**proceedings** 1298:18 1299:21 1308:24 1310:2 1319:3,18 1371:4 1372:16 1391:18 1394:7 1398:17 1431:19 1434:1 1463:1

1464:10 1472:8 1474:9
1539:14 1540:6 1549:1
1550:13 1610:17 1612:5
1620:3

**process** 1309:3 1342:16
1408:22 1416:24 1474:19
1515:16 1549:9 1559:19
1563:12 1579:21,24
1596:24

**product** 1409:5

**professional** 1348:20

**professionally** 1560:16

**profit** 1475:20 1476:19

**program** 1398:24 1399:4
1410:25

**progressively** 1581:23

**prohibited** 1544:1,21

**project** 1352:20 1365:20
1398:18 1399:6,9,25
1400:2,3 1401:25 1402:1,8
1411:15

**projected** 1524:23
1526:11

**projects** 1532:24

**promise** 1406:18 1618:19

**promote** 1570:5

**prompt** 1432:19

**promptly** 1545:1

**proof** 1488:13 1492:6

**proofread** 1605:11

**proper** 1380:9 1503:5

**properly** 1392:2 1415:10
1513:3 1514:3

**proponent** 1602:8

**propose** 1560:11

**proposition** 1489:16

**protect** 1470:17,18
1498:22 1604:9

**protected** 1334:11,12
1424:16 1487:19 1488:3,
17 1489:1,4,18 1493:22
1496:17,22,24 1497:12
1498:6 1518:7 1579:2

1598:4

**protecting** 1474:21

**protection** 1475:5
1478:12 1497:15,16
1552:6

**protections** 1497:17
1600:13

**protects** 1334:22 1424:24,
25

**proud** 1491:25 1570:2

**proudly** 1405:11

**prove** 1456:15

**prove-up** 1299:17

**proven** 1472:24,25

**provide** 1299:12 1461:6
1462:21 1463:6 1467:7
1534:17 1535:19 1591:12

**provided** 1296:23 1312:11
1333:19,22 1334:1 1416:7
1439:18 1463:16 1464:21
1467:25 1489:9 1503:17
1534:20 1594:25

**provisions** 1559:23

**provoke** 1349:1

**proximity** 1489:16
1490:16,23

**Pryor** 1287:5,9 1288:21,24
1291:9 1292:11 1294:4,6,
15 1295:3,13,16,17,25
1296:3 1297:22 1298:10
1299:10,19 1300:1
1301:13,24 1302:1,4,6,8
1303:24 1305:14,20
1306:6 1307:1 1308:2,4,22
1309:1,11,21,25 1311:22
1312:4 1313:12 1316:5,13,
17 1317:8,12,16,21
1318:5,11,20 1319:11,15
1320:2,7 1322:19 1324:7,
11 1326:10,22 1327:9
1330:5 1331:10 1332:6
1335:11 1336:15,17
1337:1 1338:13,25
1342:10 1343:20 1348:8,
11 1349:17,20 1350:9,12
1351:10 1353:2 1354:12
1355:22 1358:8 1359:22
1362:10 1366:12 1368:8

1369:21 1370:8,11 1371:1,
12,17,21 1372:7,11
1377:20 1378:5,7 1380:17
1383:14 1385:5 1386:1,9
1388:9 1389:4,14 1390:11,
15,19 1391:4,11 1392:10
1393:1,17,25 1394:18,21
1398:6 1403:18 1414:14
1415:13 1416:8 1418:9,19
1419:10,20 1420:23
1424:5 1426:14 1427:4
1428:17,22 1431:3,7
1432:2,6,12,14 1433:11,23
1435:17,21 1436:10,14
1439:20 1442:3 1443:5
1445:14 1448:23 1451:14,
21 1454:7 1456:10 1463:8,
22 1464:3,4,7,25 1467:11,
15 1468:1 1469:2 1472:2,
4,7,10,13,16,20,25 1473:6,
9,13,17 1474:2,5,7,14,16,
18,25 1475:2 1476:6,9
1479:15 1480:4,10
1481:11 1485:21 1486:2,
11 1502:11,13 1504:13,19,
24 1505:4 1506:17 1507:7,
10,17,25 1509:1,3 1561:3,
6,9,13 1564:19,25 1565:4
1572:5,6,17 1580:9
1584:3,5,13,16 1585:17,19
1586:3 1592:3,19,23
1593:1,3,8,12 1603:24
1604:1 1607:21 1608:13,
16 1610:4,14 1611:23
1612:3 1614:6,10,14

**Pryor's** 1580:5

**psychologically** 1596:21

**PTSD** 1298:9,16,22
1299:10

**public** 1376:24,25
1532:23,25 1533:1
1588:23

**publicly** 1586:16

**publish** 1295:10,13
1313:18 1327:16 1486:3
1516:13 1523:25 1533:22
1536:17 1538:25 1541:1
1543:9 1546:8 1592:12

**published** 1295:15
1327:18 1531:17 1540:14
1543:2 1545:15,21 1586:6
1592:15

**publishing** 1301:21
1327:24 1394:17 1516:14

**pull** 1314:2 1317:15
1361:14 1363:22 1370:21
1382:5 1394:25 1516:7
1523:20 1537:18 1538:5,
25 1540:24 1561:1
1591:24 1604:21 1608:5
1609:12

**pulled** 1343:17 1529:7
1586:24 1608:24

**pulling** 1478:2

**punish** 1385:2,12

**punished** 1333:16 1504:5

**punishing** 1367:14

**punitive** 1288:13 1493:20

**purpose** 1398:18 1399:7,
25 1400:4 1402:2,8
1411:15 1531:2 1579:16
1580:21 1582:20

**purposes** 1491:16,17
1506:15,16

**purview** 1613:25

**pussy** 1352:19 1361:22
1363:1 1365:20 1367:19
1368:1

**put** 1293:8,9 1309:19
1310:22 1380:7 1400:7
1402:12 1412:19 1429:23
1439:13 1448:12 1451:18
1455:1 1458:3 1459:1
1466:14 1476:22 1491:20
1503:1 1504:24 1505:22
1509:11,13 1540:20
1569:25 1570:3 1573:4
1595:16 1604:14

**puts** 1546:21

**putting** 1347:13 1405:20
1412:3

---

**Q**

**quality** 1485:22 1534:11

**question** 1288:22 1294:14
1299:24 1305:8 1307:19
1309:1,15,20 1319:21
1320:8,11,12,14 1323:13

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 494 of 642   PageID 11435
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Index: questioned..recovering

1324:6,10 1325:25 1326:8,
19 1327:1 1335:12,13,16
1336:21 1337:2 1339:18
1345:11 1346:22,24
1348:14 1352:24 1353:3,
25 1354:18 1355:3,6
1358:19 1362:16 1363:3
1365:1,23 1366:6,17,20
1368:5,14,15 1373:8
1374:3,4 1382:4,7 1386:3,
4 1388:3 1390:1,5 1392:2,
15,23 1393:10 1394:23
1395:5,22 1396:2,3,6
1403:14,21 1404:2,23
1407:23 1416:13 1417:11,
12 1418:10 1419:6,7
1420:15,24 1421:5
1423:11 1426:5 1427:8,19
1428:24 1432:18 1433:7
1437:8 1438:17 1439:1,7
1445:21 1447:10 1463:23
1464:5,13 1465:6,16
1466:1,3 1467:1,22
1468:5,21 1469:5 1470:7,
20 1471:17,20 1473:21
1502:8 1504:3 1511:13,15
1544:8 1550:16 1555:17
1556:14 1584:14 1596:6,
11,13 1606:14 1607:25
1610:5,6,7 1611:7 1612:9,
17,20,22

**questioned** 1331:10
1505:22 1508:13,16

**questioning** 1506:7
1584:6

**questions** 1291:24
1292:19,23 1333:12
1343:14,16 1344:5
1354:23 1368:11 1369:14
1374:2 1389:8 1394:24
1409:25 1422:22 1427:20
1472:5 1473:1,19,23,25
1474:4,12,14 1479:20,22
1483:11 1502:14 1511:11
1549:21 1552:2 1557:24
1558:1 1560:9 1566:17,18
1571:13 1572:6,7,8,9
1573:11,12 1590:5 1595:5,
8 1596:4 1606:20 1616:22
1618:24

**quick** 1287:8 1306:5
1372:20

**quiet** 1293:18 1403:25

**quote** 1499:5 1500:2
1569:2

**quoting** 1507:9,12

───────────────

**R**

**race** 1466:22

**races** 1460:24

**racing** 1298:4

**radio** 1361:15

**Railway** 1423:24 1424:3,9,
14,24 1453:21

**raise** 1338:9 1380:17
1392:4 1506:8,23 1557:17
1601:18

**raised** 1287:21 1292:20
1327:10 1336:10,12
1337:16 1338:6 1354:13
1371:21 1389:8 1393:6
1398:5

**raises** 1466:25

**raising** 1311:24 1393:2,5

**ramifications** 1553:4,17,
20 1554:1

**ran** 1322:11 1481:18

**range** 1356:23

**rank-and-file** 1381:5

**rationale** 1379:25

**RBFS** 1545:18

**reach** 1337:22 1341:16
1579:13

**reached** 1341:2,7,12
1352:15 1388:23 1416:24
1469:12 1579:15 1600:21
1606:16

**reaching** 1314:14 1579:16
1599:16

**reaction** 1351:2 1352:9
1520:17 1551:10 1563:23
1578:4 1595:23

**read** 1290:10 1320:18
1324:11 1363:11 1368:15,
17 1386:6,7 1397:1,2,4,15
1404:12 1429:6 1449:20,
23 1450:2,3 1545:14,17,

21,25 1547:5 1554:17
1565:8 1577:5 1584:19

**reading** 1518:17 1525:17
1565:7,22 1595:19 1618:1

**ready** 1373:15 1474:6
1501:9 1604:13

**real** 1338:22 1480:6

**realization** 1352:1

**realize** 1451:18 1503:20

**realized** 1503:22 1600:4

**realm** 1389:1

**reapply** 1495:21

**reask** 1354:4 1550:15
1584:15

**reason** 1289:22 1351:23
1362:5 1375:21 1379:7
1388:22 1432:14,17
1436:8 1445:11 1488:11
1492:24 1601:16 1606:21
1613:19

**reasonable** 1476:13
1492:18,21 1495:14

**reasons** 1354:1 1359:13
1374:25 1402:25 1429:15
1490:2 1496:1 1500:17,23,
24,25 1519:4 1606:13
1609:25

**rebut** 1375:22 1380:12
1611:3

**rebuttal** 1486:12

**rebutted** 1490:3

**recall** 1289:6,12 1292:21
1297:5 1321:9 1328:21,22
1330:16 1377:1 1380:13
1425:13,20,23 1426:11,25
1428:9 1434:5 1440:17,19,
22,25 1441:5,10 1442:5
1446:25 1447:2,16,25
1448:2,11,19 1478:3
1487:24 1489:23 1500:9
1508:4 1515:18 1518:12
1562:14 1563:13,22
1565:19 1577:19 1580:8
1581:13 1587:8 1591:20,
22 1595:11 1598:23
1599:2 1613:13,14

**recallers** 1425:16,18

**recalling** 1443:15

**receipt** 1490:24

**receive** 1329:15 1399:24
1402:17

**received** 1289:4 1307:20
1482:11 1483:20 1484:11
1505:4 1520:20 1521:20
1526:11 1527:6

**receiving** 1562:5

**recent** 1559:1

**recently** 1503:8

**recess** 1372:4 1373:9,10
1452:19 1509:17 1557:2
1620:1

**recipient** 1576:24

**reckless** 1493:22

**recognize** 1292:4,6
1390:25 1405:5 1515:1,3
1533:12

**recognized** 1353:16
1465:22 1469:10 1488:12
1498:6

**recollection** 1312:6
1355:24 1359:21 1362:22
1380:22 1391:6 1419:4
1449:19 1608:11,17
1609:15 1613:19 1614:7

**recommend** 1413:19

**recommendation**
1522:11,13 1548:8,9,16

**recommended** 1522:21
1549:14

**reconsider** 1619:15

**record** 1287:3,6,23
1377:16 1381:23 1403:8
1489:20 1491:2 1492:6
1504:16,17 1507:19
1511:20 1591:3 1609:5
1616:11

**recorded** 1368:18 1386:8
1480:17 1584:20

**records** 1522:24 1523:7,9
1524:5

**recourse** 1404:20

**recovering** 1419:21

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 495 of 642   PageID 11436

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                  Index: recruiter..representing

**recruiter** 1569:14

**rectangle** 1528:13

**recurrent** 1528:23,25 1568:1

**redirect** 1309:10 1474:17, 25

**reduce** 1293:4

**reduced** 1330:20 1417:16 1418:2

**refer** 1393:4 1421:21,23

**reference** 1347:11 1349:17 1365:22 1370:18 1454:18 1455:6 1466:24 1611:15

**referenced** 1456:6 1468:13 1524:6 1533:9 1588:3 1605:2

**references** 1507:9,13 1606:5

**referred** 1365:4 1562:22

**referred-to** 1295:11 1301:22 1306:1 1313:19 1327:22 1394:12 1516:16 1524:1 1533:23 1536:18 1543:10 1546:9 1592:13

**referring** 1307:9 1317:9 1356:21 1358:5,9 1395:10 1584:6

**refers** 1568:16 1587:25

**reflect** 1396:20,22 1397:15 1421:25 1497:4 1551:14 1568:14

**reflecting** 1497:6

**reflection** 1570:12

**reflects** 1362:19 1454:18 1543:21

**refocus** 1466:2

**reformulated** 1465:5

**refrain** 1434:18

**refresh** 1312:6 1608:11, 14,17 1609:15 1613:18

**refreshed** 1608:18 1614:7

**refreshes** 1359:20 1391:6

**regard** 1290:1 1326:1 1393:5 1419:17 1468:10 1495:14,22 1560:1 1596:7

**regarded** 1584:3

**registered** 1413:11

**regret** 1402:23

**regretful** 1597:21

**regrets** 1352:11,25

**regroup** 1501:3

**regular** 1408:18

**rehash** 1383:7

**reinstate** 1329:8

**reinstatement** 1402:24

**reiterate** 1500:7

**reject** 1420:17 1500:19

**related** 1289:17,21 1358:10 1371:23 1470:24 1543:21 1581:8 1614:24

**relations** 1365:7 1384:8 1498:5 1512:12,14 1515:24 1517:13,15,19,20, 21 1518:1,23 1552:19,23 1559:3,7,10 1563:7,10 1565:11 1577:5,9,13 1579:5,6,11,18 1590:3

**relationship** 1467:3 1481:16 1560:16

**relative** 1489:1

**relevance** 1354:12 1370:8,11 1374:11,13,17, 18,21 1376:16 1377:17 1381:9 1391:5 1435:22,23 1442:4 1443:5 1533:17 1548:23 1551:11 1564:19 1603:24 1607:21

**relevancy** 1376:3

**relevant** 1375:20 1376:10 1379:9,16 1392:7 1434:7, 10 1503:13 1549:6 1550:2, 5 1612:13,17,18

**religion** 1295:1 1454:2 1457:18 1466:13,22 1468:25 1470:24 1491:7 1549:21 1607:10,13

**religions** 1460:22

**religious** 1288:3 1289:15, 24 1290:24 1291:5 1293:1 1309:16 1340:2 1366:1,24 1367:3 1383:13 1404:2,4 1450:5 1453:25 1456:9 1459:4,14 1461:7 1462:19 1467:3 1470:13 1474:22 1491:3 1492:12 1493:4,8, 15 1494:12 1495:8,9,18 1496:21 1497:21,25 1498:10,14,15,16 1499:6, 18,20 1500:3 1548:19 1549:12 1551:9,16 1598:13 1603:21

**remain** 1332:4 1406:19

**remainder** 1474:12 1525:6

**remark** 1362:6

**remedies** 1392:3,13 1494:14

**remember** 1297:18 1307:15,17 1308:15,17 1310:19 1319:7,8 1320:16 1342:23 1344:16,17,20 1368:16 1372:6,22 1387:16 1398:15 1405:19 1430:16 1444:20 1445:9 1446:4,5,10 1456:4 1480:25 1521:4 1560:19 1561:18 1562:2,15 1563:15,17 1566:4 1568:22 1574:10 1577:18 1579:14 1587:9 1589:22 1596:10 1609:8

**remembered** 1319:1

**remind** 1541:17 1567:4 1573:20 1576:23

**reminder** 1565:13 1566:19 1612:9

**reminding** 1565:21 1566:15

**remorseful** 1597:25

**remotely** 1290:12

**removed** 1315:7 1584:25 1585:1

**render** 1298:15 1328:13 1604:13

**rendered** 1604:15

**rendering** 1604:19

**rep** 1294:19 1338:3 1342:24 1343:17 1444:19 1604:12

**repeat** 1323:12 1366:20 1584:17

**repeatedly** 1369:13

**repeating** 1297:14,15 1433:20

**rephrase** 1427:22

**replied** 1360:10

**report** 1305:7,10 1375:5 1442:20 1489:8 1545:2 1560:17 1574:14,16,18

**reported** 1305:12 1434:9 1463:9 1498:4,5 1519:12, 15 1560:24

**reporter** 1368:18 1386:8 1584:20

**reporting** 1305:1 1376:22, 23 1535:2 1544:21

**reports** 1566:20,21

**represent** 1318:15 1346:15 1348:20 1352:18 1363:19 1367:21 1415:10, 18,22,24 1416:22 1420:10 1421:22 1426:2 1435:16 1447:21 1455:4 1459:24

**representation** 1304:21 1305:2,4,12 1344:3 1359:9 1369:20 1379:12 1414:22 1416:7 1419:8,19 1420:21 1421:2,3,6

**representative** 1287:17 1308:11 1328:25 1329:3 1332:15 1498:21 1589:22 1597:16

**representatives** 1353:13 1512:20 1548:7

**represented** 1345:19 1350:24 1415:15 1416:1 1417:6,13 1462:3 1464:23 1499:22 1500:12 1559:17

**representing** 1325:23 1352:20 1357:7 1359:11 1405:10 1418:25 1462:13

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 5 July 11, 2022                      Index: represents..running

**represents** 1359:8 1500:1 1552:1 1571:11

**reprimand** 1375:9 1395:20

**reprisal** 1422:15

**request** 1287:22,23 1288:1,15 1309:23 1337:12 1343:23 1354:6 1379:19 1382:25 1383:1, 11 1420:17 1495:6,24

**requested** 1368:17 1378:22 1382:23 1386:7 1495:16 1507:14 1584:19

**requesting** 1382:23 1601:19

**required** 1331:15 1478:20 1528:24 1536:4 1545:17 1546:22 1554:14 1565:7 1604:18

**requirement** 1331:24 1493:11 1554:8

**requires** 1488:13

**reread** 1521:6

**research** 1372:25 1450:21 1486:24 1556:11 1616:9

**reserve** 1471:25 1473:24 1474:12 1479:20 1575:20 1617:8

**reside** 1511:22 1512:4 1513:10

**residence** 1512:5

**resituate** 1556:6

**resource** 1579:7 1590:3

**resources** 1579:8

**respect** 1323:5 1341:18 1345:8 1354:21 1355:1 1464:22 1493:20 1523:9 1534:20 1535:3 1541:11 1564:7 1567:19 1580:7 1589:19 1602:6

**respected** 1354:24

**respectful** 1406:19

**respectfully** 1396:8 1488:16

**respects** 1345:9

**respond** 1317:2 1360:20 1369:7 1610:23

**responded** 1360:16

**responding** 1292:19 1341:9 1360:17

**response** 1296:20 1298:2 1349:1,6 1351:6 1358:1 1369:13 1376:12,14,20 1382:8 1494:20 1496:3 1504:12 1549:10,23 1562:13 1595:11

**responses** 1368:10

**responsibilities** 1409:22 1560:22 1565:14,22 1603:14

**responsibility** 1408:21 1462:6 1514:1,2 1515:11, 14

**responsible** 1389:23 1512:16 1513:14 1529:24 1559:14 1560:5,8

**responsive** 1362:10 1572:9

**rest** 1409:20 1471:25 1473:24 1486:14 1553:11 1614:15,18 1617:21

**restate** 1610:6,7

**restraints** 1423:20

**rests** 1486:12

**result** 1331:20 1479:13 1518:9 1543:23 1544:6 1612:21

**resumés** 1400:7

**retailiated** 1430:20 1433:2 1440:22

**retain** 1523:15

**retaliate** 1438:10 1488:14

**retaliated** 1424:3 1425:9 1426:8 1427:12,14 1428:5 1429:25 1430:4,8,22 1436:20 1437:10 1438:19 1439:11 1441:1 1448:6 1458:8 1496:21

**retaliating** 1425:13 1598:4

**retaliation** 1331:20 1423:24 1490:11 1497:1

1498:19 1536:25 1537:4 1606:8

**retaliatory** 1489:4,17

**retire** 1512:1

**retired** 1511:25 1558:18, 20,21,22

**retirement** 1558:23

**return** 1480:1

**returned** 1521:4 1528:12

**reurge** 1494:2

**reveal** 1523:9 1561:7

**review** 1313:5 1446:25 1447:13,16 1520:2 1522:3, 24 1523:4,8 1530:24 1566:16 1581:1 1591:11 1594:3 1595:2 1605:6

**reviewed** 1328:23,25 1522:1 1544:15 1548:6,13 1582:16,23 1583:16 1591:7

**reviewing** 1448:10,19 1519:24 1582:20

**revised** 1541:7

**reword** 1354:4

**rewrite** 1504:25

**rid** 1357:15 1403:2,16

**ridiculed** 1426:22

**ridiculous** 1357:4

**right-to-work** 1341:1

**rights** 1288:4 1292:13 1293:14 1294:25 1332:25 1354:11,21,24 1355:9 1356:14,15,18 1357:1,20 1359:2 1407:15 1424:12 1425:23 1426:2 1427:25 1428:1 1452:7 1475:5,6 1491:18 1493:23 1552:3,7, 8 1571:15

**rise** 1288:17 1298:3 1373:3,11 1450:23 1452:20 1487:2 1509:16, 18 1510:19 1556:12 1557:3 1616:11 1620:2

**risk** 1300:19

**RLA** 1288:13 1428:3 1472:21 1475:5 1487:20 1488:5,18 1490:14,17 1494:6 1497:1,16 1498:19

**RLA-PROTECTED** 1489:7 1497:9 1500:8

**Robert** 1611:2

**rock** 1556:25

**role** 1415:4 1460:8 1482:20 1483:2 1530:23 1535:10 1550:3,6 1552:13, 20,23 1578:23 1579:10

**roles** 1482:23

**roll** 1556:25 1618:21

**room** 1297:4 1350:5 1486:10 1594:14 1612:11

**rooms** 1451:19

**roses** 1566:2

**Ross** 1308:12 1329:4 1332:11,15 1336:12,14,24 1337:3,5,6,7 1404:15 1416:15,21

**round** 1287:7 1335:10 1346:21 1366:11 1474:4 1479:18,21,25 1555:16 1618:17

**routine** 1573:10 1605:18

**RTC** 1528:22

**rude** 1566:4

**rudely** 1568:9,10,12

**rule** 1443:8 1487:9,14 1511:14 1558:2 1573:12

**ruled** 1392:12 1393:10 1619:16

**rules** 1513:22 1580:15

**ruling** 1368:9 1372:5 1375:10 1377:14,15,16 1509:10,14,20 1549:7 1619:16

**rulings** 1392:23

**rumors** 1599:4

**run** 1481:19 1574:8 1605:6

**running** 1303:6,7 1350:14

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 497 of 642   PageID 11438
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 5 July 11, 2022              Index: sacred..sidebar

## S

**sacred** 1604:8

**sad** 1348:6 1351:18

**saddened** 1563:25 1564:1

**safe** 1452:6

**safety** 1455:8 1460:4

**salary** 1399:24 1476:17

**Samuelson** 1341:20

**San** 1575:16

**Sassy** 1335:24

**save** 1346:4 1479:23

**says/fac** 1527:12

**scale** 1475:14

**Schaffer** 1518:21,22
1519:5,15 1521:11
1531:21

**schedule** 1408:15

**Schneider** 1289:4
1292:23 1307:21 1342:18,
20 1343:7,11,16 1344:5,22
1345:11 1346:1,25
1357:17 1358:20 1361:18
1454:17 1489:20 1490:9
1498:2 1501:24 1503:12,
18 1504:3 1505:17 1507:4
1521:24 1522:5 1542:24
1547:23 1548:3 1549:5
1550:4 1572:21,23 1573:1,
7,21 1586:8 1593:18
1600:18 1603:21 1607:3
1608:9 1612:10 1616:14

**Schneider's** 1497:2
1498:7

**Scholer** 1619:16

**school** 1398:25 1399:2
1408:18 1409:6 1412:1

**schools** 1399:23

**scope** 1472:12,15,19
1473:7 1476:5

**scouting** 1399:21

**screen** 1357:15 1515:25
1518:16 1531:4,25
1537:10 1613:21

**screens** 1351:17 1363:25
1486:7,8 1576:17

**scroll** 1593:10

**scrolling** 1302:2 1593:15

**search** 1290:15,16

**searched** 1290:17

**searching** 1436:8,12

**seat** 1480:1 1487:4
1557:21

**seated** 1287:4 1288:20
1373:12 1382:2 1453:7
1509:19 1510:21 1557:12

**seconds** 1393:25 1483:22

**section** 1478:19 1544:20

**SECURITY** 1288:17
1373:11 1452:20 1509:16,
18 1557:3 1620:2

**seek** 1288:12 1398:13
1400:5

**seeking** 1466:9 1470:11
1539:17

**select** 1416:21 1459:25

**send** 1291:21 1321:7
1341:22,23 1345:12
1346:11 1347:4 1353:21
1364:25 1367:4,12 1369:6
1387:21 1389:12,21
1462:12 1477:4 1522:5
1551:3 1577:10 1578:6
1594:2 1601:22 1602:1,5
1604:18

**sending** 1289:18 1339:20
1342:7 1347:7,23 1352:25
1359:13 1360:11 1365:15
1382:9,15 1385:2,18,22
1408:17 1469:16 1518:25
1585:5 1594:23 1597:21

**sends** 1542:5

**senior** 1518:24 1559:1,2,6,
10 1565:11

**seniority** 1329:10 1330:10
1356:18,23 1410:14
1529:3

**sense** 1371:19 1393:16
1403:3 1502:2,12 1547:20
1608:22 1617:7 1618:3

**sentence** 1294:23
1309:18 1356:11 1357:9
1384:15 1433:10 1434:17
1544:22 1568:21

**separate** 1347:14 1433:8
1482:23 1503:20 1510:8

**separation** 1322:16
1336:21 1379:7,8 1399:13
1401:20

**September** 1529:18
1530:5

**seriousness** 1519:7

**served** 1293:5 1330:25
1417:18 1446:24

**service** 1534:11 1567:22,
23,25 1568:4,7 1569:4
1575:13 1587:16

**services** 1559:4,5

**session** 1371:18

**set** 1312:8 1317:24 1318:2
1408:25 1409:22 1507:3
1549:25 1589:10 1606:3

**setting** 1354:22

**settlement** 1404:16

**Seventh** 1451:5 1452:7

**sexual** 1331:19 1358:2,22
1536:24 1537:3 1538:3
1554:2 1579:1 1606:7

**sexually** 1537:11,24

**shadow** 1446:19

**Shaffer** 1518:18

**share** 1346:3 1459:14
1534:22 1551:17 1579:22
1583:3,6 1589:16 1599:25

**shared** 1459:4 1529:19

**shares** 1497:24

**sharing** 1475:20 1476:20

**Sherry** 1615:18

**Shifting** 1498:17

**Shipman** 1314:16,24
1341:15

**shock** 1349:4

**shocked** 1353:8 1563:24

**shocking** 1564:12

**shoes** 1405:20

**shoot** 1478:10

**shoots** 1374:17

**shop** 1361:12

**short** 1364:14 1373:6
1480:10,11 1501:3 1576:5

**shorter** 1451:7 1501:17

**shot** 1451:12 1613:21

**shots** 1515:25 1518:16
1531:4,25 1537:10

**shove** 1457:17

**show** 1301:12 1307:18
1317:9,18,19 1321:10
1359:17,19 1364:18
1375:13 1392:19 1493:11
1494:7,8 1528:7 1529:6
1539:4,5,7 1587:2 1588:6

**showed** 1333:20 1334:1
1363:8 1532:1 1587:3,4,6

**showing** 1306:7 1486:8
1604:24

**shown** 1321:14 1364:16
1477:23

**shows** 1375:4 1452:17
1498:7 1510:3 1525:1
1586:23 1588:7

**shred** 1599:9

**sic** 1580:25

**sick** 1528:2,3,9,10

**side** 1310:17 1375:14
1412:14 1416:16 1458:3,4
1512:23 1590:12

**sidebar** 1298:17,19
1299:20 1308:25 1310:1
1317:11 1319:2,4,17
1371:3,5,12 1372:15
1390:13,18 1391:10,14,16,
17,19 1394:2,6 1431:4,18,
20 1432:15,18 1433:24,25
1435:25 1439:25 1462:25
1463:2 1464:9 1472:6,9
1474:8 1526:18 1539:13,
15 1540:5 1548:25 1549:2
1550:12 1561:8 1610:15,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 498 of 642   PageID 11439
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 5 July 11, 2022              Index: sideline..speculation

16,18 1612:4 1614:9

**sideline** 1451:6 1539:22

**sides** 1507:14

**sign** 1293:12,20 1331:6 1336:4 1425:20,24 1492:1, 2 1567:6

**signatures** 1443:13

**signed** 1294:23 1329:13, 22 1332:19,23 1404:12 1444:23 1445:2,17 1446:18

**significance** 1580:14 1587:14

**significant** 1523:13,16

**signing** 1426:21 1427:1 1428:11 1444:11,15 1446:2,13

**signs** 1374:6 1491:24

**similar** 1340:8 1351:2 1451:4 1495:5 1498:18 1548:14,18 1599:25

**similarly** 1376:17 1491:15 1492:20 1495:8

**simple** 1420:15 1437:8 1470:7 1471:17

**simplify** 1425:8

**simply** 1299:10 1318:5 1503:19 1597:7

**Sims** 1308:14 1310:7,9,20, 24 1312:11,22 1315:15,16, 19 1316:15 1317:5,6 1319:23 1320:19 1333:22 1334:1 1336:10 1337:12 1338:1,7,10,17,21 1403:7 1419:25

**Sims'** 1339:7,11

**single** 1435:13 1472:21,22 1473:3

**sir** 1302:5 1311:11 1322:11 1324:18 1339:6 1342:4 1346:10 1474:7 1501:14

**sit** 1287:5

**site** 1345:3

**sits** 1444:18

**sitting** 1308:15 1342:21 1407:3 1416:18 1420:10 1440:11 1480:20

**situated** 1376:18 1491:15 1492:20

**situation** 1303:17 1534:25 1537:6

**Sixteen** 1546:7

**sixth** 1331:3

**Sixty-six** 1561:5

**skipped** 1526:15

**sleeping** 1296:21

**slew** 1429:15

**slightly** 1368:21 1376:3 1485:24

**slow** 1567:17

**slowly** 1473:12

**SLP** 1528:2

**SLT** 1528:10

**small** 1409:5 1451:18 1491:21

**Smith's** 1314:9

**sobbing** 1349:8

**sober** 1302:18

**social** 1321:17 1323:25 1326:7 1331:18 1344:8,12 1370:6 1375:24 1378:2 1433:1 1484:24 1485:2 1497:13,18 1514:4 1518:3 1519:6 1532:21 1538:13 1542:16 1543:16 1544:1, 23 1545:2,13,22 1546:12, 16 1547:2 1554:18 1565:12,23 1566:5 1596:25 1597:3 1606:2

**socks** 1405:18,21

**Somebody's** 1508:6

**someone's** 1508:2,11

**son** 1413:15

**sort** 1299:7 1444:6 1455:5 1487:22 1619:5

**sought** 1505:11

**sound** 1357:10 1397:6

**sounds** 1361:15 1388:5 1600:3

**source** 1521:23

**southwest** 1287:13 1289:10,15 1290:13,23 1291:4 1295:6 1300:6,10 1304:7 1306:22 1309:12 1315:24 1319:24 1320:21 1321:2,3,23 1322:1,3,4,5 1323:3,15,18,24 1324:25 1325:2,23,25 1327:3 1328:20 1330:12 1331:17, 25 1333:19 1334:5 1335:3, 18 1336:7 1342:3 1345:9, 19 1347:11,18 1353:8,17 1356:24 1357:1 1359:9 1360:18 1364:11,24 1365:3,25 1366:23 1367:8, 12 1369:15 1370:5 1371:8 1374:10,15 1375:16 1376:6,8 1377:7 1378:21 1379:2,10 1380:1,11 1381:13 1382:23 1383:12 1384:2,8,21,23 1385:1,3,9, 12,17 1386:14 1387:1 1388:14,24,25 1389:2,13 1390:9 1395:6,19,23 1396:20 1397:3 1399:8,14 1401:21 1403:2,8,14 1404:3 1431:24 1432:10 1433:5,9,16 1434:4,6,8,10, 12 1435:3,14 1437:2,3 1451:23 1452:2,12 1481:13 1482:13 1484:23 1487:5,8,14 1488:7,14,21 1489:21 1490:6 1491:10, 23 1492:5 1493:21 1494:16 1496:3,11,18,20 1497:20 1499:12,13 1502:11 1505:6,12 1508:24 1510:3,23 1511:2, 25 1512:3,8,10 1513:5,9, 24 1514:11 1517:19 1520:15 1523:21 1528:20 1531:7 1532:3,10,12,14, 20,25 1533:2,15 1534:5,23 1535:14,18,21 1536:11,23 1538:2 1539:20 1542:4 1543:3,15,21 1544:14,16 1545:4,21 1546:3,18 1547:18 1552:3,8 1553:23 1558:17,24,25 1559:17 1562:19 1564:5 1567:5,6

1568:17 1569:9,14,23 1570:1,13 1571:16,19,25 1572:8,20 1573:23 1574:21,23 1575:2,4,11 1578:7 1586:12,17 1587:5, 16,17,20,23 1588:8 1592:1 1598:3,8,12 1600:10,13 1601:9,21,23 1602:8 1605:22 1611:8,9,16,18 1612:12,14,16,21

**Southwest's** 1375:14 1376:13 1384:18 1390:10 1402:24 1488:25 1489:6 1490:24 1541:11 1542:22 1545:2,8 1546:12 1606:6 1610:21,24

**Southwest-affiliated** 1347:15

**space** 1511:10,12,13 1557:23,25 1573:10

**speak** 1325:14 1330:25 1332:25 1340:25 1383:19 1390:18 1409:7 1422:11 1423:10 1425:25 1471:2 1473:14 1483:17 1614:12

**speaking** 1317:10 1320:3 1354:14 1356:1 1358:12 1366:15 1379:8 1390:17 1419:14 1422:16 1428:20 1441:8 1449:3 1455:22 1467:17 1471:7 1526:17 1580:11

**specialist** 1337:9 1515:24

**specific** 1349:24 1376:2 1440:3 1460:5,8 1517:22 1533:3 1534:12 1536:2 1545:16 1546:25 1547:5 1563:14,15 1566:3 1574:12 1609:24

**specifically** 1344:18 1355:14,15 1363:11 1364:17 1365:9 1428:4 1446:23 1455:7 1456:15 1458:17 1497:23 1534:15 1563:13 1607:25

**specifics** 1378:3 1380:3,4

**specifies** 1532:22

**speculation** 1333:5 1490:4

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 499 of 642   PageID 11440
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 5 July 11, 2022                    Index: speech..substantive

**speech** 1292:2,3,14
1293:1,2 1309:17 1334:11
1424:13 1470:15 1478:5
1485:11,16 1492:8

**spend** 1533:7

**spending** 1429:9 1470:17
1471:13 1602:22

**spends** 1487:25

**spent** 1289:23 1323:8
1324:3,15 1346:13 1400:1
1402:16 1410:9 1440:15
1459:23 1471:14 1490:1
1500:10 1575:19

**spiking** 1296:15

**split** 1529:22

**spoke** 1289:3 1446:4
1461:17 1468:9 1537:23
1609:16

**spoken** 1578:21

**spokesperson** 1559:25

**spons-** 1348:23

**sponsored** 1345:17
1348:2

**spring** 1397:23

**St** 1297:9 1398:21 1399:1,
5,22 1402:9 1412:14

**stable** 1534:18

**stack** 1374:9

**staff** 1574:2,5

**stance** 1360:4

**stand** 1373:5 1453:1
1479:25 1480:20 1489:15
1495:10 1502:6 1509:3,11,
14 1510:18 1511:5
1525:24 1556:21,24
1557:8 1597:10 1605:14

**stand-in** 1619:1,2

**standard** 1523:3 1567:23

**standards** 1564:5 1569:3

**standby** 1619:5

**standing** 1573:5 1596:15

**stands** 1528:3

**start** 1287:8 1401:9
1487:12 1500:25 1525:18
1573:13 1576:7 1592:18
1616:10

**started** 1302:19,21
1314:18 1316:1 1326:6
1399:3,6,9,13 1400:14
1416:25 1448:3 1449:15
1502:7

**starts** 1332:3 1356:11
1569:21

**state** 1298:20 1441:15
1500:23 1508:7 1511:20
1558:9

**stated** 1374:12 1383:2,4,
17 1539:2 1548:3 1595:12
1597:7 1602:4

**statement** 1310:20
1324:12 1395:3,8 1433:15
1473:16 1514:5 1532:23
1534:6,8,9 1535:22,23
1568:23 1569:1,9

**statements** 1569:8 1596:5
1597:4

**states** 1438:24 1466:19
1534:13,19 1540:12
1545:1 1546:16

**station** 1361:15

**status** 1603:1

**stay** 1293:18 1379:21
1389:3 1452:8 1460:1
1573:5

**stayed** 1384:24 1403:25

**stays** 1373:25

**stemming** 1379:15

**step** 1297:11 1307:8,11,15,
20,23 1308:8,10 1309:3,7
1310:7,16 1311:9 1312:11,
22 1313:14 1315:15,19
1316:3,22 1318:16
1319:23 1320:7,8,20,25
1321:6 1328:8,10,13,15
1337:24 1350:2 1383:4
1416:6,9,16,22 1417:15
1419:17,19 1420:7,22
1460:15 1471:19 1473:21
1474:19 1475:7

**Stephenson** 1576:25

**stepped** 1326:4 1375:11
1402:14

**stepping** 1385:10

**steps** 1411:1 1521:19

**Stew** 1335:24

**steward** 1361:12

**stick** 1333:12 1377:14
1616:20 1617:22 1618:8

**stocking** 1362:1

**stomping** 1356:15

**Stone** 1307:6 1312:12,13
1321:22 1322:4,9,17
1323:5,11,15 1324:25
1325:5 1326:5 1327:4
1334:2 1339:17,19 1340:7,
20 1341:17,18 1342:1
1344:12,24 1345:12
1346:6 1347:19 1348:25
1350:7,16 1351:2,13
1353:1 1359:13 1360:9
1362:25 1363:2,8,18,21
1364:8,25 1365:15 1367:5,
13 1369:6,14,18 1370:1
1375:2 1382:10,15 1385:3,
19 1388:23,25 1389:9
1390:3 1414:9 1421:8,10,
13,23,24 1422:1 1428:6
1445:6 1446:1,15 1447:22
1449:17 1454:17 1455:18
1457:1,2,7,10 1466:10
1467:8 1477:1,8,10,14,17,
22,24,25 1481:16 1483:13
1489:9 1491:15 1495:17
1496:16 1498:20 1499:9
1500:1 1516:1,2 1522:9
1535:6,15,16,17 1537:12
1538:22 1551:8,17 1552:8
1553:17 1554:2 1562:5,8
1571:14 1577:3 1578:14,
18 1581:10 1582:4,10,17
1583:4,23 1584:2 1585:5
1595:9,21 1596:25 1597:9,
23 1599:11 1600:6 1601:2,
5 1603:11 1606:15 1607:5,
8,17,20 1609:8,16,19
1613:11,15

**Stone's** 1339:24 1349:6
1352:9 1449:10 1499:19
1517:9 1520:3 1538:16
1555:4 1576:21 1582:1
1583:20 1596:15 1607:13

1608:12 1614:25

**stop** 1410:7 1465:17
1490:9

**stopped** 1348:10,15

**stopping** 1298:4,5 1330:6

**story** 1310:17 1590:12

**straight** 1365:13 1618:21

**street** 1532:12

**strength** 1489:12

**stress** 1296:7,8 1298:1,11
1300:9

**stress-related** 1300:3

**stretch** 1401:16

**strike** 1299:18 1326:20,25
1343:19 1346:19 1362:15
1384:12 1420:14,18
1465:25 1470:1 1565:2
1591:11

**striking** 1299:24

**string** 1576:22 1586:10

**strip** 1293:14

**stroke** 1296:13 1300:5

**Strong** 1489:14

**structure** 1412:22

**structured** 1410:13

**struggles** 1306:11,19

**studio** 1401:6

**studios** 1401:3

**stuff** 1340:13,24 1406:21
1408:4 1409:15 1460:2
1573:18 1593:14

**stunned** 1563:24

**subject** 1457:21 1486:12

**submit** 1482:17 1488:16
1493:18

**submitted** 1311:2 1392:15
1400:15 1401:22 1419:25
1482:12,19 1539:21

**substance** 1349:24
1518:9

**substantive** 1493:14

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 500 of 642   PageID 11441

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                 Index: substitute..terminating

**substitute** 1413:11,12,13

**sue** 1293:15 1404:11 1436:25 1479:9

**sufficient** 1377:18 1488:9 1489:3,17 1490:12,16 1491:1

**sufficiently** 1368:13 1473:18,21

**suggest** 1395:23 1482:17 1617:1

**suggested** 1375:1,6 1378:12

**suggesting** 1390:2

**suggests** 1317:14

**suicide** 1597:2

**suing** 1338:20

**suit** 1392:1

**Sullivan** 1342:24 1344:2 1414:23 1415:15,18,21 1418:23 1419:5 1589:24, 25

**summaries** 1302:10

**summarize** 1467:16

**summarizing** 1497:4

**summary** 1493:25 1497:3

**Sunday** 1409:12,23

**super** 1486:20

**supervisor** 1468:9

**supervisors** 1574:7,17

**supplement** 1335:7

**supplemental** 1508:22

**supplied** 1594:13,17

**support** 1359:4 1488:20 1489:17,20 1490:11,14 1492:22 1493:19 1496:13 1508:1 1591:21

**supported** 1352:2 1425:21 1483:1

**supporter** 1375:20 1425:14 1426:11 1427:1 1428:9 1440:23

**supporters** 1377:1

1435:1,6,9,12,18 1441:1

**supporting** 1354:3 1357:19 1443:14 1456:19

**supports** 1395:7

**supposed** 1361:9,23 1363:19 1365:18 1368:2 1384:9 1389:2 1499:23 1524:21 1561:6 1611:18

**supposedly** 1356:19

**surface-level** 1406:7

**surprise** 1447:12,14,15, 17,18,20 1486:9 1489:6

**suspension** 1293:5 1330:20 1417:16 1431:15 1602:14

**sustain** 1319:20 1346:18 1362:14 1390:22 1419:15 1449:4 1467:14,18 1470:4 1540:23 1548:24 1608:19, 22 1614:17,18

**sustained** 1292:10 1294:5 1318:24 1369:23 1381:24 1382:3 1384:11 1436:17 1439:24 1462:23 1467:21 1564:22 1609:4

**sustaining** 1299:23

**Suzanne** 1576:24 1608:7

**SWA** 1538:7 1540:14 1541:16 1545:9 1568:18

**swear** 1506:13 1510:18 1557:17 1563:16

**sword** 1432:23

**sworn** 1392:8 1511:7 1557:19 1573:7

**symbol** 1365:18 1368:2

**synonymous** 1498:16

**synopsis** 1522:10

**system** 1465:10 1489:15

**systems** 1399:1 1459:19

———————————

**T**

———————————

**TA** 1445:17 1447:6

**table** 1287:18 1308:14

1394:4 1407:3

**take-home** 1397:15 1398:3

**taker** 1590:21,25

**takes** 1530:12 1574:3 1617:25 1619:17

**taking** 1308:16 1332:24 1365:12 1389:23 1394:3 1404:10 1416:18 1420:1 1428:19 1460:3,6 1499:11 1591:3,4 1598:12

**Talburt** 1293:21 1333:3 1370:17 1371:10 1378:4 1381:4 1438:24

**talk** 1307:8 1337:14 1338:24 1341:5 1347:23 1363:5 1372:19,23,24 1373:6,7 1380:4 1381:3 1387:5 1392:19 1398:12 1404:7 1406:12 1408:3 1413:25 1415:3,5 1421:20 1423:23 1427:21 1428:3 1429:22 1431:18 1436:7 1439:21 1443:18 1444:9 1450:19,20 1451:4,7,9,15, 17,20,22 1452:3,9,11 1457:20 1461:3 1486:16, 21,22 1502:24 1508:5 1518:20 1534:12 1556:8, 10 1561:12 1567:24 1568:3 1588:10,22 1610:22 1611:15 1616:6,8, 16 1619:12

**talked** 1289:9 1290:7 1300:16 1313:24 1317:1 1323:23 1329:1 1332:5 1344:8,13 1347:24 1372:6 1403:7 1404:14 1429:20 1434:5 1452:10 1453:22 1467:2 1491:10 1509:24 1570:18 1585:2 1588:18

**talking** 1294:2 1297:8 1299:1 1305:9 1307:12 1319:14 1333:25 1334:9, 10 1344:16 1364:4 1370:24 1371:8 1384:22 1405:18 1406:20 1408:4,5 1420:16 1442:4 1449:14 1453:21 1454:17 1459:21 1461:24 1466:1 1490:5 1500:9,10,11,12,13 1507:20 1515:21 1521:2

1533:8 1537:20 1563:13

**talks** 1332:6 1355:19 1392:7 1499:2 1543:20 1569:22 1587:24

**Tammy** 1518:22 1519:15 1531:21

**target** 1375:8 1403:16

**targeted** 1404:19 1581:15

**targeting** 1458:11

**taught** 1413:14

**tax** 1476:2

**teach** 1567:25 1568:1,2

**teacher** 1413:11

**teachers** 1412:23

**teaching** 1413:3,4,8 1567:25

**team** 1477:16 1481:15 1498:4,5 1545:3 1559:18 1560:4 1562:23 1573:22

**tedious** 1383:9

**telling** 1335:2 1358:20 1433:12 1469:22 1506:2 1584:23 1601:4

**tells** 1334:23 1546:20

**Ten** 1514:14

**tentative** 1377:14 1427:2 1444:16,25 1445:7,24 1446:3,14 1447:23 1448:4, 10

**tenuous** 1490:19

**term** 1299:11 1307:9 1565:9 1584:11,22

**terminate** 1488:8 1547:17 1555:8 1564:15 1571:25 1583:20 1600:18 1603:18 1604:11 1606:17

**terminated** 1289:5 1295:23 1300:6,10 1302:13 1304:6 1397:21 1408:10 1410:10 1476:21 1489:21 1491:10 1601:17 1606:21 1609:24

**terminating** 1488:22

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022                    Index: termination..treated

**termination** 1307:21 1309:3 1330:20 1331:20 1374:5,10,12,16 1408:6 1417:16 1479:13 1490:3,25 1491:3 1522:14,21 1543:24 1544:7,13 1548:8 1559:24 1583:25 1602:18 1604:18

**terminator** 1549:3

**terms** 1329:6 1358:6 1383:12 1394:11 1398:15 1504:6 1528:7 1599:16

**terrible** 1553:10

**territory** 1554:4

**terrorists** 1413:18

**test** 1480:15,19

**tested** 1297:19

**testified** 1331:9 1339:16 1340:4 1341:10 1376:5 1390:4 1440:21 1445:7 1446:2,16 1448:17 1508:3,5 1592:25 1600:16 1608:14

**testify** 1446:22 1539:25

**testifying** 1539:11

**testimony** 1323:2 1333:2 1335:10 1346:21 1351:22 1352:4 1358:9 1360:13,25 1361:3 1364:23 1365:6,14 1366:3 1379:23 1380:12, 13,22,25 1383:24 1384:6 1386:2 1411:9 1413:1 1415:12 1420:14 1427:5,7 1432:25 1438:9 1440:10 1448:2,25 1465:1 1480:17, 19 1481:10 1490:2 1493:7 1498:7 1519:11 1532:18 1539:18,23 1541:22 1555:23 1560:13 1572:12 1580:6 1585:24 1588:4 1589:16 1599:11 1606:19 1609:6

**Texas** 1512:6 1558:13

**text** 1538:21

**thankful** 1293:20

**That'** 1395:22

**theme** 1375:20

**thing** 1290:14 1323:10,24 1380:18 1394:4 1402:6 1406:23 1429:12 1452:3 1480:14 1488:24 1537:15 1557:22 1597:2

**things** 1292:15 1299:7 1313:3,7 1323:23 1336:1 1341:11 1347:13 1356:20 1358:2,3,24 1380:24 1387:24 1406:13,15 1407:5 1410:4,16 1422:19 1427:12 1441:22 1447:8 1458:3 1459:25 1469:17 1471:14 1480:14 1486:18 1487:24,25 1488:8,22 1502:1 1530:23 1553:12 1560:11 1564:2,11 1566:5 1567:3 1570:4,11 1581:9, 17,18,19 1585:3 1586:23

**thinking** 1335:8 1373:23, 25 1432:15 1478:4

**thinks** 1433:2

**thought** 1297:5,16 1303:3 1319:13 1326:14 1335:1, 12 1348:9,17,19 1357:4 1366:22 1386:18 1416:3 1477:22 1485:23 1499:10 1501:18 1522:11,12 1523:16 1525:13 1561:6 1578:11 1596:24

**thoughts** 1343:21 1373:14 1597:10 1602:25

**thread** 1517:1,5,7

**threat** 1376:24,25

**threaten** 1478:10

**threatening** 1542:5

**threats** 1537:12

**threshold** 1509:22 1510:11

**threw** 1375:16

**throats** 1457:18

**thrown** 1343:14

**Thursday** 1619:3

**tie** 1483:10

**tied** 1495:18

**time** 1290:23 1291:2,10 1293:4 1294:16 1296:6

1297:10 1303:10,14 1304:2 1307:11,19 1309:12 1329:4,21 1330:2, 25 1332:8,10 1334:18 1339:6,21 1361:13 1362:7 1370:7 1371:16 1372:1 1386:23 1398:8 1401:1 1405:17 1406:20 1410:9 1412:18 1417:18 1418:17, 23 1419:15,22 1420:3 1422:23 1429:7 1431:7 1432:24 1440:12 1452:23 1453:1 1457:24 1461:16 1464:2 1469:7 1471:25 1475:12,24 1476:21,23 1480:4,14 1486:5,14 1489:16 1490:16,23 1495:20,25 1499:16 1501:22 1504:6 1506:6 1508:18 1510:4 1512:7 1514:13,18 1516:5 1517:14 1518:23 1521:25 1524:22 1529:13,22 1530:2,4,7,9 1533:7 1535:7 1538:24 1539:20 1547:9 1560:21 1562:25 1565:8 1573:3 1575:5,8 1576:6 1577:3 1578:2,10, 14 1579:22 1580:18 1587:15 1589:12,14,18 1590:22 1591:22 1598:6 1607:7 1611:24 1617:3

**timely** 1560:2

**times** 1303:23 1339:19 1343:18 1383:3 1407:4,22 1419:12 1457:19 1464:5 1467:12 1520:22 1542:13 1600:24 1607:5

**timing** 1488:25 1489:2 1510:9

**timing-wise** 1450:10

**Title** 1383:19 1427:25 1490:18 1497:16

**today** 1309:5,8 1333:10 1347:24 1396:16 1398:16 1418:1 1438:18 1476:22 1488:12 1532:18 1562:8 1566:11,12,25 1588:19 1617:12,13

**told** 1289:16,22 1290:4 1294:21 1297:6 1299:1 1312:14 1315:19,22,24

1316:11,12,15,22 1317:6 1331:1 1332:11,15 1337:3, 5,22 1338:1,8 1343:4,6 1345:13,15,20,23 1346:1, 25 1365:6 1367:1 1368:22 1418:20 1419:23 1429:13 1438:12 1480:5,14,22 1482:16 1484:18 1497:22 1503:1 1584:3 1604:13

**tolerated** 1541:13

**tomorrow** 1304:17,19 1406:12 1616:10 1617:11, 14,16,21 1618:5,6,15,17, 23 1619:20,23

**tonight** 1616:22 1617:10 1619:21

**tool** 1565:24

**top** 1296:24 1306:12 1337:8 1438:5 1516:22 1524:13 1526:10 1527:20 1532:9 1540:12 1588:18

**topic** 1360:15 1377:24 1455:5 1473:19,20 1476:8 1580:4

**topics** 1347:8 1396:10 1472:18,20

**totally** 1299:13 1365:11 1456:17 1510:14

**trade** 1410:16

**train** 1412:23

**training** 1528:10,23,25 1568:2

**transcribed** 1481:9

**transcript** 1480:24,25 1481:4

**transition** 1514:22

**transpired** 1581:7,16 1583:22 1599:12

**transportation** 1346:14

**travel** 1570:8

**treat** 1318:7 1498:22 1499:23,24 1567:16,19 1568:9,10,11 1601:7,11 1602:9

**treated** 1318:6 1343:11 1457:13,15 1458:19

1459:15 1491:5 1492:20
1495:12 1535:3 1567:20
1600:11

**treating** 1564:7 1614:13

**treatment** 1358:3,22
1452:12 1499:21 1553:7

**trial** 1287:7 1288:8
1295:12 1301:23 1306:2
1313:20 1314:9 1327:23
1377:21 1394:13 1497:3
1505:5,10,11,16 1506:9
1508:15,24 1509:22,23
1516:17 1524:2 1533:24
1536:8,11,19 1538:3
1543:3,11 1546:4,10
1592:14

**trick** 1429:2

**trip** 1302:24 1387:11,14
1410:16 1527:6,8,20,24
1528:2,13 1529:8

**trips** 1302:23 1330:11
1475:13 1513:11 1523:16
1524:21 1525:2,9,11,23
1526:6 1527:1,6,18
1529:17,25 1530:1
1542:14 1545:19

**trouble** 1357:11

**troubles** 1406:5

**true** 1299:7 1302:14,15
1351:8,9 1362:24 1442:2,7
1445:18 1446:6 1448:20
1496:8 1584:4

**Trump** 1362:6,18

**trust** 1398:10 1446:16

**truth** 1299:16 1506:3,4

**Tuesday** 1409:16 1567:2

**turn** 1333:6 1369:15
1439:15 1440:19 1449:17
1462:18 1499:25 1611:19
1613:17

**turned** 1301:7 1321:16
1334:11 1336:2 1369:19
1375:19 1378:2 1388:25
1404:17 1414:9 1417:10
1419:2 1421:9 1428:6
1433:8 1449:11,21
1461:14,20 1462:5
1466:11,16 1467:10

1468:10,20 1483:18
1484:23 1485:1,7 1498:20,
23 1610:1,12 1611:7
1612:15 1613:3,11

**turning** 1293:21 1326:6
1333:3 1334:14 1370:1,20
1375:15 1376:7 1414:8,16
1425:11 1427:14,24
1453:24 1455:20 1457:7
1465:9 1466:11 1498:24
1499:19 1500:1

**turns** 1410:17,18,19
1499:4,5

**TV** 1303:8

**TW** 1287:16

**Twenty-eight** 1558:25

**Twenty-one** 1512:9

**Two-and-a-half** 1558:19

**two-day** 1410:17 1528:12

**TWU** 1312:13 1314:10
1477:8,14,17,22 1481:14
1499:3 1513:4 1578:20
1589:21 1604:12

**TWU's** 1325:19

**tyer** 1591:5

**type** 1323:17 1331:7
1367:4 1369:8 1377:6
1388:16,18 1522:4
1562:14,20 1566:14
1581:18 1585:3 1589:17
1597:3 1601:19 1602:5

**types** 1363:13 1434:7
1547:4 1562:20 1601:22
1602:1

**typically** 1559:21

**typist** 1591:5

---

**U**

**U.S.** 1550:22

**Uh-huh** 1311:6 1328:24
1350:20 1361:20,24
1396:21 1400:17 1406:14,
17,24 1408:8 1409:24
1411:16 1412:7,24 1422:2
1423:25 1426:4 1429:21
1441:17 1442:21 1443:22

1444:22 1453:19 1458:9
1464:19

**ultimate** 1433:6 1550:2
1615:4

**ultimately** 1434:6

**un-mute** 1486:8

**un-muted** 1486:7 1576:17

**unacceptable** 1537:3

**unavailable** 1480:16

**unbeknownst** 1503:8

**underlying** 1379:25

**underneath** 1524:17
1528:14

**understand** 1300:2
1305:8 1309:9 1314:19
1317:4 1318:16 1325:22
1332:9 1345:7 1355:5
1361:3 1364:20 1366:2
1371:7 1375:3,9 1377:11,
25 1379:6,19 1381:2,15,16
1383:5 1387:2 1388:2,3
1389:25 1397:12 1401:17
1403:13 1409:6 1411:3,6
1415:1 1417:5 1419:4
1421:11,25 1423:11
1424:18 1425:1,17 1426:1,
6 1427:16,23 1437:9
1455:14 1458:22 1460:7,
13 1462:9,15 1463:14
1466:7 1467:2,4 1470:20
1482:20 1490:22 1504:2
1507:25 1517:9 1519:10
1524:10 1525:15 1530:25
1532:8 1551:13 1553:4
1554:5 1578:23 1582:1,18
1594:19 1598:16 1611:6

**understanding** 1294:4,17
1297:22 1299:11 1329:17
1366:8 1388:4 1427:18,19
1428:14 1439:2,5 1461:8
1464:20 1525:17 1535:5
1564:8 1607:12 1614:23
1615:3,4

**understood** 1288:10
1313:16 1327:13 1339:15
1347:14 1349:21 1356:2
1375:5 1377:2 1381:22
1384:6 1390:21 1416:10
1494:18 1495:23 1504:12
1509:7 1539:3 1569:19

1617:7

**undue** 1288:2,5 1313:14
1495:22,24 1555:3,7
1571:24 1604:1

**unfettered** 1292:13
1478:15

**unheard** 1523:14

**uniform** 1532:10,14
1570:7 1587:4,7

**union** 1288:3 1289:23
1290:1,5,24 1291:11,17
1293:13,16 1294:19,25
1301:17 1304:23 1305:1,
11 1308:11 1309:16
1310:12 1311:13,15
1314:18 1315:10 1317:3
1319:25 1320:21 1321:1,
13,24 1322:6,12,15,22,23,
24 1323:3,7,9,16,20,22,23
1324:2,5,17 1325:3,7,11,
12,13 1326:5 1328:21,25
1329:3 1332:15,25
1337:21,25 1338:3,18,19
1339:13,23 1341:12
1342:2,12,24 1343:17
1344:2 1345:16 1346:12
1347:11,20 1348:1
1352:14 1353:6 1355:20
1359:3 1361:12 1367:7,8
1369:4,5,18,19,25 1375:8,
15,20 1376:6,8,21,22
1377:8,9 1378:25 1379:4,
13 1380:1 1381:5 1383:18
1384:22,23,24,25 1385:7,
10,11,20 1386:13,21,25
1387:4,22 1388:8,13,17,
20,22 1389:1,12,18 1390:6
1391:9,13 1395:5 1403:3,
9,11,12 1405:10 1407:4,6,
7,10 1413:23 1414:3,6,10,
23 1415:6,8,21,23 1416:6
1417:2,10 1419:7,18
1420:20 1421:16,22
1422:5,6,8,12,14,16,18,20
1423:2,4,6,17,18 1424:11,
16,20,21 1425:9,12
1426:3,7 1427:12,14
1429:18,24 1430:8 1433:4
1434:10,11 1435:7
1436:21 1437:10 1438:10,
16,20 1439:12,16 1440:18
1441:15 1442:11 1443:13,
14 1444:7 1447:1,2

1448:7,16 1449:8 1453:17, 23,25 1454:1,6,10,25 1455:2,7,17 1456:8 1457:2,3 1458:11,19 1459:5,22 1460:6,15 1461:5,6,13,15,19 1462:4, 21 1464:22 1465:13 1467:7,25 1468:24 1469:17,23 1470:16,25 1471:3,5,6,8,9,10,12 1475:6 1481:23 1482:20, 23,25 1483:2 1487:5,25 1488:15 1489:22 1490:6 1492:2 1494:8 1495:5 1496:4,23 1498:17 1499:23 1500:12,14,15 1502:8 1505:12 1508:24 1509:4 1514:17 1516:5 1533:19 1535:7 1552:1,4, 5,10 1555:3,7 1559:21 1571:15,19,24 1575:9 1585:15 1589:13 1592:8 1595:14 1597:16 1598:4, 17 1600:6 1602:20,21,22 1603:1,4,8 1604:12,16 1605:18

union's 1304:20 1415:4 1460:8

union-paying 1390:9

union-protected 1485:11,16

union-related 1598:9

United 1301:6 1400:20

universal 1551:4

university 1489:14 1575:15,16

unmuted 1363:25

unprotected 1496:12

unquote 1499:5 1500:2

unwanted 1555:3,7 1571:24

unwise 1500:25

updated 1506:3 1507:20

updates 1554:22

upheld 1517:25

upset 1347:25 1351:20,24, 25 1352:3 1395:19 1582:5, 15

upstairs 1303:13

usual 1394:1

utilize 1505:14

utilized 1505:15

──────────

V

VA 1525:24 1526:8

vacation 1525:25 1526:9, 12 1527:22 1528:22 1529:2,3,13 1530:9,10,15

vagina 1361:18,23 1362:3, 20 1363:17 1537:16 1538:1

vague 1493:7

valid 1441:10,11

variety 1585:20

Vegas 1577:2,3

vengeance 1440:18

venture 1297:2 1301:5

verbally 1535:4

verdict 1495:7 1500:18

verify 1521:22 1531:3

version 1503:11,21,24,25 1507:20 1540:19 1541:4

versions 1503:9

versus 1381:7 1398:16

vice 1481:17

video 1301:8 1347:5 1348:25 1349:7,11 1385:2 1387:21 1390:8 1480:5,6,8 1481:2,6,8 1482:16 1483:18,22 1484:3 1485:20 1563:22,23 1570:11 1577:15 1602:5 1606:15

videos 1289:18 1325:6 1339:20 1340:15,20 1341:4,22,23 1342:1 1344:23,24 1345:2,12 1347:10,12,16,18 1351:3, 7,24 1353:1,21 1359:14 1360:11,22 1364:14 1385:19,23 1389:12 1409:2 1483:20,25

1496:15 1498:25 1499:7 1500:3,8 1515:24 1518:13, 15 1519:1 1520:10,12,18 1531:4,22 1533:4 1537:13 1538:20 1551:7,8,14 1563:20 1577:17,22,25 1578:3,6 1582:10 1584:1 1596:17 1597:4,6,22 1600:24 1601:16 1602:2

view 1339:24 1345:7 1444:2 1459:1 1460:8 1542:9 1600:12 1601:24 1611:8

viewed 1484:13 1578:4

viewing 1533:5 1578:10

views 1340:2 1492:12 1548:21 1549:6,13 1550:18 1564:2 1608:12

VII 1383:19 1427:25 1490:19

VII's 1497:16

Vincent 1615:18

violate 1385:3 1432:1,2,20 1493:11 1545:12 1579:2

violated 1323:18 1336:3 1369:20 1370:1,6 1385:23 1390:10 1466:11 1493:10 1497:13 1499:11 1542:22, 25 1545:11 1548:13 1605:22,25

violates 1497:18

violating 1485:1 1508:10 1544:4,11

violation 1331:17 1387:19 1424:3 1479:12 1484:24 1485:6 1498:18 1518:6 1543:22 1553:14 1554:3 1599:18 1606:6

violations 1433:1 1512:21 1513:18 1515:15,17 1519:6 1548:15

vis-a-vis 1567:14

vision 1541:6

visions 1402:13

vocal 1425:21 1438:13 1440:24

voice 1423:9

voiced 1324:2,14

volunteer 1433:18

volunteered 1432:5 1608:1

vote 1340:25 1407:18,21, 25 1429:11 1440:16

voted 1429:16,17

votes 1441:22 1442:8,10 1443:12

──────────

W

W-2 1301:25 1302:9

W-2S 1302:3 1475:11 1476:6

wait 1316:7 1334:21 1360:24 1428:17 1442:3 1479:16 1593:8

walk 1396:19 1397:14 1413:22 1473:11 1524:9 1525:4

walked 1303:5 1520:22

walking 1296:13 1300:5 1431:23

wanted 1293:12,14,17 1311:7 1316:18 1323:4,7, 17 1340:24 1341:4 1349:1, 4 1351:6 1359:14,15 1367:9 1403:2 1404:7 1411:8 1430:11 1467:7 1470:11,12,15,22,23 1495:17 1503:1 1519:8 1523:17 1531:3 1582:22 1594:15 1595:13

wanting 1467:15 1539:3

Washington 1368:23 1395:16 1491:12

wasted 1303:9

watch 1483:24 1520:10 1563:20

watched 1483:22 1484:16 1520:12,18

wave 1394:1

ways 1510:8 1537:9

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 504 of 642   PageID 11445
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Index: wear..Zoom

**wear** 1352:18 1363:14

**wearing** 1365:17 1367:19 1483:10

**website** 1325:19,20,21 1492:3

**Wednesday** 1409:16 1567:1 1618:1,12

**week** 1406:3,5 1409:4,8,12 1525:25 1528:22 1529:13 1530:10

**what-all** 1616:24

**wife** 1586:22

**wings** 1587:3

**wiser** 1619:1

**withdraw** 1561:10

**witness's** 1324:8

**witnesses** 1501:12,16 1502:9,11 1507:16 1617:13

**woman** 1346:5 1354:19 1355:4 1357:1 1369:2 1444:14

**woman's** 1538:1

**women** 1323:8 1345:17 1346:13 1348:21 1351:21 1352:20 1353:7 1355:9 1356:14 1360:8 1362:5,7 1363:9,10,15 1364:17 1365:12 1367:18,22,24,25 1368:23 1369:4 1389:20 1491:12,14 1492:11,14

**women's** 1290:6 1346:11 1348:1 1353:17 1354:10, 11 1355:20 1357:20 1363:10 1447:8 1454:24 1488:2 1489:24 1491:9,18 1492:16 1499:2 1500:11, 13 1519:18 1581:25 1582:4 1591:18 1595:21

**wondering** 1611:24 1619:13

**word** 1346:2 1347:2,5 1367:20 1426:3 1497:24

**wording** 1446:17

**words** 1319:25 1320:21 1422:20 1448:23,24

1454:15 1466:14 1480:21, 24 1481:1 1584:14

**wore** 1362:5 1363:10,13 1364:12 1368:1,23

**work** 1304:10 1310:11 1311:15 1386:15,16,21 1387:13,24 1398:9 1402:19 1408:6 1416:17 1435:14 1457:20 1481:21 1512:7,19 1513:22 1517:23 1523:19 1534:18 1539:22 1542:3 1547:6 1552:7,24 1559:4,16 1560:7,8 1564:9 1565:13 1566:10 1567:6 1568:12 1569:17 1570:2,4 1574:20 1579:4,18 1580:25 1581:9 1602:11

**work-like** 1542:14

**worked** 1403:12 1447:1 1512:3 1517:23 1518:7 1521:24 1523:11 1529:4 1575:12,15 1579:6 1599:17

**workforce** 1542:12 1545:16 1553:11

**working** 1301:4 1304:7 1339:12 1398:6,7 1399:6, 9,13 1402:8,10 1407:6 1442:11 1444:7 1475:12 1512:15 1529:2 1542:7 1569:13 1575:11 1618:18

**workmates** 1435:7

**workplace** 1291:19,21 1292:7,13,15,17 1331:17 1344:14,17 1386:11,12 1387:6,9,20 1388:5 1478:16 1505:9,18 1514:4 1531:11 1540:16 1541:4, 14,23 1542:2 1543:22 1544:9 1586:11,14 1606:1

**works** 1555:21

**worried** 1334:7

**worry** 1443:19

**worse** 1306:23,24 1581:24

**worst** 1441:7

**wrap** 1463:19

**wrapping** 1452:22

**write** 1566:25 1605:4

**writing** 1399:10

**written** 1327:20

**wrong** 1367:13 1369:14 1372:11 1374:22,23 1380:15 1448:18 1451:13 1505:23 1550:20 1615:10

**wronged** 1453:18

**wrote** 1359:17 1363:12 1370:16 1456:5 1508:6

---

**Y**

**y'all** 1373:23 1381:15,16 1392:24 1393:14 1451:1 1452:14,16,24 1480:13,14 1486:15,19 1501:2 1502:16 1509:10,19 1616:21 1617:8 1618:8,16 1619:6,20,24

**year** 1330:15 1396:23 1397:19,25 1398:3 1413:17 1475:15 1476:14 1528:25 1554:14 1568:1 1581:22

**years** 1290:19,21 1298:13 1302:9,12,18 1303:11 1306:17 1310:9 1342:6 1347:7,13 1356:24 1357:11 1360:13 1387:17 1398:22 1401:18,19 1405:13 1413:12,13 1490:10 1512:9 1523:12 1552:20 1558:19,25 1574:25 1575:4,19,20 1580:25 1581:23

**yes-or-no** 1366:6

**young** 1346:5

---

**Z**

**Zoom** 1485:23

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 505 of 642    PageID 11446
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022

1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF TEXAS
2
                      CASE NO. 3:17-cv-02278-X
3

4

5    -----------------------------------x

6    CHARLENE CARTER,

7                          Plaintiff,

8    v.

9    SOUTHWEST AIRLINES CO. and
     TRANSPORT WORKERS OF AMERICA,
10   LOCAL 566,

11                         Defendants.

12

13   -----------------------------------x

14

15

16              TRANSCRIPT OF THE TRIAL

17         BEFORE THE HONORABLE BRANTLEY STARR

18            UNITED STATES DISTRICT JUDGE

19

20            V O L U M E   6

21

22               Dallas, Texas

23               July 12, 2022

24                8:37 a.m.

25

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 506 of 642   PageID 11447
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                    Pages 1623..1626

Page 1623

```
 1  A P P E A R A N C E S:
 2
    FOR THE PLAINTIFFS:
 3
         NATIONAL RIGHT TO WORK FOUNDATION INC.
 4            8001 Braddock Street
              Suite 600
 5            Springfield, Virginia  22160
         BY:  MATTHEW B. GILLIAM, ESQ.
 6            mgb@nrtw.org
 7
 8       PRYOR & BRUCE
              302 North San Jacinto
 9            Rockwall, Texas 75087
         BY:  BOBBY G. PRYOR, ESQ.
10            MATTHEW D. HILL, ESQ.
              bpryor@pryorandbruce.com
11            mhill@pryorandbruce.com
12
13
14
15  FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:
16       REED SMITH, LLP
              2850 North Harwood
17            Suite 1500
              Dallas, Texas  75201
18       BY:  PAULO B. McKEEBY, ESQ.
              BRIAN K. MORRIS, ESQ.
19            pmckeeby@reedsmith.com
              bmorris@reedsmith.com
20
21
22
23
24
25
```

Page 1624

```
 1  For the Defendant Union 566:
 2
 3       CLOUTMAN & GREENFIELD, PLLC
              3301 Elm Street
 4            Dallas, TX 75226
         BY:  ADAM S. GREENFIELD, ESQ.
 5            EDWARD B. CLOUTMAN, III, ESQ.
              agreenfield@candglegal.com
 6            crawfish11@prodigy.net
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 1625

```
 1  COURT REPORTER:  MS. KELLI ANN WILLIS, RPR, CRR, CSR
                      United States Court Reporter
 2                    1100 Commerce Street
                      Room 1528
 3                    Dallas, Texas  75242
                      livenotecrr@gmail.com
 4
 5        Proceedings reported by mechanical
 6  stenography and transcript produced by computer.
 7
 8                    * * * *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 1626

```
 1                  I N D E X
 2  Formal Charge Conference ................... 1857
 3
 4            W I T N E S S E S
 5  ED SCHNEIDER
 6     Cross-Examination by Mr. Pryor ............ 1654
 7
 8  MEGGAN JONES
 9     Direct Examination by Mr. McKeeby .......... 1674
       Cross-Examination by Mr. Greenfield ........ 1683
10
11  DENISE GUTTIEREZ
12     Direct Examination by Mr. Morris ........... 1686
       Cross-Examination by Mr. Greenfield ........ 1693
13
14  MIKE SIMS
15     Direct Examination by Mr. McKeeby .......... 1695
       Voir Dire Examination by Mr. McKeeby ....... 1740
16     Cross-Examination by Mr. Greenfield ........ 1743
17
18  CHARLENE CARTER
19     Direct Examination by Mr. Greenfield ...... 1760
       Cross-Examination by Mr. Pryor ............ 1832
20
21
22
23
24
25
```

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 507 of 642   PageID 11448
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                    Pages 1627..1630

Page 1627

1
2          E X H I B I T S
3
4   Trial Exhibit 10  ...................  1658
5   Trial Exhibit 36  ...................  1671
6   Trial Exhibit 119 ...................  1709
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1628

1           - P R O C E E D I N G S -
2                   -o-
3           THE COURT SECURITY OFFICER:  All rise.
4           THE COURT:  You can have a seat.
5           Thank you.
6           Okay.  So we are on -- what day is it?
7   Does anyone know what day of trial it is?  Are we on
8   6?  It might be Day 6 trial.
9           So let's go ahead and do appearances,
10  first for Carter.
11          MR. GILLIAM:  For Carter, Matthew Gilliam,
12  Matt Hill and Bobby Pryor.
13          THE COURT:  Thank you.
14          And Southwest.
15          MR. McKEEBY:  For Southwest, Paulo McKeeby
16  and Brian Morris.
17          THE COURT:  Okay.  Thank you.
18          And for the Union.
19          MR. GREENFIELD:  On behalf of the Union,
20  Adam Greenfield and Edward Cloutman III, along with
21  our corporate rep, Mike Massoni.
22          THE COURT:  Thank you.
23          First I want to congratulate all of you
24  for clearing security downstairs.  I heard it was an
25  absolute cluster today.  So we will see when our

Page 1629

1   jury gets here.  We could probably take bets if
2   y'all want to on when they will clear security.  The
3   line is something to behold.
4           So thank y'all for being here.  That is
5   impressive.
6           I guess I'll ask y'all what you wish to
7   talk about.  The two things on my mind are exhibits.
8   I know we had timely designations and objections
9   last night I want to cover.
10          And then what I wanted to do is see if
11  there are any exhibit objections that we didn't get
12  to yesterday morning because we were talking about
13  the jury charge.
14          If we've got extra time, we can talk about
15  anything jury charge that we didn't get to yesterday
16  that's on y'all's minds.  I know we covered a lot,
17  but we didn't cover everything that y'all put in
18  writing to me.  So if anyone wants to take another
19  crack at me on something jury charge-wise, we should
20  cover that after exhibits.
21          And I just plan to do rounds like we
22  finished off doing yesterday where I'll ask Carter,
23  Southwest, Union, what's next that they want to talk
24  about.
25          What else should we cover other than

Page 1630

1   exhibits and any lingering charge thoughts from
2   yesterday morning's session?
3           MR. McKEEBY:  I had a housekeeping matter.
4           I thought that Exhibit 36 was admitted and
5   published, but I see from the list that that may not
6   be the case.  I don't think there is any objection
7   to me just publishing that in front of the jury.  I
8   thought I had done so, but I guess maybe not.
9           THE COURT:  Well, that could be on my end,
10  like I didn't publish one of yours yesterday.  So it
11  could be my fault on 36.
12          So should we go ahead and do that first
13  thing when the jury gets in?  Do you want to show 36
14  to them?
15          MR. McKEEBY:  That's fine.
16          THE COURT:  Okay.  I will make a note of
17  that.
18          I know you had prepared the redactions.
19          Only -- for the Dropbox last night, I
20  could only upload 21-Q, or download 21-Q.  So it may
21  have been user error on my end.
22          MR. HILL:  Or user error my part.  I send
23  Kevin a second link that had the full set.
24          THE COURT:  Okay.  I will make sure I
25  download that.  I just want to make sure that I have

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 508 of 642   PageID 11849
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 6 July 12, 2022                  Pages 1631..1634

Page 1631

1 a complete copy of everything we need before we send
2 the jury back.  Agreed that will probably be
3 tomorrow, not today, but I'm just trying to make
4 sure, as we land the plane, that we have everything
5 we need.
6        We have an electronic copy of 15A.
7 Remember that was the one where Stone marked with
8 yellow highlighter?  It's 57 megabytes.  So if
9 anyone wants it, we can get it to you, but it may
10 not go in your email.
11        What we will do is when we charge the jury
12 and send them back, we are going to have the final
13 list of exhibits that I give y'all that will cut off
14 everything we didn't introduce, and then we will
15 have the thumb drive and y'all can look and make
16 sure the right exhibits are on there.
17        So you can copy the thumb drive, make a
18 copy of the exhibits for yourself if you want to,
19 and that -- that's fine by me.
20        MR. PRYOR:  Your Honor, in terms of what
21 you're sending, you're sending back a hard copy as
22 well?
23        THE COURT:  So we have the hard copy
24 available if they ask, but we're sending back the
25 e-copy of every exhibit.  The only hard copy they

Page 1632

1 will have of anything is each juror will have a hard
2 copy of the jury charge that includes the questions.
3        There is going to be the master copy that
4 the foreperson will keep that's the control copy,
5 and then there is one hard copy of the exhibit list.
6 All of the exhibits themselves are actually
7 electronic.
8        We still have that hard copy exhibit of
9 15A.  If they ask for it at all, we can give it to
10 them.
11        MR. PRYOR:  We would request that the hard
12 copies go back in bound index notebooks.
13        I understand flash drives and all of that,
14 but -- I think it's a little more user-friendly for
15 them to have the actual hard copy exhibits.
16        We will put them in a binder if the Court
17 doesn't object.
18        THE COURT:  So any other thoughts from the
19 other side?
20        I don't have a problem with it.  This is
21 sort of a relic of COVID.  We had shifted to all
22 electronic back when people thought paper is what
23 transmits COVID, right?  It got easier and cheaper,
24 and so people liked it.
25        But if you've got a hard copy and the

Page 1633

1 other side can see it and they are fine with the
2 actual substance of it, fine by us.  15A is our only
3 hard copy and we can make it available.
4        MR. PRYOR:  And I'm saying we do.  I have
5 them in front of me and I've got an extra set behind
6 me.  I think we can put one together.  If I'm wrong,
7 I'm sure --
8        THE COURT:  Yeah.  The only thing I try
9 not to send back are guns, drugs, cash, right?  I
10 learned that lesson from a mentor judge who tried
11 El Chapo once.  Yes.  Wise lessons.  Don't send back
12 the guns, drugs, or cash.  But I don't think we have
13 any of that in this case.  I think we are good.
14        So I have no problem with that.  If you've
15 got a control copy and they approve of it, then we
16 will send back a laptop too.  But we can send back
17 the binders and they will probably look at those
18 first.
19        Other questions, housekeeping-wise?
20        Okay.  So let's jump into exhibits then.
21        I think I have the first objection we
22 should talk about as being Southwest designation of
23 number 50.
24        MR. McKEEBY:  I can streamline this.
25        We will withdraw that one that's admitted

Page 1634

1 through other exhibits which I can use instead of
2 that one.
3        MR. PRYOR:  Exhibit number?
4        THE COURT:  Understood.  That makes sense.
5        So 50 I'm going to note in my notes is
6 withdrawn.
7        I have 119 as Southwest designation that
8 Carter objects to, and that's a Step 2
9 documentation.
10        MR. GILLIAM:  That's right, your Honor.
11        THE COURT:  That was Mr. Gilliam?
12        MR. GILLIAM:  Yes.  I'm trying to reach
13 out here in the aisle.
14        THE COURT:  The problem is when you move
15 to where I can see you, then the microphone can't
16 grab you.
17        MR. GILLIAM:  Let me try this one.
18        THE COURT:  I've got wheels, I can move.
19        Okay.  So anything we want to talk about
20 on Step 2?  I know we've generally covered Step 2,
21 but anything we want to talk about on this document?
22        MR. GILLIAM:  We have.  We just wanted to
23 make our objection.
24        THE COURT:  I appreciate that.
25        So I will stick with my prior rulings.  I

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 509 of 642   PageID 11450
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                            Vol 6 July 12, 2022                    Pages 1635..1638

Page 1635

1 think Step 2 is admissible for those limited
2 purposes of mitigation, fair representation.
3        So I will acknowledge your objection.  I
4 will overrule it on the record here and say that at
5 the point in time that it gets offered, I will just
6 plan on overruling morning objections and letting it
7 come in.
8        So those are the two Southwest documents
9 that there were objections to.
10       In the Union documents, the first one I
11 have an objection to is Number 3.  This is the EEOC
12 charge as it pertains to the Union.  I know the EEOC
13 charge came in yesterday, but the one for Southwest.
14       MR. GREENFIELD:  Your Honor, we can move
15 on.  I'm not going to dive into it.
16       THE COURT:  Okay.  That's fine by me.  I
17 would feel compelled to reach the same conclusion,
18 but it would take time on the record.  So if you
19 don't want to spend your time on that, that's fine
20 by me.
21       MR. GREENFIELD:  I don't.
22       THE COURT:  I have 119 as your next
23 exhibit, Mr. Greenfield, that Carter objected to,
24 and this is an email from Burdine to Sims.
25       MR. GREENFIELD:  Which numbers, your

Page 1636

1 Honor?  I couldn't hear you.
2        THE COURT:  This is 119.  This is another
3 Step 2 document.
4        MR. GREENFIELD:  I think it's the same one
5 we just talked about.  It's the Step 2 hearing.
6        THE COURT:  That's true.  So I have
7 already ruled on it.  Thank you for noting that.
8        120 is the next one I have for you,
9 Mr. Greenfield, that Carter objected to.  And the
10 objection is relevance grounds.
11       I get your objection, but I didn't see the
12 objection back in the status report for the pretrial
13 proceedings.  So I know I have been a jerk to anyone
14 who is raising new ones.  But double-check me and
15 make sure I'm right.
16       MR. GILLIAM:  You are correct.  The
17 objection was not raised in the status report.
18       THE COURT:  But that's not the end of it
19 because if it is now irrelevant because of something
20 I have done in trial, then I can't hold you to a
21 pretrial objection you didn't raise.  If that makes
22 sense.
23       So I guess the question is, is it
24 irrelevant and was when you filed the status report
25 with the objections pretrial, or is it irrelevant

Page 1637

1 now because of something I've done in trial, is what
2 I'm trying to figure out.
3        MR. GILLIAM:  Well, if I'm being full
4 candid, I think it was irrelevant all along.  So --
5        THE COURT:  I get that.  And that was my
6 read, too, but I never want to assume that.  I
7 always want to talk through and ask it we made so
8 many rulings in trial that I have done something
9 that changed the scope of it.
10       So I will continue to be the jerk that
11 overrules that objection.  I'm overruling it, so if
12 I'm wrong on that, you can still raise the merits of
13 appeal.
14       136 is what I have next as a Union exhibit
15 that Carter objected to.  This is a text to Lyn
16 Montgomery.  Relevance is the main objection, and
17 then prejudice is next, and then 404(b) is next.
18       So happy to hear any argument you have,
19 Mr. Gilliam, and I will ask Mr. Greenfield for his
20 response.
21       MR. GREENFIELD:  Your Honor, we can move
22 on.  I don't intend to spend any time on that
23 exhibit today.
24       THE COURT:  Okay.  Well, that simplifies
25 things.  So I will just note that it is withdrawn.

Page 1638

1        I have the last one as being 137, and that
2 is emails on Step 2.
3        So I guess let me ask, if you are planning
4 on using that, is there anything unique about this
5 Step 2 document that changes how my analysis would
6 run on it?  Mr. Gilliam.
7        MR. GILLIAM:  No, your Honor.  It's also
8 just another Step 2 proceeding document.
9        THE COURT:  Understood.
10       So I will be consistent and I will
11 overrule that objection here on the record, and that
12 will streamline it if it gets offered into evidence.
13       So those are the only ones I had for this
14 morning.  Am I missing something from last night's
15 designations that we need to cover this morning?
16       MR. GILLIAM:  I don't think so.
17       THE COURT:  And I haven't done a cross
18 reference of what was designated two nights ago
19 compared to what we covered yesterday.
20       So I guess my question is, is there
21 something that was designated that has not yet come
22 into evidence that was objected to that could come
23 into evidence that anyone wants to tell me?
24       This is digging deep.  It's not even two
25 nights ago because we had a weekend in there.  So I

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 510 of 642   PageID 11451
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 6 July 12, 2022                              Pages 1639..1642

Page 1639

1  don't know what this would be, like Thursday night
2  designations for Friday documents.
3          So is there any other exhibit y'all want
4  to talk about?  Let me just simplify my phraseology.
5  Any other exhibit objection y'all want to talk about
6  in a pretrial posture?
7          MR. McKEEBY:  No.
8          THE COURT:  No for Southwest.
9          Anything for the Union or for Carter that
10  y'all can think of that we should talk about?
11          MR. GREENFIELD:  Not that I can think of
12  at this time, your Honor.
13          THE COURT:  Okay.  Got it.
14          Then let me shift gears back to the
15  informal charge conference we had yesterday.  We
16  covered a lot of ground but not everything.
17          So let me just ask, and I will go in
18  order.  Carter, is there anything we didn't talk
19  about yesterday that you want to talk about?
20          I know my goal is still to turn another
21  draft of the charge back to you by noon, but we are
22  not at noon yet.  I'm still working through it.
23          So is there anything else you want to
24  bring up that we didn't cover yesterday that you
25  think we should talk about?

Page 1640

1          MR. GILLIAM:  Well, it wouldn't be
2  anything new that we didn't address already in our
3  brief.  So I don't know if you want to revisit
4  something that's discussed in the brief that maybe
5  we didn't specifically talk about yesterday.
6          THE COURT:  I can thumb through my
7  documents, but while I do, let me pose the same
8  question to Southwest next, Mr. Morris, and let
9  you, Mr. Greenfield.  Is there anything on your mind
10  that we didn't talk about yesterday that you wanted
11  to get to and we just ran out of time?
12          MR. GREENFIELD:  No, I think we covered it
13  all, your Honor.
14          MR. MORRIS:  I have a couple of things.
15          THE COURT:  Let's do it.  We've got the
16  time, and we may have another hour with the security
17  line downstairs.  So you got me here.  May as well
18  use it.
19          So what have you got, Mr. Morris?
20          MR. MORRIS:  We raised in our brief this
21  notion that the request for an accommodation or the
22  knowledge of the need for an accommodation does not
23  arise until after the employee violates whatever
24  work rule is at issue, then they are not entitled to
25  an accommodation.

Page 1641

1          We cite some cases in that regard.
2          And we think the instruction should
3  reflect that and indicate that if Ms. Carter
4  violated a policy before the knowledge of her need
5  for an accommodation was apparent, then she's not
6  entitled to one.
7          THE COURT:  All right.  And I think y'all
8  were arguing Abercrombie and --
9          MR. GILLIAM:  I'll address that.  Not only
10  Abercrombie, but the main case they cite for that
11  proposition is a Fifth Circuit case called Konop
12  back.  And let me tell you why that case is totally
13  distinguishable here.
14          In Konop, you had a nurse who worked in a
15  nursing home who refused to pray the rosary with one
16  of the clients, and the company, the nursing home
17  company, fired her.
18          There, the Fifth Circuit held that the
19  nursing home had no -- no notion or no idea that she
20  needed an accommodation because she didn't -- her
21  need for an accommodation didn't become apparent
22  until after she was fired.
23          THE COURT:  She didn't say "I'm a
24  Jehovah's Witness" before her termination.
25          MR. GILLIAM:  Right.  But here the

Page 1642

1  evidence clearly establishes in the fact-finding
2  meeting that Southwest -- that Southwest knew of
3  Carter's need for an accommodation, yet continued to
4  make its termination decision and avoid its burden
5  of affirmative duty to accommodate.
6          So they -- they create this conflicting
7  requirement by firing her under its social media
8  policies for her religious beliefs and practices.
9          So there, their logic is flawed that she
10  has to give them notice of her need for an
11  accommodation before she violates the policy.
12          Well, they determined that she violates
13  the policy after her fact-finding and they fire her
14  for it, so the logic of that position is totally
15  faulty.
16          And I guess I would also just reiterate
17  our position that there should be no -- nothing in
18  the jury charge about her having to request an
19  accommodation.  It is just really an undisputed fact
20  here that Southwest knew before they fired her that
21  she needed an accommodation.
22          Ed Schneider has testified to that
23  repeatedly and it's in the fact-finding notes.  I
24  think Exhibit 98.  And in his synopsis, Exhibit 107.
25          THE COURT:  Any response, Mr. Morris, on

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 511 of 642   PageID 11452
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1643..1646

Page 1643

1 Konop and the employer not having a factual basis
2 for what the accommodation might be?
3          MR. MORRIS:  Sure.  So first, you know, we
4 cite a Fourth Circuit case that has been recited --
5 I can send you ten cases that have recited this
6 proposition that -- I'm not saying that Ms. Carter
7 necessarily, post Abercrombie, had to make a
8 specific request, but at very least, the employer's
9 knowledge of the need for an accommodation is still
10 relevant, I think even post Abercrombie.
11          Konop cites a Fourth Circuit case with
12 approval, and that's why we point to it.  We cite
13 some other district court cases, and I can give you
14 several more of them.
15          But I would say the import of this rule,
16 just to give you a practical example, an employee
17 may in some circumstance be entitled to an
18 accommodation to, say, travel to Mecca as part of
19 their religious practice.  But if they just
20 disappear for a month and then the employer says,
21 Hey, you've been gone, we are going to discipline
22 you, and they say, Whoa, Whoa, whoa, that was a
23 religious thing I was doing, I'm entitled to an
24 accommodation, the fact that the employer didn't
25 know and there was no request until after the policy

Page 1644

1 was violated means there is no accommodation
2 required for that prior violation.
3          So that's why I think in this case -- and
4 we cite cases to this effect -- our argument is
5 Ms. Carter violated the policies before her
6 Christianity had been raised to anybody.
7          THE COURT:  So what about if the knowledge
8 comes in after the policies were violated but before
9 the termination occurs?  I think that's the argument
10 they are making is in the fact-finding meeting, then
11 they were then on notice that her religion was in
12 play with the sending of the messages.
13          So what about that timeline?  Because from
14 your hypo, you know, it was a little bit different
15 on the timetable.  Here I'm wondering, what if that
16 knowledge comes into play after the policies were
17 broken but before the firing occurs.  Does that
18 change the outcome?
19          MR. MORRIS:  I don't think so.  I think
20 Chalmers counsels that once the policy is violated,
21 you are entitled to enforce that policy.
22          Now, subsequent to the employee raising
23 their religious issue or it becoming known, then
24 maybe there is leniency subsequently.  And I can
25 send additional cases if that would be helpful.

Page 1645

1          But no, I don't think the fact that the
2 response to the pre-knowledge violation is limited
3 by the fact that after the violation, they say, Hey,
4 I have been -- I have a religious reason.
5          And I think the example I gave is
6 illustrative.  If an employee leaves and the
7 employer hasn't yet decided what to do and they just
8 disappear, you don't get to then come and say, Whoa,
9 whoa, whoa, it was for a religious reason I just
10 didn't show up for work for a week.
11          THE COURT:  Understood.
12          You said you had two things, and that was
13 thing one.  Is there a thing two?
14          MR. GREENFIELD:  Your Honor, may I just
15 touch on that briefly?
16          I think an important thing to consider in
17 that is sufficiency of notice, and perhaps a jury
18 question that touched on perhaps whether Southwest
19 or the Union was absolutely put on sufficient notice
20 to provide that accommodation.
21          I think that might potentially cure any
22 issues that we are dealing with on this on the
23 Union's behalf.  I'm not speaking for Southwest, of
24 course.
25          MR. GILLIAM:  Your Honor, may I address

Page 1646

1 Mr. Greenfield?
2          THE COURT:  You may.
3          MR. GILLIAM:  The notice is apparent on
4 the Facebook -- in the Facebook videos and the
5 messages and posts themselves that this is a
6 religious issue.
7          In fact, it's obvious that President Stone
8 treated it that way because when she reports
9 Ms. Carter, she reports Ms. Carter for her religious
10 comments, quote/unquote, quotes taken directly from
11 her complaint.
12          MR. GREENFIELD:  And I guess my response
13 to that, your Honor, would be is that enough, still
14 sufficient to put either the Union or the company on
15 notice that they have to provide a reasonable
16 accommodation on that?  I think a jury should
17 consider -- should consider that question.
18          THE COURT:  Understood.
19          Thing two.
20          MR. MORRIS:  I would just say whatever
21 Ms. Stone's knowledge and notice isn't necessary
22 imputed to us.  The policy violation happened.  I
23 think under the law we are entitled to respond to it
24 even though Ms. Carter then raises her religious
25 issues.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 512 of 642   PageID 11453
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Pages 1647..1650

Page 1647

1      THE COURT:  Sure.  Understood.
2      Okay.  Is there another topic we should
3  talk about jury charge-wise?
4      MR. GILLIAM:  I could address the law he
5  cites in Chalmers if you want.  I don't want to
6  waste your time, though.
7      THE COURT:  Sure.  If you've got something
8  succinct, I'm happy to hear it.
9      MR. GILLIAM:  I would just say that
10  Chalmers is a pre-Abercrombie case.  And another
11  thing that's significant about that case is that
12  there the employer actually engaged in accommodation
13  efforts with the employee, and the whole issue there
14  was whether the accommodation was reasonable.
15      It was not a situation, as in Abercrombie
16  and in Ms. Carter's case, where the employer just
17  abruptly fired her without even initiating
18  accommodation efforts.
19      Even Alito's concurrence in Abercrombie &
20  Fitch raises the issue that the whole point of
21  undertaking the accommodation process is that the
22  employer doesn't do that, that the employer tries to
23  make efforts to work with the employee and give her
24  a reasonable accommodation and not fire her
25  abruptly.

Page 1648

1      THE COURT:  All right.  Thank you.
2      MR. GILLIAM:  But having said that, we
3  kind of touched on this issue.  One the other issues
4  that I would have touched on yesterday is that right
5  now the jury charge is formulated to where one of
6  the elements of the failure to accommodate claims is
7  whether there was a conflicting job -- yeah,
8  conflicting employment requirement.
9      Abercrombie also illustrates why that
10  element is -- it's not the best formulation of that
11  element for a case like this.
12      Abercrombie, in that case you had an
13  employee who was not hired because of Abercrombie &
14  Fitch's headscarves policy.
15      So the way that Justice Scalia formulated
16  the elements there was not whether there was some
17  conflicting requirement.  He knew, it was clear that
18  there was no conflicting requirement -- or that
19  there was a conflicting requirement because they
20  failed to hire her.
21      Similarly, in this case, they fired
22  Ms. Carter under their policies.
23      So I think that to ask the jury whether
24  there is a conflicting employment requirement is a
25  bit confusing because that -- that is a -- that

Page 1649

1  should be a clear settled issue, resolved issue.
2  They fired Ms. Carter.  That's the conflict with the
3  social media policy.
4      THE COURT:  Any response on the conflict,
5  Mr. Morris?
6      MR. MORRIS:  Yeah, two things.
7      I think one is, my recollection of the
8  testimony is Ms. Carter said, I didn't violate any
9  policy.
10      So from my vantage point -- and there is
11  case law in this regard -- if you say, I haven't
12  violated any policy, then there is nothing to be
13  accommodated.
14      So I'm not sure about -- you know, I think
15  her testimony contradicts what they are saying.
16      MR. GILLIAM:  However you construe
17  Ms. Carter's testimony there, Southwest sure thought
18  that Ms. Carter violated the social media policy.
19  They fired her for it.
20      MR. MORRIS:  Your Honor, there is a
21  case -- and I think we cited some of it in our
22  summary judgment motion -- where courts have
23  dismissed claims or granted summary judgment on
24  claims where the person alleges, actually violated
25  no policy, but they terminated anyway.

Page 1650

1      And the reasoning in those cases is if you
2  allege that no policy is violated and you are
3  terminated, what you are alleging is a
4  straightforward religious discrimination claim, not
5  a failure to accommodate claim.  Because there is
6  nothing to be accommodated under your own theory.
7      So you can still say, you know, the
8  employer has some kind of abstract hostility towards
9  people of my religion, which is sort of one way in
10  which you can establish liability, perhaps, under
11  Title VII, but you're not in the accommodation box.
12  That's why I think it is relevant.
13      MR. GILLIAM:  All of those are
14  pre-Abercrombie cases.
15      MR. MORRIS:  That's not accurate.
16      And if I could just suggest one other
17  thing about the conflict.  You know, Ms. Carter's
18  articulated religious belief is that she's a
19  Christian and that abortion is the taking of human
20  life.
21      It's not clear, in my view on the record,
22  that the particular actions she engaged in were
23  clear manifestations of that religious practice.
24      I'm not sure that there is any evidence on
25  the record right now that she was not allowed to

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 513 of 642   PageID 11454
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 6 July 12, 2022                Pages 1651..1654

Page 1651

1 manifest her articulated belief in the workplace.
2        Just because she wasn't allowed to send
3 these particular videos -- and we cite some cases
4 about that -- just because something in some way is
5 related to your religion doesn't mean it's a
6 practice that's required to be accommodated.
7        So, for example, you know, you want to
8 take -- the example you used earlier, you want to
9 travel to Mecca.  The fact that you feel like doing
10 it in March, you want to travel to Mecca in March,
11 is not something you have to accommodate.
12        Similarly, your view that abortion is the
13 taking of a human life, the fact that you want to
14 circulate videos to other people in that regard is
15 not necessarily your religious belief itself.
16        MR. GILLIAM:  Your Honor, he's addressing
17 the -- what you call the personal preference cases,
18 that personal preference doesn't necessarily dictate
19 what a reasonable accommodation is.  And that issue
20 arises when the employer undertakes to make efforts
21 to provide a reasonable accommodation.
22        But here they didn't do that.  They fired
23 her right away.  They didn't undertake any
24 accommodation efforts.
25        So whether -- if they had provided her or

Page 1652

1 attempted to provide her a reasonable accommodation,
2 then it's true that maybe Ms. Carter's personal
3 preferences for how she made her posts or
4 communicated with the Union, maybe that would come
5 into play.  But it just doesn't here because they --
6 they short-circuited the whole process by firing her
7 immediately.
8        THE COURT:  They are here.  We can bring
9 them in.  Anyone need a break or are we okay?
10        MR. GREENFIELD:  I could use a two-minute
11 restroom break.
12        THE COURT:  Let's do it.  Let's try two to
13 three minutes, how about that?
14        So I will go into recess.  I will come
15 back on in a couple of minutes, and then we will
16 bring in the jury.
17        THE COURT SECURITY OFFICER:  All rise.
18        (Recess.)
19        THE COURT SECURITY OFFICER:  All rise.
20        THE COURT:  Okay.  We can go ahead and
21 bring in Mr. Schneider, if there is nothing else
22 housekeeping-wise.
23        MR. McKEEBY:  That housekeeping issue on
24 the exhibit, do you care if Mr. Schneider is here?
25        THE COURT:  The exhibit was not with him,

Page 1653

1 right?
2        MR. McKEEBY:  Correct.
3        THE COURT:  I don't have a problem with
4 him being on the stand if -- you know what, I can
5 mute the witness monitor alone and everyone else can
6 see it.  So how about we do that.  We can go ahead
7 and bring him in.  I will mute the witness monitor
8 for you to flash 36 on.
9        MR. McKEEBY:  It's not technically my turn
10 right now, but --
11        THE COURT:  Oh, that's right.  Should we
12 wait for your next turn with him and do it?
13        MR. McKEEBY:  Yes.
14        THE COURT:  Okay.
15        (The witness entered the courtroom.)
16        THE COURT:  Welcome back, Mr. Schneider,
17 to your rightful place in the courtroom.
18        We can go ahead and get the jury now.
19        Mr. Pryor, I thought we had just handed
20 the baton over to you, is that correct?
21        So it's the end of round one.  You went,
22 you went, and then it's to you.  So you can go ahead
23 and take your rightful place.
24        (The jurors entered the courtroom.)
25        THE COURT:  Okay.  You can be seated.

Page 1654

1        And, Mr. Schneider, you are still under
2 oath, so we will just go ahead and proceed with the
3 questions from Mr. Pryor on cross-examination.
4        I will just ask y'all to keep some space
5 between questions and answers.
6        You can proceed, Mr. Pryor.
7              CROSS-EXAMINATION
8 BY MR. PRYOR:
9 Q.  Mr. Schneider, let's look at Exhibit 74, what
10 was referred to as Exhibit 74.5 yesterday.
11        And where it says, "Democrats, this is what you
12 support?" do you know whether or not that was
13 written by Ms. Carter or someone else?
14 A.  It was on Ms. Carter's page, but I'm not sure
15 who wrote it.
16 Q.  Do you think she actually made the video?
17 A.  I don't believe so.
18 Q.  Okay.  Did you ask who wrote that?
19 A.  She stated that this information was what she
20 believed --
21 Q.  Was what --
22 A.  -- but I didn't ask the question, no.
23 Q.  She posted this from someone else to show this
24 video?  Yes?
25 A.  Yes.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 514 of 642   PageID 11455
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 6 July 12, 2022                    Pages 1655..1658

Page 1655

1        MR. PRYOR:  Let's look at Exhibit 10.
2  BY MR. PRYOR:
3  Q.   While he's calling up Exhibit 10, you were
4  asked yesterday, did Ms. Carter, during the
5  fact-finding meeting, raise any complaint that she
6  was being discriminated against by the company
7  because of her religion.
8        Do you recall that?
9  A.   Yes.
10 Q.   And, in fact, at that point in time, Southwest
11 had taken no action in regard to Ms. Carter, true?
12 A.   At what point in time?
13 Q.   The fact-finding meeting.  You hadn't --
14 Southwest hadn't done anything to her, had they?
15 A.   No.  We hadn't made a decision at that point.
16 Q.   They didn't fire her at that point because of
17 her religion; that was later.
18       MR. McKEEBY:  Objection to the
19 characterization.
20       THE COURT:  Sustained.
21 BY MR. PRYOR:
22 Q.   At the fact-finding meeting --
23       MR. McKEEBY:  And move to strike, your
24 Honor.  I'm sorry.
25       THE COURT:  I will strike that.

Page 1656

1        You can ask a new question.
2  BY MR. PRYOR:
3  Q.   At the fact-finding meeting, no action had been
4  taken against her because of her religion for which
5  she would then complain, true?
6  A.   No action had been taken.  We hadn't finished
7  the investigation and she hadn't given all her
8  information at that point.
9  Q.   Okay.  That's my point.  He was saying, Well,
10 she didn't complain that you were discriminating
11 against her because of her religion at the
12 fact-finding meeting.
13       Well, that's kind of silly because no action
14 had been taken yet for her to complain about, true?
15 A.   No action had been taken yet, no.
16 Q.   Is my statement true?  There was nothing for
17 her to complain about in terms of Southwest taking
18 action because no action had been taken.  True?
19 A.   She could not complain about the action, that
20 is true.
21 Q.   Well, there would be nothing to complain about
22 because you hadn't taken action, right?
23 A.   I had not taken action, yes.
24 Q.   So you are agreeing with my statement?
25 A.   She did not complain at that point, if that is

Page 1657

1  your question, yes.
2  Q.   That's only half my question.
3        I'm going to see if you are going to agree,
4  there was nothing for her to complain about at that
5  point because you hadn't taken action against her,
6  true?
7  A.   True.
8  Q.   Okay.  And the same thing in regard to Union
9  activity.  There was nothing for her to complain
10 about Southwest taking action against her for Union
11 activity because Southwest, at the fact-finding
12 meeting, had taken no action, true?
13 A.   True.
14 Q.   That wasn't an effort -- those questions
15 weren't an effort to try and mislead the jury, was
16 it?
17       MR. McKEEBY:  Objection, your Honor.
18       THE COURT:  Sustained.
19       MR. McKEEBY:  And move to strike.
20       THE COURT:  Sustained.
21       Jury, please disregard.
22       MR. PRYOR:  Let's look at Exhibit 10.
23       We move for the introduction of
24 Exhibit 10.
25       THE COURT:  Any objection to 10?

Page 1658

1        MR. GREENFIELD:  None from the Union.
2        MR. McKEEBY:  No objection.
3        THE COURT:  Okay.  10 is in.
4        You can publish.
5        (The referred-to document was admitted
6  into evidence as Trial Exhibit 10.)
7  BY MR. PRYOR:
8  Q.   Now, this is the Southwest accommodation
9  policy, true?
10 A.   Yes.
11 Q.   And it says, "In regard to the ACT team is
12 responsible for determining whether a reasonable
13 workplace accommodation can be made.  As such, an
14 applicant or employee in need of an accommodation or
15 a leader aware of an applicant or employee's need or
16 request for accommodation should contact Southwest's
17 ACT team."
18       Did I read that correctly?
19 A.   Yes.
20 Q.   What does "leader" refer to?
21 A.   Somebody in a leadership position at Southwest
22 Airlines.
23 Q.   And, in fact, "leader" is just about anyone in
24 management.  It would certainly include you,
25 correct?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022                    Pages 1659..1662

Page 1659

1  A.  Yes.
2  Q.  Do you recall telling us, when I first asked
3  you questions in this trial, that you had no
4  obligation to report an employee's potential need
5  for an accommodation, that it was the employee's
6  responsibility?
7  A.  It's the employee's responsibility to let me
8  know or to reach out to the ACT team, that's
9  correct.
10 Q.  Is that what this says?  Where does it say it's
11 the employee -- do you see where it says "or a
12 leader aware of an applicant or employee's need."
13     It doesn't say the employee has to tell you.
14 You just have to be aware of the need.  The employee
15 doesn't have to play lawyer, the employee doesn't
16 have to use magic words, true?
17 A.  I don't know what "magic words" would be.
18 Q.  Do you believe that the policy requires you, if
19 you are aware that an employee is involved in
20 protected activity and has a need for an
21 accommodation, whether they ask you or not, you
22 should go to the ACT team and make them aware of it?
23     MR. GREENFIELD:  Objection, compound
24 question.
25     THE COURT:  I will overrule that.

Page 1660

1     You can answer.
2     THE WITNESS:  Yes, if we were made aware
3  of it.
4  BY MR. PRYOR:
5  Q.  Well, let's talk about "aware."
6     When someone tells you, I'm engaged in activity
7  because of my religious belief, and you are getting
8  ready to fire them for engaging in that activity,
9  that doesn't tell you there might be a need for an
10 accommodation?
11 A.  I did not come to that conclusion.
12 Q.  I understand that.  But do you not see when
13 someone raises something like their religious belief
14 that you should raise that issue with ACT and
15 didn't?
16     MR. McKEEBY:  Objection, vague and
17 incomplete hypothetical.
18     THE COURT:  I'll allow it.
19     THE WITNESS:  If she would have made it
20 aware to me specifically, then I would have, that
21 she needed the accommodation.
22 BY MR. PRYOR:
23 Q.  What more could she do other than use the magic
24 word "accommodation" with you, telling you -- she
25 told you over and over about how this is one of the

Page 1661

1  most important aspects of her life, and her
2  relationship with God tells her that she needs to
3  raise these issues.  That doesn't tell you that
4  religious belief is involved and an accommodation
5  should at least be considered?  It doesn't tell you?
6  A.  No, not at the time.
7  Q.  Would it now?
8  A.  If it was raised to me --
9     MR. McKEEBY:  Objection, relevance.
10    MR. PRYOR:  Well, we have a claim for
11 punitive damages.
12    THE COURT:  Hold on.  Hold on.  That's a
13 speaking objection.
14    I'll allow it.
15 BY MR. PRYOR:
16 Q.  Go ahead.  You can answer.
17 A.  If it was raised to me, then yes, I would.
18 Q.  I just told you how it was raised.
19    And if it was raised with you, someone tomorrow
20 came in and said, Hey this post on my personal
21 Facebook page is because of my religious beliefs,
22 heartfelt, significant, important religious beliefs
23 and communication, and then, would you now go
24 to the ACT team and say, Hey, do you think we should
25 consider an accommodation here?  Would you at least

Page 1662

1  do that?
2     MR. McKEEBY:  Objection, vague, incomplete
3  hypothetical, relevance.
4     THE COURT:  I'll allow it.
5     THE WITNESS:  If it was made aware to me
6  that, yes, they needed the accommodation, yes, the
7  religion was the reason for the accommodation, then
8  I would, yes.
9  BY MR. PRYOR:
10 Q.  So I guess where our disconnect is, I have now
11 told you all the facts.  I just didn't use the word
12 "accommodation."
13    If the employee still doesn't use the magic
14 word "accommodation," you are not going to go to ACT
15 and see if an accommodation can be granted, true?
16 A.  It really depends on the situation, sir.  I'm
17 not trying to say I'm not doing -- or taking care of
18 my employees.  I'm just saying that there is a
19 situation where they would make me aware of it more
20 so than what this case had.
21 Q.  Okay.  So this case, where Charlene told you
22 over and over at the fact-finding meeting -- the
23 jury will get to it, we'll put it up for them during
24 closing -- but you've read it.  And you know that
25 over and over she raised this was part of her

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 516 of 642   PageID 11457
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                    Pages 1663..1666

Page 1663

1 heartfelt religious belief that she was exercising.
2 That was not enough to put you on notice that she
3 needed an accommodation?  True?
4        MR. GREENFIELD:  Objection, your Honor,
5 asked and answered at this point.
6        THE COURT:  I will sustain.
7        MR. PRYOR:  What was the objection?
8        THE COURT:  Sustained.
9        MR. PRYOR:  I just didn't hear what the
10 objection was.
11        THE COURT:  Asked and answered.
12        MR. PRYOR:  Fair enough.
13 BY MR. PRYOR:
14 Q.  How about union activity.  If someone came in
15 and told you, Hey, I'm engaged in complaining to my
16 union, and you shouldn't be taking action against me
17 because I'm engaged in this protected activity.
18      Just knowing those facts, would you go to the
19 ACT team and say, Hey, we need to consider an
20 accommodation here?  Just on those facts, would that
21 be enough?
22 A.  No.
23 Q.  Is there a process under the social media
24 policy for pre-approval of posts, so every time
25 somebody at Southwest that's an employee that's at

Page 1664

1 home on their personal computer and wants to say
2 something to the world about their opinion about
3 whatever, that they can send it to Southwest
4 Airlines to make sure they won't get fired for it?
5 Is there a process for that?
6 A.  We always ask our employees to reach out to the
7 base if they have any questions that have to do with
8 the airline and business that they would do.
9 Q.  Has anyone ever done that, to your knowledge?
10 A.  I have had people reach out to me and ask me
11 about putting something on social media, and I have
12 cautioned them.
13 Q.  Did anyone send you something for pre-approval
14 before they posted it?
15 A.  No, not that I can recall.
16 Q.  And let's look at Exhibit 10 again.
17      Is there anything in the policy that says --
18 let's see.  That's the accommodation policy.
19      Let's look at the social media policy.  I think
20 it's -- I don't know what it is, 8, whatever it is.
21 It looks like it's 9.  Let's look at Exhibit 9.
22      Is there a process in the written social media
23 policy for an employee to come to Southwest Airlines
24 in advance and get approval so they won't get fired?
25 Is there anything like that in this policy?

Page 1665

1 A.  I would have to read through it in detail,
2 but --
3 Q.  Read it.  Read it.  You are telling me you
4 think it's in there.
5      By the way, I was told by some of the witnesses
6 yesterday that took the stand that you've got to
7 look at these policies every year, you've got to be
8 familiar with them, or you can't work at Southwest
9 Airlines.  Is that true?
10        MR. McKEEBY:  Objection, mischaracterizes
11 testimony.  It's compound as well.
12        MR. PRYOR:  The jury can see if I
13 mischaracterized it or not.
14        THE COURT:  Hold on.
15        I will allow you to rephrase it.  I will
16 sustain the objection.
17 BY MR. PRYOR:
18 Q.  Is it, in fact, your obligation to be familiar
19 with this policy as you sit here today as a 28-year
20 employee of Southwest Airlines that fired someone
21 under this very policy?
22 A.  Yes, we are supposed to be aware of it.
23 Q.  So you can't answer the basic question of
24 whether or not this policy provides a procedure for
25 pre-approval of posts without reviewing it, true?

Page 1666

1        MR. McKEEBY:  Objection, argumentative.
2        THE COURT:  I'll allow it.
3        THE WITNESS:  I don't remember that part
4 of it.  I would have to look through this to see if
5 that's actually a part, because I don't remember
6 there being something that says they could submit
7 before they post.
8 BY MR. PRYOR:
9 Q.  We will let the jury read it, and you can maybe
10 read it in your off-time to see whether or not there
11 is such --
12        MR. GREENFIELD:  Objection, your Honor, to
13 the sidebars.
14        MR. McKEEBY:  Objection to the last part.
15 Move to strike.
16        THE COURT:  Sustained.
17        I will strike the sidebar.
18        MR. PRYOR:  I pass the witness.
19        THE COURT:  Are you passing the witness,
20 Mr. Pryor?
21        MR. PRYOR:  I'm sorry.  I didn't say it
22 into the microphone, I guess.  I pass the witness,
23 your Honor.
24        THE COURT:  Okay.
25        Mr. McKeeby, round two.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 517 of 642   PageID 11458
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1667..1670

Page 1667

1        MR. McKEEBY:  Your Honor, the housekeeping
2 matter that we discussed.
3        THE COURT:  Yes.  So, jury, there was an
4 exhibit that was admitted yesterday, and I neglected
5 to show y'all the exhibit.  So I'm un-muting your
6 monitors.
7        Sidebar right quick.
8        (Thereupon, the following proceedings were
9    had at sidebar:)
10        THE COURT:  So we pulled the transcript
11 and couldn't find a reference to 36 in it.  Is there
12 another witness who you can bring it up with, 36?
13        MR. McKEEBY:  With Ms. Hudson?
14        No, I know I did.
15        THE COURT:  I have 38.
16        MR. McKEEBY:  Was that through Hudson?
17        Because that was the only exhibit that I
18 introduced through Hudson would have been 36.  Maybe
19 there was something in the numbering that was off.
20        THE COURT:  So this was late in the day,
21 but Hudson was the next to last, and then we had 44,
22 7, 11, 2, 9, 16.
23        How about we take it up at another break.
24 We will all do research and figure it out.
25        I just -- I don't have any basis to flash

Page 1668

1 it in front of the jury yet because I don't have a
2 record of it having come in with a witness.  Does
3 that make sense?
4        MR. McKEEBY:  Well, it makes sense in the
5 sense that I understand, but it just does not
6 comport with my recollection at all.  Because I know
7 I asked her, What was the context of you sending
8 this?  And she said, Because there was a lot of
9 infighting between flight attendants.
10        So we published this to tell them -- it
11 was towards the end of her testimony, and I know I
12 showed her the document, and I thought I had
13 admitted it.
14        I know I asked her, Why did you send this
15 out at the time?
16        And she said, The reason is because there
17 was squabbling about social media, and we wanted to
18 remind the flight attendants of our policy.
19        I'm certain I asked that.
20        THE COURT:  I mean, if you talked about it
21 with her, that's fine.  Here is my thought.  These
22 are business records.  The custodian probably can
23 authenticate anything.
24        So the next round, you can bring it up.
25 And if you already talked about it with her, now the

Page 1669

1 jury will see it.
2        MR. McKEEBY:  Okay.
3        (Thereupon, the sidebar was concluded and
4    the following proceedings were held in open
5    court:)
6        THE COURT:  So we are not going to flash
7 an exhibit yet.  You will probably see it at some
8 point coming up.
9        So you can proceed, Mr. McKeeby.  You can
10 go right there if you want to.
11        MR. McKEEBY:  I'm going to try to go right
12 there.
13        REDIRECT EXAMINATION
14 BY MR. McKEEBY:
15 Q.  What is a Read Before Fly memo?
16 A.  That is a memo that's sent out to the flight
17 attendant work group that they need to read before
18 they fly the next time.
19 Q.  Do you get those as well as a base manager?
20 A.  Yes, I do.
21        MR. McKEEBY:  Can you pull up 36?
22        Move to admit 36 into evidence and
23 publish.
24        MR. PRYOR:  Lack of foundation at this
25 point.

Page 1670

1        THE COURT:  Can you set it?
2 BY MR. McKEEBY:
3 Q.  Is this a Read Before Fly memo?
4    I'm sorry.  Let me back up.
5    What is this document?
6 A.  It is a Read Before Fly that was put out by
7 Naomi Hudson.
8 Q.  And who is Ms. Hudson?
9        MR. PRYOR:  Well -- I'm sorry.  Go ahead.
10        THE COURT:  Proceed.
11 BY MR. McKEEBY:
12 Q.  Who is Ms. Hudson?
13 A.  She was director of labor relations at the
14 time.
15 Q.  And is this the type of document that you would
16 have received?
17 A.  Yes, it is.
18 Q.  In the normal course of your business as a base
19 manager?
20 A.  Yes.
21        MR. McKEEBY:  Move to admit Exhibit 36 and
22 publish.
23        MR. PRYOR:  Lack of foundation.  He's
24 established no personal knowledge of this witness.
25        THE COURT:  I will overrule that.

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 518 of 642    PageID 11459
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1671..1674

Page 1671

1         Any objection from the Union?
2         MR. GREENFIELD:  No, your Honor.
3         THE COURT:  All right.  It's admitted into
4  evidence and we are publishing.
5         (The referred-to document was admitted
6    into evidence as Trial Exhibit 36.)
7         MR. McKEEBY:  And how about Exhibit 10.
8  If you could blow up the same spot and highlight the
9  same area that we did previously, which is -- yes,
10  that sentence right there.
11  BY MR. McKEEBY:
12  Q.  Mr. Pryor asked you some questions about this
13  section of the policy, correct?
14  A.  Yes.
15  Q.  And I think we established that you are a
16  leader at Southwest Airlines, correct?
17  A.  Yes.
18  Q.  And as you look at the policy, would you agree
19  that at the time of Ms. Carter's fact-finding
20  meeting that you were a leader aware of an
21  employee's need for an accommodation?
22         MR. PRYOR:  Object, leading.
23         THE COURT:  I'll allow it.
24         THE WITNESS:  I was not aware that she
25  needed an accommodation.

Page 1672

1  BY MR. McKEEBY:
2  Q.  Did she tell you during the fact-finding
3  meeting that her religious beliefs conflicted with a
4  particular Southwest policy?
5  A.  No, she did not.
6  Q.  Did she tell you that the company should not
7  apply its policies to her because of her religious
8  beliefs or practices?
9         MR. PRYOR:  Object, leading.
10         THE COURT:  I'll allow it.
11         THE WITNESS:  No, she did not.
12         MR. McKEEBY:  Nothing further.
13         THE COURT:  Okay.  Mr. Greenfield.
14         MR. GREENFIELD:  No further questions,
15  your Honor.
16         THE COURT:  Okay.  Round two for you?
17         MR. PRYOR:  As much I would like to, I
18  have to say no.
19         THE COURT:  Okay.  So no further questions
20  for you because you can't ask questions based on
21  your own questions, Mr. McKeeby.
22         So Mr. Schneider, you are now re-excused
23  as a witness.  Thank you for coming back.
24         Now Southwest can call its next witness.
25         MR. McKEEBY:  Can Mr. Schneider be excused

Page 1673

1  for the day?
2         THE COURT:  Yes.
3         MR. McKEEBY:  Southwest calls Meggan
4  Jones.
5         THE COURT:  Okay.  You may do so.
6    Ms Jones, you can come take the stand.
7         MR. McKEEBY:  And by "excused for the
8  day," can he fly back to Denver?
9         THE COURT:  I will give you no further
10  restrictions.
11         Any desire at this present time to recall
12  him in the plaintiff's rebuttal case?
13         MR. PRYOR:  A desire, but we do no plan on
14  it.
15         THE COURT:  Okay.  Understood.
16         Then I will give you no restrictions on
17  your travel or speech.  You are free to leave.
18         (The witness exited the courtroom.)
19         (MEGGAN JONES was duly sworn by the
20    Clerk.)
21         THE COURT:  Okay.  Ms. Jones, you know the
22  routine because we've said it with every witness.
23         Mr. McKeeby, you can continue.
24
25

Page 1674

1         DIRECT EXAMINATION
2  BY MR. McKEEBY:
3  Q.  Ms. Jones, state your name for the record,
4  please.
5  A.  Meggan Jones.
6  Q.  How long have you been -- where are you
7  employed currently?  I'm sorry.
8  A.  At Southwest Airlines.
9  Q.  What is your current position?
10  A.  Senior manager of labor administration.
11  Q.  How long have you been in that role?
12  A.  Just over a year and a half now.
13  Q.  What were you before that?
14  A.  I was a base manager prior to that.  I was an
15  assistant base manager prior to that.
16  Q.  Where were you a base manager?
17  A.  In Phoenix, Arizona.
18  Q.  And in 2017, what was your position?
19  A.  I was an assistant base manager at the Denver
20  in-flight base.
21  Q.  How long have you been employed overall by
22  Southwest Airlines?
23  A.  Just over 11 years.
24  Q.  Can you briefly explain to the jury, since 2017
25  is the relevant time period, what you did as a

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 519 of 642   PageID 11460
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1675..1678

Page 1675

1 assistant base manager at the Denver airport.
2 A.  I supported the Denver in-flight team and
3 flight attendants.  I supported the base manager
4 there.  Scheduling issues within the staff, personal
5 issues that arose with the flight attendants,
6 conducted investigations, and things of that nature.
7 Q.  And I don't think I asked you this question.
8 How long were you the assistant base manager in
9 Denver?
10 A.  I was three years, three and a half years.
11 Q.  Okay.  Did you work with Ms. Carter at the
12 Denver airport?
13 A.  Yes, I did.
14 Q.  What were your observations or experience with
15 her prior to the investigation that we will talk
16 about?
17 A.  Prior to this investigation and prior to being
18 an assistant base manager, I was a supervisor at the
19 Denver base, and I was actually her direct
20 supervisor.
21      My interactions with her had always been very
22 friendly up until this point.  I hadn't seen her in
23 a while when this meeting occurred because she
24 hadn't flown much over the previous three years.
25 But I had no problems or, you know, concerns at that

Page 1676

1 point.
2 Q.  You mentioned that she hadn't flown for some
3 time.  Is there a process at Southwest for flight
4 attendants to trade or give away their shifts?  Can
5 you kind of explain that to jury?
6 A.  Yes.  Southwest is one of the only airlines in
7 the country that does not have a flying minimum for
8 their flight attendants, so they can contractually
9 trade down or give away all of their assignments,
10 which is a huge perk of the job.
11 Q.  And how do they go about doing that?
12 A.  There is a system that the flight attendants
13 utilize that they can put their trips in for trade.
14 They can say, I want to give this away.  They can
15 put money to say, Hey, I will give you money if you
16 pick up this trip, or to trade into a different
17 trip.  And it's a voluntary process.
18 Q.  How did you find out about the complaints
19 against Ms. Carter?
20 A.  Ed Schneider made me aware.
21 Q.  And in what context?
22 A.  He let me know that he had received a complaint
23 and was going to be conducting an investigation, and
24 asked me if I would assist as his note-taker in that
25 meeting.

Page 1677

1 Q.  Assist as the --
2 A.  The note-taker.
3 Q.  Did you have any other responsibilities in
4 connection with the investigative process?
5 A.  I asked some clarifying questions during the
6 meeting, but other than that, I really didn't have a
7 role in the investigation itself.
8 Q.  How about prior to the fact-finding meeting,
9 were you asked to do anything prior to the meeting?
10 A.  I was asked to review the videos that had been
11 sent, and I did go look at her Facebook page.  Ed's
12 not real Facebook savvy and I am.
13      I went to check it out, which is pretty
14 standard any time we have a social media
15 investigation, just to see some context of what we
16 are looking at here from a nexus standpoint or
17 whatnot.
18 Q.  I will get to that in a second.
19      Did I understand your testimony correctly that
20 you also reviewed the videos?
21 A.  Yes, I did.
22 Q.  What do you remember about that?
23 A.  I was very disturbed by those videos.
24 Q.  Let me stop you.  Did you review two videos?
25 A.  Yes, I did.

Page 1678

1 Q.  Go ahead.
2 A.  I had to look at them to become familiar with
3 the investigation.  And I just remember being kind
4 of horrified by the images because I -- this is the
5 Internet, and we don't know, really truly, where
6 those images came from.
7      I mean, I thought that could be somebody's
8 miscarried baby or somebody's -- it felt like an
9 exploitation of something very personal and horrific
10 and it made me feel queasy.  It kind of ruined my
11 day.  I didn't feel great for the rest of the day.
12 Q.  You then, I think, indicated that you reviewed
13 Ms. Carter's Facebook page.
14      Why did you do that?
15 A.  It's pretty standard, any time there is a
16 social media investigation, just to kind of get some
17 context of, you know, okay.  We get a lot of social
18 media complaints.  So, you know, what really are we
19 looking at here from a severity standpoint and a
20 nexus standpoint.
21 Q.  Did you pull the photographs that we've seen in
22 this case from the Facebook page?
23 A.  I did pull a few photographs, yes.
24 Q.  Can you describe those photos?
25 A.  What I recall there being was a picture of her

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 520 of 642   PageID 11461
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1679..1682

Page 1679

1 flight attendant wings with some caption about
2 Southwest.  Pictures of her in uniform on the
3 aircraft, several pictures of those.
4 Q.   And what did you do to find those posts?  Walk
5 the jury kind of through it.  I don't know their
6 Facebook familiarity, so walk them through kind of
7 what you did to identify those posts, please.
8 A.   It was easy to locate her page on Facebook.  It
9 was a public page, meaning anything that was on it
10 was open to the public, which, you know, makes it
11 very easy to see what's on there.
12      And to find those photographs, I clicked on
13 "photos," and there they were.  I didn't have to do
14 a lot of digging, you don't generally have to do a
15 lot of digging on Facebook to find photographs and
16 things like that.  So it wasn't a laborious process
17 by any means.
18 Q.   How long did it take you?
19 A.   Maybe three minutes in its entirety.
20 Q.   And did I understand correctly that you
21 attended the fact-finding meeting?
22 A.   Yes, I did.
23 Q.   Let's talk a little bit about that.
24      Were you there in person?
25 A.   Yes, I was.

Page 1680

1 Q.   And if you could remind the jury, who else was
2 there?
3 A.   Ed Schneider was there.  Denise Gutierrez was
4 there from employee relations.  Edie Barnett from
5 our -- what we call our people department.  Chris
6 Sullivan and Charlene Carter.  And Chris was acting
7 as a 556 rep.
8 Q.   Did Ms. Carter admit at the fact-finding
9 meeting to sending the videos to Ms. Stone?
10 A.   Yes.
11 Q.   Now, had you had any previous dealings with
12 Ms. Stone?
13 A.   I knew her before, but not well.  I had met her
14 in, like, passing a few times.
15 Q.   In passing at the airport?
16 A.   Like at headquarters.  At the airport.
17 Q.   Can you describe to the jury your general
18 observations at the fact-finding meeting?
19 A.   Yes.  I was very surprised at the fact-finding
20 meeting.  I was -- I was frustrated at kind of what
21 was happening during the meeting.  It was a
22 difficult meeting.
23      Charlene kept taking us off topic, which the
24 topic was these videos that were sent, and there was
25 a lot of information being presented.

Page 1681

1      But what was frustrating about it was -- and
2 shocking was just she had such a lack of remorse in
3 this meeting and was very proud of what she had
4 done.
5      And that was shocking to me because it was so
6 different from the Charlene that I had interacted
7 with prior to this meeting.  I was kind of taken
8 aback by just the lack of humility and the lack of
9 receptiveness that this action was very hurtful to
10 another employee.
11 Q.   Were you the one who was responsible for taking
12 the notes of the meeting?
13 A.   Yes.
14      MR. McKEEBY:  And let's pull those up.  I
15 think they have been admitted.  98.
16 BY MR. McKEEBY:
17 Q.   Did you create this document?
18 A.   Yes, I did.
19 Q.   Did you say anything during the fact-finding
20 meeting?
21 A.   Yes, I did.
22      MR. McKEEBY:  Let me go to 98.13.
23 BY MR. McKEEBY:
24 Q.   It looks like, at the bottom of the page,
25 that's something that you said to Ms. Carter?

Page 1682

1 A.   Yes, it is.
2 Q.   Can you read that for the jury?
3 A.   "Charlene, if I can clarify, you do have the
4 right to disagree or complain about your union.
5 It's the method in which you complain or how those
6 complaints are made that causes concern when the
7 nature of those complaints begins to impact one of
8 our workplace policies."
9 Q.   I think you'll have to go to the next page.
10 A.   "That's when it becomes an issue.
11      "Your most recent post to Audrey is the main
12 reason why we are here today, because of the graphic
13 images and graphic nature of the post.
14      "Audrey is still an employee of Southwest
15 Airlines and she's represented by these policies.
16 These are expectations and guidelines for all
17 employees.  Your most recent post to her was very
18 disturbing to her and made her uncomfortable."
19 Q.   How did you feel after the meeting?
20      MR. McKEEBY:  You can take that down.
21      THE WITNESS:  I was pretty shocked after
22 the meeting.  I was kind of reeling from it, just
23 the graphic nature of the post and the videos and
24 just Charlene's conduct in the meeting.  It just
25 left me feeling kind of like perplexed and upset for

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 521 of 642   PageID 11462
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 6 July 12, 2022                Pages 1683..1686

Page 1683

1 the rest of the day.
2 BY MR. McKEEBY:
3 Q.  Did you share those feelings with
4 Mr. Schneider?
5 A.  We did have a discussion.  I don't remember the
6 details of it.  But I did tell him that I was
7 shocked because it was just so different from the
8 Charlene I had interacted with previous to this
9 meeting.
10      MR. McKEEBY:  Pass the witness.
11      Thank you, Ms. Jones.
12      THE COURT:  Thank you, Mr. McKeeby.
13      Mr. Greenfield.
14          CROSS-EXAMINATION
15 BY MR. GREENFIELD:
16 Q.  Good morning, Ms. Jones.
17 A.  Good morning.
18 Q.  It sounds like you are representing to the
19 Court and the jury that you are pretty Facebook
20 savvy, is that fair?
21 A.  You could say that.
22 Q.  And in your position in management, were you
23 tasked with looking at social media infractions or
24 complaints of flight attendants?
25 A.  Only if there was an infraction or a complaint

Page 1684

1 that would prompt me to look.
2 Q.  About how many do you think you reviewed?
3 A.  That's a loaded question.  Probably --
4 Q.  From 2015 to 2017, how many do you think you
5 reviewed?
6 A.  Probably thousands.
7 Q.  Thousands of complaints?
8 A.  Posts --
9     Of posts.  Okay.
10 A.  -- that were brought forward.
11 Q.  Can you break that down to about how many
12 complaints?
13 A.  Hundreds of complaints.
14 Q.  And would you be tasked with reviewing the
15 complaints for all the different bases?
16 A.  Not necessarily, no.
17 Q.  Just if it involved an employee at your base?
18 A.  Correct.
19 Q.  And that was Phoenix, correct?
20 A.  I was Denver and Phoenix --
21 Q.  Denver.
22 A.  -- based.
23 Q.  Denver.  I apologize.  Thank you.
24     MR. GREENFIELD:  Sorry, Ms. Willis.
25

Page 1685

1 BY MR. GREENFIELD:
2 Q.  I believe you said it was Denver, is that
3 correct?
4 A.  In 2017, it would have been Denver-based.
5 Q.  Okay.  And how many bases are there?
6 A.  There's 11 what we call brick-and-mortar bases,
7 and there's two satellite bases which are like
8 remote bases.
9 Q.  So you are saying hundreds of complaints just
10 at your base alone regarding social media
11 infractions?
12 A.  That touched my base alone, yes.
13     MR. McKEEBY:  Thank you.  No more
14 questions.
15     THE COURT:  All right.  And Mr. Pryor.
16     MR. PRYOR:  Not a thing, your Honor.
17     THE COURT:  So do you have any questions
18 based on Mr. Greenfield's questions, Mr. McKeeby?
19     MR. McKEEBY:  No.
20     THE COURT:  Any need to keep this witness?
21     We can excuse you back to your seat.
22     THE WITNESS:  Thank you.
23     THE COURT:  Okay.  Next witness for
24 Southwest.
25     MR. McKEEBY:  Southwest calls Denise

Page 1686

1 Gutierrez.
2     THE COURT:  Okay.  You may do so.
3     (The witness entered the courtroom.)
4     THE COURT:  Ms. Gutierrez, you can come on
5 in and approach the witness box up here.
6     Before you get seated, we will need to
7 swear you in.  So if you could raise your right hand
8 and Mr. Frye will give you the oath.
9     (DENISE GUTIERREZ was duly sworn by the
10 Clerk.)
11     THE COURT:  Okay.  And I will just ask for
12 some space between questions from lawyers and
13 answers, and answers and questions.  That way, if
14 there is an objection, I can rule on it before you
15 answer.
16     You can proceed, Mr. Morris.
17          DIRECT EXAMINATION
18 BY MR. MORRIS:
19 Q.  Hello, Ms. Gutierrez.
20 A.  Hi.  Good morning.
21 Q.  Ms. Gutierrez, who is your current employer?
22 A.  My current employer is JP Morgan Chase.
23 Q.  And what do you at JP Morgan?
24 A.  I do trend and theme analysis on conduct
25 activity for the firm.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 522 of 642   PageID 11463
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022                        Pages 1687..1690

Page 1687

1 Q.  And prior to working at JP Morgan, who was your
2 employer?
3 A.  Southwest Airlines.
4 Q.  And how long were you employed by Southwest
5 Airlines?
6 A.  Just shy of ten years, like nine and a half
7 years.
8 Q.  And what positions did you hold at Southwest?
9 A.  I was the -- I was an employee relations senior
10 investigator.
11 Q.  Was that your position throughout your tenure
12 at Southwest?
13 A.  Yes, through the majority of my tenure there,
14 yes.
15 Q.  And what were your duties at Southwest?
16 A.  I was responsible for conducting investigations
17 related to the harassment, sexual harassment,
18 discrimination and retaliation policy.
19 Q.  And can you tell me a little bit about employee
20 relations in general, what kind of things did they
21 do at Southwest?
22 A.  So when we would get allegations that someone
23 may have engaged in behavior that potentially
24 violated the policy related to harassment, sexual
25 harassment, discrimination and retaliation, we were

Page 1688

1 required to do an investigation, which meant that we
2 would interview individuals that might have relevant
3 information to the alleged behavior.  We would also
4 look at any additional information that might be
5 relevant to those allegations.
6     Based on that information, we would assess
7 whether there was policy violation or not.
8 Q.  And did you work with the labor relations
9 department in conducting these investigations?
10 A.  Yes.  If it did involve a union employee, we
11 would, yes.
12 Q.  Are you familiar with an investigation into a
13 complaint made by Audrey Stone regarding Charlene
14 Carter?
15 A.  I am, yes.
16 Q.  And how did you become familiar with that?
17 A.  I don't 100 percent recall, but based on what I
18 can recall, I believe that there was an email sent
19 to the employee relations email, distribution group
20 email, related to some concerns that Audrey Stone
21 had related to some Facebook messages that she had
22 received from Charlene Carter.
23 Q.  And when you learned about the investigation,
24 were you familiar with Ms. Carter?
25 A.  I was not.

Page 1689

1     MR. MORRIS:  If we can pull up Exhibit 76.
2     THE WITNESS:  Hold on one second.  I have
3 got to put on my glasses.
4 BY MR. MORRIS:
5 Q.  Sure.
6 A.  Okay.
7 Q.  If you look at the top of this email, it looks
8 like it's an email from you to Ed Schneider.
9     Do you recall this email?
10 A.  I do, yes.
11 Q.  Is this you reaching out to him to say that you
12 are going to assist with the investigation?
13 A.  That is correct, yes.
14     MR. MORRIS:  We can take that down.
15 BY MR. MORRIS:
16 Q.  So what did you do in connection with the
17 investigation into Ms. Carter?
18 A.  I'm sorry, I didn't hear that.
19 Q.  What did you do in connection with the
20 investigation into Ms. Carter?
21 A.  So I partnered with the in-flight base to
22 conduct a fact-finding.  So that's usually how
23 employee relations worked with in-flight, was that
24 in-flight would lead the fact-finding, and employee
25 relations would partner with them in the

Page 1690

1 fact-finding.  So we would interview all of the
2 parties together.
3 Q.  So did you attend the fact-finding meeting with
4 Ms. Carter?
5 A.  I did, yes.
6 Q.  And what was your role in that fact-finding
7 meeting?
8 A.  With Ms. Carter?
9 Q.  Yes.
10 A.  My role was as an active participant in asking
11 questions related to the alleged behavior with
12 Audrey Stone.  My role was specifically to the
13 behavior specific to the harassment, sexual
14 harassment, discrimination and retaliation policy.
15 Q.  And did you attend a fact-finding meeting with
16 Ms. Stone?
17 A.  I believe I did, yes.
18 Q.  And was your role the same in that meeting as
19 well as it was in Ms. Carter's fact-finding meeting?
20 A.  More or less.  You know, Audrey Stone's was
21 really to get much more information as to what her
22 concerns were relative to the allegation she was
23 making to Ms. Carter.
24 Q.  Did you make any -- let me step back.
25     When you're participating in an investigation,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 523 of 642   PageID 11464
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1691..1694

Page 1691

1 do you typically summarize your findings in some
2 way?
3 A.  After we've conducted all of the interviews,
4 you mean?
5 Q.  Correct.
6 A.  Yes.  Usually we would put together a summary
7 of sorts determining our outcome.
8 Q.  Do you recall making any conclusions in this
9 case regarding the violations of the harassment
10 policy?
11 A.  Yes, I do recall making some determinations.
12        MR. MORRIS:  Let's look at Exhibit 108,
13 please.
14 BY MR. MORRIS:
15 Q.  If you look down at the bottom, and it goes on
16 to the next page.
17    Does this document look familiar to you?
18 A.  It does, yes.
19 Q.  And what is this document?
20 A.  It would be just a summary of my findings
21 related to the harassment, sexual harassment,
22 discrimination, retaliation policy.
23 Q.  And looking at this document, and based on your
24 recollection, what were your findings in this case
25 regarding Ms. Carter?

Page 1692

1 A.  Well, you know, to be fair, I don't fully
2 remember, since it has been a little while since
3 then.
4     But looking at this email, I can see that my
5 findings were partially supported to the allegations
6 that Ms. Stone made against Ms. Carter.
7 Q.  Can you explain what you meant by "partially
8 supported"?
9 A.  Yes.  So to the best of my recollection,
10 Ms. Stone had made, you know, several allegations
11 related to the material that she received from
12 Ms. Carter via Facebook.  And we could only
13 substantiate that part of those allegations were
14 supported to violate the harassment, sexual
15 harassment, discrimination and retaliation policy.
16     So that's what we meant by "partially
17 supported," what I meant by "partially supported."
18 Q.  Do you recall what those posts were that
19 partially supported a violation of that policy?
20 A.  If I recall, I believe it was related to some
21 pictures that were sent of women who were dressed
22 like vaginas.
23 Q.  And you thought that supported a violation of
24 the harassment policy?
25 A.  I did, yes.

Page 1693

1 Q.  Did you make the decision to terminate
2 Ms. Carter?
3 A.  No.
4 Q.  Do you know who made that decision?
5 A.  That would be, you know, the in-flight base
6 management in collaboration with labor relations.
7 Q.  And when you are involved in an investigation
8 like Ms. Carter's, is it normally your role to make
9 a determination as to an appropriate discipline?
10 A.  No.
11 Q.  Who makes that decision?
12 A.  It would be leadership in conjunction with, if
13 it's a union employee, labor relations.  If it's a
14 non-union employee, usually their HR representative.
15 But employee relations had no role in determining
16 corrective action.
17 Q.  So it's fair to say that your role was just
18 assessing whether there had been a violation of the
19 policy?
20 A.  That's correct.
21        MR. MORRIS:  Pass the witness.
22        THE COURT:  All right.  Mr. Greenfield.
23           CROSS-EXAMINATION
24 BY MR. GREENFIELD:
25 Q.  Good morning, Ms. Gutierrez.

Page 1694

1 A.  Good morning, Mr. Greenfield, is that right?
2 Q.  It's Mr. Greenfield.  I represent the Union.
3 A.  Okay.
4 Q.  Okay?
5     Did anyone at the Union try to improperly
6 influence your investigation into the matter?
7 A.  No, not that I can recall.
8 Q.  And when conducting an investigation, are there
9 different rules for different employees?
10 A.  No, I don't believe so.
11 Q.  Would you treat an investigation differently
12 because the complaint was made by a union executive
13 board member?
14 A.  No.
15        MR. GREENFIELD:  Pass the witness.
16        MR. HILL:  No questions, your Honor.
17        THE COURT:  Okay.  Any need to reserve her
18 for a recall?
19        With that, you are excused as a witness.
20 Thank you for your testimony.
21        THE WITNESS:  Thank you.
22        (The witness exited the courtroom.)
23        THE COURT:  Southwest, do we have another
24 witness to call?
25        MR. McKEEBY:  We do.  Mike Sims.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 6 July 12, 2022                      Pages 1695..1698

Page 1695

1       (The witness entered the courtroom.)
2       THE COURT:  Mr. Sims, you can come on up
3 here and approach the witness box.
4       Before you get into the box, can I have
5 you raise your right hand.  We're going to swear you
6 in.
7       (MIKE SIMS was duly sworn by the Clerk.)
8       THE COURT:  Okay.  Now you can take a
9 seat.
10      THE WITNESS:  Thank you, sir.
11      THE COURT:  And Mr. Sims, I ask all
12 witnesses if they could help us keep some space
13 between questions that the lawyers that ask you and
14 your answers, and then ask the lawyers to keep space
15 between your answer and their question.
16      THE WITNESS:  Yes, sir.
17      THE COURT:  That way we can keep a clean
18 record and I can rule on any objections from the
19 lawyers before you answer.
20      THE WITNESS:  Yes, sir.
21      THE COURT:  You can proceed, Mr. McKeeby.
22      MR. McKEEBY:  Thank you.
23           DIRECT EXAMINATION
24 BY MR. McKEEBY:
25 Q.  Will you please state your name for the record.

Page 1696

1 A.  Michael Sims.  S-I-M-S.
2 Q.  How are you currently employed?
3 A.  I'm currently employed at Southwest Airlines as
4 a senior director of in-flight operations.
5 Q.  How long have you been in that position?
6 A.  Since 2017.
7 Q.  What did you do before that?
8 A.  Regional director, in-flight operations.
9 Q.  Tell the jury, what's the difference between a
10 senior director and a regional director?
11 A.  Well, a regional director, in that instance, I
12 was managing flight attendant bases across the
13 United States.  At one point I had the eastern part
14 of the United States, at another point I had the
15 western part of the United States.
16      I was promoted to senior director in 2017 where
17 that encompassed the entire area of the United
18 States for in-flight bases, which now are 11 bases,
19 but back then it was 10.
20 Q.  When in 2017 did you receive that promotion?
21 A.  That was mid summer.
22 Q.  Okay.  I asked that because I want to focus on
23 your job prior to that time.
24      And so am I right that prior to that time, you
25 were a regional director?

Page 1697

1 A.  That is correct, sir.
2 Q.  I understand you explained a little bit about
3 the breakdown and the difference between a senior
4 and regional director.
5      But as a regional director, can you generally
6 describe your job duties to the jury.
7 A.  Yes, sir.
8      Regional director primarily is focused with
9 ensuring that our flight attendants are meeting
10 company standards in terms of delivering customer
11 service.
12      So my job included insurance of the customer
13 experience for the people that fly Southwest
14 Airlines in terms of how our flight attendants
15 deliver it.
16      It also consisted of ensuring overall job
17 performance of our flight attendants, and then also
18 ensuring that our in-flight bases, which were
19 scattered throughout the United States, were running
20 effectively.
21 Q.  Have you ever been a flight attendant with
22 Southwest Airlines?
23 A.  Yes, sir.  I was hired as a flight attendant in
24 November of 1996.  Served as a flight attendant from
25 1996 to June of 2007.

Page 1698

1 Q.  Were you a member of the Union during that time
2 period?
3 A.  Yes, sir.  I was a member of transport workers
4 Union Local 556, as all flight attendants are.
5      In addition, I was elected as a union officer
6 in 2003.  I was elected as executive board member at
7 large, and at that point, I was appointed to run the
8 union office, if you will, and process employee
9 grievances.
10      So I was full-time in the union from 2003
11 through 2006.  Excuse me, until April of 2006.
12 Q.  Thank you.
13      Mr. Sims, it sounds like, given your
14 background, you are pretty knowledgeable about Local
15 556, I take it?
16 A.  Yes, sir.
17 Q.  I just kind of want to get some explanation so
18 that the jury understands the relationship between
19 Southwest Airlines and Local 556 in terms of their
20 interactions.
21      Can you just provide sort of a general
22 description of that?
23 A.  Yes.  Overall, the interactions between
24 Southwest Airlines and Transport Workers Union Local
25 556 is very professional and it's amicable.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022                        Pages 1699..1702

Page 1699

1   There are disagreements, as you can imagine
2 when it comes to collective bargaining and
3 collective bargaining agreements and their
4 administration.
5   But Southwest is very unique in the fact that
6 we have been able to work with the union through the
7 processes that allow us to resolve disputes through
8 the good times and the bad times.
9 Q.  Fair enough.
10   How about in terms of the structure of the two
11 entities.  Do they have the same, for example,
12 policies and laws -- I mean policies and procedures?
13 A.  Oh, no, sir.  It's important to note that TWU
14 Local 556 and Southwest Airlines are separate
15 entities.
16 Q.  What does that mean?
17 A.  Excuse me?
18 Q.  What do you mean by that?
19 A.  Well, by "separate entities," I mean that
20 Southwest Airlines is the company that we know that
21 operates aircraft and flies customers around the
22 country.
23   TWU Local 556 is a separate organization that
24 has its own governance, has its own budget, has its
25 own operating rules, bylaws, et cetera.

Page 1700

1   What makes the two in common is while they are
2 separate entities, TWU Local 556 is operated by
3 Southwest Airlines employees.
4 Q.  Understood.  Thank you for that clarification.
5   As a regional director of in-flight operations,
6 did you preside over something called a Step 2
7 hearing?
8 A.  Yes, sir.  At that time, I presided over the
9 majority of them, if not all.
10 Q.  All of them within your region?
11 A.  Yes, sir.  If not in the region, over the
12 whole -- the entire group of bases.  It just depends
13 on where we were in terms of our org structure at
14 that point.
15   So we did some re-orgs and we were a little
16 short-handed for a while.  How is that?
17 Q.  Understood.
18   How about the spring of 2017, did you preside
19 over --
20 A.  Yes.
21 Q.  -- Step 2 meetings at that time?
22   And we will get it, but you presided over
23 Ms. Carter's Step 2 hearing?
24   That is correct, yes, sir.
25     MR. HILL:  Running objection on relevance

Page 1701

1 and 403.
2     THE COURT:  I will grant you that running
3 objection.
4   I will overrule it and you can answer the
5 question and continue.
6 BY MR. McKEEBY:
7 Q.  Before we get into the specifics of Ms. Carter,
8 can you briefly explain to the jury what a Step 2
9 hearing is?
10 A.  Well, a Step 2 hearing is what we would
11 consider the beginning of an appeal process for an
12 employee who has found themselves in disagreement
13 with company action when it comes to issuing
14 discipline.
15   So under the Collective Bargaining Agreement,
16 our contract with Transport Workers Union Local 556,
17 we have an appeals process that allows decisions to
18 be further reviewed and analyzed and checked for
19 additional information.
20   So the Step 2 hearing, we call it Step 2,
21 because Step 1 is, Hey, I don't like or I disagree
22 with this decision, so Step 1, I file for appeal.
23   Step 2 is where the appeal is heard at my level
24 to review what transpired at the in-flight base
25 level by usually the decision made by base

Page 1702

1 leadership.
2 Q.  Now, again, speaking generally, do you have any
3 particular involvement with the grievance prior to
4 the Step 2 hearing?
5 A.  No, sir.
6 Q.  I think I asked you, but were you involved in
7 Ms. Carter's Step 2 hearing?
8 A.  I was involved in her Step 2 hearing, yes, sir.
9 Q.  What did you do, if anything, to prepare for
10 the Step 2 hearing in Ms. Carter's case?
11 A.  It was pretty standard in terms of preparation.
12 So we have a department in Southwest Airlines, it is
13 our labor relations department.  They are tasked
14 with managing the administrative part of an appeal.
15   So they sent me notice that Ms. Carter wanted
16 to appeal her termination, so they sent me the
17 information surrounding the circumstances.
18   So that would be, you know, correspondence or
19 notes or anything that had to do with the decision
20 that they made at that level.
21   So I reviewed that prior to going in and I
22 reviewed her termination letter.
23 Q.  Okay.  Did part of that -- part of the
24 materials that you reviewed include the videos that
25 we've discussed in this case, I will tell you?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022                        Pages 1703..1706

Page 1703

1 A.  Yes, sir.
2 Q.  Did you watch the videos?
3 A.  I did not watch them prior to her meeting with
4 me, but I was aware of them.  I saw that they were
5 stills.  I received pictures of the videos and then
6 saw the videos later.
7 Q.  Okay.  That was part of the labor relations
8 file that you mentioned?
9 A.  Yes, sir.
10 Q.  The still photos?
11 A.  Yes, sir.  Screen shots.
12 Q.  Screen shots, sorry.  Thank you.
13     When did you review, or when did you watch the
14 videos?
15 A.  Ah, somewhere during -- there is a 10-day
16 process after our meeting, and that's when we have a
17 decision time period.  I saw it during that and also
18 saw them in preparation for an arbitration that took
19 place later.
20 Q.  All right.  Well, then let's continue on the
21 timeline before we get to that.
22     So to kind of set the table, if you will,
23 for -- where was Ms. Carter's Step 2 hearing?  Where
24 did it take place?
25 A.  We held the meeting at Southwest Airlines

Page 1704

1 headquarters.  We have designated conference rooms
2 for those meetings, and she and her union
3 representatives met us there.
4 Q.  In person?
5 A.  Yes, sir.
6 Q.  Do you recall who her union representative --
7 you said plural representatives, more than one?
8 A.  Yes, sir.
9 Q.  Do you recall who that was?
10 A.  Yes, sir.
11 Q.  Who?
12 A.  There was two.  Becky Parker, P-A-R-K-E-R, and
13 Beth Ross, R-O-S-S.
14 Q.  Okay.  Did Carter present any documents during
15 the Step 2 hearing?
16 A.  Yes, she did.  She presented numerous
17 documents.
18 Q.  Okay.
19     MR. McKEEBY:  If you can pull Exhibit 118.
20 BY MR. McKEEBY:
21 Q.  Do you recognize this document, Mr. Sims?
22 A.  Yes, sir, I do.
23 Q.  Tell the jury what this is.
24 A.  What this is, is a list of the information that
25 she provided for us in terms of the documents.

Page 1705

1     And some of them were -- well, they were all
2 provided by her.  Some were articles from the
3 Internet.  Some were information that she felt was
4 pertinent to her case.  This is just a collective
5 list of those documents.
6 Q.  Okay.  And did she actually come to the meeting
7 and present this packet to you?
8 A.  Yes, she did present a packet.  Yes, that is
9 correct.
10 Q.  And I think -- are there different -- this an
11 index of 10 documents.  Are there more than that?
12 A.  I think there are.
13 Q.  I do, too.
14     So if you will go to 118.30, what is that
15 document?
16 A.  That's a continuation of the previous list.
17 Q.  And what about 118.61, if you could pull that.
18 A.  Again, that is continuation of the previous two
19 lists.
20 Q.  So more documents?
21 A.  Yes, sir.
22 Q.  Okay.  And, I'm sorry, I forgot if you have
23 done this, but can you just kind of generally
24 describe the content?
25     I mean, it is a long, lengthy exhibit, and I

Page 1706

1 don't want to walk through step-by-step with you.
2 But can you just describe generally to the jury what
3 this packet of documents consisted of?
4 A.  Yes.  During a Step 2 meeting -- and this is,
5 again, when they are appealing, in Ms. Carter's
6 case, the termination -- we encouraged them to bring
7 any information that they feel is pertinent or may
8 be information that wasn't considered or information
9 that would provide additional context.
10     So in Ms. Carter's case, she brought to me
11 numerous documents that she believed would be
12 helpful to me in making a decision in her favor.
13     So it's pretty typical that the union and the
14 grievant bring additional information or
15 information, again, to provide additional context.
16     So this gave me an opportunity to learn a
17 little bit more about her point of view and her
18 thoughts on why she felt that her termination was
19 not reasonable.
20 Q.  And during the Step 2 hearing, did you go over
21 the different documents that she provided?
22 A.  Well, there were numerous documents, so what we
23 agreed was that we would label them so I could keep
24 track of them, and then I committed to Ms. Carter
25 that I would look at them after the meeting.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 527 of 642   PageID 11848
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 6 July 12, 2022                    Pages 1707..1710

Page 1707

1    Because I felt that the documents were
2 important to her, therefore, they were important to
3 me, but I also wanted to hear her speak and tell me
4 her point of view.
5    And there just wasn't enough time to read 30
6 documents because some of them were two or three
7 pages each. So I did review them after our meeting
8 a couple of days after we met.
9 Q.  Did you go over the documents in terms of
10 asking Ms. Carter what they were?
11 A.  Yes.
12 Q.  And that was during the Step 2 grievance?
13 A.  Yes, sir.
14    So how it worked was she would hand me a
15 document and say, This is an article on the AFL-CIO
16 as an example.
17    And then I would say, Okay, let's mark this as
18 an AFL-CIO document.
19    And then we would set it aside and then move on
20 to the next one and the next one after that.
21        MR. McKEEBY:  Okay.  You can take that
22 down.
23 BY MR. McKEEBY:
24 Q.  Was there anything else with Southwest Airlines
25 at the Step 2 hearing?

Page 1708

1 A.  Yes.  When we conduct Step 2 hearings, we have
2 a representative from our labor relations
3 department, as they act as the case manager, if you
4 will.
5    And in this case we had a manager by the name
6 of Melissa Burdine, B-U-R-D-I-N-E.
7 Q.  And she's with labor relations?
8 A.  She was.  She has since left the company.
9 Q.  What was her role at the Step 2 hearing?
10 A.  Her role was to ensure that the documents were
11 present.  She took notes and then she also provided
12 counsel to me after the meeting.
13        MR. McKEEBY:  If we could go to
14 Exhibit 119.
15        MR. HILL:  Objection.  The ones discussed
16 this morning.
17        THE COURT:  On 119?
18        MR. McKEEBY:  Should I move to admit
19 first?
20        THE COURT:  Yes.
21        MR. McKEEBY:  Move to admit and publish
22 Exhibit 119.
23        THE COURT:  Okay.  I have the objections
24 from this morning.  I'm overruling those and
25 admitting 119.

Page 1709

1    You can publish.
2        (The referred-to document was admitted
3 into evidence as Trial Exhibit 119.)
4 BY MR. McKEEBY:
5 Q.  The first page of 119 is an email, correct?
6 A.  Yes, sir.
7 Q.  Can you describe to the jury what that email
8 is?
9 A.  This is an email from the labor relations
10 manager, Melissa Burdine, sending it to me on
11 April 6th -- that was a couple of days after the
12 hearing -- her notes that she typed during our
13 hearing.
14    And she just mentioned here that -- and this
15 did happen -- her laptop that she was working on at
16 the time, it powered down for a few minutes, but she
17 was able to plug it in.  We took about a three- or
18 four-minute break while she plugged it in.
19    And then "I will send the labor recap to you
20 next week."
21 Q.  And then if you go to the next page, are those
22 her notes?
23 A.  Yes.
24        MR. McKEEBY:  You can take that down for
25 now.

Page 1710

1 BY MR. McKEEBY:
2 Q.  Okay.  You go through the documents.  You
3 indicated that she handed them to you and that you
4 then later reviewed them.
5    What did you do next during the Step 2
6 grievance hearing?
7 A.  After the hearing, or are we still during?
8 Q.  No, no, no.  Still in the hearing.  You have
9 gone through the documents.  I understand you didn't
10 go through each one, but there was a labeling
11 process during the hearing, as I understood it?
12 A.  Yes.
13 Q.  Okay.  So what happened next at the hearing?
14 A.  At the hearing it was a pretty typical hearing.
15 And what I did was I asked Ms. Carter why she felt
16 that the termination was unjust or why she believed
17 that our company was making a mistake.
18 Q.  What do you recall her saying in response to
19 that question?
20 A.  Well, she was in a dispute with Transport
21 Workers Union Local 556.  And then during the --
22 after we went through the exhibits, we had more
23 discussion where she gave me her point of view of
24 why she felt that she wanted her job back.
25 Q.  What do you recall generally her saying about

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 528 of 642   PageID 11469
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                     Pages 1711..1714

Page 1711

1 that?
2 A. Well, she asked me, Can I have my job back?
3 Q. During the Step 2 hearing, did she admit
4 sending the video messages to Ms. Stone?
5 A. Yes. There was never any dispute between us
6 that they were sent and she did acknowledge that she
7 sent them.
8    MR. McKEEBY: 119 again.
9 BY MR. McKEEBY:
10 Q. Was Ms. Carter apologetic at all during the
11 Step 2 hearing?
12 A. I think she was -- she appeared to be
13 remorseful at that hearing and said that she had
14 gone a little over the top.
15    MR. McKEEBY: Let's look at 119.5. I'm
16 sorry. 15, I think. Yes, 15. It's at the bottom
17 here where it says "the last three weeks," the last
18 bullet. "The last three weeks." There we go.
19 BY MR. McKEEBY:
20 Q. Do you see that where it says "the last three
21 weeks"? Can you read that to the jury, Mr. Sims?
22 A. Yeah, starting -- okay.
23    "The last three weeks I could have made a
24 better choice regarding Audrey. I don't know why
25 they won't let us know. This has nothing to do with

Page 1712

1 Southwest. This was something about the Women's
2 March, because we paid for it and they didn't say
3 anything to us before they went."
4 Q. Is that the -- that's not testimony, she wasn't
5 under oath, but is that the statement that you were
6 recalling a moment ago?
7 A. Yes.
8    MR. McKEEBY: And if you go to 119.16.
9 About halfway down, where it says "cc." Yes, that's
10 the one.
11 BY MR. McKEEBY:
12 Q. Is this where she's asking for her job back?
13 A. Yes. She directly asked me, Can I have my job
14 back, because I do love my job and company.
15 Q. And did you also have a discussion during the
16 Step 2 hearing about her sending other Facebook
17 messages to other Southwest employees?
18 A. Yes.
19 Q. What do you recall about that?
20 A. I recall that she was --
21    MR. HILL: Objection, relevance.
22    THE COURT: Overruled.
23    You can answer.
24    THE WITNESS: I recall that she was very
25 passionate about her beliefs and her values, and she

Page 1713

1 wanted to share those beliefs and values with other
2 people.
3    MR. McKEEBY: Let's look at 119.17. The
4 next page, I guess. The one that says "cc" about
5 midway through, "I promise."
6    THE WITNESS: Yes, sir.
7 BY MR. McKEEBY:
8 Q. Does that refresh your recollection as to what
9 was said about further Facebook posts?
10 A. Yes.
11 Q. I'm sorry, messages?
12 A. Yes.
13    She's saying here "I promise it will never
14 happen again. If they don't like what's said, I
15 won't do it."
16 Q. And then at the top of the page, where it says
17 "BP," who do you know who that is?
18 A. BP are the initials for Becky Parker, who was
19 one of her union representatives.
20    MR. McKEEBY: And if you could blow that
21 up.
22 BY MR. McKEEBY:
23 Q. And that very last line of her question is
24 what?
25 A. "Can I trust" -- let me back up.

Page 1714

1    This is where her union representative turns to
2 Ms. Carter and asks, "Can I trust you won't do it
3 again?"
4 Q. Okay. And what did she say?
5 A. "Yes. I won't."
6    MR. McKEEBY: You can take that down now.
7 BY MR. McKEEBY:
8 Q. About how long was the Step 2 hearing?
9 A. I think it was between 90 minutes and almost
10 two hours.
11 Q. So you mentioned something earlier about 10
12 days. What was the significance of that?
13 A. Well, as I mentioned earlier, Southwest
14 Airlines and the flight attendant union have an
15 agreement, and in that agreement, which is the
16 contract, there is an appeal process that is laid
17 out.
18    So we start with Step 1. Then we have Step 2.
19 But then there are days that are designated between
20 those steps for the company or the union to gather
21 additional information.
22    So in this case, we take, in Step 2, 10
23 business days afterwards to review all of the
24 information, and then we have that time period to
25 formulate our decision back to the union.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 529 of 642   PageID 11470
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 6 July 12, 2022                Pages 1715..1718

Page 1715

1 Q.  I think you have alluded to a couple of things.
2      But in this case, what did you do during that
3 10-day period?
4 A.   During that 10-day period, I reviewed all of
5 the documents that Ms. Carter supplied.  I conferred
6 with labor relations and, you know, read through
7 some other things about -- just on my own about how
8 things were in the current state, you know, of the
9 times.  And that's how I came to make my decision.
10 Q.  When you say you conferred with labor
11 relations, do you recall with whom you conferred?
12 A.   That would have been the manager, Melissa
13 Burdine.  Possibly her leader at the time who has
14 retired, Tammy Schaffer.
15 Q.  Okay.  And did I understand your testimony
16 earlier correctly that you viewed the videos during
17 that 10-day window?
18 A.  Yes, sir.
19 Q.  Why did you do that?
20 A.  I just wanted to know.
21 Q.  What was your reaction when you saw the videos?
22      By that time you had gone though the Step 2
23 hearing, you had heard from Ms. Carter, correct?
24      What was your reaction?
25 A.  The videos were very impactful to me.  I hated

Page 1716

1 them.  They were ugly.  They were disgusting.
2      That's just the tip of the iceberg of how it
3 made me feel.  It made me feel sick.
4 Q.   Mr. Sims, I take it that part of the review
5 process at the Step 2 hearing involves your
6 assessment as to the decision that in this case
7 Mr. Schneider made?
8 A.   Yes.
9 Q.   And did you agree with that decision?
10 A.   I agreed with Mr. Schneider's decision.
11      Ms. Carter's actions under the Southwest
12 Airlines policy, procedures and our overall mission,
13 she was -- she was terminated for good reason.
14 Q.   Now, at the end of the Step 2 hearing, what
15 options did you have?
16 A.   The agreement or the contract we have with the
17 Union gives me three options at the end of a Step 2.
18      The first option is I can just accept the
19 grievance, and just say, Union, you were correct, we
20 are going to restore her employment as if nothing
21 happened.
22      The second option I have is to offer a
23 settlement, meaning that in most cases we will
24 return them back to work but with some conditions,
25 you know.

Page 1717

1      And then the final option I have is what we
2 call -- I have the authority to deny the grievance,
3 which simply means it sends it to the next stage in
4 the process, which would be a Step 3.
5 Q.   And which of these options did you arrive at?
6 A.   After careful thought, I offered a settlement.
7 Q.   And why did you -- what was the -- can you just
8 describe generally, I will show you the document in
9 a minute, but can you describe generally what you
10 mean by that.  What did you do?
11 A.   Ms. Carter asked me if she could --
12      MR. HILL:  Objection.
13      THE COURT:  I'll overrule.
14      You can answer.
15      MR. HILL:  And the settlement
16 communication.
17      THE COURT:  Yes, overruled.
18      You can answer.
19 BY MR. McKEEBY:
20 Q.   Explain generally what the proposal was, if you
21 will.
22 A.   Well, Ms. Carter asked me for her job back, and
23 I decided to help her get her job back.
24 Q.   And why did you do that?
25 A.   I wanted to give her another chance.

Page 1718

1 Q.   You said you agreed with the decision.  Why did
2 you decide to give her her job back?
3 A.   Well, she was fired for all of the right
4 reasons, but the appeals process allows us to step
5 back a little bit and review.
6      So while she was fired for all of the right
7 reasons, she convinced me in the Step 2 that she
8 would be different.  And I looked at the fact that
9 she was a long-term employee, she had a good
10 employee record, and I just, at the end of the day,
11 wanted to give her another chance.
12 Q.   And I think in the context of this case, we
13 have been referring to something called the last
14 chance agreement.  Is that the proposal to which you
15 are referring?
16 A.  Yes, sir.
17      MR. McKEEBY:  Can you pull up Exhibit 40?
18 It's in evidence.
19 BY MR. McKEEBY:
20 Q.   Can you identify this document for the jury?
21 A.   Yes, sir.  This is the last chance agreement
22 that I authorized to be offered to Ms. Carter.
23 Q.   And is this the same -- is this a form that you
24 had used in other cases?
25 A.  Yes.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 530 of 642   PageID 11471
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                            Vol 6 July 12, 2022                         Pages 1719..1722

Page 1719

1 Q.  Let's kind of go over the terms so that the
2 jury understands.
3    The first bullet -- I'm going to have them blow
4 it up for you to make it easier to read.
5 A.  Thank you.
6 Q.  You are welcome.
7    Just explain to the jury what that means.
8 A.  Well, this was me granting Ms. Carter's
9 request, and the company is going to reinstate her
10 employment, give her her job back.
11 Q.  What does "no loss of seniority" mean?
12 A.  What that means is, in the airline world or the
13 industrial world, if you will, where there is union
14 agreements, how we schedule people for their work is
15 based on seniority, or their length of service.
16    So they are able to bid for schedules or bid
17 for vacation, or get other possible other things
18 based on their length of service or their seniority.
19    So in this case, we didn't ding her, if you
20 will, with her seniority.  Her seniority was
21 restored, or left status quo, excuse me.
22 Q.  Okay.  The next bullet says, "You will receive
23 Konop pay."
24    What does that mean?
25 A.  What that meant was we were not offering any

Page 1720

1 back pay as if she had stayed at the company and was
2 working.
3    I made that decision because in reviewing her
4 work history, she was not working that much.  And
5 also, this was just another way of just saying,
6 we're going to agree to there will be Konop pay.
7    She really wasn't eligible for back pay anyway,
8 since there was no work completed.
9 Q.  What do you mean, no work completed?
10 A.  Flight attendants have a lot of flexibility to
11 modify their schedule and they can work pretty much
12 as they want in the guardrails of federal -- of
13 aviation regulations, or they can work as little as
14 they want.
15    So at that period, Ms. Carter wasn't working
16 enough to warrant a check, if you will, for coming
17 back to work.
18        MR. McKEEBY:  Okay.  Let's tick down to
19 the next bullet.
20 BY MR. McKEEBY:
21 Q.  What does that mean?
22 A.  So I reduced her termination to a 30-day
23 suspension.  So what that meant was I reinstated her
24 employment, but we had to reconcile this event
25 because she violated company policy.  She did some

Page 1721

1 things that were warranting termination of
2 employment.
3    So just to reconcile this under our work
4 conduct rules, I added we would just convert that
5 termination to a 30-day suspension, which is pretty
6 innocuous here because she had already served that
7 suspension, if you will.  So it was just something
8 that would be reflected in her file, her employment
9 file.
10        MR. McKEEBY:  Let's tick down to the next
11 one.
12 BY MR. McKEEBY:
13 Q.  Can you just tell the jury what that means?
14 A.  Yes.  We pay -- most airlines or other
15 employers pay by the hour, so you are paid 40 hours
16 a week, for example.
17    We use a term called TFP, trips for pay.
18    Not necessary to know all of that, what that
19 means.  But what we do is when somebody is
20 terminated, they accrue vacation time.
21    So once somebody is terminated, we know they
22 are not going to take that vacation time, so we just
23 pay out that vacation in a check to reconcile it.
24    So on return to work in this case, we gave her
25 the option, you can keep that money we paid to you

Page 1722

1 for your earned vacation, but if you want to
2 reinstate those vacation days, then you will just
3 pay us back and we will put that back into your
4 vacation bank.
5 Q.  Thank you, Mr. Sims.
6        MR. McKEEBY:  Let's tick down to the next
7 bullet.
8 BY MR. McKEEBY:
9 Q.  What does that mean?
10 A.  "Any record improvement will be delayed for a
11 period of time equal to the time from termination."
12    Okay.  So in the flight attendant contract, we
13 have a section that administers our attendance
14 policy.
15    So in layman's terms when a flight attendant
16 calls in sick and that is not covered by a doctor's
17 note, we assess them points.  Okay?  And they have
18 an ongoing record of attendance points that they
19 accrue for absenteeism.
20    In this case, what we did was when we reinstate
21 somebody, we always restart the record improvement
22 clock, which means that when you accrue points, you
23 have the ability several times through the year to
24 have those points removed.  And we call that record
25 improvement.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1723..1726

Page 1723

1    So this is pretty simple here.  All this is, is
2  clarifying that we will not use that record
3  improvement mechanism for the time that she was gone
4  because there is really nothing to improve, since
5  she was gone.
6  Q.   Okay.
7       MR. McKEEBY:  Let's go to the next one.
8  BY MR. McKEEBY:
9  Q.   So you, if I understand correctly, you were
10  going to have her sign an attachment?
11  A.   Yes, sir.
12  Q.   Can you generally describe that attachment?
13  A.   It's a -- it's a general legal release, and it
14  is a way to put this issue to bed.  It is we sign
15  the release and we are done.
16  Q.   Was that common in the context of last chance
17  agreements you had provided to other employees?
18  A.   Yes.
19  Q.   Let me ask you this.  Would the release have
20  still permitted -- if she had signed the release,
21  would she still have been permitted to pursue a
22  claim against the Union Local 556?
23       MR. HILL:  Objection, calls for a legal
24  conclusion.
25       THE COURT:  I will allow it if he has

Page 1724

1  personal knowledge.
2       THE WITNESS:  I'm not sure.
3  BY MR. McKEEBY:
4  Q.   Let me help you.
5       MR. McKEEBY:  Let's go to 40.3, and we
6  will flip back to this.
7  BY MR. McKEEBY:
8  Q.   Paragraph 2.  Can you just take a look at the
9  first -- look at how the -- what parties are being
10  released.  The first is Southwest Airlines, and what
11  is AirTran?
12  A.   AirTran is a former airline that was based in
13  Atlanta, Georgia, that Southwest Airlines acquired
14  in 2010, and we merged the AirTran operations and
15  employees into Southwest Airlines.
16  Q.   So the Union is not mentioned here, correct?
17  A.   No, sir.
18       MR. McKEEBY:  Let's go back to 40.1.  I
19  forgot what bullet we were on.  Maybe -- yes.
20  BY MR. McKEEBY:
21  Q.   The "in addition."  What does -- can you
22  explain to the jury what that means?
23  A.   This was intended to make it crystal clear that
24  moving forward, you need to comply with our company
25  policies.

Page 1725

1    "Any future violation of the Southwest Airlines
2  workplace bullying and hazing policing policy,
3  social media policy, or harassment, sexual
4  harassment, discrimination and retaliation policy
5  will result in termination."
6    So we wanted to have that in there to make it
7  very crystal clear our expectations moving forward.
8  Q.   And she had committed during the Step 2 hearing
9  that she wouldn't do it, correct?
10  A.   Yes, that is correct.  She told me she wouldn't
11  do this anymore.
12  Q.   Now, Ms. Carter -- if Ms. Carter has expressed
13  concerns that the company could terminate her
14  employment based on previous Facebook messages that
15  might have been uncovered, do you think those
16  concerns are legitimate?
17  A.   No.
18  Q.   Why not?
19  A.   Well, the reason is, is the last chance
20  agreement is designed to draw the line and move
21  forward.  Because you will see in the last chance
22  agreement, just reading it, it is designed to put
23  all of this to bed and call this resolved.  So there
24  would be no need to even look to previous things
25  because we are past that, we are moving forward.

Page 1726

1  Q.   Well, let's say someone had raised a complaint
2  about an old Facebook message that they had
3  uncovered and brought that to the company's
4  attention and it found its way to you.
5    How would that -- how would this agreement --
6  if she had signed it, of course -- how would that
7  have played out in that context?
8  A.   It would have been pretty simple, from my point
9  of view, because we have a -- we refer to the last
10  chance agreement and its intent, and it was to move
11  forward, not to look backwards.
12  Q.   All right.  And did Ms. Carter lose her rights
13  under the Collective Bargaining Agreement to grieve
14  any discipline that she thought was unfair if she
15  had signed this agreement?
16  A.   She did not release any rights under the
17  Collective Bargaining Agreement.
18    So that appeals process that I described, you
19  know, the Step 1, Step 2, that remains as part of
20  her ability to disagree or dispute any future
21  conflicts.
22  Q.   Okay.  Just for the sake of completeness, let's
23  go to the next -- or the remaining bullets.  We will
24  kind of handle this somewhat quickly.
25    What is the next one on the list?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 532 of 642   PageID 11473
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 6 July 12, 2022                        Pages 1727..1730

Page 1727

1 A.  "Prior to reinstatement, you will be required
2 to meet with in-flight operations director Mike
3 Sims."
4 Q.  Who is that?
5 A.  That would be yours truly.
6 Q.  What would -- what were you hoping to
7 accomplish with another meeting?
8 A.  My intent there was to bring her back to my
9 office in Dallas with her union representatives,
10 welcome her back, and help set her course to move
11 forward.
12 Q.  Okay.  What about the next bullet about the 24
13 months, what does that mean?
14 A.  It gave a life span to this document, the last
15 chance agreement.
16    So we were going to put this in her file so
17 everybody knew about the -- everybody who had a
18 business of need to know -- of her last chance
19 agreement.  And then at the end of the 24 months, we
20 are done and it was -- it would be removed and
21 pulled out.
22 Q.  Removed -- I'm sorry?
23 A.  Removed from her file, if she requested it.
24 Q.  What is the next bullet?
25 A.  A pretty standard statement on criminal

Page 1728

1 history.  That is, in the airline industry,
2 safety-sensitive employees are required to have a
3 10-year background check.
4    In her case, it wasn't necessary, because she
5 was not -- she was not an inactive employee, so
6 there was no need, but that is there in case that
7 the need comes up, it's required by the -- by the
8 Federal Government.
9 Q.  Understood.
10    The next bullet looks like just an
11 administrative process in terms of --
12 A.  Yeah.  We give their company ID back to them.
13    And then "contacting crew planning."  That is
14 our unit that builds work schedules.  So we would
15 ask her to contact the crew planning so they could
16 build her work schedule to get her back started to
17 work.
18 Q.  Okay.  And then what is the significance of the
19 next bullet, the grievance, I guess, that's the
20 union grievance being withdrawn?
21 A.  "The grievance regarding your termination will
22 be withdrawn and dismissed."
23    This again is designed to further reconcile
24 this issue and to have an understanding with all of
25 the parties, the Union and the company, that this

Page 1729

1 grievance has reached its conclusion, so it's --
2 terminated -- it's withdrawn.
3 Q.  And then the last bullet, I guess that just
4 kind of restates the settlement agreement that you
5 referenced?
6 A.  Yes, sir.  That is just a summary of the
7 following pages, which was the settlement agreement
8 that states that the grievant is releasing the
9 company, Southwest Airlines, and is going to
10 discharge Southwest Airlines from claims that she
11 may have had then or anything that may have
12 resolved -- I mean arisen from her termination.
13    So it's a pretty standard summary.
14       MR. McKEEBY:  Okay.  You can take that
15 down.
16 BY MR. McKEEBY:
17 Q.  Did you ever have any conversations with
18 Ms. Carter about the agreement to reinstate her?
19 A.  No, sir.  Our -- our agreement with the Union
20 is -- under the Collective Bargaining Agreement, is
21 the Union is her agent that represents her
22 throughout the grievance process.
23    And we do that to ensure fairness.
24    So I never had any direct conversations with
25 her because it wasn't -- she had union

Page 1730

1 representatives that were representing her.  And had
2 she wanted to have conversations with me, she could
3 have asked her union.  We could have arranged that.
4 Because we want to have union in the room, company
5 in the room at all times.
6    So I never had any conversations with her.
7 Pretty standard.
8 Q.  Has that happened before in the context of last
9 chance agreements?
10 A.  Yes.
11 Q.  There have been questions, and then that
12 process that you just described occurred?
13 A.  Yes.  Many times during a last chance
14 agreement, we will get an inquiry from the union
15 wanting -- most of the time it's clarification, but
16 other times they may want to modify or propose
17 changing the language, if you will.
18 Q.  So how did the agreement get to Ms. Carter, if
19 you know?
20 A.  Typical process is our labor relations
21 department, in this instance, it was the manager,
22 Melissa Burdine, sent it directly to the Union for
23 them to review with Ms. Carter.
24 Q.  Mr. Sims, what was your expectation with
25 respect to whether or not Ms. Carter would sign the

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 6 July 12, 2022                    Pages 1731..1734

Page 1731

1 last chance agreement?
2 A.  I thought she was going to sign it.
3 Q.  Why did you think that?
4 A.  She was very compelling when we met and she
5 asked me for her job back.  And she made commitments
6 to her union and she made commitments in my presence
7 that she wouldn't do this anymore.
8       And I took it at face value and I thought, I'm
9 going to give her another chance.  Because you
10 generally don't get chances or a do-over when you
11 send videos of aborted fetuses to people.
12      So I thought, okay, this is a risk, but I'm
13 going to offer her her job back.  And I was -- I was
14 very convinced that not only would she get her job
15 back, it would put this to bed, this whole issue.
16 Q.  I take it at some point you found out that she
17 declined the last chance agreement.
18 A.  Yes, sir.  Yes, sir.
19 Q.  What was your reaction when you found that out?
20 A.  I remember looking at my email and seeing a
21 message that she had declined, and I sat back in my
22 chair.  I was floored, to say the least.  I was
23 shocked.  Because this -- this case was so unique
24 and there was so much at stake because of the level
25 of harassment, I thought, my goodness, she will take

Page 1732

1 her job back because this is what she wants and we
2 can have a do-over.
3       And when she didn't take her job back, I was
4 beyond surprised.
5 Q.  Did you have any next steps to do when you
6 found that out?  Was there anything else in the
7 process that you needed to complete?
8 A.  No, sir.  My role was complete because when she
9 declined -- because she has -- as I had my options
10 to offer resolution, she has options as well under
11 her Collective Bargaining Agreement to process
12 through the grievance process.  So my role there was
13 complete.
14 Q.  Mr. Sims, did you base any decision in
15 connection with Ms. Carter's employment on the fact
16 that she was a Christian?
17 A.  No.
18 Q.  Did you hold that against her in any way?
19 A.  Absolutely not.
20 Q.  Prior to the Step 2 hearing process, were you
21 aware that Ms. Carter was what we called in the
22 parlance of this case a union objector?
23 A.  I did not know she was a union objector.
24 Q.  Do you know -- did you know at that time what
25 that meant?

Page 1733

1 A.  I do.
2 Q.  What was your -- let me ask you this:  Were you
3 aware of something called the recall process?
4 A.  Yes, I was aware of that.
5 Q.  What -- what -- what was your understanding of
6 the recall process?
7 A.  Well, as I mentioned earlier, Southwest
8 Airlines and TWU are separate entities.  And
9 Transport Workers Union is governed by elected
10 officers and they have their own set of bylaws and
11 constitution.
12      And their constitution has a section where if
13 they want to recall an officer, if you will, or, you
14 know, there is a mechanism for them to go through
15 this process as detailed in the TWU constitution to
16 recall one or more officers.
17      So at that point, that process was underway.
18 Q.  And prior to the Step 2 hearing that you have
19 described, were you aware of Ms. Carter's
20 involvement in that recall process?
21 A.  No.
22 Q.  Now.  During the Step 2 hearing, do I
23 understand correctly that you did become aware of
24 some of Ms. Carter's issues with union leadership?
25 A.  Yes.  She told me that she had been formally

Page 1734

1 objecting to the Union since 2013, her union
2 involvement and required membership.
3 Q.  What does that mean?
4 A.  Well, Southwest Airlines and the Union have
5 what we call a closed shop.  That means that when
6 you become a Southwest Airlines flight attendant,
7 you fall under the Collective Bargaining Agreement
8 and you are represented by the Union.
9       The law -- I'm not a lawyer, by the way, so --
10 but the law does require -- excuse me -- does allow
11 people to object and opt out of union involvement.
12      And Ms. Carter had let me know that she was an
13 objector and was not a member, per se, as most of
14 the other flight attendants were members.  Not all.
15 Q.  And did her status as an objector or her
16 support of the recall process have anything to do
17 with any decision you made with respect to handling
18 her grievance?
19 A.  No, it did not at all.
20 Q.  Mr. Sims, are you Christian?
21 A.  I am.
22 Q.  What church do you go to?
23 A.  I'm a member of First Baptist Church in
24 Midlothian, Texas.
25 Q.  And can you just very briefly describe your

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 534 of 642   PageID 11475
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                              Pages 1735..1738

Page 1735

1 personal beliefs regarding abortion to the jury.
2 A.  I am -- I'm pro life and very sympathetic and
3 compassionate to people that have been through what
4 Ms. Carter told me she had gone through because I am
5 very saddened.  I'm saddened by abortion.
6        MR. McKEEBY:  Your Honor, can we have a
7 quick sidebar?
8        THE COURT:  You may.
9        (Thereupon, the following proceedings were
10       had at sidebar:)
11       MR. McKEEBY:  I have been requested to
12 make an offer of proof on the arbitration award.
13       So what I would propose doing is asking a
14 few preliminary questions, and then have them object
15 to the award, and then we do an offer of proof.
16       THE COURT:  Outside the jury?
17       MR. McKEEBY:  Outside the jury.
18       THE COURT:  So that makes sense because
19 it's almost time for our break.
20       So I will let you ask those predicate
21 questions.  Obviously, I've ruled on keeping out the
22 arbitration award.  So object, I will sustain, we
23 will break, and then we can stick around.
24       Can we do the offer of proof at the end of
25 the break, just because we have been the record for

Page 1736

1 quite a while?
2        MR. McKEEBY:  Sure.  That's fine with me.
3        THE COURT:  Okay.  Sounds good.
4        (Thereupon, the sidebar was concluded and
5   the following proceedings were held in open
6   court:)
7        THE COURT:  Okay.  Mr. McKeeby, you can
8 ask those questions we discussed.
9 BY MR. McKEEBY:
10 Q.  Okay.  Mr. Sims, I think you mentioned --
11 sorry.  Some of the witnesses are overlapping a bit.
12 But I'm going to say that I think you mentioned that
13 there was an arbitration in connection with this
14 process?
15 A.  There was an arbitration --
16       THE COURT:  Hold on.
17       MR. HILL:  Objection, limine.
18       THE COURT:  Okay.  I will overrule that at
19 this point.
20 BY MR. McKEEBY:
21 Q.  Explain to the jury what the arbitration
22 involved.
23       MR. HILL:  Objection, limine.
24       THE COURT:  I will overrule.
25       You can answer.

Page 1737

1        THE WITNESS:  Yes, sir.
2        Again, as I mentioned earlier, in the
3 agreement that we have with the Union, there is an
4 appeals process and there are several steps in the
5 process.
6        We are governed by something called the
7 Railway Labor Act that requires airlines that are
8 under the -- companies that are under the RLA to
9 have an internal mechanism to manage disputes.
10       So in this case, when Ms. Carter chose not
11 to accept the last chance agreement, she appealed to
12 the Step 3, which is an arbitration, which basically
13 means that it is a more formalized hearing with
14 someone who presides over the hearing that is a
15 disinterested party.  They are, in effect, a judge,
16 if you will.  It's not court, but it's similar.
17       It is a very informal court, how is that?
18 BY MR. McKEEBY:
19 Q.  And was that person that you mentioned an
20 arbitrator?  Is that the arbitrator who you just
21 described?
22 A.  Yes.  Yes.  Yes.
23 Q.  And did you appear at the arbitration?
24 A.  I did.
25       MR. HILL:  Objection, limine.

Page 1738

1 BY MR. McKEEBY:
2 Q.  What was your --
3        THE COURT:  Hold on.  I'm going to rule on
4 it.
5        I will overrule that question.
6        You can answer.
7 BY MR. McKEEBY:
8 Q.  What was your role in the actual arbitration?
9        MR. HILL:  Objection, limine.
10       THE COURT:  I think now we are getting to
11 the point of detail where I will sustain the
12 objection.
13       Counsel, any further questions before we
14 take our break?
15       MR. McKEEBY:  I think this is a good time
16 for a break.
17       THE COURT:  Okay.  Let's take our morning
18 break, a little belatedly.
19       Same instructions.  You can talk to your
20 fellow jurors and court personnel, just not about
21 this case; don't talk to anyone else, and don't do
22 any research about the case.
23       We will probably take about a 15-minute
24 break, so we will see you in 15 minutes from now.
25 So I guess that is 11:07.  See you in 15 minutes,

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 535 of 642   PageID 11476
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1739..1742

Page 1739

1 thank you.
2       All rise for the jury.
3       (The jurors exited the courtroom.)
4       THE COURT:  Okay.  So we are going to take
5 about a 10-minute break, and then we will need to
6 ask some questions outside the jury's hearing in
7 what is called an offer of proof.
8       So there is a topic I have carved out of
9 the jury's hearing, but they are still entitled to
10 ask you questions about it on the record.
11      So we will come back in 10 minutes, we
12 will ask questions outside the jury's hearing, and
13 then we will bring them in when we are done.
14      Any other issues?
15      MR. McKEEBY:  No other issues.
16      THE COURT:  All right.  We will see you in
17 10 minutes.
18      (Recess.)
19      THE COURT SECURITY OFFICER:  All rise.
20      THE COURT:  Thank you.  You can be seated.
21      So we're on the record but outside the
22 jury's presence.  So we're going to do an offer of
23 proof on further details on arbitration in the
24 arbitration agreement.
25      Correct, Mr. McKeeby?

Page 1740

1       MR. McKEEBY:  Yes.
2       THE COURT:  Go for it.
3       MR. McKEEBY:  Thank you, your Honor.
4 I forget where we left off.
5           VOIR DIRE EXAMINATION
6 BY MR. McKEEBY:
7 Q.  You participated in the arbitration?
8 A.  That's correct.
9 Q.  You were a witness?
10 A.  I was a witness.
11 Q.  Were you cross-examined?
12 A.  I was.
13 Q.  Was that by Ms. Carter's lawyers?
14 A.  That is correct.
15 Q.  Now, do you recall who the arbitrator was?
16 A.  Arbitrator Lemons, L-E-M-O-N-S.  I don't
17 remember his first name.
18 Q.  How was he selected?
19 A.  There is a mechanism between the company and
20 the union to select arbitrators.  It is done via a
21 panel where the union submits names of arbitrators
22 they prefer, the company submit names of arbitrators
23 we prefer, and there is a strike method that lands
24 on a seated panel, if you will.
25      Once the panel is seated, it goes in rotation

Page 1741

1 between union picks and company picks.
2 Q.  Had you been in proceedings before Arbitrator
3 Lemons before this one?
4 A.  I believe I had.
5 Q.  Did you view him to be an experienced
6 arbitrator?
7 A.  I thought he was extremely experienced.
8 Q.  Did Ms. Carter have the opportunity to present
9 witnesses and documents at the arbitration?
10 A.  She did.
11 Q.  Did she have the opportunity to cross-examine
12 Southwest's witnesses?
13 A.  She did.
14 Q.  And did Arbitrator Lemons render a written
15 decision after the arbitration?
16 A.  He did.
17 Q.  And is that --
18      MR. McKEEBY:  Pull up 124.
19 BY MR. McKEEBY:
20 Q.  Does this appear to be the decision of
21 Arbitrator Lemons?
22 A.  It is.
23      MR. McKEEBY:  So move to admit.  I don't
24 know that --
25      THE COURT:  I will admit for the purpose

Page 1742

1 of this offer of proof, but not in front of the jury
2 as evidence that will go back to the deliberation
3 room.  Fair enough?
4       MR. HILL:  Yes, your Honor.
5       THE COURT:  Okay.  It is admitted for this
6 hearing.
7       MR. McKEEBY:  I'm done.  Thank you.
8       THE COURT:  Very good.
9       Okay.  That concludes the offer of proof.
10 We can bring in the jury.
11      I've got the jury screens muted, so
12 whenever y'all move to a new exhibit that is in
13 evidence --
14      MR. McKEEBY:  Okay.  You can take that
15 down.
16      (The jurors entered the courtroom.)
17      THE COURT:  Okay.  You can be seated.
18      And you can continue, Mr. McKeeby.
19      MR. McKEEBY:  I can, but I will not.  I
20 thank you for your time, Mr. Sims.
21      I will pass the witness.
22      THE COURT:  Okay.  So Mr. Greenfield, it
23 is your turn.
24
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1743..1746

Page 1743

CROSS-EXAMINATION
2 BY MR. GREENFIELD:
3 Q.  Good afternoon, Mr. Sims.
4 A.  Good afternoon, sir.
5 Q.  My name is Adam Greenfield and I represent the
6 Union in this matter.
7 A.  Yes, sir.
8 Q.  Okay.  I want to talk to you a little bit about
9 representation first.
10     My understanding is that Beth Ross and Becky
11 Parker represented Ms. Carter at the Step 2 hearing,
12 is that correct?
13 A.  That is correct, sir.
14 Q.  Okay.  And can you please describe the quality
15 of representation that you viewed by Ms. Ross and
16 Ms. Parker at that hearing?
17 A.  I have known Ms. Ross and Ms. Parker for many
18 years, and they are the utmost professionals, highly
19 capable, highly astute, and highly passionate about
20 their case.  I thought she was very well
21 represented.
22 Q.  And were they those things you described for
23 Ms. Carter?
24 A.  Did they --
25 Q.  Did they exhibit those characteristics in their

Page 1744

1 presentations?
2 A.  Absolutely.  Absolutely.  Becky Parker
3 especially was very passionate about ensuring that
4 Ms. Carter was taken care of in terms of their
5 disposition of the case.
6       MR. GREENFIELD:  I think we stepped on
7 each other a little bit, and my apologies to
8 Ms. Willis for that.
9 BY MR. GREENFIELD:
10 Q.  Let's ask it again so we can have a clear
11 record for the future.
12     The qualities you described in Ms. Parker and
13 Ms. Ross, did they exhibit those in the
14 representation of Ms. Carter?
15 A.  I believe they did.  I thought they were
16 outstanding and were very compelling in terms of how
17 they came prepared and how they provided
18 representation for her.
19 Q.  You talked about the last chance agreement
20 earlier with Mr. McKeeby.  Do you remember that?
21 A.  I do.
22 Q.  And did you discuss that last chance agreement
23 with either Ms. Ross or Ms. Parker at any point?
24 A.  I did not.
25 Q.  Is there anything that would have -- that could

Page 1745

1 have been represented by Ms. Carter or Ms. Parker or
2 Ms. Ross that would have changed the last chance
3 agreement that you offered to Ms. Carter?
4 A.  That I don't know.  We never had that
5 conversation.
6 Q.  Would you have considered a reduction in the
7 24-month probation letter?
8 A.  That's possible.  We just never had that
9 conversation.
10 Q.  Okay.  Could you testify to the jury if
11 there's -- if you would have taken that out
12 completely, if asked?
13     MR. HILL:  Objection.
14     THE WITNESS:  I don't think I could have
15 taken it out completely.
16     THE COURT:  Hold on.  There was an
17 objection.
18     MR. HILL:  Relevance.
19     THE COURT:  Okay.  I will overrule and
20 allow the answer to stand.
21     New question.
22     MR. GREENFIELD:  You sustained the
23 objection?  I'm sorry.
24     THE COURT:  I overruled it, but the
25 objection came after the question, so I had to say

Page 1746

1 what I was doing to the question and the answer.  I
2 let it stand.  So you can ask a new question.
3     MR. GREENFIELD:  Yes, your Honor.
4 BY MR. GREENFIELD:
5 Q.  So my understanding, based on what you said, is
6 that you don't think you would have removed that
7 stipulation?
8 A.  No, sir.
9 Q.  Why not?
10 A.  Well, Ms. Carter's actions that led to her
11 termination were very egregious, very disturbing,
12 and were very much against the principles of our
13 company.  Basically the principles of just treating
14 others with respect.
15     So that 24-month clause would not have been
16 removed because that was the purpose of the last
17 chance agreement, to have something in place to
18 ensure that Ms. Carter knew moving forward that
19 these were the expectations further highlighted to
20 ensure that she was clear on the path she needed to
21 take.
22 Q.  And your testimony earlier is that she
23 expressed remorse and that she wouldn't do it again?
24 A.  That is correct.
25 Q.  Fair to say this is a way to ensure that?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 537 of 642   PageID 11478
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1747..1750

Page 1747

1 A.  That is correct. It's, you know, in layman's
2 terms, it's our insurance policy.
3 Q.  Okay.
4      At any point during the Step 2 process, did
5 Ms. Carter ever try to convince you that the
6 messages she sent to Ms. Carter were fake or not
7 actually sent by her?
8 A.  No, she didn't. That was actually pretty
9 established from the get-go, that she admitted to
10 them.
11      MR. GREENFIELD:  Can you pull up
12 Exhibit 120?
13 BY MR. GREENFIELD:
14 Q.  Do you recognize this document, Mr. Sims?
15 A.  I do.
16 Q.  Okay. And if I can turn your attention to the
17 very bottom of the very last paragraph. Do you see
18 that paragraph?
19 A.  Yes, sir.
20 Q.  Okay. And above you said you were going to put
21 it in the file.
22 A.  Yes.
23 Q.  What did this communication mean to you?
24 A.  Well, what it was, was Ms. Carter sent this
25 email to her union representative asking to forward

Page 1748

1 this to me. And I'm assuming that that was in
2 consideration of her case or to provide additional
3 information.
4      So her union representative, Beth Ross, sent it
5 to me, and then I sent it to labor relations to add
6 to the overall file.
7 Q.  What is your impression of what, if any,
8 Ms. Carter was trying to represent to you by
9 presenting this?
10 A.  I don't have really an impression other than my
11 thought was she was wanting us to have additional
12 information.
13 Q.  Okay. Ms. Carter testified yesterday that you
14 told her that Southwest Airlines should never have
15 gotten involved in this case.
16      Did you ever say that to Ms. Carter?
17 A.  Not in those words. What I told her was
18 Southwest Airlines does not like to get involved in
19 disputes between union leaders and the constituents
20 they represent, but in this case, we were forced
21 into it.
22 Q.  Okay.
23      MR. GREENFIELD:  No more questions. Thank
24 you, sir.
25      THE COURT:  Thank you, Mr. Greenfield.

Page 1749

1      Mr. Hill, Mr. Pryor, Mr. Gilliam.
2      MR. HILL:  No questions, your Honor.
3      THE COURT:  Okay.
4      Any need to ask questions on based on
5 Greenfield's questions, Mr. McKeeby?
6      MR. McKEEBY:  No.
7      THE COURT:  Any need to reserve him to
8 call him back?
9      MR. HILL:  No.
10      THE COURT:  Okay.
11      You are excused from your testimony.
12 Thank you for being here.
13      THE WITNESS:  Thank you, sir.
14      MR. HILL:  Hold on. Maybe. We may need
15 to reserve him. I'm sorry.
16      THE COURT:  Okay. So what I will ask you
17 to do is you are excused from the courtroom. They
18 might need to call you back.
19      In light of that, I'm going to ask you not
20 to talk to anyone about the case in the meantime.
21      THE WITNESS:  Yes, your Honor.
22      THE COURT:  Thank you. Okay.
23      MR. McKEEBY:  Does that mean he can leave
24 the courthouse?
25      THE COURT:  Sidebar?

Page 1750

1      MR. McKEEBY:  Okay.
2      (Thereupon, the following proceedings were
3 had at sidebar:)
4      THE COURT:  So the question would be one
5 on timing. I have no problem with him leaving the
6 courthouse unless it looks like we're going to get
7 to the plaintiff's rebuttal case soon. I haven't
8 watched to see -- this is your last witness?
9      MR. McKEEBY:  Yes.
10      THE COURT:  You are about to rest.
11      So then you are about to go.
12      I know you have called Sims. You're going
13 to call Carter?
14      MR. GREENFIELD:  I don't intend to recall
15 Sims. I just intend to call Ms. Carter.
16      THE COURT:  Okay. Do you have any guess
17 as to how long you will go with Carter?
18      MR. GREENFIELD:  If everything goes to
19 plan, 15 minutes, but probably an hour.
20      THE COURT:  So I would say in light of
21 that, can we ask him to stay within 15 minutes of
22 the courthouse? I don't want to tell him he can't
23 leave the courthouse. We will probably need him
24 shortly after lunch is my guess.
25      MR. PRYOR:  Your Honor, part of this will

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 538 of 642   PageID 11479
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1751..1754

Page 1751

1 depend on when they rest, after they do all of that.
2        By the way, I found a very interesting
3 legal discussion.  I'm going to ask the Court for
4 some more time.  If I don't get more time, I won't
5 call him back.  If I get more time, I will consider
6 calling him back.  But we will need more time.
7        THE COURT:  I understand your request.
8        So let me ask you this while we are at
9 sidebar.  When he rests, are you going to need to
10 make a motion outside the presence of the jury --
11       MR. PRYOR:  Yes.
12       THE COURT:  -- or you going to wait to
13 make a motion until he rests?
14       MR. PRYOR:  I think procedurally, when he
15 rests, we have to -- now, the Court can certainly
16 say, I will hold off until -- it is up to you, but I
17 think we technically have to make our motion at that
18 time, and you can hold it in an abeyance and hear it
19 after the Union.  It's totally up to you.
20       THE COURT:  Okay.  So what I will do is we
21 need to go back on the record for you to rest,
22 right, you have no more witnesses, and then we will
23 kick the jury out again for you to make your motion.
24       And I will hold it abeyance until after I
25 hear the Union, just keep them out as briefly as

Page 1752

1 possible.
2        I can't stop you from making your motion.
3        MR. PRYOR:  I'm not trying to jerk this
4 gentleman's chains.  If you can give me two more
5 hours, I would love to spend some time with him.  If
6 you can only give me one more hour, 45 minutes, I'm
7 probably not going to call him.
8        THE COURT:  Okay.  Let's go back and do
9 our thing.
10       MR. GREENFIELD:  Your Honor, can I make a
11 request to Mr. Frye that after he rests and before
12 we start, I can just get a shot clock of where we
13 stand with everybody, just so I know going in if I
14 may need to request more time.
15       THE COURT:  I will ask them.  It's
16 multiple timekeepers and they calibrate against each
17 other.  So I will ask while we're doing your motion.
18       MR. GREENFIELD:  I just need a rough one.
19       MR. PRYOR:  I want to make sure I
20 understand.  When he rests, I just stand up and say,
21 We have an issue outside the presence of the jury.
22       THE COURT:  Sure.
23       (Thereupon, the sidebar was concluded and
24       the following proceedings were held in open
25       court:)

Page 1753

1        THE COURT:  Okay.  So with that, now I
2 need to ask Mr. McKeeby, do you have any other
3 witnesses for Southwest's case?
4        MR. McKEEBY:  No, your Honor.  Southwest
5 rests.
6        THE COURT:  Okay.  So do you have a
7 motion?
8        MR. PRYOR:  Your Honor, at this time we
9 have a matter to handle outside the presence of the
10 jury.
11       THE COURT:  Got it.
12       So any time anyone says the word "rest,"
13 then I've got to kick y'all out again, but we will
14 try to keep it as short as possible.
15       So don't talk to anyone about the case,
16 just talk to your fellow jurors and court personnel,
17 not about the case.  Don't do any research.
18       We will see you as soon as we can.
19       All rise.
20       (The jurors exited the courtroom.)
21       THE COURT:  Okay.  Y'all can be seated.
22       As soon as that door is closed, you can
23 go, Mr. Pryor -- Mr. Gilliam.
24       MR. PRYOR:  My lawyer.
25       MR. GILLIAM:  At this time, Plaintiff

Page 1754

1 Carter would move for a directed verdict on all
2 claims against Southwest Airlines.
3        THE COURT:  All right.  You can elaborate
4 as much or as little as you want to.  It's entirely
5 up to you.
6        MR. GILLIAM:  Well, so let's start first
7 with the RLA retaliation claims.
8        There is no question that -- let me move
9 up to the podium here for the sake of clarity.
10       There is absolutely no question that
11 Ms. Carter was fired and that she engaged in
12 RLA-protected activity.  All of her Facebook videos
13 and messages to President Stone are nothing but RLA.
14 Well, they are RLA-protected activity.  They do
15 happen to be protected by Title VII, we will get to
16 that in a minute.
17       But they were all activity opposing what
18 the Union was doing at the Women's March.  They were
19 objecting to how the Union was spending money.
20       And the -- both the videos and the
21 pictures demonstrated that, demonstrated
22 Ms. Carter's opposition.  They were part of her
23 protected activity.
24       And then as to the next factor under
25 Rocello, her RLA-protected activities were a

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 539 of 642   PageID 11480
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                        Pages 1755..1758

Page 1755

1 motivating factor for Southwest's decision to
2 terminate her employment.
3        There is -- there is no dispute or
4 question regarding that either.  I think Mr. --
5 Mr. Schneider has testified that, yes, they fired
6 her for her Facebook videos and messages to Audrey
7 Stone.  And that's all RLA-protected activity.
8        We had discussed Write-Line at another
9 point.  I know that's probably still an outstanding
10 issue, but I would say this.  While Southwest may be
11 allowed a legitimate non-discriminatory reason as an
12 affirmative defense, it doesn't have one.  Its only
13 defense is a discriminatory reason, that is, the
14 other discriminatory reasons that would come in
15 would be her Title VII rights and her religious
16 expression.
17        So shifting to that, the first RLA -- I'm
18 sorry, the first Title VII religious discrimination
19 claim against Southwest.  So Southwest fired
20 Ms. Carter -- that's the conflict with the social
21 media policies -- because of her sincerely-held
22 religious beliefs.  Ms. Carter has testified to her
23 religious beliefs.
24        And even from Mr. Sims to Mr. Schneider,
25 they all recognized that, yes, her religious belief

Page 1756

1 articulated at the fact-finding meeting was that she
2 wanted to share her message that abortion is the
3 taking of life, contrary to the will of God.
4        Southwest fired her for that.
5        And moving on to the failure to
6 accommodate claim, Southwest was perfectly aware at
7 the fact-finding meeting of Ms. Carter's need for an
8 accommodation.  Mr. Schneider had received training
9 from employee relations to recognize any sort of
10 protected categories including religion, but he --
11 he didn't do anything about it.
12        Under the acting policy, a leader who is
13 aware of any employee's need for accommodation must
14 report to the ACT team.  And that didn't happen.
15        There is no undue hardship question here
16 either because Southwest can't show, and hasn't
17 shown, that there was no possible accommodation that
18 they could make, so they would have had to terminate
19 Ms. Carter's employment.
20        No.  It is clear that what they could have
21 done, they could have asked Ms. Carter to remove the
22 nexus photos to Southwest, and that would have
23 resolved the problem for her Facebook posts on her
24 website.
25        She could have posted a disclaimer.  None

Page 1757

1 of those would have imposed more than a di minimis
2 burden on the company.  They could have done that
3 easily and accommodated Ms. Carter.
4        But instead they fired her, and firing an
5 employee is synonymous with failure to accommodate.
6        So I think I have covered all of the
7 elements.  If you have any questions, I'm happy to
8 answer them.
9        THE COURT:  Thank you.  I don't have any
10 questions, Mr. Gilliam.
11        I'm going to save a ruling for this until
12 after the Union rests and you've made a motion
13 regarding the Union in the interest of saving the
14 jury's time.  But I do need to, out of fairness, see
15 if Mr. McKeeby or Mr. Morris have a response to
16 this, briefly.
17        MR. McKEEBY:  Okay.  Brief response.
18        I think that the entirety of the argument
19 is premised under -- or on the notion that all of
20 the posts were, per se, and completely protected
21 under the RLA, at least as to that claim, as the
22 Court is well aware, we object strongly to that
23 notion.  The posts are subject to multiple
24 interpretations which the jury should be allowed to
25 assess in terms of whether or not these were --

Page 1758

1 these videos were an expression of religious belief
2 or union activity or just personal animosity toward
3 Stone, among possible interpretations.
4        Moreover, the lack of evidence of
5 motivation in this case would be a reason to deny
6 the directed verdict.
7        As to the accommodation claim, there was
8 no reason for Southwest to be aware that any
9 conflict existed between Ms. Carter's religious
10 beliefs or practices and the application of its
11 policy.
12        She never requested an accommodation and
13 it wasn't apparent to Mr. Schneider or anyone else
14 that this was a situation where Southwest could or
15 should have simply overlooked its policies and the
16 obligations under those policies to protect its
17 employees in the context of conduct such as that
18 engaged in by Ms. Carter.
19        Finally, we believe there is more than
20 sufficient evidence of undue hardship, particularly
21 with respect to Mr. Schneider's testimony of the
22 impact on employee morale and employee relations in
23 general should employees like Ms. Carter be allowed
24 to disseminate posts like this to others in the
25 workforce.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 540 of 642   PageID 11481
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                    Pages 1759..1762

Page 1759

1      THE COURT:  Understood.  Okay.  Thank you.
2      So I will save my ruling on this until
3  after we get the motion on the Union when the Union
4  rests.
5      So in light of that, anything else before
6  we call back in the jury and we hand the baton to
7  you, Mr. Greenfield?
8      MR. GREENFIELD:  No, your Honor.
9      THE COURT:  Let's bring them back in.
10      And Mr. Greenfield, you are going to call
11  who first --
12      MR. GREENFIELD:  Charlene Carter.
13      THE COURT:  Ms. Carter, can you go ahead
14  and come up to the witness box?  They are going to
15  call you as the first witness during their case.  So
16  while the jury is getting ready, you can come on up.
17      (The jurors entered the courtroom.)
18      THE COURT:  Okay.  You can be seated.
19      And so now that Southwest has rested, it's
20  your turn to present the Union's case,
21  Mr. Greenfield, and you have called as your first
22  witness --
23      MR. GREENFIELD:  Charlene Carter.
24      THE COURT:  Ms. Carter, if you could stand
25  back up.

Page 1760

1      Mr. Frye, can you administer the oath to
2  Ms. Carter once more?
3      (CHARLENE CARTER was duly sworn by the
4  Clerk.)
5      THE COURT:  Y'all know the instructions,
6  so go for it.
7          DIRECT EXAMINATION
8  BY MR. GREENFIELD:
9  Q.  Good afternoon, Ms. Carter.
10  A.  Hello.
11  Q.  Do you recall, when we spoke previously, that
12  you and I and the jury were attempting to get on the
13  same page as far as what you felt the Union did
14  wrong to you.  Is that fair?
15  A.  Yes.
16  Q.  Okay.  Today I would like to start with asking
17  you if you were in the courtroom during my opening
18  statement?
19  A.  Yes.
20  Q.  And did you hear me say that I felt this case
21  was about you being able to say whatever you wanted
22  whenever you wanted and however you wanted to in the
23  workplace?
24      Do you remember that statement?
25  A.  I remember that statement.

Page 1761

1  Q.  And do you agree with that?
2  A.  I agree with the being the union president, I
3  can speak to my union in any way that I see fit.  We
4  pay them to represent us.  And so when it comes to
5  my union, yes.
6  Q.  Okay.  And we will explore that a little bit
7  more.
8      But just to take a step back, in 2013, you
9  objected to being a union member, correct?
10  A.  That is correct.
11  Q.  And as kind of in line with what you just
12  testified, even though you objected to being in the
13  union, you still wanted a say in how the union was
14  governed and how they spent their funds, correct?
15  A.  That is correct, because I still paid dues.
16  Q.  And from 2013 to 2017, you were involved with
17  what you felt was activism against union corruption
18  at 556, is that fair?
19  A.  Yes.
20  Q.  And you talked about it on Facebook?
21  A.  Yes.
22  Q.  And you threatened to decertify the union?
23  A.  I said the word "decertify."  I think we need
24  to get rid of TWU, yes, I do.  There has been too
25  many problems.  They don't work for us.

Page 1762

1  Q.  So fair to say you threatened to decertify the
2  union?
3  A.  I didn't threaten.
4  Q.  Oh.  Okay.
5  A.  I said the word "decertify," and that means
6  replacing TWU.  Yes, I have called for that for a
7  long time.
8  Q.  Exactly.  For several years, yes?
9  A.  From the time that I started seeing what they
10  do to their own members, yes.
11  Q.  And you supported a recall petition?
12  A.  I voiced my support for that recall position.
13  Q.  You supported it?
14  A.  I supported the recall, yes.  Didn't sign it,
15  but I supported it.
16  Q.  Understood.
17      And you opposed the first tentative contract
18  agreement that Audrey Stone's administration had
19  negotiated, correct?
20  A.  Didn't get to vote, but yes, I opposed it.
21  Q.  And you sent Instant Messages to Audrey Stone
22  as well, correct?
23  A.  I sent Instant Messages to my president of TWU
24  556, yes, I did.
25  Q.  And through all of that, from 2013 to the

Page 1763

1 beginning of 2017, you maintained a clean
2 disciplinary file, isn't that right?
3 A.   That is correct.
4 Q.   Not a single complaint from another flight
5 attendant or Southwest employee, right?
6 A.   My file?
7 Q.   Yes, ma'am.
8 A.   As far as I know, yes.  I never got called in.
9 Q.   Okay.
10     So let's talk about life after February of
11 2017, okay?
12 A.   Okay.
13 Q.   That's when you started sending a very specific
14 type of message to a very specific employee,
15 correct?
16 A.   I don't know what you are talking about.
17 Q.   Okay.  Well, I'm talking about the graphic
18 abortion videos you sent to Ms. Stone.
19 A.   The baby abortion videos, yes, to my union
20 president, after they went to the union -- or the DC
21 march with Planned Parenthood, yes, I did.
22 Q.   And these are not my words, you described the
23 video as graphic yourself, isn't that right?
24 A.   That was on my personal Facebook page.  That
25 was not to her.

Page 1764

1 Q.   You don't agree that it's a graphic video?
2 A.   It is a depiction of what happens to a precious
3 little baby after it's been aborted.
4 Q.   And do you find that to be graphic?
5 A.   I find that to be graphic on my personal
6 Facebook page.  For anybody that sees the word
7 "graphic," they can scroll through it or watch the
8 video.
9     But when Ms. Stone took those women to that
10 march, she was subjected to the very same things as
11 what I sent her from pro life groups there at the
12 march.
13     So ask your question again.
14     MR. GREENFIELD:  I'd make an objection to
15 speculation and move to strike Ms. Carter's response
16 about what Ms. Stone would have viewed at the march.
17     THE COURT:  I will sustain that.
18     I will strike that one sentence.
19     Jury, please disregard that last sentence.
20 BY MR. GREENFIELD:
21 Q.   Ms. Carter, you don't know what Ms. Stone saw
22 at the march, do you?
23 A.   Not specifically, but I will also tell you,
24 too, she made me feel sick, as far as I'm concerned,
25 taking those women and wearing those pussy hats

Page 1765

1 within the march.
2     MR. GREENFIELD:  Objection, your Honor,
3 non-responsive.  Move to strike the testimony.
4     THE COURT:  I will overrule that.
5 BY MR. GREENFIELD:
6 Q.   This was the first time you had ever sent a
7 coworker a video of an aborted baby, right?
8 A.   I sent my union president, this was the only
9 time, and it was in reference to what she did by
10 taking those women to that march, yes.
11 Q.   Well, you don't dispute that Ms. Stone was a
12 coworker, correct?
13 A.   She was our union president first and foremost
14 at that particular time.  Was she a flight attendant
15 prior to that and flew regular trips, as the rest of
16 you did?  Yes.
17 Q.   Are you telling the jury today that you don't
18 believe Ms. Stone was a coworker?
19 A.   She was my union president at that time.  She
20 was a coworker in the sense that she still worked at
21 Southwest Airlines, but she was using -- she was in
22 the capacity of the union president.
23 Q.   But she was a coworker, correct?
24     MR. PRYOR:  Object, asked and answered.
25 She just answered.

Page 1766

1     THE COURT:  Hold on.  Speaking objection.
2     I will sustain that.
3     New question.
4     MR. GREENFIELD:  Yes, your Honor.
5 BY MR. GREENFIELD:
6 Q.   And after you sent those videos to Ms. Stone,
7 like clockwork, and also for the first time, you got
8 a call from the company to answer a complaint
9 against you, correct?
10 A.   Yes, I did.
11 Q.   Okay.  And you knew exactly what it was for,
12 didn't you?
13 A.   When they referenced on the call -- and this is
14 the first call I got was from Meggan Jones -- she
15 said it had to do with a post.
16     The second message I received was from Ed
17 Schneider, and they said that it had to do with a
18 post that was sent to a -- what they called just
19 another flight attendant coworker.  They didn't
20 reference that it was my union president.
21     But I never sent anything else to anybody else
22 but my union president.
23 Q.   That's right, Ms. Carter.  You knew exactly
24 what it was about when they called, didn't you?
25 A.   When they made reference to it, yes, I did.  I

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 542 of 642   PageID 11483
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1767..1770

Page 1767

1 mean --
2 Q.  But they didn't reference Ms. Stone in the
3 call, did they, that initial call?
4 A.  When they said that it was a post that I had
5 sent, I knew -- I didn't send any other posts to
6 anybody else.  So I knew.  And she's the only one
7 that I communicated with.  My president.
8 Q.  Thank you.  That's my point.
9    And there was discussion earlier by Ms. Jones
10 and Mr. Sims about remorse.
11    Are you -- let me just ask you point blank, are
12 you remorseful or sorry for the manner in which you
13 communicated to Mr. Stone?
14 A.  Not in the manner that I communicated because I
15 could have, if I was a member, I could have taken
16 that to a union membership meeting, taken the same
17 exact post, said the same exact things in that
18 membership meeting, and it would have been
19 protected.
20    Any communication further should have been
21 protected as well because it always had been
22 protected.
23 Q.  And did you agree with Ms. Jones's comment that
24 you showed no remorse for your actions?
25    MR. PRYOR:  Object, just asked and
answered.

Page 1768

1    MR. GREENFIELD:  This is a different
2 questions.  This is a different question, your
3 Honor.
4    THE COURT:  Yes, it is different.  You can
5 answer it.
6    THE WITNESS:  I showed no remorse in the
7 fact that they asked me in the manner that I sent
8 it.  No, I don't -- I'm not remorseful for objecting
9 to how my union was representing me and many other
10 coworkers at a march that I disagreed with.
11 BY MR. GREENFIELD:
12 Q.  Okay.  And my question is a little bit
13 different, so let's be clear for the jury.
14    I'm not asking you about whether you are
15 remorseful about what you were opposing.  I'm asking
16 if you were sorry for the way you approached the
17 situation.
18    MR. PRYOR:  I object.  Maybe it's just me,
19 it sounds like the third time.  The fact he can use
20 one --
21    THE COURT:  Hold on.  That's a speaking
22 objection.
23    MR. PRYOR:  Sorry.
24    Object, asked and answered.
25    THE COURT:  I will sustain that.

Page 1769

1 BY MR. GREENFIELD:
2 Q.  Mr. Sims up here, when he was up here, he
3 expressed to the jury that he felt you were sorry
4 for the way that you communicated to Ms. Stone.
5    Did you hear that testimony?
6    MR. PRYOR:  Object, mischaracterizes his
7 testimony.
8    THE COURT:  I will sustain that.
9    You can reask it in a different way.
10 BY MR. GREENFIELD:
11 Q.  Do you believe you expressed remorse to
12 Mr. Sims over the way you communicated with Audrey
13 Stone?
14 A.  The remorse that I had that I expressed was
15 that if it hurt her as a person, that I was sorry
16 for that.  But I still have that ability to
17 communicate; if she decides to take other people,
18 that we pay for, to a march like that, I'm not sorry
19 for that.
20    I'm just going to tell you right now, we've
21 always had open communication without the company
22 being involved in union business.
23    So what I probably would have done was opted
24 back in and taken that complaint to a union meeting
25 so that the company could not and would not, because

Page 1770

1 they couldn't have used it under the social media
2 policy that they claim that they used it for.
3    And we were being targeted by the union and
4 their representatives regarding social media.
5    MR. GREENFIELD:  Objection, move to
6 strike, non-responsive.  Move to strike everything
7 that did not have to do with my question involving
8 remorse.
9    THE COURT:  I will sustain that, jury.
10 Please disregard any portion of the answer that did
11 not relate to remorse.
12 BY MR. GREENFIELD:
13 Q.  Ms. Carter, I understand that.  I think the
14 jury understands those last points you were trying
15 to make.  But I would like to just stick to the
16 questions I'm asking, okay?
17 A.  Uh-huh.
18 Q.  In fact, in an earlier proceeding to get your
19 job back, you actually admitted that sending the
20 post to Ms. Stone was a mistake, isn't that correct?
21 A.  The mistake that I made was not going into the
22 union office.  But still the communication that was
23 rendered through the Facebook messages was the only
24 way that I was going to be able to make -- or
25 through email -- was the only way that I was going

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 543 of 642   PageID 11484
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Pages 1771..1774

Page 1771

1  to be able to make my statement and my dislike
2  heard.
3  Q.  Did you previously offer this same explanation
4  for what you described as a mistake?
5  A.  I don't understand that question.
6  Q.  You testified, just now, that it was a mistake,
7  but not that type of mistake, not the type of
8  mistake I'm talking about, correct?
9  A.  The mistake would be the fact that they were
10  using social media to target us, and that's exactly
11  what happened.
12     If I were to have done it again, I would have
13  gone into her office at the 556 office building and
14  spoken with her, and the company couldn't have used
15  the social media part of it to fire me.
16  Q.  Okay.
17  A.  It's protected speech between me and my union.
18  Q.  I understand that you believe it's protected
19  speech, Ms. Carter.
20     I'm talking about remorse and mistakes and
21  apologies.  That's what we are talking about.
22  That's what I'm talking about right now.  Okay?
23  A.  Correct.
24  Q.  All right.  And previously, at that earlier
25  proceeding to get your job back, you did, in fact,

Page 1772

1  say that you were sorry for what you did, isn't that
2  right?
3     MR. PRYOR:  Object, asked and answered.
4  She just explained what she meant.
5     THE COURT:  Hold on.  That's a speaking
6  objection.
7     MR. GREENFIELD:  Talking about a different
8  proceeding, your Honor.
9     THE COURT:  I will allow her to answer if
10  you clarify which proceeding.
11  BY MR. GREENFIELD:
12  Q.  At the arbitration that was discussed earlier.
13     MR. PRYOR:  Object to the arbitration.
14  Object, continuing limine issue.
15     THE COURT:  I will grant you a running
16  objection, and I will see what the question is.
17  BY MR. GREENFIELD:
18  Q.  During that hearing, isn't it true that you
19  testified --
20     MR. PRYOR:  Object, your Honor.  He's now
21  using testimony --
22     THE COURT:  We don't do speaking
23  objections.
24     MR. GREENFIELD:  If we can approach, your
25  Honor.

Page 1773

1     MR. PRYOR:  I have to approach.
2     (Thereupon, the following proceedings were
3     had at sidebar:)
4     THE COURT:  No speaking objections, right?
5  If we do speaking objections and you lose them, I
6  count that time against you.
7     MR. PRYOR:  Okay.  And I can't afford it.
8     THE COURT:  I know.  So just speak in
9  code, right?  If it's the arbitration --
10     MR. PRYOR:  I quickly said limine.
11     THE COURT:  -- details in the arbitration.
12     So these are questions of what she said at
13  the arbitration hearing.
14     MR. GREENFIELD:  I intend to impeach her.
15  Her testimony is that she's not -- she's admitting
16  that -- she is testifying that she didn't say that
17  the posts were a mistake and that she's not sorry
18  for what she's done.
19     MR. PRYOR:  That's not what she said.
20     MR. GREENFIELD:  Excuse me.
21     That is in direct contradiction to what
22  she testified at the arbitration hearing, and I
23  intend to impeach her on it.
24     THE COURT:  You can't bring up the
25  arbitration hearing.  It's too detailed.  I limined

Page 1774

1  out the arbitration hearing, details of the
2  arbitration hearing.
3     MR. GREENFIELD:  Okay.  But this --
4  details of the arbitration.  This is about her
5  specific testimony.
6     This is for a matter of impeachment.  I'm
7  not asking about any specifics other than for
8  impeachment, and I'm absolutely allowed to impeach
9  her on her prior sworn testimony.
10     MR. PRYOR:  Then do it properly.
11     First of all, I don't think that the value
12  of this -- she's testified what her mistake was,
13  over and over.  Her mistake was that she let them
14  take advantage of social media policy, not that what
15  she did was wrong.
16     MR. GREENFIELD:  And that's the
17  impeachment because --
18     MR. PRYOR:  If this Court thinks that
19  getting into the arbitration at that level is
20  important enough on that issue, we disagree.  But if
21  so, he's going to have to lay the predicate.  He's
22  going to have to --
23     THE COURT:  So I'm with you on the second
24  point.  I think you can tread carefully without
25  getting into what was involved in the arbitration

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1775..1778

Page 1775

1 and what the arbitration decision was, but you've
2 got to do it properly.
3        MR. GREENFIELD:  I intend to impeach her
4 with her prior testimony right now.
5        MR. PRYOR:  But he has to show her the
6 testimony and ask her if it's inconsistent.  He's
7 got to do it just like he would a deposition.  You
8 don't just start reading it.
9        THE COURT:  That's correct.  At this
10 point, I think she has to see it, right?
11       MR. PRYOR:  And they have to establish the
12 transcript --
13       THE COURT:  There's one question left.  Is
14 that consistent with your prior statement in
15 arbitration?  Then you have to show her.  That's the
16 last question you can ask before showing her.
17       MR. PRYOR:  I don't think he has to use
18 the word "arbitration," but I understand.
19       (Thereupon, the sidebar was concluded and
20       the following proceedings were held in open
21       court:)
22       THE COURT:  Okay.  So you can ask the
23 question we discussed at sidebar, Mr. Greenfield.
24       MR. PRYOR:  Your Honor, time on that?
25       THE COURT:  Keep going.  Ask the question.

Page 1776

1 BY MR. GREENFIELD:
2 Q.  Ms. Carter, the explanation you are giving
3 about your contrition about whether you made a
4 mistake or whether you were sorry, do you believe
5 that to be consistent with prior testimony you gave
6 at the arbitration hearing?
7        MR. PRYOR:  Object.  He just misstated her
8 testimony, not only at the arbitration, but what she
9 just said.
10       THE COURT:  I will sustain that.
11       You can rephrase it.
12 BY MR. GREENFIELD:
13 Q.  It's your testimony that it wasn't a mistake,
14 correct?
15       MR. PRYOR:  Object, asked and answered.
16       THE COURT:  I will allow this.
17       THE WITNESS:  In what --
18 BY MR. GREENFIELD:
19 Q.  Sending the message to Ms. Stone, it's your
20 testimony today that it was not a mistake?
21       MR. PRYOR:  Object, mischaracterizes
22 testimony.  The question has been asked and answered
23 three times.
24       THE COURT:  No, you put him here.  So yes,
25 you can be here.  So you can get an answer to your

Page 1777

1 question.
2        THE WITNESS:  That it was a mistake to
3 send it to her?
4 BY MR. GREENFIELD:
5 Q.  Yes, ma'am.
6 A.  I just said that.  The mistake was to use it
7 under the form of a social media portion.  I should
8 have taken it to her union office and presented it
9 to her, and then the company would have never been
10 able to get involved in the union business.
11 Q.  And do you --
12 A.  They use social media.
13 Q.  I'm sorry, I don't mean to cut you off.
14    Do you believe that is consistent with your
15 prior testimony at the arbitration proceeding?
16 A.  Honestly, I do not remember all of what I said.
17 That's been five years ago.  I would have to look at
18 it in context.
19    I will say this.  I did say I was sorry if it
20 affected her the way that she is claiming that it
21 affected her.  But again, they subjected us to them
22 taking our money and representing us in a march that
23 we did not agree with.
24 Q.  So it's your testimony that you are sorry for
25 what -- if it bothered her, but you are not sorry

Page 1778

1 for what you did, is that fair?
2 A.  In the context of what I was -- who I was
3 sending it to, my union president, I would not be
4 here today if they would not have gone to that
5 march.
6        MR. GREENFIELD:  Your Honor, I intend to
7 approach the witness for purpose of impeachment.
8        THE COURT:  You may.
9        MR. PRYOR:  Your Honor, we would like page
10 and line and a copy.
11       THE COURT:  You can get it.
12       MR. GREENFIELD:  Carter arbitration
13 transcript, Volume 2, lines 8 through 23.
14       THE COURT:  I have it.
15       MR. PRYOR:  I have to locate it.
16       MR. GREENFIELD:  I would be happy to show
17 it to you right here.
18       MR. PRYOR:  Your Honor, we object to the
19 use of the arbitration transcript.  It's not
20 inconsistent.
21       THE COURT:  I understand.
22       I will let you put it in front of the
23 witness.
24 BY MR. GREENFIELD:
25 Q.  Ms. Carter, before I show you this document, do

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 545 of 642   PageID 11486
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1779..1782

Page 1779

1 you remember testifying --
2          THE COURT:  Hold on.  We need to get you
3 to a microphone.
4          MR. GREENFIELD:  I apologize for the back
5 and forth.
6 BY MR. GREENFIELD:
7 Q.  Ms. Carter, do you remember testifying at an
8 arbitration proceeding to get your job back?
9 A.  Yes, I do.
10 Q.  And do you remember taking an oath to swear to
11 tell the truth, the whole truth, and nothing but the
12 truth for that?
13 A.  Yes, I do.
14 Q.  Can you please read silently as I read aloud.
15      Can we share a microphone?
16          THE COURT:  Hold on.
17          MR. PRYOR:  Is he having her read it
18 silently or out loud?
19          THE COURT:  He's asking for himself to
20 read it out loud while she reads it silently.
21          MR. PRYOR:  No.  I object.  It's improper
22 use.  He hadn't established an inconsistency, and
23 we've pointed it out to the Court.
24          THE COURT:  I will sustain that.
25

Page 1780

1 BY MR. GREENFIELD:
2 Q.  If you can just read from here to here.
3 A.  I'm still not clear, what am I supposed to
4 read?
5 Q.  This part.
6 A.  This right here?
7 Q.  Yes, ma'am.
8 A.  Okay.
9 Q.  Scroll down?
10 A.  Wait.  Wait.
11 Q.  I apologize.
12 A.  I'm sorry.  Because I have to digest this.  I'm
13 sorry.
14 Q.  That's all right.
15 A.  I'm not sure, who is -- this is a question,
16 correct?
17 Q.  Yes, ma'am.
18 A.  Okay.  I don't know how to read from this
19 computer.  Sorry.
20 Q.  Where can I help?
21 A.  No, I wanted to go back.  It's the question.
22 Q.  Yes, ma'am.
23 A.  Okay.
24      Okay.
25 Q.  And can you read and do you see anything else

Page 1781

1 underneath there about your testimony?
2      This is where the question is.
3 A.  Yeah, that's where I just read to.
4      I answered it the same way.
5 Q.  Ms. Carter, the document I showed you, does it
6 refresh your recollection as to what your testimony
7 was at the arbitration proceedings?
8 A.  Yes.  And it's exactly what I just told you.
9 Q.  So your testimony today -- let me ask a
10 separate question -- the caveats you've provided
11 today now about why it was a mistake and what you
12 were actually sorry about, did you offer those
13 opinions at the arbitration?
14          MR. PRYOR:  Object, misuse of a
15 transcript.  She's answered his question.  Now
16 he's --
17          THE COURT:  Hold on.  That's a speaking
18 objection.
19          MR. PRYOR:  Sorry.
20          THE COURT:  I'm overruling it.
21          MR. PRYOR:  Object to the form of the
22 question.
23          THE COURT:  You can answer.
24          THE WITNESS:  Okay.  Ask that again,
25 because I just answered that same question in the

Page 1782

1 same manner.
2 BY MR. GREENFIELD:
3 Q.  Well, see, that's why we are talking about it,
4 Ms. Carter.
5      Based on what I just showed you, does it
6 refresh your recollection that you did not offer the
7 same caveats about it being a mistake -- about why
8 it was a mistake, excuse me -- or what you were
9 sorry to?  You didn't offer that to the arbitrator,
10 did you?
11 A.  It's the same stuff, though.  It would have
12 been it's a union matter.  And the same -- I may not
13 have said those exact words, but that's exactly what
14 it meant.
15      It meant that I would have not done it in the
16 manner in which I did.  I didn't say because of the
17 social media stuff.  But I would have -- I would
18 have gone into her office.
19      Did I say the exact same words?  No.  But that
20 is the same manner in which it's -- it's being
21 portrayed.
22 Q.  Yes, ma'am.  And Ms. Carter, I'm not talking
23 about the exact same words, I'm talking about any
24 words.
25      You are offering testimony to the jury today as

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 546 of 642   PageID 11487
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022                        Pages 1783..1786

Page 1783

1 to what you think you actually made a mistake about
2 and what you actually were sorry about. But at no
3 point did you ever express any of that to the
4 arbitrator, isn't that correct?
5 A.  In that -- in that testimony --
6 Q.  Yes, ma'am.
7 A.  -- I did not use the exact same words, you are
8 correct. I didn't.
9 Q.  And not the exact same words, you didn't offer
10 any of the explanation that we are hearing today,
11 isn't that correct?
12 A.  As in saying that I would taken it to her union
13 office? It's the same type of answer.
14    I'm sorry for the way that I did it because
15 they used it -- no, I didn't say because they used
16 it under the social media policy. I made a mistake
17 by sending it through social media instead of taking
18 it to her office.
19    No, I didn't say those exact words, but that is
20 exactly what was meant.
21 Q.  So you agree that you made a mistake in the way
22 you sent it to Ms. Stone, isn't that correct?
23       MR. PRYOR:  Object, asked and answered.
24       MR. GREENFIELD:  And she's --
25

Page 1784

1 BY MR. GREENFIELD:
2 Q.  You're testifying right now --
3       MR. PRYOR:  -- leading after her
4 explanation.
5       THE COURT:  No speaking objections.
6       I will sustain that.
7 BY MR. GREENFIELD:
8 Q.  You are testifying right now before the jury
9 that what you should have done is you should have
10 gone to the union office and talked to Ms. Stone,
11 isn't that right? That's the mistake you made?
12 A.  The mistake I made was sending it through the
13 social media because they were using the social
14 media -- I would have never been called in if we
15 weren't being targeted through social media. I
16 would have gone through to her office.
17 Q.  You are sorry for that, right? The manner in
18 which you sent it?
19       MR. PRYOR:  Object, asked and answered.
20       THE WITNESS:  Oh, I'm not sorry --
21       THE COURT:  Hold on.
22       Sustained.
23       MR. GREENFIELD:  She just said she's not
24 sorry. So if that's the point, I would like to
25 approach the witness for purposes of impeachment.

Page 1785

1       MR. PRYOR:  It's a point she's explained
2 what she's sorry for and what she's not --
3       THE COURT:  I will allow her to answer
4 this question in light of that answer.
5 BY MR. GREENFIELD:
6 Q.  Are you sorry for the manner in which you sent
7 it to Ms. Stone or not, Ms. Carter? That's what I
8 want the jury to understand.
9       MR. PRYOR:  Object to the form of
10 question. It's him telling her what the jury
11 understands.
12       THE COURT:  I will sustain that.
13       Reask.
14       MR. PRYOR:  Wow.
15 BY MR. GREENFIELD:
16 Q.  Ms. Carter, are you sorry for the manner in
17 which you sent Audrey Stone the messages?
18 A.  I would have to reread what you just said,
19 because now I'm so confused on everything. I'm
20 sorry.
21 Q.  This is a very simple question. You don't have
22 to read anything.
23    I'm asking you right now, are you sorry for the
24 manner in which you sent the messages to Ms. Stone?
25       MR. PRYOR:  Object, asked and answered

Page 1786

1 repeatedly.
2       THE COURT:  Overruled.
3       You can answer.
4       THE WITNESS:  Can I see that document
5 again?
6 BY MR. GREENFIELD:
7 Q.  Ma'am, can you not answer my question without
8 reading things?
9 A.  Am I sorry for sending it in the manner -- you
10 are asking me what I said five years ago.
11 Q.  Ma'am, this is a very simple question.
12    Are you or are you not sorry for the manner in
13 which you sent the messages to Ms. Stone?
14 A.  Yes, because it got me here.
15 Q.  So you are only sorry because you are here
16 because of it, that is it? Not actually sending it
17 to her, just the result?
18 A.  I didn't know that I couldn't communicate to my
19 union president.
20       MR. GREENFIELD:  Objection, your Honor.
21 Move to strike, non-responsive.
22       THE WITNESS:  I'm sorry for the fact it
23 hurt her if it hurt her in any manner. I have
24 already said that.
25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Pages 1787..1790

Page 1787

1 BY MR. GREENFIELD:
2 Q.  And I'm not asking you about that, Ms. Carter.
3 A.  And yes, sitting here today, I am sorry for the
4 manner that I sent it.  Yes.
5 Q.  Thank you.
6     I would like to talk now about what you believe
7 should be the rules when it comes to other
8 employees' rights at the workplace.  Okay?
9 A.  Okay.
10 Q.  You believe that a union member should never
11 turn in another union member at Southwest under any
12 circumstances, correct?
13        MR. PRYOR:  Object, asked and answered
14 previously.
15        THE COURT:  I'll overrule that.
16 BY MR. GREENFIELD:
17 Q.  Is that correct?
18 A.  Repeat that.
19 Q.  You believe that a union member should never
20 turn in another union member to Southwest Airlines
21 under any circumstance, correct?
22 A.  An executive board member?  Yes, I don't think
23 that they should ever turn them in to Southwest
24 Airlines.
25 Q.  I'm just asking about any member.

Page 1788

1 A.  Any member.
2 Q.  Yes, ma'am.  We will get to executive board
3 members.  I'm just talking about --
4 A.  Any member.
5 Q.  Yes, ma'am.
6 A.  It depends upon the context.
7 Q.  Okay.  Thank you.
8     So now I want to talk to you about what you
9 believe should be the rules when it comes to you and
10 your voice, okay?
11 A.  Uh-huh.
12        MR. PRYOR:  I'm sorry.  Union what?
13 BY MR. GREENFIELD:
14 Q.  In the workplace --
15        THE COURT:  Counsel couldn't hear that.
16 Can you reask that one question?
17        MR. GREENFIELD:  Yes.  It was a signpost
18 to just talk about a transition about what we are
19 going to be speaking about, and I want to talk to
20 Ms. Carter about the rules when it comes to her and
21 her voice.
22        MR. PRYOR:  Her and her voice.  Okay.
23 BY MR. GREENFIELD:
24 Q.  In the workplace, you believe that you should
25 be able to say whatever you want, however you want,

Page 1789

1 if it is in support of your Christian beliefs,
2 right?
3        MR. PRYOR:  Asked and answered.  Very
4 beginning.
5        MR. GREENFIELD:  It's a different --
6        THE COURT:  Yeah, it's a different ending.
7 I will allow you to answer.
8        THE WITNESS:  That I can say anything and
9 anything?  Repeat that.
10 BY MR. GREENFIELD:
11 Q.  You believe that you should be able to say
12 whatever you want, however you want, if it's in
13 support of your Christian beliefs, isn't that true?
14 A.  Yes, I should be able to -- to voice my
15 Christian beliefs.
16 Q.  With no constraints, no roof on the vulgarity?
17 A.  First of all --
18 Q.  No ceiling on the trauma that it could induce?
19 A.  -- I never, ever sent these to just a member.
20 This was to my union president.
21        MR. GREENFIELD:  Objection, your Honor,
22 non-responsive --
23        THE WITNESS:  I would never send something
24 like that.  So here you go.
25        No, I would never send those types of

Page 1790

1 things to just a regular member.  No.
2 BY MR. GREENFIELD:
3 Q.  I understand.  And we are talking --
4     So you believe it changes now, based on whether
5 it's a member or an executive board member?
6 A.  The only reason that it was sent was because it
7 is a board member who actually took our money and
8 spent it.  If they wouldn't have spent the money, I
9 wouldn't have had a gripe, a dissenting opinion
10 about it and a view on it.  I don't care what they
11 do.  I do if they spend my money and represent me.
12 Q.  Yes, ma'am.  And I'm not talking to you about
13 the complaint right now.  Okay?
14     Can we be on the same page with that?
15 A.  Yes.
16 Q.  I'm asking you about your general beliefs about
17 what you can and can't do, okay?
18 A.  Okay.
19 Q.  All right.
20     In the workplace, because I don't think we have
21 an answer to this question, I understand an
22 objection is probably going to be made about that,
23 but you believe that you should be able to say
24 whatever you want, however you want, if it is in
25 support of your Christian beliefs.  That's correct,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                          Pages 1791..1794

Page 1791

1 right?
2        MR. PRYOR:  Object, asked and answered.
3        THE COURT:  I will sustain that.
4 BY MR. GREENFIELD:
5 Q.  There is no roof on the vulgarity of what you
6 can say?
7        MR. PRYOR:  Object -- I'm sorry.  I
8 thought you were done.
9        Object, asked and answered.
10        MR. GREENFIELD:  I don't believe I ever
11 got an answer to the question about vulgarity.
12        THE COURT:  There is not an answer to this
13 one.
14        THE WITNESS:  I would never be vulgar and
15 never was to any employee.  So, no, I don't believe
16 in vulgarity.
17 BY MR. GREENFIELD:
18 Q.  But you could if you wanted to, correct?
19 Because you believe --
20 A.  That's a right, but I don't believe that with
21 my heart that I would ever do that.
22 Q.  And I'm just -- and I understand that.  I'm
23 just asking you what you believe the limits on what
24 you can say are.
25        There is no roof on that vulgarity, is there?

Page 1792

1 You believe that's your right, correct?
2 A.  The first amendment in the Constitution gives
3 us rights to do --
4        MR. GREENFIELD:  Objection, your Honor,
5 non-responsive, move to strike.
6        MR. PRYOR:  She's entitled to answer his
7 question.
8        THE COURT:  Hold on.  No speaking
9 objections.
10        I will overrule.
11        You can answer the question.
12 BY MR. GREENFIELD:
13 Q.  Ms. Carter, you don't have First Amendment
14 right claims in this case, do you?
15 A.  Under my union, yes.
16        MR. PRYOR:  She didn't get to answer.
17        THE COURT:  I will let her finish her
18 prior answer.
19        MR. PRYOR:  Yes.  About the First
20 Amendment?
21        THE WITNESS:  Under my union, there is a
22 Bill of Rights, and the very first thing is freedom
23 of speech.
24        Would I be vulgar to another just regular
25 flight attendant?  First of all, I don't believe

Page 1793

1 what I sent was vulgar.  It's heartbreaking.  And I
2 sent it to one person, and she was my union
3 president.
4 BY MR. GREENFIELD:
5 Q.  And, again, Ms. Stone -- or Ms. Carter, excuse
6 me -- I'm not asking you about the post.
7 A.  No, I don't believe that it is just over the
8 top like that.
9        Vulgarity, let's say it is sexual, and what I
10 sent was costumes of what women were wearing.
11        MR. GREENFIELD:  And again, objection,
12 non-responsive, move to strike.
13        THE COURT:  I will sustain that.
14 BY MR. GREENFIELD:
15 Q.  Ms. Carter, I'm not asking you about what you
16 sent.  We all know what you sent.  Okay?
17        I'm asking about what you think you are allowed
18 to do in the workplace?  Okay?  That's just what we
19 are talking about.
20 A.  To a normal employee?  To a normal flight
21 attendant that I'm working with, no.
22        MR. GREENFIELD:  Objection, your Honor,
23 non-responsive, move to strike.  She's testifying.
24 I have not asked a question.
25        MR. PRYOR:  Object to --

Page 1794

1        THE COURT:  Hold on.  Hold on.
2        MR. PRYOR:  She's answering it.
3        THE COURT:  I think she's answering your
4 question.
5        You can finish your answer.
6        THE WITNESS:  To a normal member,
7 employee, flight attendant, that I work with, I
8 would have never sent, nor do I agree with sending
9 that to just a regular flight attendant unless they
10 were spending my money and representing me in an
11 action.
12 BY MR. GREENFIELD:
13 Q.  Okay.  Ms. Carter, again, I'm not asking you
14 what you sent or --
15 A.  I believe in the freedom of speech.
16        MR. GREENFIELD:  Objection, your Honor,
17 move to strike.  Non-responsive.
18        THE COURT:  Sustained.
19 BY MR. GREENFIELD:
20 Q.  Ms. Carter, I'm just trying to find out, so we
21 can all understand --
22 A.  Yes.  I'm just going to answer yes.  We do have
23 that right.
24        Do I think it would be something that I would
25 do to just a normal flight attendant?  No.  My union

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 549 of 642   PageID 11490
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                          Pages 1795..1798

Page 1795

1 president.
2        MR. GREENFIELD:  Objection,
3 non-responsive.  Move to strike everything after "we
4 have the right to do that."
5        THE COURT:  Sustained.
6 BY MR. GREENFIELD:
7 Q.  And because you have that right, Ms. Carter,
8 you believe you could -- I'm not saying that you
9 would -- but you could send vulgar messages to a
10 coworker in support of your religious beliefs,
11 correct?
12        MR. PRYOR:  Your Honor, object on
13 relevance and vagueness.  And this seems to be --
14        THE COURT:  Hold on.  That is speaking.
15        MR. PRYOR:  -- a hypothetical concept
16 without sufficient standing.
17        THE COURT:  I will allow the question if
18 you can answer.
19        THE WITNESS:  If an employee feels it
20 necessary, under the -- and this also goes under the
21 RLA, between union members, and that means members.
22        You are asking me members --
23        MR. GREENFIELD:  Objection, your Honor.
24        THE WITNESS:  -- is that correct?
25        MR. GREENFIELD:  Move to strike,

Page 1796

1 non-responsive.
2        I'm asking about her -- what -- if she
3 could -- if she felt she could send vulgar messages,
4 if she had the right to send vulgar messages to
5 other employees, as long it was in support of her
6 Christian beliefs.
7        THE COURT:  I think she was answering your
8 question, so I'm not going to strike it.
9        You can ask a new question.
10 BY MR. GREENFIELD:
11 Q.  Do you believe you can do that?
12 A.  Under the First Amendment --
13        MR. PRYOR:  Object to not what occurred in
14 this case.
15        THE COURT:  I understand that that's what
16 relevance means.
17        So I'm overruling and you can answer the
18 question.
19        THE WITNESS:  Under the First Amendment,
20 we should be given a right to send -- now, there may
21 be consequences, but to send to somebody a message,
22 a private message, yes.
23 BY MR. GREENFIELD:
24 Q.  And you agree that there can be consequences to
25 sending those messages, just like you just

Page 1797

1 testified.  Correct?
2 A.  To a -- under the context of just sending it,
3 yes.  But under the consequence -- or under the
4 circumstances of an action and responding to that
5 action that my union president did, I feel I have
6 every right to do that.
7 Q.  Again, Ms. Stone --
8        MR. GREENFIELD:  Objection,
9 non-responsive.  Move to strike.
10        MR. PRYOR:  Your Honor, it's absolutely
11 responsive.
12        THE COURT:  Hold on.
13        I will deny that request.
14        You can ask a new question.
15        MR. GREENFIELD:  I will.
16 BY MR. GREENFIELD:
17 Q.  Should the religions of all Southwest employees
18 be protected in the same way?
19 A.  Yes.
20 Q.  So you would agree that everyone in the
21 workplace can say whatever they want to other
22 employees as long as it was motivated by their
23 religious beliefs, isn't that right?
24        MR. PRYOR:  Object, mischaracterizes her
25 testimony.  She explained --

Page 1798

1        THE COURT:  Hold on.  Hold on.  No, no,
2 no.
3        I will sustain that.
4        MR. GREENFIELD:  Then may I backtrack to
5 get some clarity to --
6        THE COURT:  You may.
7        MR. GREENFIELD:  -- flesh that out, your
8 Honor?
9        THE COURT:  You may.
10 BY MR. GREENFIELD:
11 Q.  You have testified that you should be able to
12 say whatever you want, however you want, if it is in
13 support of your Christian beliefs, correct?
14 A.  Yes.
15 Q.  Okay.  And you believe that all religions at
16 Southwest should be protected in the same way,
17 correct?
18 A.  Yes.
19 Q.  So now we get to the big point.
20        So if everyone can say whatever they want to
21 their employees, as long as it was motivated by
22 their religious beliefs, you believe that to be
23 true, correct?
24 A.  Yes.  I believe that you should be able to
25 speak what you believe in, yes, I do.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 550 of 642   PageID 11491
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1799..1802

Page 1799

1 Q.  All right.
2      Let's move on and talk about one more rule that
3 you believe should be applied to you and your voice.
4 Okay?
5 A.  Okay.
6 Q.  You believe that because Audrey Stone was the
7 union president, no matter what you did, she
8 shouldn't be able to report you to Southwest
9 Airlines, correct?
10 A.  Correct.
11 Q.  In fact, you believe that if it was an
12 African-American board member, you could send a
13 message including the N word, and they shouldn't be
14 able to report you to Southwest Airlines, isn't that
15 correct?
16 A.  That is not correct.
17 Q.  If you were to send a message to a union
18 officer who is an African-American including the N
19 word, would it be appropriate for that person to
20 report you to Southwest Airlines?
21 A.  That's a defamation, and that -- that, first
22 off, should be handled through the union, and from
23 there, I don't know the actions.
24      But it should be -- and it would be something
25 that the union would probably take them out of the

Page 1800

1 membership or --
2 Q.  Well, you couldn't do that to a non-member,
3 could you?
4 A.  There were avenues that they could have taken
5 through the union membership.
6 Q.  Is it your testimony that the union has the
7 ability to punish you as a non-member for things you
8 say?  Officially as far as in a union capacity.  Can
9 they bring you up on charges?
10 A.  No, I don't believe they can bring me up on
11 charges.
12 Q.  No, they cannot, Ms. Carter, can they?
13 A.  That's why they were searching for other
14 avenues --
15 Q.  Well, my question, Ms. Carter --
16 A.  -- if you recall.
17      THE COURT:  Hold on.  We've got to keep
18 separation between the questions and answers.
19      You can ask a new question.
20      MR. GREENFIELD:  Yes, your Honor.
21 BY MR. GREENFIELD:
22 Q.  Back to my question.
23      If you were to send a message to a union
24 officer, you, as a non-member, who is an
25 African-American, including the N word, your

Page 1801

1 testimony is that it would be inappropriate for that
2 person to report you to Southwest Airlines, isn't
3 that right?
4 A.  I think we would probably go to -- oh, what is
5 it called? -- professional standards, and
6 professional standards is within the company.
7      MR. GREENFIELD:  Objection, your Honor,
8 non-responsive, move to strike.  I asked if she
9 thought it would be inappropriate for that person to
10 report her.
11      THE COURT:  Hold on.  That's a speaking
12 objection.  Hold on.
13      I will overrule that.
14      THE WITNESS:  First of all, I would never
15 use that word.
16      Second of all, I think that's a
17 derogatory, horrible statement to somebody.
18      So I guess if the union felt that it was
19 so derogatory, yes, then they would have to go to
20 the company.
21 BY MR. GREENFIELD:
22 Q.  And, Ms. Carter, I understand.  I'm not saying
23 you would.  I'm saying that you could, and the union
24 should not be able to turn you in to the company.
25 That is correct, right?

Page 1802

1      MR. PRYOR:  Your Honor, I object to him
2 putting her in an example of using --
3      THE COURT:  That is a speaking objection.
4 What's your --
5      MR. PRYOR:  Object to improper question,
6 improper hypothetical, putting her in that position.
7      THE COURT:  Yes.  I think I'll sustain
8 that at this point.
9 BY MR. GREENFIELD:
10 Q.  You believe an objector, okay, let's just take
11 the -- let's just take that specific example.
12      You believe an objector, if they were to send a
13 message to a union officer who is African-American
14 including the N word, it would be inappropriate to
15 turn that person in to Southwest Airlines for doing
16 that, correct?
17      MR. PRYOR:  Object, incomplete
18 hypothetical as opposed to other avenues.
19      THE COURT:  I will sustain that at this
20 point.
21 BY MR. GREENFIELD:
22 Q.  In fact, you believe that you can actually make
23 physical threats of violence to a board member and
24 they shouldn't be able to turn you in, isn't that
25 right?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 551 of 642   PageID 11492
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                     Pages 1803..1806

Page 1803

1       MR. PRYOR: Once again, an incomplete
2 hypothetical. Acting like that's the only --
3       THE COURT: Hold on. Just give me your
4 objection, not your --
5       MR. PRYOR: Improper hypothetical.
6       THE COURT: I will allow this one.
7       THE WITNESS: If it is a physical threat,
8 like execution, yes. And I also think they should
9 call the police, police first. If they feel their
10 life -- such as targeted executions, yes. I think
11 that that would be something that they should take
12 to the police and then to Southwest.
13 BY MR. GREENFIELD:
14 Q.   Just so we are clear, because you said yes and
15 it was I think a bit ambiguous.
16      Do you believe that you can make -- that a
17 threat of physical violence can be made without
18 those repercussions?
19      MR. PRYOR: Object to the hypothetical.
20      THE WITNESS: I don't understand.
21      MR. PRYOR: Asked and answered. Object,
22 403.
23      MR. GREENFIELD: I literally don't know
24 the answer.
25      THE COURT: Hold on.

Page 1804

1    I will allow it.
2       THE WITNESS: Okay. I didn't understand
3 that question.
4 BY MR. GREENFIELD:
5 Q.   All right. So just to take a step back.
6    We are talking about what you believe should
7 apply to you and your voice, okay? Yes?
8 A.   Yes.
9 Q.   Okay. And you believe that you can make a
10 physical threat of violence to an executive board
11 member in a message and that they cannot turn you in
12 to the company, isn't that correct?
13      MR. PRYOR: Object. Placing her in the
14 position of doing something improper that she
15 hasn't. It's an improper hypothetical.
16      THE COURT: I will allow her to answer
17 this one last question.
18      THE WITNESS: I never and would never
19 suggest physical violence or bring physical violence
20 or talk about physical violence to anyone at work --
21 BY MR. GREENFIELD:
22 Q.   I know you wouldn't.
23 A.   -- or a union member.
24 Q.   I apologize. I understand that --
25 A.   Place me in that position.

Page 1805

1 Q.   I understand that your testimony is that you
2 wouldn't do it.
3    But you believe you could, and that the union
4 cannot turn you in to the company, isn't that
5 correct?
6       MR. PRYOR: Same objection, and we are now
7 beyond one last time.
8       THE COURT: I will sustain that.
9 BY MR. GREENFIELD:
10 Q.   I believe your testimony is that on a threat of
11 physical violence, they should call the police,
12 right?
13      MR. PRYOR: Object, your Honor. Asked and
14 answered and skirting your ruling.
15      MR. GREENFIELD: I have not asked anything
16 about --
17      THE COURT: I will let him revisit this
18 one last time.
19 BY MR. GREENFIELD:
20 Q.   A threat of physical violence is made. You
21 think the option is that the board member should
22 call the police, correct?
23 A.   I think board member or even just a regular
24 flight attendant should call the police first, yes.
25 Q.   I'm talking about board members. You believe

Page 1806

1 the board member should call the police, correct?
2 A.   If they feel physical threat, yes.
3 Q.   Call the police, but not --
4 A.   And file a complaint.
5 Q.   Call the police, but not report it to the
6 company, right?
7       MR. PRYOR: Object, asked and answered.
8       THE COURT: Sustained.
9 BY MR. GREENFIELD:
10 Q.   Ms. Carter, you believe because Ms. Stone was
11 the union president, no matter what you did, she
12 couldn't report you, correct?
13      MR. PRYOR: Object, asked and answered
14 multiple times including --
15      THE COURT: I'll allow it.
16 BY MR. GREENFIELD:
17 Q.   Isn't that right, Ms. Stone -- or Ms. Carter?
18 A.   That -- repeat that question, please.
19 Q.   Do you believe that because Audrey Stone was
20 the union president, no matter what you did, no
21 matter what you said, she shouldn't report you to
22 Southwest Airlines. Isn't that correct?
23 A.   No matter what I said as long as it's not a
24 threat.
25 Q.   So you are making -- just so we understand, you

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 552 of 642   PageID 11493
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1807..1810

Page 1807

1 are making a caveat for a threat now, is that
2 correct?
3         MR. PRYOR:  Object, calls for a legal
4 conclusion, and her opinion is not relevant on
5 something not at issue.
6         THE COURT:  Overruled.
7         She can answer.
8         THE WITNESS:  I believe that we can speak
9 to our union president when there has been an action
10 and we are dissenting.  We have every right to say
11 anything to our union president, yes, within the
12 context of what they have done.  Especially when
13 they are using our money to do it.
14 BY MR. GREENFIELD:
15 Q.  And you could even include a physical threat,
16 isn't that right?
17         MR. PRYOR:  Object, asked and answered.
18 BY MR. GREENFIELD:
19 Q.  As long as it was talking about what they
20 were --
21         MR. PRYOR:  We've been through the
22 physical threats.
23         THE COURT:  Hold on.  He's got to finish
24 his question first.
25         Can you restate your question,

Page 1808

1 Mr. Greenfield?
2 BY MR. GREENFIELD:
3 Q.  My understanding is that when I asked you a
4 question about what you -- what you believe you
5 could do and whether or not the union or a president
6 could report you, you parsed out that it couldn't
7 include a physical threat.
8         Could you or could you not make a threat --
9 A.  A union member --
10 Q.  Excuse me.  Excuse me.
11         Could you or could you not make a threat of
12 physical violence as long it was tied to your
13 anti-union speech and not suffer the consequences of
14 being reported by the union president?  That is what
15 you believe, correct?
16         MR. PRYOR:  Object, improper hypothetical.
17 Reported to who?
18         THE COURT:  I'll allow it.
19 BY MR. GREENFIELD:
20 Q.  That's what you believe, right?
21 A.  Well, I can tell you this.  It has been done
22 before and people weren't turned in.
23         MR. GREENFIELD:  Objection, your Honor,
24 move to strike, non-responsive.
25         THE COURT:  Sustained.

Page 1809

1         MR. GREENFIELD:  I'm just asking about
2 her.
3 BY MR. GREENFIELD:
4 Q.  You believe you can do that, right, Ms. Carter?
5 You believe you can do that?
6 A.  Somebody can make a physical threat, and then
7 that person on the union board would actually, I
8 believe, would call the police, file a report, and
9 that report, if it was deemed necessary to involve
10 Southwest Airlines, yes, it would go to Southwest
11 Airlines.
12 Q.  But that's the point, Ms. Carter.
13         You believe that the executive board member can
14 and should call the police, but they cannot inform
15 their company of a physical threat.  That's your
16 testimony?
17 A.  If it is a direct physical threat such as I'm
18 going to execute you, yes.  But I would also first
19 involve the police so that you have a formal
20 complaint to also take to Southwest.
21 Q.  All right.  So now we are back to that same
22 point, because you are parsing out your explanation
23 a little bit.
24         I asked if you believed that because Audrey
25 Stone was the union president, no matter what you

Page 1810

1 did, she shouldn't be able to report you to
2 Southwest Airlines, right?
3 A.  In the context of union business, no, she
4 should not.
5 Q.  In the context of union business.  We can agree
6 on that.  She should not be able to even if it
7 includes a physical threat, right?  You believe --
8 A.  I did not physically threaten her.
9         MR. GREENFIELD:  Objection, your Honor,
10 non-responsive.  Move to strike.  I'm in the middle
11 of my question.
12         THE COURT:  Hold on.  We've got to keep
13 separation between questions and answers.
14         So I'm not going to strike it, but he
15 needs to finish his question, then she needs to
16 finish her answer.
17         You can repeat your question.
18 BY MR. GREENFIELD:
19 Q.  Okay.  Let's dial it back to the beginning
20 because it got stepped on for the record.
21         I asked you whether you believe that because
22 Audrey Stone was the union president, no matter what
23 you did, as long as it was tied to your protected
24 union speech, that she shouldn't be able report you
25 to Southwest Airlines.

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 553 of 642    PageID 11494
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                                      Vol 6 July 12, 2022                    Pages 1811..1814

Page 1811

1    MR. PRYOR: Your Honor --
2  BY MR. GREENFIELD:
3  Q.  And now it is your testimony that -- but not
4  physical threats, right?
5    MR. PRYOR: Object. First of all, it's
6  now compound, but also he's -- it's like --
7    THE COURT: Just state your objection. No
8  speaking objections.
9    MR. PRYOR: -- he's putting her in an
10  example of doing something highly improper that
11  there is no evidence she's done.
12    THE COURT: Okay, that is still a speaking
13  objection.
14    MR. PRYOR: Well. I didn't know -- can I
15  just say --
16    THE COURT: Improper hypothetical.
17    MR. PRYOR: Improper hypothetical.
18    THE COURT: I will sustain that.
19    MR. PRYOR: Sorry.
20    THE COURT: Counsel, I'm wondering if we
21  can break for lunch. It is 12:24.
22    MR. GREENFIELD: This is my last point,
23  your Honor.
24    THE COURT: Are you within five minutes?
25    MR. GREENFIELD: I'm within five minutes.

Page 1812

1    THE COURT: Okay. Let's finish your
2  examination then.
3  BY MR. GREENFIELD:
4  Q.  Do you or do you not believe that you can make
5  a threat of physical violence to a union president,
6  okay? As long it's tied to your speech, do you
7  believe -- to your union dissenting speech, do you
8  believe you can do that?
9    MR. PRYOR: Same objection. He's now
10  placing her -- same objection. Improper
11  hypothetical.
12    MR. GREENFIELD: It's not a hypothetical,
13  your Honor.
14    THE COURT: I will allow her to answer.
15    THE WITNESS: Please repeat that.
16  BY MR. GREENFIELD:
17  Q.  Yes ma'am.
18  A.  And please don't put me as the person
19  threatening because I have never threatened anybody
20  at my job.
21  Q.  Ms. Carter, again, I'm not asking you -- I'm
22  not saying anything about what you did or whether
23  you would or won't used the N word. We are just
24  talking about what you believe you can do and the
25  limits to your voice, okay?

Page 1813

1    That's what I want the jury to understand.
2  A.  Okay.
3  Q.  Do you believe that you can make a threat of
4  physical violence to your union president as long as
5  you are also dissenting to the union's position on
6  whatever? Do you believe you can do that?
7    MR. PRYOR: Object, improper hypothetical.
8  Object, asked and answered.
9    MR. GREENFIELD: It is not a hypothetical.
10    THE COURT: I'll allow it.
11  BY MR. GREENFIELD:
12  Q.  Do you believe you can do that, Ms. Carter?
13    MR. PRYOR: Same objection.
14    THE COURT: I'll allow it.
15    THE WITNESS: I believe that you can --
16  you can, and it has been done, make a threat to a
17  union officer.
18    Do I think that that is protected under
19  the RLA? A threat such as execution? No, I do not.
20    MR. GREENFIELD: Okay. I would like to
21  approach the witness for purposes of impeachment.
22    THE COURT: With what?
23    MR. GREENFIELD: Her deposition, your
24  Honor.
25

Page 1814

1  BY MR. GREENFIELD:
2  Q.  Ms. Carter, do you remember giving a deposition
3  testimony tied to this case?
4  A.  Yes. That has been a couple of years ago.
5  Yes, I do.
6  Q.  During that deposition, did you swear to tell
7  the truth, the whole truth and nothing but the
8  truth?
9  A.  Yes.
10  Q.  Okay.
11    MR. GREENFIELD: May I approach the
12  witness, your Honor?
13    THE COURT: You may.
14  BY MR. GREENFIELD:
15  Q.  Reading from page 46, can you read, please,
16  silently, as I read aloud.
17    "Had you sent Ms. Stone a message that said" --
18    MR. PRYOR: Object, improper use of
19  deposition.
20    THE COURT: I will sustain that.
21    And we need a microphone.
22    MR. GREENFIELD: May we approach sidebar?
23    THE COURT: You may.
24    (Thereupon, the following proceedings were
25  had at sidebar:)

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 554 of 642   PageID 11495
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1815..1818

Page 1815

1      MR. GREENFIELD: Your Honor, I presented
2 the testimony specifically on this issue.  I have
3 shown page and line as to what I'm going to speak
4 on.  I don't know where my mistake is in this
5 impeachment technique.
6      MR. PRYOR: First of all, he has to
7 establish that she said something inconsistent.
8      He asked a hypothetical now that is not
9 the question that was asked at deposition.  It's a
10 different question.
11      She does say, in response to that
12 question, that, no, you shouldn't report it to
13 Southwest Airlines.
14      Now if he wants to ask those questions
15 there and see if she says something different, then
16 he can use the deposition.  But not with the
17 hypothetical that is not that question.
18      THE COURT: That's my view --
19      MR. GREENFIELD: You want me to use the --
20      THE COURT: -- on all fours.
21      MR. PRYOR: I will use the exact language
22 on the page and then we will get to lunch.
23      (Thereupon, the sidebar was concluded and
24      the following proceedings were held in open
25      court:)

Page 1816

1 BY MR. GREENFIELD:
2 Q.  Had you sent Ms. Stone a message that said,
3 "I'm going to harm you," it is your view, based on
4 what you have testified today, that it would be
5 inappropriate for her to report you to Southwest
6 Airlines, is that correct?
7 A.  If I was going to harm her?
8 Q.  Yes, ma'am.
9 A.  I think that she should call the police.
10 Q.  And my question is a little bit different,
11 ma'am.
12      My question is, would it be inappropriate for
13 her to report you to Southwest Airlines?
14      MR. PRYOR: Your Honor, I object.  Can I
15 show you -- she doesn't even have it in front of
16 her.  She gave the same answer.
17      THE COURT: Sidebar.
18      (Thereupon, the following proceedings were
19      had at sidebar:)
20      MR. PRYOR: He asked the question and she
21 gave the very same answer.
22      And then he said, "That is not my
23 question."
24      That is exactly what he asked.
25      MR. GREENFIELD: No.  If you continue to

Page 1817

1 read down the page, she testifies that, look, if you
2 look at line 17 to 20 --
3      MR. PRYOR: We are not there yet, though.
4      MR. GREENFIELD: -- I'm asking a very
5 specific question.  Because this is the next
6 question that's about to follow up.  Because the
7 same thing happened at her deposition.  She tried to
8 equivocate about the police.
9      17.  "I'm asking a very specific question
10 I understand that you would have reported it to the
11 police.  Would it be inappropriate for her to also
12 report you to Southwest Airlines?"
13      THE COURT: You need to move on to the
14 second question now.  You haven't gotten there.  The
15 first question is now consistent; we have got to get
16 to the second.
17      (Thereupon, the sidebar was concluded and
18      the following proceedings were held in open
19      court:)
20 BY MR. GREENFIELD:
21 Q.  Okay, Ms. Carter.
22      So I'm asking a very specific --
23      MR. PRYOR: I would like the record to
24 reflect that my objection was sustained.
25      THE COURT: Correct.

Page 1818

1 BY MR. GREENFIELD:
2 Q.  So I'm asking a very specific question.  Okay?
3      I understand that you would have reported to
4 her to the police.  Agreed.  Would it be
5 inappropriate for her to also report it to Southwest
6 Airlines?
7 A.  If the threat was real and the police report
8 shows it.
9 Q.  The threat is just "I'm going to harm you."
10 That was the -- that was the quote.
11      I'm asking --
12 A.  In what context?  I'm going to harm you.
13      She should report it to the police, and if she
14 truly feels that she's being harmed, I still don't
15 believe that she should be going to Southwest
16 Airlines.
17 Q.  Thank you, Ms. Carter.
18      You believe even if --
19 A.  Go to the police.
20      MR. PRYOR: Wait.  Object, asked and
21 answered.
22 BY MR. GREENFIELD:
23 Q.  Even if you said, "I'm going to harm you" --
24 A.  Go to the police.
25 Q.  -- she should not be able to report it to

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 555 of 642   PageID 11496
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Pages 1819..1822

Page 1819

1 Southwest Airlines, correct?
2        MR. PRYOR:  She's answered the question.
3        THE WITNESS:  Go to the police, and then
4 they will file the complaint to Southwest Airlines.
5 BY MR. GREENFIELD:
6 Q.  Ma'am, I understand you are talking about the
7 police.
8        MR. GREENFIELD:  And I object and move to
9 strike as non-responsive.
10 BY MR. GREENFIELD:
11 Q.  I'm asking --
12 A.  No, I don't believe she should go to Southwest.
13 I believe she should go to the police.
14        MR. GREENFIELD:  Thank you, Ms. Carter.
15        THE WITNESS:  You are welcome.
16        THE COURT:  Are you passing the witness?
17        MR. GREENFIELD:  Yes, I pass the witness.
18 I apologize.
19        THE COURT:  Okay.  Now we should take
20 lunch.
21        So you can only talk to your fellow
22 jurors, not about the case.  You can't talk to
23 anyone else other than fellow jurors and court
24 personnel.  And don't do any research about the
25 case.

Page 1820

1        We will see you back here in one hour at
2 1:33.
3        All rise for the jury.
4        (The jurors exited the courtroom.)
5        THE COURT:  Okay.  So anything we need to
6 cover?  And I guess the age-old question of do I
7 tell a witness, this witness, that they can't talk
8 to anyone about the case?  I'm trying to think of my
9 recollection.  And I think in non-overnight breaks,
10 if they are continuous testimony on the stand, I ask
11 them not to talk to a lawyer even if they have Fifth
12 or Seventh Amendment rights.
13        MR. PRYOR:  Your Honor, I haven't talked
14 to her since Friday or whatever, so it's not an
15 issue.
16        But I would like to know where we are
17 going.  Is this it?
18        THE COURT:  Any other witnesses that you
19 plan to call after Ms. Carter?
20        MR. GREENFIELD:  I plan on resting, your
21 Honor.
22        THE COURT:  Thanks.
23        MR. PRYOR:  Your Honor, there is a matter
24 to raise.
25        THE COURT:  Yes.

Page 1821

1        MR. PRYOR:  I request just some additional
2 time.  And --
3        THE COURT:  Okay.  Just a second.
4        Ms. Carter, you don't have to stay
5 standing anymore.  You can leave the box.  But I
6 just ask you to not talk to anyone about the case
7 during the lunch break, since you're still a
8 witness.
9        MR. PRYOR:  And, your Honor, I think we
10 might end up -- she would be happy to step outside
11 for a minute while we talk if you are concerned
12 about the rule with her.
13        I'll have her step outside --
14        THE COURT:  That seems appropriate.
15        MR. PRYOR:  -- so I don't have to worry
16 about it.
17        Your Honor -- and I -- the case that they
18 have put on, I think you can see that their defense
19 to our claims did not require the same type of
20 time-wise, document-wise, witness-wise that we were
21 confronted with in presenting our case.
22        And I also respectfully suggest to the
23 Court, I have almost pulled a muscle not answering
24 questions of witnesses that I would love to, and I
25 fully acknowledge that we have not cut into muscle

Page 1822

1 at all in terms of our ability to provide a trial
2 for our client.
3        Having said that, I am faced at closing
4 with two parties that have an ocean of time, I think
5 at this point they could have four hours of closing,
6 and I have probably about 45 minutes.  And that's --
7 I need to spend time with this witness on
8 cross-examination now.
9        And so I know the Court has a bucket of
10 three hours, and I would like some -- I think there
11 should be some limit on -- a maximum limit on time
12 to closing.
13        I don't think the intent was to offer 12
14 hours to the other side that they -- or 6, 12,
15 whatever it was.  I think you get my point.
16        I don't think that the point was to allow
17 them to not have a need for that time and then to
18 clump it into closing, and I'm not saying that's
19 what they did.  But I would like some time
20 protection in closing and I would like some
21 additional time.
22        There we go.
23        THE COURT:  Okay.  So what I will say
24 preliminarily, and then I will ask y'all's thoughts,
25 on time protection in closing, I'm not going to give

Page 1823

1 you all of their time and then tell them they can't
2 use theirs, which is how I interpret the latter part
3 of your request.  I don't think you can do that.
4 You can't take over their case.
5        I'm not going to impose limits on closing.
6        What I do is -- I don't do that on opening
7 or closing.  I give y'all a bucket of time and let
8 y'all use the time as you see fit.
9        So I will listen to arguments from Union
10 and Southwest on how much more time they are asking
11 for.
12        But before I do, let me ask you, what is
13 your concrete request on how much more time you
14 would need?  And I understand your arguments are you
15 would use it on an adequate closing and you would
16 use it on cross-examination of Carter.  You made a
17 reference at the sidebar to wanting to ask Sims
18 questions in a rebuttal case.
19        So what are you wanting and what is it
20 for?  I want to drill down and be very concrete.
21        MR. PRYOR:  It's difficult for me to be
22 concrete.
23        I would say I need 15 to 20 minutes with
24 Ms. Carter on cross, and then I don't know what they
25 will do, and I may need another five minutes after

Page 1824

1 that.
2        So I'm looking at using a substantial
3 portion of my 45 minutes that I have left that I
4 can't afford, and so I would ask that I have time
5 for that.
6        Then for closing -- and I understand what
7 the Court is saying.  I'm not asking for their time.
8 I'm asking for a reasonable time limitation on
9 closing.  But I guess I would like an hour for
10 closing.  And I would -- assuming reasonable
11 restrictions on them.  But I understand the Court's
12 position.
13        THE COURT:  Understood.
14        Okay.  So let me shift the baton over and
15 ask Southwest and the Union for their positions.
16        MR. McKEEBY:  Our position is that we
17 oppose the request for more time, your Honor.
18        We have planned our trial presentation
19 under the rules set forth by this Court, we have
20 done our best to be efficient within those
21 guidelines, and we frankly have made strategic
22 decisions based on those time limitations.
23        To wit, what we did with Mr. Schneider.
24 We relied on the Court's rules and tried this case
25 within those rules.

Page 1825

1        To now give yet more time to plaintiffs
2 is -- is not fair, particularly given what the Court
3 mentioned yesterday about not holding any
4 efficiencies on the side of defendants against us.
5 I feel like that is effectively what is being done
6 here.  We have been efficient.
7        And, frankly, I'm not comfortable
8 criticizing opposing counsel, but they have not been
9 efficient from the time -- from the very beginning
10 of this case when my opening statement was
11 interrupted on an issue that was entirely covered by
12 a motion in limine ruling, to the constant sidebars,
13 I won't say every time, but almost every time an
14 objection to sustain, we are up there spending time.
15        And, frankly, the examination style of
16 opposing counsel, which is I understand something
17 that is at some level effective and may have been so
18 in the past, but it's questions that are vague and
19 asked in a confrontational style.
20        And that's fine, there is nothing wrong
21 with that, but it is also not the type of
22 examination technique that is going to lend itself
23 to an efficient introduction of the testimony.
24        So all of those considerations mitigate in
25 favor of not providing any more time.

Page 1826

1        THE COURT:  Understood.
2        Union position.
3        MR. GREENFIELD:  Yes.  I think the most
4 important thing to look at, from my vantage point,
5 is an issue of prejudice.
6        I have bent over backwards, I know
7 personally, I'm not going to speak for Southwest,
8 but to present our case in a way that complied with
9 the original six hours you gave us.  Now, ultimately
10 you said maybe there might be more time if we needed
11 it.
12        The way I asked questions about Southwest
13 witnesses, the way I asked questions about -- to
14 Ms. Stone, if I knew all of this entire -- if we
15 were going to rip up the time sheets, I would have
16 approached the case completely differently.  I tried
17 to play within the rules of the game that you set
18 forth.
19        And I don't believe they want to do that
20 or have ever had any intention of doing that, your
21 Honor.  They have been asking since the very moment
22 the trial started for more time.  They asked for
23 more time before it started.  You said no.  They
24 asked for more time after their opening.  They asked
25 for more time almost after every witness.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1827..1830

Page 1827

1     It has never been their intention to
2  comply with the timing rules you presented, your
3  Honor.
4        MR. PRYOR:  Response.
5        THE COURT:  Briefly.
6        MR. PRYOR:  First of all, we are all
7  operating under the same order here, and that order
8  says that you can ask for more time.  We all know
9  that is an opportunity that your order affords.  So
10 no one is being prejudiced.
11       The second is, in terms of our
12 efficiencies, while we have foregone questions we
13 would love to ask of numerous witnesses, and I think
14 that we have been as efficient as we can within the
15 bounds of zealously representing our client's
16 position to this Court, I don't think it's
17 unreasonable, given we are dealing with two parties
18 here that are aligned, that don't have the same
19 burdens and efforts required to put on our case that
20 they are dealing with.
21       I'd ask the Court for more time so we can
22 adequately cross-examine Ms. Carter and adequately
23 summarize the evidence in our closing.
24       THE COURT:  Okay.  So here is my ruling.
25       I'm going to give you a few more minutes,

Page 1828

1  but not nearly what you want, and not for the
2  reasons that any of us have talked about.
3        I'm going to give you 15 more minutes for
4  the purpose of cross-examining Carter, and here is
5  why.
6        When I let you get into the arbitration
7  testimony, if I'm a juror sitting over here, I'm
8  wondering, why wasn't this decided in arbitration?
9        I think it is fair game for you to ask her
10 on cross-examination if her claims that are
11 presented in this lawsuit at this time were at issue
12 in the arbitration.  I think you can do that without
13 running afoul of my motion in limine and correct any
14 conceptions that the jury may have.
15       I'm going back to the other points that
16 y'all made.  I echo them, and that is the reason why
17 I'm not granting more time to you.
18       But I do think that there is this --
19 perhaps an inference now regarding arbitration that
20 you are entitled to clean up.
21       I did give you the leeway of going there,
22 and I don't think you crossed over the line that I
23 was thinking of, which I appreciate.  But it does
24 leave the jurors with a question in their minds of,
25 well, why are we here?  Why didn't this end at

Page 1829

1  arbitration?
2        Okay.  So what did I say?  15 minutes.  So
3  you have 15 minutes that doesn't count to the other
4  46 minutes you have already got.
5        MR. PRYOR:  If I use ten, can I keep my
6  five?
7        THE COURT:  I'll give you the 15 to use
8  how you see fit, but I need you to use it wisely.
9  Does that make sense?
10       MR. PRYOR:  It does.
11       THE COURT:  So you are now sitting at an
12 hour and one minute.
13       MR. GREENFIELD:  And that includes his
14 time for closing?
15       THE COURT:  Yes.  And I'm not putting a
16 limit on how much of your time you are going to use
17 for closing.
18       I will tell everyone, before I go into
19 closing, you can take as much time as you want.
20 I've never seen a closing that lasted upwards of an
21 hour that a jury appreciated, right?  So you can
22 take that for what you will.
23       But jurors appreciate succinct closings
24 and they're more powerful if they do succinctly
25 summarize the evidence.  Get to the point and then

Page 1830

1  end the closing argument.
2        All right.  Any other issues before we
3  come back?
4        Okay.  So when we come back, you are going
5  to cross-examine.  We will go through however many
6  rounds we go through.  You've got your extra 15
7  minutes.  But then at the point that you rest,
8  because this is your last witness, then we will kick
9  the jury out, have another motion, I will rule on
10 both motions, and we will proceed from there.
11       MR. McKEEBY:  Your Honor, two questions.
12 Do I get the opportunity to examine Ms. Stone -- I
13 mean Ms. Carter?
14       THE COURT:  I should have asked you next.
15 Why did I go out of order?
16       I'm sorry.  I should have asked you next.
17       Based on --
18       MR. McKEEBY:  He rested, so it should be
19 me next, and then --
20       THE COURT:  Yes.  So I didn't tell you you
21 can go next.  So you should be next, Mr. McKeeby,
22 and then he'll go.
23       MR. McKEEBY:  And it is not going to be
24 much.
25       THE COURT:  Right.  And then we will go

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 558 of 642   PageID 11499
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1831..1834

Page 1831

1 back for a round two if needed.
2          MR. McKEEBY:  It is not going to be long.
3          THE COURT:  But thank you.  I'm used to
4 going in a wheel this way, and I need to -- the
5 wheel is now different.
6          MR. McKEEBY:  The other question is may
7 Mr. Sims be excused?
8          MR. PRYOR:  Yes.
9          THE COURT:  Okay.  Any other questions?
10         So I think I cut the jury loose at 12:33,
11 so 1:33 is when we should back in here.  See you
12 soon.
13         THE COURT SECURITY OFFICER:  All rise.
14         (Recess.)
15         THE COURT SECURITY OFFICER:  All rise.
16         THE COURT:  Thank you.  One quick update
17 before we get the jury.  Y'all should get jury
18 questions any minute, the latest round from me.
19         So we will come back in, we will finish up
20 this round.  Then I will kick the jury out for
21 motions and rulings.  And then see if you have a
22 rebuttal case when the jury comes back in.
23         And then if you don't have a rebuttal
24 case, then I need to send them out because I'm
25 assuming there is going to be a renewed Rule 29

Page 1832

1 motion.  Then bring the jury back in.  And then we
2 will see what time we are.  We may just send them
3 home early for the day, so we can do charge
4 conference and printing it.
5          If we have beaucoups of time, I will keep
6 them around.  But I want to make sure we have time
7 for the formal charge conference and printing the
8 charge.
9          Does that make sense for a run of show?
10 Any questions?
11         Okay.  We will bring them in.
12         (The jurors entered the courtroom.)
13         THE COURT:  Thank you.  Be seated.
14         Okay.  So Mr. Greenfield, you passed on
15 the witness.
16         Which means, Mr. McKeeby, do you have
17 questions?
18         MR. McKEEBY:  No questions for the
19 witness.
20         THE COURT:  Okay.  So now I need to ask
21 you, Mr. Pryor, do you want to question the witness?
22              CROSS-EXAMINATION
23 BY MR. PRYOR:
24 Q.  Ms. Carter, I feel like we have been here
25 before, but let me ask you, in terms of saying

Page 1833

1 anything you want to say, whether it be religious
2 speech, union activity, do you believe that that
3 includes you should be able to engage in illegal
4 speech?
5          MR. GREENFIELD:  Objection, your Honor,
6 leading the witness.
7          MR. PRYOR:  It's redirect.
8          THE COURT:  I'll allow it.
9          THE WITNESS:  No, not illegal speech.
10 BY MR. PRYOR:
11 Q.  And if you defamed someone, if you say
12 something knowingly false, do you think you should
13 be able to get sued for that?
14 A.  Oh, yes, yes.
15         MR. GREENFIELD:  Objection, your Honor
16 leading the witness.
17         THE COURT:  I'll allow it.
18 BY MR. PRYOR:
19 Q.  And also, you talked about the workplace
20 itself.  You agree to that there should be
21 reasonable limitations so you can keep peace in the
22 workplace?
23 A.  Yes.
24 Q.  Okay.
25         You didn't sign the recall petition because

Page 1834

1 were an objector and you weren't allowed to sign it,
2 right?
3 A.  Correct.
4 Q.  The Step 2 and arbitration, you were asked some
5 questions that led to those two topics.  Just want
6 to make sure we are still very clear on that, that
7 those processes did not involve your claims as to
8 your religious freedoms and your union activities
9 that are before this court today, true?
10 A.  That is correct.
11 Q.  Mistake.
12         The mistake that you are talking about is a
13 mistake of, I used social media and that gave them a
14 free shot at me?
15 A.  Correct.
16 Q.  And counsel is asking you questions about the N
17 word and threats to people, and whether or not even
18 if it is union activity, it should be reported to
19 the company.
20         Do you see an irony in a union coming in here
21 and talking about wanting the company to be involved
22 in union activity?
23 A.  Yes.
24 Q.  Is that the Local 556 that you feel is corrupt
25 and that is one of the reasons you are here?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 559 of 642   PageID 11500
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1835..1838

Page 1835

1  A.  Yes.
2        MR. GREENFIELD:  Objection, your Honor,
3  leading the witness.  If I can have a running
4  objection.
5        THE COURT:  I'll give you the running
6  objection.  I'll sustain that last objection.
7        Can you rephrase?
8  BY MR. PRYOR:
9  Q.  Ma'am, do you believe, as you sit here today,
10 that you had the right to send the complaints that
11 you did, along with the videos that you sent, to the
12 private Facebook message of Audrey Stone TWU, your
13 union president?
14 A.  Yes.
15 Q.  Do you believe that you had the religious right
16 to post on Facebook what you did that you got fired
17 for?
18 A.  Yes.
19       MR. PRYOR:  Thank you.
20       THE COURT:  Okay.  So round two,
21 Mr. Greenfield.
22       MR. GREENFIELD:  None, your Honor.
23       THE COURT:  Okay.
24       Mr. McKeeby, anything?
25       MR. McKEEBY:  No questions.

Page 1836

1        THE COURT:  Okay.  And you, one last
2  question --
3        MR. PRYOR:  No questions on my questions,
4  your Honor.
5        THE COURT:  That's right, you don't need
6  to question based on your questions.
7        Okay.  Ms. Carter, again, you can leave
8  the witness box and return to your rightful seat in
9  the courtroom.
10       Okay.  Any other witnesses that the union
11 wants to put on during its case?
12       MR. GREENFIELD:  The union rests, your
13 Honor.
14       THE COURT:  Okay.  So remember, any time
15 someone says the word "rest," now y'all got to go
16 back out for your break.  I'm sorry.
17       So same instructions as always:  You can
18 talk to your fellow jurors and court personnel, not
19 about the case; can't talk to anyone else; can't do
20 any research.  We will see you here in a few
21 minutes.
22       All rise for the jury.
23       (The jurors exited the courtroom.)
24       THE COURT:  Okay.  You can be seated.
25       Okay.  So now we've had both Defendants

Page 1837

1  rest, so let me turn it back to you, Mr. Gilliam.
2  You can make your motion as to the union, and then I
3  held in abeyance my ruling as to Southwest and your
4  motion as to Southwest.  So I need to rule on both
5  of those motions.  So I will turn the floor over to
6  you.  You can go there or the podium.  I don't -- I
7  can keep looking over at you like this.
8        MR. GILLIAM:  I like the podium a little
9  bit better.
10       So at this time, we would move for
11 directed verdict against Local 556 on all claims, as
12 to liability.
13       Let's start first with the RLA retaliation
14 claim.  We've -- the testimony and all of the
15 evidence has shown that Ms. Stone reported
16 Ms. Carter for her Facebook videos and messages that
17 were privately sent to her that were talking about
18 nothing but union -- well, opposing the Women's
19 March and union activity, RLA-protected activity.
20       Ms. Stone couldn't identify anything that
21 wasn't RLA-protected activity.
22       All of those posts on their face, they
23 mention the recall, they mention objecting to the
24 union's use of dues, they were opposing the union's
25 activities at the Women's March.

Page 1838

1        So there is -- Ms. Stone was, like I said,
2  never able to identify anything that wasn't
3  protected activity.
4        Ms. Stone was acting within the scope of
5  her official capacity.  Everything that Ms. Carter
6  sent her addressed union activities.  They never had
7  any personal/interpersonal communications about work
8  or about anything else about -- apart from the union
9  and the union's activities.
10       Local 556 Vice President Nevarez testified
11 you cannot separate the employee from the union
12 president.  She's always acting in the presidential
13 capacity.
14       Ms. Carter sent her messages to the Audrey
15 Stone TWU account.  And Ms. Stone testified that she
16 used that Audrey Stone TWU account for union
17 business.
18       Also, Ms. Carter copied on her complaint
19 Naomi Hudson, the Southwest negotiating -- CBA
20 negotiating chair of their negotiating committee and
21 director of labor relations, as well as the vice
22 president, Sonya Lacore.
23       And historically, Ms. Stone's interactions
24 with these officials at Southwest was in the
25 capacity of negotiating social media discipline and

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Pages 1839..1842

Page 1839

1 clemency for employees.
2       So of course, when she's engaging them,
3 she's acting within that capacity as well.
4       The -- and again, the videos and Facebook
5 messages privately sent to Ms. Stone were a
6 substantial or motivating factor.
7       There was another factor, we argue, as
8 Ms. Carter's religious beliefs, and we will move to
9 those in a second.  But as to the RLA activity that
10 Ms. Carter engaged in, that was a motivating factor.
11 When Ms. Stone reported Ms. Carter, her complaint in
12 Exhibit 66 revealed that she's -- that Ms. Carter
13 was talking to her about events that transpired at
14 the Women's March, about events that she and the
15 union had participated in there.
16      And she also referred to Ms. Carter's
17 political comments.  So in her meeting with
18 Southwest, she -- she was asked about Charlene
19 Carter and said she's very anti-union.
20      And what did she ask Southwest to do?  She
21 said, Make Charlene and Chris Click, another recall
22 supporter and union opponent, to stop.  Make them
23 stop.
24      Now, as for any sort of affirmative
25 defense, there is no affirmative defense that Local

Page 1840

1 556 could raise.  It could raise -- its affirmative
2 defense has to be a non-discriminatory reason.
3 There are no non-discriminatory reasons.  The only
4 reason would be Ms. Carter sending these videos and
5 messages that upset her.
6       But that is protected activity.
7       The reason -- well, the affirmative
8 defense has to be a non-discriminatory reason,
9 because if it is the same reason, there is no point
10 to the RLA's protections at all, and the statutory
11 text is totally eviscerated.
12      So there has got to be a point to those
13 RLA protections.
14      Now, let's move on to the Title VII
15 cause -- attempt to cause religious discrimination.
16      Again, I addressed how Ms. Stone was
17 acting in her official Local 556 capacity when she
18 reported Ms. Carter.  Clearly, she attempted to
19 cause Southwest to discriminate against her.  I
20 think it is clear that she was wanting Southwest
21 to -- to terminate her, but at least discipline her,
22 because she talked about all of the activities she
23 engaged in in her complaint, and then started
24 listing all of the different policies that Southwest
25 could terminate Ms. Carter under.

Page 1841

1       Policies that Ms. Stone had experience
2 with.  Ms. Stone, in her social media statement that
3 she had released just two years before, said,
4 Employees are getting turned in and terminated for
5 these policies, for violating these policies.
6       So Ms. Stone knew exactly what the results
7 of her actions could be.
8       Importantly, on this religious
9 discrimination claim against Local 556, Ms. Stone's
10 email refers to Ms. Carter's religious comments.  So
11 she knew exactly what she was reporting them for,
12 for these Facebook videos and messages.
13      So the other religious discrimination
14 claim against Local 556.  Ms. Stone knows what the
15 duty of fair representation is.  So she -- she knows
16 that treating -- that turning someone in for their
17 religious comments is, per se, treating them
18 differently from all of the other represented
19 employees that she knows she has to defend and
20 protect based on her duty of fair representation.
21 So it is, per se, discrimination.
22      She -- Ms. Stone also knew exactly what
23 she was doing because she testified that she talked
24 to her lawyers about accommodation and religious
25 discrimination.

Page 1842

1       She -- Ms. Stone's actions were in bad
2 faith as well, because she -- she believed that --
3 she testified to her belief that any employee
4 should -- who was engaging in protected activities
5 with the union should be protected and that the
6 Southwest policies don't apply.  Ms. Stone testified
7 to that.
8       But she turned Carter in anyway.
9       And I think that these particular
10 religious discrimination issues, they get to the
11 duty of fair representation claim as well.  Because
12 the discriminatory prong of arbitrary,
13 discriminatory and in bad faith is religious
14 discrimination.
15      So by engaging in religious
16 discrimination, Ms. Carter -- I mean, I'm sorry --
17 Ms. Stone and Local 556 violate the duty of fair
18 representation.
19      And the bad faith prong, again, just --
20 just described was that she believed that any time a
21 represented employee communicates with the union
22 about union activities is protected and Southwest
23 policies don't apply.
24      She negotiated that in the Collective
25 Bargaining Agreement.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 561 of 642   PageID 11502
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                  Vol 6 July 12, 2022                    Pages 1843..1846

Page 1843

1     Again, she turned Ms. Carter in anyway.
2     Let's get to the failure to accommodate
3 claim.
4     I will be quick here.
5     So here you have President Stone acting on
6 behalf of Local 556, reporting Ms. Carter. She --
7 she could have engaged in conversations with
8 Ms. Carter. She could have simply blocked her and
9 prevented her from having more communications, and
10 that was at least short of terminating her
11 employment.
12     So for that reason, just by the act of
13 turning Ms. Carter in, Audrey Stone, on behalf of
14 Local 556, who knew her affirmative obligations
15 under Title VII -- again, she testified to having
16 discussed those with a lawyer, she was well aware of
17 them -- knowing her affirmative obligations under
18 the duty of fair representation, repudiated any
19 obligation to take actions to make an exception for
20 Ms. Carter, make an exception for her religious
21 observances, beliefs and practices, and turned her
22 in.
23     And going back to the duty of fair
24 representation. So I did address the discriminatory
25 and in bad faith prongs. The -- as for the

Page 1844

1 arbitrary prong, under the Northern District of
2 Texas case McCall, treating someone differently
3 based on their -- their -- any sort of political
4 differentiation between represented employees is an
5 arbitrary action on the part of the Union president.
6     And even though I go through those
7 arbitrary, discriminatory and in bad faith prongs,
8 the fact is, is that the union has failed to meet a
9 couple of its -- its own burdens.
10     First of all, there is a presumption that
11 a union official acts in her official capacity. And
12 the union has not presented any evidence whatsoever
13 that she was acting outside of her official
14 capacity.
15     There is also the presumption that the
16 union breaches the duty of fair representation when
17 it causes another employee to be disciplined.
18     And there -- they must show, the union
19 must show, that President Stone acted in good faith
20 with rationale considerations, and representing its
21 constituency as a whole.
22     By President Stone's own definition, she
23 acted in bad faith because she turned in a
24 represented employee when she knows that Southwest
25 policies shouldn't be meddling in their

Page 1845

1 communications.
2     And it was -- it was Ms. Carter's protest
3 of the Women's March and union dissident activities
4 that -- that motivated Ms. Stone, not -- there were
5 no other rational considerations that the union has
6 shown.
7     And also, the third thing -- and these are
8 conjunctive elements -- the union also has to show
9 that it was representing its constituency as a
10 whole. How could it possibly be representing its
11 constituency as a whole when it is turning in a
12 protected employee for protected activities?
13     That doesn't represent the constituency as
14 a whole, it has -- it is targeting one member who
15 was opposing the union and who was supporting the
16 recall.
17     So again, I would like to also
18 specifically address how -- there were two
19 motivations here for Local 556 and Southwest. And
20 they wanted to discipline Ms. Carter for Facebook
21 videos and messages, and they were both RLA
22 protected and they were protected by Title VII.
23     The posts on Ms. Carter's Facebook page
24 were -- were protected under Title VII. She was
25 exercising her religious observances, beliefs and

Page 1846

1 practices and sharing her views with other flight
2 attendants.
3     And as for Southwest's defense of a nexus,
4 these -- these posts that they found that justified
5 their nexus were years old. And that the
6 uncontroverted testimony shows that these were three
7 to four years old and nobody ever disputed that,
8 nobody ever showed differently.
9     So for all of these reasons, I think the
10 Court should grant a directed verdict on all claims
11 against Southwest and Local 556.
12     THE COURT: Okay. Thank you, Mr. Gilliam.
13     Mr. Greenfield, can I hear your response?
14     MR. GREENFIELD: Yes, your Honor.
15     I think this case is interesting and
16 unique from the standpoint of we have four different
17 causes of action. Every single cause of action is
18 tied to the very same fact, right?
19     Reasonable accommodation. Failed to
20 accommodate Ms. Stone because -- or failed to
21 accommodate Ms. Carter because Ms. Stone turned her
22 in.
23     Religious discrimination. They
24 discriminated against her because they -- Ms. Stone
25 turned her in.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 562 of 642   PageID 11503
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                                 Vol 6 July 12, 2022                                       Pages 1847..1850

Page 1847

1        DFR claim.  Violated because we turned her
2   in.  Not about any other representation throughout
3   the whole process.
4        Same thing with the RLA.
5        All their claims came down to this one
6   issue.
7        And I think we have presented evidence
8   that support every element of all of those claims.
9   And I think we can start at the beginning with
10  official capacity.
11       And we will talk about this at the jury
12  charge, but official capacity is dispositive of
13  every single cause of action against the union.  If
14  Ms. Stone was not acting in her official capacity,
15  then in no way could she bind the union, she was
16  just an employee.
17       So let's start with evidence that has come
18  on about her official capacity.
19       That is in dispute.  That is why we made
20  past summary judgment.  That is why we are here
21  before the Court.  And some of the evidence that has
22  come out, we know that even Charlene Carter's own
23  exhibits show that the messages she sent were to
24  Audrey Stone, not Audrey Stone TWU.  That is not
25  what the evidence shows.

Page 1848

1        That is what they have argued.  They have
2   argued that Ms. Stone changed it.  Their argument is
3   going to be that she changed it afterwards.  But
4   that is not what the exhibits show.  That is not
5   what Ms. Carter's evidence shows that she turned in
6   to the company.
7        Witness after witness testified that
8   employees don't lose their rights when they become
9   president of the Union.  Ms. Stone was acting in her
10  capacity as an employee when she turned her in.  She
11  has always had that right.  She never loses her rights
12  as an employee.  Otherwise, her Title VII rights,
13  her rights to be free from harassment and
14  discrimination in the workplace become subservient
15  to Ms. Carter's.
16       Witness after witness testified that the
17  communications went too far.  And that
18  Ms. Stone's -- or Ms. Carter's communications lost
19  their protection.
20       Speech can be protected in one part and
21  still be harassing and violative of the law and lose
22  those protections at the same time.  The underlying
23  basis, she was dissenting against her union, agreed.
24  No dispute.
25       It was about her religious beliefs.

Page 1849

1   Agreed, no dispute.
2        So that in and of itself is protected.
3   But it then can lose -- it can lose that protection
4   and become harassing.  We could all agree that if
5   Ms. Carter had sent the very same messages but left
6   a -- but tied around a note on a chopped off horse
7   head and left it at Ms. Stone's front door, we have
8   gone too far.  We can't do that.
9        Or if it's tied to some sort of criminal
10  act, you can't do that.  At some point, it loses
11  protection and it does cross over to being
12  harassing.
13       Regarding retaliation, we have also put on
14  temporal proximity evidence.  Ms. Carter has been
15  anti-union since at least 2013.  She sent
16  hundreds -- at least 100 -- I counted 98 pages of
17  private messages to Ms. Stone and no action was
18  taken against her.
19       She opposed she was part of the recall
20  petition in 2015.  Ms. Stone didn't file any charges
21  on that.
22       Excuse me, your Honor.
23       THE COURT:  It is okay.
24       MR. GREENFIELD:  Just over and over, these
25  communications have gone on for years.  And

Page 1850

1   Ms. Carter agreed to that, that she had been
2   dissenting again the union.  She was against the
3   first tentative agreement as well.  Again, no
4   actions were taken by Ms. Stone.
5        It all came after these specific videos.
6   Okay?  And that is where we argue it went too far
7   and she lost her protection.
8        Regarding religion, we put on several
9   pieces of evidence regarding that, including that
10  Ms. Stone herself is pro life.  So they are asking
11  the jury, and you as a matter of law, to ignore
12  that, the fact that Ms. Stone, as a pro life
13  individual, is discriminating against Ms. Carter for
14  her prop life stances.  That obviously should go
15  before the jury and should be weighed.
16       Ms. Carter couldn't identify a single
17  individual who was treated more favorably than her.
18  It is just her.
19       On the failure to accommodate claim,
20  again, it ties back to the message itself.  That it
21  was turned in -- that doing that -- but preventing
22  that, again, ties back to the official capacity
23  argument.  If Ms. Stone made that as an employee,
24  she reserved the right to do that.  She never
25  relinquishes the right to be free from harassment

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 563 of 642   PageID 11504
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 6 July 12, 2022                    Pages 1851..1854

Page 1851

1 and discrimination in the workplace.
2        And so the only accommodation that she
3 sought was that Ms. Stone not turn her in.  That is
4 it.
5        And then we have several, several issues
6 of causation.  Numerous parts of each claim that
7 Ms. Carter brings requires that they show beyond a
8 preponderance of the evidence that we caused the
9 termination.
10       That certainly is in dispute.  Witness
11 after witness from Southwest testified that the
12 union had no interference into their investigation
13 process, had no weighing on the decision to
14 terminate.  That was Southwest's decision.
15       And I believe that is actually very
16 heavily tied to Southwest's legitimate
17 non-discriminatory reason for the termination, which
18 you considered earlier in denying their motion on
19 that.
20       I have nothing else, your Honor.
21       THE COURT:  All right.  Thank you,
22 Mr. Greenfield.
23       So at this point, I will say that I have
24 both the directed verdict motions against Southwest
25 and the union fully argued.  So I'm going to deny

Page 1852

1 both of those motions at this point.  Like I said, I
2 never explain our reasons for what I'm doing, why I
3 am doing it.  I just state my ruling on the record.
4        So based on that, we need to bring back in
5 the jury so we can hear if you have witnesses for a
6 rebuttal case.  Yeah, that is fine.  And then we
7 would close, close, close.
8        And then at this point, it is a close call
9 on whether there is any chance we could do a formal
10 charge conference, print the behemoth charge, and
11 read it by 5:00.
12       I think it will probably take me an hour
13 and a half to read it to them.  I figure it will
14 take us an hour and a half to do a formal charge
15 conference and print it.  Should we go for it?
16 Should we not?  What do y'all think?
17       MR. PRYOR:  What are you thinking of in
18 terms of start time tomorrow for closing?
19       THE COURT:  So assuming we do a formal
20 charge conference today, send them home, then I
21 would think tomorrow at 9:00 we start, whether we
22 are starting with a reading of the charge tomorrow
23 or if we by some miracle get it read to them at the
24 end of the day today.  So I think 9:00 tomorrow is
25 our start time regardless.

Page 1853

1        The one question I have for y'all is, do
2 we try to keep them here and do a formal charge
3 conference and print it so I can read them the
4 charge and get that done by 5?  Or do we send them
5 home and say we are just doing the formal charge
6 conference today, getting it printed, and then we
7 will read it first thing tomorrow?  Any thoughts?
8        MR. PRYOR:  I'm going to turn to over to
9 my lawyer.
10       MR. McKEEBY:  I think I would just send
11 them home.  I mean, I think since it is not clear
12 that we are even going to get to it -- well, I mean,
13 I think it is fair to send them home rather than
14 keep them here with the hope that we would be able
15 to get to it.  But obviously, that is your call.
16       THE COURT:  That is my leaning.  I'm
17 always optimistic around timing and it never works
18 out as fast as I think it will, right?  Both my
19 reading of it and the formal charge conference.
20       MR. GREENFIELD:  I agree, your Honor.
21       THE COURT:  Any objection to we will bring
22 them back in; more witnesses, no; close, close,
23 close, send them home; and then we will go from
24 there?
25       MS. GREEN:  I think that is appropriate,

Page 1854

1 your Honor.
2        THE COURT:  Okay.  Let's do it.
3        (The jurors entered the courtroom.)
4        THE COURT:  Okay.  You can be seated.
5        Okay.  I mentioned at the outset of trial,
6 sometimes plaintiffs call rebuttal cases, so I need
7 to ask you, Mr. Pryor, does the plaintiff have any
8 more witnesses they want to call for a rebuttal
9 case?
10       MR. PRYOR:  The plaintiff has no rebuttal
11 case, your Honor.
12       THE COURT:  Okay.  So does that mean the
13 plaintiff closes?
14       MR. PRYOR:  The plaintiff's case closes
15 and is closed.
16       THE COURT:  Okay.  So that means
17 Southwest, now.  Is Southwest closing?
18       MR. McKEEBY:  Southwest is closed.
19       THE COURT:  Okay.  How about the Union?
20       MR. GREENFIELD:  The Union is closed, your
21 Honor.
22       THE COURT:  Okay.  We heard rest, close,
23 close, close.  What that means is, y'all get an
24 early day to go home while we have to sit here and
25 hash through a really long jury charge that I get to

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 564 of 642   PageID 11505
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                              Pages 1855..1858

Page 1855

1  read to you first thing tomorrow morning.
2       So what is left of the trial is, I read
3  you the jury charge, then we have closing arguments
4  from Carter, Southwest and the Union, and then the
5  case is yours.  We hand the baton to you.
6       We have been working through the jury
7  charge since this case began and before then, but we
8  still have to work through all the legal argument,
9  now that the evidence is in, right?  We didn't know
10 what the evidence would be until they all said,
11 closed.
12      So we need to stick around today for a few
13 more hours to finalize the jury charge, so that
14 tomorrow at 9:00, I can read it to you.  It may take
15 an hour and a half.  It is pretty long.  I wish my
16 reading voice were like James Earl Jones', but it is
17 not.
18      So come caffeinated tomorrow at 9:00.  You
19 will hear me boringly read a charge.  And then you
20 will hear some excited closing arguments from these
21 talented lawyers.  And then the case will be yours,
22 at long last.
23      So thank you for your careful attention
24 these past two weeks.  I'm giving you the afternoon
25 off, but that doesn't mean you have to tell your

Page 1856

1  family or your employers, right?  Go do what you
2  want to do.
3       So thank you for your careful attention.
4  Same instructions, though.  Because until I say, Go
5  deliberate, then you can't talk to each other about
6  the case.  You can talk to each, just not about the
7  case.  You can't talk to anyone else.  And don't do
8  any research on the case.  All rise for the jury.
9       (The jurors exited the courtroom.)
10      THE COURT:  Okay.  Y'all can be seated.
11      I'm probably going to let us take a break
12 before we launch into the formal charge conference.
13 But let me ask, does everyone want to renew their
14 directed verdict motions?  I know we didn't hear
15 really any evidence since we just talked about the
16 most recent ones.  But does everyone want to renew
17 their directed verdict motions for posterity?
18      MR. McKEEBY:  Yes, your Honor.
19      MR. GREENFIELD:  Yes.
20      MR. GILLIAM:  Yes.
21      THE COURT:  Yes, yes, yes.  Okay.  I have
22 heard your renewed motions.  I'm rejecting all of
23 them, without saying why still again.  So that
24 ruling is on the record, so you preserved your
25 error.

Page 1857

1       So let's take a 10-minute break.  Y'all
2  can get reset, and then we will come back in and
3  talk about the formal charge.  I think we have got
4  electronic copies in your hands.  And then we will
5  see what we can get through on the charge this
6  afternoon.
7       Court is in a 10-minute recess.  We will
8  see y'all at 2:20.
9       THE COURT SECURITY OFFICER:  All rise.
10      (Recess.)
11      THE COURT SECURITY OFFICER:  All rise.
12      THE COURT:  Thank you.
13      You can be seated.
14      Okay.  We are back on the record, maybe
15 let's refresh our appearances because we are outside
16 the jury's presence at a formal charge conference.
17 So let's go for it, Mr. Gilliam.
18      MR. GILLIAM:  For plaintiff Charlene
19 Carter, Matthew Gilliam, Matt Hill, and Bobby Pryor.
20      MR. McKEEBY:  For Southwest Airlines,
21 Paulo McKeeby and Brian Morris.
22      MR. GREENFIELD:  On behalf of TWU Local
23 556, Adam Greenfield and Edward Cloutman, III.
24      THE COURT:  Okay.  Thank y'all.
25      All right.  So we are here at the formal

Page 1858

1  charge conference, sent the jury home for the day
2  and then y'all have my latest draft of the jury
3  charge and the jury questions.
4       So what I want to do is, basically, we
5  will go through this a section at a time this time.
6  And I'm just going to ask if anyone has any problems
7  with any section.  And then we will address those
8  before I move on to the next section.  As soon as my
9  computer decides to pull up the behemoth charge, I
10 will be ready to go.
11      Okay.  So I have got it up.  So we've got
12 jury instructions, a standard opening on pages 1 and
13 2.
14      Does anyone have any issues with pages 1
15 and 2?
16      MR. GREENFIELD:  I'm sorry.  You have the
17 jury instructions first?
18      THE COURT:  Uh-huh.
19      MR. GREENFIELD:  I'm sorry, I don't know
20 if I --
21      THE COURT:  So pages 1 and 2, anyone --
22 any issues with the standard instructions?
23      MR. GREENFIELD:  I'm trying to pull it up.
24 My email is not --
25      THE COURT:  How about signal to me when

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022                        Pages 1859..1862

Page 1859

1 you are ready?
2          MR. GREENFIELD:  The wheels are spinning.
3 I would be happy if you want to turn it over to see
4 what everyone else has to say to keep moving
5 forward, your Honor.  I'm just getting a spinning
6 wheel.  Thank you, though.
7          THE COURT:  I was earlier, so I feel your
8 pain.
9          MR. GREENFIELD:  I think I have got
10 them -- within moments, your Honor.  Maybe.
11 I'm ready, your Honor.
12          THE COURT:  All righty.
13          Okay.  So pages 1 and 2 are standard
14 preliminary instructions.
15          Any issues with regard to those?
16          MR. GILLIAM:  None from plaintiff.
17          THE COURT:  All right.  Any Southwest
18 issues on 1 and 2?
19          MR. MORRIS:  No, your Honor.
20          MR. GREENFIELD:  No, your Honor.
21          THE COURT:  All right.
22          Preponderance of the evidence on page 3,
23 any issues?
24          MR. GILLIAM:  None from plaintiff.
25          MR. MORRIS:  None from Southwest.

Page 1860

1          MR. GREENFIELD:  None, your Honor.
2          THE COURT:  Okay.  So we are on to
3 evidence, page 3; direct and circumstantial.
4          MR. GILLIAM:  No issues from plaintiff.
5          MR. MORRIS:  None from Southwest.
6          MR. GREENFIELD:  None, your Honor, from
7 the Union.
8          THE COURT:  Now we are on to stipulations
9 and the 15 from the pretrial order that I read at
10 the start of trial and incorporated here.
11          Any issues with the stipulation section?
12          MR. GILLIAM:  None from plaintiff.
13          MR. MORRIS:  None from Southwest.
14          MR. GREENFIELD:  None from the Union, your
15 Honor.
16          THE COURT:  All right.
17          So we are to the witnesses section on
18 pages 5 and 6.
19          MR. GILLIAM:  No issues from plaintiff.
20          MR. MORRIS:  None from Southwest.
21          MR. GREENFIELD:  None from the Union, your
22 Honor.
23          THE COURT:  All right.
24          So then similar acts on 6 and 7?
25          MR. GILLIAM:  No issues from plaintiff.

Page 1861

1          MR. MORRIS:  Your Honor, Southwest just
2 requests that the limiting instruction that is
3 further down the charge be included here as well.
4          THE COURT:  I know the limiting
5 instruction is in here.  I'm fine putting it in one
6 place.  If you want me to put it in here, I can move
7 it.  Putting it in twice, I think, gives it more
8 credence than anything else gets in the charge.
9          MR. MORRIS:  I think it is fine where it
10 is.
11          THE COURT:  Okay.  Any other issues with
12 similar acts?
13          MR. GILLIAM:  No other issues from
14 plaintiff.
15          MR. GREENFIELD:  None from me, your Honor.
16          THE COURT:  Okay.  Impeachment by
17 inconsistent statements?
18          MR. GREENFIELD:  None from the Union, your
19 Honor.
20          MR. GILLIAM:  No issues from the
21 plaintiff.
22          MR. MORRIS:  None for Southwest.
23          THE COURT:  Okay.  Depo testimony on
24 pages 7 and 8?
25          MR. GREENFIELD:  No issues from the Union,

Page 1862

1 your Honor.
2          MR. GILLIAM:  No issues from the
3 plaintiff.
4          THE COURT:  I will flag for y'all, I
5 changed, like, two or three words in here.  The
6 pattern says, "Before trial a depo was taken," and
7 Nevarez was not taken before trial.  So I just said
8 "some time before the testimony was presented," just
9 to make sure we are technically correct.
10          Are there any issues with that?  That is
11 the next-to-the-bottom line on page 7.
12          I just want to give full disclosure on
13 what I was tweaking this morning.
14          MR. MORRIS:  No issues from Southwest.
15          MR. GREENFIELD:  No, your Honor.
16          And I would just make a request from the
17 Court, if you could kindly point out if there has
18 been any adjustments so I can at least compare if we
19 get to a section.
20          THE COURT:  I have no idea.  Because I'm
21 one of three people who was changing it in the last
22 24 hours.
23          MR. GREENFIELD:  Understood.
24          THE COURT:  So I will tell you if I have
25 personal knowledge of things that I changed.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 566 of 642   PageID 11507
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                          Pages 1863..1866

Page 1863

1        MR. GREENFIELD:  Thank you.
2        THE COURT:  Yes, if you want to make a red
3 line and send it now, that is fine, to the version
4 y'all had last.
5        Okay.  So now we are at limiting
6 instructions.  Any issue with limiting instructions?
7        MR. GILLIAM:  No issues from plaintiff.
8        MR. MORRIS:  None from Southwest.
9        MR. GREENFIELD:  None for me, your Honor.
10       THE COURT:  All right.
11       Inference from filing suit.  There is
12 none.  Any issue?
13       MR. GILLIAM:  No issues from plaintiff.
14       MR. MORRIS:  None from Southwest.
15       MR. GREENFIELD:  None from the Union, your
16 Honor.
17       THE COURT:  Okay.  Now, we are into
18 parties claims.  Let's talk about Section 8 first.
19       So fair representation against Local 556.
20       Any issues on this one on pages 9, 10, and
21 touching on 11?
22       MR. GILLIAM:  Yes, your Honor.  We still
23 maintain our objection about the inclusion of
24 language about how the DFR applies during grievance
25 handling.  Grievance handling is not a relevant part

Page 1864

1 of Ms. Carter's claims in this case.  And we feel
2 that it is confusing to the jury, the claims.
3        So we object to the --
4        MR. GREENFIELD:  If I may respond, your
5 Honor.
6        THE COURT:  Yes.  So let's -- can you zoom
7 in on that sentence?  Is it the last sentence of the
8 first full paragraph that we are talking about?
9        MR. GILLIAM:  Yes.  That is one occurrence
10 of it.  It occurs in two places.  That is one place.
11 The other is on page 10, and it is the last sentence
12 of the second paragraph.
13       THE COURT:  Okay.
14       Response?
15       MR. GREENFIELD:  Yes, your Honor.
16       I understand that the attorneys are saying
17 that it is not part of their case, but when
18 Ms. Carter was on the stand, she waffled a couple
19 times back and forth, but did say at one point that
20 she did say the representation was a breach.
21       THE COURT:  In the Step 2?
22       MR. GREENFIELD:  Yes, ma'am -- yes, sir.
23       THE COURT:  Yes.  I recalled that, too.
24 So I know y'all have been consistent, but I thought
25 there --

Page 1865

1        MR. GILLIAM:  We argued it, so I --
2        THE COURT:  -- agreed.
3        But -- so I wasn't also asked to
4 judiciously estop her and strike her.
5        So because of that, I think I have got to
6 have the language in for clarity of picture from
7 what the jury heard, if that makes sense.
8        That is at least my view sitting here
9 after hearing that testimony.  So my recollection
10 was consistent with Mr. Greenfield's.
11       MR. GILLIAM:  Okay.  And.
12       A question for your Honor, for any
13 instance where, I guess, we do have an objection to
14 some of these instructions on claims, it is my
15 understanding that we need to file, to get something
16 on the record, maybe, you know, a version that, you
17 know, we would not -- that we would not object to in
18 order to preserve our objection.
19       THE COURT:  So yes, with an asterisk.  I
20 guess what I'm concerned about is not about language
21 that you would like cut out.  You can just tell me.
22       And that is why I asked you to point out
23 the specific sentences you are talking about.  So
24 right now you have preserved error that those two
25 sentences, and the spots that you identified are in

Page 1866

1 and shouldn't be, in your view.
2        My greater concern was -- and this
3 probably is evaporating, given the timing that we
4 are having this charge conference at.  If the jury
5 were back out there, and you said, Hey, I have got a
6 20-page instruction on my preferred way to handle my
7 claims, and now we are worried about the jury's
8 timing being back there, I would ask you to file
9 that, reference it in this proceeding.  And that way
10 we don't have to have you read it all.
11       So here I have no problem, if you read
12 it -- now that the jury is not waiting on us, I
13 don't have a problem with you reading what you think
14 is substantially correct.  But if it is an omission
15 that we are talking about like right here, you can
16 just say, Omit X, Starr, because it shouldn't be in
17 there.
18       And if there is something larger that you
19 want in that I'm not putting in, we need to get it
20 in, in some way.  Either you read it into the record
21 here or you file it and reference it by
22 incorporation.
23       Does that make sense?
24       MR. GILLIAM:  I think so.
25       So you mentioned a notation saying "omit."

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 567 of 642   PageID 11508
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1867..1870

Page 1867

1    Do we file something with some kind of
2 notation like that?
3        THE COURT:  No.  So as long as it is in
4 the record, that is what matters, right?  And so the
5 normal way of handling this is all verbally on the
6 record.
7        If we have somebody say, I would like a
8 different jury question that is 30 pages long, it is
9 going to take 30 minutes to read that into the
10 record.  I was concerned about them waiting back
11 there for 30 minutes.  When you could just file it,
12 refer to it in this proceeding that you are filing,
13 and then it is preserved.
14       So my preference would be, now that we are
15 not waiting on them, whatever you have got that you
16 want in that I'm keeping out, read it into the
17 record.
18       But if it really is like 30 or 40 minutes
19 worth, or more than that, then we can think about
20 whether or not we should file it.
21       So it is content you are wanting in that
22 is lengthy that would bore us all to tears that I'm
23 letting you file in reference to it in this hearing.
24 But you should still reference it in this hearing,
25 right?  I don't want you going and filing something

Page 1868

1 at midnight saying, This was my preferred charge.
2 That is not a proper way of handling it.
3        MR. GILLIAM:  Okay.
4        We just had concerns about preserving the
5 issue.  And I think we were under the impression
6 that we would have to file -- that we would have to
7 put something in writing.
8        THE COURT:  You don't have to put
9 something in writing to preserve it.  You can put it
10 in at this hearing to preserve it.
11       Now, you need something at this hearing to
12 preserve it, even if this hearing references
13 something you are filing on the docket right now or
14 an hour from now, that incorporates it by reference.
15       Does that make sense?  But you have got to
16 bring it up at this hearing.
17       If you bring it up on the docket tonight
18 and there is no reference in this hearing to it,
19 then it is not preserved at the formal charge
20 conference.
21       All right.  So if you have a question on a
22 particular thing you are wondering about, let me
23 know, because I don't just have to give you
24 generalized, we can talk through it specifically.
25       But on the ones you just told me, the two

Page 1869

1 sentences that shouldn't be there, in your view, I'm
2 overruling your objection.  Your objection is
3 perfectly clear on the record on what documents they
4 are.
5        Now, I will say, one thing I should do --
6 because I only emailed this to y'all and did not
7 send it, I'm going to read these two sentences into
8 the record because I think a reference to an email
9 is not enough.  It has got to be a reference to a
10 file document or something read into the record,
11 right?  So I caught myself there.
12       So I think your two sentences that you are
13 objecting to, Mr. Gilliam, are, this is especially
14 true when a union is handling a grievance based upon
15 a termination, the industrial equivalent of capital
16 punishment, is that one of the sentences you are
17 objecting to?
18       MR. GILLIAM:  Yes, your Honor.
19       THE COURT:  Okay.  I will overrule that
20 one.
21       And then the other sentence you are
22 objecting to is, plaintiff Carter can also prove a
23 breach of duty by the Union by showing that the
24 Union was arbitrarily ignoring a meritorious
25 grievance or processing it in a perfunctory fashion.

Page 1870

1        That's the other one you are objecting to?
2        MR. GILLIAM:  That's the other one, your
3 Honor.
4        THE COURT:  Okay.  I will overrule that
5 objection as well, based on the evidence that I
6 believe we heard.
7        Okay.  So other questions on this section
8 A, fair representation against the Union?
9        MR. GREENFIELD:  Yes, your Honor.
10       If we go down to the paragraph that
11 starts, "A union is liable for all acts."
12       THE COURT:  I'm there.
13       MR. GREENFIELD:  I think the charge sets
14 out kind of what a union is liable for, and how a
15 union violates the DFR.
16       We would just reiterate the language we
17 asked for in our formal -- or in our informal charge
18 conference.  At the end of footnote 4, we believe it
19 would be important to include, "However, a union
20 official does not lose their federally-protected
21 rights as an employee by becoming an official with
22 the Union.  As such, Defendant Southwest Airlines
23 owes the same duty to the Union and as officials as
24 any other Southwest employees."
25       THE COURT:  Understood.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 568 of 642   PageID 11509
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 6 July 12, 2022                  Pages 1871..1874

Page 1871

1       Thank you for reading it in.  I will
2   reject that.  But that was perfect in reading it in.
3   So you have preserved your argument.
4       MR. GREENFIELD:  The next issue I have,
5   your Honor.
6       THE COURT:  Yes, sir.
7       MR. GREENFIELD:  If we go down to, "The
8   law presumes."
9       THE COURT:  I'm there.
10      MR. GREENFIELD:  "Breaches its duty when
11  it causes the discharge of an employee."
12      THE COURT:  Yes, sir.
13      MR. GREENFIELD:  I believe that is a
14  misstatement of the law.  The law, if applied to
15  conduct of individuals rather than actions of the
16  executive board, creating such a presumption
17  elevates the federal rights of some employees above
18  those of others, and I think that is improper.
19      THE COURT:  All right.  Would you omit or
20  reform that statement?
21      MR. GREENFIELD:  I would take that out.
22      THE COURT:  Okay.
23      MR. GREENFIELD:  Omit it.
24      THE COURT:  Understood.
25      I will overrule that.

Page 1872

1       MR. GILLIAM:  And, your Honor, I also have
2   an objection with that statement as well.
3       THE COURT:  Okay.  Go for it.
4       MR. GILLIAM:  It currently says, "The law
5   presumes a union breaches its duty when it causes
6   the discharge of an employee."  The second sentence
7   says, "If a union caused the discharge of an
8   employee."
9       We believe that it should say the law
10  presumes union breaches its duty when it causes or
11  attempts to cause the discharge of an employee.
12      THE COURT:  Causes or attempts to cause.
13  Do you have a citation for authority for attempts to
14  cause?
15      MR. GILLIAM:  I believe the In Re Graphics
16  case, or Acklin, one of the two states it.  If not,
17  maybe the Caravan Knight case.  I know we have cited
18  it before.  I don't have the citation off the top of
19  my head.  We've often cited those together.
20      THE COURT:  Understood.
21      So what I will do is, I will overrule it
22  for now.  I will look into it, because I reserve the
23  right before charging the jury to change my mind,
24  but I will look at your cases.  But I'm going to
25  overrule it at this point.

Page 1873

1       MR. GILLIAM:  Well, one of the cases does
2   say "cause," but I believe one of the others says
3   "attempts to cause."
4       THE COURT:  Okay.  I'm overruling it at
5   this point and I reserve the right change my mind.
6       Other issues with this section?
7       MR. GREENFIELD:  The Union has no
8   additional objections to section A, your Honor.
9       THE COURT:  All right.
10      MR. GILLIAM:  No others to section A from
11  plaintiff.
12      THE COURT:  Okay.  B is RLA retaliation
13  claim against Southwest and 556.
14      So who wants to raise an objection to this
15  section?
16      MR. MORRIS:  Your Honor, Southwest would
17  request that the second sentence, The act forbids
18  any limitation, et cetera, et cetera.  That
19  statement is from the section on the purpose of the
20  RLA.  It doesn't impose any free-standing legal
21  obligations on the parties.  And we think it is
22  inappropriate to instruct the jury as to the purpose
23  of a statute.  That is for the Court's use perhaps,
24  but we think it is improper for the jury.
25      THE COURT:  Any thoughts from any other

Page 1874

1   side?  Any objection to me taking it out?
2       MR. GILLIAM:  We think it is proper to
3   include the language of the statute there.
4       MR. MORRIS:  Your Honor, if I could one
5   thing.  It says, "The act forbids."  The section
6   actually says, "the act is intended to forbid."
7   This is saying it actually forbids something.  I
8   just think that is not accurate, as well as just
9   inappropriate.
10      THE COURT:  Understood.
11      So what I will do on this is, I'm going to
12  overrule this one for now.  I'm going to take a look
13  at it as well.
14      And what I will do is, if I make any
15  changes later on today, I'm going to send y'all a
16  red line from what I tell you I'm doing at the
17  formal charge conference, if that makes sense.
18      Okay.  Other questions?
19      MR. GILLIAM:  Yes, your Honor.
20      For plaintiffs, on -- I guess starting
21  with page 13.  Let's see, the first full paragraph
22  that starts with, To prove.
23      THE COURT:  I'm there.
24      MR. GILLIAM:  And the third element says
25  that plaintiff Carter's protective activity played a

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 569 of 642   PageID 11510
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1875..1878

Page 1875

1  substantial or motivating factor.
2       I think played should be --
3       MR. GREENFIELD: And I'm sorry, Matthew.
4  I'm not there. I'm trying to track.
5       MR. GILLIAM: Oh, sorry.
6       MR. GREENFIELD: On page 13, you said?
7       MR. GILLIAM: Page 13, the first full
8  paragraph that starts with --
9       MR. GREENFIELD: To prove.
10      MR. GILLIAM: -- to prove.
11      MR. GREENFIELD: Thank you.
12      MR. GILLIAM: And then the third element.
13      MR. GREENFIELD: My apologies. Thank you.
14      MR. GILLIAM: No problem.
15      It says that plaintiff Carter -- plaintiff
16 Carter's protected activity played a substantial and
17 motivating factor.
18      We would just strike "played" and include
19 "was." The concern is that "played" may confuse
20 what the motivating factor analysis actually is.
21      THE COURT: Okay. "Played" to "was."
22      Any issues with changing played to was?
23      MR. MORRIS: Your Honor, I think that
24 is -- that's fine.
25      MR. GREENFIELD: Yes, your Honor.

Page 1876

1       THE COURT: It saves several letters,
2  which, in the grand scheme of things, we could make
3  that change throughout.
4       MR. GILLIAM: I hate to seem like I'm
5  quibbling, but I did have a concern about it.
6       THE COURT: Understood.
7       No, I -- okay. So I have made that change
8  from "played" to "was."
9       I will note, now that I'm making changes,
10 my pagination is changing a little bit, so it may
11 take me a little bit to catch up to where y'all are
12 at.
13      Okay. So I made that change from changing
14 "played" to "was."
15      Other issues with this section?
16      MR. GILLIAM: I still have a couple.
17      The other is we think there should be a
18 paragraph included to define what "substantial and
19 motivating factor" means.
20      We would -- we would amend it to read,
21 "substantial and motivating factor means any factor
22 that motivated or in any way contributed to
23 Southwest's decision to fire Carter or Local 556's
24 decision to report Carter."
25      And further include language that says

Page 1877

1  "even if other factors also motivated the decision."
2       THE COURT: Okay. So thoughts on that
3  language, on defining "substantial and motivating
4  factor"?
5       MR. MORRIS: We object to that inclusion.
6  We think it is clear as it is; long enough as it is.
7       THE COURT: Understood.
8       Any Union position?
9       MR. GREENFIELD: Same here.
10      THE COURT: Okay. So I'm going to reject
11 that inclusion, but you have preserved it.
12      MR. MORRIS: Your Honor, I have another
13 thought. I don't know if anybody else wants to jump
14 in.
15      THE COURT: You may as well, Mr. Morris.
16      MR. MORRIS: In the first sentence after
17 the Court quotes section 152.4. It says, "Plaintiff
18 Carter claims Southwest retaliated against her by
19 firing her for engaging in union-opposition-and-
20 organizational activity."
21      I think it is best not to characterize the
22 claim there, at the risk of being either inaccurate
23 or under or over inclusive, and just say "Carter
24 claims Southwest retaliated against her by firing
25 her for engaging in activity protected by the

Page 1878

1  RLA" -- or protected by section -- sorry -- I'm just
2  trying to word it properly.
3       So if we just took out "in opposition,
4  union-opposition-and-organizational activity." I
5  think that would address it.
6       THE COURT: So you suggest taking out the
7  words connected by the hyphens,
8  union-opposition-and-organizational?
9       MR. MORRIS: Correct.
10      THE COURT: I don't have an issue with
11 taking out "union opposition" and organizational
12 modifier to activity.
13      MR. GILLIAM: We do, your Honor. I think
14 that it makes it clear what -- what exact activity
15 we are talking about for the purpose of the RLA
16 claims so that, you know, the jurors don't have to
17 be lawyers and understand what it is precisely that
18 152, Third and Fourth protect and what is at issue
19 in this case.
20      THE COURT: Understood.
21      Any Union position on that phrase coming
22 out or staying in?
23      MR. GREENFIELD: I'm not sure, your Honor.
24 I'm trying to keep up. I'm on a different section.
25      THE COURT: I hear you.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 570 of 642   PageID 11511
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                   Vol 6 July 12, 2022                        Pages 1879..1882

Page 1879

1        MR. GREENFIELD:  Specifically, what are we
2  talking about?  I apologize.
3        THE COURT:  So under the block quote that
4  I have now on my page 12 -- which is different than
5  y'all's page 12 --
6        MR. GREENFIELD:  Okay.  All right.
7        THE COURT:  -- that quotes section 152.4,
8  there is a first full sentence that says, "Plaintiff
9  Carter claims that Defendant Southwest."
10       Tell me when you are at that sentence.
11       MR. GREENFIELD:  Yes, I'm there.
12       THE COURT:  Okay.  There is a long
13  hyphenated phrase, union-opposition-and-
14  organizational, that Southwest would like out that
15  Carter wants to keep in.
16       MR. GREENFIELD:  And I'm sorry, I didn't
17  hear what Southwest -- did Southwest have a
18  proposition that they wanted?
19       THE COURT:  They prefer to either cut it
20  or cut it and change the wording of, "by section
21  152, Third and Fourth," to, "by the RLA."
22       MR. GREENFIELD:  I'm fine either way, your
23  Honor.
24       THE COURT:  Okay.  I'm going to keep it in
25  for now.  I know it adds length, but it is clarity,

Page 1880

1  so I think it serves some purpose.  So I will
2  overrule the objection and keep it in.
3        What is the next objection to this
4  section?
5        MR. GILLIAM:  For plaintiff, your Honor,
6  paragraph 15 -- I'm sorry -- page 15.  I think it is
7  still page 15.  I'm using the old version for
8  guidance on pages.
9        THE COURT:  Okay.  But now you are in a
10  new section, though, right?
11       MR. GILLIAM:  Am I?
12       MR. GREENFIELD:  Fifteen would take us
13  into C --
14       THE COURT:  It would take us somewhere
15  into the C territory.
16       MR. GILLIAM:  Okay.  I'm sorry.  We are in
17  B.
18       MR. GREENFIELD:  So, Matthew, what
19  happened is and why I lost you earlier is, I believe
20  the Court cut the language about it being a -- the
21  matter of law question, and so that kind of skewed
22  our pages from your pages.
23       MR. GILLIAM:  Oh.
24       THE COURT:  Yes, it did.
25       MR. GILLIAM:  Okay.  Sorry about that.

Page 1881

1        With that mind, so it is the last
2  paragraph of paragraph B -- paragraph B, right
3  before C.
4        THE COURT:  Okay.  So the last full
5  paragraph of B, if you decide that Defendant
6  Southwest, is that correct?
7        MR. GILLIAM:  Yes.  And we believe that
8  whole paragraph should be stricken for the -- for
9  all of the reasons we have previously argued.
10       There is no -- we have argued there is no
11  legitimate, non-discriminatory reason.  There is --
12  you know, Southwest and Local 556 reported
13  Ms. Carter's messages and posts under the social
14  media policies, and that either was a discriminatory
15  reason or it was not a discriminatory reason.  And
16  the affirmative defense is meant to provide for a
17  non-discriminatory reason.
18       So it is -- the social media policies, as
19  a defense, shouldn't get two bites at the apple.
20  And it nullifies the RLA's protections to include
21  this paragraph in here.  It nullifies the whole
22  protection for the activities that Ms. Carter
23  engaged in.
24       THE COURT:  Understood.
25       So I will project your request for the

Page 1882

1  same reasons I overruled the directed verdict motion
2  which is -- shhhhh.
3        I'm joking.  But I never say why, right?
4  So I'm not going to say why now.
5        I don't want shape y'all's closing
6  arguments, right?  I don't want to tell you what I'm
7  thinking that is important to me, which may be
8  totally different than what is important to them.
9        So, you know, I have my own reasons, but I
10  have found that in the past, they usually don't
11  matter if I tell you, because they pull you off of
12  the jury's trail and on to my trail, which is just
13  irrelevant.
14       So I understand your request to remove
15  that paragraph, but I will overrule it.
16       Other objections for section B?
17       MR. GREENFIELD:  Yes, your Honor, from the
18  Union.  If we look at section 13 -- or page 13, the
19  second paragraph from the bottom that says, "All
20  union-oppositional-and-organizational activity."
21       THE COURT:  I'm there.
22       MR. GREENFIELD:  Okay.  We would seek, as
23  we requested in the informal conference, different
24  case law language.  We have provided the case of
25  Held v. American Airlines, Lesser Construction, LLC

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 571 of 642   PageID 11512
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1883..1886

Page 1883

1 and Daimler Chrysler Corp.
2        We believe a more proper instruction would
3 be under section 152, Third and Fourth, but can lose
4 protection, if the communication is vulgar,
5 offensive, abusive, or harassing under Held.
6        Special circumstances can also cause the
7 speech to lose protection under Lesser Construction.
8 Such circumstances include situations in which the
9 otherwise-protected activity is vulgar or obscene
10 and may exacerbate employee tensions.  Also from
11 Lesser Construction.
12       And then continuing on, if you find
13 plaintiff Carter's messages to Ms. Stone to be
14 indefensible or abusive, the protection is forfeited
15 under Daimler Chrysler in the NLRB case.
16       THE COURT:  Understood.
17       So I will say I think this is sort of the
18 core issue with the charge, right?  Getting down to
19 what is -- what is the categories of protected
20 conduct under the RLA.
21       And I'm not going to speak too much on
22 this because then I'm getting away from my general
23 principle of not trying to throw y'all off of the
24 jury's trail and tell you what I think is important.
25       But based on this, I can't find a Supreme

Page 1884

1 Court case or a Fifth Circuit case using that
2 language in the Railway Labor Act.  Absolutely any
3 National Labor Relations Act, what I ingrafted in.
4 I know under Konop, they had a question in a
5 footnote where they said they might, looking at a
6 Fifth Circuit National Labor Relations Act case.
7        I don't see a basis to ingraft it from a
8 National Labor Relations Act over to a Railway Labor
9 Act, unless it is necessary.
10       And from what I can tell, the reason
11 Congress used different language is, the NLRA was
12 really talking about context where you might have a
13 union, and the RLA was talking about context where
14 you will have a union.
15       So I think it is basically making it as if
16 it is the Government, right?  The Government saying
17 you will have a union in these transportation
18 contexts.  And as a result of that, it is almost
19 like you are speaking to your Government.
20       So what protected speech do you have?
21 Well, you can't say knowingly false things about
22 Government officials and you can't threaten your
23 Government officials.
24       But that separate category we find in the
25 National Labor Relations Act where you might have a

Page 1885

1 union, that level of additional protection is not
2 there against where you will have a union just like
3 it is not there where you will have your Government.
4        So that is my view from the best I can
5 extrapolate as to why the two laws are worded
6 differently and why I don't have a Supreme Court
7 case or a Fifth Circuit case telling me I need this
8 third category.
9        So that is a long way of saying I will
10 reject that request, but I appreciate you reading
11 the language into the record for us.
12       MR. GREENFIELD:  Yes, your Honor.
13 Thank you.
14       MR. MORRIS:  Your Honor, we have the
15 same -- although I was going to identify certain
16 other categories of speech that lose protection.
17       THE COURT:  You should.  So let's have you
18 read your preferred language into the record,
19 Mr. Morris.
20       MR. MORRIS:  Sure.  Just give me one
21 second.  I'm just trying to get it right here.
22       THE COURT:  Yes.
23       MR. MORRIS:  So I guess it would be,
24 "unless it is flagrant, violent, extreme, egregious,
25 inappropriate, offensive, obscene, harassing,

Page 1886

1 intimidating, or hostile."
2        THE COURT:  Understood.
3        So I'll overrule that one for the same
4 reasons I overruled the Union's request for similar
5 language in section B.
6        Okay.  Other issues with section B?
7        MR. GREENFIELD:  Yes.  I think I have one
8 more, your Honor.  I'm just trying to be clear on
9 where it is.
10       Yes.  If we go down to the -- if you --
11 the very last paragraph in section B, If you decide
12 that Defendant Southwest and/or Defendant Local 556.
13       THE COURT:  Yes.
14       MR. GREENFIELD:  If you scroll down a few
15 sentences, it gets to the section that goes section
16 152, Third and/or Fourth.
17       THE COURT:  Yes.
18       MR. GREENFIELD:  So it says, "The
19 Defendants assert that Plaintiff Carter would have
20 been discharged even if she had not engaged in
21 activity protected by section 152, Third and/or
22 Fourth."
23       We would seek additional language that
24 says, at the end of Fourth, "and/or that even if her
25 messages to Ms. Stone contained protected

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 572 of 642   PageID 11513
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1887..1890

Page 1887

1  expression, they also constituted harassment that
2  violated Southwest Airlines' employee conduct
3  policies and implicated Stone's federally-protected
4  rights."
5       THE COURT:  Understood.
6       I will reject that request.
7       Okay.  Other issues with section B?
8       It sounds like we should move to C-1.
9       So C-1 is Carter's discharge claim against
10 Southwest and 556.
11      So on my version, it is starting on
12 page 14, and runs to the top of 16.
13      Who has an issue with section C-1?
14      MR. GREENFIELD:  The Union, your Honor.
15 And correct me if I'm wrong on this -- and I
16 apologize, I had some help on this briefing.
17      But we object to it on the basis that we
18 would propose the adoption of the pattern jury
19 charge for claims of religious discrimination under
20 Title VII as presented by the Fifth Circuit.
21      THE COURT:  Understood.
22      And anyone else have thoughts on sticking
23 to the patterns?
24      So my recollection was the patterns
25 preferred some tailoring to the case, so I think

Page 1888

1  that is what we tried to accomplish in as neutral of
2  a way as possible.
3       MR. GILLIAM:  Yes, your Honor.  Just, I
4  think that in this case, the -- these instructions
5  more closely follow Abercrombie and Fitch, which I
6  think benefits this case.
7       THE COURT:  All right.  And I know I
8  haven't gone all of the way with you on Abercrombie
9  and what your view is, Abercrombie to this case, but
10 there is some part of it I have come along with you
11 on.
12      Okay.  So I have a request in for sticking
13 solely to the patterns.  I'm going to overrule that
14 request.
15      What other issues are there with C-1?
16      MR. GILLIAM:  Let's see.  I'm probably a
17 little messed up on my pages here.
18      There is a paragraph with the elements, I
19 guess for both Southwest and Local 556.  And the
20 elements basically say that either Southwest --
21 Southwest's discharge of Plaintiff Charter was
22 motivated by her sincerely-held religious
23 observance, beliefs, or practices.
24      And then the corresponding one for Local
25 556 says that Local 556's decision to report Carter

Page 1889

1  to Southwest was motivated by Carter's
2  sincerely-held religious observance, beliefs, or
3  practices.
4       Our objection there would be that it
5  should more clearly state that Ms. Carter's
6  sincerely-held religious observance, beliefs or
7  practices were a motivating factor.
8       Concern with the way it is currently
9  phrased is that it would maybe lead the jury to
10 believe that the standard is a lot higher than it
11 is.
12      In fact --
13      THE COURT:  It looks more like but-for
14 language based on how we frame it?
15      MR. GILLIAM:  Yes.  And I think -- I do --
16 I would like to state for the record that Ms. Carter
17 could also prove because of in this instance,
18 through a but-for cause analysis, the motivating
19 factor analysis is probably more appropriate.
20      I think she has either option, she could
21 prove her case through either the motivating factor
22 analysis or a but-for cause analysis.
23      And, again, to more clearly represent that
24 element, or more accurately represent the case law,
25 it should be worded to say that -- just so it is

Page 1890

1  clear for the record -- that Defendant Southwest's
2  discharge of Plaintiff Carter -- I'm sorry -- that
3  Plaintiff Carter's sincerely-held religious
4  observances, beliefs, or practices was a motivating
5  factor for Defendant Southwest's decision to
6  discharge Carter.
7       And then the corresponding one for the
8  Union should say that Carter's sincerely-held
9  religious observance, beliefs, or practices was a
10 motivating factor to Local 556's decision to report
11 Carter.
12      THE REPORTER:  Could you say that again?
13 It was garbled.
14      MR. GILLIAM:  Sure.
15      That Local 556's decision to -- I'm
16 sorry -- that Carter's sincerely-held religious
17 observances, beliefs, or practices was a motivating
18 factor for Local 556's decision to report Carter.
19      I'm starting to lose my voice.  I
20 apologize.
21      THE COURT:  I think we all are at this
22 point.
23      MR. MORRIS:  Your Honor, I would just note
24 for Southwest, that the "motivated by" language is
25 from the pattern instruction, and we don't see any

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 573 of 642   PageID 11514
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1891..1894

Page 1891

1 reason to deviate from that.  And relatedly, we
2 think the but-for instruction is the appropriate
3 one.
4        THE COURT:  Now, they think they get both
5 motivating factor and but-for, and you think they
6 just get but-for, is that correct?
7        MR. MORRIS:  Uh-huh, yes.
8        MR. GILLIAM:  That's correct.
9        THE COURT:  Okay.  Union position on these
10 two arguments?
11       MR. GREENFIELD:  No, your Honor.  I think
12 the language should read as is.
13       THE COURT:  Okay.  So I'm going to stick
14 with it as is.
15       So I get your argument that I think
16 patterns might be able to be clearer, but until they
17 clear them up, I think I'm going to stick with the
18 safe harbor in the patterns.
19       I get your point to Abercrombie and Wright
20 Line, that maybe you can get both, but the patters
21 still are sticking me to one or the other.  I
22 haven't seen sufficient clarity from Abercrombie
23 where I think I should really send both against the
24 patterns, but, yes, that may be true.
25       MR. GILLIAM:  Bostock v. Clayton County,

Page 1892

1 Georgia addresses it as well.
2        THE COURT:  Right.  I get that.  But I'm
3 not there yet.  So my inclination now is to send
4 motivating factor, but not both and not but-for, if
5 that makes sense.
6        So I will note your request, but I am
7 rejecting it.
8        THE COURT:  Okay.  What else do we have to
9 address in C-1?
10       MR. GILLIAM:  The very last paragraph.  It
11 starts, "Plaintiff Carter does not have to prove
12 that unlawful discrimination was the only reason" --
13       THE COURT:  Uh-huh.
14       MR. GILLIAM:  -- "the Defendant Local 556
15 reported her."
16       And I guess there is a corresponding
17 paragraph for Southwest that this would apply to as
18 well.
19       The concern there is that it sort of
20 equates unlawful discrimination, what you are
21 proving, by showing that Ms. Carter's
22 sincerely-healed religious beliefs were a motivating
23 factor is instead now -- you are sort of
24 substituting what you have to prove for the -- what
25 is a motivating factor.

Page 1893

1        So phrased the way it currently is, the
2 concern is that the -- it heightens the burden under
3 Title VII's motivating factor test.  Because it
4 suggests that unlawful discrimination must be the
5 motivating factor.
6        THE COURT:  Okay.  What is your suggested
7 alternative?
8        MR. GILLIAM:  That -- give me a second.
9 I'm sorry.  I lost my place here.
10       Plaintiff Carter does not have to prove
11 that -- let's see.
12       "Plaintiff Carter does not have to prove
13 that her sincerely-held religious beliefs,
14 observances, and practices was the only reason that
15 Defendant Local 556 reported her or that Defendant
16 Southwest fired her," only that it was a reason.
17       And maybe another paragraph that says
18 "Under Title VII's motivating factor test, Carter
19 need only prove that some aspect of her religious
20 observance, beliefs, or practices was a factor in
21 the decision."
22       THE COURT:  Understood.
23       I will overrule that request.
24       Other issues with C-1?
25       MR. GREENFIELD:  None, your Honor.

Page 1894

1        MR. MORRIS:  No further from Southwest.
2        THE COURT:  Anything else from Carter on
3 C-1?
4        MR. GILLIAM:  I'm trying see if this is
5 the one where -- oh, yes.  One other thing in the
6 paragraph relating to Local 556, element 2 of what
7 Ms. Carter has to prove, that Local 556 caused or
8 attempted to cause Carter's discharge by Southwest.
9        THE COURT:  Uh-huh.
10       MR. GILLIAM:  I think in accordance with
11 the language of the statutory text, it should be
12 that Local 556 caused or attempted to cause
13 Southwest to discriminate against Carter's religious
14 beliefs or practices.
15       MR. GREENFIELD:  And I'm sorry, which
16 section are we at?  Have we moved to 2?  I
17 apologize.
18       MR. GILLIAM:  Yes, element 2 of
19 Ms. Carter --
20       MR. GREENFIELD:  Section -- I'm sorry,
21 section 2?
22       THE COURT:  We are still on C-1.
23       MR. GREENFIELD:  Okay.  Thank you.
24       MR. GILLIAM:  Still on C-1.
25       And the reason being is that it is --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 6 July 12, 2022                    Pages 1895..1898

Page 1895

1 certainly in this case, you know, we allege that
2 Ms. Stone and Local 556 attempted to cause
3 Ms. Carter's discharge, but if -- if for whatever
4 reason the jury determined that they weren't trying
5 to cause her actual discharge but were trying to
6 cause just Southwest to treat her differently, to
7 discipline her, that that is still a violation of
8 the law, the statutory text.
9          THE COURT:  Okay.
10         So the current version in C-1 for the
11 paragraph that starts with, "To prove unlawful
12 discrimination by Defendant Local 556," we have a
13 second element that currently reads, "That Local 556
14 caused or attempted to cause discrimination against
15 Plaintiff Carter by Defendant Southwest."
16         And you want to put in -- can you say that
17 language one more time?
18         MR. GILLIAM:  Oh, wait.  Does it use
19 "discrimination" instead of "discharge"?
20         THE COURT:  In the current version, yes.
21 Unless I'm on a different --
22         MR. GILLIAM:  I apologize.  It does.
23         THE COURT:  So is that language now
24 sufficient in the newest version of the charge for
25 you?

Page 1896

1          MR. GILLIAM:  Yes, your Honor.  I'm sorry,
2 I missed that one.
3          THE COURT:  I know it is not your exact
4 language, but it is different than the version --
5          MR. GILLIAM:  Yes, I apologize.  I missed
6 that one, your Honor.
7          THE COURT:  Okay.  All right.
8          Other issues with C-1?
9          MR. GILLIAM:  No other issues from
10 plaintiff.  I'm sorry.
11         THE COURT:  That is fine.  Okay.
12         So we are at C-2 now.  For me, that starts
13 at the top of 16.
14         What issues are there with C-2?
15         MR. GREENFIELD:  I can start, your Honor,
16 if you would like.
17         THE COURT:  You may.
18         MR. GREENFIELD:  Just at the end, we would
19 ask for some additional language.  The first
20 paragraph, "The Union Local 556 denies Carter's
21 claim."
22         What we would like it to say is the Union
23 Local 556 denies that Audrey Stone was acting in her
24 official capacity when she reported plaintiff Carter
25 to Southwest Airlines or that her reporting was

Page 1897

1 motivated by plaintiff Carter's religion.
2          Again, this ties back to our argument
3 that -- the official capacity issue, I believe is
4 dispositive of every issue, and I think it should be
5 included in every part as we go down.
6          THE COURT:  All right.  Any thoughts by
7 Carter on that proposed language, to clarify what
8 the Union is arguing in response to this claim?
9          MR. GILLIAM:  So it is just what the Union
10 claims?
11         THE COURT:  Correct.
12         MR. GILLIAM:  Yes.  No objection for them
13 to state it.
14         THE COURT:  So I think this is the most
15 area where you have freedom to control the words
16 that are in the charge.  So give me just one minute,
17 I'm going to write the words you said in from the
18 transcript, put them in and read them back to you,
19 so hold on.
20         Okay.  Can you say your proposed language
21 one more time?
22         MR. GREENFIELD:  Yes, your Honor.
23         THE COURT:  It's the last part of it, I'm
24 trying to make sure I have down.
25         MR. GREENFIELD:  "The Union Local 556

Page 1898

1 denies that Audrey Stone was acting in her official
2 capacity when she reported Plaintiff Carter to
3 Southwest Airlines," or, "that her reporting was
4 motivated by Plaintiff Carter's religion."
5          THE COURT:  I think we need to say
6 religious -- what is the phrase?
7          MR. GILLIAM:  Religious observances,
8 beliefs, and practices.
9          MR. GREENFIELD:  No objection to that,
10 your Honor.
11         THE COURT:  I think we need to make it
12 disjunctive for this sentence, the practices, not to
13 nerd out too much.
14         MR. GREENFIELD:  Don't let your appellate
15 show too much, your Honor.
16         THE COURT:  Okay.  Instead of reading it
17 back, I'm just going to flash it up on the screen
18 for y'all.  I think I can show my screen.
19         Okay.  So it is the top paragraph that you
20 are looking at.  It's the last sentence of that
21 first full paragraph.  So anyone tell me if I have
22 gotten something wrong in that language.
23         And then I think the order of is it
24 observances, practices, or beliefs, to be consistent
25 with the next sentence.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 6 July 12, 2022                    Pages 1899..1902

Page 1899

1  MR. GREENFIELD: Yes, your Honor. That
2  looks correct.
3      THE COURT: But then we switch the order
4  in the bottom paragraph to beliefs, observances, or
5  practices, so I guess consistency is out the window
6  at this point, right? As long as we have those
7  three elements, that is what matters.
8      Okay. Any issues elsewhere?
9      MR. GREENFIELD: Yes, in the third
10 paragraph, your Honor.
11     THE COURT: Yes, sir.
12     MS. GREEN: In the elements of .1, it
13 says, "That Defendant Local 556 treated Plaintiff
14 Carter less favorably than other employees."
15     We would like that to be, "That Defendant
16 Local 556 treated Plaintiff Carter less favorably
17 than other similarly-situated non-Christian
18 employees."
19     THE COURT: Response from the Union --
20 sorry, from Carter?
21     MR. GILLIAM: Yes, I don't see how that
22 requirement applies here, how the similarly
23 situated --
24     THE COURT: Yes, I can similarly-situated.
25 I can't see Christian or non-Christian, adding that

Page 1900

1  in.
2      MR. GREENFIELD: Okay. I believe that
3  tracks Title VII language as far as the causation
4  standard, that how you were being treated
5  differently has to be from -- differently from
6  somebody outside of your protected class, her
7  protected class being Christian.
8      So the person who must have been treated
9  more or less favorably needs to be outside of that
10 protected class.
11     THE COURT: Right. But then I'm giving
12 the jury the questions of law after instructing them
13 on what that is. So my instruction might be
14 similarly situated, but if I'm going to go tell them
15 what it is, it would be like me telling them, I find
16 the following is protected activity, right?
17     So if I tell them, Here is her class, then
18 I think I'm really grabbing the things from their
19 province that I'm supposed to instruct them on and
20 have them find.
21     So I can see things similarly situated, I
22 can't see going so far as to define the protected
23 class.
24     So do you have thoughts on whether I say
25 "similarly situated" in between "other" and

Page 1901

1  "employees," Mr. Gilliam?
2      MR. GILLIAM: The problem is the legal
3  definition of similarly situated. And, again, the
4  potential to confuse the jury with that.
5      THE COURT: Yes. I think I will probably
6  leave it, because I think we have got the concept of
7  similarly situated coming into number 2 when we talk
8  about it's her religious beliefs, observances, or
9  practices. So my inclination is to leave it. So I
10 will overrule that request for similarly situated
11 and the religious specification.
12     MR. GREENFIELD: Nothing else from the
13 Union on that section, your Honor.
14     THE COURT: Okay.
15     MR. GILLIAM: Plaintiff has nothing for
16 No. 2.
17     THE COURT: All right. I assume nothing
18 from Southwest on a section that is not about
19 Southwest?
20     MR. MORRIS: Yes, nothing from Southwest.
21     THE COURT: Got it. Okay.
22     The next section is you, Mr. Morris. So
23 failure to accommodate against Southwest as to C-3.
24     So who has got an issue with C-3?
25     MR. GILLIAM: Your Honor, I guess elements

Page 1902

1  1 and 2 of what Ms. Carter has to prove, it -- I
2  guess our objection is to the inclusion of language
3  about conflicting with the job requirement. We
4  think that is sort of inherent with the facts here
5  under Abercrombie.
6      We think that the elements should
7  basically mirror those set forth in the Abercrombie
8  decision that Ms. Carter was fired because of her
9  religion, and that those should be the elements,
10 fired because of religion.
11     Or maybe stated another way, let's see,
12 that -- that -- that Ms. Carter was fired and that
13 Defendant Southwest discharged Carter with the
14 motive of avoiding the need for accommodating a
15 religious belief, observance, or practice.
16     THE COURT: All right. I understand that
17 request. I will reject it.
18     What is the next issue with C-3?
19     MR. MORRIS: Your Honor, I will reiterate
20 what we raised this morning about a violation that
21 occurs prior to the request of the knowledge of the
22 need for an accommodation, and request that in an
23 instruction indicating that if an employee violates
24 a policy before the request or need for an
25 accommodation is known, that there is no obligation

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 576 of 642   PageID 11517
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1903..1906

Page 1903

1  to provide an accommodation.
2        THE COURT: I understand that request. I
3  will reject that one as well.
4        MR. MORRIS: I don't know -- if the Union
5  doesn't have another, regarding to the undue
6  hardship defense, that we raised this morning,
7  again, we think the Court's instruction overstates
8  the burden and doesn't include all of the various
9  burdens that could constitute an undue hardship,
10  including but not limited to burden to other
11  employees, potential future harms, it doesn't
12  actually have to be any kind of monetary loss, et
13  cetera.
14        And we provided cases to that effect.
15        So we think this statement of the undue
16  hardship defense is just an overstatement of the
17  law.  And then related to that, we think an
18  instruction that an employer does not have an
19  obligation to provide an accommodation that entitles
20  employees to proselytize should be included as well.
21        THE COURT: I understand that.  I will
22  reject it because I think the last phrase
23  "disruption of the business" is a sufficient place
24  to put your concepts.
25        MR. MORRIS: I have one more, if nobody

Page 1904

1  else --
2        THE COURT: You may.
3        MR. MORRIS: The instruction that was
4  just -- that was added regarding purporting to
5  define accommodation, I think is not accurate.
6        And I think a more general statement from
7  some of the Fifth Circuit case law stating that an
8  accommodation is one that eliminates the conflict
9  between the religious belief and the employer
10  practice would be appropriate.
11        THE COURT: So what language are you
12  suggesting should go?  I'm trying to find which spot
13  you are critiquing.
14        MR. MORRIS: Oh, I apologize.
15        It is the second paragraph at the second
16  sentence.
17        THE COURT: Okay.  And you suggest
18  swapping that with?
19        MR. MORRIS: Just one second.  I'm trying
20  to formulate that myself.
21        THE COURT: Sure.
22        MR. MORRIS: If we could come back to it.
23  I don't want to hold everybody else up, if that's
24  okay.  I can propose some language before we --
25        THE COURT: Sure.  That's fine.  And I

Page 1905

1  will just say the sentence that you are addressing
2  says "an accommodation means allowing the employee
3  to engage in her religious practice or observance,
4  despite the employer's normal rules to the
5  contrary."
6        And then we can come back to whatever
7  language you want to propose for that.
8        MR. MORRIS: Sure.
9        THE COURT: Any other issues with C-3,
10  Southwest's accommodation?
11        MR. GILLIAM: Yes, your Honor.
12        There is some more language from
13  Abercrombie that we think is important, that the
14  charge should explain to the jury that employers may
15  not fire employees for their religious observance,
16  beliefs, and practices under an otherwise neutral
17  policy.  And that Title VII requires an otherwise
18  neutral policies to give way to the need for an
19  accommodation.
20        THE COURT: Right.  I understand that
21  request.  I will reject that at this point.
22        MR. GILLIAM: And one more in that same
23  vein is that we think the charge should inform the
24  jury that Title VII imposes an affirmative
25  obligation on employers not to fire an employee

Page 1906

1  because of some aspect of her religious observances,
2  beliefs, or practices.
3        THE COURT: All right.  I will reject that
4  one as well.
5        Any other issues on C-3 other than the one
6  I'm putting a pin on for Southwest?
7        MR. GILLIAM: Well, one more, and I
8  suspect I understand where your position is on this,
9  but for the record, just that the Court should also,
10  for the same reasons as stated with the other
11  Abercrombie language, is that the jury charge should
12  exclude the instruction that an employer may
13  terminate an employee for other reasons, good or
14  bad, fair or unfair.
15        THE COURT: Where is that language?
16        MR. GILLIAM: You know what, that may have
17  just appeared in one.  Yes, that just appears in
18  one, subsection one.
19        THE COURT: It is not in C-3.  Got it.
20        Okay.  Any other issues on C-3?
21        All right.  C-4 is where we are at now,
22  and that is accommodation against the Union.
23        MR. GILLIAM: For, I guess, all of our
24  requests that we made for C-3, we would also
25  reiterate for C-4 as well.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 577 of 642   PageID 11518
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 6 July 12, 2022                    Pages 1907..1910

Page 1907

1      THE COURT: I appreciate that. I will
2  overrule those requests at this time.
3      MR. GILLIAM: Maybe some -- I guess also
4  we would add some parallel language, like you find
5  in C-3, that attempting to cause the employee to
6  discriminate -- and I'm sorry -- the employer to
7  discriminate in these circumstances would be
8  synonymous with refusing to accommodate an
9  employee's religious observances, beliefs, and
10 practices.
11     THE COURT: All right. I see your
12 request. I will overrule that.
13     MR. GILLIAM: Okay.
14     MR. GREENFIELD: The Union has nothing to
15 request on that section.
16     THE COURT: On 4?
17     Mr. Morris, you don't have any language
18 handy yet on C-3, do you? Before we get to damages?
19     MR. MORRIS: Let's move on to damages. I
20 will get you that.
21     THE COURT: That is fine.
22     Okay. Damages is on my page 19.
23     So what issues do we have on a first
24 section on damages before we get to actual damages?
25     MR. GREENFIELD: Nothing from the Union,

Page 1908

1  your Honor.
2      MR. GILLIAM: Nothing from plaintiff, your
3  Honor.
4      MR. MORRIS: Nothing from Southwest.
5      THE COURT: All right.
6      How about the actual damages, small
7  paragraph?
8      MR. GILLIAM: Nothing from plaintiff.
9      MR. GREENFIELD: None from the Union.
10 Your Honor, the word "Charlene" was taken out of one
11 of the -- out of the draft and it threw off my --
12     THE COURT: Pagination? Sorry. One word
13 can cause a big headache when it comes to page
14 numbers.
15     Okay. Anything from Southwest on actual
16 damages?
17     MR. MORRIS: No, your Honor.
18     THE COURT: Okay. How about back pay?
19     MR. GILLIAM: Nothing from plaintiff, your
20 Honor.
21     MR. MORRIS: Your Honor, from Southwest, I
22 don't think there is anything in the record
23 regarding all of these various categories of damages
24 that have been identified here. It is certainly
25 nothing as to the amounts.

Page 1909

1      So we don't think it is appropriate to
2  instruct the jury as to items -- you know, tax
3  relief shared with employees, for example, that are
4  not even in the record.
5      THE COURT: Understood.
6      Are there things in that category that we
7  do remember being discussed? Like, if we are going
8  to narrow down, what would we narrow it down to?
9      MR. MORRIS: The only thing that from I
10 recall from the record is health insurance.
11     MR. GILLIAM: Seniority rights and
12 benefits were discussed.
13     MR. MORRIS: Is that monetized -- I don't
14 know if that's a monetized one. I don't know if
15 there is anything in the record about the amounts.
16     MR. GILLIAM: I think we said insurance,
17 right?
18     THE COURT: Yes, health insurance was
19 definitely in there.
20     I don't recall a monetary figure going on
21 seniority benefits.
22     MR. GILLIAM: I don't know if you got
23 that, your Honor, the jury can value that.
24     THE COURT: So, yes, and my inclination is
25 to put it in, even if it wasn't monetized. But if

Page 1910

1  we are talking about all benefits, we talked about
2  health insurance and seniority benefits.
3      MR. GILLIAM: Yes, your Honor.
4      THE COURT: Okay. So I'm going to mark
5  this up a little bit. I'm going to say, "And such
6  benefits as health insurance and seniority
7  benefits."
8      MR. MORRIS: That is good with Southwest.
9      MR. GREENFIELD: And, your Honor, just on
10 back pay, one last issue. After the first sentence,
11 just perhaps to avoid any confusion about what that
12 time period is, just to conclude what Carter would
13 have earned had she remained an employee of
14 Defendant Southwest from the time of her termination
15 through the time of trial.
16     I believe that is how back pay is defined.
17     THE COURT: Any issues with the time
18 frame?
19     MR. GILLIAM: What was the time frame?
20     THE COURT: Termination through trial.
21     MR. GILLIAM: For back pay? Well --
22     THE COURT: I think we have an instruction
23 up here, if you wouldn't mind, at the end of 19, we
24 say that you should consider the following elements
25 of actual damages, the amount of back pay is, what

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 578 of 642   PageID 11519
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                    Pages 1911..1914

Page 1911

1 she would have earned had she not been terminated
2 from her employment from March 14th to the date of
3 the verdict.
4        So I think we defined it up top.
5        MR. GREENFIELD:  Right.
6        I just missed that.
7        THE COURT:  No.  And that's right, it
8 needs to be in there.  I just want to make sure it
9 is close enough where they can link back and see it.
10       Other issues on back pay?
11       Punitive damages are next.
12       Issues on the punitive language?  It is a
13 long section.
14       MR. GREENFIELD:  Yes, your Honor.  In
15 regard to elements that are laid out, "you may award
16 punitive damages," we would object that it misstates
17 the law.  No member of 556 could meet the punitive
18 damages requirement of an individual acting in a
19 managerial capacity.
20       Plainly, "managerial capacity" refers to
21 the members of Southwest Airlines' management.  But
22 even if union officials were analogized to
23 managers -- analogized, excuse me -- Plaintiff
24 Carter was not a member of 556 and submitted to no
25 managerial authority that the executive board may be

Page 1912

1 interpreted to have.  I don't believe that punitive
2 damages apply.
3        THE COURT:  Understood.
4        What is the response, Mr. Gilliam, to the
5 Union's structure on the punitives argument?
6        MR. GILLIAM:  Yes.  I mean, managerial
7 capacity is more of a term of art.  And I think that
8 President Stone was certainly acting in a managerial
9 capacity, so the instruction is appropriate.
10       THE COURT:  So I'm going to leave it in at
11 this time.  This is the kind of thing where if it
12 does get awarded, then I would expect a more robust,
13 post-trial briefing on what the legal standard is
14 and then what evidence came into play, if that makes
15 sense.
16       But at this time, I don't think I'm going
17 to pull it out of the jury's purview based on what I
18 have seen.
19       Other issues on punitive damages?
20       MR. MORRIS:  Yes, your Honor.  I have one.
21       On the -- I don't know, it is pretty far
22 down.
23       In determining whether -- hold on --
24 Defendant Southwest or Local 556 made a good faith
25 effort to prevent discrimination, that paragraph, on

Page 1913

1 the fourth line, it refers to how or whether they
2 responded to Plaintiff Charlene Carter's complaint
3 of discrimination.
4        THE COURT:  Can you identify the paragraph
5 right quick?  I'm still --
6        MR. MORRIS:  Sure.  Yes.  It is one -- it
7 is the sixth paragraph.
8        THE COURT:  Okay.  With the last two words
9 of that paragraph being "of discrimination"?
10       MR. MORRIS:  Yes.
11       THE COURT:  Okay.  I'm there.
12       MR. MORRIS:  The reference to the
13 considerations that one could look at for punitives,
14 says how or whether they responded to Plaintiff
15 Carter's complaint of discrimination, I don't think
16 there is anything in the record of a complaint of
17 discrimination made by Ms. Carter.
18       THE COURT:  Well, there is an EEOC
19 complaint, Exhibit No. 2, that is in the record.  So
20 I guess the question is, are we confusing the jury,
21 right?  By having that language in there?
22       MR. MORRIS:  Right.
23       THE COURT:  What are you suggesting we
24 should have its place, anything?
25       MR. MORRIS:  Our suggestion would be just

Page 1914

1 to delete it.  She was terminated at that point.
2        THE COURT:  Thoughts on how to handle that
3 phrase, how or whether they responded to Carter's
4 complaint of discrimination?
5        MR. GILLIAM:  This is the one about Local
6 556, right?
7        THE COURT:  Let me scroll back up.
8        MR. GREENFIELD:  Okay.  Now I'm lost.
9        MR. GILLIAM:  With respect to Defendant
10 Local 556 --
11       THE COURT:  I mean, the lead-in sentence
12 talks about both, Southwest and 556.
13       So Southwest is proposing we admit how or
14 whether they responded to Plaintiff Charlene
15 Carter's complaints of discrimination saying there
16 are no complaints of discrimination in this case to
17 Southwest.  Therefore, it is irrelevant.
18       MR. GILLIAM:  My concern is the, I guess,
19 Local 556's acts or other attempts to discriminate
20 against -- or to turn in other employees and whether
21 this would exclude that from consideration.
22       So I would -- which is what I don't want
23 to do.
24       THE COURT:  Right.
25       I'm trying to figure out is there a way to

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 579 of 642   PageID 11520
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                Pages 1915..1918

Page 1915

1 phrase it that accomplishes what you want to, but
2 doesn't say "complaint of discrimination," which
3 seems like a term of art that wasn't really used in
4 this case, if that makes sense.
5      I see Southwest's point.  I don't know
6 what "it" means.  "It" means something.  Is there a
7 different way to phrase what "it" means?
8      MR. GREENFIELD:  I have not thought of one
9 yet.
10     THE COURT:  Okay.  It is pattern language,
11 so the question is, do we need to adapt the pattern
12 language to match this case to avoid a jury question
13 on what was the complaint of discrimination?
14     All right.  So if we can come up with an
15 understanding of what we all view it to mean,
16 then --
17     MR. GREENFIELD:  I would rather just stick
18 with the pattern language, your Honor.
19     MR. GILLIAM:  I think we are fine with the
20 pattern language.
21     MR. MORRIS:  We are not fine with the
22 pattern language.
23     THE COURT:  I get that you are not.  But
24 the question is, I can't -- I can't omit it unless I
25 have something to run with, right?

Page 1916

1      The patterns were meaning to accomplish
2 something, which may have been as simple as what
3 happens to Charlene Carter in this case, right?
4      Now, that is an inartful way of phrasing
5 it, but it means something.  I'm not okay with
6 changing the something to nothing.  So I have to
7 leave in the something for now, unless the something
8 can be changed to something clearer.
9      MR. MORRIS:  Frankly, I am just having a
10 hard time because there was no complaint of
11 discrimination, so I don't know what we would say as
12 an alternative, given that there wasn't one.
13     THE COURT:  Right.  Which gets back to the
14 issue with the conflict and an accommodation.
15     MR. McKEEBY:  Well, what about something
16 like Ms. Carter's situation, which is --
17     THE COURT:  That is what I was getting at,
18 right?
19     MR. McKEEBY:  Yes.  I think that at least
20 is -- at least less confusing.  I think the jury
21 would read that and understand what you mean, where
22 as with this, they may not know -- are you talking
23 about the EEOC charge or something else?
24     I mean, the language is not particularly
25 precise, but I think it is better than this.

Page 1917

1      THE COURT:  And if we made that change, we
2 would have to make a corresponding change in the
3 next sentence, which talks about with the Union, we
4 can talk about other people, right?  We would have
5 to talk about other union members' situations.
6      MR. McKEEBY:  It's overruled.
7      MR. MORRIS:  Well, I just think
8 "situation" sort of suggests they could consider all
9 kinds of things.
10     THE COURT:  Sure.
11     MR. MORRIS:  And, quite frankly, I think
12 that is not appropriate.  This was intended to allow
13 them to consider one thing.
14     THE COURT:  That is fair.  What I'm going
15 to say is, we all agree that this language sucks
16 from the patterns, but we can't figure out a better
17 way to do it.
18     So if someone has a bright idea before we
19 finish our formal charge conference, come back and
20 let me know.  It is on my page 22.  So I'm going to
21 put a placeholder on it.
22     MR. MORRIS:  Actually, I might have a
23 proposal.
24     THE COURT:  Okay.  Did lightning strike,
25 Mr. Morris?

Page 1918

1      MR. MORRIS:  Maybe.
2      THE COURT:  Okay.
3      MR. MORRIS:  You could say, if there is
4 evidence that Carter made the complaint of
5 discrimination to Southwest, it could be considered
6 in addressing punitive damages or something like
7 that.
8      THE COURT:  Sure.  I mean, it is as good
9 as anything we have seen, which ain't saying much.
10     MR. GILLIAM:  Right.
11     I think at that point, we prefer the
12 pattern instruction.
13     THE COURT:  My inclination is, if we stick
14 to the pattern, and we may see a question on this.
15 They may ask us what complaint of discrimination are
16 you talking about?  And then we will have to figure
17 it out.
18     But until then, I haven't heard anything
19 that I'm more comfortable with than the pattern.
20     But I like the fact that you brought it
21 up.  If no one brings up the idea, then we won't get
22 a better idea.
23     Okay.  So I will overrule the request for
24 now on changing the language from the patterns on
25 complaint of discrimination in the section on

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 580 of 642   PageID 11521
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1919..1922

Page 1919

1 punitive damages that we are on.
2        What other issues do we have with the
3 punitive damage instructions?
4        I will say, with regard to your pointing
5 out of that language, we say "Charlene," when he
6 have kept out her first name, except for the first
7 reference, so I am going to delete the word
8 "Charlene" from that sentence.
9        Okay.  Other language on punitives?
10        MR. GILLIAM:  Nothing from plaintiffs.
11        MR. MORRIS:  Nothing from Southwest.
12        MR. GREENFIELD:  Nothing else from the
13 Union.
14        THE COURT:  Okay.  I found one more
15 reference to Charlene after the enumerated list of
16 three and the punitive instructions, so I have got
17 that.
18        So we are done with punitives.  We are on
19 to front pay.  In my draft, that is page 23, is
20 where it starts.
21        MR. GREENFIELD:  And just, your Honor, if
22 I may?
23        THE COURT:  You may.
24        MR. GREENFIELD:  We either would ask for
25 an instruction or some other alternative as we

Page 1920

1 don't -- we object to being -- to front pay being
2 applied to us.
3        In our formal conference briefing, we cite
4 to Mota v. University of Texas, Texas Health, front
5 pay, definition-ally covers monetary damages for
6 future lost wages and benefits, front pay is awarded
7 only when reinstatement is not feasible because
8 hostile relationships exists between the employer
9 and the employee.  Front pay is an equitable remedy
10 to be determined by the Court at the conclusion of
11 the trial, but an advisory jury may be used.
12        The Union has no ability to give
13 Ms. Carter her job back or have any say in that, and
14 we should not be liable for any front pay damages.
15        THE COURT:  I understand that argument.
16        Let me say two things about it.
17        First, I'd probably like to consider it
18 more in a post-verdict context, when we have had the
19 benefit of the full record and the full briefing on
20 it.
21        But let me ask this question:  When you
22 said advisory, yes, I do agree that they wouldn't be
23 binding on me unless I said nothing about advisory
24 and everyone consented to it.
25        I'm fine putting in an advisory caveat.  I

Page 1921

1 thought about that, and so I can put it in here if
2 it is not in here already.
3        Any objections to me putting in an
4 advisory caveat?  And then if they go haywire, then
5 we can all revisit it in post-trial proceedings,
6 whether that is on the paper with affidavits or that
7 is another evidentiary hearing.
8        MR. GILLIAM:  I think you have one in
9 there, your Honor.
10        THE COURT:  Do I have one in there?  Is it
11 in the questions, not here?  Or is it somewhere else
12 in --
13        MR. GILLIAM:  The very last sentence in
14 that section.
15        MR. GREENFIELD:  Your Honor, I just
16 included kind of the full scope of what I thought
17 front pay was.  And I bet you it left it at that, it
18 is just that it doesn't -- we believe it doesn't
19 apply to the Union.
20        That is all that was for.
21        THE COURT:  Okay.  Got it.
22        And so I'm only overruling it to the
23 extent I don't know enough about it yet.  I'm going
24 to see what the jury says.
25        And we did have the caveat on advisory, so

Page 1922

1 I think we are covered there.
2        Okay.  Other issues with front pay?
3        MR. GILLIAM:  Nothing from plaintiff.
4        MR. MORRIS:  Nothing.  We just -- well,
5 aside from reiterating the objection that it is for
6 the Court, but, you know, nothing additional.
7        THE COURT:  Understood.
8        So I will understand that objection, which
9 is why I'm putting in the advisory language.  I'm
10 not bound by it at all.
11        Okay.  So now we should look at nominal
12 damages.
13        MR. GILLIAM:  Nothing from plaintiff.
14        THE COURT:  Anything on nominal from
15 Southwest or the Union?
16        MR. GREENFIELD:  None from the Union, your
17 Honor.
18        MR. MORRIS:  None from Southwest, your
19 Honor.
20        THE COURT:  All right.
21        So mitigation is next.
22        MR. GREENFIELD:  Just to make note to the
23 Court that it says "Charlene" several times, but
24 other than that ...
25        THE COURT:  Thank you.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 581 of 642   PageID 11522
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 6 July 12, 2022                    Pages 1923..1926

Page 1923

1    In mitigation --
2         MR. GREENFIELD:  Or -- I'm sorry, no.  It
3  is taken out.  It was in my old copy.
4         Sorry, Ms. Silver.
5         THE COURT:  Every draft is getting
6  slightly better.
7         MR. GREENFIELD:  Take my stones back.
8         THE COURT:  And plenty other places.
9         MR. GREENFIELD:  The Union has no issue
10  with the mitigation instruction.
11        THE COURT:  All right.
12        Any issue from Carter or Southwest on the
13  mitigation language?
14        MR. GILLIAM:  Nothing from Carter.
15        MR. MORRIS:  Yes, your Honor.
16        The first requirement indicating that
17  there has to be substantially equivalent employment
18  available.
19        We think that is not appropriate based on
20  the evidence in the record that Ms. Carter ceased
21  looking for employment and was engaged in various
22  nonprofit endeavors.
23        So we think the instruction should
24  indicate that if you cease searching for employment,
25  you've failed to mitigate at that time.

Page 1924

1         THE COURT:  Understood.
2    Response?
3         MR. GILLIAM:  It is an element of the
4  mitigation, right?  So I think that they do have
5  that burden to prove.
6         MR. MORRIS:  If it helps the Court, we
7  cited various cases on this issue in our response to
8  the instruction that indicate that if there is
9  evidence that an employee has ceased looking for a
10  job, then that mitigation instruction could be
11  altered.
12        THE COURT:  Understood.
13        I think I'm going to leave it as is.  So I
14  will overrule that objection.
15        Okay.  Other issues on mitigation?
16        MR. GREENFIELD:  None from us, your Honor.
17        MR. GILLIAM:  None from plaintiff.
18        MR. MORRIS:  No others from Southwest.
19        THE COURT:  All right.
20        Duty to deliberate.  First paragraph is on
21  notes, and it addresses there.
22        MR. GREENFIELD:  Nothing from the Union,
23  your Honor.
24        MR. GILLIAM:  Nothing from plaintiff.
25        MR. MORRIS:  Nothing from Southwest.

Page 1925

1         THE COURT:  Okay.
2         What I will do, then is I will give y'all
3  a 10-minute break.  We can use the bathroom, and
4  then come back and talk about the jury questions.
5         And then that will be it for y'all for the
6  day for here.  And then we will work on printing
7  this thing out, once we've made any final changes
8  based on reviewing a couple of things that I
9  flagged.
10        Okay.  So we are in a 10-minute recess.
11        I will see y'all at 4:46.
12        THE COURT SECURITY OFFICER:  All rise.
13        (Recess.)
14        THE COURT SECURITY OFFICER:  All rise.
15        THE COURT:  Thank you.  You can be seated.
16        MR. McKEEBY:  Your Honor, Mr. Morris has
17  the proposed language on that one instruction he
18  wants to read, and I actually also have a
19  housekeeping-type question.
20        THE COURT:  You bet.  Housekeeping first?
21        MR. McKEEBY:  Yes, please.
22        I'm assuming, given that the evidence is
23  closed, that if I elect to use a PowerPoint during my
24  closing, I do not need to share that with counsel?
25  But I wanted to confirm that now before --

Page 1926

1         THE COURT:  Sure.
2         So my request is for -- and I said this
3  briefly before we did voir dire on day one.  If
4  y'all have demonstratives that you want to use that
5  exist, then please disclose them the night before at
6  8:00, so do not disclose them at 6.  I assume you
7  will be working on them at 6.  But if you can
8  disclose them the night before at 8.
9         That is for anyone who is using a
10  PowerPoint for closing tomorrow.  Show it to the
11  other side, so we can talk about it tomorrow before
12  the jury gets here and we read the charge.
13        Does that make sense?
14        MR. McKEEBY:  So the entire PowerPoint,
15  then, not just the demonstratives?
16        THE COURT:  That's correct.
17        MR. PRYOR:  So the displaying of exhibits
18  to the jury, testimony from the dailies that is not
19  part of a PowerPoint, can be utilized?
20        THE COURT:  How would it not be part of
21  the PowerPoint?
22        MR. PRYOR:  I'm sorry?  Yes, okay.
23        THE COURT:  So my question to you is, I
24  didn't hear your question fully.  You are asking --
25        MR. PRYOR:  Yes.  I'm not doing a

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                  Pages 1927..1930

Page 1927

1 PowerPoint. It is --
2        THE COURT: What are you doing?
3        MR. PRYOR: That is too close to my
4 bedtime.
5        But I have to -- I'm going to use
6 exhibits. I'll say Matt, put exhibit so and so up.
7        I may refer to a daily trial transcript as
8 demonstrative evidence. And I will fill in the
9 blanks on the jury form, but I'm not sure what I'm
10 going to do until I put it on the ELMO.
11       THE COURT: Sure. So on the ELMO, that is
12 something that doesn't currently exist, right? But
13 when we are talking about depo transcripts, that is
14 something that does exist, right? That you are not
15 creating on the fly.
16       MR. PRYOR: Right.
17       THE COURT: So I would ask you to disclose
18 that or -- you can just say numbers, right? You
19 don't have to --
20       MR. PRYOR: What am I disclosing?
21       THE COURT: Exhibits or numbers, right?
22       So what I'm saying is, you're trying to
23 make sure you do the same thing he does, but to not
24 put in a PowerPoint, so you don't have to show it to
25 him. And I don't think that is fair, right?

Page 1928

1        So either we all show PowerPoints, or what
2 we are going to use, or we don't show anything.
3        But I don't think I can have one rule for
4 the people who use PowerPoint and a different rule
5 for the people who use the native exhibit and then
6 pull up a depo transcript.
7        MR. McKEEBY: Oh, trial transcript.
8        THE COURT: Trial transcript.
9        MR. PRYOR: Your Honor, it is also very
10 possible during my closing I will think of an
11 exhibit that I want. And I don't know tonight.
12       I mean, I will be happy to -- I'm making a
13 list right now. But you are telling me on the fly
14 tomorrow if I decide, oh, I do want to see
15 Exhibit 66, pull up -- I happen to know what that
16 one is.
17       THE COURT: As long you are okay not
18 seeing the PowerPoint at all, that is fine by me,
19 right? That is what we are getting into is, I want
20 to make sure we don't have an incongruence here,
21 where you get to see their stuff and they don't get
22 to see your stuff.
23       MR. McKEEBY: I'm fine with that. I
24 prefer that, frankly.
25       MR. PRYOR: Okay.

Page 1929

1        THE COURT: How about this: I just ask
2 that if you are pulling from trial materials, that
3 is actually the trial materials, right? You are
4 actually pulling from the depo, the trial
5 transcript, you are actually pulling from the
6 exhibit, and you are not altering it in any way,
7 right?
8        MR. McKEEBY: So we are not sharing it?
9        THE COURT: Not sharing.
10       MR. PRYOR: Okay.
11       THE COURT: And also not fabricating
12 anything, right?
13       MR. PRYOR: You are so strict.
14       THE COURT: I know.
15       MR. HILL: On not fabricating, let me make
16 sure we are that we are on the same page on one
17 issue here.
18       THE COURT: Sure.
19       MR. HILL: One thing we may do is show a
20 witness and show their question-and-answer
21 testimony. Meaning, like a picture of the witness
22 that we have from a deposition or something and then
23 the question-and-answer testimony.
24       THE COURT: I think that is sufficiently
25 similar to what actually happened as to not cause

Page 1930

1 concerns in my mind.
2        MR. HILL: I thought that would be the
3 case. I just wanted to confirm.
4        THE COURT: If you -- where do your
5 pictures of witnesses come from? Like, are you
6 pulling old, like, arrest photos or something? I
7 have seen pictures get very interesting. So -- and
8 that actually does make me want to ask.
9        MR. HILL: Primarily, to the extent that
10 they were deposed, they would come from --
11       THE COURT: From video depos, sure.
12       MR. HILL: To the extent that they weren't
13 deposed, if there is one in an exhibit somewhere,
14 then we would pull it from there, an exhibit that
15 has been admitted --
16       THE COURT: So you are getting it from the
17 case, not from searches of county jail records or
18 something like that?
19       I have seen -- I have seen some really
20 interesting stuff before.
21       MR. GREENFIELD: Hold on, your Honor.
22       There is pretty wild pictures in this --
23 in the evidence today, so I am slightly concerned
24 because of that, the pictures that Mr. Hill --
25       MR. HILL: I'm not going to be using it if

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 583 of 642   PageID 11524
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                    Pages 1931..1934

Page 1931

1  somebody is wearing a hat or holding a sign or
2  something.
3      THE COURT:  That's a good point.
4      MR. HILL:  It's going to be just -- it's
5  going to be trying to show them who that person is.
6      THE COURT:  A professional setting
7  photograph taken from evidence in this case.
8      MR. McKEEBY:  Yes.  And to that end, I
9  mean, if we do show an exhibit in a -- you know,
10 either in native format or in a PowerPoint, I mean,
11 my thought would be that, you know, you would affix
12 the exhibit number to the -- to the display so that
13 the parties know and the jury knows what we are --
14     THE COURT:  And I will say, I prefer that.
15 If someone doesn't do that, you have got to at least
16 tell everyone what exhibit you are talking about,
17 right?  Out of fairness.  Everyone has a right to
18 know.
19     And so if you can't technologically add
20 the label to it, then you at least need to talk
21 about it as soon as it comes up.  Otherwise, I don't
22 know that it was admitted into evidence.  When y'all
23 do that, then I usually cross check and make sure it
24 was in, right?  Because I have got my list.  And if
25 I can't cross check, then I'm going to stop you.

Page 1932

1      Does that make sense?
2      Okay.  Any other housekeeping things?
3      THE COURT:  Okay.  So Mr. Morris, you had
4  language.  Is this in page 17ish, C-1?  Or somewhere
5  else?
6      MR. MORRIS:  It is under 3 -- the third
7  paragraph, an accommodation means, that paragraph.
8      THE COURT:  Okay.  I'm at, "An
9  accommodation means," which is for me on page 17,
10 but I don't know about anyone else.
11     MR. MORRIS:  I would propose a reasonable
12 accommodation is one that eliminates or resolves the
13 conflict between the employee's religious belief or
14 practice or -- and a conflicting employment
15 requirement.
16     THE COURT:  Okay.  What is Carter's
17 position on that?  New language or current language?
18 Or something else?
19     MR. GILLIAM:  We prefer the current
20 language, not the proposed amended language.  We
21 think that it is -- it is very legal, highly
22 technical, and may be confusing to the jury.  We
23 think that the current language is -- clearly
24 represents what an accommodation is and does not
25 cause confusion for the jury.

Page 1933

1      THE COURT:  Understood.
2      I will overrule that request to change
3  that language.
4      MR. MORRIS:  Your Honor, and while we are
5  here, something else just jumped out to me that is a
6  little confusing.
7      THE COURT:  Sure.
8      MR. MORRIS:  We refer to accommodation
9  repeatedly.  I think it should be "reasonable
10 accommodation" or "reasonably accommodate," which
11 is, I think, consistent with what the law requires.
12 It is just a proper terminology.
13     THE COURT:  I see your point.  But I think
14 we also have reasonable for accommodation somewhere
15 else in the charge and I'm not sure we need to add
16 it every place.  I appreciate the request.
17     I will overrule that.
18     Okay.  Any other issues before we talk
19 questions?
20     MR. GILLIAM:  None from the plaintiff,
21 your Honor.
22     MR. MATTHEWS:  None from Southwest.
23     THE COURT:  Okay.
24     Anything else from the Union or are we
25 ready to talk questions?

Page 1934

1      MR. GREENFIELD:  We are ready to talk
2  questions, your Honor.
3      THE COURT:  Okay.  So questions, we tried
4  to put in some sign-posting given that we broke some
5  of these questions out as to Southwest and Union,
6  because it is long now.  We have got 34 pages of
7  questions.
8      So let's go to Question 1.
9      Any issues on Question 1?
10     MR. GREENFIELD:  Yes, your Honor, I do.
11     From a global point, I would just, again,
12 request that -- object to the general verdict form
13 in lieu of the special verdict form that we
14 submitted to the Court.
15     Again, I believe the purpose of this is to
16 avoid confusion, appellate uncertainty, and the need
17 for additional proceedings.
18     I just, again, just seek that the special
19 instructions be included instead of the general.
20     And I would ask that the Court recognize
21 for us to -- our Exhibit 1 to our filing, as opposed
22 to me going through and reading off every single
23 special instruction that we have deemed.  I would
24 seek to submit that in lieu of that.
25     THE COURT:  Based on my discussion with

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1935..1938

Page 1935

1  Gilliam, I think that is the kind of circumstance
2  where we should file something and refer to it.
3        Is this -- I can't remember if it was by
4  email or filed on the docket.
5        Do you recall if it was?
6        MR. GREENFIELD: I filed it as an exhibit
7  to a motion, and then I filed it as an exhibit.  And
8  then I circulated a separate Word document.
9        THE COURT: Okay.  Do you recall what
10 exhibit number that was?
11       MR. GREENFIELD: Exhibit 1.
12       THE COURT: To docket number?
13       MR. GREENFIELD: Yes, I don't know.
14       THE COURT: How about his:  Try to find
15 out before the end of our time, and then we will put
16 it in there.  And then you have absolutely hit the
17 nail on the head, incorporated that document by
18 reference.  But I would just like to get that docket
19 number in.  I'm fine with you incorporating that by
20 reference.
21       I will say that I have read the document
22 you are referring to.  I don't remember what docket
23 number it is.  And I appreciate your request for a
24 special verdict form.
25       I will overrule it, but I do believe your

Page 1936

1  argument to be preserved.  I just hope we can get
2  that docket number on.
3        MR. GREENFIELD: Yes, your Honor.  I will
4  search for that right after my next point, because I
5  have another issue on Question 1.
6        THE COURT: You may fire your other
7  question now.
8        MR. GREENFIELD: Yes, your Honor.
9        Just for preservation's sake, we would
10 seek the same language we sought previously for
11 Ms. Carter -- for the Question No. 1, that it should
12 read, "Has Plaintiff Carter proved that Audrey Stone
13 was acting exclusively/solely in her official
14 capacity" to include that language.
15       The rights of all employees at Southwest
16 Airlines are protected by multiple facets of
17 numerous statutes that prevent various forms of
18 harassment within the workforce, Title VII, FMLA,
19 ADA, et cetera.
20       Southwest Airlines, operating as a private
21 employer, an at-will employment state can terminate
22 their employees for good reason, bad reason, or no
23 reason at all, as long as it is not an illegal or
24 discriminatory reason.
25       Congress and the Courts have agreed to

Page 1937

1  give private employers wide latitude, free of
2  interference, to make their own business decisions.
3  These business decisions, including setting their
4  own policies and procedures regarding matters such
5  as bullying and harassment in the work place.  These
6  policies and procedures can always be more
7  protective of employee rights than federal
8  employment law.
9        But, nevertheless, Ms. Stone's decision to
10 turn in plaintiff Charlene Carter was -- if it was
11 in any way made to protect her rights as an
12 employee, she legally had the right to make that
13 report to Southwest Airlines.  Otherwise,
14 Ms. Stone's rights as an employee would be
15 subservient to those of plaintiff's rights, to be
16 free from any alleged retaliation by the Union, to
17 which she no longer belonged.
18       Contiguously, if an agent of the Union
19 that exercises a scintilla of their protected rights
20 as an employee, the Union could --
21       THE COURT: You need to slow down.  We're
22 having a hard time grabbing your speed reading.
23       MR. GREENFIELD: Yes, your Honor.
24       And I'm sorry, Ms. Willis.  Where did you
25 lose me?

Page 1938

1        THE COURT: To which he no longer --
2  retaliation by the union, to which he no longer
3  belonged.
4        MR. GREENFIELD: And I said, contiguously,
5  if an agent of the Union then exercises a scintilla
6  of their protected rights as an employee, the Union
7  could not possibly be held liable sans one
8  situation:  The union agent was acting exclusively
9  or solely in their capacity as a union agent.
10       The decision must have been made
11 exclusively or solely in Ms. Stone's capacity as a
12 union president to bind the Union, or else it
13 requires all union agents to potentially relinquish
14 their own federally-protected rights.
15       Nevertheless, if the Court decides to
16 exclude that language, we urge the adoption of an
17 additional question, allowing the jury to consider
18 whether the speech, though protected in content and
19 made in Ms. Stone's official capacity, was also
20 sufficiently harassing or threatening that it
21 potentially altered the condition of Ms. Stone's
22 employment.
23       Sorry.  I just wanted to get that on the
24 record, your Honor.  That is why I was speaking so
25 quickly.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 585 of 642   PageID 11526
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                Pages 1939..1942

Page 1939

1  THE COURT: I appreciate that, but
2  remember, this is the time to preserve, not the time
3  to persuade.
4  MR. GREENFIELD: Yes.
5  THE COURT: Okay. I understand your
6  argument, but I will overrule that request to have
7  exclusive language in Question 1.
8  Other issues with Question 1?
9  MR. MORRIS: Not from Southwest.
10  MR. GILLIAM: None from Carter.
11  THE COURT: All right. Question 2.
12  MR. GILLIAM: None from Carter.
13  MR. GREENFIELD: I'm sorry, your Honor,
14  just back to Question 1 real quick, we would seek
15  that it would be appropriate to include some sort of
16  additional language that says something along the
17  lines of, if no to this answer, if Ms. Stone was not
18  acting exclusively/solely in her capacity as union
19  president -- or sorry -- take out the language that
20  I was asking, just as written by -- as is, then no
21  more questions are required to be answered of --
22  regarding liability on the Union.
23  If Ms. Stone -- it stops there for us,
24  essentially, if the answer is no.
25  THE COURT: I understand that. And I will

Page 1940

1  reference back to my earlier conversation. I try,
2  to the extent possible, to pull out some of these
3  conditioning questions so that if they answer no, we
4  all know that the Union is done, right? And I can
5  certainly enter judgment to that effect.
6  If the Fifth Circuit finds out that their
7  answer to 1 was wrong, and they said they should
8  have answered 2, then they have an answer to 2 now,
9  right?
10  So I get your point. I'm not misled as to
11  what the effect of a "no" answer on Question 1 is,
12  but I'm trying to make sure that we don't have to
13  try this case three, four, or five times.
14  If we just -- you know, we got Question 1
15  wrong first; then later on next year, we got
16  Question 3 wrong. And then -- I would like this to
17  be the last time we have to try this case, even if
18  there is an incorrect jury answer. This lack of
19  conditioning for some of these questions may not
20  solve all of those problems.
21  Okay. So I get your request. I will
22  overrule it.
23  Any other questions on Question 1?
24  Okay. So now we are on to 2.
25  Any issues on 2?

Page 1941

1  MR. GILLIAM: No issues from plaintiff.
2  MR. MORRIS: None from Southwest.
3  MR. GREENFIELD: Just a running objection
4  for the request to the special instruction, which I
5  will submit to the Court. And I will look for that
6  number right now.
7  THE COURT: That sounds great. I will
8  give you that request for a special instruction
9  running objection.
10  Okay. Question 3.
11  MR. GILLIAM: No objections from the
12  plaintiff.
13  MR. MORRIS: None from Southwest.
14  THE COURT: All right. Anything
15  union-wise on Question 3, other than the special
16  instruction running objection?
17  MR. GREENFIELD: One moment, your Honor.
18  I'm scrolling right now.
19  No, your Honor. Just the same special
20  instruction.
21  THE COURT: Okay. Question No. 4.
22  MR. GILLIAM: Your Honor, I would just
23  state our same objection for the record to the jury
24  charge that the -- this affirmative defense issue
25  shouldn't be here under NRLB v. Allied Aviation; but

Page 1942

1  otherwise, no issue.
2  THE COURT: I understand that request.
3  I will overrule that.
4  Any other issues on 4?
5  MR. MORRIS: None from Southwest.
6  MR. GREENFIELD: None from us, your Honor,
7  other than the running objection.
8  THE COURT: Understood.
9  I will overrule that.
10  Okay. Question 5.
11  No objection from plaintiff.
12  MR. MORRIS: None from Southwest.
13  MR. GREENFIELD: Just the running
14  objection from the Union.
15  THE COURT: All right. I will overrule
16  that.
17  Question 6?
18  MR. GILLIAM: Your Honor, just reiterating
19  the same objection we had to Question 4 regarding
20  the Wright Line affirmative defense. We don't think
21  it should be part of the charge; otherwise, no issue
22  with Question 6.
23  THE COURT: I understand your Wright Line
24  objection. I will overrule that.
25  Any other issues on 6?

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 586 of 642   PageID 11527
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Pages 1943..1946

Page 1943

1    MR. GREENFIELD: Yes.  On Question No. 6,
2 the Union seeks the same similarly-situated,
3 non-Christian employees to be included in this
4 question.
5    THE COURT:  Understood.
6    For consistency, I will overrule that.
7    Anything else on 6?
8    Okay.  On to 7.
9    MR. GREENFIELD:  I don't believe I had any
10 actually separation out on the accommodation case
11 claims, so I don't believe I have any.  If I did, I
12 would preserve them with the same running objection.
13    THE COURT:  So what is your request,
14 Mr. Greenfield?
15    MR. GREENFIELD:  I don't know exactly,
16 your Honor.
17    THE COURT:  Sure.  That is fine.  I will
18 let you gather it.
19    MR. GREENFIELD:  I don't actually -- I
20 didn't change that, so none, your Honor.  I do --
21 would just, again, seek the inclusion of a separate
22 question on undue hardship, and that we seek to add
23 in that affirmative defense into the jury charge,
24 just for preservation's sake, your Honor.
25    THE COURT:  Understood.

Page 1944

1    I appreciate that.  I will overrule that
2 on undue hardship for the Union.
3    Anything else on 7?
4    MR. GILLIAM:  Nothing from plaintiff, your
5 Honor.
6    MR. MORRIS:  Nothing from Southwest.
7    THE COURT:  All right.
8    Question 8.
9    MR. MORRIS:  Your Honor, just for
10 consistency between Questions 8 and 9, if you look
11 at the -- Question 8, the last part of that question
12 says "exercising her rights under the Railway Labor
13 Act."  Question 9 says, "engaged in activity
14 protected by the Railway Labor Act."
15    We think the latter is the appropriate
16 phrase, and so that the end of that sentence from
17 question 9 should also be in question 8.
18    THE COURT:  Understood.
19    Does Carter have a position on conforming
20 Question 8 more to Question 9, statement on engaging
21 in protected activity under the Railway Labor Act as
22 opposed to exercising rights under the Railway Labor
23 Act?
24    MR. GILLIAM:  I think it should be engaged
25 in protected activity, engaged in activity protected

Page 1945

1 by the Railway Labor Act.
2    THE COURT:  I think that is a good change,
3 so let me make that and then I will flash my screen.
4    Okay.  So here is how Question 8 is
5 reading now after that proposed change.
6    "Has Plaintiff Carter proved that
7 Defendant Southwest retaliated against Plaintiff
8 Carter for engaging in activity protected by the
9 Railway Act -- Railway Labor Act," which matches up
10 to Question 9.
11    MR. GILLIAM:  That is right, your Honor.
12    No objection.
13    THE COURT:  All right.  So that was
14 Question 8.
15    Now, down to 9.
16    MR. GREENFIELD:  And, your Honor, before
17 we move on to No. 9, it is Docket 333, Exhibit 1.
18    THE COURT:  So Docket 333, Exhibit 1 is
19 your specific request for a special verdict as
20 opposed to a general verdict form?
21    MR. GREENFIELD:  Yes, your Honor.
22    THE COURT:  Okay.  So I will let you
23 incorporate that by reference, then.
24    I am overruling your request for that
25 verdict form, but thank you for bringing up the

Page 1946

1 docket number.
2    MR. GREENFIELD:  Sure.
3    THE COURT:  Okay.  So we have moved on
4 from Question 8, we are on Question 9.
5    Any issues with 9?
6    MR. GILLIAM:  I'm confused.  I thought
7 that we -- I thought we solved this one already.
8 Something about the formatting I'm seeing on this
9 has me confused.
10    Nine, I think, would be our Wright Line
11 mixed-motive objection that I would just reiterate,
12 if I'm looking at the right sentence.  I realize I
13 may have been looking at the wrong thing earlier
14 when I made that objection.
15    THE COURT:  Sure.
16    MR. GILLIAM:  The formatting is screwed up
17 on -- I was looking at it on my phone.
18    But yes, we would reassert our Wright Line
19 objection here for all of the reasons we stated
20 earlier.  No other issues.
21    THE COURT:  Understood.
22    I appreciate your request.  I will
23 overrule that at this time.
24    Okay.  Anything else on Question 9?
25    MR. GILLIAM:  Nothing from Carter.

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 587 of 642    PageID 11528
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1947..1950

Page 1947

1        MR. MORRIS:  Nothing from Southwest.
2        THE COURT:  All right.  How about Question
3 10?
4        MR. GILLIAM:  No objections from Carter.
5        MR. MORRIS:  No objections from Southwest.
6        THE COURT:  All right.
7        On to 11.
8        MR. GILLIAM:  I'm sorry, your Honor.  We
9 would reiterate our same motivating factor objection
10 that we made earlier, that -- instead, that it
11 should be stated that her sincerely-held religious
12 observances, beliefs, or practices was a motivating
13 factor in Southwest's decision to discharge Carter.
14        THE COURT:  I understand that objection.
15 I will stick to the pattern language, but
16 acknowledge that you may have an argument there, if
17 anyone needs to take it up.
18        Okay.  Eleven.
19        MR. MORRIS:  Your Honor, this is sort of
20 related to 11, which is the conflict question should
21 precede Question 11, when it is a conflict between
22 her religious beliefs or practices and the
23 requirement of employment.
24        THE COURT:  What is your proposed
25 question?

Page 1948

1        MR. MORRIS:  "Has Plaintiff Carter proved
2 that she had a religious belief or practice that
3 conflicted with the requirement of her employment
4 with Defendant Southwest?"
5        THE COURT:  Understood.
6        I will overrule that objection, but I
7 appreciate the question.
8        Okay.  So now we are to Question 11.
9        Carter had no objection.
10        Is there a Southwest objection, other than
11 the lack of a predicate on conflict?
12        MR. MORRIS:  I would just say "reasonably
13 accommodate" there, again.
14        THE COURT:  I understand that, but I will
15 stick to the current language.  I will overrule that
16 objection.
17        Anything else on 11?
18        All right.  We are at 12.  Your reasonable
19 accommodation language came up here.
20 Congratulations.  It is in 12.
21        MR. GILLIAM:  Your Honor, our objection
22 would be that it should state in accordance with
23 Weber, has proved that any reasonable accommodation
24 claim -- or any reasonable accommodation would have
25 imposed an undue hardship on Defendant Southwest.

Page 1949

1        THE COURT:  So you are wanting to swap
2 "each" with "any," is that the upshot of your
3 change?
4        MR. GILLIAM:  Yes.  And I don't know that
5 a specific reasonable accommodation has specifically
6 been claimed.  In fact, that is one of our
7 arguments, that they didn't initiate any
8 accommodation efforts to suggest that there was one
9 as claimed.
10        THE COURT:  So can you talk to me on why
11 it should be "any" versus "each" accommodation?
12        MR. GILLIAM:  Yes.  Under Weber, because
13 they -- because Southwest never initiated any
14 accommodation efforts, it -- it has to show that --
15 it couldn't have undertaken any accommodation that
16 would have -- that any accommodation they could have
17 taken would have imposed the undue hardship, which I
18 think is consistent with the wording in the charge
19 itself.
20        THE COURT:  Can we pull that back up?
21        So I have got at the bottom of my draft on
22 page 17, I have a sentence saying, "Defendant
23 Southwest must establish by a preponderance of the
24 evidence that it did not accommodate Plaintiff
25 Carter because any accommodation would have imposed

Page 1950

1 an undue hardship on Defendant Southwest."
2        MR. GILLIAM:  You could use the word "any"
3 in the question, too.
4        THE COURT:  So I would like to hear
5 Southwest's thoughts on this one.
6        MR. MORRIS:  I'm not sure -- I'm not sure,
7 frankly, I understand the --
8        THE COURT:  Sure.  So it's fighting over
9 one word, "any" versus "each."  Right now, we talk
10 about in the question "each accommodation."  And the
11 question is, do we make the change to any
12 accommodation.
13        Their argument is that they never
14 requested an accommodation because Carter was fired
15 before she could make such a request.  I guess the
16 thought on my end is, the accommodations were never
17 really discussed by either side.
18        And so I think it makes sense -- it
19 doesn't say any accommodation requested by Carter or
20 any one thought of by Southwest.  It just refers to
21 an accommodation, whoever thought of it.
22        I think it makes to sense any because,
23 one, that is what we say in the charge; but two, if
24 everybody is saying no specific accommodation was
25 discussed, I don't want the jury penalizing other

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 588 of 642   PageID 11529
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 6 July 12, 2022                                        Pages 1951..1954

Page 1951

1 side, Southwest or Carter, if there is not a
2 specific accommodation.  And they come back and say
3 each, what were they?  We would come back and say, I
4 don't know.
5        So my thought would be to say "any" to
6 conform to the charge and because we don't have a
7 specific accommodation at the time that either side,
8 Southwest or Union or Carter, had discussed.  But
9 that is my leaning without knowing more about any
10 versus each.
11        MR. GILLIAM:  The other part of the
12 objection is to the phrase "claimed in this case,"
13 because I think --
14        MR. MORRIS:  Well, I think wouldn't each
15 reasonable accommodation or each accommodation
16 incorporate all?  Because there is no specific --
17 there is none enumerated here and there's none that
18 have been raised.
19        THE COURT:  Right.
20        But the question is, does it incorporate
21 all, if any?
22        MR. MORRIS:  Right.
23        THE COURT:  Any presupposes if any -- each
24 presupposes there is more than one, right?  And so
25 we have accommodations that have been discussed at

Page 1952

1 trial, like blocking, ignoring on the part of the
2 Union.  Or, you know, on the part of Southwest,
3 disclaimer on the Facebook page or pulling down the
4 nexus photographs.
5        So we have multiples that were discussed
6 at trial.  But I think this almost anchors it back
7 at the time, right?  At the time of the termination.
8 What happened at the time of the termination, all
9 sides were talking about none.
10        And so "each" presupposes two or more.
11 "Any" supposes zero or more.  So I don't know.  I
12 think "any" more accurately matches the factual
13 circumstance at the time, even though at trial
14 multiple accommodations had been discussed for
15 Southwest and the Union.
16        MR. GILLIAM:  And consistent with what you
17 said, I think that "claimed in this case" should be
18 omitted as well.
19        THE COURT:  So you are saying "any
20 reasonable accommodation claimed in this case"?
21        MR. GILLIAM:  I think it is consistent
22 with the jury charge language, too.
23        THE COURT:  So what I plan on doing is,
24 any instead of "each," omitting claims, but not
25 saying "in this case."  I know that is splitting

Page 1953

1 hairs, but "in this case" can include in this trial,
2 right?  Or earlier factually on.
3        So I would say, "Do you find the Defendant
4 Southwest has proved that any reasonable
5 accommodation in this case would have imposed an
6 undue hardship on Defendant Southwest?"
7        Does Southwest want to object to that
8 language or you object keeping "in this case"?
9        MR. GILLIAM:  We still object to "in this
10 case."  Again, you know, our position is that when
11 they repudiate all efforts to accommodate, they have
12 to show that any and every possible accommodation
13 would have imposed an undue hardship.
14        THE COURT:  I understand that argument.
15 And I will overrule that request and keep in, "in
16 this case."
17        MR. MORRIS:  Your Honor, I think we are
18 okay with that language, except I think the concept
19 of "reasonable" should be removed in this case -- in
20 this instance because --
21        THE COURT:  Question 11?
22        MR. MORRIS:  Well, right.  And because,
23 you know, a reasonable accommodation is one that
24 eliminates the conflict between the religious
25 practice and the employment requirement.

Page 1954

1        And just to use some of the examples they
2 just raised, blocking Ms. -- you know blocking --
3 Ms. Stone blocking Ms. Carter or removing a nexus
4 photograph doesn't do -- has nothing to do with the
5 conflict between Ms. Carter's stated religious
6 belief or practice, i.e. sharing her view that
7 abortion is bad and the requirement of her job.
8        So I don't really concede that any
9 reasonable accommodation has been raised or at
10 issue, or anything like that.
11        THE COURT:  So you would cut the
12 "reasonable" modifier?
13        MR. MORRIS:  Correct.
14        THE COURT:  And I think out of consistency
15 with 11, that makes sense to me.  Bring in the
16 concept now -- I think we should either bring in the
17 concept in 11 or leave it out in both for
18 consistency's sake.
19        We have charged the reasonableness of
20 accommodation.  They know it has got to be
21 reasonable.  Either we have got to put it in, in
22 both places or pull it out.  I would be inclined to
23 deleting words instead of adding them at this point,
24 given that I will have to read each word tomorrow.
25        But any argument from Southwest on

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 589 of 642   PageID 11530
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1955..1958

Page 1955

1 "reasonable" in or out on Question 12?
2          MR. GILLIAM: I think it is fine with it
3 being in. I just want to clarify our position is
4 that "any" doesn't mean just one, it means "every."
5 Again, based on Weber and Hacienda Hotels, a Ninth
6 Circuit case.
7          THE COURT: Right. And I'm just trying to
8 make sure that the jury would read it that way.
9          I understand that argument, right? If
10 there is one accommodation, that would have been an
11 undue hardship. But another accommodation, that
12 wouldn't be, then they can't prove undue hardship,
13 right? Because one accommodation would not have
14 been an undue hardship. So I'm trying to make sure
15 that the working is sufficiently clear.
16          Now that I've changed "any," I'm trying to
17 make sure that my "any" has not allowed the jury to
18 think one is an undue hardship, the other is not an
19 undue hardship.
20          Well, the first thing I'm going to do is
21 pull out "reasonable" to be consistent with 11, and
22 then I'm going to look at the sentence. I will show
23 you my current draft of what I'm looking at.
24          MR. GILLIAM: I would argue it proves any
25 possible combinations.

Page 1956

1          THE COURT: I would be more inclined to
2 say "any and all accommodations." Does that make
3 sense? Because possible now seems like it is
4 changing a reasonable accommodation standard to
5 something different. But "any and all" presupposes
6 that the number is zero to whatever the maximum
7 number of accommodations would have been, that all
8 of those are an undue hardship.
9          MR. GILLIAM: "Any and all," I think makes
10 sense.
11          THE COURT: Okay. Let me put it in here,
12 we will see how it reads.
13          Am I grammatically incorrect on any and
14 all accommodation, accommodations? I don't know if
15 I'm violating the rules of grammar.
16          All right. I think this satisfies the
17 concerns on bringing out "reasonable," but having
18 whatever accommodations would have been in play in
19 this case as the proper standard.
20          So now with this language, y'all can
21 object to it. Does anyone have an objection to it?
22 Is everyone glazed over? You can't object to it?
23          MR. GILLIAM: I have already stated -- I
24 guess I will reiterate it, just we would object to
25 the inclusion of "in this case."

Page 1957

1          THE COURT: Right. I have still kept that
2 in.
3          MR. GILLIAM: But no other objections.
4          THE COURT: Okay. Any objection to "any
5 and all accommodations"?
6          MR. MORRIS: I guess I will just state for
7 the record I think that there is no evidence of any
8 accommodations that have been really proposed or at
9 issue, but I think that is it.
10          THE COURT: Understood.
11          So I will overrule that objection, keep
12 Question 12 in its current -- in its modified form.
13          Okay. So next question, 13, lost wages.
14          On Local 556?
15          MR. GREENFIELD: No objection, your Honor.
16          THE COURT: Anything from Carter on
17 Question 13?
18          MR. GILLIAM: No, your Honor.
19          MR. MORRIS: Your Honor, just one thing
20 from Southwest.
21          THE COURT: Yes.
22          MR. MORRIS: And I sort of apologize a
23 little bit, because I did request that these be
24 broken up, and I think that is good.
25          But just the way the damages questions,

Page 1958

1 with respect to Local 556 and Southwest are
2 worded -- you know, for example, if you look at the
3 lost wages sustained between these dates, you know,
4 I think the jury is probably going to look at that,
5 and if they were to find one or both of us liable,
6 they would put the same amount for both people
7 there, and then it may look like double damages,
8 essentially.
9          THE COURT: I'm glad you brought this up.
10          So yes. And we were having this
11 discussion back in chambers.
12          What we need to make sure is, in
13 post-verdict briefing, we make sure there is no
14 double recovery, right?
15          I don't know -- I don't know how to do
16 that other than hopefully the number is the same,
17 right? If it is different numbers, then we are
18 going to have an issue.
19          But presumably both numbers would be the
20 same, or nothing, right? And if they are the same
21 number, then it is capped at that number. Let's say
22 it is $10,000, right? And the answer is $10,000 for
23 both Union and Southwest. Then the recovery is
24 $10,000. It can't be a double recovery because 20
25 would be double, right? In my mind?

Case 3:17-cv-02278-X  Document 387-1  Filed 01/02/23  Page 590 of 642  PageID 11531
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                          Pages 1959..1962

Page 1959

1      The question is, if the number is
2  different, you know, if they say 8,000 for Southwest
3  and 2,000 for the Union, I'm not sure how they would
4  have gotten there and I'm not sure what to do about
5  it, right?
6      So I have thought this is the best we can
7  do, knowing that I will have to avoid a double
8  recovery on the back end. But I'm trying to figure
9  out if they can engineer a result that none of us
10  can figure out how they got there and how do undo
11  it.
12      Any bright ideas? I see the value in
13  breaking these things out, right? There could be a
14  recovery just from the Union, Southwest and not the
15  Union, or a recovery just from the Union and not
16  Southwest.
17      MR. McKEEBY: No bright ideas, just more
18  problems in the sense that, even if they do put one
19  number, then I guess there is a question of which
20  defendant pays.
21      THE COURT: Right. It is not tortfeasors,
22  but we would be talking joint and several liability,
23  if this were a tort case, right? And what is the
24  total recovery? Is it 10,000 or is it 20,000?
25      And in my view, if this were a tort case,

Page 1960

1  it would a $10,000 recovery, with joint and several
2  liability.
3      If they both have been found liable, then
4  I think there can be a judgment. But then it would
5  be my duty to make sure there is not a double
6  recovery and a double satisfaction.
7      So in my view, I think the best we can do
8  is all know that there is the potential for an odd
9  result here, hope that the dollar signs are
10  consistent, matching up to the liability questions,
11  right? And then make sure that we avoid the double
12  recovery in post-verdict machinations.
13      Or we can go back to one damages question,
14  but then we have got other problems that we create
15  by one damages question to defendants.
16      MR. GREENFIELD: Would you entertain the
17  idea of some and give some -- and again, problems
18  not solutions? So I apologize. Some sort of
19  apportionment footnote question in there, if
20  you do -- you know, or maybe on the back end of all
21  the damage questions, if you found that both
22  Southwest and the Union are liable for the
23  discharge, and you have asserted damage to both,
24  which -- how much do you assert, you know,
25  which apportion -- you know, something -- I don't

Page 1961

1  know.
2      I'm spit-balling here, but just something
3  to potentially maybe on the back end and parse it
4  out.
5      THE COURT: And I think that would work,
6  but only if we wrapped it down into one damage
7  question. And if we've found liability for both and
8  one amount of damages, then what is a proportionate
9  responsibility, right?
10      But I don't even know that this can be a
11  proportionate responsibility case, right? I almost
12  think in a case like this -- like, let's say that it
13  is $10,000 each. Unless I'm missing something, in a
14  case like this, she would have the ability to get a
15  judgment, $10,000, but then only get one
16  satisfaction, right?
17      And so the first one to pay up is the
18  first one to pay up. And so it is actually an
19  enforcement of the judgment problem, not even a
20  judgment in how it reads problem, right?
21      I would know, I can see it is 20 grand.
22  But it is almost an enforcement of the judgment
23  problem.
24      So the problem -- so while I like your
25  idea, I think I can't impose a proportionate

Page 1962

1  responsibility context in a statutory violation case
2  that is not a negligence case with a proportionate
3  responsibility-staked overlay on it.
4      So I think I have got to give her a full
5  satisfaction, potentially from each defendant who
6  they found liable, up to the level of damages that
7  they found them responsible for. But she can only
8  ever get one complete satisfaction, even if there
9  are two judgments.
10      MR. GREENFIELD: Thank you.
11      THE COURT: Does anyone want to take issue
12  with my hunch here?
13      MR. PRYOR: I just -- no, I take issue
14  with the number used, but we agree with the
15  analysis.
16      THE COURT: I knew you would, Pryor.
17      But, I mean, it would be all easier if
18  this were a tort case, right? Because then we would
19  just have one damages question and a proportionate
20  responsibility and we would know exactly how to do
21  it. But a multi-defendant statutory damages case is
22  a different animal.
23      I think we have done it as best as we can.
24  I think we all know that we have a double recovery
25  issue waiting for us at the end of the day, assuming

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022                    Pages 1963..1966

Page 1963

1 that there is liability for both and there are
2 damages for both.
3          And that we may need to talk about this,
4 if there is a different calculation for each of the
5 two defendants.  But it may actually be fine because
6 maybe then that is what the judgment looks like for
7 each defendant.  We just have to figure out what the
8 dollar amount of the double recovery would mean.
9          MR. MORRIS:  Your Honor, just thinking out
10 loud here a little bit is, if there were an
11 apportionment question there, then we would have the
12 information from the jury -- and maybe it becomes
13 unnecessary at some point, but at least we have it,
14 if it becomes necessary or relevant for some
15 question of apportionment or something.
16          MR. HILL:  What?  How would that come into
17 play?
18          THE COURT:  If they picked different
19 numbers?  If they found them both liable but said
20 Southwest was 8,000 and the Union, 6,000?
21          I don't know why they would do that.  I
22 can't think of a good reason why they would pick
23 different numbers, as we sit here today.
24          All right.  The best I can do is what we
25 have done so far, and then see what happens and hope

Page 1964

1 that they get consistent numbers, right?  And if
2 they get consistent numbers, we can figure out
3 avoiding a double recovery on the back end.  If they
4 get inconsistent numbers, then I may not release
5 them immediately, but I may send them back to the
6 jury room and we figure if we need to ask them a
7 follow-up question.
8          So I'm not saying we will never ask that,
9 but hopefully we won't need to.
10          MR. PRYOR:  I guess I'm misunderstanding
11 what -- I thought you were going to submit one
12 damage question.  If you submit two, I think it is
13 going to be very confusing for the jury for the very
14 reason you are stating.
15          Why are we stating -- it is the same
16 damage.  It is the liability question is going to
17 determine who is responsible for the damage.  And if
18 it is both, it is just as you have stated.  But to
19 give two -- I have had this happen before.  These
20 two damage questions, the jury ends up fighting
21 over, trying to split it between the two, and that
22 is not their issue, some thinking it is a double
23 recovery and they cut in half.
24          And then if they don't find liability for
25 both, she doesn't get both.  I think it is -- if

Page 1965

1 that is what you are doing, I don't know if we said
2 we don't object.  We do.
3          THE COURT:  Understood.
4          Okay.  So now we are back to the question
5 of do we lump it back into one damage question, and
6 then we use the liability questions to determine who
7 owes that amount of money.
8          If both are liable, then both owe that
9 amount of money, if those types of damages are
10 recoverable.  I know you've got your lost pay
11 argument for the Union -- sorry -- front pay for the
12 Union.
13          But we break that out, right?  So even if
14 there is a category that we treat differently, if
15 the Union is off for front pay, then we could still
16 figure out because there is a separate front pay
17 question.
18          So the question is now, are we back to one
19 damages question that doesn't identify which
20 defendant but which type of damages?
21          MR. GREENFIELD:  We contend that the two
22 damages question is still better than the joint
23 damage question, but -- it may not be perfect, but I
24 think it is closer to the right direction to where
25 we want to be.

Page 1966

1          MR. MORRIS:  Southwest agrees.
2          THE COURT:  Agrees on two, instead of one?
3          MR. MORRIS:  Yes.
4          THE COURT:  So I think I may have talked
5 myself out of it though, now.
6          Yes.  Looking at all of the types of
7 damage questions, my current thinking is the only
8 way to avoid the problem of the jury's inconsistent
9 answer on Southwest and the Union owing different
10 amounts of money for the same types of damages is to
11 send one damage question without identifying a
12 defendant and using the liability question to
13 determine if those damages are awardable against
14 that defendant.
15          MR. GREENFIELD:  And I would contend that
16 that has greater risk of confusion and prejudice by
17 lumping them together, as opposed to splitting them
18 apart and potentially dealing with this other issue.
19          THE COURT:  So I see your point, but I'm
20 not seeing how it would actually play it.  Like, I
21 see how it plays out in the other context.  They
22 start thinking who was more at fault, right?  They
23 start implying a proportion of responsibility
24 context.
25          But they can't do that if it is one

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 6 July 12, 2022                     Pages 1967..1970

Page 1967

1 question. If they found someone not liable, then
2 they are not liable. And whatever amount of damages
3 it is, they are not on the hook for.
4        MR. GREENFIELD: I actually think that it
5 is --there is a perfect example, and we can just
6 look at back pay.
7        We both could be found liable for the
8 termination under any one of the -- any number of
9 the statutes.
10       The jury could come back and say, yes, and
11 we, you know, tip the cap here -- you probably
12 understand that we will probably argue this -- but
13 that then we are not actually responsible for any of
14 the back pay damages. We are not her employer, we
15 didn't cause -- we fought to get her job back.
16       So even though we are liable, our back pay
17 should be zero. And if they are lumped together,
18 I'm going to be stuck with an argument about
19 splitting it with them and I don't want to do that.
20       MR. PRYOR: If, as a matter of law, they
21 are not responsible for the back pay, then you form
22 a judgment accordingly.
23       MR. GREENFIELD: If you would like to
24 stipulate that we are not possible for back pay, I
25 would be happy to go with that.

Page 1968

1        MR. PRYOR: Well, I'm not going to
2 stipulate -- what? No. The Court can ferret that
3 out.
4        THE COURT: I think I can ferret that out
5 in post-verdict briefing, right? If there is, as a
6 matter of law, if you are not on the hook for back
7 pay.
8        The question would be if there is some
9 sort of factual basis, not as a matter-of-law point,
10 the jury could find they are not on the hook for
11 back pay.
12       MR. GREENFIELD: And I'm not arguing from
13 a matter-of-law point. I'm arguing from a factual
14 point. And so I think if they are lumped back
15 together, then we absolutely have to have some sort
16 of apportionment because I think a jury could easily
17 find if we are both liable, for example, that the
18 Union is X, could potentially be much less.
19       Because, again, the different sort of
20 situation that we are in, that we actually -- and we
21 would argue -- even fought to get her her job back.
22 And ultimately, the decision was made by Southwest
23 Airlines to terminate her employment.
24       So if they are lumped together, then I
25 absolutely think we need some sort of apportionment

Page 1969

1 question. But I think the better way is to have
2 them split apart.
3        MR. PRYOR: I don't see it. I don't
4 understand that argument.
5        MR. HILL: It's like a joint-employer
6 case, where you get a joint and several judgment
7 from joint employers.
8        MR. GREENFIELD: We are not joint
9 employers.
10       MR. HILL: Well, that's fine, but I'm
11 using my analogy.
12       THE COURT: Well, and so what I will say
13 is, there is a universe in which the jury could say
14 the Union shouldn't have turned in her; however,
15 Southwest Airlines shouldn't have fired her, and so
16 the Union shouldn't be on the hook for back pay,
17 right? Like, the Union should be on the hook for
18 some damages, but not the full extent of the back
19 pay. This is -- so --
20       MR. PRYOR: Okay. I'm having
21 difficulties -- but I guess if you submit a question
22 like that to the jury. But, okay. I mean, I give
23 up. I don't know what to do.
24       THE COURT: I think we all give up at this
25 point.

Page 1970

1        MR. PRYOR: There has got to be a way.
2        But submitting two damage questions,
3 unless you put something in there telling the jury
4 there is no double recovery, don't think about your
5 answers to -- I mean, I don't know.
6        Otherwise, it is going to -- I know two
7 damage questions will create confusion. This other
8 hypothetical issue, I -- it seems odd that a jury
9 could consistently find them liable for getting her
10 fired, but somehow think they are not liable for
11 back pay and Southwest is, as opposed to joint and
12 several.
13       It just seems like that is an issue that
14 the Court would ferret out and not the jury, but --
15       THE COURT: So now what I'm thinking
16 about, Mr. Pryor, is two questions, but actually
17 adding in the cautionary language you are flagging,
18 which is something along the lines of, the jury is
19 to award the full measure of damages it finds
20 attributable to each defendant. The Court will take
21 separate action to avoid any double recovery.
22       MR. PRYOR: If there is really that
23 concern, I guess so.
24       MR. HILL: So you still have the problem
25 of potentially inconsistent verdicts.

Page 1971

1  And because there is one set of damages
2 that is caused by the termination, regardless of who
3 did it, who caused it. If the Union caused it, she
4 still got terminated and the pay that she lost
5 between March 14th, 2017 and the date of trial is
6 the same, March 14th to the date of trial, that she
7 would have lost if Southwest had fired her. I mean,
8 it the same quantum. Having two questions just --
9  THE COURT: I get your point, but I'm not
10 necessarily in agreement with it. The jury could
11 say that Southwest is liable for the termination and
12 the Union is liable for its breach of duty of fair
13 representation. But there is no further liability,
14 and that the Union's damages are less than
15 Southwest's damages.
16  MR. PRYOR: Okay. If it is going to be,
17 you have to have two.
18  THE COURT: So in that case, if they
19 award, you know, 8 grand against Southwest and 6
20 against the Union, then we would have judgments that
21 say 8 and 6. But I would know that her recovery
22 can't exceed 8. Does that make sense?
23  MR. PRYOR: So if they are going to be
24 two, you will put the language in that says don't
25 worry about -- give the full measure of damages each

Page 1972

1 time and the Court will ensure -- now, they would be
2 worried about double recovery.
3  THE COURT: I agree with you, Mr. Pryor.
4  MR. PRYOR: And so that is actually the
5 way I would say it, the Court will ferret this out
6 and not permit a double recovery or something.
7  THE COURT: Okay. So give me 30 seconds.
8 I'm going to draft some language, and then I will
9 show it on the screen.
10  Okay. So the language I have proposed is
11 right under the questions about damages header:
12 "The jury should award whatever recoverable damages
13 it finds that Plaintiff Carter proved each defendant
14 caused. The Court will ensure that it avoids giving
15 Plaintiff Carter more than a full recovery of the
16 damages the jury finds that she proved."
17  I can't say "double recovery," because it
18 could be 1.3, 1.8. So it is the one satisfaction
19 rule is really what we are talking about, so --
20  MR. PRYOR: And I don't guess you can put
21 in, should the jury award damages in regard to
22 Southwest Airlines, so that they understand -- and
23 although maybe that same language in the Southwest
24 Airlines --
25  THE COURT: Well, should I say, should the

Page 1973

1 jury award damages as to both defendants, the Court
2 will ensure --
3  MR. PRYOR: Yes. Yes, that would be
4 great.
5  THE COURT: I think that is the best we
6 can do, is two separate questions with the caveat.
7  And then if we have to sort out
8 something -- you know, after we get a jury verdict,
9 everyone be looking out if there is something really
10 squirrely and we need to send them back for another
11 question.
12  Normally, I accept the verdict and cut
13 them loose. But we should all be on the lookout if
14 we need to not cut them loose for some kind of
15 inconsistent jury answer that we can't resolve as a
16 matter of law on the back end. Does that make
17 sense?
18  MR. PRYOR: And where are you going to be
19 on Thursday?
20  THE COURT: I will tell Judge Kinkeade,
21 look, man.
22  So does anyone want to object to the
23 overall structure about questions about damages with
24 the preamble language I have?
25  MR. GILLIAM: No objection from plaintiff.

Page 1974

1  THE COURT: We are just talking about the
2 preamble at this point and separate questions for
3 defendants. I know y'all wanted separate questions.
4  Is the preamble good enough?
5  MR. MORRIS: Yes, your Honor. I think
6 that works.
7  THE COURT: He said cautiously. We will
8 see how this plays out in the next few days.
9  Any issue with the language that you want
10 to take, Mr. Greenfield?
11  MR. GREENFIELD: No, your Honor.
12  THE COURT: Okay. And let's talk about
13 Question 13. Now we are back to 13.
14  MR. GREENFIELD: Just to the question in
15 and of itself for lost wages and damages against
16 back pay, I think there is insufficient evidence
17 that shows that we caused the termination of
18 Ms. Carter, and I believe the question itself to be
19 inappropriate.
20  THE COURT: Understood.
21  I will overrule that objection.
22  MR. GREENFIELD: Yes, your Honor.
23  MR. GILLIAM: Plaintiff has no objection.
24  THE COURT: Okay. So moving on to
25 Question 14.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 594 of 642   PageID 11535
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022                    Pages 1975..1978

Page 1975

1     MR. GREENFIELD: No objections, your
2 Honor.
3     THE COURT: Anything from Carter on
4 Question 14?
5     MR. GILLIAM: No objection.
6     MR. MORRIS: Nothing with Southwest.
7     THE COURT: Okay. 15, punitives.
8 Local 556?
9     MR. GREENFIELD: Yes, your Honor. We just
10 renew our objection regarding punitives that we made
11 earlier.
12     THE COURT: I understand that and overrule
13 it.
14     Any other objections on Question 15?
15     MR. GILLIAM: No objections from Carter.
16     THE COURT: All right. 16, the sum of
17 money.
18     Same objection to 16 as 15,
19 Mr. Greenfield, on punitives? It's just the dollar
20 amount on punitives?
21     MR. GREENFIELD: Oh, yes. Yes, your
22 Honor. I was just trying to follow -- I was
23 thinking it was the same thing, so I'm trying to --
24     THE COURT: Yes, sir. Okay. So I will
25 overrule that objection on your punitives argument

Page 1976

1 on 16.
2     MR. GILLIAM: No objection from Carter.
3     THE COURT: All right.
4     So that should take us to 17. Nominal
5 damages against 556 for Title VII claims.
6     MR. GREENFIELD: No objection, your Honor.
7     MR. GILLIAM: No objection.
8     MR. GREENFIELD: No objection to 18.
9     THE COURT: 18. Yes. We all know they
10 are supposed to write a dollar. If they write
11 anything else, I'm supposed to reform it, right?
12 Everyone is sort of on the same page?
13     I've seen a jury award 10 in state court
14 before, and that had to reformed to a dollar.
15     MR. GILLIAM: No objection from Carter.
16     THE COURT: 19. Nominals for 556 for fair
17 representation. Any issue with Question 19?
18     MR. GREENFIELD: Your Honor, I would be
19 happy to skip all of the way down through 22 and say
20 no objections. I think they are all nominal damage
21 questions and we have no objection to them.
22     THE COURT: Understood.
23     Any issue before we get to 22 for Carter?
24     MR. GILLIAM: No.
25     THE COURT: So then 22 is the last

Page 1977

1 nominals question.
2     So 23, is that where we are at now?
3     MR. GREENFIELD: Yes, your Honor.
4     THE COURT: So front pay against Local
5 556.
6     MR. GREENFIELD: We would like to renew
7 our objections regarding front pay being
8 inapplicable to the Union. And we believe it is a
9 question for your Honor to decide, and there should
10 be some sort of jury advisory language, if it is
11 included.
12     THE COURT: Understood.
13     Do we need -- so on front pay, I don't
14 have a problem putting in more advisory language in
15 here. I know I have put it in the instructions that
16 it is advisory.
17     Any issue with me putting the disclaimer
18 in one more time here, that this is an advisory
19 question?
20     MR. GILLIAM: Yes. That's fine, your
21 Honor. We have no objection.
22     THE COURT: So I just said, "This is a
23 question for the Court on which the Court seeks the
24 jury's advice."
25     MR. GREENFIELD: Perfect. Thank you.

Page 1978

1     THE COURT: Any issue with that from
2 Carter?
3     MR. GILLIAM: No, your Honor. No
4 objection.
5     MR. HILL: I'd probably change the
6 spelling of "advice."
7     THE COURT: Advise and consent. Advice.
8 I got it wrong. Thank you. It is with a "c" now.
9     Okay. So 23, we've added the disclaimer
10 in the front.
11     How about 24? Now we are at Southwest
12 damages questions.
13     MR. MORRIS: I think we are good, your
14 Honor.
15     MR. GILLIAM: No objection.
16     THE COURT: Okay. 25. Non-economic,
17 Southwest, Title VII.
18     MR. MORRIS: Yes, your Honor. Just at the
19 end of the first question, it refers to the various
20 categories. And it says, "and other non-economic
21 losses, if any." I think that deviates from the
22 pattern instruction and should not be included.
23     THE COURT: All right. So it's that
24 phrase "and other non-economic losses, if any"?
25     MR. MORRIS: Yes.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 595 of 642   PageID 11536
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022                        Pages 1979..1982

Page 1979

1    THE COURT:  Are there any other types of
2 non-economic losses?
3    MR. MORRIS:  Excuse me?
4    THE COURT:  Even separate and apart from
5 the patterns, are there any other types of
6 non-economic losses?  I couldn't think of any in the
7 abstract, much less in the specific case.
8    So if anyone can fit something into that
9 category, I can see a reason to keep it.  But if no
10 one can fit anything from this case into that
11 category, I'm not sure it is doing any work.
12    MR. GREENFIELD:  Your Honor, we would just
13 ask that if you are going to the change the
14 instruction on that, then do it for us just so we
15 have some cohesiveness.
16    MR. MORRIS:  And that repeats in the
17 Question 1 and Question 2 subparts, so I would just
18 ask that it be removed there as well.
19    THE COURT:  Sure.  So is Carter aware of
20 any type of damages in this case that are other than
21 non-economic damages not enumerated in the breakout
22 list in Question 25?
23    MR. GILLIAM:  We are sitting here
24 pondering that, making sure that there are not -- I
25 think -- I don't think there are.  I think that's

Page 1980

1 it.
2    THE COURT:  All right.  So I'm going to
3 make this conforming change.  I will do it on this
4 screen, show y'all my work, and then I will go back
5 and do it on the Union.
6    So here is how 25 looks now.
7    MR. GILLIAM:  No objections from
8 Plaintiff.
9    MR. MORRIS:  None from Southwest.
10    THE COURT:  Okay.  Then I will go find --
11 so it is Question 14.  Now Question 14 has the
12 conforming changes.
13    MR. GILLIAM:  No objections from Carter.
14    THE COURT:  All right.  So let's go back
15 to 25.  We fixed 25.
16    Now 26.  Punitives, Southwest, Title VII.
17    MR. MORRIS:  Your Honor, we object
18 because, one, we think this question is duplicative.
19 It is also 27.
20    THE COURT:  So I thought 26 was the
21 predicate to 27.  "Do you find that the legal test
22 was met for avoiding punitives" in 26, and in 27,
23 what dollar amount.
24    MR. MORRIS:  I apologize.
25    MR. GREENFIELD:  It is the same thing I

Page 1981

1 did.  Don't worry.
2    THE COURT:  No, it's fine.  At this point
3 they are all running together with me too.  So maybe
4 one of us can see straight at this point.
5    MR. MORRIS:  I guess the only thing I
6 would say is this deviates a bit from the pattern
7 instruction about violating Ms. Carter's religious
8 rights.  I think that's kind of incomplete and
9 confusing.  I think we should just stick to the
10 pattern.
11    THE COURT:  What was the pattern?  Do you
12 have that language handy?
13    MR. MORRIS:  It just says, "Do you find
14 that the plaintiff should be awarded punitive
15 damages?"
16    Maybe we could just say "for her Title VII
17 claims," if we need that clarification.
18    THE COURT:  Any objection to changing to
19 punitives under Title VII?
20    MR. GILLIAM:  Just I think making it
21 specific to what she can get punitive damages for.
22    MR. HILL:  A jury isn't necessarily going
23 to know what Title VII -- I know it's all in the
24 instructions, but it's just a lot cleaner for them
25 if they understand, this is the one related to

Page 1982

1 religion.
2    THE COURT:  So I see both of your points.
3    Right now "religious rights" is wrong
4 because it's the first time we've used that phrase,
5 right?  We could use "religious observances,"
6 "practices," and whatever, "exercises."  But we
7 can't use "religious rights."  We can't start
8 changing terms on them now.
9    So I think at a minimum, we need to do
10 that.  And the question is, do we drop it at Title
11 VII?  I see your point on saying what it is.  I
12 don't have a problem with that as long as we are
13 consistent.
14    MR. GILLIAM:  Observances, beliefs, and
15 practices, whichever order.  I know we switched up
16 the order.
17    THE COURT:  That's our most common order.
18 "Observances, beliefs, or practices"
19 appears to be the most common.
20    Okay.  So I'm going to replace "rights"
21 with "observances, beliefs, or practices."
22    So the way I currently have it.
23    MR. MORRIS:  Your Honor, I guess it makes
24 it sound like there are sort of multiple categories
25 of things in here.  I think there is just one thing.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                          Vol 6 July 12, 2022                                          Pages 1983..1986

Page 1983

1 And I think Title VII is used throughout the
2 instruction.
3       I don't know how Southwest violated her
4 observances or violated her rights or violated her
5 religion.  I mean, that is not really the claim
6 here.
7       You know, you have one claim that she was
8 terminated for her religious belief; the other one
9 is that she wasn't granted an accommodation to
10 engage in it.  So I think this is just not quite
11 accurate.
12      MR. McKEEBY:  Something like
13 discriminating against Carter because of her
14 religious beliefs is more -- I think it better
15 relates.  Because violating her religious
16 observances makes it sound like they tackled her on
17 her way to church or something.
18      THE COURT:  Mr. McKeeby, I can get behind
19 your language for discriminating against Plaintiff
20 Carter's religious observances, beliefs, or
21 practices.  I think that makes more sense than
22 violating.
23      MR. GILLIAM:  Carter agrees with that.
24      THE COURT:  Okay.  Let me change the
25 wording up and see what I'm doing.

Page 1984

1       MR. GREENFIELD:  And, your Honor, the same
2 deal.  I would just ask for the language to track
3 for consistency's sake.
4       THE COURT:  All right.  Is that
5 language -- let's see this language first.
6       MR. HILL:  Discriminating against
7 Plaintiff Carter for her religious.
8       THE COURT:  So you say it's Carter,
9 apostrophe S?
10      MR. HILL:  No.  You lose the apostrophe S
11 and you say "Discriminating Plaintiff Carter for her
12 religious beliefs and practices."
13      MR. GILLIAM:  If you are going to type it
14 out, it probably should be "because of."  That's the
15 statutory language.
16      THE COURT:  Now are we good?
17      It was wrong when we started, so I think
18 it is right now, but I'm not sure.
19      Okay.  So --
20      MR. GREENFIELD:  15, I believe.
21      THE COURT:  15.  That would make sense.
22      Here is how 15 looks now.
23      MR. GILLIAM:  It looks like that will
24 carry down through 18, I believe.
25      THE COURT:  Yes, you are right.  Okay.

Page 1985

1       MR. GILLIAM:  Hate to be the bearer of bad
2 news.
3       THE COURT:  One good deed.
4       (Discussion off the record.)
5       MR. PRYOR:  Your Honor, may I be excused
6 and allow these two gentlemen to handle this issue
7 very competently without me?
8       THE COURT:  You may.
9       MR. PRYOR:  Thank you.
10      MR. McKEEBY:  I'm getting a similar
11 request from Ms. Jones and the Southwest contingent.
12 I assume that's okay.
13      THE COURT:  Yes.  The Court finds that
14 anyone who does not wish to be here can leave.  I
15 figure that the familiar cast of characters will
16 remain the same.
17      MR. GREENFIELD:  We are almost there.
18      THE COURT:  Okay.  I'm going to show you
19 how 15 through 18 to read.
20      So 15 now has this phrasing.
21      MR. GREENFIELD:  It looks good, your
22 Honor.
23      THE COURT:  16.
24      MR. GREENFIELD:  It looks good, your
25 Honor.

Page 1986

1       MR. GILLIAM:  No objections from Carter to
2 15 or 16.
3       THE COURT:  17.
4       MR. GREENFIELD:  It looks good, your
5 Honor.
6       MR. GILLIAM:  No objection.
7       THE COURT:  And lastly, 18.
8       MR. GILLIAM:  No objection.
9       MR. GREENFIELD:  Beautiful.  Perfect.
10 Thank you.
11      THE COURT:  Okay.  Now, where were we?
12 Can y'all tell me what question we were on with
13 Southwest that caused all of that?
14      MR. MORRIS:  25.
15      MR. GREENFIELD:  So 26, 27, and 28 should
16 all have the same.
17      THE COURT:  So 26 is where it all started.
18      27 has got to change.
19      28 has got to change.
20      Give me one moment.
21      Okay.  Do the changes we've just made have
22 an issue?  There are multiple Title VII theories
23 that involve punitive damages.  One of them is
24 termination, right?  For religious exercises,
25 observances, beliefs.  But failure to accommodate is

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 6 July 12, 2022                    Pages 1987..1990

Page 1987

1 another theory, which is why my law clerk, who is
2 smarter than I am, put the broader term "religious
3 rights" in there.
4        So the question is, can we think of a way
5 to phrase it that doesn't foreclose in the jury's
6 careful attentive mind the accommodation and theory
7 for punitives and Title VII?  Make sense?
8        So now let's look at the language again.
9        I have got 29 up.
10        MR. MORRIS:  Your Honor, my original
11 proposal was just for violating Title VII, which
12 would incorporate both theories.
13        THE COURT:  So you still don't like
14 "religious rights."  You still like religious
15 something.
16        MR. GILLIAM:  I like the language that you
17 have now, but I understand the issue and the
18 concern.
19        MR. GREENFIELD:  Your Honor, as a
20 pragmatist over here, we could just pivot to the
21 pattern jury instructions.
22        MR. HILL:  What if it's "What sum of money
23 should be assessed against Defendant Southwest as
24 nominal damages" -- that's predominant.
25        But "for discriminating against Plaintiff

Page 1988

1 Carter because of her religious observances" -- I'm
2 sorry -- because of -- "for discriminating against
3 Plaintiff Carter because of or failing to
4 accommodate her religious observances, beliefs, or
5 practices under Title VII."
6        THE COURT:  Okay.  It is even more
7 confusing because the jury is instructed about, with
8 the Union, not just terminate, attempt to terminate,
9 right?  Because the Union can't terminate.  So the
10 plot thickens even more.
11        What I'm going to suggest doing is going
12 back to the original language.  I know you don't
13 like "religious rights."  It serves a purpose, but
14 its purpose is not to confine it.  It captures
15 everything.
16        So I'm going to go back to "religious
17 rights" for all of these and keep them worded the
18 way they were.
19        And now I will hear your objection -- I
20 will hear both of your objections if you object to
21 "religious rights" being in there instead of just
22 saying "Title VII."
23        MR. MORRIS:  Sure.  Yes.  We object to
24 "religious rights" as being confusing and vague.
25 And also, we also just suggest that the Court adhere

Page 1989

1 to the pattern, just for the record.
2        THE COURT:  Understood.
3        I appreciate that.  I will overrule it and
4 stick to the original language, which I will put
5 back in as soon as I leave the bench, and then I
6 will send you a copy of it by email tonight.
7        Okay.  So that's -- we've gone through
8 Question 29.  Are there any other objections to
9 Question 29?
10        MR. GILLIAM:  No objections from
11 Plaintiff, your Honor.
12        MR. MORRIS:  If we could just, at 28, the
13 pattern instruction doesn't have nominal damages on
14 Title VII.
15        THE COURT:  So I guess we can talk through
16 what this would amount to be.  If there is any
17 measure of actual damages, then we would not have
18 nominal damages, right?
19        So in my mind, nominal damages will only
20 come in if the jury thinks that there is liability
21 but that she had not proven actual damages.
22        Does everyone have the same understanding
23 of "nominal"?
24        MR. GILLIAM:  Yes, your Honor.
25        THE COURT:  So I get nominal damages

Page 1990

1 aren't in the patterns.  I don't know that they are
2 anywhere in the patterns for any claim, right?
3 Nominals are when you don't prove damages with
4 certainty.
5        MR. MORRIS:  I was saying we could remove
6 it, but I take your point.
7        THE COURT:  I mean, I will say this,
8 nominals can also be handed by not sending a
9 question on nominals.  And if the jury writes zero,
10 I re-form it to nominals at 1 in post-verdict
11 briefing.  I've had a trial where that happened
12 before.
13        But I also have trials where they put in
14 nominals and they put in nominals -- you know, if
15 they awarded $10,000 on actual and then a dollar on
16 nominals, I wouldn't award the dollar on nominals,
17 right?  It is irrelevant at that point.
18        And so I just want to make sure everyone
19 is on the same page on what nominals serve a purpose
20 for, only if actual damages are nothing.
21        MR. GILLIAM:  Yes, we agree.
22        THE COURT:  Okay.  So that's 28.
23        29 -- so we should be at 30.
24        MR. GILLIAM:  No objection, your Honor.
25        MR. MORRIS:  The only thing, I think this

Page 1991

1 is similar to our reform earlier about protected
2 activity on the Railway Labor Act versus exercising
3 rights.  I think we reformed that in some prior
4 text.
5        THE COURT:  We did and then we undid it
6 all, so I'm trying to figure out if there is a
7 variant of it that is --
8        MR. MORRIS:  Okay.  Did we?  Maybe I've
9 forgotten.  I thought we had adopted it.
10        THE COURT:  That was Questions 26 through
11 28 as well.  But maybe there was a separate question
12 where we just addressed it and not the Title VII
13 issue.
14        I thought it was for discriminating
15 against, but here it is a retaliation question,
16 so -- I thought it was a Title VII discrimination
17 claim we reformed it on earlier, but here I'm not
18 sure the same defect exists.
19        MR. MORRIS:  I thought -- we are on 30,
20 correct?
21        THE COURT:  Correct.
22        MR. MORRIS:  Okay.  I may be
23 misremembering, I thought we had changed it to "for
24 engaging in protected activity under the Railway
25 Labor Act" versus exercising her rights.

Page 1992

1        THE COURT:  Does anyone know what question
2 we did that on?
3        MR. MORRIS:  I don't.  Because I think you
4 changed it in yours.
5        THE COURT:  Question 8, I have as, "Has
6 Carter proved Southwest retaliated against Plaintiff
7 Carter for engaging in protected activity by the
8 Railway Labor Act -- for engaging in activity
9 protected by the Railway Labor Act?"
10        MR. MORRIS:  Right.  I was just saying
11 that would make it consistent with the other
12 questions, that was all.
13        MR. GILLIAM:  We don't have any objection
14 to that.
15        MR. GREENFIELD:  And then, your Honor, not
16 to be a pain, but for consistency's sake, if we are
17 going to change it here, we should change it in the
18 Union's questions as well.
19        THE COURT:  I think it was a Union
20 question we had changed it in, but I will go back
21 and double-check.
22        So we are changing the phrase "for
23 exercising her rights under the Railway Labor Act"
24 to the phrase "for engaging in activity protected by
25 the Railway Labor Act."  Correct?  To make it

Page 1993

1 conform to 8?
2        MR. MORRIS:  Yes.  Whatever is in 8,
3 basically.
4        THE COURT:  Here is how it looks.
5        MR. GREENFIELD:  That is 21 for the Union.
6        THE COURT:  It's 21?
7        MR. GREENFIELD:  22, actually.
8        Both.
9        THE COURT:  Okay.  Here is how 21 looks
10 like now.
11        MR. GILLIAM:  No objection from Carter.
12        THE COURT:  And 22 now.
13        MR. GILLIAM:  Still no objection from
14 Carter.
15        THE COURT:  Is the Union good?
16        MR. GREENFIELD:  Yes, your Honor.
17        THE COURT:  Okay.  Where were we,
18 Question 30?
19        MR. MORRIS:  Yes.
20        MR. GILLIAM:  We had no other objections
21 to that question.
22        MR. MORRIS:  And I think that language
23 about RLA-protected rights carries through to 31 as
24 well.
25        THE COURT:  I think you are right.

Page 1994

1        So 31 now looks like this.
2        MR. GILLIAM:  No objection.
3        MR. MORRIS:  No objection for Southwest.
4        THE COURT:  Okay.  Question 32.  Front
5 pay, Southwest.
6        MR. GREENFIELD:  We just renew our
7 previous objections regarding front pay, your Honor.
8        THE COURT:  Sure.  But it is against
9 Southwest.
10        MR. GREENFIELD:  Oh, I apologize.
11        MR. MORRIS:  We make that same objection,
12 your Honor.
13        THE COURT:  Awfully charitable of you, Mr.
14 Greenfield.
15        MR. GILLIAM:  No objection.
16        THE COURT:  So I need to put my advisory
17 caveat in front of this.
18        Here is how 32 looks now with the caveat.
19        "Advice" spelled correctly, Mr. Hill?
20        MR. HILL:  It is indeed, your Honor.
21        THE COURT:  Okay.  So 32.  I will overrule
22 that objection from Southwest, but I'm putting in
23 the advisory condition.
24        33, mitigation.
25        MR. GILLIAM:  No objections.

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 599 of 642   PageID 11540
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                Vol 6 July 12, 2022                    Pages 1995..1998

Page 1995

1      MR. MORRIS:  No objection, your Honor.
2      MR. GREENFIELD:  None here, your Honor.
3      THE COURT:  All right.  And then 34?
4      MR. MORRIS:  Your Honor, we would just
5  raise our objection that we don't have to show that
6  Ms. Carter would have earned anything if she ceased
7  looking for employment, that the damages should be
8  cut off from the day she did that.
9      THE COURT:  I understand that objection.
10 I will overrule that.
11     MR. GREENFIELD:  The Union echos that
12 sentiment.
13     THE COURT:  Understood.
14     I will overrule that as well.
15     MR. GILLIAM:  No objections from Carter.
16     THE COURT:  All right.  So I now need to
17 go back and undo the changes that I did to those
18 prior questions where we got caught in a tailspin
19 and I didn't see the forest through the trees.
20     So then we need to send y'all a clean copy
21 tonight that you can see.  We will print it off
22 tonight.  Look at it.  If there is, like, a
23 scrivener's error or something that you think is
24 inconsistent with how I ruled, let me know as soon
25 as you can.

Page 1996

1      Because, for example, if we get here at --
2  I will ask for 8:45 tomorrow.  I won't ask for 8:30
3  because we don't have plenty to cover tomorrow.
4      But if you've got some sort of error that
5  you found in the charge, not an argument of yours
6  that I have overruled, but like I did something
7  wrong based on what I told you I was doing, please
8  let us know by email because these things take
9  forever to print.  And if we print something, it may
10 have a cascading effect.
11     So please let us know by email if there is
12 something you think we've missed.  Hopefully, we
13 will be able to swap out a page and not have to
14 reprint the whole thing.  But then I will try to
15 read it at 9, and then we will roll into closing,
16 closing, closing.
17     Make sense?
18     Again, I guess I need to figure out
19 tomorrow on closing if they are saving a small
20 modicum of minutes for the final word, right?
21     MR. HILL:  We are indeed.
22     THE COURT:  How many, do you know?  I
23 should have asked Mr. Pryor before he left.
24     MR. HILL:  Mr. Pryor will have a better
25 sense of that in the morning.

Page 1997

1      THE COURT:  Yes.  So I will tell you, in
2  the past, what I've done is I've let -- people tend
3  to reserve up to 10 minutes.  People who have asked
4  for more, I initially used to let go, and then
5  they'd have new arguments they bring in a rebuttal,
6  and then we've got to unwind it and I give more time
7  to rebut the new information that came in.
8      So 10 minutes, I'm perfectly comfortable
9  with saving that time out of closing for the final
10 word.
11     I'll just reiterate, and if y'all can tell
12 Mr. Pryor, if you can save your objections for the
13 end of that argument, unless someone has blown
14 through a motion in limine, right?  Stand up, look
15 at me, I will call a sidebar.
16     Otherwise, save your objections for the
17 end.  I will call a sidebar after everyone is
18 closing and see if there is anything we need to
19 address.
20     Other than that, any questions?
21     MR. GILLIAM:  No questions here.
22     THE COURT:  I'm really glad I listened to
23 you, Mr. McKeeby, on not keeping the jury here,
24 because that would have been bad.
25     MR. McKEEBY:  You can answer a question

Page 1998

1  that I have, and that is when is the one time that a
2  photograph is not hearsay?
3      THE COURT:  The one time a photograph --
4      MR. McKEEBY:  Or is hearsay, I guess.
5      THE COURT:  The one time a photograph is
6  hearsay is when a criminal defendant is accused of a
7  scheme involving withdrawing funds and there is a
8  photograph of them withdrawing funds at Western
9  Union.  It is the proof of the matter asserted that
10 they were withdrawing funds.  But it's also a
11 statement of the party, a party admission.
12     And so it is a hearsay exception, while
13 hearsay all at the same time.
14     I have had that happen before.
15     No, that was you in the Western Union
16 video.  So it stays out under hearsay, it comes back
17 in under party statement.
18     Okay.  Any other questions?
19     All right.  I will see y'all tomorrow at
20 8:45, not 8:30.  Good luck getting your closing
21 materials together tonight, and we will finish
22 strong and give it to the jury tomorrow.
23     All right.  Court is in recess.
24     THE COURT SECURITY OFFICER:  All rise.
25     (Proceedings adjourned at 5:32 p.m.)

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                              Page 1999

```
                                                        Page 1999
 1              C E R T I F I C A T E

 2

 3              I, Kelli Ann Willis, RPR, CRR, CSR

 4  certify that the foregoing is a transcript from the

 5  record of the proceedings in the foregoing entitled

 6  matter.

 7              I further certify that the transcript

 8  fees format comply with those prescribed by the

 9  Court and the Judicial Conference of the United

10  States.

11          This 13th day of July 2022.

12

13              s/ Kelli Ann Willis

                Official Court Reporters

14              Northern District of Texas

                Dallas Division

15

16

17

18

19

20

21

22

23

24

25
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                             Vol 6 July 12, 2022                    Index: $10,000..404(b)

## $

**$10,000**  1958:22,24
1960:1 1961:13,15
1990:15

## -

**--there**  1967:5

**-o-**  1628:2

## 1

**1**  1701:21,22 1714:18
1726:19 1858:12,14,21
1859:13,18 1899:12
1902:1 1934:8,9,21
1935:11 1936:5,11 1939:7,
8,14 1940:7,11,14,23
1945:17,18 1979:17
1990:10

**1.3**  1972:18

**1.8**  1972:18

**10**  1655:1,3 1657:22,24,25
1658:3,6 1664:16 1671:7
1696:19 1705:11 1714:11,
22 1739:11,17 1863:20
1864:11 1947:3 1976:13
1997:3,8

**10,000**  1959:24

**10-day**  1703:15 1715:3,4,
17

**10-minute**  1739:5 1857:1,
7 1925:3,10

**10-year**  1728:3

**100**  1688:17 1849:16

**107**  1642:24

**108**  1691:12

**11**  1667:22 1674:23 1685:6
1696:18 1863:21 1947:7,
20,21 1948:8,17 1953:21
1954:15,17 1955:21

**118**  1704:19

**118.30**  1705:14

**118.61**  1705:17

**119**  1634:7 1635:22 1636:2
1708:14,17,22,25 1709:3,5
1711:8

**119.16**  1712:8

**119.17**  1713:3

**119.5**  1711:15

**11:07**  1738:25

**12**  1822:13,14 1879:4,5
1948:18,20 1955:1
1957:12

**120**  1636:8 1747:12

**124**  1741:18

**12:24**  1811:21

**12:33**  1831:10

**13**  1874:21 1875:6,7
1882:18 1957:13,17
1974:13

**136**  1637:14

**137**  1638:1

**14**  1887:12 1974:25 1975:4
1980:11

**14th**  1911:2 1971:5,6

**15**  1711:16 1738:24,25
1750:19,21 1823:23
1828:3 1829:2,3,7 1830:6
1860:9 1880:6,7 1975:7,
14,18 1984:20,21,22
1985:19,20 1986:2

**15-minute**  1738:23

**152**  1878:18 1879:21
1883:3 1886:16,21

**152.4**  1877:17 1879:7

**15A**  1631:6 1632:9 1633:2

**16**  1667:22 1887:12
1896:13 1975:16,18
1976:1 1985:23 1986:2

**17**  1817:2,9 1932:9
1949:22 1976:4 1986:3

**17ish**  1932:4

**18**  1976:8,9 1984:24
1985:19 1986:7

**19**  1907:22 1910:23
1976:16,17

**1996**  1697:24,25

**1:33**  1820:2 1831:11

## 2

**2**  1634:8,20 1635:1 1636:3,
5 1638:2,5,8 1667:22
1700:6,21,23 1701:8,10,
20,23 1702:4,7,8,10
1703:23 1704:15 1706:4,
20 1707:12,25 1708:1,9
1710:5 1711:3,11 1712:16
1714:8,18,22 1715:22
1716:5,14,17 1718:7
1724:8 1725:8 1726:19
1732:20 1733:18,22
1743:11 1747:4 1778:13
1834:4 1858:13,15,21
1859:13,18 1864:21
1894:6,16,18,21 1901:7,16
1902:1 1913:19 1939:11
1940:8,24,25 1979:17

**2,000**  1959:3

**20**  1817:2 1823:23 1958:24
1961:21

**20,000**  1959:24

**20-page**  1866:6

**2003**  1698:6,10

**2006**  1698:11

**2007**  1697:25

**2010**  1724:14

**2013**  1734:1 1761:8,16
1762:25 1849:15

**2015**  1684:4 1849:20

**2017**  1674:18,24 1684:4
1685:4 1696:6,16,20
1700:18 1761:16 1763:1,
11 1971:5

**21**  1993:5,6,9

**21-Q**  1630:20

**22**  1917:20 1976:19,23,25
1993:7,12

**23**  1778:13 1919:19 1977:2
1978:9

**24**  1727:12,19 1862:22
1978:11

**24-month**  1745:7 1746:15

**25**  1978:16 1979:22
1980:6,15 1986:14

**26**  1980:16,20,22 1986:15,
17 1991:10

**27**  1980:19,21,22 1986:15,
18

**28**  1986:15,19 1989:12
1990:22 1991:11

**28-year**  1665:19

**29**  1831:25 1987:9 1989:8,
9 1990:23

**2:20**  1857:8

## 3

**3**  1635:11 1717:4 1737:12
1859:22 1860:3 1932:6
1940:16 1941:10,15

**30**  1707:5 1867:8,9,11,18
1972:7 1990:23 1991:19
1993:18

**30-day**  1720:22 1721:5

**31**  1993:23 1994:1

**32**  1994:4,18,21

**33**  1994:24

**333**  1945:17,18

**34**  1934:6 1995:3

**36**  1630:4,11,13 1653:8
1667:11,12,18 1669:21,22
1670:21 1671:6

**38**  1667:15

## 4

**4**  1870:18 1907:16 1941:21
1942:4,19

**40**  1718:17 1721:15
1867:18

**40.1**  1724:18

**40.3**  1724:5

**403**  1701:1 1803:22

**404(b)**  1637:17

**44** 1667:21

**45** 1752:6 1822:6 1824:3

**46** 1814:15 1829:4

**4:46** 1925:11

---

**5**

**5** 1853:4 1860:18 1942:10

**50** 1633:23 1634:5

**556** 1680:7 1698:4,15,19,
25 1699:14,23 1700:2
1701:16 1710:21 1723:22
1761:18 1762:24 1771:13
1834:24 1837:11 1838:10
1840:1,17 1841:9,14
1842:17 1843:6,14
1845:19 1846:11 1857:23
1863:19 1873:13 1881:12
1886:12 1887:10 1888:19,
25 1892:14 1893:15
1894:6,7,12 1895:2,12,13
1896:20,23 1897:25
1899:13,16 1911:17,24
1912:24 1914:6,10,12
1957:14 1958:1 1975:8
1976:5,16 1977:5

**556's** 1876:23 1888:25
1890:10,15,18 1914:19

**57** 1631:8

**5:00** 1852:11

**5:32** 1998:25

---

**6**

**6** 1628:8 1822:14 1860:18,
24 1926:6,7 1942:17,22,25
1943:1,7 1971:19,21

**6,000** 1963:20

**66** 1839:12 1928:15

**6th** 1709:11

---

**7**

**7** 1667:22 1860:24 1861:24
1862:11 1943:8 1944:3

**74** 1654:9

**74.5** 1654:10

**76** 1689:1

---

**8**

**8** 1664:20 1778:13 1861:24
1863:18 1926:8 1944:8,10,
11,17,20 1945:4,14 1946:4
1971:19,21,22 1992:5
1993:1,2

**8,000** 1959:2 1963:20

**8:00** 1926:6

**8:30** 1996:2 1998:20

**8:45** 1996:2 1998:20

---

**9**

**9** 1664:21 1667:22 1863:20
1944:10,13,17,20 1945:10,
15,17 1946:4,5,24 1996:15

**90** 1714:9

**98** 1642:24 1681:15
1849:16

**98.13** 1681:22

**9:00** 1852:21,24 1855:14,
18

---

**A**

**aback** 1681:8

**Abercrombie** 1641:8,10
1643:7,10 1647:15,19
1648:9,12,13 1888:5,8,9
1891:19,22 1902:5,7
1905:13 1906:11

**abeyance** 1751:18,24
1837:3

**ability** 1722:23 1726:20
1769:16 1800:7 1822:1
1920:12 1961:14

**aborted** 1731:11 1764:3
1765:7

**abortion** 1650:19 1651:12
1735:1,5 1756:2 1763:18,
19 1954:7

**abruptly** 1647:17,25

**absenteeism** 1722:19

**absolute** 1628:25

**absolutely** 1645:19
1732:19 1744:2 1754:10
1774:8 1797:10 1884:2
1935:16 1968:15,25

**abstract** 1650:8 1979:7

**abusive** 1883:5,14

**accept** 1716:18 1737:11
1973:12

**accommodate** 1642:5
1648:6 1650:5 1651:11
1756:6 1757:5 1843:2
1846:20,21 1850:19
1901:23 1907:8 1933:10
1948:13 1949:24 1953:11
1986:25 1988:4

**accommodated** 1649:13
1650:6 1651:6 1757:3

**accommodating** 1902:14

**accommodation**
1640:21,22,25 1641:5,20,
21 1642:3,11,19,21
1643:2,9,18,24 1644:1
1645:20 1646:16 1647:12,
14,18,21,24 1650:11
1651:19,21,24 1652:1
1658:8,13,14,16 1659:5,21
1660:10,21,24 1661:4,25
1662:6,7,12,14,15 1663:3,
20 1664:18 1671:21,25
1756:8,13,17 1758:7,12
1841:24 1846:19 1851:2
1902:22,25 1903:1,19
1904:5,8 1905:2,10,19
1906:22 1916:14 1932:7,9,
12,24 1933:8,10,14
1943:10 1948:19,23,24
1949:5,8,11,14,15,16,25
1950:10,12,14,19,21,24
1951:2,7,15 1952:20
1953:5,12,23 1954:9,20
1955:10,11,13 1956:4,14
1983:9 1987:6

**accommodations**
1950:16 1951:25 1952:14
1956:2,7,14,18 1957:5,8

**accomplish** 1727:7
1888:1 1916:1

**accomplishes** 1915:1

**accordance** 1894:10
1948:22

**account** 1838:15,16

**accrue** 1721:20 1722:19,
22

**accurate** 1650:15 1874:8
1904:5 1983:11

**accurately** 1889:24
1952:12

**accused** 1998:6

**Acklin** 1872:16

**acknowledge** 1635:3
1711:6 1821:25 1947:16

**acquired** 1724:13

**act** 1658:11,17 1659:8,22
1660:14 1661:24 1662:14
1663:19 1708:3 1737:7
1756:14 1843:12 1849:10
1873:17 1874:5,6 1884:2,
3,6,8,9,25 1944:13,14,21,
23 1945:1,9 1991:2,25
1992:8,9,23,25

**acted** 1844:19,23

**acting** 1680:6 1756:12
1803:2 1838:4,12 1839:3
1840:17 1843:5 1844:13
1847:14 1848:9 1896:23
1898:1 1911:18 1912:8
1936:13 1938:8 1939:18

**action** 1655:11 1656:3,6,
13,15,18,19,22,23 1657:5,
10,12 1663:16 1681:9
1693:16 1701:13 1794:11
1797:4,5 1807:9 1844:5
1846:17 1847:13 1849:17
1970:21

**actions** 1650:22 1716:11
1746:10 1767:23 1799:23
1841:7 1842:1 1843:19
1850:4 1871:15

**active** 1690:10

**activism** 1761:17

**activities** 1754:25 1834:8
1837:25 1838:6,9 1840:22
1842:4,22 1845:3,12
1881:22

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 603 of 642   PageID 11544
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 6 July 12, 2022                    Index: activity..ambiguous

**activity** 1657:9,11 1659:20 1660:6,8 1663:14,17 1686:25 1754:12,14,17,23 1755:7 1758:2 1833:2 1834:18,22 1837:19,21 1838:3 1839:9 1840:6 1874:25 1875:16 1877:20, 25 1878:4,12,14 1882:20 1883:9 1886:21 1900:16 1944:13,21,25 1945:8 1991:2,24 1992:7,8,24

**acts** 1844:11 1860:24 1861:12 1870:11 1914:19

**actual** 1632:15 1633:2 1738:8 1895:5 1907:24 1908:6,15 1910:25 1989:17,21 1990:15,20

**ADA** 1936:19

**Adam** 1628:20 1743:5 1857:23

**adapt** 1915:11

**add** 1748:5 1907:4 1931:19 1933:15 1943:22

**added** 1721:4 1904:4 1978:9

**adding** 1899:25 1954:23 1970:17

**addition** 1698:5 1724:21

**additional** 1644:25 1688:4 1701:19 1706:9,14,15 1714:21 1748:2,11 1821:1 1822:21 1873:8 1885:1 1886:23 1896:19 1922:6 1934:17 1938:17 1939:16

**address** 1640:2 1641:9 1645:25 1647:4 1843:24 1845:18 1858:7 1878:5 1892:9 1997:19

**addressed** 1838:6 1840:16 1991:12

**addresses** 1892:1 1924:21

**addressing** 1651:16 1905:1 1918:6

**adds** 1879:25

**adequate** 1823:15

**adequately** 1827:22

**adhere** 1988:25

**adjourned** 1998:25

**adjustments** 1862:18

**administer** 1760:1

**administers** 1722:13

**administration** 1674:10 1699:4 1762:18

**administrative** 1702:14 1728:11

**admissible** 1635:1

**admission** 1998:11

**admit** 1669:22 1670:21 1680:8 1708:18,21 1711:3 1741:23,25 1914:13

**admitted** 1630:4 1633:25 1658:5 1667:4 1668:13 1671:3,5 1681:15 1709:2 1742:5 1747:9 1770:19 1930:15 1931:22

**admitting** 1708:25 1773:15

**adopted** 1991:9

**adoption** 1887:18 1938:16

**advance** 1664:24

**advantage** 1774:14

**advice** 1977:24 1978:6,7 1994:19

**Advise** 1978:7

**advisory** 1920:11,22,23, 25 1921:4,25 1922:9 1977:10,14,16,18 1994:16, 23

**affected** 1777:20,21

**affidavits** 1921:6

**affirmative** 1642:5 1755:12 1839:24,25 1840:1,7 1843:14,17 1881:16 1905:24 1941:24 1942:20 1943:23

**affix** 1931:11

**afford** 1773:7 1824:4

**affords** 1827:9

**AFL-CIO** 1707:15,18

**afoul** 1828:13

**African-american** 1799:12,18 1800:25 1802:13

**afternoon** 1743:3,4 1760:9 1855:24 1857:6

**age-old** 1820:6

**agent** 1729:21 1937:18 1938:5,8,9

**agents** 1938:13

**agree** 1657:3 1671:18 1716:9 1720:6 1761:1,2 1764:1 1767:22 1777:23 1783:21 1794:8 1796:24 1797:20 1810:5 1833:20 1849:4 1853:20 1917:15 1920:22 1962:14 1972:3 1990:21

**agreed** 1631:2 1706:23 1716:10 1718:1 1818:4 1848:23 1849:1 1850:1 1865:2 1936:25

**agreeing** 1656:24

**agreement** 1701:15 1714:15 1716:16 1718:14, 21 1725:20,22 1726:5,10, 13,15,17 1727:15,19 1729:4,7,18,19,20 1730:14,18 1731:1,17 1732:11 1734:7 1737:3,11 1739:24 1744:19,22 1745:3 1746:17 1762:18 1842:25 1850:3 1971:10

**agreements** 1699:3 1719:14 1723:17 1730:9

**agrees** 1966:1,2 1983:23

**ahead** 1628:9 1630:12 1652:20 1653:6,18,22 1654:2 1661:16 1670:9 1678:1 1759:13

**aircraft** 1679:3 1699:21

**airline** 1664:8 1719:12 1724:12 1728:1

**airlines** 1658:22 1664:4,23 1665:9,20 1671:16 1674:8, 22 1676:6 1682:15 1687:3, 5 1696:3 1697:14,22

1698:19,24 1699:14,20 1700:3 1702:12 1703:25 1707:24 1714:14 1716:12 1721:14 1724:10,13,15 1725:1 1729:9,10 1733:8 1734:4,6 1737:7 1748:14, 18 1754:2 1765:21 1787:20,24 1799:9,14,20 1801:2 1802:15 1806:22 1809:10,11 1810:2,25 1815:13 1816:6,13 1817:12 1818:6,16 1819:1, 4 1857:20 1870:22 1882:25 1896:25 1898:3 1936:16,20 1937:13 1968:23 1969:15 1972:22, 24

**Airlines'** 1887:2 1911:21

**airport** 1675:1,12 1680:15, 16

**Airtran** 1724:11,12,14

**aisle** 1634:13

**aligned** 1827:18

**Alito's** 1647:19

**allegation** 1690:22

**allegations** 1688:5 1692:5,10,13

**allege** 1650:2 1895:1

**alleged** 1688:3 1690:11 1937:16

**alleges** 1649:24

**alleging** 1650:3

**Allied** 1941:25

**allowed** 1650:25 1651:2 1755:11 1757:24 1758:23 1774:8 1793:17 1834:1 1955:17

**allowing** 1905:2 1938:17

**alluded** 1715:1

**aloud** 1779:14 1814:16

**altered** 1924:11 1938:21

**altering** 1929:6

**alternative** 1893:7 1916:12 1919:25

**ambiguous** 1803:15

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 604 of 642   PageID 11545
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Index: amend..attendants

**amend** 1876:20

**amended** 1932:20

**amendment** 1792:2,13,20
1796:12,19 1820:12

**American** 1882:25

**amicable** 1698:25

**amount** 1910:25 1958:6
1961:8 1963:8 1965:7,9
1967:2 1975:20 1980:23
1989:16

**amounts** 1908:25 1909:15
1966:10

**analogized** 1911:22,23

**analogy** 1969:11

**analysis** 1638:5 1686:24
1875:20 1889:18,19,22
1962:15

**analyzed** 1701:18

**anchors** 1952:6

**and/or** 1886:12,16,21,24

**animal** 1962:22

**animosity** 1758:2

**answering** 1794:2,3
1796:7 1821:23

**answers** 1654:5 1686:13
1695:14 1800:18 1810:13
1970:5

**anti-union** 1808:13
1839:19 1849:15

**anymore** 1725:11 1731:7
1821:5

**apologetic** 1711:10

**apologies** 1744:7 1771:21
1875:13

**apologize** 1684:23 1779:4
1780:11 1804:24 1819:18
1879:2 1887:16 1890:20
1894:17 1895:22 1896:5
1904:14 1957:22 1960:18
1980:24 1994:10

**apostrophe** 1984:9,10

**apparent** 1641:5,21
1646:3 1758:13

**appeal** 1637:13 1701:11,
22,23 1702:14,16 1714:16

**appealed** 1737:11

**appealing** 1706:5

**appeals** 1701:17 1718:4
1726:18 1737:4

**appearances** 1628:9
1857:15

**appeared** 1711:12
1906:17

**appears** 1906:17 1982:19

**appellate** 1898:14
1934:16

**apple** 1881:19

**applicant** 1658:14,15
1659:12

**application** 1758:10

**applied** 1799:3 1871:14
1920:2

**applies** 1863:24 1899:22

**apply** 1672:7 1804:7
1842:6,23 1892:17 1912:2
1921:19

**appointed** 1698:7

**apportion** 1960:25

**apportionment** 1960:19
1963:11,15 1968:16,25

**appreciated** 1829:21

**approach** 1686:5 1695:3
1772:24 1773:1 1778:7
1784:25 1813:21 1814:11,
22

**approached** 1768:16
1826:16

**approval** 1643:12 1664:24

**approve** 1633:15

**April** 1698:11 1709:11

**arbitrarily** 1869:24

**arbitrary** 1842:12 1844:1,
5,7

**arbitration** 1703:18
1735:12,22 1736:13,15,21
1737:12,23 1738:8

**1739:**23,24 1740:7 1741:9,
15 1772:12,13 1773:9,11,
13,22,25 1774:1,2,4,19,25
1775:1,15,18 1776:6,8
1777:15 1778:12,19
1779:8 1781:7,13 1828:6,
8,12,19 1829:1 1834:4

**arbitrator** 1737:20
1740:15,16 1741:2,6,14,21
1782:9 1783:4

**arbitrators** 1740:20,21,22

**area** 1671:9 1696:17
1897:15

**argue** 1839:7 1850:6
1955:24 1967:12 1968:21

**argued** 1848:1,2 1851:25
1865:1 1881:9,10

**arguing** 1641:8 1897:8
1968:12,13

**argument** 1637:18 1644:4,
9 1757:18 1830:1 1848:2
1850:23 1855:8 1871:3
1891:15 1897:2 1912:5
1920:15 1936:1 1939:6
1947:16 1950:13 1953:14
1954:25 1955:9 1965:11
1967:18 1969:4 1975:25
1996:5 1997:13

**argumentative** 1666:1

**arguments** 1823:9,14
1855:3,20 1882:6 1891:10
1949:7 1997:5

**arise** 1640:23

**arisen** 1729:12

**arises** 1651:20

**Arizona** 1674:17

**arose** 1675:5

**arranged** 1730:3

**arrest** 1930:6

**arrive** 1717:5

**art** 1912:7 1915:3

**article** 1707:15

**articles** 1705:2

**articulated** 1650:18
1651:1 1756:1

**asks** 1714:2

**aspect** 1893:19 1906:1

**aspects** 1661:1

**assert** 1886:19 1960:24

**asserted** 1960:23 1998:9

**assess** 1688:6 1722:17
1757:25

**assessed** 1987:23

**assessing** 1693:18

**assessment** 1716:6

**assignments** 1676:9

**assist** 1676:24 1677:1
1689:12

**assistant** 1674:15,19
1675:1,8,18

**assume** 1637:6 1901:17
1926:6 1985:12

**assuming** 1748:1 1824:10
1831:25 1852:19 1925:22
1962:25

**asterisk** 1865:19

**astute** 1743:19

**at-will** 1936:21

**Atlanta** 1724:13

**attachment** 1723:10,12

**attempt** 1840:15 1988:8

**attempted** 1652:1 1840:18
1894:8,12 1895:2,14

**attempting** 1760:12
1907:5

**attempts** 1872:11,12,13
1873:3 1914:19

**attend** 1690:3,15

**attendance** 1722:13,18

**attendant** 1669:17 1679:1
1696:12 1697:21,23,24
1714:14 1722:12,15
1734:6 1763:5 1765:14
1766:19 1792:25 1793:21
1794:7,9,25 1805:24

**attendants** 1668:9,18
1675:3,5 1676:4,8,12

1683:24 1697:9,14,17
1698:4 1720:10 1734:14
1846:2

**attended** 1679:21

**attention** 1726:4 1747:16
1855:23 1856:3

**attentive** 1987:6

**attorneys** 1864:16

**attributable** 1970:20

**Audrey** 1682:11,14
1688:13,20 1690:12,20
1711:24 1755:6 1762:18,
21 1769:12 1785:17
1799:6 1806:19 1809:24
1810:22 1835:12 1838:14,
16 1843:13 1847:24
1896:23 1898:1 1936:12

**authenticate** 1668:23

**authority** 1717:2 1872:13
1911:25

**authorized** 1718:22

**avenues** 1800:4,14
1802:18

**aviation** 1720:13 1941:25

**avoid** 1642:4 1910:11
1915:12 1934:16 1959:7
1960:11 1966:8 1970:21

**avoiding** 1902:14 1964:3
1980:22

**avoids** 1972:14

**award** 1735:12,15,22
1911:15 1970:19 1971:19
1972:12,21 1973:1
1976:13 1990:16

**awardable** 1966:13

**awarded** 1912:12 1920:6
1981:14 1990:15

**aware** 1658:15 1659:12,
14,19,22 1660:2,5,20
1662:5,19 1665:22
1671:20,24 1676:20
1703:4 1732:21 1733:3,4,
19,23 1756:6,13 1757:22
1758:8 1843:16 1979:19

## B

**B-U-R-D-I-N-E** 1708:6

**baby** 1678:8 1763:19
1764:3 1765:7

**back** 1631:2,12,21,24
1632:12,22 1633:9,11,16
1636:12 1639:14,21
1641:12 1652:15 1653:16
1670:4 1672:23 1673:8
1685:21 1690:24 1696:19
1710:24 1711:2 1712:12,
14 1713:25 1714:25
1716:24 1717:22,23
1718:2,5 1719:10 1720:1,
7,17 1722:3 1724:6,18
1727:8,10 1728:12,16
1731:5,13,15,21 1732:1,3
1739:11 1742:2 1749:8,18
1751:5,6,21 1752:8
1759:6,9,25 1761:8
1769:24 1770:19 1771:25
1779:4,8 1780:21 1800:22
1804:5 1809:21 1810:19
1820:1 1828:15 1830:3,4
1831:1,11,19,22 1832:1
1836:16 1837:1 1843:23
1850:20,22 1852:4
1853:22 1857:2,14
1864:19 1866:5,8 1867:10
1897:2,18 1898:17
1904:22 1905:6 1908:18
1910:10,16,21,25 1911:9,
10 1914:7 1916:13
1917:19 1920:13 1923:7
1925:4 1939:14 1940:1
1949:20 1951:2,3 1952:6
1958:11 1959:8 1960:13,
20 1961:3 1964:3,5
1965:4,5,18 1967:6,10,14,
15,16,21,24 1968:6,11,14,
21 1969:16,18 1970:11
1973:10,16 1974:13,16
1980:4,14 1988:12,16
1989:5 1992:20 1995:17
1998:16

**background** 1698:14
1728:3

**backtrack** 1798:4

**backwards** 1726:11
1826:6

**bad** 1699:8 1842:1,13,19
1843:25 1844:7,23
1906:14 1936:22 1954:7
1985:1 1997:24

**bank** 1722:4

**Baptist** 1734:23

**bargaining** 1699:2,3
1701:15 1726:13,17
1729:20 1732:11 1734:7
1842:25

**Barnett** 1680:4

**base** 1664:7 1669:19
1670:18 1674:14,15,16,19,
20 1675:1,3,8,18,19
1684:17 1685:10,12
1689:21 1693:5 1701:24,
25 1732:14

**based** 1672:20 1684:22
1685:18 1688:6,17
1691:23 1719:15,18
1724:12 1725:14 1746:5
1749:4 1782:5 1790:4
1816:3 1824:22 1830:17
1836:6 1841:20 1844:3
1852:4 1869:14 1870:5
1883:25 1889:14 1912:17
1923:19 1925:8 1934:25
1955:5 1996:7

**bases** 1684:15 1685:5,6,7,
8 1696:12,18 1697:17
1700:12

**basic** 1665:23

**basically** 1737:12 1746:13
1858:4 1884:15 1888:20
1902:7 1993:3

**basis** 1643:1 1667:25
1848:23 1884:7 1887:17
1968:9

**bathroom** 1925:3

**baton** 1653:20 1759:6
1824:14 1855:5

**bearer** 1985:1

**beaucoups** 1832:5

**Beautiful** 1986:9

**Becky** 1704:12 1713:18
1743:10 1744:2

**bed** 1723:14 1725:23

1731:15

**bedtime** 1927:4

**began** 1855:7

**beginning** 1701:11 1763:1
1789:4 1810:19 1825:9
1847:9

**begins** 1682:7

**behalf** 1628:19 1645:23
1843:6,13 1857:22

**behavior** 1687:23 1688:3
1690:11,13

**behemoth** 1852:10 1858:9

**behold** 1629:3

**belatedly** 1738:18

**belief** 1650:18 1651:1,15
1660:7,13 1661:4 1663:1
1755:25 1758:1 1842:3
1902:15 1904:9 1932:13
1948:2 1954:6 1983:8

**beliefs** 1642:8 1661:21,22
1672:3,8 1712:25 1713:1
1735:1 1755:22,23
1758:10 1789:1,13,15
1790:16,25 1795:10
1796:6 1797:23 1798:13,
22 1839:8 1843:21
1845:25 1848:25 1888:23
1889:2,6 1890:4,9,17
1892:22 1893:13,20
1894:14 1898:8,24 1899:4
1901:8 1905:16 1906:2
1907:9 1947:12,22
1982:14,18,21 1983:14,20
1984:12 1986:25 1988:4

**believed** 1654:20 1706:11
1710:16 1809:24 1842:2,
20

**belonged** 1937:17 1938:3

**bench** 1989:5

**benefit** 1920:19

**benefits** 1888:6 1909:12,
21 1910:1,2,6,7 1920:6

**bent** 1826:6

**bet** 1921:17 1925:20

**Beth** 1704:13 1743:10
1748:4

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 606 of 642   PageID 11547
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Index: bets..Carter

**bets** 1629:1

**bid** 1719:16

**big** 1798:19 1908:13

**Bill** 1792:22

**bind** 1847:15 1938:12

**binder** 1632:16

**binders** 1633:17

**binding** 1920:23

**bit** 1644:14 1648:25 1679:23 1687:19 1697:2 1706:17 1718:5 1736:11 1743:8 1744:7 1761:6 1768:12 1803:15 1809:23 1816:10 1837:9 1876:10, 11 1910:5 1957:23 1963:10 1981:6

**bites** 1881:19

**blank** 1767:11

**blanks** 1927:9

**block** 1879:3

**blocked** 1843:8

**blocking** 1952:1 1954:2,3

**blow** 1671:8 1713:20 1719:3

**blown** 1997:13

**board** 1694:13 1698:6 1787:22 1788:2 1790:5,7 1799:12 1802:23 1804:10 1805:21,23,25 1806:1 1809:7,13 1871:16 1911:25

**Bobby** 1628:12 1857:19

**bore** 1867:22

**boringly** 1855:19

**Bostock** 1891:25

**bothered** 1777:25

**bottom** 1681:24 1691:15 1711:16 1747:17 1882:19 1899:4 1949:21

**bound** 1632:12 1922:10

**bounds** 1827:15

**box** 1650:11 1686:5

1695:3,4 1759:14 1821:5 1836:8

**BP** 1713:17,18

**breach** 1864:20 1869:23 1971:12

**breaches** 1844:16 1871:10 1872:5,10

**break** 1652:9,11 1667:23 1684:11 1709:18 1735:19, 23,25 1738:14,16,18,24 1739:5 1811:21 1821:7 1836:16 1856:11 1857:1 1925:3 1965:13

**breakdown** 1697:3

**breaking** 1959:13

**breakout** 1979:21

**breaks** 1820:9

**Brian** 1628:16 1857:21

**brick-and-mortar** 1685:6

**briefing** 1887:16 1912:13 1920:3,19 1958:13 1968:5 1990:11

**briefly** 1645:15 1674:24 1701:8 1734:25 1751:25 1757:16 1827:5 1926:3

**bright** 1917:18 1959:12,17

**bring** 1639:24 1652:8,16, 21 1653:7 1667:12 1668:24 1706:6,14 1727:8 1739:13 1742:10 1759:9 1773:24 1800:9,10 1804:19 1832:1,11 1852:4 1853:21 1868:16,17 1954:15,16 1997:5

**bringing** 1945:25 1956:17

**brings** 1851:7 1918:21

**broader** 1987:2

**broke** 1934:4

**broken** 1644:17 1957:24

**brought** 1684:10 1706:10 1726:3 1918:20 1958:9

**bucket** 1822:9 1823:7

**budget** 1699:24

**build** 1728:16

**building** 1771:13

**builds** 1728:14

**bullet** 1711:18 1719:3,22 1720:19 1722:7 1724:19 1727:12,24 1728:10,19 1729:3

**bullets** 1726:23

**bullying** 1725:2 1937:5

**burden** 1642:4 1757:2 1893:2 1903:8,10 1924:5

**burdens** 1827:19 1844:9 1903:9

**Burdine** 1635:24 1708:6 1709:10 1715:13 1730:22

**business** 1664:8 1668:22 1670:18 1714:23 1727:18 1769:22 1777:10 1810:3,5 1838:17 1903:23 1937:2,3

**but-for** 1889:13,18,22 1891:2,5,6 1892:4

**bylaws** 1699:25 1733:10

---

**C**

**C-1** 1887:8,9,13 1888:15 1892:9 1893:24 1894:3,22, 24 1895:10 1896:8 1932:4

**C-2** 1896:12,14

**C-3** 1901:23,24 1902:18 1905:9 1906:5,19,20,24 1907:5,18

**C-4** 1906:21,25

**caffeinated** 1855:18

**calculation** 1963:4

**calibrate** 1752:16

**call** 1651:17 1672:24 1680:5 1685:6 1694:24 1701:20 1717:2 1722:24 1725:23 1734:5 1749:8,18 1750:13,15 1751:5 1752:7 1759:6,10,15 1766:8,13,14 1767:3 1803:9 1805:11,22, 24 1806:1,3,5 1809:8,14 1816:9 1820:19 1852:8 1853:15 1854:6,8 1997:15,

17

**called** 1641:11 1700:6 1718:13 1721:17 1732:21 1733:3 1737:6 1739:7 1750:12 1759:21 1762:6 1763:8 1766:18,24 1784:14 1801:5

**calling** 1655:3 1751:6

**calls** 1673:3 1685:25 1722:16 1723:23 1807:3

**candid** 1637:4

**cap** 1967:11

**capable** 1743:19

**capacity** 1765:22 1800:8 1838:5,13,25 1839:3 1840:17 1844:11,14 1847:10,12,14,18 1848:10 1850:22 1896:24 1897:3 1898:2 1911:19,20 1912:7, 9 1936:14 1938:9,11,19 1939:18

**capital** 1869:15

**capped** 1958:21

**caption** 1679:1

**captures** 1988:14

**Caravan** 1872:17

**care** 1652:24 1662:17 1744:4 1790:10

**careful** 1717:6 1855:23 1856:3 1987:6

**carefully** 1774:24

**carries** 1993:23

**carry** 1984:24

**Carter** 1628:10,11 1629:22 1634:8 1635:23 1636:9 1637:15 1639:9,18 1641:3 1643:6 1644:5 1646:9,24 1648:22 1649:2,8,18 1654:13 1655:4,11 1675:11 1676:19 1680:6,8 1681:25 1688:14,22,24 1689:17,20 1690:4,8,23 1691:25 1692:6,12 1693:2 1701:7 1702:15 1704:14 1706:24 1707:10 1710:15 1711:10 1714:2 1715:5,23 1717:11,22 1718:22

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 607 of 642   PageID 11548

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Index: Carter's..charlene

1720:15 1725:12 1726:12
1729:18 1730:18,23,25
1732:21 1734:12 1735:4
1737:10 1741:8 1743:11,
23 1744:4,14 1745:1,3
1746:18 1747:5,6,24
1748:8,13,16 1750:13,15,
17 1754:1,11 1755:20,22
1756:21 1757:3 1758:18,
23 1759:12,13,23,24
1760:2,3,9 1764:21
1766:23 1770:13 1771:19
1776:2 1778:12,25 1779:7
1781:5 1782:4,22 1785:7,
16 1787:2 1788:20
1792:13 1793:5,15
1794:13,20 1795:7
1800:12,15 1801:22
1806:10,17 1809:4,12
1812:21 1813:12 1814:2
1817:21 1818:17 1819:14
1820:19 1821:4 1823:16,
24 1827:22 1828:4
1830:13 1832:24 1836:7
1837:16 1838:5,14
1839:10,11,12,19 1840:4,
18,25 1842:8,16 1843:1,6,
8,13,20 1845:20 1846:21
1849:5,14 1850:1,13,16
1851:7 1855:4 1857:19
1864:18 1869:22 1875:15
1876:23,24 1877:18,23
1879:9,15 1881:22
1886:19 1888:25 1889:16
1890:2,6,11,18 1892:11
1893:10,12,18 1894:2,7,19
1895:15 1896:24 1897:7
1898:2 1899:14,16,20
1902:1,8,12,13 1910:12
1911:24 1913:17 1916:3
1918:4 1920:13 1923:12,
14,20 1936:11,12 1937:10
1939:10,12 1944:19
1945:6,8 1946:25 1947:4,
13 1948:1,9 1949:25
1950:14,19 1951:1,8
1954:3 1957:16 1972:13,
15 1974:18 1975:3,15
1976:2,15,23 1978:2
1979:19 1980:13 1983:13,
23 1984:7,8,11 1986:1
1988:1,3 1992:6,7
1993:11,14 1995:6,15

**Carter's** 1642:3 1647:16
1649:17 1650:17 1652:2
1654:14 1671:19 1678:13

1690:19 1693:8 1700:23
1702:7,10 1703:23 1706:5,
10 1716:11 1719:8
1732:15 1733:19,24
1740:13 1746:10 1754:22
1756:7,19 1758:9 1764:15
1839:8,16 1841:10 1845:2,
23 1847:22 1848:5,15,18
1864:1 1874:25 1875:16
1881:13 1883:13 1887:9
1889:1,5 1890:3,8,16
1892:21 1894:8,13 1895:3
1896:20 1897:1 1898:4
1913:2,15 1914:3,15
1916:16 1932:16 1954:5
1981:7 1983:20

**carved** 1739:8

**cascading** 1996:10

**case** 1630:6 1633:13
1641:10,11,12 1643:4,11
1644:3 1647:10,11,16
1648:11,12,21 1649:11,21
1662:20,21 1673:12
1678:22 1691:9,24
1702:10,25 1705:4 1706:6,
10 1708:3,5 1714:22
1715:2 1716:6 1718:12
1719:19 1721:24 1722:20
1728:4,6 1731:23 1732:22
1737:10 1738:21,22
1743:20 1744:5 1748:2,15,
20 1749:20 1750:7 1753:3,
15,17 1758:5 1759:15,20
1760:20 1792:14 1796:14
1814:3 1819:22,25 1820:8
1821:6,17,21 1823:4,18
1824:24 1825:10 1826:8,
16 1827:19 1831:22,24
1836:11,19 1844:2
1846:15 1852:6 1854:9,11,
14 1855:5,7,21 1856:6,7,8
1864:1,17 1872:16,17
1878:19 1882:24 1883:15
1884:1,6 1885:7 1887:25
1888:4,6,9 1889:21,24
1895:1 1904:7 1914:16
1915:4,12 1916:3 1930:3,
17 1931:7 1940:13,17
1943:10 1951:12 1952:17,
20,25 1953:1,5,8,10,16,19
1955:6 1956:19,25
1959:23,25 1961:11,12,14
1962:1,2,18,21 1969:6
1971:18 1979:7,10,20

**cases** 1641:1 1643:5,13
1644:4,25 1650:1,14
1651:3,17 1716:23
1718:24 1854:6 1872:24
1873:1 1903:14 1924:7

**cash** 1633:9,12

**cast** 1985:15

**catch** 1876:11

**categories** 1756:10
1883:19 1885:16 1908:23
1978:20 1982:24

**category** 1884:24 1885:8
1909:6 1965:14 1979:9,11

**caught** 1869:11 1995:18

**causation** 1851:6 1900:3

**caused** 1851:8 1872:7
1894:7,12 1895:14 1971:2,
3 1972:14 1974:17
1986:13

**cautionary** 1970:17

**cautioned** 1664:12

**cautiously** 1974:7

**caveat** 1807:1 1920:25
1921:4,25 1973:6 1994:17,
18

**caveats** 1781:10 1782:7

**CBA** 1838:19

**cease** 1923:24

**ceased** 1923:20 1924:9
1995:6

**ceiling** 1789:18

**certainty** 1990:4

**cetera** 1699:25 1873:18
1903:13 1936:19

**chains** 1752:4

**chair** 1731:22 1838:20

**Chalmers** 1644:20 1647:5,
10

**chambers** 1958:11

**chance** 1717:25 1718:11,
14,21 1723:16 1725:19,21
1726:10 1727:15,18
1730:9,13 1731:1,9,17

1737:11 1744:19,22
1745:2 1746:17 1852:9

**chances** 1731:10

**change** 1644:18 1872:23
1873:5 1876:3,7,13
1879:20 1917:1,2 1933:2
1943:20 1945:2,5 1949:3
1950:11 1978:5 1979:13
1980:3 1983:24 1986:18,
19 1992:17

**changed** 1637:9 1745:2
1848:2,3 1862:5,25 1916:8
1955:16 1991:23 1992:4,
20

**changing** 1730:16
1862:21 1875:22 1876:10,
13 1916:6 1918:24 1956:4
1981:18 1982:8 1992:22

**Chapo** 1633:11

**characteristics** 1743:25

**characterization** 1655:19

**characterize** 1877:21

**characters** 1985:15

**charge** 1629:13,15 1630:1
1631:11 1632:2 1635:12,
13 1639:15,21 1642:18
1648:5 1832:3,7,8 1847:12
1852:10,14,20,22 1853:2,
4,5,19 1854:25 1855:3,7,
13,19 1856:12 1857:3,5,16
1858:1,3,9 1861:3,8
1866:4 1868:1,19 1870:13,
17 1874:17 1883:18
1887:19 1895:24 1897:16
1905:14,23 1906:11
1916:23 1917:19 1926:12
1933:15 1941:24 1942:21
1943:23 1949:18 1950:23
1951:6 1952:22 1996:5

**charge-wise** 1629:19
1647:3

**charged** 1954:19

**charges** 1800:9,11
1849:20

**charging** 1872:23

**charitable** 1994:13

**charlene** 1662:21 1680:6,
23 1681:6 1682:3 1683:8

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 608 of 642   PageID 11549

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022              Index: Charlene's..complaint

1688:13,22 1759:12,23
1760:3 1839:18,21
1847:22 1857:18 1908:10
1913:2 1914:14 1916:3
1919:5,8,15 1922:23
1937:10

**Charlene's** 1682:24

**Charter** 1888:21

**Chase** 1686:22

**cheaper** 1632:23

**check** 1677:13 1720:16
1721:23 1728:3 1931:23,
25

**checked** 1701:18

**choice** 1711:24

**chopped** 1849:6

**chose** 1737:10

**Chris** 1680:5,6 1839:21

**Christian** 1650:19
1732:16 1734:20 1789:1,
13,15 1790:25 1796:6
1798:13 1899:25 1900:7

**Christianity** 1644:6

**Chrysler** 1883:1,15

**church** 1734:22,23
1983:17

**Circuit** 1641:11,18 1643:4,
11 1884:1,6 1885:7
1887:20 1904:7 1940:6
1955:6

**circulate** 1651:14

**circulated** 1935:8

**circumstance** 1643:17
1787:21 1935:1 1952:13

**circumstances** 1702:17
1787:12 1797:4 1883:6,8
1907:7

**circumstantial** 1860:3

**citation** 1872:13,18

**cite** 1641:1,10 1643:4,12
1644:4 1651:3 1920:3

**cited** 1649:21 1872:17,19
1924:7

**cites** 1643:11 1647:5

**claim** 1650:4,5 1661:10
1723:22 1755:19 1756:6
1757:21 1758:7 1770:2
1837:14 1841:9,14
1842:11 1843:3 1847:1
1850:19 1851:6 1873:13
1877:22 1887:9 1896:21
1897:8 1948:24 1983:5,7
1990:2 1991:17

**claimed** 1949:6,9 1951:12
1952:17,20

**claiming** 1777:20

**claims** 1648:6 1649:23,24
1729:10 1754:2,7 1792:14
1821:19 1828:10 1834:7
1837:11 1846:10 1847:5,8
1863:18 1864:1,2 1865:14
1866:7 1877:18,24
1878:16 1879:9 1887:19
1897:10 1943:11 1952:24
1976:5 1981:17

**clarification** 1700:4
1730:15 1981:17

**clarify** 1682:3 1772:10
1897:7 1955:3

**clarifying** 1677:5 1723:2

**clarity** 1754:9 1798:5
1865:6 1879:25 1891:22

**class** 1900:6,7,10,17,23

**clause** 1746:15

**Clayton** 1891:25

**clean** 1695:17 1763:1
1828:20 1995:20

**cleaner** 1981:24

**clear** 1629:2 1648:17
1649:1 1650:21,23
1724:23 1725:7 1744:10
1746:20 1756:20 1768:13
1780:3 1803:14 1834:6
1840:20 1853:11 1869:3
1877:6 1878:14 1886:8
1890:1 1891:17 1955:15

**clearer** 1891:16 1916:8

**clearing** 1628:24

**clemency** 1839:1

**clerk** 1673:20 1686:10
1695:7 1760:4 1987:1

**Click** 1839:21

**clicked** 1679:12

**client** 1822:2

**client's** 1827:15

**clients** 1641:16

**clock** 1722:22 1752:12

**clockwork** 1766:7

**close** 1852:7,8 1853:22,23
1854:22,23 1911:9 1927:3

**closed** 1734:5 1753:22
1854:15,18,20 1855:11
1925:23

**closely** 1888:5

**closer** 1965:24

**closes** 1854:13,14

**closing** 1662:24 1822:3,5,
12,18,20,25 1823:5,7,15
1824:6,9,10 1827:23
1829:14,17,19,20 1830:1
1852:18 1854:17 1855:3,
20 1882:5 1925:24
1926:10 1928:10 1996:15,
16,19 1997:9,18 1998:20

**closings** 1829:23

**Cloutman** 1628:20
1857:23

**clump** 1822:18

**cluster** 1628:25

**code** 1773:9

**cohesiveness** 1979:15

**collaboration** 1693:6

**collective** 1699:2,3
1701:15 1705:4 1726:13,
17 1729:20 1732:11
1734:7 1842:24

**combinations** 1955:25

**comfortable** 1825:7
1918:19 1997:8

**comment** 1767:22

**comments** 1646:10
1839:17 1841:10,17

**commitments** 1731:5,6

**committed** 1706:24
1725:8

**committee** 1838:20

**common** 1700:1 1723:16
1982:17,19

**communicate** 1769:17
1786:18

**communicated** 1652:4
1767:7,13,14 1769:4,12

**communicates** 1842:21

**communication** 1661:23
1717:16 1747:23 1767:20
1769:21 1770:22 1883:4

**communications** 1838:7
1843:9 1845:1 1848:17,18
1849:25

**companies** 1737:8

**company** 1641:16,17
1646:14 1655:6 1672:6
1697:10 1699:20 1701:13
1708:8 1710:17 1712:14
1714:20 1719:9 1720:1,25
1724:24 1725:13 1728:12,
25 1729:9 1730:4 1740:19,
22 1741:1 1746:13 1757:2
1766:8 1769:21,25
1771:14 1777:9 1801:6,20,
24 1804:12 1805:4 1806:6
1809:15 1834:19,21
1848:6

**company's** 1726:3

**compare** 1862:18

**compared** 1638:19

**compassionate** 1735:3

**compelled** 1635:17

**compelling** 1731:4
1744:16

**competently** 1985:7

**complain** 1656:5,10,14,
17,19,21,25 1657:4,9
1682:4,5

**complaining** 1663:15

**complaint** 1646:11 1655:5
1676:22 1683:25 1688:13
1694:12 1726:1 1763:4

1766:8 1769:24 1790:13
1806:4 1809:20 1819:4
1838:18 1839:11 1840:23
1913:2,15,16,19 1914:4
1915:2,13 1916:10 1918:4,
15,25

**complaints** 1676:18
1678:18 1682:6,7 1683:24
1684:7,12,13,15 1685:9
1835:10 1914:15,16

**complete** 1631:1 1732:7,
8,13 1962:8

**completed** 1720:8,9

**completely** 1745:12,15
1757:20 1826:16

**completeness** 1726:22

**complied** 1826:8

**comply** 1724:24 1827:2

**comport** 1668:6

**compound** 1659:23
1665:11 1811:6

**computer** 1664:1 1780:19
1858:9

**concede** 1954:8

**concept** 1795:15 1901:6
1953:18 1954:16,17

**conceptions** 1828:14

**concepts** 1903:24

**concern** 1682:6 1866:2
1875:19 1876:5 1889:8
1892:19 1893:2 1914:18
1970:23 1987:18

**concerned** 1764:24
1821:11 1865:20 1867:10
1930:23

**concerns** 1675:25
1688:20 1690:22 1725:13,
16 1868:4 1930:1 1956:17

**conclude** 1910:12

**concluded** 1669:3 1736:4
1752:23 1775:19 1815:23
1817:17

**concludes** 1742:9

**conclusion** 1635:17
1660:11 1723:24 1729:1

1807:4 1920:10

**conclusions** 1691:8

**concrete** 1823:13,20,22

**concurrence** 1647:19

**condition** 1938:21
1994:23

**conditioning** 1940:3,19

**conditions** 1716:24

**conduct** 1682:24 1686:24
1689:22 1708:1 1721:4
1758:17 1871:15 1883:20
1887:2

**conducted** 1675:6 1691:3

**conducting** 1676:23
1687:16 1688:9 1694:8

**conference** 1639:15
1704:1 1832:4,7 1852:10,
15,20 1853:3,6,19 1856:12
1857:16 1858:1 1866:4
1868:20 1870:18 1874:17
1882:23 1917:19 1920:3

**conferred** 1715:5,10,11

**confine** 1988:14

**confirm** 1925:25 1930:3

**conflict** 1649:2,4 1650:17
1755:20 1758:9 1904:8
1916:14 1932:13 1947:20,
21 1948:11 1953:24
1954:5

**conflicted** 1672:3 1948:3

**conflicting** 1642:6 1648:7,
8,17,18,19,24 1902:3
1932:14

**conflicts** 1726:21

**conform** 1951:6 1993:1

**conforming** 1944:19
1980:3,12

**confrontational** 1825:19

**confronted** 1821:21

**confuse** 1875:19 1901:4

**confused** 1785:19 1946:6,
9

**confusing** 1648:25 1864:2

1913:20 1916:20 1932:22
1933:6 1964:13 1981:9
1988:7,24

**confusion** 1910:11
1932:25 1934:16 1966:16
1970:7

**congratulate** 1628:23

**Congratulations** 1948:20

**Congress** 1884:11
1936:25

**conjunction** 1693:12

**conjunctive** 1845:8

**connected** 1878:7

**connection** 1677:4
1689:16,19 1732:15
1736:13

**consent** 1978:7

**consented** 1920:24

**consequence** 1797:3

**consequences** 1796:21,
24 1808:13

**consideration** 1748:2
1914:21

**considerations** 1825:24
1844:20 1845:5 1913:13

**considered** 1661:5
1706:8 1745:6 1851:18
1918:5

**consisted** 1697:16 1706:3

**consistency** 1899:5
1943:6 1944:10 1954:14

**consistency's** 1954:18
1984:3 1992:16

**consistent** 1638:10
1775:14 1776:5 1777:14
1817:15 1864:24 1865:10
1898:24 1933:11 1949:18
1952:16,21 1955:21
1960:10 1964:1,2 1982:13
1992:11

**consistently** 1970:9

**constant** 1825:12

**constituency** 1844:21
1845:9,11,13

**constituents** 1748:19

**constitute** 1903:9

**constituted** 1887:1

**constitution** 1733:11,12,
15 1792:2

**constraints** 1789:16

**Construction** 1882:25
1883:7,11

**construe** 1649:16

**contact** 1658:16 1728:15

**contacting** 1728:13

**contained** 1886:25

**contend** 1965:21 1966:15

**content** 1705:24 1867:21
1938:18

**context** 1668:7 1676:21
1677:15 1678:17 1706:9,
15 1718:12 1723:16
1726:7 1730:8 1758:17
1777:18 1778:2 1788:6
1797:2 1807:12 1810:3,5
1818:12 1884:12,13
1920:18 1962:1 1966:21,
24

**contexts** 1884:18

**contiguously** 1937:18
1938:4

**contingent** 1985:11

**continuation** 1705:16,18

**continue** 1637:10 1673:23
1701:5 1703:20 1742:18
1816:25

**continued** 1642:3

**continuing** 1772:14
1883:12

**continuous** 1820:10

**contract** 1701:16 1714:16
1716:16 1722:12 1762:17

**contractually** 1676:8

**contradiction** 1773:21

**contradicts** 1649:15

**contrary** 1756:3 1905:5

**contributed** 1876:22

**contrition** 1776:3

**control** 1632:4 1633:15 1897:15

**conversation** 1745:5,9 1940:1

**conversations** 1729:17, 24 1730:2,6 1843:7

**convert** 1721:4

**convince** 1747:5

**convinced** 1718:7 1731:14

**copied** 1838:18

**copies** 1632:12 1857:4

**copy** 1631:1,6,17,18,21, 23,25 1632:2,3,4,5,8,15,25 1633:3,15 1778:10 1923:3 1989:6 1995:20

**core** 1883:18

**Corp** 1883:1

**corporate** 1628:21

**correct** 1636:16 1653:2,20 1658:25 1659:9 1671:13, 16 1684:18,19 1685:3 1689:13 1691:5 1693:20 1697:1 1700:24 1705:9 1709:5 1715:23 1716:19 1724:16 1725:9,10 1739:25 1740:8,14 1743:12,13 1746:24 1747:1 1761:9,10,14,15 1762:19,22 1763:3,15 1765:12,23 1766:9 1770:20 1771:8,23 1775:9 1776:14 1780:16 1783:4,8, 11,22 1787:12,17,21 1790:25 1791:18 1792:1 1795:11,24 1797:1 1798:13,17,23 1799:9,10, 15,16 1801:25 1802:16 1804:12 1805:5,22 1806:1, 12,22 1807:2 1808:15 1816:6 1817:25 1819:1 1828:13 1834:3,10,15 1862:9 1866:14 1878:9 1881:6 1887:15 1891:6,8 1897:11 1899:2 1926:16 1954:13 1991:20,21 1992:25

**corrective** 1693:16

**correctly** 1658:18 1677:19 1679:20 1715:16 1723:9 1733:23 1994:19

**correspondence** 1702:18

**corrupt** 1834:24

**corruption** 1761:17

**costumes** 1793:10

**counsel** 1708:12 1738:13 1788:15 1811:20 1825:8, 16 1834:16 1925:24

**counsels** 1644:20

**count** 1773:6 1829:3

**counted** 1849:16

**country** 1676:7 1699:22

**county** 1891:25 1930:17

**couple** 1640:14 1652:15 1707:8 1709:11 1715:1 1814:4 1844:9 1864:18 1876:16 1925:8

**court** 1628:3,4,13,17,22 1630:9,16,24 1631:23 1632:16,18 1633:8 1634:4, 11,14,18,24 1635:16,22 1636:2,6,18 1637:5,24 1638:9,17 1639:8,13 1640:6,15 1641:7,23 1642:25 1643:13 1644:7 1645:11 1646:2,18 1647:1, 7 1648:1 1649:4 1652:8, 12,17,19,20,25 1653:3,11, 14,16,25 1655:20,25 1657:18,20,25 1658:3 1659:25 1660:18 1661:12 1662:4 1663:6,8,11 1665:14 1666:2,16,19,24 1667:3,10,15,20 1668:20 1669:5,6 1670:1,10,25 1671:3,23 1672:10,13,16, 19 1673:2,5,9,15,21 1683:12,19 1685:15,17,20, 23 1686:2,4,11 1693:22 1694:17,23 1695:2,8,11, 17,21 1701:2 1708:17,20, 23 1712:22 1717:13,17 1723:25 1735:8,16,18 1736:3,6,7,16,18,24 1737:16,17 1738:3,10,17, 20 1739:4,16,19,20 1740:2

1741:25 1742:5,8,17,22 1745:16,19,24 1748:25 1749:3,7,10,16,22,25 1750:4,10,16,20 1751:3,7, 12,15,20 1752:8,15,22,25 1753:1,6,11,16,21 1754:3 1757:9,22 1759:1,9,13,18, 24 1760:5 1764:17 1765:4 1766:1 1768:4,21,25 1769:8 1770:9 1772:5,9, 15,22 1773:4,8,11,24 1774:18,23 1775:9,13,21, 22,25 1776:10,16,24 1778:8,11,14,21 1779:2, 16,19,23,24 1781:17,20,23 1784:5,21 1785:3,12 1786:2 1787:15 1788:15 1789:6 1791:3,12 1792:8, 17 1793:13 1794:1,3,18 1795:5,14,17 1796:7,15 1797:12 1798:1,6,9 1800:17 1801:11 1802:3,7, 19 1803:3,6,25 1804:16 1805:8,17 1806:8,15 1807:6,23 1808:18,25 1810:12 1811:7,12,16,18, 20,24 1812:1,14 1813:10, 14,22 1814:13,20,23 1815:18,20,25 1816:17 1817:13,19,25 1819:16,19, 23 1820:5,18,22,25 1821:3,14,23 1822:9,23 1824:7,13,19 1825:2 1826:1 1827:5,16,21,24 1829:7,11,15 1830:14,20, 25 1831:3,9,13,15,16 1832:13,20 1833:8,17 1834:9 1835:5,20,23 1836:1,5,14,18,24 1846:10,12 1847:21 1849:23 1851:21 1852:19 1853:16,21 1854:2,4,12, 16,19,22 1856:10,21 1857:7,9,11,12,24 1858:18,21,25 1859:7,12, 17,21 1860:2,8,16,23 1861:4,11,16,23 1862:4, 17,20,24 1863:2,10,17 1864:6,13,21,23 1865:2,19 1867:3 1868:8 1869:19 1870:4,12,25 1871:6,9,12, 19,22,24 1872:3,12,20 1873:4,9,12,25 1874:10,23 1875:21 1876:1,6 1877:2, 7,10,15,17 1878:6,10,20, 25 1879:3,7,12,19,24

1880:9,14,20,24 1881:4,24 1882:21 1883:16 1884:1 1885:6,17,22 1886:2,13,17 1887:5,21 1888:7 1889:13 1890:21 1891:4,9,13 1892:2,8,13 1893:6,22 1894:2,9,22 1895:9,20,23 1896:3,7,11,17 1897:6,11, 14,23 1898:5,11,16 1899:3,11,19,24 1900:11 1901:5,14,17,21 1902:16 1903:2,21 1904:2,11,17, 21,25 1905:9,20 1906:3,9, 15,19 1907:1,11,16,21 1908:5,12,18 1909:5,18,24 1910:4,17,20,22 1911:7 1912:3,10 1913:4,8,11,18, 23 1914:2,7,11,24 1915:10,23 1916:13,17 1917:1,10,14,24 1918:2,8, 13 1919:14,23 1920:10,15 1921:10,21 1922:6,7,14, 20,23,25 1923:5,8,11 1924:1,6,12,19 1925:1,12, 14,15,20 1926:1,16,20,23 1927:2,11,17,21 1928:8,17 1929:1,9,11,14,18,24 1930:4,11,16 1931:3,6,14 1932:3,8,16 1933:1,7,13, 23 1934:3,14,20,25 1935:9,12,14 1936:6 1937:21 1938:1,15 1939:1, 5,11,25 1941:5,7,14,21 1942:2,8,15,23 1943:5,13, 17,25 1944:7,18 1945:2, 13,18,22 1946:3,15,21 1947:2,6,14,24 1948:5,14 1949:1,10,20 1950:4,8 1951:19,23 1952:19,23 1953:14,21 1954:11,14 1955:7 1956:1,11 1957:1, 4,10,16,21 1958:9 1959:21 1961:5 1962:11,16 1963:18 1965:3 1966:2,4, 19 1968:2,4 1969:12,24 1970:14,15,20 1971:9,18 1972:1,3,5,7,14,25 1973:1, 5,20 1974:1,7,12,20,24 1975:3,7,12,16,24 1976:3, 9,13,16,22,25 1977:4,12, 22,23 1978:1,7,16,23 1979:1,4,19 1980:2,10,14, 20 1981:2,11,18 1982:2,17 1983:18,24 1984:4,8,16, 21,25 1985:3,8,13,18,23 1986:3,7,11,17 1987:13

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 611 of 642   PageID 11552

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022          Index: Court's..Denver-based

1988:6,25 1989:2,15,25 1990:7,22 1991:5,10,21 1992:1,5,19 1993:4,6,9,12, 15,17,25 1994:4,8,13,16, 21 1995:3,9,13,16 1996:22 1997:1,22 1998:3,5,23,24

**Court's** 1824:11,24 1873:23 1903:7

**courthouse** 1749:24 1750:6,22,23

**courtroom** 1653:15,17,24 1673:18 1686:3 1694:22 1695:1 1739:3 1742:16 1749:17 1753:20 1759:17 1760:17 1820:4 1832:12 1836:9,23 1854:3 1856:9

**courts** 1649:22 1936:25

**cover** 1629:9,17,20,25 1638:15 1639:24 1820:6 1996:3

**covered** 1629:16 1634:20 1638:19 1639:16 1640:12 1722:16 1757:6 1825:11 1922:1

**covers** 1920:5

**COVID** 1632:21,23

**coworker** 1765:7,12,18, 20,23 1766:19 1795:10

**coworkers** 1768:10

**crack** 1629:19

**create** 1642:6 1681:17 1960:14 1970:7

**creating** 1871:16 1927:15

**credence** 1861:8

**crew** 1728:13,15

**criminal** 1727:25 1849:9 1998:6

**criticizing** 1825:8

**critiquing** 1904:13

**cross** 1638:17 1823:24 1849:11 1931:23,25

**cross-examination** 1654:3,7 1683:14 1693:23 1743:1 1822:8 1823:16 1828:10 1832:22

**cross-examine** 1741:11 1827:22 1830:5

**cross-examined** 1740:11

**cross-examining** 1828:4

**crossed** 1828:22

**crystal** 1724:23 1725:7

**cure** 1645:21

**current** 1674:9 1686:21,22 1715:8 1895:10,20 1932:17,19,23 1948:15 1955:23 1957:12 1966:7

**custodian** 1668:22

**customer** 1697:10,12

**customers** 1699:21

**cut** 1631:13 1777:13 1821:25 1831:10 1865:21 1879:19,20 1880:20 1954:11 1964:23 1973:12, 14 1995:8

---

**D**

**dailies** 1926:18

**daily** 1927:7

**Daimler** 1883:1,15

**Dallas** 1727:9

**damage** 1919:3 1960:21, 23 1961:6 1964:12,16,17, 20 1965:5,23 1966:7,11 1970:2,7 1976:20

**damages** 1661:11 1907:18,19,22,24 1908:6, 16,23 1910:25 1911:11,16, 18 1912:2,19 1918:6 1919:1 1920:5,14 1922:12 1957:25 1958:7 1960:13, 15 1961:8 1962:6,19,21 1963:2 1965:9,19,20,22 1966:10,13 1967:2,14 1969:18 1970:19 1971:1, 14,15,25 1972:11,12,16,21 1973:1,23 1974:15 1976:5 1978:12 1979:20,21 1981:15,21 1986:23 1987:24 1989:13,17,18,19, 21,25 1990:3,20 1995:7

**date** 1911:2 1971:5,6

**dates** 1958:3

**day** 1628:6,7,8 1667:20 1673:1,8 1678:11 1683:1 1718:10 1832:3 1852:24 1854:24 1858:1 1925:6 1926:3 1962:25 1995:8

**days** 1707:8 1709:11 1714:12,19,23 1722:2 1974:8

**DC** 1763:20

**deal** 1984:2

**dealing** 1645:22 1827:17, 20 1966:18

**dealings** 1680:11

**decertify** 1761:22,23 1762:1,5

**decide** 1718:2 1881:5 1886:11 1928:14 1977:9

**decided** 1645:7 1717:23 1828:8

**decides** 1769:17 1858:9 1938:15

**decision** 1642:4 1655:15 1693:1,4,11 1701:22,25 1702:19 1703:17 1706:12 1714:25 1715:9 1716:6,9, 10 1718:1 1720:3 1732:14 1734:17 1741:15,20 1755:1 1775:1 1851:13,14 1876:23,24 1877:1 1888:25 1890:5,10,15,18 1893:21 1902:8 1937:9 1938:10 1947:13 1968:22

**decisions** 1701:17 1824:22 1937:2,3

**declined** 1731:17,21 1732:9

**deed** 1985:3

**deemed** 1809:9 1934:23

**deep** 1638:24

**defamation** 1799:21

**defamed** 1833:11

**defect** 1991:18

**defend** 1841:19

**defendant** 1870:22 1879:9 1881:5 1886:12 1890:1,5 1892:14 1893:15 1895:12, 15 1899:13,15 1902:13 1910:14 1912:24 1914:9 1945:7 1948:4,25 1949:22 1950:1 1953:3,6 1959:20 1962:5 1963:7 1965:20 1966:12,14 1970:20 1972:13 1987:23 1998:6

**defendants** 1825:4 1836:25 1886:19 1960:15 1963:5 1973:1 1974:3

**defense** 1755:12,13 1821:18 1839:25 1840:2,8 1846:3 1881:16,19 1903:6, 16 1941:24 1942:20 1943:23

**define** 1876:18 1900:22 1904:5

**defined** 1910:16 1911:4

**defining** 1877:3

**definition** 1844:22 1901:3

**definition-ally** 1920:5

**delayed** 1722:10

**delete** 1914:1 1919:7

**deleting** 1954:23

**deliberate** 1856:5 1924:20

**deliberation** 1742:2

**deliver** 1697:15

**delivering** 1697:10

**Democrats** 1654:11

**demonstrated** 1754:21

**demonstrative** 1927:8

**demonstratives** 1926:4, 15

**denies** 1896:20,23 1898:1

**denise** 1680:3 1685:25 1686:9

**Denver** 1673:8 1674:19 1675:1,2,9,12,19 1684:20, 21,23 1685:2

**Denver-based** 1685:4

**deny** 1717:2 1758:5 1797:13 1851:25

**denying** 1851:18

**department** 1680:5 1688:9 1702:12,13 1708:3 1730:21

**depend** 1751:1

**depends** 1662:16 1700:12 1788:6

**depiction** 1764:2

**depo** 1861:23 1862:6 1927:13 1928:6 1929:4

**depos** 1930:11

**deposed** 1930:10,13

**deposition** 1775:7 1813:23 1814:2,6,19 1815:9,16 1817:7 1929:22

**derogatory** 1801:17,19

**describe** 1678:24 1680:17 1697:6 1705:24 1706:2 1709:7 1717:8,9 1723:12 1734:25 1743:14

**description** 1698:22

**designated** 1638:18,21 1704:1 1714:19

**designation** 1633:22 1634:7

**designations** 1629:8 1638:15 1639:2

**designed** 1725:20,22 1728:23

**desire** 1673:11,13

**detail** 1665:1 1738:11

**detailed** 1733:15 1773:25

**details** 1683:6 1739:23 1773:11 1774:1,4

**determination** 1693:9

**determinations** 1691:11

**determine** 1964:17 1965:6 1966:13

**determined** 1642:12 1895:4 1920:10

**determining** 1658:12 1691:7 1693:15 1912:23

**deviate** 1891:1

**deviates** 1978:21 1981:6

**DFR** 1847:1 1863:24 1870:15

**di** 1757:1

**dial** 1810:19

**dictate** 1651:18

**difference** 1696:9 1697:3

**differentiation** 1844:4

**differently** 1694:11 1826:16 1841:18 1844:2 1846:8 1885:6 1895:6 1900:5 1965:14

**difficult** 1680:22 1823:21

**difficulties** 1969:21

**digest** 1780:12

**digging** 1638:24 1679:14, 15

**ding** 1719:19

**dire** 1740:5 1926:3

**direct** 1674:1 1675:19 1686:17 1695:23 1729:24 1760:7 1773:21 1809:17 1860:3

**directed** 1754:1 1758:6 1837:11 1846:10 1851:24 1856:14,17 1882:1

**direction** 1965:24

**directly** 1646:10 1712:13 1730:22

**director** 1670:13 1696:4,8, 10,11,16,25 1697:4,5,8 1700:5 1727:2 1838:21

**disagree** 1682:4 1701:21 1726:20 1774:20

**disagreed** 1768:10

**disagreement** 1701:12

**disagreements** 1699:1

**disappear** 1643:20 1645:8

**discharge** 1729:10

1871:11 1872:6,7,11 1887:9 1888:21 1890:2,6 1894:8 1895:3,5,19 1947:13 1960:23

**discharged** 1886:20 1902:13

**disciplinary** 1763:2

**discipline** 1643:21 1693:9 1701:14 1726:14 1838:25 1840:21 1845:20 1895:7

**disciplined** 1844:17

**disclaimer** 1756:25 1952:3 1977:17 1978:9

**disclose** 1926:5,6,8 1927:17

**disclosing** 1927:20

**disclosure** 1862:12

**disconnect** 1662:10

**discriminate** 1840:19 1894:13 1907:6,7 1914:19

**discriminated** 1655:6 1846:24

**discriminating** 1656:10 1850:13 1983:13,19 1984:6,11 1987:25 1988:2 1991:14

**discrimination** 1650:4 1687:18,25 1690:14 1691:22 1692:15 1725:4 1755:18 1840:15 1841:9, 13,21,25 1842:10,14,16 1846:23 1848:14 1851:1 1887:19 1892:12,20 1893:4 1895:12,14,19 1912:25 1913:3,9,15,17 1914:4,15,16 1915:2,13 1916:11 1918:5,15,25 1991:16

**discriminatory** 1755:13, 14 1842:12,13 1843:24 1844:7 1881:14,15 1936:24

**discuss** 1744:22

**discussed** 1640:4 1667:2 1702:25 1708:15 1736:8 1755:8 1772:12 1775:23 1843:16 1909:7,12 1950:17,25 1951:8,25

1952:5,14

**discussion** 1683:5 1710:23 1712:15 1751:3 1767:9 1934:25 1958:11 1985:4

**disgusting** 1716:1

**disinterested** 1737:15

**disjunctive** 1898:12

**dislike** 1771:1

**dismissed** 1649:23 1728:22

**display** 1931:12

**displaying** 1926:17

**disposition** 1744:5

**dispositive** 1847:12 1897:4

**dispute** 1710:20 1711:5 1726:20 1755:3 1765:11 1847:19 1848:24 1849:1 1851:10

**disputed** 1846:7

**disputes** 1699:7 1737:9 1748:19

**disregard** 1657:21 1764:19 1770:10

**disruption** 1903:23

**disseminate** 1758:24

**dissenting** 1790:9 1807:10 1812:7 1813:5 1848:23 1850:2

**dissident** 1845:3

**distinguishable** 1641:13

**distribution** 1688:19

**district** 1643:13 1844:1

**disturbed** 1677:23

**disturbing** 1682:18 1746:11

**dive** 1635:15

**do-over** 1731:10 1732:2

**docket** 1868:13,17 1935:4, 12,18,22 1936:2 1945:17, 18 1946:1

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 613 of 642   PageID 11554
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                        Index: doctor's..encouraged

**doctor's** 1722:16

**document** 1634:21 1636:3 1638:5,8 1658:5 1668:12 1670:5,15 1671:5 1681:17 1691:17,19,23 1704:21 1705:15 1707:15,18 1709:2 1717:8 1718:20 1727:14 1747:14 1778:25 1781:5 1786:4 1869:10 1935:8,17,21

**document-wise** 1821:20

**documentation** 1634:9

**documents** 1635:8,10 1639:2 1640:7 1704:14,17, 25 1705:5,11,20 1706:3, 11,21,22 1707:1,6,9 1708:10 1710:2,9 1715:5 1741:9 1869:3

**dollar** 1960:9 1963:8 1975:19 1976:10,14 1980:23 1990:15,16

**door** 1753:22 1849:7

**double** 1958:7,14,24,25 1959:7 1960:5,6,11 1962:24 1963:8 1964:3,22 1970:4,21 1972:2,6,17

**double-check** 1636:14 1992:21

**download** 1630:20,25

**downstairs** 1628:24 1640:17

**draft** 1639:21 1858:2 1908:11 1919:19 1923:5 1949:21 1955:23 1972:8

**draw** 1725:20

**dressed** 1692:21

**drill** 1823:20

**drive** 1631:15,17

**drives** 1632:13

**drop** 1982:10

**Dropbox** 1630:19

**drugs** 1633:9,12

**dues** 1761:15 1837:24

**duly** 1673:19 1686:9 1695:7 1760:3

**duplicative** 1980:18

**duties** 1687:15 1697:6

**duty** 1642:5 1841:15,20 1842:11,17 1843:18,23 1844:16 1869:23 1870:23 1871:10 1872:5,10 1924:20 1960:5 1971:12

---

## E

**e-copy** 1631:25

**Earl** 1855:16

**earlier** 1651:8 1714:11,13 1715:16 1733:7 1737:2 1744:20 1746:22 1767:9 1770:18 1771:24 1772:12 1851:18 1859:7 1880:19 1940:1 1946:13,20 1947:10 1953:2 1975:11 1991:1,17

**early** 1832:3 1854:24

**earned** 1722:1 1910:13 1911:1 1995:6

**easier** 1632:23 1719:4 1962:17

**easily** 1757:3 1968:16

**eastern** 1696:13

**easy** 1679:8,11

**echo** 1828:16

**echos** 1995:11

**Ed** 1642:22 1676:20 1680:3 1689:8 1766:16

**Ed's** 1677:11

**Edie** 1680:4

**Edward** 1628:20 1857:23

**EEOC** 1635:11,12 1913:18 1916:23

**effect** 1644:4 1737:15 1903:14 1940:5,11 1996:10

**effective** 1825:17

**effectively** 1697:20 1825:5

**efficiencies** 1825:4

1827:12

**efficient** 1824:20 1825:6, 9,23 1827:14

**effort** 1657:14,15 1912:25

**efforts** 1647:13,18,23 1651:20,24 1827:19 1949:8,14 1953:11

**egregious** 1746:11 1885:24

**EI** 1633:11

**elaborate** 1754:3

**elect** 1925:23

**elected** 1698:5,6 1733:9

**electronic** 1631:6 1632:7, 22 1857:4

**element** 1648:10,11 1847:8 1874:24 1875:12 1889:24 1894:6,18 1895:13 1924:3

**elements** 1648:6,16 1757:7 1845:8 1888:18,20 1899:7,12 1901:25 1902:6, 9 1910:24 1911:15

**elevates** 1871:17

**Eleven** 1947:18

**eligible** 1720:7

**eliminates** 1904:8 1932:12 1953:24

**ELMO** 1927:10,11

**email** 1631:10 1635:24 1688:18,19,20 1689:7,8,9 1692:4 1709:5,7,9 1731:20 1747:25 1770:25 1841:10 1858:24 1869:8 1935:4 1989:6 1996:8,11

**emailed** 1869:6

**emails** 1638:2

**employed** 1674:7,21 1687:4 1696:2,3

**employee** 1640:23 1643:16 1644:22 1645:6 1647:13,23 1648:13 1658:14 1659:11,13,14,15, 19 1662:13 1663:25 1664:23 1665:20 1680:4

1681:10 1682:14 1684:17 1687:9,19 1688:10,19 1689:23,24 1693:13,14,15 1698:8 1701:12 1718:9,10 1728:5 1756:9 1757:5 1758:22 1763:5,14 1791:15 1793:20 1794:7 1795:19 1838:11 1842:3, 21 1844:17,24 1845:12 1847:16 1848:10,12 1850:23 1870:21 1871:11 1872:6,8,11 1883:10 1887:2 1902:23 1905:2,25 1906:13 1907:5 1910:13 1920:9 1924:9 1937:7,12, 14,20 1938:6

**employee's** 1658:15 1659:4,5,7,12 1671:21 1756:13 1907:9 1932:13

**employees** 1662:18 1664:6 1682:17 1694:9 1700:3 1712:17 1723:17 1724:15 1728:2 1758:17, 23 1796:5 1797:17,22 1798:21 1839:1 1841:4,19 1844:4 1848:8 1870:24 1871:17 1899:14,18 1901:1 1903:11,20 1905:15 1909:3 1914:20 1936:15,22 1943:3

**employees'** 1787:8

**employer** 1643:1,20,24 1645:7 1647:12,16,22 1650:8 1651:20 1686:21, 22 1687:2 1903:18 1904:9 1906:12 1907:6 1920:8 1936:21 1967:14

**employer's** 1643:8 1905:4

**employers** 1721:15 1856:1 1905:14,25 1937:1 1969:7,9

**employment** 1648:8,24 1716:20 1719:10 1720:24 1721:2,8 1725:14 1732:15 1755:2 1756:19 1843:11 1911:2 1923:17,21,24 1932:14 1936:21 1937:8 1938:22 1947:23 1948:3 1953:25 1968:23 1995:7

**encompassed** 1696:17

**encouraged** 1706:6

**end** 1630:9,21 1636:18
1653:21 1668:11 1716:14,
17 1718:10 1727:19
1735:24 1821:10 1828:25
1830:1 1852:24 1870:18
1886:24 1896:18 1910:23
1931:8 1935:15 1944:16
1950:16 1959:8 1960:20
1961:3 1962:25 1964:3
1973:16 1978:19 1997:13,
17

**endeavors** 1923:22

**ending** 1789:6

**ends** 1964:20

**enforce** 1644:21

**enforcement** 1961:19,22

**engage** 1833:3 1905:3
1983:10

**engaged** 1647:12 1650:22
1660:6 1663:15,17
1687:23 1754:11 1758:18
1839:10 1840:23 1843:7
1881:23 1886:20 1923:21
1944:13,24,25

**engaging** 1660:8 1839:2
1842:4,15 1877:19,25
1944:20 1945:8 1991:24
1992:7,8,24

**engineer** 1959:9

**ensure** 1708:10 1729:23
1746:18,20,25 1972:1,14
1973:2

**ensuring** 1697:9,16,18
1744:3

**enter** 1940:5

**entered** 1653:15,24
1686:3 1695:1 1742:16
1759:17 1832:12 1854:3

**entertain** 1960:16

**entire** 1696:17 1700:12
1826:14 1926:14

**entirety** 1679:19 1757:18

**entities** 1699:11,15,19
1700:2 1733:8

**entitled** 1640:24 1641:6
1643:17,23 1644:21
1646:23 1739:9 1792:6

1828:20

**entitles** 1903:19

**enumerated** 1919:15
1951:17 1979:21

**equal** 1722:11

**equates** 1892:20

**equitable** 1920:9

**equivalent** 1869:15
1923:17

**equivocate** 1817:8

**error** 1630:21,22 1856:25
1865:24 1995:23 1996:4

**essentially** 1939:24
1958:8

**establish** 1650:10
1775:11 1815:7 1949:23

**established** 1670:24
1671:15 1747:9 1779:22

**establishes** 1642:1

**estop** 1865:4

**evaporating** 1866:3

**event** 1720:24

**events** 1839:13,14

**evidence** 1638:12,22,23
1642:1 1650:24 1658:6
1669:22 1671:4,6 1709:3
1718:18 1742:2,13 1758:4,
20 1811:11 1827:23
1829:25 1837:15 1844:12
1847:7,17,21,25 1848:5
1849:14 1850:9 1851:8
1855:9,10 1856:15
1859:22 1860:3 1870:5
1912:14 1918:4 1923:20
1924:9 1925:22 1927:8
1930:23 1931:7,22
1949:24 1957:7 1974:16

**evidentiary** 1921:7

**eviscerated** 1840:11

**exacerbate** 1883:10

**exact** 1767:17 1782:13,19,
23 1783:7,9,19 1815:21
1878:14 1896:3

**examination** 1669:13

1674:1 1686:17 1695:23
1740:5 1760:7 1812:2
1825:15,22

**examine** 1830:12

**examples** 1954:1

**exceed** 1971:22

**exception** 1843:19,20
1998:12

**excited** 1855:20

**exclude** 1906:12 1914:21
1938:16

**exclusive** 1939:7

**exclusively** 1938:8,11

**exclusively/solely**
1936:13 1939:18

**excuse** 1685:21 1698:11
1699:17 1719:21 1734:10
1773:20 1782:8 1793:5
1808:10 1849:22 1911:23
1979:3

**excused** 1672:25 1673:7
1694:19 1749:11,17
1831:7 1985:5

**execute** 1809:18

**execution** 1803:8 1813:19

**executions** 1803:10

**executive** 1694:12 1698:6
1787:22 1788:2 1790:5
1804:10 1809:13 1871:16
1911:25

**exercises** 1937:19 1938:5
1982:6 1986:24

**exercising** 1663:1
1845:25 1944:12,22
1991:2,25 1992:23

**exhibit** 1629:11 1630:4
1631:25 1632:5,8 1634:3
1635:23 1637:14,23
1639:3,5 1642:24 1652:24,
25 1654:9,10 1655:1,3
1657:22,24 1658:6
1664:16,21 1667:4,5,17
1669:7 1670:21 1671:6,7
1689:1 1691:12 1704:19
1705:25 1708:14,22
1709:3 1718:17 1742:12
1743:25 1744:13 1747:12

1839:12 1913:19 1927:6
1928:5,11,15 1929:6
1930:13,14 1931:9,12,16
1934:21 1935:6,7,10,11
1945:17,18

**exhibits** 1629:7,20 1630:1
1631:13,16,18 1632:6,15
1633:20 1634:1 1710:22
1847:23 1848:4 1926:17
1927:6,21

**exist** 1926:5 1927:12,14

**existed** 1758:9

**exists** 1920:8 1991:18

**exited** 1673:18 1694:22
1739:3 1753:20 1820:4
1836:23 1856:9

**expect** 1912:12

**expectation** 1730:24

**expectations** 1682:16
1725:7 1746:19

**experience** 1675:14
1697:13 1841:1

**experienced** 1741:5,7

**explain** 1674:24 1676:5
1692:7 1701:8 1717:20
1719:7 1724:22 1736:21
1852:2 1905:14

**explained** 1697:2 1772:4
1785:1 1797:25

**explanation** 1698:17
1771:3 1776:2 1783:10
1784:4 1809:22

**exploitation** 1678:9

**explore** 1761:6

**express** 1783:3

**expressed** 1725:12
1746:23 1769:3,11,14

**expression** 1755:16
1758:1 1887:1

**extent** 1921:23 1930:9,12
1940:2 1969:18

**extra** 1629:14 1633:5
1830:6

**extrapolate** 1885:5

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 615 of 642   PageID 11556
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022              Index: extreme..flawed

**extreme** 1885:24

**extremely** 1741:7

---

**F**

**fabricating** 1929:11,15

**face** 1731:8 1837:22

**Facebook** 1646:4 1661:21
1677:11,12 1678:13,22
1679:6,8,15 1683:19
1688:21 1692:12 1712:16
1713:9 1725:14 1726:2
1754:12 1755:6 1756:23
1761:20 1763:24 1764:6
1770:23 1835:12,16
1837:16 1839:4 1841:12
1845:20,23 1952:3

**faced** 1822:3

**facets** 1936:16

**fact** 1642:19 1643:24
1645:1,3 1646:7 1651:9,13
1655:10 1658:23 1665:18
1699:5 1718:8 1732:15
1768:7,19 1770:18 1771:9,
25 1786:22 1799:11
1802:22 1844:8 1846:18
1850:12 1889:12 1918:20
1949:6

**fact-finding** 1642:1,13,23
1644:10 1655:5,13,22
1656:3,12 1657:11
1662:22 1671:19 1672:2
1677:8 1679:21 1680:8,18,
19 1681:19 1689:22,24
1690:1,3,6,15,19 1756:1,7

**factor** 1754:24 1755:1
1839:6,7,10 1875:1,17,20
1876:19,21 1877:4 1889:7,
19,21 1890:5,10,18 1891:5
1892:4,23,25 1893:3,5,18,
20 1947:9,13

**factors** 1877:1

**facts** 1662:11 1663:18,20
1902:4

**factual** 1643:1 1952:12
1968:9,13

**factually** 1953:2

**failed** 1648:20 1844:8

1846:19,20 1923:25

**failing** 1988:3

**failure** 1648:6 1650:5
1756:5 1757:5 1843:2
1850:19 1901:23 1986:25

**fair** 1635:2 1663:12
1683:20 1692:1 1693:17
1699:9 1742:3 1746:25
1760:14 1761:18 1762:1
1778:1 1825:2 1828:9
1841:15,20 1842:11,17
1843:18,23 1844:16
1853:13 1863:19 1870:8
1906:14 1917:14 1927:25
1971:12 1976:16

**fairness** 1729:23 1757:14
1931:17

**faith** 1842:2,13,19 1843:25
1844:7,19,23 1912:24

**fake** 1747:6

**fall** 1734:7

**false** 1833:12 1884:21

**familiar** 1665:8,18 1678:2
1688:12,16,24 1691:17
1985:15

**familiarity** 1679:6

**family** 1856:1

**fashion** 1869:25

**fast** 1853:18

**fault** 1630:11 1966:22

**faulty** 1642:15

**favor** 1706:12 1825:25

**favorably** 1850:17
1899:14,16 1900:9

**feasible** 1920:7

**February** 1763:10

**federal** 1720:12 1728:8
1871:17 1937:7

**federally-protected**
1870:20 1887:3 1938:14

**feel** 1635:17 1651:9
1678:10,11 1682:19
1706:7 1716:3 1764:24
1797:5 1803:9 1806:2

1825:5 1832:24 1834:24
1859:7 1864:1

**feeling** 1682:25

**feelings** 1683:3

**feels** 1795:19 1818:14

**fellow** 1738:20 1753:16
1819:21,23 1836:18

**felt** 1678:8 1705:3 1706:18
1707:1 1710:15,24
1760:13,20 1761:17
1769:3 1796:3 1801:18

**ferret** 1968:2,4 1970:14
1972:5

**fetuses** 1731:11

**Fifteen** 1880:12

**fighting** 1950:8 1964:20

**figure** 1637:2 1667:24
1852:13 1909:20 1914:25
1917:16 1918:16 1959:8,
10 1963:7 1964:2,6
1965:16 1985:15 1991:6
1996:18

**file** 1701:22 1703:8 1721:8,
9 1727:16,23 1747:21
1748:6 1763:2,6 1806:4
1809:8 1819:4 1849:20
1865:15 1866:8,21 1867:1,
11,20,23 1868:6 1869:10
1935:2

**filed** 1636:24 1935:4,6,7

**filing** 1863:11 1867:12,25
1868:13 1934:21

**fill** 1927:8

**final** 1631:12 1717:1
1925:7 1996:20 1997:9

**finalize** 1855:13

**Finally** 1758:19

**find** 1667:11 1676:18
1679:4,12,15 1764:4,5
1794:20 1883:12,25
1884:24 1900:15,20
1904:12 1907:4 1935:14
1953:3 1958:5 1964:24
1968:10,17 1970:9
1980:10,21 1981:13

**findings** 1691:1,20,24

1692:5

**finds** 1940:6 1970:19
1972:13,16 1985:13

**fine** 1630:15 1631:19
1633:1,2 1635:16,19
1668:21 1736:2 1825:20
1852:6 1861:5,9 1863:3
1875:24 1879:22 1896:11
1904:25 1907:21 1915:19,
21 1920:25 1928:18,23
1935:19 1943:17 1955:2
1963:5 1969:10 1977:20
1981:2

**finish** 1792:17 1794:5
1807:23 1810:15,16
1812:1 1831:19 1917:19
1998:21

**finished** 1629:22 1656:6

**fire** 1642:13 1647:24
1655:16 1660:8 1771:15
1876:23 1905:15,25
1936:6

**fired** 1641:17,22 1642:20
1647:17 1648:21 1649:2,
19 1651:22 1664:4,24
1665:20 1718:3,6 1754:11
1755:5,19 1756:4 1757:4
1835:16 1893:16 1902:8,
10,12 1950:14 1969:15
1970:10 1971:7

**firing** 1642:7 1644:17
1652:6 1757:4 1877:19,24

**firm** 1686:25

**fit** 1761:3 1823:8 1829:8
1979:8,10

**Fitch** 1647:20 1888:5

**Fitch's** 1648:14

**fixed** 1980:15

**flag** 1862:4

**flagged** 1925:9

**flagging** 1970:17

**flagrant** 1885:24

**flash** 1632:13 1653:8
1667:25 1669:6 1898:17
1945:3

**flawed** 1642:9

**flesh** 1798:7

**flew** 1765:15

**flexibility** 1720:10

**flies** 1699:21

**flight** 1668:9,18 1669:16
1675:3,5 1676:3,8,12
1679:1 1683:24 1696:12
1697:9,14,17,21,23,24
1698:4 1714:14 1720:10
1722:12,15 1734:6,14
1763:4 1765:14 1766:19
1792:25 1793:20 1794:7,9,
25 1805:24 1846:1

**flip** 1724:6

**floor** 1837:5

**floored** 1731:22

**flown** 1675:24 1676:2

**fly** 1669:15,18 1670:3,6
1673:8 1697:13 1927:15
1928:13

**flying** 1676:7

**FMLA** 1936:18

**focus** 1696:22

**focused** 1697:8

**follow** 1817:6 1888:5
1975:22

**follow-up** 1964:7

**footnote** 1870:18 1884:5
1960:19

**forbid** 1874:6

**forbids** 1873:17 1874:5,7

**forced** 1748:20

**foreclose** 1987:5

**foregone** 1827:12

**foremost** 1765:13

**foreperson** 1632:4

**forest** 1995:19

**forever** 1996:9

**forfeited** 1883:14

**forget** 1740:4

**forgot** 1705:22 1724:19

**forgotten** 1991:9

**form** 1718:23 1777:7
1781:21 1785:9 1927:9
1934:12,13 1935:24
1945:20,25 1957:12
1967:21

**formal** 1809:19 1832:7
1852:9,14,19 1853:2,5,19
1856:12 1857:3,16,25
1868:19 1870:17 1874:17
1917:19 1920:3

**formalized** 1737:13

**formally** 1733:25

**format** 1931:10

**formatting** 1946:8,16

**forms** 1936:17

**formulate** 1714:25
1904:20

**formulated** 1648:5,15

**formulation** 1648:10

**forward** 1684:10 1724:24
1725:7,21,25 1726:11
1727:11 1746:18 1747:25
1859:5

**fought** 1967:15 1968:21

**found** 1701:12 1726:4
1731:16,19 1732:6 1751:2
1846:4 1882:10 1919:14
1960:3,21 1961:7 1962:6,7
1963:19 1967:1,7 1996:5

**foundation** 1669:24
1670:23

**four-minute** 1709:18

**fours** 1815:20

**fourth** 1643:4,11 1878:18
1879:21 1883:3 1886:16,
22,24 1913:1

**frame** 1889:14 1910:18,19

**frankly** 1824:21 1825:7,15
1916:9 1917:11 1928:24
1950:7

**free** 1673:17 1834:14
1848:13 1850:25 1937:1,
16

**free-standing** 1873:20

**freedom** 1792:22 1794:15
1897:15

**freedoms** 1834:8

**Friday** 1639:2 1820:14

**friendly** 1675:22

**front** 1630:7 1633:5 1668:1
1742:1 1778:22 1816:15
1849:7 1919:19 1920:1,4,
6,9,14 1921:17 1922:2
1965:11,15,16 1977:4,7,13
1978:10 1994:4,7,17

**frustrated** 1680:20

**frustrating** 1681:1

**Frye** 1686:8 1752:11
1760:1

**full** 1630:23 1637:3
1862:12 1864:8 1874:21
1875:7 1879:8 1881:4
1898:21 1920:19 1921:16
1962:4 1969:18 1970:19
1971:25 1972:15

**full-time** 1698:10

**fully** 1692:1 1821:25
1851:25 1926:24

**funds** 1761:14 1998:7,8,10

**future** 1725:1 1726:20
1744:11 1903:11 1920:6

**G**

**game** 1826:17 1828:9

**garbled** 1890:13

**gather** 1714:20 1943:18

**gave** 1645:5 1706:16
1710:23 1721:24 1727:14
1776:5 1816:16,21 1826:9
1834:13

**gears** 1639:14

**general** 1680:17 1687:20
1698:21 1723:13 1758:23
1790:16 1883:22 1904:6
1934:12,19 1945:20

**generalized** 1868:24

**generally** 1634:20
1679:14 1697:5 1702:2

**freedom** 1705:23 1706:2 1710:25
1717:8,9,20 1723:12
1731:10

**gentleman's** 1752:4

**gentlemen** 1985:6

**Georgia** 1724:13 1892:1

**get allegations** 1687:22

**get-go** 1747:9

**Gilliam** 1628:11 1634:10,
11,12,17,22 1636:16
1637:3,19 1638:6,7,16
1640:1 1641:9,25 1645:25
1646:3 1647:4,9 1648:2
1649:16 1650:13 1651:16
1749:1 1753:23,25 1754:6
1757:10 1837:1,8 1846:12
1856:20 1857:17,18,19
1859:16,24 1860:4,12,19,
25 1861:13,20 1862:2
1863:7,13,22 1864:9
1865:1,11 1866:24 1868:3
1869:13,18 1870:2 1872:1,
4,15 1873:1,10 1874:2,19,
24 1875:5,7,10,12,14
1876:4,16 1878:13 1880:5,
11,16,23,25 1881:7
1888:3,16 1889:15
1890:14 1891:8,25
1892:10,14 1893:8 1894:4,
10,18,24 1895:18,22
1896:1,5,9 1897:9,12
1898:7 1899:21 1901:1,2,
15,25 1905:11,22 1906:7,
16,23 1907:3,13 1908:2,8,
19 1909:11,16,22 1910:3,
19,21 1912:4,6 1914:5,9,
18 1915:19 1918:10
1919:10 1921:8,13 1922:3,
13 1923:14 1924:3,17,24
1932:19 1933:20 1935:1
1939:10,12 1941:1,11,22
1942:18 1944:4,24
1945:11 1946:6,16,25
1947:4,8 1948:21 1949:4,
12 1950:2 1951:11
1952:16,21 1953:9 1955:2,
24 1956:9,23 1957:3,18
1973:25 1974:23 1975:5,
15 1976:2,7,15,24 1977:20
1978:3,15 1979:23 1980:7,
13 1981:20 1982:14
1983:23 1984:13,23
1985:1 1986:1,6,8 1987:16

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 617 of 642   PageID 11558
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                        Vol 6 July 12, 2022                        Index: give..handle

1989:10,24 1990:21,24 1992:13 1993:11,13,20 1994:2,15,25 1995:15 1997:21

**give** 1631:13 1632:9 1642:10 1643:13,16 1647:23 1673:9,16 1676:4,9,14,15 1686:8 1717:25 1718:2,11 1719:10 1728:12 1731:9 1752:4,6 1803:3 1822:25 1823:7 1825:1 1827:25 1828:3,21 1829:7 1835:5 1862:12 1868:23 1885:20 1893:8 1897:16 1905:18 1920:12 1925:2 1937:1 1941:8 1960:17 1962:4 1964:19 1969:22,24 1971:25 1972:7 1986:20 1997:6 1998:22

**giving** 1776:2 1814:2 1855:24 1900:11 1972:14

**glad** 1958:9 1997:22

**glasses** 1689:3

**glazed** 1956:22

**global** 1934:11

**goal** 1639:20

**God** 1661:2 1756:3

**good** 1633:13 1683:16,17 1686:20 1693:25 1694:1 1699:8 1716:13 1718:9 1736:3 1738:15 1742:8 1743:3,4 1760:9 1844:19 1906:13 1910:8 1912:24 1918:8 1931:3 1936:22 1945:2 1957:24 1963:22 1974:4 1978:13 1984:16 1985:3,21,24 1986:4 1993:15 1998:20

**goodness** 1731:25

**governance** 1699:24

**governed** 1733:9 1737:6 1761:14

**Government** 1728:8 1884:16,19,22,23 1885:3

**grab** 1634:16

**grabbing** 1900:18 1937:22

**grammar** 1956:15

**grammatically** 1956:13

**grand** 1876:2 1961:21 1971:19

**grant** 1701:2 1772:15 1846:10

**granted** 1649:23 1662:15 1983:9

**granting** 1719:8 1828:17

**graphic** 1682:12,13,23 1763:17,23 1764:1,4,5,7

**Graphics** 1872:15

**great** 1678:11 1941:7 1973:4

**greater** 1866:2 1966:16

**GREEN** 1853:25 1899:12

**Greenfield** 1628:19,20 1635:14,21,23,25 1636:4,9 1637:19,21 1639:11 1640:9,12 1645:14 1646:1,12 1652:10 1658:1 1659:23 1663:4 1666:12 1671:2 1672:13,14 1683:13,15 1684:24 1685:1 1693:22,24 1694:1,2,15 1742:22 1743:2,5 1744:6,9 1745:22 1746:3,4 1747:11,13 1748:23,25 1750:14,18 1752:10,18 1759:7,8,10,12,21,23 1760:8 1764:14,20 1765:2,5 1766:4,5 1768:1,11 1769:1,10 1770:5,12 1772:7,11,17,24 1773:14,20 1774:3,16 1775:3,23 1776:1,12,18 1777:4 1778:6,12,16,24 1779:4,6 1780:1 1782:2 1783:24 1784:1,7,23 1785:5,15 1786:6,20 1787:1,16 1788:13,17,23 1789:5,10,21 1790:2 1791:4,10,17 1792:4,12 1793:4,11,14,22 1794:12,16,19 1795:2,6,23,25 1796:10,23 1797:8,15,16 1798:4,7,10 1800:20,21 1801:7,21 1802:9,21 1803:13,23 1804:4,21 1805:9,15,19 1806:9,16 1807:14,18

1808:1,2,19,23 1809:1,3 1810:9,18 1811:2,22,25 1812:3,12,16 1813:9,11,20,23 1814:1,11,14,22 1815:1,19 1816:1,25 1817:4,20 1818:1,22 1819:5,8,10,14,17 1820:20 1826:3 1829:13 1832:14 1833:5,15 1835:2,21,22 1836:12 1846:13,14 1849:24 1851:22 1853:20 1854:20 1856:19 1857:22,23 1858:16,19,23 1859:2,9,20 1860:1,6,14,21 1861:15,18,25 1862:15,23 1863:1,9,15 1864:4,15,22 1870:9,13 1871:4,7,10,13,21,23 1873:7 1875:3,6,9,11,13,25 1877:9 1878:23 1879:1,6,11,16,22 1880:12,18 1882:17,22 1885:12 1886:7,14,18 1887:14 1891:11 1893:25 1894:15,20,23 1896:15,18 1897:22,25 1898:9,14 1899:1,9 1900:2 1901:12 1907:14,25 1908:9 1910:9 1911:5,14 1914:8 1915:8,17 1919:12,21,24 1921:15 1922:16,22 1923:2,7,9 1924:16,22 1930:21 1934:1,10 1935:6,11,13 1936:3,8 1937:23 1938:4 1939:4,13 1941:3,17 1942:6,13 1943:1,9,14,15,19 1945:16,21 1946:2 1957:15 1960:16 1962:10 1965:21 1966:15 1967:4,23 1968:12 1969:8 1974:10,11,14,22 1975:1,9,19,21 1976:6,8,18 1977:3,6,25 1979:12 1980:25 1984:1,20 1985:17,21,24 1986:4,9,15 1987:19 1992:15 1993:5,7,16 1994:6,10,14 1995:2,11

**Greenfield's** 1685:18 1749:5 1865:10

**grievance** 1702:3 1707:12 1710:6 1716:19 1717:2 1728:19,20,21 1729:1,22 1732:12 1734:18 1863:24,25 1869:14,25

**grievances** 1698:9

**grievant** 1706:14 1729:8

**grieve** 1726:13

**gripe** 1790:9

**ground** 1639:16

**grounds** 1636:10

**group** 1669:17 1688:19 1700:12

**groups** 1764:11

**guardrails** 1720:12

**guess** 1629:6 1630:8 1636:23 1638:3,20 1642:16 1646:12 1662:10 1666:22 1713:4 1728:19 1729:3 1738:25 1750:16,24 1801:18 1820:6 1824:9 1865:13,20 1874:20 1885:23 1888:19 1892:16 1899:5 1901:25 1902:2 1906:23 1907:3 1913:20 1914:18 1950:15 1956:24 1957:6 1959:19 1964:10 1969:21 1970:23 1972:20 1981:5 1982:23 1989:15 1996:18 1998:4

**guidance** 1880:8

**guidelines** 1682:16 1824:21

**guns** 1633:9,12

**Gutierrez** 1680:3 1686:1,4,9,19,21 1693:25

---

**H**

**Hacienda** 1955:5

**hairs** 1953:1

**half** 1657:2 1674:12 1675:10 1687:6 1852:13,14 1855:15 1964:23

**halfway** 1712:9

**hand** 1686:7 1695:5 1707:14 1759:6 1855:5

**handed** 1653:19 1710:3 1990:8

**handle** 1726:24 1753:9 1866:6 1914:2 1985:6

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 618 of 642   PageID 11559
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                        Index: handled..Honor

**handled** 1799:22

**handling** 1734:17 1863:25 1867:5 1868:2 1869:14

**hands** 1857:4

**handy** 1907:18 1981:12

**happen** 1709:15 1713:14 1754:15 1756:14 1928:15 1964:19 1998:14

**happened** 1646:22 1710:13 1716:21 1730:8 1771:11 1817:7 1880:19 1929:25 1952:8 1990:11

**happening** 1680:21

**happy** 1637:18 1647:8 1757:7 1778:16 1821:10 1859:3 1928:12 1967:25 1976:19

**harassing** 1848:21 1849:4,12 1883:5 1885:25 1938:20

**harassment** 1687:17,24, 25 1690:13,14 1691:9,21 1692:14,15,24 1725:3,4 1731:25 1848:13 1850:25 1887:1 1936:18 1937:5

**harbor** 1891:18

**hard** 1631:21,23,25 1632:1,5,8,11,15,25 1633:3 1916:10 1937:22

**hardship** 1756:15 1758:20 1903:6,9,16 1943:22 1944:2 1948:25 1949:17 1950:1 1953:6,13 1955:11, 12,14,18,19 1956:8

**harm** 1816:3,7 1818:9,12, 23

**harmed** 1818:14

**harms** 1903:11

**hash** 1854:25

**hat** 1931:1

**hate** 1876:4 1985:1

**hated** 1715:25

**hats** 1764:25

**haywire** 1921:4

**hazing** 1725:2

**he'll** 1830:22

**head** 1849:7 1872:19 1935:17

**headache** 1908:13

**header** 1972:11

**headquarters** 1680:16 1704:1

**headscarves** 1648:14

**health** 1909:10,18 1910:2, 6 1920:4

**hear** 1636:1 1637:18 1647:8 1663:9 1689:18 1707:3 1751:18,25 1760:20 1769:5 1788:15 1846:13 1852:5 1855:19, 20 1856:14 1878:25 1879:17 1926:24 1950:4 1988:19,20

**heard** 1628:24 1701:23 1715:23 1771:2 1854:22 1856:22 1865:7 1870:6 1918:18

**hearing** 1636:5 1700:7,23 1701:9,10,20 1702:4,7,8, 10 1703:23 1704:15 1706:20 1707:25 1708:9 1709:12,13 1710:6,7,8,11, 13,14 1711:3,11,13 1712:16 1714:8 1715:23 1716:5,14 1725:8 1732:20 1733:18,22 1737:13,14 1739:6,9,12 1742:6 1743:11,16 1772:18 1773:13,22,25 1774:1,2 1776:6 1783:10 1865:9 1867:23,24 1868:10,11,12, 16,18 1921:7

**hearings** 1708:1

**hearsay** 1998:2,4,6,12,13, 16

**heart** 1791:21

**heartbreaking** 1793:1

**heartfelt** 1661:22 1663:1

**heavily** 1851:16

**heightens** 1893:2

**held** 1641:18 1669:4 1703:25 1736:5 1752:24 1775:20 1815:24 1817:18 1837:3 1882:25 1883:5 1938:7

**helpful** 1644:25 1706:12

**helps** 1924:6

**Hey** 1643:21 1645:3 1661:20,24 1663:15,19 1676:15 1701:21 1866:5

**higher** 1889:10

**highlight** 1671:8

**highlighted** 1746:19

**highlighter** 1631:8

**highly** 1743:18,19 1811:10 1932:21

**Hill** 1628:12 1630:22 1694:16 1700:25 1708:15 1712:21 1717:12,15 1723:23 1736:17,23 1737:25 1738:9 1742:4 1745:13,18 1749:1,2,9,14 1857:19 1929:15,19 1930:2,9,12,24,25 1931:4 1963:16 1969:5,10 1970:24 1978:5 1981:22 1984:6,10 1987:22 1994:19,20 1996:21,24

**hire** 1648:20

**hired** 1648:13 1697:23

**historically** 1838:23

**history** 1720:4 1728:1

**hit** 1935:16

**hold** 1636:20 1661:12 1665:14 1687:8 1689:2 1732:18 1736:16 1738:3 1745:16 1749:14 1751:16, 18,24 1766:1 1768:21 1772:5 1779:2,16 1781:17 1784:21 1792:8 1794:1 1795:14 1797:12 1798:1 1800:17 1801:11,12 1803:3,25 1807:23 1810:12 1897:19 1904:23 1912:23 1930:21

**holding** 1825:3 1931:1

**home** 1641:15,16,19

1664:1 1832:3 1852:20 1853:5,11,13,23 1854:24 1858:1

**Honestly** 1777:16

**Honor** 1631:20 1634:10 1635:14 1636:1 1637:21 1638:7 1639:12 1640:13 1645:14,25 1646:13 1649:20 1651:16 1655:24 1657:17 1663:4 1666:12, 23 1667:1 1671:2 1672:15 1685:16 1694:16 1735:6 1740:3 1742:4 1746:3 1749:2,21 1750:25 1752:10 1753:4,8 1759:8 1765:2 1766:4 1768:3 1772:8,20,25 1775:24 1778:6,9,18 1786:20 1789:21 1792:4 1793:22 1794:16 1795:12,23 1797:10 1798:8 1800:20 1801:7 1802:1 1805:13 1808:23 1810:9 1811:1,23 1812:13 1813:24 1814:12 1815:1 1816:14 1820:13, 21,23 1821:9,17 1824:17 1826:21 1827:3 1830:11 1833:5,15 1835:2,22 1836:4,13 1846:14 1849:22 1851:20 1853:20 1854:1,11,21 1856:18 1859:5,10,11,19,20 1860:1,6,15,22 1861:1,15, 19 1862:1,15 1863:9,16,22 1864:5,15 1865:12 1869:18 1870:3,9 1871:5 1872:1 1873:8,16 1874:4, 19 1875:23,25 1877:12 1878:13,23 1879:23 1880:5 1882:17 1885:12, 14 1886:8 1887:14 1888:3 1890:23 1891:11 1893:25 1896:1,6,15 1897:22 1898:10,15 1899:1,10 1901:13,25 1902:19 1905:11 1908:1,3,10,17, 20,21 1909:23 1910:3,9 1911:14 1912:20 1915:18 1919:21 1921:9,15 1922:17,19 1923:15 1924:16,23 1925:16 1928:9 1930:21 1933:4,21 1934:2,10 1936:3,8 1937:23 1938:24 1939:13 1941:17,19,22 1942:6,18

1943:16,20,24 1944:5,9
1945:11,16,21 1947:8,19
1948:21 1953:17 1957:15,
18,19 1963:9 1974:5,11,22
1975:2,9,22 1976:6,18
1977:3,9,21 1978:3,14,18
1979:12 1980:17 1982:23
1984:1 1985:5,22,25
1986:5 1987:10,19
1989:11,24 1990:24
1992:15 1993:16 1994:7,
12,20 1995:1,2,4

**hook** 1967:3 1968:6,10
1969:16,17

**hope** 1853:14 1936:1
1960:9 1963:25

**hoping** 1727:6

**horrible** 1801:17

**horrific** 1678:9

**horrified** 1678:4

**horse** 1849:6

**hostile** 1886:1 1920:8

**hostility** 1650:8

**Hotels** 1955:5

**hour** 1640:16 1721:15
1750:19 1752:6 1820:1
1824:9 1829:12,21
1852:12,14 1855:15
1868:14

**hours** 1714:10 1721:15
1752:5 1822:5,10,14
1826:9 1855:13 1862:22

**housekeeping** 1630:3
1652:23 1667:1 1925:20
1932:2

**housekeeping-type**
1925:19

**housekeeping-wise**
1633:19 1652:22

**HR** 1693:14

**Hudson** 1667:13,16,18,21
1670:7,8,12 1838:19

**huge** 1676:10

**human** 1650:19 1651:13

**humility** 1681:8

**hunch** 1962:12

**hundreds** 1684:13 1685:9
1849:16

**hurt** 1769:15 1786:23

**hurtful** 1681:9

**hyphenated** 1879:13

**hyphens** 1878:7

**hypo** 1644:14

**hypothetical** 1660:17
1662:3 1795:15 1802:6,18
1803:2,5,19 1804:15
1808:16 1811:16,17
1812:11,12 1813:7,9
1815:8,17 1970:8

---

## I

**i.e.** 1954:6

**iceberg** 1716:2

**ID** 1728:12

**idea** 1641:19 1862:20
1917:18 1918:21,22
1960:17 1961:25

**ideas** 1959:12,17

**identified** 1865:25
1908:24

**identify** 1679:7 1718:20
1837:20 1838:2 1850:16
1885:15 1913:4 1965:19

**identifying** 1966:11

**ignore** 1850:11

**ignoring** 1869:24 1952:1

**III** 1628:20 1857:23

**illegal** 1833:3,9 1936:23

**illustrates** 1648:9

**illustrative** 1645:6

**images** 1678:4,6 1682:13

**imagine** 1699:1

**immediately** 1652:7
1964:5

**impact** 1682:7 1758:22

**impactful** 1715:25

**impeach** 1773:14,23
1774:8 1775:3

**impeachment** 1774:6,8,
17 1778:7 1784:25
1813:21 1815:5 1861:16

**implicated** 1887:3

**implying** 1966:23

**import** 1643:15

**important** 1645:16
1661:1,22 1699:13 1707:2
1774:20 1826:4 1870:19
1882:7,8 1883:24 1905:13

**Importantly** 1841:8

**impose** 1823:5 1873:20
1961:25

**imposed** 1757:1 1948:25
1949:17,25 1953:5,13

**imposes** 1905:24

**impression** 1748:7,10
1868:5

**impressive** 1629:5

**improper** 1779:21 1802:5,
6 1803:5 1804:14,15
1808:16 1811:10,16,17
1812:10 1813:7 1814:18
1871:18 1873:24

**improperly** 1694:5

**improve** 1723:4

**improvement** 1722:10,21,
25 1723:3

**imputed** 1646:22

**in-flight** 1674:20 1675:2
1689:21,23,24 1693:5
1696:4,8,18 1697:18
1700:5 1701:24 1727:2

**inaccurate** 1877:22

**inactive** 1728:5

**inapplicable** 1977:8

**inappropriate** 1801:1,9
1802:14 1816:5,12
1817:11 1818:5 1873:22
1874:9 1885:25 1974:19

**inartful** 1916:4

**inclination** 1892:3 1901:9
1909:24 1918:13

**inclined** 1954:22 1956:1

**include** 1658:24 1702:24
1807:15 1808:7 1870:19
1874:3 1875:18 1876:25
1881:20 1883:8 1903:8
1936:14 1939:15 1953:1

**included** 1697:12 1861:3
1876:18 1897:5 1903:20
1921:16 1934:19 1943:3
1977:11 1978:22

**includes** 1632:2 1810:7
1829:13 1833:3

**including** 1756:10
1799:13,18 1800:25
1802:14 1806:14 1850:9
1903:10 1937:3

**inclusion** 1863:23 1877:5,
11 1902:2 1943:21
1956:25

**inclusive** 1877:23

**incomplete** 1660:17
1662:2 1802:17 1803:1
1981:8

**incongruence** 1928:20

**inconsistency** 1779:22

**inconsistent** 1775:6
1778:20 1815:7 1861:17
1964:4 1966:8 1970:25
1973:15 1995:24

**incorporate** 1945:23
1951:16,20 1987:12

**incorporated** 1860:10
1935:17

**incorporates** 1868:14

**incorporating** 1935:19

**incorporation** 1866:22

**incorrect** 1940:18 1956:13

**indefensible** 1883:14

**index** 1632:12 1705:11

**indicating** 1902:23
1923:16

**individual** 1850:13,17
1911:18

**individuals** 1688:2 1871:15

**induce** 1789:18

**industrial** 1719:13 1869:15

**industry** 1728:1

**inference** 1828:19 1863:11

**infighting** 1668:9

**influence** 1694:6

**inform** 1809:14 1905:23

**informal** 1639:15 1737:17 1870:17 1882:23

**information** 1654:19 1656:8 1680:25 1688:3,4,6 1690:21 1701:19 1702:17 1704:24 1705:3 1706:7,8, 14,15 1714:21,24 1748:3, 12 1963:12 1997:7

**infraction** 1683:25

**infractions** 1683:23 1685:11

**ingraft** 1884:7

**ingrafted** 1884:3

**inherent** 1902:4

**initial** 1767:3

**initially** 1997:4

**initials** 1713:18

**initiate** 1949:7

**initiated** 1949:13

**initiating** 1647:17

**innocuous** 1721:6

**inquiry** 1730:14

**instance** 1696:11 1730:21 1865:13 1889:17 1953:20

**Instant** 1762:21,23

**instruct** 1873:22 1900:19 1909:2

**instructed** 1988:7

**instructing** 1900:12

**instruction** 1641:2

1861:2,5 1866:6 1883:2 1890:25 1891:2 1900:13 1902:23 1903:7,18 1904:3 1906:12 1910:22 1912:9 1918:12 1919:25 1923:10, 23 1924:8,10 1925:17 1934:23 1941:4,8,16,20 1978:22 1979:14 1981:7 1983:2 1989:13

**instructions** 1738:19 1760:5 1836:17 1856:4 1858:12,17,22 1859:14 1863:6 1865:14 1888:4 1919:3,16 1934:19 1977:15 1981:24 1987:21

**insufficient** 1974:16

**insurance** 1697:12 1747:2 1909:10,16,18 1910:2,6

**intend** 1637:22 1750:14,15 1773:14,23 1775:3 1778:6

**intended** 1724:23 1874:6 1917:12

**intent** 1726:10 1727:8 1822:13

**intention** 1826:20 1827:1

**interacted** 1681:6 1683:8

**interactions** 1675:21 1698:20,23 1838:23

**interest** 1757:13

**interesting** 1751:2 1846:15 1930:7,20

**interference** 1851:12 1937:2

**internal** 1737:9

**Internet** 1678:5 1705:3

**interpret** 1823:2

**interpretations** 1757:24 1758:3

**interpreted** 1912:1

**interrupted** 1825:11

**interview** 1688:2 1690:1

**interviews** 1691:3

**intimidating** 1886:1

**introduce** 1631:14

**introduced** 1667:18

**introduction** 1657:23 1825:23

**investigation** 1656:7 1675:15,17 1676:23 1677:7,15 1678:3,16 1688:1,12,23 1689:12,17, 20 1690:25 1693:7 1694:6, 8,11 1851:12

**investigations** 1675:6 1687:16 1688:9

**investigative** 1677:4

**investigator** 1687:10

**involve** 1688:10 1809:9,19 1834:7 1986:23

**involved** 1659:19 1661:4 1684:17 1693:7 1702:6,8 1736:22 1748:15,18 1761:16 1769:22 1774:25 1777:10 1834:21

**involvement** 1702:3 1733:20 1734:2,11

**involves** 1716:5

**involving** 1770:7 1998:7

**irony** 1834:20

**irrelevant** 1636:19,24,25 1637:4 1882:13 1914:17 1990:17

**issue** 1640:24 1644:23 1646:6 1647:13,20 1648:3 1649:1 1651:19 1652:23 1660:14 1682:10 1723:14 1728:24 1731:15 1752:21 1755:10 1772:14 1774:20 1807:5 1815:2 1820:15 1825:11 1826:5 1828:11 1847:6 1863:6,12 1868:5 1871:4 1878:10,18 1883:18 1887:13 1897:3,4 1901:24 1902:18 1910:10 1916:14 1923:9,12 1924:7 1929:17 1936:5 1941:24 1942:1,21 1954:10 1957:9 1958:18 1962:11,13,25 1964:22 1966:18 1970:8, 13 1974:9 1976:17,23 1977:17 1978:1 1985:6 1986:22 1987:17 1991:13

**issues** 1645:22 1646:25 1648:3 1661:3 1675:4,5 1733:24 1739:14,15 1830:2 1842:10 1851:5 1858:14,22 1859:15,18,23 1860:4,11,19,25 1861:11, 13,20,25 1862:2,10,14 1863:7,13,20 1873:6 1875:22 1876:15 1886:6 1887:7 1888:15 1893:24 1896:8,9,14 1899:8 1905:9 1906:5,20 1907:23 1910:17 1911:10,12 1912:19 1919:2 1922:2 1924:15 1933:18 1934:9 1939:8 1940:25 1941:1 1942:4,25 1946:5,20

**issuing** 1701:13

**items** 1909:2

---

**J**

**jail** 1930:17

**James** 1855:16

**Jehovah's** 1641:24

**jerk** 1636:13 1637:10 1752:3

**job** 1648:7 1676:10 1696:23 1697:6,12,16 1710:24 1711:2 1712:12, 13,14 1717:22,23 1718:2 1719:10 1731:5,13,14 1732:1,3 1770:19 1771:25 1779:8 1812:20 1902:3 1920:13 1924:10 1954:7 1967:15 1968:21

**joint** 1959:22 1960:1 1965:22 1969:6,7,8 1970:11

**joint-employer** 1969:5

**joking** 1882:3

**Jones** 1673:4,6,19,21 1674:3,5 1683:11,16 1766:14 1767:9 1985:11

**Jones'** 1855:16

**Jones's** 1767:22

**JP** 1686:22,23 1687:1

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 621 of 642   PageID 11562
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                    Index: judge..leadership

**judge** 1633:10 1737:15 1973:20

**judgment** 1649:22,23 1847:20 1940:5 1960:4 1961:15,19,20,22 1963:6 1967:22 1969:6

**judgments** 1962:9 1971:20

**judiciously** 1865:4

**jump** 1633:20 1877:13

**jumped** 1933:5

**June** 1697:25

**juror** 1632:1 1828:7

**jurors** 1653:24 1738:20 1739:3 1742:16 1753:16, 20 1759:17 1819:22,23 1820:4 1828:24 1829:23 1832:12 1836:18,23 1854:3 1856:9 1878:16

**jury** 1629:1,13,15,19 1630:7,13 1631:2,11 1632:2 1642:18 1645:17 1646:16 1647:3 1648:5,23 1652:16 1653:18 1657:15, 21 1662:23 1665:12 1666:9 1667:3 1668:1 1669:1 1674:24 1676:5 1679:5 1680:1,17 1682:2 1683:19 1696:9 1697:6 1698:18 1701:8 1704:23 1706:2 1709:7 1711:21 1718:20 1719:2,7 1721:13 1724:22 1735:1,16,17 1736:21 1739:2 1742:1,10, 11 1745:10 1751:10,23 1752:21 1753:10 1757:24 1759:6,16 1760:12 1764:19 1765:17 1768:13 1769:3 1770:9,14 1782:25 1784:8 1785:8,10 1813:1 1820:3 1828:14 1829:21 1830:9 1831:10,17,20,22 1832:1 1836:22 1847:11 1850:11,15 1852:5 1854:25 1855:3,6,13 1856:8 1858:1,2,3,12,17 1864:2 1865:7 1866:4,12 1867:8 1872:23 1873:22, 24 1887:18 1889:9 1895:4 1900:12 1901:4 1905:14, 24 1906:11 1909:2,23

1913:20 1915:12 1916:20 1920:11 1921:24 1925:4 1926:12,18 1927:9 1931:13 1932:22,25 1938:17 1940:18 1941:23 1943:23 1950:25 1952:22 1955:8,17 1958:4 1963:12 1964:6,13,20 1967:10 1968:10,16 1969:13,22 1970:3,8,14,18 1971:10 1972:12,16,21 1973:1,8,15 1976:13 1977:10 1981:22 1987:21 1988:7 1989:20 1990:9 1997:23 1998:22

**jury's** 1739:6,9,12,22 1757:14 1857:16 1866:7 1882:12 1883:24 1912:17 1966:8 1977:24 1987:5

**Justice** 1648:15

**justified** 1846:4

---

## K

**keeping** 1735:21 1867:16 1953:8 1997:23

**Kevin** 1630:23

**kick** 1751:23 1753:13 1830:8 1831:20

**kind** 1648:3 1650:8 1656:13 1676:5 1678:3,10, 16 1679:5,6 1680:20 1681:7 1682:22,25 1687:20 1698:17 1703:22 1705:23 1719:1 1726:24 1729:4 1761:11 1867:1 1870:14 1880:21 1903:12 1912:11 1921:16 1935:1 1973:14 1981:8

**kindly** 1862:17

**kinds** 1917:9

**Kinkeade** 1973:20

**knew** 1642:2,20 1648:17 1680:13 1727:17 1746:18 1766:11,23 1767:5,6 1826:14 1841:6,11,22 1843:14 1962:16

**Knight** 1872:17

**knowing** 1663:18 1843:17 1951:9 1959:7

**knowingly** 1833:12 1884:21

**knowledge** 1640:22 1641:4 1643:9 1644:7,16 1646:21 1664:9 1670:24 1724:1 1862:25 1902:21

**knowledgeable** 1698:14

**Konop** 1641:11,14 1643:1, 11 1719:23 1720:6 1884:4

---

## L

**L-E-M-O-N-S** 1740:16

**label** 1706:23 1931:20

**labeling** 1710:10

**labor** 1670:13 1674:10 1688:8 1693:6,13 1702:13 1703:7 1708:2,7 1709:9,19 1715:6,10 1730:20 1737:7 1748:5 1838:21 1884:2,3, 6,8,25 1944:12,14,21,22 1945:1,9 1991:2,25 1992:8,9,23,25

**laborious** 1679:16

**lack** 1669:24 1670:23 1681:2,8 1758:4 1940:18 1948:11

**Lacore** 1838:22

**laid** 1714:16 1911:15

**land** 1631:4

**lands** 1740:23

**language** 1730:17 1815:21 1863:24 1865:6, 20 1870:16 1874:3 1876:25 1877:3 1880:20 1882:24 1884:2,11 1885:11,18 1886:5,23 1889:14 1890:24 1891:12 1894:11 1895:17,23 1896:4,19 1897:7,20 1898:22 1900:3 1902:2 1904:11,24 1905:7,12 1906:11,15 1907:4,17 1911:12 1913:21 1915:10, 12,18,20,22 1916:24 1917:15 1918:24 1919:5,9 1922:9 1923:13 1925:17 1932:4,17,20,23 1933:3

1936:10,14 1938:16 1939:7,16,19 1947:15 1948:15,19 1952:22 1953:8,18 1956:20 1970:17 1971:24 1972:8, 10,23 1973:24 1974:9 1977:10,14 1981:12 1983:19 1984:2,5,15 1987:8,16 1988:12 1989:4 1993:22

**laptop** 1633:16 1709:15

**large** 1698:7

**larger** 1866:18

**lasted** 1829:20

**lastly** 1986:7

**late** 1667:20

**latest** 1831:18 1858:2

**latitude** 1937:1

**launch** 1856:12

**law** 1646:23 1647:4 1649:11 1734:9,10 1848:21 1850:11 1871:8, 14 1872:4,9 1880:21 1882:24 1889:24 1895:8 1900:12 1903:17 1904:7 1911:17 1933:11 1937:8 1967:20 1968:6 1973:16 1987:1

**laws** 1699:12 1885:5

**lawsuit** 1828:11

**lawyer** 1659:15 1734:9 1753:24 1820:11 1843:16 1853:9

**lawyers** 1686:12 1695:13, 14,19 1740:13 1841:24 1855:21 1878:17

**lay** 1774:21

**layman's** 1722:15 1747:1

**lead** 1689:24 1889:9

**lead-in** 1914:11

**leader** 1658:15,20,23 1659:12 1671:16,20 1715:13 1756:12

**leaders** 1748:19

**leadership** 1658:21

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 622 of 642   PageID 11563
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                Vol 6 July 12, 2022                    Index: leading..make

1693:12 1702:1 1733:24

**leading** 1671:22 1672:9
1784:3 1833:6,16 1835:3

**leaning** 1853:16 1951:9

**learn** 1706:16

**learned** 1633:10 1688:23

**leave** 1673:17 1749:23
1750:23 1821:5 1828:24
1836:7 1901:6,9 1912:10
1916:7 1924:13 1954:17
1985:14 1989:5

**leaves** 1645:6

**leaving** 1750:5

**led** 1746:10 1834:5

**leeway** 1828:21

**left** 1682:25 1708:8
1719:21 1740:4 1775:13
1824:3 1849:5,7 1855:2
1921:17 1996:23

**legal** 1723:13,23 1751:3
1807:3 1855:8 1873:20
1901:2 1912:13 1932:21
1980:21

**legally** 1937:12

**legitimate** 1725:16
1755:11 1851:16 1881:11

**Lemons** 1740:16 1741:3,
14,21

**lend** 1825:22

**length** 1719:15,18 1879:25

**lengthy** 1705:25 1867:22

**leniency** 1644:24

**Lesser** 1882:25 1883:7,11

**lesson** 1633:10

**lessons** 1633:11

**letter** 1702:22 1745:7

**letters** 1876:1

**letting** 1635:6 1867:23

**level** 1701:23,25 1702:20
1731:24 1774:19 1825:17
1885:1 1962:6

**liability** 1650:10 1837:12

1939:22 1959:22 1960:2,
10 1961:7 1963:1 1964:16,
24 1965:6 1966:12
1971:13 1989:20

**liable** 1870:11,14 1920:14
1938:7 1958:5 1960:3,22
1962:6 1963:19 1965:8
1967:1,2,7,16 1968:17
1970:9,10 1971:11,12

**lieu** 1934:13,24

**life** 1650:20 1651:13
1661:1 1727:14 1735:2
1756:3 1763:10 1764:11
1803:10 1850:10,12,14

**light** 1749:19 1750:20
1759:5 1785:4

**lightning** 1917:24

**limine** 1736:17,23 1737:25
1738:9 1772:14 1773:10
1825:12 1828:13 1997:14

**limined** 1773:25

**limit** 1822:11 1829:16

**limitation** 1824:8 1873:18

**limitations** 1824:22
1833:21

**limited** 1635:1 1645:2
1903:10

**limiting** 1861:2,4 1863:5,6

**limits** 1791:23 1812:25
1823:5

**lines** 1778:13 1939:17
1970:18

**lingering** 1630:1

**link** 1630:23 1911:9

**list** 1630:5 1631:13 1632:5
1704:24 1705:5,16
1726:25 1919:15 1928:13
1931:24 1979:22

**listen** 1823:9

**listened** 1997:22

**listing** 1840:24

**lists** 1705:19

**literally** 1803:23

**LLC** 1882:25

**loaded** 1684:3

**Local** 1698:4,14,19,24
1699:14,23 1700:2
1701:16 1710:21 1723:22
1834:24 1837:11 1838:10
1839:25 1840:17 1841:9,
14 1842:17 1843:6,14
1845:19 1846:11 1857:22
1863:19 1876:23 1881:12
1886:12 1888:19,24,25
1890:10,15,18 1892:14
1893:15 1894:6,7,12
1895:2,12,13 1896:20,23
1897:25 1899:13,16
1912:24 1914:5,10,19
1957:14 1958:1 1975:8
1977:4

**locate** 1679:8 1778:15

**logic** 1642:9,14

**long** 1674:6,11,21 1675:8
1679:18 1687:4 1696:5
1705:25 1714:8 1750:17
1762:7 1796:5 1797:22
1798:21 1806:23 1807:19
1808:12 1810:23 1812:6
1813:4 1831:2 1854:25
1855:15,22 1867:3,8
1877:6 1879:12 1885:9
1899:6 1911:13 1928:17
1934:6 1936:23 1982:12

**long-term** 1718:9

**longer** 1937:17 1938:1,2

**looked** 1718:8

**lookout** 1973:13

**loose** 1831:10 1973:13,14

**lose** 1726:12 1773:5
1848:8,21 1849:3 1870:20
1883:3,7 1885:16 1890:19
1937:25 1984:10

**loses** 1848:11 1849:10

**loss** 1719:11 1903:12

**losses** 1978:21,24 1979:2,
6

**lost** 1848:18 1850:7
1880:19 1893:9 1914:8
1920:6 1957:13 1958:3
1965:10 1971:4,7 1974:15

**lot** 1629:16 1639:16 1668:8
1678:17 1679:14,15
1680:25 1720:10 1889:10
1981:24

**loud** 1779:18,20 1963:10

**love** 1712:14 1752:5
1821:24 1827:13

**luck** 1998:20

**lump** 1965:5

**lumped** 1967:17 1968:14,
24

**lumping** 1966:17

**lunch** 1750:24 1811:21
1815:22 1819:20 1821:7

**Lyn** 1637:15

_____

**M**

_____

**machinations** 1960:12

**made** 1637:7 1652:3
1654:16 1655:15 1658:13
1660:2,19 1662:5 1676:20
1678:10 1682:6,18
1688:13 1692:6,10 1693:4
1694:12 1701:25 1702:20
1711:23 1716:3,7 1720:3
1731:5,6 1734:17 1757:12
1764:24 1766:25 1770:21
1776:3 1783:1,16,21
1784:11,12 1790:22
1803:17 1805:20 1823:16
1824:21 1828:16 1847:19
1850:23 1876:7,13
1906:24 1912:24 1913:17
1917:1 1918:4 1925:7
1937:11 1938:10,19
1946:14 1947:10 1968:22
1975:10 1986:21

**magic** 1659:16,17 1660:23
1662:13

**main** 1637:16 1641:10
1682:11

**maintain** 1863:23

**maintained** 1763:1

**majority** 1687:13 1700:9

**make** 1630:16,24,25
1631:3,15,17 1633:3

1634:23 1636:15 1642:4 1643:7 1647:23 1651:20 1659:22 1662:19 1664:4 1668:3 1690:24 1693:1,8 1715:9 1719:4 1724:23 1725:6 1735:12 1751:10, 13,17,23 1752:10,19 1756:18 1764:14 1770:15, 24 1771:1 1802:22 1803:16 1804:9 1808:8,11 1809:6 1812:4 1813:3,16 1829:9 1832:6,9 1834:6 1837:2 1839:21,22 1843:19,20 1862:9,16 1863:2 1866:23 1868:15 1874:14 1876:2 1897:24 1898:11 1911:8 1917:2 1922:22 1926:13 1927:23 1928:20 1929:15 1930:8 1931:23 1932:1 1937:2,12 1940:12 1945:3 1950:11, 15 1955:8,14,17 1956:2 1958:12,13 1960:5,11 1971:22 1973:16 1980:3 1984:21 1987:7 1990:18 1992:11,25 1994:11 1996:17

makes 1634:4 1636:21 1668:4 1679:10 1693:11 1700:1 1735:18 1865:7 1874:17 1878:14 1892:5 1912:14 1915:4 1950:18, 22 1954:15 1956:9 1982:23 1983:16,21

making 1644:10 1690:23 1691:8,11 1706:12 1710:17 1752:2 1806:25 1807:1 1876:9 1884:15 1928:12 1979:24 1981:20

man 1973:21

manage 1737:9

management 1658:24 1683:22 1693:6 1911:21

manager 1669:19 1670:19 1674:10,14,15,16,19 1675:1,3,8,18 1708:3,5 1709:10 1715:12 1730:21

managerial 1911:19,20,25 1912:6,8

managers 1911:23

managing 1696:12

1702:14

manifest 1651:1

manifestations 1650:23

manner 1767:12,14 1768:7 1782:1,16,20 1784:17 1785:6,16,24 1786:9,12,23 1787:4

march 1651:10 1712:2 1754:18 1763:21 1764:10, 12,16,22 1765:1,10 1768:10 1769:18 1777:22 1778:5 1837:19,25 1839:14 1845:3 1911:2 1971:5,6

mark 1707:17 1910:4

marked 1631:7

Massoni 1628:21

master 1632:3

match 1915:12

matches 1945:9 1952:12

matching 1960:10

material 1692:11

materials 1702:24 1929:2, 3 1998:21

Matt 1628:12 1857:19 1927:6

matter 1630:3 1667:2 1694:6 1743:6 1753:9 1774:6 1782:12 1799:7 1806:11,20,21,23 1809:25 1810:22 1820:23 1850:11 1880:21 1882:11 1967:20 1968:6 1973:16 1998:9

matter-of-law 1968:9,13

matters 1867:4 1899:7 1937:4

Matthew 1628:11 1857:19 1875:3 1880:18

MATTHEWS 1933:22

maximum 1822:11 1956:6

Mccall 1844:2

Mckeeby 1628:15 1630:3, 15 1633:24 1639:7 1652:23 1653:2,9,13

1655:18,23 1657:17,19 1658:2 1660:16 1661:9 1662:2 1665:10 1666:1,14, 25 1667:1,13,16 1668:4 1669:2,9,11,14,21 1670:2, 11,21 1671:7,11 1672:1, 12,21,25 1673:3,7,23 1674:2 1681:14,16,22,23 1682:20 1683:2,10,12 1685:13,18,19,25 1694:25 1695:21,22,24 1701:6 1704:19,20 1707:21,23 1708:13,18,21 1709:4,24 1710:1 1711:8,9,15,19 1712:8,11 1713:3,7,20,22 1714:6,7 1717:19 1718:17, 19 1720:18,20 1721:10,12 1722:6,8 1723:7,8 1724:3, 5,7,18,20 1729:14,16 1735:6,11,17 1736:2,7,9, 20 1737:18 1738:1,7,15 1739:15,25 1740:1,3,6 1741:18,19,23 1742:7,14, 18,19 1744:20 1749:5,6,23 1750:1,9 1753:2,4 1757:15,17 1824:16 1830:11,18,21,23 1831:2,6 1832:16,18 1835:24,25 1853:10 1854:18 1856:18 1857:20,21 1916:15,19 1917:6 1925:16,21 1926:14 1928:7,23 1929:8 1931:8 1959:17 1983:12, 18 1985:10 1997:23,25 1998:4

meaning 1679:9 1716:23 1916:1 1929:21

means 1644:1 1679:17 1717:3 1719:7,12 1721:13, 19 1722:22 1724:22 1734:5 1737:13 1762:5 1795:21 1796:16 1832:16 1854:16,23 1876:19,21 1905:2 1915:6,7 1916:5 1932:7,9 1955:4

meant 1688:1 1692:7,16, 17 1719:25 1720:23 1732:25 1772:4 1782:14, 15 1783:20 1881:16

meantime 1749:20

measure 1970:19 1971:25 1989:17

Mecca 1643:18 1651:9,10

mechanism 1723:3 1733:14 1737:9 1740:19

meddling 1844:25

media 1642:7 1649:3,18 1663:23 1664:11,19,22 1668:17 1677:14 1678:16, 18 1683:23 1685:10 1725:3 1755:21 1770:1,4 1771:10,15 1774:14 1777:7,12 1782:17 1783:16,17 1784:13,14,15 1834:13 1838:25 1841:2 1881:14,18

meet 1727:2 1844:8 1911:17

meeting 1642:2 1644:10 1655:5,13,22 1656:3,12 1657:12 1662:22 1671:20 1672:3 1675:23 1676:25 1677:6,8,9 1679:21 1680:9,18,20,21,22 1681:3,7,12,20 1682:19, 22,24 1683:9 1690:3,7,15, 18,19 1697:9 1703:3,16,25 1705:6 1706:4,25 1707:7 1708:12 1727:7 1756:1,7 1767:16,18 1769:24 1839:17

meetings 1700:21 1704:2

megabytes 1631:8

meggan 1673:3,19 1674:5 1766:14

Melissa 1708:6 1709:10 1715:12 1730:22

member 1694:13 1698:1, 3,6 1734:13,23 1761:9 1767:15 1787:10,11,19,20, 22,25 1788:1,4 1789:19 1790:1,5,7 1794:6 1799:12 1802:23 1804:11,23 1805:21,23 1806:1 1808:9 1809:13 1845:14 1911:17, 24

members 1734:14 1762:10 1788:3 1795:21, 22 1805:25 1911:21

members' 1917:5

membership 1734:2

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 6 July 12, 2022                    Index: memo..motivations

1767:16,18 1800:1,5

**memo** 1669:15,16 1670:3

**mention** 1837:23

**mentioned** 1676:2 1703:8
1709:14 1714:11,13
1724:16 1733:7 1736:10,
12 1737:2,19 1825:3
1854:5 1866:25

**mentor** 1633:10

**merged** 1724:14

**meritorious** 1869:24

**merits** 1637:12

**message** 1726:2 1731:21
1756:2 1763:14 1766:16
1776:19 1796:21,22
1799:13,17 1800:23
1802:13 1804:11 1814:17
1816:2 1835:12 1850:20

**messages** 1644:12
1646:5 1688:21 1711:4
1712:17 1713:11 1725:14
1747:6 1754:13 1755:6
1762:21,23 1770:23
1785:17,24 1786:13
1795:9 1796:3,4,25
1837:16 1838:14 1839:5
1840:5 1841:12 1845:21
1847:23 1849:5,17
1881:13 1883:13 1886:25

**messed** 1888:17

**met** 1680:13 1704:3 1707:8
1731:4 1980:22

**method** 1682:5 1740:23

**Michael** 1696:1

**microphone** 1634:15
1666:22 1779:3,15
1814:21

**mid** 1696:21

**middle** 1810:10

**Midlothian** 1734:24

**midnight** 1868:1

**midway** 1713:5

**mike** 1628:21 1694:25
1695:7 1727:2

**mind** 1629:7 1640:9

1872:23 1873:5 1881:1
1910:23 1930:1 1958:25
1987:6 1989:19

**minds** 1629:16 1828:24

**minimis** 1757:1

**minimum** 1676:7 1982:9

**minute** 1717:9 1754:16
1821:11 1829:12 1831:18
1897:16

**minutes** 1652:13,15
1679:19 1709:16 1714:9
1738:24,25 1739:11,17
1750:19,21 1752:6
1811:24,25 1822:6
1823:23,25 1824:3
1827:25 1828:3 1829:2,3,4
1830:7 1836:21 1867:9,11,
18 1996:20 1997:3,8

**miracle** 1852:23

**mirror** 1902:7

**miscarried** 1678:8

**mischaracterized**
1665:13

**mischaracterizes**
1665:10 1769:6 1776:21
1797:24

**mislead** 1657:15

**misled** 1940:10

**misremembering**
1991:23

**missed** 1896:2,5 1911:6
1996:12

**missing** 1638:14 1961:13

**mission** 1716:12

**misstated** 1776:7

**misstatement** 1871:14

**misstates** 1911:16

**mistake** 1710:17 1770:20,
21 1771:4,6,7,8,9 1773:17
1774:12,13 1776:4,13,20
1777:2,6 1781:11 1782:7,8
1783:1,16,21 1784:11,12
1815:4 1834:11,12,13

**mistakes** 1771:20

**misunderstanding**
1964:10

**misuse** 1781:14

**mitigate** 1825:24 1923:25

**mitigation** 1635:2 1922:21
1923:1,10,13 1924:4,10,15
1994:24

**mixed-motive** 1946:11

**modicum** 1996:20

**modified** 1957:12

**modifier** 1878:12 1954:12

**modify** 1720:11 1730:16

**moment** 1712:6 1826:21
1941:17 1986:20

**moments** 1859:10

**monetary** 1903:12
1909:20 1920:5

**monetized** 1909:13,14,25

**money** 1676:15 1721:25
1754:19 1777:22 1790:7,8,
11 1794:10 1807:13
1965:7,9 1966:10 1975:17
1987:22

**monitor** 1653:5,7

**monitors** 1667:6

**Montgomery** 1637:16

**month** 1643:20

**months** 1727:13,19

**morale** 1758:22

**Morgan** 1686:22,23
1687:1

**morning** 1629:12 1635:6
1638:14,15 1683:16,17
1686:20 1693:25 1694:1
1708:16,24 1738:17
1855:1 1862:13 1902:20
1903:6 1996:25

**morning's** 1630:2

**Morris** 1628:16 1640:8,14,
19,20 1642:25 1643:3
1644:19 1646:20 1649:5,6,
20 1650:15 1686:16,18
1689:1,4,14,15 1691:12,14
1693:21 1757:15 1857:21

1859:19,25 1860:5,13,20
1861:1,9,22 1862:14
1863:8,14 1873:16 1874:4
1875:23 1877:5,12,15,16
1878:9 1885:14,19,20,23
1890:23 1891:7 1894:1
1901:20,22 1902:19
1903:4,25 1904:3,14,19,22
1905:8 1907:17,19 1908:4,
17,21 1909:9,13 1910:8
1912:20 1913:6,10,12,22,
25 1915:21 1916:9 1917:7,
11,22,25 1918:1,3 1919:11
1922:4,18 1923:15 1924:6,
18,25 1925:16 1932:3,6,11
1933:4,8 1939:9 1941:2,13
1942:5,12 1944:6,9
1947:1,5,19 1948:1,12
1950:6 1951:14,22
1953:17,22 1954:13
1957:6,19,22 1963:9
1966:1,3 1974:5 1975:6
1978:13,18,25 1979:3,16
1980:9,17,24 1981:5,13
1982:23 1986:14 1987:10
1988:23 1989:12 1990:5,
25 1991:8,19,22 1992:3,10
1993:2,19,22 1994:3,11
1995:1,4

**Mota** 1920:4

**motion** 1649:22 1751:10,
13,17,23 1752:2,17 1753:7
1757:12 1759:3 1825:12
1828:13 1830:9 1832:1
1837:2,4 1851:18 1882:1
1935:7 1997:14

**motions** 1830:10 1831:21
1837:5 1851:24 1852:1
1856:14,17,22

**motivated** 1797:22
1798:21 1845:4 1876:22
1877:1 1888:22 1889:1
1890:24 1897:1 1898:4

**motivating** 1755:1 1839:6,
10 1875:1,17,20 1876:19,
21 1877:3 1889:7,18,21
1890:4,10,17 1891:5
1892:4,22,25 1893:3,5,18
1947:9,12

**motivation** 1758:5

**motivations** 1845:19

**motive** 1902:14

**move** 1634:14,18 1635:14
1637:21 1655:23 1657:19,
23 1666:15 1669:22
1670:21 1707:19 1708:18,
21 1725:20 1726:10
1727:10 1741:23 1742:12
1754:1,8 1764:15 1765:3
1770:5,6 1786:21 1792:5
1793:12,23 1794:17
1795:3,25 1797:9 1799:2
1801:8 1808:24 1810:10
1817:13 1819:8 1837:10
1839:8 1840:14 1858:8
1861:6 1887:8 1907:19
1945:17

**moved** 1894:16 1946:3

**moving** 1724:24 1725:7,25
1746:18 1756:5 1859:4
1974:24

**multi-defendant** 1962:21

**multiple** 1752:16 1757:23
1806:14 1936:16 1952:14
1982:24 1986:22

**multiples** 1952:5

**muscle** 1821:23,25

**mute** 1653:5,7

**muted** 1742:11

**N**

**nail** 1935:17

**names** 1740:21,22

**Naomi** 1670:7 1838:19

**narrow** 1909:8

**National** 1884:3,6,8,25

**native** 1928:5 1931:10

**nature** 1675:6 1682:7,13,
23

**necessarily** 1643:7
1651:15,18 1684:16
1971:10 1981:22

**needed** 1641:20 1642:21
1660:21 1662:6 1663:3
1671:25 1732:7 1746:20
1826:10 1831:1

**neglected** 1667:4

**negligence** 1962:2

**negotiated** 1762:19
1842:24

**negotiating** 1838:19,20,
25

**nerd** 1898:13

**neutral** 1888:1 1905:16,18

**Nevarez** 1838:10 1862:7

**newest** 1895:24

**news** 1985:2

**next-to-the-bottom**
1862:11

**nexus** 1677:16 1678:20
1756:22 1846:3,5 1952:4
1954:3

**night** 1629:9 1630:19
1639:1 1926:5,8

**night's** 1638:14

**nights** 1638:18,25

**Ninth** 1955:5

**NLRA** 1884:11

**NLRB** 1883:15

**nominal** 1922:11,14
1976:4,20 1987:24
1989:13,18,19,23,25

**nominals** 1976:16 1977:1
1990:3,8,9,10,14,16,19

**non-christian** 1899:17,25
1943:3

**non-discriminatory**
1755:11 1840:2,3,8
1851:17 1881:11,17

**non-economic** 1978:16,
20,24 1979:2,6,21

**non-member** 1800:2,7,24

**non-overnight** 1820:9

**non-responsive** 1765:3
1770:6 1786:21 1789:22
1792:5 1793:12,23
1794:17 1795:3 1796:1
1797:9 1801:8 1808:24
1810:10 1819:9

**non-union** 1693:14

**nonprofit** 1923:22

**noon** 1639:21,22

**normal** 1670:18 1793:20
1794:6,25 1867:5 1905:4

**Northern** 1844:1

**notation** 1866:25 1867:2

**note** 1630:16 1634:5
1637:25 1699:13 1722:17
1849:6 1876:9 1890:23
1892:6 1922:22

**note-taker** 1676:24
1677:2

**notebooks** 1632:12

**notes** 1634:5 1642:23
1681:12 1702:19 1708:11
1709:12,22 1924:21

**notice** 1642:10 1644:11
1645:17,19 1646:3,15,21
1663:2 1702:15

**noting** 1636:7

**notion** 1640:21 1641:19
1757:19,23

**November** 1697:24

**NRLB** 1941:25

**nullifies** 1881:20,21

**number** 1633:23 1634:3
1635:11 1901:7 1931:12
1935:10,12,19,23 1936:2
1941:6 1946:1 1956:6,7
1958:16,21 1959:1,19
1962:14 1967:8

**numbering** 1667:19

**numbers** 1635:25 1908:14
1927:18,21 1958:17,19
1963:19,23 1964:1,2,4

**numerous** 1704:16
1706:11,22 1827:13
1851:6 1936:17

**nurse** 1641:14

**nursing** 1641:15,16,19

**O**

**oath** 1654:2 1686:8 1712:5
1760:1 1779:10

**object** 1632:17 1671:22
1672:9 1734:11 1735:14,
22 1757:22 1765:24
1767:24 1768:18,24
1769:6 1772:3,13,14,20
1776:7,15,21 1778:18
1779:21 1781:14,21
1783:23 1784:19 1785:9,
25 1787:13 1791:2,7,9
1793:25 1795:12 1796:13
1797:24 1802:1,5,17
1803:19,21 1804:13
1805:13 1806:7,13 1807:3,
17 1808:16 1811:5 1813:7,
8 1814:18 1816:14
1818:20 1819:8 1864:3
1865:17 1877:5 1887:17
1911:16 1920:1 1934:12
1953:7,8,9 1956:21,22,24
1965:2 1973:22 1980:17
1988:20,23

**objected** 1635:23 1636:9
1637:15 1638:22 1761:9,
12

**objecting** 1734:1 1754:19
1768:8 1837:23 1869:13,
17,22 1870:1

**objection** 1630:6 1633:21
1634:23 1635:3,11
1636:10,11,12,17,21
1637:11,16 1638:11
1639:5 1655:18 1657:17,
25 1658:2 1659:23
1660:16 1661:9,13 1662:2
1663:4,7,10 1665:10,16
1666:1,12,14 1671:1
1686:14 1700:25 1701:3
1708:15 1712:21 1717:12
1723:23 1736:17,23
1737:25 1738:9,12
1745:13,17,23,25 1764:14
1765:2 1766:1 1768:22
1770:5 1772:6,16 1781:18
1786:20 1789:21 1790:22
1792:4 1793:11,22
1794:16 1795:2,23 1797:8
1801:7,12 1802:3 1803:4
1805:6 1808:23 1810:9
1811:7,13 1812:9,10

1813:13 1817:24 1825:14
1833:5,15 1835:2,4,6
1853:21 1863:23 1865:13,
18 1869:2 1870:5 1872:2
1873:14 1874:1 1880:2,3
1889:4 1897:12 1898:9
1902:2 1922:5,8 1924:14
1941:3,9,16,23 1942:7,11,
14,19,24 1943:12 1945:12
1946:11,14,19 1947:9,14
1948:6,9,10,16,21 1951:12
1956:21 1957:4,11,15
1973:25 1974:21,23
1975:5,10,18,25 1976:2,6,
7,8,15,21 1977:21 1978:4,
15 1981:18 1986:6,8
1988:19 1990:24 1992:13
1993:11,13 1994:2,3,11,
15,22 1995:1,5,9

**objections** 1629:8,11
1635:6,9 1636:25 1695:18
1708:23 1772:23 1773:4,5
1784:5 1792:9 1811:8
1873:8 1882:16 1921:3
1941:11 1947:4,5 1957:3
1975:1,14,15 1976:20
1977:7 1980:7,13 1986:1
1988:20 1989:8,10
1993:20 1994:7,25
1995:15 1997:12,16

**objector** 1732:22,23
1734:13,15 1802:10,12
1834:1

**objects** 1634:8

**obligation** 1659:4 1665:18
1843:19 1902:25 1903:19
1905:25

**obligations** 1758:16
1843:14,17 1873:21

**obscene** 1883:9 1885:25

**observance** 1888:23
1889:2,6 1890:9 1893:20
1902:15 1905:3,15

**observances** 1843:21
1845:25 1890:4,17
1893:14 1898:7,24 1899:4
1901:8 1906:1 1907:9
1947:12 1982:5,14,18,21
1983:4,16,20 1986:25
1988:1,4

**observations** 1675:14

1680:18

**obvious** 1646:7

**occurred** 1675:23 1730:12
1796:13

**occurrence** 1864:9

**occurs** 1644:9,17 1864:10
1902:21

**ocean** 1822:4

**odd** 1960:8 1970:8

**off-time** 1666:10

**offensive** 1883:5 1885:25

**offer** 1716:22 1731:13
1732:10 1735:12,15,24
1739:7,22 1742:1,9 1771:3
1781:12 1782:6,9 1783:9
1822:13

**offered** 1635:5 1638:12
1717:6 1718:22 1745:3

**offering** 1719:25 1782:25

**office** 1698:8 1727:9
1770:22 1771:13 1777:8
1782:18 1783:13,18
1784:10,16

**officer** 1628:3 1652:17,19
1698:5 1733:13 1739:19
1799:18 1800:24 1802:13
1813:17 1831:13,15
1857:9,11 1925:12,14
1998:24

**officers** 1733:10,16

**official** 1838:5 1840:17
1844:11,13 1847:10,12,14,
18 1850:22 1870:20,21
1896:24 1897:3 1898:1
1936:13 1938:19

**Officially** 1800:8

**officials** 1838:24 1870:23
1884:22,23 1911:22

**omission** 1866:14

**omit** 1866:16,25 1871:19,
23 1915:24

**omitted** 1952:18

**omitting** 1952:24

**ongoing** 1722:18

**open** 1669:4 1679:10
1736:5 1752:24 1769:21
1775:20 1815:24 1817:18

**opening** 1760:17 1823:6
1825:10 1826:24 1858:12

**operated** 1700:2

**operates** 1699:21

**operating** 1699:25 1827:7
1936:20

**operations** 1696:4,8
1700:5 1724:14 1727:2

**opinion** 1664:2 1790:9
1807:4

**opinions** 1781:13

**opponent** 1839:22

**opportunity** 1706:16
1741:8,11 1827:9 1830:12

**oppose** 1824:17

**opposed** 1762:17,20
1802:18 1849:19 1934:21
1944:22 1945:20 1966:17
1970:11

**opposing** 1754:17
1768:15 1825:8,16
1837:18,24 1845:15

**opposition** 1754:22
1878:3,11

**opt** 1734:11

**opted** 1769:23

**optimistic** 1853:17

**option** 1716:18,22 1717:1
1721:25 1805:21 1889:20

**options** 1716:15,17
1717:5 1732:9,10

**order** 1639:18 1827:7,9
1830:15 1860:9 1865:18
1898:23 1899:3 1982:15,
16,17

**org** 1700:13

**organization** 1699:23

**organizational** 1877:20
1878:11 1879:14

**original** 1826:9 1987:10
1988:12 1989:4

**otherwise-protected**
1883:9

**outcome** 1644:18 1691:7

**outset** 1854:5

**outstanding** 1744:16
1755:9

**overlapping** 1736:11

**overlay** 1962:3

**overlooked** 1758:15

**overrule** 1635:4 1638:11
1659:25 1670:25 1701:4
1717:13 1736:18,24
1738:5 1745:19 1765:4
1787:15 1792:10 1801:13
1869:19 1870:4 1871:25
1872:21,25 1874:12
1880:2 1882:15 1886:3
1888:13 1893:23 1901:10
1907:2,12 1918:23
1924:14 1933:2,17
1935:25 1939:6 1940:22
1942:3,9,15,24 1943:6
1944:1 1946:23 1948:6,15
1953:15 1957:11 1974:21
1975:12,25 1989:3
1994:21 1995:10,14

**overruled** 1712:22
1717:17 1745:24 1786:2
1807:6 1882:1 1886:4
1917:6 1996:6

**overrules** 1637:11

**overruling** 1635:6
1637:11 1708:24 1781:20
1796:17 1869:2 1873:4
1921:22 1945:24

**overstatement** 1903:16

**overstates** 1903:7

**owe** 1965:8

**owes** 1870:23 1965:7

**owing** 1966:9

────────────

**P**

────────────

**P-A-R-K-E-R** 1704:12

**p.m.** 1998:25

**packet** 1705:7,8 1706:3

Case 3:17-cv-02278-X    Document 387-1    Filed 01/02/23    Page 627 of 642    PageID 11568
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                    Index: pages..Plainly

**pages** 1707:7 1729:7
1849:16 1858:12,14,21
1859:13 1860:18 1861:24
1863:20 1867:8 1880:8,22
1888:17 1934:6

**pagination** 1876:10
1908:12

**paid** 1712:2 1721:15,25
1761:15

**pain** 1859:8 1992:16

**panel** 1740:21,24,25

**paper** 1632:22 1921:6

**paragraph** 1724:8
1747:17,18 1864:8,12
1870:10 1874:21 1875:8
1876:18 1880:6 1881:2,5,
8,21 1882:15,19 1886:11
1888:18 1892:10,17
1893:17 1894:6 1895:11
1896:20 1898:19,21
1899:4,10 1904:15 1908:7
1912:25 1913:4,7,9
1924:20 1932:7

**parallel** 1907:4

**Parenthood** 1763:21

**Parker** 1704:12 1713:18
1743:11,16,17 1744:2,12,
23 1745:1

**parlance** 1732:22

**parse** 1961:3

**parsed** 1808:6

**parsing** 1809:22

**part** 1630:22 1643:18
1662:25 1666:3,5,14
1692:13 1696:13,15
1702:14,23 1703:7 1716:4
1726:19 1750:25 1754:22
1771:15 1780:5 1823:2
1844:5 1848:20 1849:19
1863:25 1864:17 1888:10
1897:5,23 1926:19,20
1942:21 1944:11 1951:11
1952:1,2

**partially** 1692:5,7,16,17,
19

**participant** 1690:10

**participated** 1740:7

1839:15

**participating** 1690:25

**parties** 1690:2 1724:9
1728:25 1822:4 1827:17
1863:18 1873:21 1931:13

**partner** 1689:25

**partnered** 1689:21

**parts** 1851:6

**party** 1737:15 1998:11,17

**pass** 1666:18,22 1683:10
1693:21 1694:15 1742:21
1819:17

**passed** 1832:14

**passing** 1666:19 1680:14,
15 1819:16

**passionate** 1712:25
1743:19 1744:3

**past** 1725:25 1825:18
1847:20 1855:24 1882:10
1997:2

**path** 1746:20

**pattern** 1862:6 1887:18
1890:25 1915:10,11,18,20,
22 1918:12,14,19 1947:15
1978:22 1981:6,10,11
1987:21 1989:1,13

**patterns** 1887:23,24
1888:13 1891:16,18,24
1916:1 1917:16 1918:24
1979:5 1990:1,2

**patters** 1891:20

**Paulo** 1628:15 1857:21

**pay** 1719:23 1720:1,6,7
1721:14,15,17,23 1722:3
1761:4 1769:18 1908:18
1910:10,16,21,25 1911:10
1919:19 1920:1,5,6,9,14
1921:17 1922:2 1961:17,
18 1965:10,11,15,16
1967:6,14,16,21,24
1968:7,11 1969:16,19
1970:11 1971:4 1974:16
1977:4,7,13 1994:5,7

**pays** 1959:20

**peace** 1833:21

**penalizing** 1950:25

**people** 1632:22,24 1650:9
1651:14 1664:10 1680:5
1697:13 1713:2 1719:14
1731:11 1734:11 1735:3
1769:17 1808:22 1834:17
1862:21 1917:4 1928:4,5
1958:6 1997:2,3

**percent** 1688:17

**perfect** 1871:2 1965:23
1967:5 1977:25 1986:9

**perfectly** 1756:6 1869:3
1997:8

**performance** 1697:17

**perfunctory** 1869:25

**period** 1674:25 1698:2
1703:17 1714:24 1715:3,4
1720:15 1722:11 1910:12

**perk** 1676:10

**permit** 1972:6

**permitted** 1723:20,21

**perplexed** 1682:25

**person** 1649:24 1679:24
1704:4 1737:19 1769:15
1793:2 1799:19 1801:2,9
1802:15 1809:7 1812:18
1900:8 1931:5

**personal** 1651:17,18
1652:2 1661:20 1664:1
1670:24 1675:4 1678:9
1724:1 1735:1 1758:2
1763:24 1764:5 1862:25

**personal/interpersonal**
1838:7

**personally** 1826:7

**personnel** 1738:20
1753:16 1819:24 1836:18

**persuade** 1939:3

**pertains** 1635:12

**pertinent** 1705:4 1706:7

**petition** 1762:11 1833:25
1849:20

**Phoenix** 1674:17 1684:19,
20

**phone** 1946:17

**photograph** 1931:7
1954:4 1998:2,3,5,8

**photographs** 1678:21,23
1679:12,15 1952:4

**photos** 1678:24 1679:13
1703:10 1756:22 1930:6

**phrase** 1878:21 1879:13
1898:6 1903:22 1914:3
1915:1,7 1944:16 1951:12
1978:24 1982:4 1987:5
1992:22,24

**phrased** 1889:9 1893:1

**phraseology** 1639:4

**phrasing** 1916:4 1985:20

**physical** 1802:23 1803:7,
17 1804:10,19,20 1805:11,
20 1806:2 1807:15,22
1808:7,12 1809:6,15,17
1810:7 1811:4 1812:5
1813:4

**physically** 1810:8

**pick** 1676:16 1963:22

**picked** 1963:18

**picks** 1741:1

**picture** 1678:25 1865:6
1929:21

**pictures** 1679:2,3 1692:21
1703:5 1754:21 1930:5,7,
22,24

**pieces** 1850:9

**pin** 1906:6

**pivot** 1987:20

**place** 1653:17,23 1703:19,
24 1746:17 1804:25
1861:6 1864:10 1893:9
1903:23 1913:24 1933:16
1937:5

**placeholder** 1917:21

**places** 1864:10 1923:8
1954:22

**placing** 1804:13 1812:10

**Plainly** 1911:20

**plaintiff** 1753:25 1854:7,
10,13 1857:18 1859:16,24
1860:4,12,19,25 1861:14,
21 1862:3 1863:7,13
1869:22 1873:11 1874:25
1875:15 1877:17 1879:8
1880:5 1883:13 1886:19
1888:21 1890:2,3 1892:11
1893:10,12 1895:15
1896:10,24 1897:1 1898:2,
4 1899:13,16 1901:15
1908:2,8,19 1911:23
1913:2,14 1914:14 1922:3,
13 1924:17,24 1933:20
1936:12 1937:10 1941:1,
12 1942:11 1944:4 1945:6,
7 1948:1 1949:24 1972:13,
15 1973:25 1974:23
1980:8 1981:14 1983:19
1984:7,11 1987:25 1988:3
1989:11 1992:6

**plaintiff's** 1673:12 1750:7
1854:14 1937:15

**plaintiffs** 1825:1 1854:6
1874:20 1919:10

**plan** 1629:21 1635:6
1673:13 1750:19 1820:19,
20 1952:23

**plane** 1631:4

**planned** 1763:21 1824:18

**planning** 1638:3 1728:13,
15

**play** 1644:12,16 1652:5
1659:15 1826:17 1912:14
1956:18 1963:17 1966:20

**played** 1726:7 1874:25
1875:2,16,18,19,21,22
1876:8,14

**plays** 1966:21 1974:8

**plenty** 1923:8 1996:3

**plot** 1988:10

**plug** 1709:17

**plugged** 1709:18

**plural** 1704:7

**podium** 1754:9 1837:6,8

**point** 1635:5 1643:12
1647:20 1649:10 1655:10,
12,15,16 1656:8,9,25

**polls** 1657:5 1663:5 1669:8,25
1675:22 1676:1 1696:13,
14 1698:7 1700:14
1706:17 1707:4 1710:23
1726:8 1731:16 1733:17
1736:19 1738:11 1744:23
1747:4 1755:9 1767:8,11
1774:24 1775:10 1783:3
1784:24 1785:1 1798:19
1802:8,20 1809:12,22
1811:22 1822:5,15,16
1826:4 1829:25 1830:7
1840:9,12 1849:10
1851:23 1852:1,8 1862:17
1864:19 1865:22 1872:25
1873:5 1890:22 1891:19
1899:6 1905:21 1914:1
1915:5 1918:11 1931:3
1933:13 1934:11 1936:4
1940:10 1954:23 1963:13
1966:19 1968:9,13,14
1969:25 1971:9 1974:2
1981:2,4 1982:11 1990:6,
17

**pointed** 1779:23

**pointing** 1919:4

**points** 1722:17,18,22,24
1770:14 1828:15 1982:2

**police** 1803:9,12 1805:11,
22,24 1806:1,3,5 1809:8,
14,19 1816:9 1817:8,11
1818:4,7,13,19,24 1819:3,
7,13

**policies** 1642:8 1644:5,8,
16 1648:22 1665:7 1672:7
1682:8,15 1699:12
1724:25 1755:21 1758:15,
16 1840:24 1841:1,5
1842:6,23 1844:25
1881:14,18 1887:3
1905:18 1937:4,6

**policing** 1725:2

**policy** 1641:4 1642:11,13
1643:25 1644:20,21
1646:22 1648:14 1649:3,9,
12,18,25 1650:2 1658:9
1659:18 1663:24 1664:17,
18,19,23,25 1665:19,21,24
1668:18 1671:13,18
1672:4 1687:18,24 1688:7
1690:14 1691:10,22
1692:15,19,24 1693:19

**powered** 1709:16

**powerful** 1829:24

**Powerpoint** 1925:23
1926:10,14,19,21 1927:1,
24 1928:4,18 1931:10

**Powerpoints** 1928:1

**practical** 1643:16

**practice** 1643:19 1650:23
1651:6 1902:15 1904:10
1905:3 1932:14 1948:2
1953:25 1954:6

**practices** 1642:8 1672:8
1758:10 1843:21 1846:1
1888:23 1889:3,7 1890:4,
9,17 1893:14,20 1894:14
1898:8,12,24 1899:5
1901:9 1905:16 1906:2
1907:10 1947:12,22
1982:6,15,18,21 1983:21
1984:12 1988:5

**pragmatist** 1987:20

**pray** 1641:15

**pre-abercrombie**
1647:10 1650:14

**pre-approval** 1663:24
1664:13 1665:25

**pre-knowledge** 1645:2

**preamble** 1973:24 1974:2,
4

**precede** 1947:21

**precious** 1764:2

**precise** 1916:25

**precisely** 1878:17

**predicate** 1735:20
1774:21 1948:11 1980:21

**predominant** 1987:24

**prefer** 1740:22,23 1879:19
1918:11 1928:24 1931:14
1932:19

**preference** 1651:17,18
1867:14

**preferences** 1652:3

**preferred** 1866:6 1868:1
1885:18 1887:25

**political** 1839:17 1844:3

**pondering** 1979:24

**portion** 1770:10 1777:7
1824:3

**portrayed** 1782:21

**pose** 1640:7

**position** 1642:14,17
1658:21 1674:9,18
1683:22 1687:11 1696:5
1762:12 1802:6 1804:14,
25 1813:5 1824:12,16
1826:2 1827:16 1877:8
1878:21 1891:9 1906:8
1932:17 1944:19 1953:10
1955:3

**positions** 1687:8 1824:15

**possibly** 1715:13 1845:10
1938:7

**post** 1643:7,10 1661:20
1666:7 1682:11,13,17,23
1766:15,18 1767:4,17
1770:20 1793:6 1835:16

**post-trial** 1912:13 1921:5

**post-verdict** 1920:18
1958:13 1960:12 1968:5
1990:10

**posted** 1654:23 1664:14
1756:25

**posterity** 1856:17

**posts** 1646:5 1652:3
1663:24 1665:25 1679:4,7
1684:8,9 1692:18 1713:9
1756:23 1757:20,23
1758:24 1767:5 1773:17
1837:22 1845:23 1846:4
1881:13

**posture** 1639:6

**potential** 1659:4 1901:4
1903:11 1960:8

**potentially** 1645:21
1687:23 1938:13,21
1961:3 1962:5 1966:18
1968:18 1970:25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 6 July 12, 2022           Index: prejudice..protected

**prejudice** 1637:17 1826:5 1966:16

**prejudiced** 1827:10

**preliminarily** 1822:24

**preliminary** 1735:14 1859:14

**premised** 1757:19

**preparation** 1702:11 1703:18

**prepare** 1702:9

**prepared** 1630:18 1744:17

**preponderance** 1851:8 1859:22 1949:23

**presence** 1731:6 1739:22 1751:10 1752:21 1753:9 1857:16

**present** 1673:11 1704:14 1705:7,8 1708:11 1741:8 1759:20 1826:8

**presentation** 1824:18

**presentations** 1744:1

**presented** 1680:25 1704:16 1777:8 1815:1 1827:2 1828:11 1844:12 1847:7 1862:8 1887:20

**presenting** 1748:9 1821:21

**preservation's** 1936:9 1943:24

**preserve** 1865:18 1868:9, 10,12 1939:2 1943:12

**preserved** 1856:24 1865:24 1867:13 1868:19 1871:3 1877:11 1936:1

**preserving** 1868:4

**preside** 1700:6,18

**presided** 1700:8,22

**president** 1646:7 1754:13 1761:2 1762:23 1763:20 1765:8,13,19,22 1766:20, 22 1767:7 1778:3 1786:19 1789:20 1793:3 1795:1 1797:5 1799:7 1806:11,20 1807:9,11 1808:5,14 1809:25 1810:22 1812:5

1813:4 1835:13 1838:10, 12,22 1843:5 1844:5,19,22 1848:9 1912:8 1938:12 1939:19

**presidential** 1838:12

**presides** 1737:14

**presumes** 1871:8 1872:5, 10

**presumption** 1844:10,15 1871:16

**presupposes** 1951:23,24 1952:10 1956:5

**pretrial** 1636:12,21,25 1639:6 1860:9

**pretty** 1677:13 1678:15 1682:21 1683:19 1698:14 1702:11 1706:13 1710:14 1720:11 1721:5 1723:1 1726:8 1727:25 1729:13 1730:7 1747:8 1855:15 1912:21 1930:22

**prevent** 1912:25 1936:17

**prevented** 1843:9

**preventing** 1850:21

**previous** 1675:24 1680:11 1683:8 1705:16,18 1725:14,24 1994:7

**previously** 1671:9 1760:11 1771:3,24 1787:14 1881:9 1936:10

**primarily** 1697:8 1930:9

**principle** 1883:23

**principles** 1746:12,13

**print** 1852:10,15 1853:3 1995:21 1996:9

**printed** 1853:6

**printing** 1832:4,7 1925:6

**prior** 1634:25 1644:2 1674:14,15 1675:15,17 1677:8,9 1681:7 1681:1 1696:23,24 1702:3,21 1703:3 1727:1 1732:20 1733:18 1765:15 1774:9 1775:4,14 1776:5 1777:15 1792:18 1902:21 1991:3 1995:18

**private** 1796:22 1835:12 1849:17 1936:20 1937:1

**privately** 1837:17 1839:5

**pro** 1735:2 1764:11 1850:10,12

**probation** 1745:7

**problem** 1632:20 1633:14 1634:14 1653:3 1750:5 1756:23 1866:11,13 1875:14 1901:2 1961:19, 20,23,24 1966:8 1970:24 1977:14 1982:12

**problems** 1675:25 1761:25 1858:6 1940:20 1959:18 1960:14,17

**procedurally** 1751:14

**procedure** 1665:24

**procedures** 1699:12 1716:12 1937:4,6

**proceed** 1654:2,6 1669:9 1670:10 1686:16 1695:21 1830:10

**proceeding** 1638:8 1770:18 1771:25 1772:8, 10 1777:15 1779:8 1866:9 1867:12

**proceedings** 1636:13 1667:8 1669:4 1735:9 1736:5 1741:2 1750:2 1752:24 1773:2 1775:20 1781:7 1814:24 1815:24 1816:18 1817:18 1921:5 1934:17 1998:25

**process** 1647:21 1652:6 1663:23 1664:5,22 1676:3, 17 1677:4 1679:16 1698:8 1701:11,17 1703:16 1710:11 1714:16 1716:5 1717:4 1718:4 1726:18 1728:11 1729:22 1730:12, 20 1732:7,11,12,20 1733:3,6,15,17,20 1734:16 1736:14 1737:4,5 1747:4 1847:3 1851:13

**processes** 1699:7 1834:7

**processing** 1869:25

**professional** 1698:25 1801:5,6 1931:6

**professionals** 1743:18

**project** 1881:25

**promise** 1713:5,13

**promoted** 1696:16

**promotion** 1696:20

**prompt** 1684:1

**prong** 1842:12,19 1844:1

**prongs** 1843:25 1844:7

**proof** 1735:12,15,24 1739:7,23 1742:1,9 1998:9

**prop** 1850:14

**proper** 1868:2 1874:2 1883:2 1933:12 1956:19

**properly** 1774:10 1775:2 1878:2

**proportion** 1966:23

**proportionate** 1961:8,11, 25 1962:2,19

**proposal** 1717:20 1718:14 1917:23 1987:11

**propose** 1730:16 1735:13 1887:18 1904:24 1905:7 1932:11

**proposed** 1897:7,20 1925:17 1932:20 1945:5 1947:24 1957:8 1972:10

**proposing** 1914:13

**proposition** 1641:11 1643:6 1879:18

**proselytize** 1903:20

**protect** 1758:16 1841:20 1878:18 1937:11

**protected** 1659:20 1663:17 1754:15,23 1756:10 1757:20 1767:19, 21 1771:17,18 1797:18 1798:16 1810:23 1813:18 1838:3 1840:6 1842:4,5,22 1845:12,22,24 1848:20 1849:2 1875:16 1877:25 1878:1 1883:19 1884:20 1886:21,25 1900:6,7,10, 16,22 1936:16 1937:19 1938:6,18 1944:14,21,25 1945:8 1991:1,24 1992:7,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                Index: protection..questions

9,24

**protection** 1822:20,25
1848:19 1849:3,11 1850:7
1881:22 1883:4,7,14
1885:1,16

**protections** 1840:10,13
1848:22 1881:20

**protective** 1874:25 1937:7

**protest** 1845:2

**proud** 1681:3

**prove** 1869:22 1874:22
1875:9,10 1889:17,21
1892:11,24 1893:10,12,19
1894:7 1895:11 1902:1
1924:5 1955:12 1990:3

**proved** 1936:12 1945:6
1948:1,23 1953:4 1972:13,
16 1992:6

**proven** 1989:21

**proves** 1955:24

**provide** 1645:20 1646:15
1651:21 1652:1 1698:21
1706:9,15 1748:2 1822:1
1881:16 1903:1,19

**provided** 1651:25 1704:25
1705:2 1706:21 1708:11
1723:17 1744:17 1781:10
1882:24 1903:14

**providing** 1825:25

**province** 1900:19

**proving** 1892:21

**proximity** 1849:14

**Pryor** 1628:12 1631:20
1632:11 1633:4 1634:3
1653:19 1654:3,6,8
1655:1,2,21 1656:2
1657:22 1658:7 1660:4,22
1661:10,15 1662:9 1663:7,
9,12,13 1665:12,17
1666:8,18,20,21 1669:24
1670:9,23 1671:12,22
1672:9,17 1673:13
1685:15,16 1749:1
1750:25 1751:11,14
1752:3,19 1753:8,23,24
1765:24 1767:24 1768:18,
23 1769:6 1772:3,13,20
1773:1,7,10,19 1774:10,18

1775:5,11,17,24 1776:7,
15,21 1778:9,15,18
1779:17,21 1781:14,19,21
1783:23 1784:3,19 1785:1,
9,14,25 1787:13 1788:12,
22 1789:3 1791:2,7
1792:6,16,19 1793:25
1794:2 1795:12,15
1796:13 1797:10,24
1802:1,5,17 1803:1,5,19,
21 1804:13 1805:6,13
1806:7,13 1807:3,17,21
1808:16 1811:1,5,9,14,17,
19 1812:9 1813:7,13
1814:18 1815:6,21
1816:14,20 1817:3,23
1818:20 1819:2 1820:13,
23 1821:1,9,15 1823:21
1827:4,6 1829:5,10 1831:8
1832:21,23 1833:7,10,18
1835:8,19 1836:3 1852:17
1853:8 1854:7,10,14
1857:19 1926:17,22,25
1927:3,16,20 1928:9,25
1929:10,13 1962:13,16
1964:10 1967:20 1968:1
1969:3,20 1970:1,16,22
1971:16,23 1972:3,4,20
1973:3,18 1985:5,9
1996:23,24 1997:12

**public** 1679:9,10

**publish** 1630:10 1658:4
1669:23 1670:22 1708:21
1709:1

**published** 1630:5 1668:10

**publishing** 1630:7 1671:4

**pull** 1669:21 1678:21,23
1681:14 1689:1 1704:19
1705:17 1718:17 1741:18
1747:11 1858:9,23
1882:11 1912:17 1928:6,
15 1930:14 1940:2
1949:20 1954:22 1955:21

**pulled** 1667:10 1727:21
1821:23

**pulling** 1929:2,4,5 1930:6
1952:3

**punish** 1800:7

**punishment** 1869:16

**punitive** 1661:11 1911:11,
12,16,17 1912:1,19 1918:6

1919:1,3,16 1981:14,21
1986:23

**punitives** 1912:5 1913:13
1919:9,18 1975:7,10,19,
20,25 1980:16,22 1981:19
1987:7

**purporting** 1904:4

**purpose** 1741:25 1746:16
1778:7 1828:4 1873:19,22
1878:15 1880:1 1934:15
1988:13,14 1990:19

**purposes** 1635:2 1784:25
1813:21

**pursue** 1723:21

**purview** 1912:17

**pussy** 1764:25

**put** 1629:17 1632:16
1633:6 1645:19 1646:14
1662:23 1663:2 1670:6
1676:13,15 1689:3 1691:6
1722:3 1723:14 1725:22
1727:16 1731:15 1747:20
1776:24 1778:22 1812:18
1821:18 1827:19 1836:11
1849:13 1850:8 1861:6
1868:7,8,9 1895:16
1897:18 1903:24 1909:25
1917:21 1921:1 1927:6,10,
24 1934:4 1935:15
1954:21 1956:11 1958:6
1959:18 1970:3 1971:24
1972:20 1977:15 1987:2
1989:4 1990:13,14
1994:16

**putting** 1664:11 1802:2,6
1811:9 1829:15 1861:5,7
1866:19 1906:6 1920:25
1921:3 1922:9 1977:14,17
1994:22

**Q**

**qualities** 1744:12

**quality** 1743:14

**quantum** 1971:8

**queasy** 1678:10

**question** 1636:23 1638:20
1640:8 1645:18 1646:17

1654:22 1656:1 1657:1,2
1659:24 1665:23 1675:7
1684:3 1695:15 1701:5
1710:19 1713:23 1738:5
1745:21,25 1746:1,2
1750:4 1754:8,10 1755:4
1756:15 1764:13 1766:3
1768:2,12 1770:7 1771:5
1772:16 1775:13,16,23,25
1776:22 1777:1 1780:15,
21 1781:2,10,15,22,25
1785:4,10,21 1786:7,11
1788:16 1790:21 1791:11
1792:7,11 1793:24 1794:4
1795:17 1796:8,9,18
1797:14 1800:15,19,22
1802:5 1804:3,17 1806:18
1807:24,25 1808:4
1810:11,15,17 1815:9,10,
12,17 1816:10,12,20,23
1817:5,6,9,14,15 1818:2
1819:2 1820:6 1828:24
1831:6 1832:21 1836:2,6
1853:1 1865:12 1867:8
1868:21 1880:21 1884:4
1913:20 1915:11,12,24
1918:14 1920:21 1925:19
1926:23,24 1934:8,9
1936:5,7,11 1938:17
1939:7,8,11,14 1940:11,
14,16,23 1941:10,15,21
1942:10,17,19,22 1943:1,
4,22 1944:8,11,13,17,20
1945:4,10,14 1946:4,24
1947:2,20,21,25 1948:7,8
1950:3,10,11 1951:20
1953:21 1955:1 1957:12,
13,17 1959:1,19 1960:13,
15,19 1961:7 1962:19
1963:11,15 1964:7,12,16
1965:4,5,17,18,19,22,23
1966:11,12 1967:1 1968:8
1969:1,21 1973:11
1974:13,14,18,25 1975:4,
14 1976:17 1977:1,9,19,23
1978:19 1979:17,22
1980:11,18 1982:10
1986:12 1987:4 1989:8,9
1990:9 1991:11,15 1992:1,
5,20 1993:18,21 1994:4
1997:25

**question-and-answer**
1929:20,23

**questions** 1632:2 1633:19
1654:3,5 1657:14 1659:3

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 631 of 642   PageID 11572

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                    Index: quibbling..reduction

1664:7 1671:12 1672:14,
19,20,21 1677:5 1685:14,
17,18 1686:12,13 1690:11
1694:16 1695:13 1730:11
1735:14,21 1736:8
1738:13 1739:6,10,12
1748:23 1749:2,4,5
1757:7,10 1768:2 1770:16
1773:12 1800:18 1810:13
1815:14 1821:24 1823:18
1825:18 1826:12,13
1827:12 1830:11 1831:9,
18 1832:10,17,18 1834:5,
16 1835:25 1836:3,6
1858:3 1870:7 1874:18
1900:12 1921:11 1925:4
1933:19,25 1934:2,3,5,7
1939:21 1940:3,19,23
1944:10 1957:25 1960:10,
21 1964:20 1965:6 1966:7
1970:2,7,16 1971:8
1972:11 1973:6,23 1974:2,
3 1976:21 1978:12
1991:10 1992:12,18
1995:18 1997:20,21
1998:18

**quibbling** 1876:5

**quick** 1667:7 1735:7
1831:16 1843:4 1913:5
1939:14

**quickly** 1726:24 1773:10
1938:25

**quo** 1719:21

**quote** 1818:10 1879:3

**quote/unquote** 1646:10

**quotes** 1646:10 1877:17
1879:7

---

**R**

**R-O-S-S** 1704:13

**Railway** 1737:7 1884:2,8
1944:12,14,21,22 1945:1,9
1991:2,24 1992:8,9,23,25

**raise** 1636:21 1637:12
1655:5 1660:14 1661:3
1686:7 1695:5 1820:24
1840:1 1873:14 1995:5

**raised** 1636:17 1640:20
1644:6 1661:8,17,18,19

1662:25 1726:1 1902:20
1903:6 1951:18 1954:2,9

**raises** 1646:24 1647:20
1660:13

**raising** 1636:14 1644:22

**ran** 1640:11

**rational** 1845:5

**rationale** 1844:20

**re-excused** 1672:22

**re-form** 1990:10

**re-orgs** 1700:15

**reach** 1634:12 1635:17
1659:8 1664:6,10

**reached** 1729:1

**reaching** 1689:11

**reaction** 1715:21,24
1731:19

**read** 1637:6 1658:18
1662:24 1665:1,3 1666:9,
10 1669:15,17 1670:3,6
1682:2 1707:5 1711:21
1715:6 1719:4 1779:14,17,
20 1780:2,4,18,25 1781:3
1785:22 1814:15,16
1817:1 1852:11,13,23
1853:3,7 1855:1,2,14,19
1860:9 1866:10,11,20
1867:9,16 1869:7,10
1876:20 1885:18 1891:12
1897:18 1916:21 1925:18
1926:12 1935:21 1936:12
1954:24 1955:8 1985:19
1996:15

**reading** 1725:22 1775:8
1786:8 1814:15 1852:22
1853:19 1855:16 1866:13
1871:1,2 1885:10 1898:16
1934:22 1937:22 1945:5

**reads** 1779:20 1895:13
1956:12 1961:20

**ready** 1660:8 1759:16
1858:10 1859:1,11
1933:25 1934:1

**real** 1677:12 1818:7
1939:14

**realize** 1946:12

**reask** 1769:9 1785:13
1788:16

**reason** 1645:4,9 1662:7
1668:16 1682:12 1716:13
1725:19 1755:11,13
1758:5,8 1790:6 1828:16
1840:2,4,7,8,9 1843:12
1851:17 1881:11,15,17
1884:10 1891:1 1892:12
1893:14,16 1894:25
1895:4 1936:22,23,24
1963:22 1964:14 1979:9

**reasonable** 1646:15
1647:14,24 1651:19,21
1652:1 1658:12 1706:19
1824:8,10 1833:21
1846:19 1932:11 1933:9,
14 1948:18,23,24 1949:5
1951:15 1952:20 1953:4,
19,23 1954:9,12,21
1955:1,21 1956:4,17

**reasonableness** 1954:19

**reasoning** 1650:1

**reasons** 1718:4,7 1755:14
1828:2 1834:25 1840:3
1846:9 1852:2 1881:9
1882:1,9 1886:4 1906:10,
13 1946:19

**reassert** 1946:18

**rebut** 1997:7

**rebuttal** 1673:12 1750:7
1823:18 1831:22,23
1852:6 1854:6,8,10 1997:5

**recall** 1655:8 1659:2
1664:15 1673:11 1678:25
1688:17,18 1689:9 1691:8,
11 1692:18,20 1694:7,18
1704:6,9 1710:18,25
1712:19,20,24 1715:11
1733:3,6,13,16,20 1734:16
1740:15 1750:14 1760:11
1762:11,12,14 1800:16
1833:25 1837:23 1839:21
1845:16 1849:19 1909:10,
20 1935:5,9

**recalled** 1864:23

**recalling** 1712:6

**recap** 1709:19

**receive** 1696:20 1719:22

**received** 1670:16 1676:22
1688:22 1692:11 1703:5
1756:8 1766:16

**recent** 1682:11,17 1856:16

**receptiveness** 1681:9

**recess** 1652:14,18
1739:18 1831:14 1857:7,
10 1925:10,13 1998:23

**recited** 1643:4,5

**recognize** 1704:21
1747:14 1756:9 1934:20

**recognized** 1755:25

**recollection** 1649:7
1668:6 1691:24 1692:9
1713:8 1781:6 1782:6
1820:9 1865:9 1887:24

**reconcile** 1720:24 1721:3,
23 1728:23

**record** 1635:4,18 1638:11
1650:21,25 1668:2 1674:3
1695:18,25 1718:10
1722:10,18,21,24 1723:2
1735:25 1739:10,21
1744:11 1751:21 1810:20
1817:23 1852:3 1856:24
1857:14 1865:16 1866:20
1867:4,6,10,17 1869:3,8,
10 1885:11,18 1889:16
1890:1 1906:9 1908:22
1909:4,10,15 1913:16,19
1920:19 1923:20 1938:24
1941:23 1957:7 1985:4
1989:1

**records** 1668:22 1930:17

**recoverable** 1965:10
1972:12

**recovery** 1958:14,23,24
1959:8,14,15,24 1960:1,6,
12 1962:24 1963:8 1964:3,
23 1970:4,21 1971:21
1972:2,6,15,17

**red** 1863:2 1874:16

**redactions** 1630:18

**redirect** 1669:13 1833:7

**reduced** 1720:22

**reduction** 1745:6

**reeling** 1682:22

**refer** 1658:20 1726:9 1867:12 1927:7 1933:8 1935:2

**reference** 1638:18 1667:11 1765:9 1766:20, 25 1767:2 1823:17 1866:9, 21 1867:23,24 1868:14,18 1869:8,9 1913:12 1919:7, 15 1935:18,20 1940:1 1945:23

**referenced** 1729:5 1766:13

**references** 1868:12

**referred** 1654:10 1839:16

**referred-to** 1658:5 1671:5 1709:2

**referring** 1718:13,15 1935:22

**refers** 1841:10 1911:20 1913:1 1950:20 1978:19

**reflect** 1641:3 1817:24

**reflected** 1721:8

**reform** 1871:20 1976:11 1991:1

**reformed** 1976:14 1991:3, 17

**refresh** 1713:8 1781:6 1782:6 1857:15

**refused** 1641:15

**refusing** 1907:8

**regard** 1641:1 1649:11 1651:14 1655:11 1657:8 1658:11 1859:15 1911:15 1919:4 1972:21

**region** 1700:10,11

**regional** 1696:8,10,11,25 1697:4,5,8 1700:5

**regular** 1765:15 1790:1 1792:24 1794:9 1805:23

**regulations** 1720:13

**reinstate** 1719:9 1722:2, 20 1729:18

**reinstated** 1720:23

**reinstatement** 1727:1 1920:7

**reiterate** 1642:16 1870:16 1902:19 1906:25 1946:11 1947:9 1956:24 1997:11

**reiterating** 1922:5 1942:18

**reject** 1871:2 1877:10 1885:10 1887:6 1902:17 1903:3,22 1905:21 1906:3

**rejecting** 1856:22 1892:7

**relate** 1770:11

**related** 1651:5 1687:17,24 1688:20,21 1690:11 1691:21 1692:11,20 1903:17 1947:20 1981:25

**relatedly** 1891:1

**relates** 1983:15

**relating** 1894:6

**relations** 1670:13 1680:4 1687:9,20 1688:8,19 1689:23,25 1693:6,13,15 1702:13 1703:7 1708:2,7 1709:9 1715:6,11 1730:20 1748:5 1756:9 1758:22 1838:21 1884:3,6,8,25

**relationship** 1661:2 1698:18

**relationships** 1920:8

**relative** 1690:22

**release** 1723:13,15,19,20 1726:16 1964:4

**released** 1724:10 1841:3

**releasing** 1729:8

**relevance** 1636:10 1637:16 1661:9 1662:3 1700:25 1712:21 1745:18 1795:13 1796:16

**relevant** 1643:10 1650:12 1674:25 1688:2,5 1807:4 1863:25 1963:14

**relic** 1632:21

**relied** 1824:24

**relief** 1909:3

**religion** 1644:11 1650:9 1651:5 1655:7,17 1656:4, 11 1662:7 1756:10 1850:8 1897:1 1898:4 1902:9,10 1982:1 1983:5

**religions** 1797:17 1798:15

**religious** 1642:8 1643:19, 23 1644:23 1645:4,9 1646:6,9,24 1650:4,18,23 1651:15 1660:7,13 1661:4, 21,22 1663:1 1672:3,7 1755:15,18,22,23,25 1758:1,9 1795:10 1797:23 1798:22 1833:1 1834:8 1835:15 1839:8 1840:15 1841:8,10,13,17,24 1842:10,13,15 1843:20 1845:25 1846:23 1848:25 1887:19 1888:22 1889:2,6 1890:3,9,16 1892:22 1893:13,19 1894:13 1898:6,7 1901:8,11 1902:15 1904:9 1905:3,15 1906:1 1907:9 1932:13 1947:11,22 1948:2 1953:24 1954:5 1981:7 1982:3,5,7 1983:8,14,15, 20 1984:7,12 1986:24 1987:2,14 1988:1,4,13,16, 21,24

**relinquish** 1938:13

**relinquishes** 1850:25

**remain** 1985:16

**remained** 1910:13

**remaining** 1726:23

**remains** 1726:19

**remedy** 1920:9

**remember** 1631:7 1666:3, 5 1677:22 1678:3 1683:5 1692:2 1731:20 1740:17 1744:20 1760:24,25 1777:16 1779:1,7,10 1814:2 1836:14 1909:7 1935:3,22 1939:2

**remind** 1668:18 1680:1

**remorse** 1681:2 1746:23 1767:10,23 1768:6 1769:11,14 1770:8,11 1771:20

**remorseful** 1711:13 1767:12 1768:8,15

**remote** 1685:8

**remove** 1756:21 1882:14 1990:5

**removed** 1722:24 1727:20,22,23 1746:6,16 1953:19 1979:18

**removing** 1954:3

**render** 1741:14

**rendered** 1770:23

**renew** 1856:13,16 1975:10 1977:6 1994:6

**renewed** 1831:25 1856:22

**rep** 1628:21 1680:7

**repeat** 1787:18 1789:9 1806:18 1810:17 1812:15

**repeatedly** 1642:23 1786:1 1933:9

**repeats** 1979:16

**repercussions** 1803:18

**rephrase** 1665:15 1776:11 1835:7

**replace** 1982:20

**replacing** 1762:6

**report** 1636:12,17,24 1659:4 1756:14 1799:8,14, 20 1801:2,10 1806:5,12,21 1808:6 1809:8,9 1810:1,24 1815:12 1816:5,13 1817:12 1818:5,7,13,25 1876:24 1888:25 1890:10, 18 1937:13

**reported** 1808:14,17 1817:10 1818:3 1834:18 1837:15 1839:11 1840:18 1881:12 1892:15 1893:15 1896:24 1898:2

**REPORTER** 1890:12

**reporting** 1841:11 1843:6 1896:25 1898:3

**reports** 1646:8,9

**represent** 1694:2 1743:5 1748:8,20 1761:4 1790:11

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 633 of 642   PageID 11574

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                               Vol 6 July 12, 2022                    Index: representation..Ross

1845:13 1889:23,24

**representation** 1635:2
1743:9,15 1744:14,18
1841:15,20 1842:11,18
1843:18,24 1844:16
1847:2 1863:19 1864:20
1870:8 1971:13 1976:17

**representative** 1693:14
1704:6 1708:2 1714:1
1747:25 1748:4

**representatives** 1704:3,7
1713:19 1727:9 1730:1
1770:4

**represented** 1682:15
1734:8 1743:11,21 1745:1
1841:18 1842:21 1844:4,
24

**representing** 1683:18
1730:1 1768:9 1777:22
1794:10 1827:15 1844:20
1845:9,10

**represents** 1729:21
1932:24

**reprint** 1996:14

**repudiate** 1953:11

**repudiated** 1843:18

**request** 1632:11 1640:21
1642:18 1643:8,25
1658:16 1719:9 1751:7
1752:11,14 1797:13
1821:1 1823:3,13 1824:17
1862:16 1873:17 1881:25
1882:14 1885:10 1886:4
1887:6 1888:12,14 1892:6
1893:23 1901:10 1902:17,
21,22,24 1903:2 1905:21
1907:12,15 1918:23
1926:2 1933:2,16 1934:12
1935:23 1939:6 1940:21
1941:4,8 1942:2 1943:13
1945:19,24 1946:22
1950:15 1953:15 1957:23
1985:11

**requested** 1727:23
1735:11 1758:12 1882:23
1950:14,19

**requests** 1861:2 1906:24
1907:2

**require** 1734:10 1821:19

**required** 1644:2 1651:6
1688:1 1727:1 1728:2,7
1734:2 1827:19 1939:21

**requirement** 1642:7
1648:8,17,18,19,24
1899:22 1902:3 1911:18
1923:16 1932:15 1947:23
1948:3 1953:25 1954:7

**requires** 1659:18 1737:7
1851:7 1905:17 1933:11
1938:13

**reread** 1785:18

**research** 1667:24 1738:22
1753:17 1819:24 1836:20
1856:8

**reserve** 1694:17 1749:7,15
1872:22 1873:5 1997:3

**reserved** 1850:24

**reset** 1857:2

**resolution** 1732:10

**resolve** 1699:7 1973:15

**resolved** 1649:1 1725:23
1729:12 1756:23

**resolves** 1932:12

**respect** 1730:25 1734:17
1746:14 1758:21 1914:9
1958:1

**respectfully** 1821:22

**respond** 1646:23 1864:4

**responded** 1913:2,14
1914:3,14

**responding** 1797:4

**response** 1637:20
1642:25 1645:2 1646:12
1649:4 1710:18 1757:15,
17 1764:15 1815:11
1827:4 1846:13 1864:14
1897:8 1899:19 1912:4
1924:2,7

**responsibilities** 1677:3

**responsibility** 1659:6,7
1961:9,11 1962:1,20
1966:23

**responsibility-staked**
1962:3

**responsible** 1658:12
1681:11 1687:16 1962:7
1964:17 1967:13,21

**responsive** 1797:11

**rest** 1678:11 1683:1
1750:10 1751:1,21
1753:12 1765:15 1830:7
1836:15 1837:1 1854:22

**restart** 1722:21

**restate** 1807:25

**restates** 1729:4

**rested** 1759:19 1830:18

**resting** 1820:20

**restore** 1716:20

**restored** 1719:21

**restrictions** 1673:10,16
1824:11

**restroom** 1652:11

**rests** 1751:9,13,15
1752:11,20 1753:5
1757:12 1759:4 1836:12

**result** 1725:5 1786:17
1884:18 1959:9 1960:9

**results** 1841:6

**retaliated** 1877:18,24
1945:7 1992:6

**retaliation** 1687:18,25
1690:14 1691:22 1692:15
1725:4 1754:7 1837:13
1849:13 1873:12 1937:16
1938:2 1991:15

**retired** 1715:14

**return** 1716:24 1721:24
1836:8

**revealed** 1839:12

**review** 1677:10,24
1701:24 1703:13 1707:7
1714:23 1716:4 1718:5
1730:23

**reviewed** 1677:20 1678:12
1684:2,5 1701:18 1702:21,
22,24 1710:4 1715:4

**reviewing** 1665:25
1684:14 1720:3 1925:8

**revisit** 1640:3 1805:17
1921:5

**rid** 1761:24

**rightful** 1653:17,23 1836:8

**rights** 1726:12,16 1755:15
1787:8 1792:3,22 1820:12
1848:8,11,12,13 1870:21
1871:17 1887:4 1909:11
1936:15 1937:7,11,14,15,
19 1938:6,14 1944:12,22
1981:8 1982:3,7,20 1983:4
1987:3,14 1988:13,17,21,
24 1991:3,25 1992:23
1993:23

**righty** 1859:12

**rip** 1826:15

**rise** 1628:3 1652:17,19
1739:2,19 1753:19 1820:3
1831:13,15 1836:22
1856:8 1857:9,11 1925:12,
14 1998:24

**risk** 1731:12 1877:22
1966:16

**RLA** 1737:8 1754:7,13
1755:17 1757:21 1795:21
1813:19 1837:13 1839:9
1840:13 1845:21 1847:4
1873:12,20 1878:1,15
1879:21 1883:20 1884:13

**RLA's** 1840:10 1881:20

**RLA-PROTECTED**
1754:12,14,25 1755:7
1837:19,21 1993:23

**robust** 1912:12

**Rocello** 1754:25

**role** 1674:11 1677:7
1690:6,10,12,18 1693:8,
15,17 1708:9,10 1732:8,12
1738:8

**roll** 1996:15

**roof** 1789:16 1791:5,25

**room** 1730:4,5 1742:3
1964:6

**rooms** 1704:1

**rosary** 1641:15

**Ross** 1704:13 1743:10,15,

17 1744:13,23 1745:2
1748:4

**rotation** 1740:25

**rough** 1752:18

**round** 1653:21 1666:25
1668:24 1672:16 1831:1,
18,20 1835:20

**rounds** 1629:21 1830:6

**routine** 1673:22

**ruined** 1678:10

**rule** 1640:24 1643:15
1686:14 1695:18 1738:3
1799:2 1821:12 1830:9
1831:25 1837:4 1928:3,4
1972:19

**ruled** 1636:7 1735:21
1995:24

**rules** 1694:9 1699:25
1721:4 1787:7 1788:9,20
1824:19,24,25 1826:17
1827:2 1905:4 1956:15

**ruling** 1757:11 1759:2
1805:14 1825:12 1827:24
1837:3 1852:3 1856:24

**rulings** 1634:25 1637:8
1831:21

**run** 1638:6 1698:7 1832:9
1915:25

**running** 1697:19 1700:25
1701:2 1772:15 1828:13
1835:3,5 1941:3,9,16
1942:7,13 1943:12 1981:3

**runs** 1887:12

**S**

**S-I-M-S** 1696:1

**saddened** 1735:5

**safe** 1891:18

**safety-sensitive** 1728:2

**sake** 1726:22 1754:9
1936:9 1943:24 1954:18
1984:3 1992:16

**sans** 1938:7

**sat** 1731:21

**satellite** 1685:7

**satisfaction** 1960:6
1961:16 1962:5,8 1972:18

**satisfies** 1956:16

**save** 1757:11 1759:2
1997:12,16

**saves** 1876:1

**saving** 1757:13 1996:19
1997:9

**savvy** 1677:12 1683:20

**Scalia** 1648:15

**scattered** 1697:19

**Schaffer** 1715:14

**schedule** 1719:14
1720:11 1728:16

**schedules** 1719:16
1728:14

**Scheduling** 1675:4

**scheme** 1876:2 1998:7

**Schneider** 1642:22
1652:21,24 1653:16
1654:1,9 1672:22,25
1676:20 1680:3 1683:4
1689:8 1716:7 1755:5,24
1756:8 1758:13 1766:17
1824:23

**Schneider's** 1716:10
1758:21

**scintilla** 1937:19 1938:5

**scope** 1637:9 1838:4
1921:16

**screen** 1703:11,12
1898:17,18 1945:3 1972:9
1980:4

**screens** 1742:11

**screwed** 1946:16

**scrivener's** 1995:23

**scroll** 1764:7 1780:9
1886:14 1914:7

**scrolling** 1941:18

**search** 1936:4

**searches** 1930:17

**searching** 1800:13
1923:24

**seat** 1628:4 1685:21
1695:9 1836:8

**seated** 1653:25 1686:6
1739:20 1740:24,25
1742:17 1753:21 1759:18
1832:13 1836:24 1854:4
1856:10 1857:13 1925:15

**seconds** 1972:7

**section** 1671:13 1722:13
1733:12 1858:5,7,8
1860:11,17 1862:19
1863:18 1870:7 1873:6,8,
10,15,19 1874:5 1876:15
1877:17 1878:1,24 1879:7,
20 1880:4,10 1882:16,18
1883:3 1886:5,6,11,15,21
1887:7,13 1894:16,20,21
1901:13,18,22 1907:15,24
1911:13 1918:25 1921:14

**security** 1628:3,24 1629:2
1640:16 1652:17,19
1739:19 1831:13,15
1857:9,11 1925:12,14
1998:24

**seek** 1882:22 1886:23
1934:18,24 1936:10
1939:14 1943:21,22

**seeks** 1943:2 1977:23

**sees** 1764:6

**select** 1740:20

**selected** 1740:18

**send** 1630:22 1631:1,12
1633:9,11,16 1643:5
1644:25 1651:2 1664:3,13
1668:14 1709:19 1731:11
1767:5 1777:3 1789:23,25
1795:9 1796:3,4,20,21
1799:12,17 1800:23
1802:12 1831:24 1832:2
1835:10 1852:20 1853:4,
10,13,23 1863:3 1869:7
1874:15 1891:23 1892:3
1964:5 1966:11 1973:10
1989:6 1995:20

**sending** 1631:21,24
1644:12 1668:7 1680:9

1709:10 1711:4 1712:16
1763:13 1770:19 1776:19
1778:3 1783:17 1784:12
1786:9,16 1794:8 1796:25
1797:2 1840:4 1990:8

**sends** 1717:3

**senior** 1674:10 1687:9
1696:4,10,16 1697:3

**seniority** 1719:11,15,18,
20 1909:11,21 1910:2,6

**sense** 1634:4 1636:22
1668:3,4,5 1735:18
1765:20 1829:9 1832:9
1865:7 1866:23 1868:15
1874:17 1892:5 1912:15
1915:4 1926:13 1932:1
1950:18,22 1954:15
1956:3,10 1959:18
1971:22 1973:17 1983:21
1984:21 1987:7 1996:17,
25

**sentence** 1671:10
1764:18,19 1864:7,11
1869:21 1872:6 1873:17
1877:16 1879:8,10
1898:12,20,25 1904:16
1905:1 1910:10 1914:11
1917:3 1919:8 1921:13
1944:16 1946:12 1949:22
1955:22

**sentences** 1865:23,25
1869:1,7,12,16 1886:15

**sentiment** 1995:12

**separate** 1699:14,19,23
1700:2 1733:8 1781:10
1838:11 1884:24 1935:8
1943:21 1965:16 1970:21
1973:6 1974:2,3 1979:4
1991:11

**separation** 1800:18
1810:13 1943:10

**serve** 1990:19

**served** 1697:24 1721:6

**serves** 1880:1 1988:13

**service** 1697:11 1719:15,
18

**session** 1630:2

**set** 1630:23 1633:5 1670:1

1703:22 1707:19 1727:10
1733:10 1824:19 1826:17
1902:7 1971:1

**sets** 1870:13

**setting** 1931:6 1937:3

**settled** 1649:1

**settlement** 1716:23
1717:6,15 1729:4,7

**Seventh** 1820:12

**severity** 1678:19

**sexual** 1687:17,24
1690:13 1691:21 1692:14
1725:3 1793:9

**shape** 1882:5

**share** 1683:3 1713:1
1756:2 1779:15 1925:24

**shared** 1909:3

**sharing** 1846:1 1929:8,9
1954:6

**sheets** 1826:15

**shhhhh** 1882:2

**shift** 1639:14 1824:14

**shifted** 1632:21

**shifting** 1755:17

**shifts** 1676:4

**shocked** 1682:21 1683:7
1731:23

**shocking** 1681:2,5

**shop** 1734:5

**short** 1753:14 1843:10

**short-circuited** 1652:6

**short-handed** 1700:16

**shortly** 1750:24

**shot** 1752:12 1834:14

**shots** 1703:11,12

**show** 1630:13 1645:10
1654:23 1667:5 1717:8
1756:16 1775:5,15
1778:16,25 1816:15
1832:9 1844:18,19 1845:8
1847:23 1848:4 1851:7
1898:15,18 1926:10

1927:24 1928:1,2 1929:19,
20 1931:5,9 1949:14
1953:12 1955:22 1972:9
1980:4 1985:18 1995:5

**showed** 1668:12 1767:23
1768:6 1781:5 1782:5
1846:8

**showing** 1775:16 1869:23
1892:21

**shown** 1756:17 1815:3
1837:15 1845:6

**shows** 1818:8 1846:6
1847:25 1848:5 1974:17

**shy** 1687:6

**sick** 1716:3 1722:16
1764:24

**side** 1632:19 1633:1
1822:14 1825:4 1874:1
1926:11 1950:17 1951:1,7

**sidebar** 1666:17 1667:7,9
1669:3 1735:7,10 1736:4
1749:25 1750:3 1751:9
1752:23 1773:3 1775:19,
23 1814:22,25 1815:23
1816:17,19 1817:17
1823:17 1997:15,17

**sidebars** 1666:13 1825:12

**sides** 1952:9

**sign** 1723:10,14 1730:25
1731:2 1762:14 1833:25
1834:1 1931:1

**sign-posting** 1934:4

**signal** 1858:25

**signed** 1723:20 1726:6,15

**significance** 1714:12
1728:18

**significant** 1647:11
1661:22

**signpost** 1788:17

**signs** 1960:9

**silently** 1779:14,18,20
1814:16

**silly** 1656:13

**Silver** 1923:4

**similar** 1737:16 1860:24
1861:12 1886:4 1929:25
1985:10 1991:1

**similarly** 1648:21 1651:12
1899:22 1900:14,21,25
1901:3,7,10

**similarly-situated**
1899:17,24 1943:2

**simple** 1723:1 1726:8
1785:21 1786:11 1916:2

**simplifies** 1637:24

**simplify** 1639:4

**simply** 1717:3 1758:15
1843:8

**Sims** 1635:24 1694:25
1695:2,7,11 1696:1
1698:13 1704:21 1711:21
1716:4 1722:5 1727:3
1730:24 1732:14 1734:20
1736:10 1742:20 1743:3
1747:14 1750:12,15
1755:24 1767:10 1769:2,
12 1823:17 1831:7

**sincerely-healed**
1892:22

**sincerely-held** 1755:21
1888:22 1889:2,6 1890:3,
8,16 1893:13 1947:11

**single** 1763:4 1846:17
1847:13 1850:16 1934:22

**sir** 1662:16 1695:10,16,20
1697:1,7,23 1698:3,16
1699:13 1700:8,11,24
1702:5,8 1703:1,9,11
1704:5,8,10,22 1705:21
1707:13 1709:6 1713:6
1715:18 1718:16,21
1723:11 1724:17 1729:6,
19 1731:18 1732:8 1737:1
1743:4,7,13 1746:8
1747:19 1748:24 1749:13
1864:22 1871:6,12
1899:11 1975:24

**sit** 1665:19 1835:9 1854:24
1963:23

**sitting** 1787:3 1828:7
1829:11 1865:8 1979:23

**situated** 1899:23 1900:14,
21,25 1901:3,7,10

**situation** 1647:15
1662:16,19 1758:14
1768:17 1916:16 1917:8
1938:8 1968:20

**situations** 1883:8 1917:5

**sixth** 1913:7

**skewed** 1880:21

**skip** 1976:19

**skirting** 1805:14

**slightly** 1923:6 1930:23

**slow** 1937:21

**small** 1908:6 1996:19

**smarter** 1987:2

**social** 1642:7 1649:3,18
1663:23 1664:11,19,22
1668:17 1677:14 1678:16,
17 1683:23 1685:10
1725:3 1755:20 1770:1,4
1771:10,15 1774:14
1777:7,12 1782:17
1783:16,17 1784:13,15
1834:13 1838:25 1841:2
1881:13,18

**solely** 1888:13 1938:9,11

**solutions** 1960:18

**solve** 1940:20

**solved** 1946:7

**somebody's** 1678:7,8

**Sonya** 1838:22

**sort** 1632:21 1650:9
1698:21 1756:9 1839:24
1844:3 1849:9 1883:17
1892:19,23 1902:4 1917:8
1939:15 1947:19 1957:22
1960:18 1968:9,15,19,25
1973:7 1976:12 1977:10
1982:24 1996:4

**sorts** 1691:7

**sought** 1851:3 1936:10

**sound** 1982:24 1983:16

**sounds** 1683:18 1698:13
1736:3 1768:19 1887:8
1941:7

**Southwest** 1628:14,15

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 636 of 642   PageID 11577

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                    Index: Southwest's..step

1629:23 1633:22 1634:7
1635:8,13 1639:8 1640:8
1642:2,20 1645:18,23
1649:17 1655:10,14
1656:17 1657:10,11
1658:8,21 1663:25 1664:3,
23 1665:8,20 1671:16
1672:4,24 1673:3 1674:8,
22 1676:3,6 1679:2
1682:14 1685:24,25
1687:3,4,8,12,15,21
1694:23 1696:3 1697:13,
22 1698:19,24 1699:5,14,
20 1700:3 1702:12
1703:25 1707:24 1712:1,
17 1714:13 1716:11
1724:10,13,15 1725:1
1729:9,10 1733:7 1734:4,6
1748:14,18 1753:4 1754:2
1755:10,19 1756:4,6,16,22
1758:8,14 1759:19 1763:5
1765:21 1787:11,20,23
1797:17 1798:16 1799:8,
14,20 1801:2 1802:15
1803:12 1806:22 1809:10,
20 1810:2,25 1815:13
1816:5,13 1817:12 1818:5,
15 1819:1,4,12 1823:10
1824:15 1826:7,12 1837:3,
4 1838:19,24 1839:18,20
1840:19,20,24 1842:6,22
1844:24 1845:19 1846:11
1851:11,24 1854:17,18
1855:4 1857:20 1859:17,
25 1860:5,13,20 1861:1,22
1862:14 1863:8,14
1870:22,24 1873:13,16
1877:18,24 1879:9,14,17
1881:6,12 1886:12 1887:2,
10 1888:19,20 1889:1
1890:24 1892:17 1893:16
1894:1,8,13 1895:6,15
1896:25 1898:3 1901:18,
19,20,23 1902:13 1906:6
1908:4,15,21 1910:8,14
1911:21 1912:24 1914:12,
13,17 1918:5 1919:11
1922:15,18 1923:12
1924:18,25 1933:22
1934:5 1936:15,20
1937:13 1939:9 1941:2,13
1942:5,12 1944:6 1945:7
1947:1,5 1948:4,10,25
1949:13,23 1950:1,20
1951:1,8 1952:2,15
1953:4,6,7 1954:25

1957:20 1958:1,23 1959:2,
14,16 1960:22 1963:20
1966:1,9 1968:22 1969:15
1970:11 1971:7,11,19
1972:22,23 1975:6
1978:11,17 1980:9,16
1983:3 1985:11 1986:13
1987:23 1992:6 1994:3,5,
9,22

**Southwest's**  1658:16
1741:12 1753:3 1755:1
1846:3 1851:14,16
1876:23 1888:21 1890:1,5
1905:10 1915:5 1947:13
1950:5 1971:15

**space**  1654:4 1686:12
1695:12,14

**span**  1727:14

**speak**  1707:3 1761:3
1773:8 1798:25 1807:8
1815:3 1826:7 1883:21

**speaking**  1645:23
1661:13 1702:2 1766:1
1768:21 1772:5,22 1773:4,
5 1781:17 1784:5 1788:19
1792:8 1795:14 1801:11
1802:3 1811:8,12 1884:19
1938:24

**special**  1883:6 1934:13,
18,23 1935:24 1941:4,8,
15,19 1945:19

**specific**  1643:8 1690:13
1763:13,14 1774:5
1802:11 1817:5,9,22
1818:2 1850:5 1865:23
1945:19 1949:5 1950:24
1951:2,7,16 1979:7
1981:21

**specifically**  1640:5
1660:20 1690:12 1764:23
1815:2 1845:18 1868:24
1879:1 1949:5

**specification**  1901:11

**specifics**  1701:7 1774:7

**speculation**  1764:15

**speech**  1673:17 1771:17,
19 1792:23 1794:15
1808:13 1810:24 1812:6,7
1833:2,4,9 1848:20 1883:7
1884:20 1885:16 1938:18

**speed**  1937:22

**spelled**  1994:19

**spelling**  1978:6

**spend**  1635:19 1637:22
1752:5 1790:11 1822:7

**spending**  1754:19
1794:10 1825:14

**spent**  1761:14 1790:8

**spinning**  1859:2,5

**spit-balling**  1961:2

**split**  1964:21 1969:2

**splitting**  1952:25 1966:17
1967:19

**spoke**  1760:11

**spoken**  1771:14

**spot**  1671:8 1904:12

**spots**  1865:25

**spring**  1700:18

**squabbling**  1668:17

**squirrely**  1973:10

**staff**  1675:4

**stage**  1717:3

**stake**  1731:24

**stances**  1850:14

**stand**  1653:4 1665:6
1673:6 1745:20 1746:2
1752:13,20 1759:24
1820:10 1864:18 1997:14

**standard**  1677:14 1678:15
1702:11 1727:25 1729:13
1730:7 1858:12,22
1859:13 1889:10 1900:4
1912:13 1956:4,19

**standards**  1697:10
1801:5,6

**standing**  1795:16 1821:5

**standpoint**  1677:16
1678:19,20 1846:16

**Starr**  1866:16

**start**  1714:18 1752:12
1754:6 1760:16 1775:8
1837:13 1847:9,17

1852:18,21,25 1860:10
1896:15 1966:22,23
1982:7

**started**  1728:16 1762:9
1763:13 1826:22,23
1840:23 1984:17 1986:17

**starting**  1711:22 1852:22
1874:20 1887:11 1890:19

**starts**  1870:11 1874:22
1875:8 1892:11 1895:11
1896:12 1919:20

**state**  1674:3 1695:25
1715:8 1811:7 1852:3
1889:5,16 1897:13
1936:21 1941:23 1948:22
1957:6 1976:13

**stated**  1654:19 1902:11
1906:10 1946:19 1947:11
1954:5 1956:23 1964:18

**statement**  1656:16,24
1712:5 1727:25 1760:18,
24,25 1771:1 1775:14
1801:17 1825:10 1841:2
1871:20 1872:2 1873:19
1903:15 1904:6 1944:20
1998:11,17

**statements**  1861:17

**states**  1696:13,14,15,18
1697:19 1729:8 1872:16

**stating**  1904:7 1964:14,15

**status**  1636:12,17,24
1719:21 1734:15

**statute**  1873:23 1874:3

**statutes**  1936:17 1967:9

**statutory**  1840:10 1894:11
1895:8 1962:1,21 1984:15

**stay**  1750:21 1821:4

**stayed**  1720:1

**staying**  1878:22

**stays**  1998:16

**step**  1634:8,20 1635:1
1636:3,5 1638:2,5,8
1690:24 1700:6,21,23
1701:8,10,20,21,22,23
1702:4,7,8,10 1703:23
1704:15 1706:4,20
1707:12,25 1708:1,9

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 637 of 642   PageID 11578

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022        Index: step-by-step..synonymous

1710:5 1711:3,11 1712:16
1714:8,18,22 1715:22
1716:5,14,17 1717:4
1718:4,7 1725:8 1726:19
1732:20 1733:18,22
1737:12 1743:11 1747:4
1761:8 1804:5 1821:10,13
1834:4 1864:21

**step-by-step** 1706:1

**stepped** 1744:6 1810:20

**steps** 1714:20 1732:5
1737:4

**stick** 1634:25 1735:23
1770:15 1855:12 1891:13,
17 1915:17 1918:13
1947:15 1948:15 1981:9
1989:4

**sticking** 1887:22 1888:12
1891:21

**stills** 1703:5

**stipulate** 1967:24 1968:2

**stipulation** 1746:7
1860:11

**stipulations** 1860:8

**Stone** 1631:7 1646:7
1680:9,12 1688:13,20
1690:12,16 1692:6,10
1711:4 1754:13 1755:7
1758:3 1762:21 1763:18
1764:9,16,21 1765:11,18
1766:6 1767:2,13 1769:4,
13 1770:20 1776:19
1783:22 1784:10 1785:7,
17,24 1786:13 1793:5
1797:7 1799:6 1806:10,17,
19 1809:25 1810:22
1814:17 1816:2 1826:14
1830:12 1835:12 1837:15,
20 1838:1,4,15,16,18
1839:5,11 1840:16 1841:1,
2,6,14,22 1842:6,17
1843:5,13 1844:19 1845:4
1846:20,21,24 1847:14,24
1848:2,9 1849:17,20
1850:4,10,12,23 1851:3
1883:13 1886:25 1895:2
1896:23 1898:1 1912:8
1936:12 1939:17,23
1954:3

**Stone's** 1646:21 1690:20

1762:18 1838:23 1841:9
1842:1 1844:22 1848:18
1849:7 1887:3 1937:9,14
1938:11,19,21

**stones** 1923:7

**stop** 1677:24 1752:2
1839:22,23 1931:25

**stops** 1939:23

**straight** 1981:4

**straightforward** 1650:4

**strategic** 1824:21

**streamline** 1633:24
1638:12

**stricken** 1881:8

**strict** 1929:13

**strike** 1655:23,25 1657:19
1666:15,17 1740:23
1764:15,18 1765:3 1770:6
1786:21 1792:5 1793:12,
23 1794:17 1795:3,25
1796:8 1797:9 1801:8
1808:24 1810:10,14
1819:9 1865:4 1875:18
1917:24

**strong** 1998:22

**strongly** 1757:22

**structure** 1699:10
1700:13 1912:5 1973:23

**stuck** 1967:18

**stuff** 1782:11,17 1928:21,
22 1930:20

**style** 1825:15,19

**subject** 1757:23

**subjected** 1764:10
1777:21

**submit** 1666:6 1740:22
1934:24 1941:5 1964:11,
12 1969:21

**submits** 1740:21

**submitted** 1911:24
1934:14

**submitting** 1970:2

**subparts** 1979:17

**subsection** 1906:18

**subsequent** 1644:22

**subsequently** 1644:24

**subservient** 1848:14
1937:15

**substance** 1633:2

**substantial** 1824:2 1839:6
1875:1,16 1876:18,21
1877:3

**substantially** 1866:14
1923:17

**substantiate** 1692:13

**substituting** 1892:24

**succinct** 1647:8 1829:23

**succinctly** 1829:24

**sucks** 1917:15

**sued** 1833:13

**suffer** 1808:13

**sufficiency** 1645:17

**sufficient** 1645:19
1646:14 1758:20 1795:16
1891:22 1895:24 1903:23

**sufficiently** 1929:24
1938:20 1955:15

**suggest** 1650:16 1804:19
1821:22 1878:6 1904:17
1949:8 1988:11,25

**suggested** 1893:6

**suggesting** 1904:12
1913:23

**suggestion** 1913:25

**suggests** 1893:4 1917:8

**suit** 1863:11

**Sullivan** 1680:6

**sum** 1975:16 1987:22

**summarize** 1691:1
1827:23 1829:25

**summary** 1649:22,23
1691:6,20 1729:6,13
1847:20

**summer** 1696:21

**supervisor** 1675:18,20

**supplied** 1715:5

**support** 1654:12 1734:16
1762:12 1789:1,13
1790:25 1795:10 1796:5
1798:13 1847:8

**supported** 1675:2,3
1692:5,8,14,17,19,23
1762:11,13,14,15

**supporter** 1839:22

**supporting** 1845:15

**supposed** 1665:22 1780:3
1900:19 1976:10,11

**supposes** 1952:11

**Supreme** 1883:25 1885:6

**surprised** 1680:19 1732:4

**surrounding** 1702:17

**suspect** 1906:8

**suspension** 1720:23
1721:5,7

**sustain** 1663:6 1665:16
1735:22 1738:11 1764:17
1766:2 1768:25 1769:8
1770:9 1776:10 1779:24
1784:6 1785:12 1791:3
1793:13 1798:3 1802:7,19
1805:8 1811:18 1814:20
1825:14 1835:6

**sustained** 1655:20
1657:18,20 1663:8
1666:16 1745:22 1784:22
1794:18 1795:5 1806:8
1808:25 1817:24 1958:3

**swap** 1949:1 1996:13

**swapping** 1904:18

**swear** 1686:7 1695:5
1779:10 1814:6

**switch** 1899:3

**switched** 1982:15

**sworn** 1673:19 1686:9
1695:7 1760:3 1774:9

**sympathetic** 1735:2

**synonymous** 1757:5
1907:8

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 638 of 642   PageID 11579

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 6 July 12, 2022              Index: synopsis..thousands

**synopsis** 1642:24

**system** 1676:12

---

**T**

**table** 1703:22

**tackled** 1983:16

**tailoring** 1887:25

**tailspin** 1995:18

**taking** 1650:19 1651:13
1656:17 1657:10 1662:17
1663:16 1680:23 1681:11
1756:3 1764:25 1765:10
1777:22 1779:10 1783:17
1874:1 1878:6,11

**talented** 1855:21

**talk** 1629:7,14,23 1633:22
1634:19,21 1637:7 1639:4,
5,10,18,19,25 1640:5,10
1647:3 1660:5 1675:15
1679:23 1738:19,21
1743:8 1749:20 1753:15,
16 1763:10 1787:6 1788:8,
18,19 1799:2 1804:20
1819:21,22 1820:7,11
1821:6,11 1836:18,19
1847:11 1856:5,6,7 1857:3
1863:18 1868:24 1901:7
1917:4,5 1925:4 1926:11
1931:20 1933:18,25
1934:1 1949:10 1950:9
1963:3 1974:12 1989:15

**talked** 1636:5 1668:20,25
1744:19 1761:20 1784:10
1820:13 1828:2 1833:19
1840:22 1841:23 1856:15
1910:1 1966:4

**talking** 1629:12 1763:16,
17 1771:8,20,21,22 1772:7
1782:3,22,23 1788:3
1790:3,12 1793:19 1804:6
1805:25 1807:19 1812:24
1819:6 1834:12,21
1837:17 1839:13 1864:8
1865:23 1866:15 1878:15
1879:2 1884:12,13 1910:1
1916:22 1918:16 1927:13
1931:16 1952:9 1959:22
1972:19 1974:1

**talks** 1914:12 1917:3

**Tammy** 1715:14

**target** 1771:10

**targeted** 1770:3 1784:15
1803:10

**targeting** 1845:14

**tasked** 1683:23 1684:14
1702:13

**tax** 1909:2

**team** 1658:11,17 1659:8,
22 1661:24 1663:19
1675:2 1756:14

**tears** 1867:22

**technical** 1932:22

**technically** 1653:9
1751:17 1862:9

**technique** 1815:5 1825:22

**technologically** 1931:19

**telling** 1659:2 1660:24
1665:3 1765:17 1785:10
1885:7 1900:15 1928:13
1970:3

**tells** 1660:6 1661:2

**temporal** 1849:14

**ten** 1643:5 1687:6 1829:5

**tend** 1997:2

**tensions** 1883:10

**tentative** 1762:17 1850:3

**tenure** 1687:11,13

**term** 1721:17 1912:7
1915:3 1987:2

**terminate** 1693:1 1725:13
1755:2 1756:18 1840:21,
25 1851:14 1906:13
1936:21 1968:23 1988:8,9

**terminated** 1649:25
1650:3 1716:13 1721:20,
21 1729:2 1841:4 1911:1
1914:1 1971:4 1983:8

**terminating** 1843:10

**termination** 1641:24
1642:4 1644:9 1702:16,22
1706:6,18 1710:16
1720:22 1721:1,5 1722:11

1725:5 1728:21 1729:12
1746:11 1851:9,17
1869:15 1910:14,20
1952:7,8 1967:8 1971:2,11
1974:17 1986:24

**terminology** 1933:12

**terms** 1631:20 1656:17
1697:10,14 1698:19
1699:10 1700:13 1702:11
1704:25 1707:9 1719:1
1722:15 1728:11 1744:4,
16 1747:2 1757:25 1822:1
1827:11 1832:25 1852:18
1982:8

**territory** 1880:15

**test** 1893:3,18 1980:21

**testified** 1642:22 1748:13
1755:5,22 1761:12 1771:6
1772:19 1773:22 1774:12
1797:1 1798:11 1816:4
1838:10,15 1841:23
1842:3,6 1843:15 1848:7,
16 1851:11

**testifies** 1817:1

**testify** 1745:10

**testifying** 1773:16 1779:1,
7 1784:2,8 1793:23

**testimony** 1649:8,15,17
1665:11 1668:11 1677:19
1694:20 1712:4 1715:15
1746:22 1749:11 1758:21
1765:3 1769:5,7 1772:21
1773:15 1774:5,9 1775:4,6
1776:5,8,13,20,22
1777:15,24 1781:1,6,9
1782:25 1783:5 1797:25
1800:6 1801:1 1805:1,10
1809:16 1811:3 1814:3
1815:2 1820:10 1825:23
1828:7 1837:14 1846:6
1861:23 1862:8 1865:9
1926:18 1929:21,23

**Texas** 1734:24 1844:2
1920:4

**text** 1637:15 1840:11
1894:11 1895:8 1991:4

**TFP** 1721:17

**theme** 1686:24

**theories** 1986:22 1987:12

**theory** 1650:6 1987:1,6

**thickens** 1988:10

**thing** 1630:13 1633:8
1643:23 1645:13,16
1646:19 1647:11 1650:17
1657:8 1685:16 1752:9
1792:22 1817:7 1826:4
1845:7 1847:4 1853:7
1855:1 1868:22 1869:5
1874:5 1894:5 1909:9
1912:11 1917:13 1925:7
1927:23 1929:19 1946:13
1955:20 1957:19 1975:23
1980:25 1981:5 1982:25
1990:25 1996:14

**things** 1629:7 1637:25
1640:14 1645:12 1649:6
1675:6 1679:16 1687:20
1715:1,7,8 1719:17 1721:1
1725:24 1743:22 1764:10
1767:17 1786:8 1790:1
1800:7 1862:25 1876:2
1884:21 1900:18,21
1909:6 1917:9 1920:16
1925:8 1932:2 1959:13
1982:25 1996:8

**thinking** 1828:23 1852:17
1882:7 1963:9 1964:22
1966:7,22 1970:15
1975:23

**thinks** 1774:18 1989:20

**thought** 1630:4,8 1632:22
1649:17 1653:19 1668:12,
21 1678:7 1692:23 1717:6
1726:14 1731:2,8,12,25
1741:7 1743:20 1744:15
1748:11 1791:8 1801:9
1864:24 1877:13 1915:8
1921:1,16 1930:2 1931:11
1946:6,7 1950:16,20,21
1951:5 1959:6 1964:11
1980:20 1991:9,14,16,19,
23

**thoughts** 1630:1 1632:18
1706:18 1822:24 1853:7
1873:25 1877:2 1887:22
1897:6 1900:24 1914:2
1950:5

**thousands** 1684:6,7

Case 3:17-cv-02278-X   Document 387-1   Filed 01/02/23   Page 639 of 642   PageID 11580
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 6 July 12, 2022                   Index: threat..TWU

**threat** 1803:7,17 1804:10
1805:10,20 1806:2,24
1807:1,15 1808:7,8,11
1809:6,15,17 1810:7
1812:5 1813:3,16,19
1818:7,9

**threaten** 1762:3 1810:8
1884:22

**threatened** 1761:22
1762:1 1812:19

**threatening** 1812:19
1938:20

**threats** 1802:23 1807:22
1811:4 1834:17

**three-** 1709:17

**threw** 1908:11

**throw** 1883:23

**thumb** 1631:15,17 1640:6

**Thursday** 1639:1 1973:19

**tick** 1720:18 1721:10
1722:6

**tied** 1808:12 1810:23
1812:6 1814:3 1846:18
1849:6,9 1851:16

**ties** 1850:20,22 1897:2

**time** 1629:14 1635:5,18,19
1637:22 1639:12 1640:11,
16 1647:6 1655:10,12
1661:6 1663:24 1668:15
1669:18 1670:14 1671:19
1673:11 1674:25 1676:3
1677:14 1678:15 1696:23,
24 1698:1 1700:8,21
1703:17 1707:5 1709:16
1714:24 1715:13,22
1721:20,22 1722:11
1723:3 1730:15 1732:24
1735:19 1738:15 1742:20
1751:4,5,6,18 1752:5,14
1753:8,12,25 1757:14
1762:7,9 1765:6,9,14,19
1766:7 1768:19 1773:6
1775:24 1805:7,18 1821:2
1822:4,7,11,17,19,21,25
1823:1,7,8,10,13 1824:4,7,
8,17,22 1825:1,9,13,14,25
1826:10,15,22,23,24,25
1827:8,21 1828:11,17
1829:14,16,19 1832:2,5,6

1836:14 1837:10 1842:20
1848:22 1852:18,25
1858:5 1862:8 1895:17
1897:21 1907:2 1910:12,
14,15,17,19 1912:11,16
1916:10 1923:25 1935:15
1937:22 1939:2 1940:17
1946:23 1951:7 1952:7,8,
13 1972:1 1977:18 1982:4
1997:6,9 1998:1,3,5,13

**time-wise** 1821:20

**timekeepers** 1752:16

**timeline** 1644:13 1703:21

**timely** 1629:8

**times** 1680:14 1699:8
1715:9 1722:23 1730:5,13,
16 1776:23 1806:14
1864:19 1922:23 1940:13

**timetable** 1644:15

**timing** 1750:5 1827:2
1853:17 1866:3,8

**tip** 1716:2 1967:11

**Title** 1650:11 1754:15
1755:15,18 1840:14
1843:15 1845:22,24
1848:12 1887:20 1893:3,
18 1900:3 1905:17,24
1936:18 1976:5 1978:17
1980:16 1981:16,19,23
1982:10 1983:1 1986:22
1987:7,11 1988:5,22
1989:14 1991:12,16

**today** 1628:25 1631:3
1637:23 1665:19 1682:12
1760:16 1765:17 1776:20
1778:4 1781:9,11 1782:25
1783:10 1787:3 1816:4
1834:9 1835:9 1852:20,24
1853:6 1855:12 1874:15
1930:23 1963:23

**told** 1660:25 1661:18
1662:11,21 1663:15
1665:5 1725:10 1733:25
1735:4 1748:14,17 1781:8
1868:25 1996:7

**tomorrow** 1631:3 1661:19
1852:18,21,22,24 1853:7
1855:1,14,18 1926:10,11
1928:14 1954:24 1996:2,3,
19 1998:19,22

**tonight** 1868:17 1928:11
1989:6 1995:21,22
1998:21

**top** 1689:7 1711:14
1713:16 1793:8 1872:18
1887:12 1896:13 1898:19
1911:4

**topic** 1647:2 1680:23,24
1739:8

**topics** 1834:5

**tort** 1959:23,25 1962:18

**tortfeasors** 1959:21

**total** 1959:24

**totally** 1641:12 1642:14
1751:19 1840:11 1882:8

**touch** 1645:15

**touched** 1645:18 1648:3,4
1685:12

**touching** 1863:21

**track** 1706:24 1875:4
1984:2

**tracks** 1900:3

**trade** 1676:4,9,13,16

**trail** 1882:12 1883:24

**training** 1756:8

**transcript** 1667:10
1775:12 1778:13,19
1781:15 1897:18 1927:7
1928:6,7,8 1929:5

**transcripts** 1927:13

**transition** 1788:18

**transmits** 1632:23

**transpired** 1701:24
1839:13

**transport** 1698:3,24
1701:16 1710:20 1733:9

**transportation** 1884:17

**trauma** 1789:18

**travel** 1643:18 1651:9,10
1673:17

**tread** 1774:24

**treat** 1694:11 1895:6

1965:14

**treated** 1646:8 1850:17
1899:13,16 1900:4,8

**treating** 1746:13 1841:16,
17 1844:2

**trees** 1995:19

**trend** 1686:24

**trial** 1628:7,8 1636:20
1637:1,8 1658:6 1659:3
1671:6 1709:3 1822:1
1824:18 1826:22 1854:5
1855:2 1860:10 1862:6,7
1910:15,20 1920:11
1927:7 1928:7,8 1929:2,3,
4 1952:1,6,13 1953:1
1971:5,6 1990:11

**trials** 1990:13

**trip** 1676:16,17

**trips** 1676:13 1721:17
1765:15

**true** 1636:6 1652:2
1655:11 1656:5,14,16,18,
20 1657:6,7,12,13 1658:9
1659:16 1662:15 1663:3
1665:9,25 1772:18
1789:13 1798:23 1834:9
1869:14 1891:24

**trust** 1713:25 1714:2

**truth** 1779:11,12 1814:7,8

**turn** 1639:20 1653:9,12
1742:23 1747:16 1759:20
1787:11,20,23 1801:24
1802:15,24 1804:11
1805:4 1837:1,5 1851:3
1853:8 1859:3 1914:20
1937:10

**turned** 1808:22 1841:4
1842:8 1843:1,21 1844:23
1846:21,25 1847:1 1848:5,
10 1850:21 1969:14

**turning** 1841:16 1843:13
1845:11

**turns** 1714:1

**tweaking** 1862:13

**two-minute** 1652:10

**TWU** 1699:13,23 1700:2
1733:8,15 1761:24 1762:6,

23 1835:12 1838:15,16
1847:24 1857:22

**type** 1670:15 1763:14
1771:7 1783:13 1821:19
1825:21 1965:20 1979:20
1984:13

**typed** 1709:12

**types** 1789:25 1965:9
1966:6,10 1979:1,5

**typical** 1706:13 1710:14
1730:20

**typically** 1691:1

---

**U**

**ugly** 1716:1

**Uh-huh** 1770:17 1788:11
1858:18 1891:7 1892:13
1894:9

**ultimately** 1826:9 1968:22

**un-muting** 1667:5

**uncertainty** 1934:16

**uncomfortable** 1682:18

**uncontroverted** 1846:6

**uncovered** 1725:15
1726:3

**underlying** 1848:22

**underneath** 1781:1

**understand** 1632:13
1660:12 1668:5 1677:19
1679:20 1697:2 1710:9
1715:15 1723:9 1733:23
1751:7 1752:20 1770:13
1771:5,18 1775:18
1778:21 1785:8 1790:3,21
1791:22 1794:21 1796:15
1801:22 1803:20 1804:2,
24 1805:1 1806:25 1813:1
1817:10 1818:3 1819:6
1823:14 1824:6,11
1825:16 1864:16 1878:17
1882:14 1902:16 1903:2,
21 1905:20 1906:8
1916:21 1920:15 1922:8
1939:5,25 1942:2,23
1947:14 1948:14 1950:7
1953:14 1955:9 1967:12

1969:4 1972:22 1975:12
1981:25 1987:17 1995:9

**understanding** 1728:24
1733:5 1743:10 1746:5
1808:3 1865:15 1915:15
1989:22

**understands** 1698:18
1719:2 1770:14 1785:11

**understood** 1634:4
1638:9 1645:11 1646:18
1647:1 1673:15 1700:4,17
1710:11 1728:9 1759:1
1762:16 1824:13 1826:1
1862:23 1870:25 1871:24
1872:20 1874:10 1876:6
1877:7 1878:20 1881:24
1883:16 1886:2 1887:5,21
1893:22 1909:5 1912:3
1922:7 1924:1,12 1933:1
1942:8 1943:5,25 1944:18
1946:21 1948:5 1957:10
1965:3 1974:20 1976:22
1977:12 1989:2 1995:13

**undertake** 1651:23

**undertaken** 1949:15

**undertakes** 1651:20

**undertaking** 1647:21

**underway** 1733:17

**undid** 1991:5

**undisputed** 1642:19

**undo** 1959:10 1995:17

**undue** 1756:15 1758:20
1903:5,9,15 1943:22
1944:2 1948:25 1949:17
1950:1 1953:6,13 1955:11,
12,14,18,19 1956:8,19

**unfair** 1726:14 1906:14

**uniform** 1679:2

**union** 1628:18,19 1629:23
1635:10,12 1637:14
1639:9 1645:19 1646:14
1652:4 1657:8,10 1658:1
1663:14,16 1671:1 1682:4
1688:10 1693:13 1694:2,5,
12 1698:1,4,5,8,10,24
1699:6 1701:16 1704:2,6
1706:13 1710:21 1713:19
1714:1,14,20,25 1716:17,

19 1719:13 1723:22
1724:16 1727:9 1728:20,
25 1729:19,21,25 1730:3,
4,14,22 1731:6 1732:22,23
1733:9,24 1734:1,4,8,11
1737:3 1740:20,21 1741:1
1743:6 1747:25 1748:4,19
1751:19,25 1754:18,19
1757:12,13 1758:2 1759:3
1760:13 1761:2,3,5,9,13,
17,22 1762:2 1763:19,20
1765:8,13,19,22 1766:20,
22 1767:16 1768:9
1769:22,24 1770:3,22
1771:17 1777:8,10 1778:3
1782:12 1783:12 1784:10
1786:19 1787:10,11,19,20
1788:12 1789:20 1792:15,
21 1793:2 1794:25
1795:21 1797:5 1799:7,17,
22,25 1800:5,6,8,23
1801:18,23 1802:13
1804:23 1805:3 1806:11,
20 1807:9,11 1808:5,9,14
1809:7,25 1810:3,5,22,24
1812:5,7 1813:4,17 1823:9
1824:15 1826:2 1833:2
1834:8,18,20,22 1835:13
1836:10,12 1837:2,18,19
1838:6,8,11,16 1839:15,22
1842:5,21,22 1844:5,8,11,
12,16,18 1845:3,5,8,15
1847:13,15 1848:9,23
1850:2 1851:12,25
1854:19,20 1855:4 1860:7,
14,21 1861:18,25 1863:15
1869:14,23,24 1870:8,11,
14,15,19,22,23 1872:5,7,
10 1873:7 1877:8 1878:11,
21 1882:18 1884:13,14,17
1885:1,2 1887:14 1890:8
1891:9 1896:20,22 1897:8,
9,25 1899:19 1901:13
1903:4 1906:22 1907:14,
25 1908:9 1911:22 1917:3,
5 1919:13 1920:12
1921:19 1922:15,16
1923:9 1924:22 1933:24
1934:5 1937:16,18,20
1938:2,5,6,8,9,12,13
1939:18,22 1940:4
1942:14 1943:2 1944:2
1951:8 1952:2,15 1958:23
1959:3,14,15 1960:22
1963:20 1965:11,12,15
1966:9 1968:18 1969:14,

16,17 1971:3,12,20 1977:8
1980:5 1988:8,9 1992:19
1993:5,15 1995:11 1998:9,
15

**union's** 1645:23 1759:20
1813:5 1837:24 1838:9
1886:4 1912:5 1971:14
1992:18

**union-opposition-and-**
1877:19 1879:13

**union-opposition-and-
organizational** 1878:4,8

**union-oppositional-and-
organizational** 1882:20

**union-wise** 1941:15

**unique** 1638:4 1699:5
1731:23 1846:16

**unit** 1728:14

**United** 1696:13,14,15,17
1697:19

**universe** 1969:13

**University** 1920:4

**unjust** 1710:16

**unlawful** 1892:12,20
1893:4 1895:11

**unnecessary** 1963:13

**unreasonable** 1827:17

**unwind** 1997:6

**update** 1831:17

**upload** 1630:20

**upset** 1682:25 1840:5

**upshot** 1949:2

**upwards** 1829:20

**urge** 1938:16

**user** 1630:21,22

**user-friendly** 1632:14

**utilize** 1676:13

**utilized** 1926:19

**utmost** 1743:18

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 6 July 12, 2022                          Index: vacation..worded

## V

**vacation** 1719:17 1721:20, 22,23 1722:1,2,4

**vaginas** 1692:22

**vague** 1660:16 1662:2 1825:18 1988:24

**vagueness** 1795:13

**values** 1712:25 1713:1

**vantage** 1649:10 1826:4

**variant** 1991:7

**vein** 1905:23

**verbally** 1867:5

**verdict** 1754:1 1758:6 1837:11 1846:10 1851:24 1856:14,17 1882:1 1911:3 1934:12,13 1935:24 1945:19,20,25 1973:8,12

**verdicts** 1970:25

**version** 1863:3 1865:16 1880:7 1887:11 1895:10, 20,24 1896:4

**versus** 1949:11 1950:9 1951:10 1991:2,25

**vice** 1838:10,21

**video** 1654:16,24 1711:4 1763:23 1764:1,8 1765:7 1930:11 1998:16

**videos** 1646:4 1651:3,14 1677:10,20,23,24 1680:9, 24 1682:23 1702:24 1703:2,5,6,14 1715:16,21, 25 1731:11 1754:12,20 1755:6 1758:1 1763:18,19 1766:6 1835:11 1837:16 1839:4 1840:4 1841:12 1845:21 1850:5

**view** 1650:21 1651:12 1706:17 1707:4 1710:23 1726:9 1741:5 1790:10 1815:18 1816:3 1865:8 1866:1 1869:1 1885:4 1888:9 1915:15 1954:6 1959:25 1960:7

**viewed** 1715:16 1743:15 1764:16

**views** 1846:1

**VII** 1650:11 1754:15 1755:15,18 1840:14 1843:15 1845:22,24 1848:12 1887:20 1900:3 1905:17,24 1936:18 1976:5 1978:17 1980:16 1981:16,19,23 1982:11 1983:1 1986:22 1987:7,11 1988:5,22 1989:14 1991:12,16

**VII's** 1893:3,18

**violate** 1649:8 1692:14 1842:17

**violated** 1641:4 1644:1,5, 8,20 1649:12,18,24 1650:2 1687:24 1720:25 1847:1 1887:2 1983:3,4

**violates** 1643:23 1642:11, 12 1870:15 1902:23

**violating** 1841:5 1956:15 1981:7 1983:15,22 1987:11

**violation** 1644:2 1645:2,3 1646:22 1688:7 1692:19, 23 1693:18 1725:1 1895:7 1902:20 1962:1

**violations** 1691:9

**violative** 1848:21

**violence** 1802:23 1803:17 1804:10,19,20 1805:11,20 1808:12 1812:5 1813:4

**violent** 1885:24

**voice** 1788:10,21,22 1789:14 1799:3 1804:7 1812:25 1855:16 1890:19

**voiced** 1762:12

**voir** 1740:5 1926:3

**Volume** 1778:13

**voluntary** 1676:17

**vote** 1762:20

**vulgar** 1791:14 1792:24 1793:1 1795:9 1796:3,4 1883:4,9

**vulgarity** 1789:16 1791:5, 11,16,25 1793:9

## W

**waffled** 1864:18

**wages** 1920:6 1957:13 1958:3 1974:15

**wait** 1653:12 1751:12 1780:10 1818:20 1895:18

**waiting** 1866:12 1867:10, 15 1962:25

**walk** 1679:4,6 1706:1

**wanted** 1629:10 1634:22 1640:10 1668:17 1702:15 1707:3 1710:24 1713:1 1715:20 1717:25 1718:11 1725:6 1730:2 1756:2 1760:21,22 1761:13 1780:21 1791:18 1845:20 1879:18 1925:25 1930:3 1938:23 1974:3

**wanting** 1730:15 1748:11 1823:17,19 1834:21 1840:20 1867:21 1949:1

**warrant** 1720:16

**warranting** 1721:1

**waste** 1647:6

**watch** 1703:2,3,13 1764:7

**watched** 1750:8

**we-all** 1915:15

**wearing** 1764:25 1793:10 1931:1

**Weber** 1948:23 1949:12 1955:5

**website** 1756:24

**week** 1645:10 1709:20 1721:16

**weekend** 1638:25

**weeks** 1711:17,18,21,23 1855:24

**weighed** 1850:15

**weighing** 1851:13

**western** 1696:15 1998:8, 15

**whatnot** 1677:17

**whatsoever** 1844:12

**wheel** 1831:4,5 1859:6

**wheels** 1634:18 1859:2

**whichever** 1982:15

**whoa** 1643:22 1645:8,9

**wide** 1937:1

**wild** 1930:22

**Willis** 1684:24 1744:8 1937:24

**window** 1715:17 1899:5

**wings** 1679:1

**Wise** 1633:11

**wisely** 1829:8

**wit** 1824:23

**withdraw** 1633:25

**withdrawing** 1998:7,8,10

**withdrawn** 1634:6 1637:25 1728:20,22 1729:2

**witness-wise** 1821:20

**witnesses** 1665:5 1695:12 1736:11 1741:9,12 1751:22 1753:3 1820:18 1821:24 1826:13 1827:13 1836:10 1852:5 1853:22 1854:8 1860:17 1930:5

**women** 1692:21 1764:9,25 1765:10 1793:10

**Women's** 1712:1 1754:18 1837:18,25 1839:14 1845:3

**wondering** 1644:15 1811:20 1828:8 1868:22

**word** 1660:24 1662:11,14 1753:12 1761:23 1762:5 1764:6 1775:18 1799:13, 19 1800:25 1801:15 1802:14 1812:23 1834:17 1836:15 1878:2 1908:10, 12 1919:7 1935:8 1950:2,9 1954:24 1996:20 1997:10

**worded** 1885:5 1889:25 1958:2 1988:17

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 6 July 12, 2022                    Index: wording..zoom

**wording** 1879:20 1949:18
1983:25

**words** 1659:16,17 1748:17
1763:22 1782:13,19,23,24
1783:7,9,19 1862:5 1878:7
1897:15,17 1913:8
1954:23

**work** 1640:24 1645:10
1647:23 1665:8 1669:17
1675:11 1688:1 1699:6
1716:24 1719:14 1720:4,8,
9,11,13,17 1721:3,24
1728:14,16,17 1761:25
1794:7 1804:20 1838:7
1855:8 1925:6 1937:5
1961:5 1979:11 1980:4

**worked** 1641:14 1689:23
1707:14 1765:20

**workers** 1698:3,24
1701:16 1710:21 1733:9

**workforce** 1758:25
1936:18

**working** 1639:22 1687:1
1709:15 1720:2,4,15
1793:21 1855:6 1926:7
1955:15

**workplace** 1651:1
1658:13 1682:8 1725:2
1760:23 1787:8 1788:14,
24 1790:20 1793:18
1797:21 1833:19,22
1848:14 1851:1

**works** 1853:17 1974:6

**world** 1664:2 1719:12,13

**worried** 1866:7 1972:2

**worry** 1821:15 1971:25
1981:1

**worth** 1867:19

**Wow** 1785:14

**wrapped** 1961:6

**Wright** 1891:19 1942:20,
23 1946:10,18

**write** 1897:17 1976:10

**Write-line** 1755:8

**writes** 1990:9

**writing** 1629:18 1868:7,9

**written** 1654:13 1664:22
1741:14 1939:20

**wrong** 1633:6 1637:12
1760:14 1774:15 1825:20
1887:15 1898:22 1940:7,
15,16 1946:13 1978:8
1982:3 1984:17 1996:7

**wrote** 1654:15,18

---

**Y**

**y'all** 1629:2,4,6,17
1631:13,15 1639:3,5,10
1641:7 1654:4 1667:5
1742:12 1753:13,21
1760:5 1823:7,8 1828:16
1831:17 1836:15 1852:16
1853:1 1854:23 1856:10
1857:1,8,24 1858:2 1862:4
1863:4 1864:24 1869:6
1874:15 1876:11 1883:23
1898:18 1925:2,5,11
1926:4 1931:22 1956:20
1974:3 1980:4 1986:12
1995:20 1997:11 1998:19

**y'all's** 1629:16 1822:24
1879:5 1882:5

**year** 1665:7 1674:12
1722:23 1940:15

**years** 1674:23 1675:10,24
1687:6,7 1743:18 1762:8
1777:17 1786:10 1814:4
1841:3 1846:5,7 1849:25

**yellow** 1631:8

**yesterday** 1629:12,15,22
1630:2,10 1635:13
1638:19 1639:15,19,24
1640:5,10 1648:4 1654:10
1655:4 1665:6 1667:4
1748:13 1825:3

---

**Z**

**zealously** 1827:15

**zoom** 1864:6