# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | |
|---|---|
| CHARLENE CARTER,<br><br>      Plaintiff,<br><br>V.<br><br>SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556,<br><br>      Defendants. | Civil Case No. 3:17-cv-02278-X<br><br>**PLAINTIFF CHARLENE CARTER'S BRIEF SUPPORTING HER RESPONSE TO DEFENDANT SOUTHWEST AIRLINES CO.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW; OR, IN THE ALTERNATIVE, FOR NEW TRIAL; OR, IN THE ALTERNATIVE, FOR REMITTITUR** |

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ....................................................... iii

SUMMARY ...................................................................1

ARGUMENT AND AUTHORITIES.......................................................1

I.    Southwest is not entitled to judgment or a new trial on Carter's Title VII claims .............1

   A.    Southwest is not entitled to judgment on Carter's Title VII unlawful discharge claim....................................................................1

   B.    The Court properly instructed the jury regarding Carter's failure to accommodate claims, and the trial evidence supported the jury's decision and awards ...............2

      1.    The Court's interrogatory required the jury to find that Carter proved her "sincerely held religious beliefs, observances, or practices conflicted with a job requirement," and the evidence shows the conflict ...................................2

      2.    Southwest created the conflict between its social media policies and Carter's religious beliefs and practices............................................5

      3.    Title VII's disparate treatment provision does not require employees to request an accommodation or require that the employer have actual knowledge of a need for an accommodation ...................................6

   C.    The Court's jury instructions did not improperly limit the undue hardship burden, and Southwest failed to show that accommodating Carter would have imposed an undue hardship on the company's business. ....................................7

      1.    The Court's jury instructions did not improperly limit the burdens the jury could consider in assessing undue hardship ....................................7

      2.    Southwest failed to show that accommodating Carter would have imposed an undue hardship on the company's business ................................8

   D.    The evidence supports the jury's emotional damages award................................10

   E.    The evidence supports the jury's punitive damages award ...................................12

II.    Southwest is not entitled to judgment or a new trial on Carter's RLA claims .................18

   A.    The Court's RLA-protected activity instruction was not erroneous .....................18

# TABLE OF CONTENTS

**Page(s)**

B.    The Court's inclusion of RLA Section 151a's statement forbidding any limitation upon freedom of association was an important statutory instruction informing the jury regarding the proper application of Carter's RLA-protected rights. ..............20

III.   Southwest is not entitled to judgment or a new trial on mitigation ...................................21

IV.   The CBA-arbitration findings asserted by Southwest should not be given issue preclusive effect for Carter's RLA and Title VII claims, and the arbitrator's credibility determinations should not supplant the jury's fact-finding role ........................................22

V.   Southwest's assertion that the Court unfairly managed the trial or made legal errors is without basis ....................................................................................................................24

CONCLUSION..........................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Ballew v. Cont'l Airlines, Inc.*,
    668 F.3d 777 (5th Cir. 2012) ...............................................................................24

*Bruso v. United Airlines, Inc.*,
    239 F.3d 848 (7th Cir. 2001) ...............................................................................13

*CareFlite v. Off. and Prof'l Employees Int'l Union*,
    612 F.3d 314 (5th Cir. 2010) ...............................................................................24

*Carmona v. Sw. Airlines Co.*,
    536 F.3d 344 (5th Cir. 2008) ...............................................................................24

*Cent. Progressive Bank v. Fireman's Fund Ins. Co.*,
    658 F.2d 377 (5th Cir. 1981) .................................................................................3

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    140 S. Ct. 1009 (2020) ...........................................................................................2

*Dunn v. Air Line Pilots Ass'n*,
    193 F.3d 1185 (11th Cir. 1999) ...........................................................................18

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    575 U.S. 768 (2015).......................................................................................*passim*

*EEOC v. Hacienda Hotel*,
    881 F.2d 1504 (9th Cir. 1989) ...............................................................................8

*EEOC v. Stocks, Inc.*,
    228 F.App'x 429 (5th Cir. 2007) .........................................................................13

*EEOC v. Wal-Mart Stores, Inc.*,
    187 F.3d 1241 (10th Cir. 1999) .....................................................................13, 17

*Farpella-Crosby v. Horizon Health Care*,
    97 F.3d 803 (5th Cir. 1996) .................................................................................10

*Forsyth v. City of Dallas*,
    91 F.3d 769 (5th Cir. 1996) .................................................................................10

*Garcia v. Harris Cty.*,
    No. H-16-2134, 2019 WL 132382 (S.D. Tex. Jan. 8, 2019) .................................22

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Graef v. Chemical Leaman Corp.*,
   106 F.3d 112 (5th Cir. 1997) ................................................................................23

*Grimes v. BNSF Ry. Co.*,
   746 F.3d 184 (5th Cir. 2014) ...............................................................................24

*Groff v. DeJoy*,
   __ S. Ct. __, 2023 WL 178403 (Jan. 13, 2023) ......................................................7

*Hawaiian Airlines, Inc. v. Norris*,
   512 U.S. 246 (1994) ............................................................................................24

*Heller v. EBB Auto Co.*,
   8 F.3d 1433 (9th Cir. 1993) ..................................................................................7

*Hill v. City of Pontotoc, Miss.*,
   993 F.2d 422 (5th Cir. 1993) ...............................................................................22

*Hitt v. Connell*,
   301 F.3d 240 (5th Cir. 2002) ...............................................................................10

*Int'l Ass'n of Machinists v. Street*,
   367 U.S. 740 (1961) ............................................................................................18

*Ishee v. Fed. Nat. Mortg. Ass'n*,
   No. 2:13-CV-234-KS, 2014 WL 6686705 (S.D. Miss. Nov. 26, 2014) ...............................12

*Kolstad v. Am. Dental Ass'n*,
   527 U.S. 526 (1999) .....................................................................................12, 13

*Konop v. Hawaiian Airlines, Inc.*,
   302 F.3d 868 (9th Cir. 2002) .........................................................................18, 19

*Linn v. United Plant Guard Workers of Am., Local 114*,
   383 U.S. 53 (1966)..............................................................................................18

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)..............................................................................................2

*Meyer v. Brown & Root Const. Co.*,
   661 F.2d 369 (5th Cir. 1981) ...............................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Migis v. Pearle Vision, Inc.*,
    135 F.3d 1041 (5th Cir. 1998) .........................................................................10

*Ogden v. Wax Works, Inc.*,
    214 F.3d 999 (8th Cir. 2000) ..........................................................................13

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
    418 U.S. 264 (1974).................................................................................18, 20

*Patterson v. P.H.P. Healthcare Corp.*,
    90 F.3d 927 (5th Cir. 1996) .............................................................................10

*Reef Indus., Inc. v. NLRB*,
    952 F.2d 830 (5th Cir. 1991) ...........................................................................19

*Russell v. NMB*,
    714 F.2d 1332 (5th Cir. 1983) .........................................................................20

*Schexnayder v. Bonfiglio*,
    167 F.App'x 364 (5th Cir. 2006) .....................................................................13

*Sparks v. Griffin*,
    460 F.2d 433 (5th Cir. 1972) .....................................................................21, 22

*Steele v. Louisville & N.R. Co.*,
    323 U.S. 192 (1944)...............................................................................8, 18

*Trans World Airlines, Inc. v. Hardison*,
    432 U.S. 63 (1977).................................................................................7, 8

*Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*,
    489 U.S. 426 (1989)...................................................................................20

*U.S. v. Morrison*,
    833 F.3d 491 (5th Cir. 2016) ...........................................................................24

*Wantou v. Wal-Mart Stores Texas, L.L.C.*,
    23 F.4th 422 (5th Cir. 2022) ...............................................................13, 15, 17

*Weber v. Roadway Express, Inc.*,
    199 F.3d 270 (5th Cir. 2000) .............................................................................9

# TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Zimmermann v. Assocs. First Capital Corp.*,
    251 F.3d 376 (2d Cir. 2001)..................................................................................13


**Rules & Statutes**

Fed. Rules of Civ. Proc.,
    49...............................................................................................................................3
    50(b).........................................................................................................................1
    59(a)........................................................................................................................1
    61...........................................................................................................................23

29 U.S.C. § 151, *et seq.*....................................................................................19

42 U.S.C. § 2000e ..................................................................................... *passim*

42 U.S.C. § 2000e(j) ................................................................................. *passim*

42 U.S.C. § 2000e-2(a)(1)......................................................................... 1, 16

42 U.S.C. § 2000e-2(c)(1)...............................................................................8

42 U.S.C. § 2000e-2(c)(3)...............................................................................8

45 U.S.C. § 151, *et seq.*............................................................................ *passim*

45 U.S.C. § 151a .......................................................................................20, 21

45 U.S.C. § 151a (2)-(3) ...........................................................................20, 21

45 U.S.C. § 152 ......................................................................................... *passim*

45 U.S.C. § 152 (Third) ............................................................................ *passim*

45 U.S.C. § 152 (Fourth) ........................................................................... *passim*

## SUMMARY

Pursuant to Federal Rules of Civil Procedure, Rule 50(b) and 59(a), Plaintiff Charlene Carter ("Carter"), through her counsel of record, hereby responds to Defendant Southwest Airlines Co.'s ("Southwest") renewed motion for judgment as a matter of law; or, in the alternative, for new trial; or, in the alternative, for remittitur.[1] The Court should deny Southwest's motion because Southwest is not entitled to judgment or a new trial on Carter's Title VII claims, RLA claims, or on mitigation. The Court should not give the CBA-arbitration findings issue preclusive effect, and the arbitrator's credibility determinations should not supplant the jury's fact-finding role. Finally, Southwest's assertion that the Court unfairly managed the trial or made legal errors is baseless.

## ARGUMENT AND AUTHORITIES

### I. Southwest is not entitled to judgment or a new trial on Carter's Title VII claims.

#### A. Southwest is not entitled to judgment on Carter's Title VII unlawful discharge claim.

Contrary to Southwest's characterizations,[2] the trial evidence supports the jury's finding that Southwest discharged and otherwise discriminated against Carter because of her religion. Title VII's disparate treatment provision prohibits an employer from discharging or otherwise discriminating against an employee because of her "religion," which includes "all aspects of [her] religious observance and practice, as well as belief."[3] To prove unlawful discrimination, Carter had to show that Southwest's termination of her employment "was motivated by her sincerely held religious observances, beliefs, or practices."[4] Carter presented such evidence, including Southwest's termination letter, Carter's Facebook communications, Schneider's summary of his

---

[1] Doc. Nos. 386, 386-1, 387, and 387-1.
[2] Doc. No. 386-1, p.22.
[3] 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j).
[4] Doc. No. 343, p.14; Doc. No. 250-2, pp.6-8.

investigation, Southwest's Fact Finding Meeting notes, and Schneider's testimony acknowledging that he fired Carter for Facebook messages and posts observing her religious beliefs and practices.[5] None of this evidence is "speculative" or "uncorroborated."[6] Thus, the jury correctly determined that Southwest unlawfully discharged and discriminated against Carter in violation of Title VII.

Southwest's contention that there is not sufficient record evidence mistakes what Carter must prove.[7] Carter presented direct evidence of Southwest's discrimination and discharge of Carter, and did not need to rely on a "pretext" or "indirect evidence" theory.[8] Evidence of "pretext," "hostile comments regarding Christians … or Carter's religious beliefs," or treating non-Christian employees more favorably are unnecessary to a finding that Southwest violated Title VII.[9] When there is direct evidence of discrimination, as there was here, the *McDonnell Douglas* indirect proof paradigm is inapplicable.[10] While Southwest did not discipline Carter for her religion prior to this case, there is ample evidence that the company fired her because of her religion in March 2017.[11]

**B. The Court properly instructed the jury regarding Carter's failure to accommodate claims, and the trial evidence supported the jury's decision and awards.**

**1. The Court's interrogatory required the jury to find that Carter proved her "sincerely held religious beliefs, observances, or practices conflicted with a job requirement," and the evidence shows the conflict.**

The Court's refusal to give a separate interrogatory regarding whether there was a conflict between Carter's religion and job requirements did not make the interrogatories incomplete because the jury could not have found the company liable without finding that Carter proved the

---

[5] Tr. Ex. 64, 65, 98, 103, 107, 115; Tr. Trans. 1289:8-24; 958:7-959:9; 1105:3-22; 1106:23-1107:3; 1131:3-1132:11; 1595:9-16; 1660:5-1662:8.
[6] Doc. No. 386-1, p.23.
[7] Doc. No. 386-1, pp.22-23.
[8] Doc. No. 343, pp.14-18; Doc. No. 223, pp.33-34; Doc. No. 250-2, p.9; Doc. No. 331, pp.10-11.
[9] Doc. No. 386-1, pp.22-23.
[10] *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).
[11] *See supra* at 2 n.5; Doc. No. 386-1, p.22.

conflict.[12] Rule 49 gives the Court wide latitude in submitting and framing written questions to the jury.[13] The Court's instructions required the jury to decide whether Carter "proved that Defendant Southwest failed to accommodate [] Carter's sincerely held religious beliefs, practices, or observances."[14] The Court further instructed the jury that, to prove failure to accommodate, Carter "must prove" her "sincerely held religious beliefs, observances, or practices conflicted with a job requirement."[15] Thus, the jury could not find Southwest liable for failure to accommodate without finding that Carter's religious beliefs conflicted with a job requirement.

Contrary to Southwest's contentions, the evidence shows that Southwest created the conflict between Carter's religious beliefs and practices, and its social media policies.[16] Carter showed she has a deeply held religious belief that abortion is the taking of human life contrary to God's will, and in showing others that abortion takes human life, which she observed in this case by sending pro-life videos to Local 556's president and posting them on her Facebook page.[17] Carter's religious beliefs require her to share with others that abortion is the taking of a human life and to avoid her personal promotion of abortion.[18] Local 556's use of nonmember employees' forced fees

---

[12] Doc. No. 386-1, pp.14-15. Carter maintains that it was unnecessary to make any such showing because the conflict was Southwest's undisputed discharge of Carter for religious communications that it decided were social media policy violations. Doc. No. 331, pp.12-14; *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 n.2 (2015) (firing an employee because of her religious beliefs "is synonymous with refusing to accommodate the religious practice"). Firing Carter was not a material issue of fact that was in dispute. Fed. R. Civ. P. 49(a).

[13] *See Cent. Progressive Bank v. Fireman's Fund Ins. Co.*, 658 F.2d 377, 381 (5th Cir. 1981); Doc. No. 386-1, pp.14-15.

[14] Doc. No. 343, p.38; Doc. No. 386-1, p.14.

[15] Doc. No. 343, p.17.

[16] Doc. No. 386-1, pp.15-17.

[17] Doc. No. 343, p.4, ¶1 (stipulating that Charlene Carter is a Christian who believes that abortion is the taking of a human life contrary to the teachings of the Bible and will of God); Tr. Trans. 1201:19-25; 1183:4-1206:20; 1260:13-20; 1261:10-1263:4; 1289:8-24; Tr. Ex. 64-65, 103 (SWA 4676, 4677).

[18] *Id.*; Doc. No. 386-1, p.16.

to support Planned Parenthood also violated Carter's religious mandate that she not personally promote abortion.[19] Southwest never controverted those facts or evidence.

Contrary to Southwest's characterizations, the evidence shows that Carter confronted the company with the knowledge that she made the Facebook communications for religious reasons before the company fired her.[20] Thereafter, Southwest fired Carter despite knowing her religious beliefs, observances, and practices.[21] Southwest's assertion that "general statements of her [religious] beliefs" did not put the company on notice or trigger an accommodation obligation is untrue because Carter confronted Southwest with her specific religious observances, beliefs, and practices, and knowledge that Carter sent and posted the Facebook videos for religious reasons.[22]

 Southwest is wrong that there is no evidence that its policies prohibited her from having her religious views—the company fired her under its social media policies for observing, practicing, and having those views.[23] Thus, the evidence supports the jury's findings that Carter's sincerely held religious beliefs, observances, and practices conflicted with Southwest's job requirements as it shows Southwest fired her under its social media policies.[24]

While Southwest asserts that the company did not have to accommodate every act connected to religion or an employee's personal preferences for practicing her religion, such considerations only arise to evaluate the reasonableness of the company's proposed accommodations once the

---

[19] Tr. Trans. 1256:12-1263:4.
[20] Tr. Ex. 64, 65, 103 (SWA 4676, 4677), 107, 115; Tr. Trans. 958:7-959:8; 1105:3-22; 1106:23-1107:3; 1131:3-1132:11; 1595:9-16; 1660:5-1662:8; Doc. No. 386-1, p.16.
[21] *Id.*
[22] *See supra* at 2 n.5; *see also Abercrombie*, 575 U.S. at 774 n.3; Doc. No. 386-1, pp.18, 27.
[23] *See supra* at 2 n.5; Doc. No. 331, pp.12-14; Doc. No. 386-1, 16.
[24] *See supra* at 2 n.5. While Southwest argues that there was no religious belief or practice for Southwest to accommodate, applying its social media policies to her religious messages created the conflict. As Schneider admitted, Carter did not need an accommodation until the company purported to apply its policies to her. Tr. Trans. 1656:3-1657:7.

employer has initiated the dialogue.[25] To the extent Southwest believed Carter could engage in her religious observances and practices without violating the company's policies, its policies must yield and it should have first carried out its *affirmative obligation* to initiate accommodation efforts before firing her.[26] Firing an employee for her religious practices "is synonymous with refusing to accommodate the religious practice."[27]

### 2. Southwest created the conflict between its social media policies and Carter's religious beliefs and practices.

Contrary to Southwest's arguments, the Court should not have to give a misleading instruction to the jury that the company would not have to accommodate Carter if she "violated the policy prior to Southwest suspecting her need for an accommodation."[28] Southwest's favored instruction misrepresents the law under *Abercrombie*.[29] Title VII prohibits the employer's motive of avoiding the employee's need for an accommodation when its application of work rules creates a conflict, not its knowledge of her need prior to applying the policy.[30] Title VII imposes an affirmative duty on Southwest prohibiting the company from creating conflicts between neutral "general rules of conduct" and employees' religious beliefs and practices.[31] Carter did not need an accommodation

---

[25] Doc. No. 255, p.12; Doc. No. 223, pp.39-40; Doc. No. 386-1, pp.15, 17.

[26] *Abercrombie*, 575 U.S. at 775.

[27] *Id.* at 772 n.2.

[28] Doc. No. 223, pp.43-44; Doc. No. 386-1, p.17. Southwest Denver Base Manager Ed Schneider admitted the absurdity of this characterization of events at trial. Tr. Trans. 1656:3-1657:7. Nobody had determined that Carter's Facebook messages and posts violated Southwest's social media policies until after the company apprehended her messages and decided she should be disciplined form them under its policies. Carter does not have an *ex ante* affirmative obligation to notify the company every time she communicates her religious beliefs, especially without having the prescience to know whether her beliefs might somehow offend Southwest's overly-broad social media policies. Only in Southwest's Kafkaesque world could this be regarded as "common sense." Doc. No. 386-1, p.17.

[29] *Abercrombie*, 575 U.S. at 773-74.

[30] *Id.*

[31] "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively

under Southwest's Social Media Policies until the company applied its Social Media Policies to her religious expression and fired her. Thus, the Court correctly instructed the jury consistently with the language of *Abercrombie* that Carter must prove that Southwest "discharged Carter with the motive of avoiding the need for accommodating a religious belief, observance, or practice."[32]

### 3. Title VII's disparate treatment provision does not require employees to request an accommodation or require that the employer have actual knowledge of a need for an accommodation.

Contrary to Southwest's contentions, Southwest was not entitled to judgment because Carter demonstrated that Southwest acted with the motive of avoiding her need for accommodation, *and* that Southwest had knowledge of her need.[33] Showing that an employer has "actual knowledge" of an employee's need for an accommodation is not necessary to prove the company's intentional discrimination.[34] "Instead, an [employee] need only show that his need for an accommodation was a motivating factor in the employer's decision."[35]

While knowledge is not a necessary condition of liability, the trial evidence shows that Southwest knew Carter's need for a religious accommodation, and avoided its affirmative obligations by firing her. Carter's pro-life Facebook videos and messages and her statements in the March 2017 fact-finding confronted Southwest with her need for a religious accommodation.[36] Having learned of and acknowledged Carter's religious observances, beliefs, and practices, Southwest still fired Carter in violation of its affirmative obligations under *Abercrombie*.

---

obligating employers not to discharge any individual because of such individual's 'religious observance and practice.'" *Abercrombie*, 575 U.S. at 775 (cleaned up).

[32] Doc. No. 343, p.17; Doc. No. 255, p.12; *Abercrombie*, 575 U.S. at 773.

[33] Doc. No. 386-1, pp.18-19.

[34] *Abercrombie*, 575 U.S. at 773, 774.

[35] *Id*.

[36] Tr. Ex. 64, 65; Tr. Ex. 103 (SWA 4676, 4677); 107, 115; Tr. Trans. 1289:8-24; 1068:23-1072:20; 1105:3-22; 1106:23-1107:3; 1131:3-1132:11; 1595:9-16; 1660:5-1662:8.

Southwest avoided Carter's need for an accommodation by failing to refer her issues to its ACT (accommodations) Team, and instead gathering "nexus" evidence to prosecute the case against her, and ignoring other options apart from termination.[37]

### C. The Court's jury instructions did not improperly limit the undue hardship burden, and Southwest failed to show that accommodating Carter would have imposed an undue hardship on the company's business.

#### 1. The Court's jury instructions did not improperly limit the burdens the jury could consider in assessing undue hardship.

The Court correctly instructed the jury that an undue hardship "means more than a de minimis cost on the conduct of the employer's business either in terms of financial costs or disruption of the business."[38] Contrary to Southwest's characterization, the standard is not whether the accommodation would impose more than a *de minimis* burden "on *an employee's co-workers*."[39] Title VII requires Southwest to demonstrate that it "is unable to reasonably accommodate to an employee's … religious observance or practice without undue hardship on the conduct of the employer's *business*."[40] While Southwest argues that burdens on an employee's co-workers can constitute undue hardship that does not comport with the text.

---

[37] Tr. Ex. 10; Tr. Trans. 1656:3-1657:7; 1658:8-1662:8; Tr. Ex. 1290:8-22; 1678:12-1679:19 (Jones digging for nexus posts); 1530:22-1533:6) (Emlet digging for nexus posts); 1582:17-1585:10, 1586:9-1587:2 (Schneider); Tr. Ex. 89 (SWA 4636) (Employee Relations Manager Denise Gutierrez asking President Stone to "go back and get the messages [Carter had been sending since Stone became President] and any information even if it seems trivial and send it to me); Tr. Trans. 1068:23-1072:20; Tr. Ex. 10; Tr. Trans. 1658:8-1662:8.

[38] Doc. No. 343, p.18.

[39] Doc. No. 386-1, pp.19-20.

[40] 42 U.S.C. § 2000e(j) (emphasis added). Carter objects to instructions that define "undue hardship" in accordance with the "more than *de minimis*" test in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). While this Court may be bound by *Hardison*'s "more than *de minimis*" test, it should be overturned for all of the reasons Carter already set forth. Doc. No. 223, pp.51-52; Doc. No. 250-2, p.14; Doc. No. 208, p.31. The Supreme Court granted certiorari on January 13, 2023 in *Groff v. DeJoy*, No.22-174, to reconsider *Hardison*. Carter also objects that the jury instructions allowed Southwest to raise an undue hardship defense because Southwest never initiated any accommodation efforts. *See Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440 (9th

Nothing prevented Southwest from demonstrating the "cost on the conduct of the employer's business" in terms of the "disruption of the business."[41] But Southwest failed to present any such evidence.[42] Moreover, Southwest could not show that Carter sent Facebook communications to "co-workers." Carter posted her pro-life videos to her personal Facebook page and only sent her pro-life Facebook messages to one person—President Stone.[43] There is no evidence that any other employees complained to Southwest about Carter's Facebook posts. Thus, Southwest's purported undue hardship involving "co-workers" is inapposite given Local 556's and its officials' affirmative obligations under Title VII, the RLA, and the union's duty of fair representation.[44]

### 2. Southwest failed to show that accommodating Carter would have imposed an undue hardship on the company's business.

Contrary to Southwest's assertions, the company did not present evidence that accommodating Carter would have imposed an undue hardship on the company's business.[45] Having learned in the fact-finding of Carter's religious reasons for posting the videos and sending them to the Local 556 President, Southwest did not attempt or even evaluate a religious accommodation of Carter's

---

Cir. 1993). Undue hardship requires "at a minimum, the employer negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs." *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1513 (9th Cir. 1989) (citing *Hardison*, 432 U.S. at 75). "The prohibition of discrimination because of religious practices is meant to force employers to consider whether those practices can be accommodated without undue hardship." *Abercrombie*, 575 U.S. at 778 (Alito, J., concurring). *See also*, Doc. No. 208, pp.29-30; Doc. No. 250-2, pp.13-14.

[41] Doc. No. 343, p.18.

[42] Southwest's cited authorities for religious accommodation's hardship on co-workers involve the impact on employees' schedules or operations, which is not applicable in this case. Doc. No. 386-1, pp.19-20. Even the case Southwest cites for finding undue hardship with the "possibility" of an impact on co-workers involves an imminent impact on employees in their work capacity. *Id.* Southwest has failed to articulate any such theoretical impact here. *Id.*

[43] Tr. Ex. 64, 65.

[44] 42 U.S.C. § 2000e-2(c)(1),(3); 2000e(j); 45 U.S.C. § 152 (Third) and (Fourth); *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 198 (1944); Doc. No. 221, pp.47-51.

[45] Doc. No. 386-1, pp.21.

beliefs.[46] Southwest failed to present evidence showing *any* undue hardship on its business.[47] Southwest, admitted that Carter's Facebook communications imposed no financial harm on the company prior to her termination.[48] Southwest failed to present any evidence that anyone but President Stone complained about Carter sending messages, and the evidence shows that the company did not receive any complaints about the posts Carter made on her Facebook page.[49] Southwest only discovered those posts as part of its internal investigation of President Stone's complaint, which did not mention any of Carter's public Facebook page posts.[50]

Carter demonstrated, and Southwest never disputed, that Southwest could have made minimal efforts to accommodate her that would not have imposed any undue burden. Southwest never discussed with Carter whether she would be willing to post a disclaimer on her Facebook page that her posts do not necessarily represent the company's views.[51] Southwest never asked Carter if she would remove Facebook posts that it considered to be a nexus to the workplace.[52] Nor did Southwest ever ask if Carter would take any Facebook posts down prior to her termination.[53] While Southwest references Emlet's testimony of hypothetical harassment claims from co-workers, the company only received complaints from one employee—Local 556 President Audrey

---

[46] Tr. Trans. 1068:23-1072:20; Tr. Ex. 10; 1658:8-1662:8.

[47] *Id.*

[48] Tr. Trans. 1069:20-23.

[49] Tr. Trans. 1092:5-1093:6.

[50] *See supra* at 7 n.38. Southwest's claim that Carter was "readily identifiable as a Southwest employee" is also misleading, and demonstrates a pretext for avoiding its affirmative duty to accommodate Carter's religious beliefs. Tr. Trans. 1086:11-1093:6; 1290:9-22.

[51] Tr. Trans. 1069:24-1072:20.

[52] Tr. Trans. 1291:2-8; 1071:22-1072:20.

[53] Tr. Trans. 1071:22-1072:20. To be sure, the Fifth Circuit has held that employers need not make efforts to accommodate an employee's religious beliefs if they can show that *any* accommodation would impose an undue hardship on the company's business. *See Weber v. Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000). But Southwest failed to show that any, much less every possible accommodation would have imposed an undue hardship on the conduct of its business. *See* Doc. No. 343, p.17; 42 U.S.C. 2000e(j).

Stone.[54] Southwest's claimed hardship is specious, particularly given the union's and its officials' affirmative obligations owed under Title VII, the RLA, and the DFR.[55]

### D. The evidence supports the jury's emotional damages award.

Carter's evidence supported the jury's emotional damages award. When reviewing the jury's verdict, the standard of review for emotional damages awards "is deferential to the fact finder because 'the harm is subjective and evaluating it depends considerably on the demeanor of witnesses.'"[56] To meet her burden, a plaintiff is not required to submit corroborating testimony from a spouse or family member or medical or psychological evidence.[57] Emotional distress damages may be appropriate where the plaintiff "suffers sleeplessness, anxiety, stress, marital problems, and humiliation."[58]

Contrary to Southwest's characterizations, Carter demonstrated more than just routine "hurt feelings, anger, and frustration" that are a part of life.[59] Carter presented specific evidence showing 1) the nature and the extent of her emotional distress,[60] 2) the physical manifestations of her distress, including stress, loss of sleep, loss of appetite, PTSD, and walking stroke, and 3) medical records documenting her walking stroke and invoices for counseling she had received as a result.[61]

---

[54] Tr. Ex. 66; Doc. No. 386-1, pp.21-22.

[55] *See supra* at 8 n.46.

[56] *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 937-38 (5th Cir. 1996) (citations omitted).

[57] *Hitt v. Connell*, 301 F.3d 240, 250 (5th Cir. 2002).

[58] *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998); *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 809 (5th Cir. 1996); *Forsyth v. City of Dallas*, 91 F.3d 769, 774-75 (5th Cir. 1996) (finding evidence sufficient and no basis to reverse the jury's evaluation where plaintiff testified she suffered "depression, weight loss, intestinal troubles, and marital problems" and that "she had to consult a psychologist).

[59] Doc. No. 386-1, p.24.

[60] Contrary to Southwest's arguments, Carter's testimony is not "vague" and "generalized" or otherwise insufficient to support the jury award. Doc. No. 386-1, p.24.

[61] Tr. Ex. 126-129; Tr. Trans. 1306:7-24. While Southwest belatedly raised a hearsay objection after Carter testified about her medical issues (and the testimony was not hearsay but her own understanding of her conditions), Southwest did not seek to strike the testimony, and the question

Carter also demonstrated that Southwest's termination of her employment caused these damages.[62] Carter testified to her severe reaction upon receiving the telephone call and falling to the ground crying.[63] Carter also provided evidence of the context for how Southwest's actions could be especially emotionally harmful to her, given her own experience with abortion[64] and Southwest's hostility to her religious views occasioned by its termination of her employment. Carter testified to the jury about the evening shortly after her termination in 2017 when she was not eating or sleeping, and she suffered a walking stroke.[65] Carter described going to dinner with a business partner, and that her blood pressure spiked to an extreme level, her heart constantly racing and then stopping, she did not get enough oxygen to her brain, and she "kept repeating, repeating, repeating, [and] repeating  everything that [she] was saying."[66] Carter lost 6 hours that she could not recall and ended up in the emergency room.[67] Southwest never proffered any evidence or rebutted Carter's testimony.  Further, such testimony cannot be excluded; to preserve a claim of error on a ruling to admit or exclude evidence, Federal Rule of Evidence 103 requires that a party timely objects or moves to strike, which Southwest failed to do.[68]

---

itself ("What is a walking stroke?") was not objectionable. Tr. Trans. 1296:12-1298:9. Further, Southwest did not object to Carter's testimony about her walking stroke as improper lay opinion. *See id.*  Instead, Southwest objected to lay opinion testimony only as to PTSD, and the Court struck the question and answer on that issue. Tr. Trans. 1298:11-1299:24.

[62] Carter testified that she had never suffered a walking stroke or PTSD until after she was fired. Tr. Trans. 1300:5-12; Doc. No. 386-1, p.25. While Southwest asserts without evidence that her emotional distress derives from marital problems and concern for the care of her daughter, Carter testified that losing her job exacerbated all of these problems. Tr. Trans. 1306:19-24. Furthermore, none of these other factors had caused her to suffer a walking stroke or PTSD before her termination.

[63] Tr. Trans. 1263:23-1264:20.

[64] Tr. Trans. 1193:18-1195:5.

[65] Tr. Trans. 1296:13-1297:18.

[66] Tr. Trans. 1296:14-21; 1297:1-1298:9.

[67] *Id*.

[68] Tr. Trans. 1296:13-1297:18. Southwest's objection was only as to what her doctor told her, which the Court overruled. Tr. Trans. 1296:20-24.

While Southwest argues that a lay witness may not testify as to medical causation, Carter did not offer testimony on medical causation.[69] Instead, she testified as to the timing of the walking stroke and PTSD that she suffered (after her termination and before her second step hearing), her distress during that time period, and how that stress manifested itself.[70] Such testimony about the emotional state of a party after a traumatic event is permitted from a lay witness, even when it includes the causation of the emotional state.[71] This testimony was in addition to Carter's medical bills and records that came in without objection[72] and were more than sufficient to estimate the calculation of future damages based on her testimony.[73] Notably, even if the Court reduced Carter's compensatory damages award, Southwest would still owe the punitive damages the jury awarded Carter but that she could not recover because of the Title VII statutory cap.[74]

### E.  The evidence supports the jury's punitive damages award.

Contrary to Southwest's assertions, Carter demonstrated that Southwest acted with malice and reckless indifference to Carter's federally protected right to be free from discrimination. To show reckless indifference, the employer must discriminate in the face of a perceived risk that its actions will violate federal law.[75] Southwest cannot argue that there is no evidence that Southwest managers believed they were violating Title VII-protected rights.[76] Evidence showing managers' knowledge of policies and training establishes that they perceived the risk to violating federally

---

[69] Doc. No. 386-1, p.16.
[70] Tr. Trans. 1296:13-1297:18.
[71] *Ishee v. Fed. Nat. Mortg. Ass'n*, No. 2:13-CV-234-KS, 2014 WL 6686705, at *1 (S.D. Miss. Nov. 26, 2014).
[72] Tr. Trans. 1305:15-1306:3.
[73] Tr. Ex. 126-129.
[74] Doc. No. 351, p.7; Doc. No. 374, p.20, 23.
[75] *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999).
[76] Doc. No. 386-1, p.27.

protected rights.[77] Evidence that the employer has knowledge of the anti-discrimination laws alone is sufficient to demonstrate reckless indifference and to allow punitive damages.[78]

Southwest's managers, including Schneider, received training regarding Title VII discrimination and the protection of employees' religious rights.[79] Schneider knew protected religious activity is "speech that reflects on religion in the workplace."[80] Schneider testified that managers go through required training once a year on different aspects of how to handle someone claiming they have religious beliefs interacting with Southwest policy.[81] Schneider admitted that the policy requires him to go to the ACT accommodations team if he is aware that an employee is involved in protected activity and needs an accommodation, and make ACT aware of it.[82] He testified that if Carter made him specifically aware (which she did), then he would have raised it.[83]

From the outset of the investigation, Carter's Facebook messages confronted Southwest's

---

[77] *See Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 440 (5th Cir. 2022) (manager trained on company's ethics policy statement, so she knew not to retaliate against employee because of his discrimination complaints); *EEOC v. Stocks, Inc.*, 228 F.App'x 429, 431-32 (5th Cir. 2007) (evidence showed decisionmakers had knowledge of federal anti-discrimination laws); "Malice" and "reckless indifference" "focus on the actor's state of mind" and "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535; *see also Schexnayder v. Bonfiglio*, 167 F. App'x 364, 368 (5th Cir. 2006) ("[A] jury may award punitive damages pursuant to Title VII merely if the employer knew it *may have been* violating the law.") (emphasis in original) (citing *Kolstad*, 527 U.S. at 536 (quotation omitted)).

[78] *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001)*; Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir. 2000); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1246, 1246 n.3 (10th Cir. 1999) (finding that employer's awareness of prohibitions against workplace discrimination and its company-wide policy designed to ensure compliance with ADA requirements precludes assertion that they were unaware of the relevant federal prohibition).

[79] Tr. Trans. 873:13-23.

[80] Tr. Trans. 873:13-16; 874:15-16.

[81] Tr. Trans. 873:17-22.

[82] Tr. Ex. 1659:2-1662:8.

[83] *Id*.

managers with the knowledge that her federally protected rights were at stake.[84] When President Stone complained about Carter's pro-life videos and messages Southwest managers immediately involved their Employee Relations team, which handles religious discrimination issues and protected categories.[85] President Stone complained about the religious messages Carter sent.[86] During her fact finding, Carter told Denver Base Manager Ed Schneider (in charge of the investigation and the decision-maker with respect to her termination), Employee Relations Manager Denise Gutierrez, and other Southwest managers that she posted and sent the videos because of her deeply held religious beliefs:

> I'm a Christian, I'm a conservative, and I'm pro-life. This happens to be a huge issue for me and I get the message out wherever I can. This was sent to me and I decided to post it on my Facebook page. I think if more and more people would see what actually happens… I have a deep, deep want to get the word out.[87]

Carter also told Southwest that she "work[s] with other pro-life groups" and that "for me as a Christian, if I can get the word out in any way, to every group as possible to touch this issue," I do.[88] Carter also explained her belief that "if more and more people would see what actually happens" they would not do it.[89] Carter explained that the videos were intended to show "[i]t's an abortion. It's a baby … They need to know that it's a life and not just a bunch of tissue."[90]

---

[84] Contrary to Southwest's characterizations, Carter did not just "generally reference" her religious beliefs, observances, and practices. Doc. No. 386-1, p.27. Trial evidence demonstrated that Southwest knew her specific beliefs, observances, and practices. Carter specifically explained at the fact finding meeting what her religious beliefs, observances, and practices were. Tr. Ex. 103 (SWA 4676, 4677).

[85] Tr. Ex. 66; Tr. Trans. 873:13-874:1; 874:11-15; 1053:4-15; 1054:7-1058:12; 1518:1-10; 1578:23-1579:3 (Employee Relations is in charge of determining violations of protected categories).

[86] Tr. Ex. 64-66.

[87] Tr. Ex. 103 (SWA 4676).

[88] *Id*. (SWA 4677).

[89] *Id*. (SWA 4676-4677).

[90] *Id*. (SWA 4677).

Southwest Employee Relations Manager—who ostensibly protects employees in protected categories—interrogated Carter about why she "feel[s] the need to send something religious using praying and god to [union president Audrey Stone]."[91]

Schneider remembered what Carter said at the fact finding and admitted that he knew it was religious expression.[92] Schneider's investigation report specifically noted Carter's religious beliefs.[93] While Southwest insists that managers believed they were applying policies to thwart Title VII violations of Stone's rights, the jury was entitled to reject that assertion based on the evidence presented (particularly given the union's Title VII obligations), and did, finding that President Stone was acting in her official capacity.[94] "[T]he jury, alone, weighs evidence and determines credibility."[95] The jury credited Carter's version of the facts and rejected Southwest's.

While Southwest also argues that none of the managers involved in Carter's termination were tasked with handling the provision of religious accommodations (i.e., were not ACT Team members),[96] Carter presented evidence that, under Southwest's Religious Accommodation policies, Southwest managers knew about the ACT Team and policy, and were responsible for notifying ACT Team members of an employee's need for an accommodation.[97] Carter also demonstrated that Southwest actively used its investigation to prosecute the case against her religious expression by digging up old, highly attenuated posts from Carter's Facebook timeline

---

[91] *Id.* (SWA 4685).
[92] Tr. Ex. 64, 65; Tr. Ex. 103 (SWA 4676, 4677); 107, 115; Tr. Trans. 1289:8-24; 1103:11-22-1107:3; 1131:3-1132:11; 1595:9-16; 1660:5-1662:8; Tr. Trans. 958:7-959:19.
[93] Tr. 107.
[94] Doc. No. 348, p.1; Doc. No. 386-1, p.27.
[95] *Wantou*, 23 F.4th at 440 (citation omitted).
[96] Doc. No. 386-1, p.27.
[97] Tr. Trans. 1658:8-1662:8; Tr. Ex. 10

to establish "a nexus to the workplace" and justify its illegal action.[98] There was no connection whatsoever between Carter's religious videos and messages and Southwest.[99] Given the highly attenuated nature, the company contrived this "nexus" as merely a cover for the company to fire her and evade its duty to accommodate Carter's religious beliefs and practices. Thus, there was indeed evidence that Southwest managers subjectively understood themselves to be violating Title VII, and the jury was entitled to rely upon it.[100]

Contrary to Southwest's characterizations, Carter's claim that Southwest unlawfully fired her because of her religious beliefs is not novel.[101] Title VII's plain statutory text prohibits an employer from discharging an employee or otherwise discriminating against her because of her "religion," which includes "all aspects of [her] religious observance and practice, as well as belief."[102] Nor is it a novel case of "proselytizing co-workers."[103] Carter's religious beliefs and practices were directed at the union, and Title VII's plain statutory text prohibits a union from causing or

---

[98] Tr. Ex. 10; Tr. Trans. 1656:3-1657:7; 1658:8-1662:8; Tr. Ex. 1290:8-22; 1678:12-1679:19 (Jones digging for nexus posts); 1530:22- 1533:6) (Emlet digging for nexus posts); 1582:17-1585:10, 1586:9-1587:2 (Schneider); Tr. Ex. 89 (SWA 4636) (Employee Relations Manager Denise Gutierrez asking President Stone to "go back and get the messages [Carter had been sending since Stone became President] and any information even if it seems trivial and send it to me); Tr. Trans; 1068:23-1072:20; Tr. Trans. 1658:8-1662:8; Tr. Ex. 10.

[99] Tr. Trans. 1086:11-1093:6; 1290:9-22.

[100] Doc. No. 386-1, p.28.

[101] Doc. No. 386-1, p.28.

[102] 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j). Doc. No. 343, p.14; Doc. No. 250-2, pp.6-8, 27. *Abercrombie*, 575 U.S. at 772. While Southwest argues that *Abercrombie*, decided two years before the events in this case, makes some aspects of Carter's Title VII claims novel, Schneider testified that Southwest trained its management every year on religious discrimination and protected categories, affording them plenty of time to know *Abercrombie*'s requirements. Tr. Trans. 873:17-22; Doc. No. 386-1, pp.27-28. Moreover, Title VII's plain statutory command that the company may not fire an employee because of her religious beliefs is well-settled law. Southwest's summary termination of Carter's employment was not a novel violation of the statute.

[103] Doc. No. 386-1, p.28.

attempting to cause an employee to be disciplined because of her religion.[104] Given Southwest's knowledge of Title VII, it knew that the union and its officials have independent legal duties not to discriminate against employees because of their religion. While Southwest characterizes this as an unusual case, it is only so because of Southwest's blatantly and summarily firing an employee for her religious beliefs and practices in violation of Title VII's plain text.

Southwest also argues that punitive damages are inappropriate if those alleged to have engaged in unlawful conduct understood there to be an undue hardship defense.[105] But there is no evidence that Southwest contemplated an undue hardship defense at the time it fired Carter. Moreover, Southwest did not consider whether accommodating Carter's religious beliefs imposed an undue hardship on its business because it never contemplated any accommodations for Carter at all.[106] Therefore, Southwest's theory is disingenuous and not entitled to any weight.

Southwest further argues that, even if it acted maliciously or with reckless indifference, the employer can avoid punitive damages if it can show that it made good faith efforts.[107] While true that Southwest had policies and procedures that should have prevented discrimination against Carter, the evidence demonstrates that it recklessly disregarded them and actively worked to prosecute the case against Carter even after there was no doubt as to the religious nature of the conduct being punished.[108] Where an employer ignores complaints of discrimination, a reasonable jury can conclude that the employer did not act in good faith to prevent discrimination.[109] While

---

[104] *See Wal-Mart Stores, Inc.*, 187 F.3d at 1246 n.3 (finding that employer "cannot argue that the theory upon which the plaintiffs premised their claims is novel or poorly developed, because the ADA is now a matter of settled law").

[105] Doc. No. 386-1, p.27.

[106] *See supra* at 8-10.

[107] Doc. No. 386-1, pp.28-29.

[108] *See supra* at 16 n.101.

[109] *Wantou*, 23 F.4th at 440.

those were factors the jury could consider, the jury instructions also permitted the jury to consider "how or whether they responded to [] Carter's complaint of discrimination."[110] Southwest made no good faith efforts to apply its policies in Carter's case. The jury could logically conclude (and did) that Southwest engaged in bad faith conduct.

## II. Southwest is not entitled to judgment or a new trial on Carter's RLA claims.

### A.  The Court's RLA-protected activity instruction was not erroneous.

The Court correctly instructed the jury regarding RLA Section 152 (Third) and (Fourth) speech and association protections consistent with the Supreme Court's decisions in *Steele*, *Street*, and *Austin*.[111] The Supreme Court has recognized that federal labor law principles guarantee employees' freedom to engage in "uninhibited, robust, and wide-open debate in labor disputes."[112] Employees' union representation speech is protected even if others consider their speech "intemperate, abusive, or insulting,"[113] or a "vehement," "caustic," or "unpleasantly sharp attack[]."[114] Even "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth."[115] Federal courts have applied *Austin* in the RLA context.[116] Thus, the Court

---

[110] Doc. No. 343, p.22.

[111] Doc. No. 343, p.13; Doc. No. 328, pp.2-3; Doc. No. 250-2, p.3; Doc. No. 208, pp.14-19; Doc. No. 221, pp.42-47; Doc. No. 386-1, pp.29-30; *See Steele*, 323 U.S. at 198; *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 776 (1961); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273-74 (1974). The RLA subjects unions to "constitutional limitations on [their] power to deny, restrict, destroy, or discriminate against ... [employees'] rights," including their speech and association rights to re-organize or oppose their unions, and any other employee representation or organizational matters. *See Steele*, 323 U.S. at 198.

[112] *Austin*, 418 U.S. at 274.

[113] *Id.* at 273-74, 283.

[114] *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 62 (1966).

[115] *Id.* at 63.

[116] *See Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 882 n. 10 (9th Cir. 2002) ("We see no reason why the rule announced in *Linn* [and applied in *Austin*] … regarding protected activities, should not apply in the context of the RLA.") (cleaned up); *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191-92 (11th Cir. 1999).

18

correctly instructed the jury that Carter's protected activity did not lose its protection even if her conduct was "intemperate, abusive, insulting, or hyperbolic."[117]

The Court correctly recognized it was not necessary to engraft the NLRA's limitations restricting extremely offensive speech in the workplace because Carter's speech did not impact the workplace.[118] The Court also correctly recognized that there was no Supreme Court or Fifth Circuit precedent for imposing such limitations in an RLA case.[119] While Southwest relies on cases involving conduct directed at the employer or the workplace, those cases are inapposite because Carter privately sent her RLA-protected Facebook messages to Local 556 President Stone, and did not send them to any other Southwest employees.[120] The workplace/employer requirement is important because the exception only applies to balance employee rights against the employer's interest in maintaining order and discipline.[121] Non-work conduct does not implicate that interest. Carter confined her speech to the union, and did not direct it to Southwest or the workplace.[122]

Southwest is also mistaken that the Court's instruction on protected activity will cause the RLA to run head first into Title VII anti-harassment provisions.[123] Southwest's policy arguments are not at issue in this case because Carter engaged in RLA-protected activity with the union.[124] But where an employee is engaged in lawful, non-threatening RLA-protected activity opposing the union or

---

[117] Doc. No. 343, p.13.
[118] Tr. Trans. 1883:8-1884:9. Notably, *Konop* speculated that those offensive speech limitations *might* apply in a relevant case, and, it was not clear whether the employer was making that argument. As such, it is dicta. *Konop*, 203 F.3d at 883 n.11. This Court, as in *Konop*, was not confronted by that situation. Thus, it would be improper to import that limitation from the NLRA.
[119] Tr. Trans. 1883:8-1884:9.
[120] *See e.g., Reef Indus. Inc. v. NLRB*, 952 F.2d 830, 837 (5th Cir. 1991). For the same reasons *Held* is distinguishable because the plaintiff in that case was not engaged in protected activity when he published invective on a company website. *See* Doc. No. 34, p.28; Doc. No. 386-1, p.30.
[121] *Reef Indus. Inc.*, 952 F.2d at 837; Doc. No. 328, pp.3-4.
[122] *Id.*; Doc. No. 65.
[123] Doc. No. 386-1, p.31.
[124] Doc. No. 348, p.1.

its officials, there cannot be a conflict with Title VII, especially when the very same union and its officials owe the employee affirmative duties under Title VII and the duty of fair representation.[125]

Contrary to Southwest's continued assertions, employees do not lose their RLA Section 152 (Third) and (Fourth) rights once a union is certified.[126] Employees do not permanently lose their rights to re-organize or change their union representation after the employees first certify a union. The RLA protects employees' rights to continuous "self-organization" and "re-organization" campaigns to remove unwanted unions and other efforts to remove unwanted union representatives.[127] Southwest's argument that RLA Section 152 (Third) and (Fourth) protect only precertification rights is inconsistent with the RLA's statutory text and purpose.[128]

### B. The Court's inclusion of RLA Section 151a's statement forbidding any limitation upon freedom of association was an important statutory instruction informing the jury regarding the proper application of Carter's RLA-protected rights.

Contrary to Southwest's characterizations, the Court's inclusion of RLA Section 151a's statement regarding employees' RLA rights was proper to inform the jury about the scope of the RLA Section 152 (Third) and (Fourth)'s protection of employee activity.[129] RLA Section 151a expressly states that the RLA "forbid[s] *any* limitation upon freedom of association among

---

[125] *See supra* at 8 n.46.

[126] Doc. No. 223, pp.26-28; Doc. No. 255 p.3 n.5; Doc. No. 34, pp.19-20; Doc. No. 54, pp.14-16; Doc. No. 386-1, pp.29-31.

[127] *See Russell v. NMB*, 714 F.2d 332, 1345 (5th Cir. 1983); *Austin*, 418 U.S. at 279. RLA Section 151a expressly states that the RLA "forbid[s] *any* limitation upon freedom of association among employees" and "provide[s] for the complete independence … of employees in the matter of self-organization." 45 U.S.C. § 151a (2)-(3) (emphasis added). Doc. No. 255 p.3 n.5; Doc. No. 223, p.23 n.12; Doc. No. 250-2, pp.4-5. Prohibiting employees from enforcing their RLA-protected rights under these post-certification circumstances based on dicta in *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 440 (1989), is inconsistent with the RLA's statutory text and purpose. Equal protection principles preclude any contention that RLA Section 152 (Fourth) grants rights to employees who organize unions but denies those rights to employees who refuse to join or subsidize unwanted unions after they are certified.

[128] Doc. No. 223, pp.26-28; Doc. No. 221, p.33; Doc. No. 208, pp.9-10; Doc. No. 250-2, pp.4-5.

[129] Doc. No. 386-1, p.32.

employees" and "provide[s] for the complete independence … of employees in the matter of self-organization."[130] While Southwest objects to its inclusion in the jury instructions as a statement of statutory purpose, RLA Section 151a properly informed the jury about the scope of employees' RLA-protected activity under RLA Section 152 (Third) and (Fourth).

While Southwest objects to informing the jury about the RLA's prohibition against any limitations on employees' freedom of association, it also argues that the Court should have added irrelevant language emphasizing the prompt resolution of disputes through arbitration.[131] But arbitration's relevance to resolving *some* disputes is irrelevant to Carter's enforcement of her Section 152 (Third) and (Fourth) rights. Southwest's proposed language is irrelevant, inappropriate, and prejudicial, and is merely another improper attempt to circumvent federally protected RLA rights and give claim preclusive effect to the arbitration.[132]

## III. Southwest is not entitled to judgment or a new trial on mitigation.

Contrary to Southwest's arguments, the jury instructions correctly informed the jury that, to prove Carter's failure to mitigate, the company had to show the availability of substantially equivalent employment.[133] "To succeed on this [mitigation] defense, Defendant [Southwest] must prove, by a preponderance of the evidence … that there was substantially equivalent employment available."[134] While Southwest relies on *Sellers* for the proposition that it need not prove this element, courts have recognized that case conflicts with earlier Fifth Circuit precedent in *Sparks*,

---

[130] 45 U.S.C. § 151a (2)-(3) (emphasis added); Doc. No. 250-2; Doc. No. 386-1, p.32; Doc. No. 221, p.32; Doc. No. 343, p.11.
[131] Doc. No. 386-1, p.32.
[132] Doc. No. 255, pp.6-7.
[133] Doc. No. 386-1, p.33.
[134] Doc. No. 250-1, p.7; Fifth Cir. Pattern Jury Instructions 11.14, pp.226-28; Doc. No. 343, p.25.

and the earlier decision controls in the failure to mitigate context.[135]

Contrary to Southwest's characterizations, Carter did seek to mitigate her damages.[136] While she did not yet receive pay, Carter worked for and invested her own money in two nonprofits and trained to become a pilates instructor.[137] Carter applied to Jet Blue, Delta, United, and Frontier.[138] The jury determined that Southwest failed to carry its burden to show there were other jobs available that she could have discovered and for which she was qualified.[139] Southwest failed to show that for someone whose professional reputation it tarnished substantially equivalent employment was available throughout this period. Furthermore, Carter did not have to accept a job that was dissimilar to the one she lost, one that would be a demotion, or one that would be demeaning.[140] The jury was entitled to evaluate the reasonableness of Carter's diligence, and that diligence should be evaluated in light of her individual characteristics and the job market.[141]

## IV. The CBA-arbitration findings asserted by Southwest should not be given issue preclusive effect for Carter's RLA and Title VII claims, and the arbitrator's credibility determinations should not supplant the jury's fact-finding role.

The Court should not enter a judgment in favor of Southwest or order a new trial because the Court's exclusion of the arbitrator's decision did not prejudice Southwest with respect to any claim.[142] Contrary to Southwest's characterizations, the Court did not "deviat[e] from [a] general

---

[135] Fifth Circuit Pattern Jury Instructions 11.14, p.226 (citing *Garcia v. Harris Cty.*, No. H-16-2134, 2019 WL 132382, at *2 (S.D. Tex. Jan. 8, 2019); *Sparks v. Griffin*, 460 F.2d 433, 443 (5th Cir. 1972)) (other citations omitted).
[136] Doc. No. 386-1, pp.33-34.
[137] Tr. Trans. 1398:18-1402:20; "Self-employment may be a reasonable alternative to seeking other employment for purposes of mitigation." *Hill v. City of Pontotoc, Miss.*, 993 F.2d 422, 427 (5th Cir. 1993).
[138] Tr. Trans. 1398-1400:25.
[139] *Id.*
[140] Doc. No. 343, p.25.
[141] Doc. No. 343, p.25.
[142] Doc. No. 255, pp.6-7; Doc. No. 386-1, p.13.

rule" that arbitration decisions are "presumptively admitted."[143] The Court properly excluded the arbitrator's written decision from going to the jury and substantial testimony and evidence related to the arbitrator's specific findings.[144] The Court found that "the danger of unfair prejudice, confusing the issues, and misleading the jury substantially outweigh any relevance the written decision and specific findings may have."[145]

While Southwest asserts that arbitration decisions addressing CBA just cause are often admissible in judicial proceedings related to statutory cases,[146] those cases involve admitting arbitration findings for relevant factual findings, not for legal conclusions as the arbitrator's were here.[147] The Court appropriately excluded those findings because of their unfair prejudice tantamount to giving the arbitrator's decision claim preclusive effect. The jury is the factfinder, and the arbitrator's opinion here would improperly usurp the jury's role. To the extent the Court would find any error in excluding the arbitrator's decision, such error is harmless and does not justify granting a new trial or modifying the jury's verdict.[148]

While Carter maintains that Southwest's "appropriate application" of its social media policies was irrelevant to her federal claims, Southwest presented its policies and witnesses who testified

---

[143] Doc. No. 386-1, p.13. While Southwest relies on *Graef*, the Fifth Circuit's reason for finding error in the exclusion of arbitration awards was based upon the similarity of the facts resolved by the arbitrator. *See Graef v. Chemical Leaman Corp.*106 F.3d 112, 118 (5th Cir. 1997). Contrary to Southwest's suggestions, its proposal of a limiting instruction would not be sufficient to cure the prejudice that would be caused through the introduction of the arbitrator's findings here. Doc. No. 386-1, pp.12-13.

[144] Doc. No. 232, pp.14-16.

[145] Doc. No. 292, p.2-6, 4 n.9; Doc. No. 247, pp4-5, ¶1.

[146] Doc. No. 386-1, pp.12-13.

[147] Doc. No. 232, pp.14-17; Doc. No. 255, pp.6-7

[148] Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.").

to the company's reasons for termination under its policies.[149] What Southwest is really arguing is that the arbitrator's legal conclusions should be preclusive and binding in cases to enforce the employee's federal statutory rights.[150] That is unfounded, and the Court correctly rejected it.[151]

## V. Southwest's assertion that the Court unfairly managed the trial or made legal errors is without basis.

Contrary to Southwest's arguments, this Court's decisions prior to and in the midst of trial did not prejudice Southwest, do not constitute a failure of due process, and do not warrant a new trial:

- The Court has discretion to manage trial time.[152] Carter moved for additional time prior to trial, and, in denying the motion, the Court stated, "[A]ny party may move for more time during trial. If the Court finds just cause, it will grant more time."[153] Southwest cannot say its trial prep was based on the time granted or impacted by granting more time given when they were on notice time might be extended. When the Court granted Carter a small amount of additional time, the Court granted the same amount of time in kind to Southwest;[154] these minor grants of time did not prejudice Southwest and Southwest fails to make any showing that it was prejudiced;[155]
- The Court properly exercised its discretion allowing Carter to depose witnesses who were unavailable for trial, and properly sanctioned Southwest when it failed to comply with the Court's order to make the witness employed by Southwest available for deposition;[156]
- The Court did not allow this case to proceed on a dismissed legal theory; The Court dismissed Carter's Count I and II post-certification claims because those particular claims did not *allege* animus, but it allowed Carter's Count IV post-certification claim because it *did* allege animus;[157]
- The Court did not improperly limit Southwest's communications with its witnesses during trial while allowing Carter to communicate freely with her counsel; Carter was a party and

---

[149] Tr. Ex. 6-13; Tr. Trans. 1534:1-1547:25.
[150] Doc. No. 386-1, pp.11-13.
[151] Doc. No. 69, pp.10-11; Doc. No. 54, pp.11-14. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 258 (1994); *Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 191 (5th Cir. 2014); *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349 (5th Cir. 2008); *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 783-84 (5th Cir. 2012) ("[T]he assertion of any right that is not created by a CBA is … not subject to binding arbitration under the statute." quoting *CareFlite v. Off. and Prof'l Emps. Int'l Union*, 612 F.3d 314, 320–21 (5th Cir. 2010))) (cleaned up).
[152] *U.S. v. Morrison*, 833 F.3d 491, 504 (5th Cir. 2016); Doc. No. 386-1, p.33.
[153] Doc. Nos. 288, 288-1, 296.
[154] Doc. No. 386-1, p.34.
[155] Doc. No. 386-1, p.34.
[156] Doc. Nos. 268, 282, 294, 297, 303, 339, 353, 366; Doc. No. 386-1, pp.33-34.
[157] Doc. No. 223, pp.26-28; Doc. No. 237; Doc. No. 386-1, p.34.

subject to cross-examination whereas Schneider was not Southwest's corporate rep;[158]

- Contrary to Southwest's arguments, it was not entitled to a summary judgment order addressing all of its arguments in explicit detail, and the Court's order did not violate Rule 56;[159]
- The Court's order enjoining Southwest from eliminating discrimination harming other flight attendant employees like it harmed Carter was not an impermissible "obey the law" injunction in violation of Rule 65(d); The Court issued injunctions against Southwest that were specific in their terms[160]
- The Court properly enjoined Southwest from discriminating against other flight attendants because Title VII affords courts broad relief to eliminate discrimination and prevent Southwest from harming other flight attendants, and the company has demonstrated that it will discriminate against other employees again; Southwest's characterization of class-wide basis is unavailing and inapposite;[161]

Contrary to Southwest's arguments, this Court did not make the substantive errors alleged by

Southwest:

- Carter showed and this Court correctly held that Carter exhausted her administrative remedies with respect to her failure to accommodate claim against Southwest;[162]
- Consistent with Carter's arguments, this Court properly held that RLA Sections 152 (Third) and (Fourth) grant Carter a private right of action;[163]
- As Carter showed and this Court held, Carter's claims did not involve minor disputes;[164] and
- As Carter previously demonstrated, Southwest's demand for a separate "anti-union animus" element for Carter's RLA claims was improper.[165]

## CONCLUSION

For these reasons, the Court should deny Southwest's motion in its entirety and uphold the

jury's decision in all respects.

Dated: January 23, 2023                     Respectfully submitted,

                                            /s/ Matthew B. Gilliam

---

[158] Tr. 1267:10-1275:25; Doc. No. 386-1, p.34.

[159] Doc. No. 386-1, p.34.

[160] *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 373 (5th Cir. 1981); Doc. No. 374, pp.2-3; Doc. No. 375; Doc. No. 386-1, p.34.

[161] *Id.*; Doc. Nos. 382, 399.

[162] Doc. No. 223, pp.45-46; Doc. No. 233, pp.13-14; Doc. No. 386-1, p.34.

[163] Doc. No. 223, pp.28-33; Doc. No. 208, pp.19-20; Doc. No. 232, pp.4-12; Doc. No. 386-1, p.34.

[164] Doc. No. 34, pp.12-18; Doc. No. 54, pp.11-14; Doc. No. 69, pp.8-12.

[165] Doc. No. 223, pp.20-21; Doc. No. 386-1, p.35.

Mathew B. Gilliam (*admitted pro hac vice*)
New York Bar No. 5005996
*mbg@nrtw.org*
c/o National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
Tel: 703-321-8510
Fax: 703-321-9319

Bobby G. Pryor
State Bar No. 16373720
bpryor@pryorandbruce.com
Matthew D. Hill, Of Counsel
State Bar No. 24032296
mhill@pryorandbruce.com
PRYOR & BRUCE
302 N. San Jacinto
Rockwall, TX 75087
Telephone: (972) 771-3933
Facsimile: (972) 771-8343


*Attorneys for Plaintiff Charlene Carter*

**<u>Certificate of Service</u>**

I hereby certify that on January 23, 2023, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>s/ Matthew B. Gilliam                      </u>