# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# Dallas Division

| | | |
|---|---|---|
| CHARLENE CARTER, | § § § | Civil Case No. 3:17-cv-02278-X |
| Plaintiff, | § § § | |
| v. | § § | |
| SOUTHWEST AIRLINES CO., AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 556, | § § § § § § | |
| Defendants. | § | |

**SOUTHWEST AIRLINES CO.'S REPLY IN SUPPORT OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(B); OR, IN THE ALTERNATIVE, FOR NEW TRIAL PURSUANT TO RULE 59(A); OR, IN THE ALTERNATIVE, FOR REMITTITUR**

As the Court is aware, it has addressed many of the arguments in Southwest Airlines Co.'s Rule 50 motion and in Carter's responses to the same. Southwest disagrees with many of the Court's conclusions on these issues and has stated its reasons for doing so in various submissions. In light of the limited space allotted for replies and to avoid repeating arguments previously raised, Southwest has attempted to focus its reply brief on issues that the parties have not fully addressed.

I.  **ARGUMENT**

    A.  **Carter Introduced No Direct Evidence of Discrimination**

Carter acknowledges that she presented no evidence of pretext, or comments hostile to Christianity or religion. Br. 2. She contends that she does not need to do so because her claims are based on Title VII's "direct evidence" theory, and not the "*McDonnell Douglas* indirect proof paradigm." *Id.*; *see also Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015).[1]

Carter correctly argues that she need not present any evidence of pretext if she presents direct evidence of discrimination, *see Young*, 575 U.S. at 213, but she is wrong that she "presented direct evidence of Southwest's discrimination" at trial. A direct evidence claim is "a rare case." *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 184 (5th Cir. 2018). That is because the Fifth Circuit has clarified that direct evidence under Title VII is "any statement or written document showing a discriminatory motive on its face." *Id.* at 185. This very narrow category includes only "evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). If "an inference is required for the evidence to be probative as to [an employer's] discriminatory animus in firing [an employee], the evidence is circumstantial, not direct." *Id.* at 897-98.[2]

---

[1] As such, Carter has waived any claim under Title VII's burden-shifting framework. *See, e.g.*, *Trautman v. Time Warner Cable Tex., LLC*, 756 Fed. Appx. 421, 428 n.5 (5th Cir. 2018) (plaintiff "forfeited any argument" under *McDonnell Douglas* where she argued that its pretext analysis did not apply "because she presented direct evidence").
[2] Examples of direct evidence include a supervisor's statement to a female employee that "she would be paid less because she was a woman," *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 329 (5th Cir. 1994), or a supervisor

1

Carter's evidence is not "discriminatory on its face" as she presented no evidence that any decision-maker harbored any animus towards a protected category. Instead, Carter showed simply that she informed Southwest of her religious beliefs and that Southwest later terminated her. But the Fifth Circuit has squarely rejected this theory of direct evidence, holding that "generalized knowledge about [the protected condition] and the termination itself" is "not direct evidence" of discrimination. *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 581 (5th Cir. 2020). Carter's theory requires a factfinder to infer that, by firing her for sending a graphic video about abortion, Southwest held animus towards her religion. For evidence to be direct, it must be "unambiguous." *Moss v. BMC Software*, 610 F.3d 917, 929 (5th Cir. 2010). Carter's discrimination theory requires inference, and she introduced no evidence of discriminatory animus towards a protected group.

B.     **The District Court's Undue Hardship Instruction Was Error**

Carter's defense of the district court's undue hardship instruction ignores Fifth Circuit and Supreme Court precedent. The rule in the Fifth Circuit is that "[t]he mere possibility of an adverse impact on co-workers…is sufficient to constitute an undue hardship." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 274 (5th Cir. 2000) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81 (1977)). The district court's instruction that an undue hardship can only be had "in terms of financial costs or disruption of the business," is plainly inconsistent with binding precedent.

Carter resists this precedent by noting that the Supreme Court granted certiorari on January 13, 2023, to reconsider *Hardison*. But *Hardison* was and is binding on this court unless and until the Supreme Court holds otherwise. Carter also cites the text of Title VII's undue hardship clause, emphasizing "'hardship on the conduct of the employer's *business*,'" Br. 7 (quoting 42 U.S.C. §

---

telling an employee "You're fired, too. You're too religious," *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 855 (11th Cir. 2010). This is direct evidence because it is "discriminatory on its face." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

2000e(j), but the precedential Fifth Circuit decisions holding that an undue hardship includes "lowering of morale among" employees are all binding interpretations of this clause, *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 147 (5th Cir. 1982).[3] The district court's limited instruction erroneously precluded the jury from considering this evidence of undue hardship.[4]

### C. The District Court's RLA-Protected Activity Instruction Was Erroneous

The district court instructed the jury that "[a]ctivity that is intemperate, abusive, insulting, or hyperbolic is protected activity under Section [2] Third and Fourth." Tr. 2032. In crafting this instruction, the district court relied on dicta from Supreme Court cases that are no longer good law.

Carter relies on Supreme Court cases from 1974 and earlier in defending the Court's instruction. The court's "intemperate, abusive, insulting, or hyperbolic" language comes from *Linn v. United Plant Guard Workers of Am., Local 114,* 383 U.S. 53 (1966), where the Court described the National Labor Relations Board's (NLRB) interpretation of the National Labor Relations Act: "In sum, although the Board tolerates intemperate, abusive and inaccurate statements made by the union during attempts to organize employees, it does not interpret the Act as giving either party license to injure the other intentionally by circulating defamatory or insulting material known to be false." *Id.* at 61. In the five-plus decades since *Linn*, the NLRB has squarely repudiated the cases on which *Linn* relied. Indeed, in 2020, the NLRB assessed that the "current standards for

---

[3] On that score, Southwest presented ample evidence of the effect of Carter's graphic videos on morale. *See, e.g.*, Tr. 1602 (senior supervisor testifying that allowing employees to send graphic videos of abortion to each other "would have an adverse effect on how we work together and how we interact[] as a group of employees"); Ex. 66.1 (Stone "found [Carter's] messages to be incredibly disturbing, … obscene and violent, as well as threatening in nature").

[4] Carter also contends that despite cases acknowledging impacts on co-workers can constitute an undue burden, they are inapplicable here. Carter declares – without referencing or discussing any case – that the authorities Southwest cites regarding burdens on employees relate to "impact on [their] schedules or operations." Br. 15, n.42. This is false. *See, e.g.*, *Chalmers v. Tulon Co.*, 101 F.3d 1012, 1021 (4th Cir. 1996) (employer not required to accommodate employee sending "letters to co-workers accusing them of immoral conduct" as such letters "might cause them distress."). And even where the accommodation at issue may have impacted another employee's schedule, that is not, in and of itself, what constituted the undue hardship. Rather, it was the *mere possibility* that such an accommodation would cause "hard feelings (*i.e.*, lower morale)." *Leonce v. Callahan*, 2008 U.S. Dist. LEXIS 228, *14 (N.D. Tex. Jan. 3, 2008). The evidence shows that the accommodation Carter would require – *i.e.*, to send videos of aborted fetuses to co-workers and union officials who disagreed with her religious / political views – would do just that.

analyzing abusive conduct "… have been wholly indifferent to employers' legal obligations to prevent hostile work environments on the basis of protected traits." *Gen. Motors LLC*, 369 NLRB No. 127, at *11 (July 21, 2020). Thus, the Board explained that, "nothing in the text of Section 7 [of the NLRA] suggests that abusive conduct is an inherent part of the activities that Section 7 protects." *Id.* at *13. In other words, the basis for the Court's instruction is no longer good law.

Carter argues that it is "not necessary to engraft the NLRA's limitations restricting extremely offensive speech."[5] Br. 19. That argument is odd to start, because the court's abusive conduct instruction comes directly from (since overruled) NLRA case law. *See Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 385, n.20 (1969). If the court is going to rely on NLRA precedent to craft its RLA instruction, it makes no sense for the court's instruction to rely on 1960s-era NLRB precedent and not the current law of what constitutes abusive conduct under the NLRA.[6]

Finally, in addressing the relevant instruction, the Court noted the absence of Supreme Court or Fifth Circuit authority expressly addressing what activities lose protection under section 152 Third & Fourth. That is unsurprising, as courts normally dismiss post-certification RLA cases like Carter's at the pleading stage. However, Southwest notes that the only RLA case addressing conduct similar to Carter's found that "speech relating to union activity loses statutory protection

---

[5] Carter defends the Court's protected activity instruction, asserting that it "correctly recognized it was not necessary to engraft the NLRA's limitations restricting extremely offensive speech in the workplace because Carter's speech did not impact the workplace." Br. at 26. As Carter knows, that is not the basis the Court provided for the instruction. Rather, the Court erroneously believed that the NLRA addresses the "context where you might have a union," whereas the RLA addressed the "context where you will have a union." App. 571-72 (1883:25-1885:8). Thus, the Court concluded that the scope of protected activity under the RLA is broader than it is under the NLRA and provided an instruction on that basis. But the opposite is the case. *See Indep. Union of Flight Attend v. Pan Am. World Airways*, 789 F.2d 139 n.2 (2d Cir. 1986).

[6] Carter purports to make fact-specific distinctions between this case and others where courts and the NLRB have articulated various forms of speech that lose statutory protection (*e.g.*, harassment, extreme speech, obscenity, etc.). These distinctions are immaterial because they are unrelated to the relevant question – *i.e.*, does the RLA protect every union-related communication no matter its content so long as it does not constitute a threat or reckless defamation.

4

if it is vulgar, offensive, abusive, or harassing." *Held v. Am. Airlines, Inc.*, 2007 U.S. Dist. LEXIS 7665, *21-22 (N.D. Ill. Jan. 30, 2007).[7]

### D. Section 152 Third & Fourth Apply Only Where There is Anti-Union Animus

The district court charged the jury on a count of retaliation in violation of Section 152 Third and Fourth of the RLA. *See* Tr. 2028-29. This was error. The Court had previously dismissed *with prejudice* plaintiff's RLA claims under Section 152 Third and Fourth, because plaintiff "fail[ed] to establish either the anti-union animus or a fundamental attack on the collective bargaining process on the part of Southwest necessary to bring a post-certification dispute within the jurisdiction of the district court." Dkt. No. 69 (MTD) at 17. The Court ruled as matter of law that "judicial intervention in post-certification RLA cases" is permitted in "only limited circumstances." *Id.* at 16. The court found that none of those circumstances were present here, and indeed, could not be present here, because Carter "had access to, and in fact utilized, the contractual dispute resolution procedure under the [collective bargaining agreement] to address her grievances in arbitration." *Id.* at 19. Charging the jury on this dismissed claim was error.

Not only does Carter ignore the Court's previous ruling, she ignores recent Fifth Circuit authority highlighting "the well-recognized principle that antiunion[8] animus is one of *the few circumstances* in which a post-certification suit may be brought in federal court." *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 31 F.4th 337, 342 n.4 (5th Cir. 2022).

---

[7] Carter contends that *Held* is distinguishable because the plaintiff in that case the plaintiff published invective on a company website. Br. at 26 n.120. That is false. The website was a password protected site established by the union for its members and the portion of the website where the plaintiff posted the messages at issue was not even accessible within the employer's internet network. The plaintiff posted the messages at issue while off duty from his home. Additionally, it is notable that Carter characterizes the communications at issue in *Held* as constituting unprotected "invective" as she provides no principled distinction between those communications and her own. At the very least, the jury should have been allowed to consider the issue, but the Court's instruction prohibited it from doing so.

[8] Not *pro-union* sentiment, as Carter alleged and the Court allowed the jury to consider. Southwest has found no case where a court allowed an RLA claim of this type to proceed on the theory that an employer retaliated against an employee because the employer was in favor of – rather than opposed to – a union.

Carter provided no evidence of such animus, and the court should reject her effort to create a new cause of action under the RLA.

### E. The District Court Erred in Excluding the Arbitrator's Decision

The Supreme Court has allowed that an "arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate" in a Title VII case such as this one, *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974), and the Fifth Circuit subsequently explained that a district court "should ordinarily" admit an arbitrator's findings as evidence, *Graef v. Chemical Leaman Corp.*, 106 F.3d 112, 117 (5th Cir. 1997). Nevertheless, contrary to the direction of the Fifth Circuit, the Court "wholly ignor[ed]" the arbitrator's decision. *Id.* Carter defends the exclusion of the arbitration agreement as being unfairly prejudicial. However, Carter's and the Court's reasoning applies to *all* arbitration decisions, suggesting that none of them should ever be admitted in Title VII cases. The Fifth Circuit has stated otherwise.[9]

### F. The Court Should Eliminate Damages or Hold a New Trial On the Issue

Based on this Court's instruction, Southwest could only demonstrate that Carter failed to mitigate by providing evidence regarding the availability of alternative employment. Carter acknowledges the Fifth Circuit precedent holding that a defendant can demonstrate failure to mitigate without making any such showing. *See Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132 (5th Cir. 1988). Nevertheless, Carter contends that the Court's mitigation instruction was proper

---

[9] Carter also asserts that excluding the arbitration decision is harmless. But the arbitrator's decision that Carter was fired for just cause because she violated three company policies is directly relevant to the question of whether Southwest had an impermissible motive to dismiss Carter. *See Baker v. Union Pac. R.R.*, 145 F. Supp. 2d 837, 843 (S.D. Tex. 2001) ("The arbitrator's finding that Plaintiff violated…Rules is…plainly relevant"); *Graef*, 106 F.3d at 118 (Whether an employer's termination decision violated or complied with the CBA "is plainly relevant" to the non-discriminatory / retaliatory reasons for separation); *Smith v. Lyondell Citgo Ref.*, 2006 U.S. Dist. LEXIS 14669, *7-8 (S.D. Tex. Mar. 9, 2006) (defense to discrimination claims "is supported by arbitrator's finding of just cause.").

because inconsistent Fifth Circuit authority contradicts a five decade old case (*Sparks v. Griffin*, 460 F.2d 433 (5th Cir. 1972)) and its own pattern instructions. Carter's argument lacks merit.[10]

In the 50 years since *Sparks*, the Fifth Circuit has repeatedly held that a defendant need not show the availability of comparable employment to demonstrate a failure to mitigate. *See, e.g.*, *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 309 (5th Cir. 2020) ("[I]f the defendant establishes that the plaintiff has not made reasonable efforts to obtain work, the defendant is not required to prove…equivalent work exists.").[11] The Court should do the same here.

Carter contends that, even if the mitigation instruction was erroneous, the backpay award should stand because she sufficiently attempted to mitigate by (a) volunteering for nonprofits; (b) training to become a pilates instructor in 2020 and providing part-time instruction in 2021-2022; and (c) applying to four airlines in 2018. App. 387, 412-413 (1301:2-1301:11, 1398:12-1402:20). These claimed mitigation efforts, individually and collectively, are insufficient as a matter of law.[12]

To satisfy her mitigation obligation, Carter had to, at the very least, engage in an "honest effort to find ***substantially equivalent work***." *West v. Nabors Drilling USA*, 330 F.3d 379, 394 (5th Cir. 2003). Accepting volunteer work for a non-profit, going to school to become a pilates instructor, and providing $5,000 worth of home pilates instruction in 2021-2022 do not reflect a search for employment comparable to that of a flight attendant. Rather, these engagements

---

[10] It is true that courts often utilize the Fifth Circuit's Pattern Jury Instructions. "[B]ut such instructions do not have the force of law, nor do they have any persuasive force when, as here, they contradict circuit precedent." *Givens v. Will Do, Inc.*, 2012 U.S. Dist. LEXIS 63537, *13 n.2 (S.D. Tex. May 4, 2012).

[11] *See also West*, 330 F.3d at 393. When a plaintiff abandons her post-termination job search, she has failed mitigate irrespective of any showing regarding comparable employment. *Id.*; *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990). This Court and others within this circuit have adopted and applied the Fifth Circuit authorities rejecting the comparable employment requirement. *Fulbright v. Union Pac. R.R. Co.*, 2022 U.S. Dist. LEXIS 59548, *21 (N.D. Tex. Mar. 31, 2022) ("If an employer shows that an employee has not made reasonable efforts to obtain work, it does not also have to establish the availability of substantially equivalent employment."); *Kirkwood v. Inca Metal Prods. Corp.*, 2008 U.S. Dist. LEXIS 6807, *28-29 (N.D. Tex. Jan. 30, 2008).

[12] If the Court does not agree that these are insufficient mitigation efforts as a matter of law, the jury should have been allowed to address this question in the first instance after receipt of a proper jury instruction.

demonstrate that Carter never commenced such a search and instead spent the more than 5 years between her termination and trial engaged in personal pursuits outside of the airline industry. *Scudiero v. Radio One of Tex. II*, 2015 U.S. Dist. LEXIS 133434, *57-58 (S.D. Tex. Sep. 30, 2015) ("plaintiff who…accepts work in a different field at substantially lower wages failed to mitigate.").

Carter's entire attempt to secure alternative employment consisted of applying to four positions in 2018.[13] One of those applications resulted in an interview invitation with Delta, but Carter claims she never received the interview link and never bothered to follow up. Based on these four applications and the resulting missed interview, Carter claims she is entitled to more than five years of lost wages (March 17, 2017 – July 14, 2022). These limited and belated efforts to secure post-termination employment in 2018 do not constitute sufficient mitigation. *See Sellers*, 902 F.2d at 1195 (submitting an average of "less than one job application per month" over a three year period did not constitute reasonable efforts to mitigate); *Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1468 (5th Cir. 1989).[14]

### G. There is No Basis for the Jury's Emotional Distress Award

Southwest acknowledges that a plaintiff is not required to provide corroborating expert testimony to warrant an emotional distress award. Dkt. No. 404 at 10. However, absent such evidence, the plaintiff's testimony must be "particularized and extensive" on the details of the alleged emotional injury and its relationship to the unlawful conduct. *Hitt v. Connell*, 301 F.3d

---

[13] Carter implies that had she sought comparable employment as the law requires, her efforts would have been unsuccessful because of her allegedly "tarnished" reputation. Br. 29. However, a plaintiff who abandons her job search does not satisfy her duty to mitigate and this is true even if the plaintiff shows that a diligent job search would have been futile. *See Powers*, 951 F.3d at 309 ("Plaintiffs justify their lack of efforts to obtain comparable employment by contending that any efforts they could have made would have been futile. [] Plaintiffs' unilateral decision that their job-seeking efforts would be futile does not absolve them of their duty to mitigate damages."); *Johnston v. Harris Cty. Flood Control Dist.*, 869 F.2d 1565, 1579 n.3 (5th Cir. 1989). Separately, Southwest notes that at least one airline invited Carter to an interview shortly after her termination so it is far from clear that her termination precluded her from securing comparable employment.

[14] If the Court does not to enter judgment for Southwest on mitigation, it should grant a new trial or reduce the backpay award to compensate Carter for 2018, the only year she purports to have applied for comparable employment.

240, 250 (5th Cir. 2002). The testimony and evidence regarding Carter's alleged emotional distress is sparse, vague, and general not "particularized and extensive." For example:

- Carter claims she testified that, she "was not eating or sleeping." Br. 18. The entirety of Carter's testimony in this regard is that on some unspecified date and for some unknown duration, "I wasn't eating, I wasn't sleeping." App. 386 (1296:19-21).

- Carter cried when she learned of her termination. App 340 (1264:3-20).

- On an unspecified date, Carter had dinner with an unspecified business partner who stated that she kept "repeating everything that [she] was saying and [] thought it was really odd." App. 386 (1297). During that dinner meeting, Carter had various physical ailments (*e.g.*, increased blood pressure, heart racing, etc.). *Id.*

- Carter states that she "never suffered a walking stroke or PTSD until after she was fired." Br. 18 n.62.

This evidence reflects either temporary and standard distress that cannot support the jury's award and is unsupported by evidence regarding causation, and/or is insufficiently specific. *See generally Hitt*, 301 F.3d at 250 ("'[H]urt feelings, anger and frustration are part of life,'" and are not the types of emotional harm that could support an award of damages).[15] Thus, the Court should overturn the emotional distress award. *See id.* at 251; *Brown v. Miss. Dep't of Health*, 256 Fed. Appx. 710, 711 (5th Cir. 2007) (eliminating distress award because testimony regarding anguish resulting from discrimination, emotional suffering, marital difficulties, and exacerbation of kidney condition lacked the requisite specificity).[16]

### H.    There is No Support for Punitive Damages

To support the punitive damages award, Carter contends that Southwest managers were subjectively aware that terminating Carter risked violating Title VII. To support this contention,

---

[15] Despite Southwest's objection to Carter's testimony regarding specific medical diagnoses and things unspecified providers allegedly told her, she contends that its objections were insufficient to preserve error as to emotional distress damages. This misunderstands the nature of Carter's testimony and the showing required to support the award. Carter's recounting of what an unspecified physician allegedly told her and her own subjective impression regarding the nature of various illnesses lends no support to the necessary showing that Southwest *caused* those illness.

[16] As Southwest stated in its opening motion, there is even less (indeed no) evidence of future emotional injury, or that Southwest caused those injuries. *See Thomas v. Tex. Dep't of Crim. Justice*, 297 F.3d 361, 371 (5th Cir. 2002).

Carter emphasizes that Ed Schneider attended training on protected categories and was aware of Southwest's policies prohibiting discrimination. However, this alone cannot support the punitive damages award. *See Delaronde v. Legend Classic Homes, Ltd.*, 2016 U.S. Dist. LEXIS 192992, *4-5 (S.D. Tex. Dec. 19, 2016) ("knowledge of a law is not synonymous with having committed a positive element of conscious wrongdoing"). Additionally, nothing indicates that general anti-discrimination training and policies informed Southwest managers that Title VII obligated them to allow employees to circulate abortion videos and genital images. Understandably so, as circulation of inappropriate images is the paradigmatic kind of conduct that supports a Title VII harassment claim. In contrast, courts have uniformly rejected as a matter of law claims predicated on conduct nearly identical to Carter's. *See Chalmers*, 101 F.3d at 1021; Dkt. No. 386-1 at p.21.[17]

Finally, beyond the alleged failure of Schneider and others to comply with Title VII, Carter cites no evidence to support holding Southwest vicariously liable for said conduct. But even if the alleged violations were malicious and reckless, that is insufficient to support the award against Southwest. *Wantou v. Wal-Mart Stores Tex.*, 23 F.4th 422, 439 (5th Cir. 2022) ("[E]ven if particular agents acted with malice or reckless indifference" the employer is not liable for punitive damages if "it made good-faith efforts to comply with Title VII."). The undisputed evidence shows Southwest took appropriate steps to comply with Title VII and thus it cannot be liable for punitive damages. *Miller v. Upper Iowa Univ.*, 2021 U.S. Dist. LEXIS 217088, *39-41 (W.D. La. Nov. 9, 2021) (where employer had discrimination policy, provided training, and had complaint procedure, "it cannot be liable for punitive damages for violations by its employees").

---

[17] Carter notes that employee relations was involved in the investigation into Stone's complaint. However, as reflected in Carter's termination letter, their involvement was based on a concern that Carter's messages implicated protected categories with respect to Stone. App. 288-289, 446, 457, 462, 522 (1056:7-1058:7, 1536:21-1538:1, 1578:23-1579:3, 1599:15-21, 1687:8-1692:25). Moreover, there is no evidence that anyone in employee relations had subjective knowledge that they were acting in a manner that was unlawful.

Dated: February 6, 2023       Respectfully submitted,

*/s/ Paulo B. McKeeby*
Paulo B. McKeeby
State Bar No. 00784571
Brian K. Morris
State Bar No. 24108707
**REED SMITH LLP**
2850 N. Harwood Street
Suite 1500
Dallas, Texas 75201
Phone: 469-680-4200
Facsimile: 469-680-4299
pmckeeby@reedsmith.com
bmorris@reedsmith.com

**ATTORNEYS FOR DEFENDANT SOUTHWEST AIRLINES CO.**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been filed via the Court's ECF system and all counsel of record have been served on this 6th day of February, 2023.

*/s/ Paulo B. McKeeby*
Paulo B. McKeeby