Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 1 of 367   PageID 14228
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022

```
 1              UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
 2
                 CASE NO. 3:17-cv-02278-X
 3

 4

 5   ----------------------------------------x

 6   CHARLENE CARTER,

 7                       Plaintiff,

 8   v.

 9   SOUTHWEST AIRLINES CO. and
     TRANSPORT WORKERS OF AMERICA,
10   LOCAL 566,

11                       Defendants.

12

13   ----------------------------------------x

14

15

16              TRANSCRIPT OF THE TRIAL

17       BEFORE THE HONORABLE BRANTLEY STARR

18          UNITED STATES DISTRICT JUDGE

19

20            V O L U M E   3

21

22               Dallas, Texas

23               July 7, 2022

24                8:38 a.m.

25
```

```
 1   A P P E A R A N C E S:

 2

     FOR THE PLAINTIFFS:
 3
           NATIONAL RIGHT TO WORK FOUNDATION INC.
 4             8001 Braddock Street
               Suite 600
 5             Springfield, Virginia  22160
           BY:  MATTHEW B. GILLIAM, ESQ.
 6             mgb@nrtw.org

 7

 8         PRYOR & BRUCE
               302 North San Jacinto
 9             Rockwall, Texas 75087
           BY:  BOBBY G. PRYOR, ESQ.
10             MATTHEW D. HILL, ESQ.
               bpryor@pryorandbruce.com
11             mhill@pryorandbruce.com

12

13

14

15   FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:

16         REED SMITH, LLP
               2850 North Harwood
17             Suite 1500
               Dallas, Texas  75201
18         BY:  PAULO B. McKEEBY, ESQ.
               BRIAN K. MORRIS, ESQ.
19             pmckeeby@reedsmith.com
               bmorris@reedsmith.com
20

21

22

23

24

25
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1   For the Defendant Union 566:

 2

 3        CLOUTMAN & GREENFIELD, PLLC
               3301 Elm Street
 4             Dallas, TX 75226
          BY:  ADAM S. GREENFIELD, ESQ.
 5             EDWARD B. CLOUTMAN, III, ESQ.
               agreenfield@candglegal.com
 6             crawfish11@prodigy.net

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 4 of 367   PageID 14231
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 570

```
1  COURT REPORTER:   MS. KELLI ANN WILLIS, RPR, CRR, CSR
                     United States Court Reporter
2                    1100 Commerce Street
                     Room 1528
3                    Dallas, Texas  75242
                     livenotecrr@gmail.com
4

5          Proceedings reported by mechanical

6   stenography and transcript produced by computer.

7

8                        *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 5 of 367   PageID 14232
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                           Page 571

1                          I N D E X

2

3                      W I T N E S S E S

4  AUDREY STONE

5   Cont. Direct Examination by Mr. Pryor ......... 595

6   Cross-Examination by Mr. Greenfield .......... 676

7   Cross-Examination by Mr. McKeeby ............. 768

8   Redirect Examination by Mr. Pryor ............ 792

9   Recross Examination by Mr. McKeeby ........... 814

10  Proffered Testimony .......................... 818

11

12

13  EDWARD SCHNEIDER

14     Direct Examination by Mr. Pryor ............ 867

15

16

17

18

19

20

21

22

23

24

25

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 6 of 367   PageID 14233
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 572

1

2                    E X H I B I T S

3

4    Trial Exhibit 15-A ................... 598

5    Trial Exhibit 106-A .................. 601

6    Trial Exhibit 65 .................... 616

7    Trial Exhibit 34 .................... 622

8    Trial Exhibit 21-Q .................. 644

9    Trial Exhibit 21-R .................. 644

10   Trial Exhibit 21-T .................. 651

11   Trial Exhibit 21-U .................. 657

12   Trial Exhibit 21-V .................. 660

13   Trial Exhibit 21-X .................. 672

14   Trial Exhibit 134 ................... 720

15   Trial Exhibit 67 .................... 749

16   Trial Exhibit 47 .................... 778

17   Trial Exhibit 94 .................... 780

18   Trial Exhibit 49 .................... 790

19   Trial Exhibit 21-O .................. 794

20   Trial Exhibit 21-C .................. 851

21   Trial Exhibit 71 .................... 866

22   Trial Exhibit 72 ....................  866

23   Trial Exhibit 21-M .................  866

24   Trial Exhibit 21-W .................  866

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 3 July 07, 2022                      Page 573

```
 1              -- P R O C E E D I N G S --

 2

 3              THE COURT SECURITY OFFICER:  All rise.

 4              THE COURT:  Thank you.

 5              You can be seated.

 6              Okay.  So Day 3 of trial.

 7              Let's go ahead and do appearances for

 8   Carter.

 9              MR. GILLIAM:  Matthew Gilliam for

10   Plaintiff, Charlene Carter, along with Matt Hill and

11   Bobby Pryor.

12              THE COURT:  Thank you.

13              And how about Southwest next?

14              MR. McKEEBY:  Paulo McKeeby on behalf of

15   Southwest, with Brian Morris and company

16   representative Meggan Jones.

17              THE COURT:  Thank you.

18              And how about the Union?

19              MR. GREENFIELD:  Adam Greenfield and

20   Edward Cloutman, III on behalf of TWU, Local 556.

21              We are expecting our corporate

22   representative, Mr. Michael Masoni.  The line down

23   in security was a little extra long this morning.

24              THE COURT:  Sorry to hear that.  It is

25   challenging on days like this.
```

1          We were supposed to be one of three trials

2     going on in the courthouse right now, and so we are

3     fortunate that not all of them went.  But still,

4     even if there is more than one or one plus

5     sentencings, it results in quite a line at security.

6          So thank y'all for being here timely and

7     getting through it, and no worries if someone else

8     is stuck.

9          Okay.  So I know we didn't have new

10    objections last night.

11          What I wanted to talk about right quick is

12    time clock, see if there is anything on Nevarez we

13    should talk about, and then talk about any exhibits

14    we didn't get to yesterday morning so we can

15    minimize sidebar time and inefficiencies there.

16          Okay.  On time clock, I think we sent out

17    the nightly update.  We will keep doing that.  We

18    will send y'all every night the latest exhibit list

19    that I've been keeping track of, as well as the time

20    clock.

21          What I wanted to say on the time clock is,

22    for Team Carter, I know you told me, Mr. Pryor, that

23    your goal was to use about half your time on Stone

24    and your client.

25          MR. PRYOR:  That's what we anticipate.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 3 July 07, 2022                Page 575

1              THE COURT:  If you use the other hour that
2    you predicted on Stone, then you will have used half
3    your time just on Stone and opening.
4              So I'm expressing concern.  And so what I
5    want to do is just plot this out in advance.
6    Remember my standard for when I give you more time
7    is you have used your time efficiently and you have
8    a compelling need for more.
9              What I would say, the first day
10   presentation, if you ask for more time right now, I
11   would say no, and here is why.
12             The inefficiencies I saw, I think you have
13   reached a long time ago the point of diminishing
14   returns on Stone with regard to what in the Facebook
15   messages she sent was union speak.
16             She said yes to all of them.  I think once
17   you get too deep, you have reached the economic
18   point of diminishing returns.
19             I talk to juries every time after trial,
20   and they say, Why did they say the same thing over
21   and over again, always, when even I time every
22   trial.
23             And so I think the jury is getting tired
24   of this.  And so you are actually, for each one of
25   those questions now, you are taking time away from

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

 1  your client to ask her, Well, what about page 23 in
 2  this packet, is that union speech?
 3            She said yes to all of them, right?
 4  You've made your point.
 5            Other things.  I think we have had a lot
 6  of asked and answered objections that I have
 7  sustained over here from the Defendants' side.
 8            And I get that you may need to make your
 9  point repeatedly.  I usually only sustain those if I
10  get to a third and a fourth time, right?  If you
11  circling back time three, time four.
12            I realize it's an important witness, you
13  may need to make a point more than once.
14            And the last inefficiency I'd point out
15  is, your style with this witness is combative and
16  that is fine.  I give people free rein to pick
17  whatever style they want to.  But with this witness,
18  I'm not sure it is particularly helpful from an
19  efficiency standpoint.
20            MR. PRYOR:  Right.
21            THE COURT:  I realize your need to pick
22  your style, and that is fine.  But that is your
23  choice.  I don't know that it is an efficient time
24  choice with this particular witness.
25            MR. PRYOR:  Your Honor, if I could just

```
 1   respond to one comment.

 2              THE COURT:  You may.

 3              MR. PRYOR:  I accept everything you are

 4   saying.

 5              Going through the documents, each

 6   communication, I tried to get her to say they were

 7   all union-related activities so I could -- we have

 8   our record that it's all protected activity -- and

 9   she would not.

10              We have a daily.  She did not.  She

11   refused to say that.  She said, no, she thought some

12   things were unrelated, and there were memes and

13   there were -- I did not get that definitive

14   testimony, at least I don't think I did, based on --

15   you think I did.  She absolutely did not.  I have to

16   go through it to establish that it was protected

17   activity and through her own testimony as the Union

18   president.

19              We think it is significant, and I,

20   unfortunately, have more to do.

21              As I have gone along, I have asked her, Do

22   you want to agree?  And she won't.

23              And it is important to our case, both from

24   a directed verdict standpoint, on appeal, to this

25   jury, that we establish all the communications fall
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 12 of 367   PageID 14239
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 578

1  within a protected category.

2          So I accept all of your criticism, or your

3  comments, but I will tell you my view of the

4  evidence and why I have to do that.

5          THE COURT:  I understand that.

6          So the only thing I would say in response

7  to that is, perhaps I didn't view her equivocation

8  on that point in the same way that you did.

9          MR. PRYOR:  Okay.

10         THE COURT:  But I would say, from an

11  efficiency standpoint, you can ask her, Is there

12  anything else in this packet that you think crossed

13  that line and is not union speech, right?

14         I think where she has drawn the line, at

15  least in my view, is she thought that, you know, the

16  video and the commenting online, that crossed the

17  line into a threat, and in her view, is no longer

18  union speech or protected speech.

19         And so pulling away all of her testimony,

20  that is what I view as the whole packet, union

21  speech except for those two things.

22         MR. PRYOR:  I thought that would be an

23  objectionable question, but I like it, so I will

24  definitely --

25         THE COURT:  In the interest of time, I put

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 13 of 367  PageID 14240
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 579

```
 1   y'all on a clock.  If someone objects to it, you may

 2   have to give her a couple of minutes to thumb

 3   through the packet.

 4            MR. PRYOR:  I'm happy to.

 5            THE COURT:  If you want to give her a few

 6   minutes to thumb through the packet, that is fine by

 7   me.

 8            MR. PRYOR:  I'm going to do that first

 9   thing, your Honor.

10            THE COURT:  That is fine.

11            Okay.  So I would just like to preview for

12   people in advance what I'm thinking on the clock and

13   why, and I will do the same thing once we see more

14   time being used from Southwest and the Union,

15   because I want people to use their time efficiency.

16   I want to give them more if they use it wisely, but

17   I have got to be a good steward of time.

18            Unfortunately, y'all are one of many cases

19   that we inherited that were almost trial ready when

20   I came on the bench in 2019.

21            And then with COVID and not many people

22   wanting to try their cases in COVID, I tried

23   everyone who was willing to try during COVID.

24            We have now this crushing backlog, right,

25   that is ready for trial.  So I have got four civil
```

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 14 of 367  PageID 14241
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 580

 1   that are ready in go in August.

 2              So we had another that wanted to go next

 3   week.  We moved them to August so we would have more

 4   time for this trial.

 5              But we are really trying to deal with the

 6   pandemic and the aftermath of it.

 7              So I'm not trying to be a jerk, I want to

 8   give everyone the time they want to have, but

 9   everyone wants a lot of time and everyone wants to

10   try their case now.  I'm trying to juggle that.

11              So any update on Brett Nevarez?  I assume

12   y'all did not have a happy late-night depo last

13   night?  No communication, I assume.

14              MR. McKEEBY:  I'm being signaled that

15   there has been no communication.

16              MR. GREENFIELD:  Me either.

17              THE COURT:  So what I can do is, I have a

18   draft of a show cause order that says, You have now

19   violated a couple of my court orders.  I have at the

20   bottom of that draft language asking y'all to send

21   that order as soon as I file it jointly by email to

22   Mr. Nevarez.

23              Seeing if y'all can serve it on

24   Mr. Nevarez.  I don't know if you have a process

25   server and if we can get location information, that

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 15 of 367   PageID 14242
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 3 July 07, 2022                      Page 581

1    would work to get that in his hands.

2              I think that is a predicate to any motion

3    for sanctions or contempt that would get filed from

4    Carter.

5              I will say, from Carter, I know we have

6    the certificate of no show that you filed from the

7    deposition.  I don't know that we have the trial

8    subpoena or the affidavit from the server on that.

9              And so if you file a motion on the heels

10   of my show cause, then we may need to paper up the

11   record in those two regards to have a motion that is

12   transferable to New Mexico.

13             Does that make sense?

14             So my show cause would set a hearing for

15   tomorrow morning before trial.  He's not going to

16   show to that either.  Or it lets him respond by

17   affidavit before the date of the hearing.  Or it

18   lets him do the depo before the date of the hearing

19   to avoid any need for the hearing.

20             It's a choose your own adventure.  Show up

21   to the hearing and explain why you violated these

22   orders, or do the depo, or explain under oath in

23   writing why you did it.

24             I think none of those three options would

25   probably happen, given what we have seen now.  And

1  so the most likely outcome is that Carter files

2  emergency motion for sanctions that then I

3  immediately transfer to New Mexico.

4            Thoughts on that path?

5            MR. McKEEBY:  That sounds fine to me.

6            I just -- I would want to make one point

7  of clarification, that the emails the last two days

8  have gone from Southwest in-house counsel to

9  Mr. Nevarez, not me.  Just so that if that comes up,

10  there is no confusion.  And Union's counsel has been

11  copied on those emails.

12           THE COURT:  Got it.  And I'm fine with

13  that approach, too, for service of this.

14           When I say "counsel for Southwest," I'm

15  fine with that being in-house counsel, if that makes

16  sense.

17           MR. GREENFIELD:  We sent out a joint one

18  with in-house.

19           THE COURT:  Okay.  That is great by me.

20  I'm not going to tell y'all that it has got to be

21  out-house counsel, as they are sometimes referred

22  to, or in-house.  But that is fine by me.  In-house

23  or outside counsel is fine.

24           So we have got that drafted.  I'm going to

25  ask our staff to docket that this morning.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 17 of 367   PageID 14244
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 583

1              I know we docketed the Conlon page/line
2    designation objections, and we are working on
3    Kleburne.  We should have Kleburne out shortly.  So
4    we will keep those rolling out.
5              And I think in order we looked at next are
6    Burdine, Rutherford and Lacore.
7              And so sorry for the rolling production.
8              MR. McKEEBY:  One other issue on the
9    Talburt designations.
10              THE COURT:  Yes.
11              MR. McKEEBY:  We had objections on the
12   same relevance grounds as the Court has heard before
13   that were raised in our motion in limine.
14              I think some of those were denied even in
15   the context where Mr. Talburt talks about the
16   discipline that he received.  And it is no one's
17   fault, but it is --
18              THE COURT:  Have you got specific -- well,
19   can you give me specifics?  So I'm happy to
20   reconsider anything I have done.  But if you can
21   give me specific ones -- and by email is fine,
22   right?  We may be going, and I may look at that last
23   note again.
24              MR. McKEEBY:  Okay.  I will have
25   Mr. Morris look at that.

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 18 of 367  PageID 14245
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 584

1            But I will also say that it's not -- it's
2   complicated because it's sort of comments that are
3   intertwined with other testimony that probably is
4   relevant and should come in.
5            So I just think as a practical matter -- I
6   guess I will reserve the right to change my mind on
7   this -- but as a practical matter, it may be that a
8   limiting instruction is the more appropriate vehicle
9   than to try to excise two sentences out of a video
10  clip.
11           THE COURT:  You can edit videos in a very
12  awkward fashion.
13           But all that is to say, I have already
14  sort of spilled the beans with the jury here, and so
15  that may be the easiest course, is to let it in.
16  But let me tell the jury, Hey, this was a depo.
17  I've cut out some of this, as you already know, so
18  please ignore the Southwest stuff.
19           MR. McKEEBY:  I will look more closely at
20  the specific pages that I'm talking about.
21           But I just wanted to give you and the reps
22  of the parties a heads up that I think the more
23  likely request is going to be to stand up and say,
24  Judge, we would like the limiting instruction here.
25           THE COURT:  Understood.  That helps.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1         We will look for the specific page/line by

2    email from y'all and take another look at that.

3         MR. PRYOR:  Your Honor, in that regard,

4    that actually was on my list to raise, too, after

5    our discussion yesterday.

6         I asked this -- I didn't do his

7    designations.  I asked this morning, and I was told

8    that there are portions of his testimony that

9    mentions that he was terminated and then reinstated,

10   things like that.

11        And I certainly recall asking him at

12   deposition.

13        And if we need to adjust the video, let us

14   know.  He is our next witness, but we probably won't

15   get to him until after lunch.  This guy is pretty

16   amazing at that.

17        The second is Exhibit 15, the next

18   document that Charlene communicated with Ms. Stone

19   about, says, "Well, well, well.  Brian has now been

20   reinstated, just like I predicted."

21        And I, yesterday, was discussing I thought

22   I should be able to talk about that, and I think you

23   said no.  That's fine.

24        That document is in evidence and we may

25   need to redact it or something.  But I -- I want to

1   be able to get her to say it's protected activity.

2           Now, if the question that you have

3   suggested works, I won't have to go into those

4   details with her.  But if it doesn't -- I don't want

5   to say anything about Talburt being terminated is my

6   point.  It is right there in the document that I'm

7   talking to her about.  And it will be on the screen.

8   So I want to be correct.

9           THE COURT:  Sure.  Understood.

10          Southwest?

11          MR. McKEEBY:  Again, I mean, at some

12  level, it has to come in to some degree.  So I think

13  just the repetition of the limiting instruction,

14  rather than confusing the jury about whiting out a

15  portion of the Facebook message, is the better

16  course, quite frankly.  And that's what I would

17  suggest.

18          THE COURT:  I think that is -- so we are

19  all on the same page.  I mean, I think that is the

20  wisest course of action.

21          I've already let the cat out of the bag,

22  so to speak, with that, and the jury has already

23  heard some of that.

24          So what I will do is, when you put the

25  document up on the screen, can you just give me a

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 21 of 367   PageID 14248
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 587

1  look, and then I will tell them, Hey, I have told

2  y'all before some of this stuff on how Southwest

3  treats its employees stays out of the case, but some

4  of it's already in the exhibits, so we are not going

5  to white them out.  But keep in mind, that is not

6  really a part of the case, how Southwest treated

7  other employees.

8            MR. PRYOR:  Okay.  And so what we are

9  talking about is redacting it then, when we send it

10  to the jury, take it out?  Is that --

11            THE COURT:  I think we are talking about

12  we don't redact it, but I tell them --

13            MR. PRYOR:  Oh, a limiting instruction.

14            THE COURT:  I give the jury a limiting

15  instruction that says, "Do not consider this."

16            I think juries do see an online portal of

17  boxes, right?  But when we redact personal emails

18  and things, they go, what is behind that?

19            And the short answer is it is nothing, it

20  is irrelevant.

21            Okay.  So anything else we should talk

22  about before we jump into exhibits?

23            MR. GREENFIELD:  We can wait until

24  afternoon.

25            THE COURT:  Can we get that mic a little

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 22 of 367   PageID 14249
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 588

 1    closer to you?

 2              MR. GREENFIELD:  We can wait until

 3    afternoon.

 4              THE COURT:  Okay.  Anything else,

 5    pre-exhibit, that we should cover?

 6              So for exhibits, I'm going back to my list

 7    from yesterday, and the first one I have that we did

 8    not cover either in the morning session or rule on

 9    at trial was Exhibit No. 34.

10              Mr. Greenfield, tell me if I'm wrong on

11    that.

12              34 is the first on my list to talk about

13    this morning.

14              MR. GREENFIELD:  I see 34, and I'm pulling

15    up the exhibit right now, your Honor.

16              THE COURT:  Got it.

17              MR. GREENFIELD:  I know which way this is

18    leaning, but I will maintain my relevance objection.

19              THE COURT:  I appreciate that.

20              What I want to do is, sometimes I will

21    signal y'all why I'm doing what I'm doing.  I don't

22    do that as a means to try to bully you into pulling

23    down your objections, so we can still efficiently do

24    this, just in the manner that you did.

25              So, yeah, I think it is relevant, but I

1    appreciate you still preserving your objection in an

2    efficient way.  I think we can all handle this in a

3    very similar manner.

4              So I will overrule the relevance objection

5    on the record here for 34.

6              Okay.  So the next one I have,

7    Mr. Greenfield, is 53, a Women's March, Planned

8    Parenthood newsletter.

9              I see you as having relevance, prejudice

10   and hearsay, and best evidence objections there.

11             I'm happy to hear anything you want to say

12   and I'm happy to hear Carter's response.

13             MR. GREENFIELD:  Your Honor, this is a

14   document that we talked about at sidebar yesterday.

15             I think -- I don't know if opposing

16   counsel intends to revisit this document or submit

17   it later.  But I think they kind of worked around to

18   get the information that they needed out of it, but

19   I'm not going to try his case for him.

20             But I maintain my objections on it.

21             THE COURT:  That is a good question.

22             So do you think you are going to try to

23   admit 53 today, or what is your plan?

24             MR. PRYOR:  I don't think we have a

25   sponsoring witness for that.  She didn't identify

```
 1   it.
 2           THE COURT:  Got it.
 3           So what I will say is I'll just not rule
 4   on it right now because it's not a plan to offer
 5   with a sponsoring witness as of yet.  If we need to
 6   revisit it, we can.
 7           MR. PRYOR:  I think I tried yesterday and
 8   failed.
 9           THE COURT:  I don't have 53 on my list,
10   and I do recall us talking about it at sidebar.
11           56.
12           And by the way, every day they are just
13   going to tap me on the shoulder or do something when
14   we have got our full jury, and then we will break in
15   our action so that we can bring in the jury.
16           I let in 56 yesterday.
17           I sustained 57.
18           Which I think takes us to 59, if I'm
19   right.
20           Mr. Greenfield, is 59 next on your list?
21           MR. GREENFIELD:  Yes, your Honor.
22           MR. GILLIAM:  Your Honor, I thought that
23   was withdrawn.
24           MR. GREENFIELD:  Which one?
25           I think 59 is duplicative of 56.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 25 of 367   PageID 14252
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 591

```
 1                THE COURT:  56.

 2                MR. GILLIAM:  I apologize.

 3                MR. GREENFIELD:  Is that right?

 4                THE COURT:  So if you don't intend to

 5     offer 59, we won't talk about it.

 6                MR. GILLIAM:  I think it is duplicative.

 7                THE COURT:  And 56 came into evidence.

 8                MR. GILLIAM:  Right.

 9                THE COURT:  So I will just note it as

10     withdrawn and then move on to the next one.

11                64 I have down as next.  I've got Union

12     objections on hearsay.

13                The jurors are all here.  And I will say,

14     jurors are here, despite car trouble for one juror,

15     and he still got here on time.  So our seven are

16     holding strong, they are trying to not get down to

17     six, and I appreciate that.  So we will keep you

18     posted.

19                Thank you, Mr. Gillespie, for getting

20     Ms. Stone.  You can go ahead and bring her in.  I'll

21     ask her before the jury gets here, make sure she

22     kept my instruction not to talk anyone about the

23     case.  Then we will bring in the jury and get going.

24                Sound good?

25                MR. GILLESPIE:  Yes, your Honor.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 592

1              THE COURT:  So while she comes in, 64,
2    anything you want to tell me on 64?
3              MR. GREENFIELD:  It was just the same
4    thing about the limiting instruction that we
5    discussed yesterday, so I don't think we need to
6    revisit it.  But I will maintain my objection as to
7    wanting that limiting instruction -- request, excuse
8    me.
9              THE COURT:  Understood.
10             And so what I will do on that -- and I'll
11   just say, I get the point, and I would love it from
12   an ideal nature if I could always say, this document
13   is not being offered for its truth, but it would
14   double the time of trial, because most all of these
15   documents come in under some hearsay exception or
16   not hearsay.
17             So I will just say I'm overruling the
18   objection and the limiting instruction request.
19             MR. GREENFIELD:  The same goes for 65,
20   your Honor.
21             THE COURT:  For 65.
22             Okay.  I will do the same thing for 65 as
23   for 64 then.  I will overrule that request.
24             And we have handled 68 through 72.
25             And we got it done.  We struck the landing

1  just when we needed to.  So thank you y'all for your

2  efficiency this morning.  I appreciate it.

3              MR. PRYOR:  I get that extra time?

4              THE COURT:  Well, actually, like any time

5  we make up more time, that gives me more time at the

6  end to give out if we've had an efficient

7  presentation, right?

8              MR. PRYOR:  Bring them in, Judge.

9              (The witness entered the courtroom.)

10             THE COURT:  Ms. Stone, welcome back.

11             Before I bring in the jury, I just need to

12  ask you, did you talk to anyone about the case?

13             THE WITNESS:  No.

14             THE COURT:  Okay.  Thank you for keeping

15  my instruction.

16             So we can bring in the jury.

17             MR. GREENFIELD:  Your Honor, I'm sorry, I

18  did have one more issue before we start.

19             THE COURT:  Kevin, can you go tell Randy

20  to hold?

21             MR. GREENFIELD:  I just have a personal

22  request that after Plaintiffs close with Ms. Stone,

23  that I be given a five-minute break to go make a

24  phone call.  My two-year-old suffered a severe arm

25  break last night and is in surgery this morning.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 28 of 367   PageID 14255
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 594

1   He's out of surgery, but not out of -- but not awake

2   and out of anesthesia.  And I would like to make a

3   call to check on him.

4              THE COURT:  Absolutely.  So after you

5   finish with Stone, I will break, and then go do your

6   thing.  And stay out as long as you need to.

7              I'm sorry to hear that.  That is rough.

8              MR. GREENFIELD:  Thank you, your Honor.

9              THE COURT:  Okay.  We are ready.

10             THE COURT SECURITY OFFICER:  All rise for

11  the jury.

12             (The jurors entered the courtroom.)

13             THE COURT:  All right.  Thank you.  You

14  can be seated.

15             All right.  Mr. Pryor, you can continue

16  your examination of Ms. Stone.

17             THE COURT:  Ms. Stone, you're still under

18  oath.  We don't need to swear you in again unless

19  you feel like you need another oath.

20             Feel good?

21             THE WITNESS:  (Nods head.)

22             Okay.  Let's go for it.

23             Mr. Pryor, you can continue.

24

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

| 3:17-cv-02278-X | Vol 3 July 07, 2022 | Page 595 |
|---|---|---|

```
 1              DIRECT EXAMINATION - CONTINUED
 2  BY MR. PRYOR:
 3  Q.   Good morning, Ms. Stone [sic].
 4  A.   Good morning.
 5  Q.   Yesterday we were talking about Exhibit 15 and
 6  whether or not all of Ms. Stone's [sic]
 7  communications were protected union activity.  And
 8  we made it through this page right here, 612.
 9       I'm going to give you this exhibit.
10       It has been suggested to me by someone wiser
11  than myself that maybe instead of having to go
12  through each of these and have me read them to you,
13  just have you look at it and tell us any pages that
14  you think do not relate to Charlene Stone [sic]
15  exercising her protected union activity, that she's
16  sending this in connection with communicating to her
17  union about a complaint or concern.
18       Okay?
19       Do you understand the question?
20            THE COURT:  Mr. McKeeby.
21            MR. McKEEBY:  Objection to the use of the
22  term "protected activity."  It calls for a legal
23  conclusion.
24            THE COURT:  Okay.  Overruled.  I will
25  allow the question.
```

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 30 of 367  PageID 14257
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 596

```
 1              You can approach.
 2   BY MR. PRYOR:
 3   Q.   Here is the document.
 4        And I will tell you, there are some pages that
 5   are blurred and I can't read them, and I'm not
 6   expecting you, if it is blurred, to read the blur.
 7        But those that you can read, if there is
 8   something that doesn't relate to Ms. Carter
 9   complaining about her union, let me know.
10   A.   Just for clarification, I heard you say
11   "Ms. Stone's communication," and I also heard you
12   say "Charlene Stone."
13   Q.   Okay.  I'm able to mess up any names,
14   apparently.  American Airlines, Southwest Airlines.
15        I'm talking about Charlene sending
16   communications to the president of her union, and is
17   there something in here that doesn't tie into her
18   complaint about her union.
19   A.   I'm not able to read some of these either.
20   Q.   I will tell you what.  The ones that you can't
21   read, let me give you a marker, and just kind of
22   slash across the pages that you can't read.  And
23   there's quite a few.
24        The ones that you can't read, just put a slash
25   across it.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 31 of 367   PageID 14258
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 597

1    A.    (Witness complies.)

2    Q.    When you get to the page that says "Trial

3    Exhibit 15," you can stop, because we've covered

4    everything else.

5    A.    Is that going to be on the bottom, or where

6    should I be looking for that?

7    Q.    I couldn't hear you.

8    A.    Is that going to be on the bottom?  Where would

9    I find that?

10   Q.    I will just take that part away from you.  Here

11   is what we have covered so far.

12         Did you see anything that you did not consider

13   to be protected union activity?

14   A.    Of the pages that I can read everything on it

15   clearly, no.  There's a number of pages, quite a

16   few, where I can't read everything.

17   Q.    It's almost a third of them, I'm sure.

18         I'm going to identify for the record, if you

19   will confirm for me, the ones -- that one, could you

20   read that?  You are better -- I'm not trying to talk

21   you into it.  I just couldn't read it.

22         Okay.  You could read a little, is what you're

23   saying?

24   A.    I can make out some words.

25   Q.    Fair enough.  You are entitled to read the

1  whole thing.  The same thing on this one.  But it is

2  totally up to you.  If you can read that, that is

3  great.

4        Okay.  I think that's the only one.  You can

5  leave that one up if you can read it.

6  A.   Yeah, I can make that one out.

7  Q.   So we want to identify for the record the ones

8  that you have marked yellow.  And when you marked it

9  yellow --

10             THE COURT:  We can file this on the docket

11  if you want to, just to save time.

12             MR. PRYOR:  Thank you.  We will do that.

13             Let me mark this, then, as Exhibit 15-A.

14             THE COURT:  Any objection to 15-A?

15             MR. PRYOR:  Move for the admission of

16  15-A.

17             MR. McKEEBY:  No objection.

18             MR. GREENFIELD:  No objection, your Honor.

19             THE COURT:  Okay.  I will admit 15-A.

20             (The referred-to document was admitted

21       into evidence as Plaintiff's Exhibit 15-A.)

22             MR. PRYOR:  I will hand this to the Court

23  so I don't walk away with it.

24             THE COURT:  Thank you.

25             We will color scan it.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 33 of 367   PageID 14260
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 599

 1  BY MR. PRYOR:

 2  Q.   Ma'am, let's take a look at Exhibit 6 and --

 3           MR. PRYOR:  I'm sorry.  It is not Exhibit

 4  6.  I told you guys the wrong number.

 5           106, Counsel.

 6  BY MR. PRYOR:

 7  Q.   I'm only going to show you two pages of that.

 8           MR. GREENFIELD:  I'm sorry, Counsel, 106,

 9  not 6?

10           MR. PRYOR:  106, pages 5712 through -14.

11           MR. McKEEBY:  Your Honor, 106 is not

12  listed.

13           MR. PRYOR:  Okay.  I can show you what it

14  is.

15           May we approach, Judge?

16           THE COURT:  You may.

17           (Thereupon, the following proceedings were

18      had at sidebar:)

19           MR. PRYOR:  This was -- this should have

20  been listed for Mr. Schneider, who is testifying

21  tomorrow.  But there are two pages of it, a

22  collection of information put together by Southwest

23  during its investigation.

24           There are two pages of it, or three pages

25  of it are communications from Audrey Stone to

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 34 of 367  PageID 14261
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 600

1  Charlene telling her about the right to work.  It is

2  one of the things that she complained about.

3           And also, she testified she didn't send

4  things to Charlene.  It goes to both of those

5  issues.  It is not a surprise to them; they have it

6  outlined.  I don't know why it wasn't on our list.

7  I apologize.

8           THE COURT:  Understood.

9           Let me propose and ask their response.

10          Any objection to those two pages coming in

11 conditionally and then you pull it up with Schneider

12 tomorrow?

13          MR. PRYOR:  Yes.

14          MR. McKEEBY:  No objection.

15          MR. GREENFIELD:  Can I see the two pages?

16          MR. PRYOR:  I'm going to give this to the

17 witness, too, those pages.

18          What page number?  Is 5712, 13 and 14?  Is

19 that --

20          MR. PRYOR:  This will be 106A, I guess.

21          THE COURT:  We can conditionally admit

22 106, those pages, tomorrow.  It will all connect up.

23          MR. PRYOR:  I will just show her these two

24 pages.

25          THE COURT:  Sounds great.

```
 1              (Thereupon, the sidebar was concluded and
 2         the following proceedings were held in open
 3         court:)
 4              THE COURT:  All right.  So I'm admitting
 5    pages 5712, 5713, and 5714 of document number 106.
 6              (The referred-to document was admitted
 7         into evidence as Plaintiff's Exhibit 106-A.)
 8              THE COURT:  You can show them to the
 9    witness.
10              It is conditionally admitted.  We will
11    connect it up tomorrow.
12    BY MR. PRYOR:
13    Q.   Can you identity this page of Exhibit 106,
14    SWA 5712, as a communication you sent as president
15    of the Union to Charlene Carter regarding taking
16    action on the national right-to-work legislation?
17    A.   It was a communication sent by our COPE
18    committee.  I was the chairperson and Matt Hettich
19    was my co-chairperson.  And it was sent to all
20    flight attendants whose email addresses we had on
21    file, including Charlene Carter.
22    Q.   And let's see the next page so you can
23    identify, that is part of the communication that was
24    sent to Charlene?
25    A.   Yes.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 602

 1  Q.   And in fact, at the top, it says, "Hi.  My name

 2  is Charlene Carter, and I'm a member of the

 3  Transport Workers Union, Local 556."

 4       And it goes on to tell her what to say in order

 5  to object to this right-to-work law, correct?

 6  A.   Yes.

 7  Q.   And let's just look at the next page to make

 8  sure you have identified the entire communication.

 9       And there is your picture at the end?

10  A.   Yes.

11  Q.   Okay.  Thank you.

12       Did you speak to Sonya Lacore at any time about

13  your complaint against Ms. Carter?

14  A.   No.

15            MR. PRYOR:  Your Honor, may I approach to

16  provide the witness a document to refresh her

17  recollection?

18            THE COURT:  Yes, you may.

19            MR. PRYOR:  It's not on the point I just

20  asked about.

21            THE COURT:  Okay.  Then you need to set a

22  predicate first.

23            MR. PRYOR:  Okay.

24  BY MR. PRYOR:

25  Q.   Ma'am, were you interviewed by Southwest

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 37 of 367  PageID 14264
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                        Page 603

1   Airlines after you made your complaint against

2   Charlene?

3   A.   Yes.

4   Q.   And did you, during that interview, state that

5   Charlene was anti-union?

6   A.   When they asked me questions about who she was,

7   what kind of relationship I had with her, I said

8   that she had been very outspoken about my

9   administration and had opted out of our union.

10       I don't know that I used the word "anti-union,"

11  but I did say she had been outspoken against our

12  administration.

13           MR. PRYOR:  Your Honor, may I now approach

14  the witness to refresh her recollection?

15           THE COURT:  Yes.

16           MR. PRYOR:  Exhibit 39.

17  BY MR. PRYOR:

18  Q.   I'll hand you a copy of Exhibit 39.

19       I don't think it's in evidence, but I'm just

20  identifying it for the record.

21       I'll ask you to go to the third page.

22       See where it says, "What do you think would

23  cause" --

24           MS. GREEN:  Objection, your Honor.  He's

25  reading from a document that is not in evidence.

1              THE COURT:  Sustained.

2              MR. PRYOR:  Can I approach to identify?

3              THE COURT:  You may.

4    BY MR. PRYOR:

5    Q.   This page right here, do you see that?  Does

6    that refresh your recollection as to whether or not

7    you said she was anti-union?

8              MR. GREENFIELD:  I'm sorry.  Counsel, can

9    you please show me the part of the exhibit that you

10   are reading from?

11             Can you please show me part of the

12   document so I can review it?

13             The part of the document that you are

14   looking at.

15             Thank you.

16             MR. PRYOR:  The third page.

17             MR. GREENFIELD:  Thank you.

18   BY MR. PRYOR:

19   Q.   Does that refresh your recollection now that

20   you told Southwest Airlines that Ms. Carter was

21   anti-union?

22             MR. GREENFIELD:  Objection, your Honor.

23   Counsel is testifying.

24             THE COURT:  I will allow the question.

25             THE WITNESS:  I don't recall using those

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 39 of 367  PageID 14266
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 605

1  exact words, and there's other things in here that

2  it says I said that are not accurate.

3  BY MR. PRYOR:

4  Q.   Let's go to the second page of that document

5  and see if it refreshes your recollection of the

6  document.

7       I have to be careful how I do this.

8            MR. GREENFIELD:  Counsel, can you please

9  show me the section?

10           MR. PRYOR:  The second page.

11           MR. GREENFIELD:  Thank you.

12           THE COURT:  And we can mute this from the

13 jury's screen if you want to show it on your screen.

14 It's up to you.

15           We can mute the jury screen so that we are

16 just showing the document --

17           MR. PRYOR:  They have it but that is fine.

18           THE COURT:  Just so everyone sees where

19 you are at, if that's easier.

20           MR. PRYOR:  Sure.  Let's do that.

21           THE COURT:  Okay.  Jury screens are muted.

22 You can publish.

23           MR. HILL:  What exhibit is it?

24           MR. PRYOR:  It is the second page of

25 Exhibit 39.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 40 of 367   PageID 14267
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 606

1   BY MR. PRYOR:

2   Q.   Ma'am, does it refresh your recollection that

3   not only did you say she's anti-union, you said

4   she's very anti-union.

5            MR. GREENFIELD:  Objection, your Honor.

6   Counsel is again reading from a document not in

7   evidence.

8            THE COURT:  Sustained.  I will strike that

9   question.

10  BY MR. PRYOR:

11  Q.   Does it refresh your recollection regarding

12  what you said as to her union activity?

13  A.   I have already stated that I know I answered

14  questions that she was not supportive, had for a

15  long time not been supportive of the union, was

16  against our administration.  I don't recall the

17  exact words I used.  And, again, there are --

18  Q.   Let me try it again.

19       Do you recall telling them not once, twice, but

20  multiple times that she's anti-union?

21            MR. GREENFIELD:  Objection, Your Honor.

22  Counsel is continuing to --

23            MR. PRYOR:  I'm asking for her

24  recollection now.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 607

```
 1   BY MR. PRYOR:
 2   Q.   Has your recollection been refreshed as to
 3   whether or not you told Southwest Airlines
 4   repeatedly that Charlene Carter was --
 5           MR. GREENFIELD:  Objection, your Honor.
 6   Asked and answered as well.
 7           THE COURT:  You've got to finish your
 8   question first, and then give the objection, and
 9   then I'll rule on it.
10           So ask your question.
11   BY MR. PRYOR:
12   Q.   Does it refresh your recollection, after
13   looking at this document -- by the way, what is this
14   document?
15   A.   It looks like it is a Southwest Airlines
16   document of someone that they had taking notes of
17   the phone call.
18   Q.   And does it refresh your recollection that you
19   repeatedly told them, the reason Charlene was --
20           MR. GREENFIELD:  Objection, your Honor.
21   Again, he's talking --
22           THE COURT:  You have got to let him
23   finish.
24   BY MR. PRYOR:
25   Q.   -- was sending these communications to you was
```

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 42 of 367  PageID 14269
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 608

1   because she was anti-union?

2            THE COURT:  You can answer.

3            THE WITNESS:  I don't know what words I

4   used.  I know I described her as not being friendly

5   towards the union administration for a long time.

6   BY MR. PRYOR:

7   Q.   And you explained that that's why you

8   understood she sent you these messages, true?

9   A.   No.  I actually answered -- when I was

10  repeatedly asked why she would have sent me the

11  videos, I repeatedly said, I don't -- I don't know

12  why I was asked about my opinions on abortion, if I

13  ever had conversations with her about it, and I

14  stated over and over, I don't know.  I have not ever

15  had conversations.

16  Q.   It is on the screen.  Let's look on this

17  document.

18       Are you telling me that when you were asked,

19  "What do you think would cause her to send the

20  message," you didn't repeatedly say, "She's

21  anti-union"?

22            MR. GREENFIELD:  Objection, your Honor.

23            THE COURT:  Sustained.

24  BY MR. PRYOR:

25  Q.   Does it refresh your recollection that, in

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 43 of 367  PageID 14270
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 609

1   fact, what you told Southwest Airlines was the

2   reason she sent you the message is that she's --

3           THE COURT:  Counsel, this document is not

4   in the record, so we can't pull from it.

5           MR. PRYOR:  I'm sorry?

6           THE COURT:  This document is not in

7   evidence, so we can't pull from it.  It can only be

8   used to refresh.

9           MR. PRYOR:  I thought that was the way I

10  phrased my question.  Did I not?

11          THE COURT:  But then you started talking

12  about specifics in the document.  That's where we

13  cross the line.

14          MR. PRYOR:  I will not refer to the

15  document.

16  BY MR. PRYOR:

17  Q.   You have now reviewed a portion of this

18  document, correct?

19  A.   Yes.

20  Q.   Does this refresh your recollection that when

21  you were asked, "Why do you think Charlene sent

22  these messages to you," your answer was --

23          MR. GREENFIELD:  Objection.

24  BY MR. PRYOR:

25  Q.   -- "She was anti-union"?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 44 of 367   PageID 14271
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 610

1            MR. GREENFIELD:  Objection, your Honor.
2    It is asking what she was asked based on the
3    document.
4            THE COURT:  Sustained.
5            MR. PRYOR:  Another way to do it I'm going
6    to try.  I don't mean to step on the ruling.
7    BY MR. PRYOR:
8    Q.   Ma'am, has your recollection been refreshed
9    that you told Southwest Airlines the reason you
10   received these messages from Charlene Carter is
11   because she's anti-union?
12           MR. GREENFIELD:  Objection, your Honor.
13   Counsel is again testifying about --
14           THE COURT:  Sustained.
15           Do we need a sidebar?
16           MR. PRYOR:  Yeah, I do.
17           (Thereupon, the following proceedings were
18      had at sidebar:)
19           MR. PRYOR:  I don't know where I'm messing
20   up.
21           THE COURT:  Well, so I think the thing is
22   you can't lead with a refresh.  If you are reading a
23   refresh, you are pulling from the document itself.
24   That is not evidence.
25           MR. PRYOR:  I will ask it not leading.

1            THE COURT:  What did you tell them?

2            But the other problem is, this document

3    was Southwest's notes and not hers, so she can fight

4    this all day long, like she has.

5            You have to ask open-ended questions:

6    Does this refresh what you told them?  And the

7    answer it is, it is.

8            MR. PRYOR:  Thank you.  I wish I

9    understood the rules of evidence.  I said refreshed

10   and used my time.

11           THE COURT:  It is all good.

12           MR. PRYOR:  Thank you.

13           (Thereupon, the sidebar was concluded and

14      the following proceedings were held in open

15      court:)

16           THE COURT:  You can proceed.

17   BY MR. PRYOR:

18   Q.   Ma'am, has your recollection been refreshed as

19   to what you told Southwest Airlines regarding the

20   reason Ms. Carter sent you the messages that you

21   were complaining about?

22   A.   As I have already stated, I don't know what my

23   exact words were.

24       I answered questions about her long-time

25   history of being against the union and expressing

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 612

 1  that and not being happy with our administration.
 2  Q.   Is it fair to say that you did not read most of
 3  the messages that were sent to you from 2015 to 2017
 4  from Ms. Carter?
 5  A.   At the time I had this phone call?
 6  Q.   No.  From 2015 to 2017.
 7       I'm not sure what phone call.
 8       Are you talking about when you looked at the
 9  messages on your phone?
10  A.   No.  You were just asking me about the notes
11  from this phone call I had with Southwest.
12  Q.   Right.  I'm not asking you about this document.
13       I don't know if there is a way to do it.  I
14  have difficulty with that.
15       So my question to you is, is it fair to say
16  that you did not read most of the messages you
17  received from 2015 to 2017 from Ms. Carter?
18  A.   There were many of them that I had not looked
19  at prior to me reporting the last -- the videos to
20  Southwest.
21  Q.   Are you able to tell us if it's most or not
22  most that you didn't read?
23  A.   I don't know how many.  There were so many
24  messages, and I did not keep track of what I read.
25  Q.   Did you tell Southwest Airlines that you didn't

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 47 of 367   PageID 14274
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 613

1  read them?

2  A.   I know I told them that there were -- that

3  there were messages I had not read.

4  Q.   Did you tell Southwest Airlines that you wanted

5  them to keep it a secret that you, as Union

6  president, were reporting a union member or a union

7  objector?

8  A.   Keep it a secret?  No.

9       Any report that goes to Southwest Airlines,

10  however, is supposed to be handled in a

11  professional, confidential manner when they are

12  doing an investigation.

13  Q.   Did you ask Southwest Airlines to keep that

14  information from flight attendants?

15            MR. GREENFIELD:  Objection, your Honor,

16  asked and answered.

17            THE COURT:  Sustained.

18  BY MR. PRYOR:

19  Q.   And did you talk to Southwest Airlines about

20  what you believed was a threat from another flight

21  attendant when you were interviewed about your

22  complaint against Ms. Carter?

23       If you are looking to refresh your

24  recollection, it's the last two pages.

25  A.   Yes.

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 48 of 367  PageID 14275
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 614

1  Q.   And did you tell them that it was determined

2  that there was -- those were not legitimate

3  screenshots, that those were false screenshots, the

4  complaint you had against the flight attendant?

5  A.   No.

6  Q.   If you look at the last page, does that refresh

7  your recollection?

8  A.   I didn't tell them they were false screenshots.

9  I didn't report those.

10      And these notes refer to me saying Jeanna

11  Jackson and Mike Hafner, and that was not who the

12  screenshot in question was -- was discussed.  That

13  is incorrect.

14  Q.   Did you tell Southwest Airlines that your base

15  manager pulled you aside and said it was determined

16  that there were false screenshots?

17  A.   Yes, the base manager said that.

18  Q.   Okay.  And you have evidence to say the base

19  manager was wrong?

20          MR. GREENFIELD:  Objection, your Honor.

21  The testimony calls for hearsay.

22          THE COURT:  I will allow her to answer

23  only if she has personal knowledge.

24          THE WITNESS:  I only know what was

25  reported to me by my base manager.

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 49 of 367  PageID 14276
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 615

```
 1   BY MR. PRYOR:
 2   Q.   And your base manager told you that that
 3   complaint you were making was based upon a false
 4   screenshot, true?
 5   A.   I did not make that complaint.
 6   Q.   Well, what were you being told?  Why were you
 7   talking to the base manager about it if it wasn't
 8   your complaint?
 9        I thought it was supposed to be confidential
10   when people made complaints.
11            MR. McKEEBY:  Objection, compound.
12            THE COURT:  Can you split it up?
13            MR. PRYOR:  Sure.
14   BY MR. PRYOR:
15   Q.   Did you just tell us a few minutes ago that
16   when somebody makes a complaint, it is supposed to
17   be confidential?
18   A.   Yes.
19   Q.   And did you talk to a base manager about
20   someone else's complaint about a flight attendant
21   with false screenshots?
22   A.   The base manager approached me because that
23   screenshot went viral.  It was posted on other
24   flight attendant airline pages.  It was all over the
25   place.  Everyone was talking about it.  And I was
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 50 of 367   PageID 14277
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 616

 1 | specifically named in the post.
 2 |     So my base manager pulled me aside to say that
 3 | the investigation had been closed out and that they
 4 | did not believe that it was a -- not a real
 5 | conversation, that it had been generated.
 6 | Q.   All right.  Let's look at Exhibit 65.
 7 |     I'm going to hand you a copy.
 8 |             THE COURT:  Are you moving for this?
 9 |             MR. PRYOR:  Yes, I move for the admission
10 | of 65.
11 |             THE COURT:  Okay.  Morning objections.
12 |             Okay.  I have overruled those, so it is
13 | admitted.
14 |             You can publish.
15 |             (The referred-to document was admitted
16 |     into evidence as Plaintiff's Exhibit 65.)
17 | BY MR. PRYOR:
18 | Q.   I have the same question about this I did about
19 | Exhibit 15.
20 |     Is there anything in here that doesn't relate
21 | to Ms. Carter raising her complaints about her
22 | union?
23 |     If there are, tell me the page and we will talk
24 | about it.
25 |             MR. GREENFIELD:  Objection, your Honor.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 617

1  There is no evidence that this is part of a

2  complaint.

3           MR. PRYOR:  Have I got the wrong exhibit?

4  I thought we did 66 yesterday.

5           THE COURT:  You did 66 yesterday, and we

6  are on 65 today.

7           MR. PRYOR:  This has other items in it

8  that 66 does not.

9           THE COURT:  Understood.

10          You can ask.

11 BY MR. PRYOR:

12 Q.   Is there anything in Exhibit 65 that is not

13 Ms. Carter talking about her complaints about her

14 union?

15          MR. GREENFIELD:  Again, objection, your

16 Honor.

17          There's been no foundation that this is

18 any sort of complaint.

19          THE COURT:  I think it is an okay question

20 for him to ask.

21          THE WITNESS:  I don't know what this --

22 what some of this is.  Some of this I haven't seen.

23 BY MR. PRYOR:

24 Q.   Ma'am, you have to bring the microphone to your

25 mouth for me.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 52 of 367   PageID 14279
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 618

 1  A.   I don't know what some of this is.  I have not

 2  seen a lot of this ever before.

 3  Q.   Okay.  The first two pages we have talked about

 4  before.

 5       She's complaining about her union and what she

 6  thinks is them supporting murder by supporting a

 7  Planned Parenthood March.

 8       Do you see those two?

 9  A.   Yes.

10  Q.   And that is her complaining about her union,

11  correct?

12  A.   I disagree that what she sent was complaining

13  about her union.

14  Q.   So when it says, "TWU, AFL-CIO, and 556 are

15  supporting this murder," that's not her -- that

16  sounds like a pretty strong complaint about her

17  union.

18            MR. GREENFIELD:  Objection, your Honor.  I

19  don't know where counsel is reading from that.

20            MR. PRYOR:  The first page of the exhibit.

21            MR. GREENFIELD:  Thank you.

22            MR. HILL:  I just highlighted it.

23            MR. PRYOR:  Okay.  It's on the screen.

24            MR. GREENFIELD:  Thank you.

25            THE WITNESS:  I don't believe we were

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 53 of 367   PageID 14280
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                        Page 619

1  supporting murders or the images depicted in that

2  video.

3  BY MR. PRYOR:

4  Q.   Union members are allowed to have a difference

5  of opinion, objectors are allowed to have a

6  difference of opinion and raise those, correct?

7  A.   Yes.

8  Q.   I didn't ask you if you agreed with her.  We

9  know you don't.  But it doesn't change the fact that

10  she's complaining about her union, correct?

11  A.   Again, I don't believe that's complaining about

12  the union in that depiction.

13  Q.   So just to make sure, where it says, "The union

14  is supporting murder," that is not a complaint about

15  the union?

16          MR. McKEEBY:  Objection, asked and

17  answered.

18          THE COURT:  Sustained.

19  BY MR. PRYOR:

20  Q.   Let's go to the third page.

21      And this is the anatomically correct hats and

22  she's complaining about the union supporting this

23  and using our money for this, stealing from our dues

24  for things like this.

25      That's Charlene Carter complaining about her

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 620

 1  union, correct?

 2  A.    What she wrote is, yes.

 3  Q.    What she wrote what?

 4  A.    What she wrote, yes.

 5  Q.    Okay.  The picture, the picture doesn't

 6  exemplify her complaint about what her union did?

 7  A.    No, I don't believe it does.

 8  Q.    So she's saying, These are the kind of things

 9  that were at the March that you were supporting, and

10  here is a picture of it, and you don't think that is

11  related to her union activity and actions should be

12  taken against a union member that would do something

13  like that?

14           MR. McKEEBY:  Objection, asked and

15  answered.  Compound.

16           THE COURT:  Sustained.

17  BY MR. PRYOR:

18  Q.    Do you believe the pictures are part of her

19  union activity or not?

20           MR. GREENFIELD:  Objection, your Honor,

21  asked and answered.

22           THE COURT:  Sustained.

23           MR. PRYOR:  Your Honor, she said the

24  words.  I haven't been able to get her testimony on

25  the pictures.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Page 621

```
 1              THE COURT:  I thought she answered that.

 2              MR. PRYOR:  Okay.

 3  BY MR. PRYOR:

 4  Q.   Is there anything else in this document that

 5  you looked at that you have seen before?

 6       I handed you a copy of it.  You can flip

 7  through it.

 8  A.   After the fourth page, I don't know what any of

 9  this is, and it is not things I recall ever seeing

10  before.

11  Q.   Okay.  Let's look at Exhibit 34.

12              MR. PRYOR:  I move for the admission of

13  Exhibit 34.

14              THE COURT:  All right.  34.

15              Morning objections from Union.

16              MR. GREENFIELD:  Yes, sir.

17              THE COURT:  Okay.  I've overruled those,

18  so I will allow 34 in.

19              You can publish.

20              MR. McKEEBY:  I'm sorry, was 65 admitted?

21              THE COURT:  65 is admitted --

22              MR. McKEEBY:  Thank you, your Honor.

23              THE COURT:  -- and now 34 is admitted.

24

25
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 56 of 367   PageID 14283
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 622

 1              (The referred-to document was admitted
 2         into evidence as Plaintiff's Exhibit 34.)
 3    BY MR. PRYOR:
 4    Q.   I direct your attention to the last page of
 5    Exhibit 34.
 6         First of all, what is Exhibit 34?  That's Unity
 7    Magazine.
 8    A.   It's a communication that is published on
 9    behalf of the union by our communications
10    department, usually four times a year.  Or at that
11    time, four times a year.
12              MR. PRYOR:  Let's go to the last page.
13    BY MR. PRYOR:
14    Q.   Do you see where it says, "Yippee ki-yay, and I
15    will see you online"?
16         Is that what you wrote?
17    A.   Yes.
18              MR. PRYOR:  We move for the admission of
19    21-Q, an unredacted version.
20              While you are looking, also 21-P.
21              THE COURT:  All right.  I have -- so I
22    have 21 as a whole.  I know the objections on 21 as
23    a whole.
24              MR. PRYOR:  There is an updated exhibit
25    list, your Honor, that has 21-A through it looks

```
 1    like X.
 2              This is a specific couple of pages.
 3              THE COURT:  Let's sidebar right quick.
 4              (Thereupon, the following proceedings were
 5         had at sidebar:)
 6              MR. PRYOR:  This says email 21-A through E
 7    on it, so I don't have --
 8              We are trying to keep the rest of it
 9    secret.  Now it is out.  I have no idea why.
10              MR. McKEEBY:  I don't know what they are.
11              MR. PRYOR:  You don't?
12              THE COURT:  Subparts of 21.
13              MR. McKEEBY:  Show them to me.  I just
14    don't remember right now.
15              MR. PRYOR:  21 is a bunch of emails that
16    are related to the investigation.
17              THE COURT:  Sure.
18              MR. PRYOR:  These are a couple of emails
19    that she's on, she's not on everything.  We
20    divided --
21              THE COURT:  She can't sponsor everything.
22              MR. PRYOR:  I'm only offering things she
23    can sponsor.  She's on the emails.
24              THE COURT:  I recall 21 globally, that we
25    talked about 21, and the issue was limiting
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 58 of 367   PageID 14285
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 624

1   instruction.  This comes in as to Union, not

2   Southwest.  I know there are other objections that I

3   overruled.

4             MR. PRYOR:  If you haven't seen the

5   document, it is -- you have seen it.  You just don't

6   know which one I'm referring to.

7             It is about Audrey Stone being included on

8   Brian Talburt complaints about Jeanna Jackson.

9             MR. McKEEBY:  I object.

10            THE COURT:  Can we agree all 21 subparts,

11  we will do the same thing, right?

12            I'm going to overrule the Union objections

13  but let him --

14            MR. GREENFIELD:  I forwarded the Bates

15  numbers.

16            MR. PRYOR:  Sure.  I will get that to you.

17  I'm thinking for a second what else is in it.

18            Well, if something gets offered and I

19  think that the running objection doesn't apply or

20  the instruction, I will say something.

21            The fact that Brian Talburt brings a

22  complaint against Jeanna Jackson, I'm on board with

23  this because I understand -- I understand the

24  ruling.

25            I will not talk about what actually

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 59 of 367   PageID 14286
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 625

1  happened to Ms. Jackson.  These emails don't say.

2          A limiting instruction is not necessarily

3  in my view.

4          THE COURT:  Okay.  I will give the

5  colloquial instruction on all of 21.  I'm admitting

6  21 --

7          MR. PRYOR:  O and P right now.  There may

8  be --

9          THE COURT:  Right now I'm admitting O and

10  P.

11          Say it again.

12          MR. PRYOR:  I will.

13          (Thereupon, the sidebar was concluded and

14      the following proceedings were held in open

15      court:)

16          MR. PRYOR:  Your Honor, I have to come

17  back up.

18          (Thereupon, the following proceedings were

19      had at sidebar:)

20          MR. GILLIAM:  Your Honor, my co-counsel

21  wants to use a document that you ordered to be

22  sealed.

23          MR. GREENFIELD:  I can't hear.

24          MR. GILLIAM:  We removed the names on the

25  emails.  So he's going to reference a document that

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 3 July 07, 2022                         Page 626

1    you ordered to be redacted as a result of our motion

2    to file under seal.  And just the addresses, in some

3    cases, the addresses identify who the recipient was

4    or who is cc'd.

5              And so I think Mr. Pryor would like to use

6    the document with that unredacted, even though you

7    ordered it to be redacted.  He wants to use the

8    unredacted version to help identify who the

9    recipients are.

10             THE COURT:  Okay.  I can't remember the

11   redaction order.

12             Can you refresh my recollection on what we

13   ordered on redactions?

14             MR. GILLIAM:  Yes.  It was mainly

15   addresses --

16             THE COURT:  Sure.

17             MR. GILLIAM:  -- of opposing --

18             MR. McKEEBY:  Whose addresses?

19             MR. GILLIAM:  Brett Nevarez's address.

20             MR. McKEEBY:  Maybe not the best example.

21             Who else?

22             MR. GILLIAM:  Well, I mean, he's one of

23   the recipients.

24             MR. McKEEBY:  I frankly don't care about

25   his address.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 61 of 367   PageID 14288
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 627

1           Generally, I don't think it is appropriate
2    for Southwest Airlines employees' addresses to be in
3    the record.
4           MR. GILLIAM:  The main thing is we want to
5    establish who the recipients were.
6           THE COURT:  We can stipulate one of the
7    recipients was Nevarez.  Do we have to reveal the
8    email address to --
9           MR. McKEEBY:  I can stipulate to it.
10          THE COURT:  Like why reveal the email?
11          We all know it is Brett Nevarez.  We can
12   stipulate it was Brett Nevarez.
13          You can say, The parties have stipulated
14   it was Brett Nevarez.
15          MR. GILLIAM:  He's probably not the only
16   example.
17          MR. PRYOR:  It is one thing, the email.
18          What was the basis for marking out names?
19          MR. GILLIAM:  Well, in many cases, the
20   email address is the only thing that is there.
21          THE COURT:  Don't --
22          MR. GILLIAM:  Other examples.
23          MR. PRYOR:  The ones that got unredacted,
24   that wasn't --
25          MR. GILLIAM:  To clarify, Brett Nevarez

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 62 of 367   PageID 14289
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Page 628

1  isn't the only example.  We also have some Southwest

2  management employees, Julie O'Grady, Mike Sims.

3  They are WNCO addresses, email addresses.

4          It might make it easier if Mr. Pryor would

5  show Mr. McKeeby and Mr. Greenfield and your Honor

6  the document.

7          THE COURT:  For the first one, can we

8  agree on the stipulation going forward, maybe we try

9  to agree in advance to the jury?  There are five

10 stipulations.  We added to the 15 that say these

11 exhibits went to these people.  We are not showing

12 the people.

13         MR. GREENFIELD:  Can we make it clarified

14 on the stipulation that it was emailed to them, not

15 necessarily that they received it?  Just because I

16 think there is a difference.

17         THE COURT:  Sure.  Emailed to this person.

18         MR. GREENFIELD:  Yes.

19         THE COURT:  That is fine.  Go back and say

20 which one you are doing, and then say, The parties

21 have stipulated that this email was sent to Brett

22 Nevarez.  And then I will give the limiting

23 instruction.

24         MR. PRYOR:  I have no idea who it was.

25         MR. GILLIAM:  You have the unredacted

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 63 of 367  PageID 14290
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 629

1  version.  Just don't use the unredacted.  Use the

2  redacted.

3              MR. PRYOR:  I'm not in charge of the

4  computer.

5              (Thereupon, the sidebar was concluded and

6        the following proceedings were held in open

7        court:)

8              THE COURT:  Sorry about that.

9  Housekeeping.  But I think we got a path forward.

10             Okay.  So which one are you moving to

11  introduce into evidence?

12             MR. PRYOR:  We would move for the

13  admission 21-Q.

14             Your Honor, the unredacted version of this

15  is -- has some changes to it.

16             I will come back up.

17             (Thereupon, the following proceedings were

18        had at sidebar:)

19             THE COURT:  Kevin, move the jury monitors

20  right quick.  They may already be.  They are.

21             MR. PRYOR:  If you look at the unredacted

22  version and then look at this, this is

23  incomprehensible.  The unredacted version is -- that

24  is the same document, but I have had that issue

25  before.

```
 1              This looks like the same document.
 2              So I can't even question her, really,
 3   about what it actually says.
 4              THE COURT:  It sounds like we need to take
 5   a break and redact it again.
 6              MR. PRYOR:  Tell me what you would like.
 7   Just pull off the personal email that -- redact the
 8   letter K or the letter W, like we did there?
 9              THE COURT:  Let's take a quick break, you
10   can call in and check in, and we will redact it on
11   the fly.
12              (Thereupon, the sidebar was concluded and
13        the following proceedings were held in open
14        court:)
15              THE COURT:  I'm calling a morning break so
16   we can do some redactions of the next exhibit.
17              I have asked for redacting personal email
18   addresses, just so that they are not floating around
19   in court records everywhere.
20              So we have got one problem with an exhibit
21   we need to redact on the fly.
22              I'm going to give y'all a morning break
23   right quick.  Sorry that it's earlier than planned.
24   And then we will see if we can power through until
25   lunch after that.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 65 of 367   PageID 14292
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 631

```
 1              So let's take a 10-minute break.  So let's
 2   be back here at 9:58.
 3              Yesterday I said it was going to be a
 4   five-minute break, when it was ten.
 5              And then the same three instructions as
 6   always.  Only talk to your fellow jurors and court
 7   personnel, don't talk to anyone about the case, and
 8   don't do any research about the case.
 9              We will see you in ten minutes.
10              THE COURT SECURITY OFFICER:  All rise for
11   the jury.
12              (The jurors exited the courtroom.)
13              THE COURT:  You can leave, just don't talk
14   to anyone about the case.
15               (The witness exited the courtroom.)
16              (Recess.)
17              THE COURT SECURITY OFFICER:  All rise.
18              THE COURT:  Before we bring in the jury,
19   are we good to go on 21-Q?
20              MR. PRYOR:  There are several 21s, but --
21              COURT REPORTER:  I can't hear you.
22              THE COURT:  Okay.
23              MR. PRYOR:  My first exhibit will be 21-P.
24              THE COURT:  21-P is what you are going to
25   move for, and then I give them a global disclaimer
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 66 of 367   PageID 14293
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 632

1  on all 21 subparts.  They might have information

2  that is Southwest excluded, right?  It's information

3  usable against the Union but not against Southwest.

4          Claims against the Union, not claims

5  against Southwest.  I'm trying to keep it straight.

6          MR. GREENFIELD:  Your Honor, I would just

7  like to see the final redacted copy or what it is

8  that is planning to be introduced.  I haven't seen

9  it yet.

10          THE COURT:  We've got the jury screens

11  muted.  You can pull it up.

12          MR. PRYOR:  He wants to make sure it is

13  done correctly.

14          THE COURT:  I think it was personal emails

15  and addresses that we were redacting.

16          MR. GILLIAM:  Show personal emails and

17  addresses on the screen, not to the jury.

18          MR. PRYOR:  Keep going.  It is RSP 66.

19  It's 21-P.

20          MR. HILL:  This is 21-P.

21          MR. PRYOR:  Oh, it is.  Actually, not

22  mine, but okay, I will roll with it.

23          MR. GREENFIELD:  Now, are those going to

24  remain redacted and we are stipulating that that is

25  who it was sent to?

```
 1              MR. GILLIAM:  That is my understanding.
 2              MR. GREENFIELD:  Okay.  So it is going to
 3  remain redacted to the jury, and your Honor is going
 4  to make a stipulation that --
 5              THE COURT:  So what will the jury see?
 6              MR. GREENFIELD:  That's what I'm trying to
 7  find out.
 8              MR. PRYOR:  No.  I object to that.  The
 9  jury needs to know who these people are when they
10  get this exhibit.  And you can -- certainly you can
11  mark out Brian's, but Julie O'Grady, leave her name
12  in and then take out the "@."  The same thing with
13  B-R-E.  The same thing with N-E-V-I-N-C.
14              I don't even think this needs to be
15  redacted at all.  There is nothing top secret about
16  their email addresses.
17              THE COURT:  Personal, yes, but WNCO, no,
18  right?
19              So personal email addresses, I ordered
20  this on the round of briefing and unsealing, so we
21  can't re-litigate that.
22              But so, for example, the AOL email
23  addresses, the MSN email address, and the Hotmail
24  address should be redacted.  The WNCO, Julie O'Grady
25  should not be.
```

```
 1                  MR. PRYOR:  Well, can we -- I'm sorry for
 2      interrupting.
 3                  Can we leave out everything before the
 4      "@" -- and leave in everything before at?  That
 5      doesn't tell their email address.
 6                  THE COURT:  Are y'all okay with that?
 7                  MR. PRYOR:  How does NEVINC --
 8                  THE COURT:  I'm getting -- hold on.  I'm
 9      getting head nods.
10                  Are we okay with redacting the AOL?
11                  MR. McKEEBY:  Yes.
12                  THE COURT:  Sounds fair.
13                  So can we redact the domain name?
14                  MR. PRYOR:  The MSN.com.
15                  MR. HILL:  Sure.  That is not an immediate
16      process, but I can -- I can get back there and do
17      it.
18                  MR. PRYOR:  Your Honor, before making this
19      exhibit available to the jury, we will make sure
20      that the redactions are as you have indicated.
21                  I would like to just roll on then.  I will
22      ask questions, and she will have to accept my
23      representation as to who it is from.  If not, I can
24      show her the unredacted version.
25                  THE COURT:  Or we can have the
```

1    stipulation.  I think we are all in agreement on who

2    these folks are tied to, right?  And we can give

3    stipulations back to the jury that say, On

4    Exhibit 21-P, the following people received the

5    email.

6            MR. PRYOR:  Okay.  I will state that I can

7    represent to her who sent it, who received it, who

8    is on the cc.  And if I get it wrong, they can

9    certainly tell me.  It's right in front of me.

10           THE COURT:  Understood.

11           Okay.  Are we ready to bring in the jury,

12   and then we will try to get a thumbs up whenever we

13   get a publishable redacted version with domain names

14   off?

15           MR. PRYOR:  I will live with the old one

16   if I have to, just to get us moving.

17           THE COURT:  Your point is well taken.

18           The prefix doesn't matter as much as

19   withholding some of the information.

20           Okay.  Let's bring them in.

21           (The jurors entered the courtroom.)

22           THE COURT:  All righty.  You can be

23   seated, and Mr. Pryor, you can continue.

24           MR. PRYOR:  Thank you, your Honor.

25           We move for the admission of Exhibit 21-P.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 70 of 367   PageID 14297
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 636

```
1              THE COURT:  21-P.
2              On the prior objections on 21-P, my ruling
3   on those is, I'm overruling the Union objections on
4   21-P, but I am sustaining an objection to an extent
5   from Southwest.
6              All of the 21 subparts that you are going
7   to hear from are for use in the claims against the
8   Union but not the claims against Southwest.
9              That may matter for some exhibits more
10  than others, but I will just say that globally.
11             For 21 anything, those are useful for the
12  claims against the Union, not useful for the claims
13  against Southwest.
14             I will let you publish it when y'all are
15  ready when those redactions are completed.  Just
16  give me a thumbs when they are, and I will make sure
17  I unmute the jury screens.
18             MR. PRYOR:  Thank you, your Honor.
19             I'm going to trust my co-counsel to put it
20  on the right screen.  And if not, it's not.  It's
21  him.
22             THE COURT:  No pressure.  No pressure.
23             MR. PRYOR:  21-P, please.
24             MR. GREENFIELD:  Counsel, may I have a --
25
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 71 of 367   PageID 14298
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 637

 1  BY MR. PRYOR:

 2  Q.   You have identified 21-P is an email that you

 3  are carbon-copied on from Brian Talburt.

 4           MR. GREENFIELD:  Counsel, do you have a

 5  Bates number?

 6           MR. PRYOR:  What is that?

 7           MR. GREENFIELD:  A Bates number for the

 8  page?

 9           MR. PRYOR:  It is 66, APP 66, and it

10  pretty much goes from there.

11           MR. GREENFIELD:  I understand.

12           May we conference, your Honor?

13           THE COURT:  Sure.

14           (Thereupon, the following proceedings were

15      had at sidebar:)

16           MR. GILLIAM:  I have a feeling --

17           THE COURT:  The summary judgment record

18  filing.

19           MR. GREENFIELD:  And I don't have a

20  problem with that.

21           I just don't know where to look within 21

22  because the Bates numbers for 21 don't align with

23  this 21-P.  They are different.  Unless it is

24  somewhere --

25           MR. PRYOR:  This is the way it is.  RSP

```
 1   66.

 2              MR. GREENFIELD:  I understand.

 3              THE COURT:  How am I going to keep the

 4   jury muted on all of 21?

 5              You show it to us, and then y'all can make

 6   your objection based on what you are seeing.

 7              MR. GREENFIELD:  I'm just trying to

 8   understand where it is within 21.  That is fine.  I

 9   just want to know where it is in the document.

10              THE COURT:  Agreed.

11              (Thereupon, the sidebar was concluded and

12         the following proceedings were held in open

13         court:)

14              THE COURT:  Okay.  You can proceed.

15   BY MR. PRYOR:

16   Q.   And you identified 21-P is an email that you

17   received from Brian Talburt?

18   A.   Yes.

19   Q.   Let's look at the second page.

20        And this is a post -- it's attaching a post

21   from Jeanna Jackson, who is a union member?

22   A.   Yes.

23   Q.   And her post says, "This recall is happening,

24   it is real and it is valid.  If it wasn't, then all

25   of the anti-recall people would not be fighting so
```

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 73 of 367  PageID 14300
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 639

1  hard to discredit the recall or any or all of its

2  supporters.

3        "From here on out, please be careful what you

4  post.  The usual suspects are on the hunt to get

5  anyone and everyone in trouble with the principal's

6  office.  There are tattletales on every group page

7  who like to keep the pot stirred, so just please be

8  mindful of the rules:  No names, no initials, no

9  name calling.  We are all allowed to have a

10 dissenting opinion from those who are in office at

11 556.  That is a fact.

12       "I will continue to only post facts that have

13 been confirmed and can be backed up.  Come at me as

14 you will, but we -- I/we have the truth on our side.

15 Feel free to PM or text me any information you deem

16 important.  This recall is happening."

17       That is what the document says, right?

18 A.    Yes.

19 Q.    Do you agree that's protected union activity?

20 A.    Yes.

21 Q.    All right.  Let's go to the first page.

22       By the way, she's saying she's predicting that

23 your team is going to take posts and charge people,

24 and so be careful.

25       That is one of the things she's saying, right?

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 74 of 367  PageID 14301
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 640

1              MR. GREENFIELD:  Objection, your Honor.

2    Counsel is testifying as to what his inference from

3    the document is.

4              THE COURT:  I will allow it.

5              THE WITNESS:  She doesn't say "my team."

6    I think she used the words "the usual suspects."

7    And I don't know who she is referring to there.

8    BY MR. PRYOR:

9    Q.   So who is she trying to recall?  You, right?

10   A.   I, along with most of the rest of the executive

11   board.

12   Q.   So she's saying, the people that are trying to

13   discredit us is your team.

14        You don't see that when she's talking about the

15   people that she's trying to recall?

16             MR. GREENFIELD:  Objection, your Honor.

17   Counsel is testifying as to his interpretation of

18   what the document says.

19             THE COURT:  I will allow it.

20             THE WITNESS:  She says "the usual

21   suspects."  I don't know who she's speaking of

22   there.

23   BY MR. PRYOR:

24   Q.   Okay.  Let's just be clear here, it's a recall

25   petition against your administration, and you don't

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 641

1  know who she's talking about, fair?

2  A.   Correct.

3  Q.   Let's go to the first page of this exhibit and

4  see what is being said about this protected union

5  activity.

6       This is Brian, and he's sending this email to

7  Julie O'Grady at Southwest Airlines, okay?

8       You can accept that representation.  Counsel

9  agree.

10      I see it is blacked out on your screen.

11      Do you accept that?

12 A.   Yes.

13 Q.   And it's carbon-copied to you and Brett

14 Nevarez.

15      I know that's blacked out, but I can represent

16 that to you as well.

17      Do you accept that?

18 A.   Yes.

19 Q.   So two officers of the union, both who are

20 subject of a recall, send a communication to

21 Southwest Airlines.

22      Who is Julie O'Grady?

23 A.   I don't know what her title was.

24 Q.   She's at Southwest Airlines, right?

25 A.   I believe so, yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 642

 1  Q.    Look down below.

 2        Do you know who Edgar Ma is?

 3  A.    There is a flight attendant named Edgar

 4  Maynard.

 5  Q.    Okay.  Is that one of your supporters?

 6  A.    Yes.

 7  Q.    That's one of the usual suspects, isn't it?

 8  A.    I don't know if that is who Jeanna was talking

 9  about.

10  Q.    So this email to Julie O'Grady says, "Julie, as

11  a follow-up to our conversation yesterday, I am

12  including the following recent posts.

13        "A further example of the public encouragement

14  and endorsement of retaliatory practices of Jeanna

15  Jackson and company.  Sincerely, Brian Talburt."

16        That's what he wrote to you and sent to you as

17  president of the Union, isn't it?

18  A.    That is what he wrote and sent to Julie and

19  cc'd me on.

20  Q.    And you've told us that Ms. Jackson in this

21  post was engaged in protected union activity, and

22  Mr. Talburt is telling Southwest Airlines that it is

23  an example of retaliatory practices of Jeanna

24  Jackson, true?

25  A.    Yes.

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 77 of 367  PageID 14304
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 643

1  Q.   And you are on that email.  And I'm sure there

2  is going to be an email from you saying, Wait a

3  minute, Julie.  That is wrong.  That is protected

4  activity.

5       Did you do that?

6  A.   No.

7  Q.   You are on this email, president of the Union.

8  Southwest Airlines receives it.  The president of

9  the Union is on there and being told that this other

10 union member is doing something inappropriate, and

11 you are on the email and say nothing.  True?

12            MR. GREENFIELD:  Objection, your Honor.

13            MR. McKEEBY:  Objection, asked and

14 answered.

15            THE COURT:  Sustained.

16 BY MR. PRYOR:

17 Q.   Did you take any action to disavow the effort

18 in this email to have charges brought against a

19 union member who was engaging in protected activity?

20            MR. McKEEBY:  Objection, asked and

21 answered, and mischaracterizes the testimony -- or

22 the email.

23            MR. PRYOR:  This is broader.  I asked --

24            MR. GREENFIELD:  Your Honor, objection

25 that he's testifying as to a legal opinion -- a

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 78 of 367   PageID 14305
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 644

1    legal fact.  He's saying that it was in fact

2    protected activity.

3              MR. PRYOR:  First of all --

4              THE COURT:  I'll overrule on the legal

5    fact.  You did broaden it.

6              I'll let her answer the question.

7    BY MR. PRYOR:

8    Q.   You can answer.

9    A.   Can you repeat the question?

10   Q.   Did you take any action to disavow this email

11   that you are on trying to charge a union member with

12   Southwest Airlines for engaging in protected union

13   activity?

14   A.   No.

15             MR. PRYOR:  Let's look at 21-Q.

16             I move for the admission of 21-Q.

17             THE COURT:  Same objections on 21-Q?

18             Okay.  So I will admit 21-Q.

19             The same limiting instruction.  Everything

20   in 21 is for use in the claims against the Union and

21   not in the claims against Southwest.

22             You can publish.

23             (The referred-to document was admitted

24        into evidence as Plaintiff's Exhibit 21-Q.)

25             MR. PRYOR:  I was hoping for the

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 79 of 367  PageID 14306
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 645

1    unredacted version.  It's easier to read.

2              We don't have that?  If we don't, I will

3    just read this and we will see how we do on it.

4    Maybe we can work through it without the unredacted.

5    BY MR. PRYOR:

6    Q.   This is in an email in response to the email we

7    just looked at from Deborah Edwards at Southwest

8    Airlines.  And you are on it, Julie O'Grady is on

9    it, Mr. Talburt is on it.

10        Do you accept those representations?

11   A.   Yes.

12   Q.   And --

13             MR. PRYOR:  Oh, that's the same one I

14   have.

15   BY MR. PRYOR:

16   Q.   Who is Deborah Edwards at Southwest Airlines?

17   A.   At the time she was the Phoenix base manager,

18   which is where Mr. Talburt was based.

19   Q.   Okay.  Can you pull your mic closer to you and

20   tell me what you just said?

21        You are not willing to do that?

22   A.   At the time she was the Phoenix base manager,

23   which is where Mr. Talburt was based.

24   Q.   Okay.  So this is a report to the base manager,

25   and she's -- she was on the email below.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 646

1        I didn't mention her name.

2        And she says, in response to the email, "Thank

3   you for sending these to us, Brian.  We will look

4   into this."

5        True?

6   A.   Yes.

7   Q.   And did you, in response to this email, tell

8   Southwest Airlines, You shouldn't be looking into

9   this against Ms. Jackson, the person trying to

10  recall me, because she's engaged in protected

11  activity?

12  A.   No.

13  Q.   Did you take any action to tell Southwest

14  Airlines that this was inappropriate?

15  A.   No.

16          MR. PRYOR:  Let's look at Exhibit 21-R.

17  BY MR. PRYOR:

18  Q.   By the way, the date of that is February 23rd,

19  correct?

20  A.   Yes.

21  Q.   That's one day after you had reported Charlene

22  Carter for social media violation, true?

23  A.   Yes.

24  Q.   All right.

25          MR. PRYOR:  Let's look at 21-R.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

 1                  I move for the admission of 21-R.

 2                  THE COURT:  Okay.  Same objections?

 3                  Okay.  Same ruling for me.  I'm overruling

 4    the objections other than giving the limiting

 5    instruction on 21-R.

 6                  This is another 21 that's useful for the

 7    claims against the Union but not for the claims

 8    against Southwest.

 9                  You can publish.

10                  (The referred-to document was admitted

11            into evidence as Plaintiff's Exhibit 21-R.)

12    BY MR. PRYOR:

13    Q.   You were included on the email that is Exhibit

14    21-R, true?

15    A.   Yes.

16    Q.   And along with -- I think I have something that

17    tells me.

18         Who else is on 21-R?

19         So you are on it, Mr. Talburt is on it, and

20    Julie O'Grady at Southwest Airlines is on it.

21         Do you accept that?

22    A.   My version is blacked out on who else was cc'd.

23    Q.   No, I'm asking you to accept my representation.

24         Counsel have agreed.  If I get it wrong, they

25    will tell me.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 82 of 367   PageID 14309
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 648

1  A.    Okay.  Yes.

2  Q.    Okay.

3        So you know this is going to Southwest Airlines

4  when you receive it.

5        And it is yet again a complaint by Mr. Talburt

6  to Southwest Airlines about Jeanna Jackson, true?

7  A.    I'm reading it.  One moment.

8  Q.    Okay.  Just let me know.

9  A.    Jeanna Jackson appears to be one of the flight

10 attendants he is complaining about.

11            THE COURT:  Hold on.  Is there an

12 objection?

13            MR. McKEEBY:  It's not an objection.  It

14 is a request for a more specific limiting

15 instruction, given some of the language in this

16 document, particularly about other employee

17 discipline.

18            You've given that instruction in the past,

19 but because this document is directly addressed to

20 that issue, I would request a little bit more

21 specificity in the instruction.

22            THE COURT:  Sure.  I will give it and then

23 I will ask Mr. Greenfield.

24            Okay.  So y'all know what I've talked

25 about earlier how Southwest disciplined any employee

1    is not relevant to the claims in this lawsuit.

2              There are some exhibits that have that in

3    anyways, and we are not going to redact those out

4    because it is next to information that is relevant.

5              So I will just ask you to disregard

6    information as to Southwest, I mean how Southwest

7    treated any employee discipline-wise.

8              Thank you.

9              MR. GREENFIELD:  Sorry, your Honor.  I was

10   just preparing for a sidebar.

11             THE COURT:  Okay.  Do you need a sidebar?

12             MR. GREENFIELD:  No.  I thought we were

13   heading that way.

14             THE COURT:  Okay.  Got it.

15             MR. GREENFIELD:  My apologies.

16             THE COURT:  I think we channeled in code.

17             Did I satisfy your concerns?

18             MR. McKEEBY:  Yes, your Honor.

19             THE COURT:  Okay.  We are good to go.

20             Now you can proceed.

21             MR. PRYOR:  Thank you, your Honor.

22   BY MR. PRYOR:

23   Q.   Let me make sure I understood your answer.

24        This is yet again another email from

25   Mr. Talburt.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                   Vol 3 July 07, 2022                          Page 650

1       At least in part, one of the people he's
2  complaining about again is Jeanna Jackson, correct?
3  A.   Yes.
4  Q.   Does he complain about others, did you notice?
5  A.   Yes.
6  Q.   Did he complain about other flight attendants?
7  A.   Yes.
8  Q.   Did he complain about other flight attendants
9  that are union members?
10 A.   I don't know because I don't know who else he's
11 talking about.
12 Q.   And he's reporting this to Southwest Airlines
13 for them to take action.  He's requesting action,
14 right?
15      Did you read the last paragraph?
16 A.   I'm assuming he's requesting that they take
17 action because he's complaining about various times
18 he feels like he's been harassed and retaliated
19 against.
20 Q.   I want to go back to Exhibit 21-P.  That is
21 where it had the post from Jeanna Jackson that was
22 reported to Southwest Airlines.
23      And in it she predicts that, you know what,
24 this group of -- this group of usual suspects, they
25 will be charging us for our efforts in this recall.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 85 of 367   PageID 14312
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 651

1  So be careful.

2       And in fact, her post about be careful, be

3  polite, don't say anything wrong, she gets reported

4  for that, and you are on the email doing it.

5       Is that right?

6  A.   I was cc'd on the email that was sent in.

7  Q.   Okay.  My statement is correct, though, isn't

8  it?  I'm happy to say it again.

9  A.   Yes.

10 Q.   Yes, my statement is correct.  Right?

11 A.   Yes.

12          MR. PRYOR:  Let's look at Exhibit 21-T.

13          THE COURT:  Same objections on 21-T?

14          All right.  Same ruling from me.

15          I'm overruling Union objections on

16 allowing it in under a limiting instruction.

17          This is useful for the claims against the

18 Union, not useful for the claims against Southwest.

19          You can publish Exhibit 21-T.

20          (The referred-to document was admitted

21     into evidence as Plaintiff's Exhibit 21-T.)

22 BY MR. PRYOR:

23 Q.   This is another email that you are on, dated

24 March 1st, along with Deborah Edwards, the base

25 manager, and management at Southwest Airlines,

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 86 of 367   PageID 14313
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 652

 1  yourself, and Mr. Talburt, correct?

 2  A.   Yes.

 3  Q.   And this is, once again, a complaint about

 4  Jeanna Jackson and others?

 5  A.   I don't see Jeanna's name anywhere.

 6  Q.   Let's look at the attachment.

 7       By the way, you really don't know who he's

 8  talking about here, right?

 9       Let's blow this up.

10  A.   I would be making assumptions without any other

11  context of what I just read.

12  Q.   Okay.  This is the attachment to the email.

13       Do you see where it says "Jeanna Jackson"?

14  A.   Yes, I do.

15  Q.   And she's talking about the recall effort.  And

16  it's not so blurred that I can't read it, but I'm

17  happy to read it for you.

18       But I will let you read it and tell us, do you

19  agree, again, that this is protected union activity?

20            MR. GREENFIELD:  Your Honor, I would like

21  to object.

22            I think a sidebar would be appropriate.

23            THE COURT:  Okay.

24            (Thereupon, the following proceedings were

25       had at sidebar:)

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 87 of 367  PageID 14314
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                        Page 653

1              MR. GREENFIELD:  There is a fine line that

2    counsel is walking on in what he continues to call

3    protected activity versus what she believes is

4    protected activity.

5              Defining something as protected activity

6    or not is a legal conclusion.

7              What she believes is protected union

8    speech, I believe, is a improper way --

9              THE COURT:  I'm fine with that.  It calls

10   for a legal conclusion, what she's used, what she

11   just talked about.

12             MR. GREENFIELD:  I don't believe there is

13   in evidence that she used -- I don't know what that

14   means.

15             MR. PRYOR:  She absolutely -- I will ask

16   that question that way.

17             THE COURT:  I agree.

18             MR. PRYOR:  It is her job.

19             THE COURT:  I agree with yours.

20             MR. PRYOR:  Because she is Union

21   president.

22             (Thereupon, the sidebar was concluded and

23        the following proceedings were held in open

24        court:)

25             THE COURT:  All right.  You can tweak that

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 88 of 367   PageID 14315
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 654

```
 1   like we talked about and ask it again.
 2             MR. PRYOR:  I will.
 3   BY MR. PRYOR:
 4   Q.   Let me read this.  Read along with me.  Let's
 5   make sure that we agree what this says, okay?
 6        Because it is a little blurred, but I think it
 7   is readable.  If there is something I read that is
 8   wrong, just go ahead and stop me, okay?
 9   A.   Okay.
10   Q.   This is from Jeanna Jackson, TWU 556.
11        She's a union member, right?
12   A.   Yes.
13   Q.   "It appears our little recall that could is
14   having a profound effect on this union and not in
15   this president or someone's favor."
16        Is that -- EB, is that the executive board?
17   A.   Yes.
18   Q.   "Panic has set in at the amount of power.  In
19   all of the" --
20             MR. PRYOR:  Make it a little smaller.
21   Maybe I can read that.  Yes.  So it won't be quite
22   as blurred.  Smaller, not bigger.  Not quite as big.
23             That actually may have helped.
24   BY MR. PRYOR:
25   Q.   Okay.
```

1      "Panic has set in at the amount of power.  Our

2  voices have discussed outrage and shock, actually

3  have.

4      "With that being said, that panic is creating a

5  fight or fight affect that is affecting us.  This

6  leadership is doing everything they can to stay in

7  power, even stooping so low as to turning

8  dues-paying members in for perceived SMVs."

9      Do you think that is social media violations?

10 A.   Yes.

11 Q.   In fact, that's what was going on, wasn't it?

12      You had done it, Brian Talburt had done it,

13 Mr. Nevarez was involved in it, true?

14          MR. GREENFIELD:  Objection, your Honor.

15          THE COURT:  I will allow it.

16          THE WITNESS:  Mr. Talburt was not in

17 leadership, and to my knowledge, Mr. Nevarez had not

18 turned anything in.

19 BY MR. PRYOR:

20 Q.   Well, you had turned in Ms. Carter and you were

21 involved in the emails turning in Ms. Jackson.

22      That much is true, right?

23 A.   I was cc'd on them, yes.

24 Q.   I'm sorry?

25 A.   I was cc'd on them.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  Q.   I understand.  That is involved.  You received

2  it.  You are the Union president.  You were involved

3  to the extent that you were informed of it and the

4  Union president took no action to disavow it.

5           MR. GREENFIELD:  Objection, your Honor.

6  Counsel is testifying.

7           THE COURT:  I will allow it.

8           THE WITNESS:  Yes.

9  BY MR. PRYOR:

10 Q.   And you say, "They are having their minions

11 turn in members to management for any type of

12 discussion that they do not agree with and claiming

13 they are offended, which in turn creates an FF

14 meeting."

15      Fact-finding meeting.

16      That means Southwest is going to investigate

17 them, true?

18 A.   Yes.

19 Q.   In fact, you are even on the email where they

20 take this communication, complaining about that

21 activity, and turning her in for that.  True?

22 A.   Yes.

23 Q.   "The president and executive board are

24 violating yet another bylaw, the one that says

25 members are allowed to have a dissenting opinion

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 657

1  from that of the Union without fear of reprisal or

2  lack of representation.

3       "I attach a screenshot of the actual bylaw.

4  Please read the whole paragraph."

5       I can read on.  I think we can see it.

6       But it is clear that in your belief and

7  understanding as president of Local 556, this is

8  protected union activity.  True?

9  A.   Yes.

10 Q.   And so when we go to the email where she's

11 being reported for engaging in this protected

12 activity, you once again are included as president

13 of the Union and take no action to disavow or inform

14 Southwest Airlines you disagree with the information

15 on which you are carbon-copied, true?

16 A.   Yes.

17          MR. PRYOR:  Let's look at Exhibit 21-U.

18          I move for the admission of 21-U.

19          THE COURT:  Okay.  Same objections, same

20 ruling.  21-U is in, but limited to the claims

21 against the Union, not the claims against Southwest.

22          You can publish.

23          (The referred-to document was admitted

24      into evidence as Plaintiff's Exhibit 21-U.)

25

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 92 of 367   PageID 14319
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 658

 1  BY MR. PRYOR:

 2  Q.    21-U is an email from Brian Talburt on

 3  May 15th.  He includes Mike Sims and Sonya Lacore.

 4        And Sonya Lacore is the one he was having the

 5  discussions with about using social media policy to

 6  target union members that he didn't like.

 7        Do you recall that?

 8  A.    I recall that there was an email that he had

 9  had with Sonya complaining.

10  Q.    And you know, when we say it was his email, you

11  were forwarded that email and took no action, as I

12  remember, correct?

13  A.    Yes.

14  Q.    And you were also on this email where it says

15  "President at TWU 556."

16        That is you?

17  A.    Yes.

18  Q.    And once again, he's trying to get the company

19  to take action against Jeanna Jackson, the head of

20  the recall petition, true?

21  A.    Yes.

22  Q.    And he's specifically talking about using the

23  social media policy and even puts in a portion of

24  the policy itself, right?

25  A.    I'm still reading.  I haven't gotten to that

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

 1  part.

 2  Q.   I'm sorry?

 3  A.   I'm still reading.

 4  Q.   Oh, okay.

 5  A.   Can you ask your question again, please?

 6  Q.   Yes.

 7       Once again, this is, it looks like, maybe a

 8  month and a half later, you are included on

 9  communications where there are efforts by Brian

10  Talburt with the president of the Union on the email

11  where he's once again trying to get the company to

12  take action against Jeanna Jackson.

13  A.   Yes.

14  Q.   And at the top, I will tell you that

15  carbon-copy is not just you, Audrey Stone, but it is

16  also Brett Nevarez, who was also an officer of the

17  Union, true?

18  A.   Yes.

19  Q.   And who is Mr. Sims at Southwest Airlines?

20  A.   He, at the time, and still now, is the director

21  of -- was in inflight for base operations, I

22  believe.

23  Q.   And so he responds, "Thank you, Brian.  We will

24  review your concerns."

25       And you had no response to that, true?

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 94 of 367  PageID 14321
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 660

```
 1  A.    Yes.

 2              MR. PRYOR:  Let's look at 2-V.

 3              MR. GREENFIELD:  21-V?

 4              MR. PRYOR:  I'm sorry.

 5              I move for the admission of 21-V.

 6              THE COURT:  21-V.

 7              Same objections, same ruling.  So I'm

 8  overruling the objections, admitting it in for the

 9  linted purpose of the claims against the Union, not

10  against Southwest.

11              You can publish.

12              (The referred-to document was admitted

13       into evidence as Plaintiff's Exhibit 21-V.)

14  BY MR. PRYOR:

15  Q.   And so this is an email, and I think we will be

16  able to, before it goes to the jury room at the

17  conclusion of the trial, be able to take out enough

18  of the black marks that they will know who these

19  people are so I don't have to remember it right now.

20       But I will represent to you, this is an email

21  from Brian Talburt to Mike Sims, carbon-copied Juan

22  Suarez and Deborah Edwards and Sonya Lacore, a name

23  we have heard before.

24       Those are all Southwest people?

25  A.    Yes.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 661

1  Q.   And it also includes Brett Nevarez and

2  yourself, the officers of Local 556, true?

3  A.   Yes.

4  Q.   And now it is July, and more complaints about

5  Ms. Jackson, true?

6  A.   I'm still reading.

7  Q.   Okay.  Do you see it is about Ms. Jackson now?

8  A.   Yes.

9  Q.   Once again, this is an email that senior

10 officers of Local 556 are on where you have another

11 complaint about Ms. Jackson to Southwest Airlines,

12 true?

13 A.   Yes.

14 Q.   You took no action to disavow that either, did

15 you?

16 A.   No.

17 Q.   And to your knowledge, at any time did any

18 member of the officer team at Local 556 take any

19 action to correct this -- these reports to Southwest

20 Airlines against Ms. Jackson for engaging in

21 protected union activity, as you understand it?

22 A.   No.

23      But I will also add, he references again in

24 this feeling harassed and being retaliated against,

25 and you can't do that even under the guise of

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 662

 1  protected union activity.

 2  Q.    The harassment was that she was engaging in a

 3  recall petition.

 4        What harassment?

 5        Have you seen any evidence of harassment in any

 6  of the attachments?

 7  A.    In this particular exhibit, he's specifically

 8  speaking about a physical address of another flight

 9  attendant being published to 1,000 people.

10  Q.    Okay.

11  A.    I don't see the post.  I don't know what he's

12  referencing.

13        All I have is what is in front of me.

14  Q.    He makes some allegations, I see that.

15        But in terms of evidence that you are aware of

16  to support any of this, did you ask to see any

17  evidence or documentation to support anything that

18  would justify you, as Union president, not

19  responding to these emails and saying, quit picking

20  on a union member for engaging in union activity?

21  A.    I saw a number of social media posts during

22  this time that were harassing and retaliatory in

23  nature towards various members.

24  Q.    So where are they?

25        We would be happy to talk to you about them,

 1  ma'am, or is this some more evidence that you don't

 2  have?

 3          MR. GREENFIELD:  Objection, your Honor.

 4          The witness is here to answer questions,

 5  not produce evidence.

 6          THE COURT:  Sustained.

 7          I sustained it.  You need to ask a new

 8  question.

 9  BY MR. PRYOR:

10  Q.   Where are these posts?

11       We have got lots of posts here.  We've got lots

12  of evidence here.

13          MR. GREENFIELD:  Objection.

14  BY MR. PRYOR:

15  Q.   Please point to a post.  We will be happy to

16  discuss it.

17          THE COURT:  I will allow that.

18          THE WITNESS:  I didn't put together the

19  exhibits.  I don't know what exhibits Southwest or

20  the Union are preparing to bring in.

21          I know for a fact that there were numerous

22  posts on social media that were investigated

23  regarding harassment and retaliatory behavior and

24  that there were flight attendants disciplined for

25  those posts.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 664

 1  BY MR. PRYOR:

 2  Q.   Let's talk about that.

 3       In fact, isn't what happened is, your union

 4  leadership gathered as much social media information

 5  as you could about your opponents, and you sent it

 6  to Southwest Airlines and reported it, some of it

 7  going back five years?

 8       Isn't that what you did?

 9       Is that what you are talking about?

10  A.   No.

11  Q.   You didn't do that?  You had nothing to do with

12  that, that is your sworn testimony?

13            MR. GREENFIELD:  Objection, your Honor,

14  asked and answered.

15            THE COURT:  Sustained.

16  BY MR. PRYOR:

17  Q.   Did you have anything to do with that?

18            MR. GREENFIELD:  Objection, your Honor,

19  asked and answered.

20            THE COURT:  Sustained.

21  BY MR. PRYOR:

22  Q.   Let me try another.  I didn't hear an answer to

23  my question, so I will broaden it.

24       Is it fair to say that you were aware of

25  complaints being made to Southwest Airlines about

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 99 of 367  PageID 14326
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 665

 1  recall petition supporters?

 2  A.   Yes.

 3  Q.   And in fact, did you and Rickie Spand bring

 4  allegations against several union member flight

 5  attendants to Southwest Airlines in that regard?

 6  A.   I can't speak to what Rickie Spand brought

 7  forward.  He and I didn't have conversations about

 8  it.

 9       I brought forward concerns of retaliation to

10  Southwest after I had reported Ms. Carter.

11  Q.   And in fact, you brought, in addition to

12  everything -- the emails you were on, you also

13  brought a complaint against Jeanna Jackson, true?

14  A.   Yes.

15  Q.   Let me approach and show you Exhibit 132 to see

16  if this refreshes your recollection.

17       The underlined that I'm referring to --

18            THE COURT:  We can't hear you if you are

19  not talking into a mic, Mr. Pryor.

20            MR. PRYOR:  I'm directing her attention to

21  that.  Directing her attention to that.

22  BY MR. PRYOR:

23  Q.   Ma'am, I'm going to have you review

24  Exhibit 132, and specifically the information I

25  underlined for you.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                        Page 666

```
 1        I will ask you, do you recall that, in fact,
 2   that you and Rickie Spand brought several complaints
 3   against flight attendants?
 4   A.   As I already stated, I don't know what Rickie
 5   Spand brought forward.  I don't know what his
 6   complaints were.
 7        I know what mine was.
 8   Q.   And you are telling us it was only against
 9   Jeanna Jackson that you brought a complaint?
10   A.   No, that's not what I stated.
11   Q.   Okay.  So who in addition to Ms. Carter and
12   Ms. Jackson did you bring complaints against?
13   A.   I believe the other one was Chris Click.
14   Q.   I'm sorry, who?
15   A.   Chris Click.
16   Q.   That is right, Chris Click.  That's the guy
17   that was elected president that got kicked out and
18   you ended up being president, right?
19   A.   He wasn't elected president.
20   Q.   I'm sorry?
21   A.   He was not elected president.
22   Q.   What was he elected?
23   A.   First vice president.
24   Q.   Okay.  So that was the first vice president
25   that got kicked out.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 101 of 367   PageID 14328
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 667

1      Were you then put in as first vice president

2  and then promoted to president?

3  A.   I was put in first vice president per our

4  bylaws, and due to succession in our bylaws, I

5  eventually moved up to the presidency once the

6  president was removed from office.

7  Q.   So you are reporting a recall petition

8  supporter, a previous political opponent to the

9  company, and they are both union members, right?

10 A.   Yes.

11 Q.   Is it fair to say that you never reported a

12 union member that was a supporter of yours at any

13 time for anything they did?  True?

14 A.   Yes, because I never felt harassed or

15 retaliated against by a union supporter.

16 Q.   You don't have to turn in violations of company

17 policy that you see, just only when you are

18 harassed?

19 A.   I have the right, if I feel like I'm being

20 harassed or retaliated against, to report that per

21 Southwest Airlines policy.

22           MR. PRYOR:  May I approach, your Honor?

23           THE COURT:  You may.

24           (Thereupon, the following proceedings were

25       had at sidebar:)

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 102 of 367   PageID 14329
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 668

1              MR. PRYOR:  Would it violate the limine

2    instruction to ask her what happened to Ms. Jackson?

3              I would like to make an offer of proof on

4    it outside the presence of the jury, if I'm not

5    allowed to ask.  I don't know what her answer would

6    be.

7              THE COURT:  At the next break.

8              MR. PRYOR:  Thank you.

9              (Thereupon, the sidebar was concluded and

10        the following proceedings were held in open

11        court:)

12   BY MR. PRYOR:

13   Q.   Is it your understanding that Local 556 has an

14   affirmative duty to accommodate employees' religious

15   beliefs?

16             MR. GREENFIELD:  Objection, your Honor.

17   Asking for a legal opinion as to --

18             MR. PRYOR:  She's president of the Union

19   and has obligations --

20             MR. GREENFIELD:  -- accommodating a

21   religious --

22             THE COURT:  Hold on.  No speaking

23   objections and no speaking responses.

24             I will allow her to answer the question if

25   she has personal knowledge.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 669

 1            THE WITNESS:  The only discussion or
 2   knowledge I ever had while president about religious
 3   accommodations was with an attorney and protected
 4   under attorney-client privilege.
 5   BY MR. PRYOR:
 6   Q.   As president of the Union, you had no
 7   understanding, apart from a privilege conversation
 8   with your attorney, regarding the Union's
 9   obligations to accommodate religious beliefs of its
10   members or objectors?
11   A.   It came up once during my entire
12   administration.
13   Q.   When did you have this conversation with an
14   attorney?
15   A.   I don't recall at what point it was during the
16   presidency -- during my presidency.  I just remember
17   what prompted the conversation.
18   Q.   What prompted it?
19   A.   For the inflight training flight attendant
20   candidates, the Union both spoke at training and
21   then hosted a union-sponsored dinner for the flight
22   attendant candidates.
23        And there was a flight attendant candidate who
24   had approached our treasurer at the time to ask
25   about not joining the union due to his religious

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 104 of 367   PageID 14331
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                      Page 670

 1  beliefs.
 2      I wasn't a part of that conversation.  The
 3  treasurer came to me, and it was not something that
 4  we had ever dealt -- I had never dealt with before,
 5  he had never dealt with before, so we immediately
 6  sought legal counsel.
 7  Q.   What was the religious belief involved?
 8  A.   That he was a Christian and -- again, to my
 9  knowledge, I didn't personally speak to the flight
10  attendant -- and that his belief in the Bible, he
11  was not allowed to join a union.
12  Q.   So he said he couldn't join?
13  A.   That was his request.  That based off of his
14  religious Christian beliefs, he did not want to join
15  the union, which would not take place until after
16  you actually successfully complete probation.
17  Q.   All he has to do is opt out.  Was he wanting to
18  not pay dues as well?
19  A.   Correct.  He was not requesting to opt out or
20  be an agency fee.  He was requesting to pay zero
21  dues upon completion of probation.
22  Q.   Okay.  And did the union accept or reject that
23  accommodation request?
24  A.   The accommodation request was never formally
25  made.  He did not complete probation with Southwest

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 671

```
 1   Airlines.
 2   Q.   So he never qualified even to be a union member
 3   then?
 4   A.   Correct.
 5   Q.   Okay.
 6        So since that time, having talked to your
 7   attorney and understanding your duties in regard to
 8   protecting religious views and accommodations for
 9   them, have you provided any religious
10   accommodations?
11   A.   No.  There was nothing that came up outside of
12   that.
13             MR. PRYOR:  Let me look at my notes.
14             We move for the admission of 21-X.
15             THE COURT:  21-X.
16             MR. McKEEBY:  So I'm not sure I really
17   understand the exhibit.
18             Let's just go with it.
19             MR. GREENFIELD:  Are we talking about
20   21-X?
21             THE COURT:  21-X.
22             MR. GREENFIELD:  Can we have it pulled up
23   on the screens outside the jury?
24             THE COURT:  We have got the jury screens
25   muted.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 106 of 367   PageID 14333
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 672

1              Can you pull up 21-X on the screen.

2              Now that you can see it, any other

3    objections to raise on 21-X?

4              MR. McKEEBY:  Southwest has the same

5    limiting instruction request.

6              MR. GREENFIELD:  No objection, your Honor.

7              THE COURT:  Okay.  I will overrule those

8    prior objections we discussed, and I will include

9    this with the same limiting instruction.

10             These are for the claims against the Union

11   and not for the claims against Southwest.

12             21-X is in.

13             You can publish.

14             (The referred-to document was admitted

15        into evidence as Plaintiff's Exhibit 21-X.)

16   BY MR. PRYOR:

17   Q.  Can you identify 21-X as an email that you are

18   on, carbon-copied on, Brett Nevarez is carbon-copied

19   on, it is sent from Rickie Spand?

20        And that is one of your inner-circle people?

21   A.   No.

22        It was sent from Rickie Spand and the entire

23   executive board was copied on it.  He was not anyone

24   I would consider in my inner circle.

25   Q.   He was what?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 107 of 367   PageID 14334
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 673

1  A.   He was not someone I would consider in my inner

2  circle.

3       There was points he was very outspoken against

4  me and my administration.

5  Q.   So Rickie Spand would not be someone in support

6  of your leadership, true?

7  A.   Many times over the course of my administration

8  he was not in support of my leadership.

9  Q.   How about in March of '27 [sic], was he on your

10 side then?

11 A.   It appears so, yes.

12 Q.   And he's sending to Suzanne Stephenson another

13 complaint about Jeanna Jackson and her recall

14 propaganda, true?

15 A.   Yes.

16 Q.   And you are on this, right?

17 A.   Yes.

18 Q.   Did you review it to see if it involved

19 protected union activity to see whether or not maybe

20 you should tell Suzanne Stephenson, Hey, there is

21 nothing wrong with that?

22 A.   No.

23 Q.   Is that a good example of how you performed

24 your duties as president of Local 556 in 2017?

25 A.   Can you repeat the question?

 1  Q.   Yes.

 2        Is that a good example of how you performed

 3  your duties as president of the union in 2017?

 4  A.   No, that is not -- that is -- I don't believe

 5  that not responding to this is representative of how

 6  I did my job as president.

 7  Q.   So do you think now, you know what, I should

 8  have, as Union president, exercised that fiduciary

 9  duty to my member and make sure that Southwest

10  Airlines is not confused that this is union

11  activity?

12        Did you think to do that?

13  A.   No.  I did not get involved when a flight

14  attendant brought something forward to Southwest

15  management as a concern, or any part of those

16  conversations that they chose to have with

17  leadership.

18  Q.   Well, ma'am, you are involved because you are

19  on the email.

20        If you are going to say, Hey, the fact that I'm

21  on there means nothing, why wouldn't you then

22  respond to Southwest Airlines -- yes, to Southwest

23  Airlines, and say, Hey, I'm not involved in this.

24  I'm not, as Union president, even going to comment,

25  as opposed to, it looks like the leadership of the

1  Union is on here and is either in support or

2  remaining silent.

3           MR. McKEEBY:  Objection, asked and

4  answered, compound.

5           THE COURT:  Sustained.

6  BY MR. PRYOR:

7  Q.   You don't think you, as a good Union president,

8  should have taken action in regard to any of these

9  emails where reports are being made against your

10 political opponents?

11 A.   No.

12          MR. PRYOR:  Thank you.

13          THE COURT:  Any further questions?

14          Any further questions?

15          MR. PRYOR:  I'm sorry, your Honor.

16          Other than what we just sidebarred about,

17 I have no further questions at this time.

18          THE COURT:  Sure.

19          I take that subject to, we can go ahead

20 and start cross-examination of the witness.

21          Do we know who wants to go first?

22          MR. GREENFIELD:  I will, your Honor.

23          THE COURT:  Okay.  Go for it.

24          Go ahead, Mr. Greenfield.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1                          CROSS-EXAMINATION

2    BY MR. GREENFIELD:

3    Q.   Good morning, Ms. Stone.

4    A.   Good morning.

5    Q.   Counsel for the Plaintiff talked a lot about

6    the words that were sent and whether those were

7    protected activity; is that correct?

8    A.   Yes.

9    Q.   And did you testify that the words you saw

10   were, in your opinion, protected activity?  Is that

11   correct?

12   A.   Yes.

13   Q.   Okay.  I would like to talk a little bit about

14   the actions and the manner that went along with

15   those words.

16        In your opinion, if someone would have sent you

17   a horse head that was chopped off a horse with the

18   words on it, "We are going to recall you from

19   president, Audrey Stone," would the words themselves

20   be protected activity, in your opinion?

21   A.   The words, yes.

22   Q.   What about the manner in which it was sent?

23   A.   No.

24   Q.   Okay.  What if the words that were protected

25   activity about recalling you included liable or

1  slander?  Do you think, along with when those are

2  coupled together, that is still, in your view, was

3  protected activity?

4  A.   Is there an example, just so I understand what

5  your idea of slander is?

6  Q.   Yes.

7       And let's just move on to fraud for

8  specificity's sake.

9       Do you remember the recall petition that has

10  been discussed at length by counsel?

11  A.   Yes.

12            MR. GREENFIELD:  Can you pull up Exhibit

13  No. 134.

14  BY MR. GREENFIELD:

15  Q.   Before we get into the specifics of the

16  document -- before we get into the specifics of the

17  document, what is your memory of the outcome of a

18  review of the recall petition?

19  A.   That the recall petition was essentially deemed

20  unsuccessful and invalid because it contained a

21  number of fraudulent entries, forged signatures,

22  signatures of flight attendants who had -- who were

23  no longer with us, or there were white out, there

24  were expired signatures, white out on documents

25  where they just changed the date by a year.

1  Duplicate signatures.

2      A list of reasons where the recall fell very

3  short of reaching the number needed, um, for it to

4  even to be considered, um, valid.

5  Q.   Did you consider the recall petition to be a

6  fraudulent document?

7          MR. PRYOR:  Objection, leading.

8          THE COURT:  Sustained.

9  BY MR. GREENFIELD:

10 Q.   What were your opinions of the recall petition?

11 A.   My opinion of the recall petition, um, was that

12 even the basis that it was started under, which was

13 a change in the duty day, contractual duty day, the

14 proposed change in the tentative agreement that was

15 rejected, I didn't believe that was even a basis for

16 a recall petition that a negotiated, agreed-upon

17 change in the contract wasn't a valid basis.

18      But the Union ultimately decided the Union

19 would do their due diligence and look into it, and

20 conducted a very lengthy, thorough examination of

21 the findings to determine whether or not what was

22 presented even met the criteria needed under our

23 bylaws, separate from whether or not the reason for

24 the recall was a valid reason.

25 Q.   And who made that decision to review the recall

1  petition?

2  A.    The executive board.

3  Q.    Now, my understanding is that your testimony

4  yesterday, and/or earlier today, was that the recall

5  petition came about because of the failed tentative

6  agreement on the first CBA; is that correct?

7  A.    Yes.

8  Q.    Okay.  Do you remember any of the board members

9  who voted against that tentative agreement No. 1?

10  A.    Yes.

11  Q.    Who are those board members, if you can recall?

12  A.    They were Jessica Parker --

13          MR. PRYOR:  Object on lack of foundation.

14          THE COURT:  I'll allow it.

15          Ask the question.  She can answer.

16          THE WITNESS:  Jessica Parker, David

17  Jackson, Donna Keith, and BR Ricks.  Those were the

18  four board members not named on the recall petition.

19  BY MR. GREENFIELD:

20  Q.    Okay.  Now, what steps, in your recollection,

21  did the executive board set up to review this recall

22  petition?

23  A.    The steps set up were that there was going to

24  be a committee formed, and that for obvious reasons,

25  no one that was named on the recall would serve on

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 114 of 367   PageID 14341
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 680

1    that committee or have any conversations.

2         Our typical Union process, and I think I even

3    spoke a little bit yesterday, is that our committees

4    have a liaison that serves as the go-between between

5    a committee and the executive board, who is the

6    governing body of the union.

7         So it was also agreed upon that the liaison to

8    the committee that was going to be reviewing it

9    could also not be a board member that was named on

10   the recall.

11        So the committee was set up with three of the

12   four board members who were not named and who do not

13   vote to send a tentative agreement out, and the

14   liaison was a board member who had come onto the

15   board since then and had not had any part of the

16   vote of the TA, and he was made the liaison for the

17   committee.

18        And they worked with legal counsel throughout

19   the process to ensure proper verification.

20   BY MR. GREENFIELD:

21   Q.   Okay.  So my understanding is the executive

22   board decided that a committee should be named to

23   review the petition; is that correct?

24             MR. PRYOR:  Object, leading.

25             THE COURT:  Sustained.

1   BY MR. GREENFIELD:

2   Q.   Was a committee formed?

3   A.   Yes.

4   Q.   And who were the committee members who reviewed

5   the recall petition?

6   A.   Jessica Parker, Donna Keith and John DiPippa.

7   Q.   Ms. Parker opposed the first Collective

8   Bargaining Agreement?

9   A.   Yes.

10  Q.   And Ms. Keith opposed the first Collective

11  Bargaining Agreement?

12  A.   Yes.

13  Q.   And what about Mr. DiPippa?

14  A.   Yes.  And I'm sorry, I may not have listed him

15  earlier.

16  Q.   And were those individuals named in the recall

17  petition themselves?

18  A.   No, they were not.

19  Q.   Can you identify this document?

20  A.   Yes.

21  Q.   And about a quarter way down the page, it has,

22  bolded, "Findings."

23       Do you see where I'm at?

24  A.   Yes.

25  Q.   "Entries found not valid fell into the

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 116 of 367   PageID 14343
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 682

 1  following categories."

 2       Did I read that correctly?

 3  A.   Yes.

 4  Q.   "130 no employee numbers.  442 with no dates

 5  associated to the entry.  19 with no dates, no

 6  employee numbers."

 7       And let's just go down a little bit more.

 8       36 were filed by -- were signed by members in

 9  bad standing; is that correct?

10  A.   Yes.

11  Q.   49 were either signed by individuals who were

12  no longer with the company, who had quit and/or were

13  deceased; is that correct?

14            MR. PRYOR:  Object, leading.

15            THE COURT:  Sustained.

16            MR. GREENFIELD:  Did I read that

17  correctly?

18            MR. PRYOR:  Object, leading, based on the

19  previous question.

20            THE COURT:  I will allow it.

21  BY MR. GREENFIELD:

22  Q.   Did I read that correctly?

23  A.   Yes.

24  Q.   There were 504 duplicate signatures.

25       Did I read that correctly?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 117 of 367   PageID 14344
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 3 July 07, 2022                Page 683

```
 1              MR. PRYOR:  Object, leading.

 2              THE WITNESS:  Yes.

 3  BY MR. GREENFIELD:

 4  Q.   Only 15 agency fee objectors signed it,

 5  correct?

 6              MR. PRYOR:  Object, leading.

 7              THE COURT:  It's fine.

 8              THE WITNESS:  Yes.

 9  BY MR. GREENFIELD:

10  Q.   "88 signatures did not match the employee

11  numbers."

12       Did I read that correct?

13  A.   Yes.

14  Q.   "115 signatures were either altered or the date

15  expired and year changed from year 2015 to 2016."

16       Did I read that correctly?

17  A.   Yes.

18  Q.   "1,612 issues of there being a white-out or the

19  date expired and year change from 2015 to 2016."

20       Did I read that correctly?

21  A.   Yes.

22  Q.   And why was -- why would that matter that the

23  date was changed from 2015 to 2016, if it mattered

24  at all?

25  A.   The language in our bylaws is specific to a
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 118 of 367   PageID 14345
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 684

 1  time frame, and I believe it's recall -- the first
 2  signature to when it's turned in, it has to be
 3  within, I believe, a 12-month time period.
 4  Otherwise, the signatures expire and can't -- cannot
 5  be counted as a valid signature on the recall
 6  petition.
 7  Q.   Okay.  In total, how many invalid entries do
 8  you see?
 9  A.   3,503.
10  Q.   And how many were required for a valid recall
11  petition of the board?
12       Let me ask it a different way.
13  A.   50 percent plus one of the membership, I
14  believe, is the -- I don't know the number, but I
15  believe that's the statistic needed.
16  Q.   Okay.
17  A.   The percentage.
18  Q.   Do you have a recollection about how many
19  members of the union there were?
20  A.   At this point, there were I think over 15,000.
21  Q.   So if my math is correct, that would require
22  7,001 signatures for a valid recall petition?
23  A.   Correct.
24  Q.   At the end of examination, the name Chris Click
25  was brought up.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 119 of 367   PageID 14346
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 685

1          Do you remember -- did you testify that you
2    filed a complaint with Southwest Airlines against
3    Chris Click?
4    A.    Yes.
5    Q.    And what was the nature of that?
6    A.    He had -- he was posting on social media and I
7    believe using my specific name and talking about me
8    in relation to turning in Ms. Carter.
9    Q.    And why did you turn him in for that?
10   A.    Because employees are supposed to be protected
11   under the Southwest Airlines policy to be able to
12   bring a complaint forward and not be subjected to
13   retaliation.
14         And it was one of my concerns and why it took
15   me many days between receiving the videos and
16   sending the complaint to Southwest, because I was
17   scared of being retaliated against.
18   Q.    Now, it was discussed that Mr. Click was -- was
19   Mr. Click removed from office at any point?
20   A.    Yes.
21   Q.    Okay.  And who are the other individuals who
22   were removed from office?
23         Do you remember their names?
24   A.    Jerry Lindemann, who was treasurer, and Stacy
25   Martin, who was president.

```
 1  Q.   And in what year did that occur?

 2  A.   2013.

 3  Q.   Okay.  Can you explain to the jury the

 4  circumstances as to how and why those individuals

 5  were removed from office, if you know?

 6            MR. PRYOR:  Object, lack of foundation.

 7  Request to voir dire the witness.

 8            MR. GREENFIELD:  I asked --

 9            (Thereupon, the following proceedings were

10       had at sidebar:)

11            THE COURT:  Why would you need to voir

12  dire the witness?

13            MR. PRYOR:  He can't do it, if he's not

14  going to establish a foundation.

15            MR. GREENFIELD:  I asked if she knew.

16            MR. PRYOR:  You asked what were the

17  circumstances.

18            MR. GREENFIELD:  If she knew.

19            THE COURT:  You need a foundation for

20  answering the question.

21            MR. PRYOR:  I didn't hear -- I guess I

22  still object on foundation.

23            He should find the basis of what she

24  knows.  Is it double, triple hearsay?  Does he want

25  to know her opinion?  That is a different question.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 121 of 367   PageID 14348
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 687

1    I think we need more foundation.  That is just my

2    objection.

3              THE COURT:  I understand.  I think it is

4    not offered for its truth, it is just offered for

5    the state of mind.

6              (Thereupon, the sidebar was concluded and

7         the following proceedings were held in open

8         court:)

9              THE COURT:  Okay.  You can proceed and

10   reask that question.

11   BY MR. GREENFIELD:

12   Q.   Ms. Stone, if you have personal knowledge about

13   the circumstances -- let me just ask, do you have

14   any personal knowledge about the circumstances under

15   which Mr. Lindemann, Click and Martin were removed

16   from the executive board?

17   A.   Yes, based off of that information that the

18   Union published to the membership and put out.  I

19   wasn't a part of the process.

20   Q.   Okay.  And what is your understanding of why

21   they were removed?

22   A.   There were questions about money and funds and

23   the way they were being utilized.

24        There was a presentation that they put together

25   depicting expenditures, attributing it to certain

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 122 of 367   PageID 14349
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 688

1  board members.  It was shown at some membership

2  meetings, not the others.

3       We are required to present the same information

4  at all membership meetings.  A membership meeting is

5  one long meeting that you go to in each domicile to

6  have an opportunity for the members in each domicile

7  to come and stay abreast of union business.

8       So it was a combination of factors.  And

9  ultimately it was deemed that some of their actions,

10 while in leadership position, were a violation of

11 our -- not only bylaws, but our TWU International

12 Constitution.

13 Q.   Are you aware of any additional actions that

14 the Union took against those individuals?

15 A.   Yes.

16 Q.   What are those?

17 A.   The Union filed a lawsuit because during the

18 time -- under our constitution, there -- just like

19 with Southwest -- there is an investigation, a due

20 process.  Someone is not just removed.

21      And so they were suspended and were not allowed

22 to act in their leadership positions during that

23 time.

24      They ignored that.  Actually broke into the

25 Union office.  Sent Union communications out to the

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 123 of 367   PageID 14350
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 689

1  membership with false information in it.  And they

2  continued to spend Union dues and continued to act

3  as if they were still in their positions.

4       And the lawsuit filed was to try to recover the

5  money that they illegally spent during that time, as

6  well as to return Union property that the gentlemen

7  were in possession of that they had not turned over

8  upon their removals.

9  Q.   And did that -- do you know if that lawsuit was

10  presented to a jury or not?

11  A.   I know it went to trial.  I believe it was a

12  jury trial.

13  Q.   And do you remember the result of that trial?

14  A.   The Union --

15            MR. PRYOR:  Object, your Honor.  It calls

16  for a legal conclusion.

17            We need more information about what the

18  charges were and what was done.

19            THE COURT:  Hold on.  That's a speaking

20  objection.  If you want a sidebar, you can.

21            MR. PRYOR:  Okay.

22            (Thereupon, the following proceedings were

23       had at sidebar:)

24            MR. PRYOR:  Results of a jury trial is way

25  ambiguous as to what she's testifying about.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 690

```
 1              MR. GREENFIELD:  It is a matter of public

 2   record.

 3              THE COURT:  The judgment was --

 4              MR. GREENFIELD:  I would be happy to ask.

 5   I have the document if the judge would like judicial

 6   notice.

 7              MR. PRYOR:  As an exhibit?

 8              MR. GREENFIELD:  No.  I have the document.

 9              MR. PRYOR:  A document.  Fine.

10              Let me see it.

11              MR. GREENFIELD:  Sure.

12              MR. McKEEBY:  We are staying up here.

13              THE COURT:  Wise.

14                   (Discussion off the record.)

15              MR. GREENFIELD:  Amended Judge Tonya

16   Parker.  I know her.

17              MR. PRYOR:  Let me see it.

18              How much is it?  Where is Click?  Stacy

19   Martin?

20              MR. GREENFIELD:  Well, I will be specific,

21   if you would.

22              MR. PRYOR:  Can I see this?

23              THE COURT:  $17,000.

24              You are wanting to do -- what are you

25   wanting?
```

1           MR. GREENFIELD:  I would like to ask her

2   about it.  If she doesn't recall, I would like to

3   ask the Court to take judicial notice that a

4   judgment was entered for $17,570 against Stacy

5   Martin.

6           MR. PRYOR:  For what?  That is a judgment

7   of 17,000.

8           MR. GREENFIELD:  Their entire case is

9   predicated upon the ability to tie protected

10  activity to actions.

11          What these supporters were doing were

12  spotting fraud.  They were spotting illegal

13  activity.  Their protected activity is lost at that

14  point.  At least in the --

15          I can ask her what she believes.

16          MR. PRYOR:  First of all, if you think the

17  centerpiece of it is cause, it is not.  But in any

18  event, the recall petition, what you guys were doing

19  to people trying to recall, the $17,000, what's it

20  for?  Against Stacy Martin?  It's only relevant if

21  somebody comes in and says what it is for and

22  somehow ties --

23          THE COURT:  She talked about the scope of

24  the lawsuit, right?

25          So I think he can get into judgment.  If

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 126 of 367   PageID 14353
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 3 July 07, 2022                        Page 692

1  you want to pick it apart on cross, redirect, I

2  think that is fine.

3           MR. GREENFIELD:  I have the charge to the

4  jury as well.

5           THE COURT:  You can bring it in.

6           (Thereupon, the sidebar was concluded and

7      the following proceedings were held in open

8      court:)

9           THE COURT:  You can proceed,

10  Mr. Greenfield.

11           MR. PRYOR:  I have another objection, too,

12  if I can make it up here. I can state it shortly.

13           THE COURT:  Let's state it shortly.

14           MR. PRYOR:  Okay.  I'll wait for the

15  question.

16           THE COURT:  Okay.  Go for it.

17           You can ask that question now,

18  Mr. Greenfield.

19  BY MR. GREENFIELD:

20  Q.   There was a lawsuit brought, and to be fair, do

21  you remember if any of Mr. Lindemann, Mr. Click or

22  Mr. Martin were eventually dismissed from the

23  lawsuit?

24           MR. PRYOR:  Was that a yes or no question?

25  I couldn't hear it.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                         Page 693

 1              MR. GREENFIELD:  I asked if she remembered
 2   if anyone was dismissed from the lawsuit.
 3              MR. PRYOR:  Object, leading.  Object,
 4   relevance.  Object, prejudice.  Object, lack of
 5   foundation.
 6              THE COURT:  I will allow it.
 7              THE WITNESS:  I believe that Mr. Click and
 8   Mr. Lindemann, yes, I believe they were dismissed.
 9   BY MR. GREENFIELD:
10   Q.   Leaving the former president, Mr. Martin, in
11   the suit?
12   A.   Yes.
13   Q.   And if you do have a recollection at all or
14   have personal knowledge, what was the result?
15              MR. PRYOR:  Object, compound, so I can
16   form an objection.
17              THE COURT:  I don't think it's compound.
18              MR. PRYOR:  Okay.  Then I object, lack of
19   foundation.  Object, relevance and prejudice.
20              THE COURT:  Overruled.
21              You can answer.
22              MR. PRYOR:  I thought he said belief or
23   personal knowledge, which I thought was two
24   different things.
25              THE COURT:  Recollection or personal

 1  knowledge, which I think is the same thing.

 2          So you can answer the question if you have

 3  a recollection or personal knowledge of the result

 4  of the suit.

 5          THE WITNESS:  The result was that

 6  Mr. Martin was ordered, I think by the judge, to

 7  return any personal property that he had and he was

 8  also ordered to -- there was a monetary amount that

 9  he was required to pay back the Union to reimburse

10  the money that they had spent during their

11  suspensions.

12  BY MR. GREENFIELD:

13  Q.   And do you remember the amount of that money?

14  A.   I don't remember the exact amount.

15  Q.   If I brought you a document to refresh your

16  recollection, would that help?

17  A.   Yes.

18          MR. GREENFIELD:  May I approach?

19          THE COURT:  You may.

20  BY MR. GREENFIELD:

21  Q.   Did that help refresh your recollection?

22  A.   Yes.

23  Q.   And do you remember what that amount was now?

24          MR. PRYOR:  Object, your Honor, to

25  foundation, relevance, prejudice.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                       Page 695

```
 1              And let's see if we wait five minutes and
 2   see if it refreshes her recollection.
 3              THE COURT:  I'll overrule those
 4   objections.
 5              She can answer.
 6              THE WITNESS:  $17,530.01, I believe.
 7   BY MR. GREENFIELD:
 8   Q.   That is the amount of money that a jury found
 9   that Mr. Martin had inappropriately spent on the
10   Union's behalf?
11              MR. PRYOR:  Object, mischaracterizes
12   testimony.  Object, leading.
13              THE COURT:  I will allow it.
14              THE WITNESS:  Yes.
15              MR. GREENFIELD:  I have asked our tech
16   person to pull up Exhibit 6, which is the Collective
17   Bargaining Agreement between the Union and TWU,
18   Local 556.
19              THE COURT:  It is already in, so we are
20   publishing.
21              MR. GREENFIELD:  Thank you.
22   BY MR. GREENFIELD:
23   Q.   I believe there was a discussion yesterday
24   about Article III; is that correct?
25   A.   Yes.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 130 of 367   PageID 14357
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 696

1   Q.   Okay.  And can you read silently, as I read

2   below:  "The right to manage and direct the working

3   forces subject to the provisions of this agreement

4   is vested and retained by the company."

5        Did I read that correctly?

6   A.   Yes.

7   Q.   Is that the provision you were trying to recall

8   yesterday?

9             MR. PRYOR:  Object, leading.

10            THE COURT:  I will allow that.

11            THE WITNESS:  Yes, as well as some of the

12  language above in No. 2 where it states, "Employees

13  covered by this agreement shall be governed by all

14  company rules, regulations, and orders previously or

15  hereafter issued by proper authorities of the

16  company."

17            Do you want me to keep reading?

18  Q.   That will be fine.  Thank you.

19        I would like to go a little bit back in time

20  now.

21        When did you first become a flight attendant at

22  Southwest Airlines?

23  A.   June 28, 2004.  18 years ago.

24  Q.   And when you became a flight attendant, did you

25  make a decision to be a part of the Union?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 131 of 367   PageID 14358
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 697

1   A.   It's a requirement upon -- to be a Southwest

2   flight attendant, it is -- you are a member of the

3   Union upon successful completion of probation unless

4   you voluntarily choose to opt out.

5   Q.   And what were your personal feelings about

6   joining the Union?

7   A.   I was excited.  I didn't know anything about a

8   union.  Growing up in East Texas, I hadn't been

9   exposed to it.

10       Someone early on told me to learn the contract,

11   to understand it, and know what my rights were,

12   because they would not always be offered to me.  And

13   that there wasn't going to be Southwest reminding

14   me, you know, on some of the contractual provisions

15   that I could exercise.

16       So I started reading and learning about the

17   contract and the Union, you know, as a new

18   experience, as part of my journey with Southwest.

19   Q.   And at some point, we know you became president

20   of the Union.

21       When did you become involved with the Union

22   separate from just being a member?

23   A.   In I think the end of 2005, maybe early 2006,

24   somewhere in that time frame, another flight

25   attendant and I wrote a book called "Contract

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 132 of 367   PageID 14359
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 698

1    Quickies."

2        The contract is very long.  It is -- a lot of

3    it is legalese, it does not really include examples,

4    and it is difficult for flight attendants to

5    understand.

6        I thought it would be helpful if there was kind

7    of a more flight attendant-friendly guide that used

8    real-life examples to help explain some of the parts

9    of the contract that really affect us every day when

10   we are working.

11       So we wrote this little book.  I was -- I knew

12   an officer at the time for the Union, you know, was

13   talking to him about it.

14       And it came on the Union's radar when the book

15   was -- you know, we were selling it for $10.

16       When we started selling it, that's -- the Union

17   started, you know, recruiting me to get officially

18   involved, because I was already doing work to

19   educate our membership on my own.

20       I officially became a shop steward in 2006.

21   Q.   And what were your duties as a shop steward?

22   A.   My duties were assisting our domicile executive

23   board member in the base on anything they needed.

24   They were the elected representative on the

25   executive board.

1      But, you know, whether it was lounge and

2  helping them with lounge mobilizations where we

3  would go out and talk to flight attendants about

4  current events or hot topics, particularly during

5  negotiations.

6      Another responsibility was to represent flight

7  attendants in any mandatory meetings with members of

8  Southwest Airlines's management.

9      That included representing them not only in the

10  meeting, documenting the meetings, submitting those

11  to the Union.  Sort of general shop steward

12  responsibilities.

13  Q.   Did you hold any other positions outside of

14  shop steward before your presidency?

15  A.   Yes.

16  Q.   What else?

17  A.   During the tentative agreement rollout of a

18  contract in 2009, I was on what at the time was

19  called the contract action team.

20      In the base, later on in my -- the same thing

21  that later on in my administration we referred to as

22  CAN.

23      But spending time in the bases, kind of the

24  liaison between the negotiating team and

25  rank-and-file flight attendants, to help them

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 134 of 367   PageID 14361
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 700

 1  understand the changes in the contract, make sure

 2  everyone is making an educated vote, direct them to

 3  negotiating team members if they needed to be.

 4       I also became the Baltimore domicile executive

 5  board member in 2008.

 6       Also was the co-chairperson and chairperson of

 7  our education committee.

 8       I worked with our grievance team on Board of

 9  Adjustments and arbitration work, which was

10  grievances that the Union was taking forward in

11  representation of memberships, of actually putting

12  those cases on in front of either Board of

13  Adjustment or an arbitrator.

14  Q.   That will suffice.  That's all right.

15       Did you hold any other offices or positions in

16  between that and becoming president?

17  A.   I continued to hold the position of shop

18  steward throughout my Southwest career.  I'm still a

19  shop steward.

20       And then I also held the title -- held the

21  position of first vice president briefly before

22  assuming the presidency.

23  Q.   Okay.  Why did you run for office?

24  A.   Advocacy is -- is work I'm passionate about.

25       Prior to Southwest, I worked in the children's

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 135 of 367  PageID 14362
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 701

1  mental health field and was an advocate for children

2  and adolescents who struggled with mental health

3  issues, as well as working with their families.

4       Union work was a different work group, but to

5  me, it was still about advocating for the --

6  advocating for people, and I have always been

7  passionate about education.

8       So I had started doing union work, really

9  enjoyed the work and thought I could make a

10  difference, and that is ultimately why I decided to

11  run.

12  Q.   Okay.  And when you ultimately became president

13  of the Union, did Southwest Airlines present you any

14  paperwork related to you becoming president?

15  A.   No.

16  Q.   Did they ask you to sign anything that said,

17  when you became president, that you had to give up

18  your rights as an employee?

19            MR. PRYOR:  Object, leading.

20            THE COURT:  I will sustain that one.

21            Can you rephrase?

22            MR. GREENFIELD:  Yes, your Honor.

23  BY MR. GREENFIELD:

24  Q.   Did you ever sign any documents that

25  relinquished your rights as an employee of Southwest

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 136 of 367   PageID 14363
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 702

```
 1   Airlines?
 2           MR. PRYOR:  Same objection
 3           THE COURT:  That one's good.
 4           Overruled.
 5           THE WITNESS:  No.
 6   BY MR. GREENFIELD:
 7   Q.   Were you ever under the impression that when
 8   you became president, you relinquished your rights
 9   as a Southwest employee?
10           MR. PRYOR:  Object, leading.
11           THE COURT:  I will overrule that.
12           You can answer.
13           THE WITNESS:  No.
14   BY MR. GREENFIELD:
15   Q.   Okay.  We've talked -- I found this out for the
16   first time today about your book.
17       Are you an attorney?
18   A.   No.
19   Q.   Do you find, to this day, portions of the
20   Collective Bargaining Agreement difficult for you to
21   work through?
22           MR. PRYOR:  Object, leading.
23           THE COURT:  I will allow that.
24           THE WITNESS:  Yes.
25
```

```
 1   BY MR. GREENFIELD:
 2   Q.   And when you were -- let me take a step back.
 3        At some point when you became president, you
 4   also became lead negotiator for the CBA, correct?
 5            MR. PRYOR:  Object, leading.
 6            THE COURT:  I will allow that.
 7            THE WITNESS:  Yes.
 8   BY MR. GREENFIELD:
 9   Q.   Did you do that yourself or were you a member
10   of a team doing that negotiation?
11   A.   I was a member of a 5 percent negotiating team.
12        Under our bylaws, the president is also lead
13   negotiator.  So I had four other team members.
14   Q.   So as I understand it, when you became
15   president per the bylaws, you became lead
16   negotiator?
17   A.   Yes.
18   Q.   And on that team, on your negotiating team,
19   were there any legal representatives to help you?
20   A.   Yes.
21   Q.   And who was that?
22   A.   We had -- we had two that represented us
23   throughout our contract negotiations, both through a
24   labor firm out of Miami, Phillips and Richard.
25        Mark Richard was our primary attorney at the
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 138 of 367   PageID 14365
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                        Page 704

1  bargaining table, and then one of his associates,
2  Jeff Bott, also assisted at times.
3  Q.   And who made the decision to bring them on to
4  the negotiating team?
5  A.   Mr. Richard had been the Union's attorney for
6  contract negotiations since before I worked for
7  Southwest Airlines.  He had already at that time
8  worked with the Union to negotiate two different
9  industry-leading contracts.
10       And when I came onto the team as lead
11  negotiator, they had already been prepping and
12  working on negotiations.
13       So it was already decided that he would
14  continue that role that he had been serving for many
15  years.
16  Q.   So when you came on to work on the negotiating
17  team, negotiations had already been ongoing?
18  A.   They had not been ongoing, but preparation for
19  them had been going on, because our contract became
20  amendable June 1st, 2013, and there is work that you
21  have to do to prepare before you actually just sit
22  down and start negotiating with Southwest Airlines.
23       A lot of research, behind-the-scenes work.
24       And the negotiating team had already started
25  that process under the president that was -- that

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 139 of 367   PageID 14366
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 705

 1  was removed.

 2       The timing of those removals and the changeover

 3  in leadership happened just before our contract

 4  became amendable, and we were due to start

 5  negotiations early in June.  So there, again, had

 6  been work that was behind the scenes, had been

 7  performed by the negotiating team prior to my

 8  arrival.

 9  Q.   Are you aware if the attorneys you just

10  mentioned were advising the negotiating team before

11  you joined?

12            MR. PRYOR:  Object, leading.

13            THE COURT:  I will allow that.

14            THE WITNESS:  I -- I know that they had

15  spoken.  I know that there had been conversations

16  that happened, that had happened prior, just as

17  preparation.

18            I also forgot to mention that our -- at

19  the time our TW International rep, representative

20  Garry Drummond, was also assisting the negotiating

21  team.

22  BY MR. GREENFIELD:

23  Q.   Very good.

24       Before you joined the Union, did you understand

25  what a union was and what a union did?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 140 of 367   PageID 14367
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 706

1  A.    Not well.  I had a general sense that a union,

2  you know, was to help workers' rights.

3        The union -- the then-union administration,

4  when I was in Southwest training, did a little

5  exercise for the candidates that was very

6  illustrative to me and stuck with me.  Really kind

7  of the lightbulb going off exactly in real life what

8  a union can do for people.

9  Q.    Can you elaborate on that?

10 A.    Um, our then-president at the time was speaking

11 to the class in the front of the room, and he asked

12 us all to stand up, and he said he was going to ask

13 a series of questions.  And we didn't need to answer

14 out loud, but if our personal answer to any of the

15 questions was no, we needed to sit down.

16       And he started asking questions, like, um, are

17 you under 5'7 in height?  Are you over 5'10?  Do you

18 wear contacts or glasses?  Do you wear glasses?

19       And he's going through and more people sit

20 down.

21       And he said, Are you male?

22       Eventually it got really personal and he asked

23 about weight.  Do you weigh over I think it was

24 130 pounds.

25       And by the end -- age, too, I think was

 1   another -- I don't remember all of them.

 2        But by the end, I think there was one person

 3   left standing in my -- in my class.  At the time it

 4   started with I think around 75 people.

 5        And his comment was that, prior to the Union

 6   being on property at Southwest Airlines, the only

 7   person in that room that would have even been

 8   qualified or eligible to apply to be a flight

 9   attendant under their standards was that one person

10   left standing.

11        I never forgot that.

12        And the -- what a union means, it goes so far

13   beyond even negotiating rates of pay, that it opened

14   doors for people to do careers they never thought

15   were possible, especially because I was one of those

16   people sitting down.

17        Married was another question that I forgot.

18   Children.

19        And it is an exercise that I used during my

20   presidency when I spoke to the new-hire classes,

21   because I was that person sitting in the room that

22   really just had a kind of overview of unions but

23   didn't really understand what being a member of a

24   union meant or how it pertained to me even having

25   the opportunity to be in that room.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 142 of 367   PageID 14369
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 708

1  Q.   Okay.  I would like to turn to the specifics

2  of --

3               THE COURT:  I'm wondering about breaking

4  for lunch a few minutes early because we gave you

5  your morning break so early that y'all may be ready

6  for lunch.

7               So are you okay now that I have totally

8  interrupted your flow, Mr. Greenfield, for me to

9  call that lunch break?

10              MR. GREENFIELD:  If I said no -- of

11  course, your Honor.  It is okay if you do.

12              THE COURT:  Okay.

13              So the same instructions as always.  You

14  can only talk to your fellow jurors and court

15  personnel, just not about the case, and please don't

16  do any research on the case.

17              We will see you in one hour, at 12:53.

18              All rise for the jury.

19              (The jurors exited the courtroom.)

20              THE COURT:  Before you leave the stand, I

21  will just say, can we do the voir dire questions at

22  the end?

23              We have been on the record so long.

24              MR. PRYOR:  That is fine.

25              THE COURT:  Okay.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 143 of 367   PageID 14370
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 709

1            So they were asking to ask you questions

2    about a topic I've said the jury doesn't need to

3    hear about, but the lawyers are entitled to ask you

4    a couple of questions about one of those topics.

5            So let's come back at basically 55 minutes

6    from now.  We will let you ask those questions, and

7    then we will bring in the jury and keep rolling with

8    your questions, Mr. Greenfield.

9            So you are free to leave the stand.  Still

10   can't talk to anyone about the case.

11               (Thereupon, the witness exited the

12       courtroom.)

13           THE COURT:  So anything anyone else has

14   that we need to talk about now?

15           Okay.  Good to go.

16           Thank you.

17           (Recess.)

18           THE COURT SECURITY OFFICER:  All rise.

19           THE COURT:  Thank you.  You can be seated.

20           All right.  And just a heads up, we are

21   going to email y'all the current trial clock as of

22   the lunch break.

23           So this relates back to what I mentioned

24   earlier, Ms. Stone, there are things that I cut out

25   of this case, like what did Southwest do to any

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 144 of 367   PageID 14371
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                        Page 710

1    employee.  But there are times when a lawyer will

2    have a question that I don't let in front of the

3    jury, but it is appropriate for me to let them ask

4    you that question when the jury is not in the room.

5             So I will let you ask that question on

6    Jeanna Jackson.

7             MR. PRYOR:  Thank you, Your Honor.  For

8    clarification, this is not jury time, right?

9             THE COURT:  This is not jury time, yeah,

10   that's correct.  But you can't go beyond the scope

11   we talked about.

12            MR. PRYOR:  Fair enough.

13            THE COURT:  You can't ask anything you

14   want to.

15            MR. PRYOR:  This will be very short.

16   BY MR. PRYOR:

17   Q.   Ma'am, do you know what happened in regard to

18   any investigation by Southwest Airlines into Jeanna

19   Jackson as to any punishment she received?

20   A.   I know that she was suspended, I believe twice,

21   following some sort of social media complaint and

22   violation and investigation.

23   Q.   Was that as a result of a complaint that you

24   brought or Mr. Talburt or any other union member

25   that you know of?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 145 of 367   PageID 14372
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 711

1  A.   I do not believe it was result of a complaint I

2  brought.  I am not certain who brought forward the

3  complaints that resulted in those suspensions.

4           MR. PRYOR:  That ends our offer.

5           THE COURT:  Thank you.  I appreciate that.

6           Anything else before we bring in the jury?

7           MR. PRYOR:  Yes, your Honor.

8           THE COURT:  What have you got?

9           MR. PRYOR:  Your Honor, plaintiffs would

10 request additional jury time.

11          And from our conversation this morning,

12 when you were saying that you thought that I didn't

13 need to go through each of the documents, I told you

14 my recollection was I tried to do it globally and

15 she wouldn't let me.

16      The transcript shows on page 525, it says, Did

17 you receive the communications -- first of all, when

18 Ms. Carter sent you the communications, did you read

19 them?

20      Not all of them.

21      Which ones did you read?

22      I couldn't even tell you which ones I read,

23 there were so many.

24      "QUESTION:  At some point, did you stop reading

25 them?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 712

 1          "ANSWER:  Yes."

 2          In the ones that you read, she was complaining

 3   about things you or the union were doing, correct?

 4          So I tried to ask it globally.

 5          and her answer was, Not always.

 6          Then I said, You are going to tell us that we

 7   are going to have go and see an email or Facebook

 8   communication from her where she's not talking about

 9   a complaint to the union, true?

10          So I tried again to get her to go with me on

11   it.

12              THE COURT:  I get that.  What's your

13   request?

14              So you are saying that you had to ask

15   additional minutes that you hoped to not have to

16   ask?  How much extra time do you think you burned on

17   that?

18              MR. PRYOR:  No.  No, no.  I'm responding

19   to your comment this morning.  Not because of this,

20   no.  We need quite a bit more additional time for

21   other reasons.  I'm saying, you felt like this

22   morning, that if we requested additional time, that

23   you would not be amenable.

24              You know, I'm not saying I'm the most

25   efficient attorney that ever tried a case, but the

 1   example you gave, I was doing what I had to do to

 2   show protected union activity.  That is our burden

 3   to the jury for every one of these communications.

 4   And I tried to do it globally.

 5           So and you certainly came up with a better

 6   solution, although she still took over five minutes

 7   this morning, sitting and reading -- which is fine.

 8   I think that actually went quicker.

 9           But, your Honor, at this point, this was a

10   key witness, it was central to this case, and we

11   think that the time spent with her was valuable to

12   prove our case.

13           We don't think that we wasted such time

14   that the Court should deny the time for additional

15   request.

16           We have 15 witnesses and we are -- we have

17   been spending the lunch hour trying to figure what

18   we can cut.  We can cut some witnesses.  I think

19   that it -- it doesn't afford our client the trial

20   that she's entitled, but I certainly wouldn't rise

21   it to the level of saying that it denies her a trial

22   or is incomprehensible to a jury.

23           However, if we are held to the current

24   timeline, it will.  We will not be able to -- we are

25   going to have to cut crucial witnesses and crucial

 1   testimony that we think denies our client a trial if

 2   the Court stays with the current time limit.

 3            We would request additional time.  Like I

 4   say, we are willing to cut witnesses that fall

 5   outside -- that we would like to have, but that fall

 6   outside, really, the due process aspect of the

 7   trial.

 8            So we need additional time, and I'm making

 9   the request now, because we are going to have to

10   make those decisions now.

11            THE COURT:  I understand your request.

12   I'm going to deny it at this point in time and I

13   will say on the record why.

14            What I was trying to preview this morning,

15   what my rationale was, I will say in the last trial

16   I had, the Government asked for more time when they

17   had three hours on the clock.  And I said, It is too

18   early.  Let's see how you use your three hours.

19   They used them wisely and didn't need more time.

20            At this point, when you got over five

21   hours left, I think that you still have time to

22   adjust.  I haven't seen the adjustments.  I know at

23   the start of the day, you said you'd spend an hour,

24   and you spent more.  And so I need to see you

25   adjusting to the efficiency curve.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 149 of 367   PageID 14376
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 715

1            By that, I don't mean cutting witnesses, I

2   mean cutting questions.  What do you want the jury a

3   week from now to really understand that that witness

4   said.  Right?  They will probably have three or four

5   takeaways from each witness.  What are they going to

6   say?

7            Most witnesses can be done in half hour,

8   45 minutes.  I know this witness was crucial.  I

9   don't think crucial warrants over six hours.

10           So all of that to say, I get your request,

11  and I am inclined to try to find more time to give

12  you, but I can't give you the full measure of time

13  you seek.  And I think whatever time I decide to

14  give you, it is premature for me say at this point

15  in time what that amount would be.

16           MR. PRYOR:  Your Honor, to respond to your

17  "you want to see," respectfully, I was trying to

18  allow you to see that this morning.  There were

19  additional issues that came up, but I certainly

20  truncated or I thought was more concise.  The Court

21  is the one that -- the opinion that matters.

22           We have decided to, at this point, with no

23  additional time being offered, not call Mr. Parrott,

24  not call Ms. Parker, not call Mr. Conlon.  We

25  believe those witnesses are important to this case,

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 150 of 367   PageID 14377
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 716

1  but because of the Court's ruling, we cannot call

2  them.

3          Mr. Sims we will hold in abeyance in terms

4  of the order of witnesses, and at this point put him

5  to the end, hoping that we have additional time or

6  that there is time remaining.

7          We would still call, then, after that, in

8  order, Mr. Schneider, Ms. Hudson, Ms. Lacore,

9  probably cutting Ms. Emlet, and we have cut back the

10 designations on Mr. Talburt substantially.  And we

11 will share those cutbacks with counsel -- we have

12 done them at the lunch hour -- so that we are

13 cutting his time back.

14          And we are --

15          THE COURT:  For any witness --

16          MR. PRYOR:  -- Ms. Carter.

17          THE COURT:  Understood.  And for any

18 witness who we have by depo, you are free to do

19 that.

20          MR. MORRIS:  I'm sorry?

21          THE COURT:  You are free to do that for

22 any witness who we have by depo.  Right?  If there

23 are three or four things you want the jury to take

24 away from that witness, you are fine to cut it down

25 to those things.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 151 of 367   PageID 14378
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 717

1            Which is what I've seen lawyers do in the

2   past.

3            MR. PRYOR:  We will cut them all.  And

4   Mr. Talburt's is being cut right now.  He's our next

5   witness.  So we will -- we cut it substantially.

6            So we are trying very hard.  And I respect

7   the Court's opinion.  I want you to see that we were

8   trying to respond to your concerns, and I still

9   believe we will need additional time --

10           THE COURT:  Understood.  And I will still

11  entertain that request.  All right?  And I am still

12  trying to crunch numbers on my end to see what we

13  have to give.

14           MR. PRYOR:  Thank you, Your Honor

15           MR. McKEEBY:  And I'm not sure if I heard

16  Ms. Lacore, I know I did not hear Ms. Schaffer in

17  that recitation.  Can either or both of them be

18  released from their trial subpoenas?

19           MR. PRYOR:  No.  We -- if I didn't say

20  Ms. Lacore, I meant to.  I would say we are still

21  doing Mr. Schneider.  Mr. Schneider is a witness

22  that, unfortunately, will take some time.

23  Ms. Hudson and Ms. Lacore can be shorter, but we

24  need them.  And Emlet, at this point, again, without

25  additional time, we would cut.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 152 of 367   PageID 14379
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 718

1            THE COURT:  Well, and I'm not -- I don't
2    think you should cut any trial subpoenas, right?
3            MR. PRYOR:  No.  I don't -- I'm just
4    telling the Court -- no, no, no, let me be clear.
5            If I get more time, I want all of these
6    witnesses.
7            THE COURT:  I get that.
8            MR. PRYOR:  If I have enough time.  But
9    under the time constraints that we currently have,
10   those witnesses that we think should be called, we
11   cannot call.
12           THE COURT:  Understood.  Mr. Greenfield.
13           MR. GREENFIELD:  Mr. Parrott is dutifully
14   waiting in the hall again most of this day.  Can we
15   release him, then?
16           THE COURT:  I can't release someone from a
17   trial subpoena -- I should say, I'm not going to
18   release someone from a trial subpoena.
19           MR. GREENFIELD:  Not from a subpoena, Your
20   Honor, just as a witness today.
21           MR. PRYOR:  Yeah.  And I'm unwilling to
22   release him from the subpoena, but I'm willing to
23   let him leave the courtroom now, and be on a one- or
24   two-hour call, if that works.
25           MR. GREENFIELD:  It does.  Thank you.

```
 1              THE COURT:  All right.  Let's bring in the
 2   jury.  I want to make sure we maximize our time with
 3   them, because that gives me more time to give you at
 4   the end.  If we spend all our day in sidebar with
 5   them out of the room, then I have no more time to
 6   give.
 7              THE COURT SECURITY OFFICER:  All rise for
 8   the jury.
 9              (The jurors entered the courtroom.)
10              THE COURT:  Thank you.  You can be seated.
11              And, Mr. Greenfield, you can continue.
12              CROSS-EXAMINATION - CONTINUED
13              MR. GREENFIELD:  Your Honor, before the
14   break, we discussed Exhibit No. 134, as did
15   plaintiff in their examination of Ms. Stone.  But I
16   don't believe it was ever offered into evidence.  We
17   would like to do that at this time.
18              THE COURT:  Okay.  134.  Any objection to
19   134 coming into evidence from Carter -- or from
20   Southwest?
21              MR. McKEEBY:  No objection from Southwest.
22              MR. PRYOR:  No objection.
23              THE COURT:  Okay.  134 is in.  We will
24   publish.
25
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 154 of 367   PageID 14381
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 3 July 07, 2022                  Page 720

1              (The referred-to document was admitted in
2         Evidence as Trial Exhibit 134.)
3    BY MR. GREENFIELD:
4    Q.   Ms. Stone, welcome back from lunch.  You
5    understand you are still under oath at this time?
6    A.   Yes, sir.
7    Q.   Okay.  Now that we have all eaten lunch and are
8    probably going to be a little bit sleepy, I'm going
9    to go ahead and ask you some boring questions and
10   hope everyone doesn't fall asleep.
11        I would like to talk to you just a little bit
12   about unions and union operations in general.
13        Can you tell the jury a little bit about the
14   structure of TWU Local 556, as a union?
15   A.   Our structure is initially governed by the TWU
16   international constitution, which it states that a
17   local elected executive board will be the governing
18   body of the local union.
19        The executive board is made up of flight
20   attendants.  The size is determined based on the
21   size of the membership.  So the larger the
22   membership, potentially the larger -- there is a
23   formula used to determine how many -- the size of
24   the executive board.
25        During my administration, the executive board

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 155 of 367   PageID 14382
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 721

1    was made up of 17 flight attendants.

2        That is who made, you know, decisions overall

3    about the running of the union.  But then within our

4    Local 556 bylaws, which were voted on by the

5    membership, there are different duties assigned to

6    the various board members.

7        Some are very specific, like the president is

8    responsible for staffing the union office, with

9    executive board approval, down to listing

10   responsibilities of the treasurer, for his or her

11   day-to-day job.

12       We also had flight attendants who were what we

13   would call on a full-time union pull.  Which means

14   they are still considered a Southwest Airlines

15   flight attendant, but they are working in a

16   full-time capacity for the union.

17       They worked seven days a week, actually, in our

18   union office, answering phone calls, filing

19   grievances on behalf of the membership, the

20   day-to-day direct contact in membership questions.

21       Then we also had various committees, I think

22   over 20, that were comprised of flight attendants.

23   The committees, I think I mentioned earlier,

24   education committee responsible for helping educate

25   our flight attendants on hot topics, contractual

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 156 of 367   PageID 14383
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 722

1    issues.

2         We talked about the negotiating committee.  And

3    a few joint committees within Southwest.

4         So primarily, all flight attendants that are

5    doing the day-to-day business, we had a -- one, when

6    I started, and then it grew to, I believe, three,

7    non-flight attendant staff working in our union

8    office.

9         An IT person.  We had someone -- basically, it

10   is the check and balances for payroll, who is not a

11   flight attendant.

12        And then we also, we had two -- actually, four,

13   by the time I left -- non-flight attendant staff

14   positions.

15        But outside of those four people, union

16   leadership, committee involvement are made up flight

17   attendants who are union members.  So I will stop

18   there.

19   Q.   I think everyone is still awake.  Thank you,

20   Ms. Stone.

21        I would like to talk to you about two specific

22   items that you brought up a second ago, and I would

23   like to start with the executive board.

24        How does the executive board of the union come

25   into position?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                 Vol 3 July 07, 2022                 Page 723

1    A.    Currently, under our bylaws, executive board

2    elections are held every three years.  The entire

3    executive board is up for reelection at the same

4    time.  We don't have staggered elections.  So all

5    active members have an opportunity to participate

6    and vote.

7        The domicile executive board member positions

8    are only voted on by the members into those

9    respective domiciles, or we call them bases, where

10   we are stationed out of for work.

11       Any national board position or officer is voted

12   on by the entire membership body, regardless of

13   where they are based.

14       And then we have language in our bylaws that

15   dictate in the event somewhere in the three-year

16   election cycle there becomes a vacancy on the

17   executive board, how that process works to fill the

18   vacancy until the next election, under that process.

19       If the vacancy occurs in the first half of the

20   term, which is the first 18 months, then the

21   position is offered to the next highest vote getter

22   for that position, in the -- in the previous

23   election.

24       Under our bylaws, in the second half of the 18

25   months of the term, then the executive board is

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 3 July 07, 2022                Page 724

1  responsible for -- responsible for appointing the

2  vacancy for that position.

3  Q.   Thank you.

4       And that process you just described as far as

5  vacancies, et cetera, was that at play when you

6  became president the first time around?

7  A.   Yes.

8  Q.   Okay.  And is that how you ultimately became

9  president?

10  A.   Yes.

11  Q.   Okay.  And at some point, you ran for

12  reelection.  I believe you said after a three-year

13  term?

14  A.   It was roughly just under two years after I

15  became president.  I became president in 2013,

16  approximately one year into that term.

17       And I ran for -- I ran in the election in early

18  2015 for the president position.

19  Q.   And what did the membership decide on your

20  reelection campaign?

21  A.   I was voted in as president.

22  Q.   Okay, thank you.

23       You talked about voting and voting for

24  executive boards.  Are all union members allowed to

25  vote?

1   A.    All union members are allowed to vote, yes.

2   Q.    Is there any group of individuals that are

3   flight attendants of Southwest Airlines that are not

4   allowed to vote?

5   A.    Yes.

6   Q.    Who is that group?

7   A.    Two groups.  Probationaries.  So any flight

8   attendant that is currently on probation under our

9   Southwest Airlines contract.  A flight attendant is

10  on probation their first six months of employment

11  after successfully completing training.  And because

12  they don't actually become a full member until the

13  completion of probation, they are not allowed to

14  vote in an election.  Or if they do, their vote is

15  removed or not counted.

16       And then, anyone who is no longer a member of

17  the union because they have chosen to opt out of the

18  union, they are not allowed to vote in any or

19  participate in any union election.

20  Q.    And are those individuals referred to as AFOs,

21  or objectors, as we heard earlier?  Is that what you

22  are describing?

23  A.    Yes.  All of the same group of people,

24  different terms.

25  Q.    So what is an objector, Ms. Stone?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 726

1  A.    An objector is someone who has chosen to opt

2  out of the union.  Our agency -- it is called agency

3  fee policy is set by TW International.  They

4  determine, for the people that have opted out of the

5  union, what percentage of their union dues are going

6  to be refunded to them each year.

7       They do the calculations, and send it to all of

8  the locals as to what that -- they handle that

9  piece.  But it is whatever percentage of union dues

10 was not spent directly on -- basically, membership

11 representation.

12      That could be the day-to-day running of the

13 union office, contract negotiations, anything

14 related to that.

15      The pieces that are excluded and refunded back

16 are, for example, charitable donations.  That falls

17 outside the scope of direct member representation.

18      And so that is one of the categories that they

19 utilize to determine the percentage of dues that is

20 refunded to an agency fee payor or someone who has

21 opted out, or an objector.

22 Q.   Are there any specific rights that agency fee

23 objectors lose when they opt out of the union, as

24 far as their participation in union activities?

25 A.    Yes.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 161 of 367   PageID 14388
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 727

 1   Q.    What are those?  Sorry.
 2   A.    By choosing to opt out, they completely lose
 3   their voice in terms of getting to participate in --
 4   not only the election, they can't attend any kind of
 5   union meeting.  Whether it is a membership meeting,
 6   a special meeting held, you are not allowed to
 7   participate at all in any of the activities of the
 8   union.
 9   Q.    Okay.  Now, to tie that back to what you
10   discussed as far as the structure of the union, you
11   discussed grievances.  Okay?
12         Are -- tell me broadly about the grievance
13   process at Southwest Airlines in relationship to the
14   union's role.
15   A.    We have a lot of contract language in Article
16   19 and 20 that go through both side's
17   responsibilities.  We have time frames associated
18   with all grievances that are outlined in the
19   contract.
20         Any time a flight attendant has either a
21   question about whether they might have a grievance,
22   or believe they have a grievance, then they are
23   directed to contact the union office, speak to one
24   of our flight attendants there that works in the
25   union office.  And if a flight attendant chooses to

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 162 of 367   PageID 14389
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 728

1  file a grievance, then the union should file it --
2  should file a grievance on the flight attendant's
3  behalf.
4      We file grievances from everyone.  Someone who
5  has opted out of the union, it does not preclude
6  them from having union representation for the union
7  answering contract questions they may have or from
8  filing a grievance.  We still have a responsibility
9  to file a grievance and represent them, if they
10  request union representation.
11     The contract outlines next steps of the
12  grievance process, and again, time frames of how --
13  when a flight attendant has a responsibility to even
14  notify and file a grievance, as well as on the
15  opposite side, how long Southwest has to
16  investigate, respond, et cetera.  Whether it is a
17  contractual grievance or a discipline case that has
18  been initiated by Southwest Airlines.
19  Q.   From a 5,000-foot view, can you take us through
20  the steps of the grievance process if a complaint
21  had been filed against a flight attendant, and the
22  union's role in that representation through that
23  grievance process?
24  A.   Just to clarify, so, like a potential
25  discipline grievance?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 163 of 367   PageID 14390
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 729

 1  Q.   Yes.  Perfect.

 2  A.   Okay.  We would find out about it if the flight

 3  attendant contacted the union office and said that

 4  Southwest Airlines is calling them in for what is

 5  commonly referred as a "fact-finding meeting."

 6       Fact-finding meetings can result in discipline.

 7  We always encourage people to take any

 8  representation into those meetings.

 9       We have -- any flight attendant working in the

10  grievance office could set that up, but we -- at

11  least under my administration -- tended to have

12  people whose kind of primary job was that, who know

13  who the shop stewards are on the base.  That -- if

14  the flight attendant specifically requested a

15  certain shop steward or the domicile executive board

16  member, then the person working in the office would

17  start working on seeing is that person available,

18  could that request be accommodated, when is

19  Southwest wanting the meeting to be held.

20       The union office will also coordinate if the

21  meeting time or date needs to be shifted to

22  accommodate everybody's schedule.

23       The union office will coordinate with the shop

24  steward or domicile executive board member that is

25  going to be representing them on the details as we

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 164 of 367   PageID 14391
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 730

1    know them at that time, whatever the flight

2    attendant has been told.

3         And then whoever is assigned to be their

4    representative should be making contact with them in

5    advance of the meeting, trying to find out from the

6    flight attendant, is there any additional

7    information, is there -- do you know what this could

8    be about, trying to get as ready as possible sitting

9    down with the flight attendant.  And then that

10   representative accompanies the flight attendant into

11   the meeting.

12        They are, I believe, always held on Southwest

13   property.  And Southwest usually has somebody

14   conducting the meeting, leading the meeting, as well

15   as somebody taking notes.

16        Whoever the union's representative is, is

17   responsible to take notes, as well as be the

18   advocate, when needed, for the flight attendant

19   during the meeting.

20        And part of their job is to make sure that

21   Southwest is abiding by the language of the contract

22   and conducting what should be a fair and thorough

23   meeting, as part of the investigation process,

24   outlined in our contract.

25        Once the meeting concludes, the representative

1  should submit their notes back to the union office,

2  so that the union has a record of what happened in

3  that meeting, so that the union knows when the

4  deadline is for Southwest Airlines to issue a

5  decision in the case.

6      Because if they fail to meet that time frame,

7  then it is -- it is over, and they can't come back

8  later and try to issue discipline for that

9  infraction.

10     If they issue discipline, the flight attendant

11 has the option to grieve that discipline under the

12 Collective Bargaining Agreement.

13     And if they grieve it at that point, it would

14 then -- the case would be turned over to someone

15 that we call -- I believe they are still called a

16 grievance specialist.

17     So it is someone whose primary job working in

18 the union office is to file grievances and work on

19 those.

20     Under my administration, it tended to be a

21 rotation.  We had a grievance chairperson, who

22 oversaw the grievance specialist, and she kept track

23 of case loads.  So when a grievance came in, looking

24 to see, it was kind of like who was next to take --

25 to take a case, the availability to take a case.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 166 of 367   PageID 14393
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 732

1    That is how cases were assigned, in terms of who was

2    going to be handling it.

3        And then once the grievance specialist has it,

4    the next step in the process would be working with

5    Southwest Airlines to schedule what is called a Step

6    2 hearing, which is the first -- well, second piece,

7    I guess, in the appeal process, if you look at

8    filing the grievance -- filing the grievance itself

9    is the first step in appealing a decision Southwest

10   made.

11       Then the second step would be what is called a

12   Step 2 hearing, where grievance specialists, union

13   reps could accompany the flight attendant to another

14   meeting of Southwest management.  But the person

15   hearing the meeting is not going to be somebody from

16   that base, and it is somebody that is in a higher

17   position then whoever made the decision to issue

18   discipline.

19       Step 2 process, Southwest has the option to

20   agree to the grievance, deny the grievance, or offer

21   a settlement, you know, which could be accepting

22   parts of the agreement, not others.

23       After a Step 2 hearing, if -- if a discipline

24   is not removed and a flight attendant wishes to

25   continue through the grievance process, then the

 1  next step would be for the case to come before the

 2  executive board of the union, as the final governing

 3  body of the union.

 4      The grievance specialist would put together a

 5  packet full of all of the information, the notes

 6  from the two meetings that happened so far.  Any

 7  relevant information or documentation the flight

 8  attendant has been able to provide, whatever

 9  Southwest Airlines has utilized in determining their

10  decision for discipline.

11      And then the case comes before the executive

12  board.

13      The flight attendant has the right at any point

14  in this process to withdraw their grievance if they

15  don't want to continue.

16      The case comes before the executive board.  The

17  executive board hears the case, votes on the merits

18  of the case.

19      Voting members of the executive board are

20  everyone present except the chairperson in the

21  meeting.  I think I mentioned yesterday, as the

22  president, I was almost always also required to be

23  the chairperson of the meeting.  Only, though, in

24  cases of a tie.

25      The executive board, once they make a vote, it

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 168 of 367   PageID 14395
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 734

1  is either going to continue the grievance through

2  the process, or that the grievance, they don't

3  believe, has enough merit to stand up to continuing

4  through the process to go all the way to either a

5  Board of Adjustment or an arbitration hearing.

6       In a discipline case, if the executive board

7  votes not to proceed, the flight attendant still has

8  the right to continue on through the grievance

9  process, but they would need to release the union

10  and continue on, on their own.

11      In a contractual case, a flight attendant

12  wouldn't have the option to continue fighting a

13  contractual case without the union's representation.

14      And then if it goes all the way to a hearing of

15  either a Board of Adjustment or an arbitration.

16  Arbitration is the last step.

17              MR. PRYOR:  Your Honor, we object.

18  Approach or state my objection?

19              THE COURT:  You can state in code or

20  approach.

21              MR. PRYOR:  Limine.

22              THE COURT:  I will sustain that.  If you

23  want to approach, you can.

24              MR. GREENFIELD:  That is all right.  I

25  would rather keep moving.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 169 of 367   PageID 14396
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 735

```
 1              THE COURT:  Thank you.
 2   BY MR. GREENFIELD:
 3   Q.   Ms. Stone, thank you for the thorough
 4   explanation of the process.  I think everyone is
 5   still awake during our lesson on union -- the finer
 6   points of it.
 7        I'm going to try to boil it down and be a bit
 8   more concise.  Please tell me if I'm wrong.
 9        If a complaint is filed, a fact-finding meeting
10   occurs, is that correct?
11   A.   If -- if Southwest Airlines, either through a
12   complaint or something that a member of Southwest
13   leadership witnessed, Southwest can, yes, initiate a
14   fact-finding meeting.
15   Q.   Okay.  And the union provides representation at
16   that fact-finding meeting?
17   A.   Yes.  If the flight attendant requests us.
18   Q.   Okay.
19   A.   We do sometimes have flight attendants that
20   don't call.  We don't know -- there could be
21   meetings that we are not aware of.
22   Q.   And the flight attendant has the ability to
23   select their own representation?
24   A.   Not to select.  They can make a request.
25   Q.   Okay.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 170 of 367   PageID 14397
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 736

1  A.    If there is somebody in particular -- and I

2  can't speak to how it is done now.  During my

3  administration, we tried to accommodate those

4  requests as best we could.

5      But a lot of times, they required getting an

6  extension from Southwest based on schedules.  So,

7  again, as best we could, but we could never

8  guarantee that someone would have a -- it was in our

9  policy.  It was out of our control, because it had

10 to be an agreement by Southwest, too, if there was

11 an extension.

12 Q.    And based on your personal knowledge, do you

13 know if Charlene Carter was afforded union

14 representation at her fact-finding meeting?

15 A.    It is my understanding that she did have

16 representation at her meeting, yes.

17 Q.    And if an individual is not happy with the --

18 okay.  Let me take that back.

19      Does Southwest ever exert a punishment on a

20 flight attendant after a fact-finding meeting?

21 A.    Yes.  They can issue discipline following the

22 results of the fact-finding.

23 Q.    And if, it is my understanding, that if the

24 flight attendant disagrees with that punishment,

25 they can then take it to the Step 2 hearing you were

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 737

```
 1  discussing?
 2          MR. PRYOR:  Object, leading.
 3          THE COURT:  Sustained.
 4  BY MR. GREENFIELD:
 5  Q.   What would be the process if a flight attendant
 6  disagreed with the result of the fact-finding
 7  meetings -- of the fact-finding meeting?
 8  A.   They would let the union office know that they
 9  wanted to grieve it, that they wanted to file a
10  grievance.
11      And then the union office would formally file
12  that grievance on behalf of the flight attendant,
13  which requires a process of notifying Southwest
14  Airlines.
15      And then at that point, they would work to set
16  up and coordinate the second step in the grievance
17  process, which would be the Step 2 hearing with a
18  higher number of Southwest Airlines's management,
19  would have a chance to look at that case and could
20  choose to overturn the decision made at the base
21  level.
22  Q.   Based on your personal knowledge, do you know
23  if Charlene Carter took place in a Step 2 on this
24  process?
25  A.   Yes.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 172 of 367   PageID 14399
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 738

 1   Q.   And are you aware whether or not she was

 2   provided union representation?

 3   A.   Yes.

 4   Q.   So even though you turned her in to the

 5   company, the union still provided her representation

 6   at the fact-finding meeting and the Step 2 process,

 7   is that correct?

 8            MR. PRYOR:  Objection, asked and answered.

 9   Object, leading.

10            THE COURT:  Sustained.

11   BY MR. GREENFIELD:

12   Q.   Are you aware if Ms. Carter received union

13   representation at the Step 2 meeting?

14            MR. PRYOR:  Object, asked and answered.

15            THE COURT:  I will allow that.

16            THE WITNESS:  Yes, she did.

17   BY MR. GREENFIELD:

18   Q.   I would like to turn our attention to union

19   communications.

20        Did you have a specific email address for

21   yourself as president of the union?

22   A.   Yes.

23   Q.   Okay.  What was that?

24   A.   You could utilize either president at

25   TWU556.org or astone@TWU556.org, which was the

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 173 of 367   PageID 14400
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 739

1   standard for all of our board members, either the

2   title or their first initial and last name.

3   Q.   And did you receive messages from membership,

4   email messages, on those two accounts.

5   A.   Yes.  Regularly.

6   Q.   Was there a platform that membership was given

7   to know that those two accounts existed.

8   A.   Just to clarify, it was the same account.  You

9   could just utilize either email address.  It all

10  went to the same place.

11       And, yes, that email address, I think, was --

12  is at the bottom -- my contact information in my

13  auto reply, it contained my email address, as well

14  as my union phone number.

15       And I think any publication or communication,

16  like a president's message that went out, also had

17  contact information in it as well.

18  Q.   Did you ever receive emails from your

19  membership on your president's email accounts?

20  A.   Yes.

21  Q.   How frequently?

22  A.   Daily.  And that doesn't even really describe

23  sometimes the volume of email that I received on a

24  daily basis just to that account.

25       And I was also on numerous other distribution

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  groups, within our union, that were funneling to the

2  same inbox as well.

3  Q.   Let's discuss that volume.

4      How many emails are we talking about per day

5  that you were receiving to those email addresses?

6  A.   Sometimes over 100.

7  Q.   Can you please describe your -- if -- if you

8  had any emotions tied to trying to respond to all of

9  those emails in any given day.

10 A.   It was overwhelming.  I did not have -- I did

11 not have an assistant-type role, who vetted,

12 fielded, or even organized my inbox.  The only

13 person that did that was -- was me.

14     And at numerous points during my presidency,

15 particularly when we were in active contract

16 negotiations with Southwest Airlines, the volume of

17 emails that came in between me, being the president,

18 me, being an executive board member, and me, being

19 the lead negotiator, not even touching the grievance

20 staff that I was responsible for, and responsible

21 for assisting in the day-to-day operations of our

22 union.

23     It was overwhelming isn't even accurate for how

24 impossible some days it felt, to not let things fall

25 through the cracks, something that needed to be

1  responded to responding because it was just -- it
2  was too much.
3  Q.   Outside of issues brought to you by membership,
4  what sort of issues were you dealing with as the
5  president of the union that would come to that sort
6  of email?
7  A.   As my job as the president?
8  Q.   Yeah.  Let's kind of talk about it from a
9  priority sense.
10       Were there things that came across that you had
11  to prioritize during review of your emails in any
12  given day?
13  A.   Yes.  Particularly, I would say, anything that
14  was time sensitive, which could frequently be
15  communications from anyone in Southwest Airlines
16  leadership.  Again, especially when we were in
17  contract negotiations.
18       There were times that, as the chair of the
19  executive board, there were times where the
20  executive board would be conducting a vote on a
21  matter via email, and I was responsible for keeping
22  up with the time frames, the vote counts,
23  participation.
24       So there was always -- I always had to
25  prioritize because there were things that were very

 1  time sensitive, either through -- through our

 2  policies and procedures, or through responding to

 3  something that was currently going on.

 4       And it is also the airline industry, and it is

 5  a 365-day-a-year operation.  Our members are out

 6  working 365 days of the year.  So it doesn't -- it

 7  is not a job where it ends at 5.

 8       And if there is an emergency that happens, that

 9  is obviously going to take priority over anything

10  else going on.

11  Q.   Now, when you are talking about emergencies, in

12  the airline industry, what sort of emergencies are

13  you talking about?

14  A.   Aircraft incident.

15  Q.   Okay.

16  A.   And that could be a number of things.

17       It could be -- it could be an inadvertent --

18  anything from an inadvertent mass deployment to what

19  happened with Flight 1380 in April of 2018.

20  Q.   I don't want to get too far into that, but can

21  you please tell the jury what you are referring to

22  with Flight 1380, because I myself am not precisely

23  sure.

24  A.   As simple as possible, during flight at

25  altitude, there was a -- I don't know if I'm

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 177 of 367   PageID 14404
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 743

1  using -- almost a rupture in the aircraft, caused a

2  rapid decompression, and a passenger sitting where

3  that hole occurred was sucked out of the aircraft.

4      The plane made an emergency landing and that

5  passenger ended up passing away.

6  Q.   While we were on those email communications,

7  the complaint you filed with Southwest Airlines

8  against Charlene Carter, did you turn her in for

9  anything that she sent to your union president's

10 email?

11          MR. PRYOR:  Object, leading.

12          MR. GREENFIELD:  I asked if she did or

13 not.

14          THE COURT:  I will allow this one.

15          THE WITNESS:  No.

16 BY MR. GREENFIELD:

17 Q.   All right.  I would like to talk to you about

18 complaints in general now.

19      If a union member want to lodge a complaint

20 against a fellow union member, is there a way to do

21 that internally within the union?

22 A.   Yes.

23 Q.   Can you explain how that -- how that authority

24 exists?

25 A.   Under our TWU international constitution, which

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 178 of 367   PageID 14405
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 744

1  I have mentioned, international is the -- lack of a

2  better word, supreme authority of the union, and

3  then there is the local that has to operate

4  underneath the constitution and within that

5  framework.

6      The constitution outlines the internal

7  procedure, which is essentially, it is called filing

8  charges against a member.

9      It -- keeping it short, it outlines the

10  procedures that would take place for those to be

11  vetted to see if it warrants further action, which

12  could take place either via a trial, a union trial,

13  or by the vote of a -- or be dealt with through the

14  membership body at a membership meeting.

15  Q.   Does that apply to board members as well,

16  executive board members?

17  A.   Yes.  There are procedures outlined in there

18  that refers specifically to charges being filed

19  against an executive board member.  Either from a

20  member or from a member of the executive board.

21  Q.   Okay.

22  A.   It is similar, just a little bit different, if

23  they are a board member.

24  Q.   And if a union member wanted to lodge a

25  complaint against a non-union member or an objector,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 745

```
 1  can they use that same process, that internal
 2  process?
 3  A.    No.
 4  Q.    Why not?
 5  A.    Because it is member to member.  If -- if -- if
 6  that process occurs, and the flight attendant is
 7  found guilty of violating whatever the alleged --
 8  whatever they were accused of, then the constitution
 9  outlines what could happen to that person, including
10  making them a member in bad standing.
11       And if you have already opted out of the union,
12  you are not a member anyway.  So you can't have --
13  you can't have anything levied against you.  A
14  member in bad standing, for instance, can't come to
15  a union meeting or can't vote.
16       But if you have opted out of the union, you
17  have already lost that right anyway.  So there isn't
18  an additional punishment that could be handed out.
19  Q.    As a non-union member, an objector, was there
20  any mechanism for you to bring any sort of internal
21  charges against Charlene Carter?
22  A.    No.
23  Q.    I would like to talk about your specific
24  complaint that you filed against Charlene Carter,
25  okay?
```

 1        But before we talk about that, during opening

 2   statements, which you were not here, we heard about

 3   Ms. Carter's experience about some of the posts she

 4   sent you.

 5        And I'm sorry to ask you this, but do you

 6   yourself have any life experiences tied to abortion?

 7   A.    No.

 8   Q.   You mentioned earlier today that you did work

 9   representing at-risk youth or -- I don't want to put

10   words in your mouth.  Can you remind the jury what

11   I'm referring to?

12   A.    I worked at an outpatient child and adolescent

13   mental health clinic in east Texas.  I held various

14   roles in that.  But I provided skills training to

15   children and teenagers, and I taught parenting

16   skills in the home, to a variety of different --

17   different -- children that were experiencing a

18   variety of mental health reasons and diagnoses.

19   Q.   Did any part of your work there or experience

20   there shape your views and experiences on the issue

21   of abortion?

22   A.    Yes.

23   Q.   Can you please explain that to the jury?

24              MR. PRYOR:  Your Honor, we object.

25              THE COURT:  I will allow it.

```
 1              MR. PRYOR:  Can I state the objection or
 2   do you want me to do it later?
 3              THE COURT:  You can state your basis in
 4   code or go for it at a sidebar.
 5              MR. PRYOR:  I just need it on the record.
 6              THE COURT:  Well, you need to state your
 7   basis in code or do it at a sidebar.
 8              MR. PRYOR:  The relevance of Rule 404.
 9              THE COURT:  Understood.  I will allow it.
10   You can answer the question.
11              THE WITNESS:  Part of that job, I -- I had
12   always believed that the general idea of abortion
13   was wrong.  That even in the case of an unwanted
14   pregnancy, a woman should look at all other options,
15   choose another option, like adoption if they weren't
16   in a position to keep that child.
17              And in the course of my almost five years
18   in that role, I worked with two different kiddos who
19   were the product of an incestuous rape.
20              One, it was --
21              MR. PRYOR:  Your Honor, now I object to
22   narrative.
23              THE COURT:  I will let you finish the
24   answer, but it can't be too long of an answer.
25              THE WITNESS:  After working with both of
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 182 of 367   PageID 14409
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 748

1   those children and their mothers, my views shifted.

2            Because while I -- I had never been in the

3   situation they were in, and it opened my eyes to

4   situations women could find themselves in.

5            And both of these women didn't have access

6   to resources and it was a family member in their

7   home, a relative that was raping them repeatedly

8   from a very young age.

9            And I did not believe that I or anyone

10  else have the right to tell those women or any other

11  woman in that situation that they had to carry that

12  baby.

13  BY MR. GREENFIELD:

14  Q.   Thank you, Ms. Stone.

15       And I'm going to get off this topic as quickly

16  as I can.

17       There was discussions yesterday about your

18  personal beliefs, and I just want to make them

19  clear.

20            MR. GREENFIELD:  Can you please pull up

21  Exhibit 66?

22  BY MR. GREENFIELD:

23  Q.   I'm looking at the middle of the page.

24            MR. GREENFIELD:  I would like to offer

25  this exhibit into evidence.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 183 of 367   PageID 14410
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 749

1              It's 67.

2              THE COURT:  So I will ask if there is any

3    objection from Southwest or Carter to 67?

4              MR. McKEEBY:  No objection.

5              MR. HILL:  No.

6    BY MR. GREENFIELD

7    Q.   I would like you to look at the middle of the

8    page.  There's an email --

9              THE COURT:  Hold on.

10             -- from Carter on 67.

11             MR. PRYOR:  I'm sorry?

12             MR. HILL:  No objection.

13             MR. PRYOR:  No objection.

14             THE COURT:  Okay.  Sixty-seven is in.  We

15   will publish.

16             (The referred-to document was admitted in

17        Evidence as Trial Exhibit 67.)

18   BY MR. GREENFIELD:

19   Q.   I would like to direct you to the middle of the

20   page.  There is an email from you to Suzanne

21   Stevenson.  If you could please read quietly while I

22   read aloud.

23        Suzanne, part of my message was cut --

24             THE COURT:  Can we have the witness --

25             MR. GREENFIELD:  Oh, I apologize.

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 184 of 367  PageID 14411
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 3 July 07, 2022                Page 750

```
 1              THE COURT:  -- just -- since it is not a
 2  hostile witness?
 3              MR. GREENFIELD:  Yes.
 4  BY MR. GREENFIELD:
 5  Q.   Please, Ms. Stone?
 6              THE COURT:  And she could read aloud into
 7  the record if you want.  I prefer it to come from
 8  you instead of you since it is not a hostile
 9  witness.
10              MR. GREENFIELD:  Yes, Your Honor.
11              THE WITNESS:  Suzanne, part of my message
12  was cut.  It should have said, quote, "I am
13  personally pro life, but I support others right to
14  pro choice and don't believe I have the right to
15  tell them what to do with their body.  And to be
16  sent messages that reference me as a murderer
17  couldn't be further from the truth.  My apologies as
18  I have edited and cut and pasted and agonized for
19  days.  Again, thank you for your attention, Audrey."
20  Q.   The messages -- and I'm talking about the first
21  three that you turned in to Ms. Carter to for
22  Southwest Airlines -- do you know what I'm referring
23  to?
24  A.   Yes.
25  Q.   Did you feel physically threatened by those --
```

```
 1   any of those posts?
 2              MR. PRYOR:  Object, leading.
 3              MR. GREENFIELD:  I just asked --
 4              THE COURT:  I will allow it.
 5              THE WITNESS:  Yes.
 6   BY MR. GREENFIELD:
 7   Q.   And I believe the line that we have seen
 8   repeatedly is that "I can't wait until you go back
 9   on line."  Was there --
10              MR. GREENFIELD:  I apologize, your Honor.
11              I apologize, counsel.
12   BY MR. GREENFIELD:
13   Q.   What part of those messages, if any, made you
14   feel physically threatened?
15              MR. PRYOR:  Object, leading.
16              THE COURT:  I will allow that.
17              THE WITNESS:  I took her comment that she
18   couldn't wait to see me back on line as a threat
19   because of other conversations that had just
20   recently been going on about what the flight
21   attendants -- specifically, the flight attendants
22   that had voted against the tentative agreement --
23   what they were going to do to me when I came back on
24   line.  Comments that I would need to travel with
25   body guards.  And comments about them fighting over
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 186 of 367   PageID 14413
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 752

1   who was going to get to me first.  Including with

2   depictions of weapons.

3            So at that point in my presidency, I was

4   terrified.  I had people working in the grievance

5   team who were afraid to come to work.  Because some

6   of the social media posts had been specific about me

7   and some were general to the union and contained

8   weapons.

9            Just prior to that, I had had a

10  negotiating team member, as we were preparing to go

11  on the road to roll out the second negotiated

12  tentative agreement, to roll it out for ratification

13  vote, typically members of the negotiating team

14  travel to all of the domiciles to have an

15  opportunity for the members to come in and sit

16  face-to-face and answer -- have a negotiating team

17  go over changes in the contract.  I had a

18  negotiating team member tell me that he didn't want

19  to go to the ratification meetings because he was

20  afraid of being hit by --

21            MR. PRYOR:  Object to hearsay and

22  narrative.

23            THE COURT:  Yeah, pretense, I will allow

24  it.

25            THE WITNESS:  Because he was afraid of

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 187 of 367   PageID 14414
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 753

1  being hit by a stray bullet meant for me.

2            We had also already arranged to have

3  police and/or security guards present at all of

4  those ratification meetings.

5            And we had already instituted a policy to

6  have signs placed at all of the places that those

7  were held that you could not bring weapons in.

8  Because we had had flight attendants reach out and

9  express concern about attending a membership

10  meeting, as a union member, because of the violent

11  posts and comments that were circulating.

12            So yes, I took that as a threat.

13  BY MR. GREENFIELD:

14  Q.   Did you ever, was there ever an instance -- let

15  me walk that back a little bit.

16       You mentioned an issue with targeting and,

17  bullets, et cetera.

18  A.   I'm sorry, can you repeat that?

19  Q.   Yes, ma'am.

20       You mentioned an instance with bullets,

21  targeting, et cetera.

22       Were there any instances where firearms were

23  brought to union member meetings?

24  A.   Yes.

25  Q.   Can you please talk about that?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 188 of 367   PageID 14415
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 754

1                MR. PRYOR:  Your Honor, relevance.

2                THE COURT:  I will allow it.

3                THE WITNESS:  We, at times, did

4    simultaneous meetings.  Because ten days of meetings

5    was two full business weeks.  So calendar reasons,

6    we sometimes split up.  I had two vice presidents,

7    recording secretary, other officers and board

8    members that would fill in as recording secretary.

9                So during one of the time periods that we

10   were running membership meetings in two different

11   bases at the same time -- so I'm chairing a

12   membership meeting on the East Coast, one of my vice

13   presidents is chairing a membership meeting on the

14   West Coast -- there was a meeting that I was not

15   chairing, where a member came.

16               And it was discovered at some point during

17   the meeting that he had a gun, a gun tucked in his

18   pants.

19               It was after that, that we started posting

20   signs on the doors that, regardless of any state

21   laws, weapons were not allowed at a membership

22   meeting.

23               We had also had -- where we had to seek

24   assistance from Southwest Airlines to take

25   precaution for a membership meeting that was being

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 189 of 367   PageID 14416
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 755

 1    held in Houston on an airport property because of a

 2    flight attendant that was in the grievance process,

 3    a threatening voicemail she had left on one of the

 4    staff members -- on what she -- she was going to

 5    show up to the meeting and --

 6              MR. PRYOR:  Okay.  Once again, your Honor,

 7    narrative and relevance.

 8              THE COURT:  I will allow a narrative in

 9    this format.

10              You can answer.

11              THE WITNESS:  Her intent to physically

12    cause me harm at the union meeting because of the

13    way the executive board had voted on her grievance,

14    my recording secretary, who was going to be

15    traveling with me to that meeting, said --

16    especially given the climate we were in -- we needed

17    to take this seriously --

18              MR. PRYOR:  Objection, hearsay.

19              THE COURT:  You have got to wait to let

20    her finish.  You can move to strike if I grant your

21    objection, but you have to let her finish her

22    answer.

23              THE WITNESS:  And because the meeting was

24    being held on airport property right down the hall

25    from the Southwest Airlines flight attendant lounge,

1  I reached out to Southwest Airlines to let them know

2  about the threat, and worked with the Houston

3  Southwest Airlines base manager at the time, and he

4  worked with the local airport authorities to ensure

5  that that individual did not even gain access to the

6  restricted area.

7  BY MR. GREENFIELD:

8  Q.   Do you recall any of the -- what you describe

9  as threats to you personally, do you recall any of

10 the flight attendants who you believe threatened you

11 personally?

12          MR. PRYOR:  Object, relevance.  Object

13 prejudice.  Doesn't relate to anything Ms. Carter

14 did.

15          THE COURT:  I will allow it.  You can

16 answer.

17          THE WITNESS:  Yes.

18 BY MR. GREENFIELD:

19 Q.   Can you please provide those names?

20 A.   Robert Picket was one of them.  Jeanna Jackson

21 was one of them.  Polly Momovich (sp).  And the one

22 I was just speaking of in Houston, I believe her

23 name was Rebecca, but I don't recall the last name.

24 I'm sorry.

25      But that is what I can recall right now.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 3 July 07, 2022                  Page 757

1  Q.   Thank you.

2       Ms. Carter's counsel talked to you about "an

3  exhibit where you used the term see you back on

4  line."  Do you see a difference in the way that you

5  used it and the way that Ms. Carter used it?

6               MR. PRYOR:  Object, leading.

7               THE COURT:  I will allow this.

8               THE WITNESS:  Yes.  There -- at least the

9  full last year of -- or probably sometime during the

10 last year of my presidency, I made it very clear to

11 my team members and to anyone in the membership who

12 asked me, that I would not be seeking reelection

13 because of everything I had been through.  No job

14 was worth it.

15              And so then the narrative amongst a number

16 of flight attendants who had been very open in not

17 supporting me, saying that I was never going to go

18 back to being a flight attendant, that I didn't care

19 about them, because I was never going to go back to

20 do the job, because I had a job waiting for me

21 either at TW International or at Southwest

22 management.

23              So there had been a lot of comments about

24 me not going back on line.  So I ended my last

25 presidency message with what I had said all along, I

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 192 of 367   PageID 14419
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 758

1  am a flight attendant and the only job I have lined

2  up to go back to after I complete this term is my

3  flight attendant job.

4  BY MR. GREENFIELD:

5  Q.   And I would like to talk about a little bit

6  about that timing.

7       What was the separation in time of when you

8  made your complaint about Ms. Carter and when you

9  would be going back on line as just a rank and file

10 flight attendant?

11 A.   I had, I believe, around 14 months left on my

12 term.  The complaint was made early in 2017 and my

13 term ran through April 30th of 2018.

14 Q.   Thank you.

15      Do you have any relationship with Charlene

16 Carter?

17 A.   No.

18 Q.   Had you ever spoken with Charlene Carter?

19 A.   Not directly.  She attended one membership

20 meeting, to my recollection, a couple of weeks after

21 I became president.  She was one of the members in

22 attendance.

23      To my knowledge, that was the first time I had

24 ever even been -- that I was aware that I have been

25 in a room with her.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 759

1   Q.   Do you have any recollection of any of the

2   messages you received from Ms. Carter asking you

3   about your views about abortion?

4   A.   No.

5   Q.   And the three posts that led to the complaint

6   you filed against Ms. Carter, do any of those posts

7   have any requests about Ms. Carter wanting to have a

8   conversation about your views on abortion?

9            MR. PRYOR:  Object, leading.

10           THE COURT:  I will allow it.

11           THE WITNESS:  No.

12  BY MR. GREENFIELD:

13  Q.   Did you interpret anything within those posts

14  as Ms. Carter wanting to have a conversation with

15  you about abortion?

16  A.   No.  Nothing that she had sent me had ever

17  appeared to be encouraging to have a conversation or

18  a dialogue.

19  Q.   Ms. Stone, did the local union ever donate to

20  Planned Parenthood?

21  A.   No.

22           MR. PRYOR:  I'm sorry, I didn't hear the

23  question.

24           MR. GREENFIELD:  I asked if the local

25  union ever donated to Planned Parenthood.

```
 1              MR. PRYOR:  Has the local union?

 2              MR. GREENFIELD:  Ever donated to Planned

 3   Parenthood.

 4              MR. PRYOR:  Okay.

 5   BY MR. GREENFIELD:

 6   Q.   The answer to that was no?

 7   A.    Correct.  No.

 8              MR. GREENFIELD:  If I may have a moment to

 9   just discuss with my co-counsel.  I will be right

10   back.

11              THE COURT:  You may.

12   BY MR. GREENFIELD:

13   Q.   Ms. Stone, there has been lots of discussions

14   about communications you received from Brian

15   Talburt.

16        Do you remember those?

17   A.    Yes.

18   Q.   Was Mr. Talburt ever an executive board member?

19   A.    No.

20   Q.   Was Mr. Talburt ever an agent of the union?

21              MR. PRYOR:  Object, calls for a legal

22   conclusion.

23              THE COURT:  I will allow her to answer if

24   she has personal knowledge.

25
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 195 of 367   PageID 14422
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 761

 1  BY MR. GREENFIELD:
 2  Q.    Did you believe Mr. Talburt to ever be an agent
 3  of the union?
 4  A.    No.
 5  Q.    There was discussions about Mr. Talburt on a
 6  CAN team, I believe.
 7  A.    Yes.
 8  Q.    Can you please remind the jury what the CAN
 9  was?
10  A.    Usually during any rollout of a tentative
11  agreement on the contract, after the negotiations,
12  there is more people needed than just the
13  negotiating team and the executive board to make
14  sure we are there and available to answer any
15  questions our members have about such an important
16  vote.
17        Through, I think, at least all of the contract
18  rollouts in my time at Southwest Airlines, the union
19  will ask for either, like, people that have shown
20  interest, people that have emailed the negotiating
21  team and say, Hey, what can I do to help?
22        And bring them in to help them help us make
23  sure that flight attendants understand what they are
24  voting on, understand what is going on in
25  negotiations.

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 196 of 367  PageID 14423
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 762

1      Sometimes it is put in place before you even
2  reach the agreement, because there is lot of
3  activity with the negotiations of the contract
4  actions at work.  That was one of those type of
5  committees.
6      Flight attendants that had expressed interest
7  or volunteered to assist the negotiating team.
8  We -- one -- one of their duties sometimes was
9  following a negotiating session with Southwest
10 Airlines.  The day following, all the domiciles
11 would have someone from the contract action network
12 there.
13      A lot of times, the negotiating team would
14 split up to go with them, it would be something we
15 would publicize in advance, that they would be in
16 the lounge to help answer any questions that you may
17 have.
18      Sometimes it was simply making people aware
19 where to find updates on our website of the chart of
20 where we were in the negotiating process.
21      So he was a -- he was a member that assisted
22 with that project.
23 Q.   And did any actions Mr. Talburt took have the
24 ability to bind the union in any sort of
25 negotiation?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 197 of 367   PageID 14424
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 763

```
 1  A.    No.
 2            MR. PRYOR:  Object, leading.  Object,
 3  calls for a legal conclusion.
 4            THE COURT:  I will allow her to answer if
 5  she has personal knowledge.
 6  BY MR. GREENFIELD:
 7  Q.   Do you have personal knowledge of that,
 8  Ms. Stone?
 9  A.   Yes.  And the answer is no.
10  Q.   It was discussed earlier that, at some point,
11  you represented Mr. Talburt or played a role in a
12  fact-finding or Step 2 -- regarding Mr. Talburt.
13  And I don't want to go further because I would just
14  like to you clarify, because I don't remember myself
15  exactly your role in that?
16  A.   As I mentioned earlier, sometimes flight
17  attendants would make special requests of who they
18  wanted involved in their representation.
19  Mr. Talburt asked, I think his grievance specialist,
20  if I could assist for his Step 2 hearing, the second
21  step in this appeal process.
22       And as I mentioned, normally the grievance
23  specialist, and then our grievance chairperson,
24  would normally attend the meeting.  It was never
25  just the grievance specialist.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 198 of 367   PageID 14425
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 764

1        And so there were times, including

2    Mr. Talburt's, where, upon a flight attendant's

3    request, I attended in lieu of the grievance

4    chairperson.  I accompanied the specialist.

5    Q.   Were there any other instances where you were

6    requested by flight attendants to engage in that

7    process?  If so, tell us if you remember any

8    specifics.

9    A.   Yes.  Towards the very end of my term, a

10   Dallas-based flight attendant, who had been in

11   initial training with me in 2004 -- so 14 years

12   later -- we had not seen each other, we hadn't

13   actually spoken -- but he was called in for a

14   fact-finding meeting in the Dallas base.

15       And when he reached out to the union, he asked

16   them if he could speak to me, because he wanted me

17   to be involved in his -- in his process.

18       I did not attend his fact-finding meeting.  He

19   had representation for that.  But when Southwest

20   Airlines issued discipline, I attended his Step 2

21   hearing.

22   Q.   Do you remember any specific time frame around

23   when you had been asked to represent Mr. Talburt in

24   that process?

25   A.   I think it was -- I think it was early 2015.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 199 of 367   PageID 14426
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 765

 1  Q.    Okay.

 2  A.    I'm not 100 percent certain.

 3  Q.    I understand.

 4  A.    I'm sorry, it is just a lot of history that

 5  I --

 6  Q.    Certainly, Ms. Stone.

 7           MR. GREENFIELD:  Please pull up

 8  Exhibit 26.

 9  BY MR. GREENFIELD:

10  Q.    Ms. Stone, this is Exhibit 26.  It is one of

11  the emails that had been discussed from Brian

12  Talburt to you.

13        Is that -- do you recognize this document?

14  A.    Yes.

15  Q.    All right.

16        What date was this sent to you?

17  A.    October 13th, 2014.

18  Q.    Okay.  This is Exhibit 27.  Another email.

19        Can you please tell us the date on that?

20  A.    October 13, 2014.

21  Q.    This is another email from Brian Talburt.  Can

22  you tell us the email date on that?

23  A.    October 13th, 2014.

24  Q.    The same question, Ms. Stone.

25  A.    October 13th, 2014.

1  Q.   Do you have any recollection if Mr. Talburt was

2  sending you these emails in relationship to his Step

3  2 or his grievance process?

4           MR. PRYOR:  Objection, leading.

5           THE COURT:  I will allow it.

6           THE WITNESS:  Yes, and -- yes.  Because he

7  had received discipline for using a phrase that

8  was -- I believe it was the public -- it had

9  something to do with the public execution phrase

10 that was referenced in one of those emails.

11 BY MR. GREENFIELD:

12 Q.   Okay.  And at this point, you were -- you were

13 part of the representation team in the grievance

14 process?

15 A.   Yes.

16 Q.   Would it be appropriate for a member of the

17 grievance team to take information provided to them

18 as part of the grievance and turn that information

19 over to Southwest Airlines?

20 A.   Would you repeat the question?  I just want to

21 make sure I'm understanding.

22 Q.   Yes.  If information was given to you as part

23 of a defense on the grievance team, would that be

24 appropriate basis for you to turn that employee in

25 for any sort of violation of company policy?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 201 of 367   PageID 14428
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 767

```
 1              MR. PRYOR:  Object, leading.
 2              THE COURT:  I will allow it.
 3              THE WITNESS:  There were times, when in
 4   the defense of someone, in order to accurately
 5   represent that flight attendant, especially when it
 6   was a complaint or a situation that involved two
 7   different flight attendants fighting or differing
 8   opinions, there were numerous times where, in the
 9   grievance process, something would be brought
10   forward that was needed in the defense of our
11   current client, but could open the door for
12   Southwest to then have new knowledge and information
13   to investigate someone else.
14   BY MR. GREENFIELD:
15   Q.   Do you have any understanding, based on this
16   time frame that we are looking at, why Mr. Talburt
17   would have sent you these emails?
18   A.   Because he was in the grievance process
19   following discipline he received.
20   Q.   Okay.
21              MR. GREENFIELD:  One moment.
22              Do we have Exhibit 15-A, the physical
23   copy, available?
24              I just wanted to make sure I had the right
25   thing, your Honor.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 202 of 367   PageID 14429
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                        Page 768

```
 1  BY MR. GREENFIELD:
 2  Q.   Ms. Carter's counsel asked you several
 3  questions about that stack of documents right there.
 4       Do you remember those?
 5  A.   Yes.
 6  Q.   Is it fair to say, generally, you said that the
 7  contents of the writings in those posts, you believe
 8  them to be protected activity, correct?
 9  A.   Yes.  The ones that I could read.
10  Q.   Did you turn in Ms. Carter at any point after
11  receiving any of those messages?
12  A.   Prior to February 2017, no.
13            MR. GREENFIELD:  Thank you.
14            I pass the witness, your Honor.
15            THE COURT:  All right.  Mr. McKeeby.
16                  CROSS-EXAMINATION
17  BY MR. McKEEBY:
18  Q.   Hello, Ms. Stone.
19  A.   Hello.
20  Q.   Yesterday you indicated you were represented by
21  counsel.  Who did you mean?
22  A.   Mr. Joe Gillespi.
23  Q.   And is he here today in the courtroom?
24  A.   Yes, sir, he is.
25  Q.   You understand I represent Southwest Airlines,
```

 1  correct?

 2  A.   Yes, sir.

 3            MR. McKEEBY:  Can we pull Exhibit 66?

 4            And this has been admitted.

 5  BY MR. McKEEBY:

 6  Q.   This is your complaint?

 7  A.   Yes -- not in its entirety.  There is, I

 8  believe, a second page.

 9  Q.   Okay.  The page where you -- you mean the page

10  where you clarify the -- your political views on

11  abortion, is that what you are talking about?

12  A.   That one, but there is -- the document that I'm

13  looking at doesn't finish the last sentence, so I

14  still think there is a second page to this.

15  Q.   Okay.  There -- you can go to the next page,

16  662.  Is that what you mean?

17  A.   Yes.

18  Q.   Okay.  So back to 661, please.

19       Can you read for the jury the first sentence of

20  the second paragraph that begins with "The

21  messages."

22  A.   "The messages contain two graphic videos of an

23  alleged aborted fetus and make references to murder

24  as well as political and religious comments."

25       The first two are the actual messages she sent

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 204 of 367   PageID 14431
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 770

1  me and the bottom two are the links that they came

2  from.

3            MR. McKEEBY:  Okay.  If you could pull

4  66.3.

5  BY MR. McKEEBY:

6  Q.   That is one of the two messages you reference,

7  correct?

8  A.   Yes.

9  Q.   And that is part -- or at least that is a still

10 shot of the video that -- a snippet of which was

11 shown to you yesterday, correct?

12 A.   Yes.

13 Q.   And -- by the way, who is this woman, a

14 woman -- do you know who Samina Shah is?

15 A.   No, sir.

16 Q.   Can you read the text below her name?

17 A.   Aborted baby alive, even after the abortion.

18 This is the reason abortion is murder and -- I don't

19 know what that last word it.

20 Q.   It cuts off.  Okay.

21       Did you understand that Ms. Carter authored

22 that or did you know one way or the other?

23 A.   I don't -- I don't know.

24 Q.   Okay.  But that is part of what she sent you?

25 A.   Yes.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 205 of 367   PageID 14432
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 771

```
1              MR. McKEEBY:  And if we can go to 66.5.
2   BY MR. McKEEBY:
3   Q.   Is this a still shot of the second video?
4   A.   Yes, sir.
5   Q.   And what is the reference below about
6   Democrats?  Can you read that?
7   A.   Hashtag Democrats, this is what you support,
8   question mark, if it is dot, dot, dot.
9   Q.   Did --
10             MR. McKEEBY:  You can take it down.
11  BY MR. McKEEBY:
12  Q.   Did you watch this video as well?
13  A.   I did eventually watch it, yes.
14  Q.   When did you watch it?
15  A.   I think it was a day or two after.  I mean it
16  was the next day after I had seen part of the first
17  one.
18             MR. McKEEBY:  You can take it down.
19  BY MR. McKEEBY:
20  Q.   So a day or two after you watched part of the
21  first one.  Where were you when you watched the
22  second one?
23  A.   I was in -- I was in a hotel room, the room I
24  was staying in at the conference center out of
25  Baltimore-Washington International Airport.
```

1  Q.   Okay.  The first video you watched at the

2  airport, is that correct?

3  A.   Part of it.

4  Q.   Part of it.

5       Was the amount that you saw during the trial

6  yesterday, was that representative of the amount of

7  time that you viewed --

8  A.   Roughly.  I know there was a lot of how many

9  seconds.  I don't -- and I don't recall.  And I --

10 Q.   You said that.

11 A.   Yes.  I ---

12 Q.   Okay.

13 A.   It was enough to see the images and understand

14 what they were, and to have to go pull myself

15 together.

16 Q.   I will bet Mr. Pryor was going to ask you this

17 question, but I will ask you first:  Why did you go

18 back and watch the second video?

19 A.   Because I felt like I needed to see exactly

20 what she sent me.

21 Q.   Okay.  So you talked about --

22          MR. PRYOR:  I'm sorry.  Was the witness

23 finished with her answer?

24 BY MR. McKEEBY:

25 Q.   I understand the witness to be finished.  Do

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 773

1   you have more to say?

2   A.    No, sir.

3   Q.    Thank you.

4         You talked about earlier today, I think, of a

5   telephone conversation with representatives of

6   Southwest Airlines after you made the complaint

7   about Ms. Carter, correct?

8   A.    Yes.

9   Q.    And who was on that call?

10  A.    Ed Schneider, who was the Denver-based manager,

11  which is where Ms. Carter was based.  I believe

12  Suzanne Stephenson, the Las Vegas-based manager.

13  Denise Guttierez, from employee relations at

14  Southwest Airlines.  And at some point, after they

15  notified me that I could have a union rep present,

16  and if I wanted one, I -- Brett Nevarez joined me on

17  the call.

18  Q.    Okay.  How long was the call?

19  A.    It felt like forever.  It was -- maybe 15ish

20  minutes; I don't, I don't ---

21  Q.    Now, did you have an understanding that

22  Mr. Schneider was the base manager for Denver?

23  A.    Yes.

24  Q.    What was your understanding of why he was on

25  the call?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 774

1   A.   Because that is the base where Ms. Carter was

2   at the time.

3   Q.   Okay.

4   A.   So he was the highest leadership in the Denver

5   base, her base.

6   Q.   And you reported it to Las Vegas?

7   A.   Yes.  I reported it to my base manager.

8   Q.   That was Miss Stevenson?

9   A.   Yes.

10  Q.   Prior to that telephone call, had you had any

11  interactions with Mr. Schneider before?

12  A.   I had met him.  I had met, at points or

13  another, most of in-flight managers, a lot of

14  supervisors.  I hadn't been based in Denver.  I

15  never directly worked with -- I can't recall a

16  situation where I directly worked with him, but I

17  had met him through the nature of my position.

18  Q.   What about Ms. Guttierez, had you met her

19  before?

20  A.   I had not -- no, I had never met her.  I mean,

21  I think that may have been the first time I had ever

22  spoken to her on the phone.

23  Q.   Who did most of the talking during that phone

24  call?

25  A.   Most of it was Mrs. Guttierez asking me

1  questions.

2  Q.   Okay.  Did she ask you if you had ever spoken

3  to Ms. Carter about abortion?

4  A.   Yes.

5  Q.   What did you say in response?

6  A.   I told her I had not.

7  Q.   Did Mr. Guttierez ask you what you wanted

8  Southwest Airlines to do about it?

9  A.   She asked something in that vein or what my

10 purpose of reporting this was.  And I think I -- to

11 the best of my recollection, listed that I wanted it

12 to stop.  That I -- I -- I didn't want this to

13 happen again.

14 Q.   Were you concerned that -- I'm sorry.  I didn't

15 mean to cut you off, if I did.

16 A.   I don't remember if I said it at that point.

17 One of -- one of my biggest concerns was that those

18 messages were going to be sent to another flight

19 attendant that was at that Working Women's Committee

20 meeting, and also attended the march.

21 Q.   Did you ask Ms. Guttierez or tell Ms. Guttierez

22 you thought Ms. Carter could be fired for what she

23 did?

24          MR. PRYOR:  Object, leading.

25          THE COURT:  I will allow it.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 210 of 367   PageID 14437
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 776

```
 1            THE WITNESS:  No.  I did not.
 2  BY MR. McKEEBY:
 3  Q.   Was that your desire?
 4  A.   No.  It was to make it stop and to not have her
 5  harass anybody else in the ugly way I had been
 6  harassed.
 7  Q.   When you pulled up the video at the airport,
 8  was that -- what device were you using?  Was that a
 9  laptop or something else?
10  A.   My personal -- it was my cell phone.
11  Q.   Your cell phone.
12       And was there any audio associated with the
13  video at the airport?
14  A.   To my recollection, yes.
15  Q.   What do you recall hearing?
16  A.   The comment that you had me read underneath one
17  of them about -- that said something about the baby
18  still being alive.  There was -- my recollection,
19  there was somebody in the background making comments
20  along those lines, Look, it is still moving.
21  Q.   Thank you.
22       You told Mr. Greenfield about your personal
23  beliefs regarding abortion a few minutes ago,
24  correct?
25  A.   Yes.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 211 of 367   PageID 14438
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 777

```
1   Q.   Had you ever discussed those views with

2   Ms. Carter?

3   A.   No.

4   Q.   Did she ever ask you what your views on

5   abortion were prior to sending those videos?

6   A.   No.

7   Q.   Did she ever discuss Planned Parenthood with

8   you?

9   A.   No.

10  Q.   Did she ever discuss the Women's March in

11  Washington with you prior to sending those videos?

12  A.   No.

13  Q.   I will change the subject and we can talk about

14  pink hats.

15             MR. McKEEBY:  Can you pull up Exhibit 47,

16  please?

17             MR. McKEEBY:  Southwest would move to

18  admit 47.

19             THE COURT:  Forty-seven.  Any objection

20  from union or Carter to 47?

21             MR. PRYOR:  Just one second.

22             THE COURT:  You bet.

23             MR. PRYOR:  No objection.

24             THE COURT:  Mr. Greenfield?

25             MR. GREENFIELD:  No, your Honor.
```

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 212 of 367  PageID 14439
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 778

```
 1              THE COURT:  Okay.  Forty-seven is in.  We
 2   will publish.
 3              (The referred-to document was admitted in
 4         Evidence as Trial Exhibit 47.)
 5   BY MR. McKEEBY:
 6   Q.   Can you describe to the jury what this is?
 7   A.   It is one of the messages that were sent in the
 8   batch that Ms. Carter sent me along with the two
 9   videos that we discussed.
10   Q.   And did you send this at some point to
11   Southwest as well?
12   A.   Yes.
13   Q.   And did you understand that these addresses are
14   intended to depict female genitalia?
15   A.   Yes.
16   Q.   Did you wear a hat like that when you marched
17   in Washington?
18   A.   No.
19   Q.   Do you know of any Southwest Airlines's
20   employee/flight attendant who marched with you in
21   Washington wore a hat like that or a headdress?  I'm
22   not sure what it is.
23   A.   No, not the ones -- not anyone I saw.
24   Q.   And let me clarify.
25        How about anybody at all at the march, did you
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 213 of 367   PageID 14440
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 779

 1  see anyone wearing a hat like this?

 2  A.    No.

 3  Q.    Did you wear a hat at the march?

 4  A.    Yes.

 5  Q.    Did you -- where did you get that hat?

 6  A.    Some of the ladies had knitted -- knitted hats.

 7  It was January in DC.  It was cold.  And they had

 8  knitted and distributed them to all of the ladies

 9  who volunteered to stay for the march.

10  Q.    Okay.  Did you -- when you say "the ladies,"

11  were those fellow flight attendants?

12  A.    Yes.  People that attended the Working Women's

13  Committee meeting earlier that week.

14        MR. McKEEBY:  Can we pull Exhibit 56,

15  which I think is in evidence.

16        THE COURT:  Fifty-six is in.  You can

17  publish.

18        MR. McKEEBY:  Publish 56.

19        And can we go to 56.8?

20  BY MR. McKEEBY:

21  Q.    Do you recognize yourself in that picture?

22  A.    Yes.

23  Q.    Where are you?

24  A.    I'm on the far right.

25  Q.    And are those the hats that you were talking

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1  about?

 2  A.    Yes.

 3  Q.    This is what you wore in Washington?

 4  A.    Yes.

 5  Q.    Are these all fellow flight attendants depicted

 6  here?

 7  A.    Yes.

 8            MR. McKEEBY:  Go to Exhibit 94.  I will

 9  move to admit 94.

10            THE COURT:  Any objection to 94?

11            MR. PRYOR:  No objection.

12            MR. GREENFIELD:  If I can have one moment,

13  your Honor.

14            THE COURT:  You may.

15            MR. GREENFIELD:  No objection from the

16  Union.

17            THE COURT:  All right.  Ninety-four is in.

18  You can publish.

19            (The referred-to document was admitted in

20       Evidence as Trial Exhibit 94.)

21  BY MR. McKEEBY:

22  Q.    Ms. Stone, what is this document?

23  A.    During the initial phone call with Southwest

24  Airlines that we spoke about earlier, I was asked if

25  Ms. Carter had ever sent me any other communications
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 215 of 367   PageID 14442
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 781

1   via on Facebook and I answered yes.  And I was asked

2   to send -- send them all to Southwest Airlines.

3        And I think this was one of them, to my

4   recollection.  There were so many, I think that I

5   had to send them in batches.

6   Q.   So this is another batch of those historical

7   emails that Southwest asked you to provide?

8   A.   Facebook messages.

9   Q.   I'm sorry.  Facebook messages.

10  A.   Yes.

11  Q.   I don't think counsel went over these with you.

12  And I'm not going to ask you if they are protected,

13  or union activity.  I just kind of want to know what

14  they are.

15       So, I mean, if you are okay with that, I'm

16  going to go through a couple of these.

17       94.2.  The blue mark is by something

18  referencing carpet bombing again.

19       Can you describe to the jury what that is

20  about?  If you know.

21  A.   I'm not certain exactly what she meant by

22  "carpet bombing."

23       I know that the -- this thread was implying

24  that if we didn't like how election results turned

25  out, that we would just somehow get rid of that --

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 216 of 367   PageID 14443
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 782

1  you know, get rid of that person, overturn the
2  election.
3  Q.   But this is an email that Ms. Carter --
4  sorry -- a Facebook message that Ms. Carter sent to
5  you?
6  A.   Yes.
7  Q.   And so the next page, we have an appearance by
8  Albert Einstein.  Do you know what this post is
9  about or message is about?
10 A.   She says that it is how she feels about me and
11 the rest of the board, pure evil.
12 Q.   Did you understand at the time or do you
13 understand now, the relevance to the, I guess, quote
14 from Albert Einstein?
15 A.   I -- his quote references evil.
16 Q.   Okay.
17 A.   But outside of that, I don't.
18 Q.   The next page, 94.4.  It looks like this
19 involves something about the residence of the
20 representative in Denver.
21      Do you have a sense of what that was about?
22 A.   Yes.  A discussion yesterday about the elected
23 Dallas domicile executive board member.  It was
24 regarding the actual address of where domicile
25 executive board members reside.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 217 of 367   PageID 14444
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 783

1   Q.   Why was that significant?

2   A.   Because the Dallas domicile executive board

3   member that was removed -- similar to the way the

4   union had removed another domicile executive board

5   member in the past, who did not actually live, not

6   only in the town, but in the state, where they

7   represented.

8         She was trying -- I'm assuming to say that the

9   Denver rep -- I don't -- I actually -- I don't

10  understand because the Denver rep does not live in

11  Dallas, that is true.  The Denver rep lives in

12  Denver.

13        The -- one of the other former -- Andrea, I'm

14  assuming she refers to the former Dallas domicile

15  executive board member, Andrea Garnett, whose

16  physical address isn't Dallas proper.  It is west

17  of -- of Dallas, as I'm sure many people's addresses

18  in here are.

19        It goes on to talk about me, and that is just

20  false information.  I lived in Baltimore when I was

21  the Baltimore domicile executive board member.

22  Q.   If you go to 94.7.  There is a reference in the

23  second message about, Hoping that people file

24  charges against you.

25        Do you recall that message?

1   A.    Yes.

2   Q.    What is it about?

3   A.    I believe filing charges against -- against the

4   board in a similar way that Mr. Greenfield had me

5   walk through if there is a process within the union

6   that a member could file charges against another

7   member.

8   Q.    Now, there is more in here, but I will let the

9   jury decide if they want to wade through this.

10        Did you report any of these communications from

11  Ms. Carter to Southwest Airlines?

12  A.    Prior to them requesting them as --

13  Q.    Yes.  At the time that they were sent, did you

14  complain to Southwest Airlines about any of these

15  messages?

16  A.    No.  I did not.

17  Q.    Well, why not?

18  A.    There were a lot of people unhappy with things.

19  And a lot of flight attendants that sent me, even

20  through official union channels, angry, ugly

21  comments.

22        And I knew that part of my job in being in a

23  leadership position, especially being the top leader

24  in the hierarchy of our local union, that their --

25  that was part of the job, was dealing with angry and

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 785

1   unhappy people.  And that there were always going to
2   be angry and unhappy people in the membership for a
3   variety of reasons.  And that I needed to work as
4   best I could to just work it out as much as I could
5   and focus on doing the business of the union and
6   working.
7   Q.    I'm sorry.  And working?
8   A.    Yes.
9   Q.    Can you tell the jury a bit about the Women's
10  Committee, what is that?
11  A.    It was actually established by
12  TW International, with the exception of -- at the
13  time, our local -- most of the local unions within
14  TW International -- TW stands for Transport Workers
15  Union -- most of those unions are incredibly male
16  dominated.
17        Airline mechanics, train drivers, bus
18  operators.  We were the only one whose demographic
19  was the opposite, primarily women.
20        So TW International had formed a committee to
21  try to help the members in the various TW locals
22  focus on issues that were specifically affecting
23  women because I think they felt like they didn't
24  have a lot of that representation in their
25  workplace.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Page 786

1        So it started through -- through them.  And
2   then was formed as -- at some point along the way, a
3   Local 556 committee.
4   Q.   Was that one of the joint committees that we
5   heard some testimony about earlier?
6   A.   No.  It was not a joint committee.
7   Q.   It was an exclusive Local 556 committee?
8   A.   Yes.
9   Q.   And was there a committee meeting, a Women's
10  Committee meeting, in Washington in January of 2017?
11  A.   Yes, there was.
12  Q.   What was the purpose of that meeting?
13  A.   The meeting was held at TW International
14  headquarters, in conjunction with the then
15  TW International Working Women's Committee
16  chairperson, who was also a TW 556 member and
17  Southwest flight attendant.
18       She was working full time for the international
19  union.  I'm sorry, she has since passed away.
20       So we went and worked with our local
21  chairperson to coordinate that meeting in DC to
22  bring in a number of speakers to talk to our flight
23  attendants who were in attendance.
24       One of our speakers was Liz Shuler, who is now
25  the president of AFL-CIO.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 3 July 07, 2022                  Page 787

1      Working America was one of the groups that we
2  spoke with.
3      And it was also to try to build up our local
4  committee.  And prior to that, we had not had people
5  show interest.
6      Every three years, as part of the election
7  cycle, we take letters of interest for the committee
8  chairperson's position, and there was one year that
9  nobody even submitted for the chairperson position
10  of our local committee.  So I ended up taking it on,
11  amongst my other duties, because nobody was
12  interested.
13      And we had had -- the chairperson at that time
14  had a number of flight attendants reach out asking
15  about the committee.  There seemed to be a general
16  interest.
17      So it was to kind of help really build that and
18  see what the committee could be doing on behalf of
19  our members.
20  Q.   Was there a particular day of the week that
21  that committee meeting was held?
22  A.   I believe that committee meeting -- I'm not a
23  hundred percent -- I believe it was on Thursday.
24  Q.   And when was the Women's March?
25  A.   Saturday.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 222 of 367   PageID 14449
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 788

1  Q.   And what was the connection between the Women's

2  Committee meeting on perhaps the Thursday, and the

3  Women's March on Saturday?

4  A.    Initially, I guess some of the -- some of the

5  flight attendants had reached out to the chairperson

6  of the committee showing interest in going to the

7  Women's March and asking if our union had talked

8  about that.

9       She came to me and asked me -- asked me about

10 it.  And I said that I didn't believe going to the

11 march was official union business.  That if she

12 wanted to work with TW International, and actually

13 host a meeting and conduct -- you know, have an

14 agenda and conduct union business, and if people in

15 attendance chose to stay over and volunteer their

16 time, they could do that.

17      She was working on some of the volunteer

18 opportunities for the flight attendants to do while

19 we were in DC.  But that is ultimately what

20 happened.

21 Q.   Okay.  Did you attend the entire march?

22 A.    No, I did not.

23 Q.   Did you see Ms. Carter when you were in

24 Washington?

25 A.    No.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1 | Q.   Did you later have an understanding that she

2 | was in Washington?

3 | A.   I --

4 |         MR. PRYOR:  Object, limine issue.

5 |         MR. McKEEBY:  This is a yes or no.  She

6 | doesn't sound like she knows.

7 |         THE COURT:  Yeah.  You can answer yes or

8 | no.

9 |         THE WITNESS:  I don't remember.

10 | BY MR. McKEEBY:

11 | Q.   Ms. Stone, we had not met face to face before

12 | this trial, had we?

13 | A.   No.

14 | Q.   We had a Zoom call, I think it was last week,

15 | prior to the trial, did we not?

16 | A.   Yes.

17 | Q.   And your attorney, Mr. Gillespie, was on that

18 | call?

19 | A.   Yes.

20 | Q.   And I told you during that call I was going to

21 | do something that I didn't want to do, did I not?

22 | A.   Yes.

23 | Q.   Okay.  I would like to pull the second video,

24 | Number 49, and publish it, and enter it as an

25 | exhibit.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 790

```
 1              THE COURT:  Any objection to 49 that is
 2   not in evidence yet?
 3              MR. PRYOR:  Object to the playing of the
 4   video beyond what she says she viewed.
 5              THE COURT:  I understand that objection.
 6   Any other objection to 49?
 7              MR. GREENFIELD:  No, your Honor.
 8              THE COURT:  Okay.  I will overrule that
 9   objection.  And 49 is in evidence and you can
10   publish as much of which it as you wish.
11              (The referred-to document was admitted in
12         Evidence as Trial Exhibit 49.)
13              MR. McKEEBY:  Okay.  Go ahead.
14         (Thereupon, the video clip was played.)
15              MR. McKEEBY:  You can turn it off.
16   BY MR. McKEEBY:
17   Q.   I saw that you turned your eyes and I
18   understand that.
19         Did you see enough to recognize that as the
20   video?
21   A.   Yes.
22   Q.   During the phone call that you mentioned with
23   Mr. Schneider and Ms. Guttierez, did they ask you
24   about the impact of those videos on you?
25   A.   Yes, I believe so.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 225 of 367   PageID 14452
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 791

```
 1  Q.   And did you tell them?

 2  A.   Yes.

 3            MR. McKEEBY:  I have no further questions,

 4  Your Honor.

 5            Thank you, Ms. Stone.  I'm sorry to have

 6  done that.

 7            THE COURT:  Thank you.

 8            It is time for our afternoon break.  So

 9  what I will do, is I will call it now.

10            Then we can reset, and you can ask

11  questions round two, Mr. Pryor.

12            Same instructions:  You can talk to your

13  fellow jurors, court personnel about this case.

14  Don't talk to anyone else.  Don't do any research

15  about the case.

16            All rise for the jury.

17            We will see you in 10 minutes at 3:02.

18            (The jurors exited the courtroom.)

19            THE COURT:  You are excused.  You just

20  can't talk to anyone about the case.

21            Can we get Exhibit 15-A back from you?  We

22  need to color scan that, and then we will give

23  everyone a copy of it.

24            My apologies.

25            No, that's fine.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 226 of 367   PageID 14453
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 792

 1              Anything we need to take up before the

 2   break?  Okay.  We are in recess, we will see you at

 3   3:02.

 4              (Recess.)

 5              THE COURT SECURITY OFFICER:  All rise.

 6              THE COURT:  Anything before we bring in

 7   the jury?  Okay.

 8              Let us bring them in.

 9              And, Mr. Pryor, you can go ahead to the

10   podium.  I just want to shave down as much time as

11   possible.

12              And by the way, so when we finish round

13   two, I have got to ask if anyone has a round three.

14   I recommend you don't use a round three for shot

15   clock reasons, but I will ask if anyone had a round

16   three.

17              MR. McKEEBY:  You mean with this witness?

18              THE COURT:  Yes.

19              (The jurors entered the courtroom.)

20              THE COURT:  Okay.  You can be seated.

21              Okay.  Mr. Pryor, round two.  It is your

22   chance.

23                    REDIRECT EXAMINATION

24   BY MR. PRYOR:

25   Q.   Ms. Stone, would you be surprised that if I

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 227 of 367   PageID 14454
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 793

1    sent you a bloody horse head that said, "I'm for the

2    recall petition," that that would be a crime?

3         If I have killed a horse, I have cut it up and

4    I have put its bloody carcass in your house with a

5    message, that is a crime, right?

6              MR. McKEEBY:  Object, it requires a lay

7    person to give a legal conclusion.

8              THE COURT:  I will let her answer, if she

9    has personal knowledge.

10             THE WITNESS:  I don't know if killing a

11   horse and cutting off its head is a crime.

12   BY MR. PRYOR:

13   Q.   When asked for your personal knowledge and

14   beliefs about a variety of other laws that counsel

15   asked you about, you knew the answer.

16        But you can't tell me that killing a horse and

17   putting a bloody horse in your house with a message

18   that you have no idea?

19             MR. McKEEBY:  Objection, asked and

20   answered.  And I don't know what part of it --

21             THE COURT:  Sustained.

22   BY MR. PRYOR:

23   Q.   So Jeanna Jackson.  Let's look at 21-O.

24        21-O, I can bring it up to you.  Here.

25             THE COURT:  I'm not sure O is.  It's just

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 228 of 367   PageID 14455
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 794

 1  for the witness?

 2              MR. PRYOR:  Yes -- well, no, it is for

 3  everyone.  I just don't want to wait for the --

 4              THE COURT:  I understand.  You can

 5  approach the witness, that is fine.

 6              MR. PRYOR:  I'm not terribly patient when

 7  on the clock.

 8              THE COURT:  I appreciate that.

 9              MR. PRYOR:  But I will wait.

10              THE COURT:  I have got the jury screens

11  muted, so you can show it to everyone but the jury.

12              MR. PRYOR:  Well, I move for the admission

13  of 21-O.

14              THE COURT:  21-O, same objections as to

15  the other 21 exhibits from Union and Southwest?

16              Okay.  So 21-O, I will admit over

17  objection and say it is limited to the claims

18  against the Union; it is not relevant to the claims

19  against Southwest.  And you can publish 21-O.

20              (The referred-to document was admitted in

21      Evidence as Trial Exhibit 21-O.)

22  BY MR. PRYOR:

23  Q.   There it is.

24       So this -- do you recognize this document as a

25  document that talks about charges being brought by

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 3 July 07, 2022                      Page 795

1  the union against Jeanna Jackson?

2  A.   Yes.

3  Q.   And Jeanna Jackson is the one that we saw

4  numerous emails that you were on where attempted

5  charges were repeatedly brought to the attention of

6  Southwest Airlines?  That's the same person, right?

7           MR. GREENFIELD:  I'm sorry, objection,

8  your Honor.

9           THE COURT:  Basis?

10           MR. GREENFIELD:  This is outside the scope

11  of either mine of Mr. McKeeby's examination of

12  Ms. Stone in regard to charges brought by the union.

13  Neither of us talked about that.

14           MR. PRYOR:  They absolutely talked about

15  Jeanna Jackson --

16           THE COURT:  Can you explain what you mean

17  by that and -- in re-asking your question?

18           MR. PRYOR:  Okay.

19           THE COURT:  Explain what you mean by

20  "charges brought."

21           MR. PRYOR:  Oh, by charge -- oh.

22  BY MR. PRYOR:

23  Q.   I can read it.  The union has examined the

24  charges and found them to be proper.

25      Charges are being brought against Jeanna

 1   Jackson by the union.

 2        Do you understand that?

 3   A.   Charges are brought about from a member of the

 4   union against another member.

 5   Q.   Okay.

 6   A.   It is not the union itself that brings charges.

 7   Q.   Okay.  So do you recall who brought the charges

 8   against Jeanna Jackson?

 9        MR. GREENFIELD:  Objection, Your Honor.  I

10   renew my scope objection, and also would like to

11   assert relevance.

12        THE COURT:  I think it is close enough.

13   Proceed.

14        MR. MORRIS:  I'm sorry?

15        THE COURT:  I think it is close enough.

16   Proceed.

17        You can answer.

18        THE WITNESS:  I don't remember who brought

19   charges against Jeanna.

20   BY MR. PRYOR:

21   Q.   Do you recall that, in fact, this says that,

22   The charges were found sufficient to require a trial

23   for Sister Jackson.

24        Did that happen?

25        You don't know?

1   A.   I believe there was a trial, yes.

2   Q.   You believe there was a trial and you know the

3   result, don't you?

4   A.   I do not -- this isn't a document I have looked

5   at since 2017.  I don't recall the details of this.

6   Q.   I didn't ask you the details.  I asked you, was

7   there a trial?

8   A.   I think so.

9   Q.   You don't think so, you know so?

10            MR. GREENFIELD:  Objection, asked and

11   answered.

12            MR. PRYOR:  I'm testing her answer.  She

13   absolutely knows.

14            THE COURT:  Test it once.

15   BY MR. PRYOR:

16   Q.   Did you know?

17   A.   I think there was a trial.

18   Q.   So this person you had been on emails where you

19   had been trying to get the company to do something

20   against her for months, the union -- your union has

21   a trial, and you only think there was a trial?

22   Right?

23            MR. GREENFIELD:  Objection, your Honor,

24   asked and answered.

25            THE COURT:  Sustained.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 232 of 367   PageID 14459
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 798

1  BY MR. PRYOR:

2  Q.   And this trial that you think occurred, you

3  also know the results of that trial that you think

4  occurred, don't you?

5  A.   Yes.

6  Q.   Okay.  So I just want to make sure we are

7  clear.  You weren't sure there was a trial, but you

8  are sure of what the result of the trial was, right?

9  A.   Yes, sir.

10 Q.   And that is pretty interesting, don't you

11 think?

12         MR. GREENFIELD:  Objection, your Honor,

13 argumentative.  Sidebar.

14         THE COURT:  Sustained.

15 BY MR. PRYOR:

16 Q.   And the result was that she was put on some

17 type of suspension that prevented her from running

18 for office in the next election, true?

19 A.   No.  It is not a suspension under the

20 TW International constitution.

21     As I mentioned earlier, one of the results of a

22 trial, if the members find a member to be guilty

23 and -- of the charges presented, one of the

24 disciplines or impact to that can be that they are

25 made a member in bad standing, which means they

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 233 of 367   PageID 14460
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 799

1  can't attend union meetings, they can't hold a union

2  position and they couldn't run for office.

3  Q.   I'm sorry, I used the wrong phrase.

4       But the point is, that the charges' result --

5  or the result of the trial was she didn't qualify to

6  run for the next election because she was in bad

7  standing?

8            MR. GREENFIELD:  Objection, your Honor.

9  If we can have a sidebar, please.

10           THE COURT:  You may.

11           (Thereupon, the following proceedings were

12      had at sidebar:)

13           MR. GREENFIELD:  I would like to renew my

14  scope objection at this time.  I believe we now are

15  outside of it.  We are talking about a document --

16  excuse me -- a document from November 2016.  This

17  was well after Carter's termination and it is what

18  Ms. Carter was terminated for and the reasons why

19  she was terminated, after she was gone.

20           THE COURT:  Jeanna Jackson can be within

21  the scope.

22           MR. PRYOR:  Exactly.  Jeanna -- they

23  raised Jeanna Jackson, acting like she had little or

24  no involvement in it.  And I'm entitled to now

25  follow up on what -- I talked about all her

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 234 of 367   PageID 14461
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 800

1   complaints about Jeanna Jackson.  They followed up.

2   Now I'm following on what they did.  I'm showing,

3   no, there is even more.

4            THE COURT:  I will let you do it.  I think

5   it is a really crummy use of your time.  You are

6   taking time away from your client.

7            MR. PRYOR:  If you think it is a crummy

8   use of our time --

9            THE COURT:  Every question you are asking

10  is a question you are not going to ask your client

11  when she's on the stand.  You are making it all

12  about this one witness.

13           Again, if you want to do it, I think it is

14  of marginal value.  I get it.  That is why I put the

15  time clock on you.  You can choose to do more

16  important things.

17           MR. PRYOR:  I'm past the representing my

18  client.  And I understand your opinion of our case,

19  but I'm the one that is charged with presenting it.

20  I know you are charged with judging it.  I believe

21  it is important.  I will get away from it as quickly

22  as possible, but I am concerned that you don't see

23  it as terribly relevant.

24           THE COURT:  Go forth.

25           (Thereupon, the sidebar was concluded and

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1        the following proceedings were held in open
 2        court:)
 3             THE COURT:  You can proceed.
 4   BY MR. PRYOR:
 5   Q.   You told me the Southwest Airlines
 6   Investigating Committee that -- you said you didn't
 7   say that you wanted -- that you wanted Charlene
 8   Carter fired, you said that you just wanted it to
 9   stop.
10        The only thing she ever did was send you
11   messages, correct?
12   A.   Yes.
13   Q.   And if you -- if that is all you wanted, all
14   you had to do was block her, true?
15   A.   Could have stopped the message coming to my
16   Facebook.  I was concerned about her sending those
17   images to other flight attendants that had been in
18   attendance with me, one of whom --
19   Q.   You wanted to stop her.
20        And by the way --
21   A.   May I finish?
22             THE COURT:  You may finish.
23   BY MR. PRYOR:
24   Q.   She never said --
25             THE COURT:  Hold on.  She can finish.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 236 of 367   PageID 14463
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 802

1              MR. PRYOR:  Oh, I thought she was

2    finished.  Go ahead.

3              THE WITNESS:  One of whom was very visibly

4    pregnant at the march.  And blocking Charlene would

5    not have prohibited her from turning around and

6    sending that to any of the other women that were

7    with me.

8    BY MR. PRYOR:

9    Q.   So Charlene sends these communication to her

10   union president.  Every message she ever sent you,

11   she sent to you in a private message, not for anyone

12   else.  No one could else open it.  True?

13   A.   Via Facebook, yes.

14   Q.   Okay.  So every Facebook message she sent was

15   to you, and it was private.

16        Do you have anything to tell this jury that she

17   sent those messages to anyone else?

18   A.   I never stated that.  I said I was worried

19   about that.

20   Q.   So you were worried about that, but it

21   certainly wasn't something that had ever occurred.

22   And you could have blocked her?  Right?

23              MR. GREENFIELD:  Objection, your Honor,

24   lack of foundation as to Ms. Stone's knowledge about

25   what Ms. Carter sent to any other individual.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1              THE COURT:  I will overrule that.

2   BY MR. PRYOR:

3   Q.   You can answer.

4   A.   I don't know.  I don't know if she had ever

5   communicated with any of the women that there were.

6   Q.   So what I'm asking, ma'am, is to your

7   knowledge -- to your knowledge -- did Charlene

8   Carter send any of the messages she sent to you to

9   anyone else?

10  A.   No, not to my knowledge.

11  Q.   Counsel asked you if Charlene Carter knows your

12  views on abortion, and I can't remember the other

13  questions.  But what she was sending you was

14  complaints about her union, she didn't want her

15  union spending money on a march that was sponsored

16  by Planned Parenthood.  It wouldn't matter what your

17  views on abortion were for that, would it?

18  A.   Can you repeat the question, please?

19  Q.   Yes.

20       Your views on abortion are not relevant to what

21  the Union -- what Charlene Carter viewed as the

22  Union spending money going to a Women's March

23  sponsored by Planned Parenthood, and her dues money

24  was being used for that.  That was her complaint.

25  Your views on abortion don't affect that, right?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

 1                  MR. McKEEBY:  Objection, this is argument.

 2                  THE COURT:  I will allow that.

 3                  MR. GREENFIELD:  Your Honor, if I may

 4    object, counsel is inserting --

 5                  THE COURT:  No speaking objections.  What

 6    is your basis?

 7                  MR. GREENFIELD:  Counsel is testifying

 8    with legal conclusion.

 9                  THE COURT:  That is fine.  I will overrule

10    that.  You can answer the question.

11    BY MR. PRYOR:

12    Q.   You can answer.

13    A.   The Union didn't spend union dues on the march.

14    Q.   That wasn't my question, was it, ma'am?

15    A.   It was in the question you asked me.

16    Q.   I'm talking about Charlene's concern, whether

17    she was right or wrong about the Union spending

18    money.

19         Although, you answered my question yesterday

20    that 20 women went up there on the Union's nickel,

21    but, gee, not for the march.  Well, that is not the

22    way Charlene viewed it.  But we can set aside that

23    debate.

24         From Charlene's view, the union was spending

25    money on that march, and that is what she was

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 239 of 367   PageID 14466
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 805

 1  complaining to you about.
 2       Your views on abortion do not relate to that
 3  complaint, true?
 4            MR. McKEEBY:  Same objection, this is
 5  argument.
 6            THE COURT:  I will sustain this one.
 7  BY MR. PRYOR:
 8  Q.  Does your view of abortion relate to Charlene
 9  Carter objecting to dues money being spent on the
10  Women's March, in her opinion?
11            MR. McKEEBY:  Same objection, and asked
12  and answered.
13            THE COURT:  I will allow this one.
14            MR. PRYOR:  Thanks, Judge.
15            THE WITNESS:  No.
16  BY MR. PRYOR:
17  Q.  Now, ma'am, let's up put up Exhibit 47 they
18  showed you a few minutes ago.
19       This is the anatomically correct hats.  And you
20  were asked the question of, Did you wear this hat?
21       You said no.
22       You were asked the question of, Did you see
23  anyone at the march wearing this hat?
24       You said, No.
25       But in fact, you know, because you testified

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 240 of 367   PageID 14467
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 806

1  yesterday, that you found out that, in fact, women

2  were wearing those hats at the march that your union

3  participated in, true?

4  A.   No, sir, that is not what I recall saying.  I

5  recall you talking about these images being from

6  women at the march.

7  Q.   Are you telling me, as you sit here today, that

8  you don't know that there were groups of women

9  wearing anatomically correct hats at the Women's

10  March?  Whether you saw them or not, you found out

11  that that, in fact, happened?

12  A.   After the march, yes, I did find that out.

13  Q.   Okay.  And Charlene was complaining about that

14  occurring at a march that her union was at and she

15  thought it reflected bad on the union.

16       That is her complaint, right?

17  A.   Yes.

18  Q.   Let's look at Exhibit 94.

19       I'm going to hand you a hard copy of this.

20            MR. PRYOR:  May I approach?

21            THE COURT:  You may.

22  BY MR. PRYOR:

23  Q.   I'm going to ask you the same question I asked

24  you about Exhibit 15 today.  And that is, can you

25  look through this and tell me if there is any

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 241 of 367   PageID 14468
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 807

1  communication in here that you don't think is part

2  of Ms. Carter's rights to object to her union?  Or

3  complain to her union?  If you find a page, be sure

4  and tell me, and we will talk about it.

5  A.   All of her messages are complaining about the

6  union.  All of the written text.

7  Q.   Is there anything in there that you think is

8  not protected union activity on the part of

9  Ms. Carter?

10  A.   I don't believe that sending me videos of dead

11  babies is protected union activity.

12  Q.   Now, we can talk about that all you want,

13  ma'am -- and we are getting ready to -- but in this

14  exhibit, is there anything that is not

15  union-protected activity?

16  A.   These are in this exhibit, the comment I just

17  made.  And I just answered that I do not believe

18  that is protected union activity.

19  Q.   Which pages?

20  A.   The very back.  4264.

21  Q.   4264.

22       Okay.  Other than 4264, are there any other

23  communications in Exhibit 94 that you consider not

24  to be union-protected activity?

25  A.   I don't know what the last page is.  It is

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 242 of 367   PageID 14469
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 808

1  referencing -- so I don't think the last page is

2  either, what I can see on it.

3  Q.   The page talking about, Seek God now in prayer?

4  You don't know if that is related to union activity

5  or not?

6  A.   No.

7  Q.   Anything else?

8  A.   No, not that I see.

9  Q.   As to that last page, 4267, you don't recall

10 that the communication from Ms. Carter about Alveda

11 King and her opposition to abortion was relating to

12 her complaints regarding Planned Parenthood and the

13 Union's association with it at the march?

14 A.   No.  One of the exhibits that had a bunch of

15 stuff about King, I said that I had never seen that

16 before.

17 Q.   Okay.  Let's talk about the videos.

18      So you told me this morning -- or yesterday,

19 that one of the videos that you accidentally clicked

20 on to view was two or three seconds.  And we watched

21 that this morning, right?

22 A.   I never said I watched it for two or three

23 seconds.  I said I watched part of it when it

24 automatically started playing, which videos in

25 Facebook can do.

1  Q.   Okay.  Wait.  Facebook Messenger, you're

2  telling me now -- do you recall yesterday telling us

3  that you clicked on it inadvertently and that is

4  what made it start?

5  A.   You kept asking me questions about videos not

6  automatically playing, and I would have had to have

7  hit play.  And I answered that I must have

8  inadvertently hit it.

9      But there are times -- Facebook plays videos

10 without you going in and hitting play.

11 Q.   Your testimony is, you have gone on to Facebook

12 Messenger, opened it up, and the video was playing

13 before you click on the video?

14 A.   No.  I'm talking about within Facebook.  I

15 don't believe I have ever received other videos in

16 Facebook Messenger besides the one Ms. Carter sent.

17 Q.   I'm just trying to get an answer to my

18 question.  It is your testimony that that can happen

19 on Facebook Messenger?

20 A.   No, sir.  I am saying that within Facebook,

21 videos can automatically play.

22 Q.   And I'm asking about Facebook Messenger, which

23 is where you received this video.

24     You accidentally clicked on it, was what made

25 it play, true?

1  A.   I am still saying I don't know if I

2  inadvertently hit play.  My recollection, as I have

3  said over and over, was that it started playing when

4  I opened that thread with Ms. Carter in it.

5  Q.   Did you tell the Southwest investigating

6  committee that you looked at the message, saw what

7  it was about, didn't have time to look at the video,

8  and then clicked later?

9  A.   No.  That is not what I stated to them.

10  Q.   And today, you tell us that you immediately

11  stopped playing the video, the first video, and

12  then -- I don't know, was it the next day that you

13  go to your hotel room and you decide you do want to

14  watch the second video, and you click on it and

15  watch it?

16  A.   What I stated is that I saw enough of the first

17  video.  I instantly became upset.  I stopped playing

18  it.  Removed myself from the boarding area until I

19  pulled myself together.

20       And then, yes, later on -- I believe it was the

21  next day -- I went back in and watched everything in

22  its entirety, and read the accompanying text

23  messages.

24  Q.   So knowing what it was about, you made the

25  voluntary decision to watch these videos, true?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                          Page 811

 1  A.   At that point, yes.

 2  Q.   And were you doing it at that point because you

 3  wanted to see what happens to an unborn baby during

 4  an abortion?  Or because you wanted to use it to

 5  bring charges against Ms. Carter?

 6  A.   Neither.  I wanted to know exactly what had

 7  been sent to me, why it had been sent to me, what --

 8  where this was coming from.

 9  Q.   Okay.  Well, the messages told you why it was

10  sent to you.  And you could also look on the caption

11  below the video to see where it came from.  But you

12  also wanted to see what was in the video, true?

13          MR. GREENFIELD:  Objection, your Honor,

14  counsel is testifying.

15          THE COURT:  I will allow that.

16          THE WITNESS:  I had no idea why those

17  videos had been sent to me at the time I opened it

18  and started watching it.

19  BY MR. PRYOR:

20  Q.   So you watched the video, and you saw a baby

21  moving, true?

22  A.   In one of them.  It looked -- it appeared as if

23  the baby was moving.

24  Q.   It appeared that the baby was alive.  Movement

25  indicates life, true?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 246 of 367   PageID 14473
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 812

1  A.    Yes.

2  Q.    And if anyone wanted to tell their union

3  president -- forget your views on abortion -- but if

4  you wanted to tell your union president, Don't spend

5  our money on organizations that support this, and

6  you wanted to protect a baby's life, can you think

7  of a more effective means of doing it?  You have

8  cried every time you have talked about it.  What is

9  more effective?

10 A.    I don't think it was effective.  I think it was

11 harassment and disturbing.

12 Q.    It didn't change your view about abortion, did

13 it?

14         MR. GREENFIELD:  Objection, your Honor,

15 relevance.

16         THE COURT:  Sustained.

17         MR. PRYOR:  They asked her -- okay.

18 BY MR. PRYOR:

19 Q.    It didn't change your view that a woman should

20 get to decide whether or not to have an abortion?

21         MR. McKEEBY:  Objection, asked and

22 answered.

23         MR. GREENFIELD:  Object to relevance.

24         THE COURT:  Yeah, I will sustain that one.

25

```
 1  BY MR. PRYOR:
 2  Q.   Can you tell me a more effective means of
 3  trying to tell someone that abortion is taking a
 4  life than that -- I'm not saying you have to agree
 5  with it -- can you think of a more effective means
 6  of trying to convince someone that abortion is
 7  taking a life than the actual video of the life that
 8  is being taken?
 9            MR. GREENFIELD:  Objection, relevance as
10  well.
11            THE COURT:  I will allow that.
12            THE WITNESS:  It was only effective in
13  upsetting me.
14  BY MR. PRYOR:
15  Q.   I'm not asking --
16  A.   -- making me feel harassed.  It is not that I
17  think it is an effective tool.  I don't think that
18  should be utilized.
19  Q.   You don't think that -- can you tell us a more
20  effective means of doing it to convince someone --
21  something better than actual video, of me sitting
22  here and telling you statistics or anatomy lessons?
23  What is more effective than the video?
24            MR. GREENFIELD:  Objection, your Honor,
25  asked and answered.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 248 of 367   PageID 14475
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 814

1           MR. PRYOR:  I'm looking for an answer.
2   She hasn't answered it.
3           THE COURT:  I will let you ask it this one
4   last time.
5           THE WITNESS:  Conversation would be more
6   effective.
7           MR. PRYOR:  Thank you.
8           THE COURT:  Okay.  Mr. Greenfield, round
9   two.
10          MR. GREENFIELD:  No more questions, your
11  Honor.
12          THE COURT:  Okay.  Mr. McKeeby.
13          MR. McKEEBY:  I will be quick.
14                  RECROSS EXAMINATION
15  BY MR. McKEEBY:
16  Q.  Ms. Stone, do you recall yesterday when
17  Ms. Carter's counsel criticized you for not
18  responding to the historical Facebook messages
19  regarding -- they characterized as union activity?
20          MR. PRYOR:  Object to ad hominem comments
21  and mischaracterizations.
22          THE COURT:  Can you rephrase it?
23          MR. McKEEBY:  I think I know what
24  ad hominem is, and I -- oh, union counsel.  I see.
25  I get it now.  No, that wasn't it.  I didn't even

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 249 of 367   PageID 14476
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 815

 1  notice that.

 2          Let me start again.

 3          MR. PRYOR:  Call me American Airlines

 4  Counsel.

 5  BY MR. McKEEBY:

 6  Q.  Former counsel for American Airlines questioned

 7  you yesterday and criticized you for not responding

 8  to his client's historical emails, Facebook

 9  messages.

10          MR. PRYOR:  Now -- I'm sorry.  I am

11  objecting to mischaracterization.  That is not what

12  I did.

13          THE COURT:  I think he's going after the

14  word "criticized."

15          Is that correct?  Is there any word other

16  than "criticized" you can use to stop the objection?

17          MR. McKEEBY:  Sure.

18  BY MR. McKEEBY:

19  Q.  Counsel for Ms. Carter yesterday questioned

20  your failure to respond to his client's historical

21  emails, text messages -- excuse me -- Facebook

22  messages about union activity.

23      Do you recall that?

24  A.  Yes.

25  Q.  And today he's saying you should have blocked

 1  his client.  Did you understand that?

 2  A.    Yes.

 3  Q.    Do you find that a little bit, oh,

 4  contradictory?

 5  A.    Yes.

 6  Q.    Have you ever blocked anyone on Facebook

 7  before?

 8  A.    I have now.

 9          MR. McKEEBY:  No other questions.

10          THE COURT:  Round three?  Limited scope to

11  round two.

12          MR. PRYOR:  No.

13          THE COURT:  Okay.  That means we are done

14  with you as a witness.  I no longer have to tell

15  you, you can't talk to anyone about the case.  I can

16  excuse you from the courtroom, but all witnesses are

17  subject to the right to recall.

18          It doesn't always happen, but occasionally

19  it does, so be on standby.  We may need your

20  testimony back if something else happens during the

21  trial.

22          So thank you for being here.

23          Thank you for your testimony, Ms. Stone.

24          Okay, Carter can call the next witness.

25          MR. PRYOR:  At this time we call, by video

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 251 of 367   PageID 14478
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 817

1  deposition, Brian Talburt.

2          Have you already explained video

3  depositions?  I can't remember.

4          THE COURT:  I'm about to while you queue

5  up the Talburt video.

6          So I will tell the jury, there are legal

7  reasons why a witness might not be able to be here

8  in person.  I don't have limitless power to draw

9  people in who are beyond my geographic radius.

10         So this next witness meets that test for

11 being unavailable.  They had him on a deposition,

12 which means they took his sworn testimony earlier in

13 the course of this case.  And then I have reviewed

14 that.

15         And we are going to play the relevant

16 portions of that deposition for you.  You are

17 supposed to treat that deposition, that video depo,

18 the same as if that person were live, sitting here

19 on the stand.

20         I also need to say one more thing, which

21 is there are some snippets of testimony here that go

22 to an issue I have talked to you about earlier on

23 Southwest, and maybe Southwest disciplining

24 something, or claims on how Southwest treated

25 somebody.  I told y'all that is not relevant to

 1  these claims against Southwest.

 2          Some of those are intertwined with this

 3  depo and we couldn't separate it out because it is

 4  not a live witness on the stand.  So you will hear

 5  some of that.  Please ignore that.  That is my

 6  limiting instruction to you.

 7          With that, you can queue up Talburt and

 8  go.

 9          (Thereupon, the video clip was played and

10      transcribed as follows:)

11                E X A M I N A T I O N

12  BY MR. PRYOR:

13  Q.   State your name, please.

14  A.   Brian Talburt.

15  Q.   Mr. Talburt, my name is Bobby Pryor.  I

16  represent Charlene Carter.  Who have you --

17          THE REPORTER:  Mr. Talburt, please let the

18  attorneys finish before you give an answer.

19  BY MR. PRYOR:

20  Q.   Were you a supporter of Audrey Stone both when

21  she ran for union leadership and while she was in

22  union leadership?

23  A.   Yes.  I supported her in her campaign.

24  Q.   Well, did you support her in her -- while she

25  was a leader?

```
 1  A.    In most -- in most situations, yes.
 2  Q.    What did you do as a member of CAN?
 3  A.    Basically, that was lounge education and a
 4  lounge -- and a mobilization effort for contract
 5  negotiations.
 6  Q.    That stands for Contract Action Network?
 7  A.    Correct.
 8  Q.    When were you part of CAN?
 9  A.    Oh, that would have been for our first
10  tentative agreement for a contract that ultimately
11  was settled in 2015, I guess.  So I'm guessing that
12  would have been 2013.
13  Q.    Are you currently employed by Southwest
14  Airlines?
15  A.    Yes, I am.
16  Q.    And what is your position?
17  A.    I'm a flight attendant.
18  Q.    Are you still a member of Local 556?
19  A.    Yes.
20  Q.    And your -- at this fact-finding meeting -- and
21  did this also go to a Step 2?
22  A.    No.
23  Q.    So then at Step 1, who represented you?
24  A.    Brett Nevarez.
25  Q.    And was it argued at this meeting, at this
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 820

1  hearing by you and Brett Nevarez, that your actions
2  were protected from, among other reasons, that you
3  were engaged in union activity, in fact, engaged in
4  activity relating to an election?
5  A.   Yes.
6           MR. GREENFIELD:  Object to form.
7           It is incomplete, it is vague, and it's --
8  it just paints an incomplete picture.
9           THE COURT:  You can ignore the part where
10 they talk about objections.
11 Q.   At this meeting, did you argue that your union
12 activities should be protected from Southwest's
13 social media policy?
14 A.   Yes.
15 Q.   And Mr. Nevarez supported that argument on
16 behalf of the leadership of Local 556, correct?
17 A.   He supported that argument.  Presumably the
18 rest would be accurate as well.
19 Q.   And who was president at that time of the Local
20 556?
21 A.   Audrey Stone.
22 Q.   Now, did you ever engage -- and I think you
23 have answered this before, but it is a little bit
24 more specific -- did you ever engage in an effort to
25 target union member opponents of Stone's and her

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 255 of 367   PageID 14482
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 821

1  slate, recall petition members or objectors of Local
2  556?
3  A.   You would have to define the word "target."
4  Q.   Okay.  Then tell us -- tell the jury how you
5  would define "target" in regard to targeting union
6  member opponents to Stone and her slate, union
7  member opponents acting in favor of a recall, and
8  union objectors.
9       How would you use the word "target" in regard
10 to those three classes of people?
11 A.   I -- I -- if -- I guess basically trying to
12 isolate or identify them.
13 Q.   All right.  So can you tell me, is all you did
14 to target those groups is just to find out who they
15 were?
16 A.   No, I didn't.  I didn't say that and that is
17 not what I did.
18 Q.   So tell us what you did.
19 A.   The only thing that -- what I can think of that
20 I did, would probably be turning in social media
21 violations for public comments that were made,
22 usually, that were inaccurate or offensive.
23 Q.   So when you told Southwest Airlines you don't
24 want to turn anyone in for social media violations,
25 this is a nightmare, changed your mind?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 822

```
 1  A.    Yes.
 2  Q.    So what did you do, then, to target these
 3  groups?
 4  A.    Sent them to management, certain social media
 5  posts that would have been incriminating.
 6  Q.    Who assisted you with that?
 7  A.    Assisted?
 8             MR. McKEEBY:  Object to the form.
 9             THE WITNESS:  I don't know that anybody
10  assisted me.  I would have just forwarded it to
11  somebody.
12  BY MR. PRYOR:
13  Q.    How did you identify those three classes of
14  people?
15  A.    Anybody that would have been turned would have
16  nothing to do with being an objector.  I don't even
17  know who -- the names of the objectors were not
18  public, or never disclosed, until they identified
19  themselves.
20  Q.    Who do you remember turning in?
21  A.    The only person that I can remember turning in
22  would have been Jeanna Jackson.  I'm not saying that
23  is an inclusive list, but that is the only person
24  that comes to mind at this moment.  Again, this is
25  eight years ago.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 3 July 07, 2022                  Page 823

```
 1  Q.   What about Mike Casper?
 2  A.   More than likely, Mike Casper.  Given an
 3  opportunity, I would have, yes.
 4  Q.   And why Mike Casper, if you had been given the
 5  opportunity?
 6  A.   Mike Casper was an -- has been an adversary for
 7  many years, causing a great deal of dysfunction and
 8  destruction to both Southwest and TWU.
 9  Q.   And so you would have targeted Ms. Jackson, and
10  if given the opportunity, Mr. Casper.
11       Anybody else?
12  A.   When you say "targeted," I don't know that I
13  necessarily agree with the term you're using.
14       Did I turn them in using -- turn in their words
15  to Southwest?  Yes.
16  Q.   What was the result -- first of all, who at
17  Southwest management did you talk to about targeting
18  these three groups?
19  A.   Whoever I sent them to.  I don't know whether
20  it was the social media violations department or a
21  vice president, director, base man -- probably not
22  the base manager.  I doubt that I would have
23  included them.
24  Q.   You don't recall who you sent it to?
25  A.   No.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 824

```
 1  Q.   How did you decide who to send it to?  Maybe
 2  that will help us narrow it down.
 3  A.   Probably the people that I would have had
 4  some -- the closer -- more of a working relationship
 5  with, and felt more comfortable with.
 6  Q.   And what -- who would fall within that group?
 7  A.   Possibly our -- I don't believe Sonya Lacore
 8  would have been vice president at that point; I
 9  think she was a director.
10       Mike Simms would have been a director.
11  Q.   And who would the director have been at that
12  point, Hafner?
13  A.   I would just say -- so -- I believe Sonya
14  Lacore would have been a director at that point, as
15  would have been Mike Sims.
16  Q.   Okay.  So you think you would have spoken to
17  either Ms. Lacore or Mr. Sims or both?
18  A.   Probably not spoken, probably would have
19  forwarded an email.
20  Q.   Did you exchange emails on a regular basis with
21  Sonya Lacore?
22  A.   Yes.
23  Q.   And what time period would that have been?
24  A.   Probably 2013 through -- I don't know.
25  Probably whenever she became vice president or
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 259 of 367   PageID 14486
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 825

1  shortly -- shortly thereafter, I would guess.

2      I mean, I continued to have emails with her

3  over the years of various topics.

4  Q.   And Ms. Lacore, what was her position at

5  Southwest Airlines?

6  A.   Most of the time when I dealt with her more

7  regularly, she was a director.

8  Q.   Director of what?

9  A.   Director of in-flight.

10 Q.   And explain to the jury what -- what that

11 means, to be director of in-flight?

12 A.   I don't really know what the role is, to be

13 honest with you.  It is one notch below a vice

14 president and one notch above a manager.  So I don't

15 know what her specific duties were.

16     I worked with her on a couple of projects that

17 she was basically the liaison or oversaw what we

18 were doing.  So that's when I had most of my contact

19 with her.

20 Q.   All right.  So this is an email from you to

21 Sonya Lacore dated April 29, 2014, correct?

22          (The videotaped testimony of the witness

23      was paused.)

24          MR. HILL:  Exhibit 141 displayed.  Trial

25 Exhibit 141.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                 Vol 3 July 07, 2022                    Page 826

```
 1              THE COURT:  Thank you.
 2              (The videotaped testimony of the witness
 3   was played.)
 4   BY MR. PRYOR:
 5   Q.   And you sent this to her private email,
 6   correct?
 7   A.   Apparently so, yes.
 8   Q.   With Facebook and 24/7 reach, the characters
 9   become more relevant.  Corliss particularly is
10   something that we not seen before, and it is
11   incredibly dangerous.
12        Who is Corliss?
13   A.   A Southwest flight attendant.
14   Q.   So now you are identifying another Southwest
15   Airlines employee in referring to her as "incredibly
16   dangerous," correct?
17   A.   Correct.
18   Q.   You say, "The attitude she spawns is TW
19   Airlines in the '80s.  People listen and people
20   react."
21        What are you referring to when you say, "She
22   spawns Northwest Airlines in the '80s"?
23   A.   Northwest Airlines was notorious for having
24   very poor labor management relations.
25   Q.   And they had a --
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 261 of 367   PageID 14488
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 827

1  A.   And history -- and historically, at Southwest

2  Airlines, we did not have that.

3  Q.   Okay.  So you were warning Ms. Lacore that

4  Corliss spawns an attitude of union problems with

5  management, in your opinion?

6  A.   Right.

7  Q.   Did you say --

8  A.   In my opinion, correct.

9  Q.   Did you say "right"?

10  A.   In my opinion, correct.

11  Q.   And then you said, "I am all about targeted

12  assassinations," correct?

13  A.   That's what I said.

14  Q.   And did Ms. Lacore report to you, to your

15  knowledge, to Southwest management for any of the

16  words that you have -- that we've read so far in

17  this email?

18  A.   Not to my knowledge.

19  Q.   And you know that targeted assassinations gets

20  you in trouble, because you got in trouble about

21  that, didn't you?

22  A.   That would have been -- I'm looking at the

23  timeline.  Apparently so, yes.

24  Q.   I understand your defense of the terms.  What

25  I'm pointing out is, you've been disciplined for

1  this language, and you felt comfortable using it

2  with a senior member of in-flight management at

3  Southwest Airlines, correct?

4  A.   Correct.

5  Q.   It says, I am sure with her dreadful work

6  history, there could be opportunity.

7       Are you there talking about exactly what you

8  mean, as you tell us about "targeted

9  assassinations"?  You're not suggesting that you are

10 going to assassinate Ms. Corliss, you're suggesting

11 that taking advantage of her dreadful work history

12 could be the opportunity to get -- I don't know --

13 A.   Apparently, yes.

14 Q.   Then you say, She will play very well to the

15 heavy, inner-city minority crowd coming on board

16 soon.  She will be their voice.  She will be a huge

17 threat in our upcoming election as well.  She plays

18 very well to her crowd and has as much support as

19 anyone I have seen in the past.

20      You wrote those words and you sent them to

21 Sonya Lacore, correct?

22 A.   It appears so, yes.

23 Q.   Okay.  And you know Ms. Lacore did not report

24 you to Southwest Airlines for violation of any

25 Southwest policies as a result of this, correct?

```
 1  A.    Not that I'm aware of.
 2  Q.    Do you think that your words here are racist?
 3  A.    No.
 4  Q.    Didn't you say -- I'm going to skip down to the
 5  next paragraph -- well, no, let me go to the last
 6  sentence here.
 7        You're talking about Sam Wilkins.  And then you
 8  say, Everybody loves her.  But then you say, Well,
 9  everyone except the Haters.
10        And that is a capital "H."
11        Who is haters?
12  A.    The opposition to the current administration.
13  Q.    So union members who oppose the current union
14  leadership?
15  A.    Not necessarily oppose, but are vocal and
16  public.
17  Q.    No, sir.  Just now, you said that she would
18  know, that Ms. Lacore would know.  We'll put these
19  words up for the jury.  Here's your chance to see if
20  you can tell the truth under oath.
21        Did you tell -- say that she would understand
22  that haters meant anyone that was opposed to the
23  current union administration?
24        You can answer.
25  A.    I said that's not entirely what I meant.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 830

 1  Q.    So --
 2  A.    What I meant was -- Sonya -- Sonya would be
 3  well aware of the people that were extremely vocal
 4  publicly about our current administration.  There
 5  was no secret about that.
 6  Q.    The next paragraph says, Social media is, by
 7  far, the major source of reach and must be used to
 8  our advantage.
 9        Are those the words that you used?
10  A.    Yes.
11  Q.    And then you go down to the next paragraph.
12  Cancer is a dangerous thing and must be eradicated
13  wherever possible before it spreads.
14        By the way, if you go back up to that first
15  paragraph, the cancer example you gave us as to
16  Mr. Casper, right?
17  A.    Yes.
18  Q.    And is that what you're referring to here or
19  are you talking about a larger group of people?
20  A.    Well, I'm talking about a movement.  Casper
21  would have been a pioneer in that movement.
22  Q.    You said, I would highly encourage targeting
23  people, and a one-day detective with a video camera
24  is a very cheap investment.
25        Is that a recommendation that you were making

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 265 of 367   PageID 14492
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 831

1  to Ms. Lacore?

2  A.    Apparently so, yes.

3  Q.    What were you trying to avoid by sending it to

4  her personal email?

5  A.    The filters that it may go through at

6  headquarters as opposed to not going directly to

7  her.  I don't know who reads things at headquarters.

8  Q.    Why would you be concerned about someone

9  reading this?  If you are not doing anything wrong,

10  why are you concerned?

11  A.    It was a personal -- personal communication

12  between two people.

13  Q.    And so you are worried about your -- you have

14  told us now.  You couldn't remember, but now you

15  told us in what you wrote.  You didn't want a paper

16  trail about these communications, did you?

17  A.    I didn't want to put -- basically, this was a

18  one-sided communication.  It was not intended, nor

19  expected to be -- I didn't want her to think that a

20  reply was to be expected.

21        Obviously, I'm using some inflammatory, some

22  colorful language and I would not expect her in her

23  position to respond to that.  So I was basically

24  sharing my thoughts with her.  Nothing more.

25  Q.    You sent this to Ms. Stone; one of the reasons

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 266 of 367   PageID 14493
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 832

1  was to point out that in that email below, you used

2  the "targeted assassinations" metaphor.

3        And at another point in time, you got no

4  trouble.  But here, this shows that you had used it

5  before with senior management.  Not gotten in

6  trouble.  And it was clear that you were talking

7  about terminating someone's job, not killing

8  someone, is that accurate?

9  A.   Not necessarily terminating somebody's job, but

10 basically being held accountable, yes.

11 Q.   Other than that, either terminating their job

12 or holding them accountable, my statement was an

13 accurate summary?

14 A.   Yes.

15 Q.   So in your naive way of thinking, in fact, you

16 told Ms. Stone that the reason you did this

17 communication the way you did with Ms. Lacore was to

18 keep it off the record.  You even put quotes on

19 around it, true?

20 A.   Yes.  Apparently, yes.

21        MR. McKEEBY:  This is trial Exhibit 26.

22        MR. HILL:  Trial Exhibit 26 is being

23 displayed.

24        THE WITNESS:  Could you make this a little

25 bigger?

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 267 of 367   PageID 14494
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 3 July 07, 2022                        Page 833

 1  BY MR. PRYOR:

 2  Q.   Let me scroll up.  Do you know if you sent this

 3  to Audrey Stone and her response was "Not relevant"?

 4  A.   Okay.

 5  Q.   I'm asking you if you agree that is what is --

 6  I think it is, but I need you to tell me that's what

 7  you think as well.

 8  A.   That's what it looks like, yes.

 9  Q.   Okay.  All right.

10       So at the bottom, there is something that says

11  from Mike Hafner to Brian, and that's you, right?

12  A.   I'm sorry.  Where are we looking at?

13  Q.   Can you see my cursor?  If you look at the

14  bottom, on August 16th, 2013 at 6:21 a.m., it

15  appears that you received an email from Mike Hafner

16  that was also sent to Matthew -- and I don't know

17  how to pronounce his last name.

18       At the very bottom, do you see where it says

19  "Trial Exhibit 26"?

20  A.   Oh, yes.  Yeah.  My phone is blocking it.  I

21  can't see it.

22  Q.   Okay, fair enough.

23       And if you look to the left of that, you see it

24  is an email from Mike Hafner that you're carbon

25  copied on?  At 6:21 a.m.?

1  A.    Yes.

2  Q.    And I don't have anything else about that

3  email.

4        But if you look at the email above, are you

5  able to tell us any recollection you have of what

6  Mr. Hafner was sending you?  If it helps, the

7  subject line says, "Re: Facebook."

8  A.    Okay.

9  Q.    Do you recall what Mr. Hafner was communicating

10 to you in that email?

11 A.    I -- I don't know.  I mean, I know what -- I

12 know what the email is about, but I don't know what

13 Hafner was responding to, no.

14 Q.    So then at that time Mr. Hafner was in what

15 position?

16 A.    In 2013, he would have been the vice president

17 of in-flight services.

18 Q.    And that's a member of senior management of

19 Southwest Airlines?

20 A.    Yes.

21 Q.    Okay.  Then you go on to say, But it is an

22 illustration of casual, behind-the-scene

23 conversations we have, and particularly social

24 media.  That's what you wrote, correct?

25       Do I need to make it bigger?

1  A.    No.  No.  I'm just --

2  Q.    Do you agree that that is what you wrote?

3  A.    Yes.

4  Q.    And then you write, I, along with Mike and

5  Sonya, had a meeting last summer with VdV to discuss

6  social media as a tool.

7        Did you write that?

8  A.    Yes.

9  Q.    And is "Mike," Mike Sims?

10 A.    No.  Mike Hafner.

11 Q.    Oh, I'm sorry.  Mike Hafner.

12       And is "Sonya," Sonya Lacore?

13 A.    Yes.

14 Q.    And that's the same Sonya Lacore as the last

15 email we were looking at that you were talking about

16 using social media to target assassination.

17       Again, to you that means termination or

18 otherwise hold them accountable, such as Ms. Corliss

19 and Mr. Casper?

20 A.    This particular email is a completely different

21 context and a completely different -- totally

22 different angle than what that email said.

23 Q.    And that -- that wasn't my question.

24       We can certainly talk about that question.

25       But my question is, this is the same Sonya

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 836

1  Lacore you were talking to in that previous email

2  marked trial Exhibit 141, about targeting for

3  assassination union members such as Mr. Casper and

4  Ms. Corliss, correct?

5  A.   The same person, yes.

6  Q.   And then it says, Had a meeting last summer

7  with VdV.  I think I read that.  Who is VdV?

8  A.   Mike Van de Ven.

9  Q.   Van de Ven?

10  A.   Van de Ven.

11  Q.   Your union has been addressing Southwest

12  Airlines social media policy for a long time.  We

13  have been bringing forward your concerns around the

14  lack of clear guidelines on a policy that is both

15  vague and undefined.

16      We have witnessed inconsistencies around the

17  way that the policy is applied, and it is often a

18  subjective stance that Southwest management has

19  displayed in administering the policy.

20      Do you recall that?

21  A.   Yes.

22  Q.   And that was also your opinion, correct?

23  A.   Yes, of course.

24  Q.   And it was the opinion, as far as you know, of

25  all of the leadership of the Union in 2015, of Local

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 271 of 367   PageID 14498
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 837

1   556?

2   A.   I don't know.  I can't speak for all of them.

3   But one would assume so.

4   Q.   Okay.  So could you, from conversations with

5   Brett Nevarez, tell me whether or not you understood

6   that to be his opinion as well?

7   A.   Yes.  That was my understanding, yes.

8           (The videotaped testimony of the witness

9       was paused.)

10          MR. HILL:  Let the record reflect that

11  what is displayed on the screen right now is trial

12  Exhibit 19.

13          (The videotaped testimony of the witness

14      was resumed.)

15  BY MR. PRYOR:

16  Q.   And that's your conversation with Mr. Nevarez?

17  A.   Yes, yes.

18  Q.   And that is also your understanding of

19  Holcomb's opinion based on your conversations with

20  him?

21  A.   Yes.

22  Q.   It certainly was the opinion of Ms. Stone, she

23  not only wrote this, but that was also your -- your

24  understanding from her from your dealings with her?

25  A.   Yes.

 1   Q.   Let's go down to the bottom.  It says, On a

 2   personal note, however, please note that social

 3   media issues management investigated and the

 4   resulting discipline Southwest Airlines issued did

 5   not arise out of something management simply

 6   uncovered or stumbled upon.

 7        You are not generally monitoring our sites.

 8   Instead, these cases come about as our own flight

 9   attendants are turning each other in.

10        These latest investigations have been as a

11   result of flight attendant complaints.  I am asking

12   that we please consider stopping any back-and-forth

13   fighting on social media.

14        That was your understanding in April of 2015 as

15   to Ms. Stone's opinion in this regard, correct?

16   A.   Yes.

17   Q.   And that was also your opinion, correct?

18   A.   Yes.

19             (The videotaped testimony of the witness

20        was paused.)

21             MR. HILL:  Let the record reflect Exhibit

22   21-A is displayed.  We are moving to 21-C, I see.

23             (The videotaped testimony of the witness

24        was resumed.)

25

```
 1   BY MR. PRYOR:
 2   Q.   And then let's look at Exhibit 21-C.
 3   A.   Yes.
 4   Q.   You are not on this email, but it is about the
 5   additional information.  In the subject line, it
 6   says you provided Tammy.  There are more posts from
 7   Brian.  I think he's going through all of -- all of
 8   his archived files and digging up everything he can.
 9   ER is working with the bases and Brian.
10        Did you have any conversations with anyone at
11   Southwest Airlines that would inform that email?
12   A.   I'm not aware of.
13   Q.   So according to Ms. Emlet, she thinks you are
14   going through all of the archived files, digging
15   things up, and that you are going to be working with
16   the bases, ER is going to be working with the bases
17   and you.  That's a fair interpretation of what we
18   are reading here?
19   A.   How I'm reading it is they are going to seek
20   further clarification on something that I provided
21   them.
22   Q.   ER is "Employee Relations"?
23   A.   I believe so.
24   Q.   And "Bases" is the management at the various
25   bases?  And Brian is you?
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 274 of 367   PageID 14501
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 840

 1  A.    Yes.

 2  Q.    So --

 3          MR. HILL:  Let me explain what is going on

 4  here as far as the sound.  Mr. Talburt's headphones

 5  ran out of battery part way through the deposition.

 6  And he replaced them with a set of headphones that

 7  were extremely poor.  We will get back to better

 8  sound later, but it is really difficult to hear them

 9  a little bit.  You can kind of read the transcript.

10  BY MR. McKEEBY:

11  Q.    So employee relations, which is part of the

12  management of Southwest Airlines, is going to work

13  with you and the bases about this information that

14  you've been providing, according to this email,

15  right?

16  A.    The way that she structured that, that

17  statement, I don't agree with that, it's not that

18  they are working with me, per se.  You are making

19  it -- you are portraying it as some grand

20  conspiracy, and it's not that at all.

21  Q.    Well --

22  A.    I'm going to -- I'm going to assume that if I

23  provided them something, they would ask for

24  clarification.

25  Q.    Look at 21-U.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 275 of 367   PageID 14502
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 841

```
 1              (The videotaped testimony of the witness
 2        was paused.)
 3              MR. HILL:  21-U is being displayed.
 4              (The videotaped testimony of the witness
 5        was resumed.)
 6   BY MR. PRYOR:
 7   Q.    Can you see 21-U on your screen?
 8   A.    Yes.
 9   Q.    And this is an email from you to Mike Sims and
10   Sonya Lacore, correct?
11   A.    Yes.
12   Q.    And here, do you recall this email?  When does
13   it stop?
14   A.    Yes.
15   Q.    And this is you complaining very heavily about
16   Jeanna Jackson, and the social media policy should
17   be utilized to terminate her?
18   A.    Yes.
19   Q.    True?
20   A.    Yes.
21   Q.    Then the exhibit we were previously talking
22   about, 21-U, you acknowledge it was an email you
23   sent to Sonya Lacore, to Mike Sims urging that
24   Mr. Jones be terminated for violation of the
25   Southwest social media policy.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 842

1        You also carbon copied Ms. Stone on that email,
2    correct?
3    A.   I don't -- did I?
4    Q.   It says president@TWU556.  You were --
5    A.   I'm not seeing that there.  That's why I'm
6    not -- I'm not disputing that, I just don't see it.
7    Q.   Do you know who president@TWU556.org would be?
8    A.   Yes.
9    Q.   Who?
10   A.   It would be Audrey Stone.
11   Q.   Okay.  So you did include Ms. Stone on this
12   email where you were urging that the social media
13   policy be utilized to terminate a union employee?
14   A.   Okay.
15   Q.   Sorry.  Let me share screen.
16            MR. HILL:  Let the record reflect that
17   trial Exhibit 27 is now displayed.
18   BY MR. McKEEBY:
19   Q.   Do you see Exhibit 27?
20   A.   Uh-huh.
21   Q.   At the top of this, it says it is Brian Talburt
22   to Audrey Stone, October 13, 2014, correct?
23   A.   Yes.
24   Q.   By the way, I -- before going into this
25   exhibit, let me go back and ask you about the

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 277 of 367   PageID 14504
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 843

1   reports you made in February of 2017 of the numerous

2   individuals that you previously identified.

3        Do you understand what I'm talking about now?

4   A.   Yes.

5   Q.   And are you aware that Audrey Stone, one or two

6   days in the same time frame that you were sending

7   those individuals who were members of the Union to

8   Southwest Airlines for what you said were social

9   media policy violations, at the same time you were

10  doing that, Audrey Stone made a complaint against

11  Charlene Carter.

12       Are you aware of that?

13  A.   I've heard that, yes.

14  Q.   Okay.

15  A.   But I don't know what the date and time was.

16  Q.   Did Ms. Stone talk to you about that before she

17  did it?

18  A.   No.

19  Q.   So it was just an incredible coincidence that

20  you sent all of these people for investigation that

21  were opposing the Union at the same time that

22  Ms. Stone also reported Ms. Carter for social media

23  policy violations, correct?

24  A.   I can't comment on that because I don't know.

25  Q.   And this says, To:  Brian, From:  Trudy and

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 278 of 367   PageID 14505
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                         Page 844

1  Brett Nevarez, although it says, Love Brett.

2      That might be a joint personal email address

3  for Brett and his wife, is that correct?

4  A.   Yes, I think so.

5  Q.   And that was not sent on the Union email

6  address for some reason, apparently, right?

7  A.   I don't know.

8  Q.   You don't know?

9  A.   I don't know.

10 Q.   It says, leg-breaking time for Casper the ghost

11 scab.  Did you tell me earlier that that was one of

12 the nicknames that you had for Mr. Casper?

13 A.   It was a term -- that was he was -- how he was

14 frequently referred.

15 Q.   Okay.  And, apparently by other members of the

16 leadership of Local 556, correct?

17 A.   I don't know.  Brett would be the only person

18 that I would -- that probably would have used that.

19 Q.   So at least one member of the leadership of

20 Local 556 was also referring to -- in addition to

21 yourself was referring to Mr. Casper as the ghost

22 scab, correct?

23 A.   Yes.

24 Q.   You can speak to Mr. Nevarez, saying,

25 leg-breaking time for Casper, the ghost scab.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                    Page 845

1       That's what he wrote to you, correct?

2   A.   Yes.

3   Q.   Did you turn him in for a violation of the

4   Southwest policy for that?

5   A.   I did not.

6   Q.   Why not?

7   A.   Well, I don't really see a violation of the

8   social media policy.  That's, again, a metaphor,

9   leg-breaking time.  Clearly, he did not mean he was

10  going to break Mike Casper's leg.  He's -- he's

11  referencing old-time union mentality.

12  Q.   Did you turn him in for a violation of any

13  Southwest policies?  I didn't limit it to social

14  media.

15  A.   I'm sorry.  No, I did not.

16  Q.   Although Rocky Mountain sent it to you,

17  correct?

18  A.   It would appear so, yes.

19  Q.   At the end, when he said, He is such an ass, do

20  you know who he's referring to?

21  A.   Well, if it's -- if it's replying to the

22  comment below, I'm assuming he means Casper.

23  Q.   Then -- you then include Audrey Stone in this

24  communication in which Mr. Casper is being referred

25  to as an ass and a ghost scab, correct?

```
 1   A.   Okay.

 2   Q.   Is that a yes?

 3   A.   Yes.

 4   Q.   And you say, A couple of things about this

 5   thread.  Please delete Brett's comment about

 6   leg-breaking.  Is that what you said?

 7   A.   Yes.

 8   Q.   Why are you wanting to delete that?

 9   A.   To be honest --

10              (The videotaped testimony of the witness

11        was paused.)

12              THE COURT:  Mr. Hill, can I ask, we're

13   about 20 minutes overdue for our last break of the

14   day.  Do we know how much is left of the video?

15              MR. HILL:  I would guess, like, in a --

16   just a few minutes range.

17              THE COURT:  Okay.  Let's go ahead and try

18   and finish up, and then we will break between

19   witnesses.  You can keep playing it.

20              MR. HILL:  Scroll a second.  Six, 7, 8

21   minutes.

22              THE COURT:  Okay.  Let's take our break

23   now.  And so same instructions as always:  You can

24   only talk to your fellow jurors and court personnel;

25   don't talk to anyone about the case; and don't do
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 281 of 367   PageID 14508
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 847

1   any research about the case.

2           And we will see you back here in

3   10 minutes, at 4:24.

4           THE COURT SECURITY OFFICER:  All rise for

5   the jury.

6           (The jurors exited the courtroom.)

7           THE COURT:  Okay.  Before we take our

8   break, when we come back and get the jury in, can

9   y'all move to admit 21-C, which is not in yet?  It's

10  the only one that hasn't been already been admitted.

11          And then I can ask, Same objections, gibe

12  my ruling to let it in with a limiting instruction,

13  and then we will keep moving.

14          I will keep track of anything that has not

15  been admitted yet.  We can do that at the end if

16  there is anything new that comes in.

17          And I forgot, too, to give the disclaimer

18  that when you see words on a transcript, they are

19  not evidence, like the video and the audio are.  I

20  will give that disclaimer when they come back in --

21  which is awfully amusing because it is the best

22  thing they have, given that there are some excerpts

23  from the bad headphones.

24          Any questions on that regard?

25          MR. McKEEBY:  No.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 282 of 367   PageID 14509
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                          Page 848

1              MR. PRYOR:  No questions, Your Honor, but
2    I have an issue.

3              THE COURT:  Yes.

4              MR. PRYOR:  Our next witness, because we
5    cut people, we let counsel know as soon as we did
6    cut them -- is Mr. Schneider, and I don't -- is he
7    here?

8              Never mind, it's not an issue.  He is
9    here.

10             THE COURT:  Awesome.  We will see y'all in
11   eight minutes.

12             MR. McKEEBY:  I have an issue.

13             THE COURT:  You have an issue?

14             MR. McKEEBY:  Well, Ms. Lacore --

15             THE REPORTER:  I need you to get to a
16   microphone.

17             MR. McKEEBY:  Excuse me.  Ms. Lacore,
18   witness Sonya Lacore, is going to be out of town
19   next week, so she will need to be called tomorrow to
20   the extent Carter is -- Ms. Carter and her counsel
21   plan to call her.

22             MR. GILLIAM:  We will call her tomorrow.

23             THE COURT:  Sounds great.  All right.  See
24   y'all in seven minutes.  Court is in recess.

25

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 283 of 367   PageID 14510
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 849

```
 1              (Recess.)
 2              THE COURT SECURITY OFFICER:  All rise.
 3              THE COURT:  Anything else before we bring
 4  in the jury?  We can go ahead and bring in
 5  Mr. Schneider and have him walking in while they are
 6  walking in.  Is that all right?
 7              Are you calling Schneider now?
 8              MR. McKEEBY:  Yes.  We already did, Your
 9  Honor.
10              THE COURT:  Let's do it.
11              THE REPORTER:  Don't they have eight more
12  minutes of the video?
13              THE COURT:  Oh, I'm sorry, video, eight
14  more minutes.  I blanked on that.  Do the eight
15  minutes.  I'm going to admit 21-C when they are in.
16  We can bring them in.  I will admit 21-C over object
17  limiting, give the disclaimer on transcript, and
18  then we will do that.
19              And then we will bring in Schneider.  How
20  about that?  And if someone wants to go out into the
21  hall to bring in Schneider.  I just want to minimize
22  the dead time so we have as much time for y'all as
23  we can.
24              Does that make sense?
25              MR. McKEEBY:  Thank you, Your Honor.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 284 of 367   PageID 14511
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 850

 1                 MR. PRYOR:  Thanks.

 2                 MR. GREENFIELD:  You guys got that joint

 3    email out to the -- as the witness has gone out on

 4    behalf of the parties.

 5                 THE COURT:  Thank you.  I appreciate that.

 6                 MR. HILL:  Hunting on his way.

 7                 THE COURT:  Hunting, okay.  Happy Hunting.

 8                 (Discussion off the record.)

 9                 (The jurors entered the courtroom.)

10                 THE COURT:  Thank you.  Y'all can be

11    seated.

12                 Okay.  Mr. Hill, are y'all moving to admit

13    21-C?

14                 MR. HILL:  We are indeed.

15                 THE COURT:  Okay.  And same objections.

16                 So I will overrule the objections, admit

17    21-C, which is the only exhibit you have seen on the

18    video that was not already admitted, with the same

19    instruction I gave on all the other subparts of 21,

20    which is it is for use against the Union's claims

21    but not for use against Southwest's claims.

22                 I also need to give you a disclaimer I

23    think I should have done before we played the video

24    the first time.

25                 The disclaimer is, the evidence you are

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  getting from this video deposition is the audio, and

2  the video that you are seeing.

3          We put the words of the transcript on the

4  bottom as a helpful aid to you, but if you hear

5  something different than the words you see on the

6  transcript, you are supposed to trust what you see

7  on the video and what you hear with your ears.

8          Just like I told you with notes, right,

9  the notes can't override what you see and what you

10 hear.  The same disclaimer there.

11          With that, you can keep playing our last

12 eight minutes, Mr. Hill, thank you.

13          (The referred-to document was admitted in

14     Evidence as Trial Exhibit 21-C.)

15          (The videotaped testimony of the witness

16     was resumed.)

17 BY MR. PRYOR:

18 Q.   To the present?

19 A.   Yes.

20 Q.   And then it says, Also, this was a private

21 email between Mike and I?

22     Who is "Mike"?

23 A.   I don't know.

24 Q.   I take this step very seriously, and would hate

25 to breach a confidence he obviously had in me based

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                          Page 852

1  on a long-time relationship we have developed.

2       You are talking about a Mike and a member of

3  the management of Southwest Airlines, correct?

4  A.    To be honest, I don't know.

5  Q.    Well, if you look further down, don't you refer

6  to exactly that?  Is that -- you are saying you

7  don't recall who "Mike" is.

8       Tell us the name of anyone in Southwest

9  management that you had a -- let's see how you

10 describe it -- a long-term relationship.  Name all

11 the Mikes in management at Southwest that you had a

12 long-term relationship with.

13 A.    That would be Mike Hafner, would be the only

14 one that would be.

15 Q.    So it says, This is just an illustration of the

16 types of conversations I had with senior Southwest

17 management, re: deal with problem people, and in

18 this case, specifically Hafner and Casper.

19      That's what you wrote, right?

20 A.    Yes.

21 Q.    So you've been talking to senior management

22 about targeting people such as, specifically, Hafner

23 and Casper using social media, right?

24 A.    I'm sorry, "targeting" -- "targeting" them on

25 social media?

1  Q.   Well, you can take away the word "targeted."

2  But we are talking about dealing -- let's -- what

3  word you used -- problem dealing with problem

4  people.

5       You were talking with senior members of

6  management at Southwest Airlines about dealing with

7  people such as Hafner and Casper by use of the

8  social media policy, correct?

9  A.   Yes.

10 Q.   That would include Mr. Hafner, correct?

11 A.   Yes.

12 Q.   That would include Ms. Lacour, correct?

13 A.   Yes.

14 Q.   That would include Naomi Hudson?

15 A.   Yes.

16 Q.   And did any of those people report up for any

17 violation of any Southwest policy as a result of

18 those communications?

19 A.   I don't know.  Not to my knowledge.

20 Q.   And when it says the Rocky Mountain email, that

21 is Mike's personal email, does that now tell you who

22 Rocky Mountain is?

23 A.   Yes.

24 Q.   That's Mike Hafner, correct?

25 A.   Yes.

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 288 of 367  PageID 14515
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 854

1  Q.   And Mike Hafner is the one that wrote, He is

2  such an ass, referring to Casper, the ghost scab,

3  correct?

4  A.   Yes.

5  Q.   Let me show you Trial Exhibit 29.

6       And the front cover of the center of that

7  picture is Ms. Stone, correct?

8  A.   Yes.

9  Q.   Who are the other people, if you know?

10  A.   From left, Cuyler Thompson.

11  Q.   Oh, right here is Mr. Thompson?

12  A.   Yes.

13  Q.   And who is this?

14  A.   John Parrott.  Sam Wilkins.  Crystal Revenge,

15  Todd Gain, Brett Nevarez.

16  Q.   And then are you able to see these posts here?

17  A.   Yes.

18  Q.   And it says, Click is getting agitated.  I

19  think he may have private messaged in his way into

20  big troubles for himself.

21       And then two posts down, you say, We can only

22  hope.

23       And then someone says, Go to Click's screen

24  shots and save them or screen shot this posts.

25       Do you recall this?

1  A.    I -- I don't recall it, but obviously it

2  happened.

3  Q.    And this is another effort to use social media

4  to target a union member that didn't agree with your

5  current membership or current leadership?

6  A.    It would appear so.

7  Q.    When you say "it would appear so," is than a

8  yes?

9  A.    It means it appears so.  I have no recollection

10  of it, but it's on the screen and the names are

11  there, so I'm assuming it's accurate.

12  Q.    Okay.  You are not denying that you wrote that

13  and that's the way that you recall that and that's

14  the import of what you're reading?

15  A.    Yes.

16  Q.    Let me go to 60, trial Exhibit 60.

17        This is a document authored by Audrey Stone to

18  Suzanne, Suzanne Stephenson, Naomi Hudson, Sonya

19  Lacore.

20        Have you ever seen this document before?  Take

21  your time with it, if you want.

22        I can tell you that that's the email in which

23  Ms. Stone complained of Ms. Carter.

24  A.    No, I have never seen it.

25  Q.    Okay.  You can, however, that on this email,

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 290 of 367   PageID 14517
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 856

 1  it's sent to Naomi Hudson, correct?

 2  A.   Yes.

 3  Q.   And that's one of the people that you've

 4  identified that you were talking with this senior

 5  management at Southwest Airlines about using the

 6  social media policy to deal with problem employees,

 7  correct?

 8       I've used the exact language I asked you

 9  before, sir.  Are you going to change it or are you

10  going to agree?

11  A.   I guess I'll agree.

12  Q.   Okay.  And then the same question as to Sonya

13  Lacore, correct?

14  A.   Yes.

15  Q.   Here's another one.  February 22nd, 2017.

16       By the way, that's the same day that Audrey

17  Stone made her complaint against Ms. Carter, the

18  very day?  Do you recall whether we looked at that?

19  A.   Yes.

20  Q.   So -- and so -- and that's just a coincidence

21  as well, right?

22  A.   I -- I don't know anything about it.  I don't

23  know.

24  Q.   Okay.  The trial Exhibit 71, again, you are

25  forwarding various posts on social media against

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                     Page 857

 1  some the individuals -- are involving the
 2  individuals that you turned in that you thought were
 3  violating Southwest Airlines's social media policy,
 4  correct?
 5  A.    Okay.
 6  Q.    Yes?
 7  A.    Yes.
 8  Q.    Okay.  And then 72 is more of the same.  Again,
 9  on February 22nd, 2017?
10           MR. HILL:  Now displaying Exhibit 72.  I'm
11  not going to -- probably going to stop and announce
12  it, if it actually -- if Mr. Pryor's question says,
13  Here is 71, here is 72 -- unless you tell me
14  otherwise, Judge.
15           THE COURT:  That is a fine protocol.
16           MR. HILL:  Great.
17           THE WITNESS:  I don't have any
18  recollection of it, but apparently so.
19  BY MR. PRYOR:
20  Q.    You don't dispute that this was from you and
21  that you sent it to Southwest Airlines management
22  and that it had these posts to it?  It's consistent,
23  certainly, with your recollection that you were
24  turning in people you thought were spreading
25  misinformation, correct?

1  A.   Yes.

2  Q.   All right.  So you believe that you sent

3  Exhibit 72, even though you don't recall the

4  specifics right now?

5  A.   Yes.

6  Q.   Okay.  That's -- I think that covers the ones

7  that you did.  I'm going to have you identify a few

8  more documents, and then we'll stop and wrap this up

9  for you.

10     Hold on.  I don't think I have any more

11 questions about these documents, I just want to make

12 sure you identify them.

13     This is Exhibit 21-M and this is Brian to Mike

14 Sims.  Here is the latest attempt.  Having

15 surrogates contact people to send this email to on

16 her behalf.  Funny, I didn't realize how much she

17 loved Tom.  And then you go on.

18     But some -- but sweet how wonderful everything

19 was and how wonderful our corrupt union was before

20 Audrey.

21     This is a communication in which you sent this

22 email to Mike Sims regarding Jeanna Jackson in the

23 email below, correct?

24 A.   Yes.

25 Q.   And let's look at Exhibit 21-P.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 293 of 367   PageID 14520
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 859

1          This is from you, and I'm not sure who-all it's

2    to, but certainly its -- it includes Audrey Stone.

3          Do you recall being careful, Julie.  As a

4    follow-up to our conversation yesterday, I am

5    including the following recent posts.  A further

6    example of the public encouragement and endorsement

7    of retaliatory practices that Jeanna Jackson and

8    company.

9          So this is February 23rd, 2017, one day after

10   Ms. Stone made her complaint against Ms. Carter,

11   you're sending this to Julie at Southwest Airlines

12   management, correct?

13   A.    I sent that email on that date, yes.

14   Q.    And you sent it to Julie?

15   A.    Yes.

16   Q.    I know its blacked out, but it's clearly

17   talking about Julie O'Grady.

18   A.    Okay.

19   Q.    You think so?

20   A.    Yes.

21   Q.    And then you attach what you're referring to in

22   the email, correct?

23   A.    Yes.

24   Q.    Okay.  Just a few more.

25          One, two, about five more.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 860

```
 1        Okay.  This is to Brian from Debra.  And below
 2   that?
 3              (The videotaped testimony of the witness
 4        was paused.)
 5              MR. HILL:  21-Q is now displayed on the
 6   scene.
 7              (The videotaped testimony of the witness
 8        was resumed.)
 9   BY MR. PRYOR:
10   Q.   This is one from Debra to you saying, thank you
11   for sending these to us, Brian.  Wow, its very
12   difficult to interpret the rest, but she
13   acknowledges that you sent the information, correct?
14   A.   Yes.
15   Q.   And your -- you may not remember this
16   specifically, but you're not denying that this was
17   the email that you received from her, correct?
18   A.   I am not denying it, no.
19   Q.   You think it is, right?  You have no reason to
20   dispute it?
21   A.   Correct.
22   Q.   Okay.  Let's look at 21-R.
23        Okay.  This is a much longer email.  And I'm
24   not going to go through it with you.
25              (The videotaped testimony of the witness
```

```
 1        was paused.)
 2              MR. HILL:  Because you couldn't hear Mr.
 3   Pryor, that is 21-R that is not displayed on the
 4   screen.
 5              (The videotaped testimony of the witness
 6        was resumed.)
 7   BY MR. PRYOR:
 8   Q.   I'm not going to go through it with you, but
 9   what I would like you to do, that and your welcome
10   to read it.
11        This is as an email that you just we did before
12   that you sent to Julie on February 26th, 2017 and
13   carbon copied Audrey Stone.  And I will just go as
14   slow as you want me to.
15        Do you agree with that statement?
16   A.   Yes.
17   Q.   Let's go to -- I just have one more.  I have T,
18   21-T.  And, again, this is an email that you sent on
19   March 1, 2017, and included Audrey Stone on, and it
20   just says, folks -- so I, I can't represent to you
21   who it went to, unless you can recall.
22        But do you agree that you did send this to
23   email to Ms. Stone?  And if you recall who else,
24   please tell us.
25   A.   Yes.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 296 of 367   PageID 14523
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 862

 1  Q.    Do you recall who "folks" are?

 2  A.    No.

 3  Q.    Okay.  Let's look at 21-U.

 4        That is the email May 15th, from you to -- it

 5  looks like Mike.  Well, you tell me, is that Mike

 6  Sims or is that Mike Hafner?

 7  A.    Mike Sims.

 8  Q.    Did you send this email marked Trial Exhibit

 9  21-U to Mr. Sims and then you received the thank-you

10  Brian response from Mr. Sims?

11  A.    Yes.

12  Q.    And he says, he will, presumably that we will

13  review your concerns?  Do you see that?

14  A.    Yes.

15  Q.    All right.

16        Let's identify 21-V.  And this is an email that

17  you sent on July 2nd, 2017 to Mike and Julie and

18  carbon copied Audrey Stone, correct?  Correct?

19  A.    Yes.

20  Q.    And then this is the last one.

21        And by the way, "Mike" is Mike Sims, and Julie

22  is Julie O'Grady?

23  A.    Yes.

24  Q.    And I could be wrong, but I think this is the

25  last one.  Trial Exhibit 21-W.  This is an email

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 297 of 367   PageID 14524
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 863

1   string from you to Audrey Stone that includes the
2   emails between you and it says, Why in the hell did
3   I not find the targeted assassination comments three
4   years ago when it would have been useful?
5        Do you see that?
6   A.   Yes.
7   Q.   Do you recall what you were talking about?
8   A.   I'm assuming somebody used that -- I -- I -- I
9   don't know.  I can only guess, speculate.  I don't
10  know.
11  Q.   All right.
12       You can identify 21-W as an email that, that
13  you sent to Ms. Stone?
14  A.   Yes.
15  Q.   Now --
16  A.   I'm assuming it's referencing one of my
17  termination cases where I was looking for evidence
18  of similar behavior.
19  Q.   Yes.  Were you referring to when you used
20  "targeted assassinations" in your communication with
21  Ms. Lacore?
22  A.   No.
23  Q.   You wish you had found that?
24           (The videotaped testimony of the witness
25       was concluded.)

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 298 of 367   PageID 14525
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 864

1            MR. PRYOR:  That was almost a videotape

2   deposition.

3            Your Honor, that is the end of the offer,

4   I think.  There are exhibits we need to offer.

5            THE COURT:  So I clocked exhibits 71, 72

6   and 21-M as potential exhibits we need to address

7   that were referenced that came up in the transcript

8   that are not in evidence.

9            MR. PRYOR:  We offer them at this time.

10           THE COURT:  Okay.  So, Counsel, let's look

11  at 71, 72 and 21-M.  We have talked about all of

12  those in a morning context.

13           Is there anything else you want to add to

14  what you have said to those three exhibits from our

15  morning sessions?

16           MR. GREENFIELD:  No, your Honor.

17           THE COURT:  Anything from Southwest?

18           MR. McKEEBY:  Can I just have one second

19  to look at it?

20           THE COURT:  You may.

21           MR. McKEEBY:  Seventy-one, we have no

22  objection.

23           THE COURT:  Okay.

24           MR. McKEEBY:  Seventy-two, no objection.

25           And 21-M, I think, is the limiting

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1   instruction.
 2            THE COURT:  Understood.  And I have in my
 3   notes I'm going to put the same limiting on all
 4   three.
 5            MR. McKEEBY:  Okay.
 6            THE COURT:  Okay.  So what I will do is,
 7   I'll overrule the objections we talked about before
 8   y'all came in the room.  And then I'm going to give
 9   the same limiting instruction, as with all of the 21
10   exhibits, these are for use in the claims against
11   the Union, not for use in the claims against
12   Southwest.  So they are all admitted; after the
13   fact, published.
14            MR. HILL:  Your Honor, just to make sure
15   that I don't miss submitting something for
16   admission, let me tell you the ones that I also show
17   as being introduced.
18            THE COURT:  Okay.
19            MR. HILL:  But I think maybe are already
20   on the list.  But if they are not, I want to
21   introduce them.
22            THE COURT:  Okay.  Please say them.
23            MR. HILL:  21-U.  21-P -- these are all
24   21s, until I say otherwise -- Q, R, T, U, V, W.
25            Okay.  So V is already in.  W is not in.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 300 of 367   PageID 14527
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 866

 1   And W was referenced in the --

 2                 MR. HILL:  It was.

 3                 THE COURT:  Okay.  U is in.  V is in.  T

 4   is in.  So we need to talk about W.

 5                 So you are moving for the admission of

 6   21-W.

 7                 Any difference from the other 21

 8   objections from Southwest to the Union?

 9                 MR. McKEEBY:  No, no difference.

10                 THE COURT:  Okay.  So the same ruling on

11   21-W.  It is in.  It is for use in the claims

12   against the Union, not in the claims against

13   Southwest.

14                 (The referred-to documents were admitted

15          in Evidence as Trial Exhibits 71, 72, 21-M, and

16          21-W.)

17                 With that, call your next witness.  Let's

18   see what we can squeeze in.

19                 MR. PRYOR:  Ed Schneider, your Honor.

20                 THE COURT:  You may do so.

21                 (The witness entered the courtroom.)

22                 THE COURT:  Mr. Schneider, come on down,

23   and you may approach the witness box.

24                 I'm sorry it is so late in the day, but we

25   want to utilize the rest of our time to hear what

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 301 of 367   PageID 14528
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 867

```
 1   you have to say.
 2              So you can approach, but before you make
 3   yourself comfortable, can you raise your right hand?
 4   And Mr. Frye is going to give you the oath.
 5              (EDWARD SCHNEIDER was duly sworn by the
 6         Clerk.)
 7              THE COURT:  Now you can make yourself
 8   comfortable.  It's a tight box, you can't really get
 9   comfortable.
10              And I'm just going to ask for y'all to
11   have separation between questions and answers so we
12   can keep a clean record.
13              You can proceed.
14                   DIRECT EXAMINATION
15   BY MR. PRYOR:
16   Q.   Will you state your name, sir?
17   A.   Edward Schneider.
18   Q.   Mr. Schneider, we have never met before,
19   correct?
20   A.   Correct.
21   Q.   My name is Bobby Pryor.  I represent Charlene
22   Carter.
23        Do you recognize her in the courtroom?
24   A.   I do.
25   Q.   And how are you employed?
```

```
 1  A.    I work for Southwest Airlines.

 2  Q.    What do you do for Southwest Airlines?

 3  A.    I'm the manager of the Denver in-flight base.

 4  Q.    Can you tell us what protected union activity

 5  is?

 6  A.    Freedom of speech --

 7          MR. McKEEBY:  Objection, calls for legal

 8  conclusion.

 9          THE COURT:  I will allow him to answer,

10  only if he has personal knowledge.

11          THE WITNESS:  I don't have personal

12  knowledge of it.  I just know --

13  BY MR. PRYOR:

14  Q.    What is your understanding of what protected

15  union activity list?

16          MR. McKEEBY:  Same objection.

17          THE COURT:  I will overrule it and let him

18  answer.

19          THE WITNESS:  They are allowed to have

20  speech towards the union, possibly, that --

21  BY MR. PRYOR:

22  Q.    Possibly what?

23  A.    That is all I know.  That is all I know.

24  Q.    All you know is that they are allowed to have

25  speech that possibly?  Is that your answer?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 869

```
 1  A.    No.  That they can show their opinions.
 2  Q.    Okay.  And when you say it is -- that is
 3  protected speech, what do you mean?
 4  A.    I don't know the definition of that.
 5  Q.    You don't know what you mean?
 6  A.    I'm sorry.  You're going to have to rephrase.
 7  Q.    I asked what you meant when you said, Speech
 8  toward the union.
 9  A.    I know that when they have disputes or
10  disagree, they are allowed to say those things to
11  union.
12  Q.    And what are "those things"?  Their
13  disagreements?
14  A.    Yes.
15  Q.    So they are allowed to express disagreements
16  with each other.
17        And when you say "allowed," what does that
18  mean?  In regard to the Southwest policy they are
19  allowed?
20  A.    I don't know what it would pertain to.
21  Q.    So you don't know if a union person is engaging
22  in that protected speech you talked about, how that
23  relates to Southwest policy, true?
24  A.    I'm saying I don't know the details.
25  Q.    Okay.  Well, tell us what you do know.  I
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 304 of 367   PageID 14531
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 3 July 07, 2022                        Page 870

1    didn't ask about details.  I asked what you know.

2              MR. McKEEBY:  Objection, argumentative.

3              THE COURT:  I will let him answer.

4              THE WITNESS:  As I stated, if they

5    disagree with something to do with the Union, they

6    can share their disagreement.  That is as much as I

7    know about it.

8    BY MR. PRYOR:

9    Q.   That wasn't what I asked you, you already

10   answered that question.

11        I'm asking you how that relates to the

12   Southwest policy?  Southwest has policies, the Union

13   has protective activities.

14        Do you know anything about the relationship

15   between those two?

16   A.   The Union and the company is completely

17   separate.

18   Q.   And what about if I'm a union member and I want

19   to send a strong objection to my union president,

20   and I do that, and then the Union president

21   complains to Southwest Airlines, does that violate

22   Southwest policy?

23   A.   It depends on what it is.

24   Q.   Okay.  So it is not --

25              THE COURT:  There was an objection, so let

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 305 of 367   PageID 14532
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 871

1    me hear that.
2              MR. McKEEBY:  Objection, no predicate,
3    foundation.  I don't know what the question meant.
4              MR. PRYOR:  He seemed to.
5              THE COURT:  I will allow it to stand.
6    BY MR. PRYOR:
7    Q.   All right.
8         So you have no guidance from Southwest Airlines
9    in your position as to the relationship between
10   protected speech involving the Union and Southwest
11   Airlines's policies, true?
12   A.   It depends on what it is.
13   Q.   I'm asking about the direction you received
14   from Southwest Airlines to explain to you about
15   union-protected activity as it relates to Southwest
16   policies.
17        Have you received any training on that?
18   A.   I would have to look at them on an individual
19   basis and make a determination.
20   Q.   I'm going to ask you focus on my question.
21        Are you ready for it?
22   A.   Is that a question?  Yes.  I'm ready for it.
23   Q.   Okay.  Have you received any training -- you
24   got that part of the question?
25   A.   I do.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 306 of 367   PageID 14533
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 872

1  Q.   Any training about what union-protected

2  activity is and how that would relate to Southwest

3  Airlines' policies?

4  A.   The only training we get is through experience

5  of seeing certain things happen, and be able to tell

6  one way or the other.  But it -- like I stated, it

7  would depend on what the issue at hand was.  And I

8  can't answer the question without knowing

9  specifically --

10  Q.   I'm not asking you about specifics.  I was

11  asking you about your training, sir.  We will be

12  getting into specifics.

13       So the training you have is your experience.

14       Tell us about your experience.

15  A.   What experience are you indicating?  At

16  Southwest Airlines?  My experience working for the

17  company?  Or what?

18  Q.   The experience you just testified about.  You

19  said -- I said, What training have you had about

20  union-protected activity and Southwest policies and

21  how those interact.

22       And you said, No training, experience.

23       Tell me about your experience.

24  A.   I have worked for the company for 20 -- almost

25  28 years, and I have been a leader in this company

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 307 of 367   PageID 14534
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 873

 1  since 2004.

 2  Q.   I haven't heard anything about your experience

 3  with understanding what protected-union activity and

 4  Southwest policies.  That is my question.

 5  A.   Once again, if it was something that happened,

 6  I cannot give you generalizations if I have been

 7  trained specifically on something unless I know what

 8  you are talking about.

 9  Q.   So you don't even know enough about these two

10  subject matters to know if you have had training on

11  it, true?

12  A.   I don't know the answer to that.

13  Q.   Tell me what protected religious activity is.

14  Surely they trained you on that.

15  A.   Protected religious is speech that reflects on

16  religion in the workplace.

17  Q.   And what training have you received from

18  Southwest Airlines in regard to how to handle

19  someone that is claiming they have religious beliefs

20  that are interacting with Southwest policy?

21  A.   We go through required training once a year on

22  different aspects involving that.  And we go through

23  scenarios, similar to those.

24  Q.   Give us one example.

25  A.   Of?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  Q.   You just told me you get yearly training on

2  this and they give you examples.

3       Give us one.

4  A.   So if somebody is offended by something and

5  they bring it to us, the protocol for what we are

6  supposed to do with that.

7  Q.   You do what?

8  A.   What the protocol would be on how we are

9  supposed to handle that.

10 Q.   What is the protocol?

11 A.   We have a department called Employee Relations

12 that handles those type of issues.

13 Q.   Okay.

14 A.   And I would work with them, if it were

15 something that was involving that.

16 Q.   At any time, to your knowledge, has Employee

17 Relations or you, yourself, in your 28-years,

18 offered a religious accommodation without it being

19 specifically asked for?

20 A.   I have not.

21 Q.   Do you know, of all your involvement in

22 28 years with employee relations, has that been

23 done?

24 A.   I don't, sir.

25 Q.   You can't recall any, true?

```
 1  A.    I can't recall a certain instance of it.

 2  Q.    You can?

 3        Tell us about it.

 4  A.    I said I can't recall a certain instance of

 5  that happening.

 6  Q.    Okay.  Did you consider that Charlene Carter

 7  was engaged in protected union activity as part of

 8  your investigation?

 9  A.    I know that Charlene Carter was speaking to the

10  Union or sending messages to union members

11  indicating that she was not happy with them.

12  Q.    Did you believe she was engaging in

13  protected-union activity?

14            MR. McKEEBY:  Same objection about calling

15  for a legal conclusion.

16            MR. PRYOR:  It is his belief.

17            THE COURT:  He can answer if he has

18  personal knowledge.

19            THE WITNESS:  I don't have personal

20  knowledge of that.

21  BY MR. PRYOR:

22  Q.    I'm asking about your belief.  You have

23  personal knowledge of your belief about protected

24  activity of the Union?

25            MR. McKEEBY:  Same objection, your Honor.
```

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 310 of 367   PageID 14537
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 876

1  He's asking for a legal conclusion of a lay witness

2  as to what is protected and --

3            MR. PRYOR:  If we are having speaking --

4            THE COURT:  I will let him answer, if he

5  has personal knowledge.

6            MR. McKEEBY:  He has already testified he

7  does not.

8            MR. PRYOR:  This -- no.  He's testified he

9  had a belief.  And he testified he believed he knew

10  what --

11            THE COURT:  I will let him answer this

12  question, if he has personal knowledge.

13  BY MR. PRYOR:

14  Q.   So when you -- you were in charge of the

15  investigation of Ms. Carter, correct?

16  A.   Yes.

17  Q.   Did you believe she was engaged in any union

18  protected activity?

19  A.   There was a history of her sharing her opinions

20  to the Union.

21  Q.   Did you believe those communications were

22  protected?

23  A.   To me, they seemed harassing, to some extent.

24  But it could be -- it is just the history there is

25  all I reflected on.  I didn't use that as any reason

1   to make a decision in that case.

2   Q.   Have you read your notes before you prepared

3   the termination letter?

4   A.   I did.

5   Q.   And you are telling me you didn't consider

6   those communications as part of your decision to

7   terminate her?

8   A.   I stated that I didn't consider whether that

9   was free -- speech -- protected speech or not.

10  Q.   Oh, no, I'm totally agreeing.  You didn't think

11  of it as protected speech, you just thought of it as

12  harassing, true?

13  A.   I thought of it as her disagreeing with the

14  Union several times.

15  Q.   I thought you said it was harassing?

16  A.   They seemed to be in nature.

17  Q.   You considered those communications in your

18  decision to terminate, but did not consider those

19  decisions protected union activity, true?

20  A.   I can't say that.

21  Q.   Okay.  What can you say?  So you did think it

22  was protected activity.  I thought you told us it

23  wasn't?

24  A.   I'm not sure what you are asking.

25  Q.   Her communications that you looked at, that you

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 312 of 367   PageID 14539
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 878

1  considered in your termination, you did that, right?

2  A.   I didn't necessarily consider her statements

3  that she made to the Union in my decision.  Her

4  termination was for what she posted on Facebook and

5  the messages that she sent to a Southwest employee,

6  the pictures and videos of the aborted baby.

7  Q.   Again, we will be able to look at some

8  documents tomorrow, but I want to make sure we

9  remember what you just told us.

10      You did not consider anything for her

11  termination except the abortion videos and the

12  vagina hat pictures, would that be fair?

13          MR. McKEEBY:  Objection.

14          THE WITNESS:  No, it's not.

15          MR. McKEEBY:  What else -- what else was

16  there.

17          THE COURT:  He asked a question at the

18  end, and I will let him answer he question.

19  BY MR. PRYOR:

20  Q.   What else was there?  You just told us pictures

21  and video.

22      What else was there?

23  A.   She was terminated for the bullying/hazing

24  policy and the social media policy.

25  Q.   Okay.  And what did you consider for that?  I

1  thought you told me it was the videos and the

2  pictures; it wasn't these maybe harassing union

3  comments.

4       Was it the Union harassing comments, too?

5  A.   It was for the -- she crossed the line when she

6  posted those videos, and pictures, and she sent them

7  to a Southwest employee.  That is what I was trying

8  to say.  And that is what I used as my basis for her

9  termination.

10      The comments and statements that she made to

11  the Union, just showed a history of her having a --

12  that motivation to send things to the Union.

13  Q.   So you considered those three things for

14  terminating Ms. Carter, what you considered to be

15  the harassing communications with the Union -- what

16  do you want to call it?

17  A.   All I'm saying is, that for -- for

18  bullying/hazing, there was a history of her having

19  disputes with the Union.  And the crossing line was

20  the videos and the pictures of the aborted baby.

21  Q.   Were the written communications where she was

22  complaining about her union, that you went back

23  years to look at, were those -- did you consider any

24  of those to be bullying?

25           MR. GREENFIELD:  Objection, your Honor,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 880

 1  asked and answered at least a few times at this

 2  point.

 3              THE COURT:  I will allow this one.

 4              THE WITNESS:  Only as a history, that was

 5  it.

 6  BY MR. PRYOR:

 7  Q.   So it was not a violation of Southwest policy?

 8  A.   The history that she had with the Union.

 9  Q.   The history with the Union, was it a violation

10  of any Southwest policy?

11  A.   Not on its own merits, no.

12  Q.   Well, what other merits would it be?

13  A.   The history of it would be pictures and videos

14  and Facebook posts, and the private message to

15  another Southwest employee.

16  Q.   Without the sending of the video to Audrey

17  Stone of the abortion and the pictures of the vagina

18  hats and her posts on her personal Facebook page --

19  her posts on her personal Facebook page, without

20  those three things, she would not have been found in

21  violation of any Southwest policy, true?

22  A.   Most likely.

23  Q.   What is most likely?  What are we missing?

24  A.   Because I used everything that was given to me.

25  These things were sent to me; I didn't ask for them.

1   They were offered to me as factual things that

2   happened in the past, and I considered everything

3   that was given to me.

4        The one thing, the egregious thing that she

5   did, though, was sending the pictures and the

6   videos.

7   Q.   I just -- if you are not done, go ahead.

8   A.   And posting on Facebook.

9   Q.   I'm comfortable with whatever answer you give

10  me, but I am not comfortable with you having it both

11  ways.

12       Was it the videos, the pictures --

13            MR. McKEEBY:  Objection.

14            THE COURT:  Sustained.  You can ask your

15  question.

16            I will strike it.

17            You can ask your question now.

18  BY MR. PRYOR:

19  Q.   The video, the picture, and the Facebook posts,

20  were those the basis of the termination?  Or was it

21  also the -- what you called the harassing

22  communications with the Union?  Was it all of that

23  or was it just some of it?

24            MR. McKEEBY:  Objection, asked and

25  answered.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                      Page 882

1          THE COURT:  I will allow him to answer

2    this.

3          THE WITNESS:  It was the posted pictures

4    on the Facebook page, the videos, the private

5    message sent to an employee, and the bullying and

6    hazing policy.

7          Also, the part of it was the nexus to the

8    workplace, where she was identifiable on Facebook as

9    a Southwest employee when she did these things.

10   BY MR. PRYOR:

11   Q.   The bullying, what you said about the bullying,

12   was that the communications with the union that you

13   thought were a little too harsh?

14   A.   It was the videos and pictures of the aborted

15   baby being posted on Facebook and being sent as a

16   private message.  That is what I'm trying to portray

17   here.

18   Q.   Okay.  What I'm not hearing is the -- it may

19   have provided you background, but the communications

20   with the Union that you thought might have gone over

21   the top, other than the -- what you have just

22   mentioned, were not part of your termination

23   decision?

24   A.   I never said that the video -- or the

25   communication was over the top.  I just said that

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 317 of 367   PageID 14544
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 883

 1  that was history between her and the Union.

 2  Q.   But that wasn't part of your termination

 3  decision?  Those weren't factoring into your

 4  termination decision?

 5          MR. McKEEBY:  Objection, asked and

 6  answered.

 7          THE COURT:  I will let you answer it one

 8  last time.

 9          MR. PRYOR:  I'm sorry.  I still haven't

10  gotten it.  It is just me.

11          MR. McKEEBY:  He's answered.

12  BY MR. PRYOR:

13  Q.   Go ahead.

14  A.   It was the history, I was sent all of this

15  information.  I considered the extent of the

16  information in my decision making.

17      The thing that crossed line, though, was the

18  videos and pictures posted and sent in private

19  message, and the other pictures of genitalia and

20  things.

21  Q.   Did you consider the abortion video Facebook

22  message that was sent to be protected religious

23  activity?

24          MR. McKEEBY:  Object to the form again.

25

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 318 of 367   PageID 14545
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                          Page 884

 1  BY MR. PRYOR

 2  Q.   From your belief?

 3          MR. McKEEBY:  It is calling for a legal

 4  conclusion.

 5          MR. PRYOR:  He was the decision maker.

 6          THE COURT:  I will allow him to answer, if

 7  he has personal knowledge.

 8  BY MR. PRYOR:

 9  Q.   My question is, did you consider whether or not

10  this was protected religious activity?

11      How about that?  Did you even consider that?

12          MR. McKEEBY:  Same objection.

13          THE COURT:  I will allow it.

14          THE WITNESS:  It was all part of my

15  investigation.  I looked at all of the information

16  that was given to me, and I considered every aspect

17  of it.

18          And the conclusion that I came to was

19  based on, overall, the video, the pictures, that

20  were posted and sent in private message.

21          I don't know any other way to say it to

22  you.

23  Q.   I'm going to object to the responsiveness and I

24  just ask you to focus on my question.

25  A.   Okay.

1  Q.   Did you consider the speech or the

2  communication, that Facebook communication with the

3  abortion, the communication and the abortion video,

4  to be religious activity at all?

5  A.   I pictured it -- I mean, I decided on it

6  because of the egregiousness of it.  Whether it was

7  religious or not, it was the egregious act of

8  sending it to somebody, posting it on Facebook,

9  while being depicted as a Southwest employee.

10  Q.   It is he whether or not.  Did you consider it

11  to be religious activity?

12  A.   I didn't consider it to any extent to be

13  religious activity.

14  Q.   Okay.  And then what about the union activity,

15  did you consider that Facebook post to be union

16  activity at all?  Was that part of your

17  consideration?

18          MR. McKEEBY:  Objection, asked and

19  answered.  Again, calling for a legal conclusion.

20          THE COURT:  He split this one out, so I

21  will ask the witness to answer.

22          THE WITNESS:  Can you say that one more

23  time?

24  BY MR. PRYOR:

25  Q.   Yes.  You already told us you didn't consider

 1  it religious.

 2        Now I'm asking you, did you consider that

 3  Facebook post to be part of her union activity?

 4  A.    I considered it to be her opinion on abortion.

 5            MR. PRYOR:  Object to responsiveness.  I

 6  didn't ask you about that.

 7  BY MR. PRYOR:

 8  Q.   Did you consider, as part of your termination

 9  decision, whether or not that Facebook message post

10  was part of her union activity?

11  A.   No, I did not.

12            MR. PRYOR:  All right.  This is a good

13  place to break for the day, unless you would just

14  like to go on.

15            THE COURT:  I think it is.  Thank you for

16  pointing that out.

17            So the same instructions as always:  You

18  can always talk to your fellows jurors and court

19  personnel, just not about the case.  You can't talk

20  to anyone else.  And please don't do any research

21  about the case.

22            We will see y'all at 8:45 tomorrow to

23  start at 9:00.  Thank you for patience today.

24            All rise for the jury.

25            (The jurors exited the courtroom.)

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 321 of 367   PageID 14548
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                        Page 887

```
 1              THE COURT:  Okay.
 2              And, Mr. Schneider, you are what we call a
 3   hold-over witness.  So that means you can leave the
 4   stand and the courthouse, but you can't talk to
 5   anyone about the case until your testimony is over.
 6              Understood?
 7              THE WITNESS:  Yes.
 8              THE COURT:  Okay.  Thank you for coming
 9   here today.  Sorry about you being a hold-over
10   witness.  I know it is an inconvenience.
11              Okay.  After he leaves, I will ask if
12   y'all if anything else we should talk about.
13              (The witness exited the courtroom.)
14              MR. PRYOR:  I hope the Court recalls that
15   when we had that conference and you suggested that
16   maybe I should move on to another line of
17   questioning, that I did.
18              THE COURT:  I do.  And what I will say is,
19   I have crunched some math this afternoon.  I'm
20   feeling charitable after seeing the faster cutdown
21   Talburt depo and you are going to punch more
22   quickly.
23              So now let me just lay all my cards out
24   here with y'all.  So the trial I had going next
25   week, I pushed to August.  I'm supposed to fly out
```

1  on a Southwest plane on Thursday -- don't hold up

2  the flight or do anything with the flight, I'm a

3  normal passenger -- to a conference in Utah.

4          I had originally hoped the jury could get

5  this case early on Wednesday.  But I think what I

6  can do is phone a friend for a favor and see if

7  another judge can cover jury notes, or deliberation

8  and taking a verdict.

9          And the jury gets the case at the end of

10 the day Wednesday.  That frees up more time on

11 Wednesday for us to finish the evidence, have a

12 formal charge conference, read the jury charge,

13 close, close.

14         With that, I have come up with a bucket of

15 six hours.  I am begrudgingly giving three to you

16 and reserving back, if the need arises, giving an

17 hour and a half to each of you because of prolonging

18 their presentation, if that makes sense.  I'm giving

19 it to you more out of a charitable gift, than

20 anything else.

21         MR. PRYOR:  I am turning cartwheels in

22 head.  We will make good use of that time.  Thank

23 you, Your Honor.

24         THE COURT:  I appreciate that.  I don't

25 know which judge would cover yet.  I need to start

1  making those requests, and I will start doing that

2  now.  All of the judges in the courthouse are

3  smarter than me, so I promise it will be an upgrade.

4            But I will still be available by phone --

5  as long as I'm not in the air, I will be available

6  by phone.  And my clerks have worked on this case.

7            The biggest thing I fear is a jury note

8  about the jury charge, right, and a new judge comes

9  in.  That is a scenario I would like to avoid.  But

10 I'm not, you know, out of cell range, and so I will

11 still be available.

12           So all that to say, yeah, I think that

13 is -- I think that is what I can do move some things

14 around.

15           I do need y'alls commitment to help me

16 keep trains on time.  And we were doing a pretty

17 good job today, but there were sometimes a 10-minute

18 break became a 15.  To the extent we can keep them

19 all, that is where my math lines up.

20           If we start taking 15, 20-minute breaks

21 then that -- the math just doesn't work out anymore.

22 there.

23           So it is a mutual agreement to have me

24 keep trains on time with y'all, and then me give

25 y'all all of the time we can possibly squeeze in.

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 324 of 367   PageID 14551
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 890

1              Make sense?

2              So I'm not giving you your hour and a half

3    yet, but I'm holding it in reserve.  It is like the

4    helicopters with a use in war fuel reserve.  All

5    right?  If we need to get there, we will do it.

6              MR. McKEEBY:  But you are giving him three

7    hours?

8              THE COURT:  I'm giving him three hours.

9    And I'm holding back, out of the additional time I'm

10   giving, an hour and a half that I can give y'all if

11   the need arises, because his presentation is now

12   longer.  And equitably, yours should be too.

13             I hope you won't need it, but if you do,

14   it's there.

15             Does that make sense?

16             MR. McKEEBY:  We are definitely done

17   Wednesday, at close of business.

18             THE COURT:  Yeah, we got to be.  Right?

19   We got to get this case to the jury at the close of

20   business Wednesday.

21             Now, if they stay to deliberate all night

22   or whatever, you know, it is what it is.  They can

23   do what they want to do.

24             And at some point near the end, I will

25   have to tell them there is going to be another

1  person in a robe up here older and wiser than I am

2  if it gets past Wednesday.  But I don't need to tell

3  them that yet.

4            Nevarez, nothing from Nevarez, right?

5            MR. McKEEBY:  No, we have advised --

6            MR. GREENFIELD:  No, Judge.

7            MR. McKEEBY:  -- counsel that I think we

8  already covered where he is and they are attempting

9  to serve him.

10            THE COURT:  Well, I appreciate your

11  cooperation in that.

12            MR. HILL:  Where we hope he is.  We know

13  where he landed; we think he's going home.  But --

14  and that is where we are headed, is to his home.

15  But that is where we are.

16            THE COURT:  Where in the World is Carmen

17  San Diego?  It sounds like that the old show that my

18  kids still watch on TV.

19            So tomorrow morning, our 8:30 time -- you

20  know, I've styled it also as a show-cause hearing.

21  We will see if he shows up.  I assume Southwest will

22  know in advance if he is showing up because he will

23  be flying standby.

24            MR. McKEEBY:  Perhaps.

25            Your Honor, and just for purposes of the

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 326 of 367   PageID 14553
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 892

1  record, I would like to object to the extension of

2  time.  I don't think it is warranted.

3          Southwest prepared the case based on the

4  time limits set, and based on the denial of their

5  request for additional time.  And I think it is more

6  than sufficient time to try this case in the

7  allotment originally provided.  So Southwest

8  objects.

9          THE COURT:  I understand, and I share a

10 lot of your sentiments.  What I will say is, that

11 there are lot of unique attributes to this case, and

12 so I'm trying my best to accommodate everyone's

13 concerns.

14         I will say, going from 12 to 15, is not

15 the 26 that you wanted, but I think we can squeeze

16 it out.

17         So I appreciate your objection.  I will

18 overrule it.  But that is also, understand, I'm

19 giving you all we have.  There is not another well

20 we can dip into.

21         MR. McKEEBY:  Question, scheduling-wise,

22 on the jury charge, does the Court have a sense of

23 when we might be discussing that?

24         THE COURT:  So I appreciate you bringing

25 it up.

 1              The first thing is, I need to get

 2  interrogatories to you, right?  I gave you the jury

 3  instructions; I still need to get you the questions.

 4  So we are working on that.

 5              My request would be, can we think about

 6  maybe Monday morning starting at 8:00, which hurts,

 7  instead of 8:30, and have a discussion informally on

 8  the charge.  It could be off the record.

 9              I will say, if y'all have thoughts this

10  weekend that -- I never want to deprive people of

11  time to argue on the jury charge, especially in an

12  informal charge conference.  But we will still get

13  the jury around 9, even if we don't have exhibit

14  objections to get to.

15              If anyone has deep, weighty thoughts and

16  cases, you can file something on the docket and I

17  promise I will read it, right?  So you can file

18  whatever you want to that goes after the charge that

19  I have given y'all, if that makes sense.

20              And so I will take that into

21  consideration, in addition to whatever you tell me

22  Monday at 8:00 at an informal charge conference.

23              And those two things combined can give me

24  all I need to know, so that the formal charge

25  conference, when the jury is angry at us -- so that

1    it can be as streamlined as possible.

2              So Monday at 8, is that all right?

3              MR. McKEEBY:  That works.

4              THE COURT:  I'm sorry in advance.

5              Sorry.  I should set a deadline for when

6    you file something in time for me to read it.

7              So can I ask by Sunday at 5, you file

8    anything in writing you want to that attacks my jury

9    charge and says where I'm wrong.

10             And that gives me time to read -- if you

11   file it, you know, Monday morning at 7:45, I just

12   won't have time to read it or think about it

13   beforehand.  But I will be up on Sunday working on

14   your stuff anyway.  So I will read that too.

15             Okay.  So tonight, 6:00, 8:00, we have

16   more designations due and objections due?

17             MR. GILLIAM:  Yes.

18             THE COURT:  Okay.  Anything else we need

19   to talk about?

20             Okay.  Efficiency really did pick up.

21   Thank you.  And that is in large part why I gave you

22   the additional time.

23             It has been efficient on your end today,

24   too.  And I appreciate that.  It has been

25   remarkable, so thank you for moving the ball

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 329 of 367   PageID 14556
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                              Page 895

1    forward.

2            With that, I guess I will see y'all

3    tomorrow at 8:30.

4            Thank you.

5            (Proceedings adjourned at 5:19 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 330 of 367   PageID 14557
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Page 896

1                    C E R T I F I C A T E

2

3                 I, Kelli Ann Willis, RPR, CRR, CSR

4    certify that the foregoing is a transcript from the

5    record of the proceedings in the foregoing entitled

6    matter.

7                 I further certify that the transcript

8    fees format comply with those prescribed by the

9    Court and the Judicial Conference of the United

10   States.

11               This 8th day of July 2022.

12

13                    s/ Kelli Ann Willis
                      Official Court Reporters
14                    Northern District of Texas
                      Dallas Division
15

16

17

18

19

20

21

22

23

24

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                           Index: $10..5

**$**

**$10** 698:15

**$17,000** 690:23 691:19

**$17,530.01** 695:6

**$17,570** 691:4

**-**

**-14** 599:10

**1**

**1** 679:9 819:23 861:19

**1,000** 662:9

**1,612** 683:18

**10** 791:17 847:3

**10-minute** 631:1 889:17

**100** 740:6 765:2

**106** 599:5,8,10,11 600:22 601:5,13

**106-A** 601:7

**106A** 600:20

**115** 683:14

**12** 892:14

**12-month** 684:3

**12:53** 708:17

**13** 600:18 765:20 842:22

**130** 682:4 706:24

**132** 665:15,24

**134** 677:13 719:14,18, 19,23 720:2

**1380** 742:19,22

**13th** 765:17,23,25

**14** 600:18 758:11 764:11

**141** 825:24,25 836:2

**15** 585:17 595:5 597:3 616:19 628:10 683:4

713:16 806:24 889:18, 20 892:14

**15,000** 684:20

**15-A** 598:13,14,16,19, 21 767:22 791:21

**15ish** 773:19

**15th** 658:3 862:4

**16th** 833:14

**17** 721:1

**17,000** 691:7

**18** 696:23 723:20,24

**19** 682:5 727:16 837:12

**1st** 651:24 704:20

**2**

**2** 696:12 732:6,12,19,23 736:25 737:17,23 738:6,13 763:12,20 764:20 766:3 819:21

**2-V** 660:2

**20** 721:22 727:16 804:20 846:13 872:24

**20-minute** 889:20

**2004** 696:23 764:11 873:1

**2005** 697:23

**2006** 697:23 698:20

**2008** 700:5

**2009** 699:18

**2013** 686:2 704:20 724:15 819:12 824:24 833:14 834:16

**2014** 765:17,20,23,25 825:21 842:22

**2015** 612:3,6,17 683:15, 19,23 724:18 764:25 819:11 836:25 838:14

**2016** 683:15,19,23 799:16

**2017** 612:3,6,17 673:24 674:3 758:12 768:12 786:10 797:5 843:1

856:15 857:9 859:9 861:12,19 862:17

**2018** 742:19 758:13

**2019** 579:20

**21** 622:22 623:12,15,24, 25 624:10 625:5,6 632:1 636:6,11 637:21, 22 638:4,8 644:20 647:6 794:15 850:19 865:9 866:7

**21-0** 794:13,19

**21-A** 622:25 623:6 838:22

**21-C** 838:22 839:2 847:9 849:15,16 850:13,17 851:14

**21-M** 858:13 864:6,11, 25 866:15

**21-O** 793:23,24 794:14, 16,21

**21-P** 622:20 631:23,24 632:19,20 635:4,25 636:1,2,4,23 637:2,23 638:16 650:20 858:25 865:23

**21-Q** 622:19 629:13 631:19 644:15,16,17, 18,24 860:5

**21-R** 646:16,25 647:1,5, 11,14,18 860:22 861:3

**21-T** 651:12,13,19,21 861:18

**21-U** 657:17,18,20,24 658:2 840:25 841:3,7, 22 862:3,9 865:23

**21-V** 660:3,5,6,13 862:16

**21-W** 862:25 863:12 866:6,11,16

**21-X** 671:14,15,20,21 672:1,3,12,15,17

**21s** 631:20 865:24

**22nd** 856:15 857:9

**23** 576:1

**23rd** 646:18 859:9

**24/7** 826:8

**26** 765:8,10 832:21,22 833:19 892:15

**26th** 861:12

**27** 673:9 765:18 842:17, 19

**28** 696:23 872:25 874:22

**28-years** 874:17

**29** 825:21 854:5

**2nd** 862:17

**3**

**3** 573:6

**3,503** 684:9

**30th** 758:13

**34** 588:9,12,14 589:5 621:11,13,14,18,23 622:2,5,6

**36** 682:8

**365** 742:6

**365-day-a-year** 742:5

**39** 603:16,18 605:25

**3:02** 791:17 792:3

**4**

**404** 747:8

**4264** 807:20,21,22

**4267** 808:9

**442** 682:4

**45** 715:8

**47** 777:15,18,20 778:4 805:17

**49** 682:11 789:24 790:1, 6,9,12

**4:24** 847:3

**5**

**5** 703:11 742:7 894:7

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 332 of 367   PageID 14559
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                                    Index: 5'10..add

**5'10** 706:17

**5'7** 706:17

**5,000-foot** 728:19

**50** 684:13

**504** 682:24

**525** 711:16

**53** 589:7,23 590:9

**55** 709:5

**556** 573:20 602:3
618:14 639:11 654:10
657:7 658:15 661:2,10,
18 668:13 673:24
695:18 720:14 721:4
786:3,7,16 819:18
820:16,20 821:2 837:1
844:16,20

**56** 590:11,16,25 591:1,7
779:14,18

**56.8** 779:19

**57** 590:17

**5712** 599:10 600:18
601:5,14

**5713** 601:5

**5714** 601:5

**59** 590:18,20,25 591:5

**5:19** 895:5

**6**

**6** 599:2,4,9 695:16

**60** 855:16

**612** 595:8

**64** 591:11 592:1,2,23

**65** 592:19,21,22 616:6,
10,16 617:6,12 621:20,
21

**66** 617:4,5,8 632:18
637:9 638:1 748:21
769:3

**66.3** 770:4

**66.5** 771:1

**661** 769:18

**662** 769:16

**67** 749:1,3,10,17

**68** 592:24

**6:00** 894:15

**6:21** 833:14,25

**7**

**7** 846:20

**7,001** 684:22

**71** 856:24 857:13 864:5,
11 866:15

**72** 592:24 857:8,10,13
858:3 864:5,11 866:15

**75** 707:4

**7:45** 894:11

**8**

**8** 846:20 894:2

**80s** 826:19,22

**88** 683:10

**8:00** 893:6,22 894:15

**8:30** 891:19 893:7
895:3

**8:45** 886:22

**9**

**9** 893:13

**94** 780:8,9,10,20 806:18
807:23

**94.2** 781:17

**94.4** 782:18

**94.7** 783:22

**9:00** 886:23

**9:58** 631:2

**A**

**a.m.** 833:14,25

**abeyance** 716:3

**abiding** 730:21

**ability** 691:9 735:22
762:24

**aborted** 769:23 770:17
878:6 879:20 882:14

**abortion** 608:12 746:6,
21 747:12 759:3,8,15
769:11 770:17,18 775:3
776:23 777:5 803:12,
17,20,25 805:2,8
808:11 811:4 812:3,12,
20 813:3,6 878:11
880:17 883:21 885:3
886:4

**abreast** 688:7

**absolutely** 577:15
594:4 653:15 795:14
797:13

**accept** 577:3 578:2
634:22 641:8,11,17
645:10 647:21,23
670:22

**accepting** 732:21

**access** 748:5 756:5

**accidentally** 808:19
809:24

**accommodate** 668:14
669:9 729:22 736:3
892:12

**accommodated**
729:18

**accommodating**
668:20

**accommodation**
670:23,24 874:18

**accommodations**
669:3 671:8,10

**accompanied** 764:4

**accompanies** 730:10

**accompany** 732:13

**accompanying**
810:22

**account** 739:8,24

**accountable** 832:10,

12 835:18

**accounts** 739:4,7,19

**accurate** 605:2 740:23
820:18 832:8,13 855:11

**accurately** 767:4

**accused** 745:8

**acknowledge** 841:22

**acknowledges** 860:13

**act** 688:22 689:2 885:7

**acting** 799:23 821:7

**action** 586:20 590:15
601:16 643:17 644:10
646:13 650:13,17 656:4
657:13 658:11,19
659:12 661:14,19 675:8
699:19 744:11 762:11
819:6

**actions** 620:11 676:14
688:9,13 691:10 762:4,
23 820:1

**active** 723:5 740:15

**activities** 577:7 726:24
727:7 820:12 870:13

**activity** 577:8,17 586:1
595:7,15,22 597:13
606:12 620:11,19
639:19 641:5 642:21
643:4,19 644:2,13
646:11 652:19 653:3,4,
5 656:21 657:8,12
661:21 662:1,20 673:19
674:11 676:7,10,20,25
677:3 691:10,13 713:2
762:3 768:8 781:13
807:8,11,15,18,24
808:4 814:19 815:22
820:3,4 868:4,15
871:15 872:2,20 873:3,
13 875:7,13,24 876:18
877:19,22 883:23
884:10 885:4,11,13,14,
16 886:3,10

**actual** 657:3 769:25
782:24 813:7,21

**ad** 814:20,24

**Adam** 573:19

**add** 661:23 864:13

**added** 628:10

**addition** 665:11 666:11
844:20 893:21

**additional** 688:13
711:10 712:15,20,22
713:14 714:3,8 715:19,
23 716:5 717:9,25
730:6 745:18 839:5
890:9 892:5 894:22

**address** 626:19,25
627:8,20 633:23,24
634:5 662:8 738:20
739:9,11,13 782:24
783:16 844:2,6 864:6

**addressed** 648:19

**addresses** 601:20
626:2,3,15,18 627:2
628:3 630:18 632:15,17
633:16,19,23 740:5
778:13 783:17

**addressing** 836:11

**adjourned** 895:5

**adjust** 585:13 714:22

**adjusting** 714:25

**Adjustment** 700:13
734:5,15

**adjustments** 700:9
714:22

**administering** 836:19

**administration** 603:9,
12 606:16 608:5 612:1
640:25 669:12 673:4,7
699:21 706:3 720:25
729:11 731:20 736:3
829:12,23 830:4

**admission** 598:15
616:9 621:12 622:18
629:13 635:25 644:16
647:1 657:18 660:5
671:14 794:12 865:16
866:5

**admit** 589:23 598:19
600:21 644:18 777:18
780:9 794:16 847:9
849:15,16 850:12,16

**admitted** 598:20 601:6,
10 616:13,15 621:20,
21,23 622:1 644:23

**admitting** 601:4 625:5,
9 660:8

**adolescent** 746:12

**adolescents** 701:2

**adoption** 747:15

**advance** 575:5 579:12
628:9 730:5 762:15
891:22 894:4

**advantage** 828:11
830:8

**adventure** 581:20

**adversary** 823:6

**advised** 891:5

**advising** 705:10

**Advocacy** 700:24

**advocate** 701:1 730:18

**advocating** 701:5,6

**affect** 655:5 698:9
803:25

**affecting** 655:5 785:22

**affidavit** 581:8,17

**affirmative** 668:14

**afford** 713:19

**afforded** 736:13

**AFL-CIO** 618:14
786:25

**AFOS** 725:20

**afraid** 752:5,20,25

**aftermath** 580:6

**afternoon** 587:24
588:3 791:8 887:19

**age** 706:25 748:8

**agency** 670:20 683:4
726:2,20,22

**agenda** 788:14

**agent** 760:20 761:2

**agitated** 854:18

**agonized** 750:18

**agree** 577:22 624:10
628:8,9 639:19 641:9
652:19 653:17,19 654:5
656:12 732:20 813:4
823:13 833:5 835:2
840:17 855:4 856:10,11
861:15,22

**agreed** 619:8 638:10
647:24 680:7

**agreed-upon** 678:16

**agreeing** 877:10

**agreement** 635:1
678:14 679:6,9 680:13
681:8,11 695:17 696:3,
13 699:17 702:20
731:12 732:22 736:10
751:22 752:12 761:11
762:2 819:10 889:23

**ahead** 573:7 591:20
654:8 675:19,24 720:9
790:13 792:9 802:2
846:17 849:4 881:7
883:13

**aid** 851:4

**air** 889:5

**aircraft** 742:14 743:1,3

**airline** 615:24 742:4,12
785:17

**Airlines** 596:14 603:1
604:20 607:3,15 609:1
610:9 611:19 612:25
613:4,9,13,19 614:14
627:2 641:7,21,24
642:22 643:8 644:12
645:8,16 646:8,14
647:20 648:3,6 650:12,
22 651:25 657:14
659:19 661:11,20
664:6,25 665:5 667:21
671:1 674:10,22,23
685:2,11 696:22 701:13
702:1 704:7,22 707:6
710:18 721:14 725:3,9
727:13 728:18 729:4
731:4 732:5 733:9
735:11 737:14 740:16

741:15 743:7 750:22
754:24 755:25 756:1,3
761:18 762:10 764:20
766:19 768:25 773:6,14
775:8 780:24 781:2
784:11,14 795:6 801:5
815:3,6 819:14 821:23
825:5 826:15,19,22,23
827:2 828:3,24 834:19
836:12 838:4 839:11
840:12 843:8 852:3
853:6 856:5 857:21
859:11 868:1,2 870:21
871:8,14 872:16 873:18

**Airlines'** 872:3

**Airlines's** 699:8
737:18 778:19 857:3
871:11

**airport** 755:1,24 756:4
771:25 772:2 776:7,13

**Albert** 782:8,14

**align** 637:22

**alive** 770:17 776:18
811:24

**allegations** 662:14
665:4

**alleged** 745:7 769:23

**allotment** 892:7

**allowed** 619:4,5 639:9
656:25 668:5 670:11
688:21 724:24 725:1,4,
13,18 727:6 754:21
868:19,24 869:10,15,
17,19

**allowing** 651:16

**aloud** 749:22 750:6

**altered** 683:14

**altitude** 742:25

**Alveda** 808:10

**amazing** 585:16

**ambiguous** 689:25

**amenable** 712:23

**amendable** 704:20
705:4

**Amended** 690:15

**America** 787:1

**American** 596:14
815:3,6

**amount** 654:18 655:1
694:8,13,14,23 695:8
715:15 772:5,6

**amusing** 847:21

**anatomically** 619:21
805:19 806:9

**anatomy** 813:22

**and/or** 679:4 682:12
753:3

**Andrea** 783:13,15

**anesthesia** 594:2

**angle** 835:22

**angry** 784:20,25 785:2
893:25

**announce** 857:11

**answering** 686:20
721:18 728:7

**answers** 867:11

**anti-recall** 638:25

**anti-union** 603:5,10
604:7,21 606:3,4,20
608:1,21 609:25 610:11

**anticipate** 574:25

**anymore** 889:21

**AOL** 633:22 634:10

**apologies** 649:15
750:17 791:24

**apologize** 591:2 600:7
749:25 751:10,11

**APP** 637:9

**apparently** 596:14
826:7 827:23 828:13
831:2 832:20 844:6,15
857:18

**appeal** 577:24 732:7
763:21

**appealing** 732:9

**appearance** 782:7

**appearances** 573:7

**appeared** 759:17
811:22,24

**appears** 648:9 654:13
673:11 828:22 833:15
855:9

**applied** 836:17

**apply** 624:19 707:8
744:15

**appointing** 724:1

**approach** 582:13
596:1 599:15 602:15
603:13 604:2 665:15
667:22 694:18 734:18,
20,23 794:5 806:20
866:23 867:2

**approached** 615:22
669:24

**approval** 721:9

**approximately** 724:16

**April** 742:19 758:13
825:21 838:14

**arbitration** 700:9
734:5,15,16

**arbitrator** 700:13

**archived** 839:8,14

**area** 756:6 810:18

**argue** 820:11 893:11

**argued** 819:25

**argument** 804:1 805:5
820:15,17

**argumentative** 798:13
870:2

**arise** 838:5

**arises** 888:16 890:11

**arm** 593:24

**arranged** 753:2

**arrival** 705:8

**Article** 695:24 727:15

**asleep** 720:10

**aspect** 714:6 884:16

**aspects** 873:22

**ass** 845:19,25 854:2

**assassinate** 828:10

**assassination** 835:16
836:3 863:3

**assassinations**
827:12,19 828:9 832:2
863:20

**assert** 796:11

**assigned** 721:5 730:3
732:1

**assist** 762:7 763:20

**assistance** 754:24

**assistant-type** 740:11

**assisted** 704:2 762:21
822:6,7,10

**assisting** 698:22
705:20 740:21

**associates** 704:1

**association** 808:13

**assume** 580:11,13
837:3 840:22 891:21

**assuming** 650:16
700:22 783:8,14 845:22
855:11 863:8,16

**assumptions** 652:10

**astone@twu556.org**
738:25

**at-risk** 746:9

**attach** 657:3 859:21

**attaching** 638:20

**attachment** 652:6,12

**attachments** 662:6

**attacks** 894:8

**attempt** 858:14

**attempted** 795:4

**attempting** 891:8

**attend** 727:4 763:24
764:18 788:21 799:1

**attendance** 758:22
786:23 788:15 801:18

**attendant** 613:21

614:4 615:20,24 642:3
662:9 669:19,22,23
670:10 674:14 696:21,
24 697:2,25 707:9
721:15 722:7,11,13
725:8,9 727:20,25
728:13,21 729:3,9,14
730:2,6,9,10,18 731:10
732:13,24 733:8,13
734:7,11 735:17,22
736:20,24 737:5,12
745:6 755:2,25 757:18
758:1,3,10 764:10
767:5 775:19 778:20
786:17 819:17 826:13
838:11

**attendant's** 728:2
764:2

**attendant-friendly**
698:7

**attendants** 601:20
613:14 648:10 650:6,8
663:24 665:5 666:3
677:22 698:4 699:3,7,
25 720:20 721:1,12,22,
25 722:4,17 725:3
727:24 735:19 751:21
753:8 756:10 757:16
761:23 762:6 763:17
764:6 767:7 779:11
780:5 784:19 786:23
787:14 788:5,18 801:17
838:9

**attended** 758:19 764:3,
20 775:20 779:12

**attending** 753:9

**attention** 622:4 665:20,
21 738:18 750:19 795:5

**attitude** 826:18 827:4

**attorney** 669:3,8,14
671:7 702:17 703:25
704:5 712:25 789:17

**attorney-client** 669:4

**attorneys** 705:9
818:18

**attributes** 892:11

**attributing** 687:25

**audio** 776:12 847:19
851:1

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 3 July 07, 2022                    Index: Audrey..book

**Audrey** 599:25 624:7 659:15 676:19 750:19 818:20 820:21 833:3 842:10,22 843:5,10 845:23 855:17 856:16 858:20 859:2 861:13,19 862:18 863:1 880:16

**August** 580:1,3 833:14 887:25

**authored** 770:21 855:17

**authorities** 696:15 756:4

**authority** 743:23 744:2

**auto** 739:13

**automatically** 808:24 809:6,21

**availability** 731:25

**avoid** 581:19 831:3 889:9

**awake** 594:1 722:19 735:5

**aware** 662:15 664:24 688:13 705:9 735:21 738:1,12 758:24 762:18 829:1 830:3 839:12 843:5,12

**Awesome** 848:10

**awkward** 584:12

———————

**B**

**B-R-E** 633:13

**babies** 807:11

**baby** 748:12 770:17 776:17 811:3,20,23,24 878:6 879:20 882:15

**baby's** 812:6

**back** 576:11 588:6 593:10 625:17 628:19 629:16 631:2 634:16 635:3 650:20 664:7 694:9 696:19 703:2 709:5,23 716:9,13 720:4 726:15 727:9 731:1,7 736:18 751:8, 18,23 753:15 757:3,18,

19,24 758:2,9 760:10 769:18 772:18 791:21 807:20 810:21 816:20 830:14 840:7 842:25 847:2,8,20 879:22 888:16 890:9

**back-and-forth** 838:12

**backed** 639:13

**background** 776:19 882:19

**backlog** 579:24

**bad** 682:9 745:10,14 798:25 799:6 806:15 847:23

**bag** 586:21

**balances** 722:10

**ball** 894:25

**Baltimore** 700:4 783:20,21

**Baltimore-washington** 771:25

**bargaining** 681:8,11 695:17 702:20 704:1 731:12

**base** 614:14,17,18,25 615:2,7,19,22 616:2 645:17,22,24 651:24 659:21 698:23 699:20 729:13 732:16 737:20 756:3 764:14 773:22 774:1,5,7 823:21,22 868:3

**based** 577:14 610:2 615:3 638:6 645:18,23 670:13 682:18 687:17 720:20 723:13 736:6,12 737:22 767:15 773:11 774:14 837:19 851:25 884:19 892:3,4

**bases** 699:23 723:9 754:11 839:9,16,24,25 840:13

**basically** 709:5 722:9 726:10 819:3 821:11 825:17 831:17,23 832:10

**basis** 627:18 678:12, 15,17 686:23 739:24 747:3,7 766:24 795:9 804:6 824:20 871:19 879:8 881:20

**batch** 778:8 781:6

**batches** 781:5

**Bates** 624:14 637:5,7, 22

**battery** 840:5

**beans** 584:14

**begins** 769:20

**begrudgingly** 888:15

**behalf** 573:14,20 622:9 695:10 721:19 728:3 737:12 787:18 820:16 850:4 858:16

**behavior** 663:23 863:18

**behind-the-scene** 834:22

**behind-the-scenes** 704:23

**belief** 657:6 670:7,10 693:22 875:16,22,23 876:9 884:2

**beliefs** 668:15 669:9 670:1,14 748:18 776:23 793:14 873:19

**believed** 613:20 747:12 876:9

**believes** 653:3,7 691:15

**bench** 579:20

**bet** 772:16 777:22

**Bible** 670:10

**big** 654:22 854:20

**bigger** 654:22 832:25 834:25

**biggest** 775:17 889:7

**bind** 762:24

**bit** 648:20 676:13 680:3 682:7 696:19 712:20 720:8,11,13 735:7

744:22 753:15 758:5 785:9 816:3 820:23 840:9

**black** 660:18

**blacked** 641:10,15 647:22 859:16

**blanked** 849:14

**block** 801:14

**blocked** 802:22 815:25 816:6

**blocking** 802:4 833:20

**bloody** 793:1,4,17

**blow** 652:9

**blue** 781:17

**blur** 596:6

**blurred** 596:5,6 652:16 654:6,22

**board** 624:22 640:11 654:16 656:23 672:23 679:2,8,11,18,21 680:5, 9,12,14,15,22 684:11 687:16 688:1 698:23,25 700:5,8,12 720:17,19, 24,25 721:6,9 722:23, 24 723:1,3,7,11,17,25 729:15,24 733:2,12,16, 17,19,25 734:5,6,15 739:1 740:18 741:19,20 744:15,16,19,20,23 754:7 755:13 760:18 761:13 782:11,23,25 783:2,4,15,21 784:4 828:15

**boarding** 810:18

**boards** 724:24

**Bobby** 573:11 818:15 867:21

**body** 680:6 720:18 723:12 733:3 744:14 750:15 751:25

**boil** 735:7

**bolded** 681:22

**bombing** 781:18,22

**book** 697:25 698:11,14 702:16

**boring** 720:9

**Bott** 704:2

**bottom** 580:20 597:5,8 739:12 770:1 833:10, 14,18 838:1 851:4

**box** 866:23 867:8

**boxes** 587:17

**BR** 679:17

**breach** 851:25

**break** 590:14 593:23,25 594:5 630:5,9,15,22 631:1,4 668:7 708:5,9 709:22 719:14 791:8 792:2 845:10 846:13, 18,22 847:8 886:13 889:18

**breaking** 708:3

**breaks** 889:20

**Brett** 580:11 626:19 627:11,12,14,25 628:21 641:13 659:16 661:1 672:18 773:16 819:24 820:1 837:5 844:1,3,17 854:15

**Brett's** 846:5

**Brian** 573:15 585:19 624:8,21 637:3 638:17 641:6 642:15 646:3 655:12 658:2 659:9,23 660:21 760:14 765:11, 21 817:1 818:14 833:11 839:7,9,25 842:21 843:25 858:13 860:1,11 862:10

**Brian's** 633:11

**briefing** 633:20

**briefly** 700:21

**bring** 590:15 591:20,23 593:8,11,16 617:24 631:18 635:11,20 663:20 665:3 666:12 685:12 692:5 704:3 709:7 711:6 719:1 745:20 753:7 761:22 786:22 792:6,8 793:24 811:5 849:3,4,16,19,21 874:5

**bringing** 836:13 892:24

**brings** 624:21 796:6

**broaden** 644:5 664:23

**broader** 643:23

**broadly** 727:12

**broke** 688:24

**brought** 643:18 665:6, 9,11,13 666:2,5,9 674:14 684:25 692:20 694:15 710:24 711:2 722:22 741:3 753:23 767:9 794:25 795:5,12, 20,25 796:3,7,18

**bucket** 888:14

**build** 787:3,17

**bullet** 753:1

**bullets** 753:17,20

**bully** 588:22

**bullying** 879:24 882:5, 11

**bullying/hazing** 878:23 879:18

**bunch** 623:15 808:14

**burden** 713:2

**Burdine** 583:6

**burned** 712:16

**bus** 785:17

**business** 688:7 722:5 754:5 785:5 788:11,14 890:17,20

**bylaw** 656:24 657:3

**bylaws** 667:4 678:23 683:25 688:11 703:12, 15 721:4 723:1,14,24

——————————

**C**

**calculations** 726:7

**calendar** 754:5

**call** 593:24 594:3 607:17 612:5,7,11 630:10 653:2 708:9

715:23,24 716:1,7 718:11,24 721:13 723:9 731:15 735:20 773:9, 17,18,25 774:10,24 780:23 789:14,18,20 790:22 791:9 815:3 816:24,25 848:21,22 866:17 879:16 887:2

**called** 697:25 699:19 718:10 726:2 731:15 732:5,11 744:7 764:13 848:19 874:11 881:21

**calling** 630:15 639:9 729:4 849:7 875:14 884:3 885:19

**calls** 595:22 614:21 653:9 689:15 721:18 760:21 763:3 868:7

**camera** 830:23

**campaign** 724:20 818:23

**cancer** 830:12,15

**candidate** 669:23

**candidates** 669:20,22 706:5

**capacity** 721:16

**capital** 829:10

**caption** 811:10

**car** 591:14

**carbon** 833:24 842:1 861:13 862:18

**carbon-copied** 637:3 641:13 657:15 660:21 672:18

**carbon-copy** 659:15

**carcass** 793:4

**cards** 887:23

**care** 626:24 757:18

**career** 700:18

**careers** 707:14

**careful** 605:7 639:3,24 651:1,2 859:3

**Carmen** 891:16

**carpet** 781:18,22

**carry** 748:11

**Carter** 573:8,10 574:22 581:4,5 582:1 596:8 601:15,21 602:2,13 604:20 607:4 610:10 611:20 612:4,17 613:22 616:21 617:13 619:25 646:22 655:20 665:10 666:11 685:8 711:18 716:16 719:19 736:13 737:23 738:12 743:8 745:21,24 749:3,10 750:21 756:13 757:5 758:8,16,18 759:2,6,7, 14 768:10 770:21 773:7,11 774:1 775:3, 22 777:2,20 778:8 780:25 782:3,4 784:11 788:23 799:18 801:8 802:25 803:8,11,21 805:9 807:9 808:10 809:16 810:4 811:5 815:19 816:24 818:16 843:11,22 848:20 855:23 856:17 859:10 867:22 875:6,9 876:15 879:14

**Carter's** 589:12 746:3 757:2 768:2 799:17 807:2 814:17

**cartwheels** 888:21

**case** 577:23 580:10 587:3,6 589:19 591:23 593:12 631:7,8,14 691:8 708:15,16 709:10,25 712:25 713:10,12 715:25 728:17 731:5,14,23,25 733:1,11,16,17,18 734:6,11,13 737:19 747:13 791:13,15,20 800:18 816:15 817:13 846:25 847:1 852:18 877:1 886:19,21 887:5 888:5,9 889:6 890:19 892:3,6,11

**cases** 579:18,22 626:3 627:19 700:12 732:1 733:24 838:8 863:17 893:16

**Casper** 823:1,2,4,6,10

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 337 of 367   PageID 14564

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022              Index: Casper's..comment

830:16,20 835:19 836:3
844:10,12,21,25
845:22,24 852:18,23
853:7 854:2

**Casper's** 845:10

**casual** 834:22

**cat** 586:21

**categories** 682:1
726:18

**category** 578:1

**caused** 743:1

**causing** 823:7

**CBA** 679:6 703:4

**cc'd** 626:4 642:19
647:22 651:6 655:23,25

**cell** 776:10,11 889:10

**center** 771:24 854:6

**centerpiece** 691:17

**central** 713:10

**certificate** 581:6

**cetera** 724:5 728:16
753:17,21

**chair** 741:18

**chairing** 754:11,13,15

**chairperson** 601:18
700:6 731:21 733:20,23
763:23 764:4 786:16,21
787:9,13 788:5

**chairperson's** 787:8

**challenging** 573:25

**chance** 737:19 792:22
829:19

**change** 584:6 619:9
678:13,14,17 683:19
777:13 812:12,19 856:9

**changed** 677:25
683:15,23 821:25

**changeover** 705:2

**channeled** 649:16

**channels** 784:20

**characterized** 814:19

**characters** 826:8

**charge** 629:3 639:23
644:11 692:3 795:21
876:14 888:12 889:8
892:22 893:8,11,12,18,
22,24 894:9

**charged** 800:19,20

**charges** 643:18 689:18
744:8,18 745:21 783:24
784:3,6 794:25 795:5,
12,20,24,25 796:3,6,7,
19,22 798:23 811:5

**charges'** 799:4

**charging** 650:25

**charitable** 726:16
887:20 888:19

**Charlene** 573:10
585:18 595:14 596:12,
15 600:1,4 601:15,21,
24 602:2 603:2,5 607:4,
19 609:21 610:10
619:25 646:21 736:13
737:23 743:8 745:21,24
758:15,18 801:7 802:4,
9 803:7,11,21 804:22
805:8 806:13 818:16
843:11 867:21 875:6,9

**Charlene's** 804:16,24

**chart** 762:19

**cheap** 830:24

**check** 594:3 630:10
722:10

**child** 746:12 747:16

**children** 701:1 707:18
746:15,17 748:1

**children's** 700:25

**choice** 576:23,24
750:14

**choose** 581:20 697:4
737:20 747:15 800:15

**chooses** 727:25

**choosing** 727:2

**chopped** 676:17

**chose** 674:16 788:15

**chosen** 725:17 726:1

**Chris** 666:13,15,16
684:24 685:3

**Christian** 670:8,14

**circle** 672:24 673:2

**circling** 576:11

**circulating** 753:11

**circumstances** 686:4,
17 687:13,14

**civil** 579:25

**claiming** 656:12
873:19

**claims** 632:4 636:7,8,
12 644:20,21 647:7
649:1 651:17,18
657:20,21 660:9
672:10,11 794:17,18
817:24 818:1 850:20,21
865:10,11 866:11,12

**clarification** 582:7
596:10 710:8 839:20
840:24

**clarified** 628:13

**clarify** 627:25 728:24
739:8 763:14 769:10
778:24

**class** 706:11 707:3

**classes** 707:20 821:10
822:13

**clean** 867:12

**clear** 640:24 657:6
718:4 748:19 757:10
798:7 832:6 836:14

**Clerk** 867:6

**clerks** 889:6

**click** 666:13,15,16
684:24 685:3,18,19
687:15 690:18 692:21
693:7 809:13 810:14
854:18

**Click's** 854:23

**clicked** 808:19 809:3,
24 810:8

**client** 574:24 576:1
713:19 714:1 767:11
800:6,10,18 816:1

**client's** 815:8,20

**climate** 755:16

**clinic** 746:13

**clip** 584:10 790:14
818:9

**clock** 574:12,16,20,21
579:1,12 709:21 714:17
792:15 794:7 800:15

**clocked** 864:5

**close** 593:22 796:12,15
888:13 890:17,19

**closed** 616:3

**closely** 584:19

**closer** 588:1 645:19
824:4

**Cloutman** 573:20

**co-chairperson**
601:19 700:6

**co-counsel** 625:20
636:19 760:9

**Coast** 754:12,14

**code** 649:16 734:17
747:4,7

**coincidence** 843:19
856:20

**cold** 779:7

**collection** 599:22

**Collective** 681:7,10
695:16 702:20 731:12

**colloquial** 625:5

**color** 598:25 791:22

**colorful** 831:22

**combative** 576:15

**combination** 688:8

**combined** 893:23

**comfortable** 824:5
828:1 867:3,8,9 881:9,
10

**comment** 577:1 674:24
707:5 712:19 751:17
776:16 807:16 843:24
845:22 846:5

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 338 of 367   PageID 14565

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022           Index: commenting..conversation

**commenting** 578:16

**comments** 578:3
584:2 751:24,25 753:11
757:23 769:24 776:19
784:21 814:20 821:21
863:3 879:3,4,10

**commitment** 889:15

**committee** 601:18
679:24 680:1,5,8,11,17,
22 681:2,4 700:7
721:24 722:2,16 775:19
779:13 785:10,20
786:3,6,7,9,10,15
787:4,7,10,15,18,21,22
788:2,6 801:6 810:6

**committees** 680:3
721:21,23 722:3 762:5
786:4

**commonly** 729:5

**communicated**
585:18 803:5

**communicating**
595:16 834:9

**communication** 577:6
580:13,15 596:11
601:14,17,23 602:8
622:8 641:20 656:20
712:8 739:15 802:9
807:1 808:10 831:11,18
832:17 845:24 858:21
863:20 882:25 885:2,3

**communications**
577:25 595:7 596:16
599:25 607:25 622:9
659:9 688:25 711:17,18
713:3 738:19 741:15
743:6 760:14 780:25
784:10 807:23 831:16
853:18 876:21 877:6,
17,25 879:15,21 881:22
882:12,19

**company** 573:15
642:15 658:18 659:11
667:9,16 682:12 696:4,
14,16 738:5 766:25
797:19 859:8 870:16
872:17,24,25

**compelling** 575:8

**complain** 650:4,6,8
784:14 807:3

**complained** 600:2
855:23

**complaining** 596:9
611:21 618:5,10,12
619:10,11,22,25 648:10
650:2,17 656:20 658:9
712:2 805:1 806:13
807:5 841:15 879:22

**complains** 870:21

**complaint** 595:17
596:18 602:13 603:1
613:22 614:4 615:3,5,8,
16,20 617:2,18 618:16
619:14 620:6 624:22
648:5 652:3 661:11
665:13 666:9 673:13
685:2,12,16 710:21,23
711:1 712:9 728:20
735:9,12 743:7,19
744:25 745:24 758:8,12
759:5 767:6 769:6
773:6 803:24 805:3
806:16 843:10 856:17
859:10

**complaints** 615:10
616:21 617:13 624:8
661:4 664:25 666:2,6,
12 711:3 743:18 800:1
803:14 808:12 838:11

**complete** 670:16,25
758:2

**completed** 636:15

**completely** 727:2
835:20,21 870:16

**completing** 725:11

**completion** 670:21
697:3 725:13

**complicated** 584:2

**complies** 597:1

**compound** 615:11
620:15 675:4 693:15,17

**comprised** 721:22

**computer** 629:4

**concern** 575:4 595:17
674:15 753:9 804:16

**concerned** 775:14
800:22 801:16 831:8,10

**concerns** 649:17
659:24 665:9 685:14
717:8 775:17 836:13
862:13 892:13

**concise** 715:20 735:8

**concluded** 601:1
611:13 625:13 629:5
630:12 638:11 653:22
668:9 687:6 692:6
800:25 863:25

**concludes** 730:25

**conclusion** 595:23
653:6,10 660:17 689:16
760:22 763:3 793:7
804:8 868:8 875:15
876:1 884:4,18 885:19

**conditionally** 600:11,
21 601:10

**conduct** 788:13,14

**conducted** 678:20

**conducting** 730:14,22
741:20

**conference** 637:12
771:24 887:15 888:3,12
893:12,22,25

**confidence** 851:25

**confidential** 613:11
615:9,17

**confirm** 597:19

**confirmed** 639:13

**confused** 674:10

**confusing** 586:14

**confusion** 582:10

**conjunction** 786:14

**Conlon** 583:1 715:24

**connect** 600:22 601:11

**connection** 595:16
788:1

**consideration** 885:17
893:21

**considered** 678:4
721:14 877:17 878:1
879:13,14 881:2 883:15
884:16 886:4

**consistent** 857:22

**conspiracy** 840:20

**constitution** 688:12,18
720:16 743:25 744:4,6
745:8 798:20

**constraints** 718:9

**contact** 721:20 727:23
730:4 739:12,17 825:18
858:15

**contacted** 729:3

**contacts** 706:18

**contained** 677:20
739:13 752:7

**contempt** 581:3

**contents** 768:7

**context** 583:15 652:11
835:21 864:12

**continue** 594:15,23
635:23 639:12 704:14
719:11 732:25 733:15
734:1,8,10,12

**continued** 595:1 689:2
700:17 719:12 825:2

**continues** 653:2

**continuing** 606:22
734:3

**contract** 678:17
697:10,17,25 698:2,9
699:18,19 700:1 703:23
704:6,19 705:3 725:9
726:13 727:15,19
728:7,11 730:21,24
740:15 741:17 752:17
761:11,17 762:3,11
819:4,6,10

**contracts** 704:9

**contractual** 678:13
697:14 721:25 728:17
734:11,13

**contradictory** 816:4

**control** 736:9

**conversation** 616:5
642:11 669:7,13,17
670:2 711:11 759:8,14,
17 773:5 814:5 837:16
859:4

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 339 of 367   PageID 14566

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                    Index: conversations..Crystal

**conversations** 608:13,15 665:7 674:16 680:1 705:15 751:19 834:23 837:4,19 839:10 852:16

**convince** 813:6,20

**cooperation** 891:11

**coordinate** 729:20,23 737:16 786:21

**COPE** 601:17

**copied** 582:11 672:23 833:25 842:1 861:13 862:18

**copy** 603:18 616:7 621:6 632:7 767:23 791:23 806:19

**Corliss** 826:9,12 827:4 828:10 835:18 836:4

**corporate** 573:21

**correct** 586:8 602:5 609:18 618:11 619:6, 10,21 620:1 641:2 646:19 650:2 651:7,10 652:1 658:12 661:19 670:19 671:4 676:7,11 679:6 680:23 682:9,13 683:5,12 684:21,23 695:24 703:4 710:10 712:3 735:10 738:7 760:7 768:8 769:1 770:7,11 772:2 773:7 776:24 801:11 805:19 806:9 815:15 819:7 820:16 825:21 826:6, 16,17 827:8,10,12 828:3,4,21,25 834:24 836:4,22 838:15,17 841:10 842:2,22 843:23 844:3,16,22 845:1,17, 25 852:3 853:8,10,12, 24 854:3,7 856:1,7,13 857:4,25 858:23 859:12,22 860:13,17,21 862:18 867:19,20 876:15

**correctly** 632:13 682:2, 17,22,25 683:16,20 696:5

**corrupt** 858:19

**counsel** 582:8,10,14, 15,21,23 589:16 599:5, 8 604:8,23 605:8 606:6, 22 609:3 610:13 618:19 636:24 637:4 640:2,17 641:8 647:24 653:2 656:6 670:6 676:5 677:10 680:18 716:11 751:11 757:2 768:2,21 781:11 793:14 803:11 804:4,7 811:14 814:17, 24 815:4,6,19 848:5,20 864:10 891:7

**counted** 684:5 725:15

**counts** 741:22

**couple** 579:2 580:19 623:2,18 709:4 758:20 781:16 825:16 846:4

**coupled** 677:2

**court** 573:3,4,12,17,24 575:1 576:21 577:2 578:5,10,25 579:5,10 580:17,19 582:12,19 583:10,12,18 584:11,25 586:9,18 587:11,14,25 588:4,16,19 589:21 590:2,9 591:1,4,7,9 592:1,9,21 593:4,10,14, 19 594:4,9,10,13,17 595:20,24 598:10,14, 19,22,24 599:16 600:8, 21,25 601:3,4,8 602:18, 21 603:15 604:1,3,24 605:12,18,21 606:8 607:7,22 608:2,23 609:3,6,11 610:4,14,21 611:1,11,15,16 613:17 614:22 615:12 616:8,11 617:5,9,19 619:18 620:16,22 621:1,14,17, 21,23 622:21 623:3,12, 17,21,24 624:10 625:4, 9,15 626:10,16 627:6, 10,21 628:7,17,19 629:7,8,19 630:4,9,14, 15,19 631:6,10,13,17, 18,21,22,24 632:10,14 633:5,17 634:6,8,12,25 635:10,17,22 636:1,22 637:13,17 638:3,10,13, 14 640:4,19 643:15 644:4,17 647:2 648:11, 22 649:11,14,16,19

651:13 652:23 653:9, 17,19,24,25 655:15 656:7 657:19 660:6 663:6,17 664:15,20 665:18 667:23 668:7, 11,22 671:15,21,24 672:7 675:5,13,18,23 678:8 679:14 680:25 682:15,20 683:7 686:11,19 687:3,8,9 689:19 690:3,13,23 691:3,23 692:5,8,9,13, 16 693:6,17,20,25 694:19 695:3,13,19 696:10 701:20 702:3, 11,23 703:6 705:13 708:3,12,14,20,25 709:13,18,19 710:9,13 711:5,8 712:12 713:14 714:2,11 715:20 716:15,17,21 717:10 718:1,4,7,12,16 719:1, 7,10,18,23 734:19,22 735:1 737:3 738:10,15 743:14 746:25 747:3,6, 9,23 749:2,9,14,24 750:1,6 751:4,16 752:23 754:2 755:8,19 756:15 757:7 759:10 760:11,23 763:4 766:5 767:2 768:15 775:25 777:19,22,24 778:1 779:16 780:10,14,17 789:7 790:1,5,8 791:7, 13,19 792:5,6,18,20 793:8,21,25 794:4,8,10, 14 795:9,16,19 796:12, 15 797:14,25 798:14 799:10,20 800:4,9,24 801:2,3,22,25 803:1 804:2,5,9 805:6,13 806:21 811:15 812:16, 24 813:11 814:3,8,12, 22 815:13 816:10,13 817:4 820:9 826:1 846:12,17,22,24 847:4, 7 848:3,10,13,23,24 849:2,3,10,13 850:5,7, 10,15 857:15 864:5,10, 17,20,23 865:2,6,18,22 866:3,10,20,22 867:7 868:9,17 870:3,25 871:5 875:17 876:4,11 878:17 880:3 881:14 882:1 883:7 884:6,13 885:20 886:15,18

887:1,8,14,18 888:24 890:8,18 891:10,16 892:9,22,24 894:4,18

**Court's** 716:1 717:7

**courthouse** 574:2 887:4 889:2

**courtroom** 593:9 594:12 631:12,15 635:21 708:19 709:12 718:23 719:9 768:23 791:18 792:19 816:16 847:6 850:9 866:21 867:23 886:25 887:13

**cover** 588:5,8 854:6 888:7,25

**covered** 597:3,11 696:13 891:8

**covers** 858:6

**COVID** 579:21,22,23

**cracks** 740:25

**creates** 656:13

**creating** 655:4

**cried** 812:8

**crime** 793:2,5,11

**criteria** 678:22

**criticism** 578:2

**criticized** 814:17 815:7,14,16

**cross** 609:13 692:1

**cross-examination** 675:20 676:1 719:12 768:16

**crossed** 578:12,16 879:5 883:17

**crossing** 879:19

**crowd** 828:15,18

**crucial** 713:25 715:8,9

**crummy** 800:5,7

**crunch** 717:12

**crunched** 887:19

**crushing** 579:24

**Crystal** 854:14

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 340 of 367   PageID 14567
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                    Index: current..direct

**current** 699:4 709:21
713:23 714:2 767:11
829:12,13,23 830:4
855:5

**cursor** 833:13

**curve** 714:25

**cut** 584:17 709:24
713:18,25 714:4 716:9,
24 717:3,4,5,25 718:2
749:23 750:12,18
775:15 793:3 848:5,6

**cutbacks** 716:11

**cutdown** 887:20

**cuts** 770:20

**cutting** 715:1,2 716:9,
13 793:11

**Cuyler** 854:10

**cycle** 723:16 787:7

———————————

**D**

**daily** 577:10 739:22,24

**Dallas** 764:14 782:23
783:2,11,14,16,17

**Dallas-based** 764:10

**dangerous** 826:11,16
830:12

**date** 581:17,18 646:18
677:25 683:14,19,23
729:21 765:16,19,22
843:15 859:13

**dated** 651:23 825:21

**dates** 682:4,5

**David** 679:16

**day** 573:6 575:9 590:12
611:4 646:21 678:13
698:9 702:19 714:23
718:14 719:4 740:4,9
741:12 762:10 771:15,
16,20 787:20 810:12,21
846:14 856:16,18 859:9
866:24 886:13 888:10

**day-to-day** 721:11,20
722:5 726:12 740:21

**days** 573:25 582:7

685:15 721:17 740:24
742:6 750:19 754:4
843:6

**DC** 779:7 786:21 788:19

**de** 836:8,9,10

**dead** 807:10 849:22

**deadline** 731:4 894:5

**deal** 580:5 823:7
852:17 856:6

**dealing** 741:4 784:25
853:2,3,6

**dealings** 837:24

**dealt** 670:4,5 744:13
825:6

**debate** 804:23

**Deborah** 645:7,16
651:24 660:22

**Debra** 860:1,10

**deceased** 682:13

**decide** 715:13 724:19
784:9 810:13 812:20
824:1

**decided** 678:18 680:22
701:10 704:13 715:22
885:5

**decision** 678:25
696:25 704:3 731:5
732:9,17 733:10 737:20
810:25 877:1,6,18
878:3 882:23 883:3,4,
16 884:5 886:9

**decisions** 714:10
721:2 877:19

**decompression** 743:2

**deem** 639:15

**deemed** 677:19 688:9

**deep** 575:17 893:15

**Defendants'** 576:7

**defense** 766:23 767:4,
10 827:24

**define** 821:3,5

**Defining** 653:5

**definition** 869:4

**definitive** 577:13

**degree** 586:12

**delete** 846:5,8

**deliberate** 890:21

**deliberation** 888:7

**Democrats** 771:6,7

**demographic** 785:18

**denial** 892:4

**denied** 583:14

**denies** 713:21 714:1

**Denise** 773:13

**Denver** 773:22 774:4,
14 782:20 783:9,10,11,
12 868:3

**Denver-based** 773:10

**deny** 713:14 714:12
732:20

**denying** 855:12
860:16,18

**department** 622:10
823:20 874:11

**depend** 872:7

**depends** 870:23
871:12

**depict** 778:14

**depicted** 619:1 780:5
885:9

**depicting** 687:25

**depiction** 619:12

**depictions** 752:2

**deployment** 742:18

**depo** 580:12 581:18,22
584:16 716:18,22
817:17 818:3 887:21

**deposition** 581:7
585:12 817:1,11,16,17
840:5 851:1 864:2

**depositions** 817:3

**deprive** 893:10

**describe** 739:22 740:7
756:8 778:6 781:19
852:10

**describing** 725:22

**designation** 583:2

**designations** 583:9
585:7 716:10 894:16

**desire** 776:3

**destruction** 823:8

**details** 586:4 729:25
797:5,6 869:24 870:1

**detective** 830:23

**determination** 871:19

**determine** 678:21
720:23 726:4,19

**determined** 614:1,15
720:20

**determining** 733:9

**developed** 852:1

**device** 776:8

**diagnoses** 746:18

**dialogue** 759:18

**dictate** 723:15

**Diego** 891:17

**difference** 619:4,6
628:16 701:10 757:4
866:7,9

**differing** 767:7

**difficult** 698:4 702:20
840:8 860:12

**difficulty** 612:14

**digging** 839:8,14

**diligence** 678:19

**diminishing** 575:13,18

**dinner** 669:21

**dip** 892:20

**Dipippa** 681:6,13

**dire** 686:7,12 708:21

**direct** 595:1 622:4
696:2 700:2 721:20
726:17 749:19 867:14

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 341 of 367   PageID 14568
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                Index: directed..effective

**directed** 577:24 727:23

**directing** 665:20,21

**direction** 871:13

**directly** 648:19 726:10 758:19 774:15,16 831:6

**director** 659:20 823:21 824:9,10,11,14 825:7,8, 9,11

**disagree** 618:12 657:14 869:10 870:5

**disagreed** 737:6

**disagreeing** 877:13

**disagreement** 870:6

**disagreements** 869:13,15

**disagrees** 736:24

**disavow** 643:17 644:10 656:4 657:13 661:14

**discipline** 583:16 648:17 728:17,25 729:6 731:8,10,11 732:18,23 733:10 734:6 736:21 764:20 766:7 767:19 838:4

**discipline-wise** 649:7

**disciplined** 648:25 663:24 827:25

**disciplines** 798:24

**disciplining** 817:23

**disclaimer** 631:25 847:17,20 849:17 850:22,25 851:10

**disclosed** 822:18

**discovered** 754:16

**discredit** 639:1 640:13

**discuss** 663:16 740:3 760:9 777:7,10 835:5

**discussed** 592:5 614:12 655:2 672:8 677:10 685:18 719:14 727:10,11 763:10 765:11 777:1 778:9

**discussing** 585:21 737:1 892:23

**discussion** 585:5 656:12 669:1 690:14 695:23 782:22 850:8 893:7

**discussions** 658:5 748:17 760:13 761:5

**dismissed** 692:22 693:2,8

**displayed** 825:24 832:23 836:19 837:11 838:22 841:3 842:17 860:5 861:3

**displaying** 857:10

**dispute** 857:20 860:20

**disputes** 869:9 879:19

**disputing** 842:6

**disregard** 649:5

**dissenting** 639:10 656:25

**distributed** 779:8

**distribution** 739:25

**disturbing** 812:11

**divided** 623:20

**docket** 582:25 598:10 893:16

**docketed** 583:1

**document** 585:18,24 586:6,25 589:14,16 592:12 596:3 598:20 601:5,6 602:16 603:25 604:12,13 605:4,6,16 606:6 607:13,14,16 608:17 609:3,6,12,15, 18 610:3,23 611:2 612:12 616:15 621:4 622:1 624:5 625:21,25 626:6 628:6 629:24 630:1 638:9 639:17 640:3,18 644:23 647:10 648:16,19 651:20 657:23 660:12 672:14 677:16,17 678:6 681:19 690:5,8,9 694:15 720:1 749:16 765:13 769:12 778:3 780:19,22 790:11 794:20,24,25 797:4 799:15,16 851:13 855:17,20

**documentation** 662:17 733:7

**documenting** 699:10

**documents** 577:5 592:15 677:24 701:24 711:13 768:3 858:8,11 866:14 878:8

**domain** 634:13 635:13

**domicile** 688:5,6 698:22 700:4 723:7 729:15,24 782:23,24 783:2,4,14,21

**domiciles** 723:9 752:14 762:10

**dominated** 785:16

**donate** 759:19

**donated** 759:25 760:2

**donations** 726:16

**Donna** 679:17 681:6

**door** 767:11

**doors** 707:14 754:20

**dot** 771:8

**double** 592:14 686:24

**doubt** 823:22

**draft** 580:18,20

**drafted** 582:24

**draw** 817:8

**drawn** 578:14

**dreadful** 828:5,11

**drivers** 785:17

**Drummond** 705:20

**due** 667:4 669:25 678:19 688:19 705:4 714:6 894:16

**dues** 619:23 670:18,21 689:2 726:5,9,19 803:23 804:13 805:9

**dues-paying** 655:8

**duly** 867:5

**duplicate** 678:1 682:24

**duplicative** 590:25

591:6

**duties** 671:7 673:24 674:3 698:21,22 721:5 762:8 787:11 825:15

**dutifully** 718:13

**duty** 668:14 674:9 678:13

**dysfunction** 823:7

**E**

**earlier** 630:23 648:25 679:4 681:15 709:24 721:23 725:21 746:8 763:10,16 773:4 779:13 780:24 786:5 798:21 817:12,22 844:11

**early** 697:10,23 705:5 708:4,5 714:18 724:17 758:12 764:25 888:5

**ears** 851:7

**easier** 605:19 628:4 645:1

**easiest** 584:15

**east** 697:8 746:13 754:12

**eaten** 720:7

**EB** 654:16

**economic** 575:17

**Ed** 773:10 866:19

**Edgar** 642:2,3

**edit** 584:11

**edited** 750:18

**educate** 698:19 721:24

**educated** 700:2

**education** 700:7 701:7 721:24 819:3

**edward** 573:20 867:5, 17

**Edwards** 645:7,16 651:24 660:22

**effect** 654:14

**effective** 812:7,9,10

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 342 of 367   PageID 14569

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 3 July 07, 2022          Index: efficiency..execution

813:2,5,12,17,20,23
814:6

**efficiency** 576:19
578:11 579:15 593:2
714:25 894:20

**efficient** 576:23 589:2
593:6 712:25 894:23

**efficiently** 575:7
588:23

**effort** 643:17 652:15
819:4 820:24 855:3

**efforts** 650:25 659:9

**egregious** 881:4 885:7

**egregiousness** 885:6

**Einstein** 782:8,14

**elaborate** 706:9

**elected** 666:17,19,21,
22 698:24 720:17
782:22

**election** 723:16,18,23
724:17 725:14,19 727:4
781:24 782:2 787:6
798:18 799:6 820:4
828:17

**elections** 723:2,4

**eligible** 707:8

**else's** 615:20

**email** 580:21 583:21
585:2 601:20 623:6
627:8,10,17,20 628:3,
21 630:7,17 633:16,19,
22,23 634:5 635:5
637:2 638:16 641:6
642:10 643:1,2,7,11,18,
22 644:10 645:6,25
646:2,7 647:13 649:24
651:4,6,23 652:12
656:19 657:10 658:2,8,
10,11,14 659:10
660:15,20 661:9 672:17
674:19 709:21 712:7
738:20 739:4,9,11,13,
19,23 740:5 741:6,21
743:6,10 749:8,20
765:18,21,22 782:3
824:19 825:20 826:5
827:17 831:4 832:1
833:15,24 834:3,4,10,

12 835:15,20,22 836:1
839:4,11 840:14 841:9,
12,22 842:1,12 844:2,5
850:3 851:21 853:20,21
855:22,25 858:15,22,23
859:13,22 860:17,23
861:11,18,23 862:4,8,
16,25 863:12

**emailed** 628:14,17
761:20

**emails** 582:7,11 587:17
623:15,18,23 625:1,25
632:14,16 655:21
662:19 665:12 675:9
739:18 740:4,9,17
741:11 765:11 766:2,10
767:17 781:7 795:4
797:18 815:8,21 824:20
825:2 863:2

**emergencies** 742:11,
12

**emergency** 582:2
742:8 743:4

**Emlet** 716:9 717:24
839:13

**emotions** 740:8

**employed** 819:13
867:25

**employee** 648:16,25
649:7 682:4,6 683:10
701:18,25 702:9 710:1
766:24 773:13 826:15
839:22 840:11 842:13
874:11,16,22 878:5
879:7 880:15 882:5,9
885:9

**employee/flight**
778:20

**employees** 587:3,7
628:2 685:10 696:12
856:6

**employees'** 627:2
668:14

**employment** 725:10

**encourage** 729:7
830:22

**encouragement**
642:13 859:6

**encouraging** 759:17

**end** 593:6 602:9 684:24
697:23 706:25 707:2
708:22 716:5 717:12
719:4 764:9 845:19
847:15 864:3 878:18
888:9 890:24 894:23

**ended** 666:18 743:5
757:24 787:10

**endorsement** 642:14
859:6

**ends** 711:4 742:7

**engage** 764:6 820:22,
24

**engaged** 642:21
646:10 820:3 875:7
876:17

**engaging** 643:19
644:12 657:11 661:20
662:2,20 869:21 875:12

**enjoyed** 701:9

**ensure** 680:19 756:4

**enter** 789:24

**entered** 593:9 594:12
635:21 691:4 719:9
792:19 850:9 866:21

**entertain** 717:11

**entire** 602:8 669:11
672:22 691:8 723:2,12
788:21

**entirety** 769:7 810:22

**entitled** 597:25 709:3
713:20 799:24

**entries** 677:21 681:25
684:7

**entry** 682:5

**equitably** 890:12

**equivocation** 578:7

**ER** 839:9,16,22

**eradicated** 830:12

**essentially** 677:19
744:7

**establish** 577:16,25
627:5 686:14

**established** 785:11

**event** 691:18 723:15

**events** 699:4

**eventually** 667:5
692:22 706:22 771:13

**everybody's** 729:22

**everyone's** 892:12

**evidence** 578:4 585:24
589:10 591:7 598:21
601:7 603:19,25 606:7
609:7 610:24 611:9
614:18 616:16 617:1
622:2 629:11 644:24
647:11 651:21 653:13
657:24 660:13 662:5,
15,17 663:1,5,12
672:15 719:16,19 720:2
748:25 749:17 778:4
779:15 780:20 790:2,9,
12 794:21 847:19
850:25 851:14 863:17
864:8 866:15 888:11

**evil** 782:11,15

**exact** 605:1 606:17
611:23 694:14 856:8

**examination** 594:16
595:1 678:20 684:24
719:15 792:23 795:11
814:14 867:14

**examined** 795:23

**examples** 627:22
698:3,8 874:2

**exception** 592:15
785:12

**excerpts** 847:22

**exchange** 824:20

**excise** 584:9

**excited** 697:7

**excluded** 632:2 726:15

**exclusive** 786:7

**excuse** 592:7 799:16
815:21 816:16 848:17

**excused** 791:19

**execution** 766:9

**executive** 640:10
654:16 656:23 672:23
679:2,21 680:5,21
687:16 698:22,25 700:4
720:17,19,24,25 721:9
722:23,24 723:1,3,7,17,
25 724:24 729:15,24
733:2,11,16,17,19,25
734:6 740:18 741:19,20
744:16,19,20 755:13
760:18 761:13 782:23,
25 783:2,4,15,21

**exemplify** 620:6

**exercise** 697:15 706:5
707:19

**exercised** 674:8

**exercising** 595:15

**exert** 736:19

**exhibit** 574:18 585:17
588:9,15 595:5,9 597:3
598:13,21 599:2,3
601:7,13 603:16,18
604:9 605:23,25 616:6,
16,19 617:3,12 618:20
621:11,13 622:2,5,6,24
630:16,20 631:23
633:10 634:19 635:4,25
641:3 644:24 646:16
647:11,13 650:20
651:12,19,21 657:17,24
660:13 662:7 665:15,24
671:17 672:15 677:12
690:7 695:16 719:14
720:2 748:21,25 749:17
757:3 765:8,10,18
767:22 769:3 777:15
778:4 779:14 780:8,20
789:25 790:12 791:21
794:21 805:17 806:18,
24 807:14,16,23
825:24,25 832:21,22
833:19 836:2 837:12
838:21 839:2 841:21
842:17,19,25 850:17
851:14 854:5 855:16
856:24 857:10 858:3,
13,25 862:8,25 893:13

**exhibits** 574:13 587:4,
22 588:6 628:11 636:9
649:2 663:19 794:15
808:14 864:4,5,6,14
865:10 866:15

**existed** 739:7

**exists** 743:24

**exited** 631:12,15
708:19 709:11 791:18
847:6 886:25 887:13

**expect** 831:22

**expected** 831:19,20

**expecting** 573:21
596:6

**expenditures** 687:25

**experience** 697:18
746:3,19 872:4,13,14,
15,16,18,22,23 873:2

**experiences** 746:6,20

**experiencing** 746:17

**expire** 684:4

**expired** 677:24 683:15,
19

**explain** 581:21,22
686:3 698:8 743:23
746:23 795:16,19
825:10 840:3 871:14

**explained** 608:7 817:2

**explanation** 735:4

**exposed** 697:9

**express** 753:9 869:15

**expressed** 762:6

**expressing** 575:4
611:25

**extension** 736:6,11
892:1

**extent** 636:4 656:3
848:20 876:23 883:15
885:12 889:18

**extra** 573:23 593:3
712:16

**extremely** 830:3 840:7

**eyes** 748:3 790:17

---

**F**

**face** 789:11

**face-to-face** 752:16

**Facebook** 575:14
586:15 712:7 781:1,8,9
782:4 801:16 802:13,14
808:25 809:1,9,11,14,
16,19,20,22 814:18
815:8,21 816:6 826:8
834:7 878:4 880:14,18,
19 881:8,19 882:4,8,15
883:21 885:2,8,15
886:3,9

**fact** 602:1 609:1 619:9
624:21 639:11 644:1,5
651:2 655:11 656:19
663:21 664:3 665:3,11
666:1 674:20 796:21
805:25 806:1,11 820:3
832:15 865:13

**fact-finding** 656:15
729:5,6 735:9,14,16
736:14,20,22 737:6,7
738:6 763:12 764:14,18
819:20

**factoring** 883:3

**factors** 688:8

**facts** 639:12

**factual** 881:1

**fail** 731:6

**failed** 590:8 679:5

**failure** 815:20

**fair** 597:25 612:2,15
634:12 641:1 664:24
667:11 692:20 710:12
730:22 768:6 833:22
839:17 878:12

**fall** 577:25 714:4,5
720:10 740:24 824:6

**falls** 726:16

**false** 614:3,8,16 615:3,
21 689:1 783:20

**families** 701:3

**family** 748:6

**fashion** 584:12

**faster** 887:20

**fault** 583:17

**favor** 654:15 821:7
888:6

**fear** 657:1 889:7

**February** 646:18
768:12 843:1 856:15
857:9 859:9 861:12

**fee** 670:20 683:4 726:3,
20,22

**feel** 594:19,20 639:15
667:19 750:25 751:14
813:16

**feeling** 637:16 661:24
887:20

**feelings** 697:5

**feels** 650:18 782:10

**fell** 678:2 681:25

**fellow** 631:6 708:14
743:20 779:11 780:5
791:13 846:24

**fellows** 886:18

**felt** 667:14 712:21
740:24 772:19 773:19
785:23 824:5 828:1

**female** 778:14

**fetus** 769:23

**FF** 656:13

**fiduciary** 674:8

**field** 701:1

**fielded** 740:12

**Fifty-six** 779:16

**fight** 611:3 655:5

**fighting** 638:25 734:12
751:25 767:7 838:13

**figure** 713:17

**file** 580:21 581:9 598:10
601:21 626:2 728:1,2,4,
9,14 731:18 737:9,11
758:9 783:23 784:6
893:16,17 894:6,7,11

**filed** 581:3,6 682:8
685:2 688:17 689:4
728:21 735:9 743:7
744:18 745:24 759:6

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                    Index: files..give

files 582:1 839:8,14

filing 637:18 721:18
728:8 732:8 744:7
784:3

fill 723:17 754:8

filters 831:5

final 632:7 733:2

find 597:9 633:7 686:23
702:19 715:11 729:2
730:5 748:4 762:19
798:22 806:12 807:3
816:3 821:14 863:3

findings 678:21 681:22

fine 576:16,22 579:6,10
582:5,12,15,22,23
583:21 585:23 605:17
628:19 638:8 653:1,9
683:7 690:9 692:2
696:18 708:24 713:7
716:24 791:25 794:5
804:9 857:15

finer 735:5

finish 594:5 607:7,23
747:23 755:20,21
769:13 792:12 801:21,
22,25 818:18 846:18
888:11

finished 772:23,25
802:2

firearms 753:22

fired 775:22 801:8

firm 703:24

five-minute 593:23
631:4

flight 601:20 613:14,20
614:4 615:20,24 642:3
648:9 650:6,8 662:8
663:24 665:4 666:3
669:19,21,23 670:9
674:13 677:22 696:21,
24 697:2,24 698:4,7
699:3,6,25 707:8
720:19 721:1,12,15,22,
25 722:4,11,16 725:3,7,
9 727:20,24,25 728:2,
13,21 729:2,9,14 730:1,
6,9,10,18 731:10
732:13,24 733:7,13

734:7,11 735:17,19,22
736:20,24 737:5,12
742:19,22,24 745:6
751:20,21 753:8 755:2,
25 756:10 757:16,18
758:1,3,10 761:23
762:6 763:16 764:2,6,
10 767:5,7 775:18
779:11 780:5 784:19
786:17,22 787:14
788:5,18 801:17 819:17
826:13 838:8,11 888:2

flip 621:6

floating 630:18

flow 708:8

fly 630:11,21 887:25

flying 891:23

focus 785:5,22 871:20
884:24

folks 635:2 861:20
862:1

follow 799:25

follow-up 642:11 859:4

forces 696:3

forever 773:19

forged 677:21

forget 812:3

forgot 705:18 707:11,
17 847:17

form 693:16 820:6
822:8 883:24

formal 888:12 893:24

formally 670:24 737:11

format 755:9

formed 679:24 681:2
785:20 786:2

formula 720:23

fortunate 574:3

Forty-seven 777:19
778:1

forward 628:8 629:9
665:7,9 666:5 674:14
685:12 700:10 711:2
767:10 836:13 895:1

forwarded 624:14
658:11 822:10 824:19

forwarding 856:25

found 681:25 695:8
702:15 745:7 795:24
796:22 806:1,10 863:23
880:20

foundation 617:17
679:13 686:6,14,19,22
687:1 693:5,19 694:25
802:24 871:3

fourth 576:10 621:8

frame 684:1 697:24
731:6 764:22 767:16
843:6

frames 727:17 728:12
741:22

framework 744:5

frankly 586:16 626:24

fraud 677:7 691:12

fraudulent 677:21
678:6

free 576:16 639:15
709:9 716:18,21 877:9

Freedom 868:6

frees 888:10

frequently 739:21
741:14 844:14

friend 888:6

friendly 608:4

front 635:9 662:13
700:12 706:11 710:2
854:6

Frye 867:4

fuel 890:4

full 590:14 715:12
725:12 733:5 754:5
757:9 786:18

full-time 721:13,16

funds 687:22

funneling 740:1

Funny 858:16

---

## G

gain 756:5 854:15

Garnett 783:15

Garry 705:20

gathered 664:4

gave 708:4 713:1
830:15 850:19 893:2
894:21

gee 804:21

general 699:11 706:1
720:12 743:18 747:12
752:7 787:15

generalizations 873:6

generally 627:1 768:6
838:7

generated 616:5

genitalia 778:14
883:19

gentlemen 689:6

geographic 817:9

getter 723:21

ghost 844:10,21,25
845:25 854:2

gibe 847:11

gift 888:19

Gillespi 768:22

Gillespie 591:19,25
789:17

Gilliam 573:9 590:22
591:2,6,8 625:20,24
626:14,17,19,22 627:4,
15,19,22,25 628:25
632:16 633:1 637:16
848:22 894:17

give 575:6 576:16
579:2,5,16 580:8
583:19,21 584:21
586:25 587:14 593:6
595:9 596:21 600:16
607:8 625:4 628:22
630:22 631:25 635:2
636:16 648:22 701:17
715:11,12,14 717:13

719:3,6 791:22 793:7
818:18 847:17,20
849:17 850:22 865:8
867:4 873:6,24 874:2,3
881:9 889:24 890:10
893:23

**giving** 647:4 888:15,16,
18 890:2,6,8,10 892:19

**glasses** 706:18

**global** 631:25

**globally** 623:24 636:10
711:14 712:4 713:4

**go-between** 680:4

**goal** 574:23

**God** 808:3

**good** 579:17 589:21
591:24 594:20 595:3,4
611:11 631:19 649:19
673:23 674:2 675:7
676:3,4 702:3 705:23
709:15 886:12 888:22
889:17

**governed** 696:13
720:15

**governing** 680:6
720:17 733:2

**Government** 714:16

**grand** 840:19

**grant** 755:20

**graphic** 769:22

**great** 582:19 598:3
600:25 823:7 848:23
857:16

**GREEN** 603:24

**Greenfield** 573:19
580:16 582:17 587:23
588:2,10,14,17 589:7,
13 590:20,21,24 591:3
592:3,19 593:17,21
594:8 598:18 599:8
600:15 604:8,17,22
605:8,11 606:5,21
607:5,20 608:22 609:23
610:1,12 613:15 614:20
616:25 617:15 618:18,
21,24 620:20 621:16
624:14 625:23 628:5,

13,18 632:6,23 633:2,6
636:24 637:4,7,11,19
638:2,7 640:1,16
643:12,24 648:23
649:9,12,15 652:20
653:1,12 655:14 656:5
660:3 663:3,13 664:13,
18 668:16,20 671:19,22
672:6 675:22,24 676:2
677:12,14 678:9 679:19
680:20 681:1 682:16,21
683:3,9 686:8,15,18
687:11 690:1,4,8,11,15,
20 691:1,8 692:3,10,18,
19 693:1,9 694:12,18,
20 695:7,15,21,22
701:22,23 702:6,14
703:1,8 705:22 708:8,
10 709:8 718:12,13,19,
25 719:11,13 720:3
734:24 735:2 737:4
738:11,17 743:12,16
748:13,20,22,24 749:6,
18,25 750:3,4,10 751:3,
6,10,12 753:13 756:7,
18 758:4 759:12,24
760:2,5,8,12 761:1
763:6 765:7,9 766:11
767:14,21 768:1,13
776:22 777:24,25
780:12,15 784:4 790:7
795:7,10 796:9 797:10,
23 798:12 799:8,13
802:23 804:3,7 811:13
812:14,23 813:9,24
814:8,10 820:6 850:2
864:16 879:25 891:6

**grew** 722:6

**grievance** 700:8
727:12,21,22 728:1,2,8,
9,12,14,17,20,23,25
729:10 731:16,21,22,23
732:3,8,12,20,25 733:4,
14 734:1,2,8 737:10,12,
16 740:19 752:4 755:2,
13 763:19,22,23,25
764:3 766:3,13,17,18,
23 767:9,18

**grievances** 700:10
721:19 727:11,18 728:4
731:18

**grieve** 731:11,13 737:9

**grounds** 583:12

**group** 639:6 650:24
701:4 725:2,6,23 824:6
830:19

**groups** 725:7 740:1
787:1 806:8 821:14
822:3 823:18

**Growing** 697:8

**guarantee** 736:8

**guards** 751:25 753:3

**guess** 584:6 600:20
686:21 732:7 782:13
788:4 819:11 821:11
825:1 846:15 856:11
863:9 895:2

**guessing** 819:11

**guidance** 871:8

**guide** 698:7

**guidelines** 836:14

**guilty** 745:7 798:22

**guise** 661:25

**gun** 754:17

**Guttierez** 773:13
774:18,25 775:7,21
790:23

**guy** 585:15 666:16

**guys** 599:4 691:18
850:2

— — —

## H

**Hafner** 614:11 824:12
833:11,15,24 834:6,9,
13,14 835:10,11
852:13,18,22 853:7,10,
24 854:1 862:6

**half** 574:23 575:2 659:8
715:7 723:19,24 888:17
890:2,10

**hall** 718:14 755:24
849:21

**hand** 598:22 603:18
616:7 806:19 867:3
872:7

**handed** 621:6 745:18

**handle** 589:2 726:8
873:18 874:9

**handled** 592:24 613:10

**handles** 874:12

**handling** 732:2

**hands** 581:1

**happen** 581:25 745:9
775:13 796:24 809:18
816:18 872:5

**happened** 625:1 664:3
668:2 705:3,16 710:17
731:2 733:6 742:19
788:20 806:11 855:2
873:5 881:2

**happening** 638:23
639:16 875:5

**happy** 579:4 580:12
583:19 589:11,12 612:1
651:8 652:17 662:25
663:15 690:4 736:17
850:7 875:11

**harass** 776:5

**harassed** 650:18
661:24 667:14,18,20
776:6 813:16

**harassing** 662:22
876:23 877:12,15
879:2,4,15 881:21

**harassment** 662:2,4,5
663:23 812:11

**hard** 639:1 717:6
806:19

**harm** 755:12

**harsh** 882:13

**Hashtag** 771:7

**hat** 778:16,21 779:1,3,5
805:20,23 878:12

**hate** 851:24

**haters** 829:9,11,22

**hats** 619:21 777:14
779:6,25 805:19 806:2,
9 880:18

**hazing** 882:6

**head** 594:21 634:9

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 346 of 367   PageID 14573

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Index: headdress..illustration

658:19 676:17 793:1,11
888:22

**headdress** 778:21

**headed** 891:14

**heading** 649:13

**headphones** 840:4,6
847:23

**headquarters** 786:14
831:6,7

**heads** 584:22 709:20

**health** 701:1,2 746:13,
18

**hear** 573:24 589:11,12
594:7 597:7 625:23
631:21 636:7 664:22
665:18 686:21 692:25
709:3 717:16 759:22
818:4 840:8 851:4,7,10
861:2 866:25 871:1

**heard** 583:12 586:23
596:10,11 660:23
717:15 725:21 746:2
786:5 843:13 873:2

**hearing** 581:14,17,18,
19,21 732:6,12,15,23
734:5,14 736:25 737:17
763:20 764:21 776:15
820:1 882:18 891:20

**hears** 733:17

**hearsay** 589:10 591:12
592:15,16 614:21
686:24 752:21 755:18

**heavily** 841:15

**heavy** 828:15

**heels** 581:9

**height** 706:17

**held** 601:2 611:14
625:14 629:6 630:13
638:12 653:23 668:10
687:7 692:7 700:20
713:23 723:2 727:6
729:19 730:12 746:13
753:7 755:1,24 786:13
787:21 801:1 832:10

**helicopters** 890:4

**hell** 863:2

**helped** 654:23

**helpful** 576:18 698:6
851:4

**helping** 699:2 721:24

**helps** 584:25 834:6

**Hettich** 601:18

**Hey** 584:16 587:1
673:20 674:20,23
761:21

**hierarchy** 784:24

**higher** 732:16 737:18

**highest** 723:21 774:4

**highlighted** 618:22

**highly** 830:22

**Hill** 573:10 605:23
618:22 632:20 634:15
749:5,12 825:24 832:22
837:10 838:21 840:3
841:3 842:16 846:12,
15,20 850:6,12,14
851:12 857:10,16 860:5
861:2 865:14,19,23
866:2 891:12

**historical** 781:6 814:18
815:8,20

**historically** 827:1

**history** 611:25 765:4
827:1 828:6,11 876:19,
24 879:11,18 880:4,8,9,
13 883:1,14

**hit** 752:20 753:1 809:7,8
810:2

**hitting** 809:10

**Holcomb's** 837:19

**hold** 593:20 634:8
648:11 668:22 689:19
699:13 700:15,17 716:3
749:9 799:1 801:25
835:18 858:10 888:1

**hold-over** 887:3,9

**holding** 591:16 832:12
890:3,9

**hole** 743:3

**home** 746:16 748:7

891:13,14

**hominem** 814:20,24

**honest** 825:13 846:9
852:4

**Honor** 576:25 579:9
585:3 588:15 589:13
590:21,22 591:25
592:20 593:17 594:8
598:18 599:11 602:15
603:13,24 604:22
606:5,21 607:5,20
608:22 610:1,12 613:15
614:20 616:25 617:16
618:18 620:20,23
621:22 622:25 625:16,
20 628:5 629:14 632:6
633:3 634:18 635:24
636:18 637:12 640:1,16
643:12,24 649:9,18,21
652:20 655:14 656:5
663:3 664:13,18 667:22
668:16 672:6 675:15,22
689:15 694:24 701:22
708:11 710:7 711:7,9
713:9 715:16 717:14
718:20 719:13 734:17
746:24 747:21 750:10
751:10 754:1 755:6
767:25 768:14 777:25
780:13 790:7 791:4
795:8 796:9 797:23
798:12 799:8 802:23
804:3 811:13 812:14
813:24 814:11 848:1
849:9,25 864:3,16
865:14 866:19 875:25
879:25 888:23 891:25

**hope** 720:10 854:22
887:14 890:13 891:12

**hoped** 712:15 888:4

**hoping** 644:25 716:5
783:23

**horse** 676:17 793:1,3,
11,16,17

**host** 788:13

**hosted** 669:21

**hostile** 750:2,8

**hot** 699:4 721:25

**hotel** 771:23 810:13

**Hotmail** 633:23

**hour** 575:1 708:17
713:17 714:23 715:7
716:12 888:17 890:2,10

**hours** 714:17,18,21
715:9 888:15 890:7,8

**house** 793:4,17

**Housekeeping** 629:9

**Houston** 755:1 756:2,
22

**Hudson** 716:8 717:23
853:14 855:18 856:1

**huge** 828:16

**hundred** 787:23

**hunt** 639:4

**Hunting** 850:6,7

**hurts** 893:6

**I**

**I/we** 639:14

**idea** 623:9 628:24
677:5 747:12 793:18
811:16

**ideal** 592:12

**identifiable** 882:8

**identified** 602:8 637:2
638:16 822:18 843:2
856:4

**identify** 589:25 597:18
598:7 601:23 604:2
626:3,8 672:17 681:19
821:12 822:13 858:7,12
862:16 863:12

**identifying** 603:20
826:14

**identity** 601:13

**ignore** 584:18 818:5
820:9

**Ill** 573:20 695:24

**illegal** 691:12

**illegally** 689:5

**illustration** 834:22

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 347 of 367   PageID 14574

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 3 July 07, 2022              Index: illustrative..involving

852:15

**illustrative** 706:6

**images** 619:1 772:13 801:17 806:5

**immediately** 582:3 670:5 810:10

**impact** 790:24 798:24

**implying** 781:23

**import** 855:14

**important** 576:12 577:23 639:16 715:25 761:15 800:16,21

**impossible** 740:24

**impression** 702:7

**improper** 653:8

**in-flight** 774:13 825:9, 11 828:2 834:17 868:3

**in-house** 582:8,15,18, 22

**inaccurate** 821:22

**inadvertent** 742:17,18

**inadvertently** 809:3,8 810:2

**inappropriate** 643:10 646:14

**inappropriately** 695:9

**inbox** 740:2,12

**incestuous** 747:19

**incident** 742:14

**inclined** 715:11

**include** 672:8 698:3 842:11 845:23 853:10, 12,14

**included** 624:7 647:13 657:12 659:8 676:25 699:9 823:23 861:19

**includes** 658:3 661:1 859:2 863:1

**including** 601:21 642:12 745:9 752:1 764:1 859:5

**inclusive** 822:23

**incomplete** 820:7,8

**incomprehensible** 629:23 713:22

**inconsistencies** 836:16

**inconvenience** 887:10

**incorrect** 614:13

**incredible** 843:19

**incredibly** 785:15 826:11,15

**incriminating** 822:5

**indicating** 872:15 875:11

**individual** 736:17 756:5 802:25 871:18

**individuals** 681:16 682:11 685:21 686:4 688:14 725:2,20 843:2, 7 857:1,2

**industry** 742:4,12

**industry-leading** 704:9

**inefficiencies** 574:15 575:12

**inefficiency** 576:14

**inference** 640:2

**inflammatory** 831:21

**inflight** 659:21 669:19

**inform** 657:13 839:11

**informal** 893:12,22

**informally** 893:7

**information** 580:25 589:18 599:22 613:14 632:1,2 635:19 639:15 649:4,6 657:14 664:4 665:24 687:17 688:3 689:1,17 730:7 733:5,7 739:12,17 766:17,18,22 767:12 783:20 839:5 840:13 860:13 883:15, 16 884:15

**informed** 656:3

**infraction** 731:9

**inherited** 579:19

**initial** 739:2 764:11 780:23

**initially** 720:15 788:4

**initials** 639:8

**initiate** 735:13

**initiated** 728:18

**inner-circle** 672:20

**inner-city** 828:15

**inserting** 804:4

**instance** 745:14 753:14,20 875:1,4

**instances** 753:22 764:5

**instantly** 810:17

**instituted** 753:5

**instruction** 584:8,24 586:13 587:13,15 591:22 592:4,7,18 593:15 624:1,20 625:2, 5 628:23 644:19 647:5 648:15,18,21 651:16 668:2 672:5,9 818:6 847:12 850:19 865:1,9

**instructions** 631:5 708:13 791:12 846:23 886:17 893:3

**intend** 591:4

**intended** 778:14 831:18

**intends** 589:16

**intent** 755:11

**interact** 872:21

**interacting** 873:20

**interactions** 774:11

**interest** 578:25 761:20 762:6 787:5,7,16 788:6

**interested** 787:12

**interesting** 798:10

**internal** 744:6 745:1,20

**internally** 743:21

**international** 688:11 705:19 720:16 726:3 743:25 744:1 757:21 771:25 785:12,14,20 786:13,15,18 788:12 798:20

**interpret** 759:13 860:12

**interpretation** 640:17 839:17

**interrogatories** 893:2

**interrupted** 708:8

**interrupting** 634:2

**intertwined** 584:3 818:2

**interview** 603:4

**interviewed** 602:25 613:21

**introduce** 629:11 865:21

**introduced** 632:8 865:17

**invalid** 677:20 684:7

**investigate** 656:16 728:16 767:13

**investigated** 663:22 838:3

**investigating** 801:6 810:5

**investigation** 599:23 613:12 616:3 623:16 688:19 710:18,22 730:23 843:20 875:8 876:15 884:15

**investigations** 838:10

**investment** 830:24

**involved** 655:13,21 656:1,2 670:7 673:18 674:13,18,23 697:21 698:18 763:18 764:17 767:6

**involvement** 722:16 799:24 874:21

**involves** 782:19

**involving** 857:1 871:10

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 348 of 367   PageID 14575
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                         Vol 3 July 07, 2022                    Index: irrelevant..larger

873:22 874:15

**irrelevant** 587:20

**isolate** 821:12

**issue** 583:8 593:18
623:25 629:24 648:20
731:4,8,10 732:17
736:21 746:20 753:16
789:4 817:22 848:2,8,
12,13 872:7

**issued** 696:15 764:20
838:4

**issues** 600:5 683:18
701:3 715:19 722:1
741:3,4 785:22 838:3
874:12

**items** 617:7 722:22

───────────

**J**

**Jackson** 614:11 624:8,
22 625:1 638:21
642:15,20,24 646:9
648:6,9 650:2,21 652:4,
13 654:10 655:21
658:19 659:12 661:5,7,
11,20 665:13 666:9,12
668:2 673:13 679:17
710:6,19 756:20 793:23
795:1,3,15 796:1,8,23
799:20,23 800:1 822:22
823:9 841:16 858:22
859:7

**January** 779:7 786:10

**Jeanna** 614:10 624:8,
22 638:21 642:8,14,23
648:6,9 650:2,21 652:4,
13 654:10 658:19
659:12 665:13 666:9
673:13 710:6,18 756:20
793:23 795:1,3,15,25
796:8,19 799:20,22,23
800:1 822:22 841:16
858:22 859:7

**Jeanna's** 652:5

**Jeff** 704:2

**jerk** 580:7

**Jerry** 685:24

**Jessica** 679:12,16

681:6

**job** 653:18 674:6
721:11 729:12 730:20
731:17 741:7 742:7
747:11 757:13,20
758:1,3 784:22,25
832:7,9,11 889:17

**Joe** 768:22

**John** 681:6 854:14

**join** 670:11,12,14

**joined** 705:11,24
773:16

**joining** 669:25 697:6

**joint** 582:17 722:3
786:4,6 844:2 850:2

**jointly** 580:21

**Jones** 573:16 841:24

**journey** 697:18

**Juan** 660:21

**judge** 584:24 593:8
599:15 690:5,15 694:6
805:14 857:14 888:7,25
889:8 891:6

**judges** 889:2

**judging** 800:20

**judgment** 637:17
690:3 691:4,6,25

**judicial** 690:5 691:3

**juggle** 580:10

**Julie** 628:2 633:11,24
641:7,22 642:10,18
643:3 645:8 647:20
859:3,11,14,17 861:12
862:17,21,22

**July** 661:4 862:17

**jump** 587:22

**June** 696:23 704:20
705:5

**juries** 575:19 587:16

**juror** 591:14

**jurors** 591:13,14
594:12 631:6,12 635:21
708:14,19 719:9

791:13,18 792:19
846:24 847:6 850:9
886:18,25

**jury** 575:23 577:25
584:14,16 586:14,22
587:10,14 590:14,15
591:21,23 593:11,16
594:11 605:15,21 628:9
629:19 631:11,18
632:10,17 633:3,5,9
634:19 635:3,11 636:17
638:4 660:16 668:4
671:23,24 686:3
689:10,12,24 692:4
695:8 708:18 709:2,7
710:3,4,8,9 711:6,10
713:3,22 715:2 716:23
719:2,8 720:13 742:21
746:10,23 761:8 769:19
778:6 781:19 784:9
785:9 791:16 792:7
794:10,11 802:16 817:6
821:4 825:10 829:19
847:5,8 849:4 886:24
888:4,7,9,12 889:7,8
890:19 892:22 893:2,
11,13,25 894:8

**jury's** 605:13

**justify** 662:18

───────────

**K**

**keeping** 574:19 593:14
741:21 744:9

**Keith** 679:17 681:6,10

**Kevin** 593:19 629:19

**key** 713:10

**ki-yay** 622:14

**kicked** 666:17,25

**kiddos** 747:18

**kids** 891:18

**killed** 793:3

**killing** 793:10,16 832:7

**kind** 589:17 596:21
603:7 620:8 698:6
699:23 706:6 707:22
727:4 729:12 731:24
741:8 781:13 787:17

840:9

**King** 808:11,15

**Kleburne** 583:3

**knew** 686:15,18 698:11
784:22 793:15 876:9

**knitted** 779:6,8

**knowing** 810:24 872:8

**knowledge** 614:23
655:17 661:17 668:25
669:2 670:9 687:12,14
693:14,23 694:1,3
736:12 737:22 758:23
760:24 763:5,7 767:12
793:9,13 802:24 803:7,
10 827:15,18 853:19
868:10,12 874:16
875:18,20,23 876:5,12
884:7

───────────

**L**

**labor** 703:24 826:24

**lack** 657:2 679:13 686:6
693:4,18 744:1 802:24
836:14

**Lacore** 583:6 602:12
658:3,4 660:22 716:8
717:16,20,23 824:7,14,
17,21 825:4,21 827:3,
14 828:21,23 829:18
831:1 832:17 835:12,14
836:1 841:10,23
848:14,17,18 855:19
856:13 863:21

**Lacour** 853:12

**ladies** 779:6,8,10

**landed** 891:13

**landing** 592:25 743:4

**language** 580:20
648:15 683:25 696:12
723:14 727:15 730:21
828:1 831:22 856:8

**laptop** 776:9

**large** 894:21

**larger** 720:21,22
830:19

**Las** 773:12 774:6

**late** 866:24

**late-night** 580:12

**latest** 574:18 838:10 858:14

**law** 602:5

**laws** 754:21 793:14

**lawsuit** 649:1 688:17 689:4,9 691:24 692:20, 23 693:2

**lawyer** 710:1

**lawyers** 709:3 717:1

**lay** 793:6 876:1 887:23

**lead** 610:22 703:4,12, 15 704:10 740:19

**leader** 784:23 818:25 872:25

**leadership** 655:6,17 664:4 673:6,8 674:17, 25 688:10,22 705:3 722:16 735:13 741:16 774:4 784:23 818:21,22 820:16 829:14 836:25 844:16,19 855:5

**leading** 610:25 678:7 680:24 682:14,18 683:1,6 693:3 695:12 696:9 701:19 702:10,22 703:5 705:12 730:14 737:2 738:9 743:11 751:2,15 757:6 759:9 763:2 766:4 767:1 775:24

**leaning** 588:18

**learn** 697:10

**learning** 697:16

**leave** 598:5 631:13 633:11 634:3,4 708:20 709:9 718:23 887:3

**leaves** 887:11

**Leaving** 693:10

**led** 759:5

**left** 707:3,10 714:21 722:13 755:3 758:11 833:23 846:14 854:10

**leg** 845:10

**leg-breaking** 844:10, 25 845:9 846:6

**legal** 595:22 643:25 644:1,4 653:6,10 668:17 670:6 680:18 689:16 703:19 760:21 763:3 793:7 804:8 817:6 868:7 875:15 876:1 884:3 885:19

**legalese** 698:3

**legislation** 601:16

**legitimate** 614:2

**length** 677:10

**lengthy** 678:20

**lesson** 735:5

**lessons** 813:22

**lets** 581:16,18

**letter** 630:8 877:3

**letters** 787:7

**level** 586:12 713:21 737:21

**levied** 745:13

**liable** 676:25

**liaison** 680:4,7,14,16 699:24 825:17

**lieu** 764:3

**life** 706:7 746:6 750:13 811:25 812:6 813:4,7

**lightbulb** 706:7

**limine** 583:13 668:1 734:21 789:4

**limit** 714:2 845:13

**limited** 657:20 794:17 816:10

**limiting** 584:8,24 586:13 587:13,14 592:4,7,18 623:25 625:2 628:22 644:19 647:4 648:14 651:16 672:5,9 818:6 847:12 849:17 864:25 865:3,9

**limitless** 817:8

**limits** 892:4

**Lindemann** 685:24 687:15 692:21 693:8

**lined** 758:1

**lines** 776:20 889:19

**links** 770:1

**linted** 660:9

**list** 574:18 585:4 588:6, 12 590:9,20 600:6 622:25 678:2 822:23 865:20 868:15

**listed** 599:12,20 681:14 775:11

**listen** 826:19

**listing** 721:9

**live** 635:15 783:5,10 817:18 818:4

**lived** 783:20

**lives** 783:11

**Liz** 786:24

**loads** 731:23

**local** 573:20 602:3 657:7 661:2,10,18 668:13 673:24 695:18 720:14,17,18 721:4 744:3 756:4 759:19,24 760:1 784:24 785:13 786:3,7,20 787:3,10 819:18 820:16,19 821:1 836:25 844:16,20

**locals** 726:8 785:21

**location** 580:25

**lodge** 743:19 744:24

**long** 573:23 575:13 594:6 606:15 608:5 611:4 688:5 698:2 708:23 728:15 747:24 773:18 836:12 889:5

**long-term** 852:10,12

**long-time** 611:24 852:1

**longer** 578:17 677:23 682:12 725:16 816:14 860:23 890:12

**looked** 583:5 612:8,18 621:5 645:7 797:4 810:6 811:22 856:18 877:25 884:15

**lose** 726:23 727:2

**lost** 691:13 745:17

**lot** 576:5 580:9 618:2 676:5 698:2 704:23 727:15 736:5 757:23 762:2,13 765:4 772:8 774:13 784:18,19 785:24 892:10,11

**lots** 663:11 760:13

**loud** 706:14

**lounge** 699:1,2 755:25 762:16 819:3,4

**love** 592:11 844:1

**loved** 858:17

**loves** 829:8

**low** 655:7

**lunch** 585:15 630:25 708:4,6,9 709:22 713:17 716:12 720:4,7

---

**M**

**Ma** 642:2

**made** 576:4 595:8 603:1 615:10 664:25 670:25 675:9 678:25 680:16 704:3 720:19 721:1,2 722:16 732:10, 17 737:20 743:4 751:13 757:10 758:8,12 773:6 798:25 807:17 809:4,24 810:24 821:21 843:1,10 856:17 859:10 878:3 879:10

**Magazine** 622:7

**main** 627:4

**maintain** 588:18 589:20 592:6

**major** 830:7

**make** 576:8,13 581:13 582:6 591:21 593:5,23 594:2 597:24 598:6

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 350 of 367   PageID 14577
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022                  Index: maker..membership

602:7 615:5 619:13
628:4,13 632:12 633:4
634:19 636:16 638:5
649:23 654:5,20 668:3
674:9 692:12 696:25
700:1 701:9 714:10
719:2 730:20 733:25
735:24 748:18 761:13,
22 763:17 766:21
767:24 769:23 776:4
798:6 832:24 834:25
849:24 858:11 865:14
867:2,7 871:19 877:1
878:8 888:22 890:1,15

**maker** 884:5

**makes** 582:15 615:16
662:14 888:18 893:19

**making** 615:3 634:18
652:10 700:2 714:8
730:4 745:10 762:18
776:19 800:11 813:16
830:25 840:18 883:16
889:1

**male** 706:21 785:15

**man** 823:21

**manage** 696:2

**management** 628:2
651:25 656:11 674:15
699:8 732:14 737:18
757:22 822:4 823:17
826:24 827:5,15 828:2
832:5 834:18 836:18
838:3,5 839:24 840:12
852:3,9,11,17,21 853:6
856:5 857:21 859:12

**manager** 614:15,17,19,
25 615:2,7,19,22 616:2
645:17,22,24 651:25
756:3 773:10,12,22
774:7 823:22 825:14
868:3

**managers** 774:13

**mandatory** 699:7

**manner** 588:24 589:3
613:11 676:14,22

**march** 589:7 618:7
620:9 651:24 673:9
775:20 777:10 778:25
779:3,9 787:24 788:3,7,
11,21 802:4 803:15,22

804:13,21,25 805:10,23
806:2,6,10,12,14
808:13 861:19

**marched** 778:16,20

**marginal** 800:14

**mark** 598:13 633:11
703:25 771:8 781:17

**marked** 598:8 836:2
862:8

**marker** 596:21

**marking** 627:18

**marks** 660:18

**Married** 707:17

**Martin** 685:25 687:15
690:19 691:5,20 692:22
693:10 694:6 695:9

**Masoni** 573:22

**mass** 742:18

**match** 683:10

**math** 684:21 887:19
889:19,21

**Matt** 573:10 601:18

**matter** 584:5,7 635:18
636:9 683:22 690:1
741:21 803:16

**mattered** 683:23

**matters** 715:21 873:10

**Matthew** 573:9 833:16

**maximize** 719:2

**Maynard** 642:4

**Mckeeby** 573:14
580:14 582:5 583:8,11,
24 584:19 586:11
595:20,21 598:17
599:11 600:14 615:11
619:16 620:14 621:20,
22 623:10,13 624:9
626:18,20,24 627:9
628:5 634:11 643:13,20
648:13 649:18 671:16
672:4 675:3 690:12
717:15 719:21 749:4
768:15,17 769:3,5
770:3,5 771:1,2,10,11,
18,19 772:24 776:2

777:15,17 778:5
779:14,18,20 780:8,21
789:5,10 790:13,15,16
791:3 792:17 793:6,19
804:1 805:4,11 812:21
814:12,13,15,23 815:5,
17,18 816:9 822:8
832:21 840:10 842:18
847:25 848:12,14,17
849:8,25 864:18,21,24
865:5 866:9 868:7,16
870:2 871:2 875:14,25
876:6 878:13,15
881:13,24 883:5,11,24
884:3,12 885:18 890:6,
16 891:5,7,24 892:21
894:3

**Mckeeby's** 795:11

**means** 588:22 653:14
656:16 674:21 707:12
721:13 798:25 812:7
813:2,5,20 816:13
817:12 825:11 835:17
845:22 855:9 887:3

**meant** 707:24 717:20
753:1 781:21 829:22,25
830:2 869:7 871:3

**measure** 715:12

**mechanics** 785:17

**mechanism** 745:20

**media** 646:22 655:9
658:5,23 662:21 663:22
664:4 685:6 710:21
752:6 820:13 821:20,24
822:4 823:20 830:6
834:24 835:6,16 836:12
838:3,13 841:16,25
842:12 843:9,22 845:8,
14 852:23,25 853:8
855:3 856:6,25 857:3
878:24

**meet** 731:6

**meeting** 656:14,15
688:4,5 699:10 727:5,6
729:5,19,21 730:5,11,
14,19,23,25 731:3
732:14,15 733:21,23
735:9,14,16 736:14,16,
20 737:7 738:6,13
744:14 745:15 753:10
754:12,13,14,17,22,25

755:5,12,15,23 758:20
763:24 764:14,18
775:20 779:13 786:9,
10,12,13,21 787:21,22
788:2,13 819:20,25
820:11 835:5 836:6

**meetings** 688:2,4
699:7,10 729:6,8 733:6
735:21 737:7 752:19
753:4,23 754:4,10
799:1

**meets** 817:10

**Meggan** 573:16

**member** 602:2 613:6
620:12 638:21 643:10,
19 644:11 654:11
661:18 662:20 665:4
667:12 671:2 674:9
680:9,14 697:2,22
698:23 700:5 703:9,11
707:23 710:24 723:7
725:12,16 726:17
729:16,24 735:12
740:18 743:19,20
744:8,19,20,23,24,25
745:5,10,12,14,19
748:6 752:10,18
753:10,23 754:15
760:18 762:21 766:16
782:23 783:3,5,15,21
784:6,7 786:16 796:3,4
798:22,25 819:2,18
820:25 821:6,7 828:2
834:18 844:19 852:2
855:4 870:18

**members** 619:4 650:9
655:8 656:11,25 658:6
662:23 667:9 669:10
679:8,11,18 680:12
681:4 682:8 684:19
688:1,6 699:7 700:3
703:13 721:6 722:17
723:5,8 724:24 725:1
733:19 739:1 742:5
744:15,16 752:13,15
754:8 755:4 757:11
758:21 761:15 782:25
785:21 787:19 798:22
821:1 829:13 836:3
843:7 844:15 853:5
875:10

**membership** 684:13
687:18 688:1,4 689:1

Case 3:17-cv-02278-X  Document 449  Filed 06/14/23  Page 351 of 367  PageID 14578
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022          Index: memberships..necessarily

698:19 720:21,22
721:5,19,20 723:12
724:19 726:10 727:5
739:3,6,19 741:3
744:14 753:9 754:10,
12,13,21,25 757:11
758:19 785:2 855:5

**memberships** 700:11

**memes** 577:12

**memory** 677:17

**mental** 701:1,2 746:13,
18

**mentality** 845:11

**mention** 646:1 705:18

**mentioned** 705:10
709:23 721:23 733:21
744:1 746:8 753:16,20
763:16,22 790:22
798:21 882:22

**mentions** 585:9

**merit** 734:3

**merits** 733:17 880:11,
12

**mess** 596:13

**message** 586:15
608:20 609:2 739:16
749:23 750:11 757:25
782:4,9 783:23,25
793:5,17 801:15
802:10,11,14 810:6
880:14 882:5,16
883:19,22 884:20 886:9

**messaged** 854:19

**messages** 575:15
608:8 609:22 610:10
611:20 612:3,9,16,24
613:3 739:3,4 750:16,
20 751:13 759:2 768:11
769:21,22,25 770:6
775:18 778:7 781:8,9
784:15 801:11 802:17
803:8 807:5 810:23
811:9 814:18 815:9,21,
22 875:10 878:5

**Messenger** 809:1,12,
16,19,22

**messing** 610:19

**met** 678:22 774:12,17,
18,20 789:11 867:18

**metaphor** 832:2 845:8

**Mexico** 581:12 582:3

**Miami** 703:24

**mic** 587:25 645:19
665:19

**Michael** 573:22

**microphone** 617:24
848:16

**middle** 748:23 749:7,19

**Mike** 614:11 628:2
658:3 660:21 823:1,2,4,
6 824:10,15 833:11,15,
24 835:4,9,10,11 836:8
841:9,23 845:10
851:21,22 852:2,7,13
853:24 854:1 858:13,22
862:5,6,7,17,21

**Mike's** 853:21

**Mikes** 852:11

**mind** 584:6 587:5 687:5
821:25 822:24 848:8

**mindful** 639:8

**mine** 632:22 666:7
795:11

**minimize** 574:15
849:21

**minions** 656:10

**minority** 828:15

**minute** 643:3

**minutes** 579:2,6
615:15 631:9 695:1
708:4 709:5 712:15
713:6 715:8 773:20
776:23 791:17 805:18
846:13,16,21 847:3
848:11,24 849:12,14,15
851:12

**mischaracterization**
815:11

**mischaracterizations**
814:21

**mischaracterizes**
643:21 695:11

**misinformation**
857:25

**missing** 880:23

**mobilization** 819:4

**mobilizations** 699:2

**moment** 648:7 760:8
767:21 780:12 822:24

**Momovich** 756:21

**Monday** 893:6,22
894:2,11

**monetary** 694:8

**money** 619:23 687:22
689:5 694:10,13 695:8
803:15,22,23 804:18,25
805:9 812:5

**monitoring** 838:7

**monitors** 629:19

**month** 659:8

**months** 723:20,25
725:10 758:11 797:20

**morning** 573:23
574:14 581:15 582:25
585:7 588:8,13 593:2,
25 595:3,4 616:11
621:15 630:15,22
676:3,4 708:5 711:11
712:19,22 713:7 714:14
715:18 808:18,21
864:12,15 891:19 893:6
894:11

**Morris** 573:15 583:25
716:20 796:14

**mothers** 748:1

**motion** 581:2,9,11
582:2 583:13 626:1

**motivation** 879:12

**Mountain** 845:16
853:20,22

**mouth** 617:25 746:10

**move** 591:10 598:15
616:9 621:12 622:18
629:12,19 631:25
635:25 644:16 647:1
657:18 660:5 671:14
677:7 755:20 777:17
780:9 794:12 847:9

**misinformation**

**moved** 580:3 667:5

**movement** 811:24
830:20,21

**moving** 616:8 629:10
635:16 734:25 776:20
811:21,23 838:22
847:13 850:12 866:5
894:25

**MSN** 633:23

**Msn.com.** 634:14

**multiple** 606:20

**murder** 618:6,15
619:14 769:23 770:18

**murderer** 750:16

**murders** 619:1

**mute** 605:12,15

**muted** 605:21 632:11
638:4 671:25 794:11

**mutual** 889:23

---

**N**

**N-E-V-I-N-C** 633:13

**naive** 832:15

**named** 616:1 642:3
679:18,25 680:9,12,22
681:16

**names** 596:13 625:24
627:18 635:13 639:8
685:23 756:19 822:17
855:10

**Naomi** 853:14 855:18
856:1

**narrative** 747:22
752:22 755:7,8 757:15

**narrow** 824:2

**national** 601:16 723:11

**nature** 592:12 662:23
685:5 774:17 877:16

**necessarily** 625:2
628:15 823:13 829:15
832:9 878:2

**887**:16 889:13

**needed** 589:18 593:1
678:3,22 684:15 698:23
700:3 706:15 730:18
740:25 755:16 761:12
767:10 772:19 785:3

**negotiate** 704:8

**negotiated** 678:16
752:11

**negotiating** 699:24
700:3 703:11,18 704:4,
16,22,24 705:7,10,20
707:13 722:2 752:10,
13,16,18 761:13,20
762:7,9,13,20

**negotiation** 703:10
762:25

**negotiations** 699:5
703:23 704:6,12,17
705:5 726:13 740:16
741:17 761:11,25 762:3
819:5

**negotiator** 703:4,13,16
704:11 740:19

**network** 762:11 819:6

**Nevarez** 574:12
580:11,22,24 582:9
627:7,11,12,14,25
628:22 641:14 655:13,
17 659:16 661:1 672:18
773:16 819:24 820:1,15
837:5,16 844:1,24
854:15 891:4

**Nevarez's** 626:19

**NEVINC** 634:7

**new-hire** 707:20

**newsletter** 589:8

**nexus** 882:7

**nickel** 804:20

**nicknames** 844:12

**night** 574:10,18 580:13
593:25 890:21

**nightly** 574:17

**nightmare** 821:25

**Ninety-four** 780:17

**nods** 594:21 634:9

**non-flight** 722:7,13

**non-union** 744:25
745:19

**normal** 888:3

**Northwest** 826:22,23

**notch** 825:13,14

**note** 583:23 591:9
838:2 889:7

**notes** 607:16 611:3
612:10 614:10 671:13
730:15,17 731:1 733:5
851:8,9 865:3 877:2
888:7

**notice** 650:4 690:6
691:3 815:1

**notified** 773:15

**notify** 728:14

**notifying** 737:13

**notorious** 826:23

**November** 799:16

**number** 597:15 599:4
600:18 601:5 637:5,7
662:21 677:21 678:3
684:14 737:18 739:14
742:16 757:15 786:22
787:14 789:24

**numbers** 624:15
637:22 682:4,6 683:11
717:12

**numerous** 663:21
739:25 740:14 767:8
795:4 843:1

_____

**O**

**O'GRADY** 628:2
633:11,24 641:7,22
642:10 645:8 647:20
859:17 862:22

**oath** 581:22 594:18,19
720:5 829:20 867:4

**object** 602:5 624:9
633:8 652:21 679:13
680:24 682:14,18
683:1,6 686:6,22
689:15 693:3,4,15,18,

19 694:24 695:11,12
696:9 701:19 702:10,22
703:5 705:12 734:17
737:2 738:9,14 743:11
746:24 747:21 751:2,15
752:21 756:12 757:6
759:9 760:21 763:2
767:1 775:24 789:4
790:3 793:6 804:4
807:2 812:23 814:20
820:6 822:8 849:16
883:24 884:23 886:5
892:1

**objecting** 805:9 815:11

**objection** 588:18
589:1,4 592:6,18
595:21 598:14,17,18
600:10,14 603:24
604:22 606:5,21 607:5,
8,20 608:22 609:23
610:1,12 613:15 614:20
615:11 616:25 617:15
618:18 619:16 620:14,
20 624:19 636:4 638:6
640:1,16 643:12,13,20,
24 648:12,13 655:14
656:5 663:3,13 664:13,
18 668:16 672:6 675:3
678:7 687:2 689:20
692:11 693:16 702:2
719:18,21,22 734:18
738:8 747:1 749:3,4,12,
13 755:18,21 766:4
777:19,23 780:10,11,15
790:1,5,6,9 793:19
794:17 795:7 796:9,10
797:10,23 798:12
799:8,14 802:23 804:1
805:4,11 811:13
812:14,21 813:9,24
815:16 864:22,24
868:7,16 870:2,19,25
871:2 875:14,25 878:13
879:25 881:13,24 883:5
884:12 885:18 892:17

**objectionable** 578:23

**objections** 574:10
576:6 583:2,11 588:23
589:10,20 591:12
616:11 621:15 622:22
624:2,12 636:2,3
644:17 647:2,4 651:13,
15 657:19 660:7,8
668:23 672:3,8 695:4

794:14 804:5 820:10
847:11 850:15,16 865:7
866:8 893:14 894:16

**objector** 613:7 725:25
726:1,21 744:25 745:19
822:16

**objectors** 619:5
669:10 683:4 725:21
726:23 821:1,8 822:17

**objects** 579:1 892:8

**obligations** 668:19
669:9

**obvious** 679:24

**occasionally** 816:18

**occur** 686:1

**occurred** 743:3 798:2,
4 802:21

**occurring** 806:14

**occurs** 723:19 735:10
745:6

**October** 765:17,20,23,
25 842:22

**offended** 656:13 874:4

**offensive** 821:22

**offer** 590:4 591:5 668:3
711:4 732:20 748:24
864:3,4,9

**offered** 592:13 624:18
687:4 697:12 715:23
719:16 723:21 874:18
881:1

**offering** 623:22

**office** 639:6,10 667:6
685:19,22 686:5 688:25
700:23 721:8,18 722:8
726:13 727:23,25
729:3,10,16,20,23
731:1,18 737:8,11
798:18 799:2

**officer** 573:3 594:10
631:10,17 659:16
661:18 698:12 709:18
719:7 723:11 792:5
847:4 849:2

**officers** 641:19 661:2,
10 754:7

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 3 July 07, 2022                    Index: offices..people

**offices** 700:15

**official** 784:20 788:11

**officially** 698:17,20

**old-time** 845:11

**older** 891:1

**one's** 583:16 702:3

**one-** 718:23

**one-day** 830:23

**one-sided** 831:18

**ongoing** 704:17,18

**online** 578:16 587:16
622:15

**open** 601:2 611:14
625:14 629:6 630:13
638:12 653:23 668:10
687:7 692:7 757:16
767:11 801:1 802:12

**open-ended** 611:5

**opened** 707:13 748:3
809:12 810:4 811:17

**opening** 575:3 746:1

**operate** 744:3

**operation** 742:5

**operations** 659:21
720:12 740:21

**operators** 785:18

**opinion** 619:5,6 639:10
643:25 656:25 668:17
676:10,16,20 678:11
686:25 715:21 717:7
800:18 805:10 827:5,8,
10 836:22,24 837:6,19,
22 838:15,17 886:4

**opinions** 608:12
678:10 767:8 869:1
876:19

**opponent** 667:8

**opponents** 664:5
675:10 820:25 821:6,7

**opportunities** 788:18

**opportunity** 688:6
707:25 723:5 752:15
823:3,5,10 828:6,12

**oppose** 829:13,15

**opposed** 674:25 681:7,
10 829:22 831:6

**opposing** 589:15
626:17 843:21

**opposite** 728:15
785:19

**opposition** 808:11
829:12

**opt** 670:17,19 697:4
725:17 726:1,23 727:2

**opted** 603:9 726:4,21
728:5 745:11,16

**option** 731:11 732:19
734:12 747:15

**options** 581:24 747:14

**order** 580:18,21 583:5
602:4 626:11 716:4,8
767:4

**ordered** 625:21 626:1,
7,13 633:19 694:6,8

**orders** 580:19 581:22
696:14

**organizations** 812:5

**organized** 740:12

**originally** 888:4 892:7

**out-house** 582:21

**outcome** 582:1 677:17

**outlined** 600:6 727:18
730:24 744:17

**outlines** 728:11 744:6,
9 745:9

**outpatient** 746:12

**outrage** 655:2

**outspoken** 603:8,11
673:3

**overdue** 846:13

**override** 851:9

**overrule** 589:4 592:23
624:12 644:4 672:7
695:3 702:11 790:8
803:1 804:9 850:16
865:7 868:17 892:18

**overruled** 595:24
616:12 621:17 624:3
693:20 702:4

**overruling** 592:17
636:3 647:3 651:15
660:8

**oversaw** 731:22
825:17

**overturn** 737:20 782:1

**overview** 707:22

**overwhelming** 740:10,
23

---

**P**

**p.m.** 895:5

**packet** 576:2 578:12,20
579:3,6 733:5

**page/line** 583:1 585:1

**pages** 584:20 595:13
596:4,22 597:14,15
599:7,10,21,24 600:10,
15,17,22,24 601:5
613:24 615:24 618:3
623:2 807:19

**paints** 820:8

**pandemic** 580:6

**panic** 654:18 655:1,4

**pants** 754:18

**paper** 581:10 831:15

**paperwork** 701:14

**paragraph** 650:15
657:4 769:20 829:5
830:6,11,15

**Parenthood** 589:8
618:7 759:20,25 760:3
777:7 803:16,23 808:12

**parenting** 746:15

**Parker** 679:12,16
681:6,7 690:16 715:24

**Parrott** 715:23 718:13
854:14

**part** 587:6 597:10
601:23 604:9,11,13
617:1 620:18 650:1

659:1 670:2 674:15
680:15 687:19 696:25
697:18 730:20,23
746:19 747:11 749:23
750:11 751:13 766:13,
18,22 770:9,24 771:16,
20 772:3,4 784:22,25
787:6 793:20 807:1,8
808:23 819:8 820:9
840:5,11 871:24 875:7
877:6 882:7,22 883:2
884:14 885:16 886:3,8,
10 894:21

**participate** 723:5
725:19 727:3,7

**participated** 806:3

**participation** 726:24
741:23

**parties** 584:22 627:13
628:20 850:4

**parts** 698:8 732:22

**pass** 768:14

**passed** 786:19

**passenger** 743:2,5
888:3

**passing** 743:5

**passionate** 700:24
701:7

**past** 648:18 717:2
783:5 800:17 828:19
881:2 891:2

**pasted** 750:18

**path** 582:4 629:9

**patience** 886:23

**patient** 794:6

**Paulo** 573:14

**paused** 825:23 837:9
838:20 841:2 846:11
860:4 861:1

**pay** 670:18,20 694:9
707:13

**payor** 726:20

**payroll** 722:10

**people** 576:16 579:12,
15,21 615:10 628:11,12

633:9 635:4 638:25
639:23 640:12,15 650:1
660:19,24 662:9 672:20
691:19 701:6 706:8,19
707:4,14,16 722:15
725:23 726:4 729:7,12
752:4 761:12,19,20
762:18 779:12 783:23
784:18 785:1,2 787:4
788:14 817:9 821:10
822:14 824:3 826:19
830:3,19,23 831:12
843:20 848:5 852:17,22
853:4,7,16 854:9 856:3
857:24 858:15 893:10

people's  783:17

perceived  655:8

percent  684:13 703:11
765:2 787:23

percentage  684:17
726:5,9,19

Perfect  729:1

performed  673:23
674:2 705:7

period  684:3 824:23

periods  754:9

person  628:17 646:9
695:16 707:2,7,9,21
722:9 729:16,17 732:14
740:13 745:9 782:1
793:7 795:6 797:18
817:8,18 822:21,23
836:5 844:17 869:21
891:1

personal  587:17
593:21 614:23 630:7,17
632:14,16 633:17,19
668:25 687:12,14
693:14,23,25 694:3,7
697:5 706:14,22 736:12
737:22 748:18 760:24
763:5,7 776:10,22
793:9,13 831:4,11
838:2 844:2 853:21
868:10,11 875:18,19,23
876:5,12 880:18,19
884:7

personally  670:9
750:13 756:9,11

personnel  631:7
708:15 791:13 846:24
886:19

pertain  869:20

pertained  707:24

petition  640:25 658:20
662:3 665:1 667:7
677:9,18,19 678:5,10,
11,16 679:1,5,18,22
680:23 681:5,17 684:6,
11,22 691:18 793:2
821:1

Phillips  703:24

Phoenix  645:17,22

phone  593:24 607:17
612:5,7,9,11 721:18
739:14 774:22,23
776:10,11 780:23
790:22 833:20 888:6
889:4,6

phrase  766:7,9 799:3

phrased  609:10

physical  662:8 767:22
783:16

physically  750:25
751:14 755:11

pick  576:16,21 692:1
894:20

Picket  756:20

picking  662:19

picture  602:9 620:5,10
779:21 820:8 854:7
881:19

pictured  885:5

pictures  620:18,25
878:6,12,20 879:2,6,20
880:13,17 881:5,12
882:3,14 883:18,19
884:19

piece  726:9 732:6

pieces  726:15

pink  777:14

pioneer  830:21

place  615:25 670:15
737:23 739:10 744:10,

12 762:1 886:13

places  753:6

plaintiff  573:10 676:5
719:15

Plaintiff's  598:21
601:7 616:16 622:2
644:24 647:11 651:21
657:24 660:13 672:15

plaintiffs  593:22 711:9

plan  589:23 590:4
848:21

plane  743:4 888:1

planned  589:7 618:7
630:23 759:20,25 760:2
777:7 803:16,23 808:12

planning  632:8

platform  739:6

play  724:5 809:7,10,21,
25 810:2 817:15 828:14

played  763:11 790:14
818:9 826:3 850:23

playing  790:3 808:24
809:6,12 810:3,11,17
846:19 851:11

plays  809:9 828:17

plot  575:5

PM  639:15

podium  792:10

point  575:13,18 576:4,
9,13,14 578:8 582:6
586:6 592:11 602:19
635:17 663:15 669:15
684:20 685:19 691:14
697:19 703:3 711:24
713:9 714:12,20
715:14,22 716:4 717:24
724:11 731:13 733:13
737:15 752:3 754:16
763:10 766:12 768:10
773:14 775:16 778:10
786:2 799:4 811:1,2
824:8,12,14 832:1,3
880:2 890:24

pointing  827:25 886:16

points  673:3 735:6
740:14 774:12

police  753:3

policies  742:2 828:25
845:13 870:12 871:11,
16 872:3,20 873:4

policy  658:5,23,24
667:17,21 685:11 726:3
736:9 753:5 766:25
820:13 836:12,14,17,19
841:16,25 842:13
843:9,23 845:4,8 853:8,
17 856:6 857:3 869:18,
23 870:12,22 873:20
878:24 880:7,10,21
882:6

polite  651:3

political  667:8 675:10
769:10,24

Polly  756:21

poor  826:24 840:7

portal  587:16

portion  586:15 609:17
658:23

portions  585:8 702:19
817:16

portray  882:16

portraying  840:19

position  688:10
700:17,21 722:25
723:11,21,22 724:2,18
732:17 747:16 774:17
784:23 787:8,9 799:2
819:16 825:4 831:23
834:15 871:9

positions  688:22 689:3
699:13 700:15 722:14
723:7

possession  689:7

possibly  824:7 868:20,
22,25 889:25

post  616:1 638:20,23
639:4,12 642:21 650:21
651:2 662:11 663:15
782:8 885:15 886:3,9

posted  591:18 615:23
878:4 879:6 882:3,15
883:18 884:20

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 355 of 367   PageID 14582

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                 Index: posting..protected

**posting** 685:6 754:19
881:8 885:8

**posts** 639:23 642:12
662:21 663:10,11,22,25
746:3 751:1 752:6
753:11 759:5,6,13
768:7 822:5 839:6
854:16,21,24 856:25
857:22 859:5 880:14,
18,19 881:19

**pot** 639:7

**potential** 728:24 864:6

**potentially** 720:22

**pounds** 706:24

**power** 630:24 654:18
655:1,7 817:8

**practical** 584:5,7

**practices** 642:14,23
859:7

**prayer** 808:3

**pre-exhibit** 588:5

**precaution** 754:25

**precisely** 742:22

**preclude** 728:5

**predicate** 581:2 602:22
871:2

**predicated** 691:9

**predicted** 575:2
585:20

**predicting** 639:22

**predicts** 650:23

**prefer** 750:7

**prefix** 635:18

**pregnancy** 747:14

**pregnant** 802:4

**prejudice** 589:9 693:4,
19 694:25 756:13

**premature** 715:14

**preparation** 704:18
705:17

**prepare** 704:21

**prepared** 877:2 892:3

**preparing** 649:10
663:20 752:10

**prepping** 704:11

**presence** 668:4

**present** 688:3 701:13
733:20 753:3 773:15
851:18

**presentation** 575:10
593:7 687:24 888:18
890:11

**presented** 678:22
689:10 798:23

**presenting** 800:19

**preserving** 589:1

**presidency** 667:5
669:16 699:14 700:22
707:20 740:14 752:3
757:10,25

**president** 577:18
596:16 601:14 613:6
642:17 643:7,8 653:21
654:15 656:2,4,23
657:7,12 658:15 659:10
662:18 666:17,18,19,
21,23,24 667:1,2,3,6
668:18 669:2,6 673:24
674:3,6,8,24 675:7
676:19 685:25 693:10
697:19 700:16,21
701:12,14,17 702:8
703:3,12,15 704:25
721:7 724:6,9,15,18,21
733:22 738:21,24
740:17 741:5,7 758:21
786:25 802:10 812:3,4
820:19 823:21 824:8,25
825:14 834:16 870:19,
20

**president's** 739:16,19
743:9

**president@twu556**
842:4

**president@twu556.
org** 842:7

**presidents** 754:6,13

**pressure** 636:22

**pretense** 752:23

**pretty** 585:15 618:16
637:10 798:10 889:16

**prevented** 798:17

**preview** 579:11 714:14

**previous** 667:8 682:19
723:22 836:1

**previously** 696:14
841:21 843:2

**primarily** 722:4 785:19

**primary** 703:25 729:12
731:17

**principal's** 639:5

**prior** 612:19 636:2
672:8 700:25 705:7,16
707:5 752:9 768:12
774:10 777:5,11 784:12
787:4 789:15

**prioritize** 741:11,25

**priority** 741:9 742:9

**private** 802:11,15
826:5 851:20 854:19
880:14 882:4,16 883:18
884:20

**privilege** 669:4,7

**pro** 750:13,14

**probation** 670:16,21,
25 697:3 725:8,10,13

**Probationaries** 725:7

**problem** 611:2 630:20
637:20 852:17 853:3
856:6

**problems** 827:4

**procedure** 744:7

**procedures** 742:2
744:10,17

**proceed** 611:16 638:14
649:20 687:9 692:9
734:7 796:13,16 801:3
867:13

**proceedings** 599:17
601:2 610:17 611:14
623:4 625:14,18 629:6,
17 630:13 637:14

638:12 652:24 653:23
667:24 668:10 686:9
687:7 689:22 692:7
799:11 801:1 895:5

**process** 580:24 634:16
680:2,19 687:19 688:20
704:25 714:6 723:17,18
724:4 727:13 728:12,
20,23 730:23 732:4,7,
19,25 733:14 734:2,4,9
735:4 737:5,13,17,24
738:6 745:1,2,6 755:2
762:20 763:21 764:7,
17,24 766:3,14 767:9,
18 784:5

**produce** 663:5

**product** 747:19

**production** 583:7

**professional** 613:11

**profound** 654:14

**prohibited** 802:5

**project** 762:22

**projects** 825:16

**prolonging** 888:17

**promise** 889:3 893:17

**promoted** 667:2

**prompted** 669:17,18

**pronounce** 833:17

**proof** 668:3

**propaganda** 673:14

**proper** 680:19 696:15
783:16 795:24

**property** 689:6 694:7
707:6 730:13 755:1,24

**propose** 600:9

**proposed** 678:14

**protect** 812:6

**protected** 577:8,16
578:1,18 586:1 595:7,
15,22 597:13 639:19
641:4 642:21 643:3,19
644:2,12 646:10 652:19
653:3,4,5,7 657:8,11
661:21 662:1 669:3

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 356 of 367   PageID 14583

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 3 July 07, 2022            Index: protected-union..Quickies

673:19 676:7,10,20,24
677:3 685:10 691:9,13
713:2 768:8 781:12
807:8,11,18 820:2,12
868:4,14 869:3,22
871:10 873:13,15
875:7,23 876:2,18,22
877:9,11,19,22 883:22
884:10

**protected-union**
873:3 875:13

**protecting** 671:8

**protective** 870:13

**protocol** 857:15 874:5,
8,10

**prove** 713:12

**provide** 602:16 733:8
756:19 781:7

**provided** 671:9 738:2,5
746:14 766:17 839:6,20
840:23 882:19 892:7

**providing** 840:14

**provision** 696:7

**provisions** 696:3
697:14

**Pryor** 573:11 574:22,25
576:20,25 577:3 578:9,
22 579:4,8 585:3 587:8,
13 589:24 590:7 593:3,
8 594:15,23 595:2
596:2 598:12,15,22
599:1,3,6,10,13,19
600:13,16,20,23 601:12
602:15,19,23,24
603:13,16,17 604:2,4,
16,18 605:3,10,17,20,
24 606:1,10,23 607:1,
11,24 608:6,24 609:5,9,
14,16,24 610:5,7,16,19,
25 611:8,12,17 613:18
615:1,13,14 616:9,17
617:3,7,11,23 618:20,
23 619:3,19 620:17,23
621:2,3,12 622:3,12,13,
18,24 623:6,11,15,18,
22 624:4,16 625:7,12,
16 626:5 627:17,23
628:4,24 629:3,12,21
630:6 631:20,23
632:12,18,21 633:8

634:1,7,14,18 635:6,15,
23,24 636:18,23 637:1,
6,9,25 638:15 640:8,23
643:16,23 644:3,7,15,
25 645:5,13,15 646:16,
17,25 647:12 649:21,22
651:12,22 653:15,18,20
654:2,3,20,24 655:19
656:9 657:17 658:1
660:2,4,14 663:9,14
664:1,16,21 665:19,20,
22 667:22 668:1,8,12,
18 669:5 671:13 672:16
675:6,12,15 678:7
679:13 680:24 682:14,
18 683:1,6 686:6,13,16,
21 689:15,21,24 690:7,
9,17,22 691:6,16
692:11,14,24 693:3,15,
18,22 694:24 695:11
696:9 701:19 702:2,10,
22 703:5 705:12 708:24
710:7,12,15,16 711:4,7,
9 712:18 715:16 716:16
717:3,14,19 718:3,8,21
719:22 734:17,21 737:2
738:8,14 743:11 746:24
747:1,5,8,21 749:11,13
751:2,15 752:21 754:1
755:6,18 756:12 757:6
759:9,22 760:1,4,21
763:2 766:4 767:1
772:16,22 775:24
777:21,23 780:11 789:4
790:3 791:11 792:9,21,
24 793:12,22 794:2,6,9,
12,22 795:14,18,21,22
796:20 797:12,15
798:1,15 799:22 800:7,
17 801:4,23 802:1,8
803:2 804:11 805:7,14,
16 806:20,22 811:19
812:17,18 813:1,14
814:1,7,20 815:3,10
816:12,25 818:12,15,19
822:12 826:4 833:1
837:15 839:1 841:6
848:1,4 850:1 851:17
857:19 860:9 861:3,7
864:1,9 866:19 867:15,
21 868:13,21 870:8
871:4,6 875:16,21
876:3,8,13 878:19
880:6 881:18 882:10
883:9,12 884:1,5,8
885:24 886:5,7,12

887:14 888:21

**Pryor's** 857:12

**public** 642:13 690:1
766:8,9 821:21 822:18
829:16 859:6

**publication** 739:15

**publicize** 762:15

**publicly** 830:4

**publish** 605:22 616:14
621:19 636:14 644:22
647:9 651:19 657:22
660:11 672:13 719:24
749:15 778:2 779:17,18
780:18 789:24 790:10
794:19

**publishable** 635:13

**published** 622:8 662:9
687:18 865:13

**publishing** 695:20

**pull** 600:11 609:4,7
630:7 632:11 645:19
672:1 677:12 695:16
721:13 748:20 765:7
769:3 770:3 772:14
777:15 779:14 789:23

**pulled** 614:15 616:2
671:22 776:7 810:19

**pulling** 578:19 588:14,
22 610:23

**punch** 887:21

**punishment** 710:19
736:19,24 745:18

**pure** 782:11

**purpose** 660:9 775:10
786:12

**purposes** 891:25

**pushed** 887:25

**put** 578:25 586:24
596:24 599:22 636:19
663:18 667:1,3 687:18,
24 716:4 733:4 746:9
762:1 793:4 798:16
800:14 805:17 829:18
831:17 832:18 851:3
865:3

**puts** 658:23

**putting** 700:11 793:17

**Q**

**qualified** 671:2 707:8

**qualify** 799:5

**quarter** 681:21

**question** 578:23 586:2
589:21 595:19,25
604:24 606:9 607:8,10
609:10 612:15 614:12
616:18 617:19 630:2
644:6,9 653:16 659:5
663:8 664:23 668:24
673:25 679:15 682:19
686:20,25 687:10
692:15,17,24 694:2
707:17 710:2,4,5
711:24 727:21 747:10
759:23 765:24 766:20
771:8 772:17 795:17
800:9,10 803:18
804:10,14,15,19
805:20,22 806:23
809:18 835:23,24,25
856:12 857:12 870:10
871:3,20,22,24 872:8
873:4 876:12 878:17,18
881:15,17 884:9,24
892:21

**questioned** 815:6,19

**questioning** 887:17

**questions** 575:25
603:6 606:14 611:5,24
634:22 663:4 675:13,
14,17 687:22 706:13,
15,16 708:21 709:1,4,6,
8 715:2 720:9 721:20
728:7 761:15 762:16
768:3 775:1 791:3,11
803:13 809:5 814:10
816:9 847:24 848:1
858:11 867:11 893:3

**queue** 817:4 818:7

**quick** 574:11 623:3
629:20 630:9,23 814:13

**quicker** 713:8

**Quickies** 698:1

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 357 of 367   PageID 14584

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 3 July 07, 2022                    Index: quickly..referred

**quickly** 748:15 800:21 887:22

**quietly** 749:21

**quit** 662:19 682:12

**quote** 750:12 782:13,15

**quotes** 832:18

___

**R**

**racist** 829:2

**radar** 698:14

**radius** 817:9

**raise** 585:4 619:6 672:3 867:3

**raised** 583:13 799:23

**raising** 616:21

**ran** 724:11,17 758:13 818:21 840:5

**Randy** 593:19

**range** 846:16 889:10

**rank** 758:9

**rank-and-file** 699:25

**rape** 747:19

**rapid** 743:2

**raping** 748:7

**rates** 707:13

**ratification** 752:12,19 753:4

**rationale** 714:15

**re-asking** 795:17

**re-litigate** 633:21

**reach** 753:8 762:2 787:14 826:8 830:7

**reached** 575:13,17 756:1 764:15 788:5

**reaching** 678:3

**react** 826:20

**read** 595:12 596:5,6,7, 19,21,22,24 597:14,16, 20,21,22,25 598:2,5 612:2,16,22,24 613:1,3

645:1,3 650:15 652:11, 16,17,18 654:4,7,21 657:4,5 682:2,16,22,25 683:12,16,20 696:1,5 711:18,21,22 712:2 749:21,22 750:6 768:9 769:19 770:16 771:6 776:16 795:23 810:22 827:16 836:7 840:9 861:10 877:2 888:12 893:17 894:6,10,12,14

**readable** 654:7

**reading** 603:25 604:10 606:6 610:22 618:19 648:7 658:25 659:3 661:6 696:17 697:16 711:24 713:7 831:9 839:18,19 855:14

**reads** 831:7

**ready** 579:19,25 580:1 594:9 635:11 636:15 708:5 730:8 807:13 871:21,22

**real** 616:4 638:24 706:7

**real-life** 698:8

**realize** 576:12,21 858:16

**reask** 687:10

**reason** 607:19 609:2 610:9 611:20 678:23,24 770:18 832:16 844:6 860:19 876:25

**reasons** 678:2 679:24 712:21 746:18 754:5 785:3 792:15 799:18 817:7 820:2 831:25

**Rebecca** 756:23

**recall** 585:11 590:10 604:25 606:16,19 621:9 623:24 638:23 639:1,16 640:9,15,24 641:20 646:10 650:25 652:15 654:13 658:7,8,20 662:3 665:1 666:1 667:7 669:15 673:13 676:18 677:9,18,19 678:2,5,10,11,16,24,25 679:4,11,18,21,25 680:10 681:5,16 684:1, 5,10,22 691:2,18,19

**recommend** 792:14

**recommendation** 830:25

**reconsider** 583:20

**record** 577:8 581:11 589:5 597:18 598:7 603:20 609:4 627:3 637:17 690:2,14 708:23 714:13 731:2 747:5 750:7 832:18 837:10 838:21 842:16 850:8 867:12 892:1 893:8

**recording** 754:7,8 755:14

**records** 630:19

**recover** 689:4

**RECROSS** 814:14

**recruiting** 698:17

**redact** 585:25 587:12, 17 630:5,7,10,21 634:13 649:3

**redacted** 626:1,7 629:2 632:7,24 633:3,15,24 635:13

**redacting** 587:9 630:17 632:15 634:10

**redaction** 626:11

**redactions** 626:13 630:16 634:20 636:15

**redirect** 692:1 792:23

**reelection** 723:3 724:12,20 757:12

**refer** 609:14 614:10 852:5

**reference** 625:25 750:16 770:6 771:5 783:22

**referenced** 766:10 864:7 866:1

**references** 661:23 769:23 782:15

**referencing** 662:12 781:18 808:1 845:11 863:16

**696:7** 756:8,9,23,25 772:9 774:15 776:15 783:25 793:2 796:7,21 797:5 806:4,5 808:9 809:2 814:16 815:23 816:17 821:1,7 823:24 834:9 836:20 841:12 852:7 854:25 855:1,13 856:18 858:3 859:3 861:21,23 862:1 863:7 874:25 875:1,4

**recalling** 676:25

**recalls** 887:14

**receive** 648:4 711:17 739:3,18

**received** 583:16 610:10 612:17 628:15 635:4,7 638:17 656:1 710:19 738:12 739:23 759:2 760:14 766:7 767:19 809:15,23 833:15 860:17 862:9 871:13,17,23 873:17

**receives** 643:8

**receiving** 685:15 740:5 768:11

**recent** 642:12 859:5

**recently** 751:20

**recess** 631:16 709:17 792:2,4 848:24 849:1

**recipient** 626:3

**recipients** 626:9,23 627:5,7

**recitation** 717:17

**recognize** 765:13 779:21 790:19 794:24 867:23

**recollection** 602:17 603:14 604:6,19 605:5 606:2,11,24 607:2,12, 18 608:25 609:20 610:8 611:18 613:24 614:7 626:12 665:16 679:20 684:18 693:13,25 694:3,16,21 695:2 711:14 758:20 759:1 766:1 775:11 776:14,18 781:4 810:2 834:5 855:9 857:18,23

**referred** 582:21 699:21

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 358 of 367   PageID 14585
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022                    Index: referred-to..research

725:20 729:5 844:14
845:24

referred-to 598:20
601:6 616:15 622:1
644:23 647:10 651:20
657:23 660:12 672:14
720:1 749:16 778:3
780:19 790:11 794:20
851:13 866:14

referring 624:6 640:7
665:17 742:21 746:11
750:22 826:15,21
830:18 844:20,21
845:20 854:2 859:21
863:19

refers 744:18 783:14

reflect 837:10 838:21
842:16

reflected 806:15
876:25

reflects 873:15

refresh 602:16 603:14
604:6,19 606:2,11
607:12,18 608:25
609:8,20 610:22,23
611:6 613:23 614:6
626:12 694:15,21

refreshed 607:2 610:8
611:9,18

refreshes 605:5
665:16 695:2

refunded 726:6,15,20

refused 577:11

regard 575:14 585:3
665:5 671:7 675:8
710:17 795:12 821:5,9
838:15 847:24 869:18
873:18

regular 824:20

regularly 739:5 825:7

regulations 696:14

reimburse 694:9

rein 576:16

reinstated 585:9,20

reject 670:22

rejected 678:15

relate 595:14 596:8
616:20 756:13 805:2,8
872:2

related 620:11 623:16
701:14 726:14 808:4

relates 709:23 869:23
870:11 871:15

relating 808:11 820:4

relation 685:8

relations 773:13
826:24 839:22 840:11
874:11,17,22

relationship 603:7
727:13 758:15 766:2
824:4 852:1,10,12
870:14 871:9

relative 748:7

release 718:15,16,18,
22 734:9

released 717:18

relevance 583:12
588:18 589:4,9 693:4,
19 694:25 747:8 754:1
755:7 756:12 782:13
796:11 812:15,23 813:9

relevant 584:4 588:25
649:1,4 691:20 733:7
794:18 800:23 803:20
817:15,25 826:9 833:3

religion 873:16

religious 668:14,21
669:2,9,25 670:7,14
671:8,9 769:24 873:13,
15,19 874:18 883:22
884:10 885:4,7,11,13
886:1

relinquished 701:25
702:8

remain 632:24 633:3

remaining 675:2 716:6

remarkable 894:25

remember 575:6
623:14 626:10 658:12
660:19 669:16 677:9
679:8 685:1,23 689:13

692:21 694:13,14,23
707:1 760:16 763:14
764:7,22 768:4 775:16
789:9 796:18 803:12
817:3 822:20,21 831:14
860:15 878:9

remembered 693:1

remind 746:10 761:8

reminding 697:13

removals 689:8 705:2

removed 625:24 667:6
685:19,22 686:5
687:15,21 688:20 705:1
725:15 732:24 783:3,4
810:18

renew 796:10 799:13

rep 705:19 773:15
783:9,10,11

repeat 644:9 673:25
753:18 766:20 803:18

repeatedly 576:9
607:4,19 608:10,11,20
748:7 751:8 795:5

repetition 586:13

rephrase 701:21
814:22 869:6

replaced 840:6

reply 739:13 831:20

replying 845:21

report 613:9 614:9
645:24 667:20 784:10
827:14 828:23 853:16

reported 614:25
646:21 650:22 651:3
657:11 664:6 665:10
667:11 774:6,7 843:22

REPORTER 631:21
818:17 848:15 849:11

reporting 612:19 613:6
650:12 667:7 775:10

reports 661:19 675:9
843:1

represent 635:7
641:15 660:20 699:6
728:9 764:23 767:5
768:25 818:16 861:20

867:21

representation 634:23
641:8 647:23 657:2
700:11 726:11,17
728:6,10,22 729:8
734:13 735:15,23
736:14,16 738:2,5,13
763:18 764:19 766:13
785:24

representations
645:10

representative
573:16,22 674:5 698:24
705:19 730:4,10,16,25
772:6 782:20

representatives
703:19 773:5

represented 703:22
763:11 768:20 783:7
819:23

representing 699:9
729:25 746:9 800:17

reprisal 657:1

reps 584:21 732:13

request 584:23 592:7,
18,23 593:22 648:14,20
670:13,23,24 672:5
686:7 711:10 712:13
713:15 714:3,9,11
715:10 717:11 728:10
729:18 735:24 764:3
892:5 893:5

requested 712:22
729:14 764:6

requesting 650:13,16
670:19,20 784:12

requests 735:17 736:4
759:7 763:17 889:1

require 684:21 796:22

required 684:10 688:3
694:9 733:22 736:5
873:21

requirement 697:1

requires 737:13 793:6

research 631:8 704:23
708:16 791:14 847:1
886:20

reserve 584:6 890:3,4

reserving 888:16

reset 791:10

reside 782:25

residence 782:19

resources 748:6

respect 717:6

respectfully 715:17

respective 723:9

respond 577:1 581:16
674:22 715:16 717:8
728:16 740:8 815:20
831:23

responded 741:1

responding 662:19
674:5 712:18 741:1
742:2 814:18 815:7
834:13

responds 659:23

response 578:6 589:12
600:9 645:6 646:2,7
659:25 775:5 833:3
862:10

responses 668:23

responsibilities
699:12 721:10 727:17

responsibility 699:6
728:8,13

responsible 721:8,24
724:1 730:17 740:20
741:21

responsiveness
884:23 886:5

rest 623:8 640:10
782:11 820:18 860:12
866:25

restricted 756:6

result 626:1 689:13
693:14 694:3,5 710:23
711:1 729:6 737:6
797:3 798:8,16 799:4,5
823:16 828:25 838:11
853:17

resulted 711:3

resulting 838:4

results 574:5 689:24
736:22 781:24 798:3,21

resumed 837:14
838:24 841:5 851:16
860:8 861:6

retained 696:4

retaliated 650:18
661:24 667:15,20
685:17

retaliation 665:9
685:13

retaliatory 642:14,23
662:22 663:23 859:7

return 689:6 694:7

returns 575:14,18

reveal 627:7,10

Revenge 854:14

review 604:12 659:24
665:23 673:18 677:18
678:25 679:21 680:23
741:11 862:13

reviewed 609:17 681:4
817:13

reviewing 680:8

revisit 589:16 590:6
592:6

Richard 703:24,25
704:5

Rickie 665:3,6 666:2,4
672:19,22 673:5

Ricks 679:17

rid 781:25 782:1

right-to-work 601:16
602:5

rights 697:11 701:18,
25 702:8 706:2 726:22
807:2

righty 635:22

rise 573:3 594:10
631:10,17 708:18
709:18 713:20 719:7
791:16 792:5 847:4
849:2 886:24

road 752:11

robe 891:1

Robert 756:20

Rocky 845:16 853:20,
22

role 704:14 727:14
728:22 740:11 747:18
763:11,15 825:12

roles 746:14

roll 632:22 634:21
752:11,12

rolling 583:4,7 709:7

rollout 699:17 761:10

rollouts 761:18

room 660:16 706:11
707:7,21,25 710:4
719:5 758:25 771:23
810:13 865:8

rotation 731:21

rough 594:7

roughly 724:14 772:8

round 633:20 791:11
792:12,13,14,15,21
814:8 816:10,11

RSP 632:18 637:25

rule 588:8 590:3 607:9
747:8

rules 611:9 639:8
696:14

ruling 610:6 624:24
636:2 647:3 651:14
657:20 660:7 716:1
847:12 866:10

run 700:23 701:11
799:2,6

running 624:19 721:3
726:12 754:10 798:17

rupture 743:1

Rutherford 583:6

────────────

S

sake 677:8

Sam 829:7 854:14

Samina 770:14

San 891:17

sanctions 581:3 582:2

satisfy 649:17

Saturday 787:25 788:3

save 598:11 854:24

scab 844:11,22,25
845:25 854:2

scan 598:25 791:22

scared 685:17

scenario 889:9

scenarios 873:23

scene 860:6

scenes 705:6

Schaffer 717:16

schedule 729:22 732:5

schedules 736:6

scheduling-wise
892:21

Schneider 599:20
600:11 716:8 717:21
773:10,22 774:11
790:23 848:6 849:5,7,
19,21 866:19,22 867:5,
17,18 887:2

scope 691:23 710:10
726:17 795:10 796:10
799:14,21 816:10

screen 586:7,25
605:13,15 608:16
618:23 632:17 636:20
641:10 672:1 837:11
841:7 842:15 854:23,24
855:10 861:4

screens 605:21 632:10
636:17 671:23,24
794:10

screenshot 614:12
615:4,23 657:3

screenshots 614:3,8,
16 615:21

scroll 833:2 846:20

**seal** 626:2

**sealed** 625:22

**seated** 573:5 594:14
635:23 709:19 719:10
792:20 850:11

**seconds** 772:9 808:20,
23

**secret** 613:5,8 623:9
633:15 830:5

**secretary** 754:7,8
755:14

**section** 605:9

**security** 573:3,23
574:5 594:10 631:10,17
709:18 719:7 753:3
792:5 847:4 849:2

**seek** 715:13 754:23
808:3 839:19

**seeking** 757:12

**sees** 605:18

**select** 735:23,24

**selling** 698:15,16

**send** 574:18 580:20
587:9 600:3 608:19
641:20 680:13 726:7
778:10 781:2,5 801:10
803:8 824:1 858:15
861:22 862:8 870:19
879:12

**sending** 595:16 596:15
607:25 641:6 646:3
673:12 685:16 766:2
777:5,11 801:16 802:6
803:13 807:10 831:3
834:6 843:6 859:11
860:11 875:10 880:16
881:5 885:8

**sends** 802:9

**senior** 661:9 828:2
832:5 834:18 852:16,21
853:5 856:4

**sense** 581:13 582:16
706:1 741:9 782:21
849:24 888:18 890:1,15
892:22 893:19

**sensitive** 741:14 742:1

**sentence** 769:13,19
829:6

**sentences** 584:9

**sentencings** 574:5

**sentiments** 892:10

**separate** 678:23
697:22 818:3 870:17

**separation** 758:7
867:11

**series** 706:13

**serve** 580:23 679:25
891:9

**server** 580:25 581:8

**serves** 680:4

**service** 582:13

**services** 834:17

**serving** 704:14

**session** 588:8 762:9

**sessions** 864:15

**set** 581:14 602:21
654:18 655:1 679:21,23
680:11 726:3 729:10
737:15 804:22 840:6
892:4 894:5

**settled** 819:11

**settlement** 732:21

**Seventy-one** 864:21

**Seventy-two** 864:24

**severe** 593:24

**Shah** 770:14

**shape** 746:20

**share** 716:11 842:15
870:6 892:9

**sharing** 831:24 876:19

**shave** 792:10

**shifted** 729:21 748:1

**shock** 655:2

**shop** 698:20,21 699:11,
14 700:17,19 729:13,
15,23

**short** 587:19 678:3
710:15 744:9

**shorter** 717:23

**shortly** 583:3 692:12,
13 825:1

**shot** 770:10 771:3
792:14 854:24

**shots** 854:24

**shoulder** 590:13

**show** 580:18 581:6,10,
14,16,20 599:7,13
600:23 601:8 604:9,11
605:9,13 623:13 628:5
632:16 634:24 638:5
665:15 713:2 755:5
787:5 794:11 854:5
865:16 869:1 891:17

**show-cause** 891:20

**showed** 805:18 879:11

**showing** 605:16
628:11 788:6 800:2
891:22

**shown** 688:1 761:19
770:11

**shows** 711:16 832:4
891:21

**Shuler** 786:24

**sic** 595:3,6,14 673:9

**side** 576:7 639:14
673:10 728:15

**side's** 727:16

**sidebar** 574:15 589:14
590:10 599:18 601:1
610:15,18 611:13
623:3,5 625:13,19
629:5,18 630:12 637:15
638:11 649:10,11
652:22,25 653:22
667:25 668:9 686:10
687:6 689:20,23 692:6
719:4 747:4,7 798:13
799:9,12 800:25

**sidebarred** 675:16

**sign** 701:16,24

**signal** 588:21

**signaled** 580:14

**signature** 684:2,5

**signatures** 677:21,22,
24 678:1 682:24
683:10,14 684:4,22

**signed** 682:8,11 683:4

**significant** 577:19
783:1

**signs** 753:6 754:20

**silent** 675:2

**silently** 696:1

**similar** 589:3 744:22
783:3 784:4 863:18
873:23

**Simms** 824:10

**simple** 742:24

**simply** 762:18 838:5

**Sims** 628:2 658:3
659:19 660:21 716:3
824:15,17 835:9 841:9,
23 858:14,22 862:6,7,9,
10,21

**simultaneous** 754:4

**Sincerely** 642:15

**sir** 621:16 720:6 768:24
769:2 770:15 771:4
773:2 798:9 806:4
809:20 829:17 856:9
867:16 872:11 874:24

**Sister** 796:23

**sit** 704:21 706:15,19
752:15 806:7

**sites** 838:7

**sitting** 707:16,21 713:7
730:8 743:2 813:21
817:18

**situation** 748:3,11
767:6 774:16

**situations** 748:4 819:1

**Sixty-seven** 749:14

**size** 720:20,21,23

**skills** 746:14,16

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 361 of 367   PageID 14588

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022
                                                      Index: skip..standpoint

**skip** 829:4

**slander** 677:1,5

**slash** 596:22,24

**slate** 821:1,6

**sleepy** 720:8

**slow** 861:14

**smaller** 654:20,22

**smarter** 889:3

**SMVS** 655:8

**snippet** 770:10

**snippets** 817:21

**social** 646:22 655:9
658:5,23 662:21 663:22
664:4 685:6 710:21
752:6 820:13 821:20,24
822:4 823:20 830:6
834:23 835:6,16 836:12
838:2,13 841:16,25
842:12 843:8,22 845:8,
13 852:23,25 853:8
855:3 856:6,25 857:3
878:24

**solution** 713:6

**somebody's** 832:9

**someone's** 654:15
832:7

**Sonya** 602:12 658:3,4,
9 660:22 824:7,13,21
825:21 828:21 830:2
835:5,12,14,25 841:10,
23 848:18 855:18
856:12

**sort** 584:2,14 617:18
699:11 710:21 741:4,5
742:12 745:20 762:24
766:25

**sought** 670:6

**sound** 591:24 789:6
840:4,8

**sounds** 582:5 600:25
618:16 630:4 634:12
848:23 891:17

**source** 830:7

**Southwest** 573:13,15
579:14 582:8,14 584:18

586:10 587:2,6 596:14
599:22 602:25 604:20
607:3,15 609:1 610:9
611:19 612:11,20,25
613:4,9,13,19 614:14
624:2 627:2 628:1
632:2,3,5 636:5,8,13
641:7,21,24 642:22
643:8 644:12,21 645:7,
16 646:8,13 647:8,20
648:3,6,25 649:6
650:12,22 651:18,25
656:16 657:14,21
659:19 660:10,24
661:11,19 663:19
664:6,25 665:5,10
667:21 670:25 672:4,11
674:9,14,22 685:2,11,
16 688:19 696:22
697:1,13,18 699:8
700:18,25 701:13,25
702:9 704:7,22 706:4
707:6 709:25 710:18
719:20,21 721:14 722:3
725:3,9 727:13 728:15,
18 729:4,19 730:12,13,
21 731:4 732:5,9,14,19
733:9 735:11,12,13
736:6,10,19 737:13,18
740:16 741:15 743:7
749:3 750:22 754:24
755:25 756:1,3 757:21
761:18 762:9 764:19
766:19 767:12 768:25
773:6,14 775:8 777:17
778:11,19 780:23
781:2,7 784:11,14
786:17 794:15,19 795:6
801:5 810:5 817:23,24
818:1 819:13 821:23
823:8,15,17 825:5
826:13,14 827:1,15
828:3,24,25 834:19
836:11,18 838:4 839:11
840:12 841:25 843:8
845:4,13 852:3,8,11,16
853:6,17 856:5 857:3,
21 859:11 864:17
865:12 866:8,13 868:1,
2 869:18,23 870:12,21,
22 871:8,10,14,15
872:2,16,20 873:4,18,
20 878:5 879:7 880:7,
10,15,21 882:9 885:9
888:1 891:21 892:3,7

**Southwest's** 611:3
820:12 850:21

**sp** 756:21

**Spand** 665:3,6 666:2,5
672:19,22 673:5

**spawns** 826:18,22
827:4

**speak** 575:15 586:22
602:12 665:6 670:9
727:23 736:2 764:16
837:2 844:24

**speakers** 786:22,24

**speaking** 640:21 662:8
668:22,23 689:19
706:10 756:22 804:5
875:9 876:3

**special** 727:6 763:17

**specialist** 731:16,22
732:3 733:4 763:19,23,
25 764:4

**specialists** 732:12

**specific** 583:18,21
584:20 585:1 623:2
648:14 683:25 685:7
690:20 721:7 722:21
726:22 738:20 745:23
752:6 764:22 820:24
825:15

**specifically** 616:1
658:22 662:7 665:24
729:14 744:18 751:21
785:22 852:18,22
860:16 872:9 873:7
874:19

**specificity** 648:21

**specificity's** 677:8

**specifics** 583:19
609:12 677:15,16 708:1
764:8 858:4 872:10,12

**speculate** 863:9

**speech** 576:2 578:13,
18,21 653:8 868:6,20,
25 869:3,7,22 871:10
873:15 877:9,11 885:1

**spend** 689:2 714:23
719:4 804:13 812:4

**spending** 699:23
713:17 803:15,22
804:17,24

**spent** 689:5 694:10
695:9 713:11 714:24
726:10 805:9

**spilled** 584:14

**split** 615:12 754:6
762:14 885:20

**spoke** 669:20 680:3
707:20 780:24 787:2

**spoken** 705:15 758:18
764:13 774:22 775:2
824:16,18

**sponsor** 623:21,23

**sponsored** 803:15,23

**sponsoring** 589:25
590:5

**spotting** 691:12

**spreading** 857:24

**spreads** 830:13

**squeeze** 866:18 889:25
892:15

**stack** 768:3

**Stacy** 685:24 690:18
691:4,20

**staff** 582:25 722:7,13
740:20 755:4

**staffing** 721:8

**staggered** 723:4

**stance** 836:18

**stand** 584:23 706:12
708:20 709:9 734:3
800:11 817:19 818:4
871:5 887:4

**standard** 575:6 739:1

**standards** 707:9

**standby** 816:19 891:23

**standing** 682:9 707:3,
10 745:10,14 798:25
799:7

**standpoint** 576:19
577:24 578:11

stands 785:14 819:6

start 593:18 675:20
704:22 705:4 714:23
722:23 729:17 809:4
815:2 886:23 888:25
889:1,20

started 609:11 678:12
697:16 698:16,17 701:8
704:24 706:16 707:4
722:6 754:19 786:1
808:24 810:3 811:18

starting 893:6

state 603:4 635:6 687:5
692:12,13 734:18,19
747:1,3,6 754:20 783:6
818:13 867:16

stated 606:13 608:14
611:22 666:4,10 802:18
810:9,16 870:4 872:6
877:8

statement 651:7,10
832:12 840:17 861:15

statements 746:2
878:2 879:10

states 696:12 720:16

stationed 723:10

statistic 684:15

statistics 813:22

stay 594:6 655:6 688:7
779:9 788:15 890:21

staying 690:12 771:24

stays 587:3 714:2

stealing 619:23

step 610:6 703:2 732:4,
5,9,11,12,19,23 733:1
734:16 736:25 737:16,
17,23 738:6,13 763:12,
20,21 764:20 766:2
819:21,23 851:24

Stephenson 673:12,20
773:12 855:18

steps 679:20,23
728:11,20

Stevenson 749:21
774:8

steward 579:17
698:20,21 699:11,14
700:18,19 729:15,24

stewards 729:13

stipulate 627:6,9,12

stipulated 627:13
628:21

stipulating 632:24

stipulation 628:8,14
633:4 635:1

stipulations 628:10
635:3

stirred 639:7

Stone 574:23 575:2,3,
14 585:18 591:20
593:10,22 594:5,16,17
595:3,14 596:12 599:25
624:7 659:15 676:3,19
687:12 709:24 719:15
720:4 722:20 725:25
735:3 748:14 750:5
759:19 760:13 763:8
765:6,10,24 768:18
780:22 789:11 791:5
792:25 795:12 814:16
816:23 818:20 820:21
821:6 831:25 832:16
833:3 837:22 842:1,10,
11,22 843:5,10,16,22
845:23 854:7 855:17,23
856:17 859:2,10
861:13,19,23 862:18
863:1,13 880:17

Stone's 595:6 596:11
802:24 820:25 838:15

stooping 655:7

stop 597:3 654:8
711:24 722:17 775:12
776:4 801:9,19 815:16
841:13 857:11 858:8

stopped 801:15
810:11,17

stopping 838:12

straight 632:5

stray 753:1

streamlined 894:1

strike 606:8 755:20

881:16

string 863:1

strong 591:16 618:16
870:19

struck 592:25

structure 720:14,15
727:10

structured 840:16

struggled 701:2

stuck 574:8 706:6

stuff 584:18 587:2
808:15 894:14

stumbled 838:6

style 576:15,17,22

styled 891:20

Suarez 660:22

subject 641:20 675:19
696:3 777:13 816:17
834:7 839:5 873:10

subjected 685:12

subjective 836:18

submit 589:16 731:1

submitted 787:9

submitting 699:10
865:15

subparts 623:12
624:10 632:1 636:6
850:19

subpoena 581:8
718:17,18,19,22

subpoenas 717:18
718:2

substantially 716:10
717:5

successful 697:3

successfully 670:16
725:11

succession 667:4

sucked 743:3

suffered 593:24

suffice 700:14

sufficient 796:22 892:6

suggest 586:17

suggested 586:3
595:10 887:15

suggesting 828:9,10

suit 693:11 694:4

summary 637:17
832:13

summer 835:5 836:6

Sunday 894:7,13

supervisors 774:14

support 662:16,17
673:5,8 675:1 750:13
771:7 812:5 818:24
828:18

supported 818:23
820:15,17

supporter 667:8,12,15
818:20

supporters 639:2
642:5 665:1 691:11

supporting 618:6,15
619:1,14,22 620:9
757:17

supportive 606:14,15

supposed 574:1
613:10 615:9,16 685:10
817:17 851:6 874:6,9
887:25

supreme 744:2

Surely 873:14

surgery 593:25 594:1

surprise 600:5

surprised 792:25

surrogates 858:15

suspects 639:4 640:6,
21 642:7 650:24

suspended 688:21
710:20

suspension 798:17,19

suspensions 694:11
711:3

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 363 of 367   PageID 14590
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 3 July 07, 2022              Index: sustain..thinks

**sustain** 576:9 701:20 734:22 805:6 812:24

**sustained** 576:7 590:17 604:1 606:8 608:23 610:4,14 613:17 619:18 620:16,22 643:15 663:6,7 664:15, 20 675:5 678:8 680:25 682:15 737:3 738:10 793:21 797:25 798:14 812:16 881:14

**sustaining** 636:4

**Suzanne** 673:12,20 749:20,23 750:11 773:12 855:18

**SWA** 601:14

**swear** 594:18

**sweet** 858:18

**sworn** 664:12 817:12 867:5

---

**T**

**TA** 680:16

**table** 704:1

**takeaways** 715:5

**takes** 590:18

**taking** 575:25 601:15 607:16 700:10 730:15 787:10 800:6 813:3,7 828:11 888:8 889:20

**Talburt** 583:9,15 586:5 624:8,21 637:3 638:17 642:15,22 645:9,18,23 647:19 648:5 649:25 652:1 655:12,16 658:2 659:10 660:21 710:24 716:10 760:15,18,20 761:2,5 762:23 763:11, 12,19 764:23 765:12,21 766:1 767:16 817:1,5 818:7,14,15,17 842:21 887:21

**Talburt's** 717:4 764:2 840:4

**talk** 574:11,13 575:19 585:22 587:21 588:12 591:5,22 593:12 597:20

613:19 615:19 616:23 624:25 631:6,7,13 662:25 664:2 676:13 699:3 708:14 709:10,14 720:11 722:21 741:8 743:17 745:23 746:1 753:25 758:5 777:13 783:19 786:22 791:12, 14,20 807:4,12 808:17 816:15 820:10 823:17 835:24 843:16 846:24, 25 866:4 886:18,19 887:4,12 894:19

**talked** 589:14 618:3 623:25 648:24 653:11 654:1 671:6 676:5 691:23 702:15 710:11 722:2 724:23 757:2 772:21 773:4 788:7 795:13,14 799:25 812:8 817:22 864:11 865:7 869:22

**talking** 584:20 586:7 587:9,11 590:10 595:5 596:15 607:21 609:11 612:8 615:7,25 617:13 640:14 641:1 642:8 650:11 652:8,15 658:22 664:9 665:19 671:19 685:7 698:13 712:8 740:4 742:11,13 750:20 769:11 774:23 779:25 799:15 804:16 806:5 808:3 809:14 828:7 829:7 830:19,20 832:6 835:15 836:1 841:21 843:3 852:2,21 853:2,5 856:4 859:17 863:7 873:8

**talks** 583:15 794:25

**Tammy** 839:6

**tap** 590:13

**target** 658:6 820:25 821:3,5,9,14 822:2 835:16 855:4

**targeted** 823:9,12 827:11,19 828:8 832:2 853:1 863:3,20

**targeting** 753:16,21 821:5 823:17 830:22 836:2 852:22,24

**tattletales** 639:6

**taught** 746:15

**team** 574:22 639:23 640:5,13 661:18 699:19,24 700:3,8 703:10,11,13,18 704:4, 10,17,24 705:7,10,21 752:5,10,13,16,18 757:11 761:6,13,21 762:7,13 766:13,17,23

**tech** 695:15

**teenagers** 746:15

**telephone** 773:5 774:10

**telling** 600:1 606:19 608:18 642:22 666:8 718:4 806:7 809:2 813:22 877:5

**tells** 647:17

**ten** 631:4,9 754:4

**tended** 729:11 731:20

**tentative** 678:14 679:5, 9 680:13 699:17 751:22 752:12 761:10 819:10

**term** 595:22 723:20,25 724:13,16 757:3 758:2, 12,13 764:9 823:13 844:13

**terminate** 841:17 842:13 877:7,18

**terminated** 585:9 586:5 799:18,19 841:24 878:23

**terminating** 832:7,9,11 879:14

**termination** 799:17 835:17 863:17 877:3 878:1,4,11 879:9 881:20 882:22 883:2,4 886:8

**terms** 662:15 716:3 725:24 727:3 732:1 827:24

**terribly** 794:6 800:23

**terrified** 752:4

**test** 797:14 817:10

**testified** 600:3 805:25 872:18 876:6,8,9

**testify** 676:9 685:1

**testifying** 599:20 604:23 610:13 640:2,17 643:25 656:6 689:25 804:7 811:14

**testimony** 577:14,17 578:19 584:3 585:8 614:21 620:24 643:21 664:12 679:3 695:12 714:1 786:5 809:11,18 816:20,23 817:12,21 825:22 826:2 837:8,13 838:19,23 841:1,4 846:10 851:15 860:3,7, 25 861:5 863:24 887:5

**testing** 797:12

**Texas** 697:8 746:13

**text** 639:15 770:16 807:6 810:22 815:21

**thank-you** 862:9

**then-president** 706:10

**then-union** 706:3

**thing** 575:20 578:6 579:9,13 592:4,22 594:6 598:1 610:21 624:11 627:4,17,20 633:12,13 694:1 699:20 767:25 801:10 817:20 821:19 830:12 847:22 881:4 883:17 889:7 893:1

**things** 576:5 577:12 578:21 585:10 587:18 600:2,4 605:1 619:24 620:8 621:9 623:22 639:25 693:24 709:24 712:3 716:23,25 740:24 741:10,25 742:16 784:18 800:16 831:7 839:15 846:4 869:10,12 872:5 879:12,13 880:20,25 881:1 882:9 883:20 889:13 893:23

**thinking** 579:12 624:17 832:15

**thinks** 618:6 839:13

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 364 of 367   PageID 14591
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 3 July 07, 2022                    Index: Thompson..truncated

**Thompson** 854:10,11

**thought** 577:11 578:15,
22 585:21 590:22 609:9
615:9 617:4 621:1
649:12 693:22,23 698:6
701:9 707:14 711:12
715:20 775:22 802:1
806:15 857:2,24
877:11,13,15,22 879:1
882:13,20

**thoughts** 582:4 831:24
893:9,15

**thread** 781:23 810:4
846:5

**threat** 578:17 613:20
751:18 753:12 756:2
828:17

**threatened** 750:25
751:14 756:10

**threatening** 755:3

**threats** 756:9

**three-year** 723:15
724:12

**thumb** 579:2,6

**thumbs** 635:12 636:16

**Thursday** 787:23
788:2 888:1

**tie** 596:17 691:9 727:9
733:24

**tied** 635:2 740:8 746:6

**ties** 691:22

**tight** 867:8

**time** 574:12,15,16,19,
21,23 575:3,6,7,10,13,
19,21,25 576:10,11,23
578:25 579:14,15,17
580:4,8,9 591:15
592:14 593:3,4,5
598:11 602:12 606:15
608:5 611:10 612:5
622:11 645:17,22
659:20 661:17 662:22
667:13 669:24 671:6
675:17 684:1,3 688:18,
23 689:5 696:19 697:24
698:12 699:18,23
702:16 704:7 705:19
706:10 707:3 710:8,9

711:10 712:16,20,22
713:11,13,14 714:2,3,8,
12,16,19,21 715:11,12,
13,15,23 716:5,6,13
717:9,22,25 718:5,8,9
719:2,3,5,17 720:5
722:13 723:4 724:6
727:17,20 728:12
729:21 730:1 731:6
741:14,22 742:1 754:9,
11 756:3 758:7,23
761:18 764:22 767:16
772:7 774:2,21 782:12
784:13 785:13 786:18
787:13 788:16 791:8
792:10 799:14 800:5,6,
8,15 810:7 811:17
812:8 814:4 816:25
820:19 824:23 825:6
832:3 834:14 836:12
843:6,9,15,21 844:10,
25 845:9 849:22 850:24
855:21 864:9 866:25
874:16 883:8 885:23
888:10,22 889:16,24,25
890:9 891:19 892:2,4,5,
6 893:11 894:6,10,12,
22

**timeline** 713:24 827:23

**timely** 574:6

**times** 606:20 622:10,11
650:17 673:7 704:2
710:1 736:5 741:18,19
754:3 762:13 764:1
767:3,8 809:9 877:14
880:1

**timing** 705:2 758:6

**tired** 575:23

**title** 641:23 700:20
739:2

**today** 589:23 617:6
679:4 702:16 718:20
746:8 768:23 773:4
806:7,24 810:10 815:25
886:23 887:9 889:17
894:23

**Todd** 854:15

**told** 574:22 585:7 587:1
599:4 604:20 607:3,19
609:1 610:9 611:6,19
613:2 615:2,6 642:20

643:9 697:10 711:13
730:2 775:6 776:22
789:20 801:5 808:18
811:9 817:25 821:23
831:14,15 832:16 851:8
874:1 877:22 878:9,20
879:1 885:25

**Tom** 858:17

**tomorrow** 581:15
599:21 600:12,22
601:11 848:19,22 878:8
886:22 891:19 895:3

**tonight** 894:15

**Tonya** 690:15

**tool** 813:17 835:6

**top** 602:1 633:15
659:14 784:23 842:21
882:21,25

**topic** 709:2 748:15

**topics** 699:4 709:4
721:25 825:3

**total** 684:7

**totally** 598:2 708:7
835:21 877:10

**touching** 740:19

**town** 783:6 848:18

**track** 574:19 612:24
731:22 847:14

**trail** 831:16

**train** 785:17

**trained** 873:7,14

**training** 669:19,20
706:4 725:11 746:14
764:11 871:17,23
872:1,4,11,13,19,22
873:10,17,21 874:1

**trains** 889:16,24

**transcribed** 818:10

**transcript** 711:16
840:9 847:18 849:17
851:3,6 864:7

**transfer** 582:3

**transferable** 581:12

**Transport** 602:3
785:14

**travel** 751:24 752:14

**traveling** 755:15

**treasurer** 669:24 670:3
685:24 721:10

**treat** 817:17

**treated** 587:6 649:7
817:24

**treats** 587:3

**trial** 573:6 575:19,22
579:19,25 580:4 581:7,
15 588:9 592:14 597:2
660:17 689:11,12,13,24
709:21 713:19,21
714:1,7,15 717:18
718:2,17,18 720:2
744:12 749:17 772:5
778:4 780:20 789:12,15
790:12 794:21 796:22
797:1,2,7,17,21 798:2,
3,7,8,22 799:5 816:21
825:24 832:21,22
833:19 836:2 837:11
842:17 851:14 854:5
855:16 856:24 862:8,25
866:15 887:24

**trials** 574:1

**triple** 686:24

**trouble** 591:14 639:5
827:20 832:4,6

**troubles** 854:20

**Trudy** 843:25

**true** 608:8 615:4 642:24
643:11 646:5,22 647:14
648:6 655:13,22
656:17,21 657:8,15
658:20 659:17,25
661:2,5,12 665:13
667:13 673:6,14 712:9
783:11 798:18 801:14
802:12 805:3 806:3
809:25 810:25 811:12,
21,25 832:19 841:19
869:23 871:11 873:11
874:25 877:12,19
880:21

**truncated** 715:20

**trust** 636:19 851:6

**truth** 592:13 639:14
687:4 750:17 829:20

**tucked** 754:17

**turn** 656:11,13 667:16
685:9 708:1 738:18
743:8 766:18,24 768:10
790:15 821:24 823:14
845:3,12

**turned** 655:18,20 684:2
689:7 731:14 738:4
750:21 781:24 790:17
822:15 857:2

**turning** 655:7,21
656:21 685:8 802:5
821:20 822:20,21 838:9
857:24 888:21

**TV** 891:18

**TW** 705:19 726:3
757:21 785:12,14,20,21
786:13,15,16 788:12
798:20 826:18

**tweak** 653:25

**two-hour** 718:24

**two-year-old** 593:24

**TWU** 573:20 618:14
654:10 658:15 688:11
695:17 720:14,15
743:25 823:8

**TWU556.ORG** 738:25

**type** 656:11 762:4
798:17 874:12

**types** 852:16

**typical** 680:2

**typically** 752:13

—————————————

**U**

**ugly** 776:5 784:20

**Uh-huh** 842:20

**ultimately** 678:18
688:9 701:10,12 724:8
788:19 819:10

**unavailable** 817:11

**unborn** 811:3

**uncovered** 838:6

**undefined** 836:15

**underlined** 665:17,25

**underneath** 744:4
776:16

**understand** 578:5
595:19 624:23 637:11
638:2,8 656:1 661:21
671:17 677:4 687:3
697:11 698:5 700:1
703:14 705:24 707:23
714:11 715:3 720:5
761:23,24 765:3 768:25
770:21 772:13,25
778:13 782:12,13
783:10 790:5,18 794:4
796:2 800:18 816:1
827:24 829:21 843:3
892:9,18

**understanding** 633:1
657:7 668:13 669:7
671:7 679:3 680:21
687:20 736:15,23
766:21 767:15 773:21,
24 789:1 837:7,18,24
838:14 868:14 873:3

**understood** 584:25
586:9 592:9 600:8
608:8 611:9 617:9
635:10 649:23 716:17
717:10 718:12 747:9
837:5 865:2 887:6

**unhappy** 784:18 785:1,
2

**union** 573:18 575:15
576:2 577:17 578:13,
18,20 579:14 591:11
595:7,15,17 596:9,16,
18 597:13 601:15 602:3
603:9 606:12,15 608:5
611:25 613:5,6 616:22
617:14 618:5,10,13,17
619:4,10,12,13,15,22
620:1,6,11,12,19
621:15 622:9 624:1,12
632:3,4 636:3,8,12
638:21 639:19 641:4,19
642:17,21 643:7,9,10,
19 644:11,12,20 647:7
650:9 651:15,18 652:19

653:7,20 654:11,14
656:2,4 657:1,8,13,21
658:6 659:10,17 660:9
661:21 662:1,18,20
663:20 664:3 665:4
667:9,12,15 668:18
669:6,20,25 670:11,15,
22 671:2 672:10 673:19
674:3,8,10,24 675:1,7
678:18 680:2,6 684:19
687:18 688:7,14,17,25
689:2,6,14 694:9
695:17 696:25 697:3,6,
8,17,20,21 698:12,16
699:11 700:10 701:4,8,
13 704:8 705:24,25
706:1,3,8 707:5,12,24
710:24 712:3,9 713:2
720:12,14,18 721:3,8,
13,16,18 722:7,15,17,
24 724:24 725:1,17,18,
19 726:2,5,9,13,23,24
727:5,8,10,23,25 728:1,
5,6,10 729:3,20,23
731:1,2,3,18 732:12
733:2,3 734:9 735:5,15
736:13 737:8,11 738:2,
5,12,18,21 739:14
740:1,22 741:5 743:9,
19,20,21 744:2,12,24
745:11,15,16 752:7
753:10,23 755:12
759:19,25 760:1,20
761:3,18 762:24 764:15
773:15 777:20 780:16
781:13 783:4 784:5,20,
24 785:5,15 786:19
788:7,11,14 794:15,18
795:1,12,23 796:1,4,6
797:20 799:1 802:10
803:14,15,21,22
804:13,17,24 806:2,14,
15 807:2,3,6,8,11,18
808:4 812:2,4 814:19,
24 815:22 818:21,22
820:3,11,25 821:5,6,8
827:4 829:13,23 836:3,
11,25 842:13 843:7,21
844:5 845:11 855:4
858:19 865:11 866:8,12
868:4,15,20 869:8,11,
21 870:5,12,16,18,19,
20 871:10 875:7,10,24
876:17,20 877:14,19
878:3 879:2,4,11,12,15,
19,22 880:8,9 881:22

882:12,20 883:1
885:14,15 886:3,10

**union's** 582:10 669:8
695:10 698:14 704:5
727:14 728:22 730:16
734:13 804:20 808:13
850:20

**union-protected**
807:15,24 871:15
872:1,20

**union-related** 577:7

**union-sponsored**
669:21

**unions** 707:22 720:12
785:13,15

**unique** 892:11

**Unity** 622:6

**unmute** 636:17

**unredacted** 622:19
626:6,8 627:23 628:25
629:1,14,21,23 634:24
645:1,4

**unrelated** 577:12

**unsealing** 633:20

**unsuccessful** 677:20

**unwanted** 747:13

**unwilling** 718:21

**upcoming** 828:17

**update** 574:17 580:11

**updated** 622:24

**updates** 762:19

**upgrade** 889:3

**upset** 810:17

**upsetting** 813:13

**urging** 841:23 842:12

**usable** 632:3

**usual** 639:4 640:6,20
642:7 650:24

**Utah** 888:3

**utilize** 726:19 738:24
739:9 866:25

Case 3:17-cv-02278-X   Document 449   Filed 06/14/23   Page 366 of 367   PageID 14593

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 3 July 07, 2022                    Index: utilized..witnessed

**utilized** 687:23 733:9
813:18 841:17 842:13

---

**V**

---

**vacancies** 724:5

**vacancy** 723:16,18,19
724:2

**vagina** 878:12 880:17

**vague** 820:7 836:15

**valid** 638:24 678:4,17,
24 681:25 684:5,10,22

**valuable** 713:11

**Van** 836:8,9,10

**variety** 746:16,18 785:3
793:14

**Vdv** 835:5 836:7

**Vegas** 774:6

**Vegas-based** 773:12

**vehicle** 584:8

**vein** 775:9

**Ven** 836:8,9,10

**verdict** 577:24 888:8

**verification** 680:19

**version** 622:19 626:8
629:1,14,22,23 634:24
635:13 645:1 647:22

**versus** 653:3

**vested** 696:4

**vetted** 740:11 744:11

**vice** 666:23,24 667:1,3
700:21 754:6,12 823:21
824:8,25 825:13 834:16

**video** 578:16 584:9
585:13 619:2 770:10
771:3,12 772:1,18
776:7,13 789:23 790:4,
14,20 809:12,13,23
810:7,11,14,17 811:11,
12,20 813:7,21,23
816:25 817:2,5,17
818:9 830:23 846:14
847:19 849:12,13
850:18,23 851:1,2,7

**878:21 880:16 881:19**
882:24 883:21 884:19
885:3

**videos** 584:11 608:11
612:19 685:15 769:22
777:5,11 778:9 790:24
807:10 808:17,19,24
809:5,9,15,21 810:25
811:17 878:6,11 879:1,
6,20 880:13 881:6,12
882:4,14 883:18

**videotape** 864:1

**view** 578:3,7,15,17,20
625:3 677:2 728:19
804:24 805:8 808:20
812:12,19

**viewed** 772:7 790:4
803:21 804:22

**views** 671:8 746:20
748:1 759:3,8 769:10
777:1,4 803:12,17,20,
25 805:2 812:3

**violate** 668:1 870:21

**violated** 580:19 581:21

**violating** 656:24 745:7
857:3

**violation** 646:22
688:10 710:22 766:25
828:24 841:24 845:3,7,
12 853:17 880:7,9,21

**violations** 655:9
667:16 821:21,24
823:20 843:9,23

**violent** 753:10

**viral** 615:23

**visibly** 802:3

**vocal** 829:15 830:3

**voice** 727:3 828:16

**voicemail** 755:3

**voices** 655:2

**voir** 686:7,11 708:21

**volume** 739:23 740:3,
16

**voluntarily** 697:4

**voluntary** 810:25

**volunteer** 788:15,17

**volunteered** 762:7
779:9

**vote** 680:13,16 700:2
723:6,21 724:25 725:1,
4,14,18 733:25 741:20,
22 744:13 745:15
752:13 761:16

**voted** 679:9 721:4
723:8,11 724:21 751:22
755:13

**votes** 733:17 734:7

**voting** 724:23 733:19
761:24

---

**W**

---

**wade** 784:9

**wait** 587:23 588:2 643:2
692:14 695:1 751:8,18
755:19 794:3,9 809:1

**waiting** 718:14 757:20

**walk** 598:23 753:15
784:5

**walking** 653:2 849:5,6

**wanted** 574:11,21
580:2 584:21 613:4
737:9 744:24 763:18
764:16 767:24 773:16
775:7,11 788:12 801:7,
8,13,19 811:3,4,6,12
812:2,4,6 892:15

**wanting** 579:22 592:7
670:17 690:24,25
729:19 759:7,14 846:8

**war** 890:4

**warning** 827:3

**warranted** 892:2

**warrants** 715:9 744:11

**Washington** 777:11
778:17,21 780:3 786:10
788:24 789:2

**wasted** 713:13

**watch** 771:12,13,14
772:18 810:14,15,25
891:18

**watched** 771:20,21
772:1 808:20,22,23
810:21 811:20

**watching** 811:18

**ways** 881:11

**weapons** 752:2,8
753:7 754:21

**wear** 706:18 778:16
779:3 805:20

**wearing** 779:1 805:23
806:2,9

**website** 762:19

**Wednesday** 888:5,10,
11 890:17,20 891:2

**week** 580:3 715:3
721:17 779:13 787:20
789:14 848:19 887:25

**weekend** 893:10

**weeks** 754:5 758:20

**weigh** 706:23

**weight** 706:23

**weighty** 893:15

**west** 754:14 783:16

**white** 587:5 677:23,24

**white-out** 683:18

**whiting** 586:14

**who-all** 859:1

**wife** 844:3

**Wilkins** 829:7 854:14

**Wise** 690:13

**wisely** 579:16 714:19

**wiser** 595:10 891:1

**wisest** 586:20

**wishes** 732:24

**withdraw** 733:14

**withdrawn** 590:23
591:10

**withholding** 635:19

**witnessed** 735:13
836:16

**witnesses** 713:16,18, 25 714:4 715:1,7,25 716:4 718:6,10 816:16 846:19

**WNCO** 628:3 633:17,24

**woman** 747:14 748:11 770:13,14 812:19

**women** 748:4,5,10 785:19,23 802:6 803:5 804:20 806:1,6,8

**Women's** 589:7 775:19 777:10 779:12 785:9 786:9,15 787:24 788:1, 3,7 803:22 805:10 806:9

**wonderful** 858:18,19

**wondering** 708:3

**word** 603:10 744:2 770:19 815:14,15 821:3,9 853:1,3

**words** 597:24 605:1 606:17 608:3 611:23 620:24 640:6 676:6,9, 15,18,19,21,24 746:10 823:14 827:16 828:20 829:2,19 830:9 847:18 851:3,5

**wore** 778:21 780:3

**work** 581:1 600:1 645:4 698:18 700:9,24 701:4, 8,9 702:21 704:16,20, 23 705:6 723:10 731:18 737:15 746:8,19 752:5 762:4 785:3,4 788:12 828:5,11 840:12 868:1 874:14 889:21

**worked** 589:17 680:18 700:8,25 704:6,8 721:17 746:12 747:18 756:2,4 774:15,16 786:20 825:16 872:24 889:6

**Workers** 602:3 785:14

**workers'** 706:2

**working** 583:2 696:2 698:10 701:3 704:12 721:15 722:7 729:9,16, 17 731:17 732:4 742:6 747:25 752:4 775:19

779:12 785:6,7 786:15, 18 787:1 788:17 824:4 839:9,15,16 840:18 872:16 893:4 894:13

**workplace** 785:25 873:16 882:8

**works** 586:3 718:24 723:17 727:24 894:3

**World** 891:16

**worried** 802:18,20 831:13

**worries** 574:7

**worth** 757:14

**Wow** 860:11

**wrap** 858:8

**write** 835:4,7

**writing** 581:23 894:8

**writings** 768:7

**written** 807:6 879:21

**wrong** 588:10 599:4 614:19 617:3 635:8 643:3 647:24 651:3 654:8 673:21 735:8 747:13 799:3 804:17 831:9 862:24 894:9

**wrote** 620:2,3,4 622:16 642:16,18 697:25 698:11 828:20 831:15 834:24 835:2 837:23 845:1 852:19 854:1 855:12

_____

**Y**

_____

**y'all** 574:6,18 579:1,18 580:12,20,23 582:20 585:2 587:2 588:21 593:1 630:22 634:6 636:14 638:5 648:24 708:5 709:21 817:25 847:9 848:10,24 849:22 850:10,12 865:8 867:10 886:22 887:12,24 889:24,25 890:10 893:9,19 895:2

**y'alls** 889:15

**year** 622:10,11 677:25 683:15,19 686:1 724:16 726:6 742:6 757:9,10 787:8 873:21

**yearly** 874:1

**years** 664:7 696:23 704:15 723:2 724:14 747:17 764:11 787:6 822:25 823:7 825:3 863:4 872:25 874:22 879:23

**yellow** 598:8,9

**yesterday** 574:14 585:5,21 588:7 589:14 590:7,16 592:5 595:5 617:4,5 631:3 642:11 679:4 680:3 695:23 696:8 733:21 748:17 768:20 770:11 772:6 782:22 804:19 806:1 808:18 809:2 814:16 815:7,19 859:4

**Yippee** 622:14

**young** 748:8

**youth** 746:9

_____

**Z**

_____

**Zoom** 789:14