Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 1 of 426   PageID 14595
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022

1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
2
                CASE NO. 3:17-cv-02278-X
3

4

5    ----------------------------------------x

6    CHARLENE CARTER,

7                      Plaintiff,

8    v.

9    SOUTHWEST AIRLINES CO. and
     TRANSPORT WORKERS OF AMERICA,
10   LOCAL 566,

11                     Defendants.

12

13   ----------------------------------------x

14

15

16            TRANSCRIPT OF THE TRIAL

17       BEFORE THE HONORABLE BRANTLEY STARR

18          UNITED STATES DISTRICT JUDGE

19

20            V O L U M E  4

21

22               Dallas, Texas

23               July 8, 2022

24                8:42 a.m.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1    A P P E A R A N C E S:

 2

      FOR THE PLAINTIFFS:
 3
           NATIONAL RIGHT TO WORK FOUNDATION INC.
 4              8001 Braddock Street
                Suite 600
 5              Springfield, Virginia  22160
           BY:  MATTHEW B. GILLIAM, ESQ.
 6              mgb@nrtw.org

 7

 8         PRYOR & BRUCE
                302 North San Jacinto
 9              Rockwall, Texas 75087
           BY:  BOBBY G. PRYOR, ESQ.
10              MATTHEW D. HILL, ESQ.
                bpryor@pryorandbruce.com
11              mhill@pryorandbruce.com

12

13

14

15    FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:

16         REED SMITH, LLP
                2850 North Harwood
17              Suite 1500
                Dallas, Texas  75201
18         BY:  PAULO B. McKEEBY, ESQ.
                BRIAN K. MORRIS, ESQ.
19              pmckeeby@reedsmith.com
                bmorris@reedsmith.com
20

21

22

23

24

25
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 3 of 426   PageID 14597
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 899

1   For the Defendant Union 566:

2

3        CLOUTMAN & GREENFIELD, PLLC
             3301 Elm Street
4            Dallas, TX 75226
        BY:  ADAM S. GREENFIELD, ESQ.
5            EDWARD B. CLOUTMAN, III, ESQ.
             agreenfield@candglegal.com
6            crawfish11@prodigy.net

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 4 of 426   PageID 14598
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 900

```
 1   COURT REPORTER:   MS. KELLI ANN WILLIS, RPR, CRR, CSR
                       United States Court Reporter
 2                     1100 Commerce Street
                       Room 1528
 3                     Dallas, Texas   75242
                       livenotecrr@gmail.com
 4

 5           Proceedings reported by mechanical

 6   stenography and transcript produced by computer.

 7

 8                       *  *  *  *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 5 of 426   PageID 14599
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 901

1                          I N D E X

2

3          Show Cause Hearing ..................... 910

4

5                     W I T N E S S E S

6

7    EDWARD SCHNEIDER

8       Cont. Direct Examination by Mr. Pryor .....  922

9       Cross-Examination by Mr. Greenfield ....... 1133

10

11   SONYA LACORE

12      Direct Examination by Mr. Pryor .......... 1167

13      Cross-Examination by Mr. McKeeby .......... 1170

14      Cross-Examination by Mr. Greenfield ....... 1173

15

16   CHARLENE CARTER

17      Direct Examination by Mr. Pryor .......... 1175

18

19

20

21

22

23

24

25

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 6 of 426   PageID 14600
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 902

1

2                    **E X H I B I T S**

3

4      Trial Exhibit 21-E ...................  977

5      Trial Exhibit 13  ...................  996

6      Trial Exhibit 74 .................... 1051

7      Trial Exhibit 89 .................... 1073

8      Trial Exhibit 90 .................... 1085

9      Trial Exhibit 92 .................... 1095

10     Trial Exhibit 98 .................... 1100

11     Trial Exhibit 111 ................... 1113

12     Trial Exhibit 115 ................... 1118

13     Trial Exhibit 64 .................... 1125

14     Trial Exhibit 107 ................... 1126

15     Trial Exhibit 138 ................... 1170

16

17

18

19

20

21

22

23

24

25

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 7 of 426   PageID 14601
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 903

```
 1              -- P R O C E E D I N G S --
 2                         -o-
 3           THE COURT SECURITY OFFICER:  All rise.
 4           THE COURT:  Thank you, you can be seated.
 5           Okay.  So we are on day --
 6           (Discussion off the record.)
 7           THE COURT:  Okay.  We are on the record
 8   for Day 4.  Let's knock out appearances right quick.
 9           For Carter, Mr. Gilliam.
10           MR. GILLIAM:  Matthew Gilliam for
11   Plaintiff Charlene Carter, along with Matt Hill, and
12   Bobby Pryor will be returning shortly.
13           THE COURT:  Understood.
14           Okay.  And for Southwest.
15           MR. McKEEBY:  Paulo McKeeby with Brian
16   Morris.
17           THE COURT:  Okay.  Thank you.
18           And then how about for the Union.
19           MR. GREENFIELD:  Adam Greenfield and
20   Edward Cloutman III, and Mr. Mike Masoni just walked
21   in.
22           THE COURT:  Very good.  Thank you.
23           And full disclosure, I walked in at the
24   same time as Mr. Greenfield, asked him how his son
25   was doing, got an update.  We didn't talk about
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

 1  anything else.

 2          If anyone wants to voir dire me, I'm happy

 3  to sit for questions.  I will go swear myself in and

 4  sit over there.

 5          But any time I say more than two or three

 6  words to y'all, I will self-disclose and tell

 7  everyone anything that happened.  Fair enough?

 8          Okay.  So the first item of business is

 9  Brett Nevarez.  I understand we don't have him here

10  but we have a phone number.  I don't know if anyone

11  knows his temperature on willingness to sit for a

12  depo or testify remotely for trial.

13          Does anyone know anything about Nevarez

14  other than we have a phone number?

15          MR. GREENFIELD:  I spoke with him.

16          I don't know is the answer to the question

17  after speaking with him.

18          THE COURT:  Sure.  Understood.

19          What I thought I would do is tell him,

20  Look, I had a show cause hearing for you.  I

21  understand you are not here.  I have had multiple

22  court orders for you to sit for a depo.

23          I can compel you to sit for a depo.  I

24  can't be the one to compel you to travel here, but I

25  will drop everything if you want to do the depo or

1   testify remotely for trial.

2           What I don't know is, on those options,

3   the trial option could be, Hey, the jury is here at

4   9.  Will you go live at 9 and pause Schneider or

5   will you go right after Schneider?

6           I don't know, of the available trial

7   options, what y'all think.  So can you illuminate my

8   thinking on the trial versus depo, and if trial, is

9   it pausing Schneider, going now, or is it waiting to

10  complete Schneider, or is it another option at some

11  other time?

12          So what are y'all thinking on Nevarez and

13  the choose-your-own adventure?

14          MR. HILL:  So we would like to -- we're

15  sort of being presented with this for the first

16  time.  We would like to discuss it amongst counsel

17  to try and reach a conclusion.

18          MR. PRYOR:  We can discuss it.  But we

19  have talked about our additional time.  We would

20  prefer a deposition of him so we can determine what

21  to use.

22          It would be more efficient for us to have

23  a deposition than have him live at trial, but if

24  live at trial is the only option, I guess we will

25  take that option.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 10 of 426  PageID 14604
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 906

```
 1            THE COURT:  Well, what I can do, so now
 2   it's almost like I'm an FBI hostage negotiator, but
 3   what I can do is say, Look, if you will sit for a
 4   depo tonight, then I will drop the whole thing as a
 5   judge.  I won't refer a sanctions motion.
 6            MR. PRYOR:  That's very generous of you,
 7   your Honor.  Again, he's ignored three subpoenas
 8   that we spent a lot of money serving on him.
 9            THE COURT:  Yeah.  Well --
10            MR. PRYOR:  But it's a tradeoff.  We'll
11   take it.
12            THE COURT:  I should say, I will drop my
13   attempt to punish him myself.  You know, that's
14   separate and apart from if you seek monetary
15   sanctions from him.
16            MR. PRYOR:  Okay.
17            THE COURT:  But I guess I should choose my
18   words carefully.
19            So I won't throw him in jail for punitive
20   contempt for violating multiple court orders.  Does
21   that make sense?
22            I care more about getting someone's
23   testimony than punishing one.  So if I can get it
24   eventually, that is my goal.
25            Okay.  So how about I give a pause right
```

1  quick, make sure y'all are all comfortable with

2  that.  I'm going to put on the white noise.  You can

3  talk amongst yourselves if that's a preferred course

4  of action I will pitch tonight.  Because I think

5  sooner is better than later with anyone who has

6  shown an inability to comply.

7                 (Discussion off the record.)

8            THE COURT:  Okay.  Back on the record.

9            MR. PRYOR:  Your Honor, we really

10  appreciate this opportunity.  We were really

11  dreading the weekend.  So tonight would be awesome

12  for that deposition.

13            THE COURT:  Okay.  So I will pitch

14  tonight.  Is there a start time that you are going

15  to propose?

16            MR. HILL:  8:00 Central.

17            THE COURT:  8 p.m. Central.  Okay.  That

18  is 7 p.m. his time?

19            MR. HILL:  Yes.

20            MR. McKEEBY:  Is there a limitation?

21            THE COURT:  So I have limited it to an

22  hour and a half.  So I would keep that limit.

23            MR. GREENFIELD:  Your Honor, being

24  hopeful, if we are able to set this deposition for

25  tonight, can we extend the briefing deadline that's

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 12 of 426  PageID 14606
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 908

1  due at 9 p.m.?  Because I was really going to need

2  time this evening to complete that.

3              THE COURT:  Yes.  So that's for the

4  question on protected conduct, question of law, if

5  so or if not, how do you --

6              MR. GREENFIELD:  Yes, your Honor.

7              THE COURT:  Yes.  So how about we push

8  that 24 hours?

9              MR. GREENFIELD:  That would be wonderful.

10 Thank you.

11             THE COURT:  Got it.

12             Okay.  So any other thoughts before we

13 call Mr. Nevarez?  So we are not seeking his live

14 testimony, we are seeking for him to sit for an hour

15 and a half depo at 8 p.m. Central, 7 p.m. New Mexico

16 time tonight.

17             Mr. Frye, can we try to dial up

18 Mr. Nevarez?

19             I will tell you while we are dialing him

20 up, sometimes he can hear me better than we all can

21 hear him.  If that happens, our break glass in case

22 of emergency is I'm going to say, We're going to

23 call you back from a different line.

24             Then I will ask one lawyer from each side

25 to come with me into my conference room where it is

 1  just a normal speakerphone on the conference table.

 2  Does that make sense?

 3              So if we have trouble hearing him and

 4  can't really communicate effectively, then I will

 5  just say we are calling him back, and y'all think

 6  who you want to send.

 7              Hello.  Is this Mr. Nevarez?

 8              MR. NEVAREZ:  Yes.

 9              THE COURT:  Okay.  Very good.  Sorry,

10  Mr. Nevarez.  This is Judge Brantley Starr in

11  Dallas, Texas.  We have you on speakerphone in a

12  courtroom, and so sometimes that can be difficult

13  for you to hear us or us to hear you.  I just want

14  make sure that you can hear us all right.

15              MR. NEVAREZ:  Very well.

16              You are going to turn up volume on the

17  speakerphone?

18              THE COURT:  Okay.  What we are going to

19  do, we are going to call you from a different line.

20  So give us two minutes, and then we will call you

21  from a different phone line.

22              THE WITNESS:  Okay.

23              THE COURT:  Thank you, sir.

24              Okay.  That is our cue.  Whoever the

25  designee is, come on back with me.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 14 of 426   PageID 14608
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 910

```
 1              (Recess.)

 2              (In chambers.)

 3                 S H O W   C A U S E   H E A R I N G

 4              THE COURT:  Hello.

 5              Mr. Nevarez, it is Brantley Starr again.

 6              MR. NEVAREZ:  Oh, yeah.

 7              THE COURT:  Is that better?

 8              MR. NEVAREZ:  It is very clear.  Now I can

 9    hear you.

10              THE COURT:  Very good.

11              So we are my conference I have a lawyer

12    for each of the parties and in this lawsuit with me

13    so everyone is listening in to it and we are on the

14    record.  We record everything we do in our court

15    proceedings.

16              So, Mr. Nevarez, as you probably know by

17    now, I set a show cause hearing for your failure to

18    comply with my orders to sit for a deposition.

19              I need to ask you, have you got a copy of

20    that order I entered yesterday saying that we need

21    to visit today at 8:30?

22              MR. NEVAREZ:  Yes.

23              THE COURT:  Okay.  What I am going to tell

24    you is I have the power to ask a judge in New Mexico

25    to send the marshals out to get you in handcuffs to
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 15 of 426  PageID 14609
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 911

1   sit for a deposition, but I don't like using that.

2             MR. NEVAREZ:  Right.

3             THE COURT:  My goal get you to talk at a

4   deposition so that we can use that for a trial.

5             Does that make sense?

6             So while I have the power to do that or

7   the power to seek punitive contempt to sit you in

8   jail some period of time for your failure to follow

9   court orders, I'm more concerned with just hearing

10  what you have to say at a deposition.

11            MR. NEVAREZ:  Okay.

12            THE COURT:  My request is this.  I will

13  not seek any punitive contempt, any jail time; I

14  will not seek the marshals come out and get you, if

15  you can commit to me that you will sit for a video

16  deposition tonight at 7:00, your time, that is

17  limited to an hour and a half.

18            Would you be amenable to that?

19            MR. NEVAREZ:  Yes.  Reluctantly.

20            THE COURT:  Understood.  And I don't think

21  anyone has ever wanted to sit for a deposition in

22  their life.  So I get your reluctance, generally.

23  I'm sure you have specific as well.

24            What I will do, then, is I will hold off

25  on referring this matter to judge in Las Cruces, so

1    the marshals don't come out after you.

2              What I want to do is to say that I'm going

3    to ask the lawyers, before we start on trial this

4    morning, get the jury in here, if they could send

5    you an email with instructions for how to log on

6    tonight at 7:00, your time; 8:00, our time, to sit

7    for a video deposition.

8              You will just need to make sure you have a

9    web cam and a microphone.  And then the flat form

10   they there use Zoom or some other platform, any

11   exhibits that they need to put in front of you will

12   be visible on that platform.  So you don't need

13   anything other than a computer with a webcam and

14   microphone.

15             Does that make sense?

16             MR. NEVAREZ:  Yes.

17             THE COURT:  Any other questions that the

18   lawyers have that they want to ask me?

19             MR. PRYOR:  We need the email address.

20             THE COURT:  Mr. Nevarez, what email

21   address can you give us?

22             MR. NEVAREZ:  Nevinc@msn.com.

23             Nancy, Edward, Victor, I-N-C@msn.com.

24             MR. PRYOR:  It looks like the judge got

25   it.  I couldn't understand it.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
1              THE COURT:  Nevinc@msn.com?

2              MR. NEVAREZ:  Correct.

3              THE COURT:  Very good.

4              Other questions?

5              MR. PRYOR:  Your phone number?

6              MR. NEVAREZ:  (575)496-6784.

7              MR. PRYOR:  Sir, you do have a computer

8   with a webcam?

9              MR. NEVAREZ:  Yes.

10             MR. PRYOR:  Thank you.

11             THE COURT:  All right.

12             Any other questions?

13             Okay.  So I will stand down.

14             MR. NEVAREZ:  Are you asking me or the

15  lawyers?

16             THE COURT:  That is a great question, Mr.

17  Nevarez.

18             So I was asking the lawyers here.

19             Mr. Nevarez, do you have any other

20  questions?

21             MR. NEVAREZ:  Yes.  I want to know why I

22  wasn't deposed when I was in office.  This has been

23  going five years.  They have had opportunity in

24  2017, 2018, and discovery has been closed.

25             I don't understand why depositions are
```

Case 3:17-cv-02278-X Document 450 Filed 06/14/23 Page 18 of 426 PageID 14612
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 914

1    required.

2              THE COURT:  Well, I understand that.

3              MR. NEVAREZ:  This is toward the end of

4    it.

5              THE COURT:  I understand that.  I have

6    looked another enough to limit your depo.  I would

7    normally depositions are allowed to go six hours.

8              Because of the circumstances you have just

9    said, I'm saying that this maxes out at an hour and

10   a half, does that make sense.

11             MR. NEVAREZ:  Ninety minutes.

12             THE COURT:  Yes.  That's correct.

13             MR. NEVAREZ:  Okay.  And why is it allowed

14   during the trial when they have had discovery for

15   five years?

16             THE COURT:  The jury has a fact-finding

17   duty and they would like to hear from you because

18   your name has come up a lot during this trial.

19             MR. NEVAREZ:  This was the jury's idea,

20   not --

21             THE COURT:  So my job is to listen for the

22   jury, right?  I'm not slanted for one party or

23   another.  But the jury is entitled to hear the

24   evidence.  There are several depositions.  You are

25   not the only one, Mr. Nevarez.  There are several

 1  depositions of short duration that I have allowed in

 2  the runup to trial.

 3              This is not the only trial I have done.  I

 4  have it done it probably, half the trials I have

 5  had, at the late-breaking stage, everyone realizes

 6  there is testimony that the jury should probably

 7  hear from.  So it is unfortunately a common

 8  occurrence.

 9              And you are not the only one in this trial

10  it is happening, but I am limiting it to one fourth

11  of the time normally allowed.

12              MR. PRYOR:  Can I make an additional

13  comment given the questions?

14              THE COURT:  You may.

15              MR. PRYOR:  Mr. Nevarez, this is Bobby

16  Pryor, I'm counsel for Ms. Carter.

17              The judge has told you, it is a 90-minute

18  deposition.  And then judge will of course correct

19  me it I'm wrong, just so you understand, that means

20  90 minutes on the record, that doesn't include

21  breaks.

22              No. 2, it doesn't include if you are

23  stalling or trying to delay and run out the clock on

24  a deposition.

25              Otherwise certainly that limitation

```
 1   applies, and we will follow it.

 2             THE COURT:  That's correct.

 3             So if you sit there and think for 27

 4   minutes about an answer, then that 27 minutes

 5   doesn't really count.  If you think for 10 seconds,

 6   then we will keep the clock on 10 seconds.

 7             Any other questions?

 8             MR. NEVAREZ:  No.

 9             THE COURT:  All right.  Thank you, Mr.

10   Nevarez.  I know this isn't pleasant or easy.  I

11   appreciate your willingness to help out.  I will

12   stand down for now on the assurances that you will

13   be at 7 p.m. on the platform of they send you over

14   email in the next few minutes.

15             So that concludes the show cause hearing.

16             And I will just see what happens from

17   tonight's deposition.

18             Thank you everyone.

19             Court is in recess.

20             (Recess.)

21             THE COURT SECURITY OFFICER:  All rise.

22             THE COURT:  Okay.  Anything before we get

23   the jury?

24             MR. McKEEBY:  I do have one thing I would

25   like to raise, your Honor.
```

```
 1              THE COURT:  Go for it.
 2              MR. McKEEBY:  I would like to re-urge the
 3   objection that I've been making with regard to
 4   questions that contemplate witnesses asking whether
 5   something is protected union activity.  I have been
 6   objecting on the basis of it being a legal
 7   conclusion and I think that is an accurate and fair
 8   objection, but I also think it's a problem of
 9   vagueness as well in the sense that --
10              THE COURT:  I'm right there with you.
11              So I think that if someone has dealt with
12   it, it is not a valid legal conclusion objection,
13   but do we know what we mean by protected activity?
14              So I will ask you -- when you split it
15   apart later on, religion, union speech, I think that
16   helped clarify.
17              Are we talking about the same thing?
18              MR. McKEEBY:  Not exactly, I don't think.
19   I think it should be more than that.  When you say
20   "union-protected activity," does that mean protected
21   activity under the Railway Labor Act, protected
22   activity under some other law, protected activity
23   under Southwest policies, or protected because it
24   is, you know -- and, in fact, it is not always
25   union-protected activity, sometimes it's
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 22 of 426   PageID 14616
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 918

1  union-related activity.

2              Does that mean it's related because of the

3  law, does that mean it's related because

4  conceptually or factually there is some connection

5  with the conduct or the message and the union?

6              The problem is that the witnesses don't

7  understand because the question is not clear, in

8  addition to calling for a legal conclusion, and it

9  is extremely prejudicial because it is going to

10  track language presumably in the -- in the charge.

11              And I think that that is something we need

12  to raise or we can discuss on Monday.

13              But the charge needs to be super clear.

14  Hey, I'm telling you what is protected activity, not

15  the witnesses.  And we can discuss that on Monday.

16              But the problem with these witnesses is

17  they don't know what they are answering because the

18  question is ambiguous and it needs more context.

19              Because I can tell you, if the witnesses

20  are asked, Is that protected conduct under the

21  Railway Labor Act, they are going to say, I don't

22  know what you are talking about.

23              And that is what the question is designed

24  to evoke, I think.  So I think the question is

25  ambiguous, vague, in addition to calling for a legal

1   conclusion, and that is -- I wanted to re-urge that

2   this morning.

3              THE COURT:  So I get your point.

4              I wouldn't make him go so granular as to

5   start saying "protected union activity under the

6   Railway Labor Act," right?  At some point it is so

7   granular that we will spend all our time clarifying.

8              I would appreciate if you could get their

9   definition, what's their understanding of what's

10  protected, or if they don't have one, like Schneider

11  didn't at first, then you go and start breaking it

12  up, right?  Was this religious?  Was this union?

13             And I know you will still have an

14  objection of that being too vague, but I think at

15  some point, if they haven't given you a definition

16  of protected, then you need to define it in some way

17  for them and then ask him if it is that.

18             Does that make sense?

19             MR. PRYOR:  I hear what you are saying,

20  your Honor.

21             This is the decision-maker.  This is the

22  person that should have known these things, taken

23  them into account.

24             And they can redirect and try and

25  rehabilitate; but for me to have to tell him what it

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 24 of 426   PageID 14618
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 920

1   is, he should already know.  And I should be able to

2   ask it in any variety of manner.

3              And to define for him under RLA what he

4   should already know, no, I object to having to do

5   that.

6              THE COURT:  So I think you have already

7   granulated it in religion and union with him, and

8   you actually got traction.

9              So, I mean, if he asks a question of

10  another witness that is the broad protected activity

11  and we don't have a foundation, raise the objection

12  and I will rule on it then, and we will do the

13  choose your own adventure.

14             So I take your point and I think your

15  point is valid.  We will see it come up with future

16  witnesses and figure out what we do with it then.

17             MR. PRYOR:  Thank you, your Honor.

18             THE COURT:  All right.  And exhibits, I

19  know what I'm going to do on all the exhibit

20  objections, but if you want a sidebar when you are

21  raising your objection, just ask for one.  Otherwise

22  I will rule on it here and we won't have a sidebar.

23  All right.

24             THE COURT SECURITY OFFICER:  All rise for

25  the jury.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 921

```
 1                    (The jurors entered the courtroom.)
 2                    THE COURT:  Thank you.  You can be seated.
 3                    Okay.  We can bring Mr. Schneider back in.
 4                    MR. PRYOR:  Your Honor, I feel my time
 5    ticking away.
 6                    THE COURT:  He's walking quickly.  You're
 7    good.
 8                    Welcome back, Mr. Schneider.  You can come
 9    on and approach that witness box.
10                    (The witness entered the courtroom.)
11                    THE COURT:  We already gave you the oath
12    yesterday.  I don't need to give it to you again
13    today.  I did ask you yesterday if you would give me
14    the courtesy of not talking to anyone about the
15    case.
16                    THE WITNESS:  You did.
17                    THE COURT:  So can you tell me, did you
18    talk to anyone about the case?
19                    THE WITNESS:  I did not.
20                    THE COURT:  Okay.  Thank you for
21    complying.
22                    And Mr. Pryor, you can continue your
23    questions.  I will just remind y'all, keep some
24    space between questions and answers, answers and
25    questions.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1              DIRECT EXAMINATION - CONTINUED
 2   BY MR. PRYOR:
 3   Q.   Mr. Schneider, who did you talk to about your
 4   testimony yesterday?
 5   A.   Nobody.
 6   Q.   What does that RLA mean to you?
 7   A.   Railway Labor Act.
 8   Q.   What does that mean in terms of how you did
 9   your job in regard to the investigation of the
10   claims against Ms. Carter?
11   A.   To do a full investigation and give the --
12   Q.   I'm going to apologize to you, and I'm going to
13   correct this, hopefully in the next hour.
14        I don't have my hearing aids on.  I noticed it
15   this morning whenever the judge first started
16   speaking.  So you are going to have talk into that
17   microphone for me.
18             THE COURT:  Can you repeat that question?
19             MR. PRYOR:  Yes.
20   BY MR. PRYOR:
21   Q.   I've forgotten the question, so I may have to
22   ask a different one.  But if you will just speak
23   into the microphone, I will appreciate it.
24   A.   Okay.
25   Q.   So what does "Railway Labor Act" mean to you in
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 27 of 426  PageID 14621
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 923

1  connection with your investigation of claims against

2  Ms. Carter?  Into the microphone.

3          MR. McKEEBY:  Objection.

4          THE COURT:  I will allow it.

5          THE WITNESS:  I don't know an answer for

6  that question.  I don't know what you mean.

7  BY MR. PRYOR:

8  Q.  You'll have to say it a little bit louder for

9  me.

10  A.  I don't know what you mean.

11  Q.  Okay.  Well, I asked you what RLA meant, and

12  you told me Railway Labor Act.

13      Maybe I should -- let me ask a foundational

14  question.

15      Did anything about your understanding of RLA

16  come into play in regard to your investigation of

17  the claims against Ms. Carter?

18  A.  What I know about the RLA is that airlines and

19  transportation fall under that guidance, I guess, to

20  some extent, and we are held to that.

21      But beyond that, I don't know it thoroughly

22  enough to be able to answer that question.

23  Q.  Therefore, given that that is your

24  understanding of the RLA, it didn't come into play

25  at all in regard to your investigation of

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 28 of 426  PageID 14622
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 924

1  Ms. Carter, true?

2  A.    Not specifically.

3  Q.    Well, how generally, then, sir?

4  A.    Only, like I said, that we are held -- that's

5  what an overseeing entity -- it's over the airlines

6  and transportation in general.  And we abide by some

7  of those guidelines on there.  Specifically how they

8  pertain to this case is what I'm saying I can't

9  answer that exactly.

10  Q.    Okay.  Great.

11        Tell us the guidelines that came into play in

12  your investigation of Ms. Carter.

13  A.    That we give Ms. Carter due process and I

14  conduct a thorough investigation into the

15  allegations.

16  Q.    Anything else?

17  A.    No.

18  Q.    Anything about, if she's engaged in union

19  activity, that it's protected?

20  A.    I don't know anything about union protected.

21  Q.    You don't know anything about protected union

22  activity under the RLA; that's not part of what you

23  understand of the RLA?

24  A.    I'm just saying that I don't know what that

25  means as far as protected speech or activity.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 925

1  Q.   All right.  I get it.  You don't know what
2  protected speech is or what protected union activity
3  is, true?
4              MR. McKEEBY:  Objection, asked and
5  answered.
6              THE COURT:  I will allow it this last
7  time.
8              THE WITNESS:  I don't know.
9  BY MR. PRYOR:
10 Q.   You don't know if you don't know, or you don't
11 know what protected speech, protected union activity
12 is?
13 A.   I don't know what protected speech, protected
14 union activity would be.  I'm for the company, and
15 as far as the Union goes, that's under their realm.
16 Q.   Okay.  Did you seek any advice of counsel or
17 anyone in regard to that issue before terminating
18 Ms. Carter?
19 A.   What issue are you talking about specifically?
20 Q.   The issue of whether or not there were
21 protections she was entitled to under the RLA that
22 you were not providing.
23              MR. McKEEBY:  Objection, calls for
24 attorney-client privilege.
25              THE COURT:  No, I don't think this one

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  does.  He can answer.

2            THE WITNESS:  I do not know that, if it

3  was -- I did not specifically --

4  BY MR. PRYOR:

5  Q.   You don't know what you asked?

6  A.   I did not specifically ask somebody about the

7  Railway Labor Act.

8  Q.   But did you say you didn't specifically ask?

9  Is that what you said?

10  A.   I did not ask anybody about the RLA.

11  Q.   You didn't ask at all.

12      I just want to make sure there wasn't a

13  general --

14            THE COURT:  Separation between questions

15  and answers.  You're talking over each other.

16            MR. PRYOR:  I apologize, your Honor.

17  BY MR. PRYOR:

18  Q.   What does an 18-month look-back mean to you?

19  A.   It means that we can look back in an employee's

20  record for 18 months to see any prior information

21  from that that may pertain to the case.

22  Q.   And do you -- is that the guideline or rule

23  that you follow when looking at complaints?

24  A.   That is one of the requirements, that we can

25  only go back 18 months.

```
 1  Q.   Okay.  You know you went back more than 18

 2  months in regard to Ms. Carter, though, don't you?

 3  A.   How so?

 4  Q.   I'm sorry?

 5  A.   How so?

 6  Q.   You don't know, do you?

 7       Did you go back more than 18 months in order to

 8  terminate Ms. Carter?

 9  A.   I'm not sure what you are asking as far as 18

10  months for what?  Into what area?

11  Q.   Let's try it this way:  Did you look at any

12  information that you relied upon to terminate

13  Ms. Carter that was older than 18 months?  The

14  limit.  You just said it was the requirement.

15  A.   There is information that was given to me that

16  was more than 18 months, but I didn't consider

17  anything more than 18 months.

18  Q.   Are you sure of that?

19  A.   In my decision?

20  Q.   No.  Are you sure that you did not -- yes.

21       Are you sure you did not consider as part of

22  your decision to terminate Ms. Carter information

23  more than 18 months old that you specifically relied

24  upon?

25  A.   I did not rely upon anything more than 18
```

1  months prior to that that was pertinent to the

2  investigation.

3  Q.   Did you rely upon information from her Facebook

4  page to provide a nexus in order to say there was a

5  social media policy violation?

6  A.   Social media?  It possibly could have gone back

7  more than 18 months.  I don't know the -- I don't

8  remember the specific dates.

9  Q.   I thought you said 18 months was -- required

10  that -- you didn't say it was a guideline, you said

11  that was the requirement.  You can't go back more

12  than 18 months.

13      And, in fact, you did try and create a nexus

14  between Ms. Carter's Facebook and Southwest

15  Airlines, true?

16  A.   In my understanding, the 18 months goes to play

17  for any past discipline or anything in the file.

18  Q.   So wait.  So before, I gave you every

19  opportunity to explain it.  You said you can't go

20  back more than 18 months to look at anything, and

21  now you are telling us, No, no, it is limited to

22  discipline.

23          MR. McKEEBY:  Objection, misstates

24  testimony.  Argumentative.

25          MR. PRYOR:  I'm happy to read it.

```
 1              THE COURT:  Well, let's do that.
 2              Do you want to go back?
 3              MR. PRYOR:  I'm sorry?
 4              THE COURT:  You offered to read it.  I
 5  think there is a question on whether you are
 6  accurately stating.
 7              MR. PRYOR:  It was two questions ago,
 8  maybe three.
 9  BY MR. PRYOR:
10  Q.   Sir, what is the 18-month requirement?
11  A.   We can't consider anything in their file more
12  than 18 months.
13  Q.   Anything in their file.  That wouldn't include
14  the Facebook posts that you gathered and put into
15  her file?
16  A.   No.
17  Q.   So you can go back forever?
18  A.   In certain -- when we are looking at Facebook
19  and we are looking at nexus to the workplace, it is
20  not the same thing.
21  Q.   You were the person that decided to terminate
22  Charlene Carter, according to Southwest Airlines.
23  A.   Yes.
24  Q.   Southwest Airlines gave you that
25  responsibility?
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 34 of 426  PageID 14628
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 930

1  A.    Is that a question?

2  Q.    Did anyone at Southwest Airlines tell you that

3  if it involves union activity that is not on the job

4  and it is not illegal, that you shouldn't take

5  action against them?

6  A.    No.

7  Q.    As you sit here today, has anyone ever told you

8  that?

9  A.    They have told me that I cannot consider

10 anything in their file past 18 months.

11 Q.    I'm not asking about the 18 months now, sir,

12 but thank you for volunteering that.

13       So you were told that you shouldn't have gone

14 back more than 18 months in the Facebook page, true?

15 A.    No.

16 Q.    Well, what did you just mean when you said

17 you -- since she was terminated, you've been told

18 you can't go back more than 18 months?

19 A.    On anything in the file, the employee's file.

20 Q.    That is what you already told us.

21       So why would they be telling that again after

22 Ms. Carter was terminated?

23 A.    I don't know what you mean on that.

24 Q.    Who is "they," by the way?

25 A.    That's the company and Southwest Airlines.

1  Q.   Could you put a name on it for us?

2  A.   Well, labor relations oversees that.

3  Q.   So that is not really a name either.  When I

4  mean a name, I mean a human being.

5  A.   In this particular case, I talked to Maureen

6  Emlet.

7  Q.   Ms. Emlet.

8       Who else?

9  A.   About this issue or in general?

10  Q.   About this issue.  This issue after you

11  terminated Ms. Carter to tell you that -- did anyone

12  tell you that if it is union activity and it is not

13  on the job, that you shouldn't be taking action

14  unless the activity is illegal?

15  A.   No one told me that.

16  Q.   But Ms. Emlet told you what about the 18

17  months?

18  A.   No.  You asked me who I referred to, and I said

19  labor relations, and specifically Maureen Emlet.

20  Q.   When I asked you if you'd spoken to someone

21  after Ms. Carter was terminated about this issue,

22  and you said yes, someone has spoken to you about

23  this union activity issue, did I misunderstand?

24          MR. McKEEBY:  Objection, vague.

25          THE COURT:  I will allow it.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 36 of 426  PageID 14630
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 932

1            THE WITNESS:  I didn't speak to anybody

2   after the termination.

3   BY MR. PRYOR:

4   Q.   Was Ms. Carter on the job when she sent her

5   communications to Ms. Stone?

6   A.   She was an active flight attendant for

7   Southwest Airlines.

8   Q.   Did you understand my question?

9   A.   No.

10  Q.   Okay.  Do you promise not to be evasive today?

11  A.   I'm sorry?  I didn't think I was being evasive.

12  Q.   Did Ms. Carter -- we've got Southwest Airlines

13  employees here today.  If one of them is sitting in

14  the -- if they are off work today sitting in the

15  gallery, are they on the job?

16  A.   No.

17  Q.   Okay.  Then I will ask you again, was

18  Ms. Carter on the job when she sent the

19  communications that she sent to Ms. Stone?

20  A.   I'm not aware of where she was when she sent

21  those.

22  Q.   It didn't matter to you, did it?

23  A.   No.  It didn't.

24  Q.   Okay.  So you are not even aware if she was on

25  the job or not?

1            MR. McKEEBY:  Objection, asked and

2   answered.

3            THE COURT:  Sustained.

4            MR. PRYOR:  Make sure, given his previous

5   answer.

6            MR. McKEEBY:  Objection, asked and

7   answered.

8            THE COURT:  Sustained.

9            The first one is clear.

10            MR. PRYOR:  Okay.

11  BY MR. PRYOR:

12  Q.   So you knew that she either was on the job or

13  wasn't and didn't ask, is that fair?

14            MR. McKEEBY:  Objection, asked and

15  answered.

16            THE COURT:  Sustained.

17            MR. PRYOR:  I can't summarize his

18  testimony?

19            THE COURT:  Not on something as discrete

20  as that when the answer is clear.  Save that for

21  closing argument.

22            MR. PRYOR:  Okay.

23  BY MR. PRYOR:

24  Q.   Do you know if Ms. Stone was on the job at the

25  time that she received the communication?

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 38 of 426  PageID 14632
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 934

1  A.    From what I recall with her discussion, yes.

2  Q.    What makes you think she was on the job at the

3  time she received it?

4  A.    There was a statement made that she received it

5  as she walked down the jetway to the aircraft and it

6  affected her.

7  Q.    Do you know what she was actually doing?

8  A.    No, sir.

9  Q.    So you don't know that she was on the job, do

10  you?

11  A.    Not specifically.  I know that she was going to

12  the aircraft.

13  Q.    She was actually traveling on union business,

14  but you don't know that, do you?

15  A.    No, I do not.

16  Q.    So you don't know if she was on the job or not,

17  true?

18  A.    No.

19  Q.    True?  That would take a yes if it's true.

20  A.    Yes, that is true.

21  Q.    Okay.  If an employee -- I'm going to give you

22  a hypothetical, okay?

23        If at any time you are misunderstanding what

24  I'm saying, feel free to raise your hand.

25  A.    Okay.

1  Q.   An employee of Southwest Airlines emails you

2  and tells you, Hey, you know what, I want to use the

3  social media policy to target two people that might

4  be opponents of the upcoming elections for the

5  union, and I want to support the current union

6  membership, and I want to use the social media

7  policy to get them fired.

8        Okay.  You got the example so far?

9  A.   Vaguely, yes.

10 Q.   Okay.

11       You are sitting at your computer, you open up

12 that email.  What do you do?

13            MR. McKEEBY:  Objection, vague.  What

14 email?

15            THE COURT:  I will allow it.

16            THE WITNESS:  The email was sent to me, is

17 that what you are saying?

18 BY MR. PRYOR:

19 Q.   That was the hypothetical, sir.  That was the

20 whole point.  I even said you opened it up sitting

21 at your desk.  You didn't understand that?

22 A.   Okay.  So I would possibly reach out to them

23 and have a discussion about what their intent was.

24 Q.   So you would possibly reach out.  So you might

25 not even do that.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 40 of 426  PageID 14634
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 936

1  A.   I would have to get details, or if it was more

2  information in the email.

3  Q.   So if you got more details that verified

4  exactly what I just told you, that this employee is

5  wanting to target for assassination, termination,

6  two other employees using the social media policy,

7  all you would do is possibly reach out, true?

8            MR. McKEEBY:  Objection, vague and --

9  vague.

10            THE COURT:  I will allow it.

11            THE WITNESS:  I'm not sure what you mean

12  when you say "assassination or termination."  Is it

13  both or --

14  BY MR. PRYOR:

15  Q.   You don't know what -- target for assassination

16  in this context means get them fired.

17  A.   I'm sorry.  I didn't understand that.

18  Q.   You what?

19  A.   I didn't understand that.

20  Q.   Okay.  I have now told you.

21       So you still, knowing all of that, would only

22  possibly reach out to the employee, true?

23  A.   If that were the case specifically, I would

24  reach out to the employee, yes, and possibly

25  employee relations.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 41 of 426  PageID 14635
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 937

 1  Q.   I'm having a little trouble with the word

 2  "possibly."

 3       So you've got an employee that threatens to

 4  target for assassination, which I will agree means

 5  terminate another employee, for invalid grounds

 6  using social media policy, and you would only

 7  possibly report it to employee relations?

 8            MR. McKEEBY:  Objection, calls for

 9  speculation.

10            And moreover, if it means termination,

11  let's use the word "termination" instead of

12  "assassination."

13            THE COURT:  I will allow the question.

14            THE WITNESS:  It would depend on the

15  information I find out.  That's why I said possibly.

16  I would talk to the person first, find out

17  specifically.  Emails can be misread.

18  BY MR. PRYOR:

19  Q.   Sure.

20  A.   So I would find out details.  And that's why I

21  mean possibly reach out to employee relations.

22  Q.   Let me tell you that the employee, when you

23  call him or her, verifies 100 percent that, yes, I'm

24  going to try and use social media policy to fire

25  some people that really there is no basis for firing

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 42 of 426  PageID 14636
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 938

1  them.  And they tell you that.  They verify what is

2  in the email.

3       Now what do you do?

4  A.   I would have a discussion with them and try to

5  dissuade them from doing so, and let them know the

6  ramifications of doing something like that.

7  Q.   But that's all you would do, right?  You

8  wouldn't report a target assassination threat like

9  that to employee relations, right?

10            MR. McKEEBY:  Objection,

11  mischaracterization.  Also speculation.

12            MR. PRYOR:  I'm entitled to get a little

13  sarcastic with the witness.

14            THE COURT:  I will allow the question.

15            THE WITNESS:  I would if it indicated the

16  need to do so.

17  BY MR. PRYOR:

18  Q.   Okay.  I'm sorry, you would if they didn't back

19  off what they told you, is that what you said?

20  A.   If I didn't come to some reconciliation, yes.

21  Q.   So if you weren't able to talk them out of it,

22  you would report them to employee relations, true?

23  A.   Yes.

24  Q.   By the way, let's assume that you did talk them

25  out of it.  You then would not report it to employee

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 43 of 426   PageID 14637
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 939

1   relations?

2   A.   Once again, it would depend on the statements

3   they made and what was indicated to me.

4   Q.   I just told you every single statement they

5   made.

6        Now, with those facts, if you called the

7   employee, and the employee says -- finds out you're

8   upset about it and says, Oh, I changed my mind, you

9   would not report that to employee relations, true?

10  A.   I can't say that within 100 percent.  I mean,

11  it would -- it would depend on what was --

12  Q.   Say within 99 percent then.

13             MR. McKEEBY:  Objection --

14             THE WITNESS:  I don't know.

15             THE COURT:  Sustained.

16  BY MR. PRYOR:

17  Q.   98 percent?

18             MR. McKEEBY:  Objection, asked and

19  answered.

20             THE COURT:  Sustained.

21  BY MR. PRYOR:

22  Q.   In February of 2017, at the same time you

23  received Charlene Carter, the complaint regarding

24  Charlene Carter, did anyone make you aware that

25  other members of the Union were reporting other

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 44 of 426   PageID 14638
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 940

1   members of the Union supporting a recall for

2   violations of the social media policy?

3   A.   I found that out during the investigation.

4   Q.   What did you find out during the investigation

5   about that?

6   A.   There was a statement written, I'm pretty sure

7   it was by Ms. Carter, that there is a vote, and

8   people are voting to oust the Union leadership.

9   Q.   That's all you learned?

10  A.   Yes.

11  Q.   Did you look into that?

12  A.   No.

13  Q.   Did you ever speak to Sonya Lacore about it?

14  A.   No.

15  Q.   Sonya Lacore was notified of Ms. Stone's

16  complaint at the time Ms. Stone made the complaint,

17  true?

18  A.   Say that once again.

19  Q.   Sonya Lacore was notified of the complaint made

20  by Ms. Stone against Ms. Carter at the time it was

21  made in February of 2017?

22           MR. GREENFIELD:  Objection, your Honor,

23  lack of foundation, and because of that it calls for

24  speculation.

25           THE COURT:  Sustained.

```
 1              Can you back up?
 2   BY MR. PRYOR:
 3   Q.   Do you recall the complaint that Ms. Stone
 4   filed?
 5   A.   Yes.
 6   Q.   Do you know who was included on that complaint,
 7   among others, Sonya Lacore?
 8   A.   I don't recall today.
 9   Q.   Well, I'm going to go ahead and let you assume
10   that Sonya Lacore was notified on that complaint.  I
11   will show it to you in a little while, okay?
12        You got what you are assuming?
13   A.   Yes.
14   Q.   And if Ms. Lacore was aware of information that
15   in fact, at this same time she was aware that an
16   employee in the Union supporting Ms. Stone was
17   reporting people, actually the very same day, for
18   violations of social media policy, would you expect
19   her to have told you that?
20             MR. GREENFIELD:  Objection, your Honor,
21   still lack of foundation.  If he would like the
22   witness to assume something, he can --
23             THE COURT:  Hold on.  That is a speaking
24   objection.  You can ask for a sidebar if you need
25   it.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 942

```
1              I will overrule that.

2              You can answer.

3              THE WITNESS:  I don't know.

4   BY MR. PRYOR:

5   Q.   You wouldn't want to know that, would you?

6   That would be information you wouldn't want as part

7   of your fair and impartial investigation, right?

8   A.   I don't understand the question.

9   Q.   Do you not understand what "fair and impartial"

10  is?  What did you miss?

11  A.   The entire question.

12  Q.   Really.

13       So you would not want to know that, in fact,

14  the Union, with the knowledge of Ms. Stone, who is

15  making the complaint on February 22, 2017, were also

16  bringing social media policy violations against

17  other recall supporters like Ms. Carter, you

18  wouldn't want to know that, would you?

19              MR. McKEEBY:  Objection, vague,

20  foundation.

21              THE COURT:  I will allow it.

22              THE WITNESS:  That was not part of my

23  investigation on the information I received on

24  Ms. Carter.

25
```

1   BY MR. PRYOR:

2   Q.   You wouldn't want to know that, right?  You

3   don't think that's relevant, right?

4   A.   If it was relevant, I would want to know it,

5   yes.

6   Q.   How would you know if it is relevant if

7   somebody doesn't tell you about it?

8   A.   If somebody doesn't tell me about it, then I

9   wouldn't know about it.

10  Q.   Okay.  So let's go back to my question.

11       If Ms. Lacore was aware of that, would you have

12  expected her to have informed you, since she was on

13  the complaint?

14  A.   I would expect Ms. Lacore to take whatever

15  action she deems necessary.  I can't speculate what

16  that would be.

17  Q.   If she deemed necessary to keep it a secret

18  from you, that is okay with you?

19  A.   She would have to make that decision.

20  Q.   Sorry?

21  A.   That would be a decision she would make.  I'm

22  not sure what you mean by that.

23  Q.   Well, I'm just saying, if I was -- wouldn't you

24  want that type of information to evaluate the

25  validity of Ms. Stone's complaints or were you not

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 48 of 426   PageID 14642
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 944

1    interested in that?

2    A.   I would like any information that relates to

3    the investigation.

4              MR. PRYOR:  Let's look at Exhibit 66.

5              THE COURT:  It is in.  You can publish.

6    BY MR. PRYOR:

7    Q.   It will be on the screen in front of you.

8         If you ever need a hard copy -- I can provide

9    you a hard copy at any time, but I've kind of been

10   pulling things in and out of folders.  If you need

11   it, I think I can get it for you.  It should be on

12   your screen any minute now.

13        Any hour now.

14   A.   It's a blank screen right now.

15        I've got a waterfall.

16   Q.   Patience is not a virtue I own.

17        I'm on the verge of handing you a hard copy.

18              MR. McKEEBY:  Given that that appears to

19   be your reality, what document are we talking about?

20              THE COURT:  66.

21              MR. PRYOR:  There we go.

22   BY MR. PRYOR:

23   Q.   Okay.  Here is Exhibit 66.

24        And you are not on this email, but it was

25   forwarded to you, correct?

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 49 of 426  PageID 14643
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 945

1  A.    I don't know for sure.  I'm not sure what this

2  is.  I only see the top paragraph.

3  Q.    You don't recognize this, right?  You don't

4  recognize her complaint?

5  A.    I would have to see farther down.  I don't -- I

6  only see the beginning of it.

7  Q.    So you need to see the one that was forwarded

8  to you, right?

9  A.    If I remember right, this looks familiar to the

10  one that was sent to me.

11  Q.    When's the last time you reviewed the

12  complaint?

13  A.    Within the past week.

14  Q.    I'm sorry?

15  A.    Within the past week.

16  Q.    When is the last time you reviewed Audrey

17  Stone's complaint?

18           MR. McKEEBY:  Objection, asked and

19  answered.

20           THE COURT:  I will allow this

21  clarification.

22           THE WITNESS:  For a specific day?  Friday.

23  I mean --

24  BY MR. PRYOR:

25  Q.    This past Friday, true?

```
 1   A.    Yes.

 2   Q.    Okay.  This past Friday you reviewed it, and

 3   you can't tell us that you received this document,

 4   true?

 5   A.    This one wasn't addressed to me.

 6   Q.    You didn't look at this?

 7   A.    I looked at a version of this that was

 8   forwarded to me.

 9   Q.    That's the point I'm making, sir.  This

10   document was forwarded to you, true?

11   A.    There it is, the whole thing.  Yes.

12   Q.    Is that a yes?

13   A.    This one was sent to me.

14   Q.    I just need to know if you said yes.

15   A.    Yes, this one was sent to me.

16   Q.    Okay.  So I appreciate you taking five minutes

17   to answer something about a document you looked at

18   on Friday.

19         MR. McKEEBY:  Objection, improper argument

20   of counsel.

21         THE COURT:  Sustained.

22   BY MR. PRYOR:

23   Q.    Now, this is from Audrey Stone, true?

24   A.    Yes.

25   Q.    And it's sent to Suzanne Stephenson?
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 51 of 426   PageID 14645
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 947

1  A.    Yes.

2  Q.    That's the base manager in Las Vegas?

3  A.    Yes.

4  Q.    And it is also sent to Naomi Hudson, someone

5  with labor relations and management at Southwest

6  Airlines?

7  A.    Yes.

8  Q.    And it was sent to Sonya Lacore, and she was --

9  I'm not sure of her title, but she was high up in

10  in-flight, true?

11  A.    True.

12  Q.    Would Sonya Lacore, would you expect her to be

13  involved in the investigation?

14  A.    Not at her level.  She would be aware of it,

15  but she wouldn't be involved with the investigation.

16  Q.    So you can't think of a reason why Audrey Stone

17  would include Sonya Lacore on here, could you?

18          MR. GREENFIELD:  Objection, your Honor,

19  calls for speculation.

20          THE COURT:  I will allow him to answer, if

21  he has personal knowledge.

22          THE WITNESS:  I don't know why she sent

23  it.

24  BY MR. PRYOR:

25  Q.    Do you have any understanding at all as to why

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 52 of 426   PageID 14646
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 4 July 08, 2022                         Page 948

1  someone senior in in-flight would be included on

2  Audrey Stone's complaint sent to her base manager?

3            MR. GREENFIELD:  Objection, asked and

4  answered.  And it's lack of foundation, which calls

5  for speculation.

6            THE COURT:  I will sustain on foundation.

7            MR. PRYOR:  Which was sustained, your

8  Honor?

9            THE COURT:  Foundation.

10 BY MR. PRYOR:

11 Q.   Sir, you received complaints from employees

12 about other employees?

13 A.   Yes.

14 Q.   You understand the process at Southwest

15 Airlines about how that is done?

16 A.   How what is done?

17 Q.   How complaints are handled.

18 A.   Yes.

19 Q.   And you have been there 28 years, and for at

20 least a significant part of that time, you have been

21 handling complaints?

22 A.   Yes.

23 Q.   And I'm asking you, based on your understanding

24 of the process at Southwest Airlines, can you think

25 of a reason why it would be necessary to have Sonya

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 53 of 426   PageID 14647
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 949

1  Lacore on the complaint?

2          MR. GREENFIELD:  Objection, again, lack of

3  foundation, which calls for speculation.

4          And I would be happy to sidebar to flesh

5  that out, if you need me to.

6          THE COURT:  If you want a sidebar, I will

7  let you.

8          MR. GREENFIELD:  I don't think I do.

9          THE COURT:  So I will overrule on lack of

10 foundation.  I will allow him to answer based on the

11 speculation objection, if he has personal knowledge.

12          THE WITNESS:  I don't have personal

13 knowledge of why it was sent to her.

14 BY MR. PRYOR:

15 Q.   I'm not asking about your personal knowledge,

16 I'm asking about your personal knowledge of the

17 practices and policies of Southwest Airlines.

18     Now, there's your knowledge.  Within that

19 knowledge, can you think of a reason why Sonya

20 Lacore should be on this complaint?

21          MR. McKEEBY:  Objection, asked and

22 answered.

23          THE COURT:  I will allow it.

24          MR. GREENFIELD:  Your Honor, I would renew

25 my foundation objection.  And if -- and it's

1  irrelevant for the purposes of --

2          THE COURT:  No speaking objections,

3  though.

4          Sustained on irrelevant.

5          MR. PRYOR:  Your Honor, I object to the

6  continuous objections to try and assist this witness

7  in not answering questions.

8          THE COURT:  I'm overruling the objections.

9          You can answer the question.

10         THE WITNESS:  This was sent by Audrey

11  Stone.

12  BY MR. PRYOR:

13  Q.   Um-hmm.

14  A.   I don't know why she included the people that

15  she did in the email.

16  Q.   That wasn't my question, was it?

17       I understand what you want to answer, sir, but

18  you are under oath to answer the questions I ask

19  you.

20         MR. GREENFIELD:  Objection, argumentative.

21  BY MR. PRYOR:

22  Q.   Would you answer my question?

23         THE COURT:  Sustained.

24         Ask the question.

25

 1 | BY MR. PRYOR:

 2 | Q.   I did.  Would you answer it?

 3 | A.   You'll have to repeat that.  I don't know what

 4 | the question is then.

 5 | Q.   Let's do it again.  This is another five

 6 | minutes to get a basic fact from you.

 7 |          MR. GREENFIELD:  Objection, your Honor, to

 8 | the sidebar --

 9 |          MR. PRYOR:  You've got -- your

10 | knowledge --

11 |          THE COURT:  Sustained.

12 |          Please ask the question.

13 | BY MR. PRYOR:

14 | Q.   -- your 28 years of knowledge about Southwest

15 | Airlines's process.  Have you got it so far?  Your

16 | knowledge.  No one else's, yours.

17 | A.   Yes.

18 | Q.   Within that knowledge, take that vast knowledge

19 | and tell us any explanation you can come up with for

20 | why Sonya Lacore has to be on this complaint.

21 |          MR. GREENFIELD:  Objection, your Honor, to

22 | the relevance then.

23 |          THE COURT:  I will allow it.

24 |          THE WITNESS:  I don't know why she is on

25 | this email.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 56 of 426   PageID 14650
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 952

1              MR. PRYOR:  Object, nonresponsive.

2    BY MR. PRYOR:

3    Q.   Once again, sir, did I ask you why Audrey Stone

4    included it on there?

5         What is your education?

6    A.   Generally?

7    Q.   What is your education, sir?

8    A.   I have a bachelor's degree in aviation.

9    Q.   Okay.  I'm just trying to see if you understand

10   the difference between me asking you what Audrey

11   Stone did and what you understand based on your

12   knowledge.

13        Do you see the difference?

14   A.   I don't see the difference.

15   Q.   Okay.  So I'm going to try it again, and don't

16   tell me, I don't know what Audrey Stone was

17   thinking, because I'm not asking you that.

18              MR. GREENFIELD:  Objection.

19              MR. McKEEBY:  Objection.  He's not --

20              THE COURT:  Sustained.

21              Just ask the question.

22              MR. PRYOR:  I'm sorry?

23              THE COURT:  Sustained.

24              Ask the question.

25

```
 1  BY MR. PRYOR:

 2  Q.   You got your 28 years of experience, and you've

 3  handled complaints during a lot of that 28 years.

 4        And tell me, based on your knowledge and

 5  understanding and belief about Southwest's policies,

 6  a reason you could come up with, when you saw this,

 7  on why Sonya Lacore should be on this complaint?

 8  A.   I don't know the answer to that question.

 9  Q.   You can't think of a reason, can you?

10              MR. McKEEBY:  Objection, asked and

11  answered.

12              MR. PRYOR:  I'm exploring his answer.

13              THE COURT:  I will allow this one.

14              THE WITNESS:  Can you repeat the question?

15  BY MR. PRYOR:

16  Q.   You can't think of a reason, can you?

17  A.   Sonya Lacore is the vice president of in-flight

18  who oversees all employees and flight attendants of

19  Southwest Airlines.  So I don't even know why she

20  would be included on that specifically because there

21  is more people below her in the chain of command.

22  Q.   Okay.

23  A.   So.

24  Q.   I appreciate you finally getting to the answer.

25  You can't think of a reason.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 954

```
 1        But how about the fact that Audrey Stone was
 2   aware that Sonya Lacore had been talking with people
 3   at the Union about targeting people for social media
 4   violations?  Would that be a reason?
 5             MR. McKEEBY:  Objection, foundation.
 6             THE COURT:  Sustained.
 7   BY MR. PRYOR:
 8   Q.   Let's look at:  "Dear Suzanne.  Below you will
 9   see Facebook messages that were sent to me last week
10   by Southwest Airlines flight attendant Charlene
11   Carter.  It is in regards to a TWU Local 556 Women's
12   Committee Meeting that I participated in last month
13   and a march that I voluntarily participated in a few
14   days later."
15        Did I read that correctly for you?
16   A.   Yes.
17   Q.   You know that the complaint involves Charlene
18   Carter complaining to her union, right off the bat,
19   true?
20   A.   Yes.
21   Q.   Okay.  So it didn't take days of investigation,
22   you knew in the second sentence of the complaint
23   that this involved union activity, right?
24        That's okay, you already told us.  You can say
25   it again.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 59 of 426   PageID 14653
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 955

1  A.   It says that it involves -- regards TWU Local

2  556.

3  Q.   Sir, you just told us you knew it involved

4  union activity.  All I have added now is you knew

5  right away because it is in the second sentence.

6  Are you changing your answer?

7            MR. McKEEBY:  Objection.  He's not

8  changing his answer.

9            THE COURT:  Sustained.

10            MR. PRYOR:  Your Honor, I did not hear the

11  objection.  I heard "sustained," but I didn't hear

12  the objection.

13            MR. McKEEBY:  Let me make a formal

14  objection.

15            Objection, mischaracterizes testimony,

16  argumentative.

17            THE COURT:  I will sustain that.

18  BY MR. PRYOR:

19  Q.   Did you know when you read the second sentence

20  of this complaint that it involved Charlene Carter

21  engaging in union activity?

22            MR. McKEEBY:  Objection, asked and

23  answered.

24            THE COURT:  I will allow this.

25

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 60 of 426  PageID 14654
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 956

1  BY MR. PRYOR:

2  Q.  You can answer, I think.

3           THE COURT:  Yes.

4           THE WITNESS:  Yes.  The ---

5  BY MR. PRYOR:

6  Q.  And then, even more so, she goes on to say, "Up

7  until December, I chaired RTW committee, which works

8  with TWU international to collectively help build

9  future women leaders and address women issues."

10      Again, talking about that union activity, true?

11           MR. McKEEBY:  Again, your Honor, object as

12  vague for the reasons discussed.

13           THE COURT:  I will allow this.  I will

14  allow it.  You can answer.

15           MR. PRYOR:  I object to the constant

16  objection.  There is nothing vague.  I read what the

17  agreement says.

18           THE COURT:  I can't control him any more

19  than I can control you, and everyone has been very

20  active today.

21           Can you answer the question or do you need

22  him to repeat it?

23           THE WITNESS:  No, I can answer.

24           THE COURT:  Okay.  Thank you.

25           THE WITNESS:  It does state details about

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 61 of 426   PageID 14655
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 957

```
 1   the union, yes.

 2   BY MR. PRYOR:

 3   Q.   Details about union activity, true?

 4        Did you want to leave out the word "activity"

 5   for a reason?

 6   A.   No.

 7   Q.   Why did you leave it out of your answer?

 8        You repeated my question but you left that word

 9   out, as opposed to answering it directly.

10            MR. McKEEBY:  Objection, argumentative.

11            THE COURT:  I will allow it.

12            THE WITNESS:  I was just trying to be

13   brief in my explanation.

14   BY MR. PRYOR:

15   Q.   Then why did you leave it out?

16        Instead of just saying yes, you repeated my

17   question and left out a word, "activity."

18        And that was just an accident, okay?  Right?

19            MR. McKEEBY:  Objection.  This is legal

20   argument or some kind of argument.

21            THE COURT:  I will allow it.

22            THE WITNESS:  It was not intentional.

23   BY MR. PRYOR:

24   Q.   Okay.  Then let's try it again.

25        You knew, in reading this sentence, that it
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 62 of 426   PageID 14656
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 958

1  involved union activity, the complaint, true?

2  A.    Yes.

3  Q.    It says, "The messages contain two graphic

4  videos of an alleged aborted fetus and make

5  references to murder as well as political and

6  religious comments."

7        Is it correct to say that you knew by the time

8  you read the second paragraph that this complaint

9  involved political speech and religious activity.

10 True?

11 A.    I don't know about the activity.  It says

12 "religious comments."

13 Q.    So you don't think "religious comments"

14 involves religious activity?

15 A.    I'm just being specific is all.  Because you

16 asked me about activity last time.  I'm just trying

17 to be clear.

18 Q.    I'm asking you to interpret what you read.

19       Did you believe it involved religious activity

20 and political activity, given she's telling you it

21 is involving political and religious comments?

22          MR. McKEEBY:  Object to -- object to the

23 characterization of what the document says.

24          THE COURT:  I will sustain that.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 959

```
 1  BY MR. PRYOR:
 2  Q.   Do political and religious comments involve
 3  activity?  Or can you have comments without
 4  activity?
 5            MR. McKEEBY:  Objection, vague.
 6            THE COURT:  I will allow it.
 7            THE WITNESS:  I would take it for what it
 8  says, that it was political and religious comments.
 9  BY MR. PRYOR:
10  Q.   Okay.  So when it says comments, can you think
11  of any way to make a political comment or a
12  religious comment without that falling within the
13  definition -- you have got a college degree --
14  within the definition of "activity"?
15            MR. GREENFIELD:  Objection, relevance.
16            THE COURT:  I will allow it.
17            THE WITNESS:  Emails, like I said before,
18  can be misrepresented.  So I would take for what it
19  says specifically, religious comments.
20            MR. PRYOR:  Object to the responsiveness.
21  BY MR. PRYOR:
22  Q.   That it not the question I asked.
23  A.   I'm missing the question then.  I'm sorry.
24  Q.   I'm asking you to close your eyes to this
25  document, all you want.
```

1        The question is:  Tell us, is there any way to

2    interpret the phrase "political and religious

3    comments" in a way that it would not involve

4    activity?

5            MR. McKEEBY:  Objection, vague.

6    BY MR. GILLIAM:

7    Q.   In a vacuum.  Forget this complaint.

8        Any example in the entire world that you come

9    up with.  I can't wait to hear it.

10           THE COURT:  I will allow.

11           THE WITNESS:  I wouldn't relate the two.

12   I would take I can what it says.

13   BY MR. GILLIAM:

14   Q.   Of course, you wouldn't be able to; it involves

15   activity, true?

16           MR. McKEEBY:  Objection, argumentive.

17           Asked and answered.

18   BY MR. PRYOR:

19   Q.   Go ahead.

20   A.   It involves comments.

21           THE COURT:  Hold on.  What is your second

22   objection?

23           MR. PRYOR:  I don't remember.

24           THE COURT:  I think asked and answered, is

25   what you said?

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 65 of 426   PageID 14659
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 961

```
 1              MR. McKEEBY:  I think asked and answerer,
 2   but there was another.  That is the one I don't
 3   remember.
 4              THE COURT:  I will sustain on asked and
 5   answered.
 6              MR. McKEEBY:  Thank you.
 7              THE COURT:  Not on vague.
 8              MR. PRYOR:  What it is sustained on?
 9              THE COURT:  Asked and answered.
10              MR. PRYOR:  Did the Court have to come up
11   with the objection?  I mean, I'm fine either way.
12              THE COURT:  The realtime is down.  He said
13   it, but you were talking over him.  So I thought he
14   said asked and answered.
15              MR. PRYOR:  I'm sorry, your Honor.
16   BY MR. PRYOR:
17   Q.   All right.  Then it says, "I found the messages
18   to be incredibly disturbing and believe it to be a
19   violation of social media policy."
20        Do you see that?
21   A.   No.  It is below the screen.
22        There.
23   Q.   Hang on.
24        Do you see it now?
25   A.   Yes, I do.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 4 July 08, 2022                    Page 962

1           MR. PRYOR:  Okay.

2           THE STENOGRAPHER:  I have to restart.

3           THE COURT:  Hold on.  We are going to have

4    to restart the writer.

5           MR. PRYOR:  Let's look at 19.

6           THE COURT:  We can't.  We have to restart

7    the writer.  Can we take a quick break while we

8    restart?  I'm sorry to do our morning break early

9    twice, but we got to do it reboot.

10          Same instructions as always.  Only talk to

11   your fellow jurors and court personnel, don't talk

12   to anyone about the case, and don't do any research

13   about the case.

14          We will see you in 10 minutes at 10:00.

15          THE COURT SECURITY OFFICER:  All rise for

16   the jury.

17          (The jurors exited the courtroom.)

18          THE COURT:  And same for you, you can

19   leave the box but you can't talk to anyone about the

20   case, Mr. Schneider.

21          Any questions?  Issues that anyone wants

22   to talk about?

23          We are off the record.

24

25

1              (Recess.)

2              THE COURT SECURITY OFFICER:  All rise.

3              THE COURT:  Okay.  Anything else?

4              All right.  Let's get the jury.

5              I will say, we may try to do lunch on the

6    early side, not do another break but do lunch sort

7    of in the 11:30 to 11:45 range, if that makes sense.

8              I try to not stay on the record for more

9    than -- I mean, two hours is pushing it.  I try to

10   do less than that.  Does that make sense?

11             So whoever has got the mic at that time,

12   think through 11:30 to 11:45 as a break time.

13             MR. PRYOR:  I can't stand up that long.

14   That's great.

15             (The jurors entered the courtroom.)

16             MR. PRYOR:  I wish that was a joke.

17             THE COURT:  Okay.  You can be seated.

18             Mr. Pryor, you can continue.  We are back

19   on the record.  Thanks for bearing with us.

20   BY MR. PRYOR:

21   Q.   Mr. Schneider, when you do an investigation, is

22   evaluating the credibility of witnesses part of what

23   you do?

24   A.   No, not specifically their credibility.  You

25   mean as far as their standing with the company, or

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 68 of 426  PageID 14662
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 4 July 08, 2022                Page 964

```
 1  what part of that?  I don't quite understand.
 2  Q.   You don't consider credibility?
 3  A.   Can you explain what you mean by "credibility."
 4  Q.   No.
 5  A.   Okay.
 6  Q.   You don't know what credibility means?
 7  A.   Well, my understanding of credibility is their
 8  standing in the company.  Is that what you are -- or
 9  their overall in life?
10  Q.   Sir, when you interview a witness, do you
11  consider whether or not they are telling you the
12  truth or telling you a lie?
13  A.   Yes.
14  Q.   Okay.  Let's go with that definition of
15  credibility, okay?  Do you do that?
16  A.   Do I do that?  What is that?
17  Q.   When you are doing an investigation and you are
18  interviewing a witness, do you consider their
19  credibility?
20  A.   I do consider the fact whether they are telling
21  the truth.
22  Q.   What about if they are telling a lie, do you
23  consider that?
24  A.   Yes.  Truth or lies.
25  Q.   Okay.  But that is not what you view as
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 965

1  credibility.  I just want to make sure we don't use

2  the wrong term.

3  A.   If that's the definition for "credibility" you

4  want to use, then yes, I can use that.

5  Q.   I'm not giving you a definition of

6  "credibility," sir.  You have already given us one.

7       I'm just making sure that you don't consider

8  the credibility of witnesses the way you defined the

9  word "credibility."  True?

10           MR. McKEEBY:  Objection, asked and

11  answered.

12           THE COURT:  Sustained.

13  BY MR. PRYOR:

14  Q.   Let's look at Exhibit 19.

15       Have you ever seen this document before?

16  A.   I don't recall this document.

17  Q.   I will represent to you this is a President's

18  Message written and authored by Audrey Stone.

19       You know who that is, right?

20  A.   Yes.

21  Q.   Let's go to the next page.

22       She says, among other things, "In regard to the

23  social media policy, we have witnessed

24  inconsistencies around the way the policy is applied

25  and the often subjective stance that Southwest

```
 1   management has displayed in administering the
 2   policy."
 3        I'm going to skip down to the last paragraph on
 4   that page.
 5        It says, "On a personal note, however, please
 6   know that the social media issues management
 7   investigated, and the resulting discipline Southwest
 8   Airlines issues did not arise out of something
 9   management simply uncovered or stumbled upon.  They
10   are not generally monitoring our sites.
11        "Instead, these cases come about as our own
12   flight attendants are turning each other in.  These
13   latest investigations have been the result of flight
14   attendant complaints.
15        "I am asking that we please consider stopping
16   any back-and-forth fighting on social media.  We are
17   not always going to agree with one another, but
18   please recognize that your fellow employees are
19   entitled to their own thoughts and opinions.  If we
20   have a problem, let's work it out as the
21   professionals that we are.  Please respect one
22   another."
23        Would that be consistent with Ms. Stone filing
24   a complaint against another flight attendant using
25   the social media policy?
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 71 of 426  PageID 14665
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 967

1  A.   Are you asking me if that is what she did, or

2  is this --

3  Q.   No, I'm asking you to evaluate.  You now have

4  two pieces of evidence.  You are an investigator.

5  Tell us, is that consistent?

6  A.   She's asking employees to be nice to each other

7  and considerate.

8  Q.   I'm not asking you -- we all know what it said,

9  sir, and you obviously misstated what it said.

10     I'm asking you a question.  Is this document

11 consistent with filing a complaint against another

12 flight attendant under the social media policy?

13     You are the investigator.  Are those things

14 consistent?

15             MR. GREENFIELD:  Your Honor --

16             MR. McKEEBY:  Objection, argumentative,

17 vague.

18             THE COURT:  Hold on.

19             MR. GREENFIELD:  And argumentative, and

20 objection to the sidebars as well, your Honor.

21             THE COURT:  You've got to do one at a

22 time.

23             So please restate your objection.

24             MR. McKEEBY:  Objection, argumentative,

25 vague.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1              MR. GREENFIELD:  Argumentative, and the
 2   sidebars within his commentary.
 3              THE COURT:  I will sustain on the sidebar.
 4              Can you reask it?
 5              MR. PRYOR:  Sustain on who?
 6              THE COURT:  You had sidebar commentary in
 7   your question.  Can you go ahead and reask a plain
 8   question.
 9              MR. PRYOR:  Can I just say ignore the
10   sidebar?  It's hard for me not to sidebar.
11              Okay.  I will do better.
12   BY MR. PRYOR:
13   Q.   Sir, here comes the question.
14        Exhibit 19, which I just read to you where
15   Ms. Stone -- you know what we read.  And you know
16   that she has then filed a complaint against another
17   flight attendant under the social media policy.
18        Are those things consistent with one another or
19   inconsistent?
20   A.   I don't know the exact message she was trying
21   to portray in her memo here, but I would say the
22   egregiousness of a flight attendant turning
23   something in on social media would have something to
24   do with it.  I'm not sure that's what she was
25   referring to in her memo, though.
```

1  Q.   So I didn't hear the answer.  Is it consistent

2  or inconsistent?

3  A.   I cannot say that.

4  Q.   Okay.  Would you have -- in determining

5  credibility or truthfulness or falseness of a

6  witness during your investigation, would you have

7  considered this information if it had been given to

8  you?

9  A.   No.

10  Q.   Why not?

11  A.   It wasn't part of my investigation of what was

12  the crux of the investigation.

13  Q.   So you would not have considered evidence that

14  would have shown that a key witness was being

15  inconsistent, true?

16           MR. McKEEBY:  Objection --

17           MR. GREENFIELD:  Objection,

18  mischaracterizes.

19           THE COURT:  Sustained.

20  BY MR. PRYOR:

21  Q.   Would you have considered evidence that would

22  indicate one of the witnesses you are talking to

23  might not be telling you the whole truth?

24  A.   If I had information that proved that, that

25  would be good to have, yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 970

```
 1  Q.   Okay.

 2  A.   I'm not saying this does, though.

 3  Q.   As a matter of fact, you are saying this does

 4  not, true?

 5  A.   I'm saying that I don't know what her point was

 6  for sure that she was making here, and that the

 7  information that was given to me about social media

 8  and what was posted were probably not the same

 9  thing.

10  Q.   When she says, "Don't report each other for

11  social media violations," that's ambiguous to you?

12  A.   Does it specifically say that?

13           MR. McKEEBY:  Objection, mischaracterizes

14  the --

15           MR. PRYOR:  Well, I can read it again.

16           THE COURT:  I will allow it.

17  BY MR. PRYOR:

18  Q.   You don't think it says that?

19           THE COURT:  I will allow the question.

20  I'm overruling the objection.

21           MR. PRYOR:  I'm rephrasing the question

22  now.  I don't remember what it was.

23           THE COURT:  Sure.  You can ask it again.

24           MR. PRYOR:  You were apparently

25  considering an objection.  I didn't hear --
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 75 of 426  PageID 14669
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                 Vol 4 July 08, 2022                 Page 971

 1              THE COURT:  I overruled the objection.

 2              But at this point, I don't know that he

 3   knows the question.

 4              So you can ask the old question --

 5              MR. PRYOR:  Since either one of us know

 6   the question --

 7              THE COURT:  -- or a new question.  It is

 8   up to you.

 9   BY MR. PRYOR:

10   Q.   It says in Exhibit 19, "I'm asking that we

11   please consider stopping any back-and-forth fighting

12   over social media."

13        And she before that has said, "What's happening

14   is flight attendants are reporting each other."

15        And then she's saying, "Let's be professional.

16   Let's respect each other's opinions."

17        And that's not -- you don't interpret that as

18   her saying, Let's not report things under the social

19   media policy.  That thing is a mess.  You don't see

20   it that way?

21   A.   No.

22   Q.   You do not?

23   A.   I do not.

24   Q.   And how do you see it?

25   A.   My interpretation is that she's talking about

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 76 of 426   PageID 14670
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 972

1   the back and forth on social media.

2   Q.   Exactly.

3        What was this?  What was this complaint?

4   A.   This was turning in somebody for posting

5   something and sending specific Facebook messages to

6   her.

7   Q.   Wait.  What is the difference?

8   A.   My interpretation is that she's talking about

9   on social media itself where people comment back and

10  forth.

11  Q.   Okay.

12  A.   And they're possibly not being nice about it.

13  Q.   Okay.  How is that not this?

14  A.   Because this is something that she turned in

15  that somebody posted directly to her on a private

16  message.

17  Q.   That's your answer?

18  A.   Yes.

19  Q.   That's your distinction?

20  A.   Yes.

21  Q.   Okay.

22  A.   I'm saying that I can't say what she's

23  portraying here exactly, if it is the same thing, to

24  warrant if she was being honest or not.

25  Q.   Let's look back at Exhibit -- let me ask you

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 77 of 426   PageID 14671
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 973

1  something I asked earlier.  I want to clarify and

2  make sure I understood your answer.

3       When I asked you, were you aware that people in

4  the Union were reporting other people in the Union

5  for social media policy targeting recall petition

6  supporters at the same time as Ms. Stone brought

7  this complaint against Ms. Carter, you were not

8  aware of that?

9  A.   That was a long question, but I think I got the

10 gist of it.  No.

11 Q.   And if you had been aware of it, you would have

12 considered that in your evaluation of the witnesses

13 and the evidence, true?

14 A.   I can't say that.

15 Q.   Well, so you have got Ms. Stone -- you knew, by

16 the way, that Ms. Carter was a recall supporter?

17 A.   A recall supporter?  Of the --

18 Q.   Yes.

19 A.   Yes.  She gave me that information in the

20 meeting.

21 Q.   So you knew that Ms. Carter was a recall

22 supporter, and a social media complaint was being

23 brought against her by the president of the Union.

24      You knew that much, right?

25 A.   Yes.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 78 of 426  PageID 14672
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 974

1  Q.   Would it have been important to know that, in

2  fact, the Union also had a member bringing charges

3  against other recall supporters for violations of

4  social media policy?

5           MR. McKEEBY:  Objection, calls for --

6  BY MR. PRYOR:

7  Q.   Would you have wanted to know that in order to

8  determine credibility?

9           MR. McKEEBY:  Objection, foundation, calls

10  for speculation.

11           THE COURT:  I will sustain on foundation.

12  BY MR. PRYOR:

13  Q.   Would you have wanted to know --

14           MR. PRYOR:  I'm trying to understand the

15  foundation issue, so I'm trying to create the

16  foundation.

17  BY MR. PRYOR:

18  Q.   Would you have wanted to know that information

19  if there was this big conspiracy going on to target

20  recall petitioners using social media policy?

21           MR. McKEEBY:  Same objection as to

22  vagueness.

23           THE COURT:  I will sustain on foundation.

24           You've got to back up and set the

25  foundation first and then ask it.  I don't think

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 79 of 426   PageID 14673
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 975

 1  this is a topic we have covered yet enough to

 2  warrant the question.

 3  BY MR. PRYOR:

 4  Q.   I wish I understand and I wish I had heard you,

 5  so I'm going to try anyway.

 6       Sir, you understand Audrey Stone was bringing a

 7  social media policy violation against a fellow union

 8  member or objector and using social media policy

 9  when you received a copy of Exhibit 66, Ms. Stone's

10  complaint, true?

11  A.   Yes.

12  Q.   And if at that same time you became aware that,

13  in fact, that same union leadership that Ms. Stone

14  was involved with were bringing charges against

15  other recall petition supporters for social media

16  policy and that this was a plan, would you have

17  wanted to know that?

18  A.   That was not part of my investigation, and that

19  is not something that pertained to what I was

20  investigating.

21  Q.   So you would not have wanted to know that,

22  true?

23  A.   True.

24  Q.   Were you aware of that?

25            MR. McKEEBY:  Objection, asked and

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 80 of 426   PageID 14674
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 976

1  answered, I think.

2          THE COURT:  I will allow it.

3          THE WITNESS:  Was I aware of what?  The

4  fact that -- I don't understand the question.

5  BY MR. PRYOR:

6  Q.   Were you aware that charges were being filed

7  against other recall supporters for violations of

8  social media policy at the same time Ms. Carter was

9  charged?

10 A.   I was not aware of that.

11         MR. PRYOR:  Okay.  Let's look at 21-E.

12         MR. GREENFIELD:  Your Honor, if I may ask

13 to see this document.

14         THE COURT:  21-E is not in evidence yet.

15 We will keep the screen muted.

16         MR. PRYOR:  Oh, it may not be.  It is

17 getting ready to be.  I offered 21-E.

18         MR. GREENFIELD:  I just want to see what

19 you're talking about before --

20         THE COURT:  And I've got the jury screens

21 muted so you can bring up 21-E.

22         MR. GREENFIELD:  I don't know that I have

23 an objection.  I just want to see what you are

24 talking about, Mr. Pryor.  Thank you.

25         MR. PRYOR:  Don't put it to the jury yet.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 81 of 426   PageID 14675
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 977

```
 1               MR. HILL:  It's not.

 2               MR. PRYOR:  Okay.  I offer 21-E.

 3               THE COURT:  All right.  I will ask if

 4     there are objections other than the normal 21

 5     objections.

 6               MR. McKEEBY:  The normal 21 objections.

 7               MR. GREENFIELD:  Normal.

 8               THE COURT:  Okay.  So I will overrule the

 9     normal objections, let in 21-E with a limiting

10     instruction that it's for use in the claims against

11     the Union, not for use in the claims against in

12     Southwest.

13               We can publish.

14               (The referred-to document was admitted

15          into evidence as Plaintiff's Exhibit 21-E.)

16     BY MR. PRYOR:

17     Q.   Let's look at 21-E.

18               MR. GREENFIELD:  Your Honor, if I may make

19     another objection at sidebar then.

20               THE COURT:  Okay.  We need to mute it

21     then.

22               (Thereupon, the following proceedings were

23          had at sidebar:)

24               MR. GREENFIELD:  Your Honor, if this

25     document is only being used for evidence against the
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 82 of 426   PageID 14676
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 978

1   Union, then how it affected Mr. Schneider's decision

2   to terminate then makes this line of questioning

3   irrelevant.

4            THE COURT:  So you've got an objection to

5   the question, not to the exhibit.

6            MR. GREENFIELD:  To the -- well, no.  To

7   the exhibit now based on this use.  It is being

8   presented in a different use case.

9            The limiting instruction that you just

10  gave to the jury is that this evidence is not to be

11  used against Southwest, right?  So that is what this

12  document is going to be used against, that he

13  believed this conspiracy existed.

14           MR. PRYOR:  First of all, it goes to

15  credibility.  He just said he wasn't aware of

16  anything like that.  He wasn't aware of other

17  complaints about social media policy.

18           He's on the email that shows there are 12

19  people, that charges are being served against them

20  for violations of social media policy.

21           MR. GREENFIELD:  I don't believe that was

22  his testimony.

23           THE COURT:  So I will let you ask it.

24           I think what I'm chiefly concerned about,

25  it can't be used in the claims against Southwest,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 979

 1  right?  And we can't have Southwest discipline
 2  coming into the case.  So this is early enough to
 3  where I will let it in, but again, you can --
 4          MR. PRYOR:  I have, from the first day of
 5  trial, I still feel bad because I think I stepped on
 6  a limine.  And you ruled and you limited and I
 7  appreciate it.  I have not violated it since and I
 8  won't here.  I understand the ruling.
 9          THE COURT:  Okay.  I will let you do it.
10          (Thereupon, the sidebar was concluded and
11      the following proceedings were held in open
12      court:)
13          THE COURT:  I have admitted 21-E, and you
14  can proceed with your questions.
15  BY MR. PRYOR:
16  Q.   Who is Julie O'Grady?
17  A.   She's a senior investigator for employee
18  relations.
19  Q.   Okay.  And do you see your name on this email?
20  A.   Yes.
21  Q.   It says, "After reviewing the attached
22  information, below it are the names of flight
23  attendants, the time and date of comments in 2014,
24  and the comment they made on social media that could
25  be perceived as retaliatory."

1        Do you see that?

2  A.    Yes.

3  Q.    You received this on February 27th while you

4  were doing your investigation of Ms. Carter.  True?

5  A.    Yes.

6  Q.    And did you become aware that this was

7  information supplied by Brian Talburt, a supporter

8  of Ms. Stone?

9  A.    No.

10 Q.    Are you sure of that?

11 A.    Was I aware of --

12 Q.    Yes.  You don't recall being on an email where

13 they said this was -- Brian Talburt is bringing all

14 this -- gathering all this -- scouring the Internet

15 for this information?

16 A.    I don't recall at this time that that was

17 something I was aware of.

18 Q.    At what time do you recall it?

19        You said, "I don't recall at this time."  I

20 don't know what that means other than there must be

21 some other time that you do recall it.

22 A.    I don't recall being aware of this.

23 Q.    What did you mean by "at this time"?

24 A.    Right now, today.

25 Q.    Why did you feel the need to clarify that?

1      Were you concerned there is a document that

2   would show something else?

3   A.   I don't understand that questioning.

4   Q.   What do you not understand?

5      I'm testing the credibility of your answer

6   because I don't believe it.  If you are asking me a

7   question.

8            MR. McKEEBY:  Objection to the argument --

9            MR. PRYOR:  He asked me.

10           MR. GREENFIELD:  Objection --

11           THE COURT:  Hold on.  We can't talk over

12   each other.

13           What's the objection again?

14           MR. McKEEBY:  Argumentative.

15           MR. GREENFIELD:  And objection to the

16   continued use of sidebars.

17           THE COURT:  I will sustain on both bases.

18   BY MR. PRYOR:

19   Q.   If you look at Exhibit 21-E, it refers to

20   Jeanna Jackson and potential social media policy

21   violations by Jeanna Jackson.

22      Do you see that?

23   A.   No, sir.  It must be below -- it must be below

24   the screen.

25   Q.   I can give you a hard copy or something.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 982

```
 1  A.    Okay.
 2  Q.    If we need to blow that up for you, let me
 3  know.
 4  A.    I'm good.
 5  Q.    Do you see it now?
 6  A.    Yes.  I see the name Jeanna Jackson.
 7  Q.    Do you see that charges are being brought as to
 8  Jeanna Jackson for potential violation of social
 9  media policy, true?
10  A.    Yes.
11  Q.    Do you know who Jeanna Jackson is?
12  A.    I've heard of her.
13  Q.    Tell us what you've heard.
14  A.    She's a Dallas-based flight attendant.
15  Q.    That's all you know, right?
16  A.    Yes.
17  Q.    You don't know that she was the leader of the
18  recall petition against Ms. Stone and her
19  administration?
20  A.    I may have found that out during the
21  investigation.
22  Q.    Okay.  You may have.  Did you or didn't you?
23  A.    I remember the name and being associated with
24  the recall.
25  Q.    So you received an email telling you that
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 87 of 426   PageID 14681
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 983

1    charges are being brought against Jeanna Jackson for

2    potential violation of social media policy.  Who did

3    you think was bringing those charges?

4              MR. McKEEBY:  Objection, mischaracterizes.

5    There is nothing about charges in this document.

6              THE COURT:  I will allow you to rephrase

7    "charges" and ask the same question.

8              MR. PRYOR:  Am I rephrasing?

9              THE COURT:  Yes.

10             MR. PRYOR:  Okay.

11   BY MR. PRYOR:

12   Q.   Sir, is it correct that you were aware, during

13   the time you were investigating claims against

14   Ms. Carter for social media policy by the president

15   of the Union, that Jeanna Jackson was also being

16   investigated for potential social media policy

17   violations?  True?

18   A.   Yes.

19   Q.   Who brought those complaints?

20   A.   I'm not aware.

21   Q.   Did you ever become aware?

22   A.   I don't recall that.

23   Q.   Well, if you had become aware, wouldn't you

24   have included that in your investigation?

25   A.   This was not part of my investigation and I

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 984

```
 1   didn't include it.
 2   Q.   So you were aware that -- you knew she was a
 3   recall petition supporter?  Did you know that?
 4   A.   Who is "she"?
 5   Q.   Jeanna Jackson.
 6   A.   Yes.  I found out in my investigation.
 7   Q.   Okay.  What about these others?  Did you find
 8   out, in fact, every single one of them is a recall
 9   supporter?
10   A.   I don't see the others.
11   Q.   Well, let's show you the rest of them.
12          MR. GREENFIELD:  Objection, lack of
13   foundation to his testimony about who these
14   individuals are.  There is nothing being presented
15   to the Court on that.
16          THE COURT:  I will allow you to ask.
17   BY MR. PRYOR:
18   Q.   How about Beverly Belanger?  Do you know she's
19   a recall supporter?
20   A.   No.
21          MR. GREENFIELD:  Objection, your Honor.
22   He's offering --
23   BY MR. PRYOR:
24   Q.   Did you inquire?
25          MR. GREENFIELD:  Excuse me.
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 89 of 426  PageID 14683
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 985

1          Objection, your Honor.  He's offering

2  testimony that has not been presented to the Court.

3          THE COURT:  Well, lawyers can't offer

4  testimony, so I'll tell the witnesses [sic],

5  everything you hear out a lawyer's mouth is not

6  testimony, it is not evidence.

7          You can ask your question.

8          MR. PRYOR:  Okay.  I just want to see, was

9  the objection that there's no foundation that these

10 are recall petition supporters?

11          THE COURT:  There has been testimony on

12 who the recall supporters have been in this case.

13          You can ask if he knows if someone is a

14 recall supporter.

15 BY MR. PRYOR:

16 Q.   Do you know whether or not Michelle Foley was a

17 recall petition supporter?

18 A.   No.

19 Q.   What about Charlene Bates Carter?

20 A.   Through this investigation.

21 Q.   Do you know whether or not Charlene Bates

22 Carter was a recall petition supporter?

23 A.   Yes.

24 Q.   So you know, at a minimum, two people on this

25 list that are recall petition supporters, and social

1  media policy violations are being investigated,

2  true?

3  A.    Yes.

4  Q.    What about Greg Hofer?  Do you know if he's a

5  recall petition supporter?

6  A.    No.

7  Q.    You don't know?

8  A.    I don't know.

9  Q.    And by the way, did you ask?

10 A.    No.

11 Q.    Why were you included on this email, I wonder?

12        MR. McKEEBY:  Objection.  Is that a

13 question?

14        MR. PRYOR:  Yes.  It's just another way to

15 ask a question, yes.

16        THE COURT:  I will allow it.

17        MR. GREENFIELD:  Well, then I would object

18 to the lack of foundation, and it calls for

19 speculation because if he didn't send it, he

20 wouldn't know why.

21        THE COURT:  Overrule on foundation.

22        As to speculation, you can only answer if

23 you have personal knowledge.

24        THE WITNESS:  I don't have personal

25 knowledge of this.

 1  BY MR. PRYOR:

 2  Q.   Do you have any understanding from your 28

 3  years of experience with Southwest Airlines why you

 4  would be included on this email?

 5  A.   Only that Charlene Bates at the time was

 6  Denver-based.

 7  Q.   So someone wanted you to be aware of this

 8  knowing that you were investigating Charlene Carter,

 9  true?

10              MR. McKEEBY:  Objection, foundation.

11              MR. PRYOR:  It's what his answer was.  Now

12  I'm --

13              THE COURT:  I will allow the question.

14              MR. GREENFIELD:  Then I would object to

15  speculation because it is now asking what he knew in

16  that regard or why he was -- again, why he was --

17              THE COURT:  Hold on.  That's a speaking

18  objection.

19              I will overrule the objection and only

20  allow him to answer if he has personal knowledge.

21              THE WITNESS:  I don't have personal

22  knowledge as to why.

23  BY MR. PRYOR:

24  Q.   Okay.  Let's go back to my question.

25       From your 28 years of experience, do you have

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

 1  any understanding as to why it would be that you

 2  were included on this email?

 3       You know how the structure works at Southwest

 4  Airlines.

 5       This isn't your investigation, is it?  No one

 6  asked you to investigate these people, did they?

 7            MR. GREENFIELD:  Objection, compound

 8  question.  Multiple questions.

 9            MR. McKEEBY:  And objection, asked and

10  answered.

11            THE COURT:  Okay.  Sustained.

12            Break it up, and we will see if there is

13  another objection.

14  BY MR. PRYOR:

15  Q.   Did anyone ask you to do the investigation of

16  the persons listed in this email?

17  A.   Only the one that was assigned to my base in

18  Denver.

19  Q.   Well, what was assigned to you, Ms. Carter?

20  A.   Yes.

21  Q.   And if you look at the page where Ms. Carter is

22  listed, it says, "Charlene Bates Carter, Jeanna

23  Jackson, I agree.  We need to expose each and every

24  one of them to their hypocrisy and nastiness."

25       That's what you were asked to investigate?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

| 3:17-cv-02278-X | Vol 4 July 08, 2022 | Page 989 |
|---|---|---|

```
 1  A.    Those comments, yes.
 2  Q.    You were asked to investigate those comments?
 3  A.    Not me particularly.  It was sent to me, but I
 4  have people in my base that do that.
 5        But, yes, those comments are what they are
 6  referring to in the message of the email.
 7  Q.    What did you do in regard to investigating
 8  those comments?
 9        By the way, were those comments sent to Audrey
10  Stone?
11  A.    I don't know that.
12  Q.    So you, therefore, must have gathered
13  information about these comments, since you viewed
14  this email as saying you are to investigate this,
15  right?
16  A.    At the time this happened, I had somebody else
17  on my team handle this.
18  Q.    Okay.  So who did you have investigate -- by
19  the way, this is not a complaint by Audrey Stone,
20  true?
21  A.    I don't recall it being from Audrey Stone.
22  Q.    Well, do you see anything in this email, have
23  you ever seen anything saying that Audrey Stone was
24  bringing this specific complaint against Ms. Carter?
25  A.    I can only see one portion of this, so I don't
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 94 of 426   PageID 14688
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                    Page 990

1  know.

2  Q.    What do you want to see?

3              MR. PRYOR:  Give me the exhibit.  I will

4  give him the whole thing.  It's in the boxes.

5  BY MR. PRYOR:

6  Q.   So did you -- I assume, since you were told to

7  investigate this complaint, we are going to see when

8  you interviewed Ms. Carter, you asked her about

9  these specific comments in this email, because how

10 else could you investigate it, right?

11 A.   I don't recall that part of it.

12 Q.   Sir, let me hand you --

13             MR. PRYOR:  May I approach?

14             THE COURT:  You may.

15 BY MR. PRYOR:

16 Q.   I'm going to hand you Exhibit 21-E.

17       Because you were to investigate the comments on

18 the second page that Ms. Carter's -- that are

19 attributed to Ms. Carter.

20       If you were asked to investigate that, when you

21 interviewed Ms. Carter, you certainly would have

22 asked her about those comments, true?

23             MR. McKEEBY:  Objection, mischaracterizes.

24 Objection, compound.

25             MR. GREENFIELD:  And objection on our end,

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 95 of 426  PageID 14689
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 991

 1  vague.  We don't know which investigation he's

 2  talking about at this point or which --

 3            THE COURT:  Hold on.  That is speaking.

 4  Sustained.

 5            Can you break it up, clarify it?

 6            MR. PRYOR:  What was the --

 7            THE COURT:  Compound and vague is what I

 8  sustained on.

 9            MR. PRYOR:  Okay.  I will break it up.

10  BY MR. PRYOR:

11  Q.   You have told us that you were on this email

12  because you were tasked with investigating these

13  comments regarding Ms. Carter -- that are attributed

14  to Ms. Carter, true?

15  A.   Yes.

16  Q.   Okay.  So, therefore, when you interviewed

17  Ms. Carter as part of your investigation, you asked

18  her about these comments, true?

19            MR. McKEEBY:  Objection.

20            MR. GREENFIELD:  Objection, your Honor,

21  vague.  Which investigation are we referring to?

22            THE COURT:  I will allow it.

23            THE WITNESS:  These were two separate

24  investigations.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 992

```
 1  BY MR. PRYOR:
 2  Q.   Okay.  And you didn't do the separate
 3  investigation?
 4  A.   I don't remember.
 5  Q.   Who did the separate investigation?
 6  A.   I don't remember.  That was five years ago.
 7  Q.   Well, a lot of things were five years ago.
 8       Did you assign this to someone?
 9  A.   Most likely, yes.
10  Q.   You have no recollection of doing that?
11  A.   I don't at this ---
12  Q.   Do you know that Ms. Carter was never
13  interviewed about this?
14  A.   I don't know that.
15  Q.   Well, you assigned it to someone to
16  investigate.  How can they investigate it without
17  interviewing Ms. Carter?
18  A.   There is not a time frame on this.
19  Q.   So maybe she will get a notice in a week or so
20  from now?
21          MR. McKEEBY:  Objection, argumentative.
22          THE COURT:  Sustained.
23  BY MR. PRYOR:
24  Q.   There is no time frame?
25          MR. McKEEBY:  Objection.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 993

1            THE COURT:  He asked if there is no time

2    frame.  What's your objection?

3            MR. McKEEBY:  I was objecting to the first

4    question.  I don't understand the second one.

5            THE COURT:  I sustained that.

6            So the second question is:  There is no

7    time frame.  You can answer.

8    BY MR. PRYOR:

9    Q.   So the time frame is still running; it could

10   happen at any time, right?

11   A.   Ms. Carter doesn't work for the company

12   anymore.

13   Q.   Well, so up until the time she was terminated,

14   they could have investigated this claim?

15   A.   Yes.

16   Q.   And do you know that, in fact, it never

17   occurred?

18   A.   I don't know that.

19   Q.   So you were tasked with doing this, and you

20   didn't take that task seriously enough to find out

21   if it was done?

22   A.   Not in the time frame before she was

23   terminated.

24   Q.   So you thought that since you terminated her,

25   that you didn't have to worry about this one

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 98 of 426   PageID 14692
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 994

1  anymore, true?

2  A.   It may have been worked on, I don't know.  I

3  don't remember.

4  Q.   You don't remember who you assigned it to.  You

5  think that it wasn't investigated because you fired

6  her before this investigation would be completed?

7          MR. McKEEBY:  Objection, mischaracterizes

8  testimony.

9          THE COURT:  I will allow it.

10  BY MR. PRYOR:

11  Q.   You can answer.

12  A.   I don't remember the details of this.

13  Q.   Well, you remember the detail that you were

14  assigned the investigation of this claim.

15      By the way, where in this email does it say you

16  were assigned this investigation?

17  A.   It states that it was sent to me.

18  Q.   I understand.  It was sent to a lot of people.

19      Where does it say, Oh, by the way, Ed, you are

20  the one that needs to investigate Ms. Carter?  It

21  doesn't say that, does it?

22  A.   Not specifically.

23  Q.   What does it generally say then?

24  A.   It says my name on the "to" for the email.

25  Q.   So you are supposed to know from that that you

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 995

1  are the one that is supposed to investigate this?

2  A.   Farther down it says, "Please work with labor

3  relations and your HR business partner."

4       So I would assume by this email that they mean

5  my team look into this.

6  Q.   All right.  Let's go back to Exhibit 66.

7       Ms. Stone is saying, "I find the messages to be

8  incredibly disturbing and to be a violation of the

9  social media policy."  Right?

10  A.   Yes, that's what it says.

11  Q.   "I find it obscene and violent as well as

12  threatening in nature."  Correct?

13  A.   Yes.  That's what it says.

14  Q.   Then it says, "I also believe it is a violation

15  of the workplace bullying and hazing policy under

16  cyberbullying."  Right?

17  A.   Yes.

18  Q.   And tell me where the cyberbullying policy is.

19  Is there one?

20  A.   The workplace bullying and hazing policy refers

21  to cyberbullying.

22  Q.   Workplace bullying is cyberbullying?  Yes?

23  A.   Cyberbullying could be workplace bullying and

24  hazing policy.

25  Q.   Let's look at the -- let's look at that

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 100 of 426   PageID 14694
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 996

1  cyberbullying policy.

2       Let me figure out which exhibit it is.

3            MR. HILL:  15.

4            MR. PRYOR:  Someone says 15.

5            MR. HILL:  13?

6            MR. PRYOR:  Whichever one it is.

7            THE COURT:  It is not in yet.

8            MR. GREENFIELD:  Can we mute the jury?

9            MR. PRYOR:  Is it in evidence?

10           THE COURT:  No.

11           MR. PRYOR:  We offer Exhibit 13.

12           THE COURT:  13.  Objections to 13?

13           MR. McKEEBY:  No objection.

14           MR. GREENFIELD:  No objection.

15           THE COURT:  Okay.  13 is in.  We will

16  unmute it for the jury to see.

17           (The referred-to document was admitted

18       into evidence as Plaintiff's Exhibit 13.)

19           MR. PRYOR:  Let's blow that up a little

20  bit.

21  BY MR. PRYOR:

22  Q.   Can you see it, sir?

23  A.   I do, yes.

24  Q.   Okay.  Show me where the cyberbullying is so we

25  can talk about that.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 997

 1         You told us it's in here.  Just point to it for
 2  me.
 3  A.   This may not be the latest version of it.
 4  Q.   I'm sorry?
 5  A.   This may not be the latest version of it.
 6  Q.   Well, sir, you see April 16, 2015?  This was
 7  the policy in place at the time you investigated
 8  Ms. Carter.  You don't know that?
 9              MR. McKEEBY:  Objection, foundation.
10              THE COURT:  Sustained.
11              You've got to ask him.
12  BY MR. PRYOR:
13  Q.   You think there is another version of this?
14  A.   I don't know.  I know that cyberbullying was
15  part of our workplace bullying and hazing policy.
16  Q.   Okay.  So this is what we asked Southwest
17  Airlines.  Give us your policy.  This is what they
18  gave us.
19              MR. GREENFIELD:  Objection --
20  BY MR. PRYOR:
21  Q.   You are telling us there is something else.
22              MR. GREENFIELD:  Objection, your Honor,
23  testimony, and it's talking about --
24              THE COURT:  Sustained.
25

 1  BY MR. PRYOR:

 2  Q.   So at least as to this, there is nothing in

 3  here about cyberbullying, correct?

 4  A.   I haven't read the whole thing.

 5  Q.   Read it.

 6  A.   I don't see it specifically listed in this one.

 7  Q.   But it's your sworn testimony there was a

 8  workplace bullying cyber -- what did you call it,

 9  cyber --

10  A.   What it referred to in the other letter.

11  Q.   Cyberbullying policy that you considered in

12  terminating Ms. Carter, true?

13  A.   Not a cyberbullying policy.

14  Q.   Oh.  A cyberbullying non-policy.  Is that what

15  you considered?

16  A.   No.

17  Q.   What did you consider?

18  A.   I considered the totality of the workplace

19  bullying and hazing policy.

20  Q.   Did you look at and consider a written

21  cyberbullying policy in deciding to terminate

22  Ms. Carter, as you have already testified, or does

23  this change your opinion?

24  A.   I don't know of a cyberbullying policy.  I know

25  cyberbullying was referred to.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 999

 1  Q.   You just told us a few minutes ago that she

 2  violated a cyberbullying policy, and I said, Where

 3  is it?

 4       And you said, It's in the workplace bullying

 5  policy.

 6       And it is not there, right, at least not this

 7  document, true?

 8  A.   True.

 9  Q.   Okay.  So are you standing by your testimony

10  that you absolutely did consider a written

11  cyberbullying policy in regard to terminating

12  Ms. Carter, as you initially testified?

13  A.   When you refer to "cyberbullying policy," I'm

14  only talking about the workplace bullying and hazing

15  policy which contained a cyberbullying --

16  Q.   Okay.  Great.  Tell us once again, then, where

17  it is.  It's right here in front of you.  Where is

18  it?

19  A.   It's not on this page.

20  Q.   But you are telling us there is one.  You are

21  certain because you considered it in terminating

22  Ms. Carter, true?

23  A.   I considered the totality of the workplace

24  bullying and hazing.

25  Q.   Did you consider the written cyberbullying

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1000

1  policy contained within the workplace bullying and
2  hazing policy that you've told us about?
3  A.    No.
4  Q.    Is there one?
5  A.    I stated that there is not a cyberbullying
6  policy.  I have stated that the workplace bullying
7  and hazing policy had a comment about cyberbullying
8  in it.
9  Q.    Okay.  But this one doesn't?
10 A.    Correct.
11 Q.    And when you terminated Ms. Carter, you were
12 looking at a workplace bullying policy that included
13 a comment about cyberbullying, true?
14 A.    No, I don't know that for sure.  I don't
15 remember.  Because what you are saying is that the
16 previous letter that was up referred to
17 cyberbullying, and I wasn't aware of that.
18 Q.    Sir, I'm just asking you to pick a story and we
19 can talk about it.  Which one are you going with?
20          MR. McKEEBY:  Objection, argumentative.
21 Sidebar.
22          THE COURT:  Sustained.
23          MR. PRYOR:  He's told several stories.
24 I'm entitled to call him on it.
25          THE COURT:  You can ask.  Just rephrase

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                   Vol 4 July 08, 2022                   Page 1001

```
 1  it.
 2  BY MR. PRYOR:
 3  Q.   All right.  So we can agree that this phantom
 4  cyberbullying policy is not in this document, right?
 5           MR. McKEEBY:  Objection to the sidebar
 6  about the phantom policy.
 7           MR. PRYOR:  It wasn't sidebar, it was
 8  sarcasm, and I'm allowed.
 9           THE COURT:  I will allow this question.
10  BY MR. PRYOR:
11  Q.   You can answer.  It's not in here, is it?
12  A.   The cyberbullying statement is not in here,
13  correct.
14  Q.   But while we are here, though, let's see what
15  is here.
16       It says "workplace bullying."  Do you see that?
17  A.   Yes.
18  Q.   The policy is not bullying, the policy is
19  workplace bullying.
20       Let me give you an example.  Two flight
21  attendants.  You got my example so far?
22  A.   Yes.
23  Q.   They go to Cabo on vacation.  I'm making this
24  up as I go.  They go to Cabo on vacation.
25       One of them is walking down an aisle and the
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1002

1  other one is coming towards them in an aisle, and
2  one of the flight attendants refuses to get out of
3  the way.
4       You got the example so far?
5  A.   Yes.
6  Q.   The flight attendant that can't get around that
7  flight attendant files a complaint with Southwest
8  Airlines because it violates the workplace bullying
9  policy.
10      Does it?
11            MR. McKEEBY:  Object to the incomplete
12 hypothetical.
13            THE COURT:  I will allow him to answer to
14 the extent he can.
15 BY MR. PRYOR:
16 Q.   Do you have to look at the policy to see if
17 that violates it?
18      Go ahead.  You can answer.
19 A.   I'm not sure on that one.  I would have to have
20 more details on it.
21 Q.   I have given you every detail you need, sir.
22      First of all, let's start with the basic.  They
23 are on vacation in Cabo.  Are they at the workplace?
24            MR. McKEEBY:  Objection, incomplete
25 hypothetical.  I don't know if we are talking about

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 1003

1   a plane or on the beach.  Objection.

2           MR. PRYOR:  I just said they were in a

3   hallway.

4           These objections to try and protect the

5   witness's lying is inappropriate.

6           THE COURT:  Hold on, Counsel.

7           I will strike that.

8           MR. PRYOR:  It's absolutely --

9           THE COURT:  I will strike that.

10          Okay.  Ask the question again.  Complete

11  the hypothetical.

12  BY MR. PRYOR:

13  Q.   Did I make it clear to you, sir, that they were

14  not at work in my example?

15  A.   You didn't state that.  So now I know, yes.

16  Q.   A hallway on vacation in Cabo is work?

17  A.   I don't know which hallway you are talking

18  about.

19  Q.   Okay.  All right.  It's the Hilton.

20  A.   Okay.

21  Q.   You got it?

22  A.   Yes.

23  Q.   Is that clear enough for you?

24       Can you answer my question now?

25  A.   State the question one more time.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 108 of 426   PageID 14702
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1004

1   Q.   Flight attendants are walking down an aisle

2   towards each other at the Hilton.  One of them

3   refuses to get out of the way of the other one.

4        The other person then files a complaint with

5   Southwest Airlines.

6        Would that violate the workplace bullying

7   policy?

8   A.   One of the statements in here is "blocking

9   one's path," and so that would be considered as

10  possibly violating the workplace bullying hazing

11  policy.

12  Q.   So that would violate Southwest policy even

13  though it is not in the workplace.

14  A.   We would have to investigate it to know if it

15  violated.

16  Q.   What?

17  A.   We would have to investigate it to see if it

18  violated or not on that.  To be specific.

19  Q.   I will try it another way.

20       Does the workplace bullying policy require it

21  to involve the workplace, as stated in the title?

22  A.   I would assume it would have to refer to the

23  workplace or something to take place that has to do

24  with work.

25  Q.   If you assume it has to take place in the

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 109 of 426   PageID 14703
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1005

1  workplace, what was your problem with saying, no,

2  the policy wouldn't apply to the flight attendants

3  in Cabo?

4  A.   I don't know your question on that one.

5  Q.   You didn't understand, even though I repeated

6  it over and over.

7       So, by the way, knowing whether or not it is in

8  the workplace is important, isn't it?  Because it's

9  a workplace bullying policy, right?  So that's

10 important?  It's right there in the title.  Yeah?

11      You can say yes.

12 A.   I would have to investigate to know the

13 specifics on it.  Yes, it does say "workplace" on

14 it, to answer your question.

15 Q.   Is it important to determine a workplace

16 bullying violation to determine whether or not the

17 violation took place in the workplace?

18 A.   It would have to do with work, yes.

19 Q.   No, not work, workplace.  There is a

20 difference.

21      Would it have to involve the workplace as

22 stated in the policy?

23           MR. McKEEBY:  Objection, argumentative.

24           THE COURT:  I will allow it.

25           THE WITNESS:  As stated here, it does,

```
 1  yes.
 2  BY MR. PRYOR:
 3  Q.   And, in fact, this is the policy that you
 4  terminated Ms. Carter for, and you told us you
 5  didn't even ask if it occurred in the workplace and
 6  you didn't care.  It didn't matter to you, right?
 7            MR. McKEEBY:  Objection, compound.
 8            THE COURT:  Sustained.
 9  BY MR. PRYOR:
10  Q.   You didn't even ask Ms. Carter because it
11  didn't matter to you if the activity took place in
12  the workplace?  True?
13            MR. McKEEBY:  Objection, compound.
14            THE COURT:  I will overrule that one.
15  BY MR. PRYOR:
16  Q.   You testified to it earlier, sir.  What are you
17  going to do?
18  A.   If it has to do between --
19            MR. GREENFIELD:  Objection, your Honor, to
20  the continued sidebar.
21  BY MR. PRYOR:
22  Q.   It has to do with what?
23            THE COURT:  I will allow you to answer the
24  question.
25
```

 1  BY MR. PRYOR:

 2  Q.   It has to do with what?

 3  A.   If it has to do with the workplace, yes.

 4  Q.   That wasn't my question.  Of course it has to

 5  do with the workplace.

 6       You didn't determine whether or not Ms. Carter

 7  was even at the workplace.

 8  A.   I did not.

 9  Q.   And it's crucial to firing someone for

10  violating the workplace bullying policy that you

11  fired her for violating the workplace bullying

12  policy, true?

13            MR. McKEEBY:  Objection, he's testifying,

14  argumentative.

15            THE COURT:  I will allow it.

16            THE WITNESS:  I fired her for violation of

17  the workplace hazing and bullying policy, yes.

18  BY MR. PRYOR:

19  Q.   Now I have another question for you.  I wish I

20  could remember it.

21       All right.  I remember what it was.

22       You went through a couple of drafts of the

23  termination letter for Ms. Carter, didn't you?

24  A.   I believe so, yes.

25  Q.   Yes.  And you were running it by those same

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 112 of 426   PageID 14706
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1008

1  people that were investigating all of the other

2  recall petition people, didn't you?

3  A.   Which people are you referring to?

4  Q.   Some of the people on this Exhibit 21.  It's

5  sitting in front of you.

6            MR. GREENFIELD:  Objection, your Honor,

7  lack of foundation, and calls for --

8  BY MR. PRYOR:

9  Q.   You sent it to --

10           MR. GREENFIELD:  Excuse me.

11           THE COURT:  Hold on.  I've got an

12  objection.

13           MR. GREENFIELD:  Objection, your Honor,

14  lack of foundation, and then calls for speculation.

15           THE COURT:  I will let you back up and set

16  the foundation.

17           MR. PRYOR:  Okay.  Ask again?

18           THE COURT:  Yes.

19           MR. PRYOR:  Fix it?

20  BY MR. PRYOR:

21  Q.   Sir, did you send drafts of the termination

22  letter of Ms. Carter to anyone on Exhibit 21-E?

23       And I will specifically refer you to Maureen

24  Emlet.

25  A.   Yes.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 113 of 426   PageID 14707
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1009

 1  Q.   You did send it to her, right?

 2  A.   Yes.

 3  Q.   And when you sent it to her, you guys were

 4  trying to figure out to get Ms. Carter, and you took

 5  out the word "workplace" from "bullying," didn't

 6  you?

 7  A.   I don't recall.

 8  Q.   You wouldn't do that, would you?

 9  A.   Not intentionally, no.

10  Q.   It just so happens that in your draft you took

11  out the word "workplace."  That's just an accident,

12  right?

13  A.   I don't remember when I made that that I

14  intentionally took it out for any reason.

15  Q.   Who told you you wouldn't get away with that

16  and made you put it back in?

17          MR. McKEEBY:  Objection, foundation,

18  speculation.

19  BY MR. PRYOR:

20  Q.   Anyone?

21          THE COURT:  Hold on.  There is an

22  objection.  I've got to rule on it.

23          I will overrule.

24          He can answer if he has personal

25  knowledge.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 114 of 426   PageID 14708
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1010

```
 1            THE WITNESS:  Restate the question.
 2   BY MR. PRYOR:
 3   Q.   Yes.
 4        Who told you, you are not going to get away
 5   with taking out the word "workplace," you have got
 6   to put it back in?
 7   A.   Nobody.
 8   Q.   So it's your testimony, if such an error
 9   occurred -- we will look at some documents in a
10   bit -- if such an error occurred, you are the one
11   that fixed it, right?
12   A.   I don't recognize that there was an error.  The
13   first draft was simply something that needed to be
14   proofread.
15   Q.   Let's go back to Exhibit 66.
16        Let's see if I can figure out where I was.
17        Oh.  Let's go to the fourth paragraph.  "While
18   I hold a current position."
19        "While I hold a current position within my
20   union."
21        So once again, you are being told this involves
22   the Union, true?
23            MR. McKEEBY:  Objection, the document
24   speaks for itself.
25            MR. PRYOR:  He received it and interpreted
```

```
 1   it.
 2              THE COURT:  I will allow him to answer.
 3              THE WITNESS:  It states that she holds a
 4   current position in the Union, yes.
 5   BY MR. PRYOR:
 6   Q.   And did you need someone to tell you what that
 7   position was?
 8   A.   For Audrey, no.
 9   Q.   What was her position?
10   A.   President of TWU Local 556.
11   Q.   So you knew that, right?
12   A.   Yes.
13   Q.   She goes on to talk about repeated personal
14   attacks and threats made both via social media and
15   face-to-face.
16        You know from your interview that's not
17   referring to Charlene Carter, true?
18   A.   I don't know that.
19   Q.   I'm sorry?
20   A.   I don't know that.
21   Q.   You don't what?
22   A.   I don't know that.
23   Q.   After you interviewed her, did you find out
24   that she's talking about other purported flight
25   attendants doing that, not Charlene Carter?
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 116 of 426   PageID 14710
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1012

1  Charlene Carter didn't face-to-face with her, true?
2  A.   But it says "made via social media as well as
3  altercations face-to-face."
4  Q.   I wasn't talking about that.  I'm asking about
5  the face-to-face now.  Did you think I was asking
6  about the others?
7       I said there was no face-to-face.  So you don't
8  answer that, you point to something else.  Why would
9  you do that, sir, if you are not trying to be
10 evasive?
11           MR. GREENFIELD:  Objection.  Objection,
12 your Honor, argumentative.  He's badgering the
13 witness.
14           THE COURT:  Sustained.
15           MR. PRYOR:  He's being evasive.  I'm
16 entitled to call him on it.
17           THE COURT:  You can rephrase it.
18           You can rephrase it.
19 BY MR. PRYOR:
20 Q.   Sir, did I ask you about whether or not
21 Ms. Carter is the one that caused an altercation
22 face-to-face?
23 A.   No.
24 Q.   I didn't ask you that.
25 A.   I didn't understand the question when you first

```
 1   said it.  That's what I read what it said.
 2        And no, Ms. Carter did not do anything
 3   face-to-face.
 4   Q.   Okay.  I know -- we all know that.  But what
 5   I'm trying to figure out is when I asked you that,
 6   you answered something else, if you are not trying
 7   to be evasive.
 8   A.   I'm trying --
 9             MS. GREEN:  Objection, your Honor.
10             THE COURT:  Sustained.
11             MR. GREENFIELD:  It's still argumentative.
12             MR. McKEEBY:  And move to strike.
13   BY MR. PRYOR:
14   Q.   So as a matter of fact --
15             MR. McKEEBY:  He's repeatedly referring to
16   the witness as evasive, as lying, and that needs to
17   be stricken from the record.  He can make those
18   arguments in closing.
19             THE COURT:  I will strike the last
20   reference.
21             MR. McKEEBY:  Thank you.
22             THE COURT:  You may proceed.
23   BY MR. PRYOR:
24   Q.   You, in fact, concluded that Ms. Carter made no
25   threat at all to Ms. Stone, true?
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 118 of 426   PageID 14712
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1014

 1  A.    I don't recall that.

 2  Q.    So Audrey Stone tells you she thinks she's

 3  being threatened by Charlene Carter.  That's part of

 4  her complaint.

 5        And you don't recall your conclusion as to

 6  whether or not Ms. Stone was threatened, true?

 7  A.    There were things that were stated on social

 8  media that could be perceived as threatening, yes.

 9  Q.    Did you conclude there was a threat as a result

10  of your investigation?

11  A.    I questioned her in the fact-finding as a

12  statement that she made that referred to "can't wait

13  until you get back online."  And to me, that seemed

14  like it could have been a veiled threat, so I

15  inquired to her about it.

16  Q.    Did you conclude it was a veiled threat?

17  A.    Her statement was that she didn't want her to

18  be a president anymore and she wanted her to be a

19  flight attendant.

20  Q.    Do you understand my question was what was your

21  conclusion, sir?

22  A.    It could have been a threat.

23  Q.    Okay.  So that's going to be in your report

24  then.  If you concluded it could have been a threat,

25  surely that will be in your report, right?

1  A.    Which report are you referring to?

2  Q.    Your conclusion, your investigation notes, and

3  the termination.  Surely you terminated her for

4  threatening an employee.

5  A.    "Threatening" is a general term.  To what was

6  stated specifically -- I don't know if I can answer

7  your question specifically whether she threatened

8  her.

9  Q.    Well, let's try this.

10        The harassment policy at Southwest Airlines

11  prohibits an employee in the workplace from

12  threatening another employee.

13        Do you understand that?

14  A.    Yes.

15  Q.    And there was a complaint by Ms. Stone.  Did

16  you conclude that, in fact, Ms. Carter threatened

17  Ms. Stone and fired her for it?

18  A.    There were many things that I terminated her

19  for, not specifically that one that stands out.  I

20  didn't put that in the letter specifically.

21  Q.    Oh.  So you did fire her for that, you just

22  didn't put it in the letter, is that fair?

23  A.    No, that's not what I said.

24  Q.    Well, then did you conclude it or not, sir?

25        That was part of your investigation, that was

 1   part of the charge.  Did you fire her for

 2   threatening Ms. Stone?

 3   A.   Not specifically.

 4   Q.   Generally.  Did you fire her for threatening

 5   Ms. Stone?

 6   A.   I fired her for violation of those policies.

 7          MR. PRYOR:  Objection, nonresponsive.

 8          THE WITNESS:  So if you are trying to say

 9   that I fired her for threatening, I can't say yes

10   because I can't recall specific --

11   BY MR. PRYOR:

12   Q.   You can't recall whether or not you concluded

13   she threatened, and you fired her for threatening?

14   Is that what you are telling us?

15        You may or may not have fired Ms. Carter for

16   threatening Ms. Stone?

17   A.   That was part of the investigation is what I'm

18   saying, are the comments that were made.  They may

19   have been deemed as threatening, but I fired her for

20   violation of those policies.

21        You are asking me if I fired her for

22   threatening.

23   Q.   I am.

24   A.   So no, not specifically.

25   Q.   Well, you keep saying "not specifically," and I

1  say, what does that mean, "not specifically"?

2       Is this just some way not to answer?

3       Did you generally fire her for threatening

4  Ms. Stone --

5            MR. GREENFIELD:  Objection --

6  BY MR. PRYOR:

7  Q.  -- generally, specifically, whatever phrase you

8  want to use.

9            MR. GREENFIELD:  Objection.

10           MR. McKEEBY:  Objection, asked and

11 answered.

12           THE COURT:  I will allow it.

13 BY MR. PRYOR:

14 Q.  Go ahead.

15 A.  No.

16 Q.  Okay.  Wow.  Why did it take so long to get

17 there?  I asked you four or five times.

18           MR. GREENFIELD:  Objection, argumentative.

19           MR. McKEEBY:  Objection, your Honor.

20           THE COURT:  Sustained.

21 BY MR. PRYOR:

22 Q.  Sir, did I ask you that question over and over

23 and over and you would not answer?

24           MR. McKEEBY:  Objection, argumentative.

25           MR. GREENFIELD:  Same objection, your

 1  Honor.

 2          THE COURT:  Sustained.

 3          Counsel, you got your answer.  Next

 4  question.

 5  BY MR. PRYOR:

 6  Q.   All right.  So at least at the end of the day,

 7  we know that you did not fire Ms. Carter for

 8  threatening Ms. Stone.

 9  A.   Correct.

10  Q.   Let's go to -- by the way, are you on Facebook

11  Messenger?

12  A.   No.

13  Q.   In 2017, were you on Facebook Messenger?

14  A.   No.

15  Q.   Do you know how Facebook Messenger works?

16  A.   Through the investigation, yes, I learned quite

17  a bit about Facebook.

18  Q.   I couldn't understand your answer.

19  A.   Yes, through the investigation, I learned quite

20  a bit about Facebook.

21  Q.   Okay.  Good.

22          So you learned that Facebook Messenger, when

23  you open it up, only plays a video if you ask it to?

24  Or did you not?

25  A.   If you ask it to or if you --

1  Q.    You have to click on it.

2  A.    If you click on it, yes.

3  Q.    Okay.

4        So we can agree that a video sent by Facebook

5  manager [sic], when you open it up, you can see the

6  message, you can see whatever the beginning picture

7  of the video is, but that video is not going to play

8  unless you click on it, true?

9  A.   I don't recall if it starts right away when you

10 open up Facebook or not.  I can't say that

11 specifically.

12 Q.   I thought you just told us that Facebook

13 Messenger only plays a video after you click on it.

14       You are now saying something different?

15       That was 20 seconds ago.

16 A.   Some videos that I have seen -- I don't know if

17 Facebook is this way -- you open -- you open it up

18 and it starts playing.

19       I don't know if Facebook specifically has to be

20 clicked on.  I know that some pictures -- I don't

21 use it enough to know this right offhand.

22 Q.   You raised a whole host of issues now.

23       So before when you said it only plays when you

24 click on it, what did you mean?

25                 MR. McKEEBY:  Objection, mischaracterizes

1    testimony.  That's not what he said.

2              THE COURT:  I will allow it.

3              THE WITNESS:  There are versions that you

4    have to click on, yes.

5    BY MR. PRYOR:

6    Q.   Is there a version of Facebook Messenger that

7    the algorithm allows it to play without you clicking

8    on it, to your knowledge?

9    A.   I'm saying I do not know that for sure.

10   Q.   Well, did you know it in 2017 when you made

11   your decision to terminate Ms. Carter?

12   A.   If I recall, those messages needed to be

13   clicked on.

14   Q.   Okay.  So when you investigated Ms. Carter, one

15   of your conclusions was that video is only going to

16   play if Ms. Stone clicks on it, true?

17   A.   True.

18   Q.   Do you know whether or not this Facebook page

19   was a Facebook page dedicated to Audrey Stone, TWU?

20   A.   I know it was Audrey Stone's Facebook page.

21   That is what I know.

22   Q.   I'm sorry?

23   A.   I know it is Audrey Stone's Facebook page.  I

24   do not know for sure that it was associated with TWU

25   or whatever you just said.

 1 | Q.   When you say you don't know for sure it was

 2 | Audrey Stone, TWU, does that mean you were aware of

 3 | it and unsure, or this is new information?

 4 | A.   I don't know the question.  I'm not following

 5 | you on that somehow.

 6 | Q.   Here we go.

 7 |      Did you know at the time you investigated

 8 | Ms. Carter whether or not the Facebook page she sent

 9 | the message to was a Facebook page dedicated to

10 | Audrey Stone, TWU?

11 |      Did you know that?

12 | A.   No.

13 | Q.   Would it have been important to you?

14 | A.   No.

15 | Q.   No.  Because it doesn't matter to you if it

16 | involves union activity, right?

17 |           MR. McKEEBY:  Object to the form of the

18 | question.  Again the vagueness.

19 |           THE COURT:  I will allow it.

20 | BY MR. PRYOR:

21 | Q.   It didn't matter.

22 | A.   It mattered that it was Audrey Stone's Facebook

23 | page.

24 | Q.   Okay.  That wasn't my question, was it, sir?

25 |      Why don't you answer what I ask you instead of

```
 1   what you want to say?
 2            MR. GREENFIELD:  Objection, your Honor,
 3   sidebars.
 4            MR. PRYOR:  He continuously is not
 5   answering the question.  I'm entitled to ask him why
 6   he's not, your Honor.
 7            MR. GREENFIELD:  Objection, your Honor,
 8   and I move to strike.
 9            THE COURT:  I will strike that.
10            You can ask the question.  You can ask
11   your question.
12   BY MR. PRYOR:
13   Q.   Sir, that's not what I asked you.
14        I asked you whether or not it was important to
15   you that it was an Audrey Stone, TWU, Facebook page
16   or not, not if it was important that it was an
17   Audrey Stone Facebook page.
18        You got the difference now?  Do you understand?
19   A.   No.
20   Q.   You don't understand.
21   A.   You asked me two questions.  I'm answering the
22   first one that said if it mattered to me.
23   Q.   If you will just answer what I'm asking, we
24   won't have to go back and forth.
25            MR. McKEEBY:  Objection.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 127 of 426   PageID 14721
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 4 July 08, 2022                Page 1023

1              MR. GREENFIELD:  Objection, your Honor.

2    The sidebars continue.

3              THE COURT:  Sustained.

4              I don't think he knows the foundation.  I

5    think you've got to set the foundation.  I don't

6    think he knows the foundation.

7              MR. PRYOR:  Okay.  May I approach?

8              THE COURT:  You may.

9              (Thereupon, the following proceedings were

10      had at sidebar:)

11             MR. PRYOR:  If I'm being chastised, I want

12   to know.  I'm sorry.

13             THE COURT:  I will wait for that.

14             MR. PRYOR:  I'll fix it.

15             THE COURT:  I don't know that he knows she

16   has two separate Facebook accounts, one listed TWU

17   that is Union, and one that is personal.  We covered

18   that with Stone.

19             MR. PRYOR:  Fair enough.  We did.

20             THE COURT:  We haven't covered that with

21   him yet.  So he might not know, or he might have

22   forgotten, since 2017.

23             MR. GREENFIELD:  Your Honor, continued

24   sidebars.  It is after every question, it is after

25   every comment.  He will not stop.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 128 of 426   PageID 14722
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1024

```
1              THE COURT:  And that's why I want to get
2    him on to --
3              MR. PRYOR:  I shall.
4              THE COURT:  Right now we are not
5    communicating together, and that's why I'm not ready
6    to let the record reflect that he's a liar, because
7    I think that there is a miscommunication.
8              MR. PRYOR:  Okay.  Well, I'm --
9              THE COURT:  I'm trying to point out what
10   our communication is.  We haven't told him there are
11   two, like a TWU and a personal.
12             If you clear that up, he's probably not
13   going to be evasive.  Got it?
14             MR. PRYOR:  Yes, sir.
15             (Thereupon, the sidebar was concluded and
16        the following proceedings were held in open
17        court:)
18             THE COURT:  Okay.  You can set that
19   predicate we talked about.
20             MR. PRYOR:  Let's see if we can clear this
21   up.
22   BY MR. PRYOR:
23   Q.   The Facebook page that Ms. Carter sent her
24   Facebook messages to, what was the name, the full
25   name on that Facebook page, to your knowledge?
```

```
 1  A.    Audrey Stone.
 2  Q.    If, in fact, it was Audrey Stone, TWU, would
 3  that have impacted your investigation and
 4  conclusions?
 5  A.    No.
 6  Q.    Okay.  So it didn't matter if it was sent to --
 7  intended to be sent to her union president, true?
 8  A.    No.
 9  Q.    In fact, Ms. Carter told you she was sending it
10  to her union president, that that is why she was
11  sending it, true?
12  A.    I don't know if she said that specifically.  I
13  don't remember that.
14  Q.    When we go through the interview notes that you
15  took, are you going to be surprised to see that?
16  A.    I'm saying I just didn't recall that it said
17  that specifically.  It may have.
18  Q.    Do you know whether or not the message was sent
19  to a public or private Facebook message account?
20  A.    It was private.
21  Q.    What does that mean?
22  A.    That the public can't see it.  It's to a
23  specific person.
24  Q.    So you know that it was sent to the Union
25  president, true?
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 130 of 426   PageID 14724
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1026

1  A.    It was sent to Audrey Stone.

2  Q.    Audrey Stone was the Union president, true?

3  A.    Yes.

4  Q.    You know that union activity is being talked

5  about, true?

6  A.    Yes.

7  Q.    So let me go with my question again.

8        Is it accurate to say that Charlene Carter sent

9  her message to Audrey Stone, who was also the

10 president of the Local 556?

11 A.    Yes.

12 Q.    And so she sent this message to her president

13 and she sent it in a manner in which only the

14 president could see it, true?

15 A.    Yes.

16 Q.    And the only way that president could view that

17 message, or at least the video, was to click on it?

18 A.    Yes.

19 Q.    By the way, she could have made it public,

20 couldn't she?

21 A.    The message?

22 Q.    When you are sending something to someone's

23 Facebook message account, you get to decide --

24 actually both places -- you certainly have a role in

25 whether or not it is going to be public or private,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                      Page 1027

```
 1  true?
 2  A.   I don't know it that well to say that.
 3  Q.   So if a union member sends a Facebook message
 4  to their union president and says, You are a
 5  terrible candidate, you suck, to you, that violates
 6  Southwest policy, true?
 7  A.   I wouldn't necessarily say that.
 8  Q.   Why not?  You said it doesn't matter if it went
 9  to the Union president.
10       Can employees tell other employees, You suck,
11  and Southwest say, Oh, that's okay?
12       I can be more violent if you want me to.  How
13  far do I have to go?
14  A.   The egregiousness of the message is taken into
15  consideration.
16  Q.   So would "You suck" -- one employee sends a
17  message to another employee saying, "You suck,"
18  would that violate policy?
19  A.   If that happened, the employee would have to
20  turn that in and we would conduct an investigation
21  on it.
22  Q.   It may or may not be found guilty of policy?
23  A.   Correct.
24  Q.   And the more severe the language, the more
25  likely it is to be a violation, I would assume?
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 132 of 426   PageID 14726
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1028

 1  A.    You can assume that, yes.

 2  Q.    So let's go back to my example then.

 3        A union member sends a communication to her

 4  union president, uses some vile language, "you

 5  suck," however much you want to escalate that, and

 6  that's a violation of Southwest policy?

 7  A.    It would be investigated.

 8  Q.    And depending on how vile the language is, it

 9  could be a violation?

10  A.    It could be, yes.

11  Q.    You terminated Ms. Carter for sending the

12  abortion video and the comments associated with it

13  to Ms. Stone.  That's one of the reasons, true?

14  A.    Along with others, yes.

15  Q.    I said "one of the reasons."  You understand

16  what "one" is?

17  A.    Yes.

18  Q.    Okay.  Another reason was the Facebook message

19  post that had the pictures with the anatomically

20  correct vagina hats, true?

21  A.    Yes.

22  Q.    And the third reason is she posted an abortion

23  video on her public personal Facebook account which

24  you determined to have a nexus to Southwest

25  Airlines, true?

1  A.    Yes.

2  Q.    Any other reason?

3  A.    There were statements made in the letter that

4  referred to our social media policy and bullying and

5  hazing policy, and possibly the harassment policy

6  due to the female genitalia.

7  Q.  So what was actually concluded is it was

8  possibly a violation, but it wasn't determined to be

9  a violation, right?

10          MR. McKEEBY:  Objection, vague.

11          MR. PRYOR:  Just repeating what he said.

12          THE COURT:  I will allow it.

13          THE WITNESS:  It was determined to be a

14  violation of that.

15  BY MR. PRYOR:

16  Q.  It was not determined to be a violation, it was

17  determined that it could have been, but that wasn't

18  the reason for the termination, is that fair?

19  A.    Correct, yes.

20  Q.    Okay.  So let's go back.

21          We've got these three reasons here that but for

22  these three, she would not have been terminated

23  based on the conclusions of that investigation,

24  true?

25  A.    That is a possibility.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1030

1  Q.   Not a possibility, sir.  I'm asking, isn't that

2  true?

3  A.   If you take out all three of them, is that the

4  question?

5  Q.   Yes.

6  A.   Yes, if you take out all three of them, then

7  most likely not terminated.

8  Q.   Not even most likely.  She wouldn't have been

9  terminated because those were the only conclusions.

10       Why do you have a problem agreeing with that?

11  A.   I'm agreeing with it.

12  Q.   Okay.  "Most likely" and "possibly," that's not

13  agreeing, that's hedging.

14            MR. McKEEBY:  Objection.

15  BY MR. PRYOR:

16  Q.   So I would appreciate you --

17            MR. GREENFIELD:  Objection, your Honor, to

18  the sidebars.

19            THE COURT:  Sustained.  I will strike it.

20            You can ask your question.

21  BY MR. PRYOR:

22  Q.   So these are the three reasons that she was

23  terminated, and without those three, she would not

24  have been terminated, true?

25  A.   Yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1031

```
 1  Q.   Okay.
 2            MR. PRYOR:  Let's look at exhibit -- I
 3  think it is 62.  It's actually Exhibit 68.
 4            Let me look at the next page and see if
 5  there is anything else.
 6            Actually, let me talk about the last
 7  paragraph of Exhibit 66.
 8  BY MR. PRYOR:
 9  Q.   I can read it.
10       "I am personally pro choice, and to be sent
11  messages that reference me as a murderer couldn't be
12  further from the truth."
13       Do you see that?
14  A.   Yes, I do.
15  Q.   Did it matter to your investigation whether or
16  not Ms. Stone was pro choice?
17  A.   No.
18  Q.   Ms. Carter was complaining about the way her
19  union was spending money, true?
20  A.   She made that complaint.
21  Q.   And she wasn't complaining or it didn't matter
22  whether or not Ms. Stone was pro choice or pro life,
23  true?
24  A.   Ms. Carter stated that she did not know what
25  Audrey Stone was.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 136 of 426   PageID 14730
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 4 July 08, 2022                     Page 1032

1  Q.   I didn't ask that.  I said it didn't matter.
2  You just told us it didn't matter.
3  A.   Can you restate the question then?
4  Q.   It didn't matter to your investigation whether
5  or not Ms. Stone was pro choice or pro life?
6  A.   No.
7  Q.   And the reason is because Ms. Carter was
8  complaining about her union, not about Ms. Stone,
9  true?  It didn't involve Ms. Stone's personal views.
10 A.   From what I remember, she was complaining about
11 both, Ms. Stone and the Union.
12 Q.   What was she complaining about Ms. Stone?
13       Oh, her not being a good president of the
14 Union?  Yes?
15 A.   Among other things.
16 Q.   Okay.  What other thing?
17 A.   She didn't think she was using -- I mean, she
18 thought that the pro march -- or the march in
19 Washington was not used -- the money was used in a
20 wrong way.
21 Q.   So once again, every complaint she's making is
22 about her union or the actions of her union
23 president, true?  That you are aware of.
24 A.   Yes.
25 Q.   So it's union activity she's complaining about,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1033

```
 1  not Ms. Stone personally, about the things she's
 2  doing as president of the Union, true?
 3              MR. McKEEBY:  Object to
 4  mischaracterization.
 5              THE COURT:  I will allow it.
 6  BY MR. PRYOR:
 7  Q.    That's what you just told us.
 8  A.    Say it one more time.
 9        I want to make sure I get your questions
10  correct.  I'm not intentionally trying to be
11  evasive.  I'm just trying to understand the
12  questions when you say them.
13  Q.    I'm taking the answer you just gave us, sir,
14  and I will try it again.
15  A.    Okay.
16  Q.    Isn't it correct that all of Ms. Carter's
17  complaints that you reviewed as part of your
18  investigation involved her complaints about her
19  union or her union president and how she was doing
20  her job?
21  A.    You say "all," and not all of them --
22  Q.    Every single one is what I'm saying, not an
23  exception at all.
24        If you know of an exception, we are going to
25  talk about it.
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 138 of 426  PageID 14732
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1034

```
 1  A.    Yes.

 2  Q.    Okay.  What is the exception?

 3  A.    You just asked me a question if everything

 4  was --

 5  Q.    You're agreeing with my -- okay.

 6  A.    You are confusing me.

 7  Q.    I'm asking the positive or negative.

 8        Are you agreeing that every single complaint

 9  that Ms. Carter made in the messages that she sent

10  to Ms. Stone that were part of your investigation

11  involved her complaints about the Union or the

12  activities of Ms. Stone as the president of the

13  Union?  Do you agree with that?

14  A.    I would say she was making those complaints

15  about the Union and Audrey Stone personally.

16  Q.    Okay.  What personal aspect of Ms. Stone,

17  outside of her being president, do you recall her

18  making?

19        Saying "You're corrupt," she's talking about

20  her corruption as Union president.

21        Saying, "I think you are doing a lousy job" is

22  talking about her being Union president.

23            MR. GREENFIELD:  Objection.

24            MR. McKEEBY:  Objection, your Honor.

25            MR. GREENFIELD:  Objection.  He's
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1035

 1 | continuing to testify.
 2 |          THE COURT:  Sustained.
 3 | BY MR. PRYOR:
 4 | Q.   Can you recall -- I'll rephrase.
 5 |      Can you recall any part of your investigation
 6 | that revealed a comment to Ms. Stone whether --
 7 | about her or the Union that could be separated and
 8 | say, You know, that's talking about Audrey Stone
 9 | outside her job as Union president.
10 |      Can you think of something like that?
11 | A.   No.
12 | Q.   So the only thing you know of is complaints
13 | about Ms. Stone as Union president, in that context?
14 | A.   From only the complaints, yes.
15 | Q.   And you reviewed this stuff Friday?
16 |          MR. McKEEBY:  Objection, vague.  I don't
17 | know what "this stuff" means.
18 |          THE COURT:  Sure.  You can ask it again.
19 | Clear it up what you mean by "this stuff."
20 |          MR. PRYOR:  Rephrase.
21 |          THE COURT:  Yes.
22 | BY MR. PRYOR:
23 | Q.   You reviewed the documents relating to your
24 | investigation as recently as Friday, right?
25 | A.   Yes, some of them.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1036

 1  Q.   And so you've looked at all of this, and so you
 2  know it all relates to complaints about Ms. Stone as
 3  president or complaints about the Union, right?
 4  A.   See, I interpret them differently.  They all
 5  reflect the Union, but they also kind of reflect
 6  Ms. Stone also personally.
 7  Q.   Tell us the ones that somehow are to Ms. Stone
 8  unassociated with her role as president.
 9  A.   I don't know specific ones right now offhand.
10  Q.   Okay.  Well, when you reviewed it on Friday,
11  you saw some, right?
12  A.   I don't remember reviewing that document
13  specifically where she made those complaints.
14       I reviewed a lot of different things.  I tried
15  to remember everything.
16       What I'm saying is that I don't remember every
17  detail.
18  Q.   We will go through the documents.
19       On the three, on the three categories of
20  documents that you terminated Ms. Carter for and
21  would not have terminated her or taken action
22  otherwise -- you got the question so far?
23  A.   Yes.
24  Q.   None of those three involved any personal
25  attack on Ms. Stone; they all involved her role as

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 141 of 426   PageID 14735
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1037

 1  president of the Union, true?
 2  A.   As I stated, it depends on how you take those
 3  accusations.  They could be referred to her
 4  personally, they could be referred to the Union
 5  only.  It's how you interpret them.
 6  Q.   Sir, does Southwest Airlines afford any
 7  protection to a union member engaging in
 8  union-activity communications, any at all?
 9  A.   We protect all of our employees.
10  Q.   How do you protect an employee communicating
11  with her union president?
12            MR. McKEEBY:  Objection, vague.
13            THE COURT:  I will allow it.
14            THE WITNESS:  It just depends on what is
15  stated.  If it's something that is egregious enough
16  that we would look into it and it was brought
17  forward to us.
18  BY MR. PRYOR:
19  Q.   So any statement that you see that you believe
20  violates Southwest policy you take action on?
21  A.   Yes.
22  Q.   There is no protection from any interpretation
23  of Southwest's policy in regard to those actions?
24            MR. McKEEBY:  Objection, vague.
25

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 142 of 426   PageID 14736
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1038

1  BY MR. PRYOR:

2  Q.   They are not protected.  There is no special

3  class for union activity.  That's crazy, right?

4            MR. McKEEBY:  Objection, vague and

5  compound.

6            THE COURT:  I will sustain on compound.

7  BY MR. PRYOR:

8  Q.   Do you find it ironic that the Union is here

9  fighting against protecting union activity, union

10  communications, and Ms. Carter is not --

11            MR. GREENFIELD:  Objection, your Honor,

12  sidebars.  He's making argument again.  I would ask

13  that you instruct him to stop this.

14            THE COURT:  Sustained.

15            MR. PRYOR:  I will withdraw it.

16            Okay.  Going back to Exhibit 66.

17            All right.  Let's go to the next page.

18  Let's see if there is anything else on there.

19            Okay, just scroll down.

20            I know this is not instantaneous to do

21  this.  I appreciate it.  I just want everything to

22  happen like that.

23            Go to the next page.

24            Okay.  I want to read this.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1039

1  BY MR. PRYOR:

2  Q.   This is from -- this is one of the -- we've

3  been using the phrase "buckets," by the way.  I'm

4  going to use this.

5       We've got three buckets.  One bucket that you

6  fired her for is this communication, true?

7  A.   You have to be more specific.  I don't know

8  what "this communication" is.  This particular page?

9  Q.   I'm showing it to you right now.

10      This is the communication that was sent by

11  Ms. Carter to Ms. Stone on her Facebook Messenger,

12  which we say was Audrey Stone, TWU, but that doesn't

13  matter to you, so we won't bother with that.

14      This is one of the three things you terminated

15  Ms. Carter for, this communication right here.

16           MR. McKEEBY:  Objection, mischaracterizes

17  evidence.

18           MR. PRYOR:  I'm sorry?

19           THE COURT:  I will allow it.

20           THE WITNESS:  Yes.

21  BY MR. PRYOR:

22  Q.   Okay.  And it says, "This is what you supported

23  during your paid leave with others at the Women's

24  March in DC.  You are truly despicable in so many

25  ways.  By the way, the recall is going to happen."

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 144 of 426   PageID 14738
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1040

1        Let's just stop right there.

2        So "the recall is going to happen."

3        Was she referring to recalling Audrey Stone as

4   an individual from something?

5        Is there any way to say, oh, you are talking

6   about Audrey Stone in an individual hat, or is this

7   clearly talking about Audrey Stone with her

8   president of the Union hat on?

9   A.    I believe it's president.

10  Q.    Okay.  So this communication we know was

11  referring to Audrey Stone as president of the Union.

12  Fair enough?

13  A.    It refers to the recall of the president, yes.

14  Q.    Okay.

15       "Can't wait to see you back online."

16       That's the portion that I think you eventually

17  agreed concluded was not a threat, right?

18  A.    I never concluded that completely.  It's what

19  she said in the fact-finding.

20  Q.    Well, let's state it that way.

21       You did not conclude that that was a threat and

22  you did not fire her because of making a threat.  Is

23  that fair?

24  A.    Yes.

25  Q.    Okay.

1          All right.  So let's go to the next page.

2          By the way, would you agree with me that

3   Ms. Carter is complaining about her union and how

4   they are spending her money on something she thinks

5   is murder?  Do you agree with that?

6   A.   Yes.

7   Q.   Do you want to look at it again?

8              MR. GREENFIELD:  He answered the question.

9   BY MR. PRYOR:

10  Q.   What was of the answer?

11  A.   Yes.

12  Q.   Okay.  Let's look at the next document.

13         And it starts out, "TWU, AFL-CIO, and 556 are

14  supporting this murder."

15         Would you agree this is talking about her

16  complaining about her union?

17  A.   Yes.

18  Q.   And do you see anything personal to Ms. Stone

19  outside of complaints about the union?

20  A.   On that sentence, no.

21  Q.   Okay.  So this is Bucket 2.  This is the second

22  of the three reasons that you terminated Ms. Carter.

23  And this again is specifically involving complaints

24  about the Union or Audrey Stone as Union president,

25  not individually.  True?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1042

 1  A.    Yes.

 2  Q.    Okay.  Then let's go to -- I don't know if it

 3  is going to be -- she, by the way -- when she -- you

 4  can take that off.

 5       When she made her complaint, Ms. Stone, she --

 6  that's all she included that she sent you.  In that

 7  February 22nd, 2017 complaint, that's all she

 8  complained about, right?

 9  A.    At the time, yes.

10  Q.    Oh, did she change her complaint?

11  A.    We interviewed her.

12  Q.    I'm not talking about "we."

13       Did Ms. Stone broaden at any time her

14  complaint?  Did she say, Now I want you to terminate

15  her for this document?  Anything like that?

16  A.    Not that I'm aware of.

17  Q.    Forget any words.

18       Did she broaden her complaint in any way or did

19  you broaden it?

20  A.    I don't understand the question because

21  you're --

22  Q.    Here is the question.  We got a third bucket

23  coming up as the reason you terminated her, and that

24  is the anatomically correct hats, right?  That's the

25  third bucket.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 147 of 426   PageID 14741
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1043

 1  A.    Okay.

 2  Q.    I'm not looking for an okay, I'm looking for an

 3  agreement.  Is that a yes?

 4  A.    Yes.

 5  Q.    Yes.

 6        And Ms. Stone was not making a complaint about

 7  that communication, nor did she ever, true?

 8  A.    True, outside of just supplying the pictures of

 9  it.

10  Q.    There is no "outside of."

11        You asked her to supply all communications with

12  Ms. Carter, true?

13  A.    Yes.

14  Q.    And included in that communication, a list of

15  that packet of communications, her complying with

16  your request, was that message with that picture,

17  true?

18  A.    Yes.

19  Q.    And you decided that was a violation, true?

20  A.    Our employee relations department did, yes.

21  Q.    That's right.

22        Actually, you didn't conclude that, did you,

23  the employee relations department did.

24  A.    Yes.

25  Q.    And, in fact, you concluded that those first

1  two buckets violated the harassment policy, didn't

2  you?

3  A.   What are the buckets again?

4  Q.   The buckets are the two videos that show the

5  aborted fetus.

6  A.   Just those two.  Okay.  I didn't know what --

7  Q.   You thought that was harassment, but, in fact,

8  employee relations had to tell you, no, it is not,

9  true?

10  A.   I only sent it as a possible violation.  They

11  determined whether it was or not through the

12  investigation.

13  Q.   They told you it was not, true?

14  A.   The pictures and video of the unborn fetuses

15  were determined not to be because it didn't violate

16  any of the classes.

17  Q.   That's right.  Those two videos, employee

18  relations specifically told you that does not

19  violate the harassment policy of Southwest Airlines.

20  Didn't they?

21  A.   Yes.

22  Q.   And nonetheless, you put in the letter that it

23  possibly violated it, didn't you?

24  A.   No.  You are missing part of her letter that

25  she sent to me.  She did say that it was partially

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 149 of 426   PageID 14743
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1045

1  supported as a violation because of the genitalia.

2  Q.   Okay.  It is your testimony -- they put this in

3  writing, you know.  Have you seen it?

4  A.   What is in writing?

5  Q.   Employee relations responded in writing to you.

6  A.   Correct.

7  Q.   You reviewed it last week, right?

8         MR. McKEEBY:  Object to a question about a

9  document that is not provided to the witness.  He's

10  testifying to its content.  That's not proper.

11         THE COURT:  Sustained.

12  BY MR. PRYOR:

13  Q.   Did employee relations tell you it was not a

14  violation of Southwest Airlines's harassment policy?

15  A.   They indicated to me on the letter that you are

16  referring to that it was a partial violation of the

17  policy.

18  Q.   No, I'm asking about the two videos.  I know

19  what they concluded about the hats.  We are now

20  talking about the two videos.

21  A.   Okay.

22  Q.   They told you that did not violate Southwest

23  Airlines's harassment policy, didn't they?

24  A.   Those two videos, yes.

25         MR. PRYOR:  Let's look at 65, maybe.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 150 of 426   PageID 14744
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1046

1              Go to page -- I want to be clear about the

2    question I was asking.

3    BY MR. PRYOR:

4    Q.   What I'm talking about two videos, one of the

5    videos was sent to Audrey Stone, we say TWU,

6    Facebook Messenger, right?

7    A.   Yes.

8    Q.   And the other video wasn't sent there, it was

9    posted on Charlene Carter's personal Facebook page?

10   A.   Yes.

11   Q.   Okay.  Those are the two buckets, and then this

12   picture right here is the third bucket?

13   A.   I'm sorry.  To me, it seems like your buckets

14   are changing.  So I'm trying to keep your buckets --

15   Q.   Three buckets for why you told us you fired

16   her.

17              THE COURT:  Hold on.

18              Separation.

19              Okay.  Now you can go.

20   BY MR. PRYOR:

21   Q.   Do we have to go through this again?

22        I thought we agreed there are three buckets you

23   fired her for.  This is the third one.

24   A.   My understanding was that the buckets were the

25   hazing and bullying policy, the social media policy,

1  and possibly the harassment policy.  I thought those

2  were the three buckets that we started out with.

3  And you were just talking about these within those.

4  Q.   I was asking you what you relied upon to find a

5  violation of those policies, and you told me it was

6  those three things.  Without those three things you

7  would not have terminated her.

8       Do you recall telling me that?

9  A.   Okay.

10 Q.   Okay.  So those are the three buckets I'm

11 talking about.  This is the third one which we

12 haven't shown you yet, but now we are, true?

13 A.   Yes.

14 Q.   And this once again is talking about her

15 complaints about the Union.

16      "How are you going to code this an LM2?  The

17 recall is going to happen."

18      Once again, there is nothing personal in this

19 third bucket either about Ms. Stone, it's

20 complaining about her union, and to the extent you

21 would try and find anything about Ms. Stone, it

22 would be about her activity as the president of that

23 union, although I don't even see that.

24           MR. McKEEBY:  Objection, compound.

25 Objection, argumentative.

```
 1              THE COURT:  Sustained.

 2              MR. GREENFIELD:  Objection, your Honor.

 3  He continues to testify.  I would ask you to --

 4              THE COURT:  You can break it up and reask

 5  the question.

 6  BY MR. PRYOR:

 7  Q.   This third bucket relates exclusively to

 8  Ms. Carter's complaint about her union, true?

 9  A.   Yes.

10              MR. PRYOR:  Let's scroll on until you get

11  to get APP 88.  See if you recognize this.

12              It might help if you had a copy of this.

13              Can I have 65?

14              THE WITNESS:  It's pretty large on here.

15  BY MR. PRYOR:

16  Q.   I'm sorry?

17  A.   It's pretty large on here as far as seeing it.

18  Q.   It's what?

19  A.   I can see it.

20  Q.   Well, I didn't know if you wanted to see the

21  whole thing.

22       This was part of the communications that you

23  looked at?

24  A.   It was given to me, yes.  Yes.

25  Q.   Okay.  And did you fire her for this
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 153 of 426  PageID 14747
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1049

1  communication?

2  A.    No.

3  Q.    Did you take any action at all against her or

4  consider this as part of the reason for terminating

5  her?

6  A.    No.

7  Q.    Do you believe it's appropriate for a union

8  member to talk to her union president about her

9  complaints about Planned Parenthood in this context?

10  It is okay for her to do that, right?

11  A.    To complain to the union about Planned

12  Parenthood, is that the question you are asking me?

13  Q.    Yes.  So what Ms. Carter is doing is she is

14  complaining about that they went to this march

15  sponsored by Planned Parenthood.

16        You knew that.  She told you that.

17  A.    I didn't know that it was supported by Planned

18  Parenthood.  She made the statement in the meeting,

19  but everything I saw was that it was a women's march

20  supporting women's rights.

21  Q.    You didn't know that it was sponsored by

22  Planned Parenthood?

23  A.    Ms. Carter said that in the fact-finding.

24  Q.    That's what I'm asking.  You knew her complaint

25  was it was a march supported by Planned Parenthood,

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 154 of 426   PageID 14748
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1050

1    true?

2    A.    Yes.

3    Q.    And she wanted to communicate her concerns

4    about Planned Parenthood to her union, true?

5    A.    True.

6    Q.    And are you complaining in any way that she did

7    that by, for instance, this document right here?

8    A.    No.

9    Q.    Do you know what eugenics is?

10   A.    No.

11   Q.    You didn't look into that?

12            MR. McKEEBY:   Asked and answered.

13   Objection.

14   BY MR. PRYOR:

15   Q.    Did you look into --

16            THE COURT:   Sustained.

17   BY MR. PRYOR:

18   Q.    -- whether or not eugenics was raised as an

19   issue between Ms. Carter and her union about Planned

20   Parenthood?

21            MR. GREENFIELD:   Objection, your Honor,

22   relevance, and 403.

23            THE COURT:   I will allow the answer to the

24   question.

25            THE WITNESS:   No.

```
 1  BY MR. PRYOR:

 2  Q.   And you don't know what it is?

 3  A.   No.

 4            MR. PRYOR:  Let's look at Exhibit 74.

 5  BY MR. PRYOR:

 6  Q.   Okay.  Do you recognize --

 7            MR. PRYOR:  Is it in evidence?

 8            THE COURT:  It's not.

 9            MR. PRYOR:  I offer Exhibit 74.

10            THE COURT:  Okay.  74.  Any objections on

11  Exhibit 74?

12            MR. GREENFIELD:  One moment, your Honor.

13            THE COURT:  Yes.

14            MR. GREENFIELD:  No.

15            MR. McKEEBY:  No objection from Southwest.

16            MR. GREENFIELD:  No objections.

17            THE COURT:  Okay.  74 is in evidence.  We

18  will publish.

19            (The referred-to document was admitted

20        into evidence as Plaintiff's Exhibit 74.)

21  BY MR. PRYOR:

22  Q.   Do you recognize this document?

23  A.   Yes.

24  Q.   I'm sorry?

25  A.   Yes.
```

1   Q.   Did you review this document last week?

2   A.   Yes.

3   Q.   So you were not only familiar with it at the

4   time, you have refreshed your recollection as we sit

5   here, right?

6   A.   Yes.

7   Q.   And you sent this document to Meggan Jones and

8   Dave Kissman?

9   A.   And --

10  Q.   Yes?

11  A.   Yes.

12  Q.   And Meggan Jones is an attorney for Southwest

13  Airlines.

14  A.   No.

15  Q.   What is she?

16  A.   She, at the time, was my assistant base

17  manager.

18  Q.   What?

19  A.   At the time she was my assistant base manager.

20  Q.   Okay.  I thought there was a lawyer on here

21  somewhere.  Was there a lawyer involved in the

22  investigation who sat in on the interviews?  No

23  lawyers?

24  A.   No.

25  Q.   Who is Dave Kissman?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 1053

```
 1   A.    He's my immediate leader.

 2   Q.    And you sent this to employee relations, right?

 3   A.    Correct.

 4   Q.    And employee relations' job, among other

 5   things, I assume, is to determine whether or not

 6   there are any protected rights that should be looked

 7   at after any investigation, true?

 8   A.    Yes.

 9   Q.    And, in fact, you sent this to them and said,

10   Let me know your thoughts on protected categories.

11   A.    Yes.

12   Q.    And we will get to what they told you in a

13   second, but from your knowledge, are religious

14   beliefs a protected category?

15   A.    Yes.

16   Q.    To your knowledge, is political speech a

17   protected category?

18   A.    I don't know that.

19   Q.    To your knowledge, is union activity a

20   protected category?

21   A.    I don't know that.

22   Q.    And so when you spoke to employee relations,

23   what did they tell you about protected categories?

24   A.    In this particular case or in general?

25   Q.    In this particular case.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 158 of 426   PageID 14752
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1054

1   A.    After the investigation, you mean in the letter

2   that was sent to me?

3   Q.    They didn't talk to you about protected

4   categories until the investigation was over?

5   A.    No.  I'm trying to figure out when, what place

6   in time you are talking about did they talk to me --

7   Q.    Every moment -- every moment from the time you

8   sent this email to right now.

9   A.    Yes, they've talked to me about protected

10  categories.

11  Q.    When did they talk to you?

12  A.    I don't recall dates.

13  Q.    Did they talk to you before the investigation

14  was concluded?

15  A.    They talked to me about this case and if it

16  violated or not.  I don't remember if they talked to

17  me about protected categories during this

18  investigation.

19  Q.    Okay.  So to your recollection, the person that

20  made the termination decision and the person in

21  charge of this investigation, you have no

22  recollection of employee relations at Southwest

23  Airlines ever telling you anything about protected

24  categories prior to your termination decision, true?

25            MR. McKEEBY:  Objection, asked and

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1   answered.

2            THE COURT:  I will allow it.

3            THE WITNESS:  They have talked to me about

4   that in the past if you are talking about all

5   encumbrance of when they may have talked to me.

6            But I'm trying to determine if it's a

7   specific moment when you are asking me if they

8   talked to me about protected categories, because

9   that is just general --

10  BY MR. PRYOR:

11  Q.   Sir, I made it specific to Ms. Carter.

12       You asked me, in general or this case.  I said

13  this case.

14       Now you are going back to general.

15       Do you want to watch my question?  Here we go.

16  You ready?

17  A.   Yes.

18  Q.   On February 23rd, you asked, specifically about

19  this investigation, Hey, employee relations.  Let me

20  know your thoughts about protected categories.

21       And they never spoke to you specifically about

22  this case and protected categories prior to you

23  making your termination decision, true?

24  A.   No --

25  Q.   Okay.

 1 | A.    -- they did talk to me.
 2 | Q.    When did they talk to you about Ms. Carter or
 3 | Ms. Stone's protected categories?
 4 | A.    While we were doing the investigation, employee
 5 | relations partnered with me on this investigation
 6 | and we did the interviews together.
 7 | Q.    I know you did.  Tell me about protected -- I
 8 | know they were involved.  That wasn't my question.
 9 |       What did they tell you about protected
10 | categories?
11 | A.    They told me that the genitalia pictures --
12 | Q.    That what?
13 | A.    The genitalia pictures of the faces did violate
14 | the protected category of sexual -- if that's what
15 | you are asking.
16 | Q.    Did they call sexual harassment a protected
17 | category?  Is that what they told you?
18 | A.    Sexual harassment?
19 | Q.    I thought you just said that.  Sexual
20 | harassment.
21 | A.    Harassment, sexual harassment in the harassment
22 | policy.
23 | Q.    Okay.  And they told you that's a protected
24 | category, sexual harassment?
25 | A.    They said it violated that, yes.

1  Q.   Violated a policy, right?

2  A.   Correct.

3  Q.   Okay.  I'm asking about protected categories.

4       What did they tell you about protected

5  categories?

6  A.   I would have to have the document in front of

7  me.  I don't remember specifically.

8  Q.   You don't recall generally, do you?

9  A.   I don't recall generally what?

10 Q.   Well, you are saying specifically, and I'm

11 making sure that you are not recalling something

12 generally.

13      Did they generally tell you about a protected

14 category?

15 A.   Yes.

16 Q.   What did they tell you?

17 A.   They told me that it violated one of the

18 protected categories.

19 Q.   The genitalia picture violated a protected

20 category, true?

21 A.   Yes.

22 Q.   Did they tell you about any other protected

23 categories that you should consider as part of your

24 investigation prior to making your termination

25 decision?

 1  A.    Not that I recall.

 2  Q.    You considered no other protected categories

 3  other than genitalia and how it might violate a

 4  sexual harassment policy; that's the only protected

 5  category you considered in your investigation prior

 6  to making your termination decision?

 7  A.    Yes.

 8  Q.    So it is fair to say that there was no

 9  consideration given to Ms. Carter's religious

10  beliefs in regard to your investigation or

11  termination decision, true?

12  A.    True.

13  Q.    And it's also fair to say that no consideration

14  was given to her union activity in regard to your

15  termination decision or investigation?

16  A.    Yes.

17          MR. PRYOR:  Let's see.  82.

18  BY MR. PRYOR:

19  Q.    So let's look at Exhibit 76.  I think this

20  confirms your recollection.  It's on the screen.

21       So the email at the top, just below it is the

22  one that you sent to employee relations saying, Let

23  me know your thoughts on protected categories.

24       And above it is their response, true?

25  A.    Yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 1059

1   Q.   And when they responded to your inquiry about

2   protected categories, they don't say anything about

3   protected categories, do they?

4   A.   No.

5            MR. PRYOR:  82.

6   BY MR. PRYOR:

7   Q.   Let's look at Exhibit 82.  That's

8   February 23rd.  Trying to keep a little timeline

9   here.

10       Let's look at Exhibit 82.

11           THE COURT:  Counsel, we have been on the

12   record for about an hour 45.  Are you okay if we

13   break now a little early for lunch?

14           MR. PRYOR:  Are you asking if this is a

15   good time for lunch?

16           THE COURT:  Yes.

17           MR. PRYOR:  My back is killing me.  I

18   would love to sit down.

19           THE COURT:  Okay.  So before we bring up

20   82, we will take our lunch break a little early in

21   light of the early morning break.

22           So the same three instructions.  You can

23   only talk to yourselves and court staff, just not

24   about the case.  Don't talk to anyone else and don't

25   do any research or anything like that on the case.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1060

 1   Keep an open mind.

 2               All rise for the jury.

 3               See you back here at 12:45.

 4               (The jurors exited the courtroom.)

 5               THE COURT:  Mr. Schneider, you can leave

 6   the stand.  You just can't talk to anyone about the

 7   case.  Thank you, sir.

 8               (The witness exited the courtroom.)

 9               THE COURT:  Okay.  So can I just say one

10   thing?  Housekeeping-wise, I know we are to 82.  I'm

11   not going to ask for objections on that, we can do

12   that right before lunch.

13               But also, 76, we never unmuted the jury

14   screens because 76 is not in evidence.  So if you

15   want to bring 76 in, then housekeeping-wise, think

16   about that.  Because 76 is not in and the jury did

17   not see 76.

18               MR. PRYOR:  We ask --

19               THE COURT:  Okay.  Do y'all know 76?

20               MR. PRYOR:  I can pop it back up.

21               THE COURT:  Let's pop it back up, and I'm

22   going to look in my notes for anything on 76.

23               I don't have a written objection on 76.

24               MR. McKEEBY:  No objection to 76.

25               THE COURT:  Any objection from the Union

```
 1  on 76?

 2              MR. GREENFIELD:  No, your Honor.

 3              THE COURT:  So what I will do is when we

 4  come back on the record, can you move for admission

 5  when the jury is here on 76.

 6       I will show it to them, and you can say, I

 7  talked to the witness about this, but you didn't see

 8  it because it wasn't in evidence then.  It is now.

 9  Here is the document he saw that you are now seeing.

10       And then we will move back to 82.

11       Sound good?

12       Any other issues that we have to talk about?

13              MR. GREENFIELD:  If I may sidebar, your

14  Honor.

15              THE COURT:  Sidebar here?

16              MR. GREENFIELD:  Yes.

17              (Thereupon, the following proceedings were

18       had at sidebar:)

19              MR. GREENFIELD:  Your Honor, the continued

20  sidebars and argumentative nature of his questions,

21  I'm personally aghast at the lack of courtroom

22  decorum.

23              I do not believe he's complying with the

24  rules of professionalism or with Dondi, which is a

25  requirement of this Court.  I don't even believe
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1062

 1  he's even read the case, which is a requirement of

 2  this Court.

 3            I would just like to ask you to instruct

 4  him to stop.

 5            THE COURT:  Response.

 6            MR. PRYOR:  Your Honor, in response, you

 7  have sustained a few objections, but many you have

 8  not.

 9            This is a witness, in my opinion, that is

10  trying not to answer the questions.  And so, yeah,

11  there is a little hand-to-hand combat.

12            They've over-objected and raised --

13  they've been -- their objections have been overruled

14  as much as they have been sustained.  So I don't

15  think we are into that category.

16            And I certainly know what Dondi is and I'm

17  not violating it.

18            They can object, the Court can rule.  If

19  they want to make a motion, make a motion.  But I

20  don't think there's anything like that --

21            MR. GREENFIELD:  I'm talking about the

22  repeated sidebars and argumentative comments that

23  are clearly not appropriate.

24            THE COURT:  So I will say this.  I think

25  we do need to dial down the rhetoric.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 167 of 426   PageID 14761
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                 Vol 4 July 08, 2022                 Page 1063

1              MR. PRYOR:  I will.

2              THE COURT:  On specific objections to

3   questions, I'm giving all of you leeway, but that is

4   the one area we do need to dial down.

5              I think part of the issue is there is

6   oftentimes a lack of communication, and I think what

7   you're perceiving from the witness as lying --

8              MR. PRYOR:  You are right.

9              THE COURT:  -- and evasion is he's not a

10  lawyer, and he does not have the same familiarity

11  with this case and the rules of evidence that we now

12  have.

13             When I was in private practice in the

14  appellate section of the AG's office, we would

15  always call our first mood the mood of rage because

16  you are angry that anyone can see the case

17  differently than you.  We would rip our panelists'

18  heads off for even asking a question.

19             And I think you are all at the point of

20  rage because you are so steeped in the case.  So

21  that's why we would have a second mood.  We would

22  call that the mood of reason.  We now understand why

23  you might have a lack of understanding of what I'm

24  saying, let me clarify that for you.

25             So I would like us to all get this

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 168 of 426   PageID 14762
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1064

1    afternoon to the point of reason rather than the

2    point of rage that we are at now.

3              Does that make sense?

4              MR. PRYOR:  Yes.  And there is a specific

5    example, when I came up and you told me we were

6    talking past each other, and you were exactly right.

7              And I will, as counsel says -- he used

8    dial back.  I will.  And, however, there are times

9    when the witness -- I have to fight with him.  But I

10   certainly acknowledge --

11             THE COURT:  I will agree to do that.

12             I will say this afternoon there might be

13   times where he will evade you intentionally, but I

14   don't think he's doing it all the time.

15             So I think we need to give him the benefit

16   of the doubt, not have a lawyer characterizing him

17   as a liar or evasive.  But if it really counts and

18   you can see and everyone knows he's evading you --

19             MR. PRYOR:  Okay.  I will make --

20             MR. GREENFIELD:  And if I may make it

21   abundantly clear, Mr. Pryor can interrogate the

22   witness in whatever form he wants to.  If he wants

23   to dial it up, fine.  I don't care.  That's not my

24   issue.  My issue is the repeated use of sidebars.

25   He won't stop.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1065

```
 1              THE COURT:  Understood.  Sidebars should
 2  be --
 3              MR. PRYOR:  I hear counsel's comments.  I
 4  have seen some sustained and some overruled.  And I
 5  will take into consideration counsel's comments and
 6  the Court's.
 7              MR. GREENFIELD:  I'm not talking about the
 8  argumentative objections.
 9              MR. PRYOR:  I appreciate that.
10              MR. GREENFIELD:  It has been happening for
11  three days, Mr. Pryor.
12              MR. PRYOR:  All right.  So I have a
13  sidebar issue as well.  It doesn't matter if it's on
14  the record or not.
15              I want the Court to know that we are
16  mindful that you gave us three more hours and we are
17  going to make good use of that.
18              We have made a decision to spend more time
19  with Mr. Schneider, and we are either cutting or
20  shortening substantially other witnesses.
21              I didn't want the Court to think, wow,
22  we've got three more hours.  We are going crazy.
23              We are doing that, and we will still leave
24  time for our cross and closing.  And I think there
25  is every chance we will close the evidence on
```

1  Monday, if not Monday morning.  It depends on today.

2  But that's --

3           THE COURT:  Can I ask, are there any of

4  the deposition page/line designation objections we

5  are working that we shouldn't?

6           We are going to keep working on all of

7  them --

8           MR. PRYOR:  That's a really good question.

9           THE COURT:  How about tell me -- at the

10  end of the lunch break, tell me if there are any --

11           MR. PRYOR:  We will.

12           THE COURT:  -- you say, We are just not

13  going to pursue this written deposition coming in.

14           And I know you are saving back some time

15  for Nevarez who we haven't --

16           MR. PRYOR:  That's right.

17           MR. McKEEBY:  And question as to witnesses

18  today, who do I need to have here?

19           MR. PRYOR:  As we've talked about, we

20  anticipate calling Ms. Lacore after this witness.

21           MR. McKEEBY:  Do I need to have any other

22  witness here other than Ms. Lacore?

23           MR. PRYOR:  You do not.

24           THE COURT:  What about the Union?

25           MR. PRYOR:  It means that we either think

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 171 of 426   PageID 14765
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1067

1    we're going to finish with Lacore or put on video

2    depositions or put on Ms. Carter.

3              MR. GILLIAM:  And to answer your question,

4    probably --

5              MR. PRYOR:  So I'm trying to be very open

6    about it and appreciative of the time we got.  I

7    didn't want you to think we're going crazy.

8              THE COURT:  Is there a video depo you're

9    contemplating today that we don't have rulings back

10   to you on?

11             MR. GILLIAM:  I will have to look at my

12   notes.  Kleburne is the one we are contemplating.

13             THE COURT:  Okay.

14             MR. GILLIAM:  I can't remember if --

15             MR. PRYOR:  So, no, we are good.

16             THE COURT:  Got it.

17             Okay.  We will see y'all after lunch.

18             (Thereupon, the sidebar was concluded and

19         the following proceedings were held in open

20         court:)

21             THE COURT:  Now we are in recess.

22             THE COURT SECURITY OFFICER:  All rise.

23             (Recess.)

24             THE COURT SECURITY OFFICER:  All rise.

25             THE COURT:  Anything we need to talk

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1068

1  about?  I know we're going to do housekeeping on
2  what, 76?  76.  And then you are going to come back
3  to 82.  So you will move for the admission of 76, I
4  will enter it, then you will show it to the jury,
5  and then we will move on to 82.  Got it?
6            Okay.  Let's bring them in.
7            (The jurors entered the courtroom.)
8            Okay.  You can be seated.
9            Mr. Pryor, you can continue.
10            MR. PRYOR:  Thank you, your Honor.  At
11  this time, we offer into evidence Exhibit 76, and
12  ask it that be displayed to the jury.
13            THE COURT:  Okay.  Seventy-six, I have
14  considered objections.  It is coming in.
15  Seventy-six is admitted into evidence.
16            And I will just say, this is a document
17  that the witness saw earlier but y'all didn't see.
18  So we are going to put it on the screen so you can
19  see what the witness saw earlier.
20            MR. PRYOR:  And my apologies for not
21  getting that into evidence and on the screen timely.
22  BY MR. PRYOR:
23  Q.   Sir, did you make any inquiries into whether
24  Charlene Carter needed a religious accommodation?
25  A.   No.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1069

1   Q.   Has anyone at Southwest Airlines ever told you

2   that part of your job is to consider whether or not

3   a person would need a religious accommodation?

4   A.   No.

5   Q.   To your knowledge, was this incident involving

6   Ms. Carter reported to ACT?

7   A.   No, it was not by me.

8   Q.   And what is ACT?

9   A.   The Accommodations and Career Transition Team

10  for Southwest Airlines.

11  Q.   And that is the team that, if there is an

12  accommodation consideration to be made, that is the

13  team that makes it?

14  A.   Correct.  Ms. Carter would have to take it to

15  them and they would determine if their accommodation

16  was approved.

17  Q.   And it is your testimony that Ms. Carter has to

18  raise that issue with ACT, true?

19  A.   Yes.

20  Q.   And did Ms. Carter's Facebook post that you

21  reviewed cause Southwest Airlines any financial harm

22  before she was terminated?

23  A.   Not that I'm aware of.

24  Q.   Did Southwest Airlines -- let's start with you.

25       Did you ever discuss with Ms. Carter whether

1  she would be willing to post a disclaimer on her

2  Facebook page that her posts do not necessarily

3  represent the views of Southwest Airlines?

4  A.    No.

5  Q.    Could you have done that?

6  A.    I haven't done that in the past.

7  Q.    I didn't ask if you had.  But that is something

8  you could have considered or done because you were

9  the one in charge?

10      Right?

11 A.    I don't know the answer to that question

12 because I have never had to do that.

13 Q.    So there were limitations that Southwest

14 Airlines placed on you in terms of what you could do

15 to Ms. Carter?

16 A.    I am just saying that I have never done it

17 before.

18 Q.    I understand that.  You have told us that.

19      I'm asking you, that is something that you

20 could have considered and could have done if you

21 thought it was appropriate?

22 A.    I would have to take it through our legal team

23 to make sure.

24 Q.    Okay.

25      And if your legal team told you you could do

1  it, that would be something, then, that you would

2  consider?

3  A.    Yes.

4  Q.    But you didn't do that; you didn't consider it,

5  right?

6  A.    Correct.

7  Q.    Did you or anyone to your knowledge at

8  Southwest Airlines ever ask Ms. Carter if she would

9  remove Facebook posts that it considered to be a

10  nexus to the workplace?

11  A.    Not that I'm aware of.

12  Q.    And that also is something that you could have

13  done if you had chosen to, true?

14  A.    Yes.

15  Q.    If you wanted to accommodate her union

16  activities or religious beliefs, you could have

17  considered that, right?

18          MR. McKEEBY:  Objection to the argument.

19          THE COURT:  I'll allow it.

20          THE WITNESS:  Can you repeat the question?

21  BY MR. PRYOR:

22  Q.    Yes.  If you wanted to take into consideration

23  Ms. Carter's religious beliefs or union activities

24  that were being complained about, that is something

25  you could have considered doing, just asking to

1   remove the nexus from her Facebook page?

2              MR. McKEEBY:  Objection, foundation.

3              THE COURT:  I'll allow it.

4              THE WITNESS:  I could have.

5   BY MR. PRYOR:

6   Q.   And to your knowledge -- first of all, you know

7   you didn't, you did not do that?

8   A.   No, I did not.

9   Q.   And to your knowledge, no one else at Southwest

10  Airlines did that, correct?

11  A.   No.  Not during the short time that the

12  investigation took place, because she was terminated

13  after that.  And there wasn't time.

14  Q.   And in fact, the action that was taken was

15  action that you took; it was your decision and your

16  action, not anyone else's in that regard, true?

17  A.   In regard to the termination?

18  Q.   The termination, and the manner in which you

19  did it?

20  A.   Yes.

21  Q.   Did you have any communications with Naomi

22  Hudson before contacting Audrey Stone about her

23  complaint?

24  A.   No.

25              MR. PRYOR:  Okay.  Let's go to Exhibit 82.

```
1               THE COURT:  Okay.  Jury screens are muted.

2               MR. PRYOR:  Actually, I don't need

3    Exhibit 82.  You just answered that.

4               Let's go to Exhibit 89.  I move for the

5    admission of Exhibit 89.

6               THE COURT:  Eighty-nine.  Any objections

7    on 89?

8               MR. McKEEBY:  No objection.

9               THE COURT:  Any from the union?

10              MR. GREENFIELD:  No objection, your Honor.

11              THE COURT:  Okay.  Eighty-nine is in.  We

12   will publish.

13              (The referred-to document was admitted in

14        Evidence as Trial Exhibit 89.)

15   BY MR. PRYOR:

16   Q.   Okay.  Mr. Schneider, do you recognize

17   Exhibit 89 as your notes of the interview from your

18   fact-finding team of Audrey Stone?

19   A.   Yes.

20   Q.   Let's go to the second page.  DG, who is DG?

21   A.   Denise Guttierez.

22   Q.   Okay.  And about a third of the way down the

23   page, it says, Great, tell me first the individual

24   that sent the message.

25              Do you see where I'm at?
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 178 of 426  PageID 14772
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1074

1  A.    Yes.

2  Q.    I'm going to read part of that, and feel free

3  to read it all.

4        It is a flight attendant in Denver.  Since 2008

5  when I was on the board, she has not been union

6  friendly.  It goes on to say, in 2013, when I came

7  in as president, through Facebook, she has sent me

8  various messages.  I have ignored them and have not

9  had a relationship with her.  She is very

10 anti-union.

11       Correct?

12 A.    That is what it states, yes.

13 Q.    Do you recall that your notes are consistent

14 with what you recall actually happening?

15 A.    Are you asking if my notes are accurate, is

16 that what you are asking?

17 Q.    To the best of your ability, you were writing

18 down what was said?

19 A.    Yes.

20 Q.    And what we know from this answer is that

21 communications between Ms. Carter and Ms. Stone

22 began after Ms. Stone became president of the Union,

23 right?

24 A.    Yes.  It says 2008, and then in 2013, when she

25 became president.

 1  Q.   So is that a yes?

 2  A.   Yes.

 3  Q.   And you know that she's telling you that she

 4  believes Ms. Carter's very anti-union?

 5  A.   That is the statement she made, yes.

 6  Q.   And did you actually find out from Ms. Carter

 7  that she's not anti-union, she was just anti this

 8  administration of Local 556 under Ms. Stone?

 9  A.   To some extent, yes.  The Union in general,

10  too, though.

11  Q.   Then down below that, it says, What do you

12  think would cause her to send the message?  Her

13  answer was, I have never had a conversation with

14  her, she's anti-union.

15       Once again, this answer is emphasizing this

16  relates to the Union, right?

17  A.   It states she's anti-union, yes.

18  Q.   Well, why would she send you the message?

19  She's telling you in the answer, is because she's

20  anti-union.  That is telling you it is activity

21  related to the Union, right?

22            MR. GREENFIELD:  Objection, lack of

23  foundation, calls for speculation.

24            THE COURT:  I'll allow him to answer if he

25  has personal knowledge.

```
 1              THE WITNESS:  I don't have personal
 2    knowledge why she would do that.
 3    BY MR. PRYOR:
 4    Q.   You don't have an understanding of what she
 5    told you when she said, She sent me the message
 6    because she's anti-union?  You didn't understand
 7    that?
 8              MR. GREENFIELD:  Objection, misreading the
 9    document.
10              THE COURT:  Sustained.
11    BY MR. PRYOR:
12    Q.   Why do you think -- what do you think would
13    cause her to send the message?  Part of the answer
14    is, "She's anti-union, right," right?
15              MR. McKEEBY:  Objection, foundation.
16              THE COURT:  I'll allow it.
17              THE WITNESS:  That is what it states here,
18    yes.  That's what she said.
19    BY MR. PRYOR:
20    Q.   Did you disagree with what she told you?
21    A.   I didn't agree or disagree.
22    Q.   So you didn't consider this at all?
23    A.   The anti-union part?  I considered it.  But I
24    didn't at that time agree or disagree with her.
25    Q.   She has sent messages in the past that I have
```

```
 1  ignored.
 2       Do you see that?
 3  A.   Yes.
 4  Q.   Did you investigate which messages she reviewed
 5  and which ones she did not?
 6  A.   Only the ones that she sent to us.
 7  Q.   Okay.  And of those, did you go through with
 8  her and ask her which ones she read and which ones
 9  she did not?
10  A.   No.
11  Q.   It says, I was on a ski trip with people from
12  Denver last Wednesday.  I asked them not to tag or
13  post anything on Facebook.  I went on Facebook to
14  check and there was a message from her.  I opened
15  the message and it had a video that I couldn't look
16  at because I was in the Denver airport.  I read the
17  text and closed it out.  I couldn't look at the
18  video in the airport.
19       Did I read that right?
20  A.   That is what it states, yes.
21  Q.   And once again, you have written down what you
22  believe accurately reflects what you were told?
23  A.   Correct.
24  Q.   And what you were told is, not that Ms. Stone
25  opened up the video in the airport and started
```

1 crying when she read the video and missed a plane,

2 but what you were told was, she could not open the

3 video in the airport and all she could do was read

4 the message associated with the video, correct?

5 A.   Yeah.   Just -- it states that she was in the

6 Denver airport and couldn't open it.   It doesn't

7 state why.   I don't know.

8 Q.   She read the message.   She knew what it was

9 about and she didn't watch the video at that time.

10 Later, she made the conscious decision to go in and

11 view the video, knowing what it was going to be

12 about?

13          MR. McKEEBY:   Objection, foundation,

14 speculation.

15          THE COURT:   I will overrule.

16          You can answer if you have personal

17 knowledge.

18          MR. GREENFIELD:   Then, objection, I would

19 like to, on top of that, then, make a hearsay

20 objection.

21          THE COURT:   I will overrule that.

22          THE WITNESS:   I don't know what she was

23 thinking, what she thought the video was.

24 BY MR. PRYOR:

25 Q.   Fair enough.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 183 of 426   PageID 14777
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1079

1        You know that she didn't view it until after

2    she read the message associated with it and after

3    she left the airport, some time later, she then

4    decided to view the video, based on what she told

5    you?

6    A.   It doesn't state that specifically here.

7    Q.   Well, it says, I couldn't look at the video in

8    the airport.

9        Did she tell you at some point she viewed the

10   video?

11            MR. GREENFIELD:  Objection, your Honor.

12            May we approach?

13            THE COURT:  Yes.

14            (Thereupon, the following proceedings were

15       had at sidebar:)

16            MR. GREENFIELD:  I think now we are

17   crossing clearly over to hearsay.  She's saying

18   based on what she told you --

19            THE COURT:  Party opponent?

20            MR. GREENFIELD:  Audrey Stone?

21            THE COURT:  Sure.  She's the union

22   president, the Union's a party, party opponent.

23            MR. PRYOR:  Absolutely.  Certainly at the

24   time.

25            THE COURT:  Sure.  And effect on him.  I

 1  mean, I think there are two ways around --

 2           MR. PRYOR:  But no, it is also because

 3  he's -- the investigator made the decision, his

 4  knowledge.

 5           THE COURT:  Sure.  It is her statement's

 6  impression on him.  So, I mean, I think there are

 7  two ways for this.

 8           (Thereupon, the sidebar was concluded and

 9      the following proceedings were held in open

10      court:)

11           THE COURT:  Okay.  You can ask.

12  BY MR. PRYOR:

13  Q.   Do you remember the question?

14  A.   No, sir.

15  Q.   Okay.

16      So based on what you wrote, and what you

17  recall, based on what you wrote or however you

18  recall, you know that she didn't view the video at

19  the airport.  She reviewed it somewhere else because

20  she couldn't view it at the airport, true?

21  A.   I don't recall her saying that she viewed it

22  after -- I don't know when that was.

23  Q.   You don't know that she ever viewed the video?

24  She didn't tell you she viewed it?

25  A.   I don't recall whether she said it or not.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1081

 1   Q.   One of the things you know for sure is that she
 2   told you when she got -- what she refers to here as
 3   the text and closed it out, I couldn't look at the
 4   video at the airport.  True?
 5   A.   Yes.
 6   Q.   And she told you that she was on a ski trip
 7   with some people from Denver at the time.  True?
 8   A.   Yes.
 9   Q.   That is different than saying, I was going on a
10   union trip to Baltimore, isn't it?
11   A.   It is different, yes.
12   Q.   So on the next page, she talks about, towards
13   the bottom, that -- What is your interpretation,
14   Can't wait until you get back on line.  She says,
15   I'm full-time for the Union, I know there has been a
16   recall to try to get the majority of the board
17   ousted.
18        So you were aware of the recall effort, true?
19   A.   Yes.  I don't see that on my screen, though.
20   It is not down that far.
21          MR. PRYOR:  I'm sorry, I can bring you
22   this page.  Do you want to accept my representation
23   or I can bring it to you?
24          THE WITNESS:  Either way.
25

 1 | BY MR. PRYOR:

 2 | Q.   You are okay with that?

 3 | A.   Yes.

 4 | Q.   All right.  Let's see if we can find -- it is

 5 | the next page.

 6 |      Oh, here it is, it is at the bottom here.  Do

 7 | you see where it says, I know there has been a

 8 | recall to try to get the majority of the board

 9 | ousted?  It is the last one.

10 | A.   Yes, I see it.

11 | Q.   All right.  Let's go to the next page.

12 |      So, she was asked by DG, what do you want

13 | Southwest to do?

14 |      That is the next page.

15 |      Towards the -- again, the top third, do you see

16 | where it says, "what do you want Southwest to do?"

17 | A.   Yes.

18 | Q.   And it says, make Charlene and Chris Click

19 | stop.  Tell those flight attendants not to talk

20 | about me or the Union president trying to get flight

21 | attendants fired.  They need to protect me.

22 |      Is that what she said, to the best of your

23 | recollection?

24 | A.   Yes.

25 | Q.   And she's talking about protecting herself from

1  these flight attendants, true?  Getting herself

2  protected from these flight attendants?

3  A.   It states that -- it seems that she's --

4  Q.   There's nothing in here about what I really

5  want is to protect other flight attendants, right?

6          MR. McKEEBY:  He didn't allow the witness

7  to finish.

8          THE COURT:  Yes, you can finish your

9  answer.

10          MR. PRYOR:  Oh, I'm sorry.  Were you not

11  finished?

12  A.   No.

13  BY MR. PRYOR:

14  Q.   Okay.  Finish.

15  A.   It states that those flight attendants, and it

16  talks about to get flight attendants fired, that is

17  general.  I don't know what she's referring to

18  exactly.

19  Q.   Okay.  But she's talking about, make Charlene

20  and Chris Click stop.  She says that.

21      By the way, stop what?  Do you recall?

22  A.   No.

23  Q.   And it says, tell those flight attendants, and

24  the only flight attendants mentioned would be those,

25  Charlene and Chris?

 1  A.    Yes.  I would assume so now, reading it.

 2  Q.    So tell those flight attendants not to talk

 3  about me or the Union president trying to get flight

 4  attendants fired.

 5        So "me" is her and "union president" is her,

 6  right?

 7  A.    Yes.

 8  Q.    And so she's saying, tell them not talk about

 9  Audrey Stone or Audrey Stone, president of the

10  Union, right?

11  A.    Yes.

12  Q.    And it says, "they need to protect me."  Once

13  again, my question to you is, in her answer to, what

14  do you want Southwest to do, she didn't say anything

15  about, well, really I'm -- she didn't tearfully say,

16  I'm doing this to protect other flight attendants,

17  especially one that might be pregnant.  Nothing like

18  that, right?

19              MR. GREENFIELD:  Objection, your Honor,

20  lack of foundation, speculation, and now he's

21  testifying as to what --

22              THE COURT:  Hold on.  That is a speaking

23  objection.

24              I'll allow it.

25              MR. PRYOR:  I'm comparing it --

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 189 of 426   PageID 14783
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1085

1  BY MR. PRYOR:

2  Q.   You can answer.

3  A.   Can you say the question one more time.

4  Q.   Yeah.  She didn't tell you anything about, I'm

5  not worried about me, I want you to protect other

6  flight attendants, especially one that might be

7  pregnant.  She didn't tell you that, did she?

8  A.   No.

9  Q.   Okay.

10            MR. PRYOR:  Let's go to Exhibit 90.

11            I'm sorry, your Honor, may I move -- I

12  move for the admission of Exhibit 90.

13            THE COURT:  All right.  Any objection to

14  90?

15            MR. McKEEBY:  No objection.

16            THE COURT:  Any from the Union?

17            MR. GREENFIELD:  One moment, your Honor.

18            None, your Honor.

19            THE COURT:  It is admitted.  We are

20  publishing.

21            (The referred-to document was admitted in

22       Evidence as Trial Exhibit 90.)

23  BY MR. PRYOR:

24  Q.   So it is Exhibit 90, there is an email from

25  Ms. Emlet, and you are in the lower email,

1  Mr. Schneider.  And it says here the documents that

2  create the nexus from her Facebook page.  I'm

3  summarizing.

4       I will show you those pictures.

5       That's the -- go to the next page.

6            MR. PRYOR:  Do you want me to just hand

7  him a hard copy or --

8            MR. HILL:  I'm about to drag it over.

9            MR. PRYOR:  Okay.

10 BY MR. PRYOR:

11 Q.   Okay.  Here we go.  I'm going to show you a

12 series of pictures and ask you if you recognize

13 these as the nexus that was used on her Facebook

14 page as part of one of your buckets to terminate

15 Ms. Carter.

16      Do you recognize this first one?

17 A.   I have seen it in the past, yes.

18 Q.   Is this one of the documents that you relied

19 upon as a nexus on her Facebook page to associate

20 her abortion video with Southwest Airlines?

21 A.   It shows her with a Southwest badge on, yes.

22 Q.   Okay.  The answer is yes, and it is because it

23 shows a Southwest badge?

24 A.   Yes.

25 Q.   Okay.  Can you tell from looking at it that it

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 191 of 426  PageID 14785
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1087

1  is a Southwest badge?

2  A.   Not here.  If you zoomed in, you might be able

3  to.

4  Q.   Okay, let's blow it up.  Make it a little

5  smaller, see if will ever focus in.

6       Have you ever seen a version of this Facebook

7  post that shows anything other than a blurred

8  lanyard?

9  A.   No.  I have not.

10 Q.   So -- by the way, do you know how long ago this

11 was from the time that the abortion video was

12 posted?

13 A.   No, I don't.

14 Q.   Would it matter to you, in order -- by the way,

15 a nexus is, there is some relationship between the

16 offensive post, or what be might be viewed as an

17 offensive post, and Southwest Airlines because

18 somebody going to Charlene's Facebook page could be

19 confused that maybe she's representing Southwest

20 Airlines and that affects Southwest Airlines' brand?

21          MR. GREENFIELD:  Objection, your Honor.

22 Counsel is testifying as to --

23          THE COURT:  Sustained.

24          MR. GREENFIELD:  What he believes the

25 nexus is.

 1  BY MR. PRYOR:

 2  Q.   So, your Honor, am I entitled to lead the

 3  witness on this issue?

 4          THE COURT:  I think you need to ask what

 5  the nexus is.

 6          MR. PRYOR:  So I can't lead him on this

 7  issue.  Okay.

 8          THE COURT:  You can lead him to nexus, but

 9  your definition was too long.  It amounted to you

10  testifying.

11  BY MR. PRYOR:

12  Q.   What is nexus?

13  A.   Anything that indicates that the employee is

14  employed by Southwest Airlines or has an interest in

15  Southwest Airlines.

16  Q.   So anything on a Facebook page that shows you

17  are related somehow to Southwest Airlines creates a

18  nexus with whatever the offensive post is?

19  A.   The thought process -- I'm sorry.

20  Q.   Let me try it again.

21          Is the concept, that Southwest Airlines doesn't

22  want anybody posting something that someone might

23  think, hey, that is Southwest Airlines's position?

24  Is that the brand issue?

25  A.   Yes.

```
 1   Q.    Okay.
 2         So is it -- this picture can't do that, right?
 3   A.    No.
 4   Q.    Even though this is listed as one of the
 5   reasons for the nexus?
 6   A.    We listed the whole package that was given to
 7   us, that had anything to do with Southwest Airlines.
 8   Q.    Okay.  And -- but this one would not support a
 9   nexus, true?
10   A.    Not if you can't see the badge or Southwest in
11   it.
12   Q.    Well, you have already told us that you can't,
13   right?
14   A.    Say it again.
15   Q.    You have already told us that you can't see it?
16   A.    You can't see it clearly, no.
17   Q.    You can't see it unclearly.  You can't tell at
18   all, true?
19   A.    It depends.  If somebody has flown on Southwest
20   Airlines or seen an employee with a badge, they
21   could make out that that looks like a Southwest
22   badge possibly.  That is all it's saying.
23   Q.    And that is your basis for nexus?
24   A.    No.  I'm saying that this, including all of the
25   other pictures with it, was nexus.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 194 of 426   PageID 14788
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1090

```
 1  Q.   This is one of them, right?  This is part of
 2  the nexus?
 3  A.   It could be.  It wasn't my specific one that I
 4  said to her indicated that she was employed by
 5  Southwest Airlines.
 6  Q.   Does it matter that it was -- a picture was
 7  years ago?  Can you really say there is a nexus from
 8  a picture over three years ago with a post -- is
 9  that a nexus?
10           MR. McKEEBY:  Objection, compound.
11           THE COURT:  Sustained.
12           MR. GREENFIELD:  And lack of foundation as
13  to the timing of this photo.
14           THE COURT:  Sustained.
15  BY MR. PRYOR:
16  Q.   Is there a nexus between a post today and a
17  post over 60 months ago?
18  A.   If there is something on the Facebook page that
19  indicates that they are an employee of Southwest
20  Airlines, then the nexus could be made.
21  Q.   And is that the way Southwest Airlines
22  typically enforces that policy, they go back years?
23  Scroll down those pages for half an hour and say,
24  boom, there is the nexus?
25  A.   It means there is visibility to that
```

```
1   information.  And if somebody was offended by what
2   it said, they may do a little more research and the
3   information is there.
4   Q.   So someone is going to see Ms. Carter's post
5   opposing abortion, and it is immediately going to
6   enter into their mind, you know what I'm going to
7   do, I'm going to go back five years to see whether
8   or not there is any reference to Southwest Airlines,
9   is that what you are telling us?
10              MR. McKEEBY:  Objection, foundation,
11   speculation.
12              MR. PRYOR:  Responding to his answer.
13              THE COURT:  Hold on.  I will sustain that.
14   BY MR. PRYOR:
15   Q.   Is it reasonable to believe that someone could
16   look at Charlene Carter's Facebook page where she
17   posts an abortion video, and then scrolls back over
18   three-and-a-half years to find a picture of her
19   husband in a Southwest Airlines uniform, and that is
20   going to tell the world Charlene Carter is
21   representing Southwest Airlines's position on
22   abortion?  Is that reasonable?
23   A.   If they were to look at all of the pictures
24   that were in the investigation.
25   Q.   Okay.  I just want to make sure.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1092

1        You say that is reasonable, correct?

2   A.    In today's world, there is a lot of passion out

3   there surrounding abortion, and people are very

4   motivated.  And that is a possibility.

5   Q.    And did anyone do that, other than your team?

6   Anyone?  Did anyone complain?

7             MR. GREENFIELD:  Objection -- objection,

8   your Honor.  He changed his question.  I will

9   withdraw my --

10            MR. McKEEBY:  What is the question?

11  BY MR. PRYOR:

12  Q.    Did anyone do that other than your team to try

13  and fire Ms. Carter?

14            MR. McKEEBY:  Objection to the

15  characterization.

16            THE COURT:  I'll allow it.

17            THE WITNESS:  Are you asking if someone

18  did that to fire Ms. Carter, is that your question?

19  BY MR. PRYOR:

20  Q.    I know the answer to that.  That is not my

21  question.

22        My question is, do you know of anyone other

23  than your team that went back more than three years

24  to try and find a connection to Southwest Airlines

25  on Ms. Carter's Facebook page?  Anyone?

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 197 of 426   PageID 14791
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1093

1              MR. McKEEBY:  Objection, foundation.

2              THE COURT:  I'll allow it.

3              THE WITNESS:  I'm not aware of that.  But

4    they may not come and tell me that.  It is a

5    perception that they would make on their own if they

6    did.  And that is what we are concerned about.

7    BY MR. PRYOR:

8    Q.   You are concerned with what?

9    A.   Anything -- no, I'm saying that if somebody

10   made the perception that this person's video had

11   anything to do with Southwest Airlines.

12   Q.   And you believed that it was reasonable to

13   believe that someone would go back years and

14   associate a picture with somehow Charlene Carter's

15   representing Southwest Airlines' position on

16   abortion, true?  That could happen, right?

17   A.   I answered that question.  Yes.

18   Q.   What was your answer?

19   A.   That there is a possibility.  With all of the

20   passion out there with abortion and the rights,

21   then -- people do a lot of things like that.

22   Q.   So if I picture -- put a picture of myself

23   going to church, and three years ago, I posted a

24   picture me wearing a Southwest Airlines uniform, I

25   could be fired.  I'm representing Southwest

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 198 of 426   PageID 14792
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                 Vol 4 July 08, 2022                 Page 1094

1  Airlines's position on religion, Southwest Airlines

2  doesn't want me doing that, do they?  You should

3  fire me.

4           MR. McKEEBY:  Objection, incomplete

5  hypothetical.

6           MR. GREENFIELD:  Objection, your Honor,

7  and proposing a false equivalency.

8           THE COURT:  I'll allow it.

9           THE WITNESS:  I don't know whether that

10  would or not.

11  BY MR. PRYOR:

12  Q.   It is a possibility, though, right?  Isn't that

13  what you say, "possibility"?

14  A.   I think it is a possibility that somebody could

15  make the perception that -- that is true.

16           MR. PRYOR:  Exhibit 92.  I offer Exhibit

17  92 into evidence.

18           THE COURT:  Ninety-two.  Any objections to

19  92?

20           MR. McKEEBY:  No objection.

21           THE COURT:  All right.  How about the

22  Union?

23           MR. GREENFIELD:  I can only see part of

24  that, so give me one moment, your Honor.

25  Ninety-two?  No, your Honor.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 199 of 426  PageID 14793
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 4 July 08, 2022                  Page 1095

 1                  THE COURT:  Okay.  It is admitted.  We are
 2  publishing.
 3                  (The referred-to document was admitted in
 4        Evidence as Trial Exhibit 92.)
 5  BY MR. PRYOR:
 6  Q.   This is an email from Ms. Carter to you saying,
 7  thank you -- you had contacted her about an
 8  interview, I believe, true?
 9  A.   A fact-finding meeting, yes.
10  Q.   Okay.  And it says, thank you, Mr. Schneider.
11  I will call first thing Monday morning and ask for
12  the extension.  I think she was on vacation at the
13  time?
14  A.   Out of town, yes.
15  Q.   This is all very new to me.  I have never been
16  called in for anything in 20 years, and never had to
17  use the Union before, so thanks for the help.
18        In turn, did you look at her record to see if
19  she had a record at Southwest Airlines?
20  A.   Yes.
21  Q.   Did she have a clean record at Southwest
22  Airlines?
23  A.   Yes.
24  Q.   Did you take that into consideration as a
25  possibility in regard to whether or not to provide

1  an accommodation or maybe not think about the

2  possibility of some deranged person going back five

3  years on a Facebook page?

4           MR. McKEEBY:  Objection.

5           THE WITNESS:  I don't follow the question.

6           MR. PRYOR:  Let's --

7           THE COURT:  Hold on.

8           MR. PRYOR:  I withdraw the question.

9           THE COURT:  Okay.

10          MR. McKEEBY:  Okay.

11          MR. PRYOR:  Let's look at exhibit -- that

12  is not it either.  I will get there.

13  BY MR. PRYOR:

14  Q.   Do you recall in her interview, Ms. Stone

15  telling you that there were no pro choice activities

16  by the Union?

17  A.   Did I tell her there were no pro choice?

18  Q.   She told you during the interview -- let me go

19  back to her interview notes.  Let me find them.

20       Do you recall asking her whether or not the

21  Union had taken any positions on abortion and her

22  telling you that they had not?

23  A.   I vaguely remember that.

24  Q.   You don't?  I'm sorry?

25  A.   I vaguely remember that.

```
 1  Q.    Okay.

 2        Let's look at Exhibit 56.

 3        And it's AP32, which is like the fourth or

 4  fifth page.

 5  Q.    Do you know who Jessica Parker is?

 6  A.    Yes, I do.

 7  Q.    She's a union member?

 8  A.    She was.

 9  Q.    By the way, were you a union member?

10  A.    During this investigation?

11  Q.    No.  During your tenure at Southwest Airlines?

12  A.    Yes.

13  Q.    Were you in an official position or just a

14  paying dues member?

15  A.    I was a paying dues member.

16  Q.    That is all?

17  A.    Yes.

18  Q.    Okay.  I was just trying to find out if you

19  were an officer.

20  A.    No.

21  Q.    Okay.  So this is a post from the Women's March

22  by TWU Local 556.

23        Do you see where it says, "My body, my choice"?

24  A.    Yes.

25  Q.    Is that consistent with what you were told by
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 202 of 426   PageID 14796
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 1098

 1  Ms. Stone?

 2  A.   That they don't have a stand on it?

 3  Q.   That they didn't do any pro choice activities

 4  at the march.

 5  A.   Yes, I do.

 6  Q.   It is consistent or inconsistent?

 7  A.   I don't believe that they -- I saw anything

 8  indicating that they were pro choice or pro life.

 9  Q.   Well, what does this tell you?

10       This is the TWU Local 556 post from the Women's

11  March, "My body, my choice."

12       You don't know what that means?

13  A.   I'm not completely familiar with it.  I'm sure

14  it has something to do, if you are saying so, with

15  abortion.

16  Q.   So you don't know.  The person investigating

17  doesn't know what "my body, my choice" means?

18  A.   No.  All I'm saying is that I don't know if

19  that is a union member holding it up or not.

20  Q.   Oh, no.  I'm -- the Union -- it is posted on

21  the Union Facebook.

22  A.   Okay.

23  Q.   That is the Union taking a position about the

24  march and pro choice.

25  A.   Okay.

 1  Q.   That was -- that is what I meant by my

 2  question.

 3             MR. McKEEBY:  I object, he's testifying

 4  about what the union --

 5             THE COURT:  Well, rephrase it and ask a

 6  question.

 7  BY MR. PRYOR:

 8  Q.   And so, therefore, understanding that, is that

 9  consistent or inconsistent with what Ms. Stone told

10  you?

11             MR. McKEEBY:  Well, same objection.  You

12  didn't correct the --

13             THE COURT:  Yes.  Can you back up and ask

14  your last question as a question.  You are making a

15  statement and he said okay.  But can you ask it in

16  question form.

17             MR. PRYOR:  I will.

18  BY MR. PRYOR:

19  Q.   Do you recall telling us your recollection is

20  that Ms. Stone told you that there were no pro

21  choice activities on the part of the Union in regard

22  to the Women's March, true?

23  A.   I said I vaguely remember.  I don't remember

24  the details of what was said.

25  Q.   I will take your vague recollection.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1100

```
 1   A.    Okay.
 2   Q.    But in fact, January 26, 2017, the local union
 3   posts from the Women's March a poster saying, "My
 4   body, my choice"?  Based on this document, right?
 5   A.    It shows a picture saying that statement, yes.
 6   Q.    Is that consistent or inconsistent with what
 7   she told you?
 8   A.    I would say that it is inconsistent, if this is
 9   specifically what it means.
10              MR. PRYOR:  Can you tell me the exhibit?
11   Ninety-eight.  Let's look at Exhibit 98.
12              Is it in evidence?
13              THE COURT:  It is not.
14              MR. PRYOR:  I offer Exhibit 98.
15              THE COURT:  Ninety-eight, any objection?
16              MR. McKEEBY:  No objection from Southwest.
17              THE COURT:  Okay.  How about the Union?
18              MR. GREENFIELD:  None, your Honor.
19              THE COURT:  Okay.  It is admitted.  We are
20   publishing.
21              (The referred-to document was admitted in
22        Evidence as Trial Exhibit 98.)
23   BY MR. PRYOR:
24   Q.    Mr. Schneider, are these the interview notes of
25   the interview of Charlene Carter in regard to your
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 4 July 08, 2022                  Page 1101

 1  investigation?

 2  A.    Yes.

 3  Q.    And as with the notes regarding Ms. Stone's

 4  interview, you believe that these are accurate?

 5  A.    Yes.

 6  Q.    Let's look at a couple things.

 7        Who is Eddie Barnett?

 8  A.    That is the HR VP human resource business

 9  person for Southwest Airlines.

10  Q.    It says here, he says, this is my first case

11  involving the guidelines for employees which

12  includes the social media policy, and is the main

13  reason I'm on the call.

14        Do you see that?

15  A.    Yes.

16  Q.    Do you know if that is accurate?

17  A.    If she said it, then it must be accurate.

18  Q.    If she said it, it must be true?

19  A.    Correct.

20  Q.    You know her.  You would believe her if she

21  said it?

22  A.    Yes.

23  Q.    You don't know whether or not she opined

24  regarding whether or not posts on Facebook of core

25  team members of Audrey Stone violated social media

```
 1   policy?
 2            MR. McKEEBY:  Objection, foundation, I
 3   don't know what --
 4            MR. PRYOR:  I'm creating a foundation.
 5            THE COURT:  I'll allow it.
 6            THE WITNESS:  Okay.  I did not follow your
 7   question.
 8   BY MR. PRYOR:
 9   Q.   Yes.
10        Do you know whether or not Eddie Barnett was
11   involved in Southwest Airlines's decision whether or
12   not to take action against core team members?
13            MR. PRYOR:  Hang on.  Can I approach, your
14   Honor?
15            THE COURT:  You may.
16            (Thereupon, the following proceedings were
17        had at sidebar:)
18            MR. PRYOR:  I just want to make sure I'm
19   not violating.  I'm just asking whether or not we
20   believe Eddie Barnett said in regard to the core
21   team members that it did not violate Southwest's
22   policy because it was union-protected activity and
23   not illegal.  I'm not going to ask him that.
24            MR. McKEEBY:  I'm trying to understand.
25   I'm confused.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 207 of 426   PageID 14801
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1103

 1              MR. PRYOR:  I'm telling my basis for

 2   asking the question.

 3              The question is, do you know whether or

 4   not Eddie Barnett was involved in Southwest

 5   Airlines's decision in regard to what action to

 6   take, if any, against core team members making posts

 7   on the core team member Facebook page?  I'm not

 8   asking what punishment.  I am asking --

 9              MR. McKEEBY:  I don't think I care.  That

10   question is okay.

11              THE COURT:  Yeah, I think that question is

12   okay.

13              MR. PRYOR:  That is as far as I'll go.

14              MR. McKEEBY:  I appreciate that.

15              The next one is not, I think we are all on

16   the same page.

17              MR. PRYOR:  Well, I'm done after that one.

18              MR. GREENFIELD:  Your Honor, while we are

19   here, so we don't have to come back and I don't have

20   to object and bother the jury again, I will have a

21   foundation argument objection if he doesn't set up

22   that he has some sort of knowledge about the core

23   team investigation.

24              MR. PRYOR:  Me?

25              MR. GREENFIELD:  Yeah.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 208 of 426   PageID 14802
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1104

```
 1                 MR. PRYOR:  I will take the stand.

 2                 MR. GREENFIELD:  I just --

 3                 MR. PRYOR:  No, I'm willing to.

 4                 MR. GREENFIELD:  He has to ask --

 5                 THE COURT:  He is asking you to ask that

 6      question first, do you have knowledge about core

 7      team.

 8                 MR. PRYOR:  Oh, that is not near as much

 9      fun.

10                 MR. McKEEBY:  I will put you up there.

11                 MR. PRYOR:  Wait, if I have to do that --

12      you are making me do that?

13                 THE COURT:  I don't give advisory rulings.

14                 MR. PRYOR:  Okay.  Good.  All right.

15                 THE COURT:  So you can ask the question.

16                 (Thereupon, the sidebar was concluded and

17          the following proceedings were held in open

18          court:)

19                 THE COURT:  Okay.  You can ask your

20      question.

21      BY MR. PRYOR:

22      Q.   Sir, do you know whether or not Eddie Barnett

23      was involved in Southwest Airlines's decision

24      whether or not to take action against any persons

25      making posts on what was referred to as a core team
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 209 of 426   PageID 14803
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1105

1  Facebook page in support of Audrey Stone?

2  A.    I do not know that.

3  Q.    Okay.  Let's look at Exhibit 98.

4        And the question is, do you see where it says,

5  the first is a picture of an unborn infant, why were

6  these posted on your Facebook page?

7        Do you see that?

8  A.    I haven't found it yet, no.

9  Q.    Where that cursor is?

10 A.    Yes.

11 Q.    And Charlene's response is, I'm Christian.  I'm

12 a conservative and I'm pro life.

13       You understood that at the time?

14 A.    Yes.

15 Q.    Let's go to the next page.  And again, Ed says,

16 she made the statement, I just want to know what she

17 means by that.  And then Charlene says, I had an

18 abortion, I regret every bit of it, so I work with

19 other pro life groups.  And for me as a Christian.

20 Again, she's telling this involves her religious

21 belief, true?

22 A.    True.

23 Q.    Let's go to page 4.

24       This is talking about a button she wore

25 relating to Israel.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 210 of 426   PageID 14804
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1106

1      By the way, do you know anything about that

2   button?

3   A.   As part of the investigation, yes.

4   Q.   Okay.  Do you recall that that is something she

5   started wearing after 911 without any objection from

6   Southwest Airlines?

7          MR. GREENFIELD:  Objection, your Honor.

8   He's testifying, lack of foundation.

9          THE COURT:  I'll allow it.

10         THE WITNESS:  I had never seen her wearing

11  that, so I don't know how long she had been wearing

12  it or if she even wore it.

13  BY MR. PRYOR:

14  Q.   The answer is you don't know?  Did you inquire?

15  Did you inquire?

16  A.   It shows it on the picture.

17  Q.   And from years ago, correct?

18  A.   I don't know the date.

19  Q.   Well, do you know that she told you she had

20  been wearing it for years, without objection from

21  Southwest Airlines?  Until now, apparently?

22  A.   Okay.

23  Q.   And the part I'm reading, it is in the middle,

24  it says, my love for that country through my

25  Christian, you know, beliefs, my belief system.

 1       She's again telling you she's exercising her
 2  religious beliefs, true?
 3  A.   Yes.
 4  Q.   And if you look at the bottom of page 5, you
 5  can read from there and then read the next, and then
 6  into the next page.
 7       Do you see where it says, she's our union
 8  president?
 9       Do you see that?  Towards the bottom?
10  A.   Who is saying it, Charlene?
11  Q.   She is our union president?
12  A.   Oh.
13  Q.   And then on the next page -- and the poor
14  person taking notes must have been -- who took the
15  notes?
16  A.   Meggan Jones.
17  Q.   The lady over here?
18  A.   Yes.  That is her.
19  Q.   She goes on -- and you don't have to read it
20  all -- she goes on and explains that she's opposed
21  to her union being involved in this march, right?
22  A.   Yes.
23  Q.   And then she says, if you go down, says, they
24  support Planned Parenthood.  They march right
25  alongside with them.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1108

1         Do you see that?

2    A.    Not yet.  Is it near the top?

3         Oh, down there.  Okay.

4    Q.    Do you see where it says "they support Planned

5    Parenthood, they march right along with them"?

6    A.    Right.

7    Q.    Does that refresh your recollection as opposed

8    to what you told us this morning, you don't recall

9    anything about Planned Parenthood?

10   A.    I was not aware that it was Planned Parenthood.

11   As far as I knew, it was a Women's March for women's

12   rights.

13   Q.    She was telling you that the march was

14   supported by Planned Parenthood, and that is what

15   she objected to.

16        And you missed that point entirely?

17   A.    No.  She stated that.

18   Q.    Okay.

19        And you --

20   A.    I didn't see the evidence for it.

21   Q.    Well, did you ask for evidence?  Did you

22   disagree with it?

23   A.    She showed pictures of the Union banner, but I

24   didn't see any Planned Parenthood symbols on any of

25   the -- or the Union pictures or banners.

 1  Q.   Did you see pictures of the Union marching with

 2  Southwest Airlines' name on their banner?

 3  A.   The local TWU 556 of Southwest flight

 4  attendants was written on there, yes.

 5  Q.   And was any action taken for the posts from

 6  that march that said pro life and having a nexus to

 7  Southwest Airlines?  Not five years ago, but 30

 8  minutes ago?

 9          MR. McKEEBY:  Objection, foundation.

10  Facts not in evidence.

11          THE COURT:  Sustained.

12          MR. PRYOR:  What is not in evidence?

13          MR. McKEEBY:  I will tell you what is not

14  in evidence.  I'm not sure if --

15          THE COURT:  Sidebar.

16          MR. McKEEBY:  Not comfortable responding

17  to counsel.

18          THE COURT:  Sidebar.

19          (Thereupon, the following proceedings were

20      had at sidebar:)

21          MR. McKEEBY:  Well, your question said

22  that there was a picture of a sign that said

23  Southwest Airlines and pro choice.

24          MR. PRYOR:  No, I didn't.

25          MR. McKEEBY:  Yes, you did.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 214 of 426  PageID 14808
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1110

1              MR. PRYOR:  No.  Repeat it.  I didn't.  I

2  am a little bit tired of being accused of things I

3  didn't do.  Read it.

4              MR. McKEEBY:  Okay.  If I misheard that --

5  that is what I heard.

6              THE COURT:  That is what I heard, too.

7              MR. PRYOR:  Okay.  Well, let me -- that is

8  not what I said.

9              I will rephrase it, then.

10             THE COURT:  Okay.

11             (Thereupon, the sidebar was concluded and

12         the following proceedings were held in open

13         court:)

14  BY MR. PRYOR:

15  Q.   You are aware that there was a banner at the

16  march used by Local 556 that said Southwest

17  Airlines, true?

18  A.   It said TWU 556, the meeting of Southwest

19  Airlines flight attendants.

20  Q.   So associated with Southwest Airlines, right?

21  That is your brand?

22  A.   That is associated with the Union of Southwest

23  Airlines.

24  Q.   So if you say "union," then it doesn't matter,

25  right?

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 215 of 426   PageID 14809
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1111

1  A.    I don't know.  I'm just stating what it said.

2  That is all I'm saying.

3  Q.    And I showed you earlier a picture from the

4  march that referenced pro choice, true?

5  A.    No.  It said "My body, my choice," it said.

6  Q.    All right.

7       So I'm going to represent to you, since you

8  don't know, that that is a pro choice position on

9  abortion.

10      Now, you got these two things, you have

11  Southwest Airlines -- and it is on the post, it is

12  on the same Facebook post the same day as the post

13  that says pro choice.

14      You got it?

15           MR. McKEEBY:  Objection, this is argument

16  again.

17           THE COURT:  I'll allow this.

18  BY MR. PRYOR

19  Q.    So you have got these two facts.  So is that a

20  nexus?  Or does it have to be five years ago to be a

21  nexus?

22  A.    I didn't see it on the same page, if that is

23  what you are asking me.

24  Q.    So it has to be on the same page?

25  A.    No.  I'm trying to clarify your question.  You

1  said, if they are on the same page, and I'm just

2  trying to clarify what page you are talking about.

3  Q.   The page I showed -- the Facebook page I showed

4  you earlier that says, pro choice?

5  A.   That said, "My body, my choice"?

6  Q.   That's right.

7  A.   Yes.

8  Q.   And on that same Facebook page, I don't know,

9  you may have to scroll for two seconds to get to

10 it -- there is the banner that says Southwest

11 Airlines, you are aware of that?

12 A.   If it is on there, yes.

13 Q.   And I'm saying, which is a closer nexus to

14 taking a position on abortion on behalf of Southwest

15 Airlines, that post that is within a few seconds of

16 each other, or one that is three, four, five years

17 apart?

18 A.   As far as -- if it is going to result in

19 discipline, it the egregiousness of the post-type

20 thing.  That is a stand.  And I'm not investigating

21 that.

22 Q.   Which is a closer nexus?

23 A.   Closer how?

24 Q.   Closer in time.  How about that?

25 A.   Probably if it is on the same -- in the same

```
 1   day, that is closer.
 2   Q.   Probably?
 3   A.   I don't know when the other posts were.  I
 4   don't have dates and times of every post.
 5   Q.   I told you to assume it was in the same day,
 6   within seconds, but that is okay.  It is only
 7   possible that that one is closer in time than five
 8   years.
 9        I will accept your answer and move on.
10             MR. PRYOR:  Exhibit 111.  And I offer into
11   evidence Trial Exhibit 111.
12             THE COURT:  111.  Any objections to 111?
13             MR. McKEEBY:  No objections from
14   Southwest.
15             THE COURT:  How about from the union?
16             MR. GREENFIELD:  No, your Honor.
17             THE COURT:  Okay.  111 is in.  We are
18   publishing.
19             (The referred-to document was admitted in
20        Evidence as Trial Exhibit 111.)
21   BY MR. PRYOR:
22   Q.   You are familiar with Exhibit 111 in some
23   emails, some you authored and some you received?
24   A.   Yes.
25   Q.   Let's start at the bottom one.  Denise
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 1114

1  Gutierez, she's with employee relations?

2  A.   Is that a question?  Yes, she is.

3  Q.   Let's go to the second page, at the top.

4       And it says, while the videos depicting

5  abortion are considered to be offensive, they do not

6  violate the company's harassment, sexual harassment,

7  discrimination and retaliation policy, but they

8  should be addressed.

9       That is what they told you, isn't it?

10 A.   Yes.

11 Q.   So did you agree with them?  Or did it matter?

12 A.   I agreed with them.

13 Q.   Okay.  So two of the three the buckets, two of

14 them didn't violate any harassment policies, right?

15 A.   Correct.

16 Q.   And then it says, however, the images of women

17 dressed as vaginas do violate the aforementioned

18 policy due to their sexual nature.

19      So they concluded that the vagina pictures

20 violated the policy, true?

21 A.   Yes.

22 Q.   And then you respond, I have attached the

23 termination letter.  Do you want me to add

24 harassment policy?  True?

25 A.   Yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  Q.   And this is your draft letter attached.  And it

2  says, under the reasons for termination, one,

3  Southwest Airlines's social media policy, right?

4  A.   I don't see it on here.

5  Q.   I'll get the letter for you; it's the

6  attachment.

7  A.   Okay.  Yes.  It does say "social media policy."

8  Q.   And then it says, "bullying policy."  They

9  don't have a bullying policy at Southwest Airlines,

10  do they?

11  A.   It is depicting the same policy.  But that was

12  something that needed to be edited.

13  Q.   I understand.

14      Do they have a bullying policy at Southwest

15  Airlines?  As opposed to a workplace bullying

16  policy?

17  A.   It is semantics, but it is referring to the

18  same thing.

19  Q.   There is no reason that you were wanting to

20  leave out "workplace" though, right?

21  A.   No.

22  Q.   And under the third one, it says, workplace

23  rules 3.0.0.  And that did not find its way into the

24  final termination letter, correct?

25  A.   It refers to it in part.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1116

 1  Q.   Does it reference this policy as being a basis
 2  for termination?
 3  A.   Not specifically, no.
 4  Q.   Does "not specifically" mean no or is this
 5  another where you think generally, it might?
 6  A.   No.  If we look at the letter, there is a
 7  statement in there that references --
 8  Q.   3.0.0?
 9  A.   It doesn't say it specifically.  I have to
10  read -- look at the letter again to know for sure,
11  the final termination letter.
12  Q.   It doesn't specifically say 3.0.0, but
13  generally says it?
14  A.   It says it could violate other areas.  And I
15  don't know specifically the wording.
16  Q.   I'm not asking about could.  I'm trying to ask
17  about the policies that were part of the termination
18  in 3.0.0 were not part of the determination
19  decision, true?
20  A.   True.
21  Q.   And, in fact, the harassment policy was not
22  included either, was it?
23  A.   Once again, it referred to, it could have been
24  violated.  It doesn't specifically say it was.
25  Q.   It doesn't generally say it was; it says it

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1117

```
 1  could.

 2  A.    Correct.

 3  Q.    It doesn't anywhere say she was fired for

 4  harassment policy, true?

 5  A.    Other than referencing it in there?

 6  Q.    Referencing that it could have --

 7  A.    Correct.

 8  Q.    -- but that is not the reason.  You gave two

 9  reasons --

10  A.    Correct.

11  Q.    -- workplace bullying and social media policy?

12  A.    Yes.

13  Q.    Workplace bullying that you don't know took

14  place at the workplace and social media policy, is

15  that fair?

16  A.    Correct.

17  Q.    Why was harassment not included?

18  A.    Because it was partially a violation, and we

19  didn't want to put something in there that was

20  partially violated because it wouldn't be as strong

21  as the other two.

22          MR. PRYOR:  Okay.  Let's look at Exhibit

23  115.  I move for its admission.  It may already be

24  in.  I don't know.

25          THE COURT:  115.  It is in.
```

 1              So I will ask, any objections?

 2              MR. McKEEBY:  No objections from

 3   Southwest.

 4              MR. GREENFIELD:  None, your Honor.

 5              THE COURT:  Okay.  115 is in.  We are

 6   publishing.

 7              MR. PRYOR:  Yes.

 8              (The referred-to document was admitted in

 9       Evidence as Trial Exhibit 115.)

10   BY MR. PRYOR:

11   Q.   Let's look at the final version.  It says in

12   the second paragraph, during the meeting you

13   admitted you posted graphic videos of aborted

14   fetuses on Facebook and sent those videos in a

15   private Facebook message to another Southwest flight

16   attendant.

17       Is that what it says?

18   A.   Yes.

19   Q.   Why doesn't it reference that it was sent to

20   her as union president, as you have told us?

21   A.   We are protecting one of our employees.

22   Q.   I understand.  But you have told us as to all

23   three buckets, you understood she was sending it to

24   Audrey Stone and the Union complaining about union

25   activity.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 223 of 426   PageID 14817
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1119

1      Do you understand -- I understand Audrey Stone

2  is a flight attendant, although, she wasn't working

3  as a flight attendant at the time, was she?

4          MR. McKEEBY:  Objection, compound.

5          MR. PRYOR:  I will remove it.

6  BY MR. PRYOR:

7  Q.   Was she working as a flight attendant at time

8  any of these posts were sent to her?

9  A.   She was still an employee of Southwest

10 Airlines, but she was doing union business, yes.

11 Q.   She was not acting as a flight attendant at the

12 time she received any of these posts, true?

13 A.   It is loosely how you say "she was acting as a

14 flight attendant."  She was still an active flight

15 attendant who is certified.

16 Q.   Under that definition, she will be a flight

17 attendant until she dies.

18      I'm asking you --

19          MR. GREENFIELD:  Objection, your Honor, to

20 the sidebars continuing.

21          THE COURT:  Sustained.

22          MR. PRYOR:  I withdraw that.

23 BY MR. PRYOR:

24 Q.   So she was not acting as a flight attendant at

25 the time she received any of these messages that she

1  received from Charlene Carter, true?

2  A.    True.  In the sense of the word.

3  Q.    But she was acting as union president, true?

4  A.    Yes.

5  Q.    You don't mention that here, correct?

6  A.    Correct.

7  Q.    And then it says, in the next paragraph,

8  Charlene, when you posted the graphic videos and

9  pictures on Facebook, you were identifiable as a

10 Southwest Airlines employee and represented our

11 company and a manager, disparaging flight

12 attendants, as well as to all Southwest employees.

13       That is what you wrote?

14 A.    Yes.

15 Q.    And the post you are referring to are the posts

16 we talked about earlier that were years before?

17 A.    The posts of the aborted fetus?

18 Q.    No.  The post that you say she represented --

19 you say that, you were identifiable as a Southwest

20 Airlines employee and represented our company.

21       So those posts from years ago, you are saying

22 she was representing Southwest Airlines in regard to

23 those abortion videos that are three, four years

24 apart?

25 A.    Yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1121

```
 1   Q.   Then you say, although your posts and messages
 2   may have been made and/or sent outside of work, so
 3   you are acknowledging here, you knew it did not take
 4   place in the workplace, right?
 5   A.   I said may have been.
 6   Q.   May have been made or sent.  That about covers
 7   the gambit.  By saying "may," you think that they
 8   actually did occur in the workplace?
 9   A.   I'm not saying it did or didn't.  I'm just
10   saying it could have.  And -- or it might have been
11   outside, but it still represented the company.
12   Q.   Well, not workplace, then.
13            MR. McKEEBY:  Objection; that is argument.
14            THE COURT:  You can ask it as a question.
15   BY MR. PRYOR:
16   Q.   It is not workplace, then, is it?
17   A.   What is not workplace?
18   Q.   If she's not doing it in the workplace, it is
19   not workplace?
20   A.   It is not workplace, correct.
21   Q.   And she was terminated, in part, for violating
22   the workplace bullying/hazing policy, right?
23   A.   Yes.
24   Q.   Do you know that Southwest Airlines, as part of
25   its agreement with the Union, tracks Southwest
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 226 of 426   PageID 14820
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1122

1   Airlines's reprimanding of employees?  You have to

2   keep a record of it and the Union gets it?

3   A.    Okay.

4   Q.    You don't know that?

5   A.    I'm not following the question.  I was --

6   Q.    I'm saying, do you accept what I'm telling you

7   so far?  That your company keeps a record of every

8   kind of employee that gets a punishment, and they

9   say, here is how many social media policies we had

10  this year, here is how many 30-day suspensions we

11  had?

12  A.    Yes.

13  Q.    You know they do that?

14  A.    Yes.

15  Q.    And do you know that they are required to,

16  right?

17  A.    I know they do.  I don't know about the

18  requirement.

19  Q.    And they have all kind of categories, including

20  workplace bullying and hazing policy and social

21  media and sexual harassment.  They keep all of that?

22  A.    Okay.

23  Q.    Right?  Are you aware of that?

24  A.    I have seen some stats on that.  I'm not aware

25  of how detailed the collection of that is.

1  Q.   Do you know that there is not a single record

2  in the history of Southwest Airlines of anyone being

3  terminated or reprimanded for a violation of the

4  mission statement?

5  A.   No, I wasn't aware of that.

6  Q.   And in fact, you include -- they don't even

7  keep a record of that.  You are not aware of that?

8          MR. GREENFIELD:  Objection, your Honor,

9  lack of foundation.

10          THE COURT:  Sustained.

11  BY MR. PRYOR:

12  Q.   Are you aware of whether or not the company

13  keeps track of purported violations of the company's

14  mission statement?

15  A.   No.

16  Q.   But you include mission statement in your

17  termination letter, true?

18  A.   True.

19  Q.   Had you ever done that before ever?

20  A.   It seems like we have referred to it in the

21  past.

22  Q.   Have you ever, to your recollection -- let's go

23  back that.

24      Have you ever terminated anyone prior to this

25  for violation of social media policy?

```
 1   A.    Yes.

 2   Q.    Who?

 3   A.    Or no -- you said for -- terminated violation?

 4              MR. PRYOR:  I withdraw the question.

 5   BY MR. PRYOR:

 6   Q.   It is fair to say you have never, as of the

 7   time of terminating Charlene Carter, never

 8   terminated anyone for violation of the company's

 9   social media policy?

10              THE COURT:  I'm not aware of that.

11              MR. McKEEBY:  Objection.  Objection,

12   relevance.  Prejudice.  Motion in limine.

13              THE COURT:  Limine.

14              MR. McKEEBY:  I'm sorry?

15              THE COURT:  It is limine.

16              MR. PRYOR:  Sustained?

17              THE COURT:  Yes.

18   BY MR. PRYOR:

19   Q.   There is nothing in the termination letter

20   referring to Charlene Carter having threatened

21   Ms. Stone, correct?

22   A.    No.

23              MR. PRYOR:  Let's look at Exhibit 64.  I

24   move to introduce Exhibit 64.

25              THE COURT:  Sixty-four.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 229 of 426   PageID 14823
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1125

1              MR. PRYOR:  They are calling it up.

2              THE COURT:  Okay.  Objections -- prior

3   objections?

4              MR. McKEEBY:  Sorry.  No objections.

5              MR. GREENFIELD:  None, your Honor.

6              THE COURT:  Sixty-four is in.  We can

7   publish.

8              (The referred-to document was admitted in

9        Evidence as Trial Exhibit 64.)

10  BY MR. PRYOR:

11  Q.   And can you identify Exhibit 64 as what you

12  understood Charlene Carter to have posted on her

13  Facebook page that is one of the three buckets that

14  she was terminated for?

15  A.   Yes.

16             MR. PRYOR:  And let's look at Exhibit 107.

17             MR. GILLIAM:  Move for admission.

18             MR. PRYOR:  I move for the introduction

19  admission of Exhibit 107.

20             THE COURT:  107.

21             Any objections to 107?

22             MR. McKEEBY:  No objection from Southwest.

23             THE COURT:  How about the Union?

24             MR. GREENFIELD:  None, your Honor.

25             THE COURT:  Okay.  107 is in.  We are

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1126

 1  publishing.

 2             (The referred-to document was admitted in

 3       Evidence as Trial Exhibit 107.)

 4  BY MR. PRYOR:

 5  Q.   Can you identify Exhibit 107?

 6  A.   Yes.

 7  Q.   Are these your -- tell me what it is.

 8  A.   It is a summary of my investigation sent to

 9  labor relations and employee relations, and HR VP.

10  Q.   And in the first paragraph you say, she stated

11  that Charlene Carter has been making comments that

12  indicated she was not union friendly since 2008.

13  Audrey Stone became president of TWU in 2013, and

14  she stated Charlene has been sending her messages

15  since that time, before there were any issues due to

16  abortion or women's rights.  True?

17  A.   That is what it states, yes.

18  Q.   I'm looking for a particular sentence.

19             Here we go, one, two -- in the third paragraph,

20  it says "In our fact-finding meeting with Charlene

21  she openly admitted to sending Facebook messages to

22  Audrey for at least the past two years.  She latched

23  on to the Women's March and abortion issues as her

24  defense, stating it was her values as a Christian,

25  but the harassment has been going on much longer."

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 231 of 426  PageID 14825
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1127

1        Do you see that?

2    A.    Yes.

3    Q.    What harassment?

4    A.    The continuous messages sent to Audrey Stone.

5    Q.    So the messages that were sent by Charlene

6    Carter complaining about her union is what you are

7    referring to as the harassment?

8    A.    Yes.

9    Q.    It says, Charlene has been barraging Audrey

10   with Facebook messages, rantings since March 2015,

11   has incessantly called her morally bankrupt, no

12   integrity, corrupt and inept.

13        Do you see that?

14   A.    She just got it up.  Yes, I see it at the

15   bottom.

16   Q.    And you considered her union communications to

17   be her incessantly doing those things?

18   A.    Yes.

19   Q.    Then on the next page, you once again refer to

20   it as a bullying and hazing policy, don't you?  It's

21   coming up.

22   A.    Yes.

23   Q.    Did you not realize that it had to take place

24   in the workplace?

25   A.    On the final letter I did.

1  Q.   Were you aware of it at the time that you took

2  the actions that you did against Ms. Carter?

3  A.   You mean as far as placing the word "workplace"

4  in it or what are you asking?

5  Q.   I'm asking whether or not you thought it was a

6  bullying and hazing policy or a workplace bullying

7  and hazing policy?

8  A.   The workplace bullying and hazing policy could

9  be referring to our workplace policy.  It involves

10  all of our employees.  It doesn't -- they may not

11  specifically mean it has to happen in the workplace.

12  It is a workplace bullying and hazing, it covers all

13  employees.

14  Q.   But whether they are in the workplace or not,

15  right?

16  A.   I don't know because --

17  Q.   You don't know?

18  A.   -- there are two different opinions on there.

19  I mean, you are saying -- you are making it that it

20  is specifically in the workplace only, but --

21  Q.   I'm just reading what your policy says, sir.

22  But you're telling me that "workplace" is really

23  kind of an optional word there, right?

24            MR. McKEEBY:  Objection, mischaracterizes.

25            THE COURT:  Sustained.

1  BY MR. PRYOR:

2  Q.   You are saying that the workplace bullying and

3  hazing policy doesn't necessarily just apply to the

4  workplace?  True?

5  A.   I'm saying that it covers all employees towards

6  each other.  That is what I'm saying.

7  Q.   Does it require the activity to be at the

8  workplace or not?

9  A.   I -- I think that it can be in the workplace.

10  It has to do with covering our employees, more than

11  anything.

12  Q.   Okay.  Is it limited to the workplace as stated

13  in the policy or not?

14        MR. McKEEBY:  Objection, asked and

15  answered.

16        THE COURT:  I'll allow it.

17        THE WITNESS:  I don't know whether that is

18  stated in there or not, that it has to be in the

19  workplace.

20  BY MR. PRYOR:

21  Q.   It says "workplace bullying."

22  A.   Right.

23  Q.   That is what I mean when I say it's at the top

24  in bold and it is in the statement itself.

25        So where it says "workplace bullying," what it

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 234 of 426   PageID 14828
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1130

 1  really means is workplace, and we're also going to
 2  be big brother everywhere else, right?
 3              MR. McKEEBY:  Object to the
 4  characterization.
 5              MR. PRYOR:  It seems fair.
 6              THE COURT:  I'll allow it.
 7  BY MR. PRYOR:
 8  Q.  Go ahead.  You can answer.
 9  A.  It covers the workplace and it covers how we
10  treat each other in the workplace.  It could be
11  harassing.  It could be an event that we sponsor.
12  There is different facets of it that could be true.
13              MR. PRYOR:  Let's look at Exhibit 98.
14              THE WITNESS:  Matt, can you show me where
15  that is at?
16  BY MR. PRYOR:
17  Q.  Do you recognize this is as your interview
18  notes or interview notes of Ms. Carter?  We talked
19  about them earlier.
20  A.  Yes.
21              MR. McKEEBY:  Can we wait until one lawyer
22  is at the podium?
23              MR. PRYOR:  Sure.
24              MR. McKEEBY:  I'm asking the judge, but --
25              THE COURT:  Yes.  We can.  We can wait to

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 235 of 426  PageID 14829
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1131

1   ask questions until we are down to one.

2   BY MR. PRYOR:

3   Q.   Got it.  Let's go to page 2.

4        In response to a question, Ed says, it affects

5   people when they see it.  What is being depicted on

6   the video?

7        And according to the notes of the meeting that

8   you think are accurate, she said, it is an abortion,

9   it is a baby.  People say it is just cells; that is

10  not just a tissue, it is a baby.  It shows someone

11  who made the same mistake that I did and they need

12  to understand, they need to know that it is a life

13  and not just a bunch of tissue.  That is my stance.

14       Do you see that?

15  A.   Yes.

16  Q.   That is what she told you?

17  A.   Yes.

18  Q.   Did you consider that in your termination

19  decision?

20  A.   Consider what?  Her stand?

21  Q.   Her telling you why she did that?

22  A.   Yes.

23  Q.   What consideration did you give it?

24  A.   That that is her stand and that is where her

25  belief is.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 4 July 08, 2022                Page 1132

1   Q.   But that was -- that belief was not taken into

2   consideration in regard to the termination?

3            MR. McKEEBY:  Objection, asked and

4   answered.

5            THE COURT:  Sustained.

6   BY MR. PRYOR:

7   Q.   So your -- what you told me earlier is that the

8   videos were offensive and that is why you terminated

9   her.

10       Those three buckets.  Right?

11  A.   Yes.

12  Q.   All right.

13           MR. PRYOR:  Pass the witness.

14           THE COURT:  All right.  So who is going to

15  ask questions first?  Is it you, Mr. McKeeby, or

16  you, Mr. Greenfield?

17           MR. McKEEBY:  Southwest intends to reserve

18  its questions until its case-in-chief.

19           THE COURT:  Understood.

20           Mr. Greenfield.

21           MR. GREENFIELD:  I will go ahead and ask

22  now.

23           THE COURT:  You will go now?  Okay.

24

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1133

```
 1                        CROSS-EXAMINATION
 2   BY MR. GREENFIELD:
 3   Q.   Good morning, Mr. Schneider.
 4   A.   Good morning.
 5   Q.   My name is Adam Greenfield and I represent the
 6   Union.  Have we ever met before?
 7   A.   I don't believe so.
 8   Q.   I don't believe so either.  It is nice to meet
 9   you.
10        Have you found many of counsel's questions
11   confusing today?
12   A.   Yes.
13             MR. PRYOR:  Object, leading.
14             MR. GREENFIELD:  This is not my witness.
15             MR. PRYOR:  He's certainly not adverse.
16             This is an employee of Southwest --
17             THE COURT:  I don't think that is a
18   sufficient question.  I know he can't lead him, but
19   he's got to move up a different topic and set up a
20   topic.  I think that is fine.
21             MR. McKEEBY:  There is a technical issue.
22             THE COURT:  We are pulling your feed, but
23   are you displaying anything right now?
24             Okay.  It is not pulling it up.
25             There it is.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 238 of 426   PageID 14832
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1134

 1              Is this in evidence?

 2              MR. GREENFIELD:  Yes.

 3   BY MR. GREENFIELD:

 4   Q.   Mr. Schneider, this is Exhibit 56.  Do you

 5   remember opposing counsel asking you about this

 6   document?

 7   A.   Yes.

 8   Q.   Okay.

 9        At the top of this page, it has -- it looks

10   like a post from Jessica Parker shared TWU Local

11   556's video, is that correct?

12   A.   Yes.

13   Q.   And what did Ms. Parker write?

14   A.   Why we marched.

15   Q.   All right.  Now, on the picture, there is a

16   statement there as well.

17        Can you identify what that statement says?

18   A.   Equal pay.

19   Q.   Okay.  Well, I'm specifically talking about the

20   comment that was added to the photo.

21   A.   Women make only 80 cents for every dollar.

22              MR. GREENFIELD:  Thank you.  You can take

23   it down.

24   BY MR. GREENFIELD:

25   Q.   I would like to talk to you about a couple

1   things today, your duty to investigate and the

2   decision you made to terminate Charlene Carter.

3   Okay?

4   A.    Yes.

5   Q.    Let's start with the duty to investigate.

6         All employees have a right to be free from

7   bullying and harassment in the workplace, correct?

8   A.    Yes.

9   Q.    And to be free from threats of physical

10  violence?

11  A.    Yes.

12  Q.    And if an employee brings you a complaint of

13  that nature, either of those, you have a duty to

14  investigate that, correct?

15  A.    Yes.

16  Q.    Now, I would like to go back to the

17  hypothetical that opposing counsel raised, and I

18  would like to complete that.

19        Let's go back to Cabo.  Do you remember Cabo?

20  A.    Yes.

21  Q.    Do you remember the hallway in Cabo?

22  A.    Yes.

23  Q.    Now, I would like to add on to that

24  hypothetical.

25        Let's say that one flight attendant says, I'm

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 240 of 426   PageID 14834
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1136

1  going to kick your butt the next time I see you back

2  on line.

3       Okay?

4  A.   Yes.

5  Q.   Now, is that a threat?  If that was brought to

6  you, you would have a duty to investigate?

7  A.   Yes.

8  Q.   Okay.  Now, did that threat happen in the

9  workplace?

10 A.   No.

11 Q.   But it would affect the workplace, correct?

12          MR. PRYOR:  Objection, leading.

13          THE WITNESS:  Correct.

14          THE COURT:  Sustained.

15          MR. GREENFIELD:  I will move on, your

16 Honor.

17 BY MR. GREENFIELD:

18 Q.   What is your understanding -- and I'm not

19 calling for a legal conclusion here -- but what is

20 your understanding legally could occur if you didn't

21 investigate an employee of Southwest Airlines's

22 legitimate complaint?

23          MR. PRYOR:  Object, lack of foundation,

24 especially given that he says he is not a lawyer

25 every time I asked a question.

```
1              THE COURT:  I'll allow it.
2   BY MR. GREENFIELD:
3   Q.   Would you like me to ask it again?
4   A.   Yes, please.
5   Q.   What is your understanding legally could occur
6   if you didn't investigate an employee legitimate
7   complaint?
8   A.   I would be held --
9              MR. PRYOR:  Objection, lack of foundation.
10             THE COURT:  I'll allow it.
11  BY MR. GREENFIELD:
12  Q.   Would you like me to ask it again, sir?
13  A.   No.  I would be held responsible for not
14  following through and investigating something that
15  could be a violation of one of our policies.
16  Q.   Is it your brief that that could open up the
17  company to liability?
18  A.   Yes.
19             MR. PRYOR:  Object, leading.
20             THE COURT:  Sustained.
21  BY MR. GREENFIELD:
22  Q.   And Ms. Stone does not give up her rights as a
23  flight attendant when she -- or as an employee of
24  Southwest Airlines when she becomes president of the
25  Union, does she?
```

```
 1              MR. PRYOR:  Object, leading.
 2              THE COURT:  Hold on.
 3              MR. GREENFIELD:  I'm asking whether she
 4   does or not.
 5              THE COURT:  Hold on.  Yes, I will sustain
 6   that.
 7   BY MR. GREENFIELD:
 8   Q.   Do you know whether Ms. Stone gives up her
 9   right as a flight attendant, an employee of
10   Southwest Airlines, when she becomes a union
11   president?
12   A.   She does not.
13   Q.   And in fact, at that time period, are you aware
14   whether or not Ms. Stone, the president of the Union
15   at that time, actually had a requirement to fly?
16   Did you know whether or not she had that or not?
17              MR. PRYOR:  Object, lack of foundation.
18              THE COURT:  I'll allow it.
19              THE WITNESS:  I do not know that for sure.
20   BY MR. GREENFIELD:
21   Q.   At any point in your tenure at Southwest, are
22   you aware of whether presidents had a flying
23   requirement during their term?
24   A.   Yes.
25   Q.   Does that help refresh your recollection as to
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 243 of 426   PageID 14837
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1139

 1  whether Ms. Stone had that requirement?

 2  A.   She did.  I just don't know the requirement,

 3  hour or days.

 4  Q.   You don't know the specificity?

 5  A.   Correct.

 6  Q.   But you do understand that she did have a

 7  requirement to fly during that time period?

 8  A.   Yes, she did.

 9  Q.   Back to your duty to investigate.

10       Did Audrey Stone's complaint trigger your duty

11  to investigate?

12  A.   Yes.

13            MR. GREENFIELD:  Can you pull up Exhibit

14  89?  The next page.

15  BY MR. GREENFIELD:

16  Q.   Now, if you look down the page, there is a line

17  that says -- and correct me if I read this wrong --

18  Ed, do you have a note taker?

19       Do you see where I'm at?

20  A.   Yes.

21  Q.   Okay.  And what is your response?

22  A.   Yes, it is Janet Ray.

23  Q.   So these aren't actually your notes, correct?

24  A.   She took the notes and transcribed them and

25  then sent them to me, and I verified that they were

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 244 of 426   PageID 14838
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1140

1  the correct notes.

2  Q.   But you didn't take these notes down, did you?

3  A.   Correct.

4  Q.   Okay.  And are you aware that Ms. Stone

5  testified that she thought there were errors in the

6  notes taken in this document?  Are you aware of

7  that?

8          MR. PRYOR:  Object, lack of foundation.

9  He obviously is subject to the rule and would not be

10  aware of that.

11         THE COURT:  Sustained.

12         MR. PRYOR:  Also mischaracterizes what the

13  testimony was.

14         THE COURT:  I have already ruled on your

15  first objection, so you can ask a new question.

16  BY MR. GREENFIELD:

17  Q.   Would you be surprised if Ms. Stone disagreed

18  with the contents of these notes?

19         MR. PRYOR:  Object, lack of foundation.

20  Object to the relevance of his surprise at Ms. Stone

21  realizing that this information came out.

22         THE COURT:  I'll allow it.

23         THE WITNESS:  Yes.

24  BY MR. GREENFIELD:

25  Q.   That would surprise you?

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 245 of 426   PageID 14839
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1141

 1   A.    Yes.

 2   Q.    Now, is it fair to say that what we are looking

 3   at is a Southwest Airlines record of notes taken,

 4   not by you, from words spoken by Audrey Stone that

 5   you are now being asked to testify about, is that

 6   fair?

 7              MR. PRYOR:  Objection, asked and answered.

 8              THE WITNESS:  Yes.

 9              MR. GREENFIELD:  I don't believe I have

10   asked that question.

11              THE COURT:  Hold on.

12              I'll allow that.

13   BY MR. GREENFIELD:

14   Q.    Mr. Schneider, does this sound a little bit

15   like the telephone game to you?

16   A.    It does, yes.

17   Q.    I would like to move on to your decision to

18   terminate Charlene Carter.

19   A.    Okay.

20   Q.    Do you believe that your decision was

21   heavy-handed?

22   A.    Yes.  Definitely.

23   Q.    And in fact, the company walked back from that

24   decision, isn't that correct?

25   A.    What does that mean?

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 246 of 426   PageID 14840
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1142

1              MR. PRYOR:  Leading.

2              THE COURT:  Sustained.  Ask a new

3    question.

4              MR. GREENFIELD:  Yes, your Honor.

5    BY MR. GREENFIELD:

6    Q.   Is it your understanding that the company

7    reduced the punishment to Ms. Carter?

8              MR. PRYOR:  Still object to lack of

9    foundation and leading.

10             MR. GREENFIELD:  I'm asking if it is his

11   understanding.

12             THE COURT:  I'll allow this.

13             THE WITNESS:  I didn't know it was

14   reduced.

15             MR. PRYOR:  Hang on.  Your Honor, may I

16   approach?

17             THE COURT:  You may.

18             (Thereupon, the following proceedings were

19       had at sidebar:)

20             THE COURT:  Last chance, Step 2.

21             MR. PRYOR:  Your Honor, I now understand

22   what he's asking.  I object on the last chance

23   letter as not being proper mitigation because it was

24   not unfettered.  She had to give up rights, and,

25   therefore, it cannot be mitigation.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 247 of 426   PageID 14841
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1143

1              MR. GREENFIELD:  I'm not asking for

2    purposes of mitigation.

3              MR. PRYOR:  Well, okay.  Then it is very

4    prejudicial.

5              MR. GREENFIELD:  Well, it goes to the DFR

6    claim.  It goes to what the Union has done to

7    represent.  And so if -- the Union believes -- the

8    Union argued and represented Ms. Carter at those

9    Step 2 hearings and got that termination reduced to

10   a 30-day suspension.

11             MR. PRYOR:  That is absolutely false.

12   Mike Sims testified he made that decision unfettered

13   on his own without anyone consulting him or him

14   thinking --

15             THE COURT:  We're too loud.

16             MR. PRYOR:  -- it was him.

17             MR. GREENFIELD:  It was a product of union

18   -- the offer was a product --

19             MR. PRYOR:  Put on some evidence, then,

20   because that is not what Mr. Sims said.  That letter

21   is inappropriate --

22             MR. GREENFIELD:  Mr. Sims has not

23   testified about it.

24             MR. ENIS:  I know.  You have no

25   foundation.

1                THE COURT:  So what I will say is, I

2    address in writing why I think it goes to

3    mitigation, why mitigation is a question for the

4    jury, not a question for me.  And I think I agreed

5    earlier that a jury could see maybe it is not

6    mitigation.  But that is up to them, not up to me.

7                The question now is, is you are saying it

8    is not for mitigation, because mitigation is really

9    your thing.

10               Then where are we at?  That is what I'm

11   trying to figure out.

12               MR. GREENFIELD:  Well, I still think it

13   goes to the DFR claims.  I don't disagree that the

14   termination potentially -- the Union doesn't

15   necessarily agree.

16               THE COURT:  You are claiming a DFR, that

17   it is turning her in?  Is there any other factual

18   basis for the DFR claim?

19               MR. PRYOR:  For the DFR claim?

20               THE COURT:  Right.

21               MR. PRYOR:  Yes.  They reported her.

22               THE COURT:  And that is what I said.

23               My question was, is there anything else?

24   Because if your only argument for the DFR claim is

25   they reported her, anything after reporting her, I'm

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 249 of 426   PageID 14843
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1145

1   not sure is relevant.

2            MR. PRYOR:  Well, can --

3            THE COURT:  If it was another purpose,

4   another way.  I know mitigation is another purpose,

5   if you are telling me this is.  I don't see how that

6   is relevant to the DFR claims.

7            MR. GREENFIELD:  Well, it goes -- they

8   want to say that is the -- I'll wait.

9            MR. PRYOR:  Excuse me.  I'll just listen,

10  and he probably can respond better than me.  Sorry,

11  your Honor.

12            MR. GREENFIELD:  Our duty of fair

13  representation, whether we -- that goes -- factors

14  into.  It is a built-in.  The entire thing is a

15  collective bargaining checks and balance system.

16            Even if Ms. Stone turned her in, the

17  actions of the Union were to fight for her to get

18  her job back.  It is a built-in checks and balances

19  system, and that goes directly to the DFR claim.

20            MR. GILLIAM:  It's incorrect, your Honor.

21  It's totally irrelevant.  The duty of fair

22  representation violation allegation in this case is

23  the fact that Ms. Stone turned her in, in the first

24  place.

25            MR. GREENFIELD:  Your Honor, you have

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 250 of 426   PageID 14844
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1146

1   already ruled on your motion in limine that the

2   fact-finding meeting -- our representation at the

3   fact-finding meeting, at the Step 2 hearing are

4   already relevant.  You have already ruled on that.

5           MR. PRYOR:  That is not what he's

6   offering.

7           THE COURT:  Okay.  Let's call our break.

8   And I need to go back and refresh.  You need to

9   point me to in the amended limine order that

10  controls the case, the page.

11          So can you go do that before we break?

12  And I'm going to look for that, too.  Anyone who

13  finds it, let me know.

14          I know what I said on mitigation.  I don't

15  know what I said on DFR and the timeline post

16  reporting.  Does that make sense?

17          MR. GREENFIELD:  We may be able to

18  shortcut this.

19          THE COURT:  What's that?

20          MR. GREENFIELD:  Can I ask Mr. Schneider

21  whether or not he's aware of the reduction from a

22  termination to a 30-day suspension?  And I will move

23  on after that.

24          MR. PRYOR:  I have no objection to that

25  being asked outside the presence of the jury.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 251 of 426   PageID 14845
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 4 July 08, 2022                Page 1147

1              THE COURT:  Okay.  Well, here's the thing,

2    we are going to kick the jury out for the break.

3    You can ask him that question, just to see if we

4    still need to look up the amended limine order and

5    we can do it.  Understood?

6              So jury goes out.  You ask that question.

7    And then we kick him off the stand.  And then we

8    figure out where in the limine order we need to look

9    at, if we need to look at it.

10             MR. GREENFIELD:  Yes, your Honor.

11   Understood.

12             (Thereupon, the sidebar was concluded and

13       the following proceedings were held in open

14       court:)

15             THE COURT:  Okay.  We are going to take

16   our break because we have got to track down a legal

17   issue.  So first break is going to happen now.

18   Let's come back at 2:30, 11 minutes.

19             So same three instructions; you can only

20   talk to your fellow jurors and court personnel,

21   don't talk to anyone else, and don't do any research

22   about the case.  We will see you at 2:30.

23             All rise.

24             (The jurors exited the courtroom.)

25             THE COURT:  Hold on, Mr. Schneider.  We

1    need to ask him one more question while the jury is

2    out before he takes his break.

3              So, Mr. Pryor, you can go ahead and ask

4    from counsel table -- or, sorry, it is you,

5    Mr. Greenfield, the question you wanted to ask him.

6              MR. GREENFIELD:  Yes.

7                   ^P R O F F E R

8    BY MR. GREENFIELD:

9    Q.   Are you aware of whether Ms. Carter's

10   termination was reduced to a 30-day suspension?

11   A.   I know that it was offered.

12             MR. GREENFIELD:  Okay.

13             Your Honor, is that an acceptable question

14   to ask?  Or is there an objection to that question?

15             MR. PRYOR:  He said he's not aware of it.

16             THE COURT:  Well, I think that is a

17   question for him.

18             MR. HILL:  It was offered.

19             MR. PRYOR:  What was the question?

20             MR. HILL:  It was offered, but not

21   accepted.

22             THE COURT:  The answer was, it was

23   offered, not accepted.

24             MR. HILL:  Are you aware that she was

25   offered a reduction to the 30-day suspension?

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 253 of 426   PageID 14847
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1149

```
 1              MR. PRYOR:  And what was his answer?

 2              THE COURT:  It was offered, not accepted.

 3              MR. PRYOR:  So he's aware of it?

 4              THE COURT:  Yes.

 5              MR. PRYOR:  Okay.

 6              THE COURT:  So I think you can take your

 7    break now.  And then we still have to talk after you

 8    leave the courtroom.

 9                 (The witness exited the courtroom.)

10              THE COURT:  Okay.  So he's out of the

11    room.  So the question is, do we still need to track

12    down the limine ruling?

13              So what is your position now,

14    Mr. Greenfield?

15              MR. GREENFIELD:  I haven't be able to find

16    it or looked for it in this time period.

17              But if I also may expand the relevancy

18    argument?

19              THE COURT:  You can say whatever you want

20    to at this point.

21              MR. GREENFIELD:  Sure.  The plaintiffs

22    have consistently held that a conspiracy exists

23    between the parties, and that the Union worked with

24    Southwest Airlines to facilitate the termination of

25    Charlene Carter.  Okay?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1150

1                To be able to attack their theme of the

2  case, we need to be able to show the efforts the

3  Union made and the steps it went through to show

4  that this isn't a conspiracy, which includes us

5  working on her behalf to get this last chance

6  agreement.

7                THE COURT:  Understood.  I will look at

8  the limine ruling.  I will consider that argument.

9                Anything that y'all want to say?

10               MR. GILLIAM:  Can we have a response to

11  that?

12               THE COURT:  Yes.

13               MR. GILLIAM:  Okay.  That is not the

14  theory of the case at all.  We allege a duty of fair

15  representation violation against the Union; we

16  represent an NRLA retaliation claim against the

17  Union, and a Title VII violation carried against the

18  Union.  We don't allege any sort of conspiracy

19  theory.

20               What we allege is that the Union violated

21  the duty of fair representation when Local 556

22  President, Audrey Stone, turned in Ms. Carter and

23  tried to get her fired.  That is the basic theory of

24  the case.  The Union's representation after that is

25  totally irrelevant.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 255 of 426   PageID 14849
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1151

1              MR. GREENFIELD:  Your Honor, if I could

2     add a stipulation to that, please, because they have

3     spent days putting on testimony that they think

4     union members are cozying up to Southwest Airlines.

5     That is their -- that is what they --

6              MR. GILLIAM:  No.  Our theory is that

7     union -- is that union actors are turning in other

8     flight attendants, their opponents, union officers,

9     and their agents are turning in --

10             MR. GREENFIELD:  And working with

11    Southwest Airlines.

12             THE COURT:  I understand.

13             MR. GILLIAM:  That evidence is limited.

14             MR. GREENFIELD:  There's been three days'

15    worth of evidence on it.

16             THE COURT:  I will look at it over the

17    break.  I do remember telling at one point,

18    Mr. Pryor, he couldn't get into evidence and he

19    said, I can't claim collusion?  And my thought that

20    I didn't say on the record is, it is not a criminal

21    case with a conspiracy allegation.  But I need to

22    think about it more, right?

23             MR. McKEEBY:  But I would also ask that

24    you think about it when you listen to the testimony

25    of the next witness and my objection to her

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 256 of 426   PageID 14850
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1152

1  testimony, Ms. Lacore.

2        THE COURT:  Ms. Lacore?

3        MR. McKEEBY:  It will just be a preview.

4        THE COURT:  Understood.

5        MR. GREENFIELD:  Even something they put

6  on with Brian Talburt, they even talked about

7  conspiracy with that witness, that they played for

8  the jury yesterday.

9        THE COURT:  So we now have a six-minute

10  break.  I will see y'all back here in six minutes.

11        THE COURT SECURITY OFFICER:  All rise.

12        (Recess.)

13        THE COURT SECURITY OFFICER:  All rise.

14        THE COURT:  Okay.  Limine ruling, first

15  full paragraph of page 3 of the second amended

16  limine order.  We have had so much flying around, it

17  is hard to remember.

18        Okay.  So we are talking about the

19  arbitration proceedings, but last chance Step 2 are

20  still in the same bucket in my mind.

21        So the fact of Carter's representation

22  and -- by Local 556 and Local 556 being able to

23  negotiate a last chance agreement are relevant, at

24  least to Carter's duty of fair representation claim.

25        So I adopted your argument that you made.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 257 of 426   PageID 14851
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1153

1   I haven't seen a reason to change that argument.  So

2   I'm letting you ask that question.

3              MR. GREENFIELD:  Thank you, your Honor.

4              MR. PRYOR:  And, your Honor, to make our

5   record, when he asks the question, I would like to,

6   the first time, fully state in a sidebar all of our

7   issues, in addition to what we have said in the

8   limine, and ask for a running objection.

9              THE COURT:  Okay.  So I have no problem

10  with that, but how about state it now.  We're on the

11  record.  Sidebar is the same as here.

12             MR. PRYOR:  Well, I'm not an appellate

13  lawyer, but I always kind of feel like there has got

14  to be a question pending in front of a jury that I

15  object to.  But if the Court is instructing me that

16  you want me to do it this way, I will do it this

17  way.

18             THE COURT:  Well, I mean, if we can do it

19  that way.  So that is the entire premise of our

20  morning session, right?  Everything we do in the

21  morning session is a relayed-back principle.

22             But if you want to wait for a question and

23  then come over to sidebar, we can do that.

24             MR. PRYOR:  I would appreciate that.

25             THE COURT:  That is fine.  Let's bring

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 258 of 426   PageID 14852
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1154

1  them in.

2              MR. GREENFIELD:  Your Honor, if I may, we

3  may be able to shortcut that situation as well.  I

4  believe Mr. Pryor has agreed -- and as you have

5  ruled earlier -- that this also certainly pertains

6  to mitigation.

7              Counsel and I work on these directs and

8  crosses together, and my sageful counterparts have

9  entertained me that I have missed part of the boat

10 on that.  And it absolutely does pertain to

11 mitigation as well.

12             Our efforts in representing her after her

13 termination should be considered by the jury, in

14 terms of if a jury was to decide to, in theory,

15 penalize us for our actions, we should be -- our

16 actions post termination should be considered.

17             THE COURT:  I understand that.  Okay.  We

18 can bring them in.

19             (The jurors entered the courtroom.)

20             THE COURT:  Mr. Greenfield, you can go

21 ahead and approach the podium.

22             Thank you.  You can be seated.

23             And, Mr. Greenfield, you can continue.

24 BY MR. GREENFIELD:

25 Q.   Mr. Schneider?

1  A.   Yes.

2  Q.   I will instruct you to not abuse our court

3  reporter's ears with the microphone.

4  A.   I'm sorry.  She told me to move it away when I

5  stand up.  And I move it back, and it creaks.

6  Q.   Okay.

7       Before we took our afternoon break, I was

8  asking you about how you felt about your own

9  decision to terminate Ms. Carter.

10      Do you remember those questions?

11 A.   Yes, I do.

12 Q.   Okay.

13      And do you have any personal knowledge about

14 whether Southwest Airlines decided to reduce

15 Ms. Carter's termination in any way?

16           MR. PRYOR:  Your Honor, we object, ask to

17 approach.

18           THE COURT:  You may.

19           (Thereupon, the following proceedings were

20      had at sidebar:)

21           MR. PRYOR:  And I realize, while walking

22 up here, this question might be a question early.

23 He's going into the issue -- but I certainly -- I

24 think he's raising the issue of the last chance

25 agreement.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                   Vol 4 July 08, 2022                   Page 1156

1            Does the Court understand that is what is

2   going on?  I want to make sure I'm --

3            THE COURT:  I do.

4            MR. PRYOR:  Okay.  We object to that as

5   settlement discussions.  It violates Rule 408.  It

6   is prejudicial; it doesn't relate to after acquired

7   evidence; it is not evidence of mitigation.  It is

8   not relevant; and for all of the other reasons

9   raised in our motion in limine response or our

10  motion.

11           We would ask the Court for a continuing

12  objection.  And if it is okay with the Court, when

13  he actually gets into the meat of it, I might say,

14  same objections we raised before so I get it one

15  more time on the record, make sure I have got it

16  with the right question.

17           And then I will be satisfied with a

18  continuing objection, if the Court permits it.

19           THE COURT:  Understood.  I will grant you

20  your running objection in the interest of time, and

21  I have put you on a clock.

22           What I will say is I have understood your

23  arguments, and I will overrule them for the reasons

24  stated on page 3 of the limine order, mostly on

25  mitigation and relevance to the DFR.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 261 of 426   PageID 14855
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 4 July 08, 2022                  Page 1157

```
 1              MR. PRYOR:  Okay.
 2              MR. GREENFIELD:  Thank you, your Honor.
 3   And may I request that all of this not be taxed
 4   against the Union's time?
 5              THE COURT:  Correct.
 6              (Thereupon, the sidebar was concluded and
 7        the following proceedings were held in open
 8        court:)
 9   BY MR. GREENFIELD:
10   Q.   Mr. Schneider?
11              THE COURT:  Sorry.
12              MR. GREENFIELD:  Thank you, your Honor.
13   BY MR. GREENFIELD:
14   Q.   Mr. Schneider, just so we are clear and the
15   jury is clear, are you aware or have any personal
16   knowledge of whether Southwest Airlines offered
17   Ms. Carter a reduction from termination to anything
18   else?
19              MR. PRYOR:  Your Honor, we object on the
20   running objection we just discussed.
21              THE COURT:  I will grant you that running
22   objection and overrule it.  You can answer the
23   question.
24              THE WITNESS:  Yes.
25
```

1   BY MR. GREENFIELD:

2   Q.   And what was that?

3   A.   The possibility of coming back to work for

4   Southwest Airlines.

5   Q.   Was she offered a suspension?

6   A.   I believe it did include a suspension.

7   Q.   And based on the timing of efforts, would that

8   have been essentially a time served suspension?

9   A.   Yes, it would have.

10  Q.   So if Ms. Carter would have accepted that, she

11  could have returned to work the very next day.  Is

12  that --

13          MR. PRYOR:  Object, leading.

14          THE COURT:  Yes.

15          I'll allow it.

16          THE WITNESS:  Yes, I did.

17  BY MR. GREENFIELD:

18  Q.   Would she have been able to return to work the

19  very next day?

20  A.   Yes.

21  Q.   Mr. Schneider, are you an attorney?

22  A.   No.

23  Q.   Do you understand the intricacy laws of Title

24  VII, Discrimination, Civil Rights Act of 1964?

25  A.   Basically.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 263 of 426   PageID 14857
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1159

1   Q.    Okay.  What are your basic understandings?

2   A.    That everyone is afforded equal rights,

3   especially in employment and different --

4   Q.    Okay.  Would you consider yourself an expert on

5   that matter?

6   A.    No.

7   Q.    I don't envy you, I think your job is tough.

8         Do you think you have ever made any mistakes in

9   the workplace?

10  A.    I'm sure I have.

11  Q.    In this matter and investigating these claims,

12  did you give your best efforts?

13  A.    Absolutely, yes.

14  Q.    Okay.  I would like to completely focus on this

15  decision to terminate.

16        Does the Union have any power to control your

17  investigation leading up to the termination?

18  A.    No.

19  Q.    What would you say if the Union tried to do

20  that?

21  A.    I would let them know that it is my

22  responsibility to investigate this, and I don't need

23  their assistance to do so.

24  Q.    Did that happen in the case of Charlene Carter?

25  A.    No.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1160

```
 1  Q.   Did the Union influence your decision in any
 2  way to terminate Ms. Carter?
 3  A.   No.  Not at all.
 4  Q.   So this was solely the decision of Southwest
 5  Airlines?
 6  A.   Yes.
 7  Q.   And for clarity's sake, you believe Ms. Stone's
 8  complaint to be a legitimate one, yes?
 9           MR. PRYOR:  Object, leading.
10           THE WITNESS:  Yes.
11  BY MR. GREENFIELD:
12  Q.   That you had a duty to investigate?
13           THE COURT:  Hold on.
14           MR. PRYOR:  Object to leading.
15           THE COURT:  Sustained.
16           You need to ask a new question.
17  BY MR. GREENFIELD:
18  Q.   That you had a duty to investigate?
19  A.   Yes.
20           MR. GREENFIELD:  Give me one moment.
21           We pass the witness, your Honor.
22           THE COURT:  All right.  Round two,
23  Mr. Pryor.
24           MR. PRYOR:  Nothing further, your Honor.
25           THE COURT:  Okay.  So you are excused as a
```

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 265 of 426  PageID 14859
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1161

1  witness for now, but we will need your testimony

2  when Southwest calls its case.  So I'm going to ask

3  you to still not talk to anyone about the case in

4  the meantime because you will be back as a witness

5  again.  We know it.

6          With that, you can leave the courtroom.

7  You are free to go.  Thank you for your testimony.

8          MR. McKEEBY:  Your Honor, can I have a

9  sidebar?

10          THE COURT:  You may have a sidebar.

11          (The witness exited the courtroom.)

12          (Thereupon, the following proceedings were

13      had at sidebar:)

14          MR. McKEEBY:  There is no prohibition on

15  my talking to them, is there?

16          THE COURT:  So, yeah, we should talk

17  through that.  So if I know you are going to call

18  him back, but he's left the witness stand, is he

19  still under orders to not talk?

20          I think I -- well, so I know I have

21  authority, even in a criminal case, for someone who

22  is a holdover witness on the stand to not talk to

23  anyone.

24          What I don't know is for what reason is he

25  going to be recalled?

Case 3:17-cv-02278-X    Document 450    Filed 06/14/23    Page 266 of 426    PageID 14860
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1162

1           MR. McKEEBY:  He's just any other witness

2    in my case.  I can talk to -- there's no -- I can

3    talk to him.  There's no rule preventing --

4           THE COURT:  How about this:  Can you have

5    someone give me a case on it?  I'm assuming you are

6    right, but before I change my instruction, I would

7    like to know.  If you can find me a case, then I

8    will lift the instruction by the end of the day.

9           Does that make sense?

10          MR. PRYOR:  I have the same issue, by the

11   way.  I'm going to put Ms. Carter on.  I don't think

12   we are going to finish her today.

13          MR. McKEEBY:  Absolutely, you can talk to

14   her.

15          THE COURT:  Well, actually, no, if someone

16   is a holdover on the stand --

17          MR. PRYOR:  So I lose no matter what.

18          THE COURT:  Well, and that is what I told

19   Schneider, right?  Last night and what I told two

20   different witnesses.

21          The question is, if you hold over because

22   you have left the stand that another witness is on,

23   are you then under a duty to not talk about the

24   case?

25          MR. PRYOR:  I guess I'm not seeing the

 1  distinction, but I look forward to seeing the case,

 2  see what it says.

 3            THE COURT:  So all this to say, I won't

 4  lift the instruction yet.  Send me a case, and I'm

 5  happy to lift it by the end day.  Assuming I'm

 6  wrong, once a witness leaves the stand that you know

 7  will return, they're no longer under a duty to not

 8  talk about it.

 9            MR. GREENFIELD:  Your Honor, just for my

10  own clarification, I just don't understand the basis

11  of why --

12            MR. PRYOR:  It is the rule.

13            MR. GREENFIELD:  What rule?

14            MR. PRYOR:  Invoking the rule.  Once you

15  take the stand in a case, you can't talk to anyone

16  about their testimony.

17            THE COURT:  Talking to your lawyer, and

18  your lawyer tells you everything that every other

19  thing a witness said.

20            MR. GREENFIELD:  Well, he's allowed to

21  cross-examine on it, if they spoke during the break;

22  not the advice that was given, but he can ask them

23  that.  And that's persuasive -- I'm just not aware

24  of --

25            MR. PRYOR:  It's a different issue.

1              THE COURT:  The Supreme Court has said

2     that once a witness takes the stand, they are a ward

3     of the court, of me.  I can make them sleep at my

4     house, if I want to, to make even a criminal

5     defendant who has the express Fifth Amendment right

6     to counsel.

7              And so your question needs to get informed

8     by the Supreme Court case.  But that may not hold

9     true if someone is excused as a witness for now, but

10    we will need him back, right?  Another witness is on

11    the stand.

12             So I'm saying, I don't know that case.

13    There may be an exception to the Supreme Court's

14    ward of the court --

15             MR. GREENFIELD:  This is just my -- this

16    is just my decency.  I'm just trying -- I just -- I

17    literally --

18             MR. PRYOR:  I never had this.  This is

19    interesting.

20             THE COURT:  I get that you can

21    cross-examine on it, but is he still a ward of the

22    court when we know he's coming back, but another

23    witness is on the stand?  I don't know.

24             So leave my ruling in place for now, but

25    I'm happy to have any authority to talk me out it.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 269 of 426   PageID 14863
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1165

 1                Does that make sense?  I'm happy to have
 2    any authority --
 3                MR. PRYOR:  No, this is fascinating -- no,
 4    no, I think she obviously can.
 5                THE COURT:  I had to research it for a
 6    criminal case.
 7                MR. PRYOR:  But I would like some
 8    clarification by the end of the day, but it is
 9    interesting, and I'm glad this is on Southwest's
10    time.
11                THE COURT:  I'm going to put it on my time
12    because I genuinely don't know.
13                MR. PRYOR:  As long as it's not mine, I
14    don't care.
15                THE COURT:  I'm professing ignorance.
16    Okay.
17                MR. McKEEBY:  So in terms of the process,
18    you want a briefing or just --
19                THE COURT:  Can you just send me a case
20    and a parenthetical over email to Mr. Frye and
21    Ms. Silver?  That's great.
22                MR. GREENFIELD:  Okay.
23                THE COURT:  You don't need to do a brief,
24    but just send me a case and a parenthetical.
25                MR. PRYOR:  I can ask Matt to look for a

```
 1   case.
 2              THE COURT:  Okay.  So we are done with
 3   this witness.  Are you calling -- who are you
 4   calling next?
 5              MR. PRYOR:  Ms. Lacore.
 6              THE COURT:  Okay.  Go for it.
 7              (Thereupon, the sidebar was concluded and
 8         the following proceedings were held in open
 9         court:)
10              MR. PRYOR:  Your Honor, at this time,
11   Ms. Carter calls Sonya Lacore.
12              THE COURT:  Okay.  You may do so.  We can
13   bring her in.
14              (The witness entered the courtroom.)
15              THE COURT:  Hello, Ms. Lacore.  You can
16   come on up, and the witness box is over here.
17              Before you sit down, I'm going to ask you
18   to raise your right hand, and Mr. Frye is going to
19   swear you in.
20              (SONIA LACOUR was duly sworn by the
21         Clerk.)
22              THE COURT:  Okay.  You can take a seat
23   now.
24              And you can come on up, Mr. Pryor.
25              And so I will just ask you, Ms. Lacore and
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1167

1  Mr. Pryor, if y'all can keep some separation between

2  his questions and your answers, and answers and

3  questions, so if there are any objections, I can

4  rule on those before you answer.

5          THE WITNESS:  Okay.

6          THE COURT:  You can proceed, Mr. Pryor.

7                  DIRECT EXAMINATION

8  BY MR. PRYOR:

9  Q.   Good afternoon, Ms. Lacore.

10      Would you state your name for the record?

11 A.   Sonya Lacore.

12 Q.   How are you employed?

13 A.   I work for Southwest Airlines.

14 Q.   Can you identify Exhibit 141, previously

15 admitted into evidence?  It will be on the screen in

16 just a minute.

17 A.   And where is the screen?  Oh.

18 Q.   Can you identify this document as an email at

19 the bottom that you received from Brian Talburt?

20 A.   Yes.

21 Q.   What was your position with Southwest Airlines

22 at the time this email was sent to you?

23 A.   I believe at that time I was the senior

24 director of the strategy for in-flight.

25 Q.   This was sent to your personal email address?

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 272 of 426   PageID 14866
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1168

1  A.   Yes, it appears so.

2  Q.   Did you understand the Casper referred to in

3  this email was an opponent of the Union leadership

4  of Audrey Stone?

5          MR. McKEEBY:  Your Honor, this is, I

6  think, in evidence, but with the limiting

7  instruction, which I would ask the Court repeat.

8          THE COURT:  Yes.  Okay.  So I let in this

9  exhibit with the limiting instruction that is for

10  use in the claims against the union, not in the

11  claims against Southwest.

12          Okay.  So you can reask that question so

13  she remembers what it is, Mr. Pryor.

14  BY MR. PRYOR:

15  Q.   I will restate it.

16      Mr. Casper was someone that Mr. Talburt viewed

17  as an opponent of the Union he supported?

18  A.   I really don't recall that.  I'm guessing that

19  that is what he was thinking, but I'm not sure.

20  This was a long time ago.

21  Q.   We went over this in your deposition.  You

22  recalled the context of this.  He was complaining

23  about another union member, right?

24  A.   Yes.

25  Q.   And you also understand he was warning you

 1  about Ms. Corliss, true?

 2  A.   I understand that is what he's saying in this

 3  email.

 4  Q.   And you understood Ms. Corliss to be an

 5  African-American potential leader of the Union,

 6  true?  Based on what he's telling you?

 7  A.   I know that is what he was telling me.  I

 8  didn't understand that she would be a potential

 9  union leader at that time.

10  Q.   You did not respond in writing to this email,

11  true?

12  A.   I don't remember if I did.  I don't -- I don't

13  know.

14  Q.   You have not gone back and looked?

15  A.   No, sir.  I don't use this email address at

16  all.

17  Q.   You did not bring any charges against

18  Mr. Talbert or otherwise complain about him to the

19  company?

20  A.   Not in this instance, no, sir.

21  Q.   And when you received a copy of Audrey Stone's

22  complaint against Ms. Carter, did you inform anyone

23  of the communications that you had received about

24  using social media policy to target union opponents?

25  A.   I don't recall.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1170

1   Q.   Is that the kind of thing you would forget?

2   A.   I have a lot of emails that come my way, so it

3   is possible I would forget.

4             MR. PRYOR:  Your Honor, we move for the

5   admission of Exhibit 148.

6             MR. HILL:  138, sorry.

7             MR. PRYOR:  I'm sorry, 138.

8             THE COURT:  138.  All right.  I will ask

9   if there are any objections on 138.

10            MR. McKEEBY:  No objection.

11            THE COURT:  All right.  Any from the

12  Union?

13            MR. GREENFIELD:  On 138?

14            THE COURT:  138.

15            MR. GREENFIELD:  No, your Honor.

16            THE COURT:  All right.  138 is in, we will

17  publish.

18            (The referred-to document was admitted in

19      Evidence as Plaintiff's Exhibit 138.)

20            MR. PRYOR:  Pass the witness.

21            THE COURT:  Southwest.

22            MR. McKEEBY:  Can you pull up 141?

23                    CROSS-EXAMINATION

24  BY MR. McKEEBY:

25  Q.   Ms. Lacore, did you take any action in

 1  connection with the email sent to you by
 2  Mr. Talburt?
 3            MR. PRYOR:  Object, asked and answered.
 4            THE COURT:  He can ask it.
 5            THE WITNESS:  I don't recall.
 6  BY MR. McKEEBY:
 7  Q.   Who is Mr. Talburt?
 8  A.   A Phoenix flight attendant.
 9  Q.   And is he someone with whom you communicated on
10  occasion?
11  A.   Yes, sir, on occasion.  He would -- actually,
12  frequently, write to many of us at Southwest.
13  Q.   And can you generally describe the topics that
14  he would communicate with you about?
15  A.   Brian, he was passionate about a lot of topics.
16  So it could be anything from how upset he was about
17  crew scheduling, other people, how he didn't think
18  we were doing a good job as leaders.
19       So it was a variety of topics.  And again,
20  frequent.
21  Q.   Would he ever contact you via text message?
22  A.   Yes, he did.
23  Q.   About the same type of topics?
24  A.   Yes, sir.
25  Q.   Did you ever take any action to prevent him

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1172

```
 1  from contacting you via text message?
 2  A.    I did.
 3         It became excessive.  And I -- and overly
 4  passionate.  And so I let him know that he could
 5  communicate with me via company email in a
 6  professional manner, and I blocked him from my text.
 7  Q.    You blocked him from your -- I'm sorry, I
 8  didn't hear --
 9  A.    From my text.  From my phone.
10  Q.    Ms. Lacore, did you have any involvement in the
11  decision to terminate Ms. Carter's employment?
12  A.    No, I did not.
13  Q.    Were you consulted in connection with that
14  decision?
15  A.    I was told afterwards with the letter.
16  Q.    You were copied on the letter?
17  A.    Copied on -- yes, sir.
18  Q.    And when you say "the letter," you mean the
19  termination letter?
20  A.    That's correct.
21  Q.    Did you -- were you engaged in the
22  investigation of Ms. Stone's complaint about
23  Ms. Carter?
24  A.    No, sir, I was not.
25              MR. McKEEBY:  No further questions.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 277 of 426   PageID 14871
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1173

```
 1              THE COURT:  Mr. Greenfield.
 2                   ^CROSS-EXAMINATION
 3  BY MR. GREENFIELD:
 4  Q.   Ms. Lacore, hi.  I'm Adam Greenfield, and I
 5  represent the Union.
 6       Do you understand who I am?
 7  A.   I do.
 8  Q.   You said you played no role in the decision to
 9  terminate Ms. Carter, is that correct?
10  A.   That is correct.
11  Q.   So the Union did not exert any pressure on you
12  to terminate Ms. Carter, did they?
13  A.   No, sir.
14            MR. PRYOR:  Object, leading.
15            THE COURT:  I'll allow it.
16            MR. GREENFIELD:  No more questions.  Pass
17  the witness.
18            THE COURT:  Round two, Mr. Pryor.
19                   REDIRECT EXAMINATION
20  BY MR. PRYOR:
21  Q.   Did you refer to Mr. Talburt as your pen pal?
22  A.   I guess at that time he wrote.
23       We use that term loosely at Southwest if people
24  write us a lot.
25  Q.   Is that a yes?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

| 3:17-cv-02278-X | Vol 4 July 08, 2022 | Page 1174 |
|---|---|---|

```
 1  A.    That would be yes.  He was a frequent pen pal
 2  at the time.
 3  Q.    Did you block him after you received the email
 4  communication talking about working with Southwest
 5  to utilize the social media policy to get rid of
 6  Mr. Casper and Ms. Corliss?
 7  A.    I blocked him after he wrote a really rude,
 8  vile text to me, and it was not related to that.
 9  Q.    So how long after you received the one where
10  he's talking about getting rid of these people did
11  you block him?
12  A.    I don't recall.
13  Q.    It was years, wasn't it?
14  A.    I don't recall.
15  Q.    Okay.  And Audrey Stone spoke to you about her
16  complaint against Ms. Carter, correct?
17  A.    She mentioned it in passing.
18  Q.    Okay.
19            MR. PRYOR:  Thank you.
20            THE COURT:  Round two, Mr. McKeeby.
21            MR. McKEEBY:  No round two.
22            THE COURT:  Round two?
23            MR. GREENFIELD:  No, your Honor.
24            THE COURT:  Okay.  That means no round
25  three.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 279 of 426   PageID 14873
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1175

1          Okay.  So that means you are excused as a

2    witness, so thank you for your testimony.  Thank you

3    for coming in.  You can leave the courtroom.

4          THE WITNESS:  Thank you.

5          (The witness exited the courtroom.)

6          THE COURT:  Okay.  Next witness,

7    Mr. Pryor.

8          MR. PRYOR:  Your Honor, at this time we

9    call Charlene Carter.

10          THE COURT:  Okay.  Ms. Carter, you can

11    take the stand.  And we will have you raise your

12    right hand and take the oath while you are en route.

13    You know the routine.

14          (CHARLENE CARTER was duly sworn by the

15      Clerk.)

16          THE COURT:  Okay.  You can take a seat and

17    remember my request for space between questions and

18    answers.  You can proceed, Mr. Pryor.

19                    DIRECT EXAMINATION

20    BY MR. PRYOR:

21    Q.   Good afternoon.

22    A.   Hello.  Sorry.

23    Q.   And would you state your name for the jury.

24    A.   Yes.  My name is Charlene Carter.

25    Q.   Would you tell the jury a little bit about

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 280 of 426   PageID 14874
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1176

1  yourself today, married, kids, whatever?

2  A.   Yeah.  Well, I will start back, I'm from --

3  originally from California.  I was born there, and

4  moved to Texas when I was 12.

5  Q.   Okay.  I'm going to stop you, because that is

6  not -- I meant today.

7       Are you married -- are you married with kids?

8  Don't go back to your beginning life.

9  A.   Oh, I'm sorry.  Yes, I'm married, and I have

10 two beautiful children.

11 Q.   Okay.  And a grandchild?

12 A.   I do.

13 Q.   Okay.  All right.

14      So I am going to ask you about your background,

15 and specifically as it relates to your religious

16 beliefs because those are at issue here, do you

17 understand?

18 A.   Yes.

19 Q.   Okay.

20      And let's go back now, then, to -- boy -- I'm

21 going to ask when you were born because it -- I want

22 to be able to tie an age to it, if you are okay with

23 that?

24 A.   I'm fine with that.

25 Q.   Okay.  So where were you born, when you were

1    born?

2    A.    I was born in Burbank, California, in 1965.

3    Q.    Okay.  And tell us about your parents.

4    A.    My parents were both born there in California.

5    My dad was kind of abusive.  My mom, she held

6    everything together.  She worked real hard.  She

7    worked from the time I was born.  My dad kind of was

8    a free -- I guess what I would say, he didn't really

9    like to work a whole lot.  And my mom kind of kept

10   things together.

11   Q.   And in terms of your family's faith or beliefs,

12   if they had any as you were growing up in

13   California, what was that?

14   A.    Well, we really didn't have faith in the house.

15   My grandmother would take us to church when we were

16   little.  She was Catholic.  And we would go to, you

17   know, to church like Christmas, Easter, Mother's

18   Day, that kind of thing.

19        But we never -- we never really prayed, or we

20   never had, you know, much religion in our household.

21   Not in my household growing up with my dad in my

22   home.  We never had a Bible in the house.

23   Q.   Okay.  And at some point, did you move from

24   California?

25   A.    Yes.  My dad finally decided that he was going

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1178

1  to start pursuing a career.  And when he did, he got

2  transferred to Texas, in the Dallas area.

3  Q.   And how old were you then?

4  A.   I was 12.

5  Q.   And tell us about when you moved to Texas, when

6  you were 12.  Did you go to school in Texas?  Did

7  you have --

8  A.   I did.

9  Q.   -- how did that affect your faith?

10  A.   We moved to the Corinth area, Lake Dallas area.

11  And I grew up in Lake Dallas High School.  I was on

12  drill team.

13  Q.   We found that out from --

14  A.   Yeah.

15  Q.   I don't know if I can mention it, sorry.

16       You were on the drill team, you were going to

17  high school?

18  A.   Uh-huh.

19  Q.   What was your faith at that time?

20  A.   It was still kind of the same.  You know, we

21  went to church every now and then, but it was always

22  my mom and my sister and I.  It was never my dad.

23       And again, that was usually Christmastime,

24  Easter, Mother's Day, that kind of stuff.  It

25  wasn't -- it wasn't a whole lot -- like I said,

1  there wasn't a whole lot of faith in my house, you

2  know, as in there just wasn't.

3  Q.   And did you date?

4  A.   I did.  My last year of my high school, I met a

5  gentleman -- well, I shouldn't call him a

6  gentleman -- a young boy.  He had just graduated.  I

7  knew of him, I didn't know him, you know,

8  specifically.  But we ended up dating, and actually

9  he became my first husband.

10 Q.   So we can put a name with that, tell me, what

11 is his first name?

12 A.   His name is Dana.

13 Q.   Dana?

14 A.   Dana, Uh-huh.

15 Q.   You dated him in high school.  And then what

16 did you do after you graduated high school?

17 A.   Well, I graduated early.  I wanted out of high

18 school, to be quite honest with you.  I was ready to

19 kind of get on with my life.

20 Q.   How do you graduate early?

21 A.   I had enough credits and I went to summer

22 school.

23 Q.   Okay.  So you graduated in?

24 A.   In January of '83.

25 Q.   Okay.  And what did you do in January of '83?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1180

1  A.    In January of '83 -- well, my parents moved

2  away, basically, at that same point.  So they moved

3  to Colorado.  My dad got a job in Colorado.  And

4  they left between, I would say, January and maybe

5  March is when they, you know, continued or finished

6  their move.

7        And I ended up -- not homeless, but I -- at

8  that time I had two jobs.  And I ended up going into

9  and living with my boyfriend's parents.

10 Q.    Okay.

11 A.    And I was going to school at the time.  I had

12 just started college.  I was going to TWU, Texas

13 Woman's University.

14 Q.    So you were holding down two jobs and that is

15 how you were able to go to TWU?

16 A.    Yes.  Well, and my grandmother, she had paid

17 for the first semester of school.  Yes.

18 Q.    What about your parents?

19 A.    No.  My parents didn't pay for school.  They

20 thought that was my responsibility.

21 Q.    And then what happens -- by the way, you said

22 you were living with your boyfriend's parents.

23 A.    Yes.

24 Q.    Did they put a time period on you?

25 A.    They did.  It was six months.  And I found an

 1  apartment in Denton.  I was living in a little

 2  efficiency.

 3        I was working at a restaurant, and then I was

 4  at a call center in the evening.  And it kind of was

 5  between the time that I would go to class.  Because

 6  I had a full-time schedule at Texas Woman's

 7  University at that time.  I wanted to become an

 8  OB-GYN.

 9  Q.   And were you living with anyone?

10  A.   No, not at that time.

11  Q.   Okay.

12  A.   Not at that time.

13  Q.   So you are living in an efficiency, holding

14  down two jobs, and trying to go to school full time?

15  A.   Yes.

16  Q.   All right.  So how does that work out?  What

17  happens?

18  A.   It doesn't work out well, because just, you

19  know, trying to keep your grades up and, you know,

20  going back between two jobs, and then I was dating

21  my -- like I said, my boyfriend at that time, and we

22  were pretty serious.

23        We ended up moving in together.

24  Q.   When was that?  Of this timeline, you started

25  school --

 1  A.   Yeah, that would have been probably -- it would

 2  have been a year.  Because I was in his apartment --

 3  or, sorry -- his parents' home for six months, and

 4  then I lived in my apartment for about six months,

 5  and then I moved in with him.

 6  Q.   So 1984 --

 7  A.   Yes.

 8  Q.   -- approximately.

 9       And did your parents have a reaction to that?

10  A.   My dad did.

11  Q.   What?

12  A.   He had always told me -- well, first of all, he

13  always told me if I dated a boy and I came home

14  pregnant, to pack my bags and move out.

15       So when he found out that Dana and I were

16  living together -- because I didn't, you know, come

17  right out and tell him that -- when he found out, he

18  didn't really want a whole lot to do with me and he

19  called me a whore.

20  Q.   And what did that do in terms of you going to

21  school -- not that, the fact that you are now living

22  with your boyfriend, what happens with going to

23  school?

24  A.   Well, going to school kind of had dropped back.

25  And I -- at one point, I just finally quit, because

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 287 of 426   PageID 14881
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1183

1  I was trying to help him go to school at the same

2  time, and I was working the two jobs.  And

3  eventually, I got pregnant.

4  Q.   Tell me about finding out you were pregnant.

5       By the way, were you going to school at the

6  time or was that when you --

7  A.   No.  This was right after I had dropped out.  I

8  had dropped out.  I had gone to school almost two

9  years, and I knew I wasn't going to be able to

10  continue to do what I was doing.

11  Q.   Did you try not to get pregnant?

12  A.   Yeah.  I had been on several different birth

13  control pills, and the birth control pills just made

14  me sick.  To this day, I still can't take them.

15  Q.   And so tell me about finding out you were

16  pregnant.

17  A.   Ah, well, I -- I didn't really want to believe

18  that is what it was, but I knew since I had missed.

19  And, you know, went to my doctor, because I started

20  feeling bad, and I was tired, and the whole

21  nine yards.  And a friend of mine said, you probably

22  need to go to the doctor.

23       So I went to the doctor and he confirmed it, I

24  was pregnant, and I was about nine-and-a-half to 10

25  weeks pregnant at that time.

```
 1  Q.   And so did you contact your parents for
 2  assistance?
 3  A.    No, I did not.
 4  Q.    Why not?
 5  A.    I didn't even tell them I was pregnant because
 6  I knew that that wasn't going to work.  I mean, they
 7  never sent me any money anyway.  I mean, they
 8  weren't paying for anything.  When I moved out, I
 9  moved out.
10  Q.    Who did you reach out to?
11  A.    Well, and I didn't even tell Dana for a couple
12  of days.  I just -- I couldn't bring myself to doing
13  it, because he was in a fraternity, he was going to
14  school.  And I knew that that was one -- you know,
15  something that he did not want -- I mean, he didn't
16  want to get married yet.
17       When I eventually told him, he said that we
18  can't tell -- you know, obviously, I can't tell my
19  parents, and he said, he wasn't going to tell his
20  parents.
21       So and he wasn't going to quit school.  And, of
22  course, I didn't want him to quit school.  That
23  wasn't, you know, on the radar for me.  And there
24  wasn't really anybody to go to for me, so we talked
25  about it.  And we argued about it.  And finally, I
```

```
 1  said I would get an abortion.
 2  Q.   And what did you do to make that happen?
 3  A.   Back then, you got into the Yellow Pages and
 4  you searched out under abortion, basically, or
 5  healthcare, I can't even remember.  I don't remember
 6  that.
 7       But I found Planned Parenthood and called them
 8  up.
 9  Q.   And what happened next?
10  A.   Ah, within about, I would say, three days,
11  because I was still torn --
12  Q.   What were you torn about?
13  A.   Going and getting an abortion.
14  Q.   What were your religious views at that time, if
15  they played into this?
16  A.   At that time I had somewhat -- you know, I
17  believed in God, I knew God was there, I just -- I
18  struggled.  I struggled.  I was afraid that if I did
19  this, he would hate me and that I would never be
20  forgiven.  But I was afraid not to go and do it
21  because -- I just didn't know what to do.  I was
22  afraid.  And there wasn't the resources back then
23  that there are now.  There were just not.
24  Q.   And were you looking for information from
25  Planned Parenthood in that regard?
```

1   A.    Yes.

2   Q.    What were you looking for?

3   A.    To get an abortion.

4   Q.    Were you looking for answers to questions?

5   A.    Yes, I was.

6   Q.    What questions did you have?

7   A.    Well, when we walked into Planned Parenthood,

8   they separated my boyfriend and I.  And he was in

9   the -- a waiting room.  And the lady in the front

10  took me back and I sat in an office with one of the

11  nurses.

12       And -- because I wanted to know, first of all,

13  how far along I really was, because my doctor said I

14  was about 9 to 10 weeks.  And, you know, they had --

15  eventually did an examination in there too, and they

16  said that was about right.

17       But before that, I wanted to find out -- again,

18  there wasn't a whole lot back then that you could

19  pull on Internet.  We didn't have Internet.  This

20  was like 1985, '84, '85.

21       And I asked them, you know, how -- at a

22  10 week, what does it look like?  And she said,

23  Well, really and truly, there -- you know, there is

24  not much there, it is -- you know, it is just this

25  little tiny zygote, is what they called it, and, you

 1  know, there's -- it is not formed yet.

 2        And I asked her, I said, okay, I mean, I know

 3  that there is something going on, but she assured me

 4  that the baby couldn't feel any pain.  And that kind

 5  of settled my -- my apprehension, I guess, at that

 6  time.

 7  Q.   Did you get the answers you really wanted to

 8  hear at that time?

 9  A.   Not really.  Not really.  But I didn't know

10  what to do.

11  Q.   Did you find out that those answers turned out

12  not to be accurate?

13  A.   Later on, yeah, I did.

14  Q.   But at the time, did you then make the decision

15  to go forward with the abortion?

16  A.   I did.

17  Q.   Did they tell you about whether or not there

18  would be complications?

19  A.   No, not really, because we didn't discuss that.

20  I want people to know what goes on in Planned

21  Parenthood.  Because Planned Parenthood does not

22  tell you the truth.

23  Q.   Okay.  Let me just interrupt you -- and I

24  apologize for that, but I want to make sure that we

25  understand, this is your story from your experience.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 4 July 08, 2022                    Page 1188

```
 1  A.    Yes.

 2  Q.    Okay.  Go ahead.  Tell us.

 3  A.    So I decided to have this abortion.  I went,

 4  the lady took me back to the examining room.  Put me

 5  on the table.  Gave me a small sedative.

 6        And she said I would start feeling a little bit

 7  woozy, you know, just I would still be awake, but it

 8  would kind of keep me calm.

 9        And then the doctor came in, and he said

10  that -- he kind of explained the situation, what was

11  going to be going on, and he examined me and he

12  said, yeah, you are about 10 weeks along.  He could

13  tell.  He could tell.

14        And then he told me how the procedure would go.

15        And all I remember was to the left of me was a

16  suctioning container, it was this round machine-type

17  thing.

18        And he said, you won't feel a whole lot because

19  they have numbed me down there and basically kind of

20  dilated me and then started up the suctioning

21  machine.

22  Q.    Did you feel it?

23  A.    Yeah.

24  Q.    Did you feel the baby leave your body?

25  A.    I didn't -- it was a lot of pulling and a lot
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 293 of 426   PageID 14887
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1189

1   of -- it was quite a bit of pain.  But I -- it was

2   kind of like -- I would say if you have really bad

3   monthly cycles, it would be like cramping.

4   Q.   And then what?

5   A.   Well, I could hear the suctioning machine, and

6   from there it was just -- it took place.

7        And then after that, he had to take something

8   and clean the rest out and make sure he got all of

9   the baby -- the parts out.

10  Q.   He had to do what?

11  A.   He had to make sure he had everything out.

12  Q.   Did he?

13  A.   He said he did.

14  Q.   Did you see anything?

15  A.   No.

16  Q.   Did you try to look or did you close your eyes?

17  A.   At one point I tried to look, but after what I

18  saw in the suctioning container, I just couldn't do

19  it anymore.  I knew what I had done at that point.

20  Q.   What did you see?

21  A.   A lot of blood and little parts.

22  Q.   Parts of what?

23  A.   Of a baby.

24  Q.   How did you react to that?

25  A.   I just started crying.  I just started crying.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 294 of 426  PageID 14888
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1190

1  And I knew at that point I had made the worst
2  decision of my life.
3  Q.   What happened next?
4  A.   They take you back to a room and let you kind
5  of wear down the anesthesia and they kind of make
6  sure that you are, you know, stable enough to go
7  home.  I was back there probably, what, 30 minutes,
8  maybe 45 minutes, for the local to kind of wear off.
9  And I started throwing up, bleeding pretty heavily,
10  crying a lot.
11       And then the nurse came back and said, You are
12  ready to go and I'm going to take you up to your
13  boyfriend.  And then I went home.
14  Q.   After that, were you able to put it behind you?
15  A.   No.
16  Q.   How so?
17  A.   Because I knew I had just made the worst
18  decision of my life, and it was -- I had just taken
19  the life of my little baby.
20       And I went home, and got into an argument with
21  my boyfriend.  And a really good friend came over
22  and stayed with me the rest of the night and he went
23  and stayed with his parents.  And from there --
24  Q.   Was the argument about the abortion?
25  A.   Yes.

```
 1   Q.   What was the argument?
 2   A.   It was over.  I was angry.  I was mad.  I was
 3   sad.  I was disgusted with him, I was disgusted with
 4   myself.  And I -- I didn't want to see him.  I
 5   didn't want to be around him anymore.  I just
 6   didn't -- I couldn't.  I didn't want to be around
 7   myself at that point.
 8   Q.   When you left Planned Parenthood, did they tell
 9   you whether or not you -- there were any problems
10   with the procedure?
11   A.   No.  They did not, no.
12   Q.   What happens next?  You make up with your
13   boyfriend?  I'm not trying to lead you.
14   A.   No.  No.  What happened next was, for the
15   next -- well, until he and I got married, I was
16   basically in a very depressive state, angry, didn't
17   like him, didn't like myself.  I searched out some
18   counseling.  I started searching out churches.
19   Q.   How did you feel about your relationship with
20   God after the abortion?
21   A.   I thought he basically hated me.  And I could
22   see why.  I could see why.
23   Q.   So what did you do?  You told us you got
24   married.  Why did you get married?
25   A.   So fast forward --
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1192

 1  Q.    Let me interrupt myself.

 2  A.    That's okay.

 3  Q.    It sounded like you were mad at your boyfriend,

 4  you didn't think he supported you.

 5        Why did you marry him?

 6  A.    We had dated for five years.  And we had lived

 7  together.  And he was my first and only.  And how I

 8  was raised is, if you sleep with somebody -- and,

 9  you know, we had been together five years.  I mean,

10  it was basically the next step.

11        And so we were supposed -- we were going to get

12  married.

13  Q.    Were you able to put your depression and

14  thoughts about the abortion away on your wedding

15  day?

16  A.    No.  I knew when I was walking down that aisle

17  that it probably wouldn't last.  I was still angry.

18  I was still upset.  I was still sad.

19        I was still -- but I, honestly, I just figured

20  since we had been together for five years and we had

21  gone through this, maybe we would, you know, come

22  back to a relationship.  I really honestly don't

23  know what I was thinking back then.  I made some

24  stupid decisions.

25  Q.    Welcome to life.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1193

1       So was your relationship with parents such at
2   that point that you could tell them about the
3   abortion?
4   A.   No.  I didn't tell me parents until a lot
5   later.  And that was after my son was born.
6   Q.   Okay.  Well, let me -- after you got married,
7   did that help you deal with the depression you were
8   suffering from?
9   A.   No.  It actually got worse.
10      And so we got married.  And then we bought a
11  house.  And he was still going to school, still in
12  his fraternity.  And I started working a full-time
13  job to help us, you know, get by and so forth and
14  him go to school.
15      About two years into our marriage, I got
16  pregnant again.  And that that pregnancy resulted in
17  an ectopic pregnancy.
18  Q.   Tell us what that is.
19  A.   It is when the baby is forming inside the
20  fallopian tube.
21      And then I went and saw my OB-GYN -- well, go
22  back.  The way that I found this out was that I
23  started hemorrhaging.
24      And so they immediatly -- when I got to the
25  hospital, they immediately put me in a room.  And

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 298 of 426  PageID 14892
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1194

1  the doctor came in, and that is when they found out

2  that the baby was in the tube.

3       And later finding out, after I lost that one --

4  because they had to do an emergency surgery to take

5  the baby out of the tube -- he told me that I might

6  lose that one side.  That devastated me.  I thought,

7  you know, that this was my punishment for having an

8  abortion before that, and that I probably would

9  never have kids.

10  Q.   Did the doctor tell you that it had anything to

11  do with your abortion?

12  A.   Yes, he did.

13  Q.   What?

14  A.   He said there was scar tissue down between the

15  fallopian tube going into the uterus.

16  Q.   From the abortion?

17  A.   Yes.

18  Q.   And so now you have lost two children because

19  of your decision to have an abortion in your mind.

20       Are they children to you now?

21  A.   Oh, yeah.  Yeah.  My babies, yes.

22  Q.   So how are you dealing with this now?

23       And by the way, tell me how you feel about your

24  relationship with God and your husband and how it

25  affects all of that.

1  A.   Well, the husband part, it really -- it started

2  to deteriorate some again.

3       I, for myself, I had to get some help, because

4  I was in a major depression, especially after that

5  one.

6       So like I said, I was -- before that, I was

7  actually seeking churches, I was seeking some

8  counseling.  I had found a church in Denton called

9  Denton Bible.  I started going there.  That started

10 to kind of help because I started meeting some

11 people.

12      But you know, I still wasn't back until -- what

13 helped me was when I finally got pregnant with my

14 son.

15 Q.   Tell us about that.

16 A.   At that time, I was flying for American

17 Airlines.  I was a flight attendant for them.  I had

18 gone to work for them and worked in corporate.

19 Q.   And was that okay with your husband?

20 A.   No.  Not -- not the flying part.

21      I had worked in corporate for about a year and

22 a half, and then I decided I wanted to go to

23 in-flight.  And so I did.

24      And I was based in New York.  And no, my

25 husband did not like that at all.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 1196

1        My husband was pretty controlling.  He wanted
2   to know where I was all of the time.
3        I basically married my dad.
4   Q.   Okay.  Did you have to quit that job?
5   A.   Yeah, I did.  And it was due to the fact that I
6   got pregnant with my son.
7   Q.   Okay.  And how did that pregnancy go?
8   A.   That pregnancy went great.
9   Q.   Good.  Your son was born.
10       And did that relieve your depression from the
11  abortions -- or the abortion and the second lost
12  child?
13  A.   It told me that what I needed to do was -- the
14  depression, yes.  It started to go away.  But I knew
15  I needed something more.  I knew that he had
16  forgiven me, because I had asked for that, for God
17  to forgive me.  But I hadn't forgiven myself.
18       So through that time period when my son was
19  little, I still carried that guilt around.  And I
20  got closer to God through that time period.  And I
21  actually raised my son at church.
22  Q.   Did you have an experience at church where you
23  were able to forgive yourself?
24  A.   I did.  And that is fast forward.
25  Q.   I don't want to fast forward.  This is your day

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 301 of 426  PageID 14895
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1197

 1  in court, ma'am.  We set aside some time, so I'm not

 2  trying to rush you.

 3  A.   No, I loved being a mom.  Loved being a mom.

 4  My husband and I, we still had issues, and it had a

 5  lot to do with the controlling part and the

 6  abortion.  I was still angry at him.  I didn't let

 7  go of the anger for a long time.

 8       My husband -- my first husband and I, we got

 9  divorced when my son was two.

10  Q.   What happens next?

11  A.   What happens next is that I actually decided I

12  wanted to fly again.  And so I had already applied

13  twice before at Southwest Airlines, and did not get

14  the position.

15       So I decided to try for a third time.  And the

16  third time was the charm.  And I got on at Southwest

17  in 1996.

18  Q.   Okay.  And I do want to talk about your

19  Southwest Airlines union activities, and to the

20  extent they overlap here, if you want to talk about

21  that, that is fine.

22       I'm really tracking your -- where you -- your

23  religious faith develops that affects this lawsuit.

24  A.   Okay.  So I started going to Denton Bible, like

25  I said.  And then I found another church, and it was

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 302 of 426   PageID 14896
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1198

 1  called Fellowship, Fellowship Church in Grapevine.

 2       And at the time, it was not very big, so I

 3  started taking my son there, and took him to the

 4  little kids church and went to the services on

 5  Sunday.

 6       I found out that there was a women's group, and

 7  I started feeling like I needed to get more involved

 8  in -- in the church and meeting people and so forth.

 9       And at this point, I was also dating someone

10  new.  And I wanted -- I wanted that relationship to

11  be more so in a more faith-based relationship.

12       So we started going to church together.  And

13  taking my son.  And then there was a women's group.

14  The first time that I really stepped out, the whole

15  auditorium was full of women.  And Lisa Young, who

16  is Ed Young's wife, she was the one who put this on.

17       And the first speaker was a beautiful young

18  lady, and it was -- the whole subject was on hot

19  topics, what most churches don't discuss.

20       And they felt that this was something that the

21  women's group could do and do a Bible study on.

22       So the first hot topic was on abortion.

23  Q.   What happened?

24  A.   Well, I couldn't believe it.  Because I had

25  been searching -- for me, I couldn't forgive myself.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 303 of 426  PageID 14897
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1199

1    And I knew that in order to follow God and really

2    believe in what he says, you don't just forgive

3    others, you also have to forgive yourself for the

4    things that you have done.

5         And that was what all this particular women's

6    group was about.  It was forgiving yourself for the

7    things that you have done in your past that you were

8    ashamed of, and the first one was on abortion.

9         And it floored me on -- when they said, um, if

10   this -- if -- we want all women to stand up if it

11   has affected you, your family, your friends, you

12   personally, or you have just known somebody at work

13   that has had this happen, that they had had an

14   abortion.

15        And the amount of women that stood up in that

16   auditorium, I was like, I'm finally not alone.

17   Q.   Did you stand up?

18   A.   I did.

19   Q.   And what happened next?

20   A.   Well, that was -- most of us were crying,

21   because most of us had not ever -- well, a lot of us

22   hadn't, I hadn't, I hadn't really told the story a

23   whole lot.  There was only a few of my friends that

24   knew, and then obviously my ex.  I hadn't even told

25   my boyfriend now at the time.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1200

1          It was -- it was so real, and how many people
2     it had affected, and how they react.  And it -- most
3     of those women had had an abortion that were in my
4     group.
5          So we -- we -- after the main speaker, we all
6     go off into our small Bible groups, okay?
7          Anyway, the six or eight women that were
8     sitting around our table -- or my table, that we
9     were at, I think maybe two, it was just a family
10    member that it had affected or a friend, but the
11    rest of them, they had had an abortion.  And we were
12    all about -- not the same age, but pretty close --
13    because I'm 57.  And 65, you can do the math.  I'm
14    57.
15         And I just couldn't believe how many women it
16    had affected and how they all felt.  And what all
17    they went through.  And how many, too, in the group
18    could not have children after the fact.
19         And then -- and some family members that had
20    lost women in their family, or, you know, a sister,
21    or whatever, to depression from it.  And they took
22    their own life.
23         I -- it was all an experience for me.  I had no
24    idea that, you know, that everybody felt like me, I
25    guess.

```
 1        And so for me, on that day, when -- and it was
 2   all on forgiveness for yourself.
 3        I finally felt like I had been forgiven by God.
 4   Q.   Did you pray?
 5   A.   Oh, yeah.
 6   Q.   Tell me about it.
 7   A.   And I haven't stopped since.
 8        I just asked him, I said, I need to know -- I
 9   mean, over the years, I kept saying, I'm so sorry,
10   I'm so sorry, I'm so sorry for what I have done.
11        I have taken, you know, this little baby, I'm
12   praying that he or she is in heaven.
13        I just wanted him to forgive me, but I needed
14   to forgive myself.  And if he would just -- I just
15   need to feel like I can move on.
16        And it took a long time, but I just felt him
17   move inside me.  And it was, like, God just said, it
18   is done, it is over, it is okay.
19        And I just let go of it from there on out.  But
20   I made a promise to him when that happened.  And I
21   said -- and this is one of the things that when I
22   was at the group -- I said I will never, ever, if I
23   can help it, let this happen to another young girl,
24   woman ever again, that I will do whatever I can to
25   save another baby in the womb.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1202

1  Q.   And what did you do in that regard?

2  A.   I got involved in -- it was called -- well, it

3  was a group of ladies that did a whole plethora of

4  things, but one of them was called The Exodus Group.

5       And it was all about women and children, and

6  then abortion.  So it was kind of a collective.

7  Q.   Were you going out and protesting at Planned

8  Parenthood?

9  A.   No, I have never protested at Planned

10 Parenthood.

11 Q.   What did Exodus do, and what did you do with

12 Exodus?

13 A.   Well, we partnered up with a pregnancy center.

14 It was in -- I want to say it was in Keller.  It may

15 have been Grapevine, I can't remember.  A small

16 little place.

17      We donated our time, we donated funds, we

18 donated -- and then things for babies, when these

19 young girls or ladies would come in that couldn't

20 afford things for their baby, if they decided they

21 wanted to keep their baby, we helped them.

22      We gave them resources, especially for young

23 moms.  And that would have been me.  So we had girls

24 anywhere from, I would say, 15 on up.

25 Q.   Did you talk to them?

1  A.    Yeah.   There was a couple of us that would

2  donate our time and actually -- because these girls,

3  a lot of times, they are still torn.   They don't

4  know if that is what they want to go and do.

5        So now you can seek out these places.   I mean,

6  there are so many avenues now that they can go to

7  instead of just going to a Planned Parenthood or

8  another abortion facility.

9        I'm going to tell you, abortion facilities do

10  not advertise these pregnancy centers.

11        We have actually tried through some

12  organizations to get them to put those things in

13  these abortion facilities, but they refuse.

14        So, yeah, I told them my experience.   I told

15  them what I went through.   I told them what the

16  experience was like in that room when I had that

17  abortion.

18        I told them, you know, everything that I felt,

19  and you may carry this for the rest of your life.

20  It is going to be something that is going to stay

21  with you forever.   It's never going to go away.

22  Q.   So girls that, nonetheless, decided to have an

23  abortion, did you still love them?

24  A.   Oh, yes.   Yes.   I mean, I would hope somebody

25  would have loved me then.

1  Q.   And even though you think it's taking a life,

2  are you judging them in any way?

3  A.   No, I'm not.  I'm not judging them.

4  Q.   So anything else you want to tell us about your

5  work at Exodus Group?

6  A.   It was the most beautiful thing to watch, that

7  these girls that had -- especially the younger

8  ones -- and a lot of them didn't have the support of

9  their families, either.

10       It kind of moved on to other things, though,

11  too.  And let me explain that.

12       So not only would we take care of the girls and

13  help them and then prepare them for their little

14  babies, we also had a housing apartment place that

15  we had in Dallas that, through the church and

16  through this pregnancy center, had purchased.

17       And so what they would do is they would

18  actually house these young girls in an apartment and

19  help them get on their feet and help them realize

20  that this isn't the end of their lives.

21       These choices -- even if they gave their babies

22  up, we also helped with placing them with certain

23  adoption agencies if they wanted to go that route.

24       But the most beautiful thing for me to watch

25  was when those younger girls -- and that would have

 1  been around my age -- that didn't have that support,

 2  how, when they went to the Exodus house that we had,

 3  or the apartment building, to see them with their

 4  little babies and know that they were going to

 5  thrive with their children and their life wasn't

 6  going to stop.

 7      We were going to try and help them any way we

 8  could so that they could go to school, so that they

 9  could get a job, so that they had daycare for those

10  babies.

11      That right there, for me, I wished -- if I

12  would have known that there were avenues like that

13  when I was younger, I would have gone and sought

14  them.  But I just -- I didn't know.

15  Q.   And has abortion and your view of that and how

16  to deal with that, did that continue on through

17  present day?

18  A.   Yes, it has.

19      And just to add to that, now I have a beautiful

20  daughter with my boyfriend, who I was telling you

21  about, my second -- he's my husband of 24 years now.

22  And I have beautiful -- she's now 19 and going to

23  college.  Beautiful young lady.  And I also have a

24  grandbaby.

25  Q.   And what about your relationship with God?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1206

1  A.   My relationship with God is everything that

2  sustains me, guides me, keeps me whole.

3       And it's why I'm here today.

4  Q.   I want to move on and talk about the Union and

5  Southwest Airlines, but I don't want to leave it if

6  there is something else in this event in your life

7  that you are talking about and God and abortion that

8  we haven't mentioned.

9  A.   I just know that I have been forgiven and I

10 want to do as much as I can to help somebody else.

11      And I just want to make this clear, though,

12 too.  I don't preach my religion or my Christianity,

13 my belief in Jesus, okay, I don't shove that onto

14 anybody else.

15      Do I hold that close and do I say, you know,

16 things out loud?  Yes, I do.

17      But I'm never going to deny Him after all of

18 the things that He's done for me through this time

19 period, from that moment that I had when I took a

20 life.  I know He's forgiven me.

21 Q.   All right.  I appreciate that.

22      And I -- I wanted you to have that opportunity

23 so people could understand the things that happened

24 in 2017, okay?

25      Now I want to talk about you and Southwest

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  Airlines.  So I think you said you started a job at

2  Southwest Airlines in 1996.

3       How did that come about?

4  A.   Well, like I said, I had flown for American,

5  and after I had my son, I really wanted to go back

6  to flying.  But before I got on with American, I had

7  actually applied once, and then -- well, twice,

8  because the third time was when I got on.

9       I got the job.

10  Q.   How did you get it?

11  A.   I had to, you know, apply, and we went to

12  the -- the way it was done before was you actually

13  went and had a group interview and then you had a

14  one-on-one interview, which I really wish they would

15  get back to.  I don't know if that is what they do.

16       But it was a one-on-one.  It was a very good

17  conversation with the leader, and then you got to

18  meet the people in the group when, you know, you are

19  interviewing.  It's just an exciting time.

20       I got the job, and then I ended up having to

21  take a drug test and they do a background test and

22  all of that stuff.  And then they okayed me for

23  class.

24  Q.   Let me ask you, did they provide health

25  benefits to you?

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 312 of 426   PageID 14906
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1208

1   A.   Not during -- not during -- they don't pay you
2   or anything like that before you go to training or
3   in training.  But when you get there, yes.
4   Q.   When you start the job.
5        Was that important to you?
6   A.   Oh, yes.  Yes.  Because at that time I didn't
7   have insurance.  My husband at the time, ex-husband,
8   then, he was working on his own, so he had his own
9   company, and we didn't have insurance to take care
10  of my son at that time.
11       So, yes, it was very important for me to go
12  back to a company, because we were divorced now,
13  back to a company that I knew I had those health
14  benefits for him.
15  Q.   And then is there some kind of training?  You
16  said it, but I --
17  A.   Yeah.  So for us back then, I believe it was
18  six weeks of training.  Pretty intense training
19  actually back then.
20       I didn't stay at the hotel at that time because
21  I still had my -- you know, I had my son, so I went
22  home every night and took care of him and studied
23  and came back during the day.
24       But then finally got on line and I --
25  Q.   Getting on line means?

1  A.   It means that you get your wings and you go on

2  a -- I forget what they called it back then.  I

3  think it's an OE now or an IOE, whatever it was back

4  then.

5       So you go on a training flight.  And back then

6  it was like -- I did eight legs for the day.  So it

7  was the Texas eight leg day.

8  Q.   Having worked at American as a flight

9  attendant, did you know you enjoyed being a flight

10  attendant, or did you find it --

11  A.   I loved it.  I loved it.

12  Q.   What did you love about it?

13  A.   I absolutely loved it.

14       Well, I'm a people person.  I like being around

15  people.  I don't thrive very well not having contact

16  with others.

17       I loved being on the airplane, I loved serving

18  the people on the airplane, I loved meeting the

19  people on the airplane.  I flew with some wonderful

20  people crew-wise, both cockpit crew, flight crew.

21       It was just -- it was, you know -- and you

22  don't have -- I mean you set the tone when you are

23  on the airplane.  You get to -- it's like your

24  little work atmosphere.  It's your office.

25       And for me, I loved flying C.  So because --

```
 1   Q.    Flying what?

 2   A.    Flying C.  Position C at Southwest.

 3   Q.    I have no idea that that is.

 4   A.    So that's the overwing -- overwing window exit

 5   area.

 6   Q.    Maybe everybody else understands.  I have been

 7   on a plane before, but --

 8   A.    Okay.  So you know where the emergency exit row

 9   is?

10   Q.    I do.

11   A.    Okay.  So that was my favorite place to fly.

12   Q.    Okay.  Got it.

13   A.    And the reason being was because when people

14   are getting on, we don't have a seating chart or

15   whatever on Southwest, it's open seating.  And so a

16   lot of the times, you know, especially families

17   would come back towards the back.  And so, you know,

18   the kids and the families and make them comfortable.

19         But I get to meet a lot of these people because

20   they are having to pass me.  You know, you get to

21   say hello, and so on and so forth.

22         I flew A quite a bit at the beginning, loved

23   that, but C, I just -- you got to build this rapport

24   with people that were sitting right around you, you

25   know.  And it's really interesting, the world is
```

1  really small.

2  Q.    How so?

3  A.    I would meet people -- we would get to talking,

4  you know, as people are getting seated, and I'm

5  sitting over at the overwing, and you would hear a

6  conversation, you know, behind you or the people in

7  front of you, and they would say something about

8  something that either they worked at or somebody

9  they knew or -- it was just -- I would be like, oh,

10 my gosh, I didn't know you know -- like my neighbor,

11 or just -- it was a small world.

12      And it's really a great world, to be quite

13 honest with you, out there.  I loved -- it's

14 actually a better world than you think when you are

15 up in the airplane.

16 Q.    Okay.

17 A.    No, seriously, going from coast to coast.

18 Q.    It's not always my experience on the plane, but

19 okay.

20 A.    I did.  I loved it.

21 Q.    So how did you feel about Southwest Airlines as

22 a company then?

23 A.    Oh, my gosh.  It was the best company to work

24 for.

25 Q.    Better than American Airlines?

 1   A.   Yes.

 2   Q.   Oh, come on now.

 3   A.   You weren't just a number.

 4        On American I knew where I stood.  I was a

 5   number.

 6   Q.   I'm joking about that.  I'm not saying anything

 7   bad about American.

 8   A.   No, I'm not saying anything bad about American.

 9   it was just a different culture.

10   Q.   Okay.  Tell me about how you felt about

11   Southwest Airlines when you went to work there.

12   A.   Well, Southwest Airlines was -- our CEO back

13   then and our president was Herb Kelleher, who was

14   just the most amazing person to work for.  Amazing.

15   He was a people person.  He would get on our

16   flights.  I had him on --

17   Q.   He did?

18   A.   Oh, yes, I had him on several flights out of

19   Dallas.

20        What was funny, too, is I had him on a flight

21   on an old 200 one time that he came back -- I know.

22   You don't know what I'm --

23   Q.   I have no idea what that is.

24   A.   The oldest airplanes that we had, the little

25   200s.

1        And so we had --

2   Q.   All old.

3   A.   No, they are not.  There's new ones now.

4        But the club seating in the back of the 200,

5   okay?

6        So he came -- so there was a club seating, a

7   bulkhead, and then you had the club seating in the

8   overwing, a bulkhead, and then you had the -- it

9   really wasn't first class, but it kind of looked

10  like first class up in the front.

11       So, but I usually worked in the back.  So, you

12  know, being C, I would be in the back.

13       Well, I would -- you know, I was back in the

14  back one afternoon, and I knew Herb was there,

15  because, first of all, he says hello to everybody

16  and hugs everybody.  And, unfortunately, you can't

17  even do that anymore, which I think is pretty crazy.

18       But anyway, he'd get on the airplane, and he

19  would remember your name.  He may have only met you

20  one time.

21  Q.   You have got a nametag, ma'am.

22  A.   Yes, I do know that.  But he would know.  He

23  would know you.  He'd be like, Oh, yeah, I saw you

24  at blah, blah, blah, whatever.

25       Anyway, so he would get up in the cockpit --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1214

 1  now, this was, you know, still in the '90s, right?
 2  But he would get up there and start smoking in the
 3  cockpit.  Those were his airplanes.  And he would
 4  hang out with the pilots.
 5       But then, once we got up in the air, he would
 6  come back.
 7       So one time that I had him on the airplane, he
 8  came back to the very back and he was going to help
 9  put ice in the, you know, cups, and, I mean, he was
10  helping us -- and pass out peanuts and everything
11  else.
12       My one question to him was, so in the old 200s,
13  you'd come back to where the galley is and there was
14  this door, this like accordion door thing that held
15  all of our peanuts, all of our drinks, all of our
16  ice and everything.
17       But when you are taking off -- and, of course,
18  we used to get out of our seats when we were still,
19  you know, taking off, we weren't even at
20  10,000 feet, I mean, as soon -- especially if you're
21  going to Texas, you know, all throughout Texas.
22       So as soon as those wheels get up off the
23  ground, you're like, boom, gotta go.  So you're back
24  in the back, you are trying to hold all of the cups
25  and glasses and everything, and you're trying to put

```
 1  stuff on your galley, right?
 2       He comes back -- and I'm doing, you know,
 3  trying to do the same thing, you know, trying to get
 4  my stuff on my tray and everything and get the
 5  peanuts ready, because I know that he's probably
 6  going to come back and serve peanuts.
 7  Q.   I miss the peanut days.  Go ahead.
 8  A.   Yeah.
 9       Well, anyway, he rounds the corner and he goes,
10  Hey, ladies, how is it going?
11       And we are like, Hey Herb, you know.  And we're
12  getting hugs and whatever.
13       And I go -- and so he starts doing his stuff
14  with, you know, wanting to help with the ice and the
15  cups and everything.  And he goes, I'm going to pass
16  out the peanuts.  He goes, So let's go up.
17       So I was, you know, going to help him pass out
18  the peanuts from the middle section on back.  But
19  before I did that, I go, Hey Herb, I have one
20  question for you.
21       And he goes, Yeah, what is that?
22       And I go, Who designed this galley with this
23  door that you got to like open up and everything
24  falls out at you when you are, you know, trying to
25  set your galley up.  I mean, Coke cans and peanuts
```

1  and your cups and everything.

2       And he just laughed and he goes, I guess you

3  just have to go back to the drawing -- something to

4  do with the drawing board at Southwest Airlines.

5       And I go, Is there somebody I can talk to up

6  there?

7       He goes, I don't think so.  We are stuck with

8  these.

9  Q.   I've been asking you this so that the jury can

10 understand that you truly loved your job.  Is that

11 fair to say?

12 A.   Yeah, I did.  I loved -- I loved my job.  I

13 did.

14 Q.   Okay.  And in 1996, after you cleared your -- I

15 forget what you called it -- after you got on

16 line --

17 A.   Uh-huh.

18 Q.   -- at that point in time, are you required to

19 join a union?

20 A.   Oh, you're required to join that union before

21 you even graduate.  I mean it's the day of

22 graduation.

23      The union comes in.  And I'm going to say this.

24 They never gave us the option.  They never said, you

25 can opt out of this union.  Never said that.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1217

```
 1  Q.   You know it now?

 2  A.   Oh, I know it now, yes, I do.

 3  Q.   We will get to that.

 4       But whenever you joined in 1996, was that

 5  explained to you?

 6  A.   It was part of the employment.  You had to be

 7  in the union.  We are a closed shop.  So you don't

 8  have the luxury to say, you know what, I don't want

 9  to be any part of this at all.

10       So, yeah, the union comes in.  You -- I

11  guess -- I can't remember what all we did back then,

12  but I know we had to sign something.

13       And I was actually -- it was interesting, you

14  all were talking about COPE.  When I went through

15  class, COPE was explained to us that it was

16  something there to help flight attendants.

17  Q.   What is COPE?

18  A.   It's the political action fund stuff that

19  they -- yeah.

20  Q.   What did they tell you COPE was?

21  A.   It was to help us as flight attendants.  They

22  never really said that it was a political-type

23  thing.  It was there to help us in our jobs and so

24  on and so forth.

25       I thought it was, believe it or not, I thought
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 322 of 426   PageID 14916
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                   Vol 4 July 08, 2022                   Page 1218

1  it was like one of those catastrophic fund-type

2  things that you put your money into, so I did the

3  two dollars every paycheck.

4  Q.   So wait.

5       In addition to your union dues, you signed up

6  for more because you thought it was to help flight

7  attendants?

8  A.   Yes.  I did.

9  Q.   Okay.  That's 1996.

10 A.   Yes.

11 Q.   Do you recall seeing those emails earlier in

12 the trial about how happy your union was your head

13 would explode when you finally found out what COPE

14 was?

15 A.   Yes, I did.

16 Q.   How did that make you feel?

17 A.   Not too good.  Not especially since, you know,

18 it's the Union leadership making fun of, you know, a

19 member.  I wouldn't think that that's, you know,

20 appropriate.  They work for us.  I mean, they are --

21 they are there for us.

22 Q.   Okay.  Well, let's go back to 1996 when they

23 are telling you, from your understanding, is that

24 COPE is to help the flight attendants.  They don't

25 explain that it's actually for a bunch of political

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 323 of 426  PageID 14917
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 4 July 08, 2022                Page 1219

1  causes that you may or may not agree with.

2  A.   No.  As a matter of fact, they tell you that

3  they stay out of politics.  I was told that over and

4  over again.

5  Q.   And so in 1996, were you anti-union?

6  A.   No, I was not anti-union.  I didn't know much

7  about the union at that time, but I wasn't

8  anti-union.

9  Q.   In terms of how you think a union should

10  operate, are you anti-union?

11  A.   No.  I know why unions are there, I know

12  exactly why.  Some are very, very good unions and

13  others are not.

14  Q.   1996, you joined the union.  Tell me about your

15  union activities.

16  A.   I went to -- well, at first I didn't go to a

17  whole lot of meetings at the very beginning, only

18  because I had a little boy at home, I was single, I

19  was flying to Chicago.  You name it.

20  Q.   Can I ask you about that?  How are you a flight

21  attendant and a single mom, how does that work?

22  A.   Well, whenever I flew, my son would go to his

23  daddy's house.  So my ex and I, we ended up becoming

24  friends, basically, in raising our son together

25  basically.  I mean, it's -- we lived near each

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 324 of 426   PageID 14918
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1220

 1  other.  We made sure that both parents were there

 2  for him.  We didn't separate him very much from

 3  either one of us.

 4       So when I was flying, he was with his daddy,

 5  and then when I came back into town, he was with me.

 6  Q.   Okay.  So not a lot of time for union meetings?

 7  A.   No, not at that time.  He was little.

 8  Q.   Okay.  And so at what point -- tell me your

 9  view of your union in 1996, 1997, 1998.

10  A.   Well, that was when --

11  Q.   Did you have a lot of knowledge?

12  A.   Not a whole lot.  I mean, I knew what they were

13  doing.  I mean, I knew what they were there for, you

14  know.

15       That was back in the day of Paul Sweeten.  I

16  had heard some good things and then some bad things

17  of the leadership.

18       But I -- the first union real membership that I

19  was like, wow, this is really messed up, was I had

20  come to Dallas, it was when we were going through

21  contract time, or contract negotiations.

22  Q.   When is this?

23  A.   Oh, gosh.  You know what, I don't even remember

24  what year.  It was --

25  Q.   If you're going past 2000, you're ahead of me.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1221

```
 1  A.    No, no, it was not past 2000.

 2  Q.    Go ahead.

 3  A.    It was sometime '96, '97, '98.  I don't

 4  remember when that contract was, when it was signed

 5  in.  Those years just kind of go together.

 6        But I came to a union meeting here in Dallas,

 7  and it was Paul Sweeten and his team, Garry

 8  Drummond, and a ton of flight attendants, a ton of

 9  flight attendants.

10        And they were discussing, you know, pay raises,

11  working conditions, you name it.

12  Q.    That sounds good, right?

13  A.    Yeah, it sounds good, until you're told by

14  Garry Drummond, who is TWU International -- and let

15  me tell you something, and I'm just going to be

16  really frank, he was drunk, he was drunk that night.

17  Q.    Okay.

18  A.    It was absolutely -- I just thought, wow, this

19  is what we have?

20  Q.    Okay.  Wait.

21  A.    This is our main negotiator who is working with

22  our local to get our contract signed?

23  Q.    And he's there to sell the contract?

24  A.    Yes.

25  Q.    What happens?
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 326 of 426   PageID 14920
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1222

 1  A.   Well, first of all, he tells us, That's the
 2  best you are going to get.
 3       And we were all going, well, wait a minute.  I
 4  mean, you really haven't taken much of what the
 5  flight attendants wanted in and really negotiated
 6  it.
 7       There was a lot of, you know, back and forth.
 8       I was not impressed, not impressed at all.
 9       And so that's when I really started getting
10  more involved.  And that contract was, in fact,
11  good.
12  Q.   What happens next as it relates to your
13  relationship with your -- first of all, all of this
14  time you are paying dues and you are paying COPE,
15  right?
16  A.   Yes.
17  Q.   You are still thinking COPE is that
18  catastrophic fund --
19  A.   Yeah, I thought it was there to help flight
20  attendants.
21  Q.   Did you know other flight attendants that
22  thought the same thing?
23  A.   I knew of a couple, but I didn't really discuss
24  the COPE part of the union.  I mean, it just -- I
25  didn't discuss what came out of my paycheck.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1223

1  Q.   So you just thought you were doing something

2  good to help flight attendants.

3  A.   Yes.

4  Q.   So after this experience with the contract in

5  the '97, '98 time period, what happens next

6  regarding your knowledge about your union or

7  activity?

8  A.   Okay.  So after that bad contract, and a lot of

9  people were upset about that, they really wanted new

10  union leadership.  And so there was a lady who had

11  been here for quite some time, her name was Melissa

12  Smith, and she was running on -- what her ticket was

13  called was clean sweep.

14       And so at first she was running by herself,

15  okay, and then Thom McDaniel, Cindy Ritner -- there

16  were quite a few other people -- Stacy Martin and

17  some others decided that they -- they talked to her,

18  and they ended up running, I believe, as a slate,

19  okay.

20  Q.   Did you support that slate?

21  A.   Oh, yeah.  Because I liked Melissa's -- she

22  wanted to go in there, she wanted a good contract.

23  She wanted to work for the flight attendants.  She

24  wanted to make sure the money was being spent

25  correctly within the office.  Because we were pretty

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 328 of 426  PageID 14922
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1224

1   broke back then.  There wasn't a whole lot of money

2   left after the last contract negotiations.

3         So, yeah, I supported her.  I believed in her.

4   Q.   Okay.  What happened next?

5   A.   Well, she got into office and I --

6   Q.   She got elected?

7   A.   Yes, she did, by a pretty big margin.  She got

8   elected and people were finally happy again and

9   hoping to see some changes.

10  Q.   This is for the Local 556, correct?

11  A.   Correct.

12  Q.   So this is good news?

13  A.   Yes, it is good news.

14  Q.   How long was it good news?

15  A.   Not very long.

16  Q.   What happened?

17  A.   You know, and I don't know exactly the time

18  period, but I would say within the first year she

19  was removed.

20  Q.   What was your understanding of why she was

21  removed?

22  A.   Well, I know from testifying for her, the

23  reason that they removed her was due to false

24  accusations against her.

25  Q.   Okay.  What were the accusations?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                   Vol 4 July 08, 2022                   Page 1225

```
 1  A.   Well, they were claiming, Thom McDaniel and
 2  team, were claiming that she had embezzled money out
 3  of TWU, and they were really pretty much trashing
 4  her name through the system.
 5  Q.   What happened?
 6  A.   Well, what really happened was Stacy Martin had
 7  had an incident at work, and it involved a young
 8  lady that was working in the office, and he mooned
 9  her, okay?
10  Q.   In the office?
11  A.   In the office, yes.
12       And the lady complained to Melissa.
13       And Melissa felt it was her duty, which it was,
14  because she was the president and also the person
15  that hired the office staff and so forth, so she's
16  their boss.
17       She ended up -- because this woman had
18  complained to her, had filed EEOC charges, I guess,
19  or an EEOC complaint.
20  Q.   And what happened?
21  A.   And she actually went to legal to speak about
22  that.  And that is -- that's what they said -- that
23  would be in TWU, I believe in International.
24       And they said, yes, you should be doing this,
25  okay?
```

1        So fast forward.  Stacy Martin decides he's

2   going to file charges on her because Thom, Cindy,

3   and all of the rest of them wanted her gone.

4   Q.   How did you end up getting involved in this?

5   A.   Because I had flown with Thom and I had flown

6   with Stacy Martin and I had flown with -- who was

7   the other one?  Karen Amos.

8        I hadn't flown with Cindy Ritner, but I knew

9   the scuttlebutt, let's put that it way.

10  Q.   How did flying with them make you a witness?

11  A.   The witness part of it was due to the fact that

12  I saw what they did to her in union meetings.  Oh,

13  yeah.  It was -- union meetings can get very heated.

14  A lot of words can be said, a lot of bad words can

15  be said, things can be shared there.

16       And the board treated her, along with Paul

17  Sweeten's team, like she was dog meat.

18  Q.   She was the president of the local union?

19  A.   Yes.

20  Q.   And what kind of trial did you testify in?

21  A.   Well, they removed her from office.

22  Q.   Who is "they"?

23  A.   Well, if my recollection has it correctly, they

24  filed charges on her, okay?  So she was fighting

25  these charges, which is like a trial, I think you

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 331 of 426   PageID 14925
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1227

1    heard about that before.  They filed charges on her.

2         Well, they removed her from her position at

3    that time, so Thom McDaniel ended up stepping into

4    the president's position.

5         While she was fighting these charges, okay, the

6    board had a board meeting, and the board decided to

7    charge her under Article 21, which is removal of an

8    officer.

9         So here she's fighting these charges over here,

10   okay, that are made up.  Then what they do is they

11   have their union board remove her under Article 21.

12        So from there she loses the trial, per se,

13   through the Union, but then she filed a lawsuit.

14   Q.   Okay.

15   A.   And when she filed that lawsuit, I had known

16   all these people, flown with all these people, knew

17   the back story of all of this stuff, knew how she

18   had been treated in these meetings, along with she

19   didn't embezzle money.

20   Q.   What happened at the trial?

21   A.   I testified for her.

22   Q.   Do you know the result?

23   A.   Yes.  She won.  She won a judgment against the

24   Union for treating her the way that they did.  Two

25   hundred and something thousand dollars.  $270,000, I

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 332 of 426   PageID 14926
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1228

 1   think is what it was.

 2   Q.   So if I understand correctly, in 2000, elected

 3   Union president, your candidate, wins, and then,

 4   from your understanding, is improperly removed and

 5   actually gets a judgment against the Union for what

 6   they did?

 7   A.   Correct.  And they didn't put -- they were

 8   supposed to put her back in office and they did not.

 9   And they continued the lie out on line for years.

10        And Southwest did nothing about it.

11   Q.   Southwest has a relationship with the Union,

12   from your --

13   A.   Oh, and let me back up a minute.

14             MR. McKEEBY:  Objection, leading.

15             THE WITNESS:  Let me back up.  I want to

16   be able to speak about this.

17             So Southwest Airlines, when Melissa became

18   president she was --

19             MR. McKEEBY:  Your Honor --

20             THE WITNESS:  -- pretty good friends --

21   I'm sorry.

22             MR. McKEEBY:  Objection.  I don't think

23   there is a question that is being responded to.

24             THE COURT:  Okay.  Ask your question and

25   then you can answer.

 1   BY MR. PRYOR:

 2   Q.   Tell me what you wanted to say about Southwest

 3   Airlines in that regard.

 4   A.   Okay.  So Melissa had been at Southwest for

 5   quite some time before I got on there.  She was --

 6   she was, I believe, a four-digit number.  So she had

 7   been there quite a long time.

 8   Q.   I don't know what a four-digit --

 9   A.   Well, a four-digit number meant she was kind

10   of -- not an original, but she was way up in

11   seniority, okay?

12        And she knew Colleen pretty well.  I mean,

13   they -- she had worked with Colleen Barrett, who was

14   our president.  Loved Colleen.

15        She was our culture, and they've lost that

16   culture.  I loved that culture.  It was -- it was

17   totally different than it is now.

18        But anyway, when she became president, Colleen

19   came to her and they had a meeting and she said, We

20   can no longer be seen together out of, you know,

21   office areas or whatever.  Because they were

22   friends, and she had done other things with Colleen

23   throughout the years and so forth.

24        So anyway, she said that Union business is

25   Union business and Southwest business is Southwest

Case 3:17-cv-02278-X    Document 450    Filed 06/14/23    Page 334 of 426    PageID 14928
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1230

1  business, and the two don't mingle and we stay out

2  of Union business.

3  Q.   You like that?

4  A.   Yes.

5  Q.   When was that?

6  A.   That was back in 2000 or whenever she was --

7  whenever she was --

8            MR. PRYOR:  Any time.

9            THE COURT:  I'm going to ask if we can

10 take our last break for the day, just a 10-minute

11 break, and then come back.

12           MR. PRYOR:  My back is killing me.

13           THE COURT:  Okay.  Same instructions as

14 always, jury.  You can talk to your fellow jurors

15 and court personnel, just not about the case.  You

16 can't talk to anyone else.  And don't do any

17 research.

18           We will see you back here in 10 minutes at

19 4:17.

20           All rise for the jury.

21           (The jurors exited the courtroom.)

22           THE COURT:  You can't talk to anyone about

23 the case while you are a witness.

24              (The witness exited the courtroom.)

25           THE COURT:  Okay.  Anyone have anything to

```
 1   bring up?
 2            MR. McKEEBY:  I haven't been able to give
 3   the assignment yet, so --
 4            THE COURT:  Okay.  We can give assignment.
 5            We're looking for the question of whether
 6   a witness who has left the stand but will be
 7   recalled later can be told to not talk to anyone
 8   about the case.
 9            MR. McKEEBY:  I appreciate that.
10            THE COURT:  So the search continues for
11   all of us.
12            All right.  We will take our break and I
13   will see y'all back here at 4:17.
14            (Recess.)
15            THE COURT SECURITY OFFICER:  All rise.
16            THE COURT:  We are still looking.  So
17   first one wins a prize.
18            Okay.  So are we ready for the jury?
19            MR. PRYOR:  Were we going to find out the
20   answer or we are going to do that later?
21            THE COURT:  What is that?
22            MR. PRYOR:  The rule issue.  I didn't know
23   if --
24            THE COURT:  We are still looking.  So I
25   just said first person who finds out gets a Twix
```

1    candy bar.

2           MR. HILL:  Rule 615 on its face, I think

3    pretty clearly it applies to Mr. Schneider.

4           It says, "At the party's request, the

5    Court must order witnesses excluded so they cannot

6    hear other witnesses testify."

7           Mr. McKeeby has already told us that he

8    intends to recall Mr. Schneider.  Mr. Schneider

9    remains a witness, and therefore, is excluded from

10   the courtroom.

11          MR. PRYOR:  I don't think -- maybe that's

12   the issue.  I don't know.

13          MR. HILL:  Did I misunderstood the issue?

14          THE COURT:  Well, it might be.  I know

15   there is a Supreme Court case saying once a witness

16   has left the stand overnight but is coming back the

17   nest day for their testimony where they're the next

18   witness on the stand, yes, they can be instructed to

19   not talk to anyone.

20          The question is, if they left the witness

21   box and another one comes in, then are they

22   discharged from their duty to refrain from talking

23   about the case.

24          MR. HILL:  Okay.  I'm all for it.

25          THE COURT:  So you still have a facial

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 337 of 426   PageID 14931
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1233

1    argument.

2              MR. GREENFIELD:  Your Honor, is there a

3    more recent case that you are aware of?

4              MR. PRYOR:  I should have explained it a

5    little better.

6              MR. GREENFIELD:  I apologize, Ms. Willis,

7    for the 12th time.

8              Is there a more recent case on point that

9    you are aware of other than Geders v. U.S. in '76?

10             THE COURT:  Give me that citation.

11             MR. GREENFIELD:  Yes, your Honor.

12             Okay.  425 U.S. 80, 96, Supreme Court,

13   1330.  It's a '76 Supreme Court case.

14             THE COURT:  What's that -- sorry.  What's

15   the citation, the first page of that case?

16             MR. GREENFIELD:  425 U.S. 80.

17             THE COURT:  8-0.

18             MR. GREENFIELD:  Yes.  And what I'm

19   looking at in the synopsis is that the Supreme

20   Court, Mr. Chief Justice Burger, held that the trial

21   court's order preventing defendant from consulting

22   his counsel about anything during a 17-hour

23   overnight recess in the trial between his direct and

24   cross-examination deprive defendant of his right to

25   the assistance of counsel guaranteed by the Sixth

1  Amendment.

2          And that was -- that decision was reversed

3  and remanded.

4          THE COURT:  Okay.  So we are all looking

5  for anything more recent than that.

6          All right.  Jury.

7          MR. GREENFIELD:  Your Honor, based on that

8  case, I believe it says that it is acceptable for

9  counsel to be able to address this witness.

10          (The jurors entered the courtroom.)

11          THE COURT:  Okay.  You can take a seat.

12          Mr. Pryor, you can continue.

13  BY MR. PRYOR:

14  Q.   Okay.  Ms. Carter, I did want you to give the

15  jury your background with your union and how it

16  affects the activities that you have been involved

17  in, but I might want to move you a little bit

18  quicker, okay?  And I understand there is apparently

19  a lot.  I appreciate explaining that experience in

20  2000.

21      Are we skipping over anything that you think is

22  terribly significant before we get to 2013?

23  A.   No.  No.

24  Q.   From 2000 to 2013, did you continue to be a

25  union member?

 1    A.    Yes.  I did.

 2    Q.    Even after all of that stuff and Melissa and

 3    testifying against the Union, all of that stuff you

 4    talked about, why did you stay a union member?

 5    A.    Because I didn't know I could opt out.

 6    Q.    So you are still paying dues and you are still

 7    paying COPE.

 8    A.    Yes.

 9    Q.    So we are -- by 2017, we are 17 years into

10    paying COPE.

11    A.    Yes.

12    Q.    So how active were you in the union from 2000

13    to 2013?

14    A.    I had gone to several union meetings, but they

15    were sporadic.  Some in Dallas, and then eventually

16    when I moved to -- well, I think I went to one or

17    two, maybe, in Phoenix.  I'm trying to think.

18    Because I don't know if that was -- that may have

19    been when Audrey was in office.  I can't remember.

20        I didn't go to that many union meetings --

21    yeah, union meetings.  For one, usually they were on

22    a date that I was flying, which was hard, and at

23    that time, you know, if you wanted to go to another

24    base, you had to get on the airplane and go there.

25        I was always hoping that they would do them

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1236

1   electronically as in a union meeting being there in

2   person, but yet still having the ability, which I

3   think we were getting to, in 2012, and then that got

4   shut down.

5   Q.   So from 2000 to let's say 2012, you weren't

6   terribly active but still a dues-paying member?

7   A.   Yes.  Yes.

8   Q.   What happened in 2012-2013?

9   A.   Well, it was another slate that was put in, and

10  that would have another election.

11  Q.   Okay.  Tell me about the slate that you

12  supported.

13  A.   Okay.  So -- which is interesting because it

14  involved Stacy Martin, who had harmed Melissa back

15  in the day.

16  Q.   Wait.  The mooner?

17  A.   Yes.

18  Q.   Okay.  Go ahead.

19  A.   So it was Stacy Martin, Chris Click, Jannah

20  Dalak, Don Juan, and I can't think of who all the

21  other people were.  Because there is executive board

22  members that sit, you know, like the president and

23  so forth.  Jerry Lindemann, was the other one.  He

24  was our treasurer.

25       And then we have executive board members that

1  are the domicile board members.  I can't remember

2  who all was the domicile board members.

3       But, yeah, we voted in the main people were the

4  ones that we wanted in.

5  Q.   Okay.  Is that the Click group?

6  A.   Yes, it sure is.

7  Q.   So why did you support the Click group?

8  A.   Well, because I liked Jannah Dalak, Don Juan.

9  I didn't know Jerry Lindemann all that well.  But we

10  needed a change.  And then --

11  Q.   Why did you need a change?

12  A.   Well, because some people had been in there for

13  such a long time.  I mean, it's kind of like the

14  government.  You kind of got to start having some

15  term limits.

16       So anyway, so I trusted -- and I also trusted

17  Chris Click.  Chris Click and I had had many

18  discussions because at first he didn't really know

19  about what Melissa was all about.  And so we had had

20  discussions.  He wasn't actually a fan of hers for a

21  while.

22       So anyway, fast forward to 2012, whenever it

23  was, the election.  They got elected in.

24       And before -- let me back up.  So Stacy Martin

25  was a part of that trial.  I had to call --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                     Vol 4 July 08, 2022                      Page 1238

1  Q.   What trial?

2  A.   Well, the trial for Melissa.

3  Q.   So you are going back to 2000 on me?

4  A.   Yeah, I'm just --

5  Q.   I'm on a time clock.

6  A.   I know.  I know.

7       So Stacy Martin helped remove Melissa.  Fast

8  forward.  I had to talk to Stacy before I could vote

9  for him --

10 Q.   Okay.

11 A.   -- and make sure -- I had to really, I guess,

12 trust him per se.  So I actually called him at home

13 and we had a long conversation.

14 Q.   Okay.

15 A.   So I voted for that entire slate.

16 Q.   All right.  And does that slate get elected?

17 A.   Yes.

18 Q.   And what happens?

19 A.   Pretty much the same thing that happened the

20 last time with Melissa.

21 Q.   Tell us your understanding of what happened

22 this time.

23 A.   Well, supposedly I'm hearing --

24 Q.   Pretty short?

25 A.   -- it's embezzling again, money, this, that and

 1    the other.

 2         But I can tell you this.

 3              MR. GREENFIELD:  Objection, your Honor.

 4    Lack of foundation.  Unless that's laid, it's

 5    hearsay testimony.

 6              THE COURT:  I will allow it as effect on

 7    listener.

 8              You may proceed.

 9              THE WITNESS:  Okay.

10              Well, they just testified for it

11    yesterday.  They said something to do with money or

12    something.  Anyway.

13    BY MR. PRYOR:

14    Q.   Tell us what your understanding is.

15    A.   Okay.  So you go back to -- okay.  Now I've

16    lost my train of thought.

17    Q.   In 2013, what happened with the Click slate

18    that got elected?

19    A.   Okay.  So the people that don't like us as

20    opt-outers or --

21    Q.   Wait a minute.  Were you an out-opter at that

22    time?

23    A.   No, not yet.  Not yet.

24         What I'm talking about, the people that keep

25    turning people in right now, like Brian Talburt and

```
 1   so forth.
 2   Q.    Um-hmm.
 3   A.    Okay.  Those people kept filing charges against
 4   Chris Click, Stacy Martin.  I think it was pretty
 5   much Stacy Martin for the most part, and Chris
 6   Click, okay.  They kept filing charges on them.  And
 7   they were constantly badgering them.  All right?
 8         They could never really do the union work.
 9   Q.    They are in office, but from your
10   understanding, they are being barraged with
11   complaints by --
12   A.    Yes.
13   Q.    -- the older group.
14   A.    Yes.  And we all knew this.
15   Q.    The losing group.
16   A.    Yes, absolutely.
17   Q.    All right.  What happened?
18   A.    So eventually I don't know what all happened to
19   actually have International come in and then remove
20   them again, but they got removed.
21   Q.    So once again the elected officials are removed
22   by International?
23   A.    Correct.  Three of them.  It was Chris Click,
24   Jerry Lindemann, and Stacy Martin.  And Stacy Martin
25   was our president.
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 345 of 426   PageID 14939
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1241

 1  Q.   And who takes over?

 2  A.   At that time they put in Audrey, and I think

 3  Audrey became the first vice president.  And I don't

 4  know how all that -- the other person that I guess

 5  had come in second for president either didn't want

 6  it -- I don't know.

 7        But then she got moved up to president.

 8  Q.   So did Audrey run for office?

 9  A.   Against that slate, yes.

10  Q.   And did she win?

11  A.   No.

12  Q.   So she lost, and the people that were elected

13  are kicked out?

14  A.   Correct.  All of the people that were in there

15  after the fact were the slate that had been not

16  voted in.

17  Q.   And how did you feel about that, your union?

18  A.   It was just another slap in the face for the

19  people that voted them in.

20  Q.   And what did you decide to do?

21  A.   I went to one of my last union meetings.  It

22  was in 2013, it was in Denver.  And Greg Hofer and I

23  had come up with -- several of us, actually -- bylaw

24  changes, because it was bylaw change time.

25        So I went there to represent for Denver and

1  make some bylaw changes.

2  Q.   What changes were you trying to make?

3  A.   Well, some of the wording in some of them and

4  just different things that helped govern our, you

5  know, union.

6  Q.   Okay.

7  A.   And at that time I was able to read all of the

8  horrible things, because I had the floor at that

9  time, all of the horrible things that those people

10  had said and what they were doing to remove those

11  people in the union office.  Which I was pretty glad

12  to do.

13       Now, go back.  I was a union member.  I was

14  reading their stuff.  It had all kinds of nasty

15  things in it that they had said about Stacy and all

16  of them and how they removed them.

17       And I didn't get turned in for that because

18  when you are at a union meeting, the company can't

19  do anything about that.

20  Q.   All right.  At the meeting did anything happen?

21  Did anyone threaten you?

22  A.   Yes.

23  Q.   What happened?

24  A.   At the end of the meeting, I was walking out --

25  or I got up, my friend Kim Hensley and I were

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 347 of 426   PageID 14941
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1243

1  getting up, and then I was going over to talk to
2  Chris Sullivan, who ended up being my representative
3  when I got fired.
4      I was walking, you know, out of the room or
5  whatever, and Cuyler Thompson turned and he goes,
6  Ms. Carter, Ms. Carter, if you ever say the word, if
7  I hear of it again that you say the word
8  "decertified" -- now, I'm paraphrasing right now
9  because I don't know exactly how his phrasing was --
10  I will file charges against you.
11      And then I turned and Brett Nevarez was
12  standing right behind me.  He's a pretty tall guy,
13  he's a big guy.  And he said, or I will do it.
14  Q.   And after that, how did you feel about your
15  union?
16  A.   I was disgusted with them and I opted out.
17  Q.   Tell us what -- I know the jury has heard it,
18  but I want to get your understanding of what "opting
19  out" meant.
20  A.   Okay.  So a fee-based flight attendant, or an
21  objector, what happens is, I still have to pay union
22  dues out of my paycheck every month, okay?  And I
23  pay the exact same amount as everybody else.
24      I don't get to go to union meetings, I don't
25  get to vote contract if there is a contract coming

1  up, okay.

2        So I don't have a voice there, okay?  But I

3  still have a voice within my local.

4        But I can't, like I said, I can't go to the

5  union meetings and actually participate.

6        The portion that -- so I paid the full dues,

7  and every three months -- so it's every quarter --

8  the international -- this is what I'm told -- the

9  international part that they don't take out for

10  political purposes is refunded back in a check.

11        So within that quarter I usually got about a

12  27, $28 check that International would send back to

13  me, but the local still takes out everything that

14  they need from my paycheck.

15  Q.   Did you do it for $27?

16  A.   Did I do it for $27?

17  Q.   Right.

18  A.   Yeah, I did.  We were hoping to get more

19  members because people were pretty darn fed up.  I

20  forget what the number was, it was like 100 and

21  something.

22        But a lot of people were afraid to object and

23  opt out because of the way we had been being

24  treated.

25  Q.   Is the reason you wanted the $27 you didn't

```
 1   want the union to spend the money on --
 2   A.   Yeah, I didn't want International using the
 3   money --
 4        But, you know, the thing is, we don't know
 5   where all of that money goes.  Okay.  So when --
 6   when Audrey was saying, We don't pay Planned
 7   Parenthood, okay, our union dues are taken every
 8   month.  Then a portion of that, and it's a big
 9   portion of it, goes to International, which is TWU
10   International.  Okay?
11        But we fall under also the AFL-CIO.  Then some
12   of those dues go to the AFL-CIO, and they fund
13   Planned Parenthood.  So my dues do go to fund
14   Planned Parenthood.
15   Q.   And so you opted out.  And so now, at least in
16   theory, they do not.
17   A.   That's a good question.
18   Q.   Now, it still goes to salaries of people that
19   are involved.
20   A.   Correct.
21            MR. GREENFIELD:  Objection, your Honor.
22            THE WITNESS:  It goes to all of it.  So
23   my --
24            MR. GREENFIELD:  Objection, your Honor.
25   He's leading the witness.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1              THE COURT:  I will sustain that.  More
 2   open-ended.
 3              THE WITNESS:  Okay.
 4   BY MR. PRYOR:
 5   Q.   Now, after you opted out, how were you able to
 6   raise your concerns with your union since you
 7   weren't someone that could go to a meeting?
 8              MR. GREENFIELD:  Objection, your Honor.
 9   He's still leading the witness.
10              THE COURT:  I'll allow that one.
11              THE WITNESS:  The only way to speak my
12   voice, okay, was to call them, okay, which I had
13   tried calling Audrey a couple of times.  She doesn't
14   return calls.  She just -- and half the time she was
15   never there.  We never saw her.  Well, I never saw
16   her anyway.
17              But she was -- we even had a whole thing
18   about one time where she was missing.
19              The next thing is I can either email her,
20   but then, when she was running, she had put a
21   Facebook page together that said "Audrey Stone,
22   TWU."  And the whole page was designed on when she
23   was running.  So she was putting things on that page
24   the entire time that she was running.
25              And then people were asking questions
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1247

1  about her slate and people were asking questions
2  about the union and so forth.  So she used that
3  platform as her union page.
4         We also had a page which was connected to
5  the Union on Facebook, but they shut it down to
6  where you couldn't anymore ask questions, or you
7  couldn't comment, that's what it was.  They could
8  put stuff on there, but you couldn't comment on it
9  anymore.  So they kind of censored us.
10        So my only way was either email -- because
11 she never returned phone calls -- or on her
12 Messenger.
13        So for me, when I was online, if I had --
14 if I had seen something, because we are in all of
15 these little Facebook -- and they are all private.
16 She tries to claim that they are not, but they are
17 all private, those -- and they are all
18 union-activity related.
19        So I would get a lot of the information
20 either from flying or on these Facebook pages.  So
21 one is Fusion, one is One Love, one is Sassy Stew.
22 I mean, there's a plethora of them, okay?
23        So when I would see something, you know,
24 that I didn't like and I knew what was going on, I
25 messaged her, which is, I had every right to do.

 1  BY MR. PRYOR:

 2  Q.   And did you message her regarding events or you

 3  just were sending her a message every day?

 4  A.   No.  The first message from me was when I found

 5  out that they had the core group going on.

 6       So all those screen shots of how they had

 7  talked about -- and now, granted, Audrey was an

 8  admin on that page as well, okay?  So there were

 9  certain people that were listed.  She was an

10  administrator.

11  Q.   The name of her admin on that?

12  A.   It was Audrey Stone TWU.

13  Q.   Okay.  Go ahead.

14  A.   Okay.  So anyway, it was all of their group.

15  And, you know, I don't have any problem with that.

16  If that is what they want, that is fine.

17       But the way they were talking about the rest of

18  the members was very derogatory.

19       One of my friends, Steven Hobbs, they were

20  actually talking sexual stuff about him, sexually

21  harassing him, and he's a gay man.

22       I just -- it blew my mind that they were

23  getting away with -- oh, and then you have got, you

24  know, the fucktard, you know -- they were -- they

25  were making fun of and saying such nasty things

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 1249

```
 1   about members.  And it was getting passed around
 2   finally.
 3        Somebody, I don't know who it was in their core
 4   group, got ahold of it, and then we got ahold of it.
 5   Q.   And did you --
 6             THE COURT:  Hold on.  Objection?
 7             MR. McKEEBY:  Yeah, just -- objection, can
 8   we return to the question-and-answer form, as
 9   opposed to the narrative, non-responsive.
10             MR. PRYOR:  I will ask a question.
11             THE COURT:  Yes, please do.
12   BY MR. PRYOR:
13   Q.   After finding out and seeing the messages of
14   the core team members, did you send messages to
15   Audrey Stone TWU?
16   A.   Yes.  That was my first message to her, because
17   they had been turned in to management and I was so
18   glad somebody finally caught them.
19   Q.   And was this -- what year was this?
20   A.   It had to have been '15.  2015.
21   Q.   And was there an election going on?
22   A.   Oh, yes.
23   Q.   Were you involved in that?
24   A.   Yes, I was.
25   Q.   You couldn't vote?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1250

 1  A.   No, I couldn't vote, because I had already

 2  opted out.  But I was -- you know, if friends or

 3  whatever would call me and ask me questions about

 4  the slate, the other people that were running, yes,

 5  I was involved in that.

 6       You know, if they had questions.

 7  Q.   Did you ever Facebook message Audrey Stone TWU

 8  about the removal of the Click team?

 9  A.   Yes, I did.

10  Q.   And why did you do that?

11  A.   Because they were -- well, first of all, Jerry

12  and Chris should have been put back in office.  If

13  they had a problem with -- and, you know -- and

14  unfortunately, Janna and Don, who I adore, they

15  decided to resign.

16       So at that point, all of the other -- I think

17  most of everybody from that other slate came in, so

18  now they had control of the Union.

19       Ask that question again, what was the --

20  Q.   I think you have answered it.

21  A.   Okay.

22  Q.   So you did message about that.  You messaged --

23  you told us about the -- the core team

24  communications.

25  A.   Yes.  And can I say something about that?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

 1   Q.   Well, I have to ask you a question.

 2        Tell me what you have to say about the core

 3   team message.

 4             MR. GREENFIELD:  Objection, calls for a

 5   narrative.

 6             MR. PRYOR:  I'm not sure if it does.

 7             THE COURT:  I will let her answer.

 8             THE WITNESS:  Okay.  So the core team

 9   were -- and every one of -- pretty -- I think every

10   one of their board members were on there, along with

11   the -- oh, what do you call it?  The -- well, all of

12   the board members.  So the domicile board members

13   and so forth were on there, and then some of the

14   other friends of theirs.

15             And Brian Talburt was one of them.  And he

16   actually was, at one point, a shop stew.  So when

17   they say he didn't have any relation to the union,

18   he was actually a shop stew.

19             So the core team actually -- and which I

20   agree, we should have freedom of speech.  I am not

21   against anybody speaking freely online at all.  The

22   problem was, is the core team -- the people on the

23   core team had been turning -- obviously, you have

24   seen that with Brian -- had been turning all of us

25   in for the same types of -- what?  Conversations

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 356 of 426  PageID 14950
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1252

1  about the union, not -- some maybe hate speech or

2  whatever, but it is protected union speech on One

3  Love, Sassy Stew, all of these other ones, but they

4  were taking those screen shots and they were turning

5  it into the company, and the company was going after

6  them for social media.

7          But are the core team, when they got

8  turned in -- and there was a two-day meeting --

9          MR. GREENFIELD:  Objection, your Honor,

10  again, can we return to --

11          THE COURT:  We need to get a more concrete

12  question and answer.

13          THE WITNESS:  Okay.

14  BY MR. PRYOR:

15  Q.   And let me interrupt you -- and I appreciate

16  it.  Is it fair to say you are passionate about

17  this?

18  A.   Yes.  Because it is a double standard.

19  Q.   So I'm going to move forward a little bit.  I'm

20  not saying we won't come back and let you tell us

21  about that.

22  A.   Okay.

23  Q.   But in the 2015 time frame, was there a

24  Collective Bargaining Agreement to be voted on?

25  A.   Yes, there was.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1253

1  Q.   And is that the Collective Bargaining Agreement

2  that was negotiated by the Audrey Stone team?

3  A.   Yes.

4  Q.   And what was your feeling about that?

5  A.   Well, the TA that they brought to all of us --

6  Q.   What is TA?

7  A.   Tentative agreement.

8  Q.   Okay.  So it is not a CBA yet?

9  A.   Right.  Now, I got to read it.  I didn't get to

10  vote.  So -- but yes, the TA.

11       That TA took us backwards from what we had,

12  what we already had, okay, that we had negotiated

13  over years of different contracts.  They were

14  literally taking away a lot of what we -- what we

15  had negotiated.

16       So the contract, the TA was -- and we couldn't

17  figure out why.  Why -- I mean, because eventually

18  you are going to have to come back out on line and

19  fly this -- or are you going to come back out and

20  fly this?  Okay?

21  Q.   "Fly this," meaning, you are going to have to

22  make the money that we are making?

23  A.   Yeah -- well, and go through the new -- you

24  know, scheduling, or vacation point system, you name

25  it.  Whatever was negotiated within that contract

1    took us back instead of forward.

2        And on top of that, they also took away the

3    fact that it was going to be a bonus now instead of

4    retro pay.  Where before, we had always gotten retro

5    pay from the date that that old contract expired.

6    And from that time period until the new contract,

7    okay, was ratified, you would get that new raise,

8    okay, all the way back to when that contract was

9    ready to be ratified.

10   Q.   That is a big deal?

11   A.   Oh, it is a huge deal.  Because on top of not

12   getting the money that you would have gotten with

13   the retro pay -- which we had always gotten

14   before -- the bonus was now going to be taxed at a

15   bonus rate.

16       So when the people actually -- so -- and so the

17   first contract that -- everybody said no.  It was an

18   87 percent.  They -- nobody -- everybody thought

19   that they were working with the company, basically.

20   And they were done.

21           MR. GREENFIELD:  Objection, your Honor.

22   She's testifying to what other people believe at

23   this point.

24           THE COURT:  I will allow it.  Keep going.

25

1  BY MR. PRYOR:

2  Q.   Let me -- and I get that -- your issues with

3  the TA, and that is really what I was asking about.

4       And did you communicate with your -- even as an

5  objector -- your union about your objections about

6  those issues?

7  A.   Yes.

8  Q.   And was this an important issue to you --

9  A.   Yes.

10 Q.   -- your contract with Southwest Airlines?

11 A.   It is our livelihood.  It is our -- it is our

12 safety on the airplane.  It is our vacation time.

13 It is the point system.  It is -- yeah, it is -- I

14 mean, it is -- it is what we now will be, you know,

15 governed by as flight attendants.  It is what --

16 yeah, it is our -- it is our work rules.

17 Q.   And so you raised those issues as well?

18 A.   Yes.

19 Q.   I'm going to move to 2017.

20 A.   Okay.

21 Q.   And there may be more.  And we will be back on

22 Monday.  Sorry, but we will.

23       The -- in 2017, did your union get involved in

24 something that upset you?

25 A.   Well, they had gotten involved in quite a few

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 360 of 426   PageID 14954
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1256

1    things, but yes, they did.

2    Q.    Okay.  I'm talking about in January of 2017.

3    A.    Yes.

4    Q.    And tell me how you became aware -- first of

5    all, what you were upset about and how you became

6    aware of it.

7    A.    Well, how I became aware of it was -- so the

8    march had already gone on.  And I found out about it

9    through One Love, which is one of our sites, and

10   also through the Unity Magazine, that they had been

11   to this march.

12   Q.    And what was upsetting you about -- I mean, you

13   believe in women's rights, don't you?  You believe

14   in every women's rights --

15   A.    Yes, I do.  I am a woman.

16   Q.    What is your problem?

17   A.    The main sponsor for that march -- and it had

18   been televised and it had been talked about, so I

19   don't know how anybody couldn't have known -- but it

20   was Planned Parenthood who arranged that march along

21   with -- there was another lady, I can't think of her

22   name -- but she was a big woman's, you know,

23   activist or whatever.

24        But Planned Parenthood was the main sponsor of

25   the march.

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 361 of 426  PageID 14955
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1257

1  Q.    And how did you feel about your union being

2  associated with that?  And when I say "your union,"

3  I know you are an opt out, but you are still a dues

4  payor?

5  A.    Yes.  So my money paid for that.

6  Q.    And that is still the only way that you can be

7  represented to the company for a TA or a CBA?

8  A.    Correct.

9  Q.    See how I learned these initials?

10  A.    Yeah.  So, first of all, I'm just going to

11  leave my Christian value -- or, you know, not my

12  Christian value system, but the abortion part, just

13  by -- in one bucket.  I mean, you were just saying

14  buckets.

15  Q.    Okay.  All right.

16  A.    Okay.  So one bucket is we are professionals.

17  Okay?  That is how I view my job.  I'm a

18  professional.  I dress professionally.  When I get

19  on the airplane, you know, I present myself as, you

20  know, professional.

21        They went to this march, and they were

22  wearing -- and they were called, and excuse my

23  language -- but it was called the Pussyhat Project.

24        And it was in reference to Trump making a

25  derogatory statement, and that was how that whole

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 362 of 426   PageID 14956
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                        Page 1258

 1  Pussyhat Project came to be.  Okay?
 2       And these women went to the women's meeting,
 3  and they are actually in the pictures at the women's
 4  meeting knitting these pussyhats.
 5       And no, they are not just kitty cat ears, it is
 6  supposed to be the women's genital area.
 7       And this has been told to me also by one of
 8  their board members.  Okay?
 9       So they go to this march, not only are they
10  supporting something that half, if not more than
11  half of the membership, a lot of them are men, a lot
12  of us are Christians, or -- you know, it is not the
13  whole group.  They didn't represent all of us.  But
14  that is what they claimed.
15       And they went to that march and they wore those
16  hats.  Now, if I want to be respected as a woman and
17  really have women's rights, and be valued as a
18  woman, there is no way I would wear that hat.
19  Because it is supposed to resemble or -- yeah.
20  Q.   Okay.  That is your personal view of that.  And
21  you expressed that view?
22  A.   Yes.
23  Q.   And you sent a communication, we have all seen.
24  And we have just got a few more minutes.
25  A.   Yes, I did.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1259

 1  Q.   But I want to get to a couple things, we will

 2  come back to it Monday morning, judge allowing.

 3       So you complained about that.  Did you also

 4  complain about Planned Parenthood?

 5  A.   Yes, I did.

 6  Q.   And you sent a video?

 7  A.   Yes.

 8  Q.   And in what manner -- did you send it to the

 9  public, what did you do?

10  A.   No.  I sent -- so through that whole time

11  period, of course, a lot of things were being shared

12  on Facebook.  And I came across several articles

13  about the Women's March, and the things that went on

14  there, and who was -- make a long story short, the

15  things that, you know -- there was pro people there

16  and pro choice people there, pro life and pro

17  choice.

18       And some of those pro life places are what I am

19  on, okay, so I'm hooked to them.  Those were some of

20  the videos on some of the things that I had found.

21       And for me, if I would have seen those before I

22  went in to do what I did, I never would have done

23  it.

24  Q.   And why did you send it -- well, first of all,

25  when you sent it to Audrey Stone TWU, who were you

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 364 of 426   PageID 14958
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1260

1  sending it to?

2  A.   Audrey Stone TWU, my union president.

3  Q.   And why were you sending it to your union

4  president?

5  A.   Because she is the leader of the Union that

6  also sat on the women's committee and planned this

7  march, and she led the march to DC.

8  Q.   Did you want dues spent on anything to do with

9  that?

10 A.   No.  I didn't want anything being spent on it.

11 They can go and they can march all they want.  But

12 not on my dime.

13 Q.   So that is one of the reasons.

14      But then did you also want to -- there to be an

15 understanding about what abortion was?

16 A.   Yes.

17 Q.   And did you include a video?

18 A.   Yes, I did.

19 Q.   Was it sent privately?

20 A.   Yes, it was.

21 Q.   Could it only be opened up voluntarily?

22          MR. McKEEBY:  Object to form, leading.

23          THE COURT:  Yep, can you rephrase.

24 BY MR. PRYOR:

25 Q.   Did you send it in a manner where it would pop

1  up and you couldn't avoid it or would you have to

2  voluntarily decide to look at it after having seen

3  the subject matter?

4          MR. McKEEBY:  Same objection.

5          THE COURT:  I'll allow that form.

6          THE WITNESS:  No.  You had to actually

7  click on these, both of the videos you had to click

8  on them.

9  BY MR. PRYOR:

10 Q.  Were you doing that to try and have some impact

11 on protecting unborn children?

12         MR. GREENFIELD:  Objection, your Honor

13 leading.

14         THE COURT:  I'll allow it.

15         THE WITNESS:  I wanted her to understand

16 that what she supported at that march, that was the

17 main -- it was all about, you know, pro choice and

18 women's right and you name it.  But the main portion

19 of it, was, you -- my body, my choice.  Okay?  And

20 that is what she marched in.  I helped pay for it.

21         There is lot of us that didn't like that.

22 And I felt like, you know what, the only way that I

23 can express what you just helped or marched with,

24 was sending those.

25

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 366 of 426   PageID 14960
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1262

1  BY MR. PRYOR:

2  Q.   And you have been involved in this issue.

3       Have you seen anything, in your opinion, more

4  effective to explain what abortion is?

5  A.   No, I haven't.  As a matter of fact, there is a

6  whole group out there right now that -- it is not a

7  group, it is an organization -- that actually is

8  going up to people and asking questions about

9  abortion, and do -- you know, are you for it, are

10 you against it?  And let me show you what happens.

11      And a lot of times, people, when they see

12 things like this, yeah, they are -- they had no

13 idea -- a lot of people don't understand what really

14 goes on and how big that baby really is and how much

15 it is formed in just a short amount of time.  And it

16 is a baby.  It is not just a clump of cells.

17      I mean, we can say the same thing for a little

18 puppy dog.  I have got sonogram pictures of puppies

19 and I have got sonogram pictures of babies, and they

20 look a lot alike at the same stages.

21 Q.   So when you sent the communications to Audrey

22 Stone TWU, did you believe you were speaking to your

23 union?

24 A.   Yes.  It had everything to do with the march.

25 Q.   When you sent your video to Audrey Stone TWU,

1  did you believe you were also expressing your

2  religious beliefs?

3  A.   Yes.  I told God that I would never, ever stop

4  fighting for life.

5  Q.   And we have just a few minutes, so I'm going to

6  skip for now the fact-finding meetings.

7       But did you ever in your wildest dreams think

8  that your 21-year employer would fire you for

9  exercising your union rights?

10  A.   No.

11  Q.   Did you ever in your wildest dreams believe

12  that Southwest Airlines would fire you for

13  expressing your religious beliefs?

14  A.   No.

15  Q.   Do you remember where you were when the job you

16  loved for 21 years and the company you helped build

17  called you and told you what the results of your

18  fact-finding hearing was?

19           MR. McKEEBY:  Objection, leading.

20           THE COURT:  I will sustain that.  You can

21  rephrase.

22  BY MR. PRYOR:

23  Q.   Tell us about how you found out about the

24  results and what happened.

25  A.   Well, it was almost 5:00, and they wait until

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 1264

1  the very last minute of the very last day to call

2  you.  And --

3  Q.   Were you waiting for it?

4  A.   Yeah, I was waiting for it.  I was waiting for

5  one or the other, you know, either I was fired or I

6  wasn't.

7       And they literally wait until 5:00.  And the

8  phone finally rang and it was Ed Schneider, and he

9  read the letter that you put up, my -- the letter

10  that I was fired, and read it out loud to me.

11  And --

12  Q.   What was your reaction?

13  A.   Well, my husband was standing there.  And he,

14  you know, he asked me if I had any questions, and I

15  said no.  And I had Beth Ross on the other side,

16  because the union person was on the phone with me.

17  And I just fell to my -- I fell to the ground and

18  started crying.

19  Q.   Did you pray?

20  A.   Yeah, I did.

21          MR. PRYOR:  Your Honor, this is a good

22  time to break for the week.

23          Thank you, ma'am.

24          THE COURT:  Sounds good to me.

25          Okay.  So the same three instructions.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 369 of 426   PageID 14963
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1265

1   You can only talk to your fellow jurors and court

2   personnel, but not about this case; don't talk to

3   anyone else; and don't do any research about the

4   case.

5            We will see you back here at 8:45

6   tomorrow.

7            All rise for the jury.

8            Sorry.  You've got the weekend off.

9   Congratulations.  We don't have the weekend off, but

10  y'all do.  We will see you on Monday.

11           (The jurors exited the courtroom.)

12           THE COURT:  Okay.  So you can leave the

13  witness box, but don't leave the courtroom.  I need

14  five minutes to finish up my research.

15           And then can we come back and talk about

16  witness instructions?

17           MR. McKEEBY:  Your Honor, that's fine.

18           THE COURT:  I think it is an open question

19  because I have to figure out Schneider and Stone,

20  all at the same time.  So the next five minutes,

21  don't talk about the case.  But you may be able to

22  after that.

23           MR. HILL:  I think they are actually

24  different answers, under Geders.

25           THE COURT:  What's that?

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 370 of 426   PageID 14964
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                          Page 1266

```
 1              MR. HILL:  I think they are actually
 2   different answers under Geders.
 3              THE COURT:  Yes.  And that is not the
 4   latest case on the issue.  So I will send y'all
 5   Harry v. Leak.  That is another one to look at.
 6   That is 488 U.S. 272 from 1989.
 7              MR. McKEEBY:  Can you say that cite again?
 8              THE COURT:  It is 488 U.S. 272.
 9              MR. McKEEBY:  And just as a practical
10   observation, I mean, if the rule is that I can't
11   talk to Mr. Schneider in this context, I mean, what
12   would prevent plaintiff from calling all of the key
13   defense witnesses, asking them -- getting them sworn
14   in, asking them their name and address, and then
15   dismissing them, and then, you know, I couldn't talk
16   to -- you know, defense counsel can't talk to the
17   witnesses.  That can't be the rule.
18              THE COURT:  I see your point.
19              MR. GREENFIELD:  Your Honor.
20              THE COURT:  Okay.  Give me five minutes.
21              MR. GREENFIELD:  Well, hold -- and may I
22   just offer -- I haven't had a chance to look at
23   this, but an associate brought me U.S. v. Torres, it
24   is a Fifth Circuit case.  997 F.3d 624, 2021 case.
25              THE COURT:  All right.  We will see y'all
```

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 371 of 426   PageID 14965
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1267

1   in five minutes.

2              (Recess.)

3              THE COURT SECURITY OFFICER:  All rise.

4              THE COURT:  Okay.  You can be seated.

5              Let me tell you, after looking at all of

6   the cases, my tentative leaning on each witness that

7   we are talking about, Carter and Schneider, and then

8   y'all can tell me why I'm wrong and talk me off my

9   position.

10             Okay.  So for Carter, I'm looking at the

11  cases we all talked about, and in addition, I'm

12  looking at a case Potashnick versus Port City

13  Construction.  Potashnick is P-O-T-A-S-H-N-I-C-K.

14             That citation is 609 F.2d 1101.  It's

15  Fifth Circuit from 1980.  It talked about the

16  general principles of Geders being applicable in

17  civil cases as well, largely due to the Seventh

18  Amendment right to a jury trial dating back to

19  Biblical times of sequestering witnesses.  So they

20  seem to think it is a pretty old notion, pretty old

21  practice, notwithstanding Rule 16.

22             So basically, what I'm thinking about is

23  obviously the principles of Geders cross apply when

24  it is a civil litigant, and Potashnick is making it

25  clear it is a civil litigant who is a party

1    litigant.  Right?  And Carter is a party litigant.

2              So I think the gist of what I gather from

3    Potashnick is, I'm probably not able to sideline her

4    from talking at a break as significant as a weekend

5    from talking to counsel.

6              I have concerns about coaching.  But I

7    think the way Potashnick, Geders, and the later

8    Supreme Court case I gave you talks about when you

9    have a heightened interest, like in a criminal case

10   for a criminal defendant or a civil party litigant

11   with a Seventh Amendment rights, that that right

12   warrants in favor of the ability to talk to counsel,

13   with cross-examination being the remedy for concerns

14   about coaching.

15             Does that make sense?  So you can talk to

16   your client, but they get to cross-examine on Monday

17   everything, you know, you talked about.  Right?

18   Can't disclose privilege, but they can get as close

19   as they can to ferret out what was talked about.

20             Using the same framework, the tough thing

21   for me to figure out is, who is Schneider?  Does

22   that make sense?  So Southwest could be a litigant

23   with someone who has an agent or an officer who has

24   the same Seventh Amendment interest that Carter

25   does.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 373 of 426   PageID 14967
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1269

1              So the million dollar question becomes,

2    who is Schneider?  He's not the 30(b)(6).  In

3    Potashnick, in footnote 12, it talks about the

4    president and CEO of that corporation being the

5    officer or agent, notwithstanding whether or not

6    they were a 30(b)(6).

7              So we know it is broader than 30(b)(6).

8              So I guess my question is, who is

9    Schneider?  So I don't have -- I don't have a

10   definitive answer on Schneider.  If he was a

11   30(b)(6), I would say have at it.  He's under the

12   same position as Carter over the weekend.  I don't

13   know the answer as we sit here right now.

14             MR. PRYOR:  I don't believe he was a

15   30(b)(6).  He's not a designated representative.

16   He's not an officer.  Not a controlled person.  I

17   haven't read the case, your Honor, but he's a

18   witness.  And he's a -- I don't know if he's a

19   base -- I think he's a base manager.

20             THE COURT:  And Southwest can talk to me

21   about whether my tentative leaning on the cases is

22   wrong or not and then facts about Schneider.

23             And y'all talk to me about Carter too.

24   Right?  If I'm wrong on Carter, tell me I'm wrong on

25   Carter.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 374 of 426   PageID 14968
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 1270

1              MR. McKEEBY:  Well, I mean, Schneider is a

2   base manager of the Denver base and he's the

3   decision maker in the case.  And I don't -- I think

4   Potashnick doesn't -- I agree, it talks in terms of

5   a party, so it may not be applicable.

6              But I don't think there is any other

7   contrary case law -- that I have found, anyway -- to

8   suggest that we couldn't talk to him over a weekend

9   break.  Particularly given his importance in the

10  case.

11             And again, I go back to the argument that

12  I made before we broke, that if that were the rule,

13  then the litigant could effectively deprive counsel

14  from talking to their key witnesses by calling them

15  during their case in chief and asking them a couple

16  of simple questions, and -- after they were sworn

17  in.  And then they would be barred from talking to

18  them at any point during the case, prior to putting

19  them on the stand, and that just can't be -- can't

20  be the rule.

21             THE COURT:  Well, I think that is why that

22  person is normally designated as a corporate rep.

23  Right?  That person with the most acute concern

24  there, if that makes sense.

25             MR. McKEEBY:  Well, it doesn't, I mean,

1   because there are -- you know, may be multiple

2   critical witnesses that may not be a corporate rep,

3   where you can only designate one corporate rep.

4          And so, you know, as such, they could

5   effectively bar communications between counsel and

6   these witnesses simply by calling them to the stand

7   and asking a few questions.  And depriving the

8   client of the ability to communicate with their --

9          THE COURT:  I know your argument as a

10  general concern.  I don't think that that has

11  happened in this case.

12         MR. McKEEBY:  I'm not suggesting -- I'm

13  suggesting that that is why it can't be the rule

14  because of that potentially absurd result.

15         THE COURT:  I understand that.

16         I don't see that result in this case.

17         But -- okay.  So any other arguments on

18  Schneider, factually or legally?

19         MR. McKEEBY:  And I have another argument,

20  your Honor.

21         I mean, this is a -- for Southwest

22  purposes, an employment case in which the critical

23  decision is the termination of Ms. Carter's

24  employment.  So he's acting as the agent.  He's the

25  decision maker and he's acting as the agent for

1  Southwest as to that decision.

2          So in that sense, he is a party, every bit

3  as much as a corporate officer may or may not be,

4  like Sonya Lacore, who didn't have anything to do

5  with the decision.  He's the agent as to the

6  decision at issue in the case.

7          THE COURT:  Understood.  Why is he not

8  your corporate rep, then?

9          MR. McKEEBY:  Because he lives in Denver.

10          THE COURT:  Okay.  Response.

11          MR. PRYOR:  Yeah.  The response is, he was

12  the decision maker in the underlying facts in 2017.

13  I haven't read the case, judge.  Based on what you

14  were saying, it sounds like it's talking about

15  someone involved in the litigation that is a control

16  person, or corporate rep, or something like that.

17          I mean, Mr. Schneider has not been a

18  player in this litigation.  He was -- I guess he was

19  deposed.  He was deposed and he took the stand.  He

20  was a witness.

21          And he certainly, according to them, is

22  the one that made the decision to terminate her.

23  And if that is all it takes for a base manager --

24  he's not a senior manager in the company -- to fire

25  someone, and that case there applies to him, okay.

1  But it didn't sound like it.

2          THE COURT:  Understood.  So, I mean, my

3  view of this -- and I see the argument that he was

4  the decision maker in this case -- I think from

5  Potashnick, I'm looking at it as a party as a whole

6  and the party's rights as a whole.

7          I think what I would say is, I would allow

8  any corporate rep to then slide out from the pretty

9  restrictive officer or agent kind of notion, right?

10  And say, okay, name that person your corporate rep

11  and they get immune from the operation of the rule

12  and the restraint from talking about the case, but I

13  don't think I can get there with him.  I think I

14  could if he were named the corporate rep.  I just --

15  I can't.

16          So I won't lift my restriction.  I don't

17  know where Carter is.  So I feel like under

18  Potashnick, Geders, I need to lift restriction on

19  Carter, but knowing full way you can cross exam to

20  the fullest extent any information on their

21  discussions.

22          MR. PRYOR:  Your Honor, in regard to

23  cross-examination about communications with an

24  attorney?  That is the spirit of that case, is they

25  are allowed to ask about communications with the

 1  counsel?

 2          THE COURT:  Well, you can go read Geders

 3  over the weekend.  So it -- that sounds like your

 4  homework.  Right?

 5          Geders contemplates it, Potashnick

 6  contemplates it.  They say that there is this

 7  balance, courts hate coaching of witnesses, and

 8  there is a right to counsel under the Fifth

 9  Amendment for criminal cases, under the Seventh

10  Amendment for civil cases.

11          And how we balance that out is, if it is a

12  party litigant or a criminal defendant, we let them

13  talk to their counsel, but let the other side

14  cross-examine them on what coaching occurred.

15          All right?  So we are all going to have to

16  figure out where that line is.  Obviously, we can't

17  compel her to disclose truly privileged information.

18          But if I ask somebody, did you talk to

19  your lawyer, what did you talk about, that is not

20  privileged, right, it is just not.  Everyone thinks

21  that it is.  But when you do a privilege log, all of

22  that stuff is in the privilege log, and the

23  privilege log is not privileged.

24          MR. PRYOR:  But what did you talk about?

25  You don't get really into the specifics of that.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                      Page 1275

1              THE COURT:  What did your lawyer tell you
2     is off limits.  We all know that.  So the question
3     is, what did you talk about, and how granular you
4     can go.  That is the question.
5              MR. McKEEBY:  Your Honor, a couple of
6     points.  One is, I have spoken -- because I
7     recognize now that Mr. Jones also, I think, resides
8     in Colorado, so, I mean, there were other decisions
9     in connection with --
10             THE COURT:  Sure.  It is always a
11    multi-factor analysis.
12             MR. McKEEBY:  It is a multi-factored
13    assessment.
14             But I would also like some guidance.  I
15    mean, is -- can I speak to him just generally
16    about -- not about the case or about what witnesses
17    talk about, but just about, you know, the things
18    that I would recommend in terms of testimony and
19    witness presentation and that kind of thing or are
20    you saying I just can't talk to this witness at all?
21             I mean, if I -- I think if I don't talk to
22    him about, you know, the substance of any evidence
23    that has come in or go over documents and things
24    like that, I should at least be able to talk to him
25    about the rules of being a good witness and, you

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 380 of 426   PageID 14974
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1276

 1    know, when to volunteer information and not

 2    volunteer information, and that type of thing.  But

 3    I want to make sure that the Court is comfortable

 4    with that.

 5                THE COURT:  I can say one thing and ask

 6    for any comments on the other side.

 7                The takeaway I got from reading all of the

 8    cases is there is a middle ground approach between

 9    you can talk anything but cross-examination on

10    coaching; you can talk about nothing; and then the

11    middle ground approach, which was useful really only

12    with some of these heightened interest cases is, an

13    instruction that someone can talk about general

14    trial strategy and scheduling of other witnesses.

15                And I don't know that that is the case

16    with Schneider.  I mean, it sounds like what you are

17    wanting to talk with Schneider about is how he can

18    be a good witness.

19                MR. McKEEBY:  Yes.

20                THE COURT:  And it is mild coaching,

21    right?  It is not here is how you should answer this

22    question.

23                MR. McKEEBY:  Of course.  Of course.

24                THE COURT:  But it is general decorum.  So

25    I'm not accusing you of anything unethical there.

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 381 of 426   PageID 14975
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 4 July 08, 2022                        Page 1277

1  But I haven't seen anything that lets me carve that
2  description out from the cases.
3            Now, if I'm wrong and you find something
4  concrete that gives me that, file something.  I'm
5  paying attention to the docket this weekend.  I'm
6  working like y'all are.  So file something and we
7  will take a look at it.
8            Any comments from Carter?
9            MR. PRYOR:  One thing I do know is what
10  the rule requires when you invoke the rule and what
11  he discussed would violate the rule, in our view.
12            THE COURT:  Understood.  Which is why I
13  don't know authority that would let me, right?
14  Perhaps there is a case that says, oh, that really
15  doesn't violate 615.  I understand that.
16            There might always be a case out there,
17  which I oftentimes dig for cases and don't just rely
18  on the face of the rule.  And this exercise is a
19  great demonstration of that.
20            Okay.  So can y'all tell your client that
21  I am now lifting the rule because it is a weekend.
22  She's a civil party litigant with a heightened
23  interest under the Seventh Amendment that means when
24  I get as far as a weekend, right?  Where we are even
25  beyond the Geders 17 hours, I feel I'm outside of my

1   authority, if I ask her to not talk about the case.

2   But there is a right to cross-examination.  Exactly

3   how far that will go, we will find out on Monday.

4              MR. PRYOR:  Okay.  We will do that.

5              THE COURT:  Other issues, you've got a

6   depo to get to in two and a half hours.  I hope.

7              Can there be some sort of notice, even if

8   just by email, if the depo actually happens?

9              MR. PRYOR:  Yes.

10             MR. HILL:  To Kevin?

11             THE COURT:  Kevin and Savannah.

12             Right.  So I guess -- so it would be on

13  Sunday, then, that we have 6 p.m. disclosures of

14  what is going to happen the next day and 8 p.m.

15  response.

16             But I understand baton handoff will happen

17  Monday.  So I guess the question is, then Sunday, at

18  6 p.m. y'all need to disclose who y'all would call,

19  right?  Because it will be a day of evidence for one

20  of you.

21             So I guess arm wrestle and figure out

22  which one of you wants to present a case first.

23  Again, I don't have any problems if y'all

24  intermingle and you take turns presenting a witness.

25  That is fine by me.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022                     Page 1279

1              But if y'all are going to time on Monday,

2    we need some disclosures Sunday night on what y'all

3    expect to get to on Monday.  But I won't baby-sit

4    y'all and say who has to go first.

5              Okay.  Anything else?  I gave a 24-hour

6    extension on briefing to me on protected activity in

7    the jury charge.

8              And then we talked about Monday at 8, we

9    will show up.  I know that hurts, but if you file

10   anything on jury charge that persuades, obviously I

11   need that by Sunday at five, so I can read it.

12             MR. HILL:  Will they let us up the

13   elevator?

14             THE COURT:  I certainly hope so.  I don't

15   think there is much line of security at 8:00.

16             Other questions?

17             Okay.  We will see y'all Monday morning at

18   8:00 and see you through filings and emails before

19   then.

20             Thanks, y'all.

21             THE COURT SECURITY OFFICER:  All rise.

22             (Proceedings concluded at 5:34 p.m.)

23

24

25

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 384 of 426   PageID 14978
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Page 1280

```
 1                    C E R T I F I C A T E

 2

 3              I, Kelli Ann Willis, RPR, CRR, CSR

 4   certify that the foregoing is a transcript from the

 5   record of the proceedings in the foregoing entitled

 6   matter.

 7              I further certify that the transcript

 8   fees format comply with those prescribed by the

 9   Court and the Judicial Conference of the United

10   States.

11          This 9th day of July 2022.

12

13              s/ Kelli Ann Willis
                Official Court Reporters
14              Northern District of Texas
                Dallas Division
15

16

17

18

19

20

21

22

23

24

25
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Index: $27..66

**$**

**$27** 1244:15,16,25

**$270,000** 1227:25

**$28** 1244:12

**-**

**-o-** 903:2

**1**

**10** 916:5,6 962:14 1183:24 1186:14,22 1188:12 1230:18

**10,000** 1214:20

**10-minute** 1230:10

**100** 937:23 939:10 1244:20

**107** 1125:16,19,20,21, 25 1126:3,5

**10:00** 962:14

**11** 1147:18

**1101** 1267:14

**111** 1113:10,11,12,17, 20,22

**115** 1117:23,25 1118:5, 9

**11:30** 963:7,12

**11:45** 963:7,12

**12** 978:18 1176:4 1178:4,6 1269:3

**12:45** 1060:3

**12th** 1233:7

**13** 996:5,11,12,15,18

**1330** 1233:13

**138** 1170:6,7,8,9,13,14, 16,19

**141** 1167:14 1170:22

**148** 1170:5

**15** 996:3,4 1202:24 1249:20

**16** 997:6 1267:21

**17** 1235:9 1277:25

**17-hour** 1233:22

**18** 926:20,25 927:1,7,9, 13,16,17,23,25 928:7,9, 12,16,20 929:12 930:10,11,14,18 931:16

**18-month** 926:18 929:10

**19** 962:5 965:14 968:14 971:10 1205:22

**1964** 1158:24

**1965** 1177:2

**1980** 1267:15

**1984** 1182:6

**1985** 1186:20

**1989** 1266:6

**1996** 1197:17 1207:2 1216:14 1217:4 1218:9, 22 1219:5,14 1220:9

**1997** 1220:9

**1998** 1220:9

**2**

**2** 915:22 1041:21 1131:3 1142:20 1143:9 1146:3 1152:19

**20** 1019:15 1095:16

**200** 1212:21 1213:4

**2000** 1220:25 1221:1 1228:2 1230:6 1234:20, 24 1235:12 1236:5 1238:3

**2008** 1074:4,24 1126:12

**200s** 1212:25 1214:12

**2012** 1236:3,5 1237:22

**2012-2013** 1236:8

**2013** 1074:6,24 1126:13 1234:22,24 1235:13 1239:17 1241:22

**2014** 979:23

**2015** 997:6 1127:10 1249:20 1252:23

**2017** 913:24 939:22 940:21 942:15 1018:13 1020:10 1023:22 1042:7 1100:2 1206:24 1235:9 1255:19,23 1256:2 1272:12

**2018** 913:24

**2021** 1266:24

**21** 977:4,6 1008:4 1227:7,11 1263:16

**21-E** 976:11,14,17,21 977:2,9,15,17 979:13 981:19 990:16 1008:22

**21-year** 1263:8

**22** 942:15

**22nd** 1042:7

**23rd** 1055:18 1059:8

**24** 908:8 1205:21

**24-hour** 1279:5

**26** 1100:2

**27** 916:3,4 1244:12

**272** 1266:6,8

**27th** 980:3

**28** 948:19 951:14 953:2, 3 987:2,25

**2:30** 1147:18,22

**3**

**3** 1152:15 1156:24

**3.0.0** 1115:23 1116:8, 12,18

**30** 1109:7 1190:7

**30(b)(6)** 1269:2,6,7,11, 15

**30-day** 1122:10 1143:10 1146:22 1148:10,25

**4**

**4** 903:8 1105:23

**403** 1050:22

**408** 1156:5

**425** 1233:12,16

**45** 1059:12 1190:8

**488** 1266:6,8

**4:17** 1230:19 1231:13

**5**

**5** 1107:4

**556** 954:11 955:2 1011:10 1026:10 1041:13 1075:8 1097:22 1098:10 1109:3 1110:16,18 1150:21 1152:22 1224:10

**556's** 1134:11

**56** 1097:2 1134:4

**57** 1200:13,14

**575 496-6784** 913:6

**5:00** 1263:25 1264:7

**5:34** 1279:22

**6**

**6** 1278:13,18

**60** 1090:17

**609** 1267:14

**615** 1232:2 1277:15

**62** 1031:3

**624** 1266:24

**64** 1124:23,24 1125:9, 11

**65** 1045:25 1048:13 1200:13

**66** 944:4,20,23 975:9 995:6 1010:15 1031:7 1038:16

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 386 of 426   PageID 14980
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022              Index: 68..administrator

**68** 1031:3

---

**7**

**7** 907:18 908:15 916:13

**74** 1051:4,9,10,11,17,20

**76** 1058:19 1060:13,14,
15,16,17,19,22,23,24
1061:1,5 1068:2,3,11
1233:9,13

**7:00** 911:16 912:6

---

**8**

**8** 907:17 908:15
1278:14 1279:8

**8-0** 1233:17

**80** 1134:21 1233:12,16

**82** 1058:17 1059:5,7,10,
20 1060:10 1061:10
1068:3,5 1072:25
1073:3

**83** 1179:24,25 1180:1

**84** 1186:20

**85** 1186:20

**87** 1254:18

**88** 1048:11

**89** 1073:4,5,7,14,17
1139:14

**8:00** 907:16 912:6
1279:15,18

**8:30** 910:21

**8:45** 1265:5

---

**9**

**9** 905:4 908:1 1186:14

**90** 915:20 1085:10,12,
14,22,24

**90-minute** 915:17

**90s** 1214:1

**911** 1106:5

**92** 1094:16,17,19

1095:4

**96** 1221:3 1233:12

**97** 1221:3 1223:5

**98** 939:17 1100:11,14,
22 1105:3 1130:13
1221:3 1223:5

**99** 939:12

**997** 1266:24

---

**A**

**abide** 924:6

**ability** 1074:17 1236:2
1268:12 1271:8

**aborted** 958:4 1044:5
1118:13 1120:17

**abortion** 1028:12,22
1086:20 1087:11
1091:5,17,22 1092:3
1093:16,20 1096:21
1098:15 1105:18
1111:9 1112:14 1114:5
1120:23 1126:16,23
1131:8 1185:1,4,13
1186:3 1187:15 1188:3
1190:24 1191:20
1192:14 1193:3 1194:8,
11,16,19 1196:11
1197:6 1198:22 1199:8,
14 1200:3,11 1202:6
1203:8,9,13,17,23
1205:15 1206:7
1257:12 1260:15
1262:4,9

**abortions** 1196:11

**absolutely** 999:10
1003:8 1079:23
1143:11 1154:10
1159:13 1162:13
1209:13 1221:18
1240:16

**absurd** 1271:14

**abundantly** 1064:21

**abuse** 1155:2

**abusive** 1177:5

**accept** 1081:22 1113:9
1122:6

**acceptable** 1148:13
1234:8

**accepted** 1148:21,23
1149:2 1158:10

**accident** 957:18
1009:11

**accommodate**
1071:15

**accommodation**
1068:24 1069:3,12,15
1096:1

**Accommodations**
1069:9

**accordion** 1214:14

**account** 919:23
1025:19 1026:23
1028:23

**accounts** 1023:16

**accurate** 917:7 1026:8
1074:15 1101:4,16,17
1131:8 1187:12

**accurately** 929:6
1077:22

**accusations** 1037:3
1224:24,25

**accused** 1110:2

**accusing** 1276:25

**acknowledge** 1064:10

**acknowledging**
1121:3

**acquired** 1156:6

**Act** 917:21 918:21
919:6 922:7,25 923:12
926:7 1069:6,8,18
1158:24

**acting** 1119:11,13,24
1120:3 1271:24,25

**action** 907:4 930:5
931:13 943:15 1036:21
1037:20 1049:3
1072:14,15,16 1102:12
1103:5 1104:24 1109:5
1170:25 1171:25
1217:18

**actions** 1032:22
1037:23 1128:2

1145:17 1154:15,16

**active** 932:6 956:20
1119:14 1235:12
1236:6

**activist** 1256:23

**activities** 1034:12
1071:16,23 1096:15
1098:3 1099:21
1197:19 1219:15
1234:16

**activity** 917:5,13,20,21,
22,25 918:1,14 919:5
920:10 924:19,22,25
925:2,11,14 930:3
931:12,14,23 954:23
955:4,21 956:10 957:3,
4,17 958:1,9,11,14,16,
19,20 959:3,4,14 960:4,
15 1006:11 1021:16
1026:4 1032:25 1038:3,
9 1047:22 1053:19
1058:14 1075:20
1102:22 1118:25
1129:7 1223:7 1279:6

**actors** 1151:7

**acute** 1270:23

**Adam** 903:19 1133:5
1173:4

**add** 1114:23 1135:23
1151:2 1205:19

**added** 955:4 1134:20

**addition** 918:8,25
1153:7 1218:5 1267:11

**additional** 905:19
915:12

**address** 912:19,21
956:9 1144:2 1167:25
1169:15 1234:9
1266:14

**addressed** 946:5
1114:8

**admin** 1248:8,11

**administering** 966:1

**administration** 982:19
1075:8

**administrator** 1248:10

**admission** 1061:4
1068:3 1073:5 1085:12
1117:23 1125:17,19
1170:5

**admitted** 977:14
979:13 996:17 1051:19
1068:15 1073:13
1085:19,21 1095:1,3
1100:19,21 1113:19
1118:8,13 1125:8
1126:2,21 1167:15
1170:18

**adopted** 1152:25

**adoption** 1204:23

**adore** 1250:14

**adventure** 905:13
920:13

**adverse** 1133:15

**advertise** 1203:10

**advice** 925:16 1163:22

**advisory** 1104:13

**affect** 1136:11 1178:9

**affected** 934:6 978:1
1199:11 1200:2,10,16

**affects** 1087:20 1131:4
1194:25 1197:23
1234:16

**afford** 1037:6 1202:20

**afforded** 1159:2

**AFL-CIO** 1041:13
1245:11,12

**aforementioned**
1114:17

**afraid** 1185:18,20,22
1244:22

**African-american**
1169:5

**afternoon** 1064:1,12
1155:7 1167:9 1175:21
1213:14

**AG's** 1063:14

**age** 1176:22 1200:12
1205:1

**agencies** 1204:23

**agent** 1268:23 1269:5
1271:24,25 1272:5
1273:9

**agents** 1151:9

**aghast** 1061:21

**agree** 937:4 966:17
988:23 1001:3 1019:4
1034:13 1041:2,5,15
1064:11 1076:21,24
1114:11 1144:15
1219:1 1251:20 1270:4

**agreed** 1040:17
1046:22 1114:12
1144:4 1154:4

**agreeing** 1030:10,11,
13 1034:5,8

**agreement** 956:17
1043:3 1121:25 1150:6
1152:23 1155:25
1252:24 1253:1,7

**ahead** 941:9 960:19
968:7 1002:18 1017:14
1130:8 1132:21 1148:3
1154:21 1188:2 1215:7
1220:25 1221:2
1236:18 1248:13

**ahold** 1249:4

**aids** 922:14

**air** 1214:5

**aircraft** 934:5,12

**airlines** 923:18 924:5
928:15 929:22,24
930:2,25 932:7,12
935:1 947:6 948:15,24
949:17 953:19 954:10
966:8 987:3 988:4
997:17 1002:8 1004:5
1015:10 1028:25
1037:6 1044:19
1052:13 1054:23
1069:1,10,21,24
1070:3,14 1071:8
1072:10 1086:20
1087:17,20 1088:14,15,
17,21 1089:7,20
1090:5,20,21 1091:8,19
1092:24 1093:11,24
1094:1 1095:19,22
1097:11 1101:9 1106:6,
21 1109:7,23 1110:17,

19,20,23 1111:11
1112:11,15 1115:9,15
1119:10 1120:10,20,22
1121:24 1123:2
1137:24 1138:10
1141:3 1149:24 1151:4,
11 1155:14 1157:16
1158:4 1160:5 1167:13,
21 1195:17 1197:13,19
1206:5 1207:1,2
1211:21,25 1212:11,12
1216:4 1228:17 1229:3
1255:10 1263:12

**Airlines'** 1087:20
1093:15 1109:2

**Airlines's** 951:15
1045:14,23 1088:23
1091:21 1094:1
1102:11 1103:5
1104:23 1115:3 1122:1
1136:21

**airplane** 1209:17,18,
19,23 1211:15 1213:18
1214:7 1235:24
1255:12 1257:19

**airplanes** 1212:24
1214:3

**airport** 1077:16,18,25
1078:3,6 1079:3,8
1080:19,20 1081:4

**aisle** 1001:25 1002:1
1004:1 1192:16

**algorithm** 1020:7

**alike** 1262:20

**allegation** 1145:22
1151:21

**allegations** 924:15

**allege** 1150:14,18,20

**alleged** 958:4

**allowed** 914:7,13
915:1,11 1001:8
1163:20 1273:25

**allowing** 1259:2

**alongside** 1107:25

**altercation** 1012:21

**altercations** 1012:3

**amazing** 1212:14

**ambiguous** 918:18,25
970:11

**amenable** 911:18

**amended** 1146:9
1147:4 1152:15

**Amendment** 1164:5
1234:1 1267:18
1268:11,24 1274:9,10
1277:23

**American** 1195:16
1207:4,6 1209:8
1211:25 1212:4,7,8

**Amos** 1226:7

**amount** 1199:15
1243:23 1262:15

**amounted** 1088:9

**analysis** 1275:11

**anatomically** 1028:19
1042:24

**and/or** 1121:2

**anesthesia** 1190:5

**anger** 1197:7

**angry** 1063:16 1191:2,
16 1192:17 1197:6

**answerer** 961:1

**answering** 918:17
950:7 957:9 1022:5,21

**answers** 921:24
926:15 1167:2 1175:18
1186:4 1187:7,11
1265:24 1266:2

**anti** 1075:7

**anti-union** 1074:10
1075:4,7,14,17,20
1076:6,14,23 1219:5,6,
8,10

**anticipate** 1066:20

**anymore** 993:12 994:1
1014:18 1189:19
1191:5 1213:17 1247:6,
9

**AP32** 1097:3

**apartment** 1181:1 1182:2,4 1204:14,18 1205:3

**apologies** 1068:20

**apologize** 922:12 926:16 1187:24 1233:6

**APP** 1048:11

**apparently** 970:24 1106:21 1234:18

**appearances** 903:8

**appears** 944:18 1168:1

**appellate** 1063:14 1153:12

**applicable** 1267:16 1270:5

**applied** 965:24 1197:12 1207:7

**applies** 916:1 1232:3 1272:25

**apply** 1005:2 1129:3 1207:11 1267:23

**appreciative** 1067:6

**apprehension** 1187:5

**approach** 921:9 990:13 1023:7 1079:12 1102:13 1142:16 1154:21 1155:17 1276:8,11

**approved** 1069:16

**approximately** 1182:8

**April** 997:6

**arbitration** 1152:19

**area** 927:10 1063:4 1178:2,10 1210:5 1258:6

**areas** 1116:14 1229:21

**argued** 1143:8 1184:25

**argument** 933:21 946:19 957:20 981:8 1038:12 1071:18 1103:21 1111:15 1121:13 1144:24 1149:18 1150:8 1152:25 1153:1

1190:20,24 1191:1 1233:1 1270:11 1271:9, 19 1273:3

**argumentative** 928:24 950:20 955:16 957:10 967:16,19,24 968:1 981:14 992:21 1000:20 1005:23 1007:14 1012:12 1013:11 1017:18,24 1047:25 1061:20 1062:22 1065:8

**argumentive** 960:16

**arguments** 1013:18 1156:23 1271:17

**arise** 966:8

**arm** 1278:21

**arranged** 1256:20

**Article** 1227:7,11

**articles** 1259:12

**ashamed** 1199:8

**asks** 920:9 1153:5

**aspect** 1034:16

**assassination** 936:5, 12,15 937:4,12 938:8

**assessment** 1275:13

**assign** 992:8

**assigned** 988:17,19 992:15 994:4,14,16

**assignment** 1231:3,4

**assist** 950:6

**assistance** 1159:23 1184:2 1233:25

**assistant** 1052:16,19

**associate** 1086:19 1093:14 1266:23

**assume** 938:24 941:9, 22 990:6 995:4 1004:22,25 1027:25 1028:1 1053:5 1084:1 1113:5

**assuming** 941:12 1162:5 1163:5

**assurances** 916:12

**assured** 1187:3

**atmosphere** 1209:24

**attached** 979:21 1114:22 1115:1

**attachment** 1115:6

**attack** 1036:25 1150:1

**attacks** 1011:14

**attempt** 906:13

**attendant** 932:6 954:10 966:14,24 967:12 968:17,22 982:14 1002:6,7 1014:19 1074:4 1118:16 1119:2,3,7,11, 14,15,17,24 1135:25 1137:23 1138:9 1171:8 1195:17 1209:9,10 1219:21 1243:20

**attendants** 953:18 966:12 971:14 979:23 1001:21 1002:2 1004:1 1005:2 1011:25 1082:19,21 1083:1,2,5, 15,16,23,24 1084:2,4, 16 1085:6 1109:4 1110:19 1120:12 1151:8 1217:16,21 1218:7,24 1221:8,9 1222:5,20,21 1223:2,23 1255:15

**attention** 1277:5

**attorney** 1052:12 1158:21 1273:24

**attorney-client** 925:24

**attributed** 990:19 991:13

**auditorium** 1198:15 1199:16

**Audrey** 945:16 946:23 947:16 948:2 950:10 952:3,10,16 954:1 965:18 975:6 989:9,19, 21,23 1011:8 1014:2 1020:19,20,23 1021:2, 10,22 1022:15,17 1025:1,2 1026:1,2,9 1031:25 1034:15

1035:8 1039:12 1040:3, 6,7,11 1041:24 1046:5 1072:22 1073:18 1079:20 1084:9 1101:25 1105:1 1118:24 1119:1 1126:13,22 1127:4,9 1139:10 1141:4 1150:22 1168:4 1169:21 1174:15 1235:19 1241:2,3,8 1245:6 1246:13,21 1248:7,12 1249:15 1250:7 1253:2 1259:25 1260:2 1262:21,25

**authored** 965:18 1113:23

**authority** 1161:21 1164:25 1165:2 1277:13 1278:1

**avenues** 1203:6 1205:12

**aviation** 952:8

**avoid** 1261:1

**awake** 1188:7

**aware** 932:20,24 939:24 941:14,15 943:11 947:14 954:2 973:3,8,11 975:12,24 976:3,6,10 978:15,16 980:6,11,17,22 983:12, 20,21,23 984:2 987:7 1000:17 1021:2 1032:23 1042:16 1069:23 1071:11 1081:18 1093:3 1108:10 1110:15 1112:11 1122:23,24 1123:5,7,12 1124:10 1128:1 1138:13,22 1140:4,6,10 1146:21 1148:9,15,24 1149:3 1157:15 1163:23 1233:3,9 1256:4,6,7

**awesome** 907:11

---

**B**

**babies** 1194:21 1202:18 1204:14,21 1205:4,10 1262:19

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 389 of 426   PageID 14983
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Index: baby..born

**baby** 1131:9,10 1187:4 1188:24 1189:9,23 1190:19 1193:19 1194:2,5 1201:11,25 1202:20,21 1262:14,16

**baby-sit** 1279:3

**bachelor's** 952:8

**back** 907:8 908:23 909:5,25 921:3,8 926:19,25 927:1,7 928:6,11,20 929:2,17 930:14,18 938:18 941:1 943:10 963:18 972:1,9, 25 974:24 987:24 995:6 1008:15 1009:16 1010:6,15 1014:13 1022:24 1028:2 1029:20 1038:16 1040:15 1055:14 1059:17 1060:3,20,21 1061:4,10 1064:8 1066:14 1067:9 1068:2 1081:14 1090:22 1091:7,17 1092:23 1093:13 1096:2,19 1099:13 1103:19 1123:23 1135:16,19 1136:1 1139:9 1141:23 1145:18 1146:8 1147:18 1152:10 1155:5 1158:3 1161:4, 18 1164:10,22 1169:14 1176:2,8,20 1181:20 1182:24 1185:3,22 1186:10,18 1188:4 1190:4,7,11 1192:22,23 1193:22 1195:12 1207:5,15 1208:12,13, 17,19,23 1209:2,3,5 1210:17 1212:12,21 1213:4,11,12,13,14 1214:6,8,13,23,24 1215:2,6,18 1216:3 1217:11 1218:22 1220:5,15 1222:7 1224:1 1227:17 1228:8, 13,15 1230:6,11,12,18 1231:13 1232:16 1236:14 1237:24 1238:3 1239:15 1242:13 1244:10,12 1250:12 1252:20 1253:18,19 1254:1,8 1255:21 1259:2 1265:5,

15 1267:18 1270:11

**back-and-forth** 966:16 971:11

**background** 1176:14 1207:21 1234:15

**backwards** 1253:11

**bad** 979:5 1183:20 1189:2 1212:7,8 1220:16 1223:8 1226:14

**badge** 1086:21,23 1087:1 1089:10,20,22

**badgering** 1012:12 1240:7

**bags** 1182:14

**balance** 1145:15 1274:7,11

**balances** 1145:18

**Baltimore** 1081:10

**bankrupt** 1127:11

**banner** 1108:23 1109:2 1110:15 1112:10

**banners** 1108:25

**bar** 1232:1 1271:5

**bargaining** 1145:15 1252:24 1253:1

**Barnett** 1101:7 1102:10,20 1103:4 1104:22

**barraged** 1240:10

**barraging** 1127:9

**barred** 1270:17

**Barrett** 1229:13

**base** 947:2 948:2 988:17 989:4 1052:16, 19 1235:24 1269:19 1270:2 1272:23

**based** 948:23 949:10 952:11 953:4 978:7 1029:23 1079:4,18 1080:16,17 1100:4 1158:7 1169:6 1195:24 1234:7 1272:13

**bases** 981:17

**basic** 951:6 1002:22 1150:23 1159:1

**basically** 1158:25 1180:2 1185:4 1188:19 1191:16,21 1192:10 1196:3 1219:24,25 1254:19 1267:22

**basis** 917:6 937:25 1089:23 1103:1 1116:1 1144:18 1163:10

**bat** 954:18

**Bates** 985:19,21 987:5 988:22

**baton** 1278:16

**beach** 1003:1

**bearing** 963:19

**beautiful** 1176:10 1198:17 1204:6,24 1205:19,22,23

**began** 1074:22

**beginning** 945:6 1019:6 1176:8 1210:22 1219:17

**behalf** 1112:14 1150:5

**Belanger** 984:18

**belief** 953:5 1105:21 1106:25 1131:25 1132:1 1206:13

**beliefs** 1053:14 1058:10 1071:16,23 1106:25 1107:2 1176:16 1177:11 1263:2,13

**believed** 978:13 1093:12 1185:17 1224:3

**believes** 1075:4 1087:24 1143:7

**benefit** 1064:15

**benefits** 1207:25 1208:14

**Beth** 1264:15

**Beverly** 984:18

**Bible** 1177:22 1195:9 1197:24 1198:21 1200:6

**Biblical** 1267:19

**big** 974:19 1130:2 1198:2 1224:7 1243:13 1245:8 1254:10 1256:22 1262:14

**birth** 1183:12,13

**bit** 923:8 996:20 1010:10 1018:17,20 1105:18 1110:2 1141:14 1175:25 1188:6 1189:1 1210:22 1234:17 1252:19 1272:2

**blah** 1213:24

**blank** 944:14

**bleeding** 1190:9

**blew** 1248:22

**block** 1174:3,11

**blocked** 1172:6,7 1174:7

**blocking** 1004:8

**blood** 1189:21

**blow** 982:2 996:19 1087:4

**blurred** 1087:7

**board** 1074:5 1081:16 1082:8 1216:4 1226:16 1227:6,11 1236:21,25 1237:1,2 1251:10,12 1258:8

**boat** 1154:9

**Bobby** 903:12 915:15

**body** 1097:23 1098:11, 17 1100:4 1111:5 1112:5 1188:24 1261:19

**bold** 1129:24

**bonus** 1254:3,14,15

**boom** 1090:24 1214:23

**born** 1176:3,21,25 1177:1,2,4,7 1193:5

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 390 of 426   PageID 14984
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                Vol 4 July 08, 2022                                Index: boss..Carter

1196:9

**boss** 1225:16

**bother** 1039:13
1103:20

**bottom** 1081:13 1082:6
1107:4,9 1113:25
1127:15 1167:19

**bought** 1193:10

**box** 921:9 962:19
1166:16 1232:21
1265:13

**boxes** 990:4

**boy** 1176:20 1179:6
1182:13 1219:18

**boyfriend** 1181:21
1182:22 1186:8
1190:13,21 1191:13
1192:3 1199:25
1205:20

**boyfriend's** 1180:9,22

**brand** 1087:20 1088:24
1110:21

**Brantley** 909:10 910:5

**break** 908:21 962:7,8
963:6,12 988:12 991:5,
9 1048:4 1059:13,20,21
1066:10 1146:7,11
1147:2,16,17 1148:2
1149:7 1151:17
1152:10 1155:7
1163:21 1230:10,11
1231:12 1264:22
1268:4 1270:9

**breaking** 919:11

**breaks** 915:21

**Brett** 904:9 1243:11

**Brian** 903:15 980:7,13
1152:6 1167:19
1171:15 1239:25
1251:15,24

**briefing** 907:25
1165:18 1279:6

**bring** 921:3 976:21
1059:19 1060:15
1068:6 1081:21,23
1153:25 1154:18
1166:13 1169:17

1184:12 1231:1

**bringing** 942:16 974:2
975:6,14 980:13 983:3
989:24

**brings** 1135:12

**broad** 920:10

**broaden** 1042:13,18,19

**broader** 1269:7

**broke** 1224:1 1270:12

**brother** 1130:2

**brought** 973:6,23
982:7 983:1,19 1037:16
1136:5 1253:5 1266:23

**bucket** 1039:5 1041:21
1042:22,25 1046:12
1047:19 1048:7
1152:20 1257:13,16

**buckets** 1039:3,5
1044:1,3,4 1046:11,13,
14,15,22,24 1047:2,10
1086:14 1114:13
1118:23 1125:13
1132:10 1257:14

**build** 956:8 1210:23
1263:16

**building** 1205:3

**built-in** 1145:14,18

**bulkhead** 1213:7,8

**bullying** 995:15,20,22,
23 997:15 998:8,19
999:4,14,24 1000:1,6,
12 1001:16,18,19
1002:8 1004:6,10,20
1005:9,16 1007:10,11,
17 1009:5 1029:4
1046:25 1115:8,9,14,15
1117:11,13 1122:20
1127:20 1128:6,8,12
1129:2,21,25 1135:7

**bullying/hazing**
1121:22

**bunch** 1131:13
1218:25

**Burbank** 1177:2

**Burger** 1233:20

**business** 904:8 934:13
995:3 1101:8 1119:10
1229:24,25 1230:1,2

**butt** 1136:1

**button** 1105:24 1106:2

**bylaw** 1241:23,24
1242:1

---

## C

**Cabo** 1001:23,24
1002:23 1003:16
1005:3 1135:19,21

**California** 1176:3
1177:2,4,13,24

**call** 908:13,23 909:19,
20 937:23 998:8
1000:24 1012:16
1056:16 1063:15,22
1095:11 1101:13
1146:7 1161:17 1175:9
1179:5 1181:4 1237:25
1246:12 1250:3
1251:11 1264:1
1278:18

**called** 939:6 1095:16
1127:11 1182:19
1185:7 1186:25 1195:8
1198:1 1202:2,4 1209:2
1216:15 1223:13
1238:12 1257:22,23
1263:17

**calling** 909:5 918:8,25
1066:20 1125:1
1136:19 1166:3,4
1246:13 1266:12
1270:14 1271:6

**calls** 925:23 937:8
940:23 947:19 948:4
949:3 974:5,9 986:18
1008:7,14 1075:23
1161:2 1166:11
1246:14 1247:11
1251:4

**calm** 1188:8

**cam** 912:9

**candidate** 1027:5
1228:3

**candy** 1232:1

**cans** 1215:25

**care** 906:22 1006:6
1064:23 1103:9
1165:14 1204:12
1208:9,22

**career** 1069:9 1178:1

**carefully** 906:18

**carried** 1150:17
1196:19

**carry** 1203:19

**Carter** 903:9,11 915:16
922:10 923:2,17 924:1,
12,13 925:18 927:2,8,
13,22 929:22 930:22
931:11,21 932:4,12,18
939:23,24 940:7,20
942:17,24 954:11,18
955:20 973:7,16,21
976:8 980:4 983:14
985:19,22 987:8
988:19,21,22 989:24
990:8,19,21 991:13,14,
17 992:12,17 993:11
994:20 997:8 998:12,22
999:12,22 1000:11
1006:4,10 1007:6,23
1008:22 1009:4
1011:17,25 1012:1,21
1013:2,24 1014:3
1015:16 1016:15
1018:7 1020:11,14
1021:8 1024:23 1025:9
1026:8 1028:11
1031:18,24 1032:7
1034:9 1036:20
1038:10 1039:11,15
1041:3,22 1043:12
1049:13,23 1050:19
1055:11 1056:2 1067:2
1068:24 1069:6,14,17,
25 1070:15 1071:8
1074:21 1075:6
1086:15 1091:20
1092:13,18 1095:6
1100:25 1120:1 1124:7,
20 1125:12 1126:11
1127:6 1128:2 1130:18
1135:2 1141:18 1142:7
1143:8 1149:25
1150:22 1155:9
1157:17 1158:10

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 391 of 426   PageID 14985
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022              Index: Carter's..claims

1159:24 1160:2
1162:11 1166:11
1169:22 1172:23
1173:9,12 1174:16
1175:9,10,14,24
1234:14 1243:6 1267:7,
10 1268:1,24 1269:12,
23,24,25 1273:17,19
1277:8

**Carter's** 928:14 990:18
1033:16 1046:9 1048:8
1058:9 1069:20
1071:23 1075:4 1091:4,
16 1092:25 1093:14
1148:9 1152:21,24
1155:15 1172:11
1271:23

**carve** 1277:1

**case** 908:21 921:15,18
924:8 926:21 931:5
936:23 962:12,13,20
978:8 979:2 985:12
1053:24,25 1054:15
1055:12,13,22 1059:24,
25 1060:7 1062:1
1063:11,16,20 1101:10
1145:22 1146:10
1147:22 1150:2,14,24
1151:21 1159:24
1161:2,3,21 1162:2,5,7,
24 1163:1,4,15 1164:8,
12 1165:6,19,24 1166:1
1230:15,23 1231:8
1232:15,23 1233:3,8,
13,15 1234:8 1265:2,4,
21 1266:4,24 1267:12
1268:8,9 1269:17
1270:3,7,10,15,18
1271:11,16,22 1272:6,
13,25 1273:4,12,24
1275:16 1276:15
1277:14,16 1278:1,22

**case-in-chief** 1132:18

**cases** 966:11 1267:6,
11,17 1269:21 1274:9,
10 1276:8,12 1277:2,17

**Casper** 1168:2,16
1174:6

**cat** 1258:5

**catastrophic** 1218:1
1222:18

**categories** 1036:19
1053:10,23 1054:4,10,
17,24 1055:8,20,22
1056:3,10 1057:3,5,18,
23 1058:2,23 1059:2,3
1122:19

**category** 1053:14,17,
20 1056:14,17,24
1057:14,20 1058:5
1062:15

**Catholic** 1177:16

**caught** 1249:18

**caused** 1012:21

**CBA** 1253:8 1257:7

**cells** 1131:9 1262:16

**censored** 1247:9

**center** 1181:4 1202:13
1204:16

**centers** 1203:10

**Central** 907:16,17
908:15

**cents** 1134:21

**CEO** 1212:12 1269:4

**certified** 1119:15

**chain** 953:21

**chaired** 956:7

**chambers** 910:2

**chance** 1065:25
1142:20,22 1150:5
1152:19,23 1155:24
1266:22

**change** 998:23
1042:10 1153:1 1162:6
1237:10,11 1241:24

**changed** 939:8 1092:8

**changing** 955:6,8
1046:14

**characterization**
958:23 1092:15 1130:4

**characterizing**
1064:16

**charge** 918:10,13
1016:1 1054:21 1070:9
1227:7 1279:7,10

**charged** 976:9

**charges** 974:2 975:14
976:6 978:19 982:7
983:1,3,5,7 1169:17
1225:18 1226:2,24,25
1227:1,5,9 1240:3,6
1243:10

**charlene** 903:11
929:22 939:23,24
954:10,17 955:20
985:19,21 987:5,8
988:22 1011:17,25
1012:1 1014:3 1026:8
1046:9 1068:24
1082:18 1083:19,25
1091:16,20 1093:14
1100:25 1105:17
1107:10 1120:1,8
1124:7,20 1125:12
1126:11,14,20 1127:5,9
1135:2 1141:18
1149:25 1159:24
1175:9,14,24

**Charlene's** 1087:18
1105:11

**charm** 1197:16

**chart** 1210:14

**chastised** 1023:11

**check** 1077:14
1244:10,12

**checks** 1145:15,18

**Chicago** 1219:19

**chief** 1233:20 1270:15

**chiefly** 978:24

**child** 1196:12

**children** 1176:10
1194:18,20 1200:18
1202:5 1205:5 1261:11

**choice** 1031:10,16,22
1032:5 1096:15,17
1097:23 1098:3,8,11,
17,24 1099:21 1100:4
1109:23 1111:4,5,8,13
1112:4,5 1259:16,17
1261:17,19

**choices** 1204:21

**choose** 906:17 920:13

**choose-your-own**
905:13

**chosen** 1071:13

**Chris** 1082:18 1083:20,
25 1236:19 1237:17
1240:4,5,23 1243:2
1250:12

**Christian** 1105:11,19
1106:25 1126:24
1257:11,12

**Christianity** 1206:12

**Christians** 1258:12

**Christmas** 1177:17

**Christmastime**
1178:23

**church** 1093:23
1177:15,17 1178:21
1195:8 1196:21,22
1197:25 1198:1,4,8,12
1204:15

**churches** 1191:18
1195:7 1198:19

**Cindy** 1223:15 1226:2,
8

**Circuit** 1266:24
1267:15

**circumstances** 914:8

**citation** 1233:10,15
1267:14

**cite** 1266:7

**City** 1267:12

**civil** 1158:24 1267:17,
24,25 1268:10 1274:10
1277:22

**claim** 993:14 994:14
1143:6 1144:18,19,24
1145:19 1150:16
1151:19 1152:24
1247:16

**claimed** 1258:14

**claiming** 1144:16
1225:1,2

**claims** 922:10 923:1,17
977:10,11 978:25
983:13 1144:13 1145:6
1159:11 1168:10,11

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 392 of 426   PageID 14986
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 4 July 08, 2022          Index: clarification..conclude

**clarification** 945:21
1163:10 1165:8

**clarify** 917:16 973:1
980:25 991:5 1063:24
1111:25 1112:2

**clarifying** 919:7

**clarity's** 1160:7

**class** 1038:3 1181:5
1207:23 1213:9,10
1217:15

**classes** 1044:16

**clean** 1095:21 1189:8
1223:13

**clear** 910:8 918:7,13
933:9,20 958:17
1003:13,23 1024:12,20
1035:19 1046:1
1064:21 1157:14,15
1206:11 1267:25

**cleared** 1216:14

**Clerk** 1166:21 1175:15

**click** 1019:1,2,8,13,24
1020:4 1026:17
1082:18 1083:20
1236:19 1237:5,7,17
1239:17 1240:4,6,23
1250:8 1261:7

**clicked** 1019:20
1020:13

**clicking** 1020:7

**clicks** 1020:16

**client** 1268:16 1271:8
1277:20

**clock** 915:23 916:6
1156:21 1238:5

**close** 959:24 1065:25
1189:16 1200:12
1206:15 1268:18

**closed** 913:24 1077:17
1081:3 1217:7

**closer** 1112:13,22,23,
24 1113:1,7 1196:20

**closing** 933:21
1013:18 1065:24

**Cloutman** 903:20

**club** 1213:4,6,7

**clump** 1262:16

**coaching** 1268:6,14
1274:7,14 1276:10,20

**coast** 1211:17

**cockpit** 1209:20
1213:25 1214:3

**code** 1047:16

**Coke** 1215:25

**collection** 1122:25

**collective** 1145:15
1202:6 1252:24 1253:1

**collectively** 956:8

**Colleen** 1229:12,13,14,
18,22

**college** 959:13 1180:12
1205:23

**collusion** 1151:19

**Colorado** 1180:3
1275:8

**combat** 1062:11

**comfortable** 907:1
1109:16 1210:18
1276:3

**command** 953:21

**comment** 915:13
959:11,12 972:9 979:24
1000:7,13 1023:25
1035:6 1134:20 1247:7,
8

**commentary** 968:2,6

**comments** 958:6,12,
13,21 959:2,3,8,10,19
960:3,20 979:23 989:1,
2,5,8,9,13 990:9,17,22
991:13,18 1016:18
1028:12 1062:22
1065:3,5 1126:11
1276:6 1277:8

**commit** 911:15

**committee** 954:12
956:7 1260:6

**common** 915:7

**communicate** 909:4
1050:3 1171:14 1172:5
1255:4 1271:8

**communicated**
1171:9

**communicating**
1024:5 1037:10

**communication**
933:25 1024:10 1028:3
1039:6,8,10,15 1040:10
1043:7,14 1049:1
1063:6 1174:4 1258:23

**communications**
932:5,19 1037:8
1038:10 1043:11,15
1048:22 1072:21
1074:21 1127:16
1169:23 1250:24
1262:21 1271:5
1273:23,25

**company** 925:14
930:25 963:25 964:8
993:11 1120:11,20
1121:11 1122:7
1123:12 1137:17
1141:23 1142:6
1169:19 1172:5 1208:9,
12,13 1211:22,23
1242:18 1252:5
1254:19 1257:7
1263:16 1272:24

**company's** 1114:6
1123:13 1124:8

**comparing** 1084:25

**compel** 904:23,24
1274:17

**complain** 1049:11
1092:6 1169:18 1259:4

**complained** 1042:8
1071:24 1225:12,18
1259:3

**complaining** 954:18
1031:18,21 1032:8,10,
12,25 1041:3,16
1047:20 1049:14
1050:6 1118:24 1127:6
1168:22

**complaint** 939:23
940:16,19 941:3,6,10
942:15 943:13 945:4,

12,17 948:2 949:1,20
951:20 953:7 954:17,22
955:20 958:1,8 960:7
966:24 967:11 968:16
972:3 973:7,22 975:10
989:19,24 990:7 1002:7
1004:4 1014:4 1015:15
1031:20 1032:21
1034:8 1042:5,7,10,14,
18 1043:6 1048:8
1049:24 1072:23
1135:12 1136:22
1137:7 1139:10 1160:8
1169:22 1172:22
1174:16 1225:19

**complaints** 926:23
943:25 948:11,17,21
953:3 966:14 978:17
983:19 1033:17,18
1034:11,14 1035:12,14
1036:2,3,13 1041:19,23
1047:15 1049:9
1240:11

**complete** 905:10 908:2
1003:10 1135:18

**completed** 994:6

**completely** 1040:18
1098:13 1159:14

**complications**
1187:18

**comply** 907:6 910:18

**complying** 921:21
1043:15 1061:23

**compound** 988:7
990:24 991:7 1006:7,13
1038:5,6 1047:24
1090:10 1119:4

**computer** 912:13
913:7 935:11

**concept** 1088:21

**conceptually** 918:4

**concern** 1270:23
1271:10

**concerned** 911:9
978:24 981:1 1093:6,8

**concerns** 1050:3
1246:6 1268:6,13

**conclude** 1014:9,16

1015:16,24 1040:21
1043:22

**concluded** 979:10
1013:24 1014:24
1016:12 1024:15
1029:7 1040:17,18
1043:25 1045:19
1054:14 1067:18
1080:8 1104:16
1110:11 1114:19
1147:12 1157:6 1166:7
1279:22

**concludes** 916:15

**conclusion** 905:17
917:7,12 918:8 919:1
1014:5,21 1015:2
1136:19

**conclusions** 1020:15
1025:4 1029:23 1030:9

**concrete** 1252:11
1277:4

**conditions** 1221:11

**conduct** 908:4 918:5,
20 924:14 1027:20

**conference** 908:25
909:1 910:11

**confirmed** 1183:23

**confirms** 1058:20

**confused** 1087:19
1102:25

**confusing** 1034:6
1133:11

**Congratulations**
1265:9

**connected** 1247:4

**connection** 918:4
923:1 1092:24 1171:1
1172:13 1275:9

**conscious** 1078:10

**conservative** 1105:12

**considerate** 967:7

**consideration**
1027:15 1058:9,13
1065:5 1069:12
1071:22 1095:24
1131:23 1132:2

**considered** 969:7,13,
21 973:12 998:11,15,18
999:21,23 1004:9
1058:2,5 1068:14
1070:8,20 1071:9,17,25
1076:23 1114:5
1127:16 1154:13,16

**consistent** 966:23
967:5,11,14 968:18
969:1 1074:13 1097:25
1098:6 1099:9 1100:6

**consistently** 1149:22

**conspiracy** 974:19
978:13 1149:22 1150:4,
18 1151:21 1152:7

**constant** 956:15

**constantly** 1240:7

**Construction** 1267:13

**consulted** 1172:13

**consulting** 1143:13
1233:21

**contact** 1171:21
1184:1 1209:15

**contacted** 1095:7

**contacting** 1072:22
1172:1

**contained** 999:15
1000:1

**container** 1188:16
1189:18

**contemplate** 917:4

**contemplates** 1274:5,
6

**contemplating**
1067:9,12

**contempt** 906:20
911:7,13

**content** 1045:10

**contents** 1140:18

**context** 918:18 936:16
1035:13 1049:9
1168:22 1266:11

**continue** 921:22
963:18 1023:2 1068:9
1154:23 1183:10

1205:16 1234:12,24

**continued** 922:1
981:16 1006:20
1023:23 1061:19
1180:5 1228:9

**continues** 1048:3
1231:10

**continuing** 1035:1
1119:20 1156:11,18

**continuous** 950:6
1127:4

**continuously** 1022:4

**contract** 1220:21
1221:4,22,23 1222:10
1223:4,8,22 1224:2
1243:25 1253:16,25
1254:5,6,8,17 1255:10

**contracts** 1253:13

**contrary** 1270:7

**control** 956:18,19
1159:16 1183:13
1250:18 1272:15

**controlled** 1269:16

**controlling** 1196:1
1197:5

**controls** 1146:10

**conversation** 1075:13
1207:17 1211:6
1238:13

**Conversations**
1251:25

**COPE** 1217:14,15,17,
20 1218:13,24 1222:14,
17,24 1235:7,10

**copied** 1172:16,17

**copy** 910:19 944:8,9,17
975:9 981:25 1048:12
1086:7 1169:21

**core** 1101:24 1102:12,
20 1103:6,7,22 1104:6,
25 1248:5 1249:3,14
1250:23 1251:2,8,19,
22,23 1252:7

**Corinth** 1178:10

**Corliss** 1169:1,4
1174:6

**corner** 1215:9

**corporate** 1195:18,21
1270:22 1271:2,3
1272:3,8,16 1273:8,10,
14

**corporation** 1269:4

**correct** 913:2 914:12
915:18 916:2 922:13
944:25 958:7 983:12
995:12 998:3 1000:10
1001:13 1018:9
1027:23 1028:20
1029:19 1033:10,16
1042:24 1045:6 1053:3
1057:2 1069:14 1071:6
1072:10 1074:11
1077:23 1078:4 1092:1
1099:12 1101:1
1106:17 1114:15
1115:24 1117:2,7,10,16
1120:5,6 1121:20
1124:21 1134:11
1135:7,14 1136:11,13
1139:5,17,23 1140:1,3
1141:24 1157:5
1172:20 1173:9,10
1174:16 1224:10,11
1228:7 1240:23
1241:14 1245:20
1257:8

**correctly** 954:15
1223:25 1226:23
1228:2

**corrupt** 1034:19
1127:12

**corruption** 1034:20

**counsel** 905:16 915:16
925:16 946:20 1003:6
1018:3 1059:11 1064:7
1087:22 1109:17
1134:5 1135:17 1148:4
1154:7 1164:6 1233:22,
25 1234:9 1266:16
1268:5,12 1270:13
1271:5 1274:1,8,13

**counsel's** 1065:3,5
1133:10

**counseling** 1191:18
1195:8

**count** 916:5

**counterparts** 1154:8

**country** 1106:24

**counts** 1064:17

**couple** 1007:22 1101:6
1134:25 1184:11
1203:1 1222:23
1246:13 1259:1
1270:15 1275:5

**court** 903:3,4,7,13,17,
22 904:18,22 906:1,9,
12,17,20 907:8,13,17,
21 908:3,7,11 909:9,18,
23 910:4,7,10,14,23
911:3,9,12,20 912:17,
20 913:1,3,11,16 914:2,
5,12,16,21 915:14
916:2,9,19,21,22 917:1,
10 919:3 920:6,18,24
921:2,6,11,17,20
922:18 923:4 925:6,25
926:14 929:1,4 931:25
933:3,8,16,19 935:15
936:10 937:13 938:14
939:15,20 940:25
941:23 942:21 944:5,20
945:20 946:21 947:20
948:6,9 949:6,9,23
950:2,8,23 951:11,23
952:20,23 953:13 954:6
955:9,17,24 956:3,13,
18,24 957:11,21 958:24
959:6,16 960:10,21,24
961:4,7,9,10,12 962:3,
6,11,15,18 963:2,3,17
965:12 967:18,21
968:3,6 969:19 970:16,
19,23 971:1,7 974:11,
23 976:2,14,20 977:3,8,
20 978:4,23 979:9,12,
13 981:11,17 983:6,9
984:15,16 985:2,3,11
986:16,21 987:13,17
988:11 990:14 991:3,7,
22 992:22 993:1,5
994:9 996:7,10,12,15
997:10,24 1000:22,25
1001:9 1002:13 1003:6,
9 1005:24 1006:8,14,23
1007:15 1008:11,15,18
1009:21 1011:2
1012:14,17 1013:10,19,
22 1017:12,20 1018:2
1020:2 1021:19 1022:9
1023:3,8,13,15,20

1024:1,4,9,17,18
1029:12 1030:19
1033:5 1035:2,18,21
1037:13 1038:6,14
1039:19 1045:11
1046:17 1048:1,4
1050:16,23 1051:8,10,
13,17 1055:2 1059:11,
16,19,23 1060:5,9,19,
21,25 1061:3,15,25
1062:2,5,18,24 1063:2,
9 1064:11 1065:1,15,21
1066:3,9,12,24 1067:8,
13,16,20,21,22,24,25
1068:13 1071:19
1072:3 1073:1,6,9,11
1075:24 1076:10,16
1078:15,21 1079:13,19,
21,25 1080:5,10,11
1083:8 1084:22
1085:13,16,19 1087:23
1088:4,8 1090:11,14
1091:13 1092:16
1093:2 1094:8,18,21
1095:1 1096:7,9
1099:5,13 1100:13,15,
17,19 1102:5,15
1103:11 1104:5,13,15,
18,19 1106:9 1109:11,
15,18 1110:6,10,13
1111:17 1113:12,15,17
1117:25 1118:5
1119:21 1121:14
1123:10 1124:10,13,15,
17,25 1125:2,6,20,23,
25 1128:25 1129:16
1130:6,25 1132:5,14,
19,23 1133:17,22
1136:14 1137:1,10,20
1138:2,5,18 1140:11,
14,22 1141:11 1142:2,
12,17,20 1143:15
1144:1,16,20,22 1145:3
1146:7,19 1147:1,14,
15,20,25 1148:16,22
1149:2,4,6,10,19
1150:7,12 1151:12,16
1152:2,4,9,11,13,14
1153:9,15,18,25
1154:17,20 1155:2,18
1156:1,3,11,12,18,19
1157:5,8,11,21 1158:14
1160:13,15,22,25
1161:10,16 1162:4,15,
18 1163:3,17 1164:1,3,
8,14,20,22 1165:5,11,

15,19,23 1166:2,6,9,12,
15,22 1167:6 1168:7,8
1170:8,11,14,16,21
1171:4 1173:1,15,18
1174:20,22,24 1175:6,
10,16 1197:1 1228:24
1230:9,13,15,22,25
1231:4,10,15,16,21,24
1232:5,14,15,25
1233:10,12,13,14,17,20
1234:4,11 1239:6
1246:1,10 1249:6,11
1251:7 1252:11
1254:24 1260:23
1261:5,14 1263:20
1264:24 1265:1,12,18,
25 1266:3,8,18,20,25
1267:3,4 1268:8
1269:20 1270:21
1271:9,15 1272:7,10
1273:2 1274:2 1275:1,
10 1276:3,5,20,24
1277:12 1278:5,11
1279:14,21

**court's** 1065:6 1164:13
1233:21

**courtesy** 921:14

**courtroom** 909:12
921:1,10 962:17 963:15
1060:4,8 1061:21
1068:7 1147:24 1149:8,
9 1154:19 1161:6,11
1166:14 1175:3,5
1230:21,24 1232:10
1234:10 1265:11,13

**courts** 1274:7

**covered** 975:1
1023:17,20

**covering** 1129:10

**covers** 1121:6 1128:12
1129:5 1130:9

**cozying** 1151:4

**cramping** 1189:3

**crazy** 1038:3 1065:22
1067:7 1213:17

**creaks** 1155:5

**create** 928:13 974:15
1086:2

**creates** 1088:17

**creating** 1102:4

**credibility** 963:22,24
964:2,3,6,7,15,19
965:1,3,6,8,9 969:5
974:8 978:15 981:5

**credits** 1179:21

**crew** 1171:17 1209:20

**crew-wise** 1209:20

**criminal** 1151:20
1161:21 1164:4 1165:6
1268:9,10 1274:9,12

**critical** 1271:2,22

**cross** 1065:24 1267:23
1273:19

**cross-examination**
1133:1 1170:23 1173:2
1233:24 1268:13
1273:23 1276:9 1278:2

**cross-examine**
1163:21 1164:21
1268:16 1274:14

**crosses** 1154:8

**crossing** 1079:17

**Cruces** 911:25

**crucial** 1007:9

**crux** 969:12

**crying** 1078:1 1189:25
1190:10 1199:20
1264:18

**cue** 909:24

**culture** 1212:9
1229:15,16

**cups** 1214:9,24
1215:15 1216:1

**current** 935:5 1010:18,
19 1011:4

**cursor** 1105:9

**cutting** 1065:19

**Cuyler** 1243:5

**cyber** 998:8,9

**cyberbullying** 995:16,
18,21,22,23 996:1,24
997:14 998:3,11,13,14,

21,24,25 999:2,11,13,
15,25 1000:5,7,13,17
1001:4,12

**cycles** 1189:3

———————————

**D**

**dad** 1177:5,7,21,25
1178:22 1180:3
1182:10 1196:3

**daddy** 1220:4

**daddy's** 1219:23

**Dalak** 1236:20 1237:8

**Dallas** 909:11 1178:2,
10,11 1204:15 1212:19
1220:20 1221:6
1235:15

**Dallas-based** 982:14

**Dana** 1179:12,13,14
1182:15 1184:11

**darn** 1244:19

**date** 979:23 1106:18
1179:3 1235:22 1254:5

**dated** 1179:15 1182:13
1192:6

**dates** 928:8 1054:12
1113:4

**dating** 1179:8 1181:20
1198:9 1267:18

**daughter** 1205:20

**Dave** 1052:8,25

**day** 903:5,8 941:17
945:22 979:4 1018:6
1111:12 1113:1,5
1158:11,19 1162:8
1163:5 1165:8 1177:18
1178:24 1183:14
1192:15 1196:25
1201:1 1205:17
1208:23 1209:6,7
1216:21 1220:15
1230:10 1232:17
1236:15 1248:3 1264:1
1278:14,19

**daycare** 1205:9

**days** 954:14,21

**days'** 1151:14

**DC** 1039:24 1260:7

**deadline** 907:25

**deal** 1193:7 1205:16
1254:10,11

**dealing** 1194:22

**dealt** 917:11

**Dear** 954:8

**December** 956:7

**decency** 1164:16

**decertified** 1243:8

**decide** 1026:23
1154:14 1241:20
1261:2

**decided** 929:21
1043:19 1079:4
1155:14 1177:25
1188:3 1195:22
1197:11,15 1202:20
1203:22 1223:17
1227:6 1250:15

**decides** 1226:1

**deciding** 998:21

**decision** 927:19,22
943:19,21 978:1
1020:11 1054:20,24
1055:23 1057:25
1058:6,11,15 1065:18
1072:15 1078:10
1080:3 1102:11 1103:5
1104:23 1116:19
1131:19 1135:2
1141:17,20,24 1143:12
1155:9 1159:15 1160:1,
4 1172:11,14 1173:8
1187:14 1190:2,18
1194:19 1234:2 1270:3
1271:23,25 1272:1,5,6,
12,22 1273:4

**decision-maker**
919:21

**decisions** 1192:24
1275:8

**decorum** 1061:22
1276:24

**dedicated** 1020:19
1021:9

**deemed** 943:17
1016:19

**deems** 943:15

**defendant** 1164:5
1233:21,24 1268:10
1274:12

**defense** 1126:24
1266:13,16

**define** 919:16 920:3

**defined** 965:8

**definition** 919:9,15
959:13,14 964:14
965:3,5 1088:9 1119:16

**definitive** 1269:10

**degree** 952:8 959:13

**delay** 915:23

**demonstration**
1277:19

**Denise** 1073:21
1113:25

**Denton** 1181:1 1195:8,
9 1197:24

**Denver** 988:18 1074:4
1077:12,16 1078:6
1081:7 1241:22,25
1270:2 1272:9

**Denver-based** 987:6

**deny** 1206:17

**department** 1043:20,
23

**depend** 937:14 939:2,
11

**depending** 1028:8

**depends** 1037:2,14
1066:1 1089:19

**depicted** 1131:5

**depicting** 1114:4
1115:11

**depo** 904:12,22,23,25

**905:8 906:4 908:15
914:6 1067:8 1278:6,8

**deposed** 913:22
1272:19

**deposition** 905:20,23
907:12,24 910:18
911:1,4,10,16,21 912:7
915:18,24 916:17
1066:4,13 1168:21

**depositions** 913:25
914:7,24 915:1 1067:2

**depression** 1192:13
1193:7 1195:4 1196:10,
14 1200:21

**depressive** 1191:16

**deprive** 1233:24
1270:13

**depriving** 1271:7

**deranged** 1096:2

**derogatory** 1248:18
1257:25

**describe** 1171:13

**description** 1277:2

**designate** 1271:3

**designated** 1269:15
1270:22

**designation** 1066:4

**designed** 918:23
1215:22 1246:22

**designee** 909:25

**desk** 935:21

**despicable** 1039:24

**detail** 994:13 1002:21
1036:17

**detailed** 1122:25

**details** 936:1,3 937:20
956:25 957:3 994:12
1002:20 1099:24

**deteriorate** 1195:2

**determination**
1116:18

**determine** 905:20
974:8 1005:15,16

Case 3:17-cv-02278-X  Document 450  Filed 06/14/23  Page 396 of 426  PageID 14990

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022              Index: determined..effect

1007:6 1053:5 1055:6 1069:15

**determined** 1028:24 1029:8,13,16,17 1044:11,15

**determining** 969:4

**devastated** 1194:6

**develops** 1197:23

**DFR** 1143:5 1144:13, 16,18,19,24 1145:6,19 1146:15 1156:25

**DG** 1073:20 1082:12

**dial** 908:17 1062:25 1063:4 1064:8,23

**dialing** 908:19

**dies** 1119:17

**difference** 952:10,13, 14 972:7 1005:20 1022:18

**differently** 1036:4 1063:17

**difficult** 909:12

**dig** 1277:17

**dilated** 1188:20

**dime** 1260:12

**dire** 904:2

**direct** 922:1 1167:7 1175:19 1233:23

**directly** 957:9 972:15 1145:19

**director** 1167:24

**directs** 1154:7

**disagree** 1076:20,21, 24 1108:22 1144:13

**disagreed** 1140:17

**discharged** 1232:22

**discipline** 928:17,22 966:7 979:1 1112:19

**disclaimer** 1070:1

**disclose** 1268:18 1274:17 1278:18

**disclosure** 903:23

**disclosures** 1278:13 1279:2

**discovery** 913:24 914:14

**discrete** 933:19

**discrimination** 1114:7 1158:24

**discuss** 905:16,18 918:12,15 1069:25 1187:19 1198:19 1222:23,25

**discussed** 956:12 1157:20 1277:11

**discussing** 1221:10

**discussion** 903:6 907:7 934:1 935:23 938:4

**discussions** 1156:5 1237:18,20 1273:21

**disgusted** 1191:3 1243:16

**dismissing** 1266:15

**disparaging** 1120:11

**displayed** 966:1 1068:12

**displaying** 1133:23

**dissuade** 938:5

**distinction** 972:19 1163:1

**disturbing** 961:18 995:8

**divorced** 1197:9 1208:12

**docket** 1277:5

**doctor** 1183:19,22,23 1186:13 1188:9 1194:1, 10

**document** 944:19 946:3,10,17 958:23 959:25 965:15,16 967:10 976:13 977:14, 25 978:12 981:1 983:5 996:17 999:7 1001:4 1010:23 1036:12

1041:12 1042:15 1045:9 1050:7 1051:19, 22 1052:1,7 1057:6 1061:9 1068:16 1073:13 1076:9 1085:21 1095:3 1100:4, 21 1113:19 1118:8 1125:8 1126:2 1134:6 1140:6 1167:18 1170:18

**documents** 1010:9 1035:23 1036:18,20 1086:1,18 1275:23

**dog** 1226:17 1262:18

**dollar** 1134:21 1269:1

**dollars** 1218:3 1227:25

**domicile** 1237:1,2 1251:12

**Don** 1236:20 1237:8 1250:14

**donate** 1203:2

**donated** 1202:17,18

**Dondi** 1061:24 1062:16

**door** 1214:14 1215:23

**double** 1252:18

**doubt** 1064:16

**draft** 1009:10 1010:13 1115:1

**drafts** 1007:22 1008:21

**drag** 1086:8

**drawing** 1216:3,4

**dreading** 907:11

**dreams** 1263:7,11

**dress** 1257:18

**dressed** 1114:17

**drill** 1178:12,16

**drinks** 1214:15

**drop** 904:25 906:4,12

**dropped** 1182:24 1183:7,8

**drug** 1207:21

**Drummond** 1221:8,14

**drunk** 1221:16

**due** 908:1 924:13 1029:6 1114:18 1126:15 1196:5 1224:23 1226:11 1267:17

**dues** 1097:14,15 1218:5 1222:14 1235:6 1243:22 1244:6 1245:7, 12,13 1257:3 1260:8

**dues-paying** 1236:6

**duly** 1166:20 1175:14

**duration** 915:1

**duty** 914:17 1135:1,5, 13 1136:6 1139:9,10 1145:12,21 1150:14,21 1152:24 1160:12,18 1162:23 1163:7 1225:13 1232:22

**E**

**earlier** 973:1 1006:16 1068:17,19 1111:3 1112:4 1120:16 1130:19 1132:7 1144:5 1154:5 1218:11

**early** 962:8 963:6 979:2 1059:13,20,21 1155:22 1179:17,20

**ears** 1155:3 1258:5

**Easter** 1177:17 1178:24

**easy** 916:10

**ectopic** 1193:17

**Ed** 994:19 1105:15 1131:4 1139:18 1198:16 1264:8

**Eddie** 1101:7 1102:10, 20 1103:4 1104:22

**edited** 1115:12

**education** 952:5,7

**Edward** 903:20 912:23

**EEOC** 1225:18,19

**effect** 1079:25 1239:6

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 397 of 426   PageID 14991

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Index: effective..exhibit

**effective** 1262:4

**effectively** 909:4
1270:13 1271:5

**efficiency** 1181:2,13

**efficient** 905:22

**effort** 1081:18

**efforts** 1150:2 1154:12
1158:7 1159:12

**egregious** 1037:15

**egregiousness**
968:22 1027:14
1112:19

**Eighty-nine** 1073:6,11

**elected** 1224:6,8
1228:2 1237:23
1238:16 1239:18
1240:21 1241:12

**election** 1236:10
1237:23 1249:21

**elections** 935:4

**electronically** 1236:1

**elevator** 1279:13

**else's** 951:16 1072:16

**email** 912:5,19,20
916:14 935:12,14,16
936:2 938:2 944:24
950:15 951:25 978:18
979:19 980:12 982:25
986:11 987:4 988:2,16
989:6,14,22 990:9
991:11 994:15,24 995:4
1054:8 1058:21
1085:24,25 1095:6
1165:20 1167:18,22,25
1168:3 1169:3,10,15
1171:1 1172:5 1174:3
1246:19 1247:10
1278:8

**emails** 935:1 937:17
959:17 1113:23 1170:2
1218:11 1279:18

**embezzle** 1227:19

**embezzled** 1225:2

**embezzling** 1238:25

**emergency** 908:22
1194:4 1210:8

**Emlet** 931:6,7,16,19
1008:24 1085:25

**emphasizing** 1075:15

**employed** 1088:14
1090:4 1167:12

**employee** 934:21
935:1 936:4,22,24,25
937:3,5,7,21,22 938:9,
22,25 939:7,9 941:16
979:17 1015:4,11,12
1027:16,17,19 1037:10
1043:20,23 1044:8,17
1045:5,13 1053:2,4,22
1054:22 1055:19
1056:4 1058:22
1088:13 1089:20
1090:19 1114:1 1119:9
1120:10,20 1122:8
1126:9 1133:16
1135:12 1136:21
1137:6,23 1138:9

**employee's** 926:19
930:19

**employees** 932:13
936:6 948:11,12 953:18
966:18 967:6 1027:10
1037:9 1101:11
1118:21 1120:12
1122:1 1128:10,13
1129:5,10 1135:6

**employer** 1263:8

**employment** 1159:3
1172:11 1217:6
1271:22,24

**en** 1175:12

**encumbrance** 1055:5

**end** 914:3 990:25
1018:6 1066:10 1162:8
1163:5 1165:8 1204:20
1226:4 1242:24

**ended** 1179:8 1180:7,8
1181:23 1207:20
1219:23 1223:18
1225:17 1227:3 1243:2

**enforces** 1090:22

**engaged** 924:18
1172:21

**engaging** 955:21
1037:7

**ENIS** 1143:24

**enjoyed** 1209:9

**enter** 1068:4 1091:6

**entered** 910:20 921:1,
10 963:15 1068:7
1154:19 1166:14
1234:10

**entertained** 1154:9

**entire** 942:11 960:8
1145:14 1153:19
1238:15 1246:24

**entitled** 914:23 925:21
938:12 966:19 1000:24
1012:16 1022:5 1088:2

**entity** 924:5

**envy** 1159:7

**equal** 1134:18 1159:2

**equivalency** 1094:7

**error** 1010:8,10,12

**errors** 1140:5

**escalate** 1028:5

**essentially** 1158:8

**eugenics** 1050:9,18

**evade** 1064:13

**evading** 1064:18

**evaluate** 943:24 967:3

**evaluating** 963:22

**evaluation** 973:12

**evasion** 1063:9

**evasive** 932:10,11
1012:10,15 1013:7,16
1024:13 1033:11
1064:17

**evening** 908:2 1181:4

**event** 1130:11 1206:6

**events** 1248:2

**eventually** 906:24
1040:16 1183:3
1184:17 1186:15
1235:15 1240:18
1253:17

**evidence** 914:24 967:4
969:13,21 973:13
976:14 977:15,25
978:10 985:6 996:9,18
1039:17 1051:7,17,20
1060:14 1061:8
1063:11 1065:25
1068:11,15,21 1073:14
1085:22 1094:17
1095:4 1100:12,22
1108:20,21 1109:10,12,
14 1113:11,20 1118:9
1125:9 1126:3 1134:1
1143:19 1151:13,15,18
1156:7 1167:15 1168:6
1170:19 1275:22
1278:19

**evoke** 918:24

**ex-husband** 1208:7

**exact** 968:20 1243:23

**exam** 1273:19

**examination** 922:1
1167:7 1173:19
1175:19 1186:15

**examined** 1188:11

**examining** 1188:4

**exception** 1033:23,24
1034:2 1164:13

**excessive** 1172:3

**exciting** 1207:19

**excluded** 1232:5,9

**exclusively** 1048:7

**excuse** 984:25 1008:10
1145:9 1257:22

**excused** 1160:25
1164:9 1175:1

**executive** 1236:21,25

**exercise** 1277:18

**exercising** 1107:1
1263:9

**exert** 1173:11

**exhibit** 920:19 944:4,23
965:14 968:14 971:10
972:25 975:9 977:10
978:5,7 981:19 990:3,
16 995:6 996:2,11,18

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 398 of 426   PageID 14992
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022              Index: exhibits..feet

1008:4,22 1010:15
1031:2,3,7 1038:16
1051:4,9,11,20 1058:19
1059:7,10 1068:11
1072:25 1073:3,4,5,14,
17 1085:10,12,22,24
1094:16 1095:4
1096:11 1097:2
1100:10,11,14,22
1105:3 1113:10,11,20,
22 1117:22 1118:9
1124:23,24 1125:9,11,
16,19 1126:3,5 1130:13
1134:4 1139:13
1167:14 1168:9 1170:5,
19

**exhibits** 912:11 920:18

**existed** 978:13

**exists** 1149:22

**exit** 1210:4,8

**exited** 962:17 1060:4,8
1147:24 1149:9
1161:11 1175:5
1230:21,24 1265:11

**Exodus** 1202:4,11,12
1204:5 1205:2

**expand** 1149:17

**expect** 941:18 943:14
947:12 1279:3

**expected** 943:12

**experience** 953:2
987:3,25 1187:25
1196:22 1200:23
1203:14,16 1211:18
1223:4 1234:19

**expert** 1159:4

**expired** 1254:5

**explain** 928:19 964:3
1204:11 1218:25
1262:4

**explained** 1188:10
1217:5,15 1233:4

**explaining** 1234:19

**explains** 1107:20

**explanation** 951:19
957:13

**explode** 1218:13

**exploring** 953:12

**expose** 988:23

**express** 1164:5
1261:23

**expressed** 1258:21

**expressing** 1263:1,13

**extend** 907:25

**extension** 1095:12
1279:6

**extent** 923:20 1002:14
1047:20 1075:9
1197:20 1273:20

**extremely** 918:9

**eyes** 959:24 1189:16

---

### F

**F.2d** 1267:14

**F.3d** 1266:24

**face** 1232:2 1241:18
1277:18

**face-to-face** 1011:15
1012:1,3,5,7,22 1013:3

**Facebook** 928:3,14
929:14,18 930:14 954:9
972:5 1018:10,13,15,
17,20,22 1019:4,10,12,
17,19 1020:6,18,19,20,
23 1021:8,9,22
1022:15,17 1023:16
1024:23,24,25 1025:19
1026:23 1027:3
1028:18,23 1039:11
1046:6,9 1069:20
1070:2 1071:9 1072:1
1074:7 1077:13 1086:2,
13,19 1087:6,18
1088:16 1090:18
1091:16 1092:25
1096:3 1098:21
1101:24 1103:7 1105:1,
6 1111:12 1112:3,8
1118:14,15 1120:9
1125:13 1126:21
1127:10 1246:21
1247:5,15,20 1250:7
1259:12

**faces** 1056:13

**facets** 1130:12

**facial** 1232:25

**facilitate** 1149:24

**facilities** 1203:9,13

**facility** 1203:8

**fact** 917:24 928:13
941:15 942:13 951:6
954:1 964:20 970:3
974:2 975:13 976:4
984:8 993:16 1006:3
1013:14,24 1015:16
1025:2,9 1043:25
1044:7 1053:9 1072:14
1100:2 1116:21 1123:6
1138:13 1141:23
1145:23 1152:21
1182:21 1196:5
1200:18 1219:2
1222:10 1226:11
1241:15 1254:3 1262:5

**fact-finding** 914:16
1014:11 1040:19
1049:23 1073:18
1095:9 1126:20 1146:2,
3 1263:6,18

**factors** 1145:13

**facts** 939:6 1109:10
1111:19 1269:22
1272:12

**factual** 1144:17

**factually** 918:4
1271:18

**failure** 910:17 911:8

**fair** 904:7 917:7 933:13
942:7,9 1015:22
1023:19 1029:18
1040:12,23 1058:8,13
1078:25 1117:15
1124:6 1130:5 1141:2,6
1145:12,21 1150:14,21
1152:24 1216:11
1252:16

**faith** 1177:11,14
1178:9,19 1179:1
1197:23

**faith-based** 1198:11

**fall** 923:19 1245:11

**falling** 959:12

**fallopian** 1193:20
1194:15

**falls** 1215:24

**false** 1094:7 1143:11
1224:23

**falseness** 969:5

**familiar** 945:9 1052:3
1098:13 1113:22

**familiarity** 1063:10

**families** 1204:9
1210:16,18

**family** 1199:11 1200:9,
19,20

**family's** 1177:11

**fan** 1237:20

**farther** 945:5 995:2

**fascinating** 1165:3

**fast** 1191:25 1196:24,
25 1226:1 1237:22
1238:7

**favor** 1268:12

**favorite** 1210:11

**FBI** 906:2

**February** 939:22
940:21 942:15 980:3
1042:7 1055:18 1059:8

**fed** 1244:19

**fee-based** 1243:20

**feed** 1133:22

**feel** 921:4 934:24 979:5
980:25 1074:2 1153:13
1187:4 1188:18,22,24
1191:19 1194:23
1201:15 1211:21
1218:16 1241:17
1243:14 1257:1
1273:17 1277:25

**feeling** 1183:20 1188:6
1198:7 1253:4

**feet** 1204:19 1214:20

fell 1264:17

fellow 962:11 966:18
975:7 1147:20 1230:14
1265:1

Fellowship 1198:1

felt 1155:8 1198:20
1200:16,24 1201:3,16
1203:18 1212:10
1225:13 1261:22

female 1029:6

ferret 1268:19

fetus 958:4 1044:5
1120:17

fetuses 1044:14
1118:14

fight 1064:9 1145:17

fighting 966:16 971:11
1038:9 1226:24 1227:5,
9 1263:4

figure 920:16 996:2
1009:4 1010:16 1013:5
1054:5 1144:11 1147:8
1253:17 1265:19
1268:21 1274:16
1278:21

figured 1192:19

file 928:17 929:11,13,15
930:10,19 1226:2
1243:10 1277:4,6
1279:9

filed 941:4 968:16
976:6 1225:18 1226:24
1227:1,13,15

files 1002:7 1004:4

filing 966:23 967:11
1240:3,6

filings 1279:18

final 1115:24 1116:11
1118:11 1127:25

finally 953:24 1177:25
1182:25 1184:25
1195:13 1199:16
1201:3 1208:24
1218:13 1224:8 1249:2,
18 1264:8

financial 1069:21

find 937:15,16,20 940:4
984:7 993:20 995:7,11
1011:23 1038:8 1047:4,
21 1075:6 1082:4
1091:18 1092:24
1096:19 1097:18
1115:23 1149:15
1162:7 1186:17
1187:11 1209:10
1231:19 1277:3 1278:3

finding 1183:4,15
1194:3 1249:13

finds 939:7 1146:13
1231:25

fine 961:11 1064:23
1133:20 1153:25
1176:24 1197:21
1248:16 1265:17
1278:25

finish 1067:1 1083:7,8,
14 1162:12 1265:14

finished 1083:11
1180:5

fire 937:24 1015:21
1016:1,4 1017:3 1018:7
1040:22 1048:25
1092:13,18 1094:3
1263:8,12 1272:24

fired 935:7 936:16
994:5 1007:11,16
1015:17 1016:6,9,13,
15,19,21 1039:6
1046:15,23 1082:21
1083:16 1084:4
1093:25 1117:3
1150:23 1243:3 1264:5,
10

firing 937:25 1007:9

fix 1008:19 1023:14

fixed 1010:11

flat 912:9

flesh 949:4

flew 1209:19 1210:22
1219:22

flight 932:6 953:18
954:10 966:12,13,24
967:12 968:17,22
971:14 979:22 982:14
1001:20 1002:2,6,7

1004:1 1005:2 1011:24
1014:19 1074:4
1082:19,20 1083:1,2,5,
15,16,23,24 1084:2,3,
16 1085:6 1109:3
1110:19 1118:15
1119:2,3,7,11,14,16,24
1120:11 1135:25
1137:23 1138:9 1151:8
1171:8 1195:17 1209:5,
8,9,20 1212:20
1217:16,21 1218:6,24
1219:20 1221:8,9
1222:5,19,21 1223:2,23
1243:20 1255:15

flights 1212:16,18

floor 1242:8

floored 1199:9

flown 1089:19 1207:4
1226:5,6,8 1227:16

fly 1138:15 1139:7
1197:12 1210:11
1253:19,20,21

flying 1138:22 1152:16
1195:16,20 1207:6
1209:25 1210:1,2
1219:19 1220:4
1226:10 1235:22
1247:20

focus 1087:5 1159:14

folders 944:10

Foley 985:16

follow 911:8 916:1
926:23 1096:5 1102:6
1199:1

footnote 1269:3

forever 929:17 1203:21

forget 960:7 1042:17
1170:1,3 1209:2
1216:15 1244:20

forgive 1196:17,23
1198:25 1199:2,3
1201:13,14

forgiven 1185:20
1196:16,17 1201:3
1206:9,20

forgiveness 1201:2

forgiving 1199:6

forgotten 922:21
1023:22

form 912:9 1021:17
1064:22 1099:16
1249:8 1260:22 1261:5

formal 955:13

formed 1187:1 1262:15

forming 1193:19

forward 1037:17
1163:1 1187:15
1191:25 1196:24,25
1226:1 1237:22 1238:8
1252:19 1254:1

forwarded 944:25
945:7 946:8,10

found 940:3 961:17
982:20 984:6 1027:22
1105:8 1133:10
1178:13 1180:25
1182:15,17 1185:7
1193:22 1194:1 1195:8
1197:25 1198:6
1218:13 1248:4 1256:8
1259:20 1263:23
1270:7

foundation 920:11
940:23 941:21 942:20
948:4,6,9 949:3,10,25
954:5 974:9,11,15,16,
23,25 984:13 985:9
986:18,21 987:10 997:9
1008:7,14,16 1009:17
1023:4,5,6 1072:2
1075:23 1076:15
1078:13 1084:20
1090:12 1091:10
1093:1 1102:2,4
1103:21 1106:8 1109:9
1123:9 1136:23 1137:9
1138:17 1140:8,19
1142:9 1143:25 1239:4

foundational 923:13

four-digit 1229:6,8,9

fourth 915:10 1010:17
1097:3

frame 992:18,24 993:2,
7,9,22 1252:23

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 400 of 426   PageID 14994
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022           Index: framework..Greenfield

framework 1268:20

frank 1221:16

fraternity 1184:13 1193:12

free 934:24 1074:2 1135:6,9 1161:7 1177:8

freedom 1251:20

freely 1251:21

frequent 1171:20 1174:1

frequently 1171:12

Friday 945:22,25 946:2,18 1035:15,24 1036:10

friend 1183:21 1190:21 1200:10 1242:25

friendly 1074:6 1126:12

friends 1199:11,23 1219:24 1228:20 1229:22 1248:19 1250:2 1251:14

front 912:11 944:7 999:17 1008:5 1057:6 1153:14 1186:9 1211:7 1213:10

Frye 908:17 1165:20 1166:18

fucktard 1248:24

full 903:23 922:11 1024:24 1152:15 1181:14 1198:15 1244:6 1273:19

full-time 1081:15 1181:6 1193:12

fullest 1273:20

fully 1153:6

fun 1104:9 1218:18 1248:25

fund 1217:18 1222:18 1245:12,13

fund-type 1218:1

funds 1202:17

funny 1212:20

Fusion 1247:21

future 920:15 956:9

——————————

G

gallery 932:15

galley 1214:13 1215:1, 22,25

gambit 1121:7

game 1141:15

Garry 1221:7,14

gather 1268:2

gathered 929:14 989:12

gathering 980:14

gave 921:11 928:18 929:24 973:19 978:10 997:18 1033:13 1065:16 1117:8 1188:5 1202:22 1204:21 1216:24 1268:8 1279:5

gay 1248:21

Geders 1233:9 1265:24 1266:2 1267:16,23 1268:7 1273:18 1274:2, 5 1277:25

general 924:6 926:13 931:9 1015:5 1053:24 1055:9,12,14 1075:9 1083:17 1267:16 1271:10 1276:13,24

generally 911:22 924:3 952:6 966:10 994:23 1016:4 1017:3,7 1057:8,9,12,13 1116:5, 13,25 1171:13 1275:15

generous 906:6

genital 1258:6

genitalia 1029:6 1045:1 1056:11,13 1057:19 1058:3

gentleman 1179:5,6

genuinely 1165:12

Gilliam 903:9,10 960:6, 13 1067:3,11,14 1125:17 1145:20 1150:10,13 1151:6,13

girl 1201:23

girls 1202:19,23 1203:2,22 1204:7,12, 18,25

gist 973:10 1268:2

give 906:25 909:20 912:21 921:12,13 922:11 924:13 934:21 981:25 990:3,4 997:17 1001:20 1064:15 1094:24 1104:13 1131:23 1137:22 1142:24 1159:12 1160:20 1162:5 1231:2, 4 1233:10 1234:14 1266:20

giving 965:5 1063:3

glad 1165:9 1242:11 1249:18

glass 908:21

glasses 1214:25

goal 906:24 911:3

God 1185:17 1191:20 1194:24 1196:16,20 1199:1 1201:3,17 1205:25 1206:1,7 1263:3

good 903:22 909:9 910:10 913:3 921:7 969:25 982:4 1018:21 1032:13 1059:15 1061:11 1065:17 1066:8 1067:15 1104:14 1133:3,4 1167:9 1171:18 1175:21 1190:21 1196:9 1207:16 1218:17 1219:12 1220:16 1221:12,13 1222:11 1223:2,22 1224:12,13,14 1228:20 1245:17 1264:21,24 1275:25 1276:18

gosh 1211:10,23 1220:23

gotta 1214:23

govern 1242:4

governed 1255:15

government 1237:14

grades 1181:19

graduate 1179:20 1216:21

graduated 1179:6,16, 17,23

graduation 1216:22

grandbaby 1205:24

grandchild 1176:11

grandmother 1177:15 1180:16

grant 1156:19 1157:21

granted 1248:7

granular 919:4,7 1275:3

granulated 920:7

Grapevine 1198:1 1202:15

graphic 958:3 1118:13 1120:8

great 913:16 924:10 963:14 999:16 1073:23 1165:21 1196:8 1211:12 1277:19

GREEN 1013:9

Greenfield 903:19,24 904:15 907:23 908:6,9 940:22 941:20 947:18 948:3 949:2,8,24 950:20 951:7,21 952:18 959:15 967:15,19 968:1 969:17 976:12,18,22 977:7,18,24 978:6,21 981:10,15 984:12,21,25 986:17 987:14 988:7 990:25 991:20 996:8,14 997:19,22 1006:19 1008:6,10,13 1012:11 1013:11 1017:5,9,18,25 1022:2,7 1023:1,23 1030:17 1034:23,25 1038:11 1041:8 1048:2 1050:21 1051:12,14,16

1061:2,13,16,19
1062:21 1064:20
1065:7,10 1073:10
1075:22 1076:8
1078:18 1079:11,16,20
1084:19 1085:17
1087:21,24 1090:12
1092:7 1094:6,23
1100:18 1103:18,25
1104:2,4 1106:7
1113:16 1118:4
1119:19 1123:8 1125:5,
24 1132:16,20,21
1133:2,5,14 1134:2,3,
22,24 1136:15,17
1137:2,11,21 1138:3,7,
20 1139:13,15 1140:16,
24 1141:9,13 1142:4,5,
10 1143:1,5,17,22
1144:12 1145:7,12,25
1146:17,20 1147:10
1148:5,6,8,12 1149:14,
15,21 1151:1,10,14
1152:5 1153:3 1154:2,
20,23,24 1157:2,9,12,
13 1158:1,17 1160:11,
17,20 1163:9,13,20
1164:15 1165:22
1170:13,15 1173:1,3,4,
16 1174:23 1233:2,6,
11,16,18 1234:7 1239:3
1245:21,24 1246:8
1251:4 1252:9 1254:21
1261:12 1266:19,21

**Greg** 986:4 1241:22

**grew** 1178:11

**ground** 1214:23
1264:17 1276:8,11

**grounds** 937:5

**group** 1198:6,13,21
1199:6 1200:4,17
1201:22 1202:3,4
1204:5 1207:13,18
1237:5,7 1240:13,15
1248:5,14 1249:4
1258:13 1262:6,7

**groups** 1105:19 1200:6

**growing** 1177:12,21

**guaranteed** 1233:25

**guess** 905:24 906:17
923:19 1162:25

1173:22 1177:8 1187:5
1200:25 1216:2
1217:11 1225:18
1238:11 1241:4 1269:8
1272:18 1278:12,17,21

**guessing** 1168:18

**guidance** 923:19
1275:14

**guideline** 926:22
928:10

**guidelines** 924:7,11
1101:11

**guides** 1206:2

**guilt** 1196:19

**guilty** 1027:22

**Guttierez** 1073:21
1114:1

**guy** 1243:12,13

**guys** 1009:3

———————————

**H**

**half** 907:22 908:15
911:17 914:10 915:4
1090:23 1195:22
1246:14 1258:10,11
1278:6

**hallway** 1003:3,16,17
1135:21

**hand** 934:24 990:12,16
1086:6 1166:18
1175:12

**hand-to-hand** 1062:11

**handcuffs** 910:25

**handing** 944:17

**handle** 989:17

**handled** 948:17 953:3

**handling** 948:21

**handoff** 1278:16

**hang** 961:23 1102:13
1142:15 1214:4

**happen** 993:10
1038:22 1039:25
1040:2 1047:17

1093:16 1128:11
1136:8 1147:17
1159:24 1185:2
1199:13 1201:23
1242:20 1278:14,16

**happened** 904:7
989:16 1027:19 1185:9
1190:3 1191:14
1198:23 1199:19
1201:20 1206:23
1224:4,16 1225:5,6,20
1227:20 1236:8
1238:19,21 1239:17
1240:17,18 1242:23
1263:24 1271:11

**happening** 915:10
971:13 1065:10
1074:14

**happy** 904:2 928:25
949:4 1163:5 1164:25
1165:1 1218:12 1224:8

**harassing** 1130:11
1248:21

**harassment** 1015:10
1029:5 1044:1,7,19
1045:14,23 1047:1
1056:16,18,20,21,24
1058:4 1114:6,14,24
1116:21 1117:4,17
1122:21 1126:25
1127:3,7 1135:7

**hard** 944:8,9,17 968:10
981:25 1086:7 1152:17
1177:6 1235:22

**harm** 1069:21

**harmed** 1236:14

**Harry** 1266:5

**hat** 1040:6,8 1258:18

**hate** 1185:19 1252:1
1274:7

**hated** 1191:21

**hats** 1028:20 1042:24
1045:19 1258:16

**hazing** 995:15,20,24
997:15 998:19 999:14,
24 1000:2,7 1004:10
1007:17 1029:5
1046:25 1122:20
1127:20 1128:6,7,8,12

1129:3

**head** 1218:12

**heads** 1063:18

**health** 1207:24 1208:13

**healthcare** 1185:5

**hear** 908:20,21 909:13,
14 910:9 914:17,23
915:7 919:19 955:10,11
960:9 969:1 970:25
985:5 1065:3 1172:8
1187:8 1189:5 1211:5
1232:6 1243:7

**heard** 955:11 975:4
982:12,13 1110:5,6
1220:16 1227:1
1243:17

**hearing** 904:20 909:3
910:17 911:9 916:15
922:14 1146:3 1238:23
1263:18

**hearings** 1143:9

**hearsay** 1078:19
1079:17 1239:5

**heated** 1226:13

**heaven** 1201:12

**heavily** 1190:9

**heavy-handed**
1141:21

**hedging** 1030:13

**heightened** 1268:9
1276:12 1277:22

**held** 923:20 924:4
979:11 1024:16
1067:19 1080:9
1104:17 1110:12
1137:8,13 1147:13
1149:22 1157:7 1166:8
1177:5 1214:14
1233:20

**helped** 917:16 1195:13
1202:21 1204:22
1238:7 1242:4 1261:20,
23 1263:16

**helping** 1214:10

**hemorrhaging**
1193:23

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 402 of 426   PageID 14996

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 4 July 08, 2022                    Index: Hensley..included

Hensley 1242:25

Herb 1212:13 1213:14 1215:11,19

hey 905:3 918:14 935:2 1055:19 1088:23 1215:10,11,19

high 947:9 1178:11,17 1179:4,15,16,17

Hill 903:11 905:14 907:16,19 977:1 996:3,5 1086:8 1148:18,20,24 1170:6 1232:2,13,24 1265:23 1266:1 1278:10 1279:12

Hilton 1003:19 1004:2

hired 1225:15

history 1123:2

Hobbs 1248:19

Hofer 986:4 1241:22

hold 911:24 941:23 960:21 962:3 967:18 981:11 987:17 991:3 1003:6 1008:11 1009:21 1010:18,19 1046:17 1084:22 1091:13 1096:7 1138:2,5 1141:11 1147:25 1160:13 1162:21 1164:8 1206:15 1214:24 1249:6 1266:21

holding 1098:19 1180:14 1181:13

holdover 1161:22 1162:16

holds 1011:3

home 1177:22 1182:3,13 1190:7,13,20 1208:22 1219:18 1238:12

homeless 1180:7

homework 1274:4

honest 972:24 1179:18 1211:13

honestly 1192:19,22

Honor 906:7 907:9,23

908:6 916:25 919:20 920:17 921:4 926:16 940:22 941:20 947:18 948:8 949:24 950:5 951:7,21 955:10 956:11 961:15 967:15,20 976:12 977:18,24 984:21 985:1 991:20 997:22 1006:19 1008:6,13 1012:12 1013:9 1017:19 1018:1 1022:2,6,7 1023:1,23 1030:17 1034:24 1038:11 1048:2 1050:21 1051:12 1061:2,14,19 1062:6 1068:10 1073:10 1079:11 1084:19 1085:11,17,18 1087:21 1088:2 1092:8 1094:6,24,25 1100:18 1102:14 1103:18 1106:7 1113:16 1118:4 1119:19 1123:8 1125:5,24 1136:16 1142:4,15,21 1145:11,20,25 1147:10 1148:13 1151:1 1153:3,4 1154:2 1155:16 1157:2,12,19 1160:21,24 1161:8 1163:9 1166:10 1168:5 1170:4,15 1174:23 1175:8 1228:19 1233:2,11 1234:7 1239:3 1245:21,24 1246:8 1252:9 1254:21 1261:12 1264:21 1265:17 1266:19 1269:17 1271:20 1273:22 1275:5

hooked 1259:19

hope 1203:24 1278:6 1279:14

hopeful 907:24

hoping 1224:9 1235:25 1244:18

horrible 1242:8,9

hospital 1193:25

host 1019:22

hostage 906:2

hot 1198:18,22

hotel 1208:20

hour 907:22 908:14 911:17 914:9 922:13 944:13 1059:12 1090:23 1139:3

hours 908:8 914:7 963:9 1065:16,22 1277:25 1278:6

house 1164:4 1177:14,22 1179:1 1193:11 1204:18 1205:2 1219:23

household 1177:20,21

housekeeping 1068:1

housekeeping-wise 1060:10,15

housing 1204:14

HR 995:3 1101:8 1126:9

Hudson 947:4 1072:22

huge 1254:11

hugs 1213:16 1215:12

human 931:4 1101:8

hundred 1227:25

hurts 1279:9

husband 1091:19 1179:9 1194:24 1195:1,19,25 1196:1 1197:4,8 1205:21 1208:7 1264:13

hypocrisy 988:24

hypothetical 934:22 935:19 1002:12,25 1003:11 1094:5 1135:17,24

────────────────

I

l-n-c@msn.com. 912:23

ice 1214:9,16 1215:14

idea 914:19 1200:24 1210:3 1212:23 1262:13

identifiable 1120:9,19

identify 1125:11 1126:5 1134:17 1167:14,18

ignorance 1165:15

ignore 968:9

Ill 903:20

illegal 930:4 931:14 1102:23

illuminate 905:7

images 1114:16

immediately 1091:5 1193:24,25

immune 1273:11

impact 1261:10

impacted 1025:3

impartial 942:7,9

importance 1270:9

important 974:1 1005:8,10,15 1021:13 1022:14,16 1208:5,11 1255:8

impressed 1222:8

impression 1080:6

improper 946:19

improperly 1228:4

in-flight 947:10 948:1 953:17 1167:24 1195:23

inability 907:6

inappropriate 1003:5 1143:21

incessantly 1127:11,17

incident 1069:5 1225:7

include 915:20,22 929:13 947:17 984:1 1123:6,16 1158:6 1260:17

included 941:6 948:1 950:14 952:4 953:20 983:24 986:11 987:4 988:2 1000:12 1042:6 1043:14 1116:22

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 403 of 426   PageID 14997
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022              Index: includes..issue

1117:17

**includes** 1101:12
1150:4

**including** 1089:24
1122:19

**incomplete** 1002:11,
24 1094:4

**inconsistencies**
965:24

**inconsistent** 968:19
969:2,15 1098:6 1099:9
1100:6,8

**incorrect** 1145:20

**incredibly** 961:18
995:8

**indicating** 1098:8

**individual** 1040:4,6
1073:23

**individually** 1041:25

**individuals** 984:14

**inept** 1127:12

**infant** 1105:5

**influence** 1160:1

**inform** 1169:22

**information** 926:20
927:12,15,22 928:3
936:2 937:15 941:14
942:6,23 943:24 944:2
969:7,24 970:7 973:19
974:18 979:22 980:7,15
989:13 1021:3 1091:1,3
1140:21 1185:24
1247:19 1273:20
1274:17 1276:1,2

**informed** 943:12
1164:7

**initially** 999:12

**initials** 1257:9

**inquire** 984:24
1106:14,15

**inquired** 1014:15

**inquiries** 1068:23

**inquiry** 1059:1

**inside** 1193:19 1201:17

**instance** 1050:7
1169:20

**instantaneous**
1038:20

**instruct** 1038:13
1062:3 1155:2

**instructed** 1232:18

**instructing** 1153:15

**instruction** 977:10
978:9 1162:6,8 1163:4
1168:7,9 1276:13

**instructions** 912:5
962:10 1059:22
1147:19 1230:13
1264:25 1265:16

**insurance** 1208:7,9

**integrity** 1127:12

**intended** 1025:7

**intends** 1132:17
1232:8

**intense** 1208:18

**intent** 935:23

**intentional** 957:22

**intentionally** 1009:9,
14 1033:10 1064:13

**interest** 1088:14
1156:20 1268:9,24
1276:12 1277:23

**interested** 944:1

**interesting** 1164:19
1165:9 1210:25
1217:13 1236:13

**intermingle** 1278:24

**international** 956:8
1221:14 1225:23
1240:19,22 1244:8,9,12
1245:2,9,10

**Internet** 980:14
1186:19

**interpret** 958:18 960:2
971:17 1036:4 1037:5

**interpretation** 971:25
972:8 1037:22 1081:13

**interpreted** 1010:25

**interrogate** 1064:21

**interrupt** 1187:23
1192:1 1252:15

**interview** 964:10
1011:16 1025:14
1073:17 1095:8
1096:14,18,19 1100:24,
25 1101:4 1130:17,18
1207:13,14

**interviewed** 990:8,21
991:16 992:13 1011:23
1042:11

**interviewing** 964:18
992:17 1207:19

**interviews** 1052:22
1056:6

**intricacy** 1158:23

**introduce** 1124:24

**introduction** 1125:18

**invalid** 937:5

**investigate** 988:6,25
989:2,14,18 990:7,10,
17,20 992:16 994:20
995:1 1004:14,17
1005:12 1077:4 1135:1,
5,14 1136:6,21 1137:6
1139:9,11 1159:22
1160:12,18

**investigated** 966:7
983:16 986:1 993:14
994:5 997:7 1020:14
1021:7 1028:7

**investigating** 975:20
983:13 987:8 989:7
991:12 1008:1 1098:16
1112:20 1137:14
1159:11

**investigation** 922:9,11
923:1,16,25 924:12,14
928:2 940:3,4 942:7,23
944:3 947:13,15 954:21
963:21 964:17 969:6,
11,12 975:18 980:4
982:21 983:24,25 984:6
985:20 988:5,15 991:1,
17,21 992:3,5 994:6,14,
16 1014:10 1015:2,25
1016:17 1018:16,19

1025:3 1027:20
1029:23 1031:15
1032:4 1033:18
1034:10 1035:5,24
1044:12 1052:22
1053:7 1054:1,4,13,18,
21 1055:19 1056:4,5
1057:24 1058:5,10,15
1072:12 1091:24
1097:10 1101:1
1103:23 1106:3 1126:8
1159:17 1172:22

**investigations** 966:13
991:24

**investigator** 967:4,13
979:17 1080:3

**invoke** 1277:10

**Invoking** 1163:14

**involve** 959:2 960:3
1004:21 1005:21
1032:9

**involved** 947:13,15
954:23 955:3,20 958:1,
9,19 975:14 1033:18
1034:11 1036:24,25
1052:21 1056:8
1102:11 1103:4
1104:23 1107:21
1198:7 1202:2 1222:10
1225:7 1226:4 1234:16
1236:14 1245:19
1249:23 1250:5
1255:23,25 1262:2
1272:15

**involvement** 1172:10

**involves** 930:3 954:17
955:1 958:14 960:14,20
1010:21 1021:16
1105:20 1128:9

**involving** 958:21
1041:23 1069:5
1101:11

**IOE** 1209:3

**ironic** 1038:8

**irrelevant** 950:1,4
978:3 1145:21 1150:25

**Israel** 1105:25

**issue** 925:17,19,20
931:9,10,21,23 974:15

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 404 of 426   PageID 14998
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022              Index: issues..language

1050:19 1063:5
1064:24 1065:13
1069:18 1088:3,7,24
1133:21 1147:17
1155:23,24 1162:10
1163:25 1176:16
1231:22 1232:12,13
1255:8 1262:2 1266:4
1272:6

**issues** 956:9 962:21
966:6,8 1019:22
1061:12 1126:15,23
1153:7 1197:4 1255:2,
6,17 1278:5

**item** 904:8

—————————————

**J**

—————————————

**Jackson** 981:20,21
982:6,8,11 983:1,15
984:5 988:23

**jail** 906:19 911:8,13

**Janet** 1139:22

**Janna** 1250:14

**Jannah** 1236:19
1237:8

**January** 1100:2
1179:24,25 1180:1,4
1256:2

**Jeanna** 981:20,21
982:6,8,11 983:1,15
984:5 988:22

**Jerry** 1236:23 1237:9
1240:24 1250:11

**Jessica** 1097:5
1134:10

**Jesus** 1206:13

**jetway** 934:5

**job** 914:21 922:9 930:3
931:13 932:4,15,18,25
933:12,24 934:2,9,16
1033:20 1034:21
1035:9 1053:4 1069:2
1145:18 1159:7
1171:18 1180:3
1193:13 1196:4 1205:9
1207:1,9,20 1208:4
1216:10,12 1257:17

1263:15

**jobs** 1180:8,14
1181:14,20 1183:2
1217:23

**join** 1216:19,20

**joined** 1217:4 1219:14

**joke** 963:16

**joking** 1212:6

**Jones** 1052:7,12
1107:16 1275:7

**Juan** 1236:20 1237:8

**judge** 906:5 909:10
910:24 911:25 912:24
915:17,18 922:15
1130:24 1259:2
1272:13

**judging** 1204:2,3

**judgment** 1227:23
1228:5

**Julie** 979:16

**jurors** 921:1 962:11,17
963:15 1060:4 1068:7
1147:20,24 1154:19
1230:14,21 1234:10
1265:1,11

**jury** 905:3 912:4
914:16,22,23 915:6
916:23 920:25 962:16
963:4 976:20,25 978:10
996:8,16 1060:2,13,16
1061:5 1068:4,12
1073:1 1103:20 1144:4,
5 1146:25 1147:2,6
1148:1 1152:8 1153:14
1154:13,14 1157:15
1175:23,25 1216:9
1230:14,20 1231:18
1234:6,15 1243:17
1265:7 1267:18 1279:7,
10

**jury's** 914:19

**Justice** 1233:20

—————————————

**K**

—————————————

**Karen** 1226:7

**Kelleher** 1212:13

**Keller** 1202:14

**Kevin** 1278:10,11

**key** 969:14 1266:12
1270:14

**kick** 1136:1 1147:2,7

**kicked** 1241:13

**kids** 1176:1,7 1194:9
1198:4 1210:18

**killing** 1059:17 1230:12

**Kim** 1242:25

**kind** 944:9 957:20
1036:5 1122:8,19
1128:23 1153:13
1170:1 1177:5,7,9,18
1178:20,24 1179:19
1181:4 1182:24 1187:4
1188:8,10,19 1189:2
1190:4,5,8 1195:10
1202:6 1204:10
1208:15 1213:9 1221:5
1226:20 1229:9
1237:13,14 1247:9
1273:9 1275:19

**kinds** 1242:14

**Kissman** 1052:8,25

**kitty** 1258:5

**Kleburne** 1067:12

**knew** 933:12 954:22
955:3,4 957:25 958:7
973:15,21,24 984:2
987:15 1011:11
1049:16,24 1078:8
1108:11 1121:3 1179:7
1183:9,18 1184:6,14
1185:17 1189:19
1190:1,17 1192:16
1196:14,15 1199:1,24
1208:13 1211:9 1212:4
1213:14 1220:12,13
1222:23 1226:8
1227:16,17 1229:12
1240:14 1247:24

**knitting** 1258:4

**knock** 903:8

**knowing** 936:21 987:8
1005:7 1078:11

1273:19

**knowledge** 942:14
947:21 949:11,13,15,
16,18,19 951:10,14,16,
18 952:12 953:4
986:23,25 987:20,22
1009:25 1020:8
1024:25 1053:13,16,19
1069:5 1071:7 1072:6,9
1075:25 1076:2
1078:17 1080:4
1103:22 1104:6
1155:13 1157:16
1220:11 1223:6

—————————————

**L**

—————————————

**labor** 917:21 918:21
919:6 922:7,25 923:12
926:7 931:2,19 947:5
995:2 1126:9

**lack** 940:23 941:21
948:4 949:2,9 984:12
986:18 1008:7,14
1061:21 1063:6,23
1075:22 1084:20
1090:12 1106:8 1123:9
1136:23 1137:9
1138:17 1140:8,19
1142:8 1239:4

**Lacore** 940:13,15,19
941:7,10,14 943:11,14
947:8,12,17 949:1,20
951:20 953:7,17 954:2
1066:20,22 1067:1
1152:1,2 1166:5,11,15,
25 1167:9,11 1170:25
1172:10 1173:4 1272:4

**LACOUR** 1166:20

**ladies** 1202:3,19
1215:10

**lady** 1107:17 1186:9
1188:4 1198:18
1205:23 1223:10
1225:8,12 1256:21

**laid** 1239:4

**Lake** 1178:10,11

**language** 918:10
1027:24 1028:4,8
1257:23

**lanyard** 1087:8

**large** 1048:14,17

**largely** 1267:17

**Las** 911:25 947:2

**latched** 1126:22

**late-breaking** 915:5

**latest** 966:13 997:3,5
1266:4

**laughed** 1216:2

**law** 908:4 917:22 918:3
1270:7

**laws** 1158:23

**lawsuit** 910:12 1197:23
1227:13,15

**lawyer** 908:24 910:11
1052:20,21 1063:10
1064:16 1130:21
1136:24 1153:13
1163:17,18 1274:19
1275:1

**lawyer's** 985:5

**lawyers** 912:3,18
913:15,18 985:3
1052:23

**lead** 1088:2,6,8
1133:18 1191:13

**leader** 982:17 1053:1
1169:5,9 1207:17
1260:5

**leaders** 956:9 1171:18

**leadership** 940:8
975:13 1168:3 1218:18
1220:17 1223:10

**leading** 1133:13
1136:12 1137:19
1138:1 1142:1,9
1158:13 1159:17
1160:9,14 1173:14
1228:14 1245:25
1246:9 1260:22
1261:13 1263:19

**Leak** 1266:5

**leaning** 1267:6
1269:21

**learned** 940:9 1018:16,

19,22 1257:9

**leave** 957:4,7,15
962:19 1039:23 1060:5
1065:23 1115:20
1149:8 1161:6 1164:24
1175:3 1188:24 1206:5
1257:11 1265:12,13

**leaves** 1163:6

**led** 1260:7

**leeway** 1063:3

**left** 957:8,17 1079:3
1161:18 1162:22
1180:4 1188:15 1191:8
1224:2 1231:6 1232:16,
20

**leg** 1209:7

**legal** 917:6,12 918:8,25
957:19 1070:22,25
1136:19 1147:16
1225:21

**legally** 1136:20 1137:5
1271:18

**legitimate** 1136:22
1137:6 1160:8

**legs** 1209:6

**lets** 1277:1

**letter** 998:10 1000:16
1007:23 1008:22
1015:20,22 1029:3
1044:22,24 1045:15
1054:1 1114:23 1115:1,
5,24 1116:6,10,11
1123:17 1124:19
1127:25 1142:23
1143:20 1172:15,16,18,
19 1264:9

**letting** 1153:2

**level** 947:14

**liability** 1137:17

**liar** 1024:6 1064:17

**lie** 964:12,22 1228:9

**lies** 964:24

**life** 911:22 964:9
1031:22 1032:5 1098:8
1105:12,19 1109:6
1131:12 1176:8

1179:19 1190:2,18,19
1192:25 1200:22
1203:19 1204:1 1205:5
1206:6,20 1259:16,18
1263:4

**lift** 1162:8 1163:4,5
1273:16,18

**lifting** 1277:21

**light** 1059:21

**limine** 979:6 1124:12,
13,15 1146:1,9 1147:4,
8 1149:12 1150:8
1152:14,16 1153:8
1156:9,24

**limit** 907:22 914:6
927:14

**limitation** 907:20
915:25

**limitations** 1070:13

**limited** 907:21 911:17
928:21 979:6 1129:12
1151:13

**limiting** 915:10 977:9
978:9 1168:6,9

**limits** 1237:15 1275:2

**Lindemann** 1236:23
1237:9 1240:24

**Lisa** 1198:15

**list** 985:25 1043:14

**listed** 988:16,22 998:6
1023:16 1089:4,6
1248:9

**listen** 914:21 1145:9
1151:24

**listener** 1239:7

**listening** 910:13

**literally** 1164:17
1253:14 1264:7

**litigant** 1267:24,25
1268:1,10,22 1270:13
1274:12 1277:22

**litigation** 1272:15,18

**live** 905:4,23,24 908:13

**lived** 1182:4 1192:6

1219:25

**livelihood** 1255:11

**lives** 1204:20 1272:9

**living** 1180:9,22
1181:1,9,13 1182:16,21

**LM2** 1047:16

**local** 954:11 955:1
1011:10 1026:10
1075:8 1097:22
1098:10 1100:2 1109:3
1110:16 1134:10
1150:21 1152:22
1190:8 1221:22
1224:10 1226:18
1244:3,13

**log** 912:5 1274:21,22,
23

**long** 963:13 973:9
1017:16 1087:10
1088:9 1106:11
1165:13 1168:20
1174:9 1197:7 1201:16
1224:14,15 1229:7
1237:13 1238:13
1259:14

**longer** 1126:25 1163:7
1229:20

**look-back** 926:18

**looked** 914:6 946:7,17
1036:1 1048:23 1053:6
1149:16 1169:14
1213:9

**loosely** 1119:13
1173:23

**lose** 1162:17 1194:6

**loses** 1227:12

**losing** 1240:15

**lost** 1194:3,18 1196:11
1200:20 1229:15
1239:16 1241:12

**lot** 906:8 914:18 953:3
992:7 994:18 1036:14
1092:2 1093:21 1170:2
1171:15 1173:24
1177:9 1178:25 1179:1
1182:18 1186:18
1188:18,25 1189:21
1190:10 1193:4 1197:5

1199:21,23 1203:3
1204:8 1210:16,19
1219:17 1220:6,11,12
1222:7 1223:8 1224:1
1226:14 1234:19
1244:22 1247:19
1253:14 1258:11
1259:11 1261:21
1262:11,13,20

**loud** 1143:15 1206:16
1264:10

**louder** 923:8

**lousy** 1034:21

**love** 1059:18 1106:24
1203:23 1209:12
1247:21 1252:3 1256:9

**loved** 1197:3 1203:25
1209:11,13,17,18,25
1210:22 1211:13,20
1216:10,12 1229:14,16
1263:16

**lower** 1085:25

**lunch** 963:5,6 1059:13,
15,20 1060:12 1066:10
1067:17

**luxury** 1217:8

**lying** 1003:5 1013:16
1063:7

————————————

**M**

**machine** 1188:21
1189:5

**machine-type** 1188:16

**mad** 1191:2 1192:3

**made** 934:4 939:3,5
940:16,19,21 979:24
1009:13,16 1011:14
1012:2 1013:24
1014:12 1016:18
1020:10 1026:19
1029:3 1031:20 1034:9
1036:13 1042:5
1049:18 1054:20
1055:11 1065:18
1069:12 1075:5
1078:10 1080:3
1090:20 1093:10
1105:16 1121:2,6

1131:11 1135:2
1143:12 1150:3
1152:25 1159:8
1183:13 1190:1,17
1192:23 1201:20
1220:1 1227:10
1270:12 1272:22

**Magazine** 1256:10

**main** 1101:12 1200:5
1221:21 1237:3
1256:17,24 1261:17,18

**major** 1195:4

**majority** 1081:16
1082:8

**make** 906:21 907:1
909:2,14 911:5 912:8,
15 914:10 915:12
919:4,18 926:12 933:4
939:24 943:19,21
955:13 958:4 959:11
963:10 965:1 973:2
977:18 1003:13
1013:17 1033:9
1062:19 1064:3,19,20
1065:17 1068:23
1070:23 1078:19
1082:18 1083:19
1087:4 1089:21
1091:25 1093:5
1094:15 1102:18
1134:21 1146:16
1153:4 1156:2,15
1162:9 1164:3,4 1165:1
1185:2 1187:14,24
1189:8,11 1190:5
1191:12 1206:11
1210:18 1218:16
1223:24 1226:10
1238:11 1242:1,2
1253:22 1259:14
1268:15,22 1276:3

**maker** 1270:3 1271:25
1272:12 1273:4

**makes** 934:2 963:7
978:2 1069:13 1270:24

**making** 917:3 942:15
946:9 965:7 970:6
1001:23 1032:21
1034:14,18 1038:12
1040:22 1043:6
1055:23 1057:11,24
1058:6 1099:14 1103:6

1104:12,25 1126:11
1128:19 1218:18
1248:25 1253:22
1257:24 1267:24

**man** 1248:21

**management** 947:5
966:1,6,9 1249:17

**manager** 947:2 948:2
1019:5 1052:17,19
1120:11 1269:19
1270:2 1272:23,24

**manner** 920:2 1026:13
1072:18 1172:6 1259:8
1260:25

**march** 954:13 1032:18
1039:24 1049:14,19,25
1097:21 1098:4,11,24
1099:22 1100:3
1107:21,24 1108:5,11,
13 1109:6 1110:16
1111:4 1126:23
1127:10 1180:5 1256:8,
11,17,20,25 1257:21
1258:9,15 1259:13
1260:7,11 1261:16
1262:24

**marched** 1134:14
1261:20,23

**marching** 1109:1

**margin** 1224:7

**marriage** 1193:15

**married** 1176:1,7,9
1184:16 1191:15,24
1192:12 1193:6,10
1196:3

**marry** 1192:5

**marshals** 910:25
911:14 912:1

**Martin** 1223:16 1225:6
1226:1,6 1236:14,19
1237:24 1238:7 1240:4,
5,24

**Masoni** 903:20

**math** 1200:13

**Matt** 903:11 1130:14
1165:25

**matter** 911:25 932:22

970:3 1006:6,11
1013:14 1021:15,21
1025:6 1027:8 1031:15,
21 1032:1,2,4 1039:13
1065:13 1087:14
1090:6 1110:24
1114:11 1159:5,11
1162:17 1219:2 1261:3
1262:5

**mattered** 1021:22
1022:22

**Matthew** 903:10

**Maureen** 931:5,19
1008:23

**maxes** 914:9

**Mcdaniel** 1223:15
1225:1 1227:3

**Mckeeby** 903:15
907:20 916:24 917:2,18
923:3 925:4,23 928:23
931:24 933:1,6,14
935:13 936:8 937:8
938:10 939:13,18
942:19 944:18 945:18
946:19 949:21 952:19
953:10 954:5 955:7,13,
22 956:11 957:10,19
958:22 959:5 960:5,16
961:1,6 965:10 967:16,
24 969:16 970:13
974:5,9,21 975:25
977:6 981:8,14 983:4
986:12 987:10 988:9
990:23 991:19 992:21,
25 993:3 994:7 996:13
997:9 1000:20 1001:5
1002:11,24 1005:23
1006:7,13 1007:13
1009:17 1010:23
1013:12,15,21 1017:10,
19,24 1019:25 1021:17
1022:25 1029:10
1030:14 1033:3
1034:24 1035:16
1037:12,24 1038:4
1039:16 1045:8
1047:24 1050:12
1051:15 1054:25
1060:24 1066:17,21
1071:18 1072:2 1073:8
1076:15 1078:13
1083:6 1085:15
1090:10 1091:10

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 407 of 426   PageID 15001
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Index: meaning..moment

1092:10,14 1093:1 1094:4,20 1096:4,10 1099:3,11 1100:16 1102:2,24 1103:9,14 1104:10 1109:9,13,16, 21,25 1110:4 1111:15 1113:13 1118:2 1119:4 1121:13 1124:11,14 1125:4,22 1128:24 1129:14 1130:3,21,24 1132:3,15,17 1133:21 1151:23 1152:3 1161:8, 14 1162:1,13 1165:17 1168:5 1170:10,22,24 1171:6 1172:25 1174:20,21 1228:14,19, 22 1231:2,9 1232:7 1249:7 1260:22 1261:4 1263:19 1265:17 1266:7,9 1270:1,25 1271:12,19 1272:9 1275:5,12 1276:19,23

**meaning** 1253:21

**means** 915:19 924:25 926:19 936:16 937:4,10 964:6 980:20 1035:17 1066:25 1090:25 1098:12,17 1100:9 1105:17 1130:1 1174:24 1175:1 1208:25 1209:1 1277:23

**meant** 923:11 1099:1 1176:6 1229:9 1243:19

**meantime** 1161:4

**meat** 1156:13 1226:17

**media** 928:5,6 935:3,6 936:6 937:6,24 940:2 941:18 942:16 954:3 961:19 965:23 966:6, 16,25 967:12 968:17,23 970:7,11 971:12,19 972:1,9 973:5,22 974:4, 20 975:7,8,15 976:8 978:17,20 979:24 981:20 982:9 983:2,14, 16 986:1 995:9 1011:14 1012:2 1014:8 1029:4 1046:25 1101:12,25 1115:3,7 1117:11,14 1122:9,21 1123:25 1124:9 1169:24 1174:5 1252:6

**meet** 1133:8 1207:18 1210:19 1211:3

**meeting** 954:12 973:20 1049:18 1095:9 1110:18 1118:12 1126:20 1131:7 1146:2, 3 1195:10 1198:8 1209:18 1221:6 1227:6 1229:19 1236:1 1242:18,20,24 1246:7 1252:8 1258:2,4

**meetings** 1219:17 1220:6 1226:12,13 1227:18 1235:14,20,21 1241:21 1243:24 1244:5 1263:6

**Meggan** 1052:7,12 1107:16

**Melissa** 1223:11 1225:12,13 1228:17 1229:4 1235:2 1236:14 1237:19 1238:2,7,20

**Melissa's** 1223:21

**member** 974:2 975:8 1027:3 1028:3 1037:7 1049:8 1097:7,9,14,15 1098:19 1103:7 1168:23 1200:10 1218:19 1234:25 1235:4 1236:6 1242:13

**members** 939:25 940:1 1101:25 1102:12,21 1103:6 1151:4 1200:19 1236:22,25 1237:1,2 1244:19 1248:18 1249:1,14 1251:10,12 1258:8

**membership** 935:6 1220:18 1258:11

**memo** 968:21,25

**men** 1258:11

**mention** 1120:5 1178:15

**mentioned** 1083:24 1174:17 1206:8

**mess** 971:19

**message** 918:5 965:18 968:20 972:16 989:6 1019:6 1021:9 1025:18,

19 1026:9,12,17,21,23 1027:3,14,17 1028:18 1043:16 1073:24 1075:12,18 1076:5,13 1077:14,15 1078:4,8 1079:2 1118:15 1171:21 1172:1 1248:2, 3,4 1249:16 1250:7,22 1251:3

**messaged** 1247:25 1250:22

**messages** 954:9 958:3 961:17 972:5 995:7 1020:12 1024:24 1031:11 1034:9 1074:8 1076:25 1077:4 1119:25 1121:1 1126:14,21 1127:4,5,10 1249:13,14

**messed** 1220:19

**Messenger** 1018:11, 13,15,22 1019:13 1020:6 1039:11 1046:6 1247:12

**met** 1133:6 1179:4 1213:19

**Mexico** 908:15 910:24

**mic** 963:11

**Michelle** 985:16

**microphone** 912:9,14 922:17,23 923:2 1155:3

**middle** 1106:23 1215:18 1276:8,11

**Mike** 903:20 1143:12

**mild** 1276:20

**million** 1269:1

**mind** 939:8 1060:1 1091:6 1152:20 1194:19 1248:22

**mindful** 1065:16

**mine** 1165:13 1183:21

**mingle** 1230:1

**minimum** 985:24

**minute** 944:12 1167:16 1222:3 1228:13 1239:21 1264:1

**minutes** 909:20 914:11 915:20 916:4,14 946:16 951:6 962:14 999:1 1109:8 1147:18 1152:10 1190:7,8 1230:18 1258:24 1263:5 1265:14,20 1266:20 1267:1

**mischaracterization** 938:11 1033:4

**mischaracterizes** 955:15 969:18 970:13 983:4 990:23 994:7 1019:25 1039:16 1128:24 1140:12

**miscommunication** 1024:7

**misheard** 1110:4

**misread** 937:17

**misreading** 1076:8

**misrepresented** 959:18

**missed** 1078:1 1108:16 1154:9 1183:18

**missing** 959:23 1044:24 1246:18

**mission** 1123:4,14,16

**misstated** 967:9

**misstates** 928:23

**mistake** 1131:11

**mistakes** 1159:8

**misunderstand** 931:23

**misunderstanding** 934:23

**misunderstood** 1232:13

**mitigation** 1142:23,25 1143:2 1144:3,6,8 1145:4 1146:14 1154:6, 11 1156:7,25

**mom** 1177:5,9 1178:22 1197:3 1219:21

**moment** 1051:12 1054:7 1055:7 1085:17 1094:24 1160:20

1206:19

**moms** 1202:23

**Monday** 918:12,15
1066:1 1095:11
1255:22 1259:2
1265:10 1268:16
1278:3,17 1279:1,3,8,
17

**monetary** 906:14

**money** 906:8 1031:19
1032:19 1041:4 1184:7
1218:2 1223:24 1224:1
1225:2 1227:19
1238:25 1239:11
1245:1,3,5 1253:22
1254:12 1257:5

**monitoring** 966:10

**month** 954:12 1243:22
1245:8

**monthly** 1189:3

**months** 926:20,25
927:2,7,10,13,16,17,23
928:1,7,9,12,16,20
929:12 930:10,11,14,18
931:17 1090:17
1180:25 1182:3,4
1244:7

**mood** 1063:15,21,22

**mooned** 1225:8

**mooner** 1236:16

**morally** 1127:11

**morning** 912:4 919:2
922:15 962:8 1059:21
1066:1 1095:11 1108:8
1133:3,4 1153:20,21
1259:2 1279:17

**Morris** 903:16

**Mother's** 1177:17
1178:24

**motion** 906:5 1062:19
1124:12 1146:1 1156:9,
10

**motivated** 1092:4

**mouth** 985:5

**move** 1013:12 1022:8
1061:4,10 1068:3,5

1073:4 1085:11,12
1113:9 1117:23
1124:24 1125:17,18
1133:19 1136:15
1141:17 1146:22
1155:4,5 1170:4
1177:23 1180:6
1182:14 1201:15,17
1206:4 1234:17
1252:19 1255:19

**moved** 1176:4 1178:5,
10 1180:1,2 1182:5
1184:8,9 1204:10
1235:16 1241:7

**moving** 1181:23

**multi-factor** 1275:11

**multi-factored**
1275:12

**multiple** 904:21 906:20
988:8 1271:1

**murder** 958:5 1041:5,
14

**murderer** 1031:11

**mute** 977:20 996:8

**muted** 976:15,21
1073:1

─────────

**N**

─────────

**named** 1273:14

**names** 979:22

**nametag** 1213:21

**Nancy** 912:23

**Naomi** 947:4 1072:21

**narrative** 1249:9
1251:5

**nastiness** 988:24

**nasty** 1242:14 1248:25

**nature** 995:12 1061:20
1114:18 1135:13

**necessarily** 1027:7
1070:2 1129:3 1144:15

**needed** 1010:13
1020:12 1068:24
1115:12 1196:13,15

1198:7 1201:13
1237:10

**negative** 1034:7

**negotiate** 1152:23

**negotiated** 1222:5
1253:2,12,15,25

**negotiations** 1220:21
1224:2

**negotiator** 906:2
1221:21

**neighbor** 1211:10

**nest** 1232:17

**Nevarez** 904:9,13
905:12 908:13,18
909:7,8,10,15 910:5,6,
8,16,22 911:2,11,19
912:16,20,22 913:2,6,9,
14,17,19,21 914:3,11,
13,19,25 915:15 916:8,
10 1066:15 1243:11

**Nevinc@msn.com**
913:1

**Nevinc@msn.com.**
912:22

**news** 1224:12,13,14

**nexus** 928:4,13 929:19
1028:24 1071:10
1072:1 1086:2,13,19
1087:15,25 1088:5,8,
12,18 1089:5,9,23,25
1090:2,7,9,16,20,24
1109:6 1111:20,21
1112:13,22

**nice** 967:6 972:12
1133:8

**night** 1162:19 1190:22
1208:22 1221:16
1279:2

**nine-and-a-half**
1183:24

**Ninety** 914:11

**Ninety-eight** 1100:11,
15

**Ninety-two** 1094:18,25

**noise** 907:2

**non-policy** 998:14

**non-responsive**
1249:9

**nonetheless** 1044:22
1203:22

**nonresponsive** 952:1
1016:7

**normal** 909:1 977:4,6,
7,9

**note** 966:5 1139:18

**notes** 1015:2 1025:14
1060:22 1067:12
1073:17 1074:13,15
1096:19 1100:24
1101:3 1107:14,15
1130:18 1131:7
1139:23,24 1140:1,2,6,
18 1141:3

**notice** 992:19 1278:7

**noticed** 922:14

**notified** 940:15,19
941:10

**notion** 1267:20 1273:9

**notwithstanding**
1267:21 1269:5

**NRLA** 1150:16

**numbed** 1188:19

**number** 904:10,14
913:5 1212:3,5 1229:6,
9 1244:20

**nurse** 1190:11

**nurses** 1186:11

─────────

**O**

─────────

**O'GRADY** 979:16

**oath** 921:11 950:18
1175:12

**OB-GYN** 1181:8
1193:21

**object** 920:4 950:5
952:1 956:11,15 958:22
959:20 986:17 987:14
1002:11 1021:17
1033:3 1045:8 1062:18

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 409 of 426   PageID 15003
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022              Index: objected..other's

1099:3 1103:20 1130:3
1133:13 1136:23
1137:19 1138:1,17
1140:8,19,20 1142:8,22
1153:15 1155:16
1156:4 1157:19
1158:13 1160:9,14
1171:3 1173:14
1244:22 1260:22

**objected** 1108:15

**objecting** 917:6 993:3

**objection** 917:3,8,12
919:14 920:11,21 923:3
925:4,23 928:23 931:24
933:1,6,14 935:13
936:8 937:8 938:10
939:13,18 940:22
941:20,24 942:19
945:18 946:19 947:18
948:3 949:2,11,21,25
950:20 951:7,21
952:18,19 953:10 954:5
955:7,11,12,14,15,22
956:16 957:10,19
959:5,15 960:5,16,22
961:11 965:10 967:16,
20,23,24 969:16,17
970:13,20,25 971:1
974:5,9,21 975:25
976:23 977:19 978:4
981:8,10,13,15 983:4
984:12,21 985:1,9
986:12 987:10,18,19
988:7,9,13 990:23,24,
25 991:19,20 992:21,25
993:2 994:7 996:13,14
997:9,19,22 1000:20
1001:5 1002:24 1003:1
1005:23 1006:7,13,19
1007:13 1008:6,12,13
1009:17,22 1010:23
1012:11 1013:9 1016:7
1017:5,9,10,18,19,24,
25 1019:25 1022:2,7,25
1023:1 1029:10
1030:14,17 1034:23,24,
25 1035:16 1037:12,24
1038:4,11 1039:16
1047:24,25 1048:2
1050:13,21 1051:15
1054:25 1060:23,24,25
1071:18 1072:2 1073:8,
10 1075:22 1076:8,15
1078:13,18,20 1079:11

1084:19,23 1085:13,15
1087:21 1090:10
1091:10 1092:7,14
1093:1 1094:4,6,20
1096:4 1099:11
1100:15,16 1102:2
1103:21 1106:5,7,20
1109:9 1111:15 1119:4,
19 1121:13 1123:8
1124:11 1125:22
1128:24 1129:14
1132:3 1136:12 1137:9
1140:15 1141:7
1146:24 1148:14
1151:25 1153:8
1156:12,18,20 1157:20,
22 1170:10 1228:14,22
1239:3 1245:21,24
1246:8 1249:6,7 1251:4
1252:9 1254:21 1261:4,
12 1263:19

**objections** 920:20
950:2,6,8 977:4,5,6,9
996:12 1003:4 1051:10,
16 1060:11 1062:7,13
1063:2 1065:8 1066:4
1068:14 1073:6
1094:18 1113:12,13
1118:1,2 1125:2,3,4,21
1156:14 1167:3 1170:9
1255:5

**objector** 975:8 1243:21
1255:5

**obscene** 995:11

**observation** 1266:10

**occasion** 1171:10,11

**occur** 1121:8 1136:20
1137:5

**occurred** 993:17
1006:5 1010:9,10
1274:14

**occurrence** 915:8

**OE** 1209:3

**offended** 1091:1

**offensive** 1087:16,17
1088:18 1114:5 1132:8

**offer** 977:2 985:3
996:11 1051:9 1068:11
1094:16 1100:14
1113:10 1143:18

1266:22

**offered** 929:4 976:17
1148:11,18,20,23,25
1149:2 1157:16 1158:5

**offering** 984:22 985:1
1146:6

**offhand** 1019:21
1036:9

**office** 913:22 1063:14
1186:10 1209:24
1223:25 1224:5 1225:8,
10,11,15 1226:21
1228:8 1229:21
1235:19 1240:9 1241:8
1242:11 1250:12

**officer** 903:3 916:21
920:24 962:15 963:2
1067:22,24 1097:19
1152:11,13 1227:8
1231:15 1267:3
1268:23 1269:5,16
1272:3 1273:9 1279:21

**officers** 1151:8

**official** 1097:13

**officials** 1240:21

**oftentimes** 1063:6
1277:17

**okayed** 1207:22

**older** 927:13 1240:13

**oldest** 1212:24

**one's** 1004:9

**one-on-one** 1207:14,
16

**online** 1014:13 1040:15
1247:13 1251:21

**open** 935:11 979:11
1018:23 1019:5,10,17
1024:16 1060:1 1067:5,
19 1078:2,6 1080:9
1104:17 1110:12
1137:16 1147:13
1157:7 1166:8 1210:15
1215:23 1265:18

**open-ended** 1246:2

**opened** 935:20
1077:14,25 1260:21

**openly** 1126:21

**operate** 1219:10

**operation** 1273:11

**opined** 1101:23

**opinion** 998:23 1062:9
1262:3

**opinions** 966:19
971:16 1128:18

**opponent** 1079:19,22
1168:3,17

**opponents** 935:4
1151:8 1169:24

**opportunity** 907:10
913:23 928:19 1206:22

**opposed** 957:9
1107:20 1108:7
1115:15 1249:9

**opposing** 1091:5
1134:5 1135:17

**opt** 1216:25 1235:5
1244:23 1257:3

**opt-outers** 1239:20

**opted** 1243:16 1245:15
1246:5 1250:2

**opting** 1243:18

**option** 905:3,10,24,25
1216:24

**optional** 1128:23

**options** 905:2,7

**order** 910:20 927:7
928:4 974:7 1087:14
1146:9 1147:4,8
1152:16 1156:24
1199:1 1232:5 1233:21

**orders** 904:22 906:20
910:18 911:9 1161:19

**organization** 1262:7

**organizations**
1203:12

**original** 1229:10

**originally** 1176:3

**other's** 971:16

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 410 of 426   PageID 15004
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Index: oust..person

**oust** 940:8

**ousted** 1081:17 1082:9

**out-opter** 1239:21

**over-objected** 1062:12

**overlap** 1197:20

**overly** 1172:3

**overnight** 1232:16 1233:23

**overrule** 942:1 949:9 977:8 986:21 987:19 1006:14 1009:23 1078:15,21 1156:23 1157:22

**overruled** 971:1 1062:13 1065:4

**overruling** 950:8 970:20

**overseeing** 924:5

**oversees** 931:2 953:18

**overwing** 1210:4 1211:5 1213:8

― ― ― ― ― ― ― ―

**P**

**P-O-T-A-S-H-N-I-C-K** 1267:13

**p.m.** 907:17,18 908:1, 15 916:13 1278:13,14, 18 1279:22

**pack** 1182:14

**package** 1089:6

**packet** 1043:15

**page/line** 1066:4

**pages** 1090:23 1185:3 1247:20

**paid** 1039:23 1180:16 1244:6 1257:5

**pain** 1187:4 1189:1

**pal** 1173:21 1174:1

**panelists'** 1063:17

**paragraph** 945:2 958:8 966:3 1010:17 1031:7

1118:12 1120:7 1126:10,19 1152:15

**paraphrasing** 1243:8

**parenthetical** 1165:20, 24

**Parenthood** 1049:9, 12,15,18,22,25 1050:4, 20 1107:24 1108:5,9, 10,14,24 1185:7,25 1186:7 1187:21 1191:8 1202:8,10 1203:7 1245:7,13,14 1256:20, 24 1259:4

**parents** 1177:3,4 1180:1,9,18,19,22 1182:9 1184:1,19,20 1190:23 1193:1,4 1220:1

**parents'** 1182:3

**Parker** 1097:5 1134:10, 13

**part** 924:22 927:21 942:6,22 948:20 963:22 964:1 969:11 975:18 983:25 990:11 991:17 997:15 1014:3 1015:25 1016:1,17 1033:17 1034:10 1035:5 1044:24 1048:22 1049:4 1057:23 1063:5 1069:2 1074:2 1076:13, 23 1086:14 1090:1 1094:23 1099:21 1106:3,23 1115:25 1116:17,18 1121:21,24 1154:9 1195:1,20 1197:5 1217:6,9 1222:24 1226:11 1237:25 1240:5 1244:9 1257:12

**partial** 1045:16

**partially** 1044:25 1117:18,20

**participate** 1244:5

**participated** 954:12,13

**parties** 910:12 1149:23

**partner** 995:3

**partnered** 1056:5 1202:13

**parts** 1189:9,21,22

**party** 914:22 1079:19, 22 1267:25 1268:1,10 1270:5 1272:2 1273:5 1274:12 1277:22

**party's** 1232:4 1273:6

**pass** 1132:13 1160:21 1170:20 1173:16 1210:20 1214:10 1215:15,17

**passed** 1249:1

**passing** 1174:17

**passion** 1092:2 1093:20

**passionate** 1171:15 1172:4 1252:16

**past** 928:17 930:10 945:13,15,25 946:2 1055:4 1064:6 1070:6 1076:25 1086:17 1123:21 1126:22 1199:7 1220:25 1221:1

**path** 1004:9

**Patience** 944:16

**Paul** 1220:15 1221:7 1226:16

**Paulo** 903:15

**pause** 905:4 906:25

**pausing** 905:9

**pay** 1134:18 1180:19 1208:1 1221:10 1243:21,23 1245:6 1254:4,5,13 1261:20

**paycheck** 1218:3 1222:25 1243:22 1244:14

**paying** 1097:14,15 1184:8 1222:14 1235:6, 7,10 1277:5

**payor** 1257:4

**peanut** 1215:7

**peanuts** 1214:10,15 1215:5,6,16,18,25

**pen** 1173:21 1174:1

**penalize** 1154:15

**pending** 1153:14

**people** 935:3 937:25 940:8 941:17 950:14 953:21 954:2,3 972:9 973:3,4 978:19 985:24 988:6 989:4 994:18 1008:1,2,3,4 1077:11 1081:7 1092:3 1093:21 1131:5,9 1171:17 1173:23 1174:10 1187:20 1195:11 1198:8 1200:1 1206:23 1207:18 1209:14,15,18, 19,20 1210:13,19,24 1211:3,4,6 1212:15 1223:9,16 1224:8 1227:16 1236:21 1237:3,12 1239:19,24, 25 1240:3 1241:12,14, 19 1242:9,11 1244:19, 22 1245:18 1246:25 1247:1 1248:9 1250:4 1251:22 1254:16,22 1259:15,16 1262:8,11, 13

**perceived** 979:25 1014:8

**perceiving** 1063:7

**percent** 937:23 939:10, 12,17 1254:18

**perception** 1093:5,10 1094:15

**period** 911:8 1138:13 1139:7 1149:16 1180:24 1196:18,20 1206:19 1223:5 1224:18 1254:6 1259:11

**permits** 1156:18

**person** 919:22 929:21 937:16 1004:4 1025:23 1054:19,20 1069:3 1096:2 1098:16 1101:9 1107:14 1209:14 1212:14,15 1225:14 1231:25 1236:2 1241:4 1264:16 1269:16 1270:22,23 1272:16 1273:10

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 411 of 426   PageID 15005

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                    Index: person's..possibility

person's 1093:10

personal 947:21
949:11,12,15,16 966:5
986:23,24 987:20,21
1009:24 1011:13
1023:17 1024:11
1028:23 1032:9
1034:16 1036:24
1041:18 1046:9
1047:18 1075:25
1076:1 1078:16
1155:13 1157:15
1167:25 1258:20

personally 1031:10
1033:1 1034:15 1036:6
1037:4 1061:21
1199:12

personnel 962:11
1147:20 1230:15
1265:2

persons 988:16
1104:24

persuades 1279:10

persuasive 1163:23

pertain 924:8 926:21
1154:10

pertained 975:19

pertains 1154:5

pertinent 928:1

petition 973:5 975:15
982:18 984:3 985:10,
17,22,25 986:5 1008:2

petitioners 974:20

phantom 1001:3,6

Phoenix 1171:8
1235:17

phone 904:10,14
909:21 913:5 1172:9
1247:11 1264:8,16

photo 1090:13 1134:20

phrase 960:2 1017:7
1039:3

phrasing 1243:9

physical 1135:9

pick 1000:18

picture 1019:6 1043:16
1046:12 1057:19
1089:2 1090:6,8
1091:18 1093:14,22,24
1100:5 1105:5 1106:16
1109:22 1111:3
1134:15

pictures 1019:20
1028:19 1043:8
1044:14 1056:11,13
1086:4,12 1089:25
1091:23 1108:23,25
1109:1 1114:19 1120:9
1258:3 1262:18,19

pieces 967:4

pills 1183:13

pilots 1214:4

pitch 907:4,13

place 997:7 1004:23,25
1005:17 1006:11
1054:5 1072:12
1117:14 1121:4
1127:23 1145:24
1164:24 1189:6
1202:16 1204:14
1210:11

places 1026:24 1203:5
1259:18

placing 1128:3
1204:22

plain 968:7

plaintiff 903:11
1266:12

Plaintiff's 977:15
996:18 1051:20
1170:19

plaintiffs 1149:21

plan 975:16

plane 1003:1 1078:1
1210:7 1211:18

planned 1049:9,11,15,
17,22,25 1050:4,19
1107:24 1108:4,9,10,
14,24 1185:7,25 1186:7
1187:20,21 1191:8
1202:7,9 1203:7
1245:6,13,14 1256:20,
24 1259:4 1260:6

platform 912:10,12
916:13 1247:3

play 923:16,24 924:11
928:16 1019:7 1020:7,
16

played 1152:7 1173:8
1185:15

player 1272:18

playing 1019:18

plays 1018:23 1019:13,
23

pleasant 916:10

plethora 1202:3
1247:22

podium 1130:22
1154:21

point 919:3,6,15
920:14,15 935:20 946:9
970:5 971:2 991:2
997:1 1012:8 1020:9
1063:19 1064:1,2
1079:9 1108:16
1138:21 1146:9
1149:20 1151:17
1177:23 1180:2
1182:25 1189:17,19
1190:1 1191:7 1193:2
1198:9 1216:18 1220:8
1233:8 1250:16
1251:16 1253:24
1254:23 1255:13
1266:18 1270:18

points 1275:6

policies 917:23 949:17
953:5 1016:6,20 1047:5
1114:14 1116:17
1122:9 1137:15

policy 928:5 935:3,7
936:6 937:6,24 940:2
941:18 942:16 961:19
965:23,24 966:2,25
967:12 968:17 971:19
973:5 974:4,20 975:7,8,
16 976:8 978:17,20
981:20 982:9 983:2,14,
16 986:1 995:9,15,18,
20,24 996:1 997:7,15,
17 998:11,13,19,21,24
999:2,5,11,13,15
1000:1,2,6,7,12 1001:4,

6,18 1002:9,16 1004:7,
11,12,20 1005:2,9,22
1006:3 1007:10,12,17
1015:10 1027:6,18,22
1028:6 1029:4,5
1037:20,23 1044:1,19
1045:14,17,23 1046:25
1047:1 1056:22 1057:1
1058:4 1090:22
1101:12 1102:1,22
1114:7,18,20,24
1115:3,7,8,9,11,14,16
1116:1,21 1117:4,11,14
1121:22 1122:20
1123:25 1124:9
1127:20 1128:6,7,8,9,
21 1129:3,13 1169:24
1174:5

political 958:5,9,20,21
959:2,8,11 960:2
1053:16 1217:18
1218:25 1244:10

political-type 1217:22

politics 1219:3

poor 1107:13

pop 1060:20,21
1260:25

Port 1267:12

portion 989:25 1040:16
1244:6 1245:8,9
1261:18

portray 968:21

portraying 972:23

position 1010:18,19
1011:4,7,9 1088:23
1091:21 1093:15
1094:1 1097:13
1098:23 1111:8
1112:14 1149:13
1167:21 1197:14
1210:2 1227:2,4 1267:9
1269:12

positions 1096:21

positive 1034:7

possibility 1029:25
1030:1 1092:4 1093:19
1094:12,13,14 1095:25
1096:2 1158:3

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 412 of 426   PageID 15006
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                     Index: possibly..protected

**possibly** 928:6 935:22, 24 936:7,22,24 937:2,7, 15,21 972:12 1004:10 1029:5,8 1030:12 1044:23 1047:1 1089:22

**post** 1028:19 1069:20 1070:1 1077:13 1087:7, 16,17 1088:18 1090:8, 16,17 1091:4 1097:21 1098:10 1111:11,12 1112:15 1113:4 1120:15,18 1134:10 1146:15 1154:16

**post-type** 1112:19

**posted** 970:8 972:15 1028:22 1046:9 1087:12 1093:23 1098:20 1105:6 1118:13 1120:8 1125:12

**poster** 1100:3

**posting** 972:4 1088:22

**posts** 929:14 1070:2 1071:9 1091:17 1100:3 1101:24 1103:6 1104:25 1109:5 1113:3 1119:8,12 1120:15,17, 21 1121:1

**Potashnick** 1267:12, 13,24 1268:3,7 1269:3 1270:4 1273:5,18 1274:5

**potential** 981:20 982:8 983:2,16 1169:5,8

**potentially** 1144:14 1271:14

**power** 910:24 911:6,7 1159:16

**practical** 1266:9

**practice** 1063:13 1267:21

**practices** 949:17

**pray** 1201:4 1264:19

**prayed** 1177:19

**praying** 1201:12

**preach** 1206:12

**predicate** 1024:19

**prefer** 905:20

**preferred** 907:3

**pregnancy** 1193:16,17 1196:7,8 1202:13 1203:10 1204:16

**pregnant** 1084:17 1085:7 1182:14 1183:3, 4,11,16,24,25 1184:5 1193:16 1195:13 1196:6

**Prejudice** 1124:12

**prejudicial** 918:9 1143:4 1156:6

**premise** 1153:19

**prepare** 1204:13

**presence** 1146:25

**present** 1205:17 1257:19 1278:22

**presentation** 1275:19

**presented** 905:15 978:8 984:14 985:2

**presenting** 1278:24

**president** 953:17 973:23 983:14 1011:10 1014:18 1025:7,10,25 1026:2,10,12,14,16 1027:4,9 1028:4 1032:13,23 1033:2,19 1034:12,17,20,22 1035:9,13 1036:3,8 1037:1,11 1040:8,9,11, 13 1041:24 1047:22 1049:8 1074:7,22,25 1079:22 1082:20 1084:3,5,9 1107:8,11 1118:20 1120:3 1126:13 1137:24 1138:11,14 1150:22 1212:13 1225:14 1226:18 1228:3,18 1229:14,18 1236:22 1240:25 1241:3,5,7 1260:2,4 1269:4

**president's** 965:17 1227:4

**presidents** 1138:22

**pressure** 1173:11

**pretty** 940:6 1048:14, 17 1181:22 1190:9 1196:1 1200:12 1208:18 1213:17 1223:25 1224:7 1225:3 1228:20 1229:12 1232:3 1238:19,24 1240:4 1242:11 1243:12 1244:19 1251:9 1267:20 1273:8

**prevent** 1171:25 1266:12

**preventing** 1162:3 1233:21

**preview** 1152:3

**previous** 933:4 1000:16

**previously** 1167:14

**principle** 1153:21

**principles** 1267:16,23

**prior** 926:20 928:1 1054:24 1055:22 1057:24 1058:5 1123:24 1125:2 1270:18

**private** 972:15 1025:19,20 1026:25 1063:13 1118:15 1247:15,17

**privately** 1260:19

**privilege** 925:24 1268:18 1274:21,22,23

**privileged** 1274:17,20, 23

**prize** 1231:17

**pro** 1031:10,16,22 1032:5,18 1096:15,17 1098:3,8,24 1099:20 1105:12,19 1109:6,23 1111:4,8,13 1112:4 1259:15,16,18 1261:17

**problem** 917:8 918:6, 16 966:20 1005:1 1030:10 1153:9 1248:15 1250:13 1251:22 1256:16

**problems** 1191:9 1278:23

**procedure** 1188:14 1191:10

**proceed** 979:14 1013:22 1167:6 1175:18 1239:8

**proceedings** 910:15 977:22 979:11 1023:9 1024:16 1061:17 1067:19 1079:14 1080:9 1102:16 1104:17 1109:19 1110:12 1142:18 1147:13 1152:19 1155:19 1157:7 1161:12 1166:8 1279:22

**process** 924:13 948:14,24 951:15 1088:19 1165:17

**product** 1143:17,18

**professing** 1165:15

**professional** 971:15 1172:6 1257:18,20

**professionalism** 1061:24

**professionally** 1257:18

**professionals** 966:21 1257:16

**prohibition** 1161:14

**prohibits** 1015:11

**Project** 1257:23 1258:1

**promise** 932:10 1201:20

**proofread** 1010:14

**proper** 1045:10 1142:23

**propose** 907:15

**proposing** 1094:7

**protect** 1003:4 1037:9, 10 1082:21 1083:5 1084:12,16 1085:5

**protected** 908:4 917:5, 13,20,21,22,23 918:14,

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 413 of 426   PageID 15007
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Index: protecting..question

20 919:5,10,16 920:10
924:19,20,21,25 925:2,
11,13 1038:2 1053:6,
10,14,17,20,23 1054:3,
9,17,23 1055:8,20,22
1056:3,7,9,14,16,23
1057:3,4,13,18,19,22
1058:2,4,23 1059:2,3
1083:2 1252:2 1279:6

**protecting** 1038:9
1082:25 1118:21
1261:11

**protection** 1037:7,22

**protections** 925:21

**protested** 1202:9

**protesting** 1202:7

**proved** 969:24

**provide** 928:4 944:8
1095:25 1207:24

**provided** 1045:9

**providing** 925:22

**Pryor** 903:12 905:18
906:6,10,16 907:9
912:19,24 913:5,7,10
915:12,15,16 919:19
920:17 921:4,22 922:2,
19,20 923:7 925:9
926:4,16,17 928:25
929:3,7,9 932:3 933:4,
10,11,17,22,23 935:18
936:14 937:18 938:12,
17 939:16,21 941:2
942:4 943:1 944:4,6,21,
22 945:24 946:22
947:24 948:7,10 949:14
950:5,12,21 951:1,9,13
952:1,2,22 953:1,12,15
954:7 955:10,18 956:1,
5,15 957:2,14,23 959:1,
9,20,21 960:18,23
961:8,10,15,16 962:1,5
963:13,16,18,20 965:13
968:5,9,12 969:20
970:15,17,21,24 971:5,
9 974:6,12,14,17 975:3
976:5,11,16,24,25
977:2,16 978:14 979:4,
15 981:9,18 983:8,10,
11 984:17,23 985:8,15
986:14 987:1,11,23
988:14 990:3,5,13,15

991:6,9,10 992:1,23
993:8 994:10 996:4,6,9,
11,19,21 997:12,20
998:1 1000:23 1001:2,
7,10 1002:15 1003:2,8,
12 1006:2,9,15,21
1007:1,18 1008:8,17,
19,20 1009:19 1010:2,
25 1011:5 1012:15,19
1013:13,23 1016:7,11
1017:6,13,21 1018:5
1020:5 1021:20 1022:4,
12 1023:7,11,14,19
1024:3,8,14,20,22
1029:11,15 1030:15,21
1031:2,8 1033:6
1035:3,20,22 1037:18
1038:1,7,15 1039:1,18,
21 1041:9 1045:12,25
1046:3,20 1048:6,10,15
1050:14,17 1051:1,4,5,
7,9,21 1055:10
1058:17,18 1059:5,6,
14,17 1060:18,20
1062:6 1063:1,8
1064:4,19,21 1065:3,9,
11,12 1066:8,11,16,19,
23,25 1067:5,15
1068:9,10,20,22
1071:21 1072:5,25
1073:2,15 1076:3,11,19
1078:24 1079:23
1080:2,12 1081:21
1082:1 1083:10,13
1084:25 1085:1,10,23
1086:6,9,10 1088:1,6,
11 1090:15 1091:12,14
1092:11,19 1093:7
1094:11,16 1095:5
1096:6,8,11,13 1099:7,
17,18 1100:10,14,23
1102:4,8,13,18 1103:1,
13,17,24 1104:1,3,8,11,
14,21 1106:13 1109:12,
24 1110:1,7,14 1111:18
1113:10,21 1117:22
1118:7,10 1119:5,6,22,
23 1121:15 1123:11
1124:4,5,16,18,23
1125:1,10,16,18 1126:4
1129:1,20 1130:5,7,13,
16,23 1131:2 1132:6,13
1133:13,15 1136:12,23
1137:9,19 1138:1,17
1140:8,12,19 1141:7
1142:1,8,15,21 1143:3,

11,16,19 1144:19,21
1145:2,9 1146:5,24
1148:3,15,19 1149:1,3,
5 1151:18 1153:4,12,24
1154:4 1155:16,21
1156:4 1157:1,19
1158:13 1160:9,14,23,
24 1162:10,17,25
1163:12,14,25 1164:18
1165:3,7,13,25 1166:5,
10,24 1167:1,6,8
1168:13,14 1170:4,7,20
1171:3 1173:14,18,20
1174:19 1175:7,8,18,20
1229:1 1230:8,12
1231:19,22 1232:11
1233:4 1234:12,13
1239:13 1246:4 1248:1
1249:10,12 1251:6
1252:14 1255:1
1260:24 1261:9 1262:1
1263:22 1264:21
1269:14 1272:11
1273:22 1274:24
1277:9 1278:4,9

**public** 1025:19,22
1026:19,25 1028:23
1259:9

**publish** 944:5 977:13
1051:18 1073:12
1125:7 1170:17

**publishing** 1085:20
1095:2 1100:20
1113:18 1118:6 1126:1

**pull** 1139:13 1170:22
1186:19

**pulling** 944:10
1133:22,24 1188:25

**punish** 906:13

**punishing** 906:23

**punishment** 1103:8
1122:8 1142:7 1194:7

**punitive** 906:19 911:7,
13

**puppies** 1262:18

**puppy** 1262:18

**purchased** 1204:16

**purported** 1011:24
1123:13

**purpose** 1145:3,4

**purposes** 950:1
1143:2 1244:10
1271:22

**pursue** 1066:13

**pursuing** 1178:1

**push** 908:7

**pushing** 963:9

**Pussyhat** 1257:23
1258:1

**pussyhats** 1258:4

**put** 907:2 912:11
929:14 931:1 976:25
1009:16 1010:6
1015:20,22 1044:22
1045:2 1067:1,2
1068:18 1093:22
1104:10 1117:19
1143:19 1152:5
1156:21 1162:11
1165:11 1179:10
1180:24 1188:4
1190:14 1192:13
1193:25 1198:16
1203:12 1214:9,25
1218:2 1226:9 1228:7,8
1236:9 1241:2 1246:20
1247:8 1250:12 1264:9

**putting** 1151:3 1246:23
1270:18

---

**Q**

**quarter** 1244:7,11

**question** 904:16 908:4
913:16 918:7,18,23,24
920:9 922:18,21 923:6,
14,22 929:5 930:1
932:8 937:13 938:14
942:8,11 943:10 950:9,
16,22,24 951:4,12
952:21,24 953:8,14
956:21 957:8,17
959:22,23 960:1 967:10
968:7,8,13 970:19,21
971:3,4,6,7 973:9 975:2
976:4 978:5 981:7
983:7 985:7 986:13,15
987:13,24 988:8 993:4,
6 1001:9 1003:10,24,25

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 414 of 426   PageID 15008

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022    Index: question-and-answer..recollection

1005:4,14 1006:24
1007:4,19 1010:1
1012:25 1014:20
1015:7 1017:22 1018:4
1021:4,18,24 1022:5,
10,11 1023:24 1026:7
1030:4,20 1032:3
1034:3 1036:22 1041:8
1042:20,22 1045:8
1046:2 1048:5 1049:12
1050:24 1055:15
1056:8 1063:18 1066:8,
17 1067:3 1070:11
1071:20 1080:13
1084:13 1085:3 1092:8,
10,18,21,22 1093:17
1096:5,8 1099:2,6,14,
16 1102:7 1103:2,3,10,
11 1104:6,15,20 1105:4
1109:21 1111:25
1114:2 1121:14 1122:5
1124:4 1131:4 1133:18
1136:25 1140:15
1141:10 1142:3 1144:3,
4,7,23 1147:3,6 1148:1,
5,13,14,17,19 1149:11
1153:2,5,14,22 1155:22
1156:16 1157:23
1160:16 1162:21
1164:7 1168:12
1214:12 1215:20
1228:23,24 1231:5
1232:20 1245:17
1249:10 1250:19
1251:1 1252:12
1265:18 1269:1,8
1275:2,4 1276:22
1278:17

**question-and-answer**
1249:8

**questioned** 1014:11

**questioning** 978:2
981:3

**questions** 904:3
912:17 913:4,12,20
915:13 916:7 917:4
921:23,24,25 926:14
929:7 950:7,18 962:21
979:14 988:8 1022:21
1033:9,12 1061:20
1062:10 1063:3 1131:1
1132:15,18 1133:10
1155:10 1167:2,3
1172:25 1173:16

1175:17 1186:4,6
1246:25 1247:1,6
1250:3,6 1262:8
1264:14 1270:16
1271:7 1279:16

**quick** 903:8 907:1
962:7

**quicker** 1234:18

**quickly** 921:6

**quit** 1182:25 1184:21,
22 1196:4

———————

**R**

**radar** 1184:23

**rage** 1063:15,20 1064:2

**Railway** 917:21 918:21
919:6 922:7,25 923:12
926:7

**raise** 916:25 918:12
920:11 934:24 1069:18
1166:18 1175:11
1246:6 1254:7

**raised** 1019:22 1050:18
1062:12 1135:17
1156:9,14 1192:8
1196:21 1255:17

**raises** 1221:10

**raising** 920:21 1155:24
1219:24

**ramifications** 938:6

**rang** 1264:8

**range** 963:7

**rantings** 1127:10

**rapport** 1210:23

**rate** 1254:15

**ratified** 1254:7,9

**Ray** 1139:22

**re-urge** 917:2 919:1

**reach** 905:17 935:22,24
936:7,22,24 937:21
1184:10

**react** 1189:24 1200:2

**reaction** 1182:9
1264:12

**read** 928:25 929:4
954:15 955:19 956:16
958:8,18 968:14,15
970:15 998:4,5 1013:1
1031:9 1038:24 1062:1
1074:2,3 1077:8,16,19
1078:1,3,8 1079:2
1107:5,19 1110:3
1116:10 1139:17
1242:7 1253:9 1264:9,
10 1269:17 1272:13
1274:2 1279:11

**reading** 957:25 1084:1
1106:23 1128:21
1242:14 1276:7

**ready** 976:17 1024:5
1055:16 1179:18
1190:12 1215:5
1231:18 1254:9

**real** 1177:6 1200:1
1220:18

**reality** 944:19

**realize** 1127:23
1155:21 1204:19

**realizes** 915:5

**realizing** 1140:21

**realm** 925:15

**realtime** 961:12

**reask** 968:4,7 1048:4
1168:12

**reason** 947:16 948:25
949:19 953:6,9,16,25
954:4 957:5 1009:14
1028:18,22 1029:2,18
1032:7 1042:23 1049:4
1063:22 1064:1
1101:13 1115:19
1117:8 1153:1 1161:24
1210:13 1224:23
1244:25

**reasonable** 1091:15,
22 1092:1 1093:12

**reasons** 956:12
1028:13,15 1029:21
1030:22 1041:22
1089:5 1115:2 1117:9
1156:8,23 1260:13

**reboot** 962:9

**recall** 934:1 940:1
941:3,8 942:17 965:16
973:5,16,17,21 974:3,
20 975:15 976:7
980:12,16,18,19,21,22
982:18,24 983:22
984:3,8,19 985:10,12,
14,17,22,25 986:5
989:21 990:11 1008:2
1009:7 1014:1,5
1016:10,12 1019:9
1020:12 1025:16
1034:17 1035:4,5
1039:25 1040:2,13
1047:8,17 1054:12
1057:8,9 1058:1
1074:13,14 1080:17,18,
21,25 1081:16,18
1082:8 1083:21
1096:14,20 1099:19
1106:4 1108:8 1168:18
1169:25 1171:5
1174:12,14 1218:11
1232:8

**recalled** 1161:25
1168:22 1231:7

**recalling** 1040:3
1057:11

**received** 933:25 934:3,
4 939:23 942:23 946:3
948:11 975:9 980:3
982:25 1010:25
1113:23 1119:12,25
1120:1 1167:19
1169:21,23 1174:3,9

**recent** 1233:3,8 1234:5

**recently** 1035:24

**recess** 910:1 916:19,20
963:1 1067:21,23
1152:12 1231:14
1233:23 1267:2

**recognize** 945:3,4
966:18 1010:12
1048:11 1051:6,22
1073:16 1086:12,16
1130:17 1275:7

**recollection** 992:10
1052:4 1054:19,22
1058:20 1082:23
1099:19,25 1108:7

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 415 of 426   PageID 15009
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 4 July 08, 2022          Index: recommend..represent

1123:22 1138:25
1226:23

**recommend** 1275:18

**reconciliation** 938:20

**record** 903:6,7 907:7,8
910:14 915:20 926:20
962:23 963:8,19
1013:17 1024:6
1059:12 1061:4
1065:14 1095:18,19,21
1122:2,7 1123:1,7
1141:3 1151:20 1153:5,
11 1156:15 1167:10

**redirect** 919:24
1173:19

**reduce** 1155:14

**reduced** 1142:7,14
1143:9 1148:10

**reduction** 1146:21
1148:25 1157:17

**refer** 906:5 999:13
1004:22 1008:23
1127:19 1173:21

**reference** 1013:20
1031:11 1091:8 1116:1
1118:19 1257:24

**referenced** 1111:4

**references** 958:5
1116:7

**referencing** 1117:5,6

**referred** 931:18
998:10,25 1000:16
1014:12 1029:4 1037:3,
4 1104:25 1116:23
1123:20 1168:2

**referred-to** 977:14
996:17 1051:19
1073:13 1085:21
1095:3 1100:21
1113:19 1118:8 1125:8
1126:2 1170:18

**referring** 911:25
968:25 989:6 991:21
1008:3 1011:17
1013:15 1015:1 1040:3,
11 1045:16 1083:17
1115:17 1120:15
1124:20 1127:7 1128:9

**refers** 981:19 995:20
1040:13 1081:2
1115:25

**reflect** 1024:6 1036:5

**reflects** 1077:22

**refrain** 1232:22

**refresh** 1108:7 1138:25
1146:8

**refreshed** 1052:4

**refunded** 1244:10

**refuse** 1203:13

**refuses** 1002:2 1004:3

**regard** 917:3 922:9
923:16,25 925:17 927:2
965:22 987:16 989:7
999:11 1037:23
1058:10,14 1072:16,17
1095:25 1099:21
1100:25 1102:20
1103:5 1120:22 1132:2
1185:25 1202:1 1229:3
1273:22

**regret** 1105:18

**rehabilitate** 919:25

**relate** 960:11 1156:6

**related** 918:2,3
1075:21 1088:17
1174:8 1247:18

**relates** 944:2 1036:2
1048:7 1075:16
1176:15 1222:12

**relating** 1035:23
1105:25

**relation** 1251:17

**relations** 931:2,19
936:25 937:7,21 938:9,
22 939:1,9 947:5
979:18 995:3 1043:20,
23 1044:8,18 1045:5,13
1053:2,22 1054:22
1055:19 1056:5
1058:22 1114:1 1126:9

**relations'** 1053:4

**relationship** 1074:9
1087:15 1191:19
1192:22 1193:1

1194:24 1198:10,11
1205:25 1206:1
1222:13 1228:11

**relayed-back** 1153:21

**relevance** 951:22
959:15 1050:22
1124:12 1140:20
1156:25

**relevancy** 1149:17

**relevant** 943:3,4,6
1145:1,6 1146:4
1152:23 1156:8

**relied** 927:12,23 1047:4
1086:18

**relieve** 1196:10

**religion** 917:15 920:7
1094:1 1177:20
1206:12

**religious** 919:12 958:6,
9,12,13,14,19,21 959:2,
8,12,19 960:2 1053:13
1058:9 1068:24 1069:3
1071:16,23 1105:20
1107:2 1176:15
1185:14 1197:23
1263:2,13

**reluctance** 911:22

**Reluctantly** 911:19

**rely** 927:25 928:3
1277:17

**remains** 1232:9

**remanded** 1234:3

**remedy** 1268:13

**remember** 928:8 945:9
960:23 961:3 970:22
982:23 992:4,6 994:3,4,
12,13 1000:15 1007:20,
21 1009:13 1025:13
1032:10 1036:12,15,16
1054:16 1057:7
1067:14 1080:13
1096:23,25 1099:23
1134:5 1135:19,21
1151:17 1152:17
1155:10 1169:12
1175:17 1185:5
1188:15 1202:15
1213:19 1217:11

1220:23 1221:4
1235:19 1237:1
1263:15

**remembers** 1168:13

**remind** 921:23

**remotely** 904:12 905:1

**removal** 1227:7 1250:8

**remove** 1071:9 1072:1
1119:5 1227:11 1238:7
1240:19 1242:10

**removed** 1224:19,21,
23 1226:21 1227:2
1228:4 1240:20,21
1242:16

**renew** 949:24

**rep** 1270:22 1271:2,3
1272:8,16 1273:8,10,14

**repeat** 922:18 951:3
953:14 956:22 1071:20
1110:1 1168:7

**repeated** 957:8,16
1005:5 1011:13
1062:22 1064:24

**repeatedly** 1013:15

**repeating** 1029:11

**rephrase** 983:6
1000:25 1012:17,18
1035:4,20 1099:5
1110:9 1260:23
1263:21

**rephrasing** 970:21
983:8

**report** 937:7 938:8,22,
25 939:9 970:10 971:18
1014:23,25 1015:1

**reported** 1069:6
1144:21,25

**reporter's** 1155:3

**reporting** 939:25
941:17 971:14 973:4
1144:25 1146:16

**represent** 965:17
1070:3 1111:7 1133:5
1143:7 1150:16 1173:5
1241:25 1258:13

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 416 of 426   PageID 15010

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 4 July 08, 2022                Index: representation..scar

**representation**
1081:22 1145:13,22
1146:2 1150:15,21,24
1152:21,24

**representative** 1243:2
1269:15

**represented** 1120:10,
18,20 1121:11 1143:8
1257:7

**representing** 1087:19
1091:21 1093:15,25
1120:22 1154:12

**reprimanded** 1123:3

**reprimanding** 1122:1

**request** 911:12
1043:16 1157:3
1175:17 1232:4

**require** 1004:20 1129:7

**required** 914:1 928:9
1122:15 1216:18,20

**requirement** 927:14
928:11 929:10 1061:25
1062:1 1122:18
1138:15,23 1139:1,2,7

**requirements** 926:24

**requires** 1277:10

**research** 962:12
1059:25 1091:2
1147:21 1165:5
1230:17 1265:3,14

**resemble** 1258:19

**reserve** 1132:17

**resides** 1275:7

**resign** 1250:15

**resource** 1101:8

**resources** 1185:22
1202:22

**respect** 966:21 971:16

**respected** 1258:16

**respond** 1114:22
1145:10 1169:10

**responded** 1045:5
1059:1 1228:23

**responding** 1091:12
1109:16

**response** 1058:24
1062:5,6 1105:11
1131:4 1139:21
1150:10 1156:9
1272:10,11 1278:16

**responsibility** 929:25
1159:22 1180:20

**responsible** 1137:13

**responsiveness**
959:20

**rest** 984:11 1189:8
1190:22 1200:11
1203:19 1226:3
1248:17

**restart** 962:2,4,6,8

**restate** 967:23 1010:1
1032:3 1168:15

**restaurant** 1181:3

**restraint** 1273:12

**restriction** 1273:16,18

**restrictive** 1273:9

**result** 966:13 1014:9
1112:18 1227:22
1271:14,16

**resulted** 1193:16

**resulting** 966:7

**results** 1263:17,24

**retaliation** 1114:7
1150:16

**retaliatory** 979:25

**retro** 1254:4,13

**return** 1158:18 1163:7
1246:14 1249:8
1252:10

**returned** 1158:11
1247:11

**returning** 903:12

**revealed** 1035:6

**reversed** 1234:2

**review** 1052:1

**reviewed** 945:11,16
946:2 1033:17 1035:15,
23 1036:10,14 1045:7
1069:21 1077:4
1080:19

**reviewing** 979:21
1036:12

**rhetoric** 1062:25

**rid** 1174:5,10

**rights** 1049:20 1053:6
1093:20 1108:12
1126:16 1137:22
1142:24 1158:24
1159:2 1256:13,14
1258:17 1263:9
1268:11 1273:6

**rip** 1063:17

**rise** 903:3 916:21
920:24 962:15 963:2
1060:2 1067:22,24
1147:23 1152:11,13
1230:20 1231:15
1265:7 1267:3 1279:21

**Ritner** 1223:15 1226:8

**RLA** 920:3 922:6
923:11,15,18,24
924:22,23 925:21
926:10

**role** 1026:24 1036:8,25
1173:8

**room** 908:25 1149:11
1186:9 1188:4 1190:4
1193:25 1203:16
1243:4

**Ross** 1264:15

**round** 1160:22 1173:18
1174:20,21,22,24
1188:16

**rounds** 1215:9

**route** 1175:12 1204:23

**routine** 1175:13

**row** 1210:8

**RTW** 956:7

**rude** 1174:7

**rule** 920:12,22 926:22
1009:22 1062:18

1140:9 1156:5 1162:3
1163:12,13,14 1167:4
1231:22 1232:2
1266:10,17 1267:21
1270:12,20 1271:13
1273:11 1277:10,11,18,
21

**ruled** 979:6 1140:14
1146:1,4 1154:5

**rules** 1061:24 1063:11
1115:23 1255:16
1275:25

**ruling** 979:8 1149:12
1150:8 1152:14
1164:24

**rulings** 1067:9 1104:13

**run** 915:23 1241:8

**running** 993:9 1007:25
1153:8 1156:20
1157:20,21 1223:12,14,
18 1246:20,23,24
1250:4

**runup** 915:2

**rush** 1197:2

**S**

**sad** 1191:3 1192:18

**safety** 1255:12

**sageful** 1154:8

**sake** 1160:7

**salaries** 1245:18

**sanctions** 906:5,15

**sarcasm** 1001:8

**sarcastic** 938:13

**Sassy** 1247:21 1252:3

**sat** 1052:22 1186:10
1260:6

**satisfied** 1156:17

**Savannah** 1278:11

**save** 933:20 1201:25

**saving** 1066:14

**scar** 1194:14

schedule 1181:6

scheduling 1171:17
1253:24 1276:14

Schneider 905:4,5,9,
10 919:10 921:3,8
922:3 962:20 963:21
1060:5 1065:19
1073:16 1086:1
1095:10 1100:24
1133:3 1134:4 1141:14
1146:20 1147:25
1154:25 1157:10,14
1158:21 1162:19
1232:3,8 1264:8
1265:19 1266:11
1267:7 1268:21 1269:2,
9,10,22 1270:1 1271:18
1272:17 1276:16,17

Schneider's 978:1

school 1178:6,11,17
1179:4,15,16,18,22
1180:11,17,19 1181:14,
25 1182:21,23,24
1183:1,5,8 1184:14,21,
22 1193:11,14 1205:8

scouring 980:14

screen 944:7,12,14
961:21 976:15 981:24
1058:20 1068:18,21
1081:19 1167:15,17
1248:6 1252:4

screens 976:20
1060:14 1073:1

scroll 1038:19 1048:10
1090:23 1112:9

scrolls 1091:17

scuttlebutt 1226:9

search 1231:10

searched 1185:4
1191:17

searching 1191:18
1198:25

seat 1166:22 1175:16
1234:11

seated 903:4 921:2
963:17 1068:8 1154:22
1211:4 1267:4

seating 1210:14,15
1213:4,6,7

seats 1214:18

seconds 916:5,6
1019:15 1112:9,15
1113:6

secret 943:17

section 1063:14
1215:18

security 903:3 916:21
920:24 962:15 963:2
1067:22,24 1152:11,13
1231:15 1267:3
1279:15,21

sedative 1188:5

seek 906:14 911:7,13,
14 925:16 1203:5

seeking 908:13,14
1195:7

self-disclose 904:6

sell 1221:23

semantics 1115:17

semester 1180:17

send 909:6 910:25
912:4 916:13 986:19
1008:21 1009:1
1075:12,18 1076:13
1163:4 1165:19,24
1244:12 1249:14
1259:8,24 1260:25
1266:4

sending 972:5 1025:9,
11 1026:22 1028:11
1118:23 1126:14,21
1248:3 1260:1,3
1261:24

sends 1027:3,16
1028:3

senior 948:1 979:17
1167:23 1272:24

seniority 1229:11

sense 906:21 909:2
911:5 912:15 914:10
917:9 919:18 963:7,10
1064:3 1120:2 1146:16
1162:9 1165:1 1268:15,
22 1270:24 1272:2

sentence 954:22
955:5,19 957:25
1041:20 1126:18

separate 906:14
991:23 992:2,5 1023:16
1220:2

separated 1035:7
1186:8

separation 926:14
1046:18 1167:1

sequestering 1267:19

series 1086:12

serve 1215:6

served 978:19 1158:8

services 1198:4

serving 906:8 1209:17

session 1153:20,21

set 907:24 910:17
974:24 1008:15 1023:5
1024:18 1103:21
1133:19 1197:1
1209:22 1215:25

settled 1187:5

settlement 1156:5

Seventh 1267:17
1268:11,24 1274:9
1277:23

Seventy-six 1068:13,
15

severe 1027:24

sexual 1056:14,16,18,
19,21,24 1058:4
1114:6,18 1122:21
1248:20

sexually 1248:20

shared 1134:10
1226:15 1259:11

shop 1217:7 1251:16,
18

short 915:1 1072:11
1238:24 1259:14
1262:15

shortcut 1146:18
1154:3

shortening 1065:20

shortly 903:12

shots 1248:6 1252:4

shove 1206:13

show 904:20 910:17
916:15 941:11 981:2
984:11 996:24 1044:4
1061:6 1068:4 1086:4,
11 1130:14 1150:2,3
1262:10 1279:9

showed 1108:23
1111:3 1112:3

showing 1039:9

shown 907:6 969:14
1047:12

shows 978:18 1086:21,
23 1087:7 1088:16
1100:5 1106:16
1131:10

shut 1236:4 1247:5

sic 985:4 1019:5

sick 1183:14

side 908:24 963:6
1194:6 1264:15
1274:13 1276:6

sidebar 920:20,22
941:24 949:4,6 951:8
968:3,6,10 977:19,23
979:10 1000:21 1001:5,
7 1006:20 1023:10
1024:15 1061:13,15,18
1065:13 1067:18
1079:15 1080:8
1102:17 1104:16
1109:15,18,20 1110:11
1142:19 1147:12
1153:6,11,23 1155:20
1157:6 1161:9,10,13
1166:7

sidebars 967:20 968:2
981:16 1022:3 1023:2,
24 1030:18 1038:12
1061:20 1062:22
1064:24 1065:1
1119:20

sideline 1268:3

sign 1109:22 1217:12

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 418 of 426   PageID 15012
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 4 July 08, 2022                    Index: signed..specifically

signed 1218:5 1221:4, 22

significant 948:20 1234:22 1268:4

Silver 1165:21

simple 1270:16

simply 966:9 1010:13 1271:6

Sims 1143:12,20,22

single 939:4 984:8 1033:22 1034:8 1123:1 1219:18,21

sir 909:23 913:7 924:3 929:10 930:11 934:8 935:19 946:9 948:11 950:17 952:3,7 955:3 964:10 965:6 967:9 968:13 975:6 981:23 983:12 990:12 996:22 997:6 1000:18 1002:21 1003:13 1006:16 1008:21 1012:9,20 1014:21 1015:24 1017:22 1021:24 1022:13 1024:14 1030:1 1033:13 1037:6 1055:11 1060:7 1068:23 1080:14 1104:22 1128:21 1137:12 1169:15,20 1171:11,24 1172:17,24 1173:13

sister 1178:22 1200:20

sit 904:3,4,11,22,23 906:3 908:14 910:18 911:1,7,15,21 912:6 916:3 930:7 1052:4 1059:18 1166:17 1236:22 1269:13

sites 966:10 1256:9

sitting 932:13,14 935:11,20 1008:5 1200:8 1210:24 1211:5

situation 1154:3 1188:10

six-minute 1152:9

Sixth 1233:25

Sixty-four 1124:25

1125:6

ski 1077:11 1081:6

skip 966:3 1263:6

skipping 1234:21

slanted 914:22

slap 1241:18

slate 1223:18,20 1236:9,11 1238:15,16 1239:17 1241:9,15 1247:1 1250:4,17

sleep 1164:3 1192:8

slide 1273:8

small 1188:5 1200:6 1202:15 1211:1,11

smaller 1087:5

Smith 1223:12

smoking 1214:2

social 928:5,6 935:3,6 936:6 937:6,24 940:2 941:18 942:16 954:3 961:19 965:23 966:6, 16,25 967:12 968:17,23 970:7,11 971:12,18 972:1,9 973:5,22 974:4, 20 975:7,8,15 976:8 978:17,20 979:24 981:20 982:8 983:2,14, 16 985:25 995:9 1011:14 1012:2 1014:7 1029:4 1046:25 1101:12,25 1115:3,7 1117:11,14 1122:9,20 1123:25 1124:9 1169:24 1174:5 1252:6

solely 1160:4

someone's 906:22 1026:22

son 903:24 1193:5 1195:14 1196:6,9,18,21 1197:9 1198:3,13 1207:5 1208:10,21 1219:22,24

SONIA 1166:20

sonogram 1262:18,19

Sonya 940:13,15,19 941:7,10 947:8,12,17

848:25 949:19 951:20 953:7,17 954:2 1166:11 1167:11 1272:4

sooner 907:5

sort 905:15 963:6 1103:22 1150:18 1278:7

sought 1205:13

sound 1061:11 1141:14 1273:1

sounded 1192:3

sounds 1221:12,13 1264:24 1272:14 1274:3 1276:16

Southwest 903:14 917:23 928:14 929:22, 24 930:2,25 932:7,12 935:1 947:5 948:14,24 949:17 951:14 953:19 954:10 965:25 966:7 977:12 978:11,25 979:1 987:3 988:3 997:16 1002:7 1004:5,12 1015:10 1027:6,11 1028:6,24 1037:6,20 1044:19 1045:14,22 1051:15 1052:12 1054:22 1069:1,10,21, 24 1070:3,13 1071:8 1072:9 1082:13,16 1084:14 1086:20,21,23 1087:1,17,19,20 1088:14,15,17,21,23 1089:7,10,19,21 1090:5,19,21 1091:8, 19,21 1092:24 1093:11, 15,24,25 1094:1 1095:19,21 1097:11 1100:16 1101:9 1102:11 1103:4 1104:23 1106:6,21 1109:2,3,7,23 1110:16, 18,20,22 1111:11 1112:10,14 1113:14 1115:3,9,14 1118:3,15 1119:9 1120:10,12,19, 22 1121:24,25 1123:2 1125:22 1132:17 1133:16 1136:21 1137:24 1138:10,21 1141:3 1149:24 1151:4, 11 1155:14 1157:16

1158:4 1160:4 1161:2 1167:13,21 1168:11 1170:21 1171:12 1173:23 1174:4 1197:13,16,19 1206:5, 25 1207:2 1210:2,15 1211:21 1212:11,12 1216:4 1228:10,11,17 1229:2,4,25 1255:10 1263:12 1268:22 1269:20 1271:21 1272:1

Southwest's 953:5 1037:23 1102:21 1165:9

space 921:24 1175:17

speak 922:22 932:1 940:13 1225:21 1228:16 1246:11 1275:15

speaker 1198:17 1200:5

speakerphone 909:1, 11,17

speaking 904:17 922:16 941:23 950:2 987:17 991:3 1084:22 1251:21 1262:22

speaks 1010:24

special 1038:2

specific 911:23 928:8 945:22 958:15 972:5 989:24 990:9 1004:18 1016:10 1025:23 1036:9 1039:7 1055:7, 11 1063:2 1064:4 1090:3

specifically 924:2,7 925:19 926:3,6,8 927:23 931:19 934:11 936:23 937:17 953:20 959:19 963:24 970:12 994:22 998:6 1008:23 1015:6,7,19,20 1016:3, 24,25 1017:1,7 1019:11,19 1025:12,17 1036:13 1041:23 1044:18 1055:18,21 1057:7,10 1079:6 1100:9 1116:3,4,9,12, 15,24 1128:11,20

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 419 of 426   PageID 15013

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 4 July 08, 2022        Index: specificity..stuck

1134:19 1176:15
1179:8

**specificity** 1139:4

**specifics** 1005:13
1274:25

**speculate** 943:15

**speculation** 937:9
938:11 940:24 947:19
948:5 949:3,11 974:10
986:19,22 987:15
1008:14 1009:18
1075:23 1078:14
1084:20 1091:11

**speech** 917:15 924:25
925:2,11,13 958:9
1053:16 1251:20
1252:1,2

**spend** 919:7 1065:18
1245:1

**spending** 1031:19
1041:4

**spent** 906:8 1151:3
1223:24 1260:8,10

**spirit** 1273:24

**split** 917:14

**spoke** 904:15 1053:22
1055:21 1163:21
1174:15

**spoken** 931:20,22
1141:4 1275:6

**sponsor** 1130:11
1256:17,24

**sponsored** 1049:15,21

**sporadic** 1235:15

**stable** 1190:6

**Stacy** 1223:16 1225:6
1226:1,6 1236:14,19
1237:24 1238:7,8
1240:4,5,24 1242:15

**staff** 1059:23 1225:15

**stage** 915:5

**stages** 1262:20

**stalling** 915:23

**stance** 965:25 1131:13

**stand** 913:13 916:12
963:13 1060:6 1098:2
1104:1 1112:20
1131:20,24 1147:7
1155:5 1161:18,22
1162:16,22 1163:6,15
1164:2,11,23 1175:11
1199:10,17 1231:6
1232:16,18 1270:19
1271:6 1272:19

**standard** 1252:18

**standing** 963:25 964:8
999:9 1243:12 1264:13

**stands** 1015:19

**Starr** 909:10 910:5

**start** 907:14 912:3
919:5,11 1002:22
1069:24 1113:25
1135:5 1176:2 1178:1
1188:6 1208:4 1214:2
1237:14

**started** 922:15 1047:2
1077:25 1106:5
1180:12 1181:24
1183:19 1188:20
1189:25 1190:9
1191:18 1193:12,23
1195:1,9,10 1196:14
1197:24 1198:3,7,12
1207:1 1222:9 1264:18

**starts** 1019:9,18
1041:13 1215:13

**state** 956:25 1003:15,
25 1040:20 1078:7
1079:6 1153:6,10
1167:10 1175:23
1191:16

**stated** 1000:5,6
1004:21 1005:22,25
1014:7 1015:6 1031:24
1037:2,15 1108:17
1126:10,14 1129:12,18
1156:24

**statement** 934:4 939:4
940:6 1001:12 1014:12,
17 1037:19 1049:18
1075:5 1099:15 1100:5
1105:16 1116:7 1123:4,
14,16 1129:24 1134:16,
17 1257:25

**statement's** 1080:5

**statements** 939:2
1004:8 1029:3

**states** 994:17 1011:3
1074:12 1075:17
1076:17 1077:20
1078:5 1083:3,15
1126:17

**stating** 929:6 1111:1
1126:24

**stats** 1122:24

**stay** 963:8 1203:20
1208:20 1219:3 1230:1
1235:4

**stayed** 1190:22,23

**steeped** 1063:20

**STENOGRAPHER**
962:2

**step** 1142:20 1143:9
1146:3 1152:19
1192:10

**Stephenson** 946:25

**stepped** 979:5 1198:14

**stepping** 1227:3

**steps** 1150:3

**Steven** 1248:19

**stew** 1247:21 1251:16,
18 1252:3

**stipulation** 1151:2

**Stone** 932:5,19 933:24
940:16,20 941:3,16
942:14 946:23 947:16
950:11 952:3,11,16
954:1 965:18 966:23
968:15 973:6,15 975:6,
13 980:8 982:18
989:10,19,21,23 995:7
1013:25 1014:2,6
1015:15,17 1016:2,5,16
1017:4 1018:8 1020:16,
19 1021:2,10 1022:15,
17 1023:18 1025:1,2
1026:1,2,9 1028:13
1031:16,22,25 1032:5,
8,11,12 1033:1
1034:10,12,15,16
1035:6,8,13 1036:2,6,7,

25 1039:11,12 1040:3,
6,7,11 1041:18,24
1042:5,13 1043:6
1046:5 1047:19,21
1072:22 1073:18
1074:21,22 1075:8
1077:24 1079:20
1084:9 1096:14 1098:1
1099:9,20 1101:25
1105:1 1118:24 1119:1
1124:21 1126:13
1127:4 1137:22 1138:8,
14 1139:1 1140:4,17,20
1141:4 1145:16,23
1150:22 1168:4
1174:15 1246:21
1248:12 1249:15
1250:7 1253:2 1259:25
1260:2 1262:22,25
1265:19

**Stone's** 940:15 943:25
945:17 948:2 975:9
1020:20,23 1021:22
1032:9 1056:3 1101:3
1139:10 1160:7
1169:21 1172:22

**stood** 1199:15 1212:4

**stop** 1023:25 1038:13
1040:1 1062:4 1064:25
1082:19 1083:20,21
1176:5 1205:6 1263:3

**stopped** 1201:7

**stopping** 966:15
971:11

**stories** 1000:23

**story** 1000:18 1187:25
1199:22 1227:17
1259:14

**strategy** 1167:24
1276:14

**stricken** 1013:17

**strike** 1003:7,9
1013:12,19 1022:8,9
1030:19

**strong** 1117:20

**structure** 988:3

**struggled** 1185:18

**stuck** 1216:7

**studied** 1208:22

**study** 1198:21

**stuff** 1035:15,17,19
1178:24 1207:22
1215:1,4,13 1217:18
1227:17 1235:2,3
1242:14 1247:8
1248:20 1274:22

**stumbled** 966:9

**stupid** 1192:24

**subject** 1140:9
1198:18 1261:3

**subjective** 965:25

**subpoenas** 906:7

**substance** 1275:22

**substantially** 1065:20

**suck** 1027:5,10,16,17
1028:5

**suctioning** 1188:16,20
1189:5,18

**suffering** 1193:8

**sufficient** 1133:18

**suggest** 1270:8

**suggesting** 1271:12,
13

**Sullivan** 1243:2

**summarize** 933:17

**summarizing** 1086:3

**summary** 1126:8

**summer** 1179:21

**Sunday** 1198:5
1278:13,17 1279:2,11

**super** 918:13

**supplied** 980:7

**supply** 1043:11

**supplying** 1043:8

**support** 935:5 1089:8
1105:1 1107:24 1108:4
1204:8 1205:1 1223:20
1237:7

**supported** 1039:22
1045:1 1049:17,25

1108:14 1168:17
1192:4 1224:3 1236:12
1261:16

**supporter** 973:16,17,
22 980:7 984:3,9,19
985:14,17,22 986:5

**supporters** 942:17
973:6 974:3 975:15
976:7 985:10,12,25

**supporting** 940:1
941:16 1041:14
1049:20 1258:10

**supposed** 994:25
995:1 1192:11 1228:8
1258:6,19

**supposedly** 1238:23

**Supreme** 1164:1,8,13
1232:15 1233:12,13,19
1268:8

**surely** 1014:25 1015:3

**surgery** 1194:4

**surprise** 1140:20,25

**surprised** 1025:15
1140:17

**surrounding** 1092:3

**suspension** 1143:10
1146:22 1148:10,25
1158:5,6,8

**suspensions** 1122:10

**sustain** 948:6 955:17
958:24 961:4 968:3,5
974:11,23 981:17
1038:6 1091:13 1138:5
1246:1 1263:20

**sustained** 933:3,8,16
939:15,20 940:25
946:21 948:7 950:4,23
951:11 952:20,23 954:6
955:9,11 961:8 965:12
969:19 988:11 991:4,8
992:22 993:5 997:10,24
1000:22 1006:8
1012:14 1013:10
1017:20 1018:2 1023:3
1030:19 1035:2
1038:14 1045:11
1048:1 1050:16 1062:7,
14 1065:4 1076:10

1087:23 1090:11,14
1109:11 1119:21
1123:10 1124:16
1128:25 1132:5
1136:14 1137:20
1140:11 1142:2
1160:15

**sustains** 1206:2

**Suzanne** 946:25 954:8

**swear** 904:3 1166:19

**sweep** 1223:13

**Sweeten** 1220:15
1221:7

**Sweeten's** 1226:17

**sworn** 998:7 1166:20
1175:14 1266:13
1270:16

**symbols** 1108:24

**synopsis** 1233:19

**system** 1106:25
1145:15,19 1225:4
1253:24 1255:13
1257:12

— T —

**TA** 1253:5,6,10,11,16
1255:3 1257:7

**table** 909:1 1148:4
1188:5 1200:8

**tag** 1077:12

**takeaway** 1276:7

**taker** 1139:18

**takes** 1148:2 1164:2
1241:1 1244:13
1272:23

**taking** 931:13 946:16
1010:5 1033:13
1098:23 1107:14
1112:14 1198:3,13
1204:1 1214:17,19
1252:4 1253:14

**Talbert** 980:7,13
1152:6 1167:19
1168:16 1169:18
1171:2,7 1173:21

1239:25 1251:15

**talk** 903:25 907:3 911:3
921:18 922:3,16 937:16
938:21,24 962:10,11,
19,22 981:11 996:25
1000:19 1011:13
1031:6 1033:25 1049:8
1054:3,6,11,13 1056:1,
2 1059:23,24 1060:6
1061:12 1067:25
1082:19 1084:2,8
1134:25 1147:20,21
1149:7 1161:3,16,19,22
1162:2,3,13,23 1163:8,
15 1164:25 1197:18,20
1202:25 1206:4,25
1216:5 1230:14,16,22
1231:7 1232:19 1238:8
1243:1 1265:1,2,15,21
1266:11,15,16 1267:8
1268:12,15 1269:20,23
1270:8 1274:13,18,19,
24 1275:3,17,20,21,24
1276:9,10,13,17 1278:1

**talked** 905:19 931:5
1024:19 1026:4 1054:9,
15,16 1055:3,5,8
1061:7 1066:19
1120:16 1130:18
1152:6 1184:24
1223:17 1235:4 1248:7
1256:18 1267:11,15
1268:17,19 1279:8

**talking** 917:17 918:22
921:14 925:19 926:15
944:19 954:2 956:10
961:13 969:22 971:25
972:8 976:19,24 991:2
997:23 999:14 1002:25
1003:17 1011:24
1012:4 1034:19,22
1035:8 1040:5,7
1041:15 1042:12
1045:20 1046:4 1047:3,
11,14 1054:6 1055:4
1062:21 1064:6 1065:7
1082:25 1083:19
1105:24 1112:2
1134:19 1152:18
1161:15 1163:17
1174:4,10 1206:7
1211:3 1217:14
1232:22 1239:24
1248:17,20 1256:2

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 421 of 426   PageID 15015
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 4 July 08, 2022                    Index: talks..threatened

1267:7 1268:4,5
1270:14,17 1272:14
1273:12

**talks** 1081:12 1083:16
1268:8 1269:3 1270:4

**tall** 1243:12

**target** 935:3 936:5,15
937:4 938:8 974:19
1169:24

**targeting** 954:3 973:5

**task** 993:20

**tasked** 991:12 993:19

**taxed** 1157:3 1254:14

**team** 989:17 995:5
1069:9,11,13 1070:22,
25 1073:18 1092:5,12,
23 1101:25 1102:12,21
1103:6,7,23 1104:7,25
1178:12,16 1221:7
1225:2 1226:17
1249:14 1250:8,23
1251:3,8,19,22,23
1252:7 1253:2

**tearfully** 1084:15

**technical** 1133:21

**telephone** 1141:15

**televised** 1256:18

**telling** 918:14 928:21
930:21 958:20 964:11,
12,20,22 969:23 982:25
997:21 999:20 1016:14
1047:8 1054:23 1075:3,
19,20 1091:9 1096:15,
22 1099:19 1103:1
1105:20 1107:1
1108:13 1122:6
1128:22 1131:21
1145:5 1151:17 1169:6,
7 1205:20 1218:23

**tells** 935:2 1014:2
1163:18 1222:1

**temperature** 904:11

**tentative** 1253:7
1267:6 1269:21

**tenure** 1097:11
1138:21

**term** 965:2 1015:5
1138:23 1173:23
1237:15

**terminate** 927:8,12,22
929:21 937:5 978:2
998:21 1020:11
1042:14 1086:14
1135:2 1141:18 1155:9
1159:15 1160:2
1172:11 1173:9,12
1272:22

**terminated** 930:17,22
931:11,21 993:13,23,24
1000:11 1006:4 1015:3,
18 1028:11 1029:22
1030:7,9,23,24
1036:20,21 1039:14
1041:22 1042:23
1047:7 1069:22
1072:12 1121:21
1123:3,24 1124:3,8
1125:14 1132:8

**terminating** 925:17
998:12 999:11,21
1049:4 1124:7

**termination** 932:2
936:5,12 937:10,11
1007:23 1008:21
1015:3 1029:18
1054:20,24 1055:23
1057:24 1058:6,11,15
1072:17,18 1114:23
1115:2,24 1116:2,11,17
1123:17 1124:19
1131:18 1132:2 1143:9
1144:14 1146:22
1148:10 1149:24
1154:13,16 1155:15
1157:17 1159:17
1172:19 1271:23

**terms** 922:8 1070:14
1154:14 1165:17
1177:11 1182:20
1219:9 1270:4 1275:18

**terrible** 1027:5

**terribly** 1234:22 1236:6

**test** 1207:21

**testified** 998:22 999:12
1006:16 1140:5
1143:12,23 1227:21
1239:10

**testify** 904:12 905:1
1035:1 1048:3 1141:5
1226:20 1232:6

**testifying** 1007:13
1045:10 1084:21
1087:22 1088:10
1099:3 1106:8 1224:22
1235:3 1254:22

**testimony** 906:23
908:14 915:6 922:4
928:24 933:18 955:15
978:22 984:13 985:2,4,
6,11 994:8 997:23
998:7 999:9 1010:8
1020:1 1045:2 1069:17
1140:13 1151:3,24
1152:1 1161:1,7
1163:16 1175:2
1232:17 1239:5
1275:18

**testing** 981:5

**Texas** 909:11 1176:4
1178:2,5,6 1180:12
1181:6 1209:7 1214:21

**text** 1077:17 1081:3
1171:21 1172:1,6,9
1174:8

**theme** 1150:1

**theory** 1150:14,19,23
1151:6 1154:14
1245:16

**thing** 906:4 916:24
917:17 929:20 946:11
970:9 971:19 972:23
990:4 998:4 1032:16
1035:12 1048:21
1060:10 1095:11
1112:20 1115:18
1144:9 1145:14 1147:1
1163:19 1170:1
1177:18 1188:17
1204:6,24 1214:14
1215:3 1217:23
1222:22 1238:19
1245:4 1246:17,19
1262:17 1268:20
1275:19 1276:2,5
1277:9

**things** 919:22 944:10
965:22 967:13 968:18
971:18 992:7 1014:7

1015:18 1032:15
1033:1 1036:14
1039:14 1047:6 1053:5
1081:1 1093:21 1101:6
1110:2 1111:10
1127:17 1135:1
1177:10 1199:4,7
1201:21 1202:4,18,20
1203:12 1204:10
1206:16,18,23 1218:2
1220:16 1226:15
1229:22 1242:4,8,9,15
1246:23 1248:25
1256:1 1259:1,11,13,
15,20 1262:12 1275:17,
23

**thinking** 905:8,12
952:17 1078:23
1143:14 1168:19
1192:23 1222:17
1267:22

**thinks** 1014:2 1041:4
1274:20

**Thom** 1223:15 1225:1
1226:2,5 1227:3

**Thompson** 1243:5

**thought** 904:19 928:9
961:13 993:24 1019:12
1032:18 1044:7
1046:22 1047:1
1052:20 1056:19
1070:21 1078:23
1088:19 1128:5 1140:5
1151:19 1180:20
1191:21 1194:6
1217:25 1218:6
1221:18 1222:19,22
1223:1 1239:16
1254:18

**thoughts** 908:12
966:19 1053:10
1055:20 1058:23
1192:14

**thousand** 1227:25

**threat** 938:8 1013:25
1014:9,14,16,22,24
1040:17,21,22 1136:5,8

**threaten** 1242:21

**threatened** 1014:3,6
1015:7,16 1016:13
1124:20

Case 3:17-cv-02278-X   Document 450   Filed 06/14/23   Page 422 of 426   PageID 15016
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 4 July 08, 2022              Index: threatening..true

**threatening** 995:12
1014:8 1015:4,5,12
1016:2,4,9,13,16,19,22
1017:3 1018:8

**threatens** 937:3

**threats** 1011:14 1135:9

**three-and-a-half**
1091:18

**thrive** 1205:5 1209:15

**throw** 906:19

**throwing** 1190:9

**ticket** 1223:12

**ticking** 921:5

**tie** 1176:22

**time** 903:24 904:5
905:11,16,19 907:14,18
908:2,16 911:8,13,16
912:6 915:11 919:7
921:4 925:7 933:25
934:3,23 939:22
940:16,20 941:15 944:9
945:11,16 948:20
958:7,16 963:11,12
967:22 973:6 975:12
976:8 979:23 980:16,
18,19,21,23 983:13
987:5 989:16 992:18,24
993:1,7,9,10,13,22
997:7 1003:25 1021:7
1033:8 1042:9,13
1052:4,16,19 1054:6,7
1059:15 1064:14
1065:18,24 1066:14
1067:6 1068:11
1072:11,13 1076:24
1078:9 1079:3,24
1081:7 1085:3 1087:11
1095:13 1105:13
1112:24 1113:7 1119:3,
7,12,25 1124:7 1126:15
1128:1 1136:1,25
1138:13,15 1139:7
1149:16 1153:6
1156:15,20 1157:4
1158:8 1165:10,11
1166:10 1167:22,23
1168:20 1169:9
1173:22 1174:2 1175:8
1177:7 1178:19 1180:8,
11,24 1181:5,7,10,12,
14,21 1183:2,6,25

1185:14,16 1187:6,8,14
1195:16 1196:2,18,20
1197:1,7,15,16 1198:2,
14 1199:25 1201:16
1202:17 1203:2
1206:18 1207:8,19
1208:6,7,10,20 1212:21
1213:20 1214:7
1216:18 1219:7 1220:6,
7,21 1222:14 1223:5,11
1224:17 1227:3 1229:5,
7 1230:8 1233:7
1235:23 1237:13
1238:5,20,22 1239:22
1241:2,24 1242:7,9
1246:14,18,24 1252:23
1254:6 1255:12
1259:10 1262:15
1264:22 1265:20
1279:1

**timeline** 1059:8
1146:15 1181:24

**timely** 1068:21

**times** 1017:17 1064:8,
13 1113:4 1203:3
1210:16 1246:13
1262:11 1267:19

**timing** 1090:13 1158:7

**tiny** 1186:25

**tired** 1110:2 1183:20

**tissue** 1131:10,13
1194:14

**title** 947:9 1004:21
1005:10 1150:17
1158:23

**today** 910:21 921:13
930:7 932:10,13,14
941:8 956:20 980:24
1066:1,18 1067:9
1090:16 1133:11
1135:1 1162:12 1176:1,
6 1206:3

**today's** 1092:2

**told** 915:17 923:12
930:7,9,13,17,20
931:15,16 936:4,20
938:19 939:4 941:19
954:24 955:3 990:6
991:11 997:1 999:1
1000:2,23 1006:4

1009:15 1010:4,21
1019:12 1024:10
1025:9 1032:2 1033:7
1044:13,18 1045:22
1046:15 1047:5
1049:16 1053:12
1056:11,17,23 1057:17
1064:5 1069:1 1070:18,
25 1076:5,20 1077:22,
24 1078:2 1079:4,18
1081:2,6 1089:12,15
1096:18 1097:25
1099:9,20 1100:7
1106:19 1108:8 1113:5
1114:9 1118:20,22
1131:16 1132:7 1155:4
1162:18,19 1172:15
1182:12,13 1184:17
1188:14 1191:23
1194:5 1196:13
1199:22,24 1203:14,15,
18 1219:3 1221:13
1231:7 1232:7 1244:8
1250:23 1258:7 1263:3,
17

**tomorrow** 1265:6

**ton** 1221:8

**tone** 1209:22

**tonight** 906:4 907:4,11,
14,25 908:16 911:16
912:6

**tonight's** 916:17

**top** 945:2 1058:21
1078:19 1082:15
1108:2 1114:3 1129:23
1134:9 1254:2,11

**topic** 975:1 1133:19,20
1198:22

**topics** 1171:13,15,19,
23 1198:19

**torn** 1185:11,12 1203:3

**Torres** 1266:23

**totality** 998:18 999:23

**totally** 1145:21 1150:25
1229:17

**tough** 1159:7 1268:20

**town** 1095:14 1220:5

**track** 918:10 1123:13

1147:16 1149:11

**tracking** 1197:22

**tracks** 1121:25

**traction** 920:8

**tradeoff** 906:10

**train** 1239:16

**training** 1208:2,3,15,18
1209:5

**transcribed** 1139:24

**transferred** 1178:2

**Transition** 1069:9

**transportation** 923:19
924:6

**trashing** 1225:3

**travel** 904:24

**traveling** 934:13

**tray** 1215:4

**treasurer** 1236:24

**treat** 1130:10

**treated** 1226:16
1227:18 1244:24

**treating** 1227:24

**trial** 904:12 905:1,3,6,8,
23,24 911:4 912:3
914:14,18 915:2,3,9
979:5 1073:14 1085:22
1095:4 1100:22
1113:11,20 1118:9
1125:9 1126:3 1218:12
1226:20,25 1227:12,20
1233:20,23 1237:25
1238:1,2 1267:18
1276:14

**trials** 915:4

**trigger** 1139:10

**trip** 1077:11 1081:6,10

**trouble** 909:3 937:1

**true** 924:1 925:3 928:15
930:14 934:17,19,20
936:7,22 938:22 939:9
940:17 945:25 946:4,
10,23 947:10,11 954:19
956:10 957:3 958:1,10

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 4 July 08, 2022                         Index: Trump..union

960:15 965:9 969:15
970:4 973:13 975:10,
22,23 980:4 982:9
983:17 986:2 987:9
989:20 990:22 991:14,
18 994:1 998:12 999:7,
8,22 1000:13 1006:12
1007:12 1010:22
1011:17 1012:1
1013:25 1014:6 1019:8
1020:16,17 1025:7,11,
25 1026:2,5,14 1027:1,
6 1028:13,20,25
1029:24 1030:2,24
1031:19,23 1032:9,23
1033:2 1037:1 1039:6
1041:25 1043:7,8,12,
17,19 1044:9,13
1047:12 1048:8 1050:1,
4,5 1053:7 1054:24
1055:23 1057:20
1058:11,12,24 1069:18
1071:13 1072:16
1080:20 1081:4,7,18
1083:1 1089:9,18
1093:16 1094:15
1095:8 1099:22
1101:18 1105:21,22
1107:2 1110:17 1111:4
1114:20,24 1116:19,20
1117:4 1119:12 1120:1,
2,3 1123:17,18 1126:16
1129:4 1130:12 1164:9
1169:1,6,11

**Trump** 1257:24

**trust** 1238:12

**trusted** 1237:16

**truth** 964:12,21,24
969:23 1031:12
1187:22

**truthfulness** 969:5

**tube** 1193:20 1194:2,5,
15

**turn** 909:16 1027:20
1095:18

**turned** 972:14 1145:16,
23 1150:22 1187:11
1242:17 1243:5,11
1249:17 1252:8

**turning** 966:12 968:22
972:4 1144:17 1151:7,9

1239:25 1251:23,24
1252:4

**turns** 1278:24

**Twix** 1231:25

**two-day** 1252:8

**TWU** 954:11 955:1
956:8 1011:10 1020:19,
24 1021:2,10 1022:15
1023:16 1024:11
1025:2 1039:12
1041:13 1046:5
1097:22 1098:10
1109:3 1110:18
1126:13 1134:10
1180:12,15 1221:14
1225:3,23 1245:9
1246:22 1248:12
1249:15 1250:7
1259:25 1260:2
1262:22,25

**type** 943:24 1171:23
1276:2

**types** 1251:25

**typically** 1090:22

---

## U

**U.S.** 1233:9,12,16
1266:6,8,23

**Uh-huh** 1178:18
1179:14 1216:17

**Um-hmm** 950:13
1240:2

**unassociated** 1036:8

**unborn** 1044:14 1105:5
1261:11

**unclearly** 1089:17

**uncovered** 966:9

**underlying** 1272:12

**understand** 904:9,21
912:25 913:25 914:2,5
915:19 918:7 924:23
932:8 935:21 936:17,19
942:8,9 948:14 950:17
952:9,11 964:1 974:14
975:4,6 976:4 979:8
981:3,4 993:4 994:18

1005:5 1012:25
1014:20 1015:13
1018:18 1022:18,20
1028:15 1033:11
1042:20 1063:22
1070:18 1076:6
1102:24 1115:13
1118:22 1119:1
1131:12 1139:6
1142:21 1151:12
1154:17 1156:1
1158:23 1163:10
1168:2,25 1169:2,8
1173:6 1176:17
1187:25 1206:23
1216:10 1228:2
1234:18 1261:15
1262:13 1271:15
1277:15 1278:16

**understanding** 919:9
923:15,24 928:16
947:25 948:23 953:5
964:7 987:2 988:1
1046:24 1063:23
1076:4 1099:8 1136:18,
20 1137:5 1142:6,11
1218:23 1224:20
1228:4 1238:21
1239:14 1240:10
1243:18 1260:15

**understandings**
1159:1

**understands** 1210:6

**understood** 903:13
904:18 911:20 973:2
1065:1 1105:13
1118:23 1125:12
1132:19 1147:5,11
1150:7 1152:4 1156:19,
22 1169:4 1272:7
1273:2 1277:12

**unethical** 1276:25

**unfettered** 1142:24
1143:12

**uniform** 1091:19
1093:24

**union** 903:18 917:5,15
918:5 919:5,12 920:7
924:18,20,21 925:2,11,
14,15 930:3 931:12,23
934:13 935:5 939:25
940:1,8 941:16 942:14

954:3,18,23 955:4,21
956:10 957:1,3 958:1
973:4,23 974:2 975:7,
13 977:11 978:1 983:15
1010:20,22 1011:4
1021:16 1023:17
1025:7,10,24 1026:2,4
1027:3,4,9 1028:3,4
1031:19 1032:8,11,14,
22,25 1033:2,19
1034:11,13,15,20,22
1035:7,9,13 1036:3,5
1037:1,4,7,11 1038:3,8,
9 1040:8,11 1041:3,16,
19,24 1047:15,20,23
1048:8 1049:7,8,11
1050:4,19 1053:19
1058:14 1060:25
1066:24 1071:15,23
1073:9 1074:5,22
1075:9,16,21 1079:21
1081:10,15 1082:20
1084:3,5,10 1085:16
1094:22 1095:17
1096:16,21 1097:7,9
1098:19,20,21,23
1099:4,21 1100:2,17
1107:7,11,21 1108:23,
25 1109:1 1110:22,24
1113:15 1118:20,24
1119:10 1120:3
1121:25 1122:2
1125:23 1126:12
1127:6,16 1133:6
1137:25 1138:10,14
1143:6,7,8,17 1144:14
1145:17 1149:23
1150:3,15,17,18,20
1151:4,7,8 1159:16,19
1160:1 1168:3,10,17,23
1169:5,9,24 1170:12
1173:5,11 1197:19
1206:4 1216:19,20,23,
25 1217:7,10 1218:5,
12,18 1219:7,9,14,15
1220:6,9,18 1221:6
1222:24 1223:6,10
1226:12,13,18 1227:11,
13,24 1228:3,5,11
1229:24,25 1230:2
1234:15,25 1235:3,4,
12,14,20,21 1236:1
1240:8 1241:17,21
1242:5,11,13,18
1243:15,21,24 1244:5
1245:1,7 1246:6

1247:2,3,5 1250:18
1251:17 1252:1,2
1255:5,23 1257:1,2
1260:2,3,5 1262:23
1263:9 1264:16

**Union's** 1079:22
1150:24 1157:4

**union-activity** 1037:8
1247:18

**union-protected**
917:20,25 1102:22

**union-related** 918:1

**unions** 1219:11,12

**Unity** 1256:10

**University** 1180:13
1181:7

**unmute** 996:16

**unmuted** 1060:13

**unsure** 1021:3

**upcoming** 935:4

**update** 903:25

**upset** 939:8 1171:16
1192:18 1223:9
1255:24 1256:5

**upsetting** 1256:12

**uterus** 1194:15

**utilize** 1174:5

--- V ---

**vacation** 1001:23,24
1002:23 1003:16
1095:12 1253:24
1255:12

**vacuum** 960:7

**vagina** 1028:20
1114:19

**vaginas** 1114:17

**vague** 918:25 919:14
931:24 935:13 936:8,9
942:19 956:12,16 959:5
960:5 961:7 967:17,25
991:1,7,21 1029:10
1035:16 1037:12,24
1038:4 1099:25

**vaguely** 935:9 1096:23,
25 1099:23

**vagueness** 917:9
974:22 1021:18

**valid** 917:12 920:15

**validity** 943:25

**valued** 1258:17

**values** 1126:24

**variety** 920:2 1171:19

**vast** 951:18

**Vegas** 947:2

**veiled** 1014:14,16

**verge** 944:17

**verified** 936:3 1139:25

**verifies** 937:23

**verify** 938:1

**version** 946:7 997:3,5,
13 1020:6 1087:6
1118:11

**versions** 1020:3

**versus** 905:8 1267:12

**vice** 953:17 1241:3

**Victor** 912:23

**video** 911:15 912:7
1018:23 1019:4,7,13
1020:15 1026:17
1028:12,23 1044:14
1046:8 1067:1,8
1077:15,18,25 1078:1,
3,4,9,11,23 1079:4,7,10
1080:18,23 1081:4
1086:20 1087:11
1091:17 1093:10
1131:6 1134:11 1259:6
1260:17 1262:25

**videos** 958:4 1019:16
1044:4,17 1045:18,20,
24 1046:4,5 1114:4
1118:13,14 1120:8,23
1132:8 1259:20 1261:7

**view** 964:25 1026:16
1078:11 1079:1,4
1080:18,20 1205:15
1220:9 1257:17
1258:20,21 1273:3

1277:11

**viewed** 989:13 1079:9
1080:21,23,24 1087:16
1168:16

**views** 1032:9 1070:3
1185:14

**VII** 1150:17 1158:24

**vile** 1028:4,8 1174:8

**violate** 1004:6,12
1027:18 1044:15,19
1045:22 1056:13
1058:3 1102:21 1114:6,
14,17 1116:14 1277:11,
15

**violated** 979:7 999:2
1004:15,18 1044:1,23
1054:16 1056:25
1057:1,17,19 1101:25
1114:20 1116:24
1117:20 1150:20

**violates** 1002:8,17
1027:5 1037:20 1156:5

**violating** 906:20
1004:10 1007:10,11
1062:17 1102:19
1121:21

**violation** 928:5 961:19
975:7 982:8 983:2
995:8,14 1005:16,17
1007:16 1016:6,20
1027:25 1028:6,9
1029:8,9,14,16 1043:19
1044:10 1045:1,14,16
1047:5 1117:18 1123:3,
25 1124:3,8 1137:15
1145:22 1150:15,17

**violations** 940:2
941:18 942:16 954:4
970:11 974:3 976:7
978:20 981:21 983:17
986:1 1123:13

**violence** 1135:10

**violent** 995:11 1027:12

**virtue** 944:16

**visibility** 1090:25

**visible** 912:12

**visit** 910:21

**voice** 1244:2,3 1246:12

**voir** 904:2

**volume** 909:16

**voluntarily** 954:13
1260:21 1261:2

**volunteer** 1276:1,2

**volunteering** 930:12

**vote** 940:7 1238:8
1243:25 1249:25
1250:1 1253:10

**voted** 1237:3 1238:15
1241:16,19 1252:24

**voting** 940:8

**VP** 1101:8 1126:9

--- W ---

**wait** 928:18 960:9 972:7
1014:12 1023:13
1040:15 1081:14
1104:11 1130:21,25
1145:8 1153:22 1218:4
1221:20 1222:3
1236:16 1239:21
1263:25 1264:7

**waiting** 905:9 1186:9
1264:3,4

**walked** 903:20,23
934:5 1141:23 1186:7

**walking** 921:6 1001:25
1004:1 1155:21
1192:16 1242:24
1243:4

**wanted** 911:21 919:1
974:7,13,18 975:17,21
987:7 1014:18 1048:20
1050:3 1071:15,22
1148:5 1179:17 1181:7
1186:12,17 1187:7
1195:22 1196:1
1197:12 1198:10
1201:13 1202:21
1204:23 1206:22
1207:5 1222:5 1223:9,
22,23,24 1226:3 1229:2
1235:23 1237:4
1244:25 1261:15

**wanting** 936:5 1115:19 1215:14 1276:17

**ward** 1164:2,14,21

**warning** 1168:25

**warrant** 972:24 975:2

**warrants** 1268:12

**Washington** 1032:19

**watch** 1055:15 1078:9 1204:6,24

**waterfall** 944:15

**ways** 1039:25 1080:1,7

**wear** 1190:5,8 1258:18

**wearing** 1093:24 1106:5,10,11,20 1257:22

**web** 912:9

**webcam** 912:13 913:8

**wedding** 1192:14

**Wednesday** 1077:12

**week** 945:13,15 954:9 992:19 1045:7 1052:1 1186:22 1264:22

**weekend** 907:11 1265:8,9 1268:4 1269:12 1270:8 1274:3 1277:5,21,24

**weeks** 1183:25 1186:14 1188:12 1208:18

**wheels** 1214:22

**When's** 945:11

**Whichever** 996:6

**white** 907:2

**whore** 1182:19

**wife** 1198:16

**wildest** 1263:7,11

**willingness** 904:11 916:11

**Willis** 1233:6

**win** 1241:10

**window** 1210:4

**wings** 1209:1

**wins** 1228:3 1231:17

**wished** 1205:11

**withdraw** 1038:15 1092:9 1096:8 1119:22 1124:4

**witness's** 1003:5

**witnessed** 965:23

**witnesses** 917:4 918:6,15,16,19 920:16 963:22 965:8 969:22 973:12 985:4 1065:20 1066:17 1162:20 1232:5,6 1266:13,17 1267:19 1270:14 1271:2,6 1274:7 1275:16 1276:14

**woman** 1201:24 1225:17 1256:15 1258:16,18

**woman's** 1180:13 1181:6 1256:22

**womb** 1201:25

**women** 956:9 1114:16 1134:21 1198:15 1199:10,15 1200:3,7, 15,20 1202:5 1258:2

**women's** 954:11 1039:23 1049:19,20 1097:21 1098:10 1099:22 1100:3 1108:11 1126:16,23 1198:6,13,21 1199:5 1256:13,14 1258:2,3,6, 17 1259:13 1260:6 1261:18

**won** 1227:23

**wonderful** 908:9 1209:19

**woozy** 1188:7

**word** 937:1,11 957:4,8, 17 965:9 1009:5,11 1010:5 1120:2 1128:3, 23 1243:6,7

**wording** 1116:15 1242:3

**words** 904:6 906:18

**1042:17 1141:4 1226:14

**wore** 1105:24 1106:12 1258:15

**work** 932:14 966:20 993:11 995:2 1003:14, 16 1004:24 1005:18,19 1105:18 1121:2 1154:7 1158:3,11,18 1167:13 1177:9 1181:16,18 1184:6 1195:18 1199:12 1204:5 1209:24 1211:23 1212:11,14 1218:20 1219:21 1223:23 1225:7 1240:8 1255:16

**worked** 994:2 1149:23 1177:6,7 1195:18,21 1209:8 1211:8 1213:11 1229:13

**working** 1066:5,6 1119:2,7 1150:5 1151:10 1174:4 1181:3 1183:2 1193:12 1208:8 1221:11,21 1225:8 1254:19 1277:6

**workplace** 929:19 995:15,20,22,23 997:15 998:8,18 999:4,14,23 1000:1,6,12 1001:16,19 1002:8,23 1004:6,10, 13,20,21,23 1005:1,8,9, 13,15,17,19,21 1006:5, 12 1007:3,5,7,10,11,17 1009:5,11 1010:5 1015:11 1071:10 1115:15,20,22 1117:11, 13,14 1121:4,8,12,16, 17,18,19,20,22 1122:20 1127:24 1128:3,6,8,9, 11,12,14,20,22 1129:2, 4,8,9,12,19,21,25 1130:1,9,10 1135:7 1136:9,11 1159:9

**works** 956:7 988:3 1018:15

**world** 960:8 1091:20 1092:2 1210:25 1211:11,12,14

**worried** 1085:5

**worry** 993:25

**worse** 1193:9

**worst** 1190:1,17

**worth** 1151:15

**wow** 1017:16 1065:21 1220:19 1221:18

**wrestle** 1278:21

**write** 1134:13 1171:12 1173:24

**writer** 962:4,7

**writing** 1045:3,4,5 1074:17 1144:2 1169:10

**written** 940:6 965:18 998:20 999:10,25 1060:23 1066:13 1077:21 1109:4

**wrong** 915:19 965:2 1032:20 1139:17 1163:6 1267:8 1269:22, 24 1277:3

**wrote** 1080:16,17 1120:13 1173:22 1174:7

---

Y

**y'all** 904:6 905:7,12 907:1 909:5 921:23 1060:19 1067:17 1068:17 1150:9 1152:10 1167:1 1231:13 1265:10 1266:4,25 1267:8 1269:23 1277:6,20 1278:18,23 1279:1,2,4, 17,20

**yards** 1183:21

**year** 1122:10 1179:4 1182:2 1195:21 1220:24 1224:18 1249:19

**years** 913:23 914:15 948:19 951:14 953:2,3 987:3,25 992:6,7 1090:7,8,22 1091:7,18 1092:23 1093:13,23 1095:16 1096:3 1106:17,20 1109:7

1111:20 1112:16
1113:8 1120:16,21,23
1126:22 1174:13
1183:9 1192:6,9,20
1193:15 1201:9
1205:21 1221:5 1228:9
1229:23 1235:9
1253:13 1263:16

**Yellow** 1185:3

**yesterday** 910:20
921:12,13 922:4 1152:8
1239:11

**York** 1195:24

**young** 1179:6 1198:15,
17 1201:23 1202:19,22
1204:18 1205:23
1225:7

**Young's** 1198:16

**younger** 1204:7,25
1205:13

---

**Z**

---

**Zoom** 912:10

**zoomed** 1087:2

**zygote** 1186:25