Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 1 of 383  PageID 15021
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022

1        UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF TEXAS
2
            CASE NO. 3:17-cv-02278-X
3

4

5  ----------------------------------------x

6  CHARLENE CARTER,

7                    Plaintiff,

8  v.

9  SOUTHWEST AIRLINES CO. and
   TRANSPORT WORKERS OF AMERICA,
10 LOCAL 566,

11                   Defendants.

12

13 ----------------------------------------x

14

15

16           TRANSCRIPT OF THE TRIAL

17      BEFORE THE HONORABLE BRANTLEY STARR

18         UNITED STATES DISTRICT JUDGE

19

20            V O L U M E  5

21

22              Dallas, Texas

23              July 11, 2022

24               9:02 a.m.

25

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 2 of 383   PageID 15022
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1282

```
 1   A P P E A R A N C E S:

 2

     FOR THE PLAINTIFFS:
 3
         NATIONAL RIGHT TO WORK FOUNDATION INC.
 4           8001 Braddock Street
             Suite 600
 5           Springfield, Virginia   22160
         BY:  MATTHEW B. GILLIAM, ESQ.
 6           mgb@nrtw.org

 7

 8       PRYOR & BRUCE
             302 North San Jacinto
 9           Rockwall, Texas  75087
         BY:  BOBBY G. PRYOR, ESQ.
10           MATTHEW D. HILL, ESQ.
             bpryor@pryorandbruce.com
11           mhill@pryorandbruce.com

12

13

14

15   FOR THE DEFENDANT SOUTHWEST AIRLINES CO.:

16       REED SMITH, LLP
             2850 North Harwood
17           Suite 1500
             Dallas, Texas   75201
18       BY:  PAULO B. McKEEBY, ESQ.
             BRIAN K. MORRIS, ESQ.
19           pmckeeby@reedsmith.com
             bmorris@reedsmith.com
20

21

22

23

24

25
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 3 of 383   PageID 15023
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 5 July 11, 2022                        Page 1283

```
 1   For the Defendant Union 566:

 2

 3        CLOUTMAN & GREENFIELD, PLLC
              3301 Elm Street
 4            Dallas, TX 75226
         BY:  ADAM S. GREENFIELD, ESQ.
 5            EDWARD B. CLOUTMAN, III, ESQ.
              agreenfield@candglegal.com
 6            crawfish11@prodigy.net

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   COURT REPORTER:   MS. KELLI ANN WILLIS, RPR, CRR, CSR
                       United States Court Reporter
 2                     1100 Commerce Street
                       Room 1528
 3                     Dallas, Texas  75242
                       livenotecrr@gmail.com
 4

 5           Proceedings reported by mechanical

 6   stenography and transcript produced by computer.

 7

 8                       *  *  *  *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 5 of 383   PageID 15025
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1285

1                          I N D E X

2          Informal Charge Conference (off the record)

3

4                      W I T N E S S E S

5    CHARLENE CARTER

6       Cont. Direct Examination by Mr. Pryor ...... 1288

7       Cross-Examination by Mr. McKeeby .......... 1307

8       Cross-Examination by Mr. Greenfield ........ 1405

9

10   BRETT NEVARES

11      Via Zoom deposition ....................... 1481

12

13   MAUREEN EMLET

14      Direct Examination by Mr. McKeeby ......... 1511

15      Cross-Examination by Mr. Greenfield ........ 1551

16

17   NAOMI HUDSON

18      Direct Examination by Mr. McKeeby .......... 1558

19      Cross-Examination by Mr. Greenfield ........ 1571

20

21   ED SCHNEIDER

22      Direct Examination by Mr. McKeeby ......... 1573

23      Cross-Examination by Mr. Greenfield ........ 1607

24

25

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 6 of 383   PageID 15026
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1286

1

2                    E X H I B I T S

3

4    Trial Exhibit 38  .................... 1295

5    Trial Exhibit 130 .................... 1301

6    Trial Exhibit 42 .................... 1301

7    Trial Exhibit 126 .................... 1306

8    Trial Exhibit 127 .................... 1306

9    Trial Exhibit 128 .................... 1306

10   Trial Exhibit 129 .................... 1306

11   Trial Exhibit 118 .................... 1313

12   Trial Exhibit 40 .................... 1327

13   Trial Exhibit 2  .................... 1392

14   Trial Exhibit 83 .................... 1516

15   Trial Exhibit 44 .................... 1524

16   Trial Exhibit 11 .................... 1533

17   Trial Exhibit 7 .................... 1536

18   Trial Exhibit 9 .................... 1543

19   Trial Exhibit 16 .................... 1546

20   Trial Exhibit 103 .................... 1592

21

22

23

24

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1287

```
1                   - P R O C E E D I N G S -
2               (Informal charge conference off the
3    record.)
4               THE COURT:  You can be seated.  Except for
5    you, Mr. Pryor, you've got nowhere to sit.
6               Okay.  So now we are on the record.  We
7    are in Day 5 of trial.  Let's do lightning round of
8    appearances right quick just to start off the day.
9               MR. GILLIAM:  Bobby Pryor, Matt Gilliam,
10   and Matt Hill for Plaintiff Charlene Carter.
11              THE COURT:  Thank you.
12              MR. McKEEBY:  Paulo McKeeby and Brian
13   Morris for Defendant Southwest Airlines.
14              THE COURT:  Thank you.
15              MR. GREENFIELD:  Adam Greenfield and
16   Edward Cloutman III on behalf of TW Local 566.  We
17   also have our corporate representative, Michael
18   Massoni, at the table.
19              THE COURT:  Thank you.
20              So, now, in our off-the-record informal
21   charge conference, Mr. Greenfield, you raised the
22   issue of a request for leave to add an affirmative
23   defense.  Can you make that request on the record
24   for us?
25              MR. GREENFIELD:  Yes, your Honor.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1288

1             We make a request to add in an affirmative

2   defense on the issue of undue hardship on behalf of

3   the Union pertaining to religious accommodation

4   rights.

5             We believe there is no undue prejudice

6   caused by adding in this affirmative defense.  In

7   fact, discovery has been ongoing throughout the

8   trial, and we believe, thus, adding an affirmative

9   defense causes no prejudice at this point.

10            THE COURT:  Understood.

11            So I will say that out of consistency,

12  since I did not allow a late amendment to seek

13  punitive damages under the RLA claim from the

14  plaintiff, then out of consistency I will overrule

15  your request for this affirmative defense.

16            With that, we can bring in the jury.

17            THE COURT SECURITY OFFICER:  All rise for

18  the jury.

19            (The jurors entered the courtroom.)

20            THE COURT:  Thank you.  You can be seated.

21            Okay.  Mr. Pryor, you can continue to

22  question the witness.

23            DIRECT EXAMINATION (continued)

24  BY MR. PRYOR:

25  Q.   Good morning, ladies and gentlemen.

```
1        Good morning, Ms. Carter.
2    A.   Good morning.
3    Q.   Ms. Carter, when we spoke last on Friday, you
4    had received a call from Mr. Schneider informing you
5    that you were terminated.
6        Do you recall that?
7    A.   Yes, I do.
8    Q.   I want to back up to the fact-finding meeting
9    that has been talked about in this matter where the
10   claims against you were investigated by Southwest
11   Airlines.
12       Do you recall that?
13   A.   Yes, I do.
14   Q.   In the fact-finding meeting, did you inform
15   Southwest Airlines of your religious beliefs?
16   A.   I did.  I told them I was a Christian.
17   Q.   Did you tell them how that related to you
18   sending the videos and the communications that you
19   did?
20   A.   Yes, I did.
21   Q.   Did you tell them it was related?
22   A.   Yes, I did.  I told them that the reason -- I
23   mean, it was just because the Union spent the money,
24   but also because of my religious beliefs.
25   Q.   Did you tell them about your communications in
```

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 10 of 383  PageID 15030
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1290

1  regard to union activity?

2  A.   Yes, I did.

3  Q.   What did you tell them?

4  A.   Well, I told them that everything that I had

5  sent was only to my union president and after what

6  they had done and gone to the Women's March.

7  Q.   And they've talked about some Facebook posts as

8  a nexus.

9       With the exception of the lanyard, which the

10 jury can decide if that can be read or not, but with

11 the exception of that, were there any Facebook posts

12 even within 18 months that remotely mentioned

13 Southwest Airlines?

14 A.   No.  And the thing is, is they had to go in and

15 search my pictures.  They're not even posts -- I

16 mean, you would have to search forever.

17      But they actually went in and searched my

18 pictures to find a nexus.

19 Q.   Were these pictures more than three years old?

20 A.   Yes, they were.

21 Q.   Were some more than five years old?

22 A.   I believe four, going into five, yes.

23 Q.   At any time did Southwest Airlines offer to

24 accommodate your union activity or religious

25 beliefs?

```
 1  A.    No.
 2  Q.    At any time did they, for instance, offer, if
 3  you will take off these nexus posts on Facebook
 4  regarding Southwest, then you can post regarding
 5  your religious beliefs?
 6           MR. McKEEBY:  Object to leading.
 7           THE COURT:  I'll allow it.
 8           THE WITNESS:  No.
 9  BY MR. PRYOR:
10  Q.    At any time did they offer you any
11  accommodation regarding your union activity?
12  A.    No.  As a matter of fact, they just called her
13  a flight attendant.  They never even said her name.
14      I knew who I sent them to, and it was only one
15  person.
16  Q.    By the way, the communications that you engaged
17  in with your union and your union president and your
18  post on your Facebook page, did you do those at the
19  workplace?
20  A.    No.
21  Q.    Did you send them to anyone at their workplace?
22  A.    No, I did not.
23  Q.    Counsel in opening, I think one of the
24  questions was about that you think you can just say
25  whatever you want.
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 12 of 383   PageID 15032
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1292

1       Are you asking this jury to allow you to engage

2   in illegal speech?

3   A.   No, not in illegal speech, no.

4   Q.   So you recognize limitations?

5   A.   Yes.

6   Q.   As a matter of fact, you recognize limitations

7   had you been communicating in the workplace as

8   opposed to not?

9           MR. McKEEBY:  Objection, leading.

10          THE COURT:  Sustained.

11  BY MR. PRYOR:

12  Q.   Do you have -- do you believe you should have

13  unfettered rights in the workplace to engage in

14  certain speech?

15  A.   In the workplace, there are certain things

16  that, you know -- I mean, I don't go around harming

17  people at the workplace.  I never have.

18  Q.   Ma'am, there is -- we've got a continuing

19  objection on this in responding to the questions

20  raised about that you were offered your job back.

21       Do you recall --

22  A.   Yes.

23  Q.   -- in opening, questions of Mr. Schneider?

24  A.   Yes.

25  Q.   Were you offered your job back in a manner in

1  which you could engage in free speech and religious

2  speech on your Facebook?

3  A.    No.  And then -- so let me back up.

4      They said they were going to reduce it in time

5  served for 30 days, or a 30-day suspension.

6      They also gave me what is called a last-chance

7  agreement.  And that last-chance agreement, first of

8  all, would put a bad letter, which, you know, I was

9  a good employee.  But they were going to put a bad

10  letter in my file for 24 months, which exceeded,

11  even in our contract, which was 18 months.

12      They also wanted me to sign an NDA,

13  non-disclosure, for the Union and for the company,

14  and they also wanted to strip my rights away if I

15  ever had any other issues to sue them, the company,

16  and the Union.

17      So what they really wanted me to do is just

18  stay quiet.

19      And now looking back, when I was called in on

20  that day -- and I'm so thankful I didn't sign it --

21  because Brian Talburt was already turning others in.

22  My name was on that list.

23      So I know of another employee that they did

24  this to, and she was about to go back out on line,

25  and they --

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 14 of 383   PageID 15034
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                    Page 1294

1            MR. McKEEBY:  Objection, foundation.

2            She's talking about another employee.  I

3    don't know how she knows --

4            MR. PRYOR:  It's her understanding.

5            THE COURT:  Sustained.  She can clarify.

6    BY MR. PRYOR:

7    Q.   Okay.  Go ahead.  You can finish.

8    A.   Okay.  So --

9            MR. McKEEBY:  No.  I mean, there needs to

10   be a foundation laid as to how she knows about this

11   other employee.

12           THE WITNESS:  She's a friend.

13           THE COURT:  I will let you ask the

14   foundation question.

15   BY MR. PRYOR:

16   Q.   Okay.  I've got limited time here.

17       Where did this understanding come from that you

18   have regarding how this last-chance agreement would

19   be dealt with?  Did you have a union rep?

20   A.   I did.

21   Q.   And what were you told?

22   A.   She basically said it would be like a death

23   sentence if I signed it again, or if I signed it.

24   Q.   Not only that, you weren't willing to give up

25   your rights to engage in union complaints and

1   freedom of religion?

2   A.   Correct.

3              MR. PRYOR:  Move for the admission of

4   Exhibit 38.

5              THE COURT:  38.  Any objection to 38?

6              MR. McKEEBY:  No objection from Southwest.

7              MR. GREENFIELD:  One moment, your Honor.

8              No objection, your Honor.

9              THE COURT:  Okay.  38 is in.  We will

10  publish.

11             (The referred-to document was admitted

12      into evidence as Trial Exhibit 38.)

13             MR. PRYOR:  I ask to publish it to the

14  jury, your Honor.

15             THE COURT:  It is published.

16             MR. PRYOR:  Okay.  Thank you.

17  BY MR. PRYOR:

18  Q.   Ma'am, let me ask you a little bit about your

19  damage claim.

20  A.   Okay.

21  Q.   I think you were crying on your floor with your

22  husband praying when you found out you had been

23  terminated.

24             MR. McKEEBY:  Objection, leading.

25             MR. PRYOR:  I'm laying the predicate for

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 16 of 383   PageID 15036
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1296

1  where we left off.

2          THE COURT:  You can do it.

3  BY MR. PRYOR:

4  Q.   Is that where we were?

5  A.   Yes, that is correct.

6  Q.   And again, I have limited time, but that point

7  in 2017 to now, has that caused stress in your life?

8  A.   It has caused so much stress in my life, but

9  what really gets me is my daughter.

10  Q.   And the impact on your family has an impact on

11  you?

12  A.   Correct.

13  Q.   Okay.  What is a walking stroke?

14  A.   So that's when you don't have -- my blood

15  pressure was spiking so high and it was going -- I

16  can't even explain it.  But I wasn't getting enough

17  oxygen to my brain even though I was -- I didn't

18  pass out.

19       But I had -- my doctor called it I was in a

20  fight-and-flight response in a constant manner.  I

21  wasn't eating, I wasn't sleeping.

22       I mean, my job meant everything to me.  It was

23  my career.  It was the way I provided for my family

24  along with my husband.  And on top of that, I loved

25  my job.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                        Page 1297

1        But I ended up in the hospital.  I was on

2    another -- I had another venture, which I knew I had

3    to do after I lost my job.  And I ended up in the

4    emergency room.  I have six hours that I cannot

5    recall, and I thought I had been drugged.

6        So I was able -- my husband told me, he said,

7    "You've got to get to the hospital.  You are not

8    talking" --  I was on the phone with him.  I was in

9    St. Louis, Missouri.

10       This was between the time that I had my job

11   taken away from me and my second step meeting, and I

12   was preparing for all of that as well.

13       I went to dinner with a business partner, and

14   he said I just keep repeating, repeating, repeating,

15   repeating everything that I was saying, and he

16   thought it was really odd.

17       But I drove myself back to the -- I don't even

18   remember driving back to the hotel.

19       So I got to the hospital.  They drug tested me.

20   They did an MRI.  But he just said it's --

21             MR. McKEEBY:  Objection, hearsay.

22             MR. PRYOR:  It's her understanding, your

23   Honor.

24             THE COURT:  I'll allow it.

25             THE WITNESS:  He said it was due to the

1  fact that I had so much stress in the

2  fight-and-flight response that it caused my blood

3  pressure to rise to an extreme level, and my heart

4  was doing racing and then stopping and then racing

5  and stopping.  It was just constant.

6          And physiology in your body, it changes

7  you.  I was later diagnosed just by, from my

8  counselor, because I had to go to some counseling

9  for this, with a mild case of PTSD.

10  BY MR. PRYOR:

11  Q.   Posttraumatic stress disorder associated with

12  losing your job?

13  A.   Yeah.  After 20 years --

14          MR. McKEEBY:  Objection, leading, and it

15  also is asking the witness to render essentially an

16  expert opinion as to the causation of this PTSD.

17          THE COURT:  Sidebar.

18          (Thereupon, the following proceedings were

19      had at sidebar:)

20          THE COURT:  Now state your objection.

21          MR. McKEEBY:  My objection is that he's

22  asking her to link her PTSD to her employment.  That

23  is something that an expert can do, but she is a lay

24  witness and she can't do that.

25          And moreover, it's hearsay, because she's

 1  talking about what a doctor told her about that

 2  issue.

 3            So it should be excluded on both of those

 4  grounds, particularly the first.

 5            MR. GREENFIELD:  I would like to add in

 6  also a hearsay objection that she's saying these

 7  things as if they are true, but not -- not any sort

 8  of mental impression or how she acted or actions she

 9  took because of the information.

10            MR. PRYOR:  PTSD, I simply defined what

11  the term meant.  The other is her understanding of

12  her condition and what caused it.

13            It's totally appropriate.  If they want to

14  cross-examine her, they can.

15            THE COURT:  I think it is offered for its

16  truth is the problem.  So right now we are on to

17  damages, so it's a prove-up on damages.  So I will

18  strike that.

19            MR. PRYOR:  Okay.

20            (Thereupon, the sidebar was concluded and

21       the following proceedings were held in open

22       court:)

23            THE COURT:  Okay.  So I am sustaining that

24  objection, striking that last question and answer.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1300

```
 1  BY MR. PRYOR:
 2  Q.   Did you understand that your condition was
 3  stress-related?
 4  A.   Yes.
 5  Q.   Did you ever have a walking stroke before being
 6  terminated by Southwest Airlines?
 7  A.   No.  I never knew what it was.
 8  Q.   Did you -- did anyone ever tell you that you
 9  had posttraumatic stress disorder until you were
10  terminated from American Airlines -- Southwest
11  Airlines?
12  A.   No.
13  Q.   And did you have to go on medication?
14  A.   I did.  Blood pressure.
15  Q.   Blood pressure medication?
16       Okay.  Now, you talked about the impact on your
17  family, your daughter, your own health.
18       Is there any amount of money we could offer you
19  to risk your life for this?  If we said, Hey, we
20  will give you this money to go through this again?
21  A.   No, not at all.
22  Q.   If I offered you a million bucks, you would
23  take it?
24  A.   To go through this again?
25  Q.   Yes.
```

```
 1   A.    No.

 2   Q.    Let me ask about, did you try and get a job

 3   while -- after you got fired?

 4   A.    I did, but I was also working on a business

 5   venture as well.  So I applied to Jet Blue, Delta,

 6   and United.  I had an interview with United.  And

 7   they turned me down.  And then Delta never sent me

 8   the link for the online video, and we still to this

 9   day don't know why that happened.

10   Q.    Did you apply with Frontier as well?

11   A.    I did.

12   Q.    Let me show you Exhibits --

13            MR. PRYOR:  We move for the admission of

14   Exhibit 130 and Exhibit 42.

15            THE COURT:  130 and 42.  Any objections to

16   130 or 42?

17            MR. GREENFIELD:  None from the Union, your

18   Honor.

19            MR. McKEEBY:  No objection.

20            THE COURT:  Okay.  They are admitted into

21   evidence and we are publishing.

22            (The referred-to documents were admitted

23        into evidence as Trial Exhibits 130 and 42.)

24   BY MR. PRYOR:

25   Q.    Ma'am, is Exhibit 130 a copy of your W-2?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1302

```
 1              MR. PRYOR:  It looks like 2012.  I'm not
 2   sure how far it's going to go.  Keep scrolling.
 3              THE WITNESS:  Yes, those are my W-2s.
 4              MR. PRYOR:  And is that 130?
 5              MR. HILL:  130, yes, sir.
 6              MR. PRYOR:  Then let's look at 42.  There
 7   it is.
 8   BY MR. PRYOR:
 9   Q.   There's some additional years of W-2 and
10   earning summaries?
11   A.   Yes.
12   Q.   Now, a couple of years before you were
13   terminated, you didn't fly as much as you usually
14   did, true?
15   A.   True.
16   Q.   Can you explain to us why?
17   A.   When we moved to Denver, my husband had -- he
18   had been sober for six years, and when we moved to
19   Denver, I started flying more.  And I was going to
20   fly more because my daughter was a little bit older.
21   But as soon as we got there, the drinking started
22   again pretty heavily.
23       One of my very first trips -- I actually was on
24   a trip with a friend of mine who is in the audience,
25   Kim Hensley -- and came back that night to my home
```

1  being all lit up and both garage doors open and the

2  car door to his car in his garage open.

3        And I thought, Oh, my gosh.  I mean, something

4  happened, okay?

5        I walked into the house, and the dog is

6  running -- I have a 120-pound bloodhound, and she's

7  just running all over the house.  Lights are all on

8  in the house, the TV is blaring, and my husband is

9  drunk, just wasted, on the couch.

10        My daughter at that time was nine -- because

11  we've been in Denver now 10 years -- she was nine.

12        And I'm like, Where is -- where is Hannah?

13        Well, she's upstairs.

14        And that was the first time I knew I could not

15  leave Hannah alone at home with my husband while I

16  flew.

17  Q.   Okay.  And has that situation gotten to the

18  point that, in fact, you can fly?

19            MR. McKEEBY:  Objection, leading.

20            THE COURT:  I'll allow it.

21            THE WITNESS:  It got to the point where,

22  no, I couldn't leave her, because it happened

23  several times.

24  BY MR. PRYOR:

25  Q.   Now.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

| 3:17-cv-02278-X | Vol 5 July 11, 2022 | Page 1304 |
|---|---|---|

```
 1  A.    Oh, now?
 2  Q.    Charlene, I just don't have time to go through
 3  everything you went to.  The jury --
 4  A.    She's 19 and going off to college.
 5  Q.    Okay.  So let me go back.  Before you were
 6  terminated, did you have every intention of both
 7  working full-time and making Southwest Airlines your
 8  career?
 9  A.    Yes.
10  Q.    And you are able to work full-time?
11  A.    Yes.
12  Q.    You would like to do that?
13  A.    Yes.
14  Q.    When were you able to go back full-time?
15  A.    When?
16  Q.    Yes.
17  A.    Tomorrow.
18  Q.    I'm sorry?
19  A.    I could go back tomorrow.
20  Q.    Okay.  Let me ask you about the Union's duty of
21  fair representation to you.
22        You liked Chris, the gentleman that was at the
23  fact-finding meeting, he's from the Union?
24  A.    Yes.
25  Q.    And do you think, however, though, that the
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 25 of 383   PageID 15045
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1305

1  Union reporting you to cause the fact-finding

2  meeting was a fair representation of you?

3  A.    Yes.

4  Q.    Do you think it was a fair representation of

5  them --

6  A.    No, no.

7  Q.    -- to report you?

8       Listen to my question.  Understand we are not

9  talking about Chris now, we are talking about the

10  report that was made.

11      Do you think that the Union was giving you fair

12  representation when they reported you?

13  A.    No.

14           MR. PRYOR:  Pass the witness.

15           Before I do that, I would like to offer

16  Exhibits 126, 127, 128 and 129.  They are medical

17  bills and counseling bills.

18           THE COURT:  So 126, 127, 128 and 129 is

19  what you are offering?

20           MR. PRYOR:  Yes.

21           THE COURT:  Okay.  Any objection on those

22  exhibits?

23           MR. McKEEBY:  No objection.

24           MR. GREENFIELD:  No, your Honor.

25           THE COURT:  Okay.  So they are admitted.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 26 of 383   PageID 15046
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1306

```
 1              (The referred-to documents were admitted
 2         into evidence as Trial Exhibits 126 through
 3         129.)
 4              THE COURT:  Do you want to flash them
 5   right quick for the jury?
 6   BY MR. PRYOR:
 7   Q.   And while they are showing those, you went to
 8   counseling, ma'am?
 9   A.   Yes, I did.
10   Q.   Why did you go to counseling?
11   A.   Well, because I was having struggles about
12   losing my job, and on top of that, now my husband
13   was drinking even more because of the marriage --
14   you know, this caused so many issues with my
15   marriage and it caused so many issues especially
16   with my daughter.  She had to see this and she had
17   to go through all of this.  I lost five years with
18   her doing this.
19   Q.   And the struggles that you had with your
20   husband when he was dealing with the drinking issue,
21   did the problems that you were dealing with from not
22   having your job and having been fired by Southwest
23   Airlines, did that make it better or worse?
24   A.   Worse.
25   Q.   All right.  Thank, you ma'am.
```

 1              MR. PRYOR:  Pass the witness.

 2              THE COURT:  Okay.  Mr. McKeeby.

 3              MR. McKEEBY:  Thank you, Your Honor.

 4                     CROSS-EXAMINATION

 5     BY MR. McKEEBY:

 6     Q.   Good morning, Ms. Stone -- Ms. Carter.

 7     A.   Good morning.

 8     Q.   Let's talk about the Step 2 hearing.  When I

 9     use that term, you know what I'm referring to?

10     A.   I do.

11     Q.   And that was -- at the time of the Step 2

12     hearing, I think we're talking about mid March of

13     2017, is that fair?

14     A.   I believe so.  It was March or April.  I don't

15     remember when the second step was.  It was a little

16     while.

17     Q.   You know what, I don't remember either.  We

18     might show you some documents.

19          Here is the question, though:  At the time of

20     the Step 2 hearing, you had already received the

21     termination decision from Mr. Schneider?

22     A.   Correct.

23     Q.   And so the Step 2 hearing was an opportunity

24     for you essentially to appeal that decision, is that

25     fair?

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 28 of 383  PageID 15048
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1308

1  A.    Correct.

2            MR. PRYOR:  Object, limine, your Honor.

3            THE COURT:  I'll allow it.

4            MR. PRYOR:  And continuing objection.

5            THE COURT:  I will allow that continuing

6  objection.

7  BY MR. McKEEBY:

8  Q.    Describe for the jury what the Step 2 hearing

9  looked like.

10 A.    Well, the Step 2 hearing looked like -- I had

11 Becky Parker, who was a representative for the Union

12 for grievances, and then I my liaison, Beth Ross,

13 with me.

14      It was Mike Sims across the table from me, and

15 then I can't remember who he had sitting there

16 taking notes.  It may have been Edie Barnett.  I

17 just don't remember.

18 Q.    I've been calling it, and I think we have in

19 this case, a hearing.  But you weren't under oath or

20 anything like that, were you?

21 A.    No.

22            MR. PRYOR:  Your Honor, can we approach?

23            THE COURT:  You may.

24            (Thereupon, the following proceedings were

25      had at sidebar:)

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 29 of 383   PageID 15049
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1309

1              MR. PRYOR:  Your Honor, the question he

2  asked was:  You had a chance to appeal your

3  termination.  That's the Step 2 process.

4              That's not the issues that are in front of

5  the jury today, and I think it's confusing to them.

6  I think it needs a limiting instruction to the jury

7  that Step 2 is not the issues we are about here

8  today.  I would ask for that.

9              THE COURT:  I understand.  So I will let

10  you bring that up on redirect.

11              MR. PRYOR:  She's not a lawyer, and I have

12  very limited time.  Southwest has gotten about 30

13  limiting instructions from the Court.

14              THE COURT:  I think you asked earlier a

15  question of her that she answered, which was:  Did

16  they consider your religious claims or your union

17  speech claims?  I think she can answer that again

18  with one sentence.

19              Now, do I need to put it in the jury

20  charge?  That's another question.

21              MR. PRYOR:  I think the jury needs it in

22  context, but I appreciate it.  You're overruling my

23  request?

24              THE COURT:  I am.

25              MR. PRYOR:  Thank you, your Honor.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 30 of 383   PageID 15050
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1310

```
 1              (Thereupon, the sidebar was concluded and
 2         the following proceedings were held in open
 3         court:)
 4              THE COURT:  You can proceed.
 5   BY MR. McKEEBY:
 6   Q.   Did you have any -- you mentioned the name Mike
 7   Sims.  Had you met Mr. Sims before the Step 2
 8   hearing?
 9   A.   Yes, I know Mike Sims from years ago.
10   Q.   What do you think of him?
11   A.   He's a nice guy.  He used to work for the
12   Union.  He actually was a flight attendant.
13   Q.   And you would agree with me that he was fair to
14   you during the hearing, was he not?
15   A.   They all were fair to me.
16   Q.   And he gave you the chance during the Step 2
17   hearing for you to tell your side of the story?
18   A.   Correct.
19   Q.   I mean, do you remember in your deposition you
20   made the statement that Mr. Sims was amazing?
21   A.   I mean, he listened to me.  I had a huge case
22   that I put in front of him.
23   Q.   And part of that case involved you presenting
24   documents to Mr. Sims, correct?
25   A.   That is correct.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

| 3:17-cv-02278-X | Vol 5 July 11, 2022 | Page 1311 |

```
 1  Q.   And there were quite a number of documents that
 2  you submitted to him at the beginning of the
 3  hearing, correct?
 4  A.   Yes, because I had to make my case.
 5  Q.   You had to make your case.
 6  A.   Uh-huh.
 7  Q.   Because you wanted your job back, correct?
 8  A.   Yes.
 9  Q.   That was your goal at the Step 2 hearing was to
10  get your job back?
11  A.   Yes, sir.
12  Q.   And you came prepared with a packet of
13  documents that the Union assisted you in compiling,
14  fair?
15  A.   No, the Union didn't do any of that work.  I
16  did it all on my own.
17  Q.   Did it all on your own.  Fair enough.
18           MR. McKEEBY:  I would like to bring up
19  Exhibit 118.
20           This is the first page.  Let's go to the
21  next page.
22           MR. PRYOR:  Is this in evidence?
23           THE COURT:  This is muted from the jury.
24  So just raising it with the witness for now.
25
```

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 32 of 383  PageID 15052
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1312

```
 1  BY MR. McKEEBY:
 2  Q.   Does this look like at least the first part of
 3  the packet?
 4           MR. PRYOR:  Object to improper use of a
 5  document that's not in evidence.  He's not asking to
 6  refresh her recollection.
 7           MR. McKEEBY:  I've got to establish --
 8           THE COURT:  You can set the predicate.
 9  BY MR. McKEEBY:
10  Q.   Does this look like the packet of documents
11  that you provided to Mr. Sims at the Step 2 hearing?
12  A.   It is, but it says "Audrey Stone" on it.
13  Before it said "Audrey Stone, TWU."
14  Q.   Okay.  If I told you that this packet of
15  documents was -- hold on -- 148 pages, would you
16  agree?
17  A.   I don't know how many pages it was.
18  Q.   I'm not going to make you count them.  It will
19  be into evidence, and the jury can do so if it
20  chooses.
21       But I think you did tell me that you and
22  Mr. Sims, at the Step 2 hearing, went through page
23  by page of these documents that you had assembled,
24  correct?
25  A.   It wasn't page by page, but it was -- I had
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 33 of 383   PageID 15053
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1313

1  them clipped together and I presented that

2  information to him.  Because there were several

3  things that were in each of those packets.  And I

4  was able to explain what was in those packets, and

5  he said that he would take a further review of that

6  after our meeting.

7  Q.   Let's go through a few of those things.

8            MR. McKEEBY:  But before I do, I move to

9  admit 118.

10            THE COURT:  Objections from -- well, last

11  night, I should say?

12            MR. PRYOR:  Your Honor, we object on

13  foundation, hearsay, and our continuing objection

14  under Step 2 and undue prejudice regarding the

15  characterization of this.

16            THE COURT:  Understood.

17            I will overrule those objections and admit

18  118.  We can publish to the jury.

19            (The referred-to document was admitted

20       into evidence as Trial Exhibit 118.)

21  BY MR. McKEEBY:

22  Q.   Let's move to page 118.10.  I just want to ask

23  you about a few of these that I don't think we've

24  talked about before, and just if you can tell me

25  what they are.

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 34 of 383  PageID 15054
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1314

1              MR. McKEEBY:  So 118.110 would be the one

2   I would want you to pull up first.

3   BY MR. McKEEBY:

4   Q.   What is this about?

5        First of all, this is an email from you to

6   someone named Jim Little?

7   A.   Yes.  Jim Little was our executive -- well, he

8   used to be our liaison, and I dealt with him during

9   Melissa Smith's trial.  Jim Little ended up being

10  the international president of TWU.

11  Q.   So he's someone who is above the Local 556

12  level, the defendants in this case, correct?

13  A.   That is correct.

14  Q.   So in this case, you are reaching out to him

15  about a complaint that you have regarding someone by

16  the name of Don Shipman?

17  A.   Yes.  This is back in 2013 when everything

18  started to fall apart with our union.

19  Q.   I understand.  We have been looking at some old

20  documents during this case.

21             MR. McKEEBY:  Why don't we go to 118-112.

22  BY MR. McKEEBY:

23  Q.   It looks like another complaint to the

24  international, Mr. Little, about Don Shipman, is

25  that fair?

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 35 of 383  PageID 15055
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1315

```
 1   A.    That is correct.

 2              MR. McKEEBY:  How about 118-116.

 3   BY MR. McKEEBY:

 4   Q.    Just take a second to look that.  It looks like

 5   another email from you to Mr. Little of the

 6   international?

 7   A.    Yes.  It's because they came in and removed our

 8   elected officials again.

 9   Q.    So here you are complaining again to the

10   international union, correct?

11   A.    Correct.

12              MR. McKEEBY:  Okay.  We can take that

13   down.

14   BY MR. McKEEBY:

15   Q.    During the Step 2 meeting with Mr. Sims -- by

16   the way, Mr. Sims hasn't appeared before the jury in

17   this case yet, has he?

18   A.    He had a deposition, but not in here.

19   Q.    During the Step 2 hearing, you told Mr. Sims

20   that you loved your job.

21   A.    I still do.

22   Q.    And you told him that?

23   A.    Yes.

24   Q.    And you told him that you loved Southwest,

25   didn't you?
```

1  A.   Yes.  I love the company that I started out

2  with, yes.

3  Q.   And your objective at that Step 2 hearing was

4  to get your job back?

5           MR. PRYOR:  Object, asked and answered.

6           MR. McKEEBY:  You can answer.

7           Or wait.  I'm sorry.

8           THE COURT:  I'll allow it.

9           THE WITNESS:  Yes.

10  BY MR. McKEEBY:

11  Q.   And you told him that, didn't you?

12  A.   Told him --

13           MR. PRYOR:  Object, asked and answered.

14  BY MR. McKEEBY:

15  Q.   Told Mr. Sims that?

16           THE COURT:  I'll allow it.

17           MR. PRYOR:  Object, asked and answered.

18           THE WITNESS:  That I wanted my job?

19  BY MR. McKEEBY:

20  Q.   Yes.

21  A.   Yes.

22  Q.   You also told him during the Step 2 hearing

23  that you could have made a better choice regarding

24  Audrey?

25  A.   Yes, I could.  I could have taken those into

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1317

1  her office and talked to her.  Although she doesn't

2  respond to us, she never took my calls.  I mean, she

3  was pretty non-responsive as a union president.

4  Q.   I understand all of that.

5       But you didn't say all of that to Mr. Sims.

6  What you told Mr. Sims is, I could have made a

7  better choice regarding Audrey?

8           MR. PRYOR:  Object, improper use of

9  whatever he's referring to, he has to show her.

10          THE COURT:  No speaking.  You can ask for

11 a sidebar if you want to.

12          MR. PRYOR:  No.

13          MR. McKEEBY:  I will tell you what.  I

14 will do exactly what counsel suggests.  Let me go

15 ahead and pull up but don't introduce Exhibit 119.

16          MR. PRYOR:  It's not for -- object to, if

17 he's offering it.

18          You can show the witness --

19          MR. McKEEBY:  I am going to show the

20 witness.

21          MR. PRYOR:  He can make faces if he wants

22 to.

23          THE COURT:  Hold on, Counsel.

24          Okay.  You can set the predicate with the

25 witness.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 38 of 383   PageID 15058
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1318

1          MR. McKEEBY:  I'm headed this way, but --

2          THE COURT:  You can set the predicate with

3   the witness.

4          MR. McKEEBY:  Okay.  I'm sorry.

5          MR. PRYOR:  I'm simply asking the witness

6   be treated fairly.

7          MR. McKEEBY:  I'm going try to treat --

8          THE COURT:  You can ask the predicate to

9   the witness.

10          MR. McKEEBY:  Incredible to hear that

11   coming from Mr. Pryor.

12          But I will move on and ask that the

13   witness look at page 119-point -- hold on -- 15.

14   BY MR. McKEEBY:

15   Q.   I will represent to you that these are the

16   notes from the Step 2 hearing, and I understand that

17   you haven't seen these before.

18       But at the very bottom, it says, "I could have

19   made" --

20          MR. PRYOR:  Object, improper use of a

21   document not in evidence.  Improper impeachment.  He

22   hasn't established an inconsistency or allowed her

23   to comment on it.

24          THE COURT:  Sustained.

25          MR. McKEEBY:  She said she wasn't sure

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1319

```
 1  that she remembered that.

 2            THE COURT:  Sidebar.

 3            (Thereupon, the following proceedings were

 4       had at sidebar:)

 5            MR. McKEEBY:  I think that is an

 6  inconsistency.

 7            THE COURT:  She couldn't remember what?

 8            MR. McKEEBY:  She couldn't remember if she

 9  said, "I should have made a better choice regarding

10  Audrey."

11            MR. PRYOR:  She absolutely said she could

12  make a better choice.

13            THE COURT:  I thought she admitted that

14  she could have by talking in person.

15            MR. PRYOR:  Yes.  So how is -- and this is

16  someone else's notes.

17            (Thereupon, the sidebar was concluded and

18       the following proceedings were held in open

19       court:)

20            THE COURT:  All right.  I will sustain

21  that.  You can ask a new question.

22  BY MR. McKEEBY:

23  Q.   Did you also tell Mr. Sims during the Step 2

24  hearing that this has nothing to do with Southwest,

25  it's between you and the Union, or words to that
```

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 40 of 383  PageID 15060
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1320

```
 1  effect?

 2          MR. PRYOR:  Once again, your Honor --

 3          THE COURT:  No speaking objection, just

 4  code.

 5          THE WITNESS:  I meant that --

 6          THE COURT:  Hold on.

 7          MR. PRYOR:  Step 2 issue.  The very nature

 8  of this question mischaracterizes the Step 2

 9  hearing.

10          THE COURT:  Okay.  I will allow the

11  question.

12          THE WITNESS:  Can you ask that question

13  again?

14          THE COURT:  You can ask the question

15  again, Mr. McKeeby.

16          MR. McKEEBY:  I could if I could remember

17  it.

18          THE COURT:  I can read it back.

19          Did you also tell Mr. Sims during the

20  Step 2 hearing that this has nothing to do with

21  Southwest, it is between you and the Union, or words

22  to that effect?

23          You can answer.

24          THE WITNESS:  Okay.  What I meant in my

25  Step 2 meeting was when I sent that information to
```

 1  my union president that it had nothing to do with

 2  Southwest Airlines, it wasn't done at Southwest

 3  Airlines, Southwest Airlines brought me in for a

 4  fact-finding meeting and they now are involved.

 5  BY MR. McKEEBY:

 6  Q.   And you also said during the Step 2 hearing

 7  that you would not do it again, you wouldn't send

 8  messages like that again, did you not?

 9  A.   I don't recall that.  You are going to have to

10  show that to me.

11  Q.   Well, I'm not going to do that.  I will do that

12  otherwise.

13  A.   If I could have gone to a union meeting, I

14  could have taken the exact same information, shown

15  that at the meeting, and I would have never been

16  turned in.

17       The way they did this was to use the social

18  media policy against me.  Because I was an objector,

19  I couldn't do the same as an actual member, but I

20  still paid dues.

21  BY MR. McKEEBY:

22  Q.   Well, you had a complaint -- Ms. Stone

23  complained to Southwest, correct?

24  A.   She's my union president, and yes, it was union

25  business.  It was absolutely something that had

1  nothing to do with Southwest.  It had never been

2  done like that before.

3  Q.  It had nothing to do with Southwest until

4  Ms. Stone made a complaint to Southwest, fair?

5  A.  Correct.  And then Southwest Airlines got into

6  union business.

7  Q.  And you don't think they should have done that?

8  A.  Absolutely not.

9  Q.  Even though Ms. Stone was a fellow flight

10 attendant?

11 A.  Sir, there is a difference between when she ran

12 for president, she became the union president.  She

13 knew that there were going to be complaints or good,

14 you know, accolades coming her way from members,

15 either way, it was dealt with in the union.  There

16 is a separation between the two, and it had always

17 been that way until Audrey Stone took over.

18 Q.  But she was a fellow employee, correct?

19          MR. PRYOR:  Objection.

20          THE COURT:  I will allow it.

21          THE WITNESS:  She was a fellow employee

22 before she took the hat on as our union president

23 and her union business of what she actually did with

24 our union dues.

25

 1   BY MR. McKEEBY:

 2   Q.   So is your testimony to the jury that because

 3   she was not only a Southwest employee but a union

 4   president, you could do anything you wanted with

 5   respect to Ms. Stone?

 6   A.   No, I'm not saying I would do anything I

 7   wanted, but this had everything to do about union

 8   business.  They took these women, they spent our

 9   money, and I was complaining to my union president

10   in regards to that very thing.

11   Q.   Well, what couldn't you have done to Ms. Stone?

12   A.   What -- repeat that, please.

13   Q.   Let me change the question.

14        Is there any action you could have taken toward

15   Ms. Stone for which Southwest could have disciplined

16   you?  Or because she's a union president, you can

17   make any type of communication that you wanted to,

18   whether it violated Southwest policies or not.  Is

19   that your position?

20   A.   The communications that I had with my union

21   president would have been just like if I was at a

22   union meeting.  I could have taken the exact same

23   things and talked to that in the union meeting, and

24   Southwest could not have done a thing.

25        They used the social media policy.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1      Under -- because I'm an objector, I can't go to

2  a union meeting.  So instead, I voiced my concerns

3  about how my money was being spent.  And granted,

4  she had been using that Facebook page completely for

5  union business.

6  Q.   Let me ask a question.

7           MR. PRYOR:  I object to him interrupting

8  the witness's answer.

9           THE COURT:  I will let her finish the

10 answer briefly and then you can ask a new question.

11           MR. PRYOR:  Can you read the last

12 statement she made so she can now have it in

13 context?

14           THE COURT:  "So instead, I voiced my

15 concerns about how my money was being spent.  And

16 granted, she had been using that Facebook page

17 completely for union business."

18           THE WITNESS:  And, sir, I didn't post it

19 on her page.  It was a private message, just like an

20 email.  And I could have emailed it to her as well.

21 I just didn't have her email at that moment.

22 BY MR. McKEEBY:

23 Q.   So let me explore that a little bit.

24      Is it your position that if you had emailed

25 Ms. Stone at her Southwest email address, you

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 45 of 383   PageID 15065
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 5 July 11, 2022                        Page 1325

 1  wouldn't have been disciplined?

 2  A.    It wouldn't have been at her Southwest email

 3  address, it would have been to the Union email

 4  address.

 5  Q.    Your contention is that had Ms. Stone

 6  complained about these videos that you sent to her,

 7  if they were sent through a Union email address,

 8  your contention is you wouldn't have been

 9  disciplined?

10  A.    I think that -- and I'm just going to back up.

11       Anything that has to do with union business,

12  union activity, union -- this had clearly been a

13  Union march.  We paid for it.  That gave me the

14  opportunity, at that point, to speak my dissent

15  towards that.

16       They didn't even give us an opportunity to say,

17  Please don't go, before they went.  They never

18  brought this to the membership until we saw it in

19  the minutes, and then it was on TWU's website, 556,

20  international's website, and also the AFL-CIO

21  website.

22  Q.    I get all that.  I understand all that.  I'm

23  representing Southwest Airlines, as I know you are

24  aware.

25       And my question then to you is, when Southwest

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 46 of 383   PageID 15066
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1326

1  gets that complaint from what they regard to be a
2  co-employee, a fellow flight attendant, what would
3  you have them do, just ignore it?
4  A.   Again, I'm going to say it.  They never stepped
5  in union activity or business until Audrey Stone
6  took office.  They started turning us in under the
7  social media --
8  Q.   Can you answer my question?  Should they
9  have --
10            MR. PRYOR:  Object to the interrupting
11  again of the witness.  If he wants to make a
12  motion --
13            THE COURT:  Hold on.  Hold on.  Hold on.
14  I thought she was finished.
15            Do you have anything to add to that
16  answer?
17            THE WITNESS:  No, I don't.
18            THE COURT:  Okay.  You can ask your
19  question.
20            MR. McKEEBY:  Move to strike as
21  non-responsive.
22            MR. PRYOR:  Well, she hadn't finished her
23  answer.
24            THE COURT:  She finished her answer.  I
25  won't strike it as non-responsive.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                   Vol 5 July 11, 2022                   Page 1327

```
 1              You can ask your new question.
 2  BY MR. McKEEBY:
 3  Q.   Should Southwest have ignored the complaint of
 4  Ms. Stone?  Is that your position?
 5  A.   Yes.
 6  Q.   Thank you.
 7              MR. McKEEBY:  Let's go to Exhibit 40,
 8  please.  Move to admit Exhibit 40.
 9              MR. PRYOR:  Your Honor, we have a whole
10  host of objections.  I think we've raised them and
11  have a continuing objection.  I think they would
12  apply here.
13              THE COURT:  Understood.
14              I will overrule those objections and I'm
15  allowing Number 40 in.
16              You can publish.
17              MR. GREENFIELD:  No objection, your Honor.
18              MR. McKEEBY:  Admitted and published?
19              THE COURT:  Sorry.  I knew you had no
20  written objection.  So if you have any to add,
21  please let me know.
22              (The referred-to document was admitted
23      into evidence as Trial Exhibit 40.)
24              THE COURT:  Okay.  We are publishing.
25
```

1  BY MR. McKEEBY:

2  Q.   Can you identify this document, Ms. Carter?

3  A.   Yes, I can.  This is the last-chance agreement.

4  Q.   And we actually now have a date here.  It's

5  April 17, 2017.  Correct?

6  A.   Correct.

7  Q.   And I think, to be fair, the date that I had

8  asked you about previously was the Step 2 hearing.

9  If that's the date of the last-chance agreement,

10  what's your best guess as to when the Step 2 hearing

11  was, if you have one?

12  A.    I think it is 7 or 10 days after the -- the

13  Step 2 meeting is when they have to render a

14  decision.

15  Q.   Okay.  So then the Step 2 hearing would have

16  occurred probably 7 to 10 days prior to April 17?

17  A.   Correct.

18  Q.   How did you get this letter?

19  A.   It was sent to me in a package.

20  Q.   Was it sent directly from Southwest or was it

21  from the Union?  Or do you recall?

22  A.   You know what, I don't recall.

23  Q.   You reviewed the document?

24  A.   Uh-huh.

25  Q.   You reviewed it with your union representative?

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 49 of 383   PageID 15069
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1329

1  A.    Yes.  I talked to Beth about it, and Parker --

2  I can't think of her name -- Becky Parker.

3  Q.    She's the union representative?

4  A.    She was at the time.  But Beth Ross was my

5  liaison.

6  Q.    Let's go over some of the terms here.  Let's

7  look at the first bullet.

8        That says the company will reinstate you, the

9  grievant, Charlene Carter, as a Denver-based flight

10  attendant with no loss of seniority, correct?

11  A.    Correct.

12  Q.    That means you were getting your job back if

13  you signed the agreement?

14  A.    Correct.

15  Q.    The next bullet say you will receive no back

16  pay.

17        Did you have an understanding of what that

18  meant?

19  A.    I did.

20  Q.    And that, in fact, meant that you would not get

21  any payment for the time that you missed prior to

22  had you signed the last-chance agreement, correct?

23  A.    Correct.

24  Q.    But that wasn't a big deal to you, was it,

25  because you weren't flying very much anyway, fair?

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 50 of 383   PageID 15070
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1330

```
 1  A.   I wouldn't say it's a big deal, but no, I
 2  wasn't able to fly at that particular time.  I
 3  was --
 4  Q.   In fact, you hadn't flown at all in 2017?
 5            MR. PRYOR:  Once again, object to him
 6  absolutely stopping her from giving a full answer.
 7            THE COURT:  You can finish what your prior
 8  answer was.
 9            THE WITNESS:  Okay, contractually, and
10  because of my seniority, I was able to bid my lines
11  every month and I was able to give my trips away.  I
12  never harmed Southwest Airlines by doing so.
13  BY MR. McKEEBY:
14  Q.   Right.  And you hadn't flown at all in calendar
15  year 2017 up to this point, had you?
16  A.   You know what, I don't recall.
17  Q.   Well, we will get to that later.
18  A.   Okay.
19  Q.   It says, the next bullet says that your
20  termination will be reduced to a 30-day suspension
21  beginning March 16th, correct?
22  A.   Correct.
23  Q.   And it was actually through and including the
24  date that had already passed, so you were getting
25  time served, so to speak, fair?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

| 3:17-cv-02278-X | Vol 5 July 11, 2022 | Page 1331 |
| --- | --- | --- |

 1  A.    That is what -- yeah, that is what they told

 2  me.

 3  Q.    Let's go to the sixth bullet down about the --

 4  an exchange for the consideration.

 5        This is the description of the document that

 6  they asked you to sign in connection with this, so

 7  some type of agreement, correct?

 8  A.    That is correct.

 9  Q.    You testified to that a bit when you were

10  questioned by Mr. Pryor, correct?

11  A.    Correct.

12  Q.    And the next bullet says that, in addition --

13          MR. McKEEBY:  Can you blow that part up?

14  BY MR. McKEEBY:

15  Q.    "In addition, you are required to comply with

16  all company policies and procedures, and any future

17  violation of the Southwest Airlines workplace

18  bullying and hazing policy, the social media policy,

19  or harassment, sexual harassment, discrimination or

20  retaliation policy would result in termination."

21        Do you see that?

22  A.    Correct.

23  Q.    You would agree with me that that is just a

24  requirement that would apply to any employee of

25  Southwest Airlines, they all had to comply with

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1332

1  those policies, fair?

2  A.   Yes.

3  Q.   And the next bullet is the one that starts with

4  "This agreement will remain."

5       So this is the one that I think you talked

6  about with Mr. Pryor a moment ago where it talks

7  about something being in your file for 24 months.

8       And you objected to that period of time, do I

9  understand that correctly?

10 A.   Yes.  For one.  This was the first time that --

11 and this is what Beth Ross told me.  She goes, We

12 have never done this before.  Usually it's an

13 18-month or less.  And she did tell me that it's

14 excessive.

15 Q.   Ms. Ross, your union representative, told you

16 that?

17 A.   Yes, she did.

18 Q.   So had it been the 18 months that you believed

19 it should have been, would you have signed the

20 agreement?  Is that why we are here, the difference

21 between 18 and 24 months?

22 A.   No.

23 Q.   You still wouldn't have signed it?

24 A.   No.  Because it was -- it was taking away my

25 rights as an individual to speak to my union.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 53 of 383   PageID 15073
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1333

1  Because they were going to come back at me, and we

2  have already seen that now within testimony, that

3  Brian Talburt was going to be turning us all in

4  again.

5  Q.   But that's speculation, isn't it?  You don't

6  know that he was going to turn you in.

7  A.   No, we all knew it as flight attendants.  We

8  all knew that this is what was going on.

9       Look at what he did to Jeanna Jackson.  And

10  she's here in the courtroom today.

11            MR. McKEEBY:  Your Honor --

12            THE COURT:  Let's stick to the questions.

13  BY MR. McKEEBY:

14  Q.   You also, I think, expressed concern -- and

15  maybe that's what you are expressing just now --

16  that you might be punished for something that

17  happened in the past.

18  A.   Correct.

19  Q.   But you had already provided Southwest with

20  that packet of documents that showed all of the

21  Facebook posts that you made in the past, right?

22  The packet of documents you provided to Mr. Sims,

23  you had already given him that, right?

24  A.   On my Facebook page or on Audrey's?

25  Q.   I'm talking about the packet of documents that

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 54 of 383   PageID 15074
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1334

1  you provided to Mr. Sims.  That showed the history

2  of your Facebook communications with Ms. Stone,

3  correct?

4  A.   Yes.  On Messenger, yes.

5  Q.   Right.  So Southwest had everything, right?  Or

6  was there something else that you had posted that

7  you were worried that they might go back and find

8  and discipline you for?

9  A.   No.  And that's not what I'm talking about.

10  I'm talking about other -- and they were also

11  protected speech which we were getting turned in

12  for, because obviously it was protected for them in

13  the core group.

14      But he had gone back and he was turning people

15  in the day I got called in for this fact-finding

16  meeting.  He was looking back and trying to harm

17  others.  We knew this was going on because it had

18  been going on for quite some time, and they were

19  harming some really good people.

20  Q.   Right.  But if they went back to something that

21  had happened in the past, you could say, No, wait a

22  minute.  This document protects me because it only

23  tells me I have to comply with the policies going

24  forward.

25  A.   They would gotten me again if they found

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 55 of 383   PageID 15075
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1335

1   something that they thought was egregious or they

2   didn't like.  I'm telling you, they were firing

3   and -- Southwest Airlines --

4              MR. McKEEBY:  Your Honor, limine.

5              THE COURT:  I will say, so at this point I

6   need to cut off the answer and say that if your

7   counsel wants to ask you to supplement anything that

8   you're thinking of, that's fine.  As long as you

9   have given an answer, then the next elaboration

10  needs to be in the next round of testimony.

11             MR. PRYOR:  And maybe, your Honor, I

12  misunderstood the question.  I thought it was an

13  open-ended question that allowed her to answer.  He

14  asked.  If I misunderstood, okay.

15             THE COURT:  I will pause it now, and then

16  you can ask a new question.

17  BY MR. McKEEBY:

18  Q.   You would agree with me that had Southwest

19  disciplined you for something you had done in the

20  past, you would have the right to grieve that,

21  correct?

22  A.   No.  I would have -- no.  This right here said

23  if I broke another policy, which if, let's say they

24  found something in One Love or Sassy Stew or

25  whatever, all of the other little Facebook page

1  things that were private, that Brian had and he

2  turned in, this right here would have said, guess

3  what, in that 24-month period, you have now violated

4  again.  I was not going to sign this.

5  Q.   So your belief was that even if it happened in

6  the past, was a post that you had made prior to

7  April 17, 2017, Southwest could still discipline you

8  for that?

9  A.   It was happening.  Yes.

10 Q.   And you raised those concerns with Mr. Sims, I

11 take it?

12 A.   No.  I raised those concerns with Beth Ross and

13 with --

14 Q.   With Ms. Ross --

15          MR. PRYOR:  Objection, your Honor.

16          THE WITNESS:  She was my liaison.

17          MR. PRYOR:  He is continuously

18 interrupting her answer.  He knows what her answer

19 is.

20          THE COURT:  Hold on.  We've got to keep

21 separation between the end of the question and the

22 answer.

23 BY MR. McKEEBY:

24 Q.   Who was Ms. Ross?

25 A.   She was my liaison.

1           MR. PRYOR:  No.  Object, your Honor.  That

2  was not the question.  She was explaining what Beth

3  Ross told her, and he interrupted it.

4           THE COURT:  You can finish your

5  explanation briefly on what Ms. Ross told you and

6  then define who Ms. Ross was.

7           THE WITNESS:  Beth Ross was my liaison.

8  She's right there at the very top of that.  She was

9  my grievance specialist.

10 BY MR. McKEEBY:

11 Q.   Fair enough.

12      At no point did you request of Mr. Sims, the

13 person who you said was amazing and who was fair to

14 you, Hey, I would like to talk about some concerns I

15 have about this document?

16 A.   I raised those with Becky Parker, and she said

17 this was the best I was going to get.

18 Q.   And Becky Parker --

19 A.   And she --

20 Q.   I'm sorry.

21 A.   She's the union grievance chair, and I was

22 going through her.  I was told not to reach out to

23 anybody in the company when I was in my fact-finding

24 meeting and in my first first step meeting, that

25 this was to go through the Union.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 58 of 383   PageID 15078
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1338

1  Q.   Mike Sims never told you not to contact him,

2  did he?

3  A.   No.  My union rep, though, was the one that I

4  was dealing with with all of this.

5  Q.   But no --

6  A.   And I -- I raised those concerns with her.

7       She went to Mike Sims, I guess.  I do not know

8  that for a fact.  But she told me, This is the best

9  you are going to get, Charlene.  So I did raise

10 those concerns, but not personally with Mike Sims,

11 no, I did not.

12 Q.   And you could have?

13         MR. PRYOR:  Object.  Asked and answered.

14 She just explained why she couldn't.

15         THE COURT:  I'll allow it.

16 BY MR. McKEEBY:

17 Q.   You could have contacted Mr. Sims, you could

18 have disagreed with what the Union -- the advice

19 that the Union was giving you?  I mean, you are

20 suing them in this case.  Why couldn't you have

21 picked up the phone and contacted Mike Sims or sent

22 him an email saying, Look, I have got some real

23 concerns about this agreement and what it means.  I

24 would like to talk to you about it?

25         MR. PRYOR:  Object, asked and answered,

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 59 of 383  PageID 15079
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1339

 1  compound, argumentative.
 2          THE WITNESS:  Because that's exactly --
 3          THE COURT:  I'll allow it.
 4          THE WITNESS:  Because that is exactly what
 5  Becky Parker did for me.
 6          And at this time, sir, I wasn't able to
 7  get Mike Sims' number anyway.  I mean, I guess I
 8  could have asked Becky.
 9          But they were handling all of this.  At
10  that point I was fired.  I couldn't get online to
11  get Mike Sims' number.  And I'm not trying to be
12  evasive or anything like that.  But I was working
13  through my union.
14  BY MR. McKEEBY:
15  Q.   Understood.
16       I think you testified -- I forget if it was you
17  or Ms. Stone -- but how many -- well, I'll ask the
18  question.
19       How many times had you met Ms. Stone before
20  sending the abortion videos to her?
21  A.   One time.
22  Q.   That was in 2013?
23  A.   Correct.  At a union meeting.
24  Q.   Had you ever discuss Ms. Stone's view on
25  abortion?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1  A.    No.
 2  Q.    Did you ever discussed her religious views?
 3  A.    No.
 4  Q.    Did you know if she had any -- you testified
 5  Friday about your personal experience with abortion
 6  and how deeply that impacted you.
 7        Did you ever ask Ms. Stone if she had anything
 8  similar in her past?
 9  A.    No, I didn't.
10  Q.    Did you ever ask her if she had a family member
11  that had to deal with an abortion issue or a close
12  friend?
13  A.    No.  All of the stuff that I sent her had to do
14  with them going to the march.
15  Q.    Well, you sent her videos of aborted fetuses or
16  babies, depending on your perspective, is what you
17  said.
18  A.    And they marched for Planned Parenthood.
19  Q.    Okay.
20        And after you sent the videos to Ms. Stone, did
21  you make any effort to follow up with her with any
22  additional message?
23  A.    No, I did not.  As a matter of fact, she
24  actually sent me stuff regarding how she wanted us
25  and their committee to vote or to speak against the
```

 1  national right-to-work foundation.

 2  Q.   Right.  But you never reached out to her and

 3  said, Hey, I would like to have a little bit more of

 4  a dialogue.  I sent you those videos, I wanted to

 5  make a point, and how I would like to talk to you a

 6  little further about my intent.  Anything like that?

 7  A.   No, because she had never even reached out to

 8  me.

 9  Q.   She had a history of not responding to you, I

10  think you testified to that, correct?

11  A.   To all of the things that I was concerned about

12  of them doing to our union, yes, she never reached

13  out.

14  Q.   And you never -- you didn't complain to the

15  international like you did on the Don Shipman and

16  other issues, you didn't reach out to them about

17  Ms. Stone, did you?  About the complaints that you

18  had with respect to Ms. Stone --

19  A.   Actually, I did.  I actually made two phone

20  calls to Mr. Samuelson and then Alex Garcia, and

21  neither one of them called me back.

22  Q.   Did you send them the videos?

23  A.   No, I didn't send them the videos, but they

24  knew that they had gone to the march.

25  Q.   In fact, the only person that you sent those

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 62 of 383  PageID 15082
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1342

 1  videos to was Audrey Stone, correct?

 2  A.   My union president, yes.

 3  Q.   No other employee or anyone else at Southwest?

 4  A.   No, sir.

 5  Q.   The only one you sent them to was the person

 6  who had ignored you over the past three years when

 7  you were sending the other Facebook messages that we

 8  have seen in this case, fair?

 9  A.   I sent them --

10          MR. PRYOR:  Object, asked and answered.

11          THE COURT:  I'll allow it.

12          THE WITNESS:  I sent them to my union

13  president, yes, after the march.

14  BY MR. McKEEBY:

15  Q.   Now, you attended a fact-finding meeting as

16  well in the grievance process, fair?

17  A.   That was the first meeting, yes.

18  Q.   And that was the meeting with Mr. Schneider,

19  correct?

20  A.   It was a meeting with Mr. Schneider, Meggan

21  Jones, who is also here in the courtroom sitting

22  with you.  And it was Denise Gutierrez.  I can't

23  remember if it was Edie Barnett that was on the call

24  as well.  And then my union rep, Chris Sullivan,

25  yes.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 63 of 383   PageID 15083
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1343

1  Q.   Ms. Gutierrez, was she there in person or was

2  she on the phone?

3  A.   She was on the phone.

4       And we were told that she was an attorney when

5  we first got into the meeting.

6  Q.   Who told you that?

7  A.   I believe it was Ed Schneider.

8  Q.   You found out later that he may have been

9  mistaken about that?

10 A.   That is correct.

11 Q.   Any complaints about how Mr. Schneider treated

12 you during the fact-finding meeting?

13 A.   Not complete complaints, but I was pretty much

14 being -- there were questions being thrown at me

15 about how to use Facebook by Denise Gutierrez.  I

16 had questions from Ed Schneider.

17      My union rep pulled me out of that meeting

18 three times and he said, They are badgering you.

19           MR. McKEEBY:  Move to strike as hearsay.

20           MR. PRYOR:  Object.  He asked her what her

21 thoughts were.

22           THE COURT:  Hold on.

23           I will overrule that request.

24           MR. McKEEBY:  Okay.

25

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 64 of 383   PageID 15084
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1344

 1   BY MR. McKEEBY:

 2   Q.   And you said Mr. Sullivan was your union

 3   representation at the meeting?

 4   A.   That is correct.

 5   Q.   And Mr. Schneider asked you questions during

 6   the meeting, I think you said.

 7   A.   Yes, he did.

 8   Q.   He talked to you about the social media policy

 9   during the meeting, correct?

10   A.   That's the original claim that I was being

11   called in for, and then it became the other with

12   Audrey Stone.  But yes, social media.

13   Q.   Right.  And he talked to you about the bullying

14   and hazing policy, or the workplace bullying and

15   hazing policy, correct?

16   A.   I don't remember him talking about the

17   workplace bullying and hazing -- I don't remember

18   all of the conversation specifically.

19   Q.   But you did go over those policies?

20   A.   I don't remember going over the policies in the

21   meeting.

22   Q.   During the fact-finding meeting, Mr. Schneider

23   asked you why you sent the videos, the abortion

24   videos to Ms. Stone, correct?

25   A.   Let me clarify something.  Yes, he did ask

 1   that, but I'm going to clarify something.

 2        Those -- those videos that I sent, they were

 3   from an abortion site or somebody else posting them.

 4   But those are clearly babies, and I'm going to call

 5   them babies, and they are no different than if

 6   somebody had a preemie baby or a miscarriage.

 7   Q.   I understand that's your view and I don't want

 8   to argue with you about that.  I mean, I respect

 9   your beliefs and Southwest respects your beliefs,

10   and I'm not here to debate those beliefs.

11        My question was, did Mr. Schneider ask you, Why

12   did you send those videos to Ms. Stone?

13   A.   Yes.  And I told him.

14   Q.   What did you tell him?

15   A.   I told him that I sent them because I'm a

16   Christian, and that my union president took about 20

17   women to the march in DC that was sponsored by

18   Planned Parenthood, and they also had a banner that

19   represented Southwest there at that march.

20   Q.   And you also told him that you were a

21   Christian, correct?

22   A.   That is correct.

23   Q.   And you also told him that abortion was a huge

24   issue for you?

25   A.   That is correct.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 66 of 383   PageID 15086
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1346

1    Q.   And you also told Mr. Schneider that you do

2    whatever you can to get the word out, correct?

3    A.   To share my experience about -- yes.  About an

4    abortion, to save another life, or to help another

5    young girl or woman, yes.

6    Q.   Like Ms. Stone --

7    A.   Like I went through.

8    Q.   -- was she considering an abortion, as far as

9    you knew?

10   A.   Sir, again, those were sent in regards to the

11   Women's March.  I didn't send them to her as a

12   person, I sent them to her as my union president

13   that took these women, spent our dues money for

14   transportation, for hotel, for food, and for

15   whatever else, and they did not represent all of our

16   members going to this march.  We didn't even know.

17            MR. McKEEBY:  Your Honor, non-responsive.

18            THE COURT:  I will sustain that.  I will

19   strike it.

20            Your lawyer can ask you for any further

21   elaboration in the next round of testimony.

22            You can ask a new question.

23   BY MR. McKEEBY:

24   Q.   To come back to my question, and I don't think

25   you answered it, what you told Mr. Schneider was

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  that this was an important issue for you and you do

2  whatever you can to get the word out?

3  A.   That is correct.

4  Q.   But yet the only person you chose to send the

5  video, the only person you chose to get the word out

6  to was the person who had ignored you for the last

7  three years when you were sending Facebook messages

8  about other topics?

9  A.   No.  Actually, I also got called in for posting

10  those videos on my personal Facebook page, which

11  made no reference to Southwest or the Union.  But

12  the exact same videos on my personal page.  I had

13  been putting pro-life things on my page for years.

14  Q.   Understood.  That's a separate issue.

15       But the only Southwest-affiliated person who

16  you directed those abortion videos -- however you

17  want to characterize them -- the only person

18  affiliated with Southwest who you sent those videos

19  to was Audrey Stone, fair?

20  A.   My union president for going to that march,

21  yes.

22  Q.   Thank you.

23       And let's talk about your motivation in sending

24  that to her.  You talked about that today and Friday

25  as well, that you were -- you were upset that the

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 68 of 383   PageID 15088
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1348

1  Union went on this Women's March that you contend

2  was sponsored by Planned Parenthood, fair?

3  A.    Yes.

4  Q.    That made you angry, didn't it?

5  A.    Not really angry.  It disgusted me and it made

6  me sad.

7  Q.    And you -- I'm sorry.  I'm sorry.

8            MR. PRYOR:  Your Honor, again --

9            MR. McKEEBY:  I thought she was finished.

10           THE COURT:  And he stopped.

11           MR. PRYOR:  After he interrupted.

12           THE COURT:  Counsel, you are not in charge

13  of the courtroom.

14           You can ask your next question.  Sorry.

15  You can finish your answer.  He had stopped.

16  BY MR. McKEEBY:

17  Q.   I thought you were finished.  I apologize.

18  Please go on.

19  A.    Now, disgusted, yes.  I thought it was a

20  disgusting way to represent a very professional

21  group of not just women, but also men, going to a

22  march like that.  It was political and it was also

23  Planned Parenthood spons- -- we all know what that

24  march was for.

25  Q.   You sent that video to Ms. Stone because you

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 69 of 383   PageID 15089
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1349

1   wanted to provoke an emotional response in her, did

2   you not?

3   A.    No.

4   Q.    You wanted to shock her?

5   A.    No.

6   Q.    You saw Ms. Stone's response in this courtroom

7   where she was not able to look at the video and she

8   was sobbing.

9         Did you -- first of all, you saw that, right?

10  A.    I saw her up here, yes.  I don't know if she

11  actually looked at the video.  But yes, she was over

12  here crying.

13  Q.    Right.  And she cried at the arbitration that

14  you appeared in as well, right?

15  A.    Yes.

16  Q.    After the -- I'm sorry.

17              MR. PRYOR:  Object to reference to the

18  arbitration.

19              THE COURT:  Hold on.  Objection?

20              MR. PRYOR:  Limine issue, arbitration.

21              THE COURT:  Understood.

22              I will overrule that.  The fact of is

23  something that I have said we can discuss, but not

24  the specific substance.

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1  BY MR. McKEEBY:
 2  Q.   There was an arbitration after the Step 2
 3  hearing, correct?
 4  A.   Yes.
 5  Q.   At a hotel room here in Dallas, correct?
 6  A.   Yes.
 7  Q.   And Ms. Stone was at that hearing as a witness,
 8  correct?
 9          MR. PRYOR:  Your Honor, do I have a
10  continuing -- I think I do.
11          THE COURT:  You do.
12          MR. PRYOR:  Thank you.
13          THE COURT:  Thank you for asking.  Yes,
14  running objection.
15  BY MR. McKEEBY:
16  Q.   Ms. Stone was a witness at that hearing,
17  correct?
18  A.   Yes, she was.
19  Q.   The arbitration.
20  A.   Uh-huh.
21  Q.   And you were there during the entirety of the
22  arbitration?
23  A.   Yes.
24  Q.   And you were represented by counsel at that
25  arbitration?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 5 July 11, 2022                    Page 1351

1   A.   Yes.

2   Q.   And Ms. Stone had a similar reaction as she did

3   in this courtroom when those videos were played at

4   the arbitration; she was emotional, correct?

5   A.   Yes.

6   Q.   And that's precisely the response you wanted to

7   evoke when you sent those videos to her, is that not

8   true?

9   A.   No, that's not true.

10          MR. PRYOR:  Object, asked and answered.

11          THE COURT:  Overruled.

12   BY MR. McKEEBY:

13   Q.   So did you believe Ms. Stone in the courtroom

14   and at the arbitration, or do you think she was

15   playing it up for the jury?

16   A.   When she went to the march, she had to have

17   seen pro life on huge jumbotron screens of some of

18   the most horrific, sad abortion pictures, because I

19   knew people that were there.  So if that didn't

20   upset her, then how would this upset her?  Because

21   she took those women to that march.

22   Q.   So your testimony is that because she attended

23   the march, there would be no reason to think she

24   would be upset by videos of aborted fetuses/babies?

25   A.   Everybody is upset when they see something like

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1352

1  that, but it's the realization of what she went to

2  and she supported.

3  Q.   Everybody would be upset when they saw

4  something like that, is that your testimony?

5  A.   I believe -- I mean, it breaks my heart, yeah,

6  it breaks my heart, but the only way to get the

7  message across is for people to actually see what it

8  is.

9  Q.   After seeing Ms. Stone's reaction at the

10 arbitration in the hotel in Dallas or here in this

11 courtroom, do you have any regrets about what you

12 did?

13 A.   On a personal level, I'm sorry that it affected

14 her in such a way, yes.  But on a union level, maybe

15 she should have reached out to all of us as

16 dues-paying -- even though I'm an objector, we

17 helped pay for that.

18      Don't represent us as -- to me, when you wear

19 those pink -- and it's called the pink pussy hat

20 project -- you are not representing us as women that

21 I would think that most of our flight attendants

22 would want.

23 Q.   So you said a lot there, but I'm not sure that

24 I heard an answer to my question, which is do you

25 have any regrets about your conduct in sending those

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 73 of 383  PageID 15093
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1353

1  videos of aborted babies to Ms. Stone?

2          MR. PRYOR:  Object, asked and answered.

3  She absolutely answered his question.  He's just

4  looking for a different answer.

5          THE COURT:  I'll allow it.

6          THE WITNESS:  To my union president that

7  took the money, and those women -- and I'm kind of

8  shocked with Southwest Airlines not --

9          MR. McKEEBY:  Your Honor --

10         THE WITNESS:  I would have done it again,

11  yes, because that's the only way that I could have

12  gotten my point across, that I do not ever want our

13  representatives as we pay them -- I mean, this had

14  nothing to with our jobs.  Nothing.

15  BY MR. McKEEBY:

16  Q.   You recognized some of the other attendees at

17  the Women's March who were Southwest flight

18  attendant pilots -- or, excuse me -- flight

19  attendants?

20  A.   I know pretty much all of them.

21  Q.   You didn't send any of them the videos, did

22  you?

23  A.   No.  They are not my president.

24  Q.   Now, I think you alluded to it in your answer

25  to my question.  But you would agree with me that

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 74 of 383   PageID 15094
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1354

1  you objected to the march for other reasons other

2  than just your assessment that the marchers were

3  supporting a pro-choice position, correct?

4  A.   Reword that.  Or not reword.  Reask that again,

5  I'm sorry.

6  Q.   That's a fair request.

7  A.   I'm sorry.

8  Q.   That's all right.

9       You had problems with the other aspects of the

10  Women's March, too, that didn't have anything to do

11  with abortion, such as women's rights generally?

12            MR. PRYOR:  Object to the relevance.  It's

13  not anything she raised.

14            THE COURT:  No speaking objections.

15            I'll allow it.

16  BY MR. McKEEBY:

17  Q.   Let's go to -- well, I'm sorry.  You can answer

18  my question.

19  A.   Well, it is kind of funny because I am a woman.

20  Q.   I would agree.

21  A.   And did she respect my rights?

22  Q.   This isn't the setting for you to ask me

23  questions.

24  A.   I don't believe she respected our rights.

25  Going to that march, using our money, once again,

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 75 of 383  PageID 15095
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1355

1   she didn't respect a lot of the membership by doing

2   that.

3   Q.    My question --

4   A.    And I'm a woman.

5   Q.    I understand that.

6         My question, though, Ms. Carter, is you

7   objected to not just the pro-choice aspect of that

8   march but to the march in general, to the fact that

9   they were marching on behalf of women rights

10  generally, is that fair?

11  A.    No, my biggest objection was regarding who they

12  were marching for and with, Planned Parenthood.

13          MR. McKEEBY:  Let's go to Exhibit 98, and

14  specifically 98.6, which is already in evidence.

15  And specifically 98.6.

16  BY MR. McKEEBY:

17  Q.    These are the fact-finding notes, Ms. Carter.

18  A.    Okay.

19  Q.    And the second portion where it talks about,

20  okay, our union went to the Women's March.

21          MR. McKEEBY:  Let me blow that up.

22          MR. PRYOR:  Your Honor, object to improper

23  impeachment.  This is someone else's notes.  He can

24  ask her her recollection of what she said, but to

25  impeach --

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 76 of 383   PageID 15096
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1356

1                THE COURT:  Hold on.  That's speaking.

2                Yes, understood.  You can use it in the

3    manner that we just discussed, which is it's someone

4    else's notes, but you can address them with her.

5                MR. McKEEBY:  I'm sorry?

6                THE COURT:  They are someone else's notes,

7    but you can address them with her.

8                MR. McKEEBY:  I'm using them to impeach

9    her.  I think.

10   BY MR. McKEEBY:

11   Q.   All right.  The sentence that starts with "I

12   believe" that's about right over here.

13   A.   Yes, I see that.

14   Q.   "I believe we have women rights and no one is

15   stomping on them.  I believe we have the same rights

16   as men."  Correct?

17   A.   As a flight attendant, absolutely.  I have more

18   seniority and more rights -- not rights, but more --

19   because they were supposedly marching for pay and

20   things like that.

21        Due to my job, and this is what I'm referring

22   to, is I make more money than some men do as flight

23   attendants because of the seniority range.  I have

24   been at Southwest for almost right at 21 years.

25        And there is -- so this, for me, I have all

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 77 of 383   PageID 15097
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1357

1   kind of rights as a woman at Southwest Airlines.  I

2   never complained about my job.

3   Q.   So this notion of flight attendants marching

4   for equal pay you thought was ridiculous, fair?

5   A.   In the -- when it comes to our job, and I would

6   have figured, since they were saying they were

7   representing flight attendants at this march, this

8   is kind of irrelevant on our part.

9   Q.   Let me go to the last sentence.  Does that

10  sound like something that you said?

11      "In 20 years I have never been in trouble.  I

12  don't try to hurt people.  I love my job."

13  A.   Yeah, I've never hurt anybody on my job.

14          MR. McKEEBY:  Let's go to lower on the

15  screen, if you can get rid of that.

16  BY MR. McKEEBY:

17  Q.   So Mr. Schneider, at least according to these

18  notes, indicates that he asked you if you knew for

19  sure that Audrey was supporting Planned Parenthood

20  or women's rights, correct?  Right here.  "Ed, do

21  you know for sure"?

22  A.   Yes.

23  Q.   Do you see that?

24      It is down further.

25  A.   Yes, I see it.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 5 July 11, 2022                        Page 1358

1  Q.   And your response was "It was a whole plethora

2  of things.  It was sexual harassment, fair

3  treatment, equal pay.  We already get those things

4  under the Constitution."

5       That's what you were referring about earlier,

6  in terms of you don't believe there was any issue

7  with equal pay and these other issues, fair?

8            MR. PRYOR:  Object, mischaracterizes

9  testimony.  She just answered what she was referring

10  to as it related to equal pay.  He's trying to make

11  it --

12           THE COURT:  Hold on.  That's a speaking

13  objection.

14           I will overrule that.  You can answer.

15           THE WITNESS:  Okay.  Can you ask that

16  again?

17  BY MR. McKEEBY:

18  Q.   Yes.  I'm not sure if I can ask the exact

19  question again, but I will try to get close.

20       You were telling Mr. Schneider that you didn't

21  think any of these issues that were associated with

22  the march, sexual harassment, fair treatment, equal

23  pay, none of that was legitimate because you already

24  get those things under the Constitution, correct?

25  A.   I get those under my job and the Constitution.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1359

 1  Yes.  All -- I don't believe that I am without equal
 2  rights at all.
 3  Q.   And you disagreed with the Union and the flight
 4  attendants marching in that march in support of
 5  these issues, fair?
 6  A.   When it comes to our jobs, this didn't have
 7  anything to do with our jobs.  And that's what she
 8  represents when she took the banner that says -- I
 9  believe it's the representation of 556, Southwest
10  Airlines flight attendants or whatever on the
11  banner.  She was representing us at this march.
12  Q.   You also said during the fact-finding meeting
13  that one of your reasons for sending Ms. Stone the
14  videos was because you wanted to get her feedback on
15  her position about abortion, correct?  You wanted to
16  open up a dialogue?
17  A.   Can you show me that, where I wrote that, or
18  where I said it?
19  Q.   Sure.  I can show you from the notes.
20       It's 98.11.  If that refreshes your
21  recollection.  Again --
22           MR. PRYOR:  Hang on one second.  Counsel,
23  I need to find the document.
24           Where is it?  Go ahead.  Thank you.
25           THE WITNESS:  I see it.

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 80 of 383  PageID 15100
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1360

1  BY MR. McKEEBY:

2  Q.   It says -- I guess this is actually

3  Ms. Gutierrez asking you -- "Are you familiar with

4  her stance on abortion?"

5       And you say, "No, I was trying to get feedback

6  on that."

7  A.   I was trying to get feedback on it.  They had

8  taken -- they had taken those women.

9  Q.   You were trying to get feedback from Ms. Stone?

10 A.   She could have replied to me.

11 Q.   By sending her videos of aborted babies, you

12 were hoping to get feedback from a person who had

13 ignored you for three years, is that your testimony?

14 A.   Well, I would have hoped at this point, because

15 it was such a hot topic, that she would have

16 responded.

17 Q.   And instead of responding, she made a complaint

18 to Southwest Airlines, fair?

19 A.   Correct.

20 Q.   Did you really expect her to respond to you

21 with that kind of dialogue when you sent those

22 videos?  Was that really your expectation?

23 A.   Honestly, yes.

24 Q.   Let's go to -- well, let's wait.

25      You also mention in your testimony that you

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 81 of 383  PageID 15101
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1361

1  objected to the pink hats, correct?

2  A.   That is correct.

3  Q.   And your testimony, as I understand it, and I

4  will let you correct me if I'm mistaken, but you

5  believe those pink hats were designed to look like

6  female genitalia?

7  A.   The whole -- and I've got documentation on

8  that -- but, yes, that is exactly what it was

9  supposed to be.  And that was confirmed to me by

10  Jessica Parker.

11  Q.   And who is that?

12  A.   She was a union, I believe, shop steward at the

13  time.

14           MR. McKEEBY:  Let's pull 98 back and go to

15  98.7.  It sounds like a radio station.

16  BY MR. McKEEBY:

17  Q.   This is a dialogue between you and

18  Mr. Schneider and Ms. Gutierrez about the vagina

19  hats, correct?

20  A.   Uh-huh.  Yes.

21  Q.   And there is some discussion about what it

22  means.  Charlene, you say, "Yes, that's a pussy hat.

23  It is supposed to be a vagina."

24  A.   Uh-huh.

25  Q.   And Ed at some point says, "It's a knit

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 82 of 383  PageID 15102
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1362

1  stocking cap and it's pointed on the ends."

2      And then a few lines down you say, "It's a

3  vagina hat, no different from what I sent to her."

4      Do you see that?

5  A.   The whole reason that the women wore those hats

6  was due to a remark that President Trump at that

7  time had made about grabbing women, and that was

8  what this --

9          MR. McKEEBY:  Objection, non-responsive.

10         MR. PRYOR:  It is responsive.

11         THE COURT:  It's not.  Hold on.

12         MR. McKEEBY:  I just asked her what she

13  said in the document.

14         THE COURT:  I will sustain that objection.

15         Strike.  Jury, please disregard.

16         You can ask the question.

17  BY MR. McKEEBY:

18  Q.   I'm not trying to ask you about Mr. Trump, I'm

19  just saying that this document at least reflects

20  that you said, "It's a vagina hat.  It's no

21  different than what I sent to her."

22      Is that consistent with your recollection?

23  A.   Yes.

24  Q.   But that's not true, is it?

25      What you sent to Ms. Stone looked nothing like

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 83 of 383   PageID 15103
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1363

1  the pink pussy hats that the --

2  A.    What I sent to Ms. Stone --

3  Q.    Hold on.  Let me finish my question --

4  A.    Okay.

5  Q.    -- and then I will let you talk.

6  A.    Okay.  Of course.

7  Q.    You would agree with me that what you sent to

8  Ms. Stone via Facebook Messenger showed pictures of

9  women in hats that were not at all like the hats

10  that the women in the Women's March wore?

11  A.    Not her specifically.  But if you will read

12  what I wrote her, I said, "I'm so glad this is not

13  the types of costumes that you wore and it was

14  just" -- I think "just the hats that you did wear,"

15  which I believed was degrading to us as women.

16  Q.    But you are saying here in the meeting that the

17  vagina hat is no different from what you sent to

18  her.  And by "her," you mean Ms. Stone.

19  A.    It was supposed to represent exactly that same

20  genitalia but in a little hat.  Yes.

21  Q.    Since you mentioned the message to Ms. Stone,

22  let's go ahead and pull that up.

23          MR. McKEEBY:  It's Exhibit 47.

24          THE COURT:  Its already in, so we have

25  unmuted the jury screens.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 84 of 383   PageID 15104
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1364

1             MR. McKEEBY:  Can we blow that up a little

2    bit so that she can see it?

3    BY MR. McKEEBY:

4    Q.    This is what we were talking about, correct?

5    A.    They didn't dress like that.

6    Q.    They did not dress like that, did they?

7    A.    No.

8    Q.    But this is what you sent Ms. Stone?

9    A.    That's correct.  And this was some of the

10   costumes that were there at the march.

11   Q.    But you don't know that any Southwest flight

12   attendant wore a costume like this, do you?

13   A.    Honestly, no, I don't know, because we only had

14   videos and short clips of just part of the march

15   from them.

16   Q.    But none of the pictures that we have shown in

17   this case, and specifically of women in pink hats,

18   show anything that looks like this?

19   A.    No.

20   Q.    And I understand you have an accommodation

21   claim in this lawsuit, and we will get to that in a

22   minute.

23         Is it your testimony or your position that

24   Southwest should have accommodated you by allowing

25   you to send photos like this to Ms. Stone?  Or does

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1365

1  that -- well, I will let you answer that question.

2  A.   First of all, I never knew you had to have an

3  accommodation for anything at Southwest.  I had

4  never heard of what they referred to me as the ACT

5  department.

6       And now, through testimony, I'm being told that

7  it should have gone through employee relations.

8  They didn't tell me that either.

9       But I specifically said, in my fact-finding

10  meeting, that I was a Christian and this is why, you

11  know, that I was totally against this march, and

12  then taking those women and going.

13  Q.   So let me get this straight, though.  Is it

14  your testimony and your position in this case that

15  sending these pictures to Ms. Stone was an

16  expression of your Christian faith?

17  A.   When they were wearing the actual knitted hats,

18  that was supposed to be a symbol and -- it was --

19  and I've got it in my information.  It's called the

20  Pussy Hat Project.  And no, it may not look just

21  like this, okay, exactly like this, but it was in

22  reference to exactly this.

23  Q.   But my question to you is a little bit

24  different, and it's as follows:  You are claiming in

25  this case that Southwest had some duty to reasonably

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 86 of 383   PageID 15106
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1366

1  accommodate your religious beliefs.  Correct so far?

2  Do you understand that?

3  A.   When I heard the testimony the other day, they

4  did not consider it.

5           MR. McKEEBY:  Your Honor, this is a

6  yes-or-no question.

7  BY MR. McKEEBY:

8  Q.   I just want to know what your understanding is

9  of this position in this case.  Yes or no?

10           THE COURT:  Yes, and then you can

11  elaborate in the next round.  Thank you.

12           MR. PRYOR:  I object to the extent he's

13  trying to call for a legal conclusion about our

14  position in this case.  He wants to ask her facts --

15           THE COURT:  Hold on.  No speaking

16  objections.

17           I will allow the question.

18           You can answer.

19  BY MR. McKEEBY:

20  Q.   Should I repeat the question?

21  A.   Please.

22  Q.   I thought so.

23       It's your position in this case that Southwest

24  Airlines should have accommodated your religious

25  beliefs, fair?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 5 July 11, 2022                Page 1367

```
 1  A.    I told them I was a Christian, yes.
 2  Q.    And is it your position that they should have
 3  accommodated your religious beliefs by allowing you
 4  to send this type of -- not this type -- this
 5  photograph to Ms. Stone?  Is that part of your
 6  accommodation claim?
 7  A.    This picture was sent to my union president.
 8  Southwest should have never gotten involved in union
 9  business.  If Audrey wanted to do something to me,
10  they've got counsel right over there, they could
11  have done something to me.
12  Q.    So Southwest should have allowed you to send
13  this picture to Ms. Stone, and they are wrong for
14  punishing you for doing so, is your position?
15  A.    Yes.
16  Q.    And you indicated -- you can now take it
17  down -- at the fact-finding meeting, and I think
18  perhaps in this case, that the fact that those women
19  were wearing the pink pussy hats was disgusting,
20  that's the word you used, correct?
21  A.    It was.  It didn't represent any of us as
22  women.
23  Q.    And this isn't disgusting?  This --
24  A.    Like I said, she took the women to this march,
25  and they were marching with women with -- I didn't
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1368

1   bring up the pussy hat part of it.  They wore the

2   hats that were supposed to be a symbol --

3             MR. McKEEBY:  Your Honor, non-responsive.

4             THE WITNESS:  I don't know how to answer

5   that question.

6   BY MR. McKEEBY:

7   Q.   Well, let me try and help you.

8             MR. PRYOR:  I object to him interrupting

9   her unless he gets a ruling from the Court.

10            MR. McKEEBY:  I'm not getting responses to

11  my questions.

12            THE COURT:  I think the answer was

13  sufficiently non-responsive to where now you can ask

14  the question again.

15            MR. McKEEBY:  Can you read the question?

16  I don't remember.

17            (Thereupon, the requested portion was read

18      back by the reporter as above recorded.)

19            MR. McKEEBY:  Thank you.

20  BY MR. McKEEBY:

21  Q.   I will ask it slightly differently.

22            You told us previously a moment ago that

23  the hats that the women wore in Washington were

24  disgusting.

25            Is this not disgusting to you, these

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 89 of 383   PageID 15109
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1369

1  images?

2  A.   As a woman going to that march, yes, they would

3  have been disgusting.  Again, I sent them to my

4  union president who had taken those women to that

5  march, and this was union business.

6  Q.   And did you also send this photo to Ms. Stone

7  with the hope that she would respond to open up some

8  type of dialogue with you?

9  A.   Yes.  I was hoping for it.

10            MR. McKEEBY:  I'm looking for this, your

11  Honor.

12  BY MR. McKEEBY:

13  Q.   Now, you have said repeatedly in response to

14  some of my questions that it was wrong for Ms. Stone

15  to turn you in to Southwest Airlines, fair?

16  A.   Yes.

17  Q.   I mean, that's the heart of your complaint in

18  this case about the Union, that Ms. Stone, as

19  president of the Union, turned you in, and that

20  violated their duty of fair representation, fair?

21            MR. PRYOR:  Object to a legal conclusion

22  as what the main point of her legal case is.

23            THE COURT:  Sustained.

24  BY MR. McKEEBY:

25  Q.   Your claim against the Union is that they

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1    violated their duties to you by Ms. Stone turning

2    you in?

3    A.    Yes.

4    Q.    But it was okay for you to complain to

5    Southwest about other employees who you believe

6    violated the social media policy, was it not?

7    A.    I did that one time.

8              MR. PRYOR:  Objection, relevance.

9              I'm sorry, ma'am.

10             THE WITNESS:  That's okay.

11             MR. PRYOR:  Object to relevance, your

12   Honor.  In limine issue.

13             THE COURT:  Hold on just a second.

14             I will overrule.  You can answer.

15             THE WITNESS:  Okay.  The person that I

16   actually wrote with a bunch of other flight

17   attendants was against Brian Talburt, and he had

18   made reference to executing employees, which either

19   meant harming them in a physical way or harming them

20   by turning them in and getting them fired.

21             MR. McKEEBY:  And let's pull up Document

22   61.

23   BY MR. McKEEBY:

24   Q.    This is the complaint that you are talking

25   about, correct?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1371

```
 1              MR. PRYOR:  Your Honor, first of all, is
 2   this in evidence?
 3              THE COURT:  Sidebar.
 4              (Thereupon, the following proceedings were
 5        had at sidebar:)
 6              THE COURT:  So it's not in evidence.
 7              I understand your last limine issue she
 8   was talking about Southwest disciplines somebody,
 9   but now we are getting into 61, which is her
10   complaint against Talburt.
11              So I know you had objections.
12              MR. PRYOR:  I didn't ask for a sidebar.  I
13   can't afford them.
14              Our objection is --
15              THE COURT:  I'm asking for this on my
16   time.
17              MR. PRYOR:  I appreciate that.
18              THE COURT:  This is a morning session
19   issue we didn't get to.  Does that make sense?  This
20   is one of the close calls from last night.
21              MR. PRYOR:  We've raised these issues in
22   our limine.  This is an issue from long ago.  It is
23   not related to this case.
24              And she filed this as an objector because
25   she --
```

```
 1              THE COURT:  Before that, it is time for
 2   the morning break.  Can I kick them out and then
 3   have -- let's come back a couple of minutes early on
 4   the 10-minute recess.
 5              Can I ask you where in the limine ruling
 6   we talked about this?  Because I don't remember.
 7              MR. PRYOR:  I hope I can, Judge, but I
 8   know that Mr. Gilliam can.
 9              THE COURT:  Okay.  So tell him we will
10   come back in eight minutes.
11              MR. PRYOR:  If I'm wrong, I apologize, but
12   I think it is there.
13              THE COURT:  It's fine.  We'll all look for
14   it.  No problem.
15              (Thereupon, the sidebar was concluded and
16       the following proceedings were held in open
17       court:)
18              THE COURT:  Okay.  We are going to take
19   our morning break and talk about a legal issue right
20   quick.  So let's do a 10-minute break.  We will come
21   back at 10:50.
22              So remember the same instructions.  You
23   can only talk to your fellow jurors and court
24   personnel just not about the case.  Don't talk to
25   anyone else and don't do any research about the
```

1  case.

2           We will see you in 10 minutes.

3           All rise.

4           (The jurors exited the courtroom.)

5           THE COURT:  And you can leave the stand.

6  You can't talk to anyone about the case in the short

7  break.  We will see you at 10:48 to talk about our

8  legal question.

9           All right.  We are in recess.

10          (Recess.)

11          THE COURT SECURITY OFFICER:  All rise.

12          THE COURT:  Thank you.  You can be seated.

13          Okay.  So I asked to look into the limine

14  issue.  I can tell you what my thoughts are on the

15  limine issue, but if you have a ready answer,

16  Mr. Gilliam, then you can lay it on me.

17          MR. GILLIAM:  I honestly don't think that

18  it's in the limine itself.

19          THE COURT:  I don't either.

20          MR. GILLIAM:  But it is part of our

21  objections that we made last night to exhibits.

22          THE COURT:  I will concur on that.

23          So let me tell y'all what I'm thinking on

24  61.

25          I'm thinking 61 stays out, and here is

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 94 of 383   PageID 15114
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1374

1  why.  I'm trying to think of 61 in conjunction to

2  questions we had earlier on, for example, the equal

3  pay question.

4          The equal pay question came up in some of

5  the termination interviews.  It came up in some of

6  the signs that would say "Equal pay, pro choice, my

7  body, my choice."

8          And so because that was information that

9  you could see from that stack of exhibits was before

10 Southwest since making the termination, then its

11 relevance is higher even if it was not one of the

12 stated grounds for the termination.  So then

13 prejudice isn't going to outweigh the relevance.

14          Here I don't see in the materials I have

15 that this was information Southwest was looking at

16 when making the termination.  If it was, its

17 relevance shoots up.

18          So I don't think its relevance is very

19 high.  I think there is some prejudice there to

20 Carter if it comes in that outweighs whatever

21 marginal relevance there is.

22          Tell me if you think I'm wrong.

23          MR. McKEEBY:  I think you are wrong.

24          THE COURT:  Go for it.

25          MR. McKEEBY:  Two reasons, your Honor.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1375

```
 1            One is that they have suggested through
 2   Ms. Stone and otherwise that the policy is
 3   ambiguous, employees didn't understand it.
 4            This shows that at least Ms. Carter
 5   understood it well enough to report another
 6   employee, A; and B, they have also suggested that --
 7   that the company at some level was in league or
 8   colluded with the Union to exclude and target and
 9   reprimand -- again, I understand that the limine
10   ruling eliminated the actual discipline, but that
11   has kind of -- has been stepped over, maybe not
12   intentionally in every case.
13            But -- but what the evidence will show on
14   Southwest's side is that, look, there were objectors
15   turning in union leaders and union leaders turning
16   in objectors, and at some point Southwest just threw
17   up their hands and said, We have got to assess these
18   cases on their merit.
19            So the fact that Ms. Carter turned in a
20   union supporter is relevant as to that theme.  So I
21   think it should come in for that reason.
22            I also think it should come in to rebut
23   the notion that there is some ambiguity about the
24   social media policy that prevented Ms. Carter from
25   doing exactly what she did.
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 96 of 383   PageID 15116
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1376

 1                    MR. GREENFIELD:  Your Honor, if I may.  I
 2   don't have a specific objection on this point other
 3   than a slightly different take on the relevancy
 4   issue.
 5                    Ms. Carter has consistently testified that
 6   Southwest should never get involved in union
 7   business.  She is here turning in someone to
 8   Southwest to get them involved in union business.
 9                    It goes to Ms. Carter's credibility, and
10   credibility is always relevant before the jury, your
11   Honor.
12                    THE COURT:  Response.
13                    MR. GILLIAM:  Yeah.  As for Southwest's
14   response, I don't think that it really addresses
15   your point.  In fact, I think that to the extent
16   their -- I think their relevance argument gets
17   into -- would have to get into matters of similarly
18   situated employee discipline that they themselves
19   limined.
20                    As for Local 556's response, there is a
21   huge difference between a union president or other
22   union actor reporting a non-member objector or other
23   ordinary employee and an ordinary employee reporting
24   comments about a threat of execution or public
25   threat -- I'm sorry -- yeah, threat of public

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 97 of 383   PageID 15117
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1377

1   execution against recall supporters.

2              THE COURT:  Understood.

3              MR. GREENFIELD:  If I may, your Honor.

4              THE COURT:  Briefly.

5              MR. GREENFIELD:  Ms. Carter has never

6   equivocated about when, who, and what type of

7   complaint should not be interfered with by Southwest

8   Airlines, whether it was from herself, another union

9   member, or another union president.  It goes to

10  credibility, your Honor.

11             THE COURT:  I understand that argument.

12             So I haven't heard -- I hear the

13  arguments.  I haven't heard anything that changes my

14  tentative ruling.  So I will stick with my tentative

15  ruling and keep 61 out.

16             So I'm ruling on the record that 61 is

17  overly prejudicial, it lacks relevance.

18             So I think this is sufficient here, but if

19  you want to offer it again when the jury is in the

20  box, you can do that, just like I let Mr. Pryor do

21  that earlier, at trial.

22             MR. GREENFIELD:  You Honor, may I have

23  some clarity a little bit more in-depth on this

24  topic?

25             I understand that the document is out.  Is

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1378

1  discussing Ms. Carter -- with Ms. Carter about
2  whether she turned anyone in for the social media
3  policy without going into specifics regarding
4  Mr. Talburt, is that acceptable?
5           MR. PRYOR:  It is the same issue.
6           THE COURT:  What are you asking for?
7           MR. PRYOR:  It is the same issue.
8           MR. GILLIAM:  Yeah, it is the same issue.
9  I don't think the issue is any different.  So I
10  would say, yes, it is out.
11          THE COURT:  But no one has moved for that
12  yet.  So he just suggested you move for that.
13          Are you moving for that?
14          MR. GILLIAM:  Yes.
15          THE COURT:  Basically a limine point on
16  this issue.
17          MR. GILLIAM:  So moved.
18          MR. GREENFIELD:  Your Honor, I find this
19  different.  This is exactly the bright line you've
20  drawn in your limine instructions, because we asked
21  for the same limine instructions that Southwest
22  requested on comparator evidence, et cetera.
23          It was granted for them and it was not for
24  us.  Hence, the consistent instruction that goes to
25  you may consider this evidence against the Union but

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 99 of 383   PageID 15119
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1379

1  you may not consider this evidence against

2  Southwest.

3           So if all of those instances can be

4  considered against the Union, we also need to be

5  able to consider what Ms. Carter's actions were.

6           THE COURT:  I understand that, but I don't

7  think there is a reason for separation here.  That

8  separation for the evidence you are speaking of was

9  that it's not just not relevant to claims against

10 Southwest because there is no comparator claim.  It

11 is just a direct discrimination claim.  But it does

12 go to your duty of fair representation claim that

13 you have against the Union.

14          So I don't see the lack of congruence here

15 stemming from the claims.  I just think it's not

16 relevant.  It's overly prejudicial regarding both

17 parties.  So I don't think it comes in to either

18 party.

19          So what I understand your request to be is

20 that it's not just the exhibit, it's the discussion

21 about it that should stay out.

22          MR. GILLIAM:  Yes, your Honor.  So moved

23 to keep out any testimony.

24          THE COURT:  Okay.  I mean, you know my

25 underlying rationale, but is there any argument

1   Southwest or the Union wants to make that we should

2   allow discussion other than on the exhibit?

3              MR. GREENFIELD:  Just not the specifics.

4   If we want to talk about the specifics about -- and

5   I think it's already come out.  I think the door has

6   been opened and the jury has heard it, so I don't

7   know that we can put the cat back in the bag to a

8   certain extent.

9              But is it proper to inquire whether she

10  has made any complaints, period, against other

11  Southwest employees?  Because, again, I think that

12  does go to rebut her previous testimony.

13             THE COURT:  I recall previous testimony

14  covering no complaints were made against her.  If

15  I'm wrong on that, someone can point me to the page

16  and line.

17             MR. PRYOR:  We didn't raise this issue.

18             MR. GILLIAM:  The only thing we have is

19  another complaint against her.  There are no other

20  complaints that she's made.

21             THE COURT:  Sure.  So that wasn't my

22  recollection of the testimony.  My recollection was:

23  Were there any complaints made against you?

24             Things that came up in the prior

25  testimony.

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 101 of 383  PageID 15121
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 5 July 11, 2022                  Page 1381

1              MR. GREENFIELD:  Your Honor, I guess I
2   don't understand then where the differentiation
3   occurs as to why they can talk about all the
4   different claims and issues that Brian Talburt,
5   again, just a rank-and-file member of the Union, and
6   what his actions were, those have been discussed at
7   length, versus what Ms. Carter's actions were.
8              THE COURT:  That's correct.  It's a
9   different relevance and a different prejudice
10  analysis.
11             Okay.  So I will say this is a new limine
12  point, whatever limine we are under, to discuss,
13  about her prior complaints against other Southwest
14  employees.
15             I understand y'all don't like that, and so
16  I'll understand y'all as objecting to that.  I'm
17  overruling those objections.
18             MR. McKEEBY:  And I think, as a procedural
19  matter, I move for the admission of 61.  And you are
20  overruling that, so I don't think I need to do
21  anything else, so I'm not going to do anything else.
22             THE COURT:  Understood.
23             And I can say on the record when the jury
24  is back in, I sustained objections on 61.
25             Okay.  Let's bring them in.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 102 of 383   PageID 15122
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1382

1                    (The jurors entered the courtroom.)

2                    THE COURT:  Okay.  You can be seated.

3              I sustained that objection on Exhibit 61,

4    so you can ask a new question, Mr. McKeeby.

5                    MR. McKEEBY:  Can you pull 47 back up?

6    BY MR. McKEEBY:

7    Q.   I know I asked you this question, but I don't

8    think I got a response.  If I did, I apologize.  But

9    I would ask again, was sending this message and this

10   photograph to Ms. Stone an expression of your

11   Christian beliefs?

12   A.   An expression of my Christian belief against

13   the march, yes, and against who she was marching

14   with.  This is what they marched with.  So yes.

15   Q.   So sending this photo to Ms. Stone was

16   consistent with your Christian beliefs?  Your

17   position?

18   A.   Consistent with my Christian beliefs on this

19   march, yes.

20   Q.   Let me go back to your accommodation claim here

21   briefly.

22        What is the accommodation that you are

23   requesting or would have requested that Southwest

24   make for you?

25   A.   I didn't know I had to make a request.  This

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 103 of 383   PageID 15123
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1383

1  has become a back and forth between this request.

2       I am a Christian.  I stated it in my

3  fact-finding meeting, I think several times.  And

4  then I stated, I think, in my second step meeting.

5  Q.   I understand.  The jury wasn't at those, at

6  those meetings, so I'm asking you -- I know I'm

7  asking you to rehash issues that you've done on

8  several occasions, and I can see how that could be

9  tedious.

10      But the jury hasn't heard all of that, and I

11  think they need to hear what your request is of

12  Southwest in terms of what it should have done to

13  accommodate you and your religious beliefs.

14           MR. PRYOR:  Object, calls for a legal

15  conclusion as well.

16           THE COURT:  I'll allow it.

17           THE WITNESS:  I stated I was a Christian.

18  I was objecting to a march that my union had, and I

19  believe under Title VII, it affords me to speak to

20  that, and they did not give that to me.  I didn't

21  know I had to ask it.

22  BY MR. McKEEBY:

23  Q.   Right.  And you didn't ask it because you

24  didn't know is your testimony, correct?

25  A.   That is correct.

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 104 of 383  PageID 15124
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1384

1  Q.   And there is -- you've, I think, since

2  discovered that there is a whole Southwest

3  department that deals with accommodation issues

4  called the ACT department?

5  A.   That's what I've heard through all of this and

6  what I've understood.  But then in testimony,

7  everybody was saying it should have gone to employee

8  relations.  So I don't know if even Southwest knows

9  who it's supposed to actually go to.

10            MR. McKEEBY:  Object as non-responsive.

11            THE COURT:  Sustained.

12            MR. McKEEBY:  And move to strike.

13            THE COURT:  Granted.

14            So, jury, please disregard the last

15  sentence that was said.

16  BY MR. McKEEBY:

17  Q.   Isn't it a fact, Ms. Carter, that what you are

18  asking in this case is that Southwest's policies not

19  be applied to you?

20  A.   That is not what I said and that's not what I

21  am -- policies that we had at Southwest Airlines and

22  the line between the union and what I was talking to

23  my union president about, Southwest Airlines should

24  have stayed out of union business, and be dealt with

25  within the union.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 5 July 11, 2022                           Page 1385

1  Q.   And Southwest Airlines should have not applied

2  its policies to punish you for sending a fetus video

3  to Ms. Stone, even if it did violate Southwest

4  policies?

5           MR. PRYOR:  Object, compound.

6           THE COURT:  I'll allow it.

7           THE WITNESS:  It was union business.  I'm

8  going to just say it again.

9           Southwest Airlines really had no business

10 stepping in union activity.  They would -- if I

11 would have done this at a union meeting, exactly the

12 same, Southwest Airlines has no right to punish or,

13 you know, any policies.

14 BY MR. McKEEBY:

15 Q.   To discipline you?

16 A.   Correct.

17 Q.   Your position is that Southwest did not have

18 the right to discipline you for sending those

19 abortion videos to a co-employee, Ms. Stone?

20 A.   To my union president, no, they did not have

21 the right to do that.

22 Q.   So you acknowledge at least that sending the

23 videos violated the policies, they just shouldn't

24 have applied them to you.  That's your position,

25 correct?

1              MR. PRYOR:  Object, mischaracterizes her

2    testimony.

3              MR. McKEEBY:  It's a question.

4              THE COURT:  I will allow the question.

5              THE WITNESS:  Ask it again.  I'm sorry.

6              MR. McKEEBY:  Can you read it back?

7              (Thereupon, the requested portion was read

8         back by the reporter as above recorded.)

9              MR. PRYOR:  Same objection.

10             THE COURT:  Overruled.  You can answer.

11             THE WITNESS:  The policies are workplace

12   policies.  This was not done at the workplace and

13   this also had to do with the union activities.

14             So, no, Southwest Airlines, I always --

15   when I was at work, always adhered to the policies

16   at work.  These --

17   BY MR. McKEEBY:

18   Q.   The -- I'm sorry.  I'm sorry.  I thought you

19   were finished.  Please finish.

20   A.   Well, these policies, first of all, was not

21   done at work.  Second of all, it was union business.

22        So, no, those policies should have not been --

23   I guess I didn't break those policies at that time.

24   Q.   Did you break any policies?

25   A.   Not with my union president.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 5 July 11, 2022                      Page 1387

1   Q.   And so what should Southwest have done to
2   accommodate you?  I don't understand.
3   A.   First of all, they should have never called me
4   in.  It should have been dealt with in the union.
5   Q.   Let's talk about what you said about your
6   workplace, okay?
7        You were a flight attendant, correct?
8   A.   Correct.
9   Q.   So what was your workplace, the actual plane?
10  Is that what you are saying?
11  A.   When I check in for my trip, okay, 30 minutes
12  prior to going to the gate, that is when I'm at
13  work.  And until I clock out and leave that airport,
14  when I leave, once we -- the trip is done, and I
15  think it's 30 minutes after we leave the plane and
16  everything else -- I can't remember now, it's been
17  so long, it's been five years -- then I'm off the
18  clock.
19  Q.   So by that it would have been a violation of
20  the workplace bullying and hazing policy for you to
21  send that video while you were on the plane, fair?
22  A.   Still, again, no.  That was to my union
23  president.  No.  I would have never sent those
24  things at work.  I would never -- I mean, I didn't
25  have that kind of --

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 108 of 383   PageID 15128
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1388

 1   Q.   So it's not that you --

 2   A.   I don't understand -- I guess I don't

 3   understand where you are going with this question.

 4   Q.   Well, I'm trying to get an understanding of

 5   what you mean by "workplace."  And it sounds like

 6   it's not so much that -- that you sent it off the

 7   clock or off hours, but that you sent the messages

 8   to the union president is your issue, fair?

 9             MR. PRYOR:  Object, mischaracterizes what

10   she just said.

11             THE COURT:  I will allow her to answer.

12             THE WITNESS:  Again, if I had not been an

13   objector, I could have taken this to a union

14   meeting.  Southwest could have never done anything

15   to me, said anything to me.  That's that line.

16             It's the same type of communication with

17   my union president.  It just happened to be through

18   like an email or messenger.  It was the same type of

19   communication that should have been kept within the

20   union compound.

21   BY MR. McKEEBY:

22   Q.   And the reason it wasn't kept within the union

23   compound is because Ms. Stone reached out to

24   Southwest, fair?

25   A.   Ms. Stone turned me in to Southwest.  She

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 109 of 383   PageID 15129
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1389

1  should have kept this in the union realm.

2  Q.   And what is Southwest supposed to do?

3  A.   Stay out of it.

4           MR. PRYOR:  Object, asked and answered.

5           THE COURT:  Overruled.

6  BY MR. McKEEBY:

7  Q.   I will give you a hypothetical.  Your counsel

8  raised some hypothetical questions during his

9  examination of I think Ms. Stone.  I'm going to give

10 one to you.

11      Is it your position that you had the right to

12 send the abortion videos to every dues-paying union

13 member, flight attendant at Southwest?

14           MR. PRYOR:  Object, calls for a legal

15 conclusion.

16           THE COURT:  I'll allow it.

17           THE WITNESS:  The only person that I would

18 have ever sent that to would have been my union

19 president.  I would have not sent that to any other

20 member, which I didn't do.  And even the women

21 that -- the other ones that went, I didn't send it

22 to them.  She led the march, she is the one who was

23 responsible for taking them all to DC.

24 BY MR. McKEEBY:

25 Q.   I understand all of that.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 110 of 383   PageID 15130
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1390

```
 1        My question is a hypothetical.  I know you
 2   didn't do it.  I'm not suggesting to the jury that
 3   you sent it to anyone else other than Ms. Stone.
 4   And you have testified to that.
 5        My question is, if someone did that, let's say
 6   it was someone else, some other union member, an
 7   objector if you want, if that makes you more
 8   comfortable, if they had sent that video to every
 9   union-paying Southwest flight attendant, would that
10   have violated Southwest's policies?
11             MR. PRYOR:  Object.  It's a hypothetical
12   that's not the facts of this --
13             THE COURT:  You can come to sidebar if you
14   want.
15             MR. PRYOR:  It's an improper hypothetical,
16   given what she just said.
17             THE COURT:  That's a speaking objection.
18   You can come to sidebar if you want to speak.
19             MR. PRYOR:  Object to improper
20   hypothetical.
21             THE COURT:  Understood.
22             I will sustain that one.
23             MR. McKEEBY:  Let me go to Exhibit 2.
24   BY MR. McKEEBY:
25   Q.   Do you recognize this document?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1391

```
 1   A.    Yes, I do.
 2              MR. McKEEBY:  Move to admit Exhibit 2.
 3              THE COURT:  Any objections on 2?
 4              MR. PRYOR:  We object to the admission of
 5   this document for relevance.  And the -- if he wants
 6   to ask her if it refreshes her recollection if she
 7   says something inconsistent.  But this is a legal
 8   document.
 9              THE COURT:  Anything from the Union?
10              You can come to sidebar if you want.
11              MR. PRYOR:  No, I'm fine.  Can't afford
12   it.
13              THE COURT:  Anything from the Union on 2?
14              MR. McKEEBY:  I'm going to need a sidebar
15   if -- well, I might know if I'm going to need a
16   sidebar here briefly.
17              THE COURT:  Call a sidebar.
18              (Thereupon, the following proceedings were
19        had at sidebar:)
20              MR. McKEEBY:  This is an EEOC charge,
21   which is an administrative prerequisite -- I'm
22   sorry.
23              THE COURT:  Go for it.
24              MR. McKEEBY:  This is an EEOC charge,
25   which is an administrative prerequisite to her
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 112 of 383   PageID 15132
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1392

1  filing a suit.  And so we have an issue of a

2  question of whether or not she properly exhausted

3  her administrative remedies as an affirmative

4  defense, given that she did not raise the

5  accommodation claim.

6           And secondly, it has language that --

7  that's relevant to her claim.  She talks about what

8  the basis of her claim is in that sworn document.

9  So I should be able to get into that.

10          MR. PRYOR:  That's two completely

11  different issues.

12          The first one the Court has already ruled

13  on, and the exhaustion of administrative remedies,

14  that's not an issue for this jury.  It's not an

15  issue that anyone has even submitted a question on.

16          The issue of whether or not there is

17  something in there factually that's inconsistent

18  with anything she said, if she says something

19  inconsistent, he can show it to her and talk to her

20  when he's laid that foundation.

21          But right now it's inadmissible.

22          THE COURT:  So I get your point on my

23  prior rulings on exhaustion.  My question is did

24  y'all make an objection?  I didn't see an objection

25  last night to 2.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 113 of 383   PageID 15133
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1393

```
 1                MR. PRYOR:  I didn't ojbect, Judge, sorry,

 2   but regards I'm raising it now.

 3                I know that we have made this argument

 4   before.  Actually, I will refer to Mr. Gilliam in

 5   that regard.  We are raising it now if it hadn't

 6   been raised before.  I apologize if it wasn't.  It

 7   is still an appropriate objection.

 8                THE COURT:  So I've got the intention

 9   here.  But what I will say is this, I think failure

10   to exhaust is a legal question I've already ruled

11   on.

12                So to the extent you try to get into that,

13   it may cause me to have to clean it up with a jury

14   instruction on that for y'all.  But you didn't

15   object last night to 2, so I'm going to let 2 in.

16                Does that make sense?

17                MR. PRYOR:  Can I -- I don't know -- first

18   of all, let me just point out, I didn't ask for this

19   conference.  And second, can I look and see what we

20   objected to last night?

21                I'm sure you're right, Judge, I just

22   didn't look at it.

23                THE COURT:  You can look and see if you

24   objected.

25                MR. PRYOR:  Give me two seconds and I'll
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 114 of 383   PageID 15134
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1394

 1   just wave at you and say you're right as usual.
 2               THE COURT:  We are keeping the sidebar on.
 3               The music is still one.  We are taking
 4   down one thing at counsel table.  We will be right
 5   back with you in a moment.
 6               (Thereupon, the sidebar was concluded and
 7          the following proceedings were held in open
 8          court:)
 9               THE COURT:  So I will overrule the
10   objections to Exhibit 2.  They can come in on the
11   terms that we discussed.
12               (The referred-to document was admitted
13          into evidence as Trial Exhibit 2.)
14               THE COURT:  Mr. McKeeby.
15               MR. McKEEBY:  So is it admitted?
16               THE COURT:  It is admitted into evidence.
17   We are publishing.
18               MR. PRYOR:  We have a continuing
19   objection.
20               THE COURT:  You may.
21               MR. PRYOR:  Thank you.
22   BY MR. McKEEBY:
23   Q.   One question -- well, I shouldn't say that.
24        A few questions about the document.
25               MR. McKEEBY:  Number 3, if you could pull

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 115 of 383   PageID 15135
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1395

 1  that point up.

 2  BY MR. McKEEBY:

 3  Q.   This is quite a statement, Ms. Carter.  You

 4  indicate that your employer -- and I will let the

 5  Union ask you this question if they want to, but I'm

 6  interested in the contention about Southwest

 7  Airlines.  You contend that the company supports

 8  abortion in this statement, correct?

 9  A.   The company allowed their name to be on a

10  banner at that march, and that's what I'm referring

11  to.

12  Q.   How do you know that?

13  A.   Because I have pictures of it.  And it was --

14  Q.   How do you know the company had anything to do

15  with it?  These flight attendants marched in

16  Washington.  Do you know if they asked for the

17  company's permission to do that?

18  A.   No, I don't, but I would have figured that

19  Southwest Airlines would have been pretty upset if

20  that's the case.  Did they reprimand those flight

21  attendants?

22  Q.   That' not my question.  Do you have any

23  information to suggest that anyone at Southwest

24  Airlines authorized those flight attendants to carry

25  those banners?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1   A.    They carried it.
 2   Q.    That's not my question, Ms. Carter.  My
 3   question is --
 4   A.    I have no idea.  I have no idea.  If they
 5   asked, I have no idea.
 6   Q.    All right.  You've answered my question --
 7   A.    Okay.
 8   Q.    -- and I will respectfully move on --
 9   A.    Okay.
10   Q.    -- to some boring topics for just a minute.
11           MR. McKEEBY:  Let's go to Exhibit 42.
12           THE COURT:  This is in evidence, so the
13   jury can see it.
14           MR. McKEEBY:  I don't think -- is 42 in?
15           THE COURT:  42 is in.  It came in earlier
16   today.
17           MR. McKEEBY:  Okay.
18   BY MR. McKEEBY:
19   Q.    I just want to walk you through this briefly.
20         These reflect your earnings at Southwest?
21   A.    Uh-huh.
22   Q.    And would you agree with me that they reflect
23   an average of about $15,000 a year?
24   A.    Give or take, right, yes.
25   Q.    Okay.  Give or take.  So if it's for 2014 --
```

1  well, go ahead.  Let's read the exact amount.

2      Do you know how to read these to know what your

3  actual earnings at Southwest were for 2014?

4  A.   Well, I can't read it because I don't have my

5  glasses.

6  Q.   Okay.  If it says $16,581, does that sound

7  about right, in the ballpark?

8  A.   Yes.  And this is what I was discussing with

9  you about not being able to fly.

10 Q.   Right.  I just didn't think we got it into

11 evidence as cleanly as I might like it.

12     I understand you don't have to and shouldn't

13 care about my preferences.

14     But let me walk through, the next page is for

15 2015.  And I read this to reflect a take-home pay of

16 $17,700, is that fair?

17 A.   That is correct.

18 Q.   And then finally, 2016, which -- first of all,

19 that was your last full year of employment?

20 A.   '16?

21 Q.   2016.  You were terminated in the --

22 A.   Yeah.

23 Q.   -- spring of 2017?

24 A.   March '17.

25 Q.   So 2016 was the last year of your employment,

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 118 of 383   PageID 15138
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1398

1  correct?

2  A.    Yes.

3  Q.    And your take-home pay that year was $18,598?

4  A.    Correct.

5  Q.    And this goes back to the issue that you raised

6  with Mr. Pryor that you weren't working -- you can

7  take those off -- you weren't working full-time.

8  A.    No, at that time I couldn't.  My husband was --

9  he was having to work more so on -- because I just

10  couldn't trust him with my daughter being at home at

11  that age.

12  Q.    And let me talk a little bit about your efforts

13  to seek other employment.

14       When you were -- I think you -- I don't

15  remember -- I'm getting them mixed up, too, in terms

16  of what you said today versus these other

17  proceedings, so my apologies if I blur some of this.

18       But there was something called Project Purpose

19  that you were affiliated with in 2017?

20  A.    That's correct.  And that's when I was in

21  St. Louis.  I homeschooled my daughter for the

22  last -- well, it's now been nine years.  She's

23  graduated.

24       But I had a program that I was actually

25  implementing, and it had to do with the school

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1399

1  systems in St. Louis and partly Aurora, Colorado, in
2  some of the poorer school districts.  And it was an
3  after-school -- it started out as an after-school
4  program, and we were partnering with some churches
5  also in St. Louis.
6  Q.   And you actually started working for Project
7  Purpose in January of 2017, before you left
8  Southwest, correct?
9  A.   We started the project, but I wasn't working
10 for them.  I was writing -- I was actually getting
11 the curriculum together for that.
12 Q.   Right.  And this was -- and then you actually
13 started working for them after your separation from
14 Southwest Airlines, fair?
15 A.   Yeah.  It became more of a -- yeah, it became
16 more of a -- yeah.  A job.  Yes.
17 Q.   Right.  But it was a not-for-profit in --
18 well --
19 A.   Correct.  It was a not-for-profit.  We hadn't
20 gotten our 501(c)(3) yet, so we were just actually
21 scouting for who we were going to partner up with in
22 St. Louis and partly Aurora, Colorado, in some
23 schools and churches.
24 Q.   Right.  And you did not receive a salary from
25 Project Purpose for 2017?

1  A.    No, I did not.  As a matter of fact, I spent

2  money for that project.

3  Q.    And because you were involved in this Project

4  Purpose, you did not -- you'd agree with me that you

5  did not seek paying employment at all in 2017,

6  correct?

7  A.    I had put out resumés, but resumés were just to

8  the airlines, and then later on I got called by the

9  airlines.

10  Q.    But that didn't happen in 2017, did it?

11  A.    No.  No.  Unfortunately.

12  Q.    That was later?

13  A.    Yes, it was later.  I think it was in '18 when

14  I started getting calls.

15  Q.    And you indicated that you submitted

16  applications at four airlines?

17  A.    Uh-huh.  At my husband's airline.  He's a

18  captain for Frontier.  And then it was Jet Blue.

19  Never heard from Jet Blue.  And then Delta and

20  United.

21  Q.    And I think you've indicated -- and I know this

22  was in your deposition -- that you have done some

23  Pilates instruction?

24  A.    Yes.  That was later on.  Yes.

25  Q.    How much, approximately, did you earn and over

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 121 of 383   PageID 15141
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1401

1  what period of time?

2  A.   Well, I finished class and COVID hit and they

3  closed all of the Pilates studios.

4  Q.   Are you still doing that?

5  A.   I'm doing it, but it's only part-time, and it's

6  mainly in my house.  I have a Pilates studio in my

7  home.

8  Q.   How much have you earned from that?

9       Let's start with maybe 2021, how much did you

10  earn, approximately?

11  A.   Well, '21 was pretty much a no-go because of

12  COVID.  I would say maybe 5, $6,000.  Maybe.

13  Q.   In 2022?

14  A.   No, not in '22.  Well, '21 into '22.  So give

15  or take, it would be about, maybe, 5,000, maybe.

16  That is a stretch.

17  Q.   I just want to make sure I understand.  That's

18  in 2021 or is that for both years?

19  A.   Well, it would be both years right now.

20  Q.   Am I right that since your separation from

21  Southwest, other than the four airline applications

22  that you've submitted, you have not applied for any

23  other paying employment?

24  A.   No, I didn't.  No, I didn't.  There was another

25  project, though.  I don't know if you saw that.  But

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 122 of 383   PageID 15142
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1402

 1  it was called Divine Intervention, after Project

 2  Purpose.

 3  Q.   I did see that.  That's another not-for-profit

 4  that you were associated with?

 5  A.   Yes.  And we did -- we ended up -- it's

 6  basically the same thing except that we -- there

 7  were two partners.  We branched off from what

 8  Project Purpose was, and we were working with

 9  actually several places in St. Louis.  We weren't

10  really working again working in Aurora.

11      We did get our 501(c)(3), but there were some

12  issues with -- how should I put this? -- there were

13  some issues between what the two visions were and

14  they didn't coincide, and so I stepped away from

15  that.

16      And I spent money in that as well.

17  Q.   You did not receive any income for --

18  A.   No.

19  Q.   -- work at Divine Intervention?

20  A.   No, I did not.

21  Q.   I'm flipping through these pages.  That's good

22  news for you.

23      Ms. Carter, do you regret your decision not to

24  accept Southwest's offer of reinstatement?

25  A.   No, I don't, for the same reasons that I have

```
 1  explained.
 2  Q.   If Southwest wanted to get rid of you because
 3  you were a union objector, does it make sense that
 4  they would offer your job back?
 5  A.   I'm not sure, except the fact that I had
 6  presented them with so much evidence.
 7       Honestly, Mike Sims knows and we had talked
 8  about this off the record.  He said that Southwest
 9  shouldn't have gotten involved in union business.
10  Q.   And --
11  A.   He used to be in the union.  He was one of --
12  he actually worked in the union at one point.
13  Q.   I understand that.
14       But my question for you is, why would Southwest
15  have offered you a job back if it was trying to
16  target you and get rid of you because you were an
17  objector?
18            MR. PRYOR:  Object, just asked and
19  answered.
20            MR. McKEEBY:  I didn't get an answer.
21            THE COURT:  I will allow this question to
22  be answered.
23            THE WITNESS:  Honestly, I think they knew
24  that they had messed up and that they were going to
25  make sure that I stayed quiet about it.
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 124 of 383   PageID 15144
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1404

 1  BY MR. McKEEBY:

 2  Q.   And the same question about your religious

 3  beliefs.  If Southwest had some objection to your

 4  religious beliefs, why would they have offered you a

 5  job back?

 6  A.   Again, I think they knew they had messed up and

 7  they wanted -- they didn't want me to talk about it

 8  at all.

 9  Q.   So instead --

10  A.   And you can tell, they were taking away my

11  right to come back and sue them for this.

12       Before I signed this, I read over it and over

13  it and over it.  There was a point that I did think

14  that I was going to take it.  But, again, I talked

15  to Beth Ross, and Beth Ross said, This is an

16  egregious settlement and, you know, other people are

17  getting turned in, Charlene.

18       So I -- I -- my personal feeling was I'm going

19  to get targeted again and I'm going to lose my job,

20  and then I won't have any recourse.

21            MR. McKEEBY:  Pass the witness.

22            THE COURT:  Thank you, Mr. McKeeby.

23            Okay.  Mr. Greenfield, you may question

24  the witness.

25

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 125 of 383   PageID 15145
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1405

```
 1                    CROSS-EXAMINATION
 2   BY MR. GREENFIELD:
 3   Q.   Good afternoon, Ms. Carter.
 4   A.   Good afternoon.
 5   Q.   Do you recognize who I am?
 6   A.   Yes, I do.
 7   Q.   Who am I?
 8   A.   You are Adam Greenfield.
 9   Q.   Okay.  And what is my job?
10   A.   You are representing the Union.
11   Q.   Yes, ma'am.  Yes, ma'am, I do so proudly.
12        Your case has been going on for a handful of
13   years at this point, is that fair?
14   A.   Yes, it has, five, a little over five.
15   Q.   So we've had the opportunity to meet each
16   other?
17   A.   Yeah.  The first time I met you was coming in
18   to court.  We were talking about your cute socks.
19   Q.   I remember the exact day.  And you and I
20   believe Ms. Dawn Juan were putting on your shoes.
21   A.   Yes.  They were Christmas socks.
22   Q.   Yes, ma'am.
23        And how would you describe our interactions,
24   you and I?
25   A.   You're an attorney and I'm the plaintiff.
```

```
 1  Q.   Fair to say we are cordial?

 2  A.   Yes.

 3  Q.   And you were even kind enough earlier this week

 4  to ask me about my family, when you knew we had had

 5  some troubles earlier this week, is that right?

 6  A.   Of course.

 7  Q.   Pretty surface-level conversations, though, is

 8  that fair?

 9  A.   Yes.

10  Q.   Okay.

11       Now, over the next couple of days, this

12  afternoon and tomorrow, you and I are going to talk

13  about some pretty heavy things, okay?

14  A.   Uh-huh.

15  Q.   Personal things.  Things that many of us are

16  very passionate about, okay?

17  A.   Uh-huh.

18  Q.   I will make a promise to you, right here, that

19  I will remain respectful and cordial during that

20  time because we are going to be talking about

21  personal stuff, okay?

22  A.   Okay.

23  Q.   Can we try and do the same thing?

24  A.   Uh-huh.

25  Q.   Can I have that agreement?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1407

1  A.    Of course.

2  Q.    Okay.  Thank you very much.

3        While I was sitting at counsel table, I heard

4  several times you describe Local 556 as "my union"

5  and the president as "my president" and doing things

6  like working through "my union."

7        But you weren't a union member, correct?

8  A.    I was an objector.

9  Q.    Okay.

10 A.    Still paid union dues.

11 Q.    Yes, ma'am.

12       And you were an objector as of 2013?

13 A.    That is correct.

14 Q.    Okay.

15       And as an objector, you gave up your rights to

16 go to membership meetings, correct?

17 A.    Correct.

18 Q.    And you also gave up your right to vote for the

19 executive boards and the political offices that were

20 changing, is that correct?

21 A.    That's correct.  But our vote had been taken

22 away so many times.

23 Q.    Yes, ma'am.  And my question was just a little

24 bit different.  But nonetheless, you gave up that

25 right to vote?

 1  A.    That is correct.

 2  Q.    Okay.  I would like to, before we get to

 3  anything big, talk a little bit about some of the

 4  stuff that Mr. McKeeby just left off talking about,

 5  talking about some of the efforts you made after

 6  your termination to get back to work, et cetera.

 7        Okay?

 8  A.    Uh-huh.

 9  Q.    Well, even let's jump -- I take that back.

10  Let's jump to before you were terminated.

11  A.    Okay.

12  Q.    You were homeschooling your daughter, is that

13  correct?

14  A.    Yes.

15  Q.    Okay.  And what did that schedule look like?

16  A.    We were usually doing it about four hours a

17  day.  Homeschooling is a lot different than sending

18  your child to a regular school.  We had a little

19  community that we did it with, and then my husband

20  also helped out with homeschooling.

21  Q.    And what was your responsibility in that

22  homeschooling process?

23  A.    Well, with her it was pretty easy.  I mean, we

24  had everything laid out the night before.  The

25  curriculum that I used was very, very already set.

1  So she knew which booklets that she would need for

2  the day and which videos that she would need for the

3  day and so forth.

4       And then once a week we met as a community.

5  Q.   Yes, ma'am.  I'm a product of a small

6  Montessori school, growing up here, so I understand

7  what you speak of.

8       How many days a week were you in charge of her

9  homeschooling?

10 A.   Well, I mean, I was home.  But not -- not

11 really in charge per se, because we had laid

12 everything out for the week on Sunday.

13      So there was a Monday folder, or a Monday --

14 what I would consider not a folder, but like a --

15 something that she had all of her stuff already in.

16      Tuesday, Wednesday -- we only did four days of

17 class and then we had our fifth day at our

18 community.

19 Q.   So four days of class and then a fifth day with

20 the rest of the group?

21 A.   Correct.  She had -- I mean, those were her

22 responsibilities.  So I set everything out pretty

23 much on Sunday.

24 Q.   Uh-huh.

25 A.   And then if she had questions, she would either

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 130 of 383   PageID 15150
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1410

1  ask her daddy or she would call me.

2  Q.   Yes.

3  A.   When I was flying, she would -- when I did fly,

4  she did do those things.  Because Daddy usually

5  didn't know.

6  Q.   Yes, ma'am.

7       And I will stop beating around the bush at this

8  point.  I just want to know if that impacted the

9  amount of time you spent flying before you were

10 terminated?

11 A.   No, it didn't.  It didn't.

12      Let me explain something.  My husband is a

13 pilot, and so how we had structured it at the very

14 beginning is that because of my seniority in Denver,

15 I would fly either two days -- because I could bid

16 for those things or trade down to that or trip trade

17 with people -- I could fly a two-day or turns.  And

18 turns would have been perfect for me, except that I

19 would have to fly evening turns, for the most part,

20 and that is when everything kind of fell apart for

21 my husband.

22      Let me just give you a little heads-up on that.

23 Q.   If you can be brief, because I didn't exactly

24 ask.  I want to give you an opportunity --

25 A.   He had just gotten out of an 18-month program.

 1  He's finally taken the steps to get well.  So I was

 2  dealing with all of that.

 3  Q.   I understand.  I commend his efforts.

 4  A.   I do too.

 5  Q.   Alcohol addiction is a lifelong journey.  I

 6  understand that as well.

 7       I'm just trying to be fair to you, so I just

 8  wanted to know what was impacting -- because I have

 9  heard testimony or I have heard discussions that you

10  weren't flying that much, that you were --

11  A.   Correct.  But that -- homeschooling had nothing

12  to do with --

13  Q.   Thank you.  I will move on from it then.

14  A.   Okay.

15  Q.   Now, we heard about Project Purpose.

16  A.   Uh-huh.

17  Q.   And your position there was the educational

18  director, correct?

19  A.   Correct.

20  Q.   Okay.  And you were also the educational

21  director at Divine Intervention, is that correct?

22  A.   Correct.

23  Q.   And as the educational director, you were there

24  to -- well, at Divine Intervention, you were

25  actually trying to implement an actual academy

```
 1  school, correct?

 2  A.    Correct.

 3  Q.    And you were putting together all of the

 4  curriculum?

 5  A.    The curriculum actually from what I had

 6  already.

 7  Q.    Uh-huh.

 8  A.    We were implementing pretty much what I had

 9  used.

10  Q.    Okay.

11  A.    Because it was going to be more of a

12  homeschool-type environment at this academy.

13        And just let me tell you where this academy

14  was.  It was in the north side of St. Louis, near

15  Ferguson.

16  Q.    Ms. Carter, I do appreciate all of that.  As

17  you have heard from all of the attorneys, we are

18  under a bit of a time frame.

19  A.    Okay.  Yes.  I did put it all together, though,

20  yes.

21  Q.    Thank you.  Thank you.

22        And you got together all of the structure so

23  you could train the teachers, correct?

24  A.    Uh-huh, yeah.  It was everything was together.

25  Q.    Now, Ms. Carter, on your first day of
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 133 of 383   PageID 15153
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1413

1  testimony, we heard a little bit about your

2  background and your education.

3       Do you have a teaching certificate yourself?

4  A.   No.  You don't have to have a teaching

5  certificate, though, to homeschool.

6  Q.   I didn't say you did.  I'm just asking if you

7  had one.

8  A.   No, I do not have a teaching certificate.

9  Q.   Do you have a bachelor's in education?

10 A.   No, I do not.

11 Q.   Are you a registered substitute teacher?

12 A.   I used to substitute years ago.  Yes, I did.

13 Q.   Very good.  Many years ago you substitute

14 taught?

15 A.   Yeah, I did a lot when my little boy -- my son

16 was a little boy.

17 Q.   I did it for half a year, and I found out that

18 middle-schoolers are terrorists.

19      I recommend it to nobody.

20 A.   I had little ones.

21 Q.   Okay.  All right.

22      Ms. Carter, I would like to walk through the

23 claims you are bringing against the Union.  I want

24 you, me, and the jury to all be on the same page so

25 we can actually talk about what this case is about.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  Is that all right?

2  A.   Yes.

3  Q.   Okay.  You have a claim against the Union for a

4  breach of fiduciary duty.  Is that correct?

5  A.   Correct.

6  Q.   And how did the Union do that?  How did we

7  breach our duty to you?

8  A.   By turning me in to the company.

9  Q.   Okay.  So the moment Audrey Stone turned you

10 in, the Union breached our duty, is that right?

11 A.   Yes.

12 Q.   Okay.  But we didn't breach it at the

13 fact-finding meeting, correct?

14         MR. PRYOR:  Object to the extent it calls

15 for -- it does call for a legal conclusion as to

16 whether or not it was breached by the turning in is

17 a fact of the fact-finding.

18         THE COURT:  I will allow her to answer if

19 she has a basis to do so.

20 BY MR. GREENFIELD:

21 Q.   Do you believe we breached the duty in our

22 representation of you at the fact-finding meeting?

23 A.   Not Chris Sullivan, but the Union, yes.

24 Because I should have never had to go into that

25 fact-finding meeting.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 5 July 11, 2022                Page 1415

1   Q.   Yes, ma'am.  I understand that you believe none
2   of the following should have ever happened.  I just
3   want to -- I just want to talk to you about what the
4   Union's role was at that point.  Is that all right?
5   Can we talk about that?
6   A.   Yes.  But the Union breached all of it.  I'm
7   going to say it.
8   Q.   The Union breached all of it?
9   A.   Yes.
10  Q.   So you believe we did not properly represent
11  you at your fact-finding meeting, is that your
12  testimony?
13            MR. PRYOR:  Object, asked and answered.
14            THE COURT:  I'll allow it.
15            THE WITNESS:  Chris Sullivan represented
16  me in that fact-finding meeting.  Yes, he did.
17  BY MR. GREENFIELD:
18  Q.   Okay.  And you chose Mr. Sullivan to represent
19  you?
20  A.   I did.
21  Q.   And the Union said, Yes, Mr. Sullivan can
22  represent you at your fact-finding meeting, correct?
23  A.   I don't know if he asked the Union.  I
24  didn't -- I asked him to represent me.  From there I
25  don't know what he did.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 136 of 383   PageID 15156
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1416

1  Q.   Nevertheless, he represented you?

2  A.   That is correct.

3  Q.   And you thought he did an excellent job?

4  A.   Chris did a great job.

5  Q.   Okay.

6       And then at the Step 2 hearing, the Union

7  provided you representation there as well, correct?

8            MR. PRYOR:  Object.  Continuing objection

9  on the Step 2.

10           THE COURT:  Understood.  I will give you a

11 continuing objection.

12           I will overrule it and you can answer the

13 question.

14           THE WITNESS:  Okay.

15           I had Becky Parker and Beth Ross at my

16 side.  I prepared everything for the second step,

17 neither one of them did the leg work.  They were

18 there sitting, one taking notes and the other one at

19 the very end pleading for my job.

20 BY MR. GREENFIELD:

21 Q.   Okay.  And did you select either Beth Ross or

22 Becky Parker to represent you at the Step 2 meeting?

23 A.   No, I didn't.  It was -- I think that once I

24 got into the process, it was just somebody reached

25 out, or I -- I don't know how all of that started,

1  to be quite honest with you.

2      I had never used the Union before, so you are

3  going to have to forgive me on some of the memory as

4  well.

5  Q.   I understand.  Yes, ma'am.

6      And you felt they represented you fairly and

7  competently, is that correct?

8  A.   Beth did a really good job.  She couldn't

9  figure out why I was there, though, because it was

10 the union president that turned me in.

11 Q.   Okay.  I appreciate that.  My question was a

12 little bit different.  My question was --

13 A.   I know.  And I said yes, she represented me.

14 Q.   Thank you, ma'am.

15     And at the end of that Step 2 hearing, your

16 termination was reduced to a 30-day suspension?

17 A.   That is correct.

18 Q.   Time served?

19 A.   Correct.

20 Q.   But with the 24-month probation letter,

21 correct?

22 A.   There was a lot more than just the 24-month

23 probation letter.

24 Q.   But you took issue with that?

25 A.   That is one of the issues, yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1  Q.   But we heard today that even if that was
 2  reduced to 18 months, you still would not have
 3  accepted, correct?
 4  A.   No, I would not have.
 5  Q.   Okay.  So just so we're clear, are you claiming
 6  now that there was a breach of your -- of our duty
 7  to you at the fact-finding meeting?
 8  A.   A breach?
 9           MR. PRYOR:  Object, your Honor.  He asked
10  that question already, and she's answered it.  To
11  now look for a different answer --
12           THE COURT:  I think the answer is clear
13  enough now.
14           MR. McKEEBY:  I'm not clear because I
15  think I heard two different answers.  That's why I'm
16  asking again.
17           THE COURT:  Last time.
18           You can answer.
19           MR. PRYOR:  I'd also object it calls for a
20  legal conclusion, asked and answered.  She's told
21  him the breach.
22           THE COURT:  I will overrule and you can
23  answer this last time.
24           THE WITNESS:  Chris did a very good job
25  representing me, Chris Sullivan.
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 139 of 383   PageID 15159
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1419

1              Again, he believed that I shouldn't have

2    been there because he knew who turned me in.

3    BY MS. GREEN:

4    Q.   Yes, ma'am, I understand what your recollection

5    of that conversation with Mr. Sullivan is.

6         My question is a little bit different.  My

7    question is, do you believe the Union breached our

8    duty to you in our representation at the

9    fact-finding meeting?

10             MR. PRYOR:  Your Honor, this has been

11   asked and answered.  She's going to -- how many

12   times does she have to explain?

13             THE COURT:  Hold on, Counsel.  That's a

14   speaking objection.

15             I will sustain it at this point in time.

16   BY MR. GREENFIELD:

17   Q.   Okay.  In regard to the Step 2 hearing, do you

18   believe that the Union breached their duty in our

19   representation of you at the Step 2 hearing?

20             MR. PRYOR:  Asked and answered twice.

21   He's recovering the same --

22             THE COURT:  That was his last time.

23             THE WITNESS:  I just told you that I did

24   all of the preparation of everything that I

25   submitted to Mike Sims.  Beth was to my right.  She

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 140 of 383   PageID 15160
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1420

1   was actually taking notes.  Becky Parker was to my

2   left.

3          The only time Becky Parker said anything

4   was at the very end of the meeting, I do believe,

5   and that was to plead for my job.

6          I did most, 99 percent of the pleading in

7   my second step meeting.

8          So breach shouldn't have been there in the

9   first place.

10          Were they there sitting there to represent

11  me?  Yes.

12          MR. GREENFIELD:  Okay.  And I apologize to

13  do this, but I will have to object to

14  non-responsiveness and move to strike the testimony.

15  I asked her a very simple question about the breach

16  and she's talking about something else.

17          THE COURT:  I will reject your request to

18  strike as non-responsive.

19  BY MR. GREENFIELD:

20  Q.   Yes or no, Ms. Carter, do you believe the Union

21  breached their duty to you in our representation at

22  the Step 2 hearing?

23          MR. PRYOR:  Object, asked and answered.

24  Object to instructing a witness to answer a question

25  under oath, especially --

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 141 of 383   PageID 15161
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1421

1              THE COURT:  I'll allow it.

2              THE WITNESS:  The whole representation, it

3    was a breach of duty of fair representation.

4    BY MR. GREENFIELD:

5    Q.   So that's a yes to my question, we did breach

6    in our representation?

7    A.   Yes, you did.

8    Q.   And we breached, and Ms. Stone, you believe,

9    breached that duty when she turned you in, right?

10   A.   President Stone?  Yes, I do.

11   Q.   Yes, I understand her to be the president.  We

12   have multiple presidents, and she's no longer, so

13   I'm going to call her Ms. Stone.

14        The current president is who, ma'am?

15   A.   Used to be a friend of mine, Lyn Montgomery.

16   Q.   Is she no longer the president of the Union?

17   A.   No, she's still in it.

18   Q.   She's just no longer a friend of yours?

19   A.   Well, I don't see her.  I mean, I'm not -- I

20   don't get to talk to her anymore.

21   Q.   Okay.  Well, I apologize.  I refer to her as

22   President Montgomery because I represent the Union

23   still, so that is why I refer to Audrey Stone or

24   President Stone as Ms. Stone.

25        But I will reflect to the jury, I understand

1  that you believe her to be President Stone, okay?

2  A.    Uh-huh.

3  Q.    All right.

4        You believe you can say whatever you want to a

5  union member, isn't that correct?

6  A.    You just said union member.

7  Q.    Yes, ma'am.

8  A.    Union president or --

9  Q.    I'm asking --

10 A.    -- or a board?

11 Q.    I apologize.  I didn't mean to speak over you.

12       I asked you just about a union member.

13       You believe you can say whatever you want to a

14 fellow union member, isn't that correct?  Without

15 reprisal?

16 A.    When it's speaking about union business, yes.

17 Q.    And there is no limit to that, correct?

18 A.    There never has been even within our union

19 meetings.  It can get heated, things are -- you

20 know, words are said.  Have you ever been to a union

21 meeting?  Because they are pretty, pretty intense.

22 Q.    Ma'am, it's my day to ask questions, and you've

23 had a lot of time to dispute --

24 A.    Well, they can be pretty intense.

25 Q.    But I will --

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 143 of 383   PageID 15163
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1423

1   A.   And yes, we can say whatever we want in those

2   union meetings.

3        So, yes, I do believe I can say what I need to

4   say to my union when it has to do with union

5   activities.

6   Q.   But you weren't allowed to go to union

7   meetings, were you?  You gave up that right,

8   correct?

9   A.   That is correct.  But I didn't give up my voice

10  to speak to the president or the executive board.

11  Q.   I understand, ma'am.  That was not my question.

12  A.   Okay.

13  Q.   I just asked if you gave up your right to go to

14  those meetings?

15  A.   Yes.

16  Q.   Okay.  And you also believe there is no limits

17  on what you can say to a union president, correct?

18  A.   When it has to do with union business, that is

19  correct.

20  Q.   No restraints?

21  A.   Never has been.

22  Q.   Okay.

23       I would like to talk about your claims of

24  retaliation under the Railway Labor Act.

25  A.   Uh-huh.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1424

```
 1  Q.   That's one most people don't hear every day.
 2       What is your basis for your belief that we
 3  retaliated against you in violation of the Railway
 4  Labor Act?
 5            MR. PRYOR:  Object, calls for a legal
 6  conclusion, your Honor.
 7            THE COURT:  I will allow her to answer if
 8  she has a factual basis to do so.
 9            THE WITNESS:  The Railway Labor Act gives
10  us the right to not have the company get involved in
11  any union business.  It also has for us, we have
12  actually a Bill of Rights, and the first one is
13  freedom of speech, and that has also got to do with
14  the Railway Labor Act.
15       Everything that they do within the
16  confines of the union is protected against the
17  company.
18       So that's how I understand it, and that's
19  how it had always been before, and there is a line
20  between the company and the Union when it comes to
21  union business.
22  BY MR. GREENFIELD:
23  Q.   Okay.  So --
24  A.   That protects it, the Railway Labor Act
25  protects that.
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 145 of 383   PageID 15165
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1425

1  Q.   Yes, ma'am.  I understand that is your -- we

2  have now laid out your belief of what the act

3  covers, is that fair?

4  A.   Yes.  I know there is more to it, but yes.

5  Q.   Sure.  There is plenty to it, and I'm an

6  attorney.  I have to look at it myself to know

7  exactly what is in there.

8       But to be fair, to simplify it for the jury,

9  you believe the Union retaliated against you because

10 you were an objector, correct?

11 A.   Yes, because they were turning objectors in.

12 Q.   Okay.  And you believe the Union was

13 retaliating against you because you were a recall

14 supporter, is that correct?

15 A.   Yes.  And that's again -- they were going after

16 us recallers, yes.

17 Q.   I understand.

18      And again you say "we recallers."

19      You were not actually able to -- well, let me

20 ask you, did you sign the recall petition, ma'am?

21 A.   No, but I supported it and was very vocal about

22 it.

23 Q.   And you had given up your rights to recall?

24 A.   I didn't sign it, but I still didn't give up my

25 right to speak about it.

Case 3:17-cv-02278-X    Document 451    Filed 06/14/23    Page 146 of 383    PageID 15166
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                          Page 1426

1  Q.    Ma'am, I understand that.  At no point will you

2  hear me represent that you gave up your rights to

3  dissent against the Union.  You have my word, okay?

4  A.    Uh-huh.

5  Q.    My question is whether -- I'm trying to

6  understand the basis.

7        So we have that you believe the Union

8  retaliated against you because you are an objector,

9  right?

10  A.    Yes.

11  Q.    And because you were a recall supporter?

12  A.    Correct.

13  Q.    Is there any other basis?

14          MR. PRYOR:  Object, calls for a legal

15  conclusion.

16          THE COURT:  I'll allow it.

17          THE WITNESS:  Is there any other basis?

18  BY MR. GREENFIELD:

19  Q.    Yes, ma'am.

20  A.    I know that the big contention back then was

21  signing of the contract, and the people that were

22  against the contract were ridiculed as well.  And

23  there were some heated arguments regarding that as

24  well.

25  Q.    Okay.  So being an objector, being a recall

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 147 of 383   PageID 15167
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1427

1  supporter, and opposing the signing of the first

2  tentative agreement.

3  A.   Yes.

4          MR. PRYOR:  Object, calls for a legal

5  conclusion, mischaracterizes testimony, and fails to

6  include what she mentioned earlier in the

7  deposition -- or in the testimony.

8          THE COURT:  It's a question, so I will

9  allow her to answer.

10 BY MR. GREENFIELD:

11 Q.   Am I missing anything other than those three

12 things of how you believe the Union retaliated

13 against you?

14 A.   The Union retaliated against me by turning me

15 in to the company and getting me fired.

16 Q.   Yes, ma'am.  I think we all understand that at

17 this point.  I'm just --

18 A.   So I'm not understanding -- I'm not

19 understanding more of your question.

20 Q.   Great.  Perfect.  I ask bad questions, I will

21 ask plenty more as we talk.  So I will try and back

22 that up and rephrase it for us.

23      I'm trying to understand your beliefs about

24 why.  I know that you believe turning you in, okay?

25 A.   Well, in my Christian rights, too, my Title VII

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 148 of 383   PageID 15168
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1428

1  rights.

2  Q.   Sure.  And we will get to that.  We will get to

3  that.  I just want to talk about the RLA

4  specifically.  Okay?

5       Is there anything else other than we retaliated

6  against you -- that you allege Ms. Stone turned you

7  in because you were an objector, right?

8  A.   Oh, yeah.

9  Q.   A recall supporter?

10  A.   Yes.

11  Q.   And because you oppose signing of the contract?

12  A.   Those are some of the issues, yes.

13  Q.   Are there any other ones?  I just want the jury

14  to have a full understanding.  Are there any other

15  issues?

16  A.   Well, the other issues --

17            MR. PRYOR:  Wait.  Object, asked and

18  answered.  She mentioned others, and now they are

19  going back and adding some and taking some out --

20            THE COURT:  Hold on.  That's a speaking

21  objection.

22            MR. PRYOR:  Sorry.

23            THE COURT:  I will allow her to answer the

24  question.

25

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 149 of 383   PageID 15169
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 5 July 11, 2022                    Page 1429

1  BY MR. GREENFIELD:

2  Q.   Ms. Carter, I'm not trying to trick you.  I

3  just want --

4  A.   No, no, no.  It's okay.  But I don't -- you

5  know, I know that there is a complaint out there.  I

6  don't know what all is listed because I haven't read

7  it in a long time.

8       But I will tell you this.  I was objecting to

9  everything that they were spending my money on and I

10 didn't align with their political beliefs.

11      I do know that they had sent me who to vote

12 for, which I think is a private thing for each

13 member instead of us being told.  I highly objected

14 to that.

15      There's a whole slew of, I think, reasons.

16      Heck, I was asked who I voted for, and if I

17 voted for a certain candidate that didn't align,

18 Brett Nevarez says we shouldn't be in the union.

19 Q.   Thank you, Ms. Carter.

20      And we have talked about buckets a lot.

21 A.   Uh-huh.

22 Q.   Let's talk about buckets.

23      Can we put this in a fourth bucket of you had a

24 plethora of general dissent against the Union, and

25 you believe you were being retaliated against, is

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 150 of 383   PageID 15170
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1430

1  that fair?

2  A.   Yes.  Yes.

3  Q.   Are you the only objector that was being

4  retaliated against?

5  A.   No.

6  Q.   Okay.  Can you tell me all of the objectors you

7  are aware of that you believe were also being

8  retaliated against by the Union?

9  A.   Well, there's quite a few.  But the ones that I

10 do know personally --

11 Q.   I wanted to know all of the ones that you

12 think, whether you know them personally.

13 A.   Okay.  Well, I don't know -- I know Michi

14 Foley.  I know Jeanna Jackson, who is here in this

15 courtroom.  I know Cheri Parnell.  I don't know if

16 she was an objector, I can't remember.  Yeah, she

17 was.

18      Kim Hensley, I'm not sure if she was an

19 objector, but she was one that was kind of

20 retailiated towards.

21      Mike Casper.  Greg Hofer.

22      I know who else they retaliated against but she

23 wasn't an objector was Holly Imomovich.  They harmed

24 her horribly.

25      I could go down a list.  I have to have all

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1431

1   their names in front of me.

2              THE COURT:  Hold on.

3              MR. PRYOR:  Can the witness finish her

4   answer before the sidebar?

5              THE COURT:  She can finish if she's got

6   more to complete.

7              MR. PRYOR:  Take your time.

8              THE WITNESS:  Beverly Belanger.

9              Gosh, I can't think of all of the names.

10  I know that there was a whole list that Brian also

11  sent in the day that I was being called in in my

12  fact-finding meeting, and that's a whole list of

13  people.  But there is more to add to that.

14             They all got harmed at some point.  They

15  either got a 30-day suspension -- they really went

16  after Jeanna Jackson.

17             THE COURT:  Okay.  Hold on.  This is where

18  we need to talk at sidebar.

19             (Thereupon, the following proceedings were

20      had at sidebar:)

21             THE COURT:  You can't let her finish to

22  that degree, right?  You can't let her finish to

23  that degree.  We are walking right into the limine

24  point on what Southwest did to people.

25             So she can complete her answer but not

1  violate the limine.

2          MR. PRYOR:  I don't want her to violate

3  the limine.  He asked for the names.  She --

4          THE COURT:  And then she gratuitously

5  volunteered --

6          MR. PRYOR:  Well, then she's been -- okay.

7          THE COURT:  She's been in the courtroom

8  for the limine discussions.  She's heard that.

9          So now I need to go back and say, whatever

10 Southwest did to anybody does not matter to the

11 claims in this case.

12         MR. PRYOR:  I agree with that.

13         MR. McKEEBY:  I mean, I --

14         MR. PRYOR:  Is that the reason for the

15 sidebar?  I didn't even -- I was thinking of

16 something else.

17         MR. McKEEBY:  Well, the reason for the

18 sidebar is that I think the question, frankly, was

19 phrased in a way to prompt her to provide answers

20 that violate the motion in limine.  So I don't think

21 that -- I think you phrased --

22         MR. GREENFIELD:  Guys, this is the

23 double-edged sword that I have been briefing the

24 entire time as part of my motion in limine, is that

25 once evidence is presented about certain testimony,

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1433

1   certain social media violations, I need to be able

2   to flesh out who she thinks is being retailiated

3   against.  I need to be able to --

4              THE COURT:  Well, as to the Union, yes.

5   But that's not the same as Southwest coming back

6   with ultimate dismissal.

7              So you can still ask your question on who

8   got turned in.  That's separate and apart from what

9   Southwest did to those people.  And that last

10  sentence is the one she said I find problematic.

11             MR. PRYOR:  Your Honor, I'm comfortable

12  with telling her directly that she's not being asked

13  about that.  I mean, I think she --

14             THE COURT:  So I can do that.  I can ask

15  the jury to disregard the last statement on what

16  Southwest did and then continue on, and then ask her

17  in the future if she's got information on that.

18  Don't volunteer that.  That is something --

19             MR. McKEEBY:  And I think you need to

20  explain why you are doing that by repeating the

21  limine instruction.

22             THE COURT:  Right.  I will.

23             MR. PRYOR:  No objection, your Honor.

24             THE COURT:  Sidebar.

25             (Thereupon, the sidebar was concluded and

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 154 of 383   PageID 15174
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1434

1        the following proceedings were held in open

2        court:)

3              THE COURT:  Okay.  So I will ask the jury

4   to disregard the last part on what Southwest did to

5   anyone.  If you recall, I talked about this earlier.

6              What Southwest ultimately did to anyone is

7   not relevant to the types of claims that are in this

8   lawsuit as to Southwest.

9              Anyone who might have been reported to

10  Southwest from the Union, that might be relevant to

11  the claims against the Union, but I will ask the

12  witness, if you have information on what Southwest

13  did to anyone, I have carved that out of the

14  lawsuit, given the nature of the claims at this

15  point.

16             So, jury, please disregard that last

17  sentence.

18             Please refrain from getting into that,

19  Ms. Carter.

20             And you can proceed, Mr. Greenfield.

21             MR. GREENFIELD:  Thank you.

22  BY MR. GREENFIELD:

23  Q.   Ms. Carter, right now you and I are having a

24  conversation, is that correct?

25  A.   Correct.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 155 of 383   PageID 15175
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1435

1  Q.   And these are your friends and supporters

2  behind your attorneys?

3  A.   Those are all flight attendants at Southwest.

4  Yes.

5  Q.   Are they not your friends?

6  A.   Oh, yeah, they are friends and supporters and

7  workmates and people who got harmed by the Union.

8  Q.   That's what I'm asking, if they are just

9  friends and supporters, ma'am.  Is that right,

10  Ms. Carter?

11  A.   Yes.  I mean, I think you guys have friends and

12  supporters behind you, too.

13  Q.   I don't know a single other person in this

14  courtroom other than people who work for Southwest

15  Airlines.  I don't know anybody else here.  I will

16  represent that to the Court.

17            MR. PRYOR:  Your Honor, the objection is

18  who has supporters in the gallery, the irrelevance.

19  BY MR. GREENFIELD:

20  Q.   And here is why I bring it up, Ms. Carter.

21            MR. PRYOR:  Okay.  I still have an

22  objection to relevance.

23            THE COURT:  I don't see the relevance.

24            Mr. Greenfield, you can explain for me at

25  sidebar if you want.

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 156 of 383  PageID 15176
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1436

 1              MR. GREENFIELD:  I will absolutely move
 2   on, your Honor.
 3              THE COURT:  Okay.
 4   BY MR. GREENFIELD:
 5   Q.   We are having a conversation, correct?
 6   A.   Correct.
 7   Q.   I would like to ask you to talk to me.  I don't
 8   believe there is any reason for you to be searching
 9   over in that area, is that fair, with your eyes?
10              MR. PRYOR:  Your Honor, I object.  That
11   mischaracterizes --
12              THE WITNESS:  I'm not searching over in
13   that area.
14              MR. PRYOR:  He asked her to see who is in
15   the gallery and she looks, and then he acts like
16   it's improper?
17              THE COURT:  Sustained.
18   BY MR. GREENFIELD:
19   Q.   All right.
20        People you believe were retaliated against by
21   the Union are Michi Foley?
22   A.   Kent Hand, too.
23   Q.   Kent Hand.  Okay.  I'm just trying to get
24   everybody here.
25   A.   And he had to sue to get his job back as well.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

| 3:17-cv-02278-X | Vol 5 July 11, 2022 | Page 1437 |
|---|---|---|

```
 1  Q.   Ma'am, if you could --
 2            THE COURT:  That's a Southwest issue.
 3  What Southwest did to anyone is --
 4            THE WITNESS:  Oh, I'm sorry.
 5            THE COURT:  -- not part of this lawsuit.
 6            THE WITNESS:  I'm sorry.
 7  BY MR. GREENFIELD:
 8  Q.   Ma'am my, question is very simple.  I'm just
 9  trying to understand who you believe was also being
10  retaliated against by the Union, okay?
11       We have Michi Foley, correct?
12  A.   Yes.
13  Q.   Jeanna Jackson?
14  A.   Yes.
15  Q.   Cheri Parnell?
16  A.   Yes.
17  Q.   Kim Hensley?
18  A.   Yes.
19  Q.   Mike Casper?
20  A.   Yes.
21  Q.   Greg Hofer?
22  A.   Yes.
23  Q.   Holly Imomovich?
24  A.   Yes.
25  Q.   Beverly Belanger?
```

```
 1   A.    Yes.

 2   Q.    And Kent Hand?

 3   A.    Yes.

 4         And there's many more, I just don't know their

 5   names on the top of my head.

 6   Q.    There's many more --

 7   A.    There was 100 of us, and we all had some kind

 8   of issue.

 9   Q.    There's 100 objectors.  Is it your testimony

10   that the Union took action to retaliate against all

11   100 of those individuals?

12   A.    I believe most of the ones that I just told you

13   about, we were the most vocal, and we were the ones

14   that were the most harmed.

15         But, yes, there were others that were harmed by

16   the Union.

17   Q.    My question is a little bit different, ma'am.

18         Are you claiming today that all 100 of those

19   objectors were also being retaliated against by the

20   Union?

21   A.    If they were an objector.

22   Q.    So yes.

23   A.    I don't know if they did, but yes, they went

24   after -- Brian Talburt states that he wants all

25   objectors.  I mean, he went after all of us.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

 1  Q.   Ma'am, my question is, do you have an

 2  understanding or a belief --

 3  A.   Yes, I do.

 4  Q.   Do you have a basis for saying that all 100 --

 5  A.   I have an understanding.

 6            THE COURT:  Hold on.  Hold on.

 7            Finish your question, and then you can

 8  answer.

 9  BY MR. GREENFIELD:

10  Q.   You have a basis for saying that all 100

11  objectors were being retaliated against by the

12  Union?  What is that basis?

13  A.   They put all of our names out on a list and

14  sent it around to all flight attendants so that they

15  could gather information and turn them in.  Yes.

16  And the Union did that.

17  Q.   We will come back to that.

18       Have you provided that documentation to your

19  attorneys, Ms. Carter?

20            MR. PRYOR:  Object to the extent he wants

21  to talk about communications with counsel.  He's

22  aware --

23            THE COURT:  Hold on.

24            Sustained.

25            You can bring it up at sidebar if you

 1 | want.
 2 | BY MR. GREENFIELD:
 3 | Q.   And it's your -- do you have specific knowledge
 4 | that all of the individuals that you did name, the
 5 | nine individuals, were all objectors?
 6 | A.   Yes.
 7 | Q.   You are sure about that?
 8 | A.   Pretty darn sure.  I know they were objectors
 9 | at one point.
10 | Q.   And it is your testimony that Ms. Jeanna
11 | Jackson, who is sitting over there in the gallery
12 | right now, that she was an objector during that time
13 | period?
14 | A.   She was an objector prior to that, and I
15 | believe she spent another $100 to become a member
16 | again so that she could vote on the contract.
17 |      But she was the recall petition holder, and the
18 | Union went after her with a vengeance.
19 | Q.   Yes, ma'am.  And we will turn to that recall
20 | right now.
21 |      As you testified earlier, you were being
22 | retailiated against because you were a recall
23 | supporter, correct?
24 | A.   Yes, I was vocal about it, yes.
25 | Q.   Okay.  And were all of the other recall

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 161 of 383   PageID 15181
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1441

1   supporters being retaliated against as well?

2   A.   A lot of them, yeah.  We were.  We were all

3   being -- yes.

4   Q.   All of them?

5   A.   I don't know how many there were on the recall.

6   I don't know the exact number.  But, yes, most of

7   the ones that got harmed the worst were the most

8   that were speaking about it.

9   Q.   Now, is it fair to say that you believe the

10  recall petition to be a valid complaint?

11  A.   It was a very valid complaint.

12  Q.   You believe there to be no fraud associated

13  with that document?

14  A.   I don't believe that there was any fraud.  I

15  believe that the Union -- and I'm going to state

16  this now --

17  Q.   Uh-huh.

18  A.   It was like the -- what is it?  The fox

19  guarding the henhouse.  Whatever that is.  Where you

20  actually have the actual people that we didn't want

21  in there actually doing some of the counting of the

22  votes and going through these things.

23       Yes, I don't believe that that is the way it

24  should have been handled.

25  Q.   Fair to say you believe it's a conspiracy to

 1  get --

 2  A.   It's not a conspiracy.  We know it to be true.

 3          MR. PRYOR:  Wait.  Object, your Honor, to

 4  the relevance of going down this talking about the

 5  recall petition.

 6          THE COURT:  I'll allow it.

 7          THE WITNESS:  We know it to be true, who

 8  counted the votes.  She did everything she could to

 9  make sure everything was on the up and up.  But when

10  you have the same people counting the votes as who

11  is in office or who is working with the Union, doing

12  the count, that is not a conspiracy, it is a

13  conflict of interest, and it doesn't look right, and

14  I don't think that that's the way it should have

15  been handled.

16  BY MR. GREENFIELD:

17  Q.   So you --

18  A.   So, no, I don't believe your findings, I don't.

19  Q.   So you believe the findings of the committee

20  that investigated the report --

21  A.   Uh-huh.

22  Q.   -- are false?

23  A.   I think a lot of them are, yes.

24  Q.   Well, it's either -- so you think it's

25  partially false or fully false?

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 163 of 383   PageID 15183
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1443

```
 1  A.    I think it's partially false, yes.

 2  Q.    Okay.  What do you think did they make up,

 3  ma'am?

 4  A.    Honestly --

 5              MR. PRYOR:  Relevance.

 6              THE WITNESS:  I don't know.  I just know

 7  that --

 8              THE COURT:  I need to rule on the

 9  objection first.

10              I will overrule.  You can answer.

11              THE WITNESS:  It -- it -- you shouldn't

12  have the same people counting the votes and looking

13  at these signatures as who is in the union

14  supporting the same people in the union that you are

15  actually recalling.  And that is the way it was

16  handled.

17  BY MR. GREENFIELD:

18  Q.    Okay.  And we will talk about -- we will go

19  into this in more depth, don't worry.

20        I'm just trying to get all of us on the same

21  page, okay?

22  A.    Uh-huh.

23  Q.    So you believe that it was improper and

24  fraudulent, correct?

25  A.    My personal --
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 164 of 383   PageID 15184
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1444

```
 1  Q.   The findings?
 2  A.   My personal -- my personal view --
 3  Q.   Yes, ma'am.
 4  A.   -- not anybody else's, yes, I do.
 5  Q.   And that's because the individuals who were on
 6  the committee were biased of some sort, right?
 7  A.   When you are working in and with a union, yes,
 8  I do think that's a bias.
 9  Q.   Okay.  And, again, we will talk about all of
10  that later.
11       Now, the third bucket was opposing signing of
12  the contract.
13  A.   That is correct.
14  Q.   Okay.  Are you aware that Donna Keith, a woman
15  named Donna Keith opposed signing the contract, the
16  first tentative agreement?
17       Do you know who Donna Keith is?
18  A.   I know who Donna Keith is.  I know she sits on
19  the board.  I don't know if she's a domicile rep.  I
20  can't remember what position that she -- that she
21  holds.
22  Q.   Uh-huh.
23  A.   But that was her personal -- if she signed
24  against the -- what was it -- you said the first
25  tentative agreement?
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 165 of 383   PageID 15185
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1445

1  Q.   Yes, ma'am.

2  A.   Why would I need to know if she signed it or

3  not?

4  Q.   I'm asking if you're aware or not.

5  A.   No, I was not aware.

6  Q.   Were you in the courtroom when Ms. Stone

7  testified that Ms. Keith opposed the first tentative

8  agreement?

9  A.   Yes, but I didn't remember who it was that she

10 said.

11 Q.   Do you have any reason to believe that that

12 would be inaccurate?

13 A.   I'd have to look at the --

14          MR. PRYOR:  Object, foundation.

15          THE WITNESS:  I don't know.  Because I

16 would have to look at what the -- I mean who

17 actually signed for the TA.  I don't know if it's

18 true or not.  I don't have the paperwork in front of

19 me.

20          THE COURT:  Okay.  I'm overruling that

21 foundation objection to the last question.

22 BY MR. GREENFIELD:

23 Q.   And are you aware of whether or not Mr. John

24 DiPippa opposed the first tentative agreement?

25 A.   I don't know.

1  Q.   Were you in the courtroom when Ms. Stone

2  testified that Mr. DiPippa opposed the signing of

3  the first tentative agreement?

4  A.   I don't remember who she spoke to.  I'm sorry.

5  I just don't remember.  And, you know -- and if you

6  say that's true, then that must be true.  I just

7  don't -- and I don't have the paperwork in front of

8  me.

9  Q.   And that's fair, Ms. Carter.  All I'm asking is

10 if you remember, that is all.

11 A.   Okay.

12 Q.   And Ms. Jessica Parker, are you aware whether

13 or not she opposed the signing of the first

14 tentative agreement?

15 A.   Well, I'm sure that Ms. Stone actually probably

16 testified for that, so I'm going to trust your

17 wording on this.  But, again, I don't have who

18 signed and who didn't in front of me, so I cannot

19 say with a shadow of a doubt whether they did or

20 not.  I can only take what she said here in the

21 courtroom.

22 Q.   Nor am I asking you to testify to anything that

23 you don't specifically know about, okay?

24      Are you aware of who served on the committee to

25 review the recall petition?

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 167 of 383   PageID 15187
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1447

1   A.   I know they were union members and worked in

2   the union.  I don't recall who it was, the names per

3   se.  But I do know that they were.  And I'm sure

4   it's within those names that you just said because I

5   do know that Jessica Parker was part of it.  But

6   that doesn't have anything to do with the TA.

7        I objected with Jessica Parker doing some of

8   the things that she did.  She was at the Women's

9   March.  So, again --

10  Q.   Thank you, ma'am.  My question is a little bit

11  different.

12       Would it surprise you to find out that Jessica

13  Parker was on the committee to review?

14  A.   No, it wouldn't surprise met at all.

15  Q.   Would it surprise you that Donna Keith was on

16  the committee to review the recall?

17  A.   It wouldn't surprise me at all.

18  Q.   Would it surprise you that John DiPippa was on

19  there?

20  A.   It wouldn't surprise me at all.

21  Q.   Now, all of those individuals, I will represent

22  to you, through Ms. Stone, opposed the first

23  tentative agreement.

24  A.   The two don't have anything to do with each

25  other, not with -- not with the recall.

```
 1  Q.   Okay.  But isn't it fair that -- and I believe

 2  this was your testimony -- that the recall petition

 3  was started after the first -- after the first

 4  tentative agreement failed, correct?

 5  A.   Correct.

 6  Q.   And you believe that you were being retaliated

 7  against by the Union for opposing that?

 8  A.   That is correct.

 9  Q.   Yet we have three committee members who opposed

10  the first tentative agreement who are reviewing the

11  recall petition.

12  A.   Did I put it --

13  Q.   You believe that the findings that they came up

14  with are fraudulent, is that fair?

15  A.   Did I say everybody on the board or did I say

16  as a collective the Union was going after us?

17  Q.   Ma'am, you testified that the -- I believe, and

18  correct me if I'm wrong, that the findings of the

19  committee reviewing the recall were fraudulent.

20  Isn't that true?

21  A.   I think they were, yes.  I do believe so.  I

22  believe so.

23            MR. PRYOR:  Object.  He's using her words

24  instead of -- he's using his words instead of hers.

25  He's mischaracterizing her testimony.  She didn't
```

```
 1   say --
 2              THE COURT:  Hold on.  Hold on.  That's a
 3   speaking objection.
 4              I will sustain that.
 5              MR. GREENFIELD:  All right.
 6   BY MR. GREENFIELD:
 7   Q.   And then we have this fourth bucket of general
 8   union dissent that we kind of agreed upon.
 9         Is that pertaining to, for example, the
10   messages you sent to Ms. Stone's Facebook account
11   from 2015 to 2017, before the ones you were turned
12   in for?
13   A.   The dissent?
14   Q.   Is that what we are talking about?
15   A.   Yes.  It started -- yes, it started with what
16   they did in the core group and got away with.
17   Q.   And did Ms. Stone ever turn you in for any of
18   those posts?
19   A.   If my recollection is correct, she said she
20   didn't really read most of those.
21   Q.   Okay.  So she wouldn't have turned you in for
22   it, would she have?
23   A.   If she didn't read any of them, I don't think
24   she knew what they even said.
25   Q.   So we could agree, then, it would be impossible
```

1  for her to file a complaint with you over something

2  she didn't read, is that fair?

3  A.    Yeah, if she hasn't seen them or read them.

4  Q.    Agreed.

5        You mentioned religious discrimination, so we

6  are on to our third complaint, so all of us can be

7  on the same page.

8        Yes, your Honor.

9             THE COURT:  Can I ask about a lunch break?

10  It's 12:10.  Is it okay timing-wise to take a

11  one-hour lunch break?

12             MR. GREENFIELD:  Of course.

13             THE COURT:  Okay.  Sorry about

14  interrupting your flow.

15             MR. GREENFIELD:  No problem.

16             THE COURT:  So the jury will come back at

17  1:11.

18             So the same three instructions.  You can

19  only talk to your fellow jurors or court personnel,

20  just not about this case.  You can't talk to anyone

21  else.  And don't do any research about the case.

22             We will see you in one hour.

23             All rise.

24             (The jurors exited the courtroom.)

25             THE COURT:  Before you leave, I need to

 1   ask y'all, so this goes back to our discussion at

 2   the end of the day Friday.

 3          How long of a break can I tell someone

 4   they cannot talk about the case?  My PA, similar

 5   with a Seventh Amendment right or a Fifth Amendment

 6   right, I cannot sideline an overnight break, but

 7   something shorter that I can say, don't talk to

 8   anyone about the case.

 9          So my leaning is to ask you, do not talk

10   to anyone about the case in the one-hour lunch

11   break.

12          Anyone want to take a shot at me as to why

13   I'm wrong?

14          MR. PRYOR:  If he wants to instruct her

15   not to talk to anybody, that is fine.  One-hour

16   lunch break.

17          THE COURT:  Well, to not to talk to anyone

18   about the case.  I realize we put you all in small

19   rooms.  The best I can do is ask somebody to not

20   talk about the case, right?  I can't --

21          MR. PRYOR:  We are fine with it, but I did

22   want to talk to her again about the limine to make

23   sure we don't have that issue about Southwest

24   Airlines.  I think you made it clear, but it seemed

25   to come up even after you mentioned it.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 172 of 383   PageID 15192
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1452

1            THE COURT:  I'm fine with that as an
2    exception.  The limine and what Southwest did to
3    somebody is the only thing you can talk about
4    case-wise.  Is that all right?
5            I will note your objection.  I'll overrule
6    it because I think I'm safe at an hour even for
7    someone with Fifth or Seventh Amendment rights, but
8    not in overnight stay context.
9            All right.  So please don't talk to anyone
10   about the case except to the extent we just talked
11   about.  You can talk to your lawyers about the
12   motion in limine on Southwest and their treatment of
13   individuals.
14           Okay.  Anything else before y'all take
15   your break?
16           Okay we will see y'all back here at 1:10.
17   How about that?  One minute before the jury shows
18   up.  Thank you.
19           (Recess.)
20           THE COURT SECURITY OFFICER:  All rise.
21           THE COURT:  Thank you.
22           Mr. Frye is out because he's wrapping up
23   the time clock calculations.  I'm trying to give
24   y'all, you know, half-day calculations and then
25   end-of-the-day calculations so you know a closer to

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 173 of 383   PageID 15193
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1453

 1  accurate time where you stand.  So he will come back
 2  in as soon as he's done with that.
 3            Anything before we get the jury?
 4            MR. GREENFIELD:  No.
 5            THE COURT:  Let's bring them on in.
 6            (The jurors entered the courtroom.)
 7            THE COURT:  Okay.  You can be seated.  And
 8  Mr. Greenfield, you can continue.
 9  BY MR. GREENFIELD:
10  Q.   Hello, Ms. Carter.
11  A.   Hello.
12  Q.   All right.  Do you mind if we just kind of pick
13  right back up where we left off before lunch?
14  A.   Sure.
15  Q.   Okay.  And what we were doing before lunch, is
16  you and me the jury here, we're trying to get on the
17  same page as what you are claiming and how the union
18  has wronged you, okay?
19  A.   Uh-huh.
20  Q.   All right.
21        And we just finished talking about the Railway
22  Labor Act, and we talked about your claims of breach
23  of fiduciary duty against the union.
24        And now I'm turning to, you have claims against
25  the union for religious discrimination, and that the

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  union discriminated against you because of your

2  religion?

3  A.    Correct.

4  Q.    Is that correct?

5  A.    Correct.

6  Q.    And how did the union do that, ma'am?

7              MR. PRYOR:  Object to the extent it calls

8  for a legal conclusion.

9  BY MR. GREENFIELD:

10  Q.   How do you believe the union did that?

11             THE COURT:  I will allow it to the extent

12  she has knowledge.

13             You can answer.

14             THE WITNESS:  I don't know how to

15  formulate the words correctly.

16             In the fact-finding notes that Audrey

17  Stone had sent -- or was talking with Ed Schneider

18  reflects that she's making reference to my Facebook

19  posts and my Christianity.  And I'm not exactly sure

20  why she would use such, you know -- what does my

21  Christianity have to do with my Facebook page, my

22  personal Facebook page?

23             I do believe that she went after me

24  because of the Women's March, because I'm an

25  objector, I object to everything that this union is

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1455

```
 1  doing, and she didn't go to that march -- let's put
 2  it this way, I have never seen the union go to a pro
 3  life march.  Ever.
 4         They represent everything else that is
 5  political or a hot topic of some sort.  And they
 6  don't make reference to any of our jobs per se.  I
 7  think the union should be there specifically for our
 8  jobs, our safety, the health of us on the airplane
 9  and so forth.
10  BY MR. GREENFIELD:
11  Q.   And that is why you are an objector, right,
12  ma'am?
13  A.   Oh, that -- yeah, she --
14  Q.   I understand.
15  A.   Yes.
16  Q.   Okay.  So is it fair to say that you believe
17  the union discriminated against you through
18  Ms. Stone as the president, correct?
19  A.   Correct.
20  Q.   And the discrimination is found by her turning
21  you in for the post you sent her, correct?
22  A.   And speaking about my Christianity, yes.
23  Q.   Okay.  And that's --
24  A.   She mentions it.
25  Q.   Right.  And that is within those posts?
```

1   A.    In what posts?

2   Q.    Or -- I'm sorry -- within the Facebook messages

3   you sent her?  I apologize.

4   A.    I don't -- you know what?  I don't remember all

5   of the Facebook messages that I wrote to her.  But

6   she referenced it off of my personal page.

7   Q.    Okay.  Is there anything else in any other way

8   that the union discriminated against you because of

9   your religious beliefs, other than that?

10              MR. PRYOR:  Same objection as legal

11  conclusions.

12              THE COURT:  I will allow her to answer

13  based on her personal knowledge.

14              THE WITNESS:  That is a hard one to answer

15  specifically, but their actions prove what happened

16  to me.  She got me fired for my Christian belief on

17  my Facebook page.  Also, the fact that I was totally

18  against them going to that march, and, you know,

19  supporting Planned Parenthood.  I don't know how

20  much more I can say about --

21  BY MR. GREENFIELD:

22  Q.    Is if fair to say -- I'm sorry.  I didn't mean

23  to cut you off.

24  A.    That's okay.

25  Q.    Is it fair to say that it was the actions of

1   Ms. Stone?

2   A.   Ms. Stone as being the union president.  And

3   the union, when I went -- okay.

4   Q.   Yes, ma'am, I know.  We agree on that.  I don't

5   think -- I think we are all on the same page.

6        It is fair to say that it was that act of

7   Ms. Stone turning you in, that is where you believe

8   the discrimination lies, is that fair?

9   A.   Yes.

10  Q.   Okay.  Do you know if Ms. Stone is a Christian

11  as well?

12  A.   No, I do not.

13  Q.   Do you believe anyone else was treated better

14  than you -- do you believe any non-Christians were

15  treated better than you?

16  A.   I don't know -- because -- like, you know,

17  everybody has been trying to say I'm trying to shove

18  my religion down other people's throats.  Most

19  times, unless we know of our friends, we don't

20  really talk about that at work.  I mean, because it

21  is a subject that you usually, you know, when you

22  are on the airplane, you keep -- unless you know

23  somebody.

24       Will you ask that one more time, though, the

25  way you asked it.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 178 of 383   PageID 15198
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 5 July 11, 2022                  Page 1458

1  Q.   Yes.  It wasn't -- I didn't do a really good
2  job.
3       And maybe I can put these two things side by
4  side and it will help us.
5       You claim that you were discriminated against
6  in part because you were an objector.  So we said
7  all of these other -- you had a list of some other
8  objectors that you felt were retaliated against?
9  A.   Uh-huh.
10  Q.   Do you feel like there were any other
11  Christians that the union was targeting or was it
12  just you?
13  A.   That, I don't have any knowledge of.  I don't.
14  You know, I know some of my friends that she did --
15  or they did go after are Christians, so, yes.  I
16  don't know if they displayed that, and if they knew
17  that specifically.  But, yes.
18  Q.   Are you aware of any non-Christians who were
19  treated more favorably than you by the union?
20  A.   Again, I don't know most of the objectors'
21  faith.  So I can't really say.  I don't know.
22  Q.   I understand.
23       And let's -- let's even not just say
24  "Christian," because I think to be fair, there is
25  probably different interpretations of how people

1  view Christianity, so I don't want to blanketly put

2  that on you.

3       Do you believe there is any individuals who

4  shared your religious beliefs who were also being

5  discriminated against by the union?

6  A.   Yes, I do.

7  Q.   Okay.  Who are those people?

8  A.   Jeanna Jackson.  Beverly Bellinger.  I know

9  Mike Casper, he was.  Knowledge-wise of other

10 people, I don't -- I honestly don't know.  Maybe

11 Michelle Foley, I think she falls into the same

12 camp.

13 Q.   Okay.  And can you point the jury to any

14 individuals who did not share your religious beliefs

15 who were being treated more favorably than you?

16 A.   Can I point my finger to them?

17 Q.   Yes.  Can you identify them, sorry, you know?

18 A.   Like I said, I don't know everybody's belief

19 systems.  I think that not only were there

20 Christians complaining about this, but there were

21 other members.  There's men that were talking

22 regarding this, that their union dues shouldn't have

23 been spent for this.  There's a -- we have a diverse

24 group, and they should represent all when they do

25 these things, not just a select group.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1460

 1        And really, they should stay out of political
 2   stuff, because like I said, we are all a diverse
 3   group.  They should be taking care of the contract,
 4   our jobs, our safety, our health, anything that has
 5   got to do with our specific jobs.  That is what the
 6   union should be taking care of.  Period.
 7   Q.   Yes, ma'am.  I think we understand that you
 8   have a specific view as to what the union's role
 9   should be, fair?
10   A.   Well, I think a lot of people do.  I mean, it
11   is -- you know, there are so many of us and we all
12   think differently.
13   Q.   I understand.  Absolutely.  I would completely
14   100 hundred percent agree with you the fact that --
15   well, let's just take a step back.  The union is
16   about 15,000 people?
17   A.   Give or take, yes.  I don't know what it is
18   now.
19   Q.   Just approximately.
20   A.   Yeah.
21   Q.   Fair to say within that group, there is people
22   of many different religions?
23   A.   Yes.
24   Q.   Many different races?
25   A.   Yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1  Q.    Different political beliefs?

 2  A.    Yes.

 3  Q.    Okay.  I would like to now kind of talk about

 4  your last claim that you are bringing against the

 5  union.

 6       You have claimed that the union did not provide

 7  you a religious accommodation, is that your

 8  understanding as well?

 9  A.    Yes.  I mean, they didn't -- they didn't even

10  take -- into -- especially when I went above -- when

11  I went towards the board, when I had to have my

12  meeting with the board.

13       Same argument.  You know, this was a union

14  president that turned me in.  I'm a Christian.  I

15  don't believe that our union dues -- all through

16  everything that I have said this whole time -- and I

17  actually spoke to Michael Massoni, he was the person

18  that was on the phone.  They chose not to take my

19  case, knowing that it was the union president that

20  turned me in.

21  Q.    You say he decided not to take your case?

22  A.    No, they did not take my case.  I had to bring

23  my own attorneys.

24  Q.    You are talking about the arbitration

25  proceeding?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1462

```
 1  A.    Correct.

 2  Q.    Okay.

 3  A.    And they should have represented me knowing

 4  that this was union business, and it was -- that

 5  this was the president turned me in to the company.

 6  They have a fiduciary -- a fiduciary responsibility

 7  and they take an oath not to harm a member.

 8       Now, I'm an objector, but I still pay the dues.

 9  So -- so, I mean, I don't understand all of that.

10  It shouldn't be that way.  If I'm an objector, I

11  should be able to just say, you know what, I'm going

12  to take my dues and send it to another cause, if

13  that is the case, if they are not representing us

14  the correct way.

15  Q.    Yes, ma'am.  I think we all understand at this

16  point why you are an objector and your basis for

17  doing that.

18       I would like to turn us back to the concept of

19  the religious accommodation.

20       What, if any, accommodation did you want the

21  union to provide you?

22            MR. MORRIS:  Objection, she just answered.

23            THE COURT:  Sustained.

24            MR. GREENFIELD:  I -- maybe we can -- can

25  we sidebar, your Honor?
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 183 of 383   PageID 15203
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1463

 1                    (Thereupon, the following proceedings were

 2          had at sidebar:)

 3                    MR. GREENFIELD:  I don't mean to be

 4     obstinate, but I honestly have no idea what she just

 5     said, and I don't think the jury does either.

 6                    THE COURT:  She said they didn't provide

 7     her a lawyer in the arbitration.

 8                    MR. PRYOR:  And she said they shouldn't

 9     have reported her.  It's both in her answer.  She's

10     answered.

11                    MR. GREENFIELD:  Okay.  But that is what

12     I'm trying to find clarity on.  I'm not trying to

13     belabor a point.  I'm not trying to ask and answer.

14     I just literally did not understand her answer.

15                    THE COURT:  So do you want her to tell you

16     that you should have provided her a lawyer?  If you

17     want to ask that.

18                    MR. GREENFIELD:  Okay.

19                    And then can I wrap it up and say, is

20     there anything I'm missing?

21                    THE COURT:  Sure.

22                    MR. PRYOR:  My concern is, you keep asking

23     the same question.  She feels like, well, gee, I

24     guess I must not have answered it before.  It is

25     just not fair to the witness.

Case 3:17-cv-02278-X    Document 451    Filed 06/14/23    Page 184 of 383    PageID 15204
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1464

 1                 MR. GREENFIELD:  I have asked it -- I have

 2   asked it one time.

 3                 MR. PRYOR:  Once is enough.

 4                 MR. GREENFIELD:  Mr. Pryor, you were up

 5   here asking the same question five times.  I have

 6   about 84 asked and answered.

 7                 MR. PRYOR:  I'm sure you objected.

 8                 THE COURT:  I'll let you ask.

 9                 (Thereupon, the sidebar was concluded and

10        the following proceedings were held in open

11        court:)

12                 THE COURT:  Okay.  You can ask the

13   question we discussed.

14   BY MR. GREENFIELD:

15   Q.   Okay.  And I'm not trying to be obstinate here,

16   Ms. Carter.  I'm just trying to have some clarity.

17   And so I apologize if I'm -- if you feel like I'm

18   belaboring the point, okay?

19   A.   Uh-huh.

20   Q.   Okay.  My understanding, based on what you

21   said, was that you should have been provided an

22   accommodation in respect of the union should have

23   represented you at the arbitration?  Is that what

24   you are --

25                 MR. PRYOR:  Let me object.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 185 of 383   PageID 15205
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1465

1  Mischaracterizes her testimony by not giving her

2  complete answer.

3  BY MR. GREENFIELD:

4  Q.   In part.  Is that what you are saying, in part?

5             THE COURT:  I will allow the reformulated

6  question.

7  BY MR. GREENFIELD:

8  Q.   Ms. Carter, I'm right here.

9  A.   I know that.  I am -- by turning me in, okay,

10  she went against my Christian value system.  And

11  yes, she -- you know what, if -- I'm just going to

12  do a hypothetical here for just second.  If I would

13  have been the union president --

14             MR. GREENFIELD:  Object to non-responsive,

15  Your Honor.  Her hypothetical doesn't --

16             THE COURT:  I think the question doesn't

17  call for it.  So I will stop the answer there.

18  BY MR. GREENFIELD:

19  Q.   And again, I'm not trying to cut you off.  I

20  really am not, but --

21  A.   Yes, I believe that -- I believe that they

22  should have recognized that I was a Christian.  I

23  don't know what accommodation --

24             MR. GREENFIELD:  Excuse me, your Honor,

25  objection, move to strike.  I haven't asked a

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 186 of 383   PageID 15206
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1466

1  question.  She's just talking.

2            THE COURT:  Agreed.  So can you refocus

3  your question?

4            MR. GREENFIELD:  Yes, your Honor.

5  BY MR. GREENFIELD:

6  Q.   I'm not trying to be difficult, Ms. Carter.  I

7  am just trying to understand.

8       And I think based on what you just said, is

9  that the accommodation you were seeking was that

10 that Ms. Stone, President Stone, should not have

11 turned you in, and turning you in violated what you

12 believe to be your accommodation to be able to say

13 what you needed to say regarding your religion?  Is

14 that -- I don't want to put words in your mouth.  Is

15 that right?

16 A.   Yeah, I mean, she -- she turned me in.  She

17 knew I was a Christian, she saw it on my Facebook

18 page.

19      You know, it states in our contract -- or in

20 the constitution of the -- or the international

21 constitution, that you don't discriminate against

22 race, you don't discriminate against religion, and

23 so on.

24      And when she's making reference to my

25 Christianity on my Facebook page, that raises a

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 187 of 383   PageID 15207
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1467

1    pretty good question.

2    Q.   I understand.  And we talked about that in

3    relationship to your religious discrimination

4    claims.  So I understand that.

5         But just so we are clear, so what you are

6    saying is, you should -- the accommodation that you

7    wanted the union to provide is that you could make

8    that communication to President Stone --

9    A.   Correct.

10   Q.   -- and not be turned in, is that correct?

11             MR. PRYOR:  Object, your Honor, this is

12   asked and answered.  She's answered it three times.

13   Now --

14             THE COURT:  I will sustain that.

15             MR. PRYOR:  -- he's wanting to

16   summarize --

17             THE COURT:  Hold on.  That is a speaking

18   objection.  I will sustain that.

19   BY MR. GREENFIELD:

20   Q.   Is that correct?

21             THE COURT:  No, I sustained it.  Got to

22   ask a new question.

23   BY MR. GREENFIELD:

24   Q.   Is there anything else that you believe the

25   union should have provided you as an accommodation?

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 188 of 383   PageID 15208
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1468

1                MR. PRYOR:  Object to the extent it calls

2    for a legal conclusion and to the "anything else,"

3    given that she's answered this previously in other

4    context.

5                THE COURT:  I will allow the question.

6                You can answer.

7                THE WITNESS:  Whether I'm a Christian or

8    not, I believe she did go after my Christianity

9    because she spoke about on -- in to my supervisor

10   when she turned me in regard to my personal Facebook

11   page.

12               That means she went back to look for

13   something like that, and she referenced that.  So,

14   yes, I believe she discriminated against me when it

15   comes to being a Christian.  I do.

16   BY MR. GREENFIELD:

17   Q.   Yes, ma'am.

18        I don't dispute that that is what you are

19   alleging in this lawsuit.

20   A.   No, she shouldn't have turned me in.

21   Q.   Okay.  And my question was a little bit

22   different.

23        I want to know if there is anything else you

24   believe that the union should have accommodated you

25   in regards of pertaining to your religion, other

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 189 of 383   PageID 15209
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1469

1    than that?

2              MR. PRYOR:  Again, object, asked and

3    answered.  Same objections.

4              MR. GREENFIELD:  I don't believe I ever

5    got an answer to this question.

6              THE COURT:  I will allow this one last

7    time, you can answer.

8              THE WITNESS:  You know, I don't even know

9    what an accommodation really is.  She should have

10   recognized that I was a Christian.  And I think that

11   she should have -- honestly, she should have -- she

12   should have -- well, she should have reached out to

13   members, period, with any kind of complaint.  But --

14   BY MR. GREENFIELD:

15   Q.   But you weren't a member, were you, Ms. Carter?

16   A.   I still paid dues.  I still -- she was sending

17   me things as -- as a union member.

18             MR. GREENFIELD:  Objection,

19   non-responsive.

20   BY MR. GREENFIELD

21   Q.   Ma'am, you were not a member --

22   A.   I answered that.  I'm telling you exactly how I

23   see it.  The union went after me -- she did -- for

24   my Christian beliefs.

25             MR. GREENFIELD:  Objection, your Honor,

1  non-responsive.  Move to strike.

2           THE WITNESS:  I don't know how to answer

3  it.

4           THE COURT:  I will sustain that last one

5  of yours.

6  BY MR. GREENFIELD:

7  Q.   My question was pretty simple, Ms. Carter.

8       You were not a member, correct?

9  A.   I was an objector.

10 Q.   Okay.  And so your accommodation that you were

11 seeking was that you wanted to be able to say

12 whatever you wanted to, to a coworker, as long as it

13 pertained to your religious beliefs, is that

14 correct?

15 A.   I wanted an open dialogue and freedom of speech

16 to my union president, who still has an obligation,

17 because she's spending my dues, to protect me.  It

18 is still as an objector, she still has to protect

19 us.

20 Q.   I understand, Ms. Carter.  My question was a

21 little bit different.

22      Do you agree that you wanted to be able to say

23 whatever you wanted to, to another coworker, as long

24 as it was related to your religion?

25 A.   Again, not just a coworker.  My union

1  president.  And yes.  I should have been able to

2  have that freedom to speak to her in -- just like if

3  I were in a union meeting, yes.

4  Q.   And say whatever you want?

5  A.   That is what happens in union meetings, yes.

6  Q.   Ma'am, was this a union meeting?

7  A.   It is the same context.  I was speaking to my

8  union president, just like it would have been if I

9  would have been in a union meeting.

10 Q.   But it was not a union meeting, correct?

11 A.   It was a private message, email, whatever you

12 want to call it, to my union president for the way

13 that they were spending our money, and they had gone

14 to that march, and the things that they spent, you

15 know, our dues money on.  So I don't know how much

16 more I can answer that for you.  I'm trying.

17 Q.   Just my simple question.

18 A.   Yes.  I believe that I should have an -- okay.

19 Q.   And maybe I can take a step back here.

20      My question was, this didn't occur in a

21 membership meeting, did it?

22 A.   No.  It didn't.

23 Q.   Okay.

24          MR. GREENFIELD:  Your Honor, I would like

25 to reserve the rest of my time with Ms. Carter for

```
 1    my case in chief, and I can pass the witness.
 2              MR. PRYOR:  For your case-in-chief?
 3              MR. GREENFIELD:  Yes.
 4              MR. PRYOR:  He's gone beyond direct, and
 5    so he needs to ask her questions now.
 6              THE COURT:  Sidebar.
 7              MR. PRYOR:  Okay.
 8              (Thereupon, the following proceedings were
 9        had at sidebar:)
10              MR. PRYOR:  Okay.
11              THE COURT:  So you're arguing he exceeded
12    the scope, so he's got to go now?
13              MR. PRYOR:  What?
14              THE COURT:  You are arguing that he
15    exceeded scope, so he needs to go now?
16              MR. PRYOR:  Oh, absolutely.  And I didn't
17    object --
18              THE COURT:  What topics did he exceed the
19    scope on?
20              MR. PRYOR:  The topics we were just
21    covering.  He went through every single RLA claim,
22    every single position.  I didn't do any of --
23              MR. GREENFIELD:  Are you willing to
24    concede that you haven't proven those points?
25              MR. PRYOR:  I have proven my points.  I
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 193 of 383   PageID 15213
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1473

1    didn't ask for legal questions.  You went through

2    every one of the legal concepts over my objections.

3              MR. GREENFIELD:  Every -- every single --

4    you are saying you didn't address anything about any

5    of those legal claims?

6              MR. PRYOR:  I'm saying you exceeded the

7    scope of direct --

8              MR. GREENFIELD:  I absolutely --

9              MR. PRYOR:  -- about most of your --

10             MR. GREENFIELD:  I absolutely did not.

11   All I did was walk her through her claims against

12   the -- I went very slowly, one, two, three, four --

13             MR. PRYOR:  And I asked factual -- I'm

14   sorry, your Honor, I shouldn't speak.

15             THE COURT:  It is fine.  You can say your

16   last statement.

17             MR. PRYOR:  Nothing further.

18             THE COURT:  I think it was sufficiently on

19   topic, right, there were questions that got more in

20   depth.  But I go topic by topic, not depth of the

21   question.  So I think it is sufficiently on step to

22   where I can't say that I'm boxing you out and you

23   have to ask other questions.

24             So I think you can reserve the rest of

25   your questions for your case in chief.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 194 of 383   PageID 15214
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1474

 1                Which will take the baton back to you.

 2                MR. PRYOR:  It will what?

 3                THE COURT:  It will take the baton back to

 4   you for round two of the questions on her.

 5                MR. PRYOR:  Okay.

 6                THE COURT:  Ready?

 7                MR. PRYOR:  Yes, sir.

 8                (Thereupon, the sidebar was concluded and

 9        the following proceedings were held in open

10        court:)

11                THE COURT:  Okay.  So I will let you

12   reserve the remainder of your questions for your

13   case in chief, which means I need to now ask

14   Mr. Pryor if he wants to ask more questions at this

15   point.

16                MR. PRYOR:  Yes, your Honor.

17                     REDIRECT EXAMINATION

18   BY MR. PRYOR:

19   Q.   Ms. Carter, the discussion about Step 2 process

20   and arbitration that you were involved in, those

21   were not part of your claims protecting your

22   religious activity.  That is what this case is

23   about?

24                MR. McKEEBY:  Objection, leading.

25                MR. PRYOR:  Your Honor, this is redirect.

```
 1            THE COURT:  I will allow this.
 2   BY MR. PRYOR:
 3   Q.   You can answer.
 4   A.   Correct.
 5   Q.   And, in fact, the protection of your RLA rights
 6   and your union activity rights, that is part of this
 7   lawsuit, not part of the Step 2 and arbitration?
 8   A.    Correct.
 9   Q.   Let's look at Exhibit 118.  While he's calling
10   that up, let me ask you about, you were asked about
11   your W-2s and some other documents.  And if you were
12   working full time, how much would you be making?
13   A.   Give or take, if I -- 80 to 90 trips a month up
14   to 100, at my pay scale, I could make anywhere from
15   80- to $100,000 a year.
16   Q.   And would that include benefits or it would be
17   more with benefits?
18   A.    It would be more with benefits.
19   Q.   What do you estimate that to be with benefits?
20   A.    Well, there is profit sharing.  And then there
21   is a match of your 401(k).  And then they pay a
22   certain portion of our medical insurance.  And then
23   I believe they had been getting bonuses, I know,
24   through some of the time, a bonus for -- I don't
25   know if it was for -- I know there was a bonus for
```

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 196 of 383  PageID 15216
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1476

1  the contract, but then there was a bonus after

2  companies got money or a tax break or something like

3  that.

4         MR. McKEEBY:  Your Honor, object, this is

5  beyond the scope of the --

6         MR. PRYOR:  He asked about W-2s, he asked

7  about --

8         THE COURT:  I will allow the topic.

9  BY MR. PRYOR:

10 Q.   And what do you estimate that to be?

11 A.   That is hard to estimate, because I mean, with

12 my 401 contribution and -- it -- that is hard.

13 Q.   Just give me a reasonable estimate.  Be more or

14 less than 20,000 a year?

15 A.   Oh, it would be more.

16 Q.   Okay.

17      So 80- to 100,000 in salary and more than

18 20,000 in benefits, correct?

19 A.   Yeah.  It -- well, with my 401 and the profit

20 sharing.

21 Q.   And from the time you were terminated -- if you

22 were put back in your job today, would you be able

23 to go back full time and earn that money?

24 A.   Oh, yes.  My daughter is going to college.

25 Q.   Okay.  Let's look at Exhibit 118.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 197 of 383   PageID 15217
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1477

1        Now, it said -- it says, "Audrey Stone invite
2   Audrey to Messenger" on this exhibit.
3        When you sent your message, what Facebook page
4   did you send it to?
5   A.   That is interesting.
6   Q.   That is why I'm asking.
7   A.   Yeah, it said -- well, and I said this before,
8   it said, Audrey Stone TWU.
9   Q.   And what does this say?
10  A.   This just says Audrey Stone.
11  Q.   Do you know why that is?
12  A.   She changed it.
13  Q.   Okay.  So after you sent -- when you sent it,
14  it was Audrey Stone TWU?
15  A.   That is correct.
16  Q.   And we saw that in the core team member
17  exhibit, it had Audrey Stone, TWU?
18  A.   That is correct.
19  Q.   And then after she brought this complaint, you
20  go back to print this out, what does it say?
21  A.   Well, I don't even -- I think my printouts, I
22  thought had the Audrey Stone TWU on it.
23  Q.   But the one that they have shown you says
24  Audrey Stone?
25  A.   Just Audrey Stone, yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1478

 1   Q.    Let's look at Exhibit 40.  And while they are

 2   pulling up Exhibit 40, you were asked about -- can

 3   you say anything -- do you recall me asking you on

 4   direct -- and maybe you just aren't thinking of

 5   this -- but that you can't engage in illegal speech,

 6   can you?

 7   A.    No.

 8   Q.    You are not asking for that?

 9   A.    No.

10   Q.    If you threaten to shoot somebody or you

11   commit -- say something illegal, you are not asking

12   for the protection for that, are you?

13   A.    No.

14   Q.    And you have already explained to us you are

15   not asking for unfettered communications in the

16   workplace, correct?

17   A.    Correct, yeah, no.

18   Q.    Okay.  Let's look at Exhibit 40.  And it

19   says -- if I can find the section -- in addition,

20   you are required to comply with all company policies

21   and procedures.

22         And at this point, you had been fired, right?

23   A.    Correct.

24   Q.    And you have been fired for posting on your

25   personal Facebook page?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1479

1  A.   Correct.

2  Q.   Asked you about past posts.  I'm going to ask

3  you about future posts.  So if you posted something

4  in the future, your experience is you get fired?

5  A.   Correct.

6  Q.   You didn't want to do that?

7  A.   No.  Because I got --

8  Q.   And, in fact, you would give up your right to

9  sue them when they did fire you, right?

10 A.   Correct.

11 Q.   And look at that last line, if you do anything

12 in the future that they consider a violation, it

13 will result in termination.  Correct?

14 A.   Correct.

15         MR. PRYOR:  Thank you, ma'am.

16         Oh, wait, hang on one second.

17         Thank you.  Pass the witness.

18         THE COURT:  Okay.  Mr. McKeeby.  Round

19 two.

20         MR. McKEEBY:  I will reserve questions.

21         THE COURT:  All right.  Any round two

22 questions, Mr. Greenfield?

23         MR. GREENFIELD:  I will save them.

24         THE COURT:  Okay.  With that, I think you

25 are done for this round.  You can leave the stand.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 200 of 383   PageID 15220
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1480

 1    You can return to your seat in the courtroom.

 2              And let me ask who Carter is going to call

 3    as her next witness?

 4              MR. PRYOR:  Your Honor, at this time, we

 5    call Brett Nevarez by video deposition.  I am told

 6    this video is a real video deposition.

 7              THE COURT:  Okay.  So hopefully it

 8    actually will be video and not have audio that is in

 9    and out.

10              MR. PRYOR:  And it is very short.

11              THE COURT:  Very short.  We have got it

12    cued up.

13              So what I will tell y'all is the same

14    thing I told y'all last time on depos.  Two things:

15    One is, if someone meets the test for being

16    unavailable legally, then I can allow their prior

17    recorded testimony under oath to be played to you

18    here in court, and this next witness does meet that

19    legal test.  You are to credit their testimony the

20    same as if you heard them sitting here on the stand,

21    saying the words they are going to say.

22              The second disclaimer is what I told you

23    part way through the last deposition, which is, you

24    might see the words on the bottom, the transcript.

25    Remember, that transcript is not the evidence.  The

1 evidence is the words you hear the witness say.  It

2 is the video you see.  The witness and their

3 non-verbal expressions.

4            So that is the evidence.  The transcript

5 is just a helpful assistant there for you.

6            With that, we can cue up the video and

7 play it.

8            (Thereupon, the video clip was played and

9      transcribed as follows:)

10                TESTIMONY OF BRETT NEVARES

11 BY MR. PRYOR:

12 Q.   Could you tell the jury what it was that your

13 position was with Southwest Airlines in 2000 -- I'm

14 sorry -- with the TWU Local 556 in 2017?

15 A.   I was also a negotiating team member.

16 Q.   What was your relationship with Audrey Stone?

17 A.   I was the second vice president.

18 Q.   You ran together -- well, did -- did you ever

19 run for election together?

20 A.   Yes.

21 Q.   Did you frequently work together?

22 A.   Yes.

23 Q.   Union business and in your flying, is that

24 right?

25 A.   Yes.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 202 of 383   PageID 15222
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1482

```
 1  Q.   Did you consider her a good friend?

 2  A.   I still do, yes.

 3  Q.   Did you consider her a confidante?

 4  A.   Yes.

 5  Q.   Do you know whether she considered you a

 6  confidante?

 7  A.   Yes, I believe so.

 8  Q.   Would she frequently consult you on important

 9  decisions that she made?

10  A.   Yes.

11  Q.   Did she consult you when she received a message

12  from Charlene Carter that she eventually submitted a

13  complaint to Southwest about?

14  A.   Yes.

15  Q.   And what did you tell her?

16  A.   I told her that the video was offensive.

17  Q.   Did you suggest that she submit a complaint?

18  A.   Yes.

19  Q.   When she submitted the complaint, did you

20  understand her to be doing that in her role as union

21  president?

22  A.   She never discon -- I mean, she's the president

23  of the Union.  You can't separate the roles between

24  flight attendant and employee and president of the

25  union, in my opinion.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  Q.   You supported her making that complaint in her

2  role as union president, right?

3  A.   Yes.

4         MR. HILL:  Your Honor, this is the

5  counter.

6         THE COURT:  Yes.

7         MR. HILL:  Can you tell the jury who is

8  asking?

9  BY MR. McKEEBY:

10 Q.   He is wearing his neck tie, and I have a couple

11 of questions for you.

12 A.   Okay.

13 Q.   You mentioned that when you met with Ms. Stone

14 in Baltimore, she was distraught.

15      Can you explain to the jury a little bit more

16 about what you meant by that?

17 A.   She was crying and could barely speak.  She

18 just handed me her phone and I -- I turned the video

19 on.

20 Q.   Had she received one or two videos at that

21 point or did you know?

22 A.   I -- I only watched a few seconds of one video.

23 That was enough for me to know I didn't want to

24 watch any more.

25 Q.   Do you know if there were two videos or --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1484

1  A.   I don't know if there were two or if it was

2  sent twice.   Instant Message is very inconsistent.

3  Q.   Did you have to click on the video to make it

4  play?

5  A.   Yes.

6  Q.   And it was on her phone?

7  A.   Yes.

8  Q.   And she handed it to you and you observed it at

9  that meeting in Baltimore?

10 A.   Yes.

11 Q.   Did she indicate when she had received it?

12 A.   Earlier that day.

13 Q.   Did she indicate to you where she had viewed

14 it?

15 A.   Where she had?

16 Q.   Yes.  Where was she when she watched it, if she

17 indicated that to you?

18 A.   No.  I -- no.  I don't think she told me that.

19 I just assumed there at the facility.  We were at

20 the Maritime facility outside the

21 Baltimore-Washington airport.

22 Q.   I forget if Mr. Greenfield asked you this, but

23 have you ever turned in an employee, a Southwest

24 employee, for violation of the social media policy?

25 A.   No.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1485

1  Q.   Have you ever been turned in for violating the

2  social media policy?

3  A.   Yes.

4  Q.   Who did that?

5  A.   I don't know.

6  Q.   What was the violation -- alleged violation?

7  A.   It was a Facebook post that was turned in to

8  management.

9  Q.   What did you post?

10  A.   I posted that Lynn was being discriminatory.  I

11  believed it to be union-protected speech.  That she

12  had posted some -- she behaved derogatorily in a

13  Dallas membership meeting.

14  Q.   Who was that?

15  A.   Lynn Montgomery, the president.

16  Q.   What does the concept of union-protected speech

17  mean to you?

18  A.   That management can't hold what's said in a

19  membership meeting against a member.

20            (Thereupon, the video clip concluded.)

21            MR. PRYOR:  That concludes it, your Honor.

22  And I must admit I'm losing faith in the quality of

23  these Zoom deposition offerings.  I thought it would

24  be better.  Slightly better.

25            THE COURT:  It is quite all right.  So

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 206 of 383   PageID 15226
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                    Page 1486

1  does Carter have another witness to call?

2            MR. PRYOR:  No, your Honor.

3            We would like to publish Exhibit 138.

4            THE COURT:  Yes, you can do so.  So I will

5  just tell the jury, there was a time where I

6  admitted Exhibit 138, but I don't think I had the

7  jury screens un-muted, and so that was my fault.  We

8  are going to un-mute the screens, we're showing you

9  Exhibit 138, so it doesn't surprise you when you

10  have access to it back in the jury room.

11            MR. PRYOR:  Thank you, your Honor.

12            Subject to rebuttal, Carter rests.

13            THE COURT:  Okay.  So what I will do is,

14  then, any time we get a party rest, then I have to

15  ask y'all to go take a break.  We have legal issues

16  that we have to talk about.  I wish that would have

17  come later, but there is no way to control these

18  things.

19            So I'm going to give y'all your early

20  afternoon break super early.  And so same

21  instructions:  Can't talk to anyone about the case,

22  you can only talk to your fellow jurors and court

23  personnel, just not about the case; and can't do any

24  research about the case.  With that, we will call

25  you back as soon as we are done with the legal

```
 1   issues.
 2              All rise for the jury.
 3              (The jurors exited the courtroom.)
 4              THE COURT:  Okay.  You can take a seat.
 5   Okay.  So Defendants, Union, Southwest, anyone need
 6   to make a motion at this point?
 7              MR. McKEEBY:  Yes, your Honor.
 8              Southwest would like to make a motion
 9   under Rule 50 as a matter of law -- I'm sorry,
10   should I take the podium or --
11              THE COURT:  That's great.
12              MR. McKEEBY:  Yes, so let me just start
13   again.
14              Southwest makes a motion under Rule 50 for
15   judgment as a matter of law, and there is a
16   component of my motion that will be check the box,
17   but this isn't it.
18              Your Honor, we don't disagree that some
19   degree of protected activity, at least as the Court
20   has construed the RLA, has been introduced by
21   Ms. Carter.
22              The messages are sort of a combination of
23   communications embedded in other messages.  Some of
24   which involved things like the recall election,
25   involve things like how the union spends dues, and
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 208 of 383   PageID 15228
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1488

1   otherwise expends its money, and about participation

2   in the Women's March.

3              And all of that goes to protected

4   activity, which is an element of the claim under the

5   RLA.

6              But what there is no evidence of, is that

7   any decision-maker at Southwest was motivated by any

8   of those things in deciding to terminate

9   Ms. Carter's employment.  There is not sufficient

10  evidence to go to the jury on the claim for that

11  reason.

12             As the Court recognized earlier today,

13  this is a novel claim that requires some proof that

14  Southwest would retaliate against someone based on

15  their objection to the union.

16             And I would respectfully submit that in

17  this case, while there is evidence of protected

18  conduct, again, as the Court construes the RLA --

19  and I will get to that in the second part of the

20  presentation -- but there is no evidence to support

21  the notion that the Southwest decision-makers

22  considered these things in terminating Ms. Carter's

23  employment.

24             The only thing that arguably has any

25  connection is the timing of Southwest's decision

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 209 of 383   PageID 15229
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1489

 1   relative to its discovery of the protected conduct.

 2   But the court cases are pretty clear that timing is

 3   not sufficient to establish a connection between

 4   protected activity and retaliatory motive.

 5   Particularly here, your Honor, because it is no

 6   surprise that the -- Southwest's knowledge of the

 7   RLA-protected activity came when it did.  It was

 8   part of the investigation, part of the report of

 9   Stone that provided that information.

10            So it was part and parcel of both the

11   complaint and the investigation.  So it doesn't have

12   the same -- the same inferential strength as in most

13   cases.  And I would cite to the Court to the

14   decision such as Strong v. University Healthcare

15   System, LLC, 482F.3d 802 at 808, that stand for the

16   proposition that proximity in time alone is not

17   sufficient to support retaliatory motive in

18   connection with protected conduct.

19            And there is no other evidence in the

20   record to support the notion that Ed Schneider or

21   anyone else at Southwest terminated Ms. Carter's

22   employment because she was a union objector, because

23   she participated in the recall collection, because

24   she complained about the Women's March or because

25   she complained about how dues' member money was

1  spent.

2              This testimony about the reasons for the

3  termination have not been rebutted with any

4  evidence, other than speculation and conjecture, to

5  the point where we are talking about emails in 2013

6  that were sent by union loyalists to a Southwest

7  executive who wasn't even involved in the decision.

8  And the notion was that, well, you know, she didn't

9  stop and tell Mr. Schneider about this past history

10 four years ago, so that should create the inference

11 of retaliation to support this claims.

12             That is just not sufficient evidence to go

13 to a -- it is not evidence to go to a jury to

14 support the RLA claim.

15             And there is nothing else other than the

16 proximity in time.  Again, that is not sufficient.

17             So that is the RLA claim.

18             And frankly, the -- the claims under Title

19 VII are even more tenuous.  Because there is, again,

20 yes, she explained during the fact-finding meeting

21 that she was a Christian and that she opposed

22 abortion.  We understand that.

23             And that creates some proximity in time

24 between Southwest's receipt of that information and

25 the termination decision.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 211 of 383   PageID 15231
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 5 July 11, 2022                Page 1491

1          But, again, that is not sufficient and
2    there is absolutely nothing in the record to connect
3    Ms. Carter's religious beliefs to her termination
4    from employment.  No -- no comparators, no other
5    employees who were treated preferentially based on
6    the fact that they were non-Christians, no negative
7    comments about her religion, nothing like that.
8          The best that they can do is to point to
9    that Women's March, your Honor, and say, see,
10   Southwest terminated Ms. Carter because she talked
11   about her opposition to abortion, but they let those
12   women march in Washington and didn't discipline
13   them.
14         But, your Honor, there are -- those women
15   are not similarly situated to Ms. Stone for the
16   purposes of this -- excuse me, Ms. Carter -- for the
17   purposes of this case.  They participated in a
18   general march regarding women's rights.  They --
19   they -- there was no indication that they did
20   anything other than carry one banner that was put
21   into evidence that said in small letters, you know,
22   the flight attendants Local 556, Flight Attendants
23   of Southwest airlines.
24         The only -- they didn't carry signs that
25   said, we are pro choice and we're proud of it or

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 212 of 383   PageID 15232
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1492

1   anything like that.  The only sign that is in

2   evidence is a cardboard sign that the union posted

3   on its website, that said -- had three boxes, one of

4   which said "My body, my choice."  But we don't know

5   if that is a Southwest Airlines employee or not.  It

6   is -- there is no proof of that in the record.

7              And even if there were, it wouldn't matter

8   because that is politics; that is political speech.

9              What they would have to do, and the

10  inferential leap they want this jury to make, is

11  that all of the women who participated in that march

12  have different religious views than Ms. Carter.  And

13  they don't have that evidence.

14             There were dozens of women in those

15  pictures.  They want to let the jury infer that,

16  well, they are participating in a Women's March,

17  they, therefore, must be pro choice -- may be

18  reasonable so far, but still not in evidence.  And

19  finally, they must not be Christian, therefore, they

20  are similarly situated and were treated disparately

21  to Ms. Carter.  That is not a reasonable inference

22  that can support this claim and allow it to go to

23  this jury.

24             So for that reason, the discrimination

25  claims fails as a matter of law.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 213 of 383   PageID 15233
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1493

1            The accommodation claim, your Honor, I
2  would also like to address.  The problem with
3  that -- I don't think it is distinct at all from the
4  religious discrimination claims because Ms. Carter
5  hasn't identified, really, what the accommodation
6  is.
7            Her testimony is vague, and there is no
8  indication that her religious beliefs conflicted
9  with any policy.  When I asked her on cross if she
10 violated a policy, she said no, she said she didn't
11 violate any policy, which is a requirement to show
12 that you need an accommodation.
13           So I think at the end of the day, it is
14 not a claim that is distinct from her substantive
15 religious discrimination claim, and she otherwise
16 has not met the elements of a failure to accommodate
17 claim.
18           I would also submit that there is no
19 evidence to support instructing this jury on
20 punitive damages, at least with respect to the
21 claims against Southwest.  There is no evidence of
22 malice or reckless disregard for the protected
23 rights of Ms. Carter under federal law.
24           And now to the check-the-box portion of my
25 presentation.  This is from our motion for summary

1    judgment, of course.

2              I would like to reurge the arguments

3    regarding the preclusive effect of the binding

4    arbitration agreement in this case, as presented to

5    the judge, and the Court, that Ms. Carter has no

6    private right of action under the RLA in this

7    context, given that she cannot show and has not

8    attempted to show union animus, as that concept is

9    considered by courts in this context; that this

10   court lacks jurisdiction over this dispute because

11   it is a post-certification minor dispute.

12             And, again, as to the religious

13   discrimination, that claim that she failed to

14   exhaust her administrative remedies, and, therefore,

15   cannot bring an accommodation claim against

16   Southwest Airlines.

17             Thank you, your Honor.

18             THE COURT:  Understood.  Thank you, Mr.

19   McKeeby.

20             Before I hear a response from Carter, can

21   I hear what motion you might have, Mr. Greenfield?

22   Because if you are chiming in adding on to some of

23   his motion, then I think I should just hear from

24   Carter all at once at the end.

25             MR. GREENFIELD:  Yes, your Honor.  Would

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 215 of 383   PageID 15235
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1495

1  you like me to take the podium or --

2           THE COURT:  That is fine by me, if you

3  want to.

4           MR. GREENFIELD:  I don't need to.  I think

5  the arguments are very similar.  And so the union

6  would just echo the request for motion of directed

7  verdict regarding, again, the preclusive effect of

8  the arbitration.  And similarly, on the religious --

9  the religious discrimination claims, again, there

10  has been no -- Ms. Carter just took the stand, she

11  could not identify any individual that is a

12  non-Christian that she felt was treated more

13  favorably than she was.

14           And in regard to the reasonable

15  accommodation claim, the accommodation that

16  Ms. Carter requested was, in fact, to be able to say

17  whatever she wanted to, to Ms. Stone, as long as it

18  was tied to her religious beliefs, and that cannot

19  possibly be an accommodation.

20           And again, at this time, I would then ask

21  the Court if I could reapply for my affirmative

22  defense in regard to undue burden on that issue.

23           THE COURT:  Understood.

24           So I will overrule your request for undue

25  burden affirmative defense at this time for the

1  reasons I said earlier.

2           But I would like to hear from Carter on

3  the response to both of those motions from Southwest

4  and the Union.

5           MR. GILLIAM:  Yes.  I would like to come

6  here if I could because I have the podium in my way

7  and I can't see you.

8           THE COURT:  That is true.

9           MR. GILLIAM:  This makes it a little bit

10  easier.

11          It is notable that Southwest can't point

12  to any unprotected activity that Carter engaged in

13  in support of its motion.

14          What is clear here is that they fired her

15  for her Facebook videos and messages, both privately

16  sent to Stone and posted on her own personal

17  Facebook page.  All of those message were protected.

18  Southwest fired her for those messages.

19          So there is abundant evidence that

20  Southwest discriminated against her for her

21  religious beliefs and that they retaliated against

22  her for her protected activities, and the same with

23  the union on all three claims with the union.

24          They -- her protected activities were

25  clearly a motivated factor -- motivating factor

1  under the RLA retaliation claims, because they took

2  them into consideration.  Ed Schneider's

3  investigation summary notes, exhibit -- trial

4  Exhibit 107 reflect that.  He's summarizing what he

5  found, and what he found included both Ms. -- well,

6  he was reflecting on how Ms. Carter latched on to

7  her Christian beliefs in her fact-finding meeting,

8  and he -- he enumerated that as a factor.  He

9  enumerated all of her RLA-protected activities as a

10  factor.

11         So they want to say that, oh, we didn't

12  fire Ms. Carter for her protected activities, we

13  fired her because she violated the social media

14  policies.

15         But that is the point of protection.  The

16  point of RLA protection and the point of Title VII's

17  protections is that she not be fired just because it

18  violates the social media policies.

19         I would also say, moving to the failure to

20  accommodate claim, is that Southwest was confronted

21  with Ms. Carter's religious beliefs at the

22  fact-finding hearing.  Ms. Carter told them

23  specifically that she was a Christian who has to get

24  the word out, who shares the word out.  That is her

25  observance and -- of her religious beliefs and her

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1498

1  practices.

2           Yet, what did Ed Schneider do with that

3  information?  He did nothing.  He knew that he could

4  have reported it to the ACT team, and employee

5  relations could have reported it to the ACT team.

6  But they didn't.  They recognized it was a protected

7  category, Mr. Schneider's testimony shows that, but

8  they did nothing.  They knowingly evaded their

9  obligation to make accommodation efforts for

10 Ms. Carter's religious belief.

11          What was the accommodation that Ms. Carter

12 needed?  It was to not be fired.  EEOC v.

13 Abercrombie and Fitch says that firing an employee

14 because of their religious beliefs or failing to

15 accommodate an employee because of her religious

16 beliefs is synonymous with religious discrimination.

17          Shifting to the union briefly here, so

18 again, there, it is similar.  The violation here of

19 the RLA, the RLA retaliation was that

20 President Stone turned Ms. Stone in, despite its

21 duty as the exclusive bargaining representative, to

22 treat all employees and protect all employees.

23          She turned Ms. Carter in, and in her

24 complaint, Exhibit 66, she's turning her in because

25 Ms. Carter sent her videos about a march she

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 219 of 383   PageID 15239
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1499

1  participated in.

2           She talks about the Women's March.  She

3  says that the march that TWU participated in.  And

4  she turns her in for that.

5           She also turns her in for, quote, unquote,

6  "religious comments" she made.  And she gives these

7  posts that Ms. Carter sent her, these videos that

8  Ms. Carter sent her of -- of the aborted babies.

9           She, President Stone, enumerates all of

10 the policies that she thought that Ms. Carter had

11 violated.  She's -- she's taking these posts to

12 Southwest management as someone who engages

13 Southwest management ordinarily to negotiate

14 clemency for employees.

15          But rather than negotiate clemency for

16 employees, this time, in her official capacity,

17 she's trying to have the employee be fired.

18          As for the religious discrimination claim,

19 again, Exhibit 66, Ms. Stone's complaint is turning

20 Ms. Carter in explicitly for her religious comments.

21          Now, that is, per se, disparate treatment

22 from all other represented employees because the

23 union, how is it supposed to treat all non-Christian

24 employees?  Well, how does it treat all

25 non-Christians employees?  It doesn't turn them in,

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 220 of 383   PageID 15240
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1500

1  it represents them.  But Ms. Stone is turning in

2  Ms. Carter because of her, quote, unquote,

3  "religious comments," and the videos of the aborted

4  babies.

5           Let me see just if I missed anything here

6  in my notes.

7           I guess I just reiterate, too, that these

8  Facebook videos and messages are all RLA-protected

9  activity.  She's talking about the recall.  She's

10 talking about how objector fees are being spent at

11 the Women's March.  She's talking -- Ms. Carter is

12 talking about what the union did, how it represented

13 employees at the Women's March.  She's talking about

14 a union event, and how they participated in the

15 union event, and she's criticizing the event, which

16 is her right.

17          So for all of those reasons, I oppose

18 their motion for directed verdict and I think the

19 Court should reject it.

20          THE COURT:  Thank you, Mr. Gilliam.

21          Okay.  So thank you for the arguments.

22 What I will do at this point is I will deny the

23 motions.  I never state my reasons why.  I wish I

24 could.  I have got plenty of reasons for that, but

25 it is unwise of me if I start going into the reasons

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 221 of 383   PageID 15241
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                    Page 1501

1    why I deny your motions.

2              So what I think I should do is let y'all

3    take a short break to regroup for the handing of the

4    baton over.

5              Who is going to go first?  It is you going

6    first, Mr. McKeeby?

7              MR. McKEEBY:  Yes.

8              THE COURT:  Okay.  So you can get your

9    witness ready.  Who are you going call to first?

10             MR. McKEEBY:  I am going to call Maureen

11   Emlet first.  And I'm kind of having to make some

12   decisions about witnesses somewhat on the fly, as I

13   know --

14             THE COURT:  Yes, sir.

15             MR. McKEEBY:  -- Carter's counsel as well.

16   We have got two other witnesses who will be here.  I

17   think I'm going to call the shorter witness first,

18   with the thought that we may or may not get -- that

19   would be Ms. Hudson.

20             THE COURT:  Okay.

21             MR. McKEEBY:  She would go after

22   Ms. Emlet, assuming she's here on time -- or here

23   when we need here.  And if she's not, then we will

24   call Mr. Schneider.

25             But those -- their order will depend on --

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 222 of 383   PageID 15242
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1502

1    on kind of the length of things.

2                THE COURT:  All right.  That makes sense.

3    So what we can do is, then, let's go ahead and take

4    maybe an eight-minute break.  When we come back, if

5    you want to go ahead and have Ms. Emlet on the

6    stand, then that's fine.  You can be at the podium.

7    And then I will let you haul off and get started.

8                And then I will let Union question all of

9    these witnesses second.

10               And then we will go to you third,

11   Mr. Pryor, for examination of Southwest witnesses.

12               Does that make sense?

13               MR. PRYOR:  What are we doing?

14               THE COURT:  Okay.  Any other questions

15   before we take our eight-minute break?

16               Okay.  I will see y'all back here --

17               Yes?

18               MR. McKEEBY:  I do intend to introduce the

19   Exhibit 147 through Ms. Emlet.

20               THE COURT:  Through Emlet.

21               MR. McKEEBY:  Right.  So I don't know if

22   that is an issue we want to take up after the break

23   or now.

24               THE COURT:  Let's go ahead and try to talk

25   through it now.  So 147 is the exhibit that, on

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 223 of 383   PageID 15243
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 5 July 11, 2022                         Page 1503

1    Friday, you told them that you wanted to put into

2    evidence.

3              MR. McKEEBY:  Right.

4              THE COURT:  So tell me why you think it is

5    proper, and I will hear their objection.

6              MR. McKEEBY:  Sure.  I mean, it is --

7    basically, what happened was, that there are --

8    apparently unbeknownst to me until recently --

9    different versions of the bullying and hazing

10   policing policy.  And the document that we had as an

11   exhibit was not the same version of the policy that

12   Mr. Schneider used at the fact-finding meeting, in

13   which he considered in connection -- it is relevant

14   or it came up because of this -- the language about

15   cyberbullying.

16             That is not in the exhibit that we

17   provided to the Court and so -- it is in the actual

18   policy that Mr. Schneider went over with Ms. Carter

19   at the fact-finding meeting.  And it was simply a

20   matter of I didn't realize that there was a separate

21   version of the document.

22             And so once I found that out, realized

23   that, then I advised counsel for plaintiff that,

24   hey, we have got an older version that is the

25   exhibit.  The correct version is what is Exhibit

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 224 of 383   PageID 15244
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1504

1   147, and we would ask that be allowed to use that.

2          And I understand that it may mean that

3   they need to question Mr. Schneider or Ms. Emlet

4   about the policy and cross-examine him about that.

5   And I don't think they should be, you know, punished

6   in terms of their time on that.  So I'm willing to,

7   you know, entertain that, certainly as -- as a

8   concession.

9          But that is the right policy and it should

10  be in front of the jury for them to make the, you

11  know, most informed decision that they can.

12          THE COURT:  Understood.  Response?

13          MR. PRYOR:  Your Honor, I have a document

14  I would like to mark for the Court to look at.

15  Should I call it Appendix 1 or how would you like

16  to -- I would like it to be part of the record.

17          THE COURT:  Part of this record, but not

18  part of the -- what the jury --

19          MR. PRYOR:  Correct, your Honor.

20          THE COURT:  Sure.  I'm happy for you to

21  mark it as Appendix 1, and then you can bring it up

22  to Mr. Frye -- yeah, let's call it Court Exhibit 1,

23  maybe.

24          MR. PRYOR:  I put Appendix 1 up here.

25          I'll have him rewrite Court Exhibit 1 on

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1505

 1    it, and then --
 2            May I approach, your Honor?
 3            THE COURT:  You may.
 4            MR. PRYOR:  It is an email we received
 5    before the trial began in this case in which
 6    Southwest Airlines listed their exhibits.
 7            One of the exhibits they listed, and I
 8    attached the exhibit, is Exhibit 13.  That is the
 9    workplace bullying and hazing policy.
10            And prior to trial -- three days before
11    trial -- we had a few exhibits that we sought to
12    add, and Southwest and the union took the position
13    that was prejudicial.  We ended up being able to
14    utilize those exhibits.
15            This was an exhibit that was utilized at
16    trial, and was certainly a large part of my
17    examination of Mr. Schneider focusing on the
18    workplace issue in that policy.
19            And focusing on the fact there was nothing
20    about cyberbullying in it.
21            And I did this based on this is the policy
22    they put forward.  So I questioned about their
23    policy.  Now they are saying, no, it is the wrong
24    policy.  And it is highly prejudicial to us at this
25    point to now admit it after we have examined the

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1506

 1  witness and the evidence has come in.

 2          Counsel is telling you that, well, the

 3  truth of it, it is -- there is a more updated

 4  policy.  And I'm all for getting to the truth, but

 5  their opportunity to do that came before they listed

 6  their exhibits.  It certainly came at the time I was

 7  questioning the witness about it, and they didn't

 8  raise it then.  So changing the exhibit in the

 9  middle of the trial we find prejudicial.

10          And, your Honor, I move for the admission

11  of Appendix 1.  I'm not even sure that -- I just

12  want to -- if you need authentication from me, I'm

13  more than happy to swear to it, is all I'm saying.

14          THE COURT:  I will admit this as Court

15  Exhibit 1 for the purposes of this hearing, not for

16  the purposes of jury evidence.

17          MR. PRYOR:  That's right.

18          THE COURT:  Okay.  So what I'm going to do

19  is, I'm going to think about this over our

20  eight-minute break, come back, and I will tell you

21  what I'm going to do with Exhibit 147 one way or

22  another.

23          MR. McKEEBY:  Can I raise one other issue,

24  your Honor?

25          THE COURT:  You may.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1              MR. McKEEBY:  The exhibit -- or, rather

2    the policy with the cyberbullying concept language

3    is set forth in the fact-finding meeting on -- at

4    Exhibit 198.15, where he goes over -- Mr. Schneider

5    goes over the policy with the plaintiff and

6    discusses --

7              MR. PRYOR:  What exhibit?

8              MR. McKEEBY:  This is 98.15.  98.15.  And

9    so it references -- he's quoting from the policy --

10             MR. PRYOR:  May I --

11             MR. McKEEBY:  Okay.  Yeah, sure, sure.

12             He's quoting from the policy that is at

13   147, and it references cyberbullying.  So it is in a

14   document that both sides admitted -- or requested as

15   an exhibit that was introduced already and

16   introduced through plaintiff's witnesses.

17             MR. PRYOR:  That --

18             MR. McKEEBY:  So this was already in --

19   this was in the record, and it is clear that he's

20   talking about this updated version of the policy.

21             So they can examine him and cross-examine

22   him about -- about the previous policy.  And advise

23   the jury on that, but the jury should hear the right

24   policy.

25             MR. PRYOR:  I understand the last

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 228 of 383   PageID 15248
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                        Vol 5 July 11, 2022                        Page 1508

1  argument, but the argument he just made to support

2  it, I don't think does.  This is someone's

3  handwritten notes.  She's testified she doesn't

4  recall them going over this with -- with her at all.

5  She's testified they didn't talk to her about it.

6          Somebody's notes, and who wrote "including

7  cyberbullying" still doesn't state that that is what

8  the policy said.  They don't say that this is the

9  cyberbullying policy.  They are saying, you are

10 violating cyberbullying.

11         So I don't find someone's notes to

12 overcome what they have said their policy is, and

13 that we questioned their witness about.  I just

14 think it -- I get it, but it is just -- if we were

15 before trial, fine.  But during trial, after I have

16 questioned the witness with a document they listed

17 that is their policy, I have a problem with it.  Can

18 we correct it with some time and cross?  That I

19 think it is prejudicial.

20         MR. McKEEBY:  One other point, your Honor.

21 Counsel for Carter indicated that defendants,

22 plural, objected to the supplemental exhibits that

23 Ms. Carter tried to file -- or did file prior to

24 trial that the union did object, Southwest did not

25 object.  So I would like to point that point.

1            MR. PRYOR:  You did not object?

2            MR. McKEEBY:  I did not.

3            MR. PRYOR:  Okay.  I stand corrected,

4    then.  I see an objection from the union.  You

5    didn't join?

6            MR. McKEEBY:  No.

7            THE COURT:  Understood.  Okay.  I get the

8    arguments.  So let's come back at 2:26.  We will

9    tell the jury 2:26 is when we are coming back on.

10   And I will give y'all the ruling on 147 before we

11   put Emlet on the stand.

12           MR. McKEEBY:  Thank you.

13           THE COURT:  Well, you can put Emlet on the

14   stand.  I will give you the ruling.  That will be

15   fine.

16           THE COURT SECURITY OFFICER:  All rise.

17           (Recess.)

18           THE COURT SECURITY OFFICER:  All rise.

19           THE COURT:  Y'all can be seated.

20           Okay.  So here's my ruling on 147.  On

21   147, I'm more focused on good cause than prejudice.

22   Here is why:  Once we cross the threshold of trial

23   and we are into trial and it is an exhibit that we

24   have talked about with a witness already, then I am

25   fixated more on what good cause is, and then we get

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 230 of 383   PageID 15250
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1510

 1   to prejudice next.

 2             I think page 15 of document number 98,

 3   shows me that really Southwest was on notice back in

 4   2017 of what the right policy was at the time that

 5   it was being used with Ms. Carter.  So I don't see a

 6   good cause basis to let it in at this point.

 7             So part of this, I have been trying to

 8   think of create ways separate and apart from, you

 9   know, timing and not counting that against them, but

10   I really still can't get past the good cause

11   threshold.

12             So with that, I'm going to keep out

13   Exhibit 147.  You can still move for its admission

14   with the jury in the box.  That is totally fine.

15             MR. McKEEBY:  Okay.  Thank you, your

16   Honor.

17             THE COURT:  Okay.  So we should call in

18   the jury, and then we will stand up and swear you in

19   once the jury is here.  All rise for the jury.

20             (The jurors entered the courtroom.)

21             THE COURT:  All right.  You can be seated.

22             And now we pass the baton and the case

23   over to Southwest Airlines.

24             So, Mr. McKeeby, you can call your first

25   witness, which you have graciously already done for

```
 1  me.
 2            MR. McKEEBY:  Southwest calls Maureen
 3  Emlet.
 4            THE COURT:  Okay.  Ms. Emlet, can you
 5  stand up?  And we are going to have Mr. Frye
 6  administer the oath to you.
 7            (MAUREEN EMLET was duly sworn by the
 8       Clerk.)
 9            THE COURT:  Okay.  So, Ms. Emlet, I'll
10  just ask for there to be some space between any
11  lawyer's questions of you and your answers.  And
12  then space -- they can afford the same courtesy,
13  space after your answer, before the question.  That
14  way, if there is an objection, I can rule on it
15  before you answer your question.
16            THE WITNESS:  Okay.
17            THE COURT:  Okay.  You may proceed.
18                    DIRECT EXAMINATION
19  BY MR. McKEEBY:
20  Q.   Can you state your name for the record?
21  A.   Maureen Emlet.
22  Q.   Where do you reside, Ms. Emlet?
23  A.   Aurora, Colorado.
24  Q.   How are you currently employed?
25  A.   I'm retired from Southwest Airlines.
```

1  Q.    When did you retire?

2  A.    December 31st of 2019.

3  Q.    And when you worked for Southwest, where did

4  you reside?

5  A.    In multiple locations; my last residence was in

6  Dallas, Texas.

7  Q.    And how long a period of time did you work for

8  Southwest Airlines?

9  A.    Twenty-one years.

10  Q.    What was your position with Southwest Airlines

11  in -- I'm sorry, February of 2017?

12  A.    I was a manager of labor relations.

13  Q.    What did you do as a manager of labor

14  relations?

15  A.    My focus was on working with in flight group or

16  the flight attendant group.  I was responsible for

17  ensuring that the contract was being applied

18  correctly with the flight attendants as well as

19  different company policies.  I would work very

20  closely with base managers and base representatives

21  in determining whether or not any violations had

22  been -- been made or -- either on the flight

23  attendant side or the company side.

24  Q.    Okay.

25         You mentioned a couple of concepts there that I

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 233 of 383   PageID 15253
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1513

1  want you to explain a bit more to the jury.

2      When you say "the contract was applied

3  properly," what contract do you mean?

4  A.   The Collective Bargaining Agreement between TWU

5  556 and Southwest Airlines.

6  Q.   And you indicated that you communicated or

7  coordinated with the base managers?  What is a base

8  manager?

9  A.   Southwest Airlines has several different bases,

10 or hubs, locations that flight attendants reside,

11 and their trips originate in or out of that

12 location.

13     It is called a base.  And the manager would be

14 responsible for overseeing the group of flight

15 attendants who were assigned to that base.

16 Q.   Thank you.

17     I think you also indicated something about a --

18 you said something about violations of policies.

19 Can you expand on that just a little bit?

20 A.   Yes.  In addition to the flight attendants

21 being held to abide by the contract and the flight

22 attendant work and conduct rules, there are also

23 company policies that apply to all employees of

24 Southwest Airlines.

25 Q.   Now, were there particular company policies

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

| 3:17-cv-02278-X | Vol 5 July 11, 2022 | Page 1514 |
|---|---|---|

1  over which you had responsibility or oversight?

2  A.   Yes.  I had responsibility to make sure that

3  they were being enforced properly, including the

4  social media policy, the workplace bullying and

5  hazing policy, the mission statement; multiple

6  company policies.

7  Q.   Okay.  We will get to some of these policies

8  here directly.

9       Are you familiar -- well, before we get to

10  that, now, were you ever a flight attendant for

11  Southwest?

12  A.   Yes, I was.

13  Q.   For how long a period of time?

14  A.   Ten months.

15  Q.   When was that?

16  A.   In 1998 to '99.

17  Q.   Okay.  Were you a member of the union at that

18  time?

19  A.   Yes, I was.

20  Q.   Was that the Local 556?

21  A.   Yes.

22  Q.   All right.  Now I will transition.

23       Are you familiar with the plaintiff in this

24  case, Charlene Carter?

25  A.   Yes.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                   Page 1515

```
 1   Q.    You recognize her?

 2   A.    Yes.

 3   Q.    How do you recognize her?

 4   A.    I was involved at the arbitration for

 5   Ms. Carter's claims.

 6   Q.    When you say you were involved, were you a

 7   witness?

 8   A.    I was a witness, yes.

 9   Q.    Were you cross-examined by her lawyer?

10   A.    Yes, I was.

11   Q.    Did you have some responsibility in connection

12   with Ms. Carter's -- or the complaints against

13   Ms. Carter?

14   A.    My responsibility began when I was first

15   notified of alleged violations, and during the

16   investigation process, prior to the determination

17   for the discipline for her violations.

18   Q.    And do you recall how you first became aware of

19   Ms. Carter's case?

20   A.    Yes.

21   Q.    Not the lawsuit, I'm talking about the

22   complaint.  How did you first become aware?

23   A.    I believe the first I knew of it was when our

24   employee relations specialist sent copies of videos

25   and screen shots that Ms. Carter had sent to
```

```
 1  Ms. Audrey Stone.

 2  Q.   Did you know who Ms. Stone was?

 3  A.   Yes.

 4  Q.   And who was she?

 5  A.   She, at the time, was the union president for

 6  Local 556.

 7            MR. McKEEBY:  Can you pull up Exhibit 83?

 8  Move to admit Exhibit 83.

 9            THE COURT:  Eighty-three.  Any objections

10  on 83?

11            MR. HILL:  No objections.

12            THE COURT:  Okay.  83 is admitted and you

13  can publish.

14            MR. McKEEBY:  Okay.  So publishing to the

15  jury.

16            (The referred-to document was admitted in

17      Evidence as Trial Exhibit 83.)

18  BY MR. McKEEBY:

19  Q.   Where are you on this email, if you can take

20  a -- just a moment to -- I think I see you, but I

21  will let you direct me.

22  A.   My name is at the very top, from Maureen Emlet.

23  Q.   Okay.  Below it, do you see your name as well?

24  It looks like you got a message from Ms. Gutierrez?

25  A.   Yes.  Originally -- well, it is a whole email
```

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 237 of 383  PageID 15257
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1517

1  thread.

2  Q.   Right.

3  A.   But just below the first paragraph, you can see

4  that Denise Gutierrez had sent the -- this email

5  thread to me.

6  Q.   Right.  And if you go to the next page, 83.2,

7  this is the second page of the thread, correct?

8  A.   Yes.

9  Q.   And do you understand that to be Ms. Stone's

10  complaint that was forwarded to you?

11  A.   Yes.

12  Q.   Okay.  Tell the jury who Denise Gutierrez is.

13  A.   She was one of the employee relations

14  investigators at the time.

15  Q.   And so you were in labor relations though,

16  correct?

17  A.   Yes.

18  Q.   Explain to the jury what the difference at

19  Southwest was between employee relations and labor

20  relations.

21  A.   Labor relations dealt with the Collective

22  Bargaining Agreement, that would be specific to that

23  work group.  So in my capacity, I worked mainly with

24  flight attendants and ensuring that their contract

25  was being upheld.

1        Employee relations dealt with cases of

2    discrimination and, I think, they had -- I think

3    they oversaw the social media policy.  I'm not sure

4    exactly which policies.

5        But they -- they would investigate to see

6    whether or not there was any violation of a

7    protected category.  And then I worked with the

8    bases to see if there was any -- any need or any

9    substance to the allegation that would result in

10   discipline.

11   Q.   So it doesn't look like Ms. Gutierrez said

12   anything to you in her email, but do you recall that

13   she forwarded you the videos?  Or not?

14   A.   Yes.  At first she called me, I believe that

15   morning, and then she forwarded to me the videos as

16   well as some screen shots and still shots.

17   Q.   And am I reading this correctly that you then

18   forwarded those to Ms. Shaffer and Ms. Grant?

19   A.   That's correct.

20   Q.   Let's talk about each of those individuals.

21        Who is Ms. Schaffer?

22   A.   Tammy Schaffer was my director of labor

23   relations at the time.  And Brianna Grant was the

24   senior manager.

25   Q.   And were you sending the -- did you forward the

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 239 of 383   PageID 15259
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1519

1    videos to them as well as the chain?

2    A.   Yes, I did.

3    Q.   And why did you do that?

4    A.   There were a couple of reasons.  One,

5    Ms. Schaffer had asked that she be copied in and

6    notified of any potential social media violations.

7    Also, due to the seriousness of the content, I

8    wanted to make sure that my bosses were aware of --

9    of what was going on.

10   Q.   Okay.  And I guess maybe I didn't understand

11   your testimony.

12        Were those the two people to whom you reported

13   or -- is that why you call them your bosses?

14   A.   Yes.  So Brianna Grant was my direct boss, and

15   then Tammy Schaffer -- Brianna reported to Tammy.

16   Q.   And in your email, it looks like you have some

17   discussion about the crux of Audrey -- Audrey

18   participated in the Women's March in DC in January.

19   Do you see that part of the email?

20   A.   Yes.

21   Q.   Where did that come from.

22        You can take it down.

23   A.   That was from having conversation with

24   Ms. Gutierrez, and also reviewing the contents of

25   the emails -- I'm sorry, not emails -- but the

 1 | Facebook posts that were sent to me.
 2 | Q.   And did you also -- did you also review
 3 | Ms. Stone's complaint?
 4 | A.   I did.
 5 | Q.   Now, prior to being involved in the
 6 | investigation, had you ever met Charlene Carter?
 7 | A.   No.
 8 | Q.   Had you had any experience with her?
 9 | A.   No.
10 | Q.   Did you watch the videos?
11 | A.   I did.
12 | Q.   Where were you when you watched the videos?
13 | A.   I was at my desk in the office.
14 | Q.   And is that in Dallas?
15 | A.   Yes, it is the Southwest headquarters here in
16 | Dallas.
17 | Q.   Okay.  What was -- what was your reaction when
18 | you watched the videos?
19 | A.   I felt physically ill.  I had -- I had never
20 | really received anything like that.  I actually -- I
21 | had to get up from my desk and exit the building.
22 | And I walked around the building several times
23 | before I came back in.
24 | Q.   How many laps did you do?
25 | A.   I think I did two.  It is a pretty big

1  building.

2  Q.    Talking about the corporate headquarters?

3  A.    Yes.

4  Q.    Do you remember what you did when you returned

5  to your desk?

6  A.    Yes.  I reread the content that had been sent

7  to me and then forwarded it to my direct leaders.

8  Q.    And that is what you did in the document that

9  we just looked at?

10  A.    That's correct.

11  Q.    Those leaders being Ms. Schaffer and Ms. Grant?

12  A.    Yes.

13  Q.    Now, I think you have done this somewhat, did

14  you have involvement in the investigation of the

15  complaint?

16  A.    I did.

17  Q.    Can you describe generally for the jury what

18  you did in connection with the investigation, kind

19  of the steps that you took?

20  A.    Yes.  Once I received the content from

21  Ms. Gutierrez, I also went to Ms. Carter's Facebook

22  page to verify that this content did, in fact come

23  from that source.

24       I worked with Mr. Ed Schneider, who was

25  Ms. Carter's base manager at the time; and then, of

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 242 of 383   PageID 15262
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1522

1  course, reviewed all of the documents and

2  investigations that he completed and sent to me for

3  review.

4  Q.   And what type of documents and investigations

5  did Mr. Schneider send to you?

6  A.   He sent me the fact-finding notes from

7  Ms. Carter's fact-finding meeting, he sent me the

8  notes from an interview that he had conducted with

9  Ms. Audrey Stone regarding these allegations, and he

10 sent me a synopsis of his investigation as well as

11 his recommendation of how he thought -- what he

12 thought the appropriate discipline would be.

13 Q.   And what was that recommendation?

14 A.   Termination.

15          THE COURT:  Hold on.  There was a hearsay

16 objection.

17          MR. HILL:  Yes.

18          THE COURT:  I will overrule that.

19 BY MR. McKEEBY:

20 Q.   It means you can answer.

21 A.   He recommended termination of employment for

22 Ms. Carter.

23 Q.   We will get back to that.

24     Did you review Ms. Carter's flight records in

25 connection with your investigation?

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 243 of 383   PageID 15263
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1523

```
 1  A.   Yes, I did.

 2  Q.   Why did you do that?

 3  A.   Because that was standard practice in any

 4  investigation, would be to review the -- the file,

 5  the employee file, of the flight attendant for the

 6  previous 18 months of active duty, as well as their

 7  attendance records.

 8  Q.   And what did your -- what did your review of

 9  those attendance records reveal with respect to

10  Ms. Carter?

11  A.   I found that Ms. Carter had not worked much

12  during the previous three years.

13  Q.   Was that significant at all or not?

14  A.   Well, it is not unheard of for flight

15  attendants to retain their employment, but give away

16  their trips.  But I thought it was significant that

17  Ms. Carter said that she loved her job, wanted to

18  keep her job, but it appeared that she really didn't

19  work very often.

20           MR. McKEEBY:  Let's pull Exhibit 44.  And

21  Southwest would move to admit Exhibit 44.

22           MR. HILL:  No objection.

23           MR. GREENFIELD:  No objection.

24           THE COURT:  Okay.  Forty-four is in.  You

25  can publish.
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 244 of 383   PageID 15264
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1524

1              (The referred-to document was admitted in

2        Evidence as Trial Exhibit 44.)

3    BY MR. McKEEBY:

4    Q.   So are these the -- I know this is one page --

5    but are these the flight records that you

6    referenced?

7    A.   Yes.

8    Q.   So I will tell you that this exhibit has, well,

9    several pages.  But I would like you to kind of walk

10   through the jury so that they can understand the

11   documents -- or the document and what it means.  Is

12   this for, like, a particular month?

13   A.   Yes.  So if you look at the top left of the

14   document, you can see that the employee is Charlene

15   Carter, with her employee number, and she was based

16   in Denver.

17        And then just underneath that, in blue, it says

18   January 17, that is January of 2017.

19        If you continue across from where it says

20   "January 17th," you will see the original credit was

21   supposed to be 92.4 trips.  That is approximately

22   92 hours of flying time.

23        The projected was 0.  And that is because, if

24   you look at the actual calendar page itself, you

25   will see that there is nothing on any of those

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1525

1  dates.  That shows that Ms. Carter did not fly any

2  trips during the month of January in 2017.

3  Q.   Okay.  Why don't we go to the next page, 44.2.

4  And what I will do is walk through 2016, and if the

5  jury is interested, I will let them go through the

6  remainder of the document.

7      What does it say -- for what is this document,

8  44.2?

9  A.   This is February of 2017.  Her original trips

10 that she was assigned were -- had a credit of 84.8

11 trips.  However, she did not fly anything during the

12 month of February of 2017.

13 Q.   And I misspoke.  I thought this was 2016.

14 Let's go to the next page, which I think is, if I

15 understand how you are describing these documents,

16 44-point -- it is actually 44.4, I think, if I'm

17 understanding how you are reading the documents, is

18 where we start with 2016, is that correct?

19 A.   Yes, that's correct.

20      So now you can see in the blue, it says

21 January 16th, that is January of 2016.

22 Q.   And what did she do during January of 2016?

23 A.   She did not fly any trips during that month.

24 Q.   What does the "VA" stand for?

25 A.   Vacation.  She had one week of vacation at the

1  end of December of 2015, and then January of 2016

2  begins.

3  Q.   Okay.  And then the next page, 44.5, is that

4  February of 2016?

5  A.   Yes, it is.

6  Q.   Did she take any trips during that month?

7  A.   No.

8  Q.   Is there another -- is that, the VA, the same

9  for vacation?

10  A.   Yes.  And so up at the top where it says

11  "Projected 26.25," that means she received pay for

12  the vacation days during that month.

13  Q.   I see.

14          MR. HILL:  Objection, on the basis of

15  optional completeness, as Mr. McKeeby skipped past

16  what is labeled as --

17          THE COURT:  Hold on.  That is a speaking

18  objection.  We can come to sidebar if you want.

19          MR. HILL:  No, thank you.

20          THE COURT:  I will overrule, you can

21  continue.

22  BY MR. McKEEBY:

23  Q.   The next page, I think is 44.6.  Is this for

24  March of 2016?

25  A.   Yes, it is.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1527

1  Q.   And how many trips did Ms. Carter take during

2  that month?

3  A.   She flew one day.  If you see at the very

4  bottom of the calendar page, March 27 has those

5  initials on it.  That would be the identifier of the

6  trip that she flew.  And she received 7.10 trips for

7  pay.

8  Q.   What are the letters next to that trip?  Are

9  those airport designations or something else?

10 A.    No.  It just -- it denotes the name of the

11 line.  And also, if you look at the -- where it

12 says/FAC, she was the flight attendant in the C

13 position, which is the designation of what her

14 duties were on the aircraft.

15 Q.   I see.

16      Okay.  The next page, 44.7, appears to be April

17 of 2016.  It looks like there is more activity here.

18      How many trips did she take during April of

19 2016?

20 A.   Well, the trip that is on the top left, that

21 actually happened in March.  Then beginning

22 April 8th, she had vacation.  On April 19th and

23 on -- no, just on April 19th.  She flew a one-day

24 trip, which means she went out somewhere and came

25 back the same day.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 5 July 11, 2022                  Page 1528

1       And then it looks like on April 25th, she had a

2   one-day trip, but called in sick for it.  SLP,

3   stands for sick leave with pay.

4   Q.   I'm sorry, with pay?

5   A.   Yes.

6   Q.   And on 44.8, I think we are now into May.  What

7   does this show in terms of her activity during the

8   month of May of 2016?

9   A.   On May 23rd, she called in sick, and it says,

10  SLT.  That means she called in sick for training.

11      And then she had -- it looks like she left on

12  May 26th and returned home on May 27 for a two-day

13  trip.  And the MSY that is in that rectangle

14  underneath designates that she overnighted in

15  New Orleans.

16  Q.   And MSY is the airport designation for

17  New Orleans?

18  A.   New Orleans, yes.

19  Q.   The next page is 44.9.  We are up to June.

20  What did she do in June for Southwest?

21  A.   From June 8th through 14th, she had another

22  week of vacation.  And then the RTC, she took one

23  day of recurrent training in Colorado.  All flight

24  attendants are required to do a certain number of

25  hours of recurrent training every year.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1529

1  Q.   By the way, how is it that she's getting so

2  much vacation, if she's not working?

3  A.   Because of her seniority, her vacation would

4  continue to accrue whether she worked or not.

5  Q.   Okay.

6       Exhibit 44.10.  What does this show?

7  A.   That is July of 2016.  And she was pulled from

8  a trip on July 9th, 10th and 11th for jury duty.

9  Q.   Okay.  So did she fly at all during that month?

10 A.   No, she did not.

11 Q.   What about the next page, 44.11, which looks

12 like August of 2016, did she fly during that month?

13 A.   No.  She had a week of vacation time, but no

14 flying.

15 Q.   And the next page is 44.12.  What about this

16 month?  What do those entries indicate?

17 A.   She did not fly any trips during the month of

18 September.  On September 1st, there is a designation

19 JS2.  That means she job shared with another flight

20 attendant.  So the Collective Bargaining Agreement

21 gives flight attendants the ability to bid for one

22 month's block of flying time, but split it with

23 another person.

24      So one of them would be responsible for the

25 first half of the month of trips and the other one

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                 Vol 5 July 11, 2022                 Page 1530

1   for the second half of the month of trips.

2   Q.   So do these entries indicate actual flying time

3   by Ms. Carter?

4   A.   There is no flying time in the month of

5   September.

6   Q.   What about October, on page 44.13?  Is there

7   any flying time for Ms. Carter during that month?

8   A.   No.

9   Q.   Is there vacation time?

10  A.   Yes, there is one week of vacation, but no

11  actual flying.

12  Q.   And 44.4 -- I'm sorry -- 14, takes us into

13  November.  Is there any activity on -- in that

14  month?

15  A.   There is no flying and no vacation in November

16  of '16.

17  Q.   And what about in December on 44.15?

18  A.   There is no flying in December.

19          MR. McKEEBY:  Okay.  You can take that

20  down.

21  BY MR. McKEEBY:

22  Q.   I think earlier you indicated that one of the

23  things that you did in connection with your role in

24  the investigation was to review Ms. Carter's

25  Facebook page?  Did I understand that correctly?

 1  A.    Yes.

 2  Q.    What was your purpose in doing so?

 3  A.    One, I wanted to see -- to verify that the

 4  screen shots and videos that had been sent to me

 5  actually came from Ms. Carter's Facebook page.

 6  Also, to see if she had identified herself as a

 7  flight attendant on her Facebook page, a Southwest

 8  Airlines flight attendant.

 9  Q.    And why was that important?

10  A.    Because that would create a nexus to the

11  workplace.

12  Q.    Let me direct your attention to Exhibit 90, 90,

13  which I think is already in evidence.

14            MR. McKEEBY:  Is that correct, your Honor?

15            THE COURT:  That's correct.

16  BY MR. McKEEBY:

17  Q.    Exhibit 90 has already been published to the

18  jury.  What is this document?

19  A.    This is a document that originated from Denise

20  Gutierrez, and then I forwarded it to my leaders,

21  Tammy Schaffer and Brianna Grant.

22        I sent them the -- the videos and posts that

23  Ms. Gutierrez had sent to me.

24        In addition, I attached some posts that I

25  had -- some screen shots that I had taken from

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 252 of 383   PageID 15272
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1532

1  Facebook that showed the connection between that

2  Ms. Carter's Facebook page and her being identified

3  as a Southwest Airlines flight attendant.

4  Q.   And where did you do that?  Is that something

5  that you did -- are those the attachments?

6  A.   Yes.

7  Q.   I'm sorry.  What are those -- what did you

8  understand those attachments to be?

9  A.   Off the top of my head, there were photos of

10 Ms. Carter in her Southwest Airlines uniform, there

11 were -- there was a photo of her, I believe she was

12 in street clothes, with her Southwest Airlines ID

13 around her neck.  And I think there were multiple

14 photos of her in the uniform and on the Southwest

15 Airlines's aircraft.

16 Q.   And is that what you mean by the phrase "nexus"

17 in this email -- and I think you mentioned it in

18 your testimony today?

19 A.   Yes.

20 Q.   And why was that important to Southwest?

21 A.   Because part of the social media policy also

22 specifies that the -- and it is in the mission

23 statement, I believe -- that the public image that a

24 flight attendant projects can enhance or harm the

25 public image of Southwest Airlines.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1533

```
 1   Q.   How would it enhance or harm the public image
 2   of Southwest Airlines?
 3   A.   Well, specific to Ms. Carter, she had the
 4   abortion videos on her Facebook page.  So that could
 5   be very offensive to any customers who were viewing
 6   those posts.
 7   Q.   I would like to spend a little bit of time
 8   talking about some of the policies that you
 9   referenced.
10         MR. McKEEBY:  Can we go to Exhibit No. 11?
11   BY MR. McKEEBY:
12   Q.   Do you recognize this document?
13   A.   Yes.
14         MR. McKEEBY:  I would like to move -- or
15   Southwest would move for the admission of
16   Exhibit 11.
17         MR. HILL:  Objection, relevance.
18         THE COURT:  All right.  I'm looking.  All
19   right.  Anything from the union?
20         MR. GREENFIELD:  No objection.
21         THE COURT:  I will overrule that, and
22   admit 11.  You can publish.
23         (The referred-to document was admitted in
24      Evidence as Trial Exhibit 11.)
25
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 254 of 383   PageID 15274
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1534

1  BY MR. McKEEBY:

2  Q.   Can you explain to the jury what this document

3  is?

4  A.   Yes, this is a page from the flight attendant

5  manual.  And it is a copy of the Southwest Airlines

6  mission statement.

7  Q.   And can you generally describe the mission

8  statement?

9  A.   Yes.  The beginning of the mission statement

10 discusses that we are dedicated to the highest

11 quality of customer service.  The second paragraph

12 is specific to external customers.  It talk -- well,

13 actually, the second paragraph, it states here, that

14 it is displayed in many different places.

15      And I think that the part that was specifically

16 pertinent to Ms. Carter's case is the last paragraph

17 here that says, we are committed to provide our

18 employees a stable work environment.  And then, when

19 you go down to the last line, it states, above all,

20 employees will be provided the same concern, respect

21 and caring attitude within the organization that

22 they are expected to share externally with every

23 Southwest customer.

24 Q.   And why was that particularly pertinent to

25 Ms. Carter's situation?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1535

1  A.    Because the allegations that were brought

2  against her were of one employee reporting that she

3  had not been treated with respect or care, that she

4  had been attacked verbally.

5  Q.    Now, my understanding, and I think you

6  mentioned, is that Ms. Stone was the president of

7  the Union at the time.  Is that correct?

8  A.    Yes.

9  Q.    Did that matter to you in connection with your

10 role in the investigation?

11 A.    No.  It did not.  Ms. Carter --

12 Q.    Why not?  Why not?

13 A.    Ms. Carter was first and foremost an employee

14 of Southwest Airlines.

15 Q.    Did you Ms. Stone?

16 A.    I'm sorry, Ms. Stone.

17       As well as Ms. Carter.  But Ms. Stone was first

18 and foremost an employee of Southwest Airlines.  And

19 it says right there, we are committed to provide our

20 employees, not just one or two, but all of them.

21 Q.    And how do employees at Southwest Airlines have

22 access to this mission statement?

23 A.    The mission statement is posted in multiple

24 places.  It is posted in, of course, all of our

25 headquarters, at the different locations where --

1  where we fly, in the flight attendant lounges.  And

2  also it is -- this specific copy of the document is

3  found in the flight attendant annual, and each

4  flight attendant is required to carry that manual

5  with them.

6  Q.   Okay.  Carry it with them on the flights?

7  A.   Yes.

8  Q.   Let's go to trial Exhibit 7.

9       What is --

10           MR. McKEEBY:  Well, first of all,

11  Southwest moves to admit Trial Exhibit 7.

12           MR. HILL:  No objection.

13           THE COURT:  No objection to 7.

14           MR. HILL:  No objection.

15           MR. GREENFIELD:  No objection.

16           THE COURT:  Seven is in.

17           You can publish.

18           (The referred-to document was admitted in

19       Evidence as Trial Exhibit 7.)

20  BY MR. McKEEBY:

21  Q.   What is this?  Explain to the jury what this

22  document is.

23  A.   This is Southwest Airlines' policy concerning

24  harassment, sexual harassment, discrimination and

25  retaliation.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 257 of 383   PageID 15277
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1537

1        And basically, it outlines what is and is not

2   acceptable, as well as giving some examples of

3   unacceptable behavior concerning harassment, sexual

4   harassment, discrimination and retaliation.

5   Q.   Was this policy implicated in your

6   investigation of Ms. Carter's situation?

7   A.   Yes, it was.

8   Q.   How so?

9   A.   There were -- were multiple ways.  There were

10  certain screen shots that were sent that were of a

11  sexually offensive nature.  There were also what

12  Ms. Stone perceived to be as threats that Ms. Carter

13  sent to her.  And the content of the videos was

14  harassing and intimidating.

15  Q.   The first thing that you mentioned were the --

16  was that the vagina hats?

17  A.   Yes.

18           MR. McKEEBY:  Can you pull up Exhibit 47?

19  BY MR. McKEEBY:

20  Q.   Is this what you were talking about?

21  A.   Yes, it was.

22  Q.   And why was that potentially implicating the

23  policy that we just spoke about?

24  A.   Well, it is sexually harassing, it is sexually

25  explicit.  Even though they are hats, they are

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1538

1  intended to look like a woman's vagina.

2  Q.   And how do employees at Southwest have access

3  to the -- trial Exhibit 7, the harassment, sexual

4  harassment and discrimination policy?

5           MR. McKEEBY:  You can pull that down.

6           THE WITNESS:  All employees have access to

7  it on SWA life, which is our intranet, and then

8  flight attendants also have a copy of the policy in

9  their manual.

10 BY MR. McKEEBY:

11 Q.   What is the concept of cyberbullying?

12 A.   The concept of cyberbullying would be bullying

13 of one employee to another by the use of social

14 media.

15 Q.   Did you believe that concept was implicated in

16 connection with Ms. Stone's complaint about

17 Ms. Carter?

18 A.   Yes, I did.

19 Q.   How so?

20 A.   Because the complaints that -- or the videos

21 and text messages and other documents that

22 Ms. Carter sent to Ms. Stone were done via, I

23 believe, Facebook instant messaging.

24           MR. McKEEBY:  And at this time, we would

25 like to pull but not publish Exhibit 147.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1539

```
 1              MR. HILL:  Objection.  Same objection we
 2   already stated.
 3              THE COURT:  Understood.  Are you wanting
 4   to show the witness or admit it into evidence?
 5              MR. McKEEBY:  I would like to just show it
 6   to the witness.
 7              THE COURT:  Okay.  You can show it to the
 8   witness.
 9   BY MR. McKEEBY:
10   Q.   What is this document?
11              MR. HILL:  Objection, testifying from a
12   document.
13              THE COURT:  Sidebar.
14              (Thereupon, the following proceedings were
15         had at sidebar:)
16              THE COURT:  All right.
17              MR. HILL:  He's seeking to get the
18   document in through testimony instead of through the
19   document itself.  We have already got the bullying
20   policy that was in place at the time that Southwest
21   submitted.  That is the bullying policy they have go
22   to work from.  He can't sideline this by getting
23   this other policy in through testimony.
24              MR. McKEEBY:  I'm not going to have her
25   testify as to the contents.  I'm just going to have
```

 1  her describe the document, and I'm going to go to

 2  the other document.

 3              THE COURT:  All right.  I think that is

 4  fine.

 5              (Thereupon, the sidebar was concluded and

 6       the following proceedings were held in open

 7       court:)

 8              THE COURT:  Okay.  You can proceed.

 9  BY MR. McKEEBY:

10  Q.   Can you describe this document?

11  A.   Yes.  This is a portion of a policy.  At the

12  very top of that page, it states, guidelines for

13  employees, the policy and procedure handbook.

14       This is the handbook that is published on SWA

15  Life, our intranet, that all employees have access

16  to.  And it -- it has a copy of the workplace

17  bullying and hazing policy.

18  Q.   And can you tell when this policy was

19  implemented -- or when this version of the policy

20  was put in place?

21  A.   Yes.  So --

22              MR. HILL:  Objection, same objection.

23              THE COURT:  I will sustain this one.

24              MR. McKEEBY:  Let's pull Exhibit 13,

25  please.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 261 of 383   PageID 15281
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 5 July 11, 2022                  Page 1541

```
 1            THE COURT:  It is in.  We can publish.
 2   BY MR. McKEEBY:
 3   Q.   What is this document?
 4   A.   This is an older version of the workplace
 5   bullying and hazing policy.
 6   Q.   How do you know it is an older vision?
 7   A.   Because the revised date is older than the last
 8   document that we just saw.
 9   Q.   And apart from the language of the policy, can
10   you just generally describe to the jury what
11   Southwest's policy is with respect to bullying and
12   hazing?
13   A.   Yes.  It will not be tolerated in the
14   workplace.
15   Q.   How do employees have access to this policy?
16   A.   It is available on SWA Life.
17   Q.   Again, remind me what S W A life is?
18   A.   The internal -- it is the intranet.  So our
19   internal internet.
20   Q.   Who has access to that?
21   A.   Every employee has access to it.
22   Q.   You weren't here, but there was some testimony
23   about the fact that this is a workplace bullying and
24   hazing policy.
25        Do you see that?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1542

1   A.    Yes.

2   Q.    What does "workplace" mean in that context?

3   A.    Anything that is associated with work, or the

4   employees of Southwest Airlines.

5   Q.    Well, what if an employee sends a threatening

6   message to another employee while they are at home,

7   not on a plane or not working, but to a co-employee

8   while they are home, does that implicate this policy

9   in your view?

10  A.    Absolutely.  In fact, especially in the case of

11  flight attendants, they are a very different

12  workforce.  They don't have an office.  Their office

13  is on the plane or at the hotel.  Many times they

14  are conducting work-like bidding for their trips

15  from home.  And the way that many flight attendants

16  choose to say connected is through social media.

17        When it is one -- one employee to another, they

18  are still coworkers, whether they are physically on

19  the aircraft or not.

20  Q.    And in your investigation of Ms. Carter's case,

21  did you come to any conclusion as to whether or not

22  Ms. Carter violated Southwest's bullying and hazing

23  policy?

24  A.    Yes.  I agreed with Mr. Schneider that this

25  policy had been violated.

```
 1              MR. McKEEBY:  Let's go to Exhibit No. 9,
 2    which I don't think has been published.  But
 3    Southwest would move to admit trial Exhibit No. 9.
 4              THE COURT:  All right.  Any objection to
 5    No. 9?
 6              MR. HILL:  No objection.
 7              MR. GREENFIELD:  No objection, your Honor.
 8              THE COURT:  Nine is in.
 9              You can publish.
10              (The referred-to document was admitted in
11         Evidence as Trial Exhibit 9.)
12    BY MR. McKEEBY:
13    Q.   Can you explain to the jury what this document
14    is?
15    A.   Yes, this is are the Southwest Airlines
16    employee social media policy.
17         It outlines some -- well, first of all, it
18    gives the expectations of our employees.  And you
19    can see in the second paragraph, the italicized area
20    talks about the content that is in any way later
21    related to Southwest, reflects poorly upon Southwest
22    or impacts the workplace is a violation of the
23    policy, and may result in discipline up to and
24    including termination.
25         The document goes on to give some examples of
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1544

1  what is prohibited, and then some examples of social

2  media content that is acceptable.

3  Q.   Okay.  What would be -- what are the

4  consequences of violating this policy by an

5  employee?

6  A.   That it could result in discipline up to and

7  including termination.

8  Q.   And I didn't ask you that question in

9  connection with the previous document, the workplace

10 bullying and hazing policy.  What were the potential

11 consequences of violating that policy?

12 A.   Potential discipline up to and including

13 termination.

14 Q.   Now, does Southwest monitor, independent of any

15 complaint -- you indicated that you reviewed

16 Ms. Carter's Facebook posts, but does Southwest

17 monitor employee Facebook accounts?  Pages, I guess?

18 A.   No.  Not without some complaint being brought

19 against an individual.

20 Q.   In the section towards the bottom that says,

21 monitoring and reporting prohibited conduct, there

22 is language in the second sentence about what

23 employees should do when they become aware of social

24 media content of a certain nature.

25      What should employees do?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1545

1  A.   It states that they should promptly and

2  accurately report such content to Southwest's social

3  media team.

4  Q.   And does Southwest have the expectation that

5  employees will do that?

6  A.   Yes.

7  Q.   And I forgot to ask you, how was this policy

8  made available to Southwest's employees?

9  A.   It is available on SWA Life, the intranet.

10 Q.   And did you come to an assessment as to whether

11 or not Ms. Carter's conduct violated this policy?

12 A.   Yes.  I agreed that her conduct did violate the

13 social media policy.

14 Q.   What are read before fly memorandums?

15 A.   Those are memos that are published with content

16 that is specific to the flight attendant workforce.

17 They are required to read all new read before flies

18 or RBFs, is the abbreviation for them, prior to

19 flying any trips.

20 BY MR. McKEEBY:

21 Q.   And has Southwest published those read before

22 fly memorandums regarding its social media policy?

23 A.   Yes, they have.

24 Q.   If you will go to Exhibit 16.

25      Is that one of those read before fly

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1546

```
 1  memorandums?
 2  A.    Yes.
 3              MR. McKEEBY:  Southwest moves to admit
 4  Trial Exhibit 16.
 5              THE COURT:  No objection.
 6              MR. GREENFIELD:  No objection.
 7              THE COURT:  Sixteen is in.
 8              You can publish.
 9              (The referred-to document was admitted in
10        Evidence as Trial Exhibit 16.)
11  BY MR. McKEEBY:
12  Q.    So what does this say about Southwest's social
13  media policy?  It looks like an older document,
14  January of 2013.
15  A.    It is an older document.  As you said,
16  January 11th of 2013, and it states that the social
17  media policy was introduced and is applicable to all
18  Southwest employees, including members of the Board
19  of Directors and contractors.
20        It tells employees to familiarize themselves
21  with the policy, and puts them on notice that
22  mandatory acceptance of the policy would be required
23  beginning the 16th of January, in 2013.
24        Finally, it gives the -- well, actually, these
25  are specific to flight attendants, so it gives the
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 267 of 383   PageID 15287
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1547

1    flight attendants the pathway to follow in order to
2    be able to find the entire social media policy.
3    Q.   And so maybe you said this and I missed it, but
4    to whom are these types of memorandums issued to?
5    A.   Read before flies are specific to the flight
6    attendant work group.
7    Q.   Okay.
8         And how are they distributed?
9    A.   I believe at the time that this one was
10   distributed, they were still paper copies.  And the
11   books of memos were kept in each flight attendant
12   lounge.  And then eventually we went electronic, and
13   they were all delivered electronically.
14             MR. McKEEBY:  Thank you.  You can take
15   that down now.
16   BY MR. McKEEBY
17   Q.   Did you make the decision to terminate
18   Ms. Carter's employment at Southwest?
19   A.   No, I did not.
20   Q.   Did you -- do you have a sense of who did?
21   A.   Yes.
22   Q.   And who was that?
23   A.   Mr. Ed Schneider.
24   Q.   And did you consult with him in connection with
25   your perspective on that decision?

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 268 of 383   PageID 15288
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1548

```
 1   A.   Yes, I did.

 2   Q.   Can you explain to the jury what that involved?

 3   A.   Yes.  As I stated earlier, Mr. Schneider sent

 4   me all of the information that he had gathered

 5   during his investigation, as well as all of the

 6   documents he reviewed, the different department

 7   representatives that he had consulted with and his

 8   recommendation for termination of employment.

 9   Q.   And did you agree with that recommendation?

10   A.   Yes.

11   Q.   Why?

12   A.   Because I believed that Ms. Carter's behavior

13   had violated multiple company policies.  I reviewed

14   our case history of other cases that had similar

15   violations, and I determined that what his

16   recommendation was, was in line with what we had and

17   consistent with what -- what discipline had been

18   issued in other similar cases.

19   Q.   Ms. Emlet, are you a religious person?

20   A.   I am.

21   Q.   What are your personal views regarding

22   abortion?

23            MR. HILL:  Objection, relevance.

24            THE COURT:  I will sustain that.

25            MR. McKEEBY:  Your Honor, sidebar.
```

```
 1                    (Thereupon, the following proceedings were

 2           had at sidebar:)

 3                    THE COURT:  She wasn't the terminator.

 4                    MR. McKEEBY:  She consulted.  She

 5    consulted and had input with Mr. Schneider, so I

 6    think her views are relevant.  And that is part of

 7    the motion in limine ruling that you issued about

 8    perspectives of others that were involved in the

 9    process, so I should be able to ask her that.

10                    THE COURT:  Response.

11                    MR. HILL:  In addition to being in

12    admissible, it is irrelevant because her religious

13    views aren't impactful on whether she made this --

14    whether she recommended this decision or approved

15    this decision.

16                    It is also a 404 issue, character.  They

17    are trying to say that she wouldn't have issued --

18    she wouldn't have done what she did, if not for her

19    character.  She wouldn't have done something in

20    conformance with her character, by establishing

21    these character questions of her religion and her

22    assistance on abortion.

23                    THE COURT:  Response to 404.

24                    MR. McKEEBY:  I just don't think that is

25    why it is being used at all.  I mean, it is set
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  forth in our motion in limine.  And I think her

2  perspective and beliefs are relevant to the ultimate

3  decision because she had some role in communicating

4  and consulting with Mr. Schneider.

5          THE COURT:  Yeah, I think it is relevant,

6  but only because she had a consulting role.

7          MR. McKEEBY:  I'm not going to ask every

8  witness --

9          THE COURT:  Yeah, I think it's off limits.

10 So I get your objection.  I will overrule it for

11 this witness.

12          (Thereupon, the sidebar was concluded and

13      the following proceedings were held in open

14      court:)

15          THE COURT:  Okay.  You can reask that

16 question.

17 BY MR. McKEEBY:

18 Q.   Ms. Emlet what are your personal views

19 regarding abortion?

20 A.   I believe that abortion is wrong and I am pro

21 life.

22 Q.   What is the U.S. Conference of Catholic

23 Bishops?

24 A.   It is a collection of Catholic bishops that --

25 they confer on different issues that are pertinent

1  to the Catholic church.

2      I happen to have a connection with them because

3  they send emails, monthly emails.  I belong to a --

4  a universal prayer group that prays about pro life

5  issues.

6  Q.   What -- Ms. Carter, in this case, has said that

7  she sent those videos as an expression of her -- the

8  videos to Ms. Stone as an expression of her

9  religious beliefs.

10      Do you have a reaction to that?

11          MR. HILL:  Objection, relevance.

12          THE COURT:  I will allow that.

13          THE WITNESS:  I can understand how those

14  videos might reflect what Ms. Carter believes about

15  abortion, but I don't know how they connect to her

16  religious beliefs or why that would be something

17  that she would share with Ms. Stone.

18          MR. McKEEBY:  Pass the witness, your

19  Honor.

20          THE COURT:  All right.  Mr. Greenfield.

21              CROSS-EXAMINATION

22  BY MR. GREENFIELD:

23  Q.   Good afternoon, Ms. Emlet.

24  A.   Good afternoon.

25  Q.   My name is Adam Greenfield, and I'm one of the

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1552

 1  attorneys who represents the union in this matter.

 2      I have a few questions for you.

 3      Do employees lose their rights at Southwest

 4  Airlines when they become union members?

 5  A.   No.  As a matter of fact, being a union member

 6  generally gives them additional protection over

 7  their personal work rights.

 8  Q.   Did Audrey Stone lose her rights at Southwest

 9  Airlines to be free from harassment when she became

10  the union president?

11  A.   Absolutely not.

12  Q.   Can you tell the jury a little bit about, in

13  your role, your duty to investigate, if any,

14  complaints?

15          MR. HILL:  Objection, calls for a legal

16  conclusion.

17          THE COURT:  Overruled.  You can answer.

18          THE WITNESS:  Prior to becoming a labor

19  relations manager, I was a base manager for many

20  years.  And in that role, I -- I would be involved

21  in investigating cases when allegations were brought

22  against flight attendants.

23          As a labor relations manager, my role was

24  to work with the base leaders and ensure that --

25  that we were applying the contract consistently, the

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 273 of 383   PageID 15293
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 5 July 11, 2022                  Page 1553

1  way that the contract was intended to be applied.

2  And also, that company policies were being followed.

3  BY MR. GREENFIELD:

4  Q.   Do you understand there to be any ramifications

5  if you failed to investigate a complaint?

6  A.   Certainly.  First of all, it would -- it would

7  create disparate treatment.  There could be legal

8  implications if a complaint was brought forward and

9  we did not investigate.

10      But also, it would have a terrible impact on

11 the rest of the workforce, when they see that some

12 people get away some things and other people are

13 held accountable.  We never know whether there is an

14 actual violation, until we complete an

15 investigation.

16 Q.   Based on your experience, would you have feared

17 potential legal ramifications from Ms. Stone, if you

18 had not investigated her complaints?

19 A.   My involvement didn't really involve fear of

20 legal ramifications.  My involvement was earlier on

21 in the investigation, usually, and was more focused

22 on what are we doing in accordance with the

23 Southwest policies, the Collective Bargaining

24 Agreement.

25      And then, if it goes further from there, are

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 274 of 383   PageID 15294
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1554

1  there any -- any legal ramifications?  For instance,

2  if Ms. Stone brought forward allegations of sexual

3  abuse or violation.  That then gets into the legal

4  territory.  But I'm not an attorney, so --

5  Q.   I understand.  Thank you, Ms. Emlet.

6       You mentioned policies.

7       Are you aware of any annual acknowledgement

8  requirement by flight attendants pertaining to

9  policies?

10  A.   Yes.

11  Q.   Can you describe what that is to the jury?

12  A.   Yes.  I would need to see the documents to tell

13  you exactly which policies, but I know that every

14  year, the flight attendants are required to -- they

15  are sent a notice via their laptops -- iPads that

16  they are issued, and the notice is to say that they

17  have read and agreed to comply with the different

18  policies, including the social media policy and I

19  believe the discrimination policy.

20  Q.   Are flight attendants allowed to continue

21  flying if they don't acknowledge those policies and

22  policy updates?

23  A.   They are not.

24  Q.   So in order for Ms. Carter to continue to fly,

25  she would have acknowledged the cyberbullying

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                         Vol 5 July 11, 2022                         Page 1555

```
 1  policy, is that correct?

 2  A.   That's correct.

 3  Q.   Did the union exert any undue or unwanted

 4  pressure during your investigation of Ms. Stone's

 5  complaints against Ms. Carter?

 6  A.   No.

 7  Q.   Did the union exert any undue or unwanted

 8  pressure in the decision to terminate Ms. Carter?

 9  A.   No.

10            MR. McKEEBY:  Pass the witness.

11            THE COURT:  All right.

12            MR. HILL:  We don't have anything.

13            THE COURT:  What's that?

14            MR. HILL:  We don't have anything.

15            THE COURT:  Okay.  So there is no need for

16  a round two with this witness.

17            MR. McKEEBY:  I do have one question.

18            THE COURT:  Based on his?

19            MR. McKEEBY:  No.  I will do it with

20  another witness.

21            THE COURT:  That works.  So you are

22  excused as a witness.  Congratulations.  Thank you

23  for your testimony.

24            THE WITNESS:  Thank you.

25            THE COURT:  Who do you plan to call next,
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1556

```
 1   Mr. McKeeby?

 2              MR. McKEEBY:  I plan to call Ms. Hudson

 3   next.

 4              THE COURT:  Okay.  You may do so --

 5   actually, why don't we take a break while you

 6   resituate.  We will take our last break of the

 7   afternoon.

 8              Same instructions:  You can only talk to

 9   your fellow jurors and court personnel, just not

10   about the case; can't talk to anyone else; and don't

11   do any research about the case.  We will see you in

12   10 minutes at 3:40.  All rise.

13              (The jurors exited the courtroom.)

14              MR. McKEEBY:  Housekeeping question, may

15   mass Ms. Emlet be excused?  She's --

16              THE COURT:  Yes.  Yes.  Any objections to

17   cutting her loose?

18              MR. HILL:  No objection.

19              THE COURT:  Okay.  Let's cut her loose.

20   That is fine.  And then if you want Ms. Hudson to be

21   on the stand at the end of the break, that's fine

22   too.

23              So we will be back here at 3:40 with

24   Hudson on the stand, you can be at the podium, and

25   we will rock and roll.  Thank you.  See you in nine
```

 1  minutes.

 2              (Recess.)

 3              THE COURT SECURITY OFFICER:  All rise.

 4              THE COURT:  Anything before we get the

 5  jury?

 6              MR. GILLIAM:  No.

 7              THE COURT:  Okay.  Ms. Hudson, welcome.

 8  Once they come in, then we will have you stand up,

 9  and then Mr. Frye is going to give you the oath.

10              THE WITNESS:  Okay.

11              (The jurors entered the courtroom.)

12              THE COURT:  Okay.  You can be seated.

13              Mr. McKeeby, you called your next witness

14  already.  Can you tell the jury her name?

15              MR. McKEEBY:  Naomi Hudson.

16              THE COURT:  Okay.  Ms. Hudson, can you

17  raise your right hand, and Mr. Frye will swear you

18  in.

19              (NAOMI HUDSON was duly sworn by the

20      Clerk.)

21              THE COURT:  Now you can take a seat.  And

22  then I will say the same thing I do to every

23  witness, I'm just going to ask for some space

24  between questions from lawyers and your answers, and

25  then some space that they give you between your

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1558

 1  answers and their questions.  That way, if there is

 2  an objection, I can rule on the objection before you

 3  launch into an answer.

 4              THE WITNESS:  Okay.

 5              THE COURT:  You can proceed, Mr. McKeeby.

 6              MR. McKEEBY:  Thank you.

 7                    DIRECT EXAMINATION

 8  BY MR. McKEEBY:

 9  Q.   Can you state your full name for the jury

10  please?

11  A.   Naomi Hudson.

12  Q.   Where do you live, Mr. Hudson?

13  A.   Carrollton, Texas.

14  Q.   Are you currently employed?

15  A.   I am not.

16  Q.   Where were you previously employed?

17  A.   Southwest Airlines.

18  Q.   How long have you been retired?

19  A.   Two-and-a-half years.

20  Q.   I said retired.  Maybe I shouldn't assume that.

21  Are you retired?

22  A.   I am retired.

23  Q.   What did you do prior to your retirement at

24  Southwest Airlines?

25  A.   Twenty-eight years at Southwest Airlines.  And

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 279 of 383   PageID 15299
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1559

1  my most recent position was a senior advisor.  But

2  immediately prior to that, I was senior director of

3  labor relations, including of the flight attendant

4  work group, we call it in flight services or cabin

5  services.

6  Q.   And was that your position, senior director of

7  labor relations -- excuse me -- in February of 2017?

8  A.   Yes.

9  Q.   And can you explain to the jury what you did as

10 the senior director of labor relations?

11 A.   Yes.

12 Q.   What was your job?

13 A.   I will.

14       Well, I was responsible for -- as the lead

15 negotiator for Collective Bargaining Agreement.  And

16 that is our contract, our work group contract with

17 our flight attendants.  I represented Southwest

18 Airlines of the negotiating team as a lead.  I also

19 oversaw the grievance -- any grievance process that

20 had to do with disputes between the company and the

21 union, any grievances filed typically by the union

22 against the company for either contractual

23 provisions or for discipline, up and including

24 termination.

25       I was the liaison and spokesperson for our

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1560

1  company in that particular regard, to make sure that

2  we addressed the grievances timely, in accordance to

3  our contract.

4        And what else did I do?  I oversaw a team of

5  people that were responsible for the daily operation

6  of the administration of the contract.  And I was a

7  company liaison between various work groups

8  responsible for -- by work groups, I mean different

9  divisions within the company that had questions

10  regarding our flight attendants and whether or not

11  we could propose certain things for them to do.  So

12  we interpreted the contract for our company.

13  Q.   The jury heard testimony before you from

14  Maureen Emlet.  Do you know Ms. Emlet?

15  A.   I do.

16  Q.   And what was her relationship professionally

17  with you in February of 2017?  Did she report to

18  you?

19  A.   Yes.  I'm trying to remember the dates, because

20  I went back and forth.

21       But in that time period, she would have -- she

22  was a manager, under my responsibilities.  But her

23  immediate boss would have been the director, and the

24  director reported to me.  So Maureen was one of my

25  managers.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 281 of 383   PageID 15301
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1561

```
 1              MR. McKEEBY:  Okay.  Let me pull up
 2   Exhibit 66, which is in evidence.
 3              MR. PRYOR:  It is not on the list of
 4   exhibits, object --
 5              THE COURT:  Sixty-six is in already.
 6              MR. PRYOR:  I thought we were supposed to
 7   reveal the exhibits we were using --
 8              THE COURT:  Sidebar, please.
 9              MR. PRYOR:  If that is not the case, I'll
10   withdraw.
11              THE COURT:  Okay.  If it is already in, I
12   will let anyone talk about it.
13              MR. PRYOR:  Okay.
14   BY MR. McKEEBY:
15   Q.   Do you believe you are the same Naomi Hudson
16   who is listed on this email?
17   A.    Yes.
18   Q.   Do you remember getting this email?
19   A.   Didn't know I needed to bring my cheaters, but
20   hold on.
21   Q.   Okay.  Sorry.
22              THE COURT:  Thank you.
23   BY MR. McKEEBY
24   Q.   We have some assistance for you.
25   A.    Thank goodness.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1562

1      Yes.

2  Q.   And yes, you remember seeing this?

3  A.   Yes, I do.  I'm sorry.

4  Q.   Now, did you know -- I take it you knew

5  Ms. Stone prior to receiving the email?

6  A.   Yes.

7  Q.   And did you know Ms. Carter, who is in the

8  courtroom today, the person about whom Stone was

9  complaining?

10  A.   No, I'm afraid I didn't.

11  Q.   Okay.

12      Now, what actions would you have taken in

13  response to getting an email like this?

14  A.   Well, this type of -- and I recall it, I don't

15  remember the full context of this particular email,

16  but I do know that this is a complaint about

17  potential harassment and such.

18      And so we have another division within

19  Southwest Airlines that conducts investigations for

20  these types of -- for this type of activity --

21  potential activity or alleged activity.  And so I

22  would ensure that it is referred to them, in

23  addition that somebody from my team -- for example,

24  in Maureen's position -- that was aware of it, so

25  they can ensure that we are within our time frames?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                        Page 1563

1         Again, as outlined in our Collective Bargaining

2    Agreement.  But we would -- I would make sure that

3    the appropriate folks saw and were aware of this

4    complaint.

5    Q.   And by "appropriate folks," you mean people in

6    departments or --

7    A.   Yes.  The employee relations department, as

8    well as they call -- in my department, my division,

9    not a department -- but my division, of labor

10   relations.

11   Q.   And did you consult with Ms. Emlet in

12   connection with her involvement in this process?

13   A.   I don't recall specifically talking to her.  I

14   probably did.  But to be very specific, I don't

15   remember a specific conversation with her.

16        I'm sure I did, but I don't -- I can't swear

17   that I remember a conversation.

18   Q.   All right.

19        Did you what the -- did you have occasion to

20   watch the videos?

21   A.   I did.  Now, I don't know if it was two or one,

22   but I do recall seeing a video.

23   Q.   What was your reaction when you saw the video?

24   A.   I was a stunned, number one, shocked.  I think

25   pretty saddened and kind of disappointed.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1564

1  Q.   Why were you saddened?

2  A.   Well, we all have our views about things, and

3  that is okay.  Nobody is trying to tell somebody

4  what to think.

5       But we have standards at Southwest Airlines,

6  and we have -- the company ensures that we are

7  treating each other with a measurement of respect

8  and care, and understanding that we are all

9  different.  Diverse work group to say the least, and

10 that is what we want.

11      So when it comes to certain things like this,

12 such graphic, such shocking egregiousness, it is

13 just not acceptable.

14 Q.   And did you have an opinion about the decision

15 to terminate Ms. Carter's employment?

16 A.   Yes.  I did have an opinion.

17 Q.   What was that, what was the opinion?

18 A.   The opinion is --

19          MR. PRYOR:  Object to relevance, Your

20 Honor, she wasn't -- lack of foundation, as to a

21 decision maker.

22          THE COURT:  Sustained.

23 BY MR. McKEEBY:

24 Q.   Let me --

25          MR. PRYOR:  And I apologize.  I'm not sure

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1565

 1  if an answer got in, if it did, I would move to
 2  strike.
 3           THE COURT:  No, it didn't.
 4           MR. PRYOR:  Okay.  I couldn't hear.
 5  BY MR. McKEEBY:
 6  Q.   Can you identify this document for the jury?
 7  A.   Yes, I can.  That is a required reading.  We
 8  call it read before fly at that time.  I think we
 9  still -- have another term for it maybe now.
10           But it is a memo from me, it was Naomi Hudson,
11  senior director of labor relations.  And it is
12  regarding social media behavior and policy, and is a
13  reminder only to our -- to our flight attendant work
14  group about the responsibilities, and our
15  expectations as a company.
16  Q.   And this looks it was issued on October 12,
17  2016?
18  A.   Yes.
19  Q.   And do you recall the context of issuing this
20  memorandum or authoring it, I guess?
21  A.   Yes.  Again, reminding our employees of their
22  responsibilities.  And without reading it directly,
23  just that -- that social media is there.  It is
24  there as a tool.
25           And while we are not Pollyanna, we are not

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1566

```
 1  blind as a company and think that everything is all
 2  roses, there is a certain line -- and there is no
 3  specific direct line -- but we all know not to just
 4  to be rude and hateful.  And just remember that
 5  things that are posted on social media, no matter if
 6  they are private, they -- they are forever there and
 7  they can be passed on to others.
 8         And we -- we have -- we can't allow our
 9  employees to say something to another employee that
10  is going to impact their work life, not that, oh, I
11  don't like your orange dress today but -- or your
12  flowery jacket, whatever you have on today, but
13  something just so egregious and so gross, we don't
14  allow that type of behavior.  So we are just
15  reminding people of the policies and to definitely
16  review the policy.
17         And if you have questions, of course, you know,
18  we always welcome questions from our employees.  But
19  just as a reminder, that here is what -- we are
20  seeing a lot of reports, let's cut it out.
21  Q.  We are seeing a lot of reports, you said?
22  A.  From various people.  Yeah.  That's -- that
23  would have generated this particular memo.  Not
24  just, you know, I have nothing else to do, so I'm
25  just, you know, write a memo because today it is
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  Wednesday, or whatever day it was.  Probably

2  Tuesday.

3       But because things are going on.  And we have

4  to remind our employees about their behavior and our

5  expectations as a Southwest Airlines employee.  When

6  people sign up to work for Southwest Airlines -- and

7  not a perfect company by far -- but one of the best,

8  I'll tell you that.

9  Q.   What -- go ahead.  I'm sorry.

10 A.   No, but I will tell you, we have expectations.

11 We have high expectations of our employees.  Just

12 the same as our customers have high expectations of

13 the company.

14 Q.   And what are those expectations vis-a-vis

15 employees?

16 A.   Treat people courteous -- I'm sorry.  Do tell

17 me slow down, so I will do that.

18           THE COURT:  It is okay.

19           THE WITNESS:  Treat people with respect,

20 right people the way you would like to be treated.

21 And, you know, without giving the exact, but, you

22 know, we believe in customer service, we believe in

23 a high standard of customer service.

24           And we talk about internal customer

25 service no matter what we are teaching.  We teach it

1  in new hire, we teach it in every year recurrent

2  training, we teach it -- not just teach it, but we

3  talk about it, we engage our employees in what

4  customer service is.

5  BY MR. McKEEBY:

6  Q.  What does that concept of internal customer

7  service mean?

8  A.  It means that because I have a coworker, I'm

9  not going to treat that coworker rudely.  I wouldn't

10  want anybody to treat our paying customers rudely.

11  I am most certainly not going to treat anybody I

12  work with rudely either.  We just don't do that.  It

13  is not acceptable.

14  Q.  And does this document reflect that policy,

15  philosophy?

16  A.  It refers to the -- yeah, I think it does,

17  because southwest Airlines's policies may be found

18  in SWA Life, and that is exactly where we keep our

19  policies.

20  Q.  Let me direct your attention to the second to

21  last paragraph the first sentence, we must all

22  remember.

23  A.  Yeah, our mission statement.  Thank you for

24  pointing that out.

25  Q.  You are welcome.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1569

```
 1        What is the mission statement?
 2  A.   It is -- I don't -- I can't quote it right now,
 3  but it is to the highest standards of customer
 4  service.  We are committed to that for our
 5  customers, we are committed to that for our
 6  employees.
 7        And I will tell you this, some customers -- I
 8  mean, a lot of companies have mission statements.
 9  Southwest Airlines' mission statement to our
10  employees is equally important as it is to our
11  paying customers.  It just is.
12        And that is ingrained from the day we begin
13  working, the day we fly.  I used to be a corporate
14  recruiter from Southwest Airlines, so I can tell you
15  that I know that for a fact.  That is engrained in
16  applicants.  And we will let them know, if this does
17  not work out for you, this is not the right place,
18  because these are our expectations.
19  Q.   Understood.
20        I want to go up to the second paragraph, the
21  second line, that starts with, when negative
22  comments.  This talks about being detrimental to
23  Southwest brand, and yours as well.
24        What does that mean?
25  A.   Well, you know, we put on -- a lot of people --
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1570

 1  not we, I take that back -- some people on Southwest

 2  Airlines, they are proud to work for the company,

 3  they will say their position, and they sometimes put

 4  things about their work life.  And that is great.

 5  And we want to promote that.  We want people to know

 6  that our employees are not just the one -- the ones

 7  behind the uniform, but they are human.  They have

 8  family, they have activities, travel, and all that

 9  such.

10      But when you do something so gross -- for

11  example, this video -- and other things that are

12  just completely gross, that is a reflection on

13  Southwest Airlines.  Even though it may be deemed

14  initially as private, not much is very private.  In

15  fact, I'm not quite sure anything electronically is

16  private ever.  But so it is a negative brand there.

17      But then also, I think about -- and I have

18  talked about this with some of my colleagues -- I

19  wonder about these people that would post something

20  so outrageous as -- I wonder if their family knows

21  that they do this.  I mean, their brand, I wonder if

22  their members of their personal clubs or

23  organizations that they belong to, know that this

24  is, you know, the behavior.

25      So that is what we mean by brand, the company's

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1 | brand and the individual's brand.

2 | Q.   And by individuals, you mean employees?

3 | A.   Yes.

4 |         MR. McKEEBY:  Pass the witness.

5 |         THE COURT:  Okay.  Mr. Greenfield.

6 |              CROSS-EXAMINATION

7 | BY MR. GREENFIELD:

8 | Q.   Hello, Ms. Hudson.

9 | A.   Hello.

10 | Q.   My name is Adam Greenfield, and I'm one of the

11 | attorneys that represents Local 556 in this matter.

12 | A.   Okay.

13 | Q.   A few questions for you.

14 |     What Audrey Stone became president of the

15 | Union, did she lose her rights to be free from

16 | harassment as an employee of Southwest Airlines?

17 | A.   No, of course not.

18 | Q.   Are you aware of any instance in which the

19 | union was able to influence how Southwest Airlines

20 | conducted an investigation into an employee

21 | complaint?

22 | A.   No.

23 | Q.   Are you aware of any instance in which the

24 | union excerpted undue or unwanted that pressure in

25 | the decision of Southwest Airlines to terminate an

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 292 of 383   PageID 15312
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                    Page 1572

1  employee?

2  A.    No.

3          MR. McKEEBY:  Pass the witness, your

4  Honor.

5          THE COURT:  All right.  Mr. Pryor.

6          MR. PRYOR:  No questions, your Honor.

7          THE COURT:  No questions for this witness.

8          Okay.  Any questions from Southwest

9  responsive to Mr. Greenfield's questions?

10          MR. McKEEBY:  No, your Honor.

11          THE COURT:  That means we are done with

12  your testimony.  Thank you for coming in.  You are

13  excused as a witness.

14          THE WITNESS:  Okay, thank you.

15          THE COURT:  Any issues with me excusing

16  her as a witness?

17          MR. PRYOR:  Can be excused.

18          THE COURT:  You may leave the courtroom.

19          THE WITNESS:  Thank you.  Okay.  And can I

20  ask Southwest who the next witness is?

21          MR. McKEEBY:  Yes, Ed Schneider.

22          THE COURT:  Okay.  You may call

23  Mr. Schneider back.

24              (The witness exited the courtroom.)

25              (The witness entered the courtroom.)

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 293 of 383   PageID 15313
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 5 July 11, 2022                Page 1573

 1              THE COURT:  Okay.  Mr. Schneider.  You can
 2    come back up here to the place you know all too
 3    well.  Because I let you out as witness last time, I
 4    need to put you under oath again.  So if you could
 5    stay standing, and Mr. Frye will administer the
 6    oath.
 7              (ED SCHNEIDER was duly sworn by the
 8        Clerk.)
 9              THE COURT:  Okay.  And you know the
10    routine, I'm just asking for some space between
11    their questions and your answers, and your answers
12    and their questions so I can rule on objections.
13              You can continue -- well, you can start
14    again.
15                    DIRECT EXAMINATION
16    BY MR. McKEEBY:
17    Q.   Okay.  I think I'm going to probably cover some
18    stuff -- basic stuff that may have been covered
19    initially, but can you explain who you are to the
20    jury -- remind the jury who you are?
21    A.   My name is Ed Schneider.  I am one of the --
22    the base manager for our Denver in flight team at
23    Southwest Airlines.
24    Q.   What does a base manager do?
25    A.    I oversee all of the operation of our in flight

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 294 of 383   PageID 15314
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1574

1  base, which is 2400 flight attendants that we have

2  in our base.  And I have a staff of 21 that I

3  oversee that takes care of those flight attendants

4  and their daily duties.

5  Q.   Who are the staff of 21, what kind of employees

6  are they?

7  A.   I have 13 supervisors and five coordinators and

8  three assistant base managers that help me run the

9  operation.

10 Q.   And I'm sorry if you -- I don't remember if you

11 mentioned this in your description.

12      Are you specific to in flight operations?

13 A.   Yes.

14 Q.   So do the flight attendants who report to

15 the -- or through the Denver base, I should say, do

16 they report through you?

17 A.   The supervisors are their immediate leader, and

18 then they report to me, yes.

19 Q.   So do you have, like, an office at the airport,

20 or where do you go when you go to work?

21 A.   Yes.  It is in the C concourse where Southwest

22 Airlines operation in the Denver base is located.

23 Q.   How long have you been employed with Southwest

24 Airlines?

25 A.   It will be 28 years this month.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 5 July 11, 2022                      Page 1575

1  Q.   And have you -- have you ever been a flight

2  attendant with Southwest?

3  A.    I have.  I flew as a flight attendant for

4  Southwest for eight and-a-half years.

5  Q.   During what period of time?

6  A.   1996 to 2004.

7  Q.   Excuse me.

8       During that time, were you a member of the

9  Union while you were a flight attendant?

10 A.    Yes, I was.

11 Q.   What did you do before working for Southwest?

12 A.    I worked for Delta Airlines, I worked in their

13 customer service department.

14 Q.   And what about prior to that?

15 A.    Prior to that, I worked for the university that

16 I went to, National University in San Diego and

17 attended college.

18 Q.   Were you in the military ever?

19 A.    I was.  I spent five years active duty in the

20 military and four years reserve.

21 Q.   What branch?

22 A.    Navy.

23 Q.   Now, I think we have established at some level

24 that you were involved in the investigation of

25 complaints made against Charlene Carter?

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 296 of 383   PageID 15316
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1576

 1  A.    Yes.

 2  Q.    Now, did you know Ms. Carter prior to the

 3  investigation based on your position as base manager

 4  in Denver?

 5  A.    No, I did not.  I was in Denver just a short

 6  time before this.

 7  Q.    When did you start in Denver?

 8  A.    January of 2017.

 9  Q.    And before that, where were you?

10  A.    Phoenix, Arizona.

11  Q.    So did you have -- had you made any impressions

12  of Ms. Carter prior to the investigation?

13  A.    Not that I'm aware of.

14          MR. McKEEBY:  Let's go to Exhibit 76.

15  This is in evidence.

16          THE COURT:  It is.  We have got the

17  screens un-muted.  The jury can see it.

18          MR. McKEEBY:  Thank you, your Honor.

19  BY MR. McKEEBY:

20  Q.    Is this email how you became aware of

21  Ms. Stone's complaints against Ms. Carter?

22  A.    Yes, part way down the email string, yes.

23  Q.    And if you could remind the jury who -- looks

24  like the original recipient of the email is Suzanne

25  Stephenson.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1577

1        Who is that?
2   A.   She is -- she was the Las Vegas based manager
3   at the time.  And Ms. Stone was based in Las Vegas.
4   Q.   And then it looks like you forwarded the email
5   to employee relations DG, is that -- do I read that
6   correctly?
7   A.   Yes.
8   Q.   Who is DG?
9   A.   That is the entire employee relations group.  I
10  send it to the group and they can decide who the
11  investigator will be in their department.
12  Q.   And in your -- in your email to employee
13  relations, you indicate the images are graphic.
14  A.   Yes.
15  Q.   I take it that means you had seen the video?
16  A.   Yes.
17  Q.   Had you seen one or two videos at that point,
18  if you remember?
19  A.   I don't recall that early in the investigation
20  exactly when I saw both of them.
21  Q.   But it appears from this that you saw at least
22  one of the videos at this point?
23  A.   Yes, that is correct.
24  Q.   And at some point in the investigation, did you
25  see both of the videos?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1578

```
 1  A.    Yes, I did.
 2  Q.    And regardless of when exactly in time you saw
 3  the videos, can you explain to the jury your
 4  reaction when you -- when you viewed those?
 5  A.    I was very disheartened as to why someone would
 6  send these graphic images and videos to another
 7  employee at Southwest Airlines.
 8       It affected me, seeing those images, and I
 9  couldn't imagine someone who may have gone through
10  something like that, viewing them at the same time.
11       And I thought they were very disturbing.
12  Q.    What do you mean someone who may have gone
13  through something like that?
14  A.    At the time, I wasn't aware if Ms. Stone would
15  have been through something like that or could have
16  been affected adversely by them.
17  Q.    And -- and did you have -- did you know
18  Ms. Stone prior to being involved in this case?
19  A.    I did not know her.  I knew she was the
20  president of the TWU Local 556.
21  Q.    Had you ever spoken to her?
22  A.    No.
23  Q.    What did you understand Ms. Gutierrez's role in
24  the investigation to be?
25  A.    Ms. Gutierrez is in charge of determining if a
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  harassment, sexual harassment -- any of those -- may

2  violate one of the protected categories.  And her --

3  she will let me know if she feels that was the case.

4  Q.   And did you involve any work groups other than

5  employee relations in the investigation?

6  A.   Yes.  I worked with labor relations also and

7  the human resource business partner.

8  Q.   Who is the human resources business parents?

9  A.   Edith Barnett.

10 Q.   And what was the role of the labor -- who was

11 the labor relations employee?

12 A.   Maureen Emlet.

13 Q.   Did you reach out to Ms. Emlet or did she reach

14 out to you or do you remember?

15 A.   I reached out to her.

16 Q.   What was your purpose in reaching out to

17 Ms. Emlet?

18 A.   I work with labor relations on all of our cases

19 to make sure that we are following the guidelines.

20 Q.   What guidelines do you mean?

21 A.   As far as giving the employee due process and

22 making sure they have their time to share whatever

23 information they have.

24 Q.   What is the context of due process mean to you

25 in that context?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1  A.   It means that someone is given the ability to
 2  explain themselves or give details about what may or
 3  may not have happened.
 4  Q.   Since we are kind of on the topic, in
 5  Mr. Pryor's examination of you, there was some
 6  testimony about going back further than 18 months
 7  with respect to some of Ms. Carter's Facebook posts,
 8  do you recall that?
 9            MR. PRYOR:  Object to improper direct,
10  that would have been appropriate cross-examination.
11            THE COURT:  That's a speaking objection.
12  I will allow it.
13  BY MR. McKEEBY:
14  Q.   What is the significance of the 18 months?
15  A.   We have rules that we cannot go back more than
16  18 months during a look back at a person's history,
17  to determine whether it is discipline or anything
18  that may have happened in that time frame.  We
19  cannot go back further than 18 months.
20  Q.   Meaning you can't back further than 18 months
21  for what purpose?
22  A.   For -- when we are looking at past history of
23  discipline, or discussions, anything that may have
24  happened with the flight attendant in the past 18
25  years [sic]?  With their work history.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1    Q.    Now did that apply to the review of

2    Ms. Carter's Facebook posts in connection with the

3    investigation?

4    A.    No, it did not.

5    Q.    Explain to the jury why not.

6    A.    The Facebook posts were just indicating a

7    history of what transpired on Facebook, and that

8    wasn't related to the investigation as far as her

9    work history and those things.

10   Q.    Now, did you interview Ms. Stone in connection

11   with your investigation?

12   A.    I did, yes.

13   Q.    What do you recall about that interview?

14   A.    She was affected about those images, and it --

15   it made her feel that she was being targeted.  And

16   she brought up the history of how it transpired and

17   things that have happened to her in the past, and

18   the march, and those type of things that happened.

19   Q.    When you say history of things that had

20   happened to her in the past, what do you mean?

21   A.    The Facebook messages that were sent to her.

22   And kept coming over the past year and a half to two

23   years.  And she was feeling that they progressively

24   were getting worse.

25   Q.    And you said you discussed the Women's March

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                    Page 1582

1  during Stone's interview.  Did I understand that

2  correctly?

3  A.    Yes.

4  Q.    What did Ms. Stone say about the Women's March?

5  A.    She said that Ms. Carter was upset about the

6  march.

7  Q.    And did you make any assessments -- I think you

8  alluded to this, but I want to make sure I'm

9  clear -- any assessments during that interview with

10 Ms. Stone on the impact of the videos on her

11 personally?

12 A.    Yes.  She was devastated by them.  She broke

13 down in the discussion with it, and I could tell it

14 affected her to a great extent.  And she was very

15 upset about it.

16 Q.    And I think you said that you reviewed Carter's

17 previous Facebook messages to Ms. Stone.  Do I

18 understand that correctly?

19 A.    Yes.

20 Q.    What was your purpose in reviewing those

21 messages?

22 A.    They were given to me, and I wanted to make

23 sure that I reviewed everything that was given to me

24 for evidence or indicating what may have happened in

25 the past.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 303 of 383   PageID 15323
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1583

1  Q.   Did you ask for those historical messages?

2  A.   When she mentioned them, in the meeting, yes, I

3  asked for those, if she was willing to share them.

4  Q.   You asked Ms. Stone?

5  A.   Yes.

6  Q.   And did she share them?

7  A.   Yes.  She did.

8  Q.   And if we go to Exhibit 94.  Let's go -- just

9  kind of flip through there, if you would.

10        Are these the --

11            THE COURT:  Ninety-four is in evidence and

12  the jury can see this.

13            MR. McKEEBY:  Yes, sorry.

14  BY MR. McKEEBY:

15  Q.   Are these the historical emails that you

16  reviewed?

17  A.   Yes.

18  Q.   And explain to the jury to what degree you

19  considered these emails in connection with your

20  decision to terminate Ms. Stone's employment?

21  A.   It wasn't considered to any great extent, just

22  the history of what had transpired between

23  Ms. Carter and Ms. Stone.  And the fact that there

24  had been prior messages sent, and it wasn't -- it

25  didn't involve the termination decision.  That was

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1584

1   all just the images and videos that were sent to

2   Ms. Stone.

3   Q.   I think you told Mr. Pryor that you regarded

4   the emails nonetheless as harassing, is that true?

5           MR. PRYOR:  I object to improper direct.

6   He's referring to my questioning, it should have

7   been on cross-examination.

8           THE COURT:  I'll allow it.

9   BY MR. McKEEBY:

10  Q.   Can you explain to the jury what you meant by

11  that term in connection with these emails -- I'm

12  sorry, Facebook messages?

13          MR. PRYOR:  I apologize, could I get the

14  question, I didn't hear the words used.

15          THE COURT:  You can reask it.

16          MR. PRYOR:  Thanks.

17          MR. McKEEBY:  Can you repeat it?  I'm

18  sorry.

19          (Thereupon, the requested portion was read

20      back by the reporter as above recorded.)

21  BY MR. McKEEBY:

22  Q.   And the term I meant was harassment.

23  A.   Yes.  The fact that they were telling her that

24  she's not fit to do the job, that she will be

25  removed, and there is a group that are going to make

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 305 of 383  PageID 15325
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1585

1  sure that she's removed from office, and the fact

2  that it talked about her personally also, inept at

3  her job and those type of things.

4  Q.   And if you go to the first page of this

5  document, it looks like Ms. Stone is sending this to

6  Ms. Gutierrez?

7  A.   Yes.

8  Q.   And then is that you copied on the email?

9  A.   Yes, it is.

10            MR. McKEEBY:  Let's go to Exhibit 50.  And

11  I apologize, I think this is admitted.

12            THE COURT:  I can check.  Fifty is not.

13            MR. McKEEBY:  Move for -- to admit

14  Exhibit 50.

15            THE COURT:  Anything on 50 from union or

16  from Carter.

17            MR. PRYOR:  It is not on their list.

18            THE COURT:  All right.

19            MR. PRYOR:  And I think this is

20  duplicative of a variety of other exhibits too.

21            MR. McKEEBY:  I think it is in evidence in

22  another exhibit, and I just don't have it handy.

23            THE COURT:  All right.  I will let you

24  circle back to it at the end of the testimony.

25            MR. McKEEBY:  Okay.  Let's go to

 1  Exhibit 90.

 2           THE COURT:  Any objection to 90?

 3           MR. PRYOR:  Which exhibit?  Just a moment,

 4  Your Honor.

 5           THE COURT:  It is in.  So we are

 6  published.  Sorry.  You can discuss it at will.

 7  BY MR. McKEEBY:

 8  Q.   What is Exhibit 90, Mr. Schneider?

 9  A.   That is an email from Denise Gutierrez

10  initially on the string, and then Maureen Emlet

11  indicating evidence of nexus to the workplace

12  between Charlene Carter and Southwest.

13  Q.   What does that concept mean, nexus to the

14  workplace?

15  A.   It is something where, on Facebook, a person

16  publicly can see that the person is employed by

17  Southwest Airlines.

18  Q.   And did you access Ms. Carter's Facebook page

19  in connection with the investigation?

20  A.   I did not.

21  Q.   Did you have a Facebook account?

22  A.   I don't personally, no.  My wife has an account

23  and she shows me things sometimes.  But that is it.

24  Q.   So somebody else pulled the posts for you, I

25  take it?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1587

 1   A.   Yes, in my office.
 2   Q.   And what did these nexus posts show you?
 3   A.   One of them showed flight attendant wings with
 4   her name on it.  One of them showed her in uniform
 5   next to an aircraft, Southwest aircraft.
 6        And others showed, I think it was a friend of
 7   the family and her husband, possibly, in uniform.
 8   And -- I'm trying to recall them all.  Those are the
 9   ones I remember.
10   Q.   How about let's go to I think 90.8?
11   A.   Yes.  That was also one of them.
12   Q.   This is one of them?
13   A.   Yes.
14   Q.   What is the significance of this photograph?
15   A.   Herb Kelleher was our CEO in the initial time
16   with Southwest Airlines began service.  And it is
17   the Southwest colors on it, asking for Herb's -- to
18   get his old job back.
19   Q.   How does this -- does this link Ms. Carter to
20   Southwest?
21   A.   Herb Kelleher is a very popular person and well
22   known throughout the industry.  And the colors,
23   obviously, are indicative of Southwest Airlines, and
24   it talks about the company.
25   Q.   Well, it refers to, "our CEO," correct?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1   A.   Yes.

2   Q.   And what about the next page, is this exhibit

3   90.9, is that one of the images that you referenced

4   earlier in your testimony just now?

5   A.   Yes, it is.

6   Q.   What does it show?

7   A.   It shows Charlene Carter and her crew next to

8   the Southwest aircraft in the jetway.

9           MR. McKEEBY:  And let me go to the

10  exhibit another way, your Honor, to talk about those

11  other documents.

12          Let's go to Exhibit 74.

13          THE COURT:  It is in, so the jury can see

14  it.

15  BY MR. McKEEBY:

16  Q.   I think you -- this was a document that was

17  entered through you, if I'm not mistaken, this email

18  at the beginning of the chain, the top, we talked

19  about that earlier today, correct?

20  A.   Yes.

21  Q.   Okay.

22       What I want to talk about is on page 74.5.

23       Is that one of the public posts that you found

24  on Ms. Carter's Facebook page?

25  A.   Yes.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 309 of 383   PageID 15329
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1589

 1  Q.   Did you conduct a fact-finding meeting with

 2  Ms. Carter?

 3  A.   Yes.

 4  Q.   What -- what -- what does that -- explain to

 5  the jury --

 6            MR. McKEEBY:  You can go ahead and take

 7  that down.

 8  BY MR. McKEEBY:

 9  Q.   -- what a fact-finding meeting is.

10  A.   A fact-finding meeting is what we set up with

11  the person who is alleged to have done something,

12  and we agree on a date and time with the employee

13  and their union.  And we conduct the meeting

14  face-to-face, and we give the employee time to

15  explain what happened during the alleged event.

16       And they can share and give testimony and give

17  any type of evidence they have available to the

18  investigator at that time, which would have been me.

19  Q.   And with respect to Ms. Carter's fact-finding,

20  who was in attendance?

21  A.   It was myself, Meggan Jones, the TWU

22  representative, Chris -- I can't remember his last

23  name.

24  Q.   Sullivan?

25  A.   Sullivan, yes, please.  Thank you.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1590

1        And Charlene Carter were in attendance in
2   person.  And we had Denise Gutierrez from employee
3   relations and Edie Barnett from human resource
4   business partner on the phone during the meeting.
5   They could ask questions and listen.
6   Q.   Was Ms. Gutierrez on the phone or was she there
7   in person?
8   A.   She was on the phone.
9   Q.   Where was the fact-finding held?
10  A.   In the in flight base in Denver.
11  Q.   And did Ms. Carter have the opportunity to tell
12  her side of the story during the fact-finding
13  meeting?
14  A.   Yes.
15  Q.   And did she do so?
16  A.   Yes, she did.
17  Q.   You mentioned Meggan Jones, is that her in the
18  courtroom?
19  A.   Yes.
20  Q.   What was her position?
21  A.   She was my note taker for that.
22  Q.   What was her job at the time?
23  A.   She is the assistant base manager for Denver in
24  flight.
25  Q.   And you indicated she was the note taker.  What

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 311 of 383   PageID 15331
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1591

1   does that mean?

2   A.   During these meetings, the only way we can

3   record them is by taking notes.  And Meggan is very

4   adept as taking good notes and a very efficient

5   tyer -- typist, and did a great job of capturing the

6   notes on that.

7   Q.   Are those notes something you reviewed after

8   she finalized them?

9   A.   Yes.

10  Q.   And we will get to those in a minute.

11       Did you review any -- strike that.

12       Did Ms. Carter provide you with any documents

13  at the fact-finding meeting?

14  A.   Yes, she did.

15  Q.   Can you generally describe those documents for

16  the jury?

17  A.   They were documents that indicated the

18  participants in the Women's March and different

19  events associated with that.

20       And if I recall, there were other photos of her

21  support for pro life.

22       I don't recall all of them at this time.

23  Q.   Okay.  Well, I'm going to help you.

24           MR. McKEEBY:  Let's pull up Exhibit 103.

25           And I don't believe this is in evidence,

1  so Southwest moves to admit Exhibit 103.

2           THE COURT:  103 any objection.

3           MR. PRYOR:  Just a moment.  I need to see

4  it.  This document is in a different Exhibit number

5  I guess already in evidence.  But it if it is just

6  the fact-finding notes, no objection, I guess,

7  again.

8           THE COURT:  Any from the union, any

9  objection to 103?

10          MR. GREENFIELD:  No, your Honor.

11          THE COURT:  All right.  103 is in.  You

12  can publish.

13          (The referred-to document was admitted in

14     Evidence as Trial Exhibit 103.)

15          THE COURT:  They're published to the jury.

16  BY MR. McKEEBY:

17  Q.   These are the fact finding notes, but if you go

18  to page -- well, let me start with your email.

19          MR. PRYOR:  Your Honor, is it more than

20  just the fact finding notes?

21          MR. McKEEBY:  It says in the email it is

22  the images as well.

23          MR. PRYOR:  I'm just going through --

24          MR. McKEEBY:  Information that Ms. Carter

25  brought to the meeting that he's testified to.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1                    MR. PRYOR:  Okay.
 2                    THE COURT:  All right.  You can proceed.
 3                    MR. PRYOR:  I'm just going through the
 4    document right now.
 5                    MR. McKEEBY:  Thank you.
 6    BY MR. McKEEBY:
 7    Q.   So explain to the jury what this email is.
 8                    MR. PRYOR:  Okay.  Wait.  Your Honor, it
 9    is in evidence?  I still haven't had a chance do
10    scroll through the document.
11                    THE COURT:  You had no objection to it.
12                    MR. PRYOR:  Well, I had no objection when
13    I though it was a fact finding memo.  Now I found
14    out there is a lot of stuff attached to it, so I'm
15    scrolling through it -- no objection.
16                    THE COURT:  Okay.  You can proceed.
17    BY MR. McKEEBY:
18    Q.   Mr. Schneider, so it looks like that there is a
19    combination of documents in 103.
20         Would you agree with that?
21    A.   Yes.
22    Q.   Can you identify what those categories of
23    documents are?
24    A.   I only see the front page, but when we are
25    conducting an investigation, we hold a fact-finding
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 314 of 383   PageID 15334
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1594

1  meeting.  And before Denise Gutierrez can make her

2  decision on harassment policy, I send her the notes

3  also from the meeting so she can review and make her

4  decision.

5  Q.   All right.

6       Well, the fact -- the notes are already in

7  evidence in a different exhibit, and we will go over

8  those in a moment.

9            MR. McKEEBY:  At Exhibit No. 103.19, if

10  you could just kind of flip through those page by

11  page, so that the witness can see.

12            THE WITNESS:  These are the images that

13  were supplied to us, but unfortunately,

14  Ms. Gutierrez and Ms. Barnett were not in the room,

15  so they didn't get to see them.  So I wanted to make

16  sure that we sent the evidence to them that

17  Ms. Carter supplied for us.

18  BY MR. McKEEBY:

19  Q.   Okay.  I want to make sure I understand.

20       Ms. Carter handed you these documents during

21  the fact-finding meeting?

22  A.   Yes.

23  Q.   And you were sending them to that Ms. Emlet and

24  Ms. Gutierrez so that they would have access to what

25  Ms. Carter provided?

```
 1   A.    Yes.
 2   Q.    And did you review this information in
 3   connection with the fact-finding?
 4   A.    Yes, I did.
 5   Q.    Did you ask questions of Ms. Carter during the
 6   fact-finding?
 7   A.    Yes, I did.
 8   Q.    Was one of those questions of Ms. Carter why
 9   she sent the messages to Ms. Stone?
10   A.    Yes.
11   Q.    And what do you recall her response being?
12   A.    She stated that she was pro life, and she
13   wanted to get this message out to everybody.  And at
14   one point, she indicated that the union was pro
15   choice, and she did not agree with that.
16            MR. McKEEBY:  Let's put the document back
17   up, if you would.  Can you go to 103.16.
18   BY MR. McKEEBY:
19   Q.    If I'm reading this correctly, it indicates
20   that Ms. Carter said she was hoping to get a
21   dialogue with Ms. Stone regarding the Women's March?
22   A.    Yes.
23   Q.    What was your reaction to that explanation?
24   A.    The images that were sent did not elicit open
25   conversation or dialogue.
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 316 of 383   PageID 15336
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1596

1  Q.   That is a conclusion that you came to?

2  A.   Yes.

3  Q.   What is the basis of that conclusion?

4  A.   Because they were not questions, they were more

5  statements.

6  Q.   Did you question Ms. Carter's explanation in

7  that regard?

8  A.   I did.

9  Q.   Did you tell her that?

10  A.   I do not remember exactly if it was myself

11  asking that question.  It was asked in the meeting,

12  yes.

13  Q.   What question was asked during the meeting?

14  A.   Did she know the affiliation -- or what

15  Ms. Stone's standing on abortion was.

16  Q.   Was that important to you?

17  A.   To be sent these images and graphic videos to

18  someone and not knowing their background or what has

19  happened personally in their lives, yes, it was

20  important, because it could have been detrimental to

21  someone psychologically.

22  Q.   How so?  I just want you to expand on that a

23  little bit.

24  A.   My thought process is that not knowing the

25  background of Ms. Stone -- social media has a way of

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 317 of 383   PageID 15337
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1597

1  affecting people.  And I know that -- I'm just going

2  to say suicide is a big thing out there, and people

3  can be affected by these type of social media

4  statements and videos and images.

5      And I think that is something that wasn't

6  considered when the videos and the images were sent.

7  Because she stated that she was simply trying to get

8  her message across and wasn't trying to have a

9  dialogue with Ms. Stone to find out what her

10 thoughts were on it or what her stand was on it.

11 She didn't know that information.

12 Q.   How would you describe Ms. Carter's --

13 Ms. Carter was there at the meeting, face-to-face,

14 correct?

15 A.   Yes.

16 Q.   And her union representative was there with her

17 in attendance?

18 A.   Yes.

19 Q.   How would you characterize Ms. Carter's

20 demeanor during the fact-finding?

21 A.   She was not regretful for doing -- sending

22 videos and the personal messages, she didn't seem

23 apologetic for it at all towards Ms. Stone, and

24 seemed to be justified for what she did.

25 Q.   Did she seem remorseful at all?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 5 July 11, 2022                  Page 1598

```
 1  A.    No, not at all.
 2  Q.    Did Carter make any claim during the
 3  fact-finding meeting that she believed Southwest was
 4  retaliating against her based on union protected
 5  activities?
 6  A.    Can you say that one more time.
 7  Q.    Did Carter say, in the fact-finding meeting,
 8  that she believed that Southwest was discriminating
 9  against her because of her union-related activities?
10  A.    No, she did not.
11  Q.    Did Carter claim during the fact-finding
12  meeting that Southwest was taking action against her
13  based on her religious beliefs?
14  A.    No.
15  Q.    Now, you became aware, in connection with the
16  investigation, as I understand it, that Ms. Carter
17  had a history with the union, correct?
18  A.    Yes.
19  Q.    Now, did you know that prior to the
20  investigation?
21  A.    I did not.
22  Q.    Were you -- there has been some discussion in
23  this case about a recall election.
24        Do you know what that means?
25  A.    I know what it means through the investigation.
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 319 of 383   PageID 15339
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1599

1  She explained that.

2  Q.   Were you not aware of the recall movement prior

3  to the investigation?

4  A.   I had heard rumors of it and knew very little

5  about what it involved.

6  Q.   Did you feel like the investigation was fair?

7  A.   Absolutely, yes.

8  Q.   Why do you think that?

9  A.   I looked at every shred of evidence we had and

10  considered everything that was given to me, and

11  testimony by Ms. Stone and Ms. Carter, looking at

12  the history of what had transpired, just to give

13  credit to everything that was given to me before I

14  made my decision.

15  Q.   After the fact-finding, what did you do in

16  terms of reaching that decision?

17  A.   I worked with Denise Gutierrez to learn if she

18  made the determination that it was a violation of

19  our harassment/sexual harassment policy.  I

20  discussed with Maureen Emlet to make sure that I was

21  within the guidelines of my decision.

22  Q.   What do you mean "guidelines of your decision"?

23  A.   Guidelines in labor as far as making this

24  decision, and historical, and anything that she

25  could share of cases that were similar or anything.

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                  Vol 5 July 11, 2022                  Page 1600

```
 1   Q.   And the "she" in this context is Ms. Emlet?

 2   A.   Yes, correct.

 3   Q.   Okay.  Now, obviously, it sounds like you knew,

 4   before, but during the investigation, you realized

 5   that the person who was making the complaint was

 6   president of the Union, Ms. Audrey Stone, correct?

 7   A.   Yes.

 8   Q.   Did that fact have an impact on the

 9   investigation?

10   A.   No.  She was an employee of Southwest Airlines

11   and that is how I treated it.

12   Q.   Was she, in your view, entitled to the

13   protections of the policies of Southwest Airlines

14   like any other employee?

15   A.   Yes, 100 percent.

16   Q.   I think you've testified to this, but I will

17   ask again, just to lay a predicate.  Was it your

18   decision, Mr. Schneider, to terminate Ms. Carter's

19   employment?

20   A.   Yes, it was.

21   Q.   And can you tell the jury why you reached that

22   decision?

23   A.   The decision was based on, like I have said a

24   few times, the egregiousness of the videos and the

25   posts that were made and the personal messages that
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

1  were sent depicting a very graphic image, and one

2  that I considered affected Ms. Stone in a great way.

3       And it seemed that the escalation was there.

4  She crossed the line, basically, of just telling

5  Ms. Stone how she felt about her being president and

6  her duties.  And crossed the line as to what we

7  would do as a company and how we treat fellow

8  employees.

9       Southwest has a great culture, and our habits

10 have always been to take care of each other and

11 treat each other with kindness and caring, and this

12 gave none of that.  And it affected every part of

13 how she conducted herself.

14      And I was concerned that it was going to

15 possibly escalate.  And I -- in some way.  But just

16 the graphic nature of these videos is the reason why

17 she was terminated.

18 Q.   In the fact-finding, did Ms. Carter raise the

19 issue of requesting some type of accommodation?

20 A.   No, she did not.

21 Q.   If Southwest were to allow employees to make

22 these types of posts and send them to other

23 employees, what would be the impact on Southwest

24 Airlines in your view?

25 A.   If we allowed this --

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1602

1  Q.   If you allowed employees to send these types of

2  videos to co-employees, what would you say would be

3  the impact?

4  A.   As I stated earlier, there is a certain level

5  of disrespect when you send this type of video

6  graphic to another employee.  We would lose respect

7  for each other, we would lose the family-type feel

8  that Southwest Airlines has always been a proponent

9  of in how we treat each other.

10      And it would have an adverse affect on how we

11  work together and how we interacted as a group of

12  employees.

13  Q.   Now, did you consider any lesser form of

14  discipline, suspension or counseling or something

15  along those lines?

16  A.   I considered everything that was available as

17  far as discipline for it.  And due to the

18  egregiousness of this, termination was the right

19  choice in this.

20  Q.   And did Ms. Carter's opposition to union

21  leadership and her complaints about how the union

22  was spending union member dues have anything to do

23  with your decision?

24  A.   No.

25  Q.   What are your thoughts about the notion that

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 323 of 383   PageID 15343
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1603

 1 | her status as a union objector would influence your
 2 | decision?
 3 | A.   It didn't influence my decision at all.  That
 4 | is a choice between the employee and their union.
 5 | The company doesn't get involved in that at all, and
 6 | I did not even consider that in my decision making.
 7 | Q.   And did you have -- did you have a personal
 8 | preference as to who the leaders of the Union would
 9 | be?
10 | A.   I did not.
11 | Q.   And I asked if you had ever met Stone.
12 |      Just to make sure we are clear, had you ever
13 | interacted with her in connection with your
14 | responsibilities as a base manager in either Denver
15 | or Phoenix?
16 | A.   No.
17 | Q.   And did Ms. Carter being a Christian have
18 | anything to do with your decision to terminate her
19 | employment?
20 | A.   No, not at all.
21 | Q.   What are your religious beliefs, Mr. Schneider?
22 | A.   I am also Christian.
23 | Q.   What are your beliefs regarding abortion?
24 |           MR. PRYOR:  Relevance, Your Honor.
25 |           THE COURT:  Overruled.  You can answer.

1            MR. PRYOR:  Object on 404 and undue

2   prejudice.

3            THE COURT:  Overruled, you can answer.

4            THE WITNESS:  I am pro life.

5   BY MR. McKEEBY

6   Q.   What does that mean to you?

7   A.   It means that I do not agree with abortion and

8   I think that every life is sacred and we should

9   protect it to the greatest extent that we can.

10  Q.   How did you communicate the decision to

11  terminate Ms. Carter's employment to her?

12  A.   I called the union, TWU rep in Dallas, and I

13  told them that I was ready to render my decision.

14  They called Ms. Carter, and put it on conference

15  call, and I rendered my decision to both Ms. Carter

16  and the union.

17  Q.   And did you follow that up with a letter?

18  A.   Yes.  We are required to send the termination

19  letter the same day as the rendering.

20            MR. McKEEBY:  And I think we -- I think

21  that is in evidence as Exhibit 115.  Can we pull

22  that up?

23            THE COURT:  It is in evidence.  We are

24  showing the jury.

25            MR. McKEEBY:  Thank you.

```
 1  BY MR. McKEEBY:
 2  Q.    And is that the letter that you referenced?
 3  A.    Yes, it is.
 4  Q.    And did you write this letter?
 5  A.    Yes, I did.
 6  Q.    Did you run it by Ms. Emlet for her review and
 7  comment?
 8  A.    Yes.
 9  Q.    And did she have some changes?
10  A.    They were minor changes.  I always like to have
11  them proofread to make sure that everything is
12  correct.
13  Q.    In the phone call where you informed Ms. Carter
14  of your decision, did anything stand out about that
15  call?
16  A.    No.
17  Q.    Is it brief?
18  A.    It was routine and very brief.  The union keeps
19  it brief also, and they discuss off line anything
20  after.
21  Q.    And the letter indicates that you determined
22  that Ms. Carter's conduct violated Southwest
23  policies.
24        What policies did you determine Ms. Carter's
25  conduct violated?
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                Vol 5 July 11, 2022                Page 1606

1  A.   The workplace bully and hazing policy and the

2  social media policy.

3  Q.   And is that set forth in the document?

4  A.   Yes, it is.  It is bullet pointed.

5  Q.   And it also references that the conduct also

6  could be a violation of Southwest's policy

7  concerning harassment, sexual harassment,

8  discrimination and retaliation?

9  A.   Yes.

10  Q.   Was that based on what Ms. Gutierrez had

11  advised you during the course of the investigation?

12  A.   Yes.

13  Q.   So there are a couple of reasons in here.  Let

14  me ask you this question:  Had Ms. Carter only sent

15  the video images to Ms. Stone, her co-employee,

16  would you have still reached the decision to

17  terminate her employment?

18  A.   Yes.  That is what I was trying to say the

19  first day of testimony, that -- outside of all of

20  the peripheral questions that I was being asked,

21  that was the main reason why she was terminated.

22         MR. McKEEBY:  Okay.  I will pass the

23  witness.

24         THE COURT:  Okay, Mr. Greenfield.

25

```
 1                        CROSS-EXAMINATION
 2   BY MR. GREENFIELD:
 3   Q.   Hello, Mr. Schneider, welcome back.
 4   A.   Thank you.
 5   Q.   How many times did you meet with Ms. Stone in
 6   the course of your investigation?
 7   A.   In the meeting, one time.
 8   Q.   At any point during that meeting, did Ms. Stone
 9   make any derogatory comments about Ms. Carter's
10   religion?
11   A.   No.
12   Q.   Did you gain any understanding as to
13   Ms. Stone's religion?
14   A.   No, I did not.
15   Q.   Okay.
16        And Ms. Carter?
17   A.   Not in the meeting with Ms. Stone.
18   Q.   Okay.
19        Did you ever come to information on whether
20   Ms. Stone was personally pro life or pro choice?
21            MR. PRYOR:  Object to relevance, object.
22   To --
23            THE COURT:  I'll allow it.
24            THE WITNESS:  In the meeting?  I didn't
25   ask that question, specifically.  I think she
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1608

 1 | volunteered at some point in the investigation that
 2 | she was pro choice.
 3 | BY MR. GREENFIELD:
 4 | Q.   Okay.
 5 |           MR. GREENFIELD:  Can you pull up
 6 | exhibit 67 for me?  And if you can highlight the
 7 | middle portion for me just where it says "Suzanne."
 8 | BY MR. GREENFIELD:
 9 | Q.   Have you ever seen this email, Mr. Schneider?
10 | A.   Yes.
11 | Q.   Does that refresh your recollection as to
12 | Ms. Stone's personal views?
13 |           MR. PRYOR:  Your Honor, there is no need
14 | to refresh it.  He testified.
15 |           THE WITNESS:  I'm sorry.
16 |           MR. PRYOR:  It is improper use of a
17 | document to refresh recollection that doesn't need
18 | to be refreshed.
19 |           THE COURT:  So I will sustain that, but
20 | this exhibit is already in evidence.  So that is not
21 | a basis for me to keep it from the jury seeing it,
22 | if that makes sense.  So I will sustain the
23 | objection, but I'm not going to order the exhibit
24 | pulled down.
25 |           MR. GREENFIELD:  Nonetheless, you can take

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1609

```
 1   it down.
 2            THE WITNESS:  Am I allowed to answer or is
 3   that --
 4            THE COURT:  I sustained the objection, so
 5   I think the answer is already in the record from
 6   your prior testimony.
 7   BY MR. GREENFIELD:
 8   Q.   Do you remember Ms. Stone discussing any other
 9   employees with you during that meeting?
10   A.   Could you be a little more --
11   Q.   Sure.
12            MR. GREENFIELD:  Can you pull up
13   Exhibit 39, and to page 5.
14   BY MR. GREENFIELD:
15   Q.   Does this document refresh your recollection if
16   Ms. Stone spoke to you about a flight attendant
17   named Holly Imomovich?
18   A.   Yes, it does.
19   Q.   And did Ms. Stone express any concerns to you
20   about Ms. Imomovich?
21   A.   Yes, she did.
22   Q.   And what were those concerns?
23   A.   Pictures that were -- they were flight
24   attendants that had been terminated for specific
25   reasons.
```

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1610

```
 1  Q.   Okay.  Are you aware who, if anyone, turned
 2  Ms. Imomovich into the company?
 3  A.   I am not.
 4           MR. PRYOR:  Sorry, Your Honor, could I
 5  hear the question again?
 6           THE COURT:  Can you restate the question?
 7  Mr. Greenfield, can you restate that question?
 8           MR. McKEEBY:  Yes, Your Honor.
 9           THE COURT:  He didn't hear it.
10           MR. GREENFIELD:  Yes, your Honor.
11  BY MR. GREENFIELD:
12  Q.   Do you know who, if anyone, turned
13  Ms. Imomovich in to the company?
14           MR. PRYOR:  Okay.  Your Honor, I think I'm
15  going to have a sidebar.  Where is it at?
16           THE COURT:  Sidebar.
17           (Thereupon, the following proceedings were
18      had at sidebar:)
19           THE COURT:  Okay.  Objection?
20           MR. GILLIAM:  Yeah.  Your Honor this is
21  actually foreclosed by Southwest's limine, that they
22  want to talk about these other disciplinary cases,
23  and we haven't been able to respond to them because
24  of Southwest's limine.
25           So they want to go into detail about Holly
```

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 331 of 383   PageID 15351
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1611

1  Imomovich's discipline, they want to go into detail

2  of Robert Hibbit's discipline, but we have not had

3  the opportunity to present any evidence to rebut

4  what they are going to say because we have been

5  limined out of it.

6           THE COURT:  So I understand that.

7           But the question at hand was who turned

8  them in to Southwest, which I view as different than

9  what did Southwest do to them.  So, yes, my guard is

10  up on this, but I don't think they have gotten to

11  the limine point of it yet.

12           MR. GREENFIELD:  I'll be very careful with

13  it, your Honor.

14           THE COURT:  Do I need to -- because he

15  said one reference earlier, they did talk about what

16  Southwest did to somebody.  Can I come out of this

17  and say, hey, whenever my instruction, we are not

18  supposed to tell what Southwest did to anybody, if

19  you need to turn someone in, that's -- that is --

20  are you okay with me saying that so the witness

21  hears it from me, and then we will proceed?

22           MR. GILLIAM:  Yes, your Honor.

23           MR. PRYOR:  Your Honor, it this a fair use

24  of conferring?  I'm just wondering about our time.

25           THE COURT:  Yes.  So I will take this one

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 332 of 383   PageID 15352
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1612

1  on me because we got close, but not over the line,
2  so this one is on me.

3          MR. PRYOR:  Thank you.

4          (Thereupon, the sidebar was concluded and
5      the following proceedings were held in open
6      court:)

7          THE COURT:  Okay.  So what I will do is, I
8  will let you, in just a second, Mr. Greenfield, ask
9  your last question.  But for the jury's reminder --
10 and, Mr. Schneider, I don't know if I've said this
11 since you have been in the room -- I have carved out
12 any part of this case which involves how Southwest
13 disciplined an employee.  That is not relevant to
14 the claims against Southwest.

15         If someone turned in an employee to
16 Southwest, that is not Southwest discipline yet.
17 And that is relevant to this case.  So the question
18 that he asked you, I think is relevant.  And it is
19 one you can answer.

20         So can you ask this question again, but
21 don't get into any Southwest discipline as a result
22 of his question.  You can ask again, Ms. Greenfield.

23         MR. GREENFIELD:  Sure, I will be as
24 precise as I can.

25

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 333 of 383   PageID 15353
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 5 July 11, 2022                      Page 1613

1  BY MR. GREENFIELD:

2  Q.    And I think we heard your answer.  Are you

3  aware of who, if anyone, turned in Ms. Imomovich to

4  the company?

5            THE COURT:  Object, lack of foundation.  I

6  will allow him to answer if he has personal

7  knowledge.

8            THE WITNESS:  I don't know.

9  BY MR. GREENFIELD:

10  Q.    Okay.  And if you go down to page 6, the next

11  page, do you know if Ms. Stone ever turned in

12  Ms. Jeanna Jackson to the company?

13  A.    I don't recall that.

14  Q.    Based on these notes, what do you recall of

15  your conversation between you and Ms. Stone

16  regarding Ms. Jeanna Jackson?

17  A.    Yes, she did turn in Jeanna Jackson.

18  Q.    Based on this document, does it refresh your

19  recollection as to the reason why that may have

20  occurred?

21  A.    Because it depicted a screen shot of a picture

22  of a bullet in her head.

23  Q.    Now, you are the Denver-based manager, correct?

24  A.    Yes.

25  Q.    And I would imagine that your purview generally

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 334 of 383   PageID 15354
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1614

1   is limited to employees who are based in Denver?

2   A.   Yes.

3   Q.   I have a few people that I want to ask you

4   about that you may not know about because they are

5   at other bases, but just in case.

6             MR. PRYOR:  Your Honor, for optional

7   completeness regarding his refreshed recollection,

8   can we point out --

9             THE COURT:  Sidebar.  Hold on.  Sidebar.

10             MR. PRYOR:  That is all.

11             THE COURT:  I didn't hear what you were

12   saying.  You can only speak in code.  And I'm not

13   treating you --

14             MR. PRYOR:  For optimal completeness, that

15   he point out the rest of -- that the allegation was

16   false.

17             THE COURT:  Okay.  I will sustain that.  I

18   will sustain that.  Can you ask him about the rest

19   of it?

20             MR. GREENFIELD:  I was trying to be

21   careful to not, but --

22   BY MR. GREENFIELD:

23   Q.   Your understanding is that the complaint was

24   related to a bullet, a picture of a bullet in

25   Ms. Stone's head, is that correct?

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

```
 1  A.   Yes, that is correct.
 2  Q.   And to be fair to everyone here, my
 3  understanding, based on this document, is it your
 4  understanding that that post was ultimate -- was a
 5  fabrication?
 6  A.   It was determined about that, yes.
 7  Q.   And that was determined after an investigation,
 8  correct?
 9  A.   Yes.
10  Q.   But nothing wrong with the complaint in and of
11  itself?
12  A.   No.  Not at all.
13  Q.   Do you know a Michelle Foley?
14  A.   I have heard the name.
15  Q.   Do you know if she's still employed by the
16  company?
17  A.   I do not.
18  Q.   Do you know a Sherry Parnell Vincent?
19  A.   No.
20  Q.   Do you know a Kim Hensley?
21  A.   Yes.
22  Q.   Do you know if Kim -- I don't know if it's a
23  man or -- if Kim is still employed by the company?
24  A.   Yes.
25  Q.   She is?
```

1    A.    Yes.

2              MR. McKEEBY:  Pass the witness, your

3    Honor.

4              THE COURT:  Okay.  It is 5:01, so I'm

5    going to say we should break here for the day.  Same

6    three instructions as always:  You can only talk to

7    your fellow jurors and court personnel, just not

8    about this case; can't talk to anyone else; and

9    please don't do any research about the case.  We

10   will see you tomorrow morning at 8:45 to start on

11   the record at 9:00.  All rise for the jury.

12              (The jurors exited the courtroom.)

13              THE COURT:  Okay.  We seem to keep holding

14   you as an overnight witness, Mr. Schneider.  I'm

15   sorry for that.  But with that, I still have to ask

16   you to not talk to anyone about the case since you

17   are still a witness.

18              But you are free to leave the courtroom.

19   So you have your freedom at least; so there's that.

20              We will stick around after he's out of the

21   courtroom so I can ask -- see if y'all have got any

22   other questions we should address tonight.

23              (The witness exited the courtroom.)

24              THE COURT:  Okay.  So what-all do we need

25   to cover now?

Case 3:17-cv-02278-X  Document 451  Filed 06/14/23  Page 337 of 383  PageID 15357
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1617

 1            MR. McKEEBY:  I need to suggest that I

 2  will need some but probably not all of the extra

 3  time.  I don't know exactly how much I will need,

 4  but I will need more than -- at least, based on our

 5  calculations of how far I have gone, I will need

 6  some of it.

 7            THE COURT:  Understood.  That makes sense.

 8  And I held it in reserve, knowing that y'all might,

 9  so that is fine.

10            I guess tonight at 6:00, we need to hear

11  who else you plan to get to tomorrow that you didn't

12  already designate for today.  You had Gutierrez on

13  the list today.  So we will hear any other witnesses

14  tomorrow.

15            And then we need to hear from you for who

16  you plan to get to tomorrow, Ms. Greenfield.

17            MR. GREENFIELD:  Yes, your Honor.

18            THE COURT:  So we will hear that at 6.  We

19  will hear their objections to your exhibits at 8.

20  And then I will say, I guess, you know, we might

21  rest, rest, close, close, close tomorrow.  And if we

22  do, that we should probably stick around whenever

23  that is and do the formal charge conference.  And we

24  can print the behemoth charge overnight because it

25  takes a while, right, and then bring the jury back

1  on Wednesday to have a reading of the charge.  And

2  then closing argument, closing argument, closing

3  argument.  Does that make sense?

4         I just don't know -- you know, I don't

5  know if we are going to finish tomorrow at 4:00,

6  tomorrow at 3, tomorrow at 5 or 6.  We will see.

7  But the later we finish, the harder it will be to

8  have y'all stick around and do a formal charge

9  conference.  So we will just play it by ear.

10         MR. McKEEBY:  Point of clarification, can

11  we assume that closing arguments will be on

12  Wednesday at some point?

13         THE COURT:  Yes.  I don't think there is

14  any possibility for us to have closing argument

15  tomorrow, given that we still have got to do a

16  formal charge conference.  I will try to get y'all

17  my next round of the jury charge by tomorrow at noon

18  at the latest.  We are working on it right now.  But

19  I can promise it by noon.  I don't know if I can get

20  it to you earlier.  I will if I can.

21         But yeah, so we may roll straight in from

22  the close of evidence to a formal charge conference

23  tomorrow.  That is ideal.

24         Other questions?

25         Judge Kinkeade has graciously agreed to be

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 339 of 383   PageID 15359
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                     Page 1619

 1  my stand-in, and he's older, wiser than I am, and

 2  also funnier than I am.  So he will be the stand-in

 3  judge, so he's on duty for Thursday and Friday.

 4           Now, he may -- because he doesn't live too

 5  far from the courthouse, sort of be on standby,

 6  like I let y'all -- usually, when the jury goes into

 7  deliberations, I usually give you freedom to leave

 8  the courthouse so as long as you are having somebody

 9  15 minutes away or so.  He might do the same, so we

10  will see.  It is up to him at that point.

11           But I will still be on the phone and able

12  to talk through with him any jury notes or any other

13  issues that may come up that he's wondering about.

14           So prep for Judge Kinkeade to be your

15  judge.  You can file your motion to reconsider every

16  ruling that Judge Scholer and I have ever ruled on

17  as soon as he takes the case over.

18           Anything else?

19           All right.  Well, with that, we will see

20  y'all tomorrow at 8:45 -- 8:30.  Sorry.  And then we

21  will just see those filings tonight by email.  Not

22  filings, emails, on what we are going to take up

23  tomorrow, what objections we have.

24           Thank y'all.  We'll see you in the

25  morning.

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 340 of 383   PageID 15360
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1620

1    Court is in recess.

2    THE COURT SECURITY OFFICER:  All rise.

3    (Proceedings concluded at 5:06 p.m.)

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 341 of 383   PageID 15361
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Page 1621

 1                    C E R T I F I C A T E

 2

 3             I, Kelli Ann Willis, RPR, CRR, CSR

 4    certify that the foregoing is a transcript from the

 5    record of the proceedings in the foregoing entitled

 6    matter.

 7             I further certify that the transcript

 8    fees format comply with those prescribed by the

 9    Court and the Judicial Conference of the United

10    States.

11             This 12th day of July 2022.

12

13             s/ Kelli Ann Willis
               Official Court Reporters
14             Northern District of Texas
               Dallas Division

15

16

17

18

19

20

21

22

23

24

25

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 5 July 11, 2022                              Index: $100..42

## $

**$100** 1440:15

**$100,000** 1475:15

**$15,000** 1396:23

**$16,581** 1397:6

**$17,700** 1397:16

**$18,598** 1398:3

**$6,000** 1401:12

## 0

**0** 1524:23

## 1

**1** 1504:15,21,22,24,25 1506:11,15

**10** 1303:11 1328:12,16 1373:2 1556:12

**10-minute** 1372:4,20

**100** 1438:7,9,11,18 1439:4,10 1460:14 1475:14 1600:15

**100,000** 1476:17

**103** 1591:24 1592:1,2,9, 11,14 1593:19

**103.16** 1595:17

**103.19** 1594:9

**107** 1497:4

**10:48** 1373:7

**10:50** 1372:21

**10th** 1529:8

**11** 1533:10,16,22,24

**115** 1604:21

**118** 1311:19 1313:9,18, 20 1475:9 1476:25

**118-112** 1314:21

**118-116** 1315:2

**118.10** 1313:22

**118.110** 1314:1

**119** 1317:15

**119-point** 1318:13

**11th** 1529:8 1546:16

**12** 1565:16

**120-pound** 1303:6

**126** 1305:16,18 1306:2

**127** 1305:16,18

**128** 1305:16,18

**129** 1305:16,18 1306:3

**12:10** 1450:10

**13** 1505:8 1540:24 1574:7

**130** 1301:14,15,16,23, 25 1302:4,5

**138** 1486:3,6,9

**14** 1530:12

**147** 1502:19,25 1504:1 1506:21 1507:13 1509:10,20,21 1510:13 1538:25

**148** 1312:15

**14th** 1528:21

**15** 1318:13 1510:2 1619:9

**15,000** 1460:16

**16** 1397:20 1530:16 1545:24 1546:4,10

**16th** 1330:21 1525:21 1546:23

**17** 1328:5,16 1336:7 1397:24 1524:18

**17th** 1524:20

**18** 1290:12 1293:11 1332:18,21 1400:13 1418:2 1523:6 1580:6, 14,16,19,20,24

**18-month** 1332:13 1410:25

**19** 1304:4

**198.15** 1507:4

**1996** 1575:6

**1998** 1514:16

**19th** 1527:22,23

**1:10** 1452:16

**1:11** 1450:17

**1st** 1529:18

## 2

**2** 1307:8,11,20,23 1308:8,10 1309:3,7 1310:7,16 1311:9 1312:11,22 1313:14 1315:15,19 1316:3,22 1318:16 1319:23 1320:7,8,20,25 1321:6 1328:8,10,13,15 1350:2 1390:23 1391:2,3,13 1392:25 1393:15 1394:10,13 1416:6,9,22 1417:15 1419:17,19 1420:22 1474:19 1475:7

**20** 1298:13 1345:16 1357:11

**20,000** 1476:14,18

**2000** 1481:13

**2004** 1575:6

**2012** 1302:1

**2013** 1314:17 1339:22 1407:12 1490:5 1546:14,16,23

**2014** 1396:25 1397:3

**2015** 1397:15 1449:11 1526:1

**2016** 1397:18,21,25 1525:4,13,18,21,22 1526:1,4,24 1527:17,19 1528:8 1529:7,12 1565:17

**2017** 1296:7 1307:13 1328:5 1330:4,15 1336:7 1397:23 1398:19 1399:7,25 1400:5,10 1449:11 1481:14 1510:4 1512:11 1524:18

**1525:2,9,12** 1559:7 1560:17 1576:8

**2019** 1512:2

**2021** 1401:9,18

**2022** 1401:13

**21** 1356:24 1401:11,14 1574:2,5

**22** 1401:14

**23rd** 1528:9

**24** 1293:10 1332:7,21

**24-month** 1336:3 1417:20,22

**2400** 1574:1

**25th** 1528:1

**26.25** 1526:11

**26th** 1528:12

**27** 1527:4 1528:12

**28** 1574:25

**2:26** 1509:8,9

## 3

**3** 1394:25 1618:6

**30** 1293:5 1309:12 1387:11,15

**30-day** 1293:5 1330:20 1417:16 1431:15

**31st** 1512:2

**38** 1295:4,5,9,12

**39** 1609:13

**3:40** 1556:12,23

## 4

**40** 1327:7,8,15,23 1478:1,2,18

**401** 1476:12,19

**401(k)** 1475:21

**404** 1549:16,23 1604:1

**42** 1301:14,15,16,23 1302:6 1396:11,14,15

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 343 of 383   PageID 15363
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Index: 44..act

**44** 1523:20,21 1524:2

**44-point** 1525:16

**44.10** 1529:6

**44.11** 1529:11

**44.12** 1529:15

**44.13** 1530:6

**44.15** 1530:17

**44.2** 1525:3,8

**44.4** 1525:16 1530:12

**44.5** 1526:3

**44.6** 1526:23

**44.7** 1527:16

**44.8** 1528:6

**44.9** 1528:19

**47** 1363:23 1382:5 1537:18

**482f.3d** 1489:15

**4:00** 1618:5

---

**5**

**5** 1287:7 1401:12 1609:13 1618:6

**5,000** 1401:15

**50** 1487:9,14 1585:10, 14,15

**501(c)(3)** 1399:20 1402:11

**556** 1314:11 1325:19 1359:9 1407:4 1481:14 1491:22 1513:5 1514:20 1516:6 1571:11 1578:20

**556's** 1376:20

**566** 1287:16

**5:01** 1616:4

**5:06** 1620:3

---

**6**

**6** 1613:10 1617:18 1618:6

**61** 1370:22 1371:9 1373:24,25 1374:1 1377:15,16 1381:19,24 1382:3

**66** 1498:24 1499:19 1561:2

**67** 1608:6

**6:00** 1617:10

---

**7**

**7** 1328:12,16 1536:8,11, 13,19 1538:3

**7.10** 1527:6

**74** 1588:12

**74.5** 1588:22

**76** 1576:14

---

**8**

**8** 1617:19

**80** 1475:13

**80-** 1475:15 1476:17

**802** 1489:15

**808** 1489:15

**83** 1516:7,8,10,12,17

**83.2** 1517:6

**84** 1464:6

**84.8** 1525:10

**8:30** 1619:20

**8:45** 1616:10 1619:20

**8th** 1527:22 1528:21

---

**9**

**9** 1543:1,3,5,11

**90** 1475:13 1531:12,17 1586:1,2,8

**90.8** 1587:10

**90.9** 1588:3

**92** 1524:22

**92.4** 1524:21

**94** 1583:8

**98** 1355:13 1361:14 1510:2

**98.11** 1359:20

**98.15** 1507:8

**98.6** 1355:14,15

**98.7** 1361:15

**99** 1420:6 1514:16

**9:00** 1616:11

**9th** 1529:8

---

**A**

**abbreviation** 1545:18

**Abercrombie** 1498:13

**abide** 1513:21

**ability** 1529:21 1580:1

**aborted** 1340:15 1351:24 1353:1 1360:11 1499:8 1500:3

**abortion** 1339:20,25 1340:5,11 1344:23 1345:3,23 1346:4,8 1347:16 1351:18 1354:11 1359:15 1360:4 1385:19 1389:12 1395:8 1490:22 1491:11 1533:4 1548:22 1549:22 1550:19,20 1551:15 1596:15 1603:23 1604:7

**absolutely** 1319:11 1321:25 1322:8 1330:6 1353:3 1356:17 1436:1 1460:13 1472:16 1473:8,10 1491:2 1542:10 1552:11 1599:7

**abundant** 1496:19

**abuse** 1554:3

**academy** 1411:25 1412:12,13

**accept** 1402:24

**acceptable** 1378:4 1537:2 1544:2 1564:13 1568:13

**acceptance** 1546:22

**accepted** 1418:3

**access** 1486:10 1535:22 1538:2,6 1540:15 1541:15,20,21 1586:18 1594:24

**accolades** 1322:14

**accommodate** 1290:24 1366:1 1383:13 1387:2 1493:16 1497:20 1498:15

**accommodated** 1364:24 1366:24 1367:3 1468:24

**accommodation** 1288:3 1291:11 1364:20 1365:3 1367:6 1382:20,22 1384:3 1392:5 1461:7 1462:19, 20 1464:22 1465:23 1466:9,12 1467:6,25 1469:9 1470:10 1493:1, 5,12 1494:15 1495:15, 19 1498:9,11 1601:19

**accordance** 1553:22 1560:2

**account** 1449:10 1586:21,22

**accountable** 1553:13

**accounts** 1544:17

**accrue** 1529:4

**accurate** 1453:1

**accurately** 1545:2

**acknowledge** 1385:22 1554:21

**acknowledged** 1554:25

**acknowledgement** 1554:7

**act** 1365:4 1384:4 1423:24 1424:4,9,14,24 1425:2 1453:22 1457:6 1498:4,5

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 344 of 383   PageID 15364
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022        Index: acted..allowed

**acted** 1299:8

**action** 1323:14 1438:10
1494:6 1598:12

**actions** 1299:8 1379:5
1381:6,7 1456:15,25
1562:12

**active** 1523:6 1575:19

**activities** 1386:13
1423:5 1496:22,24
1497:9,12 1570:8
1598:5,9

**activity** 1290:1,24
1291:11 1325:12
1326:5 1385:10
1474:22 1475:6
1487:19 1488:4 1489:4,
7 1496:12 1500:9
1527:17 1528:7
1530:13 1562:20,21

**actor** 1376:22

**acts** 1436:15

**actual** 1321:19 1365:17
1375:10 1387:9 1397:3
1411:25 1441:20
1503:17 1524:24
1530:2,11 1553:14

**Adam** 1287:15 1405:8
1551:25 1571:10

**add** 1287:22 1288:1
1299:5 1326:15
1327:20 1431:13
1505:12

**addiction** 1411:5

**adding** 1288:6,8
1428:19 1494:22

**addition** 1331:12,15
1478:19 1513:20
1531:24 1549:11
1562:23

**additional** 1302:9
1340:22 1552:6

**address** 1324:25
1325:3,4,7 1356:4,7
1473:4 1493:2 1616:22

**addressed** 1560:2

**addresses** 1376:14

**adept** 1591:4

**adhered** 1386:15

**administer** 1511:6
1573:5

**administration** 1560:6

**administrative**
1391:21,25 1392:3,13
1494:14

**admissible** 1549:12

**admission** 1295:3
1301:13 1381:19
1391:4 1506:10
1510:13 1533:15

**admit** 1313:9,17 1327:8
1391:2 1485:22
1505:25 1506:14
1516:8 1523:21
1533:22 1536:11
1539:4 1543:3 1546:3
1585:13 1592:1

**admitted** 1295:11
1301:20,22 1305:25
1306:1 1313:19
1319:13 1327:18,22
1394:12,15,16 1486:6
1507:14 1516:12,16
1524:1 1533:23
1536:18 1543:10
1546:9 1585:11
1592:13

**adverse** 1602:10

**adversely** 1578:16

**advice** 1338:18

**advise** 1507:22

**advised** 1503:23
1606:11

**advisor** 1559:1

**affect** 1602:10

**affected** 1352:13
1578:8,16 1581:14
1582:14 1597:3 1601:2,
12

**affecting** 1597:1

**affiliated** 1347:18
1398:19

**affiliation** 1596:14

**affirmative** 1287:22
1288:1,6,8,15 1392:3
1495:21,25

**afford** 1371:13 1391:11
1511:12

**affords** 1383:19

**AFL-CIO** 1325:20

**afraid** 1562:10

**after-school** 1399:3

**afternoon** 1405:3,4
1406:12 1486:20
1551:23,24 1556:7

**age** 1398:11

**agree** 1310:13 1312:16
1331:23 1335:18
1353:25 1354:20
1363:7 1396:22 1400:4
1432:12 1449:25
1457:4 1460:14
1470:22 1548:9
1589:12 1593:20
1595:15 1604:7

**agreed** 1449:8 1450:4
1466:2 1542:24
1545:12 1554:17
1618:25

**agreement** 1293:7
1294:18 1328:3,9
1329:13,22 1331:7
1332:4,20 1338:23
1406:25 1427:2
1444:16,25 1445:8,24
1446:3,14 1447:23
1448:4,10 1494:4
1513:4 1517:22
1529:20 1553:24
1559:15 1563:2

**ahead** 1294:7 1317:15
1359:24 1363:22
1397:1 1502:3,5,24
1567:9 1589:6

**aircraft** 1527:14
1532:15 1542:19
1587:5 1588:8

**airline** 1400:17 1401:21

**airlines** 1287:13
1289:11,15 1290:13,23
1300:6,10,11 1304:7
1306:23 1321:2,3

1322:5 1325:23
1330:12 1331:17,25
1335:3 1353:8 1357:1
1359:10 1360:18
1366:24 1369:15
1377:8 1384:21,23
1385:1,9,12 1386:14
1395:7,19,24 1399:14
1400:8,9,16 1435:15
1451:24 1481:13
1491:23 1492:5
1494:16 1505:6
1510:23 1511:25
1512:8,10 1513:5,9,24
1531:8 1532:3,10,12,25
1533:2 1534:5 1535:14,
18,21 1542:4 1543:15
1552:4,9 1558:17,24,25
1559:18 1562:19
1564:5 1567:5,6
1569:14 1570:2,13
1571:16,19,25 1573:23
1574:22,24 1575:12
1578:7 1586:17
1587:16,23 1600:10,13
1601:24 1602:8

**Airlines'** 1536:23
1569:9

**Airlines's** 1532:15
1568:17

**airplane** 1455:8
1457:22

**airport** 1387:13
1484:21 1527:9
1528:16 1574:19

**Alcohol** 1411:5

**Alex** 1341:20

**align** 1429:10,17

**allegation** 1518:9
1614:15

**allegations** 1522:9
1535:1 1552:21 1554:2

**allege** 1428:6

**alleged** 1485:6 1515:15
1562:21 1589:11,15

**alleging** 1468:19

**allowed** 1318:22
1335:13 1367:12
1395:9 1423:6 1504:1

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 345 of 383   PageID 15365
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                  Index: allowing..aware

1554:20 1601:25
1602:1 1609:2

allowing 1327:15
1364:24 1367:3

alluded 1353:24
1582:8

amazing 1310:20
1337:13

ambiguity 1375:23

ambiguous 1375:3

amendment 1288:12
1451:5 1452:7

American 1300:10

amount 1300:18
1397:1 1410:9

analysis 1381:10

and-a-half 1575:4

angry 1348:4,5

animus 1494:8

annual 1536:3 1554:7

answers 1418:15
1432:19 1511:11
1557:24 1558:1
1573:11

anymore 1421:20

apologetic 1597:23

apologies 1398:17

apologize 1348:17
1372:11 1382:8 1393:6
1420:12 1421:21
1422:11 1456:3
1464:17 1564:25
1584:13 1585:11

apparently 1503:8

appeal 1307:24 1309:2

appearances 1287:8

appeared 1315:16
1349:14 1523:18

appears 1527:16
1577:21

Appendix 1504:15,21,
24 1506:11

applicable 1546:17

applicants 1569:16

applications 1400:16
1401:21

applied 1301:5
1384:19 1385:1,24
1401:22 1512:17
1513:2 1553:1

apply 1301:10 1327:12
1331:24 1513:23
1581:1

applying 1552:25

approach 1308:22
1505:2

approved 1549:14

approximately
1400:25 1401:10
1460:19 1524:21

April 1307:14 1328:5,
16 1336:7 1527:16,18,
22,23 1528:1

arbitration 1349:13,18,
20 1350:2,19,22,25
1351:4,14 1352:10
1461:24 1463:7
1464:23 1474:20
1475:7 1494:4 1495:8
1515:4

area 1436:9,13 1543:19

arguably 1488:24

argue 1345:8

arguing 1472:11,14

argument 1376:16
1377:11 1379:25
1393:3 1461:13 1508:1
1618:2,3,14

argumentative 1339:1

arguments 1377:13
1426:23 1494:2 1495:5
1500:21 1509:8
1618:11

Arizona 1576:10

aspect 1355:7

aspects 1354:9

assembled 1312:23

assess 1375:17

assessment 1354:2
1545:10

assessments 1582:7,
9

assigned 1513:15
1525:10

assistance 1549:22
1561:24

assistant 1481:5
1574:8 1590:23

assisted 1311:13

assume 1558:20
1618:11

assumed 1484:19

assuming 1501:22

attached 1505:8
1531:24 1593:14

attachments 1532:5,8

attacked 1535:4

attempted 1494:8

attendance 1523:7,9
1589:20 1590:1
1597:17

attendant 1291:13
1310:12 1322:10
1326:2 1329:10
1353:18 1356:17
1364:12 1387:7
1389:13 1390:9
1482:24 1512:16,23
1513:22 1514:10
1523:5 1527:12
1529:20 1531:7,8
1532:3,24 1534:4
1536:1,3,4 1545:16
1547:6,11 1559:3
1565:13 1575:2,3,9
1580:24 1587:3
1609:16

attendants 1333:7
1352:21 1353:19
1356:23 1357:3,7
1359:4,10 1370:17
1395:15,21,24 1435:3
1439:14 1491:22
1512:18 1513:10,15,20
1517:24 1523:15

1528:24 1529:21
1538:8 1542:11,15
1546:25 1547:1
1552:22 1554:8,14,20
1559:17 1560:10
1574:1,3,14 1609:24

attended 1342:15
1351:22 1575:17

attendees 1353:16

attention 1531:12
1568:20

attitude 1534:21

attorney 1343:4
1405:25 1425:6 1554:4

attorneys 1412:17
1435:2 1439:19
1461:23 1552:1
1571:11

audience 1302:24

audio 1480:8

Audrey 1312:12,13
1316:24 1317:7
1319:10 1322:17
1326:5 1342:1 1344:12
1347:19 1357:19
1367:9 1414:9 1421:23
1454:16 1477:1,2,8,10,
14,17,22,24,25 1481:16
1516:1 1519:17 1522:9
1552:8 1571:14 1600:6

Audrey's 1333:24

August 1529:12

Aurora 1399:1,22
1402:10 1511:23

authentication
1506:12

authoring 1565:20

authorized 1395:24

average 1396:23

aware 1325:24 1430:7
1439:22 1444:14
1445:4,5,23 1446:12,24
1458:18 1515:18,22
1519:8 1544:23 1554:7
1562:24 1563:3
1571:18,23 1576:13,20
1578:14 1598:15

1599:2 1610:1 1613:3

**B**

**babies** 1340:16 1345:4,
5 1353:1 1360:11
1499:8 1500:4

**baby** 1345:6

**bachelor's** 1413:9

**back** 1289:8 1292:20,
25 1293:3,19,24
1297:17,18 1302:25
1304:5,14,19 1311:7,10
1314:17 1316:4
1320:18 1325:10
1329:12,15 1333:1
1334:7,14,16,20
1341:21 1346:24
1361:14 1368:18
1372:3,10,21 1380:7
1381:24 1382:5,20
1383:1 1386:6,8 1394:5
1398:5 1403:4,15
1404:5,11 1408:6,9
1426:20 1427:21
1428:19 1432:9 1433:5
1436:25 1439:17
1450:16 1451:1
1452:16 1453:1,13
1460:15 1462:18
1468:12 1471:19
1474:1,3 1476:22,23
1477:20 1486:10,25
1502:4,16 1506:20
1509:8,9 1510:3
1520:23 1522:23
1527:25 1556:23
1560:20 1570:1
1572:23 1573:2 1580:6,
15,16,19,20 1584:20
1585:24 1587:18
1595:16 1607:3
1617:25

**background** 1413:2
1596:18,25

**bad** 1293:8,9 1427:20

**badgering** 1343:18

**bag** 1380:7

**ballpark** 1397:7

**Baltimore** 1483:14
1484:9

**Baltimore-**
**washington** 1484:21

**banner** 1345:18
1359:8,11 1395:10
1491:20

**banners** 1395:25

**barely** 1483:17

**bargaining** 1498:21
1513:4 1517:22
1529:20 1553:23
1559:15 1563:1

**Barnett** 1308:16
1342:23 1579:9 1590:3
1594:14

**base** 1512:20 1513:7,
13,15 1521:25 1552:19,
24 1573:22,24 1574:1,
2,8,15,22 1576:3
1590:10,23 1603:14

**based** 1456:13 1464:20
1466:8 1488:14 1491:5
1505:21 1524:15
1553:16 1555:18
1576:3 1577:2,3
1598:4,13 1600:23
1606:10 1613:14,18
1614:1 1615:3 1617:4

**bases** 1513:9 1518:8
1614:5

**basic** 1573:18

**basically** 1294:22
1378:15 1402:6 1503:7
1537:1 1601:4

**basis** 1392:8 1414:19
1424:2,8 1426:6,13,17
1439:4,10,12 1462:16
1510:6 1526:14 1596:3
1608:21

**baton** 1474:1,3 1501:4
1510:22

**beating** 1410:7

**Becky** 1308:11 1329:2
1337:16,18 1339:5,8
1416:15,22 1420:1,3

**began** 1505:5 1515:14
1587:16

**begin** 1569:12

**beginning** 1311:2
1330:21 1410:14
1527:21 1534:9
1546:23 1588:18

**begins** 1526:2

**behalf** 1287:16 1288:2
1355:9

**behaved** 1485:12

**behavior** 1537:3
1548:12 1565:12
1566:14 1567:4
1570:24

**behemoth** 1617:24

**belabor** 1463:13

**belaboring** 1464:18

**Belanger** 1431:8
1437:25

**belief** 1336:5 1382:12
1424:2 1425:2 1439:2
1456:16 1459:18
1498:10

**beliefs** 1289:15,24
1290:25 1291:5 1345:9,
10 1366:1,25 1367:3
1382:11,16,18 1383:13
1404:3,4 1427:23
1429:10 1456:9 1459:4,
14 1461:1 1469:24
1470:13 1491:3 1493:8
1495:18 1496:21
1497:7,21,25 1498:14,
16 1550:2 1551:9,16
1598:13 1603:21,23

**believed** 1332:18
1363:15 1419:1
1485:11 1548:12
1598:3,8

**believes** 1551:14

**Bellinger** 1459:8

**belong** 1551:3 1570:23

**benefits** 1475:16,17,
18,19 1476:18

**Beth** 1308:12 1329:1,4
1332:11 1336:12
1337:2,7 1404:15
1416:15,21 1417:8
1419:25

**Beverly** 1431:8
1437:25 1459:8

**bias** 1444:8

**biased** 1444:6

**bid** 1330:10 1410:15
1529:21

**bidding** 1542:14

**big** 1329:24 1330:1
1408:3 1426:20
1520:25 1597:2

**biggest** 1355:11

**Bill** 1424:12

**bills** 1305:17

**binding** 1494:3

**bishops** 1550:23,24

**bit** 1295:18 1302:20
1324:23 1331:9 1341:3
1364:2 1365:23
1377:23 1398:12
1407:24 1408:3
1412:18 1413:1
1417:12 1419:6
1438:17 1447:10
1468:21 1470:21
1483:15 1496:9 1513:1,
19 1533:7 1552:12
1596:23

**blanketly** 1459:1

**blaring** 1303:8

**blind** 1566:1

**block** 1529:22

**blood** 1296:14 1298:2
1300:14,15

**bloodhound** 1303:6

**blow** 1331:13 1355:21
1364:1

**blue** 1301:5 1400:18,19
1524:17 1525:20

**blur** 1398:17

**board** 1422:10 1423:10
1444:19 1448:15
1461:11,12 1546:18

**boards** 1407:19

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 347 of 383   PageID 15367
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Index: Bobby..Carter

**Bobby** 1287:9

**body** 1298:6 1374:7
1492:4

**bonus** 1475:24,25
1476:1

**bonuses** 1475:23

**booklets** 1409:1

**books** 1547:11

**boring** 1396:10

**boss** 1519:14 1560:23

**bosses** 1519:8,13

**bottom** 1318:18
1480:24 1527:4
1544:20

**box** 1377:20 1487:16
1510:14

**boxes** 1492:3

**boxing** 1473:22

**boy** 1413:15,16

**brain** 1296:17

**branch** 1575:21

**branched** 1402:7

**brand** 1569:23
1570:16,21,25 1571:1

**breach** 1414:4,7,12
1418:6,8,21 1420:8,15
1421:3,5 1453:22

**breached** 1414:10,16,
21 1415:6,8 1419:7,18
1420:21 1421:8,9

**break** 1372:2,19,20
1373:7 1386:23,24
1450:9,11 1451:3,6,11,
16 1452:15 1476:2
1486:15,20 1501:3
1502:4,15,22 1506:20
1556:5,6,21 1616:5

**breaks** 1352:5,6

**Brett** 1429:18 1480:5
1481:10

**Brian** 1287:12 1293:21
1333:3 1336:1 1370:17
1381:4 1431:10
1438:24

**Brianna** 1518:23
1519:14,15 1531:21

**briefing** 1432:23

**briefly** 1324:10 1337:5
1377:4 1382:21
1391:16 1396:19
1498:17

**bright** 1378:19

**bring** 1288:16 1309:10
1311:18 1368:1
1381:25 1435:20
1439:25 1453:5
1461:22 1494:15
1504:21 1561:19
1617:25

**bringing** 1413:23
1461:4

**broke** 1335:23 1582:12

**brought** 1321:3
1325:18 1477:19
1535:1 1544:18
1552:21 1553:8 1554:2
1581:16 1592:25

**bucket** 1429:23
1444:11 1449:7

**buckets** 1429:20,22

**bucks** 1300:22

**building** 1520:21,22
1521:1

**bullet** 1329:7,15
1330:19 1331:3,12
1332:3 1606:4 1613:22
1614:24

**bully** 1606:1

**bullying** 1331:18
1344:13,14,17 1387:20
1503:9 1505:9 1514:4
1538:12 1539:19,21
1540:17 1541:5,11,23
1542:22 1544:10

**bunch** 1370:16

**burden** 1495:22,25

**bush** 1410:7

**business** 1297:13
1301:4 1321:25 1322:6,
23 1323:8 1324:5,17
1325:11 1326:5 1367:9

1369:5 1376:7,8
1384:24 1385:7,9
1386:21 1403:9
1422:16 1423:18
1424:11,21 1462:4
1481:23 1579:7,8
1590:4

———————————

**C**

**cabin** 1559:4

**calculations** 1452:23,
24,25 1617:5

**calendar** 1330:14
1524:24 1527:4

**call** 1289:4 1342:23
1345:4 1366:13
1391:17 1410:1
1414:15 1421:13
1465:17 1471:12
1480:2,5 1486:1,24
1501:9,10,17,24
1504:15,22 1510:17,24
1519:13 1555:25
1556:2 1559:4 1563:8
1565:8 1572:22
1604:15 1605:13,15

**called** 1291:12 1293:6,
19 1296:19 1334:15
1341:21 1344:11
1347:9 1352:19
1365:19 1384:4 1387:3
1398:18 1400:8 1402:1
1431:11 1513:13
1518:14 1528:2,9,10
1557:13 1604:12,14

**calling** 1308:18 1475:9

**calls** 1317:2 1341:20
1371:20 1383:14
1389:14 1400:14
1414:14 1418:19
1424:5 1426:14 1427:4
1454:7 1468:1 1511:2
1552:15

**camp** 1459:12

**candidate** 1429:17

**cap** 1362:1

**capacity** 1499:16
1517:23

**captain** 1400:18

**capturing** 1591:5

**car** 1303:2

**cardboard** 1492:2

**care** 1397:13 1460:3,6
1535:3 1564:8 1574:3
1601:10

**career** 1296:23 1304:8

**careful** 1611:12
1614:21

**caring** 1534:21
1601:11

**carried** 1396:1

**Carrollton** 1558:13

**carry** 1395:24 1491:20,
24 1536:4,6

**Carter** 1287:10 1289:1,
3 1307:6 1328:2 1329:9
1355:6,17 1374:20
1375:4,19,24 1376:5
1377:5 1378:1 1384:17
1395:3 1396:2 1402:23
1405:3 1412:16,25
1413:22 1420:20
1429:2,19 1434:19,23
1435:10,20 1439:19
1446:9 1453:10
1464:16 1465:8 1466:6
1469:15 1470:7,20
1471:25 1474:19
1480:2 1482:12 1486:1,
12 1487:21 1491:10,16
1492:12,21 1493:4,23
1494:5,20,24 1495:10,
16 1496:2,12 1497:6,
12,22 1498:11,23,25
1499:7,8,10,20 1500:2,
11 1503:18 1508:21,23
1510:5 1514:24
1515:13,25 1520:6
1522:22 1523:10,11,17
1524:15 1525:1 1527:1
1530:3,7 1532:10
1533:3 1535:11,13,17
1537:12 1538:17,22
1542:22 1551:6,14
1554:24 1555:5,8
1562:7 1575:25 1576:2,
12,21 1582:5 1583:23
1585:16 1586:12

1587:19 1588:7 1589:2
1590:1,11 1591:12
1592:24 1594:17,20,25
1595:5,8,20 1597:13
1598:2,7,11,16 1599:11
1601:18 1603:17
1604:14,15 1605:13
1606:14 1607:16

**Carter's** 1376:9 1379:5
1381:7 1488:9,22
1489:21 1491:3
1497:21 1498:10
1501:15 1515:5,12,19
1521:21,25 1522:7,24
1530:24 1531:5 1532:2
1534:16,25 1537:6
1542:20 1544:16
1545:11 1547:18
1548:12 1564:15
1580:7 1581:2 1582:16
1586:18 1588:24
1589:19 1596:6
1597:12,19 1600:18
1602:20 1604:11
1605:22,24 1607:9

**carved** 1434:13
1612:11

**case** 1298:9 1308:19
1310:21,23 1311:4,5
1314:12,14,20 1315:17
1338:20 1342:8
1364:17 1365:14,25
1366:9,14,23 1367:18
1369:18,22 1371:23
1372:24 1373:1,6
1375:12 1384:18
1395:20 1405:12
1413:25 1432:11
1450:20,21 1451:4,8,
10,18,20 1452:10
1461:19,21,22 1462:13
1472:1 1473:25
1474:13,22 1486:21,23,
24 1488:17 1491:17
1494:4 1505:5 1510:22
1514:24 1515:19
1534:16 1542:10,20
1548:14 1551:6
1556:10,11 1561:9
1578:18 1579:3
1598:23 1612:12,17
1614:5 1616:8,9,16
1619:17

**case-in-chief** 1472:2

**case-wise** 1452:4

**cases** 1375:18 1489:2,
13 1518:1 1548:14,18
1552:21 1579:18
1599:25 1610:22

**Casper** 1430:21
1437:19 1459:9

**cat** 1380:7

**categories** 1579:2
1593:22

**category** 1498:7
1518:7

**Catholic** 1550:22,24
1551:1

**causation** 1298:16

**caused** 1288:6 1296:7,
8 1298:2 1299:12
1306:14,15

**CEO** 1587:15,25

**certificate** 1413:3,5,8

**cetera** 1378:22 1408:6

**chain** 1519:1 1588:18

**chair** 1337:21

**chance** 1309:2 1310:16
1593:9

**change** 1323:13

**changed** 1477:12

**changing** 1407:20
1506:8

**character** 1549:16,19,
20,21

**characterization**
1313:15

**characterize** 1347:17
1597:19

**charge** 1287:2,21
1309:20 1348:12
1391:20,24 1409:8,11
1578:25 1617:23,24
1618:1,8,16,17,22

**Charlene** 1287:10
1304:2 1329:9 1338:9
1361:22 1404:17

1482:12 1514:24
1520:6 1524:14
1575:25 1586:12
1588:7 1590:1

**cheaters** 1561:19

**check** 1387:11 1487:16
1585:12

**check-the-box**
1493:24

**Cheri** 1430:15 1437:15

**chief** 1472:1 1473:25
1474:13

**child** 1408:18

**chiming** 1494:22

**choice** 1316:23 1317:7
1319:9,12 1374:6,7
1491:25 1492:4,17
1595:15 1602:19
1603:4 1607:20 1608:2

**choose** 1542:16

**chooses** 1312:20

**chose** 1347:4,5
1415:18 1461:18

**Chris** 1304:22 1305:9
1342:24 1414:23
1415:15 1416:4
1418:24,25 1589:22

**Christian** 1289:16
1345:16,21 1365:10,16
1367:1 1382:11,12,16,
18 1383:2,17 1427:25
1456:16 1457:10
1458:24 1461:14
1465:10,22 1466:17
1468:7,15 1469:10,24
1490:21 1492:19
1497:7,23 1603:17,22

**Christianity** 1454:19,
21 1455:22 1459:1
1466:25 1468:8

**Christians** 1458:11,15
1459:20

**Christmas** 1405:21

**church** 1551:1

**churches** 1399:4,23

**circle** 1585:24

**cite** 1489:13

**claim** 1288:13 1295:19
1344:10 1364:21
1367:6 1369:25
1379:10,11,12 1382:20
1392:5,7,8 1414:3
1458:5 1461:4 1472:21
1488:4,10,13 1490:14,
17 1492:22 1493:1,14,
15,17 1494:13,15
1495:15 1497:20
1499:18 1598:2,11

**claimed** 1461:6

**claiming** 1365:24
1418:5 1438:18
1453:17

**claims** 1289:10
1309:16,17 1379:9,15
1381:4 1413:23
1423:23 1432:11
1434:7,11,14 1453:22,
24 1467:4 1473:5,11
1474:21 1490:11,18
1492:25 1493:4,21
1495:9 1496:23 1497:1
1515:5 1612:14

**clarification** 1618:10

**clarify** 1294:5 1344:25
1345:1

**clarity** 1377:23 1463:12
1464:16

**class** 1401:2 1409:17,
19

**clean** 1393:13

**cleanly** 1397:11

**clear** 1418:5,12,14
1451:24 1467:5 1489:2
1496:14 1507:19
1582:9 1603:12

**clemency** 1499:14,15

**Clerk** 1511:8 1557:20
1573:8

**click** 1484:3

**clip** 1481:8 1485:20

**clipped** 1313:1

**clips** 1364:14

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 349 of 383   PageID 15369
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                Index: clock..confidante

**clock** 1387:13,18 1388:7 1452:23

**close** 1340:11 1358:19 1371:20 1612:1 1617:21 1618:22

**closed** 1401:3

**closely** 1512:20

**closer** 1452:25

**closing** 1618:2,11,14

**clothes** 1532:12

**Cloutman** 1287:16

**clubs** 1570:22

**co-employee** 1326:2 1385:19 1542:7 1606:15

**co-employees** 1602:2

**code** 1320:4 1614:12

**coincide** 1402:14

**colleagues** 1570:18

**collection** 1489:23 1550:24

**collective** 1448:16 1513:4 1517:21 1529:20 1553:23 1559:15 1563:1

**college** 1304:4 1476:24 1575:17

**colluded** 1375:8

**Colorado** 1399:1,22 1511:23 1528:23

**colors** 1587:17,22

**combination** 1487:22 1593:19

**comfortable** 1390:8 1433:11

**commend** 1411:3

**comment** 1318:23 1605:7

**comments** 1376:24 1491:7 1499:6,20 1500:3 1569:22 1607:9

**commit** 1478:11

**committed** 1534:17 1535:19 1569:4,5

**committee** 1340:25 1442:19 1444:6 1446:24 1447:13,16 1448:9,19

**communicate** 1604:10

**communicated** 1513:6

**communicating** 1292:7 1550:3

**communication** 1323:17 1388:16,19 1467:8

**communications** 1289:18,25 1291:16 1323:20 1334:2 1439:21 1478:15 1487:23

**community** 1408:19 1409:4,18

**companies** 1476:2 1569:8

**company** 1293:13,15 1316:1 1329:8 1331:16 1337:23 1375:7 1395:7, 9,14 1414:8 1424:10, 17,20 1427:15 1462:5 1478:20 1512:19,23 1513:23,25 1514:6 1548:13 1553:2 1559:20,22 1560:1,7,9, 12 1564:6 1565:15 1566:1 1567:7,13 1570:2 1587:24 1601:7 1603:5 1610:2,13 1613:4,12 1615:16,23

**company's** 1395:17 1570:25

**comparator** 1378:22 1379:10

**comparators** 1491:4

**competently** 1417:7

**compiling** 1311:13

**complain** 1341:14 1370:4

**complained** 1321:23 1325:6 1357:2 1489:24,

25

**complaining** 1315:9 1323:9 1459:20 1562:9

**complaint** 1314:15,23 1321:22 1322:4 1326:1 1327:3 1360:17 1369:17 1370:24 1371:10 1377:7 1380:19 1429:5 1441:10,11 1450:1,6 1469:13 1477:19 1482:13,17,19 1483:1 1489:11 1498:24 1499:19 1515:22 1517:10 1520:3 1521:15 1538:16 1544:15,18 1553:5,8 1562:16 1563:4 1571:21 1600:5 1614:23 1615:10

**complaints** 1294:25 1322:13 1341:17 1343:11,13 1380:10,14, 20,23 1381:13 1515:12 1538:20 1552:14 1553:18 1555:5 1575:25 1576:21 1602:21

**complete** 1343:13 1431:6,25 1465:2 1553:14

**completed** 1522:2

**completely** 1324:4,17 1392:10 1460:13 1570:12

**completeness** 1526:15 1614:7,14

**comply** 1331:15,25 1334:23 1478:20 1554:17

**component** 1487:16

**compound** 1339:1 1385:5 1388:20,23

**concede** 1472:24

**concept** 1462:18 1485:16 1494:8 1507:2 1538:11,12,15 1568:6 1586:13

**concepts** 1473:2

1512:25

**concern** 1333:14 1463:22 1534:20

**concerned** 1341:11 1601:14

**concerns** 1324:2,15 1336:10,12 1337:14 1338:6,10,23 1609:19, 22

**concession** 1504:8

**concluded** 1299:20 1310:1 1319:17 1372:15 1394:6 1433:25 1464:9 1474:8 1485:20 1540:5 1550:12 1612:4 1620:3

**concludes** 1485:21

**conclusion** 1366:13 1369:21 1383:15 1389:15 1414:15 1418:20 1424:6 1426:15 1427:5 1454:8 1468:2 1542:21 1552:16 1596:1,3

**conclusions** 1456:11

**concourse** 1574:21

**concur** 1373:22

**condition** 1299:12 1300:2

**conduct** 1352:25 1488:18 1489:1,18 1513:22 1544:21 1545:11,12 1589:1,13 1605:22,25 1606:5

**conducted** 1522:8 1571:20 1601:13

**conducting** 1542:14 1593:25

**conducts** 1562:19

**confer** 1550:25

**conference** 1287:2,21 1393:19 1550:22 1604:14 1617:23 1618:9,16,22

**conferring** 1611:24

**confidante** 1482:3,6

confines 1424:16

confirmed 1361:9

conflict 1442:13

conflicted 1493:8

conformance 1549:20

confronted 1497:20

confusing 1309:5

Congratulations 1555:22

congruence 1379:14

conjecture 1490:4

conjunction 1374:1

connect 1491:2 1551:15

connected 1542:16

connection 1331:6 1488:25 1489:3,18 1503:13 1515:11 1521:18 1522:25 1530:23 1532:1 1535:9 1538:16 1544:9 1547:24 1551:2 1563:12 1581:2,10 1583:19 1584:11 1586:19 1595:3 1598:15 1603:13

consequences 1544:4,11

consideration 1331:4 1497:2

considered 1379:4 1482:5 1488:22 1494:9 1503:13 1583:19,21 1597:6 1599:10 1601:2 1602:16

consistency 1288:11, 14

consistent 1362:22 1378:24 1382:16,18 1548:17

consistently 1376:5 1552:25

conspiracy 1441:25 1442:2,12

constant 1296:20

1298:5

constitution 1358:4, 24,25 1466:20,21

construed 1487:20

construes 1488:18

consult 1482:8,11 1547:24 1563:11

consulted 1548:7 1549:4,5

consulting 1550:4,6

contact 1338:1

contacted 1338:17,21

contend 1348:1 1395:7

content 1519:7 1521:6, 20,22 1537:13 1543:20 1544:2,24 1545:2,15

contention 1325:5,8 1395:6 1426:20

contents 1519:24 1539:25

context 1309:22 1324:13 1452:8 1468:4 1471:7 1494:7,9 1542:2 1562:15 1565:19 1579:24,25 1600:1

continue 1288:21 1433:16 1453:8 1524:19 1526:21 1529:4 1554:20,24 1573:13

continued 1288:23

continuing 1292:18 1308:4,5 1313:13 1327:11 1350:10 1394:18 1416:8,11

continuously 1336:17

contract 1293:11 1426:21,22 1428:11 1440:16 1444:12,15 1460:3 1466:19 1476:1 1512:17 1513:2,3,21 1517:24 1552:25 1553:1 1559:16 1560:3, 6,12

contractors 1546:19

contractual 1559:22

contractually 1330:9

contribution 1476:12

control 1486:17

conversation 1344:18 1419:5 1434:24 1436:5 1519:23 1563:15,17 1595:25 1613:15

conversations 1406:7

coordinated 1513:7

coordinators 1574:7

copied 1519:5 1585:8

copies 1515:24 1547:10

copy 1301:25 1534:5 1536:2 1538:8 1540:16

cordial 1406:1,19

core 1334:13 1449:16 1477:16

corporate 1287:17 1521:2 1569:13

correct 1295:2 1296:5, 12 1307:22 1308:1 1310:18,24,25 1311:3,7 1312:24 1314:12,13 1315:1,10,11 1321:23 1322:5,18 1328:5,6,17 1329:10,11,14,22,23 1330:21,22 1331:7,8, 10,11,22 1333:18 1334:3 1335:21 1339:23 1341:10 1342:1,19 1343:10 1344:4,9,15,24 1345:21,22,25 1346:2 1347:3 1350:3,5,8,17 1351:4 1354:3 1356:16 1357:20 1358:24 1359:15 1360:19 1361:1,2,4,19 1364:4,9 1366:1 1367:20 1370:25 1381:8 1383:24,25 1385:16,25 1387:7,8 1395:8 1397:17 1398:1,4,20 1399:8,19 1400:6 1407:7,13,16,17,20,21 1408:1,13 1409:21 1411:11,18,19,21,22

1412:1,2,23 1414:4,5, 13 1415:22 1416:2,7 1417:7,17,19,21 1418:3 1422:5,14,17 1423:8,9, 17,19 1425:10,14 1426:12 1434:24,25 1436:5,6 1437:11 1440:23 1443:24 1444:13 1448:4,5,8,18 1449:19 1454:3,4,5 1455:18,19,21 1462:1, 14 1467:9,10,20 1470:8,14 1471:10 1475:4,8 1476:18 1477:15,18 1478:16,17, 23 1479:1,5,10,13,14 1503:25 1504:19 1508:18 1517:7,16 1518:19 1521:10 1525:18,19 1531:14,15 1535:7 1555:1,2 1577:23 1587:25 1588:19 1597:14 1598:17 1600:2,6 1605:12 1613:23 1614:25 1615:1,8

corrected 1509:3

correctly 1332:9 1454:15 1512:18 1518:17 1530:25 1577:6 1582:2,18 1595:19

costume 1364:12

costumes 1363:13 1364:10

couch 1303:9

counsel 1291:23 1317:14,23 1335:7 1348:12 1350:24 1359:22 1367:10 1389:7 1394:4 1407:3 1419:13 1439:21 1501:15 1503:23 1506:2 1508:21

counseling 1298:8 1305:17 1306:8,10 1602:14

counselor 1298:8

count 1312:18 1442:12

counted 1442:8

**counter** 1483:5

**counting** 1441:21
1442:10 1443:12
1510:9

**couple** 1302:12 1372:3
1406:11 1483:10
1512:25 1519:4
1606:13

**court** 1287:4,11,14,19
1288:10,17,20 1291:7
1292:10 1294:5,13
1295:5,9,15 1296:2
1297:24 1298:17,20
1299:15,22,23 1301:15,
20 1303:20 1305:18,21,
25 1306:4 1307:2
1308:3,5,23 1309:9,13,
14,24 1310:3,4 1311:23
1312:8 1313:10,16
1316:8,16 1317:10,23
1318:2,8,24 1319:2,7,
13,19,20 1320:3,6,10,
14,18 1322:20 1324:9,
14 1326:13,18,24
1327:13,19,24 1330:7
1333:12 1335:5,15
1336:20 1337:4
1338:15 1339:3
1342:11 1343:22
1346:18 1348:10,12
1349:19,21 1350:11,13
1351:11 1353:5
1354:14 1356:1,6
1358:12 1362:11,14
1363:24 1366:10,15
1368:9,12 1369:23
1370:13 1371:3,6,15,18
1372:1,9,13,17,18,23
1373:5,11,12,19,22
1374:24 1376:12
1377:2,4,11 1378:6,11,
15 1379:6,24 1380:13,
21 1381:8,22 1382:2
1383:16 1384:11,13
1385:6 1386:4,10
1388:11 1389:5,16
1390:13,17,21 1391:3,
9,13,17,23 1392:12,22
1393:8,23 1394:2,8,9,
14,16,20 1396:12,15
1403:21 1404:22
1405:18 1414:18
1415:14 1416:10
1418:12,17,22 1419:13,

22 1420:17 1421:1
1424:7 1426:16 1427:8
1428:20,23 1431:2,5,
17,21 1432:4,7 1433:4,
14,22,24 1434:2,3
1435:16,23 1436:3,17
1437:2,5 1439:6,23
1442:6 1443:8 1445:20
1449:2 1450:9,13,16,
19,25 1451:17 1452:1,
20,21 1453:5,7 1454:11
1456:12 1462:23
1463:6,15,21 1464:8,
11,12 1465:5,16 1466:2
1467:14,17,21 1468:5
1469:6 1470:4 1472:6,
11,14,18 1473:15,18
1474:3,6,10,11 1475:1
1476:8 1479:18,21,24
1480:7,11,18 1483:6
1485:25 1486:4,13,22
1487:4,11,19 1488:12,
18 1489:2,13 1494:5,
10,18 1495:2,21,23
1496:8 1500:19,20
1501:8,14,20 1502:2,
14,20,24 1503:4,17
1504:12,14,17,20,22,25
1505:3 1506:14,18,25
1509:7,13,16,18,19
1510:17,21 1511:4,9,17
1516:9,12 1522:15,18
1523:24 1526:17,20
1531:15 1533:18,21
1536:13,16 1539:3,7,
13,16 1540:3,7,8,23
1541:1 1543:4,8
1546:5,7 1548:24
1549:3,10,23 1550:5,9,
14,15 1551:12,20
1552:17 1555:11,13,15,
18,21,25 1556:4,9,16,
19 1557:3,4,7,12,16,21
1558:5 1561:5,8,11,22
1564:22 1565:3
1567:18 1571:5 1572:5,
7,11,15,18,22 1573:1,9
1576:16 1580:11
1583:11 1584:8,15
1585:12,15,18,23
1586:2,5 1588:13
1592:2,8,11,15 1593:2,
11,16 1603:25 1604:3,
23 1606:24 1607:23
1608:19 1609:4 1610:6,
9,16,19 1611:6,14,25

1612:6,7 1613:5
1614:9,11,17 1616:4,7,
13,24 1617:7,18
1618:13 1620:1,2

**courteous** 1567:16

**courtesy** 1511:12

**courthouse** 1619:5,8

**courtroom** 1288:19
1333:10 1342:21
1348:13 1349:6 1351:3,
13 1352:11 1373:4
1382:1 1430:15 1432:7
1435:14 1445:6 1446:1,
21 1450:24 1453:6
1480:1 1487:3 1510:20
1556:13 1557:11
1562:8 1572:18,24,25
1590:18 1616:12,18,21,
23

**courts** 1494:9

**cover** 1573:17 1616:25

**covered** 1573:18

**covering** 1380:14
1472:21

**covers** 1425:3

**COVID** 1401:2,12

**coworker** 1470:12,23,
25 1568:8,9

**coworkers** 1542:18

**create** 1490:10 1510:8
1531:10 1553:7

**creates** 1490:23

**credibility** 1376:9,10
1377:10

**credit** 1480:19 1524:20
1525:10 1599:13

**crew** 1588:7

**cried** 1349:13

**criticizing** 1500:15

**cross** 1493:9 1508:18
1509:22

**cross-examination**
1307:4 1405:1 1551:21
1571:6 1580:10 1584:7
1607:1

**cross-examine**
1299:14 1504:4
1507:21

**cross-examined**
1515:9

**crossed** 1601:4,6

**crux** 1519:17

**crying** 1295:21
1349:12 1483:17

**cue** 1481:6

**cued** 1480:12

**culture** 1601:9

**current** 1421:14

**curriculum** 1399:11
1408:25 1412:4,5

**customer** 1534:11,23
1567:22,23,24 1568:4,6
1569:3 1575:13

**customers** 1533:5
1534:12 1567:12
1568:10 1569:5,7,11

**cut** 1335:6 1456:23
1465:19 1556:19
1566:20

**cute** 1405:18

**cutting** 1556:17

**cyberbullying**
1503:15 1505:20
1507:2,13 1508:7,9,10
1538:11,12 1554:25

**D**

**daddy** 1410:1,4

**daily** 1560:5 1574:4

**Dallas** 1350:5 1352:10
1485:13 1512:6
1520:14,16 1604:22

**damage** 1295:19

**damages** 1288:13
1299:17 1493:20

**darn** 1440:8

**date** 1328:4,7,9
1330:24 1541:7

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 352 of 383   PageID 15372

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022               Index: dates..disciplinary

1589:12

**dates** 1525:1 1560:19

**daughter** 1296:9
1300:17 1302:20
1303:10 1306:16
1398:10,21 1408:12
1476:24

**Dawn** 1405:20

**day** 1287:7,8 1293:20
1301:9 1334:15 1366:3
1405:19 1408:17
1409:2,3,17,19 1412:25
1422:22 1424:1
1431:11 1451:2
1484:12 1493:13
1527:3,25 1528:23
1567:1 1569:12,13
1604:19 1606:19
1616:5

**days** 1293:5 1328:12,
16 1406:11 1409:8,16,
19 1410:15 1505:10
1526:12

**DC** 1345:17 1389:23
1519:18

**deal** 1329:24 1330:1
1340:11

**dealing** 1306:20,21
1338:4 1411:2

**deals** 1384:3

**dealt** 1294:19 1314:8
1322:15 1384:24
1387:4 1517:21 1518:1

**death** 1294:22

**debate** 1345:10

**December** 1512:2
1526:1 1530:17,18

**decide** 1290:10
1577:10

**decided** 1461:21

**deciding** 1488:8

**decision** 1307:21,24
1328:14 1402:23
1488:25 1489:14
1490:7,25 1504:11
1547:17,25 1549:14,15
1550:3 1555:8 1564:14,

21 1571:25 1583:20,25
1594:2,4 1599:14,16,
21,22,24 1600:18,22,23
1602:23 1603:2,3,6,18
1604:10,13,15 1605:14
1606:16

**decision-maker**
1488:7

**decision-makers**
1488:21

**decisions** 1482:9
1501:12

**dedicated** 1534:10

**deemed** 1570:13

**deeply** 1340:6

**Defendant** 1287:13

**defendants** 1314:12
1487:5 1508:21

**defense** 1287:23
1288:2,6,9,15 1392:4
1495:22,25

**define** 1337:6

**defined** 1299:10

**degrading** 1363:15

**degree** 1431:22,23
1487:19 1583:18

**deliberations** 1619:7

**delivered** 1547:13

**Delta** 1301:5,7 1400:19
1575:12

**demeanor** 1597:20

**Denise** 1342:22
1343:15 1517:4,12
1531:19 1586:9 1590:2
1594:1 1599:17

**denotes** 1527:10

**Denver** 1302:17,19
1303:11 1410:14
1524:16 1573:22
1574:15,22 1576:4,5,7
1590:10,23 1603:14
1614:1

**Denver-based** 1329:9
1613:23

**deny** 1500:22 1501:1

**department** 1365:5
1384:3,4 1548:6
1563:7,8,9 1575:13
1577:11

**departments** 1563:6

**depend** 1501:25

**depending** 1340:16

**depicted** 1613:21

**depicting** 1601:1

**depos** 1480:14

**deposition** 1310:19
1315:18 1400:22
1427:7 1480:5,6,23
1485:23

**depth** 1443:19 1473:20

**derogatorily** 1485:12

**derogatory** 1607:9

**describe** 1308:8
1405:23 1407:4
1521:17 1534:7 1540:1,
10 1541:10 1554:11
1591:15 1597:12

**describing** 1525:15

**description** 1331:5
1574:11

**designate** 1617:12

**designates** 1528:14

**designation** 1527:13
1528:16 1529:18

**designations** 1527:9

**designed** 1361:5

**desk** 1520:13,21
1521:5

**detail** 1610:25 1611:1

**details** 1580:2

**determination**
1515:16 1599:18

**determine** 1580:17
1605:24

**determined** 1548:15
1605:21 1615:6,7

**determining** 1512:21
1578:25

**detrimental** 1569:22
1596:20

**devastated** 1582:12

**DG** 1577:5,8

**diagnosed** 1298:7

**dialogue** 1341:4
1359:16 1360:21
1361:17 1369:8
1470:15 1595:21,25
1597:9

**Diego** 1575:16

**difference** 1322:11
1332:20 1376:21
1517:18

**differentiation** 1381:2

**differently** 1368:21
1460:12

**difficult** 1466:6

**dinner** 1297:13

**Dipippa** 1445:24
1446:2 1447:18

**direct** 1288:23 1379:11
1472:4 1473:7 1478:4
1511:18 1516:21
1519:14 1521:7
1531:12 1558:7 1566:3
1568:20 1573:15
1580:9 1584:5

**directed** 1347:16
1495:6 1500:18

**directly** 1328:20
1433:12 1514:8
1565:22

**director** 1411:18,21,23
1518:22 1559:2,6,10
1560:23,24 1565:11

**Directors** 1546:19

**disagree** 1487:18

**disagreed** 1338:18
1359:3

**disappointed** 1563:25

**disciplinary** 1610:22

discipline 1334:8
1336:7 1375:10
1376:18 1385:15,18
1491:12 1515:17
1518:10 1522:12
1543:23 1544:6,12
1548:17 1559:23
1580:17,23 1602:14,17
1611:1,2 1612:16,21

disciplined 1323:15
1325:1,9 1335:19
1612:13

disciplines 1371:8

disclaimer 1480:22

discon 1482:22

discovered 1384:2

discovery 1288:7
1489:1

discriminate 1466:21,
22

discriminated 1454:1
1455:17 1456:8 1458:5
1459:5 1468:14
1496:20

discriminating 1598:8

discrimination
1331:19 1379:11
1450:5 1453:25
1455:20 1457:8 1467:3
1492:24 1493:4,15
1494:13 1495:9
1498:16 1499:18
1518:2 1536:24 1537:4
1538:4 1554:19 1606:8

discriminatory
1485:10

discuss 1339:24
1349:23 1381:12
1586:6 1605:19

discussed 1340:2
1356:3 1381:6 1394:11
1464:13 1581:25
1599:20

discusses 1507:6
1534:10

discussing 1378:1
1397:8 1609:8

discussion 1361:21
1379:20 1380:2 1451:1
1474:19 1519:17
1582:13 1598:22

discussions 1411:9
1432:8 1580:23

disgusted 1348:5,19

disgusting 1348:20
1367:19,23 1368:24,25
1369:3

disheartened 1578:5

dismissal 1433:6

disorder 1298:11
1300:9

disparate 1499:21
1553:7

disparately 1492:20

displayed 1458:16
1534:14

dispute 1422:23
1468:18 1494:10,11

disputes 1559:20

disregard 1362:15
1384:14 1433:15
1434:4,16 1493:22

disrespect 1602:5

dissent 1325:14
1426:3 1429:24 1449:8,
13

distinct 1493:3,14

distraught 1483:14

distributed 1547:8,10

districts 1399:2

disturbing 1578:11

diverse 1459:23
1460:2 1564:9

Divine 1402:1,19
1411:21,24

division 1562:18
1563:8,9

divisions 1560:9

doctor 1296:19 1299:1

document 1295:11
1312:5 1313:19
1318:21 1327:22
1328:2,23 1331:5
1334:22 1337:15
1359:23 1362:13,19
1370:21 1377:25
1390:25 1391:5,8
1392:8 1394:12,24
1441:13 1503:10,21
1504:13 1507:14
1508:16 1510:2
1516:16 1521:8 1524:1,
11,14 1525:6,7
1531:18,19 1533:12,23
1534:2 1536:2,18,22
1539:10,12,18,19
1540:1,2,10 1541:3,8
1543:10,13,25 1544:9
1546:9,13,15 1565:6
1568:14 1585:5
1588:16 1592:4,13
1593:4,10 1595:16
1606:3 1608:17
1609:15 1613:18
1615:3

documentation
1361:7 1439:18

documents 1301:22
1306:1 1307:18
1310:24 1311:1,13
1312:10,15,23 1314:20
1333:20,22,25 1475:11
1522:1,4 1524:11
1525:15,17 1538:21
1548:6 1554:12
1588:11 1591:12,15,17
1593:19,23 1594:20

dog 1303:5

domicile 1444:19

Don 1314:16,24
1341:15

Donna 1444:14,15,17,
18 1447:15

door 1303:2 1380:5

doors 1303:1

double-edged
1432:23

doubt 1446:19

dozens 1492:14

drawn 1378:20

dress 1364:5,6 1566:11

drinking 1302:21
1306:13,20

driving 1297:18

drove 1297:17

drug 1297:19

drugged 1297:5

drunk 1303:9

due 1297:25 1356:21
1362:6 1519:7 1579:21,
24 1602:17

dues 1321:20 1322:24
1346:13 1407:10
1459:22 1461:15
1462:8,12 1469:16
1470:17 1471:15
1487:25 1602:22

dues' 1489:25

dues-paying 1352:16
1389:12

duly 1511:7 1557:19
1573:7

duplicative 1585:20

duties 1370:1 1527:14
1574:4 1601:6

duty 1304:20 1365:25
1369:20 1379:12
1414:4,7,10,21 1418:6
1419:8,18 1420:21
1421:3,9 1453:23
1498:21 1523:6 1529:8
1552:13 1575:19
1619:3

E

ear 1618:9

earlier 1309:14 1358:5
1374:2 1377:21
1396:15 1406:3,5
1427:6 1434:5 1440:21
1484:12 1488:12
1496:1 1530:22 1548:3
1553:20 1588:4,19
1602:4 1611:15
1618:20

**early** 1372:3 1486:19, 20 1577:19

**earn** 1400:25 1401:10 1476:23

**earned** 1401:8

**earning** 1302:10

**earnings** 1396:20 1397:3

**easier** 1496:10

**easy** 1408:23

**eating** 1296:21

**echo** 1495:6

**ed** 1343:7,16 1357:20 1361:25 1454:17 1489:20 1497:2 1498:2 1521:24 1547:23 1572:21 1573:7,21

**Edie** 1308:16 1342:23 1590:3

**Edith** 1579:9

**education** 1413:2,9

**educational** 1411:17, 20,23

**Edward** 1287:16

**EEOC** 1391:20,24 1498:12

**effect** 1320:1,22 1494:3 1495:7

**efficient** 1591:4

**effort** 1340:21

**efforts** 1398:12 1408:5 1411:3 1498:9

**egregious** 1335:1 1404:16 1566:13

**egregiousness** 1564:12 1600:24 1602:18

**eight-minute** 1502:4, 15 1506:20

**Eighty-three** 1516:9

**elaborate** 1366:11

**elaboration** 1335:9 1346:21

**elected** 1315:8

**election** 1481:19 1487:24 1598:23

**electronic** 1547:12

**electronically** 1547:13 1570:15

**element** 1488:4

**elements** 1493:16

**elicit** 1595:24

**eliminated** 1375:10

**else's** 1319:16 1355:23 1356:4,6 1444:4

**email** 1314:5 1315:5 1324:20,21,25 1325:2, 3,7 1338:22 1388:18 1471:11 1505:4 1516:19,25 1517:4 1518:12 1519:16,19 1532:17 1561:16,18 1562:5,13,15 1576:20, 22,24 1577:4,12 1585:8 1586:9 1588:17 1592:18,21 1593:7 1608:9 1619:21

**emailed** 1324:20,24

**emails** 1490:5 1519:25 1551:3 1583:15,19 1584:4,11 1619:22

**embedded** 1487:23

**emergency** 1297:4

**Emlet** 1501:11,22 1502:5,19,20 1504:3 1509:11,13 1511:3,4,7, 9,21,22 1516:22 1548:19 1550:18 1551:23 1554:5 1556:15 1560:14 1563:11 1579:12,13,17 1586:10 1594:23 1599:20 1600:1 1605:6

**emotional** 1349:1 1351:4

**employed** 1511:24 1558:14,16 1574:23 1586:16 1615:15,23

**employee** 1293:9,23 1294:2,11 1322:18,21

1323:3 1331:24 1342:3 1365:7 1375:6 1376:18, 23 1384:7 1482:24 1484:23,24 1492:5 1498:4,13,15 1499:17 1515:24 1517:13,19 1518:1 1523:5 1524:14, 15 1535:2,13,18 1538:13 1541:21 1542:5,6,17 1543:16 1544:5,17 1563:7 1566:9 1567:5 1571:16, 20 1572:1 1577:5,9,12 1578:7 1579:5,11,21 1589:12,14 1590:2 1600:10,14 1602:6 1603:4 1612:13,15

**employees** 1370:5,18 1375:3 1380:11 1381:14 1491:5 1498:22 1499:14,16,22, 24,25 1500:13 1513:23 1534:18,20 1535:20,21 1538:2,6 1540:13,15 1541:15 1542:4 1543:18 1544:23,25 1545:5,8 1546:18,20 1552:3 1565:21 1566:9, 18 1567:4,11,15 1568:3 1569:6,10 1570:6 1571:2 1574:5 1601:8, 21,23 1602:1,12 1609:9 1614:1

**employer** 1395:4

**employment** 1298:22 1397:19,25 1398:13 1400:5 1401:23 1488:9, 23 1489:22 1491:4 1522:21 1523:15 1547:18 1548:8 1564:15 1583:20 1600:19 1603:19 1604:11 1606:17

**end** 1336:21 1416:19 1417:15 1420:4 1451:2 1493:13 1494:24 1526:1 1556:21 1585:24

**end-of-the-day** 1452:25

**ended** 1297:1,3 1314:9 1402:5 1505:13

**ends** 1362:1

**enforced** 1514:3

**engage** 1292:1,13 1293:1 1294:25 1478:5 1568:3

**engaged** 1291:16 1496:12

**engages** 1499:12

**engrained** 1569:15

**enhance** 1532:24 1533:1

**ensure** 1552:24 1562:22,25

**ensures** 1564:6

**ensuring** 1512:17 1517:24

**entered** 1288:19 1382:1 1453:6 1510:20 1557:11 1572:25 1588:17

**entertain** 1504:7

**entire** 1432:24 1547:2 1577:9

**entirety** 1350:21

**entitled** 1600:12

**entries** 1529:16 1530:2

**enumerated** 1497:8,9

**enumerates** 1499:9

**environment** 1412:12 1534:18

**equal** 1357:4 1358:3,7, 10,22 1359:1 1374:2,4, 6

**equally** 1569:10

**equivocated** 1377:6

**escalate** 1601:15

**escalation** 1601:3

**essentially** 1298:15 1307:24

**establish** 1312:7 1489:3

**established** 1318:22

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 355 of 383   PageID 15375
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                      Vol 5 July 11, 2022              Index: establishing..Facebook

1575:23

**establishing** 1549:20

**estimate** 1475:19
1476:10,11,13

**evaded** 1498:8

**evasive** 1339:12

**evening** 1410:19

**event** 1500:14,15
1589:15

**events** 1591:19

**eventually** 1482:12
1547:12

**everybody's** 1459:18

**evidence** 1295:12
1301:21,23 1306:2
1311:22 1312:5,19
1313:20 1318:21
1327:23 1355:14
1371:2,6 1375:13
1378:22,25 1379:1,8
1394:13,16 1396:12
1397:11 1403:6
1432:25 1480:25
1481:1,4 1488:6,10,17,
20 1489:19 1490:4,12,
13 1491:21 1492:2,13,
18 1493:19,21 1496:19
1503:2 1506:1,16
1516:17 1524:2
1531:13 1533:24
1536:19 1539:4
1543:11 1546:10
1561:2 1576:15
1582:24 1583:11
1585:21 1586:11
1589:17 1591:25
1592:5,14 1593:9
1594:7,16 1599:9
1604:21,23 1608:20
1611:3 1618:22

**evoke** 1351:7

**exact** 1321:14 1323:22
1347:12 1358:18
1397:1 1405:19 1441:6
1567:21

**examination** 1288:23
1389:9 1474:17
1502:11 1505:17
1511:18 1558:7

1573:15 1580:5

**examine** 1507:21

**examined** 1505:25

**examples** 1537:2
1543:25 1544:1

**exceed** 1472:18

**exceeded** 1293:10
1472:11,15 1473:6

**excellent** 1416:3

**exception** 1290:9,11
1452:2

**excerpted** 1571:24

**excessive** 1332:14

**exchange** 1331:4

**exclude** 1375:8

**excluded** 1299:3

**exclusive** 1498:21

**excuse** 1353:18
1465:24 1491:16
1559:7 1575:7

**excused** 1555:22
1556:15 1572:13,17

**excusing** 1572:15

**executing** 1370:18

**execution** 1376:24
1377:1

**executive** 1314:7
1407:19 1423:10
1490:7

**exert** 1555:3,7

**exhaust** 1393:10
1494:14

**exhausted** 1392:2

**exhaustion** 1392:13,
23

**exhibit** 1295:4,12
1301:14,25 1311:19
1313:20 1317:15
1327:7,8,23 1355:13
1363:23 1379:20
1380:2 1382:3 1390:23
1391:2 1394:10,13
1396:11 1475:9

1476:25 1477:2,17
1478:1,2,18 1486:3,6,9
1497:3,4 1498:24
1499:19 1502:19,25
1503:11,16,25 1504:22,
25 1505:8,15 1506:8,
15,21 1507:1,4,7,15
1509:23 1510:13
1516:7,8,17 1523:20,21
1524:2,8 1529:6
1531:12,17 1533:10,16,
24 1536:8,11,19
1537:18 1538:3,25
1540:24 1543:1,3,11
1545:24 1546:4,10
1561:2 1576:14 1583:8
1585:10,14,22 1586:1,
3,8 1588:2,10,12
1591:24 1592:1,4,14
1594:7,9 1604:21
1608:6,20,23 1609:13

**exhibits** 1301:12,23
1305:16,22 1306:2
1373:21 1374:9 1505:6,
7,11,14 1506:6 1508:22
1561:4,7 1585:20
1617:19

**exit** 1520:21

**exited** 1373:4 1450:24
1487:3 1556:13
1572:24 1616:12,23

**expand** 1513:19
1596:22

**expect** 1360:20

**expectation** 1360:22
1545:4

**expectations** 1543:18
1565:15 1567:5,10,11,
12,14 1569:18

**expected** 1534:22

**expends** 1488:1

**experience** 1340:5
1346:3 1479:4 1520:8
1553:16

**expert** 1298:16,23

**explain** 1296:16
1302:16 1313:4
1410:12 1419:12
1433:20 1435:24
1483:15 1513:1

1517:18 1534:2
1536:21 1543:13
1548:2 1559:9 1573:19
1578:3 1580:2 1581:5
1583:18 1584:10
1589:4,15 1593:7

**explained** 1338:14
1403:1 1478:14
1490:20 1599:1

**explaining** 1337:2

**explanation** 1337:5
1595:23 1596:6

**explicit** 1537:25

**explicitly** 1499:20

**explore** 1324:23

**express** 1609:19

**expressed** 1333:14

**expressing** 1333:15

**expression** 1365:16
1382:10,12 1551:7,8

**expressions** 1481:3

**extent** 1366:12 1376:15
1380:8 1393:12
1414:14 1439:20
1452:10 1454:7,11
1468:1 1582:14
1583:21 1604:9

**external** 1534:12

**externally** 1534:22

**extra** 1617:2

**extreme** 1298:3

**eyes** 1436:9

————————

**F**

————————

**fabrication** 1615:5

**face-to-face** 1589:14
1597:13

**Facebook** 1290:7,11
1291:3,18 1293:2
1324:4,16 1333:21,24
1334:2 1335:25 1342:7
1343:15 1347:7,10
1363:8 1449:10
1454:18,21,22 1456:2,

5,17 1466:17,25
1468:10 1477:3
1478:25 1485:7
1496:15,17 1500:8
1520:1 1521:21
1530:25 1531:5,7
1532:1,2 1533:4
1538:23 1544:16,17
1580:7 1581:2,6,7,21
1582:17 1584:12
1586:15,18,21 1588:24

**faces** 1317:21

**facility** 1484:19,20

**fact** 1288:7 1291:12
1292:6 1298:1 1303:18
1329:20 1330:4 1338:8
1340:23 1341:25
1349:22 1355:8
1367:18 1375:19
1376:15 1384:17
1400:1 1403:5 1414:17
1456:17 1460:14
1475:5 1479:8 1491:6
1495:16 1505:19
1521:22 1541:23
1542:10 1552:5
1569:15 1570:15
1583:23 1584:23
1585:1 1592:17,20
1593:13 1594:6 1600:8

**fact-finding** 1289:8,14
1304:23 1305:1 1321:4
1334:15 1337:23
1342:15 1343:12
1344:22 1355:17
1359:12 1365:9
1367:17 1383:3
1414:13,17,22,25
1415:11,16,22 1418:7
1419:9 1431:12
1454:16 1490:20
1497:7,22 1503:12,19
1507:3 1522:6,7
1589:1,9,10,19 1590:9,
12 1591:13 1592:6
1593:25 1594:21
1595:3,6 1597:20
1598:3,7,11 1599:15
1601:18

**factor** 1496:25 1497:8,
10

**facts** 1366:14 1390:12

**factual** 1424:8 1473:13

**factually** 1392:17

**failed** 1448:4 1494:13
1553:5

**failing** 1498:14

**fails** 1427:5 1492:25

**failure** 1393:9 1493:16
1497:19

**fair** 1304:21 1305:2,4,
11 1307:13,25 1310:13,
15 1311:14,17 1314:25
1322:4 1328:7 1329:25
1330:25 1332:1
1337:11,13 1342:8,16
1347:19 1348:2 1354:6
1355:10 1357:4 1358:2,
7,22 1359:5 1360:18
1366:25 1369:15,20
1379:12 1387:21
1388:8,24 1397:16
1399:14 1405:13
1406:1,8 1411:7 1421:3
1425:3,8 1430:1 1436:9
1441:9,25 1446:9
1448:1,14 1450:2
1455:16 1456:22,25
1457:6,8 1458:24
1460:9,21 1463:25
1599:6 1611:23 1615:2

**fairly** 1318:6 1417:6

**faith** 1365:16 1458:21
1485:22

**fall** 1314:18

**falls** 1459:11

**false** 1442:22,25
1443:1 1614:16

**familiar** 1360:3 1514:9,
23

**familiarize** 1546:20

**family** 1296:10,23
1300:17 1340:10
1406:4 1570:8,20
1587:7

**family-type** 1602:7

**fault** 1486:7

**favorably** 1458:19
1459:15 1495:13

**fear** 1553:19

**feared** 1553:16

**February** 1512:11
1525:9,12 1526:4
1559:7 1560:17

**federal** 1493:23

**feedback** 1359:14
1360:5,7,9,12

**feel** 1458:10 1464:17
1581:15 1599:6 1602:7

**feeling** 1404:18
1581:23

**feels** 1463:23 1579:3

**fees** 1500:10

**fell** 1410:20

**fellow** 1322:9,18,21
1326:2 1372:23
1422:14 1450:19
1486:22 1556:9 1601:7
1616:7

**felt** 1417:6 1458:8
1495:12 1520:19
1601:5

**female** 1361:6

**Ferguson** 1412:15

**fetus** 1385:2

**fetuses** 1340:15

**fetuses/babies**
1351:24

**fiduciary** 1414:4
1453:23 1462:6

**Fifty** 1585:12

**fight-and-flight**
1296:20 1298:2

**figure** 1417:9

**figured** 1357:6 1395:18

**file** 1293:10 1332:7
1450:1 1508:23 1523:4,
5 1619:15

**filed** 1371:24 1559:21

**filing** 1392:1

**filings** 1619:21,22

**finalized** 1591:8

**finally** 1397:18 1411:1
1492:19 1546:24

**find** 1290:18 1334:7
1359:23 1378:18
1433:10 1447:12
1463:12 1478:19
1506:9 1508:11 1547:2
1597:9

**finding** 1592:17,20
1593:13

**findings** 1442:18,19
1444:1 1448:13,18

**fine** 1335:8 1372:13
1391:11 1451:15,21
1452:1 1473:15 1495:2
1502:6 1508:15
1509:15 1510:14
1540:4 1556:20,21
1617:9

**finger** 1459:16

**finish** 1294:7 1324:9
1330:7 1337:4 1348:15
1363:3 1386:19 1431:3,
5,21,22 1439:7 1618:5,
7

**finished** 1326:14,22,24
1348:9,17 1386:19
1401:2 1453:21

**fire** 1479:9 1497:12

**fired** 1301:3 1306:22
1339:10 1370:20
1427:15 1456:16
1478:22,24 1479:4
1496:14,18 1497:13,17
1498:12 1499:17

**firing** 1335:2 1498:13

**fit** 1584:24

**Fitch** 1498:13

**fixated** 1509:25

**flash** 1306:4

**flesh** 1433:2

**flew** 1303:16 1527:3,6,
23 1575:3

**flies** 1545:17 1547:5

**flight** 1291:13 1310:12

1322:9 1326:2 1329:9
1333:7 1352:21
1353:17,18 1356:17,22
1357:3,7 1359:3,10
1364:11 1370:16
1387:7 1389:13 1390:9
1395:15,20,24 1435:3
1439:14 1482:24
1491:22 1512:15,16,18,
22 1513:10,14,20,21
1514:10 1517:24
1522:24 1523:5,14
1524:5 1527:12
1528:23 1529:19,21
1531:7,8 1532:3,24
1534:4 1536:1,3,4
1538:8 1542:11,15
1545:16 1546:25
1547:1,5,11 1552:22
1554:8,14,20 1559:3,4,
17 1560:10 1565:13
1573:22,25 1574:1,3,
12,14 1575:1,3,9
1580:24 1587:3
1590:10,24 1609:16,23

**flights** 1536:6

**flip** 1583:9 1594:10

**flipping** 1402:21

**floor** 1295:21

**flow** 1450:14

**flowery** 1566:12

**flown** 1330:4,14

**fly** 1302:13,20 1303:18
1330:2 1397:9 1410:3,
15,17,19 1501:12
1525:1,11,23 1529:9,
12,17 1536:1 1545:14,
22,25 1554:24 1565:8
1569:13

**flying** 1302:19 1329:25
1410:3,9 1411:10
1481:23 1524:22
1529:14,22 1530:2,4,7,
11,15,18 1545:19
1554:21

**focus** 1512:15

**focused** 1509:21
1553:21

**focusing** 1505:17,19

**folder** 1409:13,14

**Foley** 1430:14 1436:21
1437:11 1459:11
1615:13

**folks** 1563:3,5

**follow** 1340:21 1547:1
1604:17

**food** 1346:14

**foreclosed** 1610:21

**foremost** 1535:13,18

**forever** 1290:16 1566:6

**forget** 1339:16 1484:22

**forgive** 1417:3

**forgot** 1545:7

**form** 1602:13

**formal** 1617:23 1618:8,
16,22

**formulate** 1454:15

**Forty-four** 1523:24

**forward** 1334:24
1505:22 1518:25
1553:8 1554:2

**forwarded** 1517:10
1518:13,15,18 1521:7
1531:20 1577:4

**found** 1295:22 1334:25
1335:24 1343:8
1413:17 1455:20
1497:5 1503:22
1523:11 1536:3
1568:17 1588:23
1593:13

**foundation** 1294:1,10,
14 1313:13 1341:1
1392:20 1445:14,21
1564:20 1613:5

**fourth** 1429:23 1449:7

**fox** 1441:18

**frame** 1412:18 1580:18

**frames** 1562:25

**frankly** 1432:18
1490:18

**fraud** 1441:12,14

**fraudulent** 1443:24
1448:14,19

**free** 1293:1 1552:9
1571:15 1616:18

**freedom** 1295:1
1424:13 1470:15
1471:2 1616:19 1619:7

**frequently** 1481:21
1482:8

**Friday** 1289:3 1340:5
1347:24 1451:2 1503:1
1619:3

**friend** 1294:12 1302:24
1340:12 1421:15,18
1482:1 1587:6

**friends** 1435:1,5,6,9,11
1457:19 1458:14

**front** 1309:4 1310:22
1431:1 1445:18 1446:7,
18 1504:10 1593:24

**Frontier** 1301:10
1400:18

**Frye** 1452:22 1504:22
1511:5 1557:9,17
1573:5

**full** 1330:6 1397:19
1428:14 1475:12
1476:23 1558:9
1562:15

**full-time** 1304:7,10,14
1398:7

**fully** 1442:25

**funnier** 1619:2

**funny** 1354:19

**future** 1331:16 1433:17
1479:3,4,12

────────────

**G**

────────────

**gain** 1607:12

**gallery** 1435:18
1436:15 1440:11

**garage** 1303:1,2

**Garcia** 1341:20

**gate** 1387:12

**gather** 1439:15

**gathered** 1548:4

**gave** 1293:6 1310:16
1325:13 1407:15,18,24
1423:7,13 1426:2
1601:12

**gee** 1463:23

**general** 1355:8
1429:24 1449:7
1491:18

**generally** 1354:11
1355:10 1521:17
1534:7 1541:10 1552:6
1591:15 1613:25

**generated** 1566:23

**genitalia** 1361:6
1363:20

**gentleman** 1304:22

**gentlemen** 1288:25

**get all** 1325:22 1443:20

**Gilliam** 1287:9 1372:8
1373:16,17,20 1376:13
1378:8,14,17 1379:22
1380:18 1393:4 1496:5,
9 1500:20 1557:6
1610:20 1611:22

**girl** 1346:5

**give** 1294:24 1300:20
1325:16 1330:11
1383:20 1389:7,9
1393:25 1396:24,25
1401:14 1410:22,24
1416:10 1423:9
1425:24 1452:23
1460:17 1475:13
1476:13 1479:8
1486:19 1509:10,14
1523:15 1543:25
1557:9,25 1580:2
1589:14,16 1599:12
1619:7

**giving** 1305:11 1330:6
1338:19 1465:1 1537:2
1567:21 1579:21

**glad** 1363:12

**glasses** 1397:5

**goal** 1311:9

**good** 1288:25 1289:1,2
1293:9 1307:6,7
1322:13 1334:19
1402:21 1405:3,4
1413:13 1417:8
1418:24 1458:1 1467:1
1482:1 1509:21,25
1510:6,10 1551:23,24
1591:4

**goodness** 1561:25

**gosh** 1303:3 1431:9

**grabbing** 1362:7

**graciously** 1510:25
1618:25

**graduated** 1398:23

**Grant** 1518:18,23
1519:14 1521:11
1531:21

**granted** 1324:3,16
1378:23 1384:13

**graphic** 1564:12
1577:13 1578:6
1596:17 1601:1,16
1602:6

**gratuitously** 1432:4

**great** 1416:4 1427:20
1487:11 1570:4
1582:14 1583:21
1591:5 1601:2,9

**greatest** 1604:9

**GREEN** 1419:3

**Greenfield** 1287:15,21,
25 1295:7 1299:5
1301:17 1305:24
1327:17 1376:1 1377:3,
5,22 1378:18 1380:3
1381:1 1404:23 1405:2,
8 1414:20 1415:17
1416:20 1419:16
1420:12,19 1421:4
1424:22 1426:18
1427:10 1429:1
1432:22 1434:20,21,22
1435:19,24 1436:1,4,18
1437:7 1439:9 1440:2
1442:16 1443:17
1445:22 1449:5,6
1450:12,15 1453:4,8,9
1454:9 1455:10

1456:21 1462:24
1463:3,11,18 1464:1,4,
14 1465:3,7,14,18,24
1466:4,5 1467:19,23
1468:16 1469:4,14,18,
20,25 1470:6 1471:24
1472:3,23 1473:3,8,10
1479:22,23 1484:22
1494:21,25 1495:4
1523:23 1533:20
1536:15 1543:7 1546:6
1551:20,22,25 1553:3
1571:5,7,10 1592:10
1606:24 1607:2 1608:3,
5,8,25 1609:7,12,14
1610:7,10,11 1611:12
1612:8,22,23 1613:1,9
1614:20,22 1617:16,17

**Greenfield's** 1572:9

**Greg** 1430:21 1437:21

**grievance** 1337:9,21
1342:16 1559:19

**grievances** 1308:12
1559:21 1560:2

**grievant** 1329:9

**grieve** 1335:20

**gross** 1566:13 1570:10,
12

**grounds** 1299:4
1374:12

**group** 1334:13 1348:21
1409:20 1449:16
1459:24,25 1460:3,21
1512:15,16 1513:14
1517:23 1547:6 1551:4
1559:4,16 1564:9
1565:14 1577:9,10
1584:25 1602:11

**groups** 1560:7,8
1579:4

**growing** 1409:6

**guard** 1611:9

**guarding** 1441:19

**guess** 1328:10 1336:2
1338:7 1339:7 1360:2
1381:1 1386:23 1388:2
1463:24 1500:7
1519:10 1544:17
1565:20 1592:5,6

1617:10,20

**guidelines** 1540:12
1579:19,20 1599:21,22,
23

**Gutierrez** 1342:22
1343:1,15 1360:3
1361:18 1516:24
1517:4,12 1518:11
1519:24 1521:21
1531:20,23 1578:25
1585:6 1586:9 1590:2,6
1594:1,14,24 1599:17
1606:10 1617:12

**Gutierrez's** 1578:23

**guy** 1310:11

**guys** 1432:22 1435:11

───────────

**H**

**habits** 1601:9

**half** 1413:17 1529:25
1530:1 1581:22

**half-day** 1452:24

**hand** 1436:22,23
1438:2 1557:17 1611:7

**handbook** 1540:13,14

**handed** 1483:18
1484:8 1594:20

**handful** 1405:12

**handing** 1501:3

**handled** 1441:24
1442:15 1443:16

**handling** 1339:9

**hands** 1375:17

**handwritten** 1508:3

**handy** 1585:22

**hang** 1359:22 1479:16

**Hannah** 1303:12,15

**happen** 1400:10
1551:2

**happened** 1301:9
1303:4,22 1333:17
1334:21 1336:5
1388:17 1415:2

1456:15 1503:7
1527:21 1580:3,18,24
1581:17,18,20 1582:24
1589:15 1596:19

**happening** 1336:9

**happy** 1504:20 1506:13

**harassing** 1537:14,24
1584:4

**harassment** 1331:19
1358:2,22 1536:24
1537:3,4 1538:3,4
1552:9 1562:17
1571:16 1579:1
1584:22 1594:2
1599:19 1606:7

**harassment/sexual**
1599:19

**hard** 1456:14 1476:11,
12

**harder** 1618:7

**hardship** 1288:2

**harm** 1334:16 1462:7
1532:24 1533:1

**harmed** 1330:12
1430:23 1431:14
1435:7 1438:14,15
1441:7

**harming** 1292:16
1334:19 1370:19

**hat** 1322:22 1352:19
1361:22 1362:3,20
1363:17,20 1365:20
1368:1

**hateful** 1566:4

**hats** 1361:1,5,19
1362:5 1363:1,9,14
1364:17 1365:17
1367:19 1368:2,23
1537:16,25

**haul** 1502:7

**hazing** 1331:18
1344:14,15,17 1387:20
1503:9 1505:9 1514:5
1540:17 1541:5,12,24
1542:22 1544:10
1606:1

**head** 1438:5 1532:9

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                    Vol 5 July 11, 2022                Index: headed..Hudson

1613:22 1614:25

**headed** 1318:1

**headquarters** 1520:15
1521:2 1535:25

**heads-up** 1410:22

**health** 1300:17 1455:8
1460:4

**Healthcare** 1489:14

**hear** 1318:10 1377:12
1383:11 1424:1 1426:2
1481:1 1494:20,21,23
1496:2 1503:5 1507:23
1565:4 1584:14 1610:5,
9 1614:11 1617:10,13,
15,18,19

**heard** 1352:24 1365:4
1366:3 1377:12,13
1380:6 1383:10 1384:5
1400:19 1407:3 1411:9,
15 1412:17 1413:1
1418:1,15 1432:8
1480:20 1560:13
1599:4 1613:2 1615:14

**hearing** 1307:8,12,20,
23 1308:8,10,19
1310:8,14,17 1311:3,9
1312:11,22 1315:19
1316:3,22 1318:16
1319:24 1320:9,20
1321:6 1328:8,10,15
1350:3,7,16 1416:6
1417:15 1419:17,19
1420:22 1497:22
1506:15

**hears** 1611:21

**hearsay** 1297:21
1298:25 1299:6
1313:13 1343:19
1522:15

**heart** 1298:3 1352:5,6
1369:17

**heated** 1422:19
1426:23

**heavily** 1302:22

**heavy** 1406:13

**Heck** 1429:16

**held** 1299:21 1310:2
1319:18 1372:16

1394:7 1434:1 1464:10
1474:9 1513:21 1540:6
1550:13 1553:13
1590:9 1612:5 1617:8

**helped** 1352:17
1408:20

**helpful** 1481:5

**henhouse** 1441:19

**Hensley** 1302:25
1430:18 1437:17
1615:20

**Herb** 1587:15,21

**Herb's** 1587:17

**hey** 1300:19 1337:14
1341:3 1503:24
1611:17

**Hibbit's** 1611:2

**high** 1296:15 1374:19
1567:11,12,23

**higher** 1374:11

**highest** 1534:10
1569:3

**highlight** 1608:6

**highly** 1429:13 1505:24

**Hill** 1287:10 1302:5
1483:4,7 1516:11
1522:17 1523:22
1526:14,19 1533:17
1536:12,14 1539:1,11,
17 1540:22 1543:6
1548:23 1549:11
1551:11 1552:15
1555:12,14 1556:18

**hire** 1568:1

**historical** 1583:1,15
1599:24

**history** 1334:1 1341:9
1490:9 1548:14
1580:16,22,25 1581:7,
9,16,19 1583:22
1598:17 1599:12

**hit** 1401:2

**Hofer** 1430:21 1437:21

**hold** 1312:15 1317:23
1318:13 1320:6
1326:13 1336:20

1343:22 1349:19
1356:1 1358:12
1362:11 1363:3
1366:15 1370:13
1419:13 1428:20
1431:2,17 1439:6,23
1449:2 1467:17
1485:18 1522:15
1526:17 1561:20
1593:25 1614:9

**holder** 1440:17

**holding** 1616:13

**holds** 1444:21

**Holly** 1430:23 1437:23
1609:17 1610:25

**home** 1302:25 1303:15
1398:10 1401:7
1409:10 1528:12
1542:6,8,15

**homeschool** 1413:5

**homeschool-type**
1412:12

**homeschooled**
1398:21

**homeschooling**
1408:12,17,20,22
1409:9 1411:11

**honest** 1417:1

**honestly** 1360:23
1364:13 1373:17
1403:7,23 1443:4
1459:10 1463:4
1469:11

**Honor** 1287:25 1295:7,
8,14 1297:23 1301:18
1305:24 1307:3 1308:2,
22 1309:1,25 1313:12
1320:2 1327:9,17
1333:11 1335:4,11
1336:15 1337:1
1346:17 1348:8 1350:9
1353:9 1355:22 1366:5
1368:3 1369:11
1370:12 1371:1
1374:25 1376:1,11
1377:3,10,22 1378:18
1379:22 1381:1 1418:9
1419:10 1424:6
1433:11,23 1435:17
1436:2,10 1442:3

1450:8 1462:25
1465:15,24 1466:4
1467:11 1469:25
1471:24 1473:14
1474:16,25 1476:4
1480:4 1483:4 1485:21
1486:2,11 1487:7,18
1489:5 1491:9,14
1493:1 1494:17,25
1504:13,19 1505:2
1506:10,24 1508:20
1510:16 1531:14
1543:7 1548:25
1551:19 1564:20
1572:4,6,10 1576:18
1586:4 1588:10
1592:10,19 1593:8
1603:24 1608:13
1610:4,8,10,14,20
1611:13,22,23 1614:6
1616:3 1617:17

**hope** 1369:7 1372:7

**hoped** 1360:14

**hoping** 1360:12 1369:9
1595:20

**horribly** 1430:24

**horrific** 1351:18

**hospital** 1297:1,7,19

**host** 1327:10

**hot** 1360:15 1455:5

**hotel** 1297:18 1346:14
1350:5 1352:10
1542:13

**hour** 1450:22 1452:6

**hours** 1297:4 1388:7
1408:16 1524:22
1528:25

**house** 1303:5,7,8
1401:6

**Housekeeping**
1556:14

**hubs** 1513:10

**Hudson** 1501:19
1556:2,20,24 1557:7,
15,16,19 1558:11,12
1561:15 1565:10
1571:8

**huge** 1310:21 1345:23
1351:17 1376:21

**human** 1570:7 1579:7,
8 1590:3

**hundred** 1460:14

**hurt** 1357:12,13

**husband** 1295:22
1296:24 1297:6
1302:17 1303:8,15
1306:12,20 1398:8
1408:19 1410:12,21
1587:7

**husband's** 1400:17

**hypothetical** 1389:7,8
1390:1,11,15,20
1465:12,15

———————

**I**

**ID** 1532:12

**idea** 1396:4,5 1463:4

**ideal** 1618:23

**identified** 1493:5
1531:6 1532:2

**identifier** 1527:5

**identify** 1328:2
1459:17 1495:11
1565:6 1593:22

**ignore** 1326:3

**Ill** 1287:16

**ill** 1520:19

**illegal** 1292:2,3 1478:5,
11

**image** 1532:23,25
1533:1 1601:1

**images** 1369:1 1577:13
1578:6,8 1581:14
1584:1 1588:3 1592:22
1594:12 1595:24
1596:17 1597:4,6
1606:15

**imagine** 1578:9
1613:25

**immediately** 1559:2

**Imomovich** 1430:23
1437:23 1609:17,20
1610:2,13 1613:3

**Imomovich's** 1611:1

**impact** 1296:10
1300:16 1553:10
1566:10 1582:10
1600:8 1601:23 1602:3

**impacted** 1340:6
1410:8

**impactful** 1549:13

**impacting** 1411:8

**impacts** 1543:22

**impeach** 1355:25
1356:8

**impeachment** 1318:21
1355:23

**implement** 1411:25

**implemented** 1540:19

**implementing**
1398:25 1412:8

**implicate** 1542:8

**implicated** 1537:5
1538:15

**implicating** 1537:22

**implications** 1553:8

**important** 1347:1
1482:8 1531:9 1532:20
1569:10 1596:16,20

**impossible** 1449:25

**impression** 1299:8

**impressions** 1576:11

**improper** 1312:4
1317:8 1318:20,21
1355:22 1390:15,19
1436:16 1443:23
1580:9 1584:5 1608:16

**in-depth** 1377:23

**inaccurate** 1445:12

**inadmissible** 1392:21

**include** 1427:6
1475:16

**included** 1497:5

**including** 1330:23
1508:6 1514:3 1543:24
1544:7,12 1546:18
1554:18 1559:3,23

**income** 1402:17

**inconsistency**
1318:22 1319:6

**inconsistent** 1391:7
1392:17,19 1484:2

**incredible** 1318:10

**independent** 1544:14

**indicating** 1581:6
1582:24 1586:11

**indication** 1491:19
1493:8

**indicative** 1587:23

**individual** 1332:25
1495:11 1544:19

**individual's** 1571:1

**individuals** 1438:11
1440:4,5 1444:5
1447:21 1452:13
1459:3,14 1518:20
1571:2

**industry** 1587:22

**inept** 1585:2

**infer** 1492:15

**inference** 1490:10
1492:21

**inferential** 1489:12
1492:10

**influence** 1571:19
1603:1,3

**inform** 1289:14

**informal** 1287:2,20

**information** 1299:9
1313:2 1320:25
1321:14 1365:19
1374:8,15 1395:23
1433:17 1434:12
1439:15 1489:9
1490:24 1498:3 1548:4
1579:23 1592:24
1595:2 1597:11

1607:19

**informed** 1504:11
1605:13

**informing** 1289:4

**ingrained** 1569:12

**initial** 1587:15

**initially** 1570:14
1573:19 1586:10

**initials** 1527:5

**input** 1549:5

**inquire** 1380:9

**instance** 1291:2
1554:1 1571:18,23

**instances** 1379:3

**instant** 1484:2 1538:23

**instruct** 1451:14

**instructing** 1420:24
1493:19

**instruction** 1309:6
1378:24 1393:14
1400:23 1433:21
1611:17

**instructions** 1309:13
1372:22 1378:20,21
1450:18 1486:21
1556:8 1616:6

**insurance** 1475:22

**intend** 1502:18

**intended** 1538:1
1553:1

**intense** 1422:21,24

**intent** 1341:6

**intention** 1304:6
1393:8

**intentionally** 1375:12

**interacted** 1602:11
1603:13

**interactions** 1405:23

**interest** 1442:13

**interested** 1395:6
1525:5

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 361 of 383   PageID 15381
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                           Vol 5 July 11, 2022                    Index: interesting..jury

**interesting** 1477:5

**interfered** 1377:7

**internal** 1541:18,19 1567:24 1568:6

**international** 1314:10, 24 1315:6,10 1341:15 1466:20

**international's** 1325:20

**internet** 1541:19

**interpretations** 1458:25

**interpreted** 1560:12

**interrupted** 1337:3 1348:11

**interrupting** 1324:7 1326:10 1336:18 1368:8 1450:14

**Intervention** 1402:1,19 1411:21,24

**interview** 1301:6 1522:8 1581:10,13 1582:1,9

**interviews** 1374:5

**intimidating** 1537:14

**intranet** 1538:7 1540:15 1541:18 1545:9

**introduce** 1317:15 1502:18

**introduced** 1487:20 1507:15,16 1546:17

**investigate** 1518:5 1552:13 1553:5,9

**investigated** 1289:10 1442:20 1553:18

**investigating** 1552:21

**investigation** 1489:8, 11 1497:3 1515:16 1520:6 1521:14,18 1522:10,25 1523:4 1530:24 1535:10 1537:6 1542:20 1548:5 1553:15,21 1555:4 1571:20 1575:24 1576:3,12 1577:19,24

1578:24 1579:5 1581:3, 8,11 1586:19 1593:25 1598:16,20,25 1599:3,6 1600:4,9 1606:11 1607:6 1608:1 1615:7

**investigations** 1522:2, 4 1562:19

**investigator** 1577:11 1589:18

**investigators** 1517:14

**invite** 1477:1

**involve** 1487:25 1553:19 1579:4 1583:25

**involved** 1310:23 1321:4 1367:8 1376:6,8 1400:3 1403:9 1424:10 1474:20 1487:24 1490:7 1515:4,6 1520:5 1548:2 1549:8 1552:20 1575:24 1578:18 1599:5 1603:5

**involvement** 1521:14 1553:19,20 1563:12

**involves** 1612:12

**ipads** 1554:15

**irrelevance** 1435:18

**irrelevant** 1357:8 1549:12

**issue** 1287:22 1288:2 1299:2 1306:20 1320:7 1340:11 1345:24 1347:1,14 1349:20 1358:6 1370:12 1371:7, 19,22 1372:19 1373:14, 15 1376:4 1378:5,7,8,9, 16 1380:17 1388:8 1392:1,14,15,16 1398:5 1417:24 1437:2 1438:8 1451:23 1495:22 1502:22 1505:18 1506:23 1549:16 1601:19

**issued** 1547:4 1548:18 1549:7,17 1554:16 1565:16

**issues** 1293:15 1306:14,15 1309:4,7 1341:16 1358:7,21

1359:5 1371:21 1381:4 1383:7 1384:3 1392:11 1402:12,13 1417:25 1428:12,15,16 1486:15 1487:1 1550:25 1551:5 1572:15 1619:13

**issuing** 1565:19

**italicized** 1543:19

___

**J**

**jacket** 1566:12

**Jackson** 1333:9 1430:14 1431:16 1437:13 1440:11 1459:8 1613:12,16,17

**January** 1399:7 1519:18 1524:18,20 1525:2,21,22 1526:1 1546:14,16,23 1576:8

**Jeanna** 1333:9 1430:14 1431:16 1437:13 1440:10 1459:8 1613:12,16,17

**Jessica** 1361:10 1446:12 1447:5,7,12

**Jet** 1301:5 1400:18,19

**jetway** 1588:8

**Jim** 1314:6,7,9

**job** 1292:20,25 1296:22,25 1297:3,10 1298:12 1301:2 1306:12,22 1311:7,10 1315:20 1316:4,18 1329:12 1356:21 1357:2,5,12,13 1358:25 1399:16 1403:4,15 1404:5,19 1405:9 1416:3,4,19 1417:8 1418:24 1420:5 1436:25 1458:2 1476:22 1523:17,18 1529:19 1559:12 1584:24 1585:3 1587:18 1590:22 1591:5

**jobs** 1353:14 1359:6,7 1455:6,8 1460:4,5

**John** 1445:23 1447:18

**join** 1509:5

**Jones** 1342:21 1589:21 1590:17

**journey** 1411:5

**JS2** 1529:19

**Juan** 1405:20

**judge** 1372:7 1393:1,21 1494:5 1618:25 1619:3, 14,15,16

**judgment** 1487:15 1494:1

**July** 1529:7,8

**jumbotron** 1351:17

**jump** 1408:9,10

**June** 1528:19,20,21

**jurisdiction** 1494:10

**jurors** 1288:19 1372:23 1373:4 1382:1 1450:19, 24 1453:6 1486:22 1487:3 1510:20 1556:9, 13 1557:11 1616:7,12

**jury** 1288:16,18 1290:10 1292:1 1295:14 1304:3 1306:5 1308:8 1309:5,6,19,21 1311:23 1312:19 1313:18 1315:16 1323:2 1351:15 1362:15 1363:25 1376:10 1377:19 1380:6 1381:23 1383:5, 10 1384:14 1390:2 1392:14 1393:13 1396:13 1413:24 1421:25 1425:8 1428:13 1433:15 1434:3,16 1450:16 1452:17 1453:3,16 1459:13 1463:5 1481:12 1483:7,15 1486:5,7,10 1487:2 1488:10 1490:13 1492:10,15,23 1493:19 1504:10,18 1506:16 1507:23 1509:9 1510:14,18,19 1513:1 1516:15 1517:12,18 1521:17 1524:10

1525:5 1529:8 1531:18
1534:2 1536:21
1541:10 1543:13
1548:2 1552:12
1554:11 1557:5,14
1558:9 1559:9 1560:13
1565:6 1573:20
1576:17,23 1578:3
1581:5 1583:12,18
1584:10 1588:13
1589:5 1591:16
1592:15 1593:7
1600:21 1604:24
1608:21 1616:11
1617:25 1618:17
1619:6,12

**jury's** 1612:9

**justified** 1597:24

―――――――――――

**K**

**keeping** 1394:2

**Keith** 1444:14,15,17,18
1445:7 1447:15

**Kelleher** 1587:15,21

**Kent** 1436:22,23 1438:2

**kick** 1372:2

**Kim** 1302:25 1430:18
1437:17 1615:20,22,23

**kind** 1353:7 1354:19
1357:1,8 1360:21
1375:11 1387:25
1406:3 1410:20
1430:19 1438:7 1449:8
1453:12 1461:3
1469:13 1501:11
1502:1 1521:18 1524:9
1563:25 1574:5 1580:4
1583:9 1594:10

**kindness** 1601:11

**Kinkeade** 1618:25
1619:14

**knew** 1291:14 1297:2
1300:7 1303:14
1322:13 1327:19
1333:7,8 1334:17
1341:24 1346:9
1351:19 1357:18
1365:2 1403:23 1404:6

1406:4 1409:1 1419:2
1449:24 1458:16
1466:17 1498:3
1515:23 1562:4
1578:19 1599:4 1600:3

**knit** 1361:25

**knitted** 1365:17

**knowing** 1461:19
1462:3 1596:18,24
1617:8

**knowingly** 1498:8

**knowledge** 1440:3
1454:12 1456:13
1458:13 1489:6 1613:7

**Knowledge-wise**
1459:9

―――――――――――

**L**

**labeled** 1526:16

**labor** 1423:24 1424:4,9,
14,24 1453:22 1512:12,
13 1517:15,19,21
1518:22 1552:18,23
1559:3,7,10 1563:9
1565:11 1579:6,10,11,
18 1599:23

**lack** 1379:14 1564:20
1613:5

**lacks** 1377:17 1494:10

**ladies** 1288:25

**laid** 1294:10 1392:20
1408:24 1409:11
1425:2

**language** 1392:6
1503:14 1507:2 1541:9
1544:22

**lanyard** 1290:9

**laps** 1520:24

**laptops** 1554:15

**large** 1505:16

**Las** 1577:2,3

**last-chance** 1293:6,7
1294:18 1328:3,9
1329:22

**latched** 1497:6

**late** 1288:12

**latest** 1618:18

**launch** 1558:3

**law** 1487:9,15 1492:25
1493:23

**lawsuit** 1364:21
1434:8,14 1437:5
1468:19 1475:7
1515:21

**lawyer** 1309:11
1346:20 1463:7,16
1515:9

**lawyer's** 1511:11

**lawyers** 1452:11
1557:24

**lay** 1298:23 1373:16
1600:17

**laying** 1295:25

**lead** 1559:14,18

**leader** 1574:17

**leaders** 1375:15
1521:7,11 1531:20
1552:24 1603:8

**leadership** 1602:21

**leading** 1291:6 1292:9
1295:24 1298:14
1303:19 1474:24

**league** 1375:7

**leaning** 1451:9

**leap** 1492:10

**learn** 1599:17

**leave** 1287:22 1303:15,
22 1373:5 1387:13,14,
15 1450:25 1479:25
1528:3 1572:18
1616:18 1619:7

**led** 1389:22

**left** 1296:1 1399:7
1408:4 1420:2 1453:13
1524:13 1527:20
1528:11

**leg** 1416:17

**legal** 1366:13 1369:21,
22 1372:19 1373:8
1383:14 1389:14
1391:7 1393:10
1414:15 1418:20
1424:5 1426:14 1427:4
1454:8 1456:10 1468:2
1473:1,2,5 1480:19
1486:15,25 1552:15
1553:7,17,20 1554:1,3

**legally** 1480:16

**legitimate** 1358:23

**length** 1381:7 1502:1

**lesser** 1602:13

**letter** 1293:8,10
1328:18 1417:20,23
1604:17,19 1605:2,4,21

**letters** 1491:21 1527:8

**level** 1298:3 1314:12
1352:13,14 1375:7
1575:23 1602:4

**liaison** 1308:12 1314:8
1329:5 1336:16,25
1337:7 1559:25 1560:7

**lies** 1457:8

**life** 1296:7,8 1300:19
1346:4 1351:17 1455:3
1538:7 1540:15
1541:16,17 1545:9
1550:21 1551:4
1566:10 1568:18
1570:4 1591:21
1595:12 1604:4,8
1607:20

**lifelong** 1411:5

**lightning** 1287:7

**Lights** 1303:7

**limine** 1308:2 1335:4
1349:20 1370:12
1371:7,22 1372:5
1373:13,15,18 1375:9
1378:15,20,21 1381:11,
12 1431:23 1432:1,3,8,
20,24 1433:21 1451:22
1452:2,12 1549:7
1550:1 1610:21,24
1611:11

**limined** 1376:19

1611:5

limit 1422:17

limitations 1292:4,6

limited 1294:16 1296:6
1309:12 1614:1

limiting 1309:6,13

limits 1423:16 1550:9

lines 1330:10 1362:2
1602:15

link 1298:22 1301:8
1587:19

list 1293:22 1430:25
1431:10,12 1439:13
1458:7 1561:3 1585:17
1617:13

listed 1429:6 1505:6,7
1506:5 1508:16
1561:16

listen 1305:8 1590:5

listened 1310:21

lit 1303:1

literally 1463:14

live 1558:12 1619:4

lives 1596:19

LLC 1489:15

Local 1287:16 1314:11
1376:20 1407:4
1481:14 1491:22
1514:20 1516:6
1571:11 1578:20

located 1574:22

location 1513:12

locations 1512:5
1513:10 1535:25

long 1335:8 1371:22
1387:17 1429:7 1451:3
1470:12,23 1495:17
1512:7 1514:13
1558:18 1574:23
1619:8

longer 1421:12,16,18

looked 1308:9,10
1349:11 1362:25
1521:9 1599:9

loose 1556:17,19

lose 1404:19 1552:3,8
1571:15 1602:6,7

losing 1298:12 1306:12
1485:22

loss 1329:10

lost 1297:3 1306:17

lot 1352:23 1355:1
1408:17 1413:15
1417:22 1422:23
1429:20 1441:2
1442:23 1460:10
1566:20,21 1569:8,25
1593:14

Louis 1297:9 1398:21
1399:1,5,22 1402:9
1412:14

lounge 1547:12

lounges 1536:1

love 1316:1 1335:24
1357:12

loved 1296:24 1315:20,
24 1523:17

lower 1357:14

loyalists 1490:6

lunch 1450:9,11
1451:10,16 1453:13,15

Lyn 1421:15

Lynn 1485:10,15

M

made 1305:10 1310:20
1316:23 1317:6
1318:19 1319:9 1322:4
1324:12 1333:21
1336:6 1341:19
1347:11 1348:4,5
1360:17 1362:7
1370:18 1373:21
1380:10,14,20,23
1393:3 1408:5 1451:24
1482:9 1499:6 1508:1
1512:22 1545:8
1549:13 1575:25
1576:11 1581:15
1599:14,18 1600:25

main 1369:22 1606:21

make 1287:23 1288:1
1306:23 1311:4,5
1312:18 1317:21
1319:12 1323:17
1326:11 1340:21
1341:5 1356:22
1358:10 1371:19
1380:1 1382:24,25
1392:24 1393:16
1401:17 1403:3,25
1406:18 1442:9 1443:2
1451:22 1455:6 1467:7
1475:14 1484:3 1487:6,
8 1492:10 1498:9
1501:11 1502:12
1504:10 1514:2 1519:8
1547:17 1560:1 1563:2
1579:19 1582:7,8,22
1584:25 1594:1,3,15,19
1598:2 1599:20
1601:21 1603:12
1605:11 1607:9 1618:3

maker 1564:21

makes 1390:7 1487:14
1496:9 1502:2 1608:22
1617:7

making 1304:7
1374:10,16 1454:18
1466:24 1475:12
1483:1 1579:22
1599:23 1600:5 1603:6

malice 1493:22

man 1615:23

management 1485:8,
18 1499:12,13

manager 1512:12,13
1513:8,13 1518:24
1521:25 1552:19,23
1560:22 1573:22,24
1576:3 1577:2 1590:23
1603:14 1613:23

managers 1512:20
1513:7 1560:25 1574:8

mandatory 1546:22

manner 1292:25
1296:20 1356:3

manual 1534:5 1536:4
1538:9

march 1290:6 1307:12,
14 1325:13 1330:21
1340:14 1341:24
1342:13 1345:17,19
1346:11,16 1347:20
1348:1,22,24 1351:16,
21,23 1353:17 1354:1,
10,25 1355:8,20 1357:7
1358:22 1359:4,11
1363:10 1364:10,14
1365:11 1367:24
1369:2,5 1382:13,19
1383:18 1389:22
1395:10 1397:24
1447:9 1454:24 1455:1,
3 1456:18 1471:14
1488:2 1489:24 1491:9,
12,18 1492:11,16
1498:25 1499:2,3
1500:11,13 1519:18
1526:24 1527:4,21
1581:18,25 1582:4,6
1591:18 1595:21

marched 1340:18
1382:14 1395:15

marchers 1354:2

marching 1355:9,12
1356:19 1357:3 1359:4
1367:25 1382:13

marginal 1374:21

Maritime 1484:20

mark 1504:14,21

marriage 1306:13,15

mass 1556:15

Massoni 1287:18
1461:17

match 1475:21

materials 1374:14

Matt 1287:9,10

matter 1289:9 1291:12
1292:6 1340:23
1381:19 1400:1
1432:10 1487:9,15
1492:7,25 1503:20
1535:9 1552:1,5 1566:5
1567:25 1571:11

matters 1376:17

maureen 1501:10

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 364 of 383   PageID 15384

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                Index: Maureen's..messages

1511:2,7,21 1516:22
1560:14,24 1579:12
1586:10 1599:20

**Maureen's** 1562:24

**Mckeeby** 1287:12
1291:6 1292:9 1294:1,9
1295:6,24 1297:21
1298:14,21 1301:19
1303:19 1305:23
1307:2,3,5 1308:7
1310:5 1311:18 1312:1,
7,9 1313:8,21 1314:1,3,
21,22 1315:2,3,12,14
1316:6,10,14,19
1317:13,19 1318:1,4,7,
10,14,25 1319:5,8,22
1320:15,16 1321:5,21
1323:1 1324:22
1326:20 1327:2,7,18
1328:1 1330:13
1331:13,14 1333:11,13
1335:4,17 1336:23
1337:10 1338:16
1339:14 1342:14
1343:19,24 1344:1
1346:17,23 1348:9,16
1350:1,15 1351:12
1353:9,15 1354:16
1355:13,16,21 1356:5,
8,10 1357:14,16
1358:17 1360:1
1361:14,16 1362:9,12,
17 1363:23 1364:1,3
1366:5,7,19 1368:3,6,
10,15,19,20 1369:10,
12,24 1370:21,23
1374:23,25 1381:18
1382:4,5,6 1383:22
1384:10,12,16 1385:14
1386:3,6,17 1388:21
1389:6,24 1390:23,24
1391:2,14,20,24
1394:14,15,22,25
1395:2 1396:11,14,17,
18 1403:20 1404:1,21,
22 1408:4 1418:14
1432:13,17 1433:19
1474:24 1476:4
1479:18,20 1483:9
1487:7,12 1494:19
1501:6,7,10,15,21
1502:18,21 1503:3,6
1506:23 1507:1,8,11,18
1508:20 1509:2,6,12
1510:15,24 1511:2,19

1516:7,14,18 1522:19
1523:20 1524:3
1526:15,22 1530:19,21
1531:14,16 1533:10,11,
14 1534:1 1536:10,20
1537:18,19 1538:5,10,
24 1539:5,9,24 1540:9,
24 1541:2 1543:1,12
1545:20 1546:3,11
1547:14,16 1548:25
1549:4,24 1550:7,17
1551:18 1555:10,17,19
1556:1,2,14 1557:13,15
1558:5,6,8 1561:1,14,
23 1564:23 1565:5
1568:5 1571:4 1572:3,
10,21 1573:16 1576:14,
18,19 1580:13 1583:13,
14 1584:9,17,21
1585:10,13,21,25
1586:7 1588:9,15
1589:6,8 1591:24
1592:16,21,24 1593:5,
6,17 1594:9,18
1595:16,18 1604:5,20,
25 1605:1 1606:22
1610:8 1616:2 1617:1
1618:10

**Meaning** 1580:20

**means** 1329:12
1338:23 1361:22
1468:12 1474:13
1522:20 1524:11
1526:11 1527:24
1528:10 1529:19
1568:8 1572:11
1577:15 1580:1
1598:24,25 1604:7

**meant** 1296:22 1299:11
1320:5,24 1329:18,20
1370:19 1483:16
1584:10,22

**measurement** 1564:7

**media** 1321:18 1323:25
1326:7 1331:18 1344:8,
12 1370:6 1375:24
1378:2 1433:1 1484:24
1485:2 1497:13,18
1514:4 1518:3 1519:6
1532:21 1538:14
1542:16 1543:16
1544:2,24 1545:3,13,22
1546:13,17 1547:2

1554:18 1565:12,23
1566:5 1596:25 1597:3
1606:2

**medical** 1305:16
1475:22

**medication** 1300:13,
15

**meet** 1405:15 1480:18
1607:5

**meeting** 1289:8,14
1297:11 1304:23
1305:2 1313:6 1315:15
1320:25 1321:4,13,15
1323:22,23 1324:2
1328:13 1334:16
1337:24 1339:23
1342:15,17,18,20
1343:5,12,17 1344:3,6,
9,21,22 1359:12
1363:16 1365:10
1367:17 1383:3,4
1385:11 1388:14
1414:13,22,25 1415:11,
16,22 1416:22 1418:7
1419:9 1420:4,7
1422:21 1431:12
1461:12 1471:3,6,9,10,
21 1484:9 1485:13,19
1490:20 1497:7
1503:12,19 1507:3
1522:7 1583:2 1589:1,
9,10,13 1590:4,13
1591:13 1592:25
1594:1,3,21 1596:11,13
1597:13 1598:3,7,12
1607:7,8,17,24 1609:9

**meetings** 1383:6
1407:16 1422:19
1423:2,7,14 1471:5
1591:2

**meets** 1480:15

**Meggan** 1342:20
1589:21 1590:17
1591:3

**Melissa** 1314:9

**member** 1321:19
1340:10 1377:9 1381:5
1389:13,20 1390:6
1407:7 1422:5,6,12,14
1429:13 1440:15
1462:7 1469:15,17,21

1470:8 1477:16
1481:15 1485:19
1489:25 1514:17
1552:5 1575:8 1602:22

**members** 1322:14
1346:16 1447:1 1448:9
1459:21 1469:13
1546:18 1552:4
1570:22

**membership** 1325:18
1355:1 1407:16
1471:21 1485:13,19

**memo** 1565:10
1566:23,25 1593:13

**memorandum**
1565:20

**memorandums**
1545:14,22 1546:1
1547:4

**memory** 1417:3

**memos** 1545:15
1547:11

**men** 1348:21 1356:16,
22 1459:21

**mental** 1299:8

**mention** 1360:25

**mentioned** 1290:12
1310:6 1363:21 1427:6
1428:18 1450:5
1451:25 1483:13
1512:25 1532:17
1535:6 1537:15 1554:6
1574:11 1583:2
1590:17

**mentions** 1455:24

**merit** 1375:18

**message** 1324:19
1340:22 1352:7
1363:21 1382:9
1471:11 1477:3
1482:11 1484:2
1496:17 1516:24
1542:6 1595:13 1597:8

**messages** 1321:8
1342:7 1347:7 1388:7
1449:10 1456:2,5
1487:22,23 1496:15,18
1500:8 1538:21

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 365 of 383   PageID 15385
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                     Vol 5 July 11, 2022                  Index: messaging..night

1581:21 1582:17,21
1583:1,24 1584:12
1595:9 1597:22
1600:25

**messaging** 1538:23

**messed** 1403:24
1404:6

**messenger** 1334:4
1363:8 1388:18 1477:2

**met** 1310:7 1339:19
1405:17 1409:4
1447:14 1483:13
1493:16 1520:6
1603:11

**Michael** 1287:17
1461:17

**Michelle** 1459:11
1615:13

**Michi** 1430:13 1436:21
1437:11

**mid** 1307:12

**middle** 1506:9 1608:7

**middle-schoolers**
1413:18

**Mike** 1308:14 1310:6,9
1338:1,7,10,21 1339:7,
11 1403:7 1419:25
1430:21 1437:19
1459:9

**mild** 1298:9

**military** 1575:18,20

**million** 1300:22

**mind** 1453:12

**mine** 1302:24 1421:15

**minor** 1494:11 1605:10

**minute** 1334:22
1364:22 1396:10
1452:17 1591:10

**minutes** 1325:19
1372:3,10 1373:2
1387:11,15 1556:12
1557:1 1619:9

**miscarriage** 1345:6

**mischaracterizes**
1320:8 1358:8 1386:1

1388:9 1427:5 1436:11
1465:1

**mischaracterizing**
1448:25

**missed** 1329:21 1500:5
1547:3

**missing** 1427:11
1463:20

**mission** 1514:5
1532:22 1534:6,7,9
1535:22,23 1568:23
1569:1,8,9

**Missouri** 1297:9

**misspoke** 1525:13

**mistaken** 1343:9
1361:4 1588:17

**misunderstood**
1335:12,14

**mixed** 1398:15

**moment** 1295:7
1324:21 1332:6
1368:22 1394:5 1414:9
1516:20 1586:3 1592:3
1594:8

**Monday** 1409:13

**money** 1289:23
1300:18,20 1323:9
1324:3,15 1346:13
1353:7 1354:25
1356:22 1400:2
1402:16 1429:9
1471:13,15 1476:2,23
1488:1 1489:25

**monitor** 1544:14,17

**monitoring** 1544:21

**Montessori** 1409:6

**Montgomery** 1421:15,
22 1485:15

**month** 1330:11
1475:13 1524:12
1525:2,12,23 1526:6,12
1527:2 1528:8 1529:9,
12,16,17,25 1530:1,4,7,
14 1574:25

**month's** 1529:22

**monthly** 1551:3

**months** 1290:12
1293:10,11 1332:7,18,
21 1418:2 1514:14
1523:6 1580:6,14,16,
19,20

**morning** 1288:25
1289:1,2 1307:6,7
1371:18 1372:2,19
1518:15 1616:10
1619:25

**Morris** 1287:13
1462:22

**motion** 1326:12
1432:20,24 1452:12
1487:6,8,14,16 1493:25
1494:21,23 1495:6
1496:13 1500:18
1549:7 1550:1 1619:15

**motions** 1496:3
1500:23 1501:1

**motivated** 1488:7
1496:25

**motivating** 1496:25

**motivation** 1347:23

**motive** 1489:4,17

**mouth** 1466:14

**move** 1295:3 1301:13
1313:8,22 1318:12
1326:20 1327:8
1343:19 1378:12
1381:19 1384:12
1391:2 1396:8 1411:13
1420:14 1436:1
1465:25 1470:1
1506:10 1510:13
1516:8 1523:21
1533:14,15 1543:3
1565:1 1585:13

**moved** 1302:17,18
1378:11,17 1379:22

**movement** 1599:2

**moves** 1536:11 1546:3
1592:1

**moving** 1378:13
1497:19

**MRI** 1297:20

**MSY** 1528:13,16

**multiple** 1421:12
1512:5 1514:5 1532:13
1535:23 1537:9
1548:13

**music** 1394:3

**muted** 1311:23

---

**N**

**named** 1314:6 1444:15
1609:17

**names** 1431:1,9 1432:3
1438:5 1439:13 1447:2,
4

**naomi** 1557:15,19
1558:11 1561:15
1565:10

**national** 1341:1
1575:16

**nature** 1320:7 1434:14
1537:11 1544:24
1601:16

**Navy** 1575:22

**NDA** 1293:12

**neck** 1483:10 1532:13

**needed** 1466:13
1498:12 1561:19

**negative** 1491:6
1569:21 1570:16

**negotiate** 1499:13,15

**negotiating** 1481:15
1559:18

**negotiator** 1559:15

**NEVARES** 1481:10

**Nevarez** 1429:18
1480:5

**news** 1402:22

**nexus** 1290:8,18
1291:3 1531:10
1532:16 1586:11,13
1587:2

**nice** 1310:11

**night** 1302:25 1313:11
1371:20 1373:21
1392:25 1393:15,20

1408:24

**Ninety-four** 1583:11

**no-go** 1401:11

**non-christian** 1495:12
1499:23

**non-christians**
1457:14 1458:18
1491:6 1499:25

**non-disclosure**
1293:13

**non-member** 1376:22

**non-responsive**
1317:3 1326:21,25
1346:17 1362:9 1368:3,
13 1384:10 1420:18
1465:14 1469:19
1470:1

**non-responsiveness**
1420:14

**non-verbal** 1481:3

**nonetheless** 1407:24
1584:4 1608:25

**noon** 1618:17,19

**north** 1412:14

**not-for-profit** 1399:17,
19 1402:3

**notable** 1496:11

**note** 1452:5 1590:21,25

**notes** 1308:16 1318:16
1319:16 1355:17,23
1356:4,6 1357:18
1359:19 1416:18
1420:1 1454:16 1497:3
1500:6 1508:3,6,11
1522:6,8 1591:3,4,6,7
1592:6,17,20 1594:2,6
1613:14 1619:12

**notice** 1510:3 1546:21
1554:15,16

**notified** 1515:15
1519:6

**notion** 1357:3 1375:23
1488:21 1489:20
1490:8 1602:25

**November** 1530:13,15

**number** 1311:1
1327:15 1339:7,11
1394:25 1441:6 1510:2
1524:15 1528:24
1563:24 1592:4

—————————

**O**

**oath** 1308:19 1420:25
1462:7 1480:17 1511:6
1557:9 1573:4,6

**object** 1291:6 1308:2
1312:4 1313:12 1316:5,
13,17 1317:8,16
1318:20 1324:7
1326:10 1330:5 1337:1
1338:13,25 1342:10
1343:20 1349:17
1351:10 1353:2
1354:12 1355:22
1358:8 1366:12 1368:8
1369:21 1370:11
1383:14 1384:10
1385:5 1386:1 1388:9
1389:4,14 1390:11,19
1391:4 1393:15
1403:18 1414:14
1415:13 1416:8 1418:9,
19 1420:13,23,24
1424:5 1426:14 1427:4
1428:17 1436:10
1439:20 1442:3
1445:14 1448:23
1454:7,25 1464:25
1465:14 1467:11
1468:1 1469:2 1472:17
1476:4 1508:24,25
1509:1 1561:4 1564:19
1580:9 1584:5 1604:1
1607:21 1613:5

**objected** 1332:8
1354:1 1355:7 1361:1
1393:20,24 1429:13
1447:7 1464:7 1508:22

**objecting** 1381:16
1383:18 1429:8

**objection** 1292:9,19
1294:1 1295:5,6,8,24
1297:21 1298:14,20,21
1299:6,24 1301:19
1303:19 1305:21,23
1308:4,6 1313:13
1320:3 1322:19

1327:11,17,20 1336:15
1349:19 1350:14
1355:11 1358:13
1362:9,14 1370:8
1371:14 1376:2 1382:3
1386:9 1390:17
1392:24 1393:7
1394:19 1404:3 1416:8,
11 1419:14 1428:21
1433:23 1435:17,22
1443:9 1445:21 1449:3
1452:5 1456:10
1462:22 1465:25
1467:18 1469:18,25
1474:24 1488:15
1503:5 1509:4 1511:14
1522:16 1523:22,23
1526:14,18 1533:17,20
1536:12,13,14,15
1539:1,11 1540:22
1543:4,6,7 1546:5,6
1548:23 1550:10
1551:11 1552:15
1556:18 1558:2
1580:11 1586:2 1592:2,
6,9 1593:11,12,15
1608:23 1609:4
1610:19

**objections** 1301:15
1313:10,17 1327:10,14
1354:14 1366:16
1371:11 1373:21
1381:17,24 1391:3
1394:10 1469:3 1473:2
1516:9,11 1556:16
1573:12 1617:19
1619:23

**objective** 1316:3

**objector** 1321:18
1324:1 1352:16
1371:24 1376:22
1388:13 1390:7 1403:3,
17 1407:8,12,15
1425:10 1426:8,25
1428:7 1430:3,16,19,23
1438:21 1440:12,14
1454:25 1455:11
1458:6 1462:8,10,16
1470:9,18 1489:22
1500:10 1603:1

**objectors** 1375:14,16
1425:11 1430:6 1438:9,
19,25 1439:11 1440:5,8
1458:8

**objectors'** 1458:20

**obligation** 1470:16
1498:9

**observance** 1497:25

**observed** 1484:8

**obstinate** 1463:4
1464:15

**occasion** 1563:19

**occasions** 1383:8

**occur** 1471:20

**occurred** 1328:16
1613:20

**occurs** 1381:3

**October** 1530:6
1565:16

**odd** 1297:16

**off-the-record**
1287:20

**offensive** 1482:16
1533:5 1537:11

**offer** 1290:23 1291:2,10
1300:18 1305:15
1377:19 1402:24
1403:4

**offered** 1292:20,25
1299:15 1300:22
1403:15 1404:4

**offering** 1305:19
1317:17

**offerings** 1485:23

**office** 1317:1 1326:6
1442:11 1520:13
1542:12 1574:19
1585:1 1587:1

**OFFICER** 1288:17
1373:11 1452:20
1509:16,18 1557:3
1620:2

**offices** 1407:19

**official** 1499:16

**officials** 1315:8

**ojbect** 1393:1

**older** 1302:20 1503:24

1541:4,6,7 1546:13,15
1619:1

**one-day** 1527:23
1528:2

**one-hour** 1450:11
1451:10,15

**ongoing** 1288:7

**online** 1301:8 1339:10

**open** 1299:21 1303:1,2
1310:2 1319:18
1359:16 1369:7
1372:16 1394:7 1434:1
1464:10 1470:15
1474:9 1540:6 1550:13
1595:24 1612:5

**open-ended** 1335:13

**opened** 1380:6

**opening** 1291:23
1292:23

**operation** 1560:5
1573:25 1574:9,22

**operations** 1574:12

**opinion** 1298:16
1482:25 1564:14,16,17,
18

**opportunity** 1307:23
1325:14,16 1405:15
1410:24 1506:5
1590:11 1611:3

**oppose** 1428:11
1500:17

**opposed** 1292:8
1444:15 1445:7,24
1446:2,13 1447:22
1448:9 1490:21

**opposing** 1427:1
1444:11 1448:7

**opposition** 1491:11
1602:20

**optimal** 1614:14

**optional** 1526:15
1614:6

**orange** 1566:11

**order** 1501:25 1547:1
1554:24 1608:23

**ordinarily** 1499:13

**ordinary** 1376:23

**organization** 1534:21

**organizations**
1570:23

**original** 1344:10
1524:20 1525:9
1576:24

**Originally** 1516:25

**originate** 1513:11

**originated** 1531:19

**Orleans** 1528:15,17,18

**outlined** 1563:1

**outlines** 1537:1
1543:17

**outrageous** 1570:20

**outweigh** 1374:13

**outweighs** 1374:20

**overcome** 1508:12

**overly** 1377:17 1379:16

**overnight** 1451:6
1452:8 1616:14
1617:24

**overnighted** 1528:14

**overrule** 1288:14
1313:17 1327:14
1343:23 1349:22
1358:14 1370:14
1394:9 1416:12
1418:22 1443:10
1452:5 1495:24
1522:18 1526:20
1533:21 1550:10

**Overruled** 1351:11
1386:10 1389:5
1552:17 1603:25
1604:3

**overruling** 1309:22
1381:17,20 1445:20

**oversaw** 1518:3
1559:19 1560:4

**oversee** 1573:25
1574:3

**overseeing** 1513:14

**oversight** 1514:1

**oxygen** 1296:17

───────────

**P**

**p.m.** 1620:3

**PA** 1451:4

**package** 1328:19

**packet** 1311:12 1312:3,
10,14 1333:20,22,25

**packets** 1313:3,4

**pages** 1312:15,17
1402:21 1524:9
1544:17

**paid** 1321:20 1325:13
1407:10 1469:16

**paper** 1547:10

**paperwork** 1445:18
1446:7

**paragraph** 1517:3
1534:11,13,16 1543:19
1568:21 1569:20

**parcel** 1489:10

**Parenthood** 1340:18
1345:18 1348:2,23
1355:12 1357:19
1456:19

**parents** 1579:8

**Parker** 1308:11 1329:1,
2 1337:16,18 1339:5
1361:10 1416:15,22
1420:1,3 1446:12
1447:5,7,13

**Parnell** 1430:15
1437:15 1615:18

**part** 1310:23 1312:2
1331:13 1357:8
1364:14 1367:5 1368:1
1373:20 1410:19
1432:24 1434:4 1437:5
1447:5 1458:6 1465:4
1474:21 1475:6,7
1480:23 1488:19
1489:8,10 1504:16,17,
18 1505:16 1510:7

1519:19 1532:21
1534:15 1549:6
1576:22 1601:12
1612:12

**part-time** 1401:5

**partially** 1442:25
1443:1

**participants** 1591:18

**participated** 1489:23
1491:17 1492:11
1499:1,3 1500:14
1519:18

**participating** 1492:16

**participation** 1488:1

**parties** 1379:17

**partly** 1399:1,22

**partner** 1297:13
1399:21 1579:7 1590:4

**partnering** 1399:4

**partners** 1402:7

**party** 1379:18 1486:14

**pass** 1296:18 1305:14
1307:1 1404:21 1472:1
1479:17 1510:22
1551:18 1555:10
1571:4 1572:3 1606:22
1616:2

**passed** 1330:24 1566:7

**passionate** 1406:16

**past** 1333:17,21
1334:21 1335:20
1336:6 1340:8 1342:6
1479:2 1490:9 1510:10
1526:15 1580:22,24
1581:17,20,22 1582:25

**pathway** 1547:1

**Paulo** 1287:12

**pause** 1335:15

**pay** 1329:16 1352:17
1353:13 1356:19
1357:4 1358:3,7,10,23
1374:3,4,6 1397:15
1398:3 1462:8 1475:14,
21 1526:11 1527:7
1528:3,4

**paying** 1400:5 1401:23 1568:10 1569:11

**payment** 1329:21

**people** 1292:17 1334:14,19 1351:19 1352:7 1357:12 1404:16 1410:17 1424:1 1426:21 1431:13,24 1433:9 1435:7,14 1436:20 1441:20 1442:10 1443:12,14 1458:25 1459:7,10 1460:10,16, 21 1519:12 1553:12 1560:5 1563:5 1566:15, 22 1567:6,16,19,20 1569:25 1570:1,5,19 1597:1,2 1614:3

**people's** 1457:18

**perceived** 1537:12

**percent** 1420:6 1460:14 1600:15

**perfect** 1410:18 1427:20 1567:7

**period** 1332:8 1336:3 1380:10 1401:1 1440:13 1460:6 1469:13 1512:7 1514:13 1560:21 1575:5

**peripheral** 1606:20

**permission** 1395:17

**person** 1291:15 1319:14 1337:13 1341:25 1342:5 1343:1 1346:12 1347:4,5,6,15, 17 1360:12 1370:15 1389:17 1435:13 1461:17 1529:23 1548:19 1562:8 1586:15,16 1587:21 1589:11 1590:2,7 1600:5

**person's** 1580:16

**personal** 1340:5 1347:10,12 1352:13 1404:18 1406:15,21 1443:25 1444:2,23 1454:22 1456:6,13 1468:10 1478:25

**picked** 1338:21

**picture** 1367:7,13 1613:21 1614:24

**pictures** 1290:15,18,19 1351:18 1363:8 1364:16 1365:15 1395:13 1492:15 1609:23

**Pilates** 1400:23 1401:3, 6

**pilot** 1410:13

**pilots** 1353:18

**pink** 1352:19 1361:1,5 1363:1 1364:17 1367:19

**place** 1420:9 1539:20 1540:20 1569:17 1573:2

**places** 1402:9 1534:14 1535:24

**plaintiff** 1287:10 1288:14 1405:25 1503:23 1507:5 1514:23

**plaintiff's** 1507:16

**plan** 1555:25 1556:2 1617:11,16

**plane** 1387:9,15,21 1542:7,13

**Planned** 1340:18 1345:18 1348:2,23 1355:12 1357:19 1456:19

**play** 1481:7 1484:4 1618:9

**played** 1351:3 1480:17 1481:8

**playing** 1351:15

**plead** 1420:5

**pleading** 1416:19 1420:6

**plenty** 1425:5 1427:21 1500:24

**plethora** 1358:1 1429:24

**personally** 1338:10 1430:10,12 1582:11 1585:2 1586:22 1596:19 1607:20

**personnel** 1372:24 1450:19 1486:23 1556:9 1616:7

**perspective** 1340:16 1547:25 1550:2

**perspectives** 1549:8

**pertained** 1470:13

**pertaining** 1288:3 1449:9 1468:25 1554:8

**pertinent** 1534:16,24 1550:25

**petition** 1425:20 1440:17 1441:10 1442:5 1446:25 1448:2, 11

**philosophy** 1568:15

**Phoenix** 1576:10 1603:15

**phone** 1297:8 1338:21 1341:19 1343:2,3 1461:18 1483:18 1484:6 1590:4,6,8 1605:13 1619:11

**photo** 1369:6 1382:15 1532:11

**photograph** 1367:5 1382:10 1587:14

**photos** 1364:25 1532:9,14 1591:20

**phrase** 1532:16

**phrased** 1432:19,21

**physical** 1370:19

**physically** 1520:21 1542:18

**physiology** 1298:6

**pick** 1453:12

**plural** 1508:22

**podium** 1487:10 1495:1 1496:6 1502:6 1556:24

**point** 1288:9 1296:6 1303:18,21 1325:14 1330:15 1335:5 1337:12 1339:10 1341:5 1353:12 1360:14 1361:25 1369:22 1375:16 1376:2,15 1378:15 1380:15 1381:12 1392:22 1393:18 1395:1 1403:12 1404:13 1405:13 1410:8 1415:4 1419:15 1426:1 1427:17 1431:14,24 1434:15 1440:9 1459:13,16 1462:16 1463:13 1464:18 1474:15 1478:22 1483:21 1487:6 1490:5 1491:8 1496:11 1497:15,16 1500:22 1505:25 1508:20,25 1510:6 1577:17,22,24 1595:14 1607:8 1608:1 1611:11 1614:8,15 1618:10,12 1619:10

**pointed** 1362:1 1606:4

**pointing** 1568:24

**points** 1472:24,25

**policies** 1323:18 1331:16 1332:1 1334:23 1344:19,20 1384:18,21 1385:2,4, 13,23 1386:11,12,15, 20,22,23,24 1390:10 1478:20 1497:14,18 1499:10 1512:19 1513:18,23,25 1514:6,7 1518:4 1533:8 1548:13 1553:2,23 1554:6,9,13, 18,21 1566:15 1568:17, 19 1600:13 1605:23,24

**policing** 1503:10

**policy** 1321:18 1323:25 1331:18,20 1335:23 1344:8,14,15 1370:6 1375:2,24 1378:3

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 369 of 383   PageID 15389

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022          Index: political..problems

1387:20 1484:24
1485:2 1493:9,10,11
1503:10,11,18 1504:4,9
1505:9,18,21,23,24
1506:4 1507:2,5,9,12,
20,22,24 1508:8,9,12,
17 1510:4 1514:4,5
1518:3 1532:21
1536:23 1537:5,23
1538:4,8 1539:20,21,23
1540:11,13,17,18,19
1541:5,9,11,15,24
1542:8,23,25 1543:16,
23 1544:4,10,11
1545:7,11,13,22
1546:13,17,21,22
1547:2 1554:18,19,22
1555:1 1565:12
1566:16 1568:14
1594:2 1599:19 1606:1,
2,6

political 1348:22
1407:19 1429:10
1455:5 1460:1 1461:1
1492:8

politics 1492:8

Pollyanna 1565:25

poorer 1399:2

poorly 1543:21

popular 1587:21

portion 1355:19
1368:17 1386:7
1475:22 1493:24
1540:11 1584:19
1608:7

position 1323:19
1324:24 1327:4 1354:3
1359:15 1364:23
1365:14 1366:9,14,23
1367:2,14 1382:17
1385:17,24 1389:11
1411:17 1444:20
1472:22 1481:13
1505:12 1512:10
1527:13 1559:1,6
1562:24 1570:3 1576:3
1590:20

possibility 1618:14

possibly 1495:19
1587:7 1601:15

post 1291:4,18 1324:18
1336:6 1455:21 1485:7,
9 1570:19 1615:4

post-certification
1494:11

posted 1334:6 1479:3
1485:10,12 1492:2
1496:16 1535:23,24
1566:5

posting 1345:3 1347:9
1478:24

posts 1290:7,11,15
1291:3 1333:21
1449:18 1454:19
1455:25 1456:1 1479:2,
3 1499:7,11 1520:1
1531:22,24 1533:6
1544:16 1580:7 1581:2,
6 1586:24 1587:2
1588:23 1600:25
1601:22

posttraumatic
1298:11 1300:9

potential 1519:6
1544:10,12 1553:17
1562:17,21

potentially 1537:22

practice 1523:3

practices 1498:1

prayer 1551:4

praying 1295:22

prays 1551:4

precise 1612:24

precisely 1351:6

preclusive 1494:3
1495:7

predicate 1295:25
1312:8 1317:24 1318:2,
8 1600:17

preemie 1345:6

preference 1603:8

preferences 1397:13

preferentially 1491:5

prejudice 1288:5,9
1313:14 1374:13,19

1381:9 1509:21 1510:1
1604:2

prejudicial 1377:17
1379:16 1505:13,24
1506:9 1508:19

prep 1619:14

preparation 1419:24

prepared 1311:12
1416:16

preparing 1297:12

prerequisite 1391:21,
25

present 1611:3

presentation 1488:20
1493:25

presented 1313:1
1403:6 1432:25 1494:4

presenting 1310:23

president 1290:5
1291:17 1314:10
1317:3 1321:1,24
1322:12,22 1323:4,9,
16,21 1342:2,13
1345:16 1346:12
1347:20 1353:6,23
1362:6 1367:7 1369:4,
19 1376:21 1377:9
1384:23 1385:20
1386:25 1387:23
1388:8,17 1389:19
1407:5 1417:10
1421:10,11,14,16,22,24
1422:1,8 1423:10,17
1455:18 1457:2
1461:14,19 1462:5
1465:13 1466:10
1467:8 1470:16 1471:1,
8,12 1481:17 1482:21,
22,24 1483:2 1485:15
1498:20 1499:9 1516:5
1535:6 1552:10
1571:14 1578:20
1600:6 1601:5

presidents 1421:12

pressure 1296:15
1298:3 1300:14,15
1555:4,8 1571:24

pretty 1302:22 1317:3
1343:13 1353:20

1395:19 1401:11
1406:7,13 1408:23
1409:22 1412:8
1422:21,24 1440:8
1467:1 1470:7 1489:2
1520:25 1563:25

prevented 1375:24

previous 1380:12,13
1507:22 1523:6,12
1544:9 1582:17

previously 1328:8
1368:22 1468:3
1558:16

print 1477:20 1617:24

printouts 1477:21

prior 1328:16 1329:21
1330:7 1336:6 1380:24
1381:13 1387:12
1392:23 1440:14
1480:16 1505:10
1508:23 1515:16
1520:5 1545:18
1552:18 1558:23
1559:2 1562:5 1575:14,
15 1576:2,12 1578:18
1583:24 1598:19
1599:2 1609:6

private 1324:19 1336:1
1429:12 1471:11
1494:6 1566:6 1570:14,
16

privately 1496:15

pro 1351:17 1374:6
1455:2 1491:25
1492:17 1550:20
1551:4 1591:21
1595:12,14 1604:4
1607:20 1608:2

pro-choice 1354:3
1355:7

pro-life 1347:13

probation 1417:20,23

problem 1299:16
1372:14 1450:15
1493:2 1508:17

problematic 1433:10

problems 1306:21
1354:9

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 370 of 383   PageID 15390
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                                    Vol 5 July 11, 2022                    Index: procedural..pulled

**procedural** 1381:18

**procedure** 1540:13

**procedures** 1331:16 1478:21

**proceed** 1310:4 1434:20 1511:17 1540:8 1558:5 1593:2, 16 1611:21

**proceeding** 1461:25

**proceedings** 1298:18 1299:21 1308:24 1310:2 1319:3,18 1371:4 1372:16 1391:18 1394:7 1398:17 1431:19 1434:1 1463:1 1464:10 1472:8 1474:9 1539:14 1540:6 1549:1 1550:13 1610:17 1612:5 1620:3

**process** 1309:3 1342:16 1408:22 1416:24 1474:19 1515:16 1549:9 1559:19 1563:12 1579:21,24 1596:24

**product** 1409:5

**professional** 1348:20

**professionally** 1560:16

**profit** 1475:20 1476:19

**program** 1398:24 1399:4 1410:25

**progressively** 1581:23

**prohibited** 1544:1,21

**project** 1352:20 1365:20 1398:18 1399:6,9,25 1400:2,3 1401:25 1402:1,8 1411:15

**projected** 1524:23 1526:11

**projects** 1532:24

**promise** 1406:18 1618:19

**promote** 1570:5

**prompt** 1432:19

**promptly** 1545:1

**proof** 1488:13 1492:6

**proofread** 1605:11

**proper** 1380:9 1503:5

**properly** 1392:2 1415:10 1513:3 1514:3

**proponent** 1602:8

**propose** 1560:11

**proposition** 1489:16

**protect** 1470:17,18 1498:22 1604:9

**protected** 1334:11,12 1424:16 1487:19 1488:3,17 1489:1,4,18 1493:22 1496:17,22,24 1497:12 1498:6 1518:7 1579:2 1598:4

**protecting** 1474:21

**protection** 1475:5 1478:12 1497:15,16 1552:6

**protections** 1497:17 1600:13

**protects** 1334:22 1424:24,25

**proud** 1491:25 1570:2

**proudly** 1405:11

**prove** 1456:15

**prove-up** 1299:17

**proven** 1472:24,25

**provide** 1432:19 1461:6 1462:21 1463:2 1467:7 1534:17 1535:19 1591:12

**provided** 1296:23 1312:11 1333:19,22 1334:1 1416:7 1439:18 1463:16 1464:21 1467:25 1489:9 1503:17 1534:20 1594:25

**provisions** 1559:23

**provoke** 1349:1

**proximity** 1489:16 1490:16,23

**Pryor** 1287:5,9 1288:21,24 1291:9 1292:11 1294:4,6,15 1295:3,13,16,17,25 1296:3 1297:22 1298:10 1299:10,19 1300:1 1301:13,24 1302:1,4,6,8 1303:24 1305:14,20 1306:6 1307:1 1308:2,4,22 1309:1,11,21,25 1311:22 1312:4 1313:12 1316:5,13,17 1317:8,12,16,21 1318:5,11,20 1319:11, 15 1320:2,7 1322:19 1324:7,11 1326:10,22 1327:9 1330:5 1331:10 1332:6 1335:11 1336:15,17 1337:1 1338:13,25 1342:10 1343:20 1348:8,11 1349:17,20 1350:9,12 1351:10 1353:2 1354:12 1355:22 1358:8 1359:22 1362:10 1366:12 1368:8 1369:21 1370:8, 11 1371:1,12,17,21 1372:7,11 1377:20 1378:5,7 1380:17 1383:14 1385:5 1386:1, 9 1388:9 1389:4,14 1390:11,15,19 1391:4, 11 1392:10 1393:1,17, 25 1394:18,21 1398:6 1403:18 1414:14 1415:13 1416:8 1418:9, 19 1419:10,20 1420:23 1424:5 1426:14 1427:4 1428:17,22 1431:3,7 1432:2,6,12,14 1433:11,23 1435:17,21 1436:10,14 1439:20 1442:3 1443:5 1445:14 1448:23 1451:14,21 1454:7 1456:10 1463:8, 22 1464:3,4,7,25 1467:11,15 1468:1 1469:2 1472:2,4,7,10, 13,16,20,25 1473:6,9, 13,17 1474:2,5,7,14,16, 18,25 1475:2 1476:6,9 1479:15 1480:4,10 1481:11 1485:21 1486:2,11 1502:11,13 1504:13,19,24 1505:4 1506:17 1507:7,10,17, 25 1509:1,3 1561:3,6,9, 13 1564:19,25 1565:4 1572:5,6,17 1580:9 1584:3,5,13,16 1585:17,19 1586:3 1592:3,19,23 1593:1,3, 8,12 1603:24 1604:1 1607:21 1608:13,16 1610:4,14 1611:23 1612:3 1614:6,10,14

**Pryor's** 1580:5

**psychologically** 1596:21

**PTSD** 1298:9,16,22 1299:10

**public** 1376:24,25 1532:23,25 1533:1 1588:23

**publicly** 1586:16

**publish** 1295:10,13 1313:18 1327:16 1486:3 1516:13 1523:25 1533:22 1536:17 1538:25 1541:1 1543:9 1546:8 1592:12

**published** 1295:15 1327:18 1531:17 1540:14 1543:2 1545:15,21 1586:6 1592:15

**publishing** 1301:21 1327:24 1394:17 1516:14

**pull** 1314:2 1317:15 1361:14 1363:22 1370:21 1382:5 1394:25 1516:7 1523:20 1537:18 1538:5,25 1540:24 1561:1 1591:24 1604:21 1608:5 1609:12

**pulled** 1343:17 1529:7 1586:24 1608:24

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 371 of 383   PageID 15391
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                    Index: pulling..recall

pulling 1478:2

punish 1385:2,12

punished 1333:16
1504:5

punishing 1367:14

punitive 1288:13
1493:20

purpose 1398:18
1399:7,25 1400:4
1402:2,8 1411:15
1531:2 1579:16
1580:21 1582:20

purposes 1491:16,17
1506:15,16

purview 1613:25

pussy 1352:19 1361:22
1363:1 1365:20
1367:19 1368:1

put 1293:8,9 1309:19
1310:22 1380:7 1400:7
1402:12 1412:19
1429:23 1439:13
1448:12 1451:18
1455:1 1458:3 1459:1
1466:14 1476:22
1491:20 1503:1
1504:24 1505:22
1509:11,13 1540:20
1569:25 1570:3 1573:4
1595:16 1604:14

puts 1546:21

putting 1347:13
1405:20 1412:3

**Q**

quality 1485:22
1534:11

question 1288:22
1294:14 1299:24
1305:8 1307:19 1309:1,
15,20 1319:21 1320:8,
11,12,14 1323:13
1324:6,10 1325:25
1326:8,19 1327:1
1335:12,13,16 1336:21
1337:2 1339:18
1345:11 1346:22,24
1348:14 1352:24

1353:3,25 1354:18
1355:3,6 1358:19
1362:16 1363:3 1365:1,
23 1366:6,17,20
1368:5,14,15 1373:8
1374:3,4 1382:4,7
1386:3,4 1388:3
1390:1,5 1392:2,15,23
1393:10 1394:23
1395:5,22 1396:2,3,6
1403:14,21 1404:2,23
1407:23 1416:13
1417:11,12 1418:10
1419:6,7 1420:15,24
1421:5 1423:11 1426:5
1427:8,19 1428:24
1432:18 1433:7 1437:8
1438:17 1439:1,7
1445:21 1447:10
1463:23 1464:5,13
1465:6,16 1466:1,3
1467:1,22 1468:5,21
1469:5 1470:7,20
1471:17,20 1473:21
1502:8 1504:3 1511:13,
15 1544:8 1550:16
1555:17 1556:14
1584:14 1596:6,11,13
1606:14 1607:25
1610:5,6,7 1611:7
1612:9,17,20,22

questioned 1331:10
1505:22 1508:13,16

questioning 1506:7
1584:6

questions 1291:24
1292:19,23 1333:12
1343:14,16 1344:5
1354:23 1368:11
1369:14 1374:2 1389:8
1394:24 1409:25
1422:22 1427:20
1472:5 1473:1,19,23,25
1474:4,12,14 1479:20,
22 1483:11 1502:14
1511:11 1549:21
1552:2 1557:24 1558:1
1560:9 1566:17,18
1571:13 1572:6,7,8,9
1573:11,12 1590:5
1595:5,8 1596:4
1606:20 1616:22
1618:24

quick 1287:8 1306:5
1372:20

quiet 1293:18 1403:25

quote 1499:5 1500:2
1569:2

quoting 1507:9,12

**R**

race 1466:22

races 1460:24

racing 1298:4

radio 1361:15

Railway 1423:24
1424:3,9,14,24 1453:21

raise 1338:9 1380:17
1392:4 1506:8,23
1557:17 1601:18

raised 1287:21 1292:20
1327:10 1336:10,12
1337:16 1338:6
1354:13 1371:21
1389:8 1393:6 1398:5

raises 1466:25

raising 1311:24
1393:2,5

ramifications 1553:4,
17,20 1554:1

ran 1322:11 1481:18

range 1356:23

rank-and-file 1381:5

rationale 1379:25

RBFS 1545:18

reach 1337:22 1341:16
1579:13

reached 1341:2,7,12
1352:15 1388:23
1416:24 1469:12
1579:15 1600:21
1606:16

reaching 1314:14
1579:16 1599:16

reaction 1351:2 1352:9
1520:17 1551:10

1563:23 1578:4
1595:23

read 1290:10 1320:18
1324:11 1363:11
1368:15,17 1386:6,7
1397:1,2,4,15 1404:12
1429:6 1449:20,23
1450:2,3 1545:14,17,
21,25 1547:5 1554:17
1565:8 1577:5 1584:19

reading 1518:17
1525:17 1565:7,22
1595:19 1618:1

ready 1373:15 1474:6
1501:9 1604:13

real 1338:22 1480:6

realization 1352:1

realize 1451:18
1503:20

realized 1503:22
1600:4

realm 1389:1

reapply 1495:21

reask 1354:4 1550:15
1584:15

reason 1289:22
1351:23 1362:5
1375:21 1379:7
1388:22 1432:14,17
1436:8 1445:11
1488:11 1492:24
1601:16 1606:21
1613:19

reasonable 1476:13
1492:18,21 1495:14

reasons 1354:1
1359:13 1374:25
1402:25 1429:15
1490:2 1496:1 1500:17,
23,24,25 1519:4
1606:13 1609:25

rebut 1375:22 1380:12
1611:3

rebuttal 1486:12

rebutted 1490:3

recall 1289:6,12
1292:21 1297:5 1321:9

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS

3:17-cv-02278-X                              Vol 5 July 11, 2022                    Index: recallers..religious

1328:21,22 1330:16
1377:1 1380:13
1425:13,20,23 1426:11,
25 1428:9 1434:5
1440:17,19,22,25
1441:5,10 1442:5
1446:25 1447:2,16,25
1448:2,11,19 1478:3
1487:24 1489:23
1500:9 1508:4 1515:18
1518:12 1562:14
1563:13,22 1565:19
1577:19 1580:8
1581:13 1587:8
1591:20,22 1595:11
1598:23 1599:2
1613:13,14

recallers 1425:16,18

recalling 1443:15

receipt 1490:24

receive 1329:15
1399:24 1402:17

received 1289:4
1307:20 1482:11
1483:20 1484:11
1505:4 1520:20
1521:20 1526:11
1527:6

receiving 1562:5

recent 1559:1

recently 1503:8

recess 1372:4 1373:9,
10 1452:19 1509:17
1557:2 1620:1

recipient 1576:24

reckless 1493:22

recognize 1292:4,6
1390:25 1405:5 1515:1,
3 1533:12

recognized 1353:16
1465:22 1469:10
1488:12 1498:6

recollection 1312:6
1355:24 1359:21
1362:22 1380:22
1391:6 1419:4 1449:19
1608:11,17 1609:15
1613:19 1614:7

recommend 1413:19

recommendation
1522:11,13 1548:8,9,16

recommended
1522:21 1549:14

reconsider 1619:15

record 1287:3,6,23
1377:16 1381:23
1403:8 1489:20 1491:2
1492:6 1504:16,17
1507:19 1511:20
1591:3 1609:5 1616:11

recorded 1368:18
1386:8 1480:17
1584:20

records 1522:24
1523:7,9 1524:5

recourse 1404:20

recovering 1419:21

recruiter 1569:14

rectangle 1528:13

recurrent 1528:23,25
1568:1

redirect 1309:10
1474:17,25

reduce 1293:4

reduced 1330:20
1417:16 1418:2

refer 1393:4 1421:21,23

reference 1347:11
1349:17 1365:22
1370:18 1454:18
1455:6 1466:24
1611:15

referenced 1456:6
1468:13 1524:6 1533:9
1588:3 1605:2

references 1507:9,13
1606:5

referred 1365:4
1562:22

referred-to 1295:11
1301:22 1306:1
1313:19 1327:22
1394:12 1516:16
1524:1 1533:23

1536:18 1543:10
1546:9 1592:13

referring 1307:9
1317:9 1356:21 1358:5,
9 1395:10 1584:6

refers 1568:16 1587:25

reflect 1396:20,22
1397:15 1421:25
1497:4 1551:14
1568:14

reflecting 1497:6

reflection 1570:12

reflects 1362:19
1454:18 1543:21

refocus 1466:2

reformulated 1465:5

refrain 1434:18

refresh 1312:6
1608:11,14,17 1609:15
1613:18

refreshed 1608:18
1614:7

refreshes 1359:20
1391:6

regard 1290:1 1326:1
1393:5 1419:17
1468:10 1495:14,22
1560:1 1596:7

regarded 1584:3

registered 1413:11

regret 1402:23

regretful 1597:21

regrets 1352:11,25

regroup 1501:3

regular 1408:18

rehash 1383:7

reinstate 1329:8

reinstatement
1402:24

reiterate 1500:7

reject 1420:17 1500:19

related 1289:17,21

1358:10 1371:23
1470:24 1543:21
1581:8 1614:24

relations 1365:7
1384:8 1498:5 1512:12,
14 1515:24 1517:13,15,
19,20,21 1518:1,23
1552:19,23 1559:3,7,10
1563:7,10 1565:11
1577:5,9,13 1579:5,6,
11,18 1590:3

relationship 1467:3
1481:16 1560:16

relative 1489:1

relevance 1354:12
1370:8,11 1374:11,13,
17,18,21 1376:16
1377:17 1381:9 1391:5
1435:22,23 1442:4
1443:5 1533:17
1548:23 1551:11
1564:19 1603:24
1607:21

relevancy 1376:3

relevant 1375:20
1376:10 1379:9,16
1392:7 1434:7,10
1503:13 1549:6 1550:2,
5 1612:13,17,18

religion 1295:1 1454:2
1457:18 1466:13,22
1468:25 1470:24
1491:7 1549:21
1607:10,13

religions 1460:22

religious 1288:3
1289:15,24 1290:24
1291:5 1293:1 1309:16
1340:2 1366:1,24
1367:3 1383:13 1404:2,
4 1450:5 1453:25
1456:9 1459:4,14
1461:7 1462:19 1467:3
1470:13 1474:22
1491:3 1492:12 1493:4,
8,15 1494:12 1495:8,9,
18 1496:21 1497:21,25
1498:10,14,15,16
1499:6,18,20 1500:3
1548:19 1549:12
1551:9,16 1598:13

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 373 of 383   PageID 15393
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022          Index: remain..retaliated

1603:21

**remain** 1332:4 1406:19

**remainder** 1474:12 1525:6

**remark** 1362:6

**remedies** 1392:3,13 1494:14

**remember** 1297:18 1307:15,17 1308:15,17 1310:19 1319:7,8 1320:16 1342:23 1344:16,17,20 1368:16 1372:6,22 1387:16 1398:15 1405:19 1430:16 1444:20 1445:9 1446:4,5,10 1456:4 1480:25 1521:4 1560:19 1561:18 1562:2,15 1563:15,17 1566:4 1568:22 1574:10 1577:18 1579:14 1587:9 1589:22 1596:10 1609:8

**remembered** 1319:1

**remind** 1541:17 1567:4 1573:20 1576:23

**reminder** 1565:13 1566:19 1612:9

**reminding** 1565:21 1566:15

**remorseful** 1597:25

**remotely** 1290:12

**removed** 1315:7 1584:25 1585:1

**render** 1298:15 1328:13 1604:13

**rendered** 1604:15

**rendering** 1604:19

**rep** 1294:19 1338:3 1342:24 1343:17 1444:19 1604:12

**repeat** 1323:12 1366:20 1584:17

**repeatedly** 1369:13

**repeating** 1297:14,15

1433:20

**rephrase** 1427:22

**replied** 1360:10

**report** 1305:7,10 1375:5 1442:20 1489:8 1545:2 1560:17 1574:14,16,18

**reported** 1305:12 1434:9 1463:9 1498:4,5 1519:12,15 1560:24

**reporter** 1368:18 1386:8 1584:20

**reporting** 1305:1 1376:22,23 1535:2 1544:21

**reports** 1566:20,21

**represent** 1318:15 1346:15 1348:20 1352:18 1363:19 1367:21 1415:10,18,22, 24 1416:22 1420:10 1421:22 1426:2 1435:16 1447:21 1455:4 1459:24

**representation** 1304:21 1305:2,4,12 1344:3 1359:9 1369:20 1379:12 1414:22 1416:7 1419:8,19 1420:21 1421:2,3,6

**representative** 1287:17 1308:11 1328:25 1329:3 1332:15 1498:21 1589:22 1597:16

**representatives** 1353:13 1512:20 1548:7

**represented** 1345:19 1350:24 1415:15 1416:1 1417:6,13 1462:3 1464:23 1499:22 1500:12 1559:17

**representing** 1325:23 1352:20 1357:7 1359:11 1405:10 1418:25 1462:13

**represents** 1359:8 1500:1 1552:1 1571:11

**reprimand** 1375:9 1395:20

**reprisal** 1422:15

**request** 1287:22,23 1288:1,15 1309:23 1337:12 1343:23 1354:6 1379:19 1382:25 1383:1,11 1420:17 1495:6,24

**requested** 1368:17 1378:22 1382:23 1386:7 1495:16 1507:14 1584:19

**requesting** 1382:23 1601:19

**required** 1331:15 1478:20 1528:24 1536:4 1545:17 1546:22 1554:14 1565:7 1604:18

**requirement** 1331:24 1493:11 1554:8

**requires** 1488:13

**reread** 1521:6

**research** 1372:25 1450:21 1486:24 1556:11 1616:9

**reserve** 1471:25 1473:24 1474:12 1479:20 1575:20 1617:8

**reside** 1511:22 1512:4 1513:10

**residence** 1512:5

**resituate** 1556:6

**resource** 1579:7 1590:3

**resources** 1579:8

**respect** 1323:5 1341:18 1345:8 1354:21 1355:1 1464:22 1493:20 1523:9 1534:20 1535:3 1541:11 1564:7 1567:19 1580:7

1589:19 1602:6

**respected** 1354:24

**respectful** 1406:19

**respectfully** 1396:8 1488:16

**respects** 1345:9

**respond** 1317:2 1360:20 1369:7 1610:23

**responded** 1360:16

**responding** 1292:19 1341:9 1360:17

**response** 1296:20 1298:2 1349:1,6 1351:6 1358:1 1369:13 1376:12,14,20 1382:8 1494:20 1496:3 1504:12 1549:10,23 1562:13 1595:11

**responses** 1368:10

**responsibilities** 1409:22 1560:22 1565:14,22 1603:14

**responsibility** 1408:21 1462:6 1514:1, 2 1515:11,14

**responsible** 1389:23 1512:16 1513:14 1529:24 1559:14 1560:5,8

**responsive** 1362:10 1572:9

**rest** 1409:20 1471:25 1473:24 1486:14 1553:11 1614:15,18 1617:21

**restate** 1610:6,7

**restraints** 1423:20

**rests** 1486:12

**result** 1331:20 1479:13 1518:9 1543:23 1544:6 1612:21

**resumés** 1400:7

**retaliated** 1430:20 1433:2 1440:22

**retain** 1523:15

**retaliate** 1438:10
1488:14

**retaliated** 1424:3
1425:9 1426:8 1427:12,
14 1428:5 1429:25
1430:4,8,22 1436:20
1437:10 1438:19
1439:11 1441:1 1448:6
1458:8 1496:21

**retaliating** 1425:13
1598:4

**retaliation** 1331:20
1423:24 1490:11
1497:1 1498:19
1536:25 1537:4 1606:8

**retaliatory** 1489:4,17

**retire** 1512:1

**retired** 1511:25
1558:18,20,21,22

**retirement** 1558:23

**return** 1480:1

**returned** 1521:4
1528:12

**reurge** 1494:2

**reveal** 1523:9 1561:7

**review** 1313:5 1446:25
1447:13,16 1520:2
1522:3,24 1523:4,8
1530:24 1566:16
1581:1 1591:11 1594:3
1595:2 1605:6

**reviewed** 1328:23,25
1522:1 1544:15 1548:6,
13 1582:16,23 1583:16
1591:7

**reviewing** 1448:10,19
1519:24 1582:20

**revised** 1541:7

**reword** 1354:4

**rewrite** 1504:25

**rid** 1357:15 1403:2,16

**ridiculed** 1426:22

**ridiculous** 1357:4

**right-to-work** 1341:1

**rights** 1288:4 1292:13
1293:14 1294:25
1332:25 1354:11,21,24
1355:9 1356:14,15,18
1357:1,20 1359:2
1407:15 1424:12
1425:23 1426:2
1427:25 1428:1 1452:7
1475:5,6 1491:18
1493:23 1552:3,7,8
1571:15

**rise** 1288:17 1298:3
1373:3,11 1450:23
1452:20 1487:2
1509:16,18 1510:19
1556:12 1557:3
1616:11 1620:2

**risk** 1300:19

**RLA** 1288:13 1428:3
1472:21 1475:5
1487:20 1488:5,18
1490:14,17 1494:6
1497:1,16 1498:19

**RLA-PROTECTED**
1489:7 1497:9 1500:8

**Robert** 1611:2

**rock** 1556:25

**role** 1415:4 1460:8
1482:20 1483:2
1530:23 1535:10
1550:3,6 1552:13,20,23
1578:23 1579:10

**roles** 1482:23

**roll** 1556:25 1618:21

**room** 1297:4 1350:5
1486:10 1594:14
1612:11

**rooms** 1451:19

**roses** 1566:2

**Ross** 1308:12 1329:4
1332:11,15 1336:12,14,
24 1337:3,5,6,7
1404:15 1416:15,21

**round** 1287:7 1335:10
1346:21 1366:11
1474:4 1479:18,21,25
1555:16 1618:17

**routine** 1573:10
1605:18

**RTC** 1528:22

**rude** 1566:4

**rudely** 1568:9,10,12

**rule** 1443:8 1487:9,14
1511:14 1558:2
1573:12

**ruled** 1392:12 1393:10
1619:16

**rules** 1513:22 1580:15

**ruling** 1368:9 1372:5
1375:10 1377:14,15,16
1509:10,14,20 1549:7
1619:16

**rulings** 1392:23

**rumors** 1599:4

**run** 1481:19 1574:8
1605:6

**running** 1303:6,7
1350:14

━━━━━━━━━━━

**S**

**sacred** 1604:8

**sad** 1348:6 1351:18

**saddened** 1563:25
1564:1

**safe** 1452:6

**safety** 1455:8 1460:4

**salary** 1399:24 1476:17

**Samuelson** 1341:20

**San** 1575:16

**Sassy** 1335:24

**save** 1346:4 1479:23

**says/fac** 1527:12

**scale** 1475:14

**Schaffer** 1518:21,22
1519:5,15 1521:11
1531:21

**schedule** 1408:15

**Schneider** 1289:4

1292:23 1307:21
1342:18,20 1343:7,11,
16 1344:5,22 1345:11
1346:1,25 1357:17
1358:20 1361:18
1454:17 1489:20
1490:9 1498:2 1501:24
1503:12,18 1504:3
1505:17 1507:4
1521:24 1522:5
1542:24 1547:23
1548:3 1549:5 1550:4
1572:21,23 1573:1,7,21
1586:8 1593:18
1600:18 1603:21
1607:3 1608:9 1612:10
1616:14

**Schneider's** 1497:2
1498:7

**Scholer** 1619:16

**school** 1398:25 1399:2
1408:18 1409:6 1412:1

**schools** 1399:23

**scope** 1472:12,15,19
1473:7 1476:5

**scouting** 1399:21

**screen** 1357:15
1515:25 1518:16
1531:4,25 1537:10
1613:21

**screens** 1351:17
1363:25 1486:7,8
1576:17

**scroll** 1593:10

**scrolling** 1302:2
1593:15

**search** 1290:15,16

**searched** 1290:17

**searching** 1436:8,12

**seat** 1480:1 1487:4
1557:21

**seated** 1287:4 1288:20
1373:12 1382:2 1453:7
1509:19 1510:21
1557:12

**seconds** 1393:25
1483:22

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 375 of 383   PageID 15395
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022                    Index: section..sir

**section** 1478:19
1544:20

**SECURITY** 1288:17
1373:11 1452:20
1509:16,18 1557:3
1620:2

**seek** 1288:12 1398:13
1400:5

**seeking** 1466:9
1470:11 1539:17

**select** 1416:21 1459:25

**send** 1291:21 1321:7
1341:22,23 1345:12
1346:11 1347:4
1353:21 1364:25
1367:4,12 1369:6
1387:21 1389:12,21
1462:12 1477:4 1522:5
1551:3 1577:10 1578:6
1594:2 1601:22 1602:1,
5 1604:18

**sending** 1289:18
1339:20 1342:7 1347:7,
23 1352:25 1359:13
1360:11 1365:15
1382:9,15 1385:2,18,22
1408:17 1469:16
1518:25 1585:5
1594:23 1597:21

**sends** 1542:5

**senior** 1518:24 1559:1,
2,6,10 1565:11

**seniority** 1329:10
1330:10 1356:18,23
1410:14 1529:3

**sense** 1371:19 1393:16
1403:3 1502:2,12
1547:20 1608:22
1617:7 1618:3

**sentence** 1294:23
1309:18 1356:11
1357:9 1384:15
1433:10 1434:17
1544:22 1568:21

**separate** 1347:14
1433:8 1482:23
1503:20 1510:8

**separation** 1322:16
1336:21 1379:7,8

1399:13 1401:20

**September** 1529:18
1530:5

**seriousness** 1519:7

**served** 1293:5 1330:25
1417:18 1446:24

**service** 1534:11
1567:22,23,25 1568:4,7
1569:4 1575:13
1587:16

**services** 1559:4,5

**session** 1371:18

**set** 1312:8 1317:24
1318:2 1408:25
1409:22 1507:3
1549:25 1589:10
1606:3

**setting** 1354:22

**settlement** 1404:16

**Seventh** 1451:5 1452:7

**sexual** 1331:19 1358:2,
22 1536:24 1537:3
1538:3 1554:2 1579:1
1606:7

**sexually** 1537:11,24

**shadow** 1446:19

**Shaffer** 1518:18

**share** 1346:3 1459:14
1534:22 1551:17
1579:22 1583:3,6
1589:16 1599:25

**shared** 1459:4 1529:19

**shares** 1497:24

**sharing** 1475:20
1476:20

**Sherry** 1615:18

**Shifting** 1498:17

**Shipman** 1314:16,24
1341:15

**shock** 1349:4

**shocked** 1353:8
1563:24

**shocking** 1564:12

**shoes** 1405:20

**shoot** 1478:10

**shoots** 1374:17

**shop** 1361:12

**short** 1364:14 1373:6
1480:10,11 1501:3
1576:5

**shorter** 1451:7 1501:17

**shot** 1451:12 1613:21

**shots** 1515:25 1518:16
1531:4,25 1537:10

**shove** 1457:17

**show** 1301:12 1307:18
1317:9,18,19 1321:10
1359:17,19 1364:18
1375:13 1392:19
1493:11 1494:7,8
1528:7 1529:6 1539:4,
5,7 1587:2 1588:6

**showed** 1333:20
1334:1 1363:8 1532:1
1587:3,4,6

**showing** 1306:7
1486:8 1604:24

**shown** 1321:14
1364:16 1477:23

**shows** 1375:4 1452:17
1498:7 1510:3 1525:1
1586:23 1588:7

**shred** 1599:9

**sic** 1580:25

**sick** 1528:2,3,9,10

**side** 1310:17 1375:14
1412:14 1416:16
1458:3,4 1512:23
1590:12

**sidebar** 1298:17,19
1299:20 1308:25
1310:1 1317:11 1319:2,
4,17 1371:3,5,12
1372:15 1390:13,18
1391:10,14,16,17,19
1394:2,6 1431:4,18,20
1432:15,18 1433:24,25
1435:25 1439:25
1462:25 1463:2 1464:9
1472:6,9 1474:8

1526:18 1539:13,15
1540:5 1548:25 1549:2
1550:12 1561:8
1610:15,16,18 1612:4
1614:9

**sideline** 1451:6
1539:22

**sides** 1507:14

**sign** 1293:12,20 1331:6
1336:4 1425:20,24
1492:1,2 1567:6

**signatures** 1443:13

**signed** 1294:23
1329:13,22 1332:19,23
1404:12 1444:23
1445:2,17 1446:18

**significance** 1580:14
1587:14

**significant** 1523:13,16

**signing** 1426:21
1427:1 1428:11
1444:11,15 1446:2,13

**signs** 1374:6 1491:24

**similar** 1340:8 1351:2
1451:4 1495:5 1498:18
1548:14,18 1599:25

**similarly** 1376:17
1491:15 1492:20
1495:8

**simple** 1420:15 1437:8
1470:7 1471:17

**simplify** 1425:8

**simply** 1299:10 1318:5
1503:19 1597:7

**Sims** 1308:14 1310:7,9,
20,24 1312:11,22
1315:15,16,19 1316:15
1317:5,6 1319:23
1320:19 1333:22
1334:1 1336:10
1337:12 1338:1,7,10,
17,21 1403:7 1419:25

**Sims'** 1339:7,11

**single** 1435:13
1472:21,22 1473:3

**sir** 1302:5 1311:11
1322:11 1324:18

1339:6 1342:4 1346:10
1474:7 1501:14

sit  1287:5

site  1345:3

sits  1444:18

sitting  1308:15
1342:21 1407:3
1416:18 1420:10
1440:11 1480:20

situated  1376:18
1491:15 1492:20

situation  1303:17
1534:25 1537:6

Sixteen  1546:7

sixth  1331:3

Sixty-six  1561:5

skipped  1526:15

sleeping  1296:21

slew  1429:15

slightly  1368:21
1376:3 1485:24

slow  1567:17

slowly  1473:12

SLP  1528:2

SLT  1528:10

small  1409:5 1451:18
1491:21

Smith's  1314:9

sobbing  1349:8

sober  1302:18

social  1321:17 1323:25
1326:7 1331:18 1344:8,
12 1370:6 1375:24
1378:2 1433:1 1484:24
1485:2 1497:13,18
1514:4 1518:3 1519:6
1532:21 1538:13
1542:16 1543:16
1544:1,23 1545:2,13,22
1546:12,16 1547:2
1554:18 1565:12,23
1566:5 1596:25 1597:3
1606:2

socks  1405:18,21

Somebody's  1508:6

someone's  1508:2,11

son  1413:15

sort  1299:7 1444:6
1455:5 1487:22 1619:5

sought  1505:11

sound  1357:10 1397:6

sounds  1361:15
1388:5 1600:3

source  1521:23

southwest  1287:13
1289:10,15 1290:13,23
1291:4 1295:6 1300:6,
10 1304:7 1306:22
1309:12 1315:24
1319:24 1320:21
1321:2,3,23 1322:1,3,4,
5 1323:3,15,18,24
1324:25 1325:2,23,25
1327:3 1328:20
1330:12 1331:17,25
1333:19 1334:5 1335:3,
18 1336:7 1342:3
1345:9,19 1347:11,18
1353:8,17 1356:24
1357:1 1359:9 1360:18
1364:11,24 1365:3,25
1366:23 1367:8,12
1369:15 1370:5 1371:8
1374:10,15 1375:16
1376:6,8 1377:7
1378:21 1379:2,10
1380:1,11 1381:13
1382:23 1383:12
1384:2,8,21,23 1385:1,
3,9,12,17 1386:14
1387:1 1388:14,24,25
1389:2,13 1390:9
1395:6,19,23 1396:20
1397:3 1399:8,14
1401:21 1403:2,8,14
1404:3 1431:24
1432:10 1433:5,9,16
1434:4,6,8,10,12
1435:3,14 1437:2,3
1451:23 1452:2,12
1481:13 1482:13
1484:23 1487:5,8,14
1488:7,14,21 1489:21
1490:6 1491:10,23

1492:5 1493:21
1494:16 1496:3,11,18,
20 1497:20 1499:12,13
1502:11 1505:6,12
1508:24 1510:3,23
1511:2,25 1512:3,8,10
1513:5,9,24 1514:11
1517:19 1520:15
1523:21 1528:20
1531:7 1532:3,10,12,
14,20,25 1533:2,15
1534:5,23 1535:14,18,
21 1536:11,23 1538:2
1539:20 1542:4 1543:3,
15,21 1544:14,16
1545:4,21 1546:3,18
1547:18 1552:3,8
1553:23 1558:17,24,25
1559:17 1562:19
1564:5 1567:5,6
1568:17 1569:9,14,23
1570:1,13 1571:16,19,
25 1572:8,20 1573:23
1574:21,23 1575:2,4,11
1578:7 1586:12,17
1587:5,16,17,20,23
1588:8 1592:1 1598:3,
8,12 1600:10,13
1601:9,21,23 1602:8
1605:22 1611:8,9,16,18
1612:12,14,16,21

Southwest's  1375:14
1376:13 1384:18
1390:10 1402:24
1488:25 1489:6
1490:24 1541:11
1542:22 1545:2,8
1546:12 1606:6
1610:21,24

Southwest-affiliated
1347:15

space  1511:10,12,13
1557:23,25 1573:10

speak  1325:14 1330:25
1332:25 1340:25
1383:19 1390:18
1409:7 1422:11
1423:10 1425:25
1471:2 1473:14
1483:17 1614:12

speaking  1317:10
1320:3 1354:14 1356:1
1358:12 1366:15

1379:8 1390:17
1419:14 1422:16
1428:20 1441:8 1449:3
1455:22 1467:17
1471:7 1526:17
1580:11

specialist  1337:9
1515:24

specific  1349:24
1376:2 1440:3 1460:5,8
1517:22 1533:3
1534:12 1536:2
1545:16 1546:25
1547:5 1563:14,15
1566:3 1574:12
1609:24

specifically  1344:18
1355:14,15 1363:11
1364:17 1365:9 1428:4
1446:23 1455:7
1456:15 1458:17
1497:23 1534:15
1563:13 1607:25

specifics  1378:3
1380:3,4

specifies  1532:22

speculation  1333:5
1490:4

speech  1292:2,3,14
1293:1,2 1309:17
1334:11 1424:13
1470:15 1478:5
1485:11,16 1492:8

spend  1533:7

spending  1429:9
1470:17 1471:13
1602:22

spends  1487:25

spent  1289:23 1323:8
1324:3,15 1346:13
1400:1 1402:16 1410:9
1440:15 1459:23
1471:14 1490:1
1500:10 1575:19

spiking  1296:15

split  1529:22

spoke  1289:3 1446:4
1461:17 1468:9
1537:23 1609:16

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 377 of 383   PageID 15397

CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                              Vol 5 July 11, 2022              Index: spoken..substance

**spoken** 1578:21

**spokesperson**
1559:25

**spons-** 1348:23

**sponsored** 1345:17
1348:2

**spring** 1397:23

**St** 1297:9 1398:21
1399:1,5,22 1402:9
1412:14

**stable** 1534:18

**stack** 1374:9

**staff** 1574:2,5

**stance** 1360:4

**stand** 1373:5 1453:1
1479:25 1480:20
1489:15 1495:10
1502:6 1509:3,11,14
1510:18 1511:5
1525:24 1556:21,24
1557:8 1597:10
1605:14

**stand-in** 1619:1,2

**standard** 1523:3
1567:23

**standards** 1564:5
1569:3

**standby** 1619:5

**standing** 1573:5
1596:15

**stands** 1528:3

**start** 1287:8 1401:9
1487:12 1500:25
1525:18 1573:13
1576:7 1592:18
1616:10

**started** 1302:19,21
1314:18 1316:1 1326:6
1399:3,6,9,13 1400:14
1416:25 1448:3
1449:15 1502:7

**starts** 1332:3 1356:11
1569:21

**state** 1298:20 1441:15
1500:23 1508:7
1511:20 1558:9

**stated** 1374:12 1383:2,
4,17 1539:2 1548:3
1595:12 1597:7 1602:4

**statement** 1310:20
1324:12 1395:3,8
1433:15 1473:16
1514:5 1532:23 1534:6,
8,9 1535:22,23 1568:23
1569:1,9

**statements** 1569:8
1596:5 1597:4

**states** 1438:24 1466:19
1534:13,19 1540:12
1545:1 1546:16

**station** 1361:15

**status** 1603:1

**stay** 1293:18 1379:21
1389:3 1452:8 1460:1
1573:5

**stayed** 1384:24
1403:25

**stays** 1373:25

**stemming** 1379:15

**step** 1297:11 1307:8,
11,15,20,23 1308:8,10
1309:3,7 1310:7,16
1311:9 1312:11,22
1313:14 1315:15,19
1316:3,22 1318:16
1319:23 1320:7,8,20,25
1321:6 1328:8,10,13,15
1337:24 1350:2 1383:4
1416:6,9,16,22 1417:15
1419:17,19 1420:7,22
1460:15 1471:19
1473:21 1474:19
1475:7

**Stephenson** 1576:25

**stepped** 1326:4
1375:11 1402:14

**stepping** 1385:10

**steps** 1411:1 1521:19

**Stew** 1335:24

**steward** 1361:12

**stick** 1333:12 1377:14
1616:20 1617:22
1618:8

**stocking** 1362:1

**stomping** 1356:15

**Stone** 1307:6 1312:12,
13 1321:22 1322:4,9,17
1323:5,11,15 1324:25
1325:5 1326:5 1327:4
1334:2 1339:17,19
1340:7,20 1341:17,18
1342:1 1344:12,24
1345:12 1346:6
1347:19 1348:25
1350:7,16 1351:2,13
1353:1 1359:13 1360:9
1362:25 1363:2,8,18,21
1364:8,25 1365:15
1367:5,13 1369:6,14,18
1370:1 1375:2 1382:10,
15 1385:3,19 1388:23,
25 1389:9 1390:3
1414:9 1421:8,10,13,
23,24 1422:1 1428:6
1445:6 1446:1,15
1447:22 1449:17
1454:17 1455:18
1457:1,2,7,10 1466:10
1467:8 1477:1,8,10,14,
17,22,24,25 1481:16
1483:13 1489:9
1491:15 1495:17
1496:16 1498:20
1499:9 1500:1 1516:1,2
1522:9 1535:6,15,16,17
1537:12 1538:22
1551:8,17 1552:8
1553:17 1554:2 1562:5,
8 1571:14 1577:3
1578:14,18 1581:10
1582:4,10,17 1583:4,23
1584:2 1585:5 1595:9,
21 1596:25 1597:9,23
1599:11 1600:6 1601:2,
5 1603:11 1606:15
1607:5,8,17,20 1609:8,
16,19 1613:11,15

**Stone's** 1339:24
1349:6 1352:9 1449:10
1499:19 1517:9 1520:3
1538:16 1555:4
1576:21 1582:1
1583:20 1596:15
1607:13 1608:12
1614:25

**stop** 1410:7 1465:17
1490:9

**stopped** 1348:10,15

**stopping** 1298:4,5
1330:6

**story** 1310:17 1590:12

**straight** 1365:13
1618:21

**street** 1532:12

**strength** 1489:12

**stress** 1296:7,8 1298:1,
11 1300:9

**stress-related** 1300:3

**stretch** 1401:16

**strike** 1299:18 1326:20,
25 1343:19 1346:19
1362:15 1384:12
1420:14,18 1465:25
1470:1 1565:2 1591:11

**striking** 1299:24

**string** 1576:22 1586:10

**strip** 1293:14

**stroke** 1296:13 1300:5

**Strong** 1489:14

**structure** 1412:22

**structured** 1410:13

**struggles** 1306:11,19

**studio** 1401:6

**studios** 1401:3

**stuff** 1340:13,24
1406:21 1408:4
1409:15 1460:2
1573:18 1593:14

**stunned** 1563:24

**subject** 1457:21
1486:12

**submit** 1482:17
1488:16 1493:18

**submitted** 1311:2
1392:15 1400:15
1401:22 1419:25
1482:12,19 1539:21

**substance** 1349:24
1518:9

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 378 of 383   PageID 15398
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                          Vol 5 July 11, 2022                 Index: substantive..team

**substantive** 1493:14

**substitute** 1413:11,12, 13

**sue** 1293:15 1404:11 1436:25 1479:9

**sufficient** 1377:18 1488:9 1489:3,17 1490:12,16 1491:1

**sufficiently** 1368:13 1473:18,21

**suggest** 1395:23 1482:17 1617:1

**suggested** 1375:1,6 1378:12

**suggesting** 1390:2

**suggests** 1317:14

**suicide** 1597:2

**suing** 1338:20

**suit** 1392:1

**Sullivan** 1342:24 1344:2 1414:23 1415:15,18,21 1418:25 1419:5 1589:24,25

**summaries** 1302:10

**summarize** 1467:16

**summarizing** 1497:4

**summary** 1493:25 1497:3

**Sunday** 1409:12,23

**super** 1486:20

**supervisor** 1468:9

**supervisors** 1574:7,17

**supplement** 1335:7

**supplemental** 1508:22

**supplied** 1594:13,17

**support** 1359:4 1488:20 1489:17,20 1490:11,14 1492:22 1493:19 1496:13 1508:1 1591:21

**supported** 1352:2 1425:21 1483:1

**supporter** 1375:20 1425:14 1426:11 1427:1 1428:9 1440:23

**supporters** 1377:1 1435:1,6,9,12,18 1441:1

**supporting** 1354:3 1357:19 1443:14 1456:19

**supports** 1395:7

**supposed** 1361:9,23 1363:19 1365:18 1368:2 1384:9 1389:2 1499:23 1524:21 1561:6 1611:18

**supposedly** 1356:19

**surface-level** 1406:7

**surprise** 1447:12,14, 15,17,18,20 1486:9 1489:6

**suspension** 1293:5 1330:20 1417:16 1431:15 1602:14

**sustain** 1319:20 1346:18 1362:14 1390:22 1419:15 1449:4 1467:14,18 1470:4 1540:23 1548:24 1608:19,22 1614:17,18

**sustained** 1292:10 1294:5 1318:24 1369:23 1381:24 1382:3 1384:11 1436:17 1439:24 1462:23 1467:21 1564:22 1609:4

**sustaining** 1299:23

**Suzanne** 1576:24 1608:7

**SWA** 1538:7 1540:14 1541:16 1545:9 1568:18

**swear** 1506:13 1510:18 1557:17 1563:16

**sword** 1432:23

**sworn** 1392:8 1511:7 1557:19 1573:7

**symbol** 1365:18 1368:2

**synonymous** 1498:16

**synopsis** 1522:10

**system** 1465:10 1489:15

**systems** 1399:1 1459:19

─────────────

**T**

**TA** 1445:17 1447:6

**table** 1287:18 1308:14 1394:4 1407:3

**take-home** 1397:15 1398:3

**taker** 1590:21,25

**takes** 1530:12 1574:3 1617:25 1619:17

**taking** 1308:16 1332:24 1365:12 1389:23 1394:3 1404:10 1416:18 1420:1 1428:19 1460:3,6 1499:11 1591:3,4 1598:12

**Talburt** 1293:21 1333:3 1370:17 1371:10 1378:4 1381:4 1438:24

**talk** 1307:8 1337:14 1338:24 1341:5 1347:23 1363:5 1372:19,23,24 1373:6,7 1380:4 1381:3 1387:5 1392:19 1398:12 1404:7 1406:12 1408:3 1413:25 1415:3,5 1421:20 1423:23 1427:21 1428:3 1429:22 1431:18 1436:7 1439:21 1443:18 1444:9 1450:19,20 1451:4,7,9, 15,17,20,22 1452:3,9, 11 1457:20 1461:3 1486:16,21,22 1502:24 1508:5 1518:20 1534:12 1556:8,10 1561:12 1567:24 1568:3 1588:10,22

**symbol** 1610:22 1611:15 1616:6,8,16 1619:12

**talked** 1289:9 1290:7 1300:16 1313:24 1317:1 1323:23 1329:1 1332:5 1344:8,13 1347:24 1372:6 1403:7 1404:14 1429:20 1434:5 1452:10 1453:22 1467:2 1491:10 1509:24 1570:18 1585:2 1588:18

**talking** 1294:2 1297:8 1299:1 1305:9 1307:12 1319:14 1333:25 1334:9,10 1344:16 1364:4 1370:24 1371:8 1384:22 1405:18 1406:20 1408:4,5 1420:16 1442:4 1449:14 1453:21 1454:17 1459:21 1461:24 1466:1 1490:5 1500:9,10,11,12,13 1507:20 1515:21 1521:2 1533:8 1537:20 1563:13

**talks** 1332:6 1355:19 1392:7 1499:2 1543:20 1569:22 1587:24

**Tammy** 1518:22 1519:15 1531:21

**target** 1375:8 1403:16

**targeted** 1404:19 1581:15

**targeting** 1458:11

**taught** 1413:14

**tax** 1476:2

**teach** 1567:25 1568:1,2

**teacher** 1413:11

**teachers** 1412:23

**teaching** 1413:3,4,8 1567:25

**team** 1477:16 1481:15 1498:4,5 1545:3 1559:18 1560:4 1562:23 1573:22

**tedious** 1383:9

**telling** 1335:2 1358:20
1433:12 1469:22
1506:2 1584:23 1601:4

**tells** 1334:23 1546:20

**Ten** 1514:14

**tentative** 1377:14
1427:2 1444:16,25
1445:7,24 1446:3,14
1447:23 1448:4,10

**tenuous** 1490:19

**term** 1299:11 1307:9
1565:9 1584:11,22

**terminate** 1488:8
1547:17 1555:8
1564:15 1571:25
1583:20 1600:18
1603:18 1604:11
1606:17

**terminated** 1289:5
1295:23 1300:6,10
1302:13 1304:6
1397:21 1408:10
1410:10 1476:21
1489:21 1491:10
1601:17 1606:21
1609:24

**terminating** 1488:22

**termination** 1307:21
1309:3 1330:20
1331:20 1374:5,10,12,
16 1408:6 1417:16
1479:13 1490:3,25
1491:3 1522:14,21
1543:24 1544:7,13
1548:8 1559:24
1583:25 1602:18
1604:18

**terminator** 1549:3

**terms** 1329:6 1358:6
1383:12 1394:11
1398:15 1504:6 1528:7
1599:16

**terrible** 1553:10

**territory** 1554:4

**terrorists** 1413:18

**test** 1480:15,19

**tested** 1297:19

**testified** 1331:9
1339:16 1340:4
1341:10 1376:5 1390:4
1440:21 1445:7 1446:2,
16 1448:17 1508:3,5
1592:25 1600:16
1608:14

**testify** 1446:22 1539:25

**testifying** 1539:11

**testimony** 1323:2
1333:2 1335:10
1346:21 1351:22
1352:4 1358:9 1360:13,
25 1361:3 1364:23
1365:6,14 1366:3
1379:23 1380:12,13,22,
25 1383:24 1384:6
1386:2 1411:9 1413:1
1415:12 1420:14
1427:5,7 1432:25
1438:9 1440:10 1448:2,
25 1465:1 1480:17,19
1481:10 1490:2 1493:7
1498:7 1519:11
1532:18 1539:18,23
1541:22 1555:23
1560:13 1572:12
1580:6 1585:24 1588:4
1589:16 1599:11
1606:19 1609:6

**Texas** 1512:6 1558:13

**text** 1538:21

**thankful** 1293:20

**That'** 1395:22

**theme** 1375:20

**thing** 1290:14 1323:10,
24 1380:18 1394:4
1402:6 1406:23
1429:12 1452:3
1480:14 1488:24
1537:15 1557:22
1597:2

**things** 1292:15 1299:7
1313:3,7 1323:23
1336:1 1341:11
1347:13 1356:20
1358:2,3,24 1380:24
1387:24 1406:13,15
1407:5 1410:4,16

1422:19 1427:12
1441:22 1447:8 1458:3
1459:25 1469:17
1471:14 1480:14
1486:18 1487:24,25
1488:8,22 1502:1
1530:23 1553:12
1560:11 1564:2,11
1566:5 1567:3 1570:4,
11 1581:9,17,18,19
1585:3 1586:23

**thinking** 1335:8
1373:23,25 1432:15
1478:4

**thinks** 1433:2

**thought** 1297:5,16
1303:3 1319:13
1326:14 1335:1,12
1348:9,17,19 1357:4
1366:22 1386:18
1416:3 1477:22
1485:23 1499:10
1501:18 1522:11,12
1523:16 1525:13
1561:6 1578:11
1596:24

**thoughts** 1343:21
1373:14 1597:10
1602:25

**thread** 1517:1,5,7

**threat** 1376:24,25

**threaten** 1478:10

**threatening** 1542:5

**threats** 1537:12

**threshold** 1509:22
1510:11

**threw** 1375:16

**throats** 1457:18

**thrown** 1343:14

**Thursday** 1619:3

**tie** 1483:10

**tied** 1495:18

**time** 1290:23 1291:2,10
1293:4 1294:16 1296:6
1297:10 1303:10,14
1304:2 1307:11,19
1309:12 1329:4,21

1330:2,25 1332:8,10
1334:18 1339:6,21
1361:13 1362:7 1370:7
1371:16 1372:1
1386:23 1398:8 1401:1
1405:17 1406:20
1410:9 1412:18
1417:18 1418:17,23
1419:15,22 1420:3
1422:23 1429:7 1431:7
1432:24 1440:12
1452:23 1453:1
1457:24 1461:16
1464:2 1469:7 1471:25
1475:12,24 1476:21,23
1480:4,14 1486:5,14
1489:16 1490:16,23
1495:20,25 1499:16
1501:22 1504:6 1506:6
1508:18 1510:4 1512:7
1514:13,18 1516:5
1517:14 1518:23
1521:25 1524:22
1529:13,22 1530:2,4,7,
9 1533:7 1535:7
1538:24 1539:20
1547:9 1560:21
1562:25 1565:8 1573:3
1575:5,8 1576:6 1577:3
1578:2,10,14 1579:22
1580:18 1587:15
1589:12,14,18 1590:22
1591:22 1598:6 1607:7
1611:24 1617:3

**timely** 1560:2

**times** 1303:23 1339:19
1343:18 1383:3 1407:4,
22 1419:12 1457:19
1464:5 1467:12
1520:22 1542:13
1600:24 1607:5

**timing** 1488:25 1489:2
1510:9

**timing-wise** 1450:10

**Title** 1383:19 1427:25
1490:18 1497:16

**today** 1309:5,8 1333:10
1347:24 1396:16
1398:16 1418:1
1438:18 1476:22
1488:12 1532:18
1562:8 1566:11,12,25
1588:19 1617:12,13

**told** 1289:16,22 1290:4
1294:21 1297:6 1299:1
1312:14 1315:19,22,24
1316:11,12,15,22
1317:6 1331:1 1332:11,
15 1337:3,5,22 1338:1,
8 1343:4,6 1345:13,15,
20,23 1346:1,25 1365:6
1367:1 1368:22
1418:20 1419:23
1429:13 1438:12
1480:5,14,22 1482:16
1484:18 1497:22
1503:1 1584:3 1604:13

**tolerated** 1541:13

**tomorrow** 1304:17,19
1406:12 1616:10
1617:11,14,16,21
1618:5,6,15,17,23
1619:20,23

**tonight** 1616:22
1617:10 1619:21

**tool** 1565:24

**top** 1296:24 1306:12
1337:8 1438:5 1516:22
1524:13 1526:10
1527:20 1532:9
1540:12 1588:18

**topic** 1360:15 1377:24
1455:5 1473:19,20
1476:8 1580:4

**topics** 1347:8 1396:10
1472:18,20

**totally** 1299:13 1365:11
1456:17 1510:14

**trade** 1410:16

**train** 1412:23

**training** 1528:10,23,25
1568:2

**transcribed** 1481:9

**transcript** 1480:24,25
1481:4

**transition** 1514:22

**transpired** 1581:7,16
1583:22 1599:12

**transportation**
1346:14

**travel** 1570:8

**treat** 1318:7 1498:22
1499:23,24 1567:16,19
1568:9,10,11 1601:7,11
1602:9

**treated** 1318:6 1343:11
1457:13,15 1458:19
1459:15 1491:5
1492:20 1495:12
1535:3 1567:20
1600:11

**treating** 1564:7
1614:13

**treatment** 1358:3,22
1452:12 1499:21
1553:7

**trial** 1287:7 1288:8
1295:12 1301:23
1306:2 1313:20 1314:9
1327:23 1377:21
1394:13 1497:3 1505:5,
10,11,16 1506:9
1508:15,24 1509:22,23
1516:17 1524:2
1533:24 1536:8,11,19
1538:3 1543:3,11
1546:4,10 1592:14

**trick** 1429:2

**trip** 1302:24 1387:11,14
1410:16 1527:6,8,20,24
1528:2,13 1529:8

**trips** 1302:23 1330:11
1475:13 1513:11
1523:16 1524:21
1525:2,9,11,23 1526:6
1527:1,6,18 1529:17,25
1530:1 1542:14
1545:19

**trouble** 1357:11

**troubles** 1406:5

**true** 1299:7 1302:14,15
1351:8,9 1362:24
1442:2,7 1445:18
1446:6 1448:20 1496:8
1584:4

**Trump** 1362:6,18

**trust** 1398:10 1446:16

**truth** 1299:16 1506:3,4

**Tuesday** 1409:16
1567:2

**turn** 1333:6 1369:15
1439:15 1440:19
1449:17 1462:18
1499:25 1611:19
1613:17

**turned** 1301:7 1321:16
1334:11 1336:2
1369:19 1375:19
1378:2 1388:25
1404:17 1414:9
1417:10 1419:2 1421:9
1428:6 1433:8 1449:11,
21 1461:14,20 1462:5
1466:11,16 1467:10
1468:10,20 1483:18
1484:23 1485:1,7
1498:20,23 1610:1,12
1611:7 1612:15 1613:3,
11

**turning** 1293:21 1326:6
1333:3 1334:14 1370:1,
20 1375:15 1376:7
1414:8,16 1425:11
1427:14,24 1453:24
1455:20 1457:7 1465:9
1466:11 1498:24
1499:19 1500:1

**turns** 1410:17,18,19
1499:4,5

**TV** 1303:8

**TW** 1287:16

**Twenty-eight** 1558:25

**Twenty-one** 1512:9

**Two-and-a-half**
1558:19

**two-day** 1410:17
1528:12

**TWU** 1312:13 1314:10
1477:8,14,17,22
1481:14 1499:3 1513:4
1578:20 1589:21
1604:12

**TWU's** 1325:19

**tyer** 1591:5

**type** 1323:17 1331:7
1367:4 1369:8 1377:6
1388:16,18 1522:4

1562:14,20 1566:14
1581:18 1585:3
1589:17 1597:3
1601:19 1602:5

**types** 1363:13 1434:7
1547:4 1562:20
1601:22 1602:1

**typically** 1559:21

**typist** 1591:5

## U

**U.S.** 1550:22

**Uh-huh** 1311:6
1328:24 1350:20
1361:20,24 1396:21
1400:17 1406:14,17,24
1408:8 1409:24
1411:16 1412:7,24
1422:2 1423:25 1426:4
1429:21 1441:17
1442:21 1443:22
1444:22 1453:19
1458:9 1464:19

**ultimate** 1433:6 1550:2
1615:4

**ultimately** 1434:6

**un-mute** 1486:8

**un-muted** 1486:7
1576:17

**unacceptable** 1537:3

**unavailable** 1480:16

**unbeknownst** 1503:8

**underlying** 1379:25

**underneath** 1524:17
1528:14

**understand** 1300:2
1305:8 1309:9 1314:19
1317:4 1318:16
1325:22 1332:9 1345:7
1355:5 1361:3 1364:20
1366:2 1371:7 1375:3,9
1377:11,25 1379:6,19
1381:2,15,16 1383:5
1387:2 1388:2,3
1389:25 1397:12
1401:17 1403:13
1409:6 1411:3,6 1415:1

Case 3:17-cv-02278-X   Document 451   Filed 06/14/23   Page 381 of 383   PageID 15401
CHARLENE CARTER vs SOUTHWEST AIRLINES and TRANSPORT WORKERS
3:17-cv-02278-X                    Vol 5 July 11, 2022        Index: understanding..videos

1417:5 1419:4 1421:11, 25 1423:11 1424:18 1425:1,17 1426:1,6 1427:16,23 1437:9 1455:14 1458:22 1460:7,13 1462:9,15 1463:14 1466:7 1467:2, 4 1470:20 1482:20 1490:22 1504:2 1507:25 1517:9 1519:10 1524:10 1525:15 1530:25 1532:8 1551:13 1553:4 1554:5 1578:23 1582:1, 18 1594:19 1598:16 1611:6

**understanding** 1294:4,17 1297:22 1299:11 1329:17 1366:8 1388:4 1427:18, 19 1428:14 1439:2,5 1461:8 1464:20 1525:17 1535:5 1564:8 1607:12 1614:23 1615:3,4

**understood** 1288:10 1313:16 1327:13 1339:15 1347:14 1349:21 1356:2 1375:5 1377:2 1381:22 1384:6 1390:21 1416:10 1494:18 1495:23 1504:12 1509:7 1539:3 1569:19 1617:7

**undue** 1288:2,5 1313:14 1495:22,24 1555:3,7 1571:24 1604:1

**unfettered** 1292:13 1478:15

**unheard** 1523:14

**uniform** 1532:10,14 1570:7 1587:4,7

**union** 1288:3 1289:23 1290:1,5,24 1291:11,17 1293:13,16 1294:19,25 1301:17 1304:23 1305:1,11 1308:11 1309:16 1310:12 1311:13,15 1314:18 1315:10 1317:3 1319:25 1320:21

1321:1,13,24 1322:6, 12,15,22,23,24 1323:3, 7,9,16,20,22,23 1324:2, 5,17 1325:3,7,11,12,13 1326:5 1328:21,25 1329:3 1332:15,25 1337:21,25 1338:3,18, 19 1339:13,23 1341:12 1342:2,12,24 1343:17 1344:2 1345:16 1346:12 1347:11,20 1348:1 1352:14 1353:6 1355:20 1359:3 1361:12 1367:7,8 1369:4,5,18,19,25 1375:8,15,20 1376:6,8, 21,22 1377:8,9 1378:25 1379:4,13 1380:1 1381:5 1383:18 1384:22,23,24,25 1385:7,10,11,20 1386:13,21,25 1387:4, 22 1388:8,13,17,20,22 1389:1,12,18 1390:6 1391:9,13 1395:5 1403:3,9,11,12 1405:10 1407:4,6,7,10 1413:23 1414:3,6,10,23 1415:6, 8,21,23 1416:6 1417:2, 10 1419:7,18 1420:20 1421:16,22 1422:5,6,8, 12,14,16,18,20 1423:2, 4,6,17,18 1424:11,16, 20,21 1425:9,12 1426:3,7 1427:12,14 1429:18,24 1430:8 1433:4 1434:10,11 1435:7 1436:21 1437:10 1438:10,16,20 1439:12,16 1440:18 1441:15 1442:11 1443:13,14 1444:7 1447:1,2 1448:7,16 1449:8 1453:17,23,25 1454:1,6,10,25 1455:2, 7,17 1456:8 1457:2,3 1458:11,19 1459:5,22 1460:6,15 1461:5,6,13, 15,19 1462:4,21 1464:22 1465:13 1467:7,25 1468:24 1469:17,23 1470:16,25 1471:3,5,6,8,9,10,12 1475:6 1481:23 1482:20,23,25 1483:2 1487:5,25 1488:15

1489:22 1490:6 1492:2 1494:8 1495:5 1496:4, 23 1498:17 1499:23 1500:12,14,15 1502:8 1505:12 1508:24 1509:4 1514:17 1516:5 1533:19 1535:7 1552:1, 4,5,10 1555:3,7 1559:21 1571:15,19,24 1575:9 1585:15 1589:13 1592:8 1595:14 1597:16 1598:4,17 1600:6 1602:20,21,22 1603:1, 4,8 1604:12,16 1605:18

**union's** 1304:20 1415:4 1460:8

**union-paying** 1390:9

**union-protected** 1485:11,16

**union-related** 1598:9

**United** 1301:6 1400:20

**universal** 1551:4

**university** 1489:14 1575:15,16

**unmuted** 1363:25

**unprotected** 1496:12

**unquote** 1499:5 1500:2

**unwanted** 1555:3,7 1571:24

**unwise** 1500:25

**updated** 1506:3 1507:20

**updates** 1554:22

**upheld** 1517:25

**upset** 1347:25 1351:20, 24,25 1352:3 1395:19 1582:5,15

**upstairs** 1303:13

**usual** 1394:1

**utilize** 1505:14

**utilized** 1505:15

## V

**VA** 1525:24 1526:8

**vacation** 1525:25 1526:9,12 1527:22 1528:22 1529:2,3,13 1530:9,10,15

**vagina** 1361:18,23 1362:3,20 1363:17 1537:16 1538:1

**vague** 1493:7

**valid** 1441:10,11

**variety** 1585:20

**Vegas** 1577:2,3

**vengeance** 1440:18

**venture** 1297:2 1301:5

**verbally** 1535:4

**verdict** 1495:7 1500:18

**verify** 1521:22 1531:3

**version** 1503:11,21,24, 25 1507:20 1540:19 1541:4

**versions** 1503:9

**versus** 1381:7 1398:16

**vice** 1481:17

**video** 1301:8 1347:5 1348:25 1349:7,11 1385:2 1387:21 1390:8 1480:5,6,8 1481:2,6,8 1482:16 1483:18,22 1484:3 1485:20 1563:22,23 1570:11 1577:15 1602:5 1606:15

**videos** 1289:18 1325:6 1339:20 1340:15,20 1341:4,22,23 1342:1 1344:23,24 1345:2,12 1347:10,12,16,18 1351:3,7,24 1353:1,21 1359:14 1360:11,22 1364:14 1385:19,23 1389:12 1409:2 1483:20,25 1496:15 1498:25 1499:7 1500:3, 8 1515:24 1518:13,15

1519:1 1520:10,12,18
1531:4,22 1533:4
1537:13 1538:20
1551:7,8,14 1563:20
1577:17,22,25 1578:3,6
1582:10 1584:1
1596:17 1597:4,6,22
1600:24 1601:16
1602:2

**view** 1339:24 1345:7
1444:2 1459:1 1460:8
1542:9 1600:12
1601:24 1611:8

**viewed** 1484:13 1578:4

**viewing** 1533:5
1578:10

**views** 1340:2 1492:12
1548:21 1549:6,13
1550:18 1564:2
1608:12

**VII** 1383:19 1427:25
1490:19

**VII's** 1497:16

**Vincent** 1615:18

**violate** 1385:3 1432:1,
2,20 1493:11 1545:12
1579:2

**violated** 1323:18
1336:3 1369:20 1370:1,
6 1385:23 1390:10
1466:11 1493:10
1497:13 1499:11
1542:22,25 1545:11
1548:13 1605:22,25

**violates** 1497:18

**violating** 1485:1
1508:10 1544:4,11

**violation** 1331:17
1387:19 1424:3
1479:12 1484:24
1485:6 1498:18 1518:6
1543:22 1553:14
1554:3 1599:18 1606:6

**violations** 1433:1
1512:21 1513:18
1515:15,17 1519:6
1548:15

**vis-a-vis** 1567:14

**vision** 1541:6

**visions** 1402:13

**vocal** 1425:21 1438:13
1440:24

**voice** 1423:9

**voiced** 1324:2,14

**volunteer** 1433:18

**volunteered** 1432:5
1608:1

**vote** 1340:25 1407:18,
21,25 1429:11 1440:16

**voted** 1429:16,17

**votes** 1441:22 1442:8,
10 1443:12

---

**W**

**W-2** 1301:25 1302:9

**W-2S** 1302:3 1475:11
1476:6

**wait** 1316:7 1334:21
1360:24 1428:17
1442:3 1479:16 1593:8

**walk** 1396:19 1397:14
1413:22 1473:11
1524:9 1525:4

**walked** 1303:5 1520:22

**walking** 1296:13
1300:5 1431:23

**wanted** 1293:12,14,17
1311:7 1316:18 1323:4,
7,17 1340:24 1341:4
1349:1,4 1351:6
1359:14,15 1367:9
1403:2 1404:7 1411:8
1430:11 1467:7
1470:11,12,15,22,23
1495:17 1503:1 1519:8
1523:17 1531:3
1582:22 1594:15
1595:13

**wanting** 1467:15
1539:3

**Washington** 1368:23
1395:16 1491:12

**wasted** 1303:9

**watch** 1483:24 1520:10
1563:20

**watched** 1483:22
1484:16 1520:12,18

**wave** 1394:1

**ways** 1510:8 1537:9

**wear** 1352:18 1363:14

**wearing** 1365:17
1367:19 1483:10

**website** 1325:19,20,21
1492:3

**Wednesday** 1409:16
1567:1 1618:1,12

**week** 1406:3,5 1409:4,
8,12 1525:25 1528:22
1529:13 1530:10

**what-all** 1616:24

**wife** 1586:22

**wings** 1587:3

**wiser** 1619:1

**withdraw** 1561:10

**witness's** 1324:8

**witnesses** 1501:12,16
1502:9,11 1507:16
1617:13

**woman** 1346:5 1354:19
1355:4 1357:1 1369:2
1444:14

**woman's** 1538:1

**women** 1323:8 1345:17
1346:13 1348:21
1351:21 1352:20
1353:7 1355:9 1356:14
1360:8 1362:5,7
1363:9,10,15 1364:17
1365:12 1367:18,22,24,
25 1368:23 1369:4
1389:20 1491:12,14
1492:11,14

**women's** 1290:6
1346:11 1348:1
1353:17 1354:10,11
1355:20 1357:20
1363:10 1447:8
1454:24 1488:2

1489:24 1491:9,18
1492:16 1499:2
1500:11,13 1519:18
1581:25 1582:4
1591:18 1595:21

**wondering** 1611:24
1619:13

**word** 1346:2 1347:2,5
1367:20 1426:3
1497:24

**wording** 1446:17

**words** 1319:25 1320:21
1422:20 1448:23,24
1454:15 1466:14
1480:21,24 1481:1
1584:14

**wore** 1362:5 1363:10,
13 1364:12 1368:1,23

**work** 1304:10 1310:11
1311:15 1386:15,16,21
1387:13,24 1398:9
1402:19 1408:6
1416:17 1435:14
1457:20 1481:21
1512:7,19 1513:22
1517:23 1523:19
1534:18 1539:22
1542:3 1547:6 1552:7,
24 1559:4,16 1560:7,8
1564:9 1565:13
1566:10 1567:6
1568:12 1569:17
1570:2,4 1574:20
1579:4,18 1580:25
1581:9 1602:11

**work-like** 1542:14

**worked** 1403:12
1447:1 1512:3 1517:23
1518:7 1521:24
1523:11 1529:4
1575:12,15 1579:6
1599:17

**workforce** 1542:12
1545:16 1553:11

**working** 1301:4 1304:7
1339:12 1398:6,7
1399:6,9,13 1402:8,10
1407:6 1442:11 1444:7
1475:12 1512:15
1529:2 1542:7 1569:13
1575:11 1618:18

**workmates**  1435:7

**workplace**  1291:19,21
1292:7,13,15,17
1331:17 1344:14,17
1386:11,12 1387:6,9,20
1388:5 1478:16 1505:9,
18 1514:4 1531:11
1540:16 1541:4,14,23
1542:2 1543:22 1544:9
1586:11,14 1606:1

**works**  1555:21

**worried**  1334:7

**worry**  1443:19

**worse**  1306:23,24
1581:24

**worst**  1441:7

**wrap**  1463:19

**wrapping**  1452:22

**write**  1566:25 1605:4

**writing**  1399:10

**written**  1327:20

**wrong**  1367:13
1369:14 1372:11
1374:22,23 1380:15
1448:18 1451:13
1505:23 1550:20
1615:10

**wronged**  1453:18

**wrote**  1359:17 1363:12
1370:16 1456:5 1508:6

—————————
**Y**
—————————

**y'all**  1373:23 1381:15,
16 1392:24 1393:14
1451:1 1452:14,16,24
1480:13,14 1486:15,19
1501:2 1502:16
1509:10,19 1616:21
1617:8 1618:8,16
1619:6,20,24

**year**  1330:15 1396:23
1397:19,25 1398:3
1413:17 1475:15
1476:14 1528:25
1554:14 1568:1
1581:22

**years**  1290:19,21
1298:13 1302:9,12,18
1303:11 1306:17
1310:9 1342:6 1347:7,
13 1356:24 1357:11
1360:13 1387:17
1398:22 1401:18,19
1405:13 1413:12,13
1490:10 1512:9
1523:12 1552:20
1558:19,25 1574:25
1575:4,19,20 1580:25
1581:23

**yes-or-no**  1366:6

**young**  1346:5

—————————
**Z**
—————————

**Zoom**  1485:23