UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLENE CARTER, §
§
*Plaintiff,* §
§
v. §
§ Civil Action No. 3:17-CV-2278-X
§
TRANSPORT WORKERS UNION §
OF AMERICA, LOCAL 556, and §
SOUTHWEST AIRLINES CO., §
§
*Defendants.* §

## MEMORANDUM OPINION AND ORDER GRANTING SANCTIONS

Southwest Airlines Co. ("Southwest") fired flight attendant Charlene Carter for sending social-media messages about abortion. Southwest claimed the messages violated its social-media policies regarding civility. The jury found that Southwest violated Title VII's protections of Carter's religious speech. The Court ordered Carter reinstated, enjoined Southwest from discriminating against the religious beliefs of its flight attendants, and ordered Southwest to notify its flight attendants of Title VII's prohibition on religious discrimination. Carter moved for sanctions regarding that notice, which is the motion before the Court.

Specifically, the Court ordered "Southwest . . . to inform Southwest flight attendants that, under Title VII, [Southwest] may not discriminate against Southwest flight attendants for their religious practices and beliefs."[1] Instead, Southwest's notice said, "[t]he court [] ordered us to inform you that Southwest ***does***

---

[1] Doc. 375 at 3 (temporarily vacated in part on other grounds).

1

***not*** discriminate against our Employees for their religious practices and beliefs."[2] Southwest's notice failed to mention Title VII, that the federal law known as Title VII contains a prohibition, and that that prohibition forbids Southwest from discriminating against flight attendants for their religious beliefs.   Instead, Southwest's notice communicated that there's nothing to see here—aside from the Court's bequeathing Southwest a badge of honor for not discriminating (which the Court did not do).

Not content with merely inverting the Court's notice, Southwest also sent a memo to its flight attendants the same day, stating that its employees must abide by the types of policies over which Southwest fired Carter and that it believed its firing of Carter was justified because of those policies.

Carter moved for sanctions.   [Doc. 382].   Civil sanctions (like those at issue here) require a court to determine whether a party violated a court order and, if so, what sanction to impose to compel compliance.

It's hard to see how Southwest could have violated the notice requirement more.   Take these modified historical and movie anecdotes.   After God told Adam, "[Y]ou must not eat from the tree [in the middle of the garden],"[3] imagine Adam telling God, "I do not eat from the tree in the middle of the garden"—while an apple core rests at his feet.   Or where Gandalf bellows, "You shall not pass,"[4] the Balrog muses, "I do not pass," while strolling past Gandalf on the Bridge of Khazad-dûm.

---

[2] Doc. 383-2 at 2 (emphasis added).

[3] Genesis 2:17 (NIV).

[4] THE FELLOWSHIP OF THE RING (New Line Cinema 2001).

In the universe we live in—the one where words mean something—Southwest's notice didn't come close to complying with the Court's order.  So the Court **GRANTS** Carter's motion and holds Southwest in civil contempt.

So how can the Court compel compliance with its order?  The first piece of a remedy is ordering Southwest to provide this statement verbatim to its flight attendants to set the record straight:

> The United States District Court for the Northern District of Texas ordered Southwest to issue the following statement to you: On December 20, 2022, Southwest's Legal Department issued an e-mail to all flight attendants entitled "Recent Court Decision" regarding a federal court judgment against Southwest and Transport Workers Union, Local 556.  That e-mail said, "[t]he court . . . ordered us to inform you that Southwest does not discriminate against our Employees for their religious practices and beliefs."  The United States District Court for the Northern District of Texas subsequently found that the statement's use of "does not discriminate" was incorrect.  Accordingly, the Court has ordered Southwest's Legal Department to issue the following amended statement:

> Under Title VII, Southwest may not discriminate against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion.

But Southwest also argues that it has the right to speak, just like it did with the memo to flight attendants reminding them to abide by the policies over which it unlawfully fired Carter.  The Court agrees that Southwest has the right to speak.  But Southwest has long harbored the view—during trial, after the verdict, and (as evinced by its memo to flight attendants) even after the judgment—that its policies on civility trump federal laws like Title VII.  And if Southwest continues to represent to its flight attendants that it may discriminate against them if they violate

Southwest's civility policies, Southwest will likely find itself (yet again) on the wrong side of the Court's order. Southwest needs to understand, when communicating with its employees, that federal protections for religious freedom override any company civility policy. The rule of law and the republican form of government guarantee no less.

Because Southwest's right to speak when implementing the Court's injunction ensures a continued partnership in the future, and Southwest's speech and actions toward employees demonstrate a chronic failure to understand the role of federal protections for religious freedom, the Court concludes that training on religious freedom for three lawyers at Southwest the Court finds responsible (Kerrie Forbes, Kevin Minchey, and Chris Maberry) is the least restrictive means of achieving compliance with the Court's order. The Alliance Defending Freedom ("ADF") has conducted such training in the past, and the Court deems that appropriate here.[5]

## I.  Background

A jury found that Southwest and Transport Workers Union of America, Local 556 ("Local 556") discriminated against Carter for her religious practices or beliefs in violation of Title VII. Because "injunctive relief is mandatory" in most Title VII cases,[6] the Court ordered "Southwest and Local 556 to inform Southwest flight

---

[5] The Court also awards Carter attorney fees and costs for this contempt proceeding.

[6] *E.E.O.C. v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 469–70 (5th Cir. 2013) (en banc).

attendants that, under Title VII, [Southwest and Local 556] may not discriminate against Southwest flight attendants for their religious practices and beliefs."[7]

Local 556 had no trouble conveying Title VII's prohibition on discrimination.[8] Southwest, on the other hand, struggled.  Although Southwest circulated multiple drafts, Kevin Minchey authored a draft that said, "[t]he court [] ordered us to inform you that Southwest **does not** discriminate against our Employees for their religious practices and beliefs."[9]  Title VII's prohibition on discrimination was conspicuously absent.  On December 20, 2022, Southwest sent Minchey's language to its flight attendants in an e-mail (the "Recent Court Decision notice").

To make matters worse, Southwest contemporaneously circulated a document (the "Inflight Info on the Go memorandum" or "IIOTG memo") to its flight attendants, presenting Southwest's views on Carter's case.  At the outset, the memo lambasts Carter, saying that Southwest believes that her conduct underlying this case "crossed the boundaries of acceptable behavior," was "inappropriate, harassing, and offensive," and "did not adhere to Southwest policies and guidelines."[10]  Next, the memo states that Southwest is "appealing the decision," but it did not state that

---

[7] Doc. 375 at 3.  The Court includes only the portion of that order that is relevant to Carter's contempt motion.

[8] Doc. 383-4 at 2 (telling flight attendants that "[t]he court [] ordered us to inform you that TWU Local 556, under Title VII, may not discriminate based on religious practices and beliefs").

[9] Doc. 383-2 at 2; *see also* Tr. Trans. at 232, 284.  Although the identity of the drafter was initially privileged, multiple witnesses testified to Minchey's authorship in the public portion of the show-cause hearing.

[10] Doc. 383-3 at 2; *see also id.* (arguing that Carter's "online conversation . . . created unnecessary tension among a workgroup" and contained "extremely graphic and disturbing visuals").

Southwest declined to seek a stay of the injunctive portions of the ruling.[11]  Next, the memo emphasizes that, unlike Carter, Southwest flight attendants "must all adhere to" Southwest's "established policies."[12]  The memo concludes by reminding Southwest flight attendants that they must "take care of each other . . . in every interaction, including those online" and that they must "work to ensure that everyone is comfortable in their work environment by consistently displaying [c]ivility . . . at all times."[13]

Carter moved for sanctions based on both communications.  Southwest's position on its communications has evolved.  For instance, on December 28, 2022, Southwest averred that its Recent Court Decision notice "complied with the spirit and wording of the Court's judgment" and that there was nothing "confusing about the wording of Southwest's notice."[14]  Any variation from the Court-ordered statement was merely "a distinction without a difference."[15]

But Southwest changed its tune from recalcitrance to self-flagellation in April 2023 after the Court scheduled a show-cause hearing and telegraphed its "concern[] that Southwest distorted the specificity of the Court's injunctive relief [] to its own flight attendants."[16]  With the help of outside counsel, Southwest now acknowledges

---

[11] *Id.*; *see also id.* (relating that an arbitrator had "upheld" the termination and "found [Carter's] postings and messages to be repulsive and beyond the bounds of civility" (cleaned up)).

[12] *Id.*

[13] *Id.*

[14] Doc. 383-6 at 3.

[15] *Id.*; *accord* Doc. 394 at 9 (averring on January 6, 2023 that Southwest's use of "does not discriminate" didn't "mislead the reader[s] or cause confusion").

[16] Doc. 409 at 22.

that "it was wrong to issue" the Recent Court Decision notice because it could give "the impression that this Court ruled that Southwest had not discriminated against an employee because of her religious beliefs."[17]

At the show-cause hearing, the Court heard testimony from three of Southwest's in-house lawyers—Kerrie Forbes, Kevin Minchey, and Chris Maberry—one of Southwest's public-relations employees—Brandy King—and Southwest's outside counsel, Paulo McKeeby.

## II. Legal Standards

Under Federal Rule of Civil Procedure 70, "[i]f a judgment requires a party . . . to perform any [] specific act and the party fails to comply," the Court "may [] hold the disobedient party in contempt."[18]  A court may also "invoke [its] inherent power to sanction" upon "a finding of bad faith or willful abuse of the judicial process."[19] The party moving for contempt bears the burden of proof,[20] and "show cause orders do not [] shift the burden to the alleged contemnor."[21]  "Upon a finding of civil contempt, the Court has broad discretion to impose judicial sanctions that would coerce compliance with its orders and compensate the moving party for any losses sustained."[22]

---

[17] Doc. 419 at 2.

[18] FED. R. CIV. P. 70(a), (e).

[19] *In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014) (cleaned up).

[20] *Sealed Appellant 1 v. Sealed Appellee 1*, 211 F.3d 252, 255 (5th Cir. 2000).

[21] *Charitable DAF Fund LP v. Highland Capital Mgmt. LP*, No. 3:21-CV-1974-X, 2022 WL 4538466, at *12 (N.D. Tex. Sept. 28, 2022) (Starr, J.).

[22] *Mary Kay Inc. v. Designs by Deanna, Inc.*, No. 3:00-CV-1058-D, 2013 WL 6246484, at *4 (N.D. Tex. Dec. 3, 2013) (Fitzwater, J.).

## III. Analysis

The Court considers (A) whether Southwest violated the Court's order, and (B) the appropriate sanction.

### A. Violations of Court Order

This is a civil contempt proceeding, so the Court is concerned with ensuring compliance with its orders and not punishing Southwest for past violations of its orders (known as criminal contempt).  "[T]he elements of civil contempt are (1) that a court order was in effect, [] (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[23] The first two elements are largely uncontested.[24]  The Court ordered "Southwest . . . to inform Southwest flight attendants that, under Title VII, [Southwest] may not discriminate against Southwest flight attendants for their religious practices and beliefs."[25]  And that order required certain conduct—it required Southwest to convey that (1) Title VII, (2) prohibited, (3) Southwest, (4) from discriminating, (5) based on religious practices or beliefs.  The only issue is whether Southwest complied with that order.  Remarkably, Southwest failed to comply with the requirements of that five-part sentence in four ways.

First, the Recent Court Decision notice said nothing of Title VII—the first element of the Court-ordered message.  And Title VII wasn't an extraneous detail.

---

[23] *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009) (cleaned up) (emphasis omitted).

[24] The Court addresses below Southwest's argument that the Court's order lacked specific and definite language.

[25] Doc. 375 at 3.  Carter also moves for sanctions based on other Court orders.  At this time, the Court only sanctions Southwest for its failure to issue the Court-ordered notice.

The Court was concerned that Southwest appeared "poised to repeat" its discriminatory conduct "with other flight attendants."[26]  Because the Court had no confidence that Southwest would conform its conduct to Title VII in the future, it was important to inform Southwest flight attendants that federal law (a higher authority than Southwest) prohibited Southwest's discriminatory conduct.  Thus, Southwest's failure to mention Title VII gutted the Recent Court Decision notice from the get-go.

Second, and most critically, the Recent Court Decision notice failed to convey any legal prohibition on discrimination—the second element of the Court-ordered notice—by replacing the Court-ordered *may not* with *does not*.  And that change radically shifted the meaning of the notice.  *May*—the word the Court used—means "have permission to."[27]  So *may* conveys the presence or absence of a prohibition.  Conversely, *do* means to "commit" or to "bring to pass."[28]  *Do* conveys nothing about a prohibition.  So by replacing *may not* with *does not*, Southwest removed the concept of a legal prohibition on Southwest's discrimination.  That failure to convey a legal prohibition renders the Recent Court Decision notice particularly anemic.

Third, the Recent Court Decision notice implied that the Court shares Southwest's sunny view of its own conduct.  By saying "the court [] ordered us to inform you," the notice suggests that whatever follows that statement is a

---

[26] Doc. 374 at 28.

[27] *May*, MERRIAM-WEBSTER DICTIONARY,  https://www.merriam-webster.com/dictionary/may (last visited Aug. 7, 2023).

[28] *Do*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/do (last visited Aug. 7, 2023).

communication from the Court.[29]  Thus, as Southwest now concedes, the conjunction of "the court [] ordered us to inform you" with "Southwest does not discriminate" suggests that the Court holds the view that Southwest does not discriminate.[30]  And the notion that Southwest's actions received the Court's imprimatur suggests that the Court perceives that Southwest never violated a legal prohibition.  But that's the antithesis of the Court-ordered notice.  The Court ordered Southwest to convey a legal prohibition (Southwest may not discriminate)—not to imply the lack thereof (Southwest does not discriminate).

Fourth, the juxtaposition of the IIOTG memo and the Recent Court Decision notice implies a dearth of legal prohibition on Southwest's discriminatory conduct *vis-à-vis* flight attendants' online interactions.  Here's how.  The IIOTG memo conveys a *modus ponens* syllogism:

1.  If a flight attendant must follow Southwest's policies, then that flight attendant may not act as Carter did online.[31]
2.  Southwest's flight attendants must follow Southwest's policies.[32]

The necessary inference is obvious—***Southwest's flight attendants may not act as Carter did online***.  Accordingly, given the temporal proximity of the Recent Court Decision notice and the IIOTG memo,[33] on December 20, 2022, Southwest flight

---

[29] Doc. 383-2 at 2.

[30] *Id.*; *see also* Doc. 419 at 2 (acknowledging that "someone could read [that] sentence . . . and have the impression that this Court ruled that Southwest had not discriminated against an employee because of her religious beliefs").

[31] Doc. 383-3 at 2 (conveying that Carter "did not adhere to Southwest policies and guidelines" in her online interactions).

[32] *Id.* (warning that Southwest flight attendants "must all adhere to" Southwest's "established policies and guidelines").

[33] Flight attendants reasonably would have considered those two messages together because Southwest e-mailed those messages to flight attendants back-to-back.  Further, the IIOTG memo even

attendants read that Southwest "does not discriminate" against its flight attendants and that Southwest may prohibit flight attendants from acting as Carter did online. But that's the antithesis of the Court-ordered notice to its flight attendants that Title VII prohibits Southwest from discriminating against them for their religious beliefs and practices expressed online.

Although Southwest largely concedes that it was wrong to issue the Recent Court Decision notice, Southwest also attempts to justify its statement in four ways. None of these four arguments leaves the gate.

First, Southwest raises the affirmative defense of substantial compliance.[34] A prospective contemnor can show substantial compliance by showing "reasonably diligent and energetic [] attempt[s] to accomplish what was ordered."[35] But Southwest devoted diligence and energy only to circumventing the Court's order—not to complying with it. The *in camera* documents with privileged information indicate that decision was willful—not accidental. For the reasons given in the *ex parte* addendum, Southwest did not substantially comply with the Court's order.

Second, Southwest provides a revisionist interpretation, saying that "does not discriminate" actually "conveys that Southwest **will not** discriminate **in the**

---

alluded to the Recent Court Decision notice. *Id.* (noting that the Court required Southwest to "distribute communication to Flight Attendants about the ruling").

[34] *Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987) (recognizing that, "[o]nce a violation [is] demonstrated, the burden then f[alls] on [the prospective contemnors] to show . . . substantial compliance with" the Court's order).

[35] *Bisous Bisous LLC v. Cle Grp., LLC*, No. 3:21-CV-1614-B, 2021 WL 4219707, at *3 (N.D. Tex. Sept. 16, 2021) (Boyle, J.) (cleaned up). Some courts impose a more-onerous standard. *Id.* Because Southwest flunks even the less-onerous standard, the Court doesn't resolve that issue.

*future*."[36]  That's wrong.  *Does* is a present-tense verb, so it doesn't contain a future-tense connotation as Southwest propounds.[37]  In any event, tense is not the issue here.  The Court ordered Southwest to convey a legal prohibition, and Southwest didn't do that.  Southwest's revisionist interpretation comes up short.

Third, Southwest argues that its anti-discrimination policy says, "Southwest ***does not*** tolerate discrimination . . . of any kind."[38]  Thus, Southwest contends that its use of "does not" forcefully conveys antipathy towards discrimination in a manner reminiscent of its anti-discrimination policy.[39]  Southwest shoots itself in the foot.  The anti-discrimination policy says Southwest "does not ***tolerate*** discrimination."[40]  *Tolerate* means "to allow to be . . . done without prohibition."[41]  While "does not tolerate" connotes a prohibition,[42] mention of a prohibition is precisely what the Recent Court Decision notice lacked.  So Southwest's anti-discrimination policy illustrates the Recent Court Decision notice's inadequacy.

---

[36] Doc. 394 at 10 (emphases added).

[37] *Does*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/does (last visited Aug. 7, 2023).  For instance, it's perfectly consistent to say that "Southwest does not assign seats" and "Southwest may, at some point, assign seats."  *E.g.*, Alison Fox, *Incoming Southwest CEO Says Assigned Seats May Be in Airline's Future*, TRAVEL + LEISURE, https://www.travelandleisure.com/travel-news/new-southwest-airlines-ceo-assigned-seats (last visited Aug. 7, 2023) ("Southwest does not currently assign seats . . . .  Assigned seating may be in Southwest's future.").

[38] Doc. 429-1 at 6 (emphasis added).

[39] Tr. Trans. at 380–81, 359 (Minchey testifying that "[u]m, 'does' is more direct, more of the way that we say things at Southwest when we talk about prohibitions against discrimination").

[40] Doc. 429-1 at 6 (emphasis added).

[41] *Tolerate*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/tolerate (last visited Aug. 7, 2023).

[42] Even so, "does not tolerate" wouldn't do the trick here.  Southwest needed to convey that ***Title VII*** prohibited discrimination—not that ***Southwest***, of its own accord, prohibited discrimination.

Fourth, Southwest contends a court can sanction a party only if the party violated "a court order requiring in specific and definite language that a person do . . . an act" and that a "vague or ambiguous" order won't do.[43]  Southwest insinuates that the Court-ordered notice was not definite and specific because "the Court did not mandate a particular script or statement that Southwest was obligated to publish."[44] To begin, Southwest tilts at windmills.  Sure, the Court didn't require Southwest to use verbatim language, but the Court isn't sanctioning Southwest for failing to use verbatim language.[45]  In any event, Southwest can't seem to put its finger on the portion of the Court's order that, it contends, was ambiguous.  That's likely because the Court didn't stutter: Southwest needed to convey Title VII's prohibition ***in some manner***.  Because it didn't, the Court sanctions Southwest.

The Court **GRANTS** Carter's motion for contempt and holds Southwest in contempt.

### B. Appropriate Sanctions

To determine the appropriate sanctions, courts consider "(1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order."[46]  Carter seeks four

---

[43] *Martin v. Trinity Indus., Inc.,* 959 F.2d 45, 47 (5th Cir. 1992) (cleaned up).

[44] Doc. 394 at 10.

[45] Southwest could have conveyed Title VII's prohibition in myriad ways.  For instance, Southwest could have said, "Title VII prohibits Southwest from discriminating," "Title VII forbids Southwest from discriminating," "under Title VII, Southwest is proscribed from discriminating," or "Title VII obligates Southwest not to discriminate."

[46] *Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 567 (5th Cir. 1990).

sanctions—attorney fees, a flat fine, a revised notice, and religious-liberty training. The Court considers each in turn.

### 1. Attorney Fees

"[A]n assessment of attorney's fees is undoubtedly within a court's inherent power[.]"[47] Here, Southwest has agreed to "reimburse [Carter] for all her reasonable attorneys' fees connected to the Motion for Contempt and Motion to Compel proceedings."[48] Accordingly, the Court awards Carter attorney fees and costs and directs Carter to file a bill of costs and a motion with proof of fees for the motion-for-contempt and motion-to-compel proceedings.

### 2. Flat Fine

Carter requests a "punitive sanction[]" of a flat fine in the "high six figures."[49] But the Court is holding Southwest in civil contempt. "[A] flat, unconditional fine . . . is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance."[50] Accordingly, the Court declines to impose a flat fine.

### 3. Revised Notice

Carter wants Southwest to "issue corrective notices," and she provides specific language she'd like Southwest to use.[51] Although Southwest has agreed to "re-issue

---

[47] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991).

[48] Doc. 419 at 5. The motion to compel involves Carter's request to compel Southwest to produce documents regarding the sanctions motion. The Court previously granted the motion to compel. In addition to attorney fees for the motion to compel and the motion for sanctions, at the show-cause hearing, Southwest orally agreed to reimburse Carter's reasonable costs as well.

[49] Doc. 428 at 7, 10.

[50] *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) (cleaned up).

[51] Doc. 382 at 14–16.

the Email Notice . . . with the 'may not discriminate' language," Southwest opposes Carter's proposed language.[52]   So the only issue is whether reissuance is an appropriate sanction or whether more language is necessary.   The Court considers the four factors.

First, Southwest's noncompliance caused significant harm.   The Court had to devise its remedies in this case "to vindicate the policies of" Title VII.[53]   Accordingly, it was important for Southwest flight attendants to be aware that Title VII prohibits Southwest's religious discrimination.   But Southwest's Recent Court Decision notice suggested that there's no such thing as Southwest's religious discrimination, and the IIOTG memo suggested that Southwest may, in fact, unabashedly curtail flight attendants' religious beliefs and practices expressed in their online interactions in the name of civility.   Worse, the Recent Court Decision notice suggested that the Court endorsed Southwest's erroneous views.   Accordingly, the Court finds significant harm from Southwest's noncompliance.

Second, mere reissuance would have little probable effectiveness against that harm.   To adequately inform flight attendants of Title VII's protections, any revised notice must—at the risk of stating the obvious—reference Title VII.   But Southwest has not agreed to reference Title VII in its reissued notice.   Next, any revised notice needs to remedy the fact that, as Southwest concedes, the Recent Court Decision notice misrepresented the Court's position.   Southwest has not agreed to clarify that

---

[52] Doc. 419 at 5.

[53] *Gordon v. JKP Enters. Inc.*, No. 01-20420, 2002 WL 753496, at *7 (5th Cir. Apr. 9, 2002) (per curiam) (cleaned up).

misrepresentation.  Lastly, any revised notice needs to highlight the error in the Recent Court Decision notice.  Here's why: Multiple e-mails on a single topic pose a significant risk of confusing people.  Sans any highlighting of the error in the previous message, Southwest's flight attendants would likely harbor confusion about the reissued notice.  Accordingly, mere reissuance lacks probable effectiveness.

Third, Southwest has vast financial resources, and there's no evidence that a more extended statement would meaningfully cost Southwest anything more than reissuance.

Fourth, Southwest's disregard of the Court's order was willful.  When confronted with its error, Southwest doubled down for months, claiming that Carter's complaint constituted "a distinction without a difference."[54]  Unsurprisingly, then, at no point has Southwest maintained that its "does not discriminate" language was an inadvertent mistake.  And, for the reasons described in the *ex parte* addendum, Southwest cannot with a straight face chalk up its language to a mistake or inadvertence.  Southwest's disregard of the Court's order was willful.  Accordingly, the Court concludes that mere reissuance is an inadequate sanction.

Southwest lodges one objection, namely that "a particular statement would violate Southwest's First Amendment right against compelled speech."[55]  Under

---

[54] Doc. 383-6 at 3; *accord* Doc. 394 at 9 (averring on January 6, 2023 that Southwest's use of "does not discriminate" didn't "mislead the reader[s] or cause confusion").

[55] Doc. 394 at 18.

strict scrutiny,[56] a governmental entity may compel speech only when the speech is "narrowly tailored to promote the government's compelling interest."[57]

First, there's a compelling governmental interest in informing flight attendants of their rights under Title VII. Title VII requires courts to fashion "remedies [] devised to vindicate the policies of [Title VII]."[58] And one of Title VII's policies is to "eliminat[e] discrimination."[59] To begin to do that, the Court sought to inform flight attendants of Southwest's prior discrimination—by having Southwest provide the jury verdict and the Court's judgment—and inform flight attendants of Title VII's prohibition on Southwest's future discrimination. But Southwest did effectively the opposite. It warranted that it does not discriminate against its flight attendants and then implied in the IIOTG memo that it may, in fact, discriminate against its flight attendants in the future if they are uncivil in its opinion. That language obfuscated the fact of Southwest's prior discrimination and utterly failed to convey Title VII's prohibition. In a word, Southwest stymied Title VII's policies with Carter and continues to do so now. The Court must remedy that. And, as noted, the only effective remedy is to call attention to the error in the Recent Court Decision

---

[56] Lesser scrutiny likely applies here. For instance, two courts have rejected First Amendment challenges to court-ordered notices, finding that the notices constituted commercial speech, which is subject to lesser scrutiny. *See Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*, 799 F.3d 437, 453 (5th Cir. 2015), *on reh'g*, No. 13-20250, 2015 WL 13768849 (5th Cir. Oct. 22, 2015); *Barajas v. Acosta*, No. H-11-3862, 2012 WL 1952261, at *4 (S.D. Tex. May 30, 2012). Likewise, regulation of attorney speech is often subject to lesser scrutiny. *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 756 (5th Cir. 2008) ("[T]he Supreme Court has held that attorney speech may be subject to diminished First Amendment protection[.]"). But because neither party engages in any meaningful First Amendment analysis, the Court assumes, *arguendo*, that strict scrutiny applies.

[57] *Hersh*, 553 F.3d at 768.

[58] *Gordon*, 2002 WL 753496, at *7 (cleaned up).

[59] *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981) (cleaned up).

notice and then to convey Title VII's prohibition. There's a compelling governmental interest in vindicating Title VII's policies in that manner.[60]

Second, the compelled speech is narrowly tailored to vindicate Title VII's policies. As noted, a mere reissued statement alone would serve only to confuse flight attendants. To vindicate Title VII's policies, the Court must highlight the error in the Recent Court Decision notice and then accurately convey Title VII's prohibition. But to ensure that that speech remains narrowly tailored, the Court will not require further language. For instance, Carter has requested a compelled communication that includes an apology, a summary of the jury's verdict, and multiple admissions that the Recent Court Decision notice was misleading. Those statements would not be narrowly tailored to vindicate Title VII's policies, so the Court will not compel those statements.[61]

Southwest cites a slew of cases in support of its compelled-speech objection, but all are inapposite. Initially, Southwest cites two unpublished Central District of California cases. Although both cases recognized possible First Amendment implications of court-ordered speech, neither found that a court-ordered statement violated the First Amendment or conducted any First Amendment analysis—they ruled on other grounds.[62]

---

[60] *Cf. Hersh*, 553 F.3d at 748, 766 (finding that Congress had a sufficiently compelling interest in requiring "debt relief agencies to disclose specific basic information about bankruptcy to assisted persons whom they are counseling through the bankruptcy process" to "ensur[e] that debtors who are contemplating filing for bankruptcy have some basic knowledge about the process").

[61] *See Woodruff v. Ohman*, 29 F. App'x 337, 346 (6th Cir. 2002) ("[A]n apology will little serve the purposes of Title VII.").

[62] *See Cameroon Ass'n of Victims of Ambazonia Terrorism Inc. v. Ambazonia Found. Inc.*, No. CV 20-1115 PA (ASx), 2020 WL 4852858, at *4 (C.D. Cal. Feb. 6, 2020) (concluding that a court-ordered

Next, Southwest cites cases where courts declined to compel apologies because "an apology will little serve the purposes of Title VII."[63]  But those cases didn't deal with the First Amendment.  And, in any event, the Court is not requiring Southwest to apologize.

Next, Southwest cites cases prohibiting courts from ordering public readings of court-ordered notices because public readings create "[t]he ignominy of a forced public . . . confession of sins."[64]  But the Court isn't mandating that Minchey publicly proclaim the errors of his ways whilst detained in stocks at the town square.  And, tellingly, the same courts that criticized public readings approved of written notices.[65]

Southwest's cases are inapposite.  Accordingly, the Court **ORDERS** Southwest to provide the following notice verbatim to its flight attendants.

> The United States District Court for the Northern District of Texas ordered Southwest to issue the following statement to you:   On December 20, 2022, Southwest's Legal Department issued an e-mail to all flight attendants entitled "Recent Court Decision" regarding a federal court judgment against Southwest and Transport Workers Union, Local 556.  That e-mail said, "[t]he court . . . ordered us to inform you that Southwest does not discriminate against our Employees for their religious practices and beliefs."  The United States District Court for the Northern District of Texas subsequently found that the statement's use of "does not discriminate" was incorrect.  Accordingly,

---

statement "raises significant First Amendment considerations" without conducting any First Amendment analysis); *Riley's Am. Heritage Farms v. Claremont Unified Sch. Dist.*, No. EDCV 18-2185JGB (SHKx), 2020 WL 5792475, at *4 (C.D. Cal. Aug. 27, 2020) (recognizing the "irony in [a] First Amendment case" where plaintiffs requested a court-ordered statement, but only concluding that "[s]uch a remedy does not meet the standards . . . for injunctive relief under Section 1983").

[63] *Woodruff*, 29 F. App'x at 346.

[64] *HTH Corp. v. N.L.R.B.*, 823 F.3d 668, 675 (D.C. Cir. 2016) (cleaned up).

[65] *See, e.g.*, *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. N. L. R. B.*, 383 F.2d 230, 232 (D.C. Cir. 1967) ("Amongst the approved remedies are the requirements that the employer mail to each employee the notice which informs the employee of his statutory right to be free from coercion, interference, and restraint, and to post copies of this same notice.").

the Court has ordered Southwest's Legal Department to issue the following amended statement:

Under Title VII, Southwest may not discriminate against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion.

### 4. Religious-Liberty Training

Training that's tailored to address a contemptuous action is a commonplace sanction.[66]  Training "in the relevant subject area" is particularly appropriate when a party "does not appear to comprehend" an area of the law.[67]  In light of the four factors, religious-liberty training is an appropriate sanction.

First, as noted, there's been significant harm from Southwest's noncompliance. Second, as noted, Southwest's disregard of the Court's order was willful.  Third,

---

[66] *See, e.g.*, *Hardy v. Asture*, No. 1:11CV299, 2013 WL 566020, at *8 (W.D.N.C. Feb. 13, 2013) (requiring an attorney "to attend eight hours of continuing legal education courses on the subject of the practice of social security litigation in federal court"); *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 456 (S.D.N.Y. 2011) (ordering an attorney "to attend four hours of continuing legal education courses on the subject of federal practice and procedure within one year of this decision"); *Balthazar v. Atl. City Med. Ctr.*, 137 F. App'x 482, 490 (3d Cir. 2005) (approving a district court's order that an attorney "attend two continuing legal education courses, one entitled Federal Practice and Procedure, the other entitled Attorney Professionalism and Rules of Professional Conduct"); *see also, e.g.*, *In re Marshall*, No. 3:15-MC-88-JWD, 2016 WL 81484, at *11 (M.D. La. Jan. 7, 2016) (requiring an attorney to "attend . . . six hours of ethics and/or professionalism training"); *Ball v. LeBlanc*, 300 F.R.D. 270, 273 (M.D. La. 2013) ("[P]ossible sanctions [] include . . . ethics training[.]"); *Moser v. Bret Harte Union High Sch. Dist.*, 366 F. Supp. 2d 944, 988 (E.D. Cal. 2005) ("Ms. Yama is . . . ordered to attend 20 hours of CLE ethics training[.]").

[67] *Edmonds v. Seavey*, 379 F. App'x 62, 64–65 (2d Cir. 2010) ("[C]ounsel does not appear to comprehend the function of the civil RICO statute.  Thus, the district court's chosen sanction is particularly apropos: requiring that counsel attend CLE courses in the relevant subject area."); *see In re Burghoff*, 374 B.R. 681, 686–87 (Bankr. N.D. Iowa 2007) ("It appears that the concept of the inappropriateness of plagiarism is lost on Mr. Cannon which unfortunately reveals a fundamental professional deficiency . . . . Because Mr. Cannon does not appreciate the nature of plagiarism, . . . Mr. Cannon's deficiency calls for the [] method of instruction offered in a law school course on professional responsibility."); *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, No. 09-60351, 2011 WL 4433570, at *3 (S.D. Fla. Sept. 21, 2011) (requiring ethics training because, "[b]ased on Warrick's appearance before this Court, his conduct reflects a significant failure to understand his ethical responsibilities, particularly the exercise of independent judgment, and a profound lack of basic competence").

religious-liberty training will impose a minimal burden on Southwest. In particular, the Court is not requiring Southwest to pay for that training. And, as noted below, the Court requires Southwest to arrange for a representative of ADF to fly to Dallas.[68] Flying one person to and from a city imposes a minimal burden on one of the United States's major airlines.

Lastly, religious-liberty training has significant probable effectiveness. Southwest habitually points to its policies as a pretext for discrimination.[69] For instance, in the IIOTG memo, Southwest maintained its belief that firing Carter was justified because she "did not adhere to Southwest policies."[70] Even in these show-cause proceedings, Southwest couldn't resist crowing about recent revisions to its policies.[71] But "whether or not Southwest followed its policies, it violated federal law."[72] And "Southwest [continually] misses th[at] point."[73]

Here's how that concern relates to Carter's contempt motion. Southwest did two things wrong here: Southwest issued (1) the erroneous "does not discriminate" language, and (2) the IIOTG memo, strongly implying that Southwest may permissibly discriminate against flight attendants if they violate Southwest's

---

[68] To further reduce any burden on Southwest, the Court is not requiring Southwest's employees to travel to receive their training.

[69] *See, e.g.*, Doc. 374 at 13 n.54 (recognizing that Southwest "earnestly recommit[ted] to following the same policies that got it in trouble with the jury").

[70] Doc. 383-3 at 2 (conveying Southwest's belief that Carter "did not adhere to Southwest policies and guidelines" in her online interactions).

[71] *See, e.g.*, Doc. 429 at 5; *see also, e.g.*, Doc. 429-1 at 2–6.

[72] Doc. 374 at 13 n.54.

[73] *Id.*

policies.  Here, the contemnor's conduct is worse than the mine-run contempt easily "cured" by a remedial notice: Southwest did not **evade** the Court's order; Southwest **inverted** the Court's order.  In the future, Southwest could follow its Court-ordered remedial statement with a second IIOTG memo lambasting Carter for "not adher[ing] to Southwest policies" and mandating that all flight attendants "adhere to" Southwest's "established policies."[74]  Because Southwest maintains the right to speak, the Court needs to impose some sanction that will help ensure that Southwest will not again attempt to undermine the Court-ordered notice with another citation to its policies.

That's where religious-liberty training comes in.  When a litigant "does not appear to comprehend" a legal concept, training in "the relevant subject area" constitutes a "particularly apropos" sanction.[75]  As explained in the *ex parte* addendum, Forbes, Minchey, and Maberry were at the root of the problem.  Accordingly, the Court directs Southwest to send those individuals to religious-liberty training in the hopes that, on round two, that training will coerce compliance with (instead of the continued undermining of) the Court's orders in this case.[76]

Unfortunately, this isn't the first time an entity has needed religious-liberty training after it attempted to suppress speech.  Fortunately, there are esteemed non-

---

[74] Doc. 383-3 at 2.

[75] *Edmonds*, 379 F. App'x at 64–65.

[76] *Cf.* Doc. 383-6 at 2–3 (requiring that new flight attendants—and apparently Carter—attend four weeks of training to ensure they understand Southwest's policies and practices for flight attendants).  The Court finds that religious-liberty training and the verbatim notice are the least severe sanctions adequate to coerce compliance with its order.

profit organizations that are dedicated to preserving free speech and religious freedom.[77]  And some of those entities laudably provide training free of charge for those who have struggled to respect religious liberties in the manner federal law requires.  For instance, ADF recently agreed to "conduct a First Amendment training session" for three professors who allegedly discriminated against a student for posting "materials to her social media accounts" and sending "messages to fellow students" containing, among other things, religious views.[78]  And, in that case, the defendants allegedly cited their school policies as a reason to curtail religious speech.[79]  Because this case also involves an entity's citation to its policies in an apparent attempt to end-run legal protections against religious discrimination based on online activities, ADF is particularly well-suited to train Southwest's employees who are most responsible for the communications at issue here.

Southwest raises four counterarguments.  First, Southwest's witnesses repeatedly averred that they do, in fact, know that federal law trumps Southwest's policies.[80]  *Au contraire*.  Southwest has never disclaimed its view in the IIOTG memo that its discrimination against Carter was justified by Southwest's policies.  In any event, Southwest refused to confess that federal law trumps its policies until it caught

---

[77] *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1722 (2018) (recognizing that ADF was counsel on a successful Supreme Court appeal).

[78] *DeJong v. Pembrook*, ALLIANCE DEFENDING FREEDOM, https://adfmedia.org/case/dejong-v-pembrook (last visited Aug. 7, 2023).

[79] Complaint at 46, *DeJong v. Pembrook*, No. 3:22-cv-1124-NJR (S.D. Ill. May 31, 2022), ECF No. 1 ("Defendants applied Policies 3C6 and 3C7 when they imposed the no-contact orders against Ms. DeJong.").

[80] *See, e.g.*, Tr. Trans. at 321, 356, 381.

wind of the Court's skepticism.  At this point, Southwest's tardy "[p]rotestations o[f] repentance and reform timed to . . . blunt the force of a [contempt order] offer insufficient assurance that the practice sought to be enjoined will not be repeated."[81] Southwest's gallows conversion doesn't fly here.

Second, Southwest contends that "training [] will not secure compliance with the judgment" because the "judgment did not order Southwest to attend religious-liberty training."[82]  But the implied proposition is asinine: A sanction need not be co-extensive with a prior order—it need only coerce compliance with a prior order.[83]

Third, Southwest contends that "religious-liberty training would not compensate [] Carter for any loss."[84]  That's true, but inapposite.  The Court orders training to coerce compliance with its orders, not to compensate Carter.

Fourth, the Court held a civil contempt proceeding—not a criminal contempt proceeding.  And "a judgment of civil contempt is conditional[] and may be lifted if the contemnor purges himself of the contempt."[85]  Court-ordered training isn't

---

[81] *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 354–55 (5th Cir. 1977) (cleaned up). It's also not clear that Southwest's agreement to treat Carter "like every other employee" is an assurance it will comply with the law.  *See id.* at 355.

[82] Doc. 429 at 3.

[83] *E.g.*, *Marshall*, 2016 WL 81484, at *11 (requiring ethics training that the court had not previously ordered); *Hampton v. Henderson*, No. 93-5318, 1994 WL 14070, at *1 (5th Cir. Jan. 3, 1994) (per curiam) (recognizing that a court can sanction a litigant by prohibiting them from proceeding in forma pauperis even where the court had not previously ordered such conduct).  Conditional imprisonment and fines also provide obvious examples of civil sanctions that are not co-extensive with the prior orders for which compliance is sought.

[84] Doc. 429 at 3.

[85] *United States v. Rizzo*, 539 F.2d 458, 463 (5th Cir. 1976).

conditional.  Thus, Southwest's argument goes, training isn't a civil sanction—it's criminal.

At the outset, even on its face, Southwest's citation to caselaw divulges the error in Southwest's reasoning: "[A] ***judgment*** of civil contempt" must be conditional—but that doesn't mean that every ***sanction*** must be avoidable.[86] Unsurprisingly, then, courts routinely impose unconditional, civil sanctions with which a party must comply in order to purge itself of contempt.[87]  Here, Southwest may purge itself of contempt but only after attending religious-liberty training.

But more fundamentally, Southwest misunderstands the legal framework. "[W]hether a contempt is civil or criminal turns on the character and purpose of the sanction involved."[88]  In that analysis, conditionality isn't the lodestar.  Instead, contempt is civil in character if it "compensates the party in whose favor the breached order was issued[] or coerces compliance with the court's orders."[89]

Conditionality factors in where the "character" of the sanction isn't self-evident.  For instance, when a court fines or imprisons a contemnor, those sanctions "to some extent punish . . . as well as coerce . . . obedience."[90]  To render those

---

[86] *Id.*

[87] For instance, courts have "authority . . . to award attorneys' fees in a civil contempt proceeding." *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272–73 (5th Cir. 1977).  Attorney fees aren't conditional, but they're still civil in nature.  Likewise, when a litigant makes "repetitive and frivolous filings," the Court may unconditionally forbid that litigant from proceeding *in forma pauperis. Hampton*, 1994 WL 14070, at *1.

[88] *Bagwell*, 512 U.S. at 827 (cleaned up); *see also Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 631 (1988) (recognizing that the "the critical feature[]" in determining whether a sanction is civil or criminal is "the character of the relief" at issue).

[89] *In re Hipp, Inc.*, 895 F.2d 1503, 1515 (5th Cir. 1990).

[90] *Bagwell*, 512 U.S. at 828.

sanctions coercive instead of punitive, courts must introduce some coercive characteristic. Enter conditionality. "A conditional penalty . . . is civil because it is specifically designed to compel the doing of some act."[91] In short, courts ascertain a coercive characteristic of conditional penalties because the contemnor "has it in his power to avoid any penalty" by complying with a court order.[92]

Tellingly, Southwest doesn't cite any case requiring a training sanction to be conditional—it only cites cases about fines and imprisonment.[93] That's likely because training is an intrinsically "coercive sanction[]" that helps "obtain compliance with [a] [c]ourt's [o]rder."[94] Here's how that works: In some cases, a contemnor's conduct shows that the contemnor "does not appear to comprehend" an area of the law with which it must comply.[95] In such situations, training "in the relevant subject area"[96] helps the contemnor to "appreciate the nature of" the prohibited conduct.[97] Armed with a better understanding of the legal area at issue, a contemnor can better conform its conduct to the law. Accordingly, no conditionality is necessary to render training coercive.

---

[91] *Hicks*, 485 U.S. at 633.

[92] *Id.* (cleaned up).

[93] Doc. 429 at 2 (citing *Rizzo*, 539 F.2d at 463 and *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911)); *see also Rizzo*, 539 F.2d at 462 (recognizing that the district court ordered "incarceration" and "a fine"); *Gompers*, 221 U.S. at 449 (considering fines and imprisonment).

[94] *Portland v. City of Portland*, No. 3:20-CV-00917-HZ, 2021 WL 982613, at *2 (D. Or. Mar. 16, 2021).

[95] *Edmonds*, 379 F. App'x at 64–65.

[96] *Id.* at 65.

[97] *Burghoff*, 374 B.R. at 686–87.

Unsurprisingly, then, courts routinely send parties and lawyers to training as a coercive civil sanction.[98]  The Court declines to hold that, in order to impose that routine sanction, courts must empanel a jury, appoint an independent prosecutor, and give all the other procedural protections accompanying a criminal contempt proceeding.[99]

## IV.  Conclusion

For the foregoing reasons, the Court **GRANTS** Carter's motion for sanctions and holds Southwest in contempt.  The Court **ORDERS** Southwest to take the following actions, and Southwest may purge itself of this contempt judgment by taking all of the following four actions:

1. Southwest must send Kerrie Forbes, Kevin Minchey, and Chris Maberry to religious-liberty training.  That training shall be conducted by ADF at a time set by ADF, it shall last a minimum of 8 hours of instructional time, and it must be completed by August 28, 2023.[100]  Southwest must transport ADF's representative to Dallas and be responsible for any food, accommodation, or other travel expenses for ADF's representative.

---

[98] *See, e.g.*, *Marshall*, 2016 WL 81484, at *1, 11 (holding a lawyer "in civil contempt" and requiring ethics training); *Portland*, 2021 WL 982613, at *2 (finding that training of a party was a "coercive sanction" that helps "obtain compliance with [a] [c]ourt's [o]rder").

[99] *Ravago Ams. L.L.C. v. Vinmar Int'l Ltd.*, 832 F. App'x 249, 256–57 (5th Cir. 2020) (per curiam) (noting the requirement of "involvement of an independent prosecutor," "proof beyond a reasonable doubt," and sometimes even "the right to [a] jury trial" in criminal contempt proceedings (cleaned up)).

[100] *See, e.g.*, *Roy v. Am. Prof'l Mktg., Inc.*, 117 F.R.D. 687, 693 (W.D. Okla. 1987) (requiring several attorneys "to attend the seminar on November 23, 1987, entitled 'Practicing in the Western District'").

2. Southwest must e-mail to each of its flight attendants the following language verbatim:

> The United States District Court for the Northern District of Texas ordered Southwest to issue the following statement to you: On December 20, 2022, Southwest's Legal Department issued an e-mail to all flight attendants entitled "Recent Court Decision" regarding a federal court judgment against Southwest and Transport Workers Union, Local 556. That e-mail said, "[t]he court . . . ordered us to inform you that Southwest does not discriminate against our Employees for their religious practices and beliefs." The United States District Court for the Northern District of Texas subsequently found that the statement's use of "does not discriminate" was incorrect. Accordingly, the Court has ordered Southwest's Legal Department to issue the following amended statement:

> Under Title VII, Southwest may not discriminate against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion.

Southwest may not issue that statement until Forbes, Minchey, and Maberry have completed the above-mentioned training.[101]

3. Southwest shall file a declaration on the docket by September 5, 2023 at 5:00 PM, certifying that Forbes, Minchey, and Maberry all attended that training and providing proof that Southwest issued the required verbatim statement only after Forbes, Minchey, and Maberry attended religious-liberty training.[102]

---

[101] The Court requires Southwest to attend training before issuing the verbatim notice so that, to the extent Southwest feels compelled to issue any new communication similar to the IIOTG memo contemporaneously with the verbatim notice, it has the benefit of training before it issues that new communication.

[102] *See, e.g.*, *Roy*, 117 F.R.D. at 693 ("[C]ounsel will provide proof of attendance in the form of an affidavit filed with this Court."); *Moser*, 366 F. Supp. 2d at 988 ("Ms. Yama is . . . ordered to . . .

4.  Southwest must pay Carter's reasonable attorney fees and costs for the motion-for-contempt and motion-to-compel proceedings.

**IT IS SO ORDERED** this 7th day of August, 2023.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

submit proof of such training to the Court by December 31, 2005."); *Ass'n of Women with Disabilities Advocating Access v. Mouet*, No. 06CV2240JM(LSP), 2007 WL 951837, at *1 (S.D. Cal. Mar. 23, 2007) ("Upon completion of the four hours of classes, Mr. Pinnock is instructed to file with the court a notice indicating that he has complied with the continuing education sanction.").